# 12-5086

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

---

**UNITED STATES OF AMERICA**,

Appellee,

-against-

**AZIBO AQUART**,

Defendant-Appellant.

---

**ON APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF CONNECTICUT**

---

**BRIEF FOR DEFENDANT-APPELLANT**

---

**BEVERLY VAN NESS**
233 Broadway, Suite 2704
New York, NY 10279
(212) 274-0402

**SEAN J. BOLSER**
**BARRY J. FISHER**
Federal Capital Appellate Resource Counsel Project
Federal Public Defender, N.D.N.Y.
Brooklyn Office
One Pierrepont Plaza – 16th Floor
Brooklyn, New York 11201
(718) 330-1200, x406

# TABLE OF CONTENTS

TABLE OF CONTENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  i

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  x

JURISDICTIONAL STATEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE ISSUES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

PRELIMINARY STATEMENT AND STATEMENT OF THE CASE. . . . . . . . . 3

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

I.      The evidence.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    A.      Over a ten-month period, Aquart oversaw a drug operation at
            215 Charles Street.  Aquart sometimes physically disciplined
            employees and others when they infringed on his business, but
            the injuries were not severe. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    B.      Aquart was shown to have reason to be mad at Tina Johnson for
            selling crack from her apartment, which started after he obtained
            a bad batch, but not a motive to plan her murder.. . . . . . . . . . . . . . . 9

    C.      The government presented evidence that Aquart assembled a group
            to break into Tina Johnson's apartment... . . . . . . . . . . . . . . . . . . . . . 11

    D.      Taylor testified that the plan was to break into Tina Johnson's
            apartment to rob her and force them out.  Aware of the bats and
            gloves they had, Taylor had no inkling anyone would be killed.. . . 13

    E.      A significant portion of Taylor's version of events inside the
            apartment was contradicted by Efrain Johnson, whose statements
            implicating himself and Taylor were put into evidence by the
            defense at sentencing.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

F.     The three victims were all duct-taped and beaten to death, and fingerprints of both Aquart brothers were found on plastic bags at the scene................................................... 20

G.     There was additional evidence connecting the four men to the scene, but none of it corroborated Taylor's account of who was responsible for the fatal beatings, and some of it contradicted him and bolstered Efrain's account, including DNA evidence. ........ 24

     1.     DNA evidence...................................... 24

     2.     Blood spatter evidence.. ............................ 27

     3.     Additional evidence relevant to Taylor's and Efrain's conflicting accounts................................. 30

H.     Lashika Johnson, Efrain's sister, testified that Aquart directed her to dispose of material connected to the murders, including a drill she said belonged to him, and described his cool and remorseless demeanor immediately after the killings.  This testimony was uncorroborated............................................. 31

II.   Additional evidence and argument relevant to jury's sentencing determination and verdict....................................... 33

     A.     The government submitted seven aggravating factors to the jury. . . 33

     B.     The defense presented compelling mitigating evidence, through 17 witnesses, about the circumstances of Aquart's life.. ......... 36

     1.     Aquart's early years were spent in isolation and poverty, marred by exposure to violence in the community and at home and to negative male role models.. ................ 36

     2.     Azibo's mother drowned when he was 12.  He bounced around from place to place and was then put in the custody of his 18-year-old brother, Azizi, who was ill-equipped to

ii

care for him.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

3.    The authorities who got to know the Aquart brothers after their mother's death, and when they became involved with the criminal justice system, unsuccessfully opposed Azizi getting custody of Azibo, an at risk boy.  At age 14, Azibo was left essentially unsupervised and began getting into trouble.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

4.    Azibo was incarcerated, and functioned well in a structured setting.  He also used his talents to help others.. . . . . . . . . . 50

5.    An expert on federal maximum security prisons testified that Aquart could be securely housed if given a life sentence and would not pose a threat to others.. . . . . . . . . . . . . . . . . 51

III.    After lengthy deliberations, the jury rendered split sentencing verdicts... . 52

SUMMARY OF ARGUMENT.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

ARGUMENT.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

I.    Through Repeated and Purposeful Misconduct, the Prosecutors Prevented the Jury from Fairly Considering an Eyewitness Account of the Killings, Introduced by Aquart at the Sentencing Hearing, That Would Have Contradicted the Testimony of the Government's Lead Cooperator and the Government's Arguments on Key Sentencing Factors.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

A.    Taylor testified that, while he did nothing, Aquart or his brother (or both) duct-taped Tina, and Aquart beat Tina to death.  But, in contradiction, Efrain maintained in his proffer statements that he and Taylor were the ones who duct-taped Tina and that Taylor began to beat her, all while Aquart was in a different room.. . . . . . 67

B.    On its face, and in light of the physical evidence, Efrain's version of the participants' conduct  inside the apartment was as plausible

as Taylor's, if not more so............................... 69

C.   But the government unfairly disparaged Efrain's proffer statements through a series of improper tactics... ........................ 74

1.   The prosecutor engaged in blatant vouching by telling jurors that the government had formally determined Efrain was lying and therefore it had refused him a cooperation agreement... ........................................ 74

2.   The prosecutor misled jurors to think that, in a subsequent court proceeding, Efrain had squarely renounced his statements about Taylor's participation in Tina's binding and assault.. ...................................... 79

3.   The prosecutor urged jurors at sentencing to reject Efrain's account because it conflicted with counsel's complete defense against all the charges at the trial. Improperly, this penalized Aquart's exercise of his constitutional rights to a bifurcated defense and implied that even his own lawyer did not believe Efrain's version... ........................ 86

D.   These errors require reversal of Aquart's death sentences.. ....... 91

II.  The Jury's Assessment of the Credibility of John Taylor, a Critical Cooperating Witness Used to Support Aquart's Convictions and the Government's Argument for a Death Sentence, Was Unfairly Influenced by His Deliberately-elicited Misleading Testimony That He Never Expected to Get out of Prison. In Fact, His Cooperation Resulted in a 9-year Prison Term, an Almost Unimaginably Low Sentence Compared to What the Jury Learned Was the Statutory Minimum Term for His Guilty Plea to Three Counts of Murder: Life in Prison Without the Possibility of Release... ........................................ 98

A.   John Taylor apparently testified untruthfully that he did not expect any sentencing leniency for becoming a cooperating witness against Azibo Aquart... ................................... 100

iv

B.  Taylor's disavowal of the expectation of a sentencing benefit stood in sharp contrast to the testimony of other cooperators, thus bolstering his credibility with the jurors.  His presentation by the government as a person tormented by what he had seen, who truthfully relayed what he knew solely to bring the perpetrator to justice, also appeared carefully orchestrated. . . . . . . . . . . . . .   104

C.  Taylor's misrepresentation, if established, would be material, since his testimony was crucially important to the government and it was bolstered by his proclaimed disavowal of a self-interested motive for cooperating.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   108

D.  A hearing should be ordered, as the jury's material misapprehension of fact concerning Taylor's motive for cooperating would mandate reversal of Aquart's capital convictions and death sentences.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   111

III.  The Government Did Not Provide Legally Sufficient Evidence That Aquart Engaged in Substantial Planning and Premeditation to Cause the Victims' Deaths, a Statutory Aggravating Factor.. . . . . . . . . . . . . . . .   116

A.  The record does not support the government's contention that Aquart entered the apartment intending to kill anyone.. . . . . . . . . .   120

1.  Aquart arranged and made preparations with his accomplices for a break-in, not a murder.  And he would not have enlisted their aid on false pretenses since he had no reason to think that when the break-in turned into a triple slaying, his accomplices would join in to help or remain silent afterwards.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   120

2.  Taylor's account of events inside the apartment further supports the view that the intent to kill was not formed until after the break-in: the men wore masks to hide their identities from the victims, the victims were not immediately bound and killed (Aquart first looked for

property to steal), and, despite their precautions, one or more victims apparently recognized them.. . . . . . . . . . . . . . 123

3.    Aquart advertised his problems with Tina and, with the dry run, his plan to take action, and he would not have expected these numerous additional witnesses to remain silent when a triple homicide was discovered – and they did not. Moreover, the murders would be expected to shine a spotlight on the Charles Street operation and terminate Aquart's drug business – as they did. . . . . . . . . . . . . . . . . . 125

4.    Acts of such extreme violence were shown to be out of character for Aquart, even against those he knew or suspected were selling drugs in the Charles Street building.. 127

5.    The reasonable inference to draw from the record is that Aquart's intent changed once he entered the apartment and the event unfolded. Indeed, Taylor supplied a plausible reason: the victims recognized Azibo and/or Azikiwe despite their efforts to hide their identities.. . . . . . . . . . . . . . 130

B.    The government failed to establish, beyond a reasonable doubt, that the murders were substantially planned and substantially premeditated... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 131

C.    The jury's erroneous finding of the substantial-planning factor requires reversal of Aquart's death sentences.. . . . . . . . . . . . . . . 133

IV.    The Government Failed to Prove Aquart Personally Murdered More than One Victim, an Aggravating Factor, Which Requires Vacatur of His Death Sentences. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 139

A.    Viewing the evidence in the light most favorable to the government, the multiple killings aggravator was not established.. . . . . . . . . . 140

B.    Aquart's death sentences for killing Tina Johnson and Basil Williams must be vacated, given the obvious importance of the

vi

multiple killings aggravator to the jury's verdict.. . . . . . . . . . . . .  145

V.     Cooperating Witness Lashika Johnson Falsely Denied to the Jury That
       She Had Been Threatened at a Proffer Session, and Aquart's Trial
       Prosecutors – the One Who Johnson Later Acknowledged Had Made a
       Threat and the Other Two Who Had Been Present – Let this
       Testimony Stand.  This False Testimony Prejudiced Aquart at the
       Both the Guilt and Penalty Phases of the Trial and Requires Reversal
       of His Murder Convictions and Death Sentences.. . . . . . . . . . . . . . . . .  148

       A.     At different trials, Lashika Johnson gave flatly contradictory
              accounts of what took place at a government proffer session
              on October 14, 2008... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  150

       B.     The court below clearly erred in finding that Lashika did not
              commit perjury at Aquart's trial.. . . . . . . . . . . . . . . . . . . . . . . . . .  155

       C.     The perjury was material, mandating reversal of Aquart's murder
              convictions and death sentence.. . . . . . . . . . . . . . . . . . . . . . . . . .  161

VI.    Contrary to the Fundamental Rules Governing Closing Arguments, the
       Prosecution Interjected Facts Not In Evidence, Misleading the Jurors
       about the Thoroughness of Its Expert's Analysis of the DNA Evidence..  169

VII.   Federal Juries Consistently Decline to Impose Capital Punishment in
       Cases, like Aquart's, in Which the Defendant Is Found Not to Pose a
       Threat of Violence in Prison.  Thus His Aberrational Death Sentence
       Is Constitutionally Disproportionate and Should Be Reduced.. . . . . . . .  179

       A.     The Eighth Amendment requires proportionality review to
              safeguard against the risk of a freakish or arbitrary death sentence
              and to identify categories of crimes or offenders for which capital
              punishment is now recognized by juries as excessive... . . . . . . . . .  179

       B.     After this issue was fully litigated by both sides, Aquart's jury
              unanimously found that the BOP could "safely and securely"
              confine him.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  183

vii

C.     Dangerousness represents an overarching consideration for juries in capital sentencing.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  185

D.     Aquart's death sentence was abberrational, for, when federal juries find that a defendant does not pose a future danger in prison, they almost invariably reject the death penalty.. . . . . . . . . . . . . . . . . . . .  187

E.     Because it is an outlier, Aquart's death sentence should be set aside as disproportionate.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  193

VIII.  The Federal Death Penalty Act Operates in a Constitutionally Arbitrary and Capricious Manner.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  198

A.     The Constitution forbids a capital-punishment scheme in which, like "being struck by lightening," death sentences are imposed on "a capriciously selected handful" of the thousands of death-eligible offenders, and no legitimate "basis can be discerned for the selection.". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  199

B.     Under the expansive federal death penalty, only a small sliver — 1.6 to 2.0 percent — of eligible offenders are actually sentenced to death.  And, judging from the results, there appears to be no rhyme or reason for the selection process (except perhaps race). Indeed, defendants in scores of authorized cases no less aggravated than Aquart's have been spared the death penalty by juries or the government.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  204

1.     Examples of cases in which federal capital juries declined to impose a death sentence. . . . . . . . . . . . . . . . . . . . . . . . . . .  210

2.     Examples of cases in which the government authorized a capital prosecution but later consented to a non-death disposition or otherwise withdrew the authorization.. . . . . .  214

IX.    Capital Punishment Violates the Eighth Amendment's Ban on Cruel and Unusual Punishment.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  219

viii

X.    The Government's Evidence Does Not Support the VICAR Counts: It
       Failed to Prove That the Enterprise Affected Interstate Commerce or
       That Aquart's Motive Was to Maintain or Increase His Position in
       His Enterprise. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   228

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   230

CERTIFICATE OF COMPLIANCE.. . . . . . . . . . . . . . . . . . . . . . . . . . . . .   23

AF F GP F WO  TO BRIEF. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   a

# TABLE OF AUTHORITIES

## CASES

Alleyne v. United States, 133 S. Ct. 2151 (2013). . . . . . . . . . . . . . . . . . . . . . . . . 228

Atkins v. Virginia, 536 U.S. 304 (2002). . . . . . . . . . .   181, 193, 194, 200, 219, 225

Apprendi v. New Jersey, 530 U.S. 466 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . 228

Barefoot v. Estelle, 463 U.S. 880 (1983). . . . . . . . . . . . . . . . . . . . . . . . . 184, 185

Baze v. Rees, 553 U.S. 35 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 195

Bedford v. Collins, 567 F.3d 225 (6th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . 91

Bell v. State, 841 So. 2d 329 (Fla. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 178

Boone v. Paderick, 541 F.2d 447 (4th Cir. 1976). . . . . . . . . . . . . . . . . . . . . . . . 104

Bruton v. United States, 391 U.S. 123 (1968). . . . . . . . . . . . . . . . . . . . . . . . . . . 96

Coker v. Georgia, 433 U.S. 584 (1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . 181, 193

Cunningham v. Zant, 928 F.2d 1006. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

Deck v. Missouri, 544 U.S. 622 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 186

Drake v. Portuondo, 553 F.3d 230 (2d Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . 161

Enmund v. Florida, 458 U.S. 782 (1982). . . . . . . . . . . . . . . . . . . . . . 181, 193, 226

Furman v. Georgia, 408 U.S. 238 (1972). . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Giglio v. United States, 405 U.S. 150 (1972). . . . . . . . . . . . . . . . . . . . . . . . . . . 164

Graham v. Florida, 560 U.S. 28 (2010). . . . . . . . . . . . . .   194, 195, 219, 220, 225

x

Greer v. Miller, 483 U.S. 756 (1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

Gregg v. Georgia, 428 U.S. 153 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Hall v. Florida, 134 S. Ct. 1986 (2014). . . . . . . . . . . . . . . . . . . . . . . . 200, 220, 221

Jackson v. Brown, 513 F.3d 1057 (9th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . 166

Jackson v. Denno, 378 U.S. 368 (1964). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

Jackson v. Virginia, 443 U.S. 307. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 132, 145

Jenkins v. Artuz, 294 F.3d 284 (2d Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . 113

Johnson v. Mississippi, 486 U.S. 578 (1988). . . . . . . . . . . . . . . . . . . . . . . 86, 115

Johnson v. United States, 520 U.S. 461 (1997). . . . . . . . . . . . . . . . . . . . . . . . 97

Jones v. Chappell, 2014 WL 3567365 (C.D. Cal. July 16, 2014). . . . . . . . . 203, 222

Jones v. United States, 527 U.S. 373 (1999). . . . . . . . . . . . . . . . . . . . . . 180, 203

Jurek v. Texas, 428 U.S. 262 (1976). . . . . . . . . . . . . . . . . . . . 179, 181, 184, 192

Kelly v. South Carolina, 534 U.S. 246 (2002). . . . . . . . . . . . . . . . . . . . . . . . 186

Kennedy v. Louisiana, 554 U.S. 407 (2008). . . . . . . . . . . . 181, 193, 194, 219, 225

Kimbrough v. United States, 552 U.S. 85 (2007). . . . . . . . . . . . . . . . . . . . . . 181

King v. Hoke, 825 F.2d 720 (2d Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . 114

Lewis v. Jeffers, 497 U.S. 764 (1990). . . . . . . . . . . . . . . . . . . . . . . . . . . 132, 145

Lockett v. Ohio, 438 U.S. 586 (1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 167

Mansfield v. Beeler, 238 Fed. Appx. 794 (3d Cir. 2007). . . . . . . . . . . . . . . . . . 195

McKee v. United States, 462 F.2d 243 (2d Cir.1972). . . . . . . . . . . . . . . . . . . . 114

McCleskey v. Kemp, 481 U.S. 279 (1987). . . . . . . . . . . . . . . . . . . . . . . . . 201, 202

Miller v. Alabama, 132 S. Ct. 2455 (2012). . . . . . . . . . . . . . . . . . . . . . . . . 219, 220

Napue v. Illinois, 360 U.S. 264 (1959). . . . . . . . . . . . . .  104, 113, 162, 164, 166

Phillips v. Ornoski, 673 F.3d 1168 (9th Cir. 2012).  . . . . . . . . . . . . . . . . . . . . . 166

People v. Lavalle, 3 N.Y.3d 88 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 221

Proffitt v. Florida, 428 U.S. 242 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 178

Pulley v. Harris, 465 U.S. 37 (1984). . . . . . . . . . . . . . . . . .  178, 179, 180, 181, 192

Roper v. Simmons, 543 U.S. 551 (2005).  . . . . . 181, 193, 194, 195, 208, 219, 225

Shih Wei Su v. Filion, 335 F.3d 119 (2d Cir. 2003). . . . . . . . . . . . . . . . . . . 161, 164

Simmons v. South Carolina, 512 U.S. 154 (1994). . . . . . . . . . . . . . . . . . . . . . . 185

Sivak v. Hardison, 658 F.3d 898 (9th Cir. 2011). . . . . . . . . . . . . . . . . . . . . 104, 166

Taylor v. Kentucky, 436 U.S. 478 (1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 232

Thompson v. Oklahoma, 487 U.S. 815 (1988). . . . . . . . . . . . . . . . . . . . . . . . 56, 218

Tison v. Arizona, 481 U.S. 137 (1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 204

Townsend v. Burke, 334 U.S. 736 (1948). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

Trop v. Dulles, 356 U.S. 86 (1958). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56, 218

United States v. Addonizio, 442 U.S. 178 (1979). . . . . . . . . . . . . . . . . . . . . . . . 103

United States v. Agurs, 427 U.S. 97 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . 161

United States v. Al-Moayad, 545 F.3d 139 (2d Cir. 2008). . . . . . . . . . . . . . . . . 232

United States v. Allen, 247 F.3d 741 (8th Cir. 2001). . . . . . . . . . . . . . . . . . . . . 180

United States v. Bagley, 473 U.S. 667 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . 104

United States v. Bernard, 299 F.3d 467 (5th Cir. 2002). . . . . . . . . . . . . . . . . . . 136

United States v. Brown, 352 F.3d 654 (2d Cir. 2003). . . . . . . . . . . . . . . . . 133, 145

United States v. Brown, 959 F.2d 63 (6th Cir. 1992). . . . . . . . . . . . . . . . . . . . . 204

United States v. Burse, 531 F.2d 1151 (2d Cir. 1976). . . . . . . . . . . . . . . . . . . . . 174

United States v. Cassese, 428 F.3d 92 (2d Cir. 2005). . . . . . . . . . . . . . . . . . . . . 117

United States v. Certified Env. Services, Inc., 753 F.3d 72 (2d Cir. 2014). . . . . 231

United States v. Coplan, 703 F.3d 46 (2d Cir. 2012). . . . . . . . . . . . . . . . . . . . . 117

United States v. Cromitie, 727 F.3d 194 (2d Cir. 2013). . . . . . . . . . . . . . . 155, 161

United States v. Dhinsa, 243 F.3d 635 (2d Cir. 2001). . . . . . . . . . . . . 211, 228, 229

United States v. Dunnigan, 507 U.S. 87 (1993). . . . . . . . . . . . . . . . . . . . . . . . . 155

United States v. Fell, 360 F.3d 135 (2d Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . 167

United States v. Fell, 571 F.3d 264 (2d Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . 215

United States v. Ferguson, 676 F.3d 260 (2d Cir. 2011). . . . . . . . . . . . . . . . . . . 85

United States v. Fields, 483 F.3d 313 (5th Cir. 2007). . . . . . . . . . . . . . . . . . . . . 86

United States v. Flores, 63 F.3d 1342 (5th Cir. 1995). . . . . . . . . . . . . . . . . . . . 132

United States v. Friedman, 909 F.2d 705 (2d Cir. 1990). . . . . . . . . . . . . . . 91, 175

United States v. Gleason, 616 F.2d 2 (2d Cir.1979). . . . . . . . . . . . . . . . . . . . . 100

United States v. Glenn, 312 F.3d 58 (2d Cir. 2002). . . . . . . . . . . . . . . . . . . 62, 117

United States v. Gomez, 580 F.3d 94 (2d Cir. 2009). . . . . . . . . . . . . . . . . . . . 228

United States v. Groysman, 766 F.3d 147 (2d Cir. 2014).. . . . . . . . . . . . . . 78, 97

United States v. Hammer, 226 F.3d 229 (3rd Cir. 2000). . . . . . . . . . . . . . . . . 179

United States v. Haynes, 729 F.3d 178 (2d Cir. 2013). . . . . . . . . . . . . . . . . . . 232

United States v. Higgs, 353 F.3d 281 (4th Cir. 2003). . . . . . . . . . . . . . . . . . . . 180

United States v. Iverson, 637 F.2d 799 (D.C. Cir. 1980). . . . . . . . . . . . . . . . . 100

United States v. Jackson, 390 U.S. 570 (1968). . . . . . . . . . . . . . . . . . . . . . . . . . 89

United States v. Jacobson, 15 F.3d 19 (2d Cir. 1994). . . . . . . . . . . . . . . . . 99, 112

United States v. James, 712 F.3d 79 (2d Cir. 2013). . . . . . . . . . . . . . . . . . . . . 209

United States v. Jones, 16 F.3d 487 (2d Cir. 1994). . . . . . . . . . . . . . . . . . . . . . 96

United States v. Jones, 132 F.3d 232 (5th Cir. 1998). . . . . . . . . . . . . . . . . . . . 180

United States v. Josephberg, 562 F.3d 478 (2d Cir. 2009). . . . . . . . . . . . . . . . 155

United States v. Kaplan, 586 F.2d 980 (2d Cir. 1978) . . . . . . . .   119, 133, 140, 146

United States v. Leone, 215 F.3d 253 (2d Cir. 2000). . . . . . . . . . . . . . . . . 99, 100

United States v. Lorenzo, 534 F.3d 153 (2d Cir. 2008). . . . . . . . . . . . . . . . . . 117

United States v. Lujan, 603 F.3d 850 (10th Cir. 2010). . . . . . . . . . . . . . . . . . . 210

xiv

United States v. McCullah, 76 F.3d 1087 (10th Cir. 1996). . . . . . . . . . . . . . . . 132

United States v. McDavid, 41 F.3d 841 (2d Cir. 1994). . . . . . . . . . . . . . . . . . 114

United States v. Mitchell, 502 F.3d 931 (9th Cir. 2007). . . . . . . . . . . . . . . . . 180

United States v. Modica, 663 F.2d 1173 (2d Cir. 1981). . . . . . . . . . . . . . . . 77, 175

United States v. Morris, 498 F.3d 634 (7th Cir. 2007). . . . . . . . . . . . . . . . . . 113

United States v. Muniz, 60 F.3d 65 (2d Cir. 1995). . . . . . . . . . . . . . . . . . . . . 133

United States v. Needham, 604 F.3d 673 (2d Cir. 2010). . . . . . . . . . . . . . . . . 228

United States v. Newman, 2014 WL 6911278 (2d Cir. Dec. 10, 2014) . . . . . . 117

United States v. Olano, 507 U.S. 725 (1993). . . . . . . . . . . 133, 136, 145, 146, 147

United States v. Perez, 144 F.3d 204 (2d Cir. 1998). . . . . . . . . . . . . . . . . . . . 78

United States v. Quinones, 313 F.3d 49 (2d Cir. 2002). . . . . . . . . . . . . . . 218, 219

United States v. Rahman, 189 F.3d 88 (2d Cir. 1999). . . . . . . . . . . . . . . . . . . 231

United States v. Richter, 826 F.2d 206 (2d. Cir. 1987). . . . . . . . . . . . . . . . . . 174

United States v. Robin, 545 F.2d 775 (2d Cir. 1976). . . . . . . . . . . . . . . . . . . . 114

United States v. Rosa, 17 F.3d 1531 (2d Cir.1994). . . . . . . . . . . . . . . . . . . . . 174

United States v. Sampson, 486 F.3d 13 (1st Cir. 2007). . . . . . . . . . . . . . . . . . 202

United States v. Sanchez, 176 F.3d 1214 (9th Cir. 1999). . . . . . . . . . . . . . . . . 91

United States v. Scop, 846 F.2d 135 (2d Cir. 1988). . . . . . . . . . . . . . . . . . . . . 78

United States v. Seijo, 514 F.2d 1357 (2d Cir. 1975). . . . . . . . . . . . . . . . . . . . 164

United States v. Suarez, 588 F.2d 352 (2d Cir.1978). . . . . . . . . . . . . . . . . . . . . . 174

United States v. Tingle, 658 F.2d 1332 (9th Cir. 1981). . . . . . . . . . . . . . . . . . . 163

United States v. Tipton, 90 F.3d 861 (4th Cir. 1996). . . . . . . . . . . . . 132, 133, 145

United States v. Torres, 719 F.2d 549 (2d Cir. 1983). . . . . . . . . . . . . . . . . . 99, 112

United States v. Torres, 140 F.3d 392 (2d Cir. 1998). . . . . . . . . . . . . . . . . . . . . 114

United States v. Troya, 733 F.3d 1125 (11th Cir. 2013). . . . . . . . . . . . . . . 189, 190

United States v. Tucker, 404 U.S. 443 (1972). . . . . . . . . . . . . . . . . . . . . . . . . . . 115

United States v. Universita, 298 F.2d 365 (2d Cir. 1962). . . . . . . . . . . . . . . . . . 174

United States v. Valentine, 820 F.2d 565 (2d Cir. 1987). . . . . . . . . . . . . . . . . . . 85

United States v. Wallach, 935 F.2d 445 (2d Cir. 1991). . . . . . . 148, 161, 163, 164

United States v. Webster, 162 F.3d 308 (5th Cir. 1998). . . . . . . . . . . . . . . . . . 116

United States v. Wexler, 522 F.3d 194 (2d Cir. 2008). . . . . . . . . . . . . . . . 119, 140

United States v. Whitten, 610 F.3d 168 (2d Cir. 2010). . . . . . . . . . . . . . . . . . . 90

United States v. Young, 470 U.S. 1 (1985). . . . . . . . . . . . . . . . . . . . . . . . . 77, 174

Victor v. Nebraska, 511 U.S. 1 (1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 132

Walker v. Georgia, 555 U.S. 979 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 192

Woodson v. North Carolina, 428 U.S. 280 (1976). . . . . . . . . . . . . . . . . . . 114, 180

Zant v. Stephens, 462 U.S. 862 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . 89, 200

# CONSTITUTON, STATUTES, AND RULES

18 U.S.C. § 924. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 204

18 U.S.C. § 1959. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 227, 229

18 U.S.C. § 2119. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 204

18 U.S.C. § 3231. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

18 U.S.C. § 3553. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 181

18 U.S.C. § 3591. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 204, 205

18 U.S.C. § 3592. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 116, 131, 205

18 U.S.C. § 3593. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 65, 185

18 U.S.C. § 3594. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 168, 190

18 U.S.C. § 3595. . . . . . . . . . . . . . . . . . . . . . 1, 100, 119,133, 145, 180, 230, 232

18 U.S.C. § 3624. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

21 U.S.C. § 841. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

28 U.S.C. § 1254. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 180

28 U.S.C. § 1291. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 2106. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99, 112

2012 Conn. Pub. Acts no. 12–5. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 221

Ill. Comp. Stat. ch. 725, § 119–1 (West 2012). . . . . . . . . . . . . . . . . . . . . . . 221

N.J. Stat. Ann. § 2C. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 221

2009 N.M. Laws ch. 11, §§ 5–7. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 221

Md. Correc. Servs. Code Ann. § 3–901 *et seq*. (Lexis 2008). . . . . . . . . . . . . . . 221

Tex. Code. Crim. Proc. Art. 37.071 (Supp. 1975-76). . . . . . . . . . . . . . . . . . . . . . . 179

U.S. Const., amend. V. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100, 197

U.S. Const., amend. VI. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89, 90, 228

U.S. Const., amend. VIII. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

U.S. Const., amend. XIV. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 198, 199

## OTHER AUTHORITIES

American Bar Association Standards for Criminal Justice 3-5.8(b)
    (2d ed. 1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 174

John Blume *et al.*, Lessons from the Capital Jury Project, Chapter 5 in
    Beyond Repair? America's Death Penalty, (Stephen P. Garvey ed., 2003). . 135

John H. Blume, *et al.*, Future Dangerousness in Capital Cases: Always
    "At Issue," 86 Cornell L. Rev. 397 (2001). . . . . . . . . . . . . . . . . . . . . . . 186, 187

William J. Bowers *et al.*, Foreclosed Impartiality in Capital Sentencing:
    Jurors' Predispositions, Guilt-Trial Experience, and Premature Decision
    Making, 83 Cornell L. Rev. 1476 (1998). . . . . . . . . . . . . . . . . . . . . . . . . . . 135

Stephen B. Bright, The Future of the Death Penalty in Kentucky and
    America, 102 Ky. L.J. 739 (2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 223

Sally Constanzo & Mark Constanzo, Life or Death Decisions: An Analysis
    of Capital Jury Decision Making Under the Special Issues Sentencing
    Framework, 18 Law & Hum. Behav. 151 (1994). . . . . . . . . . . . . . . . . . . . . 187

Theodore Eisenberg, *et al.*, But Was He Sorry: The Role of Remorse in Capital

Sentencing, 83 Cornell L. Rev. 1599 (1998). . . . . . . . . . . . . . . . . . . . . . . . . 174

Steven P. Garvey, Aggravation and Mitigation in Capital Cases: What Do Jurors Think?, 98 Colum. L. Rev. 1538 (1998). . . . . . . . . . . . . . . . . . . . . . . . 187

Kamin, Sam & Marceau, Justin F., Waking the Furman Giant (August 5, 2014), U.C. Davis L.R., Forthcoming (U. DenverLegal Studies Research Paper No. 14-39, available at SSRN:http://ssrn.com/abstract=2476572). . . . . . . . . 202, 207

Rory K. Little, The Federal Death Penalty: History and Some Thoughts About the Department of Justice's Role, 26 Ford. Urb. L.J. 347(1999). . . . . 205

James S. Liebman & Peter Clarke, Minority Practice, Majority's Burden: The Death Penalty Today, 9 Ohio St. J. Crim. L. 255 (2011). . . . . . . . . . . . . . . 224

Ian Lovett, Executions Are Suspended by Governor in Washington, N.Y. Times (Feb. 11, 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 221

L. Sand, J. Siffert, W. Loughlin & S. Reiss, Modern Federal Jury Instructions, Criminal (Lexis 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

Robert J. Smith, The Geography of the Death Penalty and Its Ramifications, 92 B.U.L. Rev. 227, 230 (2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 224

Robert J. Smith, Bidish J. Sarma & Sophie Cull, The Way the Court Gauges Consensus (And How to Do it Better), 35 Cardozo L. Rev. 2397 (2012). . . 223

Scott E. Sundby, War and Peace in the Jury Room: How Capital Juries Reach Unanimity, 62 Hastings L.J. 103 (Nov. 2010). . . . . . . . . . . . . . . . . . . . . . . 187

United States Attorneys Criminal Resource Manual, Title 9, Capital Eligible Statutes Assigned by Section (2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 204

United States Congress, Racial Disparities in Federal Death Penalty Prosecutions, 1988-94, Staff Report by the Subcommittee on Civil and Constitutional Rights Committee on the Judiciary, 103rd Cong., 2nd Sess. (March 1994), available at www.ncjrs.gov/pdffiles/153840.pdf. . . . . . . . . . . 216

United States Congressional Research Service, <u>Capital Punishment: An Overview of Federal Death Penalty Statutes</u> (Jan. 5, 2005). . . . . . . . . . . . . . 204

United States DOJ, <u>Bureau of Justice Statistics, Capital Punishment, 2012,</u> Available at http://www.bjs.gov/content/pub/pdf/cp12st.pdf. . . . . . . . . . . . . 223

Charles Alan Wright *et al.*, 3 Federal Practice and Procedure § 588 (4th ed. database updated 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 174

# JURISDICTIONAL STATEMENT

Azibo Aquart appeals from a judgment of conviction and sentence of death entered on December 18, 2012, amended on January 14, 2013, by the United States District Court for the District of Connecticut (Arterton, J.) (A.813-817, 818-822). Notice of Appeal was timely filed on December 30, 2012 (A.823). Jurisdiction in the District Court was conferred by 18 U.S.C. § 3231. Appellate jurisdiction is invoked pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3595.

# STATEMENT OF THE ISSUES

1.    Whether, through repeated and purposeful misconduct, the prosecutors prevented the jury from fairly considering Efrain Johnson's eyewitness account of the killings, introduced by Aquart at the sentencing hearing, that would have contradicted the testimony of the government's lead cooperator, John Taylor, and the government's arguments on key sentencing factors.

2.    Whether the jury's assessment of the credibility of John Taylor, a critical cooperating witness used to support Aquart's convictions and the government's argument for a death sentence, was unfairly influenced by his deliberately-elicited misleading testimony that he never expected to get out of prison. In fact, his cooperation resulted in a 9-year prison term, an almost

1

unimaginably low sentence compared to what the jury learned was the statutory minimum term for his guilty plea to three counts of murder: life in prison without the possibility of release.

3.    Whether the government failed to provide legally sufficient evidence that Aquart engaged in substantial planning and premeditation to cause the victims' deaths, a statutory aggravating factor, and whether the proof of two other aggravating factors – that Aquart committed the murder for pecuniary gain, and procured the murders by promising Taylor a place in the drug operation – was also legally deficient.

4.    Whether the government failed to prove Aquart personally murdered more than one victim, another statutory aggravating factor.

5.    Whether cooperating witness Lashika Johnson falsely denied to the jury that she had been threatened at a proffer session, and Aquart's trial prosecutors – the one who Johnson later acknowledged had made a threat and the other two who had been present – let this testimony stand, prejudicing the jury's deliberations at both the guilt and sentencing phases of the proceeding.

6.    Whether, contrary to the fundamental rules governing closing arguments, the prosecution interjected facts not in evidence, misleading the jurors about the thoroughness of its expert's analysis of the DNA evidence.

2

7.     Whether Aquart's death sentence is constitutionally disproportionate and should be reduced, given that federal juries consistently decline to impose capital punishment in cases, like Aquart's, in which the defendant is found not to pose a threat of violence in prison.

8.     Whether Aquart's death sentences should be vacated because The Federal Death Penalty Act operates in a constitutionally arbitrary and capricious manner.

9.     Whether the death penalty is unconstitutional because it is contrary to evolving standards of decency, thus requiring reversal of Aquart's death sentences.

## PRELIMINARY STATEMENT AND STATEMENT OF THE CASE

Aquart was charged with orchestrating and participating in the murders of three people, Tina Johnson, James Reid and Basil Williams, on August 24, 2005. He led a crack-selling business run from an apartment in Bridgeport, Connecticut, and the victims lived in another apartment in the same building.  The government theorized that Aquart planned the murders because Tina had started to sell small quantities of crack on her own and would not stop.  He enlisted three people to help break into Tina's apartment: his brother, Azikiwe; an acquaintance, Efrain

3

Johnson; and John Taylor, a man he had only recently met.

All four men were eventually indicted for murder and other offenses, the Aquart brothers in 2006 and Efrain Johnson in 2007 (see DE 8, 47, 105, 361).[1] Taylor was separately indicted in 2010 (DE 13, case 3:10-cr-61).  A notice of intent to seek the death penalty was filed against Azibo and Azkiwe Aquart in 2009 (DE 228, 229), and a final notice was filed in August, 2010 (DE 479 at A.76, 480).  Efrain Johnson's case was severed (DE 233), as was Azikiwe Aquart's (3/30/11 transcript, pp. 2-5), and Azibo Aquart was tried alone.

The final indictment against Aquart contained six capital counts, two for each victim: murder to maintain or increase Aquart's position in the narcotics racketeering enterprise, 18 U.S.C. § 1959(a)(1), and drug-related murder, 21 U.S.C. §§ 841(b)(1)(A) and 848(e)(1)(A).  He was also charged with conspiracy to murder and narcotics conspiracy (A.58-75).

After a jury trial, Aquart was convicted of all these offenses.  At a

---

[1] Numbers preceded by "A." refer to the pages of appellant's appendix.  The prefixes "T." and "P." refer, respectively, to transcript citations for the guilt-innocence trial (which started April 20, 2011) and the sentencing hearing (which began May 31, 2011, on p. 4386); since the transcripts for each phase were not separately numbered, the prefixes will identify the source proceeding; "DE" refers to documents filed electronically and listed on the District Court's docket sheet; "GX" and "DX" refer to government and defense trial exhibits, respectively, and "GX-P" and "DX-P" refer to sentencing-hearing exhibits.

sentencing hearing pursuant to 18 U.S.C. § 3593, the same jury sentenced him to

death for killing Tina Johnson and Basil Williams, but could not agree on a

sentence for James Reid's murder. Accordingly, a sentence of life in prison

without the possibility of release was imposed on those counts.

## STATEMENT OF FACTS

I.    **The evidence.**

   A.    **Over a ten-month period, Aquart oversaw a drug operation at 215 Charles Street. Aquart sometimes physically disciplined employees and others when they infringed on his business, but the injuries were not severe.**

From the fall of 2004 through August 2005, Azibo Aquart headed a crack-

selling business based in a Bridgeport residential building. $10 bags were sold out

of apartment 211 at 215 Charles Street, on a 24-hour, seven days a week basis.

Unit 202 was established as a "lookout" apartment. The government presented

numerous witnesses who described the operation. Most were employees, many of

them addicts, who testified pursuant to cooperation agreements.

The defense did not challenge Aquart's guilt of drug conspiracy (see

defense summation at T.4267-68). The jurors determined, through findings on the

verdict sheet, that the conspiracy involved over 280 grams of crack (T.4363; see

T.4345-46).

5

Several witnesses testified about beatings Aquart administered when he thought someone was cutting into his profits. The beatings were brief and controlled, and the injuries were relatively minor – the worst was a broken nose. This evidence, summarized below, was presented to show the means and methods of Aquart's racketeering enterprise and the operation of the drug conspiracy. Its relevance to sentencing was to support the aggravating factor that Aquart had committed other acts of violence that posed a serious threat to the lives and safety of others. These beatings did not suggest that he would be inclined to kill anyone, either to further his drug business or otherwise, let alone that he would plan to torture and beat three people to death, or relish their suffering.

Jacqueline Bryant was a crack cocaine addict who became a seller for Aquart (T.1110-27). Once when she smoked ten bags of crack instead of selling them, Aquart and another employee hit her, with the other man taking the lead. Aquart punched her and she blacked out. When she "woke up," her knee was "busted open" and a broken ceramic ashtray was nearby. Bryant assumed Aquart had deliberately hit her with the ashtray, but it may have broken when she fell (T.1134-35, 1208). She waited two or three days before going to the hospital. They cleaned the knee joint and she was discharged the next day (GX 245, pp.3-4, 37-38 at A.650-51, 685-86).

6

Venro Fleming also bought crack in apartment 211 and then started selling for Aquart (T.1288-96, 1299-1302).  One day Aquart "pushed" him.  Some crack was missing, and Aquart thought Fleming owed him for it (T.1319-22, 1367-69).  Fleming had a bruise under one eye, a small cut near his other eye and a swollen lip (T.1321, 1324-25; see GX 249, pp.1-3 at A.711-13).  He did not notice any injuries to his nose, but medical records indicated a fracture (T.1325; see GX 249, pp.2, 6 at A.712, 716).  Fleming was sent home the same day (GX 249, pp.1-2 at A.711-12).

Frank Hodges was a crack addict who became another seller in apartment 211 (T.695-709).  He once "borrowed" some of Aquart's money and tried to replace it by selling cocaine he obtained from another source.  Aquart beat him, using his hands and feet (T.731, 734, 841-42, 847; see also T.1145; T.1469-72; T.2572).  Another employee may have beat him as well (see T.853, 1472, 2654).  Hodges' face swelled up (see T.1146; T.1802; T.2572), but he did not seek treatment for almost a week (T.734-35).  He had "a nondisplaced fracture of the nasal bone" (radiology report, GX 246, p.5 at A.707) and bruises on his right eye and neck (id., p.2 at A.703).  He was given a prescription for Ibuprofen and

7

Tylenol and discharged (id., pp.1-2 at A.703-04).[2]

Juanita Hopkins, nicknamed Vanessa (T.726-27), was another crack

user/seller (T.2531-38, 2545, 2549-51). Aquart's "rules" were that you could not

sell anyone else's drugs in the apartment or let anyone else do so (T.2553). Her

brother, John Sullivan, did not work for Aquart, but she and Hodges helped

Sullivan sell his crack in apartment 211 (T.2565-66). Someone told Aquart, and

one day Sullivan was caught there. Aquart came in, told everyone else to leave,

and pulled out a gun (T.2566-67; P.4685-87).

Sullivan said Aquart hit him twice with a gun, on his head and ear (P.4687,

4689). He got two stitches for what the doctor indicated were "superficial"

wounds and went home (P.4690, 4692-93; GX-P 12A, p.5 at A.767). Hopkins

claimed that Aquart hit her more than once with a gun "in my nose and . . . in my

eye," and that the assault on her and her brother lasted "about five minutes"

(T.2567-68; see T.1477 [witness said she had a black eye immediately thereafter]).

She did not seek medical attention (T.2569). Sullivan said he did not see Aquart

hit her and did not think he had (P.4688). Her boyfriend Hodges, who saw

Sullivan bleeding, testified that Hopkins was not hurt (T.741; see P.4678). And

---

[2] Hodges thought a rib had been cracked as well (T.731, 734). But his medical records (GX 246 at A.702-07) say nothing about the latter; in fact, the radiology report attached as the last page states "[n]o evidence of rib fracture."

8

Bryant, who knew Hopkins and her brother and also saw the latter bleeding right

after the incident, could not recall Aquart ever hurting Hopkins (T.1150, 1146-

49).[3]

> **B.    Aquart was shown to have reason to be mad at Tina Johnson for
> selling crack from her apartment, which started after he obtained
> a bad batch, but not a motive to plan her murder.**

215 Charles Street is a three-story condominium building containing 36

apartments (see GX 101A at A.562-599). Basil Williams was the tenant in

apartment 101 (T.758, 1152). Living with him the summer of 2005 were Tina

Johnson and her boyfriend, James Reid, also known as Tippy (T.78-80). Tina and

Reid were "regular customers" at apartment 211, where Aquart's employees sold

crack (T.716-17; Basil Williams did not use crack, e.g., T.759).

Aquart once received an inferior batch of crack, and Tina got some

elsewhere and began to sell it from her apartment. Some of Aquart's customers

---

[3] At the sentencing hearing, to further support the other acts of violence
aggravator, Anthony Armstead recounted a beating in October, 2009, when he and
Aquart were in jail together. Aquart came into a cell and struck him. Armstead
may have hit the bunk when he fell, and then was hit some more (P.4570-74).
Armstead did not see a weapon, and did not believe he was hit with an object
(P.4579). No weapons were found (P.4660). He sustained multiple head wounds,
receiving stitches or staples for six; the biggest needed seven sutures (see P.4576-
77; GX-P 9, pp.1-2 at A.756-57; see also photos, GX-P 3-7). Armstead was
discharged the same day and the sutures and staples were removed 12 days later
(GX-P 9, pp.1, 3-4 at A.756, 758-59). By that time, "all wounds [were] well
healed" (id., p.1 at A.756).

started buying from her.  His sales slowed but did not cease (T.757-63; 1484-85;

T.2579).  Bryant helped Tina.  They bought small quantities of crack, sold some of

it and smoked the rest (T.1149-54).  Rodney Womble, who became Aquart's

"lieutenant" in the building, oversaw sales at apartment 211; he would get crack

from Aquart and supply the workers, and deliver the money back (T.1429-31,

1439-40, 1445-48).  Womble said that Aquart continued to make money during

the time Tina sold crack.  "[S]he wasn't selling that much drugs.  Like I told

[Aquart] at one time, she's only selling enough to support her own habit."  Given

the bad quality of Aquart's drugs at that time, this made sense to Womble

(T.1506).

Aquart told Tina to stop selling, as did Womble (T.1506).  One time

Womble brandished a table leg to intimidate her.  These exchanges were witnessed

by others, and Aquart knew this (T.1159-61, 1215-17; T.1487-92).  Tina would

not back down.  She once yelled at Womble that if she could not sell, nobody else

would (T.1160, 1162-63; T.1490-92).  When Womble updated Aquart on Tina's

sales, Aquart said, "I'll take care of it" – Womble said "that was just his word for

everything, 'I'll take care of it.'" (T.1488, 1492).

When Aquart returned from a trip down south, Womble reported that Tina

was still selling (T.1486, 1493-94).  Aquart asked him to buy a bat.  Womble did,

10

but it remained in Womble's apartment (T.1496-97).

**C.** **The government presented evidence that Aquart assembled a group to break into Tina Johnson's apartment.**

John Taylor met Aquart that same summer, and began selling marijuana for him. Aquart asked him to sell crack on occasion, but Taylor did not want to: if caught, you got more time for selling crack than "weed" (T.2234-49). A few weeks before the killings, they took a trip down south with Aquart's girlfriend and his brother, Azikiwe (T.2249-53). Aquart asked Taylor if he could help him out with something in Connecticut, and Taylor said he would (T.2275). Taylor testified he also overheard Aquart tell his brother that he "had a problem with some people in this [sic] building" (T.2276-77).

Soon after they returned, Aquart asked Taylor to come to Bridgeport. The two of them, with Azikiwe, drove to a diner near the Charles Street building.[4] On the way, they stopped at a Walgreen's and Aquart made a purchase – he had said something about duct tape, Taylor testified (T.2279-85). They met Efrain Johnson (referred to as Big Boy) (T.2286-87; see GX 208). Aquart said he wanted to "move some people out," they "were into his money business" (T.2291-92).

They entered the building, Azikiwe and Efrain carrying bats. Azikiwe gave

---

[4] On the trip south, Aquart told Taylor he would set him up there selling drugs (T.2285).

11

them masks – with holes for the eyes and nose, effectively concealing their faces – and latex gloves.  They all lined up near a door, which a light-skinned woman knocked on.  Nobody answered, and Efrain left.  The other three went upstairs to apartment 211.  That was where Taylor would be set up, Aquart told him (T.2293-300).[5]

A few days later, Aquart called and invited Taylor back to Bridgeport; he said Efrain Johnson "got a couple of girls at the diner" (T.2302).

---

[5] Taylor's recollection of events was sometimes fluid and even demonstrably inaccurate.  For example, in a pre-trial interview he said he did not recognize Judith Rivera when Agent Munger showed him her picture (T.4118-22), but at trial he insisted that it was she who had knocked on the door that night (T.2297-98, 2434-36; see GX 217).  But Rivera did not corroborate this (see generally T.1619-1729).  Rather, it was Frank Hodges who knocked.  Aquart came upstairs and asked Hodges to knock on Basil Williams' door, and if someone opened it, to "get out the way" (T.778-86; see also T.2585-86).

Hodges knew Tina was selling, and he passed at least three other people in the laundry room on his way to her door; they were dressed in black and had bandanas and rubber gloves.  Hodges did not look at their faces, because he did not want to recognize them or have them recognize him.  Aquart also had a bandana around his neck and was wearing plastic gloves.  Hodges assumed that if they got inside "it wasn't going to be nice," it "wasn't going to be a joyous occasion."  But no one answered (T.782-85, 867-69).

Taylor also said that after they dispersed and he and Aquart went upstairs, Juanita Hopkins came up and bought crack from Aquart (T.2300-01; see GX 213).  Hopkins denied this (T.2584-85).

**D.   Taylor testified that the plan was to break into Tina Johnson's apartment to rob her and force them out.  Aware of the bats and gloves they had, Taylor had no inkling anyone would be killed.**

Taylor met up with Aquart and Azikiwe (nicknamed Ziggy) and they drove to the Charles Street building (T.2302-06).  Efrain met them there.  He had bats, and Azikiwe again handed out gloves and masks.[6]  Aquart said he knew "she" was there now, and told Taylor, "Well, you going to help because she got a son and he's a big guy and you going to handle him."  Taylor agreed  (T.2306-07).

When they got to Tina's apartment, Aquart pulled out a gun.  Efrain and Azikiwe had the bats.  Taylor thought they were going to "tear the place up" to get people out (T.2372-73); robbery was also on the agenda (T.2464; GX 247, p.9 [stipulated offense conduct] at A.709).  Taylor did not know anyone would be killed (T.2373 at A.130).

Consistent with Taylor's belief, it would be an odd precaution to wear masks if Aquart's plan was to kill the occupants.  Moreover, robbing other drug

---

[6] There are three individuals mentioned in this brief whose last name is Johnson: Tina Johnson, Efrain Johnson (no relation to Tina) and Lashika Johnson, Efrain's sister.  For clarity, they are never referred to as "Johnson," and are often mentioned by their first names only.  Similarly, Azibo Aquart and his brothers, Azikiwe and Azizi Aquart, are sometimes referred to by their first names to avoid confusion (Azikiwe was charged as a participant in the murders; Azizi testified as a mitigation witness at the sentencing proceeding).  Basil Williams and James Reid, the other two murder victims, are usually referenced by their last names.

13

dealers was not unprecedented for Aquart's organization. There was evidence that other people sold drugs in the Charles Street building (T.828; 1649-50), including a woman named Velma who sold crack. At the direction of Womble (Aquart's lieutenant), Hopkins once robbed Velma of her stash (T.2607-10). There was also evidence that assault – not murder – was considered a fitting punishment for other dealers: Randi Washington, who worked for Aquart for a short time, claimed that Aquart once asked him to pistol-whip a "Spanish male" who was selling inside the building. Washington could not find the man at the time and that was the end of it (T.1999-2002).

### E.    A significant portion of Taylor's version of events inside the apartment was contradicted by Efrain Johnson, whose statements implicating himself and Taylor were put into evidence by the defense at sentencing.[7]

According to Taylor, Azibo kicked Tina's door open and they all went in, Taylor last. Taylor said Williams approached and asked what was going on. At gunpoint, Williams was directed back to his bedroom and Azibo told him to get on

---

[7] Aquart's defense at the guilt-innocence trial was that he played no role in the murders, and that Taylor invented Aquart's and his own participation to save himself from another drug conviction – he did not realize his statements to police constituted a confession to felony murder (see generally T.4266-315, and, regarding Taylor, T.4306-11). Efrain's proffer statements were admitted as reliable hearsay at sentencing (see Point I), and were not intended to (and did not) undermine the jury's guilty verdict.

the ground; he gave the same order to Tina and Reid, who were in another bedroom (T.2311-15 at A.111-15). The Aquart brothers went into the latter room and Efrain entered Williams' room. Azibo came out and asked Taylor to help move the living room couch against the door, to keep it closed. He told Taylor to stand at the living room window and watch out (T.2315-2320 at A.115-20).[8]

Taylor heard the sound of duct-taping. He claimed he went back and forth a couple of times and saw the Aquarts taping Tina and Reid. Efrain was still in Williams' room, but Taylor did not see him taping (T.2320-21 at A.120-21). After the taping sounds stopped, Taylor heard someone make a muffled sound like "yeow." He immediately went back and said he saw Azibo hitting Tina with a bat, and Azikiwe doing the same to Reid. He claimed that Azibo was standing over Tina, raising the bat over his head and swinging it down. Taylor described Azibo's actions as "bashing her like he was at a . . . meat market." His brother "was over there doing the same thing." Taylor said, "Yo, what are you doing?" Azibo allegedly replied, "Yo, come and get you some" (T.2321-23, 2502-03 at A.121-23, 137-38).

_____

[8] The front door of the apartment opened into the living room, from which a short hallway led to two adjacent bedrooms. Tina and Reid's room was at the end of the hall. It was impossible to see into Williams' room from the living room, and neither bedroom was visible if one was standing at the living room window (see GX 101B [diagram of apartment, not to scale] at A.600).

15

Taylor said, "I'm out of here."  He went to the front door and pushed the

couch away.  He saw Azibo hand his gun to Azikiwe, and the latter followed

Taylor out.  On his way, Azikiwe picked up a cell phone and some money that

Azibo had earlier taken from Tina and Reid's room and put on a counter.  Taylor

said Azibo had done this "way before they started duct taping" (T.2323-26 at

A.123-26).  As Azikiwe and Taylor drove away, Azikiwe asked him, "Did you

hear the people say our names?"  Taylor said he had not (T.2327 at A.109).[9]

Taylor was arrested for murder at the end of 2009, in North Carolina

(T.2356-68).  He entered into a cooperation agreement and pleaded guilty to three

counts of felony murder, with robbery as the underlying felony (T.2369-72; see

GX 247, pp. 1, 9 at A.708-09).  He admitted he told lie after lie during his North

Carolina interview with the police.  In keeping with the defense at trial that Taylor

invented his own participation in the crime as well as Azibo's, these initial lies

---

[9] Taylor testified that Azikiwe lost his phone on their trip down south
(T.2254-55), and that after the murders, Azikiwe used Taylor's phone to make a
call (T.2332-33).  But Taylor also said that when he drove to Bridgeport prior to
the killings, he called Azikiwe for directions and Azikiwe told him where to go.
Azikiwe was alone when they met up; Azibo arrived in a separate car (T.2302-04).
Taylor also said that Azikiwe offered to give Taylor the cell phone they had stolen
from Tina's apartment when they left together (T.2327) – a strange gesture if
Azikiwe had no phone of his own.  Moreover, Womble said that Aquart provided
cell phones to "[e]verybody" who worked in his drug operation (T.1445; see also
T.1637-38, 1654).  Given this abundance, there was no reason why Azikiwe would
have delayed replacing his lost phone.

16

were the focus of over half of defense counsel's cross-examination (see T.2384-416, 2433-34, 2438-67).  The rest concerned other false statements Taylor had made, his criminal record, his rapid agreement to engage in proffer sessions with the government, and his knowledge of the murders from other sources like media coverage (see generally T.2374-2493).  He was not asked about his testimony concerning what happened in Tina's apartment.

Through Lashika Johnson, Efrain's sister, the government introduced certain admissions Efrain had made.  Efrain told Lashika "he helped tie the people up and rough them up a little bit, but . . . when he left those people were still alive" (T.2907-08 at A.143-44).  He said he left Aquart alone in the apartment, and that "everything that they had or used was disposed of before they came to me" – "Bats and gloves and maybe masks" (T.2909 at A.145).

At the sentencing hearing, the defense presented other statements Efrain had made to Special Agent Christopher Munger, who had interviewed Efrain on multiple occasions (P.5497 at A.275).  Efrain gave a much different account than Taylor did, implicating both himself and Taylor.

Whereas Taylor claimed that Azibo kicked the door open and entered first, encountering Williams, Efrain said that he knocked on the door pretending to be a drug customer and that a woman cracked opened the door.  The four men rushed

17

in, Efrain first and Taylor second (P.5498-99, 5501, 5503-04, 5505-06, 5507-08 [no gun was mentioned] at A.276-77, 279, 281-82, 283-84, 285-86).

Notably, Efrain's statement that it was Tina – not Williams – who came into the living room was corroborated by Taylor early on in the case.  In his first interview with police in North Carolina, he said that a woman opened the door after Azibo (not Efrain) knocked on it, and that Azibo "put a gun in the woman's face and said he was the cops."  Taylor did not recall the first part of this statement at trial, but he specifically disavowed only that Azibo announced he was a police officer; the rest – including that it was a woman who answered the door – was "the truth" (T.2460-61 at A.132-33).

Efrain also stated that Taylor (referred to as "Big Dude") grabbed the woman in the living room and the two brothers ran down the hall, pushing or following a man into a back bedroom on the right [Williams' room] (P.5499-5502, 5504, 5508, 5515-16 at A.277-280, 282, 286, 293-94).  Taylor gave Efrain rubber gloves and told him to put them on, and Efrain began taping the woman's hands at Taylor's direction.  Impatient with how long it was taking, Taylor ripped the tape from Efrain and finished taping the woman's hands and feet himself (P.5502, 5504, 5507-08 at A.280, 282, 285-86; see P.5506 at A.284: Taylor handed Efrain gloves outside the apartment).

18

Although Taylor claimed that it was the Aquart brothers who taped Tina, while Taylor did nothing, Efrain's contrary testimony was corroborated by DNA evidence: Efrain's DNA was found on tape around Tina's hands, and Taylor's DNA could not be eliminated (see Section G.1).

Efrain said the woman had asked what was going on and he told her to calm down. Taylor punched her in the face when she screamed (P.5502, 5504 at A.280, 282). As Efrain watched Taylor taping, he looked down the hall and "tried to see in the bedroom where Azibo and Azikiwe took the unknown male, but all he could hear were sounds of punching and moaning" or "thumping and moaning" or "tussling noise" (P.5502-03, 5504-05, 5509 at A.280-81, 282-83, 287).

Efrain also told police that Taylor pulled a long metal pipe out of his pants pocket and struck the woman in the head with it. Efrain ran out of the apartment (P.5503, 5505 at A.281, 283; see P.5507 at A.285: in a later session, Efrain said he left as Taylor was taping, when Taylor told him to go). Efrain said the woman was leaning over the bed when struck, and when Munger reminded him that he had said this took place in the living room, Efrain said it was a sofa bed. The pipe was about ten inches long and two inches thick (P.5505 at A.283; see P.5509 at A.287: Efrain repeated that the woman was leaning over a bed while being taped). In a later session, Efrain said that Taylor told the woman to shut up and get on the

19

ground when they first entered, and that Efrain then heard "a metallic thud sound" when Taylor hit her (P.5507 at A.285).

The prosecutor elicited that in different interviews, Efrain said he was inside the apartment for eight minutes, for 25 minutes, or about 15 to 30 minutes (P. 5522-23 at A.300-01).[10] In one session, he denied seeing baseball bats or wearing ski masks (P.5534 at A.312).

The prosecutor also established that Efrain made these statements during proffer sessions, which were a precursor to a cooperation agreement. The prosecutor elicited that he was never offered such an agreement, however, because "it was determined he was lying" (P.5511-12 at A.312; see Point I).

### F. The three victims were all duct-taped and beaten to death, and fingerprints of both Aquart brothers were found on plastic bags at the scene.

Tina's son, Leroy Whittingham, was supposed to pick her up the morning of August 24, 2005 (she was going to move out), but she did not answer when he knocked (T.75, 86-88). He climbed in her open bedroom window and saw her and Reid lying on the floor with pillows over them (T.88-90). They were bound with

---

[10] She also elicited that Efrain had made a sworn statement during an aborted guilty plea that he had helped Azibo, not Taylor, tape the woman (P.5524-25 at A.302-03). This was misleading and should not have been introduced. See Point I, where several ways in which the government sought to undermine Efrain's credibility are attacked as error.

duct tape and there was blood everywhere. Williams was on the floor of his

bedroom, also duct-taped and bloody. Whittingham called 911 (T.89-90).

The emergency medical technician who responded saw that the hands and

feet of each victim were very tightly bound with duct tape. So were Reid's and

Williams' heads, with space left to breathe through their noses. Tina's head was

not wrapped, but she was very tightly gagged with tape (T.131, 148-49, 157-58,

161-65, 169-70).

There was a large amount of blood spatter on the walls and ceiling of Tina

and Reid's room. There was also blood all over the floor, and what appeared to be

some of Reid's brain matter near his head (T.131-32, 146, 150-56). See

photographs GX 121-1 thru 121-10 [Tina]; 122-1 thru 122-7 [Reid]; 120-1 thru

120-7 [Williams]; 127-130E, 168-69 [blood spatter in Tina/Reid bedroom] at

A.630-43, 646-47).

Based on her autopsy, Dr. Susan Williams opined that Basil Williams was

struck on the head four times with a blunt instrument such as a bat or big pipe

(T.3938-39, 3944-45). His skull had numerous eggshell-type fractures (T.3941-

43). He also had some facial contusions and abrasions (the latter may have been

caused by the tape), contusions on his arms and three small incised wounds

(T.3928-38; see autopsy report: GX 305, pp.2-3; photographs: GX 300 thru

21

303A).

Tina Johnson's skull was fractured in three places: on her face and two places on the back of her head. She also sustained multiple lacerations in these areas (Dr. Frank Evangelista: T.1740-55; see autopsy report: GX 322, p.1 at A.727; photographs: GX 315-318, 324-325). She could have been struck as many as nine times "if" each laceration resulted from a separate blow, but the medical examiner admitted that it was "hard to say exactly how many" strikes there were (T.1752-53). A bat could have been the weapon, or a pipe – any blunt instrument (T.1753, 1755-56, 1762). Johnson's left wrist was also broken (T.1756-58; GX 322, p.2 at A.728).

The back of James Reid's head had six lacerations from 1" to 5 1/2" long. Dr. Malka Shah believed they were caused by at least 3 to 5 blows with a blunt instrument – *e.g.*, a bat, a pipe, a tire iron. Reid's skull was fractured in three areas underneath these wounds, and the brain itself had extensive contusions as well as lacerations (T.431-41, 462-63; see autopsy report: GX 314, pp.2, 5-6 at A.724, 725-26; photographs: GX 307, 308, 311, 312). Reid's left elbow was broken, and his right arm had contusions (T.419-24; GX 309, 310, 314 at p.2 at A.724).

Thomas Martin, the government's blood spatter expert, described two kinds of spatter: those generated by impact to the body and those created by cast-off

22

from the weapon (P.4519-20). The majority of blood in Williams' bedroom was pooled near his head, with some small areas of blood spatter nearby. The spatters were either from impact or, in one area, "expiration spatters" from Williams' nose as he exhaled (P.4535-41; GX-P 1A-F at A.740-745). But the room was "primarily void of blood spatters" (P.4541).

Not so in the other bedroom, where "there was blood spatters pretty much everywhere" (P.4541). This included large, heavy cast-off spatters on Wall A of the room – at the head of the bed close to Reid's feet – and on the ceiling [denominated Wall D] (P.4541-64; GX-P 1G thru P at A.746-755; see diagram of apartment with lettered walls, GX 101B at A.600). Based on the location of injuries to Tina's head and blood stains on her shirt, she was hit while face up and face down (P.4543-47). She and Reid were hit "many, many times," with "a great amount of force" (P.4556, 4565-66). Martin was not asked to opine about the positions of the perpetrators.

The manner in which Williams' arms were bound differed markedly from the other two victims. Williams' forearms were duct-taped together, and tape crisscrossed down to his hands which were also bound. Tina's and Reid's arms were not taped, only their hands. Also, the back of Reid's head was not wrapped as completely as Williams' was (compare GX 120-1, 120-3, 120-4, 120-5 [BW] at

23

A.612, 614, 615, 616; GX 121-7, 121-8 [TJ] at A.620, 621; GX 122-1, 122-3, 122-5 [JR] at A.624, 626, 627).  Thus, it did not appear that the victims were bound by the same person.

In Williams' bedroom were two plastic bags, a blue one and a white one from Walgreens, stuck together with a small piece of duct tape (Ortiz: T.1029-32; see GX 123,123-1, 455 at A.628, 629, 731).  John Pleckaitis identified multiple prints on both bags as those of Azikiwe Aquart: two from his right middle finger on the blue bag, and one each from his left and right thumbs and his left middle and ring fingers on the Walgreen's bag (T.2754-57, 2794-96).  He identified one print of Azibo's on the tape connecting them (T.2757-68).  It was from the left middle finger, and it was on the nonadhesive side inside a fold (T.2758, 2768, 2802).

This evidence was found a foot or so from Williams' head, under the outside edge of a pillow on top of his head (T.1030-32, 1083-84; see GX 120-1, 120-7 at A.612, 617; DX F, G at A.738, 739).  It was moved by a crime scene detective and was photographed both close to the victim's head (on top of his blood on the rug) and spread out near the radiator, but it had not been in those positions originally (T.345, 647-53, 665-66, 1084-87, 1089-90; compare GX 123, 123-1 at A.628, 629, with GX 120-2, 120-3 at A.613, 614).

24

**G.**   **There was additional evidence connecting the four men to the scene, but none of it corroborated Taylor's account of who was responsible for the fatal beatings, and some of it contradicted him and bolstered Efrain's account, including DNA evidence.**

**1.**   **DNA evidence.**

DNA evidence conclusively linked Efrain to duct tape binding Tina Johnson's hands – this was consistent with his statements to police and contrary to Taylor's claim that he saw the Aquart brothers tape her.  And Taylor's DNA profile could not be eliminated from mixtures on two items found in Tina and Reid's bedroom – which he never admitted entering – including on latex stuck to tape on Tina's hands.

Christine Roy performed DNA analysis on swabs from numerous items (see charts, GX 462-67 at A.732-37).[11]  James Reid's genetic profile was included in the mixture on the cuff of a latex glove found in the living room (13-Z1), and Azibo Aquart's profile was effectively included (T.3174-85, GX 464 at A.734; see GX 136).[12]  Basil Williams' DNA was definitively linked to three items recovered

---

[11] Maria Warner took many of the swabs, including from plastic gloves or pieces of gloves, some latex and some vinyl, all but one from Tina Johnson's bedroom (T.2995-97, 3022-35, 3063-64; see also T.1056-57, GX 148).  The DNA found on a vinyl glove that was on a bedside table (T.3033-35) was contaminated in the lab (T.3202-08; see DX HH re 16-Z1).

[12] The cuff was underneath a cushion of the living room couch, and it was of a different color and transparency than the other gloves and a glove tip that were

25

from Tina and Reid's bedroom, each of which, in turn, was linked to other victims and, most definitively, to Azibo's brother, Azikiwe (see Point IV).

From items recovered from Tina's bedroom, the DNA profiles of both Aquart brothers were included on a double vinyl glove found on the floor (one glove inside of another) (14-1-Z1), and the expert could not exclude John Taylor as a contributor to the mixture (T.3185-92; GX 137, 465 at A.735). Roy explained that the ability to identity a person's DNA in a sample increases as the number of their genetic markers found in the sample increase (T.3161, 3470). A "could not be eliminated" finding rested on the presence of sufficient genetic evidence to support it (T.3156). The number of Taylor's genetic markers detected on the glove in Tina's bedroom (14-1-Z1) would be shared by 1 out of 30 African-Americans (T.3190-91).[13]

Three different swabs were taken of latex material found stuck to tape that had bound Tina's hands (see GX 433 at A.730). Efrain's DNA was identified on

---

found in Tina Johnson's bedroom (compare GX 136 and 447-48 [the cuff] with GX 137, 138 and 148).

[13] Roy's statistical analysis expressed the frequency with which the combinations of alleles found at the various loci for which genetic material could be analyzed would be found in the three dominant populations in Connecticut: African-American, Caucasian, and Hispanic – in other words, how many persons within each group could be included or could not be eliminated as a source (T.3138-39).

one (9-Z2), and he could not be eliminated as a contributor to another (9-Z3)

(T.3164-74; GX 465 at A.735). As for the third (9-Z1), neither the Aquart

brothers, Efrain nor John Taylor could be eliminated as contributors (T.3155-64).

The number of Taylor's markers found on this piece of latex would be shared by 1

out of every 110 African-Americans (T.3163).[14]

### 2. Blood spatter evidence.

Taylor claimed that Aquart used repeated overhead motions to strike Tina,

"bashing" her as if he was "at a meat market," and that Azikiwe did the same to

Reid (see T.2322, 2502-03 at A.122, 137-38). The blood spatter evidence was

consistent only with the latter claim; it was inconsistent with the former.

The heavy cast-off spatter in the room was on the wall near Reid's feet at

---

[14] The prosecutors never claimed that such frequencies were so low as to be meaningless, nor did Roy. Indeed, she affirmatively included Azibo, his brother and two of the victims as contributors to the mixture on a glove found on the bedroom floor (14-1-Z1) based on a frequency of only 1 out of 400 African-Americans for each (T.3186-87). And although Efrain admitted he taped Tina's hands (see, e.g., P.5502 at A.280) and his DNA was affirmatively included in the mixture on one piece of latex stuck to that tape (T.3164, 3169, 3171-72 re 9-Z2, frequency of 1 in 7 billion), Roy could only say he could not be eliminated from another fragment on this same tape, with a statistical frequency of 1 in 70 African-Americans (T.3162-63 re 9-Z1). Moreover, the "cannot be eliminated" findings for Taylor were grounded in the fact that he was unquestionably in the apartment that day. Roy also found DNA from an unidentified male on fingernail clippings from Tina's right hand – the four defendants, Williams and Reid were affirmatively eliminated as the source (T.3446-51 re 32-1-Z1).

27

the head of the bed (denominated Wall A), and on the 9 1/3-foot ceiling (Wall D) over him (P.4549-59; GX-P 1, J thru M at A.749-52; see GX 101B [diagram] at A.600). The government's expert stated that that spatter was made by an overhead striking motion, with the object casting up to the ceiling and back toward Wall A (P.4552-53; see photos, id. at A.749-52). There was also a lot of blood spatter on the closet wall parallel to Reid's body (Wall B), including high up (see GX 101A, photos linked to numbers 9 thru 12 at A.573-76; GX 122-2, 128, 128A at A.625, 632, 633). DNA tests on all of the blood samples from Walls A, B and D were consistent with Reid alone. Tina's DNA was eliminated (see chart, GX 466 at A.736).[15]

The blood spatter evidence was inconsistent with Taylor's graphic account of the way Azibo beat Tina. From the position of Reid's body and the cast-off of his blood on Wall A and the ceiling, it is clear that his killer straddled his body with his feet and struck in a direction parallel to the closet (Wall B). It would

_____

[15] These letters were used to discuss the findings of the government's blood spatter and DNA experts. Tina and Reid's bodies were found perpendicular to each other, with their heads very close and near the door to the hall; the doorway was part of Wall B. Tina was lying parallel to the foot of the bed, nearest to Wall C, with her head close to the hallway door. Reid was lying parallel to the long side of the bed, next to the closet wall (Wall B), with his feet near Wall A at the head of the bed. The ceiling was denominated Wall D.

have been impossible for Tina's killer to stand next to Reid's killer given the furniture in the small room, and the fact that their bodies were at right angles to one another (see GX 121-3, 121-9, 121-10 at A.618, 622, 623). Thus, Tina's killer must have stood at right angles with Reid's killer, near and parallel to the wall closest to Tina (Wall C) and not far from the hall door.

Had Azibo repeatedly propelled a bat down on Tina from over his head, as Taylor contended, there should have been cast-off spatter on the ceiling above her body – just as with Reid – and on the rug leading to the hallway. Particularly so since Tina's head was not bound with tape as Reid's was. But there was no spatter in these areas.

Moreover, the government's expert noted that there was minimal blood spatter on the wall nearest Tina's body (Wall C), and that spatter was close to the ground. It was unlikely to be cast-off spatter (versus impact spatter), given the close quarters around her – her body was between the foot of the bed and a chest of drawers, with her head facing the door to the hall (P.4559-64; GX-P 1, N thru P at A.753-755; see GX 101B [diagram] at A.600; 101A, photos linked to numbers 5 thru 8 at A.569-572). Tina's DNA could not be eliminated from one blood sample taken from Wall C. This was the only sample in the room in which her DNA was not eliminated altogether (see GX 466 at A.736).

29

### 3. Additional evidence relevant to Taylor's and Efrain's conflicting accounts.

Consistent with Tina being subdued in the living room as Efrain stated, there was damage to the living room wall that adjoined the kitchen – a large hole and two smaller indentations (<u>see</u> GX 115F at A.601; 101A and linked photos 31-33 at A.594-96). Leroy Whittingham testified he had "punched the [living room] wall" (T.96), but he was never shown any photographs and never said he actually broke through.

When the authorities arrived, a floral couch was in the hall that would have made it difficult to drag or carry a fully-bound Tina – who weighed 251 pounds (<u>see</u> GX 322, p.1 at A.727) – to her bedroom (<u>see</u> GX 117J at A.611). But it would not have been impossible, since Efrain and Taylor were both large men. Moreover, Leroy Whittingham stated unequivocally that that couch was not in the hallway the night before, when he visited his mother (T.94-96). And when shown a photograph of the couch, John Taylor himself said he had never seen it before (T.2468-70), and he never mentioned any couch being in the hallway (<u>see also</u> T.1158: Bryant never saw a couch in the hall).

Finally, Taylor reported that bats were used to kill the victims, and the government scoffed at Efrain's statement that Taylor had a pipe with which he

struck Tina (see P.5632 at A.376).  But among Williams' injuries were three small

incised wounds: on his forehead and on each of his elbows (T.3928, 3936-37).

The medical examiner stated that this type of wound did not result from blunt

force trauma.  Rather, they were made with a sharp instrument (T.3932-38).  A

hollow pipe would have such an edge.

> **H.      Lashika Johnson, Efrain's sister, testified that Aquart directed
> her to dispose of material connected to the murders, including a
> drill she said belonged to him, and described his cool and
> remorseless demeanor immediately after the killings.  This
> testimony was uncorroborated.**

Lashika Johnson, Efrain's sister, dated Azibo from the end of 2004 into

September 2005.  She had previously sold marijuana for him and was aware of his

crack operation; she also sold small amounts of crack for him (T.2810-19, 2840-

49, 2854-59).  She testified pursuant to a proffer agreement, exempting her from

prosecution if she told the truth (T.2914-16).

Sometime after 1:30 a.m. on August 24, 2005, she and Efrain were at a

restaurant when Azibo called; he spoke with Efrain, who left after finishing his

meal (T.2871-73, 2875-76).  Some hours later (it was almost light out), Lashika

was asleep in her apartment.  She was awakened by the voices of Efrain, Azibo

and Azikiwe.  She heard the voice of another man, who sounded like he was from

New Haven or New York, but when she went into the living room no one else was

31

there (T.2878-79). The Aquart brothers only had their underwear on (T.2880-81). Azibo directed Lashika to take two to three garbage bags to a dumpster a few blocks away. She said he also gave her a drill to dispose of, which she claimed to recognize as his.[16] He told her to put gloves on before touching anything. The bags felt as if they had clothes in them (T.2882-85, 2911-12).

The accounts that Taylor and Lashika gave of this time period were inconsistent. Lashika implied that Taylor's voice was the fourth one she had heard in her apartment, and testified that Efrain later told her Taylor was there (T.2949, 2963-66, 2970). But Taylor said he did not see Aquart or Efrain right after the murders. Instead, he said that he and Azikiwe left Tina's apartment together and Azikiwe drove them to another apartment, where Azikiwe changed clothes (T.2328-29). They then went somewhere else and smoked some marijuana alone,

---

[16] The frame to Williams' apartment door had been splintered on the inside near the door jamb, which was also damaged (T.301-05; GX 116, 116C, 116F at A.602, 604, 605). There were several screws in the door, securing it to the frame from the inside, and some screws were found on the living room table (T.303-06, 309; GX 116A-G-H-I-J, 117A at A.603, 606-09, A.610). No drill was found in the apartment (T.548).

Lashika made statements about the drill after a proffer session at which she denied being threatened. At her brother's subsequent trial, however, she acknowledged that she had been yelled at by a prosecutor (also the prosecutor at Aquart's trial) and threatened with immediate incarceration and the loss of her children. This was the subject of a defense motion to set aside the verdict in the District Court (see Point V).

after which Azikiwe took Taylor back to his own car. Taylor drove home to

Norwalk (T.2329-33). If Azikwe had already removed his bloody clothes before

going to Lashika's place as Taylor maintained, he would not have stripped to his

underwear in her apartment as she testified. Taylor also did not report seeing a

drill being carried into Tina's apartment, by Aquart or anyone else.[17]

## II.   Additional evidence and argument relevant to jury's sentencing determination and verdict.

### A.    The government submitted seven aggravating factors to the jury.

Relying almost exclusively on evidence adduced at the guilt-phase of the

proceeding, the government alleged five statutory aggravating factors: Aquart

killed multiple victims; he substantially planned and premeditated each killing; he

committed each in expectation of pecuniary gain; he procured the killings by

promising to hire Taylor to sell drugs for him; and he committed each murder in

an especially heinous, cruel, or depraved manner, in that it involved torture or

---

[17] The government also called Shamarr Meyers, who met Aquart in jail in 2010 (T.3630-33, 3648). Aquart gave him notes about information he wanted Myers to disseminate, including a claim that a man named Letho [a real person, who had been killed during a home invasion robbery] had admitted committing the murders (see T.3651-52, 3657-71; GX 506). Meyers also testified that Aquart said he "told them [people selling crack in his building] they had to go," and that "they had to die" (T.3643). Meyers had been convicted of multiple felonies and was then arrested again for selling heroin (T.3626-30). He had pleaded guilty before meeting with prosecutors in this case, but had not yet been sentenced when he testified. He was hoping to get the minimum (T.3674, 3719-20).

serious physical abuse.

The government also charged two non-statutory aggravators. One was that Aquart committed criminal acts of violence that posed a serious threat to the lives and safety of persons other than the homicide victims. The government relied on evidence of the assaults on Hodges, Bryant, Fleming, Hopkins, Sullivan and Armstead, previously discussed.

The second non-statutory aggravator was victim impact: Aquart caused loss, injury and harm to the victims and their families. The government called Tina Johnson's two daughters, Lativia and Erica Whittingham (see P.4776-4826; see also GX-P 14V). Her son, Leroy Whittingham, supplied family background information at the guilt-phase (see T.75-81). Letters were also submitted from Tina's husband, Leroy Whittingham, Sr., and her mother, Barbara Johnson (P.4619-20), as well as her funeral flyer with accompanying poems by her brother, Terry Walley (P.4620-22; GX-P 21). Mary and Brian Reid, James Reid's mother and brother, also testified (P.4708-35), as did Basil Williams' sister, Pamela Williams, and his brother, John David Williams (P.4736-71). Eleanor Lane, Williams' sister-in-law, submitted a letter, and a statement was read by his daughter, Karen Hurdle (P.4622-23, 4827-28). Numerous photographs were also introduced into evidence (see GX-P 14A-P, R-U [Tina]; 15A-H [Reid]; and 16A-F

34

[Williams]).

This evidence showed the importance of the victims to their families and the loss occasioned by their untimely deaths. It also fleshed them out and outlined their good qualities. For example, Basil Williams was a native of Barbados, and had a happy marriage and children from a prior relationship. He was very depressed when his wife passed away and used alcohol to ease his pain (P.4736-37, 4740-43, 4747-48, 4765). He was a quiet person, but funny, and "never bothered a fly" (T.4623, 4748, 4758). Tina Johnson was remembered as a supportive, loving mother, "the glue" that kept the extended family together (P.4779-83, 4825). She tried to hide her drug use and did not let it "overcome her" (P.4793-96). She was "an excellent cook," and gave her children "a good life" (P.4780-81). James Reid enjoyed sports and majored in computers at college (P.4713-14). He had one child, a daughter, and was a "peacemaker" between his brothers (P.4715, 4721). He had "a giving heart" (P.4721; see P.4729).

On sentencing summation (see generally P.5615-49, 5687-703 at A.359-392, 430-445), the prosecutors argued that Aquart had personally killed Tina and Williams and that his brother killed Reid. They focused heavily on the multiple killings aggravator (see Point IV), and their contention that Aquart had entered the apartment knowing he would kill all three people. The latter was required to

35

prove the substantial planning aggravator, as well as two others: procuring

Taylor's assistance by promising him a place in the crack operation, and killing for

pecuniary gain (see Point III). The prosecutors also stressed the manner in which

the victims were taped and beaten as evidence supporting the heinous and cruel

aggravator, though it was not at all clear who had restrained and killed each

victim. Efrain Johnson's statements were dismissed as "internally inconsistent[,] .

. . inconsistent with the forensic and testimonial evidence, . . . [and] inconsistent

with the defendant's theory of the case during the guilt phase" (P.5632 at A.376),

which was "that Taylor wasn't even there for the murders" (P.5633 at A.377).

**B.     The defense presented compelling mitigating evidence, through 17 witnesses, about the circumstances of Aquart's life.**

**1.     Aquart's early years were spent in isolation and poverty, marred by exposure to violence in the community and at home and to negative male role models.**

Sonia Smith met Richard Aquart in Jamaica, and began having children

with him when she was a teenager. She came to the United States illegally in the

early 1980's, with her first two sons, Azizi and Azikiwe. Richard had sent for her,

but he had effectively left her by the time Azibo was born in 1981.[18] Richard had

had a child with another woman around the same time, and did not see Azibo for

_____

[18] The parties stipulated that Aquart was 23 years old at the time of the murders (P.5577).

36

"quite awhile." He only came around every so often (P.4833-38; 4861-63; 4886; 4981, 4984-87, 4991-92). Richard had several other children and moved around a lot (P.4992-93).

Sonia moved to Bridgeport around the time Azibo was born (P.4987, 4989-90). They were very poor and she was without legal status, and they struggled. Richard sold marijuana, and Sonia sought work but mostly without success. The neighborhood was full of crime and drugs (4838, 4844-45; 4864-66; 4988-89, 5004, 5009). Richard's relationships with other women caused a lot of conflict with Sonia, as did his drug-dealing. She tried to hang on, and entered into a sham marriage with one of his associates to try to legalize her status (P.4842-43; 4888-89; P.4953, 5006-07; 4913-14; see DX P-D).

Richard and Sonia were both members of The Twelve Tribes of Israel, a Rastafarian religious group. It was a very insular community, with virtually no contact with others. The members distrusted the authorities (P.4859-60; 4980-84, 4986-87, 4998-99, 5008, 5110). As an example, Azibo's older brother Azizi recalled that when their babysitter died in the house, he did not call 911 (P.4999). The boys were also taught not to mention they had a father, because he was undocumented and was involved in criminal activity (P.4990-91).

Azizi testified that the boys were constantly picked on and bullied in school

37

because they were "Rastas." People would call them names and pull their head covers off, and even the teachers would join in. They had to fight constantly (P.5003-04; see DX P-V [photo of young Azibo with dreadlocks] at A.776). Their membership in the Twelve Tribes also disgusted and alienated Sonia's mother, who had moved to Canada (P.4845-46; 4886-88; 4982).

Physical limitations added to Azibo's isolation. He was born bowlegged, and was required to wear metal braces when he was very young. It was hard for him to sleep, and he sometimes fell off the bed and had to wait to be picked up – everybody was "running around" and did not notice (P.4996-97). Then, when he was five, he was in a car accident. He broke his leg, and had to wear a lower body cast for several months which immobilized and isolated him (P.5012-14).

By this time, Richard was living in Hartford with another woman (P.5108). Sonia and the boys remained poor, but Richard would sometimes breeze in with a pocketful of cash from selling drugs and buy them toys and clothes. "So," Azizi said, "it would be feast and famine. We would have nothing and then we would have Big Wheels" (P.5004).

Sonia moved around a lot. Azibo lived in seven locations in Bridgeport between 1981 and 1992, attending four different elementary schools. He then spent several months in Jamaica before returning to Bridgeport. They moved to

38

New York City for a brief period in 1993, and then to Stamford (see P.4989-90, 4999-5002, 5005, 5008-09, 5011, 5015, 5017-20, 5023-26; DX P-SS [map of residential moves and school transfers] at A.788, DX P-TT-1 and TT-2 [showing different schools between 1986 and summer, 1994] at A.789-92, 793-801; P.4894-95).

Sonia was often not at home, sometimes for days at a time – Azizi described himself and his brothers as "latchkey kids" (P.4915; 5009-10, 5029-30, 5036-37). Azizi was left in charge of his siblings, which was not a good situation: "a child ruling another child" (P.4914-16). Azibo would sometimes get mad or upset and run off – this was when he was between the ages of four and seven. He had quite a temper (P.4916-17, 4928-29). But Sonia did not want any officials in her life, including social workers who may have helped Azibo (P.4918, 4930, 4937-38).

Azizi said that Sonia was a strict disciplinarian. She would hit the boys with belts, hangers, broomsticks, shoes and the telephone. She would sometimes have them beat each other, "to kind of share the punishment or share the burden" (P.5030-31).

When Azibo was eight, Azizi and Azikiwe moved to Hartford with their father. Richard insisted, and they wanted to go (P.4849; 4868; 5109; 5018). Richard did not pay much attention to Azibo (P.4920-21; see 5121). When Azibo

visited his father and brothers, he felt like "the odd man out" (P.5110-11), and his brothers picked on him (P.4919). Nevertheless, Azibo looked up to Richard (P.5115-16). Richard's teaching as a father was, "you are going to grow up and be a man and you are going to be strong" (P.4921). His sons were rewarded for making a good "screw face" – "the most hardest, intimidating face you could show" (P.5008; see DX P-H at A.774, a photo Azizi was asked about showing a very young Azibo with a "screw face," surrounded by his brothers and mother who are all smiling). According to Azizi, Richard's goal was "to rape America." His children were taught that "America was foul and that the only thing good was to take as much as you can and then leave" (P.5012).

Richard was a violent man, who lived on the fringes of society. Early on in his drug-dealing, Sonia worked as his "mule," transporting drugs. Richard had "turf wars" with rival "crews." He once handed Azizi a pistol, put the three boys in a closet, and told Azizi to shoot if someone came in he did not know (P.5004-06). On another occasion, one of the boys' uncles was shot, and he was nursed by Sonia and other women in their living room (P.5006).

Azibo's father graduated to selling cocaine. He used a series of aliases and was convicted of several crimes in Connecticut and New Jersey: narcotics possession with intent to sell, weapons possession, and larceny. He was a fugitive

40

for several years (P.4911; 5043, 5050; 5112-15; <u>see</u> DX P-G, P-LL, P-MM, P-PP).

Although Richard was described as "very charismatic" and "respected" (P.4909-10), he was also a person "not to be crossed" (P.5115). For example, when a man who owed Richard money delayed paying, Richard went to his house and poured gasoline around the front door. He took a match and pushed it under the door. Not surprisingly, the man got the message and paid up (P.4912-13).

Another negative male role model for Azibo was his stepfather Skibo. Sonia became involved with him before the oldest boys moved away; Azibo was a young child (P.5018, 5027-28). Like Richard, Skibo was a drug dealer. He bought cars, jewelry and flashy clothes with the money he earned selling drugs (P.5033-34). Richard once came over and threatened Skibo with a revolver. It was partly because Skibo was involved with Sonia – "old man, new man thing" as Azizi put it – but it was also over drug territory. Skibo "[wa]s selling to people that [Richard] used to sell to" (P.5034).

Skibo became verbally and physically abusive, punching and head-butting Sonia. The relationship was "volatile" and unhealthy (P.4949; 5125-26; 5138-39; 5541-42). Skibo also beat Azibo (P.5085).

They had three daughters together, and Skibo was not interested in Sonia's sons. For example, he got her a car, and when she complained that it was not big

41

enough for the six children, Skibo made clear he did not want her sons in the vehicle (P.4948-49, 5125-26, 5542-43).  The couple finally separated, and Sonia ceded custody of her daughters to Skibo hoping that would "cut down on some of the drama" (P.5543).

The other adult male in Azibo's life was his uncle Paul (Richard's brother).  Paul visited from Jamaica for a time when Azibo was young, and they were very close.  As a family friend described it, "it was like magic. . . .  They just clicked.  They communicated."  Paul put "a glitter in [Azibo's] eye."  But Paul was later killed in Jamaica, which was "devastating" to Azibo; he had a "kind of downtrodden sadness" (P.4921-22).

Sonia eventually started a hair salon in New York, falsifying her address on a business certificate she filed with the state (P.5036-37; see DX-P N).  Sometimes she would commute back to Connecticut, and sometimes she would stay in her friend's apartment.  She would occasionally bring Azibo with her  (P.5538-41; 5136-37; see DX P-N).  A woman who worked in the same premises as Sonia recalled Azibo as a "very sweet child" of 10 or 11, who would help watch his sisters (P.5558-59).

42

**2.    Azibo's mother drowned when he was 12.  He bounced around from place to place and was then put in the custody of his 18-year-old brother, Azizi, who was ill-equipped to care for him.**

When Azibo was 12 years old, during a trip to Florida, Sonia drowned at the beach  (P.4851; 5545-46, 5554-57; <u>see</u> DX P-Q at A.775).  A funeral service was held a week later (<u>see</u> DX P-C at A.772).  Azibo had been withdrawn and "stoic." But at the internment, his aunt recalled, he "let out this wail that . . . I don't think I would ever forget.  I still hear it in my head.  And he dove for the coffin" as it was lowered into the ground.  Some people grabbed him but he got away and took off. "And I think for me at that moment I watched him shatter, and as far as I'm concerned he has never actually come back from that moment" (P.4890-92).

As people were dispersing after the service, Sharon Headley, an acquaintance of Azibo's parents and fellow member of The Twelve Tribes of Israel, saw Azibo (P.5153-55).  Azibo said he did not know where he was going, and asked if he could come home with her.  His grandmother refused to take him, and his stepfather Skibo had absolutely no interest in him (P.5156-58; P.5058-59). His father was in jail (P.5061-62).  Sharon took Azibo home to Queens.  He was a "really nice kid" and "he didn't have anywhere to go and seemed lost" (P.5159).

Azibo "would always do what I told him," she said, and got along well with

43

her children (P.5168). But he was clearly very depressed, although he would always say he was fine. He was not adjusting to his mother's death well and she thought he needed counseling, but she had three children of her own and could not afford it. One day Headley found a bottle of rum under Azibo's bed, and he admitted he had been drinking because he could not sleep (P.5159-62). She eventually contacted social services for help. Her efforts were unsuccessful, and she was "at [her] wits end" – he had started cutting classes and she did not know what to do (P.5163-68). He ended up going back to Connecticut, to stay with his brother, Azizi (P.5168-69).

Azibo also lived "on and off" with Eleanor Cooper, another Twelve Tribes member, after his mother died; his brothers did as well, but Azibo was there for the shortest period. This was because Cooper discovered that some money had been stolen from her house, and she accused Azibo. He denied it, but she asked him to leave and he did. Cooper later found out that her then husband was the thief and she apologized to Azibo. He was "gracious" about it (P.5127-29).

Another place Azibo stayed at briefly was Carol Porter's home. He was "in turmoil," she said, but he could not be comforted and would go off by himself (P.4872-73). He also stayed with his aunt in Canada for a short time the summer after Sonia died (P.4892, 4898). A witness summarized his situation: he lived

44

"here, there, everywhere" – "even in a shed in some backyard" (P.4852-53; see 4855).

After Azizi turned 18 (Azibo was 14), he got an apartment for himself and his brothers in a crime- and drug-ridden area of Bridgeport. This was all he could afford. They moved to several other apartments, together with Azizi's girlfriend (P.5021-23). Azizi eventually received $100,000 in insurance money as the beneficiary on his mother's policy, and successfully applied for guardianship of his siblings (P.5059, 5061, 5070, 5092; see DX P-Z at A.777).

Soon after Azibo came to live with him, Azizi was shot and almost died. He had joined a gang while his mother was still alive, and, as Azibo became aware, had become a drug-seller himself in his father's operation; he had been arrested at age 16. Azizi was shot by a rival gang member and was hospitalized for a month. His siblings and fiancée dispersed to other locations for their safety (P.5047-52, 5065-68).

Around this same time, at age 14, Azibo was arrested as a juvenile. Azizi reacted with anger. He pushed Azibo very hard, maybe too hard as he later acknowledged. The Department of Children and Families (DCF) got involved with them as a result of the arrest. This further upset Azizi, and Azibo then got into more trouble (P.5069, 5071-73). Azizi admitted he was not equipped to be a

45

guardian for Azibo (P.5073), and that maybe part of Azibo's acting out resulted

from the pain of his mother's death (P.5071). "We were kids raising kids. . . . I

had no awareness of what [Azibo] was going through emotionally" (P.5073).

Azizi's now wife, Nashiekah Bennett, echoed that they were really not able

to manage Azibo, being teenagers themselves (P.5473, 5476). They did not use

the insurance proceeds wisely, spending it on take-out food and entertainment as

well as necessaries (P.5475-76). And "drugs were all around us. You had limited

choices. You either picked up a gun or you picked up a baby. . . . there were very

limited choices for black kids in Bridgeport. . . . if you didn't have something

making you make the right choice you were going to make the wrong choice"

(P.5477). When Azibo got in trouble with the law, Azizi was "angered" and

"hardened a little bit" (P.5480-83). Unlike Azibo, Azizi "had a son that kept him

going. He also had something to wake up to. . . . he had a wife that loved him"

(P.5489).

> **3.** **The authorities who got to know the Aquart brothers after their mother's death, and when they became involved with the criminal justice system, unsuccessfully opposed Azizi getting custody of Azibo, an at risk boy. At age 14, Azibo was left essentially unsupervised and began getting into trouble.**

Loretta Jay worked for the Department of Children and Families in the early

1990's (P.5230-31). Azizi was "[d]istrustful" and "not willing to engage with the system" (P.5232-33). He turned down the services DCF offered, including placement in a group home under DCF care. She also advised him that Azibo should receive counseling (P.5237-39). She did not believe that Azizi was equipped to take on a parenting role, but the case was closed in January 1995 and none of the boys was ever taken into protective custody (P.5238-40).

Diana D'Amato and Jonathan Davis partnered as juvenile probation officers in Bridgeport in the 1990's. They both got involved with Azizi after he was arrested for marijuana and weapons' possession when he was 16 (P.5253-57; 5276-77). They later took on Azibo, another "high risk client" who warranted intensive supervision. Azibo had been arrested for possession of marijuana (P.5254, 5257; 5279; see DX P-EE-1 at A.778-82).

After Sonia died, D'Amato recalled, Azizi became "hardened," "bitter," "closed off" and "angry" (P.5258, 5267-68). Azibo was "very hurt, very sad, very – he had no parents, he had an older brother who was bitter. So, basically, he was being raised by nobody" (P.5259). Azibo was also "angry," and would "come at [D'Amato] a lot verbally to challenge me on stuff" (id.).[19]

---

[19] D'Amato described a home visit she made, where she encountered a pit bull behind a fence. Azibo threatened to let the dog out, "It's going to kill you," but when D'Amato took up his bluff and told him to go ahead, he laughed and

47

James Shannon was a school psychologist who saw Azibo and Azizi several times during this period (P.5418-19, 5423).  He believed Azibo was pushing against the boundaries and rules Azizi set up, which was very typical for adolescents.  He also thought that it would be "very difficult" for an 18-year-old to effectively supervise a 14-year-old (P.5424, 5427-29; see DX P-DDD at A.802).  Shannon noted in a report that Azibo was "a salvageable youngster who is at a critical point in his development " (P.5430; DX P-DDD at A.802).

Probation Officer D'Amato was "very upset" that Azizi got custody of Azibo (P.5259).  Azibo "definitely needed a therapeutic foster home," but that never happened.  Bridgeport at that time was "[r]eally bad.  Really really out of control.  The gangs, the violence, the drug-selling.  It was horrible" (P.5260-61).  Adults would use children to sell, because the penalties for juveniles were so much less (P.5261-63).  Azibo was involved in drug-selling when they were supervising him, and he "was on the streets a lot" (P.5263, 5265).

Probation Officer Davis, too, described Bridgeport at this time as "heavy crime, drugs. . . .  There was a lot of murders and death in the community" (P.5291).  It was easy for kids to get sucked into life on the streets (id.).  Like

---

kept the gate closed.  She thought he was trying to test her.  He would never talk about his feelings, despite her efforts; "he had too much pain inside of him" (P.5259-60, 5270).

D'Amato, Davis also opposed Azizi getting custody of Azibo.  In fact, Davis filed

a neglect petition against Azizi, contending that Azibo had been denied proper

care and attention.  Davis filed an affidavit stating that Azibo was 14 years old and

"had a history of poor judgment"; Azizi was rarely at home, and Azibo was

"clearly at risk in a home without proper supervision and structure" (P.5283-85;

see DX P-EE-2 at A.783-85).

Subsequently, Davis observed that Azibo was compliant with court orders.

But he was resisting efforts to help him and was difficult for his brother to handle.

Azizi was "overwhelmed with his responsibilities" to his wife, his infant son, and

his two younger siblings.  Davis believed that Azibo needed to be placed out of

the home (P.5286-89, 5304-06).

Then, Azibo became somewhat "unstable."  In February and April 1996,

still age 14, he tested positive, respectively, for marijuana and alcohol (his blood

alcohol level was .40 %) (see DX P-EE-4 and EE-5 at A.786 and 787) .  Davis

again recommended residential placement, but Azibo was then arrested for

robbery (he went up to another youth and demanded a dollar, threatening that he

had a weapon though he did not).  This was considered a serious juvenile offense,

which resulted in his transfer to adult court.  Azibo's DCF supervision was

accordingly terminated (P.5289-94, 5297-98, 5308-09).

49

### 4. Azibo was incarcerated, and functioned well in a structured setting. He also used his talents to help others.

Mary McCoy met Azibo when he was jailed at Enfield Correctional Institution. She was his teacher (P.5311). He studied for and ultimately earned his GED in June, 2001 (P.5311-15; see DX P-AAA-1, -2 and -3 at A.803-05, 806-07, 808). He then volunteered to become a tutor for McCoy, and she chose him to help her in an English as a second language course. She said he was well-spoken, had patience, and worked well with other people. Azibo also trained to become a volunteer with the Literary Volunteers of America (P.5315-20; see DX P-AAA-4 at A.809-11). His performance evaluation rated him "excellent" in all categories (P.5320; see D P-AAA-5 at A.812).

Azibo worked with McCoy until December 2003, when she was transferred. He also helped her maintain the computers they had, and certain records, and was willing to do whatever she asked (P.5321-22). Azibo was "probably the best tutor" she ever had (P.5322). He took some college business courses as well (P.5323-24). McCoy became a sort of mother figure to him, though she found him to be a very private person. She did not even know what he was incarcerated for (P.5323-25).

Numerous witnesses described Azibo as a very intelligent person (P.5259;

50

5426; 5317).

> **5.     An expert on federal maximum security prisons testified that Aquart could be securely housed if given a life sentence and would not pose a threat to others.**

As a result of litigation concerning the admissibility of the prison assault on Anthony Armstead, which the defense argued would inject an uncharged aggravating factor of Aquart's future dangerousness, the court agreed to instruct the jury that "the government does not assert, nor has the government established, that if sentenced to life imprisonment without possibility of release, Azibo Aquart will present a future danger to any other person.  It would, therefore, be improper for you to allow consideration of any notion of future dangerousness to enter into your deliberations or into your individual determination as to the appropriate sentence" (P.5594 [jury charge] at A.341; see DE 836, 858).  (It was the government that first suggested such a charge (DE 858:5; 5/26/11 Tr.49)).  The defense was also permitted to call an expert witness on the Bureau of Prisons to try to allay any jury concerns, and in support of the mitigating factor that, "[i]f Azibo Aquart is sentenced to life imprisonment, the Bureau of Prisons has the capability of safely and securely confining him" (see P.5602 at A.349).

The defense called Mark Bezy, who had 28 years of experience at the Federal Bureau of Prisons, including several associate warden and warden

positions (P.5330-48). He testified about conditions and security measures at

maximum security prisons where Aquart would be housed if he got a life sentence

(P.5348-76). Bezy was aware that serious assaults and even murders had occurred

in federal facilities, even those designated "supermax" (P.5397-5410).

Bezy had reviewed Aquart's prison records, and was specifically aware of

the federal jail assault on Anthony Armstead (P.5348, 5410-11). Bezy opined that

the Bureau of Prisons could securely and safely house Aquart if he received a life

sentence  (P.5377).

On his summation (see P.5651-87 at A.393-429), defense counsel discussed

the mitigation evidence, arguing that a death sentence was not warranted. Counsel

also asked jurors to consider Efrain Johnson's statements about what happened as

suggesting that John Taylor minimized his own role in the crime (see P.5658-59 at

A.401-02).

## III.    After lengthy deliberations, the jury rendered split sentencing verdicts.

The jurors started deliberating on June 13, 2011 (P.5710), and did not reach

a verdict until June 15th (P.5745). They sentenced Aquart to death for the

murders of Tina Johnson and Basil Williams, but could not reach a unanimous

verdict for the murder of James Reid (P.5753-54). Per the court's charge (P.5570

at A.317), Aquart was sentenced to life in prison for the Reid murder counts (see

52

12/17/12 Tr.22-23).

The jury unanimously found all of the aggravating factors established, as to each victim (see completed verdict sheet, DE 936:3-5 at A.485-87).

The jurors also unanimously found that 25 of Aquart's 28 mitigating factors were proven, and nine found an additional two proven (see DE 936:6-10 at A.488-92).[20]  Many related to the crime and violence he had been exposed to growing up and the negative lessons learned from his father; the isolation he faced as a result of constant moving around and the distrust of others who were not part of the Twelve Tribes culture; and the lack of support and guidance he received after his mother's untimely death.

Others concerned the severity of the alternate punishment option to death, life in prison without possibility of release, and the lack of risk that Aquart would hurt others if he received that sentence: the jury unanimously found that Aquart could be safely and securely managed.

The jury also unanimously found that Aquart's life had value.  And they

---

[20] The remaining mitigator – that Azibo received no meaningful adult supervision after his mother's death – was found proved by two jurors.  This was perhaps in response to the government's argument that Azizi did his best to parent Azibo in the period when the two brothers lived together.

wrote in an additional mitigating factor: that he has a child.[21]

# SUMMARY OF ARGUMENT

Azibo Aquart was hardly the most likely candidate to become the only federal defendant, across the entire country, to be condemned to execution in 2011, one of the only six federal defendants nationwide to receive a death sentence in the four years since, and one of only two on federal death row from this Circuit though the federal death penalty has existed for almost three decades. The outcome in this case is aberrational, rendering the death sentences unconstitutionally disproportionate and arbitrary. Moreover, declining acceptance and use across the country have left capital punishment out of step with the contemporary values embodied in the 8th Amendment.

Point VII: Since Congress re-enacted capital punishment, the federal death penalty has been, in practice, almost entirely reserved for defendants deemed by the sentencing jury to pose a danger of future violence in prison. To a striking, constitutionally significant degree, federal capital juries almost uniformly refuse to impose sentences of death on defendants they find can be adequately and safely

---

[21] Shante Pettway, Azibo's former girlfriend, testified that at the time of trial, Azibo's daughter, Angel, was five years old (T.2100, 2182-83). Shante said that Azibo had encouraged her get back to school and helped her, and that he had been a caring partner to her (T.2178-80).

maintained in prison. Aquart's jury, by contrast, unanimously found that he could be safely and securely controlled in federal prison and yet still sentenced him to death. His case is more than a rare exception; it is an aberration. Indeed, in the last 8 years, since 2007, in more than 60 cases, only one other defendant was found to not to pose a risk of future danger, but still sentenced to die. Given the nearly universal practice of federal capital juries, Aquart's sentence is unconstitutionally disproportionate. Absent a finding that he would pose a risk of future violence in prison, indeed in the face of a unanimous finding to the contrary, Aquart's death sentence violates the 8th Amendment.

Point VIII: If the presence or absence of future dangerousness does not explain federal capital sentencing determinations, then it is apparent, from the history of the federal death penalty, that no constitutionally legitimate explanation exists. The federal death penalty operates in an arbitrary and capricious manner, moreso even than the statutes struck down in Furman v. Georgia, 408 U.S. 238 (1972). A tiny fraction — 1.6 to 2 percent — of offenders eligible for capital punishment receive it, and no rhyme or reason can be discerned for distinguishing between those defendants sentenced to death and those who are spared. A review of federal capital trials resulting in life sentences shows that many included jury findings of aggravating factors, similar to, or more serious than, the findings in

55

this case: multiple victims, substantial planning, heinousness — and terrorism, a

prior homicide, or committing the capital murder in a federal prison.  And the

different results cannot be explained away by the case for life presented by the

defense: Aquart presented significant mitigating evidence that the jurors found

proved, mostly unanimously, such as that he was exposed to violence, drug

dealing, and abuse from his parents as a young child.  Absent any rational

underlying organizing principle, being sentenced to death in a federal case remains

comparable to being "struck by lightning," a rare and freakish event, id. at 309-10

(Stewart, J., concurring), and, thus, the system violates the 8th Amendment and

due process.

Point IX:  Finally, capital punishment is withering across the country:

Thirty-six states have either abolished the death penalty, have executions on hold,

or have not carried out an execution in at least 5 years.  The number of death

sentences returned by juries has dropped dramatically in recent years.  And the

overwhelming majority of death sentences and executions come from the states in

the so-called "death belt" of the Old South.  Even in those states with active

capital punishment schemes, a tiny fraction of communities are responsible for

disproportionate numbers of sentences and executions.  In light of the modern

trend disfavoring the death penalty, its use would be contrary to the "'evolving

56

standards of decency that mark the progress of a maturing society'" embodied by

the Eighth Amendment. Thompson v. Oklahoma, 487 U.S. 815, 821 (1988)

(quoting Trop v. Dulles, 356 U.S. 86, 101 (1958)).

How then is the aberration of the outcome in this case explained?  In part,

the explanation lies in a series of prosecutorial improprieties that prejudiced the

jury's ability to consider gaps, contradictions, and credibility problems with the

government's evidence.

Point I:  Cooperating witness John Taylor was the foundation of the

government's case, at both the guilt and sentencing phases.  He was the only

witness it presented to events inside the apartment, and he painted a chilling

portrait of Azibo Aquart's role in the break-in, and the taping and beating deaths

of the victims.  Indeed, Taylor absolved himself and Efrain Johnson from any

violent conduct: they essentially just stood around, he said, as Azibo and his

brother bound and killed two victims as the third lay helpless on the floor.

As the government knew, this portrait was considerably muddied by Efrain

Johnson, who had provided a much different account in proffer interviews.  He

said that it was he and Taylor who duct-taped Tina, and that he saw Taylor hit her

with a pipe and his fists before Efrain fled.  The court permitted the defense to

introduce these statements at the sentencing hearing, over the government's

57

strenuous objections, finding them sufficiently reliable as both self-inculpatory
(moreso than Taylor's testimony) and consistent with other evidence, including
some DNA material found in the tape around Tina's hands.

Having lost the battle to exclude Efrain's statements, the prosecution used
several improper tactics to denigrate them: The government engaged in blatant
vouching, eliciting from an FBI agent that, unlike Taylor, Efrain had not been
offered a cooperation agreement, because it had been determined that he was
lying. The government misled the jurors, suggesting, falsely, that Efrain had
previously made statements, under oath, that materially contradicted the
statements relied upon by the defense. And, in closing statements to the
sentencing jury, the government urged that Efrain's statements contradicted the
defense theory during the guilt/innocence proceedings, penalizing Aquart for
exercising his Sixth and Eighth Amendment rights to mount a defense, and
suggesting, unfairly and erroneously, that the defense itself did not believe
Efrain's account. This misconduct, separately and together, conveyed to jurors
that Efrain's account should be dismissed because the government, Efrain himself,
and even Azibo's trial lawyers knew it was a lie.

Point II: This was not the only example of government overreaching raised
on this appeal. The prosecutor deliberately elicited that Taylor did not think his

58

cooperation would benefit him; he explained that he was testifying only because it was the right thing to so, to bring Aquart to justice. Driving the point home, when asked by the prosecutor (who posed this question to no other cooperating witness), "When do you think you are going to go home?," Taylor replied that he did not think he would ever get out of prison. This testimony was almost certainly false and, in fact, Taylor ultimately received a sentence of nine years instead of the statutory minimum he faced of life without release. The government let this testimony stand, uncorrected, violating Aquart's rights to due process and a reliable sentencing determination.

Point V: Of a piece, the prosecutors also let stand perjured testimony from another government witness, Lashika Johnson, Efrain's sister. Lashika denied, at Aquart's trial, that she had been threatened at a proffer session. The three government lawyers prosecuting Aquart had been present at the proffer session and let her testimony stand. At her brother's subsequent trial, however, she admitted that one of these very attorneys had, in fact, threatened her, with immediate incarceration and loss of her children. She took from the threat that she needed to "start saying different things" — after which she did make additional incriminating allegations about Azibo's conduct immediately after the murders. Again, permitting perjured testimony to stand uncorrected violated Aquart's rights

59

to due process and a reliable sentencing determination.

Point VI:  And the prosecutor also improperly, and falsely, assured jurors during guilt-phase summation that another suspect in the murders, Rodney Womble, had been cleared by DNA analysis.  Womble, a lieutenant in the drug operation, had had a history of run-ins with Tina Johnson.  But law enforcement never obtained a reference sample from him, and so his profile was never compared to the evidence in this case, a point raised by the defense in summation. The government responded that because Womble's profile, as a convicted felon, was in the FBI's CODIS database and because the lab had submitted evidence samples to CODIS for comparison, he had, in effect, been ruled out as a possible source of the evidence samples.  But the evidence did not support the government's argument. Well settled law, governing closing arguments, makes it misconduct for a prosecutor to argue facts not in evidence or to urge the jurors to draw inferences that cannot be supported.

Government overreach in selection and presentation of aggravating factors to the sentencing jury further explains the outcome in this case.  The jurors' deliberations at sentencing were skewed by the submission of a number of aggravating factors unsupported by legally sufficient evidence.  Indeed, of the five statutory aggravators considered and found proved by the jury, four were

60

deficient.

Point III:  The government urged, and the jury found, that Aquart already

intended to kill all three victims – and anyone else who happened to be present –

when he entered the apartment, such that the murders were the result of substantial

planning and premeditation.  This plan was formulated, according to the

government, because Tina Johnson had begun selling small quantities of crack

from her apartment a few weeks earlier, cutting into his profits.  But the evidence

introduced was insufficient to support the government's theory.

To the contrary, the evidence was more consistent with a plan to rob or

assault that turned deadly only after some triggering event inside of the apartment.

For example, a robbery/assault is what Taylor thought was intended, and the

break-in began with Azibo searching for property to steal.  Indeed, there was no

proof that any of Azibo's accomplices was aware that murder was the plan.  Since

two of them, Taylor and Efrain Johnson, barely knew Aquart, it would have been

extremely risky to count on them to help him kill the victims and to remain quiet

about it afterwards if they were caught.  Moreover, a triple homicide would

obviously result in intense law enforcement scrutiny of Aquart's drug operation in

the building, and shut it down (as it did).  It makes no sense that Aquart would put

himself out of business in order to retaliate for Tina's short-term, negligible sales.

61

Indeed, the men all wore ski masks inside the apartment, which would be unnecessary if they were to be killed. And there was evidence that, despite their efforts to disguise themselves, one or more of the victims recognized them. This suggested a very different, and nearly contemporaneous, motive for the murders.

Because there was, at the least, "equal or nearly equal circumstantial support" for a pre-existing intent to kill and an intent to kill formed close in time to the murders, a reasonable doubt as to the substantial planning and premeditation aggravating factor necessarily existed. See United States v. Glenn, 312 F.3d 58, 70 (2d Cir. 2002). For the same reason – lack of evidence of an advance plan to kill – there was insufficient evidence of two other statutory aggravating factors: that the murders were committed for pecuniary gain and that Aquart procured Taylor's aid for the purpose of advancing his homicidal plan.

Point IV: The government also urged, and the jury found, that Aquart personally killed more than one victim. The jury sentenced Azibo to death for the killing of Tina Johnson and Basil Williams, but not James Reid, suggesting that the jurors credited Taylor's account of seeing Azibo striking Tina and Azikiwe striking Reid. But Taylor never said that he saw anyone tape or strike, let alone kill, Williams. And no forensic or other evidence pointed to Azibo as Williams' killer. Notably, Taylor did not purport to provide a complete narrative of events

62

prior to his leaving the apartment with Azikiwe, and there was no proof that Williams was killed last, as the government asserted. The contention that he died at Azibo's hands was also just an assertion: the prosecutor did not even attempt to support this claim during closing argument. The multiple killings aggravating factor was unproved and should never have been submitted to the jury.

In sum, this case was far less aggravated than the government portrayed it to be, but a series of prosecutorial errors prejudiced the jury's ability to fairly consider the evidentiary gaps and substantial credibility issues. The errors unquestionably mattered, for even with their commission, the jurors deliberated extensively, and voted for a death sentence for only two of the three murders.

# I.

## Through Repeated and Purposeful Misconduct, the Prosecutors Prevented the Jury from Fairly Considering an Eyewitness Account of the Killings, Introduced by Aquart at the Sentencing Hearing, That Would Have Contradicted the Testimony of the Government's Lead Cooperator and the Government's Arguments on Key Sentencing Factors.

At the guilt-phase of the proceeding, John Taylor, the government's lead cooperator, had been the only witness who was in the victims' apartment and saw and heard the murders. At the sentencing hearing, his trial testimony — and his testimony alone, to a large extent — supported the government's arguments about the participants' respective conduct in the apartment, and about the aggravators and mitigators that turned on that conduct.

To challenge those arguments, the defense offered the only other eyewitness account the jury heard about who did what during the crime — statements from proffer interviews given to the FBI and prosecutors by Efrain Johnson, one of the participants in the crime.[22] Efrain's account directly contradicted Taylor's in

---

[22] At trial, the government had introduced testimony from cooperator Lashika Johnson, Efrain's sister. She claimed that after the crime, Efrain told her that he had "helped tie the people up and rough them up a little bit, but he said when he left those people were still alive." She also said Efrain "said something like he left" Aquart "by hisself . . . in the apartment" and that the participants had "bats and gloves and maybe masks" (T.2908-09). But Lashika's credibility was

important ways, and also cast doubt on Taylor's overall credibility.  Though hearsay is admissible at a capital sentencing hearing, see 18 U.S.C. § 3593(c), the government claimed that Efrain's statements were unreliable, and it fought tooth and nail to keep them away from the sentencing jury (DE 915, P.5202-15, 5448-53, 5459-62 at A.216-29, 260-65, 271-74).

But the district court admitted them, through the FBI case agent, Christopher Munger.  In so ruling, the court recognized that Efrain's account bore certain hallmarks of reliability, including being self-inculpatory ("more so than Mr. Taylor's" testimony) and corroborated by certain physical evidence.  The court also acknowledged that Efrain's account was highly relevant to rebut the government's arguments on crime-related sentencing factors that were "central" to the government's case for death (P.5456-58, 5462 at A.268-270, 274).

Once Munger took the stand, however, the government employed a series of improper tactics that, individually and collectively, prevented the jury from fairly considering this critical evidence.

First, the prosecutor engaged in blatant vouching by eliciting from the FBI agent that, unlike Taylor, Efrain "never got a cooperation agreement" because "it

_____

questionable.  See Point V.  And, even if believed, none of the statements she attributed to Efrain said who he "helped tie" and "rough up," or where Taylor or Aquart were at the time or what either of them did.

65

was determined" that Efrain "was lying."

Second, during that same cross-examination, the prosecutor misled jurors into falsely thinking that Efrain himself had, in another court proceeding and under oath, unequivocally renounced a key element of his account of the killings.

And finally, in summation, the prosecutor urged jurors to reject Efrain's statements, and what they showed about Aquart's and Taylor's relative roles, because they clashed with defense counsel's earlier trial strategy of disputing the proof that Aquart or Taylor were even in the apartment. This effectively penalized Aquart for the bifurcated defense to which he was entitled under the Sixth and Eighth Amendments. It also improperly suggested that even defense counsel did not credit the statements, but rather had introduced them only as a belated ploy to hoodwink the jury.

In short, the prosecutor conveyed to jurors that Efrain's account of the killings should be dismissed because the government, Efrain himself, and even defense counsel had declared or considered it a lie.

Defense counsel objected to most, though not all, of this misconduct. And as a whole, these improper tactics were sustained, repeated, and almost certainly knowing, particularly since their illegality was clear under binding precedent and, in two instances, they were discussed beforehand at bench conferences. Although

66

the court gave curative instructions in response to two defense objections, those instructions were inadequate, both because they were vague and incomplete and because the harm was so severe and the bell could not be unrung. Although defense counsel did not push further and seek a mistrial, the prosecutorial misconduct, as a whole, requires reversal of Aquart's death sentences, even if assessed under the plain-error standard.

**A.    Taylor testified that, while he did nothing, Aquart or his brother (or both) duct-taped Tina, and Aquart beat Tina to death. But, in contradiction, Efrain maintained in his proffer statements that he and Taylor were the ones who duct-taped Tina and that Taylor began to beat her, all while Aquart was in a different room.**

According to Taylor's trial testimony, after the participants forced their way into the victims' apartment, he saw and heard Aquart and his brother duct-tape Tina and Reid; then Aquart began beating Tina to death, while his brother Azikwe did likewise to Reid. Taylor testified that he saw Aquart standing over Tina, raising a baseball bat over his head and swinging it down, "bashing her like he was at a . . . meat market," while she yelled. Meanwhile, according to Taylor, the fourth participant, Efrain, stood waiting near or just inside another bedroom into which the remaining victim, Williams, had retreated. Taylor never heard or saw Efrain do anything, to Williams or the other victims. Taylor also claimed that he himself did nothing, but just stood by. When he asked what was going on, Aquart

67

invited him to join in the attack ("Yo, come and get you some").  At that point,

according to Taylor, he fled the apartment, immediately followed by Azikwe.  <u>See</u>

Statement of Facts, Section I.E.

Efrain's proffer statements, which Agent Munger relayed, contradicted

Taylor's version of events.  Those statements were made over the course of seven

different interviews, stretching over almost three years, from right after Efrain's

arrest to a little over a year before Aquart's trial.[23]  All but the first interview

occurred in the presence of Efrain's attorneys, in the hope of a possible

cooperation agreement.[24]  (P.5497-5509, 5511-12  at A.275-287, 289-90; DE

906:2, n.1).

Efrain told the FBI and prosecutors that, when the four participants entered

the victims' apartment, Taylor handed him gloves and told him to start taping

---

[23] Agent Munger testified about the proffer interviews, and reviewed and read aloud from his FBI "302" reports on them while on the stand.  The reports were also reviewed by the court as part of the litigation over the admissibility of this testimony, and were discussed by the court and the parties in the pleadings and colloquies on that issue.  The interviews occurred on March 6, 2007; March 7, 2007; August 11, 2008; October 2, 2008; November 20, 2008; May 4, 2009; and February 8, 2010 (DE 906:2-4; P.5206-07, 5216-23, 5497-5535 at A.220-21, 230-37, 275-313).

[24] Munger made a slight mistake in testifying that all the interviews were proffer sessions.  <u>Compare</u> P.5511-12 at A.289-90 <u>with</u> DE 906:2, n.1.

1415772, Page90 of 257

Tina's hands and legs.[25]  He did, but Taylor became impatient and took over the

taping himself.  Then, Taylor punched Tina and hit her on the head with a long,

two-inch thick metal pipe.  Meanwhile, the Aquart brothers prodded Williams into

the back bedroom.  Efrain heard sounds of  what sounded like "punching and

moaning" or "thumping and "moaning" or "tussling" coming from that direction,

but did not see anything.  He left the apartment before any of the other three

participants, after Taylor started hitting Tina with the pipe (P.5497-5509 at A.275-

87).  See Statement of Facts, Section I.E.

**B.      On its face, and in light of the physical evidence, Efrain's version of the participants' conduct  inside the apartment was as plausible as Taylor's, if not more so.**

As the district court indicated in admitting Efrain's statements at the

sentencing hearing, there were reasons to consider them reliable and, in some

important ways, even more reliable than Taylor's account of the killings.

For one thing, Efrain's claim that he started taping Tina and that Taylor

finished the job comported with some of the physical evidence: Efrain's DNA was

found on pieces of latex in the duct tape binding Tina's wrists (T.3164, 3169,

3171-72).  Furthermore, as the district court noted (P.5458 at A.270), although no

---

[25] In one statement, Efrain said he touched Tina first and tripped over her or
knocked her down (P.5516-17 at A.289-90).

conclusive match could be made, testing indicated that other DNA found in

mixtures on this latex, and on a glove far inside Tina's bedroom, may well have

come from Taylor.[26]  This evidence seems difficult to reconcile with Taylor's

testimony that Aquart was the one who taped and then started beating Tina, while

Taylor and Efrain were in other rooms, and that Taylor never entered the

bedrooms.

As the court also observed (P.5208-09 at A.222-23; see also DE 906:8),

Efrain's statement that Taylor hit Tina with a two-inch wide pipe comported with

the expert testimony that her injuries could have been inflicted by something other

than a baseball bat if of sufficient diameter.[27]  See Statement of Facts, Section I.F.

In addition, as the court further noted (P.5211, 5457 at A.225, 269), Efrain's

statements were significantly more inculpatory of himself than Taylor's were of

_____

[26] The government's DNA expert testified that only 1 in 30 African-
Americans carries the set of markers identified in the mixture found on the glove,
as Taylor did.  It was 1 in 110 for the set of markers found in the mixture on the
latex, which also corresponded to Taylor (T.3163, 3190-91 at A.170, 178-79).
Since the number of people with access to a glove stuck inside tape binding a
murder victim was vanishingly small, the fact that Taylor could not be eliminated
from this mixture is particularly significant.

[27] It also makes no sense that Taylor would have entered the apartment
unarmed, especially since he had been told in advance that he was responsible for
neutralizing Tina's adult son, a sizable man whom Aquart thought would be there;
more plausible is that Taylor had his own weapon, the pipe that Efrain saw him
pull out and use on Tina.

Taylor (or, indeed, of Efrain). Efrain acknowledged forcibly entering Tina's

apartment "knowing that criminal violence was going to go on," as the court

phrased it. More important, he implicated himself in the ensuing assault on Tina,

including helping duct-tape her and being right next to her as she started to be

beaten, without intervening. Taylor, by contrast, claimed to have never even been

in the same room as any of the victims when they were being bound or attacked,

let alone to have touched any of them himself. And he said he heard and saw what

was going on, but never witnessed Efrain do anything to any victim (P.5456-58 at

A.268-70).

       To be sure, the government called the court's and (in cross-examining

Munger) the jury's attention to other things Efrain told the authorities that

conflicted with certain physical evidence, other witness's testimony, or Efrain's

own statements (DE 915; P.5205-15, 5449-62, 5511-35 at A.219-29, 261-74, 289-

313). The government harped most on Efrain's recollection that the assault on

Tina occurred in the living room, not the bedroom where she was found (along

with bloodstains from her injuries and the DNA from Efrain) (P.5519-21 at A.297-

99). But it is plausible that Efrain forgot the precise room; it was relatively

immaterial as compared to who did what, and he was first interviewed almost two

years after the killings. Even if (as the government claimed, P.5208 at A.222) he

71

did lie about the room to distance himself from the location where (by the time of the interviews) he knew the murders had occurred, he had nothing to gain by saying Taylor had helped tape and begun beating Tina, or that Aquart was in a different room at the time, if those things were not true.

The same applies to the other contradictions the government fastened on: Like Taylor, Efrain, when first confronted by investigators, initially denied any knowledge of the incident and then backtracked slightly (saying he had gone to the door but never entered the apartment).  But he quickly acknowledged his involvement and gave his full account after being confronted with his DNA being found on latex in the tape on Tina (P.5512-14  at A.290-92).  He also told his interrogators that the participants had pushed open the door rather than breaking it down, did not report that Aquart had a gun, did not recall there being baseball bats or masks, could not remember what Taylor looked like well enough to identify him from a photo array, varied in the number of minutes he thought he was in the apartment (saying it was eight, 25, or 45 in different statements), denied participating in the earlier aborted effort to enter Tina's apartment, and gave contradictory statements about whether he had sold crack for Aquart.[28] (P.5515-18,

---

[28] Some of these statements may well have been true, since they were contradicted only by Taylor's version, were supported by the record, or both.  This includes, for example, that the intruders pushed open the apartment door rather

5522-23, 5534-35 at A.293-96, 300-01, 312-13; see also P.5205-06 at A.219-20).

Not only did more numerous and significant contradictions abound in Taylor's testimony, but he acknowledged on the stand that he had repeatedly lied to authorities. See Statement of Facts, Section I.E. See also P.5211 at A.225 (court observes that Efrain "does contradict himself in instances, but . . . he places himself at the scene of the triple murder, and . . . talked about participating"); P.5454 at A.266 (defense counsel notes that "Mr. Taylor's testimony itself is a bundle of contradictions"). It should have been left to the jury to fairly consider both Taylor's and Efrain's accounts, assess their credibility, and decide whether Efrain's description of who did what inside the apartment raised reasonable doubts about the aspects of Taylor's version that the government was relying on in urging a death sentence. (See DE 917:3 (defense "ask[s] the Court to let jurors consider" accounts of "both men" and "decide for themselves")).

---

than breaking it down. There was evidence that Tina's son, who discovered the bodies the next day, "kicked" down the front door to get inside (T.90-91, 118-122, 173-74). While the door had been screwed to the frame by one of the assailants, this could have been done not because they had knocked the door off its hinges but simply to delay discovery of the crime. Moreover, while Taylor testified on direct that the intruders broke down the door, he had previously told police that a woman opened the door after Aquart knocked on it (T.2460-61 at A.132-33).

**C.** **But the government unfairly disparaged Efrain's proffer statements through a series of improper tactics.**

    **1.** **The prosecutor engaged in blatant vouching by telling jurors that the government had formally determined Efrain was lying and therefore it had refused him a cooperation agreement.**

Once it became clear that the court intended to admit Efrain's statements, the discussion turned to what the government would be allowed to elicit on Munger's cross-examination. The previous day the prosecutor had argued that Efrain's statements were unreliable, for he "was never offered a cooperation agreement because it was never determined that he was able to tell the truth." (P.5202 at A.216; <u>see also</u> P.5210 at A.224). Now she asked to be able to bring out "the part" of one interview "where the government and the FBI agents are telling him that he's lying" (P.5451 at A.263). Defense counsel disagreed, insisting that the government should not substitute its own opinion about who was lying for that of the jury (P.5454-55 at A.266-67; <u>see also</u> DE 917:2). When the court listed what the government could bring out, it omitted the refusal to extend Efrain a cooperation agreement or the determination that he was lying (P.5458-61 at A.270-73).

Nonetheless, on cross-examination, the prosecutor seized on that point at the very start. Asked what a "proffer" was, Munger said it was a meeting where

74

the subject "sits down with the assistant U.S. attorneys" and others to "tell their side of the story. They're supposed to tell everything, . . . and tell the truth." Munger added that the statements Efrain made were during proffer sessions. The defense objected that this was "outside the scope" — apparently a reference to the ground rules for cross-examination the court had set earlier. But the court, not seeing where the questioning was heading, "overruled" the objection (P.5511-12 at A.289-90). So the prosecutor proceeded:

> Q. And proffer sessions are designed to work towards a
> cooperation agreement, correct?
>
> A. Yes.
>
> Q. And Efrain Johnson never got a cooperation
> agreement, did he?
>
> A. No.
>
> Q. And that's because it was determined he was lying.

(P.5512 at A.290). (The jury knew that Taylor *had* received a cooperation agreement.). At that point, defense counsel objected, and the court sustained (P.5512 at A.290).

Nonetheless, the prosecutor returned to this subject moments later. After asking Munger what Efrain had said in court during an aborted guilty plea, the prosecutor asked: "Now, prior to him coming in — and that was just an attempt at

75

a straight plea, correct, not a cooperation agreement?"[29]  Munger confirmed this.

The defense objected again and asked for the testimony to be stricken.  The court

responded: "I'm going to permit it."  Defense counsel asked to approach (P.5525

at A.303).

At sidebar, the prosecutor acknowledged she was trying to elicit the agent's

"impressions before of what [Efrain] was saying to them" — in other words, that

they believed he was lying.  Aquart's lawyer said that would be "vouching,"

noting that "the government doesn't get to decide" for the jury which witnesses are

telling the truth.  The court indicated it would "strike the business about the

cooperation agreement"; but when the government complained, it backtracked

saying, "you've already established he never had a cooperation agreement"

(P.5526-27 at A.304-05).

The court then told jurors that it would "strike the last question and

answer."  It added, opaquely, "you are to understand that discussion to have been

with respect to a proceeding in which Efrain Johnson attempted to enter a guilty

plea" (P.5534 at A.312).  The jury was never told to ignore Munger's testimony

that the government had refused to make Efrain a cooperator, nor was it ever

cautioned against assessing credibility based on which witnesses the government

---

[29] The aborted plea is discussed further below, in Section D.2.

or its agents believed or had given cooperation agreements.

Along with twice calling to jurors' attention that Efrain had been denied such a cooperation agreement, and that this was because it was "determined" he was "lying," the prosecutor repeatedly phrased her questions to Munger about Efrain's statements so as to make clear the government considered them incredible. Thus, when asking about certain things Efrain said had not happened (but which Taylor said had happened), she prefaced her question with "he did not admit" and similar phrasing. And when she asked about certain things Efrain said had happened (but Taylor omitted or denied), she began with words like "he claimed." (P.5513-15, 5517-19, 5522-23, 5534-35 at A.291-93, 295-97, 300-01, 312-13).

All of this, in short, amounted to blatant and impermissible vouching. The cross-examination plainly invited jurors to treat Taylor's account as truthful and Efrain's as false because the government, in the form of its prosecutors and agents, had formally deemed them so and thus rewarded Taylor with a cooperation agreement, but denied one to Efrain. There is a grave risk the jurors accepted that invitation. See United States v. Young, 470 U.S. 1, 18-19 (1985) (vouching "may induce the jury to trust the Government's judgment rather than its own view of the evidence"); United States v. Modica, 663 F.2d 1173, 1178–79 (2d Cir. 1981)

77

("when the prosecutor conveys to the jurors his personal view that a witness spoke the truth, it may be difficult for them to ignore his views, however biased and baseless they may in fact be").

Such vouching is improper whether it comes from the prosecutor, see, e.g., id. ("This Court has repeatedly warned prosecutors not to vouch for their witnesses' truthfulness," and "[t]he policies underlying this proscription go to the heart of a fair trial"), or from a law-enforcement witness, see, e.g., United States v. Scop, 846 F.2d 135, 142 (2d Cir. 1988) (holding improper a government investigator's testimony that was "based on his positive assessment of the trustworthiness and accuracy of the testimony of the government's witnesses"). See also United States v. Groysman, 766 F.3d 147, 157-58 (2d Cir. 2014).

Here, the vouching was even worse, since it conveyed not only that both the FBI agent and the AUSA's personally disbelieved Efrain, but also that such disbelief was so firm and strong that the government — presumably including additional, higher-level officials — had formalized it in denying him cooperator status. By invoking the specter of a decision made behind closed doors by unnamed officials, such vouching also implied that those decisions may have been premised on additional information not presented to the jury. See, e.g., United States v. Perez, 144 F.3d 204, 210 (2d Cir. 1998) (one of the evils of vouching is

78

that it "impl[ies] the existence of extraneous proof").

### 2. The prosecutor misled jurors to think that, in a subsequent court proceeding, Efrain had squarely renounced his statements about Taylor's participation in Tina's binding and assault.

From the first time that Efrain spoke with federal law enforcement officials about the murders shortly after his arrest, through a series of seven interviews stretching over three years, into early 2010, he never deviated from his insistence that he and Taylor were the ones who had taped Tina Johnson and that Taylor had started to assault her, while Aquart was in a different room. Most of Efrain's interviews were attended by both his counsel and prosecutors and occurred as part of a proffer process in contemplation of a possible cooperation agreement (see DE 906, 915, 917; P.5211-24, 5447-62 at A.225-38, 259-74).

But ultimately no such agreement was struck.[30]  (See P.5452 at A.264.) Thus, more than a year after his last interview memorialized in a 302 report, and on the eve of Aquart's trial, Efrain appeared in court to enter a *non-cooperation*

---

[30] Perhaps this was because Efrain insisted on keeping to an account of the attack on Tina that implicated Taylor, and thus clashed with the prosecution's theory and Taylor's version. Importantly, it was not in Efrain's interest to make up such a version or, if he had made it up, to steadfastly adhere to it. Taylor was arrested in 2009 and soon began proffering as well, and it must have been clear to Efrain and his counsel that the government was seeking to build a case against Aquart, not Taylor. Moreover, as the court noted, Efrain's account inculpated himself more than Taylor's version (in which Efrain did nothing to any victim) did. See P.5211, 5457 at A.225, 269.

79

guilty plea.  The transcript reflects that the government had agreed to let him plead

guilty to murder while engaged in drug trafficking (one count for each victim),

with a stipulation that he would receive a sentence of between 25 and 35 years

imprisonment.  (See Johnson transcript dated 3/8/11, pp.1-3, 20-22, 28 at A.459-

61, 462-64, 466.)

The prosecutors, in consultation with Efrain's counsel, had drafted a plea

agreement and filed it, contemplating that it would be signed by all counsel and

Efrain in open court.  (See id. at 25 at A.465.)  Notably, the government

completely omitted the section on "offense conduct" that it had included in

detailed form in every other plea agreement for every other cooperating witness in

Aquart's case.[31]  Thus, there was no recitation (agreed-upon, or otherwise) of facts

about what Efrain had done to advance the homicides.

In court, a prosecutor identified the elements of the charges that Efrain

would acknowledge as aiding or abetting the three murders while engaged in a

drug conspiracy with "your codefendants . . . . Azibo Aquart and Azikwe Aquart,

with whom you are charged."  (3/8/11 transcript, p.31 at A.467).  Summarizing,

the prosecutor said:  "So, basically you would have to know or be part of their

conspiracy to sell drugs, and that they committed these murders with your

---

[31] See, e.g., GX 247, p.9 (Taylor's plea agreement) at A.709.

assistance" (id. at A.467). No mention was made of Taylor.

The court then asked Efrain to "tell me what it is that you did that shows you are in fact guilty" of helping the Aquart brothers commit the murders. Efrain started to respond:

> THE DEFENDANT: I helped someone – Dreddy [Aquart's nickname] – gain access to someone's house, and I taped the person up. And that's it. . . .

> THE COURT: And you helped someone. Who is the someone?

> THE DEFENDANT: Dreddy. Azibo.

> THE COURT: And you helped him do what?

> THE DEFENDANT: Tape Tina Johnson up, and I drove him from the scene . . . . I drove Azibo to Tina Johnson's apartment. When I got there, I put on gloves and I helped him gain entry by knocking on the door, and when they went in there, I helped him tape her up, and then I drove him away from there, Azibo . . . .

> THE COURT: . . . . You've told me that you helped Azibo tape Tina Johnson up.

> THE DEFENDANT: Yes, ma'am.

Id., at 32-34 at A.468-69.

Nothing further was said by Efrain about events inside the apartment. He was not asked to and never tried to provide a full account of what took place, or what each of the participants had done. Most important, like the prosecutor, the

court never asked Efrain anything about Taylor, or even uttered his name. And Efrain never mentioned him; that is not surprising, since he had been asked to say only how he had helped Aquart and Azikwe.

Later in the colloquy, the plea was aborted because Efrain would not acknowledge that he was aware of and had participated in Aquart's cocaine conspiracy, another essential element of the offense (id., pp.34-35, 39-41 at A.470-71, 472-74).[32]

At Aquart's sentencing hearing, when the defense sought to introduce Efrain's 302 statements (see DE 906), the government responded at length with various alleged self-contradictions by Efrain and other reasons why those statements were unreliable and should not be admitted (see DE 915, P.5202-23, 5449-55 at A.216-237, 261-67). But the government never mentioned Efrain's aborted plea colloquy, let alone suggested it contradicted his earlier 302 statements. (The prosecutors had not forgotten the plea colloquy. On the contrary, they cited other portions of it to attack Efrain's credibility with the court, arguing that he had "lied [at that proceeding] about knowing that Aquart was a crack dealer and lied about his own crack dealing" (P.5451 at A.263).

---

[32] When Efrain was later tried for the murders, several months after Aquart was sentenced to die, he adhered to his account of how he and Taylor had taped Tina and Taylor had started to assault her (see DE 1168:9; DE 1176:4-5).

Just before the court ruled that Efrain's 302 statements were admissible, it said its recollection was that, during the aborted plea, Efrain had said "he helped Mr. Aquart tape up . . . Tina," and that the government could put that in (P.5456 at A.268). The prosecutor not only accepted the invitation, but pushed even further, characterizing the colloquy as one in which Efrain "said in this court that *it wasn't Taylor he was helping tape*, that it was the defendant he was helping tape." (emphasis added) (P.5459 at A.271; <u>see also</u> P.5461 at A.273: court picks up on prosecutor's characterization).

Thus, on cross-examination of Munger, the prosecutor elicited that during the aborted plea, Efrain "never said a word about Taylor having anything to do with the taping," but rather had said he helped Aquart tape Tina:

> Q:     And during that plea, he had to tell the court under oath what he did wrong, correct?
>
> A:     Yes.
>
> Q:     And isn't it true that during that statement – excuse me, during that sworn statement, that Johnson said "I helped Dreddy gain access to someone's house and that's it"? Did you hear him say that?
>
> A:     I heard him say that.
>
> Q:     And then he – and then the Court asked, "And you helped someone. Who is the someone?" And Johnson replied "Azibo." Did you hear that?

83

A:     Yes.

Q:     And then the Court asked, "And you helped him do what?"  And Johnson responded, "Tape Tina Johnson up and I drove him from the scene."  Did you hear that?

A:     Yes.

Q:     *So he never said a word about Taylor having anything to do with the taping, did he?*

A:     *That is correct.*

(P. 5524-25 at A.302-03) (emphasis added).  (Trial counsel's redirect examination of Munger did not address the aborted plea colloquy.)

Thus, the jury was given impression that Efrain was asked about his, Aquart's, and Taylor's conduct in the apartment, and that he repudiated his earlier account that Taylor had helped tape Tina, instead saying that Aquart had done so, as Taylor testified.  Moreover, jurors were told that he did this formally ("under oath" and to "the court").

This was highly misleading.  The plausible reading of the colloquy — in light of the actual transcript, the surrounding circumstances, and Efrain's 302 statements — is that when he said "I helped him [Aquart] tape her up," he meant this was one of the ways he helped Aquart in the overall venture — *not* that Aquart too had actually taped Tina alongside him.  The court had launched its

84

inquiry by asking him how he had helped "Azibo" and "Azikwe" commit the murders. Efrain said "I taped the person up." It was the court that then introduced the "helping Azibo" construction, interjecting: "And you helped someone. Who is the someone?" to which Efrain replied, "Azibo." When the court then asked: "And you helped him do what," Efrain identified several things he did to "help" Aquart, including knocking on the door, driving him away from the scene, and taping Tina. No doubt the prosecutors understood the colloquy the same way, and that is why they did not include it among the litany of supposed contradictions they cited to try to keep Efrain's statements from Aquart's jury — until the court gave them the idea.

Even if Efrain's colloquy is considered ambiguous, with it being unclear whether he meant to say that his taping helped Aquart or instead that Aquart had personally taped too, the prosecutor's cross-examination of Munger would still have been misleading. For it suggested there was no uncertainty, but rather that Efrain had been asked pointed questions and had clearly and unequivocally renounced any claim that Taylor had taped, saying, instead, that it was Aquart.[33]

---

[33] It does not matter that records outside the jury's knowledge are what establishes the falsity of the information presented by the government. See United States v. Valentine, 820 F.2d 565, 569-71 (2d Cir. 1987). Nor does it matter that Munger's cross-examination testimony can be parsed to make it appear technically or literally true, *e.g.*, Efrain did not, in fact, "say a word" in the plea colloquy

By giving the jury a false impression on such a significant issue, the government violated Aquart's Eighth Amendment and due process rights.  See Johnson v. Mississippi, 486 U.S. 578, 590 (1988) (reversing death sentence where "the jury was allowed to consider evidence that has been revealed to be materially inaccurate"); United States v. Fields, 483 F.3d 313, 337 (5th Cir. 2007) ("A defendant may not be sentenced on the basis of misinformation of constitutional magnitude") (citation omitted).

> **3.**    **The prosecutor urged jurors at sentencing to reject Efrain's account because it conflicted with counsel's complete defense against all the charges at the trial.  Improperly, this penalized Aquart's exercise of his constitutional rights to a bifurcated defense and implied that even his own lawyer did not believe Efrain's version.**

At the guilt-innocence trial, the jurors were instructed on accomplice liability (T.4170-72), and told by the prosecutor in summation that "even if [Aquart] did not strike fatal blows, as the Judge instructed you, he is guilty as an aider and abettor" (T.4243).  They did not need to determine who did what inside the apartment, which participant killed which victim, or even whether Aquart

─────────────────

about Taylor participating in the taping.  See id. at 570-71 (finding prosecutor's false "implications" constituted misconduct because they "gave the trial jury an unfair and inaccurate impression"); United States v. Ferguson, 676 F.3d 260, 288 (2d Cir. 2011) (even where "substance" is not technically false, "misleading structure" of a prosecutor's presentation "could amount to misconduct").

personally did anything to any of the victims, in order to convict him on the capital counts. Instead, his guilt essentially turned on whether he participated at all. Therefore, his trial counsel, in order to contest the case against him, disputed whether the evidence established that Aquart was present during the incident. <u>See</u> Statement of Facts, Section I.E.

But at the sentencing hearing, having found Aquart guilty of the three victims' murders, the jury necessarily would confront a different set of issues and thus a different inquiry into the incident. While much of the hearing would focus on Aquart's prior background, a number of the aggravating factors and one mitigating factor would revolve around his and the other participants' precise conduct in connection with the killings.

Yet the prosecutor complained that any sentencing claim about Taylor's and Aquart's relative roles in the killings would clash with counsel's trial defense that Aquart was not guilty of any crime, because neither he nor Taylor were "there at all" or "involved in the murders." For that reason, the prosecutor insisted, the court should keep out Efrain's statements, for such switching of "tactics" would amount to "gamesmanship" and further showed the statements were "unreliable" (P.5213 at A.227, DE 915; <u>see also</u> P.5449-50 at A.261-62).

At the sentencing hearing, after hearing all the arguments about Efrain's

87

statements, the court listed the ways in which the government would be permitted to try to attack their credibility.  It did not include invoking defense counsel's trial strategy.[34]  (P.5456-62 at A.268-74).

Nonetheless, the government mounted that very, improper attack in summation.  The prosecutor observed that the defense's effort to use Efrain's statements as evidence of the defendants' respective "roles" in the killings was "inconsistent with the defendant's theory of the case during the guilt phase" (P. 5632 at A.376).  She elaborated: When defense counsel had cross-examined Taylor at trial, "he wasn't asked one question about what role he actually played in the offense.  Why?  Because then the defense theory was that Taylor wasn't even there for the murders" (P. 5633 at A.377).

Defense counsel objected and, at sidebar, said the argument was "denigrating the defense" for "challenging . . . whether or not the government had proven its case beyond a reasonable doubt" (P.5633-34 at A.377-78; see also DE 827:72-76).  The court agreed that "decisions by defense counsel . . . on how to litigate the case are not relevant at the penalty phase" (P.5634 at A.378).  When

---

[34] Just before the sentencing hearing began, the defense had filed an *in limine* motion arguing the government should not be permitted to support a death sentence by invoking Aquart's exercise of his constitutional rights to plead not guilty and require the government to prove its case at trial (DE 827:68-71).

88

the sidebar concluded, the court told the jurors it was "sustaining the defense's objection," and that they should "not take into account in your deliberations at the penalty phase the strategic conduct of counsel" (P.5635 at A.379). That vague warning, however, did nothing to dispel the prosecutor's suggestion that counsel knew how valueless Efrain's statements were, and had presented them belatedly to hoodwink jurors.

The prosecutor's comments violated Aquart's Sixth Amendment right to plead not guilty and insist that the government prove all the charges to a jury at trial, and his Eighth Amendment right to bifurcated proceedings on guilt and punishment.

In Gregg v. Georgia, 428 U.S. 153 (1976), the Supreme Court found that such a "bifurcated" procedure remedied the defects that had led it to strike down Georgia's previous unitary capital-punishment scheme. It enabled a defendant to contest guilt and yet, if convicted, then present information and argument about why his life should be spared — including matters that would have been "prejudicial with respect to guilt or innocence alone." Id. at 190-92. This would prevent a defendant who pled not guilty and went to trial from being penalized in the capital-sentencing process. Id. at 192 & n.41, discussing United States v. Jackson, 390 U.S. 570, 581 (1968) (invalidating statute that allowed death

89

sentence only for those defendants who went to trial but spared those who pled

guilty, as violating Sixth Amendment).  See also Zant v. Stephens, 462 U.S. 862,

885 (1983) (government may not use "inferences from conduct that is

constitutionally protected . . . for example . . . the request for trial by jury" in

support of death sentence).

In United States v. Whitten, 610 F.3d 168 (2d Cir. 2010), this Court relied

on Jackson and Zant in condemning a prosecutor's appeal to jurors to discount

evidence of a capital defendant's remorse because it was inconsistent with his

choice to plead not guilty and go to trial.  By citing the defendant's

"constitutionally protected decision to go to trial," the prosecutor had

"unconstitutionally burdened" his Sixth Amendment rights.  Id. at 194-96.  See

also Cunningham v. Zant, 928 F.2d 1006, 1019 & nn.21-22 (11th Cir. 1991)

("outrageous" misconduct for prosecutor to argue that defense effort at trial to

persuade jury into believing defendant was not guilty conflicted with effort to

mitigate his culpability for murder at capital sentencing hearing).

Similarly, here, the prosecutor urged jurors to discount Aquart's sentencing

evidence about his and Taylor's relative roles in the killings, which *assumed* guilt

as counsel had to at that stage, because it clashed with counsel's earlier defense at

the trial, which had *denied* guilt.  This effectively penalized Aquart for exercising

90

his Sixth Amendment right to trial — and thereby also undermined his Eighth

Amendment right to a bifurcated defense.

The prosecutor's comments also implied that even Aquart's trial counsel did

not believe Efrain's account. The jury was left to think that the belated

presentation of his statements at sentencing was a cynical ploy because, at trial,

counsel had not bothered to use them or to challenge Taylor's version of what

occurred in the apartment. See, e.g., United States v. Friedman, 909 F.2d 705, 709

(2d Cir. 1990) (improper for prosecutor to accuse defense of willingness to "make

unfounded arguments" and to denigrate "defense counsel's entirely legitimate role

as an advocate"); United States v. Sanchez, 176 F.3d 1214, 1224-25 (9th Cir.

1999) (prosecutor committed misconduct by "denigrating the defense as a sham");

Bedford v. Collins, 567 F.3d 225, 233 (6th Cir. 2009) ("prosecutor may not . . .

deride legitimate defenses").

**D.    These errors require reversal of Aquart's death sentences.**

Questions about the conduct of each of the participants were critical to

several key factors at the sentencing hearing. The instructions directed jurors to

consider Aquart's "actions" alone, not those of others, when considering

91

aggravating factors involving conduct inside the apartment.[35]  The jury had to

assess each aggravator separately for each of the three murders (P.5582, 5586,

5590 at A.329, 333, 337).  And the completed verdict form shows the jurors

considered it important who did what to which victim.[36]

Taylor's testimony proved central to the government's argument that

Aquart's conduct was especially cruel and depraved, a statutory aggravating factor

(see P.5626-29, 5697-5700 at A.370-73, 440-43).  Taylor was the only one who

claimed Aquart had said "come get you some" while beating Tina, offering Taylor

a chance to participate in her murder.  This, the government contended, showed

that Aquart took "pleasure" in the pain and suffering he was inflicting (P.5626 at

A.370).  "What sets this case apart . . . is that after the defendant beat Tina's head

with a baseball bat, he turned to John Taylor and he asked, 'do you want to get

some too?'" (P.5699 at A.442).  The government also used Taylor's testimony to

argue that Aquart had personally duct-taped and beaten to death Tina and

---

[35] If even one juror failed to find an aggravator proved beyond a reasonable doubt, it could not be weighed in the jury's sentencing determination (P. 5582 at A.329).

[36] They sentenced Aquart to die on the counts involving the victims whom the government claimed he personally killed, Tina and Williams, but returned a non-unanimous life verdict for the counts involving the remaining victim, Reid (DE 936: 12-13 at A.494-95).

92

Williams, two of the three victims.[37] (*E.g.*, P.4485 at A.209). That argument

enabled the government to blame Aquart for the cruel manner of their binding and

assaults (including leaving "Tina's eyes . . . uncovered" to cause her "mental

torture"), which, it told jurors, also magnified the cruelness aggravator (P.5626-29,

5697, 5699-5700 at A.370-73, 440, 442-43).

Persuading the jury that Aquart beat Tina and Williams also let the

government tally another, independent aggravating factor, that he had personally

killed more than one victim (DE 936:4 at A.486; see P.5625-26 at A.369-70; but

see Point IV). Likewise, the prosecutors invoked Taylor's version of events to

argue that Aquart had premeditated and planned the killings before he entered the

apartment.[38] (*E.g.*, P.5622-25 at A.366-69). This constituted yet another

aggravating factor the jury weighed.

Taylor's account of his and Aquart's relative conduct also must have

influenced how jurors weighed the mitigating factor that Taylor would not be

_____

[37] This, however, could not logically be inferred from Taylor's account,
even accepting his testimony. See Point IV (challenging sufficiency of the
evidence to support the aggravating factor that Aquart personally killed more than
one victim).

[38] But, as with the multiple-killings aggravator, this too could not be
logically inferred from Taylor's account, even accepting his testimony. See Point
III (challenging sufficiency of the evidence to support aggravating factor of
substantial planning and premeditation).

93

sentenced to death for his role in the killings (see DE 936:6 at A.488; P.5658-60 at A.401-03). As the prosecutor argued in summation, if Taylor's version of who did what was accepted, the mitigator lacked significance, since Aquart was the one who "personally killed Tina and Basil," and thus bore the lion's share of "responsibility" for the murders (P.5635 at A.379). And, of course, Taylor, according to his self-serving testimony, had done nothing; he just stood by horrified and then fled.

But Efrain's account diverged from Taylor's testimony on all these elements on which the government relied. Rather than Aquart going straight to the bedroom, duct-taping Tina and Reid with his brother and brutally beating Tina to death, and inviting Taylor to take part, Efrain said that he and Taylor were the ones who duct-taped Tina and that it was Taylor who began to beat her on the head, with a two-inch thick metal pipe — all while Aquart was not even in the room. And rather than Taylor and Azikwe departing first, Efrain told the authorities that he was the first to flee, leaving Taylor, Aquart and Azikwe in the apartment. Efrain's account not only contradicted Taylor's testimony on these key points, but it also cast grave doubt on Taylor's credibility generally, and thus

undermined all the events he reported inside the apartment.[39]

The prosecutor's improper cross-examination of Munger and summation comments were extensive, repeated, and almost certainly intentional. These tactics were clearly forbidden under well-established law, and were not among the impeachment avenues the court had licensed after a lengthy colloquy.

The lengths the government went to keep this evidence from the jury, and then to discredit it, demonstrates just how damaging it was to the argument for a death sentence. The government needed an undisturbed story line about what occurred inside the apartment. It got that from Taylor. Efrain challenged that story line, and the government was clearly very concerned that its case for executing Aquart could not withstand the doubts that Efrain's statements might sow in jurors' minds.

In the end, the prosecutor conveyed to jurors that Efrain's account of the killings should be dismissed out of hand because the government, Efrain himself,

---

[39] In urging the court to admit Efrain's statements, trial counsel identified some, but not all, of these sentencing issues as ones on which the statements were being introduced. But in his motion to admit this evidence, counsel noted broadly that they weakened the government's case "on any other aggravating factors for which Taylor's testimony plays any part" (DE 906:5-6 at A.481-82). And the jury would have been licensed to use them this broadly, since the government never requested and the court never gave any instruction limiting how or for what purposes Efrain's statements could be considered.

and even defense counsel had declared or considered it a lie.  It is hard to imagine that any juror could have ignored such a compelling, one-two-three punch to Efrain's credibility, even if given the strongest, most unequivocal of curative instructions.  "[I]t would be quixotic to expect the jurors to perform such mental acrobatics . . . . To tell a jury to ignore" such testimony and comments "is to ask human beings to act with a measure of dispassion and exactitude well beyond mortal capacities.  The presumption that a jury will adhere to a limiting instruction evaporates where there is an overwhelming probability that the jury will be unable to follow the court's instructions and the evidence is devastating to the defense." United States v. Jones, 16 F.3d 487, 493 (2d Cir. 1994), quoting Greer v. Miller, 483 U.S. 756, 766 n.6 (1987).  See also Bruton v. United States, 391 U.S. 123, 136 (1968); Jackson v. Denno, 378 U.S. 368, 378 (1964).  Here, moreover, the curative instructions the court did give, which addressed two of the three areas of misconduct, were unclear and insufficient, as discussed above.

It is true that trial counsel did not challenge all of the government's misconduct, failing to object to the prosecutor's elicitation from Munger that Efrain had renounced his 302 statements in his aborted plea.[40]  It is also true that,

---

[40] The record does not reveal whether this was because counsel had not obtained a copy of the plea transcript, had gotten it but not reviewed it, had read it but forgotten it, or for some other reason.

where trial counsel did object and the court sustained the objections, he did not seek the additional remedy of a mistrial. But the errors are plain — as demonstrated by the cited case law forbidding such misconduct — they affected Aquart's substantial rights by prejudicing the jury's consideration of critical defense evidence, and they seriously affected the fairness and reliability of the sentencing proceeding. They accordingly call for reversal even if assessed under the plain-error standard. See Johnson v. United States, 520 U.S. 461, 466-67 (1997); Fed. R. Crim. P. 52(b). See also, e.g., United States v. Groysman, 766 F.3d 147, 155-56 (2d Cir. 2014) (plain-error reversal for several instances of prosecutorial misconduct, including vouching for witness's credibility).

The Court should vacate Aquart's death sentences and remand for a new capital sentencing hearing.

## II.

**The Jury's Assessment of the Credibility of John Taylor, a Critical Cooperating Witness Used to Support Aquart's Convictions and the Government's Argument for a Death Sentence, Was Unfairly Influenced by His Deliberately-elicited Misleading Testimony That He Never Expected to Get out of Prison. In Fact, His Cooperation Resulted in a 9-year Prison Term, an Almost Unimaginably Low Sentence Compared to What the Jury Learned Was the Statutory Minimum Term for His Guilty Plea to Three Counts of Murder: Life in Prison Without the Possibility of Release.**

The jury was informed that, based on his guilty plea to three counts of felony murder, John Taylor faced a mandatory minimum sentence of life in prison without parole. He hoped for a lesser sentence, he testified, as the other cooperators also acknowledged. But the prosecutor asked Taylor an additional, pointed question: "When do you think you are going to go home?" He replied that he did not think he would ever get out of prison. He was testifying against Azibo Aquart not out of self-interest, but because it was the right thing to do: the victims did not have to die. In fact, Taylor ultimately received a sentence of 108 months, and could be released as early as mid-2017 (4/16/12 transcript, pp. 39, 43-44 at A.559, 560-61). If he behaves well in prison and earns good time credit, he could be out even sooner. See 18 U.S.C. § 3624(b)(1).

98

There is good reason to think that Taylor misrepresented his sentence expectations to the jury, falsely claiming that he did not believe he would personally benefit from cooperating, and that the government did not elicit this testimony by happenstance.  If so, Aquart's right to due process and to a fair and reliable sentencing determination was violated.  Taylor was the government's most important witness, and the jurors surely credited his testimony – including, relevant to sentencing, key details at odds with statements of another participant in the crime, Efrain Johnson – because Taylor presented himself as having no motive to lie.

This Court should retain jurisdiction over the appeal and order a hearing as to whether Taylor expected to get a real, rather than wholly illusory, benefit from his cooperation with the government.  See, generally United States v. Jacobson, 15 F.3d 19, 21-22 (2d Cir. 1994) (outlining procedure for supplemental fact-finding while case is on direct appeal); 28 U.S.C. § 2106; see also, e.g., United States v. Leone, 215 F.3d 253, 256-57 (2d Cir. 2000) (remanding for further fact-finding on limited issue); United States v. Torres, 719 F.2d 549, 551 (2d Cir. 1983) (directing supplementation of record by trial court so that Court of Appeals "can fairly decide the issues raised on appeal").

If Taylor misrepresented his expectations, Aquart's capital convictions

99

should be reversed and a new trial ordered.  At the least, his death sentences

should be vacated and the case remanded for a new penalty proceeding.  U.S.

Const., Amends. V, VIII; 18 U.S.C. § 3595(c)(2).

**A.**     **John Taylor apparently testified untruthfully that he did not expect any sentencing leniency for becoming a cooperating witness against Azibo Aquart.**

 "In practical experience, few, if any factors are more likely to induce an

accused to testify, possibly falsely, against another, than the expectation of

prosecutorial or sentencing leniency. . . .  an alleged accomplice who has not yet

been charged or sentenced is susceptible to direct or indirect pressure to cooperate

with the government and . . . his testimony should therefore be considered with

special caution."  United States v. Iverson, 637 F.2d 799, 803 (D.C. Cir. 1980); see

L. Sand, J. Siffert, W. Loughlin & S. Reiss, Modern Federal Jury Instructions,

Criminal ¶ 7.01, Instruction 7-11 (Lexis 2014); United States v. Gleason, 616 F.2d

2, 15 (2d Cir.1979).

But John Taylor categorically ruled out this motive to lie: he acknowledged

he faced a life sentence for each of the three murder counts to which he had pled

guilty, and claimed he was telling the truth about what happened only because he

felt bad about the murders: "[the victims] shouldn't got killed, it never should have

gone to the point it went to" (T. 2372 at A.129).  Asked by the prosecutor what he

was hoping would happen to him, he replied, "[l]esser sentence"; asked more pointedly "when do you think you are going to go home?," he said, "I don't think I'm never going home" (T. 2374 at A.131).

Taylor's testimony that he hoped for leniency but did not think he would be released was not inconsistent: the jury may have believed that he hoped to obtain some discount off a life sentence for helping the government, but not sufficient enough to be meaningful. Taylor was 34 years old when he testified (T. 2221-22). To have a life outside prison walls, then, he would have to get a hugely reduced sentence. It is unfathomable that a layperson would speculate that a term of anything close to nine years was possible for a thrice-convicted murderer with an extensive prior criminal history, even one who lacked an intent to kill – especially when the witness himself said he expected to die in prison, and the prosecutor elicited and let such testimony stand. Nor did defense counsel have any tools at trial with which to impeach Taylor. His sentencing prospects were the subject of attorney-client communications, and challenging his claim could only have led to its reiteration.

Yet it is not merely possible but virtually certain that Taylor knew he could earn a very substantial benefit for testifying favorably for the government. At Taylor's sentencing proceeding, his attorney, Robert Casale, referenced a case in

101

the District of Connecticut where such relief was obtained (see 4/16/12 transcript,

pp. 28-29 at A.557-58). In that case, United States v. Perez, et al,[41] Mr. Casale

represented Fausto Gonzalez, who was convicted of murder on the basis, in part,

of the testimony of a cooperating witness, Mario Lopez.[42] Lopez was a knowing

accomplice to the intentional murder, and pled guilty to it.[43] Lopez received a

sentence of only 60 months.[44]

As a result of his representation of Fausto Gonzalez, then, Taylor's lawyer

was well aware of the very significant sentencing benefit a cooperator can obtain,

even one convicted of intentional murder. Indeed, at Taylor's sentencing, Mr.

Casales specifically mentioned the "single digit" sentences received by

cooperators in the Gonzalez case, who, he argued, had a higher level of "moral

blameworthiness" than Taylor did (4/16/12: 28-29 at A.557-58). And when

---

[41] 3:02-cr-00007 (JBA).

[42] These facts are set forth in the referenced docket sheets, and in the briefs filed by Gonzalez and by the government on Gonzalez's appeal, both accessible on Westlaw. See Gonzalez brief, 2006 WL 5431332 (C.A.2), at pp. 1-6 (including, at p. 5, "The only evidence the government had to convict Mr. Gonzalez came from the lips of the alleged accomplices, including Mario Lopez"); government brief, 2006 WL 5431328 (C.A.2), at pp. 1, 11-16.

[43] See docket sheet in United States v. Lopez, 3:02-cr-00001 (JBA), including docket entry for 01/03/2002.

[44] Id., including judgment entered on 12/11/08.

102

Taylor's guilty plea had been entered, Mr. Casales informed the court that he had

spent "a considerable amount of time" discussing "what a plea would entail *and*

*what the consequences might be*" [emphasis added]; this was because Taylor was

unfamiliar with the federal system where – unlike in state court – a plea was taken

without any sentencing "deal locked in with the judge" (Taylor plea minutes,

10/18/10, pp. 7-8 at A.457-58 [the plea was taken on the same day that Taylor's

cooperation agreement was signed, see GX 247A, p.1 at A.710; the agreement

explicitly referenced the court's ability to impose a sentence below the statutory

minimum upon government motion]).

It is unfathomable that defense counsel did not relay his experience to

Taylor. He could not *promise* a "single digit" sentence to Taylor if he cooperated,

but he could not have failed to impart that this was by no means a pipe dream.

The government was also well-aware of this: Peter Markle, who participated in

Mr. Aquart's prosecution as well as that of John Taylor, was one of the

prosecutors in both the Gonzalez and Lopez cases (see docket sheets).

To be clear, we are not complaining that Taylor made an erroneous

prediction about his sentence, believing that he would die in prison and later

learning that he would serve, at the most, nine years. Cf. United States v.

Addonizio, 442 U.S. 178 (1979) (sentence is not voidable because judge

103

mistakenly believed defendant would be released on parole before end of term imposed).  Taylor did not know, and could not have known, the actual sentence he would get when he testified at Aquart's trial.

Rather, the complaint is that Taylor misled the jury by affirmatively claiming he thought he would never be released, when he had to have known – and the government had to have known – that that was highly unlikely.  The fact that no specific sentence had been (or could be) promised in advance gave Taylor an even "greater incentive to make the testimony pleasing to the [government]."  Sivak v. Hardison, 658 F.3d 898, 916 (9th Cir. 2011) (reversing death sentence for Napue violation concerning witness's denial of expectation of benefit for testifying), quoting Boone v. Paderick, 541 F.2d 447, 451 (4th Cir. 1976).  A witness has a stronger motive to lie if no firm commitment has been provided.  See United States v. Bagley, 473 U.S. 667, 683 (1985).  In this case, the government's star witness disavowed such a motive, and claimed he was testifying altruistically, to bring Aquart to justice.

**B.     Taylor's disavowal of the expectation of a sentencing benefit stood in sharp contrast to the testimony of other cooperators, thus bolstering his credibility with the jurors.  His presentation by the government as a person tormented by what he had seen, who truthfully relayed what he knew solely to bring the perpetrator to justice, also appeared carefully orchestrated.**

All the cooperation agreements in evidence referenced the government's

104

undertaking to file a 5K.1 motion informing the court, where warranted, of the witness's substantial assistance; this would authorize the court "to impose a sentence below an otherwise applicable mandatory minimum term" (see GX 234A-237A, 239A, 242A, 247A; see also T.1537-39; T.2599, 2649-50; charge at T.4212).

The other cooperators each admitted, on direct examination, that they hoped or expected to receive a reduced sentence as a result of their testimony, even though no explicit promise had been made and the term would be up to the judge. Womble faced a mandatory minimum of 20 years and a maximum of life after he pleaded guilty to narcotics conspiracy (T.1382-83, 1537), but he was "praying" for a lesser term (T.1509). Hodges entered the same plea as Womble did, carrying the same statutory minimum (T.800-01), and he hoped to get a sentence of four years (time served) (T.802-03). Hopkins had a mandatory minimum of ten years for her drug conspiracy plea (T.2597-99), and she testified she "want[ed] to go home" as a result of an expected 5K.1 motion (T.2599). Randolph was facing a five-year mandatory minimum for her drug conspiracy offense, and had served only a few days in prison by the time she testified (T.1768, 1833); she, too, was hoping the judge "will be easy on sentencing" (T.1834). Rivera pleaded guilty to maintaining a drug-involved premises and faced a 20-year maximum but no mandatory

minimum (T.1656; see GX 239, pp. 1-2); she was hoping her case would just "fade[] away" (T.1658).[45]

Taylor's examination followed a different script. After eliciting that the death penalty was not being sought against him, the prosecutor asked why he was testifying; when he replied, "[t]o tell the truth," she pressed: "Why?" Because, Taylor said, "[p]eople got killed for no reason. . . . it never should have gone to the point it went to" (T.2372 at A.129). Shortly thereafter, the prosecutor showed Taylor a photo of Tina's and Reid's bodies and asked why he had not called 911 when he left the apartment; he replied that he was "[s]cared" of getting "lock[ed] . . . up the way I am now"; he had not called them later because he "didn't know what to do" (T.2373 at A.130). The prosecutor then again focused Taylor on his motive for testifying: "What are you hoping happens to you?" When he said, "[l]esser sentence," she pressed him again: "Do you think you are going to go home tomorrow? A. No. Q. When do you think you are going to go home? A. I don't think I'm never going home" (T.2374 at A.131). This was the conclusion of his direct examination. Taylor was crying at this point, prompting the judge to

---

[45] Randi Washington pleaded guilty to narcotics conspiracy and firearms charges (T.2027-28). There were no mandatory minimums (see GX 242, p. 2), and he had already served his sentence by the time he testified (T.2029). Thus, when asked what he hoped would happen as a result of testifying against Aquart, he said, "[n]othing" (T.2029).

note that there were tissues nearby (T.2374 at A.131; see T.4251-52 at A.195-96).

Taylor was thus presented as a witness who was morally compelled to secure Aquart's conviction, with no hope of a benefit to himself. This dovetailed with a prior example of Taylor's allegedly standing up for what was right, which the prosecutor elicited early on in his examination. Turning to the topic of Taylor's criminal history, the prosecutor asked if "something happen[ed]" when he first started to sell drugs (T.2224-25 at A.106-07). He said, "[y]es," and was led through a narrative of how his supplier got mad at him and fired a shot, which mortally wounded "a little boy." The prosecutor established that Taylor had talked to the police and told them who the killer was. This created such a risk of retaliation that Taylor had to be escorted to the school bus by police officers (T.2225-27 at A.107-09).

Taylor claimed to be similarly altruistic about informing on Aquart. And the jury would likely credit his claim that, although he hoped for leniency, he expected to die in prison. For although none of the cooperators knew what sentence they would ultimately receive, the others had a rational basis for believing they would get out of jail if they substantially assisted the government. In sharp contrast, Taylor was facing a minimum of life, a vastly longer sentence than the minimums required for Womble and Hodges (the cooperators who had

107

pled to the next most serious charges).  Moreover, Taylor had a significantly

longer list of prior convictions than any of the others: four drug felonies and one

for robbery (T.2227-29, 2376-80).[46]

**C.    Taylor's misrepresentation, if established, would be material, since his testimony was crucially important to the government and it was bolstered by his proclaimed disavowal of a self-interested motive for cooperating.**

John Taylor was the centerpiece of the government's case.  There were

items of evidence that connected Aquart to the crime scene, and witnesses who

testified that he was displeased with Tina Johnson for selling drugs out of the

Charles Street building.  But the government presented no evidence, save Taylor's

testimony, about how the murders were committed or by whom.  It was Taylor

who related going to buy the duct tape and gloves at Walgreens and the men's

forced entry into the apartment, armed with bats and a gun; he who described the

subduing of the victims; he who said he heard and saw Azibo and Azikiwe Aquart

taping two of the victims; and he who witnessed the brothers bludgeoning Tina

Johnson and James Reid to death, which he relayed in graphic detail.  Taylor also

underscored Azibo's position of leadership among the perpetrators, which

---

[46] The two cooperators with the most serious records, next to Taylor, were Hodges and Womble.  The jury learned that Hodges had three prior drug convictions (T.693-96), and that Womble had one (T.1384-85, 1522).

bolstered the government's argument that all the murders were committed by Azibo or at his direction and behest.

Taylor's testimony was clearly material to the jury's sentencing determination as well, including the procurement aggravating factor. So was Azibo's purported remark, "come get you some," inviting Taylor to join in the carnage. The government used this to underscore Aquart's depravity and relishment of the killings to support the torture aggravator, as well as Aquart's role in tightly taping at least two of the victims. According to Taylor, the Aquart brothers cornered and subdued Tina and Reid in their bedroom, and taped them there – Taylor did nothing at all to assist in the violence.

But a second eyewitness account was introduced by the defense at the penalty proceeding that starkly contradicted Taylor. Efrain Johnson repeatedly told the authorities that it was Taylor and Efrain who taped Tina, and that Taylor began the assault on her by hitting her in the head with a pipe. Azibo was not even in the room while this was going on; Taylor took the lead and acted without direction. Taylor's blanket denial of a motive to curry favor with the government necessarily bolstered his account and undercut Efrain's, skewing the jury's consideration of its life or death sentencing options. See Point I.

In sum, Taylor provided the only eyewitness account of the murders at trial,

109

and his testimony was central to the jurors' views on the heinousness of Aquart's

conduct and the existence and weight of certain aggravating factors at sentencing.

The jurors knew that Taylor had repeatedly lied to the authorities when he was

first confronted on December 2, 2009, in Pine Tops, North Carolina; Taylor

acknowledged this (see, e.g., T.2362-65, 2392-409, 2465-66, 2493).  But he never

described the murders during that first interview.  He did not report seeing any

victim being struck, or anyone with a bat in his hand.  Taylor did eventually tell

the authorities that Azibo had kicked in the door and a woman came out, that he

put a gun in her face and said they were police, and that Azikiwe Aquart handed

tape to Azibo and the latter taped all three victims (T.2460-62, 2464-65).  But

several of these claims were inconsistent with Taylor's trial testimony.  There, he

said Basil Williams responded to the knock; he did not mention anyone saying

"police" or report seeing anyone hand duct tape to anyone else; and he said the

two brothers taped Johnson and Reid, he did not see anyone tape Williams (see

T.2311-21).

It was not until Taylor signed a proffer agreement with the government on

January 15, 2010, that he made any statements about the perpetrators' alleged

roles in the killings.  The proffer agreement, which the defense offered into

evidence, was the precursor to a cooperation agreement.  Taylor signed it as his

110

second meeting with law enforcement, the first meeting they had in Connecticut (T.2429-32, 2478-81; see DX S ["The government will consider the evidence discussed . . . to assess [Taylor's] potential ability to cooperate with the government"). By that time, Taylor had been arrested for murder in North Carolina and appeared in federal court with counsel, and he was transported to Connecticut where he was assigned the two lawyers, including Mr. Casales, who remained with him throughout his case (T.2387-88, 2473-75, 2477-78). Taylor was advised in North Carolina of both the minimum and maximum punishments for the murders – the death penalty was the maximum – and he had asked to meet with prosecutors before he left for Connecticut (T.2475-77, 2479).

Thus, Taylor pursued cooperator status very soon after his arrest, knowing full well the seriousness of his situation. He made statements about the killings only after securing a proffer agreement. He was steadfast in his denial of any involvement in the murders, and his value to the government depended on his incrimination of Azibo Aquart. On the latter score, he unquestionably delivered.

**D.      A hearing should be ordered, as the jury's material misapprehension of fact concerning Taylor's motive for cooperating would mandate reversal of Aquart's capital convictions and death sentences.**

Given the materiality of the issue to Aquart's conviction and sentence, this Court should order further fact-finding. Taylor and any other relevant witnesses

111

should be called at a hearing concerning his sentencing expectations, including his awareness of the benefits received by other cooperators in serious felony cases, and whether he thought it possible that he could receive a parole-eligible sentence. See Jacobson, 15 F.3d at 21-22; 28 U.S.C. § 2106 (appellate court has power to "require such further proceedings to be had as may be just under the circumstances"); see also, e.g., Torres, 719 F.2d at 551 (ordering supplementation of record so Court could adjudicate issues presented on the appeal).

If the District Court finds that Taylor misrepresented his sentencing expectations, reversal of Aquart's capital murder convictions and accompanying death sentences would be warranted. The jury already had some evidentiary basis for questioning Taylor's account of the murders. For example, Efrain Johnson said he and Taylor taped Tina, not the Aquart brothers as Taylor claimed, and Efrain's DNA was found to be included in the tape around her hands; Taylor's DNA could not be eliminated (see Statement of Facts, Section I.G.1). There was also other DNA evidence suggesting Taylor was in Tina's bedroom (a glove found on the floor) contrary to his testimony (id.). And Taylor's account of Azibo swinging the bat over his head and "bashing" Tina like he was at a "meat market" was belied by the blood spatter expert's testimony (id., I.G.2).

That Taylor hoped his testimony would please the government, and result in

112

a tangible sentencing benefit for himself, would have been additional, and powerful, impeachment evidence. "The possibility of a lower sentence, awarded in part precisely because of the assistance [the cooperator] was providing at [defendant's] trial, provided an incentive for [the cooperator] to say whatever the prosecutor wanted to hear." United States v. Morris, 498 F.3d 634, 640 (7th Cir. 2007). Taylor baldly denied this incentive, asserting under oath that he did not expect any meaningful relief for testifying. His credibility, which should have been evaluated against a powerful motive to curry favor with the government, became, effectively, unassailable.

The jurors were thereby steered to credit to Taylor's account of the murders, unblemished by any stain of self-interest. In truth, however, he stood to gain handsomely by cooperating, as was borne out by his eventual sentence of nine years. Had the jurors known that a parole-eligible sentence was not only possible for Taylor but likely, they would have assessed his credibility through a quite different lens. That he was willing to shade the truth about his sentencing expectations, after taking an oath to tell the truth, would also have been independent grounds to discredit his account.

This Court has noted that "false evidence as to a witness's credibility" can be "'determinative'" of a jury's verdict. Jenkins v. Artuz, 294 F.3d 284, 295 (2d

113

Cir. 2002), quoting Napue v. Illinois, 360 U.S. 264, 269 (1959). In addition, due

process requires that a defendant not be sentenced "based on materially false

information" or a "material misapprehension of fact." United States v. Torres, 140

F.3d 392, 404 (2d Cir. 1998), citing Townsend v. Burke, 334 U.S. 736, 740-41

(1948) (defendant improperly sentenced, where several charges judge believed

defendant had been convicted of had actually been dismissed); United States v.

McDavid, 41 F.3d 841, 843-44 (2d Cir. 1994) (sentence vacated due to court's

erroneous belief that defendant had been on probation when current offense was

committed; "[a] sentence based *in part* on material misinformation may not stand."

[emphasis in original], citing Townsend v. Burke, 334 U.S. 736, 741); see also

King v. Hoke, 825 F.2d 720, 724 (2d Cir. 1987). The defense has no burden of

proving the jurors actually relied on Taylor's misstatement. Rather, it is enough

that they probably did. See United States v. Robin, 545 F.2d 775, 779 (2d Cir.

1976); see also McKee v. United States, 462 F.2d 243, 245-46 (2d Cir.1972) .

In a capital sentencing proceeding, there is also a need for heightened

reliability in the sentencing decision. See Woodson v. North Carolina, 428 U.S.

280, 305 (1976). Because of the "qualitative difference" between imprisonment

and death, "there is a corresponding difference in the need for reliability in the

determination that death is an appropriate punishment."). Id. It is imperative,

then, that the jury be given accurate information.  <u>Gregg v. Georgia</u>, 428 U.S. 153,

190 (1976) ("accurate sentencing information is an indispensable prerequisite to a

reasoned determination of whether a defendant shall live or die").  Indeed, a death

sentence cannot be upheld when it is imposed by a jury permitted to consider

materially inaccurate evidence.  <u>See</u> <u>Johnson v. Mississippi</u>, 486 U.S. 578, 584-86,

590 (1988) (death sentence vacated, when a conviction that formed the basis of an

aggravating circumstance was later found to be invalid); <u>see also</u> <u>United States v.

Tucker</u>, 404 U.S. 443, 447-48 (1972) (affirming vacatur of non-capital sentence,

which was founded, in part, on two prior convictions which were reversed several

years later on right to counsel grounds).

    Accordingly, reversal should be the remedy if Taylor falsely testified he

thought he would receive no benefit from testifying against Aquart, and would die

in prison.  A hearing should be ordered.

115

## III.

### The Government Did Not Provide Legally Sufficient Evidence That Aquart Engaged in Substantial Planning and Premeditation to Cause the Victims' Deaths, a Statutory Aggravating Factor.

It is a statutory aggravating factor that "[t]he defendant committed the offense after substantial planning and premeditation to cause the death of a person." 18 U.S.C. § 3592(c)(9). As the court below charged (P.5588-89 at A.335-36), the aggravator requires proof of both substantial premeditation and substantial planning, and of the murder, not of any other offense. See United States v. Webster, 162 F.3d 308, 325 (5th Cir. 1998). "'Planning' means mentally formulating a method for doing something or achieving some end. 'Premeditation' means thinking or deliberating about something and deciding beforehand whether to do it. 'Substantial' planning and premeditation means a considerable or significant amount of both" (P.5588-89 at A.335-36).

Here, the government theorized that because Tina Johnson started selling crack from her apartment a few weeks before her murder, thereby cutting into Aquart's profits in a negligible amount (per Aquart's "lieutenant," Rodney Womble), Aquart decided that not only must she be killed, but that her apartment-mates, James Reid and Basil Williams, also had to die – along with anyone else

116

who happened to be there such as Tina's son, Leroy.  But there was no supporting proof.  Rather, viewing the evidence in the light most favorable to the government, there was ample proof that Aquart planned the break-in of Tina's apartment.  He told John Taylor he intended to rob the victims and move them out, using duct tape to restrain and keep them quiet and bats to threaten and maybe even assault them.  He assembled his "team" as the prosecutors argued (after advertising his bad intentions to several people in the building).  The government simply asked the jury to infer from this same evidence, coupled with the fact that the victims were ultimately killed, that murder had also been part of Aquart's plan long before the break-in occurred.  The homicidal scheming started, the government argued, on his trip down south with his brother and Taylor (see P.5622-24, 5635, 5692, 5694-95 at A.366-68, 379, 435, 437-38).

Even if there was "equal or nearly equal circumstantial support" for a theory of a pre-existing intent to kill and a theory that the murders were not conceived of in advance, a reasonable doubt would necessarily exist.  See United States v. Glenn, 312 F.3d 58, 70 (2d Cir. 2002).[47]  But as discussed below, there

---

[47] This Court has reversed several convictions based on the Glenn standard. See United States v. Newman, __ F.3d __, 2014 WL 6911278, at *9, 13 (2d Cir. December 10, 2014); United States v. Coplan, 703 F.3d 46, 72 (2d Cir. 2012); United States v. Lorenzo, 534 F.3d 153, 159, 161-62 (2d Cir. 2008): United States v. Cassese, 428 F.3d 92, 98-99 (2d Cir. 2005) (upholding District Court's

117

was undisputed evidence indicating that Azibo had not intended to kill anyone when he entered the apartment, and that the murders were instead triggered by events inside. For example, Taylor made clear that no one was taped or killed immediately. Instead, Azibo initially looked for property to steal, placing money and a cell phone found in Tina's room on the kitchen counter "way before" the duct-taping started (T.2325-26 at A.125-26). Also, the men all wore ski masks to hide their identities, an unnecessary precaution if the plan was to kill the occupants. Their identity was evidently compromised at some point, however, as indicated by the first words Azikiwe spoke to Taylor as they left they apartment: "Did you hear people say our names?" (T.2327 at A.127). Further, Azibo never informed a single one of his accomplices that he intended to slay anyone; he had never before committed an act even approaching such extreme violence – even against people he thought were selling drugs on their own in "his" building, as Tina was; and he advertised his displeasure with Tina and his break-in plan to numerous people, thereby creating a pool of witnesses to implicate him in the murders if murder had been his goal. And, as anyone would predict, the triple slayings were the subject of intense police investigation, and effectively shut Azibo's drug operation down.

---

judgment of acquittal).

On review of the record, the substantial-planning and premeditation aggravator was not supported by legally sufficient evidence.  See United States v. Wexler, 522 F.3d 194, 209 (2d Cir. 2008) ("A judgment of acquittal is warranted if the evidence is 'nonexistent *or so meager* that no reasonable jury could find guilt beyond a reasonable doubt" [emphasis added]).

We acknowledge that defense counsel did not raise the claim below.  However, this Court is statutorily required to review the sufficiency of the evidence supporting the jury's finding of an aggravating factor.  18 U.S.C. § 3595(c)(1).  Here, the substantial planning aggravator was not proved, yet it played a vital role in the government's argument for Aquart's execution.  Its submission and weighing warrants this Court's plain error review and reversal of Aquart's death sentences.  Cf. United States v. Kaplan, 586 F.2d 980, 982 and n.4 (2d Cir. 1978) (reversing convictions based on unpreserved sufficiency claim).[48]

---

[48] As discussed at the end of this point, if this aggravator cannot be sustained, then two others must fall as well: that Aquart committed the murders for pecuniary gain, and that he procured Taylor's aid in the murders with a promise of payment.  This provides additional support for reversal of the death sentences.

119

**A.   The record does not support the government's contention that Aquart entered the apartment intending to kill anyone.**

   **1.   Aquart arranged and made preparations with his accomplices for a break-in, not a murder.  And he would not have enlisted their aid on false pretenses since he had no reason to think that when the break-in turned into a triple slaying, his accomplices would join in to help or remain silent afterwards.**

There was no proof that Aquart admitted, in advance, that he intended to kill anyone – including to his accomplices.  On the contrary, in fact, Taylor was enlisted to commit a robbery and/or move some people out of the building (T.2291-92, T.2370-72; GX 247, pp. 1, 9 at A.708-09).[49]  When directly asked by the prosecutor what he thought was going to happen, Taylor replied, "I thought maybe we was going to go inside and just beat the place up, like tear the place up.  Like, you know, how people do, like when you try to get somebody out of there, tear them up.  I didn't know they was just going to go in there and kill them" (T.2373 at A.130).  The prosecutor urged jurors to credit this testimony on penalty

---

[49] GX 247 at A.708-09 is Taylor's plea agreement, which states in the body and in the stipulation of offense conduct his belief that a robbery was intended, and his agreement to participate in a robbery.  There is no reference to a preconceived plan to murder anyone.  For the record, the plea agreement of Aquart's brother, Azikiwe, is identical to Taylor's in these respects (DE 960:9 at A.499; see also 2 at A.498).  And, at his plea proceeding, Azikiwe read a detailed statement in which he again acknowledged his agreement "to participate *in what I believed would be a robbery*," with no mention of an advance plan to kill (8/26/11 transcript, p.28 at A.501 [emphasis added]).

phase summation: this was "a home invasion robbery" (P. 5619 at A.363).[50]

Taylor held this belief even though the four men had two bats between them, a gun, duct tape and latex gloves. All of the paraphernalia that the government theorized was part of Aquart's murder plan was, to Taylor, perfectly consistent with a plan to rob, intimidate and effectively chase people out of the neighborhood, assaulting them if need be. Duct tape could be used to restrain people – including Tina Johnson's son, a big man, who Aquart thought would be there – and keep them quiet; it was the wee hours of the morning when the break-in occurred. The gloves would guard against any of the men leaving fingerprints or DNA evidence, an advisable precaution even when committing far lesser crimes than murder. And the weapons, too, were consistent with the plan Taylor recounted.[51]

------------------------------------

[50] Shamarr Myers, who met Aquart in jail many years after the murders, reported two relevant admissions Aquart made. First, he said he had told people selling crack in the building that "*they had to go*" (T.3642-44 [emphasis added]). This was consistent with Taylor's testimony about a planned eviction. Myers also testified Aquart said "they had to die" (id.). This sheds no light on *when* this decision was made, before entering the apartment or as events unfolded inside.

[51] So was bringing a drill. If Aquart was going to put Tina and the others out on the street, drilling the door shut afterwards would keep them out in the short term and underscore the message to move. Or he could have planned to leave them tied up – alive – inside the apartment, drilling the door shut to postpone their liberation. According to Taylor, Aquart gained entry by kicking the door open; drilling would serve to delay people coming out and in. This would

And so it was for Efrain Johnson as well. He acknowledged to his sister, Lashika Johnson, that he had "helped tie the people up and rough them up a little bit," and that they had disposed of the "[b]ats and gloves and maybe masks" (Lashika could not recall for sure whether he mentioned the latter to her) before returning to her apartment. But Efrain never mentioned or even hinted to anyone that he believed the plan included murder, and said the victims were all alive when he left (see T.2907-09, 2968-70; P.5498-5509).

Further, Aquart did not know Taylor or Efrain very long or very well, and it is highly implausible that Aquart would enlist their aid if murder was the goal. Taylor had sold marijuana for Aquart for a short time, in Norwalk rather than in Bridgeport where Aquart lived. Aquart invited him to go on a trip down south, but he knew that Taylor was from the south. The two traveled in different cars and stayed in different rooms, and the trip was, as far as Taylor knew, for pleasure. As for Efrain, he had known Aquart longer than Taylor, but there was no proof that the two men were close or even that Efrain shared an interest in Aquart's crack

---

also help send a message, as well as facilitate the men escaping undetected. Indeed, the latter scenario is identical to the one posited by the government, except for the nature of Aquart's intent when he entered: to rob and possibly assault Tina Johnson for continuing to sell in the building, or, as the government maintained, to kill at least three people, maybe four (if Tina's son had been present), in the same building in which he operated his lucrative drug-selling business.

operation – he was not shown to be a part of it.

Given this evidence of, essentially, a passing acquaintanceship, and the fact that Aquart never mentioned killing anyone to Taylor or Efrain, Aquart could not have counted on either of them to help once his homicidal intent was revealed. Beating people up is one thing, murder is a qualitatively different act. Not surprisingly, in fact, Taylor said he left as soon as the extreme beatings began, and Efrain said he left even before that point (as Taylor finished binding Tina and hit her). Aquart also would not have been able to depend on these men remaining silent: they were not drug addicts like most of Aquart's employees, and were not shown to be in Aquart's thrall.[52]

> **2.  Taylor's account of events inside the apartment further supports the view that the intent to kill was not formed until after the break-in: the men wore masks to hide their identities from the victims, the victims were not immediately bound and killed (Aquart first looked for property to steal), and, despite their precautions, one or more victims apparently recognized them.**

As discussed, it is simply not credible that Aquart would arrange for Taylor's and Efrain's presence as eyewitnesses to a triple (or possible quadruple) homicide. Indeed, this hypothesis is completely at odds with the level of planning

---

[52] There was also no proof that Aquart was close enough to his brother, Azikiwe, to be able to count on *his* aid in the killings, or on his refusal to cooperate against Azibo down the road.

123

he otherwise exhibited.

Instead, it is reasonable to conclude that the murders were a spur-of-the-moment action, with the accomplices becoming witnesses or participants by happenstance rather than by design. Notably, the victims were not bound and killed immediately, which would have been expected if murder was the goal. Instead, Aquart first looked for property according to Taylor, finding money and Tina's cell phone in her room. He came out and placed these items on the kitchen counter "way before" the duct-taping started (T.2325-26 at A.125-26).

Further, if Aquart knew he was going to silence the victims' permanently, why would he bother to have the men cover their faces? All of the men, including Aquart, wore masks *during* the break-in (T.2307, 2471-73 at A.110, 134-36). Indeed, the prosecutor acknowledged that is was *the victims* that Aquart wanted to conceal their identity from (P.5625 at A.369: "defendant's real issue was with Tina. . . . He was wearing a ski mask, he could have turned and walked out the door and chosen to spare James and Basil").

Moreover, although Taylor did not report hearing any words spoken while Aquart searched for property, or thereafter, he admittedly helped Azibo move the living room couch against the door at the front of the apartment (the victims were in the back bedrooms with the other perpetrators), and then stood at the living

124

room window as a look-out. Thus, he was not in a position to hear everything that was said. And there is evidence that there was some kind of exchange with a victim that could have sparked the killings: based on Azikiwe's question to Taylor as they fled – "did you hear the people say our names?" (T.2327 at A.127) – Azibo's effort to conceal their identities by masks failed. If the plan, going in, had been to murder the victims, the fact that one or more victims recognized them (despite their ski masks) would have been unworthy of mention by Azikiwe.

**3. Aquart advertised his problems with Tina and, with the dry run, his plan to take action, and he would not have expected these numerous additional witnesses to remain silent when a triple homicide was discovered – and they did not. Moreover, the murders would be expected to shine a spotlight on the Charles Street operation and terminate Aquart's drug business – as they did.**

There was other proof that was inconsistent with a pre-existing plan to kill. First, Aquart did not hide what he was doing from others. People who lived or sold drugs in the Charles Street building, like Jackie Bryant, knew that Tina had begun selling crack and that Aquart was displeased. When Rodney Womble reported that Tina would not stop selling, Aquart told him to go buy a baseball bat. The night of the dry run, Aquart fetched Frank Hodges, his employee, from his sales apartment and had him knock on Tina's door. Aquart had a bandana around his neck and was wearing plastic gloves, and he told Hodges to knock and then get

125

out of the way when the door opened. Three other men stood near the door, all dressed in black with bandanas and rubber gloves. Juanita Hopkins was in the sales apartment, and Hodges immediately came back and told her what had happened (T.780-86, 865-69). It would be natural for Hodges to share this information with other employees, as happened with respect to assaults Aquart committed in the past.

And these memories were not allowed to fade: the successful break-in was just a few days later. Yet, like Taylor and Efrain Johnson, Hodges said he knew "it wasn't going to be good" (T.785), but he did not suspect that Aquart intended to kill anyone. On the morning of the murders, in fact, when Hodges was asked by a police officer if he knew anything about them, Hodges said "no." This was the truth, Hodges testified (T.790-91) – he did not make a connection between the incident a couple of nights earlier and the slayings.

In addition, a triple homicide would obviously bring a lot of attention to the building and to Aquart's drug operation there, as it immediately did. The occupants of the building would all be questioned, including all of the "employees" who were subject to criminal charges themselves, and would thus have good reason to cooperate (as many ultimately did). The police attention spawned by the murders destroyed the operation, in fact, and landed Aquart in jail

126

for cocaine trafficking.

Conversely, evicting or even assaulting Tina Johnson would not be expected to shine a spotlight on Aquart's business. She was dealing crack and was a long-time addict and drug possessor, and she would not likely complain to the police if she was roughed up due to her involvement in the trade. As Aquart knew, with the exception of Jackie Bryant, not one of his prior assault victims ever complained to the authorities. And even when Bryant did, nothing came of it.[53] Moreover, even if Tina did go to the police, she would not be able to make a positive identification herself: Aquart brought masks and gloves to protect their identities.

### 4. Acts of such extreme violence were shown to be out of character for Aquart, even against those he knew or suspected were selling drugs in the Charles Street building.

The jury heard evidence of other acts of violence by Aquart which, by contrast, underscored just how anomalous the murders were. This anomaly also suggested that the killings were not planned in advance but were, instead,

---

[53] Per the medical records, GX 245 at A.648-701, Bryant was injured in mid-November 2004. Aquart had not been convicted by the time he was arrested for drug-selling in 2006, even after an alleged attempt to bribe Bryant to drop the assault charge. But unlike this and other assaults he was accused of, a triple homicide was not going to be overlooked or left to languish. Indeed, the authorities were all over the murder case from its inception.

127

spontaneous acts.  Notably, his prior violence was also in response to conduct that undercut the business, when an employee was short of money for drugs sold, for example, or had stolen some drugs, or smoked some of Aquart's product (see Statement of Facts, Section I.A).  But the injuries inflicted were never serious enough to be life-threatening, much less life-ending (id.).[54]

Indeed, Aquart never administered a beating remotely approaching the savage attacks that the homicide victims sustained, *even when he believed others were selling their own drugs in the Charles Street building and stealing his customers as Tina did* – like John Sullivan, with Juanita Hopkins' help (P.4686-89 at A.212-15; see T.2565-68 at A.139-42).  Each reported they were assaulted as a result, but neither was seriously injured.  When Aquart confronted Sullivan – who reportedly had *repeatedly* sold his own supply of crack from Aquart's Charles Street apartment (T.2565-66 at A.139-40) – Aquart punished him by hitting him on the head with a gun; Aquart stated, "Ain't nobody selling out of here.  If I catch somebody selling out of here I'm going to take you somewhere in the basement or something and have you sell my drugs for free" (P.4689 at A.215).

Tina Johnson's transgression was similar in degree to the punished acts of others, and virtually identical to that of John Sullivan: she started to sell crack

---

[54] This included the post-arrest assault on Anthony Armstead in jail.

128

from her apartment in August, 2005, when Aquart received a bad batch, profiting off people who would otherwise have been Aquart's customers. But Womble, his "lieutenant" who oversaw the business, acknowledged that Tina's sales did not have much of an impact, since she was only selling enough to support her own habit (T.1506-07 at A.104-05). And she had not been selling for long, as the government itself acknowledged on guilt-phase summation (T.4247 at A.194) and on penalty summation (P.5621-22 at A.365-66).

Although Tina was taking a very small piece of Aquart's business, he did not like that and she was told to stop. She refused, and Aquart told Womble he would "take care of it" (T.1488 at A.103). The government urged jurors to consider this a death threat, but Womble testified that "I'll take care of it" was Aquart's pat response to everything (T.1488 at A.103).

In sum, there was certainly proof that Tina Johnson's conduct – selling drugs in the Charles Street building and ignoring orders to stop – bothered Aquart. There was a motive to rob her of her drugs and drug proceeds and punish her, perhaps even assault her as he had assaulted others. But the evidence did not establish a motive to beat Tina Johnson to death, not to mention kill her companion, James Reid, and Basil Williams, who never sold drugs of any kind.

129

**5.      The reasonable inference to draw from the record is that Aquart's intent changed once he entered the apartment and the event unfolded.  Indeed, Taylor supplied a plausible reason: the victims recognized Azibo and/or Azikiwe despite their efforts to hide their identities.**

The paucity of proof that Aquart had a pre-existing intent or motive to kill at the time he entered the apartment begs the question, what happened to convert a robbery/eviction into a triple homicide?  On that point, as previously discussed, there is evidence that, despite his precautions, the victims recognized them: Taylor testified that after they left the apartment together, Azikiwe asked him, "Did you hear the people say our names?" (T.2327 at A.127).  This was clearly important to Azikiwe, as it was one of the very few remarks he made to Taylor about the crime (T.2327-28 [the others were, "do you want this [Tina's stolen] phone?" and, "I think I got something on my pants"] at A.127-28; see generally T.2326-33).

There is no question that Azibo took the trouble to hide who he and his accomplices were from the people in the apartment.  A home invasion robbery and possible assault was a far more serious crime than the prior assaults he had committed, and he could not rule out that Tina – who the record showed was not easily intimidated – would turn him in if she knew he was responsible.  If his plan was thwarted and his identity became known to her, he risked lengthy incarceration.

130

That the killings were motivated by that concern is a far more plausible scenario than the one posited by the government. Its theory was that Aquart meticulously planned a brutal triple or quadruple homicide (had Tina's son been there) for behavior similar to that which he had previously dealt with far less severely, enlisting at least two accomplices in his scheme that he did not really know and could not depend on, after having advertised his evil intentions to people he knew well, that would result in intense police scrutiny of his drug operation in the building and shut his business down.

**B.      The government failed to establish, beyond a reasonable doubt, that the murders were substantially planned and substantially premeditated.**

To meet its burden of proof, the government was required to establish that Aquart decided to kill the victims before he entered their apartment, and that all of the people and paraphernalia he brought in – a number of accomplices to aid him, bats, gloves, masks, duct tape, the drill – were part of his plan to commit murder, not assault or robbery or any other offense. That was the government's theory. If the intent to kill originated *after* Aquart gained entry, the aggravator would necessarily fail.

For virtually all murders require some planning and premeditation. But the statutory aggravator requires a *substantial* amount of each. See 18 U.S.C. § 3592(c)(9). As the court below charged the jury, substantial "means a

131

considerable or significant amount" (P.5589). <u>See</u> <u>United States v. Tipton</u>, 90

F.3d 861, 896 ("considerable" planning and premeditation); <u>United States v.</u>

<u>McCullah</u>, 76 F.3d 1087, 1110 (10th Cir. 1996) ("substantial" means

"'considerable in quantity: significantly large'"); <u>United States v. Flores</u>, 63 F.3d

1342, 1373-74 (5th Cir. 1995) ("substantial" means a "high magnitude"). <u>See also</u>

<u>Victor v. Nebraska</u>, 511 U.S. 1, 19 (1994) (when used to denote "magnitude,"

"substantial" means "to a large degree").

The requirement of a "substantial" amount of advance planning and

premeditation is not merely based on the language of the Federal Death Penalty

Act. Rather, it is compelled by the Eighth Amendment, which dictates that a

statutory aggravator must "genuinely narrow the class of persons eligible for the

death penalty" and "reasonably justify the imposition of a more severe sentence on

the defendant compared to others found guilty of murder." <u>Lewis v. Jeffers</u>, 497

U.S. 764, 776 (1990).

In Aquart's case, construing the evidence in the light most favorable to the

prosecution, no rational trier of fact could have found the substantial-planning and

premeditation aggravator, relating as it must to the homicides, proven beyond a

reasonable doubt. <u>See</u> <u>id.</u> at 781-83 (applying sufficiency review standard of

<u>Jackson v. Virginia</u>, 443 U.S. 307, 319 [1979], to aggravating circumstance in

132

capital murder prosecution); United States v. Tipton, supra, 90 F.3d 861, 896

(same, applied in federal capital case).

## C. The jury's erroneous finding of the substantial-planning factor requires reversal of Aquart's death sentences.

The Federal Death Penalty Act requires the Court of Appeals to

independently review "whether the evidence supports the special finding of the

existence of an aggravating factor."  18 U.S.C. § 3595(c)(1).  Here, since the

substantial-planning aggravator was not supported by legally sufficient evidence,

its submission to the jury was error.  The error was also plain, "plain" meaning

"clear" or "obvious."  See United States v. Olano, 507 U.S.725, 734 (1993); cf.

United States v. Muniz, 60 F.3d 65, 70 (2d Cir. 1995) (appellate sufficiency

challenge not plain error where, "if there was a deficiency it was not extreme," the

evidence presented was "close to" sufficient, "even if it fell a trifle short").  There

is also no conceivable strategic reason for failing to challenge such an important

aggravating factor, which this Court has remarked makes it "more inclined to

deem an error 'plain.'"  United States v. Brown, 352 F.3d 654, 665 (2d Cir. 2003).

This Court has also held that the government's failure "to adduce sufficient

evidence to warrant submission to the jury is a defect affecting substantial rights."

Kaplan, supra, 586 F.2d 980, 982 at n.4.  This is the third prong of plain error

analysis, which requires a finding that the error was prejudicial.  Olano, 507 U.S

133

at 734. That finding must be made here. First, the substantial-planning aggravating factor played a significant role in the government's argument for death. Several pages of the opening summation were devoted to describing the murders as a chillingly "well-orchestrated execution," the planning for which started while Aquart was on his trip south with his brother and Taylor (P.5624 at A.368; see P.5622-24 at A.366-68). His "real issue was with Tina," the prosecutor noted, and he could have let the others live. But "when the defendant kicked down the apartment door to 101, . . . he intended for everybody in that apartment to die" (P.5625 at A.369). Aquart was "substantially more culpable . . . than either Taylor or Johnson," because "[h]e planned this, he hired his crew, he premeditated these murders" (P.5635 at A.5635).

There were numerous other references to this aggravator, all in service of the propriety of a death sentence. Aquart "chose to carefully plan and execute . . . three people inside their homes" (P.5692 at A.435); "It is the defendant who carefully planned to ambush them and slaughter them in their own home" (P.5694 at A.437); he "took the opportunity for a nice trip to Busch Gardens to help plan the murders" (P.5695 at A.438); "What sets this case apart is the extensive planning and premeditation that took place. And what sets it apart is that the defendant relished in each and every act as he underwent it and that plan went

134

forward" (P.5700 at A.443).

The alleged meticulous and cold-blooded planning of three murders –

including two people who had done nothing themselves to undermine Aquart's

business – thus played a prominent role in the government's argument for death.

It was underlined in its own right and used to underscore the heinousness of

Aquart's crime. That the jury found this aggravating factor established, and

weighed it in support of a death sentence, was unquestionably prejudicial. Indeed,

empirical studies have shown that capital juries often consider premeditation

highly aggravating.[55] Aquart's jurors must have shared this view.

Also relevant to prejudice analysis are the considerable number of

mitigating factors the jury found proven. And, significantly, the jurors were not

unanimous as to the appropriate sentence to impose on Aquart for James Reid's

murder. This demonstrates that the punishment vote was a close one, even with all

the aggravating factors they found to be established. If the substantial planning

and premeditation aggravator had not been found and weighed by the jurors, they

---

[55] See, e.g., John Blume *et al.*, Lessons from the Capital Jury Project, Chapter 5 in Beyond Repair? America's Death Penalty, at 151-52 (Stephen P. Garvey ed., 2003); William J. Bowers *et al.*, Foreclosed Impartiality in Capital Sentencing: Jurors' Predispositions, Guilt-Trial Experience, and Premature Decision Making, 83 Cornell L. Rev. 1476, 1504 (1998); Theodore Eisenberg, *et al.*, But Was He Sorry: The Role of Remorse in Capital Sentencing, 83 Cornell L. Rev. 1599, 1617 (1998).

may well have deadlocked on sentence for all the capital counts, if not reached a
unanimous life verdict.

For these reasons, the consideration and weighing of this important
aggravator by the jurors, in support of the death sentences they imposed,
"seriously affect[ed] the fairness" of the capital sentencing proceeding.  See
Olano, 507 U.S. at 736.  This Court should accordingly reverse Aquart's death
sentences.

Additionally, if the substantial planning and premeditation aggravating
factor was not proved beyond a reasonable doubt, then two other aggravators were
insufficiently established as well: that Aquart committed the murders for
pecuniary gain, and that he procured Taylor's aid in the murders by promising him
a place in his drug operation.

With respect to pecuniary gain, as the court below charged (P.5587-88 at
A.334-35), the government was required to prove that Aquart expected a
pecuniary gain from the killings, not from any other offense such as robbery.  See,
e.g., United States v. Bernard, 299 F.3d 467, 483-84 (5th Cir. 2002).  In keeping
with that principle, the government claimed that Aquart planned the killings to
stop Tina Johnson's drug sales, which were reducing his own sales.  The
prosecutor argued on summation that Aquart "committed these murders to

maintain his drug territory" (P.5621 at A.365). Tina Johnson was "impinging on his profits" by "taking his customers and he wanted them back, and he chose to make that happen by literally eliminating the competition" (id. at A.365). That he would kill three people "over a few dollars" showed his greed and "utter lack of respect for human life" (P.5621-22 at A.365-66).

If there was insufficient evidence that Aquart planned to kill the victims when the group broke into the apartment, rather than doing so based on unexpected events inside, then his motive for the murders could not have been a financial one. The pecuniary gain aggravator must therefore be dismissed.

The procurement aggravator was similarly linked to the murders (see charge, P.5586 at A.333), premised on the theory that Aquart enlisted Taylor to help in the break-in after stating he would employ Taylor in the Charles Street drug operation. The government had to acknowledge that Aquart never explicitly asked Taylor to kill anyone: Taylor said he had no idea murders were planned (see P.4490 at A.211).

Thus, the prosecutor focused jurors on Aquart's intent in enlisting Taylor's unwitting aid in what *Aquart* knew would be a triple homicide: "It is of no consequence" that Taylor was not aware of Aquart's "deadly plan," she argued. "What is relevant is that when the defendant offered something of value to John

137

Taylor in exchange for his assistance, he [Aquart] intended to kill Tina Johnson, James Reid and Basil Williams" (id. at A.211). But if the intent to kill was formed only after gaining entry to the apartment, the procurement aggravator cannot be sustained.

This Court should vacate Aquart's death sentences, strike all three aggravating factors, and order a new penalty trial.

# IV.

## The Government Failed to Prove Aquart Personally Murdered More than One Victim, an Aggravating Factor, Which Requires Vacatur of His Death Sentences.

The prosecutors argued that Aquart personally killed Tina Johnson and Basil Williams, and that his brother, Azikiwe, killed James Reid. The jury agreed, finding as proved that Azibo had killed more than one person during a single criminal episode, a statutory aggravator. Per the court's instructions, this finding could be based only Azibo's personal actions, not on those of any other person. And the jury had to unanimously agree on which victims he had killed (P.5582, 5590 at A.329, 337). The jury sentenced Aquart to death for killing Tina and Williams, but not Reid.

Taylor claimed to witness Azibo fatally beating Tina Johnson, and that testimony must be accepted for purposes of sufficiency of the evidence analysis. But the government's contention that it was Azibo who killed Basil Williams was pure speculation. Taylor did not witness Williams' murder (nor did Efrain Johnson). Indeed, there was no evidence that Williams was killed last, as the government posited, with Azibo in the apartment alone. It is not surprising, then, that the prosecutors made virtually no effort to support the claim that Azibo was Williams' killer: they simply asserted that this was so.

139

The aggravator should not have been submitted to the jury. See United States v. Wexler, 522 F.3d 194, 209 (2d Cir. 2008) ("A judgment of acquittal is warranted if the evidence is 'nonexistent *or so meager* that no reasonable jury could find guilt beyond a reasonable doubt" [emphasis added]). Defense counsel did not preserve this claim, but it meets the plain error standard for reversal. The multiple killings aggravator was important to the government's argument for Aquart's execution, and the jury found it proved and weighed it. Aquart's death sentences should be vacated. Cf. United States v. Kaplan, 586 F.2d 980, 982 and n.4 (2d Cir. 1978) (reversing convictions based on unpreserved sufficiency claim).

## A. Viewing the evidence in the light most favorable to the government, the multiple killings aggravator was not established.

Taylor did not claim to see anyone tape or beat Basil Williams. His last reference to Efrain was that he was in Williams' room as the Aquart brothers taped Tina Johnson and James Reid. But when Taylor witnessed their beatings, he did not see Williams in his separate bedroom. For all he knew, even crediting his testimony, Williams may have already been dead.

Significantly, Taylor did not purport to give a blow by blow account of everybody's actions in the apartment. On the contrary, his account was an incomplete narrative at best. As discussed in Point III, Taylor acknowledged there was a gap of time between the group entering the apartment and when Taylor

140

heard some sounds of duct-taping (see T.2325-26 at A.125-26; see T.2315-20 at A.115-20). And he was not in a position to see or hear everything that happened, because he helped Azibo move the living room couch as the other perpetrators remained in the back, and then stood by the living room window watching out (see T.2315-2320 at A.115-20). In fact, there is evidence that one or more victims recognized other men in the group and stated their names, yet Taylor admitted he did not hear this (see T.2327 at A.127).

There was another gap after the sounds of taping ceased, during which Taylor alerted the others to someone coming and Azikiwe came into the living room to investigate; satisfied that no one was there, Azikiwe returned to the back and the sound of taping resumed (T.2321 at A.121). Taylor had not seen Williams for some period of time by this point, and never claimed to see him again before fleeing.

There was also DNA evidence linking Williams to Azikiwe Aquart. The government's expert testified that the DNA of Williams, Reid and Azikiwe was included on a piece of nylon stocking found at the head of the boxspring in Tina and Reid's bedroom (15-Z2); the number of their genetic markers that were detected would be shared by only 1 in 1000 African-Americans. Tina's and Azibo's DNA could not be excluded, but with significantly lower odds: 1 in 450

141

for Tina and 1 in 220 for Azibo (T.3197-3201 at A.180-84; see T.508-11 at A.99-102; GX 101A and photo linked to no. 15 at A.579).  This indicated that Azikiwe came in contact with Williams before killing Reid, since Taylor testified that Azikiwe left the apartment right after Reid's murder (T.2323-27 at A.123-27).

Similarly, Williams' DNA was included on a double glove found on the floor at the head of Tina and Reid's bed,[56] and could not be eliminated from a piece of latex stuck to tape around Tina's hands.[57]

Thus, there were several items of evidence with or indicative of Williams' DNA found in Tina and Reid's bedroom, all linked to Azikiwe (including one with substantially higher odds than Azibo).  And Taylor did not rule Azikiwe out as the person responsible for Williams' murder: Taylor only had a couple of fleeting glances into Williams' bedroom, and did not see him at all when he ultimately went back to see Tina and Reid being beaten in their separate bedroom.  By that time, Taylor had been standing at the living room window for a period of time.

Given the dearth of evidence that Williams died at Azibo's hands, the government understandably had very little to say to support this claim.  In opening

---

[56]  T.3084, 3186-87 at A.159, 176-77; see T.503-06 at A.95-98; GX 101A and photo linked to no. 14 at A.578.

[57]  T.3155-64 at A.162-71, re tape fragment 9-Z1; none of the four perpetrators could be eliminated.

142

statement at the penalty phase, a prosecutor made two assertions (P.4485-86 at
A.209-10), neither of which were repeated on summation.  First, she claimed that
Williams and Tina "were killed in the same manner.  Both bodies were covered"
(P.4486 at A.210).  But all three victims were killed in the same manner, taped and
beaten over the head.  And all three were covered in part.  Williams had a small
blanket on his back obscuring his hands but his head was uncovered (see GX 120-
1 at A.612; T.184 at A.84).  Tina's son said that both she and Reid had "pillows
over them" when he climbed through the window – pictures suggest these were
couch cushions – and he moved them off his mother (T.89, 97 at A.82, 83; see GX
121-3, 121-4 at A.618-19).  Since the victims' heads were right next to each other,
this action evidently removed the cushion(s) from Reid as well.  And the mattress
was leaning upright over part of Reid's body (GX 121-4, 121-9 at A.619, 622).

Second, the prosecutor noted that Williams' blood was found on the inside
front door lock, and the evidence "indicates" that Azibo "sealed that apartment
door" (P.4486 at A.210).  It is true that a very small amount of Williams' blood
was found on the lock (see T.296-301 at A.85-90; T.3215-16 at A.186-87; GX
164-65 at A.644-45).  But the lock was not close to any of the screws drilled to
keep the door closed (see T.303-06 at A.91-94; GX 116, 116A, C, F-J at A.602,
603, 604, 605-09).  Also, as discussed, there was no proof that Williams was killed

143

last, and his blood could have been on any one of the perpetrators. The government's theory was that Azibo stayed behind with the drill, and that each of the other three left by the front door. Any one of them could have left Williams' blood as they reached for the doorknob to pull the door open. Indeed, if it was Azibo who had deposited Williams' blood on the lock, one would expect to find additional traces on the screws and around the areas of the frame where they were inserted. None was discovered.

In any event, even if it was firmly established that it was Azibo who made the deposit – which it was not – this did not mean he killed Williams. It was a trace amount, which he could have picked up from checking Williams before leaving, or from blood on the floor or surrounding objects, or from blood transferred from Azikiwe's person or weapon when he came from Williams' room into Tina and Reid's. As noted, the argument was so weak that the government did not repeat it on summation. There, the prosecutors simply asserted – with no supporting argument at all – that Azibo was Williams' murderer (see P.5625, 5628-29, 5700 at A.369, 373-73, 443).

In sum, there was no evidence from any source, testimonial or forensic, that Azibo killed Williams – certainly not evidence to establish this beyond a reasonable doubt, as the government was required to do.

144

**B.**    **Aquart's death sentences for killing Tina Johnson and Basil Williams must be vacated, given the obvious importance of the multiple killings aggravator to the jury's verdict.**

As discussed in Point III, this Court must independently review "whether the evidence supports the special finding of the existence of an aggravating factor." 18 U.S.C. § 3595(c)(1). Construing the evidence in the light most favorable to the prosecution, no rational trier of fact could have found the multiple killings aggravator proven beyond a reasonable doubt. See Lewis v. Jeffers, 497 U.S. 764, 781-83 (1990) (applying sufficiency review standard of Jackson v. Virginia, 443 U.S. 307, 319 [1979], to aggravating circumstance in capital murder prosecution); United States v. Tipton, supra, 90 F.3d 861, 896 (same, applied in federal capital case).

Its submission to the jury also meets the plain error standard of review. In a capital case, allowing jurors to deliberate on an aggravating factor that is so deficiently supported is certainly plain error, "plain" meaning "clear" or "obvious." See United States v. Olano, 507 U.S. 725, 734 (1993). And this Court is even "more inclined to deem an error 'plain'" where, as here, there is no possible strategic reason for counsel's failure to move to dismiss any aggravating factor – much less one as important as the multiple killings one, as discussed below. See United States v. Brown, 352 F.3d 654, 665 (2d Cir. 2003).

145

Finally, the government's failure "to adduce sufficient evidence to warrant submission to the jury is a defect affecting substantial rights" (United States v. Kaplan, supra, 586 F.2d 980, 982 at n.4), the third component of plain error analysis. Olano, 507 U.S. at 734. There can be no question that the multiple killings aggravator figured prominently in the government's argument for Aquart's execution. The prosecutors underscored that he had "brutally and cruelly murder[ed] three defenseless human beings" (P.5616 at A.360). His "issue" was with Tina, and he could have killed her alone. But instead he "chose to murder all three victims at the same time" (P.5625 at A.369), and was personally responsible for killing Tina and Williams (id. at A.369); he helped bind Reid, the prosecutor claimed, and watched as his brother bludgeoned that victim. "Killing one person is horrible; beating three people to death is beyond comprehension" (P.5626 at A.370; see P.5702-03 at A.445-46).

In addition, the jurors' sentencing verdict demonstrates unequivocally that the number of victims they believed had died at Azibo's hands was of overriding importance. They found numerous aggravating factors established and weighed them against the substantial mitigation evidence presented, and sentenced Aquart to death for killing Tina and Williams; they could not agree that execution was justified for Reid's murder, which Taylor attributed to Aquart's brother, Azikiwe.

146

Had they rejected the multiple killings aggravator, and concluded that Azibo was responsible for only one of the three fatal beatings – or, at the least, that the government had not proved he killed more than one person – it is doubtful they would have voted a death verdict for either Williams' or Tina's killing.

For these reasons, the jurors' weighing of this important aggravator in support of the death sentences they imposed on Aquart "seriously affected the fairness" of the capital sentencing proceeding.  See Olano, 507 U.S. at 736.  Those sentences should accordingly be reversed and the case remanded for a new penalty trial.

## V.

**Cooperating Witness Lashika Johnson Falsely Denied to the Jury That She Had Been Threatened at a Proffer Session, and Aquart's Trial Prosecutors – the One Who Johnson Later Acknowledged Had Made a Threat and the Other Two Who Had Been Present – Let this Testimony Stand. This False Testimony Prejudiced Aquart at the Both the Guilt and Penalty Phases of the Trial and Requires Reversal of His Murder Convictions and Death Sentences.**

"Whether the introduction of perjured testimony requires a new trial depends on the materiality of the perjury to the jury's verdict and the extent to which the prosecution was aware of the perjury." United States v. Wallach, 935 F.2d 445, 456 (2d Cir. 1991). Here, Lashika Johnson (Azibo Aquart's former girlfriend and Efrain Johnson's sister) testified as a government cooperator at each man's trial. Before Aquart's jury, she acknowledged that she had started to cry at a particular proffer session when agents said they did not believe her, but she flatly denied that she had been threatened. The three lawyers prosecuting Aquart's case had been present at this interview, and her testimony went unremarked. At Efrain Johnson's later trial, however, which took place prior to Aquart's formal sentencing by the District Court, Lashika testified that at this same session, one of these prosecutors had "stood up" and "yell[ed]" at her, threatening to have

148

Johnson placed "in shackles" and taken "to jail" immediately, and further

threatening that her children would be "take[n] away" from her.  She believed that

the only way to avoid this was to "start saying different things."

Aquart filed a post-verdict motion for a new trial and penalty proceeding

based on this newly-discovered evidence (DE 1102 at A.502-14).  The District

Court denied the motion, finding that Lashika had not committed perjury.  In any

event, the Court ruled, the error was not sufficiently prejudicial to warrant a new

trial given the other evidence of Aquart's guilt (DE 1177:10 at A.555).  The Court

did not address Aquart's contention that the perjury mandated a new penalty

proceeding (see DE 1102:1, 9-10, 12-13; DE 1106:9-10).

The District Court's finding that no perjury was committed was clear error,

and there can be no dispute that the government was aware of the false testimony

at Aquart's trial.  Moreover, the presentation of perjured testimony materially

affected the jury's guilt and sentencing verdicts.  Unaware of the coercive

practices of the government at an early proffer session with Lashika, defense

counsel was deprived of important impeachment evidence; had the prosecutors

corrected her false testimony, the defense would also have had proof that the

witness was not only willing to lie to serve her own interests, but to lie to the

jurors, under oath.  And Lashika was not a minor witness for the government, but

149

a significant one.

Indeed, the District Court acknowledged that Lashika's testimony was "very important" to the government.  However, it denied Aquart any remedy for the witness's perjured testimony (DE 1177:9-10 at A.554-55).  This ruling was an abuse of discretion: the witness's uncorrected false testimony violated Aquart's right to due process and to a fair and reliable sentencing determination.  His murder convictions and death sentences should therefore be reversed.  At the very least, the case should be remanded for a hearing to provide the government with a second opportunity to specify the exact nature of the "consequences" it admittedly warned Lashika about at a "confrontation" it admittedly had with her (see DE 1105:2-3, 12-13 at A.516-17, 526-27) – a confrontation and warning that were not reflected in any way in the FBI 302 report of the interview (a copy of this report is contained in the appendix at A.454-55).

**A.    At different trials, Lashika Johnson gave flatly contradictory accounts of what took place at a government proffer session on October 14, 2008.**

At Aquart's trial, Lashika testified that she entered into a proffer agreement with the government on September 18, 2008 (T. 2914-15; see GX 268).  She disclosed her marijuana dealing, first supplied by her brother and later by Azibo Aquart.  She sold small amounts, eventually getting up to one or two pounds per week.  She also sold a "small amount" of crack for Aquart "for a little while" (T.

150

2940-42; see also T. 2815-19, 2839-42).  Lashika testified that under the terms of the proffer, if she told the truth, she would not be "punished for what [she] did" (T. 2915).[58]

Despite these acknowledged consequences, Lashika admitted she was not entirely candid with the government even after signing the proffer agreement.  At trial, however, she said she was testifying about what happened because "[i]t's the right thing to do" (T. 2915-17).

On cross-examination, Lashika was asked several questions about an interview on October 14, 2008, almost a month after entering into the proffer agreement (T. 2943-46 at A.146-149).[59]  She agreed that law enforcement personnel had told her then that they did not believe she was telling the truth.  She knew that meant she was "in big trouble," that her proffer would be "gone" and she "could be prosecuted."  She started to cry (T. 2944-45 at A.147-48).  Then she told them some things she had not mentioned before, and the proffer agreement was not "rip[ped] up" (T. 2945-46 at A.148-49).  But Lashika flatly denied she provided more information because she had been threatened:

_____

[58] This referred to her uncharged drug sales (see T. 2941-42); Lashika testified that she did not believe she had committed any crime by helping Aquart after the murders – she just did what he told her to do (T. 2958).

[59] The transcript mistakenly says 2007 (see DE 1105:5, n.2 at A.519).

151

A.    Not because I was threatened.

Q.    You were being threatened, were you not?

A.    I don't think it was a threat.  It was just more so like they were telling me what was right and what I had to do.

Q.    And you understood that if you didn't do what they said, you were in big trouble.

A.    I understood that if I didn't do what was right then I would be in trouble.

(T. 2946 at A.149).

Notably, defense counsel had no basis to suspect that Lashika was not being candid when she denied being threatened at this meeting.  As the court below noted in its opinion, the FBI's 302 report of this particular interview, provided to the defense in discovery, stated only the following: prosecutors and investigators told Lashika they did not believe she was being truthful, she began to cry, and she had a short private discussion with her lawyer.  The interview then resumed, with Lashika asking if she could start over (DE 1177:2, n. 2 at A.547).

In subsequent proffer sessions, Lashika supplied additional information incriminating Aquart that she claimed she just happened to recall (T. 2946-55 at A.149-58); she "couldn't remember everything all at first," details were "slowly piecing themselves together" (T. 2950 at A.153).  Among other things, she said

152

Aquart had had her dispose of a power drill the morning of the murders; she had previously denied knowledge of any drill (T. 2945-47 at A.148-50).

On February 21, 2012, eight months after the jury's verdict but before Aquart was formally sentenced, Lashika testified at her brother Efrain's trial. There, she stated that she had been threatened at an early proffer session, and provided a vivid description. She was "yelled" at by a prosecutor, who "stood up and threatened to put [her] in shackles"; Lashika was "threatened that [she would] be going to jail," and she was told that she would "lose her children" (see DE 1102:2 at A.503). This "scared" her, and necessitated a break so she would have time to "gather [her]self." She believed that if she "didn't start saying different things that [she] could be going to jail" and "lose [her] kids" (id. at A.503; see also DE 1177:4 at A.549). Lashika said that even though her attorney was present, the prosecutor "didn't seem to have any hesitation to yell at [her] and say that if [she] d[id]n't do this we're going to send [her] to jail and take away [her] kids in front of everybody in that whole room"; the prosecutor "made clear she was going to have those agents who were present take [her] out of that room *right then* and take [her] to jail" (DE 1102:2 at A.503 [emphasis added]; see DE 1105:9-10 at A.523-24).

This vivid and detailed account was irreconcilable with Lashika's testimony

153

at Aquart's trial. There, she claimed that someone at the proffer session simply remarked that they did not believe Lashika was being truthful. Lashika maintained at the second trial that the prosecutor had heatedly cited specific and dire consequences of Lashika's adherence to her story: not the conjectural possibility of future incarceration if the government decided to prosecute her for drug-dealing and prevailed, but the immediate loss of Lashika's liberty and her children.

In sum, Lashika testified under oath at Aquart's trial that she was not threatened or admonished in any fashion. She testified under oath at her brother's trial that she was in fact bullied and scared into providing incriminating information. Indeed, the court below recognized the inconsistency: at Aquart's trial, Lashika "testified that she did not regard" her exchange with the authorities "as a threat, but during [her brother's] trial she agreed with defense counsel's characterization that the AUSA threatened to put her in shackles, send her to jail, and take away her children" (DE 1177:6 at A.551). There was another – and significant – difference between the two accounts. At Aquart's trial Lashika claimed she changed her account because it was the "right" thing to do. At the second trial, she said she was coerced: she believed the prosecutor's threats would be immediately carried out if she "didn't start saying different things."

154

**B.    The court below clearly erred in finding that Lashika did not commit perjury at Aquart's trial.**

To obtain a new trial because a witness has lied, the defendant must make a four-point showing: "'(i) the witness actually committed perjury; (ii) the alleged perjury was material; (iii) the government knew or should have known of the perjury at [the] time of trial; and (iv) the perjured testimony remained undisclosed during trial.'" United States v. Cromitie, 727 F.3d 194, 221 (2d Cir. 2013), quoting United States v. Josephberg, 562 F.3d 478, 494 (2d Cir. 2009).

As to the first point, a witness commits perjury by "giv[ing] false testimony concerning a material matter with the willful intent to provide false testimony, as distinguished from incorrect testimony resulting from confusion, mistake, or faulty memory." United States v. Dunnigan, 507 U.S. 87, 94 (1993). There is no question here that Lashika gave diametrically opposed accounts of what happened at the October proffer.[60] Indeed, the District Court did not deny that Lashika gave inconsistent testimony on whether or not she had been threatened, and in fact

---

[60] There is also no question that the third and fourth prongs of the Cromitie test were met. The government was aware of the perjury, since the same three prosecutors who attended the proffer session at issue – including the one who made the threats to Lashika – were the trial prosecutors at Aquart's trial. Moreover, the perjury was not revealed until long after his verdict, when Lashika testified at her brother's trial. As discussed in Section A, the 302 report of the interview in question did not even allude to any threats made to Lashika. Thus, Aquart's lawyers had no grounds to challenge her testimony.

155

assumed this (DE 1177:6 at A.551).  But it concluded that " the testimony in the two trials was consistent as to its inculpatory substance," and, therefore, did not evidence that Lashika "willfully intended to testify falsely at Mr. Aquart's trial" (id.:6-7 at A.551-52).  This conclusion rested on flawed grounds.

First, the court found that Lashika testified at Aquart's trial that "the Government confronted her with the potential for prosecution for lying at the October 14, 2008 proffer session, causing her to cry" (DE 1177:7 at A.552).  This finding of fact is erroneous.  Instead, Lashika acknowledged *only* that she was told that people did not believe her, and that this is what caused her to cry.  She agreed with counsel that she "understood," on her own, that their lack of belief could result in the loss of her proffer agreement.  But she never said anyone at the meeting mentioned *any* consequences for sticking to her story, much less warned her of the potential for prosecution (T. 2945 at A.148).

At her brother's trial, in stark contrast, Lashika testified that she had been physically confronted about her apparent lies at the proffer session, and warned she would suffer if she did not provide additional information: she would be taken to jail "right then" and lose her children.

The two versions cannot be attributed to mistake or carelessness.  The witness was examined at length about the same subject at the two trials, and she

156

portrayed what happened, and why she had made additional statements, in

opposite ways.  Moreover, given her graphic description of the prosecutor's

threatening behavior at her brother's trial, it is impossible to believe she simply

forgot this behavior at Aquart's trial – particularly since she was specifically asked

if she had been threatened.

To further support its conclusion that Lashika did not commit perjury, the

District Court noted that at two points in her testimony at Efrain's trial, Lashika

took issue with defense counsel's characterization of the facts (DE 1177:7 at

A.552). Apparently, but erroneously, the court believed that this diluted her claim

of being threatened.  The first instance was when Lashika was asked whether the

prosecutor "said if you didn't start saying what they wanted to hear they were

going to take you off to jail?"; she replied, "[the prosecutor] didn't put it in exactly

those words" (id. at A.552).  But the court failed to note that the witness was not

contesting the threat itself, because when counsel immediately followed up with

the question, "She threatened you'd be going to jail?," Lashika said "Yes" (see

quoted testimony at DE 1177:3-4 at A.548-49).

The second instance cited by the court occurred when Efrain's counsel

inquired, "But I think [it is] fair to say that Ms. Dayton . . . made clear to you that

either you get down with the program with what the government was looking to do

157

or you were going to jail; is that the message?" Lashika replied, "I don't know really how to word – that you are wording it completely correct" (DE 1177:7 at A.552). But again, an immediate followup was posed – "I mean, did you feel that if you didn't start saying different things that you could be going to jail?," "You could lose your kids?" – and the witness said, "Yeah" (see testimony quoted at DE 1177:4 at A.549). Moreover, Lashika never once retracted her testimony that she was threatened at that meeting, and forcefully so – an admission she had explicitly denied at Aquart's trial.

Thus, Lashika's two qualifications of the facts did not dispute either that threats were made or the nature of those threats. As to those facts, Lashika repeatedly affirmed them. She also affirmed what she thought she had to do to stay out of jail: "say[] different things."

The District Court had one final basis for its 'no perjury' finding: the parties' pre-trial agreement in Aquart's case that cooperating witnesses would avoid mentioning a trial prosecutor's presence at pre-trial interviews (see DE 669:45 at A.480). The court evidently believed that this may have hamstrung Lashika from disclosing the threats made at the proffer session when testifying at Aquart's trial, making it less likely that she intended to deceive Aquart's jury (see DE 1177:7-8 at A.552-53).

158

This rationale also rested on a misapprehension of the facts.  Defense counsel had never sought to preclude a witness from revealing that "a government attorney" attended a proffer session, or even that "a prosecutor" did so.  Rather, in order to avoid unsworn witness and vouching errors, he simply asked that witnesses not mention the presence, by name, of any of the *trial* prosecutors (see motion of Azikiwe Aquart, DE 661:5-7 at A.475-77, adopted by Azibo Aquart's counsel in DE 664:1, 8 at A.478, 479).  The government agreed, and said it would "instruct the cooperating witnesses to state only that a 'government attorney' was present" without identifying that attorney by name (DE 669:45 at A.480 ).[61] Accordingly, there were no strictures on Lashika revealing that she had been threatened by "a prosecutor" or "a government attorney."  And there were certainly no strictures precluding mention of the actual threats she had received.

In sum, the District Court did not set forth any defensible basis for finding that Lashika Johnson did not wilfully present false testimony to Aquart's jury.  On the contrary, the record shows that she did.   And there is no basis to conclude that she invented the threats at Efrain's trial.  She appeared as a government witness

---

[61] In its decision below, the court stated it had issued an order precluding mention of any prosecutor's presence at a pre-trial interview (DE 1177:4, 7-8 at A.549, 552-53). The court did not provide any citation for this ruling, and we have been unable to find any such order.

against him, and there is no suggestion that she sought to use the threats to recant her statements incriminating Efrain.  Significantly, the government never claimed she did this when opposing Aquart's motion for a new trial.

Moreover, when Lashika revealed what took place at her brother's trial, the government did not challenge the substance of her testimony in any way.  In fact, the only allusion made to its substance came on re-redirect examination, when Mr. Markle asked Lashika if he or Ms. Reynolds (the two Efrain Johnson prosecutors) had ever yelled at her or threatened to take her children away.

These two had prosecuted Aquart as well, and they were present at the October proffer session in question; it was Aquart's third prosecutor, Ms. Dayton, who had spoken to Lashika so forcefully.  None of these prosecutors submitted an affirmation in opposition to Aquart's post-verdict motion.  Significantly, however, the government did acknowledge in its papers that there was "a confrontation" and that Lashika was warned of "the consequences" of lying (DE 1105:2-3, 12-13 at A.516-17, 526-27).

The government did not elaborate on what "consequences" were cited, or on the nature of the "confrontation."  However, these two acknowledged facts are consistent with Lashika's testimony at her brother's trial, and at odds with her testimony before Aquart's jury.  There, despite the express invitation to reveal

160

threatening behavior by her interviewers, Lashika did not mention any threats, any warnings of consequences, or any kind of confrontation at all.[62]

**C.    The perjury was material, mandating reversal of Aquart's murder convictions and death sentences.**

In United States v. Agurs, 427 U.S. 97, 103 (1976), the Court held that "a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." Perjury is necessarily "material" if it satisfies this reasonable likelihood test. United States v. Cromitie, 727 F.3d 194, 221-22. It is a lenient standard. Indeed, this Court has "interpreted Supreme Court precedent as holding that 'if it is established that the government knowingly permitted the introduction of false testimony reversal is virtually automatic.'" Drake v. Portuondo, 553 F.3d 230, 241 (2d Cir. 2009) (conviction

---

[62] The government did assert in its opposition papers (without benefit of an affirmation) that "the government did not threaten to take away Lashika's children or to escort her out of the courthouse in shackles" (DE 1105:13 at A.527). Notably, Lashika did not claim the prosecutor had said she would personally do either of these things. And, perhaps the government took issue with counsel's characterization of the prosecutor's remarks as a "threat" – it denied making any threats, and asserted it instead "advised" the witness of the [unspecified] consequences of violating the proffer agreement (id. at A.527). In any event, as noted, the government did acknowledge a confrontation with the witness, and that she was warned of the consequences of lying – facts that Aquart's jury never learned, which pressured Lashika to change her story.

161

reversed), quoting Shih Wei Su v. Filion, 335 F.3d 119, 127 (2d Cir. 2003) (conviction reversed); accord United States v. Wallach, 935 F.2d 445, 456 (2d Cir. 1991) (conviction reversed).  The same standard applies whether the government actively solicits false testimony or passively fails to correct it when it is given. See Napue v. Illinois, supra, 360 U.S. 264, 269.

In this case, the court below correctly acknowledged that Lashika's testimony "was without doubt very important, corroborating aspects of Taylor's" (DE 1177:9 at A.554).  For example, she implicated Azibo and her brother in the "dry run" before the murders, saying Azibo asked for Efrain's help in handling something and Efrain leaving thereafter (T.2873-75); she said Azibo spoke with Efrain in the early morning hours on the date of the crime, and that Azibo parked his car near her house after that (T.2870-73, 2975-78); and she placed Azibo in the company of her brother, Azikiwe Aquart and a fourth person at her apartment immediately after the murders (T.2878-79, 2949, 2966, 2970).  She also said Azibo told her to dispose of several garbage bags containing, according to the government, the blood-covered garments worn by the men during the crime and the drill Azibo had used to seal the victims' apartment (T.2878-86, 2910-12).  And Lashika relayed that Azibo got a call from Azikiwe shortly after the murders evidently using Tina Johnson's phone: Azibo was aggravated and asked Azikiwe,

162

why are you calling from this cell phone? (T.2891-92).

But the District Court dismissed the value to the jury of learning of Lashika's perjury because other evidence relevant to her credibility was presented (DE 1177:8 at A.553). This cumulativeness analysis ignores both the nature and purpose of the pressure exerted on Lashika, and the importance of the jurors learning that she had taken an oath and deliberately lied *to them*.

The impeachment evidence at issue was qualitatively different than proof that Lashika had sold marijuana over a 10-month period, or that she had lied during her first meetings with law enforcement (see DE 1177:8 at A.553). It also went beyond being afraid that she could be prosecuted for drug crimes if she did not tell the truth. Rather, the prosecutor had exerted pressure on Lashika to change her account, and threatened her with immediate incarceration and loss of her children if she did not comply. This was of a different ilk than the impeachment material cited by the court below. See Wallach, 935 F.2d 445, 458. Threats can be just as much a motivator to tell the authorities what they want to hear as the promise of a benefit, and Lashika admitted at her brother's trial that the prosecutor's threats scared her. That she could lose her children was particularly coercive. See United States v. Tingle, 658 F.2d 1332, 1336 (9th Cir. 1981).

Just as important, had the government exposed her false testimony at

163

Aquart's trial, the jurors would have had proof that she had lied under oath at that

very proceeding.  This Court has recognized the significance of such evidence,

which would have "directly call[ed] into question the veracity of the rest of h[er]

statements."  Wallach, 935 F.2d at 458; accord, United States v. Seijo, 514 F.2d

1357, 1363-64 (2d Cir. 1975); see also Shih Wei Su v. Filion, supra, 335 F.3d 119,

129 at n. 6.  "It was one thing for the jury to learn that [the witness] had a history

of improprieties; it would have been an entirely different matter for them to learn

that after having taken an oath to speak the truth he made a conscious decision to

lie."  Wallach, 935 F. 2d at 457.

       The Supreme Court has also found due process error when a prosecutor fails

to correct testimony he knows to be false, even when the falsehood "goes only to

the credibility of the witness."  Napue v. Illinois, 360 U.S. 264, 269 (1959).   In

Napue, the government's witness denied he had received a promise of

consideration in exchange for his testimony.  In fact, however, the prosecutor had

promised to make a recommendation for a reduction of the witness's sentence if he

testified against the defendant.  The prosecutor let the perjured testimony stand.

The Supreme Court reversed defendant's conviction, even though "the jury was

apprised of other grounds for believing that the witness . . . may have had an

interest in testifying against petitioner."  Id. at 270.  See also Giglio v. United

164

States, 405 U.S. 150 (1972) (new trial required where government witness testified falsely as to matter relating to credibility and prosecutor should have known of falsehood).

In this case, additionally, Lashika chose to whitewash the bullying behavior she had been subjected to. This was proof of her interest in currying favor with the government by making her testimony incriminating Aquart more believable.

As a result of her false denial of being threatened, Aquart's jury was left in the dark. His counsel could only note on summation that Lashika's marijuana selling was covered by the proffer agreement, and argue that she was unreliable because she kept embellishing her account as things "pop[ped] into her mind" (T.4304-06 at A.199-201). He also faulted the government generally for not recording proffer sessions, or having cooperators read the interview reports to verify they were accurate (see T.4313-15 at A.202-04).

The prosecutor countered on rebuttal that jurors had heard how the Federal Bureau of Investigation "documented pretty much every detail of these [proffer] meetings, including every time a witness didn't tell the truth. Despite that, counsel argues to you that somehow the government's not actually looking for the truth, that we're only looking for those facts that corroborate witnesses who implicate the defendant" (T.4322 at A.206). As previously noted, however, the report of the

165

Lashika proffer session at issue did not record a single detail about threats made to

her. The government was thus able to shield the witness from important

impeachment, and also take the high road concerning its investigative tactics.

Aquart's murder convictions should accordingly be reversed and a new trial

ordered. At the very least, his death sentences should be vacated. See Phillips v.

Ornoski, 673 F.3d 1168, 1190-97 (9th Cir. 2012) (vacating death sentence, but not

conviction, for Napue error); Sivak v. Hardison, 658 F.3d 898, 912-18 (9th Cir.

2011) (same); Jackson v. Brown, 513 F.3d 1057, 1076-79 (9th Cir. 2008) (same).

There was substantial mitigating evidence in this case, virtually all of which the

jurors found established. The death verdict was not swiftly reached, and the jurors

could not agree to impose that sentence on Aquart for James Reid's murder, which

was committed by Azikiwe Aquart.

Lashika, in turn, was a critical government witness, who offered key support

for the death verdicts. It was Lashika who recounted how calm Aquart acted in

her apartment shortly after the brutal murders, with the presence of mind to direct

her to dispose of the men's bloody clothing, to ask her to put on gloves before

handling the bags, to take them to a dumpster several blocks away, and to have her

use his car to go to his place to get fresh clothes for him (T. 2880-89, 2911-12).

She was told to leave the car there to make it look like he had been home all night,

166

and complained about the clothes she brought back for him (T. 2888-89).  This

behavior, if credited, evidenced a callousness and lack of remorse on Aquart's part

that had to have affected the jury's penalty-phase verdict.

Lashika also said Aquart asked her to dispose of a drill (T. 2884-85) – the

drill that the government argued was chilling evidence of the defendant's

substantial premeditation and planning in carrying out the murders.  To rule out

that Aquart found the drill by happenstance at the murder scene, and used it

spontaneously, Lashika claimed she had seen it before when Aquart used it to

make a peephole in her door (T. 2884-85).

As previously discussed, Lashika also corroborated Taylor in many respects,

as the court below acknowledged.  A juror who legitimately questioned Taylor's

account could look to Lashika Johnson for pivotal corroboration, unaware that she

felt free to lie under oath when it suited her purpose.  Had the prosecutor

confronted Lashika with her lie, to correct the record, jurors would have had

reason to wonder whether she had lied about other matters, and whether Taylor,

too, was above committing perjury in order to advance his own interest.  Notably,

the jurors were instructed that if they found that any witness had deliberately

presented false testimony, they were entitled to discredit all of their testimony if

they so chose (T. 4206).

The imposition of the death penalty requires a particularly high degree of reliability.  Lockett v. Ohio, 438 U.S. 586, 604 (1978). See also United States v. Fell, 360 F.3d 135, 143 (2d Cir. 2004) and cases cited therein. This high standard of reliability was compromised by the government's failure to correct perjured testimony.  Moreover, in the context of a capital sentencing proceeding, the standard for reversal – a "reasonable likelihood that the false testimony could have affected" the jury's verdict – this Court need only be satisfied that the error could have affected just one juror.  For absent a unanimous vote for death, Aquart would have been sentenced to life in prison without the possibility of release.  See P.5570; 18 U.S.C. § 3594.  That standard was unquestionably satisfied here. Accordingly, Aquart's death sentences cannot stand.  At the least, the case should be remanded for a hearing.

# VI.

## Contrary to the Fundamental Rules Governing Closing Arguments, the Prosecution Interjected Facts Not In Evidence, Misleading the Jurors about the Thoroughness of Its Expert's Analysis of the DNA Evidence.

One of the defense themes during the guilt/innocence proceedings was that law enforcement prematurely settled on Aquart as a suspect, to the exclusion of others (T.4268 at A.197). That rush to judgment had implications for the government's evidence. In particular, the defense asked the jurors to worry that the government's single-minded focus on Aquart may have resulted in "observer bias" — "the problem that an interpretation is driven by or colored by knowing who you are comparing the samples to" (T.4281 at A.198; see also T.3537 at A.193) — undermining the reliability of the interpretation of the DNA evidence.

A glaring omission in the case, raising the specter of observer bias, was the crime lab's failure to obtain a DNA sample from Rodney Womble, for comparison purposes. Christine Roy, a Forensic Science Examiner with the Connecticut State Forensic Science Laboratory, performed DNA analyses for the government (T.3108). She performed DNA testing on items of evidence submitted to the lab by law enforcement, attempted to develop DNA profiles from those items, and, when possible, compared those profiles to reference samples taken from the

169

victims and from certain of the suspected participants in the crime, namely Azibo and Azikiwe Aquart, John Taylor, and Efrain Johnson (T.3107-08, 3165, 3169, 3203; see also GX 463).

Inexplicably, however, law enforcement never provided her with a reference sample from Rodney Womble. She had no sample from him despite the fact that the initial request for examination sent to the lab at the very beginning of the case in 2005 named only two suspects, Azibo Aquart and Womble (T.3290 at A.189) — a fact that AUSA Dayton acknowledged in her closing statements (T.4319 at A.205: "there were two suspects named, the defendant and Rodney Womble"). Womble, Aquart's lieutenant, was known to have had had altercations with Tina Johnson concerning her drug sales, see Statement of Facts, Section I.B., and, so, the government had cause to list him as a suspect. And Womble very quickly began to cooperate with the government (T.1383, 1510-11, GX 234A (cooperation agreement, dated May 8, 2006) and so, presumably, would have consented to a sample. Whatever the reason, absent a reference sample, Womble was not included in the comparisons performed by Roy.

The defense, reasonably, raised this failure in its closing arguments:

> [Roy] had evidence in the form of an evidence request with the suspect's name on it, Azibo Aquart. And Rodney Womble, we don't know what happened with Womble, but we know by the time the testing began he was cooperating and his DNA profile was never

170

provided to the lab.

(T.4281 at A.198).

In response, AUSA Dayton argued that Roy had no need for a sample from Womble, because, as a convicted felon, his profile was contained in CODIS. CODIS, as Roy had explained, is the DNA database maintained by the FBI, comprising DNA profiles from convicted felons and certain evidentiary samples (T.3112, 3165). Dayton suggested that the CODIS database served the same function as a reference sample for a convicted felon, such as Womble:

> The defense has also brought up the fact that Womble's DNA was not submitted for testing. Well, first of all, you know Womble is a convicted felon, and you know from Christine Roy that Womble – excuse me, that the CODIS database is made up of the DNA of convicted felons. And, in fact, you know that's how they originally got the hit on Efrain Johnson and proved that he, too, was part of these murders.

(T.4326 at A.207). Driving the point home, she finished, "There is absolutely no evidence in this record whatsoever to suggest that Womble's DNA was at that crime scene." (T.4328 at A.208). In other words, the government asked the jurors to believe that, had Womble's DNA been present in the apartment, on any of the items tested, it would have been identified, because his profile is in the FBI's CODIS database.

The evidence, however, did not support such an inference. Instead, Roy testified that CODIS would not accept just any sample. She explained that local

171

laboratories are permitted to submit DNA profiles for inclusion in and comparison to the FBI database — but with certain restrictions (T.3112, 3165, 3203 at A.160, 172, 185). Labs are not permitted to submit samples that would generate excessive hits, which would degrade the value of the database:

> [T]here are certain rules as to which type of profiles can go in and the information that you can put in the profile. You can't put in so little information that you would have hits on, you know, hundreds of individuals that are in the database. You are required to put in a certain amount of information.

(T.3113 at A.161). Roy never testified that she submitted every profile developed from the evidentiary samples in this case to the CODIS database: She testified that she submitted two specific evidentiary samples — 9-Z2, the sample that generated the hit for Efrain Johnson, referred in the government's closing, and 16-Z1 — but made no such representation regarding any other sample (T.3165, 3169, 3203 at A.172, 173, 185).

Most of the evidentiary samples in this case were mixtures, and many of those were highly complex, with the possibility of three or four or more different contributors, some with only partial profiles (*i.e.*, missing genetic markets at one or more of the comparison sites or loci) and varying degrees of contribution

172

(T.3132, 3152, 3154, 3163, 3183-84, 3186, 3191, 3197, 3202, 3409).[63] As Roy explained, frequency rates (the likelihood of a DNA profile being shared by individuals in a population) increase sharply for mixtures with partial profiles, given the fewer data points for comparison (T.3160-61, 3223 at A.167-68, 188). High frequency rates for some of the partial profiles found in the mixtures obtained in this case — with correspondingly higher rates of possible "hits" in the CODIS database — may explain why Roy did not submit evidentiary samples beyond the two she testified she sent.

Absent evidence that Roy caused the evidence samples in this case (other than the two she specifically addressed) to be compared to the CODIS database, AUSA Dayton's argument to the jury that CODIS obviated the need for a reference sample from Womble was false.[64]

---

[63] The two samples that Roy testified she submitted to CODIS, by contrast, were relatively simple and yielded sufficient information to qualify for CODIS submission. 9-Z2, the sample submitted to CODIS that generated the hit on Efrain Johnson, was merely "consistent with" being a mixture," with evidence of a second possible contributor at only one locus (T.3165, 3405-07 at A.172, 190-92), and provided a full profile across all loci (T. 3161, 3171-72 at A.168, 174-75). And Roy explained that the profiled derived from 16-Z1 provided "enough information in it to put it into CODIS." (T.3203 at A.185).

[64] The district court had directed that all mistrial motions be made in writing (T.4350), and, so, the defense filed a written motion for a mistrial (DE 829). The district court denied the defense motion, finding, in pertinent part, that the challenged remarks were "based on the facts in evidence." (DE 1074:9). It

173

It is well settled that "[a]lthough the inherent controversial nature of

litigation permits substantial latitude in the closing arguments of counsel," the

prosecutor in a criminal case "has a 'special duty not to mislead,' and should not

deliberately misstate the evidence." United States v. Richter, 826 F.2d 206, 209

(2d. Cir. 1987) (citing United States v. Universita, 298 F.2d 365, 367 (2d Cir.

1962); United States v. Suarez, 588 F.2d 352, 354 (2d Cir.1978); United States v.

Burse, 531 F.2d 1151, 1154 (2d Cir.1976)). "[I]t is improper for a prosecutor to

mischaracterize the evidence or refer in summation to facts not in evidence."

United States v. Rosa, 17 F.3d 1531, 1548-49 (2d Cir.1994); see also United

States v. Young, 470 U.S. 1, 7 (1985) ("The prosecutor may argue all reasonable

inferences from evidence in the record. It is unprofessional conduct for the

prosecutor intentionally to misstate the evidence or mislead the jury as to the

inferences it may draw.") (quoting ABA Standards for Criminal Justice 3-5.8(b)

(2d ed. 1980)); 3 Charles Alan Wright et al., Federal Practice and Procedure § 588

_____

explained that the evidentiary record supported "that (1) Womble is a convicted
felon, (2) that the CODIS database is made up primarily of the DNA profiles of
convicted felons, and (3) the CODIS database had detected Efrain Johnson's
profile on an evidentiary item submitted to CODIS by Ms. Roy" (id.). Each is
plainly true, but insufficient, separately or taken together. Missing from the
court's recitation is the critical link between CODIS and the evidentiary samples.
Nothing mentioned by the court supports an inference that Roy submitted all of
the evidentiary samples to CODIS for comparison.

(4th ed. database updated 2014) ("It is misconduct for a prosecutor to make an assertion to the jury of a fact, either by way of argument or by an assumption in a question, unless there is evidence of that fact.").

In suggesting that the CODIS database functioned as an equivalent of a comparison sample from Womble, the government violated its obligation not to mislead the jurors and caused substantial prejudice to Aquart, depriving him of due process of law, United States v. Modica, 663 F.2d 1173 (1981), as measured by the severity of the misconduct, the efficacy of steps adopted to cure the misconduct, and the certainty of conviction absent the misconduct, United States v. Friedman, 909 F.2d 705, 709 (2d. Cir. 1990).[65]

The misconduct here was egregious. See Modica, 663 F.2d at 1181 (among elements weighed in this inquiry is whether misconduct was intentional). It is not credible that the challenged remarks were anything but knowing and intentional: Roy's four days of testimony about the DNA in this case occupied a primary place at the trial, and AUSA Dayton, who made the improper CODIS argument in rebuttal, handled her direct and re-direct (T.3107, 3582). It was Dayton who elicited from Roy that she had submitted profiles from two items to CODIS

---

[65] The defense relied on a written motion for mistrial and did not seek a curative instruction to remedy the false suggestion that Roy had submitted evidentiary samples to CODIS. Accordingly, no curative instruction was given.

(T.3165, 3203 at A.172, 185) — a question she did not ask about any other

evidence samples.  In opposing the defense written motion for a mistrial, the

government never suggested that AUSA Dayton had misspoken or

misremembered the evidence in good faith; instead, the government argued that

the statements were appropriate.  (DE 852, at 12-17).[66]  Critically, however, in five

pages of quotations from the transcripts, the government provided not one citation

that would support the leap that Dayton had asked the jurors to make — that Roy

had submitted evidentiary samples, other than the two she expressly mentioned, to

CODIS.

And the misconduct mattered.  The defense cross-examination of Roy had

focused on the difficulties — such as "drop out" and the judgments that must be

made to distinguish actual genetic markers from types of noise that the evaluation

process may generate in the data — that inhere in interpreting complex multiple-

_____

[66] In its opposition, the government agreed that CODIS imposed restrictions
on the profiles that could be submitted, but quibbled over how to describe the
category of exclusion (DE 852, at 14-15, describing 16-Z1, as a complex mixture).
But the fact that Roy submitted 16-Z1 — a sample that she explained provided
sufficient data for submission — speaks not at all to the question of whether she
submitted others, on which she offered no such assurances.  And the government
also assured the court, irrelevantly, that once submitted to CODIS, comparisons
occurred automatically, without for additional requests (id. at 16).  Needless to
say, how profiles were processed *after* submission to CODIS is unrelated to the
question of whether the profiles were submitted in the first instance.

source DNA mixtures (see, e.g., T.3451-77, 3486-88, 3490-93, 3504-07, 3534-36).

As the defense urged in closing, mixtures must be interpreted (T.4272).  Observer

bias, foreknowledge or belief about the proper result, can therefore undermine the

weight and reliability of the resulting conclusions.

Christine Roy's DNA analysis was central to both the government and

defense cases during the guilt/innocence proceedings.  She was on the witness

stand for four days.  The government urged the DNA evidence as independent

proof that the Aquarts, Taylor, and Johnson were in the apartment (T.4257-59,

4260, 4263, 4329).  And, critically, the government argued that the DNA evidence

corroborated the testimony of John Taylor (T.4235-39, 4259, 4335), whose

changing stories to law enforcement and his status as a cooperating government

witness had impaired his credibility.  The defense, by contrast, hammered how

difficult it is to interpret DNA evidence (T.4272-74), and emphasized, as Roy

acknowledged on cross examination, the presence of genetic materials that could

not have come from any of the victims or the Aquarts, Taylor, or Johnson  —

including the DNA profile of a man found under one of Tina Johnson's fingernails

(T.3446-51, 4278).  The government's cheat could well have influenced the jurors'

resolution of these competing narratives.

Misconduct concerning such critical evidence denied Aquart due process

177

and undermines confidence in the jury's verdict.  This Court should reverse and order a new trial.

# VII.

## Federal Juries Consistently Decline to Impose Capital Punishment in Cases, like Aquart's, in Which the Defendant Is Found Not to Pose a Threat of Violence in Prison. Thus His Aberrational Death Sentence Is Constitutionally Disproportionate and Should Be Reduced.

### A. The Eighth Amendment requires proportionality review to safeguard against the risk of a freakish or arbitrary death sentence and to identify categories of crimes or offenders for which capital punishment is now recognized by juries as excessive.

Comparative proportionality review, which "numerous" state capital statutes provide for, requires an appellate court "to determine whether, considering both the crime and the defendant, the sentence is disproportionate to that imposed in similar cases." Pulley v. Harris, 465 U.S. 37, 43-44 (1984). It is a feature of Georgia's law that the Supreme Court hailed as helping guard against the sort of random and freakish sentencing outcomes that had previously led it to strike down the state's old death-penalty scheme in Furman v. Georgia, 408 U.S. 238 (1972). See Gregg v. Georgia, 428 U.S. 153, 198 (1976) (Joint Opinion of Stewart, Powell & Stevens, JJ.). See also Proffitt v. Florida, 428 U.S. 242, 253, 258-59 (1976). Such review is critical to ensuring that the death penalty continues to be "reserved for only the most aggravated and least mitigated of . . . murders." Bell v. State, 841 So. 2d 329, 337-38 (Fla. 2002).

179

In Pulley, the Supreme Court found that California's capital statute had

sufficient "checks on arbitrariness" because, among other things, the law required

that the state supreme court not only review each death sentence but also

determine whether the weight of the evidence supported it.  465 U.S. at 51-54.

The Court relied in part on its earlier decision in Jurek v. Texas, 428 U.S. 262

(1976), upholding Texas's death-penalty law although it lacked comparative

proportionality review.  There, the Court had said that the provision for a

mandatory appeal to "a court with a statewide jurisdiction" would "promote the

evenhanded, rational, and consistent imposition of death sentences" and "assure

that sentences of death will not be 'wantonly' or 'freakishly' imposed."  Id. at

276.[67]

But the FDPA does not provide for the court of appeals to review the

relative weight of the aggravating and mitigating factors for a death sentence.

And though a defendant sentenced to death has the right to appeal to one of eleven

different courts of appeal, an appeal is not mandatory according to the one circuit

that has addressed the issue.  See United States v. Hammer, 226 F.3d 229, 236-37

(3rd Cir. 2000).  More important, even when appeals are taken, no court of

---

[67] See also id. at 269, citing Tex. Code. Crim. Proc. Art. 37.071 (Supp.
1975-76) ("The judgment of conviction and sentence of death shall be subject to
automatic review by the Court of Criminal Appeals.").

nationwide jurisdiction considers each case.  See 18 U.S.C. § 3595.  Rather,

further appeal to the United States Supreme Court is discretionary.  See 28 U.S.C.

§ 1254.  And it is virtually never granted: Although more than 60 federal

defendants in the modern era have been condemned to death, and three have been

executed, the Supreme Court has granted plenary review in only one case.  See

Jones v. United States, 527 U.S. 373 (1999).  Such a  non-mandatory, fragmented

system cannot assure "evenhanded, rational and consistent imposition" of the

federal death penalty across the circuits, particularly in a jurisdiction vastly larger

and more diverse than any single state.[68]

Omitting any such review would paradoxically leave federal capital

defendants with *less* protection than non-capital ones.  See Woodson v. North

Carolina, 428 U.S. 280, 305 (1976) (Constitution grants capital defendant greater

protections in sentencing process because "[d]eath, in its finality, differs more

from life imprisonment than a 100-year prison term differs from one of only a year

_____

[68] No circuit has ever considered this argument for distinguishing Pulley, let alone been confronted with such a factually supported claim of disproportionality like Aquart's, as detailed below.  Some courts have turned aside the quite different argument that comparative proportionality review is constitutionally required whenever non-statutory aggravating factors are used.  See United States v. Mitchell, 502 F.3d 931, 980 (9th Cir. 2007); United States v. Allen, 247 F.3d 741, 760 (8th Cir. 2001), vacated on other grounds, 536 U.S. 953 (2002); United States v. Higgs, 353 F.3d 281, 320-21 (4th Cir. 2003); United States v. Jones, 132 F.3d 232, 240-41 (5th Cir. 1998).

or two"). In federal court, a kind of comparative proportionality review is a familiar component of ordinary sentencing under 18 U.S.C. § 3553(a)(6). That provision requires a sentencing court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." See Kimbrough v. United States, 552 U.S. 85, 108 (2007) ("district courts must take account of sentencing practices in other courts").

In the years since Pulley, moreover, the Supreme Court has embraced a form of proportionality review to "vindicate the underlying [Eighth Amendment] principle that the death penalty is reserved for a narrow category of crimes and offenders." Roper v. Simmons, 543 U.S. 551, 568-69 (2005). That review focuses on whether recent sentencing practices and other objective evidence of contemporary values indicates that capital punishment has become excessive for a given category of defendant or crime. See Atkins v. Virginia, 536 U.S. 304, 306, 311-12, 319 (2002) (the mentally-retarded); Roper, 543 U.S. at 560-69 (juveniles); Kennedy v. Louisiana, 554 U.S. 407, 421-27 (2008) (rape of a child). See also Enmund v. Florida, 458 U.S. 782, 794 (1982) (non-triggerperson in a felony-murder); Coker v. Georgia, 433 U.S. 584, 596 (1977) (rape of an adult).

Thus, under both the Gregg-Jurek-Pulley and the Atkins-Roper-Kennedy lines of cases, the Eighth Amendment requires this Court to review whether the

182

death sentence received by Aquart was comparatively or constitutionally disproportionate on the ground that, as discussed below, the jury unanimously determined him to be non-dangerous.

**B.**    **After this issue was fully litigated by both sides, Aquart's jury unanimously found that the BOP could "safely and securely" confine him.**

The government did not rely on the aggravating factor that Aquart would likely be assaultive in federal prison, or any such "dangerousness" aggravator. But Aquart asserted the contrary as a mitigating factor and the government aggressively resisted it.  Thus, at the sentencing hearing, both Aquart and the government focused on whether he presented a risk of violence in federal prison.

The government presented evidence that, more than a decade before, while Aquart was serving a drug sentence in a Connecticut prison, he came into the cell of another prisoner, Anthony Armstead, and struck him.  Armstead may have struck his head on the bunk when he fell, and then was hit some more (P.4570-74). He did not see a weapon, and did not believe he was hit with an object (P.4579). No weapons were found (P.4660).  He received stitches and staples for head wounds, and was discharged from the infirmary the same day (see P.4576-77; GX-P 9, pp.1-4 at A.756-59; GX-P 3-7).

Aquart, in turn, called Mark Bezy, a correctional expert who had almost 20

years of working for the Federal Bureau of Prisons (BOP). He had served as

regional administrator; a Warden of several institutions, including the United

States Penitentiary (USP) at Terre Haute, which houses death row prisoners; and

one of the officials who had helped initiate the BOP's super-maximum ADX

facility in Florence, Colorado. Bezy reviewed Aquart's prison records and

received information about the capital crimes. He described for the jury the

extensive, sophisticated security, surveillance, and disciplinary procedures that the

BOP would apply to Aquart, who would be housed in a USP if not in ADX

Florence. Bezy concluded, "to a reasonable degree of certainty" that, based on his

individual review of Aquart, the BOP "can safely and securely house him."

(P.5330-31, 5339-46, 5348, 5367-77 at A.239-40, 241-246, 247, 248-58).

In summation, both sides keyed on the issue of Aquart's future

dangerousness. The government dwelt on the assault against Armstead, and

insisted that Bezy could not say for sure exactly where Aquart would be housed if

sentenced to life (P.5639 at A.383). The defense emphasized Bezy's testimony

that the BOP could manage Aquart, the security in USP's is effective, and the rate

of serious assaults extraordinarily low, and noted that Aquart had never threatened

a staff member during his previous prison stay (P.5660-61, 5664-65 at A.403-04,

407-08).

184

The issue of dangerousness was presented to the jury through a proposed mitigating factor on the verdict form: "If Azibo Aquart is sentenced to life imprisonment, the Bureau of Prisons has the capability of safely and securely confining him." All 12 jurors found that Aquart had proved it by a preponderance of the evidence (DE 936:9 at A.491). The court also instructed jurors that, with regard to the aggravating factors, "the government does not assert, nor has the government established" that Aquart would "present a future danger to any other person" if sentenced to life (P.5594 at A.341).

## C. Dangerousness represents an overarching consideration for juries in capital sentencing.

It is unsurprising that future dangerousness received considerable attention from both sides at Aquart's sentencing hearing. When the Supreme Court re-validated capital punishment more than three decades ago, it recognized that one important purpose of the death penalty is "the incapacitation of dangerous criminals and the consequent prevention of crimes that they may otherwise commit in the future." Gregg v. Georgia, 428 U.S. 153, 186 & n.28 (1976) (opinion of Stewart, Powell & Stevens, JJ.). One of the three statutes it approved, Texas's, made dangerousness the keystone of the sentencing determination. See Jurek v. Texas, 428 U.S. 262, 272-74 (1976) (jury's "prediction of future criminal conduct reflects an "essential element" of the "criminal justice system"); Barefoot v.

185

Estelle, 463 U.S. 880, 896 (1983) (approving "the likelihood of a defendant

committing further crimes" as a "criterion for imposing the death penalty").  In

subsequent years, as life imprisonment without parole became the prevailing

alternative to capital punishment, the Court indicated that a valid basis for a death

sentence is that the defendant "pose[s] a danger to others in prison and that

executing him is the only means of eliminating the threat to the safety of other

inmates or prison staff."  Simmons v. South Carolina, 512 U.S. 154, 165 & n.5

(1994).

The FDPA, enacted the year Simmons was decided, allows the government

and the defense to fashion and present their own aggravating and mitigating

factors for the jury to weigh, in addition to ones listed in the statute that make the

defendant eligible for a death sentence.  See 18 U.S.C. § 3593(a), (c).  In the years

since, dangerousness has become a focal point in federal death-penalty cases.  The

more than 200 completed verdict sheets from previous federal capital trial over

two decades show that the presence or absence of future dangerousness is almost

always submitted to the jury, either as an aggravating factor, a mitigating factor, or

both.[69]

---

[69] These verdict sheets (each of which reflects the title, court, and docket
number of the case and the date the verdict was entered) are available on the
website of the Federal Death Penalty Resource Counsel Project (FDPRC), Verdict

186

Moreover, as the Supreme Court has recognized, even when neither side explicitly argues the defendant would or would not be violent in the future, a capital sentencing proceeding almost invariably raises it as a prominent issue in jurors' minds. See Kelly v. South Carolina, 534 U.S. 246, 254 (2002); Deck v. Missouri, 544 U.S. 622, 633 (2005). See also John H. Blume, *et al.*, Future Dangerousness in Capital Cases: Always "At Issue," 86 Cornell L. Rev. 397, 398 (2001).

**D.     Aquart's death sentence was abberrational, for, when federal juries find that a defendant does not pose a future danger in prison, they almost invariably reject the death penalty.**

For Aquart, what is surprising is that, having unanimously agreed he could be safely and securely confined — in other words, they were convinced he would *not* cause violence in prison — the jury nonetheless sentenced him to die. As one federal court recognized, empirical studies of actual capital jurors consistently show that "future dangerousness is one of the most [significant] issues, if not the most significant, for juries in deciding whether or not to sentence a defendant to

---

Sheets, www.capdefnet.org/FDPRC/pubmenu.aspx?menu_id=803&folder_id=5633. The data discussed below is drawn from the verdict sheets, and from descriptions of the cases, also available on the FDPRC website, Authorized Cases, www.capdefnet.org/FDPRC/pubmenu.aspx?menu_id=96&folder_id=5120, and the website of the Death Penalty Information Center, Federal Death Row Prisoners, www.deathpenaltyinfo.org/federal-death-row-prisoners.

death." United States v. Johnson, No. 02-cv-06998, ECF #112, p.6 (N.D. Ill. Dec. 13, 2010), citing Blume, *supra*, at 404; Steven P. Garvey, Aggravation and Mitigation in Capital Cases: What Do Jurors Think?, 98 Colum. L. Rev. 1538, 1559-60 (1998): Sally Constanzo & Mark Constanzo, Life or Death Decisions: An Analysis of Capital Jury Decision Making Under the Special Issues Sentencing Framework, 18 Law & Hum. Behav. 151, 160 (1994). See also Scott E. Sundby, War and Peace in the Jury Room: How Capital Juries Reach Unanimity, 62 Hastings L.J. 103, 117 (Nov. 2010) ("Having just convicted the defendant of murder, the first concern among jurors is . . . ensuring that, above all else, the defendant will never kill again. Jurors consistently expressed the view . . . that they would vote for a death sentence if they were not assured that the defendant would be safely locked away").

The verdict sheets for federal capital cases confirm this. Since Congress reenacted capital punishment, 76 federal death sentences have formally been imposed, aside from Aquart's case.[70] In only 2.6 percent (2 other cases) did the

---

[70] A total of 73 federal defendants besides Aquart have been sentenced to death, but three of them were sentenced to death twice, once at trial and then again at a resentencing after receiving appellate relief. Of those 73 other defendants, three were executed, one was granted clemency, one died of natural causes, 10 had their death verdicts or sentences overturned by reviewing courts, and 58 remain under active sentences of death. Three additional defendants who received jury verdicts of death that were set aside by the district court before formal sentencing,

jury, rather than finding dangerousness as an aggravator, unanimously find *non-dangerousness* as a mitigating factor, as in Aquart's case.[71]  And in less than 4 percent (3 other such cases) did even a majority of jurors find such a mitigator.[72]  Whereas, in 67 percent (51 of the 76 cases), the jurors expressly indicated on the verdict sheet that they unanimously considered the defendant a risk of violence in prison if sentenced to life.[73]

---

and thus were never sentenced to death, are omitted from the analysis.  See Death Penalty Information Center Website, Federal Death Row Prisoners - Synopsis of Cases, http://www.deathpenaltyinfo.org/federal-death-row-prisoners#cases; Federal Death Penalty Resource Counsel Website, Declaration of Kevin McNally, www.capdefnet.org/FDPRC/WorkArea/DownloadAsset.aspx?id=5687.

[71] See Verdict Sheets, *supra*.  Those were Steven Sanders and Alfonso Rodriguez.

[72]  See Verdict Sheets, *supra*.  Those were James Roane, Corey Johnson, Billie Allen, and Daryl Lawrence.

[73]  See Verdict Sheets, *supra*.  In 46 of those 51 cases, the jury unanimously found dangerousness as an aggravating factor.  Those defendants were Shannon Agofsky, Marc Barnette (at first sentencing), Anthony Battle, Brandon Bernard, Alfred Bourgeois, Carlos Caro, Wesley Coonce, Odell Corley, Len Davis (at first sentencing and resentencing), Joseph Duncan, Joseph Ebron, Edward Fields, Sherman Fields, Chad Fulks, Marvin Gabrion, Edgar Garcia, Juan Garza, Charles Hall, Orlando Hall, Thomas Hager, David Hammer (at first sentencing), Paul Hardy, Norris Holder, Dustin Honken, David Jackson, Darryl Johnson, Juri Kadamovas, William LeCroy, Daniel Lee, Iouri Mikhel, Keith Nelson, Arboleda Ortiz, Jeff Paul, Julius Robinson, Kaboni Savage, German Sinisterra, Mark Snarr, Richard Stitt, Rejon Taylor, Jorge Torrez, Alejandro Umana, Christopher Vialva, Bruce Webster, and Ronell Wilson (at first sentencing and resentencing).  In the five others, the jury unanimously rejected non-dangerousness as a mitigating factor.  Those were Richard Jackson, Bountaem Chanthadara, Donald Fell, David

Moreover, in light of the jury studies, there is good reason to think that many of the remaining 20 juries that imposed death without having to record any finding on this issue nonetheless considered the defendant dangerous and that this influenced them. Indeed, in one such recent case, the court of appeals acknowledged this. See United States v. Troya, 733 F.3d 1125, 1134-35 (11th Cir. 2013) (although no dangerousness-related factor was submitted to the jury, the government still implicitly "put . . . future dangerousness at issue" and led the jury to think the defendant "would be just as lawless in the future" in prison).

Even more important, these trends have markedly accelerated over time, since the advent of the modern federal death penalty more than a quarter century ago. Thus, in the last eight years, since 2007, jury-determined sentences have been imposed in 67 federal capital cases besides Aquart's. In the 21 of those other cases that resulted in death sentences, juries unanimously determined dangerousness in 19 — finding it as an aggravator in 16, rejecting it as a mitigator in two others, and finding it as a mitigating in one other.[74] And, in the case of the

---

Runyon, and Lisa Montgomery.

[74] Of the 19, dangerousness was unanimously found as an aggravator in the cases of Carlos Caro, Wesley Coonce, Joseph Duncan, Joseph Ebron, Edgar Garcia, Thomas Hager, Charles Hall, Juri Kadamovas, Iouri Mikhel, Kaboni Savage, Mark Snarr, Rejon Taylor, Jorge Torrez, Alejandro Umana, and Ronell Wilson (first sentencing and resentencing). Dangerousness was unanimously

190

remaining two codefendants sentenced to death at a joint trial, Daniel Troya and

Ricardo Sanchez, although no dangerousness factor was submitted to the jury, the

court of appeals, as noted above, found that the government had implicitly led the

jury to believe they would be violent in prison if sentenced to life.  See Troya, 733

F.3d at 1134-35.  Thus, it appears that, putting Aquart aside, all but one federal

defendant sentenced to death in the last eight years — 20 of 21, more than 95

percent — have been considered dangerous or potentially dangerous by the jury.

Equally significant, over the last eight years, juries (and in one case, a

sentencing judge) have unanimously or by a majority found *non*-dangerousness as

a mitigating factor in 7 cases, besides Aquart's.  In still 12 other cases, several,

though not a majority, of jurors found non-dangerousness.  And in all but one of

those 19 cases (95 percent) the jurors (and, in one case, a sentencing judge) either

voted unanimously for a life sentence or they returned a not-unanimous verdict

that resulted in a life sentence, see 18 U.S.C. § 3594.[75]

———————————

rejected as a mitigator in the cases of Lisa Montgomery and David Runyon.  It was
unanimously found as a mitigator in Steven Sanders' case.  See Verdict Sheets,
*supra*.  See also Authorized Cases, *supra*; Federal Death Row Prisoners - Synopsis
of Cases, *supra*.

[75] As reflected in the verdict sheets, those 19 defendants were David
Hammer (judge sentencing), Naeem Williams, Jamal Shakir, Timothy O'Reilly,
Vincent Basciano, Gilberto Caraballo, Khalid Barnes, Humberto Pepin, Richard
James, Eric Hans, Kenneth Wilk, Petro Krylov, William Sablan, Maurice Phillips,

191

Nor can this striking disparity be dismissed on the theory that Aquart's case must have been worse in other respects than those in which non-dangerousness determinations resulted in life sentences. To be sure, while Aquart's jury agreed he would not be dangerous in prison if sentenced to life, it did find several serious aggravating factors. But those other 19 life cases — several of which were tried in this Circuit — were, on the whole, no less serious. For example, Naeem Williams beat and starved to death a five-year old child over the course of months. Jamal Shakir, the head of a large-scale interstate drug-smuggling gang, committed six planned killings to silence his victims as witnesses or for revenge. Eric Hans was also found guilty of six murders after he torched a hotel where his ex-girlfriend was staying. Petro Krylov kidnapped three people for ransom, killed them, and then dumped their bodies in reservoir. Ahmed Salad and Abukar Beyle were Somali pirates convicted of the murders of four Americans whose boat they hijacked. William Sablan, who had 20-year history of violent crime and was incarcerated at the BOP's super-maximum prison, USP Florence, killed another inmate, eviscerated his internal organs, and wrote on the cell wall with the

---

Alexis Candelario, Lashaun Casey, Abukar Beyle, Ahmed Salad, and Steven Sanders. As noted above, Sanders was the only one sentenced to death. See Verdict Sheets, *supra*. See also Authorized Cases, *supra*; Federal Death Row Prisoners - Synopsis of Cases, *supra*.

victim's blood.  Vincent Basciano, the head of a large organized-crime family in

New York, committed two premeditated murders to enhance his status in the

organization and, the jury found, other uncharged homicides and attempted

homicides.  Maurice Phillips ordered the murders of a female informant and her

godson.  Khalid Barnes shot to death two victims for financial gain.  So did

Humberto Pepin-Taveras, who then dismembered the victims' corpses.  And

Kenneth Wilk and LaShaun Casey killed law-enforcement officers in the course of

their official duties.[76]

**E.    Because it is an outlier, Aquart's death sentence should be set aside as disproportionate.**

Aquart's death sentence is aberrational in that, as discussed above, he is one

of only two federal defendants in more than 60 cases over eight years whose jury

unanimously found non-dangerousness yet sentenced him to die.  Indeed, in that

period, no other jury, besides his and that one other, anywhere in the country,

voted for death where even two or more jurors found non-dangerousness.  This

consistent trend is critical since comparative proportionality review under the

Gregg-Jurek-Pulley line of cases must be tied to *current* jury sentencing practices.

For "[i]f a time comes when juries generally do not impose the death sentence in a

---

[76] These descriptions are drawn from Authorized Cases, *supra*, and Verdict Forms, *supra*, as supplemented by court orders and opinions in these cases.

certain kind of murder case," disproportionality will be found in the outlier case in which one such defendant *is* condemned to die.  Walker v. Georgia, 555 U.S. 979, 987 (2008) (Thomas, J., concurring in denial of certiorari), quoting Gregg, 428 U.S. at 206.

The Supreme Court has also recognized the importance of recent trends in proportionality review under the Atkins-Roper-Kennedy line of cases.  As far back as 1977, in Coker, in which the Court invalidated the death penalty for the rape of an adult, it relied in part on the fact that "in the vast majority of cases" over the previous four years, "at least 9 out of 10 juries have not imposed the death sentence" for rape in states where the law permitted it.  433 U.S. at 597.  The Court took a similar approach in Enmund, observing that "society's rejection of the death penalty for accomplice liability in felony murders is also indicated by the sentencing decisions that juries have made" over the preceding nine years.  458 U.S. at 794.

More recently, in Atkins, where the Court found the death penalty excessive for the mentally retarded, it had rejected this same claim 13 years before, but found that, since then, there had been a consistent change of direction away from the use of capital punishment for such offenders.  The Court regarded this as critical because the "proportionality precept" at the heart of the Eighth

194

Amendment turns on "evolving standards of decency," which should be judged largely by " evidence of contemporary values."  536 U.S. at 311-12.  Likewise, in Roper, where the Court found the death penalty constitutionally excessive for juvenile offenders, it had rejected the same claim 16 years before.  The Court relied in part on the "infrequency of its use" in recent years in the numerous states that did not prohibit it.  543 U.S. at 564-67.  See also Graham v. Florida, 560 U.S. 28, 62 (2010) ("Actual sentencing practices are an important part of the Court's inquiry into consensus.  Here, an examination of actual sentencing practices in jurisdictions where the sentence in question is permitted by statute discloses a consensus against its use") (citations omitted).

Finally, to the extent proportionality review under the Atkins-Roper-Kennedy line of cases requires the Court's "own judgment . . . be brought to bear on the question of the acceptability of the death penalty under the Eighth Amendment" for defendants judged non-dangerous, Kennedy, 554 U.S. at 434, this too should support Aquart's claim.  To be sure, the Supreme Court has recognized that retribution and deterrence could also serve as legitimate penological justifications for capital punishment in some categories of cases.  See, e.g., Roper, 543 U.S. at 571.  It does not follow, however, that these rationales, standing alone, justify the death penalty for defendants judged non-dangerous and

195

thus for whom a life sentence without release is demonstrably unrelated to the

third objective of incapacitation.  Cf. Kennedy, 554 U.S. at 441 (it need not be said

with "certainty that the death penalty for child rape serves no deterrent or

retributive function" in order to deem it disproportionate).  Incarceration in a high-

security United States Penitentiary until death is an extraordinarily severe

punishment.[77]  As the Supreme Court recently recognized:

> Life without parole sentences share some characteristics with death
> sentences that are shared by no other sentences.  The State does not
> execute the offender sentenced to life without parole, but the sentence
> alters the offender's life by a forfeiture that is irrevocable. It deprives
> the convict of the most basic liberties without giving hope of
> restoration, except perhaps by executive clemency—the remote
> possibility of which does not mitigate the harshness of the sentence
> . . . . this sentence means denial of hope; it means that good behavior
> and character improvement are immaterial; it means that whatever the
> future might hold in store for the mind and spirit of [the convict], he
> will remain in prison for the rest of his days.

Graham, 560 U.S. at 69 (citation and internal quotation omitted).  For these

reasons too, the prospect of such a "severe sanction" is not a materially less

effective deterrent, even assuming that a killer contemplates the possibility of

---

[77] Under BOP regulations, a defendant sentenced to life imprisonment is
automatically sent to a United States Penitentiary, and remains at such a security
level indefinitely.  See e.g., Mansfield v. Beeler, 238 Fed. Appx. 794, 798-99 (3d
Cir. 2007).

apprehension and engages in a "cost-benefit analysis."[78]  Roper, 543 U.S. at 572.

Accordingly, the Court should find Aquart's death sentences disproportionate under the Eighth Amendment, and order the district court to resentence him to a lesser sentence on each those capital counts.[79]

---

[78] Though "[t]he legitimacy of deterrence as an acceptable justification for the death penalty is also questionable, at best.  Despite 30 years of empirical research in the area, there remains no reliable statistical evidence that capital punishment in fact deters potential offenders."  Baze v. Rees, 553 U.S. 35, 79 (2008) (Stevens, J., concurring).

[79] This claim addresses how this Court should consider Aquart's appeal rather than any error by the district court, and thus need not and could not have been preserved below.

# VIII.

## The Federal Death Penalty Act Operates in a Constitutionally Arbitrary and Capricious Manner.

In the previous point, Aquart argues that, in federal death penalty cases, the jury's finding or refusal to find that the defendant would likely engage in violence in federal prison overarchingly determines who does and does not receive a death sentence — and that as a matter of constitutional proportionality, his jury's unanimous finding that the Bureau of Prisons can safely and securely confine him requires that his death sentence be set aside.  See Point VII.

Should the Court reject that argument and future dangerousness as the overriding explanation for how the federal death penalty functions, then the sentencing scheme it is left to confront is one that operates arbitrarily and capriciously in selecting the tiny fraction of offenders who should die from the broad pool of death-eligible offenders.  Such a statute, as applied to Aquart, violates the Fifth Amendment's due process clause and the Eighth Amendment's prohibition on cruel and unusual punishments.[80]

---

[80] Aquart preserved this issue below (see DE 328:6-13; DE 329; DE 533:5-9).

**A.** **The Constitution forbids a capital-punishment scheme in which, like "being struck by lightening," death sentences are imposed on "a capriciously selected handful" of the thousands of death-eligible offenders, and no legitimate "basis can be discerned for the selection."**

In Furman v. Georgia, 408 U.S. 238 (1972), the Supreme Court struck down existing death-penalty laws because it found the punishment was being imposed arbitrarily and capriciously.[81]  A number of the justices relied on evidence that under those statutes, a broad pool of offenders were legally eligible for the death penalty, but only 15-20 percent of them were ultimately sentenced to death — and that a comparison of this group with those spared showed no legitimate basis for the sorting process.[82]

Thus, Justice Stewart, noting that the death penalty was "infrequently imposed" for murder, went on to conclude:

_____

[81] Furman consisted of nine separate opinions, and one *per curiam* opinion that concluded "the imposition of and carrying out of the death penalty in [the cases before the Court] constitute cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments."  408 U.S. at 239 (*per curiam*).

[82] Chief Justice Burger, dissenting, accepted the empirical data as accurate, citing to four sources for the proposition that between 15-20 percent of convicted murderers and rapists were sentenced to death in jurisdictions where the death penalty was available for such offenses.  408 U.S. at 386 n.11 (Burger, C.J., & Blackmun, Powell, & Rehnquist, JJ., dissenting).  See also id. at 435 n.19 (Powell, J., dissenting).  Justice Stewart cited to Chief Justice Burger's statement as support for the conclusion that the imposition of death is truly "unusual."  Id. at 309 & n.10 (Stewart, J., concurring).

199

> These death sentences are cruel and unusual in the same way that
> being struck by lightning is cruel and unusual. For, of all the people
> convicted of . . . murders . . . . many just as reprehensible as these, the
> petitioners are among a capriciously selected random handful upon
> whom the sentence of death has in fact been imposed . . . . I simply
> conclude that the Eighth and Fourteenth Amendments cannot tolerate
> the infliction of a sentence of death under legal systems that permit
> this unique penalty to be so wantonly and so freakishly imposed.

Furman, 408 U.S. at 309-10 (Stewart, J., concurring) (citations and footnotes
omitted).

As Justice White succinctly put it, "the death penalty is exacted with great
infrequency even for the most atrocious crimes and . . . there is no meaningful
basis for distinguishing the few cases in which it is imposed from the many cases
in which it is not." Such a regime could not serve the penological purposes of
deterrence or retribution. Id. at 313 (White, J., concurring).

Justice Brennan likewise summarized the constitutional problem: "When
the punishment of death is inflicted in a trivial number of the cases in which it is
legally available, the conclusion is virtually inescapable that it is being inflicted
arbitrarily . . . . it is highly implausible that only the worst criminals or the
criminals who commit the worst crimes are selected for this punishment." Id. at
293-94 (Brennan, J., concurring). See also id. at 248 (Douglas, J., concurring).

The obligation to select only the "worst" murders and murderers reflects not
just a need for consistency, but the principle, recognized since Furman, that "the

200

culpability of the average murderer is insufficient to justify the most extreme

sanction available to the State." Hall v. Florida, 134 S. Ct. 1986, 1993 (2014),

quoting Atkins v. Virginia, 536 U.S. 304, 319 (2002). Thus, after Furman, the

Court has approved sentencing schemes that have promised, through the use of

aggravating factors and other procedures (*e.g.*, bifurcated proceedings, mandatory

appellate review, *etc.*), to "reasonably justify the imposition of a more severe

sentence on the defendant compared to others found guilty of murder." Zant v.

Stephens, 462 U.S. 862, 865 (1983).

The result, the Court anticipated, would be capital-sentencing patterns that

are no longer arbitrary and capricious. Thus, beginning four years after Furman,

in a case approving Georgia's new statute, a plurality observed that "[o]n their

face, these procedures seem to satisfy the concerns of Furman." Gregg v. Georgia,

428 U.S. 153 (1976) (Joint Opinion of Stewart, Powell & Stevens, JJ.). In

concurrence, Justice White elaborated, predicting that,

> [a]s the types of murders for which the death penalty may be imposed
> become more narrowly defined and are limited to those which are
> particularly serious or for which the death penalty is peculiarly
> appropriate . . . it becomes reasonable to expect that juries — even
> given discretion not to impose the death penalty — will impose the
> death penalty in a substantial portion of the cases so defined. If they
> do, it can no longer be said that the penalty is being imposed
> wantonly and freakishly or so infrequently that it loses its usefulness
> as a sentencing device.

Id. at 222 (White, J., concurring). Echoing the plurality's willingness to accept the state's promise that the new procedure would rectify the problems identified in Furman, Justice White declined to simply assume that, under such a revised scheme, "the death penalty will inexorably be imposed in as . . . standardless, and rare a manner as it was imposed under the scheme declared invalid in Furman." Id. at 221.

A decade after Gregg, in McCleskey v. Kemp, 481 U.S. 279 (1987), the Court considered whether Georgia's then-decade-old capital scheme had resulted in constitutionally disproportionate sentencing patterns, ones McCleskey claimed correlated with race. The court noted that it had approved the "facial validity" of the state's statute in Gregg, based on several features, including one "important . . . safeguard" absent from the FDPA, a requirement that the state supreme court review the proportionality of each death sentence. That safeguard had been implemented in McCleskey's case, with the state supreme court finding that his death sentence "was not disproportionate to other death sentences imposed in the State," and "support[ing] this conclusion with an appendix containing citations to 13 cases involving generally similar murders." Id. at 303-306.

The Supreme Court also independently considered whether the system was "arbitrary and capricious *in application*." Id. at 308. It noted that an empirical

202

study of Georgia death sentences from McCleskey's own expert "in fact confirms

that the Georgia system results in a *reasonable level of proportionality* among the

class of murderers eligible for the death penalty . . . . the system sorts out cases

where the sentence of death is highly likely and highly unlikely, leaving a

midrange of cases where the imposition of the death penalty in any particular case

is less predictable." Id. at 313 n.36 (emphasis added).  It deemed this "a far cry"

from the disparities it had confronted in Furman.[83]  McCleskey, 481 U.S. at 313

(citation omitted).

    Thus, Furman remains good law, even after McCleskey.  And a death-

penalty scheme that produces the kinds of disparities in Furman cannot satisfy the

Eighth Amendment.  See also generally Kamin, Sam & Marceau, Justin F.,

Waking the Furman Giant (August 5, 2014), U.C. Davis L.R., Forthcoming (U.

Denver Legal Studies Research Paper No. 14-39, available at SSRN:

http://ssrn.com/abstract=2476572).  Indeed, a federal court recently invalidated

---

[83] In considering a challenge like Aquart's in United States v. Sampson, 486
F.3d 13, 24 (1st Cir. 2007), the First Circuit cited McCleskey but mistakenly
ignored its as-applied analysis and its finding that the actual sentencing outcomes
under Georgia's revised scheme demonstrated a reasonable level of
proportionality.  The First Circuit also unreasonably imposed on the defendant an
impossible burden of proof, namely, to account for every conceivable factual
difference between every one of the thousands of death-eligible federal cases.  See
id.

California's capital-punishment system on <u>Furman</u> grounds, because only an arbitrarily determined fraction of those sentenced to death in that state end up being executed.  See <u>Jones v. Chappell</u>, ___ F. Supp. 2d ___, 2014 WL 3567365 (C.D. Cal. July 16, 2014).

**B.    Under the expansive federal death penalty, only a small sliver — 1.6 to 2.0 percent — of eligible offenders are actually sentenced to death. And, judging from the results, there appears to be no rhyme or reason for the selection process (except perhaps race).  Indeed, defendants in scores of authorized cases no less aggravated than Aquart's have been spared the death penalty by juries or the government.**

The federal death penalty scheme creates an extremely large "pool" of capital-eligible offenders that fall within its scope.  Between 1972 (when <u>Furman</u> was decided) and 1988, Congress prescribed the death penalty for just a handful of narrowly-specified federal crimes.  See <u>Jones v. United States</u>, 527 U.S. 373, 407 n.3 (1999) (Ginsburg, Breyer, Stevens & Souter, JJ., dissenting).  But through a series of laws and amendments, centering around the passage of the FDPA in 1994, a myriad of federal crimes, under no fewer than 60 different statutes, are now punishable by death.  The scheme applies to all 50 states and all U.S. territories, regardless of whether the state forbids the death penalty; tribal members charged with crimes in Indian Country; crimes against U.S. nationals abroad; crimes against foreign nationals outside U.S. jurisdiction; and crimes that do not involve U.S. nationals or property but where the perpetrator was "found"

204

within U.S. jurisdiction.[84]  And while some federal capital crimes address interests

unique to the federal government, many encompass commonplace criminal

conduct (like that for which Aquart was sentenced to die) lacking any particular

interest to warrant federal prosecution over state action.[85]  In sum, the federal

capital scheme embraces a wide sweep of factual scenarios that subject a large

pool of offenders to punishment by death.

Although the FDPA requires that a jury find at least one intent factor and

one aggravating factor before it can determine to impose a death sentence, those

additional requirements do little to narrow the eligible pool.  The intent factors,

see 18 U.S.C. § 3591(a)(2), essentially constitute the constitutional minimum that

the Supreme Court has set for capital punishment, see Tison v. Arizona, 481 U.S.

---

[84]  See Congressional Research Service, Capital Punishment: An Overview of Federal Death Penalty Statutes (Jan. 5, 2005); U.S. Attorneys' Criminal Resource Manual, Title 9, Capital Eligible Statutes Assigned by Section (2011), http://www.justice.gov/usao/eousa/foia_reading_room/usam/title9/crm00071.htm.

[85]  For example, under the Hobbs Act, "the United States could in theory prosecute virtually every would-be thief who had been prosecuted and sentenced for the conduct under state law, no matter how trivial the amount at issue," United States v. Brown, 959 F.2d 63, 68 (6th Cir. 1992), and when the robber uses a gun, and the victim dies, the robber has committed a federal capital crime.  18 U.S.C. §§ 924(c), (j).  Likewise, the purely local criminal act of stealing a car from its operator (i.e., carjacking) becomes a federal capital offense when such an offense results in death by virtue of the fact that all cars move through interstate commerce.  18 U.S.C. § 2119.

205

137 (1987), including permitting a capital sentence for an accomplice who neither

kills, attempts to kill, intends to kill, or aids and abets a killing, as long as he acted

with "reckless disregard for human life." 18 U.S.C. § 3591(a)(2)(D). Similarly,

many of the 16 statutory aggravating factors listed in the FDPA, see 18 U.S.C. §

3592(c), are extraordinarily broad. For example, a number simply replicate

elements of the offense, such as that the killing occurred in the course of another

crime; apply (as interpreted by the courts) to almost any murder, such as that the

killing caused a grave risk of death to others; or hinge on relatively minor prior

criminal activity, such as that the defendant had two prior drug convictions. See

18 U.S.C. § 3592(c)(1)-(16).

In short, as a former federal prosecutor once responsible for administering

the death penalty explained:

> When the generality of these statutory aggravating factors and [their]
> commonality in many murders are considered together with the added
> authority to invoke non-statutory aggravators, it is the rare federal
> defendant that could not, in theory, be sentenced to death simply upon
> conviction of any killing offense.

Rory K. Little, The Federal Death Penalty:  History and Some Thoughts About the

Department of Justice's Role, 26 Ford. Urb. L.J. 347, 403 (1999).

Not surprisingly, under this expansive capital scheme, a very large number

of offenders prove eligible for federal death-penalty prosecutions.  In the quarter

century since 1988 (when FDPA's precursor, the Anti-Drug Abuse Act, was

enacted), 3,924 offenders have fallen into this category. See Federal Death

Penalty Resource Counsel Website, Declaration of Kevin McNally,

www.capdefnet.org/FDPRC/WorkArea/DownloadAsset.aspx?id=5687.[86]  In this

period, the federal government has authorized a capital prosecution in 495 of the

death-eligible cases — about 13 percent.  And in over half of those authorized

cases, the government withdrew the death notice, either pursuant to a plea or

unilaterally.  Of the remaining 233 cases that proceeded to a capital sentencing

hearing, the government obtained only 80 death verdicts (against 77 defendants,

three of whom were sentenced to death twice).  Of those, 16 have been judicially

vacated.[87]  One other defendant had his death sentence commuted by the President.

Therefore, in the modern era, the number of federal death sentences not yet

invalidated stands at only 63.[88]  See id.; Death Penalty Information Center, Federal

---

[86] This is an updated version of the declaration submitted in support of
Aquart's challenge in the district court, see DE 328-3, and contains summary
statistics through December 10, 2014.

[87]  That figure may increase as additional direct appeals and federal habeas
challenges make their way through the court system.

[88] Of those, 59 federal defendants remain under active sentence of death.
Three were executed, including Timothy McVeigh, who dropped his legal
challenges and thus became a "volunteer."  (The last federal execution was more
than 11 years ago.).  Another individual died in 2013 while on federal death row.
See Declaration of Kevin McNally, *supra*.

207

Death Row Prisoners - Synopsis of Cases,

http://www.deathpenaltyinfo.org/federal-death-row-prisoners#cases

When considered as a proportion of the pool of 3,911 federal death-eligible

cases that have been resolved to date (the 3,924 total, cited above, less the 13

death-authorized cases that are pending trial), that yields a death-sentence rate of

only 2.0%, even if all 80 death verdicts are used — and 1.6%, if the 63 non-

invalidated death sentences are used. This stands far below the 15-20% rates in

the capital schemes deemed unconstitutional in Furman. This is indeed a

"freakishly or spectacularly rare" rate of infliction. 408 U.S. at 293 (Brennan, J.,

concurring). It is lower than the rate in *any* state (or the military system) that has

been subjected to an empirical narrowing study, save for one, according to a recent

article. See Kamin & Marceau, *supra*, at 29 (describing 10 studies showing death-

sentencing rates between ranging from 4.4 to 23%).[89]

Indeed, the present federal rate is actually even lower than 2.0 or 1.6%,

since it has dropped over the life of the modern federal death penalty. Thus, in the

decade and a half from 1996 (when the earliest eligible cases under the 1994

FDPA began to be tried) through 2010, 66 death sentences were imposed — an

average of 4.4 death sentences each year. But, since then, even those meager

---

[89] One study, of Colorado, found a death-sentencing rate of 0.56%. See id.

numbers have dropped significantly. Thus, in the fours years hence, from 2011

through the present, a total of just seven death sentences (including Aquart's) were

imposed, for an average of just over half a death sentence each year.[90]

Furthermore, federal death-sentencing patterns, as in Furman, reveal "no

meaningful basis" for distinguishing this narrow sliver of defendants who are

condemned to die from the vast majority who are spared, id. at 313 (White, J.,

concurring), many of whom committed murders "just as reprehensible" as the ones

in Aquart's case, id. at 309-10 (Stewart, J., concurring). It is beyond the scope of

this brief to compare Aquart's case with the thousands of death-eligible cases that

did not end in a death sentence, especially since counsel lack access to information

about the facts of the non-authorized cases. But a sampling of the more than 400

authorized cases that were diverted from death via jury verdicts of life or

government deauthorizations (as part of a negotiated plea or unilaterally)

---

[90] See Death Penalty Information Center, Death Sentences in the United States from 1977 by State and Year, http://www.deathpenaltyinfo.org/death-sentences-united-states-1977-2008; Death Penalty Information Center, Federal Death Penalty - Synopsis of Cases, http://www.deathpenaltyinfo.org/federal-death-row-prisoners#cases. This trend, together with the fact that the last federal execution was in 2003, more than a decade ago, also suggests that the federal death penalty no longer comports with contemporary standards of decency, and for that reason too violates the Eighth Amendment. See, e.g., Roper v. Simmons, 543 U.S. 551 (2005). See Point IX, post.

illustrates that there is nowhere close to any consistent, predictable measure for determining which defendants will be spared and which condemned.[91]  Many of these cases included jury findings of multiple, serious aggravating factors, including ones found in Aquart's case such as multiple (sometimes numerous) victims, substantial planning, and/or heinousness, or other equally or more serious aggravators, such as, for example, terrorism, a prior homicide, or committing the capital murder in a federal prison.

### 1.  Examples of cases in which federal capital juries declined to impose a death sentence.

- United States v. Ronald Mallay (E.D.N.Y.).  The defendant was convicted of four killings as part of an insurance-fraud, murder-for-hire scheme.  The two capital counts involved vulnerable victims, who were killed in a cruel and heinous manner.  See also United States v. James, 712 F.3d 79, 84-87 (2d Cir. 2013).

- United States v. Alexis Candelario-Santana (D.P.R.).  The defendant masterminded a shooting rampage in which he and others opened fire in a bar, killing eight people.  He had been convicted of 13 prior murders.

- United States v. Thomas Pitera (E.D.N.Y.).  The defendant was responsible for seven drug-related murders in furtherance of a large-scale drug trafficking organization.  The victims were tortured and their bodies dismembered.

---

[91] The cases and descriptions below are drawn from data maintained by the Federal Death Penalty Resource Counsel Project, FDPRC Website, Authorized Cases, www.capdefnet.org/FDPRC/pubmenu.aspx?menu_id=96&folder_id=5120, and from the completed verdict forms, Verdict Forms, *supra*, as supplemented by court orders and opinions from those cases.

- United States v. Shani Nurani Shiekh Abrar, Abukar Osman Beyle, and Ahmed Muse Salad (E.D. Va.). The defendants, three Somali pirates, were convicted of the murders of four Americans off the coast of Somalia. They boarded the Americans' yacht, took the Americans as hostages, and after negotiations with the Navy failed, opened fire, killing the hostages and two other pirates.

- United States v. James Dinkins and Melvin Gilbert (D. Md.). The defendants were convicted of killing two federal witnesses to protect a drug organization and to retaliate against and intimidate potential witnesses who tried to interfere. Dinkins was also convicted of the murder of a third individual and for the non-fatal shooting of a fourth.

- United States v. Larry Lujan (D.N.M.). The defendant was convicted of what the Tenth Circuit characterized as "a gruesome [crime] in which Lujan (and his companions) severely beat [the victim] over a significant period of time, sexually assaulted [him], and engaged in other acts to terrify and isolate [the victim]." United States v. Lujan, 603 F.3d 850, 852 (10th Cir. 2010). In addition, at the penalty phase, the government proved beyond a reasonable doubt that Lujan had committed two other "equally gruesome" murders, in which he slit the victims' throats, "poured gasoline over [their] bodies, including [one who was] apparently still-breathing . . . and set them on fire . . . . The victims' eleven-year-old daughter discovered the bodies the next afternoon." Id.

- United States v. Steven Green (W.D. Ky.). The defendant went with three other soldiers to the home of a 14-year-old Iraqi girl, where he shot and killed the teen's mother, father, and sister; raped the girl; and then shot her in the face.

- United States v. James McTier (E.D.N.Y.). The defendant, the leader of one of the most dangerous and feared street gangs in New York, murdered three people, including an innocent bystander during a drive-by shooting, and an 18-year-old whom he stabbed through the heart. He also attempted to murder three others, including an off-duty officer, a 13-year-old girl who was shot in the head, and a woman during another drive-by shooting who was holding her two-year old child.

211

- United States v. John Mayhew (S.D. Ohio).  The defendant killed his ex-wife, her boyfriend, and his 18-year old daughter with whom he was having an incestuous relationship.  He also shot a state trooper in the chest, and rigged his car with bombs.

- United States v. Dennis Cyrus (N.D. Cal.).   The defendant was convicted of three RICO murders, including one of a government witness.

- United States v. Barry Mills, Tyler Bingham, Wayne Bridgewater and Henry Houston  (C.D. Cal.).  The defendants, prison inmates who were leaders of the Aryan Brotherhood, a nationwide prison gang, directed numerous murders to expand the power of the gang.

- United States v. Johnny Davis (E.D. La.).  The enforcer for a drug gang, the defendant was convicted of three murders.

- United States v. Terry Nichols (D. Colo.).  Timothy McVeigh's co-defendant was convicted of conspiracy to use a weapon of mass destruction and eight counts of involuntary manslaughter for his participation in the Oklahoma City Bombing, which killed 168 people and injured more than 680 others.

- United States v. Zacarias Moussaoui (E.D. Va.).  The defendant was an Al-Qaeda conspirator convicted of involvement in the September 11, 2001 terrorist attacks, in which thousands were killed.

- United States v. Joseph Minerd (W.D. Pa.).  The defendant detonated a pipe bomb in an apartment, which killed his pregnant ex-girlfriend, her unborn child, and her 3-year-old daughter.

- United States v. Chevie Kehoe (E.D. Ark.).  The defendant murdered a man, his wife, and her 8-year-old daughter in furtherance of his affiliation with a white supremacist organization.

- United States v. Gurmeet Singh Dhinsa (E.D.N.Y.).  The defendant was the of a racketeering organization who ordered the murder of two employees cooperating with authorities in a criminal investigation of him and plotted the murder of a third.  See also United States v. Dhinsa, 243 F.3d 635, 643-

212

45 (2d Cir. 2001).

- United States v. Kristen Gilbert (D. Mass.). The defendant was a nurse who murdered four patients and attempted to murder three others.

- United States v. Vincent Basciano (E.D.N.Y.). The defendant, the former boss of an organized crime family, was convicted of two murders. The jury also found he plotted to kill a federal prosecutor and had committed numerous other murders and attempted murders.

- United States v. Dean Beckford (E.D. Va.). The defendant was responsible for six drug-related murders.

- United States v. Elijah Williams and Reverend Williams (S.D.N.Y.). The defendants were responsible for three execution-style murders.

- United States v. John Bass (E.D. Mich.). The defendant was responsible for four drug-related murders, two of which were capital.

- United States v. Kevin Gray and Rodney Moore (D.D.C.). One defendant was convicted of nineteen drug-related murders, and the other of ten drug-related murders.

- United States v. Tommy Edelin (D. D.C.). The defendant was responsible for 14 drug-related murders.

- United States v. Jamal Shakir (M.D. Tenn.). The defendant, a leader of the Crips gang, was responsible for three murders.

- United States v. Shaheem Johnson and Raheem Johnson (E.D. Va.). The defendants were responsible for five drug-related murders.

- United States v. Claude Dennis (E.D. Va.). The defendant was responsible for six drug-related murders.

- United States v. Anthony Jones (D. Md.). The defendant was responsible for five drug-related murders.

213

- United States v. Mariano Martinez (C.D. Cal.).  The defendant, a Mexican Mafia gang member, was convicted of three murders and of ordering eight others.

- United States v. Willis Haynes (D. Md.).  The defendant was convicted of kidnapping and murdering three women.

- United States v. Naeem Williams (D. Haw.).  The defendant beat his five-year old daughter almost daily for months, often while she was duct-taped to her bed, and withheld food from her for days at a time, until she died.

- United States v. John McCluskey (D.N.M.).  The defendant escaped from a state prison in New Mexico, and carjacked, kidnapped, and shot to death a married couple who were vacationing.

**2.     Examples of cases in which the government authorized a capital prosecution but later consented to a non-death disposition or otherwise withdrew the authorization.**

- United States v. Gary Watland (D. Colo.).  The defendant, who had a prior murder and escape conviction, stabbed another inmate to death in a United States Penitentiary.

- United States v. Lorie Ann Taylor-Keller (W.D. Va.).  The defendant drove to the home of her ex-husband where she and her co-defendant shot him, his wife, and her 5-year-old daughter.  They subsequently set fire to the residence to destroy the evidence.

- United States v. Jason Tisdale (D. Kan.).  The defendant, a member of the Crips gang, was responsible for three RICO, drug-related murders.

- United States v. Ritz Williams (M.D. Pa.).  The defendant was an inmate with a prior murder conviction who stabbed another inmate to death in a USP.

- United States v. Eric Rudolph (N.D. Ala.).  The defendant was responsible for a series of anti-abortion and anti-gay-motivated terrorist bombings over a two year-period, which killed two people and injured at least 150 others.

214

- United States v. Connell C. Williams (W.D. Okl.). The defendant was an army private who killed his girlfriend's 10-year-old son at Fort Sill by starving him to a slow death over a period of months.

- United States v. Michael S. Jacques (D. Vt.). The defendant, who had a history of sexual assaults against children and women, kidnapped, sexually assaulted and murdered a 12-year-old girl.

- United States v. Theodore Kaczynski (E.D. Cal.). The defendant, the so-called "Unabomber," was responsible for mailing or hand-delivering a series of explosive devices that killed three people and injured 23 others.

- United States v. Wilfredo Acosta-Martinez and Victor Rodriguez (E.D. Pa.). The defendants committed four murders in operating a multimillion-dollar drug gang.

- United States v. Clarence Heatley and John Cuff (S.D.N.Y.). One defendant pleaded guilty to involvement in thirteen drug-related murders, and the other to involvement in nine.

- United States v. Buford Furrow (C.D. Cal.). The defendant killed a postal worker and shot five people (including three children) at a Jewish Center.

- United States v. Fu Xin Chen, Jai Wu Chen, and You Zhong Peng (E.D.N.Y.). The defendants were Chinese gang members who kidnapped, raped, and murdered three illegal Chinese immigrants, one of whom was held for ransom and killed when her family failed pay.

- United States v. Peter Rollack (S.D.N.Y.). The defendant, a gang leader, pleaded guilty to six drug-related killings, including some ordered while he was incarcerated.

- United States v. Harry Burton (D. Md.). The defendant, a member of a drug and firearm organization, murdered three individuals in aid of racketeering.

Nor can Aquart's case be distinguished from these on a theory it lacked

mitigation. On the contrary, the jury found numerous mitigating factors, including

215

substantial ones, such as that he could be safely and securely controlled in federal

prison; that he was exposed to violence, drug dealing, and abuse from his parents

as a young child; and that the homicide victims in this case were drug dealers

whose trafficking contributed to their deaths.  See DE 936:6-10.  See also

Statement of Facts, Section II.B.  Indeed, the last of these factors was cited by a

number of judges on this Court as a particularly weighty consideration in a federal

capital defendant's favor.  See United States v. Fell, 571 F.3d 264, 276-78 (2d Cir.

2009) (Raggi, Cabranes, Parker, Wesley & Livingston, JJ., and Jacobs, C.J.,

concurring in denial of rehearing en banc).

        If any characteristic of Aquart's case can help explain why he was selected

from the many other comparable federal capital offenders, there is some reason to

suspect — as there was in Furman — that it may be his race.  408 U.S. at 310

(Stewart, J., concurring).  Aquart, who is of Jamaican descent, is black.[92]   A total

of 11 of the last 16 federal defendants sentenced to death, over the course of the

past six years, have been people of color.  (Three of the five white defendants

sentenced to death in that period were long-term or life-sentenced BOP inmates

---

        [92] The federal jury that sentenced Aquart consisted of 10 white jurors and
two African-American ones.  (The record shows this if the juror number for each
juror, identified at T.69, is compared with the corresponding jury questionnaires,
which indicate race.).

216

convicted of additional killings in prison).[93]  Nor is this apparent disparity a new

phenomenon; a 1994 Congressional study, which examined federal death penalty

cases over the previous six-year period, found that "[r]acial minorities are being

prosecuted under federal death penalty law far beyond their proportion in the

general population or the population of criminal offenders . . . . This pattern of

inequality adds to the mounting evidence that race continues to play an

unacceptable part in the application of capital punishment."[94]

The apparent disparity extends quite starkly to this Circuit, where, after a

quarter century of the federal death penalty, hundreds of death-eligible cases, and

more than a score of capital sentencings, the only two federal defendants who are

under federal sentence of death are African-American.[95]  Indeed, it is difficult to

reconcile Aquart's death sentence with the life sentences imposed in this circuit on

defendants like Vincent Basciano and Thomas Pitera, who, as noted above, were

---

[93] See Death Penalty Information Center, Federal Death Row Prisoners, www.deathpenaltyinfo.org/federal-death-row-prisoners#cases; Authorized Cases, *supra*.

[94] Racial Disparities in Federal Death Penalty Prosecutions, 1988-94, Staff Report by the Subcommittee on Civil and Constitutional Rights Committee on the Judiciary, 103rd Cong., 2nd Sess. at 1 (March 1994), available at www.ncjrs.gov/pdffiles/153840.pdf.

[95] The other is Ronell Wilson, from the Eastern District of New York, whose case is also currently on appeal to this Court.

217

white organized crime leaders convicted of similarly aggravated multiple murders.

*        *        *

In summary, the federal death penalty carries no more predictibility than "a lottery system." Furman, 408 U.S. at 293 (Brennan, J., concurring). Receiving a federal death sentence remains comparable to being "struck by lightning," a rare and freakish event. Id. at 309-10 (Stewart, J., concurring). Aquart's death sentence is as arbitrary and capricious as the ones the Supreme Court set aside in Furman, and therefore it violates the Eighth Amendment and due process. It should be set aside, and the district court directed to resentence him to life imprisonment.

# IX.

## Capital Punishment Violates the Eighth Amendment's Ban on Cruel and Unusual Punishment.

In 2002, this Court rejected an argument that capital punishment is inconsistent with the Eighth Amendment.  United States v. Quinones, 313 F.3d 49, 62 & n.10 (2d Cir. 2002) (citing Gregg v. Georgia, 428 U.S. 153, 186-87 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.).  Sweeping changes in the last twelve years — numerous states have abolished capital punishment or enjoined its use and juries return dramatically few death verdicts than they once did — undermine that holding.  Today, the death penalty no longer comports with "'the evolving standards of decency that mark the progress of a maturing society'" embodied by the Eighth Amendment.  Thompson v. Oklahoma, 487 U.S. 815, 821 (1988) (quoting Trop v. Dulles, 356 U.S. 86, 101 (1958)).[96]

---

[96] Here, Aquart argues that capital punishment, itself, no longer comports with the evolving standards of decency embodied in the Eighth Amendment.  He has also raised two other Eighth-Amendment challenges to application of the death penalty in this case: In Point VII, Aquart urges that the constitution forbids imposition of a sentence of death against a defendant whom the jury unanimously found to be non-dangerous and capable of being safely managed in prison, and in Point VIII, he argues that the arbitrary and capricious manner of selecting those few defendants who are sentenced to death under the FDPA is unconstitutional. Each of the three points articulates a distinct reason to reverse the sentence in this case, but each, in addition, also reinforces the other — turning in part on the rarity of use and the arbitrary features of the remainder — and, if any one did not suffice, together they cumulatively require reversal.

The Supreme Court, in recent years, in cases in which it has narrowed the categories of offenders and offenses that may be eligible for capital punishment, refined its "evolving standards" analysis. That analysis looks to "objective evidence of contemporary values," Atkins v. Virginia, 536 U.S. 304, 321 (2002): objective evidence such as legislative actions and actual sentencing practices in jurisdictions where the punishment is permitted, see, e.g., Atkins, 536 U.S. at 312, 313-16, 321 (execution of persons with intellectual disability violates 8th Amendment); Roper v. Simmons, 543 U.S. 551, 564-65, 568 (2005) (execution of minors); Kennedy v. Louisiana, 554 U.S. 407, 422-24, 433-34 (2008) (death penalty for child rape); Graham v. Florida, 560 U.S. 48, 62-63 (2010) (life without parole for minors convicted of crimes other than homicide); Miller v. Alabama, 132 S. Ct. 2455, 2470-73 (2012) (mandatory life without parole for minors).

At the time this Court decided Quinones, it might have been possible to give primary weight to the number of jurisdictions with laws on the books that permit a punishment. Quinones, 313 F.3d at 63 n.11 (observing that "as of 2000, thirty eight states as well as the federal government had capital statutes"). In its most recent cases, however, the Supreme Court has underscored that the accounting is more refined:

> There are measures of consensus other than legislation. Actual
> sentencing practices are an important part of the Court's inquiry into

220

consensus.  Here, an examination of actual sentencing practices in jurisdictions where the sentence in question is permitted by statute discloses a consensus against its use.

Graham, 560 U.S. at 62 (finding consensus against punishment, despite fact that 37 states and the District of Columbia permitted it) (internal quotation marks and citations omitted); see also Miller, 132 S. Ct. at 2472 (in some cases, "simply counting . . . would present a distorted view"); Hall v. Florida, 134 S. Ct. 1986, 1997 (2014) (tallying the number of states that impose a bright-line IQ cutoff to determine intellectual disability, but excluding states that do not actively impose capital punishment because, in those states the "laws and jurisprudence on this issue are unlikely to receive attention" and therefore may not reflect the state's current views on the issue).  Thus, states that theoretically permit a punishment, but do not use it in practice, are included on the abolition side of the scales, and, under the Supreme Court's current jurisprudence, infrequency or lack of use can tip the balance.

Objective indicia concerning the death penalty as a whole shows an unmistakable trend: Capital punishment, in theory and in practice, is on the wane in this country, and is now out of step with contemporary values.

Thirty-two states and the federal government have laws that authorize capital punishment.  Since 2002, however, five jurisdictions have abolished the

221

death penalty legislatively, replacing it with a sentence of life without parole: New

Jersey, New Mexico, Illinois, Connecticut and Maryland. See 2012 Conn. Pub.

Acts no. 12–5; Ill. Comp. Stat. ch. 725, § 119–1 (West 2012); Md. Correc. Servs.

Code Ann. § 3–901 et seq. (Lexis 2008); N.J. Stat. Ann. § 2C:11–3(b)(1) (West

Supp.2013); 2009 N.M. Laws ch. 11, §§ 5–7; see also Hall, 134 S. Ct. at 1997.  In

addition, the New York Court of Appeals invalidated New York's death penalty

under the State Constitution in 2004, see People v. LaValle, 3 N.Y.3d 88 (2004),

and legislation has not been passed to reinstate it.  See Hall, 134 S. Ct. at 1997.

And in many jurisdictions where capital punishment remains technically in

force, its infrequent use demonstrates its disfavored status.

- The governors of two states, Washington and Oregon, have imposed moratoria on executions for the remainder of their terms, and the governor of Colorado issued an indefinite reprieve in the only death penalty case to reach him during his tenure.  See Ian Lovett, Executions Are Suspended by Governor in Washington, N.Y. Times (Feb. 11, 2014).[97]

- Arkansas, California, Kentucky, Louisiana, Montana, and North Carolina, a de facto moratorium on executions is in place because of lethal-injection challenges; most of those states have not had an execution since 2008.  See Death Penalty Information Center, Death Penalty on Hold in Most of the

---

[97] Available at http://www.nytimes.com/2014/02/12/us/washington-governor-jay-inslee-suspends-death-penalty.html, last visited Dec. 17, 2014

Country.[98]

- For example, in California, which has the nation's largest death row (over 700), no execution has occurred since 2006 because courts have enjoined the state from carrying out any death sentence until it passes a lawful execution protocol.  See Jones v. Chappell, ___ F. Supp. 2d ___, 2014 WL 3567365, at *1 (C.D. Cal. July 16, 2014).[99]

- Recently, three states, Arizona, Ohio, and Oklahoma, temporarily halted executions as reviews are conducted of botched executions.  See Death Penalty on Hold.  In six additional states, while no formal hold is in place, no execution has been conducted in at least five years.  See id. (Kansas, Nebraska, Nevada, New Hampshire, Pennsylvania, Wyoming).

In all, thirty-six states have either abolished the death penalty, have executions on hold, or have not carried out an execution in at least 5 years.  See Death Penalty on Hold.

No state has re-introduced the death penalty in nearly two decades, since

---

[98] http://www.deathpenaltyinfo.org/node/5829, last reviewed Dec. 17, 2014. The Death Penalty Information Center ("DPIC") website compiles information pertaining to capital punishment.

[99] In 2014, the United States District Court for the Central District of California held the state's death penalty unconstitutional, finding that excessive delays in execution of sentence, resulting from the dysfunctional administration of its system, resulted in an unconstitutionally arbitrary capital sentencing scheme. Id. at *14.  The court emphasized that despite the high number of death sentences handed down in that state, 900 since 1978, only 13 individuals have been executed in that same time.  See id. at *1.  The state has filed a notice of appeal.

223

New York in 1995.  See ProCon.org, "Timeline of State Death Penalty Laws,

1972-2013;[100] Stephen B. Bright, The Future of the Death Penalty in Kentucky and

America, 102 Ky. L.J. 739, 744 (2014) ("The trend has been in one direction.").

Across the country, in recent years, juries have returned far fewer death

sentences, and far fewer executions have been carried out, than in years past.  The

average number of death sentences per year in the period spanning the years 2002

through 2011 was 115, while the average number in the period from 1992 to 2001

was 273. Robert J. Smith, Bidish J. Sarma & Sophie Cull, The Way the Court

Gauges Consensus (And How to Do it Better), 35 Cardozo L. Rev. 2397, 2443

(2012).  There were 39 executions in 2013 — four fewer than the number carried

out in 2011 and 2012 (43) — compared to 65 in 2003 and 98 in 1999.  See

Department of Justice, Bureau of Justice Statistics, Capital Punishment, 2012, at 3,

14.[101]

The overwhelming majority of death sentences actually handed down come

from the "death belt" — Alabama, Florida, Georgia, Louisiana, Mississippi, South

Carolina, and Texas.  See Robert J. Smith, The Geography of the Death Penalty

---

[100] http://deathpenalty.procon.org/view.resource.php?resourceID=001172, last visited on December 17, 2014.

[101] Available at http://www.bjs.gov/content/pub/pdf/cp12st.pdf, last visited on December 17, 2014.

and Its Ramifications, 92 B.U.L. Rev. 227, 230 (2012). "In 2009 five states,

Alabama, Arizona, California, Florida and Texas – accounted for two thirds of

death sentences nationally." Id. at 230. And, even within states with active

capital punishment systems, only a small fraction of local communities account for

the great bulk of death sentences. James S. Liebman & Peter Clarke, Minority

Practice, Majority's Burden: The Death Penalty Today, 9 Ohio St. J. Crim. L. 255,

350 (2011). For example, in California, between 2004 and 2009, "64% of

counties did not sentence anyone to death and 90% returned no more than one

death." Geography of the Death Penalty at 231. In Florida, fewer than half of the

counties sentenced anyone to death between 2004 and 2009. Id. "Texas has 254

counties, of which 222 (88%) sentenced no one to death from 2004 to 2009, just

four counties imposed death sentences at a rate of more than one a year." Id. at

232. Just 10% of counties in the United States account for all death sentences

imposed from 2004 to 2009. Id. at 233. A 2013 review by the Death Penalty

Information Center in 2013 found that

> Only 2% of the counties in the U.S. have been responsible for the
> majority of cases leading to executions since 1976. Likewise, only
> 2% of the counties are responsible for the majority of today's death
> row population and recent death sentences. To put it another way, all
> of the state executions since the death penalty was reinstated stem
> from cases in just 15% of the counties in the U.S. All of the 3,125
> inmates on death row as of January 1, 2013 came from just 20% of
> the counties.

Death Penalty Information Center, "The 2% Death Penalty: How a Minority of Counties Produce Most Death Sentences at Enormous Costs to Us All," Executive Summary (2013).[102]

Where the objective evidence shows a consensus among "the citizenry and its legislators," the 8th Amendment still requires this Court to bring its own judgment to bear, to assess whether there is any reason to disagree with that consensus. Atkins, 536 U.S. at 313. No reason exists. Capital punishment in this country has devolved to a rump system: infrequently used, confined to a tiny fraction of counties, within a geographically bound fraction of the nation. So limited, and turning on such a wholly arbitrary factor such as the location of the trial, capital punishment no longer "measurably advance[s]" the only two justifications that the Supreme Court has recognized support the most extreme sanction — retribution and deterrence. Atkins, 536 U.S. at 318-19, 321; see also Roper, 543 U.S. at 571-72; Kennedy, 554 U.S. at 434, 441-42; Graham, 560 U.S. at 67-68. And unless a punishment "measurably contributes to one or both of these goals, it 'is nothing more than the purposeless and needless imposition of pain and suffering,' and hence an unconstitutional punishment." Atkins, 536 at

---

[102] Available at http://www.deathpenaltyinfo.org/documents/TwoPercentReport.pdf, last visited on Dec. 17, 2014.

319 (quoting <u>Enmund v. Florida</u>, 458 U.S. 782, 798 (1982)).

The evolution of a new consensus opposed to capital punishment renders imposition of capital punishment cruel and unusual within the meaning of the 8th Amendment. This Court should reverse Aquart's sentence and remand for new re-sentencing. In the alternative, this Court should remand for an evidentiary hearing on the emerging standards of decency.

# X.

## The Government's Evidence Does Not Support the VICAR Counts: It Failed to Prove That the Enterprise Affected Interstate Commerce or That Aquart's Motive Was to Maintain or Increase His Position in His Enterprise.

Aquart was convicted of four VICAR-related counts: Count 1, conspiracy to murder in aid of racketeering and Counts 2 through 4, murder in aid of racketeering, under 18 U.S.C. § 1959.  Aquart, here, challenges the sufficiency of the government's proof on these counts.  Specifically, the government failed to prove that (1) the racketeering enterprise affected interstate commerce and (2) the government offered no evidence at all that Aquart, in committing the murders, acted to gain entry to or to maintain or increase his position in his enterprise.  We acknowledge that both claims are foreclosed by the caselaw of this Circuit, which this Court is bound to apply.  Accordingly, we summarize each issue below, in order to preserve the issues for en banc review and to preserve Aquart's opportunity to seek review from the United States Supreme Court.

For each of the four counts, the government was required to prove that the alleged enterprise "affect[ed] interstate commerce" (T.4160-62, 4179).  The short-lived enterprise charged in this case sold small amounts of crack cocaine locally,

228

out of the Charles Street apartments in Bridgeport, Connecticut.  The government

offered no evidence that the drugs sold traveled in interstate commerce or that the

sales had an effect on interstate commerce.  This Court has held that, with respect

to cocaine, jurors may infer, based on lay knowledge, that cocaine is imported into

the United States, and that expert evidence on the matter is not necessary.  See,

e.g., United States v. Needham, 604 F.3d 673, 680 (2d Cir. 2010) (citing United

States v. Gomez, 580 F.3d 94, 102 (2d Cir. 2009)).  Such a presumption, however,

effectively absolves the jury from finding an element of the offense, and runs afoul

of the Supreme Court's Apprendi v. New Jersey, 530 U.S. 466 (2000) line of

cases, holding that the 6th Amendment requires the jury to find every element of

the offense — a line most recently elaborated on in Alleyne v. United States, 133

S. Ct. 2151 (2013).  The presumption should be overturned.

　　According to the government, Aquart was the unchallenged leader of the

enterprise.  The government adduced absolutely no evidence that Aquart

committed the murders of which he was convicted for the purpose of "maintaining

or increasing" his own position in the enterprise.  None of the witnesses ever

suggested, and no juror could reasonably have inferred, that his position as leader

would have been in jeopardy had he not committed the murders.  We acknowledge

that, under this Court's holding in United States v. Dhinsa, 243 F.3d 635 (2d Cir.

229

2001), the motive element need not relate strictly to the defendant's personal position, but may be satisfied when the purpose is to maintain or enhance the position of the enterprise itself.  See id. at 671 ("we have affirmed convictions under section 1959(a) for violent crimes committed or sanctioned by high ranking leaders of the enterprise for the purpose of protecting the enterprise's operations and furthering its objectives").  But the holding of Dhinsa, sweeping broadly, cannot be squared with the plain language of § 1959, which on its face proscribes acts of violence committed "for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity" — which, fairly read, sweeps more narrowly to cover only a defendant's own personal position.  Dhinsa, and the cases on which it relies, should be overruled.

## CONCLUSION

Aquart has raised challenges to his capital convictions in Points II, V and VI.  For the reasons stated therein, this Court should remand for a hearing to determine if John Taylor, the government's lead cooperator, lied when he claimed he did not expect any sentencing benefit as a result of his incriminating testimony (see Point II); if so, Aquart's capital convictions should be reversed and a new trial ordered.  Lashika Johnson, the other main cooperator, most certainly committed

perjury when she denied being threatened at a proffer session (see Point V), and the government improperly assured jurors that one of the initial suspects in the murders, Rodney Womble, had been cleared by DNA analysis (see Point VI).

If the convictions are affirmed, this Court should vacate the death sentences imposed on Aquart and remand his case for imposition of a sentence of life in prison without the possibility of release.[103] For the reasons stated in Points VII, VIII and IX, the death penalty is unconstitutional in that it is imposed arbitrarily and is contrary to evolving standards of decency (see Points VIII and IX). It is also unconstitutional as applied to a defendant, like Aquart, who has been found not to pose a risk of violence if confined to prison under a sentence of life without the possibility of release (see Point VII).

Alternatively, for the reasons stated in Points I through VI, this Court should vacate the death sentences and order a new penalty proceeding. See 18 U.S.C. § 3595(c)(2)(C). Efrain Johnson provided an account of events inside the apartment that conflicted with John Taylor's version, and seriously undermined the government's story line about the perpetrators' respective roles in the

_____

[103] A lesser term of 20 years to life is authorized for the three drug-related murder convictions, but Aquart waived his right to seek such a sentence. See DE 873:1-4. Accordingly, the jury was not given this lesser sentence alternative. See, e.g., P.5567-68 at A.314-15; DE 936:12-13 at A.494-95.

231

subduing, taping and murders of the three victims. To blunt Efrain's narrative, and its affect on Taylor's credibility, the government used improper tactics – vouching and unfair impeachment – to denigrate Efrain's statements (see Point I). As previously mentioned, Aquart has also raised other serious issues about the credibility of John Taylor and Lashika Johnson, who each supplied evidence that the government relied on in support of its argument for Aquart's execution (see Points II and V).

Additionally, Aquart has presented substantial challenges to four of the seven aggravating factors weighed by jurors, including that the murders were the result of substantial planning and premeditation (Point III), and that Aquart personally killed more than one victim (Point IV). As a result of the submission of these factors, which were not supported by legally sufficient evidence, the case appeared more aggravated than it was, tilting the jury toward a death sentence.

The relief Aquart requests is appropriate even if no single error is deemed sufficiently prejudicial to warrant reversal. See United States v. Rahman, 189 F.3d 88, 145 (2d Cir. 1999) ("[T]he effect of multiple errors in a single trial may cast such doubt on the fairness of the proceedings that a new trial is warranted, even if no single error requires reversal"). The cumulative error doctrine specifically embraces claims that have not been sufficiently preserved for

232

appellate review.  See United States v. Certified Environmental Services, Inc., 753

F.3d 72, 95-97 (2d Cir. 2014).  Moreover, under the Federal Death Penalty Act,

the combined effect of sentencing errors should be considered when the Court

determines whether a death sentence "was imposed under the influence of passion,

prejudice, or any other arbitrary factor."  18 U.S.C. § 3595(c)(2)(A).

The errors raised on this appeal, aggregately at the least, violated "the due

process guarantee of fundamental fairness" to which Aquart was entitled.  See

Taylor v. Kentucky, 436 U.S. 478, 487 at n.15 (1978); United States v. Haynes,

729 F.3d 178, 197 (2d Cir. 2013); United States v. Al-Moayad, 545 F.3d 139, 178

(2d Cir. 2008).  They also violated his Eighth Amendment right to a fair and

reliable sentencing determination.

Respectfully submitted,


/s/_____
    BEVERLY VAN NESS



/s/_____
    SEAN J. BOLSER
    BARRY J. FISHER
    Federal Capital Appellate Resource Counsel

    Counsel for Azibo Aquart

Dated: January 13, 2015

## **CERTIFICATE OF COMPLIANCE**

Beverly Van Ness, attorney for appellant Azibo Aquart, hereby certifies that she is aware of the requirements of Rule 32(a)(5), (6) and(7)(B)-(C) of the Federal Rules of Appellate Procedure and that, according to the word-processing system used to prepare this brief (Word Perfect), the brief (excluding tables of contents and authorities and addendum) contains approximately 55,793 words, using Times New Roman, a proportionally-spaced font, size 14 point.  By order dated January 6, 2015, the Court granted me permission to file an over-length brief as specified above.

Dated: New York, New York
          January 13, 2015

                                        /s/_____
                                             Beverly Van Ness

# ADDENDUM TO BRIEF

## Index to Transcripts by Date of Proceeding[1]

**guilt phase**:

4/20/11          pp. 1-257 (opening statements and beginning of
                    testimony)
4/21/11          258-458
4/25/11          459-681
4/26/11          682-951
4/27/11          952-1188
4/28/11          1189-1418
4/29/11          1419-1691
5/2/11           1692-1972
5/3/11           1673-2186
5/4/11           2187-2418
5/5/11           2419-2617
5/9/11           2618-2826
5/10/11          2827-3067
5/11/11          3068-3272
5/12/11          3273-3396
5/13/11          3397-3569
5/13/11          separate transcript for charge conference, pp. 1-108
5/16/11          3570-3806
5/17/11          3807-4030
5/18/11          4031-4142

_____

[1] Jury selection began on 3/1/11 when groups of potential jurors were summoned to fill out questionnaires. Individual *voir dire* started on 3/21/11 and the jury was selected on 4/19/11. No issues are being raised on the appeal that relate to jury selection or to pre-trial proceedings, so those transcripts are not included in this index.

a

| | |
|---|---|
| 5/18/11 | separate transcript for charge conference, pp. 109-54 |
| 5/20/11 | 4143-4353 (jury charge, summations and start of deliberations) |
| 5/23/11 | 4354-4385 (continued deliberations and verdict) |

**pre-penalty phase**:

| | |
|---|---|
| 5/24/11 | 1-23 (miscellaneous penalty issues) |
| 5/26/11 | 1-129 (argument on penalty motions) |

**penalty phase**:

| | |
|---|---|
| 5/31/11 | 4386-4632 (including opening statements and start of proof) |
| 6/1/11 | 4633-4774 |
| 6/2/11 | 4775-4966 |
| 6/3/11 | 4967-5193 |
| 6/6/11 | 5194-5443 |
| 6/6/11 | separate transcript for charge conference, pp. 1-77 |
| 6/7/11 | 5444-5565 |
| 6/7/11 | separate transcript for charge conference, pp. 78-158 |
| 6/13/11 | 5566-5715 (jury charge, summations, start of deliberations) |
| 6/14/11 | 5716-5743 (continued deliberations) |
| 6/15/11 | 5744-5758 (continued deliberations and verdict) |

**post-verdict and sentencing**:

| | |
|---|---|
| 11/22/12 | 1-50 (argument on motion to set aside verdict) |
| 12/12/12 | 1-16 (miscellaneous sentencing issues) |
| 12/17/12 | 1-27 (imposition of sentence) |