# 12-5086

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

UNITED STATES OF AMERICA,

Appellee,

-against-

AZIBO AQUART,

Defendant-Appellant.

ON APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF CONNECTICUT

## APPENDIX FOR DEFENDANT-APPELLANT

### VOLUME 1 of 2 (Pages A.1 to 453)

**BEVERLY VAN NESS**
233 Broadway, Suite 2704
New York, NY 10279
(212) 274-0402

**SEAN J. BOLSER**
**BARRY J. FISHER**
Federal Capital Appellate Resource Counsel Project
Federal Public Defender, N.D.N.Y.
Brooklyn Office
One Pierrepont Plaza – 16th Floor
Brooklyn, New York 11201
(718) 330-1200, x406

# **APPENDIX**[1]

District Court Docket Entries . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Superceding (final) Indictment 3/3/10, DE361 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

Notice of Intent to Seek the Death Penalty (final) 8/13/10, DE479 . . . . . . . . . . . . . . . . . . . . . 76

## **MINUTES**

Guilt-phase Trial Minutes 4/20/11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

Guilt-phase Trial Minutes 4/21/11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

Guilt-phase Trial Minutes 4/25/11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

Guilt-phase Trial Minutes 4/29/11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103

Guilt-phase Trial Minutes 5/4/11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106

Guilt-phase Trial Minutes 5/5/11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 132

Guilt-phase Trial Minutes 5/10/11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 143

Guilt-phase Trial Minutes 5/11/11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 159

Guilt-phase Trial Minutes 5/12/11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 189

Guilt-phase Trial Minutes 5/13/11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 190

Guilt-phase Trial Minutes 5/20/11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 194

Sentencing Hearing Minutes 5/31/11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 209

Sentencing Hearing Minutes 6/1/11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 212

Sentencing Hearing Minutes 6/6/11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 216

Sentencing Hearing Minutes 6/7/11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 259

---

[1] Many of the documents listed are excerpts rather than full copies. Documents filed via Pacer are referred to as "DE," for docket entry.

Sentencing Hearing Minutes 6/13/11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 314

    Jury Instructions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 314
    Government Summation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 359
    Defense Summation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 394
    Government Rebuttal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 430
    Final Jury Instructions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 446

## MOTIONS, CHARGE REQUESTS AND OTHER DOCUMENTS

FBI 302 Report from 10/14/08 Proffer Session with Lashika Johnson . . . . . . . . . . . . . . . . . . 454

United States v. John Taylor, Plea Transcript, 10/18/10 . . . . . . . . . . . . . . . . . . . . . . . . . . . 456

United States v. Efrain Johnson, Aborted Plea Transcript, 3/8/11 . . . . . . . . . . . . . . . . . . . . 459

Azikiwe Aquart's Motions in Limine, DE 661, 3/11/11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 475

Defendant's Motions in Limine, DE 664, 3/13/11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 478

Government Response, Motions in Limine, DE 669, 3/17/11 . . . . . . . . . . . . . . . . . . . . . . . . 480

Defendant's Motion in Limine - Efrain Johnson Statements, DE 906, 6/1/11 . . . . . . . . . . . . 481

Completed Sentencing Verdict Sheet, DE 936, 6/15/11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 483

Plea Agreement, Azikwe Aquart, DE 960, 8/26/11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 497

United States v. Azikiwe Aquart, Plea Transcript, 8/26/11 . . . . . . . . . . . . . . . . . . . . . . . . . . 500

Defendant's Post-trial Motion, DE 1102, 3/8/12 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 502

Government Response to Post-trial Motion, DE 1105, 3/21/12 . . . . . . . . . . . . . . . . . . . . . . . 515

Defendant's Reply to Post-trial Motion, DE 1106, 4/2/12 . . . . . . . . . . . . . . . . . . . . . . . . . . . 536

Court Decision, Post-trial Motion, DE 1177, 12/6/12 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 546

United States v. John Taylor, Sentencing Transcript, 4/16/12 . . . . . . . . . . . . . . . . . . . . . . . . 556

# EXHIBITS

Government Exhibit 101A, Interactive Diagram of 215 Charles St. . . . . . . . . . . . . . . . . . . . . . 562

Government Exhibit 101B, Diagram of Apartment 101 (not to scale) . . . . . . . . . . . . . . . . . 600

Government Exhibit 115F, Photograph of View into Apartment 101 . . . . . . . . . . . . . . . . . 601

Government Exhibit 116, Photograph of Apartment 101 with Damaged Door Frame . . . . . . 602

Government Exhibit 116A, Close-up Photograph of Damage to Front Door Frame . . . . . . . 603

Government Exhibit 116C, Photograph of Damage to Front Door Frame . . . . . . . . . . . . . . . 604

Government Exhibit 116F, Photograph of Damage to Front Door Frame . . . . . . . . . . . . . . . 605

Government Exhibit 116G, Photograph of Door with Screw . . . . . . . . . . . . . . . . . . . . . . . 606

Government Exhibit 116H, Close-up Photograph of Screw in Front Door Frame . . . . . . . . 607

Government Exhibit 116I, Close-up Photograph of Screw in Front Door Frame . . . . . . . . . . 608

Government Exhibit 116J, Close-up Photograph of Screw in Front Door Frame . . . . . . . . . . 609

Government Exhibit 117A, Close-up Photograph of Table with Cards and Screws . . . . . . . . 610

Government Exhibit 117J, Photograph of Floral Couch in Hallway . . . . . . . . . . . . . . . . . . 611

Government Exhibit 120-1, Photograph of Basil Williams . . . . . . . . . . . . . . . . . . . . . . . . 612

Government Exhibit 120-2, Photograph of Basil Williams . . . . . . . . . . . . . . . . . . . . . . . . 613

Government Exhibit 120-3, Photograph of Basil Williams . . . . . . . . . . . . . . . . . . . . . . . . 614

Government Exhibit 120-4, Photograph of Basil Williams . . . . . . . . . . . . . . . . . . . . . . . . 615

Government Exhibit 120-5, Photograph of Basil Williams . . . . . . . . . . . . . . . . . . . . . . . . 616

Government Exhibit 120-7, Photograph of Basil Williams . . . . . . . . . . . . . . . . . . . . . . . . 617

Government Exhibit 121-3, Photograph of Tina Johnson . . . . . . . . . . . . . . . . . . . . . . . . 618

Government Exhibit 121-4, Photograph of Tina Johnson . . . . . . . . . . . . . . . . . . . . . . . . . 619

Government Exhibit 121-7, Photograph of Tina Johnson . . . . . . . . . . . . . . . . . . . . . . . . . . 620

Government Exhibit 121-8, Photograph of Tina Johnson . . . . . . . . . . . . . . . . . . . . . . . . . 621

Government Exhibit 121-9, Photograph of Tina Johnson . . . . . . . . . . . . . . . . . . . . . . . . . 622

Government Exhibit 121-10, Photograph of Tina Johnson . . . . . . . . . . . . . . . . . . . . . . . . 623

Government Exhibit 122-1, Photograph of James Reid . . . . . . . . . . . . . . . . . . . . . . . . . . 624

Government Exhibit 122-2, Photograph of James Reid . . . . . . . . . . . . . . . . . . . . . . . . . . 625

Government Exhibit 122-3, Photograph of James Reid . . . . . . . . . . . . . . . . . . . . . . . . . . 626

Government Exhibit 122-5, Photograph of James Reid . . . . . . . . . . . . . . . . . . . . . . . . . . 627

Government Exhibit 123, Photograph of Plastic Bags with Duct Tape . . . . . . . . . . . . . . . . 628

Government Exhibit 123-1, Photograph of Plastic Bags with Duct Tape . . . . . . . . . . . . . . 629

Government Exhibit 127, Photograph of Blood Stains on Wall A in Johnson/Reid
Bedroom . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 630

Government Exhibit 127A, Close-up Photograph of Blood Stains on Wall A in Johnson/Reid
Bedroom . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 631

Government Exhibit 128, Photograph of Blood Stains on Wall B in Johnson/Reid
Bedroom . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 632

Government Exhibit 128A, Photograph of Blood Stains on Wall B in Johnson/Reid
Bedroom . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 633

Government Exhibit 128B, Close-up Photograph of Blood Stains on Wall B in Johnson/Reid
Bedroom . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 634

Government Exhibit 129A, Photograph of Blood Stains on Door and Wall C along Baseboard
in Johnson/Reid Bedroom . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 635

Government Exhibit 129B, Photograph of Blood along Wall C and Floorboard in Johnson/Reid
Bedroom . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 636

Government Exhibit 129C, Photograph of Blood along Wall C and Floorboard in Johnson/Reid
Bedroom . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 637

iv

Government Exhibit 129D, Close-up Photograph of Blood along Wall C and Floorboard in Johnson/Reid Bedroom . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 638

Government Exhibit 130A, Photograph of Blood on Wall D (Ceiling) in Johnson/Reid Bedroom . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 639

Government Exhibit 130B, Photograph of Blood on Wall D (Ceiling) in Johnson/Reid Bedroom . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 640

Government Exhibit 130C, Close-up Photograph of Blood on Wall D (Ceiling) in Johnson/Reid Bedroom . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 641

Government Exhibit 130D, Close-up Photograph of Blood on Wall D (Ceiling) in Johnson/Reid Bedroom . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 642

Government Exhibit 130E, Close-up Photograph of Blood on Wall D (Ceiling) in Johnson/Reid Bedroom . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 643

Government Exhibit 164, Close-up Photograph of Blood on Top of Front Door Lock . . . . . . 644

Government Exhibit 165, Close-up Photograph of Blood on Top of Front Door Lock . . . . . . 645

Goverment Exhibit 168, Photograph of Blood on Wall A and Wall D (Ceiling) in Johnson/Reid Bedroom . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 646

Government Exhibit 169, Photograph of Blood on Carpet in Johnson/Reid Bedroom . . . . . . 647

Government Exhibit 245, Jackie Bryant Medical Records . . . . . . . . . . . . . . . . . . . . . . . . . . . 648

Government Exhibit 246, Frank Hodges Medical Records . . . . . . . . . . . . . . . . . . . . . . . . . 702

Government Exhibit 247, John Taylor's Plea Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . 708

Government Exhibit 247A, John Taylor's Cooperation Agreement . . . . . . . . . . . . . . . . . . . . 710

Government Exhibit 249, Venro Fleming Medical Records . . . . . . . . . . . . . . . . . . . . . . . . . 711

Government Exhibit 305, Medical Examiner Report - Basil Williams . . . . . . . . . . . . . . . . . . 720

Government Exhibit 314, Medical Examiner Report - James Reid . . . . . . . . . . . . . . . . . . . 723

Government Exhibit 322, Medical Examiner Report - Tina Johnson . . . . . . . . . . . . . . . . . . 727

Government Exhibit 433, Close-up Photograph of Duct Tape on Tina Johnson's Hands . . . 730

v

Government Exhibit 455, Close-up Photograph of Walgreens Bag . . . . . . . . . . . . . . . . . . . . 731

Government Exhibit 462, DNA Chart . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 732

Government Exhibit 463, DNA Chart . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 733

Government Exhibit 464, DNA Chart . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 734

Government Exhibit 465, DNA Chart . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 735

Government Exhibit 466, DNA Chart . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 736

Government Exhibit 467, DNA Chart . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 737

Defendant's Exhibit F, Photograph of Basil Williams . . . . . . . . . . . . . . . . . . . . . . . . . . . . 738

Defendant's Exhibit G, Photograph of Basil Williams . . . . . . . . . . . . . . . . . . . . . . . . . . . . 739

**Sentencing Hearing Exhibits**

Government Exhibit P1-A, Photograph of Basil Williams . . . . . . . . . . . . . . . . . . . . . . . . . . . 740

Government Exhibit P1-B, Photograph of Basil Williams . . . . . . . . . . . . . . . . . . . . . . . . . . . 741

Government Exhibit P1-C, Photograph of Basil Williams . . . . . . . . . . . . . . . . . . . . . . . . . . . 742

Government Exhibit P1-D, Photograph of Basil Williams . . . . . . . . . . . . . . . . . . . . . . . . . . . 743

Government Exhibit P1-E, Photograph of Basil Williams . . . . . . . . . . . . . . . . . . . . . . . . . . . 744

Government Exhibit P1-F, Photograph of Basil Williams . . . . . . . . . . . . . . . . . . . . . . . . . . . 745

Government Exhibit P1-G, Photograph of Basil Williams' Bedroom . . . . . . . . . . . . . . . . . . 746

Government Exhibit P1-H, Photograph of Tina Johnson . . . . . . . . . . . . . . . . . . . . . . . . . . . 747

Government Exhibit P1-I, Photograph of Tina Johnson and James Reid . . . . . . . . . . . . . . . . 748

Government Exhibit P1-J, Blood Spatter Photograph, Johnson/Reid Bedroom . . . . . . . . . . . 749

Government Exhibit P1-K, Blood Spatter Photograph, Johnson/Reid Bedroom . . . . . . . . . . 750

Government Exhibit P1-L, Blood Spatter Photograph, Johnson/Reid Bedroom . . . . . . . . . . 751

Government Exhibit P1-M, Blood Spatter Photograph, Johnson/Reid Bedroom . . . . . . . . . . . 752

Government Exhibit P1-N, Blood Spatter Photograph, Wall C in Johnson/Reid Bedroom . . . 753

Government Exhibit P1-O, Blood Spatter Photograph, Wall C in Johnson/Reid Bedroom . . 754

Government Exhibit P1-P, Blood Spatter Photograph, Wall C in Johnson/Reid Bedroom . . . 755

Government Exhibit P9, Anthony Armistead Medical Records . . . . . . . . . . . . . . . . . . . . . . . . 756

Government Exhibit P12A, John Sullivan Medical Records . . . . . . . . . . . . . . . . . . . . . . . . . 763

Defense Exhibit P-C, Funeral Program for Sonia Smith . . . . . . . . . . . . . . . . . . . . . . . . . . . 772

Defense Exhibit P-H, Photograph of Aquart Family - Sonia Smith and Sons
     as Children . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 774

Defense Exhibit P-Q, Florida Death Certificate for Sonia Smith . . . . . . . . . . . . . . . . . . . . 775

Defense Exhibit P-V, Photograph of Azibo Aquart . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 776

Defense Exhibit P-Z, Guardianship Certificate, Azizi Aquart for Azibo . . . . . . . . . . . . . . 777

Defense Exhibit P-EE1, Predispositional Study by Probation Officer on Behalf of Azibo
     Aquart . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 778

Defense Exhibit P-EE2, Neglect Petition by Probation Officer on behalf of Azibo Aquart . . 783

Defense Exhibit P-EE4, Update Case Summary for Azibo Aquart . . . . . . . . . . . . . . . . . . . 786

Defense Exhibit P-EE5, Update Summary for Azibo Aquart . . . . . . . . . . . . . . . . . . . . . . . 787

Defense Exhibit P-SS, Map of Residences of and Schools Attended by Azibo Aquart . . . . . . 788

Defense Exhibit P-TT1, Azibo Aquart School Records . . . . . . . . . . . . . . . . . . . . . . . . . . . . 789

Defense Exhibit P-TT2, Azibo Aquart School Records . . . . . . . . . . . . . . . . . . . . . . . . . . . . 793

Defense Exhibit P-DDD, Recommendation by School Psychologist as to Azibo Aquart . . . . 802

Defense Exhibit P-AAA1, Azibo Aquart Education Records, CCI-Enfield . . . . . . . . . . . . . 803

Defense Exhibit P-AAA2, Azibo Aquart Education Records, CCI-Enfield . . . . . . . . . . . . . 806

Defense Exhibit P-AAA3, Azibo Aquart Education Records, CCI-Enfield . . . . . . . . . . . . . . 808

Defense Exhibit P-AAA4, Azibo Aquart Literacy Volunteer Certificate, CCI-Enfield . . . . . 809

Defense Exhibit P-AAA5, Azibo Aquart Tutoring Report, CCI-Enfield . . . . . . . . . . . . . . . . 812

**OTHER**

Judgment of Conviction, DE1185, 12/18/12 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 813

Amended Judgment of Conviction, DE1195, 1/14/13 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 818

Notice of Appeal, DE1191, 12/30/2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 823

APPEAL,CLOSED,EFILE

# U.S. District Court
# United States District Court for the District of Connecticut (New Haven)
## CRIMINAL DOCKET FOR CASE #: 3:06–cr–00160–JBA–3

Case title: USA v. Aquart et al

Date Filed: 06/06/2006
Date Terminated: 12/18/2012

Assigned to: Judge Janet Bond
Arterton

**Defendant (3)**

**Azibo Aquart**
*TERMINATED: 12/18/2012*
*also known as*
D.
*TERMINATED: 12/18/2012*
*also known as*
Dreddy
*TERMINATED: 12/18/2012*
*also known as*
Jumbo
*TERMINATED: 12/18/2012*
*also known as*
Azibo Smith
*TERMINATED: 12/18/2012*
*also known as*
Azibo Siwatu Jahi Smith
*TERMINATED: 12/18/2012*

represented by **Beverly Van Ness**
The Woolworth Bldg.
233 Broadway, Suite 2704
New York, NY 10279
212–274–0402
Email: bvanness.law@gmail.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Justin T. Smith**
Law Office of Justin T. Smith
383 Orange St.
New Haven, CT 06511
203–464–7774
Email: smithjt32@yahoo.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**Michael O. Sheehan**
Sheehan & Reeve
350 Orange St., Suite 101
New Haven, CT 06511
203–787–9026
Fax: 203–787–9031
Email: msheehan@sheehanandreeve.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**Pending Counts**

**Disposition**

Defendant is hereby sentencedOn Count One, the defendant Azibo Aquart is sentenced to a term of imprisonment of ten years with three years of supervised release.All sentences imposed on Counts 1 through 8 are to run consecutively to each other. AMENDED JUDGMENT: The defendant shall pay to the United States a special assessment of $100.00 on each of Counts One through Eight, for a total of $800, which shall be made to the Clerk of Court from defendants earnings under the Bureau of Prisons Inmate Financial Responsibility Program. Title 18, United States Code, Section 3013(a).

Conspiracy to Murder in Aid of
Racketeering
(1sss)

MURDER, FIRST DEGREE
(2sss–4sss)

Pursuant to Title 18, United States Code, Sections 3591–3597 and in accordance with the Special Verdict Form (Penalty Phase) dated June 15,

**A.1**

2011, it is hereby ORDERED that the death penalty be imposed on defendant Azibo Aquart on each of Counts Two and Four.

Pursuant to Title 18, United States Code, Sections 3591−3597, and Title 21, United States Code, Section 848(n)(9)(1996), and in accordance with the Special Verdict Form (Penalty Phase) dated June 15, 2011, it is hereby ORDERED that the death penalty be imposed on defendant Azibo Aquart on each of Counts Five and Seven.

On Count Eight, the defendant Azibo Aquart is sentenced to a term of life imprisonment and supervised release for life.

CONTINUING CRIMINAL ENTERPRISE
(5sss−7sss)

Conspiracy to Possess with Intent to Distribute 50 Grams or More of Cocaine Base
(8sss)

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
| --- | --- |
| CONSPIRACY TO DISTRIBUTE NARCOTICS −(Conspiracy to possess with intent to distribute more than fifty grams of cocaine base) (1) | Dismiss by USA |
| MURDER, FIRST DEGREE; (VCAR Conspiracy to Commit Murder) (1s) | Dismiss by USA |
| ATTEMPT/CONSPIRE TO MAIM/ASSAULT(Conspiracy to Murder in Aid of Racketeering) (1ss) | Dismiss by USA |
| MURDER, FIRST DEGREE; (VCAR Murder); and 18:2 (Aiding & Abetting) (2s−4s) | Dismissed by USA |
| MURDER, FIRST DEGREE(Murder in Aid of Racketeering) (2ss−4ss) | Dismissed by USA |
| UNLAWFUL TRANSPORT OF FIREARMS, ETC. − (Possession of firearms and ammunition by a convicted felon) (3) | On Count Three, the defendant Azibo Aquart is sentenced to a term of life imprisonment. |
| CONTROLLED SUBSTANCE − SELL, DISTRIBUTE, OR DISPENSE; (Conspiracy to Possess with Intent to Distribute and Distribution of 50 Grams or More of a Detectable Quantity of Cocaine Base (5s) | Dismissed by USA |
| CONTINUING CRIMINAL ENTERPRISE(Drug−Related Murder) (5ss−7ss) | Dismissed by USA |
| | Dismissed by USA |

**A.2**

UNLAWFUL TRANSPORT OF
FIREARMS, ETC.; and 924(e)(1);
(Possession of a Firearm by a
Convicted Felon)
(7s)

CONSPIRACY TO DISTRIBUTE
CONTROLLED
SUBSTANCE(Conspiracy to Possess          Dismissed by USA
with Intent to Distribute 50 Grams or
More of Cocaine Base)
(8ss)

UNLAWFUL TRANSPORT OF
FIREARMS, ETC.(Possession of a          Dismissed by USA
Firearm by a Convicted Felon)
(10ss)

Possession of a Firearm by a
Convicted Felon                          Dismissed by USA
(10sss)

**Highest Offense Level
(Terminated)**

Felony

| **Complaints** | **Disposition** |
| --- | --- |
| None | |

**Plaintiff**

**USA**                       represented by   **Alina Reynolds**
                                              U.S. Attorney's Office–BPT
                                              1000 Lafayette Blvd., 10th Floor
                                              Bridgeport, CT 06604
                                              203–696–3000
                                              Fax: 203–579–5550
                                              Email: alina.reynolds@usdoj.gov
                                              *LEAD ATTORNEY*
                                              *ATTORNEY TO BE NOTICED*

                                              **David B. Fein**
                                              U.S. Attorney's Office–NH
                                              157 Church St., 23rd floor
                                              New Haven, CT 06510
                                              203–821–3700
                                              Email: David.Fein@usdoj.gov
                                              *TERMINATED: 05/14/2013*
                                              *LEAD ATTORNEY*
                                              *ATTORNEY TO BE NOTICED*

                                              **H. Gordon Hall**
                                              U.S. Attorney's Office–NH
                                              157 Church St., 23rd floor
                                              New Haven, CT 06510
                                              203–821–3700
                                              Email: Gordon.Hall@usdoj.gov
                                              *LEAD ATTORNEY*
                                              *ATTORNEY TO BE NOTICED*

                                              **Jacabed Rodriguez–Coss**
                                              U. S. Department of Justice
                                              Capital Case Unit

**A.3**

915 Lafayette Blvd., Room 309
Bridgeport, CT 06604
203−696−3000
Email: Jacabed.Rodriguez−Coss2@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James I. Glasser**
Wiggin & Dana−NH
One Century Tower
265 Church Street P.O. Box 1832
New Haven, CT 06508−1832
203−498−4313
Email: jglasser@wiggin.com
*TERMINATED: 09/24/2007*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John H. Durham**
U.S. Attorney's Office−NH
157 Church St., 23rd floor
PO Box 1824
New Haven, CT 06510
203−821−3700
Email: john.durham@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Julie B. Mosley**
U.S. Dept. of Justice−Crim Div.
Organ.Crime
Criminal Division
Organized Crime and Gang Section
1301 New York Ave., N.W.
Washington, DC 20005
202−305−4575
Fax: 202−514−3601
Email: Julie.Mosley@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick F. Caruso**
U.S. Attorney's Office−NH
157 Church St., 23rd floor
New Haven, CT 06510
203−821−3791
Fax: 203−773−5373
Email: patrick.caruso@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Peter D. Markle**
U.S. Attorney's Office−NH
157 Church St., 23rd floor
New Haven, CT 06510
203−821−3700
Email: Peter.Markle@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Tracy L. Dayton**
U.S. Attorney's Office−BPT
915 Lafayette Blvd. Room 309
Bridgeport, CT 06604
203−696−3000

Fax: 203–579–5575
Email: tracy.dayton@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 11/08/2006 | 47 | INDICTMENT returned before Holly B. Fitzsimmons.Returned before grand jury number B–05–2 Bridgeport Rotation, Warrant Lodged as Detainer to issue, as to Azikiwe Aquart (1) count(s) 1s, 2s, Azibo Aquart (3) count(s) 1, 3. (Gutierrez, Y.) (Entered: 11/13/2006) |
| 11/08/2006 | 68 | ELECTRONIC FILING ORDER as to Azibo Aquart. Signed by Judge Peter C. Dorsey on 11/8/06. (Jefferson, V.) (Entered: 01/08/2007) |
| 11/20/2006 | 49 | Minute Entry for proceedings held before Judge Peter C. Dorsey :Initial Appearance as to Azibo Aquart held on 11/20/2006 Jury Selection set for 1/4/2007 09:00 AM in Courtroom One, 141 Church St., New Haven, CT before Judge Peter C. Dorsey. Total Time: 0 hours and 25 minutes(Court Reporter Falcone, ECRO.) (Villano, P.) (Entered: 11/21/2006) |
| 11/20/2006 | 50 | ELECTRONIC SCHEDULING ORDER as to Azikiwe Aquart, Azibo Aquart Substantive Motions due 12/11/06 Government Response due 12/20/06 Jury Selection set for 1/4/2007 09:00 AM in Courtroom One, 141 Church St., New Haven, CT before Judge Peter C. Dorsey.. Signed by Judge Peter C. Dorsey on 11/20/06. (Villano, P.) (Entered: 11/21/2006) |
| 11/20/2006 | 99 | CJA 20 as to Azibo Aquart: Appointment of Attorney Justin T. Smith for Azibo Aquart. Signed by Clerk on 4/12/07. (Jefferson, V.) (Entered: 04/12/2007) |
| 11/21/2006 | 53 | USM Return of Service on warrant executed as to Azibo Aquart on 12/19/05 (Villano, P.) (Entered: 11/29/2006) |
| 12/11/2006 | 57 | NOTICE OF E–FILED JURY SELECTION CALENDAR as to Azikiwe Aquart, Azibo Aquart: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. Jury Selection set for 1/5/2007 09:00 AM in Courtroom One, 141 Church St., New Haven, CT before Judge Peter C. Dorsey. (Villano, P.) (Entered: 12/11/2006) |
| 12/19/2006 | 62 | NOTICE OF E–FILED AMENDED JURY SELECTION CALENDAR as to Azikiwe Aquart, Azibo Aquart: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. Jury Selection set for 1/10/2007 10:00 AM in Courtroom One, 141 Church St., New Haven, CT before Judge Peter C. Dorsey. (Villano, P.) (Entered: 12/19/2006) |
| 01/03/2007 | 66 | MOTION to Sever Defendant *Motion to Sever Counts* by Azibo Aquart. (Attachments: # 1 Memorandum in Support of Motion to Sever)(Smith, Justin) (Entered: 01/03/2007) |
| 01/05/2007 | 67 | RESPONSE/REPLY by USA as to Azibo Aquart (Glasser, James) (Entered: 01/05/2007) |
| 01/09/2007 | 72 | MOTION to Suppress *Evidence* by Azibo Aquart. (Smith, Justin) (Entered: 01/09/2007) |
| 01/09/2007 | 73 | Memorandum in Support by Azibo Aquart re 72 MOTION to Suppress *Evidence* (Attachments: # 1 Affidavit)(Smith, Justin) (Entered: 01/09/2007) |
| 01/09/2007 | 76 | RULING denying 72 Motion to Suppress Evidence as to Azibo Aquart (3). Signed by Judge Peter C. Dorsey on 1/9/07. (Villano, P.) (Entered: 01/09/2007) |
| 01/30/2007 | 80 | RESPONSE/REPLY by USA as to Azibo Aquart re 66 Motion to Sever Defendant (Glasser, James) (Entered: 01/30/2007) |
| 02/12/2007 | 85 | NOTICE OF E–FILED JURY SELECTION CALENDAR as to Azikiwe Aquart, Azibo Aquart: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL |

A.5

| | | |
|---|---|---|
| | | RECEIVE. ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. Jury Selection set for 3/1/2007 09:00 AM in Courtroom One, 141 Church St., New Haven, CT before Judge Peter C. Dorsey. (Villano, P.) (Entered: 02/12/2007) |
| 02/21/2007 | 86 | Proposed Jury Instructions by USA as to Azibo Aquart (Glasser, James) (Entered: 02/21/2007) |
| 02/21/2007 | 87 | Proposed Voir Dire by USA as to Azibo Aquart (Glasser, James) (Entered: 02/21/2007) |
| 02/21/2007 | 88 | NOTICE of *Enhanced Penalties* by USA as to Azibo Aquart (Glasser, James) (Entered: 02/21/2007) |
| 02/23/2007 | 89 | NOTICE OF E–FILED AMENDED JURY SELECTION CALENDAR as to Azibo Aquart: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. Jury Selection set for 3/1/2007 09:00 AM in Courtroom One, 141 Church St., New Haven, CT before Judge Peter C. Dorsey. (Villano, P.) (Entered: 02/23/2007) |
| 02/27/2007 | 90 | ELECTRONIC ORDER granting 66 Motion to Sever Defendant as to Azibo Aquart (3). Signed by Judge Peter C. Dorsey on 2/27/07. (Villano, P.) (Entered: 02/27/2007) |
| 02/28/2007 | 91 | Minute Entry for proceedings held before Judge Peter C. Dorsey :Hearing as to Azibo Aquart held on 2/28/2007 Total Time: 0 hours and 40 minutes(Court Reporter K. Falcone, ECRO.)(Villano, P.) (Entered: 02/28/2007) |
| 02/28/2007 | 92 | ELECTRONIC ORDER TO CONTINUE – Ends of Justice as to Azibo Aquart Time excluded from 1/14/07 until 9/6/07. The Court finds that the ends of justice served by taking this action outweigh the best interest of the public and the defendant in a speedy trial for reasons state in open court this date. Signed by Judge Peter C. Dorsey on 2/28/07. (Villano, P.) (Entered: 02/28/2007) |
| 04/12/2007 | 98 | MOTION for Interim Payment by Azibo Aquart. (Smith, Justin) (Entered: 04/12/2007) |
| 04/16/2007 | 100 | ELECTRONIC ORDER granting 98 Motion for Interim Payment as to Azibo Aquart (3). Signed by Judge Peter C. Dorsey on 4/16/07. (Villano, P.) (Entered: 04/16/2007) |
| 05/17/2007 | | CJA 20 as to Azibo Aquart: Authorization to Pay Attorney Justin T. Smith. Amount: $ 6,952.52, Voucher # 070514000002. 99 CJA 20 – Appointment Interim #1 payment. Signed by Judge Peter C. Dorsey on 5/17/07. (Villano, P.) (Entered: 06/25/2007) |
| 06/28/2007 | 105 | SECOND SUPERSEDING INDICTMENT returned before William I. Garfinkel.Returned before grand jury number B–05–02 Bridgeport Rotation, Detainer to issue, as to Azikiwe Aquart (1) count(s) 1ss, 2ss–4ss, 5ss, 6ss, Azibo Aquart (3) count(s) 1s, 2s–4s, 5s, 7s, Efrain Johnson (4) count(s) 1, 2–4. (Villano, P.) (Entered: 07/03/2007) |
| 06/29/2007 | 108 | Minute Entry for proceedings held before Judge Peter C. Dorsey :Arraignment as to Azibo Aquart (3) Count 1s,2s–4s,5s,7s held on 6/29/2007, Initial Appearance as to Azibo Aquart held on 6/29/2007, Added attorney Michael O. Sheehan for Azibo Aquart., Plea entered by Azibo Aquart Not Guilty on counts 1s – 5s & 7s Total Time: 0 hours and 17 minutes(Court Reporter Falcone, ECRO.)(Villano, P.) (Entered: 07/03/2007) |
| 07/03/2007 | 109 | ELECTRONIC ORDER Government shall file their Notice of Intent to Pursue Capital Punishment on or before March 7, 2008 as to Azikiwe Aquart, Azibo Aquart, Efrain Johnson. Signed by Judge Peter C. Dorsey on 6/29/07. (Villano, P.) (Entered: 07/03/2007) |
| 07/06/2007 | 110 | MOTION to Seal by Azibo Aquart. (Sheehan, Michael) (Entered: 07/06/2007) |
| 07/06/2007 | 111 | SEALED MOTION – Filed separately from case by Azibo Aquart. (Ruocco, M.) (Entered: 07/06/2007) |

| 07/10/2007 | 112 | ELECTRONIC ORDER granting 110 Motion to Seal as to Azibo Aquart (3); granting 111 Sealed Motion as to Azibo Aquart (3). Signed by Judge Peter C. Dorsey on 7/10/07. (Villano, P.) (Entered: 07/10/2007) |
| --- | --- | --- |
| 07/10/2007 | 113 | CJA 30: Appointment of Attorney Michael O. Sheehan for Azibo Aquart in Death Penalty Proceedings as to Azibo Aquart. Signed by Clerk on 7/10/07. (Ruocco, M.) (Entered: 07/13/2007) |
| 07/10/2007 | 114 | CJA 30: Appointment of Attorney Justin T. Smith for Azibo Aquart in Death Penalty Proceedings as to Azibo Aquart.. Signed by Clerk on 7/10/07. (Ruocco, M.) (Entered: 07/13/2007) |
| 07/25/2007 | 118 | ORDER of Referral as to Azikiwe Aquart, Azibo Aquart, Efrain Johnson. Signed by Judge Peter C. Dorsey on 7/24/07. (Moore, P.) (Entered: 07/26/2007) |
| 08/02/2007 | 122 | NOTICE OF E–FILED JURY SELECTION CALENDAR as to Azikiwe Aquart, Azibo Aquart, Efrain Johnson: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. Jury Selection set for 9/6/2007 09:00 AM in Courtroom One, 141 Church St., New Haven, CT before Judge Peter C. Dorsey. (Villano, P.) (Entered: 08/02/2007) |
| 08/16/2007 | 138 | CJA 23 Financial Affidavit by Azibo Aquart (Jefferson, V.) (Entered: 08/16/2007) |
| 08/21/2007 | 139 | MEMORANDUM TO ALL COUNSEL APPOINTED UNDER THE CRIMINAL JUSTICE ACT (CJA) as to Azikiwe Aquart, Azibo Aquart, Efrain Johnson. Signed by Judge Peter C. Dorsey on 8/15/07. (Attachments: # 1 Attached Order of Referral) (Inferrera, L.) (Entered: 08/21/2007) |
| 08/29/2007 | 140 | ATTORNEY APPEARANCE Peter D. Markle appearing for USA (Jefferson, V.) (Entered: 08/29/2007) |
| 09/04/2007 | 142 | TRANSCRIPT of Proceedings (Arraignment On Second Superceding Indictment), as to Azikiwe Aquart, Azibo Aquart held on 6/29/07 before Judge Peter C. Dorsey. Court Reporter: Bowles Reporting Service, Stephen C. Bowles. (Torrenti, R.) (Entered: 09/05/2007) |
| 09/04/2007 | 145 | TRANSCRIPT of Proceedings, (Arraignment On First Superceding Indictment), as to Azibo Aquart held on 11/20/06 before Judge Peter C. Dorsey. Court Reporter: Bowles Reporting Service, Stephen C. Bowles. (Torrenti, R.) (Entered: 09/05/2007) |
| 09/04/2007 | 146 | TRANSCRIPT of Proceedings, (Hearing On Withdrawal Of Defendant's Motion To Sever), as to Azibo Aquart held on 2/28/07 before Judge Peter C. Dorsey. Court Reporter: Bowles Reporting Service, Stephen C. Bowles. (Torrenti, R.) (Entered: 09/05/2007) |
| 10/04/2007 | | CJA 30: Authorization to Pay Attorney Michael O. Sheehan in Death Penalty Proceedings as to Azibo Aquart Amount: $ 15,297.05, Voucher # 071004000002. 113 CJA 30 – Appointment Interim #1 payment. Signed by Judge Joan G. Margolis on 10/4/07. (Villano, P.) (Entered: 10/11/2007) |
| 10/11/2007 | | CJA 30: Authorization to Pay Attorney Justin T. Smith in Death Penalty Proceedings as to Azibo Aquart Amount: $ 5,459.88, Voucher # 071010000014. 99 CJA 20 – Appointment Interim #1 payment. Signed by Judge Joan G. Margolis on 10/11/07. (Villano, P.) (Entered: 10/19/2007) |
| 11/21/2007 | 155 | NOTICE OF E–FILED STATUS CONFERENCE CALENDAR as to Azikiwe Aquart, Azibo Aquart, Efrain Johnson: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. Status Conference set for 12/11/2007 02:00 PM in Chambers Room 107, 141 Church St., New Haven, CT before Judge Peter C. Dorsey (Villano, P.) (Entered: 11/21/2007) |
| 11/30/2007 | | CJA 30: Authorization to Pay Attorney Michael O. Sheehan in Death Penalty Proceedings as to Azibo Aquart Voucher # 071130000001. 113 CJA 30 – Appointment Interim #2 payment. Signed by Judge Joan G. Margolis on 11/30/07. (Villano, P.) (Entered: 12/20/2007) |

**A.7**

| | | |
|---|---|---|
| 12/11/2007 | 160 | Minute Entry for proceedings held before Judge Peter C. Dorsey:Status Conference as to Azikiwe Aquart, Azibo Aquart, Efrain Johnson held on 12/11/2007 in chambers Total Time: 1 hours and 40 minutes(Villano, P.) (Entered: 01/10/2008) |
| 12/20/2007 | 156 | AMENDED ELECTRONIC ORDER as to Azikiwe Aquart, Azibo Aquart, Efrain Johnson re 109 Electronic Order. Government shall file their Notice of Intent to Pursue Capital Punishment on or before May 7, 2008.. Signed by Judge Peter C. Dorsey on 12/20/07. (Villano, P.) (Entered: 12/20/2007) |
| 02/22/2008 | <u>164</u> | First MOTION for Extension of Time For the Government to File Notice of Death Penalty until June 7 by Azibo Aquart. (Sheehan, Michael) (Entered: 02/22/2008) |
| 02/25/2008 | 165 | ELECTRONIC ORDER granting 164 Motion for Extension of Time For the Government to File Notice of Death Penalty until June 6, 2008 as to Azibo Aquart (3). Signed by Judge Peter C. Dorsey on 2/25/08. (Villano, P.) (Entered: 02/25/2008) |
| 03/04/2008 | | CJA 30: Authorization to Pay Attorney Justin T. Smith in Death Penalty Proceedings as to Azibo Aquart Voucher # 080303000008. 114 CJA 30 – Appointment Interim #2 payment. Signed by Judge Joan G. Margolis on 3/4/08. (Villano, P.) (Entered: 03/12/2008) |
| 04/02/2008 | | CJA 30: Authorization to Pay Attorney Justin T. Smith in Death Penalty Proceedings as to Azibo Aquart Voucher # 080327000008. 114 CJA 30 – Appointment Interim #3 payment. Signed by Judge Joan G. Margolis on 4/2/08. (Villano, P.) (Entered: 04/10/2008) |
| 05/16/2008 | <u>186</u> | PROPOSED Order Re: Notice of Intention to Seek the Death Penalty by USA as to Azibo Aquart. (Jefferson, V.) (Entered: 05/19/2008) |
| 05/21/2008 | <u>187</u> | ORDER DIRECTING THE GOVERNMENT TO SERVE NOTICE OF ITS INTENTION TO SEEK THE DEATH PENALTY as to Azikiwe Aquart, Azibo Aquart, Efrain Johnson. Signed by Judge Peter C. Dorsey on 5/21/08. (Villano, P.) (Entered: 05/21/2008) |
| 06/02/2008 | <u>191</u> | MOTION to Incur Expenses by Azibo Aquart. (Rodko, B.) (Entered: 06/03/2008) |
| 06/05/2008 | | CJA 30: Authorization to Pay Michael Sheehan in Death Penalty Proceedings as to Azibo Aquart Voucher # 080604000016. Interim #3 payment. Signed by Magistrate Judge Joan G. Margolis on 6/5/08. (Inferrera, L.) (Entered: 06/17/2008) |
| 06/06/2008 | 192 | ORDER granting 191 Motion to Incur Expenses as to Azibo Aquart (3). Signed by Judge Joan G. Margolis on 6/5/08. (Rodko, B.) (Entered: 06/09/2008) |
| 07/10/2008 | | CJA 30: Authorization to Pay Justin T. Smith in Death Penalty Proceedings as to Azibo Aquart Voucher # 080709000002. Interim #4 payment. Signed by Judge Joan G. Margolis on 7/10/08. (S–Inferrera, L.) (Entered: 07/21/2008) |
| 08/19/2008 | <u>198</u> | Second MOTION to Seal CJA Motion by Azibo Aquart. (Sheehan, Michael) (Entered: 08/19/2008) |
| 08/19/2008 | <u>200</u> | EX PARTE MOTION by Azibo Aquart. (Villano, P.) (Entered: 08/25/2008) |
| 08/20/2008 | 199 | ELECTRONIC ORDER granting 198 Motion to File Motion Under Seal as to Azibo Aquart (3). Signed by Judge Peter C. Dorsey on 8–20–08. (Miller, K.) (Entered: 08/20/2008) |
| 08/26/2008 | 201 | ELECTRONIC ORDER granting 200 ExParte Motion as to Azibo Aquart (3). Signed by Judge Peter C. Dorsey on 8/26/08. (Villano, P.) (Entered: 08/26/2008) |
| 08/29/2008 | <u>202</u> | SEALED MOTION by USA as to Azikiwe Aquart, Nathaniel Grant, Azibo Aquart, Efrain Johnson. (Rodko, B.) (Entered: 09/05/2008) |
| 09/02/2008 | | CJA 20 as to Azibo Aquart: Authorization to Pay Michael O. Sheehan. Voucher # 080829000005. Interim #4 payment. Signed by Magistrate Judge Joan G. Margolis on 9/2/08. (Inferrera, L.) (Entered: 09/02/2008) |
| 09/05/2008 | <u>203</u> | SEALED ORDER granting 202 Sealed Motion as to Azikiwe Aquart (1), Nathaniel Grant (2), Azibo Aquart (3), Efrain Johnson (4). Signed by Judge Peter C. Dorsey on 9/5/08. (Rodko, B.) (Entered: 09/05/2008) |

**A.8**

| 09/09/2008 | 206 | Third MOTION to Seal *CJA Request* CJA Request by Azibo Aquart. (Sheehan, Michael) (Entered: 09/09/2008) |
|---|---|---|
| 09/09/2008 | 209 | MOTION to Incur Expenses by Azibo Aquart. (document #208 corrected) (Rodko, B.) (Entered: 09/11/2008) |
| 09/11/2008 | 207 | ELECTRONIC ORDER granting 206 Motion to Seal CJA Request as to Azibo Aquart (3). Signed by Judge Peter C. Dorsey on 9/11/08. (Villano, P.) (Entered: 09/11/2008) |
| 09/12/2008 | 210 | ELECTRONIC ORDER granting 209 Motion to Incur Expenses as to Azibo Aquart (3). Signed by Judge Peter C. Dorsey on 9/12/08. (Villano, P.) (Entered: 09/12/2008) |
| 09/19/2008 | 211 | MOTION to Amend 187 ORDER *GOVERNMENT'S MOTION TO AMEND ORDER REGARDING NOTICE OF INTENTION TO SEEK THE DEATH PENALTY* by USA as to Azikiwe Aquart, Azibo Aquart, Efrain Johnson. (Attachments: # 1 Text of Proposed Order)(Reynolds, Alina) Motion relief and links Modified on 9/22/2008 (Bauer, J.). (Entered: 09/19/2008) |
| 09/22/2008 | 212 | ORDER granting 211 Motion to Amend 187 ORDER GOVERNMENT'S MOTION TO AMEND ORDER REGARDING NOTICE OF INTENTION TO SEEK THE DEATH PENALTY as to Azikiwe Aquart (1), Azibo Aquart (3), Efrain Johnson (4). Signed by Judge Peter C. Dorsey on 9/22/08. (Villano, P.) (Entered: 09/22/2008) |
| 09/23/2008 | 213 | ATTORNEY APPEARANCE Tracy L. Dayton appearing for USA (Dayton, Tracy) (Entered: 09/23/2008) |
| 11/25/2008 | | CJA 30: Authorization to Pay Michael O. Sheehan in Death Penalty Proceedings as to Azibo Aquart Voucher # 30–081118000005. Interim #5 payment. Signed by Magistrate Judge Joan G. Margolis on 11/25/08. (Inferrera, L.) (Entered: 12/02/2008) |
| 12/01/2008 | 222 | MOTION to Seal *CJA Motion* CJA Motion by Azibo Aquart. (Sheehan, Michael) (Entered: 12/01/2008) |
| 12/01/2008 | 224 | SEALED MOTION CJA Motion – by Azibo Aquart. (Villano, P.) (Entered: 12/04/2008) |
| 12/02/2008 | 223 | ELECTRONIC ORDER granting 222 Motion to Seal CJA Motion CJA Motion as to Azibo Aquart (3). Signed by Judge Peter C. Dorsey on 12/2/08. (Villano, P.) (Entered: 12/02/2008) |
| 12/05/2008 | 225 | ELECTRONIC ORDER granting 224 Sealed Motion CJA Motion as to Azibo Aquart (3). Signed by Judge Peter C. Dorsey on 12/5/08. (Villano, P.) (Entered: 12/05/2008) |
| 12/16/2008 | | CJA 30: Authorization to Pay Justin T. Smith in Death Penalty Proceedings as to Azibo Aquart Voucher # 081208000008. Interim #5 payment. Signed by Magistrate Judge Joan G. Margolis on 12/16/08. (Inferrera, L.) (Entered: 12/29/2008) |
| 01/15/2009 | 226 | MOTION to Amend/Correct 212 Amended ORDER *Government's Motion To Amend Order Regarding Notice of Intention To Seek The Death Penalty* by USA as to Azikiwe Aquart, Azibo Aquart, Efrain Johnson. (Attachments: # 1 Text of Proposed Order)(Reynolds, Alina) Motion relief, links and text Modified on 1/16/2009 (Bauer, J.). (Entered: 01/15/2009) |
| 01/16/2009 | 227 | SECOND AMENDED ORDER granting 226 Motion to Amend/Correct 212 Amended ORDER Government's Motion To Amend Order Regarding Notice of Intention To Seek The Death Penalty as to Azikiwe Aquart (1), Azibo Aquart (3), Efrain Johnson (4). Signed by Judge Peter C. Dorsey on 1/16/09. (Villano, P.) (Entered: 01/16/2009) |
| 01/29/2009 | 228 | NOTICE OF INTENT TO SEEK DEATH PENALTY by USA as to Azibo Aquart (Reynolds, Alina) (Entered: 01/29/2009) |
| 01/30/2009 | 230 | Certificate of Service by USA as to Azikiwe Aquart, Azibo Aquart re 228 Notice of Intent to Seek Death Penalty, 229 Notice of Intent to Seek Death Penalty (Reynolds, Alina) (Entered: 01/30/2009) |
| 02/09/2009 | 231 | ELECTRONIC ORDER terminating 186 PROPOSED Order Re: Notice of Intention to Seek the Death Penalty as to Azibo Aquart (3). Entered in Error as a Motion.. Signed by Judge Peter C. Dorsey on 2/9/09. (Villano, P.) (Entered: 02/09/2009) |

**A.9**

| 02/17/2009 | 244 | Minute Entry for proceedings held before Judge Peter C. Dorsey:Status Conference as to Azikiwe Aquart, Azibo Aquart, Efrain Johnson held on 2/17/2009 Total Time: 1 hours and 35 minutes(Villano, P.) (Entered: 03/27/2009) |
| --- | --- | --- |
| 02/19/2009 | 234 | Fifth MOTION to Seal CJA motion by Azibo Aquart. (Sheehan, Michael) (Entered: 02/19/2009) |
| 02/19/2009 | 235 | SEALED MOTION to Modify CJA Budget – by Azibo Aquart. (S–Inferrera, L.) (Entered: 02/19/2009) |
| 02/23/2009 | | CJA 30: Authorization to Pay Justin T. Smith in Death Penalty Proceedings as to Azibo Aquart ; Voucher # 090217000002. Interim #6 payment. Signed by Magistrate Judge Joan G. Margolis on 2/23/09. (S–Inferrera, L.) (Entered: 03/13/2009) |
| 02/24/2009 | 236 | ELECTRONIC ORDER granting 234 Motion to Seal CJA motion as to Azibo Aquart (3). Signed by Judge Peter C. Dorsey on 2/24/09. (Villano, P.) (Entered: 02/24/2009) |
| 02/24/2009 | 237 | ELECTRONIC ORDER granting 235 Sealed Motion to Modify CJA Budget as to Azibo Aquart (3). Signed by Judge Peter C. Dorsey on 2/24/09. (Villano, P.) (Entered: 02/24/2009) |
| 03/13/2009 | | CJA 30: Authorization to Pay Michael O. Sheehan in Death Penalty Proceedings as to Azibo Aquart; Voucher # 090312000008. Interim #6 payment. Signed by Magistrate Judge Joan G. Margolis on 3/13/09. (Inferrera, L.) (Entered: 03/18/2009) |
| 03/19/2009 | | CJA 30: Authorization to Pay Justin T. Smith in Death Penalty Proceedings as to Azibo Aquart; Voucher # 090319000001. Interim #7 payment. Signed by Magistrate Judge Joan G. Margolis on 3/19/09. (Inferrera, L.) (Entered: 03/26/2009) |
| 03/30/2009 | | CJA 30: Authorization to Pay Michael O. Sheehan in Death Penalty Proceedings as to Azibo Aquart; Voucher # 090327000003. Interim #7 payment. Signed by Magistrate Judge Joan G. Margolis on 3/30/09. (Inferrera, L.) (Entered: 04/06/2009) |
| 03/31/2009 | 245 | Sixth MOTION to Seal CJA Motion by Azibo Aquart. (Sheehan, Michael) (Entered: 03/31/2009) |
| 03/31/2009 | 247 | MOTION to Incur Expenses by Azibo Aquart. (Villano, P.) (Entered: 04/01/2009) |
| 04/01/2009 | 246 | ELECTRONIC ORDER granting 245 Motion to Seal CJA Motion as to Azibo Aquart (3). Signed by Judge Peter C. Dorsey on 4/1/09. (Villano, P.) (Entered: 04/01/2009) |
| 04/01/2009 | 248 | ELECTRONIC ORDER granting 247 Motion to Incur Expenses as to Azibo Aquart (3). Signed by Judge Peter C. Dorsey on 4/1/09. (Villano, P.) (Entered: 04/01/2009) |
| 04/02/2009 | 250 | MOTION to Seal CJA Motion Regarding Budget by Azibo Aquart. (Sheehan, Michael) (Entered: 04/02/2009) |
| 04/02/2009 | 252 | MOTION to Incur Expenses by Azibo Aquart. (Villano, P.) (Entered: 04/06/2009) |
| 04/02/2009 | 255 | THIRD SUPERSEDING INDICTMENT returned before Judge Holly B. Fitzsimmons.Returned before grand jury number B–08–02 as to Azikiwe Aquart (1) count(s) 1sss, 2sss–4sss, 5sss–7sss, 8sss, 9sss, Azibo Aquart (3) count(s) 1sss, 2ss–4ss, 5ss–7ss, 8ss, 10ss, Efrain Johnson (4) count(s) 1s, 2s–4s. (Gutierrez, Y.) (Entered: 04/06/2009) |
| 04/03/2009 | 251 | ELECTRONIC ORDER granting 250 Motion to Seal CJA Motion Regarding Budget as to Azibo Aquart (3). Signed by Judge Peter C. Dorsey on 4/3/09. (Villano, P.) (Entered: 04/03/2009) |
| 04/06/2009 | 254 | ELECTRONIC ORDER granting 252 Motion to Incur Expenses as to Azibo Aquart (3). Signed by Judge Peter C. Dorsey on 4/6/09. (Villano, P.) (Entered: 04/06/2009) |
| 04/24/2009 | 260 | NOTICE OF E–FILED CALENDAR as to Azikiwe Aquart, Azibo Aquart: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. Arraignment set for 4/28/2009 02:00 PM in Courtroom One, 141 Church St., New Haven, CT before Judge Peter C. Dorsey (Villano, P.) (Entered: 04/24/2009) |
| 04/28/2009 | 263 | Minute Entry for proceedings held before Judge Joan G. Margolis:Arraignment as to Azibo Aquart (3) Count 1ss,2ss–4ss,5ss–7ss,8ss,10ss held on 4/28/2009, Plea entered |

| | | |
|---|---|---|
| | | by Azibo Aquart Not Guilty on counts 1sss thru 8sss & 10sss Total Time: 0 hours and 09 minutes(Court Reporter Garguilo, ECRO.)(Villano, P.) (Entered: 05/01/2009) |
| 06/05/2009 | | CJA 30: Authorization to Pay Justin T. Smith in Death Penalty Proceedings as to Azibo Aquart; Voucher # 090603000002. Interim #8 payment. Signed by Magistrate Judge Joan G. Margolis on 6/5/09. (Inferrera, L.) (Entered: 06/12/2009) |
| 06/05/2009 | | CJA 30: Authorization to Pay Michael O. Sheehan in Death Penalty Proceedings as to Azibo Aquart; Voucher # 090603000001. Interim #8 payment. Signed by Magistrate Judge Joan G. Margolis on 6/5/09. (Inferrera, L.) (Entered: 06/12/2009) |
| 06/25/2009 | 269 | MOTION to Seal CJA Motion by Azibo Aquart. (Sheehan, Michael) (Entered: 06/25/2009) |
| 06/25/2009 | 271 | MOTION to Incur Expenses by Azibo Aquart. (Villano, P.) (Entered: 06/26/2009) |
| 06/26/2009 | 270 | ELECTRONIC ORDER granting 269 Motion to Seal CJA Motion as to Azibo Aquart (3). Signed by Judge Peter C. Dorsey on 5/26/09. (Villano, P.) (Entered: 06/26/2009) |
| 06/26/2009 | 272 | ELECTRONIC ORDER granting 271 Motion to Incur Expenses as to Azibo Aquart (3). Signed by Judge Peter C. Dorsey on 6/26/09. (Villano, P.) (Entered: 06/26/2009) |
| 07/27/2009 | 273 | MOTION to Continue *Motions Deadline* by Azibo Aquart. (Smith, Justin) (Entered: 07/27/2009) |
| 08/10/2009 | 275 | ELECTRONIC ORDER granting 274 Motion to Continue Motions Deadline to 10/9/09 as to Azikiwe Aquart (1); granting 273 Motion to Continue Motions Deadline to 10/9/09 as to Azibo Aquart (3). Signed by Judge Peter C. Dorsey on 8/10/09. (Villano, P.) (Entered: 08/10/2009) |
| 09/08/2009 | | CJA 30: Authorization to Pay Justin T. Smith in Death Penalty Proceedings as to Azibo Aquart; Voucher # 090908000020. Interim #9 payment. Signed by Magistrate Judge Joan G. Margolis on 9/8/09. (Inferrera, L.) (Entered: 09/17/2009) |
| 09/14/2009 | 278 | ELECTRONIC ORDER TO CONTINUE – Ends of Justice as to Azikiwe Aquart, Azibo Aquart, Efrain Johnson Time excluded from 4/28/09 until 5/6/2010. Signed by Judge Peter C. Dorsey on 9/14/09. (Villano, P.) (Entered: 09/14/2009) |
| 09/21/2009 | 286 | Minute Entry for proceedings held before Judge Peter C. Dorsey:Status Conference as to Azikiwe Aquart, Azibo Aquart held on 9/21/2009 Total Time: 1 hours and 30 minutes(Villano, P.) (Entered: 10/06/2009) |
| 09/21/2009 | 311 | Minute Entry for proceedings held before Judge Peter C. Dorsey:Status Conference as to Azikiwe Aquart, Azibo Aquart, Efrain Johnson held on 9/21/2009 Total Time: 1 hours and 25 minutes(Villano, P.) (Entered: 12/14/2009) |
| 10/31/2009 | | CJA 30: Authorization to Pay Michael O. Sheehan in Death Penalty Proceedings as to Azibo Aquart; Voucher # 091030000009. Interim #9 payment. Signed by Magistrate Judge Joan G. Margolis on 10/31/09. (Inferrera, L.) (Entered: 11/10/2009) |
| 11/10/2009 | 292 | MOTION to Continue *Defendant's Motions Deadline* by Azibo Aquart as to Azikiwe Aquart, Azibo Aquart. (Smith, Justin) (Entered: 11/10/2009) |
| 11/12/2009 | 294 | ELECTRONIC ORDER granting 292 Motion to Continue Defendant's Motions Deadline as to Azikiwe Aquart (1), Azibo Aquart (3); granting 293 Motion to Continue Defendant's Motions Deadline as to Azikiwe Aquart (1). The deadline is extended to 12/11/09. Signed by Judge Peter C. Dorsey on 11/12/09. (Villano, P.) (Entered: 11/12/2009) |
| 11/17/2009 | | CJA 30: Authorization to Pay Justin T. Smith in Death Penalty Proceedings as to Azibo Aquart; Voucher # 091110000004. Interim #10 payment. Signed by Magistrate Judge Joan G. Margolis on 11/17/09. (Inferrera, L.) (Entered: 12/01/2009) |
| 12/08/2009 | 309 | MOTION to Continue *Defendant's Motion Deadline* by Azibo Aquart. (Smith, Justin) (Entered: 12/08/2009) |
| 12/09/2009 | 310 | ELECTRONIC ORDER granting 309 Motion to Continue Defendant's Motion Deadline to 12/22/09 as to Azibo Aquart (3). Signed by Judge Peter C. Dorsey on 12/9/09. (Villano, P.) (Entered: 12/09/2009) |

**A.11**

| 12/21/2009 | 316 | MOTION to Sever Defendant by Azibo Aquart. (Attachments: # 1 Memorandum in Support of Motion to Sever Defendants, # 2 Exhibit A−1, # 3 Exhibit A−2, # 4 Exhibit B−1, # 5 Exhibit B−2)(Smith, Justin) (Entered: 12/21/2009) |
|---|---|---|
| 12/22/2009 | 319 | MOTION to Strike *Statutory Aggravator* by Azibo Aquart. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Sheehan, Michael) (Entered: 12/22/2009) |
| 12/22/2009 | 320 | MOTION to Dismiss *Superseding Indictment* by Azibo Aquart. (Sheehan, Michael) (Entered: 12/22/2009) |
| 12/22/2009 | 322 | MOTION to Compel *Discovery* by Azibo Aquart. (Sheehan, Michael) (Entered: 12/22/2009) |
| 12/22/2009 | 324 | MOTION to Sever Defendant by Azikiwe Aquart as to Azikiwe Aquart, Nathaniel Grant, Azibo Aquart, Efrain Johnson. (Attachments: # 1 Memorandum in Support of Motion to Sever Defendants, # 2 Exhibit A, # 3 Exhibit B)(Stern, David) (Entered: 12/22/2009) |
| 12/22/2009 | 325 | MOTION to Sever Defendant *Motion to Sever Count 10* by Azibo Aquart. (Sheehan, Michael) (Entered: 12/22/2009) |
| 12/22/2009 | 327 | MOTION to Strike *Statutory Aggravators* by Azibo Aquart. (Sheehan, Michael) (Entered: 12/22/2009) |
| 12/22/2009 | 329 | MOTION to Dismiss *Death Penalty Notice* by Azibo Aquart. (Sheehan, Michael) (Entered: 12/22/2009) |
| 01/06/2010 | 331 | MOTION to Seal CJA Motion by Azibo Aquart. (Sheehan, Michael) (Entered: 01/06/2010) |
| 01/06/2010 | 332 | SEALED MOTION CJA Motion − by Azibo Aquart. (Villano, P.) (Entered: 01/07/2010) |
| 01/07/2010 | 333 | ELECTRONIC ORDER granting 331 Motion to Seal CJA Motion as to Azibo Aquart (3). Signed by Judge Peter C. Dorsey on 1/7/2010. (Villano, P.) (Entered: 01/07/2010) |
| 01/07/2010 | 334 | ELECTRONIC ORDER granting 332 Sealed Motion CJA Motion as to Azibo Aquart (3). Signed by Judge Peter C. Dorsey on 1/7/2010. (Villano, P.) (Entered: 01/07/2010) |
| 01/26/2010 | 359 | Minute Entry for proceedings held before Judge Peter C. Dorsey:Status Conference as to Azikiwe Aquart, Azibo Aquart, Efrain Johnson held on 1/26/2010 Total Time: 1 hours and 20 minutes(Villano, P.) (Entered: 03/05/2010) |
| 01/28/2010 | | CJA 30: Authorization to Pay Michael O. Sheehan in Death Penalty Proceedings as to Azibo Aquart Voucher # 100127000006. Interim #10 payment. Signed by Magistrate Judge Joan G. Margolis on 1/28/10. (Inferrera, L.) (Entered: 03/10/2010) |
| 02/04/2010 | 350 | MOTION Establish Jury Selection Procedures by Azibo Aquart. (Sheehan, Michael) (Entered: 02/04/2010) |
| 02/08/2010 | 353 | MOTION to Seal CJA Motion by Azibo Aquart. (Sheehan, Michael) (Entered: 02/08/2010) |
| 02/08/2010 | 355 | SEALED MOTION to Incur Expenses by Azibo Aquart. (Villano, P.) (Entered: 02/11/2010) |
| 02/11/2010 | 354 | ELECTRONIC ORDER granting 353 Motion to Seal as to Azibo Aquart (3). Signed by Judge Peter C. Dorsey on 2/11/2010. (Villano, P.) (Entered: 02/11/2010) |
| 02/11/2010 | 356 | ELECTRONIC ORDER granting 355 Motion to Incur Expenses as to Azibo Aquart (3). Signed by Judge Peter C. Dorsey on 2/11/2010. (Villano, P.) (Entered: 02/11/2010) |
| 03/03/2010 | 361 | FOURTH SUPERSEDING INDICTMENT returned before Judge William I. Garfinkel.Returned before grand jury number B−09−02 as to Azikiwe Aquart (1) count(s) 1ssss, 2ssss−4ssss, 5ssss−7ssss, 8ssss, 9ssss, Azibo Aquart (3) count(s) 1sss, 2sss−4ss, 5sss−7sss, 8sss, 10sss, Efrain Johnson (4) count(s) 1ss, 2ss−4ss. (S−Torres, ) (Entered: 03/08/2010) |

**A.12**

| 03/08/2010 | 360 | MOTION to Seal CJA Motion Regarding Budget by Azibo Aquart. (Sheehan, Michael) (Entered: 03/08/2010) |
|---|---|---|
| 03/10/2010 | 363 | ELECTRONIC ORDER granting 360 Motion to Seal CJA Motion Regarding Budget as to Azibo Aquart (3). Signed by Judge Peter C. Dorsey on 3/10/2010. (Villano, P.) (Entered: 03/10/2010) |
| 03/12/2010 | 364 | SEALED MOTION to Incur Expenses by Azibo Aquart. (Villano, P.) (Entered: 03/12/2010) |
| 03/19/2010 | | CJA 30: Authorization to Pay Justin T. Smith in Death Penalty Proceedings as to Azibo Aquart ; Voucher # 100312000020. Interim #12 payment. Signed by Magistrate Judge Joan G. Margolis on 3/19/10. (S–Inferrera, L.) (Entered: 03/29/2010) |
| 03/29/2010 | 367 | ELECTRONIC ORDER granting 364 Motion to Incur Expenses as to Azibo Aquart (3). Signed by Judge Peter C. Dorsey on 3/29/2010. (Villano, P.) (Entered: 03/29/2010) |
| 03/29/2010 | 368 | NOTICE OF E–FILED STATUS CONFERENCE CALENDAR as to Azikiwe Aquart, Azibo Aquart, Efrain Johnson: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. Status Conference set for 4/7/2010 11:30 AM in Chambers Room 107, 141 Church St., New Haven, CT before Judge Peter C. Dorsey (Villano, P.) (Entered: 03/29/2010) |
| 03/30/2010 | 369 | NOTICE OF E–FILED AMENDED STATUS CONFERENCE CALENDAR as to Azikiwe Aquart, Azibo Aquart: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. Status Conference set for 4/7/2010 11:30 AM in Chambers Room 107, 141 Church St., New Haven, CT before Judge Peter C. Dorsey (Villano, P.) (Entered: 03/30/2010) |
| 03/30/2010 | | Terminate Deadlines and Hearings as to Azikiwe Aquart, Azibo Aquart, Efrain Johnson for status conference canceled: (Villano, P.) (Entered: 03/30/2010) |
| 03/30/2010 | 371 | ELECTRONIC ORDER TO CONTINUE – Ends of Justice as to Azikiwe Aquart, Azibo Aquart, Efrain Johnson Time excluded from 5/6/2010 until 9/10/2010. The Defendant's motion to continue jury selection having been granted, the Court finds that the ends of justice served by taking this action outweigh the best interest of the public and the defendants in a speedy trial. Signed by Judge Peter C. Dorsey on 3/30/2010. (Villano, P.) (Entered: 03/30/2010) |
| 03/30/2010 | 372 | AMENDED ELECTRONIC ORDER as to Azikiwe Aquart, Azibo Aquart re 370 Electronic Order on Motion to Continue Jury Selection to September, 2010. Motion to Continue Jury Selection also includes co–defendant Azibo Aquart. Signed by Judge Peter C. Dorsey on 3/30/2010. (Villano, P.) (Entered: 03/30/2010) |
| 04/07/2010 | 374 | Minute Entry for proceedings held before Judge Joan G. Margolis:Arraignment as to Azibo Aquart (3) Count 1sss,2sss–4sss,5sss–7sss,8sss,10sss held on 4/8/2010, Plea entered Not Guilty on counts 1, 2, 3, 4, 5, 6, 7, 8 and 10, Defendant detained ( Jury Selection set for 9/10/2010 09:00 AM in Courtroom One, 141 Church St., New Haven, CT before Judge Peter C. Dorsey) 08 minutes(Court Reporter CD/FTR.)(Gutierrez, Y.) Modified on 5/17/2010 (Gutierrez, Y.). (Entered: 04/08/2010) |
| 04/12/2010 | 375 | REPLY TO RESPONSE to Motion by USA as to Azikiwe Aquart, Azibo Aquart re 324 MOTION to Sever Defendant, 329 MOTION to Dismiss *Death Penalty Notice*, 327 MOTION to Strike *Statutory Aggravators*, 320 MOTION to Dismiss *Superseding Indictment*, 319 MOTION to Strike *Statutory Aggravator*, 316 MOTION to Sever Defendant, 325 MOTION to Sever Defendant *Motion to Sever Count 10*, 326 MOTION to Strike *Aggravating Factors*, 321 MOTION to Sever Count Nine of the Third Superceding Indictment, 323 MOTION to Dismiss *Third Superceding Indictment*, 328 MOTION to Dismiss *the Government's Notice of Intent to Seek the Death Penalty* (Reynolds, Alina) (Entered: 04/12/2010) |
| 04/16/2010 | 377 | MOTION to Seal CJA Budget Motion by Azibo Aquart. (Sheehan, Michael) (Entered: 04/16/2010) |

**A.13**

| 04/16/2010 | 379 | SEALED MOTION to Incur Expenses by Azibo Aquart. (Villano, P.) (Entered: 04/20/2010) |
|---|---|---|
| 04/20/2010 | 378 | ELECTRONIC ORDER granting 377 Motion to Seal as to Azibo Aquart (3). Signed by Judge Peter C. Dorsey on 4/20/2010. (Villano, P.) (Entered: 04/20/2010) |
| 04/21/2010 | 380 | ELECTRONIC ORDER granting 379 Motion to Incur Expenses as to Azibo Aquart (3). Signed by Judge Peter C. Dorsey on 4/21/2010. (Villano, P.) (Entered: 04/21/2010) |
| 04/26/2010 | 381 | NOTICE OF E–FILED STATUS CONFERENCE CALENDAR as to Azikiwe Aquart, Azibo Aquart, Efrain Johnson: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. Status Conference set for 4/28/2010 10:00 AM in Chambers Room 107, 141 Church St., New Haven, CT before Judge Peter C. Dorsey (Villano, P.) (Entered: 04/26/2010) |
| 04/26/2010 | 382 | WAIVER of Speedy Trial by Azibo Aquart (Sheehan, Michael) (Entered: 04/26/2010) |
| 04/27/2010 | 384 | ELECTRONIC ORDER TO CONTINUE – Ends of Justice as to Azibo Aquart re 382 Waiver of Speedy Trial Time excluded from 5/6/2010 until 9/10/2010. Signed by Judge Peter C. Dorsey on 2/27/2010. (Villano, P.) Modified on 4/28/2010 (Villano, P.). (Entered: 04/27/2010) |
| 04/27/2010 | 386 | MOTION for Extension of Time to File Response/Reply *to Government's Response* until May 17, 2010 by Azibo Aquart. (Smith, Justin) (Entered: 04/27/2010) |
| 04/28/2010 | 387 | Minute Entry for proceedings held before Judge Peter C. Dorsey:Status Conference as to Azikiwe Aquart, Azibo Aquart, Efrain Johnson held on 4/28/2010 Total Time: 0 hours and 30 minutes(Villano, P.) (Entered: 04/28/2010) |
| 04/29/2010 | 392 | ELECTRONIC ORDER granting 386 Motion for Extension of Time to File Response/Reply to Government's Response until May 17, 2010 as to Azibo Aquart (3). Signed by Judge Peter C. Dorsey on 4/29/2010. (Villano, P.) (Entered: 04/29/2010) |
| 04/29/2010 | 393 | Reset Deadlines re Motions as to Azibo Aquart 322 MOTION to Compel Discovery, 319 MOTION to Strike Statutory Aggravator, 329 MOTION to Dismiss Death Penalty Notice, 327 MOTION to Strike Statutory Aggravators, 324 MOTION to Sever Defendant, 325 MOTION to Sever Defendant Motion to Sever Count 10, 316 MOTION to Sever Defendant, 320 MOTION to Dismiss Superseding Indictment, 350 MOTION Establish Jury Selection Procedures. Responses due by 5/17/2010 (Villano, P.) (Entered: 04/29/2010) |
| 05/05/2010 | 394 | Sealed Document: Habeas Writ and Application by USA as to Azikiwe Aquart, Nathaniel Grant, Azibo Aquart, Efrain Johnson – (S–Barrille, J.) (Entered: 05/05/2010) |
| 05/17/2010 | 404 | Docket Entry Correction as to Azibo Aquart re 374 Minute Entry for proceedings. Entry modified to add the correct filed date,.(Gutierrez, Y.) (Entered: 05/17/2010) |
| 05/17/2010 | | CJA 30: Authorization to Pay Michael O. Sheehan in Death Penalty Proceedings as to Azibo Aquart; Voucher # 100517000001. Interim #12 payment. Signed by Magistrate Judge Joan G. Margolis on 5/17/10. (Inferrera, L.) (Entered: 05/20/2010) |
| 05/17/2010 | | CJA 30: Authorization to Pay Michael O. Sheehan in Death Penalty Proceedings as to Azibo Aquart; Voucher # 100517000001. Interim #12 payment. Signed by Magistrate Judge Joan G. Margolis on 5/17/10. (Inferrera, L.) (Entered: 05/21/2010) |
| 05/18/2010 | 406 | REPLY TO RESPONSE to Motion by Azibo Aquart re 316 MOTION to Sever Defendant (Smith, Justin) (Entered: 05/18/2010) |
| 05/21/2010 | | Attorney update in case as to Azikiwe Aquart, Nathaniel Grant, Azibo Aquart, Efrain Johnson. Attorney David B. Fein for USA added. (Villano, P.) (Entered: 05/24/2010) |
| 05/28/2010 | | CJA 30: Authorization to Pay Michael O. Sheehan in Death Penalty Proceedings as to Azibo Aquart ; Voucher # 100521000003. Interim #11 payment. Signed by Magistrate Judge Joan G. Margolis on 5/28/10. (Inferrera, L.) (Entered: 06/09/2010) |

**A.14**

| 05/28/2010 | | CJA 30: Authorization to Pay Justin T. Smith in Death Penalty Proceedings as to Azibo Aquart; Voucher # 100521000002. Interim #14 payment. Signed by Magistrate Judge Joan G. Margolis on 5/28/10. (Inferrera, L.) (Entered: 06/09/2010) |
|---|---|---|
| 06/02/2010 | 412 | MOTION to Seal Budget Motion by Azibo Aquart. (Sheehan, Michael) (Entered: 06/02/2010) |
| 06/02/2010 | 414 | SEALED MOTION to Incur Expenses by Azibo Aquart. (Villano, P.) (Entered: 06/03/2010) |
| 06/03/2010 | 413 | ELECTRONIC ORDER granting 412 Motion to Seal Budget Motion as to Azibo Aquart (3). Signed by Judge Peter C. Dorsey on 6/2/2010. (Villano, P.) (Entered: 06/03/2010) |
| 06/07/2010 | 418 | ELECTRONIC ORDER granting 414 Motion to Incur Expenses as to Azibo Aquart (3). Signed by Judge Peter C. Dorsey on 6/7/2010. (Villano, P.) (Entered: 06/07/2010) |
| 06/16/2010 | | Case as to Azikiwe Aquart, Azibo Aquart reassigned to Judge Janet Bond Arterton. Judge Peter C. Dorsey no longer assigned to the case. (S–D'Onofrio, B.) (Entered: 06/16/2010) |
| 06/22/2010 | 419 | NOTICE OF E–FILED CALENDAR as to Azikiwe Aquart, Nathaniel Grant, Azibo Aquart, Efrain Johnson: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION.( Status Conference set for 7/6/2010 09:00 AM in Chambers before Judge Janet Bond Arterton) (Torday, B.) (Entered: 06/22/2010) |
| 06/24/2010 | 431 | USM Return of Service on Subpoena executed as to Azikiwe Aquart, Azibo Aquart, Efrain Johnson on 3/30/2010 (Villano, P.) (Entered: 07/12/2010) |
| 06/29/2010 | 425 | AMENDED NOTICE OF E–FILED CALENDAR as to Azikiwe Aquart, Nathaniel Grant, Azibo Aquart, Efrain Johnson: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION.(A HEARING ON PENDING MOTION AND STATUS Conference set for 7/6/2010 09:00 AM in Courtroom Two, 141 Church St., New Haven, CT before Judge Janet Bond Arterton) (Torday, B.) (Entered: 06/29/2010) |
| 07/06/2010 | 426 | NOTICE OF E–FILED CALENDAR as to Azikiwe Aquart, Azibo Aquart: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. Motion Hearing set for 7/8/2010 08:30 AM in Courtroom Two, 141 Church St., New Haven, CT before Judge Janet Bond Arterton (Torday, B.) (Entered: 07/06/2010) |
| 07/06/2010 | 427 | Minute Entry for proceedings held before Judge Janet Bond Arterton:Status Conference as to Azikiwe Aquart, Azibo Aquart, Efrain Johnson held on 7/6/2010 Total Time: 1 hours and 30 minutes(Court Reporter S. Montini.)(Torday, B.) (Entered: 07/06/2010) |
| 07/07/2010 | 428 | MOTION to Compel Discovery of DNA Evidence by Azibo Aquart. (Attachments: # 1 Exhibit Exhibits A –I)(Sheehan, Michael) Modified on 7/8/2010 to correct motion event (Kelsey, N.). (Entered: 07/07/2010) |
| 07/08/2010 | 429 | Minute Entry for proceedings held before Judge Janet Bond Arterton:Motion Hearing as to Azikiwe Aquart, Azibo Aquart, Efrain Johnson held on 7/8/2010 re 322 MOTION to Compel Discovery filed by Azibo Aquart, 324 MOTION to Sever Defendant filed by Azikiwe Aquart, 329 MOTION to Dismiss Death Penalty Notice filed by Azibo Aquart, 327 MOTION to Strike Statutory Aggravators filed by Azibo Aquart, 320 MOTION to Dismiss Superseding Indictment filed by Azibo Aquart, 319 MOTION to Strike Statutory Aggravator filed by Azibo Aquart, 428 MOTION to Compel filed by Azibo Aquart, 316 MOTION to Sever Defendant filed by Azibo Aquart, 325 MOTION to Sever Defendant Motion to Sever Count 10 filed by Azibo Aquart, 326 MOTION to Strike Aggravating Factors filed by Azikiwe Aquart, 350 MOTION Establish Jury Selection Procedures filed by Azibo Aquart, 321 MOTION to Sever Count Nine of the Third Superceding Indictment filed by Azikiwe Aquart, 318 MOTION for Order Re: Compelling Compliance with Local Rules Relating to Discovery and Disclosures filed by Azikiwe Aquart, 323 MOTION to Dismiss Third |

| | | |
|---|---|---|
| | | *Superceding Indictment* filed by Azikiwe Aquart, 328 MOTION to Dismiss *the Government's Notice of Intent to Seek the Death Penalty* filed by Azikiwe Aquart Total Time: 1 hours and 50 minutes(Court Reporter Sharon Montini.)(Torday, B.) (Entered: 07/08/2010) |
| 07/08/2010 | 430 | Marked Exhibit List by Azibo Aquart (Torday, B.) (Entered: 07/08/2010) |
| 07/15/2010 | | CJA 30: Authorization to Pay Justin T. Smith in Death Penalty Proceedings as to Azibo Aquart; Voucher # 100713000007. Interim #15 payment. Signed by Magistrate Judge Joan G. Margolis on 7/15/10. (Inferrera, L.) (Entered: 07/21/2010) |
| 07/28/2010 | 433 | Memorandum in Support by Azibo Aquart re 428 MOTION to Compel *Production of DNA Evidence* (Sheehan, Michael) (Entered: 07/28/2010) |
| 08/04/2010 | | CJA 30: Authorization to Pay Justin T. Smith in Death Penalty Proceedings as to Azibo Aquart; Voucher # 100803000003. Interim #16 payment. Signed by Magistrate Judge Joan G. Margolis on 8/4/10. (Inferrera, L.) (Entered: 08/05/2010) |
| 08/10/2010 | 434 | MOTION to Seal CJA Budget Motion by Azibo Aquart. (Sheehan, Michael) (Entered: 08/10/2010) |
| 08/10/2010 | 435 | NOTICE OF E−FILED CALENDAR as to Azikiwe Aquart, Azibo Aquart, Efrain Johnson: TELEPHONE Scheduling Conference set for 8/17/2010 04:30 PM before Judge Janet Bond Arterton GOVERNMENT TO INITIATE THE CALL TO CHAMBERS AT 203−773−2456.(Torday, B.) (Entered: 08/10/2010) |
| 08/10/2010 | 439 | SEALED MOTION to Incur Expenses by Azibo Aquart. (Torday, B.) (Entered: 08/12/2010) |
| 08/10/2010 | 484 | Minute Entry for proceedings held before Judge Janet Bond Arterton:Telephone Scheduling Conference as to Azikiwe Aquart, Azibo Aquart held on 8/20/2010 50 minutes(Court Reporter Sharon Montini.)(Torday, B.) (Entered: 09/01/2010) |
| 08/11/2010 | 436 | MOTION to Continue *Trial and Jury Selection* by Azibo Aquart. (Sheehan, Michael) (Entered: 08/11/2010) |
| 08/11/2010 | | CJA 30: Authorization to Pay Michael O. Sheehan in Death Penalty Proceedings as to Azibo Aquart; Voucher # 100811000001. Interim #14 payment. Signed by Magistrate Judge Joan G. Margolis on 8/11/10. (Inferrera, L.) (Entered: 08/11/2010) |
| 08/11/2010 | 437 | Memorandum in Support by Azibo Aquart re 436 MOTION to Continue *Trial and Jury Selection (Supplemental Statement)* (Sheehan, Michael) (Entered: 08/11/2010) |
| 08/12/2010 | 438 | NOTICE OF E−FILED AMENDED CALENDAR as to Azikiwe Aquart, Azibo Aquart, Efrain Johnson: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. Scheduling Conference set for 8/17/2010 04:30 PM in Courtroom Two, 141 Church St., New Haven, CT before Judge Janet Bond Arterton (Torday, B.) (Entered: 08/12/2010) |
| 08/12/2010 | 440 | ORDER granting 434 Motion to Seal as to Azibo Aquart (3); granting 439 Motion to Modify CJA budget as to Azibo Aquart (3). Signed by Judge Joan G. Margolis on 8/12/10. (S−Torday, B.) (Entered: 08/12/2010) |
| 08/13/2010 | 443 | First MOTION for Leave to File *Amended Notice of Intent to Seek the Death Penalty* by USA as to Azibo Aquart. (Attachments: # 1 Exhibit)(Dayton, Tracy) (Entered: 08/13/2010) |
| 08/13/2010 | 445 | ORDER: Defendants 316 , 324 Motions to Sever from one another are DENIED, but any penalty phases will be individualized sequential proceedings; Azikiwes Motion to Sever Count Nine 321 is GRANTED; and Azibos Motion to Sever Count Ten 325 is GRANTED. Signed by Judge Janet Bond Arterton on 08/13/2010. (Kretman, J.) (Entered: 08/13/2010) |
| 08/17/2010 | 446 | NOTICE OF E−FILED CALENDAR: The parties' scheduling conference set for 8/17/2010 at 4:30 PM will be held in Chambers Room #118, 141 Church St., New Haven, CT before Judge Janet Bond Arterton. Attorney Stern will participate via telephone. (Tooker, A.) (Entered: 08/17/2010) |

| 08/17/2010 | 447 | Minute Entry for proceedings held before Judge Janet Bond Arterton:Scheduling Conference as to Azikiwe Aquart, Azibo Aquart, Efrain Johnson held on 8/17/2010 Total Time: 2 hours and 15 minutes(Court Reporter S. Montini.)(Torday, B.) (Entered: 08/18/2010) |
|---|---|---|
| 08/18/2010 | | Reset Deadlines/Hearings as to Azikiwe Aquart, Azibo Aquart: TELEPHONE Status Conference set for 8/31/2010 09:30 AM before Judge Janet Bond Arterton; Government to initiate call to chambers. (Torday, B.) (Entered: 08/19/2010) |
| 08/19/2010 | 448 | MOTION to Seal Statement In Support of Motion to Continue Trial by Azibo Aquart. (Sheehan, Michael) (Entered: 08/19/2010) |
| 08/19/2010 | 449 | ORDER ON PENDING MOTIONS:denying 318 Motion for Order as to Azikiwe Aquart (1); denying, without prejudice to renew 326 Motion to Strike as to Azikiwe Aquart (1); granting 444 Motion for Leave to File as to Azikiwe Aquart (1); denying, as moot 319 Motion to Strike as to Azibo Aquart (3); denying 322 Motion to Compel as to Azibo Aquart (3); denying, without prejudice to renew 327 Motion to Strike as to Azibo Aquart (3); granting 428 Motion to Compel as to Azibo Aquart (3); granting 443 Motion for Leave to File as to Azibo Aquart (3)Telephone Status Conference set for 8/31/10 at 9:30 a.m.;Counsel for Azibo Aquart to file supplemental briefing (in camera) by 8/20/10, as to Doc. #436.. Signed by Judge Janet Bond Arterton on 8/18/10. (Torday, B.) (Entered: 08/19/2010) |
| 08/19/2010 | 453 | MOTION to Seal Ex Parte Motion by Azibo Aquart. (Sheehan, Michael) (Entered: 08/19/2010) |
| 08/19/2010 | 454 | Sealed Document: Memo in support of by Azibo Aquart re 448 MOTION to Seal Statement In Support of Motion to Continue Trial – (Torday, B.) (Entered: 08/20/2010) |
| 08/19/2010 | 455 | SEALED MOTION for testing – by Azibo Aquart. (Torday, B.) (Entered: 08/20/2010) |
| 08/19/2010 | 488 | Minute Entry for proceedings held before Judge Janet Bond Arterton:Telephone Scheduling Conference as to Azikiwe Aquart, Azibo Aquart held on 8/19/2010 50 minutes(Court Reporter S. Montini.)(Torday, B.) (Entered: 09/07/2010) |
| 08/23/2010 | 459 | ORDER granting 453 Motion to Seal as to Azibo Aquart (3); granting 455 Sealed Motion as to Azibo Aquart (3). Signed by Judge Janet Bond Arterton on 8/20/10. (S–Torday, B.) (Entered: 08/23/2010) |
| 08/24/2010 | 460 | MOTION to Seal Ex Parte Statement Regarding Testing and Continuance of Trial Date by Azibo Aquart. (Sheehan, Michael) (Entered: 08/24/2010) |
| 08/24/2010 | 461 | Sealed Document: Supplemental memorandum by Azibo Aquart re 455 SEALED MOTION for testing – – (Torday, B.) (Entered: 08/25/2010) |
| 08/25/2010 | 463 | MOTION for Bill of Particulars or in the alternative a Motion to Compel Discovery by Azibo Aquart. (Attachments: # 1 Exhibit A)(Smith, Justin). Added MOTION to Compel on 8/26/2010 (Kelsey, N.). (Entered: 08/25/2010) |
| 08/26/2010 | 470 | Memorandum in Support by Azibo Aquart re 436 MOTION to Continue *Trial and Jury Selection* (Sheehan, Michael) (Entered: 08/26/2010) |
| 08/26/2010 | 472 | SEALED WRIT of Habeas Corpus Signed by Judge Joan G. Margolis. (S–Torday, B.) (Entered: 08/27/2010) |
| 08/27/2010 | 478 | Memorandum in Support by Azibo Aquart re 463 MOTION for Bill of Particulars MOTION to Compel (Sheehan, Michael) (Entered: 08/27/2010) |
| 08/27/2010 | 479 | NOTICE OF INTENT TO SEEK DEATH PENALTY *as amended* by USA as to Azibo Aquart re 443 First MOTION for Leave to File *Amended Notice of Intent to Seek the Death Penalty*, 228 Notice of Intent to Seek Death Penalty, 449 Order on Motion for Order, Order on Motion to Strike, Order on Motion for Leave to File,, Order on Motion to Compel,,,,,,,,,,,,,,,,,,,,, (Dayton, Tracy) (Entered: 08/27/2010) |
| 08/30/2010 | 481 | NOTICE OF E–FILED CALENDAR as to Azikiwe Aquart, Azibo Aquart: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. |

**A.17**

| | | TELEPHONE Status Conference set for 8/31/2010 09:30 AM before Judge Janet Bond Arterton. The government shall initiate the call to chambers at 203–773–2456. (Torday, B.) (Entered: 08/30/2010) |
|---|---|---|
| 08/30/2010 | 482 | First MOTION to Compel *Federal Rule of Criminal Procedure 12.2(b) Evidence* by USA as to Azikiwe Aquart, Azibo Aquart. (Dayton, Tracy) (Entered: 08/30/2010) |
| 08/31/2010 | 483 | ORDER granting, until 11/29/10 for jury selection 436 Motion to Continue trial and jury selection as to Azibo Aquart (3). Signed by Judge Janet Bond Arterton on 8/31/10. (Torday, B.) (Entered: 08/31/2010) |
| 08/31/2010 | 489 | Minute Entry for proceedings held before Judge Janet Bond Arterton:Telephone Scheduling Conference as to Azikiwe Aquart, Azibo Aquart held on 8/31/2010 Total Time: 1 hours(Court Reporter S. Montini.)(Torday, B.) (Entered: 09/07/2010) |
| 09/03/2010 | 485 | TRANSCRIPT of Proceedings as to Azikiwe Aquart, Nathaniel Grant, Azibo Aquart, Efrain Johnson held on 7/8/10 before Judge Arterton. Court Reporter: S. Montini. Type of Hearing: Transcript of Oral Argument. NOTICE RE REDACTION OF TRANSCRIPTS: The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.ctd.uscourts.gov. Redaction Request due 9/24/2010. Redacted Transcript Deadline set for 10/4/2010. Release of Transcript Restriction set for 12/2/2010. (Montini, S.) (Entered: 09/03/2010) |
| 09/03/2010 | 486 | TRANSCRIPT of Proceedings as to Azikiwe Aquart, Nathaniel Grant, Azibo Aquart, Efrain Johnson held on 8/17/10 before Judge Arterton. Court Reporter: S. Montini. Type of Hearing: Transcript of Status Conference. NOTICE RE REDACTION OF TRANSCRIPTS: The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.ctd.uscourts.gov. Redaction Request due 9/24/2010. Redacted Transcript Deadline set for 10/4/2010. Release of Transcript Restriction set for 12/2/2010. (Montini, S.) (Entered: 09/03/2010) |
| 09/08/2010 | 490 | MOTION to Seal Budget Motion by Azibo Aquart. (Sheehan, Michael) (Entered: 09/08/2010) |
| 09/08/2010 | 491 | SEALED MOTION to Modify CJA Budget – by Azibo Aquart. (Torday, B.) (Entered: 09/09/2010) |
| 09/11/2010 | 492 | ORDER granting 490 Motion to Seal as to Azibo Aquart (3); granting 491 Sealed Motion as to Azibo Aquart (3). Signed by Judge Joan G. Margolis on 9/11/2010. (S–Rodko, B.) (Entered: 09/13/2010) |
| 09/14/2010 | | CJA 30: Authorization to Pay Justin Smith in Death Penalty Proceedings as to Azibo Aquart; Voucher # 100907000005. Interim #17 payment. Signed by Magistate Judge Joan G. Margolis on 9/14/10. (Inferrera, L.) (Entered: 10/04/2010) |
| 09/16/2010 | 500 | MOTION to Seal CJA Budget Motion by Azibo Aquart. (Sheehan, Michael) (Entered: 09/16/2010) |
| 09/16/2010 | 503 | SEALED MOTION to Incur Expenses by Azibo Aquart. (Torday, B.) (Entered: 09/17/2010) |
| 09/20/2010 | 504 | MOTION to Seal CJA Budget Motion by Azibo Aquart. (Sheehan, Michael) (Entered: 09/20/2010) |
| 09/20/2010 | 505 | SEALED MOTION to Incur Expenses by Azibo Aquart. (Torday, B.) (Entered: 09/21/2010) |
| 09/22/2010 | 506 | ORDER: granting 504 Motion to Seal as to Azibo Aquart (3); granting 505 Motion to Incur Expenses as to Azibo Aquart (3). Signed by Judge Joan G. Margolis on 9/22/2010. (Rodko, B.) (Entered: 09/22/2010) |

| 09/30/2010 | 514 | ORDER: denying without prejudice to renew 503 Motion to Incur Expenses as to Azibo Aquart (3). Signed by Judge Joan G. Margolis on 9/29/2010. (Rodko, B.) (Entered: 09/30/2010) |
|---|---|---|
| 10/01/2010 | 516 | MOTION to Seal Budget Motion by Azibo Aquart. (Sheehan, Michael) (Entered: 10/01/2010) |
| 10/01/2010 | 519 | SEALED MOTION to Modify CJA Budget by Azibo Aquart. (Torday, B.) (Entered: 10/05/2010) |
| 10/05/2010 | 518 | ELECTRONIC ORDER granting 516 Motion to Seal as to Azibo Aquart (3). THIS IS THE ONLY NOTICE COUNSEL WILL RECEIVE FROM THE COURT. Signed by Judge Joan G. Margolis on 10/5/10. (Margolis, Joan) (Entered: 10/05/2010) |
| 10/05/2010 | 520 | Sealed Document: by USA as to Azikiwe Aquart, Nathaniel Grant, Azibo Aquart, Efrain Johnson – (Attachments: # 1 Appendix, # 2 Appendix)(S–Barrille, J.) (Entered: 10/05/2010) |
| 10/05/2010 | 524 | WRIT of Writ of Habeas Corpus issued as to Azikiwe Aquart, Nathaniel Grant, Azibo Aquart, Efrain Johnson Signed by Judge Judge Joan G. Margolis. (Torday, B.) (Entered: 10/07/2010) |
| 10/06/2010 | 521 | ORDER granting 519 Motion to Incur Expenses as to Azibo Aquart (3). Signed by Judge Joan G. Margolis on 10/6/2010. (Rodko, B.) (Entered: 10/06/2010) |
| 10/06/2010 | 522 | TRANSCRIPT of Proceedings as to Azikiwe Aquart, Nathaniel Grant, Azibo Aquart, Efrain Johnson held on 8/31/10 before Judge Arterton. Court Reporter: S. Montini. Type of Hearing: Transcript of Telephonic Status Conference. NOTICE RE REDACTION OF TRANSCRIPTS: The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.ctd.uscourts.gov. Redaction Request due 10/27/2010. Redacted Transcript Deadline set for 11/6/2010. Release of Transcript Restriction set for 1/4/2011. (Montini, S.) (Entered: 10/06/2010) |
| 10/06/2010 | 523 | Sealed Document: Application for Writ of Habeas Corpus by USA as to Azikiwe Aquart, Nathaniel Grant, Azibo Aquart, Efrain Johnson – (Torday, B.) (Entered: 10/07/2010) |
| 10/13/2010 | 525 | ENTERED IN ERROR: Second MOTION to Compel *Disclosure Pursuant to Federal Rule of Criminal Procedure 12.2 of Expert Evidence of a Mental Condition* by USA as to Azikiwe Aquart, Nathaniel Grant, Azibo Aquart, Efrain Johnson. (Dayton, Tracy) Modified on 10/14/2010: Motion incorrectly docketed on entire case (Kelsey, N.). (Entered: 10/13/2010) |
| 10/13/2010 | 526 | Second MOTION to Compel Disclosure Pursuant to Federal Rule of Criminal Procedure 12.2 of Expert Evidence of a Mental Condition by USA as to Azibo Aquart. Document No. 525 redocketed on correct case. (Kelsey, N.) (Entered: 10/14/2010) |
| 10/14/2010 | 527 | NOTICE OF E–FILED CALENDAR: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. A Telephonic Status Conference is set for 10/26/2010 4:00 PM before Judge Janet Bond Arterton. The Government shall initiate the call to chambers at 203–773–2456. (Kretman, J.) (Entered: 10/14/2010) |
| 10/14/2010 | | CJA 30: Authorization to Pay Justin T. Smith in Death Penalty Proceedings as to Azibo Aquart; Voucher # 101013000003. Interim #18 payment. Signed by Magistrate Judge Joan G. Margolis on 10/14/10. (Inferrera, L.) (Entered: 10/28/2010) |
| 10/20/2010 | 530 | RESPONSE/REPLY by Azibo Aquart *to 526 Government's 12.2 Motion* (Sheehan, Michael) Modified on 10/21/2010 to create link to underlying motion (Kelsey, N.). (Entered: 10/20/2010) |
| 10/26/2010 | 532 | MOTION to Seal CJA Budget Motion by Azibo Aquart. (Sheehan, Michael) (Entered: 10/26/2010) |
| 10/26/2010 | 533 | ORDER: Azibo Aquart's Motion to Dismiss the Superseding Indictment 320 , Azikiwe Aquart's Motion to Dimiss the Third Superseding Indictment 323 , Azikiwe |

| | | Aquart's Motion to Dismiss the Government's Notice of Intent to Seek the Death Penalty 328 , and Azibo Aquart's Motion to Dismiss Death Penalty Notice 329 are DENIED. Signed by Judge Janet Bond Arterton on 10/26/2010. (Kretman, J.) (Entered: 10/26/2010) |
|---|---|---|
| 10/26/2010 | 534 | SEALED MOTION to Modify CJA Budget by Azibo Aquart. (Torday, B.) (Entered: 10/26/2010) |
| 10/26/2010 | 537 | Minute Entry for proceedings held before Judge Janet Bond Arterton:Telephone Status Conference as to Azikiwe Aquart, Azibo Aquart held on 10/26/2010 Total Time: 1 hours(Court Reporter S. Montini.)(Torday, B.) (Entered: 11/02/2010) |
| 10/27/2010 | 535 | ORDER granting 532 Motion to Seal as to Azibo Aquart (3); granting 534 Motion to Incur Expenses as to Azibo Aquart (3). Signed by Judge Joan G. Margolis on 10/27/2010. (S–Rodko, B.) (Entered: 10/27/2010) |
| 10/29/2010 | 536 | AMENDED SCHEDULING ORDER as to Azikiwe Aquart, Azibo AquartJury Selection set for 3/1–4/2011 09:00 AM in Courtroom Two, 141 Church St., New Haven, CT before Judge Janet Bond Arterton), ( Jury Trial( First Phase) set for 4/6–29/2011 09:00 AM in Courtroom Two, 141 Church St., New Haven, CT before Judge Janet Bond Arterton, ( Jury Trial (Second Phase set for 5/9–20/11/2011 09:00 AM in Courtroom Two, 141 Church St., New Haven, CT before Judge Janet Bond Arterton,Jury Status conference set for 3/8/2011 09:00 AM in Chambers Room #118, 141 Church St., New Haven, CT before Judge Janet Bond Arterton) Length of Trial 4–6 weeks. Signed by Judge Janet Bond Arterton on 10/28/10. (Torday, B.) (Entered: 10/29/2010) |
| 11/05/2010 | 539 | MOTION to Seal CJA Budget Motion by Azibo Aquart. (Sheehan, Michael) (Entered: 11/05/2010) |
| 11/05/2010 | 540 | SEALED MOTION to Modify CJA Budget by Azibo Aquart. (Torday, B.) (Entered: 11/08/2010) |
| 11/08/2010 | 543 | ORDER: granting 540 Motion to Incur Expenses as to Azibo Aquart (3). Signed by Judge Joan G. Margolis on 11/8/2010. (Rodko, B.) (Entered: 11/09/2010) |
| 11/08/2010 | 545 | ORDER: granting 539 Motion to Seal as to Azibo Aquart (3). Signed by Judge Joan G. Margolis on 11/8/2010. (Rodko, B.) (Entered: 11/09/2010) |
| 11/16/2010 | 548 | MOTION to Seal Notice by Azibo Aquart. (Sheehan, Michael) (Entered: 11/16/2010) |
| 11/16/2010 | 549 | Sealed Document: by Azibo Aquart –Notice Pursuant to Rule 12.2 (Torday, B.) (Entered: 11/16/2010) |
| 11/18/2010 | 550 | NOTICE OF E–FILED CALENDAR as to Azikiwe Aquart, Azibo Aquart: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. Telephone Status Conference set for 11/29/2010 01:00 PM before Judge Janet Bond Arterton The government shall initiate the call to chambers at 203–773–2456.(Torday, B.) (Entered: 11/18/2010) |
| 11/22/2010 | 553 | ORDER: granting 500 Motion to Seal as to Azibo Aquart (3); granting 548 Motion to Seal as to Azibo Aquart (3). Signed by Judge Joan G. Margolis on 11/22/2010. (Rodko, B.) (Entered: 11/22/2010) |
| 11/29/2010 | 557 | NOTICE OF E–FILED CALENDAR as to Azikiwe Aquart, Azibo Aquart: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. Telephone Status Conference set for 12/6/2010 09:00 AM before Judge Janet Bond Arterton Attorney Michael Sheehan to initiate the call to chambers at 203–773–2456.(Torday, B.) (Entered: 11/29/2010) |
| 11/29/2010 | 558 | Minute Entry for proceedings held before Judge Janet Bond Arterton:Telephone Status Conference as to Azikiwe Aquart, Azibo Aquart held on 11/29/2010 45 minutes(Court Reporter S. Montini.)(Torday, B.) (Entered: 11/30/2010) |
| 12/03/2010 | 559 | MOTION to Seal Motion by Azibo Aquart. (Sheehan, Michael) (Entered: 12/03/2010) |

| 12/03/2010 | 560 | Sealed Document: Memorandum Regarding 12.2 procedures by Azibo Aquart (Torday, B.) (Entered: 12/06/2010) |
|---|---|---|
| 12/06/2010 | 561 | ENTERED IN ERROR: *SEALED* First MOTION for Discovery by USA as to Azikiwe Aquart, Nathaniel Grant, Azibo Aquart, Efrain Johnson. (Attachments: # 1 Exhibit)(Dayton, Tracy) Modified on 12/7/2010: Motion incorrectly filed on entire case. (Kelsey, N.). (Entered: 12/06/2010) |
| 12/06/2010 | 562 | MOTION to Seal Govt. Discovery Motion, Docket Entry 561 by Azibo Aquart. (Sheehan, Michael) (Entered: 12/06/2010) |
| 12/06/2010 | 563 | Minute Entry for proceedings held before Judge Janet Bond Arterton:Telephone Status Conference as to Azibo Aquart held on 12/6/2010 Total Time: 1 hours and 30 minutes(Court Reporter S. Montini.)(Torday, B.) (Entered: 12/06/2010) |
| 12/06/2010 | 566 | SEALED MOTION for Discovery – by USA as to Azibo Aquart. Document No. 561 redocketed to docket motion on correct defendant's case. (Kelsey, N.) (Entered: 12/07/2010) |
| 12/06/2010 | 567 | Sealed Document: Reply by USA as to Azibo Aquart re 530 , 549 , 560 Responses re 526 MOTION to Compel. Document 566 redocketed to docket second part. (Kelsey, N.) Modified on 12/9/2010 to add missing links (Kelsey, N.). (Entered: 12/07/2010) |
| 12/06/2010 | | CJA 30: Authorization to Pay Justin T. Smith in Death Penalty Proceedings as to Azibo Aquart; Voucher # 19. Interim payment. Signed by Magistrate Judge Joan G. Margolis on 12/6/10. (Inferrera, L.) (Entered: 12/20/2010) |
| 12/08/2010 | 568 | Sealed Document: Supplemental Notice pursuant to Rule 12.2 by Azibo Aquart re 549 Sealed Document – (Torday, B.) (Entered: 12/09/2010) |
| 12/09/2010 | 569 | ORDER GRANTED: The reasons for sealing outweights the public's presumed interest in access to filing at this time 559 Motion to Seal as to Azibo Aquart and 562 Motion to Seal as to Azibo Aquart (3). Signed by Judge Janet Bond Arterton on 12/6/10. (Torday, B.) (Entered: 12/09/2010) |
| 12/15/2010 | 573 | NOTICE OF E–FILED CALENDAR as to Azibo Aquart: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. Hearing on Notice of Rule 12.2 set for 12/17/2010 03:15 PM in Courtroom Two, 141 Church St., New Haven, CT before Judge Janet Bond Arterton (Torday, B.) (Entered: 12/16/2010) |
| 12/16/2010 | 575 | Sealed Document: Memorandum Re: proposed 12.2 Order by Azibo Aquart – (Torday, B.) (Entered: 12/17/2010) |
| 12/17/2010 | 576 | Minute Entry for proceedings held before Judge Janet Bond Arterton:Status Conference on Rule 12.2 as to Azibo Aquart held on 12/17/2010 Total Time: 1 hours and 15 minutes(Court Reporter Sharon Montini.)(Torday, B.) (Entered: 12/20/2010) |
| 12/22/2010 | 579 | ORDER on 12.2 Notice as to Azibo Aquart. Signed by Judge Janet Bond Arterton on 12/22/10. (Torday, B.) (Entered: 12/22/2010) |
| 12/22/2010 | 580 | Sealed Document:Proposed 12.2 Order by Azibo Aquart – (Torday, B.) (Entered: 12/22/2010) |
| 12/23/2010 | 581 | Sealed Document: Notice of Disclosure by Azibo Aquart – (Torday, B.) (Entered: 12/23/2010) |
| 01/06/2011 | | Attorney update in case as to Azikiwe Aquart, Nathaniel Grant, Azibo Aquart, Efrain Johnson. Attorney Julie B. Mosley for USA added. (Villano, P.) (Entered: 01/07/2011) |
| 01/10/2011 | 582 | ATTORNEY APPEARANCE Julie B. Mosley appearing for USA *firewall attorney* (Mosley, Julie) (Entered: 01/10/2011) |
| 01/11/2011 | | CJA 30: Authorization to Pay Michael O. Sheehan in Death Penalty Proceedings as to Azibo Aquart; Voucher # 110107000005. Interim #14 payment. Signed by Magistrate Judge Joan G. Margolis on 1/11/11. (Inferrera, L.) (Entered: 01/20/2011) |
| 01/11/2011 | | CJA 30: Authorization to Pay Justin T. Smith in Death Penalty Proceedings as to Azibo Aquart; Voucher # Interim #20. Interim #20 payment. Signed by Magistrate |

**A.21**

| | | Judge Joan G. Margolis on 1/11/11. (Inferrera, L.) (Entered: 01/20/2011) |
|---|---|---|
| 01/21/2011 | 585 | Application for Writ of Habeas Corpus ad Testificandum as to Azibo, et al Aquart With Order Thereon. Original writ and Two True Attested Copies Handed USM for Service. Signed by Judge Janet Bond Arterton. (Torday, B.) (Entered: 01/24/2011) |
| 01/21/2011 | 586 | WRIT of Habeas Corpus Ad Testificandum issued as to Azibo Aquart, et al Signed by Judge Judge Janet Bond Arterton. (Torday, B.) (Entered: 01/24/2011) |
| 01/28/2011 | 588 | ENTERED IN ERROR: MOTION for Order Re: Case Transcripts by Azikiwe Aquart as to Azikiwe Aquart, Nathaniel Grant, Azibo Aquart, Efrain Johnson. (Stern, David) Modified on 1/31/2011: Motion incorrectly filed on Entire Case (Kelsey, N.). (Entered: 01/28/2011) |
| 02/01/2011 | 593 | APPLICATION for Writ of Habeas Corpous by USA as to Azikiwe Aquart, Nathaniel Grant, Azibo Aquart, Efrain Johnson (Torday, B.) (Entered: 02/03/2011) |
| 02/01/2011 | 594 | WRIT of Habeas Corpous issued as to Azikiwe Aquart, Nathaniel Grant, Azibo Aquart, Efrain Johnson Signed by Judge Mark R. Kravitz. (Torday, B.) (Entered: 02/03/2011) |
| 02/03/2011 | 592 | ATTORNEY APPEARANCE Jacabed Rodriguez–Coss appearing for USA (Rodriguez–Coss, Jacabed) (Entered: 02/03/2011) |
| 02/03/2011 | 596 | ORDER granting 595 Sealed Motion as to Azikiwe Aquart & Azibo Aquart. Signed by Judge Joan G. Margolis on 2/3/11. (Torday, B.) (Entered: 02/07/2011) |
| 02/04/2011 | 595 | SEALED MOTION Motion and Order for Transfer of Custody – by USA as to Azikiwe Aquart, Nathaniel Grant, Azibo Aquart, Efrain Johnson. (Torday, B.) (Entered: 02/07/2011) |
| 02/07/2011 | | CJA 30: Authorization to Pay Michael O. Sheehan in Death Penalty Proceedings as to Azibo Aquart; Voucher # 110128000011. Interim #15 payment. Signed by Magistrate Judge Joan G. Margolis on 2/7/11. (Inferrera, L.) (Entered: 02/15/2011) |
| 02/08/2011 | 597 | ENTERED IN ERROR: MOTION *FOR OPENING STATEMENTS* by USA as to Azikiwe Aquart, Nathaniel Grant, Azibo Aquart, Efrain Johnson (Attachments: # 1 Memorandum in Support)(Dayton, Tracy) Modified on 2/9/2011: used wrong event and incorrectly filed on entire case (Kelsey, N.). (Entered: 02/08/2011) |
| 02/08/2011 | 598 | MOTION for Opening Statement by USA as to Azikiwe Aquart, Azibo Aquart. Document No. 597 redocketed on correct defendant cases and to correct event. (Kelsey, N.) (Entered: 02/09/2011) |
| 02/08/2011 | 600 | Minute Entry for proceedings held before Judge Janet Bond Arterton:Telephone Status Conference as to Azikiwe Aquart, Azibo Aquart held on 2/8/2011 Total Time: 1 hours and 15 minutes(Court Reporter S. Montini.)(Torday, B.) (Entered: 02/10/2011) |
| 02/09/2011 | 599 | TRIAL SCHEDULING ORDER as to Azikiwe Aquart, Azibo Aquart Initial Voir Dire Questions due 2/11/11 with Final proposed Voir Dire due 3/8/11; Jury Trial(Guilt Phase) set for 4/6–29/2011 09:30 AM in Courtroom Two, 141 Church St., New Haven, CT before Judge Janet Bond Arterton;Jury Trial(Penalty Phase) set for 5/9–20/11 09:30 AM in Courtroom Two, 141 Church St., New Haven, CT before Judge Janet Bond Arterton; Jury Selection set for 3/1–4/2011 09:30 AM and 2:00p.m. in Courtroom Two, 141 Church St., New Haven, CT before Judge Janet Bond Arterton. Signed by Judge Janet Bond Arterton on 2/9/11. (Torday, B.) (Entered: 02/09/2011) |
| 02/14/2011 | 601 | SEALED MOTION to Incur Expenses by Azikiwe Aquart, Azibo Aquart. (Torday, B.) (Entered: 02/15/2011) |
| 02/16/2011 | 604 | ORDER: granting 601 Motion to Incur Expenses as to Azikiwe Aquart (1), Azibo Aquart (3). Signed by Judge Joan G. Margolis on 2/16/2011. (Rodko, B.) (Entered: 02/16/2011) |
| 02/16/2011 | 606 | MOTION to Seal motion for discovery by USA as to Azikiwe Aquart, Azibo Aquart. (Torday, B.) (Entered: 02/16/2011) |

**A.22**

| 02/16/2011 | 607 | SEALED MOTION – for Discovery and Motion to Compel Disclosure under FRCP 12.2 by USA as to Azikiwe Aquart, Azibo Aquart. (Torday, B.) (Entered: 02/16/2011) |
| 02/16/2011 | 608 | MOTION to Seal motion for court order by USA as to Azibo Aquart. (Torday, B.) (Entered: 02/16/2011) |
| 02/16/2011 | 609 | SEALED MOTION – Expedited Motion for Court Order by USA as to Azibo Aquart. (Torday, B.) (Entered: 02/16/2011) |
| 02/16/2011 | 610 | MOTION to Seal statement Re: Motion #609 by USA as to Azibo Aquart. (Torday, B.) (Entered: 02/16/2011) |
| 02/16/2011 | 611 | Sealed Document: Statement by USA as to Azibo Aquart re 609 SEALED MOTION – – (Torday, B.) (Entered: 02/16/2011) |
| 02/16/2011 | 612 | TRANSCRIPT of Proceedings: Type of Hearing: Transcript of Hearing Re: Rule 12.2. Held on 12/17/10 before Judge Arterton. Court Reporter: S. Montini. **IMPORTANT NOTICE – REDACTION OF TRANSCRIPTS:** To remove personal identifier information from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within seven (7) calendar days of this date. If no such Notice is filed, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available through PACER without redaction 90 days from today's date. The transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. The policy governing the redaction of personal information is located on the court website at www.ctd.uscourts.gov. Redaction Request due 3/9/2011. Redacted Transcript Deadline set for 3/19/2011. Release of Transcript Restriction set for 5/17/2011. (Montini, S.) (Entered: 02/16/2011) |
| 02/16/2011 | 613 | TRANSCRIPT of Proceedings: Type of Hearing: Transcript of Telephone Conference. Held on 12/6/10 before Judge Arterton. Court Reporter: S. Montini. **IMPORTANT NOTICE – REDACTION OF TRANSCRIPTS:** To remove personal identifier information from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within seven (7) calendar days of this date. If no such Notice is filed, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available through PACER without redaction 90 days from today's date. The transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. The policy governing the redaction of personal information is located on the court website at www.ctd.uscourts.gov. Redaction Request due 3/9/2011. Redacted Transcript Deadline set for 3/19/2011. Release of Transcript Restriction set for 5/17/2011. (Montini, S.) (Entered: 02/16/2011) |
| 02/17/2011 | 614 | Sealed Document: Obejction to Motion for Discovery by Azibo Aquart re 607 SEALED MOTION – – (Torday, B.) (Entered: 02/18/2011) |
| 02/18/2011 | 615 | SEALED MOTION Motion and Order for Transfer of Custody – by USA as to Azikiwe Aquart, Nathaniel Grant, Azibo Aquart, Efrain Johnson. (Torday, B.) (Entered: 02/18/2011) |
| 02/18/2011 | 616 | ORDER granting 615 Sealed Motion as to Azikiwe Aquart (1), Nathaniel Grant (2), Azibo Aquart (3), Efrain Johnson (4). Signed by Judge Joan G. Margolis on 2/18/11. (Torday, B.) (Entered: 02/18/2011) |
| 02/23/2011 | 619 | ENTERED IN ERROR: MOTION for Reconsideration re 349 Proposed Voir Dire filed by Azikiwe Aquart *and Court Order Allocating Additional Peremptory Challenges to the Defendants* by USA as to Azikiwe Aquart, Nathaniel Grant, Azibo Aquart, Efrain Johnson. (Attachments: # 1 Exhibit)(Rodriguez–Coss, Jacabed) Modified on 2/24/2011: Motion incorrectly filed on entire case (Kelsey, N.). (Entered: 02/23/2011) |
| 02/23/2011 | 624 | Government's Motion for Reconsideration of 599 Order Allocating Additional Peremptory Challenges to Defendants, by USA as to Azikiwe Aquart, Azibo Aquart. Document No. 619 redocketed on correct defendant cases. (Kelsey, N.) (Entered: |

| | | 02/24/2011) |
|---|---|---|
| 02/24/2011 | | Set/Reset Deadlines/Hearings. A hearing is scheduled on 617 618 619 as to Azikiwe Aquart, Azibo Aquart for 2/28/2011 04:00 PM in Courtroom Two, 141 Church St., New Haven, CT before Judge Janet Bond Arterton. (Kretman, J.) (Entered: 02/24/2011) |
| 02/24/2011 | 620 | Sealed Document: Response to objections by USA as to Azibo Aquart re 614 Sealed Document, 607 SEALED MOTION – – (Torday, B.) (Entered: 02/24/2011) |
| 02/24/2011 | 621 | MOTION to Seal Response to Objection by USA as to Azibo Aquart. (Torday, B.) (Entered: 02/24/2011) |
| 02/24/2011 | 622 | MOTION to Seal Motion Re: Timetable by Azibo Aquart. (Torday, B.) (Entered: 02/24/2011) |
| 02/24/2011 | 623 | SEALED MOTION – Re:Timetable by Azibo Aquart. (Torday, B.) (Entered: 02/24/2011) |
| 02/24/2011 | 625 | Certificate of Service by Azikiwe Aquart as to Azikiwe Aquart, re 617 MOTION for Extension of Time to preview juror questionnaires until March 21, 2011, 618 MOTION to Sever Defendant (Stern, David) Modified on 2/25/2011 to correct filer (Brown, S.). (Entered: 02/24/2011) |
| 02/24/2011 | 626 | RESPONSE/REPLY by Azikiwe Aquart as to Azikiwe Aquart, re 624 Motion for Reconsideration, (Stern, David) Modified on 2/25/2011 to correct link and filers (Brown, S.). (Entered: 02/24/2011) |
| 02/24/2011 | | Reset Deadlines re Motion or Report and Recommendation in case as to Azikiwe Aquart, Azibo Aquart 617 MOTION for Extension of Time to preview juror questionnaires until March 21, 2011, 618 MOTION to Sever Defendant. Motion Hearing set for 2/28/2011 04:00 PM in Courtroom Two, 141 Church St., New Haven, CT before Judge Janet Bond Arterton (Torday, B.) (Entered: 02/25/2011) |
| 02/25/2011 | 627 | TRIAL MEMO *Re The Selection of an Impartial Jury in a Capital Case* by USA as to Azikiwe Aquart, Azibo Aquart (Rodriguez–Coss, Jacabed) (Entered: 02/25/2011) |
| 02/28/2011 | 630 | ORDER Motions to seal granted as the only means to effectuate the Court's Order Re: FireWall attorney procedures 606 Motion to Seal as to Azikiwe Aquart (1); 621 Motion to Seal as to Azibo Aquart (3); 622 Motion to Seal as to Azibo Aquart (3). Signed by Judge Janet Bond Arterton on 2/28/11. (Torday, B.) (Entered: 02/28/2011) |
| 02/28/2011 | 631 | NOTICE *of Appearance on behalf of Third Party Subpoena Recipient the United Illuminating Company* by United Illuminating Company (Shonka, Natalie) Modified on 3/1/2011 to correct filer (Kelsey, N.). (Entered: 02/28/2011) |
| 02/28/2011 | 632 | Third Party MOTION to Quash *Subpoena by Third Party Subpoena Recipient the United Illuminating Company* by United Illuminating Company (Attachments: # 1 Exhibit Subpoena)(Shonka, Natalie) Modified on 3/1/2011 to correct filer (Kelsey, N.). (Entered: 02/28/2011) |
| 02/28/2011 | 633 | ORDER: For the reasons set forth in the Court's bench ruling on February 28, 2011, the following is ordered. Azibo Aquart's Motion 463 for Bill of Particulars is DENIED without prejudice to renew. The Government's Motion 598 for Opening Statement is GRANTED; the Government and each Defendant will be given 20 minutes for an opening statement. Azikiwe Aquart's Motion 617 to Modify Jury Selection Procedures is GRANTED. The Government's Motion 624 for Reconsideration of Order 599 Allocating Additional Peremptory Challenges to Defendants is DENIED. Signed by Judge Janet Bond Arterton on 02/28/2011. (Budris, K.) (Entered: 02/28/2011) |
| 02/28/2011 | 639 | Minute Entry for proceedings held before Judge Janet Bond Arterton:Motion Hearing as to Azikiwe Aquart, Azibo Aquart held on 2/28/2011 re 598 MOTION for Opening Statements filed by USA 617 MOTION for extension of time, Azikiwe Aquart 624 MOTION for reconsideration Total Time: 2 hours(Court Reporter S. Montini.)(Torday, B.) (Entered: 03/03/2011) |

| | | |
|---|---|---|
| 03/01/2011 | 635 | Minute Entry for proceedings held before Judge Janet Bond Arterton:Jury Selection as to Azikiwe Aquart, Azibo Aquart held on 3/1/2011 (2 sessions) Total Time: 1 hours and 20 minutes(Court Reporter S. Montini.)(Torday, B.) (Entered: 03/02/2011) |
| 03/01/2011 | | CJA 30: Authorization to Pay Justin Smith in Death Penalty Proceedings as to Azibo Aquart; Voucher # 110223000015. Interim #21 payment. Signed by Magistrate Judge Joan G. Margolis on 3/1/11. (Inferrera, L.) (Entered: 03/15/2011) |
| 03/02/2011 | 634 | Set Motion Hearing in case as to Azikiwe Aquart, Azibo Aquart 607 SEALED MOTION on Discovery under 12.2 b. TELEPHONE Motion Hearing set for 3/4/2011 03:15 PM before Judge Janet Bond Arterton Government shall initiate the call to chambers at 203–773–2456.(Torday, B.) (Entered: 03/02/2011) |
| 03/02/2011 | 637 | TRANSCRIPT of Proceedings: Type of Hearing: Transcript of Jury Selection, Day One. Held on 3/1/11 before Judge Arterton. Court Reporter: S. Montini. **IMPORTANT NOTICE – REDACTION OF TRANSCRIPTS:** To remove personal identifier information from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within seven (7) calendar days of this date. If no such Notice is filed, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available through PACER without redaction 90 days from today's date. The transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. The policy governing the redaction of personal information is located on the court website at www.ctd.uscourts.gov. Redaction Request due 3/23/2011. Redacted Transcript Deadline set for 4/2/2011. Release of Transcript Restriction set for 5/31/2011. (Montini, S.) (Entered: 03/02/2011) |
| 03/02/2011 | 638 | Minute Entry for proceedings held before Judge Janet Bond Arterton:Jury Selection as to Azikiwe Aquart, Azibo Aquart held on 3/2/2011 Total Time: 1 hours and 10 minutes(Court Reporter S. Montini.)(Torday, B.) (Entered: 03/03/2011) |
| 03/03/2011 | 640 | Minute Entry for proceedings held before Judge Janet Bond Arterton:Jury Selection as to Azikiwe Aquart, Azibo Aquart held on 3/3/2011 Total Time: 1 hours(Court Reporter S. Montini.)(Torday, B.) (Entered: 03/03/2011) |
| 03/03/2011 | 641 | ENTERED IN ERROR: MOTION to Withdraw Document – *United Illuminating's Motion to Quash [Document # 632] and to Withdraw Appearance as Third–Party Subpoena Recipient* by United Illuminating Company as to Azikiwe Aquart, Nathaniel Grant, Azibo Aquart, Efrain Johnson. (Shonka, Natalie) Modified on 3/4/2011; Motion incorrectly docketed on entire case (Kelsey, N.). (Entered: 03/03/2011) |
| 03/03/2011 | 644 | MOTION to Withdraw Document 632 Third Party MOTION to Quash Subpoena by Third Party Subpoena Recipient the United Illuminating Company; MOTION for United Illuminating to withdraw its appearance in the case as to Azibo Aquart. Document No. 641 redocketed to correct defendant's case, to add second motion relief and to link to underlying motion. (Kelsey, N.) Modified on 3/4/2011 (Kelsey, N.). (Entered: 03/04/2011) |
| 03/04/2011 | 645 | TRANSCRIPT of Proceedings: Type of Hearing: Transcript of Hearing on Motions. Held on 2/28/11 before Judge Arterton. Court Reporter: S. Montini. **IMPORTANT NOTICE – REDACTION OF TRANSCRIPTS:** To remove personal identifier information from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within seven (7) calendar days of this date. If no such Notice is filed, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available through PACER without redaction 90 days from today's date. The transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. The policy governing the redaction of personal information is located on the court website at www.ctd.uscourts.gov. Redaction Request due 3/25/2011. Redacted Transcript Deadline set for 4/4/2011. Release of Transcript Restriction set for 6/2/2011. (Montini, S.) (Entered: 03/04/2011) |

**A.25**

| 03/04/2011 | 646 | EX PARTE MOTION *TO DISCLOSUE PRESENTENCE REPORTS AND OTHER PROBATION MATERIALS* by USA as to Azikiwe Aquart, Azibo Aquart. (Reynolds, Alina) (Entered: 03/04/2011) |
|---|---|---|
| 03/04/2011 | 647 | Minute Entry for proceedings held before Judge Janet Bond Arterton:Jury Selection as to Azikiwe Aquart, Azibo Aquart held on 3/4/2011 Total Time: 1 hours and 15 minutes(Court Reporter S. Montini.)(Torday, B.) (Entered: 03/04/2011) |
| 03/04/2011 | 648 | ORDER: Defendant Azikiwe Aquart's 618 Renewed Motion to Sever is DENIED. Signed by Judge Janet Bond Arterton on March 4, 2011. (Kretman, J.) (Entered: 03/04/2011) |
| 03/04/2011 | 652 | Minute Entry for proceedings held before Judge Janet Bond Arterton:Telephone Motion Hearing as to Azibo Aquart held on 3/4/2011 re 609 SEALED MOTION – filed by USA, 607 SEALED MOTION – filed by USA Total Time: 1 hours(Court Reporter Sharon Montini.)(Torday, B.) (Entered: 03/08/2011) |
| 03/07/2011 | 650 | ORDER granting in part 607 Sealed Motion as to Azibo Aquart (3); granting in part 609 Sealed Motion as to Azibo Aquart (3). Signed by Judge Janet Bond Arterton on 3/4/11. (Torday, B.) (Entered: 03/07/2011) |
| 03/07/2011 | 653 | SEALED MOTION Motion In Limine – by Azibo Aquart. (Torday, B.) (Entered: 03/08/2011) |
| 03/07/2011 | 654 | Sealed Document: Withdrawal of Noitce pursuant to Rule 12.2 by Azibo Aquart re 549 Sealed Document – (Torday, B.) (Entered: 03/08/2011) |
| 03/10/2011 | 657 | MOTION for Bill of Particulars by Azibo Aquart. (Sheehan, Michael) (Entered: 03/10/2011) |
| 03/11/2011 | 662 | ENTERED IN ERROR – SEALED MOTION – by USA as to Azikiwe Aquart, Nathaniel Grant, Azibo Aquart, Efrain Johnson. (Barrille, J.) Modified on 3/15/2011 as motion filed on the wrong case (Barrille, J.). (Entered: 03/11/2011) |
| 03/11/2011 | 663 | ENTERED IN ERROR – SEALED ORDER granting 662 Sealed Motion as to Azikiwe Aquart (1), Nathaniel Grant (2), Azibo Aquart (3), Efrain Johnson (4). Signed by Judge William I. Garfinkel on 3/11/11. (Barrille, J.) Modified on 3/15/2011 as order was filed on the wrong case(Barrille, J.) (Entered: 03/11/2011) |
| 03/13/2011 | 664 | MOTION in Limine by Azibo Aquart. (Attachments: # 1 Memorandum in Support)(Smith, Justin) (Entered: 03/13/2011) |
| 03/14/2011 | 665 | NOTICE *OF EXPERT WITNESSES* by USA as to Azikiwe Aquart, Azibo Aquart (Dayton, Tracy) (Entered: 03/14/2011) |
| 03/15/2011 | 706 | SEALED MOTION seal objections – by USA as to Azibo Aquart. (Torday, B.) (Entered: 03/29/2011) |
| 03/15/2011 | 707 | Sealed Document: Firewall Response by USA as to Azibo Aquart re 653 SEALED MOTION Motion In Limine – – (Torday, B.) (Entered: 03/29/2011) |
| 03/17/2011 | 669 | Memorandum in Opposition by USA as to Azikiwe Aquart, Azibo Aquart re 664 MOTION in Limine, 661 MOTION in Limine *And Memorandum in Support of Motions to Admit Evidence* (Dayton, Tracy) (Entered: 03/17/2011) |
| 03/17/2011 | 670 | MOTION to Seal CJA Motion by Azibo Aquart. (Sheehan, Michael) (Entered: 03/17/2011) |
| 03/17/2011 | 672 | SEALED MOTION to Incur Expenses by Azibo Aquart. (Inferrera, L.) (Entered: 03/17/2011) |
| 03/21/2011 | 673 | Minute Entry for proceedings held before Judge Janet Bond Arterton:Jury Selection as to Azikiwe Aquart, Azibo Aquart held on 3/21/2011 Total Time: 8 hours(Court Reporter Sharon Montini.)(Torday, B.) (Entered: 03/22/2011) |
| 03/21/2011 | 682 | SEALED MOTION Motion and Order for Transfer of Custody – by USA as to Azikiwe Aquart, Azibo Aquart. (Torday, B.) (Entered: 03/24/2011) |
| 03/22/2011 | 674 | ORDER: granting 672 Motion to Incur Expenses as to Azibo Aquart (3). Signed by Judge Joan G. Margolis on 3/22/2011. (Rodko, B.) (Entered: 03/22/2011) |

**A.26**

| 03/22/2011 | 678 | Minute Entry for proceedings held before Judge Janet Bond Arterton:Jury Selection as to Azikiwe Aquart, Azibo Aquart held on 3/22/2011, continued to 3/23/11 at 8:30am Total Time: 9 hours and 30 minutes(Court Reporter Sharon Montini.)(Torday, B.) (Entered: 03/23/2011) |
|---|---|---|
| 03/23/2011 | 675 | ENTERED IN ERROR: MOTION Challenge to Juror 413 by Azibo Aquart. (Sheehan, Michael) Modified on 3/24/2011; Document is not a Motion (Kelsey, N.). (Entered: 03/23/2011) |
| 03/23/2011 | 676 | ENTERED IN ERROR: MOTION Challenge to Juror 11 by Azibo Aquart. (Sheehan, Michael) Modified on 3/24/2011; document is not a Motion (Kelsey, N.). (Entered: 03/23/2011) |
| 03/23/2011 | 677 | ENTERED IN ERROR: MOTION Oppposition to Challenge to Juror 17 by Azibo Aquart. (Sheehan, Michael) Modified on 3/24/2011; Document is Not a Motion (Kelsey, N.). (Entered: 03/23/2011) |
| 03/23/2011 | 680 | Response in Opposition to 685 Defendants' Challenge to Juror #413 as to Azikiwe Aquart, Azibo Aquart, by USA. (Reynolds, Alina) Modified on 3/24/2011: corrected event, corrected link to underlying document and corrected docket entry text (Kelsey, N.). (Entered: 03/23/2011) |
| 03/23/2011 | 684 | Minute Entry for proceedings held before Judge Janet Bond Arterton:Jury Selection as to Azikiwe Aquart, Azibo Aquart held on 3/23/2011 continued to 3/24 at 9:30am Total Time: 9 hours(Court Reporter Sharon Montini.)(Torday, B.) (Entered: 03/24/2011) |
| 03/23/2011 | 685 | Defense Challenge for Cause to Juror No. 413 by Azikiwe Aquart, Azibo Aquart; Document No. 675 redocketed on correct defendants cases. (Kelsey, N.) (Entered: 03/24/2011) |
| 03/23/2011 | 686 | Defense Challenge for Cause to Juror No. 11 by Azikiwe Aquart, Azibo Aquart; Document No. 676 redocketed on correct defendants' cases. (Kelsey, N.) (Entered: 03/24/2011) |
| 03/23/2011 | 687 | Defense Opposition to Government's Challenge to Juror No. 17 by Azikiwe Aquart, Azibo Aquart ; Document No. 677 redocketed on correct defendants' cases. (Kelsey, N.) (Entered: 03/24/2011) |
| 03/23/2011 | 689 | ORDER granting 682 Sealed Motion as to Azikiwe Aquart (1), Azibo Aquart (3). Signed by Judge Janet Bond Arterton on 3/23/11. (Torday, B.) (Entered: 03/24/2011) |
| 03/24/2011 | 681 | ENTERED IN ERROR: MOTION Opposition to Jury Challenge by Azibo Aquart. (Sheehan, Michael) Modified on 3/24/2011; Document is Not a Motion (Kelsey, N.). (Entered: 03/24/2011) |
| 03/24/2011 | 683 | RESPONSE/REPLY by USA as to Azikiwe Aquart, Azibo Aquart re 686 Defendants' Challenge to Juror No. 11 (Rodriguez–Coss, Jacabed) Modified on 3/24/2011 to correct link to underlying document (Kelsey, N.). (Entered: 03/24/2011) |
| 03/24/2011 | 688 | Defense Opposition to Government's Challenge for Cause to Juror No. 69 and Defense Challenge for Cause to Juror No. 91, by Azikiwe Aquart, Azibo Aquart. Document No. 681 redocketed on correct defendants' cases. (Kelsey, N.) (Entered: 03/24/2011) |
| 03/24/2011 | 690 | GOVERNMENTS Response to 687 Defense Opposition to Government's Challenge to Juror No. 17 by USA as to Azikiwe Aquart, Azibo Aquart. (Dayton, Tracy) Modified on 3/25/2011 to correct event and edit docket entry text (Kelsey, N.). (Entered: 03/24/2011) |
| 03/24/2011 | 693 | Minute Entry for proceedings held before Judge Janet Bond Arterton:Jury Selection as to Azikiwe Aquart, Azibo Aquart held on 3/24/2011, continued until 3/25/11 at 9:30am Total Time: 6 hours and 30 minutes(Court Reporter Sharon Montini.)(Torday, B.) (Entered: 03/25/2011) |
| 03/25/2011 | 691 | RESPONSE/REPLY by Azikiwe Aquart, Azibo Aquart as to Azikiwe Aquart, Azibo Aquart*DEFENSE CHALLENGE FOR CAUSE TO JUROR NO. 96* (Sheehan, Michael) Modified on 3/28/2011 to remove incorrect defendants' names (Kelsey, N.). (Entered: 03/25/2011) |

**A.27**

| 03/25/2011 | 692 | Certificate of Service by Azikiwe Aquart, Azibo Aquart re 688 Reply/Response Misc *Defendants Opposition to Governments Challenge for Cause to Juror No. 69 and Defense Challenge for Cause to Juror No. 91* (Sheehan, Michael) (Entered: 03/25/2011) |
|---|---|---|
| 03/25/2011 | 702 | Minute Entry for proceedings held before Judge Janet Bond Arterton:Jury Selection as to Azikiwe Aquart, Azibo Aquart held on 3/25/2011, continued to 3/28/11 at 8:30am Total Time: 9 hours and 30 minutes(Court Reporter Sharon Montini.)(Torday, B.) (Entered: 03/28/2011) |
| 03/26/2011 | 694 | RESPONSE/REPLY by Azibo Aquart as to Azikiwe Aquart, Azibo Aquart *DEFENSE CHALLENGE FOR CAUSE TO JUROR NO. 196* (Sheehan, Michael) (Main Document 694 replaced on 4/1/2011 to correct missing electronic signature) (Kelsey, N.) (Entered: 03/26/2011) |
| 03/26/2011 | 695 | MOTION Strike Juror 258 for Cause by USA as to Azikiwe Aquart, Azibo Aquart. (Dayton, Tracy) (Entered: 03/26/2011) |
| 03/27/2011 | 696 | MOTION Strike Juror 215 for cause by USA as to Azikiwe Aquart, Azibo Aquart. (Dayton, Tracy) (Entered: 03/27/2011) |
| 03/27/2011 | 697 | MOTION to Sever Defendant by Azibo Aquart. (Sheehan, Michael) (Entered: 03/27/2011) |
| 03/27/2011 | 698 | RESPONSE/REPLY by Azibo Aquart as to Azikiwe Aquart, Azibo Aquart re 695 Motion for Miscellaneous Relief *Objection to Motion to Strike Juror 258* (Sheehan, Michael) (Entered: 03/27/2011) |
| 03/28/2011 | 699 | MOTION to Strike *Juror #69 for Cause* by USA as to Azikiwe Aquart, Azibo Aquart. (Rodriguez−Coss, Jacabed) (Entered: 03/28/2011) |
| 03/28/2011 | 700 | MOTION Motion to Strike Juror 31 by USA as to Azikiwe Aquart, Azibo Aquart. (Reynolds, Alina) (Entered: 03/28/2011) |
| 03/28/2011 | 703 | ORDER withdrawing 632 Motion to Quash as to Azibo Aquart (3); granting 644 Motion to Withdraw Document#32 as to Azibo Aquart (3); granting 644 Motion to withdraw appearance as to Azibo Aquart (3). Signed by Judge Janet Bond Arterton on 3/28/11. (Torday, B.) (Entered: 03/28/2011) |
| 03/28/2011 | | Attorney update in case as to Azikiwe Aquart, Nathaniel Grant, Azibo Aquart, Efrain Johnson. Attorney Natalie Nicole Shonka terminated. (Torday, B.) (Entered: 03/28/2011) |
| 03/28/2011 | 704 | Response by USA as to Azikiwe Aquart, Azibo Aquart re 688 Defense Opposition to Government's Challenge for Cause to Juror No. 69 and Defense Challenge for Cause to Juror No. 91 (Rodriguez−Coss, Jacabed) Modified on 3/29/2011 to correct underlying link and edit docket entry text (Kelsey, N.). (Entered: 03/28/2011) |
| 03/28/2011 | 708 | Minute Entry for proceedings held before Judge Janet Bond Arterton:Jury Selection as to Azikiwe Aquart, Azibo Aquart held on 3/28/2011, contnued to 3/29/11 8:20am Total Time: 10 hours and 30 minutes(Court Reporter Sharon Montini.)(Torday, B.) (Entered: 03/29/2011) |
| 03/29/2011 | 705 | RESPONSE/REPLY by Azibo Aquart as to Azikiwe Aquart, Azibo Aquart re 700 Motion for Miscellaneous Relief (Sheehan, Michael) (Entered: 03/29/2011) |
| 03/29/2011 | 709 | Minute Entry for proceedings held before Judge Janet Bond Arterton:Jury Selection as to Azikiwe Aquart, Azibo Aquart held on 3/29/2011, until 3/30/11 Total Time: 10 hours and 30 minutes(Court Reporter Sharon Montini.)(Torday, B.) (Entered: 03/30/2011) |
| 03/30/2011 | 712 | NOTICE OF E−FILED CALENDAR as to Azibo Aquart: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. Telephone Conference on Discovery request from firewall attorney set for 4/5/2011 09:00 AM before Judge Janet Bond Arterton (Torday, B.) (Entered: 03/31/2011) |
| 03/30/2011 | 713 | Minute Entry for proceedings held before Judge Janet Bond Arterton:Jury Selection as to Azikiwe Aquart, Azibo Aquart held on 3/30/2011, continued to 3/31/11 for |

| | | |
|---|---|---|
| | | Azibo Aquart only. Oral open end speedy trial waiver by Azikiwe Aquart, GRANTED. Total Time: 8 hours(Court Reporter Sharon Montini.)(Torday, B.) (Entered: 03/31/2011) |
| 03/30/2011 | 724 | ORAL ORDER granting, absent objection from government 697 Motion to Sever Defendant as to Azibo Aquart (3). Signed by Judge Janet Bond Arterton on 3/30/11. (Torday, B.) (Entered: 04/05/2011) |
| 03/31/2011 | 710 | RESPONSE/REPLY by Azibo Aquart *Request to Reconsider Challenge to Juror 392* (Sheehan, Michael) (Entered: 03/31/2011) |
| 03/31/2011 | 720 | Minute Entry for proceedings held before Judge Janet Bond Arterton:Jury Selection as to Azibo Aquart held on 3/31/2011, continued to 4/4/11 at 8:30am Total Time: 6 hours and 30 minutes(Court Reporter Sharon Montini.)(Torday, B.) (Entered: 04/04/2011) |
| 04/01/2011 | 716 | Memorandum in Opposition by USA as to Azibo Aquart re 657 MOTION for Bill of Particulars (Rodriguez–Coss, Jacabed) (Entered: 04/01/2011) |
| 04/03/2011 | 717 | RESPONSE/REPLY by Azibo Aquart *Challenge to Juror 451* (Sheehan, Michael) (Entered: 04/03/2011) |
| 04/03/2011 | 718 | RESPONSE/REPLY by Azibo Aquart *Challenge to Juror 420* (Sheehan, Michael) (Entered: 04/03/2011) |
| 04/03/2011 | 719 | RESPONSE/REPLY by Azibo Aquart *Challenge to Juror 445* (Sheehan, Michael) (Entered: 04/03/2011) |
| 04/04/2011 | 721 | MOTION Motion to Qualify Juror 420 by USA as to Azibo Aquart. (Rodriguez–Coss, Jacabed) (Entered: 04/04/2011) |
| 04/04/2011 | 722 | SEALED MOTION to Incur Expenses Re: Transcripts by Azibo Aquart. (Torday, B.) (Entered: 04/05/2011) |
| 04/04/2011 | 723 | REPLY TO RESPONSE to Motion by Azibo Aquart re 653 SEALED MOTION Motion In Limine – (Torday, B.) (Entered: 04/05/2011) |
| 04/04/2011 | 729 | Minute Entry for proceedings held before Judge Janet Bond Arterton:Jury Selection as to Azibo Aquart held on 4/4/2011, continued to 4/6/11. Total Time: 10 hours(Court Reporter S. Montini.)(Torday, B.) (Entered: 04/05/2011) |
| 04/05/2011 | 725 | ORDER: In light of Defendant Azibo Aquart's withdrawal of his Fed. R. Crim. P. 12.2 Notice and after colloquy with counsel about the nature and scope of the Shannon testimony identified in Defendant's 653 Motion in Limine, the Government 707 Response requesting that the Court's order be renewed to require discovery to be provided to the firewall team and to allow Government experts to examine and evaluate Defendant for the conditions asserted in Defendant's 12.2.(b)(2) notice is DENIED for the reasons of record. Signed by Judge Janet Bond Arterton on 4/5/2011. (Kretman, J.) (Entered: 04/05/2011) |
| 04/05/2011 | 727 | RESPONSE/REPLY by Azibo Aquart *Reply to 721 Challenge to Juror 420* (Sheehan, Michael) Modified on 4/7/2011 to add link to underlying motion (Kelsey, N.). (Entered: 04/05/2011) |
| 04/05/2011 | 728 | RESPONSE/REPLY by Azibo Aquart *Request to reconsider Challenge to Juror 529* (Sheehan, Michael) (Entered: 04/05/2011) |
| 04/05/2011 | 730 | ORDER granting 722 Motion to Incur Expenses as to Azibo Aquart (3). Signed by Judge Janet Bond Arterton on 4/5/11. (Torday, B.) (Entered: 04/05/2011) |
| 04/05/2011 | 731 | RESPONSE/REPLY by Azibo Aquart *Request for reconsideration on Challenge to Juror 518* (Sheehan, Michael) (Entered: 04/05/2011) |
| 04/05/2011 | 732 | RESPONSE/REPLY by Azibo Aquart *Request for Reconsideration on Challenge to Juror 525* (Sheehan, Michael) (Entered: 04/05/2011) |
| 04/05/2011 | 733 | First MOTION To excuse Juror 552 by USA as to Azibo Aquart. (Dayton, Tracy) (Entered: 04/05/2011) |

| 04/06/2011 | 734 | Minute Entry for proceedings held before Judge Janet Bond Arterton:Voir Dire begun on 4/6/2011 Azibo Aquart (3) on Count 1sss,2sss−4sss,5sss−7sss,8sss,10sss, Jury Selection as to Azibo Aquart held on 4/6/2011, CONTINUED TO 4/11/11 Total Time: 6 hours and 30 minutes(Court Reporter S.)(Torday, B.) Modified on 6/8/2011 to edit text(Walker, J.). (Entered: 04/06/2011) |
|---|---|---|
| 04/06/2011 | | CJA 30: Authorization to Pay Justin T. Smith in Death Penalty Proceedings as to Azibo Aquart; Voucher # 110328000015. Interim #22 payment. Signed by Magistrate Judge Joan G. Margolis on 4/6/11. (Inferrera, L.) (Entered: 04/21/2011) |
| 04/08/2011 | 735 | MOTION to Seal CJA Motion by Azibo Aquart. (Sheehan, Michael) (Entered: 04/08/2011) |
| 04/08/2011 | 736 | MOTION to Unseal Document *Court Conference and for Copy of Transcript* by USA as to Azibo Aquart. (Rodriguez−Coss, Jacabed) (Entered: 04/08/2011) |
| 04/08/2011 | 737 | MOTION Reply to Juror No. 392 re 710 Reply/Response Misc by USA as to Azibo Aquart. (Markle, Peter) (Entered: 04/08/2011) |
| 04/08/2011 | 740 | SEALED CJA MOTION − by Azibo Aquart. (Pesta, J.) (Entered: 04/11/2011) |
| 04/09/2011 | 739 | RESPONSE/REPLY by Azibo Aquart re 736 Motion to Unseal Document *Objection to Government Motion* (Sheehan, Michael) (Entered: 04/09/2011) |
| 04/11/2011 | 742 | Minute Entry for proceedings held before Judge Janet Bond Arterton:Jury Selection as to Azibo Aquart held on 4/11/2011 Total Time: 6 hours(Court Reporter S. Montini.)(Torday, B.) (Entered: 04/11/2011) |
| 04/12/2011 | 743 | Minute Entry for proceedings held before Judge Janet Bond Arterton:Jury Selection as to Azibo Aquart held on 4/12/2011,fINAL JURY SELECTION 4/19/11 AT 8:30A.M. ( Pretrial Conference set for 4/14/2011 09:00 AM in Courtroom Two, 141 Church St., New Haven, CT before Judge Janet Bond Arterton) Total Time: 4 hours(Court Reporter Sharon Montini.)(Torday, B.) (Entered: 04/12/2011) |
| 04/13/2011 | 744 | RESPONSE/REPLY by Azibo Aquart re 669 Memorandum in Opposition to Motion *Government's Motion in Limine* (Smith, Justin) (Entered: 04/13/2011) |
| 04/14/2011 | 747 | Minute Entry for proceedings held before Judge Janet Bond Arterton: denying,see order[#633] 463 Motion to Compel as to Azibo Aquart (3); granting 608 Motion to Seal as to Azibo Aquart (3); granting 610 Motion to Seal as to Azibo Aquart (3); granting 646 ExParte Motion as to Azibo Aquart (3); granting in part and denying in part 657 Motion for Bill of Particulars as to Azibo Aquart (3); denying 664 Motion in Limine as to Azibo Aquart (3); denying 736 Motion to Unseal Document as to Azibo Aquart (3); Motion Hearing as to Azibo Aquart held on 4/14/2011 re 609 SEALED MOTION − filed by USA. Deadlines set: Expert Report for guilt phase due 4/15/11; Defendant obj. to photos due 4/15/11; Deft. objection [#744] to govt's intent to introduce statements against penal interest by E. Johnson(Under Advisement) Total Time: 3 hours and 30 minutes(Court Reporter S. Montini.) (Torday, B.) (Entered: 04/14/2011) |
| 04/14/2011 | 748 | ORDER denying 695 Motion Strike Juror 258 as to Azibo Aquart (3); granting 696 Motion Strike Juror 215 as to Azibo Aquart (3); granting 699 Motion to StrikeJuror 69 as to Azibo Aquart (3); granting 700 Motion Strike Juror 31 as to Azibo Aquart (3); granting 721 Motion Strike Juror 420 as to Azibo Aquart (3); denying 733 Motion Strike Juror 552 as to Azibo Aquart (3); finding as moot 737 Motion Strike Juror 392 as to Azibo Aquart (3). Signed by Judge Janet Bond Arterton on 4/14/11. (Torday, B.) (Entered: 04/14/2011) |
| 04/15/2011 | 749 | ORDER granting 740 Sealed Motion as to Azibo Aquart (3). Signed by Judge Joan G. Margolis on 4/14/11. (Torday, B.) (Entered: 04/15/2011) |
| 04/15/2011 | 750 | First MOTION to Preclude *testimony regarding polygraph examination reports* by USA as to Azibo Aquart. (Dayton, Tracy) (Entered: 04/15/2011) |
| 04/18/2011 | 754 | Minute Entry for proceedings held before Judge Janet Bond Arterton:Telephone Status Conference as to Azibo Aquart held on 4/18/2011 Total Time: 1 hours(Court Reporter s.)(Torday, B.) (Entered: 04/21/2011) |

| 04/19/2011 | 751 | Minute Entry for proceedings held before Judge Janet Bond Arterton:FINAL Jury Selection as to Azibo Aquart held on 4/19/2011, TRIAL TO START 4/20/11 AT 8:30AM. Total Time: 4 hours(Court Reporter S. Montini.)(Torday, B.) (Entered: 04/19/2011) |
|---|---|---|
| 04/20/2011 | 752 | Minute Entry for proceedings held before Judge Janet Bond Arterton:Jury Trial as to Azibo Aquart held on 4/20/2011 Jury Trial Continued Until 4/21/11 at 9:30am Total Time: 7 hours and 15 minutes(Court Reporter S. Montini.)(Torday, B.) (Entered: 04/21/2011) |
| 04/21/2011 | 753 | ORDER: The Government's 750 Motion to Preclude Testimony Regarding Polygraph Examination Reports is GRANTED, absent objection and for good cause shown. Signed by Judge Janet Bond Arterton on 4/21/11. (Kretman, J.) (Entered: 04/21/2011) |
| 04/21/2011 | 755 | Minute Entry for proceedings held before Judge Janet Bond Arterton:Jury Trial as to Azibo Aquart held on 4/21/2011 Jury Trial Continued Until 4/25/11 at 9:30am Total Time: 5 hours and 30 minutes(Court Reporter S. Montini.)(Torday, B.) (Entered: 04/21/2011) |
| 04/21/2011 | 756 | NOTICE *of Supplemental Disclosure Pursuant to Fed.R.Crim.P. 16(b)* by Azibo Aquart (Smith, Justin) (Entered: 04/21/2011) |
| 04/22/2011 | 757 | Motion regarding Admissibility of Grand Jury Transcript by Azibo Aquart *Trial (Sheehan, Michael) Modified on 4/25/2011 to correct event(Kelsey, N.). (Entered: 04/22/2011)* |
| 04/22/2011 | 758 | Motion to *Withdraw Defendant Azibo Aquart's 756 Supplemental Disclosure Pursuant to Fed.R.Crim.P. 16(b)* by Azibo Aquart re 756 Notice (Other) (Smith, Justin) Modified on 4/25/2011 to correct event (Kelsey, N.). (Entered: 04/22/2011) |
| 04/22/2011 | 759 | NOTICE *Defendant Azibo Aquart's Supplemental Disclosure Pursuant to Fed.R.Crim.P. 16(b) date 4.22.11* by Azibo Aquart (Smith, Justin) (Entered: 04/22/2011) |
| 04/22/2011 | 760 | *Motion to Modify sequestration Order* by Azibo Aquart (Sheehan, Michael) Modified on 4/25/2011 to correct event (Kelsey, N.). (Entered: 04/22/2011) |
| 04/25/2011 | 761 | ORDER Premitting defense mitigation specialist and paralegal to bring electronic equipment into Court as to Azibo Aquart. Signed by Judge Janet Bond Arterton on 4/25/11. (Torday, B.) (Entered: 04/25/2011) |
| 04/25/2011 | 762 | ORDER: Defendant Azibo Aquart's 760 Motion for Modification of the Sequestration Order is GRANTED as set forth on the record of April 25, 2011. Signed by Judge Janet Bond Arterton on 4/25/2011. (Kretman, J.) (Entered: 04/25/2011) |
| 04/25/2011 | 764 | Minute Entry for proceedings held before Judge Janet Bond Arterton:Jury Trial as to Azibo Aquart held on 4/25/2011 Jury Trial Continued Until 4/26/11 at 9:30am Total Time: 7 hours(Court Reporter S. Montini.)(Torday, B.) (Entered: 04/26/2011) |
| 04/26/2011 | 763 | Proposed Jury Instructions by Azibo Aquart (Smith, Justin) (Entered: 04/26/2011) |
| 04/26/2011 | 765 | Minute Entry for proceedings held before Judge Janet Bond Arterton:Jury Trial as to Azibo Aquart held on 4/26/2011 Jury Trial Continued Until 4/27/11 AT 9:30AM Total Time: 5 hours and 30 minutes(Court Reporter S. Montini.)(Torday, B.) (Entered: 04/26/2011) |
| 04/27/2011 | 766 | MOTION To Admit Coconspirator Statements by USA as to Azibo Aquart. (Dayton, Tracy) (Entered: 04/27/2011) |
| 04/27/2011 | 767 | TRIAL MEMO *Concerning Impeachment of Government Witnesses by Agent Reports and Notes* by USA as to Azibo Aquart (Reynolds, Alina) (Entered: 04/27/2011) |
| 04/27/2011 | 771 | Minute Entry for proceedings held before Judge Janet Bond Arterton:Jury Trial as to Azibo Aquart held on 4/27/2011 Jury Trial Continued Until 4/28/11 AT 9:30AM Total Time: 6 hours(Court Reporter Sharon Montini.)(Torday, B.) (Entered: 04/29/2011) |
| 04/28/2011 | 768 | SEALED MOTION Motion In Limine – by Azibo Aquart. (Torday, B.) (Entered: 04/28/2011) |

**A.31**

| 04/28/2011 | 769 | ORDER: For the reasons set forth on the record on April 28, 2011, the Government's 766 Motion to Admit Co–conspirator Statements is GRANTED, and Defendant's 768 Motion in Limine is GRANTED in part and DENIED in part. Signed by Judge Janet Bond Arterton on 4/28/2011. (Kretman, J.) (Entered: 04/28/2011) |
|---|---|---|
| 04/28/2011 | 770 | Minute Entry for proceedings held before Judge Janet Bond Arterton:Jury Trial as to Azibo Aquart held on 4/28/2011 Jury Trial Continued Until 4/29/11 AT 9:30AM Total Time: 5 hours and 30 minutes(Court Reporter Sharon Montini.)(Torday, B.) (Entered: 04/29/2011) |
| 04/29/2011 | 772 | MOTION in Limine to allow cross–examination regarding prior conduct of witness by Azibo Aquart. (Torday, B.) (Entered: 04/29/2011) |
| 04/29/2011 | 774 | Minute Entry for proceedings held before Judge Janet Bond Arterton:Jury Trial as to Azibo Aquart held on 4/29/2011 Jury Trial Continued Until 5/2/11 AT 9:30AM Total Time: 6 hours and 30 minutes(Court Reporter Sharon Montini.)(Torday, B.) (Entered: 05/02/2011) |
| 05/02/2011 | 773 | Proposed Jury Instructions by Azibo Aquart (Sheehan, Michael) (Entered: 05/02/2011) |
| 05/02/2011 | 775 | Minute Entry for proceedings held before Judge Janet Bond Arterton:Jury Trial as to Azibo Aquart held on 5/2/2011 Jury Trial Continued Until 5/3/11 at 9:30am Total Time: 6 hours and 10 minutes(Court Reporter S. Montini.)(Torday, B.) (Entered: 05/02/2011) |
| 05/03/2011 | 778 | MOTION In Limine To exclude use of prior convictions outside FRE 609 by USA as to Azibo Aquart. (Dayton, Tracy) Modified on 5/4/2011 to correct motion event(Kelsey, N.) (Entered: 05/03/2011) |
| 05/03/2011 | 781 | Proposed Jury Instructions by USA as to Azibo Aquart (Dayton, Tracy) (Main Document 781 replaced on 5/5/2011) (Kelsey, N.). (Entered: 05/03/2011) |
| 05/03/2011 | 782 | Minute Entry for proceedings held before Judge Janet Bond Arterton:Jury Trial as to Azibo Aquart held on 5/3/2011 Jury Trial Continued Until 5/4/11 at 9:30am Total Time: 6 hours(Court Reporter S. Montini.)(Torday, B.) (Entered: 05/04/2011) |
| 05/04/2011 | 783 | Minute Entry for proceedings held before Judge Janet Bond Arterton:Jury Trial as to Azibo Aquart held on 5/4/2011 Jury Trial Continued Until 5/5/11 AT 9AM Total Time: 6 hours(Court Reporter Sharon Montini.)(Torday, B.) (Entered: 05/04/2011) |
| 05/05/2011 | 784 | SEALED MOTION to Incur Expenses re Transportation and Lodging of Witnesses by Azibo Aquart. (Kelsey, N.) (Entered: 05/05/2011) |
| 05/05/2011 | 785 | Docket Entry Correction as to Azibo Aquart re 781 Proposed Jury Instructions/Request to Charge: Corrected pdf. (Kelsey, N.) (Entered: 05/05/2011) |
| 05/05/2011 | 911 | Minute Entry for proceedings held before Judge Janet Bond Arterton:Jury Trial as to Azibo Aquart held on 5/5/2011 AT 5/9/11 AT 9:30AM Total Time: 5 hours and 30 minutes(Court Reporter S. Montini.)(Torday, B.) (Entered: 06/02/2011) |
| 05/06/2011 | 786 | SEALED MOTION to Incur Expenses re: Expert Witness by Azibo Aquart. (Kelsey, N.) (Entered: 05/06/2011) |
| 05/09/2011 | 787 | Minute Entry for proceedings held before Judge Janet Bond Arterton:Jury Trial as to Azibo Aquart held on 5/9/2011 Jury Trial Continued Until 5/10/11 AT 9:30AM Total Time: 6 hours(Court Reporter Sharon Montini.)(Torday, B.) (Entered: 05/09/2011) |
| 05/09/2011 | 788 | MOTION to Preclude *Evidence That DNA Results Were reviewed by a Second Examiner* by Azibo Aquart. (Sheehan, Michael) (Entered: 05/09/2011) |
| 05/10/2011 | 789 | ORDER: granting 786 Motion to Incur Expenses as to Azibo Aquart (3). Signed by Judge Joan G. Margolis on 5/10/2011. (Rodko, B.) (Entered: 05/10/2011) |
| 05/10/2011 | 790 | MOTION to Preclude *Testimony of Thomas Martin* by Azibo Aquart. (Smith, Justin) (Main Document 790 replaced on 5/12/2011) (Kelsey, N.). (Entered: 05/10/2011) |
| 05/10/2011 | 791 | Minute Entry for proceedings held before Judge Janet Bond Arterton:Jury Trial as to Azibo Aquart held on 5/10/2011 Jury Trial Continued Until 5/11/11 @ 9:30am Total Time: 6 hours(Court Reporter Sharon Montini.)(Torday, B.) (Entered: 05/11/2011) |

**A.32**

| 05/11/2011 | 792 | ORDER: Defendant's 788 Motion to Preclude is GRANTED by agreement of the parties on the terms set forth on the record. Signed by Judge Janet Bond Arterton on 5/11/2011. (Kretman, J.) (Entered: 05/11/2011) |
| --- | --- | --- |
| 05/11/2011 | 793 | MOTION To Quash Subpoena Issued to Connecticut State Laboratory by USA as to Azibo Aquart. (Attachments: # 1 Exhibit May 19, 2008 Discovery Letter, # 2 Exhibit Defense email)(Dayton, Tracy) Modified on 5/12/2011 to correct motion event (Kelsey, N.). (Entered: 05/11/2011) |
| 05/11/2011 | 795 | Oral MOTION for contempt as to Christine Roy for failure to produce records. by Azibo Aquart. (Torday, B.) (Entered: 05/12/2011) |
| 05/11/2011 | 796 | Minute Entry for proceedings held before Judge Janet Bond Arterton:Jury Trial as to Azibo Aquart held on 5/11/2011 Jury Trial Continued Until 5/12/11 9am Total Time: 6 hours(Court Reporter Sharon Montini.)(Torday, B.) (Entered: 05/12/2011) |
| 05/12/2011 | 794 | Docket Entry Correction as to Azibo Aquart re 790 MOTION to Preclude Testimony of Thomas Martin: Corrected pdf to include electronic signature. (Kelsey, N.) (Entered: 05/12/2011) |
| 05/12/2011 | 798 | Minute Entry for proceedings held before Judge Janet Bond Arterton:Jury Trial as to Azibo Aquart held on 5/12/2011 Jury Trial Continued Until 5/13 @ 9:30am Total Time: 3 hours and 30 minutes(Court Reporter Sharon Montini.)(Torday, B.) (Entered: 05/13/2011) |
| 05/13/2011 | 797 | MOTION to Preclude *Admission of Summary Chart* by Azibo Aquart. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Smith, Justin) (Entered: 05/13/2011) |
| 05/13/2011 | 799 | ORDER granting 784 Motion to Incur Expenses as to Azibo Aquart (3). Signed by Judge Joan G. Margolis on 5/13/11. (Pesta, J.) (Entered: 05/13/2011) |
| 05/13/2011 | 800 | Minute Entry for proceedings held before Judge Janet Bond Arterton:Jury Trial as to Azibo Aquart held on 5/13/2011 Jury Trial Continued Until 5/16 at 9:30am Total Time: 6 hours(Court Reporter S. Montini.)(Torday, B.) (Entered: 05/13/2011) |
| 05/13/2011 | 857 | Minute Entry for proceedings held before Judge Janet Bond Arterton:Charge Conference as to Azibo Aquart held on 5/13/2011 Total Time: 2 hours(Court Reporter S. Montini.)(Torday, B.) (Entered: 05/25/2011) |
| 05/14/2011 | 801 | MOTION in Limine *to Introduce Prior Inconsistent Statements of Witnesses* by Azibo Aquart. (Attachments: # 1 Memorandum in Support)(Smith, Justin) (Entered: 05/14/2011) |
| 05/15/2011 | 802 | MOTION in Limine *To Exclude Extrinsic Evidence of Prior Inconsistent Statements* by USA as to Azibo Aquart. (Rodriguez−Coss, Jacabed) (Entered: 05/15/2011) |
| 05/16/2011 | 803 | MOTION for Discovery by Azibo Aquart. (Sheehan, Michael) (Entered: 05/16/2011) |
| 05/16/2011 | 804 | ORDER: Defendant's 757 Motion to Admit a Portion of Leroy Whittingham's Grand Jury testimony is GRANTED as set forth on the record of May 13, 2011; Defendant's 790 Motion to Preclude Thomas Martin from testifying is DENIED as moot, given the Government's representation that it will not call Martin as a witness during the guilt phase of the trial; the Government's 793 Motion to Quash the subpoena of Christine Roy is DENIED; Defendant's oral Motion for Contempt is DENIED given Roy's compliance with the subpoena; and Defendant's 803 Motion for Discovery is DENIED by agreement of the parties. Signed by Judge Janet Bond Arterton on 5/16/2011. (Kretman, J.) (Entered: 05/16/2011) |
| 05/16/2011 | 805 | ORAL MOTION to Seal Notification of Expert Witness by Azibo Aquart. (Villano, P.) (Entered: 05/17/2011) |
| 05/16/2011 | 806 | Minute Entry for proceedings held before Judge Janet Bond Arterton: granting 805 Motion to Seal as to Azibo Aquart (3); Jury Trial as to Azibo Aquart held on 5/16/2011 Jury Trial Continued Until 5/17/2011 at 9:30 a.m.. Total Time: 6 hours and 10 minutes(Court Reporter Montini, Sharon.) (Villano, P.) (Entered: 05/17/2011) |
| 05/16/2011 | 807 | Sealed Document: Notification of Expert Witness by Azibo Aquart − (Villano, P.) (Entered: 05/17/2011) |

| 05/17/2011 | 809 | ORAL MOTION for Judgment of Acquittal by Azibo Aquart. (Villano, P.) (Entered: 05/18/2011) |
|---|---|---|
| 05/17/2011 | 810 | Minute Entry for proceedings held before Judge Janet Bond Arterton: denying without prejudice 809 Oral Motion for Judgment of Acquittal as to Azibo Aquart (3); Jury Selection as to Azibo Aquart held on 5/17/2011. Total Time: 5 hours and 30 minutes(Court Reporter Montini, Sharon.) (Villano, P.) (Villano, P.). (Entered: 05/18/2011) |
| 05/17/2011 | 813 | Docket Entry Correction as to Azibo Aquart re 810 Minute Entry. Added pdf to Docket Entry (Villano, P.) (Entered: 05/19/2011) |
| 05/18/2011 | 808 | TRIAL MEMO *In Support of Impeachment by Omission* by Azibo Aquart (Attachments: # 1 Exhibit A)(Sheehan, Michael) (Entered: 05/18/2011) |
| 05/18/2011 | 811 | Motion to Permit Defense to ask Leading Questions of Government Agents under Rule 611(c) by Azibo Aquart (Sheehan, Michael) Modified on 5/19/2011 to correct event (Kelsey, N.). (Entered: 05/18/2011) |
| 05/18/2011 | 812 | TRIAL MEMO Re: Alternate Jurors by USA as to Azibo Aquart. (Markle, Peter) Modified on 5/19/2011: Document Is Not a Motion (Kelsey, N.). (Entered: 05/18/2011) |
| 05/18/2011 | 814 | Minute Entry for proceedings held before Judge Janet Bond Arterton:Jury Trial as to Azibo Aquart held on 5/18/2011 Jury Trial Continued Until 5/20/2011 at 9:30 a.m. Total Time: 3 hours and 0 minutes(Court Reporter Montini, Sharon.)(Villano, P.) (Entered: 05/19/2011) |
| 05/18/2011 | 815 | Minute Entry for proceedings held before Judge Janet Bond Arterton:Charging Conference as to Azibo Aquart held on 5/18/2011 Total Time: 1 hours and 20 minutes(Court Reporter Montini, Sharon.)(Villano, P.) (Entered: 05/19/2011) |
| 05/19/2011 | 816 | NOTICE OF E–FILED CALENDAR as to Azibo Aquart: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. A Telephonic Status Conference is set for May 19, 2011 at 2:30 p.m. before Judge Janet Bond Arterton. Counsel for the Government shall initiate the call to Chambers: 203–773–2456. (Kretman, J.) (Entered: 05/19/2011) |
| 05/20/2011 | 830 | Minute Entry for proceedings held before Judge Janet Bond Arterton:Jury Trial as to Azibo Aquart held on 5/20/2011 Jury Trial Continued Until 5/23/2011 at 9:00 a.m. Total Time: 6 hours and 0 minutes(Court Reporter Montini, Sharon.)(Villano, P.) (Entered: 05/23/2011) |
| 05/20/2011 | 834 | Jury Instructions as to Azibo Aquart (Torday, B.) (Entered: 05/23/2011) |
| 05/22/2011 | 821 | TRIAL MEMO *Objection to Proposed retention of Alternates* by Azibo Aquart (Sheehan, Michael) (Entered: 05/22/2011) |
| 05/22/2011 | 822 | MOTION Request for Pre–Penalty Hearing Regarding Victim Impact Evidence by Azibo Aquart. (Sheehan, Michael) (Entered: 05/22/2011) |
| 05/22/2011 | 823 | Proposed Jury Instructions by Azibo Aquart (Sheehan, Michael) (Entered: 05/22/2011) |
| 05/22/2011 | 824 | Proposed Jury Instructions by USA as to Azibo Aquart (Rodriguez–Coss, Jacabed) (Entered: 05/22/2011) |
| 05/22/2011 | 825 | Memorandum in Opposition by USA as to Azibo Aquart re 822 MOTION Request for Pre–Penalty Hearing Regarding Victim Impact Evidence (Rodriguez–Coss, Jacabed) (Entered: 05/22/2011) |
| 05/22/2011 | 826 | MOTION Motion to Strike Procurement Aggravator by Azibo Aquart. (Sheehan, Michael) (Entered: 05/22/2011) |
| 05/22/2011 | 827 | Motion in Limine to Preclude prosecutorial Misconduct on Summation by Azibo Aquart. (Sheehan, Michael) Modified on 5/23/2011 to correct event (Kelsey, N.). (Entered: 05/22/2011) |
| 05/22/2011 | 828 | MOTION in Limine *to Exclude Execution Impact Evidence from the Penalty Phase* by USA as to Azibo Aquart. (Rodriguez–Coss, Jacabed) (Entered: 05/22/2011) |

| 05/22/2011 | 829 | MOTION Motion for Mistrial by Azibo Aquart. (Sheehan, Michael) (Entered: 05/22/2011) |
| --- | --- | --- |
| 05/23/2011 | 831 | MOTION to Preclude *Testimony of Thomas L. Martin* by Azibo Aquart. (Attachments: # 1 Exhibit A – Martin Report, # 2 Exhibit B – Martin Report Continued)(Smith, Justin) (Entered: 05/23/2011) |
| 05/23/2011 | 832 | Minute Entry for proceedings held before Judge Janet Bond Arterton:Jury Trial as to Azibo Aquart held on 5/23/2011 Jury Trial Continued until 5/27/11 AT 9:30AM Total Time: 4 hours(Court Reporter S. Montini.)(Torday, B.) (Entered: 05/23/2011) |
| 05/23/2011 | 833 | JURY VERDICT as to Azibo Aquart (3) Guilty on Count 1sss,2sss–8sss. (Torday, B.) Modified on 5/24/2011 (Torday, B.). (Entered: 05/23/2011) |
| 05/23/2011 | 835 | MOTION in Limine *Regarding Government Aggravators* by Azibo Aquart. (Sheehan, Michael) (Entered: 05/23/2011) |
| 05/23/2011 | 836 | MOTION in Limine *to Preclude Evidence of Armstead Assault* by Azibo Aquart. (Sheehan, Michael) (Entered: 05/23/2011) |
| 05/23/2011 | 837 | RESPONSE/REPLY by Azibo Aquart re 822 Motion Regarding Victim Impact Evidence (Sheehan, Michael) Modified on 5/24/2011 to add missing link to underlying motion (Kelsey, N.). (Entered: 05/23/2011) |
| 05/23/2011 | 838 | TRIAL MEMO *Initial List of Mitigating Factors* by Azibo Aquart (Sheehan, Michael) (Entered: 05/23/2011) |
| 05/23/2011 | 839 | Preliminary Witness List by Azibo Aquart (Sheehan, Michael) (Entered: 05/23/2011) |
| 05/23/2011 | 840 | MOTION in Limine *to Exclude Evidence of Conditions of Confinement from the Penalty Phase* by USA as to Azibo Aquart. (Rodriguez–Coss, Jacabed) (Entered: 05/23/2011) |
| 05/23/2011 | 841 | REQUIREMENT OF PROFFER OF TESTIMONY OF VICTIM–IMPACT WITNESSES: The Government is directed to file a proffer of the expected victim–impact testimony, including the format and any related exhibits, for each victim–impact witness it will offer. This proffer is necessary to enable the Court to perform its functions under 18 U.S.C. § 3593(c) and shall be filed no later than 5:00 p.m. on Tuesday May 24, 2011. Signed by Judge Janet Bond Arterton on 5/23/2011. (Kretman, J.) (Entered: 05/23/2011) |
| 05/23/2011 | 846 | JURY VERDICT(Corrected Entry) as to Azibo Aquart (3) Guilty on Count 5sss–7sss. (Torday, B.) (Entered: 05/24/2011) |
| 05/23/2011 | 853 | Marked Witness List by USA, Azibo Aquart as to Azibo Aquart (Torday, B.) (Entered: 05/25/2011) |
| 05/23/2011 | 854 | Marked Exhibit List by USA as to Azibo Aquart (Torday, B.) (Entered: 05/25/2011) |
| 05/23/2011 | 855 | Marked Exhibit List by Azibo Aquart (Torday, B.) (Entered: 05/25/2011) |
| 05/23/2011 | 856 | COURT EXHIBIT LIST as to Azibo Aquart (Torday, B.) (Entered: 05/25/2011) |
| 05/24/2011 | 842 | RESPONSE/REPLY by Azibo Aquart *Objection to Government 828 Motion to Preclude Execution Impact Testimony* (Sheehan, Michael) Modified on 5/25/2011to add missing link to underlying motion (Kelsey, N.). (Entered: 05/24/2011) |
| 05/24/2011 | 843 | SEALED and EX PARTE Motion for Witness Travel – by Azibo Aquart. (Kelsey, N.) (Entered: 05/24/2011) |
| 05/24/2011 | 844 | ORDER granting 843 Sealed Motion for witness travel as to Azibo Aquart (3). Signed by Judge Janet Bond Arterton on 5/24/11. (Torday, B.) (Entered: 05/24/2011) |
| 05/24/2011 | 845 | MOTION For Court Order Instructing Connecticut State Juvenile Probation to Answer Questions from Government by USA as to Azibo Aquart. (Rodriguez–Coss, Jacabed) Modified on 5/25/2011 to correct motion event (Kelsey, N.). (Entered: 05/24/2011) |
| 05/24/2011 | 847 | Notice of Compliance with Court Order by USA as to Azibo Aquart. (Rodriguez–Coss, Jacabed) Modified on 5/31/2011 to edit docket entry text and |

| | | |
|---|---|---|
| | | terminate Motion event (Kelsey, N.). (Entered: 05/24/2011) |
| 05/24/2011 | 848 | RESPONSE/REPLY by Azibo Aquart re 836 Motion in Limine, 840 Motion in Limine (Sheehan, Michael) (Entered: 05/24/2011) |
| 05/24/2011 | 849 | ORDER: The Government's 845 Motion for Order is GRANTED. Signed by Judge Janet Bond Arterton on 5/24/2011. (Kretman, J.) (Entered: 05/24/2011) |
| 05/24/2011 | 850 | SCHEDULING ORDER: Presentation of information during the penalty phase will commence on May 31, 2011 and will conclude by June 7, 2011. Jury deliberations will begin on June 13, 2011. Signed by Judge Janet Bond Arterton on 5/24/2011. (Kretman, J.) (Entered: 05/24/2011) |
| 05/24/2011 | 867 | Minute Entry for proceedings held before Judge Janet Bond Arterton:Telephone Status Conference as to Azibo Aquart held on 5/24/2011 30 minutes(Court Reporter S. Montini.)(Torday, B.) (Entered: 05/26/2011) |
| 05/25/2011 | 851 | RESPONSE/REPLY by Azibo Aquart re 847 Motion for Miscellaneous Relief *regarding Government's Victim Impact Proffer* (Sheehan, Michael) (Entered: 05/25/2011) |
| 05/25/2011 | 852 | Memorandum in Opposition by USA as to Azibo Aquart re 829 MOTION Motion for Mistrial (Dayton, Tracy) (Entered: 05/25/2011) |
| 05/25/2011 | 858 | Memorandum in Opposition by USA as to Azibo Aquart re 836 MOTION in Limine *to Preclude Evidence of Armstead Assault* (Rodriguez–Coss, Jacabed) (Entered: 05/25/2011) |
| 05/25/2011 | 859 | Memorandum in Opposition by USA as to Azibo Aquart re 831 MOTION to Preclude *Testimony of Thomas L. Martin* (Attachments: # 1 Exhibit)(Dayton, Tracy) (Entered: 05/25/2011) |
| 05/25/2011 | 860 | RESPONSE/REPLY by USA as to Azibo Aquart re 835 Motion in Limine *In Opposition To Defendant's Motion To Preclude Non–Statutory Aggravating Factor* (Reynolds, Alina) (Entered: 05/25/2011) |
| 05/25/2011 | 861 | RESPONSE/REPLY by Azibo Aquart to Response 858 to 836 MOTION in Limine to Preclude Evidence of Armstead Assault (Sheehan, Michael) Modified on 5/26/2011 to add missing links to underlying motion (Kelsey, N.). (Entered: 05/25/2011) |
| 05/25/2011 | 862 | Memorandum in Opposition by USA as to Azibo Aquart re 826 MOTION Motion to Strike Procurement Aggravator (Rodriguez–Coss, Jacabed) (Entered: 05/25/2011) |
| 05/25/2011 | 863 | ORDER: The Government's 847 "Motion" in compliance with the Court's 841 Requirement of Proffer of Testimony of Victim–Impact Witnesses fails to contain descriptions of victim–impact testimony sufficient for the Court to determine whether that information will be "unduly inflammatory," see Payne v. Tennessee, 501 U.S. 808, 831 (1991) (O'Connor, J., concurring), and admissibility under 18 U.S.C. § 3593(c). Accordingly, the Government is hereby directed to provide by the time of oral argument on May 26, 2011 more detailed descriptions of the testimony said to reflect "unique circumstances" and "impact" of the murders, as well as the letters and photographs the Government will offer. Signed by Judge Janet Bond Arterton on 5/25/2011. (Kretman, J.) (Entered: 05/25/2011) |
| 05/25/2011 | 864 | MOTION to Strike *Certain Proposed Mitigating Factors and to Modify Others* by USA as to Azibo Aquart. (Rodriguez–Coss, Jacabed) (Entered: 05/25/2011) |
| 05/26/2011 | 865 | Notice of Compliance with Court Order re 863 Order, by USA as to Azibo Aquart. (Rodriguez–Coss, Jacabed) Modified on 5/31/2011 to correct docket entry text and terminate motion (Kelsey, N.). (Entered: 05/26/2011) |
| 05/26/2011 | 866 | RESPONSE/REPLY by Azibo Aquart re 859 Memorandum in Opposition to 831 Motion *to Preclude Blood Spatter Testimony* (Smith, Justin) Modified on 5/27/2011 to add missing link to underlying motion (Kelsey, N.). (Entered: 05/26/2011) |
| 05/26/2011 | 869 | RESPONSE/REPLY by Azibo Aquart re 864 Motion to Strike *Certain Mitigating Factors* (Attachments: # 1 Affidavit)(Sheehan, Michael) (Entered: 05/26/2011) |

| 05/26/2011 | 871 | Minute Entry for proceedings held before Judge Janet Bond Arterton:Motion Hearing as to Azibo Aquart held on 5/26/2011 re 828 MOTION in Limine *to Exclude Execution Impact Evidence from the Penalty Phase* filed by USA, 836 MOTION in Limine *to Preclude Evidence of Armstead Assault* filed by Azibo Aquart, 831 MOTION to Preclude *Testimony of Thomas L. Martin* filed by Azibo Aquart, 835 MOTION in Limine *Regarding Government Aggravators* filed by Azibo Aquart, 840 MOTION in Limine *to Exclude Evidence of Conditions of Confinement from the Penalty Phase* filed by USA Total Time: 3 hours and 45 minutes(Court Reporter S. Montini.)(Torday, B.) (Entered: 05/27/2011) |
|---|---|---|
| 05/26/2011 | 872 | ORDER denying 828 Motion in Limine as to Azibo Aquart (3); denying 831 Motion to Preclude as to Azibo Aquart (3); granting in part and denying in part 835 Motion in Limine as to Azibo Aquart (3); denying 836 Motion in Limine as to Azibo Aquart (3); denying 840 Motion in Limine as to Azibo Aquart (3). Signed by Judge Janet Bond Arterton on 5/26/11. (Torday, B.) (Entered: 05/27/2011) |
| 05/27/2011 | 870 | MOTION in Limine *to Preclude testimony of Proposed new Witness* by Azibo Aquart. (Sheehan, Michael) (Entered: 05/27/2011) |
| 05/27/2011 | 873 | Proposed Jury Instructions by Azibo Aquart (Sheehan, Michael) (Main Document 873 replaced on 6/1/2011) (Kelsey, N.). (Entered: 05/27/2011) |
| 05/27/2011 | 874 | MOTION for Hearing *Pursuant to Fed.R.Evid. 702* by Azibo Aquart. (Smith, Justin) (Entered: 05/27/2011) |
| 05/27/2011 | 875 | NOTICE OF E–FILED CALENDAR as to Azibo Aquart: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. A Daubert hearing and status conference is scheduled for May 31, 2011 at 8:00 a.m. in Courtroom Two, 141 Church St., New Haven, CT before Judge Janet Bond Arterton. (Kretman, J.) (Entered: 05/27/2011) |
| 05/27/2011 | 876 | RESPONSE/REPLY by USA as to Azibo Aquart *Response to Defendant's 870 Motion to Preclude Testimony of Proposed Witness* (Reynolds, Alina) Modified on 5/31/2011 to create link to underlying motion (Kelsey, N.). (Entered: 05/27/2011) |
| 05/28/2011 | 877 | Response in Opposition to Defendant's Objections to Court's Proposed Preliminary Instruction for Penalty Phase re 873 Proposed Jury Instructions/Request to Charge by USA as to Azibo Aquart. (Rodriguez–Coss, Jacabed) Modified on 5/31/2011 to correct docket entry text and terminate motion (Kelsey, N.). (Entered: 05/28/2011) |
| 05/29/2011 | 878 | Memorandum in Opposition by USA as to Azibo Aquart re 874 MOTION for Hearing *Pursuant to Fed.R.Evid. 702* (Dayton, Tracy) (Entered: 05/29/2011) |
| 05/29/2011 | 879 | MOTION in Limine *to Exclude Witness Testimony* by Azibo Aquart. (Attachments: # 1 Exhibit "A")(Sheehan, Michael) (Entered: 05/29/2011) |
| 05/29/2011 | 880 | TRIAL MEMO *Supplemental Memorandum regarding Execution Impact Evidence* by Azibo Aquart (Sheehan, Michael) (Entered: 05/29/2011) |
| 05/29/2011 | 881 | RESPONSE/REPLY by Azibo Aquart *Supplemental Memorandum Regarding Victim Impact Testimony* (Attachments: # 1 Exhibit A)(Sheehan, Michael) (Entered: 05/29/2011) |
| 05/29/2011 | 882 | RESPONSE/REPLY by Azibo Aquart *Regarding 826 Motion to Strike Procurement Aggravator* (Sheehan, Michael) Modified on 5/31/2011 to create link to underlying motion(Kelsey, N.). (Entered: 05/29/2011) |
| 05/29/2011 | 883 | REPLY TO RESPONSE to Motion by Azibo Aquart re 874 MOTION for Hearing *Pursuant to Fed.R.Evid. 702* (Attachments: # 1 Exhibit A, # 2 Exhibit A (continued))(Smith, Justin) (Entered: 05/29/2011) |
| 05/29/2011 | 884 | MOTION to Compel *Disclosure of Notes of Defense Witnesses* by USA as to Azibo Aquart. (Rodriguez–Coss, Jacabed) (Main Document 884 replaced on 7/14/2011) (Kelsey, N.). (Entered: 05/29/2011) |
| 05/29/2011 | 885 | MOTION in Limine *to Exclude Unsworn Allocution by Defendant* by USA as to Azibo Aquart. (Rodriguez–Coss, Jacabed) (Entered: 05/29/2011) |

| 05/30/2011 | 886 | RESPONSE/REPLY by Azibo Aquart re 877 Motion for Miscellaneous Relief, 873 Proposed Jury Instructions/Request to Charge (Sheehan, Michael) (Entered: 05/30/2011) |
| 05/30/2011 | 887 | MOTION to Preclude *Hearsay re Jail Assault* by Azibo Aquart. (Sheehan, Michael) (Entered: 05/30/2011) |
| 05/30/2011 | 888 | Memorandum in Opposition by USA as to Azibo Aquart re 826 MOTION Motion to Strike Procurement Aggravator (Dayton, Tracy) (Entered: 05/30/2011) |
| 05/30/2011 | 889 | MOTION to Preclude *Testimony Regarding Unavailable Videotape* by Azibo Aquart. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Smith, Justin) (Entered: 05/30/2011) |
| 05/30/2011 | 890 | MOTION in Limine *To Preclude Testimony of Defense Mitigation Witness Marva Lewis* by USA as to Azibo Aquart. (Reynolds, Alina) (Entered: 05/30/2011) |
| 05/30/2011 | 891 | Response in Opposition to Supplemental Memorandum in Support of Exclusion of Certain Victim Impact Evidence re 881 Reply/Response Misc by USA as to Azibo Aquart. (Rodriguez–Coss, Jacabed) Modified on 5/31/2011 to correct event and modify docket entry text (Kelsey, N.). (Entered: 05/30/2011) |
| 05/30/2011 | 892 | MOTION to Preclude *Evidence of Residual Doubt from the Penalty Phase* by USA as to Azibo Aquart. (Rodriguez–Coss, Jacabed) (Main Document 892 replaced on 6/8/2011) (Kelsey, N.). (Entered: 05/30/2011) |
| 05/30/2011 | 893 | TRIAL MEMO *Supplemental Memorandum of Law in Support of Government's Opposition to Defendant's Objections to Proposed Jury Instructions in Penalty* by USA as to Azibo Aquart (Rodriguez–Coss, Jacabed) (Entered: 05/30/2011) |
| 05/30/2011 | 894 | ORDER: Defendant's 827 Motion in Limine to Prohibit Specified Types of Prosecutorial Misconduct in Penalty–Phase Summation is GRANTED absent any opposition from the Government. Signed by Judge Janet Bond Arterton on 5/30/2011.(Kretman, J.) (Entered: 05/30/2011) |
| 05/31/2011 | 896 | Minute Entry for proceedings held before Judge Janet Bond Arterton:Motion Hearing as to Azibo Aquart held on 5/31/2011 re 822 MOTION Request for Pre–Penalty Hearing Regarding Victim Impact Evidence filed by Azibo Aquart, 826 MOTION Motion to Strike Procurement Aggravator filed by Azibo Aquart, 887 MOTION to Preclude *Hearsay re Jail Assault* filed by Azibo Aquart, 874 MOTION for Hearing *Pursuant to Fed.R.Evid. 702* filed by Azibo Aquart Total Time: 2 hours and 30 minutes(Court Reporter Sharon Montini.)(Torday, B.) (Entered: 05/31/2011) |
| 05/31/2011 | 897 | ORDER granting 822 Motion for a pre–penalty phase hearing as to Azibo Aquart (3); denying 826 Motion to strike as to Azibo Aquart (3); denying 874 Motion for Hearing as to Azibo Aquart (3); granting 887 Motion to Preclude as to Azibo Aquart (3). Signed by Judge Janet Bond Arterton on 5/31/11. (Torday, B.) (Entered: 05/31/2011) |
| 05/31/2011 | 898 | Minute Entry for proceedings held before Judge Janet Bond Arterton:Jury Trial as to Azibo Aquart held on 5/31/2011 Jury Trial Continued Until 6/1/11 AT 9:30AM, ( Motion Hearing set for 6/1/2011 08:45 AM in Courtroom Two, 141 Church St., New Haven, CT before Judge Janet Bond Arterton) Total Time: 5 hours(Court Reporter Sharon Montini.)(Torday, B.) (Entered: 05/31/2011) |
| 05/31/2011 | 899 | Memorandum in Opposition by USA as to Azibo Aquart re 889 MOTION to Preclude *Testimony Regarding Unavailable Videotape* (Dayton, Tracy) (Entered: 05/31/2011) |
| 06/01/2011 | 900 | ORDER: By agreement of the parties, Defendant's 870 Motion to Preclude New Witness and 879 Motion in Limine to Exclude Witness Testimony are GRANTED as to the Government's case–in–chief, and Defendant's 889 Motion to Preclude Testimony Regarding Unavailable Videotape is DENIED. Signed by Judge Janet Bond Arterton on 6/1/2011. (Kretman, J.) (Entered: 06/01/2011) |
| 06/01/2011 | 901 | Docket Entry Correction as to Azibo Aquart re 873 Response to Proposed Jury Instructions: corrected pdf to reflect electronic signature. (Kelsey, N.) (Entered: 06/01/2011) |
| 06/01/2011 | 902 | Minute Entry for proceedings held before Judge Janet Bond Arterton:Jury Trial as to Azibo Aquart held on 6/1/2011 Jury Trial Continued Until 6/2/11 AT 9:30AM Total Time: 4 hours(Court Reporter Sharon Montini.)(Torday, B.) (Entered: 06/01/2011) |

| 06/01/2011 | 903 | ORDER: The Government's 884 Motion for Disclosure Pursuant to Standing Order on Pretrial Discover is GRANTED in part and DENIED in part. Pursuant to the Local Criminal Standing Order on Discovery, Defense counsel will allow the Government to inspect and copy any of the following items that are within the possession, custody or control of the Defendant, the existence of which is known or by the exercise of due diligence may become known to the Defendant: (a) books, papers, documents, photographs or tangible objects that the Defendant intends to introduce as evidence in his case−in−chief at trial; (b) results or reports of physical or mental examinations and of scientific tests or experiments made in connection with this case that the Defendant intends to offer as evidence at trial or which were prepared by a defense witness who will testify concerning the contents thereof. However, the Standing Order does not require disclosure of notes written by prospective defense witnesses, and therefore, Defendant is not required to provide such notes to the Government if no reports exist. Signed by Judge Janet Bond Arterton on 6/1/2011. (Kretman, J.) (Entered: 06/01/2011) |
| 06/01/2011 | 904 | Proposed Jury Instructions by Azibo Aquart (Sheehan, Michael) (Entered: 06/01/2011) |
| 06/01/2011 | 905 | TRIAL MEMO *Proposed Special Verdict Form* by Azibo Aquart (Sheehan, Michael) (Entered: 06/01/2011) |
| 06/01/2011 | 906 | MOTION in Limine *to Admit Certain Statements of Efrain Johnson* by Azibo Aquart. (Sheehan, Michael) (Entered: 06/01/2011) |
| 06/01/2011 | 907 | RESPONSE/REPLY by Azibo Aquart re 890 Motion in Limine *Objection to Government's Motion to Exclude testimony of Dr. Marva Lewis* (Sheehan, Michael) (Entered: 06/01/2011) |
| 06/02/2011 | 908 | Proposed Jury Instructions by USA as to Azibo Aquart (Rodriguez−Coss, Jacabed) (Entered: 06/02/2011) |
| 06/02/2011 | 909 | Proposed Jury Instructions by USA as to Azibo Aquart (Dayton, Tracy) (Main Document 909 replaced on 6/6/2011) (Kelsey, N.). (Entered: 06/02/2011) |
| 06/02/2011 | 910 | EX PARTE MOTION and Order to Pay Expenses by Azibo Aquart. (Torday, B.) (Entered: 06/02/2011) |
| 06/02/2011 | 912 | MOTION in Limine *Regarding Mark Bezy Testimony* by Azibo Aquart. (Attachments: # 1 Exhibit A)(Sheehan, Michael) (Entered: 06/02/2011) |
| 06/02/2011 | 913 | Minute Entry for proceedings held before Judge Janet Bond Arterton:Jury Trial as to Azibo Aquart held on 6/2/2011 Jury Trial Continued Until 6/3/11 AT 9:30AM Total Time: 5 hours and 30 minutes(Court Reporter Sharon Montini.)(Torday, B.) (Entered: 06/03/2011) |
| 06/03/2011 | 918 | Minute Entry for proceedings held before Judge Janet Bond Arterton:Jury Trial as to Azibo Aquart held on 6/3/2011 Jury Trial Continued Until 6/6/11 at 8:30am Total Time: 6 hours and 30 minutes(Court Reporter Sharon Montini.)(Torday, B.) (Entered: 06/06/2011) |
| 06/05/2011 | 915 | Memorandum in Opposition by USA as to Azibo Aquart re 906 MOTION in Limine *to Admit Certain Statements of Efrain Johnson* (Dayton, Tracy) (Entered: 06/05/2011) |
| 06/05/2011 | 916 | RESPONSE/REPLY by Azibo Aquart re 912 Motion in Limine *Supplemental memorandum Regarding Mark Bezy Testimony* (Sheehan, Michael) (Entered: 06/05/2011) |
| 06/06/2011 | 917 | RESPONSE/REPLY by Azibo Aquart re 906 Motion in Limine, 915 Memorandum in Opposition to Motion *in Limine Regarding Johnson Statements* (Sheehan, Michael) (Entered: 06/06/2011) |
| 06/06/2011 | 919 | Docket Entry Correction as to Azibo Aquart re 909 Proposed Jury Instructions: corrected pdf to reflect electronic signatures and certificate of service. (Kelsey, N.) (Entered: 06/06/2011) |
| 06/06/2011 | 920 | Minute Entry for proceedings held before Judge Janet Bond Arterton: denying 890 Motion in Limine as to Azibo Aquart (3); Jury Trial – Death Penalty Phase as to Azibo Aquart held on 6/6/2011 Jury Trial – Death Penalty Phase Continued Until |

| | | |
|---|---|---|
| | | 6/7/11 at 9:30am. Total Time: 6 hours and 45 minutes(Court Reporter S. Montini.) (Torday, B.) (Entered: 06/06/2011) |
| 06/06/2011 | 921 | Minute Entry for proceedings held before Judge Janet Bond Arterton:Charge Conference as to Azibo Aquart held on 6/6/2011 Total Time: 1 hours and 15 minutes(Court Reporter Sharon Montini.)(Torday, B.) (Entered: 06/07/2011) |
| 06/07/2011 | 922 | Minute Entry for proceedings held before Judge Janet Bond Arterton:Jury Trial – Death Penalty Phase as to Azibo Aquart held on 6/7/2011 Jury Trial – Death Penalty Phase Continued Until 6/13/11 AT 9:30AM Total Time: 3 hours and 15 minutes(Court Reporter S. Montini.)(Torday, B.) (Entered: 06/07/2011) |
| 06/08/2011 | 924 | Docket Entry Correction as to Azibo Aquart re 892 MOTION to Preclude *Evidence of Residual Doubt from the Penalty Phase*: corrected pdf to reflect electronic signature. (Kelsey, N.) (Entered: 06/08/2011) |
| 06/10/2011 | 925 | TRIAL MEMO *In Support of Government's Objections to Court's Final Charge* by USA as to Azibo Aquart (Rodriguez–Coss, Jacabed) (Entered: 06/10/2011) |
| 06/11/2011 | 926 | RESPONSE/REPLY by Azibo Aquart re 925 Trial Memo *Objecting to Government Requests Regarding Final Jury Instructions* (Sheehan, Michael) (Entered: 06/11/2011) |
| 06/11/2011 | 927 | MOTION in Limine *to preclude Certain Arguments in Closing* by Azibo Aquart. (Sheehan, Michael) (Entered: 06/11/2011) |
| 06/13/2011 | 928 | ORAL MOTION FOR A MISTRIAL by Azibo Aquart. (Torday, B.) (Entered: 06/14/2011) |
| 06/13/2011 | 929 | Minute Entry for proceedings held before Judge Janet Bond Arterton:Jury Trial – Death Penalty Phase as to Azibo Aquart held on 6/13/2011 Jury Trial – Death Penalty Phase Continued Until 6/14/11 AT 9AM Total Time: 8 hours(Court Reporter S. Montini.)(Torday, B.) (Entered: 06/14/2011) |
| 06/13/2011 | 930 | Court Jury Instructions as to Azibo Aquart (Torday, B.) (Entered: 06/14/2011) |
| 06/13/2011 | 933 | Marked Witness List by USA, Azibo Aquart as to Azibo Aquart (Torday, B.) (Entered: 06/15/2011) |
| 06/13/2011 | 934 | Marked Exhibit List by USA as to Azibo Aquart (Torday, B.) (Entered: 06/15/2011) |
| 06/13/2011 | 935 | Marked Exhibit List by Azibo Aquart (Torday, B.) (Entered: 06/15/2011) |
| 06/14/2011 | 931 | Minute Entry for proceedings held before Judge Janet Bond Arterton:Jury Trial – Death Penalty Phase as to Azibo Aquart held on 6/14/2011 Jury Trial – Death Penalty Phase Continued Until 6/15 at 9am Total Time: 8 hours(Court Reporter S. Montini.)(Torday, B.) (Entered: 06/15/2011) |
| 06/15/2011 | 936 | JURY VERDICT as to Azibo Aquart (3) IN PHASE TWO OF TRIAL ON Count 2–7. (Torday, B.) (Entered: 06/15/2011) |
| 06/15/2011 | | SET MOTION SCHEDULING ORDER DEADLINES as to Azibo Aquart: Substantive Motions due 6/29/11; Government Response due 7/21/11; Defendant Replies due 8/4/11 (Torday, B.) (Entered: 06/15/2011) |
| 06/15/2011 | 937 | Minute Entry for proceedings held before Judge Janet Bond Arterton:Jury Trial – Death Penalty Phase as to Azibo Aquart held on 6/15/2011 Total Time: 1 hours and 45 minutes(Court Reporter S. Montini.)(Torday, B.) (Entered: 06/15/2011) |
| 06/15/2011 | 938 | COURT EXHIBIT LIST as to Azibo Aquart (Torday, B.) (Entered: 06/15/2011) |
| 06/20/2011 | | CJA 30: Authorization to Pay Michael O. Sheehan in Death Penalty Proceedings as to Azibo Aquart Voucher # 110617000004. Interim #16 payment. Signed by Magistrate Judge Joan G. Margolis on 6/20/11. (Inferrera, L.) (Entered: 06/29/2011) |
| 06/20/2011 | | CJA 30: Authorization to Pay Justin T. Smith in Death Penalty Proceedings as to Azibo Aquart Voucher # 110617000003. Interim #23 payment. Signed by Magistrate Judge Joan G. Margolis on 6/20/11. (Inferrera, L.) (Entered: 06/29/2011) |

| | | |
|---|---|---|
| 06/22/2011 | 943 | ORDER granting 910 Sealed Motion as to Azibo Aquart (3). Signed by Judge Janet Bond Arterton on 6/22/11. (Torday, B.) (Entered: 06/22/2011) |
| 06/23/2011 | 944 | MOTION for Extension of Time to File Post Trial Motions until July 20, 2011 by Azibo Aquart. (Sheehan, Michael) (Entered: 06/23/2011) |
| 06/27/2011 | 945 | ORDER granting, defendant's motions to be filed by July 20, 2011, governments response due August 10, 2011, defendant's reply due August 19, 2011. 944 Motion for Extension of Time as to Azibo Aquart (3). Signed by Judge Janet Bond Arterton on 6/24/11. (Torday, B.) (Entered: 06/27/2011) |
| 07/13/2011 | 946 | MOTION For Extension Of Time by Azibo Aquart. (Smith, Justin) Modified on 7/14/2011 to correct relief (Malone, P.). (Entered: 07/13/2011) |
| 07/14/2011 | 947 | ORDER granting with modification, defendant's motions to be filed by August 8, 2011, government response due August 26, 2011; defendant's reply due September 6, 2011. 946 Motion for Extension of Time as to Azibo Aquart (3). Signed by Judge Janet Bond Arterton on 7/14/11. (Torday, B.) (Entered: 07/14/2011) |
| 07/14/2011 | 948 | Docket Entry Correction as to Azibo Aquart re 884 MOTION to Compel *Disclosure of Notes of Defense Witnesses*: Corrected pdf to reflect electronic signatures. (Kelsey, N.) (Entered: 07/14/2011) |
| 08/08/2011 | 952 | MOTION for New Trial *for Penalty Proceedings* by Azibo Aquart. (Sheehan, Michael) (Entered: 08/08/2011) |
| 08/12/2011 | 953 | ORDER: granting 670 Motion to Seal as to Azibo Aquart (3); granting 735 Motion to Seal as to Azibo Aquart (3). Signed by Judge Joan G. Margolis on 8/12/2011. (Rodko, B.) (Entered: 08/12/2011) |
| 08/26/2011 | 958 | Memorandum in Opposition by USA as to Azibo Aquart re 952 MOTION for New Trial *for Penalty Proceedings* (Dayton, Tracy) (Entered: 08/26/2011) |
| 08/30/2011 | 963 | ORDER granting 448 Motion to Seal as to Azibo Aquart (3); denied as moot 482 Motion to Compel as to Azibo Aquart (3); granting in part and denying in part 526 Motion to Compel as to Azibo Aquart (3); granting in part and denying in part 566 Sealed Motion as to Azibo Aquart (3); granting 606 Motion to Seal as to Azibo Aquart (3); denying as moot 623 Sealed Motion as to Azibo Aquart (3); granting 653 Sealed Motion as to Azibo Aquart (3); granting 706 Sealed Motion as to Azibo Aquart (3); granting 758 Motion to Withdraw Document as to Azibo Aquart (3); granting 772 Motion in Limine as to Azibo Aquart (3); denying 778 Motion in Limine as to Azibo Aquart (3); denying as moot 797 Motion to Preclude as to Azibo Aquart (3); granting 801 Motion in Limine as to Azibo Aquart (3); denying 802 Motion in Limine as to Azibo Aquart (3); granting in part and denying in part 811 Motion as to Azibo Aquart (3); denying 864 Motion to Strike as to Azibo Aquart (3); ening as moot 885 Motion in Limine as to Azibo Aquart (3); denying as moot 892 Motion to Preclude as to Azibo Aquart (3); granting 906 Motion in Limine as to Azibo Aquart (3); granting in part and denying in part 912 Motion in Limine as to Azibo Aquart (3); granting 927 Motion in Limine as to Azibo Aquart (3). Signed by Judge Janet Bond Arterton on 8/29/11. (Torday, B.) (Entered: 08/30/2011) |
| 09/06/2011 | 966 | RESPONSE/REPLY by Azibo Aquart *In Support of 952 Motion for New Trial* (Sheehan, Michael) Modified on 9/7/2011 to create link to motion (Malone, P.). (Entered: 09/06/2011) |
| 09/23/2011 | | CJA 30: Authorization to Pay Michael Sheehan in Death Penalty Proceedings as to Azibo Aquart. Voucher # 110923000001. Interim #17 payment. Signed by Magistrate Judge Joan G. Margolis on 9/23/2011. (Garguilo, B) (Entered: 10/04/2011) |
| 09/28/2011 | 972 | ORDER as to Azibo Aquart re 952 MOTION for New Trial for Penalty Proceedings filed by Azibo Aquart, 829 MOTION Motion for Mistrial filed by Azibo Aquart, ( Motion Hearing set for 11/22/2011 01:00 PM in Courtroom Two, 141 Church St., New Haven, CT before Judge Janet Bond Arterton). Signed by Judge Janet Bond Arterton on 9/27/11. (Torday, B.) (Entered: 09/28/2011) |
| 10/03/2011 | | CJA 30: Authorization to Pay Michael Sheehan in Death Penalty Proceedings as to Azibo Aquart. Voucher # 110930000004. Interim #18 payment. Signed by Magistrate Judge Joan G. Margolis on 10/3/2011. (Garguilo, B) (Entered: 10/13/2011) |

| 11/08/2011 | 985 | NOTICE OF E–FILED CALENDAR as to Azibo Aquart: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION.,Motion Hearing set for 11/22/2011 01:00 PM in Courtroom Two, 141 Church St., New Haven, CT before Judge Janet Bond Arterton) Motion Hearing on 928 MOTION MISTRIAL, 829 MOTION Motion for Mistrial, 952 MOTION for New Trial *for Penalty Proceedings*. (Torday, B.) (Entered: 11/08/2011) |
| --- | --- | --- |
| 11/17/2011 | 990 | AMENDED NOTICE OF E–FILED CALENDAR as to Azibo Aquart: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. Motion Hearing set for 11/22/2011 03:15 PM (NEW TIME) in Courtroom Two, 141 Church St., New Haven, CT before Judge Janet Bond Arterton), Motion or Report and Recommendation in case as to Azibo Aquart 928 MOTION MISTRIAL, 829 MOTION Motion for Mistrial, 952 MOTION for New Trial *for Penalty Proceedings*.(Torday, B.) (Entered: 11/17/2011) |
| 11/22/2011 | 994 | Minute Entry for proceedings held before Judge Janet Bond Arterton:Motion Hearing as to Azibo Aquart held on 11/22/2011 re 928 MOTION MISTRIAL filed by Azibo Aquart, 952 MOTION for New Trial *for Penalty Proceedings* filed by Azibo Aquart, 829 MOTION Motion for Mistrial filed by Azibo Aquart Taken Under Advisement Total Time: 1 hours and 10 minutes(Court Reporter S. Montini.)(Torday, B.) (Entered: 11/23/2011) |
| 12/23/2011 | 1013 | TRANSCRIPT of Proceedings: as to Azibo Aquart Type of Hearing: Transcript of Oral Argument on Motions for Mistrial and New Trial for Penalty Proceedings. Held on 11/22/11 before Judge Arterton. Court Reporter: S. Montini. **IMPORTANT NOTICE – REDACTION OF TRANSCRIPTS:** To remove personal identifier information from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within seven (7) calendar days of this date. If no such Notice is filed, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available through PACER without redaction 90 days from today's date. The transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. The policy governing the redaction of personal information is located on the court website at www.ctd.uscourts.gov. Redaction Request due 1/13/2012. Redacted Transcript Deadline set for 1/23/2012. Release of Transcript Restriction set for 3/22/2012. (Montini, S.) (Entered: 12/23/2011) |
| 02/21/2012 | 1074 | ORDER: Defendant Azibo Aquart's Motion for a Mistrial as to the Guilt phase proceedings [Doc. # 829]is DENIED. Signed by Judge Janet Bond Arterton on 02/21/2012. (Flagg, K.) (Entered: 02/21/2012) |
| 02/24/2012 | 1091 | ORDER: Defendant Azibo Aquart's Motion for New Trial as to the Penalty Phase Proceedings [Doc. # 952] is DENIED. Signed by Judge Janet Bond Arterton on 2/24/12.(Flagg, K.) (Entered: 02/24/2012) |
| 02/28/2012 | 1096 | SENTENCING SCHEDULING ORDER as to Azibo Aquart Sentencing set for 3/28/2012 03:30 PM in Courtroom Two, 141 Church St., New Haven, CT before Judge Janet Bond Arterton;. Signed by Judge Janet Bond Arterton on 2/27/12. (Torday, B.) (Entered: 02/28/2012) |
| 03/01/2012 | 1098 | SENTENCING MEMORANDUM by USA as to Azibo Aquart (Dayton, Tracy) (Entered: 03/01/2012) |
| 03/08/2012 | 1102 | MOTION for New Trial by Azibo Aquart. (Sheehan, Michael) (Entered: 03/08/2012) |
| 03/19/2012 | 1104 | ORDER as to Azibo Aquart re 1096 Sentencing Scheduling Order. Signed by Judge Janet Bond Arterton on 3/19/12. (Torday, B.) (Entered: 03/19/2012) |
| 03/21/2012 | 1105 | Memorandum in Opposition by USA as to Azibo Aquart re 1102 MOTION for New Trial (Reynolds, Alina) (Entered: 03/21/2012) |
| 04/02/2012 | 1106 | RESPONSE/REPLY re: 1102 Motion for new trialby Azibo Aquart (Sheehan, Michael) Modified on 4/3/2012 to create link(Falcone, K.). (Entered: 04/02/2012) |

**A.42**

| | | |
|---|---|---|
| 04/11/2012 | 1107 | Sealed Document:Motion to modify phase three CJA budget by Azibo Aquart – (Falcone, K.) (Entered: 04/11/2012) |
| 05/10/2012 | | SEALED TRANSCRIPT of Proceedings as to Azibo Aquart held on 3/21/11 before Judge Arterton. Court Reporter: S. Montini. Type of Hearing: Jury Selection, Day Five. (Montini, S.) (Entered: 05/10/2012) |
| 05/10/2012 | 1120 | SEALED TRANSCRIPT of Proceedings as to Azibo Aquart held on 3/22/11 before Judge Arterton. Court Reporter: S. Montini. Type of Hearing: Jury Selection, Day Six. (Montini, S.) (Entered: 05/10/2012) |
| 05/10/2012 | 1121 | SEALED TRANSCRIPT of Proceedings as to Azibo Aquart held on 3/23/11 before Judge Arterton. Court Reporter: S. Montini. Type of Hearing: Jury Selection, Day Seven. (Montini, S.) (Entered: 05/10/2012) |
| 05/10/2012 | 1122 | SEALED TRANSCRIPT of Proceedings as to Azibo Aquart held on 3/24/11 before Judge Arterton. Court Reporter: S. Montini. Type of Hearing: Jury Selection, Day Eight. (Montini, S.) (Entered: 05/10/2012) |
| 05/10/2012 | 1123 | SEALED TRANSCRIPT of Proceedings as to Azibo Aquart held on 3/25/11 before Judge Arterton. Court Reporter: S. Montini. Type of Hearing: Jury Selection, Day Nine. (Montini, S.) (Entered: 05/10/2012) |
| 05/10/2012 | 1124 | SEALED TRANSCRIPT of Proceedings as to Azibo Aquart held on 3/28/11 before Judge Arterton. Court Reporter: S. Montini. Type of Hearing: Jury Selection, Day Ten. (Montini, S.) (Entered: 05/10/2012) |
| 05/10/2012 | 1125 | SEALED TRANSCRIPT of Proceedings as to Azibo Aquart held on 3/29/11 before Judge Arterton. Court Reporter: S. Montini. Type of Hearing: Jury Selection, Day Eleven. (Montini, S.) (Entered: 05/10/2012) |
| 05/10/2012 | 1126 | SEALED TRANSCRIPT of Proceedings as to Azibo Aquart held on 3/30/11 before Judge Arterton. Court Reporter: S.Montini. Type of Hearing: Jury Selection, Day Twelve. (Montini, S.) (Entered: 05/10/2012) |
| 05/10/2012 | 1127 | SEALED TRANSCRIPT of Proceedings as to Azibo Aquart held on 3/31/11 before Judge Arterton. Court Reporter: S. Montini. Type of Hearing: Jury Selection, Day Thirteen. (Montini, S.) (Entered: 05/10/2012) |
| 05/10/2012 | 1128 | SEALED TRANSCRIPT of Proceedings as to Azibo Aquart held on 4/4/11 before Judge Arterton. Court Reporter: S. Montini. Type of Hearing: Jury Selection, Day Fourteen. (Montini, S.) (Entered: 05/10/2012) |
| 05/10/2012 | 1129 | SEALED TRANSCRIPT of Proceedings as to Azibo Aquart held on 4/6/11 before Judge Arterton. Court Reporter: S. Montini. Type of Hearing: Jury Selection, Day Fifteen. (Montini, S.) (Entered: 05/10/2012) |
| 05/10/2012 | 1130 | SEALED TRANSCRIPT of Proceedings as to Azibo Aquart held on 4/11/11 before Judge Arterton. Court Reporter: S. Montini. Type of Hearing: Jury Selection, Day Sixteen. (Montini, S.) (Entered: 05/10/2012) |
| 05/10/2012 | 1131 | SEALED TRANSCRIPT of Proceedings as to Azibo Aquart held on 4/12/11 before Judge Arterton. Court Reporter: S. Montini. Type of Hearing: Jury Selection, Day Seventeen. (Montini, S.) (Entered: 05/10/2012) |
| 05/10/2012 | 1132 | SEALED TRANSCRIPT of Proceedings as to Azibo Aquart held on 4/19/11 before Judge Arterton. Court Reporter: S. Montini. Type of Hearing: Jury Selection, Day Eighteen. (Montini, S.) (Entered: 05/10/2012) |
| 05/10/2012 | 1133 | TRANSCRIPT of Proceedings: as to Azibo Aquart Type of Hearing: Jury Selection, Day Two. Held on 3/2/11 before Judge Arterton. Court Reporter: S. Montini. **IMPORTANT NOTICE – REDACTION OF TRANSCRIPTS:** To remove personal identifier information from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within seven (7) calendar days of this date. If no such Notice is filed, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available through PACER without redaction 90 days from today's date. The transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After |

| | | that date it may be obtained through PACER. The policy governing the redaction of personal information is located on the court website at www.ctd.uscourts.gov. Redaction Request due 5/31/2012. Redacted Transcript Deadline set for 6/10/2012. Release of Transcript Restriction set for 8/8/2012. (Montini, S.) (Entered: 05/10/2012) |
|---|---|---|
| 05/10/2012 | 1134 | TRANSCRIPT of Proceedings: as to Azibo Aquart Type of Hearing: Jury Selection, Day Four. Held on 3/4/11 before Judge Arterton. Court Reporter: S. Montini. **IMPORTANT NOTICE – REDACTION OF TRANSCRIPTS:** To remove personal identifier information from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within seven (7) calendar days of this date. If no such Notice is filed, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available through PACER without redaction 90 days from today's date. The transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. The policy governing the redaction of personal information is located on the court website at www.ctd.uscourts.gov. Redaction Request due 5/31/2012. Redacted Transcript Deadline set for 6/10/2012. Release of Transcript Restriction set for 8/8/2012. (Montini, S.) (Entered: 05/10/2012) |
| 05/10/2012 | 1135 | TRANSCRIPT of Proceedings: as to Azibo Aquart Type of Hearing: Transcript of Hearing on Pending Motions. Held on 4/14/11 before Judge Arterton. Court Reporter: S. Montini. **IMPORTANT NOTICE – REDACTION OF TRANSCRIPTS:** To remove personal identifier information from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within seven (7) calendar days of this date. If no such Notice is filed, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available through PACER without redaction 90 days from today's date. The transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. The policy governing the redaction of personal information is located on the court website at www.ctd.uscourts.gov. Redaction Request due 5/31/2012. Redacted Transcript Deadline set for 6/10/2012. Release of Transcript Restriction set for 8/8/2012. (Montini, S.) (Entered: 05/10/2012) |
| 05/10/2012 | 1136 | TRANSCRIPT of Proceedings: as to Azibo Aquart Type of Hearing: Trial Transcript, Volume I. Held on 4/20/11 before Judge Arterton. Court Reporter: S. Montini. **IMPORTANT NOTICE – REDACTION OF TRANSCRIPTS:** To remove personal identifier information from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within seven (7) calendar days of this date. If no such Notice is filed, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available through PACER without redaction 90 days from today's date. The transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. The policy governing the redaction of personal information is located on the court website at www.ctd.uscourts.gov. Redaction Request due 5/31/2012. Redacted Transcript Deadline set for 6/10/2012. Release of Transcript Restriction set for 8/8/2012. (Montini, S.) (Entered: 05/10/2012) |
| 05/10/2012 | 1137 | TRANSCRIPT of Proceedings: as to Azibo Aquart Type of Hearing: Trial Transcript, Volume II. Held on 4/21/11 before Judge Arterton. Court Reporter: S. Montini. **IMPORTANT NOTICE – REDACTION OF TRANSCRIPTS:** To remove personal identifier information from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within seven (7) calendar days of this date. If no such Notice is filed, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available through PACER without redaction 90 days from today's date. The transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. The policy governing the redaction of personal information is located on the court website at www.ctd.uscourts.gov. Redaction Request due 5/31/2012. Redacted Transcript Deadline set for 6/10/2012. Release of Transcript Restriction set for 8/8/2012. (Montini, S.) (Entered: 05/10/2012) |

| 05/10/2012 | 1138 | TRANSCRIPT of Proceedings: as to Azibo Aquart Type of Hearing: Trial Transcript, Volume III. Held on 4/25/11 before Judge Arterton. Court Reporter: S. Montini. **IMPORTANT NOTICE – REDACTION OF TRANSCRIPTS:** To remove personal identifier information from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within seven (7) calendar days of this date. If no such Notice is filed, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available through PACER without redaction 90 days from today's date. The transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. The policy governing the redaction of personal information is located on the court website at www.ctd.uscourts.gov. Redaction Request due 5/31/2012. Redacted Transcript Deadline set for 6/10/2012. Release of Transcript Restriction set for 8/8/2012. (Montini, S.) (Entered: 05/10/2012) |
|---|---|---|
| 05/10/2012 | 1139 | TRANSCRIPT of Proceedings: as to Azibo Aquart Type of Hearing: Trial Transcript, Volume IV. Held on 4/26/11 before Judge Arterton. Court Reporter: S. Montini. **IMPORTANT NOTICE – REDACTION OF TRANSCRIPTS:** To remove personal identifier information from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within seven (7) calendar days of this date. If no such Notice is filed, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available through PACER without redaction 90 days from today's date. The transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. The policy governing the redaction of personal information is located on the court website at www.ctd.uscourts.gov. Redaction Request due 5/31/2012. Redacted Transcript Deadline set for 6/10/2012. Release of Transcript Restriction set for 8/8/2012. (Montini, S.) (Entered: 05/10/2012) |
| 05/10/2012 | 1140 | TRANSCRIPT of Proceedings: as to Azibo Aquart Type of Hearing: Trial Transcript, Volume V. Held on 4/27/11 before Judge Arterton. Court Reporter: S. Montini. **IMPORTANT NOTICE – REDACTION OF TRANSCRIPTS:** To remove personal identifier information from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within seven (7) calendar days of this date. If no such Notice is filed, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available through PACER without redaction 90 days from today's date. The transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. The policy governing the redaction of personal information is located on the court website at www.ctd.uscourts.gov. Redaction Request due 5/31/2012. Redacted Transcript Deadline set for 6/10/2012. Release of Transcript Restriction set for 8/8/2012. (Montini, S.) (Entered: 05/10/2012) |
| 05/10/2012 | 1141 | TRANSCRIPT of Proceedings: as to Azibo Aquart Type of Hearing: Trial Transcript, Volume VI. Held on 4/28/11 before Judge Arterton. Court Reporter: S. Montini. **IMPORTANT NOTICE – REDACTION OF TRANSCRIPTS:** To remove personal identifier information from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within seven (7) calendar days of this date. If no such Notice is filed, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available through PACER without redaction 90 days from today's date. The transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. The policy governing the redaction of personal information is located on the court website at www.ctd.uscourts.gov. Redaction Request due 5/31/2012. Redacted Transcript Deadline set for 6/10/2012. Release of Transcript Restriction set for 8/8/2012. (Montini, S.) (Entered: 05/10/2012) |
| 05/10/2012 | 1142 | TRANSCRIPT of Proceedings: as to Azibo Aquart Type of Hearing: Trial Transcript, Volume VII. Held on 4/29/11 before Judge Arterton. Court Reporter: S. Montini. **IMPORTANT NOTICE – REDACTION OF TRANSCRIPTS:** To remove personal identifier information from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within seven (7) calendar days of this date. If no such Notice is filed, the court will assume redaction |

**A.45**

| | | |
|---|---|---|
| | | of personal identifiers is not necessary and the transcript will be made available through PACER without redaction 90 days from today's date. The transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. The policy governing the redaction of personal information is located on the court website at www.ctd.uscourts.gov. Redaction Request due 5/31/2012. Redacted Transcript Deadline set for 6/10/2012. Release of Transcript Restriction set for 8/8/2012. (Montini, S.) (Entered: 05/10/2012) |
| 05/10/2012 | 1143 | TRANSCRIPT of Proceedings: as to Azibo Aquart Type of Hearing: Trial Transcript, Volume VIII. Held on 5/2/11 before Judge Arterton. Court Reporter: S. Montini. **IMPORTANT NOTICE – REDACTION OF TRANSCRIPTS:** To remove personal identifier information from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within seven (7) calendar days of this date. If no such Notice is filed, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available through PACER without redaction 90 days from today's date. The transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. The policy governing the redaction of personal information is located on the court website at www.ctd.uscourts.gov. Redaction Request due 5/31/2012. Redacted Transcript Deadline set for 6/10/2012. Release of Transcript Restriction set for 8/8/2012. (Montini, S.) (Entered: 05/10/2012) |
| 05/10/2012 | 1144 | TRANSCRIPT of Proceedings: as to Azibo Aquart Type of Hearing: Trial Transcript, Volume IX. Held on 5/911 before Judge Arterton. Court Reporter: S. Montini. **IMPORTANT NOTICE – REDACTION OF TRANSCRIPTS:** To remove personal identifier information from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within seven (7) calendar days of this date. If no such Notice is filed, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available through PACER without redaction 90 days from today's date. The transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. The policy governing the redaction of personal information is located on the court website at www.ctd.uscourts.gov. Redaction Request due 5/31/2012. Redacted Transcript Deadline set for 6/10/2012. Release of Transcript Restriction set for 8/8/2012. (Montini, S.) (Entered: 05/10/2012) |
| 05/10/2012 | 1145 | TRANSCRIPT of Proceedings: as to Azibo Aquart Type of Hearing: Trial Transcript, Volume X. Held on 5/4/11 before Judge Arterton. Court Reporter: S. Montini. **IMPORTANT NOTICE – REDACTION OF TRANSCRIPTS:** To remove personal identifier information from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within seven (7) calendar days of this date. If no such Notice is filed, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available through PACER without redaction 90 days from today's date. The transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. The policy governing the redaction of personal information is located on the court website at www.ctd.uscourts.gov. Redaction Request due 5/31/2012. Redacted Transcript Deadline set for 6/10/2012. Release of Transcript Restriction set for 8/8/2012. (Montini, S.) (Entered: 05/10/2012) |
| 05/11/2012 | 1146 | TRANSCRIPT of Proceedings: as to Azibo Aquart Type of Hearing: Trial Transcript, Volume XI. Held on 5/5/11 before Judge Arterton. Court Reporter: S. Montini. **IMPORTANT NOTICE – REDACTION OF TRANSCRIPTS:** To remove personal identifier information from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within seven (7) calendar days of this date. If no such Notice is filed, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available through PACER without redaction 90 days from today's date. The transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. The policy governing the redaction of |

**A.46**

| | | |
|---|---|---|
| | | personal information is located on the court website at www.ctd.uscourts.gov. Redaction Request due 6/1/2012. Redacted Transcript Deadline set for 6/11/2012. Release of Transcript Restriction set for 8/9/2012. (Montini, S.) (Entered: 05/11/2012) |
| 05/11/2012 | 1147 | TRANSCRIPT of Proceedings: as to Azibo Aquart Type of Hearing: Trial Transcript, Volume XIII. Held on 5/10/11 before Judge Arterton. Court Reporter: S. Montini. **IMPORTANT NOTICE – REDACTION OF TRANSCRIPTS:** To remove personal identifier information from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within seven (7) calendar days of this date. If no such Notice is filed, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available through PACER without redaction 90 days from today's date. The transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. The policy governing the redaction of personal information is located on the court website at www.ctd.uscourts.gov. Redaction Request due 6/1/2012. Redacted Transcript Deadline set for 6/11/2012. Release of Transcript Restriction set for 8/9/2012. (Montini, S.) (Entered: 05/11/2012) |
| 05/11/2012 | 1148 | TRANSCRIPT of Proceedings: as to Azibo Aquart Type of Hearing: Trial Transcript, Volume XIV. Held on 5/11/11 before Judge Arterton. Court Reporter: S. Montini. **IMPORTANT NOTICE – REDACTION OF TRANSCRIPTS:** To remove personal identifier information from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within seven (7) calendar days of this date. If no such Notice is filed, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available through PACER without redaction 90 days from today's date. The transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. The policy governing the redaction of personal information is located on the court website at www.ctd.uscourts.gov. Redaction Request due 6/1/2012. Redacted Transcript Deadline set for 6/11/2012. Release of Transcript Restriction set for 8/9/2012. (Montini, S.) (Entered: 05/11/2012) |
| 05/11/2012 | 1149 | TRANSCRIPT of Proceedings: as to Azibo Aquart Type of Hearing: Trial Transcript, Volume XV. Held on 5/12/11 before Judge Arterton. Court Reporter: S. Montini. **IMPORTANT NOTICE – REDACTION OF TRANSCRIPTS:** To remove personal identifier information from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within seven (7) calendar days of this date. If no such Notice is filed, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available through PACER without redaction 90 days from today's date. The transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. The policy governing the redaction of personal information is located on the court website at www.ctd.uscourts.gov. Redaction Request due 6/1/2012. Redacted Transcript Deadline set for 6/11/2012. Release of Transcript Restriction set for 8/9/2012. (Montini, S.) (Entered: 05/11/2012) |
| 05/11/2012 | 1150 | TRANSCRIPT of Proceedings: as to Azibo Aquart Type of Hearing: Transcript of Guilt Phase Charge Conference, Volume I. Held on 5/13/11 before Judge Arterton. Court Reporter: S. Montini. **IMPORTANT NOTICE – REDACTION OF TRANSCRIPTS:** To remove personal identifier information from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within seven (7) calendar days of this date. If no such Notice is filed, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available through PACER without redaction 90 days from today's date. The transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. The policy governing the redaction of personal information is located on the court website at www.ctd.uscourts.gov. Redaction Request due 6/1/2012. Redacted Transcript Deadline set for 6/11/2012. Release of Transcript Restriction set for 8/9/2012. (Montini, S.) (Entered: 05/11/2012) |

| 05/11/2012 | 1151 | TRANSCRIPT of Proceedings: as to Azibo Aquart Type of Hearing: Trial Transcript, Volume XVI. Held on 5/13/11 before Judge Arterton. Court Reporter: S. Montini. **IMPORTANT NOTICE – REDACTION OF TRANSCRIPTS:** To remove personal identifier information from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within seven (7) calendar days of this date. If no such Notice is filed, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available through PACER without redaction 90 days from today's date. The transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. The policy governing the redaction of personal information is located on the court website at www.ctd.uscourts.gov. Redaction Request due 6/1/2012. Redacted Transcript Deadline set for 6/11/2012. Release of Transcript Restriction set for 8/9/2012. (Montini, S.) (Entered: 05/11/2012) |
|---|---|---|
| 05/11/2012 | 1152 | TRANSCRIPT of Proceedings: as to Azibo Aquart Type of Hearing: Trial Transcript, Volume XVII. Held on 5/16/11 before Judge Arterton. Court Reporter: S. Montini. **IMPORTANT NOTICE – REDACTION OF TRANSCRIPTS:** To remove personal identifier information from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within seven (7) calendar days of this date. If no such Notice is filed, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available through PACER without redaction 90 days from today's date. The transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. The policy governing the redaction of personal information is located on the court website at www.ctd.uscourts.gov. Redaction Request due 6/1/2012. Redacted Transcript Deadline set for 6/11/2012. Release of Transcript Restriction set for 8/9/2012. (Montini, S.) (Entered: 05/11/2012) |
| 05/11/2012 | 1153 | TRANSCRIPT of Proceedings: as to Azibo Aquart Type of Hearing: Trial Transcript, Volume XVIII. Held on 5/17/11 before Judge Arterton. Court Reporter: S. Montini. **IMPORTANT NOTICE – REDACTION OF TRANSCRIPTS:** To remove personal identifier information from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within seven (7) calendar days of this date. If no such Notice is filed, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available through PACER without redaction 90 days from today's date. The transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. The policy governing the redaction of personal information is located on the court website at www.ctd.uscourts.gov. Redaction Request due 6/1/2012. Redacted Transcript Deadline set for 6/11/2012. Release of Transcript Restriction set for 8/9/2012. (Montini, S.) (Entered: 05/11/2012) |
| 05/11/2012 | 1154 | TRANSCRIPT of Proceedings: as to Azibo Aquart Type of Hearing: Trial Transcript, Volume XIX. Held on 5/18/11 before Judge Arterton. Court Reporter: S. Montini. **IMPORTANT NOTICE – REDACTION OF TRANSCRIPTS:** To remove personal identifier information from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within seven (7) calendar days of this date. If no such Notice is filed, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available through PACER without redaction 90 days from today's date. The transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. The policy governing the redaction of personal information is located on the court website at www.ctd.uscourts.gov. Redaction Request due 6/1/2012. Redacted Transcript Deadline set for 6/11/2012. Release of Transcript Restriction set for 8/9/2012. (Montini, S.) (Entered: 05/11/2012) |
| 05/11/2012 | 1155 | TRANSCRIPT of Proceedings: as to Azibo Aquart Type of Hearing: Transcript of Guilt Phase Charge Conference, Volume II. Held on 5/18/11 before Judge Arterton. Court Reporter: S. Montini. **IMPORTANT NOTICE – REDACTION OF TRANSCRIPTS:** To remove personal identifier information from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within seven (7) calendar days of this date. If no such Notice is filed, the court |

| | | |
|---|---|---|
| | | will assume redaction of personal identifiers is not necessary and the transcript will be made available through PACER without redaction 90 days from today's date. The transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. The policy governing the redaction of personal information is located on the court website at www.ctd.uscourts.gov. Redaction Request due 6/1/2012. Redacted Transcript Deadline set for 6/11/2012. Release of Transcript Restriction set for 8/9/2012. (Montini, S.) (Entered: 05/11/2012) |
| 05/11/2012 | 1156 | TRANSCRIPT of Proceedings: as to Azibo Aquart Type of Hearing: Trial Transcript, Volume XX. Held on 5/20/11 before Judge Arterton. Court Reporter: S. Montini. **IMPORTANT NOTICE – REDACTION OF TRANSCRIPTS:** To remove personal identifier information from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within seven (7) calendar days of this date. If no such Notice is filed, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available through PACER without redaction 90 days from today's date. The transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. The policy governing the redaction of personal information is located on the court website at www.ctd.uscourts.gov. Redaction Request due 6/1/2012. Redacted Transcript Deadline set for 6/11/2012. Release of Transcript Restriction set for 8/9/2012. (Montini, S.) (Entered: 05/11/2012) |
| 05/11/2012 | 1157 | TRANSCRIPT of Proceedings: as to Azibo Aquart Type of Hearing: Trial Transcript, Volume XXI. Held on 5/23/11 before Judge Arterton. Court Reporter: S. Montini. **IMPORTANT NOTICE – REDACTION OF TRANSCRIPTS:** To remove personal identifier information from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within seven (7) calendar days of this date. If no such Notice is filed, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available through PACER without redaction 90 days from today's date. The transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. The policy governing the redaction of personal information is located on the court website at www.ctd.uscourts.gov. Redaction Request due 6/1/2012. Redacted Transcript Deadline set for 6/11/2012. Release of Transcript Restriction set for 8/9/2012. (Montini, S.) (Entered: 05/11/2012) |
| 05/11/2012 | 1158 | TRANSCRIPT of Proceedings: as to Azibo Aquart Type of Hearing: Transcript of Telephone Conference. Held on 5/24/11 before Judge Arterton. Court Reporter: S. Montini. **IMPORTANT NOTICE – REDACTION OF TRANSCRIPTS:** To remove personal identifier information from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within seven (7) calendar days of this date. If no such Notice is filed, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available through PACER without redaction 90 days from today's date. The transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. The policy governing the redaction of personal information is located on the court website at www.ctd.uscourts.gov. Redaction Request due 6/1/2012. Redacted Transcript Deadline set for 6/11/2012. Release of Transcript Restriction set for 8/9/2012. (Montini, S.) (Entered: 05/11/2012) |
| 05/11/2012 | 1159 | TRANSCRIPT of Proceedings: as to Azibo Aquart Type of Hearing: Transcript of Motions Hearing. Held on 5/26/11 before Judge Arterton. Court Reporter: S. Montini. **IMPORTANT NOTICE – REDACTION OF TRANSCRIPTS:** To remove personal identifier information from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within seven (7) calendar days of this date. If no such Notice is filed, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available through PACER without redaction 90 days from today's date. The transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. The policy governing the redaction of |

| | | personal information is located on the court website at www.ctd.uscourts.gov. Redaction Request due 6/1/2012. Redacted Transcript Deadline set for 6/11/2012. Release of Transcript Restriction set for 8/9/2012. (Montini, S.) (Entered: 05/11/2012) |
|---|---|---|
| 05/11/2012 | 1160 | TRANSCRIPT of Proceedings as to Azibo Aquart Type of Hearing: Trial Transcript, Volume XXII. Held on 5/31/11 before Judge Arterton. Court Reporter: S. Montini. **IMPORTANT NOTICE – REDACTION OF TRANSCRIPTS:** To remove personal identifier information from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within seven (7) calendar days of this date. If no such Notice is filed, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available through PACER without redaction 90 days from today's date. The transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. The policy governing the redaction of personal information is located on the court website at www.ctd.uscourts.gov. Redaction Request due 6/1/2012. Redacted Transcript Deadline set for 6/11/2012. Release of Transcript Restriction set for 8/9/2012. (Montini, S.) (Entered: 05/11/2012) |
| 05/24/2012 | 1161 | ORDER: granting 1107 Sealed Document Motion to modify phase three CJA budget filed by Azibo Aquart. Signed by Judge Joan G. Margolis on 5/23/2012. (Rodko, B.) (Entered: 05/24/2012) |
| 12/06/2012 | 1177 | RULING denying 1102 Motion for New Trial as to Azibo Aquart (3). Signed by Judge Janet Bond Arterton on 12/6/12. (Torday, B.) (Entered: 12/06/2012) |
| 12/06/2012 | 1178 | NOTICE OF E–FILED CALENDAR as to Azibo Aquart: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. Sentencing set for 12/17/2012 01:30 PM in Courtroom Two, 141 Church St., New Haven, CT before Judge Janet Bond Arterton (Torday, B.) (Entered: 12/06/2012) |
| 12/11/2012 | 1193 | Minute Entry for proceedings held before Judge Janet Bond Arterton:Telephone Status Conference as to Azibo Aquart held on 12/11/2012 Total Time: 1 hours(Torday, B.) (Entered: 01/04/2013) |
| 12/13/2012 | 1179 | SENTENCING MEMORANDUM by Azibo Aquart (Sheehan, Michael) (Entered: 12/13/2012) |
| 12/14/2012 | 1180 | ORDER as to Azibo Aquart. Signed by Judge Janet Bond Arterton on 12/14/12. (Tooker, A.) (Entered: 12/14/2012) |
| 12/16/2012 | 1181 | RESPONSE/REPLY by USA as to Azibo Aquart re 1179 Sentencing Memorandum (Reynolds, Alina) (Entered: 12/16/2012) |
| 12/16/2012 | 1182 | RESPONSE/REPLY by Azibo Aquart *Regarding 1179 Sentencing* (Sheehan, Michael) Modified on 12/17/2012 to create link to 1179(Malone, P.). (Entered: 12/16/2012) |
| 12/17/2012 | 1183 | ORAL MOTION to Dismiss to dismiss all outstanding countsby USA as to Azibo Aquart. (Torday, B.) (Entered: 12/18/2012) |
| 12/17/2012 | 1184 | Minute Entry for proceedings held before Judge Janet Bond Arterton: granting 1183 Motion to Dismiss all remaining courts as to Azibo Aquart (3); Sentencing as to Azibo Aquart held on 12/17/2012. 45 minutes(Court Reporter Sharon Montini.) (Torday, B.) (Entered: 12/18/2012) |
| 12/18/2012 | 1185 | JUDGMENT as to Azibo Aquart (3), Count(s) 1, 1s, 1ss, Dismiss by USA; Counts 10ss, 10sss, 2s–4s, 2ss–4ss, 5s, 5ss–7ss, 7s, 8ss, Dismissed by USA; Count(s) 1sss, Defendant is hereby sentenced On Count One, the defendant Azibo Aquart is sentenced to a term of imprisonment of ten years with three years of supervised release.All sentences imposed on Counts 1 through 8 are to run consecutively to each Count(s) 2sss–4sss, Pursuant to Title 18, United States Code, Sections 3591–3597 and in accordance with the Special Verdict Form (Penalty Phase) dated June 15, 2011, it is hereby ORDERED that the death penalty be imposed on defendant Azibo Aquart on each of Counts Two and Four.; Count(s) 3, On Count Three, the defendant Azibo Aquart is sentenced to a term of life imprisonment.; On Count Six, the defendant Azibo Aquart is sentenced to a term of life imprisonment. Counts 5sss–7sss, Pursuant |

| | | to Title 18, United States Code, Sections 3591–3597, and Title 21, United States Code, Section 848(n)(9)(1996), and in accordance with the Special Verdict Form (Penalty Phase) dated June 15, 2011, it is hereby ORDERED that the death penalty be imposed on defendant Azibo Aquart on each of Counts Five and Seven.; Count(s) 8sss, On Count Eight, the defendant Azibo Aquart is sentenced to a term of life imprisonment and supervised release for life.. Signed by Judge Janet Bond Arterton on 12/18/12. (Torday, B.) (Entered: 12/18/2012) |
|---|---|---|
| 12/30/2012 | 1191 | NOTICE OF APPEAL by Azibo Aquart Filing fee $ 455. (Sheehan, Michael) (Entered: 12/30/2012) |
| 12/30/2012 | | Transmission of Notice of Appeal as to Azibo Aquart to US Court of Appeals re 1191 Notice of Appeal – Final Judgment (Bauer, J.) (Entered: 01/02/2013) |
| 01/02/2013 | 1192 | MOTION to Amend/Correct 1185 *Judgment* by Azibo Aquart. (Sheehan, Michael) Modified on 1/4/2013 to create link(Falcone, K.). (Entered: 01/02/2013) |
| 01/14/2013 | 1194 | ORDER granting 1192 Motion to Amend/Correct as to Azibo Aquart (3). Signed by Judge Janet Bond Arterton on 1/11/13. (Torday, B.) (Entered: 01/14/2013) |
| 01/14/2013 | 1195 | AMENDED JUDGMENT as to Azibo Aquart (3), Count(s) 1, 1s, 1ss, Dismiss by USA; Count(s) 10ss, 10sss, 2s–4s, 2ss–4ss, 5s, 5ss–7ss, 7s, 8ss, Dismissed by USA; Count(s) 1sss, Defendant is hereby sentencedOn Count One, the defendant Azibo Aquart is sentenced to a term of imprisonment of ten years with three years of supervised release.All sentences imposed on Counts 1 through 8 are to run consecutively to each other.Count(s) 2sss–4sss, Pursuant to Title 18, United States Code, Sections 3591–3597 and in accordance with the Special Verdict Form (Penalty Phase) dated June 15, 2011, it is hereby ORDERED that the death penalty be imposed on defendant Azibo Aquart on each of Counts Two and Four.; Count(s) 3, On Count Three, the defendant Azibo Aquart is sentenced to a term of life imprisonment.; Count(s) 5sss–7sss, Pursuant to Title 18, United States Code, Sections 3591–3597, and Title 21, United States Code, Section 848(n)(9)(1996), and in accordance with the Special Verdict Form (Penalty Phase) dated June 15, 2011, it is hereby ORDERED that the death penalty be imposed on defendant Azibo Aquart on each of Counts Five and Seven.; Count(s) 8sss, On Count Eight, the defendant Azibo Aquart is sentenced to a term of life imprisonment and supervised release for life. AMENDED JUDGMENTThe defendant shall pay to the United States a special assessment of $100.00 on each of Counts One through Eight, for a total of $800, which shall be made to the Clerk of Court from defendants earnings under the Bureau of Prisons Inmate Financial Responsibility Program.Title 18, United States Code, Section 3013(a).<br>Signed by Judge Janet Bond Arterton on 1/11/13. (Torday, B.) (Entered: 01/14/2013) |
| 02/14/2013 | 1196 | TRANSCRIPT of Proceedings: as to Azibo Aquart Type of Hearing: Transcript of Sentencing Hearing. Held on 12/17/12 before Judge Arterton. Court Reporter: S. Montini. **IMPORTANT NOTICE – REDACTION OF TRANSCRIPTS:** To remove personal identifier information from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within seven (7) calendar days of this date. If no such Notice is filed, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available through PACER without redaction 90 days from today's date. The transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. The policy governing the redaction of personal information is located on the court website at www.ctd.uscourts.gov. Redaction Request due 3/7/2013. Redacted Transcript Deadline set for 3/17/2013. Release of Transcript Restriction set for 5/15/2013. (Montini, S.) (Entered: 02/14/2013) |
| 02/14/2013 | 1197 | TRANSCRIPT of Proceedings: as to Azibo Aquart Type of Hearing: Transcript of Jury Selection, Day Three. Held on 3/3/11 before Judge Arterton. Court Reporter: S. Montini. **IMPORTANT NOTICE – REDACTION OF TRANSCRIPTS:** To remove personal identifier information from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within seven (7) calendar days of this date. If no such Notice is filed, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available |

| | | |
|---|---|---|
| | | through PACER without redaction 90 days from today's date. The transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. The policy governing the redaction of personal information is located on the court website at www.ctd.uscourts.gov. Redaction Request due 3/7/2013. Redacted Transcript Deadline set for 3/17/2013. Release of Transcript Restriction set for 5/15/2013. (Montini, S.) (Entered: 02/14/2013) |
| 04/02/2013 | 1198 | CJA 24 as to Azibo Aquart: Authorization to Pay Sharon Montini $ 98.55 for Transcript, Voucher # 130306000072. Date of Court Hearing 12/17/12 Signed by Judge Janet Bond Arterton on 2/22/13. (Wood, R.) (Entered: 04/02/2013) |
| 04/29/2013 | 1199 | TRANSCRIPT of Proceedings: as to Azibo Aquart Type of Hearing: Transcript of Telephone Conference. Held on 10/26/10 before Judge Arterton. Court Reporter: S. Montini. **IMPORTANT NOTICE – REDACTION OF TRANSCRIPTS:** To remove personal identifier information from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within seven (7) calendar days of this date. If no such Notice is filed, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available through PACER without redaction 90 days from today's date. The transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. The policy governing the redaction of personal information is located on the court website at www.ctd.uscourts.gov. Redaction Request due 5/20/2013. Redacted Transcript Deadline set for 5/30/2013. Release of Transcript Restriction set for 7/28/2013. (Montini, S.) (Entered: 04/29/2013) |
| 04/29/2013 | 1200 | TRANSCRIPT of Proceedings: as to Azibo Aquart Type of Hearing: Transcript of Telephone Conference. Held on 11/29/10 before Judge Arterton. Court Reporter: S. Montini. **IMPORTANT NOTICE – REDACTION OF TRANSCRIPTS:** To remove personal identifier information from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within seven (7) calendar days of this date. If no such Notice is filed, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available through PACER without redaction 90 days from today's date. The transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. The policy governing the redaction of personal information is located on the court website at www.ctd.uscourts.gov. Redaction Request due 5/20/2013. Redacted Transcript Deadline set for 5/30/2013. Release of Transcript Restriction set for 7/28/2013. (Montini, S.) (Entered: 04/29/2013) |
| 04/29/2013 | 1201 | TRANSCRIPT of Proceedings: as to Azibo Aquart Type of Hearing: Transcript of Telephone Conference. Held on 12/11/12 before Judge Arterton. Court Reporter: S. Montini. **IMPORTANT NOTICE – REDACTION OF TRANSCRIPTS:** To remove personal identifier information from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within seven (7) calendar days of this date. If no such Notice is filed, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available through PACER without redaction 90 days from today's date. The transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. The policy governing the redaction of personal information is located on the court website at www.ctd.uscourts.gov. Redaction Request due 5/20/2013. Redacted Transcript Deadline set for 5/30/2013. Release of Transcript Restriction set for 7/28/2013. (Montini, S.) (Entered: 04/29/2013) |
| 04/29/2013 | 1202 | TRANSCRIPT of Proceedings: as to Azibo Aquart Type of Hearing: Transcript of Telephone Conference. Held on 2/8/11 before Judge Arterton. Court Reporter: S. Montini. **IMPORTANT NOTICE – REDACTION OF TRANSCRIPTS:** To remove personal identifier information from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within seven (7) |

| | | |
|---|---|---|
| | | calendar days of this date. If no such Notice is filed, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available through PACER without redaction 90 days from today's date. The transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. The policy governing the redaction of personal information is located on the court website at www.ctd.uscourts.gov. Redaction Request due 5/20/2013. Redacted Transcript Deadline set for 5/30/2013. Release of Transcript Restriction set for 7/28/2013. (Montini, S.) (Entered: 04/29/2013) |
| 04/29/2013 | 1203 | TRANSCRIPT of Proceedings: as to Azibo Aquart Type of Hearing: Transcript of Telephone Conference. Held on 4/18/11 before Judge Arterton. Court Reporter: S. Montini. **IMPORTANT NOTICE – REDACTION OF TRANSCRIPTS:** To remove personal identifier information from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within seven (7) calendar days of this date. If no such Notice is filed, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available through PACER without redaction 90 days from today's date. The transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. The policy governing the redaction of personal information is located on the court website at www.ctd.uscourts.gov. Redaction Request due 5/20/2013. Redacted Transcript Deadline set for 5/30/2013. Release of Transcript Restriction set for 7/28/2013. (Montini, S.) (Entered: 04/29/2013) |
| 05/01/2013 | 1205 | TRANSCRIPT of Proceedings: as to Azibo Aquart Type of Hearing: Transcript of Status Conference. Held on 7/6/10 before Judge Arterton. Court Reporter: S. Montini. **IMPORTANT NOTICE – REDACTION OF TRANSCRIPTS:** To remove personal identifier information from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within seven (7) calendar days of this date. If no such Notice is filed, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available through PACER without redaction 90 days from today's date. The transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. The policy governing the redaction of personal information is located on the court website at www.ctd.uscourts.gov. Redaction Request due 5/22/2013. Redacted Transcript Deadline set for 6/1/2013. Release of Transcript Restriction set for 7/30/2013. (Montini, S.) (Entered: 05/01/2013) |
| 05/01/2013 | 1206 | TRANSCRIPT of Proceedings: as to Azibo Aquart Type of Hearing: Transcript of Status Conference. Held on 8/17/10 before Judge Arterton. Court Reporter: S. Montini. **IMPORTANT NOTICE – REDACTION OF TRANSCRIPTS:** To remove personal identifier information from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within seven (7) calendar days of this date. If no such Notice is filed, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available through PACER without redaction 90 days from today's date. The transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. The policy governing the redaction of personal information is located on the court website at www.ctd.uscourts.gov. Redaction Request due 5/22/2013. Redacted Transcript Deadline set for 6/1/2013. Release of Transcript Restriction set for 7/30/2013. (Montini, S.) (Entered: 05/01/2013) |
| 05/01/2013 | 1207 | TRANSCRIPT of Proceedings: as to Azibo Aquart Type of Hearing: Transcript of Telephone Conference. Held on 8/19/10 before Judge Arterton. Court Reporter: S. Montini. **IMPORTANT NOTICE – REDACTION OF TRANSCRIPTS:** To remove personal identifier information from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within seven (7) calendar days of this date. If no such Notice is filed, the court will assume redaction |

**A.53**

| | | |
|---|---|---|
| | | of personal identifiers is not necessary and the transcript will be made available through PACER without redaction 90 days from today's date. The transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. The policy governing the redaction of personal information is located on the court website at www.ctd.uscourts.gov. Redaction Request due 5/22/2013. Redacted Transcript Deadline set for 6/1/2013. Release of Transcript Restriction set for 7/30/2013. (Montini, S.) (Entered: 05/01/2013) |
| 08/22/2013 | 1218 | MOTION for sealed transcripts by Azibo Aquart. (Torday, B.) (Entered: 08/29/2013) |
| 08/29/2013 | 1219 | ORDER granting 1218 Motion for sealed transcripts as to Azibo Aquart (3). Signed by Judge Janet Bond Arterton on 8/28/13. (Torday, B.) (Entered: 08/29/2013) |
| 08/29/2013 | 1220 | ORDER as to Azibo Aquart re 1218 MOTION for sealed transcripts filed by Azibo Aquart<br>Signed by Judge Janet Bond Arterton on 8/28/13. (Torday, B.) (Entered: 08/29/2013) |
| 08/30/2013 | 1221 | ORDER as to Azikiwe Aquart re 1218 MOTION for sealed transcripts filed by Azibo Aquart. Appellate counsel for Azibo Aquart are permitted to obtain and review the sealed transcript of the 6/20/11 status conference in the case of Azikiwe Aquart. Signed by Judge Stefan R. Underhill on 8/30/13. (Sbalbi, D.) (Entered: 08/30/2013) |
| 09/04/2013 | 1222 | SEALED TRANSCRIPT of Proceedings: as to Azibo Aquart Type of Hearing: Transcript of Telephone Conference. Held on 3/4/11 before Judge Arterton. Court Reporter: S. Montini. **IMPORTANT NOTICE – REDACTION OF TRANSCRIPTS:** To remove personal identifier information from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within seven (7) calendar days of this date. If no such Notice is filed, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available through PACER without redaction 90 days from today's date. The transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. The policy governing the redaction of personal information is located on the court website at www.ctd.uscourts.gov. Redaction Request due 9/25/2013. Redacted Transcript Deadline set for 10/5/2013. Release of Transcript Restriction set for 12/3/2013. (Montini, S.) Modified on 4/11/2014 (Torday, B.). (Entered: 09/04/2013) |
| 11/22/2013 | 1225 | MOTION GOVERNMENTS MOTION TO TRANSFER EVIDENCE by USA as to Azibo Aquart, Efrain Johnson. (Attachments: # 1 ATTACHMENT A, # 2 ATTACHMENT B, # 3 ATTACHMENT C)(Markle, Peter) (Entered: 11/22/2013) |
| 11/25/2013 | 1226 | ORDER granting, pursuant to the parties agreement 1225 Motion to transfer evidence as to Azibo Aquart (3), Efrain Johnson (4). Signed by Judge Janet Bond Arterton on 11/25/13. (Torday, B.) (Entered: 11/25/2013) |
| 11/25/2013 | 1227 | Government exhibits returned this date as to Azibo Aquart, Efrain Johnson: (Torday, B.) Modified on 12/2/2013 (Torday, B.). (Entered: 11/27/2013) |
| 02/19/2014 | 1228 | MOTION to transfer defense trial exhibits to appellate counsel by Azibo Aquart. (Torday, B.) Modified on 2/20/2014 (Torday, B.). (Entered: 02/20/2014) |
| 02/20/2014 | 1229 | ORDER granting 1228 Motion to transfer defense trial exhibits to appellate counsel as to Azibo Aquart (3). Signed by Judge Janet Bond Arterton on 2/19/14. (Torday, B.) (Entered: 02/20/2014) |
| 03/25/2014 | 1230 | Defendant trial exhibits returned as to Azibo Aquart: (Torday, B.) (Entered: 03/26/2014) |
| 04/04/2014 | 1231 | MOTION to transmit sealed documents to appellate counsel by Azibo Aquart. (Torday, B.) (Entered: 04/04/2014) |
| 04/04/2014 | 1232 | ORDER granting 1231 Motion to transmit sealed documents as to Azibo Aquart (3). Signed by Judge Janet Bond Arterton on 4/4/14. (Torday, B.) (Entered: 04/04/2014) |

| | | |
|---|---|---|
| 10/15/2014 | 1236 | CORRECTED TRANSCRIPT of Proceedings: as to Azibo Aquart Type of Hearing: Trial Transcript, Volume XIV. Held on 5/11/11 before Judge Arterton. Court Reporter: S. Montini. **IMPORTANT NOTICE – REDACTION OF TRANSCRIPTS:** To remove personal identifier information from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within seven (7) calendar days of this date. If no such Notice is filed, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available through PACER without redaction 90 days from today's date. The transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. The policy governing the redaction of personal information is located on the court website at www.ctd.uscourts.gov. Redaction Request due 11/5/2014. Redacted Transcript Deadline set for 11/15/2014. Release of Transcript Restriction set for 1/13/2015. (Montini, S.) (Entered: 10/15/2014) |
| 12/11/2014 | 1237 | TRANSCRIPT of Proceedings: as to Azibo Aquart Type of Hearing: Trial Transcript, Volume XXIV. Held on 6/1/11 before Judge Arterton. Court Reporter: S. Montini. **IMPORTANT NOTICE – REDACTION OF TRANSCRIPTS:** To remove personal identifier information from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within seven (7) calendar days of this date. If no such Notice is filed, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available through PACER without redaction 90 days from today's date. The transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. The policy governing the redaction of personal information is located on the court website at www.ctd.uscourts.gov. Redaction Request due 1/1/2015. Redacted Transcript Deadline set for 1/11/2015. Release of Transcript Restriction set for 3/11/2015. (Montini, S.) (Entered: 12/11/2014) |
| 12/11/2014 | 1238 | TRANSCRIPT of Proceedings: as to Azibo Aquart Type of Hearing: Penalty Phase Charge Conference, Volume I. Held on 6/6/11 before Judge Arterton. Court Reporter: S. Montini. **IMPORTANT NOTICE – REDACTION OF TRANSCRIPTS:** To remove personal identifier information from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within seven (7) calendar days of this date. If no such Notice is filed, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available through PACER without redaction 90 days from today's date. The transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. The policy governing the redaction of personal information is located on the court website at www.ctd.uscourts.gov. Redaction Request due 1/1/2015. Redacted Transcript Deadline set for 1/11/2015. Release of Transcript Restriction set for 3/11/2015. (Montini, S.) (Entered: 12/11/2014) |
| 12/11/2014 | 1239 | TRANSCRIPT of Proceedings: as to Azibo Aquart Type of Hearing: Penalty Phase Charge Conference, Volume II. Held on 6/7/11 before Judge Arterton. Court Reporter: S. Montini. **IMPORTANT NOTICE – REDACTION OF TRANSCRIPTS:** To remove personal identifier information from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within seven (7) calendar days of this date. If no such Notice is filed, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available through PACER without redaction 90 days from today's date. The transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. The policy governing the redaction of personal information is located on the court website at www.ctd.uscourts.gov. Redaction Request due 1/1/2015. Redacted Transcript Deadline set for 1/11/2015. Release of Transcript Restriction set for 3/11/2015. (Montini, S.) (Entered: 12/11/2014) |
| 12/11/2014 | 1240 | TRANSCRIPT of Proceedings: as to Azibo Aquart Type of Hearing: Trial Transcript, Volume XXV. Held on 6/2/11 before Judge Arterton. Court Reporter: S. Montini. |

**A.55**

| | | |
|---|---|---|
| | | **IMPORTANT NOTICE – REDACTION OF TRANSCRIPTS:** To remove personal identifier information from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within seven (7) calendar days of this date. If no such Notice is filed, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available through PACER without redaction 90 days from today's date. The transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. The policy governing the redaction of personal information is located on the court website at www.ctd.uscourts.gov. Redaction Request due 1/1/2015. Redacted Transcript Deadline set for 1/11/2015. Release of Transcript Restriction set for 3/11/2015. (Montini, S.) (Entered: 12/11/2014) |
| 12/11/2014 | 1241 | TRANSCRIPT of Proceedings: as to Azibo Aquart Type of Hearing: Trial Transcript, Volume XXVI. Held on 6/3/11 before Judge Arterton. Court Reporter: S. Montini. **IMPORTANT NOTICE – REDACTION OF TRANSCRIPTS:** To remove personal identifier information from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within seven (7) calendar days of this date. If no such Notice is filed, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available through PACER without redaction 90 days from today's date. The transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. The policy governing the redaction of personal information is located on the court website at www.ctd.uscourts.gov. Redaction Request due 1/1/2015. Redacted Transcript Deadline set for 1/11/2015. Release of Transcript Restriction set for 3/11/2015. (Montini, S.) (Entered: 12/11/2014) |
| 12/11/2014 | 1242 | TRANSCRIPT of Proceedings: as to Azibo Aquart Type of Hearing: Trial Transcript, Volume XXIX. Held on 6/13/11 before Judge Arterton. Court Reporter: S. Montini. **IMPORTANT NOTICE – REDACTION OF TRANSCRIPTS:** To remove personal identifier information from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within seven (7) calendar days of this date. If no such Notice is filed, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available through PACER without redaction 90 days from today's date. The transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. The policy governing the redaction of personal information is located on the court website at www.ctd.uscourts.gov. Redaction Request due 1/1/2015. Redacted Transcript Deadline set for 1/11/2015. Release of Transcript Restriction set for 3/11/2015. (Montini, S.) (Entered: 12/11/2014) |
| 12/11/2014 | 1243 | TRANSCRIPT of Proceedings: as to Azibo Aquart Type of Hearing: Trial Transcript, Volume XXX. Held on 6/14/11 before Judge Arterton. Court Reporter: S. Montini. **IMPORTANT NOTICE – REDACTION OF TRANSCRIPTS:** To remove personal identifier information from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within seven (7) calendar days of this date. If no such Notice is filed, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available through PACER without redaction 90 days from today's date. The transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. The policy governing the redaction of personal information is located on the court website at www.ctd.uscourts.gov. Redaction Request due 1/1/2015. Redacted Transcript Deadline set for 1/11/2015. Release of Transcript Restriction set for 3/11/2015. (Montini, S.) (Entered: 12/11/2014) |
| 12/11/2014 | 1244 | TRANSCRIPT of Proceedings: as to Azibo Aquart Type of Hearing: Trial Transcript, Volume XXXI. Held on 6/15/11 before Judge Arterton. Court Reporter: S. Montini. **IMPORTANT NOTICE – REDACTION OF TRANSCRIPTS:** To remove |

**A.56**

| | | |
|---|---|---|
| | | personal identifier information from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within seven (7) calendar days of this date. If no such Notice is filed, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available through PACER without redaction 90 days from today's date. The transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. The policy governing the redaction of personal information is located on the court website at www.ctd.uscourts.gov. Redaction Request due 1/1/2015. Redacted Transcript Deadline set for 1/11/2015. Release of Transcript Restriction set for 3/11/2015. (Montini, S.) (Entered: 12/11/2014) |
| 12/11/2014 | 1245 | TRANSCRIPT of Proceedings: as to Azibo Aquart Type of Hearing: Trial Transcript, Volume XXVII. Held on 6/6/11 before Judge Arterton. Court Reporter: S. Montini. **IMPORTANT NOTICE – REDACTION OF TRANSCRIPTS:** To remove personal identifier information from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within seven (7) calendar days of this date. If no such Notice is filed, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available through PACER without redaction 90 days from today's date. The transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. The policy governing the redaction of personal information is located on the court website at www.ctd.uscourts.gov. Redaction Request due 1/1/2015. Redacted Transcript Deadline set for 1/11/2015. Release of Transcript Restriction set for 3/11/2015. (Montini, S.) (Entered: 12/11/2014) |
| 12/11/2014 | 1246 | TRANSCRIPT of Proceedings: as to Azibo Aquart Type of Hearing: Trial Transcript, Volume XXVIII. Held on 6/7/11 before Judge Arterton. Court Reporter: S. Montini. **IMPORTANT NOTICE – REDACTION OF TRANSCRIPTS:** To remove personal identifier information from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within seven (7) calendar days of this date. If no such Notice is filed, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available through PACER without redaction 90 days from today's date. The transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. The policy governing the redaction of personal information is located on the court website at www.ctd.uscourts.gov. Redaction Request due 1/1/2015. Redacted Transcript Deadline set for 1/11/2015. Release of Transcript Restriction set for 3/11/2015. (Montini, S.) (Entered: 12/11/2014) |

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FILED

B-09-02

2010 MAR -3  P 3: 15

UNITED STATES OF AMERICA

- v -

AZIBO AQUART,
 also known as "Azibo Smith," "D,"
 "Dreddy" and "Jumbo;"
AZIKIWE AQUART,
 also known as "Z" and "Ziggy;" and
EFRAIN JOHNSON,
 also known as "Pootney."

CRIMINAL NUMBER: 3:06 CR 160 (PCD)

VIOLATIONS:
18 U.S.C. § 1959(a)(5)
(Conspiracy to Murder In Aid of
Racketeering);

18 U.S.C. § 1959(a)(1) (Murder In Aid of
Racketeering);

21 U.S.C. § 841(b)(1)(A) and 848(e)(1)(A)
(Drug-Related Murder);

21 U.S.C. §§ 846, 841(a)(1) and
841(b)(1)(A)(iii)
(Conspiracy to Distribute and to Possess
with Intent to Distribute 50 Grams or More
of Cocaine Base);

21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C)
(Possession with Intent to Distribute
Cocaine Base);

18 U.S.C. § 922(g)(1) and
924(e)(1)(Possession of a Firearm by a
Convicted Felon)

18 U.S.C. § 2 (Aiding and Abetting)

FOURTH SUPERSEDING INDICTMENT

The Grand Jury Charges:

Introduction to All Counts

  At various times relevant to this Fourth Superseding Indictment, in the District of

Connecticut and elsewhere:

1

**A.58**

The Enterprise

1.      **AZIBO AQUART**, also known as "Azibo Smith," "D," "Dreddy" and "Jumbo;" **AZIKIWE AQUART**, also known as "Z" and "Ziggy;" and **EFRAIN JOHNSON**, also known as "Pootney;" who are defendants herein, together with Rodney Womble, also known as "Big Man;" John Taylor, also known as "Big Boy;" Frankie Hodges, also known as "Steve;" Juanita Hopkins, also known as "Vanessa;" Nathaniel Grant, also known as "Stone;" Randi Washington, also known as "Bear;" James Rucker, also known as "Pops;" Sherrel Randolph, also known as "Sherrel Jones;" and Judith Rivera; who are not named as defendants herein, and others known and unknown to the Grand Jury, were officers, members and associates of a criminal organization, referred to in this Superseding Indictment as the "Aquart Enterprise" or the "enterprise," whose members and associates engaged in various acts of criminal activity including murder, conspiracy to murder, assault and narcotics trafficking.  The Aquart Enterprise operated primarily within the Charles Street Apartments located at 215 Charles Street, Bridgeport, Connecticut.

2.      The Aquart Enterprise, including its leadership, membership and associates, constituted an "enterprise" as defined in Title 18, United States Code, Section 1959(b)(2), that is, a group of individuals associated in fact which was engaged in, and the activities of which affected, interstate and foreign commerce.  The enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

3.      Defendant **AZIBO AQUART** founded and was the leader of the enterprise whose members and associates distributed cocaine base, primarily in Bridgeport, Connecticut. **AZIBO**

2

**A.59**

**AQUART** employed street-level narcotics dealers, including Hodges and Hopkins, among others, to sell drugs on behalf of the enterprise. Defendant **AZIBO AQUART** employed Womble as a "lieutenant" to provide the dealers with crack cocaine, to collect drug proceeds and to supervise and maintain control over the day-to-day operations of the enterprise. Defendant **AZIKIWE AQUART** was employed by **AZIBO AQUART** to supervise and maintain control over the activities of the street-level dealers. Defendant **AZIBO AQUART** also recruited and employed Grant, Washington and Taylor to act as "lookouts" to warn members and associates of the enterprise of police activity in and around the Charles Street Apartments, as well as of the trafficking activity of rival dealers that threatened the vitality of the drug enterprise. Defendant **EFRAIN JOHNSON** associated with, and was recruited by, defendant **AZIBO AQUART** to participate, and he did participate, in the murders of Tina Johnson, James Reid and Basil Williams in order that **JOHNSON** could gain entrance to and maintain and increase his position in the enterprise and as consideration for a promise and an agreement to pay anything of pecuniary value from the enterprise. John Taylor also associated with, and was recruited by, defendant **AZIBO AQUART** to participate, and he did participate, in the murders of Tina Johnson, James Reid and Basil Williams in order that Taylor could gain entrance to and maintain and increase his position in the enterprise and as consideration for a promise and an agreement to pay anything of pecuniary value from the enterprise.

<u>Goals and Purposes of the Enterprise</u>

4.      The members and associates of the Aquart Enterprise sought, among other things, to:

      a.      Preserve and protect the power, territory and profits of the Aquart

3

**A.60**

Enterprise through the use of intimidation, violence and threats of violence;

      b.     Promote and enhance the criminal activities of the Aquart Enterprise and its members and associates; and

      c.     Generate income for members and associates of the Aquart Enterprise through the sale and distribution of narcotics.

<u>Means and Methods of the Enterprise</u>

      5.     The members and associates of the Aquart Enterprise carried out criminal activities in furtherance of the conduct of the enterprise's affairs. **AZIBO AQUART**, **AZIKIWE AQUART** and **EFRAIN JOHNSON**, who are the defendants herein, and other members and associates of the enterprise, participated in the conduct of the affairs of the enterprise by the following means and methods, among others:

      a.     Obtaining large quantities of crack cocaine which were then re-packaged and distributed in retail quantities to the street-level dealers at locations in and around the Charles Street Apartments in Bridgeport, Connecticut.  The members and associates distributed the narcotics, after which the defendants and their associates would collect payment of the narcotics trafficking proceeds from the dealers employed by the enterprise; and

      b.     Committing, attempting to commit and threatening to commit acts of violence, including murder, attempted murder and assault, to protect and expand the Aquart Enterprise's criminal operations. These acts of violence were often perpetrated in a conspicuous manner in order to maintain control over members of the enterprise and to deter anyone who posed a threat to the continued vitality and success of the criminal activities of the enterprise.  In particular, in or about the summer of 2005, the enterprise became involved in a narcotics

**A.61**

trafficking dispute with a rival over the right to sell crack-cocaine within the Charles Street

Apartments.  This dispute resulted in members of the enterprise confronting their rival and her

associates.

COUNT ONE<br>
(Conspiracy to Murder In Aid of Racketeering)

6.      At various times relevant to this Superseding Indictment, the Aquart enterprise, as

more fully described in paragraphs one through five above, which are realleged and incorporated

as if fully set forth in this paragraph, constituted an enterprise as defined in Title 18, United

States Code, Section 1959(b)(2), that is, a group of individuals associated in fact which was

engaged in, and the activities of which affected, interstate and foreign commerce.

7.      From in or about the fall of 2004, to in or about August 2005, the above-described

enterprise through its members and associates engaged in racketeering activity as defined in Title

18, United States Code, Sections 1959(b)(1) and 1961(1), namely, narcotics trafficking in

violation of Title 21, United States Code, Sections 841(a)(1) and 846, and acts involving murder,

in violation of the laws of the State of Connecticut.

8.      In or about August 2005 and continuing to on or about August 24, 2005, in the

District of Connecticut, **AZIBO AQUART**, also known as "Azibo Smith," "D," "Dreddy" and

"Jumbo;" **AZIKIWE AQUART**, also known as "Z" and "Ziggy;" and **EFRAIN JOHNSON**,

also known as "Pootney;" who are the defendants herein, as consideration for the receipt of, and

as consideration for a promise and an agreement to pay, anything of pecuniary value from the

enterprise, and for the purpose of gaining entrance to and maintaining and increasing their

position in the enterprise, an enterprise engaged in racketeering activity, did unlawfully, willfully

5

**A.62**

and knowingly conspire to murder Tina Johnson and her associates, in violation of Connecticut

General Statutes, Section 53a-48(a), 53a-54c and 53a-54a.

All in violation of Title 18, United States Code, Section 1959(a)(5).

COUNT TWO<br>(Murder in Aid of Racketeering of Tina Johnson)

9.      At various times relevant to this Superseding Indictment, the Aquart Enterprise, as

more fully described in paragraphs one through five above, which are realleged and incorporated

as if fully set forth in this paragraph, constituted an enterprise as defined in Title 18, United

States Code, Section 1959(b)(2), that is, a group of individuals associated in fact, which was

engaged in, and the activities of which affected, interstate and foreign commerce.

10.     From in or about the fall of 2004, to in or about August 2005, the above-described

enterprise through its members and associates engaged in racketeering activity as defined in Title

18, United States Code, Sections 1959(b)(1) and 1961(1), namely, narcotics trafficking in

violation of Title 21, United States Code, Sections 841(a)(1) and 846, and acts involving murder,

in violation of the laws of the State of Connecticut.

11.     On or about August 24, 2005, in the District of Connecticut, **AZIBO AQUART**,

also known as "Azibo Smith," "D," "Dreddy" and "Jumbo;" **AZIKIWE AQUART**, also known

as "Z" and "Ziggy;" and **EFRAIN JOHNSON**, also known as "Pootney;" who are the

defendants herein, together with John Taylor, who is not named as a defendant herein, as

consideration for the receipt of, and as consideration for a promise and an agreement to pay,

anything of pecuniary value from the enterprise, and for the purpose of gaining entrance to and

maintaining and increasing their position in the enterprise, an enterprise engaged in racketeering

6

**A.63**

activity, did murder Tina Johnson unlawfully, willfully, knowingly, and in the perpetration of,

and attempt to perpetrate, a robbery, in violation of Connecticut General Statutes, Sections 53a-

54a, 53a-54c and 53a-8a.

All in violation of Title 18, United States Code, Section 1959(a)(1), and Title 18, United

States Code, Section 2.

COUNT THREE
(Murder in Aid of Racketeering of James Reid)

12.      At various times relevant to this Superseding Indictment, the Aquart Enterprise, as

described in paragraphs one through five above, which are realleged and incorporated as if fully

set forth in this paragraph, constituted an enterprise as defined in Title 18, United States Code,

Section 1959(b)(2), that is, a group of individuals associated in fact which was engaged in, and

the activities of which affected, interstate and foreign commerce.

13.      From in or about the fall of 2004, to in or about August 2005, the above-described

enterprise through its members and associates engaged in racketeering activity as defined in Title

18, United States Code, Sections 1959(b)(1) and 1961(1), namely, narcotics trafficking in

violation of Title 21, United States Code, Sections 841(a)(1) and 846, and acts involving murder,

in violation of the laws of the State of Connecticut.

14.      On or about August 24, 2005, in the District of Connecticut, **AZIBO AQUART**,

also known as "Azibo Smith," "D," "Dreddy" and "Jumbo;" **AZIKIWE AQUART**, also known

as "Z" and "Ziggy;" and **EFRAIN JOHNSON**, also known as "Pootney;" who are the

defendants herein, together with John Taylor, who is not named as a defendant herein, as

consideration for the receipt of, and as consideration for a promise and an agreement to pay,

7

**A.64**

anything of pecuniary value from the enterprise, and for the purpose of gaining entrance to and maintaining and increasing their position in the enterprise, an enterprise engaged in racketeering activity, did murder James Reid unlawfully, willfully, knowingly, and in the perpetration of, and attempt to perpetrate, a robbery, in violation of Connecticut General Statutes, Sections 53a-54a, 53a-54c and 53a-8a.

All in violation of Title 18, United States Code, Section 1959(a)(1), and Title 18, United States Code, Section 2.

<u>COUNT FOUR</u>
(Murder in Aid of Racketeering of Basil Williams)

15.    At various times relevant to this Superseding Indictment, the Aquart Enterprise, as more fully described in paragraphs one through five above, which are realleged and incorporated as if fully set forth in this paragraph, constituted an enterprise as defined in Title 18, United States Code, Section 1959(b)(2), that is, a group of individuals associated in fact which was engaged in, and the activities of which affected, interstate and foreign commerce.

16.    From in or about the fall of 2004, to in or about August 2005, the above-described enterprise through its members and associates engaged in racketeering activity as defined in Title 18, United States Code, Sections 1959(b)(1) and 1961(1), namely, narcotics trafficking in violation of Title 21, United States Code, Sections 841(a)(1) and 846, and acts involving murder, in violation of the laws of the State of Connecticut.

17.    On or about August 24, 2005, in the District of Connecticut, **AZIBO AQUART**, also known as "Azibo Smith," "D," "Dreddy" and "Jumbo;" **AZIKIWE AQUART**, also known as "Z" and "Ziggy;" and **EFRAIN JOHNSON**, also known as "Pootney;" who are the

8

**A.65**

defendants herein, together with John Taylor, who is not named as a defendant herein, as

consideration for the receipt of, and as consideration for a promise and an agreement to pay,

anything of pecuniary value from the enterprise, and for the purpose of gaining entrance to and

maintaining and increasing their position in the enterprise, an enterprise engaged in racketeering

activity, did murder Basil Williams unlawfully, willfully, knowingly, and in the perpetration of,

and attempt to perpetrate, a robbery, in violation of Connecticut General Statutes, Sections 53a-

54a, 53a-54c and 53a-8a.

All in violation of Title 18, United States Code, Section 1959(a)(1), and Title 18, United

States Code, Section 2.

COUNT FIVE
(Drug-Related Murder of Tina Johnson)

18.      On or about August 24, 2005, within the District of Connecticut, **AZIBO**

**AQUART**, also known as "Azibo Smith," "D," "Dreddy" and "Jumbo," and **AZIKIWE**

**AQUART**, also known as "Z" and "Ziggy;" who are the defendants herein, together with John

Taylor, who is not named as a defendant herein, while engaged in an offense punishable under

Section 841(b)(1)(A) of Title 21 of the United States Code, to wit: conspiracy to distribute and to

possess with intent to distribute 50 grams or more of a mixture and substance containing a

detectable amount of cocaine base ("crack cocaine"), a Schedule II controlled substance, did

knowingly and intentionally kill and command, induce, procure and cause the intentional killing

of Tina Johnson, and such killing did result.

In violation of Title 21, United States Code, Section 848(e)(1)(A), and Title 18, United

States Code, Section 2.

9

**A.66**

<u>COUNT SIX</u>
(Drug-Related Murder of James Reid)

19.     On or about August 24, 2005, within the District of Connecticut, **AZIBO AQUART**, also known as "Azibo Smith," "D," "Dreddy" and "Jumbo," and **AZIKIWE AQUART**, also known as "Z" and "Ziggy," who are the defendants herein, together with John Taylor, who is not named as a defendant herein, while engaged in an offense punishable under Section 841(b)(1)(A) of Title 21 of the United States Code, to wit: conspiracy to distribute and to possess with intent to distribute 50 grams or more of a mixture and substance containing a detectable amount of cocaine base ("crack cocaine"), a Schedule II controlled substance, did knowingly and intentionally kill and command, induce, procure and cause the intentional killing of James Reid, and such killing did result.

In violation of Title 21, United States Code, Section 848(e)(1)(A), and Title 18, United States Code, Section 2.

<u>COUNT SEVEN</u>
(Drug-Related Murder of Basil Williams)

20.     On or about August 24, 2005, within the District of Connecticut, **AZIBO AQUART**, also known as "Azibo Smith," "D," "Dreddy" and "Jumbo," and **AZIKIWE AQUART**, also known as "Z" and "Ziggy," who are the defendants herein, together with John Taylor, who is not named as a defendant herein, while engaged in an offense punishable under Section 841(b)(1)(A) of Title 21 of the United States Code, to wit: conspiracy to distribute and to possess with intent to distribute 50 grams or more of a mixture and substance containing a detectable amount of cocaine base ("crack cocaine"), a Schedule II controlled substance, did knowingly and intentionally kill and command, induce, procure and cause the intentional killing

10

**A.67**

of Basil Williams, and such killing did result.

In violation of Title 21, United States Code, Section 848(e)(1)(A), and Title 18, United States Code, Section 2.

## COUNT EIGHT
### (Conspiracy to Possess with Intent to Distribute 50 Grams or More of Cocaine Base)

21.     From in and about the fall of 2004, to in or about August 2005, in the District of Connecticut and elsewhere, **AZIBO AQUART**, also known as "Azibo Smith," "D," "Dreddy" and "Jumbo," and **AZIKIWE AQUART**, also known as "Z" and "Ziggy," who are defendants herein, together with Rodney Womble, also known as "Big Man;" John Taylor, also known as "Big Boy;" Frankie Hodges, also known as "Steve;" Juanita Hopkins, also known as "Vanessa;" Sherrel Randolph, also known as "Sherrel Jones;" Nathaniel Grant, also known as "Stone;" Randi Washington, also known as "Bear;" Judith Rivera; and James Rucker, also known as "Pops;" who are not named as defendants herein, together with others known and unknown to the Grand Jury, did knowingly and intentionally conspire to distribute and to possess with intent to distribute 50 grams or more of a mixture and substance containing a detectable amount of cocaine base ("crack cocaine"), a Scheduled II controlled substance, contrary to the provisions of Title 21, United States Code, Section 841(a)(1).

All in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A)(iii) and 846.

## COUNT NINE
### (Possession with Intent to Distribute Cocaine Base)

22.     On or about May 24, 2006, in the District of Connecticut and elsewhere, **AZIKIWE AQUART**, also known as "Z" and "Ziggy," the defendant herein, did knowingly and

11

**A.68**

intentionally possess with intent to distribute a mixture and substance containing a detectable

quantity of cocaine base ("crack cocaine"), a Schedule II controlled substance.

In violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C).

COUNT TEN
(Possession of a Firearm by a Convicted Felon)

23.     In or about May 2005, in the District of Connecticut, **AZIBO AQUART** also

known as "Azibo Smith," "D," "Dreddy" and "Jumbo," the defendant herein, having been

convicted in the Superior Court of the State of Connecticut of crimes punishable by

imprisonment for a term exceeding one year, that is: (1) Sale of Narcotics, in violation of

Connecticut General Statutes § 21a-277(a), on December 21, 2000; (2) Sale of Narcotics, in

violation of Connecticut General Statutes § 21a-277(a) on December 21, 2000; (3) Failure To

Appear in the First Degree, in violation of Connecticut General Statutes § 53a-172 on December

21, 2000; (4) Sale of Narcotics, in violation of Connecticut General Statutes § 21a-277(a) on

January 15, 1997; and, (5) Robbery in the Third Degree, in violation of Connecticut General

Statutes § 53a-136 on January 15, 1997, did knowingly possess firearms and ammunition in and

affecting commerce, that is, a Smith and Wesson, Model 422, .22 caliber pistol bearing serial

number UAC3966; a Smith and Wesson, Model 22A, .22 caliber pistol bearing serial number

UAZ2474; a Smith and Wesson, Model 65LS, .357 caliber revolver bearing serial number

CHV0228, and one round of Winchester 9 mm Luger ammunition; 14 rounds of Federal 9mm

ammunition; 11 rounds of Federal .380 caliber ammunition; one round of Remington .380 caliber

ammunition; and eight rounds of CCI .22 caliber ammunition, each of which had been

transported in interstate commerce.

12

**A.69**

All in violation of Title 18, United States Code, Sections 922(g)(1) and 924(e)(1).

**A.70**

## NOTICE OF SPECIAL FINDINGS

The allegations contained in Paragraphs One through Twenty-Three of this Fourth Superseding Indictment are hereby realleged and incorporated by reference as if fully set forth herein.

**Defendant AZIBO AQUART, also known as "Azibo Smith," "D," "Dreddy" and "Jumbo"**

As to Counts Two, Three, Four, Five, Six and Seven of this Fourth Superseding Indictment, the defendant **AZIBO AQUART**, also known as "Azibo Smith," "D," "Dreddy" and "Jumbo":

(1)     Was 18 years of age or older at the time of the offense. Title 18, United States Code, Section 3591(a); Title 21, United States Code, Section 848(l) (1996).

(2)     Intentionally killed Tina Johnson [Counts Two and Five], James Reid [Counts Three and Six] and Basil Williams [Counts Four and Seven]. Title 18 U.S.C. Section 3591(a)(2)(A); Title 21, United States Code, Section 848(n)(1)(A) (1996).

(3)     Intentionally inflicted serious bodily injury that resulted in the death of Tina Johnson [Counts Two and Five], James Reid [Counts Three and Six] and Basil Williams [Counts Four and Seven]. Title 18, United States Code, Section 3591(a)(2)(B); Title 21, United States Code, Section 848(n)(1)(B) (1996).

(4)     Intentionally participated in an act, contemplating that the life of a person would be taken and intending that lethal force would be used in connection with a person, other than one of the participants in the homicide offense, and Tina Johnson [Counts Two and Five], James Reid [Counts Three and Six] and Basil Williams [Counts Four and Seven] died as a direct result of the act. Title 18, United States Code, Section 3591(a)(2)(C); Title 21, United States Code,

**A.71**

Section 848(n)(1)(C) (1996).

(5)    Intentionally and specifically engaged in an act of violence, knowing that the act

created a grave risk of death to a person, other than one of the participants in the homicide

offense, such that participation in the act constituted a reckless disregard for human life, and Tina

Johnson [Counts Two and Five], James Reid [Counts Three and Six] and Basil Williams [Counts

Four and Seven] died as a direct result of the act. Title 18, United States Code, Section

3591(a)(2)(D); Title 21, United States Code, Section 848(n)(1)(D) (1996).

(6)    Committed the homicide offense in an especially heinous, cruel, and depraved

manner in that it involved torture and serious physical abuse to the victim. Title 18, United States

Code, Section 3592(c)(6); Title 21, United States Code, Section 848(n)(12) (1996).

(7)    Procured the commission of the homicide offense by payment, and promise of

payment, of anything of pecuniary value. Title 18, United States Code, Section 3592(c)(7); Title

21, United States Code, Section 848(n)(6) (1996).

(8)    Committed the homicide offense as consideration for the receipt, and in the

expectation of the receipt, of anything of pecuniary value. Title 18, United States Code, Section

3592(c)(8); Title 21, United States Code, Section 848(n)(7) (1996).

(9)    Committed the homicide offense after substantial planning and premeditation to

cause the death of a person. Title 18, United States Code, Section 3592(c)(9); Title 21, United

States Code, Section 848(n)(8) (1996).

(10)    Intentionally killed and attempted to kill more than one person in a single criminal

episode. Title 18, United States Code,  Section 3592(c)(16).

As to Counts Four and Seven of this Superseding Indictment:

15

**A.72**

(11)     The victim Basil Williams was particularly vulnerable due to old age and infirmity. Title 18, United States Code, Section 3592(c)(11); Title 21, United States Code, Section 848(n)(9) (1996).

Pursuant to Title 18, United States Code, Sections 3591 and 3592, and Title 21, United States Code, Section 848 (1996).

**Defendant AZIKIWE AQUART, also known as "Z" and "Ziggy"**

As to Counts Two, Three, Four, Five, Six and Seven of this Fourth Superseding Indictment, the defendant **AZIKIWE AQUART**, also known as "Z" and "Ziggy":

(1)     Was 18 years of age or older at the time of the offense. Title 18, United States Code, Section 3591(a); Title 21, United States Code, Section 848(l) (1996).

(2)     Intentionally killed Tina Johnson [Counts Two and Five], James Reid [Counts Three and Six] and Basil Williams [Counts Four and Seven]. Title 18 U.S.C. Section 3591(a)(2)(A); Title 21, United States Code, Section 848(n)(1)(A) (1996).

(3)     Intentionally inflicted serious bodily injury that resulted in the death of Tina Johnson [Counts Two and Five], James Reid [Counts Three and Six] and Basil Williams [Counts Four and Seven].  Title 18, United States Code, Section 3591(a)(2)(B); Title 21, United States Code, Section 848(n)(1)(B) (1996).

(4)     Intentionally participated in an act, contemplating that the life of a person would be taken and intending that lethal force would be used in connection with a person, other than one of the participants in the homicide offense, and Tina Johnson [Counts Two and Five], James Reid [Counts Three and Six] and Basil Williams [Counts Four and Seven] died as a direct result of the act. Title 18, United States Code, Section 3591(a)(2)(C); Title 21, United States Code,

**A.73**

Section 848(n)(1)(C) (1996).

(5)     Intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the homicide offense, such that participation in the act constituted a reckless disregard for human life, and Tina Johnson [Counts Two and Five], James Reid [Counts Three and Six] and Basil Williams [Counts Four and Seven] died as a direct result of the act.  Title 18, United States Code, Section 3591(a)(2)(D); Title 21, United States Code, Section 848(n)(1)(D) (1996).

(6)     Committed the homicide offense in an especially heinous, cruel, and depraved manner in that it involved torture and serious physical abuse to the victim. Title 18, United States Code, Section 3592(c)(6); Title 21, United States Code, Section 848(n)(12) (1996).

(7)     Committed the homicide offense as consideration for the receipt, and in the expectation of the receipt, of anything of pecuniary value. Title 18, United States Code, Section 3592(c)(8); Title 21, United States Code, Section 848(n)(7) (1996).

(8)     Committed the homicide offense after substantial planning and premeditation to cause the death of a person. Title 18, United States Code, Section 3592(c)(9); Title 21, United States Code, Section 848(n)(8) (1996).

(9)     Intentionally killed and attempted to kill more than one person in a single criminal episode. Title 18, United States Code,  Section 3592(c)(16).

As to Counts Four and Seven of this Superseding Indictment:

(10)     The victim Basil Williams was particularly vulnerable due to old age and infirmity. Title 18, United States Code, Section3592(c)(11); Title 21, United States Code, Section 848(n)(9) (1996).

**A.74**

Pursuant to Title 18, United States Code, Sections 3591 and 3592, and Title 21, United States Code, Section 848 (1996).

FOREPERSON

NORA R. DANNEHY
ACTING UNITED STATES ATTORNEY

PETER D. MARKLE
CHIEF, DRUG TASK FORCE

ALINA P. REYNOLDS
SUPERVISORY UNITED STATES ATTORNEY

TRACY LEE DAYTON
ASSISTANT UNITED STATES ATTORNEY

17

**A.75**

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | Docket No. 3:06 CR 160 (JBA) |
| v. | : | |
| | : | |
| AZIBO AQUART | : | August 13, 2010 |
| | : | |

## NOTICE OF INTENT TO SEEK THE DEATH PENALTY
### AS TO DEFENDANT AZIBO AQUART

The United States of America hereby notifies the Court and defendant **AZIBO**

**AQUART** under Chapter 228 (Sections 3591-3598) of Title 18, United States Code, and Title

21, United States Code, Section 848(h) (1996), that it believes that the circumstances of this case

are such that, in the event that the defendant is convicted of one or more of the intentional

killings of Tina Johnson [Counts Two and Five], James Reid [Counts Three and Six] or Basil

Williams [Counts Four and Seven], as charged in the Fourth Superseding Indictment, a sentence

of death is justified and the United States will seek the death penalty for the defendant **AZIBO**

**AQUART** as to each offense.

Pursuant to the requirements of Title 18, United States Code, Sections 3593(a), (d), and

(e), and Title 21, United States Code, Section 848(h) (1996), for each of Counts Two, Three,

Four, Five, Six and Seven, the United States will introduce evidence establishing beyond a

reasonable doubt: (a) one or more of the statutory proportionality factors set forth by Title18,

United States Code, Sections 3591(a)(2)(A)-(D), and Title 21, United States Code, Sections

848(n)(1) (A)-(D) (1996), and (b) one or more of the statutory aggravating factors set forth by

Title 18, United States Code, Sections 3592(c)(1)-(16), and Title 21, United States Code,

Sections 848(n)(2)-(12) (1996).

**A.76**

As permitted by Title 18, United States Code, Sections 3593(a) and (d), and Title 21, United States Code, Section 848(n)(1) (B) (1996) the United States will also seek to prove certain non-statutory aggravating factors set forth in this Notice.

A.    Preliminary Factors

Pursuant to Title 18, United States Code, Section 3593(a), and Title 21, United States Code, Section 848(h)(1996), the United States will rely on the following preliminary factors to establish defendant **AZIBO AQUART's** eligibility for the death penalty as to each of Counts Two, Three, Four, Five, Six and Seven:

(1)    The defendant intentionally killed Tina Johnson [Counts Two and Five], James Reid [Counts Three and Six] and Basil Williams [Counts Four and Seven]. Title 18, United States Code, Section 3591(a)(2)(A); Title 21, United States Code, Section 848(n)(1)(A) (1996).

(2)    The defendant intentionally inflicted serious bodily injury that resulted in the death of Tina Johnson [Counts Two and Five], James Reid [Counts Three and Six] and Basil Williams [Counts Four and Seven]. Title 18, United States Code, Section 3591(a)(2)(B); Title 21, United States Code, Section 848(n)(1)(B) (1996).

(3)    The defendant intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than one of the participants in the homicide offense, and Tina Johnson [Counts Two and Five], James Reid [Counts Three and Six] and Basil Williams [Counts Four and Seven] died as a direct result of the act. Title 18, United States Code, Section 3591(a)(2)(C); Title 21, United States Code, Section 848(n)(1)(C) (1996).

2

**A.77**

(4)     The defendant intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the homicide offense, such that participation in the act constituted a reckless disregard for human life, and Tina Johnson [Counts Two and Five], James Reid [Counts Three and Six] and Basil Williams [Counts Four and Seven] died as a direct result of the act. Title 18, United States Code, Section 3591(a)(2)(D); Title 21, United States Code, Section 848(n)(1)(D) (1996).

B.      Statutory Aggravating Factors under 18 U.S.C. §§ 3592(c)(1)-(16):

Pursuant to Title 18, United States Code, Section 3593(a), and Title 21, United States Code, Section 848(h) (1996), the United States will rely on the following statutory aggravating factors as justifying a sentence of death as to each of Counts Two, Three, Four, Five, Six and Seven:

1.      **Heinous, Cruel, or Depraved Manner of Committing Offense**:  The defendant committed the homicide offense in an especially heinous, cruel, or depraved manner in that it involved torture or serious physical abuse to Tina Johnson [Counts Two and Five], James Reid [Counts Three and Six] and Basil Williams [Counts Four and Seven]. Title 18, United States Code, Section 3592(c)(6); Title 21, United States Code, Section 848(n)(12) (1996).

2.      **Procurement of the Offense by Payment.**  The defendant procured the commission of the homicide offense by payment, or promise of payment, of anything of pecuniary value.  Title 18, United States Code, Section 3592(c)(7); Title 21, United States Code, Section 848(n)(6) (1996).

3.      **Pecuniary Gain**:  The defendant committed the homicide offense as consideration for the receipt, or in the expectation of the receipt, of anything of pecuniary value.

3

**A.78**

Title 18, United States Code, Section 3592(c)(8); Title 21, United States Code, Section 848(n)(7) (1996).

4. **Substantial Planning and Premeditation**: The defendant committed the homicide offense after substantial planning and premeditation to cause the death of a person. Title 18, United States Code, Section 3592(c)(9); Title 21, United States Code, Section 848(n)(8) (1996).

5. **Multiple Killings or Attempted Killings**: The defendant intentionally killed or attempted to kill more than one person in a single criminal episode. Title 18, United States Code, Section 3592(c)(16).

Pursuant to Title 18, United States Code, Section 3592(c), and Title 21, United States Code, Section 848(h) (1996), the United States will also rely on the following statutory aggravating factor as justifying a sentence of death for Counts Four and Seven:

C.    Non-Statutory Factors Under 18 U.S.C. § 3593(a):

In addition to the statutory aggravating factors set forth above, the United States will rely on the following non-statutory aggravating factors to justify a sentence of death as to each of Counts One, Two, Three, Four, Five, Six and Seven of the Fourth Superseding Indictment, pursuant to Title 18, United States Code, Section 3593(a), and Title 21, United States Code, Section 848(h) (1996):

1. **Other Specific Acts of Violence**. The defendant committed criminal acts of violence that posed a serious threat to the lives and safety of persons other than the victims in this case. The defendant engaged in a continuing pattern of violent criminal conduct, including but

4

**A.79**

not limited to, the following: threats of violence towards others; the brandishing of firearms; and, the physical beating of others.

      2.    **Victim Impact Evidence**.  As reflected by the victims' personal characteristics as individual human beings and the impact of the offenses on the victims and their families, the defendant caused loss, injury, and harm to the victims and their families, *see Payne v. Tennessee*, 501 U.S. 808, 825-827 (1991), including, but not limited to, the following:

      (a)  Characteristics of victim:  The defendant caused the death of the victims who enjoyed a strong relationship with their families, including their parents, their siblings and their children and grandchildren.

      (b)  Impact of the offenses on the family of the victim:  The victims' families have suffered severe and irreparable harm.  The victim, Tina Johnson [Counts Two and Five], provided financial and emotional support to her entire family.  The two other victims, James Reid [Counts Three and Six] and Basil Williams [Counts Four and Seven], provided emotional support to their families.

5

**A.80**

The Government further gives notice that in support of imposition of the death penalty, it intends to rely upon all the evidence admitted by the Court during the guilt phase of the trial and the offenses of conviction as described in the Fourth Superseding Indictment as they relate to the background and character of the defendant **AZIBO AQUART** in his moral culpability, and the nature and circumstances of the offenses charged in the Fourth Superseding Indictment.

Dated: August 13, 2010
New Haven, Connecticut

Respectfully submitted,

DAVID B. FEIN
UNITED STATES ATTORNEY
DISTRICT OF CONNECTICUT

6

**A.81**

1  pushed the blind over to the side, and I seen my mom

2  and Tippy laying on the floor with pillows over

3  them.

4      Q.   What did you do at that point?

5      A.   At that point I jumped up and I jumped in

6  the window.  I went over to my mother and I was just

7  moving pillows off her saying, "Get up, mom."

8      Q.   Were you holding your mom at that point?

9      A.   Yeah.

10     Q.   Did you see anything else in the room?

11     A.   I seen Tippy on the floor next to my

12  mother.  And it's like a lot of stuff.

13     Q.   Did you see whether or not they were tied

14  up with anything?

15     A.   Yeah, they was tied up with duct tape.

16     Q.   Did you see if there was any blood?

17     A.   Yes, there was blood on the wall and blood

18  on the ceiling.

19     Q.   What did you do next?

20     A.   I went inside the front room and called

21  911.  I seen Basil in his room laying on the end of

22  his bed, tied up at the foot of his bed.

23     Q.   When you say you went to the front room?

24     A.   The living room.

25     Q.   Did you go in the living room?

1    I'm sorry, if we could look at DG 3080.

2    BY MR. SMITH:

3        Q.   Mr. Whittingham, looking at around line 13,

4    does that refresh your memory as to what you told

5    the grand jury?

6                MS. REYNOLDS:  As to what?

7                THE COURT:  You need to ask him the

8    question, get his answer.  If it's inconsistent with

9    the grand jury testimony, you can then go to the

10   question and answer there.

11   BY MR. SMITH:

12       Q.   Mr. Whittingham, you testified here today

13   that after you entered the apartment you went -- you

14   saw your mother; is that correct?

15       A.   Yes.

16       Q.   And you removed some pillows from her body,

17   and then you touched the body.  Is that correct?

18       A.   Yes.

19       Q.   Okay.  Did you move the body, roll it?

20       A.   No.

21       Q.   Okay.  And then you went into the living

22   room; is that correct?

23       A.   Yes.

24       Q.   And you testified that the door was locked?

25       A.   Yes.

**A.83**

**Guilt-phase Trial Minutes April 20, 2011**

```
1              THE COURT:  Yes.
2      Q.   I apologize.  Ms. O'Donnell, when you
3   entered the bedroom where the single male victim
4   was, was there anything on top of him that you are
5   aware of?
6      A.   The only thing that I could recall is that
7   there was something by his elbows.  What it was, I
8   don't know.
9      Q.   Was there anything covering his head?
10     A.   There was nothing covering his head.  There
11  was like a white -- I think a pillow, I don't know,
12  I didn't pick it up and inspect it, close to his
13  head, but not covering his head.
14     Q.   Okay.  And, similarly, the female victim
15  had nothing covering her when you entered the room;
16  is that correct?
17     A.   No, there was nothing covering her.
18          MR. SMITH:  I have nothing further.
19  Thank you, your Honor.
20          Thank you, Ms. O'Donnell.
21          THE COURT:  All right.  Any redirect?
22          MR. MARKLE:  No, your Honor.
23          THE COURT:  All right, thank you,
24  Ms. O'Donnell.  You are excused.  You may step down.
25          Let's get started with the government's
```

**A.84**

**Guilt-phase Trial Minutes April 21, 2011**

296

```
 1   I think just happened, I mean whether she thinks

 2   it's laughable --

 3            THE COURT:  I disagree.

 4            MR. SHEEHAN:  Okay, well, I respect your

 5   Honor's opinion on that.

 6            THE COURT:  And so that -- let's just

 7   think about how we might either have -- if it's a

 8   repeat objection, you can just tell me it's the same

 9   objection as to something or other.  In any event,

10   I'm not trying to curtail your right to object or

11   get rulings on things, I'm just trying to think

12   through how we might do this efficiently.  That's

13   all.

14            Okay, thank you very much.

15            (Sidebar concluded)

16            THE COURT:  All right, Ms. Reynolds, you

17   may proceed.

18            MS. REYNOLDS:  Thank you, your Honor.

19       Q.   I'm going to draw your attention to your

20   monitor there and ask you to take a look at

21   Government's Exhibit 164.

22            Do you recognize what that's a photograph

23   of?

24       A.   Yes.

25       Q.   What is that a photograph of?
```

**Guilt-phase Trial Minutes April 21, 2011**

1    A.    That is the door lock on the interior side

2    of the front door to apartment 101 marked with a

3    scale numbered No. 35.

4    Q.    And taking a look at Government's

5    Exhibit 165, do you recognize what that is a photo

6    of?

7    A.    Yes.

8    Q.    Is that just a close-up?  Can you describe

9    what's in that photo?

10    A.    It's a closer shot of the same lock, closer

11    shot of the scale and a small blood-like stain

12    underneath the scale.

13        MS. REYNOLDS:  Your Honor, I would move

14    as full exhibits 164 and 165.

15        MR. SHEEHAN:  No objection.

16        THE COURT:  All right, they are full

17    exhibits.

18    Q.    Starting then with Government's 164, again,

19    can you describe what the picture shows here in 164?

20    A.    I believe this is No. 165.

21    Q.    You are correct.  Starting -- all right,

22    well, let's start with Government's 165.  What's

23    depicted in that photograph?

24    A.    That's just a close-up of the top portion

25    of the lock on the interior side of the door to

**A.86**

**Guilt-phase Trial Minutes April 21, 2011**

1    apartment 101.  And the white rectangular scale

2    above it is just, again, showing approximate

3    measurement of the stain.

4        Q.   And did you take any other steps with

5    regard to that blood-like substance on the lock

6    area?

7        A.   That area was swabbed and collected as

8    Exhibit 35.

9        Q.   Okay.  Showing you Government's Exhibit 166

10   and 167.

11            THE COURT:  I'm sorry, when you say

12   Exhibit 35, is that a Bridgeport police number?

13            THE WITNESS:  Bridgeport police

14   Exhibit 35.

15       Q.   And that's shown in the photograph which is

16   Government's Exhibit 165?

17       A.   Yes.

18       Q.   There are a lot of numbers.  I'm just going

19   to hand up Government's 167.

20            THE COURT:  I'm sorry, what happened to

21   166?

22            MS. REYNOLDS:  I'm not going to hand

23   that one up right now.

24       Q.   So, I'm going to hand up 167 and ask you if

25   you recognize what's contained in there.

**A.87**

**Guilt-phase Trial Minutes April 21, 2011**

1    A.    Yes.

2    Q.    And what's contained in 167?

3    A.    Government 167 is the swabs of Bridgeport

4  Exhibit No. 35 shown in this picture.

5    Q.    And have you written in your property

6  report a description where Government's 167, which

7  contains the cotton swabs of 135, came from?

8    A.    In my crime scene report, yes.

9    Q.    Do you know where the cotton swabs came

10 from on the label?

11   A.    Yes, on the label it is incorrectly stated

12 the location that is of this -- where the sample was

13 taken from.

14   Q.    Have you had an opportunity prior to

15 testifying here today to review the evidence and

16 compare it to your reports?

17   A.    Yes.

18   Q.    And what, again, did you determine with

19 regard to the label of the cotton swabs contained in

20 the Government's 167?

21   A.    The label that is actually on the exhibit

22 incorrectly states the location where the exhibit

23 was taken from.

24   Q.    Does it have exhibit -- the Bridgeport

25 property number 35 on it?

**A.88**

**Guilt-phase Trial Minutes April 21, 2011**

300

1      A.   Yes, it does.

2      Q.   What's incorrect is where it was taken

3 from, correct?

4      A.   Yes.

5      Q.   And do you know whether or not a report was

6 subsequently done to correct the information

7 contained on that label?

8      A.   Yes.  When the error was discovered a

9 supplemental report was written by Detective Ortiz

10 explaining the error.

11           MS. REYNOLDS:  Your Honor, I would move

12 as a full exhibit Government's 167.

13           MR. SHEEHAN:  May I see it, your Honor?

14 I don't have that.

15           MS. REYNOLDS:  Yes.

16           MR. SHEEHAN:  May I briefly voir dire,

17 your Honor?

18           THE COURT:  You may.

19 VOIR DIRE EXAMINATION

20 BY MR. SHEEHAN:

21      Q.   Detective Devan, did you actually do the

22 swabbing?

23      A.   Yes, I did.

24           MR. SHEEHAN:  I have no objection.

25           THE COURT:  167 is a full exhibit.

**A.89**

1          MS. REYNOLDS:  Thank you, your Honor.

2     CONTINUED DIRECT EXAMINATION

3     BY MS. REYNOLDS:

4          Q.    And again, showing that up on the -- it's

5     got your name, and does it show the Exhibit No. 35?

6          A.    Yes.

7          Q.    It's got the information that you said

8     where it was recovered from, but that was incorrect

9     and later corrected?

10         A.    That's right.

11         Q.    And after that exhibit was collected, the

12    two cotton swabs of the blood-like substance from

13    the door lock, which is contained in Government's

14    167, what was done with those cotton swabs?

15         A.    Cotton swabs are again packaged and turned

16    in to the property room as evidence.

17         Q.    And do you know whether or not those cotton

18    swabs were also sent to the lab for further

19    analysis?

20         A.    Yes, they were.

21         Q.    Now, staying with the front door area of

22    the apartment, I'm going to hand you a series of

23    photographs starting with 116.  Actually I'm going

24    to start with 116A, and I'm going to hand up 116C,

25    116F, 116G, 116H, 116I, 116J.  I'm going to hand

**Guilt-phase Trial Minutes April 21, 2011**

303

```
 1      A.    Uh-huh (indicating affirmatively).
 2      Q.    116 --
 3            MR. SHEEHAN:  I'm going to object to the
 4    leading on this.  Is there a question?
 5            THE COURT:  Just go through them
 6    one-by-one.
 7            MS. REYNOLDS:  I was.
 8            THE COURT:  Yes.
 9      Q.    Again, showing you 116G, do you recognize
10    what that's a photograph of?
11      A.    That's the front door frame area.
12      Q.    116H, do you recognize that?
13      A.    That is a closer shot of the frame area
14    also showing a screw in the door.
15      Q.    And 116I?
16      A.    This is a photograph of the top of the door
17    frame, and it appears that there is damage to the
18    top of the door itself where it meets the frame.
19      Q.    And 116J, do you recognize what that is?
20      A.    It shows the door frame with a black screw
21    in the frame.
22            MS. REYNOLDS:  Your Honor, I would move
23    as full exhibits 116A, 116C, 116F, 116G, 116H, 116I,
24    and 116J.
25            MR. SHEEHAN:  No objection.
```

**A.91**

**Guilt-phase Trial Minutes April 21, 2011**

304

1          THE COURT:  All right, full exhibits

2     starting with 116A.

3          MR. SHEEHAN:  I don't think that's the

4     same picture.  Of A --

5     Q.   116A.  Do you recognize?

6          MR. SHEEHAN:  I'm sorry, may I just

7     look, because it doesn't appear to be, maybe I'm --

8     I have a cropped picture.  It might not be an issue.

9          MS. REYNOLDS:  You can use that copy.

10    I've provided an extra copy to counsel.

11    Q.   So, taking a look at 116A, can you tell us

12    what this photograph shows.  Again, this is of the

13    front door of the apartment?

14    A.   This is the front doorjamb of apartment 101

15    and that black circle is actually a screw in the

16    doorjamb.

17    Q.   And that's right here in the middle of the

18    photograph?

19    A.   Yes.

20    Q.   Can you describe what the door frame area

21    looked like when you went to the scene to process

22    it?

23    A.   When we got to the scene it doesn't appear

24    there was any damage to the door itself, but the

25    frame and the doorjamb itself were damaged.

**Guilt-phase Trial Minutes April 21, 2011**

305

1        Q.    And showing you Government's Exhibit 116C;

2   can you tell us what you see in that photograph?

3        A.    That's the doorjamb area of the front door

4   of the apartment, and it's showing the damage to the

5   jamb.

6        Q.    And then 116F is just a close-up of that

7   damage to the doorjamb area of the front door to

8   apartment 101?

9        A.    Yes.

10       Q.    And showing you Government's Exhibit 116G,

11  is that the top part of the door?

12       A.    It's the -- yes, the top part of the

13  door -- the door to the apartment.  And again, the

14  black circle near the center of the picture is a

15  screw.

16       Q.    And so as you were processing the scene and

17  you and your colleagues were taking photographs,

18  what did you notice about the front door of

19  apartment 101 in addition to the damage to the

20  doorjamb?

21       A.    We noticed that there were several screws

22  in the door going through the door into the jamb

23  frame part of the doorway.

24       Q.    And those screws were from the inside of

25  the apartment, interior side of the door?

**A.93**

**Guilt-phase Trial Minutes April 21, 2011**

1     A.    From the interior side, yes.

2     Q.    Showing you Government's Exhibit 116I; what

3 do you see in that picture?

4     A.    That's a photo of the top portion of the

5 door to the apartment, and you can see, again, the

6 screw which goes from the interior side of the door

7 through the door.  And it appeared to us it went

8 into the frame of the -- next to the door.

9     Q.    And that's the screw that I'm pointing to

10 with my pen there on the ELMO?

11     A.    Yes.

12     Q.    Into the door frame, correct?

13     A.    Yes.

14     Q.    And then showing you Government's

15 Exhibit 116J, is that a close-up of another screw in

16 the door frame?

17          MR. SHEEHAN:  I'm going to object to the

18 leading form of the question.

19     Q.    Can you tell us what's depicted in

20 Government's Exhibit 116J?

21     A.    That's a close-up showing a black screw in

22 the door frame.

23     Q.    Now, did you also process the area, once

24 you get into the apartment, in that living room

25 area?

**A.94**

Guilt-phase Trial Minutes April 25, 2011

503

1    to take a look at Government's 137A.  Do you

2    recognize what's contained in Government 137A?

3         A.   Yes.

4         Q.   And what is that?

5         A.   This is a brown bag which contained

6    Bridgeport Exhibit No. 14 which we collected as a

7    latex glove from the first bedroom where

8    Ms. Johnson and Mr. Reid were located.

9         Q.   And taking a look at your screen there at

10   Government's Exhibit 137, which is already in

11   evidence, do you recognize what that's a photograph

12   of?

13                  MR. SHEEHAN:  137?

14                  MS. REYNOLDS:  Government's 137.

15        A.   Yes.

16        Q.   Do you recognize what that's a photograph

17   of?

18        A.   Yes.

19        Q.   What is that a photograph of?

20        A.   It's a photograph of a latex glove with

21   placard No. 14, yellow placard No. 14 next to it.

22        Q.   Again, referring to Government's 137A,

23   what's contained in that exhibit?

24        A.   This is Exhibit 14, which is depicted in

25   the photograph.

**A.95**

**Guilt-phase Trial Minutes April 25, 2011**

504

1    Q.   And are there any differences between

2  what's contained inside the plastic evidence bag

3  with Bridgeport No. 14 as it appears today in the

4  evidence bag versus how it appeared at the scene?

5    A.   Yes.

6    Q.   And can you describe what the difference

7  is?

8    A.   At the scene, when the evidence was located

9  and collected, it appeared to be one latex glove,

10  and it was collected as such, it wasn't manipulated,

11  it was just collected and placed in this brown paper

12  bag.  As a result of collecting it and submitting it

13  to the Connecticut state --

14           MR. SHEEHAN:  I'm going to object to

15  anything further as to what happened at the lab as

16  being hearsay.

17           THE COURT:  Let me just first ask, is

18  137 in evidence?

19           MR. SHEEHAN:  I don't think it is, your

20  Honor.

21           THE COURT:  I don't think it is.

22           MS. REYNOLDS:  The photograph, I had it

23  marked in evidence, your Honor, but if not, I would

24  mark 137, which is the photograph, at this time, as

25  a full exhibit.

**A.96**

**Guilt-phase Trial Minutes April 25, 2011**

```
 1              MR. SHEEHAN:  I have no objection to

 2    that, your Honor.

 3              THE COURT:  All right.

 4              MS. REYNOLDS:  Thank you, your Honor.

 5              THE COURT:  And 137A?

 6              MS. REYNOLDS:  And 137A, I would also

 7    move as -- at this point as a full exhibit.  I was

 8    just having the witness describe how it appears

 9    differently in the evidence bag as opposed to when

10    it was seized at the scene, which I was having her

11    to do before.

12              THE COURT:  Why don't you finish that

13    examination?

14              MR. SHEEHAN:  Your Honor, I have an

15    objection pending with respect to this witness

16    testifying about what happened at the lab.

17              THE COURT:  I think she's talking about

18    the differences between what she saw.  Well, let me

19    establish -- let me ask Ms. Reynolds to continue

20    questioning on 137A.

21              MS. REYNOLDS:  Yes, your Honor.

22         Q.   Again, taking a look at the contents of

23    137A, can you describe the difference between how it

24    appears today in the evidence bag and how it

25    appeared when it was seized back in apartment 101?
```

**A.97**

**Guilt-phase Trial Minutes April 25, 2011**

506

1      A.   Okay.  When it was seized in apartment 101,

2   we took it to be a latex glove, and that's how it

3   was labeled.  We didn't manipulate it, we didn't

4   move it, we didn't touch it any further, other than

5   to pick it up and place it in the paper bag for

6   collection.  Today, as it appears, there are

7   actually two gloves, and each of them is now

8   stained.  One is a darker color, the other one is

9   more yellowish color.

10      Q.   And other than that difference you've

11   described here today, does the contents of what you

12   collected as Bridgeport 14 and what has now been

13   marked as Government's Exhibit 137A appear to be in

14   the same condition it was in?

15      A.   Yes.

16           MS. REYNOLDS:  I would move, your Honor,

17   as a full exhibit Government's 137A.

18           MR. SHEEHAN:  I would oppose that, your

19   Honor.  I think there are substantial differences,

20   and it is not -- this witness cannot establish a

21   proper foundation with respect to the admissibility

22   of that object.

23           MS. REYNOLDS:  Your Honor, there will be

24   further connection of this item.  I can ask one

25   other question.

**A.98**

**Guilt-phase Trial Minutes April 25, 2011**

1    also in this envelope.

2              THE COURT:  Although you knew it only to

3    be a single latex glove?

4              THE WITNESS:  It appeared that way at

5    the scene, yes.

6              THE COURT:  I'm going to admit that

7    subject to the connection by which -- what will that

8    be?

9              MS. REYNOLDS:  Your Honor, there will be

10   forensic lab examiners who will be testifying later

11   in the trial.

12             THE COURT:  All right.

13             MS. REYNOLDS:  Specifically, Maria

14   Warner, from the lab will be testifying, your Honor.

15             THE COURT:  Thank you.

16       Q.   I'm going to hand you Government's

17   Exhibit 142A and ask you to take a look at that.  Do

18   you recognize what's contained in Government's 142A?

19       A.   Yes.

20       Q.   And what is that?

21       A.   This is a brown paper bag which contained a

22   brown nylon stocking.

23       Q.   And taking a look at your monitor, do you

24   recognize what that's a photograph of?

25       A.   Yes.

**A.99**

**Guilt-phase Trial Minutes April 25, 2011**

1    Q.   And what is that a photograph of?

2    A.   It's a photograph of a dark-colored nylon

3    stocking.  It's actually on the box spring marked

4    with a yellow placard No. 15.

5    Q.   And does that photograph fairly and

6    accurately depict how the nylon stocking appeared on

7    the box spring when it was found inside Tina -- when

8    it was found inside apartment 101?

9    A.   Yes.

10    Q.   And where was it found?

11    A.   This was in the bedroom where Ms. Johnson

12    and Mr. Reid were located, on the box spring.

13           MS. REYNOLDS:  Your Honor, I would move

14    as a full exhibit Government's 142, which is the

15    photograph.

16           MR. SHEEHAN:  No objection to the photo.

17           THE COURT:  142A is a full exhibit.

18           MR. SHEEHAN:  No, I think it's 142 is

19    what she's offering you.

20           MS. REYNOLDS:  142 is the photograph.

21    Your Honor, at this point I'm just going to show

22    that to the jury.

23    Q.   142, can you describe --

24           THE COURT:  All right, I see.  Okay.

25    142 is a full exhibit.

**A.100**

**Guilt-phase Trial Minutes April 25, 2011**

1    MS. REYNOLDS:  Thank you, your Honor.

2    Q.  And, again, just taking a look at the

3  photograph up on the screen, can you describe for

4  the jury what that photograph shows?

5    A.  That's a close-up photograph of a

6  dark-colored nylon stocking, which was located on

7  the box spring in the bedroom marked with a yellow

8  placard No. 15, indicating Exhibit No. 15 for the

9  Bridgeport Police Department.

10    Q.  And taking a look then at 142A, which is

11  the plastic evidence bag, again, what is contained

12  in that evidence bag?

13    A.  This is a brown paper bag labeled with a

14  Bridgeport Police Department evidence label for

15  Exhibit No. 15, and also a brown nylon stocking.

16    Q.  And does the contents of 142A appear to be

17  in the same or substantially the same condition it

18  was in at the time that it was found and seized as

19  evidence from within Tina Johnson's bedroom?

20    A.  Yes, it does.

21    MS. REYNOLDS:  Your Honor, I would move

22  as a full exhibit at this time Government's 142A.

23    MR. SHEEHAN:  May I see it?  I have no

24  objection.

25    THE COURT:  142A is a full exhibit.

**A.101**

**Guilt-phase Trial Minutes April 25, 2011**

511

1    Q.   Again, just taking a look at the monitor

2    there, what is depicted on the monitor now, which is

3    the contents of 142A?

4    A.   That's Bridgeport Police Exhibit 15, the

5    brown nylon stocking.

6    Q.   And turning that exhibit around, is there

7    also the brown paper bag where it was originally

8    received?

9    A.   Yes.

10    Q.   And, again, this shows the label -- well,

11    what does this show?

12    A.   The larger label is the Bridgeport Police

13    Department evidence label, and the smaller

14    rectangular label underneath it is the label from

15    the Connecticut State Police Forensic Lab.

16    Q.   I'm going to hand you Government's

17    Exhibit 143A.  Taking a look then at Government's

18    143A, do you recognize what's contained in that

19    exhibit?

20    A.   Yes.

21    Q.   And what is that?

22    A.   This is a brown paper bag which contains a

23    light bulb that had blood-like stains on it.

24    Q.   And how is it that you are able to

25    recognize Government's Exhibit 143A?

**A.102**

**Guilt-phase Trial Minutes April 29, 2011**

1488

```
 1       A.    Inside the foyer of the building.

 2       Q.    And what did you say to her?

 3       A.    I asked her was she selling drugs.

 4       Q.    What did she say to you?

 5       A.    She said "Yeah."

 6       Q.    What did you say to her?

 7       A.    I said, "All right."  I just walked away.

 8       Q.    Why were you asking her?

 9       A.    I knew, but I wanted to hear it from her.

10       Q.    And what did you do when you heard her

11  confirm that she was selling crack?

12       A.    I told Dreddy that.

13       Q.    And what did Dreddy tell you?

14       A.    "I'll take care of it."

15       Q.    Did he tell you to go over there and take

16  care of it?

17       A.    No.

18       Q.    Do you know what he meant when he said

19  "I'll take care of it"?

20       A.    No, that was just his word for everything,

21  "I'll take care of it."

22       Q.    Did you ever have any further words with

23  Tina Johnson?

24       A.    Yeah.

25       Q.    When was that?
```

**A.103**

**Guilt-phase Trial Minutes April 29, 2011**

1506

1    person by the name of Zee?

2        A.   No.

3        Q.   To your knowledge, did you ever speak to

4    any of those people, Efrain Johnson, John Taylor or

5    Zee, in person or on your cell phone?

6        A.   Never.

7        Q.   You said that Tina Johnson's drug sales

8    were interfering with your operation?

9                MR. SMITH:   Objection with the leading.

10               THE COURT:   Sustained.

11       Q.   Was the defendant still making money during

12   the time that Tina Johnson was selling drugs?

13       A.   Yeah.

14       Q.   A good amount of money?

15       A.   No, she wasn't selling that much drugs.

16   Like I told him at one time, she's only selling

17   enough to support her own habit and enough to buy --

18   you know just to keep her own self satisfied, which

19   wasn't wrong, I don't think, because why buy

20   something that's no good when she could -- you know.

21       Q.   You told that to the defendant?

22       A.   Yeah, I had told it to him.

23       Q.   To your knowledge, did Basil Williams ever

24   sell drugs?

25       A.   No.

**A.104**

1    Q.   To your knowledge, did James Reid ever sell

2  drugs?

3    A.   No.

4    Q.   Were you -- after you gave the defendant --

5  let me ask you this:  After you met with him at the

6  Brazilian restaurant, were you still acting at his

7  lieutenant in the drug operation?

8    A.   No.

9    Q.   And you said that there is -- in every pack

10 there is all the smaller bags?

11   A.   Yeah.

12   Q.   Do you know how much the bags weighed?

13   A.   No, you don't sit there and weigh them out.

14 You just put enough, by eye, that's enough for $10.

15   Q.   When you met at the Brazilian restaurant,

16 do you know how long before that was -- before you

17 heard about the murders?

18   A.   Soon after.

19   Q.   I'm sorry?

20   A.   Soon after.  Not too long after.

21   Q.   Within days?

22   A.   A week might be too long.  Days, a week.

23 Seven days might have been too long.

24   Q.   After the murders, after you found out that

25 three people had been murdered, where did you

**Guilt-phase Trial Minutes May 4, 2011**

```
 1              THE COURT:  But I need you and the
 2   microphone to be closer together.  Okay.  It will
 3   move.  You can pull it.  It's wireless.  Okay.
 4   Thank you.
 5        Q.   Where did you go to high school?
 6        A.   Southwest High School.
 7        Q.   And how far did you go in school?
 8        A.   Tenth grade.
 9        Q.   How old were you in 10th grade?
10        A.   I don't remember.
11        Q.   Why did you leave school in 10th grade?
12        A.   Because I caught my first felony.
13        Q.   Caught your first felony?
14        A.   Yes.
15        Q.   And what was the felony for?
16        A.   Possession of narcotics, drugs.
17        Q.   How old were you when you started selling
18   drugs?
19        A.   Sixteen, 17.
20        Q.   And who first gave you drugs?
21        A.   Well, we would -- started dealing with
22   other friends and I started buying from him, he is
23   telling me how to buy the drugs, and I started
24   buying them on my own.
25        Q.   Did something happen when you first started
```

**A.106**

**Guilt-phase Trial Minutes May 4, 2011**

1    getting drugs?

2        A.    Yes.

3        Q.    What happened?

4        A.    Some guys that I grew up with, and they end

5    up giving me drugs, and then they left off and went

6    somewhere, and when we came back -- when they came

7    back, the other guy, the friend of that guy, he say

8    that, give me the drugs and --

9        Q.    Who did he say "give me the drugs" to?

10       A.    Me.

11       Q.    And what did you do?

12       A.    I gave him the drugs.

13       Q.    What happened?

14       A.    And when I gave him the drugs, that's when

15   I found out that he didn't tell him to get the drugs

16   from me.  At the time of that the guy who gave me

17   the drugs, he wanted to kill me.

18       Q.    How do you know he wanted to kill you?

19       A.    Because he shot at me and he end up -- a

20   little boy got killed.

21       Q.    What did he shoot at you with?

22       A.    AK 47.

23       Q.    Did you get hit?

24       A.    I got grazed.  I don't know if I got grazed

25   or the bullet hit the ground then and then some

**A.107**

**Guilt-phase Trial Minutes May 4, 2011**

1   fragment came across the bridge of my nose.

2      Q.   Across the bridge of your nose?

3      A.   Yeah.

4      Q.   You said a little boy got killed.  Who was

5   the little boy?

6           MR. SHEEHAN:  Objection, irrelevant.

7           THE COURT:  Sustained.

8      Q.   Okay.  After you got shot, did you talk to

9   the police?

10      A.   Yes.

11      Q.   Did you give them a statement?

12      A.   Yes.

13      Q.   Did you tell them who did it?

14      A.   Yes.

15           MR. SHEEHAN:  Objection, irrelevant.

16           THE COURT:  Overruled.

17      Q.   And how did this affect your -- were you

18   still going to school then?

19      A.   Yes.

20      Q.   And how did it affect you at school?

21      A.   For a week they wouldn't let me -- they

22   would call me to the principal office and I would go

23   down to the office, and when they rang the bell for

24   the school to turn out I was dragged -- I was let

25   out with officers taken to the school bus.

**Guilt-phase Trial Minutes May 4, 2011**

2227

 1       Q.    Police officers would escort you to the

 2    school bus?

 3       A.    Yes.

 4       Q.    Do you know why that was?

 5             MR. SHEEHAN:  Objection, irrelevant.

 6             THE COURT:  Overruled.

 7       Q.    Do you know why they were escorting you to

 8    the school bus?

 9       A.    Because they didn't want no retaliation

10    from the guys that -- they didn't catch them yet.

11       Q.    Did they eventuality get caught?

12       A.    Yes.

13             MR. SHEEHAN:  Objection, irrelevant.

14             THE COURT:  Sustained.

15       Q.    You said you didn't stay in school after

16    10th grade; is that right?

17             You have to say yes or no.

18       A.    No.

19       Q.    Are you taking classes now?

20       A.    Yes.

21       Q.    What are you studying for?

22       A.    GED.

23       Q.    You said that also you had started selling

24    drugs and you said you got your first felony for

25    possession of narcotics.  How old were you then?

**Guilt-phase Trial Minutes May 4, 2011**

1  the photo, your Honor.

2      Q.   And what did you see?  Did the big guy have

3  anything with him when he walked in?

4      A.   The only thing I know, I know that it

5  wasn't no bats with us when we got there.  When he

6  got there, that's when I seen the bats again.

7      Q.   What happened after the big guy joined you?

8      A.   That's when we got the gloves, that's when

9  we got the mask.

10      Q.   Where did you get the gloves and the mask

11  from?

12      A.   Ziggy.

13      Q.   What happened next?

14      A.   That's when he was like -- well, that's

15  what Dreddy was saying, "Well, I know she's there

16  now."

17      Q.   Did you know what he meant when he said "I

18  know she's there now"?

19      A.   No.

20      Q.   Did he say anything else at that time?

21      A.   He said that, "Well, you going to help

22  because she got a son and he's a big guy and you

23  going to handle him."

24      Q.   Did you agree?

25      A.   Yes.

**Guilt-phase Trial Minutes May 4, 2011**

1    you do?

2        A.    We went to -- when we got to the second

3    floor, we went to the door, went through the door.

4    When we went through the door, that's when we -- it

5    was -- you could see the apartment door right here.

6    So, when we come through the door we could see the

7    apartment door, and all the four of us went in and

8    waited right at the door.

9        Q.    So, you said when you came out of the door,

10   the door of -- what were you coming out?

11       A.    The stairway door.

12       Q.    So, as soon as you come out of the

13   stairwell door, you said you could see the door.

14   What door are you talking about?

15       A.    The door we was going to go through.

16       Q.    What happened next?

17       A.    Everybody standing around the door, then

18   that's when Dreddy pulled out a gun.

19       Q.    What did the gun look like?

20       A.    Silver, maybe a revolver.

21       Q.    Do you know what kind of gun?

22       A.    No.

23       Q.    So, he had a silver gun?

24       A.    Uh-huh (indicating affirmatively).

25       Q.    Is that yes?

**Guilt-phase Trial Minutes May 4, 2011**

```
 1        A.    Yes, yes.

 2        Q.    And who had the bats?

 3        A.    Ziggy and Dreddy -- I meant Ziggy and the

 4   big guy.

 5        Q.    What did you have?

 6        A.    Nothing.

 7        Q.    As you went into the door -- or as you went

 8   to the door, what happened next?

 9        A.    That's when Dreddy had went up to the door

10   and said -- kicked the door in, boom, kicked the

11   door again, boom.  That's when everybody went in

12   behind, it's like boom boom, started going in.  When

13   I heard somebody say, "who is it," then that's when

14   the door came open, and when the door came open,

15   that's when all of us went inside.

16        Q.    Who was in first?

17        A.    Dreddy.

18        Q.    And who is the person who kicked the door

19   open?

20        A.    Dreddy.

21        Q.    So Dreddy goes in, who goes in after

22   Dreddy?

23        A.    Ziggy.

24        Q.    Then who?

25        A.    The big guy.
```

**A.112**

**Guilt-phase Trial Minutes May 4, 2011**

```
1       Q.   And then who?

2       A.   Me.

3       Q.   You all four go in the apartment?

4       A.   Yes.

5       Q.   What happens next?

6       A.   When we went inside the apartment, that's

7   when we got inside the apartment, then that's when

8   the guy -- that's when the -- it was a guy coming to

9   the door.  When he came to the door, that's when he

10  was, like, "What's going on," he said.

11      Q.   What did that guy look like?

12      A.   The skinny guy.

13      Q.   A skinny guy?

14      A.   Yes.

15      Q.   White, black, Latino?

16      A.   Black guy.

17      Q.   Okay.

18      A.   It was a skinny guy, he said, "What's going

19  on?"  "Get on the ground, get on the ground, get on

20  the ground."  Everybody got on the ground.  That's

21  when the girl in the room and the guy who was in the

22  room with her, and the guy was in this room, and

23  everybody was on the ground and then --

24      Q.   Who is yelling "Get on the ground, get on

25  the ground"?
```

**A.113**

**Guilt-phase Trial Minutes May 4, 2011**

2314

1      A.   Dreddy.

2      Q.   Okay.  And you said that -- you are

3   pointing over to your left.  You saw a girl and a

4   man in that room on the left?

5      A.   Yes.

6           MR. SHEEHAN:  Objection to the leading,

7   your Honor.

8           THE COURT:  Pardon me?

9           MR. SHEEHAN:  Object to the leading

10   nature of the question.

11          THE COURT:  Would you rephrase.

12          MS. DAYTON:  Sure.

13     Q.   Who did you see in the room on the left?

14     A.   The girl, a female woman and a male.

15     Q.   What sort of room was that that you saw

16   them in?

17     A.   Bedroom.

18     Q.   And the gentleman you said that you saw

19   come out, what did you see happen to him?  Like what

20   happened next after?

21     A.   Pushed into the room on the right.

22     Q.   Who pushed him?

23     A.   It wasn't -- like nobody literally touched

24   him, it was like when you see somebody with a gun,

25   instinct going to tell you to go back, so he went

**Guilt-phase Trial Minutes May 4, 2011**

1    back into where his room was.

2        Q.   Who is pointing the gun then?

3        A.   Dreddy.

4        Q.   And what's he saying while he's pointing

5    the gun, if anything?

6        A.   "Get down."

7        Q.   And are they getting down?

8        A.   Yes.

9        Q.   What are you doing?

10       A.   I at the time -- everybody had -- when

11   he -- when we got there, he went here and the big

12   guy -- Dreddy and his brother went to this room.

13       Q.   And who was in this room?

14       A.   The female and the male.

15       Q.   Okay.

16       A.   And me and the big guy, we went to -- I

17   didn't go in the room, but he went in the room where

18   the older guy was.  Everybody was standing right

19   here.

20       Q.   Did you go towards that room, too?

21       A.   Yes.

22       Q.   Okay.  And then what did you do?

23       A.   That's where everybody was on the ground,

24   and when everybody was laying down, that's when

25   Ziggy came out, came over to me, because I was

**A.115**

**Guilt-phase Trial Minutes May 4, 2011**

2316

1  standing on the outside, I could, like, see both.  I

2  could see them two in this room, I could see him in

3  this room, because I'm standing right here in the

4  room.

5      Q.    Are the bedrooms close to each other?

6      A.    Yes, right besides each other.

7      Q.    Okay.  What happens?  What do you do next?

8      A.    After that Dreddy came -- Ziggy -- Ziggy

9  came out, he came out, he was like, "Come on, you

10  got to come over here and look out the window."  So

11  I go over.  He took me over to where the window was,

12  and there was no window right here.  No, at first we

13  got in, people was on the ground, he came in, me and

14  Dreddy came out.

15      Q.    And what did you do?

16      A.    We pushed the couch back to the door.

17      Q.    Okay.  Where did you get the couch from?

18      A.    It was in the living room.  I guess the

19  living room.

20      Q.    Was it sitting in the middle of the living

21  room or against the wall?

22      A.    Against the wall.

23      Q.    Was it a short couch or a long couch?

24      A.    Long couch.

25      Q.    And you said you and Dreddy pushed it up

**A.116**

**Guilt-phase Trial Minutes May 4, 2011**

1   against the door?

2       A.   Yes.

3       Q.   Why?

4       A.   Because I guess when we kicked the door in

5   the door -- it hinges came off or broke or cracked

6   the door frames or something, but the door wouldn't

7   shut like it's supposed to hold it back, so we came

8   up, me and him, he said "Grab the couch."  I grabbed

9   the couch and we pushed the couch back up against

10  the door.

11      Q.   I'm going to show you Government's

12  Exhibit 116K.  Do you recognize what this is a

13  photograph of?

14      A.   Yes.

15      Q.   What is it?

16      A.   That's the house, the apartment.

17      Q.   And when you went into this room, is this

18  the room that you got the couch from?

19      A.   Yes.

20      Q.   And do you see the couch in the picture?

21      A.   Yes.

22           MS. DAYTON:  Indicating on the left side

23  of the photo, your Honor.

24      Q.   So, that sort of off-white couch.  And is

25  that where it was when you first saw it?

**Guilt-phase Trial Minutes May 4, 2011**

2318

1      A.   Yes.

2      Q.   And where did you push it up to?

3      A.   Pulled the couch out from the front of the

4  handle and pulled it all the way to the door.

5      Q.   Okay.  I'm going to show you --

6           MS. DAYTON:  What's in evidence as 117H,

7  your Honor.

8      Q.   Is that, can you see what this is?

9      A.   Yes.

10     Q.   Is that the area that you pushed the couch

11 to?

12     A.   Yes.

13     Q.   Right where it is or closer or further away

14 to the door?

15     A.   To the door.  Right.  Up to the door for to

16 hold the door shut.

17     Q.   And what did you do after that?  Is that

18 when you went down the hall?

19     A.   Yes.

20     Q.   When you got down the hall, what did you

21 see?

22     A.   That's when they was still on the ground

23 and Ziggy was in the room with the male and the

24 female, and the big guy was standing at the door of

25 the male, and we -- he said, that's when -- that's

**A.118**

**Guilt-phase Trial Minutes May 4, 2011**

```
 1    when me and Dreddy was out.  And that's when Dreddy

 2    had told me to go, not Ziggy, Dreddy had told me to

 3    go to the window and watch out.

 4         Q.   Was the son that you were supposed to take

 5    care of, was he in the apartment?

 6         A.   No.

 7         Q.   Did you go out to the window?

 8         A.   Yes.

 9         Q.   And I'm going to show you --

10              MS. DAYTON:  What's in evidence as 117E,

11    your Honor.

12              That didn't work.

13         Q.   Do you see in this picture the area in

14    which you were standing?

15         A.   Yes.

16         Q.   And where were you standing?

17         A.   Right here.

18              MS. DAYTON:  Indicating sort of on the

19    left side next to the fan, your Honor.

20         Q.   And when you were standing over there,

21    could you see out the window?

22         A.   Yes.

23         Q.   And what do you see when you look out that

24    window?

25         A.   The street and the walkway and up under the
```

**A.119**

**Guilt-phase Trial Minutes May 4, 2011**

2320

1    -- where your cars go.

2        Q.   You could see right down into the street?

3        A.   Yes.

4        Q.   And as you're standing there, what happens?

5    What are you doing?  Do you just stand there?  Do

6    you move around?

7        A.   At the time I was just standing there, you

8    know, the only thing I know -- he, Dreddy had went

9    back, and the only thing I'm hearing is duct tape,

10   shh, shh, shh.

11       Q.   That's what it sounded like?

12       A.   Yes.

13       Q.   What did you do, did you go back to look?

14       A.   I went back to look a couple of times.

15       Q.   What did you see?

16       A.   Dreddy and Ziggy duct taping.

17       Q.   Who are they duct taping?

18       A.   The male and the female.

19       Q.   In the left bedroom?

20       A.   Yes.

21       Q.   Could you see where the big guy, the other

22   guy was?

23       A.   Still standing there and he was still

24   laying on the ground.

25       Q.   Who was still laying on the ground?

**A.120**

**Guilt-phase Trial Minutes May 4, 2011**

2321

1    A.    The skinny male.

2    Q.    Did you actually see the big guy duct

3  taping anyone?

4    A.    No.

5    Q.    So, you see the defendant and his brother

6  duct taping people.  What happens next?  What do you

7  do?

8    A.    So, now I'm back and forth, that's all.

9  I'm hearing this duct taping, duct tape, so I went

10  back and forth, running back and forth, going back

11  and forth looking, and all of a sudden everybody is

12  finished up, don't hear no more duct tape.

13        So now I was in -- I was standing, it was

14  somebody coming and I told, I said, "Yo, somebody

15  coming."  He said, "Hold on, hold on."  He stopped,

16  and Ziggy had came out over there by the window

17  where I was at, and looked.  "It's nobody, it's

18  nobody," then he went back.  Then they -- I guess

19  they started back duct taping.

20    Q.    What happened next?

21    A.    All of a sudden you start hearing nothing,

22  nothing.  And then right after that I go back, I

23  heard somebody like "Yeow."

24    Q.    Like a loud-type pitch sound?

25    A.    And I said, I go back, I go back, and I

**A.121**

**Guilt-phase Trial Minutes May 4, 2011**

1    look, I said, "Yo, what are you doing?"

2        Q.   You go where to look?

3        A.   I go back because I heard somebody yelling,

4    I'm like -- making a whole muffled sound.  I'm like,

5    like, like, wow.  So when I go back, when I go back

6    and look, I look, I seen them.  He was standing over

7    like this over and start hitting her.

8        Q.   Who is standing like that?

9        A.   Dreddy.

10       Q.   Okay.  You indicated, you put the pointer

11   over your head and knocking down in front of you.

12   And who is he hitting?

13       A.   The female, staying right here.

14       Q.   Is she on the floor?

15       A.   Yes.

16       Q.   And when the defendant is hitting her,

17   what's he hitting her with?

18       A.   The bat.

19       Q.   What is she doing?

20       A.   What could you do but yell.  The only thing

21   you can do.  And she was just yelling and when I --

22   just laying there and he's standing over her, and

23   Ziggy is standing on the other side doing the same

24   thing to the other guy.  I'm, like, "Yo, what are

25   you doing?"  And then he said, "Yo, come and get you

**Guilt-phase Trial Minutes May 4, 2011**

2323

1    some."

2       Q.   Who said come and get you some?

3       A.   Dreddy.

4       Q.   When you say that Ziggy was doing the same

5    thing to the other guy, can you explain what you

6    mean?

7       A.   When I came round, the only person I seen

8    at the time was Dreddy.  When I go at the time in

9    the hallway, it ain't like short, but when you go a

10   little closer you look, so now when I get to the

11   corner of the hallway, now I see him go in the

12   front.  I'm looking at him, I'm seeing him doing the

13   same thing what he's doing.  So I, like, what's

14   going on.

15      Q.   So what do you do at this point?

16      A.   I leave.  I said, "I'm out of here."  So

17   now I going, like the couch in front of the door, so

18   I go and push the couch out with my body, push the

19   couch out with my body, and when I looked back

20   that's when I see Dreddy handing Ziggy the gun.

21      Q.   And what are you thinking at that point?

22      A.   I don't think what I going to do.  They

23   going to come and get me or what?  I don't know.  I

24   don't know what.  My mind was just going so fast

25   it -- I was, yeah, I was thinking he was going to

**A.123**

**Guilt-phase Trial Minutes May 4, 2011**

2324

1   come and get me.

2       Q.   So, you see the defendant hand Ziggy the

3   gun.  Do you see Ziggy -- let me go back for a

4   minute.

5            You say you moved the couch away from the

6   door, you indicated, with your body.  Are you facing

7   the door or are you facing into the room?  Do you

8   know what I mean?

9       A.   Not exactly.

10      Q.   So, if the door is here and the couch is

11  pushed up to it, do you face the door and move your

12  body this way, or do you face your back to the door

13  and you are moving the furniture away from you

14  that's in front of you?

15      A.   Could we go back, I'll show you.

16      Q.   Sure.  Okay.  Does that help?

17      A.   No, to the door, the door with the couch.

18           MS. DAYTON:  Can you close the light

19  please, your Honor, I think it's easier to see.

20      Q.   Does that help?

21      A.   Yes.  I was right behind the couch and the

22  door was wedged right to the -- the couch was wedged

23  to the door.  That's when I pushed it with my

24  stomach and I could still see --

25      Q.   So, you were facing into the apartment.

**A.124**

**Guilt-phase Trial Minutes May 4, 2011**

```
 1      A.    Yeah, you could see.

 2      Q.    As you are pushing the couch away, what do

 3  you see happen?

 4      A.    He, Dreddy, handed Ziggy the gun.

 5      Q.    And what happens next?

 6      A.    I went outside, he came behind me.

 7      Q.    Other -- did Ziggy bring the gun with him?

 8      A.    No.  I don't know if he did or not.  I

 9  don't know then.

10      Q.    Did you see him bring anything else with

11  him?

12      A.    Besides the bat?

13      Q.    Okay, did he bring a bat?

14      A.    Yeah.

15            MR. SHEEHAN:  Can I ask for

16  clarification.  Who is the "he" counsel is referring

17  to.

18      Q.    Ziggy?

19      A.    Ziggy.

20      Q.    Did Ziggy take anything out of that

21  apartment towards you?

22      A.    Well, when we got inside, that's when the

23  lady -- way before all that, before the lady started

24  getting beat with the bat, he grabbed a cell phone

25  and some money and put it on top of that counter.
```

**Guilt-phase Trial Minutes May 4, 2011**

2326

1    Q.   Which counter?

2    A.   Right here, where you can't even see it.

3  It's right over here.

4    Q.   Indicating to the right?

5    A.   Yes.

6    Q.   What's over there?

7    A.   The kitchen I think.

8    Q.   So you are pointing at the defendant.  The

9  defendant took a cell phone and some money?

10   A.   Yeah, it's way before they started duct

11 taping.  It was on top of the counter.

12   Q.   The defendant put it on top of the counter?

13   A.   Yes.

14   Q.   Did you see where he got the cell phone and

15 the money from?

16   A.   Out of the room where the male and the

17 female was.

18   Q.   So, what does this have to do with Ziggy

19 leaving?  When he left did the cell phone and the

20 money stay there?

21   A.   No, the cell phone and money left with

22 Ziggy.

23   Q.   Did you see him take them?

24   A.   Yes.

25   Q.   And when you walked out, what happened?

**A.126**

**Guilt-phase Trial Minutes May 4, 2011**

```
 1        A.   Both of us went downstairs.  He was
 2   leaving.  We went downstairs.  I followed him.  We
 3   got in the car, we drove out of the parking lot and
 4   that's --
 5        Q.   What was your state of mind right then?
 6   How did you feel?
 7        A.   I don't feel too good right now.
 8        Q.   You get in the Corolla?
 9        A.   Yes.
10        Q.   And where do you go?
11        A.   Got in the car, went out the parking lot
12   and went to the left.
13        Q.   Is Ziggy talking to you in the car?
14        A.   Yes.
15        Q.   What's he saying?
16        A.   "Did you hear the people say our names?"
17        Q.   Ziggy is asking you that?
18        A.   Yes.  And I said "No."
19        Q.   What else did he say, if anything?
20        A.   He said, "Do you, do you -- do you want
21   this phone?"  "No."
22        Q.   The phone he took from the apartment?
23        A.   Yes.
24             MR. SHEEHAN:  Objection to leading, your
25   Honor.
```

**A.127**

**Guilt-phase Trial Minutes May 4, 2011**

 1           THE COURT:  I think that's

 2    clarification.  Overruled.

 3       Q.   And as you started -- was Ziggy driving

 4    during these conversations?

 5       A.   Yes.

 6       Q.   Did he -- what else did he say, if

 7    anything?

 8       A.   He just said, "I think I got something on

 9    my pants."  And then I didn't pay it no mind, I was

10    just trying to just don't say too much, not say too

11    much, not say too much for I don't know what's going

12    to happen next.  He just took out -- I just seen him

13    beat somebody.  I don't know what he's going to do

14    next.  Now he got a gun, he don't have to beat, he

15    just got to point and shoot.  So I'm, like, all

16    right.  I don't know what to do, I'm just sitting

17    like trying to play calm as I can, like.  So, we

18    left from there, we went somewhere else, and I don't

19    know where we was going, but we left.  We parked on

20    the side of a street and we walked up around to an

21    apartment.

22       Q.   And what did the apartment look like?

23       A.   I can't really tell you in detail, but it

24    was a door here and a door here.  But it was -- like

25    I think it was one house.

**A.128**

**Guilt-phase Trial Minutes May 4, 2011**

1          THE COURT:  It's a full exhibit.

2          MS. DAYTON:  Thank you, your Honor.

3     Q.   And, Mr. Taylor, what charges did you plead

4  guilty to?

5     A.   Three counts of felony murder.

6     Q.   And do you know what sort of sentence you

7  are facing?

8     A.   Life sentence.

9     Q.   For each count?

10    A.   Yes.

11    Q.   Is the government seeking the death penalty

12 against you?

13    A.   No.

14    Q.   When you were first arrested back in

15 Pinetops, did you even know that this could

16 potentially be a death penalty case?

17    A.   No.

18    Q.   Why are you testifying?

19    A.   To tell the truth.

20    Q.   Why?

21    A.   People got killed for no reason.  They

22 shouldn't got killed.  When I said they shouldn't

23 got killed, it never should have gone to the point

24 it went to.

25    Q.   When you walked into that apartment that

**Guilt-phase Trial Minutes May 4, 2011**

1  day, what did you think was going to happen?

2      A.   My question is, I thought maybe we was

3  going to go inside and just beat the place up, like

4  tear the place up.  Like, you know, how people do,

5  like when you try to get somebody out of there, tear

6  them up.  I didn't know they was just going to go in

7  there and kill them.

8      Q.   I'm going to go show you a picture marked

9  121-10.

10          MR. SHEEHAN:  Is that in evidence

11  already, counsel?

12          MS. DAYTON:  Yes.

13          MR. SHEEHAN:  I'm sorry.

14          MS. DAYTON:  Yes.

15      Q.   Mr. Taylor, do you see that photo, 121-10?

16      A.   Yes.

17      Q.   Did you see this on the day you were in the

18  apartment?

19      A.   Yeah.

20      Q.   Why didn't you call 911?

21      A.   Scared.

22      Q.   Scared of what?

23      A.   I figured if I told the truth they would

24  lock me up the way I am now.

25      Q.   And why didn't you call the police later?

**Guilt-phase Trial Minutes May 4, 2011**

2374

```
 1        A.    I didn't know what to do.  I didn't.

 2        Q.    What are you hoping happens to you?

 3        A.    Lesser sentence.

 4        Q.    Do you think you are going to go home

 5   tomorrow?

 6        A.    No.

 7        Q.    When do you think you are going to go home?

 8        A.    I don't think I'm never going home.

 9              MS. DAYTON:  Thank you, your Honor, I

10   have nothing further at this time.

11              Thank you, Mr. Taylor.

12              THE COURT:  Thank you.

13   Cross-examination.

14              MR. SHEEHAN:  Thank you, your Honor.

15              THE COURT:  There are tissues on the

16   witness stand.

17   CROSS-EXAMINATION

18   BY MR. SHEEHAN:

19        Q.    Afternoon, Mr. Taylor.  My name is Michael

20   Sheehan and I represent Mr. Aquart.

21   The prosecutor went through your criminal history.

22              THE COURT:  All right, why don't we take

23   a five-minute recess, ladies and gentlemen.

24              MR. SHEEHAN:  That will be fine, your

25   Honor.
```

**A.131**

**Guilt-phase Trial Minutes May 5, 2011**

1  where you met with a Spanish female.

2      A.    Yes.

3      Q.    And then you told them that Dreddy and

4  Ziggy left and then came back with a fourth guy.

5      A.    This was still in -- sitting on the couch

6  in North Carolina?

7      Q.    Yeah.

8      A.    That was the truth, but it was also -- the

9  end part that was a lie.  The fourth guy didn't come

10 up with us to the third floor apartment.  They

11 didn't go out and get the fourth guy, he left.

12     Q.    Okay.  Did you have any reason in North

13 Carolina to be protecting the fourth guy?

14     A.    No.

15     Q.    The only person you were trying to protect

16 in North Carolina was you, right?

17     A.    Yes.

18     Q.    Then do you remember telling them that

19 Dreddy knocked on the door -- when you went

20 downstairs to the apartment, Dreddy knocked on the

21 door and the woman opened the door?

22     A.    Can you repeat that again, please.

23     Q.    Did you tell -- back in Pinetops, did you

24 tell the law enforcement that Dreddy knocked on the

25 door and the woman opened the door?

**A.132**

```
1        A.    What floor?  Second or third floor?

2        Q.    Second floor?

3        A.    No, a female knocked on the door.

4        Q.    Okay.  I understand that's what your

5   testimony is, but I'm asking you if you remember

6   back in Pinetops whether you told them that Dreddy

7   knocked on the door, meaning the door of the

8   apartment where the murders took place, and the

9   woman opened the door?

10       A.    Don't remember.

11       Q.    And that you then told them that Dreddy put

12  a gun in the woman's face and said he was the cops

13  and rushed into the apartment.

14       A.    That was also the truth, but it was also a

15  lie.

16       Q.    And the lie part was?

17       A.    The cop and -- that's about it.

18       Q.    And then you said that Dreddy gave -- I'm

19  sorry, Ziggy gave the duct tape to Dreddy and you

20  saw Dreddy duct tape the three people inside the

21  apartment.

22       A.    Excuse me?

23       Q.    You told the police officers December 2nd

24  that Ziggy handed the duct tape to Dreddy and that

25  you then saw Dreddy duct tape the three people
```

**Guilt-phase Trial Minutes May 5, 2011**

2471

1  as the couch you used to prop up the door, did you?

2      A.   I understand but I don't understand what

3  you are saying.

4      Q.   All right, I'm going to go back.  You have

5  a recollection of meeting with them and seeing

6  pictures of this couch, right?  Referencing

7  Defendant's Exhibit A.

8      A.   Yes, I remember that.

9      Q.   And you said on that date that you did not

10  recognize that couch.

11      A.   Exactly.

12      Q.   Now, do you remember what color gloves

13  everybody had on that date?

14      A.   No, I don't remember.  The only thing I

15  remember what gloves I had on.

16      Q.   Okay.  And do you remember when you entered

17  a plea of guilty in this case, one of the things

18  that you had to do was write out a statement in your

19  own hand, in your own writing about what happened on

20  that date?  Right?

21      A.   Yes.

22      Q.   And do you remember what it was that you

23  wrote in that statement about the color of the

24  gloves?

25      A.   Blue.

**Guilt-phase Trial Minutes May 5, 2011**

1    Q.   Okay.  And do you remember writing in that
2  statement that everyone had masks and blue rubber
3  gloves?
4    A.   I may have said that, but then more time
5  thinking about it, I couldn't remember.  I know
6  everybody had rubber gloves.
7    Q.   Okay.  And do you remember when it was that
8  you entered that -- when you pled guilty?
9    A.   Do I remember what day I pled guilty on?
10   Q.   Yeah, what year.
11   A.   I think it was last year.  If I'm not -- I
12 might be right.
13   Q.   Okay.  And you did write in that document
14 that you submitted to the Court that -- in your own
15 hand, that everyone had masks and blue rubber
16 gloves, correct?
17   A.   I may have wrote that.  Like I said, I -- I
18 have to see it again.
19   Q.   Okay.  And let me show you this, and
20 perhaps if I could just draw your attention right
21 here.
22   A.   Yes.
23   Q.   Okay.  And by "yes" you mean that you did
24 tell the Court at that time in your own hand that
25 everybody had masks and blue rubber gloves?

**Guilt-phase Trial Minutes May 5, 2011**

1      A.    Yes.

2      Q.    And that was on October 18, 2010, was it

3  not?

4      A.    I don't remember the date, but if -- yes.

5      Q.    Okay.

6            MR. SHEEHAN:  Your Honor, I wonder if we

7  could stipulate as to the date the plea was entered.

8            MS. DAYTON:  Absolutely.

9            MR. SHEEHAN:  So, for the record, your

10  Honor, the plea in this case was -- in Mr. Taylor's

11  case was entered on October 18th, 2010.

12            THE COURT:  All right.

13      Q.    And I want to go back just very, very

14  briefly to Pinetops.  You had indicated that you --

15  and this is back in December, that you really --

16  December of 2009, that you had -- in trying to talk

17  yourself out of a problem you got yourself in a big

18  one, right?

19      A.    Yes.

20      Q.    And at that time when they told you that

21  you were arrested for murder, that was a big concern

22  for you, was it not?

23      A.    Yes.

24      Q.    Now you were initially presented in federal

25  court in North Carolina?

**A.136**

**Guilt-phase Trial Minutes May 5, 2011**

2502

 1          THE COURT:  I'm going to, in light of

 2    that direction to the government, overrule your

 3    objection.

 4          (Sidebar concluded)

 5      Q.   Sorry about that.  Mr. Taylor, do you

 6    remember what you told the agents with respect to

 7    who killed the victims?

 8      A.   Yes.

 9      Q.   And do you remember what you told them with

10    respect to who was bashing the victims over the head

11    with the baseball bats?

12      A.   Yes.

13          MR. SHEEHAN:  Same objection, your

14    Honor.

15          THE COURT:  Overruled.

16      Q.   And what did you tell them?

17          MR. SHEEHAN:  Same objection, your

18    Honor.

19          THE COURT:  Overruled.

20      Q.   You can answer.

21          THE COURT:  This is what you told the

22    agents.

23      A.   Okay, that when I walked back from the

24    window, went back and looked, Dreddy was standing

25    over the victim's body bashing her like he was at a

**A.137**

**Guilt-phase Trial Minutes May 5, 2011**

2503

1  meat cleaver -- that he was at a meat market,

2  beating them.  His brother was over there doing the

3  same thing.

4      Q.   Do you remember what type of bats they

5  were?

6              MR. SHEEHAN:  Objection.  Outside the

7  scope of the cross.

8              THE COURT:  Sustained.

9      Q.   Do you have any doubt about the

10  truthfulness of what you testified to --

11              MR. SHEEHAN:  Objection.

12      Q.   -- here?

13              MS. DAYTON:  I didn't even get the

14  question out.

15              MR. SHEEHAN:  I don't think a witness

16  can be allowed to characterize his own truthfulness,

17  your Honor.

18              THE COURT:  Let me hear the full

19  question.

20      Q.   The truthfulness to what you testified to

21  here today and yesterday?

22              MR. SHEEHAN:  Objection, your Honor.

23              THE COURT:  Sustained.

24              MS. DAYTON:  I have nothing further.

25  Thank you.

**A.138**

**Guilt-phase Trial Minutes May 5, 2011**

 1    on your table.  We'll take a five-minute recess.

 2                    MS. DAYTON:  Thank you, your Honor.

 3                    (Jury exited the courtroom.)

 4                    THE COURT:  All right, we'll stand in

 5    recess.

 6                    Please don't discuss your testimony.

 7                    MS. DAYTON:  Is it okay if her lawyer

 8    speaks with her?  I won't speak with her lawyer.

 9                    (Recess).

10                    THE COURT:  All right, Ms. Hopkins, are

11    you okay?

12                    THE WITNESS:  Yes.  Thank you.

13                    THE COURT:  Please bring in the jury.

14                    (Jury entered the courtroom.)

15                    THE COURT:  Please be seated, ladies and

16    gentlemen.  You may continue.

17                    MS. DAYTON:  Thank you, your Honor.

18        Q.   Ms. Hopkins, when we just broke we were

19    talking about how you got in trouble with the

20    defendant.  Why don't you tell us first what you got

21    in trouble for.

22        A.   Well, this particular time I got in trouble

23    for allowing my brother to come in to Charles

24    Street, Pops' house.

25        Q.   What's your brother's name?

**A.139**

**Guilt-phase Trial Minutes May 5, 2011**

1      A.    John Sullivan.

2      Q.    Did he have a nickname?

3      A.    John-John.

4      Q.    I'm showing you what's in evidence as

5   Government's Exhibit 224.  Do you recognize that

6   person?

7      A.    Yes.

8      Q.    Who is that?

9      A.    John-John.

10     Q.    Okay.  You said you let him into the

11  apartment.  What was the problem with that?

12     A.    He shouldn't have been there because we

13  were helping him sell his drugs out of that

14  apartment.

15     Q.    Who is "we"?

16     A.    Frankie and I.

17     Q.    And you were helping who sell their drugs?

18     A.    John-John.

19     Q.    And what happened?

20     A.    Big Man came in that night and he noticed

21  John-John there, and Big Man stayed about five

22  minutes, and Big Man got up to leave out and I went

23  behind Big Man to ask him a question about would I

24  be working tonight once Frankie was finished, but he

25  never answered, he kept walking.  So, I went back

1    into the apartment and a few minutes later Dreddy

2    came to the apartment.

3        Q.   And what happened when Dreddy came to the

4    apartment?

5        A.   He told everybody to leave except for me

6    and John-John.

7        Q.   And what happened next?

8        A.   He went in a gym bag and pulled out a

9    pistol.

10       Q.   Who did?

11       A.   Dreddy.

12       Q.   And what happened?

13       A.   He hit me with it and then he would hit my

14   brother, then he would hit me again and then he

15   would hit my brother.

16       Q.   With the gun?

17       A.   Yes.

18       Q.   And where was he hitting you?

19       A.   He hit me in my nose and he hit me in my

20   eye.

21       Q.   And were you injured by it?

22       A.   Yes.

23       Q.   And did you see where he hit your brother?

24       A.   Yes.

25       Q.   Where did he hit your brother?

**Guilt-phase Trial Minutes May 5, 2011**

2568

```
 1        A.    In the head.

 2        Q.    Once, more than once?

 3        A.    More than once.

 4        Q.    And did you see if your brother was

 5   injured?

 6        A.    Yes.

 7        Q.    And how did you know he was injured?

 8        A.    Because he was bleeding.

 9        Q.    Where was he bleeding from?

10        A.    The head.

11        Q.    And what happened -- well, was the

12   defendant saying anything while he was beating up on

13   you and your brother?

14             MR. SMITH:  Objection to the form.

15             THE COURT:  Overruled.

16        A.    Yes.

17        Q.    What was the defendant saying?

18        A.    "Didn't I tell you about bringing people in

19   my house to sell drugs."

20        Q.    How long did this go on for, the defendant

21   hitting you and your brother?

22        A.    For about five minutes.

23        Q.    And what happened when he was done?

24        A.    He left.

25        Q.    And what did you do at that point?
```

**A.142**

**Guilt-phase Trial Minutes May 10, 2011**

1　gentlemen.　Continued direct examination of

2　Ms. Johnson by Mr. Markle.

3　　　　　　　MR. MARKLE:　Thank you, your Honor.

4　　　　　　　THE COURT:　These momentary lapses.

5　　Q.　Ms. Johnson, I had shown you Government's

6　Exhibit 500 and you recognize that as the letter

7　your brother sent you from prison, correct?

8　　A.　Yes.

9　　　　　　　MR. MARKLE:　We'll offer it just for

10　identification at this point, your Honor.

11　　　　　　　THE COURT:　Very well.

12　　Q.　Now, before your brother went into prison,

13　Ms. Johnson, did there come a time -- did you have

14　conversations with him about the murders?

15　　A.　Yes.

16　　Q.　And what caused you to have a conversation

17　with him about the murders?　If you could just sit

18　up a little bit.

19　　A.　The fact that he wanted to go visit my

20　mother, which was odd, and then something changed

21　about his characteristics, like he wasn't the same

22　person.

23　　Q.　Were you concerned about your brother?

24　　A.　Yes.

25　　Q.　And where did you have a conversation with

**Guilt-phase Trial Minutes May 10, 2011**

2908

1    him about it?

2         A.    I believe my house.

3         Q.    And was anyone else present?

4         A.    No.

5         Q.    And what did he tell you at that time?

6              MR. SHEEHAN:  Objection for the reasons

7    previously stated, your Honor.

8              THE COURT:  Based on my previous ruling,

9    it is overruled.

10             MR. SHEEHAN:  May I have a continuing

11   objection with respect to this line of questioning?

12             THE COURT:  You may.

13             MR. SHEEHAN:  Thank you, your Honor.

14        Q.    What did your brother tell you?

15        A.    I asked him what was wrong, if he was ever

16   going to tell me what happened, and he basically

17   told me -- he didn't give me a full response, but he

18   just said that he helped tie the people up and rough

19   them up a little bit, but he said when he left those

20   people were still alive.

21        Q.    And did he say who he helped?

22        A.    Not at that moment, no.

23        Q.    At a later time did he do that?

24             MR. SHEEHAN:  Objection to leading.

25             THE COURT:  Sustained.

**A.144**

**Guilt-phase Trial Minutes May 10, 2011**

2909

1      Q.   Did he ever tell you who he helped?

2      A.   He said something like he left Dreddy by

3   hisself (sic).

4      Q.   Left him where?

5      A.   In the apartment.

6      Q.   And was anyone else present when he said

7   that?

8      A.   No.

9      Q.   He told that to you?

10     A.   Yes.

11     Q.   Did he say anything about any -- how the

12   acts were performed?

13     A.   Well, I asked him about anything else, like

14   as far as evidence went.  He said that everything

15   that they had or used was disposed of before they

16   came to me.

17     Q.   And what did he say -- what were those

18   things that were disposed of?

19     A.   Bats and gloves and maybe masks.

20     Q.   And that was according to who?

21     A.   My brother.

22     Q.   Did he say how many people were involved?

23          MR. SHEEHAN:  Objection, leading.

24          THE COURT:  Sustained.

25     Q.   Did he say that he was in the apartment

**A.145**

**Guilt-phase Trial Minutes May 10, 2011**

1      A.   No.

2      Q.   What does it mean when you have somebody's

3  back?  What does it mean to you when you say that

4  you've got somebody's back?

5      A.   When I told him that I meant that whatever

6  he needed to do to save his life and to free him of

7  this, then he should.  If it meant he wanted to

8  tell, then he should tell, and that I would do the

9  same because it's what was right.

10      Q.   In other words, you were going to help him,

11  right?

12      A.   Not help him.  Not help him.

13      Q.   Well, what you had told him was "I got your

14  back," right?

15      A.   Right.

16      Q.   Now, on that -- then -- so that was your

17  third interview on September 24th.  And then you

18  came back on October 14, 2007, for another

19  interview, right?

20      A.   Right.

21      Q.   And in that interview they asked you about

22  a power drill and you said you have no idea about a

23  power drill, right?

24      A.   Right.

25      Q.   You said I never saw it, I never saw a

**A.146**

**Guilt-phase Trial Minutes May 10, 2011**

1    power drill, right?  You told them that?

2        A.    Possibly.

3        Q.    You told them I didn't put it in the bags,

4    I don't know anything about that, right?

5        A.    Possibly.

6        Q.    And at that meeting you added in a new

7    detail about Azikiwe going to Philadelphia with you

8    and Efrain.

9        A.    No, his brother went to Philadelphia with

10   me and my brother.

11       Q.    That's Azikiwe, right?  I'm sorry?

12       A.    Yeah, yeah.  I'm sorry.

13       Q.    Fair enough.  Let me rephrase that.  You

14   knew him as Ozzie?

15       A.    Right.

16       Q.    At the October 14th interview you added in

17   that new detail about Ozzie going to Philadelphia

18   with you and Efrain.

19       A.    Right.

20       Q.    You hadn't told them previously about Ozzie

21   going with you, had you?

22       A.    I guess not.

23       Q.    And then in that meeting they confronted

24   you, did they not?

25       A.    About?

**A.147**

**Guilt-phase Trial Minutes May 10, 2011**

1    Q.   They said that we don't think that you are

2    telling us the truth.

3    A.   Yeah.

4    Q.   Now, you understood that at that point that

5    if the law enforcement people didn't believe you,

6    you were in big trouble.

7    A.   Yeah.

8    Q.   And they were telling you they didn't

9    believe you, right?

10   A.   Yes.

11   Q.   And then you started crying?

12   A.   Uh-huh (indicating affirmatively).

13   Q.   And you understood, however, that if they

14   didn't believe you, your proffer was gone, right?

15   A.   Right.

16   Q.   You could be prosecuted, right?

17   A.   Right.

18   Q.   And so you told them some more stuff about

19   your brother, didn't you?

20   A.   Possibly.

21   Q.   Well, you now told them that your brother

22   had admitted tying up people.

23   A.   Yes.

24   Q.   You hadn't told them that before, had you?

25   A.   No.

**Guilt-phase Trial Minutes May 10, 2011**

1    Q.   Is telling them that what you mean by I've

2  got your back?

3    A.   I'm sorry?

4    Q.   Well, you now said that your brother had

5  admitted tying people up, right?

6    A.   Right.

7    Q.   Because you were being threatened, right?

8    A.   Not because I was being threatened.

9    Q.   You were being threatened, were you not?

10   A.   I don't think it was a threat.  It was just

11  more so like they were telling me what was right and

12  what I had to do.

13   Q.   And you understood that if you didn't do

14  what they said, you were in big trouble.

15   A.   I understood that if I didn't do what was

16  right then I would be in trouble.

17   Q.   And at that point in time after you told

18  them that additional detail about your brother, they

19  didn't rip up the proffer agreement, did they?

20   A.   No.

21   Q.   Then on October 22nd they called you back

22  for a fifth interview, did they not?

23   A.   Yeah.

24   Q.   Any idea why they called you back so soon

25  after the prior meeting?

**A.149**

**Guilt-phase Trial Minutes May 10, 2011**

1      A.   No.

2      Q.   Was there anything that you needed to

3   practice at these meetings?

4      A.   No.  More so it was time.

5      Q.   And now at this meeting you added in the

6   story about the power drill, right?

7      A.   Right.

8      Q.   You'd been previously questioned about it

9   and you said you had no knowledge, right?

10     A.   Right.

11     Q.   But now you remembered taking it out of

12  your apartment to the dumpster.

13     A.   Right.

14     Q.   And you not only remembered it, you knew

15  the color of it, right?

16     A.   Right.

17     Q.   And then you added in a new story, did you

18  not, about remembering a phone call that you say

19  Azibo had?

20     A.   Possibly, but I remember the phone call.

21     Q.   You hadn't told them anything about this

22  phone call before, had you?

23     A.   Possibly not.

24     Q.   And you now told them that you remembered

25  this phone call where Azibo was saying something

**Guilt-phase Trial Minutes May 10, 2011**

1    about my brother is in the building.

2        A.    Yes.

3        Q.    Cops are everywhere, right?

4        A.    I don't remember that.

5        Q.    We need to get him out of that.  You don't

6    remember telling them that?

7        A.    I remember him telling me to go pick him

8    up.

9        Q.    Okay.  So that's a conversation you

10   remember between him and you.

11       A.    Him telling me to go pick him up, yes.

12       Q.    Do you remember telling the police, the law

13   enforcement people, that there was a phone

14   conversation where Azibo was saying, "My brother is

15   in the building, the cops are everywhere, we need to

16   get him out"?

17       A.    Possibly.

18       Q.    That's a dramatic detail, isn't it?

19       A.    All of them are.

20       Q.    All of them are?

21       A.    All of them are.

22       Q.    It is something that you hadn't mentioned

23   previously, right?

24       A.    Right.

25       Q.    And now we're three years, more than three

**A.151**

**Guilt-phase Trial Minutes May 10, 2011**

1    years after the murders, right?

2        A.   Okay.

3        Q.   I don't know if you were asked this

4    question, but you previously told law enforcement

5    that Azibo stayed at your house 'til about noon that

6    day.

7        A.   A little before maybe.  But yeah.

8        Q.   Is that your recollection now?

9        A.   Yes.

10       Q.   And you said something about the fourth

11   guy, that it sounded like he was from New Haven or

12   New York.

13       A.   That was something that I asked my brother,

14   but I thought I heard when I woke up that night

15   another voice in my house.  So, I was assuming that

16   there was another person.  But I asked my brother

17   later on was there another person.

18       Q.   So you were talking to your brother about

19   what his recollection was, right?

20       A.   Not really, just more so the unanswered

21   question that I had.  I asked him.

22       Q.   And then more recently in January 20th of

23   2010, that would be your -- about your sixth

24   interview.

25       A.   Okay.

**Guilt-phase Trial Minutes May 10, 2011**

1   Q.   You had another meeting with the law

2   enforcement, right?

3   A.   Okay.

4   Q.   Is that another practice session for you?

5   A.   I wouldn't call it a practice session.

6   Q.   And now four and a half years later you now

7   recall seeing Azibo arrive outside your apartment.

8   A.   Right.

9   Q.   In his red Cadillac, right?

10   A.   Right.

11   Q.   Whereas previously you'd said nothing about

12   that.

13   A.   I mean, everything was coming to me not all

14   at once.  But I couldn't remember everything all at

15   first.

16   Q.   And we're now four and a half years later

17   and these things, you say, they're now coming to

18   you, right?

19   A.   They're not now coming to me, they're

20   slowly piecing themselves together.

21   Q.   And on that date you told the agents that

22   Efrain had told you that he had previously gotten

23   crack from Azibo.

24   A.   Yes.

25   Q.   But the first time you told them that

1    Efrain only got marijuana, right?

2        A.    Right.

3        Q.    As far as now telling them about crack, did

4    you still feel like you had Efrain's back?

5        A.    No, it was just another one of the things

6    that just popped into my mind.  I just knew what

7    happened because it just came up.

8        Q.    And then another thing that popped into

9    your mind was Efrain telling you that he had to

10   handle something with Azibo, right?

11       A.    Right.

12       Q.    That's a brand new story that just popped

13   into your mind at that time, isn't it?

14       A.    At what time?

15       Q.    At that interview on January 20, 2010.

16       A.    I don't remember he said he had to handle

17   something with Azibo.  I remember him saying he had

18   to handle something, though.

19       Q.    And then you added in you remembered -- or

20   it popped into your mind a new detail about a trip

21   to Norwalk, right?

22       A.    Yeah.

23       Q.    And we're now almost five years later when

24   these details keep popping into your mind, right?

25       A.    This particular thing didn't pop.  They

**Guilt-phase Trial Minutes May 10, 2011**

1    asked me had I ever -- like, where did I go with

2    him, like where we ever been together.

3        Q.   And let me ask you this:  Before today, had

4    you told anybody the new story, the story about

5    picking up Azikiwe at Charles Street?

6        A.   I told them.

7        Q.   When did you tell them?

8        A.   I don't remember.

9        Q.   It was after January of 2010, wasn't it?

10       A.   Again, the date, I don't remember, but I

11   told them.

12       Q.   You didn't tell them about it on January --

13   in January of 2010, did you?

14       A.   I don't remember.

15       Q.   Would looking at a report refresh your

16   recollection about that?

17       A.   No.

18       Q.   Okay.  You didn't tell them about it on

19   September 18, 2008, did you?

20       A.   I don't remember.

21       Q.   Would looking at a report refresh your

22   recollection?

23       A.   No.

24       Q.   Okay.  And you didn't tell them about it on

25   September 24, 2008, did you?

**Guilt-phase Trial Minutes May 10, 2011**

2953

1      A.    Again, I don't know how long ago I told

2   them I had to pick him up.

3      Q.    And I take it looking at a report wouldn't

4   refresh your recollection about that, would it?

5      A.    No, no.

6      Q.    And on October 14, 2008, you don't recall

7   whether you told them that or not.

8      A.    I don't recall.

9      Q.    And looking at a report wouldn't refresh

10  your recollection about that, would it?

11     A.    No, sir.

12     Q.    And on October 22, 2008, again, you don't

13  know if you told them about that new detail.

14     A.    I don't remember when I told them.

15     Q.    How long ago was it when you told them?

16     A.    I don't know.

17     Q.    Days?

18     A.    I'm sure not days, but I don't remember

19  exactly when.  It's been a long time.

20     Q.    When was the last time you met with law

21  enforcement?

22     A.    Last week, Friday.

23     Q.    Okay.  And did you tell it to them at that

24  time?

25     A.    No.  They had already known.

**A.156**

**Guilt-phase Trial Minutes May 10, 2011**

1    Q.   All right.  And when was the time before

2  that that you met with them?

3    A.   Oh, God.  I don't remember.  It's been so

4  long and so many times, I don't remember dates.  I

5  don't remember how often.  I don't remember how far

6  apart.  I don't remember.

7    Q.   Isn't it a fact that prior to December 13,

8  2010, in fact prior to December 16, 2010, you had

9  never told them about this new detail?

10    A.   I don't remember.

11    Q.   Indeed, prior to January 27, 2011, you

12  hadn't told them about this new detail.

13    A.   I don't remember exactly when I told them.

14    Q.   When you told them about it, what did they

15  say to you?

16         MR. MARKLE:  Objection, your Honor, it's

17  hearsay.

18         MR. SHEEHAN:  I'm not asking it for the

19  truth of the matter, your Honor.

20         MR. MARKLE:  It's irrelevant.

21         MR. SHEEHAN:  It's not irrelevant, your

22  Honor.

23         THE COURT:  The question is:  "Before

24  January 27, 2011, you hadn't told them about this

25  new detail."  "I don't remember exactly when I told

**Guilt-phase Trial Minutes May 10, 2011**

1   them."  "When you told them it, what did they say to

2   you?"  That is either hearsay -- of what relevance

3   is it?

4           MR. SHEEHAN:  It goes to her state of

5   mind and it also goes to trying to place the period

6   of time when she made this statement.

7           THE COURT:  I think there is another way

8   to achieve those goals.  Rephrase your question,

9   please.

10  Q.   Do you recall any conversations with them

11  when you first told them about this detail?

12  A.   No, I don't recall.

13  Q.   Did they say to you, for example, hey, you

14  never told us that before?

15  A.   I don't remember that.

16  Q.   Did they ask you how was it that you

17  happened to remember this fact?

18  A.   No, not that I can remember.

19  Q.   Did they ask you why was it that you never

20  told us about this previously?

21  A.   I don't know.

22  Q.   You don't recall?

23  A.   I don't recall.  I don't think so.  I don't

24  know.

25  Q.   Let me ask you this:  According to your

**Guilt-phase Trial Minutes May 11, 2011**    3084

```
 1        A.   I believe so.  I don't actually recall.

 2        Q.   Your notes don't reflect that, in any case?

 3        A.   No, they don't.

 4        Q.   And as far as the swabbing process that you

 5   used, you swabbed both the inside and the outside

 6   areas of the glove, did you not, part of the glove?

 7        A.   The gloves were swabbed on both sides, that

 8   is correct, separately.

 9        Q.   And do you do a -- for example, let's say

10   you gave separate numbers to each glove.  I think we

11   saw that in the picture yesterday.

12        A.   Yes.

13        Q.   Right?  Do you use a separate swab on each

14   glove?

15        A.   Oh, yes, definitely.

16        Q.   And with that swab -- you gave it a number,

17   14-1-Z1?

18        A.   One is 14-1.

19        Q.   14-1?

20        A.   Z1.

21        Q.   And --

22        A.   And 14-2-Z1.

23        Q.   So, do you use the same swabs to do the

24   inside and the outside area of the glove?

25        A.   Yes, the swab was -- excuse me, the glove
```

**Guilt-phase Trial Minutes May 11, 2011**     3112

1      Q.    How many people are in the DNA section of

2   the lab?

3      A.    Currently there is about 21 people.

4      Q.    And you handle everything for the state of

5   Connecticut?  I mean your lab, your DNA section.

6      A.    Correct, unless there is -- I don't know

7   why we would ever send anything beyond us unless it

8   was a case that involved an individual in DNA, then

9   we'd have to send it out to some other lab.

10     Q.    Why is it important to be accredited?

11     A.    Because you want to be able to, A, submit

12   your data to the CODIS, which is run by the FBI, and

13   CODIS is a big database that contains DNA profiles

14   from convicted offenders as well as DNA profiles

15   from evidentiary samples.

16           Now, there are some rules that we have to

17   follow before we can submit a DNA profile to this

18   CODIS database.  And also you want to be able to

19   receive federal funding, is another reason.  So,

20   those are all.

21     Q.    Okay.  Go ahead.

22     A.    To maintain your quality, and also in

23   particular to be able to submit profiles into the

24   CODIS database.

25     Q.    You said that CODIS has DNA profiles from

**A.160**

 1  convicted offenders.  What are the standards?  You

 2  said there are some standards you have to follow or

 3  process; what does that mean?

 4      A.   Well, the profiles from forensic samples,

 5  you have to -- there are certain rules as to which

 6  type of profiles can go in and the information that

 7  you can put in the profile.  You can't put in so

 8  little information that you would have hits on, you

 9  know, hundreds of individuals that are in the

10  database.  You are required to put in a certain

11  amount of information.

12      Q.   Okay.  In addition to the accreditation

13  process, is the lab also audited?

14      A.   Yes.  As part of our accreditation process

15  the laboratory has to be audited once a year.  This

16  audit can be from an outside agency or we can do an

17  internal audit.  But for DNA it has to be outside

18  agency audit at least every other year.

19      Q.   And are you aware of whether the DNA

20  section has passed all of its audits?

21      A.   Yes.

22      Q.   Yes, it has?

23      A.   Yes, it has.

24      Q.   Okay.  And you mentioned proficiency tests

25  that you do twice a year.  What types of things do

**Guilt-phase Trial Minutes May 11, 2011**       3155

1    when it goes through the detection procedure and

2    analysis, it's represented by a peak, and that peak

3    height is reflective of how much amplified DNA was

4    detected in that sample.  So, we have what we call a

5    minimum threshold level.  So, those are the genetic

6    markers that are reported and represented by

7    numbers.  But we also look at a range of peaks that

8    are present that don't reach minimum threshold

9    level, but we do observe them and we indicate on the

10   report or in the profiles with an asterisk.

11        Q.   We'll get back into that.

12        A.   So there was evidence of at least --

13        Q.   First of all, what was 9-Z1?

14        A.   9-Z1 was swabbing of latex type material

15   from submission 9.

16        Q.   And you said that there were at least four

17   individuals that contributed.  Now, with respect to

18   the known profiles that you received, you had the

19   three victims and the four suspects in this case.

20   Can you say -- can you tell us who was included, if

21   anyone, as contributors?

22             THE COURT:  In 9-Z1?

23             MS. DAYTON:  Yes.

24        Q.   If you could stay on the page when you get

25   there because I'm going to ask you a few questions

**Guilt-phase Trial Minutes May 11, 2011**    3156

1  about it.

2      A.   Okay.  The individuals who were included as

3  contributors were Tina Johnson and James Reid.

4      Q.   And again, just "included" means what?

5      A.   That the genetic markers that were in the

6  known DNA profile were also detected in the DNA

7  profile from 9-Z1.

8      Q.   So, every -- all of their -- Tina Johnson

9  and James Reid, all of their genetic markers or

10 alleles were also present in the mixture; is that

11 correct?

12     A.   That is correct.  That is correct, yeah.

13     Q.   Who could not be eliminated as a

14 contributor?

15     A.   Basil Williams, Azibo Aquart, Azikiwe

16 Aquart, Efrain Johnson and John Taylor.

17     Q.   So, basically, what does that mean in terms

18 of, again, they can't be eliminated?

19     A.   That means that not all of their genetic

20 markers were detected in the DNA profile from 9-Z1,

21 but there was sufficient genetic evidence there not

22 to eliminate them as contributors to that DNA

23 profile.

24     Q.   Going into the statistical analysis, if we

25 could start with Tina Johnson and James Reid.  What

1   was the statistical rarity that you found for them?

2       A.   It's not for them.

3       Q.   Okay.

4       A.   So let me just clarify.

5       Q.   Please do.

6       A.   When we make a conclusion such as Tina

7   Johnson and James Reid are included as contributors

8   to the DNA profile, we're asking the question what

9   is the rarity of finding individuals in the three

10  major populations who could be -- who also could be

11  included in that detected DNA profile of the

12  evidentiary sample.

13          So, my statistical evaluation is the

14  expected frequency of individuals who could be a

15  contributor to the DNA profile from item 9-Z1, which

16  was the swabbing of the latex type material from

17  submission 9, is approximately one in 24,000 in the

18  African-American population, approximately one in

19  21,000 in the Caucasian population and approximately

20  one in 20,000 in the Hispanic population.

21      Q.   So, when it says, say, going from the

22  bottom up, one in 20,000, the other 19,999 you would

23  expect to eliminate them?

24      A.   Right.  If you tested 20,000 Hispanic

25  individuals' DNA profile you would expect

1    approximately one of those individuals could be a

2    contributor to the DNA profile from the evidentiary

3    sample 9-Z1.

4        Q.   Moving on to Basil Williams who you said

5    could not be eliminated, can you say what his -- the

6    rarity evaluation is with him?

7        A.   The expected frequency of individuals who

8    cannot be eliminated as a contributor to the DNA

9    profile, and that's all those I tested except for

10   D2, and D2 is just the name of a location of the

11   site that was tested, from item 9-Z1 is

12   approximately one in 24,000 -- sorry, 2,400 in the

13   African-American population, approximately one in

14   7,600 in the Caucasian population and approximately

15   one in 6,000 in the Hispanic population.

16       Q.   When you say except in D2, I'm pointing to

17   D2, so what does that mean there was no 20 or 25

18   there?

19       A.   For this particular result one of the

20   genetic markers was called or reported and the other

21   genetic marker was not reported.  It was -- there

22   was a peak on the electropherograms that was in the

23   position of one of the genetic markers but did not

24   rise to the level of being reported.

25       Q.   What's an electropherogram?

**Guilt-phase Trial Minutes May 11, 2011**     3159

1      A.   I'm sorry.  An electropherogram is just the

2    peaks represented in the chart, the result.  That's

3    how the amplified DNA is represented as an

4    electropherogram.  It's kind of a chart, a graph,

5    would be better, not a chart, of peaks, and that's

6    what the amplified DNA, how it's represented.

7      Q.   When you say peaks, like little mountains?

8      A.   Yes, little mountains.

9      Q.   In various sizes?

10     A.   Various heights.

11     Q.   So, when you say there was one marker that

12   was represented.  So, either the 20 or the 25 was

13   there, but the other one wasn't?

14     A.   Correct.

15     Q.   Okay.

16     A.   So, therefore, that site is not included in

17   our statistical evaluation.

18     Q.   And is that why the numbers drop from one

19   in 24,000 to 1 in 2,400, for example?

20     A.   Correct, because I'm not using all 15

21   results to do my statistical evaluation.

22     Q.   Moving on to Azibo and Azikiwe Aquart.

23   What were the statistical analysis for them and how

24   did you arrive at it?

25     A.   The expected frequency of individuals who

1   cannot be eliminated as a contributors to the DNA

2   profile at all loci tested except for D21, D2 and

3   FGA from item 9-Z1, is approximately one in 140 in

4   the African-American population, approximately 240

5   in the Caucasian population, and approximately one

6   in 220 in the Hispanic population.

7        Q.   So, again, now three locations D21, D2, and

8   FGA.  And so, for Azibo and Azikiwe Aquart, what is

9   that exact -- so what does that exactly mean that

10  those loci are not included?

11       A.   That their genetic markers were fully not

12  detected in those three sites.  Therefore, we can't

13  use those three -- the information at those three

14  sites when we do our statistical evaluation.

15       Q.   Okay.  So, when you do the statistical

16  evaluation, does each site get its own percentage,

17  or how does that work?

18       A.   Well, we're looking at the frequency of the

19  genetic markers that are detected at each site.  And

20  we -- so you are combining the result of each site.

21       Q.   Okay.

22       A.   I'm not sure that's an answer to that

23  question.

24       Q.   Okay.  Let me try again.  This is a lawyer

25  speaking to a forensic examiner.  So, you said

**Guilt-phase Trial Minutes May 11, 2011**     3161

1   earlier that if someone is included they would have

2   all 15 sites.  And would there be a statistical sort

3   of probability for each site individually?

4        A.   Correct.  And that's based, again, on the

5   frequency of the genetic markers that are seen in

6   each of the three populations.

7        Q.   So, if, for instance, FGA is not included,

8   so you would only be using 14 sites to do the

9   evaluation.

10       A.   Right.  And FGA would be represented by a

11  one because obviously if you multiply something by

12  zero you end up with zero.

13       Q.   So the numbers get smaller if loci are

14  dropped out.  The bottom number I should say, the

15  denominator.

16       A.   So if you start with a full inclusion for a

17  sample, you have one number, and as you

18  progressively remove more and more of those loci

19  from the statistical evaluation, that one in number

20  will get smaller.

21       Q.   Okay.

22       A.   From the original number of full inclusion.

23       Q.   Which is one in seven billion?

24       A.   It depends on what the sample is.

25       Q.   Okay.  Here it was one in 24,000 for Tina

**Guilt-phase Trial Minutes May 11, 2011**          3162

1   Johnson and James Reid, that was full inclusion,

2   correct?

3       A.   For full inclusion the expected frequency

4   of individuals that could be a contributor to the

5   DNA profile from 9-Z1 is approximately one in 24,000

6   in the African-American population, approximately

7   one in 21,000 in the Caucasian population, and

8   approximately one in 20,000 in the Hispanic

9   population.

10      Q.   Is it fair to say that whether or not what

11  the race of the individual is, you don't make a call

12  based on a particular race of a known sample?  Is

13  that fair?

14      A.   We give statistics based on the DNA profile

15  obtained from the evidentiary sample.  None of our

16  testing that we do tells us what population group

17  the contributor or source of that DNA profile would

18  fall into.  So, what we do is we calculate the

19  frequency for three population groups, the major

20  three population groups in Connecticut.

21      Q.   Okay.  Moving to Efrain Johnson.  On this

22  we have two more people, Efrain Johnson cannot be

23  eliminated.  Can you explain the statistical

24  evaluation here?

25      A.   The expected frequency of individuals who

1    cannot be eliminated as a contributor to the DNA

2    profile at all loci except for D21, D13, D2 and D18

3    from item 9-Z1 is approximately one in 70 in the

4    African-American population, approximately one in 60

5    in the Caucasian population, and approximately one

6    in 50 in the Hispanic population.

7         Q.   So, significantly lower numbers?

8         A.   Yes.  It's also based on if your -- how

9    many genetic markers are present in those loci that

10   you are also using, that you are using in your

11   statistical evaluation, because the more genetic

12   markers that are at a site, of course, the more

13   individuals that could have contributed to that DNA

14   profile.

15        Q.   Okay.  And John Taylor, what are his --

16   what's his statistical evaluation?

17        A.   The expected frequency of individuals who

18   cannot be eliminated as a contributor to the DNA

19   profile at all loci tested except for D7, D2, D18

20   and FGA from item 9-Z1 is approximately one in 110

21   in the African-American population, approximately

22   one in 180 in the Caucasian population and

23   approximately one in 200 in the Hispanic population.

24        Q.   So, is it fair to say this is a very

25   complex mixture?

1        A.    There was evidence of at least four

2   contributors.

3        Q.    Okay.  I'm going to move on to some of the

4   other samples, not in quite as much detail.

5   Sticking with evidentiary submission No. 9, which

6   for the record is Government's Exhibit 121D and

7   121D-1 it was represented by photo 433 yesterday,

8   government exhibit, three swabs were submitted to

9   you on that one, on the submission 9.

10       A.    Yes.

11       Q.    I'm going to draw your attention to -- I

12   should say back to Government's Exhibit 465.  It's

13   on your thing, you also have it in front of you.

14   Did you perform DNA testing on submission 9-Z2?

15       A.    Yes, I did.

16       Q.    And from your analysis, what sort of result

17   did you obtain?

18       A.    The results were consistent with item 9-Z2

19   being a mixture.  And why I'm saying "consistent

20   with" is because there is evidence at only one site

21   that was tested that had evidence of a mixture.

22       Q.    What site was that, if you know?

23       A.    D19.

24       Q.    So, there was like one extra number at D19?

25       A.    No, there was a peak height difference that

Guilt-phase Trial Minutes May 11, 2011        3165

1    was significant, that indicated that it was -- item

2    9-Z2 was consistent with a mixture.

3        Q.   Can you say again, what that means, a peak

4    height difference?

5        A.   That just means how the amplified DNA is

6    represented as peak.  The peak height represents how

7    much of amplified DNA at that position or that

8    genetic marker is detected.  So you have peaks of

9    various heights, and so there was one peak that was

10   significantly larger than the other peak which was

11   an indication that at that site there was a mixture.

12   And since there was only one site, there was

13   evidence of a mixture, we refer to that result as

14   consistent with being a mixture.

15       Q.   Were the results from 9-Z2 put into CODIS?

16       A.   Yes, they were.

17       Q.   You described CODIS.  Can you remind the

18   jurors what that is?

19       A.   CODIS is a DNA profile database that is run

20   by the FBI and you can -- state accredited

21   laboratories can submit known evidentiary samples to

22   that database, and then it's compared to known

23   profiles and other evidentiary samples that are in

24   that database.

25       Q.   Did you receive a CODIS hit?

**A.172**

1    way it goes?

2                    MS. DAYTON:  Yeah.

3                    THE COURT:  That seems fine.

4                    (Sidebar concluded).

5        Q.    Did you get a CODIS hit?

6        A.    Yes, I did.

7        Q.    And who was that for?

8        A.    Efrain Johnson.

9        Q.    Did you thereafter obtain a blood sample

10   from the submitting agency for Efrain Johnson?

11       A.    Yes.

12       Q.    And did you compare the evidentiary sample

13   in 9-Z2 to the known sample for Efrain Johnson?

14       A.    Yes.

15       Q.    And what conclusion did you reach?

16       A.    Efrain Johnson is included as a contributor

17   to the DNA profile from item 9-Z2.

18       Q.    And before we go on to the statistical

19   evaluation, did you compare 9-Z2 to all of the

20   individuals in this case?

21       A.    Yes, all the known samples that I received.

22       Q.    So Efrain Johnson, who is 61-1S1 EJ, he was

23   included, correct?

24       A.    Yes.

25       Q.    Everybody else, what were they?

1   doesn't tell me who that genetic marker came from.

2   I'm just doing a comparison from a known DNA profile

3   to DNA profile from an evidentiary sample.  Since we

4   share genetic markers there very well could be some

5   genetic markers that an individual has in their DNA

6   profile that could be there, but that doesn't mean

7   that they're a contributor to that DNA profile.

8       Q.   When you say that people share genetic

9   markers, that means in some places there will be

10  similar -- like, for instance, at D8 James Reid is

11  13, 14, Azibo Aquart is a 13, 14, Azikiwe Aquart is

12  a 13, 15.  So John Taylor is a 13, 16, so they share

13  a 13, but they have other markers that are

14  different.  Is that accurate?

15      A.   Correct.  You can see that they -- those

16  James Reid, Azibo Aquart, Azikiwe Aquart and John

17  Taylor all have a 13 genetic marker at D8.  So

18  they --

19      Q.   Okay.

20      A.   So you could have genetic markers in the

21  DNA profile from the evidence that are also -- the

22  person may have those in their DNA profile, but

23  again, that doesn't mean that they contributed to

24  that DNA profile.

25      Q.   So, you mentioned that Efrain Johnson was

A.174

**Guilt-phase Trial Minutes May 11, 2011**          3172

1    included as a contributor.  What was your

2    statistical evaluation of your findings?

3         A.    The expected frequency of individuals who

4    could be a contributor to the DNA profile from 9-Z2

5    is less than one in seven billion in the African

6    American, Caucasian and Hispanic population.

7         Q.    Fewer than one in seven billion?

8         A.    Is less than one in seven billion.

9         Q.    And that's what you said earlier -- how did

10   you describe that statistical analysis earlier?

11        A.    As our ceiling.

12        Q.    The top, the highest.  That's basically the

13   largest number you would call, you wouldn't go one

14   in 12 billion?

15        A.    That's correct.

16        Q.    So, again, out of every seven billion

17   people tested, you would expect to exclude the other

18   6,999,999,999 people.

19        A.    Yes.  You would not expect to find more

20   than one individual in those seven billion who could

21   be a contributor to the DNA profile from 9-Z2.

22        Q.    Moving on to 9-Z3, which is also a swabbing

23   of a latex glove from submission 9.  Did you perform

24   DNA testing on that item?

25        A.    Yes.

**A.175**

**Guilt-phase Trial Minutes May 11, 2011**　　3186

1    14-1-Z1.

2    　　　　MS. DAYTON:  It's Government's

3    Exhibit 137A for the record.

4    　　Q.  I'll put 465 back up on the ELMO.  Did you

5    perform DNA testing on this submission?

6    　　A.  14-1 Z1, yes.

7    　　Q.  And what was this, what was the 14-1 Z1?

8    　　A.  Could I just get back to this chart for a

9    second?

10    　　Q.  Sure.

11    　　A.  14-1 Z1 was swabbing of glove.

12    　　Q.  And what did you find with respect to your

13    analysis?

14    　　A.  I obtained DNA profile from 14-1-Z1 and the

15    results demonstrated that the profile from 14-1-Z1

16    was a mixture.

17    　　Q.  Did you find any individuals who are

18    included as contributors?

19    　　A.  Yes.  I compared the DNA profiles that were

20    submitted -- the known samples that were submitted

21    in this case, and James Reid, Basil Williams, Azibo

22    Aquart and Azikiwe Aquart are included as

23    contributors to the DNA profile from 14-1-Z1.

24    　　Q.  And was the statistical analysis for all

25    four of them the same?

**A.176**

1    A.    Yes.

2    Q.    And what was it?

3    A.    The expected frequency of individuals who

4    could be a contributor to the DNA profile from item

5    14-1-Z1 is approximately one in 400 in the

6    African-American population, approximately one in

7    1,300 in the Caucasian population, and approximately

8    one in 1,200 in the Hispanic population.

9    Q.    And you mentioned that Azibo Aquart, the

10   defendant, is included.  Were all of the defendant's

11   genetic markers also present in this sample at every

12   loci?

13   A.    The genetic markers that were in the DNA

14   profile from Azibo Aquart, those genetic markers

15   were detected in the DNA profile from 14-1-Z1, but

16   again it's not that -- that marker that was

17   detected, I know it comes from --

18   Q.    Right.  You don't know the defendant,

19   right?

20   A.    No.

21   Q.    You've never met him?

22   A.    No.

23   Q.    Correct?  And you didn't personally draw

24   his blood?

25   A.    Correct.

1   14-1-Z1 at all loci tested except for D5 and D13 is

2   approximately one in 60 in the African-American

3   population, approximately one in 90 in the Caucasian

4   population, and approximately one in 70 in the

5   Hispanic population.  And I do want to add that for

6   this test of this sample I used only -- there are

7   only 13 sites tested.

8       Q.   Why?

9       A.   Because our original testing before we used

10  the Identifiler kit we used two kits called Profiler

11  Plus and COfiler and they covered 13 sites as well

12  as the Amelogenin site.

13      Q.   When did the testing change from 13 sites

14  to 15 sites?  Approximately, if you know.

15      A.   Between the time that the first report was

16  generated and when the second report was generated.

17  So that would be between the end of -- sometime

18  towards the end of 2005 and the beginning of 2006.

19      Q.   And the lab started to use the new, the 15

20  site test instead of the 13 --

21      A.   Correct.

22      Q.   -- to test.  And did you also compare John

23  Taylor's profile against the evidentiary sample in

24  14-1-Z1?

25      A.   Yes, I did.

Guilt-phase Trial Minutes May 11, 2011    3191

1      Q.   And what did you find?

2      A.   He cannot be eliminated as a contributor to

3  the DNA profile from item 14-1-Z1.

4      Q.   What was your statistical analysis there?

5      A.   The expected frequency of individuals who

6  cannot be eliminated as a contributor to the DNA

7  profile at all loci tested except D7, D18 and FGA

8  from item 14-1-Z1 is approximately one in 30 in

9  African-American population, approximately one in 50

10  in the Caucasian population, and approximately one

11  in 60 in the Hispanic population.

12      Q.   When the you say at all sites except D7,

13  D18 and FGA, why are those excluded?

14      A.   Because his genetic markers were not --

15  those genetic markers that he has were not detected

16  in the DNA profile of 14-1-Z1, not fully detected.

17  I'm not -- I would have to check -- do the

18  comparison.

19      Q.   Okay.  Is it that some genetic markers were

20  not present?

21      A.   Correct.

22      Q.   And Efrain Johnson, was he included or

23  cannot be excluded?

24      A.   He was eliminated as a contributor to the

25  DNA profile from 14-1-Z1.

A.179

**Guilt-phase Trial Minutes May 11, 2011**    3197

1    the packaging.

2         Q.    And does it bear the ID number for this

3    case?

4         A.    Yes, it does.

5         Q.    And what submission number is that?

6         A.    15.

7         Q.    So, we're going to talk about that one

8    right now.  Do you recognize anyone's initials on

9    that?

10        A.    Yes, I recognize Maria Warner's initials.

11        Q.    And did you receive an evidentiary swab

12   derived from submission 15?

13        A.    Yes, I did.

14        Q.    And did you test -- did you test 15-Z2?

15        A.    Yes, I did.

16        Q.    And what was 15-Z2?

17        A.    15-Z2 was a swabbing of a piece of

18   stocking.

19        Q.    And what did your results demonstrate?

20        A.    The results demonstrate that item 15-Z2 is

21   a mixture.

22        Q.    And were you able to determine how many

23   people might have contributed to that mixture?

24        A.    At least five people contributed to that

25   DNA mixture.

**Guilt-phase Trial Minutes May 11, 2011**     3198

1      Q.    And did you analyze this against all the

2    known samples that you had?

3      A.    Yes, I compared it to the known samples

4    submitted in this case.

5      Q.    And did you find that any of the known

6    individuals were included as contributors?

7      A.    Yes.

8      Q.    Who?

9      A.    James Reid, Basil Williams and Azikiwe

10   Aquart are included as contributors to the DNA

11   profile from item 15-Z2.

12     Q.    And what was your statistical analysis with

13   respect to those three individuals?

14     A.    The expected frequency of individuals who

15   could be a contributor to the DNA profile from item

16   15-Z2 is approximately one in 1,000 in the

17   African-American population, approximately one in

18   1,500 in the Caucasian and Hispanic populations.

19     Q.    So, again, for the Caucasian and Hispanic

20   population, 1,499 people would be excluded out of

21   every 1500?

22     A.    Yes.  You would expect approximately 1,499

23   individuals out of that 1,500 would be eliminated as

24   a contributor to that DNA profile.

25     Q.    And for the African-American population,

A.181

Guilt-phase Trial Minutes May 11, 2011       3199

1   999 out of every thousand you would expect them to

2   be excluded?

3       A.    Approximately 999 out of a thousand you

4   would expect to be eliminated as a contributor to

5   that DNA profile.

6       Q.    With respect to -- did you find anyone that

7   could not be eliminated as a contributor from the

8   known samples?

9       A.    Tina Johnson cannot be eliminated as a

10  contributor to the DNA profile from item 15-Z2.

11      Q.    What was your statistical analysis with

12  regard to Tina Johnson?

13      A.    The expected frequency of individuals who

14  could be -- actually, I have a typo here.

15      Q.    In your report?

16      A.    Yes.

17      Q.    Okay.  Is that your report or your notes?

18      A.    My report.

19      Q.    Okay.  Do you have your results with you?

20      A.    It's just that I should have had in -- the

21  report it says the expected frequency of individuals

22  who could be a contributor, and it should be the

23  expected frequency of individuals who cannot be

24  eliminated as a contributor.

25      Q.    Okay.  And do you have the statistical

A.182

Guilt-phase Trial Minutes May 11, 2011          3200

1    analysis there?

2         A.    Yes.

3         Q.    Okay.

4         A.    So the DNA profile from item 15-Z2 at all

5    loci tested except for D2 is approximately one in

6    450 of the African-American population,

7    approximately one in a thousand in the Caucasian

8    population, and approximately one in 990 in the

9    Hispanic population.

10        Q.    And was there anyone else from the knowns

11   who could not be excluded as a contributor -- cannot

12   be eliminated?

13        A.    Azibo Aquart cannot be eliminated as a

14   contributor to the DNA profile from item 15-Z2.

15        Q.    And what was the statistical analysis with

16   regard to Azibo Aquart?

17        A.    Again, it should read the expected

18   frequency of individuals who cannot be eliminated as

19   a contributor to the DNA profile from item 15-Z2 at

20   all loci tested except D21, D2 and vWA is

21   approximately one in 220 in the African-American

22   population, approximately one in 510 in the

23   Caucasian population, and approximately one in 360

24   in the Hispanic population.

25        Q.    And why at all loci tested except D21, D2

A.183

1  and vWA?

2      A.   Because there was not -- all of his genetic

3  markers were not detected at those three sites.

4  It's not -- again, it's just that the genetic

5  markers and the DNA profile from the evidence did

6  not have those genetic markers which were also found

7  in his DNA profile.

8      Q.   I'm going to move on to 16-Z1.

9          MS. DAYTON:  This is Government's

10 Exhibit 138A for the record.

11     Q.   Do you recognize this?

12     A.   Yes, I recognize the laboratory label on

13 the packaging.

14     Q.   And is the ID number for this case on that?

15     A.   Yes.

16     Q.   And do you recognize Marie Warner's

17 initials?

18     A.   Yes, I do.

19     Q.   And do you know what this item is?

20     A.   It's submission No. 16.

21     Q.   And did you analyze any evidentiary swab

22 from that sample?

23     A.   Yes, I did.

24     Q.   Submission -- excuse me.

25          And what did you find?

1   they are included as a contributor.

2        Q.    So, how was this determined?

3        A.    I put that DNA profile from 16-Z1 into

4   CODIS.

5        Q.    Why did you put it into CODIS?

6        A.    Because it was an evidentiary sample and

7   there was enough information in it to put it into

8   CODIS.

9        Q.    What happened after you put it into CODIS?

10       A.    Sometime later it hit on the DNA profile of

11   a member of laboratory staff.

12       Q.    So, is there a -- when you work at the

13   laboratory do you have to give a DNA sample?

14       A.    Yes, I did.

15       Q.    Does everybody that works there?

16       A.    Now everybody does.

17       Q.    Did that used to be the case?

18       A.    No.

19       Q.    What was -- how did it work before?

20       A.    There was -- well, we had to give our DNA

21   profile as a member of the DNA section, and then

22   later that was expanded to include everybody in the

23   forensic lab, including people who have nothing to

24   do with evidence.

25       Q.    So, is this just a -- why?  Why do you give

Guilt-phase Trial Minutes May 11, 2011     3215

1      Q.    Drawing your attention to Government's

2   Exhibit 167, which is also on the desk in front of

3   you there.  Do you recognize that?

4      A.    Yes, I do.

5      Q.    How?

6      A.    There is the laboratory label on the

7   packaging and I also recognize my initials.

8      Q.    And do you know where this came from?

9      A.    According to the label, that was placed on

10  the packaging, not by myself or the laboratory, it

11  was taken from wall F, below Exhibit 31, (A, B C)

12  within apartment number 101, 215 Charles Street,

13  Bridgeport, Connecticut.

14     Q.    And this is submission 48 you said?

15     A.    Yes.

16     Q.    And here for your results it says

17  "blood-like stain single source."  What does that

18  mean?

19     A.    That means when I looked at the sample the

20  swabs were stained brownish-black, and after I did

21  the screening test on one of the swabs it came up

22  positive, but in my opinion there was not enough for

23  further serological testing.  That means to go on

24  and do the test for human blood.  Therefore, I

25  wanted to not use any more of the sample up and keep

A.186

1    what was there on the swab for DNA testing.

2        Q.    And what were your results for this

3    particular item?

4        A.    The results are consistent with Basil

5    Williams being a source of the DNA profile from item

6    48-1, and I sub-itemed submission 48 to 48-1 because

7    the second swab that was included with the one that

8    I tested for DNA came up negative for the screening

9    test for blood.  So, I did not test that swab, I

10   didn't retain it, I returned it with the packaging.

11       Q.    And what was your statistical analysis with

12   respect to submission 48, Government's Exhibit 167?

13       A.    The expected frequency of individuals who

14   could be the source of the DNA profile from item

15   48-1 is less than one in seven billion in the

16   African-American, Caucasian, and Hispanic

17   populations.

18       Q.    And was anyone else included or couldn't be

19   eliminated from 48-1?

20       A.    No, all the other known samples that were

21   received, the results eliminated them as the source

22   of the DNA profile from item number 48-1.

23       Q.    I'm going to show you Government's

24   Exhibit 131 and 131A, just ask you do you recognize

25   these?

```
 1        A.    Well, it was a partial profile which means
 2   I did not get a result at all the sites on the DNA
 3   that I tested.  But you don't need to have a result
 4   at all 15 loci when you have a profile that's
 5   consistent with a single source to get -- reach that
 6   ceiling statistic.
 7        Q.    Is that because it's not as diluted as a
 8   mixture?
 9        A.    No.
10        Q.    Why is it?
11        A.    Because there is not a lot -- because it's
12   consistent with a single source, there is not a lot
13   of -- there is only, at most, two genetic markers
14   that are detected at each of those sites tested.
15   So, therefore, there are not the -- what we call
16   that calculation is the random match probability or
17   the random man probability, which means the
18   frequency of finding a random man having -- could be
19   the source of that DNA profile is very low.
20        Q.    When you say "random man" you include
21   random women in that too, right?
22        A.    Right.  It's random man as human man.
23              THE COURT:  Soon to be known as random
24   person.
25              MS. DAYTON:  Legislation pending.
```

**A.188**

**Guilt-phase Trial Minutes May 12, 2011**

1   government's questions you indicated that at the

2   start of this investigation you were advised that

3   there were two people of interest, correct?

4       A.   On the request for examination form there

5   were two names listed.

6       Q.   And we've talked about Mr. Aquart, Azibo

7   Aquart, in your testimony, right?

8       A.   Correct.

9       Q.   Were you ever asked to look at a profile

10  for the other individual?

11      A.   No.

12      Q.   Okay.  And that other person was Rodney

13  Womble, correct?

14      A.   I don't recall exactly.

15      Q.   Is it on your notes?

16      A.   I can look.

17      Q.   Sure.

18      A.   Rodney Wombie [sic] was on the request that

19  came in with the evidence dated 8/29/2005.

20      Q.   Okay.  May I look at what you refreshed

21  your recollection with?

22      A.   Sure.  Right here.

23      Q.   All right.  And the name there is Rodney

24  Womble.

25      A.   Oh, yes, Womble.  Sorry.

**Guilt-phase Trial Minutes May 13, 2011**

3405

1      A.   Yes.  The genetic marker 12 that's found in

2    9-Z2 under D19 could not have come from Efrain

3    Johnson.

4              MR. SHEEHAN:  Could we take down the

5    builds, please, and just go back to Exhibit NN.

6      Q.   But in every other respect the genetic

7    markers in the two samples are identical, are they

8    not?

9      A.   They have the same number listed, yes.

10     Q.   And this tells us, does it not, one of

11   three things.  It tells us that that sample might be

12   a mixture, sample 9-Z2.  That's where you said it's

13   consistent with being a mixture, right?

14     A.   Yes, that's what I called it, consistent

15   with being a mixture.

16     Q.   Okay.  And it also might mean that this is

17   a single source sample from somebody other than Mr.

18   Johnson.

19     A.   Well, it's consistent -- when you look at

20   the DNA profile it's consistent with being a

21   mixture.

22     Q.   All right.  And when you say it is

23   consistent with being a mixture, the only

24   difference, I take it, is at that one locus, namely

25   D19?

**A.190**

**Guilt-phase Trial Minutes May 13, 2011**

3406

1    A.    Yes.

2    Q.    All right.  And a third possibility is that

3    12 is not really an allele, a genetic marker, is it

4    not?

5    A.    No, that's not a possibility.  Under our

6    protocols it's a genetic marker.

7    Q.    Okay.  The reason why you indicated that

8    9-Z2 is consistent with being a -- actually you have

9    different terminology that you use in your reports

10   for dealing with mixtures, do you not?

11   A.    That is correct.

12   Q.    And one set of terminology that you use is

13   that you say that the sample is a mixture.

14   A.    We say the sample -- the results

15   demonstrate that that DNA profile from that item is

16   a mixture.

17   Q.    But that's not what you are saying with

18   respect to 9-Z2, correct?

19   A.    That's right.  I've said it's consistent

20   with being a mixture.

21   Q.    Which means that you don't know whether it

22   is a mixture or not?

23   A.    There is evidence that it is a mixture, and

24   it's only at one site that there is evidence of a

25   mixture, not two sites.  We have to have two sites

**A.191**

**Guilt-phase Trial Minutes May 13, 2011**

1   with evidence of a mixture in order to call it -- in

2   order to say that it demonstrates it's a mixture.

3   So, at this profile there is evidence that it was a

4   mixture at D19.

5       Q.   And under your criteria you cannot say

6   whether or not it is a mixture, correct?

7       A.   Right.  If I --

8       Q.   Thank you.  I'm sorry?

9       A.   If we have, as I said, two sites that we

10  test evidence of a mixture, then we use the term

11  demonstrates it's a mixture.  But because I had one

12  site here with evidence of a mixture, we call it

13  consistent with a mixture.

14      Q.   All right.  So if 9-Z2 is, in fact, a

15  mixture, and if one were to conclude that Mr.

16  Johnson was a contributor to that sample, that would

17  mean that at least one other person's DNA is on that

18  sample, right?

19      A.   That's correct, that profile is consistent

20  with two contributors to it.

21      Q.   And you compared the profiles of the other

22  people in this case to 9-Z2, did you not?

23      A.   Yes.

24      Q.   And you excluded them as contributors to

25  this sample, correct?

**A.192**

**Guilt-phase Trial Minutes May 13, 2011**

1    the known profiles in front of you.

2        Q.    Why is that a problem in forensic science?

3        A.    Because you don't want those known profiles

4    to influence you on your analysis of the evidentiary

5    sample.

6        Q.    And you would agree, would you not, that

7    that's a danger that needs to be worked against, a

8    risk?

9        A.    Well, that's why you don't sit there while

10   you have your results up and while you are doing

11   your results of your analysis with the known

12   profiles there.  Oftentimes we don't have the known

13   profiles.

14       Q.    In this case you did, did you not, at least

15   as far as Mr. Aquart was concerned, from early on?

16       A.    For Azibo Aquart I had his -- the known was

17   submitted 12/13/05.  So, the sample that we've been

18   discussing, 14-1-Z1, that analysis was already done.

19       Q.    Okay, but what was not done was at least

20   there was no -- on your part there was no assessment

21   at that point in time about where drop out was?

22       A.    I don't put a written assessment down, but

23   when I'm looking at the DNA profile I notice things

24   like low level peaks and degradation.  But it's not

25   written down because that's part of our

 1    not want to let the defendant know he had to dump

 2    his gun.

 3                In August the defendant receives a batch

 4    of crack cocaine which is of poor quality.

 5    Customers are complaining and going elsewhere.  In

 6    August, Tina Johnson's sales increase as the

 7    defendant's decline.  She benefits from his batch of

 8    poor quality crack cocaine.

 9                In August, from August 14th to 20th, the

10    defendant goes south with Shante and his two

11    co-conspirators, Taylor and Azikiwe.  And while the

12    defendant's away, Womble tells him that he

13    confronted Tina, but she won't stop selling.  The

14    defendant tells Womble, "I will take care of it."

15    The defendant tells Taylor, "I have a problem to

16    take care of when we return.  I have to move some

17    people out."

18                On August 20, 2005, the defendant does

19    return to Bridgeport and he meets with Womble

20    immediately and Womble is short on drug money and

21    Womble tells the defendant that Tina is still

22    selling from apartment 101 and the defendant tells

23    Womble to go buy a baseball bat and gives him money.

24    And in August of 2005, you know from the evidence,

25    that Tina is not deterred by Womble's threats.  In

1          And the evidence is that he, and/or his

2     co-defendants, bound the victims so tightly you

3     could barely cut the tape off of them, so vigorously

4     that the duct tape, once removed, stood on its own.

5     A message to others.  And if that wasn't sufficient,

6     the evidence establishes that the defendant and his

7     brother, aided by Efrain Johnson and John Taylor and

8     baseball bats, bludgeoned them to death, leaving

9     blood spatter from the floor to the ceiling and on

10    every wall in Tina's room.  No one dare sell in 215

11    Charles Street, and the message was loud and clear.

12          And if not for the diligent work and

13    professionalism of dedicated law enforcement

14    officers from the Bridgeport Police Department and

15    agents of the FBI, and forensic experts like

16    Christine Roy and John Pleckaitis, and the testimony

17    of those who had been used or abused or intimidated

18    in the past, to finally come into this courtroom and

19    tell you what they knew, Bryant, Hopkins, Hodges,

20    Judith, Sherrell, Fleming, Womble, Taylor, Myers, do

21    you think anyone would have dared sell from 215

22    Charles Street ever again without the defendant's

23    approval?

24          Some saw it coming, Taylor saw it

25    happen.  Taylor saw and heard the sights and sounds

1   of murder.  He saw things that made a convicted

2   felon cry while he relived it on the witness stand.

3   He saw the beginning, and LeRoy and EMT Karen

4   O'Donnell, and now you, saw the ending.  Taylor

5   said, "What happened to those people didn't need to

6   happen."  But the defendant told Shamarr Myers they

7   had to go, the defendant had to take care of it.

8           And Taylor testified and recalled the

9   brutality as if he was at apartment 101 again and

10  was watching it all happen again.  Question:  "As

11  you went into the door --  or as you went to the

12  door, what happened next?"

13          Taylor answer:  "That's when Dreddy had

14  went up to the door and said -- kicked the door in,

15  boom, kicked the door again, boom.  That's when

16  everybody went in behind, it's like boom, boom,

17  started going in.  When I heard somebody say 'who is

18  it,' then that's when the door came open, and when

19  the door came open, that's when all of us went

20  inside."

21          Question: "Who was in first?"

22          Answer:  "Dreddy."

23          Question:  "And who is the person who

24  kicked the door open?"

25          Answer:  "Dreddy."

**A.196**

**Guilt-phase Trial Minutes May 20, 2011**

```
 1    to commit murder.  As for the drug conspiracy, you
 2    might well find that the government has in fact met
 3    that burden.  In the time afforded to me, I'd like
 4    to discuss with you the murders and the conspiracy
 5    to commit the murders.
 6              And with respect to those murders, I
 7    submit that based on all of the evidence the
 8    government has failed to prove Mr. Aquart guilty
 9    beyond a reasonable doubt, and you, therefore, must
10    acquit him of those charges.
11              When I first spoke to you a few weeks ago
12    I told you that chronology was important.  The
13    police developed a suspect and then they developed
14    the evidence.  The police knew there was a drug
15    operation at 215 Charles Street, specifically in
16    apartment 211.  They'd been there three times in the
17    past year in raids.  The investigators also learned
18    that Ms. Johnson was selling drugs from apartment
19    101.  And when the investigators came to believe
20    that Mr. Aquart was the one who controlled apartment
21    211, they had a suspect.
22              Now, the government spent a great deal
23    of time talking to you about the motive, limitation
24    of competition, but think about the other testimony
25    that we've heard.  There were other apartments
```

**A.197**

**Guilt-phase Trial Minutes May 20, 2011**

1    subjected to the same treatment.  Ms. Roy says,

2    well, we don't do it that way.  The point is she

3    should.  It should be evenhanded.  This was the only

4    way to avoid the observer bias.

5              We're not asking you to conclude that

6    Ms. Roy manipulated data or consciously forced

7    anyone to fit or not fit inside of a profile.  But

8    observer bias, the problem that an interpretation is

9    driven by or colored by knowing who you are

10   comparing the samples to; it exists.  She had

11   evidence in the form of an evidence request with the

12   suspect's name on it, Azibo Aquart.  And Rodney

13   Womble, we don't know what happened with Womble, but

14   we know by the time the testing began he was

15   cooperating and his DNA profile was never provided

16   to the lab.

17             She knew that the staff person was not a

18   suspect.  Is this why the different treatment?  We

19   don't know.  And Marie Warner, the tech who

20   collected the evidence, did the swabbings, said

21   something interesting.  She said, "Do you know,

22   contamination is not necessarily a terrible thing."

23   I suppose there could be worse things at the lab, I

24   suppose it could burn down and all of the evidence

25   would be lost, but it's definitely not a good thing

**Guilt-phase Trial Minutes May 20, 2011**

1    Street to get drugs.  This is not this exclusive

2    operation.  That building was a 24-hour drugstore

3    that was wide open and was a target.  Any of those

4    apartments were targets for anybody looking for

5    drugs, cash or both.

6              That brings us to Lashika Johnson.

7    March 7, 2007, the police knock on Lashika Johnson's

8    door.  They questioned her about murders and bloody

9    clothes.  She didn't know her brother was arrested

10   at this time.  She said she didn't know anything

11   about the murders at all.  Later she learns her

12   brother is arrested.  At some point they tell her,

13   it's not clear, but they tell her, hey, there is a

14   warrant for your arrest, you'll need a lawyer, and

15   they help her get one.

16             Eventually they talk to her again,

17   September of '08, over three years after the

18   murders.  And by this time she knows her brother is

19   charged for the murders and that he is facing the

20   death penalty potentially at that time.  And she's

21   been talking to him this entire time, either through

22   visits, on the phone or in writing.

23             So, at that first meeting with the

24   agents she signs a proffer agreement.  She admits

25   she's been selling one to two pounds of marijuana a

**Guilt-phase Trial Minutes May 20, 2011**

 1   week, including at Charles Street.  And so she now

 2   says, oh, yeah, I -- there is some bloody clothes,

 3   and she gets rid of them.  And they ask her about a

 4   power drill.  I don't know anything about a power

 5   drill, never saw one.  And the agents say, we don't

 6   believe you.  She knows if they don't believe her,

 7   that's trouble.  So, the story changes.  Now there

 8   is a power drill in the bag of clothes.  And slowly

 9   over time she adds new stories; another interview

10   another story.

11           Now, Azibo is getting a phone call from

12   his brother.  That's a new story.  And now Efrain is

13   confessing the murders to her; another interview,

14   another story.  Now Azibo is arriving at her

15   apartment in a Cadillac; another interview, another

16   story.  And Lashika said something also interesting,

17   things just kept popping into her mind.  At trial

18   something new popped into her mind, that Azibo told

19   her to go pick up Azikiwe at Charles Street sometime

20   after the murders.  That detail did not pop into her

21   mind in her interview on September 18, 2008.  It

22   didn't pop into her mind on September 24, 2008 or

23   October 14, 2008 or on October 22, 2008 or on

24   January 20.  2010.  At trial a new detail that just

25   popped into her mind.

**A.200**

**Guilt-phase Trial Minutes May 20, 2011**

4306

1          And what do all these new stories tell

2     us?  She's a storyteller.  If you can't entrust your

3     most serious affairs to this person, because either

4     things just pop into her mind or she just makes them

5     up, you can't rely on her.

6          John Taylor.  We watched Mr. Taylor

7     testify.  Maybe he sort of looked like the fool, guy

8     from down south, not too sophisticated.  Maybe you

9     should go back and listen to those tapes where he's

10    talking about trying to get bailed out.  He doesn't

11    seem too unsophisticated on those tapes.  He doesn't

12    seem like a fool there.  He's got convictions going

13    back to the age of 17.  He's in the highest criminal

14    history category.  He knows how things work.  He's

15    home, asleep in Pinetops, North Carolina, December

16    2nd, 2009, and at least five agents, some from

17    Connecticut, standing there at his doorstep.  By his

18    own words, they all rush in on him, they start

19    asking him questions.

20          Now, Taylor knows a story, but where

21    does this story come from?  He's part of a drug

22    operation back in Connecticut.  He went down south

23    with Azibo and Azikiwe a few days before the

24    murders.  He knows that.  He came back to

25    Connecticut with them.  He was incarcerated at the

**A.201**

**Guilt-phase Trial Minutes May 20, 2011**

1   all?

2           We're left with serious questions about

3   the reliability of the DNA evidence.  You see the

4   government only wants you to see the results, they

5   don't want you to see the process.  They don't want

6   you see how subjective it was.  But you did need to

7   see that process so you can determine if you in fact

8   can rely on those results, because it's not the

9   experts that decide these cases, it's you.

10          And we're left with the testimony of the

11  cooperating witnesses.  Now, the thing about the

12  cooperating witnesses is that their testimony was

13  really, in a way, like the DNA results.  That's what

14  you saw when they testified here.  You saw the end

15  result, the final polished product.  What you truly

16  did not get to see, what the government did not show

17  you, was the process.  We tried to explore that

18  process.  Myself or Mr. Sheehan would ask many of

19  these witnesses whether they made a particular

20  statement to a particular agent, particular person

21  at a particular time, and the government would often

22  ask these same witnesses the same things.  Did they

23  tape that interview, Mr. Hodges?  Did they have you

24  sign a statement, Mr. Womble?  Did they ask you to

25  view the report for accuracy, Mr. Taylor?  The

**Guilt-phase Trial Minutes May 20, 2011**

1    answer was always no.  Why not?  Why not record the

2    interview?  Why not sign the statement?  Why not

3    have the witness review the report for accuracy?

4    What don't you know about what happened in those

5    meetings?  Sometimes six, seven, eight, nine

6    meetings per witness.  If they're telling the truth

7    why that many meetings?  What don't you know?  Why

8    don't you know it?

9             The government has brought the most

10   serious charges it can in this case.  Why shouldn't

11   you know exactly how it was that Frank Hodges got

12   the story straight?  Why shouldn't you know exactly

13   how it was that Rodney Womble got on board.  Why

14   shouldn't you know exactly how it was that things

15   kept popping into Lashika Johnson's mind?  Why

16   shouldn't you know how it was a woman in Judith

17   Rivera's condition in August 2005 can remember some

18   detail five years later about men in her apartment?

19   Why shouldn't you know exactly how John Taylor's

20   story evolved and then changed again right before

21   your eyes?  You should know.  You deserve to know.

22            But, unfortunately, you don't know.  And

23   if you don't know how the end result is reached, how

24   the polished product got put in front of you, and

25   whether that's for DNA results or the testimony of

**A.203**

**Guilt-phase Trial Minutes May 20, 2011**

```
 1    these witnesses, then what you don't know is whether
 2    you can truly rely on that testimony or those
 3    results.  And if you don't know whether you can rely
 4    on that testimony or those results, then that's a
 5    reasonable doubt.  And if you have a reasonable
 6    doubt, any of you, you must vote not guilty.  And
 7    that is what I'm asking you to do, find Mr. Aquart
 8    not guilty.
 9              Thank you again for your time.
10              THE COURT:  Thank you.  We'll take a
11    five minute recess and we'll conclude with the
12    government's rebuttal closing.
13              (Jury exited the courtroom.)
14              THE COURT:  I'm going to just put this
15    supplemental charge on their chairs so they know
16    what is supplemented and they can just put it in
17    their notebooks.  Anything further?  We stand in
18    recess.
19              (Recess)
20              THE COURT:  All right, please be seated.
21    Are we ready for the jury?
22              MS. REYNOLDS:  Can we have one second
23    just to let this heat up.  It's ready.
24              THE COURT:  Let's bring in the jurors.
25    I'm going to need to tell them about this charge
```

**A.204**

**Guilt-phase Trial Minutes May 20, 2011**

1    guy?  And the defense --

2                MR. SHEEHAN:  I'm going to object to

3    that last characterization, your Honor.  I don't

4    think that it's appropriate for counsel to be making

5    those comments.  It's up to the jury to make that

6    determination.

7                THE COURT:  The jury understands that

8    the jury will decide whether the government has

9    proved beyond a reasonable doubt.  That is your

10   determination, and yours alone, and I will ask Ms.

11   Dayton to continue.

12               MS. DAYTON:  Thank you, your Honor.

13               And the defense has repeatedly suggested

14   that law enforcement focused on the defendant to the

15   exclusion of everybody else, and there is absolutely

16   no evidence to support that.  Number one, Christine

17   Roy told you that when she first received this case

18   in 2005, that there were two suspects named, the

19   defendant and Rodney Womble.

20               You also heard, as was stated earlier,

21   that the investigation of this case did not cease in

22   September of 2005 with the defendant's arrest.  That

23   is what you would have expected if the police were

24   only focused on the defendant.  It was after the

25   defendant's arrest, in fact, that several other

**Guilt-phase Trial Minutes May 20, 2011**

1   witnesses to find out every detail about what they

2   knew, then it took several meetings.  And if it took

3   100 times sitting down with John Taylor or Lashika

4   Johnson to uncover every last thing that a human

5   being could know about these brutal beatings, then

6   it took 100 meetings.

7            If there is any question about the

8   thoroughness and the intent of the government's

9   investigation in this case, ask yourself this:  How

10  would you know that any witness had lied on a prior

11  occasion if law enforcement hadn't documented that

12  fact?  Again, you've heard repeatedly about the

13  meetings with these witnesses and then you've heard

14  that the government, be it in the form of the

15  Bridgeport Police Department or the Federal Bureau

16  of Investigation, documented pretty much every

17  detail of these meetings, including every time a

18  witness didn't tell the truth.  Despite that,

19  counsel argues to you that somehow the government's

20  not actually looking for the truth, that we're only

21  looking for those facts that corroborate witnesses

22  who implicate the defendant.

23           Now, what's interesting is we just saw a

24  good example of that type of behavior.  Counsel

25  stood up here and they told you -- they talked to

**Guilt-phase Trial Minutes May 20, 2011**

1    inappropriate argument.

2              THE COURT:  I think the jury understands

3    it's the government, and I'll ask that that be the

4    way that it be phrased from now on.

5              MS. DAYTON:  Thank you, your Honor.

6              The defense has also brought up the fact

7    that Womble's DNA was not submitted for testing.

8    Well, first of all, you know Womble is a convicted

9    felon, and you know from Christine Roy that Womble

10   -- excuse me, that the CODIS database is made up of

11   the DNA of convicted felons.  And, in fact, you know

12   that's how they originally got the hit on Efrain

13   Johnson and proved that he, too, was part of these

14   murders.  And while the defense has absolutely no

15   burden of proof in this case, the government bears

16   the entire burden of proof, and that never shifts,

17   you did hear that there was a DNA expert at the lab

18   during much of the DNA testing observing what was

19   going on.

20             MR. SHEEHAN:  I'm going to object, your

21   Honor.  May we approach?

22             THE COURT:  Yes.

23             (Sidebar conference)

24             MR. SHEEHAN:  Counsel is not only

25   alluding to facts that are not in evidence, but

**Guilt-phase Trial Minutes May 20, 2011**

```
 1   case there was any confusion, the CODIS database is

 2   a database only available to law enforcement.

 3              You may proceed.

 4              MS. DAYTON:  There is absolute no

 5   evidence in this record whatsoever to suggest that

 6   Womble's DNA was at that crime scene.  That, too, is

 7   telling.  As telling as the fact that on

 8   cross-examination the defense never asked Womble a

 9   word about whether or not he was involved in this

10   murder.  In fact, they were far more concerned with

11   the murder case that he testified in 20 years ago.

12              Look, admittedly we agree on one thing,

13   the DNA testimony, it was complex, dry, and the

14   presentation was long and the statistics are hard to

15   understand.  You heard all of these numbers, one in

16   a thousand, 1 in seven billion.  And then with

17   respect to the latex cuff from the defendant's

18   glove, you heard one in 79 million.

19              So, what does that actually mean?  It

20   means that the defendant's genetic markers, some of

21   the defendant's genetic markers showed up at all 15

22   of the sites that they test.  There were only --

23              MR. SHEEHAN:  Objection.

24              MS. DAYTON:  There were only two --

25              MR. SHEEHAN:  That is
```

**Sentencing Minutes May 31, 2011**

4485

1 heard.  We will not present that evidence to you

2 again.  You will rely on your memory and your notes

3 as to what witnesses have said.  In the first part

4 of the case you considered that evidence to decide

5 whether or not the defendant was guilty of the

6 crimes that he was charged with.  Now that you have

7 found him guilty, in this part of the case you will

8 consider the evidence this time in support of the

9 intent threshold factors and the aggravating

10 factors, factors which you must find before you can

11 consider the death penalty in this case.

12    You will first consider whether the

13 defendant acted with the appropriate intent in

14 committing the murders.  The government submits that

15 the defendant intentionally killed Tina Johnson.  We

16 will ask you to recall the testimony of John Taylor

17 who testified that the defendant himself, after

18 tying Tina Johnson's hands and wrists and gagging

19 her with duct tape, beat her repeatedly as she lay

20 defenseless on the floor of her own bedroom.  That

21 evidence, the government submits, establishes the

22 first intent factor with regards to the murder of

23 Tina Johnson, that is, that the defendant

24 intentionally killed the victim.

25    We submit that the defendant also

**Sentencing Minutes May 31, 2011**

 1    intentionally killed Basil Williams.  The evidence

 2    establishes that Basil Williams and Tina Johnson

 3    were killed in the same manner.  Both bodies were

 4    covered.  In addition, you'll recall that the blood

 5    of Basil Williams was found on the lock on the

 6    inside door of apartment 101.  Now, clearly, Basil

 7    did not leave his own blood on that look.  It was

 8    transferred there by someone from where he was

 9    laying dead.  And you have heard evidence that

10    indicates that it was the defendant himself who

11    sealed that apartment door.  So the government

12    submits that the first intent factor also applies to

13    the murder of Basil Williams.  That the defendant

14    intentionally killed the victim.

15            Now, you've also heard evidence that the

16    defendant aided and abetted the murder of James

17    Reid.  We will ask you to consider again the

18    evidence submitted in support of that murder in the

19    guilt part of the case.  That evidence established

20    that the defendant himself kicked down the door of

21    apartment 101; that he pointed a gun at Basil

22    Williams and pushed him, forced him back into his

23    bedroom and down on the floor; that he then turned

24    that weapon to James and Tina Johnson and pushed

25    them back into their bedroom and down on the floor.

**A.210**

**Sentencing Minutes May 31, 2011**

```
 1   defendant told John Taylor he had a problem in his
 2   building and he needed to move some people out, and
 3   he promised John Taylor a spot in his drug
 4   enterprise, a spot at 215 Charles Street where he
 5   could cell drugs and make money.
 6            Now, when considering this particular
 7   statutory aggravating factor, we'll ask you to
 8   concentrate on the intent and mental state of the
 9   defendant.  It is of no consequence that John Taylor
10   was not fully aware of the full extent of the
11   defendant's deadly plan.  What is relevant is that
12   when the defendant offered something of value to
13   John Taylor in exchange for his assistance, he
14   intended to kill Tina Johnson, James Reid and Basil
15   Williams.
16            Fourth, that the defendant committed the
17   murders in an especially heinous, cruel and depraved
18   manner in that they involved torture or physical
19   abuse to the victims.  The testimony established
20   that the hands and wrists of each of the three
21   victims in this case were wrapped with duct tape so
22   strongly, so tightly that the detectives had trouble
23   getting the scissors underneath to cut them off.
24   Karen O'Donnell, the first EMT to respond to the
25   crime scene has described it as very angry.  The
```

**A.211**

1    else was there; if you remember?

2         A.    There was a few people in there.

3         Q.    Do you remember any of them?

4         A.    No, not really.  My sister, Frank.  I don't

5    know who was in the old guy's room, but there was

6    some girls in there, you know, I mean in the

7    apartment as well as me.

8         Q.    And what happened?

9         A.    I was just like sitting there getting --

10   sitting there getting high and just chilling, and I

11   was about to leave, actually, because I had got a

12   phone call.  But before I could leave Dreddy had

13   came in there, and I didn't even know who Dreddy

14   was, I didn't even, you know, I didn't even really

15   pay him no mind, I didn't think he paid me any mind.

16        Q.    And when he came in what happened?

17        A.    Come to find out, the girl Tina, I guess

18   every time I was coming over there she was telling

19   him or Womble or somebody that I was coming over

20   there selling drugs or cooking up, which that wasn't

21   true.

22        Q.    Okay.

23        A.    That wasn't.

24        Q.    So, when the defendant came in, what

25   happened?

**A.212**

```
 1        A.    So when he came in, I guess he looked at me
 2   and I looked at him and then he told everybody to
 3   leave.
 4        Q.    And what happened after he told everyone to
 5   leave, what did you do?
 6        A.    Everybody was leaving out and I was the
 7   last one to get up to leave to go to the door, and
 8   when I got to the door he stopped me, and the way he
 9   stopped me, when he stopped me, he -- I didn't even
10   see it coming, he whooped out an Uzi or something
11   and he hit me in the head and he hit me in the ear.
12        Q.    An Uzi gun?
13        A.    Yeah.
14        Q.    And what did the gun actually look like?
15        A.    A black Uzi.  A full-clip Uzi.
16        Q.    A full-clip?
17        A.    Yeah, I guess.
18        Q.    So, like one of the long clips?
19        A.    No.  Yeah, long clip, but it was short.
20   The gun was short.
21        Q.    You indicated on the left side of your head
22   and your ear.  The defendant hit you twice?
23        A.    Yeah.
24        Q.    With the gun?
25        A.    Yeah.
```

**Sentencing Hearing Minutes June 1, 2011**   4688

```
1        Q.    Was anyone else in the room while you were
2    being hit?
3        A.    My sister and Frank.
4        Q.    Did you see --
5        A.    And I think Womble.
6        Q.    And Womble?
7        A.    I think so, yeah.
8        Q.    And did you see the defendant hit anyone
9    else with the gun?
10       A.    No, no.
11       Q.    Did you see him hit your sister with
12   anything?
13       A.    I know she was screaming, but I don't think
14   he hit her.
15       Q.    What was she screaming?
16       A.    She wanted the altercation to stop, I
17   guess.
18       Q.    And did the defendant say anything to her?
19       A.    Told her to shut up.
20       Q.    And did he say anything to you?
21       A.    He was like -- he was telling me, did -- he
22   was asking me why I was there and was I selling
23   anything out of that apartment.
24       Q.    What did you tell him?
25       A.    I was telling him, no, I'm just -- you
```

A.214

```
 1   know, at the time she went by the name of Vanessa --
 2   but I was, like, "Neet's my sister, I'm just here
 3   chilling with her."
 4        Q.   What did the defendant say?
 5        A.   He was -- he didn't really believe me.  He
 6   had me go in my pocket, he looked at my ID and, you
 7   know, at that time I was, like, I just wanted to --
 8   I wanted to really kill him, that's what I wanted to
 9   do.
10        Q.   Okay.  Did you hit him back?
11        A.   Didn't touch him.
12        Q.   Were you bleeding?
13        A.   Yeah, profusely.
14        Q.   Did the defendant say anything else to you?
15        A.   He was, like, "Ain't nobody selling out of
16   here.  If I catch somebody selling out of here I'm
17   going to take you somewhere in the basement or
18   something and have you sell my drugs for free.
19   Ain't nobody selling out of here but me and Womble."
20             And I'm, like, "Yo, I'm not trying to
21   sell out of here.  I'm just here chilling with my
22   sister."  And I guess Frank and the old man was
23   telling him, and he's, like, yeah, they really
24   brothers and sisters, and I guess he believed it and
25   then he got a call or something and then he bounced.
```

**Sentencing Hearing Minutes June 6, 2011**

```
 1    this is one of those factors, and that seems to me
 2    to be a proper application of principles and methods
 3    to the facts of the case.  So, given that proffer,
 4    I'm going to deny the motion in limine and we should
 5    be, therefore, ready to proceed with Dr. Lewis.
 6              Now, the next issue is Efrain Johnson
 7    statements to law enforcement.  I'm a little bit
 8    confused, and I have not -- the government seems to
 9    be asserting a confrontation right, which would not
10    seem to be applicable.
11              MS. DAYTON:  Well, no.  The government's
12    asserting that the statements were completely
13    unreliable and it's not a free-for-all in the
14    sentencing phase.  It's not whatever the defense
15    wants to get in the defense gets in.  The statements
16    that they're offering do not fall under the
17    declarations against interest hearsay exception.
18    They were made to law enforcement officers in an
19    effort for Johnson to cooperate with the government.
20    The defendant -- that defendant, Johnson, was never
21    offered a cooperation agreement because it was never
22    determined that he was able to tell the truth.  We
23    could not corroborate the majority of what he said.
24    And, in fact, even at the end he couldn't tell the
25    truth.  As your Honor saw, he came in here, and as
```

**Sentencing Hearing Minutes June 6, 2011**

```
 1   Mr. Sheehan saw, because he was sitting here, too,
 2   Johnson lied during his plea allocution.
 3            THE COURT:  Well, I don't know that he
 4   lied.  He certainly did not allocute to the crime in
 5   the indictment.  But the question here is where his
 6   statements -- well, whether or not the government
 7   could corroborate.  This is different from whether
 8   or not they would have been admissible by the
 9   government at the guilt phase, which they certainly
10   wouldn't have been since, as the government argues
11   here, they're clearly testimonial and Mr. Johnson is
12   clearly not available.  So, as to the defendant they
13   would not have been admissible against the
14   defendant.
15            MS. DAYTON:  Correct.
16            THE COURT:  And so why is it -- how is
17   it that the government argues that they enjoy the
18   same position as the defendant with respect to the
19   admissibility of out of court statements by an
20   unavailable witness where that witness's statements
21   have in part been previously offered?
22            MS. DAYTON:  So these statements haven't
23   been in part previously offered.  The government
24   offered a declaration against --
25            THE COURT:  Other statements.
```

**A.217**

**Sentencing Hearing Minutes June 6, 2011**

5204

 1              MS. DAYTON:  -- made years before.

 2              THE COURT:  Other statements of Mr.

 3   Johnson.

 4              MS. DAYTON:  Right.

 5              THE COURT:  Were previously offered.

 6              MS. DAYTON:  But that's different, your

 7   Honor.  Those statements --

 8              THE COURT:  Well, why is that different?

 9              MS. DAYTON:  Because those were

10   statements made in private to his sister versus to

11   law enforcement under situations where you'd expect

12   him to tell the truth.

13              THE COURT:  They're not testimonial,

14   that's right, that's why they came in.

15              MS. DAYTON:  But they were considered

16   declaration against interest because they have the

17   inherent reliability because they were not made to

18   law enforcement and because they were made under a

19   situation that was private.  The capital

20   jurisprudence makes clear that the government and

21   the defendant both enjoy the right to a

22   constitutional trial, and for evidence to be offered

23   that has absolutely no reliability, such as the

24   statements here, the jurisprudence on declarations

25   against interest, including ones having to do

**A.218**

**Sentencing Hearing Minutes June 6, 2011**

5205

```
 1   specifically with capital cases, make clear that the
 2   statement offered has to have its own inherent
 3   reliability.  And for instance in Green v Georgia,
 4   the statement was found to be reliable precisely
 5   because it was made to a person who was not in law
 6   enforcement.  In Buchanan, however, the court kept
 7   out -- the district court was found properly to have
 8   kept out statements, the Fourth Circuit held,
 9   because there was no inherent reliability in those
10   statements because instead of being made
11   spontaneously to a friend under a situation where
12   you would expect a person to be telling the truth,
13   they were made to the defendant's mitigation expert
14   by friends and family of the defendant.  So it's not
15   a situation where there was inherent reliability.
16            Here, again, these statements were
17   Johnson's statements.  Unlike the declarations
18   against interest, the ones that were made shortly
19   after the crime to his sister in private under a
20   situation where you would expect the defendant to
21   tell the truth, Johnson to tell the truth, and they
22   were so far against his penal interest that, you
23   know, they had inherent reliability for all of those
24   reasons, here Johnson spent the majority of time
25   talking to law enforcement trying to shift blame to
```

**A.219**

**Sentencing Hearing Minutes June 6, 2011**

5206

```
 1    the defendant, to Azikiwe Aquart and to John Taylor.
 2              Nothing about Johnson's statements could
 3    be corroborated except the fact the four of them
 4    were there.  But even that Johnson claimed not to be
 5    able to recognize Taylor.  Johnson claimed that he
 6    hadn't been there on the earlier run when they tried
 7    to get into the apartment.  Johnson claimed to law
 8    enforcement not to have seen bats or masks though he
 9    told his sister years before he ever spoke to law
10    enforcement that they had in fact had bats and
11    masks.
12              THE COURT:  Was that in the denial,
13    bats?  Was that in his statements that I have?  I
14    don't remember that.
15              MS. DAYTON:  Yes.  Well, the defense
16    gave you those statements, but it should be in
17    there.
18              THE COURT:  Tell me what the date of
19    that statement would be.
20              MS. DAYTON:  I think it's the last
21    statement.  The 2009 statement, your Honor.
22              THE COURT:  I have a 2010 as the latest.
23              MS. DAYTON:  Hang on, I need to -- I
24    believe that would be the one, your Honor.  He was
25    brought in and specifically confronted.  In 2009 was
```

**A.220**

**Sentencing Hearing Minutes June 6, 2011**

 1    when he declined to identify John Taylor.

 2              MR. SHEEHAN:  He did in 2010, your

 3    Honor.

 4              MS. DAYTON:  Yes, 2010 he denied the

 5    bats and the ski masks.

 6              MR. SHEEHAN:  I think your Honor does

 7    have that one.  At least I intended to give it to

 8    your Honor.  That's the one that is accompanied --

 9    well, there is actually two.

10              MS. DAYTON:  Can you hand it up?

11              MR. SHEEHAN:  Sure.  This was the last

12    one, your Honor.

13              THE COURT:  So, Mr. Sheehan, are you

14    going to argue this?

15              MR. SHEEHAN:  Yes, your Honor.

16              MS. DAYTON:  Could I point out a few

17    more inconsistencies before we go on?

18              THE COURT:  Yes.

19              MS. DAYTON:  So, Johnson repeatedly

20    tries to say, for instance, that Tina Johnson was

21    attacked in the front living room.  He says it in

22    the proffer from March 7, 2007, November 20, 2008,

23    and also August 11, 2008.  He says that she was --

24    that she's the one who answered the door and that

25    she was attacked in the front room, tied up there

**Sentencing Hearing Minutes June 6, 2011**

5208

1    and dragged to the back.  There is absolutely no

2    evidence to corroborate that whatsoever.  There is

3    no blood on the floor in the front room.  The

4    defense position, and what they've maintained

5    throughout, is there was a couch in the hallway.  So

6    it would have been impossible to drag a woman of Ms.

7    Johnson's size down that hallway.  But there is

8    nothing to suggest that ever occurred.  There are no

9    drag marks, there is nothing.  All the evidence

10   suggests she was attacked back in the bedroom.

11          But the reason that Johnson lied about

12   this was precisely to minimize his behavior.  The

13   reason he said it was in the front room was to avoid

14   putting himself in the back bedroom where Ms.

15   Johnson and Mr. Reid were killed.

16          He also talks about the fact that there

17   was -- the only weapon that he ever saw was some

18   alleged sliding metal pipe, making it sound like

19   something a police officer would use, like a police

20   officer baton, and there is no evidence to suggest

21   that any of the victims were hit with such an item.

22          At one point --

23          THE COURT:  So tell me why you say that?

24   Because none of the witnesses -- or all of the

25   witnesses who were cause of death witnesses said

**A.222**

**Sentencing Hearing Minutes June 6, 2011**

1  that it could have been a pipe of enough diameter.

2          MS. DAYTON:  Right, two-inches is not

3  much of a diameter, your Honor.  They all said it

4  needed to be something of a large diameter.  And

5  also according to Tom Martin it had to be a weapon

6  that would be sufficiently large to hold enough

7  blood to create the sort of cast off that was seen

8  all around the entire room in every -- well, just in

9  the back bedroom, in the southwest bedroom; notably

10 not in the front room where Johnson claimed the

11 beating originally took place.

12         Johnson also, of course, trips himself up

13 at one point because he talks about Tina getting hit

14 over a bed, and then when he's reminded that he said

15 that, oh, you actually said it was in the living

16 room, he then said, oh, well, there was sofa bed in

17 the living room.  And this is in the March 7, 2007,

18 on page 3, and there was of course no sofa bed in

19 the living room.

20         Johnson, his entire process with the

21 government was attempting to minimize his own

22 behavior.  And despite the defense claim in their

23 newest filing that the reason the government didn't

24 put on Efrain Johnson and John Taylor is because

25 their views or their statements were diametrically

```
 1    opposed is just blatantly incorrect.  The last time
 2    the government spoke to Mr. Johnson was over a year
 3    ago and it was determined that he had the inability
 4    to tell the truth.  The government stopped speaking
 5    with him, proffering him or anything else.  They
 6    continued with Mr. Taylor because his testimony, his
 7    statements were actually able to be corroborated by
 8    the evidence, and it wasn't until six months or
 9    eight months after the government stopped speaking
10    with Mr. Johnson that Taylor pled guilty to a
11    cooperation agreement, which occurred in front of
12    your Honor, of course.
13              So, the case law in the Second Circuit
14    makes clear that for statements to be considered
15    reliable they had to have been made under a
16    situation where the person is speaking to someone
17    they believe to be an ally, not to law enforcement,
18    as explained in Sasso, which is 59 F.3d 341 at 349
19    Second Circuit 1995.
20              Latine holds the same, that the
21    accomplice made the statement to a perceived ally,
22    not to police, and thus was not seeking to curry
23    favor or in a coercive atmosphere.  Latine is 25
24    F.3d 1162 at 1166, Second Circuit 1994.
25              Green v. Georgia, specifically -- which
```

**Sentencing Hearing Minutes June 6, 2011**

1  is 442 U.S. 95, 1979, talked about the reliability

2  of the statement because it was not made to law

3  enforcement, that it was made to a friend.

4          And the case law on this has always held

5  the same, your Honor.  So it's not -- it doesn't

6  have to do with a right to confront, it has to do

7  with putting reliable information in front of the

8  jury.  And if the information is not reliable, it's

9  not meant for the jury to hear because it's

10  confusing, it's misleading, and it's inappropriate.

11  It's an inappropriate way to get what is alleged to

12  be a mitigating factor in front of the jury when

13  it's not actually a mitigating factor and there is

14  no evidence to support the reliability.

15          THE COURT:  So, let me ask you this:  He

16  does contradict himself in instances, but where he

17  places himself at the scene of the triple murder,

18  and I thought talked about participating in the

19  masking type binding up of them where he talked

20  about Taylor saying he was doing it too slowly --

21  and there was something else.  These are rather

22  inculpating statements, aren't they?

23          MS. DAYTON:  So, the fact that he makes

24  one inculpating statement does not make the whole

25  statement reliable.  That's the government's

**A.225**

**Sentencing Hearing Minutes June 6, 2011**

5212

 1    contention.  Number one, even in trying to -- even

 2    in making this inculpating statement, he's

 3    minimizing.  He's saying, I didn't want to tape him

 4    up, Taylor handed me the tape and demanded that I do

 5    it, and then took it away from me and I stood

 6    against the wall and then I got scared and I left.

 7    And there is nothing to corroborate that, period.

 8              There is, again, no evidence whatsoever,

 9    forensic or otherwise, to suggest that Tina Johnson

10    was taped up in the front room or beaten there or

11    dragged down the hall.  This all happened in the

12    back southwest bedroom.  And so by making that

13    statement, whether or not he inculpates himself with

14    one statement, that doesn't open the door to a host

15    of completely unreliable statements.

16              Do you know if he said, oh, I was the

17    driver on a bank robbery, I never went in the bank,

18    and then it turned out there was video of him going

19    in the bank, we wouldn't let his statement in he was

20    the driver because there is proof that it's not

21    credible, that it's minimizing behavior; even though

22    he puts himself in the crime, he minimizes his role.

23              And that's the issue here, is he

24    minimizing, is he making his statement in a

25    situation that is inherently unreliable, and the

## Sentencing Hearing Minutes June 6, 2011

5213

1　case law from the Second Circuit on up to -- well,

2　Second Circuit, Fourth Circuit, up to the Supreme

3　Court says, yes, this was made in a situation that

4　is inherently unreliable.  And your Honor heard John

5　Taylor testify, you've seen the forensic evidence,

6　and the government would submit that you can also

7　take that into consideration when making a

8　determination about the reliability of Johnson's

9　statements to law enforcement and that -- and find

10　them unreliable based upon what you heard.  The

11　government would submit that John Taylor's testimony

12　was very credible.

13　　　　　　We also, as we said in the motion, find

14　it notable that the defense tactic was not to say

15　that he was there and more involved, but to say that

16　he wasn't there at all.  And so now to try to shift

17　and say, okay, he was there and he's more

18　responsible than, you know, Efrain Johnson or so

19　responsible the defendant shouldn't be found to be

20　as responsible is ludicrous.  It's just -- it's

21　gamesmanship.  And this is meant to be a fair trial

22　for both the defendant and for the government, your

23　Honor, and putting on inherently unreliable

24　testimony, the government has no way to effectively

25　rebut that, and we do under 3593 have the right to

**Sentencing Hearing Minutes June 6, 2011**

1    rebut testimony, and if something --

2              THE COURT:  So when you say you have no

3    way to effectively rebut this, why is it that you

4    can't do so as you've been doing this morning, in

5    referencing the other statements that are

6    contradictory and demonstrably false?

7              MS. DAYTON:  But, your Honor, if you

8    feel that the testimony is such that the government

9    would have to sit there and argue it that way, I

10   mean, isn't that a finding that it's unreliable?

11             THE COURT:  You didn't answer my

12   question.

13             MS. DAYTON:  Because that's not how --

14             THE COURT:  Why shouldn't you --

15             MS. DAYTON:  Because that isn't how we

16   should be forced to spend our time arguing to the

17   jury, on something that shouldn't be let in, period,

18   because it's unreliable, inherently unreliable.

19   Your Honor, I don't know if you had the opportunity

20   to read the cases, but when you put these next to

21   each, other courts routinely exclude exactly this

22   type of information, including from the penalty

23   phase.

24             The fact that the defendant is facing

25   the death penalty doesn't mean he gets to throw

**A.228**

**Sentencing Hearing Minutes June 6, 2011**

1    whatever he wants to at the wall and see what

2    sticks.  We have a right to a fair trial.  If

3    evidence is unreliable it should not be allowed in,

4    period, regardless of who is promoting that

5    evidence.  And we can't call a witness unless -- you

6    know, we could -- we can't call a witness.  We can't

7    call Efrain Johnson to the stand and cross-examine

8    him.  We can't call his attorneys, who acknowledge

9    that they knew he was lying.  There is, like, really

10   nothing we can do.  It's unreliable testimony.  It's

11   almost impossible to sit there and prove that it's a

12   lie, and for us to have to spend the hour, or

13   whatever you give us, arguing to the jury, you know,

14   that this is unreliable and you shouldn't believe

15   it, it's misleading and confusing and it shouldn't

16   be allowed to be presented to the jury, period.

17          THE COURT:  All right, let me hear from

18   the defense.  Thank you.

19          You don't dispute that this is made --

20   that these statements are testimonial.

21          MR. SHEEHAN:  No.

22          THE COURT:  And you don't dispute that

23   they purport to minimize Mr. Johnson's involvement.

24          MR. SHEEHAN:  They characterize his

25   involvement in a way that does not make him --

**Sentencing Hearing Minutes June 6, 2011**

5216

1    certainly does not make him as culpable as either

2    Mr. Aquart or his brother or, indeed, as culpable as

3    Mr. Taylor.

4              THE COURT:  That would be minimizing his

5    role in order to accomplish --

6              MR. SHEEHAN:  I don't know what happened

7    in that room, your Honor.

8              THE COURT:  We're just looking at the

9    statements.  Now, are you offering all of these

10   statements?  Are there other statements that he made

11   that you are not offering?

12             MR. SHEEHAN:  I am offering those

13   portions of the statements where he describes his

14   role and the role of Mr. Taylor.  The jury has

15   already found Mr. Aquart to be guilty of these

16   crimes.

17             THE COURT:  You've given me a collection

18   of reports and pictures.  Is that what you mean by

19   you are offering the portions of the statements

20   where he describes his role and the role of Mr.

21   Taylor?

22             MR. SHEEHAN:  Yes, those.  I'm sorry,

23   what I am -- I have given you all of what I thought,

24   and if I missed that 2010 one, I apologize for that.

25   I have given you all of his 302s.  I am not offering

**A.230**

```
 1   all of those 302s.
 2               THE COURT:  What are you offering so I
 3   know what we're talking about?
 4               MR. SHEEHAN:  So on the March 6th 30 --
 5   March 6th investigation.
 6               THE COURT:  Wait, I'm sorry.  Hold on a
 7   moment.  I have March 14, 2007.
 8               MR. SHEEHAN:  Yes, that's it.  The date
 9   of the transcription is March 14th, but the
10   investigation was on March 6th.  I'm offering that
11   portion of the statements starting on the bottom of
12   page 2 where he knocked on the door pretending to be
13   a customer and then proceeding up to -- through
14   where "Big Dude" -- which I believe is who he is --
15   is the fourth person -- "grabbed the woman and
16   rushed into the living room and then Big Dude handed
17   the rubber gloves to Johnson," which takes us
18   through to the end of "Big Dude finished wrapping
19   her hands and feet," and then at the end of that
20   paragraph that "Johnson saw Big Dude."
21               THE COURT:  I'm sorry, hold on.  All
22   right, the hands and feet.  Then what?
23               MR. SHEEHAN:  "Johnson saw Big Dude pull
24   an object from inside" --
25               THE COURT:  We leave the next part out,
```

**Sentencing Hearing Minutes June 6, 2011**

5218

1   the next sentence out?

2           MR. SHEEHAN:  Yes, I'm just offering his

3   role, not the role of Azibo or Azikiwe.

4           THE COURT:  "Johnson backed up to the

5   wall and watched," is that also offered?

6           MR. SHEEHAN:  No, your Honor, I wasn't

7   offering that.  But I can.  I was not offering that.

8           THE COURT:  So you pick up again at

9   "Johnson saw Big Dude pull an object from inside

10  pants pocket."

11          MR. SHEEHAN:  "And strike the unknown

12  female on the right side of the head."

13          THE COURT:  Is that the portion of the

14  March 6th statement that you are claiming?

15          MR. SHEEHAN:  Yes, your Honor.  The next

16  one is on March 7, 2007.  And on the second page of

17  that where he -- towards the bottom, last full

18  paragraph where "Big Man and Aquart told Johnson

19  that his job was to knock on the apartment door and

20  to pretend to be a drug customer."

21          THE COURT:  I'm sorry, I'm on March 7th.

22  The last full paragraph starts "in the summer of

23  2005."  Is that where you are?

24          MR. SHEEHAN:  Page 2.  I'm sorry.  No,

25  on page 2 of the March -- the investigation date on

**Sentencing Hearing Minutes June 6, 2011**

1  the bottom left is the controlling one, your Honor,

2  but on page 2 of that.

3           THE COURT:  What's the first line of the

4  paragraph you are referring to?

5           MR. SHEEHAN:  First line is "Johnson" --

6           THE COURT:  "Johnson and Big Man," okay.

7           MR. SHEEHAN:  But what I am proposing

8  here is "Big Man and Aquart told Johnson that his

9  job was to knock on the apartment door and pretend

10  to be a drug customer.  Johnson knocked on the door

11  while the others waited around the corner.  When an

12  unknown female occupant answered the door, they bum

13  rushed her charging into the apartment."

14           THE COURT:  Is that all for this report?

15           MR. SHEEHAN:  And then "Big Man and

16  Johnson pushed the unknown female into the living

17  room.  Big Man handed rubber gloves to Johnson and

18  told him to put them on and instructed Johnson to

19  tape the unknown female up.  Johnson began taping

20  her hands.  When the unknown female started

21  screaming, Big Man punched her in the face and she

22  stumbled to the ground.  Big Man told Johnson to

23  tape her feet together.  When Big Man grew impatient

24  with the speed at which Johnson was taping the

25  unknown female's feet, he ripped the duct tape out

**A.233**

**Sentencing Hearing Minutes June 6, 2011**

5220

1    of Johnson's hands."

2            And then on the -- not the next

3    paragraph, but the following paragraph, Big Man

4    said -- "Johnson said that Big Man pulled a long

5    metal pipe from his pants and smacked the unknown

6    female on the right side of the head while she was

7    leaning over the bed."

8            THE COURT:  Hold on.  That's in the last

9    paragraph?

10            MR. SHEEHAN:  No, I'm sorry, it's in --

11    we -- it's in the --

12            THE COURT:  All right, I see it.  So

13    it's the first full paragraph.

14            MR. SHEEHAN:  I think on page 3.  It is

15    the second full paragraph where it starts with

16    "Johnson said that."

17            THE COURT:  Okay.

18            MR. SHEEHAN:  "Big Man pulled a long

19    metal pipe from his pants and smacked the unknown

20    female on the right side of the head."

21            THE COURT:  All right.

22            MR. SHEEHAN:  "While she was leaning

23    over the bed."

24            THE COURT:  All right.

25            MR. SHEEHAN:  "Johnson described the

**A.234**

**Sentencing Hearing Minutes June 6, 2011**

5221

```
 1   metal pipe as approximately two-inches thick and

 2   ten-inches long."

 3             THE COURT:  Anything further from that

 4   report?

 5             MR. SHEEHAN:  "Johnson ran out of the

 6   apartment when Big Man struck the female."

 7             And then on the report dated August 11,

 8   2008, on page 4, the last sentence of the -- I'm

 9   sorry, the second to last paragraph, the last

10   sentence of that, "While standing outside the door

11   unknown male No. 1 gave Johnson cream-colored latex

12   gloves to put on."

13             And then in the following paragraph,

14   "Johnson knocked on the door and a female voice

15   answered 'Who is it?'  Johnson answered, 'Yo, what

16   up?'  When she cracked the door open the unknown

17   male No. 1 pushed Johnson through the door and they

18   all bum rushed into the apartment.  The unknown male

19   and Johnson pushed the woman into the living room.

20   The unknown male told Tina to shut up and to get on

21   the ground.  Johnson heard a metallic thud sound

22   when the unknown male No. 1 hit the woman."

23             And then on the following page "Unknown

24   male No. 1 handed the duct tape to Johnson and told

25   him to duct tape her hands and legs.  Johnson did
```

**A.235**

```
 1    not move fast enough, so the unknown male ripped the

 2    tape from him and took over taping Tina."

 3                Finally, your Honor, in the 302 dated

 4    October 2nd, 2008, on the bottom October 9th --

 5                THE COURT:  Just one moment.  I have

 6    date of transcription October 1st and it was taken

 7    on September 25th.  Is that the one you are talking

 8    about?

 9                MR. SHEEHAN:  No, it's the following

10    one, your Honor, the date of transcription is 10/9

11    2008.

12                THE COURT:  I don't have that.

13                MR. SHEEHAN:  It's 10/2, 2008.  It has

14    the pictures attached to it, your Honor.

15                THE COURT:  I just have pictures.  I

16    don't have any 10/2.

17                MR. SHEEHAN:  That's a six-page report.

18                THE COURT:  Would you give that to me

19    marking out what it is you are claiming?

20                Does that finish the proffer?

21                MR. SHEEHAN:  Yes, your Honor.

22                THE COURT:  Okay.  Then I will have it

23    completely here and I can consider the arguments.

24                MR. SHEEHAN:  Would your Honor like me

25    to just hand it up.  It's not a big section.  I can
```

**Sentencing Hearing Minutes June 6, 2011**

5223

```
 1   just hand that in.
 2              THE COURT:  No, just mark it.
 3              MS. DAYTON:  Your Honor?
 4              THE COURT:  Do you have that report?
 5   Yes, you must.
 6              MS. DAYTON:  But I have a response to
 7   some of what he said here.
 8              THE COURT:  I'll tell you what, we will
 9   take up further argument.  Because I don't think
10   I've actually heard the defendant's argument, and
11   then I'll hear the government.  But I think we
12   should get going with the jury.  But at least I have
13   a complete record to look at, which I did not
14   earlier.
15              And then the only other matter we have
16   that remains is what will be appropriate for
17   cross-examination of Mr. Bezy.  I'm wondering if it
18   makes some sense to wait to hear the direct of Mr.
19   Bezy before we actually make that ruling.
20              Would that be satisfactory to the
21   government?
22              MS. DAYTON:  That's fine, your Honor.
23              THE COURT:  All right.
24              MR. SHEEHAN:  The only question I have,
25   your Honor, is on that one -- and the reason why I
```

**Sentencing Hearing Minutes June 6, 2011**

```
 1    ask for -- filed the motion -- I guess that's fine,

 2    your Honor.  That would be fine.

 3              THE COURT:  All right.  Who will be the

 4    first witness today?

 5              MR. SMITH:  That would be Loretta Jay.

 6              THE COURT:  That's still going to be

 7    Loretta Jay?

 8              MR. SMITH:  Although, your Honor, we did

 9    want to offer into evidence -- I think we have come

10    to an agreement with the government as to Richard

11    Aquart's criminal records.

12              THE COURT:  Have you come to some

13    agreement about that?

14              MR. SHEEHAN:  We did, your Honor.

15              MS. DAYTON:  You look so shocked.

16              THE COURT:  I'm just looking

17    inquisitively whether or not that is true.

18              MS. DAYTON:  It is.  We're going to put

19    in the rap sheet, the New Jersey prior conviction,

20    and then one underlying -- then we're going to make

21    clear on the rap sheet it says robbery, but he was

22    convicted of larceny.  And then there is one

23    underlying document from the rap sheet that they're

24    going to make clear it's not an additional

25    conviction, that it relates to one of the
```

**A.238**

Sentencing Hearing Minutes June 6, 2011

5330

1    Q.    Immigration and Naturalization Services.

2    A.    Naturalization services.

3    Q.    And prior to working for that Creative

4  Corrections, were you also involved in correctional

5  activity?  Did you have another job?

6    A.    Prior to, yes.  I retired in 2006 from the

7  federal Bureau of Prisons.

8    Q.    Okay.  And in that little gap in between

9  your retirement in 2006 and then going to Creative

10  Consultants, what did you do?

11    A.    I retired in 2006 and I went to work -- I

12  went to work for the GEO Group out of Boca Raton,

13  Florida.  It's a private prison company.  I ran a

14  private prison in Florence, Arizona.  Our client was

15  the Arizona Department of Corrections.

16    Q.    And how many inmates were in that facility?

17    A.    I ran a thousand-bed sex offender unit down

18  there.

19    Q.    How many staff would have been generally --

20  how many staff were involved in that facility?

21    A.    With the programming and security staff we

22  probably had a couple hundred.

23    Q.    Now, you mentioned that prior to that you

24  were involved -- you were an employee of the federal

25  Bureau of Prisons, correct?

**Sentencing Hearing Minutes June 6, 2011**

5331

1     A.   Correct.

2     Q.   I'm going to kind of flip this around and

3  instead of going from recent, I'm going to go back

4  and ask you when it was that you started working for

5  the Department of Corrections?

6     A.   I started 1978 as a correctional officer at

7  the federal -- a correctional institution in Oxford,

8  Wisconsin.

9     Q.   What is your educational background?

10    A.   I have a Bachelor of Science from the

11 University of Nebraska in criminal justice.

12    Q.   And did you have your Bachelor's degree

13 when you started with the Department of Corrections?

14    A.   Yes.

15    Q.   And what was your -- what were your first

16 responsibilities as a correctional officer?

17    A.   Basically to operate the inmate housing

18 unit, supervise the inmate details and provide

19 security and correctional coverage for the

20 institution.

21    Q.   And this you mentioned was in Oxford,

22 Wisconsin?

23    A.   Correct.

24    Q.   What level of facility was that?

25    A.   Oxford at that time was a medium security

**A.240**

**Sentencing Hearing Minutes June 6, 2011**

5341

1    Q.   What's the difference between a CMU and,
2  say, a United States penitentiary?
3    A.   The CMU inmates are placed in there for
4  monitoring, very strict monitoring of their
5  communications, whether it's verbal, written, any
6  contact they have with anyone outside the prison.
7    Q.   Okay.  Now, after Marion, where did you go
8  next within the Bureau of Prisons?
9    A.   I was promoted then to the correctional
10 services administrator in the north central regional
11 office in Kansas City, Missouri.
12   Q.   And what area of the country does that
13 north -- is it the north central?
14   A.   Correct.
15   Q.   What area, what states does the north
16 central office control?
17   A.   We controlled Colorado, Illinois,
18 Wisconsin, Minnesota, Missouri.  Basically the north
19 central portion of the United States.
20   Q.   And how many institutions are there, or
21 were there at that time in that region?
22   A.   I believe at that time there was 16 to 18.
23   Q.   And what level of facilities were there
24 within the north central region in the Bureau of
25 Prisons?

**Sentencing Hearing Minutes June 6, 2011**

5342

1    A.   We had the -- we had all securities from

2    the ADX in Colorado to prison camps.  We had high

3    rises in Chicago, metropolitan correctional centers

4    that housed -- they're administrative level where we

5    can house all security levels of individuals.

6    Q.   And what were your general responsibilities

7    as a correctional services administrator?

8    A.   I was the resource person for all the

9    institutions in that region regarding security and

10   correctional practices.  I conducted, again, audits

11   and reviews of the facility operations.  I was

12   involved with the -- myself and my staff oversaw the

13   disciplinary transfer process of the inmates.  I was

14   involved in the initial placement of inmates in the

15   ADX, the control unit, and also it would go on into

16   special reports for the regional director or

17   Washington as needed, do after-action reports.

18   Q.   And in that context as a correctional

19   service administrator, did you meet with your other

20   colleagues in other -- who were at similar levels in

21   other regions of the country?

22   A.   Yes.

23   Q.   And did you become aware of the facilities

24   that those individuals were supervising?

25   A.   Yes.

**A.242**

**Sentencing Hearing Minutes June 6, 2011**

5343

1      Q.   And how close a contact as a correctional

2   service administrator would you have with, say,

3   well, like the northeast region?  Would that be a

4   regular contact?  Or how often would you be talking

5   to those people?

6      A.   You'd probably talk to them on a weekly

7   basis, if not more, because if I had a difficult

8   problem in my region that I needed to place in his

9   region, I would have to contact him and see if he

10  would accept the case.  Or he'd contact me to see if

11  I would accept cases out of his region.

12     Q.   And when you say a difficult contact -- I

13  think you used the word a difficult contact or

14  something.

15     A.   A management issue.

16     Q.   Okay.  And would that include moving

17  inmates?

18     A.   It would -- we would approve them, I would

19  accept them into the north central region into a

20  facility.  They would accept them into the

21  northeast.  But the movement was coordinated by the

22  -- by a different group within the BOP and the

23  marshals service.

24     Q.   The physical movement?

25     A.   The physical movement, correct.

**Sentencing Hearing Minutes June 6, 2011**

5344

1    Q.   That's where you'd go to Oklahoma or

2  something to get to next door?

3    A.   Yeah, correct.

4    Q.   Okay.  And after serving as a

5  correctional -- how long did you do that, the

6  correctional service administrator?

7    A.   I believe it was about approximately three

8  and a half years.

9    Q.   And after that did you get another position

10  within the federal Bureau of Prisons?

11    A.   I was promoted to the associate warden at

12  the United States penitentiary in Leavenworth,

13  Kansas.

14    Q.   So, would this be the second United States

15  penitentiary that you were directly involved with,

16  one in Marion and now at Leavenworth?

17    A.   Correct.

18    Q.   But in the course of your service as a

19  correctional service administrator you were well

20  familiar with other policies and procedures in other

21  United States penitentiaries?

22    A.   Correct.

23    Q.   And how long did you serve as an associate

24  warden at Leavenworth?

25    A.   I believe it was three, three and a half

**A.244**

**Sentencing Hearing Minutes June 6, 2011**

1    years.

2         Q.    And what are the job responsibilities of an

3    associate warden?  What do you do there?

4         A.    When I first went there I was associate

5    warden of custody where I oversaw, I was responsible

6    for the correctional services department, and ISM,

7    and I believe one other small department.  We housed

8    1200 high security inmates.  We developed security

9    operations and programs for the inmates.

10        Q.    Okay.  And after -- so you are an associate

11   warden at Leavenworth.  How many staff did you

12   supervise?  I'm sorry, if you've already said it.

13        A.    At Leavenworth it was probably I think 200

14   and -- I think it went to high it was 230 plus and

15   at the low maybe 220.

16        Q.    And how many adults were at the high

17   security facility at Leavenworth when you were

18   there?

19        A.    We averaged approximately 1200.

20        Q.    And after Leavenworth, where you were an

21   associate warden, did you get another promotion

22   within the Bureau of Prisons?

23        A.    I was promoted to the warden at the federal

24   correctional institution in Elkton, Ohio.

25        Q.    And how long did you remain as a warden at

**Sentencing Hearing Minutes June 6, 2011**

5346

1    that facility?

2         A.    I believe it was two years.

3         Q.    Okay.  So you called it federal

4    correctional institution, so that's basically -- now

5    you are back to a medium level facility?

6         A.    At that time Elkton was a low security.  It

7    had a double secure perimeter and it also it had

8    what we call a satellite low.  It was a hybrid

9    institution, kind of between a camp and a low.  It

10   was a camp that somebody had put a single fence

11   around and made it a secure facility.  It was

12   something the Bureau had done at a couple locations.

13        Q.    And how long did you stay in Elkton?

14        A.    Approximately two years.

15        Q.    And after Elkton did you get another

16   promotion within the Bureau of Prisons?

17        A.    I was promoted to the warden at the United

18   States Penitentiary in Terre Haute, Indiana.

19        Q.    And what is the -- how many inmates are at

20   Terre Haute in the United States penitentiary there?

21        A.    I was there -- when I arrived we were in

22   the process of constructing and activating a new

23   penitentiary there, too.  So initially we had

24   approximately 900 inmates in the old original

25   penitentiary, which was built in the 1930s.  We

**Sentencing Hearing Minutes June 6, 2011**

```
 1              THE COURT:  Then Mr. Bezy will be so
 2   qualified and the jury will remember the earlier
 3   instruction of what that means.  All right.
 4        Q.   And how long was it, sir, that you remained
 5   at Terre Haute?
 6        A.   Approximately two years.
 7        Q.   Now, in this case at my request, sir, have
 8   you reviewed the prison records for the defendant,
 9   Mr. Aquart?
10        A.   Yes.
11        Q.   Before today you never saw Mr. Aquart, did
12   you?
13        A.   No.
14        Q.   Before you walked in this courtroom.
15        A.   No, I had to look for him.
16        Q.   And that included his records from the
17   Connecticut Department of Corrections and the Wyatt
18   Detention Facility in Rhode Island?
19        A.   Correct.
20        Q.   And in addition, sir, you are aware, are
21   you not, you've been informed that Mr. Aquart has
22   been found guilty of violations of federal law as
23   regards his role in the murders of three people who
24   were beaten to death in the context of drug cases?
25        A.   Yes.
```

**Sentencing Hearing Minutes June 6, 2011**

1    and it's approved by, I believe the assistant

2    director out of -- correctional programs out of

3    Washington who will make the final determination, or

4    that it will go to the ADX GP.

5         Q.   Some people, are they designated to the ADX

6    GP?

7         A.   Approximately 5 percent of the population

8    at ADX is directly from the court.  The population

9    of the ADX is, I think 492 is their max.

10        Q.   And in comparison with a U.S. prison, if I

11   were sent to the ADX unit, would I have the same

12   kind of housing?

13        A.   No, ADX, it's all single cell.  It's more

14   secure than a USP.  Most of the cells have a solid

15   doors and then a vestibule and then a grilled door

16   inside.  It's all single rec and single cell.

17        Q.   And what is the approximate size of the

18   cell at the ADX unit?

19        A.   It's a standard cell.  I don't recall

20   off --

21        Q.   And what's in that cell?

22        A.   You have in one corner a stainless steel

23   shower, you have a concrete bed, you have a concrete

24   writing table that is built in the wall.  You have a

25   concrete stool for the desk, and then you have a

**Sentencing Hearing Minutes June 6, 2011**

5368

1   stainless steel toilet and sink combination.

2        Q.   How are inmates removed from their cells?

3   How does that process work?

4        A.   Well, they're all in full restraints when

5   they come out.  In general pop they're handcuffed

6   from behind.  At the grille door staff get ahold of

7   the restraints.  There is at least one other officer

8   there with a baton.  So they're always under direct

9   staff supervision.

10       Q.   And you indicated that that period lasts,

11  the initial period anyway, at least in your

12  understanding is at least three years?

13       A.   Well, they're teamed in, I believe it's

14  12 months with set review periods, but, again, the

15  staff look at each individual case and they weigh

16  each individual case separately.

17       Q.   What kind of controls are there within the

18  Bureau of Prisons with respect to monitoring of

19  communications?  Let's say at a United States

20  penitentiary or higher level facility.

21       A.   For written correspondence, all outgoing

22  correspondence is turned in to the unit officer.

23  It's not sealed.  Staff will check the

24  correspondence.  The morning staff from midnight to

25  eight will review the correspondence, check it for

**A.249**

```
 1    contraband.  There is also hot lists for inmates if
 2    they're of a particular interest that their mail is
 3    forwarded directly to the investigator's office,
 4    it's further read down there.  The unit officer
 5    would then seal the mail and then it would go
 6    outside to the post office.
 7              Incoming mail is picked up by institution
 8    staff at the post office.  It's taken, it's screened
 9    by metal detectors or X-ray machine.  Each letter is
10    then opened and checked for contraband.  Again, if
11    there is a unique interest in the inmate, that mail
12    go will go to the investigator's office before it
13    will go to the inmate.
14        Q.   And how about on phones, are there
15    restrictions on phones?
16        A.   Yes.  Each inmate is authorized, there is
17    allowed 300 minutes of phone time each month.  All
18    calls are either collect or the inmate can buy them
19    and put them on a debit card system where he's
20    paying for the phones.  They're allowed 15-minute
21    phone calls, and then the way the system is set up
22    there is dead time, usually I think it's 45 minutes
23    or so between calls, so an inmate can't just sit on
24    the phone for back to back calls, so it opens it up
25    for other inmates to use the phone.  All calls are
```

**Sentencing Hearing Minutes June 6, 2011**

1   recorded and subject to live monitoring.  Some are

2   live monitored.

3       Q.   Now, at a communications -- you mentioned

4   they have CMUs.  Are those controls even more

5   strict?

6       A.   Yeah, the CMU, all phone calls are live

7   monitored.

8       Q.   And how about letters?

9       A.   They can -- if it's a unique individual, if

10  it's written in a foreign language, then there is

11  staff that will be sent that reads that language, or

12  if there is unique coding or material of interest,

13  it can be sent to somebody that focuses on that

14  inmate or a group, and it will be looked at that

15  way.

16      Q.   And does the warden have power, for

17  example, to restrict mail or phone privileges?

18      A.   Yes.  Both privileges.  The warden can pull

19  and suspend phone privileges for periods of time,

20  and then as part of the disciplinary sanction you

21  can take phone periods, you can take the phone

22  privilege away for indefinite periods of time.

23           The warden can also by -- if there is a

24  threat to the overall running of the institution or

25  the community, people can be put on restricted

**Sentencing Hearing Minutes June 6, 2011**

5371

1  correspondence requirements, too.

2     Q.   As warden did you actually do that with

3  respect to some inmates; that is, restrict their

4  phone and their correspondence?

5     A.   If it was a subject -- as far as the

6  written correspondence, if it was an ongoing

7  investigation, yes, I restricted who they could

8  write to and reviewed all of their incoming and

9  outgoing correspondence.

10          As far as phones, when I was a warden at

11  Ohio they allowed smoking at that time inside.  It's

12  supposed to be in the yard, inmates are not

13  compliant, so we talked to them, they didn't want to

14  listen, so if they were caught smoking in the unit

15  by the officer, I suspended their visitation, phones

16  and commissary for a year.  That became a little bit

17  burdensome on the staff, so then I decided I'll quit

18  selling tobacco to them and that worked even better.

19          At Terre Haute if you were caught either

20  possessing an intoxicant or making intoxicants,

21  again, I suspended -- I had the DHO suspend the

22  phone, visitation, commissary for a year, first

23  offense.

24     Q.   You mentioned that, like ADX, after that

25  three years, there is a kind of a step-down

**A.252**

**Sentencing Hearing Minutes June 6, 2011**

1   procedure?

2       A.   It's possible, yes.  There is inmates that

3   I put there in 1995 that are still in that process,

4   that are still in that unit.

5       Q.   And what criteria does the ADX use as far

6   as moving inmates in or out?  What is their

7   criteria?

8       A.   Again, it's a referral.  It's -- they're

9   afforded due process hearing, and if there is a

10  recommendation for placement, then they're sent to

11  the ADX.

12      Q.   Now, is there kind of an intelligence

13  gathering mechanism that you used when you were a

14  warden at the facilities?

15      A.   Yes, I had my own local investigator,

16  special investigative supervisor.  He had, I think

17  up to six people working for him.  Then the region

18  has an intelligence staff.  There is a central

19  office intelligence staff and then there is a group

20  out in Sacramento, California, that is a joint

21  intelligence group with all federal law enforcement

22  and there is one in Pennsylvania too.

23      Q.   And when you were the warden how often

24  would you actually walk through your facility?

25      A.   I went -- I would tour my special housing

**A.253**

**Sentencing Hearing Minutes June 6, 2011**

1  unit every Tuesday at one o'clock.  I would take

2  certain staff with me.  At that time I woke up every

3  inmate in that unit to make sure they were alive and

4  well and breathing, and if they had any issues they

5  could address it with me then.  Then I would proceed

6  up to the special confinement unit and do the same

7  there.

8           Every day at eleven o'clock I would go to

9  the dining room and I stood mainline while the

10 inmates ate.  I spent an hour plus there every day,

11 so if an inmate had an issue of concern he could

12 address it with me personally.  It diffused a lot of

13 issues, and it's a source of good information, too.

14      Q.    Let me ask you to assume the following:

15 Let's assume that an individual had been convicted

16 of a triple homicide in connection -- in the context

17 of a drug operation and his conviction was in 2011,

18 and that individual was also found to have assaulted

19 another inmate at the end of 2009 while in a

20 detention facility pending trial.  And assume

21 further that if the United States attorney or the

22 Department of Justice were lobbying hard for

23 designation for ADX, do you have an opinion as to

24 where that individual is likely to be designated?

25      A.    Very likely he could go into the GP at the

**A.254**

5374

1    ADX or with the right amount of pressure he could go

2    to the control unit at the ADX too.

3        Q.    What's the difference between the control

4    unit?

5        A.    Control unit is a unit within the ADX where

6    based upon an inmate's behavior, most of them are

7    there for -- they have taken another life of an

8    inmate while they're incarcerated, escaped, or very

9    unique threat to the safety and security of the

10    institution.  There can be a recommendation for

11    placement in the control unit.

12           There they're afforded a due process

13    hearing where they can call witnesses.  Hearing

14    administrator presides over the hearing and then

15    there is a recommendation for placement.  If they're

16    approved, then the unit team of the control unit

17    will establish a period of time for their placement.

18           When I was involved in it, if it was --

19    if it involved a homicide within one of the federal

20    prisons, they normally got 60 months, and now I

21    understand they're giving them 72 months in there.

22    Again, it's behavior based.  They get credit for the

23    months they're in there with clear conduct.  If

24    they've mismanaged or don't program, that month can

25    be taken away from them.  So, they have to do --

**Sentencing Hearing Minutes June 6, 2011**

1    they'll do it in a control unit.  It's not

2    additional time, it's just time that the Bureau says

3    you will be in this unit.

4         Q.   Now, in your experience over the 20-plus

5    years, have you worked in facilities which had

6    individuals who were doing a sentence of life

7    without parole?

8         A.   Yes, every -- when I was at Terre Haute,

9    when I left, when I retired, I had about

10   approximately, I think, 12 to 1500, and out of that

11   300 were doing natural life.

12        Q.   How is it that correctional staff, in your

13   opinion, how do they maintain control over inmates

14   who are doing life without parole?  It seems kind of

15   like those inmates have nothing to lose.

16        A.   Penitentiaries are set up to be restrictive

17   in a control environment, and basically the only

18   decision an inmate has in a penitentiary is whether

19   they're going to follow the rules or not.  If they

20   don't, then there is policies and procedures for

21   inmate discipline on that.  Most of them do program.

22   It's a controlled environment that, you know, for

23   safety and security.

24        Q.   Is there a difference between short-term

25   and long-term prisoners in terms of maintaining,

5376

1  difficulty in maintaining control?

2      A.    Some of the younger short-term inmates can

3  be problematic because they know they have a ticket

4  out after a certain number of years.  My experience,

5  people doing long time are normally less

6  problematic.

7      Q.    And let me ask you, does the fact that you

8  have the same inmates in these penitentiaries for a

9  long time, does that impact on the stability within

10 that institution?

11     A.    Yeah, inmates in a penitentiary tend to --

12 they get into their own program of doing their time,

13 staff know who they are.  It's not a real transient

14 population.  They're there for extended periods of

15 times, for years, so they know the staff, staff know

16 them, and, you know, if the warden is out there and

17 about taking care of business, it's a safe

18 environment.

19     Q.    When you basically walked the facility,

20 were you armed or guarded by other staff?

21     A.    No, I walked by myself.

22     Q.    Do you have an opinion as to whether well

23 run and well managed facilities, are they effective

24 in minimizing violence?

25     A.    Yes, they are.

A.257

**Sentencing Hearing Minutes June 6, 2011**

1    Q.   And based upon your review of the

2  defendant's records within the Department of

3  Corrections and the records from Wyatt, do you have

4  an opinion to a reasonable degree of certainty on

5  the ability of the Bureau of Prisons to securely and

6  safely house the defendant if he's sentenced to life

7  without parole?

8    A.   I believe they can safely and securely

9  house him.

10          MR. SHEEHAN:  I have no further

11  questions of Mr. Bezy.  Thank you, your Honor.

12          THE COURT:  All right,

13  cross-examination.

14  CROSS-EXAMINATION

15  BY MS. DAYTON:

16    Q.   Good afternoon, Mr. Bezy.

17    A.   Hello.

18    Q.   I'm Tracy Dayton.  I'm an assistant United

19  States attorney in the District of Connecticut.

20       So you've worked a lot of places, huh?

21    A.   Yes.

22    Q.   You moved around a lot?

23    A.   Yes.

24    Q.   With your children?

25    A.   Yes.

**Sentencing Hearing Minutes June 7, 2011**

```
 1    that discussion, then, Mr. Aquart?

 2              THE DEFENDANT:  Yes, your Honor.

 3              THE COURT:  All right.  And you have now

 4    made up your mind, and either way, under either form

 5    of addressing the jury, you are not going to do

 6    that; is that correct.

 7              THE DEFENDANT:  Yes.

 8              THE COURT:  All right.  And you

 9    understand that you could do that.

10              THE DEFENDANT:  Yes, I choose not to.

11              THE COURT:  So we will -- I will

12    consider that you are well advised and that you have

13    made an informed and knowledgeable decision.  Okay.

14              Now, the issue raised by the defendant's

15    motion to admit certain statements from Efrain

16    Johnson made to law enforcement raises very

17    difficult questions with respect to admissibility of

18    evidence at a penalty phase in a capital case.  The

19    case law is not easily guiding the outcome of this

20    decision.  I think the only two cases that the

21    government relied on that dealt with precluding

22    defendant's evidence at a penalty phase going to

23    either an aggravator or a mitigator are the Buchanan

24    decision from the Fourth Circuit and the Davis

25    decision also from the Fourth Circuit.
```

**A.259**

**Sentencing Hearing Minutes June 7, 2011**

```
1              I have looked at all of the cases that
2    the parties have cited and find the greatest
3    guidance to come in a more general form from Fell,
4    relying in part or following the precepts of Gregg,
5    that the heightened reliability that is sought at
6    the penalty phase is achieved by more, not less,
7    evidence on the aggravating and mitigating factors
8    for the jury to consider so long as it is relevant,
9    so long as it doesn't unfairly prejudice the
10   defendant and so that it doesn't confuse the jury.
11   Fell recognizes that the evidence at this stage is,
12   "more diffuse," than that which is relevant at the
13   guilt phase.
14              The factors I have looked at after
15   considering the arguments on both sides --
16              MS. DAYTON:  Your Honor, I'm sorry, may
17   I interrupt you for a moment, because yesterday you
18   didn't let me respond.  You didn't let me -- you
19   didn't give me an opportunity because the jury came
20   back in and you said that you would let me respond
21   and that I would have additional time to argue on
22   this.
23              THE COURT:  Why do I have all these
24   notes about what you were arguing?
25              MS. DAYTON:  Well, I had spoken, then
```

**A.260**

**Sentencing Hearing Minutes June 7, 2011**

```
 1   Mr. Sheehan spoke, and then you said you were going
 2   to give me an opportunity to respond.
 3              THE COURT:  All right.
 4              MS. DAYTON:  And I think some of the
 5   things that I wanted to say with respect to the
 6   unreliability of Johnson's statements is, one, he
 7   does not only minimize his role, but -- and he gives
 8   little bits and pieces, like first he claims he spit
 9   on Tina Johnson and then he says that he never went
10   past the front room.  But then he keeps
11   contradicting himself by saying he's bent over a
12   bed.  He also -- there is evidence by Johnson's own
13   statements, but also from his sister, that Johnson
14   spent time with the Aquarts after the murders.  And
15   the whole theory that was put forth during the guilt
16   phase is that Big Man, so to speak, was Womble, that
17   the other person who committed this crime was
18   Womble.  And you could see in Johnson's statements
19   that he's trying to put this off on Womble.
20              There is no testimony that Taylor was Big
21   Man.  He was Black and he was Yes Yes, and they keep
22   saying, and Johnson keeps saying Big Man and Big
23   Dude to try to insinuate that it was Womble.  But
24   the most interesting part is that Efrain Johnson
25   never identifies John Taylor.  He never -- he
```

**A.261**

**Sentencing Hearing Minutes June 7, 2011**

1   pretends not to know who he is when he looks at his

2   pictures.  He's shown two separate lineups and in

3   neither of those does he identify John Taylor.  And

4   so -- and the defense in fact argued to the jury

5   that John Taylor wasn't there, and that he got all

6   his statements from being at the Bridgeport

7   Correctional Center and hearing about them from

8   other people, allegedly including Womble.

9           They said the reason he didn't know about

10  the color of the gloves was because he wasn't there.

11  The reason he didn't know about which couch was in

12  front of the door was because he wasn't there.  And

13  so, you know, that's one thing about the

14  unreliability.

15          Number two, parsing the statements the

16  way they have, is not giving -- it's beyond

17  confusing and misleading to the jury.  You know,

18  they claim, the defense, that things such as moaning

19  and punching don't go -- that they only go to guilt,

20  when, in fact, those, as opposed to Johnson's other

21  statements, actually go to issues such as torture.

22  Or, for instance, throughout the 302s, Johnson makes

23  statements that definitely go to the issue of

24  procurement because he repeatedly states that he was

25  recruited by Aquart to engage in these crimes by the

**A.262**

## Sentencing Hearing Minutes June 7, 2011

5451

1   promise of payment, and in particular weed, he was

2   getting paid in weed.

3          But so, the government thinks that these

4   should not come in, period, because Johnson

5   minimizes his behavior, he minimizes his sister's

6   behavior, he lies about recognizing Taylor, he says

7   he didn't ever see bats, he didn't ever see gloves,

8   when clearly the jury accepted John Taylor's

9   testimony.  They came back with a verdict in fewer

10  than three hours, your Honor.  And to put these in

11  without putting Johnson on the stand or anyone else

12  is just to throw, again, mud, when, you know -- and

13  to parse them especially is beyond confusing and

14  misleading.

15         The government thinks they should come

16  in, period, but if they're going to come in at all,

17  then they should all come in in their entirety,

18  including the part where the government and the FBI

19  agents are telling him that he's lying.

20         And we should also be able to call a

21  witness who will testify that Johnson came in here

22  and he tried to plead guilty to three counts of

23  murder, said he was guilty of three counts of murder

24  and then lied about knowing that Aquart was a crack

25  dealer and lied about his own crack dealing.  And we

**A.263**

**Sentencing Hearing Minutes June 7, 2011**

1    can give your Honor all the other 302s that the

2    defense didn't give you showing like five or six

3    undercover buys made from Johnson where they bought

4    crack from him.  But also in the proffer statements,

5    with his attorney there, he said he sold crack for

6    Aquart on three or four occasions and then he came

7    in here and he lied and he told your Honor, I didn't

8    even know he sold crack.

9            So your Honor has seen firsthand that

10   Johnson can't tell the truth, that he minimizes his

11   own role in these offenses, that he minimizes his

12   behavior, period.  For the defense to argue we

13   didn't put him on as a trial strategy is blatantly

14   false.  He wasn't given a cooperation agreement.  He

15   wasn't going to be called as a witness, and that was

16   decided over a year ago.  It has nothing to do with

17   trial strategy, it has to do that the government

18   doesn't suborn perjury, it's that Johnson clearly

19   stated that Aquart was the leader, that he did this.

20   The government wasn't going to put him on to say

21   that because he couldn't tell the truth about

22   himself and his own role.

23           If the defense wants to submit a

24   mitigator to the jury saying that John Taylor and

25   Efrain Johnson are not going to be sentenced to

**A.264**

**Sentencing Hearing Minutes June 7, 2011**

```
 1   death for their role in this offense, the government
 2   stipulates, that's fine, we'll agree that's been
 3   proven.  But to put these in to prove that, these
 4   statements do not prove that.  That's a given.  The
 5   Attorney General is not seeking the death penalty on
 6   them and we agree.
 7            THE COURT:  Mr. Sheehan.
 8            MR. SHEEHAN:  I think -- I thought your
 9   Honor had reached a decision.  I'm waiting to hear
10   your Honor's decision.
11            THE COURT:  No, I want to hear your
12   response to what the government, in essence, is
13   saying; that Mr. Johnson's testimony is so
14   unreliable on truthfulness that it should not be
15   permitted.  Or if it is to be permitted it should
16   not be limited to just the statements you identified
17   to me yesterday as the statements which are the ones
18   you seek.  And I understand that you are seeking to
19   offer these on a mitigator, that is, that
20   co-defendants of different roles -- excuse me, will
21   not be sentenced to death for their role, which the
22   government now agrees to stipulate to, and the
23   aggravator of heinous, cruel and depraved, that is,
24   to cast doubt on Taylor 's credibility, including
25   the very damaging -- you want some statement
```

**A.265**

**Sentencing Hearing Minutes June 7, 2011**

```
 1   highlighted in the government opening at the penalty
 2   phase.
 3            Is there any other purpose for which you
 4   are offering this?
 5            MR. SHEEHAN:  No, your Honor.
 6            THE COURT:  And so would you please
 7   respond then to, A, the claim that Johnson's
 8   testimony is unreliable because he minimizes his
 9   role, contradicts himself, and then the government's
10   argument that if your portions come in, all of them
11   should come in.
12            MR. SHEEHAN:  Well, first of all, with
13   respect to minimizing role, I think the same
14   argument is appropriate with respect to Mr. Taylor.
15   Ultimately the jury has to make a determination on
16   that issue in the context of the mitigators.  I
17   think as far as contradicting himself, that is --
18   Mr. Taylor's testimony itself is a bundle of
19   contradictions.  What the government is, in essence,
20   saying, is because they -- whether we'd say
21   strenuously or vehemently or categorically, or
22   whatever adjective they choose to use, they do not
23   believe Mr. Johnson, and whether categorically or
24   strenuously or whatever, they do believe all of what
25   Mr. Taylor said.
```

**Sentencing Hearing Minutes June 7, 2011**

```
 1              I think obviously that's substituting
 2    their own personal opinion for that of the jury.
 3    The fact that Mr. Johnson was involved in and
 4    arrested in crack dealing well after Mr. Aquart was
 5    arrested in this case, that crack dealing had
 6    nothing to do with Mr. Aquart as they well know.  So
 7    I don't quite know how that fits into their argument
 8    here except in a general obfuscation sense.
 9              The fact that Mr. Johnson did not pick
10    out Mr. Taylor out of the photo ID, we're not
11    offering that as evidence.
12              THE COURT:  All right.  So that gets to
13    the next thing.  If you offer your statements, why
14    shouldn't the government be permitted to put in
15    Mr. Johnson's other statements that it says show
16    contradictions and -- contradictions.
17              MR. SHEEHAN:  I think if they put in
18    their statements that are limited to the areas that
19    we're talking about, and to the extent there are
20    contradictions in those statements that contradict
21    the issues that we are raising, which are narrowed,
22    basically to what happened in terms of entering into
23    the apartment and what happened within the
24    apartment, that would probably -- that would be
25    appropriate.
```

**A.267**

**Sentencing Hearing Minutes June 7, 2011**

```
 1              I think if there -- if their general
 2    sense is, and, for example, they seem to want to put
 3    in all the 302s about Mr. Johnson's crack dealing
 4    afterwards.  I don't think that has anything to do
 5    with anything.  I think that they're offering to put
 6    in Mr. Johnson's statement to the Court at the time
 7    of the sentencing that he was not involved in crack
 8    dealing.  I don't think that has anything to do with
 9    the subject matter that we're narrowly offering
10    these statements on.
11              THE COURT:  You are aware that he said
12    at his attempted proffer, because you were there,
13    that -- I don't mean proffer, allocution, that he
14    helped Mr. Aquart tape up, I think it was Tina
15    Johnson.  I mean, I just want you to remember these
16    things because if you are permitted, they're going
17    to be permitted.
18              MR. SHEEHAN:  Well --
19              THE COURT:  So the issues are entering
20    the apartment, dealing with the victims, who did
21    what.  Those are the areas that your statements go
22    to, right?
23              MR. SHEEHAN:  Yes, your Honor.
24              THE COURT:  Well, here is what I think.
25    The jury has no other evidence about the nature of
```

**A.268**

**Sentencing Hearing Minutes June 7, 2011**

1  the murders committed in the apartment other than

2  Mr. Taylor, and then, of course, the physical

3  evidence.  And so given that this goes to the very

4  central issue of whether Azibo Aquart's actions were

5  heinous, cruel and depraved, the issue of Taylor's

6  credibility, that he in large part did nothing other

7  than be a lookout, when Johnson's statement is that

8  he and Johnson were involved with taping the

9  victims, there has been comment on the evidence

10  supporting heinous, cruel and depraved as to how

11  tight the tape was, and as I previously mentioned,

12  Mr. Aquart's statement about "Come and get you

13  some," so I think these are pretty central issues on

14  a statutory aggravator and on the relative roles.

15          I don't think statements to the police

16  are inherently totally unreliable.  The

17  descriptions, and I went back and read Mr. Taylor's

18  testimony as well, are of an inherently chaotic and

19  fast moving scene of substantial emotional impact.

20  Mr. Johnson's statements certainly are inculpatory,

21  and more so than Mr. Taylor's, that he got Tina

22  Johnson to open the door, that he joined the bum's

23  rush into the apartment, that he helped to tape the

24  victims knowing criminal violence was going to go

25  on, and then was going on and did nothing.

**A.269**

**Sentencing Hearing Minutes June 7, 2011**

5458

1          And I don't think that his testimony is

2    at -- his statements are at odds with the physical

3    evidence since he describes Taylor as striking one

4    blow, which the government's expert testified would

5    not be enough to cause the splatter that was found

6    in the bedroom, and thus the absence of blood in the

7    other room where he seems to be locating the initial

8    masking, taping undertaking is not expressly

9    contradicted.  And DNA testimony about the duct tape

10    binding on Ms. Johnson couldn't exclude Taylor.

11          So, I think that following the reasoning

12    of Fell, that this -- the defendant should be

13    permitted to offer these statements.  But the

14    government certainly will be permitted to offer all

15    of the statements that bear on the subject matter of

16    the defendant's selections relating to entering the

17    apartment, dealing with the victims and who did what

18    in their various iterations.  In that way the

19    government has the same opportunity -- has the

20    opportunity to demonstrate what Johnson is saying is

21    in his statements du jour, when he had said other

22    contradictory things or statements that indicate

23    his, you know, either prior claim of lack of

24    knowledge or contrary statements, including his

25    inability to identify Taylor.

**A.270**

**Sentencing Hearing Minutes June 7, 2011**

5459

```
 1              I think that is the appropriate

 2    resolution to a difficult question, so we will

 3    proceed on that basis.

 4              MS. DAYTON:  Your Honor, just for

 5    clarification, since they're putting this in to go

 6    towards the heinous, cruel and, you know, towards an

 7    aggravator, the government intends to put in the

 8    testimony that he -- that Johnson heard moaning and

 9    punching coming from back in Williams's room; the

10    fact that the defendant -- Johnson said in this

11    court that it wasn't Taylor he was helping tape,

12    that it was the defendant he was helping tape,

13    because that all goes to relative roles, too.  And

14    we're going to put in pyramid issue because they're

15    going to argue that.  And that he was -- he said

16    repeatedly he got paid.  We're going to put in the

17    fact that he saw the drills because that also goes

18    to depraved nature of this crime.

19              THE COURT:  But the drills part is not

20    what he is being offered on here.

21              MS. DAYTON:  But why?  The government

22    is --

23              THE COURT:  You have that evidence

24    already in, that's why.

25              MS. DAYTON:  I understand.  But they're
```

**A.271**

5460

```
 1   putting something in, we should be able to go after

 2   the credibility, and the fact that --

 3              THE COURT:  You can on the same

 4   statements on the same subject matters that he is

 5   putting this in on.  It's not an opportunity to

 6   review the guilt phase evidence, and you can -- you

 7   certainly will be permitted to talk about the

 8   internal and express contradictions to the extent --

 9              MS. DAYTON:  Your Honor, any witness

10   who, quote-unquote, testifies, their credibility is

11   at issue.  And regardless of what -- for instance

12   when Mr. Taylor testified, regardless what the

13   government asked him, they asked him about every

14   single statement in every single 302 that was

15   written about him, and your Honor did not limit them

16   on that.  The DNA is another good example, they had

17   Ms. Roy up there, you know, for three days

18   questioning her credibility.

19              THE COURT:  Let's not rehash the

20   evidence.

21              MS. DAYTON:  But the issue is the

22   government is being limited on their attack on

23   Efrain Johnson's credibility.  That was exactly why

24   there is --

25              THE COURT:  No, you are dividing this
```

A.272

**Sentencing Hearing Minutes June 7, 2011**

```
 1   up.  You are conflating his credibility with your
 2   ability to use this as a springboard to reinforce
 3   your evidence on the cruel, heinous and depraved
 4   aggravator.  I will let you put in, I think it's
 5   appropriate, that he heard the moaning and so forth,
 6   because it suggests that Mr. Johnson's sequence of
 7   events is, at best, inaccurate.  But not the whole
 8   scene of -- that goes to the heinous, cruel and
 9   depraved aggravator.  You certainly will be
10   permitted to put in his sworn statement to the Court
11   that he helped Aquart -- Azibo Aquart tape the
12   victims as opposed to this.  You certainly have the
13   opportunity to demonstrate -- to -- yes, demonstrate
14   the lack of credibility and/or bias such that the
15   witness statements should not be given weight.  But
16   I don't think it's appropriate for the Court to be
17   making a decision about whether Johnson is truthful
18   and accurate when, in fact, it may have been that
19   what he said to the Court at his attempted
20   allocution was not truthful and accurate.
21            So, that's how we're going to deal with
22   it.  It's difficult and I'm trying to be fair, but
23   not exclude defendant's evidence that is relevant on
24   the issue of cruel, depraved and heinous.  The other
25   of the stipulation we can just put in the charge.
```

**Sentencing Hearing Minutes June 7, 2011**

5462

 1          MS. DAYTON:  Well, we won't stipulate
 2     then.  That's the thing, if they're going to get to
 3     put on relative culpability, the government is not
 4     going to stipulate.  Because we're saying we would
 5     stipulate to avoid creating this whole misleading,
 6     confusing mess.  But we're not going to stipulate.
 7          THE COURT:  All right.  Well, that makes
 8     then two very central issues of the relative roles
 9     and the heinous, cruel and depraved.  Okay, then I
10     think we are ready to begin.
11          MR. SMITH:  Your Honor, Agent Munger
12     left the courtroom.  He was under subpoena.
13          THE COURT:  Where is he?
14          MR. SMITH:  It's unknown.
15          MS. RODRIGUEZ-COSS:  They gave us an
16     order of witnesses and we went by their order of
17     witnesses.
18          THE COURT:  So you have Ms. Bennett or
19     Ife Felix available.
20          MR. SHEEHAN:  But that's simply, your
21     Honor, because I told them that -- I said to them
22     this morning that the first issue I was asking the
23     Court to deal with was Mr. Johnson.  And I noted
24     that --
25          MS. DAYTON:  He's coming back.  I don't

**A.274**

**Sentencing Hearing Minutes June 7, 2011**

5497

```
 1    questions for Ms. Bennett, your Honor.
 2                 THE COURT:  All right, thank you.
 3    Ms. Bennett.  You may step down.  You are excused.
 4                 MR. SMITH:  Your Honor, the defendant
 5    calls Special Agent Christopher Munger.
 6          C H R I S T O P H E R   M U N G E R
 7    Having first affirmed, was examined and testified as
 8    follows:
 9                 THE WITNESS:  My name is Special Agent
10    Chris Munger, M-u-n-g-e-r, Bridgeport, Connecticut.
11                 THE COURT:  You may proceed.
12    DIRECT EXAMINATION
13    BY MR. SMITH:
14        Q.    Good morning, Agent Munger.
15        A.    Good morning.
16        Q.    Just to refresh the jury's recollection,
17    you were one of the FBI agents assigned to
18    investigate these murders.
19        A.    Yes.
20        Q.    And in the course of that investigation,
21    you conducted a series of interviews with Efrain
22    Johnson.
23        A.    Yes.
24        Q.    Efrain Johnson was determined to be the
25    third -- or the fourth person, or the third person,
```

**A.275**

**Sentencing Hearing Minutes June 7, 2011**

1   involved in the homicides.

2       A.   Yes.

3       Q.   Okay.  I'm going to hand you some of your

4   reports now, so if you need to reference those.

5           In the course of your investigation, you

6   interviewed Efrain Johnson on March 6, 2007; is that

7   correct?

8       A.   Yes.

9       Q.   That was almost immediately after his

10  arrest.

11      A.   It was the night of his arrest, yes.

12      Q.   I'm turning your attention -- you prepared

13  a 302 in regards to that; is that correct?

14      A.   Yes, I did.

15      Q.   Now, a 302 is the FBI report that

16  memorializes that interview.

17      A.   Yes.

18      Q.   And I'm turning your attention to the

19  bottom of page 2 of that March 6th report.

20          In the course of that interview, Johnson

21  discussed with you what his role was and the role of

22  others.

23      A.   Yes.

24      Q.   And he told you in the course of that

25  interview that he had knocked on the door pretending

**Sentencing Hearing Minutes June 7, 2011**

5499

```
 1   to be a crack cocaine customer.

 2       A.   Yes.

 3       Q.   And when the unknown female opened the

 4   door, they all bum rushed the door.  He told you

 5   that as well.

 6       A.   Yes.

 7       Q.   And he told you that someone he referred to

 8   as Big Dude grabbed the woman and rushed into the

 9   living room.

10       A.   I believe he said -- I would have to read

11   it.

12              MS. DAYTON:  Objection, leading.

13              THE COURT:  Sustained.

14              MR. SMITH:  Your Honor, this is, and as

15   before, a witness associated with the adverse party.

16              MS. DAYTON:  Your Honor, they called

17   him.

18              THE COURT:  I'm going to sustain the

19   objection.

20       Q.   All right, did he tell you --

21              THE COURT:  We would like the testimony

22   to come from Mr. Munger.

23       Q.   Did he tell you when the unknown female

24   opened the door they all bum rushed the door?

25       A.   Yes.
```

**A.277**

**Sentencing Hearing Minutes June 7, 2011**

5500

```
 1      Q.   And did he tell you that Big Dude
 2   grabbed --
 3              MS. DAYTON:  Objection.
 4      Q.   And rushed into the --
 5              MS. DAYTON:  Leading.
 6              THE COURT:  Why don't you ask him what
 7   he told him.
 8      Q.   After he told you that they bum rushed the
 9   door, what did he tell you in that interview?
10              MR. SHEEHAN:  Could we approach, your
11   Honor.
12              (Sidebar conference).
13              MR. SHEEHAN:  The reason why I think
14   it's important that we be allowed to lead this
15   witness is because we have indicated the narrow area
16   that we intend to question him on.  If he goes other
17   places, then that's going to just open up other
18   avenues, and that's why I think we should be allowed
19   to lead.
20              MS. DAYTON:  They should have prepared
21   the witness.  They called him, they -- do you know
22   what, you asked me --
23              THE COURT:  Stop it.
24              MS. DAYTON:  Not to attack you.
25              THE COURT:  Just stop it.
```

**A.278**

**Sentencing Hearing Minutes June 7, 2011**

5501

```
 1            MS. DAYTON:  We had a conversation off
 2   the record.  He asked me to not attack him at
 3   sidebar, and he repeatedly does it.
 4            THE COURT:  I just asked you to stop
 5   that.  I don't want any more of this.  Everybody is
 6   very tense and I want you to keep it under control,
 7   all of you.
 8            You can ask him to refer to his 302 and
 9   what did he tell you next.  That is going to keep
10   him on the beam.
11            MR. SHEEHAN:  Okay.
12            MR. SMITH:  That's fine.
13            (Sidebar concluded)
14       Q.   I apologize for the interruption, Agent
15   Munger.
16            I had asked you about Mr. Johnson telling
17   you about the fact that they bum rushed the door.
18   What did he tell you after that?
19       A.   Directly after that?
20       Q.   Yes.
21       A.   He said they bum rushed the door, that --
22            THE COURT:  You can refer to your report
23   if you would like to.
24            THE WITNESS:  Thank you.
25       A.   He said that as they pushed in he -- the
```

Sentencing Hearing Minutes June 7, 2011

5502

1    Big Dude and he went into the living room pushing

2    the woman in, and that the two brothers ran down the

3    hallway.

4        Q.    All right.

5        A.    And pushed or followed an unknown male into

6    a back bedroom.

7        Q.    And what did he tell you next?

8        A.    He said that Big Dude handed him rubber

9    gloves and instructed him to put them on.

10       Q.    When you say "him," you are referring to

11   Mr. Johnson?

12       A.    Yes.  Sorry.

13       Q.    And what did he tell you next?

14       A.    Mr. Johnson began taping the female

15   victim's hands.  And do you want me to keep going?

16       Q.    Yes, please.

17       A.    During that time she was asking what was

18   going on.  He said to calm down.  The Big Dude

19   punched her.  Big Dude ripped the tape out of

20   Johnson's hands and finished the taping himself, and

21   that's when Johnson said he backed up and became

22   more of an observer.

23       Q.    What did he say next?

24       A.    Well, he said he put his back up to the

25   wall and watched.  Then he was trying to see down --

**A.280**

5503

```
 1   he was trying to see down the hallway to see what
 2   was going on there.  I'm trying not to miss
 3   something here.  He tried to see in the bedroom
 4   where Azibo and Azikiwe took the unknown male, but
 5   all he could hear were sounds of punching and
 6   moaning.  He saw the Big Dude pull an object out of
 7   the side of his pants and strike the unknown female
 8   on the right side of the head.  And that's when he
 9   said he ran out of the apartment.
10       Q.   Johnson said he ran out of the apartment?
11       A.   He ran out.
12       Q.   You had occasion to interview Mr. Johnson
13   again on March 7, 2007; is that right?
14       A.   Correct.
15       Q.   And in the course of that interview -- I'm
16   turning your attention to page 2 so you can
17   reference that if needed.  And the second to last
18   paragraph, about halfway down, I'm referencing that,
19   in regards to what Mr. Johnson told you that his job
20   was.
21           What did he tell you his job was that night
22   at the apartment?
23       A.   He said that his job was to knock on the
24   apartment door while the others waited around the
25   corner, and then when the unknown female answered
```

5504

1  the door they would bum rush her, charging in the

2  apartment.

3      Q.   Okay.  And what did he tell you next?

4      A.   That Big Man and he pushed the female into

5  the living room while Azibo and Azikiwe pushed an

6  unknown male into a bedroom.  Big Man handed him

7  rubber gloves.

8      Q.   Meaning to Johnson?

9      A.   I'm sorry.  Big Man handed Mr. Johnson

10 gloves, told him to put them on, and instructed

11 Johnson to tape the female up.  This was going on in

12 the living room, I think.

13     Q.   Then what did he tell you?

14     A.   She started screaming.  Big Man punched her

15 in the face.  She stumbled to the ground.

16     Q.   What did he tell you next?

17     A.   Big Man told Johnson to tape her feet

18 together.  The Big Man grew impatient with the speed

19 in which Johnson was taping her feet and ripped the

20 duct tape out of his hands, and that's when

21 Mr. Johnson backed up against the wall and watched

22 what was going on.

23     Q.   And what did he tell you next?

24     A.   He said that he's in the living room.  He

25 says the bedroom door was partially open and he

**A.282**

5505

1    tried to peek down the hallway and all he heard was

2    thumping and moaning from the room that Azibo and

3    Azikiwe went in.

4         Q.    And what did he tell you next?

5         A.    Big Man pulled a long metal pipe out of his

6    pants and smacked the unknown female on the right

7    side of the head while she was leaning over the bed.

8         Q.    And what did he tell you next?

9         A.    At that point we reminded him he had told

10   us that they were in the living room, not in the

11   bedroom.  And so he then said there was a sofa bed.

12        Q.    And then did he describe the pipe?

13        A.    He described the pipe as approximately

14   two-inches thick, ten-inches long.  This is the one

15   that supposedly came out of the pants.

16        Q.    And then what did Johnson tell you?

17        A.    He ran out of the apartment, and when -- he

18   said he ran out when Big Man struck the unknown

19   female.

20        Q.    Turning your attention to an interview you

21   did with Mr. Johnson on August 11, 2008.

22        A.    A particular page?

23        Q.    Yes, page 4, please.  Starting in that

24   fourth paragraph down, about middle part of the

25   paragraph, wherein Mr. Johnson is describing which

1    door that Azibo told him it was.

2          Would you describe what Mr. Johnson told you

3    in regards to that?

4       A.   The fourth paragraph?  If I'm understanding

5    you correctly, they came up to the first floor,

6    Azibo told Johnson which door it was.  And then

7    Johnson and the unknown male walked up to the door

8    where they were all gathered -- or when they were

9    all gathered, while standing outside, that's when

10   the Big Man now gets the gloves outside.  So,

11   unknown male hands him cream-colored latex gloves

12   outside the apartment now.

13      Q.   This is what Mr. Johnson is telling you,

14   that the Big Dude is handing him, Johnson, the

15   cream-colored gloves?

16      A.   No, I'm sorry, unknown male, who is

17   identified in this as the Big Dude.  Sorry.

18      Q.   And what did he tell you next?

19      A.   He knocked on the door.  A female voice

20   answered, "Who is it?"  He said, "Yo, what's up?"

21   She cracked the door open.  At that point -- in this

22   report it's referred to as unknown male, but it is

23   the Big Dude -- pushed Johnson through the door.

24   And they all bum rushed in.  Johnson and the unknown

25   male pushed the woman into the living room, and the

**Sentencing Hearing Minutes June 7, 2011**

```
1    unknown male told her to shut up, get on the ground

2    and Johnson heard a metallic thud sound.

3        Q.    When?

4        A.    When it hit the woman.

5        Q.    When who hit the woman?

6        A.    When the unknown male, the Big Dude.

7        Q.    Okay.  And what did Mr. Johnson tell you

8    next?

9        A.    That the unknown male, slash, Big Dude,

10   handed the duct tape to Johnson and told him to duct

11   tape her hands and her legs.

12       Q.    And what did he tell you next?

13       A.    And once again, he didn't move fast enough,

14   so the other guy, the Big Dude, ripped the tape from

15   his hand and took over the taping of the woman.

16       Q.    And then what did he tell you?

17       A.    And he -- and in this one he says the

18   unknown male told Johnson to leave.

19       Q.    And finally there was an interview on

20   October 2nd, 2008, correct?

21       A.    Yes.  I'm sorry.

22       Q.    That's all right.

23             Turning your attention to page 3, the fifth

24   paragraph down.  What did Mr. Johnson tell you in

25   that interview?
```

Sentencing Hearing Minutes June 7, 2011

1      A.    I'm sorry, say that again.

2      Q.    This is the fifth paragraph down.

3      A.    Second from the bottom?

4      Q.    Page 3, yeah, second from the bottom.

5      A.    What was your question now?

6      Q.    What did he tell you in regards to that

7  part of the interview?

8      A.    He said they stacked in the stairwell.  He

9  doesn't remember anyone walking by with a black bag.

10  He remembers the unknown male, slash, Big Dude,

11  handed Johnson a pair of rubber gloves, Johnson went

12  up to the door and knocked.  Once the door was

13  slightly opened, Johnson pushed into the

14  apartment -- or Johnson was pushed into the

15  apartment from behind, and the unknown male moved in

16  the center of the living room with the female.

17  Female was shoved to the ground.  Azibo and Azikiwe

18  ran down the hallway and pushed a black male into

19  the room on the right.

20      Q.    And then what did he tell you?

21      A.    The unknown male held Tina down.  I'm

22  sorry, the female.  At this point, referring to Tina

23  Johnson, and told Efrain Johnson to duct tape her

24  hands.  He says, Johnson says, he was doing a lousy

25  job and moving too slowly, the unknown male grew

**Sentencing Hearing Minutes June 7, 2011**

1   impatient, shoved Johnson against the wall, took

2   over.  Johnson stated that the female was leaning

3   over a bed while she was being taped.

4        Q.   What did he tell you then?

5        A.   He stood there for a few minutes, looked

6   down the hall, heard a lot of tussling noise from

7   down the hall.  He then departed the apartment and

8   going down the stairwell into the underground

9   parking garage.

10       Q.   To your understanding when he was referring

11  to Big Dude in these interviews, he was referring to

12  John Taylor?

13            MS. DAYTON:  Objection.

14       A.   At the time we didn't --

15            THE COURT:  Basis?

16            Well, I'm going to let him answer the

17  question.  Did you know --

18       Q.   What was your understanding about who

19  Mr. Johnson was referring to when he said Big Dude?

20       A.   There was a series of interviews over a

21  year, I think a year, 18 months, at different

22  points.  We didn't know if he was making the

23  character up to lessen his role, and then at this

24  point I did not -- he was not identified.  We did

25  not identify John Taylor, so it was just a large

**Sentencing Hearing Minutes June 7, 2011**

```
 1   male that we were still trying to identify at that
 2   point.
 3               MR. SMITH:  I have nothing further, your
 4   Honor.
 5               THE COURT:  All right, shall we take a
 6   brief recess?
 7               MS. DAYTON:  Sure.
 8               THE COURT:  Take a 15-minute recess.
 9               (Jury exited the courtroom)
10               THE COURT:  All right, Mr. Munger, we'll
11   be back in 15 minutes.  Please don't discuss your
12   testimony.
13               (Recess).
14               THE COURT:  All right, Mr. Munger, why
15   don't you come back to the stand and we'll bring
16   back the jury.
17               MS. DAYTON:  I'm sorry I didn't stop at
18   sidebar when you told me to.  I am apologizing.
19               THE COURT:  I don't want any more
20   sniping at one lawyer to another.  I am going to
21   stop it in its tracks and whoever is doing it is
22   going to be the one who is the target of that.  I
23   understand that emotions are running high, but it is
24   not only unseemly, it's unprofessional to snipe at
25   each other.
```

**A.288**

**Sentencing Hearing Minutes June 7, 2011**

```
 1                    Please bring the jury in.
 2                    (Jury entered the courtroom.)
 3                    THE COURT:  Please be seated, ladies and
 4    gentlemen.  Cross-examination of Agent Munger.
 5                    MS. DAYTON:  Thank you, your Honor.
 6    CROSS-EXAMINATION
 7    BY MS. DAYTON:
 8        Q.   Good morning, Agent Munger.
 9        A.   Good morning.
10        Q.   Can you please explain to the jury what a
11    proffer is.
12        A.   A proffer is when somebody comes in, a
13    subject, comes in with his attorney, sits down with
14    assistant U.S. attorneys and the agents or the task
15    force officers.  They enter into an agreement and
16    they basically tell their side of the story.
17    They're supposed to tell everything, anything and
18    everything, and tell the truth.
19        Q.   And usually the proffers, that's another
20    word for a meeting, right?
21                    MR. SMITH:  I'm going to object --
22        A.   Yes.
23                    MR. SMITH:  -- as this being outside the
24    scope.
25                    THE COURT:  The statements on which
```

**Sentencing Hearing Minutes June 7, 2011**

1    Mr. Munger was questioned were proffer sessions.

2                   THE WITNESS:  Yes.

3                   THE COURT:  Overruled.

4         Q.    And proffer sessions are designed to work

5    towards a cooperation agreement, correct?

6         A.    Yes.

7         Q.    And Efrain Johnson never got a cooperation

8    agreement, did he?

9         A.    No.

10        Q.    And that's because it was determined he was

11   lying.

12                  MR. SMITH:  Objection.

13                  THE COURT:  Sustained.

14        Q.    So, you first met with him on March 6th of

15   2007.

16        A.    Yes.

17        Q.    And at that time Johnson said he hadn't

18   been to Charles Street for eight or nine years,

19   correct?

20        A.    Yes.

21        Q.    And then you showed him a DNA lab report

22   showing his DNA was found at the scene.

23        A.    Yes.

24        Q.    And then --

25                  MR. SMITH:  Objection.  This is all

**A.290**

**Sentencing Hearing Minutes June 7, 2011**

```
 1    outside the scope.
 2               THE COURT:  No, it's not, because his
 3    later statements -- how far back does eight or nine
 4    years ago.  No, it goes back to the time -- I'm
 5    going to permit that question.
 6        Q.   And then after -- you showed him a DNA lab
 7    report, correct?
 8        A.   Yes, I did.
 9        Q.   And then he changed his story and said that
10    Dreddy told him to knock on the door to see if the
11    occupants would sell him drugs, right?
12        A.   Yes.
13        Q.   And he claimed that a woman answered the
14    door.
15        A.   Yes.
16        Q.   And he said that he spit in this woman's
17    face, right?
18        A.   Yes.
19        Q.   And then they left, correct?  That's what
20    he said to you?
21        A.   Yes.
22        Q.   Okay.  And then, he was confronted, Johnson
23    was confronted with the fact that his DNA was
24    actually on a piece of latex glove stuck in the duct
25    tape, correct?
```

**Sentencing Hearing Minutes June 7, 2011**

1      A.    Yes.

2      Q.    And he asked if he could start over?

3      A.    Yes.

4      Q.    And after that he said the defendant called

5  him on the day of the murders, right?

6      A.    Yes.

7           MR. SMITH:  Objecting as being outside

8  the scope.

9           THE COURT:  Sustained.

10     Q.    And that he, being Johnson, the defendant,

11  Azikiwe Aquart, and someone he kept referring to as

12  a Big Dude went over to Charles Street in the middle

13  of the night on the day of the murders, correct?

14     A.    Yes.

15     Q.    And he kept calling Taylor -- well, he

16  never called him Taylor, did he?

17     A.    No, he never did.

18     Q.    Or John?

19     A.    Nope.

20     Q.    Or Fitzgerald?

21     A.    No.

22     Q.    Or Yes Yes?

23     A.    No.

24     Q.    Or Black?

25     A.    No.

Sentencing Hearing Minutes June 7, 2011

5515

```
 1        Q.   He just kept calling him Big Dude, right?
 2        A.   Big Dude.
 3        Q.   And he said they went to Charles Street,
 4   and Johnson said he knocked on the door, right?
 5        A.   Yes.
 6        Q.   And he said again that Tina answered it,
 7   correct?
 8        A.   He said a female, but yes.
 9        Q.   A female.  And he did not admit that the
10   door was kicked in, did he?
11        A.   He said to the contrary, she opened the
12   door and they pushed through once there was a, you
13   know, a crack in the --
14        Q.   Once it was opened.
15        A.   Yes.
16        Q.   Okay.  And Johnson didn't admit that the
17   defendant had a gun, did he?
18        A.   No, he did not.
19        Q.   And he said that all four rushed into the
20   living, correct?
21        A.   He said he and the Big Dude went into the
22   living room, pushed the woman back in the living
23   room, and Azibo and Azikiwe went down the hallway
24   and pushed a man into the back right bedroom.
25        Q.   Which would be Basil Williams, right?
```

A.293

**Sentencing Hearing Minutes June 7, 2011**

5516

```
 1        A.    Yes.

 2        Q.    Now, at first Johnson claimed that it was

 3   the Big Dude who hit Tina, right?

 4        A.    Yes.

 5        Q.    And he later, on November 20, 2008,

 6   admitted that he, quote-unquote, touched the victim

 7   first, right?

 8        A.    The female victim.  Which date?

 9        Q.    November 20th of 2008.  Drawing your

10   attention to the fourth paragraph down.

11        A.    I don't have that 302.

12        Q.    I'm sorry.  You just have the one the

13   defense gave you?

14        A.    Yes.

15        Q.    Okay.

16              THE COURT:  So November 20, 2008, what

17   did he say about touching the victim.

18              THE WITNESS:  Johnson said he touched

19   the victim Tina Johnson first because he was the

20   first one in the door.

21        Q.    And Johnson claimed that he tripped over

22   Tina, correct?

23        A.    Yes.

24        Q.    And that he knocked her down?

25        A.    He push her down and -- yes.
```

**A.294**

**Sentencing Hearing Minutes June 7, 2011**

1     Q.   So, he pushed her down, not the Big Dude.

2     A.   Yes.

3     Q.   Okay.  And on this date he was shown a

4  photographic lineup, wasn't he?

5     A.   Yes.

6          MS. DAYTON:  This has been shown to the

7  defense and I understand they have no objection.

8          Is that correct.

9          MR. SMITH:  No objection.

10         MS. DAYTON:  We'd ask to admit

11  Government's Exhibit 17 for the penalty phase, your

12  Honor.

13         THE COURT:  All right.

14     Q.   And though this is a bit dark, do you see

15  John Taylor in that lineup?

16     A.   Yes, I do.

17     Q.   What number is he?

18     A.   He's No. 6.

19     Q.   So right here?

20     A.   Yes.

21     Q.   And when you showed this to Johnson, did he

22  identify Taylor?

23     A.   No, he did not.

24     Q.   Did he say he recognized anyone in those

25  photos?

**A.295**

**Sentencing Hearing Minutes June 7, 2011**

```
 1        A.    He didn't recognize anyone.

 2        Q.    Okay.  And did you again later meet with

 3   Johnson on May 4th, 2009, to show him a different

 4   photographic lineup?

 5        A.    Yes, and I don't have that here.

 6        Q.    Okay.  Is that the right date?

 7        A.    Yes.

 8             MS. DAYTON:  Your Honor, the government

 9   seeks to admit Government Exhibit 18 for the penalty

10   phase.  It's my understanding there is no objection.

11             MR. SMITH:  No objection.

12             THE COURT:  All right.

13        Q.    And did you show him this photographic

14   lineup?

15        A.    Yes, I did.

16        Q.    Is John Taylor in there?

17        A.    Yes.

18        Q.    What No. -- well, where is he?

19        A.    He's in -- it would be No. 7.

20        Q.    Right here?

21        A.    Yes.  That's him.

22        Q.    And did Johnson admit to you that he

23   recognized Taylor?

24        A.    He did not recognize any individuals

25   contained in the array -- the photo array.
```

**Sentencing Hearing Minutes June 7, 2011**

1      Q.   Despite the fact that he admitted he had

2   gone and committed a murder with this person.

3      A.   Yes.

4      Q.   Now, you testified on direct that Johnson

5   told you that Taylor gave him tape to tape Tina up;

6   is that correct?

7      A.   Yes.

8      Q.   And he claimed when he wasn't moving fast

9   enough that the Big Dude, who he couldn't identify,

10  ripped the tape out of his hands and finished taping

11  Tina's hands and feet.

12     A.   Yes.

13     Q.   And said this all happened in the living

14  room, correct?

15     A.   Yes.

16     Q.   Though on the various days he said it

17  happened on the ground and then on a bed and then on

18  a sofa bed.

19          MR. SMITH:  I'm going to object to the

20  compound form of the question.

21          THE COURT:  Sustained.

22     Q.   First he said --

23          THE COURT:  Just ask him what he told

24  him and on what date.

25     Q.   So, on 3/6/07 he told you that it happened

**A.297**

**Sentencing Hearing Minutes June 7, 2011**

1    on the ground, correct?

2        A.   I believe so.  Just give me one second.

3             Yes.

4        Q.   And the very next day, 3/7/07, you

5    interviewed him again, right?

6        A.   Yes.

7        Q.   And this time he said that Tina was

8    attacked on the bed, correct?

9        A.   He made the comment that the Big Dude hit

10   her while she was leaning over the bed.

11       Q.   And you reminded him that he had previously

12   said it was on the ground.

13            MR. SMITH:  I'm going to object.

14            THE COURT:  Basis?

15            MR. SMITH:  What he -- we're talking

16   about what Mr. Johnson told him.

17            THE COURT:  That was part of the direct

18   examination.  I'm going to permit the question.

19       Q.   Is that right?

20       A.   Can you ask it again?

21       Q.   And you reminded him that he had previously

22   said it was in the living room on the ground.

23       A.   Yes, I think I specifically said there was

24   no bed in the living room.

25       Q.   And what did Mr. Johnson tell you then?

**Sentencing Hearing Minutes June 7, 2011**

1      A.   He said it was a sofa bed.

2      Q.   There was no sofa bed in that apartment,

3   correct?

4      A.   No.

5      Q.   And so -- he also said that Tina was -- or

6   that the woman was taped, hands and feet, in that

7   front living room, correct?

8           THE COURT:  What date are you referring

9   to?

10          MS. DAYTON:  On 3/6 and 3/7/07.  Well,

11  repeatedly, your Honor.

12     A.   Yes.

13     Q.   And you're aware Tina died in the back

14  southwest bedroom, correct?

15          MR. SMITH:  Objection.  It's outside the

16  scope what he has knowledge of.  It's what

17  Mr. Johnson told him about what happened.

18          THE COURT:  I think it could be

19  rephrased.

20     Q.   Did you remind Mr. Johnson that Tina died

21  in the back bedroom?

22     A.   Yes.

23     Q.   And Tina weighed over 250 pounds, correct?

24     A.   I know she was a large woman.

25          MR. SMITH:  Object as to the relevance

Sentencing Hearing Minutes June 7, 2011

5522

```
 1    of this.
 2                THE COURT:  Overruled.
 3        Q.   So, she would have had to have been dragged
 4    back there fully taped.
 5                MR. SMITH:  Objection, speculation.
 6                THE COURT:  Sustained.
 7        Q.   And Johnson told you on 3/6 and 3/7/07 that
 8    he could hear the sounds of punching and moaning
 9    coming from the room where the defendant was with
10    Mr. Williams, correct?
11        A.   Yes.
12        Q.   And he said he also heard thumping coming
13    from that room although he claimed he couldn't see
14    into the room.
15        A.   Yes.
16        Q.   And he said that -- Johnson told you,
17    however, that he knew that the defendant and Azikiwe
18    were in that room.
19        A.   Yes.
20        Q.   Now, on August 11, '08, do you have that?
21        A.   Yes, I do.
22        Q.   Turning your attention to page 5, paragraph
23    three, Johnson claimed he was only in the apartment
24    for eight minutes; is that correct?
25        A.   Yes.
```

**A.300**

**Sentencing Hearing Minutes June 7, 2011**

1     Q.   Although previously on the 7th he admitted

2  that he was in the -- excuse me, March 7th of 2007,

3  he admitted he was in the apartment for 25 minutes;

4  is that correct?

5     A.   Give me one second.

6     Q.   Okay.  Drawing your attention to page 3.

7     A.   That helps.  Thank you.

8     Q.   Second full paragraph, last line.

9     A.   Yes.  He said he was in the apartment for

10  approximately 25 minutes.

11     Q.   And then later in October 2nd of 2008,

12  drawing your attention to page 4, first full

13  paragraph, Johnson admitted that the whole event

14  took 30 to 45 minutes; is that correct?

15     A.   Which paragraph?

16     Q.   The first full paragraph.

17     A.   Yes.  He said the whole event took 30 to

18  45 minutes.

19     Q.   And that he waited in the car for about

20  15 minutes of that.

21     A.   Fifteen to 20 minutes, yes.

22     Q.   Johnson also told you that -- he claimed

23  that Big Dude got rid of the clothes after the

24  murders, correct?

25             MR. SMITH:  Objection, outside the

**A.301**

**Sentencing Hearing Minutes June 7, 2011**

5524

```
 1    scope.
 2              THE COURT:  Sustained.
 3         Q.   Were you here in this court when Johnson
 4    came in here to plead guilty?
 5         A.   Yes, I was.
 6         Q.   And during that plea, he had to tell the
 7    court under oath what he did wrong, correct?
 8         A.   Yes.
 9         Q.   And isn't it true that during that
10    statement -- excuse me, during that sworn statement,
11    that Johnson said "I helped Dreddy gain access to
12    someone's house and I taped the person up and that's
13    it"?  Did you hear him say that?
14         A.   I heard him say that.
15         Q.   And then he -- and then the Court asked,
16    "And you helped someone.  Who is the someone?"  And
17    Johnson replied "Azibo."  Did you hear that?
18         A.   Yes.
19         Q.   And then the Court asked, "And you helped
20    him do what?"  And Johnson responded, "Tape Tina
21    Johnson up and I drove him from the scene."
22              Did you hear that?
23         A.   Yes.
24         Q.   So, he never said a word about Taylor
25    having anything to do with the taping, did he?
```

**A.302**

**Sentencing Hearing Minutes June 7, 2011**

5525

```
 1       A.    That is correct.
 2       Q.    Now, prior to him coming in -- and that was
 3  just an attempt at a straight plea, correct, not a
 4  cooperation agreement?
 5       A.    That is correct.
 6             MR. SMITH:  Objection.  Object as to the
 7  relevance of that.  Ask that it be stricken.
 8             MR. SHEEHAN:  May we approach on that?
 9             THE COURT:  I'm going to permit it.
10             MR. SHEEHAN:  Can we approach on that,
11  your Honor?
12             THE COURT:  Yes.
13             (Sidebar conference)
14             MR. SHEEHAN:  Your Honor, he was seeking
15  to get credit.  The distinction between a straight
16  plea and a cooperation agreement makes no sense in
17  the context for this jury's understanding.  That's
18  the problem with the question.
19             THE COURT:  What's the purpose of the
20  question?
21             MS. DAYTON:  To show that -- well, they
22  asked about his impressions before of what Johnson
23  was saying to them.
24             MR. SMITH:  Not in a direct sense, your
25  Honor.  I asked what his understanding of who Big
```

**A.303**

**Sentencing Hearing Minutes June 7, 2011**

5526

1    Dude was.  It was confined to that very small area.

2         MS. DAYTON:  Then I'll go back into the

3    February 2010 proffer where he was confronted, told

4    that he was contradicted, and he denied all of this.

5    I'll do that instead.

6         MR. SMITH:  Your Honor, that's -- what

7    someone else said, from the point of view of this

8    witness, this may well be the truth.  The government

9    doesn't get to decide that.  And the other problem

10   with asking about the plea, your Honor, what type of

11   plea, is that it suggests the government has the

12   authority to offer plea deals and that they didn't

13   offer such a plea deal to Mr. Johnson, and it's a

14   form of vouching.

15        THE COURT:  It seems to me what's

16   relevant for the jury's purposes is he came in to

17   plead guilty, to tell truthfully what he did.  And

18   that's been in and we should continue.  I'm going to

19   strike the business about the cooperation agreement

20   which is just between the defendant and the

21   government.  The Court doesn't play a role in the

22   cooperation agreement other than to make sure he

23   knows what it says.

24        MS. DAYTON:  If I may just add one

25   thing, your Honor.  The reason I asked it is because

**A.304**

**Sentencing Hearing Minutes June 7, 2011**

1  during the guilt phase of the trial and during

2  argument, the defense repeatedly referred to the

3  fact that only the government has the right to

4  decide who is telling the truth and who is not, and

5  that as long as we say something that benefits --

6  someone said something that benefited us, we'd put

7  them on the stand.

8          THE COURT:  But you've already

9  established he never had a cooperation agreement.

10         MS. DAYTON:  Okay.  I'll move on, but I

11 am going to ask about that.

12         THE COURT:  Let me look at this.

13         MR. SMITH:  Your Honor, that is

14 absolutely outside the scope.

15         THE COURT:  So this is just with respect

16 to the first attempt of breaking in and he denied

17 taking part in that attempt.

18         MS. DAYTON:  And the bats and the ski

19 masks.

20         THE COURT:  But that hasn't been --

21         MS. DAYTON:  Your Honor, but the bats go

22 directly to the heinous issue and he did bring up

23 the alleged pipe.

24         THE COURT:  Right.

25         MS. DAYTON:  And so this goes to that

**A.305**

**Sentencing Hearing Minutes June 7, 2011**

5528

1    issue.  He claims he never saw any other weapons,

2    and this goes directly to the issue of the weapons

3    that were used.

4              THE COURT:  No, he doesn't say that.  He

5    says he denies wearing a ski mask or seeing any

6    baseball bats.

7              MS. DAYTON:  Right.

8              MR. SMITH:  That's not inconsistent.  He

9    didn't see the murders by his own accounting.

10             THE COURT:  Well --

11             MS. DAYTON:  Your Honor, you even said

12   yesterday that --

13             THE COURT:  But what he's talking about

14   here is not any other weapon.  He didn't asked about

15   any other weapon.  He just denied seeing baseball

16   bats.

17             MS. DAYTON:  He was repeatedly

18   throughout the course of the proffers asked about

19   weapons, and they were allowed to bring in the pipe.

20   And if that goes to the heinousness, well, so does

21   the baseball bats.  They opened the door to the

22   weapons.

23             THE COURT:  But how does this contradict

24   the earlier statements that he gave about what

25   Taylor had --

**A.306**

1          MS. DAYTON:  Your Honor, it goes to his

2   -- number one, it goes to his credibility.  Number

3   two, it was established that you could see

4   everything in that apartment.  It was like

5   500 square feet; no matter where you were standing

6   you could see into the rooms.  There is no way that

7   he didn't see baseball bats.  And there is no way

8   that these victims were all killed with a ten-inch

9   pipe.  Your Honor acknowledged as much this morning

10  when you said that Martin testified that one small

11  hit wouldn't have caused this.  They raised the

12  issue of the heinous, cruel and depraved manner.  I

13  have a right -- and relative roles.  And so this was

14  the whole reason I said none of this should come in,

15  period, because it's like -- it gets confusing.  But

16  they raised the issue of what weapon was used to

17  strike people and if they're saying that relative

18  culpability, well, hitting someone with a ten-inch

19  pipe versus hitting someone was a baseball bat is a

20  whole different thing.

21          THE COURT:  So the statement that he

22  makes on February 8, 2010, is whether he was aware

23  of the use of baseball bats or ski masks.

24          MS. DAYTON:  And the attempt.

25          THE COURT:  It says in homicides.

**Sentencing Hearing Minutes June 7, 2011**

```
 1              MS. DAYTON:  Well, it's poorly written.
 2              THE COURT:  He denied wearing a ski mask
 3   or seeing any baseball bats.
 4              MS. DAYTON:  And this was specifically
 5   after his sister told us that, you know, he had said
 6   about the baseball bats and the ski masks.
 7              THE COURT:  Anything further?
 8              MR. SMITH:  I think your original
 9   analysis was correct, your Honor.  He made
10   statements about what he witnessed.  When they come
11   to him and say, well, was there these baseball bats,
12   and he says no, that may conflict with other
13   witnesses, that's true, but that's not how you
14   impeach -- if Mr. Johnson was on the stand, well,
15   you know, isn't it true that so and so said there
16   were baseball bats there, that would be an improper
17   question in terms of trying to impeach him.  This is
18   just a general impeachment of his credibility.  They
19   can introduce Mr. Johnson's record, they can bring
20   up the inconsistent statements, but this is not
21   inconsistent with his prior statement.  He never
22   said before I did see baseball bats and now he's
23   denying it.
24              THE COURT:  Well, it's somewhat
25   inconsistent with his sister's testimony on what he
```

**A.308**

**Sentencing Hearing Minutes June 7, 2011**

5531

1    said.

2              MR. SMITH:  Again, your Honor, it may be

3    inconsistent with some other witness's testimony,

4    but on direct I asked him about what happened in the

5    apartment.  He told the agents from his point of

6    view what he saw.  Now, this is not necessarily

7    inconsistent because he left by his own account

8    before the murders occurred.  Now --

9              THE COURT:  It seems to me that none of

10   these statements that the defendant's have put in

11   gets to whether he did or did not see baseball bats

12   or ski masks.  So, I'm not sure, other than a broad

13   attack on his credibility, which is what I was not

14   going to permit, only where the statements that were

15   offered were contradicted or not credible.

16             MS. DAYTON:  Your Honor, he claimed that

17   the only weapon he saw was a ten-inch pipe.

18             THE COURT:  I don't think that's

19   accurate.  He says I saw the ten-inch of pipe, he

20   didn't say that was the only thing he saw.  I don't

21   remember any testimony read from the 302 in which he

22   said that was the only weapon he saw.

23             MS. DAYTON:  Your Honor, they put on

24   Johnson to attack Taylor's credibility.

25             THE COURT:  Correct.

**A.309**

**Sentencing Hearing Minutes June 7, 2011**

```
 1              MS. DAYTON:  I am only attacking
 2    Johnson's credibility with Johnson's statements
 3    versus -- but you are right, number one, it does
 4    conflict with -- his own testimony basically.
 5              THE COURT:  So that's for argument.
 6              MS. DAYTON:  No, but not if I can't get
 7    it in.  I can't argue it if I can't get it in.  And
 8    he claims -- they have left the inference that these
 9    murders were committed with a ten-inch pipe.  And
10    the defendant, this defendant, Johnson, contradicted
11    himself.  He told Lashika Johnson that he saw
12    baseball bats and he was wearing a ski mask and that
13    he saw the victims get hit with a baseball bat.
14              MR. SMITH:  I don't believe that's an
15    accurate representation of the testimony of
16    Ms. Johnson, Lashika.
17              MR. MARKLE:  That she saw -- I don't
18    know about being hit, but there were gloves and
19    masks.
20              MR. SMITH:  I disagree, your Honor, I
21    think he said he knew those things had been disposed
22    of, but he didn't say he saw them.
23              MS. DAYTON:  He did say he saw them.
24              THE COURT:  Okay.  The testimony has
25    been that he took -- said he took part in the first
```

**A.310**

**Sentencing Hearing Minutes June 7, 2011**

5533

1    attempt.

2              MS. DAYTON:  No, he --

3              THE COURT:  To get into apartment, no.

4              MR. SMITH:  No, your Honor, the portions

5    of the 302 I read were talking about the night of

6    the murders.  I did not ask any questions about the

7    first attempt or any other time.

8              THE COURT:  So the spitting was the

9    second attempt?

10             MR. SMITH:  I believe that's what --

11             MR. SHEEHAN:  This is the only time.

12             MR. SMITH:  This is the only time that

13   was ever discussed.

14             MS. DAYTON:  Your Honor, but going back

15   to relative culpability, if their whole argument

16   this morning was based on relative culpability, and

17   if relative culpability is truly the reason they

18   wanted this in, then relative culpability has to do

19   with the baseball bats, has to do with the relative

20   culpability, and him lying about it also has to do

21   with it because he can't tell the truth about

22   anything.  That's the whole point.  It leaves the

23   jury with a misimpression about his testimony, or

24   his statements.

25             THE COURT:  I'll permit the government

**A.311**

**Sentencing Hearing Minutes June 7, 2011**

1  to ask what he said when asked about the ski mask or

2  seeing any baseball bats because he has testified as

3  to what he did see in the other statements.  This is

4  within the scope of that.  And this may be argued as

5  to whatever he told Lashika Johnson, which I urge

6  people to check the transcript before arguing it.

7  So I'm going to permit that he denied wearing a ski

8  mask or seeing any baseball bats, but that's all.

9            MS. DAYTON:  Okay.  Thank you.

10           (Sidebar concluded)

11           THE COURT:  So, ladies and gentlemen,

12  I'm going to strike the last question and answer.

13  And you are to understand that discussion to have

14  been with respect to a proceeding in which Efrain

15  Johnson attempted to enter a guilty plea.  All

16  right.

17     Q.   Do you have the proffer statement from

18  February 8, 2010?

19     A.   No, I don't.

20     Q.   Did you ask Efrain Johnson about ski masks

21  and baseball bats?

22     A.   Yes, we did.

23     Q.   What did he tell you?

24     A.   He denied -- we asked if he was aware of

25  the use of baseball bats or ski masks.  He denied

**Sentencing Hearing Minutes June 7, 2011**

1  seeing any baseball bats or wearing any ski masks.

2      Q.   And so during the course of speaking with

3  Johnson, did you also ask him about selling crack

4  cocaine?

5              MR. SMITH:  Objection, outside the

6  scope.

7              THE COURT:  Sustained.

8      Q.   Do you know how the defendant Johnson -- I

9  mean how the defendant knew Johnson?

10             MR. SMITH:  Objection, outside the

11  scope.

12             THE COURT:  Sustained.

13     Q.   Did Johnson ever acknowledge -- well, he

14  claimed to have seen this ten-inch pipe come out of

15  Taylor's pants, correct?

16     A.   Yes.

17     Q.   And he never acknowledged seeing any other

18  weapon, did he?

19     A.   That is correct.

20     Q.   Thank you.

21             MS. DAYTON:  I have nothing further,

22  your Honor.

23             MR. SMITH:  We have no further

24  questions, your Honor.  Thank you.

25             THE COURT:  All right, Agent Munger,

**Sentencing Hearing Minutes June 13, 2011**

```
 1              THE COURT:  All right then, we will
 2    bring the jurors in.
 3              Good morning, Mr. Aquart.
 4              THE DEFENDANT:  Good morning, your
 5    Honor.
 6              (Jury entered the courtroom.)
 7              THE COURT:  Good morning, ladies and
 8    gentlemen.  Please be seated.
 9              It is now my duty to again instruct you
10    on the law that's applicable to this sentencing
11    phase in this case.  After that, you will hear the
12    closing arguments of counsel.  We will give you the
13    charge, that you have a copy of in your notebooks,
14    you will hear the closing argument of the
15    government, and we will then break for a half hour
16    lunch.  You will then hear the closing argument of
17    defense counsel and the rebuttal closing of the
18    government, and then a few final instructions from
19    me.  And after that, you will then begin your
20    deliberations in accordance with these instructions
21    that I'm going to give you.
22              Counts Two through Seven on which you
23    found the defendant Azibo Aquart guilty carry the
24    potential for the death penalty; that is, they are
25    each known as capital counts.  The sole question
```

**A.314**

**Sentencing Hearing Minutes June 13, 2011**

 1   before you is whether the defendant Azibo Aquart

 2   should be sentenced for his capital offenses to life

 3   imprisonment without release or the death penalty.

 4   There is no parole in the federal system, so a life

 5   sentence means precisely that.

 6            The selection between these very serious

 7   choices is yours, and yours alone, to make.  Whether

 8   you determine that Azibo Aquart should be sentenced

 9   to death or to life imprisonment without the

10   possibility of release, the Court is required to

11   impose that sentence which you chose.

12            If you have found -- you have found

13   defendant Azibo Aquart guilty of the following

14   capital counts of the indictment:  Counts Two, Three

15   and Four, murder in aid of racketeering of Tina

16   Johnson, James Reid and Basil Williams; and

17   Counts Five, Six and Seven, drug-related murder of

18   Tina Johnson, James Reid and Basil Williams.  These

19   are the six counts at issue at this stage, and you

20   must approach the sentencing decision before you

21   separately as to each count and with an open mind.

22            I cannot stress to you enough the

23   importance of your giving careful and thorough

24   consideration to all of the evidence.  And

25   regardless of any opinion that you may have as to

**A.315**

**Sentencing Hearing Minutes June 13, 2011**

1    what the law is or should be, it would be a

2    violation of your oaths as jurors to base your

3    sentencing decision on any view of the law other

4    than that which I give you now in these final

5    instructions.

6            A special verdict form has been prepared

7    that you must complete.  This verdict form details

8    the specific findings you are required to make and

9    will aid you in making your findings in the proper

10   order and in properly performing your deliberative

11   duties.

12           Although Congress has left it wholly to

13   you, the jury, to decide defendant Azibo Aquart's

14   punishment, it has narrowed and channeled your

15   discretion in specific ways by requiring that you

16   consider and weigh any aggravating and mitigating

17   factors proved in this case.  These factors have to

18   do with the circumstances of the crime, the personal

19   traits, character or background of defendant Azibo

20   Aquart, or anything else relevant to the sentencing

21   decision.

22           Aggravating factors are those that would

23   tend to support imposition of the death penalty.  By

24   contrast, mitigating factors are those that suggest

25   that life in prison without the possibility of

**A.316**

**Sentencing Hearing Minutes June 13, 2011**

5570

1    release is the appropriate sentence in this case.

2            Your task is not simply to decide what

3    aggravating and mitigating factors have been shown

4    to exist.  Rather, you are called upon to evaluate

5    any such factors and to make a unique,

6    individualized choice between the death penalty and

7    life in prison without the possibility of release.

8    The law does not assume that any defendant such as

9    Azibo Aquart found guilty of premeditated murder

10   should be sentenced to death.  Thus, your decision

11   on the question of his punishment is a uniquely

12   personal, moral judgment which the law leaves up to

13   each of you.

14           However, the decision to impose the

15   death sentence on Azibo Aquart must be a unanimous

16   decision.  If all 12 of you do not unanimously agree

17   that a sentence of death should be imposed on a

18   particular count, then the sentence will be life

19   imprisonment without possibility of release.

20           The government at all times and as to all

21   counts has the burden of proving beyond a reasonable

22   doubt a threshold mental state factor, at least one

23   statutory aggravating factor, and any non-statutory

24   aggravating factors.  Even if the government proves

25   the things it is required to prove, you are still

**A.317**

**Sentencing Hearing Minutes June 13, 2011**

```
 1    not required to impose the death penalty.  There is
 2    never any such requirement in the law.
 3              The definition of reasonable doubt is
 4    the same as I instructed you at the guilt phase.  It
 5    is doubt based upon reason and common sense.  It is
 6    a doubt that a reasonable person has after carefully
 7    weighing all of the evidence.  It is a doubt which
 8    would cause a reasonable person to hesitate to act
 9    in a matter of importance in his or her personal
10    life.  Proof beyond a reasonable doubt must,
11    therefore, be proof of such convincing character
12    that a reasonable person would not hesitate to rely
13    and act upon it in the most important of his or her
14    own affairs.
15              A reasonable doubt is not a caprice or a
16    whim, it is not a speculation or suspicion, and it
17    is not sympathy.  Beyond a reasonable doubt does not
18    mean beyond all doubt.  A reasonable doubt may arise
19    from the evidence or the lack of evidence.
20              The burden is at all times on the
21    government to prove the threshold and aggravating
22    factors, which I will be describing to you shortly,
23    beyond a reasonable doubt.  This burden never shifts
24    to the defendant who never has the burden of
25    disproving the existence of anything on which the
```

**Sentencing Hearing Minutes June 13, 2011**

5572

```
1   government bears the burden of proof beyond a
2   reasonable doubt.  The law does not require a
3   defendant to produce any evidence that a particular
4   aggravating factor does not exist or that death is
5   not an appropriate sentence.  In addition, the law
6   does not require the defendant to testify.  You may
7   draw no inference against him from the fact that he
8   has chosen not to testify.  That fact must not be
9   considered by you in any way in arriving at any
10  aspect of your sentencing decision.
11         Defendant Azibo Aquart is entitled to,
12  but not required to, present evidence of mitigating
13  factors.  Here, defendant Azibo Aquart asserts a
14  number of mitigating factors, and it is his burden
15  to establish any mitigating factors by a
16  preponderance of the evidence.
17         To prove something by a preponderance of
18  the evidence is a lesser standard of proof than
19  proof beyond a reasonable doubt.  To prove something
20  by a preponderance of the evidence is to prove that
21  it is more likely true than not true.  It is
22  determined by considering all of the evidence and
23  deciding what evidence is more believable.  It is
24  proof that a fact is more than 50 percent likely to
25  be true.
```

**A.319**

**Sentencing Hearing Minutes June 13, 2011**

```
1              Whether a factor is proved beyond a
2     reasonable doubt by the government or by a
3     preponderance of the evidence by the defendant is
4     not determined by the number of witnesses or
5     exhibits presented; rather, it is the quality and
6     the persuasiveness of the evidence which controls.
7              In making all of the determinations you
8     are required to make in this phase of the trial, you
9     may consider any information presented during this
10    penalty phase and any relevant evidence from the
11    guilt phase of the trial.  Recall that for our
12    purpose here the terms "evidence" and "information"
13    have the same meaning.
14              In deciding what the facts are, you may
15    have to decide what testimony you believe and what
16    testimony you do not believe.  You may believe all
17    of what a witness said, or only part of it, or none
18    of it.  In deciding what testimony of any witness to
19    believe, consider the witness's intelligence, the
20    opportunity the witness had to see or hear things
21    testified about, the witness's memory, any motives
22    that the witness may have for testifying a certain
23    way, the manner of the witness while testifying,
24    whether that witness said something different at an
25    earlier time, the general reasonableness of the
```

**Sentencing Hearing Minutes June 13, 2011**

5574

1    testimony, and the extent to which the testimony is

2    consistent with other evidence that you believe.  In

3    addition to deciding the credibility of each

4    witness, you also decide what weight or significance

5    you will give to each witness's testimony.

6          Now, you will recall during the course of

7    this phase of the trial you heard the testimony of

8    individuals referred to as experts in a particular

9    field.  Specifically Tom Martin, blood spatter, and

10   Mark Bezy, prison conditions.  A witness qualified

11   as an expert may be permitted to testify to his or

12   her opinion about which he or she has special

13   knowledge, skill, experience, education or training.

14   Such testimony is presented to you on the theory

15   that someone who is experienced and knowledgeable in

16   a particular field can assist you in understanding

17   the evidence or in reaching an independent decision

18   on the facts.

19          In weighing an expert's opinion

20   testimony, you should consider his or her

21   qualifications, the reasons for his opinions, the

22   facts upon which the opinions are based, the reasons

23   for testifying, as well as all the other

24   considerations that ordinarily apply when you are

25   deciding whether or not to believe any witness's

**A.321**

**Sentencing Hearing Minutes June 13, 2011**

1   testimony.  And you may give the opinion testimony

2   whatever weight, if any, you find it deserves in

3   light of all of the evidence in the case.

4          You should not, however, accept either

5   expert's opinion testimony merely because I allowed

6   the witness to testify as an expert concerning his

7   opinion.  And nor should you substitute it for your

8   own reason, judgment and common sense.  The

9   determination of the facts in this case rests solely

10  with you.

11         Now, I'm going to discuss with you the

12  deliberative process that you will shortly be

13  engaging in and discuss with you the steps that you

14  must follow in deciding the sentence for each of the

15  six counts.

16         First, you must decide whether the

17  government has proven beyond a reasonable doubt that

18  the defendant, Azibo Aquart, was at least 18 years

19  old at the time of the capital offense.  That's a

20  statutory requirement.

21         Second, you must decide whether the

22  government has proven beyond a reasonable doubt at

23  least one of two threshold mental states claimed by

24  the government, and I will be describing that

25  shortly.

**A.322**

**Sentencing Hearing Minutes June 13, 2011**

```
 1              Third, you must decide whether the
 2    government has proven beyond a reasonable doubt at
 3    least one of the five statutory aggravating factors
 4    claimed.
 5              Fourth, you must decide whether the
 6    government has proven beyond a reasonable doubt
 7    either or both of the non-statutory factors it
 8    claims.
 9              Fifth, you must decide whether any of
10    you find that any mitigating factors have been
11    proved by Azibo Aquart by a preponderance of the
12    evidence.
13              Sixth, each of you must weigh the
14    aggravating factors you have all found to exist and
15    any mitigating factors you have individually found
16    to exist to determine the appropriate sentence.  In
17    regard to each capital count you must decide whether
18    the aggravating factors you have found to exist for
19    that offense sufficiently outweigh the mitigating
20    factors found to exist for that offense beyond a
21    reasonable doubt so as to justify imposing a
22    sentence of death on defendant Azibo Aquart for that
23    offense; or, in the absence of any mitigating
24    factors, whether the aggravating factors alone are
25    sufficient to justify imposing a sentence of death
```

**Sentencing Hearing Minutes June 13, 2011**

```
 1    on the defendant, Azibo Aquart, for that offense.

 2                    And then seventh, you must then

 3    unanimously decide whether to sentence the defendant

 4    Azibo Aquart to death or to life in prison without

 5    release for each of the six counts.

 6                    Now, I'm going to go through each of

 7    those steps with you.  The first one, finding as to

 8    the defendant's age.  Under the Federal Death

 9    Penalty Act, before jurors may consider imposition

10    of the death penalty they must first unanimously

11    agree that the defendant was at least 18 years of

12    age at the time of the offense, and the parties have

13    stipulated that the defendant, Azibo Aquart, was

14    23 years of age on August 24, 2005.  You will find

15    that stipulation at Exhibit 13F.  You will indicate

16    your finding in Section 1 of the special verdict

17    form and continue your deliberations.

18                    The next step, finding a threshold

19    mental state factor.  Before you may consider

20    imposition of the death penalty for any count, you

21    must first unanimously find that the government has

22    proved beyond a reasonable doubt the existence as to

23    that count of a threshold mental state factor.  The

24    government claims two:  One, that the defendant,

25    Azibo Aquart, intentionally killed Tina Johnson or
```

**A.324**

**Sentencing Hearing Minutes June 13, 2011**

5578

1    Basil Williams; or, two, that the defendant, Azibo

2    Aquart, intentionally participated in an act,

3    contemplating that the life of a person would be

4    taken or intending that lethal force would be used

5    in connection with a person, and Tina Johnson, James

6    Reid and Basil Williams died as a direct result of

7    that act.

8              Although I will be discussing the capital

9    counts of conviction collectively, in your

10   deliberations regarding the existence of the

11   threshold mental state factor and statutory

12   aggravating factors, you must treat each count

13   separately.

14             Your findings as to whether the

15   government has proved the existence beyond a

16   reasonable doubt of a particular threshold mental

17   state factor must be separate and unanimous as to

18   each count.  And with regard to your findings, you

19   may not rely solely on your earlier verdict of guilt

20   or your factual determinations in the guilt phase of

21   the trial.  Instead, you must now each decide this

22   issue for yourselves again, considering all of the

23   evidence from both the guilt and penalty phases.

24             Any finding that a threshold mental

25   state factor has been proved as to a particular

**Sentencing Hearing Minutes June 13, 2011**

```
 1   count must be based on defendant Azibo Aquart's
 2   personal actions and intent.  Intent may be proven
 3   by any statements made and acts done by defendant
 4   Azibo Aquart, considering all of the facts and
 5   circumstances in evidence which may aid in a
 6   determination of his intent.  You may, but are not
 7   required to, infer that a person intends the natural
 8   and probable consequences of his acts knowingly done
 9   or knowingly omitted.
10               If you unanimously find beyond a
11   reasonable doubt that one of the claimed threshold
12   mental state factors exists as to a count, you will
13   indicate that finding on the appropriate line of
14   Section II of the special verdict form which
15   provides a space for you to indicate whether you
16   find the government has proved one of the claimed
17   threshold mental state factors in regard to each
18   victim and associated counts.  If you do not
19   unanimously find one of these claimed threshold
20   mental state factors to have been proved with
21   respect to any of the counts, your deliberations
22   will be complete and you will just complete the
23   certification in Section VIII of the special verdict
24   form.  For any count you do not unanimously find
25   that the government has proven the existence of one
```

**Sentencing Hearing Minutes June 13, 2011**

```
 1   claimed threshold mental state factor, your

 2   deliberative task as to that count will be over, and

 3   the Court will impose a mandatory life imprisonment

 4   without possibility -- sentence of life imprisonment

 5   without possibility of release on that count.

 6            I instruct you that if you find that one

 7   claimed mental state factor is proved to exist, it

 8   is not an aggravating factor and may not be weighed

 9   by you in deciding whether or not to impose a

10   sentence of death.  It is simply a separate

11   requirement, a threshold under the Federal Death

12   Penalty Act which must be fulfilled before you are

13   permitted to make any further findings.  And this is

14   because not all murders are eligible for the death

15   penalty.  Only those murders that satisfy a

16   threshold mental state factor, and as I will

17   describe shortly, a statutory aggravating factor,

18   justify consideration of the death penalty.

19   However, a finding that a claimed threshold mental

20   state factor has been proved beyond a reasonable

21   doubt cannot, in and of itself, justify a death

22   penalty precisely because it is not an aggravating

23   factor to be weighed.  As I will explain to you,

24   more is required before you may decide that the

25   death penalty is to be imposed rather than a
```

**Sentencing Hearing Minutes June 13, 2011**

1   sentence of life in prison without possibility of

2   release.

3              So now we'll go to the third step

4   regarding statutory aggravating factors.  If you

5   unanimously find that the government has proven the

6   existence of any threshold mental state factor as to

7   a particular count or counts, you then must proceed

8   to determine whether the government has proven

9   beyond a reasonable doubt the existence of at least

10  one statutory aggravating factor.  The government

11  alleges five statutory aggravating factors for each

12  count:

13              1.  That the defendant committed the

14  homicide offense in an especially heinous, cruel or

15  depraved manner in that it involved torture or

16  serious physical abuse;

17              2.  That the defendant procured the

18  commission of the homicide offense by payment or

19  promise of payment of anything of pecuniary value;

20              3.  That the defendant committed the

21  homicide offense as consideration for the receipt,

22  or in the expectation of receipt, of anything of

23  pecuniary value;

24              4.  That the defendant committed the

25  homicide offense after substantial planning and

**A.328**

**Sentencing Hearing Minutes June 13, 2011**

5582

1    premeditation to cause the death of Tina Johnson,

2    James Reid and Basil Williams;

3              And 5.  That the defendant intentionally

4    killed or attempted to kill more than one person in

5    a single criminal episode.

6              The law directs you to consider and

7    decide separately as to each count for which you

8    have found the existence of a threshold mental state

9    factor whether the government has proved beyond a

10   reasonable doubt the existence of any of these five

11   statutory aggravating factors that it claims.  You

12   are reminded that to find the existence of a

13   statutory aggravating factor as to a particular

14   count, your decision must be unanimous as to that

15   aggravating factor.  If you are not unanimous on a

16   particular statutory aggravating factor, that factor

17   cannot be used in your deliberations.  Any finding

18   that any of these factors has been proven must be

19   based on Azibo Aquart's personal actions and intent.

20             If you find that any of the five

21   statutory aggravating factors exists as to any count

22   or counts, you are to indicate that finding on the

23   appropriate line in Section III of the Special

24   Verdict Form for that count.  If you do not

25   unanimously find that one of the five statutory

**A.329**

**Sentencing Hearing Minutes June 13, 2011**

1    aggravating factors has been proved with respect to

2    any one of the counts, your deliberations are

3    finished and you should proceed directly to the

4    certification in Section VIII of the Special Verdict

5    Form.

6              For any count you do not unanimously

7    find that the government has proved any of the five

8    statutory aggravating factors, your deliberative

9    task as to that count will be over and the Court

10   will impose a mandatory sentence of life in prison

11   without possibility of release on that count.

12             All right, now I'm going to instruct you

13   with more detail on these five specific statutory

14   aggravating factors claimed by the government.

15             The first statutory aggravating factor

16   the government alleges is that the defendant

17   committed the homicide offense in an especially

18   heinous, cruel or depraved manner in that it

19   involved torture or serious physical abuse to Tina

20   Johnson, Counts Two and Five; James Reid, Counts,

21   Three and Six; and Basil Williams, Counts Four and

22   Seven.

23             To establish the defendant killed the

24   victim in an especially heinous, cruel or depraved

25   manner, the government must prove that the killing

5584

```
1    involved either torture or serious physical abuse to
2    the victim.  However, just because an offense
3    involves torture or serious physical abuse does not
4    mean that it was committed in an especially heinous,
5    cruel or depraved manner.  Rather, you must decide
6    whether any proven torture or serious physical abuse
7    rendered the murder especially heinous, especially
8    cruel or especially depraved.
9                You must not find this factor to exist
10   unless you unanimously agreed as to whether torture,
11   serious physical abuse or both has been proved
12   beyond a reasonable doubt.  In other words, all 12
13   of you must agree that it involved torture and was,
14   thus, heinous, cruel or depraved, or all 12 of you
15   must agree it involved serious physical abuse to the
16   victim and was thus heinous, cruel and depraved, or
17   that it involved both.
18               "Heinous" means extremely wicked or
19   shockingly evil, where the killing was accompanied
20   by such additional acts of torture or serious
21   physical abuse of the victim as to set it apart from
22   other killings.
23               "Cruel" means the defendant, by
24   torturing the victim, intended to inflict a higher
25   degree of pain than is involved in just killing the
```

**A.331**

**Sentencing Hearing Minutes June 13, 2011**

1    victim.

2         "Depraved" means the defendant relished

3    the killing or showed indifference to the suffering

4    of the victim as evinced by torture or serious

5    physical abuse of the victim.

6         "Torture" includes mental as well as

7    physical abuse of the victim.  In either case, the

8    victim must have been conscious of the abuse at the

9    time it was inflicted and the defendant must have

10   specifically intended to inflict severe mental or

11   physical pain or suffering on the victim, apart from

12   killing the victim.

13        "Serious physical abuse" means a

14   significant or considerable amount of injury or

15   damage to the victim's body.  Serious physical

16   abuse, unlike torture, may be inflicted either

17   before or after death, and does not require that the

18   defendant be conscious of the abuse at the time it

19   was inflicted.  However, the defendant must have

20   specifically intended the abuse in addition to the

21   killing.

22        The word "especially" means highly or

23   unusually great, distinctive, peculiar, particular

24   or significant, when compared to other killings.

25        Pertinent factors in determining whether

5586

```
 1    a killing was especially heinous, cruel or depraved

 2    may include infliction of gratuitous violence on the

 3    victim above and beyond that necessary to commit the

 4    killing and the helplessness of the victim.

 5             Further, you may only consider the

 6    actions of the defendant.  You may not consider the

 7    manner in which any other person committed or

 8    participated in the murder.

 9             Your finding as to this statutory

10    aggravating factor must be indicated in the

11    appropriate space in Section III of the Special

12    Verdict Form.

13             The next statutory aggravating factor

14    alleged by the government is that the defendant

15    procured the commission of the homicide offense by

16    payment or promise of payment of anything of

17    pecuniary value.

18             To establish that the defendant procured

19    the commission of the offense by payment or promise

20    of anything of pecuniary value, the government must

21    prove beyond a reasonable doubt that the defendant

22    arranged to have someone else commit the offense or

23    assist in committing it.

24             To "procure" means to obtain, induce or

25    cause to take place.  The words "payment or "promise
```

A.333

**Sentencing Hearing Minutes June 13, 2011**

1    of payment" should be given their ordinary, everyday

2    meaning, which includes giving or offering

3    compensation in return for services.  "Anything of

4    pecuniary value" means money, property or anything

5    else having some economic value, benefit or

6    advantage.

7            Your finding as to this statutory

8    aggravating factor must be indicated in the

9    appropriate space in Section III of the Special

10    Verdict Form.

11            The third statutory factor alleged by

12    the government, that the defendant committed the

13    murders as consideration for the receipt, and in

14    expectation of the receipt, of something of

15    pecuniary value.

16            The words "expectation of receipt"

17    should be given their ordinary, everyday meaning,

18    which includes obtaining or expecting to obtain.

19    "Something of pecuniary value" means anything in the

20    form of money, property or anything else having some

21    economic value, benefit or advantage.

22            In order to prove this statutory factor,

23    the government must prove that the defendant, Azibo

24    Aquart, killed the victim referred to in the

25    particular count with the expectation of receiving

**A.334**

**Sentencing Hearing Minutes June 13, 2011**

5588

```
 1    something of pecuniary value.  It is not sufficient
 2    for you to find that he committed any offense other
 3    than murder with the expectation of receiving
 4    something of pecuniary value.  And your finding as
 5    to this aggravating factor will be indicated in the
 6    appropriate space in Section III of the Special
 7    Verdict Form.
 8              The fourth statutory aggravating factor
 9    alleged by the government is that the defendant
10    committed the homicide offense after substantial
11    planning and premeditation to cause the death of
12    Tina Johnson, Counts Two and Five; James Reid,
13    Counts Three and Six; and Basil Williams,
14    Counts Four and Seven.
15              In order to prove this statutory factor
16    against the defendant, the government must prove
17    that he engaged in substantial planning and
18    premeditation to cause the death of the victim named
19    in the particular count you are considering.  It is
20    not sufficient for you to find that the defendant
21    engaged in substantial planning and premeditation to
22    commit any offense other than murder.
23              "Planning" means mentally formulating a
24    method for doing something or achieving some end.
25              "Premeditation" means thinking or
```

**A.335**

**Sentencing Hearing Minutes June 13, 2011**

```
 1   deliberating about something and deciding beforehand
 2   whether to do it.
 3                "Substantial" planning and premeditation
 4   means a considerable or significant amount of both
 5   planning and premeditation.
 6                If you've reached the stage where you
 7   are considering statutory aggravating factors, you
 8   will necessarily have found both that the defendant
 9   is guilty of participation in the murder and that he
10   intended to commit the murder or intended lethal
11   force would be used as specified in the threshold
12   mental factor you found.  However, the substantial
13   planning and the premeditation statutory aggravating
14   factor requires more.  To find that the government
15   has satisfied its burden of proving that the
16   defendant engaged in substantial planning and
17   premeditation to cause the death of a victim, you
18   must find that the defendant's actual planning and
19   premeditation was considerable, large, or
20   significant in relation to that which would be
21   necessary to commit the homicide offense.
22                Your finding as to this statutory factor
23   will be indicated in the appropriate space in
24   Section III of the Special Verdict Form.
25                The fifth statutory factor, statutory
```

**Sentencing Hearing Minutes June 13, 2011**

5590

```
1    aggravating factor alleged by the government, is
2    that the defendant intentionally killed or attempted
3    to kill more than one person in a single criminal
4    episode.
5              The government must prove to you beyond a
6    reasonable doubt that the defendant intentionally
7    killed or attempted to kill more than one person in
8    a single criminal episode, and you must unanimously
9    agree on the particular actual victims.  You may
10   only consider the actions of the defendant.  You may
11   not consider the manner in which any other person
12   committed or participated in the murder.
13             "Intentionally killing" a person means
14   killing a person on purpose; that is, willfully,
15   deliberately or with a conscious desire to cause the
16   person's death, and not just accidentally or
17   involuntarily.
18             A "single criminal episode" is an act or
19   series of related criminal acts which occur within a
20   relatively limited time and place, or are directed
21   at the same person, or are part of a continuous
22   course of conduct related in time, place or purpose.
23             A person of sound mind and discretion may
24   be presumed to have intended the ordinary and
25   natural and probable consequences of his knowing and
```

**A.337**

**Sentencing Hearing Minutes June 13, 2011**

1    voluntary acts.  However, this presumption is not

2    required.  Thus, you may infer, but are not required

3    to infer, from the defendant's conduct that the

4    defendant intended to kill a person if you find:  1,

5    that the defendant was a person of sound mind and

6    discretion; 2, the person's death was an ordinary,

7    natural and probable consequence of the defendant's

8    acts; and 3, that the defendant committed these acts

9    knowingly and voluntarily.

10              Your finding as to this statutory factor

11   will be indicated in the appropriate place in

12   Section III of the Special Verdict Form.

13              Finally, as to the statutory aggravating

14   factors claimed, let me reiterate, if you do not

15   unanimously find that the government has proved

16   beyond a reasonable doubt at least one statutory

17   aggravating factor as to a count, your deliberations

18   as to that particular count have concluded.

19              Now, we go to the step of considering the

20   non-statutory aggravating factors.  If, and only if,

21   you have unanimously found that the government has

22   proved the existence of a threshold mental state

23   factor and at least one of the statutory aggravating

24   factors as to a particular count or counts, you must

25   then consider whether the government has proved the

**Sentencing Hearing Minutes June 13, 2011**

```
 1    existence of a "non-statutory aggravating factor"

 2    with regard to that count or those counts.  You must

 3    agree unanimously, and separately as to each count,

 4    that the government has proved beyond a reasonable

 5    doubt the existence of any alleged non-statutory

 6    aggravating factor before you may consider that

 7    non-statutory aggravating factor in your

 8    deliberations.

 9           The law permits you to consider only the

10    two non-statutory aggravating factors that are

11    claimed by the government and which are particularly

12    listed below.  You are not free to consider any

13    other facts in aggravation that you conceive of on

14    your own.  You may not consider the relative cost to

15    taxpayers in executing the defendant Azibo Aquart

16    rather than incarcerating him in prison pursuant to

17    a life sentence without possibility of release.

18           The statutory -- excuse me, the

19    non-statutory aggravating factors alleged by the

20    government are as follows:

21           1.   Other specific acts of violence.

22    The first non-statutory aggravating factor that the

23    defendant alleges is that the defendant committed

24    criminal acts of violence that posed a serious

25    threat to the lives and safety of persons other than
```

**A.339**

**Sentencing Hearing Minutes June 13, 2011**

5593

 1    the victims in this case, and that the defendant

 2    engaged in a continuing pattern of violent criminal

 3    conduct.

 4            The government alleges the following

 5    assaults by defendant as other specific acts of

 6    violence as establishing a continuing pattern of

 7    violent criminal conduct:  1.  Assault on Frank

 8    Hodges;

 9                    2.   Assault on Jackie Bryant;

10                    3.   Assault on Venro Fleming;

11                    4.   Assault on Juanita Hopkins;

12                    5.   Assault on John Sullivan;

13            And 6.  Assault on Anthony Armstead.

14            These are the only acts you are

15    permitted to consider.  You may not consider any one

16    of these acts unless you first determine that the

17    government has proved beyond a reasonable doubt that

18    the defendant in fact committed it.

19            In order for you to find this

20    aggravating factor proven, you must unanimously

21    agree that, A, any such acts posed a serious threat

22    to the lives and safety of the victims, and B, that

23    acts so found demonstrate that the defendant engaged

24    in a continuing pattern of violent criminal conduct.

25            "Pattern" means a mode of behavior or

**A.340**

**Sentencing Hearing Minutes June 13, 2011**

5594

```
 1    series of acts that are recognizably consistent.
 2              Let me caution you, the government does
 3    not assert, nor has the government established, that
 4    if sentenced to life imprisonment without
 5    possibility of release, Azibo Aquart will present a
 6    future danger to any other person.  It would,
 7    therefore, be improper for you to consider -- to
 8    allow consideration of any notion of future
 9    dangerousness to enter into your deliberations or
10    into your individual determination as to the
11    appropriate sentence.  The only purpose for which
12    the acts of violence listed above have been admitted
13    for your consideration are to establish the
14    non-statutory aggravating factor of "other specific
15    acts of violence" as I have just described.  They
16    have not been admitted for any other purpose and may
17    not be considered for any other purpose.
18              The second non-statutory aggravating
19    factor alleged by the government is that the
20    defendant caused loss, injury, and harm to the
21    victims and their families, including, but not
22    limited to, the following:
23              A.   The defendant caused the death of
24    the victims who enjoyed a strong relationship with
25    their families, including their parents, their
```

**A.341**

**Sentencing Hearing Minutes June 13, 2011**

5595

1    siblings, and their children and grandchildren;

2             B.  The victims' families have suffered

3    severe and irreparable harm.  The victim, Tina

4    Johnson, Counts Two and Five provided financial and

5    emotional support to her entire family.  The other

6    two victims, James Reid, Counts Three and Six, and

7    Basil Williams, Count Four and Seven, provided

8    emotional support to their families.

9             You have heard evidence concerning the

10   impact of the victims' deaths on their families.

11   This evidence is, by it's nature, emotional.  I

12   instruct you that you should not permit the

13   emotional component of this evidence to overwhelm

14   your ability to follow the law and make a sentence

15   determination that takes into account all of the

16   evidence that you have heard.  Your decision about

17   whether or not to impose the death penalty may not

18   be based on undue sympathy, passion and prejudice.

19             Because the law does not permit a

20   victim-impact witness to state or to indicate

21   whether he or she personally favors or opposes the

22   death penalty in this case, you should draw no

23   inference from the fact that no victim-impact

24   witness has testified as to his or her view on the

25   subject and you should not speculate on the subject.

**A.342**

**Sentencing Hearing Minutes June 13, 2011**

```
 1              Again, your findings regarding each
 2    non-statutory aggravating factor must be separate
 3    and unanimous with regard to each count you are
 4    considering.  You must also unanimously agree that
 5    the government has proved beyond a reasonable doubt
 6    that the non-statutory aggravating factors alleged
 7    by the government are, in fact, aggravating, that
 8    is, that they make the crime worse, more serious or
 9    severe and thus may be considered in favor of the
10    death penalty.  Thus, there are two basic findings
11    on the non-statutory aggravating factor that the
12    government must prove beyond a reasonable doubt:
13              1.  That the factor alleged by the
14    government has been established; and
15              2.  That the factor is aggravating.
16              Again, an aggravating factor is a fact
17    or circumstance that would tend to support
18    imposition of the death penalty.
19              If you unanimously find that the
20    government has proved either non-statutory
21    aggravating factor beyond a reasonable doubt as to
22    any count or counts, you will indicate that in
23    Section IV on the Special Verdict Form.
24              Even if you do not find a non-statutory
25    aggravating factor proven with regard to any counts,
```

**Sentencing Hearing Minutes June 13, 2011**

1  you will still continue your deliberations and

2  consider the death penalty as a possible sentence,

3  but obviously you may not base any determination

4  that the death penalty is appropriate on the claimed

5  but unproved non-statutory aggravating factor.

6            You'll note this instruction is different

7  from the instructions for threshold mental state and

8  statutory aggravating factors where, if you didn't

9  find the threshold mental state factor or at least

10  one statutory factor, you could not proceed to

11  deliberate further on that particular count.

12            Please understand that you can consider

13  in your sentencing decision only those statutory and

14  non-statutory factors that you unanimously found

15  proved beyond a reasonable doubt, and you may not

16  give any further consideration to any statutory and

17  non-statutory aggravating factor that you do not

18  find so proved.

19            All right, we're now at the fifth step,

20  mitigating factors.  Before you may consider the

21  appropriate punishment for any capital count for

22  which you have unanimously found beyond a reasonable

23  doubt at least one threshold mental state factor and

24  at least one statutory aggravating factor, you must

25  consider whether the defendant has established the

**Sentencing Hearing Minutes June 13, 2011**

```
 1    existence of any mitigating factors.  A mitigating
 2    factor is not offered to justify or excuse the
 3    defendant's conduct with respect to the offense of
 4    conviction.  Instead, a mitigating factor is a fact
 5    about the defendant's background, record or
 6    character, or about the circumstances surrounding
 7    the capital offenses, or anything else relevant that
 8    would suggest in fairness that a sentence of life
 9    imprisonment without the possibility of release is a
10    more appropriate punishment than a sentence of death
11    in this case.
12              The law does not require that there be a
13    connection between the mitigating evidence and the
14    crime committed.  It is not necessary, for example,
15    for the defense to establish that evidence of a bad
16    childhood led to the commission of the offense.
17    Thus, whether or not the mitigating factors have a
18    direct connection to the crimes does not affect
19    their status as mitigating circumstances that you
20    are required to consider.
21              Unlike aggravating factors which you
22    must find proved beyond a reasonable doubt, in order
23    for you to consider them in your deliberations, the
24    law does not require unanimity with respect to
25    mitigating factors.  Any one juror persuaded of the
```

**A.345**

**Sentencing Hearing Minutes June 13, 2011**

```
 1   existence of a mitigating factor must consider it in

 2   his or her sentencing decision.

 3              It is the defendant's burden to establish

 4   any mitigating factors by a preponderance of the

 5   evidence as I previously defined that term on page

 6   4.  This lesser standard of -- this is a lesser

 7   standard of proof under the law than proof beyond a

 8   reasonable doubt which is the standard for which the

 9   government is held.

10              The defendant claims as mitigating

11   factors the following:

12              1.  Neither John Taylor nor Efrain

13   Johnson will be sentenced to death for their roles

14   in the murders of Basil Williams, James Reid or Tina

15   Johnson;

16              2.  One or more -- excuse me, one or

17   more victims chose to engage in illegal drug

18   trafficking activities, a circumstance that

19   contributed to their deaths;

20              3.  If not sentenced to death, Azibo

21   Aquart will be in prison for the rest of his life

22   without possibility of release;

23              4.  Lifetime imprisonment is a severe

24   punishment;

25              5.  Azibo Aquart's execution would cause
```

**Sentencing Hearing Minutes June 13, 2011**

1  others to suffer grief and loss;

2          6.  Azibo Aquart grew up in communities

3  characterized by violence and crime;

4          7.  Before age 16 Azibo Aquart lived in

5  16 different places;

6          8.  Azibo Aquart attended eight

7  different schools in nine years;

8          9.  Throughout his childhood Azibo

9  Aquart lacked adequate parental supervision;

10          10.  Azibo Aquart was exposed to

11  emotional and physical abuse inflicted on his

12  mother;

13          11.  Azibo Aquart's parents both sold

14  illegal drugs;

15          12.  Azibo Aquart's father, Richard

16  Aquart, exposed Azibo Aquart to violence and drug

17  dealing;

18          13.  Richard Aquart stored illegal

19  weapons in the home;

20          14.  From the time Azibo Aquart was

21  five, Richard Aquart was a fugitive who used

22  aliases;

23          15.  When Azibo Aquart was 11 his father

24  was sent to prison for eight years and then deported

25  to Jamaica;

**A.347**

**Sentencing Hearing Minutes June 13, 2011**

```
 1                    16.   Richard Aquart was a poor role
 2     model;
 3                    17.   Azibo Aquart's parents and others
 4     around him taught him to distrust the police and the
 5     judicial system and to disregard the law;
 6                    18.   Azibo Aquart and his brothers,
 7     Azizi and Azikiwe, were picked on and bullied
 8     because of their cultural differences;
 9                    19.   When he was 12 Azibo Aquart's
10     mother drowned;
11                    20.   From the time of his mother's death
12     Azibo Aquart had no meaningful adult supervision;
13                    21.   When Azibo Aquart was 13 his
14     brother, Azizi Aquart, was shot three times and
15     nearly died;
16                    22.   At age 17 Azizi Aquart was
17     ill-equipped to handle the responsibility of being a
18     guardian of a 13-year-old;
19                    23.   Azibo Aquart's close relatives and
20     friends failed to properly care for him after his
21     mother's death or his brother's shooting;
22                    24.   Although social service providers
23     and juvenile court officials identified Azibo Aquart
24     as an at-risk child, no effective action was taken;
25                    25.   While incarcerated as a young adult
```

**A.348**

**Sentencing Hearing Minutes June 13, 2011**

5602

1　Azibo Aquart obtained his GED;

2　　　　　26.　At the Enfield Correctional Center,

3　Azibo Aquart was a certified literacy tutor who

4　helped other inmates;

5　　　　　27.　If Azibo Aquart is sentenced to

6　life imprisonment the Bureau of Prisons has the

7　capability of safely and securely confining him;

8　　　　　And 28.　Azibo Aquart's life has value.

9　　　　　In Section V of the Special Verdict Form

10　you are asked to report for each mitigating factor

11　considered the number of jurors who found a

12　particular mitigating factor to be established by a

13　preponderance of the evidence.

14　　　　　In addition to the mitigating factors

15　specifically raised by the defendant, the law

16　permits each of you to consider anything about the

17　circumstances of the offense or anything about

18　defendant Azibo Aquart's background, record or

19　character or anything else relevant that you

20　individually believe mitigates against the

21　imposition of the death penalty.

22　　　　　The law does not limit your consideration

23　of mitigating factors to those that are articulated

24　in advance.　As such, if there are any mitigating

25　factors not argued by the attorney for the defendant

**A.349**

**Sentencing Hearing Minutes June 13, 2011**

5603

1   Azibo Aquart, but which any juror on his or her own

2   or with others finds to be established by a

3   preponderance of the evidence, that juror must

4   consider it in his or her sentencing determination.

5              In Section V of the Special Verdict Form

6   you are asked to identify any such additional

7   mitigating factors that one or more of you

8   independently finds to exist.

9              In short, your discretion in considering

10  mitigating factors is much broader than your

11  discretion in considering aggravating factors.  And

12  this was a choice expressly made by Congress in

13  enacting the Federal Death Penalty Act.  As I

14  already mentioned, the existence of a mitigating

15  factor is a distinct consideration from whatever

16  weight, if any, should ultimately be given -- I'm

17  going to start that over.  As I have mentioned, the

18  existence of a mitigating factor is a distinct

19  consideration from whatever weight, if any, should

20  ultimately be given to that factor in your

21  deliberations.  For example, any number of jurors

22  may find a particular mitigating factor is proved to

23  exist, but those individual jurors might later

24  choose to give that particular mitigating factor

25  different levels of significance during your

**A.350**

**Sentencing Hearing Minutes June 13, 2011**

5604

1  weighing process.

2         With this distinction in mind, Section V

3  of the Special Verdict Form only asks you to report

4  how many jurors found the existence of a particular

5  mitigating factor to be established by a

6  preponderance of the evidence.

7         After you have completed your findings

8  regarding the existence or non-existence of

9  mitigating factors, then you will proceed to weigh

10  the aggravating factors and mitigating factors with

11  regard to each of the counts for which you have

12  unanimously found the threshold mental state factor

13  and at least one statutory aggravating factor, and

14  that brings us to the weighing step, step VI.

15         If, and only if, you unanimously find

16  that the government has proven beyond a reasonable

17  doubt the existence of a threshold mental state

18  factor and at least one statutory aggravating factor

19  with regard to any count, and after you have

20  considered whether the government has proved any

21  non-statutory aggravating factor, and after you have

22  determined whether Azibo Aquart has proven by a

23  preponderance of the evidence the existence of any

24  mitigating factors, then you must engage in a

25  weighing process.

**A.351**

**Sentencing Hearing Minutes June 13, 2011**

5605

1          This weighing process asks whether you

2    are unanimously persuaded beyond a reasonable doubt

3    that the aggravating factors sufficiently outweigh

4    any mitigating factors, or, in the absence of any

5    mitigating factors, that the aggravating factors are

6    in and of themselves sufficient to justify a

7    sentence of death.

8          Each juror must individually decide

9    whether under all of the facts and circumstances in

10   this case a sentence of death has been proved

11   justified.  You are to conduct this weighing process

12   separately with regard to each of the counts for

13   which you have found the mental state element and at

14   least one statutory aggravating factor.  The

15   specific offenses in the counts for which you are

16   considering the sentence are not aggravating factors

17   and, thus, may not be considered themselves as

18   aggravating factors in your weighing process.  This

19   means, for example, that the fact that Count two

20   charges murder in aid of racketeering while Count

21   five charges a drug-related murder are not

22   aggravating factors to be weighed in the balancing

23   to decide what the sentence should be on those two

24   counts since both counts relate to the death of Tina

25   Johnson.

**A.352**

**Sentencing Hearing Minutes June 13, 2011**

1    You must independently weigh the
2    aggravating factor or factors that you unanimously
3    found to exist, and each of you must weigh any
4    mitigating factors that you individually or with
5    others found to exist.  Remember, you are not to
6    weigh the threshold mental state factors as any part
7    of this process nor any aggravating factors you
8    didn't find proved nor the nature of the specific
9    counts of conviction.
10           In engaging in the weighing process you
11   must avoid any influence of passion, prejudice or
12   any other arbitrary consideration.  Your
13   deliberations should be based on the evidence you
14   have seen and heard and the law on which I have
15   instructed you.  The process of weighing aggravating
16   and mitigating factors, or weighing aggravating
17   factors alone if you find no mitigating factors, in
18   order to determine if a death sentence is justified,
19   is by no means a mechanical process.  In other
20   words, you should not simply count the total number
21   of aggravating and mitigating factors and reach a
22   decision based on which number is greater.  Rather,
23   you should give -- you should consider the weight
24   and the value of each factor.
25           The law contemplates that different

**Sentencing Hearing Minutes June 13, 2011**

 1    factors may be given different weights or different

 2    values by different jurors.  Thus, you may find that

 3    one mitigating factor outweighs all the aggravating

 4    factors combined, or that the aggravating factor,

 5    proved do not, standing alone, justify imposition of

 6    the sentence of death beyond a reasonable doubt.

 7    Similarly, you may instead find beyond a reasonable

 8    doubt that a single aggravating factor sufficiently

 9    outweighs all mitigating factors combined so as to

10    justify a sentence of death.

11            Each juror is to decide individually

12    what weight or value is to be given to a particular

13    aggravating or mitigating factor in the

14    decision-making process.  If you do not unanimously

15    determine beyond a reasonable doubt that the

16    aggravating factors sufficiently outweigh the

17    mitigating factors so as to justify a sentence of

18    death as to any count, then you may not consider the

19    death penalty for that count and you will reflect

20    that determination in Section VI.

21            Remember that even a finding that the

22    aggravating factors sufficiently outweigh the

23    mitigating factors to justify a sentence of death

24    does not require that you impose a sentence of

25    death.  There is never any requirement that the

**Sentencing Hearing Minutes June 13, 2011**

1   death sentence be imposed.  Your determination of

2   what the sentence shall be will be the result of

3   your carefully weighing these various factors and

4   making a unique, individual judgment about the

5   sentence that is appropriate for the defendant Azibo

6   Aquart.

7         And the seventh and last step is your

8   determination of sentence.  Whether or not the

9   circumstances in this case persuade you that a

10   sentence of death is called for is a decision that

11   the law leaves entirely to you.  Remember that

12   before the sentence of death can be imposed, all 12

13   jurors must agree that beyond a reasonable doubt

14   death is in fact -- let me do that again.  Remember,

15   that before a sentence of death can be imposed, all

16   12 jurors must agree that beyond a reasonable doubt

17   death is in fact the appropriate sentence knowing,

18   as I have told you, no juror is ever required by the

19   law to impose a death sentence.  The decision is

20   yours as individuals to make.  Any one of you may

21   decline to impose a death sentence.  You do not have

22   to give a reason for your decision.  The law has

23   given each of you the discretion to temper justice

24   with mercy.

25         Bear in mind that in order to find that

**Sentencing Hearing Minutes June 13, 2011**

1  a sentence of death should be imposed on defendant

2  Azibo Aquart, the jurors must first have unanimously

3  concluded that beyond a reasonable doubt a death

4  sentence is justified because the aggravating factor

5  or factors sufficiently outweigh any mitigating

6  factors, as I discussed earlier.  However, once it

7  is imposed, I cannot change it.  I will have no

8  discretion and I must then sentence the defendant to

9  death.

10          If you unanimously determine that the

11  defendant, Azibo Aquart, should be sentenced to life

12  in imprisonment without possibility of release,

13  record that determination in Section VII of the

14  Special Verdict Form.  If you unanimously determine

15  that the defendant Azibo Aquart shall be sentenced

16  to death, record that determination in Section VII

17  of the Special Verdict Form.

18          It is your duty as jurors to discuss the

19  issue of punishment with each other in an effort to

20  reach agreement if you can do so.  However, each of

21  you must decide the question of punishment for

22  yourselves, but only after full consideration of the

23  evidence with the other members of the jury and

24  respectful consideration of their views.  While you

25  are discussing this matter, do not hesitate to

**Sentencing Hearing Minutes June 13, 2011**

1    re-examine your own opinion and to change your mind

2    if you become convinced that you are wrong.  But do

3    not give up your honest beliefs as to the weight or

4    the effect of the evidence or the appropriate

5    sentence for Azibo Aquart solely because others

6    think differently or simply to get the case over

7    with.

8              In consideration of whether the death

9    sentence is appropriate, you must not consider the

10   race, color, religious beliefs, national origin or

11   sex of either Azibo Aquart or of any victim.  You

12   are not to return a sentence of death unless you

13   would return a sentence of death for the crime in

14   question without regard to the race, color,

15   religious beliefs, national origin or sex of either

16   Azibo Aquart or any victim.

17             To emphasize the importance of this

18   consideration, Section VIII of the Special Verdict

19   Form contains a certification statement.  Each juror

20   should carefully read that statement and sign your

21   name in the appropriate place if the statement

22   accurately reflects the manner in which each of you

23   reached your individual decision.

24             Now, after you have heard counsel from

25   both sides in their closing arguments, I'll give you

**Sentencing Hearing Minutes June 13, 2011**

1  a few final instructions about the verdict form and

2  your deliberations.

3           At this point we will take a five-minute

4  recess, you will then hear the government's closing

5  argument.  We will then take a half hour for lunch,

6  return for the defendant's closing argument and the

7  government's rebuttal argument.  You still must not

8  discuss this case.

9           We will stand in recess.

10          (Jury exited the courtroom.)

11          THE COURT:  All right, counsel, do you

12  want to just take the five-minute recess and I'm

13  have you put your pinpoint objections on the record

14  when we finish everything.

15          MS. RODRIGUEZ-COSS:  We're ready now.

16          THE COURT:  All right, go ahead.

17          MR. SHEEHAN:  Your Honor, Attorney Van

18  Ness is going to handle this.

19          MS. RODRIGUEZ-COSS:  Should we address

20  the Court from counsel table?

21          THE COURT:  That's fine.

22          MS. RODRIGUEZ-COSS:  Your Honor, as

23  previously indicated, the government objects to the

24  definition of mitigating factor at pages 2, 28, 31,

25  34 and 35.

**Sentencing Hearing Minutes June 13, 2011**

```
1    sheet as an option for each count for the jury.
2                 THE COURT:  All right, thank you very
3    much.
4                 Let's take three minutes and then we'll
5    be back for the government's closing.
6                 (Recess)
7                 THE COURT:  All right, please be seated,
8    ladies and gentlemen.  We will bring in the jury.
9                 (Jury entered the courtroom)
10                THE COURT:  Please be seated, ladies and
11   gentlemen.  The government will now give its closing
12   argument; Tracy Dayton to deliver it.
13                MS. DAYTON:  Thank you, your Honor.
14                Good morning.  I want to begin by
15   thanking you on behalf of the Court, the defense and
16   the government for your participation in this case.
17   You've shown an incredible amount of dedication
18   despite the fact it's been a very long process.  We
19   appreciate the sacrifices, the personal sacrifices
20   you have made and the time that you have devoted to
21   this case.  You've been incredibly attentive and
22   served with distinction, and for that we all thank
23   you.
24                We've now come to the close of this case.
25   You've already found the defendant guilty of three
```

**Sentencing Hearing Minutes June 13, 2011**

5616

1    horrific murders, so now we've come to the time

2    where you must decide what his punishment should be.

3    No one is going to suggest to you that this is an

4    easy process or that it's an easy decision.  It's

5    not.  In fact, it's likely one of the most difficult

6    decisions that you'll ever be called upon to make.

7    Which is why the government wants to spend some time

8    going through with you how you go about making that

9    decision, how you decide what justice demands when a

10   man like the defendant, who the evidence shows has

11   absolutely no regard for human life, brutally and

12   cruelly murders three defenseless human beings.

13              In a moment I'm going to speak with you

14   about the process that you must follow in coming to

15   your decision.  But before I do, I want to focus you

16   back on the victims in this case.  One of the

17   factors that you may consider is the rippling

18   effects that this case had not only on the victims,

19   but on their families.  In evidence you have several

20   photos that were admitted in order to give you a

21   glimpse of Tina, of James, and of Basil, the people

22   that they were and the lives that they lived.  We

23   ask that before you return a verdict in this case,

24   that each and every one of you look at each and

25   every photograph to try to understand the loss that

**A.360**

**Sentencing Hearing Minutes June 13, 2011**

5617

1    was suffered.

2              What you'll notice as you look at these

3    photographs is that there are large portions of the

4    victims' lives that are not represented, parts that

5    can never be replaced and photographs that will

6    never be taken.

7              For instance, here is a photograph of

8    Tina holding Lativia's and Erica's first born

9    children.  But where is the photograph of Tina

10   holding Akeela, Erica's now six-month-old child, the

11   granddaughter that Tina will never hold.

12             Here is a photograph of James with his

13   brothers, but where is the photograph of James as

14   the best man at his brother Jason's wedding, a

15   wedding that he'll never attend.

16             And here is a photograph of Basil with

17   his family, with his mom Odessa.  But where is the

18   photograph of Basil taking care of Odessa, his mom,

19   the woman who can't even remember that he's dead.

20   Odessa Williams, Barbara Johnson and Mary Reid,

21   three women, three mothers, who had to bury their

22   own children.

23             The government asks that when you look at

24   these photos you think about the moments that make

25   up a lifetime, you think about the incredible loss

**A.361**

**Sentencing Hearing Minutes June 13, 2011**

1   that has been suffered, and about the fact that

2   Lativia couldn't even hug her mother good-bye, that

3   she was denied that right to closure, all because in

4   bludgeoning Tina to death the defendant left her

5   without enough bone struck to hold her face in

6   place.  Think about the fact that John David will

7   never hear Basil yelling to him from the sidelines

8   of a cricket game, and James will never again laugh

9   with his brothers.

10          Look at this photo of Leroy with Tina.

11  Look at the smile on her face.  Tragically this is

12  not how Leroy will remember his mother.  Rather, his

13  last vision of his mother is of Tina covered in duct

14  tape, covered in blood, bound and gagged.  There is

15  no amount of help and no amount of intervention that

16  can ever make that vision go away.

17          A few moments ago the Judge instructed

18  you on the procedure that you must follow in making

19  a determination as to the appropriate and justified

20  sentence in this case.  You've already found the

21  defendant guilty of six counts of capital murder,

22  and so now you must move on to the eligibility

23  threshold factors that the Judge instructed you on.

24          First, you have to determine if the

25  defendant was 18 years of age or older at the time

**Sentencing Hearing Minutes June 13, 2011**

5619

```
 1    he committed these murders.  About this, there is no

 2    dispute.  The government and the defense have

 3    stipulated that the defendant was 23 years of 18 on

 4    October 24, 2005, when he killed Tina, James and

 5    Basil.

 6             Next, you must determine whether or not

 7    the government has proven to you beyond a reasonable

 8    doubt at least one of the preliminary intent

 9    factors.  We have alleged two.  The government

10    submits to you that based upon the evidence that you

11    already relied upon in finding the defendant guilty

12    of intentional murder, that we have proven to you

13    beyond a reasonable doubt that he intentionally

14    murdered Tina and Basil.  Specifically, the evidence

15    established beyond a reasonable doubt that the

16    defendant intentionally killed Tina and Basil by

17    personally beating them to death with a baseball

18    bat.

19             With respect to all three victims, the

20    evidence established beyond a reasonable doubt that

21    the defendant intentionally participated in an act,

22    which in this case is a home invasion robbery,

23    contemplating that the life of a person would be

24    taken or that lethal force would be used against

25    another person, and that the victims, Tina, James
```

**Sentencing Hearing Minutes June 13, 2011**

5620

1    and Basil, died as a result of that act.

2              Simply put, the government submits that

3    repeatedly bludgeoning someone over the head with a

4    baseball bat is the intentional infliction of lethal

5    force.

6              After you find that the threshold

7    eligibility factors have been satisfied, you must

8    move on to consider whether or not the government

9    has proven beyond a reasonable doubt at least one

10   statutory aggravating factor.  Here we have alleged

11   not just one, but five, and we submit to you that

12   we've proven them all beyond a reasonable doubt.

13             The first aggravating factor that the

14   government has proven is that the defendant procured

15   the commission of the murders by the promise of

16   payment.  With respect to this factor, you learned

17   that the defendant did not just associate with this

18   criminal enterprise, he led it.  Witness after

19   witness came in here and told you that the defendant

20   supplied the crack, he set the prices, he chose the

21   drug apartment, he arranged for the lookout

22   apartment, he hired the lookouts, he hired and paid

23   the sellers, he collected the money, he disciplined

24   the workers, and when it was necessary, he bonded

25   out his employees.  And when it was time to

**A.364**

**Sentencing Hearing Minutes June 13, 2011**

```
 1   eliminate the competition, he told his lieutenant
 2   "I'll take care of it," and then he hired his team.
 3   You heard from Taylor that the defendant's currency
 4   was drugs and that while they were in Georgia he
 5   told Taylor that he was having a problem and that he
 6   needed Taylor's help.  In exchange, he promised to
 7   set Taylor up in Charles Street so that Taylor could
 8   make money earning drugs.
 9            The next aggravating factor that the
10   government submits it has proven beyond a reasonable
11   doubt is that the defendant committed these murders
12   with the expectation of pecuniary gain.  Here the
13   evidence, we submit, is crystal clear.  The
14   defendant committed these murders to maintain his
15   drug territory.  The evidence you heard was that the
16   defendant benefited, profited from every bag of
17   crack that was sold.  Every bag was important to
18   him.  In fact, he repeatedly sent people to the
19   hospital over messing up a few bags of crack.
20            Part of the reason the defendant wanted
21   Tina dead was that she was impinging upon his
22   profits.  She was taking his customers and he wanted
23   them back, and he chose to make that happen by
24   literally eliminating the competition.  The fact
25   that the defendant, who made thousands of dollars a
```

**A.365**

**Sentencing Hearing Minutes June 13, 2011**

5622

1    week in the drug trade, would murder three people

2    over a few dollars is overwhelming evidence not only

3    of the defendant's greed and his intent to derive

4    pecuniary gain, but also his utter lack of respect

5    for human life.

6           The next aggravating factor that the

7    government submits it has proven to you beyond a

8    reasonable doubt is that the defendant engaged in

9    substantial planning and premeditation.  The

10   evidence that you heard is that the defendant

11   started planning the victim's demise long before he

12   actually murdered them.  You heard that the

13   defendant was not about to tolerate Tina selling

14   drugs in his building, and the defendant let her

15   know that.  You heard about the fight between Tina

16   and the defendant from Jackie Bryant.  Ms. Bryant

17   told you that that fight was enough to scare her,

18   but Tina didn't back down.  So then the defendant

19   instructed Womble to set upon Tina, but she still

20   didn't back down.

21          So then the defendant went into action.

22   First, while in Georgia, he explained the problem he

23   was having with Tina to his brother, Azikiwe Aquart,

24   and he hired Taylor for his team.  Next, when they

25   returned to Bridgeport, he immediately met with

**A.366**

**Sentencing Hearing Minutes June 13, 2011**

5623

```
1   Womble and he gave him money in order to buy a bat.

2   The government submits this is evidence that the

3   defendant had not only decided that he was go to go

4   murder the victims, but he had decided precisely the

5   weapon he was going to use to do it.

6            The defendant then met up with Azikiwe

7   and Taylor and they began shopping around different

8   stores to buy duct tape.  You heard that they went

9   to several stores and that the defendant did not

10  rest until he found what he wanted at Walgreen's

11  where he bought not only the duct tape, but the

12  latex gloves designed to mask his presence at the

13  scene.

14           They then met up with Johnson and they

15  converged upon the victims' home.  The defendant

16  enlisted the help of Frank Hodges in order to get

17  them in the door, but it didn't work, no one

18  answered when Frank knocked.  So, did this deter the

19  defendant?  The evidence shows no, it didn't.

20  Rather than give up or abandon his plan, the

21  defendant found a way to perfect it.  He once again

22  gathered his forces, amassed his weapons, donned his

23  ski masks and his gloves, and then he kicked in the

24  victims' door, invaded their home armed with

25  baseball bats, a gun, duct tape and a drill.  Even
```

**A.367**

**Sentencing Hearing Minutes June 13, 2011**

5624

1  the scene inside the apartment shows that this was

2  all very well-orchestrated.  The victims were not

3  scattered about the apartment.  Rather, the evidence

4  shows that they were subdued with a gun, thoroughly

5  hog-tied with the duct tape, and then beaten to

6  death in their own bedrooms.

7          The defendant's actions after he killed

8  the victims also speaks significantly to the

9  substantial planning that went into these crimes.

10  After he murdered the victims, the defendant walked

11  into the front room, but he didn't walk out the

12  front door.  Rather, he took the drill he had

13  brought and he stood there drilling the door shut

14  and sealing the victims in their own home.  The

15  defendant then turned around, walked back into the

16  room where Tina and James were lying in pools of

17  their own blood, and he stepped over them like they

18  were trash to climb out the bedroom window.

19          The defendant then arranged to conceal

20  the evidence by having Lashika Johnson get rid of

21  the clothing, and he set about looking for a place

22  to move his business, explaining to Taylor that the

23  murders had brought a lot of heat on the building.

24  This was not a spontaneous act of violence, this was

25  a well-orchestrated execution.

**A.368**

**Sentencing Hearing Minutes June 13, 2011**

5625

1          Next, the government must prove that the

2    defendant intended to murder more than one victim in

3    a single criminal episode.  Here the evidence shows

4    that the defendant not only intended to, but he did

5    murder three victims.  As you'll remember, the

6    defendant's real issue was with Tina.  It's arguable

7    that he could have satisfied his need for revenge

8    and proven his dominance in the drug trade by

9    killing Tina alone.  He had that option.  He was

10   wearing a ski mask, he could have turned and walked

11   out the door and chosen to spare James and Basil,

12   chosen to let them live to see their families again.

13   But he didn't.  Instead, the defendant chose to

14   murder all three victims at the same time.  The

15   government submits that it's clear from the evidence

16   that when the defendant kicked down the apartment

17   door to 101, that he intended for everybody in that

18   apartment to die.

19          The evidence also established beyond a

20   reasonable doubt that the defendant personally

21   killed both Tina and Basil by beating them over the

22   head with baseball bats.  The evidence also shows

23   that the defendant, in concert with his brother,

24   bound James, and that Azikiwe Aquart then beat James

25   to death in accordance with the defendant's wishes.

**A.369**

**Sentencing Hearing Minutes June 13, 2011**

```
 1           Killing one person is horrible; beating
 2    three people to death is beyond comprehension.  The
 3    government submits it has proven this factor beyond
 4    a reasonable doubt and that it should receive great
 5    weight in your deliberations.
 6           The final factor that further sets this
 7    case and this defendant apart from others is the
 8    shockingly heinous, cruel and depraved manner in
 9    which the defendant killed the victims.  If you look
10    at the definition of depraved, it states that the
11    defendant must have relished the killings or he must
12    have shown indifference to the victim's suffering,
13    meaning that he knew she was suffering but he
14    continued to harm her anyway.
15           Here, the fact that the defendant
16    continued to bludgeoned Tina as she began to wail is
17    evidence of his complete indifference to her pain.
18    While it may have been the pleasure of retaliation
19    that provoked him to invite Taylor to come and get
20    him some, the government submits that this is
21    incontrovertible evidence of the defendant's
22    depravity.
23           All three victims, Tina, James and
24    Basil, were subject to torture and serious physical
25    abuse.  All three were duct taped with such a
```

**Sentencing Hearing Minutes June 13, 2011**

```
 1    ferocity that James' elbow and Tina's wrist broke in
 2    the process.  They were duct taped so tightly and
 3    with so many layers that it was hard to get the tape
 4    off.  They couldn't even cut it off without cutting
 5    the victim.  But once it was removed, the tape stood
 6    up on its own.
 7              Even looking at the evidence it's hard
 8    to say what's worse, the fact that Tina's eyes were
 9    left uncovered, the mental torture that she must
10    have experienced watching the man she loved get
11    bludgeoned to death, watching his skull get crushed
12    and his blood splatter all over the room, or the
13    fact that both James and Basil had their faces
14    completely covered in duct tape with the exception
15    of the holes that were left for their noses.
16              Ask yourself, why would someone leave a
17    hole for the victim's nose unless he wanted to make
18    sure that the victim didn't suffocate before he had
19    a chance to beat him over the head with the baseball
20    bat.
21              You saw the photograph of Tina in life.
22    Here is what she looked like when the defendant was
23    done with her.  The evidence has established that
24    Tina was alive during her attack.  According to the
25    medical examiner, she was bludgeoned on the front,
```

**A.371**

**Sentencing Hearing Minutes June 13, 2011**

```
 1   back and side of her head, and you can see that,
 2   meaning that she had to have changed positions
 3   during the course of the assault.  That's confirmed
 4   by Tom Martin's testimony that Tina had blood
 5   spatter both on the front and the back of her shirt,
 6   which the government submits could not have happened
 7   unless Tina changed position during the assault.
 8            You also saw the photograph of James in
 9   life.  And here is what he looked like when the
10   defendant and his brother were done with him.  The
11   evidence establishes that James, like Tina, was
12   repeatedly struck on his head.  Again, Tom Martin
13   explained that pooling of blood does not begin until
14   after the first blow that actually breaks the skin.
15   Therefore, in order for James' blood to have covered
16   the walls and the ceiling in the way that it did,
17   James would have -- James would had to have been hit
18   repeatedly from several angles or while he was still
19   moving, soaking the bat in blood and casting the
20   blood off around the room.  James, like Tina, had
21   his skull crushed; pieces of it were lodged in his
22   brain.
23            And then there was Basil.  Basil who
24   never hurt anyone in life.  Basil who made his
25   brothers laugh in life.  And here is what he looked
```

**A.372**

**Sentencing Hearing Minutes June 13, 2011**

5629

```
 1    like when the defendant was done with him.  Basil,

 2    who the evidence shows, experienced death not once,

 3    but twice.  As Basil lay in his room, his face and

 4    his head covered with duct tape, he could not see or

 5    speak, but the evidence is that he could breathe

 6    through that nose hole.  And the government submits

 7    that Basil, like John Taylor, could hear the sounds

 8    of death from the room next door, the deafening

 9    sound of silence, and then the sound of his friend

10    Tina, the woman who had taken care of him, getting

11    bludgeoned to death, her high-pitched wail and her

12    pain and fear as the defendant beat the life out of

13    her.

14              Yet, there was absolutely nothing that

15    Basil could do about that.  How could he even cry?

16    The duct tape was so tight, where would the tears

17    go?  So Basil, all 5'2, 139 pounds of him, was left

18    to lie there and to wait and anticipate his own

19    death, an indescribable mental anguish.  And Basil

20    did die at the hands of the defendant.  The evidence

21    shows from the expired blood spatter right by his

22    nose that his last breaths were through his own

23    blood before his skull was crushed to pieces.

24              How does one accurately describe the

25    gratuitous violence that the defendant inflicted
```

**A.373**

**Sentencing Hearing Minutes June 13, 2011**

5630

1  upon the victims?  And how does James' mother

2  explain to his daughter that the last impression

3  that anyone will ever have of her father's face is

4  the one that he left in this death mask.

5          The law only requires the government to

6  prove one threshold factor and one statutory

7  aggravating factor in order for the defendant to be

8  considered eligible for the death penalty.  Here,

9  the government submits that we've not only proven

10  all five aggravating factors, that we've also proven

11  beyond a reasonable doubt two non-statutory

12  aggravating factors that should also weigh into your

13  deliberations.

14          The first we already spoke about, and

15  that is the effect that these murders had on the

16  victims and upon their families, the families to

17  whom they were all incredibly close.  The defendant

18  robbed the victims of their lives, he stole years

19  from them, decades during which they should have

20  been playing with their grandchildren, loving their

21  children, laughing with their siblings and caring

22  for their aging parents.  Instead, the defendant

23  devastated three families.  He deprived Tippy's dad

24  of his will to live and left Erica wanting to take

25  her mom's pain and her mom's place.  The defendant

**A.374**

**Sentencing Hearing Minutes June 13, 2011**

```
 1   broke the hearts of three families and he left them
 2   all with a permanent void.
 3              The next non-statutory aggravating
 4   factor that the government submits it has proven to
 5   you beyond a reasonable doubt is that the defendant
 6   engaged in a continuing course of criminal, violent
 7   conduct.  The defendant's unrelenting and escalating
 8   campaign of violence, one serious assault after
 9   another, makes these crimes, his murders, even
10   worse.  Think for a minute about the defendant's
11   mentality.  He left the day-to-day operations of his
12   drug trafficking organization up to his lieutenant.
13   However, he took it upon himself to be the enforcer,
14   to physically assault people when they violated his
15   rules, although the evidence showed sometimes he
16   needed no provocation at all.  You have heard about
17   the assaults and seen the medical records for most
18   of his victims.  Jackie Bryant, Venro Fleming, Frank
19   Hodges, Juanita Hopkins, John Sullivan, and of
20   course Anthony Armstead.
21              What the evidence has established is
22   that the defendant tormented the weak, he attacked
23   the unsuspecting, and he brutalized those who were
24   too scared to fight back.  This factor speaks to the
25   depth and breadth and seriousness of the defendant's
```

**Sentencing Hearing Minutes June 13, 2011**

1    ongoing conduct, and we submit should also weigh

2    heavily into your deliberations.

3              After you've considered the aggravating

4    factors, then you need decide if the defense has

5    proven to you any of the 28 mitigating factors that

6    they claim exist.  Only one of the proposed

7    mitigators relates to the crimes that the defendant

8    committed, and that's No. 1.  Specifically No. 1

9    states that neither John Taylor nor Efrain Johnson

10   will receive the death penalty for their roles in

11   the offense.

12             The defense is trying to bolster this

13   factor by relying upon Johnson's statements to law

14   enforcement, statements which are not only

15   internally inconsistent and not only inconsistent

16   with the forensic and testimonial evidence, but also

17   inconsistent with the defendant's theory of the case

18   during the guilt phase.

19             For instance, Johnson claims that the

20   only weapon he saw was a ten-inch pipe that Taylor

21   allegedly whipped out of his pocket.  Well, you know

22   from the medical examiners and Tom Martin that the

23   victims were not killed with a ten-inch pipe.  There

24   was blood on the walls and blood dripping from the

25   ceiling, and the slaughterhouse effect in the

**Sentencing Hearing Minutes June 13, 2011**

```
 1   southwest bedroom must have been made, as you

 2   learned from Tom Martin, with a weapon of sufficient

 3   length and surface area to splatter that quantity of

 4   blood up to the 9'3 7/8 inch ceiling.

 5              So ask yourself, why did the defense

 6   introduce Johnson's statements?  The government

 7   submits that it was in an effort to shift blame from

 8   the defendant to Taylor, to make Taylor look like he

 9   was more involved in these offenses than he

10   testified to here at trial.  But you saw Taylor

11   testify and you saw him get cross-examined; the

12   cross-examination where he wasn't asked one question

13   about what role he actually played in the offense.

14   Why?  Because then the defense theory was that

15   Taylor wasn't even there for the murders.

16              MR. SHEEHAN:  I'm going to object, your

17   Honor.  May we approach?

18              THE COURT:  You may.

19              (Sidebar conference)

20              MR. SHEEHAN:  Your Honor, for the

21   reasons we have stated in our previously filed

22   motion in limine, I believe that counsel's arguments

23   at this point, in effect comparing what issues were

24   raised at the guilt phase, constitutes a form of

25   denigrating the offense -- denigrating the defense.
```

**A.377**

**Sentencing Hearing Minutes June 13, 2011**

 1  We had no obligation at the guilt phase to present a

 2  theory of defense.  Indeed, what we were challenging

 3  was whether or not the government had proven its

 4  case beyond a reasonable doubt.

 5          For the reasons that we set forth in

 6  section 23 -- 24 -- I'm sorry, on 23 in that memo, I

 7  think this whole argument, to the extent that

 8  they're trying to say, well, this is what they

 9  argued in the guilt phase, constitutes an improper

10  form of argument and it should be precluded.

11          MS. DAYTON:  The government disagrees,

12  and it's almost over anyway.

13          MR. SHEEHAN:  I --

14          THE COURT:  To the extent that the

15  government is claiming that there is something wrong

16  or different or flawed about what defense counsel

17  did by having an inconsistent theory, I'm going to

18  sustain your objection.  I will instruct the jury

19  that what -- that the --

20          MS. DAYTON:  May we --

21          THE COURT:  -- decisions by defense

22  counsel are not -- on how to litigate the case are

23  not relevant at the penalty phase.

24          MS. DAYTON:  They're the agents for the

25  defendant and the defendant claimed that Taylor

**Sentencing Hearing Minutes June 13, 2011**

```
 1    wasn't there and now he's --
 2              THE COURT:  It's all about the
 3    defendant, it's not about their counsel.
 4              (Sidebar concluded)
 5              THE COURT:  All right, ladies and
 6    gentlemen, I'm sustaining the defense's objection
 7    and I will ask you to not take into account in your
 8    deliberations at the penalty phase the strategic
 9    conduct of counsel.  This is for you to assess based
10    on what you find proved and what you conclude about
11    the defendant and the government's proof.
12              All right, you may continue.
13              MS. DAYTON:  So, is it true that neither
14    Taylor nor Johnson will receive the death penalty
15    for their roles in the offense?  Yes, that is true.
16    But the government submits that there is a very good
17    reason for that.  The evidence has established that
18    the defendant was substantially more culpable, bore
19    more responsibility for these crimes than either
20    Taylor or Johnson.  This was his building, his drug
21    operation.  He planned this, he hired his crew, he
22    premeditated these murders.  He personally killed
23    Tina and Basil, and he personally chose to end the
24    lives of the three victims.
25              The defendant has also raised three
```

**Sentencing Hearing Minutes June 13, 2011**

5636

1    potential mitigators related to prison.  First, if

2    he's not sentenced to death that he will be

3    sentenced to life in prison.  Yes, that is true and

4    that is the law.  The government submits that does

5    absolutely nothing to mitigate the defendant's

6    vicious crimes in this case.

7              MR. SHEEHAN:  I object.

8              THE COURT:  A mitigator does not have to

9    relate to the crimes.  The jury will consider that

10   as argument only.

11             MS. DAYTON:  Second, the defendant

12   states that life imprisonment is severe punishment.

13   What you learned about life imprisonment you learned

14   from the defendant's expert, Mark Bezy, and from

15   Anthony Armstead.  What you heard is that the cell

16   doors open at 5:00 a.m. and they stay open until

17   approximately 9:00 p.m.  During that time period the

18   inmates can work, attend classes, play basketball,

19   played handball, shop in the commissary, go to the

20   law library, go to the yard, hang out in common

21   areas, watch TV, talk and play cards.  Inmates can

22   write letters, talk on the phone, and receive

23   visitors.  They're fed --

24             MR. SHEEHAN:  I'm going to object.  May

25   I approach?

**A.380**

**Sentencing Hearing Minutes June 13, 2011**

```
 1              MS. DAYTON:  Your Honor.
 2              THE COURT:  What is --
 3              MR. SHEEHAN:  This was specifically --
 4              THE COURT:  Very rapidly.
 5              MR. SHEEHAN:  This was specifically
 6    raised, your Honor.
 7              (Sidebar conference)
 8              MR. SHEEHAN:  In our motion in limine at
 9    section 16 we objected to their commenting on the
10    cost or comforts.  This is not the cost, this is the
11    comforts of life imprisonment.  There was no
12    objection to that.
13              MS. DAYTON:  I'm not --
14              MR. SHEEHAN:  This motion in limine was
15    sustained.  It's at page --
16              MS. DAYTON:  I'm not talking about the
17    comfort of prison, I'm talking about the evidence
18    that they put on through their expert.  I'm talking
19    directly from the evidence that was derived at
20    trial.  I've never seen counsel object like is
21    happening in this trial during the closing argument.
22              MR. SHEEHAN:  Your Honor, could I
23    address that?
24              THE COURT:  Can you just wait a sec.
25    The primary focus of your objection is cost.  It has
```

**A.381**

**Sentencing Hearing Minutes June 13, 2011**

1   not been the direction of her argument.  The

2   mitigator has been that life in prison is harsh.

3   She is taking the evidence that has been educed that

4   may bear against a finding that that mitigator has

5   been proved or that it mitigates.  I do not

6   understand her argument to be implying that the jury

7   should consider the cost of food, shelter and so

8   forth, and I have specifically, over the

9   government's objection, charged that cost is not a

10  consideration.

11          To the extent she limits it to the

12  harshness as opposed to claiming that it would not

13  be sufficient justice to sending him to those

14  circumstances, I don't think that the objection

15  should be sustained so long as it's confined to

16  rebutting that mitigator.

17          MR. SHEEHAN:  Your Honor, could I just

18  indicate for the record that I'm objecting as well

19  with respect to the comforts of prison as being an

20  appropriate factor for the government to be arguing.

21          And the reason why, despite counsel's

22  objections, the reason why I am making these

23  objections is because of the myriad of cases which

24  hold that if you don't object you waive it.

25          THE COURT:  That's fine, and I'm simply

**A.382**

**Sentencing Hearing Minutes June 13, 2011**

5639

```
 1    putting it in the context of this argument, that she
 2    is responding to this express mitigator that life in
 3    prison would be harsh and not on the government's
 4    own argument making the suggestion that life
 5    imprisonment is either costly or comfortable.
 6                (Sidebar concluded)
 7                THE COURT:  The objection is overruled
 8    the argument is focused only on the mitigator
 9    related to life imprisonment is harsh and for no
10    other reason.
11                MS. DAYTON:  So, is prison restrictive?
12    Yes.  But the government submits that, again, does
13    not mitigate the fact that the defendant callously
14    and viciously murdered three human beings.
15                Third, the defendant claims that if
16    sentenced to life in prison that he can be securely
17    housed by the Bureau of Prisons.  Again, you saw
18    Mark Bezy testify, the defendant's expert.  The
19    government respectfully submits that you should
20    accord his prediction about where the defendant
21    might be housed absolutely no weight.  Mr. Bezy does
22    not work for the Bureau of Prisons, he is not
23    consulted by the Bureau of Prisons, and as he
24    acknowledged, he does not know where the defendant
25    might ultimately be sentenced.
```

**A.383**

**Sentencing Hearing Minutes June 13, 2011**

```
 1              And then there are 19 proposed
 2   mitigators that all appear to be varying ways of
 3   saying the defendant had a difficult childhood.
 4   Let's examine those.  By all accounts the defendant
 5   was born into the arms of a loving and nurturing
 6   mother.  She has been repeatedly described as a
 7   wonderful woman who was caring, intelligent and
 8   industrious.  Who could ask for a better role model?
 9   The defendant lived with her for the first 12 years
10   of his life; arguably, his most formative years, the
11   time when you learn right from wrong and when you
12   establish your moral core.
13              You also heard that the defendant's
14   biological father, Richard Aquart, although not an
15   ideal parent, was not only intelligent, charismatic
16   and well-liked and respected in the community, but
17   also that he clearly loved and provided for his
18   children.  Yes, he was a drug dealer, he sold
19   marijuana, and that is bad, but the evidence also
20   showed that he largely insulated the defendant from
21   his drug dealing activities.
22              You remember when the defendant was very
23   young, less than two years old, his parents
24   separated and the defendant stayed living with his
25   mother.  The defendant's mother eventually remarried
```

**A.384**

**Sentencing Hearing Minutes June 13, 2011**

1  his stepfather, Skibo; Skibo, who Azizi told you,

2  cared for the defendant and defendant's stepsisters

3  to the exclusion of Azizi and Azikiwe.  And on the

4  occasions when the defendant went to visit his

5  father, he also had the love, care and nurturing of

6  his stepmother Gillian Walcott.

7          There is nothing to suggest that the

8  defendant was deprived of love or nurturing during

9  the first 12 years of his life.  He had a roof over

10  his head, food to eat, clothes to wear, Big Wheels,

11  bicycles and birthday parties.  The defendant was

12  surrounded by people who loved him and by people who

13  tried to give him guidance and discipline.

14          You learned that when the defendant was

15  not in school or in the company of a parent or

16  stepparent, that he was either in daycare or with

17  his nanny, Rose McKinney, with a family friend or

18  with his brother Azizi.  There was testimony that

19  somehow it was so damaging that the defendant would

20  somehow be left with his older brother, but Azizi

21  summed it up the best when he said "being the oldest

22  comes with both privileges and responsibility," like

23  keeping an eye on your kid brother.

24          When the brother was 12 his mother

25  tragically drowned.  No one disputes that was a

**A.385**

**Sentencing Hearing Minutes June 13, 2011**

```
 1    horrible loss.  In fact, the government agrees that
 2    it is horrible to have one's mother taken away from
 3    them.  And the year after his mother's death sounds
 4    like it was also difficult.  The defendant was
 5    understandably sad and not yet settled.  He spent
 6    some time in the company of his maternal aunt and
 7    then several months with Sharon Headley.
 8    Interesting, you'll see the school records from that
 9    period where the defendant actually did okay in
10    school.  Soon, however, the defendant became too
11    much for Ms. Headley to handle.  He stopped
12    following her rules.  But this really was not new
13    behavior.  In fact, the evidence you heard was that
14    the defendant was a handful before his mother passed
15    away.  As Mr. Adams told you, the defendant would
16    run away when the defendant didn't get his way.  He
17    was filled with rage, rough with people and with
18    animals, and he had to be handled with kid gloves.
19            So, the defendant returned home to live
20    with Azizi, which worked out very well because Azizi
21    wanted him back.  Azizi had stepped up, become
22    emancipated and used the $100,000 insurance policy
23    that his mother had left him and the state
24    assistance that he was receiving to obtain a
25    two-bedroom apartment and to take care of his
```

**Sentencing Hearing Minutes June 13, 2011**

5643

```
 1    brothers.  And by all accounts he did a great job.
 2    In fact, you'll remember the probation report that
 3    actually said he did a tremendous job and he did
 4    much better than most adults in his situation.
 5              But the evidence shows that soon the
 6    defendant didn't want to follow Azizi's rules
 7    either.  First, he got caught with marijuana.  Not
 8    exactly a major violation, but notable in the fact
 9    that the entire system came running to his rescue.
10    The defendant was placed on intensive probation and
11    he had two probation officers coming to see him
12    three times a week.  He repaid them by threatening
13    to sic a Pit Bull on Ms. Hart-D'Amato.  The
14    defendant also started going to individual therapy,
15    group family and family therapy.  Mr. Shannon told
16    you that's not because there was anything wrong with
17    the defendant psychologically, but rather they were
18    trying to give him any needed support.  And how did
19    the defendant respond?  Well, he made a choice.  He
20    decided to go out and rob somebody.  He said he had
21    a weapon, threatened to kill them over what turned
22    out to be a dollar.  So, the defendant ended up in
23    jail, which is what happens to people who decide to
24    live outside the rules and restrictions placed upon
25    them by society.
```

**A.387**

**Sentencing Hearing Minutes June 13, 2011**

5644

```
 1              But even in jail the defendant was not
 2    cast aside.  Rather, he was provided with an
 3    education and given the tools to succeed by a woman
 4    who quite obviously cared about the defendant and
 5    his development, Ms. McCoy.  In fact, you heard over
 6    and over again that the defendant is actually an
 7    intelligent and articulate person who has the
 8    capability and had the foundation to live a
 9    law-abiding life.  He chose not to.  He was given
10    the guardrails about which Mr. Shannon spoke and the
11    defendant decided to dive over them.  He did not
12    want to be reined in, he wanted to rule, and the
13    government respectfully submits it's not about his
14    mother's death, that it's about him.
15              So, let's talk for a minute about what
16    the defendant did when he got out of jail at
17    20 years old with a GED and business level college
18    courses.  College level business courses.  Let's
19    review the evidence about all the good deeds that
20    the defendant did as an adult to bring value to his
21    life and to the lives of those around him.  It's
22    going to be a very short discussion because you
23    heard absolutely no evidence whatsoever about
24    anything the defendant did positively as an adult.
25    It's not as if he was at Charles Street acting as a
```

**A.388**

**Sentencing Hearing Minutes June 13, 2011**

1   literacy tutor or encouraging Ms. Hopkins to return
2   and finish her education.
3            The defendant had different aspirations.
4   He took his GED and he put his math skills to work
5   breaking down kilos of crack cocaine and counting
6   the proceeds from his crack sales.  He took his
7   business savvy and he started a prolific drug
8   trafficking enterprise.  Rather than picking up a
9   baby, like Azizi did, he picked up guns and baseball
10  bats.  He even turned his pen of freedom into a
11  weapon of destruction using it to manipulate,
12  harass, threaten and suborn perjury.
13           If you have any question about whether
14  or not the defendant had an option not to turn out
15  this way, you need look no further than his brother
16  Azizi; a man who also lost his mother, whose father
17  was a drug dealer, who himself sold drugs, joined a
18  gang, was shot at 16, and became a father at 17.
19  Yet Azizi managed to attend high school, to attend
20  college, to remain legitimately and gainfully
21  employed for well over a decade, all the while
22  providing for his family, his now four children, and
23  trying to keep his family together.  The government
24  submits this is not about whether the defendant had
25  an ability to understand the morality of his

**A.389**

**Sentencing Hearing Minutes June 13, 2011**

```
 1   actions.  The defendant had a moral compass; he
 2   chose to point it in the wrong direction.
 3            If you need any further insight into the
 4   value that the defendant places on human life,
 5   consider the fact that the defendant brutally
 6   murdered Tina, James and Basil when his then
 7   17-year-old girlfriend, Shante Pettway, was eight
 8   months pregnant with his child.  That speaks volumes
 9   about the defendant's character and his moral fiber,
10   and the government submits tells you more about the
11   defendant than any defense witness who testified
12   here before you.  And that's likely because none of
13   the defense witnesses who testified had seen or
14   spoken to the defendant in years, most of them for
15   well over a decade.  Even Azizi and his wife have
16   not seen or spoken to the defendant in over two
17   years.
18            As you've learned, not every murder
19   warrants the death penalty.  But the evidence has
20   proven to you that the defendant and his crimes are
21   in a different league.  He has truly given meaning
22   to the word heinous.  The evidence has proven to you
23   that the defendant is a cold and calculating
24   murderer.  He killed for money, he killed because he
25   could, and he killed because he enjoyed it.  The
```

**A.390**

**Sentencing Hearing Minutes June 13, 2011**

```
 1   defense tries to mitigate this horrible crime by
 2   claiming that the defendant had a bad childhood and
 3   that the victims had it coming, but they didn't.
 4   They didn't deserve to die, much less to die in the
 5   tormented manner in which they did.  In fact, while
 6   the defense has presented 28 factors that he claims
 7   amounts to mitigation, you must remember what is
 8   important is not the quantity of factors, but, as
 9   the Judge told you, the quality.  And what the
10   government submits is that when you scrutinize these
11   factors, really take a look at them, you'll see that
12   these so-called mitigators actually carry and
13   deserve no true weight.
14           Sometimes there comes a case where the
15   factors and the defendant combine to form the
16   perfect storm, a storm of events and actions and
17   conduct that leaves such a wake of devastation that
18   the only just penalty is death.  Here, sadly, you
19   have that perfect storm.  No murder is tolerable and
20   no murder is without its graphic, gruesome and
21   tragic consequences.  But these murders,
22   individually and collectively, demand a punishment
23   beyond the ordinary for they are extraordinary in
24   their senselessness, their callousness and their
25   execution.  And the government submits it's not just
```

**Sentencing Hearing Minutes June 13, 2011**

5648

1    the murders, it is the violent and inhumane way in
2    which the defendant chose to live his life.  The
3    evidence shows that he dehumanized people, he fed
4    their addictions, he used them and he abused them,
5    and then he murdered the victims so that he could
6    prove his dominance in the drug trade.  It is the
7    defendant who tipped the scales and it is the
8    defendant's actions that have proven that the death
9    penalty is the appropriate and justified sentence in
10   this case.
11          As you heard before, a trial does not
12   begin with opening statements and it does not end
13   with closing arguments.  Rather, it begins with
14   picking a fair and impartial jury and it ends with
15   you, the jury, coming to a just and fair verdict.
16          Ladies and gentlemen, that is what the
17   government asks you to do now, to do justice, to let
18   your verdict speak of the loss of Tina, of James and
19   of Basil, to let your verdict speak to the loss
20   suffered by all of those who loved them, and to let
21   it speak of the fact that the defendant slaughtered
22   three defenseless human beings, tortured them to
23   death over a few bags of crack.
24          The government expects that the defense
25   will ask for your mercy, but the government submits

A.392

**Sentencing Hearing Minutes June 13, 2011**

1  that the defendant has not earned your mercy.

2  Prison is what he's asking for and the death penalty

3  is what he has earned.  Thank you.

4          Thank you, your Honor.

5          THE COURT:  Ladies and gentlemen, we

6  will take a half an hour for lunch, I think your

7  lunch has arrived, and then we will return and hear

8  the defendant's closing argument and the

9  government's rebuttal closing.  Please still do not

10  discuss the case with each other.

11          (Jury exited the courtroom.)

12          THE COURT:  All right, counsel, we will

13  return at ten minutes past one.

14          MR. SHEEHAN:  Your Honor, before we do

15  that, let me indicate I would be moving for a

16  mistrial at this time.  I think that in addition to

17  the reasons set forth at the bench, in closing

18  argument she was -- at the end she was asking for

19  the death sentence on behalf of the victims of the

20  crime, which I think is improper.  She was

21  suggesting that there has to be a nexus between the

22  mitigation despite your Honor's earlier comments to

23  that effect.  Your Honor's earlier correction of her

24  comments, she was suggesting that there has to be a

25  nexus between the mitigation and the ultimate

**Sentencing Hearing Minutes June 13, 2011**

```
 1              MR. SHEEHAN:  Thank you, your Honor.
 2              And good afternoon, everyone.  And I
 3   join the government in thanking you for all of the
 4   reasons that were said by Attorney Dayton.
 5              Let's talk about photos.  What do we see
 6   here in this photo?  A happy family:  A mom looking
 7   strong and healthy; dad bending over two older boys
 8   on their new Big Wheels; a big baby, Jumbo, tucked
 9   into or almost sprawling out of the stroller.  A
10   nice picture.  Does that picture tell the whole
11   truth?  Does any picture tell the whole truth?
12   Certainly not this one.  You don't see the betrayal
13   that greeted Sonia when she arrived from Jamaica
14   with the two other boys to learn about the other
15   woman and the other child waiting for Richard in
16   Bridgeport.  You don't see Richard as a hustler, as
17   a charismatic, self-centered guy.  You don't see him
18   as a big-time drug dealer.
19              What you don't see in this picture is
20   the vulnerability of all of these children.  And you
21   don't see the fragility of their situation,
22   undocumented without any social service system to
23   help them.  It's true they had a community in the 12
24   Tribes, but it was a community that kept them out of
25   the mainstream.  And indeed, for them, the
```

**Sentencing Hearing Minutes June 13, 2011**

1     mainstream was the problem.

2                  What you can't see in this picture is

3     that for Sonia there was no place to go back to.

4     And what you don't see in this picture is how much

5     of all of her time and energy and emotional

6     resources would have to be spent just to hang on.

7                  Let's look at the next photo.  What do

8     see here?  A beautiful smile on Sonia.  We see the

9     open countenances on the older boys.  And we see the

10    toddler.  I submit to you this is the kind of photo

11    that we all have to see in our brothers' and

12    sisters' family photo albums.  They're going to have

13    that photo and they're going to say, well, look at

14    Michael.  And they joke, look at that funny little

15    frown on his face, and Michael is going to just have

16    to smile and say, gees, thanks for keeping that

17    photo.  Kind of funny in the family gatherings when

18    everybody gets together to share the albums.

19                 But what we don't see in this photo is

20    really the screw face, the story that Azizi told us.

21    We don't see how children are encouraged not to show

22    feelings.  We don't see children being taught only

23    to be soldiers; not soldiers for a larger cause, but

24    instead dad's soldier in dad's army on dad's

25    campaign.  And what's his campaign?  To get

**Sentencing Hearing Minutes June 13, 2011**

5653

1    everything he can from America.

2             Well, dad's not in this picture, you

3    might ask.  He isn't, but we know from the evidence,

4    and even if this photo doesn't show it, that he's

5    around.  He's there with all of his charisma and all

6    of his negative influences.

7             Let's look at the next photo.  Mother of

8    the year photo.  And here we have three beautiful

9    boys.  We have the touching handwriting of all of

10   them.  Aziboo Smith down at the bottom, pretty

11   typical for a six-year-old.  To her sons, no doubt,

12   she was the mother of the year.  But let's look

13   behind that certificate and ask ourselves at the

14   time of this certificate, where is dad?  And let's

15   look at the court records that you have in front of

16   you.

17            Well, we know from the first page that

18   dad has been arrested on his drug case.  And we know

19   from the second page, and this section right here

20   that's highlighted, that he's already been

21   convicted, he's filed a motion for acquittal, and

22   then his bond is called and forfeited, and the

23   reason for that is dad is a fugitive as of December

24   of 1986, a fugitive from Connecticut.  And that is

25   what is going on behind the certificate.

**Sentencing Hearing Minutes June 13, 2011**

```
 1              And it's not as if dad just jumped bond
 2    and took off.  Would that he had.  No, he's there in
 3    all of their lives.  And where is he?  Well, he's up
 4    in Hartford under one of his assumed names and he's
 5    still running drugs.  What do we know about that
 6    period in between the screw face photo and the mom
 7    of the year?  We know that the male role model in
 8    Azibo's life is the guy with the gas can on the
 9    porch pouring that gas on the porch of the fellow
10    who owes him the money and then slipping the match
11    under the door.  We don't have a photo of that, but
12    you do have Mike Adams' testimony, Mike Adams who
13    came up here from North Carolina to tell you about
14    it.
15              And let's look at the next photo.  What
16    do we have there?  That's a photo of Sonia, the boys
17    and her daughter.  And, again, what do we see there?
18    A confident, beautiful smile on Sonia's face.  And
19    what is that?  That's the outer face that her
20    friends have told us about, Lillian and Desta.  The
21    outer face that she presents to the outside world.
22    Interestingly here, none of the boys have their
23    dreads.  Do you see Azibo in his white sweatshirt
24    there and the two older boys?  And maybe Richard's
25    influence -- you might say, well, there is no
```

**Sentencing Hearing Minutes June 13, 2011**

5655

1    dreads, maybe Richard's influence has kind of waned

2    a bit, sort of maybe he's not really around.  That

3    looks like a happy family photo.

4           But let's think about what's behind that

5    photo from what other people who testified here.

6    You know about Sonia's difficult relationship with

7    Skibo, the baby's father.  And what about that guy

8    Richard?  Or is it Donovan?  What's his name?  What

9    is his name right now?  Well, we get an answer to

10   that because you've got the New Jersey records in

11   here.  And let's focus in on who the New Jersey guy

12   is.  Oh, yes, Millard Walcott.  That's also Richard

13   Aquart, everybody agrees to that.  And what's he

14   arrested with back on January 14, 1988?  Possession

15   of cocaine, unlawful possession of a weapon, all of

16   that.  And what happens after this?  He goes on the

17   run in New Jersey as well.

18          So, now in January of '88, which is the

19   time of -- about the time of that family photo there

20   with the baby, behind this is Richard.  Richard, a

21   double fugitive.  Richard using Millard Walcott to

22   get away with stuff.  And we also know where Richard

23   is.  He's up in Hartford.  And what do we know about

24   this time?  We know that Sonia is about to send the

25   older boys up to him.

**Sentencing Hearing Minutes June 13, 2011**

5656

1          These photos show the promise in their

2    lives.  The other records and their testimony show

3    the peril in their -- in Azibo's early life.  And

4    this is how the stage was set.

5          As good parents we try to protect our

6    children.  As good parents we try to guard them.

7    Their lives to us are precious, their futures are

8    ours to shape.  We're not always perfect, but as

9    good parents we all try our best and we try to

10   protect them from things that are behind those

11   photos because as parents we know those things can

12   harm children.  As Jim Shannon told you, we are the

13   strong barrier that keeps our kids from falling into

14   the sea.  Azibo did not fall into the sea, he was

15   thrown into it.  And the life that once held promise

16   and future and hope for the future has now been

17   reduced to dying in prison.

18         Let's look at this slide here.  And the

19   Judge told you this in her instructions over and

20   over again, life in prison means exactly that, no

21   parole, no release.  He will never -- by your

22   verdict, you have decided that he will never come

23   out of prison alive.

24         And let's look at that second slide

25   because this really paints the picture here for you.

**Sentencing Hearing Minutes June 13, 2011**

5657

1 It's not where Azibo will die, but how will he die.

2 The only issue here is will he be strapped to a

3 gurney in an execution chamber or will he die in the

4 time that was ordained for him.

5 Judge Arterton has given you the

6 framework for deciding this issue, and we

7 appreciate, all of us do, the careful attention

8 you've given to these instructions, but I want to

9 submit to you a couple of things. The first is what

10 this case, what it is not about. And at this point

11 in the case, as the Judge has instructed you, this

12 is not about excuses. We're not blaming. It's not

13 a blame game. We're not avoiding responsibility.

14 And certainly it's not an issue of justification.

15 Instead, what is it about? It's about

16 your unique and individual choice between life and

17 death. It's about whether another human being lives

18 or dies. It's about for each of you is death the

19 only answer. It's about the power that the law has

20 given to you of life and death, the power the law

21 has entrusted in each and every one of you to temper

22 justice with mercy, and the power that the law has

23 given to each and every one of you to weigh the

24 alternatives.

25 We recognize the burden that you have

**Sentencing Hearing Minutes June 13, 2011**

```
 1   agreed to assume.  Congress, although it has given
 2   you various factors to consider, has left that
 3   ultimate decision in each of your hands.  As Judge
 4   Arterton has told you at all stages in these
 5   proceedings, starting from jury selection to her
 6   preliminary instructions, and again today, death is
 7   never required.  The only circumstance under which
 8   the death penalty is imposed is if each and every
 9   one of you agree.  And if not, the law requires that
10   the sentence be life without release.  The law
11   answers that question as to what happens if everyone
12   does not agree.  This is your framework and this is
13   what sets the stage for you.
14           I want to briefly address those
15   statements you've been given in the penalty phase
16   from Efrain Johnson.  Because he is not available to
17   testify, the law makes those statements available to
18   you.  And what that information, that new
19   information strongly suggests is that John Taylor
20   was much more involved in these murders than he
21   previously testified to.  And what it suggests is
22   that Mr. Taylor minimized his role.  That renders
23   his credibility on other aspects of what happened in
24   that apartment somewhat suspect.  We're not
25   suggesting to you that the conflicting story, that
```

**A.401**

**Sentencing Hearing Minutes June 13, 2011**

```
 1    information that was provided by Mr. Johnson in any

 2    way should shake your conclusion about Azibo's guilt

 3    for these murders, but it does bear on what

 4    punishment should be applied to him in this case.

 5              The government has suggested, well, don't

 6    believe Mr. Johnson because he was only excusing

 7    himself.  But isn't it equally, equally likely that

 8    Taylor was doing precisely the same thing?  The fact

 9    is the Court -- or the government has certainly

10    conceded neither Taylor nor Johnson will be punished

11    by a sentence of death.  Yes, these additional

12    statements from Johnson, they did implicate both

13    Azibo and Azikiwe, and we do not challenge again the

14    guilty verdicts, but they paint a different picture

15    not only of Taylor's role, but also of Johnson's

16    role.

17              Well, why does that matter you might

18    ask.  Generally in a non-capital case the punishment

19    that other people get, indeed the punishment that a

20    defendant gets, is a matter for the court, and it's

21    not a matter for you, the jury, to speculate on.

22    But here in this one unique circumstance your

23    responsibility is different.  That's because in this

24    case, unlike a non-capital case, each and every one

25    of you are the sentencers, and the law requires that
```

**Sentencing Hearing Minutes June 13, 2011**

1  you consider the whole picture in deciding Azibo's

2  sentence.  The fact that others were also involved

3  in the offense and will not receive a death sentence

4  is something that you can and should consider in

5  deciding on the punishment for Azibo.

6          One of the other things that you are also

7  required to consider is the fact that one or more of

8  the victims were engaged in drug dealing.

9  Understanding no one is saying that it is okay to

10  kill drug dealers, but what we are saying, however,

11  is that in deciding to deal drugs people do take on

12  risks.  And the reason they take on the risks is

13  because of the benefits.  The benefits that they're

14  seeking are making money that they would not have

15  otherwise made.  That's why people sell drugs.  And

16  one of the risks is the risk of violence.  And it's

17  not okay to kill drug dealers, and these three

18  people did not deserve to die, but because it's not

19  okay to kill drug dealers, Azibo will be in prison

20  for the rest of his life.

21          What will his life be like in prison?

22  From Mr. Bezy we know that Azibo, if sentenced to

23  life without release, is going to be at a U.S.

24  penitentiary or higher designation facility.  The

25  government tells you just ignore the fact that Mr.

**A.403**

**Sentencing Hearing Minutes June 13, 2011**

```
 1    Bezy comes before you with more than 27 years of
 2    experience within the Federal Bureau of Prisons.
 3    Mr. Bezy told you about his rise through the ranks
 4    from being a correctional officer to a lieutenant to
 5    a captain; about his assignments as a correctional
 6    services administrator in the north central office
 7    which managed a whole conglomeration of prisons;
 8    about his appointments and responsibilities as
 9    warden at various camps, medium security facilities,
10    those are the FCIs he talked about, and U.S.
11    penitentiaries; and about his knowledge of all of
12    the Bureau of Prisons' procedures and policies.
13               Was he an expert?  This was conceded.
14    What was the challenge to his credibility?  That on
15    one occasion he used intemperant language to a
16    deputy warden in an internal meeting?  Does this in
17    any way render his opinion less reliable?  Not at
18    all.
19               What we learned from Mr. Bezy is that
20    the Federal Bureau of Prisons can, with a reasonable
21    degree of certainty, safely and securely house Azibo
22    for the rest of his life.  Will he be deprived of
23    almost everything that we recognize as freedom; the
24    ability to choose who to live with, the ability to
25    choose where to work, the ability to choose when to
```

**A.404**

**Sentencing Hearing Minutes June 13, 2011**

5662

1   go for a walk, the ability to choose what to wear as

2   clothes, where to live, who he can associate with,

3   all of the pleasures we associate with freedom?  The

4   answer to that is yes.  But will he be a danger to

5   others?  The answer to that is no.

6            It's critical that you understand that

7   this testimony has to be fit in with the Court's

8   instructions in this case.  As Judge Arterton has

9   instructed you, all of the evidence, all of the

10  evidence regarding the assaults, including the

11  assault against Mr. Armstead, are not being offered

12  and cannot be considered by you as any kind of

13  evidence that Azibo would commit further dangerous

14  acts in prison.  It would be improper for you to

15  consider this one act in prison over a

16  five-and-a-half-year period as anything further than

17  a single action.  You have the instructions with you

18  on this, and it is right there on page 24 of those

19  instructions, and I just want to read that to you at

20  this moment, and this slide summarizes it.  "The

21  government does not assert, nor has the government

22  established, that if sentenced to life without

23  possibility of release Azibo Aquart will present a

24  future danger to anyone.  It would, therefore, be

25  improper for you to allow any consideration of any

**A.405**

**Sentencing Hearing Minutes June 13, 2011**

 1   notion of future dangerousness to enter into your

 2   deliberations or into your individual determinations

 3   as to the appropriate sentence."

 4          What does Mr. Bezy tells us about the

 5   choices available to inmates doing life without the

 6   possibility of release in the United States

 7   penitentiary or higher?  The only decision that an

 8   inmate has in a penitentiary is whether they are

 9   going to follow the rules or not.  If they don't,

10   they're locked up for 23 hours a day.  In fact, it's

11   a little bit more than that, as I recall his

12   testimony, because there is five hours a week out of

13   that cell.  Maybe they add in the shower time in

14   addition.  But it means that all of your life you

15   are in that cell.  And that's just within the

16   prison, the United States penitentiary.  The Federal

17   Bureau of Prisons can also send people to what they

18   call the special management units, or that ADX

19   facility that Mr. Bezy told us about in Colorado

20   that he helped to set up.

21          It's true that some people in prison

22   don't get the message, but everybody knows the

23   consequences and almost all of them do get the

24   message.  The fact is that the Bureau of Prisons has

25   the controls and the expertise in place to house

**A.406**

**Sentencing Hearing Minutes June 13, 2011**

 1  Azibo if he is sentenced to life without the

 2  possibility of release.

 3          Mr. Bezy has also explained the

 4  difference in general between lifers or short-term

 5  inmates and why -- that's sort of kind of initially

 6  a paradoxical issue, but why is it that long-termers

 7  are easier to manage.  And the fact is there are

 8  incentives in place to go with the program which

 9  other inmates may not have as strongly.  The same

10  staff, the same inmate population, the concern

11  generally without -- throughout the institution of

12  basically people finding their place.

13          I want you to remember as well that Mr.

14  Bezy was not just talking in the abstract.  He told

15  us his opinion after a complete review of Azibo's

16  file and the circumstances of this case.  Was there

17  anything that the government brought out that

18  contradicted this opinion?  Well, I guess you could

19  say the intemperant remark.  But other than that,

20  was there any evidence?  None.  What about the

21  Armstead photos?  But Mr. Bezy was fully familiar

22  with those.

23          Is there violence in prison from time to

24  time?  Yes, this is a sad fact.  And the government

25  asked Mr. Bezy about those statistics.  And you have

**Sentencing Hearing Minutes June 13, 2011**

1    the testimony there.  But my recollection is that

2    Mr. Bezy said -- or was asked, well, 59 serious

3    assaults on staff in 2010.  If the prison population

4    in 2010 was 179,000 inmates, that would be a rate of

5    about three incidents per every 10,000 people.

6    That's not a high measure by any means considering

7    that everybody in there is convicted of crimes.

8          But also take into account that there

9    was no evidence presented to you that Azibo ever so

10    much as made a threat or took any negative actions

11    directed against staff members.  Those issues that

12    were suggested by cross-examination of Mr. Bezy

13    about what happens in prison are really red

14    herrings.  Don't get distracted by them.  You should

15    rest assured that if sentenced to life there is no

16    reason to believe, and indeed as the instructions

17    from the Judge remind you, you are prohibited from

18    inferring that Azibo would be a danger to anyone.

19    Does Azibo need to be executed to protect others or

20    society in general?  No.

21          On the basis of these factors alone,

22    there are substantial reasons to conclude that death

23    is not necessary and that the correct sentence here

24    is life without the possibility of release.  But

25    there is really much more to it than that.

**A.408**

**Sentencing Hearing Minutes June 13, 2011**

5666

```
 1              I want to go back to the circumstances
 2   of Azibo's life and I want to ask you to think back
 3   to the voir dire.  All of you were asked if you were
 4   open to considering the circumstances of a child's
 5   life in the context of mitigation.  And my
 6   recollection is that at least some of you said yes,
 7   sure.  Others expressed a little hesitation, well,
 8   do you know, the circumstances of childhood, people
 9   said, that doesn't excuse a crime for me.  And then
10   either the Judge or one of the defense lawyers or
11   one of the prosecution tried to help you to make it
12   clearer.  And all of you understood in the end that
13   this is not about -- evidence is not offered to
14   excuse the crime at all.  And in fact all of you,
15   all of you expressed an openness to seeing this
16   evidence as possible grounds for mitigation as a
17   reason to consider life instead of death.  If you
18   hadn't been open to this possibility, I assure you,
19   you would not have been qualified to sit as a juror
20   on this case.
21              Now, Sonia was a remarkable woman in many
22   ways, but I submit she was unlucky in her choice of
23   partners.  Richard, dashing and charismatic, he
24   seems to have had quite a magnetic power over women,
25   and it's not surprising a teenage Sonia, escaping to
```

**A.409**

**Sentencing Hearing Minutes June 13, 2011**

5667

1    what perhaps was, for her, a much less desirable
2    life in Jamaica, may have found Richard's charisma
3    irresistible, and then, with her kids in tow, two of
4    them, the older boys, arrives in the United States
5    to find the whole underlying circus, shall we call
6    it, or tragedy, shall we call it, the other pregnant
7    woman right there.  And what Lillian Reid tells us
8    is that then she was ready to, or in fact I think
9    Lillian actually said she did go back to Jamaica.
10   But really what was there to go back to Jamaica to?
11   What was there for her?  I don't think there was
12   much.  And so what was her choice?  Hang on and make
13   due was her only realistic choice.
14            What kind of a dad was Richard?  Well,
15   they concede he was a criminal.  The government
16   suggests that Richard's convictions, well, weren't
17   really all that important.  Who knew about them?
18   Were they secrets?  Well, maybe in the beginning to
19   outsiders they might have been.  Mike Adams doesn't
20   seem to have caught on until he posted property as
21   collateral.  Maybe that's the one where Richard
22   jumped the bail.  As far as friends and family,
23   though, it's hard to believe that Richard's status
24   was a secret.  In fact, everyone who testified here
25   told you that they either personally knew him or his

**A.410**

**Sentencing Hearing Minutes June 13, 2011**

```
 1   reputation in that tight 12 Tribes community as
 2   being a drug dealer.
 3               Well, what does this matter?  Who
 4   teaches us more than our parents?  Was Sonia herself
 5   involved, at least partially, in the drug world?
 6   The evidence suggests that was the case, initially
 7   anyway, as a mule.  A "mule" meaning somebody who
 8   was bringing drugs in and out for Richard.  After
 9   all, women are somewhat less likely to attract
10   attention.  And if she was only directly involved in
11   the beginning, wasn't she at least passively
12   involved throughout the many years Richard was such
13   a presence in their lives?  Indeed, for many years
14   didn't she have to frame her life around the cycles
15   of Richard's boom and bust activities?
16               Let's look back at that photo of the Big
17   Wheels again and just remember what Azizi told us:
18   Sometimes we got Big Wheels and sometimes we had
19   nothing.  Dad would come in with the big present or
20   else we wouldn't have toilet paper.
21               I think from all the evidence you can
22   conclude that Sonia over time developed strength and
23   over time her goals were independent goals, they
24   weren't Richard's goals, and that over time her goal
25   was not to rape America, but to find a better life
```

**A.411**

```
 1   here for herself and her children.  But the fact is
 2   that she had this guy here, this man, the father of
 3   her boys, around her until the time that he was
 4   ultimately arrested, and not arrested on those cases
 5   where he was the fugitive, but arrested when he
 6   actually went to jail.
 7           He wasn't there physically necessarily
 8   with her, but he was taking care of the boys and a
 9   continual presence in their lives.  Indeed, she even
10   sent the older boys to live with him in Hartford
11   while she was struggling to build an alternative
12   life with Skibo.  Why did she do this, you might
13   ask.  Richard was a fugitive at the time.  Mike
14   Adams had told you about posting the bond.  We know
15   he skipped out in December of '86.  We know he had
16   New Jersey looking for him since he got arrested
17   there in 1988.  Why would she send the boys to him,
18   the older boys?  The answer is, well, maybe she had
19   no better choices.  Maybe she was having a hard time
20   dealing with the older boys herself.  Or maybe, and
21   perhaps quite likely, in her opinion as she saw it
22   Richard was not all bad.  Almost everybody, I submit
23   to you, is more than the sum of their bad acts.
24           One thing that we have seen from some of
25   the witnesses in this case is that people who engage
```

**Sentencing Hearing Minutes June 13, 2011**

5670

```
 1   in criminal activity do not necessarily have all of
 2   their family turn their backs entirely on them.  And
 3   the other thing we know, and here the evidence is
 4   overwhelming, is that Sonia's world was so narrow
 5   and so confined -- I mean, for the longest time she
 6   seems to have had no papers.  She never had a strong
 7   family to fall back on.  Her choice to send the boys
 8   to Richard may have seemed like the only possible
 9   option to her.
10               Lillian Reid tells us about the sham
11   marriage to Ernest Reardon that Sonia embarked upon.
12   Carol Porter tells us about the economic hardship in
13   those early days in Bridgeport.  The government
14   asked, well, how was Carol able to pull her children
15   out of that world?  And the answer is she moved.
16   And how did she move?  She had family, her
17   grandmother in East Hartford, her father in New
18   York, to help her.
19               Sonia, as we can see from the map, and
20   this is the map that we introduced to you, never
21   found a stable place to raise her children.  Let's
22   look at the places where Azibo lived before the age
23   of 16, and the schools.  The blue is the places.
24   And then let's look at the schools that Azibo
25   attended, and that's the white.  Now, the government
```

**A.413**

 1   suggests, hey, there is nothing unremarkable about a
 2   person moving to get better locations.  But what
 3   they ignore is the fact that for this family each
 4   move, because they were so isolated, only diminished
 5   the sense of connection with other people and
 6   diminished any moderating impact of friends and
 7   neighbors on the negative factors that were there in
 8   the family.  Sonia, as we know from Maribel and
 9   Desta and others, never had the relationship with
10   her mother to back her up and give her alternatives
11   that might have enabled her to make a clean break
12   with Richard and to protect her children from his
13   negative influence.
14          How big a presence was Richard in
15   Azibo's life?  We know from Carol Porter and Lillian
16   Reid that Richard was not around when Azibo was
17   born.  But we also know he was never really very far
18   away.  Azizi tells us that his parents split up,
19   finally split up when the boys were younger, and my
20   recollection is that he said it was shortly before
21   Azibo started school.  But we also know that Richard
22   was a continuing presence in all of their lives,
23   including Azibo.  We know that the older boys moved
24   up to Hartford to live with Richard and Gillian, and
25   we know that Azibo visited them there.  From Azizi's

**Sentencing Hearing Minutes June 13, 2011**

1   testimony and the school records, we know this was

2   right about the time that Sonia moved to Chestnut

3   Street, which from our school records says 1990, and

4   at that point in time Azibo would have been around

5   nine years old, Azizi would have been 13, and

6   Azikiwe would have been 11.

7            But we also know that throughout this

8   period of time Richard would be at 12 Tribes

9   functions with his posse.  We can all appreciate, I

10  hope, how this would capture a young boy's

11  imagination.  We can also assume from the evidence

12  that although Richard may have been up in Hartford

13  with Gillian, he continued to run his herb gates.

14  And I don't think that's an organic garden anybody

15  is talking about.  It's a drug house, and he's

16  running that out of Bridgeport.

17            Mike Adams tells us how all of the boys,

18  including Azibo, looked up to Richard, and about

19  Richard's reputation in the community.  Gillian also

20  tells us about Azibo yearning to be with his father

21  and also being on the outside during the Hartford

22  years.

23            Why does this matter?  I think if there

24  is one thing that we all know for sure, it's that

25  childhood matters for all of us.  For Azibo growing

**A.415**

**Sentencing Hearing Minutes June 13, 2011**

5673

1   up in Bridgeport, a latchkey kid surrounded by

2   crime.  In fact, do you recall Azizi's testimony

3   about that Adams Street house?  Wasn't that the

4   stash house on the other side of Stratford Avenue?

5   That's where dad had his activities.  That was a

6   place to play.

7            To know that your father was part of

8   this, to know that you live in an isolated

9   community, isolated from the larger population, what

10  this all means is that you are extremely at risk.

11  And what to adults, what to adults appear to be

12  choices, to children become simply the way things

13  are and become the reality to be adjusted to and to

14  become the reality that shapes who we later become.

15           Unlike other children, in Azibo's world,

16  the last place in the world you would look for help

17  was the 911 call.  Think back to Azizi's testimony

18  and then reflect on this in light of our experience

19  as parents and adults.  Do you know, we wouldn't

20  want our children calling 911, and the reason for

21  that is because that 911 call is reserved for true

22  emergencies, and as parents we might discipline our

23  children for calling that number unnecessarily.

24           But for the Aquarts at that point in

25  time, the issue was not that they didn't want to

**A.416**

1    inconvenience the emergency responders, but rather

2    that they did not have any emergency responders in

3    their life at all.  A baby dies, a baby-sitter dies,

4    and no one calls the police.  This tells us volumes

5    about that subculture that these children grew up

6    in.  It was isolated; you could not trust outsiders.

7         For Sonia, the beginning life with Skibo

8    may well have seemed more promising.  But what we

9    learned from Desta Meghoo, who came here from

10   Ethiopia, and Khadijah Jumaralli and from Ife Felix,

11   Cheryl Kennedy, is that there were lots of problems

12   there, and that these problems included verbal and

13   physical abuse.  And from all that we have heard, it

14   is clear that Skibo never bonded with the boys.  And

15   we also learned from Azizi that Skibo himself was

16   involved in illegal activities.

17        Given that Sonia had allowed her older

18   boys to move up to Hartford with their father and

19   that she allowed Azibo to visit them there, how

20   truly effective was she in protecting Azibo from all

21   of these bad influences?  Did she try?  The evidence

22   is that she was trying.  But was it effective?

23   Let's think back on her response when she learned

24   that Azizi had been arrested in Bridgeport.  Here

25   she did take action.  But how was it, you might ask,

**Sentencing Hearing Minutes June 13, 2011**

1   that things got so bad?  Prior to this we know the

2   older boys had been back in Bridgeport and the

3   federal authorities were in hot pursuit of Richard

4   up in Hartford, and this Linwood Avenue address

5   we've got over here on the second side of the map,

6   that was an ongoing drug operation in full tilt

7   where her 15-year-old and her 13-year-old were armed

8   and dealing drugs, and where Azibo, then ten or 11,

9   was visiting and like a sponge taking everything in.

10              Was Sonia just too busy to pick up on

11  the signals before Azizi's arrest?  Maybe she -- she

12  certainly had a lot of pressures.  She had a new

13  store, she had new babies, she was commuting from

14  Bridgeport to New York.  She was basically camped at

15  her friend Khadijah's house.  It's not to fault her,

16  but it's simply she had too many responsibilities to

17  effectively shoulder them all.

18              Again, what does this mean?  Again, how

19  do children learn?  How many times has a child

20  called your attention to what you previously said

21  even if you didn't say it directly to him or her?

22  How many times does a child call your attention to

23  what you did even if you had not intended it to be

24  an example for him or her?  What do children learn

25  from their peers, from their older brothers and

**A.418**

**Sentencing Hearing Minutes June 13, 2011**

 1    sisters?  Is it only what we want them to learn, or

 2    is it what they see and observe all around them?

 3    Why is it that we say that actions speak louder than

 4    words?  Because it's true.  Children know that.  And

 5    that's why environment matters.

 6              Do you know, even that move out of

 7    Bridgeport, was that the right step?  Well, there

 8    was certainly something to be said for it because

 9    there were the boys hooked up with criminal

10    activity.  But it also meant moving away from any

11    other adult support system.  And it also meant

12    piling more responsibilities on Azizi to keep

13    everything, including his two younger brothers, in

14    place.

15              And how did he do in that?  Well, we

16    know from his testimony, and we can infer from all

17    of the facts, that part of his responsibility was to

18    get him and his brothers off to school.  Let's look

19    at Azibo's Stamford records here and those are in

20    evidence.  And let's take a look at just how well he

21    was doing.  Fifteen times tardy in that last

22    quarter.  That's when they just enrolled in

23    Stamford.  Sixteen times tardy from the first

24    quarter.  The following year, 20 times tardy, 35

25    times tardy, and then in that final quarter, and

**A.419**

**Sentencing Hearing Minutes June 13, 2011**

1     that's the quarter where Sonia died, 27 days absent

2     and 11 days tardy.  Is that the sign of somebody

3     getting their younger brother off to school?

4              The grades, the government says, looked

5     okay.  Well, they don't to me.  They look rotten.

6     Putting aside the music and computer, a few Cs, and

7     then all Ds and Fs.  Would any one of us want their

8     kids to bring home that report card?  Was that a

9     good experience?  Let's look at the next page as

10    well.  Well, here is what we see.  Was this kid at

11    risk?  "Properly placed, but needs strong

12    supervision and structure.  Would benefit from

13    alternative placement."  What's that in education

14    speak?  It says things weren't all that well in

15    Stamford.

16             And what else do we know about Stamford

17    where we put Azizi in charge?  How does Azizi do?

18    Well, not so good.  Got expelled from school for

19    bringing drugs.  He also told us about a police case

20    in Stamford.  We may be sure that Sonia was not

21    pleased with these developments, but again, isolated

22    in Stamford, working to set up her business in New

23    York, how many choices did she have?

24             But what all of these facts, the

25    tardiness, the grades, Azizi's expulsion, Azizi's

**A.420**

**Sentencing Hearing Minutes June 13, 2011**

1    criminal case tell us is, again, the protective

2    system around Azibo was extraordinarily fragile.

3              And then by the time that Sonia travelled

4    to Florida with the boys in May of 1994, was

5    progress being made?  By Desta's account there was.

6    Ife, too, has given us grounds for hope.  Grounds

7    for hope as they sat there on the beach talking

8    about the future.  Maybe free of Skibo in a new

9    place she could put it all together.  And

10   unfortunately this was not to be and the riptide

11   took her, the one constant presence in Azibo's life

12   was taken away forever.  Let's look at that funeral

13   program.  That's what the boys got instead of a mom.

14   Was she a virtuous woman?  I'm sure she was.  Where

15   did this leave the boys?

16              Now is the time, if ever there was one,

17   when consistent adult intervention was required.

18   Richard was locked up.  Unlikely that he would have

19   been much of a positive help, but in any case, he

20   was clearly out of the picture.  Skibo, no interest.

21   Grandma seems to either have been unwilling or

22   unable to take an active role.  The 12 Tribes, well,

23   aside from the women who provided temporary housing

24   in the immediate aftermath of Sonia's death, there

25   was never a sustaining help from that source either.

**A.421**

**Sentencing Hearing Minutes June 13, 2011**

```
1              And how did this impact on Azibo?
2   Recall Maribel's testimony about his wail of sorrow,
3   how much he was shattered.  Now the government tells
4   us of course he was sad but, do you know, bad things
5   happen to people and some of them get beyond it.
6   Does that simplistic answer do for anybody?  The
7   better question is what would we want done for our
8   children if they were cast adrift at the age of 12
9   and 14 and 17.
10             The government suggests that Azizi
11  stepped in to fill the breach.  Well, unlike some of
12  the adults in their lives, it's true that he tried.
13  But was he really equipped to do the task?  What we
14  know from the facts is that he had recently been
15  involved in criminal activity himself.  He had been
16  helping his father at Linwood Avenue, in Yarrington
17  Court in Bridgeport.  He had been in with the Bush
18  Mob gang.  He had been expelled from school for
19  drugs.  And most importantly, he had no experience
20  or no confidence in the outside world.  Recall the
21  testimony of Diane Hart-D'Amato.  "You can't help
22  me," he told her.
23             One thing we hopefully learn as children
24  and then take with us as adults, is that when the
25  task is too big we enlist help, but enlisting help
```

**A.422**

**Sentencing Hearing Minutes June 13, 2011**

1　was contrary to all of his training.  Sonia Headley

2　told us about the impact of -- Sharon Headley told

3　us about the impact of Sonia's death on Azibo.

4　Drinking rum to fall asleep.  Ask yourself why did

5　he go to New York with somebody he barely knew?  Was

6　it because his brothers were somewhat foreign to him

7　after the years in Hartford, years that he had

8　observed but was not allowed to fully share?  Or was

9　it that he recognized, maybe subconsciously, that he

10　needed guidance and structure from others that these

11　brothers could not provide for themselves, let alone

12　for him.  And ask yourself why did Azizi take on all

13　the responsibility for Azibo and why did he resist

14　seeking help from the outside.  I think that we can

15　answer this question from all that we have seen

16　about their lives.  Maybe he had promised his mom

17　and dad to keep the family together, but also

18　remember that they never, never had been taught to

19　trust anyone from the outside for help.

20　　　　　　Ask yourself this:  Was Sonia's legacy,

21　that insurance policy, was money what was really

22　needed here?  Maybe the money was good for Azizi in

23　allowing him and Nasheika to set up their own little

24　island, a little island where you could get takeout

25　food whenever you wanted, a little island where you

**A.423**

1   didn't have nosey adults butting into your business,

2   a little island where you were free from the

3   pressures of Nasheika's mom to do what she wanted, a

4   place of freedom for them.  But maybe that money

5   also tricked Azizi into thinking he could go it

6   alone, he could take on what all the professionals

7   who had tried to intervene had recognized, take on a

8   situation where help was desperately needed for

9   Azibo.

10          And here I'd ask you to think about the

11  testimony of Jonathan Davis and Diane Hart-D'Amato

12  and Loretta Jay and James Shannon.  Think, too,

13  about this:  Just how strong was the pull of the

14  streets when Azizi finally got the boys back

15  together?  Where was that?  Fifth Street, at Auntie

16  Carla's.  Fifth Street, the bloody Fifth Street.

17  Well, that is the area that Mike Adams talked about

18  that had descended from Hollywood to horror.  This

19  was in Bridgeport where from Loretta Jay we're told

20  that social workers needed escorts from police.

21          And then let's think of the next

22  development, Azizi gets shot.  For him that may well

23  have been the wake-up call.  And from what I would

24  guess, that some, if not all of us, have seen in our

25  own lives, and what we have certainly seen from some

5682

1   of the witnesses in this case, the fact is that

2   redemption can come from unexpected sources and

3   redemption comes at unexpected times.  Recall how

4   Judy Rivera fell to the bottom and now seems to have

5   gotten her life back on track.  Think about Venro

6   Fleming looking at his arrest photo and then shaking

7   his head, that now he's another person.  Think about

8   the hope expressed by Juanita Hopkins that maybe she

9   can get her life together.  Yes, redemption does

10   happen sometimes.  And maybe for Azizi that was an

11   act of redemption.

12          But also think of it this way.  Think of

13   the perspective of the shooting from Azibo's point

14   of view.  Mom had just been taken away.  By what?  A

15   random wave.  Azizi had just been shot.  He had been

16   bounced around from place to place.  Suddenly

17   everything is uncertain.  How do people respond to

18   uncertainty?  How do youngsters respond to

19   uncertainty?  How do we push against the boundaries?

20   Is it surprising that Azizi's efforts now at this

21   time to direct and guide Azibo would have

22   encountered some resistance?

23          Azizi tried, but he had a lot on his

24   plate.  He had a new baby, he had a young

25   girlfriend, he had a need to finish their schooling.

**A.425**

**Sentencing Hearing Minutes June 13, 2011**

5683

```
1   Think about Jonathan Davis's initiation of that
2   neglect proceeding.  Jonathan goes to the house and
3   Azizi is not there.  We see that in Exhibit EE-2, "a
4   home setting that was poorly supervised in that the
5   older brother was rarely home to supervise him."
6              True, in the end, all of the adults had
7   kind words and no doubt kind thoughts for Azizi's
8   efforts.  But the fact is that everyone who thought
9   about it realized that that task was too large for
10  any 18-year-old.  In the opinion of this
11  intensive -- "it is the opinion of this intensive
12  supervision probation officer that Azizi is
13  overwhelmed with his responsibilities and feels that
14  it is his responsibility to keep them together."
15  Yes, he felt responsible, but he was overwhelmed and
16  he didn't trust anybody.
17             You found that Azizi committed these
18  crimes, and these crimes are facts.  The fact is
19  that Azizi -- Azibo's life -- I'm sorry, you found
20  that Azibo committed these crimes and that is a
21  fact.  But the fact is that Azibo's life was marred
22  by tragedy.  Sonia was an amazing woman and her loss
23  is one we can appreciate.  Do the circumstances of
24  Azibo's childhood excuse the crime?  That's never
25  been the question.  Do they weigh in favor of a
```

**A.426**

**Sentencing Hearing Minutes June 13, 2011**

```
 1    sentence of life imprisonment?  The answer is yes.
 2                I want to also bring to your attention
 3    again the testimony of Mary McCoy.  And let's look
 4    at that certificate of appreciation.  The fact is
 5    that Azibo will spend the rest of his life in
 6    prison.  Has he demonstrated a capacity to care for
 7    and act kindly in a positive way towards others in
 8    that harsh environment of a prison?  Yes, he does.
 9    Do people care about Azibo?  Absolutely.  His
10    brother, Azizi; his sister-in-law, Nasheika; Mary
11    McCoy, who recalled with fondness the Mother's Day
12    card; Lillian Reid, who remembers his stay with her
13    and his thanks for having provided him with a
14    refuge; Desta makGOO, who I mentioned before came
15    here from Africa to testify on his behalf and who
16    recalled his short stay with appreciation; Eleanor
17    Cooper, who told us about Azibo's willing acceptance
18    of her apology after falsely accusing him of
19    stealing from her and putting him out; ago DEECH
20    shall, who remembered the cologne incident and his
21    kindness towards her children; Sharon Headley, who
22    recalled his thanks to her at later 12 Tribe
23    functions; James Shannon, who saw both the peril and
24    the promise in his life and who came here before you
25    to testify.
```

**A.427**

**Sentencing Hearing Minutes June 13, 2011**

```
 1              And also consider the testimony of
 2    Shante Pettway in the guilt phase of this case, the
 3    mother of their child Angel.  Shante, who
 4    demonstrated affection and concern even though she
 5    was called to testify against him.
 6              One of the mitigating factors you are
 7    allowed to consider is whether Azibo's execution
 8    would cause others to suffer grief and loss.  Why,
 9    am I asked, is this relevant?  The reason why it's
10    relevant is that each of you needs to bring to bear
11    all of your own experiences in deciding this
12    question.  We don't screen out your sensibilities.
13    We don't tell you to consider only this or only
14    that.  We don't give you a formula for a decision.
15    Instead, we ask you to bring your own sense of
16    compassion and decide this issue.  Consider the
17    testimony of all of these witnesses and how they
18    testified.
19              And, finally, I want to address the
20    issue of mercy.  In the instruction Judge Arterton
21    told you that each of you has been given by the law
22    the discretion to temper justice with mercy.  Maybe
23    that's not fair, maybe we shouldn't put that
24    responsibility on you, but the fact is that we do.
25    The government has argued to you that Azibo is not
```

**Sentencing Hearing Minutes June 13, 2011**

5686

```
 1    entitled to mercy.  Look at what he did in this
 2    case, they've argued.  But that's not really what
 3    mercy is about.  Mercy is not something that is
 4    earned.  Nobody is entitled to mercy.  Nobody really
 5    has a right to it.  Mercy really is our response to
 6    tragedy, it's our recognition of potential, it's our
 7    expression of hope.  It's our willingness to say
 8    that death is not the answer, to say that there is
 9    an opportunity for rehabilitation and redemption if
10    his life is spared.  That act of mercy is really the
11    redemption for all of us.
12              There has been, no doubt, too much
13    killing.  That killing has to stop, and it can stop
14    here with us, and it can stop now, and life
15    imprisonment, for that reason, is the appropriate
16    sentence in this case.
17              For all of these reasons, I ask that
18    this be your verdict.  It is an individual decision,
19    and I urge you to respect one another when you begin
20    to deliberate.  If a juror truly believes death is
21    the answer, that juror is entitled to believe that.
22    And if a juror believes that life is the answer,
23    that juror is entitled to believe that.  In the
24    process of deliberation, I urge all of you to talk
25    together, to deliberate together, to express your
```

**A.429**

**Sentencing Hearing Minutes June 13, 2011**

5687

```
 1    feelings to each other, and to recognize that each

 2    of you individually needs to make the decision that

 3    your mind and your heart require.  Please, I ask

 4    you, let the killing stop with you.

 5                    Thank you very much.

 6                    THE COURT:  All right, thank you.

 7                    Rebuttal closing on behalf of the

 8    government by Ms. Reynolds.

 9                    MS. REYNOLDS:  Thank you, your Honor.

10                    Members of the jury, Mr. Sheehan

11    mentioned that actions speak louder than words, and

12    they do.  What this case is about is what the

13    defendant decided to do, the choices he made as an

14    adult.  This is a defendant who chose baseball bats

15    as his murder weapon even though he had a gun.  This

16    is a defendant who broke into the home of the

17    victims in the middle of the night.  This is a

18    defendant who brought duct tape.  He made sure to

19    bring duct tape, and he wrapped the victims in it,

20    and then bludgeoned them to death after they were

21    utterly defenseless.  This is the defendant who

22    thought to bring a drill with him so he could seal

23    the front door of their apartment and entomb all

24    three of the victims in their own home.  This is a

25    defendant who deserves the death penalty.
```

**A.430**

```
 1            Now, Mr. Sheehan -- I want to first
 2    address the arguments Mr. Sheehan made about the
 3    defendant's childhood and the defendant's
 4    background.  He talked at length about the witnesses
 5    that they presented during the penalty phase.  You
 6    heard from witness after witness that the defense
 7    presented who knew the defendant when he was a
 8    child, who knew him when he was a born, when he was
 9    a toddler, when he was 12 and 13 years old.  But
10    interestingly, most of them didn't know the
11    defendant as an adult.  In fact, most of them told
12    you they hadn't even seen the defendant since the
13    time he was 12 or 13 years old.
14            And when you think about what you heard
15    from the defense in mitigation in this case, these
16    witnesses and what they told you, they told you
17    about the 12 Tribes, they told you about the
18    defendant's father's narcotics trafficking activity,
19    they told you about the tragic death of the
20    defendant's mother.  But when you sift through
21    everything they told you about the defendant's
22    background and his childhood, and when you really
23    shake it out, there is nothing of consequence left.
24            There is nothing that should -- you
25    should give any weight to about the defendant's
```

A.431

**Sentencing Hearing Minutes June 13, 2011**

```
 1   background and childhood, because on August 24th of
 2   2005 this defendant wasn't a kid who had just lost
 3   his mother.  This defendant wasn't some wayward
 4   person who had nowhere to go.  This defendant wasn't
 5   a drug addict who had succumbed to his addiction, or
 6   someone with mental illness.  No, he was the
 7   founding partner and the leader of a violent and
 8   prolific crack enterprise.  He was the boss, he made
 9   the decisions, he decided what the rules would be,
10   and he enforced those rules.
11            And let's talk about rules because --
12   well, before I do that, let me add, the defendant
13   was 23 years old.  He wasn't a kid who had slipped
14   through the cracks.  He was someone who was the boss
15   of his own organization.  You'll recall the
16   testimony.  He was the one driving around in the
17   fancy Cadillacs.  He was the one driving around in
18   the black Chevy Tahoe.  He was the one who made
19   every decision.  He managed every aspect of that
20   drug organization, from where the product would be
21   packaged and how it would be packaged, from where it
22   would be sold, to how much it would be sold for and
23   by whom it would be sold.  And all of those profits
24   came right back up to line the defendant's pockets.
25            And so the evidence is that the
```

**A.432**

**Sentencing Hearing Minutes June 13, 2011**

1    defendant was well aware of rules.  He made his own

2    rules.  He made sure to enforce the rules.  Some of

3    what the defense has argued today is that they're

4    arguing that the defendant didn't have proper rules

5    and boundaries, he didn't have a proper father

6    figure in place when he was a child, and therefore,

7    he wasn't able to know right from wrong.  But again,

8    think about what the defendant did as an adult.  He

9    had his own enterprise.  He made the rules.  He knew

10   right from wrong.  He chose not to follow society's

11   rules.  He wanted to follow his own rules, the rules

12   that would benefit him.  That's what he did.  Those

13   were his choices.

14            Now, Mr. Sheehan has told you and has

15   discussed with you again the testimony you heard

16   about what happened after the defendant's mother

17   tragically passed away.  He told you about Azizi,

18   and you heard Azizi testify.  He took guardianship

19   of his brothers, and he tried his best.  He imposed

20   rules, but the defendant didn't want to follow those

21   rules either.  He didn't want to follow any rules

22   unless they benefited him.

23            Mr. Sheehan told you today in his

24   argument and went on about all of the other people

25   who tried to help the defendant along the way.  And

**A.433**

**Sentencing Hearing Minutes June 13, 2011**

```
 1    there were numerous people.  Sonia's friends, you
 2    heard from many of them who tried to give the
 3    defendant a second chance, tried to help him when he
 4    was a child.  But the defendant threw all of those
 5    second chances away as well.  He was given many of
 6    those chances.
 7              Azizi did his best; he set rules, he
 8    kept the family together.  And now, all of these
 9    years later, they say he was ill-equipped, but at
10    the time he was commended.  Azizi was commended for
11    keeping the family together and for taking on that
12    responsibility.  He did his best.  Make no mistake
13    about it, Azizi didn't fail the defendant, the
14    defendant failed Azizi.  The GED teachers and the
15    juvenile probation officers didn't fail the
16    defendant, he failed them, because the lack of a
17    father figure and the tragic loss of your mother at
18    a young age does not equal a lack of freewill.
19    People grow up, and when they grow up they make
20    choices, and they have the freewill to make choices
21    and they choose to do the right thing.
22              But that's not what this defendant did.
23    And you saw that Azizi, he could have chosen, like
24    his brother Azizi did, to go to college, to raise a
25    family, to be a productive, law-abiding citizen.
```

**A.434**

**Sentencing Hearing Minutes June 13, 2011**

5692

1   That's not what this defendant chose.  He chose

2   differently.  He chose to live a life of violence

3   and a life of crime.  Those were his choices.  It is

4   not the fault of Azizi that the defendant made those

5   choices when he became an adult.  It is not the

6   fault of the City of Bridgeport that the defendant

7   made those choices when he became an adult.  It is

8   not the fault of Jonathan Davis, his juvenile

9   probation officer, or the GED teacher.  These were

10  his choices.  In the end he acted, he chose.

11          And what did he choose?  He chose to

12  carefully plan and execute, plan, to murder three

13  people inside their homes.  He chose a path of

14  death, a path that led to the brutal murder of Tina,

15  James and Basil.

16          Now, I wanted to discuss that a little

17  bit further, because the defense argued about the

18  people that were in place during the defendant's

19  childhood, and there were -- you heard testimony

20  from Mr. Shannon.  Even Mr. Shannon, a psychologist,

21  told you when he testified the defendant was

22  articulate, he was intelligent.  He didn't see any

23  learning disability, evidence of any learn

24  disabilities.  He didn't see the need to order a

25  psychological examination or psychiatric

**A.435**

**Sentencing Hearing Minutes June 13, 2011**

1     examination.  And he gave advice to the defendant.

2     He gave him that pen.  Do you remember you heard Mr.

3     Shannon testify about that, that this will be your

4     freedom, this will be your chance out, education and

5     a pen.  But the defendant chose to ignore that as

6     well.  All along the way people tried to help him

7     when he was a child, but he chose differently.

8            I want to address also one of the

9     arguments that the defendant made to you just a few

10    minutes ago, or the defense made, and that is this

11    idea and this mitigator that they're proposing to

12    you about the assumption of the risk, that somehow

13    the victims were involved in such a dangerous

14    activity that they contributed to their own murders.

15    They've argued from the beginning of this trial that

16    the victims assumed the risk, and now they're

17    arguing to you that somehow Tina and James' use of

18    crack cocaine and Tina's sale of small amounts of

19    crack cocaine was so dangerous an activity that it

20    contributed to their own murders.

21            You should give absolutely no weight to

22    that suggestion.  Tina, James and Basil were at home

23    asleep.  What could possibly be so dangerous about

24    that activity to lead to their own murders or

25    contributed to their own murders?  Tina, James and

**Sentencing Hearing Minutes June 13, 2011**

1   Basil were not drug kingpins defending their stash

2   and their kilograms of crack cocaine.  They were

3   unarmed.  They weren't engaged in some running gun

4   battle through the streets of Bridgeport with Tina's

5   crew shooting at the defendant's crew.  That's not

6   what happened here.  They were at home asleep.

7                It is the defendant who engaged in

8   violent acts.  It is the defendant who injected

9   danger into that situation.  It is the defendant who

10  carefully planned to ambush them and slaughter them

11  in their own home.

12                I also wanted to address another one of

13  the arguments that defense counsel made to you, and

14  that is the execution impact.  And Mr. Sheehan

15  talked to you and argued to you that if the death

16  penalty is imposed there will be an impact obviously

17  on Azizi and his wife and the children.  And you

18  heard Azizi and his wife testify to you about what

19  that would mean to them.  But you should remember

20  that it is the defendant who long ago abandoned his

21  family.  It's the defendant who long ago abandoned

22  Azizi and Azizi's wife, his sister-in-law, and his

23  nieces and nephews.  The defendant wasn't writing

24  letters to his nieces and nephews.  He wasn't

25  calling his nieces and nephews.  When he went on

**A.437**

**Sentencing Hearing Minutes June 13, 2011**

1  trips to Busch Gardens, it wasn't with his family

2  and friends.  No, he took his co-conspirators, John

3  Taylor and Azikiwe, who brought a gun.  He took the

4  opportunity for a nice trip to Busch Gardens to help

5  plan the murders and to further his drug trafficking

6  business.

7         The defendant wasn't busy writing

8  letters from jail to his family and friends.  Who

9  was he writing to?  He was writing to Venro Fleming

10  who he had viciously assaulted, and he was

11  threatening Venro in that letter.  He was writing to

12  Frankie Hodges' lawyer and telling Frankie Hodges'

13  lawyer, trying to plant the suggestion that Mr.

14  Hodges should not plead or cooperate in this case.

15  He was busy writing to Shante Pettway, yes, the

16  mother of his newborn child.  And remember those

17  letters.  He wasn't asking her how the baby was

18  doing or how she was doing, he was ordering her to

19  go see some lawyers and trying to plan -- or trying

20  to plant the suggestion that the statements that

21  Jackie Bryant and John Sullivan had made to the

22  police should be discredited.  That's what he was

23  doing.

24         And who was he calling from jail?  He

25  wasn't calling Azizi, he wasn't calling his

**Sentencing Hearing Minutes June 13, 2011**

5696

1    sister-in-law, or the nieces and nephews.  He was

2    busy calling Shante.  And you heard him.  Remember

3    those calls, how he spoke to Shante, how he

4    manipulated and controlled her and how he ordered

5    her to get Azikiwe on the phone.  He ordered both of

6    them to bond John Taylor out of jail.  That's how he

7    was using his phone privileges and his mail

8    privileges, not to keep in touch with friends and

9    family.  In short, the defendant communicated with

10   people not out of concern, he communicated with

11   people if it served his interest.

12            And this case is not about the

13   predictions that Mr. Bezy has made.  You look at the

14   evidence.  You should focus on the choices and the

15   acts the defendant has made time and again in his

16   life.  He has engaged in a pattern of assaults and

17   he continued that pattern of assaults with the

18   assault of Anthony Armstead.

19            What sets this case apart is how the

20   defendant chose to murder Tina, Basil and James.

21   The defendant's actions here do speak louder than

22   words, and they speak about his moral culpability.

23   The evidence clearly shows that the defendant had

24   intended to go to their apartment, the apartment of

25   Tina, James and Basil, with the intent to kill them.

**A.439**

**Sentencing Hearing Minutes June 13, 2011**

```
 1              How he committed those murders, how he
 2    have carried out his plan is what makes these
 3    murders worse.  The defendant had a gun, but he
 4    didn't shoot his victims.  These murders would have
 5    been horrific enough if he had gone in there and
 6    shot them all and gotten it over quickly.  But he
 7    didn't do that.  Instead, he killed them in a
 8    totally depraved manner.  He relished in each and
 9    every act of depravity.  He systematically tied the
10    victims up with duct tape, duct tape that he made
11    sure to bring with him to that apartment.  He tied,
12    gagged, bound Tina Johnson, a defenseless woman, and
13    when she was down on the ground he raised a bat
14    above his head and smashed it into her head
15    repeatedly, and each time he did it he brought all
16    his force on to her head.
17              But the depravity didn't end there
18    because when he was done hitting Tina over the head
19    with that bat --
20              MR. SHEEHAN:  Your Honor, I'm going to
21    object.  May we approach?
22              THE COURT:  Yes.
23              (Sidebar conference).
24              MR. SHEEHAN:  Your Honor, I think this
25    is well beyond rebuttal.  The purpose -- I did not
```

**Sentencing Hearing Minutes June 13, 2011**

5698

 1   in any sense attack or challenge any of the

 2   aggravators alleged by the government in this case,

 3   and what we're hearing right now is a complete

 4   repeat of those matters, which is not proper

 5   rebuttal argument.

 6           MS. REYNOLDS:  Your Honor, I submit it

 7   goes to the defendant's actions.  The entire theme

 8   of rebuttal is to rebut the mitigators.  This is

 9   about how the defendant acted.  I think it's fair

10   argument.  That's what rebuttal is about.

11           THE COURT:  What do you say to the fact

12   that the subject of the details of the murders

13   themselves were not a part of the cross-examination

14   -- closing argument?

15           MS. REYNOLDS:  Because I am arguing to

16   the jury this is why they should impose the death

17   penalty, the depravity, the heinous nature and --

18           THE COURT:  But the question is if

19   that's not raised in the defendant's closing, what

20   are you rebutting?

21           MS. REYNOLDS:  Mercy arguments, general

22   arguments that his life and background mitigate in

23   favor of life.  I'm saying you have to go back to

24   what he did in that apartment.

25           THE COURT:  What you need to do is you

**A.441**

**Sentencing Hearing Minutes June 13, 2011**

5699

1   need to relate them to his arguments, not just a

2   stand-alone repeat of the gory details.  So, if what

3   you are doing is saying the defendant asked for your

4   mercy, this is why redemption and mercy don't apply,

5   but not just a freeform, untethered argument,

6   statements, relating back to the details of the

7   crime which in and of themselves were not the

8   subject of the closing argument.  Okay?

9          MS. REYNOLDS:  Okay.

10         (Sidebar concluded)

11         MS. REYNOLDS:  Mr. Sheehan in his

12  arguments talked to you about mercy.  The government

13  submits the defendant doesn't deserve your mercy,

14  and that is because of what he did inside that

15  apartment.  What sets this case apart, as I was

16  about to say, is that after the defendant beat

17  Tina's head with a baseball bat, he turned to John

18  Taylor and he asked, do you want to get some, too?

19         What sets this case apart and what makes

20  mercy not appropriate for this defendant is what he

21  did inside that apartment, because as he was beating

22  Tina, he watched as his brother beat and bashed

23  James' head with so much force that James' blood

24  covered all the walls in that room and reached the

25  ceiling over nine feet above.

**A.442**

**Sentencing Hearing Minutes June 13, 2011**

```
 1              What sets this case apart is the
 2    extensive planning and premeditation that took
 3    place.  And what sets it apart is that the defendant
 4    relished in each and every act as he underwent it
 5    and that plan went forward.
 6              What sets this case apart is that the
 7    defendant wrapped Basil Williams with duct tape and
 8    he beat him over the head so hard that his skull
 9    shattered like an eggshell and his brain shook
10    inside his head.
11              What is the moral character of a person
12    who commits such a heinous, such a cruel and such a
13    depraved crime?  Is that the person that deserves
14    the minimum sentence under the law?  The government
15    submits the answer is no.
16              Tina's brother wrote "I'll never again
17    hear the joy of my sister's smile."  The defendant
18    has robbed Tina's grandchildren of a loving
19    grandmother and he has robbed and stolen from Jamar,
20    Latavia, Erica and Leroy all of those small moments
21    that they loved to share with their mother, their
22    impromptu family picnics, the surprise birthday
23    gifts, and the good cooking.  James's brother Brian
24    told you that what he misses most about his brother
25    James is his happiness.
```

**A.443**

**Sentencing Hearing Minutes June 13, 2011**

```
 1              MR. SHEEHAN:  Your Honor, I'm going to
 2   renew my objection.
 3              THE COURT:  Please relate this to the
 4   arguments of the defendant.
 5              MS. REYNOLDS:  I make these arguments,
 6   the government makes these arguments, members of the
 7   jury, because the defense has asked you for mercy
 8   for the defendant, and we argue that he doesn't
 9   deserve your mercy.  We understand that you are
10   merciful people capable of mercy, but he doesn't
11   deserve your mercy, and the reason is that he stole
12   from the victims moment after moment that they will
13   not be able to share with their family.
14              You heard from Brian that he misses his
15   brother's good heart.  You heard from Mary Reid that
16   she gave James the name Tippy because he walked on
17   his tiptoes all the time when he was a young boy.
18   The defendant has robbed Brian and Jason of that
19   special bond they shared with their older brother.
20   And the defendant has shattered Mary Reid's life by
21   so brutally taking her oldest son.
22              Basil's only daughter wrote her dad Basil
23   was a caring and good man, and she lamented she will
24   never be able to make that trip from Barbados to
25   Connecticut so that Basil could meet his younger
```

**A.444**

**Sentencing Hearing Minutes June 13, 2011**

```
 1   grandchildren.  The defendant stole from Basil's
 2   brother, John David, and his sister, Pam, those
 3   office visits he would come by in the afternoon.  He
 4   stole from them the ability to spend time with their
 5   brother.  He stole from Basil the opportunity to
 6   spend time with his grandchildren and his daughter
 7   in Barbados, and to spend time with his ailing
 8   mother so that she wouldn't have to keep asking as
 9   her dementia gets worse, "where is Basil?  Why
10   hasn't he called me?"
11            Basil's sister told you that he was a
12   funny man and he had a funny way of laughing and
13   that she could still hear it in her head sometimes,
14   and that she misses just knowing he was there, just
15   having him around.
16            The defense is asking you to impose a
17   sentence of life and they argue that it's a severe
18   enough punishment.  But in this case it's the most
19   lenient punishment that you could possibly impose.
20   He wants you to choose life when he deliberately
21   took the lives of three human beings.  They have
22   asked you for mercy, and, again, there is no doubt
23   that you are all capable of mercy.  The law, as Mr.
24   Sheehan pointed out in the slides, and as the Judge
25   instructed you, the law entitles you to temper
```

**A.445**

**Sentencing Hearing Minutes June 13, 2011**

```
 1    justice with mercy, but it does not require you to
 2    do so.  What about this defendant entitles him to
 3    any mercy?  What about what the defense has
 4    presented entitles the defendant to your mercy?
 5    Nothing.  He does not deserve to live out the rest
 6    of his days in jail.
 7              You must now make this most serious and
 8    difficult decision.  It is a serious and difficult
 9    decision, and we ask when you carefully weigh the
10    evidence you've heard you return the only verdict
11    and the only sentence that is supported by the
12    evidence, and the only just sentence, we'd ask that
13    you sentence the defendant to death.  The
14    defendant's inhumane acts call out for the death
15    penalty in this case.  The defendant earned the
16    death penalty.  The defendant deserves the death
17    penalty.  The defendant should pay the ultimate
18    price for so brutally taking the lives of Tina,
19    James and Basil.
20              THE COURT:  All right, thank you.
21              Now, ladies and gentlemen, the Court's
22    instructions, of which you have a copy for your
23    reference and used as I was delivering them to you,
24    and may certainly, and should, refer to them during
25    the deliberation, are the instructions that you are
```

**Sentencing Hearing Minutes June 13, 2011**

1    to follow.

2                    If any attorney or any witness or any

3    exhibit suggests a different principle, please

4    remember that it is the Court's instructions that

5    you must follow.

6                    I've referenced in these instructions a

7    Special Verdict Form that was prepared to assist you

8    during your deliberations, and it's in the front

9    pocket of your notebooks.  And you are required to

10   record your decisions on this form.  Section 1 gives

11   you the place to record your findings as to the

12   defendant's age.  Section 2 has the space to record

13   your findings on the threshold mental state factors

14   that I described to you and gives you the

15   instructions if you answered no to all of the counts

16   for both of the mental state factors, that you're

17   finished and you should just go to the certification

18   in Section VIII.

19                   Section III is the place where you will

20   record your findings on whether the government has

21   met its burden of proving beyond a reasonable doubt

22   each or any of the five statutory aggravating

23   factors that it claims.

24                   Section IV gives you the section -- the

25   space to record your findings on whether the

**Sentencing Hearing Minutes June 13, 2011**

5705

```
 1   government has proved beyond a reasonable doubt the

 2   two non-statutory aggravating factors that it

 3   claims.

 4              Section V then gives you -- Section IV,

 5   the two non-statutory aggravating factors being

 6   continuing pattern of acts of violence and victim

 7   impact.

 8              Section V contains the space for you to

 9   record your findings on each of the mitigating

10   factors indicating the number of jurors who found

11   that factor proved by a preponderance of the

12   evidence.  Obviously if nobody did, you put zero, if

13   everybody did you put 12, and whatever it is in

14   between.

15              You will also find at the end of that

16   section, after No. 28, a place where you may add

17   additional mitigating factors that any member of the

18   jury has found to exist.  If they're more than that,

19   you just use the back of that page.

20              Section VI is where you record your

21   findings on your weighing process.  And you will see

22   that it is for each count and relates those counts

23   to each victim, and asks as to those counts on which

24   you found the threshold mental state and at least

25   one statutory aggravating factor, whether you
```

**A.448**

**Sentencing Hearing Minutes June 13, 2011**

5706

1    unanimously find beyond a reasonable doubt that the

2    aggravating factors sufficiently outweigh all of the

3    mitigating factors, or in the absence of mitigating

4    factors, that the aggravating factors themselves

5    justify a sentence of death, and you answer that yes

6    or no as it is set out.

7            And then Section VII of the Special

8    Verdict Form is the place where you will record your

9    determination of the sentence for each count.  You

10   will see that for example, Count two, Tina Johnson,

11   there are two entries:  We, the jury, unanimously

12   find that the defendant, Azibo Aquart, should be

13   sentenced to death.  Or, we, the jury, unanimously

14   find that the defendant, Azibo Aquart, should be

15   sentenced to life imprisonment without the

16   possibility of release.  And you do that for each

17   count which will cover all three victims.

18           Section -- the foreperson will then date

19   at the bottom of that the date that you signed this,

20   and you will see that each juror, after you have

21   finished Section VII, the determination of sentence,

22   must sign your name indicating that that sentence

23   above reflects the jury's unanimous decision.  And

24   the foreperson will indicate the date of signing.

25           And then Section VIII is the

**A.449**

**Sentencing Hearing Minutes June 13, 2011**

1    certification I described in which each of you has

2    to certify that consideration of race, color,

3    religious belief, national origin or sex of either

4    the defendant or the victims was not involved in

5    reaching your decision.  And each of you sign that

6    and the foreperson then gives the date and time in

7    which you have completed your form, signs it,

8    advises the marshal outside your door that in fact

9    you have reached the determinations that are

10   required.

11           So, I've now outlined for you the rules

12   of law that are applicable to your consideration of

13   the death penalty and the process by which you

14   should determine the facts and weigh the evidence,

15   and in just a moment you will retire to the jury

16   room.  The importance of your deliberations should

17   be obvious.  I remind you that you can return a

18   decision sentencing Azibo Aquart to death only if

19   all 12 of you are unanimously persuaded beyond a

20   reasonable doubt that the death sentence is in fact

21   the appropriate sentence in this case.

22           When you are in the jury room, please

23   discuss all aspects of the sentencing issues among

24   yourselves with candor and frankness, but also with

25   a due regard and respect for the opinions of each

**A.450**

**Sentencing Hearing Minutes June 13, 2011**

1   other.  Each of you must decide this question for
2   yourself and not merely go along with the
3   conclusions of your fellow jurors.  In the course of
4   your deliberations, no juror should surrender his or
5   her conscientious belief of what's the truth, what's
6   the weight and what's the effect of the evidence and
7   what should be the outcome as determined by that
8   your juror's individual conscience and evaluation of
9   the case.  Remember that the parties and the Court
10  are relying on you to give full, considered and
11  mature consideration to the sentencing decision.
12  And by doing so you carry out to the fullest your
13  oaths as jurors.
14          If it becomes necessary during your
15  deliberations for you to ask for testimony to be
16  read back or to ask questions or seek clarification
17  or to communicate with me for any reason, simply
18  tell me, send me a note that identifies what the
19  question or issue is that's signed by your
20  foreperson.  Don't attempt to communicate with the
21  Court or any court personnel other than by means of
22  such a signed note.  I will not communicate with any
23  member of the jury touching on your sentencing
24  decision other than in writing or orally back here
25  in the courtroom.

**A.451**

**Sentencing Hearing Minutes June 13, 2011**

```
 1              When you've reached the decision, then
 2    you'll just send me a note that your foreperson
 3    signs that you've completed your deliberations, but
 4    you should not state what your determinations are.
 5    And in no communication with the Court should you
 6    ever give any numerical count of where you stand in
 7    your deliberations except as that is required in the
 8    final Special Verdict Form when you have completed
 9    your work.  Whatever determinations you reach, the
10    foreperson must complete the Special Verdict Form
11    accordingly and be prepared to report to the Court
12    the jurors' findings as to the threshold mental
13    state factor, the aggravating or mitigating factors,
14    the weighing decision and the sentencing decision,
15    and the foreperson will sign and indicate it, as
16    will the jurors, in signing the sentence
17    determination and the certification section.
18              I again remind you that nothing I have
19    said in these instructions, nothing I have said or
20    done during the trial has been said or done to
21    suggest to you in any way what I think the outcome
22    should be.  What the sentencing decision should be
23    is your exclusive duty and your responsibility, and
24    I thank you for your service as jurors.
25              It comes the time that I must again
```

**A.452**

**Sentencing Hearing Minutes June 13, 2011**

5710

1    excuse, but not discharge, the alternates.  And

2    again I want to make clear that you remain in

3    readiness to step in and step up as jurors if it is

4    required because of the inability of a juror to

5    continue.  Thus, you must still not discuss this

6    case.  You must hold yourself in readiness to be

7    called back.  You are not being discharged and you

8    won't be discharged until the jury has returned its

9    verdict in this case.  And I again thank you for

10   your service as alternates and will continue to

11   thank you while you hold yourself in readiness even

12   though you are not part of the deliberative process

13   at this stage and may not be at all.

14             So, you are excused to go home, making

15   sure that we know where to be in touch with you, and

16   we will advise you of the point at which you are

17   discharged or need to be recalled.  Thank you very

18   much.

19             Ladies and gentlemen of the jury, you

20   should retire to begin your deliberative process.

21             (Jury exited the courtroom.)

22             THE COURT:  All right, counsel, I will

23   ask you to remain in the near vicinity of the

24   courtroom, if not the courtroom itself, in the event

25   the jury needs further instruction or detail.  When