# 12-5086

*To Be Argued By:*
TRACY LEE DAYTON

## United States Court of Appeals

### FOR THE SECOND CIRCUIT

### Docket No. 12-5086

————

UNITED STATES OF AMERICA,
*Appellee,*

-vs-

AZIBO AQUART, aka D, aka Dreddy, aka Jumbo,
aka Azibo Smith, aka Azibo Siwatu Jahi Smith,
*Defendant-Appellant,*

(For continuation of caption, see inside cover)

————

ON APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF CONNECTICUT

### BRIEF FOR THE UNITED STATES OF AMERICA

DEIRDRE M. DALY
*United States Attorney*
*District of Connecticut*

TRACY LEE DAYTON
JACABED RODRIGUEZ-COSS
SANDRA S. GLOVER
*Assistant United States Attorneys*

LESLIE R. CALDWELL
*Assistant Attorney General*

SUNG-HEE SUH
*Deputy Assistant*
*Attorney General*

DAVID M. LIEBERMAN
*Attorney*
*Criminal Division*
*Appellate Section*

AZIKIWE AQUART, aka Zee, Nathaniel Grant, aka
Correctional Officer Stone, EFRAIN JOHNSON,

*Defendants.*

# **Table of Contents**

Table of Authorities ............................................ xii

Statement of Jurisdiction ............................ xxviii

Statement of Issues Presented for Review ..... xxix

Preliminary Statement ......................................... 1

Statement of the Case ......................................... 4

I. The guilt phase ................................................. 6

  A. The government's case ................................. 6

    1. Aquart runs a large-scale crack cocaine
      trafficking organization in the Charles
      Street building ......................................... 6

    2. Tina's sale of crack cocaine interferes
      with Aquart's profits ............................. 11

    3. Aquart solicits the help of co-
      conspirators Taylor and Azikiwe to
      murder the victims ............................... 13

    4. Aquart attempts to gain entry to the
      victims' apartment ............................... 15

    5. Aquart, Azikiwe, Taylor, and Johnson
      brutally murder Tina, James, and
      Basil ...................................................... 21

6. Aquart directs Lashika to dispose of evidence connecting him to the murders ................................................. 25

7. Leroy discovers Tina, James, and Basil bludgeoned to death ............................. 27

8. Crime scene investigators process the murder scene and collect numerous items of evidence, some of which are later determined to bear Aquart's DNA and fingerprints ............................................. 30

9. Medical examiners determine that Tina, James, and Basil died as a result of blunt force trauma to their skulls .................. 31

   a. Basil's autopsy ................................... 31

   b. Tina's autopsy ................................... 32

   c. James's autopsy ................................ 33

10. Forensic examination of items recovered from the crime scene establishes Aquart's involvement in the murders ................. 34

   a. DNA testing ....................................... 35

   b. Fingerprint analysis ......................... 38

11. An analysis of telephone call records links Aquart, Azikiwe, Taylor, and Johnson to the murders ........................ 39

ii

12. Efrain Johnson admits to Lashika that he assisted Aquart in the commission of the murders, and Taylor eventually admits his role as well ........................................ 41

13. Aquart attempts to obstruct justice by persuading witnesses not to testify or to testify falsely............................................ 43

a. Aquart wrote a letter to Venro Fleming.................................................. 44

b. Aquart drafted a script for Shamarr Myers .................................................... 46

B. The defendant's case .................................. 49

C. The verdict ................................................ 50

II. The penalty phase.......................................... 50

A. The government's penalty phase case .......................................................... 50

1. Aquart murdered the victims in a heinous, cruel, and depraved manner.................................................. 52

2. Aquart engaged in a continuing pattern of acts of violence .................... 55

3. The victims' murders had a devastating impact on their loved ones ....................................................... 56

iii

B. Aquart's penalty phase evidence .............. 57

    1. Aquart's background and
       upbringing ................................. 60

    2. Aquart's early involvement in criminal
       activity .................................. 62

    3. Testimony from correctional consultant
       Mark Bezy ............................... 63

    4. Johnson's proffer statements .............. 64

C. The penalty phase verdict........................ 64

Summary of Argument ..................................... 67

Argument............................................................. 75

I. There was sufficient evidence to prove that
Aquart's enterprise affected interstate
commerce and that Aquart murdered Tina,
James, and Basil to maintain or increase his
position in the enterprise...............................75

  A. Relevant facts ........................................... 75

  B. Governing law and standard of
     review......................................................... 75

  C. Discussion ................................................. 78

    1. Aquart's crack cocaine distribution
       enterprise affected interstate
       commerce .................................79

iv

2. Aquart committed the murders to maintain his position in the enterprise and to protect the enterprise's operations ...............................................81

II. The government did not present perjured testimony from John Taylor about his sentencing expectations................................ 85

A. Relevant facts ............................................ 85

B. Governing law and standard of review ........................................ 91

C. Discussion ................................................. 93

1. John Taylor did not testify falsely ...... 94

2. The government did not recognize any perjury during Taylor's testimony ............................................... 98

3. The allegedly false testimony did not affect the jury's appraisal of Taylor's credibility........................................... 100

4. An evidentiary hearing to determine Taylor's sentencing expectations is not warranted...................................... 105

III. The district court properly exercised its
     discretion to deny Aquart's new trial motion
     based on the claim that Lashika Johnson
     offered perjured testimony ........................ 109

    A. Relevant facts ........................................ 109

    B. Governing law and standard of
       review .................................................... 116

    C. Discussion ............................................. 116

       1. Lashika Johnson did not testify
          falsely................................................ 117

       2. The government did not recognize
          any perjury in Lashika's
          testimony ......................................... 121

       3. The disputed testimony did not affect
          the jury's appraisal of Lashika's
          credibility......................................... 122

IV. The government's guilt phase summation
     discussed the evidence and reasonable
     inferences from that evidence ................... 126

    A. Relevant facts ........................................ 126

    B. Governing law and standard of
       review .................................................... 130

vi

C. Discussion ............................................... 132

   1. The government's rebuttal tendered a fair inference to the jury regarding the absence of Womble's DNA .......... 132

   2. The rebuttal did not deprive Aquart of a fair trial ...................................... 136

V. The jury was able to fairly consider Efrain Johnson's statements during the penalty phase of the proceedings ............................ 140

A. Relevant facts ......................................... 140

B. Governing law and standard of review ..................................................... 144

C. Discussion ............................................... 147

   1. The government's cross-examination of Agent Munger was proper and did not constitute impermissible vouching for a government witness .................. 147

     a. Agent Munger's testimony that Johnson never received a cooperation agreement was proper .................... 147

     b. The government's question to clarify that Johnson never received a cooperation agreement was proper, but in any event, was immediately struck from the record .................... 151

c. There was no prejudice from the government's question about why Johnson was denied a cooperation agreement ...................................... 155

d. The phrasing of the government's questions did not amount to vouching ......................................... 159

2. The government did not mislead the jury about Johnson's change-of-plea proceeding .......................................... 162

a. Relevant facts ................................. 163

b. Discussion ...................................... 164

3. The government did not infringe upon Aquart's right to present a defense ............................................... 168

a. Relevant facts ................................. 168

b. Discussion ...................................... 170

VI. The evidence was sufficient to prove that Aquart engaged in substantial planning and premeditation to cause the victims' deaths and the district court did not err by submitting this aggravating factor to the jury ........................................... 175

A. Relevant facts ....................................... 175

viii

B. Standard of review ................................. 176

  1. Sufficiency of the evidence
    standard ............................................ 176

  2. Manifest injustice ............................. 181

C. Discussion ............................................. 182

  1. The evidence established beyond
    a reasonable doubt that Aquart
    engaged in substantial planning
    and premeditation to murder Tina,
    James, and Basil .............................. 183

  2. Aquart's claim to the contrary— that
    he only intended to commit a robbery—
    is belied by the evidence ................... 187

  3. Aquart failed to establish that
    upholding the verdict would
    constitute a manifest miscarriage
    of justice ............................................ 195

VII. The evidence was sufficient to prove that
   Aquart intentionally killed or attempted
   to kill multiple victims in a single criminal
   episode and the district court did not err
   by submitting this aggravating factor to
   the jury ...................................................... 198

  A. Relevant facts ...................................... 198

B. Governing law and standard of
  review ................................................ 199

C. Discussion .......................................... 200

  1. A rational jury could easily conclude
     that Aquart intentionally killed or
     attempted to kill multiple victims
     in a single criminal episode............. 201

  2. Aquart failed to show that
     upholding the verdict would
     constitute a manifest miscarriage
     of justice ........................................ 207

VIII. The Federal Death Penalty Act does
     not authorize courts to conduct an
     independent "proportionality review"
     of the aggravating and mitigating factors
     to determine the appropriateness of a
     capital sentence.................................... 209

IX. The FDPA is constitutional ...................... 212

A. Relevant facts ...................................... 212

B. Governing law and standard of
  review ................................................ 212

C. Discussion........................................... 214

  1. Infrequency of the death penalty's
     imposition........................................ 215

x

2. Lack of "meaningful basis" to predict
jury verdicts ..................................... 218

3. Race-related considerations ............. 219

X. Capital punishment does not violate the
Eighth Amendment ................................... 221

Conclusion ...................................................... 225

Federal Rule of Appellate Procedure 32(a)(7)(C)
Certification

Addendum

# Table of Authorities

Pursuant to "Blue Book" rule 10.7, the Government's citation of cases does not include "certiorari denied" dispositions that are more than two years old.

# Cases

*Apprendi v. New Jersey,*
530 U.S. 466 (2000) ........................................ 80

*Atkins v. Virginia,*
536 U.S. 304 (2002) ..................................... 211

*Baze v. Rees,*
553 U.S. 35 (2008) ....................................... 222

*Brown v. Sanders,*
546 U.S. 212 (2006) ..................................... 195

*Cavazos v. Smith,*
134 S. Ct. 2 (2011) ........................ 180, 194, 206

*Coker v. Georgia,*
433 U.S. 484 (1977) ..................................... 223

*Coleman v. Johnson,*
132 S. Ct. 2060 (2012) (per curiam)..... 194, 206

*Darden v. Wainwright,*
477 U.S. 168 (1986) ...................... 145, 151, 158

xii

*Eddings v. Oklahoma*,
  455 U.S. 104 (1982) ..................................... 219

*Furman v. Georgia*,
  408 U.S. 238 (1972) ............. 215, 216, 217, 218

*Glossip v. Gross*,
  No. 14-7955, 2015 WL 2473454
  (U.S. June 29, 2015) .................................... 222

*Gonzalez v. United States*,
  722 F.3d 118 (2d Cir. 2013).......................... 106

*Greer v. Miller*,
  483 U.S. 756 (1987) ............................. 153, 154

*Gregg v. Georgia*,
  428 U.S. 153 (1976) ................................*passim*

*Howard v. Walker*,
  406 F.3d 114 (2d Cir. 2005).......................... 148

*Hudson v. McMillian*,
  503 U.S. 1 (1992) ........................................ 221

*Jackson v. Virginia*,
  443 U.S. 307 (1979) ........................ 76, 177, 179

*Jenkins v. Artuz*,
  294 F.3d 284 (2d Cir. 2002)................... 92, 100

xiii

*Jones v. United States*,
  527 U.S. 373 (1999) .............................. 181, 218

*Kansas v. Marsh*,
  548 U.S. 163 (2006) ..................................... 217

*Kennedy v. Louisiana*,
  554 U.S. 407 (2008) ..................... 211, 222, 223

*Lee v. Illinois*,
  476 U.S. 530 (1986) ..................................... 148

*Lowenfield v. Phelps*,
  484 U.S. 231 (1988) ..................................... 214

*McCleskey v. Kemp*,
  481 U.S. 279 (1987) ..............................*passim*

*Napue v. Illinois*,
  360 U.S. 264 (1959) ................................ 92, 122

*Pulley v. Harris*,
  465 U.S. 37 (1984) ....................... 209, 210, 211

*Richardson v. Marsh*,
  481 U.S. 200 (1987) ..................................... 153

*Roper v. Simmons*,
  543 U.S. 551 (2005) .............................. 211, 224

xiv

*Sivak v. Hardison*,
658 F.3d 898 (9th Cir. 2011) ........................ 101

*Smith v. Mitchell*,
567 F.3d 246 (6th Cir. 2009) ........................ 154

*United States v. Abdullah*,
162 F.3d 897 (6th Cir. 1998) ........................ 182

*United States v. Agurs*,
427 U.S. 97 (1976) .................................... 92, 93

*United States v. Allen*,
247 F.3d 741 (8th Cir. 2001), *vacated
on other grounds*,
536 U.S. 953 (2002) ............................. 210, 214

*United States v. Applins*,
637 F.3d 59 (2d Cir. 2011) ............................. 76

*United States v. Autuori*,
212 F.3d 105 (2d Cir. 2000) .......................... 179

*United States v. Avellino*,
136 F.3d 249 (2d Cir. 1998) .......................... 106

*United States v. Banki*,
685 F.3d 99 (2d Cir. 2011) ........................... 130

*United States v. Banks*,
514 F.3d 959 (9th Cir. 2008) .......................... 81

*United States v. Barrett*,
   496 F.3d 1079 (10th Cir. 2007) ...................... 66

*United States v. Bernard*,
   299 F.3d 467 (5th Cir. 2002) ............... 181, 197

*United States v. Best*,
   219 F.3d 192 (2d Cir. 2000)........................... 76

*United States v. Bin Laden*,
   126 F. Supp. 2d 290 (S.D.N.Y. 2001)........... 199

*United States v. Bolden*,
   545 F.3d 609 (8th Cir. 2008) ....................... 176

*United States v. Bryant*,
   711 F.3d 364 (2d Cir.)
   (per curiam), *cert. denied*,
   134 S. Ct. 804 (2013) .................................... 214

*United States v. Caraballo-Rodriguez*,
   726 F.3d 418 (3d Cir. 2013) (en banc) ......... 179

*United States v. Carr*,
   424 F.3d 213 (2d Cir. 2005)................. 131, 161

*United States v. Cassese*,
   428 F.3d 92 (2d Cir. 2005)........................... 178

*United States v. Celaj*,
   649 F.3d 162 (2d Cir. 2011).......................... 205

xvi

*United States v. Concepcion,*
   983 F.2d 369 (2d Cir. 1992)........................... 83

*United States v. Coplan,*
   703 F.3d 46 (2d Cir. 2012), *cert. denied,*
   134 S. Ct. 71 (2013). .................... 130, 145, 170

*United States v. Coriaty,*
   300 F.3d 244 (2d Cir. 2002)......................... 156

*United States v. Cromitie,*
   727 F.3d 194 (2d Cir. 2013), *cert. denied,*
   135 S. Ct. 53, 135 S. Ct. 54,
   135 S. Ct. 54, and 135 S. Ct. 56 (2014)...*passim*

*United States v. Crowley,*
   318 F.3d 401 (2d Cir. 2003)........................... 77

*United States v. Dantzler,*
   771 F.3d 137 (2d Cir. 2014)................... 91, 146

*United States v. Dhinsa,*
   243 F.3d 635 (2d Cir. 2001)..................... 81, 84

*United States v. Diaz,*
   176 F.3d 52 (2d Cir. 1999)............................ 83

*United States v. Dunnigan,*
   507 U.S. 87 (1993) ........................................ 93

xvii

*United States v. Ebron,*
    683 F.3d 105 (5th Cir. 2012), *cert. denied,*
    134 S. Ct. 512 (2013) ............................ 176, 181

*United States v. Edwards,*
    342 F.3d 168 (2d Cir. 2003) ......................... 131

*United States v. Elfgeeh,*
    515 F.3d 100 (2d Cir. 2008) ......................... 158

*United States v. Elias,*
    285 F.3d 183 (2d Cir. 2002) .......... 145, 171, 174

*United States v. Espaillet,*
    380 F.3d 713 (2d Cir. 2004) ......................... 179

*United States v. Espinal,*
    981 F.2d 664 (2d Cir. 1992) ......................... 132

*United States v. Farhane,*
    634 F.3d 127 (2d Cir. 2011) ................. 131, 170

*United States v. Feliciano,*
    223 F.3d 102 (2d Cir. 2000) ......................... 170

*United States v. Fields,*
    483 F.3d 313 (5th Cir. 2007) ......................... 66

*United States v. Fields,*
    516 F.3d 923 (10th Cir. 2008) ............. 176, 181

xviii

*United States v. Forbes,*
___ F.3d ___, No. 14-733,
2015 WL 3852230
(2d Cir. June 23, 2015). ................................ 116

*United States v. Friedman*,
909 F.2d 705 (2d Cir. 1990) .......................... 172

*United States v. Garcia*,
754 F.3d 460 (7th Cir.), *cert. denied*,
135 S. Ct. 395 (2014) ..................................... 81

*United States v. George*,
779 F.3d 113 (2d Cir. 2015) ........................... 76

*United States v. Glenn*,
312 F.3d 58 (2d Cir. 2002) ............................ 178

*United States v. Glover*,
558 F.3d 71 (1st Cir. 2009) ........................... 135

*United States v. Harvey*,
746 F.3d 87 (2d Cir. 2014) (per curiam) ........ 75

*United States v. Higgs*,
353 F.3d 281 (4th Cir. 2003) ........................ 210

*United States v. Huezo*,
546 F.3d 174 (2d Cir. 2008) ........................... 76

*United States v. Hutchinson,*
  573 F.3d 1011 (10th Cir. 2009) ...................... 82

*United States v. Jackson,*
  335 F.3d 170 (2d Cir. 2003) ........................... 76

*United States v. Jones,*
  132 F.3d 232 (5th Cir. 1998) ............... 211, 214

*United States v. Josephberg,*
  562 F.3d 478 (2d Cir. 2009) ..................... 92, 93

*United States v. LaMorte,*
  950 F.2d 80 (2d Cir. 1991) ........................... 145

*United States v. Lawrence,*
  735 F.3d 385 (6th Cir. 2013), *cert. denied,*
  135 S. Ct. 753 (2014) ............................ 213, 220

*United States v. Lee,*
  549 F.3d 84 (2d Cir. 2008) ............................. 77

*United States v. Lighty,*
  616 F.3d 321 (4th Cir. 2010) ....................... 213

*United States v. Locascio,*
  6 F.3d 924 (2d Cir. 1993) ............................. 130

*United States v. Lopesierra-Gutierrez,*
  708 F.3d 193 (D.C. Cir. 2013) ..................... 182

*United States v. Lopez,*
    74 F.3d 575 (5th Cir. 1996) .......................... 178

*United States v. Luciano,*
    329 F.3d 1 (1st Cir. 2003)............................. 182

*United States v. MacPherson,*
    424 F.3d 183 (2d Cir. 2005).............. 76, 77, 179

*United States v. McCarthy,*
    54 F.3d 51 (2d Cir. 1995)............................. 154

*United States v. Mejia,*
    545 F.3d 179 (2d Cir. 2008)........................... 79

*United States v. Millar,*
    79 F.3d 338 (2d Cir. 1996)........................... 171

*United States v. Mitchell,*
    502 F.3d 931
    (9th Cir. 2007)................. 66, 210, 214, 218, 220

*United States v. Modica,*
    663 F.2d 1173 (2d Cir. 1981)............... 144, 161

*United States v. Monteleone,*
    257 F.3d 210 (2d Cir. 2001)...... 93, 98, 118, 119

*United States v. Morgan,*
    385 F.3d 196 (2d Cir. 2004).......................... 179

xxi

*United States v. Needham*,
  604 F.3d 673 (2d Cir. 2010)...................... 79, 80

*United States v. Ortiz*,
  315 F.3d 873 (8th Cir. 2002) ....................... 199

*United States v. Payton*,
  159 F.3d 49 (2d Cir. 1998)............................. 77

*United States v. Perez*,
  144 F.3d 204 (2d Cir. 1998)......................... 162

*United States v. Persico*,
  645 F.3d 85 (2d Cir. 2011)........................... 123

*United States v. Peterson*,
  808 F.2d 969 (2d Cir. 1987)......................... 157

*United States v. Pierce*,
  785 F.3d 832 (2d Cir. 2015)..................... 75, 76

*United States v. Quinones*,
  313 F.3d 49 (2d Cir. 2002).................... 222, 223

*United States v. Resto*,
  824 F.2d 210 (2d Cir. 1987)......................... 157

*United States v. Reyes*,
  157 F.3d 949 (2d Cir. 1998)........................... 83

*United States v. Rivera,*
   971 F.2d 876 (2d Cir. 1992)................. 131, 172

*United States v. Robinson,*
   473 F.3d 387 (1st Cir. 2007)................ 155, 158

*United States v. Rodriguez,*
   581 F.3d 775 (8th Cir. 2009) ........................ 220

*United States v. Rodriguez,*
   587 F.3d 573 (2d Cir. 2009).......................... 130

*United States v. Rodriguez,*
   968 F.2d 130 (2d Cir. 1992)......................... 131

*United States v. Rosa,*
   11 F.3d 315 (2d Cir. 1993)............................. 83

*United States v. Sampson,*
   486 F.3d 13 (1st Cir. 2007).....................*passim*

*United States v. Santos,*
   541 F.3d 63 (2d Cir. 2008)........................... 178

*United States v. Savage,*
  No. 07-550-03, 07-550-04, 07-550-05,
  2013 WL 1934531
  (E.D. Pa. May 10, 2013)................................ 200

xxiii

*United States v. Shareef,*
  190 F.3d 71
  (2d Cir. 1999) ........................ 132, 145, 157, 158

*United States v. Smith,*
  413 F.3d 1253 (10th Cir. 2005) ..................... 82

*United States v. Stewart,*
  433 F.3d 273 (2d Cir. 2006).......................... 107

*United States v. Thomas,*
  377 F.3d 232 (2d Cir. 2004)................. 153, 157

*United States v. Thomas,*
  453 F.3d 838 (7th Cir. 2006) ........................ 155

*United States v. Tipton,*
  90 F.3d 861 (4th Cir. 1996) .......................... 177

*United States v. Tocco,*
  135 F.3d 116 (2d Cir. 1998)......................... 131

*United States v. Truman,*
  688 F.3d 129 (2d Cir. 2012)......................... 154

*United States v. Valentine,*
  820 F.2d 565 (2d Cir. 1987)......................... 144

*United States v. Vargas-Ocampo,*
  747 F.3d 299 (5th Cir.) (en banc),
  *cert. denied,* 135 S. Ct. 170 (2014) .............. 179

xxiv

*United States v. Wallach,*
  935 F.2d 445 (2d Cir. 1991) ............................ 94

*United States v. Walsh,*
  194 F.3d 37 (2d Cir. 1999) .............................. 77

*United States v. Webster,*
  162 F.3d 308
  (5th Cir. 1998) .............. 176, 181, 196, 199, 208

*United States v. White,*
  486 F.2d 204 (2d Cir. 1973) .......................... 156

*United States v. White,*
  972 F.2d 16 (2d Cir. 1992) ............................ 108

*United States v. Whitten,*
  610 F.3d 168 (2d Cir. 2010) .......................... 130

*United States v. Wilkerson,*
  361 F.3d 717 (2d Cir. 2004) .......................... 223

*United States v. Williams,*
  690 F.3d 70
  (2d Cir. 2012) ............... 146, 162, 170, 171, 172

*United States v. Williams,*
  784 F.3d 798 (D.C. Cir. 2015) ........ 77, 182, 195

*United States v. Young,*
  470 U.S. 1 (1985) ................................. 132, 144

xxv

*Zafiro v. United States*,
   506 U.S. 534 (1993) ..................................... 153

*Zant v. Stephens*,
   462 U.S. 862 (1983) ..................................... 216

## Statutes

18 U.S.C. § 2 ................................................. 4, 50

18 U.S.C. § 922 ............................................... 4

18 U.S.C. § 1959 ......................................... *passim*

18 U.S.C. § 3231 ........................................... xxvii

18 U.S.C § 3591 ................................ 212, 213, 218

18 U.S.C. § 3592 ....................... 175, 198, 199, 213

18 U.S.C. § 3593 ........................................ 66, 213

18 U.S.C. § 3595 ............................. xxvi, 181, 209

18 U.S.C. § 3742 ............................................. xvi

21 U.S.C. § 846 ............................................. 4, 50

21 U.S.C. § 848 ...................................... 4, 50, 175

28 U.S.C. § 1291 ............................................. xvi

## Rules

Fed. R. App. P. 4 .......................................... xxviii

Fed. R. Evid. 806............................................. 161

## Other

U.S. Attorney's Manual § 9-10.000 ................ 212

## Statement of Jurisdiction

This is an appeal from a judgment entered in the United States District Court for the District of Connecticut (Janet Bond Arterton, J.), which had subject matter jurisdiction over this federal criminal prosecution under 18 U.S.C. § 3231. Judgment entered against Azibo Aquart on December 18, 2012, and was amended on January 14, 2013. DA50-51; DA813-822.[1] On December 30, 2012, Aquart filed a timely notice of appeal pursuant to Fed. R. App. P. 4(b). DA50; DA823.

This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. §§ 3595(a) and 3742(a).

---

[1] "DA" refers to defendant Aquart's Appendix, "GA" refers to the Government's Appendix, and "AOB" refers to Aquart's Opening Brief. In addition, some of the exhibits that were introduced at trial are reproduced in a separate bound volume of exhibits. Please note that as this is a murder case, some of these exhibits are graphic and disturbing.

xxviii

### Statement of Issues
### Presented for Review

I.    Whether the evidence presented, viewed in the light most favorable to the government, was sufficient to support the jury's findings that Aquart's racketeering enterprise affected interstate commerce and that Aquart's motive for murdering Tina Johnson, James Reid and Basil Williams was to maintain and increase his position in his enterprise?

II.    Whether cooperating witness John Taylor committed perjury when he testified that he thought he might spend the rest of his life in prison for his role in the murders, and, if so, whether the government knew or should have known of such alleged perjury?

III.    Whether cooperating witness Lashika Johnson committed perjury when she testified that the government did not threaten her during a proffer session?

IV.    Whether the government's argument that there was no evidence in the record to suggest that Rodney Womble's DNA was found at the crime scene was proper rebuttal?

V.    Aquart raises several challenges to the government's treatment of Efrain Johnson's post-arrest and proffer statements, which

xxix

were introduced by the defense during the penalty-phase of the trial:

A. Whether eliciting testimony that Johnson did not receive a cooperation agreement amounted to improper vouching for John Taylor?

B. Whether the government misled the jury by highlighting the inconsistency between Johnson's proffer statements and his allocution during a failed change-of-plea hearing?

C. Whether the government infringed upon Aquart's Sixth and Eighth Amendment rights by arguing to the jury that Johnson's proffer statements were inconsistent with Aquart's theory of defense during the guilt-phase of the trial?

VI. Whether the evidence presented, viewed in the light most favorable to the government, was sufficient to support the jury's findings that Aquart substantially planned and premeditated the murders of the victims?

VII. Whether the evidence presented, viewed in the light most favorable to the government, was sufficient to support the jury's findings that Aquart intentionally murdered or attempted to murder more than one person in a single criminal episode?

xxx

VIII. Whether this Court should conduct a "proportionality review" to determine if imposition of the death penalty in Aquart's case constitutes a disproportionate punishment when compared to sentences imposed in other federal capital cases?

IX. Whether the Federal Death Penalty Act operates in an arbitrary and capricious manner?

X. Whether capital punishment violates the Eighth Amendment's prohibition on cruel and unusual punishment?

xxxi

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

## Docket No. 12-5086

_____

UNITED STATES OF AMERICA,

*Appellee,*

-vs-

AZIBO AQUART,

*Defendant-Appellant.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF CONNECTICUT

## BRIEF FOR THE UNITED STATES OF AMERICA

### Preliminary Statement

On the morning of August 24, 2005, Azibo
Aquart and three accomplices killed Tina John-
son, her boyfriend, James Reid, and their friend,
Basil Williams.[2] The three victims were bludg-

---

[2] There were several individuals with the last name
"Johnson" involved with this case. Therefore, victim
Tina Johnson will be referred to as "Tina" through-
out this brief. For the sake of consistency, victims

eoned to death with baseball bats. According to Aquart, Tina had to die because she refused to stop selling crack cocaine in his drug distribution territory.

On May 23, 2011, a federal jury found Aquart guilty of conspiracy to murder in aid of racketeering, three counts of murder in aid of racketeering, three counts of drug-related murder, and conspiracy to distribute and to possess with intent to distribute 50 grams or more of cocaine base. Approximately one month later, the same jury unanimously agreed that the aggravating factors sufficiently outweighed Aquart's mitigating evidence so as to justify the imposition of the death penalty for four of the six capital counts, namely, those related to the murders of Tina and Basil. The jury was unable to reach a unanimous verdict in favor of either the death penalty or a life sentence on the capital counts related to the murder of James.

On appeal, Aquart raises four challenges to his conviction: that there was insufficient evidence on the murder-in-aid-of-racketeering counts, that the government presented false tes-

---

Basil Williams and James Reid, and the family members of all three victims, will similarly be referred to by their first names. Efrain Johnson, one of Aquart's accomplices, will be referred to as "Johnson." His sister, Lashika Johnson, will be referred to as "Lashika." Azibo's brother, Azikiwe Aquart, will be referred to as "Azikiwe."

2

timony from two separate witnesses, and that the government's summation argued facts not in evidence. *See* Arguments I-IV. He also raises three challenges to the penalty phase of his trial: that the government committed misconduct in its handling of a defense witness and that the evidence was insufficient to support two aggravating factors, the substantial planning and premeditation factor and the multiple victims factor. *See* Arguments V-VII. Finally, Aquart argues that the imposition of the death penalty is unconstitutional because it is disproportionate, because the death penalty is arbitrary and capricious, and because it violates the Eighth Amendment. *See* Arguments VIII-X.

For the reasons set forth below, Aquart's arguments are without merit. Aquart received a fair trial, and the jury properly found him guilty of all charged offenses. Furthermore, there was no misconduct during the trial, and the jury had more than enough evidence to find all of the aggravating factors presented to it. Finally, Aquart's constitutional challenges to the death penalty have all been rejected by the Supreme Court and this Court. Aquart's convictions and sentences should be affirmed.

3

## Statement of the Case

On December 7, 2005, a federal grand jury indicted Azibo Aquart and others on narcotics charges. *See United States v. Aquart*, No. 3:05cr309. On November 8, 2006, the same grand jury returned a separate indictment against Aquart on narcotics and weapons charges. DA5. Aquart was first charged in the murders by the second superseding indictment, returned on June 28, 2007. DA6.

On March 3, 2010, as relevant here, a subsequent grand jury returned a fourth superseding indictment charging Aquart in nine counts: conspiracy to murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(5) (Count One); three counts of murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(1) and § 2 (Counts Two – Four); three counts of drug-related murder, in violation of 21 U.S.C. § 848(e)(1)(A) and 18 U.S.C. § 2 (Counts Five – Seven); conspiracy to distribute and to possess with intent to distribute 50 grams or more of cocaine base, in violation of 21 U.S.C. § 846 (Count Eight); and possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1) (Count Ten). DA12; DA58-75. On August 27, 2010, the government filed an amended notice of intent to seek the death penalty against Aquart. DA17; DA76-81.

4

On May 23, 2011, after a four-week trial on the narcotics and murder charges,[3] a jury found Aquart guilty on Counts One through Eight. DA35; GA1137. On June 15, 2011, the same jury unanimously found that Aquart should be sentenced to death for the murders of Tina and Basil (Counts Two, Four, Five and Seven). DA40; DA483-96.

On March 8, 2012, Aquart filed a motion for a new trial. DA42. The district court (Janet B. Arterton, J.) denied that motion on December 6, 2012. DA50; DA546.

On December 18, 2012, the district court sentenced Aquart to death on Counts Two, Four, Five and Seven, to life imprisonment on Counts Three, Six, and Eight, and to 10 years' imprisonment on Count One. DA50-51; DA813. On the government's motion, the district court dismissed Count Ten. DA50. An amended judgment entered on January 14, 2013, DA51; DA818, and Aquart filed a timely notice of appeal on December 30, 2012, DA51; DA823.

Aquart is currently serving the term of imprisonment imposed by the district court.

---

[3] The district court severed Count Ten for trial. DA16.

5

# I. The guilt phase

## A. The government's case

### 1. Aquart runs a large-scale crack cocaine trafficking organization in the Charles Street building.

In late August 2005, Azibo Aquart was the leader of a prolific narcotics trafficking organization that operated out of an apartment building on Charles Street in Bridgeport, Connecticut. GA403; GA1754-55 (Gov't Exs. 102A, 109).

Several witnesses, including Frank Hodges, Juanita Hopkins, Venro Fleming, Jacqueline Bryant, Rodney Womble, and Sherrell Randolph, who were themselves members of Aquart's organization, testified at trial regarding the existence and inner-workings of the narcotics trafficking conspiracy. GA175-76; GA179; GA182; GA185; GA187; GA218; GA281; GA285; GA323; GA325-26; GA342; GA354. The witnesses explained that Aquart used apartment 211, which was leased by James Rucker, as the base of operations for his drug trafficking organization. GA279; GA302; GA323; GA325; GA351; GA403-04; GA408; GA503; GA634. Aquart provided Rucker with cash, groceries and crack cocaine in exchange for the use of his apartment. GA183; GA363. Aquart also directed his dealers to "take care of" Rucker by giving him money or crack to smoke. GA183; GA337.

6

Initially, Aquart personally delivered the drugs to his dealers in apartment 211 and collected the proceeds of the drug sales. GA181; GA282; GA285; GA326; GA337. Soon, however, Aquart started sending one of his lieutenants—Tyler Bember, who worked for Aquart at the outset of the conspiracy, or Womble, who became Aquart's lieutenant after Bember was incarcerated—in his place. GA180-81; GA282; GA286; GA326; GA337; GA354; GA356-58; GA636; GA638-39. Aquart would supply Womble with a large quantity of pre-packaged crack cocaine. Womble would then parcel the drugs out to Aquart's dealers to be redistributed from apartment 211. GA177; GA181-82; GA218; GA372; GA446-47; GA505. Once the dealers sold the crack, they gave the proceeds of the sales to Womble and he would give them a new supply of narcotics. GA178; GA360. Womble would then turn over the proceeds of the drug operation to Aquart. GA358; GA360; GA447-48. Members of Aquart's operation sold thousands of dollars-worth of crack cocaine from apartment 211 every day. GA283; GA354; GA359.

During the course of the conspiracy, law enforcement raided apartment 211 on at least three occasions. GA186-88; GA227-28; GA233; GA312-14; GA328; GA639; GA651-52. Due to this increased law enforcement activity, in the summer of 2005, Aquart's organization began using apartment 202, which was diagonally

7

across the hallway from apartment 211, as a look-out point. GA188; GA286; GA361; GA407; GA410; GA640. Apartment 202 provided the perfect vantage point from which to watch for the police because the front window provided a view of the entryway to the building. GA189; GA361; GA407-08; GA640. At the time, apartment 202 was leased to Judith Rivera, who lived there with her boyfriend Rafael Melendez. GA188-89; GA286; GA360-61; GA407-08; GA640. Both Rivera and Melendez were addicted to crack cocaine and obtained their drugs from apartment 211. GA408.

Aquart hired Randi Washington,[4] and Nathaniel Grant to act as lookouts in what Aquart termed "[his] building." GA189-90; GA361; GA411; GA499; GA501; GA641. The lookouts worked in eight or twelve hour shifts during which they would sit guard at the front window of apartment 202. GA189-90; GA411; GA501-03. However, Washington testified that he stopped working for Aquart after one week because

---

[4] In May 2005, prior to becoming a lookout at the Charles Street building, Washington purchased several firearms, a laser grip and a speed loader for Aquart using his (Washington's) gun license. GA488-90; GA497; GA523. The guns included two .22 caliber pistols and one .357 caliber revolver. GA489; GA512-13. Washington also saw Aquart with at least three other firearms, including a Mac-10, a .38 caliber and a 9 millimeter. GA490-91.

8

"there was no amount of money that [Aquart] could pay me to do what he wanted me to do on that block . . . I wasn't going to stand over there and rough people up that really wasn't doing anything." GA505; GA523-24. After Washington quit, Aquart's brother, Azikiwe, took his place. GA410.

After Womble became Aquart's lieutenant, Aquart began spending less time at the Charles Street building. GA182. When Aquart did show up, which was approximately three times a week, he would do so unexpectedly and in the middle of the night in order to check on who was in the apartment, how the operation was running, and to "make sure [] nothing was going on that shouldn't be going on in the apartment." GA182-83; GA639. In particular, Aquart wanted to ensure that everyone abided by his rules, such as that there not be too many people in the apartment at any one time, that no one "mess up his money" by smoking more crack than they were selling, and that no one sell narcotics that they obtained from a source other than him. GA183; GA213-14; GA367-68; GA639.

The consequences for violating Aquart's rules were severe. For example, in mid-November 2004, Aquart went to apartment 211 to collect proceeds from Bryant. Bryant, however, was short approximately $100 because she had smoked more crack cocaine than she had sold. GA284; GA307. Aquart responded by punching

9

Bryant until she blacked out. GA284; GA302. When Bryant awoke, her "knee was busted open" and there was a broken ceramic ashtray covered with blood lying next to her. GA284; GA343. Bryant wanted to go to the hospital but was physically unable to move. GA284. Two or three days later, Bryant's daughter showed up at the apartment with the police. GA284. Bryant told the police that Aquart had assaulted her. GA284. She was then transported to the hospital where she received stiches on her knee and was given a walker because she was unable to bend her leg. GA284; GA303; GA1792-1800 (Gov't Ex. 245). Bryant's leg was permanently scarred. GA285; GA300.

Thereafter, in February 2005, Aquart assaulted Fleming because he believed that Fleming owed him money for crack cocaine that was "missing." GA179; GA330-31. Fleming's hospital records reflect that during the assault Aquart cut Fleming's eye and lip and fractured his nose. GA331-32; GA1822-27 (Gov't Ex. 249).

Similarly, in May 2005, Hodges spent some of Aquart's narcotics trafficking proceeds. GA183. Hodges tried to replace the money by selling narcotics that he obtained from another source. GA183; GA643. When Womble saw that Hodges was selling something other than what Womble had supplied him, he called Aquart. GA213-14; GA368; GA643. Within minutes, Aquart showed up at apartment 211, and proceeded to punch

10

and stomp on Hodges's head, face and body. GA183-84; GA368; GA643. Following the assault, Hodges's head was swollen and he was bleeding from his nose and mouth. GA287; GA369; GA451; GA470; GA643. Hodges went to the hospital to be treated for his injuries. Hodges's hospital records reflect that Aquart blackened Hodges's eye and fractured his nose. GA184-85; GA1801-06 (Gov't Ex. 246). While Womble did not take part in the assault, he also did not intervene because, as he explained, "[Aquart's] the boss, so I can't—he's calling the shots." GA368.

On another occasion, Womble discovered Hopkins's brother, John Sullivan, selling drugs in apartment 211. GA186; GA287; GA642. When Womble alerted Aquart, he came to the apartment and repeatedly hit both Sullivan and Hopkins in the face and head with a Mac-10 firearm. GA186; GA370; GA642. During the assault, Aquart said to Hopkins, "[d]idn't I tell you about bringing people in my house to sell drugs." GA642. Hopkins did not go to the hospital after the assault as she feared repercussions from Aquart. GA643.

### 2. Tina's sale of crack cocaine interferes with Aquart's profits.

In the summer of 2005, Tina and her boyfriend, James, moved into apartment 101 in the Charles Street building with their friend, Basil,

11

so that Tina could care for Basil, who was in poor health. GA20-21. While she lived in the Charles Street building, Tina bought crack from Aquart. GA207; GA280; GA329-30; GA352; GA371.

At some point that summer, Aquart obtained a batch of low quality crack cocaine that many customers complained was "no good." GA190; GA288; GA371. As a result, Aquart's dealers were having a hard time selling the drugs and business began to slow. GA190. During this time period, Tina bought crack cocaine from another source. GA190-91; GA288. Finding the drugs to be of a better quality than Aquart's, Tina purchased an eight-ball, or 3.5 grams of crack cocaine. GA288. Tina broke the eight-ball down into smaller quantities and repackaged it for resale. GA288; GA371. Once she sold the first eight-ball, Tina purchased a second one and repeated the process. GA288. Tina also helped Bryant buy an eight-ball and the two of them began working together to sell small quantities of crack cocaine from apartment 101. GA190; GA288.

Because Tina's crack was "better" than what Aquart was selling, several of the customers who usually purchased drugs from Aquart's organization instead started buying from Tina and Bryant. GA207; GA290; GA371-72; GA645. As a result, the volume of crack sales in apartment 211 declined. GA191; GA645.

12

Womble brought this fact to Aquart's attention. GA371-72; GA645. Aquart and Womble, in turn, approached Hodges and asked if Tina was selling crack. When Hodges confirmed that she was and that the sales in apartment 211 had slowed, *see* GA191; GA372; GA397, Aquart confronted Tina and Bryant and warned them that they "better stop, stop selling." GA290.

Despite Aquart making it clear that he was not going to give them a second warning, Tina and Bryant did not stop selling. GA290. Aquart then threatened Tina and Bryant that they "better quit" and that he was "not playing." GA290; GA304. Tina and Bryant still did not stop.

One evening, a customer knocked on Tina's door. GA291. When Tina opened the door, Aquart appeared from behind the woman and Tina immediately slammed the door shut. GA291. After that incident, Bryant decided that she had had enough. GA291. Bryant therefore stopped selling crack and told Tina that they should just let Aquart "have the building." GA291. Tina refused. GA291.

### 3. Aquart solicits the help of co-conspirators Taylor and Azikiwe to murder the victims.

John Taylor moved from North Carolina to Connecticut in 2004. GA558. By the summer of 2005, however, Taylor was experiencing financial difficulties. GA559. Taylor turned to a friend

13

for help. The friend, in turn, introduced Taylor to Aquart as a person from whom Taylor could obtain drugs for redistribution. GA559. Thereafter, Aquart started supplying Taylor with marijuana that had been pre-packaged in plastic bubble gum containers. Taylor sold the containers for $20 a-piece. GA560; GA603. For every $1,000 worth of marijuana that Taylor sold, he gave Aquart $500 and kept $500 for himself. GA562.

In late August 2005, Aquart, who knew that Taylor was from North Carolina, asked Taylor if he was interested in taking a trip down south. GA563-64. When Taylor stated that he was, Aquart told him to get packed and that they would pick him up that evening. GA563.

Later that night, Aquart, Shante Pettway (one of Aquart's girlfriends) and Azikiwe picked Taylor up and the four drove down South. During the trip, they spent time in Virginia, North Carolina and Georgia. GA564-65; GA566; GA603. While they were in Georgia, Aquart told Taylor that he needed Taylor's help with something when they returned to Connecticut. GA569. Taylor agreed to help despite the fact that, at that point, he did not know what Aquart needed him to do. GA569. Later the same evening, Taylor overheard Aquart telling Azikiwe that he was having "a problem with some people in this building." GA569-70.

14

The following day, Aquart, Pettway, Taylor and Azikiwe drove back to Connecticut. GA570. They arrived home the weekend of August 20, 2005. GA570.

### 4. Aquart attempts to gain entry to the victims' apartment.

While Aquart was on his trip South, Womble and Tina had a heated argument about the fact that she was still selling drugs in the building. GA372-73; GA400-01; GA457. During the argument, Womble held a table leg in his hand, trying to intimidate Tina. GA373; GA384; GA398; GA400-01; GA666; GA1018-19. But Tina was not intimidated. Instead, she responded by repeatedly yelling at Womble, "If I can't sell nobody is selling." GA373; GA398; GA457. Eventually, Womble returned the table leg to apartment 211 and left the building. GA373. Womble then called Aquart and told him about the argument. GA373; GA457.

When Aquart returned from his trip, Womble met him at a restaurant in Bridgeport and gave him the proceeds from the narcotics sales made while Aquart was away. GA374; GA400. Aquart asked if Tina was still selling drugs in the building. GA374. Womble replied that she was and that sales were still slow. GA374. Aquart then gave Womble $60 and asked Womble to buy him (Aquart) a baseball bat. GA374; GA399. Womble bought the bat and brought it home. However,

15

he never actually gave it to Aquart because after their meeting at the restaurant, Womble never saw or spoke to Aquart again.[5] GA375-76; GA399; GA457-58; GA460; GA471-72.

Within one or two days of their return, Aquart called Taylor and asked him to come to Bridgeport. GA570. Taylor took the train to Bridgeport and was met at the station by Azikiwe. GA570-71. Azikiwe and Taylor then went to pick up Aquart. GA571.

When Aquart got in the car, he told Azikiwe and Taylor that he needed to buy duct tape. GA571. Azikiwe took Aquart to Walgreens, and Aquart went into the store alone. GA571. When he returned to the car he was carrying a white

---

[5] Several weeks before the murders, Aquart gave his Mac-10 machine gun to Womble to hold for safe-keeping. GA365. A few days later, after an incident where Womble used the Mac-10 to threaten another person, Womble got rid of the gun to avoid being caught with it by the police. GA366; GA371; GA397; GA452-53; GA470. Womble was afraid to tell Aquart that he lost the gun. GA370. When Aquart called to request the return of the weapon, Womble put him off and avoided him. GA371. Womble continued to work for Aquart for a short period of time after the loss of the gun, but once Aquart returned from his trip and Womble had paid him the proceeds from the week of narcotics sales, Womble completely cut his ties with Aquart. GA376; GA394; GA460; GA471; GA645.

16

Walgreens bag inside of which were rolls of duct tape. GA571.

Aquart, Azikiwe, and Taylor then drove a short distance to a diner that was next to the Charles Street building and parked behind the restaurant. GA572; GA604. Aquart told Taylor that the building next door was where Aquart planned to "set him up," as they had discussed during their trip down South. GA572; GA623. Taylor understood Aquart's offer to "set him up" to mean that Aquart was going to provide him with a location where he could make money selling drugs. GA572.

Efrain Johnson, the fourth accomplice, met Aquart, Azikiwe, and Taylor behind the diner. GA572. Aquart then told Azikiwe, Taylor, and Johnson that there were some people who were "into his money business" and that he wanted to "take them out or move them out, out of the building." GA573. Azikiwe gave each of the men a face mask that had holes for the eyes and the nose, and a pair of latex gloves. GA574-75. Azikiwe and Johnson also picked up baseball bats that Johnson supplied.[6] GA574. The four men then stepped over a retaining wall that separated the diner from the building and entered the

---

[6] Although Taylor did not actually see Johnson pull the baseball bats out of his car, he testified that he had not seen the bats prior to Johnson's arrival and believed that Johnson brought them. GA574.

17

Charles Street building through the side en-
trance. GA573-74; GA1756-58 (Gov't Exs. 110-
112). Once inside, they climbed at least two
flights of interior stairs and lined up against a
wall. GA574. As they stood and waited, Taylor
saw a light-skinned woman, who he later identi-
fied as Judith Rivera, repeatedly knock on the
victims' door. GA574-75. When no one answered
the door, Johnson took the baseball bats and left
the building. GA575.

Aquart, Azikiwe, and Taylor then went up-
stairs to Rivera's apartment, which Aquart re-
ferred to as one of his "drug spots." GA574-75;
GA609. Aquart told Taylor that the apartment
was where he planned to set Taylor up to make
some money. GA575. Aquart also indicated that
the apartment provided a vantage point to
"watch[] them, make sure they do everything
right." GA575. Taylor and Aquart remained in
the apartment for a brief period of time, after
which Azikiwe drove Taylor back to the train
station and Taylor returned to Norwalk. GA576.

Taylor's testimony about the attempted entry
into Tina's apartment was largely corroborated
by other evidence at trial. In particular, Bryant
and Hodges testified about seeing several suspi-
cious men in the building: A few days before the
murders, Bryant went to 215 Charles Street be-
tween approximately 2:00 a.m. and 3:00 a.m. to
buy drugs. GA303. On her way to the building,
Bryant walked through the parking lot behind

18

the diner. GA291. There, Bryant noticed "some guys at a car" and "they noticed [her]." GA291. Bryant said that while it gave her pause, she nevertheless continued on to the building. GA291-92. As Bryant walked through the building, she saw several men in the hallway on the first floor that she recognized to be the same men that she had seen in the diner parking lot. GA291. Bryant noticed that the men were "dressed in black," which made Bryant nervous. GA291-92. However, because Bryant's addiction was stronger than her fear, she did not leave the building. GA292. Instead, Bryant ran up the stairs to the second floor, entered apartment 211 and asked Hodges for two bags of crack. GA195.

Shortly thereafter, there was a knock at the door of apartment 211. GA195; GA292; GA308; GA647. When Hodges opened the door, he found Aquart standing there, dressed in black with a bandana around his neck and plastic gloves on his hands. GA195-96; GA292; GA308. Aquart motioned for Hodges to come out of the apartment. GA196; GA292; GA308; GA669. When Hodges stepped outside, Aquart told him to go downstairs, knock on the door and, if anyone opened the door, to get out of the way. GA196. While Aquart did not specify which door he wanted Hodges to knock on, Hodges knew that Tina was the only person on the first floor that "[Aquart] would want to see." GA196. Hodges al-

19

so knew that whatever Aquart had planned "wasn't going to be nice." GA196.

Hodges and Aquart walked to the stairwell. GA196. Hodges noticed that there were at least three other figures in the laundry room by the stairs, all of whom followed him and Aquart downstairs. GA196; GA1002; GA1019.

When Hodges reached Tina's door, he knocked lightly with the hope that no one inside the apartment would hear the knock. GA196. Hodges then walked back to the stairwell and told Aquart that no one answered the door. GA197. When Hodges returned to apartment 211, he told Hopkins that Aquart directed him to knock on Tina's door, but that no one answered. GA197; GA647.

Lashika Johnson, who is Efrain Johnson's sister and was one of Aquart's girlfriends at the time of the murders, also provided testimony that corroborated Taylor's testimony regarding the attempted entry into the victims' apartment.[7] Specifically, Lashika recalled that a cou-

---

[7] Lashika met and began dating Aquart in the fall of 2004. GA703-04. During the course of their relationship, Aquart asked Lashika to assist him with certain facets of his narcotics trafficking operation. *See, e.g.*, GA711; GA714 (deliver marijuana to Charles Street); GA716 (bail Rucker out of jail using Aquart's money); GA711 (deliver crack cocaine to Aquart's customers).

20

ple of nights before the murders she heard Johnson talking to Aquart. GA719. Although Lashika could not hear the entire conversation, she did hear Aquart tell Johnson, "I need you to help me handle something." GA719. Johnson then left Lashika's apartment explaining that "he had to go deal with something." GA719; GA738. Johnson and Aquart returned to Lashika's apartment later that evening, but there was no discussion about where they had been. GA719.

### 5. Aquart, Azikiwe, Taylor, and Johnson brutally murder Tina, James, and Basil.

On August 23, 2005, the night before the murders, Lashika and Johnson threw a party at a club in Bridgeport. The party lasted from approximately 11 p.m. until 1:00 a.m. on August 24. GA717-18. After the party, Lashika, Johnson, and several other people went to Denny's Restaurant to have breakfast. GA718. While at Denny's, Aquart called Lashika asking to speak to Johnson. GA718-19. Johnson had a brief conversation with Aquart and left shortly thereafter. Lashika finished her breakfast and then she, too, left the restaurant and went home. GA720.

At about the same time, Aquart called Taylor, told him that Johnson had some girls at the diner and invited Taylor to join them. GA576. Taylor borrowed a friend's car and drove to Bridgeport. GA576. When Taylor arrived, he left his car

21

in a parking lot and got into the car with Aquart and Azikiwe. The three then drove to the Charles Street building and parked in the building's underground lot. GA576-77.

As Aquart, Azikiwe, and Taylor got out of the car, Johnson walked into the parking lot from Charles Street and joined them. GA577. Azikiwe handed each of them gloves and masks, and both Azikiwe and Johnson took hold of baseball bats, as well.[8] GA577-78. Aquart then stated, "Well, I know she's there now," and told Taylor, "[Y]ou going to help because she got a son and he's a big guy and you going to handle him." GA577.

Aquart, Azikiwe, Johnson, and Taylor entered the building through a doorway in the garage and climbed several sets of interior stairs. GA577-78; GA1759 (Gov't Ex. 114). When they left the stairwell, they approached the victims' apartment. GA578. Aquart pulled out a gun and began to kick the apartment door. GA578. Taylor heard someone inside say, "[w]ho is it?" But Aquart continued to kick the door until the frame broke and the door flew open. GA579. All four men rushed into the apartment; Aquart entered first, followed by Azikiwe, Johnson, and Taylor. GA578-79.

---

[8] Taylor did not did see Johnson carry the baseball bats into the garage on the night of the murders, but again noted that the bats did not materialize until Johnson joined them. GA577.

22

Basil, who had been approaching the door, asked, "[w]hat's going on?" GA579. Aquart pointed the gun at Basil and yelled, "[g]et on the ground, get on the ground." GA579. Basil ran back to his bedroom and got on the ground. GA579. Tina and James also got on the ground in their bedroom. GA579.

Aquart and Azikiwe ran into Tina's and James's bedroom and Johnson followed Basil into his bedroom. GA579. Shortly thereafter, Aquart walked out of the bedroom and directed Taylor to help him move a couch up against the front door to keep it closed. GA579-80; GA618; GA1764 (Gov't Ex. 117H). Aquart told Taylor to keep watch out the living room window and to let them know if anyone was coming. GA580. Aquart then returned down the hall toward the bedrooms. GA580.

While standing at the front window, Taylor repeatedly heard the sound of duct tape being pulled off the roll. GA580. Taylor walked back toward the bedrooms a few times and saw Aquart and Azikiwe binding Tina and James with duct tape. GA580-81. Taylor also saw Johnson standing at the door to Basil's room; Taylor did not see Johnson bind any of the victims with duct tape. GA581.

Taylor explained that the sound of duct taping suddenly stopped and the apartment was momentarily silent. GA581. He then heard a muffled, but loud-pitched yell. GA581. Taylor

23

walked down the hallway toward the bedrooms and asked, "[y]o, what are you doing?" GA581. It was then that Taylor saw Aquart standing over Tina, and Azikiwe standing over James, bludgeoning them with baseball bats. GA581. Taylor described the scene: "When I walked back from the window, went back and looked, [Aquart] was standing over the victim's body bashing her like he was at a meat cleaver—that he was at a meat market, beating them. His brother was over there doing the same thing." GA626.

Taylor again asked Aquart what he was doing; Aquart replied, "[y]o, come and get you some." Taylor responded, "I'm out of here" and turned to leave the apartment. GA581. When Taylor reached the front door, he looked back down the hallway and saw Aquart hand Azikiwe his gun. GA581-82. Azikiwe then walked out of the bedroom, grabbed Tina's cell phone and some money from the kitchen counter and followed Taylor out of the apartment.[9] GA582; GA613.

Taylor and Azikiwe walked downstairs and got into Azikiwe's car. GA582. As they drove away from the building, Azikiwe asked Taylor, "[d]id you hear the people say our names?" Tay-

---

[9] Before Aquart and Azikiwe began duct taping the victims, Taylor saw Aquart take a cellular telephone and some money from Tina's and James's bedroom. GA582. Aquart walked out of the bedroom, placed the items on the kitchen counter and then returned to the bedroom. GA582.

24

lor responded, "[n]o." GA582. Azikiwe then asked Taylor if he wanted the cell phone that Azikiwe took from the apartment. Taylor again responded, "[n]o." GA582. Taylor explained that he was very frightened because he had "just seen [Azikiwe] beat somebody. I don't know what he's going to do next. Now he got a gun, he don't have to beat, he just got to point and shoot." GA582.

At some point after Azikiwe and Taylor left, Johnson left the apartment, too, leaving Aquart alone in the apartment with the three victims. GA727; GA743. Although there was no direct testimony about Aquart's actions at that point, the evidence showed that he murdered Basil, drilled the front door shut and then fled through Tina's window. GA77.

### 6. Aquart directs Lashika to dispose of evidence connecting him to the murders.

Taylor recalled going to two apartments with Azikiwe after the murders. GA583. First, he and Azikiwe briefly stopped at an apartment where Azikiwe changed his clothes. GA583; GA614. Next, they went to Lashika's apartment, where they remained just long enough to smoke some marijuana. GA583; GA612; GA614; GA616. Azikiwe then dropped Taylor off at his car and Taylor drove back to Norwalk. GA584.

When Taylor got home, he went to sleep for several hours. GA584. When he awoke, he

25

turned on the television and saw "breaking news" regarding the murder of three people in the Charles Street building. GA584-85; GA589. Taylor tried to call Aquart, but was unable to reach him. GA584.

Meanwhile, Lashika was awoken at dawn by the sound of men talking. GA720. She got up and walked into her living room. GA720. There, Lashika found Johnson, Aquart, and Azikiwe, the latter two of whom were clad only in boxer shorts and t-shirts. GA720.

Aquart asked Lashika to take some garbage bags that were sitting by her front door and put them in a dumpster that was a couple of blocks from her apartment. GA721. Although Lashika did not look inside the bags, she knew that they contained clothing based upon the feel of the bags. GA721. Aquart also gave Lashika a black drill and instructed her to throw that in the dumpster, as well. GA721. Lashika did as Aquart instructed. GA722. After Lashika disposed of the clothing and the drill, Aquart instructed her to drive his car to his apartment to get him some clothing to wear. GA722. Aquart told Lashika that she should leave his car at his apartment and that she should park it in such a manner as to make it appear that he had been home all day and all night. GA722-23. Again, Lashika did as directed. GA722. When asked why she agreed to do what Aquart asked, Lashi-

26

ka explained that "you just don't ask questions, you just do what you are told, and I did." GA722.

By the time Lashika returned to her apartment, Aquart was still there but both her brother and Azikiwe were gone. GA723. Later that morning, Aquart received a call on his cellular telephone. GA723; GA955-57; GA1837-46 (Gov't Ex. 264). During the call, Lashika heard Aquart ask, "[w]hy would you take a cell phone from . . . why would you be calling me from this cell phone?" GA723; GA737; GA740. A review of toll records for Tina's cellular telephone revealed that the call to Aquart was placed from Tina's cellular telephone at 10:25 a.m., which was *after* Tina had been found murdered. GA821-22; GA958; GA968; GA1828-46 (Gov't Exs. 263-264).

### 7. Leroy discovers Tina, James, and Basil bludgeoned to death.

On August 24, 2005, at approximately 10:00 a.m., Leroy Whittingham went to visit his mother, Tina, at her apartment in the Charles Street building. GA20. When he arrived at her apartment, he knocked on the door repeatedly; no one answered. GA20; GA22. Leroy walked outside and around to the area of the building where his mom's room was situated. GA22. Leroy noticed that his mom's bedroom window was open so he pushed the blinds aside. GA22-23. As he did, Leroy saw his mom and James lying on the floor with pillows on top of them. GA23. Both were

27

bound with duct tape. GA23. The walls and ceiling were covered in blood. GA23.

Leroy jumped in the window, threw the pillows off of Tina and held her, crying for her to get up. GA23; GA25. Tina did not respond. GA23.

Leroy ran toward the living room to call 911. GA23; GA25. When he passed Basil's bedroom, Leroy saw Basil bound with duct tape and lying on the floor at the foot of his bed. GA23. The living room appeared as if there had been "a war in there," and there was a couch blocking the hallway between the living room and the bedrooms that had not been there the night before. GA23-24; GA31-32; GA85; GA1765 (Gov't Ex. 117J).

Leroy tried to open the front door, but was unable to do so because it was drilled shut from the inside. GA23; GA25; GA76-77; GA1760-63 (Gov't Exs. 116G, 116H, 116I, 116J). Leroy turned and ran back down the hall and jumped out his mom's bedroom window screaming for help. GA23; GA25. A woman heard his screams and stopped to help him call 911. GA18-19; GA23; GA413; GA647. The emergency operator received the call at 10:14 a.m. and immediately dispatched an ambulance and the police. GA17; GA117.

Emergency Medical Technician Karen O'Donnell and her partner, Rosanna Mendoza, arrived in the area within five minutes of the

28

call. GA26; GA28. As they followed Leroy into the building, they heard a loud crashing noise— the sound of Leroy kicking in the front door to the apartment. GA23; GA25; GA29-31; GA43-44; GA1754 (Gov't Ex. 102A).

O'Donnell and Mendoza found Tina and James lying head-to-head on the floor of one bedroom. GA33; GA37; GA66; GA1771 (Gov't Ex. 121-4). Tina was lying face up and James was lying on his stomach with his face turned toward the left. GA37. Both Tina and James had been very tightly bound with multiple layers of duct tape around their arms and ankles. GA38; GA40; GA1772-73 (Gov't Exs. 121-6, 121-8); GA1776-77 (Gov't Exs. 122-5, 122-7). Tina also had several layers of duct tape that wound through her mouth and encircled her head. GA33; GA1774 (Gov't Ex. 121-10); GA1928 (Gov't Ex. 424). The duct tape was so tight that it was cutting into Tina's face. GA37. James, on the other hand, had duct tape encircling his entire face and head. GA33; GA38; GA40; GA1775 (Gov't Ex. 122-3); GA1930 (Gov't Ex. 435). It was apparent from the scene and the fact that there was "blood everywhere," including on the ceiling and the walls, that both Tina and James had been the victims of a violent assault. GA33; GA37; GA1780-84 (Gov't Exs. 127, 128A, 129A, 129B, 130).

The EMT's found Basil in the other bedroom of the apartment. He was lying face-down on the

29

floor. GA41; GA1767 (Gov't Ex. 120-2). Basil's entire face, with the exception of one small portion of his nose, and the back of his head was encased in duct tape. GA41-42; GA1768 (Gov't Ex. 120-3); GA1927 (Gov't Ex. 414). Basil's arms and ankles were bound with duct tape, as well. GA41-42; GA1769-70 (Gov't Exs. 120-5, 120-6).

All three victims were duct taped in a similar manner. The duct tape was wrapped so tightly on all of the victims that "it was pushing on the skin surrounding it and causing it to . . . come out over [the tape]. Especially in the face area, you [could] see that it was pushing in so hard that it was causing the tissue around it to collapse over the top of it." GA43. *See also* GA33.

## 8. Crime scene investigators process the murder scene and collect numerous items of evidence, some of which are later determined to bear Aquart's DNA and fingerprints.

Crime scene investigators spent three days processing the bloody crime scene. GA80. After the victims were transported to the Medical Examiner's Office, *see* GA70, the investigators collected physical evidence from the apartment, which included, but was not limited to, latex and vinyl gloves, broken pieces of latex gloves, a Walgreens bag containing a box of latex gloves, a blue-green plastic bag that was affixed by a piece of duct tape to a white plastic Walgreens

bag and a small multi-tool pocket knife. GA81-82; GA86-87; GA96-97; GA1013-14; GA1016; GA1778 (Gov't Ex. 123-1); GA1785-88 (Gov't Exs. 136, 137, 139, 140).

Investigators also saw that there was blood throughout the apartment, including in both bedrooms and in the living room. GA89-93. Investigators collected swabs of blood from the walls and the ceiling in Tina's and James's bedroom and from the inside portion of the apartment door, among other places. GA89; GA93-94; GA1780-84 (Gov't Exs. 127, 128A, 129A, 129B, 130); GA1789-90 (Gov't Exs. 164-65). All of the evidence was sent to the Connecticut State Forensic Science Laboratory to be analyzed for trace evidence, fingerprints and DNA. GA84-89.

### 9. Medical examiners determine that Tina, James, and Basil died as a result of blunt force trauma to their skulls.

#### a. Basil's autopsy

Basil's autopsy revealed that he had contusions on his right and left eyelids; an abrasion on his right cheek; a contusion and an abrasion on his right lower lip; an abrasion on his forehead; a contusion behind his right ear; multiple contusions on the left side of his scalp; an incised wound on the left side of his forehead; and a contusion on the back of his head. GA982-85; GA1870-72 (Gov't Exs. 300-300A, 301); GA1874-

31

87 (Gov't Ex. 305). Dr. Susan Williams, the medical examiner, also noted that Basil had an incised wound on each of his elbows that were likely caused by a sharp object such as would have been used to cut the duct tape. GA984; GA1873 (Gov't Ex. 302).

Furthermore, the top, back, and left side of Basil's skull was fractured into numerous pieces like a broken "eggshell . . . or like [] puzzle pieces," and Basil had global, subarachnoid hemorrhaging on his brain, meaning that there was bleeding under the thin membrane covering his brain. GA986; GA988. Based upon the number of Basil's head injuries, Dr. Williams determined that there were four impact sites caused by four separate blows to the head. GA985. Dr. Williams explained that it would "require[] a lot of force to fracture the skull [] in a lot of places such as this." GA986.

Dr. Williams further concluded that the cause of Basil's death was "blunt traumatic head injury" and the manner of death was homicide. GA988-89. She also opined that Basil's injuries were consistent with having been caused by a baseball bat. GA986; GA991.

### b. Tina's autopsy

Tina's autopsy revealed that she had a laceration on her mid-forehead; a laceration on the left side of her nose; contusions under her left eye, on her left eyelid and on her left eyebrow;

32

contusions inside her mouth; multiple lacera-
tions behind her left ear; two lacerations on the
back of her head; petechial hemorrhaging in her
eyes; and a fractured wrist. GA436-38; GA440;
GA1906-23 (Gov't Exs. 315-16, 319, 322). Tina
also had multiple skull fractures on the left side
and the back of her skull. GA439.

Based upon the number of Tina's head inju-
ries and the fact that there were multiple impact
sites, Dr. Frank Evangelista, the medical exam-
iner, determined that Tina may have suffered as
many as eight blows to the head. GA436-37;
GA439. He also explained that it would take
"significant force to cause the skull to fracture in
the way that it did." GA439. While Dr. Evange-
lista could not definitively state what type of
weapon caused Tina's injuries, he opined that
the injuries were consistent with having been
inflicted by a "firm object such as a baseball bat."
GA439; GA441. He further concluded that the
cause of Tina's death was "blunt force trauma"
and the manner of death was homicide. GA440.

### c. James's autopsy

James's autopsy revealed that he had a lacer-
ation on the left side of his face; bruising and
abrasions inside his mouth that were caused by
his lips getting caught between his teeth when
the duct tape was wrapped around his face; mul-
tiple lacerations on the sides and the top of his
head; a contusion on his right, upper arm; inju-

33

ries on his right elbow; and a fractured left elbow. GA105-06; GA108-09; GA1888-1905 (Gov't Exs. 306-308, 314).

Dr. Malka Shah, the medical examiner, also found that James had multiple skull fractures and that a piece of his skull had caved into his brain cavity. GA109-11. Based upon the number of injuries to his head, Dr. Shah determined that James suffered three to five blows to his head. GA109.

Dr. Shah further concluded that the cause of James's death was "blunt traumatic head injury" and the manner of death was homicide. GA111; GA113. She also explained that James's injuries appeared to have been caused by a weapon with a "round[] configuration," consistent with a baseball bat. GA106; GA109; GA111; GA114.

### 10. Forensic examination of items recovered from the crime scene establishes Aquart's involvement in the murders.

As set forth above, crime scene investigators collected numerous pieces of physical evidence from the crime scene. Of particular relevance were a piece of a latex glove found in the front room of the apartment, several pieces of latex gloves stuck in the duct tape removed from the victims' bodies, a vinyl glove found in Tina's and James's bedroom, and a blue plastic bag that

34

was affixed to a white plastic Walgreens bag by a small piece of duct tape.

### a. DNA Testing

Christine Roy, a Forensic Science Examiner from the Connecticut State Forensic Laboratory, testified that she developed DNA profiles from numerous items that were collected from the crime scene. GA785-87. Roy then compared the DNA profiles[10] that she developed from the evidentiary items against "known" DNA profiles for Tina, James, Basil, Aquart, Azikiwe, Johnson, and Taylor. GA782; GA787. While Roy conducted DNA testing on several items recovered from the crime scene, the items listed below were of particular significance.

First, Roy developed a DNA profile from one of three pieces of latex glove stuck in the duct tape that was cut from Tina's hands and wrists. GA766; GA1929 (Gov't Ex. 433); GA1934 (Gov't Ex. 465). Roy entered that profile into an FBI database that contains DNA profiles that have been collected from convicted felons as well as

---

[10] A complete DNA profile is comprised of 30 genetic markers that are spread among 15 sites with two genetic markers at each site. GA780-81. Each genetic marker is represented by a number. GA780-81. There is one additional site for gender identification that is represented as an "X" for female and an "XY" for male. GA782.

35

profiles that have been collected from evidentiary samples. GA778; GA792. She received a "hit" for Efrain Johnson. GA793. Thereafter, Roy obtained a sample of Johnson's blood and compared the DNA profile developed from his blood to the DNA profile developed from the piece of latex glove. GA793. Roy concluded that Johnson was "included as a contributor" meaning that all 30 of his genetic markers were found in the evidentiary profile. GA784; GA793; GA851-52. Roy concluded that the expected frequency of this occurrence was one in seven billion individuals. GA7932. Roy explained the statistic to mean that if you conducted DNA testing on seven billion people, you would find only "one individual in those seven billion who could [have been] a contributor to the DNA profile" and that the remaining 6,999,999,999 people would be excluded as possible contributors. GA793.

Next, Roy developed a DNA profile from a section of a latex glove that was discovered under the cushion of the couch that Aquart and Taylor pushed against the front door. GA749-50; GA794; GA855; GA1785 (Gov't Ex. 136); GA1931 (Gov't Ex. 447); GA1933 (Gov't Ex. 464). This DNA profile was a mixture meaning that it contained at least two individuals' DNA. GA783-84; GA794; GA855-56; GA3419-21. Roy concluded that James was "included as a contributor" because all of his genetic markers were found in the evidentiary sample. GA794; GA855. Roy also

36

concluded that Aquart could not be eliminated as a contributor. GA794; GA855. In this instance, the finding of "cannot be eliminated as a contributor" meant that a significant number of Aquart's genetic markers, namely, 28 of 30, were found in the evidentiary profile. GA785; GA795-96; GA901-02; GA1933-34 (Gov't Exs. 464-465). Roy explained that the expected frequency of this occurrence was one in 79 million African Americans.[11] GA795-96.

Roy also developed a DNA profile from a vinyl glove that was discovered in Tina's and James's bedroom. GA756; GA1786 (Gov't Ex. 137); GA1932 (Gov't Ex. 451); GA1934 (Gov't Ex. 465). This DNA profile was a complex mixture of DNA. GA797. Roy concluded that James, Basil, Aquart, and Azikiwe were all included as contributors, meaning that all of their genetic markers were detected in the evidentiary sample. GA797. The expected frequency of this occurrence was one in 400. GA797. Roy also concluded that Tina could not be eliminated as a contributor. GA798. Finally, Roy concluded that Taylor could not be eliminated as a contributor. GA798. Roy explained that the expected fre-

---

[11] Roy expressed the frequency statistics for the three largest population groups in Connecticut: African Americans, Caucasians and Hispanics. In other words, what is the likelihood of finding an individual in each of those population groups who could have contributed to the evidentiary DNA profile. GA785.

37

quency of this occurrence was one in 30 African Americans. GA798. Roy explained that the low "expected frequency" statistics, *e.g.*, one in 30 as opposed to one in 79 million, was a result of their being "multiple genetic markers detected at [] multiple sites" meaning that there was a larger pool of people who could have contributed to the DNA profile. GA798.

### b. Fingerprint analysis

John Pleckaitis, a Latent Print Examiner from the Connecticut State Forensic Laboratory, testified that he examined several items recovered from the crime scene for the presence of latent prints. GA685-86. Pleckaitis then compared the latent prints developed on the evidentiary items against "known" fingerprint exemplars for Tina, Basil, James, Aquart, Azikiwe, Taylor, Womble, and Rucker. GA991-92.

In particular, Pleckaitis examined a blue-green plastic bag, a white plastic Walgreens bag, and a piece of duct tape that was stuck to both bags and holding them together, all of which were found next to Basil's body. GA686-88; GA1924-26 (Gov't Exs. 400, 403-404). Pleckaitis developed several latent fingerprint impressions that were suitable for comparison, including four impressions on the blue-green bag, four impressions on the Walgreens bag, and one impression on the piece of duct tape. GA688-89.

38

Pleckaitis determined that two of the latent print impressions on the blue-green bag and four of the latent print impressions on the Walgreens bag were made by Azikiwe. GA689-90; GA699. Pleckaitis also determined that the latent print impression on the piece of duct tape was made by Aquart's left middle finger. GA690; GA692; GA700.

### 11. An analysis of telephone call records links Aquart, Azikiwe, Taylor, and Johnson to the murders.

An analysis of telephone records associated with Aquart, Azikiwe,[12] Taylor, Johnson, Lashika, and Womble revealed that during the early morning hours of August 24, 2005, Aquart, Taylor, and Johnson communicated with each other numerous times. GA959-60; GA962-65; GA1828-69 (Gov't Exs. 263-264, 273-277, 278-79). Specifically, on August 24, 2005, between the hours of 1:00 a.m. and 5:03 a.m., there were 21 calls between Aquart and Taylor and five calls between

---

[12] Azikiwe lost his cellular telephone approximately one week prior to the murders. GA614. On August 24, 2005, Azikiwe activated a new cellular telephone bearing telephone number 203-615-8307. GA971. The first recorded use of the telephone was on August 24, 2005 at 11:26 a.m. when Azikiwe called Aquart for the first of ten times that day. GA964; GA971; GA973; GA1850-51 (Gov't Ex. 274); GA1868-69 (Gov't Ex. 279).

39

Aquart and Johnson. GA607; GA969-70; GA1866-69 (Gov't Exs. 278-79). There was then a 40-minute period from 5:04 a.m. to 5:43 a.m., during which Aquart, Taylor, and Johnson did not make any calls to one another or to anyone else. GA969-70; GA979; GA1866-67 (Gov't Ex. 278).

After the 40-minute void, the first call Aquart received was from Johnson at 5:44 a.m. GA970; GA1867 (Gov't Ex. 278). Aquart called Johnson back six minutes later. GA970; GA1867 (Gov't Ex. 278). Then, between 6:01 a.m. and 6:21 a.m., Aquart received three incoming calls from Taylor's phone, and made two outgoing calls to the same phone. GA1867 (Gov't Ex. 278). Following the last call, Aquart did not use his phone to call either Taylor or Johnson again. GA970; GA1845-46 (Gov't Ex. 264); GA1867 (Gov't Ex. 278). However, as noted above, Aquart did receive a call from Tina's cellular telephone at 10:25 a.m., after Tina had already been found murdered. GA821-22; GA958; GA968; GA1836 (Gov't Ex. 263); GA1845 (Gov't Ex. 264).

Notably, although Aquart attempted to call Womble three times at around 2:00 a.m. on August 24, 2005, all three calls went unanswered and Womble did not return Aquart's calls. GA970-71; GA1844 (Gov't Ex. 264); GA1849 (Gov't Ex. 273); GA1866-67 (Gov't Ex. 278). Moreover, there is no evidence that Womble *ever*

40

spoke to Azikiwe, Taylor, or Johnson, much less on the night of the murders. GA975.

### 12. Efrain Johnson admits to Lashika that he assisted Aquart in the commission of the murders, and Taylor eventually admits his role as well.

While Lashika never spoke to either Aquart or Azikiwe about the murders, she did eventually speak to her brother. GA724; GA727. The conversation occurred before Johnson's arrest. GA727. Johnson told Lashika that "he helped tie the people up and rough them up a little bit, but [] when he left those people were still alive." GA727; GA743. Johnson also told Lashika that he had been in the apartment with Aquart and Azikiwe, but that by the time he left, Aquart was the only one in the apartment with the victims. GA728. Finally, Johnson told Lashika that they disposed of the bats, gloves, and masks that they used before going to Lashika's apartment on the morning of the murders. GA728; GA743. When Lashika asked Johnson if there had been someone in her apartment that morning other than Aquart, Azikiwe, and Johnson, Johnson acknowledged that there was, but that the fourth person did not live in Bridgeport. GA743.

Meanwhile, a few weeks after the murders, Taylor was arrested for selling drugs and taken to the Bridgeport Correctional Center. GA585-

41

86. There, Taylor ran into Aquart, who had been arrested in early September 2005 on a parole violation. GA533-34; GA586; GA611. Aquart and Taylor did not have a detailed discussion about the murders, although Aquart mentioned that his "baby momma got rid of the weapons." GA586.

Aquart told Taylor that Bridgeport had become "too hot" so he wanted to move his narcotics trafficking business down South. GA5862. Aquart said that if Taylor was willing to help him, he could arrange for Pettway to pay his bond and get him out of jail. GA586-89. Aquart gave Taylor Pettway's[13] and Azikiwe's telephone numbers. GA586. Although Taylor spoke to them several times, he was ultimately unsuccessful in persuading anyone to post his bond. GA588-89.

Taylor pled guilty to his narcotics trafficking charge and was sentenced to serve two-and-a-half years' imprisonment. GA589. When he completed his sentence, Taylor moved back to North Carolina. GA590. Between September 2005 and December 2009, Taylor spoke to no one about the murders of Tina, James, and Basil. GA590.

---

[13] Aquart wrote Pettway's name and address on a piece of paper and gave it to Taylor. GA586; GA1791 (Gov't Ex. 231A). Taylor gave that piece of paper to law enforcement at the time of his (Taylor's) December 2009 arrest. GA592; GA597.

42

On December 2, 2009, law enforcement offic-
ers located Taylor at a relative's house in North
Carolina. GA591; GA596. Taylor initially denied
having any knowledge about the murders and,
when shown photographs of Aquart, Azikiwe,
Johnson, and Pettway, falsely claimed that he
did not recognize them. GA591; GA601. Over the
course of the next several hours, Taylor contin-
ued to lie and to minimize his involvement be-
cause he "was scared . . . to tell the truth" and
"embarrassed . . . [a]bout what [he] did." GA593;
GA598-602; GA604; GA610-12; GA614; GA616;
GA621-22.

Taylor eventually acknowledged, however,
that he not only recognized Aquart, Azikiwe, and
Johnson, but also that he had been present dur-
ing the murders. GA592. Specifically, Taylor
admitted that he went to the victims' apartment
with Aquart, Azikiwe, and Johnson and that af-
ter Aquart kicked in the door, the four men en-
tered the apartment. GA616-17. Taylor also ad-
mitted that Aquart bound the victims with duct
tape and then beat them to death with baseball
bats. GA616-17. Taylor was then placed under
arrest. GA597; GA617-18.

### 13. Aquart attempts to obstruct jus-
tice by persuading witnesses not
to testify or to testify falsely.

As noted above, Aquart was first charged
with the murders of Tina, James, and Basil in

43

June 2007. DA6. While detained on those charges, Aquart wrote (as relevant here) two documents attempting to influence the testimony of two witnesses:

### a. Aquart wrote a letter to Venro Fleming.

In October 2009, Aquart wrote a three-page letter to Venro Fleming, *see* GA333, in which he purported to be apologizing for beating Fleming: "I knew you weren't like everyone else & I shouldn't have treated you that way." GA334; GA1940 (Gov't Ex. 514). Fleming, however, interpreted Aquart's letter to be a threat. GA334.

In particular, Aquart first told Fleming, "I know your (sic) smart enough that even if it's to help yourself for your own safety, you'll listen. Because man to man, if I didn't try to warn you about certain things you should know about (now that we found you) I wouldn't be real." GA334; GA1940 (Gov't Ex. 514).

Aquart then complained that Bryant was the source of his legal problems: "[Bryant] told the Feds that Basil's apartment on the first floor was really Tina's apartment & her & Tippy was big time drug-dealers & [Bryant] started working for them & Pop's house didn't like it & that's why they died." GA335; GA1940 (Gov't Ex. 514).

Aquart advised Fleming, "[Y]ou DON'T have to talk to ANYBODY about this stuff," and that

44

Fleming should not tell anyone that Aquart contacted him. GA335. Aquart cautioned that if Fleming nevertheless was to speak with the "feds" he should remember to state:

(1)     "[T]hey were "not a gang & no one worked for me . . . they just came & went & did their own thing. *EVERYONE DID THEIR OWN THING* The charge is 'Conspiracy." It means when TWO OR MORE people get together to do something illegal. If people were doing what they do on their own, there is no conspiracy & we can't all be guilty", and

* * *

(3)     "NEVER make Jackie [Bryant] sound like a drug-dealer, only a prostitute/addict who always came around to buy & acted like she was looking for Dee or waiting for him . . . so that's why you thought she use to work for him or something."

GA337; GA339-40; GA1941-42 (Gov't Ex. 514).

Aquart added that the only reason he should ever see Fleming in a courthouse was if Fleming "wanted to let them know they got it all wrong & this is how things really went, not because you said the wrong thing & they got you in handcuffs next to us trying to ruin your life too! You feel me!" GA338; GA1942 (Gov't Ex. 514). Aquart also said that Fleming should pass his message on

45

to anyone from Charles Street with whom Fleming was still in contact and "let them know the deal if you care about them." GA338; GA1952 (Gov't Ex. 514).

At the conclusion of the letter, Aquart stated, "I hope you got the message." GA340; GA1942 (Gov't Ex. 514).

### b. Aquart drafted a script for Shamarr Myers.

In early 2010, Aquart befriended Shamarr Myers, who is a convicted narcotics trafficker with whom Aquart was incarcerated while awaiting trial. GA906-09. Aquart told Myers, who was also from Bridgeport, that he made his money by selling crack cocaine from an "old man's" apartment in a building on Charles Street. GA909. Aquart also told Myers that he had some problems with other people who had been selling crack in the building. GA911. Aquart explained to Myers that he told those people that "they had to go," but then decided that "they had to die." GA911.

In May or June of 2010, Aquart asked Myers to help him on his case and gave Myers a letter containing a list of things that he wanted Myers to do, which included testifying at trial. GA913; GA915; GA927; GA937-39; GA1936-38 (Gov't Ex. 506). According to Myers, Aquart's goal was to "get it out to the jury that it could have been

46

somebody else that committed the crime." GA913.

The first page of Aquart's letter contained the title "Interview Focus Points. Kite Story," and the name "Rodney Big Man Womble." GA915; GA1936 (Gov't Ex. 506). This portion of the letter instructed Myers to tell the government that another inmate intercepted "kites" that Womble allegedly tried to send to Aquart.[14] GA915-16; GA1936 (Gov't Ex. 506). Myers was supposed to say that while he could not remember the content of the kites, that the inmate considered them to be his "get out of jail free" card, implying that they were very incriminating. GA916; GA1936 (Gov't Ex. 506). Myers testified that no one had shown him any such messages and he did not know if they actually existed. GA916.

The next portion of the letter stated, "Confidential until courtroom outburst" and then "Everybody knows who did it. They know, too. Letho did that shit. They don't care. They just want to kill Dreddy. (Look at jury)." GA916; GA1936 (Gov't Ex. 506). Myers explained that Aquart wanted him to have an outburst and to look at the jury while stating that "Letho" was the one who committed the murders.[15] GA916. Myers

---

[14] A "kite" is a message sent between prisoners. GA913.

[15] Although "Letho" was a real person, he was murdered before Aquart's trial began. GA916; GA918.

47

was also supposed to testify that his friend "Simone" said that "Letho" confessed to her that he killed Tina, James, and Basil. GA916; GA1936 (Gov't Ex. 506). Myers told Aquart that the story "sounded stupid." GA916.

Finally, the letter contained a section entitled "Bridgeport Federal Relationship and Snitch (False Witness Mentality to Get Off.)" GA916; GA1938 (Gov't Ex. 506). Here, Aquart instructed Myers to "point the finger at prosecutors and agents at the table" and testify that they solicited Myers's testimony without regard for whether or not he actually knew anything about Aquart or the murders. GA916-17; GA1938 (Gov't Ex. 506). Aquart directed Myers to say that the government "gave out peoples' names, dates, times and where they were from and how they were involved with Charles Street" and told Myers that "[a]ll [he] would had (sic) to do was remember some of that stuff." GA917; GA1938 (Gov't Ex. 506). In particular, Aquart told Myers to say that "[the prosecutor] said something about bags and bats." GA917; GA1938 (Gov't Ex. 506). Myers was then to testify that the government promised, in return for his false testimony, to "put him somewhere nice" and then to release him from jail early. GA916-17; GA1938 (Gov't Ex. 506).

Myers testified that no one from the government had provided him with any information about the murders and that he did not even

48

know how the victims had died. GA917. In fact, Myers explained that he had initiated contact with the government and turned over Aquart's letter because he just wanted to "tell the truth." GA918; GA927. Myers also testified that he had not been moved "somewhere nice," the government had not made him any promises regarding his sentence, and that he knew his sentence would ultimately be determined by the Judge. GA916-18; GA922; GA927.

## B. The defendant's case

The defense called Detective Warren Delmonte, Special Agent Michael Syrax and Special Agent Christopher Munger to testify regarding allegedly inconsistent statements made to them by cooperating witnesses. For example, Syrax testified that during an interview on September 23, 2005, Hodges stated that he saw the three males "either in the stairwell or in the laundry room," rather than in the second floor laundry room, as Hodges testified. GA1019.

Munger testified, among other things, that Womble initially minimized the quantity of narcotics that were sold from apartment 211 and that Lashika Johnson failed to mention during her first several interviews that she picked up Azikiwe at the Charles Street building at some point after the murders. GA1027-28. Munger also testified that Taylor initially identified the floral couch that was in the hallway of the vic-

49

tims' apartment as the one that he and Aquart used to block the victims' door, rather than the living room couch as he later clarified, and that Taylor did not initially recognize the photograph of Rivera as the "Hispanic woman" he saw in the third-floor apartment. GA1030-31; GA1765 (Gov't Exs. 117J).

### C. The verdict

On May 23, 2011, the jury found Aquart guilty of all charges against him: conspiracy to commit murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(5) (Count One); the murders in aid of racketeering of Tina, James, and Basil, in violation of 18 U.S.C. § 1959(a)(1) and § 2 (Counts Two – Four); the drug-related murders of Tina, James, and Basil, in violation of 21 U.S.C. § 848(e)(1)(A) and 18 U.S.C. § 2 (Counts Five – Seven); and conspiracy to distribute and to possess with intent to distribute 50 grams or more of cocaine base, in violation of 21 U.S.C. § 846 (Count Eight). GA1091-92; GA1137-39.

## II. The penalty phase

### A. The government's penalty phase case

During the penalty phase, the government sought to prove five statutory aggravating factors with respect to each victim:

(1) That Aquart committed the homicide offense in an especially heinous, cruel, or depraved

50

manner in that it involved torture or serious physical abuse to each victim;

(2) That Aquart procured the commission of the homicide offense by payment, or promise of payment, of anything of pecuniary value;

(3) That Aquart committed the homicide offense as consideration for the receipt, or in the expectation of receipt, of anything of pecuniary value;

(4) That Aquart committed the homicide offense after substantial planning and premeditation; and

(5) That Aquart intentionally killed or attempted to kill more than one person in a single criminal episode.

GA1160.

The government also sought to prove two non-statutory aggravating factors with respect to each victim:

(1) That Aquart committed criminal acts of violence that posed a serious threat to the lives and safety of persons other than the victims in this case, and that by doing so, Aquart engaged in a continuing pattern of violent criminal conduct; and

(2) That Aquart caused the death of the victim who enjoyed a strong relationship with his or her family, including his or her parents, siblings, children and grandchildren, and the vic-

51

tim's family has suffered severe and irreparable harm, including the loss of emotional support from the victim and, in the case of Tina Johnson, financial support.

GA1160-61.

The government offered all evidence from the liability phase of the trial during the penalty phase. GA1159. In addition, the government supplemented the guilt phase evidence with (1) blood spatter evidence as it related to the torturous manner in which the victims were murdered, (2) information regarding additional assaults that Aquart committed as part of his continuing pattern of acts of violence, and (3) victim-impact evidence that showed the devastating effect the murders had on Tina's, James's, and Basil's families.

## 1. Aquart murdered the victims in a heinous, cruel and depraved manner.

In addition to the medical examiner evidence regarding the victims' injuries, the government called Tom Martin, an expert in blood stain pattern analysis, to testify regarding the severity of the beatings Aquart and Azikiwe inflicted. GA1170.

52

Martin explained that there was blood spatter[16] both on the front and on the back of Tina's shirt. GA1179-80. In order for that to have occurred, Tina would had to have been moving during the attack. GA1180. In other words, Aquart would have had to have beaten Tina both while she was lying on her stomach (for the spatter to be on her back) and while she was lying on her back (for the spatter to be on her chest). GA1179-80. These findings were consistent with the medical examiner's determination that Tina had injuries on three different sides of her head. GA1180.

James had blood spatter on the back of his shirt meaning that he was beaten when lying face down. GA1180. There was a lot of pooled blood around the top of James's head caused by the blood draining from his skull. GA1180.

---

[16] Martin explained that blood spatter is created when you introduce energy or force to a liquid blood source thereby causing blood droplets to be propelled through the air. GA1173. Blood spatter is subcategorized into impact spatter, cast-off spatter and expiration spatter. GA1173. Impact spatter is the result of an object making contact with a liquid pool of blood and causing the pool to break up, *i.e.*, splash, and disperse through the air. GA1173. Cast-off spatter is created when blood that has collected on or "stuck to" an item, such as a blunt object, flies off the object when it is in motion. GA1173. Expiration spatter is blood that is propelled from the mouth, nose or a wound by an expulsion of air from the body. GA1173.

53

James's shirt was also covered with saturation stains, which may have been caused by the blood draining from Tina's head. GA1180.

Martin also explained that the fact that there was blood spatter on three of the walls in Tina's and James's bedroom meant that the victims were struck from several angles. GA1184; GA1780-84 (Gov't Exs. 127, 128, 129A, 129B, 130). With respect to the blood spatter on the ceiling, which was approximately nine feet and four inches high, Martin explained that there were "very large" spatters, some of which were "so large" that blood "subsequently flow[ed] down the wall." GA1180-81; GA1784 (Gov't Ex. 130). Martin stated that in order for an object to produce spatters of that size it would have to have enough surface area to hold a large amount of blood. GA1181. Moreover, the item would have to be long enough that when raised in an upwardly direction it could propel a large amount of blood onto the ceiling. GA1181. Martin concluded that a "bat would fit that description." GA1181. Further, based upon the directionality of the ceiling spatter, Martin opined that a person wielding the weapon would have had to be using it with an overhand motion. GA1181. While Martin was not able to give an exact number of the times that the victims were hit, he replied, "many, many times" and with a "great amount of force." GA1182; GA1185.

54

Finally, Martin explained the majority of the blood stains in Basil's room were confined to the area around Basil's head. GA1177. The "pooling stains" in front of Basil's face were caused by Basil's blood draining from his nose. GA1178. And the blood spatter just beyond the pools of blood were caused by either Basil's head being struck with blunt force or by Basil exhaling blood and air through his nose. GA1178.

### 2. Aquart engaged in a continuing pattern of acts of violence.

John Sullivan, Hopkins's brother, testified that Aquart pistol-whipped him in the head because he believed that Sullivan was selling drugs from apartment 211. GA1215. Aquart told Sullivan, "[a]in't nobody selling out of here. If I catch somebody selling out of here I'm going to take you somewhere in the basement or something and have you sell my drugs for free. Ain't nobody selling out of here but me and Womble." GA1215. Following the assault, Sullivan, who was bleeding profusely, went to the hospital to be treated for his injuries. GA1216; GA1952 (Gov't Ex. 12A). There, he received stitches on his head and on his ear. GA1216.

Anthony Armstead, with whom Aquart was incarcerated pending trial, testified that Aquart assaulted him at the Wyatt Detention Center. GA1186. Specifically, on October 2, 2009, Armstead was in another inmate's cell when Aquart

55

walked in and asked, "[y]ou know who I am?" GA1186. When Armstead replied, "[n]o," Aquart struck him on the right side of his face. GA1186. Armstead fell to the ground and tried to protect himself. However, Aquart repeatedly struck Armstead in the head. GA1186.

Armstead eventually got away from Aquart and returned to his own cell. GA1187. When he looked in the mirror, he saw that he was "bleeding everywhere." GA1187; GA1943-44 (Gov't Exs. 3-4). Armstead was transported to the hospital to be treated for his injuries, which included lacerations under his right eye, above his left eye, on the left side of his head, behind his left ear, on the right side of his mouth and inside his mouth. Armstead received seven stitches on his scalp, four stitches over his left eye, two stiches below his right eye, three stiches on his lip and three staples behind his left ear. GA1187; GA1945-51 (Gov't Ex. 9). At the time of the assault, Armstead did not know Aquart and, in fact, had never spoken to him. GA1188.

### 3. The victims' murders had a devastating impact on their loved ones.

The government called six witnesses to testify about the impact that the victims' murders had upon those closest to them. The witnesses included James's mother, Mary Reid, GA1220-25; James's brother, Brian Reid, GA1225-27; Basil's sister, Pamela Williams, GA1227-32; Basil's

brother, John David Williams, GA1232-36; Tina's oldest daughter, Latavia Whittingham, GA1237-46; and Tina's youngest daughter, Erica Whittingham, GA1246-50. The witnesses spoke about the victims' personal characteristics and the overwhelming loss that they and other family members felt as a result of the victims' murders.

The government also introduced letters from Basil's daughter, Karen Hurdle, GA1250; Basil's sister-in-law, Eleanor Layne, GA1199; Tina's husband, Leroy Whittingham, Sr., GA1198; Tina's mother, Barbara Johnson, GA1198; and poems written by Tina's brother, Terry Walley, GA1198-99, and Tina's daughter, Erica. Finally, the government introduced several photographs of the victims taken at various points in their lives.

### B. Aquart's penalty phase evidence

Aquart introduced documentary evidence, dozens of photographs from his childhood and testimony from 19 penalty phase witnesses in support of his proposed mitigating factors. These factors included:

(1) Neither John Taylor nor Efrain Johnson will be sentenced to death for their roles in the murders of Basil Williams, James Reid, and Tina Johnson;

57

(2) One or more victims chose to engage in illegal drug-trafficking activities, a circumstance that contributed to their deaths;

(3) If not sentenced to death, Azibo Aquart will be imprisoned for the rest of his life without the possibility of release;

(4) Lifetime imprisonment is severe punishment;

(5) Azibo Aquart's execution would cause others to suffer grief and loss;

(6) Azibo Aquart grew up in communities characterized by violence and crime;

(7) Before age 16, Azibo Aquart lived in 16 different places;

(8) Azibo Aquart attended 8 different schools in 9 years;

(9) Throughout his childhood, Azibo Aquart lacked adequate parental supervision;

(10) Azibo Aquart was exposed to emotional and physical abuse inflicted on his mother;

(11) Azibo Aquart's parents both sold illegal drugs;

(12) Azibo Aquart's father, Richard Aquart, exposed Azibo Aquart to violence and drug dealing;

(13) Richard Aquart stored illegal weapons in the home;

58

(14) From the time Azibo Aquart was 5, Richard Aquart was a fugitive who used aliases;

(15) When Azibo Aquart was 11, his father was sent to prison for 8 years and then deported to Jamaica;

(16) Richard Aquart was a poor role model;

(17) Azibo Aquart's parents and others around him taught him to distrust the police and the judicial system and to disregard the law;

(18) Azibo Aquart and his brothers Azizi and Azikiwe were picked on and bullied because of their cultural differences;

(19) When he was 12, Azibo Aquart's mother drowned;

(20) From the time of his mother's death, Azibo Aquart had no meaningful adult supervision;

(21) When Azibo Aquart was 13, his brother, Azizi Aquart, was shot three times and nearly died;

(22) At age 17, Azizi Aquart was ill-equipped to handle the responsibility of being the guardian of a 13 year-old;

(23) Azibo Aquart's close relatives and family friends failed to properly care for him after his mother's death or his brother's shooting;

(24) Although social service providers and juvenile court officials identified Azibo Aquart as an at-risk child, no effective action was taken;

59

(25) While incarcerated as a young adult, Azibo Aquart obtained his GED;

(26) At the Enfield Correction Center, Azibo Aquart was a certified literacy tutor who helped other inmates;

(27) If Azibo Aquart is sentenced to life imprisonment, the Bureau of Prisons has the capability of safely and securely confining him; and

(28) Azibo Aquart's life has value.

GA1161-62.

The evidence Aquart presented was generally grouped into four categories: (1) his background and family dynamics; (2) his early involvement with the criminal justice system; (3) expert testimony regarding security in federal penitentiaries; and (4) testimony from Agent Munger regarding statements Johnson made during various proffer sessions.

## 1. Aquart's background and upbringing

Several people, some of whom had known Aquart since birth, testified regarding his childhood.[17] GA1251; GA1258. For instance, these

---

[17] None of the witnesses who testified on Aquart's behalf, including his family members, family friends, teachers and juvenile probation officers, had seen, spoken to or corresponded with Aquart for periods of time ranging from two years to fifteen years.

60

witnesses relayed that Aquart's father was involved in narcotics trafficking and illegal firearm possession and, as such, was a very poor role model. GA1253; GA1260; GA1265; GA1271; GA1273; GA1291. By the time Aquart was 11 years old, his father was sentenced to a lengthy term of imprisonment and was then deported to Jamaica. GA1357.

Aquart's mother was described as an "amazing mom," who loved and cared for her children deeply and worked hard to give her children a better life. GA1262; GA1265; GA1301; GA1315; GA1330. However, when Aquart was 12 years old, his mother drowned during a family vacation. GA1256. Aquart was initially "stoic" about her death, but harbored a lot of anger.[18]

---

GA1257; GA1263; GA1268; GA1274; GA1319; GA1331; GA1335; GA1361; GA1401; GA1433.

[18] Mike Adams, who was a close friend of the family, *see* GA1301, testified that Aquart was actually full of rage long before his mother died. Adams explained that there were "many days where if [Aquart] lost his temper you . . . need to be in alert mode because you don't know what might take place." GA1275. Adams described dealing with Aquart to be like "dealing with a bull." GA1275. And while Adams was surprised to learn that Azikiwe had been involved in the triple homicide, he was not surprised—based upon Aquart's behavior as a child—to learn that Aquart had been involved in such a violent crime. GA1277.

GA1266. He later became withdrawn and had difficulty sleeping. GA1333.

When Aquart's brother Azizi turned 18, he obtained guardianship of Aquart and Azikiwe. GA1266; GA1311. Although Azizi was young and, therefore, this was not the ideal living situation, Azizi nonetheless maintained a close bond with Aquart and kept his family together. GA1318-19; GA1364-65; GA1369; GA1400. Moreover, Azizi provided Aquart with "loving care and food and clothing and education and safety," and even attended counseling with him after Aquart started to get in trouble with the law. GA1317-18; GA1415. Azizi and his wife, Nashieka Bennett, testified that Aquart's death would be a devastating loss for them and their family, although Bennett acknowledged that Azizi did not feel that their children were safe around Aquart. GA1312; GA1414; GA1417.

### 2. Aquart's early involvement in criminal activity

Jonathan Davis and Diane D'Amato, both of whom are juvenile probation officers for the State of Connecticut, testified regarding their contact with Aquart. GA1363.

Davis supervised Aquart after he was arrested for possession of marijuana. GA1363. Aquart was placed on intensive supervision and was subject to home visits three times a week. GA1369. Although Aquart initially did very well

62

insofar as he was getting good grades, playing basketball and living the "life of a relatively normal teenager," eventually he became "violent and confrontational and difficult for his brother to handle." GA1369. In fact, during one probationary visit, Aquart threatened to release a pit bull on D'Amato and told her, "[i]t's going to get you. It's going to kill you." GA1358. Davis continued to supervise Aquart until he was arrested for an armed robbery and transferred to adult court. GA1367-68.

### 3. Testimony from correctional consultant Mark Bezy

Prison consultant Mark Bezy testified about where the Bureau of Prisons would house Aquart if he was sentenced to life without parole. Bezy claimed that, at a minimum, Aquart would be sentenced to a United States Penitentiary. GA1382. Bezy also stated, in response to a hypothetical posed by defense counsel, that if the United States Attorney was "lobbying hard" for designation to the Administrative Maximum Facility in Florence, Colorado ("ADMAX"), that Aquart could be sentenced to the general population unit in that facility. GA1386-87. Bezy continued that "with the right amount of pressure" from the U.S. Attorney or the Department of Justice, Aquart also could be sent to the ADMAX control unit, which is more restrictive than general population. GA1387.

### 4. Johnson's proffer statements

Aquart called FBI Special Agent Christopher Munger to testify about various statements Johnson made to law enforcement during a post-arrest interview on March 6, 2007, and during proffer sessions on March 7, 2007, August 11, 2008, and October 2, 2008. In particular, Aquart elicited testimony from Agent Munger regarding Johnson's claims that it was Taylor who pushed Tina down, punched her, bound her with duct tape and struck her with a ten-inch-by-two-inch metal pipe. GA1419. According to Johnson, all of this occurred in the living room of the victims' apartment while Tina was leaning over a sofa bed. GA1419-20.

The Johnson statements introduced by Aquart through Agent Munger were internally inconsistent, except in one respect: Johnson repeatedly stated that he saw Aquart and Azikiwe run down the hall and either push or follow Basil into his bedroom. GA1418-19. Johnson said that he could not see what was going on in the bedroom, but could hear sounds of punching and moaning. GA1419.

## C. The penalty phase verdict

On June 15, 2011, after three days of deliberations, the jury completed the 14-page special verdict form and announced its sentencing verdict. The jury unanimously found that Aquart

64

was 18 years of age at the time of the murders[19] and that he possessed the threshold mental state, to wit: (1) that he intentionally killed Tina and Basil, and (2) that he intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, and the victim died as a direct result of that act, with respect to Tina, Basil, and James. GA1480; GA1524.

The jury also unanimously found that the government had proven all of the statutory and non-statutory aggravating factors beyond a reasonable doubt, and that Aquart had proven by a preponderance of the evidence 25 of his 28 proposed mitigating factors. As to the remainder of the mitigating factors, nine jurors found that throughout his childhood, Aquart lacked adequate parental supervision, nine jurors found that Aquart was exposed to emotional and physical abuse that was inflicted on his mother, and two jurors found that from the time of his mother's death, Aquart had no meaningful adult supervision. GA1480-81; GA1525-31. Finally, the jury unanimously found an additional mitigator that it handwrote on the special verdict form: "The defendant Azibo Aquart has a child." GA1481; GA1532.

---

[19] The parties stipulated that Aquart was over 18 years of age at the time of the commission of the murders. GA1250.

65

After determining beyond a reasonable doubt that the aggravating factors sufficiently outweighed all of the mitigating factors[20] thereby justifying a sentence of death for all three murders, the jury chose to impose the death penalty on only four of the six capital counts, namely, those related to the murders of Tina and Basil. GA1481-82; GA1533-35. The jury was unable to reach a unanimous verdict in favor of either the death penalty or a life sentence on the counts related to the murder of James. GA1482; GA1534.

---

[20] The district court instructed the jury that it had to find that the aggravating factors outweighed the mitigating factors "beyond a reasonable doubt." GA1444. This standard is not required by the Federal Death Penalty Act. That statute only asks the jury to find whether the aggravating factors "sufficiently outweigh all the mitigating . . . factors found to exist to justify a sentence of death," not whether the jury is so persuaded beyond a reasonable doubt. 18 U.S.C. § 3593(e). *See, e.g.*, *United States v. Sampson*, 486 F.3d 13, 31 (1st Cir. 2007) (holding that reasonable doubt standard is not required for FDPA weighing); *United States v. Fields*, 483 F.3d 313, 345-46 (5th Cir. 2007) (same); *United States v. Mitchell*, 502 F.3d 931, 993-94 (9th Cir. 2007) (same); *United States v. Barrett*, 496 F.3d 1079, 1107-1108 (10th Cir. 2007 (same).

## Summary of Argument

I. The evidence supporting Aquart's murder-in-aid-of-racketeering convictions was sufficient. *First*, the evidence was more than sufficient to show that Aquart's racketeering enterprise affected interstate commerce. Aquart's enterprise trafficked in cocaine and, as this Court has recognized, cocaine necessarily travels in interstate commerce. Further, the enterprise purchased guns and ammunition that travelled in interstate commerce and the enterprise members themselves moved in interstate commerce. In short, a rational jury could easily find that Aquart's enterprise affected interstate commerce.

*Second*, the evidence was sufficient to show that Aquart committed the murders for the purpose of maintaining or increasing his role in the enterprise. Because Aquart committed the murders to eliminate a competitive threat to his narcotics distribution enterprise—and to set an example for others who might contemplate crossing Aquart's enterprise—the jury could reasonably infer that Aquart committed the murders to maintain his role in the enterprise.

II. The government did not present perjured testimony when John Taylor, the principal cooperating witness in this case, stated that he did not think he would ever go home. Aquart claims that this statement must have been false, be-

67

cause Taylor must have known that another co-operator in a different murder case received a five-year sentence. But even if Taylor knew about the other defendant's sentence, that knowledge would not demonstrate that Taylor expected a similar sentence in his case, and thus would not demonstrate that his stated sentencing expectations were false. For the same reason, Aquart cannot demonstrate that the government knew, or should have known, that Taylor's testimony was false. Moreover, even if Taylor's testimony were determined to be false, Aquart cannot show he is entitled to relief because any false testimony on this topic would be immaterial. Taylor's motive to testify was thoroughly explored at trial, and his credibility was repeatedly attacked. There is no reason to believe that any false statement on this one topic would have had any effect on the verdict. Finally, Aquart has not demonstrated any basis or need for an evidentiary hearing. Aquart's speculation about Taylor's sentencing expectations is insufficient to warrant a hearing.

III. The district court properly denied Aquart's new trial motion based on the argument that Lashika Johnson presented perjured testimony when she stated that she did not feel threatened during a proffer session. Lashika's testimony about the proffer session was largely consistent with her testimony about that proffer session during her brother's trial. Any minor in-

68

consistencies between the two descriptions of
that session were due to the different questions
posed to her and the different trial contexts.
Furthermore, Aquart cannot show that the gov-
ernment knew, or should have known, that La-
shika's stated perceptions of the proffer session
were false. Finally, Aquart cannot show that any
mischaracterization of the proffer session would
have had any impact on the verdict. Aquart
brought out evidence to challenge Lashika's mo-
tive for testifying and to suggest that she
changed her story after being confronted by the
government. Given this impeachment evidence,
and given the overwhelming evidence of Aquart's
guilt, any misstatement in Lashika's characteri-
zation of the proffer session did not affect the ju-
ry's verdict.

IV. The district court properly denied
Aquart's mistrial motion based on one alleged
mis-statement during rebuttal summation. The
government's statement that there was no evi-
dence that Womble's DNA was at the crime sce-
ne was a proper response to Aquart's attempt to
frame Womble as a possible alternative suspect.
Moreover, it was a reasonable inference from the
evidence in the record that CODIS could have
detected Womble's DNA profile if Womble's DNA
profile had in fact been present on the eviden-
tiary items recovered from the crime scene.
Aquart was free to argue—and did argue—
different inferences from the evidence, but the

69

government's interpretation of the evidence was not improper.

In any event, even if the statement was improper, it did not deprive Aquart of a fair trial. Any suggestion that Womble was a participant in the murders was pure speculation, with no foundation in any of the physical evidence or testimony about the murders. Further, even if Womble had participated in the murders, that fact would hardly exonerate Aquart.

V. The government did not prevent the jury from fully considering Efrain Johnson's proffer statements during the penalty phase of the trial. *First*, the government's cross-examination of Agent Munger was proper and did not constitute improper "vouching." The government properly elicited testimony that Johnson did not receive a cooperation agreement in an attempt to clarify the nature of the government's relationship with Johnson. When the government returned to this topic, the defense objected. The court struck two questions and an answer, and issued immediate curative instructions. Finally, the government did not "vouch" for Taylor's credibility by the way it phrased its questions on cross-examination of Munger about Johnson's statements; the government merely questioned the credibility of Johnson's statements by highlighting the inconsistencies in those statements. In all of these contexts, then, to the extent there

70

was any impropriety, it did not undermine the fairness of the proceeding.

*Second*, the government properly cross-examined Agent Munger about Johnson's failed change-of-plea proceeding. Although Aquart believes that the government mischaracterized that proceeding, the government merely asked questions about the questions and answers posed during the proceeding. Further, the government reasonably highlighted the differences between Johnson's change-of-plea proceeding and his proffer statements. To the extent that Aquart drew alternative inferences from those differences, he was free to make those arguments to the jury.

*Third*, the government did not infringe on Aquart's right to present a defense when the court contrasted Aquart's theory in the guilt phase of the trial with his arguments in the penalty phase of the trial. The government's statement was a comment on the weakness of Aquart's argument, and as such, was proper advocacy. In any event, the defense immediately objected and the court gave a curative instruction. In light of the fleeting nature of the comment, the immediate curative instruction, and the clear evidence that none of the government's conduct vis-à-vis Johnson's statements had any impact on the jury's verdict, Aquart cannot show that government misconduct caused him substantial prejudice.

71

VI.    The evidence was more than sufficient to support the "substantial planning and premeditation" aggravator. Aquart recruited accomplices, gathered materials, conducted at least one attempt, surveilled the victims' home, and devised a plan for the murders. All of this evidence—when coupled with the severe and consistent injuries inflicted on all three victims—support the jury's finding that Aquart engaged in substantial planning and premeditation to kill the victims. Aquart posits alternative readings of the evidence, and draws different inferences from that evidence. But his arguments rest on implausible readings of the evidence, and in any event, are irrelevant. The question is not whether a jury could have reached a different conclusion, but rather whether a rational jury could have found substantial planning and premeditation. Here, there is no doubt that standard is met. Finally because Aquart did not raise this issue below, he must show a manifest miscarriage of justice, which he cannot do because even without this factor, the jury would have reached the same conclusion.

VII.    The evidence was more than sufficient to prove that Aquart intentionally killed or attempted to kill more than one person in a single criminal episode. Aquart concedes that the evidence sufficiently established that he killed Tina, but claims that the evidence was insufficient to show that he killed Basil. This argument rests

72

on a selective reading of the evidence. Viewing the evidence in the light most favorable to the verdict, the evidence established that Aquart broke into the victims' apartment intending to kill all three victims. Taylor saw Aquart kill Tina and Azikiwe kill James. Then, Aquart was left alone in the apartment while Basil was still alive. Therefore, the jury could reasonably infer that Aquart killed Basil. This inference was supported by forensic evidence recovered from the apartment. Finally, Aquart cannot establish that the resulting verdict resulted in a manifest miscarriage of justice. Even without this factor, the jury would still have reached the same conclusion.

VIII. The Federal Death Penalty Act does not authorize "proportionality" review—a comparison of the sentence imposed here with the sentences imposed in similar capital cases to determine whether they were proportionate. Moreover, as the Supreme Court and multiple Courts of Appeals have held, the Eighth Amendment does not require such review. Accordingly, Aquart's request for proportionality review in his case is without foundation.

IX. The FDPA operates consistent with the Due Process Clause of the Fifth Amendment. *First*, Aquart's claim that the statute operates arbitrarily fails because the FDPA properly channels the jury's discretion to impose the

73

death penalty. *Second*, although Aquart argues that there is no meaningful basis to distinguish between cases in which the death penalty is imposed and cases in which it is not, the Supreme Court has made clear that the Constitution is not violated by seemingly inconsistent results that actually reflect the circumstances of the crimes and the characteristics of the defendant. *Third*, Aquart has made no showing that the FDPA operated in a racially biased manner in his case.

X. As the Supreme Court and this Court have held, the death penalty does not violate the Eighth Amendment's prohibition on cruel and unusual punishment. If the law is to change on this issue, that change must come from the Supreme Court.

74

## Argument

### I. There was sufficient evidence to prove that Aquart's enterprise affected interstate commerce and that Aquart murdered Tina, James, and Basil to maintain or increase his position in the enterprise.

#### A. Relevant facts

Facts stemming from the evidence adduced at trial, which are pertinent to consideration of this issue, are set forth in the Statement of the Case above. Additional facts are set forth below.

#### B. Governing law and standard of review

Although this Court reviews a sufficiency of the evidence claim *de novo*, *see United States v. Harvey*, 746 F.3d 87, 89 (2d Cir. 2014) (per curiam), "a defendant mounting such a challenge bears a heavy burden." *Id.* (internal quotations omitted). In assessing whether the evidence is sufficient to sustain a conviction, the Court views "the evidence in the light most favorable to the government, drawing all inferences in the government's favor and deferring to the jury's assessments of the witnesses' credibility." *United States v. Pierce*, 785 F.3d 832, 838 (2d Cir. 2015) (internal quotations omitted). The Court will "sustain the jury's verdict if '*any* rational trier of fact could have found the essential elements of

75

the crime beyond a reasonable doubt.'" *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

"Under this stern standard, a court . . . may not usurp the role of the jury by substituting its own determination of . . . the weight of the evidence and the reasonable inferences to be drawn for that of the jury." *United States v. MacPherson*, 424 F.3d 183, 187 (2d Cir. 2005) (citations and internal quotation marks omitted). "[I]t is the task of the jury, not the court, to choose among competing inferences that can be drawn from the evidence." *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003). The evidence must be viewed in conjunction, not in isolation; and its weight and the credibility of the witnesses are matters for argument to the jury, not a ground for legal reversal. *See United States v. George*, 779 F.3d 113, 120 (2d Cir. 2015); *United States v. Applins*, 637 F.3d 59, 76 (2d Cir. 2011); *United States v. Best*, 219 F.3d 192, 200 (2d Cir. 2000).

"[T]he law draws no distinction between direct and circumstantial evidence," and "[a] verdict of guilty may be based entirely on circumstantial evidence as long as the inferences of culpability . . . are reasonable." *MacPherson*, 424 F.3d at 190. "Furthermore, jurors are entitled, and routinely encouraged, to rely on their common sense and experience in drawing inferences." *United States v. Huezo*, 546 F.3d 174, 182

76

(2d Cir. 2008). Because there is rarely direct evidence of a person's state of mind, "the *mens rea* elements of knowledge and intent can often be proved through circumstantial evidence and the reasonable inferences drawn therefrom." *MacPherson*, 424 F.3d at 189; *see also United States v. Crowley*, 318 F.3d 401, 409 (2d Cir. 2003). Moreover, "the government need not negate every theory of innocence." *United States v. Lee*, 549 F.3d 84, 92 (2d Cir. 2008) (internal quotation marks omitted).

In short, this Court may not disturb a conviction on grounds of legal insufficiency absent a showing that "no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Walsh*, 194 F.3d 37, 51 (2d Cir. 1999) (internal quotation marks omitted). "The ultimate question is not whether *we believe* the evidence adduced at trial established defendant's guilt beyond a reasonable doubt, but whether *any rational trier of fact could so find.*" *United States v. Payton*, 159 F.3d 49, 56 (2d Cir. 1998) (emphasis in original).[21]

---

[21] Because Aquart did not raise these issues below, his claims are reviewed to determine whether the resulting verdict was a manifest miscarriage of justice. *See United States v. Williams*, 784 F.3d 798, 802 (D.C. Cir. 2015); *see also* Part VI.B.2., *infra.*

77

## C. Discussion

The jury convicted Aquart of one count of conspiracy to murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(5), and three counts of murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(1) (collectively the "VICAR counts"). Aquart contests the sufficiency of the government's evidence supporting these convictions. AOB228-30.

Aquart first argues that the evidence was insufficient to prove that the racketeering enterprise affected interstate commerce. AOB228-29. Aquart does not claim any inadequacy in the proof that the enterprise existed or that the enterprise sold crack cocaine. Rather, he contends that the government did not offer any proof that the narcotics sold by the enterprise traveled in interstate commerce or that the sales had an effect on interstate commerce. AOB229.

Aquart next argues that the evidence was insufficient to prove that he committed the murders in order to maintain or increase his position in the enterprise. AOB228. Here, Aquart does not claim that the evidence was insufficient to prove that he committed the murders. Instead, he claims that the government "adduced absolutely no evidence" regarding Aquart's motive for doing so. AOB229.

Aquart's claims have no merit; the jury's verdict was well-supported by the evidence. Fur-

78

ther, as Aquart acknowledges, both of his claims are foreclosed by this Court's precedent.

### 1. Aquart's crack cocaine distribution enterprise affected interstate commerce.

To convict Aquart on the four VICAR counts alleged in the indictment, the government was required to establish, as relevant here, that Aquart's racketeering enterprise "[wa]s engaged in, or the activities of which affect[ed], interstate or foreign commerce." 18 U.S.C. § 1959(b)(2). "Transporting goods . . . across state lines is a classic example of engaging in interstate commerce," as is the "[u]se of an instrumentality of commerce, such as telephone lines." *United States v. Mejia*, 545 F.3d 179, 203 (2d Cir. 2008). "[A]ny . . . conduct having even a *de minimis* effect on interstate commerce [also] suffices." *Id*.

In the Second Circuit, an enterprise involved in cocaine distribution "meets this standard" because cocaine "necessarily travel[s] in interstate commerce." *United States v. Needham*, 604 F.3d 673, 680 (2d Cir. 2010). As detailed above, the government's evidence overwhelming established that Aquart's enterprise was trafficking in crack cocaine, thereby satisfying the interstate commerce element, as articulated by this Court. Moreover, the government presented evidence that guns and ammunition purchased by the enterprise travelled in interstate commerce,

79

GA674-80, and that the enterprise participants themselves moved across state lines, *see* GA569 (during trip to North Carolina and Georgia, Aquart recruited Taylor to "help him . . . [w]ith something when [they] g[o]t back to Connecticut"). On this record, then, there is no doubt that a rational jury could find that the enterprise affected interstate commerce. Indeed, in closing argument, the defense did not even contest this issue.

And while the rule in *Needham* provides an easy way for this Court to conclude that a rational jury could have found that Aquart's enterprise affected interstate commerce, it does not take this issue away from the jury, in violation of *Apprendi v. New Jersey*, 530 U.S. 466 (2000), as Aquart argues. The jury was specifically instructed that it had to find the enterprise affected interstate commerce, GA1041, and in closing argument, the prosecution argued this issue to the jury, citing not only the trafficking in crack cocaine, but also the use of guns that had traveled in interstate commerce. GA1061. In sum, the evidence was more than sufficient for a rational jury to conclude that the enterprise affected interstate commerce.

80

## 2. Aquart committed the murders to maintain his position in the enterprise and to protect the enterprise's operations.

The VICAR counts also required the government to prove that Aquart committed the murders, or conspired to commit the murders, "for the purpose of . . . maintaining or increasing position in an enterprise engaged in racketeering activity." 18 U.S.C. § 1959(a). This Court has "affirmed convictions under section 1959(a) for violent crimes committed or sanctioned by high ranking leaders of the enterprise for the purpose of protecting the enterprise's operations and furthering its objectives or where the defendant, as a leader within the enterprise, was expected to act based on the threat posed to the enterprise and that failure to do so would have undermined his position within that enterprise." *United States v. Dhinsa*, 243 F.3d 635, 671 (2d Cir. 2001) (collecting cases). Other courts have as well. *See, e.g.*, *United States v. Garcia*, 754 F.3d 460, 472 (7th Cir.) (VICAR conviction affirmed for leader of Latin Kings who sanctioned assault of gang members who defied orders and violated gang rules), *cert. denied*, 135 S. Ct. 395 (2014); *United States v. Banks*, 514 F.3d 959, 970 (9th Cir. 2008) (sufficient for VICAR conviction that defendant "acted out of concern for his status in the eyes of his 'little homies' within the gang, or his reputation among other gang members gen-

81

erally"); *United States v. Smith*, 413 F.3d 1253, 1278 (10th Cir. 2005) ("A conviction under § 1959(a) will stand even when the underlying crime was sanctioned by a high-ranking leader of the RICO enterprise, if the high-ranking leader was expected to act and any failure to do so would have undermined his position in the enterprise."), *overruled on other grounds*, *United States v. Hutchinson*, 573 F.3d 1011, 1019-1022 (10th Cir. 2009).

As Aquart acknowledges, his conduct fit this bill. Specifically, at trial, eight witnesses, six of whom were themselves members of the enterprise, testified regarding the existence and inner-workings of Aquart's prolific crack cocaine distribution operation. Their testimony established that Aquart was the undisputed leader of the organization and that he regularly used violence to control those who worked for him, as well as to punish those who attempted to compete with him.

The evidence further established that Tina's crack sales interfered with Aquart's enterprise insofar as several of the customers that usually purchased drugs from Aquart's organization instead started buying from Tina. GA207; GA290; GA371-72; GA645. As a result, Aquart's profits declined. GA191; GA645.

Despite repeated warnings, Tina refused to stop selling in Aquart's territory. GA290-91; GA304. To the contrary, Tina took the position

82

that, "[i]f [she couldn't] sell nobody is selling." GA373; GA398; GA457. In other words, she threatened to destroy Aquart's enterprise. Aquart responded by assembling a crew to help him "solve" his problem and to get Tina out of "his money business." GA569-70; GA573.

Viewing the evidence in the light most favorable to the government, a jury could reasonably conclude that Aquart murdered Tina, James, and Basil to protect the operations of his enterprise, and to set an example for his other associates, who, fearing the same fate, would avoid committing similar transgressions in the future. *See United States v. Diaz,* 176 F.3d 52, 94-96 (2d Cir. 1999) (motive requirement satisfied where failure to order murder to protect drug business would have undermined defendant's leadership position in enterprise); *United States v. Rosa*, 11 F.3d 315, 340-41 (2d Cir. 1993) (motive requirement satisfied where leader of drug organization murdered worker over a dispute over a narcotics distribution spot); *United States v. Reyes*, 157 F.3d 949, 955 (2d Cir. 1998) (motive requirement satisfied where leader of drug organization murdered rival who was infringing on his drug business); *see also United States v. Concepcion*, 983 F.2d 369, 381-83 (2d Cir. 1992) (defendant expected to respond to reported threats to the organization and failure to do so would undermine his position and authority in his organization).

83

According to Aquart, the *Dhinsa* standard is insufficient because it allows conviction of a defendant who committed a crime to maintain or enhance the position of the enterprise itself, and not the *defendant's* position in the enterprise. But as *Dhinsa* and this Court's cases recognize, when the *leader* of an enterprise acts to maintain the enterprise, he acts to maintain *his role* in that enterprise.

84

## II. The government did not present perjured testimony from John Taylor about his sentencing expectations.

Aquart argues—for the first time—that the government purposely elicited, and John Taylor knowingly provided, false testimony regarding his sentencing expectations. AOB98-115. Aquart requests that the Court reverse his capital convictions and order a new trial, or reverse his death sentences and order a new penalty proceeding. AOB99-100. Alternatively, Aquart requests a remand for further fact-finding on Taylor's sentencing expectations. AOB111-15.

### A. Relevant facts

Taylor's testimony on direct examination spanned more than a hundred pages of the trial transcript. GA555-94. During the course of his direct examination, the government thoroughly reviewed Taylor's criminal history. Specifically, the government established that Taylor began dealing drugs at the age of 16 and that he had four prior convictions for possessing or selling narcotics and a fifth conviction for robbery. GA556-58.

With respect to Taylor's cooperation, the government established that Taylor met with the government on numerous occasions both before and after he pled guilty. GA593. Taylor testified that he was not completely honest with the gov-

85

ernment during several of the earlier meetings because he was trying to minimize his culpability as it related to his narcotics trafficking activities and because he was ashamed about his participation in the murders. GA591-93.

Finally, the government established that Taylor pled guilty to three counts of felony murder, that he entered into a cooperation agreement with the government, and that the government was not seeking the death penalty against him. GA593. The government introduced Taylor's plea agreement and his cooperation agreement into evidence. GA593; GA1807-21 (Gov't Exs. 247, 247A). The standard language in Taylor's cooperation agreement provided, in pertinent part, that if the government determined that Taylor provided substantial assistance in the investigation or prosecution of another person, it would file a motion that would authorize the court to sentence Taylor below the otherwise applicable mandatory minimum sentences. The agreement noted, however, that there were no representations or promises as to what sentence he would receive, and that the "sentence to be imposed on the defendant remains within the sole discretion of the sentencing Court." GA1818-19 (Gov't Ex. 247A at 2-3).

After introducing Taylor's plea agreements, the government asked Taylor why he was testifying. Taylor responded, "[t]o tell the truth." GA593. The government then asked, "[w]hy?"

86

Taylor replied, "[p]eople got killed for no reason. They shouldn't got killed." GA593.

The government showed Taylor a photograph of Tina and James at the crime scene and asked why he did not call 911. Taylor responded that he was scared that "if I told the truth they would lock me up the way I am now." GA594. When asked what he was hoping for in terms of the resolution of his case, Taylor replied, "[l]esser sentence." GA594. When asked whether he thought he would be going home tomorrow, Taylor stated "[n]o." GA594. The government then asked Taylor when he thought he would be going home. GA594. Taylor responded, "I don't think I'm never going home." GA594.

Aquart then cross-examined Taylor over the course of two days, focusing primarily on the number of times that Taylor had lied to law enforcement. In fact, Aquart's counsel reviewed the 18-page, single-spaced FBI report memorializing Taylor's pre-arrest statement virtually line-by-line, highlighting every alleged inconsistency or falsehood. *See* GA600-601. Aquart did not ask Taylor any questions regarding the commission of the murders or about Taylor's role in the murders.

On redirect, in response to Aquart's myriad accusations that Taylor had lied, the government asked Taylor, "do you think it's going to help you to lie here today?" GA624. Taylor responded "[n]o." GA624. The government then

87

asked, "[w]hy not?" Taylor responded, "[b]ecause if I get—if I perjury and they—perjury, I don't want perjury. That's another charge. I don't want that. I'm looking for help." GA624. The government then asked Taylor, "[a]nd if you lie in court, what do you think your sentence on the murders, the three murder charges, is going to be?" Taylor answered, "[s]till the same." At this point, defense counsel objected because the question invited Taylor to speculate:

Defense: Objection. I don't think he has any—what he thinks the Court's sentence will be, I would object to that, your Honor.

Court: On what grounds?

Defense: First of all, *it invites speculation on his part.*

Court: It's his state of mind.

Defense: Are we going to get into what his lawyers have told him, your Honor?

Court: No. (To the government) Do you want to rephrase your question?

Gov't: I can re-ask it.

Court: No, rephrase it to exclude anything his lawyers have told him.

88

> Gov't: (To Taylor) Your personal thoughts, not what your lawyers told you, if you lie in court, what do you think you are going to be sentenced to on the three murders?
>
> Taylor: Life sentence.

GA624 (emphasis added).

Approximately nine months later, on February 16 and 17, 2012, Taylor testified in the trial of Efrain Johnson, which was also presided over by the Hon. Janet B. Arterton. GA1603-86. Over the course of two days of trial testimony, Taylor again described his background, his involvement in drug trafficking, the events that led up to the murders, the murders themselves, and his cooperation with the government. Taylor was again subjected to extensive cross-examination. His testimony at Johnson's trial was consistent with his testimony at Aquart's trial.

Two months, later, on April 16, 2012, the district court sentenced Taylor. During the course of the hearing, the court asked Taylor what he thought he should have done differently on the night of the murders:

> Court: Is there anything that you've thought about that you would do differently if you had it to do over?

89

| | |
|---|---|
| Taylor: | Yes, ma'am. |
| Court: | What would that be? |
| Taylor: | I would have went to the police and told the police. Or if I—if I could have stopped—if I knew they was going in to kill them, I would— |
| Court: | I know you didn't know that. |

GA1577.

The court also made clear that after having seen Taylor testify at both Aquart's and Johnson's trials, she not only found him credible, but also understood that the jury found him to be more credible than Johnson, who had testified at his own trial: "And you testified not once, but twice, and it would appear that the jury credited your account in the second case versus another account that they obviously did not credit, and I suspect that's because juries are pretty good at telling who's being truthful." GA1578.

The court also acknowledged that Taylor's intellectual limitations, as described by a psychiatrist, played into her determination of the appropriate sentence to impose. In particular, the court noted that Taylor's limitations likely prevented him from grasping, prior to seeing Aquart beating Tina to death, that Aquart intended to murder the victims. GA1578. Finally,

90

the court advised Taylor that she found his expression of remorse to be sincere. GA1578.

Citing to the need to "reflect the seriousness of the crime" and Taylor's involvement in it, but "recognizing that the two are of very much different levels," the court imposed a term of imprisonment of 108 months to be followed by a five year term of supervised release. GA1578-79. The court explained that, in addition to all of the factors delineated in § 3553, including Taylor's cooperation, she calculated the sentence to be approximately twice the total time Taylor had previously spent in prison, and approximately four times longer than the longest sentence he had ever served. GA1579.

## B. Governing law and standard of review

Because Aquart claims for the first time on appeal that Taylor committed perjury with respect to his sentencing expectations, plain error review applies. "This standard is met when (1) there is an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; (3) the error affected the appellant's substantial rights, which in the ordinary case means it affected the outcome of the district court proceedings; and (4) the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *United States v. Dantzler*, 771 F.3d 137, 141 (2d Cir. 2014) (internal quotations omitted).

91

It is well established that the government may not knowingly use false evidence, including false testimony, to obtain a conviction. *United States v. Agurs*, 427 U.S. 97, 103 (1976) ("[A] conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.") (internal citations omitted). This principle applies even if the false testimony goes only to the credibility of the witness as "[t]he jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend." *Napue v. Illinois*, 360 U.S. 264, 269 (1959); *see also Jenkins v. Artuz*, 294 F.3d 284, 293 (2d Cir. 2002).

To succeed on a request for a new trial on the ground that a witness committed perjury, the defendant bears the burden of establishing that "'(i) the witness actually committed perjury; (ii) the alleged perjury was material; (iii) the government knew or should have known of the perjury at [the] time of trial; and (iv) the perjured testimony remained undisclosed during trial.'" *United States v. Cromitie*, 727 F.3d 194, 221 (2d Cir. 2013) (quoting *United States v. Josephberg*, 562 F.3d 478, 494 (2d Cir. 2009)), *cert.*

92

*denied,* 135 S. Ct. 53, 135 S. Ct. 54, 135 S. Ct. 54, and 135 S. Ct. 56 (2014).

"A witness commits perjury if he gives false testimony concerning a material matter with the willful intent to provide false testimony, as distinguished from incorrect testimony resulting from confusion, mistake, or faulty memory." *United States v. Monteleone,* 257 F.3d 210, 219 (2d Cir. 2001) (citing *United States v. Dunnigan,* 507 U.S. 87, 94 (1993)). "Differences in recollection do not constitute perjury." *Josephberg,* 562 F.3d at 494. Neither do "[s]imple inaccuracies or inconsistencies in testimony . . . rise to the level of perjury." *Monteleone,* 257 F.3d at 219. Furthermore, "perjury is 'material' if there is any 'reasonable likelihood that the false testimony could have affected the judgment of the jury.'" *Cromitie,* 727 F.3d at 221-22 (quoting *Agurs,* 427 U.S. at 103).

## C. Discussion

Aquart has not shown that Taylor committed perjury, much less that the government knew or should have known of the alleged perjury. And even if he could show that Taylor committed perjury, he cannot show that Taylor's statement regarding his sentencing expectations was material to the jury's verdict such that "but for the [allegedly] perjured testimony, the defendant would most likely not have been convicted."

93

*United States v. Wallach*, 935 F.2d 445, 456 (2d Cir. 1991) (internal quotations omitted).

### 1. John Taylor did not testify falsely.

Taylor acknowledged both on direct and cross-examination that he was testifying pursuant to a cooperation agreement that included a promise by the government to make a motion advising the district court of Taylor's cooperation and authorizing the court to sentence him below the mandatory minimum sentence of life imprisonment. *See* GA1818-19 (Gov't Ex. 247A at 2-3). A copy of Taylor's cooperation agreement was introduced into evidence. GA593. Furthermore, Taylor admitted that he was testifying with the hope of receiving a "lesser sentence," GA594, and because he was "looking for help," GA624. Aquart does not question the veracity of these statements.

Rather, Aquart argues that Taylor *expected* that he would not be sentenced to life imprisonment and, therefore, that he purposely misled the jury regarding the likely magnitude of any future sentencing reduction by stating that "I don't think I'm never going home."[22] GA594.

---

[22] Aquart acknowledges, as he must, that "Taylor did not know, and could not have known, the actual sentence he would get when he testified at Aquart's trial." AOB104. Therefore, Aquart's claim is not that Taylor had been promised a specific sentence, or

94

But, as was apparent to the jurors who were watching Taylor testify, the context in which his statement was made does not support an inference of perjury. Specifically, Taylor acknowledged his participation in a brutal triple homicide during which the victims were murdered in an especially heinous manner. Upon viewing a photograph of the victims at the crime scene, Taylor became visibly affected by the memory of what he had done and what he had witnessed. GA594. Consequently, Taylor's belief, at that juncture, that he may spend the rest of his life in prison was a reasonable expression of despair given the acts he had just described.

Aquart's suggestion that Taylor harbored an expectation of a substantial sentencing reduction is speculative and implausible. To be sure, as Aquart conceded at trial, *see* GA624, and in his brief, *see* AOB104, no one knew what Taylor's sentence ultimately would be. Indeed, Aquart claimed at trial that asking Taylor to estimate his sentence "invite[d] speculation on [Taylor's] part." GA624. And Aquart acknowledges now that "[i]t is unfathomable that a layperson would speculate that a term of anything close to nine years was possible for a thrice-convicted mur-

---

*knew* what his sentence would be, but rather that he "misled" the jury when he related his speculation about his possible sentence because, according to Aquart, he did not really believe he would spend his life in prison. AOB104.

95

derer with an extensive prior criminal history, even one who lacked an intent to kill...." AOB101.

Given that: (1) the government advised Taylor in writing that it was not making "any promises or representation as to what sentence the defendant [would] receive," *see* GA1818-19 (Gov't Ex. 247A at 2-3); (2) the district court expressly advised Taylor during his plea colloquy that "no one knows what your sentence will actually be until it is imposed on the day of sentencing," *see* GA1560; and (3) Taylor acknowledged during his guilty plea colloquy that *no one* had made him any promises regarding his future sentence, *see* GA1560, it is implausible that Taylor knew or should have known that his sentence would be reduced to nine years, if reduced at all. This is especially so because—as Aquart himself points out, *see* AOB107-08—Taylor was facing three terms of life imprisonment, had a significantly longer list of prior convictions than any other cooperating witness and had just admitted in front of the judge who was ultimately going to sentence him that when first confronted by law enforcement about the murders, he lied in an effort to avoid being charged. In short, on this record, there is no reasonable argument that Taylor *knew* that he would receive a nine-year sentence.

Nonetheless, Aquart argues that Taylor's testimony was misleading because even if he did not *know* what sentence he would receive, he

96

must have *expected* that he would receive a short sentence. In support of this argument, Aquart speculates that Taylor's attorney must have told him that his cooperation would result in a significant sentence reduction. AOB101-103. According to Aquart, because one of Taylor's attorneys was previously involved in a murder case in which a cooperating witness—who, like Taylor, was also an accomplice to the murder—was sentenced to five years' imprisonment, Taylor's attorney must have told Taylor that a "single digit" sentence was a possibility. AOB102-103. Based on this speculation, Aquart contends that Taylor's testimony that he expected a life sentence was misleading.

Assuming for the sake of argument that Taylor's attorney told him that a cooperating witness in an unrelated case, who was represented by a different attorney, received a significant sentence reduction in a murder case, Aquart's allegation that Taylor committed perjury still fails. While Taylor, like every other cooperating witness, hoped that his cooperation would result in a lesser sentence, *see* GA594, the fact that he might have been told that another defendant received a short sentence in another case does not establish that Taylor's stated expectation—that he would spend his life in prison—was false or misleading. Even if Taylor knew that a short sentence was a *possibility*, that knowledge does not establish that Taylor *expected* such a sen-

97

tence in his case. There is nothing inconsistent between Taylor knowing that a short sentence was given to another defendant in another murder case and a belief that such a sentence was not a realistic possibility for *him* given his conduct and background. Aquart has identified no evidence to suggest any inconsistency, and accordingly cannot show that Taylor committed perjury.

In sum, Aquart's speculative assertion on appeal that it was "virtually certain that Taylor knew he could earn a very substantial benefit" for cooperating, AOB101, is insufficient to show that Taylor provided false testimony concerning a material matter with the willful intent to provide false testimony. *See Monteleone*, 257 F.3d at 219.

## 2. The government did not recognize any perjury during Taylor's testimony.

To obtain a new trial, Aquart must establish not only that Taylor committed perjury, but also that the government knew or should have known that Taylor's testimony regarding his sentencing expectations was false. Aquart cannot meet this burden because there is no evidence that the government believed that Taylor's statements were anything other than sincere.

Taylor pled guilty to three counts of felony murder. GA593. While Taylor clearly hoped to

receive a "lesser sentence," *see* GA594, based up-
on the severity of the crimes to which he pled
guilty and his lengthy criminal record, it was not
unreasonable for him to fear that he could spend
the rest of his life in prison. The two sentiments
are not mutually exclusive; nor are they suspect.
Moreover, given the context of this case, the gov-
ernment had no reason or ability to question
Taylor's state-of-mind on this issue, and Aquart
has failed to demonstrate otherwise. According-
ly, even if Taylor expected—based on conversa-
tions with his attorney—that Judge Arterton
would sentence him to nine years' imprisonment,
any mischaracterization of his expectations on
his part cannot be charged to the government.

Aquart reasons, however, that because one of
the prosecutors involved in his case was also in-
volved in a prior murder prosecution that result-
ed in a short sentence for a cooperating witness,
the government must have known that Taylor
was "misleading" the jury when he expressed his
fear that he might spend the rest of his life in
prison.[23] But just as Taylor could have believed

---

[23] Aquart fails to mention that one of his trial attor-
neys also represented a defendant in that prior case
and therefore would have been in possession of the
same information that he attributes to the govern-
ment and to Taylor's attorney. *See United States v.*
*Perez, et al.*, No. 3:02cr7 (JBA). Thus, because any
knowledge attributable to the government was also
attributable to Aquart, his claim that "defense coun-

99

that a short sentence was imposed in a different case and yet still believed that he would not get a similar result, so too could the government. Thus, Aquart cannot show that the government knew, or reasonably should have known, that Taylor "misled" the jury.

### 3. The allegedly false testimony did not affect the jury's appraisal of Taylor's credibility.

Even if this Court were to determine that Taylor's statement that he did not think he was ever going home was false, it was not material to the verdict. *See Cromitie*, 727 F.3d at 221-22 (noting that even when a government witness offers false testimony, relief is only warranted if a "reasonable likelihood" exists that the disputed testimony "affected the judgment of the jury") (citation omitted). *First*, unlike *Jenkins*, 294 F.3d 284, relied on by Aquart, where an agreement for leniency by the government was never disclosed, here the jury was informed through the introduction of the cooperation agreement itself that Taylor expected the government to move for a reduction of Taylor's sentence if he

---

sel [did not] have any tools at trial with which to impeach Taylor," AOB101, lacks merit. Aquart had the tools to impeach Taylor on this issue, but he made a strategic decision not to do so out of concern that, "challenging [Taylor's] claim could only have led to its reiteration." AOB101.

complied with his obligations under the agreement.[24] The defense clarified Taylor's motives on cross-examination. For example, the defense elicited from Taylor that he was initially facing the death penalty, *see* GA619, but that his maximum sentence following his plea to a cooperation agreement was life imprisonment, GA608. In the context of a death penalty case, the clear implication was that Taylor sought sentencing leniency in exchange for his cooperation. Further, Taylor frankly admitted that one of the reasons he had lied to the government from the outset was in order to "help [him]self." GA624. In short, Taylor's motives for testifying were fully explored before the jury.

Taylor was also cross-examined for two days regarding his multiple inconsistent statements. For instance, the defense catalogued a long list of examples where Taylor lied to law enforcement, including some instances of lying that occurred after Taylor entered into both a proffer agreement and a cooperation agreement. Taylor candidly admitted that he repeatedly lied to the

---

[24] Aquart's reliance on *Sivak v. Hardison*, 658 F.3d 898 (9th Cir. 2011), is similarly unavailing. In *Sivak*, the prosecution never disclosed a number of letters that showed lenient treatment of a government witness. *Id.* at 910. When the witness testified that he was unaware of any such treatment, the government failed to correct the record. *Id.* at 911.

101

government to protect himself and stay out of prison. GA598-99.

In addition, the court advised the jury that they should consider carefully the testimony of an accomplice, such as Taylor:

> [A]ccomplice testimony is of such a nature that it must be scrutinized with great care and viewed with particular caution when you consider how much of that testimony to believe....You should ask yourselves whether these witnesses would benefit more by lying or by telling the truth. Was their testimony made up in any way because they believed or hoped that they would somehow receive favorable treatment by testifying falsely? On the other hand, did they believe that their interests would be best served by testifying truthfully?

GA1053. The court further instructed the jury to consider "with great caution" the testimony of witnesses who testified pursuant to cooperation agreements. The court explained, in substance, that these witnesses testified with the expectation of receiving sentencing leniency from the government and the court:

> [T]he cooperating witnesses in this case have been promised that if they testified truthfully and completely and fully they will receive what is called a 5K1.1 letter

102

from the government. Upon such a motion by the government stating that a defendant provided substantial assistance in the investigation or prosecution of another person who has committed a crime, the court may impose a sentence below the mandatory minimum sentence. Two factors to keep in mind are: One, only the government can make such a motion, and it cannot be compelled to do so; and two, the sentencing court has complete discretion as to whether or not it will grant that motion, and is free, in any event, to impose any sentence within the minimum and maximum authorized by law. Final determination as to the sentence to be imposed rests with the court.

GA1053-54.

Finally, the district court instructed the jury to scrutinize the testimony of each cooperating witness because that witness "has an interest different than any ordinary witness." GA1054. The court explained that the jury "must examine his or her testimony with great caution" because the witness "hopes that he or she will receive a lighter sentence by giving testimony favorable to the prosecution" and, therefore, "may have a motive to testify falsely." GA1054.

Having heard these instructions, the jury understood that Taylor testified under a cooperation agreement, that he hoped to receive a light-

103

er sentence, that he had a motive to offer untruthful testimony and, thus, that his testimony should be carefully scrutinized. In the absence of proof that the jury did not understand or was unable to follow the court's instructions, this Court should presume that the jury did as they were told and viewed Taylor like every other cooperator, weighing his testimony with "great caution" and "great care." GA1054.

Lest there was any confusion following the court's instructions as to Taylor's motive for testifying, during summation the government reiterated that Taylor had testified pursuant to a cooperation agreement and that he could receive a more lenient sentence for having done so: "Will the witnesses receive consideration, leniency for testifying? That is up to the sentencing judge. They will be sentenced, their cooperation will be made known. We do not know what their sentence will be, nor do they. That is properly and solely for the sentencing judge to determine." GA1059.

Even assuming for the sake of argument, then, that Aquart could establish that Taylor misrepresented his sentencing expectations, bringing this fact to the attention of the jury would have added little in terms of impeachment value. Given the amount of time and the number of methods used by the defense to challenge Taylor's credibility, it is doubtful that Taylor's one off-hand remark about "not going home" was

104

material to the jury's sentencing determination on Aquart. This is especially so because Taylor repeatedly admitted that he *hoped* for a lesser sentence, which was of primary significance in terms of the jury understanding that Taylor had a motivation to lie, regardless of what sentence he feared might ultimately be imposed.

Therefore, when the testimony of Taylor is considered jointly with the argument of government counsel and the instructions of the court, it is clear that the jury was well aware of the factors bearing on his credibility and was able to fairly evaluate the same.

At a minimum, because Taylor's statement about his sentencing expectations was not material in this case, Aquart cannot establish that any error here affected his substantial rights. Further he cannot show that this testimony affected the integrity of the judicial proceedings. In sum, Aquart cannot show he is entitled to relief under plain error review.

### 4. An evidentiary hearing to determine Taylor's sentencing expectations is not warranted.

As an alternative argument, Aquart asks this Court to remand for an evidentiary hearing to determine whether Taylor affirmatively misrepresented his sentencing expectations at trial. According to Aquart, at this hearing, the district court would hear testimony regarding Taylor's

105

"awareness of the benefits received by other co-operators in serious felony cases and whether he thought it was possible that he could receive a parole-eligible sentence." AOB112.

But Aquart has offered no arguments or evidence that would justify an evidentiary hearing. To be sure, he has offered his *speculation* that Taylor *must* have expected something different than a life sentence, but this is mere speculation. In the absence of some *reason* to believe that Taylor's expectations were not as he stated, there is no basis for holding a hearing to test Taylor's veracity. Speculation alone is insufficient. *See, e.g., Gonzalez v. United States*, 722 F.3d 118, 131 (2d Cir. 2013) ("To warrant a hearing, the motion must set forth specific facts supported by competent evidence, raising detailed and controverted issues of fact that, if proved at a hearing, would entitle him to relief."); *United States v. Avellino*, 136 F.3d 249, 261 (2d Cir. 1998) (court properly concluded that no evidentiary hearing required where defendant offered no non-speculative basis for his argument). Aquart's request for an evidentiary hearing should be denied.

In any event, a hearing to address the questions posed now by Aquart would be pointless. To the extent that Aquart wants to inquire about what Taylor's attorney told him, those questions would be barred by the attorney-client privilege. To the extent Aquart wants to ask Taylor to

106

speculate about his sentencing expectations at the time of his testimony, Aquart has provided no reason to believe that Taylor would testify at such a hearing.[25] And even Aquart acknowledged that these two inquiries would be improper in any event. *See* GA624 (defense counsel objecting to line of questioning because it would require speculation and inquiries into attorney-client privileged communications).

Moreover, even if there were some way to conduct a hearing that did not involve speculation or inquiries into communications between Taylor and his attorney, findings on the topics Aquart wants to explore would add little to this case. Specifically, even if a hearing established that Taylor knew that cooperators in other cases received substantially reduced sentences, or that Taylor thought it was possible he could receive a parole-eligible sentence, that would not demonstrate that his stated expectations at trial were false. He could simultaneously understand that a short sentence was possible, but also reasonably expect that it was unlikely for his case. Thus, a hearing would serve no purpose. *See, e.g., United States v. Stewart*, 433 F.3d 273, 302 (2d Cir. 2006) (holding that district court did not abuse its discretion by denying a motion without a hearing where the resolution of the disputed

---

[25] In the absence of testimony from *Taylor*, there is no basis for concluding that Taylor's expectations were anything other than what he said at trial.

107

issue would not change the outcome); *United States v. White*, 972 F.2d 16, 22 (2d Cir. 1992) ("Since it is not necessary to resolve the issues that might be the focus of an evidentiary hearing, the district court did not abuse its discretion in refusing to conduct an evidentiary hearing.").

In sum, there is no basis or need for an evidentiary hearing on Taylor's sentencing expectations.

108

### III. The district court properly exercised its discretion to deny Aquart's new trial motion based on the claim that Lashika Johnson offered perjured testimony.

Aquart alleges, *see* AOB148-68, that Lashika Johnson, Efrain Johnson's sister, lied on the witness stand when she testified that she "d[idn't] think" prosecutors had threatened her at a proffer session. GA737. Aquart requests that the Court reverse his capital convictions and death sentences and order a new trial. AOB150.

### A. Relevant facts

The government called Lashika to testify during the guilt phase of Aquart's trial. As relevant here, Lashika's testimony was as follows: She began dating Aquart in the fall of 2004. GA703-04. Then, a couple of nights before the murders, she heard Aquart tell Johnson, "I need you to help me handle something." GA719. Johnson then left Lashika's apartment explaining that "he had to go deal with something." GA719; GA738. Johnson and Aquart returned to Lashika's apartment later that evening, but there was no discussion about where they had been. GA719.

On the evening of August 23, 2005 and into the early morning hours of August 24, 2005, Lashika and Johnson threw a party at a club.

109

GA717-18. After the party, Lashika, Johnson, and several other people went to Denny's for breakfast. GA718. During their meal, Aquart called Lashika and asked to speak to Johnson. GA718-19. Johnson had a brief conversation with Aquart and left shortly thereafter. Lashika finished her breakfast and then she, too, left and went home. GA720.

Lashika was awoken at dawn by the sound of men talking. GA720. In her living room, she found Johnson, Aquart, and Azikiwe, the latter two of whom were clad only in boxer shorts and t-shirts. GA720.

Aquart asked Lashika to throw out some garbage bags, which Lashika believed contained clothing, in a dumpster that was a couple of blocks from her apartment. GA721. Aquart also gave Lashika a black drill and told her to throw that in the dumpster as well. GA721. When she returned from this errand, Aquart directed Lashika to retrieve clothes from his apartment and to park his car in front of his apartment to make it appear that he had been home all day and evening. GA722-23.

Lashika never spoke to either Aquart or Azikiwe about the murders. She did, however, speak to her brother. GA724; GA727. Johnson admitted to Lashika that "he helped tie the people up and rough them up a little bit, but [] when he left [the apartment] those people were still alive." GA727; GA743. Johnson also told Lashika

110

that he had been in the apartment with Aquart, Azikiwe, and another person who was not from Bridgeport, but that when he (Johnson) left the apartment "he left [Aquart] by hisself (sic)." GA728. Finally, Johnson told Lashika that they disposed of the bats, gloves, and masks that they used before going to Lashika's apartment on the morning of the murders. GA728; GA743.

On cross-examination, defense counsel quizzed Lashika about her statements during various meetings and proffer sessions with the government. In particular, defense counsel asked about an October 14, 2008 proffer session, during which Lashika denied knowledge about a power drill. GA737. Lashika testified that when the government questioned her veracity during this proffer session, she started to cry because she was worried that she would lose her proffer agreement. GA737. At that point, according to Lashika, she told the government about Johnson's admission that he had tied up the victims on the night of the murders. GA737. Defense counsel then asked Lashika, "[y]ou were being threatened, right?" to explain why Lashika had, in substance, given up her brother. GA737. Lashika responded, "I don't think it was a threat. It was just more like they were telling me what was right and what I had to do." GA737.

Eight months after the jury's verdict in Aquart's trial, on February 17 and 21, 2012, Lashika testified at her brother Efrain Johnson's

111

trial. DA521. On cross-examination, Johnson's defense counsel questioned Lashika about the October 14, 2008 proffer session:

> Defense: Am I correct at that meeting that [the prosecutor] yelled at you?
>
> Lashika: Yes.
>
> Defense: And she stood up and threatened to put you in shackles?
>
> Lashika: Yes.
>
> Defense: She said if you didn't start saying what they wanted to hear they were going to take you off to jail?
>
> Lashika: She didn't put it in exactly those words.
>
> Defense: She threatened you'd be going to jail?
>
> Lashika: Yes.
>
> Defense: That you were going to lose your children?
>
> Lashika: Yes.
>
> Defense: How did that make you feel?
>
> Lashika: It didn't feel too good.
>
> Defense: And they had to basically take a break at that point, right?

112

Lashika:    Yes.

Defense:    And give you some time to gather yourself, right?

Lashika:    Yes.

Defense:    But I think fair to say that [the prosecutor] made clear to you that either you get down with the program with what the government was looking to do or you were going to jail; is that the message?

Lashika:    I don't know really how to word—that you are wording it completely correct.

Defense:    I mean, did you feel that if you didn't start saying different things that you could be going to jail?

Lashika:    Yeah.

Defense:    You could lose your kids?

Lashika:    Yeah.

GA1726-27.

On re-direct, Lashika acknowledged that her attorney was present during the proffer session in question, and that she spoke to her attorney privately during the session. GA1728. Lashika then testified that nothing the government said or did at the meeting prompted her to lie:

113

> Gov't:     Was there anything that [the government] or anyone could say that would make you lie about your brother?
>
> Lashika:   No.
>
> Gov't:     Is there any fear about your children that would make you lie about your own brother?
>
> Lashika:   No.

GA1728.

On re-cross, defense counsel again elicited Lashika's testimony that a prosecutor had "yelled" at her and threatened to "take away [her] kids." GA1729. But again, on re-direct, Lashika indicated that her statements were truthful:

> Gov't:     Have you been threatened to say anything?
>
> Lashika:   No.
>
> Gov't:     Had you ever been told you'd better say something bad about your brother or anything else?
>
> Lashika:   No.
>
> Gov't:     Are you telling us about your brother because it's the truth or because you've been threatened?

114

Lashika:     Because it's the truth.

GA1730.

On March 8, 2012, Aquart filed a motion for a new trial, alleging that Lashika's testimony during his trial, where she denied being threatened during the proffer session, was perjured and suborned by the government. DA502-14.

The district court denied relief, finding that Lashika's testimony, even if inconsistent, did not amount to perjury. DA551-52. Judge Arterton, who presided over Aquart's and Johnson's trials, reasoned that Lashika offered "consistent" testimony regarding the "inculpatory substance." DA552. The court further observed that the discrepancies in Lashika's testimony between the two trials could be explained by (1) the fact that the parties in Aquart's trial operated under an order that "the presence of prosecutors not be mentioned"; and (2) Aquart's defense counsel put "no question . . . to [Lashika] s[eeking] to elicit her testimony about specific prosecutorial conduct" at the proffer session. DA552-53.

The district court further concluded that the jury's verdict "could hardly have been materially affected by how accurately [Lashika] characterized the Government's confrontation with her during her October 14, 2008 interview." DA554. Defense counsel had elicited a number of admissions about "[Lashika's] credibility and motivation to give false testimony favoring the Gov-

115

ernment," including admissions that Lashika had lied during her initial meetings to protect herself and Johnson, and that she changed her story after the government accused her of lying. DA553.

## B. Governing law and standard of review

The Court reviews a decision to deny a new trial motion for abuse of discretion. *United States v. Forbes*, ___ F.3d ___, No. 14-733, 2015 WL 3852230, at *2 (2d Cir. June 23, 2015). "A district court abuses or exceeds the discretion accorded to it when (1) its decision rests on an error of law (such as application of the wrong legal principle) or a clearly erroneous factual finding, or (2) its decision—though not necessarily the product of a legal error or a clearly erroneous factual finding—cannot be located within the range of permissible decisions." *Id.* (quotations omitted).

The law governing the alleged presentation of perjured testimony is set forth in Part II.B., *supra*.

## C. Discussion

Aquart cannot show that the district court abused its discretion in denying his motion for a new trial because he cannot show that Lashika committed perjury, that the government knew, or should have known, of the alleged perjury at

116

the time of trial, and that any allegedly false statements were material.[26]

### 1. Lashika Johnson did not testify falsely.

To establish that Lashika willfully intended to testify falsely at his trial, Aquart cites Lashika's purportedly inconsistent testimony regarding the proffer sessions: Lashika testified at Aquart's trial that she was not threatened by prosecutors and testified at Johnson's trial that she was.

This showing is insufficient. Lashika's testimony at the two trials conveyed the same core message. At Aquart's trial, Lashika testified that prosecutors warned her, "we don't think that you are telling us the truth." GA737. Lashika understood the consequences of this accusation: her proffer might be "gone" and she "could be prosecuted" if she "didn't do what was right." GA737. At Johnson's trial, facing a series of leading yes-or-no questions from defense counsel, Lashika agreed that prosecutors accused her of lying and threatened that she would "be going to jail," and,

---

[26] The fourth prong of *Cromitie*, which requires the defendant to establish that "the perjured testimony remained undisclosed during trial," is not disputed. 727 F.3d at 221. The factual basis of this claim emerged during Johnson's trial, which occurred approximately eight months after Aquart's trial.

117

as a result, "lose [her] children," if "[she] didn't start saying different things."[27] GA1726-27. Both presentations conveyed the same core facts: prosecutors accused Lashika of lying and reminded her of the dire consequences that could ensue if she did not tell the truth. The fact that she conveyed those facts differently at the two trials does not mean that her statements rose to the level of perjury. *See Monteleone*, 257 F.3d at 219 ("Simple inaccuracies or inconsistencies in testimony do not rise to the level of perjury.").

Further, as the district court found, any inconsistencies between the accounts was attributable to the different trial contexts and the different questions posed to Lashika. At Aquart's trial, defense counsel put "no question . . . to [Lashika] . . . about specific prosecutorial conduct." DA552-53. At Johnson's trial, by contrast, counsel explored that topic with a series of leading questions that practically placed words in Lashika's mouth. Indeed, on at least two occasions, Lashika corrected defense counsel and

---

[27] The government acknowledges that its prosecutors "advised [Lashika], in front of her attorney, of the consequences of any violation of the proffer agreement, and more specifically, of what would happen if [Lashika] continued to provide information that was purposefully false and misleading." DA526. "The government did not threaten to take away [Lashika's] children or to escort her out of the courtroom in shackles." DA527.

118

disagreed with his characterization of what the prosecutor stated to her during the proffer session. GA1726; GA1727. Given the vastly different nature of the questions posed to Lashika at two different trials by two different defense counsel, one can hardly conclude that her testimony varied, much less that it was perjurious.

The different questions posed to Lashika arose in part, as the district court recognized, from the court's order, in Aquart's trial, that the presence of prosecutors not be mentioned and that questions should not be posed "to elicit [Lashika's] testimony about specific prosecutorial conduct in the interview." DA552-53. Given this context, the court properly found that any inconsistencies in Lashika's testimony were not intentionally false statements. DA553.

Furthermore, even if Aquart could establish inconsistencies between Lashika's statements, his claim fails. As this Court has explained, "inconsistencies in testimony" do not, by themselves, demonstrate that the witness actually committed perjury. *Monteleone*, 257 F.3d at 219. This case offers a textbook lesson of that principle. Lashika's responses at Johnson's trial were all over the map. She initially agreed that prosecutors threatened that she would "be going to jail" and "lose her children" if she "didn't start saying different things." GA1726. But on redirect, Lashika clarified that she had never "been threatened to say anything" or "told you'd

119

better say something bad about your brother or anything else," and she insisted that her account was "the truth." GA1730. This testimony, in its totality, was muddled and internally inconsistent. As such, it is impossible to say that it contradicted her testimony at Aquart's trial, where she refused to label the prosecutors' advisements as threats, and therefore does not establish any willful falsification on her part.[28]

Aquart carries the burden of demonstrating that Lashika willfully offered false testimony at his trial, and he has failed to meet that burden. Accordingly, Aquart cannot show that the dis-

---

[28] Aquart's claim suffers another defect: he has not demonstrated that Lashika's testimony at Johnson's trial was the "truth," such that any inconsistent statement at Aquart's trial was false. Assuming that one of Lashika's statements at her brother's trial could be taken as inconsistent with her testimony at Aquart's trial, it would be much more likely that Lashika lied at her brother's trial, where she had a plausible incentive to shade her testimony. Indeed, Aquart's counsel pressed that very charge at Aquart's trial, accusing Lashika of "hav[ing] [Efrain's] back" and "protect[ing] him." GA1077. At most, then, Aquart has established that one of Lashika's accounts was false, but he has failed to isolate which one was false. Because the record (assuming any inconsistency at all) could equally support the inference that Lashika offered a false account at Johnson's trial rather than Aquart's trial, this perjury claim fails.

trict court clearly erred in finding that Lashika did not commit perjury at his trial.

## 2. The government did not recognize any perjury in Lashika's testimony.

Just as Aquart has failed to show that Lashika committed perjury, he has failed to show that the government knew or should have known of Lashika's perjury at the time of trial.

Aquart insists that he met this burden because three of the Assistant United States Attorneys who prosecuted Aquart were present at the proffer session. Not so. Despite having attended the proffer session, these prosecutors lacked knowledge that any particular testimony by Lashika was false, much less perjurious.

On cross-examination, Lashika acknowledged that, after prosecutors accused her of lying, she changed her story and implicated her brother and Aquart. Defense counsel then asked, "[b]ecause you were being threatened, right?" Lashika responded, "I don't think it was a threat. It was just more like they were telling me what was right and what I had to do." GA737. The key here is that Lashika's response addressed *her subjective interpretation* of the prosecutors' statements. Because the accuracy of Lashika's characterization—"I don't think it was a threat"—rested on her own perceptions, prosecutors had no reason or ability to question it.

121

Aquart's reliance on *Napue*, 360 U.S. at 265, to argue otherwise is misplaced. There, the state's key witness testified at a criminal trial that he had not received any consideration for his testimony, and the prosecutor knew that this statement was false. The Supreme Court held that the prosecutor had a duty to correct the falsity. *Id*. at 269. This case presents far different circumstances. Whether or not the witness in *Napue* entered a cooperation agreement was a fact immediately known to the prosecutor. Whether or not Lashika perceived a prosecutor's statement as a "threat," rather than an admonishment regarding the consequences of lying, is a fuzzy and subjective distinction. Any mischaracterization of her feelings cannot be charged to the government.

### 3. The disputed testimony did not affect the jury's appraisal of Lashika's credibility.

Even where a government witness offered false testimony, relief is only warranted if a "reasonable likelihood" exists that the disputed testimony "affected the judgment of the jury." *Cromitie*, 727 F.3d at 221-22 (quotation omitted). Here too, Aquart falls short.

As the district court found, defense counsel at Aquart's trial elicited substantial impeachment evidence to argue that the government had pressured Lashika into changing her story. Counsel

122

questioned Lashika's "credibility and motivation to give false testimony," drawing admissions that "she had lied during her first meetings with the government in order to protect herself and her brother . . . and that she only changed her story after being confronted about her untruthful statements."[29] DA553. Lashika understood that she faced "big trouble" at the proffer session—specifically, the prospect of prosecution—"if the law enforcement people didn't believe [her]." GA737. It is unreasonable to conclude that Aquart's jury, having been informed of the "law-enforcement pressure on [Lashika] to change her initial versions and denials," DA554, would have reached a different result had Lashika further characterized the confrontation as a "threat." *Cf. United States v. Persico*, 645 F.3d 85, 111 (2d Cir. 2011) ("[W]here the undisclosed evidence merely furnishes an additional basis on which to challenge a witness whose credibility has already been shown to be questionable or is subject to extensive attack by reason of other evidence, the undisclosed evidence may properly be viewed as cumulative, and hence not material.").

---

[29] Aquart's counsel effectively attacked Lashika's credibility on other grounds as well, including (1) her illegal drug activities; (2) her inconsistent statements to law enforcement, including an instance where she lied after signing the proffer agreement; and (3) the fact that she had avoided prosecution. GA730; GA734; GA740.

123

Additionally, regardless of how Lashika characterized this confrontation, the "inculpatory substance" of her testimony across the two trials was "consistent." DA552. She observed Aquart, Azikiwe, and Johnson in her living room shortly after the murders, Aquart and Azikiwe were wearing only underwear; she disposed of bags of clothing and a drill at Aquart's direction; and she discussed a later conversation where Johnson admitted his and Aquart's involvement in the murders. Furthermore, although Lashika alleged at Johnson's trial that prosecutors had threatened her during the proffer session, she testified that her account was "the truth" and that prosecutors did not say "anything . . . that would make [her] lie." GA1728; GA1730. Lashika's consistent testimony regarding Aquart's conduct, coupled with her insistence at Johnson's trial that the so-called "threats" had not influenced her testimony, undercuts Aquart's claim that the discrepancy would have made any difference.

The overwhelming trial evidence also demonstrates that there was no reasonable likelihood that Lashika's characterizations of the proffer session influenced the jury's deliberations. The government presented 63 witnesses, documenting Aquart's drug trafficking activities, his history of assaulting his associates, his fraught relationship with Tina, and his decision to obtain a baseball bat after he learned that Tina was un-

124

dercutting his drug business. The evidence also placed Aquart inside Tina's apartment, namely, a forensic examiner identified Aquart's DNA profile on two pieces of latex glove, one in the living room and one in Tina's bedroom. GA794-97. This evidence corroborated the testimony of Taylor, who testified that Aquart wore gloves while killing the victims. GA589. A latent prints examiner also identified Aquart's fingerprints on duct-tape located in Basil's bedroom. GA690. Thus, even without Lashika's testimony, the record convincingly established Aquart's participation in the murders.

As to the penalty phase, Lashika's testimony contributed little. She connected Aquart to the murders, but offered no information on how the murders were planned or who undertook the primary role.

Thus, neither Lashika's specific testimony regarding the proffer session nor her general testimony regarding events proximate to the murders materially altered the evidentiary picture. As the district court properly found, then, the jury would have reached the same result, with or without her. DA554. Accordingly, the district court properly denied Aquart's motion for a new trial.

125

IV.  The government's guilt phase summation discussed the evidence and reasonable inferences from that evidence.

Aquart contends that the government interjected facts outside the record regarding DNA evidence during its guilt phase rebuttal. AOB169-78. Aquart requests that the Court reverse his convictions and order a new trial. AOB178.

## A. Relevant facts

During the government's case-in-chief, Forensic Examiner Christine Roy testified that she examined physical evidence from the murder scene and concluded that Aquart's DNA profile matched DNA profiles developed from two pieces of latex glove recovered from the crime scene. Roy also linked Johnson to evidence found at the scene. However, the process of identifying Johnson's DNA was more complex than the others.

Roy explained that the FBI runs the CODIS database, which "contains DNA profiles from convicted offenders" and from evidentiary samples. GA778; GA792. In addition, the CODIS database contains the DNA profiles of Connecticut State Lab personnel in order to check for contamination issues. GA801. With respect to evidentiary DNA samples, accredited agencies, including her laboratory, may "submit a DNA profile to this CODIS database." GA778. CODIS will

126

then "compare[]" that unknown profile to "known profiles and other evidentiary samples" stored in its database. GA792. However, there are rules that have to be followed before an evidentiary DNA profile can be submitted to the CODIS database. GA778. Specifically, an accredited lab cannot enter an evidentiary DNA profile that contains too little information or that would cause "hits" on hundreds of individuals in the database. GA779; GA801. Instead, a lab can only submit a profile that contains enough information to make comparisons to other profiles. GA779.

In this case, through the submission to CODIS of DNA profiles on evidentiary samples, CODIS identified Johnson's DNA profile on one piece of evidence (9-Z2) and a Connecticut State Lab Trace Examiner's DNA on another piece of evidence (16-Z1). GA792-93; GA801; GA882. Armed with this information, Roy obtained a blood sample from Johnson, retested the crime scene evidence, and confirmed the presence of Johnson's DNA profile. GA793.

On cross-examination, Roy testified that she did not receive a blood sample for Rodney Womble and was not specifically asked to look at his DNA profile. GA823. Roy also acknowledged that some of the blood samples and swabs she received contained mixed DNA profiles, and that she could not identify the source of every genetic marker from those mixtures. GA862-63; GA900.

127

During summation, the defense again attacked the DNA evidence, criticizing the process by which the results were reached and the government's allegedly selective presentation of the evidence. GA1069-70; GA1079 ("We're left with serious questions about the reliability of the DNA evidence. You see the government only wants you to see the results, they don't want you to see the process. They don't want you [to] see how subjective it was."). The defense repeatedly suggested that someone other than Aquart contributed the genetic markers detected on the evidentiary items, *see* GA1070 ("And what is it to say that those unknown persons contributing those genetic markers were not contributing the same genetic markers attributed to either Azibo or Azikiwe Aquart?"), and that, but for the laboratory's faulty and careless protocol, Aquart would have been eliminated as a contributor, GA1070-71. Finally, the defense argued that the lab knew that Womble had been named as a suspect, but that due to "observer bias" his DNA was never tested. GA1071. The reason for this, the defense insinuated, was because the government did not want to know if Womble was involved in the murders: "And Rodney Womble, we don't know what happened with Womble, but we know by the time the testing began he was cooperating and his DNA profile was never provided to the lab." GA1071.

128

The government responded to this charge during rebuttal by focusing the jury on three facts: (1) "Womble is a convicted felon"; (2) "the CODIS database is made up of the DNA of convicted felons"; and (3) "that's how [the Connecticut laboratory] originally got the hit on Efrain Johnson and proved that he, too, was part of these murders." GA1082. The government then argued, "[t]here is absolute[ly] no evidence in this record whatsoever to suggest that Womble's DNA was at the crime scene." GA1083.

Although defense counsel did not object to this statement at the time, Aquart subsequently filed a motion for a mistrial, asserting that the government falsely "impli[ed] . . . that they looked for such evidence, a fact which is unsupported by the record." GA1539.

The district court denied the motion, characterizing the government's rebuttal as a "proper response" to Aquart's attempt to frame Womble as a possible alternative suspect. GA1550. The government's rebuttal, the court reasoned, was premised on the inference that "CODIS *could* have detected Womble's DNA profile, as it had detected [Efrain] Johnson's, if Womble's DNA profile had in fact been present on the evidentiary items." GA1550-51.

129

## B. Governing law and standard of review

This Court reviews a district court's denial of a motion for mistrial for abuse of discretion. *United States v. Rodriguez*, 587 F.3d 573, 583 (2d Cir. 2009).

A defendant asserting that a prosecutor's remarks warrant a new trial "'faces a heavy burden, because the misconduct alleged must be so severe and significant as to result in the denial of his right to a fair trial.'" *United States v. Banki*, 685 F.3d 99, 120 (2d Cir. 2011) (quoting *United States v. Locascio*, 6 F.3d 924, 925 (2d Cir. 1993)) (alterations omitted); *see also United States v. Whitten*, 610 F.3d 168, 202 (2d Cir. 2010) ("We will reverse on the ground of prosecutorial misconduct only if that misconduct caused substantial prejudice by so infecting the trial with unfairness as to make the resulting conviction a denial of due process." (internal quotation marks omitted)). "In considering whether inappropriate remarks rise to the level of prejudicial error, we examine the severity of the misconduct, the measures adopted to cure the misconduct, and the certainty of conviction absent the misconduct." *United States v. Coplan*, 703 F.3d 46, 86 (2d Cir. 2012) (internal quotation marks omitted), *cert. denied*, 134 S. Ct. 71 (2013).

However, as this Court repeatedly has held, the government "'has broad latitude regarding

130

the inferences it may reasonably suggest to the jury during summation.'" *Id*. at 87 (quoting *United States v. Edwards*, 342 F.3d 168, 181 (2d Cir. 2003)). Furthermore, "[t]he law has long recognized that summations—and particularly rebuttal summations—are not detached exposition[s] with every word carefully constructed before the event. Precisely because such arguments frequently require improvisation, courts will not lightly infer that every remark is intended to carry its most dangerous meaning." *United States v. Farhane*, 634 F.3d 127, 167 (2d Cir. 2011) (internal citations, quotation marks and alterations omitted). Thus, "[i]t is a rare case in which improper comments in a prosecutor's summation are so prejudicial that a new trial is required." *United States v. Rodriguez*, 968 F.2d 130, 142 (2d Cir. 1992).

Moreover, "[u]nder the invited or fair response doctrine, the defense summation may open the door to an otherwise inadmissible prosecution rebuttal. In particular, where the defense summation makes arguments and allegations against the government, the prosecutor may respond to them in rebuttal." *United States v. Tocco*, 135 F.3d 116, 130 (2d Cir. 1998) (citations omitted); *United States v. Rivera*, 971 F.2d 876, 883 (2d Cir. 1992); *see also United States v. Carr*, 424 F.3d 213, 227 (2d Cir. 2005). Consequently, any remarks about which the defendant complains should be considered "within the con-

131

text of the entire trial," *United States v. Espinal*, 981 F.2d 664, 666 (2d Cir. 1992) (citing *United States v. Young*, 470 U.S. 1, 11-12 (1985)), and relief should be granted only if the remarks, viewed against the entire argument before the jury, "so infect[ed] the trial with unfairness as to make the resulting conviction a denial of due process." *United States v. Shareef*, 190 F.3d 71, 78 (2d Cir. 1999).

### C. Discussion

The district court properly denied Aquart's motion for mistrial. The disputed comments during the government's summation were permissible and, in any event, did not deprive Aquart of a fair trial.

### 1. The government's rebuttal tendered a fair inference to the jury regarding the absence of Womble's DNA.

During his summation, Aquart attacked the manner in which the government obtained and presented forensic evidence. First, he argued that the government "developed a suspect (Aquart) and then they developed the evidence" to confirm Aquart's involvement. GA1068. Aquart next asked the jury to disbelieve the DNA test results because, although Womble was a suspect in the charged offenses, Roy never requested, and law enforcement never provided,

132

Womble's DNA profile to the lab for comparison to the crime scene evidence. GA1071. Finally, Aquart argued that Roy only identified Aquart's DNA on the evidentiary samples because of "observer bias," meaning that her "interpretation [of the evidence was] driven by or colored by knowing" that Aquart was a suspect. GA1071.

The government's rebuttal made three points, all supported by undisputed record evidence. The government stated that "Womble is a convicted felon," and he is. *See* GA347. Next, the government observed that "the CODIS database is made up of the DNA of convicted felons," and it is. *See* GA778. And, third, the government reminded the jury that law enforcement discovered Johnson's involvement in the murders by submitting crime scene evidence to CODIS for testing, exactly as the forensic examiner testified. *See* GA792-93. The government's final comment—that there was "no evidence in this record whatsoever to suggest that Womble's DNA was at that crime scene"—is also factually accurate. No forensic evidence in the record linked Womble to the murders.

Aquart nevertheless impugns this last part of the rebuttal. Because the government did not adequately test for Womble's DNA, he says, the government misled jurors by stating that the record contained "no evidence" of that DNA. According to Aquart, because Roy's laboratory only submitted two evidentiary samples to the

133

CODIS database, it was misleading to suggest that had Womble's DNA been present at the crime scene, it would have been identified.

As a preliminary matter, Aquart's argument rests on a mistaken premise. Roy never testified that she submitted only two evidentiary samples to CODIS, *see* AOB173 ("Roy did not submit evidentiary samples beyond the two she testified she sent."), or that she could not submit complex mixtures into CODIS.[30]

---

[30] Significantly, Aquart's claim that the two evidentiary items for which Roy received CODIS hits—9-Z2 and 16-Z1—could only be submitted to CODIS due to the fact that they "were relatively simple" mixtures is not accurate. *See* AOB173 n.63. It is true that evidentiary sample 9-Z2 was relatively simple in that there was only one genetic marker that could not be accounted for by Johnson and therefore must have been contributed by a second person. GA792; GA852. But evidentiary sample 16-Z1 was a complex mixture comprised of DNA contributed by *at least* four people. GA801. Yet, despite the complexity of this mixture, it was submitted to CODIS and, in fact, yielded a match for a State Lab employee, demonstrating contamination of the sample. Accordingly, it was entirely reasonable to infer that evidentiary samples that were equally or less complex, that is, which were comprised of DNA contributed from four or fewer individuals, were similarly submitted to CODIS. *See*, *e.g.*, GA794-95 (12-Z1: two contributors); GA860; GA1933 (Gov't Ex. 464) (13-Z1: three contributors); GA862; GA899; GA1935 (Gov't Ex.

134

But on a more fundamental level, Aquart's claim ignores context. "Where the defendant has presented a defense, as [Aquart] did here, the government is permitted to discuss competing inferences from the evidence on the record." *United States v. Glover*, 558 F.3d 71, 77 (1st Cir. 2009). Aquart had just invited the jury to discredit *all of the DNA evidence* because the Connecticut laboratory did not test for Womble's DNA. On rebuttal, the government fairly reminded jurors that CODIS could have detected Womble's DNA profile, as it detected Johnson's, if Womble's profile was present on the submitted evidentiary items. Because CODIS's testing did not report Womble as a contributor for the tested samples, and because that result carries evidentiary significance, the government fairly observed that the record contained "no evidence" of Womble's DNA at the crime scene.

To be clear, Aquart had a right to challenge that inference as flawed by, for instance, emphasizing (1) the government's failure to obtain a reference sample from Womble for the Connecticut lab; (2) allegations of observer bias by the forensic examiner who confirmed the presence of Aquart's DNA profile on the crime scene evidence; and (3) the fact that several of the other samples collected from the crime scene contained mixtures, which could obscure evidence of an-

---

467) (32-1-Z1: three contributors); and GA789 (9Z-1: four contributors).

135

other individual's DNA. AOB172-75. And Aquart did; his closing argument addressed these criticisms. *See* GA1069-71.

But any dispute about the significance of the CODIS submissions turns on a battle of inferences, which the parties aired in their respective summations. The government referred only to evidence "in this record" and argued the fair (albeit disputed) inferences from that evidence. As the district court recognized, these efforts constitute permissible advocacy, not professional misconduct. Thus, the court appropriately denied Aquart's motion for mistrial on that basis.

## 2. The rebuttal did not deprive Aquart of a fair trial.

The prosecutor's statement regarding Womble's DNA, even if improper, occurred in a lengthy and otherwise proper summation and did not affect the fairness of the trial.

First, any suggestion that Womble participated in the triple murder was pure speculation with no foundation in the record. Setting aside the DNA testing, the record contains no physical evidence connecting Womble to the murder scene. Law enforcement identified several latent prints at the scene and compared them to fingerprint samples from Womble. GA689. None of the latent prints matched his, but several matched Aquart and his brother Azikiwe. GA689-70.

136

In addition, the jury heard three key narratives regarding the murders:

- Taylor testified that he, Aquart, Azikiwe, and Johnson participated in the murders. GA578-79. Taylor also testified that he, Aquart, Azikiwe, and Johnson participated in the attempt to gain entry to the victims' apartment a few nights before the actual murders. GA572-75.

- Lashika testified that she saw Aquart, Azikiwe, and Johnson in her living room shortly after the murders and that Aquart asked her to dispose of evidence. GA720-21.

- Efrain Johnson told Lashika that he had been in the victims' apartment on the night of the murders with Aquart, Azikiwe, and another person who was not from Bridgeport, and that when he (Johnson) left the apartment, that Aquart was the only one left in the apartment. GA728.

None of these accounts identified Womble.

Furthermore, Sherrell Randolph provided uncontested testimony that Womble was home with her the night of the murders. GA1667-68; GA1681-82. And there was nothing in the phone records to suggest that anyone other than Aquart, Azikiwe, Johnson, and Taylor took part

137

in the murders. GA970-71. In fact, the only "contact" between Aquart and Womble the evening of the murders took the form of three unanswered calls that Aquart placed to Womble. GA975.

Faced with all of this evidence, the jury necessarily would have excluded Womble from the list of participants in the murders, regardless of what the government argued during its summation.

This point is underscored by the manner in which the defense approached Womble's cross-examination. During the guilt phase, Womble testified for the government, documenting his long history of selling drugs for Aquart and describing Aquart's response—"I'll take care of it," GA372—when he learned that Tina was undercutting his business. If the defense believed that Womble was responsible for the murders, they would have presumably broached the issue on cross-examination, both to attack Womble's credibility and to introduce him as an alternative suspect. That did not occur; Aquart's attorneys did not ask Womble one question about the night of the murders and never once accused Womble of involvement. GA381-401. This omission did far more to undercut the defendant's competing narrative regarding Womble's culpability than the government's accurate comments regarding the evidentiary DNA samples and CODIS.

Finally, even if there were some evidence that one of the unidentified genetic profiles at the

138

crime scene belonged to Womble, that result would hardly exonerate Aquart. The forensic examiner still matched Aquart to the DNA profiles on gloves recovered inside the apartment. GA794-97; GA855; GA901-02. The latent prints examiner located Aquart's fingerprint on duct-tape left in Basil's bedroom. GA690; GA692; GA700. And every eyewitness (Taylor, Lashika, and Efrain Johnson) identified Aquart as either present inside the apartment during the murders or looking to dispose of incriminating evidence shortly after the murders. GA578-79; GA721-22; GA728. In light of this evidence, the jury would have found Aquart guilty independent of any hypothesis concerning Womble's DNA or his participation in the murders.

For these reasons, the district court appropriately exercised its discretion when denying Aquart's motion for mistrial.

139

## V. The jury was able to fairly consider Efrain Johnson's statements during the penalty phase of the proceeding.

Aquart argues that the government prevented the jury from giving fair consideration to Johnson's hearsay proffer statements, admitted into evidence during the penalty phase of the trial, by (1) telling the jurors that Johnson was lying and vouching for Taylor's credibility, (2) misleading the jury as to sworn statements Johnson made under oath before the court, and (3) infringing Aquart's Sixth Amendment right to trial and his Eighth Amendment right to a "bifurcated defense" by comments in summation. Aquart claims that the court erred by failing to grant a mistrial *sua sponte* and requests that this Court reverse his death sentences and order a new penalty phase trial. AOB97.

### A. Relevant facts

During the penalty phase of the trial, Aquart called Agent Munger to testify about various statements Johnson made to law enforcement during a post-arrest interview on March 6, 2007, and during proffer sessions on March 7, 2007, August 11, 2008, and October 2, 2008:

For example, on March 6, 2007, Johnson told law enforcement that on the night of the murders, he knocked on the victims' door pretending to be a customer wishing to purchase crack co-

140

caine. GA1418. When Tina opened the door, they all "bum rushed" into the apartment. GA1418. Taylor grabbed Tina and pushed her into the living room, while Aquart and Azikiwe ran down the hall and either "pushed" or "followed" Basil into the back bedroom on the right. GA1418-19. Johnson said that he could not see what was going on in the back bedroom, but could hear sounds of punching and moaning. GA1419.

Johnson also claimed that Taylor was the one who gave him rubber gloves, but admitted that after he put the gloves on that he (Johnson) began taping Tina's hands. GA1419. According to Johnson, when Tina asked what was going on, he told her to calm down. Taylor, however, responded by punching her. GA1419. Taylor then ripped the tape away from Johnson, finished taping Tina and then pulled an object out of his pants pocket, which he used to strike Tina. GA1419. Johnson claimed that it was at that point that he ran out of the apartment. GA1419.

The defense then elicited that during a March 7, 2007 proffer session, Johnson said that Taylor told him to tape Tina's feet, as opposed to her hands as he claimed post-arrest. Johnson also stated that Taylor pulled a metal pipe out of his pocket that was 10 inches long and two inches thick and struck Tina as she was leaning over a bed. GA1419. When agents reminded Johnson that in his first statement he said that Tina was assaulted in the living room, not in the bedroom,

141

Johnson added that it was a "sofa bed." GA1419; GA1423. (There was no sofa bed in the apartment. GA1423.)

Next, the defense elicited testimony that during an August 11, 2008 proffer session, Johnson said that Taylor gave him latex gloves while they were standing just outside the apartment door, rather than inside the apartment. GA1420. Johnson also said that immediately upon their entry into the apartment, Johnson heard a "metallic thud" and then Taylor handed him duct tape and directed him to tape Tina's hands *and* legs. GA1420. Moreover, Johnson now claimed that when Taylor decided that he was not taping quickly enough, he told Johnson to leave the apartment. GA1420.

Finally, the defense elicited testimony that during an October 2, 2008 proffer session, Johnson said that Taylor gave him rubber gloves while they were still in the stairwell. GA1420. He then returned to the story that Taylor pushed Tina to the ground—as opposed to onto a bed—while Aquart and Azikiwe ran down the hallway and pushed Basil into the bedroom on the right. GA1420.

On cross-examination, the government inquired about a number of inconsistent statements Johnson made during the above-described meetings, such as his initial claim that he had not been to Charles Street in close to a decade. GA1421. Munger explained that it was only

142

when confronted with a DNA report that John-
son changed his story and stated that on the
night of the murders, Aquart told him to knock
on the victims' door in order to see if the occu-
pants would sell him drugs. GA1421. Johnson
continued that when Tina opened the door, he
spit in her face and that they then left without
entering the apartment. GA1421. When con-
fronted with information that his DNA was
found in a piece of latex glove stuck in the duct
tape wrapped around Tina's wrists, Johnson
asked if he could "start over." GA1421-22.

Johnson then stated that he, Aquart, Aziki-
we, and Taylor went to Charles Street in the
middle of the night. GA1422. Johnson said he
knocked on the door and when Tina answered,
they rushed into the living room. GA1422. John-
son initially stated that Taylor pushed Tina into
the living room while Aquart and Azikiwe ran
down the hallway and pushed Basil into the
right-side, back bedroom. GA1422. However,
during a November 20, 2008 proffer session,
Johnson changed his story and admitted that he
(Johnson) was the first person to "touch" Tina.
GA1422. Specifically, Johnson said that he
tripped over Tina and pushed her to the ground.
GA1422.

Munger also testified that Johnson had been
shown two different photographic arrays on No-
vember 20, 2008 and May 4, 2009, respectively,
both of which contained photographs of Taylor.

143

GA1422-23. On both occasions, Johnson claimed not to recognize anyone depicted in the arrays. GA1422-23.

Additionally, Munger explained that Johnson's account of how long he remained in the victims' apartment during the murders repeatedly changed. For example, on March 7, 2007, Johnson said he was in the apartment for 25 minutes. GA1424. On August 11, 2008, he said he was only in the victims' apartment for eight minutes. GA1424. And, on October 2, 2008, Johnson said that the murders took between 30 and 45 minutes and that he was in the apartment for all but 15 minutes of that time. GA1424.

Additional facts relevant to Aquart's claims are set forth below.

## B. Governing law and standard of review

"[R]eversing a criminal conviction for prosecutorial misconduct is a drastic remedy that courts generally are reluctant to implement." *United States v. Valentine*, 820 F.2d 565, 570 (2d Cir. 1987). In fact, "[i]nappropriate prosecutorial comments, standing alone, would not justify a reviewing court to reverse a criminal conviction obtained in an otherwise fair proceeding." *United States v. Young*, 470 U.S. 1, 11-12 (1985); accord *United States v. Modica*, 663 F.2d 1173, 1184 (2d Cir. 1981) ("Reversal is an ill-suited remedy for prosecutorial misconduct...."). To

144

warrant reversal, the prosecutorial misconduct must cause the defendant "'substantial prejudice'" by "'so infecting the trial with unfairness as to make the resulting conviction a denial of due process.'" *United States v. Shareef*, 190 F.3d 71, 78 (2d Cir. 1999) (quoting *United States v. LaMorte*, 950 F.2d 80, 83 (2d Cir. 1991) and *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)).

In assessing whether prosecutorial misconduct caused "substantial prejudice," this Court has adopted a three-part test, considering (1) "the severity of the misconduct," (2) "the measures adopted to cure the misconduct," and (3) "the certainty of conviction absent the misconduct." *United States v. Coplan*, 703 F.3d 46, 86 (2d Cir. 2012) (internal quotations omitted), *cert. denied*, 134 S. Ct. 71 (2013); *see also United States v. Elias*, 285 F.3d 183, 190 (2d Cir. 2002); *Shareef*, 190 F.3d at 78.

As Aquart concedes, *see* AOB96-97, he did not: (1) object to all of the conduct that he now claims was improper; (2) object to the curative instructions given by the court following the challenges that he did raise, or request additional curative measures; or (3) ask the court to grant a mistrial based upon any of his alleged claims of prosecutorial misconduct. Nonetheless, Aquart now contends that the district court should have granted a mistrial *sua sponte*. AOB67. Because Aquart did not object on some

145

issues, and raises the argument that the court should have granted a mistrial for the first time on appeal, plain error review applies to many of his claims.

Under plain error review, Aquart must demonstrate not only that there was an "error" that is "clear or obvious," but also that "the error affected the appellant's substantial rights, which in the ordinary case means it affected the outcome of the district court proceedings; and . . . the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *United States v. Dantzler*, 771 F.3d 137, 141 (2d Cir. 2014). In short, the plain error standard "require[es this Court] to reject any assignment of error that does not amount to flagrant abuse which seriously affects the fairness, integrity, or public reputation of judicial proceedings, and causes "substantial prejudice" to the defendant. *United States v. Williams*, 690 F.3d 70, 75 (2d Cir. 2012).

146

## C. Discussion

### 1. The government's cross-examination of Agent Munger was proper and did not constitute impermissible vouching for a government witness.

Aquart claims that the prosecutor "engaged in blatant vouching" at four points in the cross-examination of Agent Munger. AOB58. These arguments are without merit.

### a. Agent Munger's testimony that Johnson never received a cooperation agreement was proper.

Aquart claims that when the prosecutor elicited from Agent Munger that Johnson never received a cooperation agreement, the jury must have inferred that the government had determined that Johnson was not telling the truth. AOB74. Neither the record, nor the applicable law supports Aquart's argument.[31]

---

[31] Aquart claims that the court listed what the government could solicit on cross-examination from Agent Munger, and it did not include the fact that Johnson was not offered a cooperation agreement. AOB74. Aquart mischaracterizes the court's ruling, which did no more than delineate about which of Johnson's statements the government could inquire. GA1408.

147

The government's initial questions during Agent Munger's cross-examination appropriately identified—without objection—the conditions under which Johnson made the majority of his statements to the FBI, namely, during proffer sessions with his attorney wherein Johnson was attempting to negotiate a cooperation agreement. GA1421. Such a line of questioning was proper because the circumstances under which statements are made to law enforcement are relevant to a witness's credibility and motive to lie, as Aquart repeatedly drove home throughout the course of the trial. *See Lee v. Illinois*, 476 U.S. 530, 541 (1986) (holding that hearsay confessions, made to law enforcement, by accomplices that incriminate defendants are "presumptively unreliable"); *cf. Howard v. Walker*, 406 F.3d 114, 124 (2d Cir. 2005) (noting that "'the admission of [co-defendants' statements] will distort the truthfinding process'") (quoting *Lee*, 476 U.S. at 542).

In fact, the defense similarly asked Agent Munger about the circumstances under which witnesses made statements to law enforcement. *See* GA1033-34 (defense questions to Munger about whether Washington and Lashika were interviewed under proffer agreements).

Next, the government established, again *without objection*, that Johnson did not receive a cooperation agreement. GA1421. This, too, was an appropriate question. In the absence of such

148

testimony, the jury may have speculated that Johnson had entered into a cooperation agreement because all of the previous testimony regarding proffer sessions was in the context of government witnesses who proffered in furtherance of reaching such agreements. *See*, *e.g.*, GA384; GA464; GA512; GA620; GA653.

Further, the fact that no cooperation agreement was reached with Johnson was a permissible means for the government to clarify the nature of the government's relationship with Johnson, which again was precisely what the defense did when questioning all of the government's cooperating witnesses. That is, the defense cross-examined the government's cooperating witnesses regarding the parameters of their relationship with the government, including whether they met with the government during proffer sessions and in preparation for trial; the terms of any proffer and/or cooperation agreements into which the witnesses entered with the government; and promises the government made to the witnesses, such as filing a 5K1.1 motion, because these facts, the defense insinuated, colored the witnesses' testimony. *See*, *e.g.*, GA223 (defense to Hodges: "But the cooperation agreement, if the government doesn't believe you've testified truthfully, they can pull the deal?"); GA385 (defense to Womble: "So, what you have to do is provide substantial assistance to the government…And it's only that if they decide that

149

you've provided substantial assistance…then they'll file a motion with the court, right?); GA663 (defense to Hopkins: "[The] government is the one who decides whether or not to file [a 5k] motion, correct...And it's in the government's sole discretion to determine whether or not you were truthful, correct?); GA737 (defense to Lashika: "And you understood, however, that if [the government] didn't believe you, your proffer was gone, right?"); *cf.* GA467 (defense to the court regarding cross-examination of Randolph: "[W]hat she knew at the time she was speaking for the first time to the federal agents …goes to her state of mind in regards to her cooperation and her motives for doing so.").

In this context, the fact that Johnson did *not* have a cooperation agreement with the government was an important distinction. Not only did it clarify the nature of Johnson's relationship with the government, thereby explaining why the government did not call Johnson as a witness, but it also prevented the jury from assuming that the government did not call Johnson to testify solely because his testimony would have differed from that of Taylor.

In any event, Aquart did not object to this testimony by Agent Munger and because the questions were proper, cannot show that they meet the standard for reversal on plain error review. Moreover, in the context of the entire trial, he cannot show that these questions clarifying

150

the scope of Johnson's relationship with the government had any impact on his substantial rights.

### b. The government's question to clarify that Johnson never received a cooperation agreement was proper, but in any event, was immediately struck from the record.

To be sure, Aquart *did* object later when the government attempted to clarify through Agent Munger that Johnson's attempt to plead guilty, "was just an attempt at a straight plea . . . not a cooperation agreement?" GA1424. When Munger responded, "That is correct," the defense objected. GA1424. The district court sustained the objection, struck both the question and the answer, and instructed the jury that it should view the proceeding in question simply as one in which "Efrain Johnson attempted to enter a guilty plea." GA1427.

Once again, the government's question was not improper and, when viewed in context, *see Darden,* 477 U.S. at 179, it is clear that the defendant suffered no prejudice. To begin, the jury had earlier learned, without objection, that the government did not enter into a cooperation agreement with Johnson. The government's question regarding Johnson's attempt to enter

151

into a "straight plea" did no more than reiterate that fact.

More importantly, when Aquart objected, the question and the answer were immediately struck and the court issued a curative instruction. Aquart requested no further remedy. GA1424; GA1427.

Further, the court's general instructions made clear that the jury should not consider the question or answer in this context. In particular, the district court expressly instructed the jury that questions posed by attorneys are not evidence and should not be considered when deciding the facts of the case. *See* GA1050 ("Now, when deciding facts you must disregard the following things which are not evidence: . . . questions that were asked of the witnesses are not evidence;"). In addition, the court instructed the jury that if a party made an objection that was sustained by the court, the jury was to disregard both the question and any response:

> [A]ttorneys have a duty to their client to object when they believe the evidence should not be received, and you should not be influenced by the objection or the Court's ruling on the objection. If the objection was sustained, ignore the question. If the question was—if an answer had been given already, ignore the answer. If the objection was overruled, treat the an-

152

swer as evidence as you would any other
answer.

GA1050. *See United States v. Thomas*, 377 F.3d
232, 245 (2d Cir. 2004) (noting that pattern in-
structions help mitigate impact of misconduct
when it is not severe). The jury is presumed to
follow the court's instructions, *see Zafiro v. Unit-
ed States*, 506 U.S. 534, 540 (1993) ("[E]ven if
there were some risk of prejudice, here it is of
the type that can be cured with proper instruc-
tions, and 'juries are presumed to follow their in-
structions.'") (quoting *Richardson v. Marsh*, 481
U.S. 200, 211 (1987))), and Aquart has failed to
show otherwise.

Moreover, a single question and an immedi-
ate objection followed by the striking of the ques-
tion and a curative instruction, as was the case
here, is insufficient to establish that a defendant
was denied his right to a fair trial. *See Greer v.
Miller*, 483 U.S. 756, 766 (1987). In *Greer,* the
prosecutor asked the defendant on cross-
examination, "Why didn't you tell this story to
anybody when you got arrested?" 483 U.S. at
759. Defense counsel objected immediately and
requested a mistrial claiming that the prosecu-
tor's question violated the defendant's right to
remain silent. The trial judge denied the motion,
but sustained the objection and instructed the
jury to ignore the question. *Id.* The Supreme
Court noted that the prosecutor had improperly
commented upon the defendant's right to remain

153

silent, but nonetheless found the limited inquiry to be insufficient to "constitute a due process violation" or to have resulted in the denial of the defendant's right to a fair trial. *Id.* at 765. As the Supreme Court explained, "a single question, an immediate objection, and two curative instructions[] clearly indicates that the prosecutor's improper question did not violate [the defendant's] due process rights." *Id.* at 766.

Other courts have reached similar conclusions. *See United States v. Truman,* 688 F.3d 129, 143-44 (2d Cir. 2012) (improperly asking one witness whether another witness was lying insufficient to deprive defendant of a fair trial, even when coupled with misconduct during summation, given the strong likelihood of conviction); *United States v. McCarthy*, 54 F.3d 51, 55-56 (2d Cir. 1995) (even if improper, prosecutor's questions regarding defendant's familiarity with legal system did not warrant a reversal because court sustained objections to the questions, the prosecution ended its examination and the court instructed that questions asked by counsel are not evidence: "Thus, even if the questions were improper, the district court cured any potential bias posed by the questions."); *Smith v. Mitchell*, 567 F.3d 246, 256 (6th Cir. 2009) (asking defendant what "kind of sounds [the victim] made when you ripped his throat from ear to ear," although improper, was not so flagrant as to infect the trial with unfairness or

154

to make the resulting conviction a denial of due process); *United States v. Robinson*, 473 F.3d 387, 395 (1st Cir. 2007) (any error resulting from improperly asking defendant if another witness was lying was harmless because court sustained the defendant's objection and relieved him from answering); *United States v. Thomas*, 453 F.3d 838, 846 (7th Cir. 2006) (concluding that "were-they-lying" questions did not influence the jury's verdict because of the weight of the evidence and the standard jury instruction advising the jury of its role to decide the credibility of all witnesses).

Therefore, even if the Court were to determine that the government's question was inappropriate, the impropriety was not severe, it was immediately cured by the district court's instruction and, for the reasons explained above, did not impact the jury's findings. Consequently, Aquart cannot establish that he was substantially prejudiced or that his trial was infected with unfairness so as to justify reversal of his death sentences.

### c. There was no prejudice from the government's question about why Johnson was denied a cooperation agreement.

During cross-examination, the government asked Agent Munger to explain for the jury what is meant by a "proffer session." Agent Munger

155

replied that a "proffer is when somebody comes in . . . with his attorney . . . enter[s] into an agreement and they basically tell their side of the story." GA1421. Munger explained that while proffer sessions are "designed to work towards a cooperation agreement," in this instance, Johnson did not receive a cooperation agreement. GA1421. When the government asked, "And that's because it was determined he was lying," the defense objected and the district court sustained the objection. Munger never answered the question. GA1421.

Although Munger never answered the government's question, Aquart argues that the question itself was so improper that it rendered his trial fundamentally unfair. Aquart's argument fails to put the one question in context or to consider the curative measures adopted or the certainty of the verdict absent the alleged impropriety.

To be sure, this Court has been critical of the prosecution's use of any form of the word "lie" in certain contexts, *see, e.g.*, *United States v. White*, 486 F.2d 204, 206 (2d Cir. 1973), but the Court has also held that use of the word does not always amount to misconduct. In particular, "'[u]se of the words 'liar' and 'lie' to characterize disputed testimony when the witness's credibility is clearly in issue is ordinarily not improper unless such use is excessive or is likely to be inflammatory.'" *United States v. Coriaty*, 300 F.3d

156

244, 255 (2d Cir. 2002) (quoting *United States v. Peterson*, 808 F.2d 969, 977 (2d Cir. 1987)); *see also Shareef*, 190 F.3d at 79; *United States v. Resto*, 824 F.2d 210, 212 (2d Cir. 1987) (prosecutor's statement that defendant's testimony was "out-and-out lies" not improper because not excessive or inflammatory); *Thomas*, 377 F.3d at 244-45 (unnecessary to determine whether prosecutor's accusation that defendant repeatedly lied constituted misconduct because even if the comments were improper, they did not cause substantial prejudice). In short, the prosecutor's one use of the word "lying" to describe a witness whose credibility was at issue was not obviously improper.

In any event, regardless of the propriety of the question, there was no prejudice to Aquart. The government asked a single question regarding why Johnson did not enter into a cooperation agreement. The defense immediately objected; the witness did not answer the question. While no immediate curative instruction was given—or requested—as set forth above, the court's general instructions made clear that the jury should not consider the prosecutor's question in this context. *See* GA1050.

Moreover, on this record, even if Aquart could somehow establish that the jury considered the prosecutor's question as evidence, he has failed to establish "a strong likelihood that the effect of the evidence [was] devastating to the defend-

157

ant," *United States v. Elfgeeh*, 515 F.3d 100, 127 (2d Cir. 2008) (internal citations omitted), or that it rendered his trial unfair. The government's question communicated to the jury that Johnson did not enter into a cooperation agreement because someone had determined that he was lying. But, when viewed in context, it is clear that the jury would have gleaned that message, in any event. On cross-examination, the government properly emphasized the many inconsistencies in Johnson's statements; the clear import of the government's line of questioning was that Johnson fabricated or purposely omitted information, or changed his story when confronted by physical evidence, in his multiple stories over time. In other words, the government's questioning emphasized that Johnson had lied in his conversations with law enforcement. *See Robinson*, 473 F.3d at 395 ("That there was a contradiction between [the defendant's] testimony and [the agent's] was obvious. Pointing out the obvious most likely scored the government, at most, rhetorical points."). Because the question about which Aquart complains conveyed to the jurors no more than what they already knew from the government's unchallenged presentation, that is, that Johnson was untruthful, any error, if it occurred, did not "'so infect the trial with unfairness as to make the result[] a denial of due process.'" *Shareef*, 190 F.3d at 78 (quoting *Darden*, 477 U.S. at 181).

158

Here, the prosecutor's use of the word "lying" was an isolated event, it occurred after the court had already instructed the jury that the questions of counsel are not evidence, and the court immediately sustained an objection to the question. When considered in the context of the entire penalty phase, there is no basis for concluding that Aquart was prejudiced by this single comment, much less that he was substantially prejudiced so as to have been denied a fair trial.

### d. The phrasing of the government's questions did not amount to vouching.

Aquart contends that the government engaged in vouching by phrasing its questions on cross-examination to make clear that it considered Johnson's statements to lack credibility (*i.e.*, "Johnson claimed . . . "). AOB77. Aquart has failed to identify anything that was improper about the government's questions or to offer any legal support to substantiate his suggestion that the government's cross-examination style amounted to "vouching." His assertions amount to no more than a complaint that he did not like the government's questions. Notably, Aquart failed to object to any of the questions about

159

which he now complains, underscoring the fact that there was no impropriety.[32]

Aquart offered Johnson's hearsay statements in an effort to prove the truth of the matter asserted therein. The government objected to the admission of the statements because they were internally inconsistent and inherently unreliable. GA1344-47; GA1405-06. When the statements were admitted over the government's objections, the government was entitled to attack the credibility of the speaker and the statements.

---

[32] Aquart's allegation that the government prevented the jury from giving fair consideration to Johnson's proffer statements is belied by the record. As the government argued at trial, Johnson's statements were lacking in indicia of reliability. That is, they were self-serving, internally inconsistent and inconsistent with both the forensic and testimonial evidence presented during the guilt phase. GA1344-49; GA1405-09. Despite the government's objections, the court allowed Aquart to introduce four small excerpts from four different proffer sessions, *see* GA1406-08, and would not permit the government on cross-examination to introduce other portions of Johnson's statements bearing upon his credibility. GA1424; GA1427. Such a limitation allowed the *defense* to present Johnson's proffer statements as reliable when, in fact, they were replete with material inconsistencies.

160

Federal Rule of Evidence 806 permits a party to attack the credibility of the speaker when hearsay statements are introduced into evidence:

> When a hearsay statement . . . has been admitted in evidence, the declarant's credibility may be attacked, and then supported, by any evidence that would be admissible for those purposes if the declarant had testified as a witness. The court may admit evidence of the declarant's inconsistent statement or conduct, regardless of when it occurred or whether the declarant had an opportunity to explain or deny it.

F.R.E. 806. Here, the government did no more than it was entitled to do, that is, challenge Johnson's credibility by highlighting the inconsistencies in his statements. Aquart should not now be heard to argue that attacking the credibility of the declarant, whose statements he offered, somehow constituted vouching for a government witness.

Vouching occurs when a prosecutor expresses a "'personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant.'" *United States v. Carr*, 424 F.3d 213, 227 (2d Cir. 2005) (quoting *United States v. Modica*, 663 F.2d 1173, 1179 (2d Cir. 1981)). Attacking the credibility of a defense witness by highlighting the falsities and inconsistencies in the witness's statements does not

161

amount to vouching. *See Williams*, 690 F.3d at 76 ("'[W]hat might superficially appear to be improper vouching for witness credibility may turn out on closer examination to be permissible reference to the evidence in the case.'") (quoting *United States v. Perez*, 144 F.3d 204, 210 (2d Cir. 1998)).

Rather, what was communicated to the jury through the unchallenged testimony was that Johnson's story changed every time he spoke with the government. To hold that this constitutes vouching would be to curtail the government's right to cross-examination. Moreover, because there was no error in allowing the questions, Aquart cannot show any impact on his substantial rights.

## 2. The government did not mislead the jury about Johnson's change-of-plea proceeding.

Aquart claims that the government, through its cross-examination, misled the jury into falsely believing that Johnson, while under oath during a failed change-of-plea hearing, provided an account of the murders that was inconsistent with the account he provided during proffer sessions. But this was not misleading: Johnson *did* provide testimony under oath that was inconsistent with his proffer statements. In particular, and as relevant here, in Johnson's proffer statements, he said that Taylor was responsible

162

for taping Tina, but he did not make that statement during the plea colloquy. GA1419-20; DA468-70. The government properly emphasized those inconsistencies. Moreover, the defense did not object to this line of questioning, and cannot now establish plain error in its admission.

### a. Relevant facts

During cross-examination, the government and Agent Munger had the following exchange:

Gov't: Were you here in this court when Johnson came in here to plead guilty?

Munger: Yes, I was.

Gov't: And during that plea, he had to tell the court under oath what he did wrong, correct?

Munger: Yes.

Gov't: And isn't it true that during that statement—excuse me, during that sworn statement, that Johnson said "I helped Dreddy gain access to someone's house and I taped the person up and that's it" Did you hear him say that?

Munger: I heard him say that.

Gov't: And then he—and then the Court asked, "And you helped

163

|          | someone. Who is the someone?" And Johnson replied "Azibo." Did you hear that? |
|----------|------------------------------------------------------------------------------|
| Munger:  | Yes. |
| Gov't:   | And then the Court asked, "And you helped him do what?" And Johnson responded, "Tape Tina Johnson up and I drove him from the scene." Did you hear that? |
| Munger:  | Yes. |
| Gov't:   | So, he never said a word about Taylor having anything to do with the taping, did he? |
| Munger:  | That is correct. |

GA1424.[33] The defense did not object.

### b. Discussion

Aquart contends that this sequence of questions was "highly misleading" because they suggested that the district court directly asked Johnson about the role of other participants when, Aquart claims, the district court only asked "how [Johnson] had helped Aquart and Azikiwe." AOB82; AOB85.

---

[33] The full transcript from this plea proceeding is found at GA1731-42.

164

Aquart's challenge to the government's cross-examination rests on a strained reading of the record. Thus, for example, Aquart claims that the court specifically asked Johnson what he did to "help[] the Aquart brothers commit the murders," *see* AOB81, even though a fair reading of the transcript does not support that argument. Aquart also contends that it was the court that "introduced the 'helping Azibo' construction," *see* AOB85, when it is readily apparent that it was Johnson who repeatedly interjected Aquart's name.[34] Aquart concludes that it "is not surprising" that Johnson did not once utter Taylor's name "since he had been asked to say only how he had helped Aquart and Azikwe (sic)." AOB82. Again, Aquart's representation regarding the tenor of the court's questioning is belied by a review of the transcript.[35]

---

[34] In fact, although Aquart's brief uses quotation marks to suggest that the court made particular statements about "helping Azibo," a careful review of the transcript reveals that the court did not use those words. *See* AOB84-85 ("The court had launched its inquiry by asking [Johnson] how he had helped 'Azibo' and 'Azikwe' (sic) commit the murders."); *see also* AOB85 ("It was the court that then introduced the 'helping Azibo' construction.").

[35] Aquart also insinuates that the government purposely failed to mention Taylor during the plea hearing. Again, this is refuted by a review of the record. While allocuting, Johnson denied one of the essential

165

Armed with this strained reading of the transcript, Aquart claims that the only "plausible reading" was that Johnson's statement that "he helped [Aquart] tape [Tina] up" meant that taping Tina was "one of the ways he helped Aquart in the overall venture—not that Aquart, too, had actually taped Tina alongside him." AOB84. This argument overlooks the most natural reading of the transcript. Johnson told the court, "I helped someone—Dreddy—gain access to someone's house, and I taped the person up. And that's it." GA1424. When the court indicated that Johnson was going to have to provide more specifics, he explained, "When I got there, I put on gloves, I helped him gain entry by knocking on the door, and when they went in there, I helped him tape her up, and then I drove him away from there, Azibo." GA1739. The most reasonable reading of Johnson's statement is the literal one: that

---

elements of the offense. GA1739. In response, the government explained what it believed the evidence would show. In doing so, the government did not limit itself to Johnson's involvement with Aquart and Azikiwe. Rather, in describing the murders, the government stated, "There were four persons involved, the defendant, Azibo Aquart, Azikiwe Aquart and John Taylor…they each had different roles to play during the course of the murders." GA1740. And, in describing the narcotics trafficking conspiracy, the government explained that the participants included, "Not just Azibo Aquart, Azikiwe Aquart as well. And John Taylor was involved in it, too." GA1741.

166

Johnson helped Aquart gain entry to the apart-
ment and that after he and his co-defendants en-
tered ("they went in there"), Johnson helped
Aquart bind Tina.

But even if Aquart's alternative reading of
the transcript is plausible, the distinction is ir-
relevant. The key is that Johnson first indicated
that he personally taped Tina and then claimed
that he helped Aquart tape Tina. At no point did
he say that he helped Taylor tape Tina, despite
the court's invitation to explain who it was that
he helped. Therefore, the fact remains that
Johnson's proffer statements (where he said that
Taylor taped Tina) and his statements to the
court at his failed change-of-plea hearing (where
he said that he taped Tina, or he helped Aquart
tape her) differed.

As is apparent from the plea transcript, the
district court asked Johnson open-ended, general
questions regarding his role in the offense. John-
son had the opportunity, while under oath, to
say that he assisted Taylor. He did not do so. Ra-
ther, he repeatedly stated that he helped only
Aquart. Johnson's sworn statements to the court
were thus inconsistent with his proffer state-
ments. Accordingly, the government reasonably
highlighted the differences in Johnson's accounts
so they could be considered by the jury when as-
sessing his credibility.

The difference in Johnson's accounts was ei-
ther a sign of Johnson's unreliability, as the gov-

167

ernment posited, or attributable to the nature of the plea colloquy, as Aquart now argues. Because the government's position was a reasonable reading of the record, the government appropriately presented it on cross-examination. Aquart could have disputed the inconsistencies on re-direct examination, or emphasized his reading of the colloquy in closing argument, but he chose to let the matter rest without comment. Having chosen not to emphasize his alternative reading to the jury, he should not be heard now to complain that the government presented its own reading of the transcript.

### 3. The government did not infringe upon Aquart's right to present a defense.

#### a. Relevant facts

During the penalty phase summation, the government addressed the unreliability of Johnson's statements. First, the government argued that Johnson's proffer statements were, "not only internally inconsistent and not only inconsistent with the forensic and testimonial evidence, but also inconsistent with the defendant's theory of the case during the guilt phase." GA1451. The defense did not object to this argument.

Then, after discussing some of the inconsistencies in Johnson's proffer statements, the government addressed the significance, if any, of

168

those statements. The government argued that Aquart introduced Johnson's statements to shift blame from Aquart to Taylor, and to attack Taylor's credibility with respect to his level of involvement in the actual assaults. GA1451. The government reminded the jurors that they had seen Taylor testify and answer questions on cross-examination, and that it was notable that during the cross-examination "he wasn't asked one question about what role he actually played in the offense." GA1451. Once again, the defense did not object to this argument.

The government then posited that the reason Taylor was not asked about his role in the murders or confronted with Johnson's statements was, "[b]ecause then the defense theory was that Taylor wasn't even there for the murders."[36] GA1451. At that point, defense counsel objected. GA1451. The court sustained the defense objection and directed the jury not to consider the "strategic conduct of counsel" during delibera-

---

[36] The defense argued during its summation in the guilt phase that Taylor was lying about being present at the crime scene and that his testimony had been fabricated from what he learned through the prison grapevine. GA571; GA1077-78. However, in the penalty phase, Aquart presented Johnson's statements to prove that Taylor was not only present during the murders, but also took an active role in the assault on Tina.

169

tions. GA1452. Aquart did not request additional curative measures.

### b. Discussion

Aquart argues that reversal of his death sentences is required claiming that the government's statement about the defense theory denied him a fair trial. AOB89; AOB91. But as set forth above, a defendant who, like Aquart, "seeks to overturn his conviction based on alleged prosecutorial misconduct in summation bears a 'heavy burden.'" *Farhane,* 634 F.3d at 167 (quoting *United States v. Feliciano,* 223 F.3d 102, 123 (2d Cir. 2000)). *See, e.g.*, *Williams*, 690 F.3d at 75 ("The defendant must show not simply that a particular summation comment was improper, but that the comment, viewed against the entire argument to the jury, and in the context of the entire trial, was so severe and significant as to have substantially prejudiced him, such that the resulting conviction [was] a denial of due process.") (internal quotations and citations omitted); *Coplan*, 703 F.3d at 86 (in deciding whether misconduct caused substantial prejudice, the Court considers the severity of misconduct, the curative measures, and the certainty of conviction absent the misconduct).

Here, Aquart stumbles on the first step because the government's argument was not improper. As this Court has recognized, "[a] prosecutor is not precluded from vigorous advocacy

170

. . . in summation." *Williams*, 690 F.3d at 75 (internal quotation marks omitted). Urging a jury not to be distracted by frivolous arguments, as the prosecutor did here, falls well within the parameters approved by this Court. *See id.* ("[W]e do not think it improper or excessive, without more, for a prosecutor to criticize defense arguments as merely being attempts to 'grasp at straws' or 'focus on distractions.'"); *see also United States v. Elias*, 285 F.3d 183, 190 n.3 (2d Cir. 2002) ("We see nothing inherently wrong with characterizing a defense tactic as desperate."); *United States v. Millar*, 79 F.3d 338, 343-44 (2d Cir. 1996) (declining to reverse a conviction where the prosecution stated in summation that the defense case was "hog wash" and a "smoke screen," and suggested that defense counsel was trying to "confuse" the members of the jury and "lead them astray"). Indeed, the government simply pointed out that Aquart's attack on Taylor's credibility was unconvincing given that the defense had failed to question Taylor on the most important issue in the case: what happened inside the victims' apartment. In the context of a summation focused on the evidence, and on demonstrating for the jurors why the prosecution established proof beyond a reasonable doubt, a fleeting remark regarding a defense tactic was not improper. In short, "the remarks here amounted to nothing more than a legitimate 'attempt to focus the jury's attention upon the evidence and away from defense counsel's

171

claims.'" *Williams,* 690 F.3d at 75-76 (quoting *Rivera,* 971 F.2d at 883).

The cases cited by Aquart are all unavailing as they involve extreme examples where the prosecutor directly maligned the integrity of the defense attorney or warned the jury that defense counsel had perpetrated a scam on them. Indeed, this case is a far cry from the sort of sustained attack on the integrity of defense counsel that this Court found to be reversible error in *United States v. Friedman,* 909 F.2d 705, 708 (2d Cir. 1990) (reversing a conviction where, *inter alia,* the prosecution stated in summation that "some people [defense counsel] would have you pull down the wool over your eyes and forget all that, because while some people ... go out and investigate drug dealers and prosecute drug dealers and try to see them brought to justice, there are others who defend them, try to get them off, perhaps even for high fees"). The government did not make disparaging remarks about defense counsel or attempt to impugn counsel's integrity. Similarly, the government did not comment on Aquart's right to remain silent, to plead not guilty or to put the government to its burden of proof at trial. In fact, the government did not comment on Aquart's "trial strategy" as it related to his guilt, which had already been decided. Rather, the government commented only upon Aquart's interpretation of the evidence making the point that if Taylor was not present for the

172

murders, as Aquart originally argued, he could not possibly be more culpable than he claimed.

Regardless of the propriety of the government's comment, the district court immediately resolved the matter: it sustained the defense objection, terminated the government's argument on the issue and directed the jury not to consider defense counsel's strategy during its deliberations. The court also directed the jury that it must make its decision based only "on what you find proved and what you conclude about the defendant and the government's proof." GA1452. Aquart did not request additional curative measures and did not request a mistrial. GA1452. Furthermore, the remark occurred during a lengthy and otherwise proper summation and did not affect the fairness of the trial. In short, Aquart cannot show that one fleeting remark caused him substantial prejudice.

\* \* \*

As described above, Aquart claims that several of the government's questions and arguments prevented the jury from fully and fairly considering Johnson's statements. Those claims are meritless.

But it is also important to note one final point about the purported impact of the government's conduct here: even if there was misconduct, there is no doubt that none of the prosecutor's actions had any impact on the jury's verdict.

173

*Elias*, 285 F.3d at 190. In particular, for Aquart, Johnson's statements were relevant because they impeached Taylor's testimony in two ways: (1) they showed that he played a larger role in the offense than Taylor claimed (relating to the first mitigating factor, *i.e.*, that neither Taylor nor Johnson would be sentenced to death for their roles in the murders); and (2) they called into question Taylor's testimony that Aquart's conduct was especially cruel and depraved (relating to the first aggravating factor, *i.e.*, that Aquart committed the homicide offense in an especially heinous, cruel, or depraved manner). GA1406-1407.

The jury unanimously found Aquart's mitigating factor that other culpable parties would not be sentenced to death to be proved, GA1528, and thus he suffered no prejudice on that front. And, the evidence establishing Aquart's heinous, cruel and depraved conduct was overwhelming; Aquart's failure to question the sufficiency of the evidence as to this factor in his summation to the jury, in his motion for a new penalty phase or in this appeal, underscore that fact. DA41 (Doc. 952); DA502-14; GA1456-65. Accordingly, there is no basis to conclude that Aquart suffered substantial prejudice from the government's conduct in the penalty phase of this trial.

174

## VI. The evidence was sufficient to prove that Aquart engaged in substantial planning and premeditation to cause the victims' deaths and the district court did not err by submitting this aggravating factor to the jury.

Aquart alleges that the evidence was insufficient to prove that he engaged in substantial planning and premeditation to cause the victims' deaths. AOB116-37. At most, according to Aquart, the record establishes that he intended to break into the victims' apartment to rob and possibly assault the victims, but then made a spur-of-the-moment decision to kill them. Aquart requests reversal of his death sentences. AOB119.

### A. Relevant facts

The indictment alleged as one of the five statutory aggravating factors that Aquart committed the homicide offenses after substantial planning and premeditation to cause the death of a person, pursuant to 18 U.S.C. § 3592(c)(9) and 21 U.S.C. § 848(n)(7)(1996). DA72. At the conclusion of the penalty phase, the district court instructed the jury on this factor. As relevant here, the court told the jury that it had to find that Aquart "engaged in substantial planning and premeditation to cause the death" of the victims. GA1440. Further, the court explained that the jury had to find substantial

175

planning and premeditation for murder: "It is
not sufficient for you to find that the defendant
engaged in substantial planning and premedita-
tion to commit any offense other than murder."
GA1440. *See United States v. Webster*, 162 F.3d
308, 325 (5th Cir. 1998) (holding that "substan-
tial planning" must be done by the defendant
and must relate to the killing).

Facts stemming from the evidence adduced at
trial, which are pertinent to consideration of this
issue, are set forth in the Statement of the Case
above. Additional facts are set forth below.

## B. Standard of review

### 1. Sufficiency of the evidence stand-
ard

A defendant challenging the sufficiency of the
evidence as to a jury's finding of an aggravating
factor faces a "high hurdle." *United States v.
Fields*, 516 F.3d 923, 940 (10th Cir. 2008). In
such instances, the Court "ask[s] only whether,
taking the evidence–both direct and circumstan-
tial, together with the reasonable inferences
therefrom–in the light most favorable to the gov-
ernment, a reasonable jury could [make the chal-
lenged finding] beyond a reasonable doubt." *Id.*
at 940-41 (internal quotations omitted); *United
States v. Ebron*, 683 F.3d 105, 151 (5th Cir.
2012), *cert. denied*, 134 S. Ct. 512 (2013); *United
States v. Bolden*, 545 F.3d 609, 615 (8th Cir.
2008); *United States v. Sampson*, 486 F.3d 13, 47

(1st Cir. 2007); *United States v. Tipton*, 90 F.3d 861, 896 (4th Cir. 1996) ("We review such insufficiency claims under the same *Jackson v. Virginia* standard applied to guilt findings.").

Although the standard for sufficiency claims is well established, *see* Part I.B., *supra*, Aquart urges this Court to apply an improper standard that would allow the Court to weigh the evidence and second-guess the jury's determination. In particular, Aquart argues that if there was "equal or nearly equal circumstantial support" to support his theory that he did not substantially plan and premeditate the murders, that "reasonable doubt would necessarily exist." AOB117. Aquart is wrong.[37]

Aquart's proposed standard does not faithfully describe this Court's task when evaluating the sufficiency of the evidence. Indeed, it runs counter to the Supreme Court's teaching in *Jackson v. Virginia* that a jury verdict must be upheld if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," 443 U.S. 307, 319 (1979) (emphasis in original), which the Second Circuit has long understood to mean that "where either of the two results, a reasonable doubt or no reasonable

---

[37] As set forth in the text, Aquart mis-states the standard for sufficiency of the evidence and urges this Court to apply the "equipoise" rule. Regardless of the rule, however, Aquart's claim fails.

177

doubt, is fairly possible, the court must let the jury decide the matter," *United States* v. *Santos*, 541 F.3d 63, 70 (2d Cir. 2008) (internal quotation marks omitted). Under that standard, it is not for the Court of Appeals to marshal the evidence for and against guilt, compare the relative weight, and then decide which case is stronger or if they are in "equipoise." That is the jury's role. It is for the reviewing court to determine only whether a rational view of the evidence supports the jury's finding.

In support of his flawed approach, Aquart cites to *United States v. Glenn*, 312 F.3d 58 (2d Cir. 2002), wherein the "equipoise rule" was first introduced in this Circuit, borrowed from a now-repudiated holding of the Fifth Circuit. *See Glenn*, 312 F.3d at 70 ("[I]f the evidence viewed in the light most favorable to the prosecution gives 'equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence,' then 'a reasonable jury must necessarily entertain a reasonable doubt.'") (quoting *United States* v. *Lopez*, 74 F.3d 575, 577 (5th Cir. 1996)). *Glenn* was almost immediately identified as being in tension with established Second Circuit precedent. *See United States v. Cassese*, 428 F.3d 92, 104-05 (2d Cir. 2005) (Raggi, J., dissenting) ("*Glenn* did not . . . abrogate the [earlier] holding . . . that, when 'either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, a reviewing court must let the jury de-

178

cide the matter.'" (quoting *United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000); citing *United States v. MacPherson*, 424 F.3d 183 (2d Cir. 2005); *United States v. Morgan*, 385 F.3d 196 (2d Cir. 2004); *United States* v. *Espaillet*, 380 F.3d 713 (2d Cir. 2004)).

Moreover, after exporting the "equipoise rule" to the Second Circuit, the Fifth Circuit, sitting *en banc*, repudiated it as an unfaithful application of Supreme Court precedent. *See United States v. Vargas-Ocampo*, 747 F.3d 299, 301 (5th Cir.) (en banc) (holding that "the 'equipoise rule' is not helpful in applying the Supreme Court's standard prescribed in *Jackson* v. *Virginia*" and therefore "abandon[ing] use of the 'equipoise rule'"), *cert. denied*, 135 S. Ct. 170 (2014). Similarly, the Third Circuit, sitting *en banc*, has repudiated its version of the "equipoise rule," which precluded conviction in drug conspiracy cases where evidence of the defendant's knowledge of the conspiracy's object was "just as consistent" with a conspiracy involving non-drug contraband. *United States v. Caraballo-Rodriguez*, 726 F.3d 418, 431-32 (3d Cir. 2013) (en banc) ("[W]e specifically disavow the reasoning we previously embraced—that the jury's verdict could not stand when the evidence was as consistent with contraband other than controlled substances, even though a jury could rationally conclude that the defendant knew the subject of the conspiracy was drugs."). In short,

179

as the Third and Fifth Circuits have recognized, rationality, not evidentiary balancing, is the standard under which jury verdicts are judged.

A recent decision of the Supreme Court confirms that the Third and Fifth Circuits were correct to abandon their "equipoise tests" and that other Circuits were well-advised to have never embraced them in the first place. In *Cavazos v. Smith*, the Supreme Court faulted a reviewing court for "substitut[ing] its judgment for that of a . . . jury on the question whether the prosecution's or the defense's expert witnesses more persuasively explained the cause of a death." 132 S. Ct. 2, 4 (2011) (per curiam). Weighing of the evidence in that manner ran afoul of the simple rule that a "reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." *Id.* Recognizing that "rational people can sometimes disagree," the Supreme Court observed that "the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold." *Id.*

Accordingly, Supreme Court precedent dictates that in reviewing the jury's findings in this case, the Court should "ask only whether, taking the evidence–both direct and circumstantial, together with the reasonable inferences therefrom–in the light most favorable to the govern-

180

ment, a reasonable jury could [make the challenged finding] beyond a reasonable doubt." *Fields*, 516 F.3d at 940 (internal quotations omitted).

## 2. Manifest injustice

Under federal law, even if a Court finds an error, it "shall not reverse or vacate a sentence of death on account of any error which can be harmless, including any erroneous special finding of an aggravating factor, where the Government establishes beyond a reasonable doubt that the error was harmless." 18 U.S.C. § 3595(c)(2). Therefore, if a jury finds an invalid aggravating factor, an "appellate court may choose to consider whether absent [the] invalid factor, the jury would have reached the same verdict . . . ." *Jones v. United States*, 527 U.S. 373, 402 (1999); *Ebron*, 683 F.3d at 152-53; *United States v. Bernard*, 299 F.3d 467, 484 (5th Cir. 2002); *United States v. Webster*, 162 F.3d 308, 326 (5th Cir. 1998) ("We opt to apply the second method of harmless error review, and inquire into whether the sentence would have been imposed absent the invalid aggravator.").

In this case, Aquart failed to object to the submission of the "substantial planning and premeditation" factor to the jury. *See* AOB119. In fact, Aquart opted not to contest the presence of this aggravating factor either to the jury, *see* GA1467-68 ("I did not in any sense attack or

181

challenge any of the aggravators alleged by the government in this case"), or in the motion for a new penalty phase. DA41 (Doc. 952); GA502-14 (Doc. 1102).

When a defendant fails to preserve a challenge to the sufficiency of the evidence, he must show "that upholding the [jury finding] would constitute 'a manifest miscarriage of justice.'" *United States v. Williams*, 784 F.3d 798, 802 (D.C. Cir. 2015) (quoting *United States v. Lopesierra-Gutierrez*, 708 F.3d 193, 206 (D.C. Cir. 2013)); *United States v. Abdullah*, 162 F.3d 897, 903 (6th Cir. 1998); *United States v. Luciano*, 329 F.3d 1, 5 & n.6 (1st Cir. 2003). "A manifest miscarriage of justice occurs when the record is devoid of evidence pointing to guilt or the evidence on a key element of the offense was so tenuous that a conviction would be shocking." *Williams*, 784 F.3d at 802 (internal quotations omitted).

## C. Discussion

Aquart argues that the evidence did not establish that he engaged in substantial planning and premeditation to cause the victims' deaths. AOB116. Aquart acknowledges, as he must, that several days before the murders he recruited three accomplices to assist him with his plan to forcibly enter the victims' apartment, restrain the victims with duct tape and to assault them with baseball bats. AOB117. He further

182

acknowledges that he acquired a gun, duct tape, baseball bats and latex gloves, and orchestrated what amounted to a dry-run just days before the murders. AOB117. Finally, Aquart admits that he brought a power drill so he could drill the victims' door shut "to delay people coming out and in . . . as well as facilitate the men escaping undetected." AOB121 n.51. Aquart insists, however, that this record demonstrates only a premeditated plan to commit robbery and assault, and that the intent to murder was later conceived, having been "triggered by events inside." AOB118.

Aquart's claim has no merit. As described in greater detail below, the jury's finding that Aquart engaged in substantial planning and premeditation to cause the victims' death was well supported by the evidence. At a minimum, Aquart has not demonstrated a manifest miscarriage of justice.

### 1. The evidence established beyond a reasonable doubt that Aquart engaged in substantial planning and premeditation to murder Tina, James, and Basil.

Viewing the evidence in the light most favorable to the government, there was a sufficient basis for rational jurors to conclude beyond a reasonable doubt that Aquart engaged in sub-

183

stantial planning and premeditation to commit the victims' murders.

The evidence established that Aquart started planning to kill Tina, James, and Basil at least one week before the actual commission of the murders. Specifically, while in Georgia, Aquart recruited accomplices—Azikiwe and Taylor—to help him with "a problem" he was having with some people in the building. GA569-70. Aquart's admission to Myers that he decided that the people with whom he was having a problem "had to die," *see* GA911, made clear for the jury what type of assistance Aquart was soliciting. Notably, when Aquart made this statement to Myers, he did not indicate that he only decided the victims had to die because they recognized him during a robbery.

Next, immediately upon Aquart's return to Bridgeport, he began to assemble the materials necessary for the murders. After learning that Tina was still selling crack in his building, Aquart gave Womble $60 and told him to buy him a baseball bat. GA374; GA399. From this fact, the jury could reasonably conclude that by that time, Aquart had not only decided that he was going to kill the victims, but also decided on the means by which he intended to accomplish the murders.

One or two days later, Aquart had his accomplices assemble in Bridgeport. GA570. The group acquired more materials (*e.g.*, duct tape), GA571,

184

then gathered near the Charles Street building where they donned ski masks and gloves, picked up baseball bats, and made their first attempt to commit the murders. GA572; GA574.

A few days after the attempt, Aquart told Taylor to come back to Bridgeport. GA576. When he arrived, Aquart, Azikiwe, and Taylor met Johnson at the Charles Street building. GA576-77. This time, Aquart knew that Tina was home, GA577, and had a plan for Taylor, namely, that he "handle" Tina's son, who Aquart characterized as a "big guy." GA577. The jury could reasonably infer from Aquart's statements, including the fact that he knew Tina was home, that he had been surveilling the victims in preparation for the attacks and had a plan for the attack.

While still in the garage, the four men donned masks and gloves.[38] In addition, Azikiwe and Johnson each had a baseball bat and Aquart had a gun. GA577-78. They entered the building, walked up to the victims' apartment and Aquart kicked in the front door. GA578. Aquart then used the gun he brought to subdue the victims. GA579.

---

[38] Aquart ran a large drug business out of 215 Charles Street and thus one would expect to find his fingerprints throughout the complex. Yet Aquart still wore latex gloves indicating that he knew the attack on Tina would be messy.

185

The scene inside the apartment corroborates the view that Aquart planned to kill the victims. All three victims were methodically hog-tied, bound and beaten in the same manner, evidencing a significant degree of planning, premeditation and coordination. Further, the severity of injuries inflicted on the victims dispels any notion that Aquart intended only a robbery or run-of-the-mill assault. All three were bound tightly in duct tape. GA33; GA727-28; GA1772-74 (Gov't Exs. 121-6, 121-8, 121-10); GA1928 (Gov't Ex. 424); GA33; GA1775-77 (Gov't Exs. 122-3, 122-5, 122-7); GA1930 (Gov't Ex. 435); GA41; GA1768-70 (Gov't Exs. 120-3, 120-5, 120-6); GA1927 (Gov't Ex. 414). Further, all of the victims suffered severe beatings: Aquart struck Tina on the head with a baseball bat as many as eight times, GA439; GA581, and blood drained from James's crushed skull, GA39; GA581. Aquart beat Basil in the same fashion, striking him in the head as many as four times and with enough force to fracture his skull like an eggshell. GA986. Had these murders occurred spur-of-the-moment, as Aquart suggests, one would expect more inconsistency. Further, the jury could reasonably conclude that these types of severe injuries reflected substantial planning and premeditation.

Aquart's actions also demonstrate that he planned ahead to cover up his crime. Rather than leaving the apartment after the murders, he used the drill that he brought with him and

186

drilled the apartment door shut from the inside, effectively entombing the victims and delaying their discovery. GA23; GA25.

From all of this evidence, the jury could reasonably infer—and did infer—that Aquart engaged in substantial planning and premeditation to commit the victims' murders.

### 2. Aquart's claim to the contrary— that he only intended to commit a robbery—is belied by the evidence.

Attempting to refute the jury's well-founded conclusion that Aquart committed the murders after substantial planning and premeditation, Aquart posits what he terms a "far more plausible scenario." AOB131. Under Aquart's alternate theory, the group entered the victims' apartment intending to commit a robbery and an assault "if need be." AOB121. When one victim recognized Azikiwe, Aquart changed course and abruptly murdered everyone.

Aquart's theory hangs on inferences he draws from scattered pieces of evidence. Thus, for example, he points to a statement that Azikiwe made to Taylor as they left the apartment: "Did you hear the people say our names?" GA582. This exchange reveals that Azikiwe was concerned that they had been recognized, but does not demonstrate—as Aquart argues—that their identity had actually been compromised. *See* AOB118. More importantly, *Azikiwe's* statement

187

to Taylor sheds no light on *Aquart's* state of mind during the episode, let alone establishes a reasonable motive to "convert a robbery/eviction into a triple homicide." *See* AOB130. Indeed, the evidence to support this interpretation of Azikiwe's statement was so speculative that counsel did not even argue it to the jury.

Aquart also argues that the fact that he and his accomplices wore masks was inconsistent with the government's theory because masks were "an unnecessary precaution if the plan was to kill the occupants." AOB118. Aquart ignores the evidence, however, that he and his accomplices donned the masks *before* entering the building, thereby disguising their identities from potential bystanders who they encountered on the way to the victims' apartment. GA574; GA577.

Next, Aquart focuses on the fact that he removed Tina's cellular telephone and money from her room before killing the victims and argues that this is "undisputed evidence" that he did not intend to kill anyone when he entered the apartment. AOB118. But the sequence of events actually undercuts Aquart's claim. To begin, it was entirely reasonable for the jury to conclude that removing Tina's cellular telephone from her reach prior to beginning the assault served the same purpose as blocking the front door with a couch and gagging the victims with duct tape, that is, it made it impossible for the victims to

188

call for help. Furthermore, had Aquart only intended to accomplish a home-invasion robbery, he could have stopped at the point that he took Tina's phone and money, but he did not. Even assuming that robbery was actually part of Aquart's plan, it is logical to assume that he would perform the robbery *before* binding and murdering the victims. It is illogical to assume that Aquart would have killed the victims and then waded through the crime scene looking for things to steal. In short, the fact that he took the phone first does nothing to advance his argument.

Aquart also claims that he "never informed a single one of his accomplices that he intended to slay anyone," and argues this was proof that he did not premeditate the murders. AOB118. Aquart makes this assertion despite there being absolutely no evidence in the record regarding what Aquart said to Johnson or to Azikiwe[39] about his intentions vis-à-vis the victims. But the fact that Aquart pitched his plan to Taylor

---

[39] It is correct that Azikiwe stated during his plea allocution that he planned to participate in what he believed would be a robbery and that he made no mention of an advance plan to kill. AOB120 n.49. Azikiwe was not required to allocute to having engaged in substantial planning and premeditation to commit murder as it was not an element of the offense to which he pled guilty. Therefore, the omission of such language is of no consequence.

189

as a robbery is not surprising. AOB120. As Aquart admits, "murder is a qualitatively different act," and he "could not have counted on [Taylor or Johnson] to help once his homicidal intent was revealed." AOB123. If Aquart had argued this point to the jury, which he did not, the jury could have reasonably concluded that Aquart harbored the intent to kill from the outset, and that he withheld that intention from Taylor—and even from his other accomplices—in order to secure their participation.

In an apparent effort to counter this reasoning, Aquart claims that he "would not have enlisted [his codefendants'] aid on false pretenses since he had no reason to think that when the break-in turned into a triple slaying, his accomplices would join in to help or remain silent afterwards." AOB120. But as discussed in greater detail below, Aquart had *every* reason to believe that his accomplices would remain quiet; as Aquart acknowledges, in his experience, no one (with the exception of Bryant), ever reported him to the police. *See* AOB127.

Aquart also claims that acts of extreme violence were out-of-character for him and that he had "never administered a beating remotely approaching the savage attacks that the homicide victims sustained." AOB127-28. He then attempts to reason that the "anomalous" nature of the murders demonstrates that he did not premeditate the brutal deaths of the victims.

190

AOB127. To be sure, there was no evidence that Aquart had ever bludgeoned anyone to death in the past, but a review of the evidence of Aquart's past violent conduct belies any assertion that his conduct was "anomalous." *See* Statement of the Case, Part I.A.1. Indeed, although Aquart does not address this fact, the jury unanimously found beyond a reasonable doubt that Aquart repeatedly committed "criminal acts of violence that posed a serious threat to the lives and safety" of individuals other than the victims in this case. GA1527. In other words, the jury found that Aquart's commission of life-threatening violence was not an anomaly or out-of-character. Moreover, while the murders were more extreme than the prior assaults, the jury could have reasonably concluded that Aquart considered Tina's competitive drug sales to be a more egregious "transgression" thereby meriting a different level of response.

Finally, Aquart points to his history of disciplining subordinates who were "short of money," stole drugs or undercut his business in some manner and argues that because Tina's "transgression was similar in degree to the punished acts of others," that he must have carried the same intent, *i.e.*, "to rob her of her drugs and drug proceeds and punish her, perhaps even assault her as he had assaulted others." AOB128-29. This comparison fails and the jury could

191

have reasonably rejected this account as implausible.

During each of the prior assaults, Aquart's clear purpose was to punish rule violations and exert his dominance. Aquart did not try to hide his identity even though they were committed in front of other witnesses and were of enough severity to send his victims to the hospital. Indeed, the "value" of these assaults would have been greatly diminished if Aquart committed them anonymously. Moreover, during the prior assaults, Aquart acted alone and there is no evidence that he took anything from those victims, let alone drugs or drug proceeds. And Aquart knew that, with the exception of Bryant, none of his prior assault victims had reported him to the police. AOB127. Therefore, if Aquart's intent had been merely to punish Tina as he had done to others, he could have done so publically and with virtual impunity. In fact, Aquart admits as much: "[Tina] would not likely complain to the police if she was roughed up due to her own involvement in the trade." AOB127. Aquart's statement reflects a tacit admission that if an assault was all that he intended, he would had committed it as he did all of the others—without hiding his identity. How otherwise would Tina know that she was being assailed "due to her own involvement in the trade?" And, in the absence of that knowledge, Aquart would have

192

failed to achieve the intended effect of causing Tina to stop selling drugs in the building.

Here, however, Aquart recruited a team of accomplices, acquired an assortment of weapons and supplies, obscured his identity with a mask and his ability to be detected at a later time with gloves, and meticulously planned the break-in. These extensive planning efforts, as compared to his earlier confrontations, indicate that he intended a deadly penalty for Tina.

Notably, if Aquart's theory was true, *i.e.*, that he thought he had been recognized, he could have left the residence without assaulting the witnesses in the first instance. That is, it is clear from the photographs of the victims that if they had said anything to indicate they recognized Aquart that they would have to have done so prior to him gagging and blinding them with duct tape. At that juncture, the robbery was complete and the victims would not yet have been injured. Thus, the only liability he would be facing would stem from the forced entry into the victims' home. Because Tina had never reported Aquart to the police for his rampant drug dealing activities or for threatening her on multiple occasions prior to the murders, it is not reasonable to conclude that he feared she would call the police because he kicked in her door.

In sum, Aquart asks this Court to ignore the well-established standard for sufficiency of the evidence claims and to instead view the evidence

193

in the light most favorable to him. Aquart further asks this Court to substitute its judgment for that of the jury's and to conclude that his alternative explanation—that he premeditated a robbery and then made a split second decision to murder, a theory which he first proposes on appeal—was the more "plausible scenario." *See* AOB131. However, a reviewing court must take the evidence and the reasonable inferences to be drawn therefrom in the light most favorable to the government. Applying this proper standard of review means that only inferences that are "so insupportable as to fall below the threshold of bare rationality" may be disturbed. *Coleman v. Johnson*, 132 S. Ct. 2060, 2065 (2012) (per curiam). Moreover, the Court may "set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury. *Cavazos*, 132 S. Ct. at 4. Here, Aquart's proposed alternative readings of the evidence are entirely insufficient to throw the jury's decision into question. Rather, viewing the evidence and the reasonable inferences to be drawn therefrom in the light most favorable to the government makes clear that the jury made a reasonable and well-supported finding that Aquart engaged in substantial planning and premeditation to murder the victims.

194

### 3. Aquart failed to establish that upholding the verdict would constitute a manifest miscarriage of justice.

Even assuming arguendo that the district court erred in submitting this factor to the jury, Aquart is not entitled to relief because he cannot establish that any error resulted in a manifest miscarriage of justice. *See Williams*, 784 F.3d at 802.

The evidence of "substantial planning and premeditation" was also relevant to the "heinous, cruel and depraved conduct" factor. For example, the testimony regarding the baseball bats and duct tape that Aquart used to inflict torture and serious physical abuse, and the drill that Aquart used to ensure the victims would not be easily discovered, were relevant to both factors. Accordingly, the "heinous, cruel and depraved conduct" factor would have permitted the jury to give aggravating weight to the same information that supported the allegedly failed factor. *See Brown v. Sanders*, 546 U.S. 212, 224 (2006) (jury's consideration of invalid eligibility factors in the weighing process did not produce constitutional error because all of the facts and circumstances admissible to establish the invalid factors were also properly adduced as aggravating facts bearing upon a valid aggravating factor).

195

Moreover, even without the "substantial planning and premeditation" evidence, the jury would have imposed a sentence of death. The jury found two other statutory aggravating factors beyond a reasonable doubt that did not relate to planning or premeditation, including that Aquart: (1) committed the homicide offense in an especially heinous, cruel, or depraved manner in that it involved torture or serious physical abuse, and (2) intentionally killed or attempted to kill more than one person in a single criminal episode.[40] The jury also found two non-statutory aggravating factors beyond a reasonable doubt, neither of which related to the planning of the murders, including that Aquart: (1) engaged in a continuing pattern of acts of violence that posed a serious threat to the lives and safety of persons other than the victims, and (2) caused loss, injury and harm to the victims' families. The facts supporting these four factors, when weighed against the mitigating factors, overwhelmingly support the jury's verdict. *See Webster*, 162 F.3d

---

[40] The government concedes that if this Court were to find the evidence insufficient to establish that Aquart intended to murder the victims prior to entering their apartment then two additional aggravators would fail, namely, that Aquart procured the commission of the homicide offense by payment, or promise of payment, of anything of pecuniary value and that he committed the homicide offense as consideration for the receipt, or in the expectation of receipt, of anything of pecuniary value.

196

at 326 (after removing the substantial planning and premeditation factor, "the facts supporting the 'especially heinous, cruel or depraved' factor alone, when weighed against the extant mitigating factors, justify a finding that the jury still would have imposed a death sentence. The addition of the other three factors merely buttresses the conclusion"); *see also id.* ("The import of substantial planning and premeditation to commit the offense of kidnaping pales in comparison to the brutal nature of [the defendant's] actions and the suffering [the victim] must have felt as a result, so we do not think the jury would have placed significant weight on the invalid factor relative to the others."); *cf. Bernard,* 299 F.3d at 485 ("We are confident that the jury would have imposed the same sentences [based upon the heinous, cruel or depraved and substantial planning and premeditation aggravating factors] even if the pecuniary gain factor had not been submitted for their consideration.").

197

## VII. The evidence was sufficient to prove that Aquart intentionally killed or attempted to kill multiple victims in a single criminal episode and the district court did not err by submitting this aggravating fact to the jury.

Aquart argues that the evidence was insufficient to prove that he personally murdered both Tina and Basil. AOB139-47. In particular, he asserts that the evidence establishing that he killed Basil was "pure speculation." AOB139. For this reason, he claims that it was error for the district court to submit this aggravator to the jury. Aquart requests reversal of his death sentences.

### A. Relevant facts

The indictment alleged as one of the five statutory aggravating factors that Aquart intentionally killed or attempted to kill more than one person in a single criminal episode, pursuant to 18 U.S.C. § 3592(c)(16). DA72; GA1160. With respect to this factor, as relevant here, the district court instructed the jury that it had to find that Aquart "intentionally killed or attempted to kill more than one person." Further, the jury was told that it could presume that Aquart intended "the ordinary, natural and probable consequences of his knowing and voluntary acts." GA1441.

198

Facts stemming from the evidence adduced at trial, which are pertinent to consideration of this issue, are set forth in the Statement of the Case above. Additional facts are set forth below.

## B. Governing law and standard of review

To establish the multiple killings aggravator, the government must prove that "[t]he defendant intentionally killed or attempted to kill more than one person in a single criminal episode." 18 U.S.C. § 3592(c)(16). The government does not have to prove that the defendant *personally* killed more than one person. Rather, the government need only prove that the defendant *intended* for more than one person to die, or attempted to kill more than one person. *See United States v. Bin Laden*, 126 F. Supp. 2d 290, 300 (S.D.N.Y. 2001) (noting that the multiple killings/attempted killings aggravator "focuses on Defendants' particular desire that there be multiple victims, rather than just one"); *United States v. Ortiz*, 315 F.3d 873, 901 (8th Cir. 2002) ("A defendant does not have to kill multiple people personally to meet the aggravator; he need only have had an intention to attempt multiple killings. This is true whether he acted alone or whether . . . he acted with others."); *cf. Webster,* 162 F.3d at 322 (finding with respect to aggravating factors that "there is no reason why the jury cannot take a broader look at the crime in assessing the aggravating factors; it need not

199

limit itself exclusively to the defendant's conduct or intent. Indeed, an aggravating factor properly may focus on the defendant, on the circumstances of the crime itself, or on the characteristics of the victim."); *United States v. Savage*, No. 07-550-03, 07-550-04, 07-550-05, 2013 WL 1934531, *20 (E.D. Pa. May 10, 2013) (finding no authority that "precludes the vicarious imposition of aggravating factors on a defendant").

The standard for sufficiency claims is set forth in Parts I.B. and VI.B. Here, because Aquart did not challenge the sufficiency of the evidence on this aggravating factor below, his claim is reviewed for a manifest miscarriage of justice. *See* Part VI.B.2.

## C. Discussion

Aquart argues that the evidence failed to establish the multiple killings aggravating factor. AOB140. Aquart agrees that the evidence sufficiently identified him as Tina's killer, but disputes that it proved that he killed Basil. As a result, Aquart claims, the government failed to establish that he "personally murdered more than one victim." AOB139.

Once again, it is notable that Aquart's defense counsel did not contest the sufficiency of the proof with respect to this aggravating factor either to the jury, *see* GA1456-57, or in his motions for a new penalty phase, DA41 (Doc. 952); GA502-14 (Doc. 1102). That is because, as shown

200

below, the evidence was plainly sufficient to show that Aquart intentionally killed or attempted to kill multiple victims.

## 1. A rational jury could easily conclude that Aquart intentionally killed or attempted to kill multiple victims in a single criminal episode.

Viewing the evidence in the light most favorable to the government, there was a sufficient basis for a rational jury to conclude beyond a reasonable doubt that Aquart intentionally killed or attempted to kill more than one person in a single criminal episode.

The evidence adduced at trial established that on August 24, 2005, Aquart gathered his conspirators, all of whom he had recruited, and went to the Charles Street building intending to commit murder. After they entered the apartment, Aquart, Azikiwe, and Johnson then went back to the victims' bedrooms and bound the victims' heads, faces, wrists, and ankles with duct tape. GA580-81. After rendering the victims helpless, Aquart and Azikiwe began to bludgeon Tina and James with baseball bats. *See* GA581. When Taylor saw what Aquart and Azikiwe were doing, he turned to leave the apartment. Aquart instructed Azikiwe to go with Taylor, leaving only Aquart and Johnson in the victims' apartment. GA582; GA613.

201

The evidence also established that Johnson left the victims' apartment before Aquart. Specifically, prior to Johnson's arrest—when he did not have an incentive to lie—Johnson admitted to his sister Lashika that "he helped tie the people up and rough them up a little bit," but insisted that "when he left those people were still alive." GA727; GA743. Johnson also told Lashika that he "left [Aquart] by hisself (sic) in the apartment." GA728. Therefore, there was ample evidence from which the jury could conclude that Aquart was left alone in the apartment with a baseball bat, a drill and at least one defenseless victim.

Furthermore, Taylor's testimony belies Aquart's claim that Basil "may have already been dead" when Aquart murdered Tina. *See* AOB140. Taylor's testimony established that after Aquart told the victims to get on the ground, both Aquart and Azikiwe went into Tina's and James's bedroom. GA579. Once the duct taping began, Taylor walked down the hall towards the bedrooms several times. GA580-81. Each time he saw Aquart and Azikiwe binding Tina and James with duct tape and saw Johnson standing at the door to Basil's room. GA580-81. Taylor also saw that Basil was still "laying on the ground" in his bedroom. GA580-81. When the sound of duct taping stopped, the first thing that Taylor

202

heard was the sound of Tina screaming.[41] GA581. At that point, Taylor walked to the bedroom door and saw Aquart bludgeoning Tina and Azikiwe bludgeoning James. GA581. Johnson was not hitting anyone, much less Basil. GA581. Therefore, contrary to Aquart's claim, there was ample evidence from which the jury could conclude that Tina and James were murdered first, and that Aquart murdered Basil after his co-conspirators left the apartment.

Further supporting this conclusion was the fact that Basil's blood was found on the inside of the apartment door. Specifically, the evidence showed that before Aquart left the victims' apartment, he climbed up on the couch to drill the front door shut, effectively entombing the victims in their home. GA77. As he did this, he transferred Basil's blood[42] from his (Aquart's) bloody clothing to the inside of the apartment door. GA74-76; GA1789-90 (Gov't Exs. 164-165). Aquart then fled through Tina's bedroom win-

---

[41] If Basil was the first victim killed, presumably Taylor would have heard his screams when the duct taping stopped.

[42] Roy developed a DNA profile from the blood on the deadbolt on the inside of the apartment door and compared it to the "known" DNA profiles. Roy determined that the results were consistent with Basil being the source of the blood on the lock. The results eliminated Tina, James, Aquart, Azikiwe, Johnson, and Taylor as the source of the DNA. GA804.

203

dow. These facts, and the reasonable inferences to be drawn therefrom, when viewed in the light most favorable to the government, demonstrate that the evidence was sufficient to support the jury's finding that Aquart intentionally killed both Tina and Basil in a single criminal episode.

Even if the evidence was insufficient to establish that Aquart "struck the lethal blow" that killed Basil, the jury's finding that Aquart intentionally killed or attempted to kill multiple victims in a single criminal episode would still stand. As the district court's instructions explained, the multiple victims aggravator applied if Aquart intentionally killed more than one person, or if he "*attempted* to kill" more than one person. GA1441 (emphasis added).

Here, Aquart's actions readily established that, at a minimum, he attempted to kill Basil. Aquart recruited accomplices, procured the necessary tools and planned the details of the break-in. Aquart then led his accomplices to the victims' home, kicked in their apartment door, subdued the victims with a firearm, removed Tina's phone from her reach so she could not call for help, and then bound and gagged the victims. Based upon the discovery of Aquart's fingerprint on a piece of duct tape next to Basil's head, it would have been reasonable for the jury to conclude that Aquart took part in binding Basil. After the victims were bound, Aquart beat Tina with such ferocity that there can be no question

204

that he intended for her to die. Assuming for the sake of argument that Aquart did not personally beat Basil to death but merely "checked [Basil] before leaving," as Aquart hypothesizes, AOB144, that act would be very telling with respect to his intent. That is, why would he "check" a victim other than to make sure that he was dead. Clearly he did not check Basil with the intention of getting him help.

But even if Basil was alive when Aquart left, Aquart ensured that he would not remain that way for long. In fact, Aquart drilled the apartment door thereby delaying the victims' discovery and preventing them from receiving help. In short, Aquart's actions demonstrate that he not only intended to kill multiple victims, but that, at a minimum, he took a substantial step toward doing so. *See United States v. Celaj*, 649 F.3d 162, 171 (2d Cir. 2011) (approaching victim's home with accomplices, all of whom were armed with guns and police shields, and speaking to victim's housekeeper to determine if he was home found to be "far beyond" mere preparation and constituted a "substantial step" toward commission of a robbery). Given this evidence, a rational juror could have concluded that Aquart intentionally killed or attempted to kill multiple victims during a single criminal episode.

Aquart again asks this Court to ignore the well-established standard for review of sufficiency of the evidence claims, which mandates that

205

the evidence be viewed in the light most favorable to the government, and to instead draw every reasonable inference in the light most favorable to him. Aquart further asks this Court to substitute its judgment for that of the jury's and to conclude that his alternative explanation— that anyone of the remaining three co-conspirators could have killed Basil— was the more "plausible scenario." However, a reviewing court must take the evidence and the reasonable inferences to be drawn therefrom in the light most favorable to the government. As established above, this means that only inferences that are "so insupportable as to fall below the threshold of bare rationality" may be disturbed. *Coleman*, 132 S. Ct. at 2065.

Here, if the jury credited Taylor's testimony that he and Azikiwe left after Azikiwe and Aquart killed Tina and James; and further credited Lashika's testimony that when Johnson left the apartment all three victims were alive, then they reasonably concluded that Aquart killed Basil, as Aquart was the only perpetrator left in the apartment. That reasonable inference was well-supported by the forensic evidence recovered. The defendant must do more than hypothesize to throw the jury's decision into question. He must demonstrate that no rational trier of fact could have agreed with the jury. *Cavazos*, 132 S. Ct. at 4. But when the evidence presented at trial is viewed in the light most favorable to

206

the government it is clear that the jury made a reasonable and well-supported finding that Aquart intentionally killed or attempted to kill more than one person in a single criminal episode.

## 2. Aquart failed to show that upholding the verdict would constitute a manifest miscarriage of justice.

Aquart is not entitled to relief because he cannot establish that any error resulted in a manifest miscarriage of justice. Aquart was charged with multiple murders, and thus all of the evidence related to this aggravating factor was properly before the jury. And even without the multiple killings factor, the jury would have imposed a sentence of death. The jury found four other aggravating statutory factors beyond a reasonable doubt, including that Aquart: (1) committed the homicide offense in an especially heinous, cruel, or depraved manner in that it involved torture or serious physical abuse, (2) procured the commission of the homicide offense by payment, or promise of payment, of anything of pecuniary value; (3) committed the homicide offense as consideration for the receipt, or in the expectation of receipt, of anything of pecuniary value; and (4) committed the offense after substantial planning and premeditation to kill the victims. The jury also found two non-statutory aggravating factors beyond a reasonable doubt, including that Aquart: (1) engaged in a continu-

207

ing pattern of acts of violence that posed a serious threat to the lives and safety of persons other than the victims, and (2) caused loss, injury and harm to the victims' families. The facts supporting these six factors, when weighed against the mitigating factors, overwhelmingly support the jury's verdict. *See Webster*, 162 F.3d at 326.

208

## VIII. The Federal Death Penalty Act does not authorize courts to conduct an independent "proportionality review" of the aggravating and mitigating factors to determine the appropriateness of a capital sentence.

Aquart requests that this Court undertake, in the first instance, a "proportionality review" of his capital sentence. AOB179-97. This device, adopted by several state death penalty codes, requires appellate courts to "compare [the defendant's] sentence with the sentences imposed in similar capital cases and thereby to determine whether they were proportionate." *Pulley v. Harris*, 465 U.S. 37, 39-40 (1984). According to Aquart, the Eighth Amendment requires proportionality review, and such an inquiry would establish that his death sentence is disproportionate to other federal capital cases.

Federal law does not authorize this inquiry. Under the Federal Death Penalty Act ("FDPA"), federal appellate courts must review "the evidence submitted during the trial," "the information submitted during the sentencing hearing," "the procedures employed in the sentencing hearing," and "the special findings returned" by the jury on aggravating and mitigating factors. 18 U.S.C. § 3595(b). The statute does not authorize courts to compare the jury's decision to impose a capital sentence in the case before it with decisions by juries in other cases and jurisdic-

209

tions. Aquart concedes as much. *See* AOB180 ("[T]he FDPA does not provide for the court of appeals to review the relative weight of the aggravating and mitigating factors for a death sentence.").

Nor does the Eighth Amendment command such an inquiry. The Supreme Court said so in *Pulley*: "that some schemes providing proportionality review are constitutional does not mean that such review is indispensable. . . . Examination of our [prior] cases makes clear that they do not establish proportionality review as a constitutional requirement." 465 U.S. at 44-45. The Court repeated this admonition several years later, noting that "proportionality review is not constitutionally required" "where the statutory procedures adequately channel the sentencer's discretion."[43] *McCleskey v. Kemp*, 481 U.S. 279, 306 (1987).

Recognizing this authoritative holding, the other courts of appeals have universally rejected claims that Congress's failure to authorize proportionality review renders the FDPA unconstitutional under the Eighth Amendment. *See United States v. Mitchell*, 502 F.3d 931, 980 (9th Cir. 2007); *United States v. Higgs*, 353 F.3d 281, 320-21 (4th Cir. 2003); *United States v. Allen*,

---

[43] For the reasons explained below, the FDPA adequately channels the jury's discretion during the penalty phase.

210

247 F.3d 741, 760 (8th Cir. 2001), *vacated on other grounds*, 536 U.S. 953 (2002); *United States v. Jones*, 132 F.3d 232, 240-41 (5th Cir. 1998). Unless and until the Supreme Court revisits *Pulley*, this Court must reach the same conclusion.

Aquart's citations, *see* AOB182, to cases such as *Atkins v. Virginia*, 536 U.S. 304 (2002), *Roper v. Simmons*, 534 U.S. 551 (2005), and *Kennedy v. Louisiana*, 554 U.S. 407 (2008) are beside the point. Those decisions recognized categorical rules prohibiting capital punishment based on the nature of the offense (*e.g.*, a non-homicide crime) or the circumstances of the offender (*e.g.*, intellectually disabled or youth). Aquart asks for something different—an inquiry into whether the death penalty would constitute a disproportionate punishment in *his particular case*. The FDPA does not authorize such review, and the Eighth Amendment does not mandate it.

211

## IX.    The FDPA is constitutional.

Aquart contends that the FDPA violates the Fifth Amendment's guarantee of due process. AOB192-218.

### A. Relevant facts

Aquart filed a motion to dismiss the government's notice of intent to seek the death penalty, arguing, among other claims, that the FDPA operates in an unconstitutionally arbitrary and capricious manner. The district court rejected the claim. DA19-20 (Doc. 533).

### B. Governing law and standard of review

The FDPA restricts the government's discretion to seek the death penalty. The statute enumerates a list of eligible offenses, all involving the death of a victim. 18 U.S.C § 3591. Even where the grand jury charges an enumerated offense, the decision to seek the death penalty rests with Attorney General, who undertakes extensive consultation with the United States Attorney and the Department of Justice Capital Case Review Committee regarding the strength of the government's evidence, the aggravating factors of the offense, and the defendant's mitigating circumstances. *See* U.S. Attorney's Manual § 9-10.000.

212

The FDPA also restricts the jury's discretion to impose the death penalty on a defendant convicted of a death-eligible offense. Before a jury may recommend a capital sentence for an offense involving homicide, it must find the existence of at least one of the "intent" factors enumerated in 18 U.S.C. § 3591(a)(2) to ensure that the defendant acted with a degree of culpability sufficient to justify that sentence. The jury must also find the existence of at least one of the statutory aggravating factors listed in 18 U.S.C. § 3592(c). *See* 18 U.S.C. § 3593(e)(2). If the jury finds both requirements satisfied, it may consider any non-statutory aggravating factors for which notice has been given, and each juror must weigh all aggravating factors found by the jury against the mitigating factors that any individual juror finds to exist. 18 U.S.C. §§ 3593(c), (d). The jury may recommend a capital sentence if it unanimously concludes that all the aggravating factors sufficiently outweigh all the mitigating factors so as to justify a capital sentence or, in the absence of any mitigating factor, that the aggravating factors are sufficient to justify a capital sentence. 18 U.S.C. § 3593(e).

Every federal appellate court to address the matter has concluded that the FDPA's procedures comply with the Eighth Amendment. *See United States v. Lawrence*, 735 F.3d 385, 418 (6th Cir. 2013), *cert. denied*, 135 S. Ct. 753 (2014); *United States v. Lighty*, 616 F.3d 321,

213

368 n.44 (4th Cir. 2010); *Mitchell*, 502 F.3d at 982; *United States v. Sampson*, 486 F.3d 13, 23-25 (1st Cir. 2007); *Allen*, 247 F.3d at 760-61; *Jones*, 132 F.3d at 248.

Aquart's challenge to the FDPA's constitutionality presents a question of law, which is subject to *de novo* review. *United States v. Bryant*, 711 F.3d 364, 368 (2d Cir.) (per curiam), *cert. denied*, 134 S. Ct. 804 (2013).

## C. Discussion

Aquart concedes that the FDPA's procedures, which require the jury to find at least one intent factor and one statutory aggravating factor before imposing a death sentence, satisfy "the constitutional minimum the Supreme Court has set for capital punishment." AOB205; *see also Lowenfield v. Phelps*, 484 U.S. 231, 244 (1988) ("[A] capital sentencing scheme must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder.") (internal quotation marks and citation omitted). He instead alleges that the statute operates in an arbitrary and capricious manner, citing (1) the infrequency of the death penalty's imposition; (2) the lack of any "meaningful basis" to distinguish between cases in which the death penalty is imposed and cases in which it is not; and (3) the

214

disproportionate imposition of the death penalty on minority defendants.

The government will address each argument in turn.

### 1. Infrequency of the death penalty's imposition

To make his claim about the infrequency of the death penalty's imposition, Aquart invokes the Supreme Court's decision in *Furman v. Georgia*, 408 U.S. 238 (1972), invalidating Georgia's capital punishment system. In that case, the Court recognized that only 15-to-20 percent of convicted murders received capital sentences in jurisdictions that authorized the death penalty, *id*. at 386 n.11 (Burger, C.J., dissenting), and Justice Stewart's concurring opinion asserted that death sentences imposed under these schemes are "cruel and unusual in the same way that being struck by lightning is cruel and unusual," *id*. at 309. *See also id*. at 313 (White, J., concurring) (observing that "the death penalty is exacted with great infrequency"). Aquart cites statistics purporting to establish that, since 1988, only two percent of the more than 3,900 federal defendants who have committed capital-eligible offenses have been sentenced to death. AOB206-208. Accordingly, he asserts that the FDPA, like the scheme at issue in *Furman*, is unconstitutional.

215

Subsequent decisions make clear, however, that the *Furman* decision was not based on the infrequency with which the death penalty was imposed, but rather on the fact that under the capital sentencing scheme at issue, juries exercised unguided—and potentially arbitrary—discretion in deciding whether or not to sentence defendants to death: "there was no basis for determining in any particular case whether the penalty was proportionate to the crime." *McCleskey*, 481 U.S. at 301. *Furman* did not produce a majority opinion, but the Supreme Court subsequently clarified its holding as follows: "where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Gregg v. Georgia*, 428 U.S. 153, 189 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.); *see also Zant v. Stephens*, 462 U.S. 862, 874 (1983) (explaining that language from *Gregg* is "[a] fair statement of the consensus expressed by the Court in *Furman*").

Together, *Furman* and *Gregg* require that a death penalty statute "(1) rationally narrow the class of death-eligible defendants[] and (2) permit a jury to render a reasoned, individualized sentencing determination based on a death-eligible defendant's record, personal characteris-

216

tics, and the circumstances of his crime." *Kansas v. Marsh*, 548 U.S. 163, 174 (2006). *Gregg* illustrates these requirements. There, the Court reviewed the capital sentencing scheme adopted by Georgia in response to *Furman*. The lead opinion noted several components of Georgia's new system that ensured its constitutionality: The scheme bifurcated guilt and sentencing proceedings so that the jury could receive all relevant information for sentencing without the risk that evidence irrelevant to the defendant's guilt would influence the jury's consideration of that issue; it narrowed the class of homicide offenses subject to the death penalty to cases in which the jury found at least one statutory aggravating circumstance beyond a reasonable doubt; it allowed the defendant to introduce any relevant mitigating evidence that might influence the jury not to impose a death sentence; and it required a particularized inquiry into the circumstances of the offense together with the character and propensities of the offender. Thus, the Georgia scheme allowed "some jury discretion," but that discretion was "controlled by clear and objective standards so as to produce nondiscriminatory application." 428 U.S. at 197-98 (internal quotation omitted). The system "balance[d] the desirability of a high degree of uniformity against the necessity for the exercise of discretion." *McCleskey*, 481 U.S. at 313 n.35.

217

The FDPA similarly limits the potential for arbitrariness by guiding the jury's discretion: the statute bifurcates the guilt and penalty deliberations into two phases and, in the latter, requires the jury to consider the circumstances of the crime and the background, record, and personal characteristics of the defendant in deciding whether to impose capital punishment. 18 U.S.C. §§ 3591, *et seq. See also Jones v. United States*, 527 U.S. 373, 376-79 (1999) (summarizing FDPA procedures). The FDPA thus satisfies the dictates of *Furman* and *Gregg*, and the mere fact that "the death penalty is infrequently sought or imposed" in the federal system "does not render the FDPA unconstitutional." *Mitchell*, 502 F.3d at 983; *see also Sampson*, 486 F.3d at 24 (same).

## 2. Lack of "meaningful basis" to predict jury verdicts

Aquart separately submits that the FDPA's application is arbitrary because he cannot discern any "meaningful basis" or "consistent, predictable measure for determining which defendants will be spared and which condemned." AOB209-10. This argument is foreclosed by *McCleskey*, in which the Supreme Court stated that "[t]he Constitution is not offended by inconsistency in results based on the objective circumstances of the crime. Numerous legitimate factors may influence . . . a defendant's ultimate sentence." 481 U.S. at 307 n.28. In addition, be-

218

cause the Court has mandated that a sentencing jury "be permitted to consider any relevant mitigating factor" in an individual case, any effort to distill a predictable measure of results across capital proceedings is a flawed exercise; "a consistency produced by ignoring individual differences is a false consistency." *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982); *accord Sampson*, 486 F.3d at 24-25.

In any event, the "examples" that Aquart submits are wholly inadequate to prove that the death penalty has been imposed in an arbitrary manner. AOB210-15. His one-sentence summaries of other capital cases lack details and fail to account for the objective circumstances of the underlying crimes, the aggravating and mitigating factors present, and the strength of the parties' evidence on each factor. The First Circuit, when presented with the same claim and case descriptions, criticized the defendant's position for "ignor[ing] individual differences across offenders and offenses." *Sampson*, 486 F.3d at 25. This Court should hold the same. On this record, "there is no principled basis for finding that similar cases are treated differently." *Id.*

### 3. Race-related considerations

Finally, Aquart speculates that his Jamaican race "may" best explain the capital sentence in this case. AOB216. To bolster that charge, Aquart states that 11 of the 16 federal defend-

219

ants sentenced to death over the past six years have been minorities. In addition, Aquart cites a two-decades-old congressional study indicating that, under the previous federal capital statute, the federal government prosecuted racial minorities "far beyond their proportion." AOB217.

This argument does nothing to advance Aquart's constitutional claim. Aquart "must prove that the decisionmakers in *his* case acted with discriminatory purpose," and he has presented no specific evidence of purposeful discrimination by either the U.S. Attorney's Office or the Attorney General against him or the other minority defendants he references. *McCleskey*, 481 U.S. at 292. Aquart's "[b]are statistical discrepancies are insufficient to prove a Fifth Amendment violation with respect to implementation of a statute." *Sampson*, 486 F.3d at 26; *accord Lawrence*, 735 F.3d at 439; *United States v. Rodriguez*, 581 F.3d 775, 815 (8th Cir. 2009); *Mitchell*, 502 F.3d at 982.

220

## X. Capital punishment does not violate the Eighth Amendment.

Aquart alternatively seeks reversal of his capital sentence, alleging that it violates the Eighth Amendment's prohibition on cruel and unusual punishment. AOB219-27. Aquart raises this claim for the first time on appeal; therefore, the same is reviewed for plain error.

"[T]he Eighth Amendment's prohibition of cruel and unusual punishments draws its meaning from the evolving standards of decency that mark the progress of a maturing society." *Hudson v. McMillian*, 503 U.S. 1, 8 (1992) (internal quotations omitted). In *Gregg*, the Supreme Court rejected the argument that the death penalty violates "standards of decency," finding that "a large proportion of American society continues to regard it as an appropriate and necessary criminal sanction." 428 U.S. at 179. Thus, the Court concluded that capital punishment does not violate the Eighth Amendment. *Id*. at 177-81 (joint opinion by Stewart, Powell, and Stevens, JJ.) (recognizing and rejecting the argument that "evolving standards of decency" barred the death penalty under the Eighth Amendment's "cruel and unusual" clause); *id*. at 187 (holding "that the death penalty is not a form of punishment that may never be imposed, regardless of the circumstances of the offense, regardless of the character of the offender, and regardless of

221

the procedure followed in reaching the decision to impose it").

While Aquart attempts to marshal evidence of changing attitudes as a basis for declaring the death penalty unconstitutional, the Supreme Court has not altered its view or its rulings. Indeed, as recently as June 2015, the Supreme Court stated that "we have time and again reaffirmed that capital punishment is not *per se* unconstitutional." *Glossip v. Gross*, No. 14-7955, 2015 WL 2473454, *16 (U.S. June 29, 2015); *see also Baze v. Rees*, 553 U.S. 35, 47 (2008) ("We begin with the principle, settled by *Gregg*, that capital punishment is constitutional."). Likewise, the Court's most recent opinion on evidence of evolving social standards relating to the imposition of capital punishment for a class of crimes reaffirmed the death penalty's constitutionality as a general matter: "Though the death penalty is not invariably unconstitutional, *see Gregg* . . ., the Court insists upon confining the instances in which the punishment can be imposed." *Kennedy v. Louisiana*, 554 U.S. 407, 420 (2008).

In 2002, this Court rejected a capital defendant's claim that the death penalty offends the Eighth Amendment, holding it "foreclosed by the Supreme Court's holding in *Gregg*." *United States v. Quinones*, 313 F.3d 49, 62 n.10 (2d Cir. 2002). "[I]f the well-settled law on this issue is to change," the Court remarked, "that is a change that only the Supreme Court or Congress is au-

222

thorized to make." *Id*. at 69. *See also Sampson,* 486 F.3d at 20 ("[W]hen the Supreme Court has directly decided an issue, we must follow the case [that] directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions.") (internal quotations omitted).

Aquart questions the vitality of *Quinones*, alleging that "[s]weeping changes in the last twelve years . . . undermine that holding." AOB219. But in *Quinones*, this Court announced that only the Supreme Court (by revisiting *Gregg*) or Congress (by revising the FDPA) could abolish capital punishment for federal defendants like Aquart. This Court could not do so in the first instance. That decision controls the disposition of Aquart's claim here. *See United States v. Wilkerson*, 361 F.3d 717, 732 (2d Cir. 2004) ("[Panels of the Court] are bound by the decisions of prior panels until such time as they are overruled either by an en banc panel of our Court or by the Supreme Court.").

This Court's cautious approach is dictated by stare decisis and the Supreme Court's express reservation of issues concerning evolving standards of decency related to capital punishment. As the Court explained, "'the Constitution contemplates that in the end our own judgment will be brought to bear on the question of the acceptability of the death penalty under the Eighth Amendment.'" *Kennedy*, 554 U.S. at 434 (quoting *Coker v. Georgia*, 433 U.S. 484, 597 (1977) and

223

citing *Roper v. Simmons*, 543 U.S. 551, 563 (2005)). Accordingly, any reevaluation of "evolving standards of decency" is for the Supreme Court, not this Court.

Finally, even if this Court were to consider Aquart's argument, his argument lacks persuasive force. While it is true that several states have abolished the death penalty over the last 12 years, Aquart points to nothing that attributes this action to a change in society's standards of decency. Aquart argues that the recent abolition of capital punishment in a handful of states reflects a societal rejection of the death penalty. Conceivably, some of the states that abolished capital punishment were motivated solely by the economic arguments against it, not by a general moral rejection of capital punishment. Seen in that light, the percentage of society that harbors no moral opposition to the death penalty could be larger than Aquart would have this Court believe. In any event, he cites insufficient evidence to support his argument.

Because the Supreme Court has continuously upheld the constitutionality of the death penalty under its own Eighth Amendment jurisprudence, this Court should reject Aquart's arguments to the contrary.

224

## Conclusion

For the foregoing reasons, the judgment of the district court should be affirmed.

Dated: July 15, 2015

Respectfully submitted,

DEIRDRE M. DALY
UNITED STATES ATTORNEY
DISTRICT OF CONNECTICUT

TRACY LEE DAYTON
ASSISTANT U.S. ATTORNEY

JACABED RODRIGUEZ-COSS
ASSISTANT U.S. ATTORNEY

DAVID M. LIEBERMAN
ATTORNEY
CRIMINAL DIVISION
APPELLATE SECTION

Sandra S. Glover
Assistant United States Attorney (of counsel)

225

## Federal Rule of Appellate Procedure
## 32(a)(7)(C) Certification

This is to certify that on July 2, 2015 the Court granted the government permission to file a brief of no more than 55,793 words. This brief contains fewer than the requested number of words, in that the brief is calculated by the word processing program to contain approximately 46,856 words, exclusive of the Table of Contents, Table of Authorities, Addendum, and this Certification.

TRACY LEE DAYTON
ASSISTANT U.S. ATTORNEY

226

**Addendum**

**Eighth Amendment to the United States Constitution**

Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.

**18 U.S.C. § 1959. Violent crimes in aid of racketeering activity**

**(a)** Whoever, as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity, or for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity, murders, kidnaps, maims, assaults with a dangerous weapon, commits assault resulting in serious bodily injury upon, or threatens to commit a crime of violence against any individual in violation of the laws of any State or the United States, or attempts or conspires so to do, shall be punished—

　**(1)** for murder, by death or life imprisonment, or a fine under this title, or both; and for kidnapping, by imprisonment for any term of years or for life, or a fine under this title, or both;

Add. 1

**(2)** for maiming, by imprisonment for not more than thirty years or a fine under this title, or both;

**(3)** for assault with a dangerous weapon or assault resulting in serious bodily injury, by imprisonment for not more than twenty years or a fine under this title, or both;

**(4)** for threatening to commit a crime of violence, by imprisonment for not more than five years or a fine under this title, or both;

**(5)** for attempting or conspiring to commit murder or kidnapping, by imprisonment for not more than ten years or a fine under this title, or both; and

**(6)** for attempting or conspiring to commit a crime involving maiming, assault with a dangerous weapon, or assault resulting in serious bodily injury, by imprisonment for not more than three years or a fine of under this title, or both.

**(b)** As used in this section—

**(1)** "racketeering activity" has the meaning set forth in section 1961 of this title; and

**(2)** "enterprise" includes any partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity, which

Add. 2

is engaged in, or the activities of which affect, interstate or foreign commerce.

**18 U.S.C. § 3592. Mitigating and aggravating factors to be considered in determining whether a sentence of death is justified** (selected portions)

**(c) Aggravating factors for homicide.**—In determining whether a sentence of death is justified for an offense described in section 3591(a)(2), the jury, or if there is no jury, the court, shall consider each of the following aggravating factors for which notice has been given and determine which, if any, exist:

\* \* \*

**(9) Substantial planning and premeditation.—The** defendant committed the offense after substantial planning and premeditation to cause the death of a person or commit an act of terrorism.

\* \* \*

**(16) Multiple killings or attempted killings.—The** defendant intentionally killed or attempted to kill more than one person in a single criminal episode.

Add. 3

**18 U.S.C. § 3595. Review of a death sentence**
(selected portions)

**(c) Decision and disposition.—**

**(1)** The court of appeals shall address all substantive and procedural issues raised on the appeal of a sentence of death, and shall consider whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor and whether the evidence supports the special finding of the existence of an aggravating factor required to be considered under section 3592.

**(2)** Whenever the court of appeals finds that--

  **(A)** the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor;

  **(B)** the admissible evidence and information adduced does not support the special finding of the existence of the required aggravating factor; or

  **(C)** the proceedings involved any other legal error requiring reversal of the sentence that was properly preserved for appeal under the rules of criminal procedure,

Add. 4

the court shall remand the case for reconsideration under section 3593 or imposition of a sentence other than death. The court of appeals shall not reverse or vacate a sentence of death on account of any error which can be harmless, including any erroneous special finding of an aggravating factor, where the Government establishes beyond a reasonable doubt that the error was harmless.

## Federal Rule of Evidence 806. Attacking and Supporting the Declarant's Credibility

When a hearsay statement—or a statement described in Rule 801(d)(2)(C), (D), or (E)—has been admitted in evidence, the declarant's credibility may be attacked, and then supported, by any evidence that would be admissible for those purposes if the declarant had testified as a witness. The court may admit evidence of the declarant's inconsistent statement or conduct, regardless of when it occurred or whether the declarant had an opportunity to explain or deny it. If the party against whom the statement was admitted calls the declarant as a witness, the party may examine the declarant on the statement as if on cross-examination.

Add. 5