# 12-5086

*To Be Argued By:*
Tracy Lee Dayton

## United States Court of Appeals

### FOR THE SECOND CIRCUIT

### Docket No. 12-5086

————

UNITED STATES OF AMERICA,

*Appellee,*

-vs-

AZIBO AQUART, aka D, aka Dreddy, aka Jumbo,
aka Azibo Smith, aka Azibo Siwatu Jahi Smith,

*Defendant-Appellant,*

(For continuation of caption, see inside cover)

————

ON APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF CONNECTICUT

### GOVERNMENT APPENDIX-VOLUME I (GA1 – GA300)

DEIRDRE M. DALY
*United States Attorney*
*District of Connecticut*

TRACY LEE DAYTON
JACABED RODRIGUEZ-COSS
SANDRA S. GLOVER
*Assistant United States Attorneys*

LESLIE R. CALWELL
*Assistant Attorney General*

SUNG-HEE SUH
*Deputy Assistant*
*Attorney General*

DAVID M. LIEBERMAN
*Attorney*
*Criminal Division*
*Appellate Section*

AZIKIWE AQUART, aka Zee, Nathaniel Grant, aka
Correctional Officer Stone, EFRAIN JOHNSON,

*Defendants.*

# TABLE OF CONTENTS

Trial Transcript – Volume I dated April 20, 2011 ......................................GA1

Trial Transcript – Volume II dated April 21, 2011....................................GA65

Trial Transcript – Volume III dated April 25, 2011 ................................GA115

Trial Transcript – Volume IV dated April 26, 2011.................................GA171

Trial Transcript – Volume V dated April 27, 2011 ..................................GA238

Trial Transcript – Volume VI dated April 28, 2011.................................GA298

Trial Transcript – Volume VII dated April 29, 2011 ...............................GA355

Trial Transcript – Volume VIII dated May 2, 2011 .................................GA423

Trial Transcript – Volume IX dated May 3, 2011....................................GA494

Trial Transcript – Volume X dated May 4, 2011 .....................................GA547

Trial Transcript – Volume XI dated May 5, 2011....................................GA605

Trial Transcript – Volume XII dated May 9, 2011 ..................................GA655

Trial Transcript – Volume XIII dated May 10, 2011 ...............................GA707

Trial Transcript – Volume XIV dated May 11, 2011 ...............................GA767

Trial Transcript – Volume XV dated May 12, 2011..................................GA819

Trial Transcript – Volume XVI dated May 13, 2011 ...............................GA850

Trial Transcript – Volume XVII dated May 16, 2011...............................GA893

Trial Transcript – Volume XVIII dated May 17, 2011 ............................GA952

Trial Transcript – Volume XIX dated May 18, 2011 ..............................GA1008

## TABLE OF CONTENTS (cont'd)

Trial Transcript – Volume XX dated May 20, 2011 ................................ GA1036

Trial Transcript – Volume XXI dated May 23, 2011 ............................. GA1089

Transcript of Guilt Phase Charge Conference – Volume I
    dated May 13, 2011 ............................................................................ GA1097

Transcript of Guilt Phase Charge Conference – Volume II
    dated May 18, 2011 ............................................................................ GA1124

Guilt Phase Verdict Form dated May 23, 2011 ...................................... GA1137

Trial Transcript – Volume XXII dated May 31, 2011 ........................... GA1140

Trial Transcript – Volume XXIV dated June 1, 2011 ........................... GA1201

Trial Transcript – Volume XXV dated June 2, 2011 ............................ GA1237

Trial Transcript – Volume XXVI dated June 3, 2011 ........................... GA1285

Trial Transcript – Volume XXVII dated June 6, 2011 .......................... GA1342

Trial Transcript – Volume XXVIII dated June 7, 2011 ......................... GA1404

Trial Transcript – Volume XXIX dated June 13, 2011 ......................... GA1435

Trial Transcript – Volume XXX dated June 14, 2011 ........................... GA1472

Trial Transcript – Volume XXXI dated June 15, 2011 .......................... GA1479

Transcript of Penalty Phase Charge Conference – Volume I
    dated June 6, 2011 .............................................................................. GA1483

Transcript of Penalty Phase Charge Conference – Volume II
    dated June 7, 2011 .............................................................................. GA1502

Special Verdict Form (Penalty Phase) dated June 15, 2011 .................. GA1523

Motion for Mistrial dated May 23, 2011 ................................................ GA1537

## <u>TABLE OF CONTENTS</u> (cont'd)

Ruling on Defendant's Motion for a Mistrial dated February 21, 2012  GA1542

Transcript of John Taylor's Guilty Plea dated October 18, 2010 ........... GA1555

Transcript of John Taylor' Sealed Cooperation Agreement Plea
    Dated October 18, 2010 ...................................................................... GA1565

Transcript of John Taylor's Sentencing Hearing dated April 16, 2012 . GA1569

Trial Transcript of Efrain Johnson – Volume VII dated February 16, 2012
    [Testimony of John Taylor] ............................................................... GA1580

Trial Transcript of Efrain Johnson – Volume VIII dated February 17, 2012
    [Testimony of John Taylor] ............................................................... GA1643

Trial Transcript of Efrain Johnson – Volume IX dated February 21, 2012
    [Testimony of Lashika Johnson] ....................................................... GA1712

Failed Change-of-Plea Hearing Transcript of Efrain Johnson
    dated March 8, 2011 .......................................................................... GA1731

Transcript of Azikiwe Aquart Change of Plea dated August 26, 2011 .. GA1742

Government Exhibit 100A ........................................................................ GA1751

Government Exhibit 102A ........................................................................ GA1754

Government Exhibit 109 .......................................................................... GA1755

Government Exhibit 110 .......................................................................... GA1756

Government Exhibit 111 .......................................................................... GA1757

Government Exhibit 112 .......................................................................... GA1758

Government Exhibit 114 .......................................................................... GA1759

Government Exhibit 116G ....................................................................... GA1760

## TABLE OF CONTENTS (cont'd)

Government Exhibit 116H ........................................................GA1761

Government Exhibit 116I.........................................................GA1762

Government Exhibit 116J ........................................................GA1763

Government Exhibit 117H ........................................................GA1764

Government Exhibit 117J .........................................................GA1765

Government Exhibit 120-1 ........................................................GA1766

Government Exhibit 120-2 ........................................................GA1767

Government Exhibit 120-3 ........................................................GA1768

Government Exhibit 120-5 ........................................................GA1769

Government Exhibit 120-6 ........................................................GA1770

Government Exhibit 121-4 ........................................................GA1771

Government Exhibit 121-6 ........................................................GA1772

Government Exhibit 121-8 ........................................................GA1773

Government Exhibit 121-10 .......................................................GA1774

Government Exhibit 122-3 ........................................................GA1775

Government Exhibit 122-5 ........................................................GA1776

Government Exhibit 122-7 ........................................................GA1777

Government Exhibit 123-1 ........................................................GA1778

Government Exhibit 124 ..........................................................GA1779

Government Exhibit 127 ..........................................................GA1780

## TABLE OF CONTENTS (cont'd)

Government Exhibit 128A.................................................................GA1781

Government Exhibit 129A.................................................................GA1782

Government Exhibit 129B.................................................................GA1783

Government Exhibit 130 .................................................................GA1784

Government Exhibit 136 .................................................................GA1785

Government Exhibit 137 .................................................................GA1786

Government Exhibit 139 .................................................................GA1787

Government Exhibit 140 .................................................................GA1788

Government Exhibit 164 .................................................................GA1789

Government Exhibit 165 .................................................................GA1790

Government Exhibit 231A.................................................................GA1791

Government Exhibit 245 .................................................................GA1792

Government Exhibit 246 .................................................................GA1801

Government Exhibit 247 .................................................................GA1807

Government Exhibit 247A.................................................................GA1817

Government Exhibit 249 .................................................................GA1822

Government Exhibit 263 .................................................................GA1828

Government Exhibit 264 .................................................................GA1837

Government Exhibit 273 .................................................................GA1847

Government Exhibit 274 .................................................................GA1850

## TABLE OF CONTENTS (cont'd)

Government Exhibit 275 ........................................................................GA1852

Government Exhibit 276 ........................................................................GA1860

Government Exhibit 277 ........................................................................GA1864

Government Exhibit 278 ........................................................................GA1866

Government Exhibit 279 ........................................................................GA1868

Government Exhibit 300 ........................................................................GA1870

Government Exhibit 300A.......................................................................GA1871

Government Exhibit 301 ........................................................................GA1872

Government Exhibit 302 ........................................................................GA1873

Government Exhibit 305 ........................................................................GA1874

Government Exhibit 306 ........................................................................GA1888

Government Exhibit 307 ........................................................................GA1889

Government Exhibit 308 ........................................................................GA1890

Government Exhibit 314 ........................................................................GA1891

Government Exhibit 315 ........................................................................GA1906

Government Exhibit 316 ........................................................................GA1907

Government Exhibit 319 ........................................................................GA1908

Government Exhibit 322 ........................................................................GA1909

Government Exhibit 400 ........................................................................GA1924

## TABLE OF CONTENTS (cont'd)

Government Exhibit 403 ...................................................................GA1925

Government Exhibit 404 ...................................................................GA1926

Government Exhibit 414 ...................................................................GA1927

Government Exhibit 424 ...................................................................GA1928

Government Exhibit 433 ...................................................................GA1929

Government Exhibit 435 ...................................................................GA1930

Government Exhibit 447 ...................................................................GA1931

Government Exhibit 451 ...................................................................GA1932

Government Exhibit 464 ...................................................................GA1933

Government Exhibit 465 ...................................................................GA1934

Government Exhibit 467 ...................................................................GA1935

Government Exhibit 506 ...................................................................GA1936

Government Exhibit 514 ...................................................................GA1939

Government Exhibit 3 .......................................................................GA1943

Government Exhibit 4 .......................................................................GA1944

Government Exhibit 9 .......................................................................GA1945

Government Exhibit 12A...................................................................GA1952

1

```
 1              UNITED STATES DISTRICT COURT
 2               DISTRICT OF CONNECTICUT
 3   * * * * * * * * * * *     *
                               *
 4   UNITED STATES OF AMERICA,  * Case No 6cr160(JBA)
 5              Plaintiff,       *
                               *
 6         vs.                   *
                               *
 7   AZIBO AQUART              * April 20, 2011
                               *
 8              Defendant.       *
                               *
 9   * * * * * * * * * * * *   *
10                 TRIAL TRANSCRIPT
11                   VOLUME I
12   BEFORE:  THE HONORABLE JANET BOND ARTERTON U.S.D.J.,
13                                        and jury
     Appearances:
14   FOR THE GOVERNMENT:  ALIA REYNOLDS, ESQ
                          TRACY DAYTON, ESQ.
15                        PETER MARKLE, ESQ.
                          JACABED RODRIGUEZ-COSS
16                        United States Attorney's Office
                          915 Lafayette Blvd
17                        Bridgeport, CT 06604
18   FOR THE DEFENDANT    MICHAEL SHEEHAN, ESQ
19   AZIBO AQUART:        Sheehan & Reeve
                          139 Orange Street
20                        New Haven CT 06510
21                        JUSTIN SMITH, ESQ.
                          383 Orange Street
22                        New Haven, CT 06511
23
24   Court Reporter:      Sharon Montini, RMR
25   Proceedings recorded by mechanical stenography,
     transcript produced by computer.
```

2

```
 1              THE COURT:  Please be seated.
 2              MR. SHEEHAN:  Good morning, your Honor.
 3              MS. DAYTON:  Good morning.
 4              MR. SHEEHAN:  Your Honor, Mr. Smith is
 5   up talking to Mr. Aquart.  We can -- I don't think
 6   we need Mr. Aquart for this.
 7              THE COURT:  No, we don't.  I had
 8   circulated the preliminary charge draft.  I have
 9   gotten no further input on that.  Is it
10   satisfactory?
11              MR. SHEEHAN:  Yes, your Honor, from the
12   defense perspective.
13              MS. DAYTON:  Yes.
14              THE COURT:  Then we will proceed with
15   that.  I also have the government's motion in limine
16   to exclude the results of Frank Hodges' polygraph.
17   I have no opposition to that.
18              MR. SHEEHAN:  Your Honor, I wonder if --
19   Mr. Hodges is not scheduled to testify today.
20              THE COURT:  Are you sure?
21              MR. SHEEHAN:  I sure hope so because --
22              MS. DAYTON:  Yes, at the earliest he
23   would be tomorrow.
24              THE COURT:  All right.  How far do you
25   think you'll get today on the witness list?
```

3

```
 1              MS. DAYTON:  We think probably through
 2   Joette Devan, your Honor.
 3              THE COURT:  All right.  And then there
 4   were some question about a model.
 5              MS. DAYTON:  It's over there.
 6              MR. SHEEHAN:  Yes, your Honor.  We have
 7   seen that model and we do not -- your Honor, we have
 8   reviewed the model.  The model actually, as I
 9   understand it, and I'm loathe to -- because I might
10   -- the top lifts off.
11              MS. DAYTON:  Does it comes off.
12              THE COURT:  So it's a two-level model.
13   And which floor is the crime scene?
14              MS. DAYTON:  The first floor.
15              THE COURT:  So, that's why you are going
16   to take the top off.
17              MS. DAYTON:  Yes, the top would be taken
18   off for that purpose.  And then the second floor is
19   where the drug apartment and the lookout apartment
20   were, which is why it's a two-level apartment.  And
21   then the underground garage is there as well.
22              MR. SHEEHAN:  In fact it's a three-level
23   apartment, but the third floor we don't have on
24   this.
25              THE COURT:  And through which witness
```

4

```
 1   will this be coming in?
 2              MS. REYNOLDS:  It will be identified and
 3   moved into evidence through Sandra Holliday who is
 4   from the FBI graphics unit that created the model
 5   and also some digital graphic exhibits.  But it
 6   won't be used through her, we're just going to move
 7   it in because they created it and then we're going
 8   to use it through the crime scene investigator,
 9   Joette Devan, which will be later in the day.
10              MS. DAYTON:  And we'll move this after
11   opening statements.  If we could -- or we'll move it
12   at some point.  We were going to maybe ask for a
13   very brief break between instructions and opening
14   statements just to move stuff around, but we can get
15   rid of that after opening statements, too.  We don't
16   have to take a break for that, we can just drag it
17   out of the way.
18              THE COURT:  Now, we had spoken about the
19   length of your opening statements.  Has that changed
20   in any way?
21              MS. DAYTON:  Mine is 15 minutes.
22              MR. SHEEHAN:  Ours will be less than
23   that, your Honor.
24              THE COURT:  All right.
25              MS. DAYTON:  You had said 20, we made it
```

5

```
1    shorter.
2              THE COURT:  So, you want a break after
3    instructions and before opening?
4              MS. DAYTON:  Yes, just maybe for five
5    minutes, three minutes, just to realign ourselves.
6              MR. SHEEHAN:  I think the request is
7    after instruction and opening, just --
8              MS. DAYTON:  Well, after instructions
9    before opening, and then after opening we can just
10   ask the agent to stand up and move that.  That's
11   going to take one second.  The jury doesn't have to
12   move for that.
13             THE COURT:  You need to make sure the
14   marshals know where you are moving it to.
15             MS. DAYTON:  We'll probably put it back
16   in our room back there.
17             THE COURT:  All right.  Whenever there
18   is equipment that's being moved around in the
19   courtroom, you need to let the marshals know because
20   they may have some security issue that we would not
21   be sensitive to.
22             MS. DAYTON:  Okay.
23             THE COURT:  All right.  Then let's go
24   back to polygraph.  He's not going to be testifying
25   'til tomorrow, but I have had no objection.  Is
```

6

```
1    there any objection to excluding the results of his
2    polygraph exam?
3              MR. SHEEHAN:  Your Honor, I would ask
4    that we be allowed to respond to that tomorrow
5    morning.  I don't know the answer to that.
6              THE COURT:  How about if there is to be
7    an opposition it gets filed tonight so that we can
8    know what it is that we are dealing with.  I would
9    like to start evidence at 9:30.  If we're going to
10   have argument on things we're going to have to come
11   in earlier.  So that's why it's important to know
12   beforehand when our start time is.
13             MR. SHEEHAN:  We'll file it by the end
14   of the evening.
15             THE COURT:  Is that going to disrupt
16   you?
17             MS. DAYTON:  No.  Thank you, your Honor.
18             MR. SHEEHAN:  We frankly didn't even
19   think Hodges was likely to be here tomorrow, but I
20   think he's --
21             MS. DAYTON:  We were worried about -- we
22   didn't want to run out of witnesses.
23             THE COURT:  Yes.  No, no, this is good.
24             MR. SHEEHAN:  I'm just saying we learned
25   about Hodges at 6:00 p.m. last night.
```

7

```
1              MS. DAYTON:  Well, you learned about
2    Hodges five years ago.
3              MR. SHEEHAN:  Well, exactly.  We knew
4    that the schedule might contemplate --
5              THE COURT:  You learned his place.
6              MR. SHEEHAN:  Yes.
7              MS. DAYTON:  We had said originally we
8    thought he might be Monday, but we don't know -- we
9    can't account for how long cross-examination will
10   be.
11             THE COURT:  Of course.  There is one
12   other scheduling issue that has come up in my
13   schedule yesterday, and that is Friday, May 6th, we
14   will not sit.  Let me make sure I have that.  Yes,
15   Friday May 6th we will not sit.
16             All right, I don't have anything else for
17   you.  I will go now and have the preliminary
18   instructions copied for the jurors.  They will not
19   be left with the jurors for two reasons:  One, I
20   don't want them to be preoccupied with that without
21   the full charge; and secondly, we may come to change
22   that charge in some ways.  So, Ms. Torday will
23   collect them.  Why don't we collect them after
24   opening statements.
25             So, we're going to do the charge and then
```

8

```
1    go right into opening statements and then take a
2    break, is that your contemplation?
3              MS. DAYTON:  No, I thought we would take
4    a couple minute break between instructions.  Because
5    this could take quite some time and just to take a
6    couple minute break.
7              THE COURT:  All right.  You did say
8    that.  And then just go from opening statements to
9    calling your first witness.
10             MS. DAYTON:  Yes.  And the only other
11   thing that I was going to suggest, I see the
12   notebooks.  You might want to let them know it's
13   okay to use them at any time.  That they get left
14   here, though, at night.
15             THE COURT:  That's sort of a standard
16   thing that I do tell them.  All right, is there
17   nothing else?
18             MR. SHEEHAN:  I'm just checking, your
19   Honor.  I understood that there were going to be
20   exhibit books.
21             THE COURT:  I have that.
22             MR. SHEEHAN:  You have one, your Honor?
23             MS. DAYTON:  We're working very, very
24   hard.  There are a lot of exhibits, they're trying
25   to make the copies.  They're doing the best they
```

9

```
1   can.
2            MR. SHEEHAN:  I don't have it yet.  So
3   that's all I'm --
4            THE COURT:  There are some substitutions
5   being made.
6            MS. DAYTON:  And they're working, the
7   paralegals have worked every night late.  They're
8   trying to get everything done, so they are making
9   you a copy.
10           THE COURT:  All right, anything else?
11           MR. SHEEHAN:  No, your Honor.
12           MS. DAYTON:  No, your Honor.  Thank you.
13           THE COURT:  All right.  We are ready for
14  smooth sailing starting at 9:30.
15           MS. DAYTON:  Yes.  And thank you for the
16  Court staff and to you, your Honor.  The staff is
17  phenomenal.  Beyond phenomenal.
18           THE COURT:  All right, we'll get
19  Mr. Aquart down here a little before 9:30 so we can
20  bring the jurors in promptly at 9:30.  Thank you.
21  We stand in recess.
22           (Recess)
23           THE COURT:  All right, please be seated,
24  ladies and gentlemen.  Good morning.  Good morning,
25  Mr. Aquart.
```

10

```
1            THE DEFENDANT:  Good morning.
2            THE COURT:  We are missing one juror.
3            MR. SHEEHAN:  I'm sorry, did your Honor
4   say we are missing one juror?
5            THE COURT:  No. 10.
6            MR. SHEEHAN:  Can I just ask, that's not
7   their number, that's our number.  I got it.
8            THE COURT:  Do you have a copy?  Do you
9   need a copy of this?
10           MR. SHEEHAN:  That might be helpful,
11  your Honor.  I have -- I think I -- it would be
12  helpful.
13           THE CLERK:  She's here, Judge.
14           THE COURT:  All right, you can bring
15  them in.
16           (Jury entered the courtroom.)
17           THE COURT:  All right, why don't you all
18  be seated, ladies and gentlemen, while we wait for
19  your colleague.
20           All right.  Good morning, ladies and
21  gentlemen.  We are here today to begin the trial of
22  United States v. Azibo Aquart.  Our first order of
23  business is for you to take the oath to carry out
24  your responsibilities as jurors in this case.  I'll
25  ask you to stand and raise your right hand.
```

11

```
1            (Oath administer to jury)
2            THE COURT:  Please be seated.  Ladies
3   and gentlemen, I'm going to give you some
4   preliminary instructions both on your duty and
5   conduct as jurors and on the law, the charges that
6   are contained in the indictment and are attempting
7   to be proved in this case.
8            You have a copy of these preliminary
9   instructions, but when I conclude this they will be
10  collected.  You will get a full and much more
11  complete set of instructions after all the evidence
12  is completed and after you have heard -- and before
13  you hear the closing arguments of counsel.  And you
14  will be able to keep that copy for your reference
15  during your deliberations.
16           What I want to do now is to give you an
17  orientation to the law that will be at issue here
18  and a first pass-through on the elements of each
19  crime that are set out in the indictment.  There is
20  no expectation that you will remember it all, but it
21  is useful, I believe, to familiarize you with the
22  nature of the charges and some of the terms that are
23  going to be used so that when you hear them in the
24  final charge they're not brand new.  So you are
25  invited to listen, you are invited to follow along,
```

12

```
1   or a combination, and I do it that way because we
2   know that some people learn better at listening,
3   some people learn better reading, and we want to be
4   as helpful as possible to you as you begin your work
5   as jurors in this case.
6            It will be your duty to find from the
7   evidence what the facts are.  You will recall I
8   called you the judges of the facts.  You -- and that
9   is for you, and you alone, to be the judges of the
10  facts.  And you will then have to apply those facts
11  to the law as I will give it to you.  And you must
12  follow that law whether you agree with it or not.
13  Please remember that there will be nothing that I
14  say during the course of this trial that should be
15  taken by you as in any way indicating what your
16  verdict should be.  During the course of the trial
17  you will hear references to "counsel" or "attorneys"
18  or "lawyers."  Those terms all mean the same thing.
19  And when you hear references to "the Court," and it
20  means to the judge presiding over the case, which is
21  me.
22           Now, you are going to be making your
23  determinations from the evidence.  The evidence from
24  which you will find the facts will consist of the
25  testimony of the witnesses, documents, and other
```

GA3

13

```
 1   things that are received into the record as
 2   exhibits.  You will have exhibits with you at the
 3   end when you are deliberating.  But I want to
 4   identify for you the nature of exhibits as we begin.
 5         There are two kinds of -- the nature of
 6   evidence.  There are two kinds of evidence, direct
 7   and circumstantial.  Direct evidence is, as its name
 8   suggests, direct proof of a fact, such as the
 9   testimony of an eyewitness.  Circumstantial evidence
10   is proof of one fact from which you are able to
11   infer or conclude that another fact exists.  And I
12   want you to understand that you may consider both
13   kinds of evidence, circumstantial evidence as well
14   as direct evidence, and the law makes no distinction
15   between direct and circumstantial evidence.  Now,
16   that may not conform to what you've seen on
17   television or in the movies in dramatic courtroom
18   scenes where a lawyer announces that the other
19   side's case is weak because it's based on mere
20   circumstantial evidence.  A suggestion that
21   circumstantial evidence is not good evidence is just
22   not correct.
23         So, it will be up to you as the jurors to
24   decide which witnesses you believe, which witnesses
25   you do not believe, or how much of any witness's
```

14

```
 1   testimony you choose to accept or reject and what
 2   weight, if any, you will give to a witness's
 3   testimony.  But I want you to understand that there
 4   are certain things that aren't evidence and you
 5   should keep that in mind because they must not be
 6   considered by you.
 7         The statements or the arguments or the
 8   questions by the lawyers, or if I were to ask any
 9   questions, questions are not evidence.  The answers
10   to the questions is what constitutes the evidence.
11   The questions put to witnesses are not evidence.
12   The objections to questions are not evidence.
13   Lawyers have an obligation to their clients to make
14   an objection when they believe the evidence being
15   offered is improper under the Federal Rules of
16   Evidence and you should not be influenced by the
17   objection or by my ruling on it.  If the objection
18   is sustained, you will ignore the question.  If it's
19   overruled, the witness will answer and you should
20   treat the answer like any other.
21         If you're instructed that some item of
22   evidence is received for a limited purpose only, I
23   will be clear that that instruction is and what that
24   limited purpose is, and you must follow that
25   instruction.  Testimony that I tell you -- that I
```

15

```
 1   exclude or tell you to disregard, of course, would
 2   not be evidence and must not be considered.  And
 3   anything that you may have seen or heard outside the
 4   courtroom is not evidence, it must be disregarded.
 5   You will recall you must decide this case solely on
 6   the evidence that's presented to you here in the
 7   courtroom.
 8         Now, I'm going to go into some of the
 9   principles of law and then the law of the specific
10   counts to familiarize you with the job ahead and to
11   give you a context for understanding the evidence
12   which will begin in just a little while.
13         Since the law presumes the defendant to
14   be innocent, the burden of proving his guilt beyond
15   a reasonable doubt on the government throughout the
16   trial.  A defendant never has the burden of proving
17   his innocence or producing any evidence at all, and
18   this means that the government must prove the
19   defendant's guilt and he does not have to prove his
20   innocence.  He may remain silent and present no
21   evidence if he elects to do so, and you, as jurors,
22   may not draw any inference from that election.  You
23   must presume the defendant innocent throughout the
24   case and throughout your deliberations until such
25   time, if any, that you as a jury are satisfied that
```

16

```
 1   the government has proved his guilt beyond a
 2   reasonable doubt.
 3         If the government does not meet its
 4   burden of proving beyond a reasonable doubt that the
 5   defendant is guilty, you must reach a guilty -- a
 6   verdict of not guilty.  If, on the other hand, you
 7   find that the government has met its burden of
 8   proving beyond a reasonable doubt that the defendant
 9   is guilty, then you should reach a verdict of
10   guilty.
11         The indictment which is a statement of
12   what the government claims, it is not in any sense
13   evidence of the allegations it contains, the
14   defendant Azibo Aquart has pleaded not guilty to the
15   charges against him in the indictment and,
16   therefore, the government has the burden of proving
17   each of the elements of each of the eight counts
18   beyond a reasonable doubt.  And the purpose of this
19   trial is to provide the forum for the government to
20   attempt to prove by its evidence that the defendant
21   Azibo Aquart is guilty of each of the crimes charged
22   in the indictment.
23         Before charging the specific eight
24   counts, the indictment begins with what it calls
25   introduction to all counts, and it reads:  In the
```

17

1  District of Connecticut and elsewhere -- it speaks
2  of the enterprise and I will define that later --
3  Azibo Aquart, also known as "Azibo Smith," "D,"
4  "Dreddy," and "Jumbo," the defendant herein,
5  together with Azikiwe Aquart, also known as "Z" and
6  "Ziggy;" Efrain Johnson, also known as "Pootney;"
7   Rodney Womble, also known as "Big Man;" John
8  Taylor, also known as "Big Boy;" Frankie Hodges,
9  also known as "Steve;" Juanita Hopkins, also known
10  as "Vanessa;" Nathaniel Grant, also known as
11  "Stone;" Randi Washington, also known as "Bear;"
12  James Rucker, also known as "Pops;" Sherrel
13  Randolph, also known as "Sherrel Jones;" and Judith
14  Rivera; who are not named as the defendants herein,
15  and others known and unknown to the Grand Jury were
16  officers, members and associates of a criminal
17  organization referred to in the Superseding
18  Indictment as the "Aquart enterprise" or the
19  "enterprise," whose members and associates engaged
20  in various acts of criminal activity including
21  murder, conspiracy to murder, assault and narcotics
22  trafficking.  The Aquart enterprise operated
23  primarily within the Charles Street apartments
24  located at 215 Charles Street, Bridgeport,
25  Connecticut.

18

1       The indictment continues.  The Aquart
2  enterprise, including its leadership, membership and
3  associates, constituted an enterprise as defined
4  under federal law in Title 18, United States Code,
5  Sections 1959(b)(2), that is, a group of individuals
6  associated in fact which was engaged in and the
7  activities of which affected interstate and foreign
8  commerce.
9       The enterprise constituted an ongoing
10  organization whose members functioned as a
11  continuing unit for a common purpose of achieving
12  the objectives of the enterprise.
13       Defendant Azibo Aquart founded and was
14  the leader of the enterprise whose members and
15  associates distributed cocaine base, primarily in
16  Bridgeport, Connecticut.  Azibo Aquart employed
17  street-level narcotics dealers, including Hodges and
18  Hopkins, among others, to sell drugs on behalf of
19  the enterprise.  Defendant Azibo Aquart employed
20  Womble as a lieutenant to provide the dealers with
21  crack cocaine, to collect drug proceeds, and to
22  supervise and to maintain control over the
23  day-to-day operations of the enterprise.  Azikiwe
24  Aquart was employed by Azibo Aquart to supervise and
25  maintain control over the activities of the

19

1  street-level dealers.  Defendant Azibo Aquart also
2  recruited and employed Grant, Washington and Taylor
3  to act as lookouts, to warn members and associates
4  of the enterprise of police activity in and around
5  the Charles Street apartments as well as of the
6  trafficking activity of rival dealers that
7  threatened the vitality of the drug enterprise.
8       Efrain Johnson associated with and was
9  recruited by defendant Azibo Aquart to participate,
10  and he did participate in the murders of Tina
11  Johnson, James Reid and Basil Williams in order that
12  Johnson could gain entrance to and maintain and
13  increase his position in the enterprise and as
14  consideration for a promise and an agreement to pay
15  anything of pecuniary value from the enterprise.
16       John Taylor also associated with and was
17  recruited by defendant Azibo Aquart to participate
18  and he did participate in the murders of Tina
19  Johnson, James Reid and Basil Williams in order that
20  Taylor could gain entrance to and maintain and
21  increase his position in the enterprise and as
22  condition for a promise and an agreement to pay
23  anything of pecuniary value from the enterprise.
24       The indictment sets out the alleged goals
25  and purposes of the enterprise.  The members and

20

1  associates of the Aquart enterprise sought, among
2  other things, to preserve and protect the power,
3  territory, and profits of the Aquart enterprise
4  through the use of intimidation, violence and
5  threats of violence; promote and enhance the
6  criminal activities of the Aquart enterprise and its
7  members and associates; and generate income for
8  members and associates of the Aquart enterprise
9  through the sale and distribution of narcotics.
10       The indictment sets out what it alleges
11  as the means and methods of the enterprise.  The
12  members and associates of the Aquart enterprise
13  carried out criminal activities in furtherance of
14  the conduct of the enterprise's affairs.  Azibo
15  Aquart, who is the defendant herein, and other
16  members and associates of the enterprise,
17  participated in the conduct of the affairs of the
18  enterprise by the following means and methods, among
19  others:  Obtaining large quantities of crack cocaine
20  which were then repackaged and redistributed in
21  retail quantities to the street-level dealers at
22  locations in and around the Charles Street
23  apartments in Bridgeport, Connecticut.  The members
24  and associates distributed the narcotics, after
25  which the defendants and their associates would

21

```
1   collect payment of the narcotics trafficking
2   proceeds from the dealers employed in the
3   enterprise;
4            Committing and attempting to commit and
5   threatening to commit acts of violence, including
6   murder, attempted murder and assault, to protect and
7   expand the Aquart enterprise's criminal operations.
8   These acts of violence were often perpetuated in a
9   conspicuous manner in order to maintain control over
10  the members of the enterprise and to deter anyone
11  who posed a threat to the continued vitality and
12  success of the criminal activities of the
13  enterprise.
14           In particular, in or about the summer of
15  2005, the enterprise became involved in a narcotics
16  trafficking dispute with a rival over the right to
17  sell crack cocaine within the Charles Street
18  apartments.  This dispute resulted in members of the
19  enterprise confronting their rival and her
20  associates.
21           So now we move to Count One of the -- the
22  indictment is broken into eight counts, and the
23  first is conspiracy to commit murder in aid of
24  racketeering.  Counts One through Four charge the
25  defendant with violating Title 18, United States
```

22

```
1   Code, 1959.  Count One charges the defendant with
2   conspiracy to commit murder in aid of racketeering.
3   Specifically, Count One reads:  At various times
4   relevant to this Superseding Indictment, the Aquart
5   enterprise, as more fully described in paragraphs
6   one through five above, which are realleged and
7   incorporated as fully set forth in this paragraph
8   constituted an enterprise defined in 18, United
9   States Code, 1959(b)(2), that is, a group of
10  individuals associated in fact which was engaged in
11  and the activities of which affected enterprise and
12  foreign commerce.
13           From in or about the fall of 2004 to in
14  or about August 2005, the above-described
15  enterprise, through its members and associates,
16  engaged in racketeering activity as defined in 18,
17  United States Code, 1959(b)(1) and 1961(1), namely
18  narcotics trafficking, in violation of 21, U.S.
19  Code, 841(a)(1) and 846, and acts involving murder,
20  in violation of the laws of the State of
21  Connecticut.
22           In or about August 2005 and continuing to
23  on or about August 24, 2005, in the District of
24  Connecticut, Azibo Aquart, also known as "Azibo
25  Smith," "D," "Dreddy," and "Jumbo," the defendant
```

23

```
1   herein, as consideration for the receipt of and in
2   consideration for a promise and agreement to pay
3   anything of pecuniary value from the enterprise, and
4   for the purpose of gaining entrance to and
5   maintaining and increasing his position in the
6   enterprise, an enterprise engaged in racketeering
7   activity, did unlawfully, willfully and knowingly
8   conspire to murder Tina Johnson and her associates,
9   in violation of Connecticut law 53a-48a 54a-54c.
10           The elements of the count of conspiracy
11  to commit murder in aid of racketeering, each of
12  which the government must prove beyond a reasonable
13  doubt are five.  They are:  One, that on or about
14  the date charged in Count One, August 24, 2005, an
15  enterprise affecting interstate commerce existed;
16  two, that the enterprise was engaged in racketeering
17  activity; three, that the defendant was associated
18  with or held a position in the enterprise; four,
19  that the defendant knowingly and willfully conspired
20  with others to murder another individual; and five,
21  that at least one of the defendant's purposes in
22  conspiring to murder another individual was to
23  maintain or increase his position in the
24  racketeering enterprise.
25           Let me define for you enterprise and
```

24

```
1   affecting interstate commerce.  An enterprise is
2   defined to include any association or group of
3   individuals associated in fact, which is engaged in,
4   or the activities of which affect, interstate or
5   foreign commerce.  An enterprise does not have to
6   have a particular name or, indeed, any name at all.
7   To establish that an enterprise existed, the
8   government must prove that there was in fact during
9   the period charged a group of individuals as
10  described in the indictment with:  A common or
11  shared purpose of engaging in a course of conduct;
12  an ongoing and continuing formal or informal
13  organization or structure; core personnel who
14  functioned as a continuing unit; and that the
15  organization had an existence separate and
16  independent from the racketeering activity.  The
17  group may be organized for a legitimate or lawful
18  purpose or it may be organized for an unlawful
19  purpose.  The personnel of the enterprise may change
20  and need not be associated with the enterprise for
21  the entire period that's alleged in the indictment.
22           Interstate commerce is commerce between
23  one state and another.  The defendant need not have
24  intended or even known that the acts of the
25  enterprise would affect such commerce.  The
```

**GA6**

25

1  enterprise's effect on interstate or foreign
2  commerce need not have been substantial and even a
3  minimum effect is sufficient and can be established
4  by showing either that the enterprise itself or the
5  racketeering activities of those associated with it
6  affected interstate commerce.
7         The second element of Count One that I
8  gave you, that the government must prove beyond a
9  reasonable doubt is that this enterprise, as I've
10 defined it, engaged in racketeering activity on or
11 around the time charged in the -- of the alleged
12 offense, August 24, 2005.
13        The RICO statute, Racketeer Influenced
14 and Corrupt Organizations, is titled 18 U.S. Code
15 1961, and it defines the term "racketeering
16 activity" to mean the commission of certain crimes,
17 including as the Indictment alleges in this case,
18 any acts involving murder in violation of the laws
19 of Connecticut or narcotics trafficking in violation
20 of federal law.
21        The third element of Count One that the
22 government must prove beyond a reasonable doubt is
23 that the defendant held a position in the
24 racketeering enterprise.  A defendant held a
25 position in the enterprise if he knowingly and

26

1  willfully associated himself with the enterprise.
2  The defendant need not have been associated with the
3  enterprise for the entire period of its existence,
4  but the defendant must have been associated with the
5  enterprise at the time he committed the crimes
6  charged.  A defendant's association with the
7  enterprise must be knowing.  That is, he must have
8  been connected to the enterprise in some meaningful
9  way and have had knowledge of the existence of the
10 enterprise through a general awareness of some of
11 its purposes, activities and personnel.
12        We're now on the fourth element that the
13 government must prove beyond a reasonable doubt for
14 Count One, that is, that the defendant knowingly and
15 willfully conspired with others to murder another
16 individual.  A conspiracy is a combination or
17 agreement of two or more persons to join together to
18 accomplish some unlawful purpose.  It's a kind of
19 partnership in criminal purposes in which each
20 member becomes the agent of every other member.  One
21 may become a member of the conspiracy without full
22 knowledge of all of the details of the unlawful
23 scheme or the names or identities of all the other
24 alleged conspirators.  The alleged object of this
25 conspiracy was to commit murder.  A conspiracy is an

27

1  offense that is separate from the actual commission
2  of any offense that may have been committed pursuant
3  to that conspiracy.
4         The government need not show that the
5  alleged members of the conspiracy entered into any
6  express or formal agreement or that they directly
7  stated between themselves the details of the scheme
8  and its object or purpose or the precise means by
9  which the object was or purpose was to be
10 accomplished.  What the government must prove is
11 that there was a mutual understanding, either spoken
12 or unspoken, between two or more people to cooperate
13 with each other to accomplish an unlawful act.
14        And then the fifth and last element of
15 Count One is that the government must prove beyond a
16 reasonable doubt is that at least one of the
17 defendant's purposes in conspiring with the others
18 to murder another individual was to maintain or
19 increase his position in the racketeering
20 enterprise.  Because Count One alleges only a
21 conspiracy to murder, the government need not prove
22 that the defendant actually committed a murder.  The
23 government must prove that the defendant conspired
24 to murder another individual and that one of the
25 purposes for doing so was to maintain or increase

28

1  his position in the racketeering enterprise.
2         So that's Count One, the conspiracy
3  count.  Then we move to Counts Two, Three and Four,
4  which are the substantive counts of murder in aid of
5  racketeering.
6         These charges are the same for each of
7  the three victims and it reads as follows:  At
8  various times relevant to the Superseding Indictment
9  the Aquart enterprise, as more fully described in
10 paragraphs one through five above, which are
11 realleged and reincorporated as if fully set forth
12 in this paragraph, constituted an enterprise as
13 defined under federal law, that is, a group of
14 individuals associated in fact which was engaged in
15 and the activities of which affected interstate and
16 foreign commerce.
17         From in or about the fall of 2004 to in
18 or about August of 2005, the above-described
19 enterprise through its members and associates
20 engaged in racketeering activity as defined under
21 federal law, namely, narcotics trafficking, in
22 violation of federal law, and acts involving murder,
23 in violation of the laws of the State of
24 Connecticut.
25         In or about August 24, 2005, in the

1  District of Connecticut, Azibo Aquart, also known as
2  "Azibo Smith," "D," "Dreddy," and "Jumbo," the
3  defendant herein, together with Azikiwe Aquart, also
4  known as "Z" and "Ziggy;" Efrain Johnson, also known
5  as "Pootney;" and John Taylor, who are not named as
6  defendants herein, as consideration for the receipt
7  of and as consideration for a promise and an
8  agreement to pay anything of pecuniary value from
9  the enterprise, and for the purpose of gaining
10 entrance to and maintaining and increasing their
11 position in the enterprise, an enterprise engaged in
12 racketeering activity, did unlawfully, willfully and
13 knowingly murder Tina Johnson, Count One; James
14 Reid, Count -- excuse me, Count Two; James Reid,
15 Count Three; and Basil Williams, Count Four in
16 violation of Connecticut law, and all in violation
17 of federal law.
18        The elements of murder in aid of
19 racketeering are five, each of which the government
20 must prove beyond a reasonable doubt.  One, that on
21 or about the date charged, August 24, 2005, an
22 enterprise affecting interstate commerce existed;
23 two, that the enterprise was engaged in a
24 racketeering activity; three, that defendant was
25 associated with or held a position in the

1  enterprise; four, the defendant knowingly and
2  intentionally murdered another individual; and five,
3  that at least one of the defendant's purposes in
4  murdering that individual was to maintain or
5  increase his position in the racketeering
6  enterprise.
7        And I have defined the terms that are
8  used in these elements earlier in connection with
9  the definitions of the elements for conspiracy to
10 commit murder in aid of racketeering.
11       Let's move to Counts Five, Six and Seven
12 which are charged as drug-related murders.  And they
13 charge the defendant with murder while engaged in a
14 drug trafficking offense.  These charges are the
15 same for each of the three victims and read as
16 follows:  On or about August 24, 2005, in the
17 District of Connecticut, Azibo Aquart, also known as
18 "Azibo Smith," "D," "Dreddy" and "Jumbo," the
19 defendant herein, together with Azibo Aquart, also
20 known as "Z," "Ziggy," and John Taylor, who are not
21 named as defendants herein while engaged in an
22 offense punishable under Section 841(b)(1)(A) of
23 Title 21, United States Code, to wit, conspiracy to
24 distribute and to possess with intent to distribute
25 50 grams or more of a mixture and substance

1  containing a detectable amount of cocaine base, also
2  called crack cocaine, a Schedule II controlled
3  substance, did knowingly and intentionally kill and
4  command, induce, procure and cause the intentional
5  killing of Tina Johnson, Count Five, James Reid,
6  Count Six and Basil Williams, Count Seven, and such
7  killing did result in violation of federal law.
8        For the government to prove the defenses
9  charged in Counts Five, Six and Seven, it must prove
10 beyond a reasonable doubt each of four elements.
11 One, that the defendant intentionally killed the
12 victim or intentionally commanded, induced, procured
13 or caused the killing of the victim; two, that such
14 killing occurred while the defendant was a member of
15 and engaging in the drug conspiracy charged in Count
16 Eight -- which we'll get to -- of the Indictment;
17 three, that the defendant acted knowingly and
18 intentionally; and four, that the killing was
19 connected in a meaningfully way to the drug
20 conspiracy.
21       And now we're at Count Eight which is
22 conspiracy to possess with intent to distribute
23 50 grams or more of cocaine base.  Count Eight
24 charges the defendant with conspiracy to possess
25 with intent to distribute narcotics in violation of

1  federal law.  The Indictment reads from in and about
2  the fall 2004 to in or about August 2005, in the
3  District of Connecticut and elsewhere, Azibo Aquart
4  also known as "Azibo Smith," "D," "Dreddy" and
5  "Jumbo," the defendant herein, together with Azikiwe
6  Aquart also known as "Z" and "Ziggy;" Rodney Womble,
7  also known as "Big Man;" John Taylor, also known as
8  "Big Boy;" Frankie Hodges, also known as "Steve;"
9  Juanita Hopkins, also known as "Vanessa;" Sherrel
10 Randolph, also known as "Sherrel Jones;" Nathaniel
11 Grant, also known as "Stone;" Randi Washington, also
12 known as "Bear;" Judith Rivera and James Rucker,
13 also known as "Pops;" who are not named as
14 defendants herein, together with others known and
15 unknown to the Grand Jury, did knowingly and
16 intentionally conspire to distribute and to possess
17 with intent to distribute 50 grams or more of a
18 mixture and substance containing a detectable amount
19 of cocaine base, crack cocaine, a Schedule II
20 controlled substance, contrary to provisions of
21 federal law and in violation of federal law.
22       To prove this Count Eight, the government
23 must prove each of the following three elements
24 beyond a reasonable doubt.  You will recall these
25 elements in part from the earlier conspiracy count:

33

1  One, two or more persons entered into the particular
2  unlawful agreement; two, the defendant knowingly and
3  intentionally became a member of the agreement; and
4  three, the members of the -- members of the
5  conspiracy -- and three, members of the conspiracy
6  conspired to commit an unlawful act.  Here the
7  government must prove that the object of the
8  conspiracy was the crime of distribution or
9  possession with intent to distribute cocaine base in
10  an amount of 50 grams or more.
11          Now, that is your introduction, ladies
12  and gentlemen, to the law that you will eventually
13  be applying to the case.  I hope it provides you
14  with some introduction to the framework, as well as
15  some of the terminology.  And now I'd like to
16  conclude with just a few words about your conduct as
17  jurors.
18          Until the case is submitted to you at the
19  end of the evidence and after I have charged you on
20  the applicable law, you must not discuss this case
21  with anyone, not even with your fellow jurors.  I
22  know that it may seem awkward when you come here day
23  after day for the purpose ultimately of discussing
24  this case to not discuss the case at all or any of
25  the evidence that you've heard, but you must follow

34

1  that order.  And there is a reason for it.  Evidence
2  is presented to you witness after witness, exhibit
3  after exhibit.  It is not the whole picture at one
4  time.  You must keep an open mind throughout the
5  evidence and not make any premature decisions.  If
6  you were to discuss the case with each other before
7  you'd heard all of the evidence, if you were to
8  discuss it with family or friends, there is a risk
9  that you might prematurely and erroneously reach a
10  conclusion about the evidence.  So that is the
11  purpose of that law.
12          After the case is submitted to you, then
13  you must discuss it only in the jury room and only
14  with your fellow jurors.  It is important that you
15  keep an open mind and that you not decide any issue
16  in the case until the entire case has been submitted
17  to you under the instructions of the Court.
18          Let me remind you of the oath that you
19  just took a few minutes ago.  You do solemnly swear
20  you will consider the matters in issue between the
21  government and the defendant according to the law as
22  the judge shall instruct you, and based upon the
23  evidence presented in court, and you will render a
24  true and just verdict during the course of the
25  trial.  And until you have announced your verdict in

35

1  court, you will speak nothing to anyone of the case
2  now before the Court, nor shall you permit any
3  person to speak to you concerning the same.  After
4  your verdict has been announced in court, you will
5  speak to no one concerning the deliberations or the
6  vote of the jury or of any other individual juror
7  other than yourself unless the presiding judge gives
8  you permission to do so.
9          Now, during the course of the trial you
10  and witnesses and lawyers and court personnel may
11  meet outside the courtroom, in part because you use
12  the same entrance to the courthouse.  We may appear
13  to be unfriendly or distant.  That's actually how it
14  should be because you are not supposed to have any
15  substantial contact with anybody involved with the
16  case outside the formal courtroom setting.  So
17  please don't be surprised by any aloofness on our
18  part, we will not be offended by your aloofness.
19  Wear your jury pin when you are in the courthouse so
20  you can be identified as needing to behave in that
21  way.  And it's important because the appearances of
22  fairness and impartiality are as important as the
23  actual fairness and impartiality of the jurors.  If
24  one side were to see you having conversation with a
25  witness or a lawyer maybe over something as

36

1  innocuous as the weather, it may nonetheless give
2  them the impression that some sort of undue
3  influence is being exercised.  And that's the reason
4  for the rule of aloofness.
5          Third, as I have said before, do not do
6  any research, do not make any investigation about
7  this case on your own.  Don't deviate from your
8  normal route to pass by a place of significance in
9  the case.  Do not do any Internet research.  Do not
10  use any electronic device or media such as
11  telephone, cell phone, Smart phone, iPhone,
12  BlackBerry, computer, Internet, Internet service,
13  any text or instant messaging service, any Internet
14  chat room, blog, or website such as Facebook,
15  MySpace, Linkedin, YouTube or Twitter to communicate
16  or to receive from or to anyone any information
17  about any aspect of this case or to conduct any
18  research about this case until you are finally
19  excused from the case.  This is essential because
20  you are to decide this case solely on the basis of
21  the evidence that's presented to you here in the
22  courtroom.
23          All right then, I hope these preliminary
24  instructions help orient you as you begin to hear
25  the evidence.  I will instruct you again in greater

37

1  detail, particularly on the law applicable to the
2  case, but I will ask you to bear the principles that
3  I have given you in mind and keep it open to
4  evidence throughout the trial.
5        We will take a brief five-minute recess
6  and then trial will begin.  The parties will give
7  their opening statements.  After that, the
8  government will begin to present its evidence in
9  support of the charges in the Indictment.  After the
10 government has presented its evidence, the defendant
11 may present evidence, but is not obligated to do so.
12 If the defendant does present evidence, the
13 government is entitled to present rebuttal evidence.
14 And then once all the evidence is in, I will
15 instruct you on the law to be applied.  You will
16 then hear the lawyers present their closing
17 arguments that will summarize and interpret the
18 evidence for you from their standpoint.  That is not
19 evidence itself.  After the closing arguments you
20 will then retire to consider your verdict of not
21 guilty or guilty which must be unanimous.
22       You have notebooks.  You are invited to
23 take such notes as you wish.  You do not have to
24 take notes.  Please remember the notes are memory
25 aids for you and you alone.  Don't share your notes

38

1  with anyone else.  Evidence will be presented each
2  day from 9:30 to 3:30, and during the deliberation
3  stage at the very end jurors should anticipate being
4  here from nine to five unless we need to make some
5  special accommodations.  There will be no trial this
6  Friday, April 22, and no trial on Friday May 6.
7  We'll take a five-minute break now, we'll attempt to
8  schedule another break around 11:00 or 11:15, and
9  we'll attempt to break for a half-hour lunch around
10 one.
11       So, if you will -- each time that you
12 leave the courtroom, leave your notebooks on your
13 chair.  They'll be there when you come back.  At the
14 end of the day Ms. Torday will collect them, store
15 them and redistribute them to you.  She will also at
16 this time collect the preliminary instructions which
17 we've been presenting to you.  We stand in recess
18 for five minutes.
19       (Jury exited the courtroom)
20       THE COURT:  All right, please the bring
21 in the jury.
22       MS. DAYTON:  Your Honor, should I just
23 go to the podium?
24       THE COURT:  As you wish.  Or I will call
25 you.  Will it be Mr. Smith or Mr. Sheehan making the

39

1  opening?
2        MR. SMITH:  It will be me, your Honor.
3        (Jury entered the courtroom.)
4        THE COURT:  All right, ladies and
5  gentlemen, please be seated.  I had earlier told you
6  that we would take a -- ordinarily a recess around
7  11:00, 11:15.  We won't do that today because we
8  have just taken one, but we will break for lunch a
9  little bit earlier and have a break in the afternoon
10 as well.
11       We're now prepared to begin with the
12 opening statements.  They are statements, they are
13 not evidence.
14       And on behalf of the government,
15 Ms. Dayton will proceed.
16       MS. DAYTON:  Thank you, your Honor.
17 Good morning.
18       August 24, 2005, was the worst day of
19 Leroy Whittingham's life.  It didn't start out that
20 way.  As Leroy would tell you, he got up, he got
21 dressed, he went over to Charles Street in
22 Bridgeport in order to pick up his mom, Tina
23 Johnson.  When Leroy arrived at the Charles Street
24 building, he went upstairs to apartment 101 where
25 his mom, Tina, had been staying with her boyfriend,

40

1  James Reid, at the home of their friend Basil
2  Williams.
3        Leroy knocked on the door, but no one
4  answered.  So, he knocked again and again, and he
5  waited and no one answered.  So, he began to call
6  out for his mom and even used his cell phone to call
7  her, and she still didn't answer.  He couldn't
8  understand why.  He had spoken to his mom the night
9  before, she knew he was coming to pick her up.  So
10 he tried the door, and it was locked.  And Leroy got
11 a really bad feeling.  Leroy knew that his mom was
12 having serious problems with someone in the
13 building, and he just began to panic.
14       Leroy will tell you he ran back out of
15 the building and around the side to his mom's
16 bedroom window.  When he got there, he saw that it
17 was open, and so Leroy reached in and he pushed the
18 shade aside.  And what Leroy saw in there is forever
19 burned in his memory, because while this was the
20 worst day of Leroy's life, it was the last day of
21 Tina Johnson's, James Reid's and Basil Williams'
22 life.
23       What Leroy saw there on the floor in the
24 bedroom was his mom, Tina, and her boyfriend, James,
25 bound and gagged with duct tape and covered in

41

1   blood.  The whole room was covered in blood; the
2   walls, the ceiling, the floor.
3           Leroy jumped in the window and he
4   cradled his mom in his arms trying to help, but he
5   didn't know what to do.  There was so much blood he
6   thought they had been shot.  Leroy laid his mom down
7   and he ran to the front door to try to go out and
8   get help.  But when he got to the door he couldn't
9   get it open, it had been drilled shut from the
10  inside, sealing the victims in the apartment.
11          Leroy turned around and he ran back down
12  the hall towards his mom, and it was then for the
13  first time that he saw her friend, Basil Williams,
14  also bound and gagged with duct tape and laying
15  facedown on the floor in his bedroom.
16          Leroy jumped out the window screaming
17  and called 911.  You'll hear that call and his
18  desperate pleas for help.  But it was too late for
19  help, which is why you are here.  Tina, James and
20  Basil were all dead, murdered, bludgeoned to death
21  by baseball bats, and it was the defendant, Azibo
22  Aquart, who did it, he and his three
23  co-conspirators.
24          I'm Tracy Dayton.  I'm an assistant
25  United States attorney in the District of

42

1   Connecticut.  Here with me are Jacabed
2   Rodriguez-Coss, Peter Markle and Alina Reynolds,
3   also of the United States Attorney's Office, and
4   Special Agents Christopher Munger and David Dillon
5   in the first row from the Federal Bureau of
6   Investigation.  Together we represent the United
7   States of America in this case, and together we're
8   going to bring you back to the beginning of the
9   case, to the summer of 2004.
10          You see, by then the defendant had taken
11  over apartment 211 in the Charles Street building
12  and he was using it as the base of operations for
13  his narcotics trafficking organization.  He had
14  people who sold drugs for him all day, every day.
15  Crack cocaine.  He had a lieutenant who watched over
16  the operations, and he even had a lookout apartment
17  down the hall so that he could keep an eye out for
18  law enforcement activity and keep an eye on the
19  sellers in apartment 211 to make sure they weren't
20  breaking any of his rules.
21          By the summer of 2005, the evidence will
22  show that the defendant had a complete lock on the
23  drug trade in the Charles Street area for over a
24  year.  He ran a flourishing business; he dominated
25  the building and he ruled by violence.  The

43

1   defendant instilled fear in others, except Tina
2   Johnson.
3           You see, Tina was addicted to crack
4   cocaine.  And while she used to buy small quantities
5   of crack cocaine from the defendant and other
6   members of his organization, in the summer of 2005
7   she began to sell small quantities of crack cocaine
8   in order to support her own habit.  The evidence
9   will show that the defendant did not approve of
10  Tina's decision to sell on his turf and he planned
11  to make her stop.
12          But Tina was no shrinking violet, and
13  despite efforts to intimidate her, she refused to
14  back down.  And for that, the evidence will show,
15  the defendant decided that she must die.  And not
16  just Tina, Tina, her boyfriend James and her friend
17  Basil Williams.  Basil Williams who had nothing
18  whatsoever to do with Tina's decision to sell crack
19  cocaine.  Basil did not smoke crack cocaine, he did
20  not sell crack cocaine, and his only involvement was
21  that he was Tina's friend.
22          Now, you may be asking yourself at this
23  point what evidence am I going to hear to prove all
24  of those charges to me.  What am I going to hear
25  that will prove to me that the defendant sold large

44

1   quantities of crack cocaine and that he murdered
2   Tina, James and Basil?  As the Judge said, the
3   evidence is going to come to you in bits and pieces
4   throughout the course of the trial from many
5   different sources and not necessarily in
6   chronological order like it does on TV.
7           For instance, you are going to hear from
8   crime scene examiners and see physical evidence
9   recovered from the crime scene, including the duct
10  tape that was used to bind the victims and the latex
11  gloves that the defendant used while he murdered
12  them.
13          You are going to hear from a latent
14  fingerprint examiner who will tell you that he
15  recovered the defendant's fingerprints from the
16  scene of the murders.  And that he also recovered
17  the defendant's brother's fingerprints from the
18  scene of the murder, Azikiwe Aquart, who was also a
19  member of this narcotics trafficking organization
20  and who also participated in these murders.
21          You are going to hear from a forensic DNA
22  examiner who will tell you that DNA was recovered
23  from the scene of the murders and that it was
24  consistent with the defendant having left it there.
25          You are going to see phone records that

45

1  will show the defendant communicating with other
2  members of this narcotics trafficking organization
3  before, during and immediately following the
4  murders.  You are going to hear phone calls wherein
5  the defendant is speaking to other members of the
6  organization and talking about drug dealing.
7        And you are going to see letters the
8  defendant wrote; letters that not only show the
9  defendant's association with other witnesses in this
10 case, but that show in one particular instance the
11 defendant specifically instructing a witness as to
12 how to testify at this trial.
13       You are also going to hear firsthand
14 in-depth testimony from several members of the
15 organization about the inner workings of the
16 enterprise.  For instance, you are going to hear
17 from two of the defendant's employees, Frank Hodges
18 and Juanita Hopkins.  They're going to tell you
19 about the fact that they sold crack cocaine out of
20 apartment 211 all day, every day.  They'll tell you
21 about how much crack they sold, how much crack they
22 smoked, and how the defendant would beat them up
23 when they messed up his profits.
24       You are going to hear from Judith
25 Rivera.  Judith Rivera will tell you she, like

46

1  Hodges and Hopkins, was addicted to crack cocaine.
2  Ms. Rivera allowed the defendant to use her
3  apartment as a lookout point in exchange for some
4  drugs and the promise of some rent money.
5        You are going to hear from Randi
6  Washington.  Washington was one of those lookouts.
7  Washington will tell you that he didn't know the
8  defendant for very long, but he quickly gained the
9  defendant's trust by buying him handguns.
10       You are going to hear from Rodney Womble.
11 Rodney Womble was one of the defendant's lieutenants
12 in this narcotics trafficking organization.  Womble
13 will tell you how it was his job to deliver crack to
14 the sellers in apartment 211 every day and then to
15 collect the narcotics trafficking proceeds and bring
16 them back to the defendant.  Womble will also tell
17 you it was his responsibility to be the defendant's
18 eyes and ears at the Charles Street building and to
19 let the defendant know if anyone was breaking his
20 rules.
21       And Womble will tell you he, in fact,
22 had brought Tina's drug dealing to the defendant's
23 attention, and that at the defendant's direction
24 Womble confronted Tina and told her to stop selling
25 drugs.  And when Tina refused to back down, Womble

47

1  related that information to the defendant and the
2  defendant told Womble that he, the defendant, would
3  take care of it.
4        And you are going to hear from John
5  Taylor.  John Taylor is going to bring you right
6  into the heart of these murders.  Why?  Because he
7  was there.  John Taylor is going to tell you how on
8  August 24, 2005, he, the defendant, Azikiwe Aquart
9  and Efrain Johnson all met in the underground garage
10 at the Charles Street building.  There the four
11 donned latex gloves and masks and went upstairs to
12 the victims' apartment.  The defendant had a gun,
13 Azikiwe Aquart and Efrain Johnson each had baseball
14 bats.  Taylor's job was to take care of Leroy,
15 Tina's son, in the event he was in the apartment.
16       When they got to the victims' apartment
17 the defendant kicked in the door and the four rushed
18 inside.  The defendant pointed his gun at the
19 victims and demanded they get on the ground.  Then,
20 as the defendant, Azikiwe Aquart and Efrain Johnson
21 bound the victims with duct tape rendering them
22 defenseless, Taylor blocked the front door with
23 furniture and stood guard by the window to make sure
24 that nobody was coming.  Taylor will tell you that
25 shortly after that he heard a horrible sound and he

48

1  looked around the corner and walked down the hall
2  just in time to see the defendant hitting Tina over
3  the head with a baseball bat.
4        Ladies and gentlemen, you are not going
5  to like John Taylor.  He was a part of this horrible
6  crime.  He was not caught until four and a half
7  years after it was committed, and when he was caught
8  he lied and lied again.  But he will testify and he
9  will tell you that he has now taken responsibility
10 for his role in these offenses.  He has pled guilty
11 to three counts of murder and he will be here to
12 testify about what he did and the defendant did.
13       The reality is you may not like many of
14 these witnesses.  They're criminals, plain and
15 simple.  They are people who chose, either through
16 greed or drug addiction, to earn a living by selling
17 drugs and committing other crimes.
18       These people are called cooperating
19 witnesses.  Most of them are here testifying
20 pursuant to cooperation agreements with the
21 government.  That means that they're not here
22 testifying out of the goodness of their hearts.
23 Rather, they're testifying with the hope that by
24 doing so that the judge who ultimately sentences
25 them will give them less time in prison.

**GA12**

49

1    But it's important to remember that
2  trials are not about whether or not you like the
3  witness.  Trials are about whether or not you
4  believe the witness.  So, we invite you to listen
5  closely to their testimony, scrutinize it, and
6  compare it to all of the other evidence in this
7  case.
8    Now, admittedly, some of the evidence is
9  going to be hard to scrutinize, it's disturbing and
10 graphic.  And we're not showing it to you for that
11 reason.  We're not trying to upset you.  We're
12 showing it to you because it is the evidence in this
13 case.  For instance, you are going to hear from
14 medical examiners and you are going to see autopsy
15 photographs that show that the victims died as a
16 result of blunt force trauma to their heads.  You
17 are going to hear that means they were struck
18 multiple times, each one of them, on the head with a
19 solid object, and that Basil Williams' skull was
20 literally shattered.
21    And some of the evidence in this case
22 won't be perfect.  For instance, you are going to
23 hear from the DNA examiner that one evidentiary swab
24 amongst 70 taken in this case was contaminated at
25 the lab by another technician.  But as difficult,

50

1  graphic or even imperfect as the evidence may be, we
2  want you to consider it carefully and compare it
3  against what the witnesses have said, because what
4  you'll find is that the witnesses not only
5  corroborate one another, but are corroborated by all
6  of the evidence in this case.
7    In short, the evidence will prove beyond
8  a reasonable doubt that the defendant was the leader
9  of a violent narcotics trafficking organization, he
10 sold large quantities of crack cocaine, and he
11 murdered Tina, James and Basil.  He murdered them
12 because Tina was interfering with his drug
13 trafficking profits and to punish her for selling on
14 his turf.
15    At the end of the case the attorneys are
16 all going to have a chance to speak with you again
17 and to go over the evidence that's been presented to
18 you.  And at that time the government will discuss
19 with you how the evidence we've presented proves
20 each and every one of the essential elements that
21 have been charged, and at that time we're going to
22 ask you to return the only verdict that will be
23 compelled by the evidence, and that is a verdict of
24 guilty as charged.
25    Thank you.

51

1    THE COURT:  All right, thank you.
2  Representing Mr. Aquart, Mr. Smith.
3    MR. SMITH:  Thank you, your Honor.
4    Good morning, ladies and gentlemen.  My
5  name is Justin Smith.  I'm one of the attorneys
6  representing Azibo Aquart.  I want to thank you on
7  behalf of myself, Michael Sheehan, and Azibo Aquart
8  for participating in this process.
9    As you all know, Mr. Aquart is charged
10 with the most serious of crimes.  We talked about it
11 in voir dire, and the potential penalties that are
12 involved.
13    Now, the government has spent a few
14 minutes here laying out for you what they think the
15 evidence will show, and that's their job, to lay out
16 the evidence, to present the evidence to you that
17 they say will prove that Mr. Aquart is guilty beyond
18 a reasonable doubt.
19    Our job as defense attorneys, of course,
20 is to defend Mr. Aquart to the best of our abilities
21 and to point out where the government's evidence
22 fails.  But you, as jurors, each of you individually
23 must make your own decision in regards to what the
24 evidence shows.  You must listen carefully to each
25 piece of evidence, to each witness, and evaluate

52

1  very carefully those witnesses who appear before you
2  and what motives that they may have to shape their
3  testimony in a way that assists the government,
4  because we expect that after you carefully evaluate
5  all of that, that you will find that the government
6  will have failed to meet their burden of proof
7  beyond a reasonable doubt.
8    The government, as they presented what
9  they expected the case or the evidence to show,
10 mentioned something about chronology.  Chronology
11 here is important.  After learning of the murders,
12 the police very quickly focused on Mr. Aquart as
13 their primary suspect, and that was to the exclusion
14 of nearly anyone else that could have been involved.
15 And they did this without having any physical
16 evidence or the results of any tests of physical
17 evidence at their disposal.  The police came to
18 believe that Mr. Aquart was in fact dealing drugs
19 through the use of others at that building in
20 Charles Street in Bridgeport.
21    What we also expect you will find after
22 listening carefully to all of the testimony of these
23 witnesses is that the drug trade is a dangerous one,
24 and that people who engage in the drug trade do so
25 at their own peril.  There are risks involved when

53

1  you decide to deal drugs.  There is the risk of
2  arrest and being put in prison, the risk of being
3  robbed, and the risk of violence.  And people who
4  engage in those risks then, including the victims in
5  this case, as tragic as this is, did so at their own
6  peril.  They assumed those risks.
7           Now, the government has talked much about
8  Tina Johnson and the others' rivalry with
9  Mr. Aquart, and I think you'll find after listening
10  to all of the evidence that to the extent there was
11  a rivalry between Tina Johnson and anyone, it was
12  not Mr. Aquart.
13          You see, the police quickly focused on
14  Mr. Aquart and came to the conclusion that he was
15  involved in these murders.  And their initial
16  investigation was driven largely by the statements
17  of some of the people that the government talked
18  about, Mr. Hodges, Ms. Hopkins, Mr. Womble, and
19  others.
20          The government told you what they thought
21  these witnesses would say about Mr. Aquart's dealing
22  in drugs and involvement in the murders.  But you
23  are going to find, again, that each and every one of
24  those witnesses has a very strong motive to shape
25  their testimony to assist the government.  They've

54

1  all been charged with very serious crimes.  There
2  will be witnesses who appear in front of you who are
3  not cooperating witnesses, will admit to their own
4  criminal activity, but were never charged.  And the
5  people who are charged are charged with crimes that
6  carry potentially severe prison sentences, sometimes
7  decades.  These people will tell you that they have
8  either been in prison or are currently in prison and
9  it's not somewhere where they want to be, and their
10  testimony is their ticket out, to either not return
11  to prison or to get out as soon as possible.
12          And perhaps most importantly in the case
13  is John Taylor, who the government admits right up
14  front to you, because they have to, that he lied
15  again and again and again and again, but now they'll
16  say he's telling the truth.  But for him, his
17  testimony is a way to avoid the death penalty or
18  perhaps a lifetime in prison.  So, you must be very
19  careful in evaluating what he says.
20          The government has laid out a series of
21  records that they say will corroborate the testimony
22  of these witnesses, but we think you'll see these
23  records are at times uncertain, confusing, and in
24  some cases directly contradict the testimony of the
25  witnesses.

55

1           Now, to the physical evidence that the
2  government has talked about.  They again told you
3  that at one point it's not like you see on TV.  They
4  may not have been referring to the physical
5  evidence, but that holds true here as well.  It's
6  not like what you see on TV.  Fingerprints and DNA
7  are not the smoking gun.  They are subject to an
8  unbelievable amount of uncertainty.  And again, the
9  government has to tell you, oh, by the way, some of
10  it has been contaminated.
11          Overall, as I told you, your job here is
12  the most important one.  It is you who decides what
13  the evidence shows, what it doesn't show, what it
14  means, what it doesn't mean.  And we expect after
15  your careful consideration, each of you as
16  individuals will come to your own conclusion about
17  the evidence and the weight that it carries, and we
18  expect after all of that, you will find Mr. Aquart
19  is not guilty, that the government has failed to
20  prove their case beyond a reasonable doubt.  And
21  that is the verdict when we speak again at the end
22  of the case that we would ask you to return, not
23  guilty.
24          Thank you.
25          THE COURT:  All right, thank you.

56

1           Ladies and gentlemen, we will start
2  evidence in just a moment.  I want you to remember
3  that the potential penalties in this case play no
4  role and must not be part of your consideration of
5  whether or not the government has proved guilt
6  beyond a reasonable doubt.  All of you were
7  questioned on this, you all said you could and would
8  follow this direction.
9           All right, I'll ask the government then
10  to please call your first witness.
11          MS. REYNOLDS:  Thank you, your Honor.
12  The government --
13          MR. SHEEHAN:  Your Honor, before we do
14  that, could we approach the bench.
15          THE COURT:  Yes.
16          (Sidebar conference)
17          MR. SHEEHAN:  I have a basic concern
18  about Ms. Dayton's opening where, among other
19  things, she represented that Mr. Whittingham was
20  going to testify that he knew that his mom was
21  having very serious problems with somebody in the
22  building.  Now, I specifically contacted the
23  government to ask if they intended to offer any
24  statements by Mr. Whittingham about problems that
25  his mother was having in the building and my

57

1  answer -- or I was told no, and that's the reason
2  why I did not pursue a motion in limine on that
3  question.
4          Mr. Taylor has testified -- in the 302s
5  there are various references to things that
6  Mr. Taylor alleges that his mother said to him,
7  which I believe are hearsay and not subject to any
8  exception.  But my concern is that having
9  represented that they were not going to be putting
10  on anything that Mr. Whittingham is claiming that
11  his mother said to him, how then can they be arguing
12  that he knew that his mom was having very serious
13  problems in the building, and, if so, what is the
14  significance of their saying no, they didn't intend
15  to do that.
16          MS. DAYTON:  No, I said -- there was a
17  question about if we were going to elicit a bunch of
18  information about the specifics of the conversation
19  with Tina Johnson, and the answer was no.  He's
20  going to say the reason he panicked and went around
21  to the side was because he thought there was
22  something wrong.  We're not going to say with Dreddy
23  or anyone else, we're just going to say he knew
24  there was a problem.  Most people don't start to
25  kick people's doors in unless they think there's a

58

1  problem.
2          MS. REYNOLDS:  He's going to testify he
3  knew she was addicted to crack cocaine, he was
4  worried about her because her addiction was getting
5  worse.  He's not going to get into specifics about
6  conversations about what his mother told him, just
7  that he was worried.
8          THE COURT:  The defendant's concern was
9  Ms. Dayton's statement that he knew that his mother
10  was having problems with someone in the building,
11  and Mr. Sheehan represents that the government had
12  said that they would not be offering evidence of
13  what Tina Johnson had said to her son.  Do I have
14  that summarized?
15          MS. DAYTON:  It's a bit of an
16  overstatement because what I said to Mr. Sheehan was
17  that it was Alina Reynolds' witness and he needed to
18  speak to her.  He asked me questions about a number
19  of witnesses, and I said, are they going to get into
20  the specifics, my understanding is no.  That was how
21  the conversation went.  So -- but it goes to explain
22  his actions that he knew she was having a problem.
23  I didn't say he knew she was having a problem with
24  Dreddy.
25          THE COURT:  No, you did not say that.

59

1          MS. REYNOLDS:  And specifically, your
2  Honor, because it is my witness, he was simply going
3  to testify that he recalled his mom -- he visited
4  her at that apartment daily because he was worried
5  about her drug addiction and that they were trying
6  to get her to move out.  There is not going to be
7  any reference to the defendant at all.  He's not
8  going to mention the defendant at all.  He's going
9  to say that he was worried about her.
10          THE COURT:  All right.  I don't see, at
11  least immediately right now, something to be done.
12  I'd like to hear the witness and then we will see
13  whether or not -- and there seems to be perhaps a
14  difference of opinion on what was said to whom about
15  what Mr. Whittingham would testify to.  That doesn't
16  give the Court a very clear record.  If you have
17  something in writing or in response to your request
18  that is more helpful, but let's -- I'd like to see
19  what the witness has to say.  And the statement by
20  the government was not that she was having a problem
21  with Mr. Aquart.
22          MS. DAYTON:  Right.  There is also one
23  more thing.  Mr. Smith said that Mr. Taylor was
24  testifying to avoid the death penalty.  That is
25  factually incorrect.  A decision was made before --

60

1  a decision was made before he had even signed a
2  cooperation agreement, and we're going to ask for
3  that to be corrected to the jury at some point, but
4  we can deal with that later.
5          MR. SHEEHAN:  I'm going to move for a
6  mistrial on what the representations were that were
7  made to me that I believe were contradicted by what
8  the government said in the opening statement.
9          THE COURT:  Okay, but what I want you to
10  do is I want you to put it in a motion for mistrial
11  with the specifics of what it is you are claiming is
12  said in light of what the witness testifies to and
13  we will take that up.
14          MS. DAYTON:  Your Honor, you've already
15  instructed the jury initially that what we said is
16  not evidence, so it's hardly relevant.
17          THE COURT:  I understand.  All right.
18  Thank you.
19          MR. SHEEHAN:  Oh, one other thing.  I'm
20  assuming, your Honor, that there is a sequestration
21  order in effect.
22          THE COURT:  I have not issued a
23  sequestration order.
24          MR. SHEEHAN:  I would request a
25  sequestration order.  And I would ask who it is that

61

1  the government would be relying on as witnesses who
2  might in their opinion be not subject to the
3  sequestration order.
4          MS. DAYTON:  The victims' family has a
5  right to be here under the Victims Rights Act.
6          MR. SHEEHAN:  I'm not objecting to the
7  victims' family.
8          MS. DAYTON:  Okay.  And then it's
9  possible that the case agent, either one of them,
10 David Dillon or Christopher Munger, could get
11 called.  It's more likely they would be called by
12 the defense.  So -- and they are the investigating
13 agents, and we would ask that they be designated as
14 such.
15         MR. SHEEHAN:  I would not object to
16 that, your Honor, and I would just say that Anna
17 Bulkin, who is here, is our mitigation specialist,
18 she would not be testifying in the guilt phase in
19 any case.  And the other person would be our
20 investigator who might be in and out, Michael
21 Udvardi, and I would ask that those be exempted.  I
22 don't anticipate calling Mr. Udvardi.  I don't
23 anticipate calling him, but I think they occupy
24 essentially a similar position.  But with respect to
25 the balance, then I would ask that there be a

62

1  sequestration order.
2          MS. DAYTON:  You don't have any
3  witnesses in the courtroom?
4          MR. SHEEHAN:  No.
5          MS. DAYTON:  Okay.
6          THE COURT:  And you have no other
7  witnesses in the courtroom other than those that
8  there is no objection to there being here or who
9  have a right to be here?
10         MS. DAYTON:  JayJay Gonzalez is in the
11 courtroom, we're not intending to call him, but we
12 can tell him to leave just in case.
13         MR. SHEEHAN:  That would be fine.  Thank
14 you, your Honor.
15         (Sidebar concluded)
16         THE COURT:  All right.
17         MS. REYNOLDS:  May I proceed, your
18 Honor.
19         THE COURT:  I'll ask the government to
20 call your first witness.
21         MS. REYNOLDS:  Thank you, your Honor.
22 We'll are prepared to begin presenting evidence in
23 the case and we would call our first witness, 911
24 operator Maria Guadagno.
25         THE COURT:  All right, Ms. Guadagno,

63

1  please take the stand, remain standing, the oath
2  will be administered to you.
3          M A R I A   G U A D A G N O,
4  Having first affirmed, was examined and testified as
5  follows:
6          THE WITNESS:  G-U-A-D-A --
7          THE COURT:  Please bring the microphone
8  close to you or you to the microphone.
9          THE WITNESS:  G-U-A-D-A-G-N-O,
10 Bridgeport.
11         THE COURT:  All right, you may proceed,
12 Ms. Reynolds.
13         MS. REYNOLDS:  Thank you, your Honor.
14 DIRECT EXAMINATION
15 BY MS. REYNOLDS:
16    Q.   Ms. Guadagno, who do you work for?
17    A.   I work for Bridgeport Public Safety.  I'm
18 on 911 telecommunicator, dispatcher.
19         THE COURT:  You are going to need to
20 move the microphone closer to you, you are not being
21 amplified.
22    Q.   And how long have you been a 911 operator
23 with Bridgeport?
24    A.   25 years.
25    Q.   And can you describe what your duties and

64

1  responsibilities are as a 911 operator?
2     A.   Answer the phone and put it into the
3  computer as I get the information.
4     Q.   Okay.  And that's for all emergency calls?
5     A.   Yes.
6     Q.   And can you describe what your typical work
7  schedule is as a 911 operator?  Do you have a
8  specific shift you work?
9     A.   I work eight to four in the daytime, and I
10 dispatch, I answer phones, I do stolen cars, and
11 right now I'm currently training on fire.
12    Q.   When you say you are training on fire, is
13 that working with the fire department emergency
14 calls as well?
15    A.   Correct.
16    Q.   And when you say that your duties would
17 include answering calls and inputting things into
18 the computer, could you describe what that means if
19 you've got a 911 call?
20    A.   Well, you get their name, their location,
21 what happened, any descriptions, if you can.
22    Q.   Okay.  And when a 911 call comes in to you,
23 can you describe technically if it's recorded?
24    A.   Yes, everything is recorded.
25    Q.   Okay.  And when you mentioned the computer

GA16

65

1  screen, is that a computer screen that sits in front
2  of you as you take a 911 call?
3      A.   Correct.
4      Q.   And what types of information -- you
5  mentioned some of the things.  What types of
6  information comes up on that computer screen?
7      A.   The address, the name, phone number and
8  then a summary of what you want to put in there.
9      Q.   And when you say a summary of what you want
10 to put in there, is that information that you --
11     A.   Given.
12     Q.   -- put in to summarize the call?
13     A.   Uh-huh (indicating affirmatively).
14     Q.   Okay.  Yes?
15     A.   Yes.
16     Q.   Okay.  And can you -- after a call comes in
17 and you've taken it, are you able through the
18 computer system to update the information?
19     A.   Yes.
20     Q.   I'm going to draw your attention to August
21 of 2005 and ask you if you remember if you were
22 working at that time as a 911 operator?
23     A.   Okay.
24     Q.   You were?
25     A.   Yes.

66

1      Q.   Okay.  And specifically I'm going to draw
2  your attention to August 24th of 2005.  Do you
3  recall if you were working on that day?
4      A.   Yes.
5      Q.   And do you recall what shift you were
6  working?
7      A.   Eight to four.
8      Q.   Do you recall answering a 911 call that
9  morning that came in from -- regarding an incident
10 that had happened in the area of Charles Street in
11 Bridgeport, Connecticut?
12     A.   Yes.
13     Q.   Prior to testifying here today, did you
14 have an opportunity to review that phone call, a CD
15 containing the phone calls you received that day?
16     A.   Yes.
17     Q.   And did you also have an opportunity to
18 review the computerized summary of that phone call
19 that came in that day?
20     A.   Yes.
21     Q.   And finally, did you have an opportunity to
22 view a transcript that was prepared of the 911 call?
23     A.   Yes.
24          MS. REYNOLDS:  Your Honor, may I
25 approach?

67

1          THE COURT:  You may.
2      Q.   Showing you Government's Exhibit 100, do
3  you recognize that CD?
4      A.   Yes.
5      Q.   How do you recognize it?
6      A.   You let me listen to it and I initialed it.
7      Q.   And does that CD contain the 911 call that
8  you took that morning of August 24, 2005?
9      A.   Yes.
10          MS. REYNOLDS:  Your Honor, I would move
11 as a full exhibit Government's 100.
12          MR. SHEEHAN:  No objection, your Honor.
13          MR. SMITH:  No objection, your Honor.
14          THE COURT:  100 is a full exhibit.
15     Q.   And showing you Government's Exhibit 100A,
16 do you recognize what that's a printout of?
17     A.   The computer printout of the 911 call that
18 day.
19          MS. REYNOLDS:  Your Honor, I would move
20 100A as a full exhibit.
21          THE COURT:  All right.
22          MR. SMITH:  No objection.
23          THE COURT:  Full exhibit absent
24 objection.
25 BY MS. REYNOLDS:

68

1      Q.   And finally, just showing you Government's
2  Exhibit 100B, do you recognize this as the
3  transcript of the 911 call contained on Government's
4  Exhibit 100?
5      A.   Yes.
6          MS. REYNOLDS:  Your Honor, I would just
7  mark this for identification purposes.  I'm not
8  going to move it in, but I would ask that copies be
9  provided to the jury when we play the call.
10          THE COURT:  All right, and this will be
11 what the government has prepared as a transcript
12 from the call?
13          MS. REYNOLDS:  Yes, your Honor.
14          THE COURT:  So you may use that as an
15 aid.  Obviously the evidence will be the call
16 itself, such that if you believe that's not a
17 correct transcription you are to rely on the call
18 itself.
19 BY MS. REYNOLDS:
20     Q.   And if I could just, Ms. Guadagno, have you
21 take a look at the monitor in front of you.  I've
22 just showed you Government's Exhibit 100A.  Do you
23 see that up there?
24     A.   Yes.
25     Q.   And is this what you mentioned is the

69

```
1   computerized printout of the 911 call?
2       A.  Yes.
3       Q.  And you had mentioned that it would show
4   the person's name and phone number; is that correct?
5       A.  Yes.
6       Q.  And just taking a look at the screen, does
7   that show -- well, what does it say up there as far
8   as the name of the caller?
9       A.  Leroy.
10      Q.  And does it show the phone number that
11  Leroy called from when he placed that 911 call?
12      A.  Yes.
13      Q.  And what is that number?
14      A.  996-2047.
15          MS. REYNOLDS:  Your Honor, at this time
16  we would play Government's Exhibit 100, the 911
17  call.  So if we could pass out those transcripts.
18          THE COURT:  All right.
19          And you will run the transcript on the
20  screen, or no?
21          MS. REYNOLDS:  No, your Honor.  We're
22  doing it the old-fashioned way, just paper.
23          THE COURT:  I have a new light dimmer
24  system I'm anxious to try.
25          MS. REYNOLDS:  There will be plenty of
```

70

```
1   opportunity.
2           So at this time I'm going to play
3   government's 100.
4           (Tape played)
5           MS. REYNOLDS:  I have no further
6   questions, your Honor.
7           THE COURT:  All right,
8   cross-examination.
9           MR. SMITH:  Thank you, your Honor.
10  CROSS-EXAMINATION BY MR. SMITH:
11      Q.  Good morning, Ms. Guadagno.
12      A.  Good morning.
13      Q.  Am I pronouncing that correctly?
14      A.  Guadagno, yes.
15      Q.  Guadagno, thank you.
16      Now, I wanted to ask you about a few things
17  that occurred on the tape.  There is a period of
18  silence that we hear, correct?
19      A.  I'm sorry, say it again.
20      Q.  There is periods of silence that we hear
21  during the tape?
22      A.  Right.
23      Q.  And is that silence like meaning you are
24  just not on the air at that moment?
25      A.  Uh-huh (indicating affirmatively).
```

71

```
1       Q.  So, you might be away from --
2       A.  I put him on hold to call.
3       Q.  You put him on hold and you are entering
4   information on the computer, something like that?
5       A.  Correct.
6       Q.  So, this tape is seven minutes and
7   12 seconds long according to this counter here.
8   Does that sound about right?
9           THE COURT:  You are going to need to say
10  that once again for the court reporter's benefit.
11      A.  Yes.
12      Q.  So, that would have been the entire amount
13  of time you were dealing with this particular call,
14  correct?
15      A.  Yes.
16      Q.  Now, are you responsible for dispatching
17  the police or does someone else do that?
18      A.  Someone else was doing that at that time.
19      Q.  So they would take the information from you
20  and then dispatch the police?
21      A.  Yes.
22      Q.  Okay.  But at some point you actually
23  called the ambulance company; is that right?
24      A.  Right.
25      Q.  And then there is a point in the call where
```

72

```
1   you've got a call from a dispatcher at Troop G; is
2   that correct?
3       A.  It wasn't me, it was another.  That was
4   operator 36.  If you heard, I'm operator 31.
5       Q.  So, you were not privy to that
6   conversation --
7       A.  No.
8       Q.  -- with the person from Troop G.  Okay.
9           And who was -- there is a point when,
10  however, it was you who received information about a
11  phone number, 203-273-9101?
12      A.  That was the other operator.
13      Q.  That was the other operator.  Okay.
14  Now, at one point near the end of the tape you are
15  speaking to Leroy again?
16      A.  Correct.
17      Q.  Now, did he -- how did that occur?  Did he
18  call you or did you call him?
19      A.  I had to call him back because I had put
20  him on hold.
21      Q.  Okay.
22      A.  And that's why you hear the silence.  He
23  disconnected.
24      Q.  Okay.
25          MR. SMITH:  Would I be able to bring up
```

73

1  the CD exhibit again.  Thank you.
2      Q.  This exhibit, am I correct in noting that
3  the phone number that's sort of in the middle of the
4  page there, 996-2047 --
5      A.  Correct.
6      Q.  -- that's the number Leroy was calling you
7  from?
8      A.  Yes.
9      Q.  That information -- when it says report by
10 Leroy, comma, to the left of that, is that
11 information that just comes up on the computer or do
12 you generate that information?
13     A.  I typed that in.
14     Q.  You typed that in.  So that's not saying
15 that Leroy is -- that doesn't come up on your
16 computer with being associated with 996-2047?
17     A.  No.
18     Q.  That's information that you input?
19     A.  Correct.
20         MR. SMITH:  May I have just a moment,
21 your Honor.
22         THE COURT:  Yes.
23 BY MR. SMITH:
24     Q.  Just one last thing.  Towards the end of
25 the phone call it sounds like there is another

74

1  person with Mr. -- Leroy yelling in the background?
2      A.  From the tape, yes.  At the time I didn't
3  know.
4      Q.  Okay.  But from the tape it sounds to you
5  like that's what is happening?
6      A.  Yes.
7          MR. SMITH:  I have nothing further.
8          THE COURT:  All right, Ms. Reynolds, any
9  redirect?
10         MS. REYNOLDS:  No, thank you, your
11 Honor.
12         THE COURT:  All right, thank you,
13 Ms. Guadagno.  You may step down.  You are excused.
14     Will the government please call its next
15 witness.
16         MS. REYNOLDS:  Yes, your Honor.  The
17 government calls Leroy Whittingham.
18         THE COURT:  Mr. Whittingham, would you
19 please come over to the witness stand over here and
20 remain standing and Ms. Torday will administer the
21 oath to you.
22     L E R O Y   W H I T T I N G A M,
23 Having first affirmed, was examined and testified as
24 follows:
25         THE WITNESS:  My name is Leroy

75

1  Whittingham, W-H-I-T-T-I-N-G-H-A-M.
2          THE COURT:  And your town of residence,
3  sir?
4          THE WITNESS:  New Haven, Connecticut.
5          THE COURT:  Thank you.  You may proceed.
6          MS. REYNOLDS:  Thank you, your Honor.
7  DIRECT EXAMINATION
8  BY MS. REYNOLDS:
9      Q.  Mr. Whittingham, how old are you?
10     A.  I'm 24.
11     Q.  And where were you born?
12     A.  Stamford, Connecticut.
13     Q.  Where did you grow up?
14     A.  Stamford.
15     Q.  And when you were growing up in Stamford,
16 who did you live with there?
17     A.  My mother, Tina Johnson.
18     Q.  Any other family members?
19     A.  My sisters, my brothers.
20     Q.  How many sisters do you have?
21     A.  I got two sisters, one brother.
22     Q.  What are your sisters' names?
23     A.  Erica Whittingham, Lativia Whittingham and
24 Jamar Whittingham.
25     Q.  What's the lineup?  Who is the oldest, who

76

1  is the youngest?
2      A.  Jamar is the oldest, then Lativia, Erica is
3  the third oldest, and I'm the baby.
4      Q.  Okay.  And did there come a time when you
5  and your family moved to Bridgeport?
6      A.  Yes.
7      Q.  Do you remember about how old you were when
8  you and your family moved to Bridgeport?
9      A.  I was 12, turning 13.
10     Q.  All right.  And after that did there come a
11 time that you and your family moved to Shelton,
12 Connecticut?
13     A.  Yes.
14     Q.  And do you recall about how old you were
15 when you moved to Shelton?
16     A.  I was 14, turning 15.
17     Q.  Fourteen going on 15?
18     A.  Yeah.
19     Q.  Did you go to high school in Shelton?
20     A.  Yes, I did.
21     Q.  All right, did you go to Shelton High?
22     A.  Yes.
23     Q.  While you were in school, and earlier than
24 that time period but also during high school, did
25 you learn that you had a learning disability?

77

1   A.   Yes.
2   Q.   Were you able to -- did you graduate from
3   high school eventually?
4   A.   No, I didn't.
5   Q.   And you are currently receiving social --
6   A.   Security.
7   Q.   -- security because of your disability?
8   A.   Yes.
9   Q.   During that time period when you were
10  living in Shelton, who -- which family members were
11  living with you in Shelton?
12  A.   My mother and my sister.
13  Q.   Had your father moved out by then?
14  A.   Yes.
15  Q.   How long -- do you know how long your
16  parents were married?
17  A.   Twenty-something years.
18  Q.   Twenty-something years?
19  A.   Yeah.
20  Q.   When you say you were living with your
21  mother and your sister when you were in Shelton,
22  which sister were you living with at that time?
23  A.   Lativia Whittingham.
24  Q.   And did she have any daughters that were
25  living with you?

78

1   A.   Yes.
2   Q.   Okay.
3   A.   My niece, Donatasha Whittingham (ph).
4   Q.   I'm going to draw your attention
5   specifically now to the summer of 2005.  Do you
6   recall if at that time you were still living in
7   Shelton, Connecticut?
8   A.   Yes.
9   Q.   And how old were you in August of 2005?
10  A.   2005, I was 18.
11  Q.   Did there come a time that your mom, Tina
12  Johnson, in the summertime of 2005 started spending
13  some time over at an apartment building on 215
14  Charles Street?
15  A.   Yes.
16  Q.   Did you have an opportunity to visit your
17  mom over at 215 Charles Street?
18  A.   Yes.
19  Q.   At that time where was your brother Jamar
20  living?
21  A.   Bridgeport, Connecticut.
22  Q.   And about how far away was Jamar living
23  from where your mom was living?
24  A.   Fifteen minutes away.
25  Q.   When you say 15 minutes, is that a

79

1   15-minute walk or a drive?
2   A.   Yeah, like a 15-minute walk, but like a
3   five-minute drive.
4   Q.   And you indicated that you did have an
5   opportunity to go visit your mom or see your mom at
6   215 Charles Street.  Do you remember what apartment
7   she was staying in?  Well, let me withdraw that.
8       Did she start actually staying over at 215
9   Charles Street in the summer of 2005?
10  A.   Do I know what apartment?
11  Q.   First of all, do you know if she started
12  staying at 215 Charles Street?
13  A.   Yes.
14  Q.   So, did she move out from your home in
15  Shelton?
16  A.   Yeah, she stopped coming from that time
17  period, to just staying in Bridgeport.
18  Q.   And when you would go over to 215 Charles
19  Street, do you recall what apartment she was staying
20  in?
21  A.   On the first floor, on the right-hand side
22  when you walk up the stairs.
23  Q.   All right.  And do you know if anyone else
24  was living there with her?
25  A.   Her boyfriend James, and Basil.

80

1   Q.   All right.  And when you the say "her
2   boyfriend James," did you know James's full name?
3   A.   James Reid.
4   Q.   Did you get to know James a little bit that
5   summer of 2005?
6   A.   Yes, I did.
7   Q.   And did you know whether he went by any
8   nicknames?
9   A.   Tippy.
10  Q.   Tippy?
11  A.   Uh-huh (indicating affirmatively).
12  Q.   And you mentioned Basil.  Did you know
13  Basil's full name?
14  A.   No, I didn't.
15  Q.   Did you have an opportunity to meet Basil
16  when you would go visit your mom at 215 --
17  A.   Yes, I did.
18  Q.   And do you recall if Basil was older or
19  younger than your mom?
20  A.   He was older.
21  Q.   And did you develop a bit of a nickname for
22  him?
23  A.   Just Basil.
24  Q.   Just Basil?
25  A.   Yeah.

**GA20**

81

1    Q.   Okay.  And when you would go visit your
2  mom, did you learn whether or not she was performing
3  any duties or working with regards to Basil?
4    A.   Yeah, she was taking care of him.
5    Q.   And when you say she was taking care of
6  him, do you know what she was doing?
7    A.   Like making sure that he washed up and make
8  sure he ate and make sure he was all right.
9    Q.   Had your mom been a nurse before?
10    A.   Yes.
11    Q.   And when you would go over there to visit
12  her, did you see her doing those things for Basil?
13    A.   Yeah.
14    Q.   When you went over to the apartment
15  building at Charles Street, did you ever go to any
16  other apartments or always just to visit your mom?
17    A.   Always just to visit my mom.
18    Q.   That summer, did you start visiting your
19  mom more frequently come August of 2005?
20    A.   Yes.  I used to call her a lot and I come
21  see her like two times a day.
22    Q.   So you would call her about --
23    A.   Uh-huh (indicating affirmatively).
24    Q.   How often would you call her a day?
25    A.   Like four, five times a day.

82

1    Q.   And when you would call her, did you have a
2  cell phone at the time?
3    A.   Yes, I did.
4    Q.   Do you recall what your cell phone number
5  was by any chance?
6    A.   I don't even remember.  It was a while ago.
7    Q.   Do you think if I showed you something with
8  the number that that would help you remember what
9  your cell phone was at the time?
10    A.   Yeah.
11    MS. REYNOLDS:  Your Honor, could I
12  approach just showing a phone record?
13    THE COURT:  You may.
14    If this refreshes your recollection,
15  causes you remember the number, then you can testify
16  what the number was, but don't just read it off the
17  document.  All right?
18    THE WITNESS:  Okay.
19  BY MS. REYNOLDS:
20    Q.   If you could just take a look here at this
21  number in this phone record, does that refresh your
22  recollection as to what your cell phone number was
23  back in August of 2005?
24    A.   I don't remember, really.
25    Q.   Okay, thank you.  That's okay.

83

1    Now, you said you would call your mom using
2  your cell phone during the day a few times a day.
3  Did you know whether your mom had a cell phone at
4  the time?
5    A.   Yes, she did.
6    Q.   And when you would call her, did you call
7  her on her cell phone?
8    A.   Yes.
9    Q.   Did she always take your calls?
10    A.   Yes, she did.
11    Q.   Did there come a time in August of 2005
12  that you learned that your mom was using crack
13  cocaine there?
14    A.   Yeah, I -- yes, I did.
15    Q.   Did your mom have a crack cocaine addiction
16  problem?
17    A.   Yes, she did.
18    Q.   And was that one of the reasons you started
19  going over to visit her and also one of the reasons
20  you would call to check up on her --
21    A.   Yes.
22    Q.   -- in August of 2005?
23    A.   Yes.
24    Q.   Did you learn in August of 2005 whether or
25  not your mom had run into some problems -- without

84

1  telling us anything else -- with regards to her
2  crack addiction related to the building there at 215
3  Charles Street?
4    MR. SMITH:  Objection.
5    THE COURT:  Can you be more precise
6  about that?  What's your objection?
7    MR. SMITH:  Your Honor, I think the form
8  of the question is inviting an answer that might not
9  be --
10    THE COURT:  Would you mind rephrasing.
11    MS. REYNOLDS:  No, I wouldn't mind, your
12  Honor.
13  BY MS. REYNOLDS:
14    Q.   Did you learn if there were any issues your
15  mom was having over at Charles Street?
16    A.   Yes.
17    Q.   And once you found out about those issues,
18  did that cause you concern?
19    A.   Yes, it did.
20    Q.   Did you and your family discuss those
21  issues?  Without telling us what you said, did you
22  and your family discuss the issues your mom was
23  having?
24    A.   Yes.
25    MR. SMITH:  Objection, relevance.

85

```
 1          THE COURT:  Overruled.
 2     Q.   And after you and your family discussed
 3  that, did you decide that you wanted your mom to
 4  move out of 215 Charles Street?
 5     A.   Yes, I did.
 6     Q.   And drawing your attention specifically to
 7  August 23rd, 2005, the day before your mom was
 8  murdered, did you have an opportunity to talk to
 9  your mom that day?
10     A.   Yes, I did.
11     Q.   Did you call her on the phone?
12     A.   Yes.
13     Q.   And she took your call?
14     A.   Yes.
15     Q.   Did you also have an opportunity to stop by
16  that evening of August 23rd, 2005?
17     A.   Yes, I did.
18     Q.   And you went to the apartment where she was
19  living at the time?
20     A.   Yes.
21     Q.   Do you recall if anyone else was in the
22  apartment with her that evening of August 23, 2005?
23     A.   Basil and Tippy.
24     Q.   And do you remember about what time you
25  went to visit her that evening?
```

86

```
 1     A.   It had to have been around like -- it was
 2  the sun wasn't out.  It had to be like seven,
 3  eight o'clock.
 4     Q.   Did you go with anybody to visit her.
 5     A.   Yes.
 6     Q.   Who did you go with?
 7     A.   My girlfriend.
 8     Q.   Did you and your girlfriend both go inside
 9  to the apartment at that time?
10     A.   Yes, we did.
11     Q.   And you said Basil and Tippy were there?
12     A.   Yes.
13     Q.   Do you recall what everyone was doing that
14  evening?
15     A.   Yes.
16     Q.   What were they doing?
17     A.   Tippy was sitting down eating, Basil was
18  listening to music, my mom was talking to me.
19     Q.   Did you introduce your mom to your
20  girlfriend at that time?
21     A.   Yes, I did.
22     Q.   And did you discuss with your mom at that
23  time moving out of Charles Street?
24     A.   Yes, I did.
25     Q.   Did you come to an agreement to come back
```

87

```
 1  the next morning to pick her up?
 2     A.   Yes, I did.
 3     Q.   And had she agreed to move out the next
 4  day?
 5     A.   Yes.
 6     Q.   About how long were you in the apartment
 7  that evening visiting your mom?
 8     A.   Ten minutes.
 9     Q.   So you had just stopped by?
10     A.   Uh-huh (indicating affirmatively).
11     Q.   You have to say yes.
12     A.   Yes.
13     Q.   After you left where did you go?
14     A.   I went to my brother's apartment and I
15  stayed there overnight.
16     Q.   And that's your brother, Jamar.
17     A.   Yes.
18     Q.   Did your girlfriend go with you to Jamar's.
19     A.   She dropped me off and went home.
20     Q.   I'm going to ask you now about the morning
21  of August -- August 24, 2005.  You said you spent
22  the night at your brother Jamar's home.
23     A.   Yes.
24     Q.   What did you do when you got up that
25  morning?
```

88

```
 1     A.   When I got up, I called my mother's phone.
 2  No answer, nobody picked up, so I called again.  And
 3  when I didn't get the response that I wanted, the
 4  answer, I got up I walked over to Charles Street.
 5     Q.   So, you walked from Jamar's home to your
 6  mom's home at Charles Street.
 7     A.   Yes.
 8     Q.   And about how long did that take you?  Do
 9  you remember?
10     A.   It took me like 15 minutes.
11     Q.   Do you remember about what time you started
12  calling her that morning?
13     A.   No, it was early in the morning, probably
14  around like 9:30, 10:00.
15     Q.   At 9:30 or 10:00.  It was after you had
16  gotten up?
17     A.   Yeah.
18     Q.   What happened when you got over to Charles
19  Street?
20     A.   When I got over there, I was knocking on
21  the door.  It was quiet.  Nobody was answering the
22  door.  I got suspicious and I was, like, why nobody
23  not answering the door?  Why is it so quiet in
24  there?  So, I walked around the side of the building
25  and I seen the window open and the blinds down, so I
```

**GA22**

89

```
1   pushed the blind over to the side, and I seen my mom
2   and Tippy laying on the floor with pillows over
3   them.
4       Q.   What did you do at that point?
5       A.   At that point I jumped up and I jumped in
6   the window.  I went over to my mother and I was just
7   moving pillows off her saying, "Get up, mom."
8       Q.   Were you holding your mom at that point?
9       A.   Yeah.
10      Q.   Did you see anything else in the room?
11      A.   I seen Tippy on the floor next to my
12  mother.  And it's like a lot of stuff.
13      Q.   Did you see whether or not they were tied
14  up with anything?
15      A.   Yeah, they was tied up with duct tape.
16      Q.   Did you see if there was any blood?
17      A.   Yes, there was blood on the wall and blood
18  on the ceiling.
19      Q.   What did you do next?
20      A.   I went inside the front room and called
21  911.  I seen Basil in his room laying on the end of
22  his bed, tied up at the foot of his bed.
23      Q.   When you say you went to the front room?
24      A.   The living room.
25      Q.   Did you go in the living room?
```

90

```
1       A.   Yes.
2       Q.   When you went in there, did you see what
3   the apartment looked like at the time?
4       A.   It was destroyed.  Like a big struggle,
5   fighting.  Everything was messed up.  There was
6   everything all over the place.  Stuff like
7   everywhere.  Somebody like had a war in there,
8   fighting.
9       Q.   And you said you saw that Basil was in his
10  room tied up as well?
11      A.   Yes.
12      Q.   Were you able to get out of the front door?
13  Do you recall having to leave?
14      A.   I jumped back out the window and I made a
15  911 call.
16      Q.   So, when you jumped out the window you
17  started calling 911?
18      A.   Yeah.  Yes.
19      Q.   And do you remember if there was a woman
20  there who started helping you?
21      A.   Yes, I do remember.
22      Q.   Do you recall if you went back inside the
23  apartment?
24      A.   I kicked the door.
25      Q.   You kicked the door.  When you say you
```

91

```
1   kicked the door, do you mean the front door?
2       A.   Yes.
3       Q.   And did you go back in?
4       A.   Yeah, I did.  I came back out with the
5   lady, and then by the time I came out the ambulance
6   people came.
7       Q.   And when you say you came back out of the
8   apartment with the lady, is that the woman who was
9   helping you when you were calling 911?
10      A.   Yes.
11      Q.   All right.  She got you out of the
12  apartment?
13      A.   Yes.
14      Q.   And you said the ambulance arrived?
15      A.   Yes.
16      Q.   And did you stay in the front part of the
17  building at that time?
18      A.   Yes, I did.
19      Q.   And did the ambulance personnel eventually
20  come out?
21      A.   Yes.
22      Q.   And what did they say?
23           MR. SMITH:  Objection.
24      Q.   Well, what happened next?
25           MS. REYNOLDS:  It doesn't go to the
```

92

```
1   truth, your Honor, it just explains.
2           THE COURT:  But is it necessary?
3       Q.   After the 911 -- after the emergency
4   personnel came out, do you recall where you were
5   taken at that point?
6       A.   I was in the front with people that was
7   surrounding me in a circle and praying for me, and
8   when they came out they said that my mother didn't
9   make it.
10      Q.   And eventually did you contact your other
11  family members?
12      A.   Yes, I did.
13      Q.   And eventually did you go to the police
14  station?
15      A.   Yes.
16           MS. REYNOLDS:  I have nothing further,
17  your Honor.
18           THE COURT:  All right,
19  cross-examination.
20           MR. SMITH:  Thank you, your Honor.  If I
21  could just have a moment.
22  CROSS-EXAMINATION
23  BY MR. SMITH:
24      Q.   Hi, Mr. Whittingham.
25      A.   How are you doing?
```

93

1    Q.   My name is Justin Smith and I represent
2  Azibo Aquart.  You understand that I have to ask you
3  some questions.
4    A.   Yes.
5    Q.   And my questions aren't designed to
6  embarrass you or anything, okay, so you understand
7  that.
8    A.   Yes.
9    Q.   Okay.  You had testified about the summer
10  of 2005 and speaking with your mother when she was
11  alive at Charles street.  You said you called her
12  often?
13    A.   Yes.
14    Q.   And that was from the cell phone that you
15  had at the time?
16    A.   Yes.
17    Q.   And that was to the cell phone that she had
18  at the time?
19    A.   Yes.
20    Q.   And you had that cell phone for a while?
21    A.   Probably for like two months, three months.
22    Q.   And she had her cell phone for some time?
23    A.   Yes.
24    Q.   Okay.  Now, when you went to the apartment
25  building that day, were you alone?

94

1    A.   I went to the apartment building before the
2  murder happened?
3    Q.   That morning, yes.  Were you alone?
4    A.   Yes, I was alone.
5    Q.   The evening before when you had gone there
6  you went, you said, with your girlfriend?
7    A.   Yes.
8    Q.   What was her name?
9    A.   Camille.
10    Q.   Camille.  And her last name?
11    A.   I don't know.  I forgot her last name.
12    Q.   And when you went in, you saw the condition
13  of the apartment the night before the murders,
14  correct?
15    A.   Yes.
16    Q.   And there was a couch in the hallway,
17  correct?
18    A.   A couch in the hallway?
19    Q.   Yes.  Do you recall a couch being in the
20  hallway?
21    A.   A couch in the living room, but not in the
22  hallway.
23    Q.   Okay.
24         THE COURT:  Before that is on the
25  screen, could you put it --

95

1         MR. SMITH:  I'm sorry, your Honor.  Yes,
2  I'm going to.
3         THE COURT:  Thank you.
4  BY MR. SMITH:
5    Q.   Mr. Whittingham, you can see that in front
6  of you there?
7    A.   Yes.
8    Q.   Do you recognize that photo?
9    A.   Yes.
10    Q.   Is that a fair and accurate representation
11  of the hallway in your mother's apartment the night
12  you visited her?
13    A.   The night I visited her that couch was not
14  there.
15    Q.   Was not there?
16    A.   No.
17    Q.   Okay.  Was that couch there that morning?
18         MS. REYNOLDS:  Your Honor, is it being
19  moved in so that the jury can see it?
20         THE COURT:  Are you offering that
21  Mr. Smith?
22         MR. SMITH:  Yes, your Honor.
23         THE COURT:  All right, then we will mark
24  that as Defendant's A.
25         MR. SMITH:  Yes.

96

1         THE COURT:  All right.  It's a full
2  exhibit absent objection.  And it may be displayed.
3  BY MR. SMITH:
4    Q.   So, that couch you said was not in that
5  position that night?
6    A.   No.
7    Q.   Okay.  And was it in that position the next
8  morning?
9    A.   I don't remember.
10    Q.   Okay.  Now, you recall that you testified
11  before the grand jury in this matter?
12    A.   Yes.
13    Q.   And this was quite a while ago, 2005?
14    A.   '5, yes.
15    Q.   And do you remember telling the grand jury
16  that when you went into the living room you were
17  grabbing at things?
18    A.   I was upset, yes.
19    Q.   And sort of tearing at things?
20    A.   I punched the wall.
21    Q.   Do you recall telling the grand jury that
22  you opened the apartment door from the inside?
23    A.   I don't remember.
24    Q.   Okay.
25         MR. SMITH:  Could we look at DG 3079.

**GA24**

97

```
1   I'm sorry, if we could look at DG 3080.
2   BY MR. SMITH:
3       Q.   Mr. Whittingham, looking at around line 13,
4   does that refresh your memory as to what you told
5   the grand jury?
6           MS. REYNOLDS:  As to what?
7           THE COURT:  You need to ask him the
8   question, get his answer.  If it's inconsistent with
9   the grand jury testimony, you can then go to the
10  question and answer there.
11  BY MR. SMITH:
12      Q.   Mr. Whittingham, you testified here today
13  that after you entered the apartment you went -- you
14  saw your mother; is that correct?
15      A.   Yes.
16      Q.   And you removed some pillows from her body,
17  and then you touched the body.  Is that correct?
18      A.   Yes.
19      Q.   Okay.  Did you move the body, roll it?
20      A.   No.
21      Q.   Okay.  And then you went into the living
22  room; is that correct?
23      A.   Yes.
24      Q.   And you testified that the door was locked?
25      A.   Yes.
```

98

```
1       Q.   And you did not go out the door?
2       A.   No.
3       Q.   Okay.  You recall, however, testifying at
4   the grand jury?
5       A.   Yes.
6       Q.   And do you recall telling the grand jury
7   that you unlocked the door?  "I unlocked it."
8           MS. REYNOLDS:  Objection, your Honor.
9   Objection.
10          THE COURT:  Basis?
11          MS. REYNOLDS:  He said he didn't recall
12  going out the front door.  Now he's starting to read
13  from the grand jury.
14          THE COURT:  He said he did not go out
15  the front door.
16          MS. REYNOLDS:  Correct.  Now counsel is
17  reading from a grand jury transcript.
18          MR. SMITH:  I'm asking if he told the
19  grand jury these things, your Honor.
20          MS. REYNOLDS:  He said he didn't recall
21  what he told the grand jury.
22          THE COURT:  All right, I'm going to let
23  you just read the question and read the answer.  It
24  doesn't matter whether he remembers it or not.  It
25  was testimony given under oath to the grand jury.
```

99

```
1   Go ahead.
2           MR. SMITH:  Thank you, your Honor.
3           THE COURT:  Just read the question and
4   the answer.
5       Q.   You were asked:  "What did you do at that
6   point?
7           Answer:  "I unlocked it, went out the front
8   door, scoping in the hallway, like nobody didn't
9   hear nothing, heard nothing.  Then I ran back in the
10  building inside the apartment.  I locked the door
11  and jumped out the window."
12          You told the grand jury that?
13      A.   I don't remember.
14      Q.   At some point you went back out the window
15  of the bedroom; is that correct?
16      A.   Yes, I did.
17      Q.   And you said that you went around, back
18  into the front of the building?
19      A.   Yes.
20      Q.   And then you went to the apartment door?
21      A.   Yes.
22      Q.   And it was at that point that you kicked it
23  in?
24      A.   Yes.
25      Q.   Okay.  And then you the re-entered the
```

100

```
1   apartment with this woman; is that right?
2       A.   Yes.
3       Q.   And then you left the apartment?  Am I
4   correct in understanding that?
5       A.   Yes, I did.
6       Q.   And then the ambulance arrived.  Is that
7   the sequence?
8       A.   Yes.
9           MR. SMITH:  Just a moment, your Honor.
10          THE COURT:  Yes.
11          MR. SMITH:  Your Honor, I'd like to move
12  to enter as a defense exhibit that page of the grand
13  jury testimony.
14          MS. REYNOLDS:  We would object to that,
15  your Honor.
16          THE COURT:  I will reserve on that and
17  we'll take up argument at a break.
18          MR. SMITH:  Thank you, your Honor.
19          THE COURT:  Would that be B for ID?
20          MR. SMITH:  Thank you.
21          THE COURT:  And the date is?  Date of
22  the grand jury testimony?
23          MR. SMITH:  Yes, your Honor.  I believe
24  it's November 2nd, 2005.  And this would be page --
25  I'm sorry, your Honor, I misspoke, it is March 8,
```

**GA25**

101

```
1    2006, and this would be page 20.
2              THE COURT:  All right.  Thank you.
3    BY MR. SMITH:
4       Q.   Mr. Whittingham, thank you for answering my
5    questions.
6              THE COURT:  All right, redirect.
7              MS. REYNOLDS:  No, thank you, your
8    Honor.
9              THE COURT:  All right, thank you,
10   Mr. Whittingham.  You are excused.  You may step
11   down.
12             All right, would you please call your
13   next witness.
14             MR. MARKLE:  Yes, your Honor, government
15   would call Karen O'Donnell.
16             MS. DAYTON:  Your Honor, just for the
17   record, now that Mr. Whittingham has testified, it's
18   okay to have him stay in the courtroom, correct?
19             THE COURT:  Yes.
20             All right, Ms. O'Donnell, would you
21   please come over to the witness stand and remain
22   standing, raise your right hand and the oath will be
23   administered to you.
24             K A R E N   O ' D O N N E L L,
25   Having first affirmed, was examined and testified as
```

102

```
1    follows:
2              THE WITNESS:  It's O-D-O-N-N-E-L-L.
3              THE COURT:  You need to pull the
4    microphone close to you and speak into it.
5              THE WITNESS:  Is that better?
6              THE COURT:  I don't know if it's better.
7              THE WITNESS:  O-D-O-N-N-E-L-L.
8              THE COURT:  No, it's not better enough.
9    Please scoot up.
10             THE WITNESS:  How is that?
11             THE COURT:  Thank you.
12             All right, Mr. Markle.
13             THE CLERK:  What is your town of
14   residence?
15             THE WITNESS:  Stratford.
16   DIRECT EXAMINATION
17   BY MR. MARKLE:
18       Q.   Speak right into the microphone.
19             Ms. O'Donnell, would you the tell the ladies
20   and gentlemen how you're employed.
21       A.   I'm employed at the American Medical
22   Response.
23       Q.   What is American Medical Response?
24       A.   It's an ambulance service in Bridgeport,
25   Connecticut.
```

103

```
1        Q.   How long have you been employed by -- is it
2    known by AMR?
3        A.   Yes.
4        Q.   AMR?
5        A.   Seven years.
6        Q.   Has that been continuous employment?  For
7    all seven years have you served as an ambulance
8    responder?
9        A.   No, it was broken up in 2008, 2009, I was
10   deployed to Afghanistan.
11       Q.   In what capacity?  What were you doing in
12   Afghanistan?
13       A.   I'm a corpsman in the Navy, so medical.
14       Q.   So, your service with AMR was interrupted
15   by your service with the Navy?
16       A.   Yes, in 2008.
17       Q.   Okay.  And in regards to -- you are an EMT,
18   correct?
19       A.   Yes.
20       Q.   And what does that stand for?
21       A.   Emergency medical technician.
22       Q.   And have you received training to be an
23   EMT?
24       A.   Yes.
25       Q.   And what sort of training have you
```

104

```
1    received?
2        A.   We go to school for approximately 12 to
3    14 months, and then we do ride time.
4        Q.   Okay, so there is actual, like, classroom
5    training?
6        A.   There is classroom training and they call
7    it on-the-job training, you are just not employed.
8    You go as a third rider for approximately 80 hours
9    before you can graduate.
10       Q.   And that's the ride time?
11       A.   Yes.
12       Q.   And that's with somebody who is already
13   certified?
14       A.   Yes.
15       Q.   And are you also what's referred to as an
16   EMT intermediate, certified as an EMT intermediate?
17       A.   Yes, I am.
18       Q.   What does that mean?
19       A.   That's more schooling to have better
20   patient assessment skills.
21       Q.   So, an EMT is able to do -- once you are
22   certified as an EMT, what are you able to do in
23   terms of patient assessment?
24       A.   You have basic life support where you can
25   perform CPR, you recognize if you need a higher
```

105

```
1    level of care, which would be an intermediate or a
2    paramedic.
3        Q.   And then once you are an intermediate you
4    can -- is there more you can do for a patient when
5    you respond to an accident or --
6        A.   Yes.
7        Q.   And what is that?
8        A.   We can start IVs and give certain
9    medications that EMT basics cannot give.
10       Q.   And you are also trained as a paramedic?
11       A.   Yes, I went to school for paramedic, but
12   then I got deployed, so I couldn't finish.
13       Q.   So, you didn't finish?
14       A.   Right.
15       Q.   And the paramedic training, it's obviously
16   additional training?
17       A.   Yep, it's longer school.  It's almost two
18   years of schooling and a lot more ride time.
19       Q.   And that would allow you to do further
20   assessment and treatment of victims of accidents?
21       A.   Yes.
22       Q.   Or shootings or whatever it is?
23       A.   Yes.
24       Q.   And as a Navy corpsman?
25       A.   Corpsman.
```

106

```
1        Q.   Corpsman, I'm sorry.  It's not corpswoman?
2        A.   No.
3        Q.   Did you -- would you -- what would be your
4    responsibilities when you were in Afghanistan?
5        A.   I worked in a facility where we housed
6    detainees and I gave them medical treatment.  And I
7    also went out with MP battalion on convoys and we
8    patrolled villages and things like that.  So, I was
9    their primary medic.  I took care of their injuries.
10       Q.   So, battlefield injuries?
11       A.   Yes.
12       Q.   And you would treat people who suffered
13   injuries?
14       A.   Our people and the enemy.
15       Q.   And enemy?
16       A.   Yes.
17       Q.   Okay.  And are you scheduled to go back to
18   Afghanistan?
19       A.   Yes, I am.
20       Q.   And for how long are you going to be
21   deployed this time?
22       A.   Approximately a year.
23       Q.   And what would be your responsibility at
24   that time?
25       A.   Same as last.  I'm a corpsman still, so I
```

107

```
1    would be doing medical things.
2        Q.   And in regards to being an EMT, as of
3    August 24th of 2005, how long had you been working
4    as an EMT?
5        A.   Approximately two years.
6        Q.   And your training had been completed and
7    you were certified; is that correct?
8        A.   Yes.
9        Q.   Did you respond in those two years, up to
10   August of 2005, to, would it be fair to say,
11   hundreds of emergency calls?
12       A.   I would say closer to a thousand.
13       Q.   A thousand?
14       A.   A thousand plus.
15       Q.   And where were you working?  What was
16   your -- was there a specific assigned area or city
17   that you worked?
18       A.   Bridgeport.
19       Q.   And when you say respond, we're talking
20   about accidents, emergencies of any type, crimes?
21       A.   Anytime 911 is called and they request some
22   type of medical assistance we respond to it.
23       Q.   And how many hours -- or what hours would
24   you work during the week back in 2005?
25       A.   Anywhere between 40 and 80 hours a week.
```

108

```
1        Q.   Was that up to you or up to --
2        A.   It was up to me.
3        Q.   Okay.  So you were enthusiastic?
4        A.   Very.
5        Q.   And working extra hours back then?
6        A.   Yes.
7        Q.   And since August of 2005, have you
8    responded to thousands of more emergency 911 calls?
9        A.   I would say yes, but when I came home in
10   2009 I was promoted and I work inside in a
11   supervisory position now and outside.  So, I do
12   both.
13       Q.   So you are not responding to as many calls
14   as you previously did?
15       A.   No.
16       Q.   And in August of 2005, would you work alone
17   or would you always be with a partner?
18       A.   I always had a partner.
19       Q.   And who was your partner back then?
20       A.   Rosanna Mendoza (ph).
21       Q.   Was she also a certified EMT?
22       A.   She was a paramedic.
23       Q.   So, she was certified as a paramedic?
24       A.   Licensed.  We're licensed.
25       Q.   Fully licensed?
```

109

```
1      A.   Yes, paramedics are licensed, EMTs are
2   certified.
3      Q.   And do you recall on August 24, 2005, being
4   responded to a crime scene -- or I mean being
5   dispatched to a crime scene?
6      A.   Yes.
7      Q.   And do you recall where you were when you
8   received that dispatch or that call?
9      A.   Yes, I do.  We were at Saint Vincent's
10  Medical Center.
11     Q.   Saint Vincent's Medical Center?
12     A.   Yes.
13     Q.   And do you recall approximately what time
14  you received that dispatch?
15     A.   I would say it was 10:00, 10:15 range, I
16  don't know.  It was around ten o'clock in the
17  morning.
18     Q.   It was in the morning hours?
19     A.   Yes.
20     Q.   And do you recall where you were sent?
21     A.   Originally the first address we were sent
22  to was on Main Street with the cross of Charles
23  Street.  So, we were driving from St. Vincent's down
24  on Main towards Charles because we were told it was
25  -- the address was on Main --
```

110

```
1      Q.   So, there was some confusion over the exact
2   address that you were responding to?
3      A.   From our dispatcher, yes.
4      Q.   I'm sorry?
5      A.   From our dispatcher, yes.
6      Q.   And did you know what you -- what reason
7   you were being sent there for?
8      A.   Originally it came in as a shooting.
9      Q.   And were you in an ambulance?  What kind of
10  vehicle were you in?
11     A.   We were in an ambulance.
12     Q.   And were you dressed the way you are today
13  in court?
14     A.   No.
15     Q.   How were you dressed?
16     A.   A blue shirt instead of a white one.
17     Q.   And you are dressed this way because you
18  are going back to work after this?
19     A.   Well, I went to work before I came here and
20  then I'm going to go back to work.  So --
21     Q.   So, it was blue, but similar to what you
22  are wearing today?
23     A.   Pretty much the same exact, just blue.
24     Q.   And you are in a vehicle that's marked as
25  an ambulance?
```

111

```
1      A.   Yes.
2      Q.   And did you go with sirens, lights,
3   anything?
4      A.   Yes, it was a priority one.
5      Q.   Priority one?
6      A.   Which is lights and sirens.
7      Q.   And approximately how long did it take for
8   you to go from St. Vincent's to the scene?
9      A.   Less than five minutes.  Maybe four.  I
10  can't be exact with that number.  I don't know.
11     Q.   Very short time?
12     A.   Very short time.
13     Q.   And did you eventually -- well, when you
14  arrived in the area, how did you find out where the
15  right place was, what was the right location?
16     A.   As we were driving down Main Street towards
17  Charles we were being flagged down by somebody
18  standing on the corner of Charles and Main.  There
19  is a diner there and there was somebody standing
20  near that parking lot waving us.  So, then we got on
21  our radio and told them we were being waved onto
22  Charles, and that's when we were told that the call
23  was actual located on Charles.  So, we were in the
24  right spot.
25     Q.   So, you were in the right spot?
```

112

```
1      A.   Yes.
2      Q.   No matter how you got dispatched there?
3      A.   Right.
4      Q.   And there was a person outside.  Was it a
5   male or female?
6      A.   It was a male.
7      Q.   And was he -- how did he draw your
8   attention?
9      A.   He was waving his arms frantically and
10  screaming.  I could barely hear him over the sirens,
11  but I knew he was saying something, I just couldn't
12  make out what it was.
13     Q.   And did you park on Charles Street?
14     A.   We did.
15     Q.   And did you -- what did you do when you
16  first parked when you stopped?
17     A.   The first thing we did was shut off the
18  siren and then we notified our dispatcher we are on
19  scene.  And then we asked where PD was.
20     Q.   Meaning the police department?
21     A.   Yes.
22     Q.   So there were no police officers in sight
23  when you arrived?
24     A.   No.
25     Q.   Okay.  And what, if anything, happened next
```

113

```
1    that you recall?
2        A.   That I recall?  The gentleman that was
3    waving his hands and pointing us in the direction
4    came to my -- the driver's side and started knocking
5    on the window telling me to hurry up, that his mom
6    just got shot.
7        Q.   That his mom just got shot?
8        A.   That's what he said.
9        Q.   And at that time had you requested police
10   to respond?
11       A.   Yes.
12       Q.   And they still were not there, though?
13       A.   No.
14       Q.   What, if anything -- what is your training?
15   Do you usually go in before the police arrive?
16       A.   No, not in a violent situation.  If there
17   is an assault or a shooting or stabbing we wait for
18   PD assistance.
19       Q.   So, the protocol is for you to wait for
20   police to arrive?
21       A.   Yes.
22       Q.   So, did you wait for police to arrive?
23       A.   No.  We at that time did not have a choice,
24   there was a crowd forming and we didn't want the
25   crowd or who I think is the son, I don't know
```

114

```
1    because he didn't specify if he was or not, to turn
2    on us and start getting angry with us.  So, we
3    proceeded toward the house.
4        Q.   Did the person who said "my mom has been
5    shot" appear to be upset?
6        A.   Extremely.
7        Q.   Extremely?
8        A.   Uh-huh (indicating affirmatively).
9        Q.   And were you able to talk to him at all?
10       A.   A little bit, but he was very all over the
11   place.  You know, he tugged on me a couple of times
12   and we tried to tell him to calm down and let us get
13   our gear together.  We were trying to wait a minute
14   for PD before we entered, but we couldn't stall that
15   much.
16       Q.   Okay.  So, how long -- so did you in fact
17   get your gear?
18       A.   We did.
19       Q.   And what does that consist of, which is the
20   equipment that you get, you take into the scene?
21       A.   We'll grab a first-in bag, which is a first
22   responder's bag, and it has everything we need to do
23   any type of procedure, if we need to intubate or
24   start IVs or give medication or stop bleeding.
25   Anything we need is in this bag.  Then we carry an
```

115

```
1    oxygen bag, and then we carry a monitor which could
2    deliver electricity to the heart where we can put
3    stickers on people and see if they have a heartbeat.
4        Q.   What's your responsibility in terms of
5    treatment of a victim of whatever the emergency is?
6        A.   Depending on how many victims.  I assist
7    the paramedic and pretty much hand over any
8    equipment, or I start to perform life-saving
9    measures while my partner is doing something else.
10   So, we work in tandem, kind of.
11       Q.   And did you -- once you had your equipment,
12   did you and your partner exit your vehicle?
13       A.   We did.
14       Q.   And where did you proceed to go?
15       A.   We started to make our way up the stairs
16   while we were still asking for the arrival of PD,
17   when they were going to get there.  We needed a
18   time.  We asked numerous times what's the ETA of PD
19   as we were walking up the stairs.
20       Q.   So you were wondering when the police were
21   going to arrive, but now you have to go in?
22       A.   We have to go, yes.
23       Q.   And what happened to the individual who had
24   said "my mom has been shot"?
25       A.   He went in front of us.  He took off.  I
```

116

```
1    lost sight of him.
2        Q.   And when you say he went in front of you,
3    towards the building?
4        A.   Towards the building, up the stairs.
5        Q.   And did you proceed up the stairway to the
6    building?
7        A.   Yes, we did.
8        Q.   I'm going to ask you to look at the
9    monitor.  And do you see what's been marked
10   Government's Exhibit 102?
11       A.   I do.
12       Q.   And do you recognize that photograph?
13       A.   I do.
14       Q.   And what is that?
15       A.   That is the front of the building that we
16   went into.
17       Q.   Is that the building you subsequently
18   entered?
19       A.   Yes.
20       Q.   And is that how it appeared on August 24,
21   2005, to the best of your recollection?
22       A.   Yes.
23            MR. MARKLE:  I would offer that, your
24   Honor.
25            THE COURT:  All right, absent objection.
```

**GA29**

117

```
 1            MR. SMITH:  No objection.
 2            THE COURT:  It will be a full exhibit,
 3  102.
 4            MR. MARKLE:  Your Honor, if I may, if I
 5  could just go through them and then mark them.  Is
 6  it all right to mark them at the end rather that do
 7  it one-by-one?
 8            THE COURT:  That's fine.
 9            MR. MARKLE:  Thank you.
10  BY MR. MARKLE:
11       Q.  So, actually, right where the arrow is,
12  Ms. O'Donnell, is that about where the entrance is?
13       A.  That is the entrance.
14       Q.  That is?
15       A.  Yes.
16       Q.  So, as you proceeded up the stairs what, if
17  anything, happened?
18       A.  As we were walking up the stairs my partner
19  got on the radio again to ask for PD and tripped and
20  fell walking up the stairs.  So, I turned around to
21  help her up, and then we just proceeded into the --
22       Q.  And when you, again, went to go into the
23  apartment, could you see the person that had flagged
24  you down?
25       A.  No, he was still out of my sight.
```

118

```
 1       Q.  And as you turned around and proceeded up
 2  the stairs, did you have the equipment or your
 3  partner?
 4       A.  There was a lot to carry, so we were both
 5  carrying items.
 6       Q.  And did you at that time -- well, let me
 7  just show you another photograph.
 8            I'll show you in a minute.  As you proceeded
 9  up the stairs, did you hear or see anything else
10  happen after you helped your partner up from the
11  steps?
12       A.  Yes, we heard a loud noise like a crash
13  noise or something that startled us.
14       Q.  And it certainly caught your attention?
15       A.  Certainly.
16       Q.  Did you subsequently learn what that was?
17       A.  Yes, we did.
18       Q.  And when did you learn what that was?
19       A.  As soon as we entered through that door
20  there is another door, and you go in the hallway and
21  you -- kind of a little hook around, that's the
22  front door to the residence, and it seemed to have
23  been forced open.
24       Q.  And let me the show you -- I'm sorry.  Is
25  that a close-up of the stairway as you -- that you
```

119

```
 1  entered the building?
 2       A.  Yes, it is.
 3       Q.  That's the stairway where you indicated
 4  that your partner fell?
 5       A.  Fell walking up the stairs.
 6            MR. MARKLE:  I would offer the
 7  government 102A as a full exhibit, your Honor.
 8            MR. SMITH:  No objection.
 9            THE COURT:  It's a full exhibit.
10  BY MR. MARKLE:
11       Q.  Ms. O'Donnell, you can see in that
12  photograph there is a doorway that allows you
13  entrance into the apartment building right at the
14  top of those stairs?
15       A.  Yes, there is.
16       Q.  Once you entered there, is there a second
17  doorway you have to go through?
18       A.  There is like a security door.
19       Q.  And you proceeded through there?
20       A.  Yes.
21       Q.  And was it those doors that you saw that
22  had been -- is that where you heard the noise from,
23  or was it further in?
24       A.  No, it was further in.
25       Q.  And did proceed further into the apartment
```

120

```
 1  building?
 2       A.  Yes, we did.
 3            MS. DAYTON:  Can we dim the lights a
 4  little, your Honor?
 5            THE COURT:  Oh, let's see.
 6            MR. MARKLE:  I should have asked for
 7  that.
 8  BY MR. MARKLE:
 9       Q.  Do you see what's on the monitor now,
10  Ms. O'Donnell?
11       A.  Yes, I do.
12       Q.  And do you recognize that?
13       A.  That's right through the first door, right
14  before the second door.
15       Q.  And that's just allowing you into the
16  hallway where the apartment was located?
17       A.  Yes.
18            MR. MARKLE:  The government would offer
19  102B, your Honor, as a full exhibit.
20            THE COURT:  There being no objection
21  it's a full exhibit.
22  BY MR. MARKLE:
23       Q.  And did you, in fact, proceed through that
24  doorway?
25       A.  Yes, we did.
```

121

1    Q.   And down a short hallway or long hallway?

2    A.   It was very short to the front door.

3    Q.   At that time did you see where the person

4    had gone?  Did you see the individual who said his

5    mom had been shot?

6    A.   He was still out of our sight, but as we

7    entered that hallway and you looked to the right,

8    there is a doorway that was forced open.

9    Q.   And could you see that the door had been

10   broken in?

11   A.   Yes.

12   Q.   Okay.

13   A.   Because it was open.

14   Q.   What did you observe?

15   A.   I observed the molding around the door had

16   been broken.  So, common sense tells you it was

17   forced.

18   Q.   I'll show you what's been marked

19   Government's Exhibit 116 and ask you if you

20   recognize that doorway.

21   A.   I think that would be the front door.

22   Q.   To the apartment?

23   A.   Yes.  The back side of it, though.

24   Q.   And is that the part of the frame that you

25   indicated you saw that was broken on August 24th?

122

1    A.   Yes.  Yes, it is.

2         MR. MARKLE:  The government would offer

3    116, your Honor, as a full exhibit.

4         THE COURT:  All right, absent objection

5    it is a full exhibit.

6    BY MR. MARKLE:

7    Q.   And did you actually go inside that

8    apartment at that time?

9    A.   Yes, we did.

10   Q.   And when you entered, what was the first

11   thing you saw as you entered the apartment?  Was the

12   door still on the hinges?

13   A.   The door was still on the hinges, just

14   open.

15   Q.   Just open?

16   A.   Yes.

17   Q.   And the framing had been broken apart?

18   A.   Yes.

19   Q.   And when you entered, what did you first --

20   who went first, you or your partner?

21   A.   I did.

22   Q.   You have to speak a little bit louder.

23   A.   I went first.

24   Q.   What, if anything -- what did you first

25   observe when you entered the apartment?

123

1    A.   The first thing I noticed was the living

2    room was in shambles a bit.  There was a couch that

3    was in the middle of the floor rather than where

4    couches usually are, against the wall.  I noticed a

5    hole in the wall between the kitchen and the

6    hallway, and you could see all of that from the

7    front door.

8    Q.   Did you see anyone when you first entered?

9    A.   No, I did not.

10   Q.   I'm going to show us what's been marked --

11        MR. SHEEHAN:  Your Honor, could we just

12   ask Mr. Markle to put them up -- thank you.

13   Q.   Can you look at the monitor.  And I'd ask

14   you if you recognize that.

15        MR. MARKLE:  This is Government's

16   Exhibit 117C for the record.

17   A.   Yes, that's just inside the front door.

18   Q.   And you just mentioned that there was a

19   couch in an odd position or away from the wall.  Is

20   that depicted in the Government 117C?

21   A.   Yes, it is.

22   Q.   Is that the way that living room appeared

23   to you on August 24th when you entered?

24   A.   Yes.

25        MR. MARKLE:  Offer 117C, your Honor.

124

1         MR. SMITH:  No objection.

2         THE COURT:  Absent objection it's a full

3    exhibit.

4    BY MR. MARKLE:

5    Q.   Now, that it's up on the screen, the couch

6    is to -- as you look at the photograph, to the

7    right?

8    A.   Yes.

9    Q.   And the wall would be towards the left?

10   A.   Yes.  And that's the wall to the left where

11   the arrow is, that wall has a hole in it.

12   Q.   Okay, that's where you saw something had

13   smashed into that wall?

14   A.   Yes.

15   Q.   And was that couch moved by you or your

16   partner?

17   A.   No.

18   Q.   Were any of the items in the apartment

19   moved by you, any of the furniture moved by you?

20   A.   No.

21   Q.   Is that based on your training or is that

22   just your personal preference or is that the

23   protocol?

24   A.   Partly training.  We're taught if we think

25   something is a crime scene to be very careful not to

125

```
1   touch anything in the apartment, or wherever the
2   crime scene is.  And then the other part is common
3   sense not to touch anything.
4       Q.   You do your best to preserve the scene as
5   you found it?
6       A.   Yes, we did.
7       Q.   I would ask you to look at what's been
8   marked for identification as Government 115F.  Do
9   you recognize that photograph?
10      A.   That is from the hallway looking into the
11  apartment.
12      Q.   So, as you entered, this is what you would
13  have seen?
14      A.   Yes.  You see that, and the couch and the
15  hole.  And then there is a kitchen right next to
16  that wall, too.  So I saw that as well.
17      Q.   I'm sorry?
18      A.   I saw the kitchen as well.
19      Q.   Okay.
20           MR. MARKLE:  The government would offer
21  115F, your Honor.
22           THE COURT:  All right, absent objection
23  it's a full exhibit.
24  BY MR. MARKLE:
25      Q.   So, again, now that the jurors can see it,
```

126

```
1   there is a rather large hole in the wall that you
2   observed?
3       A.   Yes.
4       Q.   This is your vantage, your view as you
5   entered the apartment?
6       A.   That is the first thing we saw when we came
7   around the corner.
8       Q.   And, again, the couch is somewhat pulled
9   away and towards the middle of the room?
10      A.   Yes.
11      Q.   Now, did you see any people in that room?
12      A.   No.
13      Q.   Did you hear any noise in the house in the
14  apartment?
15      A.   Yes, we did.  The same gentleman that
16  flagged us down was in the apartment and he was very
17  upset.
18      Q.   And you could hear he was upset?
19      A.   I could hear him, yes.
20      Q.   Did somebody else then enter the apartment
21  other than you and your partner?
22      A.   There was a female that came in after us
23  and we instructed her to please remove him so that
24  we could do our jobs.
25      Q.   And did she do that?
```

127

```
1       A.   I believe so, yes.
2       Q.   About how long while you were in the
3   apartment was the young man --
4       A.   A few minutes.  Not long.
5       Q.   Did you see him carry anything into the
6   apartment?
7       A.   No.
8       Q.   Did you see him in possession of anything
9   while he was outside?
10      A.   No.
11      Q.   Did he have a bag, tape, weapons?
12      A.   Not that I recall, nothing like that.
13      Q.   No bag, no tape, no weapons that you saw?
14      A.   No.
15      Q.   How about when he left, did you see him
16  leaving with anything in his hands?
17      A.   No.
18      Q.   Now, you said you saw the living room.  Did
19  you -- where did you next proceed to go?
20      A.   Just past that hole in the wall there is a
21  hallway.  So we went down that hallway.
22      Q.   That's where the bedrooms ends up being in
23  the apartment?
24      A.   Yes.
25      Q.   Okay.  I'm going to show you what's been
```

128

```
1   marked Government's Exhibit 117J and ask you if that
2   shows the hallway that you just referred to?
3       A.   Yes, it does.
4       Q.   And is that a true and accurate -- is that
5   how the hallway appeared as you walked down that
6   hallway?
7       A.   Yes.
8           MR. MARKLE:  I would offer 117J, your
9   Honor, as a full exhibit.
10           THE COURT:  All right.  Absent
11  objection, it's a full exhibit.
12      Q.   Now, Ms. O'Donnell, it's not a great
13  picture, but that's the hallway.  It's blocked by
14  something.  What is that item?
15      A.   A couch.
16      Q.   And, again, did you put that couch there?
17      A.   No.
18      Q.   Did you move that couch?
19      A.   No.
20      Q.   And, in fact, in regards to that couch,
21  what did you do?  Could you get around it?
22      A.   We had to lift our gear up over it and
23  shimmy past it in order to get down the hall.
24      Q.   So, we're at one end as we look at that
25  photograph, one end of the hallway and the couch.
```

**GA32**

129

```
1   You had to get to the other end of the hallway and
2   the couch?
3       A.   Yes.
4       Q.   And you did it in such a way that even your
5   equipment wasn't hitting the couch or touching the
6   couch?
7       A.   We did our best not to touch it.
8       Q.   Did you physically move it towards a wall
9   or away from a wall?
10      A.   No.
11      Q.   Back or forwards?
12      A.   No.
13      Q.   It was just as you found it?
14      A.   Yes.
15      Q.   And after you went past that 117I, that
16  couch, what did you -- did you come upon what
17  appeared to be a bedroom?
18      A.   We came upon two.  They're right next to
19  each other.
20      Q.   Okay.  So, the first bedroom that you came
21  upon, was there anyone present inside that bedroom?
22      A.   Yes, there was a female victim and a male
23  victim.
24      Q.   And what did you observe about them?  Well,
25  did you go in that room?
```

130

```
1       A.   I did not enter fully.  My partner entered
2   to check for signs of life on the female victim.
3       Q.   And why did she respond to the female
4   victim initially?
5       A.   We noticed some bubbling around the nose.
6   That might have indicated maybe some breaths were
7   trying to be taken.
8       Q.   What did you -- did you look in that room?
9       A.   I did.
10      Q.   And do you recall what you saw?
11      A.   I do.
12      Q.   And do you recall it from seeing pictures
13  or do you recall it from August 24, 2005?
14      A.   I recall it from August 24, 2005.
15      Q.   Had you been to a crime scene or accident
16  scene that was similar to this?
17      A.   Never.
18      Q.   Had you ever responded to a triple
19  homicide?
20      A.   No, that was the first one.
21      Q.   And when you looked in that room, did you
22  observe the female victim?
23      A.   I did.
24      Q.   And did you know her name?
25      A.   No.
```

131

```
1       Q.   But there was one female.  Was there --
2   tell me, was there a female and a male?
3       A.   Yes, there was a female and a male in that
4   room.
5       Q.   And was the -- what was the condition of
6   the female as you observed her?
7       A.   The female was bound by the hands and the
8   feet, and she had duct tape in her mouth.  And the
9   man, same, was bound at the hands and feet with duct
10  tape, and the duct tape was around -- I only saw the
11  back of his head, so I could only see just the
12  backside of his head where I could see duct tape.
13      Q.   Were both people bound with the same
14  appearing duct tape?
15      A.   Yes.
16      Q.   And in the same manner?
17      A.   The same manner.  Very angry.
18      Q.   And were they on a bed, on a couch, on a
19  chair, on the floor?  Where were they located?
20      A.   They were on the floor.
21      Q.   And were they clothed or unclothed?
22      A.   They were clothed.
23      Q.   And could you see that they had been the
24  victims of some sort of assault?
25      A.   Yes.
```

132

```
1       Q.   And how would you know that?
2       A.   By the blood spatter on the ceiling and the
3   walls.  By the victims themselves, they were
4   appeared to be swollen and bloody.  Yes.
5       Q.   I'm going to show you --
6           THE COURT:  We are getting to our lunch
7   hour, Mr. Markle.  Is this a good stopping point?
8           MR. MARKLE:  That would be perfect, your
9   Honor.
10          THE COURT:  All right.  I will now use
11  my handy dandy switch here for the light, and we
12  will take a half hour for lunch.  So, we will be
13  back about five to one.  Leave your notebooks here,
14  please do not discuss the case.
15          Ms. O'Donnell, I'll ask you to come back
16  five 'til one.  Thank you very much.
17          (Jury exited the courtroom.)
18          MS. DAYTON:  Your Honor, as juror ten
19  walked by, she said to me it's hot in here.  So, I
20  just want to put that on the record.
21          THE COURT:  It is; however, reduced
22  below 80 now.
23          MS. DAYTON:  Which is a good thing.  I
24  turned to Mr. Smith, I said, She said it's hot in
25  here.  I just want it on the record that's what she
```

133

```
1   said.
2           THE COURT:  Thank you.  Please be
3   seated.  There is an outstanding objection to the
4   defendant's offer of B for identification, which is
5   the grand jury transcript from March 8, '06 at page
6   20.  The grounds of your objection, Ms. Reynolds?
7           MS. REYNOLDS:  Your Honor, he never --
8   my understanding is, I guess it's being offered as a
9   prior inconsistent statement.  But I think that's
10  why the actual transcript is being offered.  I'm not
11  sure.  But I think that the witness answered he
12  didn't remember saying that.  So, I think that's the
13  end of the inquiry at that point.
14          THE COURT:  The purpose of your offer,
15  Mr. Smith?  You have impeached him with what you
16  believe to be a prior inconsistent statement.  What
17  is the basis for admitting the transcript of that?
18          MR. SMITH:  It's admissible, your Honor,
19  as a sworn testimony at the grand jury.  It's
20  admissible under the rules of evidence, and although
21  he says he doesn't remember saying that, he
22  testified here today he did not open that door.  He
23  testified in 2006 that he, in fact, did open that
24  door.
25          THE COURT:  All right.  It seems to me
```

134

```
1   that you have impeached him with reading his
2   prior -- what you claim to be his prior inconsistent
3   statement, and that will remain as the record there,
4   and the -- there is -- the transcript itself will
5   not be admitted.
6           MR. SHEEHAN:  Your Honor, just
7   briefly --
8           THE COURT:  Yes.
9           MR. SHEEHAN:  -- if I could.  Do you see
10  the problem?  What he claims, it's not what he
11  claims is the transcript.  It is the transcript,
12  your Honor, and a jury might conclude that that
13  wasn't the transcript.
14          THE COURT:  But I asked what was the
15  date of the transcript, what was the page of the
16  transcript.  They know it's a grand jury transcript.
17  I indicated that this was his sworn testimony before
18  the grand jury.  I don't know what I was thinking,
19  and nor do I understand from just the little excerpt
20  that you would put in that they would gain any
21  greater knowledge.
22          MR. SHEEHAN:  Your Honor, I think what
23  it would do would be allow them when they deliberate
24  to have the physical evidence of what it was that he
25  said.  That -- that it's not just Mr. Smith or
```

135

```
1   myself arguing, it is the evidence of what he said,
2   and as such, the transcript is the evidence.
3           THE COURT:  And they have -- you have
4   what he said in the record, and if the jurors need
5   that read back, they can certainly have it.  You
6   want to provide me with some authority for why in
7   addition to that the actual transcript needs to come
8   in for an impeaching statement, I will be happy to
9   reconsider that.
10          MR. SHEEHAN:  Thank you, your Honor.
11          THE COURT:  All right.  If there is
12  nothing else, then, we will adjourn 'til five 'til
13  one and resume with Ms. O'Donnell.  All right.
14  Thank you.
15          (Recess)
16          MR. SMITH:  Your Honor, before we begin,
17  just briefly.  We had subpoenaed some records from
18  the Department of Corrections.  There is a gentleman
19  here with them.  He has some concerns that there
20  might be some medical records or things that would
21  not normally be subject to the subpoena, and I
22  didn't know how the Court wanted to proceed, if the
23  Court wanted to review those or --
24          THE COURT:  I'll review them.
25          MR. SMITH:  Okay.  I'll just bring those
```

136

```
1   forward.
2           THE COURT:  But not right now.
3           MR. SMITH:  Would you like me to give
4   them to Ms. Torday, or at the end of the day?
5           THE COURT:  You can bring them to me,
6   but I'm not going to look at them right now.
7           MR. SMITH:  I understand.
8           THE COURT:  While you are doing that,
9   and before we lose track, under 613, the prior
10  inconsistent statement of Mr. Whittingham in writing
11  was offered.  The government objected on the basis
12  that he didn't remember.  Is that -- do you think --
13  Ms. Reynolds, is it your position that that means he
14  didn't have the opportunity to explain or rebut as
15  required under 613?  What's the basis for keeping it
16  out?
17          MS. REYNOLDS:  I think it is partially
18  that, your Honor.  I don't think they've laid enough
19  of a foundation to actually introduce the grand jury
20  testimony as evidence.  They, in fact, elicited
21  several responses, one being that he didn't
22  remember.  A couple of times I think he said he
23  didn't remember, and then I believe counsel read the
24  question and said, is that what happened, and he
25  explained he didn't do that, that he went out the
```

137

```
1   front window.  I just don't see enough of a basis to
2   admit the actual question and answer.
3            THE COURT:  All right.  So that will be
4   the objection you are responding to.
5            MR. SHEEHAN:  Well, your Honor, I could
6   indicate -- I could give you the authority right now
7   on that point.  I would rely on 613.  I would
8   specifically rely on the Second Circuit case in
9   United States v. Strother, which is -- I'm sorry --
10  49 F.3d 869, where, among other things, they
11  actually find error, which is an unbelievable thing,
12  but they hold that extrinsic evidence of a prior
13  inconsistent statement is more persuasive to a jury
14  than a witness' acknowledgement of inconsistencies
15  in a prior statement, and that cite is U.S. v.
16  Brown, 313 F.2d 197, also a Second Circuit case, and
17  a Seventh Circuit case U.S. v. Lashmett, 965 F.2d
18  179, and Weinstein on Section 61305 makes the same
19  point relying -- looking back to Lashmett, which
20  appears to be cited with approval by the Second
21  Circuit in Strother.
22           THE COURT:  You are not offering it as
23  substantive evidence?
24           MR. SHEEHAN:  No.
25           THE COURT:  Only impeachment?
```

138

```
1            MR. SHEEHAN:  Correct.
2            THE COURT:  Let me look at the
3   decisions.
4            MR. SHEEHAN:  And could I raise one
5   other issue, and I apologize.  I know we have got
6   the jury waiting.  I am requesting, your Honor, that
7   the sequestration rule that the Court entered not be
8   applicable to penalty-phase witnesses until we get
9   to a -- unless and until we get to a penalty phase.
10           MS. DAYTON:  Your Honor, the government
11  objects.  You entered a sequestration order at
12  sidebar.  There was no exceptions to that rule, and
13  we specifically asked, do you have witnesses in
14  here, we're told no, and then it turns out that they
15  did, and they remained for testimony.
16           MR. SHEEHAN:  A, I did not -- not know
17  that at the time I said it, but, B, I made that
18  mistake.  I think that they're two separate phases.
19           THE COURT:  Who are the witnesses who
20  remained?
21           MR. SHEEHAN:  Deborah Sobers was here, I
22  believe, Nadyne Nelson was here, and Alicea Jones.
23  And those are potential witnesses in the penalty
24  phase.
25           THE COURT:  And how long were they here?
```

139

```
1            MR. SHEEHAN:  I believe they were here
2   through the testimony of the witnesses, so that
3   would be this morning.  They came in after I had
4   approached the bench.
5            THE COURT:  All right, the only issue --
6   there are two issues.  One is should they be
7   sequestered from now on out?  You oppose that?
8            MR. SHEEHAN:  I do, your Honor.
9            THE COURT:  And the other is, should
10  they be -- having been here during the testimony,
11  should they be precluded from testifying at the
12  penalty phase?  They are subject to the
13  sequestration order.  The sequestration order
14  applies to the trial -- the trial is all parts of
15  this proceeding, and I gather that they were here
16  out of inadvertence to notice that they were here,
17  but not because they had a need to be here for the
18  purpose of their testimony.
19           MR. SHEEHAN:  Correct.
20           THE COURT:  None of that was put
21  forward.
22           MR. SHEEHAN:  No, your Honor.
23           THE COURT:  Let's exclude them from now
24  on out, and if the government is intending to move
25  to in some way preclude their testimony, we'll have
```

140

```
1   that in motion practice.  All right.
2            MR. SHEEHAN:  Thank you, your Honor.
3            MS. DAYTON:  Your Honor, at the
4   conclusion of today, can we deal with the fact that
5   Mr. Smith said to the jury that John Taylor was
6   testifying to avoid the death penalty, which is a
7   factually incorrect statement.
8            MR. SHEEHAN:  Your Honor, that is not
9   factually incorrect.
10           THE COURT:  I want to bring the jury in.
11  We will take care of it when you present to me.
12  What exactly is the status of Mr. Taylor?  I am not
13  just -- not just argument on it.
14           All right, please bring in the jury.
15           (Jury entered the courtroom.)
16           THE COURT:  All right, ladies and
17  gentlemen.  Please be seated.  From time to time,
18  there are legal arguments about the issues relating
19  to evidence that I need to resolve.  I will try to
20  do so not taking up your time.  That's not always
21  possible, but sometimes we do it at lunch or at
22  recess.  There is a theory that you would rather be
23  out in the jury room than sitting here in the
24  courtroom while we argue it.  However, having 18 of
25  you in the jury room might not be quite the ideal
```

141

```
1   place.  I understand that it's crowded.  But please
2   be patient.  We will be as expeditious as possible.
3            All right.  Ms. O'Donnell is back on the
4   stand.  You remain under oath, and you may proceed,
5   Mr. Markle.
6            MR. MARKLE:  Thank you, your Honor.
7   DIRECT EXAMINATION
8   BY MR. MARKLE:
9      Q.   Ms. O'Donnell, you were indicating just
10  before we broke for lunch that you had looked into
11  the first bedroom that you came upon; is that
12  correct?
13     A.   Yes.
14     Q.   And at that time, were you wearing any kind
15  of suit or any -- what was your outfit?  How were
16  you outfitted?
17     A.   At that time I just had my uniform on.  I
18  had not donned my gloves yet.  We usually hold off
19  putting our gloves on until we have patient contact
20  to not contaminate our gloves before we touch the
21  patient.
22     Q.   Did you have a mask or anything like that
23  on at the time?
24     A.   No.
25     Q.   At any time during the -- while you were --
```

142

```
1   the period of time you were in the apartment?
2      A.   No.
3      Q.   So, the only thing that you ever did
4   eventually put on were gloves?
5      A.   Yes.
6      Q.   What kind of gloves are they?
7      A.   They're blue, like neoprene gloves.
8      Q.   They're heavier than the average like what
9   you use for dishes or housecleaning?
10     A.   They're heavier than like the gloves you
11  get at Home Depot to like strip paint off something.
12  They're a little heavier than that, but they're not
13  at heavy as those thick latex dishwashing gloves.
14     Q.   So, you need something that you can move
15  with your equipment?
16     A.   They're puncture protection.
17     Q.   Okay.  So, when you entered -- I'm going to
18  show you what's been marked Government's
19  Exhibit 121-1 and ask you if you recognize this
20  photograph.
21            MR. MARKLE:  Your Honor, during the
22  lunch break, I did show the photographs that I
23  intend to show to the witness to counsel, and I
24  understand there is no objection, so I can just
25  proceed.
```

143

```
1            THE COURT:  Is this a part of a series?
2            MR. MARKLE:  I'm sorry?
3            THE COURT:  Is this a part of a series?
4            MR. MARKLE:  Yes, your Honor.
5            THE COURT:  It's 121-1 through what?
6            MR. MARKLE:  Well, it's not a perfect
7   series.  I'll give you the numbers.  121-1, 121-4,
8   121-6, 121-9, 121-10, 122-1, 122-2, 122-3, 122-5,
9   122-7, 124, 120-2, 120-1, 120-3 120-4, 120-5 and
10  120-6.
11            THE COURT:  And absent objection,
12  they're full exhibits.
13            MR. SHEEHAN:  Could we approach just
14  briefly?
15            THE COURT:  Pardon?
16            MR. SHEEHAN:  Could we approach just
17  briefly, your Honor?
18            THE COURT:  I thought there was no
19  objection to these.
20            MR. SHEEHAN:  There --
21            MR. MARKLE:  I thought so.
22            MR. SHEEHAN:  There just are different
23  numbers, and I'm just going to try to clarify.
24            THE COURT:  Could we straighten it --
25  it's a matter of the numbers.  Can we straighten the
```

144

```
1   numbers out?
2            MR. MARKLE:  You tell me which number,
3   and I'll --
4            MR. SHEEHAN:  May we approach?
5            THE COURT:  Yes.
6            (Sidebar conference)
7            MR. SHEEHAN:  I got numbers down like
8   that this is a different set of numbers.  I think it
9   makes as much sense, your Honor, if we can just
10  proceed by putting them on the screen.  I apologize
11  for the confusion, but --
12            MR. MARKLE:  Every one of those is the
13  same.
14            MR. SHEEHAN:  Where is 122, 121, 123?  I
15  don't have any 124s, I don't have any 125s.
16            MR. MARKLE:  I don't know which list --
17            MR. SHEEHAN:  This is what I got.
18            MR. MARKLE:  This is what I showed you
19  before, 121-1, 122-2.
20            THE COURT:  He's saying you don't have
21  any 120 --
22            MR. SHEEHAN:  3s.
23            THE COURT:  123, 124, 125 and 126.
24            MR. MARKLE:  I'll do it the other way.
25            THE COURT:  If there is a section we can
```

145

```
1   agree on, let's do it that way.  Is it the 122,
2   121-1?
3              MR. SHEEHAN:  Your Honor, I'm familiar
4   with the photos.  The issue is I just want to look
5   at them for cumulative --
6              THE COURT:  All right, we'll do them
7   that way.
8              (Sidebar concluded)
9   Q.   Ms. O'Donnell, showing you Government's
10  Exhibit 121-1, do you recognize that photograph?
11  A.   Yes.
12  Q.   What does that photograph show?
13  A.   It's the doorway to one of the bedrooms.
14  Q.   Is that the doorway into the first bedroom
15  you came upon?
16  A.   It's hard to see if the victims are in that
17  photo, but I believe so, yes.
18  Q.   And, well, in either bedroom -- were there
19  victims found in both bedrooms you entered?
20  A.   Yes, there was.
21             MR. MARKLE:  I would offer full exhibit.
22             THE COURT:  Absent objection, 121-1 is a
23  full exhibit.
24  Q.   And, as you've indicated, it's difficult to
25  see into that room, but that's one of the doorways
```

146

```
1   of a bedroom that you entered?
2   A.   Yes.
3   Q.   Let's see if we can make it clearer.  In
4   the first bedroom that you entered, do you recall
5   what, if anything, you first observed?
6   A.   I observed two victims lying almost head to
7   head.  The gentleman, the male victim was sort of
8   face down, leaning with the left side of his face,
9   so exposing the back of his head, and the female
10  victim was on her back, with her arms behind her
11  back, face up.
12  Q.   And you indicated that there was blood all
13  around?
14  A.   There was blood everywhere.  It was on the
15  ceiling, on the walls.  Just everywhere on the
16  floor.  There was -- just everywhere you looked.
17  Q.   If you look at your monitor, you'll see
18  Exhibit 121-4.  Do you recognize that photograph?
19  A.   Yes.
20  Q.   And what do you recognize that to be?
21  A.   I recognize that as the female victim and
22  the male victim as I described --
23  Q.   Are those --
24  A.   -- as I described them laying.
25  Q.   Other than the placards, obviously, that
```

147

```
1   are in the picture, is that how the two victims'
2   bodies were found by you?
3   A.   Yes.
4              MR. MARKLE:  I would offer 124-4 as a
5   full exhibit, your Honor.
6              THE COURT:  Absent objection, it's a
7   full exhibit.
8              MR. MARKLE:  Thank you.
9   Q.   Now, you indicated that there was a male
10  and female.  Is the male closest as you look at the
11  picture or furthest?
12  A.   The male is in the white striped shirt, and
13  the female is in the gray.
14             MS. DAYTON:  Could we make it darker in
15  here, your Honor?  It's hard to see the pictures.
16  Q.   So there is a mattress that is not wrapped
17  in plastic.  Is that where the male victim is
18  located, right below that mattress?
19  A.   Yes.
20  Q.   And the markers, the 5 and the 6, those
21  were obviously not there when you came upon the
22  victims, correct?
23  A.   No, they were not there.
24  Q.   And those are on the victim that you
25  learned was Tina Johnson?
```

148

```
1   A.   Yes.
2   Q.   And that was the female victim?
3   A.   Yes.
4   Q.   And you indicated that -- did you see any
5   duct tape on the male victim?
6   A.   Yes, I did.
7   Q.   And what area of his body did you see duct
8   tape?
9   A.   I saw his hands were duct taped, and I
10  could see part of his head and the side of his face
11  had duct tape on it.
12  Q.   Did that duct tape appear to be loosely
13  wrapped around him, or tightly?  Or how would you
14  describe it?
15  A.   On the male it was tight.  On the female, I
16  believe, it was tighter.  It was actually cutting
17  into her face, that's how tight the duct tape was.
18  Q.   Was it wrapped around her eyes, nose,
19  mouth?  What area?
20  A.   It was in her mouth.
21  Q.   I'm sorry?
22  A.   In her mouth.
23  Q.   And you say it was almost cutting her
24  mouth --
25  A.   Yes.
```

149

```
 1      Q.   -- it was so tightly wrapped?
 2      A.   It was very tightly wrapped.
 3      Q.   Did you touch or do anything to -- with the
 4  duct tape?
 5      A.   No.
 6      Q.   So, their hands, legs, face?
 7      A.   No.
 8      Q.   Did your partner?
 9      A.   No.  We thought there were signs of life
10  from the female, so we were going to proceed by
11  removing the duct tape, and my partner checked a
12  carotid pulse and felt no pulse and then decided
13  that she would try to do a compression, because we
14  were still convinced that the bubbles were actually
15  gasps to get some breaths in, and when she started a
16  compression on the chest, she felt rigor had started
17  setting in, so we aborted removing any of the duct
18  tape or anything, and my partner made her way out.
19      Q.   So, were those the three things you check
20  to see if the person's viable, if you could do
21  anything for them?
22      A.   Yes, we check for signs.
23      Q.   I'm sorry?
24      A.   You -- we check for signs of life.
25      Q.   When you say rigor, what are you referring
```

150

```
 1  to?
 2      A.   The body starts to harden once it expires,
 3  and you cannot compress.  It's like pushing on a
 4  table when the body starts to harden up.
 5      Q.   And that's what you found with the female
 6  victim?
 7      A.   Yes.
 8      Q.   And when you -- after checking for all
 9  three of those for signs of life, was there any
10  indication of any sign of life?
11      A.   There was no indication of sign of life on
12  either of the victims in that room.
13      Q.   And did you observe where your partner went
14  when she went to address the victim Tina Johnson to
15  see if she was alive?
16      A.   Yes, she stepped -- I guess this is better,
17  this side.  She stepped over her and knelt down on
18  the box spring.
19      Q.   On the plastic-covered box spring?
20      A.   Yes.
21      Q.   So, if I put the arrow --
22      A.   Yes, she knelt approximately there.  She
23  leaned in and felt her carotid and then looked back
24  at me.  She walked around here because she couldn't
25  stay on this side of the female due to the blood,
```

151

```
 1  and there was some brain matter from the male
 2  victim.  So, my partner had to make her way across,
 3  knelt down where that arrow is, checked a carotid
 4  pulse on the female, and then started to do
 5  compressions on the breast line, and then made her
 6  way back by not touching or moving anything to the
 7  doorway.
 8      Q.   Again, to the best of your ability and her
 9  ability, nothing was moved in that room?
10      A.   When she knelt down on the box spring, one
11  of the rings had -- because of the depression of her
12  knee, had moved slightly towards her leg.  She
13  didn't touch it, though.  Just from her body weight,
14  it moved the ring that was on the box spring.
15      Q.   You are saying ring.  Was there one or more
16  rings on the plastic-covered mattress?
17      A.   Yes.
18      Q.   And how many were there?
19      A.   I believe two.
20      Q.   And they were there when you got there?
21      A.   Yes.
22      Q.   And they remained there when you left?
23      A.   Yes.
24      Q.   But they might have shifted a little from
25  her leaning on the mattress?
```

152

```
 1      A.   Yes.  That was the only clean spot for her
 2  to kneel down and check.  There was blood everywhere
 3  else.
 4      Q.   Now, as to the other person who was in that
 5  room, the male victim, did your partner ever go
 6  and check him for any signs of life?
 7      A.   No.  We observed brain matter from the
 8  victim, male victim, so that indicated to us that
 9  there would be no signs of life.  He was expired at
10  that time.
11      Q.   Okay.  And when you say brain matter, did
12  you literally see a substance on him, or on -- where
13  did you observe that?
14      A.   We observed that coming down his shoulder
15  onto the floor.  You can tell the difference.
16      Q.   And, based on your training and experience,
17  you knew that there was no chance of reviving him?
18      A.   Correct.
19      Q.   I'm going to show you what's been marked
20  Government's Exhibit 121-6 and ask you if you
21  recognize what's depicted in that photograph.
22      A.   That would be the female's feet.
23      Q.   And was that the way she was bound when you
24  came upon her?
25      A.   Yes.
```

153

1    Q.   And that's the duct tape you observed on

2  her ankles?

3    A.   Yes.

4          MR. MARKLE:  Offer it as a full exhibit,

5  your Honor.

6          THE COURT:  Absent any objection, it's a

7  full exhibit.

8    Q.   And, again, this was -- obviously, the

9  placard was not in the room, but other than that,

10  was that the position of her feet and the duct tape

11  when you observed the victim upon entering the

12  Charles Street apartment?

13    A.   Yes.

14    Q.   I'll ask you to look at what's been marked

15  Government's Exhibit 121-9 and ask you if you

16  recognize that photograph.

17    A.   Yes, I do.

18    Q.   And what does that show?

19    A.   That's a photograph of the female and the

20  male victim in the same position they were in.

21    Q.   And does that photograph demonstrate or

22  display the duct tape around the female victim's

23  mouth area that you described before?

24    A.   Yes.

25    Q.   And does it also show brain matter on the

154

1  floor next to the male victim?  You can't see it in

2  that photo?  If you can't see it --

3    A.   It's very dark, but if this was a lighter

4  photo, you could see it.

5    Q.   Is that the position they were found in,

6  almost head to shoulder, really?

7    A.   Yes.

8          MR. MARKLE:  I would offer Government

9  121-9, your Honor.

10          THE COURT:  Absent objection, it's a

11  full exhibit.

12    Q.   Now, if you look at the center of that

13  photograph, Ms. O'Donnell, there appears to be a

14  piece of duct tape on the top of the female victim's

15  forehead or head?

16    A.   Yes.

17    Q.   Was that tightly wrapped, or was that just

18  a -- how was that on her?

19    A.   That was just how it presents in the

20  picture.  I didn't notice -- I was too distracted by

21  how tight it was in her mouth and how the scene was,

22  so the duct tape on her head, I don't recall it

23  wrapping completely around.

24    Q.   And do you recall -- and, again, the duct

25  tape, it's not a clear picture, but that is the way

155

1  it was wrapped on her mouth when you found her,

2  correct?

3    A.   Yes.

4    Q.   And I think at the very corner of the

5  mattress you can see a little bit better one of the

6  rings that you said was -- there were two rings.

7  That's one of them depicted in that photograph?

8    A.   Yes.

9    Q.   If you look at what's been marked

10  Exhibit 121-10, is that a further depiction of the

11  female and male victim in the first bedroom you'd

12  entered?

13    A.   Yes.

14    Q.   And does that again show the duct tape

15  around the female victim's mouth?

16    A.   Yes, it does.

17    Q.   And is that photograph helpful in showing

18  the brain matter that you saw from the second

19  victim?

20    A.   Yes, right below where your arrow is

21  placed.

22    Q.   It's not up there yet.

23    A.   Sorry.

24    Q.   And is that a true and accurate depiction

25  of the murder scene when you came upon it?

156

1    A.   Yes, it is.

2          MR. MARKLE:  Offer 121-10.

3          MR. SMITH:  Your Honor, I'm going to

4  object, cumulative at this point.

5          THE COURT:  Claim, Mr. Markle?

6          MR. MARKLE:  I do claim it, your Honor.

7          THE COURT:  What is your claim, I said.

8          MR. MARKLE:  She indicated that the

9  brain matter was not depicted in the other

10  photographs that she described.  This shows it.

11          THE COURT:  All right.  And this

12  displays the brain matter that you were testifying

13  about?

14          THE WITNESS:  Yes, it does.

15          THE COURT:  The objection is overruled.

16          MR. MARKLE:  Thank you, your Honor.

17    Q.   Ms. O'Donnell, again, perhaps with the use

18  of the pointer, and if you have to stand up, or if

19  you could reach it from there, could you show the

20  ladies and gentlemen of the jury the area that was

21  significant to you?

22    A.   Right here.

23    Q.   You'd better sit down again.

24    A.   Yeah, right there.  You can see some of the

25  brain matter from the male victim's cracked skull.

**GA39**

157

1    Q.   And, again, what did that indicate to you,
2  based on your training and experience?
3    A.   That the male victim would have no signs of
4  life at that point.
5    Q.   And did you observe how -- well, whether or
6  not the male victim had tape around any parts of his
7  body?
8    A.   I could see his hands clearly, and I could
9  just see the side of his face and head, and so I saw
10  duct tape there as well.
11    Q.   And he was basically face down as shown in
12  the photograph?
13    A.   Yes.
14    Q.   And were his hands bound under him, or
15  behind his back?
16    A.   Behind his back.
17    Q.   If you look at what's been marked
18  Government's Exhibit 122-1, does that depict the way
19  in which his hands were bound?
20    A.   Yes, it does.
21    Q.   And is that exactly as you saw them when
22  you entered on August 24, 2005?
23    A.   Yes, it is.
24             MR. MARKLE:  Offer Government 122-1,
25  your Honor.

158

1             THE COURT:  All right.  No objection,
2  and it's a full exhibit.
3    Q.   And, again, Ms. O'Donnell, you said --if
4  you look at the top just under the -- just above the
5  collar of the victim's shirt, you saw some duct
6  tape, apparently, around his head?
7    A.   Yes.
8    Q.   And then as to the hands, that's -- again,
9  you already saw it, but for the jurors, in 122-1, is
10  that exactly how his hands were bound with the duct
11  tape?
12    A.   Yes, it was.
13    Q.   And did that duct tape appear to be loosely
14  attached or tied or wrapped or tightly?  How would
15  you describe it?
16    A.   I would describe it as extremely tight.
17    Q.   And did you notice whether or not his
18  feet -- could you see whether his ankles or feet
19  were bound with duct tape?
20    A.   I don't recall, but based on the other
21  victims, I would assume that they would all be taped
22  the same way.
23    Q.   Now, after you realized that neither of
24  these victims were viable, that there wasn't
25  anything you could do for them, did you proceed into

159

1  any other part of the apartment?
2    A.   Yes, I went into the second bedroom.
3    Q.   At this time, while you even attending to
4  the first two and when you go to the second, is
5  anyone else in the apartment other than you and your
6  partner?
7    A.   Yes, PD had arrived.
8    Q.   So, police officers were present?
9    A.   Yes.
10    Q.   Okay.
11    A.   And our supervisor had arrived also.
12    Q.   Did they go into the first bedroom that we
13  just went through the series of the photographs on?
14    A.   Not while we were in there.
15    Q.   And did they go into the second bedroom?
16    A.   Not while we were in there.
17    Q.   So, you were the first person -- you and
18  your partner were the first people to enter the
19  first bedroom, other than if the person, the son,
20  went in there?
21    A.   Yes.
22    Q.   And you were the first people to enter the
23  second bedroom?
24    A.   I was.
25    Q.   Your partner did not go into the second

160

1  bedroom?
2    A.   No.
3    Q.   So, what did you do when you came upon the
4  second bedroom?
5    A.   I checked --
6    Q.   What happened?
7    A.   Sorry.  I checked for signs of life on the
8  male victim in that room.
9    Q.   Did you look in from the doorway
10  originally?
11    A.   Yes, I did.
12    Q.   I will show you what's been marked
13  Exhibit 120-2 and ask you on the monitor if that
14  appears to be the -- do you recognize that
15  photograph?
16    A.   Yes, I do.
17    Q.   And what -- is that a photograph of the
18  bedroom that you went into?
19    A.   Yes.
20    Q.   And do you know where that photo was taken
21  from?
22    A.   The doorway.
23    Q.   So, you would be standing in the doorway
24  looking in just as you were?
25    A.   Yes.

161

1      Q.   And is that -- other than, again, the
2  placards by the victim's body, is that exactly how
3  you saw the room?
4      A.   That's how I recall the victim lying.
5              MR. MARKLE:  Offer 120-2 as a full
6  exhibit, your Honor.
7              MR. SHEEHAN:  No objection.
8              MR. MARKLE:  120-2.  Did I make it sound
9  like I --
10             THE COURT:  You said just 122.
11             MR. MARKLE:  I'm sorry.
12             THE COURT:  Is it 120-2?
13             MS. DAYTON:  120-2.
14             THE COURT:  All right.  It's a full
15 exhibit.
16     Q.   Ms. O'Donnell, when you -- so, basically,
17 as we look at this picture, this is how you were
18 looking into the room?
19     A.   That was at first glance.  Yes, that's what
20 I saw.
21     Q.   And did you notice that the victim's --
22 that there was any use of duct tape on this victim?
23     A.   Yes, I saw that his feet were bound.
24     Q.   And what did you do after you realized that
25 there was a third victim in this apartment?

162

1      A.   I handed the equipment to my partner so
2  that we were careful not to place anything down, and
3  then I proceeded into that room to check for signs
4  of life.
5      Q.   And did you actually check for signs of
6  life?
7      A.   Yes, I did.
8      Q.   So, you personally attended to this victim?
9      A.   Yes, I did.
10     Q.   And did you go through the same process
11 that you previously described your partner did with
12 the other victim?
13     A.   The only thing I didn't do was try
14 compression on this male due to the fact when I got
15 high enough and saw his hands, and then saw that his
16 face was completely covered from here to here with
17 duct tape, so I didn't roll him, I couldn't do a
18 compression.  So, I checked for carotid, and I put
19 my finger under his nose to feel for breaths, but
20 there was nothing.  He was expired.
21     Q.   So, there was nothing you could do for
22 victim -- the third victim?
23     A.   Nothing.
24     Q.   And you said his face was covered.  I'm
25 going to show you what's been marked 120-1 and ask

163

1  you if you recognize this photograph.
2      A.   Yes, I do.
3      Q.   And is that the victim in -- the third
4  victim in the second bedroom?
5      A.   Yes, it is.
6      Q.   And is that how his head was wrapped in
7  duct tape when you came upon him?
8      A.   Yes.
9      Q.   And did you move anything from around his
10 body when you saw him?
11     A.   No.
12     Q.   And he was basically lying facedown?
13     A.   Yes.
14     Q.   And was there any part of his head that
15 was -- wasn't wrapped in the duct tape?
16     A.   As soon as I approached, and I was standing
17 over him, I saw just a portion of his nose.
18     Q.   That was the only part of his face you
19 could see protruding?
20     A.   Yes.
21             MR. MARKLE:  Offer Government 120-1,
22 your Honor.
23             THE COURT:  All right.  It's a full
24 exhibit.
25     Q.   And, again, Ms. O'Donnell, did the duct

164

1  tape around the victim's head appear to be loosely
2  or tightly wrapped?
3      A.   Tightly wrapped.
4      Q.   Could you get -- could you get under it, or
5  see under it?
6      A.   No.
7      Q.   And were his hands -- obviously, when we
8  look at 120-1 -- were his hands also bound with duct
9  tape?
10     A.   Yes, they were.
11     Q.   And is that exactly how his hands were
12 bound when you came upon him?
13     A.   I didn't see that portion on my initial
14 entry to the room.  There was something covering
15 that portion, which would be around his elbows.  I
16 did see lower, so I did notice there was duct tape.
17     Q.   You saw some duct tape, but --
18     A.   Yes.
19     Q.   -- not to the extent that's shown on the
20 photographs, that's correct, because there was
21 something lying over that part of his body?
22     A.   That is correct.
23     Q.   Could you tell that his hands were behind
24 his back?
25     A.   Yes.

165

```
1       Q.   And could you see whether or not -- I
2   forgot if I asked you whether his legs were bound.
3       A.   Yes, they were.
4       Q.   Let me show you 120-6 and ask you if this
5   depicts the way his -- is that a true and accurate
6   depiction of the way his ankles or legs were bound
7   when you found him?
8       A.   Yes.
9            MR. MARKLE:  Offer 120-6, your Honor.
10           THE COURT:  Full exhibit.
11      Q.   And, again, did the duct tape on his legs
12  appear to be tight or loosely done?
13      A.   They appeared to be tight.
14      Q.   Now, after -- let me just check one other
15  photograph.  You indicated previously that his head
16  was completely wrapped except for one portion.  I'm
17  going to show you what's marked 120-3 and ask you if
18  you recognize this photograph.
19      A.   Yes, I do.
20      Q.   And, other than the placard, is that
21  exactly how you found the victim in the second
22  bedroom?
23      A.   Yes.
24           MR. MARKLE:  Offer it as a full exhibit.
25           MR. SMITH:  Objection.  I think this is
```

166

```
1   cumulative, your Honor.
2            THE COURT:  What is it offered for,
3   Mr. Markle?
4            MR. MARKLE:  It shows exactly how the
5   victim's head was duct taped as the witness
6   described.
7            THE COURT:  What do you claim it's
8   cumulative to?
9            MR. SMITH:  Your Honor, the witness has
10  already testified as to the status of the victim's
11  head and what she observed and what part was not
12  duct taped.  This is simply cumulative of that.
13           THE COURT:  Are you claiming there is
14  another photograph that shows the same thing?
15           MR. SMITH:  There was a previous
16  photograph, your Honor.  I don't have the exhibit in
17  front of me.  I believe it was two to three
18  photographs prior to this one, your Honor, that
19  showed a further-away view of this.
20           THE COURT:  120-1.  Mr. Markle, what is
21  necessary for this photograph that's not portrayed
22  in 120-1?
23           MR. MARKLE:  I think, your Honor, 120 --
24  I'm sorry, 120-1 does show it to some degree, but I
25  think it's clearly not -- it's not as clear as this
```

167

```
1   photograph, and I know this is the last photograph,
2   your Honor, but I think it clearly shows what the
3   witness is testifying to.  The other one is somewhat
4   dark, and the angle is certainly not as clear.
5            THE COURT:  I'm going to permit the
6   exhibit.  It's a close-up.  There is more detail.
7   And 120-3 will be admitted.
8            MR. MARKLE:  Thank you, your Honor.
9            THE COURT:  Are there any other
10  photographs, or shall I put the light back on?
11           MR. MARKLE:  I was just going to ask the
12  witness about this one, your Honor, and that will be
13  all.
14           THE COURT:  Go ahead.
15      Q.   Ms. O'Donnell, again, you did see a
16  photograph that showed this somewhat, but is this a
17  close-up and more detailed view of the third victim
18  that you came upon?
19      A.   Yes, this is the view I saw when I checked
20  the carotid, and then I was able to see the nose.
21      Q.   Other than the placard, again, this would
22  be almost -- we're almost looking at the victim as
23  you would have been looking at him as you were
24  trying to see if he was viable?
25      A.   Yes.
```

168

```
1       Q.   You were looking down, and this is exactly
2   what you saw?
3       A.   Yes, it is.
4       Q.   Thank you.
5            MR. MARKLE:  There are no further
6   photographs, your Honor.
7       Q.   Now, I've asked you as you have taken us
8   through the apartment, but just to make it clear,
9   was there any furniture that you or your partner --
10  that you recall you or your partner moving in any
11  way while you were inside the apartment?
12      A.   No.
13      Q.   And did there come a time where you did put
14  on gloves so that you could attempt to treat any of
15  the three victims?
16           MR. SMITH:  Objection, asked and
17  answered earlier in the testimony.
18           THE COURT:  Sustained.
19      Q.   After you put on gloves, did you take them
20  off while you were at the scene?
21      A.   No, we took them off when we exited the
22  apartment.
23      Q.   Did you leave any gloves at the scene of
24  these murders?
25      A.   No.
```

169

```
1      Q.   Did you leave any items there that you
2    brought in yourself?
3      A.   No.
4      Q.   You took all your equipment?
5      A.   Yes.
6      Q.   Your gloves?
7      A.   Everything.
8      Q.   Everything.  And when you left the
9    apartment, you indicated police had already arrived?
10     A.   Yes.
11     Q.   And was the scene, to your observation,
12   secured by the police at that time?
13     A.   Yes, it was.
14     Q.   Did you see any other people going in and
15   out, other than police officers?
16     A.   No.
17     Q.   Did you see the police tape being put up or
18   up?
19     A.   That, I don't recall.
20     Q.   And, again, as to the tightness of the duct
21   tape, without touching it, how could you tell how
22   tight?  How did you make that observation that it
23   was extremely tight?
24     A.   Because it was pushing on the skin
25   surrounding it and causing it to, like, kind of come
```

170

```
1    over it.  Especially in the face area, you can see
2    that it was pushing in so hard that it was causing
3    the tissue around it to collapse over the top of it.
4      Q.   And did you see that as to all three
5    victims?
6      A.   Yes.
7      Q.   And I think at the beginning you said it
8    looked like it was someone -- it was done by -- in
9    anger.  Is that what you meant by that?
10          MR. SMITH:  Objection.  That calls for
11   speculation, your Honor.
12          MR. MARKLE:  She testified --
13          THE COURT:  I'm going to sustain.
14     Q.   Did you --
15          THE COURT:  It' a leading question.
16     Q.   As to the duct tape, did you ever touch it
17   or try to remove it in any way?
18     A.   No.
19     Q.   Thank you.
20          MR. MARKLE:  I have no further
21   questions.
22          THE COURT:  Cross-examination.
23          MR. SMITH:  Thank you, your Honor.
24   CROSS-EXAMINATION
25   BY MR. SMITH:
```

171

```
1      Q.   Good afternoon, Ms. O'Donnell.  My name is
2    Justin Smith.  I'm one of the attorneys who
3    represents Azibo Aquart.  When you arrived on the
4    scene, you initially were met by the young man at
5    the corner of Charles and Main Street?
6      A.   It wasn't totally at the corner, it was
7    kind of just before the corner a little bit waving
8    his arms.
9      Q.   So, it was not directly in front of the
10   building?
11     A.   No.
12     Q.   Okay.  And you I believe testified that he
13   seemed pretty distraught?
14     A.   Yes.
15     Q.   And was trying to open the vehicle door; is
16   that right?
17     A.   My vehicle?
18     Q.   Yes.
19     A.   He knocked on the window and was saying
20   "please hurry, please help."
21     Q.   Okay.  And when you arrived, there were no
22   police there yet?
23     A.   No.
24     Q.   You had also mentioned that there were
25   crowds forming?
```

172

```
1      A.   Yes.
2      Q.   Can you expand on that a little bit?
3      A.   Usually, especially in Bridgeport, whenever
4    there is any type of incident, people always look,
5    they start to gather in the area of where
6    somebody is freaking out.
7      Q.   Okay.
8      A.   People tend to look around.
9      Q.   So, there were a number of people in the
10   area, or at least beginning to congregate in the
11   area?
12     A.   It seemed -- I mean, I can't recall fully.
13   I didn't count them, but I noticed there was a mass
14   starting to form.
15     Q.   Do you know if some of them might have come
16   out of the building?
17     A.   I did not.
18     Q.   Is it possible some of them came out of the
19   building?
20     A.   It's possible they came out of the diner,
21   they came out of the house across the street.  I
22   mean, sure, it's possible they came out of there,
23   too.
24     Q.   Now, when you -- to be clear, you followed
25   the young man into the apartment building; is that
```

**GA43**

173

```
1    right?
2         A.   Yes, he went up the stairs before we did.
3         Q.   But is it fair to say you lost sight of him
4    at some point?
5         A.   Yes, I did.
6         Q.   So, he was inside the apartment building
7    and out of your sight as you were ascending the
8    stairs?
9         A.   Yes.
10        Q.   And when you entered the building, is it my
11   understanding there is two doors?
12        A.   Yes, there is the front door at the top of
13   the stairs, and then like a security door that you
14   have to be buzzed into.
15        Q.   And did you have to be buzzed in through
16   that door?
17        A.   No, that door was open.
18        Q.   So, that door was wide open when you
19   arrived there?
20        A.   Yes.
21        Q.   Okay.  And you said at some point you heard
22   a loud bang?
23        A.   Yes.
24        Q.   But you didn't know exactly what caused
25   that sound?
```

174

```
1         A.   No, I do not.
2         Q.   Okay.  And when you arrived at the
3    apartment door, was the young man outside the
4    apartment, or was he already inside the apartment?
5         A.   He was inside.  I could still hear him
6    screaming and crying "please help, please help."  I
7    could hear him.
8         Q.   So, when you came -- or, let me rephrase
9    that.  When the door to the apartment came into your
10   view, it was already open?
11        A.   Yes, it was.
12        Q.   And you observed some damage to that door,
13   you said?
14        A.   Yes.  It seemed it was forced.
15        Q.   But you do not know yourself when that
16   damage occurred?
17        A.   No, I do not.
18        Q.   And you do not know if it, in fact,
19   occurred when you heard the loud bang?
20        A.   No.
21        Q.   Okay.  Now, as you approached the
22   apartment, did you see anything on the floor outside
23   the apartment?
24        A.   There appeared to be some -- could have
25   been trash.  It look like little bags.
```

175

```
1         Q.   Little bags.  Do you recall speaking to an
2    investigator working for the defense in this case, a
3    gentleman by the name of Michael Udvardi?
4         A.   I do recall someone coming to my job.
5         Q.   And do you recall telling that person that
6    those little baggies appeared to be drug bags to
7    you?
8         A.   Well, I'm sure they could have been.  I
9    mean, I've been in Bridgeport for seven years now.
10   You kind of see things.
11        Q.   But to you they appeared to be little
12   baggies that would contain drugs?
13        A.   They were the size of baggies that
14   contained drugs most of the time.
15        Q.   You don't know exactly what was in them?
16        A.   No, I don't.
17        Q.   You had seen similar packaging in the past?
18        A.   Yes, I had.
19        Q.   So, the young man who had led you to the
20   apartment, he was still inside the apartment as you
21   approached the apartment?
22        A.   Yes.
23        Q.   Okay.  And you said he was screaming and
24   yelling?
25        A.   Yes, he was upset.
```

176

```
1         Q.   And did he remain in the apartment as you
2    and your partner entered the apartment?
3         A.   As we were walking into the apartment, he
4    was in the apartment, and then my partner had said
5    something to a female, whom I couldn't recognize if
6    she was sitting in here right now, and asked that
7    female to remove the male that was screaming and
8    crying.
9         Q.   Okay.  When you entered the apartment,
10   where was the male?  Was he in the living room area,
11   was he in the bedroom area?
12        A.   He was still out of my sight as we walked
13   through the door.
14        Q.   So, meaning as you entered that door, you
15   did not see him in the immediate living room area?
16        A.   No, I did not.
17        Q.   So, fair to say that he was down toward the
18   bedrooms at that point?
19        A.   I would assume he would be down by his mom,
20   I think.
21        Q.   Okay.  And then you mentioned that there
22   was quite a bit of furniture there --
23        A.   Yes.
24        Q.   -- in the apartment that seemed out of
25   place?
```

177

```
1      A.   Well, the couch that was in the middle of
2   the floor.  Usually, a couch is against the wall,
3   and I noticed that it was not.  So, that was
4   something that was odd to me.
5      Q.   And as you turned to go down the hall --
6   you looked at a photo previously, but I would like
7   to show you another photo, if I might.
8           MR. SMITH:  And this is Defense Exhibit
9   A, your Honor.  It's already been admitted.
10          THE COURT:  Very well.
11          MR. SMITH:  Unfortunately, I've lost my
12  projector series here.  If I could just have a
13  moment.
14     Q.   Before we get to that, Ms. O'Donnell, the
15  female that you described that had taken the young
16  man out, was she also already in the apartment when
17  you arrived?
18     A.   Like I said before, I couldn't describe
19  her.  I don't know where she came from.  She could
20  have come from the sky.  I have no idea.  I really
21  don't recall her at all.
22     Q.   Okay.
23     A.   I just know my partner -- I heard my
24  partner talking, and I heard a female voice, and
25  then the next thing I know the son is out and we're
```

178

```
1   doing our job.
2      Q.   Okay.  So, I'm a little confused.  The
3   female was, in fact, not in the apartment when you
4   entered the apartment; is that right?
5      A.   You mean, was she in front of me?
6      Q.   Yes.
7      A.   No.
8      Q.   And at some point you heard her, but you
9   never actually saw her?
10     A.   No, I was -- no, I was too distracted by
11  the scene.
12     Q.   Okay.  I want to bring to your attention
13  Defendant's Exhibit A.  Does that accurately reflect
14  what you saw looking down the hallway from the
15  living room?
16     A.   Yes.
17     Q.   And that was the couch that you had to move
18  around; is that correct?
19     A.   That's the couch.  We picked our gear up
20  over it and sidestepped to the bedrooms.
21     Q.   So, you didn't place that couch in that
22  position?
23     A.   No.
24     Q.   And that was -- it depicts how you saw it
25  that morning?
```

179

```
1      A.   Yes.
2      Q.   I'm sorry, I'm going to bring that up just
3   a moment.  When you were in the living room looking
4   down towards the bedrooms, you could not see the
5   victims from the living room at that point?
6      A.   If we were standing on this side of the
7   couch?
8      Q.   Yes.
9      A.   I didn't see the victims until we got to
10  the doorways.
11     Q.   So, you had to get all the way to the
12  doorway before you could actually see the victims;
13  is that right?
14     A.   Anybody would have to get all the way to
15  the doorways.
16     Q.   Okay.  Now, you testified that it was your
17  partner -- and that's Ms. Mendoza; is that correct?
18     A.   Yes.
19     Q.   And she was the one who entered the bedroom
20  with the two victims; is that right?
21     A.   That is correct.
22     Q.   Okay.  And that she had climbed upon the
23  box spring there?
24     A.   She didn't, like, crawl all over it.  She
25  stepped over the female victim and put one knee on
```

180

```
1   the box spring to then feel for a carotid.
2      Q.   And you stated that you had observed some
3   bubbles coming from the female victim's nose?
4      A.   Yes.  That's what prompted her to check for
5   signs of life.
6      Q.   Because that could be indication that the
7   person was breathing?
8      A.   It could be an indication that the person
9   was trying to breathe.
10     Q.   Okay.  But when she began the chest
11  compressions, that indicated that the victim was in
12  rigor, you said?
13     A.   Yeah, she compressed the chest once and
14  felt rigor had started setting, so she -- we stopped
15  and got out of there.
16     Q.   Okay.  And rigor would indicate that the
17  body had been expired for some time?
18     A.   Yes.
19     Q.   Not --
20     A.   The exact time I don't know, because it
21  depends on the atmosphere of which the victim is in,
22  if it's hot, cold.  There is a lot of factors.
23     Q.   But certainly more than a few minutes or
24  maybe an hour?
25     A.   I would have to say more than an hour.
```

181

```
 1      Q.   Okay.  And although the bubbles in the nose
 2 can be an indication of an attempt to breathe, is it
 3 possible that the bubbles could be caused by, after
 4 the body has expired, air escaping from the body?
 5      A.   Yes, it could be the gasses and the air
 6 escaping.
 7      Q.   So, is doesn't necessarily indicate
 8 breathing or attempts to breathe?
 9      A.   Well, no, it doesn't, but it could be both.
10 That's why you have to check.
11      Q.   Right.
12      A.   Right.
13      Q.   Okay.  Now, you left the apartment; is that
14 right --
15      A.   Yes.
16      Q.   -- at some point?
17      A.   Yes.
18      Q.   And you testified about seeing the police
19 there?
20      A.   The police entered the apartment pretty
21 quickly after we entered.  After the son was
22 removed, and we walked down the hallway, I turned
23 around because my partner was in the room, and PD
24 was on scene.
25      Q.   Okay.  So, the police officer was actually
```

182

```
 1 in the apartment while you were in the apartment?
 2      A.   Yes, one police officer --
 3      Q.   Okay.
 4      A.   -- was standing at the other end of the
 5 hall.
 6      Q.   Okay.  And after you left the apartment and
 7 were back outside -- I take it you had taken your
 8 equipment with you?
 9      A.   Yes.
10      Q.   Do you recall whether the police asked you
11 to save your boots?
12      A.   Yes, they did.
13      Q.   And did you do that?
14      A.   I saved them for about two years, two and a
15 half years, and then I threw them away.
16      Q.   The police had never come back and asked
17 for them after that?
18      A.   For my boots, no.
19      Q.   You talked a little bit about the gloves
20 that you wore.  It's my understanding from your
21 testimony you didn't actually put the gloves on
22 until you were already inside the scene?  Or inside
23 the apartment, I should say.
24      A.   Well, we tend not to do that because if I
25 put gloves on in the street and started touching
```

183

```
 1 things, when I get into an apartment, my gloves are
 2 now contaminated and I'm going to touch a patient or
 3 somebody with them.  So, what we do is we wait until
 4 we get to the patient's side and then put them on so
 5 that they're as clean as possible while we touch a
 6 patient.
 7      Q.   Okay.  And the gloves, they are designed
 8 for you to protect against biological hazards,
 9 biological agents?
10      A.   It's for myself and for the patient, so
11 they don't get my germs and I don't get theirs.
12      Q.   Now, of course to put the gloves on you
13 have to use your bare hands to put them on first; is
14 that right?
15      A.   We're taught a technique to put them on so
16 we're not grabbing them by the fingers.  We grab
17 them up by the wrists.
18      Q.   And then you put them on there; is that
19 right?
20      A.   Yes.
21      Q.   At the scene?
22      A.   Yes.
23      Q.   Okay.
24           MR. SMITH:  Could I have just a moment,
25 your Honor.
```

184

```
 1           THE COURT:  Yes.
 2      Q.   I apologize.  Ms. O'Donnell, when you
 3 entered the bedroom where the single male victim
 4 was, was there anything on top of him that you are
 5 aware of?
 6      A.   The only thing that I could recall is that
 7 there was something by his elbows.  What it was, I
 8 don't know.
 9      Q.   Was there anything covering his head?
10      A.   There was nothing covering his head.  There
11 was like a white -- I think a pillow, I don't know,
12 I didn't pick it up and inspect it, close to his
13 head, but not covering his head.
14      Q.   Okay.  And, similarly, the female victim
15 had nothing covering her when you entered the room;
16 is that correct?
17      A.   No, there was nothing covering her.
18           MR. SMITH:  I have nothing further.
19 Thank you, your Honor.
20           Thank you, Ms. O'Donnell.
21           THE COURT:  All right.  Any redirect?
22           MR. MARKLE:  No, your Honor.
23           THE COURT:  All right, thank you,
24 Ms. O'Donnell.  You are excused.  You may step down.
25           Let's get started with the government's
```

**GA46**

185

1  next witness, and then we'll take a break in about
2  15 minutes.
3          MS. REYNOLDS:  Your Honor, at this time,
4  the government calls Sandra Holliday.
5          THE COURT:  All right.  All right.
6  Would you please remain standing, and the oath will
7  be administered to you.
8          S A N D R A   H O L L I D A Y,
9  having first affirmed, was examined and testified as
10 follows;
11         THE WITNESS:  Sandra Holliday,
12 H-O-L-L-I-D-A-Y.  I live in Fredericksburg,
13 Virginia.
14         THE COURT:  You may approach.  Proceed,
15 Ms. Reynolds.
16         MS. REYNOLDS:  Thank you, your Honor.
17 DIRECT EXAMINATION
18 BY MS. REYNOLDS:
19     Q.   Ms. Holliday, where do you work?
20     A.   I work at the FBI laboratory.
21     Q.   And is that in Quantico, Virginia?
22     A.   Yes.
23     Q.   What do you do there?
24     A.   I'm a visual information specialist.  I
25 have worked in that, operational projects unit,

186

1  since 1990 preparing two-dimensional and three-
2  dimensional graphics for trial.  I have worked on
3  many cases.  The Unabomber.
4      Q.   And you mentioned you work in a particular
5  unit.  Could you say what unit you work in?
6      A.   Operational projects unit.
7      Q.   And can you just describe -- you mentioned
8  some of your duties.  Can you describe your duties
9  and responsibilities as a member of the operational
10 projects unit?
11     A.   We either travel to the scene and take
12 measurements ourselves, and then take those
13 measurements back and prepare exhibits for trial, or
14 we have ERT teams that will go and do the same
15 thing.  They will take the measurements and send the
16 data back to us.
17     Q.   And can you describe what some of the cases
18 are you've worked on since you've been in that unit
19 since 1990?
20     A.   I've worked on the Unabomber case.  I've
21 worked on the Oklahoma City bombing case.  I worked
22 on the Jasper, Texas dragging case.  I was the
23 director's liaison during 9/11.
24     Q.   And can you describe what some of the types
25 of exhibits are that you and your colleagues in the

187

1  operational project unit help create for trial?
2      A.   We create either two-dimensional or
3  three-dimensional, which are technical
4  illustrations, which are to scale.  We also prepare
5  interactive graphics for trial as well.
6      Q.   And are there different units within the
7  operational projects unit?
8      A.   There are different areas of -- yes.
9      Q.   And is there an area that also prepares
10 just models of buildings and things like that?
11     A.   Yes, we have the physical model unit.  My
12 unit is the demonstrative evidence unit.
13     Q.   And do all of you and your colleagues work
14 together within that unit --
15     A.   Yes.
16     Q.   -- on projects?
17     A.   Yes, we do.
18     Q.   And you mentioned you've been with the
19 operational projects unit at Quantico since 1990.
20 Were you previously employed by the FBI?
21     A.   Yes, I've been employed at the FBI since
22 1979.
23     Q.   Well, you must have started very young.
24     A.   Thank you.
25     Q.   What were some of your other assignments

188

1  within the FBI?
2      A.   I started as a clerk in Division 6.  I
3  worked in civil rights.  Then I worked for the
4  inspection division as a secretary, and then I
5  eventually ended up in the operational projects
6  unit.
7      Q.   And to become a member of the operational
8  projects unit, did you receive any special training,
9  or did you go to school to study any particular
10 areas?
11     A.   I have a Bachelors of Fine Arts in web
12 design.  I also have completed a lot of courses,
13 crime scene diagramming courses, at Quantico,
14 Virginia, and forensic art courses at Quantico, also
15 as well as a lot of software classes.
16     Q.   And throughout your time with the lab at
17 Quantico in the operations project unit, do you
18 receive sort of on-the-job training and updates in
19 the technology?
20     A.   Yes.
21     Q.   And I'm going to draw your attention now to
22 approximately early 2009 and ask you if you recall
23 at that time if you became involved in an
24 investigation involving a crime scene at 215 Charles
25 Street in Bridgeport?

189

1    A.   Yes, the case was originally assigned to
2  another visual information specialist, but she was
3  transferred out of the unit, so then I received the
4  case.
5    Q.   You were the lucky one?
6    A.   Yes.
7    Q.   And did you have a colleague that was
8  working with you that also got assigned in or about
9  that time?
10    A.   Yes.  He worked in the physical model area,
11  and his name is Cleatus Spitznogle.
12    Q.   And you and Cleatus began work on the case
13  about that time?
14    A.   Yes.
15    Q.   Can you describe what types of models or
16  graphics you were asked to prepare in this case and
17  that you started working on?
18    A.   Cleatus was asked to prepare a physical 3D
19  model of the building.  We received blueprints and
20  we went off the blueprint's measurements, but then
21  we noticed that a couple things were not adding up,
22  so we travelled, actually physically, to the
23  place --
24    Q.   Okay.
25    A.   -- and made sure that those measurements

190

1  were correct.
2    Q.   All right.  And so when you say you
3  travelled, you did an on-site visit to 215 Charles
4  Street in Bridgeport?
5    A.   Yes.
6    Q.   And you came to Bridgeport with Cleatus?
7    A.   Yes.
8    Q.   And you mentioned that you had to verify or
9  remeasure some of the parts of the building; is that
10  correct?
11    A.   Yes, because the front entrance had been
12  remodelled and redone, so we had to go there on site
13  to measure it to make sure that it was accurate.
14    Q.   Okay.  And you also mentioned that you had
15  the blueprints for the building that existed, and
16  exists still today, at 215 Charles Street?
17    A.   Yes, correct.
18    Q.   And did you and did Cleatus, in fact, build
19  a model of 215 Charles Street, or a portion of the
20  building?
21    A.   Yes.
22    Q.   All right.
23         MS. REYNOLDS:  Your Honor, at this time,
24  I'll keep going and maybe at the break we can
25  move -- it's Exhibit -- okay, I'm going to ask my

191

1  helpers to move the Exhibit 100, your Honor.  I'm
2  sorry, it's not 100.  Let me correct that.  It's
3  Exhibit 101, your Honor, at this time.
4    Q.   I just wheeled in Exhibit 101.  And is that
5  the model that Cleatus and you and your colleagues
6  at the operational projects unit ended up creating
7  of the apartment building at 215 Charles Street?
8    A.   Yes.
9    Q.   And do you know whether that model is to
10  scale?
11    A.   Yes, it's three-eighth inch scale.
12    Q.   Three-eighth inch scale.  And, again, this
13  was created using the blueprints and also the
14  measurements that you came to take at the building,
15  correct?
16    A.   Correct.
17         MS. REYNOLDS:  Your Honor, at this time,
18  I would move as a full exhibit the government's 101.
19         MR. SHEEHAN:  No objection.
20         THE COURT:  101 is a full exhibit.
21    Q.   Now, in addition to the model, you
22  mentioned that your sort of specialty is the
23  computerized and digital graphic exhibits; is that
24  correct?
25    A.   Yes.

192

1    Q.   And did you, in fact, create some exhibits
2  based on the information you started developing
3  during your investigation, some digital exhibits?
4    A.   Yes, I took Cleatus's data that he had in
5  what is called AutoCAD, which is a computer-aided
6  design program, and I took his data, and I was able
7  to create a three-dimensional model on the computer
8  of the entire building.  Because Cleatus couldn't do
9  the entire building because it would have just been
10  so large and so heavy, so we felt by me creating it
11  on computer, that that would be a better solution.
12    Q.   Okay.  And just taking a look at 101, this
13  just shows the basement, the first floor and the
14  second floor, correct?
15    A.   Correct.
16    Q.   And it doesn't show the entire second half
17  of the building, correct?
18    A.   Correct.
19    Q.   And there is, in fact, a third floor which
20  is not in the model but is in your digital?
21    A.   Yes.
22    Q.   And did you create any other exhibits, any
23  other digital exhibits?
24    A.   I created an interactive presentation using
25  the crime scene diagram of the apartment itself, the

193

1  different rooms and the different items that were
2  found in each room.
3      Q.  Okay.  And let me just show you what I'll
4  mark Government Exhibit 101A.  This is a CD.  And
5  does that contain the digital exhibits you created
6  for us in this case?
7      A.  Yes, it does.
8          MS. REYNOLDS:  Your Honor, I would move
9  as a full exhibit Government's 101A.
10         THE COURT:  All right.  Absent
11 objection, it's a full exhibit.
12         MR. SMITH:  No objection, your Honor.
13     Q.  And showing you -- if you look at your
14 monitor there, is this one of the exhibits that you
15 created, computer exhibits that you created?
16     A.  Yes.
17     Q.  And this is just an aerial photograph of
18 the area of 215 Charles Street; is that correct?
19     A.  Correct.
20     Q.  In addition to this aerial photograph, did
21 you receive a number of crime scene photographs from
22 the Bridgeport Police Department and the FBI who
23 were investigating this case?
24     A.  Yes, I did.  And we also had the FBI
25 photographer take photographs when we went on site

194

1  for the reference when we built the model and
2  created it.
3      Q.  And did you -- did the FBI photographer
4  take this photograph, if you know?
5      A.  No.
6      Q.  So, again, this is the aerial photograph.
7  And then if we click onto your exhibit that you
8  created, to the first floor, can you describe what
9  that is?
10     A.  That's the layout of the first floor, and
11 if you scroll over the pertinent apartments, they
12 will highlight, and it just shows the layout of the
13 entire first floor.
14     Q.  Okay.  And then there is a unit 211 on the
15 second floor.  If you scroll over it, it
16 highlights --
17     A.  Yes.
18     Q.  And then unit 202 on the second floor, that
19 if you scroll over it, it highlights that unit,
20 correct?
21     A.  Correct.
22     Q.  And then, obviously, as you mentioned, if
23 you scroll to unit 101, that's an apartment on the
24 first floor?
25     A.  Yes.

195

1      Q.  Then clicking onto this exhibit, can you
2  describe what this is?
3      A.  This is the entire model that I created
4  on -- the first one down on the right is -- or down
5  on the left is the entire model together, and then I
6  just kind of pushed the floors to the side so you
7  could see each floor and the pertinent apartments
8  that needed to be highlighted.
9      Q.  And, again, if you touch --
10         MR. SMITH:  Your Honor, I'm going to
11 object and ask that this be brought off the screen
12 immediately.  There is evidence here that's not in
13 evidence yet.
14         MS. REYNOLDS:  The model is in evidence.
15         MR. SMITH:  Your Honor, there is writing
16 on this that is not in evidence yet.
17         THE COURT:  Could you turn the light off
18 for just a moment?
19         MS. REYNOLDS:  This is on the CD that
20 they didn't object to, your Honor.  I'm not going to
21 click onto the letters.  I'm just having her
22 describe what the exhibit is.
23         MR. SMITH:  Your Honor, may we approach?
24         THE COURT:  She can describe what the
25 exhibits are, then we'll take a recess and I'll hear

196

1  you then.  Okay?
2          MS. REYNOLDS:  Okay.  Let me just click
3  onto --
4      Q.  You mentioned you also created a diagram of
5  an apartment, correct?
6      A.  Correct.
7      Q.  Do you recall if that was apartment 101?
8      A.  Yes.
9      Q.  And, again, this was information that you
10 had received from the Bridgeport Police Department
11 and the FBI, correct?
12     A.  Correct.
13     Q.  And that you confirmed when you came on
14 scene?
15     A.  Correct.
16     Q.  And is that the diagram that you created
17 using the information and crime scene photographs
18 that the Bridgeport Police Department and the FBI
19 had provided to you?
20     A.  Yes.
21         MS. REYNOLDS:  Your Honor, again, this
22 has been entered into evidence absent objection on
23 Exhibit 101A.  I was just going to show it so the
24 jury could see what it is.  I'm not going to at this
25 time click onto the actual numbers.

197

```
1              THE COURT:  Go ahead with this one.
2              MS. REYNOLDS:  I should note for the
3     record some of the photos have already been entered
4     into evidence.  All of these were provided to
5     counsel long ago.
6         Q.   Again, taking a look at the screen, this is
7     unit 101, and this is a diagram of the apartment
8     that you created a computerized diagram?
9         A.   Yes.
10        Q.   And can you just describe what each number
11    represents.
12        A.   That was based on the crime scene diagram
13    the police department created based on items that
14    were found in each room of the apartment.
15        Q.   And if you click onto the number, does
16    something happen to the diagram?
17        A.   Yes, it actually shows the actual crime
18    scene photo that is in correlation to that number.
19        Q.   So, the crime scene photographs are linked
20    to those particular numbers on the diagram?
21        A.   Yes, they are.
22             MS. REYNOLDS:  And I'm going to use an
23    example, because, your Honor, this photo is already
24    in evidence.
25             MR. SMITH:  Your Honor, this exhibit is
```

198

```
1     in evidence.  Those photos are not necessarily in
2     evidence.
3              MS. REYNOLDS:  They are in evidence.
4     They were moved in.
5              THE COURT:  Let's --
6              MR. SMITH:  These are all the photos
7     that have been -- previously been admitted?
8              THE COURT:  But the picture she's going
9     to put up, put it on the little screen so counsel
10    can see that's in evidence.  You may go ahead.
11        Q.   And just clicking on it to show the jury
12    how the diagram would work, I just clicked on it,
13    using my computer, onto the No. 1, and then that is
14    what calls up that particular crime scene photo that
15    you used to create the diagram, correct?
16        A.   Correct.
17        Q.   If you do that throughout the diagram,
18    that's what pops up, correct?
19        A.   Correct.
20        Q.   Different photos?
21             THE COURT:  All right.  Are you at a
22    good stopping point?
23             MS. REYNOLDS:  Your Honor, I think I
24    could finish with this witness.
25             THE COURT:  Well, there is an
```

199

```
1     outstanding issue.
2              MS. REYNOLDS:  Okay.
3              THE COURT:  You can keep going.
4              MS. REYNOLDS:  I'll just show one --
5     yes, I've shown all three.
6         Q.   And those were the three digital-type
7     diagrams that you created that's contained in 101A,
8     correct?
9         A.   Correct.
10             MS. REYNOLDS:  I'm at a good stopping
11    point, your Honor.
12             THE COURT:  Before we go on with
13    cross-examination, let's take a ten-minute recess,
14    ladies and gentlemen.  I don't know if it's going to
15    be any cooler in your jury room, but we're trying to
16    get the chill on.
17             (Jury exited the courtroom.)
18             THE COURT:  You may take a rest also.
19    If you would come back in ten minutes, please.  And
20    don't discuss your testimony.
21             All right, counsel.  With respect to
22    Mr. Smith's objection, I anticipate that it was the
23    use of the word "lookout"?
24             MR. SMITH:  Well, yes, your Honor.  That
25    is not in evidence yet.  I mean, I don't necessarily
```

200

```
1     have an objection to this exhibit, but when it
2     begins telling them that things are without any witness
3     having identified them as such, this witness has no
4     personal knowledge of what each apartment meant in
5     this case.  To have them scrolling over it and then
6     all of this popping up in front of the jury I think
7     is improper.
8              THE COURT:  What would you like to do?
9              MS. REYNOLDS:  I took it -- I'm not
10    going to use it with this witness anymore, and I
11    moved on when that did happen.
12             THE COURT:  All right.
13             MS. REYNOLDS:  I didn't refer to it
14    anymore.
15             THE COURT:  I expect there will be
16    testimony later on that will patch that up.
17             MS. REYNOLDS:  Yes.
18             THE COURT:  But Ms. Reynolds is not
19    going to use that photo.  Is that satisfactory,
20    Mr. Smith?
21             MR. SMITH:  That's fine, your Honor.
22             MS. REYNOLDS:  I did just have one other
23    question of the witness that I forgot to ask her.
24    When she comes back in, then I will be done with my
25    direct.
```

201

1          THE COURT:  Let's take a ten-minute
2  recess, and then we'll be back.
3          (Recess)
4          THE COURT:  All right.  Please be
5  seated.  All right.  We'll bring in the jury.
6          (Jury entered the courtroom.)
7          THE COURT:  Please be seated, ladies and
8  gentlemen.  Ms. Holliday remains under oath.
9          Ms. Reynolds, you had one more question,
10  you said.
11          MS. REYNOLDS:  Yes, your Honor.  Thank
12  you.
13      Q.  Ms. Holliday, with regard to apartment 101
14  in 215 Charles Street, you had indicated you had
15  taken measurements and looked at the blueprints,
16  correct?  And do you recall what the height or what
17  the measurement is from floor to ceiling inside
18  apartment 101?
19      A.  It was 9 feet 3 and 7/8 inches.
20          THE COURT:  Could you speak into the
21  microphone, please?
22      A.  It was 9 feet 3 and 7/8 inches.
23      Q.  9 feet 3 and 7/8 inches from the floor to
24  the ceiling within apartment 101?
25      A.  Yes.

202

1          MS. REYNOLDS:  Nothing further, your
2  Honor.  Thank you.
3          THE COURT:  All right.
4  Cross-examination?
5          MR. SMITH:  We have no questions, your
6  Honor.  Thank you.
7          THE COURT:  All right.  Thank you.
8  Thank you, Ms. Holliday.  You may be excused.  You
9  may step down.
10          (Witness excused)
11          Would the government please call its
12  next witness?
13          MS. REYNOLDS:  Your Honor, the
14  government calls Detective Joette Devan of the
15  Bridgeport Police Department.
16          THE COURT:  Detective Devan, would you
17  please come to the witness stand.  Please remain
18  standing.  The oath will be administered to you.
19          J O E T T E    D E V A N,
20  having first affirmed, was examined and testified as
21  follows:
22          THE WITNESS:  Joette Devan, d-e-v-a-n,
23  and I live in Stratford, Connecticut.
24          MS. REYNOLDS:  Can you just see if that
25  microphone is on.

203

1          THE COURT:  It's not.
2          MS. REYNOLDS:  May I inquire, your
3  Honor?
4          THE COURT:  You may.
5  DIRECT EXAMINATION
6  BY MS. REYNOLDS:
7      Q.  Detective, where do you work?
8      A.  I work for the Bridgeport Police
9  Department.
10          THE COURT:  I'm going to ask you to move
11  your chair up so we can hear you.  Thank you.
12      Q.  What do you do there?
13      A.  I'm a detective in the crime scene unit.
14      Q.  How long have you been a detective in the
15  crime scene unit?
16      A.  I've been in the crime scene unit for seven
17  years.
18      Q.  And prior to that, were you employed as a
19  police officer in the Bridgeport PD?
20      A.  Yes, two years prior to that I was a
21  detective in the detective bureau, and for five
22  years prior to that I was in patrol.
23      Q.  And when you say you were in patrol, you
24  were just regular police work on the street?
25      A.  Yes, patrol officer.

204

1      Q.  And then you became a detective after that?
2      A.  Yes.
3      Q.  And then in order to join the crime scene
4  unit, did you have to undergo any specialized
5  training?
6      A.  Once I was accepted in the crime scene
7  unit, then we started specialized training for that
8  type of work, yes.
9      Q.  And can you just describe what it is you do
10  as a detective in the crime scene unit of the
11  Bridgeport Police Department?
12      A.  In the crime scene unit, we respond to
13  crime scenes when we are requested to do so, and
14  process the scene for evidence and documentation
15  purposes.
16      Q.  And what types of cases, generally, do you
17  respond to as a member of the crime scene unit?
18      A.  Well, generally, we respond to all
19  homicides, robberies where there is injury, or where
20  there is evidence that is more than just basic
21  collection or where the scene needs to be processed
22  more than just photographs or one or two pieces of
23  evidence.  But we respond to any type of crime scene
24  that we're requested at.
25      Q.  So, there is some evidence that a regular

205

1  police officer could collect pursuant to an arrest,
2  for example, but if there is anything that a regular
3  police officer shouldn't be involved in, then your
4  unit gets called out?
5      A.   That is correct.
6      Q.   And you mentioned you respond to all murder
7  cases in Bridgeport?
8      A.   Yes.
9      Q.   And once you joined the crime scene unit,
10 you mentioned you did some specialized training.
11 Can you indicate what types of techniques you were
12 trained to use as a member of the crime scene unit
13 in order to process and document the different types
14 of crime scenes you would respond to?
15     A.   Well, since I joined the crime scene unit,
16 I've attended numerous classes involving evidence
17 collection, evidence detection, blood pattern
18 analysis, crime scene reconstruction, shooting
19 reconstruction.  I recently attended the National
20 Forensic Academy, which is a ten-week training
21 program in University of Tennessee.
22     Q.   Numerous courses?
23     A.   Yes.
24     Q.   Have you -- are you certified in, for
25 example, fingerprint identification?

206

1      A.   I am certified as a crime scene analyst by
2  the International Association for Identification.
3      Q.   And as a crime scene analyst, what are the
4  different types of evidence or evidence collection
5  techniques that you've been trained to use?
6      A.   We're trained to collect any type of
7  evidence, and I mean any type of evidence.  Anything
8  that can constitute physical evidence.  Something
9  that's actually tangible.  Anything from an item, to
10 fingerprints, to biological evidence.
11     Q.   And I'm going to draw your attention to
12 August of 2005.  Where were you assigned at that
13 time in the Bridgeport PD?
14     A.   In the crime scene unit.
15     Q.   And how long had you been a crime scene
16 investigator in August of 2005?
17     A.   Approximately, a year and a half at that
18 time.
19     Q.   And by that time, a year and a half into
20 your time with the crime scene unit, do you recall
21 approximately how many crime scenes you had
22 responded to and had helped to process?
23     A.   By that time I would say probably, 25, 30
24 crime scenes.
25     Q.   And did any of those include murder crime

207

1  scenes?
2      A.   Yes.
3      Q.   And drawing your attention specifically to
4  August 24th of 2005, in the morning time period,
5  were you working that day?
6      A.   Yes, I was.
7      Q.   And do you recall on that day being called
8  out to a crime scene at 215 Charles Street in
9  Bridgeport?
10     A.   Yes, we were.
11     Q.   And who were you working with that day?
12     A.   That day my partner was Detective Ricardo
13 Vargas, and once we arrived at the scene Detective
14 Paul Ortiz and Detective Joseph Gallagher also were
15 assisting with the crime scene.
16     Q.   And drawing your attention to Exhibit 102,
17 which is already in evidence --
18         MR. SHEEHAN:  I'm sorry.  Did you say
19 102?
20         MS. REYNOLDS:  Yes, Government's 102.
21     Q.   Is that the front of 215 Charles Street?
22     A.   Yes, it is.
23     Q.   And that's where you responded that morning
24 of August 24th?
25     A.   Yes.

208

1      Q.   And when you got there, can you describe
2  what you saw in the surrounding area of the building
3  located at 215 Charles Street?
4      A.   When we arrived on scene, the scene was
5  already being secured, meaning that the traffic was
6  diverted, and the road was closed between just to
7  the east of this building and all the way down --
8  several buildings down on the west with crime scene
9  tape, and also marked police vehicles.  There were
10 also police officers on scene.
11     Q.   And when you say the street was closed off,
12 was the -- Charles Street where the building is
13 located, was that closed off to traffic?
14     A.   Yes.
15     Q.   And showing you Government's Exhibit 102A,
16 looking on your monitor there, is that just a
17 close-up of the entryway?
18     A.   Yes, it is.
19         MS. REYNOLDS:  Your Honor, I would move
20 this as a full exhibit.
21         MR. SHEEHAN:  No objection.
22         THE COURT:  I think that's in, isn't it?
23         MS. REYNOLDS:  I think it might be.
24         THE COURT:  Well, it's in again.
25         MR. SHEEHAN:  Again, I don't object,

209

```
1    your Honor.
2              THE COURT:  Thank you.
3         Q.   So, is that, again, just a close-up of
4    215 Charles Street, correct?
5         A.   Yes, the front entrance.
6         Q.   When you respond to the scene, do you have
7    any special vehicle that you bring with you that you
8    and your colleagues come to, or can you --
9         A.   Yes, we have a crime scene van.
10        Q.   And what types of equipment do you have in
11   your crime scene van?
12        A.   Well, in the van we carry the equipment
13   that we need to process the scenes, including
14   cameras, video cameras, packaging materials,
15   measuring equipment, protective clothing, things of
16   that nature.  Anything we might need to process the
17   scene.
18        Q.   And you were able -- you got your van right
19   close to the scene?
20        A.   Close to the scene, yes.
21        Q.   I'm going to show you Government's
22   Exhibit 103.  Is that photograph a side view of the
23   building at 215 Charles Street?
24        A.   Yes, that photograph is taken from Charles
25   Street as well, but at an angle.  Still the front of
```

210

```
1    the building.
2         Q.   And taking a look at the right-hand side of
3    the photograph --
4              MR. SHEEHAN:  Your Honor, is this in
5    evidence?  Are they moving it?
6              MS. REYNOLDS:  I would move it, your
7    Honor, as a full exhibit.
8              THE COURT:  There is no objection,
9    Mr. Sheehan?
10             MR. SHEEHAN:  No, your Honor.
11             THE COURT:  Thank you.
12             MR. SHEEHAN:  Could I just ask, however,
13   we do it on the screen first, the small screen?
14             THE COURT:  Yes, that's the procedure to
15   be used.
16             MR. SHEEHAN:  Thank you, your Honor.
17        Q.   Again, taking a look at Government's
18   Exhibit 103, which was just admitted, absent
19   objection, taking a look just at the right-hand side
20   of the photograph where I'm showing the arrow, is
21   that like an alleyway between the building at
22   215 Charles Street and the next building over?
23        A.   There is a fence there separating the two
24   properties.  To the left of the fence, against the
25   building, is like a small -- it's a yard, I guess
```

211

```
1    would you call it.  It's a grass area against the
2    side of the building, and then the fence separates
3    215 from the building next to it.
4         Q.   And taking a look at Government's
5    Exhibit 105 up on your monitor, do you recognize
6    what that -- what that's a photograph of?
7         A.   Yes.
8         Q.   And what is that a photograph of?
9         A.   That is a photograph of the side of
10   215 Charles Street.  It's the window to the bedroom
11   of apartment 101.
12        Q.   And let me step back.  When you got to the
13   crime scene at 215 Charles Street, you mentioned you
14   were working with your partner Paul Ortiz that day?
15        A.   Ricardo Vargas, and then Paul Ortiz and
16   Joseph Gallagher also came into the unit.
17        Q.   And as you got to the scene, and once you
18   got there, what's the first thing that you and your
19   colleagues did?
20        A.   First thing we did when we arrived at this
21   crime scene, or any, is that we speak with the
22   police officer who's the first responder and the
23   detectives on scene just to get kind of an idea of
24   what we're looking at.  And then we do a walkthrough
25   of the scene itself.  Again, to get a better idea of
```

212

```
1    how we're going to approach processing the scene.
2         Q.   And did you, in fact, do a walkthrough of
3    the scene at Charles Street?
4         A.   Yes.
5         Q.   And did you go inside the building?
6         A.   Yes.
7         Q.   What apartment did you go into at that
8    time?
9         A.   The first place we went was apartment 101.
10        Q.   And before you went in there -- well, when
11   you first went in there, what did you go in there to
12   do?
13        A.   Again, just get an idea of what the scene
14   looked like and how we would approach processing it.
15        Q.   And do you recall what you saw when you
16   first got into apartment 101?
17        A.   Well, when we first entered the apartment,
18   there was sort of a large sofa kind of blocking the
19   door a little bit, like when you first walked in,
20   and other than that there didn't seem to be too much
21   amiss in the initial room, and we were directed down
22   the hallway towards the bedrooms and started from
23   there.
24        Q.   And prior to getting into -- right into
25   apartment 101, did you notice whether or not there
```

213

```
1    was a police officer at the door?
2         A.   Yes.
3         Q.   And what was his function, that police
4    officer's function at the door of apartment 101?
5         A.   The officer's posted at the door to secure
6    the scene and make sure other people aren't entering
7    and to keep the scene -- it's integrity.
8         Q.   And when you went in, was anybody else
9    inside the apartment when you first went in to
10   assess what type of crime scene it was?
11        A.   When I first entered, I believe that
12   Officer Laracuenta was at the door, and I don't
13   believe anybody else was in the apartment.
14        Q.   You mentioned Officer Laracuenta.  Was he
15   the first responder, as far as you know?  He was the
16   one at the door, correct?
17        A.   Yes.
18        Q.   What is the next step you and your
19   colleagues from the crime scene unit take at that
20   point once you assess what type of crime scene you
21   have?
22        A.   Well, then we actually exit the scene again
23   and go and have a little meeting, discuss exactly
24   how we're going to approach the scene, and who is
25   going to be assigned to what job or task at the
```

214

```
1    scene.
2         Q.   And did you have that meeting outside of
3    apartment 101?
4         A.   Yes.
5         Q.   And what did you and your colleagues
6    determine as to how you were going to approach the
7    scene inside apartment 101?
8         A.   Well, in this case, what we decided was
9    that with the captain's approval, the state lab, the
10   Connecticut State Lab was going to be called in for
11   their input, and also the medical examiner's office
12   was requested to respond.
13        Q.   Okay.
14        A.   That was the first step.
15        Q.   Now, when you say with the captain's
16   approval, who was the captain at that time?
17        A.   Captain Lynn Kerwin.
18        Q.   Captain Lynn Kerwin.  And was she on scene
19   at the time?
20        A.   Yes, she was.
21        Q.   So, was the Connecticut State Forensic Lab
22   and the medical examiner contacted after you had
23   that meeting?
24        A.   Yes, they were.
25        Q.   And did anyone from those offices respond
```

215

```
1    directly to the crime scene?
2         A.   Yes, they did.
3         Q.   Now, while you were waiting for them to
4    respond, did you take any other steps at that point
5    as far as initiating your processing of the scene?
6         A.   Yes.
7         Q.   And what steps did you take?
8         A.   While we were waiting for the lab personnel
9    and medical examiner's office, we began with
10   documentation of the scene, taking notes, and also
11   photographing and videotaping.
12        Q.   And did you split up who would do what as
13   far as processing the scene?
14        A.   Yes, everybody is assigned a particular
15   task.
16        Q.   And what was your task that day?
17        A.   My task was the crime scene report.
18        Q.   Can you describe for the members of the
19   jury what you mean by a crime scene report?  What
20   would you do in the crime scene report?
21        A.   My task that day was to write the crime
22   scene report.  So, basically, what we're doing is
23   documenting the scene as we found it, the scene as
24   it changed, and anything that we did while we were
25   at the scene.
```

216

```
1         Q.   And what was Detective Paul Ortiz's
2    function, or his job, as far as processing the
3    scene?
4         A.   Paul's assignment that day was evidence
5    collection.
6         Q.   And when you say "evidence collection," can
7    you describe what you mean by that?
8         A.   Well, once we start processing the scene
9    and determine what we are going to collect as
10   evidence, then it's actually Detective Ortiz's job
11   to physically collect the evidence and package it.
12        Q.   Package it and then?
13        A.   Turn it in to the property room.
14        Q.   All right.  And what about Detective
15   Vargas, what was his main job at the time?
16        A.   Detective Vargas was doing the photography
17   at the scene.
18        Q.   And while you were there at the crime
19   scene, did you all work together?
20        A.   Yes.
21        Q.   Now, did you go back inside apartment 101
22   at that time once you had your different functions
23   you were going to perform?
24        A.   Yes.
25        Q.   And prior to going back into apartment 101,
```

217

```
1    did you have to put any special gear on?
2        A.   Yes.
3        Q.   Okay.
4        A.   We wear protective suits, Tyvek suits.
5    They're commonly referred to as bunny suits.
6    They're from the neck down completely covered,
7    gloves, and head covering as well.
8        Q.   And are your shoes also covered?
9        A.   Yes.
10       Q.   And you put those on, those suits,
11   protective suits on outside of apartment 101?
12       A.   Yes.
13       Q.   And did all of you put those suits on
14   before going back into apartment 101?
15       A.   Yes, we did.
16       Q.   Is that standard procedure that you use
17   when you are going to process a scene such as the
18   one you encountered at 101?
19       A.   At this particular scene, yes.  It's not in
20   every scene.  There is some level of protective gear
21   that we wear.  At this scene, it was determined we
22   would do full suits.
23       Q.   And why was that determination made?
24       A.   It was immediately evident upon entry that
25   the scene was basically a biological hazard, and we
```

218

```
1    also did not want to contaminate the scene further
2    ourselves by leaving our own evidence behind.  This
3    way, we protect the scene from us, and we're
4    protected from anything at the scene as well.
5        Q.   And then once you had your protective gear
6    on and your partners that day had their protective
7    gear on, did you go back into apartment 101?
8        A.   Yes.
9        Q.   And when you entered back into the
10   apartment, was Officer Laracuente still guarding the
11   front door?
12       A.   Yes.
13       Q.   And what was your plan that morning as far
14   as how you would approach the scene, how you would
15   start processing what was inside apartment 101?
16       A.   Well, after the state lab came to the scene
17   and we took them in and got their assessment and
18   their recommendations, we still, again, as I said,
19   waited for the medical examiner's office before we
20   actually did anything more than photography.
21       Q.   And did the medical examiner's --
22   representatives from the medical examiner's office
23   also arrive at the scene?
24       A.   Yes, one of the doctors and one of the
25   investigators came to the scene.
```

219

```
1        Q.   And what was determined after you spoke to
2    them after they arrived?
3        A.   We wanted to make sure they had an
4    opportunity to see the scene and see the victims as
5    we found them, and it was determined, in cooperation
6    with the doctors, that we would collect some of the
7    evidence from the victims before they were
8    transported to the medical examiner's office,
9    including the duct tape and their upper body
10   clothing.
11       Q.   And did you determine where within the
12   apartment you would start, which victim you would
13   start with?
14       A.   The medical examiner's office decided to
15   start with Mr. Williams in the bedroom to the right.
16       Q.   So, there came a time that you were able to
17   identify the three victims inside the apartment?
18       A.   We had tentative identification on the
19   victims, yes.
20       Q.   When you say Mr. Williams, is that Basil
21   Williams, and he was the single victim in one of the
22   bedrooms?
23       A.   Yes.
24       Q.   In showing you what's already in evidence
25   as Government's Exhibit 120-1, is that a photograph
```

220

```
1    of Basil Williams as he appeared in his bedroom when
2    you went into his bedroom that day?
3        A.   Yes.
4        Q.   When you mentioned the duct tape, taking a
5    look at 120-1, there is duct tape on his head,
6    correct, and also on his arms and wrists.  Do you
7    recall whether there was duct tape on his legs as
8    well?
9        A.   Yes, there was.
10       Q.   So, in consultation with the medical
11   examiner's office, you said it was determined that
12   some of the duct tape would be cut at the scene?
13       A.   Yes.
14       Q.   And how did you do that?  Or who did that
15   and how did you do that?
16       A.   Detective Ortiz and the investigator from
17   the medical examiner's office that was out there
18   actually removed the duct tape from the victims.
19       Q.   And were you present when it was removed
20   from the victims?
21       A.   Yes, I was.
22       Q.   And, again, Detective Ortiz was the
23   evidence collection person, as you described before,
24   correct?
25       A.   Yes.
```

221

1    Q.   Did he actually collect it then after it
2 was removed from the victim?
3    A.   Yes, he did.
4    Q.   And, again, you started first with Basil
5 Williams, correct?
6    A.   Yes.
7    Q.   And just showing you Government's
8 Exhibit 120-2, which is also in evidence already, do
9 you see these yellow placards 1, 2, 3, 4?  Are those
10 placed by you and your colleagues on evidence when
11 you process a scene?
12    A.   Yes, they would have been put there by
13 Detective Ortiz.
14    Q.   And is that a technique that you use to
15 identify evidence when you are processing a scene?
16    A.   Yes.
17    Q.   And so what's the significance of the No.
18 1, 2, 3, 4?
19    A.   The only significance of the numbers is to
20 basically identify a particular piece of evidence.
21 It doesn't have anything to do with, you know, a
22 time frame or -- it's just to identify a particular
23 evidence to a particular number, and the cards
24 definitely make it easier to see in a photograph
25 what the area -- where you are looking for a

222

1 particular piece of evidence.
2    Q.   So, you have identified that piece by
3 placing a placard next to it or near it, correct?
4    A.   Yes, ma'am.
5    Q.   And you mentioned that Detective Vargas was
6 in charge of taking photographs and photographing
7 the scene that day, correct?
8    A.   Yes.
9    Q.   So, he would take photographs, before and
10 after the placards?
11    A.   Yes, we take photographs initially upon
12 entry before anything is touched or moved just to
13 show the scene as we find it, and then once we start
14 determining what evidence is going to be collected,
15 the individual pieces of evidence are marked with
16 the placards and then photographed again.
17    Q.   And do you recall prior to putting the
18 placards there and making the determination that you
19 were going to cut this duct tape off from Basil
20 Williams, do you recall if there was anything near
21 him or on top of him that you had to take off and
22 then photograph?
23    A.   I believe there was a pillowcase of some
24 sort on him, and perhaps a pillow as well.
25    Q.   I'm showing you Government's Exhibit 120-4.

223

1 Maybe I won't show you that.
2         MS. REYNOLDS:  I'm going to keep going
3 right now, your Honor.
4    Q.   So, once you remove those items, then you
5 said you would photograph it, correct?  Once you had
6 the placards in place?
7    A.   Right before the evidence is collected,
8 it's photographed again with the placards in place.
9    Q.   And what types of things are you doing
10 while this is going on in order to document and
11 prepare your crime scene report?
12    A.   Note-taking, generally, of who is doing
13 what, and documenting times that evidence is
14 collected as well.
15    Q.   After you finished with Basil -- well, did
16 the medical examiner and Detective Ortiz, in fact,
17 cut off the duct tape from Basil Williams?
18    A.   Yes, Detective Ortiz and the investigator,
19 yes.
20    Q.   And, again, you were present for that?
21    A.   Yes, I was.
22    Q.   And did you see what it was put into, the
23 duct tape, once it was cut from the victims' bodies?
24    A.   Yes, each individual piece of duct tape was
25 collected and put into tin cans similar to paint

224

1 cans.
2    Q.   And why was the duct tape put into a tin
3 can when it was -- or a paint can, when it was
4 collected?
5    A.   We wanted to try to preserve the duct tape
6 as best as possible, and it can't be packaged in
7 plastic, and it can't be packaged in paper because
8 it would stick to it.  So, these paint cans kind of
9 preserve the duct tape the best way so that it can
10 be sent to the state lab.
11    Q.   And when you say the duct tape can't be
12 packaged in plastic, can you explain why it can't be
13 packaged in plastic?
14    A.   There is a possibility in cases where the
15 duct tape is on a person that there is biological
16 evidence on the duct tape, and biological evidence
17 cannot be packaged in plastic since plastic doesn't
18 breathe.  It will actually mold.
19    Q.   Okay.  And why can't it be packaged in
20 paper?
21    A.   Number one, duct tape would stick to paper.
22 We don't want to add additional evidence to the
23 evidence, first of all, and second of all, paper
24 doesn't hold it to form very well, and this way, by
25 using a paint can, it can't be crushed, and,

**GA56**

225

```
1   actually, you know, stick the tape more to itself
2   and destroy more evidence.
3       Q.   And, showing you Government's Exhibit --
4   taking a look at your monitor now, do you see
5   Government's Exhibit 120-4?
6       A.   Yes.
7       Q.   And is that a closer view of the placards
8   1, 2, 3 -- well, can you describe what that photo
9   shows?
10      A.   The photo shows a midrange image of
11  Mr. Williams and placards 1, 2 and 3 near and on
12  him.
13          MS. REYNOLDS:  Your Honor, I would move
14  as a full exhibit Government's Exhibit 120-4.
15          MR. SHEEHAN:  No objection.
16          THE COURT:  All right.  Full exhibit.
17  And, again, this shows the placards.
18      Q.   So, what would placard No. 1 represent?
19      A.   I think -- I can't --
20      Q.   If you could see.
21      A.   I think the placard No. 1 is representing
22  the duct tape on Mr. Williams' head and face.
23      Q.   And then 2 and 3 represent other -- well,
24  do you recall what the 2 represents?
25      A.   I believe the shirt, his shirt was placard
```

226

```
1   No. 2, and the duct tape on his wrists and arms was
2   No. 3.
3       Q.   And then taking a look on your monitor
4   there, Government's Exhibit 120-5, is that just a
5   closer view of 2 and 3, the placards and the
6   victim's body?
7       A.   Yes, it shows a better picture of the duct
8   tape on his arms.
9           MS. REYNOLDS:  Your Honor, I would move
10  as a full exhibit Government's Exhibit 120-5.
11          MR. SHEEHAN:  Your Honor, I think that's
12  cumulative.  Objection.
13          THE COURT:  Can you go back to 120-4,
14  talking about the placards, its numbers.  Is there
15  some detail you are trying to pick up in 5 that
16  isn't captured in 4?
17          MS. REYNOLDS:  It's a close-up view of
18  the duct tape, your Honor, so, yes, and the detail
19  of the shirt, which is represented by the No. 2.
20  It's clear in this picture.  And then the No. 3 is
21  the duct tape on the arms and hands of the victim.
22          THE COURT:  All right.  To the extent
23  that detail has significance later on, it is more
24  detail than 120-4, I'll permit it.
25          MS. REYNOLDS:  Thank you, your Honor.
```

227

```
1       Q.   Taking a look, then, at Government's
2   Exhibit 120-5.
3           MR. SHEEHAN:  I'm sorry.  You didn't
4   offer --
5           THE COURT:  That's what was just
6   offered.  You objected.
7           MR. SHEEHAN:  I did, and I thought she
8   had -- I thought your Honor's ruling was she had
9   to --
10          THE COURT:  No, I said I would admit it.
11  Sorry.
12          MR. SHEEHAN:  Thank you.  I
13  misunderstood, your Honor.
14          MS. REYNOLDS:  And if your Honor could
15  dim the lights a little bit.
16          THE COURT:  Yes.
17      Q.   So, again, taking a look at what's in
18  evidence as Government's Exhibit 120-5, placard No.
19  2 represents what piece of evidence that you
20  collected with your colleagues from Basil Williams'
21  body?
22      A.   His shirt.
23      Q.   And then placard No. 3 represents what
24  evidence you collected from the scene?
25      A.   It would be the duct tape from his arms and
```

228

```
1   hands.
2       Q.   And then in the original photo that we had
3   already shown, was there also a placard No. 4?
4       A.   Yes, there was.
5       Q.   And do you recall what that piece of
6   evidence represented?
7       A.   I believe that was the duct tape on his
8   ankles.
9       Q.   Once it was collected, was all the duct
10  tape put into these paint cans that you referred to?
11      A.   Yes, individually, yes.
12      Q.   Each one?
13          MS. REYNOLDS:  Your Honor, could I
14  approach?
15          THE COURT:  You may.
16      Q.   Starting with Government's Exhibit 120A,
17  could you describe what that is?
18      A.   This is the paint can which was collected
19  as Exhibit 1.  The duct tape from Mr. Williams' face
20  and head was placed inside of this container.
21      Q.   And showing you what's been marked
22  Government's Exhibit 120A-1.  Do you recognize what
23  that is?
24      A.   Yes, this is the duct tape that was
25  originally cut from Mr. Williams' head and placed
```

229

1  inside that can.

2      Q.   And prior to your testifying here today,

3  were you present for when the duct tape was removed

4  from the paint cans and placed into these sealed

5  plastic envelopes?

6      A.   Yes.

7      Q.   And then it was numbered with the

8  Bridgeport evidence number, correct?

9      A.   Yes.

10     Q.   That corresponds to the paint can 120?

11     A.   Correct.

12          MS. REYNOLDS:  Your Honor, I would move

13  as a full exhibit Government's 120 and 120A-1.

14          MR. SHEEHAN:  No objection.

15          THE COURT:  It's the 120A and 120A-1.

16          MS. REYNOLDS:  Yes, thank you.  120A is

17  the paint can.

18          THE COURT:  Is the can, and then 120A-1

19  is the plastic envelope containing the tape.  All

20  right.  They are full exhibits, absent objection.

21     Q.   Showing you Government's 120B, do you

22  recognize what that is?

23     A.   Yes.

24     Q.   And what is that?

25     A.   This is the can that the duct tape from Mr.

230

1  Williams' ankles was originally placed in when it

2  was cut off his body.

3      Q.   I'm sorry.  I should just stand corrected.

4  That's 120C.  Let me hand you 120C for purposes of

5  identification.  And, again, is that the paint can

6  where the duct tape from his hands was collected?

7      A.   Yes, it is.

8      Q.   And was a corresponding plastic evidence

9  bag created?

10     A.   Yes, it was.

11     Q.   And showing you Government's

12  Exhibit 120C-1, is that the duct tape that came from

13  inside 120C?

14     A.   Yes, it is.

15     Q.   And then showing you what's been marked

16  Government's Exhibit 120D, do you recognize that?

17     A.   Yes.

18     Q.   And what is that?

19     A.   That is the can that held the duct tape

20  that was cut from Mr. Williams' ankles.

21     Q.   And then was a similar plastic evidence bag

22  created, and I'll show you what's been marked

23  Government's Exhibit 120D-1?

24     A.   Yes.

25     Q.   And is that the duct tape that was

231

1  contained inside the can?

2      A.   Yes, it is.

3          MS. REYNOLDS:  Your Honor, I would move

4  as full exhibits Government's Exhibit 120C and

5  120C-1, the duct tape from the hands, and 120D and

6  120D-1, the duct tape from the ankles.

7          MR. SHEEHAN:  Could I just briefly voir

8  dire on that issue, your Honor?

9          THE COURT:  Yes.

10  VOIR DIRE EXAMINATION

11  BY MR. SHEEHAN:

12     Q.   I'm sorry.  Could you -- if I might see

13  what you have there as 120D.  There appears to be

14  another number on it.  I'm just trying to understand

15  the numbering system on this.  Could you tell me

16  what -- what does the No. 4 signify on this original

17  label, the larger white label?

18     A.   That's the Bridgeport Police Department

19  label.

20     Q.   Okay.

21     A.   That is put on by Detective Ortiz once the

22  evidence is packaged.  The smaller white,

23  rectangular label underneath it is the Connecticut

24  State Forensic Lab identification label.

25     Q.   So, in other words, the 4 on the top where

232

1  it says Exhibit 4, that's what is corresponding to

2  the placard?

3      A.   Right.

4          MR. SHEEHAN:  Thank you.  I'm sorry,

5  your Honor.  Thank you for clearing that up.

6      Q.   That would be true on this other one,

7  right?  You've got on this other one you were

8  offering as 5.

9          THE COURT:  It's the C and D series.

10          MS. REYNOLDS:  A is already in evidence.

11  120C and 120C-1, 120D, 120D-1.

12     Q.   So C is 120, and that would be

13  corresponding to the label we saw?

14     A.   Yes, to the placard No. 3, yes.

15          MR. SHEEHAN:  I have no objection, your

16  Honor.

17          THE COURT:  All right.  120C, 121C-1,

18  120D and 121D-1 are full exhibits.

19     Q.   120A-1 is the duct tape from the victim's

20  head, correct?

21     A.   Yes.

22          MS. REYNOLDS:  Your Honor, could I

23  publish 120A-1, 120C-1, and 120D-1 to the jury at

24  this time?

25          THE COURT:  Yes.  Publish means

233

1 circulated amongst you.  Testimony will continue, so
2 pay attention to both, please.
3 　　　　MS. REYNOLDS:  Just to be clear, those
4 are in heat-sealed packages, your Honor.
5 　　Q.　And focusing, then, on the duct tape that
6 was collected at the scene first from Basil
7 Williams' body, and as you looked at it after it was
8 collected, did you notice any difference from the
9 time you collected it from the body and as it
10 appears in court today?
11 　　A.　Yes.
12 　　Q.　And can you describe for the members of the
13 jury what's different about the duct tape now?
14 　　A.　The way the duct tape is packaged now in
15 those plastic envelopes, it's actually folded
16 neatly, and also appears to be stained.
17 　　Q.　Do you know, based on your training and
18 experience, and your collection of evidence in this
19 case and other cases, what those stains are that you
20 are referring to?
21 　　A.　Yes, when the evidence is submitted to the
22 state laboratory, they use different stains to try
23 and detect evidence on, in this case, the duct tape.
24 　　Q.　When you say they use different stains to
25 try to detect evidence, what type of evidence are

234

1 they trying to detect?
2 　　　　MR. SHEEHAN:  Objection.  It calls for
3 hearsay.  She's asking what the lab is doing.
4 　　　　THE COURT:  Sustain the objection.
5 　　Q.　Why do you seize these types of -- this
6 type of evidence, for example, the duct tape that
7 was taken from the victim's body?
8 　　A.　Duct tape is the type of evidence that can
9 provide more evidence based on the fact that things
10 stick to it, including fingerprints and hairs and
11 fibers, which can lead to more information for us as
12 investigators.
13 　　Q.　And that's the type of evidence that you as
14 a crime scene investigator would try to collect at a
15 crime scene, for example, a murder scene like this
16 one, correct?
17 　　A.　Yes.
18 　　　　MR. SHEEHAN:  Objection, leading.
19 　　　　THE COURT:  Sustained.  Would you
20 rephrase?
21 　　　　MS. REYNOLDS:  Yes, your Honor.
22 　　Q.　What, again -- are those -- the types of
23 pieces of evidence that you've just described,
24 what's the purpose of trying to seize those?
25 　　A.　Because they --

235

1 　　　　MR. SHEEHAN:  Objection.  That's been
2 asked and answered.
3 　　　　THE COURT:  No, you objected.  Is that
4 the type of evidence that you as a crime scene
5 investigator would try to collect at a crime scene
6 like this?
7 　　　　THE WITNESS:  Yes, ma'am.
8 　　　　THE COURT:  All right.  And the next
9 question was, what's the purpose of trying to seize
10 those?
11 　　　　THE WITNESS:  We seize evidence so that
12 it can be analyzed and hopefully provide more
13 information for the investigation.
14 　　Q.　And after the evidence is seized and
15 collected and put into the containers that we see in
16 court here today, what's done with it at that point
17 by you and your colleagues?
18 　　A.　Once the evidence is seized, we go back to
19 the police department and actually seal it and
20 package it to be sent, in this case, to the state
21 forensic lab for analysis.
22 　　Q.　And did you do that in this case?
23 　　A.　For a number of the pieces of evidence that
24 were collected, yes.
25 　　Q.　And showing you what I marked Government's

236

1 Exhibit 120B, do you recognize --
2 　　　　MR. SHEEHAN:  C?
3 　　　　MS. REYNOLDS:  B.
4 　　　　MR. SHEEHAN:  B, thank you.
5 　　Q.　Do you recognize what's contained in 120B?
6 　　A.　Yes.
7 　　Q.　And how is it that you are able to
8 recognize 120B?
9 　　A.　From the label and the markings on the
10 package.
11 　　Q.　And the label, is that the Bridgeport
12 Police Department label?
13 　　A.　Yes, it is.
14 　　Q.　And what is contained in 120B?
15 　　A.　This is Bridgeport Exhibit 2, which is
16 Mr. Williams' shirt, which corresponds to the number
17 placard in the pictures that you viewed.
18 　　Q.　And is there a reason that Bridgeport 2,
19 which was the shirt from Basil Williams, was put
20 into plastic -- well, a paper bag?
21 　　A.　Yes.
22 　　Q.　Can you describe why you use a paper bag
23 for something like a shirt from the victim's body?
24 　　A.　Mr. Williams' shirt appeared to have
25 blood-like stains on it, and that being biological

237

```
1   evidence, as I explained earlier, needs to be
2   packaged in paper so that it can breathe and not
3   mold, basically.
4       Q.   And once that was collected, it was put
5   directly into a paper bag, the one you are holding
6   here?
7       A.   It was put into a paper bag for transport
8   back into the police department, then it had to be
9   dried fully before it could be packaged permanently.
10      Q.   And do you know whether or not --
11          MS. REYNOLDS:  Well, your Honor, I don't
12  think I've moved it as a full exhibit, so at this
13  time, I would move as a full exhibit Government's
14  120B.
15          MR. SHEEHAN:  Objection.  May I
16  approach?
17          THE COURT:  What's your objection?
18          MR. SHEEHAN:  Your Honor, I don't think
19  it's relevant.  And may I approach on this?
20          THE COURT:  Are you going to have any
21  further questioning, Ms. Reynolds, on 120B today?
22          MS. REYNOLDS:  Not much, just one
23  question, where it was sent after.
24          THE COURT:  I'll see you at sidebar.
25          (Sidebar conference).
```

238

```
1           MR. SHEEHAN:  So, your Honor, the shirt
2   has no relevance except to inflame the jury, and to
3   circulate the bloody shirt, there is no forensic
4   evidence recovered from it that links anybody to the
5   scene.  It's just basically like handing out a
6   relic, and I think in that scale it's either
7   irrelevant, or, B, it's unfairly prejudicial.
8           THE COURT:  It's in a bag.  Are we
9   opening the bag?
10          MS. REYNOLDS:  No, we are not, your
11  Honor.  It's in a bag.  We're moving the shirt in
12  because it was tested as the victim's blood, and
13  there is a certain type of blood spatter that will
14  become relevant at a certain time, but we do not
15  intend to open the bag and show it to the jury.
16  We're simply putting in another piece of physical
17  evidence.
18          THE COURT:  Is it sealed in a way they
19  can't open it, either?
20          MS. REYNOLDS:  Yes.
21          THE COURT:  But it links up that aspect
22  of the inspection with some later evidence of
23  what -- whose blood is on the wall?
24          MS. REYNOLDS:  Well, it's the victim's.
25  In processing the scene, anything that they
```

239

```
1   collected is relevant.  They have to explain how
2   they processed the scene.  What they collected, how
3   they collected, where they sent it.
4           THE COURT:  It doesn't seem to me to be
5   unfair, prejudicial, in the sense that it just looks
6   like a paper bag right now, but it does represent
7   the comprehensive -- or the procedure that they've
8   used.
9           MR. SHEEHAN:  But it's more than just a
10  paper bag.  It's a paper bag with the shirt off -- I
11  realize they're going to argue some of the duct tape
12  is relevant, but I think in the context of the
13  paper -- of the shirt off the person's back, the
14  dead person's back, while it's true that it's being
15  handed around in a paper bag, I don't think that
16  it -- all it does is serve to inflame the jury.  It
17  doesn't add anything cumulative to the state's case.
18          THE COURT:  It's not going to be
19  published.
20          MS. REYNOLDS:  It's not going to be
21  published.  It's --
22          THE COURT:  Paper --
23          MS. REYNOLDS:  It's a paper bag.
24          THE COURT:  I'm not going to permit it
25  to be published.  It's simply a manifestation of the
```

240

```
1   steps taken for the crime scene investigation.  But
2   one question does remain.  If, in fact, it's not
3   going to be used in any of the blood spatter or
4   blood sample testimony, should we just leave it as
5   ID, and we therefore have accomplished what you want
6   to accomplish, which is show thoroughness of the
7   crime scene investigation?
8           MS. DAYTON:  It will be used in the
9   blood spatter testimony.  All of the victims' shirts
10  will be part of that testimony.
11          MS. REYNOLDS:  We have to show a chain
12  of custody.
13          THE COURT:  All right.  I misunderstood
14  what Ms. Reynolds was saying.  I thought she said it
15  wasn't.  If that's the case, I'm going to overrule.
16          MR. SHEEHAN:  Do you know, frankly, they
17  have the victim's blood, and they based the testing
18  not on the shirts, but on the blood -- they have
19  samples from the blood taken at the medical
20  examiner's office.  So, I don't --
21          THE COURT:  Well --
22          MR. SHEEHAN:  I don't understand.
23          THE COURT:  On the representation that
24  the blood from the shirt is part of testimony to
25  come, and in light of the fact that it's going to
```

241

```
1   be -- remain packaged in its paper bag and not
2   circulated to the jury, I'm going to overrule the
3   objection.  If that turns out not to be the case,
4   then it will be revisited, and removed from evidence
5   if it's not otherwise relevant.
6           (Sidebar concluded)
7           MS. REYNOLDS:  Again, your Honor, I
8   would move as a full exhibit Government's
9   Exhibit 120B.
10          THE COURT:  It's a full exhibit, over
11  objection.
12      Q.  And, Ms. Devan, after you finished, you and
13  your colleagues finished collecting the duct tape
14  and the shirt from Basil Williams, did you proceed
15  at that time to the other victims?
16      A.  Yes.
17      Q.  Again, you had determined to start
18  collecting evidence first with the victims; is that
19  correct?
20      A.  Yes, with the medical examiner's office on
21  scene, we decided that the evidence from the victims
22  would be collected at that time under their
23  supervision.  So, we did the evidence collection of
24  the victims first.
25      Q.  And so after the items that we've just
```

242

```
1   introduced were collected, did you then go to the
2   other bedroom?
3       A.  Yes.
4       Q.  And is that where the victims Tina -- well,
5   which victims were in the other bedroom?
6       A.  Mr. Reid and Ms. Johnson.
7       Q.  Okay.  And did you then begin collecting
8   evidence from the body of Mr. Reid?
9       A.  Yes.
10      Q.  And what did you collect from his body?
11      A.  I believe it was basically the same process
12  as with Mr. Williams, the duct tape from his head,
13  his arms, and his legs, as well as his shirt.
14      Q.  And that duct tape, starting first with the
15  duct tape, was that also placed into paint cans for
16  purposes of collecting it?
17      A.  Yes, it was.
18      Q.  And did you then -- after you did all of
19  that collection, did you also do the same procedures
20  for the victim Tina Johnson?
21      A.  Yes, we did.
22      Q.  And it wasn't -- well, did the medical
23  examiners stay there, the medical examiner
24  representatives stay there while all of that
25  evidence was collected from the victims' bodies?
```

243

```
1       A.  Yes, they did.
2           MS. REYNOLDS:  Could I approach, your
3   Honor?
4           THE COURT:  You may.
5       Q.  Showing you what I'll mark Government's
6   Exhibit 122A.  Do you recognize that?
7       A.  Yes.
8       Q.  And what is that?
9       A.  This was the -- this is the can that the
10  duct tape from Mr. Reid's head and face was placed
11  into when it was removed from him.
12      Q.  And showing you what's been marked
13  Government's Exhibit 122A-1.  Do you recognize that?
14      A.  Yes.
15      Q.  And what is that?
16      A.  This is the duct tape that was originally
17  placed inside this can.
18      Q.  And when you were at the scene, did you
19  designate each victim with a number?
20      A.  Yes.
21      Q.  And do you recall which victim was which
22  number?
23      A.  Mr. Williams was referred to for our
24  purposes as victim No. 1.  Mr. Reid was victim No.
25  2, and Ms. Johnson victim 3.
```

244

```
1       Q.  So, showing you what's been marked
2   Government's Exhibit 122C.  Do you recognize that?
3       A.  Yes.
4       Q.  And what is that?
5       A.  This is the can which contained the section
6   of duct tape removed from Mr. Reid's arms and hands.
7       Q.  And showing you Government's
8   Exhibit 122C-1.  Do you recognize that?
9       A.  Yes.
10      Q.  What is that?
11      A.  The duct tape that was originally removed
12  and placed in this can.
13      Q.  And, again, how are you able to recognize
14  the outside of the paint can?
15      A.  It has the Bridgeport Police Department
16  label on it, which designates the exhibit number,
17  and identifies the location it was collected from,
18  and the description of the evidence itself.
19      Q.  And showing you Government's Exhibit 122D.
20  Do you recognize that?
21      A.  Yes.
22      Q.  And what is that?
23      A.  This is the can that contained the duct
24  tape that was removed from Mr. Reid's ankles.
25      Q.  Showing you Government's Exhibit 122D-1, do
```

**GA61**

245

```
1   you recognize that?
2       A.   Yes.
3       Q.   And what is that?
4       A.   This is the duct tape that was originally
5   placed in this can.
6       Q.   Now --
7            MS. REYNOLDS:  Your Honor, at this time,
8   the government would move as full exhibits 122A,
9   122A-1, 122C and 122C-1, and 122D, and 122D-1.
10           MR. SHEEHAN:  No objection.
11           THE COURT:  Full exhibits.
12           MS. REYNOLDS:  And I would ask that we
13  be allowed to publish 122D-1, 122C-1, and 122A-1 to
14  the jury at this time, your Honor.
15           THE COURT:  You may.  When you have
16  finished looking at the exhibits, if the last person
17  to see them either put them on the wall right there,
18  Ms. Torday will collect them.
19      Q.   Again, Detective, with regard to the duct
20  tape that's in 122A-1 and 122C-1 and 122D-1, do they
21  appear different to you now they are in evidence
22  bags as compared to when they were collected from
23  James Reid's body?
24      A.   Yes.
25      Q.   Could you describe how they appear
```

246

```
1   different?
2       A.   Again, in the same respect as the prior
3   exhibits.  The tape is actually neatly folded and
4   appears to be stained.
5       Q.   And after it was collected and put into the
6   paint cans and processed, do you know where it was
7   sent?
8       A.   The Connecticut State Forensic Lab.
9       Q.   And then showing you Government's
10  Exhibit 122B, do you recognize what's contained --
11  well, do you recognize that?
12      A.   Yes.
13      Q.   How is it you are able to recognize 122B?
14      A.   It's labeled with a Bridgeport Police
15  Department Police sticker.
16      Q.   And what's contained in 122B?
17      A.   This is the shirt that James Reid was
18  wearing.
19      Q.   And after that was collected from
20  Mr. Reid's body was it packaged in a similar paper
21  bag, correct?
22      A.   Yes.
23      Q.   And then it was eventually sent to the lab
24  for further testing?
25      A.   I don't think this was initially sent to
```

247

```
1   the lab, no.
2       Q.   It was kept where?  Exhibits, once they're
3   collected and processed as evidence, where are they
4   kept?
5       A.   We turn them into the Bridgeport Police
6   Department property room, which is at the police
7   department.
8       Q.   And you turn them in after you've already
9   labeled everything?
10      A.   After they're packaged and labeled and
11  sealed, yes.
12      Q.   And, again, as you're collecting these
13  exhibits from the victims' bodies, are you making
14  notes in order to prepare your property report?
15      A.   Yes.
16      Q.   And your crime scene report?
17      A.   Yes.  I take notes, as well as whoever is
18  collecting the evidence.
19      Q.   Okay.  You indicated when I was asking you
20  to describe the difference in the duct tape that
21  it's neatly -- you described it as being neatly
22  folded into the evidence bags, correct?
23      A.   Yes.
24      Q.   What did it look like before it was neatly
25  folded into the evidence bags?
```

248

```
1       A.   When it was removed from the victims, it's
2   removed as carefully as possible to try to preserve
3   it as best as possible.  So, however it's cut off,
4   we try to kind of keep the shape a little bit
5   because where it's cut may make a difference to the
6   state lab examiners as well.  So, we try to maintain
7   a little bit of its shape, so -- and that's another
8   reason for using the cans, so they can't get smushed
9   in a bag, basically.
10           MS. REYNOLDS:  Your Honor, we are
11  prepared to go to the next victim.
12           THE COURT:  It's 3:30.  I'm going to
13  recess for the day.  Ladies and gentlemen, we will
14  continue at 9:30 tomorrow morning.  Please leave
15  your notebooks here.  Please remember that you are
16  not to discuss this case with anyone.  And then we
17  will continue to pass the exhibits around starting
18  tomorrow, and starting with -- I guess juror No. 9
19  will be the next one to see the exhibits.
20           JUROR:  We've seen it.
21           THE COURT:  Now, everyone has seen it.
22  Very good.  All right, then.  Thank you very much.
23  Have a nice afternoon.  We'll see you tomorrow
24  morning.
25           (Jury exited the courtroom).
```

249

```
1          THE COURT:  All right, counsel.  Please
2   be seated.  You are excused, Detective.  Would you
3   be back here at 9:30 tomorrow morning, please?
4          THE WITNESS:  Yes, ma'am.
5          THE COURT:  And don't discuss your
6   testimony with anyone.
7          THE WITNESS:  Yes, ma'am.
8          THE COURT:  Thank you very much.
9          (Witness excused)
10          THE COURT:  I just wanted to clarify one
11  thing.  Exhibit 120B, which is Mr. Williams' shirt,
12  and No. 2 on the various -- as a placard, the
13  government will be using that shirt and the blood on
14  that shirt in subsequent blood testing and spatter
15  testing evidence; is that right?
16          MS. DAYTON:  Your Honor, the blood
17  spatter expert looked at the victims' shirts, in
18  particular, for patterns on their shirts, yes.
19          THE COURT:  Okay.  All right.  Is there
20  anything else that we need to take up before we
21  adjourn for the day?
22          MS. DAYTON:  Your Honor, we still
23  haven't heard about whether or not Mr. Baden --
24  Dr. Baden will be testifying.
25          MR. SMITH:  Your Honor, I spoke with
```

250

```
1   Attorney Sullivan, actually, this morning because I
2   have been scrambling to have this conference call
3   with Dr. Baden.  He informed me this morning
4   Dr. Baden will be available this afternoon for a
5   conference call.  As soon as I leave here, we will
6   do that.  Your Honor, I called multiple times
7   yesterday to try to reach Dr. Baden and did not get
8   through.  Attorney Sullivan, who had worked with
9   Dr. Baden previously, sort of stepped in to help to
10  try to make that contact, and that's been made.  I
11  only have the one contact number for him.
12          THE COURT:  So, you will be able to
13  decide by the end of the day; is that correct?
14          MR. SMITH:  I believe so.
15          THE COURT:  Would you advise counsel as
16  soon as possible?
17          MR. SMITH:  Absolutely, your Honor.
18  Also, again, with Thomas Martin having, you know --
19  I'm not sure what exactly he's basing his opinion
20  on, but apparently now it's also looking at some
21  shirts.  I don't know if that was done before.  We
22  would need to know that as well.  We still don't
23  have that report as well.
24          THE COURT:  I thought you had the blood
25  spatter report.
```

251

```
1          MR. SMITH:  We do not.
2          MS. DAYTON:  We have it.  We'll give it
3   to them today.
4          THE COURT:  All right.  So, you'll get
5   that.  Anything else remains outstanding?
6          MR. SHEEHAN:  The only thing today we
7   were able to deal with the tape, the transcript of
8   the tape.  We've had -- because it was a short tape,
9   I was able to listen to it in the recess.  We have
10  not had any transcripts that the government intends
11  to offer.
12          THE COURT:  Are there any other tapes?
13          MR. SHEEHAN:  There is a bunch of tapes,
14  and I just didn't know if they were offering any
15  conversations.  We've gotten multiple tapes.
16          MS. DAYTON:  Not this week, we're not
17  offering any other tapes, but we'll get them
18  transcripts this week.
19          THE COURT:  All right.  And then since
20  we aren't sitting on Friday, you can have a good
21  Friday and listen to tapes.  All right.
22          MR. SHEEHAN:  I have listened.  I just
23  don't know if they're offering them to compare to
24  any transcripts.  That's actually the practical
25  problem.
```

252

```
1          THE COURT:  But you'll get the
2   transcripts, so you can do that.  All right.  Any
3   other issues?
4          MR. SHEEHAN:  No, I don't intend to
5   brief that unless your Honor thinks a briefing is
6   appropriate on the six -- on the --
7          THE COURT:  You've given me authority.
8          MR. SHEEHAN:  I have, your Honor, and I
9   just didn't know if you wanted more.
10          THE COURT:  Interestingly, the cases do
11  not make crystal clear the analysis.  The Second
12  Circuit has acknowledged that extrinsic evidence of
13  a prior inconsistent statement is more persuasive to
14  a jury than a witness's acknowledgement of
15  inconsistencies in a prior statement and that 613
16  should be read broadly to permit extrinsic evidence
17  of a prior inquiry statement, even where the witness
18  admits to making it, but the exercise of discretion
19  comes where the witness in good faith asserts that
20  the witness can't remember giving the statement in
21  the grand jury, which is from the Second Circuit's
22  case in 1970 of U.S. v. Insana, but -- and there are
23  two out of the circuit cases that have held where
24  the witness has an inability to recall statements.
25  That doesn't even conclude any evidence of
```

253

```
 1   dissembling.  Mr. Whittingham here said that he
 2   couldn't recall making the statements to the grand
 3   jury that were claimed to be inconsistent.  They
 4   were claimed to be inconsistent.  That's not
 5   implausible since the grand jury testimony was over
 6   five years ago, and there is no other record
 7   indicating his bad faith.  The question becomes a
 8   little murkier where I don't think the government
 9   objected to the question and answer from the grand
10   jury testimony, but objects to the transcript of
11   that.  Do I have that right?
12           MR. SHEEHAN:  It seems to me, your
13   Honor, that is really sending the Court into rather
14   perilous territory where the Court now is suddenly
15   making decisions about the credibility of witnesses
16   and --
17           THE COURT:  No, there is no testimony.
18   There is no record of -- what I'm saying is that
19   there are cases that fall on either side with
20   analyses that needs -- are not totally congruent,
21   and an odd situation here, where I believe the
22   government didn't object to Mr. Smith's examination
23   by the grand jury testimony, but objects to the
24   written transcript.  That's the anomaly.
25           MR. SHEEHAN:  Actually, your Honor,
```

254

```
 1   if -- I think the real thing that the -- what the
 2   Second Circuit case is standing for the proposition
 3   is that the grand jury testimony becomes the
 4   impeachment, and if these other cases are asking the
 5   Court to jump in and make determinations as to good
 6   faith about witnesses as to why, I think that's
 7   just -- that's just asking for trouble.
 8           MS. REYNOLDS:  Judge, I think I did
 9   object to the question and answer.
10           THE COURT:  I'll look at the transcript.
11           MS. REYNOLDS:  I would have to go back
12   and look, and we'll take a look at the issue as
13   well, your Honor.
14           THE COURT:  We'll continue with our
15   talmudic undertaking in this season of passover.
16           Thank you.
17           MR. SMITH:  Your Honor, would the Court
18   like me to pass that page forward?
19           THE COURT:  Yes, that would be helpful.
20   Thank you.
21           MR. SMITH:  It is already marked
22   Defendant's Exhibit B, but it hasn't been admitted
23   as full.
24           THE COURT:  ID.  Yes, all right.  If
25   there is nothing else, we will stand in recess until
```

255

```
 1   tomorrow at 9:30.  Thank you.
 2           (Recess)
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

256

```
 1                I N D E X
 2
 3   WITNESS                               PAGE
 4   MARIA GAUDAGNO
 5   Direct Examination by Ms. Reynolds     63
 6   Cross-Examination by Mr. Smith         70
 7
 8   LEROY WHITTINGHAM
 9   Direct Examination by Ms Reynolds      74
10   Cross-Examination by Mr. Smith         92
11
12   KAREN O'DONNELL
13   Direct Examination by Mr. Markle      102
14   Cross-Examination by Mr. Smith        170
15
16   SANDRA HOLLIDAY
17   Direct Examination by Ms. Reynolds    185
18
19   JOETTE DEVAN
20   Direct Examination by Ms. Reynolds    203
21
22
23
24
25
```

257

```
1        I certify that the foregoing is a
2  correct transcript from the record of proceedings in
3  the above-entitled matter.
4
5              4/21/11
6               Date
7
8           /S/  Sharon Montini
9            Official Reporter
```

258

```
1           UNITED STATES DISTRICT COURT
2             DISTRICT OF CONNECTICUT
3  * * * * * * * * * * *      *
4  UNITED STATES OF AMERICA,  * Case No 6cr160(JBA)
5              Plaintiff,     *
6        vs.                  *
7  AZIBO AQUART              * April 21, 2011
8              Defendant.     *
9  * * * * * * * * * * * *     *
10             TRIAL TRANSCRIPT
11               VOLUME II
12  BEFORE:  THE HONORABLE JANET BOND ARTERTON U.S.D.J.,
                                              and jury
13  Appearances:
14  FOR THE GOVERNMENT:    ALIA REYNOLDS, ESQ
                           TRACY DAYTON, ESQ.
15                         PETER MARKLE, ESQ.
                           JACABED RODRIGUEZ-COSS
16                         United States Attorney's Office
                           915 Lafayette Blvd
17                         Bridgeport, CT 06604
18
19  FOR THE DEFENDANT      MICHAEL SHEEHAN, ESQ
    AZIBO AQUART:          Sheehan & Reeve
20                         139 Orange Street
                           New Haven CT 06510
21                         JUSTIN SMITH, ESQ.
22                         383 Orange Street
                           New Haven, CT 06511
23
24  Court Reporter:      Sharon Montini, RMR
25  Proceedings recorded by mechanical stenography,
    transcript produced by computer.
```

259

```
1           THE COURT:  Good morning, counsel,
2  Mr. Aquart.  Good morning, ladies and gentlemen.
3           MR. SHEEHAN:  Could I just indicate,
4  your Honor, on the polygraph, we are not claiming
5  that.
6           THE COURT:  Okay, thank you.  You
7  subpoenaed the Department of Corrections records.
8           MR. SHEEHAN:  Yes.
9           THE COURT:  I have looked through them.
10  I don't find any medical records that they were
11  referring to --
12           MR. SMITH:  This was just the
13  information I had received from the person who
14  delivered the records, your Honor.
15           THE COURT:  So, I am going to turn these
16  over.  I have been engaged in the marvelously
17  mindless task of taking out birth dates and Social
18  Security numbers, and if I've missed any I will let
19  you finish that up.
20           MR. SMITH:  We'll close our eyes to
21  that.
22           THE COURT:  At the end of the day that's
23  a good activity.
24           MR. SMITH:  Thank you.
25           THE COURT:  Now, with respect to --
```

260

```
1  there was an issue about a monitor.  Tell me what
2  that's about.
3           MR. SMITH:  Part of the issue for me is
4  that the government has their machine set up, but
5  when we link in during a cross-examination I don't
6  have -- it doesn't come through this machine and I
7  can't see what the witness and the counsel see at
8  the same time.  I'm sort of just looking at my --
9           MR. SHEEHAN:  I do have a suggestion,
10  your Honor.  We have a very small monitor and we
11  could just -- we could just add that to the mix.  I
12  don't think it would obstruct the view.
13           MR. SMITH:  Or even next to the computer
14  monitor.
15           THE COURT:  It looks to be about as high
16  as the computer.
17           MR. SHEEHAN:  I think it's -- yeah, it's
18  this one, your Honor.
19           THE COURT:  All right.  Well, you are
20  free to set that up.  And I don't think it will
21  obstruct my view.
22           MR. SMITH:  We can do that at the break.
23           THE COURT:  Mr. Gallucci, will that
24  present any issues for you?
25           THE MARSHAL:  I'm sorry, your Honor?
```

261

```
1          THE COURT:  Putting another monitor on
2  the podium.
3          THE MARSHAL:  No, your Honor.  Thank
4  you.
5          MR. SMITH:  Another thing, your Honor,
6  if it does become an issue, maybe we can find a
7  small table to put here so --
8          MS. DAYTON:  How are we going to see the
9  witness?  Some of us are short.  Seriously.
10         THE COURT:  You are free to move around
11 whenever you need to.
12         MR. SHEEHAN:  We can move the monitor
13 over here, for example.
14         MS. DAYTON:  That would be good.
15         MR. SHEEHAN:  The only other thing, your
16 Honor, we've talked to the tech people at the court,
17 they would give us a second monitor that -- so,
18 assuming that's all squared away, we're set.
19         THE COURT:  Okay.
20         MR. SMITH:  Thank you, your Honor.
21         THE COURT:  All right, then.  So we are
22 continuing with Detective Devan.  Anything else
23 before we bring in the jury?
24         MR. SHEEHAN:  No, your Honor.
25         THE COURT:  All right, please bring them
```

262

```
1  in.
2          (Jury entered the courtroom)
3          THE COURT:  Good morning, ladies and
4  gentlemen.  Please be seated.  We will continue with
5  the testimony of Detective Devan, examination by Ms.
6  Reynolds.
7          Good morning.
8          THE WITNESS:  Good morning.
9          THE COURT:  Detective, you remain under
10 oath.  You may be seated.
11         THE WITNESS:  Thank you.
12         THE COURT:  All right, Ms. Reynolds you
13 may proceed.
14         MS. REYNOLDS:  Thank you, your Honor.
15             J O E T T E   D E V A N,
16 Having been previously affirmed, was examined and
17 testified as follows:
18 CONTINUED DIRECT EXAMINATION
19 BY MS. REYNOLDS:
20     Q.  Good morning, Detective.  When we left off
21 yesterday afternoon we had -- you had been
22 describing the duct tape that was recovered from the
23 victims at the crime scene, and I wanted to go back
24 to that and ask you if you also recovered duct tape
25 from Tina Johnson.
```

263

```
1      A.  Yes, we did.
2      Q.  I'm going to show you a series of
3  photographs and ask you to take a look at those.
4          MS. REYNOLDS:  May I approach, your
5  Honor?
6          THE COURT:  Yes.
7      Q.  Showing you what I'll demarc Government's
8  Exhibit 121-2, 121-3, and 121-5, let me show you
9  those.  Do you recognize those photographs?
10     A.  Yes.
11     Q.  And what are those photographs of?
12     A.  These are photographs taken at the crime
13 scene in the first bedroom showing Tina Johnson in
14 all three pictures and one of the pictures has both
15 Tina Johnson and Mr. Reid.
16         MS. REYNOLDS:  Your Honor, I would move
17 as full exhibits 121 -- I'm sorry.  121-2, 121-3,
18 and 121-5.
19         MR. SMITH:  Your Honor, may we have a
20 look at those before --
21         THE COURT:  I'm sorry?
22         MR. SMITH:  We haven't been able to see
23 those.
24         THE COURT:  Have a look.
25         MS. REYNOLDS:  They're in the evidence
```

264

```
1  binder and on the list that we gave counsel.
2          MR. SHEEHAN:  May I have one second,
3  your Honor?
4          THE COURT:  Yes.
5          MR. SHEEHAN:  No objection.
6          THE COURT:  All right, 121-2 -3 and -5
7  are full exhibits.
8          MS. REYNOLDS:  Thank you, your Honor.
9      Q.  And taking a look at the screen when it
10 pops up, showing you first 121-2, can you
11 describe -- and you can look -- I'll hand you the
12 photograph.  Can you describe what's depicted in
13 that photograph?
14     A.  This is a photograph of the crime scene as
15 we found it.  The bedroom to the left which we just
16 referred to as the room with the two victims in it,
17 and this was as you enter the room just to the left,
18 and it shows Mr. Reid face down with the mattress
19 partially on top of him.  And you can also see
20 Ms. Johnson's head and face.
21     Q.  And that's where the area is pointing on
22 the screen right now, that's Ms. Johnson?
23         MS. DAYTON:  Your Honor, can we turn the
24 lights down even more.  It might help the
25 resolution.
```

**GA66**

265

1    THE COURT:  The answer is apparently no.
2  Let me turn them off.
3    MS. DAYTON:  It's a little better.
4    THE COURT:  All right, there is a -- if
5  there is something you need to -- where is the
6  pointer?  If you need to point onto the picture what
7  you are talking about.
8    Q.  If you could just show where Tina Johnson
9  is located.
10    A.  Yeah, it's very difficult to see here.
11  This is James Reid right here and Ms. Johnson would
12  be right here.
13    Q.  Okay.
14    MS. REYNOLDS:  I'm going to try on the
15  ELMO, your Honor, to see if we could get a better
16  picture with this projector.  So let me just switch.
17  That is better.
18    Q.  So can you just again, using the pointer if
19  that helps, can you just show where James Reid is
20  and then where Tina Johnson is?
21    A.  This is Mr. Reid right here, his head is
22  this end, his shirt, his arm here, and this is
23  Ms. Johnson.  This is her face here.
24    Q.  And again, you had mentioned when you
25  walked into that bedroom this is how you found the

266

1  scene when you the began processing it, correct?
2    A.  Yes, it is.
3    Q.  Okay.  And then showing you 121-3, can you
4  describe what you see in this photograph towards the
5  right-hand side.  Was that there, those cushions,
6  when you walked in?
7    A.  Yes, they were partially on Ms. Johnson's
8  legs.
9    Q.  And then after you walk in -- and did you
10  move anything at that point?  You photograph first
11  and then -- can you describe how you start
12  processing the scene?
13    A.  The initial photographs are taken before
14  anything is touched or moved.  And once the medical
15  examiner's office arrived, as I was saying
16  yesterday, then what we needed to move to get to the
17  victims was moved for the benefit of the medical
18  examiner's office in being able to remove the duct
19  tape and the clothing from the victims.
20    Q.  And then showing you Government's
21  Exhibit 121-5, can you describe what you see there.
22  Once you start processing the scene, is that when
23  you start placing the markers?
24    A.  Yes, once the initial photographs are taken
25  without the placards, then the items that will be

267

1  collected as evidence are identified and marked with
2  the placards.  This is Exhibits 6 and 7 seen in this
3  picture and then the placard photos are taken before
4  the evidence is actually collected.
5    Q.  And I'm going to hand up to you
6  Government's Exhibit 122-6 and 122-7, and ask you to
7  take a look at those.  Do you recognize those two
8  photographs?
9    A.  Yes.
10    Q.  And what are those photographs of?
11    A.  122-6 and 122-7 are both photographs of Mr.
12  Reid's wrists and ankles, respectively.
13    Q.  And do those show placards in them?
14    A.  Yes.
15    MS. REYNOLDS:  Your Honor, I would move
16  as full exhibits 122-6 and -7.
17    MR. SHEEHAN:  No objection.
18    THE COURT:  All right, they are full
19  exhibits.
20    Q.  Showing you Government's Exhibit 122-6, can
21  you describe what we see in that photograph?
22    A.  That's a photograph of Mr. Reid's wrists
23  marked with placard No. 11 showing that was
24  collected as Exhibit No. 11.
25    Q.  And when you were on scene and once you and

268

1  your colleagues began the process of cutting the
2  duct tape off the victims' bodies, were you able to
3  see how tightly the duct tape was wrapped around the
4  various portions of the body?
5    A.  It appeared to be wrapped tightly and in
6  several layers.
7    Q.  And drawing your attention then to
8  Government's 122-7, what is that a photo of?
9    A.  That is a photograph of Mr. Reid's ankles
10  marked with placard No. 12.
11    Q.  And using the pointer there, can you see --
12  can you point out if there is any blood droplets or
13  what appear to be blood droplets on the duct tape
14  there?
15    A.  It appears that in this area and in this
16  area there were blood-like droplets on the duct
17  tape.
18    Q.  Just for purposes of the record, right on
19  the duct tape itself, it appears on the duct tape,
20  and part of the pant legs of Mr. Reid, correct?
21    A.  Yes.
22    MS. REYNOLDS:  May I approach, your
23  Honor?
24    THE COURT:  Yes.  Are you finished with
25  the screen?

269

```
1            MS. REYNOLDS:  Oh, yes, I am.  Sorry.
2            THE COURT:  It's not such a good idea to
3   turn that light off.
4            MS. REYNOLDS:  It might be cooler.
5            THE COURT:  We might not want to do off
6   again.
7       Q.   If I could just show you what's been
8   demarced Government's Exhibit 121A, do you recognize
9   what that is?
10      A.   Yes.
11      Q.   And what is that?
12      A.   This is the can that contained the duct
13  tape that was removed from Ms. Johnson's head and
14  face.
15      Q.   And showing you Government's
16  Exhibit 121A-1, do you recognize that?
17      A.   Yes.
18      Q.   And what is that?
19      A.   This is the duct tape that was originally
20  in the can.
21      Q.   And now showing you Government's
22  Exhibit 121C, do you recognize that?
23      A.   Yes.
24      Q.   And can you tell us what that is?
25      A.   This is the can that contained the duct
```

270

```
1   tape that was removed from Ms. Johnson's ankles.
2       Q.   And showing you Government's
3   Exhibit 121C-1, do you recognize that?
4       A.   Yes.  This is the duct tape that was
5   originally collected and placed in this can.
6            MR. SHEEHAN:  I'm sorry, on who?  May
7   I -- I'm sorry, I just didn't hear on whose hands.
8            MS. REYNOLDS:  In the can.
9            MR. SHEEHAN:  I'm sorry, in the can.
10  I'm sorry.
11      Q.   And then finally showing you Government's
12  121D, do you recognize that?
13      A.   Yes.
14      Q.   And what is that?
15      A.   This is the can that contained the duct
16  tape that was removed from Ms. Johnson's wrists and
17  hands.
18      Q.   Showing you 121D-1, do you recognize that?
19      A.   Yes, this is the sections of duct tape that
20  were originally in the can.
21      Q.   And do all of those items have labels that
22  correspond to the Bridgeport evidence number?
23      A.   Yes, they do.
24           MS. REYNOLDS:  Your Honor, I would move
25  as full exhibits government 121A, 121A-1, 121C,
```

271

```
1   121C-1, 121D, and 121D-1.
2            MR. SHEEHAN:  May I briefly voir dire
3   the witness, your Honor?
4            THE COURT:  Yes.
5   VOIR DIRE EXAMINATION
6   BY MR. SHEEHAN:
7       Q.   Ms. Reynolds asked you about the markers.
8   Do you have 121A?
9       A.   No, I don't.
10           MS. REYNOLDS:  I took that.
11           MR. SHEEHAN:  I'm sorry.
12      Q.   So, on 121A, the Bridgeport police assigned
13  that an Exhibit No. 5?
14      A.   Yes, sir.
15      Q.   Is that it?  And do you have 121C?
16      A.   Yes.
17      Q.   And can you tell me what the exhibit number
18  that the Bridgeport police assigned that?
19      A.   This was Bridgeport police Exhibit No. 7.
20      Q.   Seven, okay.  And you have 121D there?
21      A.   Yes.
22      Q.   Can you tell me what the exhibit number was
23  on that?
24      A.   The Bridgeport police exhibit number was
25  Exhibit No. 8.
```

272

```
1       Q.   And so the 121D, that was a number assigned
2   for purposes of the court proceeding?
3       A.   That's my understanding, yes.
4       Q.   And similarly, on 121A, that's the duct
5   tape, I believe?
6       A.   Yes.
7       Q.   Is that --
8       A.   This one.
9       Q.   No, this is the can.  121A-1?
10           MS. REYNOLDS:  I have that.
11      Q.   All right.  So that has -- that also has
12  the Bridgeport Police Department number on it?
13      A.   Yes, it does.
14      Q.   5?
15      A.   Corresponding number.
16      Q.   And similarly, 7 would go with 121C-1?
17      A.   Correct.
18      Q.   And 8 would go with -- all right.  8 goes
19  then with 121D-1?
20      A.   Yes, sir.
21           MR. SHEEHAN:  Thank you.  I don't have
22  any further questions, and I have no objection.
23           THE COURT:  All right, if there is no
24  objection, those are full exhibits and you may
25  proceed.
```

273

```
1              MS. REYNOLDS:  Thank you, your Honor.
2   CONTINUED DIRECT EXAMINATION
3   BY MS. REYNOLDS:
4       Q.   Detective, can you describe how it is that
5   the duct tape looks different from when you and your
6   colleagues removed it from the victim's body and how
7   it appears today?
8       A.   Well, in all three of the cases, as was
9   similar yesterday, the tape is actually neatly
10  folded now and appears to be stained.  This is
11  different in the respect that it appears that
12  different sections of the duct tape were actually
13  packaged in separate plastic bags.
14      Q.   When you say "this," what number are you
15  holding?
16      A.   I'm sorry.  This is Bridgeport Exhibit 8,
17  and it's Exhibit 121D-1.
18      Q.   All right, and that's the duct tape from
19  Tina Johnson's hands and arms?
20      A.   Yes.
21      Q.   And, again, you said there are sections of
22  it that are repackaged?
23      A.   It appears it's separated somehow within
24  plastics bags within this plastic envelope.
25      Q.   And again, after these were seized and
```

274

```
1   collected and processed by the Bridgeport PD, do you
2   know where they were sent?
3       A.   Once they were collected and turned into
4   the property room as evidence, lab requests were
5   done to send them to the Connecticut State Forensic
6   Laboratory for examination.
7       Q.   And members of your team in the crime scene
8   unit prepared those lab requests that go with the
9   items to the lab?
10      A.   Yes.
11      Q.   All right.
12              MS. REYNOLDS:  Your Honor, if I could
13  just publish 121 -- the ones that are in the plastic
14  bags to the jury at this time?
15              THE COURT:  You may.
16              MS. REYNOLDS:  I'm also going to hand
17  up, your Honor, just one of the paint cans, 121D,
18  just to publish one of these to the jury as well.
19              THE COURT:  All right.
20      Q.   And while we're doing that, Detective, once
21  all of the duct tape was removed from the victim's
22  body, did you also -- you testified yesterday you
23  also removed shirts, correct?
24      A.   Yes.
25      Q.   And showing you Government's Exhibit 121B,
```

275

```
1   do you recognize what's contained in that exhibit?
2       A.   Yes.
3       Q.   And what is that?
4       A.   This is the shirt that was removed from
5   Ms. Johnson's body.
6       Q.   That was the gray shirt that we saw in the
7   photographs?
8       A.   A gray shirt, yes.
9       Q.   And, again, that's marked with the
10  Bridgeport evidence collection sticker, correct?
11      A.   Yes, it is.
12      Q.   And was it placed in a brown bag like that,
13  brown paper bag?
14      A.   A bag similar to this initially and then
15  taken back to the police department evidence area to
16  be dried thoroughly before it was packaged
17  permanently.
18              MS. REYNOLDS:  Your Honor, at this time
19  I would move as a full Exhibit 121B.
20              MR. SHEEHAN:  I'd object for the reasons
21  yesterday.  Can we approach on that?
22              THE COURT:  Do you need to or do we just
23  remember the reasons?
24              MR. SHEEHAN:  I think there is a
25  difference as well, your Honor.
```

276

```
1              THE COURT:  All right, I'll hear you.
2              Excuse, ladies and gentlemen, I think it
3   will be much more efficient to take care of it this
4   way rather than send you back into that much too
5   small room.
6              (Sidebar conference)
7              MR. SHEEHAN:  I would renew my
8   objection.  I don't think it's relevant to any
9   future examination, future testimony.  I would
10  object to it being published to the jury for the
11  reasons I stated yesterday.  My understanding on
12  this one, my understanding this was not sent for any
13  testing.
14              MS. DAYTON:  This is relevant to the
15  blood spatter expert whose report they do now have.
16  They were also previously provided with a separate
17  picture of the victims' shirts because they were
18  taken out and specifically photographed separately
19  and provided to the blood spatter expert for the
20  purpose of inclusion and his analysis for his
21  testimony.  He will be testifying regarding the
22  victims' shirts.
23              THE COURT:  And do I recall that the
24  blood spatter expert's testimony includes analysis
25  of the spatter pattern on the shirts themselves?
```

277

```
1            MS. DAYTON:  Yes.
2            THE COURT:  I think for this -- and you
3   weren't offering to publish it.
4            MS. REYNOLDS:  I was also going to put
5   it on the record, we don't intend to open it or
6   publish it to the jury.
7            THE COURT:  And that would be
8   appropriate.
9            MS. DAYTON:  That's at this time.  We
10  may at some later time with the blood spatter
11  expert, but that's a different issue.
12           THE COURT:  So for the time being on the
13  government's representation that in fact that shirt
14  does pertain to forthcoming testimony, it is
15  relevant.  It will not be published, so it's not in
16  some way unduly prejudicial.  And so my ruling will
17  be the same as it was for the other, and if it turns
18  out that the blood spatter expert's testimony
19  doesn't relate to the pattern of blood examined on
20  the shirts, then we can reexamine it.
21           MS. REYNOLDS:  I'm just going to put on
22  the record I'm also going to move in 122B, which is
23  James Reid's shirt.  I believe we got that in
24  yesterday.
25           THE COURT:  120?
```

278

```
1            MS. REYNOLDS:  122.
2            THE COURT:  122.
3            MS. REYNOLDS:  B is James Reid's shirt.
4   I thought I had moved it in yesterday within the
5   day, but we checked the record and I didn't actually
6   offer it, so I would just move both of them in at
7   this time based on the Court's ruling.
8            THE COURT:  Shall we have the same
9   objection?
10           MR. SHEEHAN:  Yes.
11           THE COURT:  And the same --
12           MR. SHEEHAN:  Yes.
13           THE COURT:  -- analysis.
14           MR. SHEEHAN:  Yes.
15           THE COURT:  So, 122B and 121B will be
16  full exhibits.
17           MR. SHEEHAN:  Your Honor, obviously this
18  renews the objection.
19           THE COURT:  Correct.
20           (Sidebar concluded)
21           THE COURT:  So 121B, 122B are full
22  exhibits.
23           MS. REYNOLDS:  And just so we're clear,
24  your Honor.
25      Q.   121B is the exhibit you are holding,
```

279

```
1   Detective Devan, correct?  And that was the shirt
2   from Tina Johnson?
3       A.   Yes, it is.
4       Q.   Then handing you 122B, was that the shirt
5   recovered from James Reid's body?
6       A.   Yes, it is.
7       Q.   Now, Detective, what happened once you and
8   Detective Vargas and Detective Ortiz finished
9   collecting the duct tape and the shirts from the
10  victim's body?  What happened next?
11      A.   After all the evidence was collected from
12  the bodies, then the bodies were actually removed
13  from the scene by the medical examiner's office
14  personnel.
15      Q.   Okay.  And did there come a time that you
16  were called upon to try to identify the victim Tina
17  Johnson and victim James Reid?
18      A.   Yes.
19      Q.   And what steps did you take in order to
20  make that identification?
21      A.   The victims were fingerprinted at the
22  medical examiner's office after their autopsy and
23  then the fingerprints are compared to make a
24  positive identification by prints that were on file
25  with the Bridgeport Police Department.
```

280

```
1       Q.   And were you involved in the process of
2   obtaining those fingerprint cards and making that
3   comparison?
4       A.   Yes.
5       Q.   I'm going to hand up what's been previously
6   marked as Government's Exhibit 145 and Government's
7   Exhibit 146 and have you take a look at that and see
8   if you recognize them.
9            Starting with Government's Exhibit 145, do
10  you recognize --
11           MR. SHEEHAN:  Your Honor, we don't have
12  those.  May I look at them?
13           No objection, your Honor.
14           THE COURT:  All right, then -- you want
15  to have the witness identify them?
16           MS. REYNOLDS:  Yes.
17      Q.   Starting with Government's Exhibit 145, can
18  you tell us what is contained in that exhibit?
19      A.   Government Exhibit 145 is the ten print
20  fingerprint card that was on file with the
21  Bridgeport Police Department for James Reid.
22      Q.   And Government's Exhibit 146, what's that?
23      A.   Exhibit 146 is the ten print fingerprint
24  card that was on file with Bridgeport Police
25  Department for Tina Johnson.
```

281

```
1      Q.   Okay.  And --
2           THE COURT:  So those are now full
3  exhibits absent objection.
4           MS. REYNOLDS:  Thank you, your Honor.
5      Q.   And with regard to the identification, can
6  you describe what it is you do once you have the
7  fingerprint cards and the fingerprints from the
8  victim?
9      A.   The fingerprints that were taken from the
10 victims at the medical examiner's office at the time
11 of their autopsy were compared to these fingerprint
12 cards that were on file with the Bridgeport Police
13 Department, as I said, to make a positive
14 identification.  And the process basically entails
15 taking a particular fingerprint from the card from
16 the autopsy and compare it the same finger on the
17 known card, and doing a fingerprint comparison by
18 looking at the pattern type and then more
19 specifically the minutia in the fingerprint to make
20 actual points of match.
21     Q.   And you were able to match both -- and
22 identify James Reid and Tina Johnson from the
23 fingerprints, correct?
24     A.   Yes.
25     Q.   And you mentioned that the bodies were
```

282

```
1  removed by the medical examiner and taken to the
2  medical examiner's office, correct?
3      A.   Yes, that is correct.
4      Q.   At some point later in this process did you
5  also go to the medical examiner's office?
6      A.   Yes, I did.
7      Q.   And what do you do there when you go to the
8  medical examiner's office?
9      A.   Whenever we have a homicide in Bridgeport
10 one of the crime scene investigators also attends
11 the autopsy of the victim at the medical examiner's
12 office when it's performed.
13     Q.   And did you attend any autopsies in this
14 case?
15     A.   Yes, all three were done on the same day
16 and I was present for them.
17     Q.   And do you know how it was Basil Williams's
18 identity was determined, if you know?
19     A.   I don't remember.  I don't think he had
20 fingerprints on file with the police department.
21     Q.   Handing you Government's Exhibit 147, do
22 you recognize what's contained in there?
23     A.   Yes.
24     Q.   And what is that?
25     A.   These are the fingerprints that were taken
```

283

```
1  from Mr. Williams at the autopsy.
2      Q.   And he was eventually identified, but you
3  didn't do an identification based on fingerprints?
4      A.   I don't believe I did.
5           MR. SHEEHAN:  Your Honor, my book
6  doesn't contain 147.  I just would like to look at
7  that, if I might.
8           I have no objection to this.  I thought
9  counsel was starting -- if counsel is offering it.
10          MS. REYNOLDS:  Yes, we would offer 147
11 also.
12          THE COURT:  All right, it's a full
13 exhibit.
14     Q.   Detective, once the bodies were removed
15 from the scene, what was the next step that you and
16 your colleagues took in order to continue to process
17 the scene?
18     A.   Once the victims were removed from the
19 scene, we began searching, a cursory search, we
20 still weren't touching things and moving things,
21 just items of evidence that were visible at that
22 point were identified, and we started from there
23 without really moving anything or disturbing the
24 scene.
25     Q.   And I'm going to draw your attention to
```

284

```
1  when you started your search and looking at and
2  processing the front door area of the apartment,
3  okay.  And I'm going to ask you to take look at your
4  monitor and see if you recognize what's contained in
5  Government's Exhibit 115.  I'm actually going to
6  show you a series of photographs starting with 115
7  then 115A, 115B, 115C, 115D, and 115D-1 and 115D-2.
8           Starting with 115, what's in that
9  photograph?
10     A.   That's a photograph of the front door of
11 the apartment 101.
12     Q.   Showing you 115A, is that just a close-up
13 of the front door?
14     A.   Yes, it's more the top half of the door.
15     Q.   And showing you 115B, is that just a
16 close-up of the number on the door?
17     A.   Yes, it is.
18     Q.   Again, we're talking about the front door
19 to apartment 101?
20     A.   Yes.
21     Q.   Showing you Government 1115C, what's that a
22 photograph of?
23     A.   That's a photograph of the lock on the
24 front door.
25     Q.   Showing you Government's Exhibit 115D, do
```

285

1  you recognize what that is a photo of?
2      A.    That is a photograph of a blood-like stain
3  on the front door.
4      Q.    Showing you Government's Exhibit 115D-1, do
5  you recognize what that is?
6      A.    Yes, that is a photograph of the blood
7  stain, blood-like stain on the front door marked
8  with scales and the evidence No. 27.
9              MR. SHEEHAN:  I don't have that.  May I
10 see what counsel is referencing?
11             Is that part of the evidence book?  I
12 just don't know.
13             THE COURT:  That one was not.
14             MR. SHEEHAN:  Counsel has given me an
15 extra copy.  Thank you.  No objection to 115D.
16             MS. REYNOLDS:  I would, your Honor, at
17 this time offer 115, 115A, 115B, 1115C, 115D, and
18 115D-1 as full exhibits.
19             THE COURT:  All right, you referenced
20 D-2.
21             MS. REYNOLDS:  And D-2, yes.  One more,
22 your Honor.
23             MR. SHEEHAN:  I haven't seen D-1.
24             MS. REYNOLDS:  We don't need D-2, your
25 Honor, it's just a close-up of D-1, so we'll --

286

1              MR. SHEEHAN:  That was one I didn't get
2  a copy of.
3              THE COURT:  You have D-1?
4              MR. SHEEHAN:  I have D-2.  No, I don't
5  have D-1.
6              MS. DAYTON:  Your Honor, just for the
7  record, counsel does have all of these photographs.
8  They just don't have it all marked with the evidence
9  exhibit sticker.
10             THE COURT:  I don't have them in my book
11 either, so there may be some confusion there.  D-1
12 is offered.  You have D-1?
13             MR. SHEEHAN:  No, I don't.  I mean, I
14 may have it somewhere.  I don't -- I wasn't provided
15 it as part of the exhibits, your Honor.
16             Thank you.
17             THE COURT:  All right, so there is no
18 objection to those exhibits.
19             MR. SHEEHAN:  No, there is not, your
20 Honor.
21             THE COURT:  All right, then they are
22 full exhibits, and that does not include D-2.  Do I
23 have that right?
24             MS. REYNOLDS:  No, I'm offering D-1 and
25 D-2.

287

1              THE COURT:  All right.  And there is no
2  objection to those.
3              MR. SHEEHAN:  Correct, your Honor.
4              THE COURT:  So they will all be in.
5  Thank you.
6              MS. REYNOLDS:  Thank you, your Honor.
7      Q.    Again, just starting with 115, that's just
8  the front door, correct?
9      A.    Yes, it is.
10             THE COURT:  I'm sorry.  Hang on two
11 seconds.
12             Do you need the courtroom darker than
13 that, Ms. Reynolds?
14             MS. REYNOLDS:  Not right now, your
15 Honor.  That's fine.  I'm just going to go through
16 these.  These are just pictures of the front door.
17     Q.    Showing you 115A, is that just a close-up
18 of the front door?
19     A.    Yes.
20     Q.    And 115B, is just a close-up of the
21 apartment number, correct?
22     A.    Yes, it is.
23     Q.    And then showing you 1115C, is that a
24 picture of the door lock, the dead bolt and the
25 doorknob?

288

1      A.    Yes.
2      Q.    And 115D, can you describe what's in that
3  photo?
4      A.    That's a photograph of the blood-like
5  stains that were on the exterior side of the door of
6  the apartment.
7      Q.    And showing you 115D-2 -- actually, I'm
8  sorry, D -- let me start with D-1.
9              Can you describe what you do when you find a
10 blood-like stain at a scene, for example, here on
11 the front door of the apartment?
12     A.    Because we were going to collect this stain
13 as evidence, it's marked with scales.  The small
14 rectangular stickers are basically little rulers
15 just to give approximate size to the stain that
16 we're collecting.  And then the 27 underneath it
17 identifies the evidence number of that exhibit.
18     Q.    And that evidence number then goes into the
19 property report and your crime scene report,
20 correct?
21     A.    Yes.
22     Q.    And taking a look then 115D-2, is that just
23 a close-up photo showing that marker and the
24 measurement?
25     A.    Yes, it is.

289

1    Q.   Now, can you describe what you do after you
2  have identified what appears to be a blood-like spot
3  there on the front door?  You've tagged it and
4  marked it, what steps do you then take with regard
5  to that potential piece of evidence?
6    A.   In order to collect a blood sample from a
7  stain like this, because it's not feasible to really
8  just take the entire door as evidence, the
9  blood-like stain itself is collected using sterile
10 cotton swabs and sterile water.  The swabs are
11 moistened with the sterile water and then rubbed
12 over the stain we want to collect so it's
13 transferred onto the cotton.  Then that dries
14 briefly and it's packaged in a box that holds the
15 Q-tips, the cotton swabs, and collected in that
16 manner.
17   Q.   And do you take any other steps with regard
18 to collecting a blood sample from an item like a
19 door?  Do you have a control sometimes?
20   A.   For the sample, yes.  The control is taken
21 separately, and that's for blood-like stains.  The
22 control sample is basically just a sample of the
23 sterile water we're using to show there is no
24 contamination in the water.
25   Q.   Okay.  So I'm going to hand up to you

290

1  Government's Exhibit 125 and 125A.
2           MR. SHEEHAN:  May we approach, your
3  Honor?
4           THE COURT:  Yes.
5           (Sidebar conference)
6           THE COURT:  Yes.
7           MR. SHEEHAN:  Your Honor, if they're
8  going to publish these, again I have the same
9  concern.  I don't think there is any relevance in
10 the lab reports.
11          THE COURT:  Okay, let's start with, are
12 you intending to show these?
13          MS. REYNOLDS:  We're not going to open
14 these, your Honor, they're biohazardous.  We're just
15 showing them, marking them, and explaining what was
16 done with them.  It's evidence collected from the
17 scene.  We're in the process of putting on a crime
18 scene investigator.  We have to go through the
19 process they used, what they looked for, what they
20 collected, how they collected it.  It's relevant to
21 her testimony.
22          MR. SHEEHAN:  My objection is to the
23 circulation of the items.  If they're not proposing
24 to do that, okay.
25          THE COURT:  They are not going to

291

1  publish them.
2           MS. DAYTON:  They can just be shown to
3  the jury, not handed out to them.
4           THE COURT:  Right.
5           MS. REYNOLDS:  Yes.
6           MS. DAYTON:  I'll hold them up.
7           THE COURT:  All right, that's 125 and
8  125A.
9           MS. REYNOLDS:  125 and 125A.
10          THE COURT:  You can be Vanna White.
11          (Sidebar concluded)
12   Q.   So, again, taking a look at Government's
13 Exhibit 125 and 125A, and starting with 125, can you
14 tell us what's contained in that exhibit?
15   A.   125 is the box containing the swabs that
16 were collected as Exhibit 27, as shown in the
17 picture.
18   Q.   And what is 125A?
19   A.   125A is the control sample, swabs for
20 Exhibit 27 or Government's Exhibit 125.
21          MS. REYNOLDS:  Your Honor, I would offer
22 as full exhibits 125 and 125A.
23          MR. SHEEHAN:  Again, subject to our
24 colloquy at the bench, I have no objection.
25          THE COURT:  All right, they are full

292

1  exhibits.
2    Q.   And, Detective, with regard to these two
3  cotton swabs of the blood found on the front door of
4  the apartment, or the blood-like substance found on
5  the front door of the apartment, what did you do
6  after you collected those samples as you've
7  described?  What do you do next?
8    A.   The sample -- the swabs were put directly
9  and into this box, and the box is then taken back to
10 the police department and sealed and labeled as an
11 exhibit.
12   Q.   And were there any requests for further
13 testing of that, the swabs contained in Exhibit 125,
14 further forensic or laboratory analysis of those?
15   A.   Yes, this was sent to the Connecticut State
16 Forensic Laboratory for analysis as well.
17          MS. REYNOLDS:  And I'm just going to
18 just show these 125 and 125A to the jury so they can
19 just see a closer --
20          MS. DAYTON:  I'm just going to show them
21 to you since they have biohazard --
22          MR. SHEEHAN:  May we approach, your
23 Honor?
24          THE COURT:  Yes.
25          (Sidebar conference)

293

1          THE COURT:  So we probably have a
2   definitional problem about what "publication" means.
3          MR. SHEEHAN:  I would say we have a huge
4   definitional problem, not to speak --
5          THE COURT:  When we talk about
6   publishing, we hand them to the jury and they pass
7   them around, as opposed to showing them on the
8   screen or showing them in some other way.  Perhaps
9   we will get a definition of what your definition is
10  in terms of forms of publication.
11         MR. SHEEHAN:  Yes.  I would think there
12  is really no difference from what they did in terms
13  of handing them out.
14         THE COURT:  I think there is because you
15  earlier had complained, objected because they having
16  the victims' shirts in their hands was, you thought,
17  overwhelmingly prejudicial, and so that's why this
18  difference.
19         MS. DAYTON:  The basis of his objection
20  earlier, too, he didn't want the boxes opened.  And
21  while we were at sidebar I said I'm just showing
22  them to the jury and your Honor made the joke.  So,
23  Mr. Sheehan was standing right here while that was
24  said.  I'm not sure what the basis of his objection
25  is.

294

1          THE COURT:  So, I find nothing wrong
2   with what they've done.  They could have just as
3   well --
4          MR. SHEEHAN:  On the ELMO which is what
5   I thought they would do.
6          THE COURT:  So, let's be clear about
7   what exactly is going to happen and what won't work.
8          MR. SHEEHAN:  Okay.
9          MS. DAYTON:  Your Honor, we object
10  because -- and here is the basis.  Mr. Sheehan is
11  going to spend hours, maybe days, cross-examining
12  our DNA examiner regarding contamination, regarding
13  who came through the crime scene, how things were
14  handled, and for him to say earlier that this stuff
15  is not relevant is actually laughable.  That's the
16  victim's blood on the door.  And Mr. Sheehan knows
17  that.
18         Number two, we have a right to prove our
19  case and we have a right to deal with the issues
20  relating to how things were collected and whether or
21  not they were contaminated.  And there was in fact a
22  contamination in this case.  And we have a right to
23  show the jury that proper steps were taken to
24  collect evidence at the crime scene.
25         Mr. Sheehan and Mr. Smith asked me a

295

1   couple of days ago if we would agree to stipulate to
2   police reports coming in about who walked through
3   the crime scene and we said no, they can call the
4   witnesses.  So, it's very clear what the defense is
5   going to be in this case.  So for Mr. Sheehan to
6   repeatedly object to us showing the jury that the
7   proper steps were taken is -- honestly, it's very
8   problematic for the government.
9          THE COURT:  All right, the --
10         MR. SHEEHAN:  Your Honor?
11         THE COURT:  Your case has not been in
12  any way interrupted in my view.  I have made the
13  rulings, the jury has seen what is needed to be
14  seen.  Is there a way in which we can reserve
15  objections to a break?  I'll ask you just to see if
16  there is a way that we can take something up at
17  breaks as opposed to returning to the sidebar with
18  great frequency.
19         MR. SHEEHAN:  Your Honor, the problem
20  is, as I'm sure the Court is well aware, a break
21  does not accomplish oftentimes the problems of
22  releasing the skunk into the jury box.
23         THE COURT:  Okay.
24         MR. SHEEHAN:  And to the extent that --
25  to the extent that it is not going to happen, which

296

1   I think just happened, I mean whether she thinks
2   it's laughable --
3          THE COURT:  I disagree.
4          MR. SHEEHAN:  Okay, well, I respect your
5   Honor's opinion on that.
6          THE COURT:  And so that -- let's just
7   think about how we might either have -- if it's a
8   repeat objection, you can just tell me it's the same
9   objection as to something or other.  In any event,
10  I'm not trying to curtail your right to object or
11  get rulings on things, I'm just trying to think
12  through how we might do this efficiently.  That's
13  all.
14         Okay, thank you very much.
15         (Sidebar concluded)
16         THE COURT:  All right, Ms. Reynolds, you
17  may proceed.
18         MS. REYNOLDS:  Thank you, your Honor.
19  Q.   I'm going to draw your attention to your
20  monitor there and ask you to take a look at
21  Government's Exhibit 164.
22         Do you recognize what that's a photograph
23  of?
24  A.   Yes.
25  Q.   What is that a photograph of?

297

1    A.   That is the door lock on the interior side
2  of the front door to apartment 101 marked with a
3  scale numbered No. 35.
4    Q.   And taking a look at Government's
5  Exhibit 165, do you recognize what that is a photo
6  of?
7    A.   Yes.
8    Q.   Is that just a close-up?  Can you describe
9  what's in that photo?
10   A.   It's a closer shot of the same lock, closer
11 shot of the scale and a small blood-like stain
12 underneath the scale.
13        MS. REYNOLDS:  Your Honor, I would move
14 as full exhibits 164 and 165.
15        MR. SHEEHAN:  No objection.
16        THE COURT:  All right, they are full
17 exhibits.
18   Q.   Starting then with Government's 164, again,
19 can you describe what the picture shows here in 164?
20   A.   I believe this is No. 165.
21   Q.   You are correct.  Starting -- all right,
22 well, let's start with Government's 165.  What's
23 depicted in that photograph?
24   A.   That's just a close-up of the top portion
25 of the lock on the interior side of the door to

298

1  apartment 101.  And the white rectangular scale
2  above it is just, again, showing approximate
3  measurement of the stain.
4    Q.   And did you take any other steps with
5  regard to that blood-like substance on the lock
6  area?
7    A.   That area was swabbed and collected as
8  Exhibit 35.
9    Q.   Okay.  Showing you Government's Exhibit 166
10 and 167.
11        THE COURT:  I'm sorry, when you say
12 Exhibit 35, is that a Bridgeport police number?
13        THE WITNESS:  Bridgeport police
14 Exhibit 35.
15   Q.   And that's shown in the photograph which is
16 Government's Exhibit 165?
17   A.   Yes.
18   Q.   There are a lot of numbers.  I'm just going
19 to hand up Government's 167.
20        THE COURT:  I'm sorry, what happened to
21 166?
22        MS. REYNOLDS:  I'm not going to hand
23 that one up right now.
24   Q.   So, I'm going to hand up 167 and ask you if
25 you recognize what's contained in there.

299

1    A.   Yes.
2    Q.   And what's contained in 167?
3    A.   Government 167 is the swabs of Bridgeport
4  Exhibit No. 35 shown in this picture.
5    Q.   And have you written in your property
6  report a description where Government's 167, which
7  contains the cotton swabs of 135, came from?
8    A.   In my crime scene report, yes.
9    Q.   Do you know where the cotton swabs came
10 from on the label?
11   A.   Yes, on the label it is incorrectly stated
12 the location that is of this -- where the sample was
13 taken from.
14   Q.   Have you had an opportunity prior to
15 testifying here today to review the evidence and
16 compare it to your reports?
17   A.   Yes.
18   Q.   And what, again, did you determine with
19 regard to the label of the cotton swabs contained in
20 the Government's 167?
21   A.   The label that is actually on the exhibit
22 incorrectly states the location where the exhibit
23 was taken from.
24   Q.   Does it have exhibit -- the Bridgeport
25 property number 35 on it?

300

1    A.   Yes, it does.
2    Q.   What's incorrect is where it was taken
3  from, correct?
4    A.   Yes.
5    Q.   And do you know whether or not a report was
6  subsequently done to correct the information
7  contained on that label?
8    A.   Yes.  When the error was discovered a
9  supplemental report was written by Detective Ortiz
10 explaining the error.
11        MS. REYNOLDS:  Your Honor, I would move
12 as a full exhibit Government's 167.
13        MR. SHEEHAN:  May I see it, your Honor?
14 I don't have that.
15        MS. REYNOLDS:  Yes.
16        MR. SHEEHAN:  May I briefly voir dire,
17 your Honor?
18        THE COURT:  You may.
19 VOIR DIRE EXAMINATION
20 BY MR. SHEEHAN:
21   Q.   Detective Devan, did you actually do the
22 swabbing?
23   A.   Yes, I did.
24        MR. SHEEHAN:  I have no objection.
25        THE COURT:  167 is a full exhibit.

301

1           MS. REYNOLDS:  Thank you, your Honor.
2    CONTINUED DIRECT EXAMINATION
3    BY MS. REYNOLDS:
4       Q.   And again, showing that up on the -- it's
5    got your name, and does it show the Exhibit No. 35?
6       A.   Yes.
7       Q.   It's got the information that you said
8    where it was recovered from, but that was incorrect
9    and later corrected?
10      A.   That's right.
11      Q.   And after that exhibit was collected, the
12   two cotton swabs of the blood-like substance from
13   the door lock, which is contained in Government's
14   167, what was done with those cotton swabs?
15      A.   Cotton swabs are again packaged and turned
16   in to the property room as evidence.
17      Q.   And do you know whether or not those cotton
18   swabs were also sent to the lab for further
19   analysis?
20      A.   Yes, they were.
21      Q.   Now, staying with the front door area of
22   the apartment, I'm going to hand you a series of
23   photographs starting with 116.  Actually I'm going
24   to start with 116A, and I'm going to hand up 116C,
25   116F, 116G, 116H, 116I, 116J.  I'm going to hand

302

1    those up to you and have you take a look.
2           Starting with 116A, do you recognize what
3    that is a photograph of?
4       A.   Yes.
5       Q.   Can you describe what's shown in that
6    photograph?
7       A.   It's the front door jamb.
8       Q.   And then taking a look at 116C, do you
9    recognize that photograph?
10      A.   Yes.
11      Q.   And what does that show?
12      A.   It shows the front doorjamb as well with an
13   area of damage.
14      Q.   And again, this is the front door to
15   apartment 101, correct?
16      A.   Correct.
17      Q.   And then showing you 116F, is that another
18   photograph showing a close-up of the damage to the
19   front door?
20      A.   To the front doorjamb, yes.
21      Q.   And then showing you Government's 116G, do
22   you recognize what that is a photo of?
23      A.   The door frame area.
24      Q.   Okay.  Hard to recognize.  These are all
25   photographs of the front door, correct?

303

1       A.   Uh-huh (indicating affirmatively).
2       Q.   116 --
3           MR. SHEEHAN:  I'm going to object to the
4    leading on this.  Is there a question?
5           THE COURT:  Just go through them
6    one-by-one.
7           MS. REYNOLDS:  I was.
8           THE COURT:  Yes.
9       Q.   Again, showing you 116G, do you recognize
10   what that's a photograph of?
11      A.   That's the front door frame area.
12      Q.   116H, do you recognize that?
13      A.   That is a closer shot of the frame area
14   also showing a screw in the door.
15      Q.   And 116I?
16      A.   This is a photograph of the top of the door
17   frame, and it appears that there is damage to the
18   top of the door itself where it meets the frame.
19      Q.   And 116J, do you recognize what that is?
20      A.   It shows the door frame with a black screw
21   in the frame.
22           MS. REYNOLDS:  Your Honor, I would move
23   as full exhibits 116A, 116C, 116F, 116G, 116H, 116I,
24   and 116J.
25           MR. SHEEHAN:  No objection.

304

1           THE COURT:  All right, full exhibits
2    starting with 116A.
3           MR. SHEEHAN:  I don't think that's the
4    same picture.  Of A --
5       Q.   116A.  Do you recognize?
6           MR. SHEEHAN:  I'm sorry, may I just
7    look, because it doesn't appear to be, maybe I'm --
8    I have a cropped picture.  It might not be an issue.
9           MS. REYNOLDS:  You can use that copy.
10   I've provided an extra copy to counsel.
11      Q.   So, taking a look at 116A, can you tell us
12   what this photograph shows.  Again, this is of the
13   front door of the apartment?
14      A.   This is the front doorjamb of apartment 101
15   and that black circle is actually a screw in the
16   doorjamb.
17      Q.   And that's right here in the middle of the
18   photograph?
19      A.   Yes.
20      Q.   Can you describe what the door frame area
21   looked like when you went to the scene to process
22   it?
23      A.   When we got to the scene it doesn't appear
24   there was any damage to the door itself, but the
25   frame and the doorjamb itself were damaged.

**GA76**

305

```
1      Q.    And showing you Government's Exhibit 116C;
2  can you tell us what you see in that photograph?
3      A.    That's the doorjamb area of the front door
4  of the apartment, and it's showing the damage to the
5  jamb.
6      Q.    And then 116F is just a close-up of that
7  damage to the doorjamb area of the front door to
8  apartment 101?
9      A.    Yes.
10     Q.    And showing you Government's Exhibit 116G,
11  is that the top part of the door?
12     A.    It's the -- yes, the top part of the
13  door -- the door to the apartment.  And again, the
14  black circle near the center of the picture is a
15  screw.
16     Q.    And so as you were processing the scene and
17  you and your colleagues were taking photographs,
18  what did you notice about the front door of
19  apartment 101 in addition to the damage to the
20  doorjamb?
21     A.    We noticed that there were several screws
22  in the door going through the door into the jamb
23  frame part of the doorway.
24     Q.    And those screws were from the inside of
25  the apartment, interior side of the door?
```

306

```
1      A.    From the interior side, yes.
2      Q.    Showing you Government's Exhibit 116I; what
3  do you see in that picture?
4      A.    That's a photo of the top portion of the
5  door to the apartment, and you can see, again, the
6  screw which goes from the interior side of the door
7  through the door.  And it appeared to us it went
8  into the frame of the -- next to the door.
9      Q.    And that's the screw that I'm pointing to
10  with my pen there on the ELMO?
11     A.    Yes.
12     Q.    Into the door frame, correct?
13     A.    Yes.
14     Q.    And then showing you Government's
15  Exhibit 116J, is that a close-up of another screw in
16  the door frame?
17          MR. SHEEHAN:  I'm going to object to the
18  leading form of the question.
19     Q.    Can you tell us what's depicted in
20  Government's Exhibit 116J?
21     A.    That's a close-up showing a black screw in
22  the door frame.
23     Q.    Now, did you also process the area, once
24  you get into the apartment, in that living room
25  area?
```

307

```
1      A.    Yes.
2      Q.    And look for evidence in that area?
3      A.    Yes, through the whole apartment.
4      Q.    And focussing first then on the area of the
5  living room, do you recall whether or not there was
6  a table, like a kitchen table near the entryway?
7          MR. SHEEHAN:  Object to the leading form
8  of the question.
9          MS. REYNOLDS:  Your Honor, I'm going to
10  show a photograph and turn to a new area of the
11  apartment.
12          THE COURT:  Do you want to show her the
13  picture and ask her what that depicts.
14          MS. REYNOLDS:  I can do that, your
15  Honor.
16     Q.    Showing you Government's Exhibit 117 and
17  117A.  Take a look first at 117.  Do you recognize
18  what that's a photograph of?
19     A.    Yes.
20     Q.    What do you see in that photograph?
21     A.    This photograph is taken just inside the
22  door to the apartment looking to the right as you
23  enter.
24     Q.    And what's depicted in the photograph?
25     A.    It's a picture of a table with a lace
```

308

```
1  tablecloth and the couch which is positioned in
2  front of that table.
3      Q.    And can you also see anything else?
4      A.    You can see still see the open door, the
5  edge of the door as it opens into the apartment.
6      Q.    And then taking a look at Government's
7  Exhibit 117A, what is that a photograph of?
8      A.    That's a close-up photograph of the table I
9  just described.
10          MS. REYNOLDS:  Your Honor, I would move
11  as full exhibits Government's 117 and 117A.
12          MR. SHEEHAN:  No objection.
13          THE COURT:  Full exhibits.
14     Q.    And what is -- can you describe what's
15  depicted up on the screen now that we have 117,
16  Government's Exhibit 117?
17     A.    This is a photograph just as you enter the
18  apartment.  The table is against the wall to the
19  right and the sofa was actually almost in front of
20  the doorway in front of the table.
21     Q.    Okay.  And was that how the apartment
22  living room area appeared when you got to the scene?
23     A.    When we entered the scene, yes.
24     Q.    Again, so there is the couch that's moved
25  up towards the kitchen table?
```

309

1    A.   Yes.

2    Q.   Or the dining room table?

3    A.   Yes.

4    Q.   Over here on the right-hand side of the

5    photo, it's hard to see with our projector here, but

6    what is that I'm pointing to with the arrow?

7    A.   That's the entry door into the apartment.

8    Q.   And showing you Government's 117A, what is

9    that?

10    A.   That's a closer photograph of the table

11    alone.

12    Q.   And what do you see on the table there?

13    A.   They're miscellaneous items, including

14    cards and a couple of screws, a candle, a lighter.

15    Q.   I'm going to hand up a few more photographs

16    of the living room area and ask you to take a look.

17    Starting with 117D, do you recognize that

18    photograph?

19    A.   Yes.

20    Q.   Okay, what is depicted in that photograph?

21    A.   That is the rest of the living room.  You

22    could still see the other end of the sofa, and then

23    it shows the wall of the living room with the front

24    window.

25    Q.   And showing you Government's Exhibit 117E,

310

1    what's depicted in that photograph?

2    A.   That is another overall photograph of the

3    living room showing the sofa, part of the table, and

4    the rest of the contents of the living room,

5    including the front window.

6    Q.   And then showing you 117F, what's depicted

7    in that photograph?

8    A.   That is the living room as well showing the

9    furniture against the wall that would have been to

10    the right as you enter.  You see the arm of the sofa

11    and a piece of wood trim on the floor as well.

12    Q.   And showing you 117G, do you recognize what

13    that is a photo of?

14    A.   That's another picture showing the side of

15    the sofa and the piece of wood trim on the floor and

16    a fan next to it.

17    MS. REYNOLDS:  Your Honor, I would move

18    as full exhibits Government's 117D, 117E, 117F,

19    117G.

20    MR. SHEEHAN:  No objection.

21    THE COURT:  All right, they are full

22    exhibits.

23    Q.   And starting with 117E, can you describe

24    what you see in that photograph?

25    A.   That's a photograph of the living room of

311

1    apartment 101 taken from near the entry door and

2    facing the front window.  You can see, again, the

3    table which is against the wall to the right with

4    the sofa in front of it.  And this also shows the

5    rest of the furniture in the living room.

6    Q.   And, again, this area that I'm pointing to,

7    that's the front window of the living room?

8    A.   That's the front window that looks out the

9    front of the building.

10    Q.   And showing you 117F, can you tell us

11    what's in that photograph?

12    A.   That is the living room as well.  It is the

13    furniture that's against the wall to the right as

14    you enter.  You can see the arm of the sofa.

15    Q.   That's in this area here?

16    A.   Correct.

17    Q.   Next to the government sticker?

18    A.   Correct.  And on the floor right next to

19    the fan and the sofa is a piece of white wood trim.

20    Q.   And were you able to determine what that

21    white wood trim was?

22    A.   We believed that it was the missing piece

23    of trim from the front door.

24    Q.   And showing you Government's Exhibit 117G,

25    what can be seen in that photograph?

312

1    A.   That's a picture of the wood trim as well

2    just from a little bit of a different angle.  And

3    there you can see how it's underneath the sofa a

4    little bit better.

5    Q.   All right.  Again, that just shows a

6    close-up of that wood trim?

7    A.   Yes.

8    Q.   I'll hand up just one more photograph,

9    117H, and ask you to take a look at that.

10    And what is that view depicted in that

11    photograph?

12    A.   This is a photograph of the living room

13    taken from the area near the window looking back

14    toward the front door of the apartment.

15    MS. REYNOLDS:  Your Honor, I would offer

16    117H as a full exhibit.

17    MR. SHEEHAN:  No objection.

18    THE COURT:  Full exhibit.

19    Q.   So, again, taking a look at 117H, can you

20    describe what we see in that photograph?

21    A.   That is the living room in apartment 101

22    taken from the area closer to the front window

23    looking back toward the front door of the apartment.

24    And you can see the sofa and the table with the lace

25    tablecloth as well.

313

```
1        Q.   Now, in this area I'm pointing to?
2        A.   That would be the front door to the
3   apartment.
4        Q.   After you took these photographs, you and
5   your colleagues, did you also start at some point
6   moving some of the items to see if you could find
7   anything else in that area of the living room of the
8   apartment?
9        A.   Yes.
10       Q.   And can you describe what you would do to
11  do that, what steps you take at that point?
12       A.   Once we do the photographs, we'll begin the
13  search.  Then we actually begin to move things,
14  cushions to the chairs, cushions to the sofas.  We
15  look in drawers, in cabinets, underneath things,
16  just to do a thorough search to see if there is
17  anything else of evidentiary value to us that we can
18  find.
19       Q.   And do you recall eventually moving the
20  living room couch back up against the wall of the
21  living room?
22       A.   Yes.  It was inconvenient to have this in
23  the middle of the room moving in and out, so we
24  moved it further back to where we believed it
25  originally was.
```

314

```
1        Q.   At some point do you recall whether or not
2   you removed the cushions to the living room couch?
3        A.   Yes, we did.
4             MR. SHEEHAN:  Is the answer did she move
5   the cushion?
6             THE COURT:  Yes.  She said yes.
7             MR. SHEEHAN:  I thought she said we
8   moved -- did you move -- may I just inquire, your
9   Honor?
10            Did you move the cushions?
11            THE WITNESS:  We were all searching.
12  I'm not exactly sure which one of us moved the
13  cushions.  We were all there.
14            MS. REYNOLDS:  Well, your Honor --
15            THE COURT:  Okay.
16            MS. REYNOLDS:  I can clarify.  If that's
17  his objection, I'll clarify it.
18            THE COURT:  Okay.
19       Q.   Detective Devan, when you say we were all
20  together, who are you referring to?
21       A.   The crime scene team, myself along with
22  Detective Ortiz and Detective Vargas.
23       Q.   And did you all work together throughout
24  the whole process of searching for evidence inside
25  apartment 101?
```

315

```
1        A.   Yes.
2        Q.   And, in fact, you were in charge of
3   documenting where things were recovered and who
4   recovered them, correct?
5        A.   It was part of my report as well, yes.
6        Q.   And so was it Detective Ortiz, part of his
7   property report?
8        A.   I'm sorry?
9        Q.   Did Detective Ortiz also do a property
10  report?
11       A.   Oh, yes.
12       Q.   And again, all these photographs were taken
13  and you were present when they were taken, correct?
14       A.   Yes.
15       Q.   And so, again, with regard to the couch in
16  the living room, eventually you described in order
17  to continue your search for evidence you have to
18  start moving things, correct?
19       A.   Yes.
20            MR. SHEEHAN:  I would object to the
21  leading form of the questions.
22            MS. REYNOLDS:  Trying to get back to
23  where I was.  I will withdraw that.
24       Q.   What did you do?  How was it you were able
25  to look for more evidence?
```

316

```
1        A.   Once we started searching for evidence,
2   then we moved things and opened drawers and cabinets
3   and looked underneath things to do a thorough
4   search.  We have to make sure that everything is
5   searched thoroughly to be sure we don't miss
6   anything.
7        Q.   And in the living room area, could you
8   describe what steps you and your colleagues took in
9   order to look for evidence in that area?
10            MR. SHEEHAN:  Object to the form of the
11  question, your Honor.  To the extent that it's
12  eliciting what her colleagues did, unless she
13  observed it, it would be hearsay.
14            THE COURT:  She testified that's part of
15  her report, is documenting who does what.
16            Isn't that correct, detective?
17            THE WITNESS:  We were all together
18  during the search.
19            THE COURT:  All right.  Would you make
20  clear in the question, Ms. Reynolds, who is doing
21  what?
22            MS. REYNOLDS:  Yes, your Honor.
23            THE COURT:  And who sees who doing what,
24  at least from her standpoint.
25            MS. REYNOLDS:  I will, your Honor.
```

**GA79**

317

```
 1        THE COURT:  Thank you.
 2     Q.   Focusing just in the living room area, when
 3  you were in that area looking for evidence, what was
 4  your role?  What were you doing?
 5     A.   I was searching as well as documenting.
 6  So, anything that would have been located by my
 7  partner or myself, I would document in my notes for
 8  my report later.  But I was searching as well.
 9     Q.   And what was Detective Vargas doing during
10  that time period when -- again, focusing just in the
11  living room area?
12     A.   After the photographs were taken he was
13  searching the area also.
14     Q.   And what was Detective Ortiz doing during
15  that time period when you were -- just again,
16  focusing in the living room area?
17     A.   Detective Ortiz was searching the area as
18  well.
19     Q.   And you were present, you, yourself, with
20  Detective Ortiz and Detective Vargas in the living
21  room when you were searching for evidence, correct?
22     A.   Yes.
23     Q.   Was anyone else during this whole time
24  period that you, Detective Vargas and
25  Detective Ortiz were searching for evidence inside
```

318

```
 1  apartment 101, was anyone else in that apartment?
 2     A.   The first day Detective Gallagher was also
 3  on scene and Sergeant Remely was present through the
 4  processing of the scene as well.
 5     Q.   When you say the first day, how many days
 6  total did you end up spending processing the scene
 7  at apartment 101?
 8     A.   We were there over the course of three
 9  days.
10     Q.   And on that first day you said Detective
11  Remely and Sergeant Gallagher were also present?
12     A.   Detective Gallagher and Sergeant Remely.
13     Q.   Sorry, I got their ranks wrong.  And what
14  was their function at the scene on that first day?
15     A.   The first day Detective Gallagher shot a
16  video of the scene, and Sergeant Remely is the
17  supervisor, so he is basically in charge of
18  supervision of the scene and what we do there.
19     Q.   Okay.  And were they there the whole time
20  you were there the first day?
21     A.   Yes.
22     Q.   And you mentioned you were -- you came back
23  to the scene the next day; is that correct?
24     A.   Yes, in the afternoon after the autopsies.
25     Q.   Was that the first day or --
```

319

```
 1     A.   The second day.
 2     Q.   The second day.  And you also on that day
 3  -- who was present processing evidence on the second
 4  day?
 5     A.   The second day it was Detective Ortiz,
 6  Detective Vargas and myself, and Sergeant Remely was
 7  there as well.
 8     Q.   Okay.  And did you have to return a third
 9  day?
10     A.   Yes, we did.
11     Q.   And who was present on the third day?
12     A.   The third day was Detective Ortiz,
13  Detective Vargas, myself, and Sergeant Remely as far
14  as a supervisor is concerned.
15     Q.   And throughout that time period, can you
16  describe how it was -- were you able to secure
17  apartment 101?
18     A.   Yes, once the scene was closed down for the
19  night, the door to the apartment is closed and
20  sealed with evidence tape and initialed.  An officer
21  is posted at that door and remains there on post
22  until we return and unseal the door to reenter.  And
23  the same thing was done the first night and the
24  second night to return the third day.
25     Q.   And throughout those three days that you
```

320

```
 1  are processing the scene, did you have contact with
 2  any other detectives or people investigating the
 3  case or interviewing witnesses or anything like
 4  that?
 5     A.   We may have.  I know the first day the
 6  tentative IDs of the victims were given to us.  I
 7  don't think at that time being, involved in the
 8  scene, we were really informed anything of the
 9  investigation itself.
10     Q.   So, what is -- is there a difference
11  between being a detective investigating and a
12  detective doing the crime scene?  What is the
13  difference?
14     A.   The way the Bridgeport Police Department
15  works, within the detective bureau there are
16  different units.  The crime scene unit that I'm part
17  of, we investigate the scene itself.  We don't have
18  anything to do with the interviews of witnesses or
19  suspects.  The investigators, we call them GI
20  detectives, it means general investigations, and
21  they actually are the ones who do the interviews
22  with the witnesses and follow leads and clues to the
23  people who can provide more information.
24        MS. REYNOLDS:  If I can just -- your
25  Honor, what time is the -- I was going to turn to a
```

321

```
1   different area.  I'm not sure what time the break
2   is.
3              THE COURT:  Around ten past, 15 past.
4     Q.   So, with regard to those detective
5   investigators, they were not on the scene processing
6   evidence, correct?
7     A.   No.
8              MR. SHEEHAN:  Objection to the leading
9   form of the question.
10             THE COURT:  Sustained.
11    Q.   Were the detective investigators on the
12  scene while you were processing the scene for
13  evidence?
14    A.   While we were processing the scene, no.
15    Q.   Now, I'm going to draw your attention and
16  ask you to take a look at Government's Exhibit 136A,
17  see if you recognize what this is.
18    A.   Yes.
19    Q.   And what is contained in 136A?
20    A.   Government 136A is Bridgeport Exhibit
21  No. 13, which is actually this piece of latex which
22  was originally contained within this paper bag.
23    Q.   And how is it that you are able to
24  recognize what is contained in Government's
25  Exhibit 136A?
```

322

```
1     A.   The original paper bag is labeled with the
2   Bridgeport Police Department evidence sticker.  And
3   its contents have been removed and enclosed in this
4   plastic envelope.
5              MS. REYNOLDS:  Your Honor, I would offer
6   as a full exhibit Government's 136A.
7              MR. SHEEHAN:  May I see it, your Honor?
8              THE COURT:  Yes.  Would you like to go
9   over and see it?  You can't get there.
10             MS. REYNOLDS:  I can hand it over, your
11  Honor.
12             MR. SHEEHAN:  I'm going to object at
13  this time on foundation basis.
14             THE COURT:  Do you want to establish her
15  knowledge of where that was found and what happened
16  to it.
17             MS. REYNOLDS:  Yes, your Honor.
18    Q.   You indicated that there is a Bridgeport
19  evidence label on that?
20    A.   Yes.
21    Q.   And does that label give you any
22  information as to where that item was seized and --
23  can you describe that?
24             MR. SHEEHAN:  Well, your Honor, may we
25  approach?  Because I've seen what that is and
```

323

```
1   they're offering it -- somebody else -- that's not
2   her label.
3              THE COURT:  But let's finish the answer
4   to that question.
5              Does the label give you information as
6   to where the item was seized?
7              THE WITNESS:  Yes, it does.
8     Q.   And where was --
9              MS. REYNOLDS:  Can I ask the next
10  question?
11             MR. SHEEHAN:  Then I think --
12             THE COURT:  It needs the basis for her
13  knowledge.
14    Q.   We were just talking again about the living
15  room area.  Were you present when the living room
16  area of the apartment was searched for evidence?
17    A.   Yes.
18    Q.   And do you recall whether or not any
19  evidence was seized from the couch area in the
20  living room?
21             MR. SHEEHAN:  Your Honor, I object.  She
22  did --
23             THE COURT:  The question will contain
24  the answer to that.
25             MR. SHEEHAN:  Well --
```

324

```
1              THE COURT:  Do you recall personally
2   whether any evidence was seized from the couch area
3   in the living room?
4              THE WITNESS:  Yes, there was.
5              THE COURT:  Do you recall that yourself?
6              THE WITNESS:  Yes, I do.
7              THE COURT:  Okay.
8     Q.   Were you present when that evidence was
9   seized from the couch area?
10    A.   Yes, I was.
11    Q.   Did you see it getting seized?
12    A.   Yes, I did.
13    Q.   Do you recall who actually picked it up and
14  seized it?
15    A.   Detective Ortiz.
16    Q.   And do you know or did you see what
17  Detective Ortiz did with that piece of evidence
18  after he seized it from the couch area?
19    A.   Yes.
20    Q.   And what did he do with it?
21    A.   It was placed in this paper bag.
22    Q.   And, again, as you've described with regard
23  to the evidence, once it's seized and placed in a
24  paper bag, do you know what happens to it after
25  that?
```

**GA81**

325

1    A.   Yes, we take it back to the police
2  department to finish labelling it and sealing it to
3  turn it into the property room.
4    Q.   When you say "we take it back," who are you
5  referring to?
6    A.   In this case it's Detective Ortiz,
7  Detective Vargas and myself.  We were working as the
8  team on this scene.
9    Q.   Again, as a member of that team, when you
10  did -- did you go back to the precinct eventually
11  with items of evidence that you observed were seized
12  at the apartment in 101, apartment 101?
13    A.   Yes.  And I document them while they're
14  being seized.
15    Q.   And after documenting and after observing
16  them being seized, with regards to the item
17  contained in Government Exhibit 136A, did you
18  document where that item was seized and whom it was
19  seized by?
20    A.   Yes.
21    Q.   Were you present when it was taken back to
22  the police station to further be processed as
23  evidence?
24    A.   Yes.
25    Q.   And does that item contained in 136A appear

326

1  to be in the same or substantially the same
2  condition it was in at the time that you saw it
3  seized from the couch area and then processed as
4  evidence?
5    A.   Generally, yes.
6    Q.   And when you say "generally yes," is there
7  any difference -- or can you describe what the
8  difference is between what you're observing in the
9  plastic envelope that's been marked Government
10  Exhibit 136A and how that item appeared at the time
11  that it was seized, that you saw it being seized by
12  Detective Ortiz?
13    A.   When it was located and subsequently seized
14  at the scene, it just -- it appeared to be a lighter
15  color.  This appears to be a darker color, and it's
16  actually more crumpled or folded than it appeared to
17  be at the scene.
18    Q.   After that item was seized, do you know
19  what was done with it after it was seized and
20  processed?
21    A.   This was submitted to the Connecticut state
22  forensic lab for further processing as well.
23       MS. REYNOLDS:  Your Honor, I would offer
24  as a full exhibit Government's Exhibiting 136A.
25       MR. SHEEHAN:  May I voir dire, your

327

1  Honor?
2       THE COURT:  You may.
3  VOIR DIRE EXAMINATION
4  BY MR. SHEEHAN:
5    Q.   Detective, your notes don't reflect who
6  actually found that, do they?
7    A.   Who actually found it?  No.
8    Q.   Okay.  And, in fact, you don't -- you don't
9  know who found that object, do you?
10    A.   Off -- no.
11    Q.   Okay.  And so what you know is that at some
12  point somebody told you that that object had been
13  found in the apartment, correct?
14    A.   Well, I was in the same room, yes.
15    Q.   Correct.  And somebody else was telling you
16  that that's where they found the object, right?
17    A.   Yes.
18    Q.   Okay.  And so of your own firsthand
19  knowledge you don't know where that object was
20  found, do you?
21    A.   It was --
22    Q.   Do you?
23       MS. REYNOLDS:  Your Honor, I'd ask she
24  be allowed to answer the question.
25    A.   I'm not sure I understand because I was --

328

1  we were all three searching the room together, and
2  as the room was being searched anything -- in any
3  case during the processing of the scene, anything
4  that was located was drawn to everyone's attention
5  so that it could be documented and collected.
6    Q.   So, in other words, somebody said to you,
7  oh, look what I found?
8       MS. REYNOLDS:  Your Honor.
9       THE COURT:  This is cross-examination.
10       MS. REYNOLDS:  I'm going to object.
11       MR. SHEEHAN:  Your Honor, I would object
12  to the foundation for this item coming in.
13       THE COURT:  And so it is time for our
14  morning break.
15       Would you be back in 15 minutes, please,
16  leaving your notebooks here and not discussing the
17  case.
18       (Jury exited the courtroom)
19       THE COURT:  All right, Detective, if you
20  would like to take a recess and be back about 25
21  past.  Thank you.
22       THE WITNESS:  Thank you.
23       THE COURT:  All right, have you finished
24  laying the foundation you intend to lay,
25  Ms. Reynolds?

329

```
1        MS. REYNOLDS:  I thought I had finished
2   it, your Honor.  I could ask one or two more
3   foundational questions as to what happens before the
4   item is actually seized.
5        THE COURT:  All right.
6        Mr. Sheehan, do you want to make your
7   objection now or do you want to wait and hear the
8   further questioning?
9        MR. SHEEHAN:  Well, I have made my -- I
10  have made my objection, your Honor.  If she's going
11  to ask more questions.
12       MS. REYNOLDS:  I'm happy to move it in
13  subject to connection as well, your Honor.  We have
14  Detective Ortiz.  We can call him.  I don't want --
15  this is not a big issue.
16       THE COURT:  I'm a little bit unclear.
17  She says that she saw the evidence seized by
18  Detective Ortiz, but then she says she doesn't know
19  where the object was found.  So I'm a little
20  confused about her relationship to having personal
21  knowledge with this item.  So if you wouldn't mind
22  clearing that up.
23       MS. REYNOLDS:  I can try to clear that
24  up, your Honor.  And as I stated, if it's still not
25  clear enough, I think I would move it in subject to
```

330

```
1   connection because, as she testified,
2   Detective Ortiz was actually in charge of collecting
3   the evidence.  And so that would be fine.
4        THE COURT:  All right, let's see where
5   we get with a few more organizational questions and
6   see how we should handle that exhibit.  All right,
7   let's stand in recess.
8        (Recess)
9        THE COURT:  All right, bring in the
10  jury, please.
11       (Jury entered the courtroom)
12       THE COURT:  Please be seated, ladies and
13  gentlemen.  We'll continue with examination of
14  Detective Devan by Ms. Reynolds.
15       MS. REYNOLDS:  Thank you, your Honor.
16  CONTINUED DIRECT EXAMINATION
17  BY MS. REYNOLDS:
18   Q.   Detective Devan, before the break we were
19  talking about Government's Exhibit 136A, and I would
20  just hand that up to you, and I just wanted to ask
21  you again, could you describe the process utilized
22  before an item of evidence is seized at the scene
23  when you were processing the scene with
24  Detective Ortiz and Detective Vargas?
25       MR. SHEEHAN:  Objection.
```

331

```
1        THE COURT:  Basis for objection?
2        MR. SHEEHAN:  Asked and answered.
3        THE COURT:  Okay, the -- are you asking
4   about this particular item of evidence?  She's
5   described generally what happens.
6        MS. REYNOLDS:  I was just trying to get
7   back to where we were, your Honor, but that's fine.
8    Q.   With regard to this particular piece of
9   evidence, were you present when it was seized?
10   A.   Yes.
11   Q.   And did you see who actually seized it?
12   A.   Yes.
13   Q.   Now, was Detective Ortiz present when it
14  was seized?
15   A.   Yes.
16   Q.   And was Detective Vargas also there when it
17  was seized?  And again, it we're referring to the
18  item in 136A.
19   A.   Yes.
20   Q.   And what is your role?  Once an item is
21  identified before it's seized, what is your role
22  with regard to a piece of evidence, specifically
23  with regard to this piece of evidence?  What did you
24  do at that point?
25   A.   Once a piece of evidence, in this case this
```

332

```
1   piece, is located, it's documented by, in this case,
2   me, and photographed before it's actually seized in
3   place.  It's left in place until it's documented.
4    Q.   A photograph is taken, left in place before
5   it's seized?
6    A.   Yes.  An item is found and then it's
7   photographed and documented in notes as to where it
8   is and what it is before it's actually seized.
9    Q.   And then who seized this piece of evidence?
10   A.   Detective Ortiz.
11   Q.   And were you present when Detective Ortiz
12  seized the piece of evidence contained in Government
13  136A?
14   A.   Yes.
15   Q.   And did you see where it was seized from?
16   A.   Yes.
17   Q.   And where was it seized from?
18   A.   The living room under one of the cushions
19  on the sofa.
20   Q.   And again, you had described that some
21  items are -- some furniture and things were moved so
22  you could look for other evidence.  Is that what you
23  had described before?
24   A.   Yes.
25       MS. REYNOLDS:  Your Honor, at this point
```

333

1  again I would move 136 as a full exhibit.
2           MR. SHEEHAN:  May I am briefly voir
3  dire, your Honor.
4           THE COURT:  Yes.
5  VOIR DIRE EXAMINATION
6  BY MR. SHEEHAN:
7     Q.   Detective, an item gets found, correct?
8     A.   Yes.
9     Q.   And then it gets photographed?
10    A.   Yes.
11    Q.   And then it gets seized, right?
12    A.   There are more steps.  Once an item is
13  found, then it is left in place while it is
14  photographed and documented, then it's seized.
15    Q.   You didn't find this item, did you?
16    A.   I don't know which one of the team found
17  it.  That's why we work as a team.
18           MR. SHEEHAN:  I renew my objection.
19           MS. REYNOLDS:  Your Honor, I'm happy to
20  offer this item, just to move along, subject to
21  connection.
22           THE COURT:  I'm going to permit it to be
23  offered in that regard.  It will be admitted subject
24  to further testimony of detectives doing the finding
25  and the seizing.  All right?

334

1           MS. REYNOLDS:  Yes, your Honor, thank
2  you.
3           THE COURT:  Thank you.
4  CONTINUED DIRECT EXAMINATION.
5  BY MS. REYNOLDS:
6     Q.   And taking a look at your monitor,
7  Government's Exhibit 136, do you see what that's a
8  photograph of?
9     A.   Yes.
10    Q.   And what is that a photograph of?
11    A.   That is a photograph of the sofa in the
12  living room, apartment 101, after the cushions have
13  been removed showing Bridgeport Exhibit 13 on the
14  sofa.
15    Q.   And when you say Bridgeport Exhibit 13, is
16  there one of those Bridgeport placards in the
17  photograph?
18    A.   Yes, there is a yellow placard with a
19  No. 13 on it next to the piece of evidence.
20    Q.   And again, taking a look at Government's
21  Exhibit 136A, which has been admitted subject to the
22  connection of the testimony of Detective Ortiz, what
23  is the Bridgeport property number for the item
24  contained in Government's Exhibit 136A?
25    A.   It's Bridgeport Exhibit No. 13.

335

1           MS. REYNOLDS:  Your Honor, I would offer
2  as a full exhibit a photograph contained in
3  Government's 136.
4           MR. SHEEHAN:  I renew my objection, your
5  Honor.
6           MS. REYNOLDS:  To the photograph?
7           THE COURT:  This is a photograph.
8           MR. SHEEHAN:  Yes.
9           THE COURT:  I'm going to admit it
10  conditional on any additional testimony needed from
11  Detective Ortiz.
12           MS. REYNOLDS:  Thank you, your Honor.
13    Q.   And showing you Government's Exhibit 136,
14  can you describe what's contained in that
15  photograph?
16    A.   That is the photograph of the sofa in
17  apartment 101, the living room area with the cushion
18  removed showing Bridgeport placard No. 13 next to a
19  piece of evidence that was seized as Exhibit 13.
20    Q.   And when that piece of evidence was seized
21  or when that piece of evidence was located, did you
22  and Detective Vargas and Detective Ortiz go look at
23  it before seizing it?
24    A.   Yes.
25    Q.   And did Detective Vargas -- was he in

336

1  charge of actually photographing the items in place?
2     A.   Yes.
3     Q.   And does this photograph, as you look at it
4  here today, appear to be a fair and accurate
5  representation of the photograph that was taken of
6  Bridgeport Exhibit 13, the piece of latex glove that
7  was located under the cushion of the couch in the
8  living room?  Does this photograph appear to be an
9  accurate representation of what you saw that day
10  with regard to Bridgeport property Exhibit 13?
11    A.   Yes.
12    Q.   Now, again, with regard to that exhibit, do
13  you know whether or not after it was seized and
14  processed as evidence, do you know if anything was
15  done with it?
16    A.   It was sent to the Connecticut state lab
17  for examination.
18    Q.   Now, just staying for one more moment there
19  for a little bit longer in the living room area of
20  the apartment, I'm going to ask you to take a look
21  at Government's Exhibit 116, another photograph that
22  was taken.
23           I'm going to hand it to you, 116K.  Do you
24  recognize that?
25    A.   Yes.

**GA84**

337

```
1       Q.   And what is that a photograph of?

2       A.   This is a photograph of the living room of

3  apartment 101 after the sofa was moved away from the

4  door and put back against the wall.

5            MS. REYNOLDS:  Your Honor, I would offer

6  as a full exhibit Government's Exhibit 116K.

7            MR. SHEEHAN:  K?

8            MS. REYNOLDS:  Yes.

9            MR. SHEEHAN:  No, your Honor.

10           THE COURT:  116K is a full exhibit.

11           So, are there two exhibits 116 and 116K?

12           MS. REYNOLDS:  Right now I'm just

13  offering 116K.  It's taking a while to search, so

14  I'm just going to move on, your Honor.  I'm not sure

15  what's going on with our system here.

16      Q.   Can you just describe what's contained in

17  the photograph in 116K?  Do you see it on your

18  screen?

19      A.   I'm only seeing a portion of the photo.

20      Q.   If you could just take a look and just give

21  us a description.

22      A.   This is a photograph of the living room in

23  apartment 101 taken from near the front door or

24  looking toward the front window.  It shows the

25  furniture that we've seen in previous photographs.
```

338

```
1  The only thing different is that the sofa has been

2  moved away from the front door, away from the table

3  and pushed back against the wall to the left.  And

4  you also see the broken pieces of wood trim on the

5  floor.

6       Q.   Let's see if it works now that I've

7  actually put the right switch on.  There you go.

8            116, again, what does that photograph show

9  now that the jury can actually see it?

10      A.   It's the living room of apartment 101.  The

11  photograph is taken from the area of the front door

12  looking toward the front window of the living room.

13  The sofa which was in the previous pictures next to

14  the table on the right has been moved back and near

15  the wall on the left.

16      Q.   This is the sofa over here?

17      A.   Yes.

18      Q.   And that was moved by you and your team --

19      A.   Yes.

20      Q.   -- to the wall.  And what is depicted --

21      A.   Those are the pieces of wood trim.

22      Q.   And where did those pieces of wood trim

23  appear to come from?

24      A.   It appeared to us that they were from the

25  damaged door frame of the front door.
```

339

```
1       Q.   Now, I'm going to ask you to take a look at

2  what's already in evidence as Government's 117J.  Do

3  you recognize that photograph?

4       A.   Yes.

5       Q.   What is that a photograph of?

6       A.   That is a photograph from the living room

7  looking down the short hallway towards the bedrooms

8  in apartment 101.

9       Q.   And do you recall the couch that is shown

10  in that photograph?

11      A.   Yes, it was a love seat-sized sofa from

12  what I recall, and it was on its back up against the

13  wall.

14      Q.   And that's in the hallway leading up to the

15  bedrooms, correct?

16      A.   Yes.

17      Q.   And did you and your team eventually move

18  that couch out of the way?

19      A.   Yes, we did.

20      Q.   I'm going to ask you to take a look at

21  Government's Exhibit 119, see if you recognize what

22  that's a photograph of.

23      A.   Yes.

24      Q.   And what is that a photograph of?

25      A.   This is a photograph of the first bedroom,
```

340

```
1  which was to the -- almost straight, a little bit to

2  the left in the hallway, photographed from the

3  hallway.

4       Q.   And is that the bedroom where the two

5  victims were found, Tina Johnson and James Reid?

6       A.   Yes.

7            MS. REYNOLDS:  Your Honor, I would offer

8  as a full exhibit Government's 119.

9            THE COURT:  Any objection?

10           MR. SHEEHAN:  No objection, your Honor.

11           THE COURT:  119 is a full exhibit.

12      Q.   So, putting that up on the screen, that's

13  Government's 119, can you just describe the angle,

14  what we're seeing here, what angle that photograph

15  was taken from?

16      A.   The photo was taken from the hall looking

17  into the bedroom where Ms. Johnson and Mr. Reid were

18  found.

19      Q.   Now I'm going to show you a photograph,

20  123.  Before I do that, let me show you what I'll

21  demarc Government's Exhibit 170, ask you to take a

22  look at that.  Before, let me show it to -- showing

23  you Government's Exhibit 170, do you recognize what

24  that is a photograph of?

25      A.   That is a photograph -- I'm sorry.  That's
```

341

1  a photograph of the hall after the love seat has
2  been removed.
3           MS. REYNOLDS:  Your Honor, I would offer
4  as a full exhibit Government's 170.
5           MR. SHEEHAN:  Can I briefly confer with
6  counsel.  I don't think I have any objection, but I
7  just had a question.
8           THE COURT:  Detective Devan, there is
9  water and cups there.  Help yourself.
10          MR. SHEEHAN:  No objection, your Honor,
11 thank you.
12          THE COURT:  All right.  170 is a full
13 exhibit.
14      Q.   So, taking a look at 170 up on the screen
15 there.  Can you describe what angle that photograph
16 is taken from?
17      A.   It's taken from the living room area
18 looking down the hall toward the bedroom where
19 Ms. Johnson and Mr. Reid were found.  You can see in
20 the foreground of that bottom right of the photo the
21 arm of the sofa in that living room.
22      Q.   So, this I'm pointing to, in the forefront
23 is the sofa.  This photograph is taken from the edge
24 of the living room looking down into Tina and
25 James's bedroom?

342

1       A.   Correct.
2       Q.   You can see the dresser there, is that what
3  that is?
4       A.   Yes, it is.
5       Q.   And again, you and your team had removed
6  that floral love seat from the hallway eventually,
7  correct?
8       A.   Yes.
9       Q.   And is this doorway that you can see sort
10 of on the edge of that picture, to the right-hand
11 side of the photo, is that the doorway to Basil's
12 room, where he was found?
13      A.   Yes, it is.
14      Q.   Now, showing you Government's Exhibit 123,
15 123-1, and 123A.  Starting with Government's 123.
16          MR. SHEEHAN:  Is that 123 or 120-3?
17          MS. REYNOLDS:  123.
18          MR. SHEEHAN:  Okay.
19      Q.   Do you recognize what that's a photograph
20 of?
21      A.   Yes.
22      Q.   And what is that a photograph of?
23      A.   This is a photograph of two plastic bags,
24 one white and one blue, that are adhered by a piece
25 of duct tape.  And this was in Mr. Williams'

343

1  bedroom.  On the floor, I'm sorry.
2       Q.   And showing you Government's Exhibit 123-1,
3  what is that a photograph of?
4       A.   That's a photograph of the same two bags
5  marked with yellow placard No. 22.
6       Q.   And showing you Government's Exhibit 123A,
7  do you recognize that?
8       A.   Yes.
9       Q.   And what's contained in Government's 123A?
10      A.   This is the paper bag containing Bridgeport
11 Exhibit 22, which are the same two plastic bags
12 adhered with duct tape that was in the photographs.
13          MS. REYNOLDS:  And first, your Honor, at
14 this time I would move as full exhibits Government's
15 123 and 123-1, the photographs.
16          MR. SHEEHAN:  May I briefly voir dire?
17          THE COURT:  Yes.
18 VOIR DIRE EXAMINATION
19 BY MR. SHEEHAN:
20      Q.   Detective, looking at 123, is that
21 something that you personally found?
22          MS. REYNOLDS:  We're voir diring on the
23 photograph?
24          MR. SHEEHAN:  I think we have three
25 items.

344

1           MS. REYNOLDS:  I asked just first with
2  regard to the photographs.  I was moving those in
3  first as full exhibits.
4           MR. SHEEHAN:  I thought 123 was the
5  photo.
6           THE COURT:  It is.
7           MR. SHEEHAN:  Okay.
8           THE COURT:  Did you want to voir dire
9  about the photo?
10          MR. SHEEHAN:  Yes.
11          THE COURT:  Go ahead.
12      Q.   Was the item that was photographed in 123
13 something that you found personally?
14          MS. REYNOLDS:  I don't know how that
15 goes to the photograph, your Honor.
16          MR. SHEEHAN:  Well, all right.  Let's go
17 back.  Let's start with 123A, the bag.
18          MS. REYNOLDS:  Well, I'm not offering
19 that right now.  I'm offering two photographs, your
20 Honor.  I'm doing this -- I only offered the two
21 photographs at this point, your Honor.
22          THE COURT:  Do you have further voir
23 dire on the photograph?
24          MR. SHEEHAN:  Yes.
25      Q.   123, the item in that photograph, is that

345

1  something that you personally found?
2          MS. REYNOLDS:  Again, I object, your
3  Honor, I don't know how that goes to --
4          THE COURT:  Well, if this is a fair and
5  accurate depiction of what was found there, she
6  needs to be able to have some basis for saying that
7  it was.
8          MS. REYNOLDS:  All right.  Thank you,
9  your Honor.
10    A.  Well, actually, with this item, Detective
11  Gallagher put his hand on it first.  And we all saw
12  it at the same time because we all immediately
13  noticed that the two bags were stuck together.  But
14  I was standing directly next to Detective Gallagher
15  when he first touched it.
16    Q.  Okay.  And is that where it was -- and was
17  it photographed on-site?
18    A.  We were actually going through items in
19  Mr. Williams' room and this is one of the items that
20  was picked up to examine to see what it was.
21    Q.  So, it was picked up and then put down at
22  another location?
23    A.  Put down right the same place he picked it
24  up from.  We had to see what it was before we knew
25  it was of evidentiary value to us.

346

1          MR. SHEEHAN:  Okay, I have no objection.
2          THE COURT:  All right, 123 is a full
3  exhibit.
4          MS. REYNOLDS:  And I had offered 123-1,
5  your Honor, which is another photograph of the item
6  with the Bridgeport placard.  I'm assuming there is
7  no objection to that.
8          MR. SHEEHAN:  123-1.
9          THE COURT:  That's the same thing with
10  the placard.
11          MS. REYNOLDS:  Correct.
12          MR. SHEEHAN:  Okay.  Did you have a copy
13  of it?  That's not in here.
14          MS. REYNOLDS:  Well, you have it.
15          MR. SHEEHAN:  On the representations, I
16  got it, I'm sure I do.  Thank you.
17  CONTINUED DIRECT EXAMINATION
18  BY MS. REYNOLDS
19    Q.  Taking a look at Government's 123 first,
20  again, which bedroom is this item located in?
21    A.  This was in Mr. Williams' bedroom.
22    Q.  And the photograph, can you describe what's
23  shown in that photograph?
24    A.  That is the floor of the bedroom and the
25  photo shows two plastic bags, again, one white and

347

1  one blue, that are stuck to each other with duct
2  tape.
3    Q.  And you indicated before you were present
4  when that item was located inside Mr. Williams's
5  bedroom, correct?
6    A.  Yes.
7    Q.  Then once it was determined that it had
8  some potential evidentiary value, is that when you
9  then mark it before it's seized and take a
10  photograph of it marked in place?
11    A.  Yes, it's photographed there in place and
12  then marked with an exhibit number placard and
13  documented and then collected.
14    Q.  Again, your job is to document the item,
15  correct?
16    A.  I was taking the notes, yes.
17    Q.  And showing you 123-1, what is in that
18  photograph?
19    A.  That's the same item, the two plastic bags
20  with the duct tape, now just marked with yellow
21  placard No. 22 identifying it as Exhibit No. 22.
22    Q.  And then, again, handing up Government's
23  Exhibit 123A, do you recognize what's contained in
24  that exhibit?
25    A.  Yes.

348

1    Q.  And how is it that you are able to
2  recognize what's contained in 123A?
3    A.  The bag is labeled with the Bridgeport
4  evidence label.
5    Q.  Okay.  And does it have a Bridgeport
6  evidence number on it?
7    A.  Yes, it does, Exhibit No. 22.
8    Q.  And were you present when the item was
9  actually picked up and seized as evidence?
10    A.  Yes.
11    Q.  And did you see who picked it up and seized
12  it as evidence?
13    A.  Yes, that was Detective Ortiz.
14    Q.  And did you see what Detective Ortiz did
15  with Bridgeport Exhibit 22 once it was seized by
16  him?
17    A.  Yes.
18    Q.  And what did he do with it?
19    A.  It was placed in this bag.
20    Q.  And eventually was that bag taken back to
21  the police station when you and your team were
22  processing the other evidence?
23    A.  Yes.
24    Q.  And were you present when that particular
25  item contained in Government's Exhibit 123A was

349

```
1   further processed back at the police station?
2        A.   Yes.
3             MS. REYNOLDS:  Your Honor, I would offer
4   as a full exhibit Government's 123A.
5             MR. SHEEHAN:  No objection.
6             THE COURT:  123A is now a full exhibit.
7        Q.   And after -- do you know what happened with
8   123A, what's contained inside 123A, after it was
9   seized by Detective Ortiz and processed as evidence
10  by you and your team?
11       A.   It was submitted to the Connecticut state
12  forensic lab for examination.
13       Q.   And is there any biohazard if that's opened
14  by you here in court today?
15       A.   No.
16            MS. REYNOLDS:  Your Honor, I would ask
17  to approach and have that item opened up -- and I
18  have scissors and gloves -- so it can be shown to
19  the jury.
20            THE COURT:  All right.
21       Q.   Detective, I'm just going to hand you some
22  scissors and some gloves.  If you can just try to
23  open that item.
24            MR. SHEEHAN:  Could we just approach?  I
25  have a question.  Maybe counsel can answer it at the
```

350

```
1   bench.
2             (Sidebar conference)
3             MR. SHEEHAN:  My recollection of the
4   white bag is that it is bloody.
5             MS. REYNOLDS:  No, that's not correct.
6             MR. SHEEHAN:  Are you sure?
7             MS. REYNOLDS:  This was fingerprinted.
8             MR. SHEEHAN:  I know it was
9   fingerprinted.
10            MS. DAYTON:  There may be some blood on
11  the bag, but even so, there is no reason it can't be
12  opened and shown to the jury from where she is.
13            MR. SHEEHAN:  I don't see any point in
14  showing the jury a bloody bag.
15            MS. DAYTON:  Really?  It's a murder
16  case.
17            THE COURT:  If this is okay to open, we
18  don't know what -- we can't see what's in there.  It
19  seems to me it's appropriate to show them.  It
20  doesn't have to be passed around.
21            MS. REYNOLDS:  It's just going to be
22  shown.  Just for the record, all of the items that
23  were determined to be possibly biohazard were left
24  in those heat-sealed plastic bags.  The evidence was
25  already reviewed with the detectives and the agents.
```

351

```
1   This was evidence that was determined doesn't have
2   to be taken out and resealed into a plastic bag.
3             THE COURT:  Does it need to be passed
4   all the way around?
5             MS. REYNOLDS:  No, I'm not going to pass
6   it around.  I just want to show it to the jury to
7   describe what condition it's in now and how it
8   appeared back then.
9             MR. SHEEHAN:  I think it's fair that --
10  people have a kind of an aversion to picking up
11  bloody bags, that's why they use rubber gloves.
12  That's why they do all sorts of things.
13            THE COURT:  Are you questioning their
14  technique?  I'm not sure what your objection is.
15            MR. SHEEHAN:  Well, the assertion that
16  there is nothing biohazardous doesn't really comport
17  with what it is.
18            THE COURT:  Why don't we leave that for
19  your cross-examination.  She said it's no biohazard
20  and you can cross-examine on it.
21            MS. REYNOLDS:  Just for the record, the
22  reason she's using gloves is because there is a dye
23  that was used when it was fingerprinted that would
24  get on her fingers.  That's why she's using gloves.
25            MR. SHEEHAN:  All right.
```

352

```
1             (Sidebar concluded)
2        Q.   So, again, Detective Devan, if you could
3   open up that bag, Government's Exhibit 123A, and
4   just pull out what's inside so we can just show it
5   to the jury from here, the witness stand.  If you
6   could just open up those bags.
7             And right now, just for purposes of the
8   record, you are showing the Walgreens plastic
9   shopping bag to the jury, correct?
10       A.   Yes.
11       Q.   And also contained in the exhibit is a blue
12  plastic bag, shopping-type bag as well, correct?
13       A.   Correct.
14       Q.   And can you describe what the difference is
15  as you look at the two bags here in court today as
16  opposed to when they were first seen inside Basil
17  Williams' room and then seized at that time?
18       A.   Well, first of all, they were originally
19  stuck together with duct tape, which apparently is
20  no longer present.  They've also been marked in
21  several places.  And as is apparent, they're -- the
22  white bag is now yellow and the blue bag also has
23  yellowish stains on it.
24       Q.   And do you know what would cause those
25  yellowish stains that's on the bags now?
```

**GA88**

353

```
1     A.   Yes.  In my training I would believe that
2   these bags have been stained with dye in order to
3   attempt to locate latent evidence.
4     Q.   And when you say "latent evidence," what
5   type of evidence are you referring to?
6     A.   Fingerprints is a good example, which is
7   probably what this could be.  Well, I know that's
8   what we submitted it for, to locate fingerprint
9   evidence at the Connecticut state lab.
10    Q.   So, these items, the two bags, were
11  submitted to the lab for further analysis, including
12  fingerprint testing?
13    A.   Including fingerprints, yes.
14    Q.   If you could just place those back in the
15  bag, in the brown bag.
16         Now, Detective, once you started you and
17  your team started removing items that were in the
18  various rooms, you indicated before then you would
19  search for other evidence that might be in there,
20  correct?
21    A.   Yes.
22    Q.   And drawing your attention then to the room
23  where Tina Johnson and James Reid were found, did
24  you do further searches in that room for evidence?
25    A.   Yes.
```

354

```
1     Q.   And specifically drawing your attention to
2   the walls, can you describe what the walls of the
3   bedroom of Tina Johnson and James Reid looked like
4   when you went to the scene to process it?
5     A.   The walls, including the ceiling, all had
6   spatter on it which appeared to be blood-like
7   material.
8     Q.   And were you present when the various walls
9   were marked and identified for potential seizure of
10  evidence from the blood that was on the walls?
11    A.   Yes.
12    Q.   And who else was present when that type of
13  evidence, the blood on the various walls, was
14  photographed and eventually processed as evidence?
15    A.   Well, definitely Detective Vargas was
16  there.  And during the initial investigation
17  Detective Ortiz was there as well.
18    Q.   And showing you up on your monitor there,
19  can you see Government's Exhibit 127?
20    A.   Yes.
21         MR. SHEEHAN:  That's going on the
22  screen.
23         MS. REYNOLDS:  I'm sorry.
24    Q.   Do you recognize what's contained in
25  Government's Exhibit 127?
```

355

```
1     A.   Yes.
2     Q.   And is that a photograph?
3     A.   It is.
4     Q.   And what is that a photograph of?
5     A.   This is a midrange photograph of one of the
6   walls in the bedroom where Tina Johnson and James
7   Reid were located.  It's been designated as wall A.
8   There are various markings on it and also blood-like
9   droplets and spatter.
10    Q.   And showing you Government's Exhibit 127A,
11  do you recognize what that's a photograph of?
12    A.   Yes.
13    Q.   And what is that a photograph of?
14    A.   This photograph depicts scales and Magic
15  Marker marking on the wall and several very small
16  blood-like droplets and one larger blood-like
17  droplet.
18    Q.   And does it have a letter here on the
19  photograph as well?
20    A.   Yes, it's labeled as A.
21    Q.   All right.  And do these photographs appear
22  to be fair and accurate representations of what
23  wall A inside bedroom -- inside the bedroom of Tina
24  Johnson and James Reid looked like as you were
25  processing that scene?
```

356

```
1     A.   Yes.
2         MS. REYNOLDS:  Your Honor, I would offer
3   as full exhibits Government's 127 and 127A.
4         MR. SHEEHAN:  No objection.
5         THE COURT:  Full exhibits.
6     Q.   Showing you first Government's 127, can you
7   describe what's depicted in that photograph?
8     A.   That is a photo of the wall that has been
9   marked wall A in the bedroom where Tina Johnson and
10  James Reid were located, and the marks on the wall,
11  the dark marks are blood-like stains.
12    Q.   And then showing you Government's
13  Exhibit 127A, what is shown in that photograph?
14    A.   That's a close-up photograph of one of the
15  larger droplets and several of the smaller marked
16  with scales and labeled A in magic marker.
17    Q.   I'm going to hand up Government's
18  Exhibit 128, 128A and 128B and have you take a look
19  at those photographs.
20         Taking a look first at 128, do you recognize
21  what that's a photograph of?
22    A.   Yes.
23    Q.   And what is that a photograph of?
24    A.   This is another wall in the bedroom where
25  Tina Johnson and James Reid were located, and this
```

357

1  has been marked wall B.

2      Q.   And then taking a look at Government's

3  Exhibit 128A, do you recognize what that is a

4  photograph of -- oh, 128A, yes?

5      A.   This is a photograph of the same wall

6  marked B.  There are also several scales in place on

7  the wall near several of the blood-like stains.

8      Q.   And then taking a look at 128B, do you

9  recognize what that's a photograph of?

10      A.   Yes, it's a photo of the same wall,

11  close-up shot of a cluster, if you will, of several

12  small blood-like droplets with scales and B3 written

13  in magic marker next to it.

14      Q.   And do those photographs of wall B as it

15  appeared when you were processing the scene -- do

16  they appear to be fair and accurate representations

17  of what wall B looked like when you and your team

18  were processing the scene?

19      A.   Yes.

20          MS. REYNOLDS:  Your Honor, I would offer

21  as full exhibits Government's 128, 128A and 128B.

22          MR. SHEEHAN:  No objection.

23          THE COURT:  They are full exhibits.

24      Q.   Starting with Government's 128, I'm showing

25  you that photograph.  Can you describe what can be

358

1  seen there on wall B?

2      A.   This is wall B, which was labeled wall B in

3  the bedroom where Ms. Johnson and Mr. Reid were

4  located.  You see the light switch there.  The spots

5  on the wall are blood-like stains.

6      Q.   So, all of this along the door frame?

7      A.   Yes.

8      Q.   Up towards the wall.  And then do you

9  recall what this is on the right-hand side?

10      A.   That's a closet door.

11      Q.   And so there is also blood?

12          MR. SHEEHAN:  Objection to leading.

13      Q.   What can you see as you look at the closet

14  door depicted in the photograph?

15      A.   There are blood-like stains on the closet

16  door as well as on the wall and the trim around the

17  door.

18      Q.   And then showing you Government's

19  Exhibit 128A, can you describe what we're looking at

20  in that photograph?

21      A.   That's wall B again in the bedroom.

22  Basically the same photo from the same angle.  This

23  time there are scales in there labelling different

24  areas of the blood-like stains.

25      Q.   Were you present when those scales, as you

359

1  call them, shown here, is that what you are

2  referring to the scales, those markings?

3      A.   Yes.

4      Q.   Were you present when those were placed on

5  the walls to identify the different blood that was

6  seen on the walls?

7      A.   Yes, I was.

8      Q.   And do you know who did that?

9      A.   Detective Vargas.

10      Q.   And did he also photograph the blood as it

11  was discovered on the walls in the bedroom?

12      A.   Yes, he did.

13      Q.   And showing you Government's Exhibit 128B,

14  can you describe what's depicted in that photograph?

15      A.   That is a close-up of a section of wall B

16  showing the scales up close with the, again, cluster

17  of blood-like stains in that area marked as B3.

18      Q.   I'm going to hand up a series of other

19  photos starting with 129, and then 129A, 129B, 129C,

20  and 129D, and I'm going to ask you to take a look at

21  those photographs.

22          And starting with Government's Exhibit 129,

23  do you recognize what's depicted in that photograph?

24      A.   Yes.

25      Q.   And what is that?

360

1      A.   This is the wall in the bedroom where

2  Ms. Johnson and Mr. Reid were located that was

3  designated wall C.

4      Q.   And what part of the wall is depicted in

5  that photograph?  It's wall C?

6      A.   Yes.  It appears to be from the floor.  I

7  can't tell you can actually see all the way to the

8  ceiling, but it's the better part of the length --

9  the height of the wall.

10      Q.   And taking a look at 129A, do you recognize

11  what that's a photograph of?

12      A.   Yes.

13      Q.   Okay.  And what is that a photograph of?

14      A.   This is a photograph of the bottom section

15  of the door to the bedroom where Ms. Johnson and

16  Mr. Reid were located.  The door is in the open

17  position, and, again, it shows the bottom part of

18  the door with blood-like spatter on it.

19      Q.   And taking a look at Government 129B, do

20  you recognize what that depicts?

21      A.   Yes, this is wall C in the same bedroom

22  again.  You can still see the corner of the open

23  door in the picture, but it shows farther over into

24  the room on the bottom section of the wall, and

25  there is blood-like spatter on the bottom part of

361

1 the wall as well.

2 Q. And then taking a look at Government's

3 Exhibit 129C, what is depicted in that photograph?

4 A. This is the bottom, along the bottom

5 section of wall C as well, showing the floorboard

6 with blood-like spatter and a little bit of spatter

7 above that as well.

8 Q. And then finally taking a look at

9 Government's Exhibit 129D, do you recognize what

10 that is a photograph of?

11 A. This appears to be a close-up photograph of

12 part of wall C with a good deal of blood-like

13 spatter. Part of it marked off with scales and the

14 scale is labelled C1.

15 Q. Thank you.

16 MS. REYNOLDS: Your Honor, I would offer

17 as full exhibits Government Exhibits 129, 129A,

18 129B, 129C, and 129D.

19 MR. SHEEHAN: Your Honor, I object.

20 Could I approach? I just want --

21 THE COURT: Yes.

22 (Sidebar conference)

23 MR. SHEEHAN: Explain the basis. I'm a

24 little bit at a loss because we just got the Martin

25 report this morning, but is it going to be the

362

1 government's contention that these are -- that these

2 are things that Mr. Martin relies upon in terms of

3 the guilt phase in this case?

4 MS. DAYTON: Yes.

5 MR. SHEEHAN: Okay, if that's their

6 contention.

7 MS. REYNOLDS: Just for the record, this

8 is also part of the processing of the crime scene.

9 And the entire scene was processed looking for

10 evidence. So, this is just generally evidence of

11 what was found in that room. There will be other

12 evidence offered in connection with the blood

13 spatter.

14 MS. DAYTON: It's also, some of it is

15 also going to be entered through the DNA examiner of

16 the victims' blood spatter on the walls.

17 MR. SHEEHAN: Okay.

18 THE COURT: Okay.

19 MR. SHEEHAN: I guess it's not unduly

20 cumulative. Then perhaps --

21 MS. REYNOLDS: It's a different wall.

22 THE COURT: Different spots.

23 MS. DAYTON: We're not doing every spot.

24 (Sidebar concluded)

25 THE COURT: All right, so there is no

363

1 objection then to 129, 129A, B, C and D. They are

2 full exhibits.

3 Q. Taking a look first at 129, is that wall C?

4 A. Yes, it is.

5 Q. And looking at towards the bottom of that

6 photograph, what can you see there? It's hard to

7 see in this photograph, but does that show some of

8 the blood-like spatter you were describing?

9 A. Yes, toward the bottom of the wall and on

10 the floorboard, baseboard I guess is the word, you

11 can see the dark marks that were blood-like stains.

12 Q. Can you also see those little markers.

13 It's the marker at the bottom that you referred to?

14 A. Yes, the scales are in place at that point.

15 Q. What's the purpose of those, drawing those

16 scales; if you know?

17 A. The scales are just small rulers,

18 basically. And it just gives you an idea of the

19 size -- or it gives the lab actually the size of the

20 area you are looking at or focusing on in that

21 section.

22 Q. And taking a look at Government's

23 Exhibit 129A, what's shown in that photograph?

24 A. That is a picture of the door to the

25 bedroom that's in the open position. And at the

364

1 bottom, on the bottom section of the door there is

2 blood-like spatter.

3 Q. And then showing you 129B, what's depicted

4 in that photograph?

5 A. That is a picture of the bottom portion of

6 wall C. Again you can see the edge of the door in

7 the picture as well. This is just over from the

8 door toward the bottom of the wall. Again, a good

9 deal of blood-like spatter.

10 Q. And then let me show you Government's

11 Exhibit 129C. Is this just a close-up photo of that

12 baseboard?

13 A. Yes, that's a closer photo of just that

14 section of the wall, towards the bottom of it.

15 Q. And then taking a look at Government's

16 Exhibit 129D, can you describe what's shown in that

17 photograph?

18 A. That's a close-up photo of that section

19 which is marked off by the two scales labeled C1,

20 and it's marking off an area of blood-like spatter.

21 Q. Again, these are these scales that you've

22 referred to?

23 A. Yes.

24 Q. Moving on then to Government's Exhibit 130,

25 I'm going to hand up to you Government's

365

1  Exhibit 130, 130A, 130B, 130C, 130D, and 130E, and
2  ask you to take a look at those photos and see if
3  you recognize what's depicted in those photographs.
4  Just take a look at each one.
5       Starting with Government's Exhibit 130, do
6  you recognize what's contained in that photograph,
7  what's depicted in that photograph?
8       A.  Yes, that's a midrange photograph of what
9  was called wall D.
10      Q.  Okay.  And do you remember what wall D was?
11      A.  I'd have to refer to my notes.  I don't
12  want to misstate.
13      Q.  Is there something that could help refresh
14  your recollection as to what wall D was?
15      A.  Yes.
16      Q.  Just handing you --
17          MR. SHEEHAN:  May I see what counsel is
18  handing?
19          MS. REYNOLDS:  Handing her a copy of her
20  report.
21      Q.  Is this the report that you prepared, the
22  property report -- crime scene report?
23      A.  Crime scene report, yes.
24      Q.  Do you think there is something in there
25  that could refresh your recollection as to the

366

1  designation of wall D?
2       A.  Yes.
3       Q.  And what was wall D?
4       A.  Wall D is the ceiling.
5       Q.  And so --
6          MR. SHEEHAN:  May I ask which page,
7  counsel, she's looking at.  I'm sorry.
8       Q.  Which page?
9       A.  Page 6.
10         MR. SHEEHAN:  Thank you.
11      Q.  So, again, taking a look at the photograph
12  contained in Government's Exhibit 130, you indicated
13  that that's a photograph of wall D and blood-like
14  spatter on wall D, which is the ceiling?
15      A.  Correct, which is the ceiling.
16      Q.  And taking a look at the next photograph,
17  130A, what's depicted in that photograph?
18      A.  This is a photo of wall D as well showing
19  blood-like stains.  There are scales in this picture
20  also.
21      Q.  And then taking a look at Government's
22  Exhibit 130B, do you recognize what's depicted in
23  that photograph?
24      A.  Yes, this is another picture of wall D, or
25  the ceiling, that shows blood-like spatter as well,

367

1  and there is a scale in that photograph also.
2       Q.  And then taking a look at Government's
3  Exhibit 130C, do you recognize what that's a
4  photograph of?
5       A.  This is a photograph of a -- two scales,
6  D-2 is written next to it, and the scales are
7  outlining one blood-like droplet and there is an
8  arrow indicating, pointing toward the south wall of
9  the room.
10      Q.  And then showing you Government's
11  Exhibit 130D, do you recognize what that's a
12  photograph of?
13      A.  Yes, this is a photograph of wall D, the
14  ceiling, showing a large area of blood-like spatter,
15  a section of which is marked off with two scales.
16  The scale is marked D4 and there is an arrow to
17  indicate direction towards the south wall as well.
18      Q.  And then taking a look at Government's
19  Exhibit 130E, do you recognize what that is a
20  photograph of?
21      A.  That is a closer photograph of the same
22  scales showing -- labeled D4, showing a closer photo
23  of the area of blood-like spatter.
24      Q.  And do all of the pictures contained in 130
25  through 130E appear to be fair and accurate

368

1  representations of what the ceiling looked like
2  inside Tina Johnson and James Reid's bedroom when
3  you were there processing the scene?
4       A.  Yes.
5          MS. REYNOLDS:  Your Honor, I would move
6  as full exhibits government's 130, 130A, 130B, 130C,
7  130D, and 130E.
8          MR. SHEEHAN:  No objection.
9          THE COURT:  Full exhibits.
10      Q.  And starting with Government's Exhibit 130,
11  can you describe what's shown in that photograph?
12      A.  That's a photograph of the ceiling.
13  It is showing a good area of the ceiling, blood-like
14  spatter in that area and several areas that are
15  marked with scales.
16      Q.  And then taking a look at Government's
17  Exhibit 130 -- I'm sorry.  That was actually 130.
18  This is the same photo.  Let me just show you 130C,
19  just to show a close-up you described before.  Can
20  you describe what's shown in this photograph?
21      A.  That is a photograph of the ceiling close
22  up showing the two scales marking off one particular
23  droplet of blood-like substance labeled 2D and an
24  arrow showing the direction towards the south wall
25  of the room.

**GA92**

369

1    Q.   And then showing you Government's

2   Exhibit 130D, what is shown in this photograph?

3    A.   That is a section of wall D showing a good

4   deal of blood-like spatter in the area.  One section

5   marked off with the scales labelled D4, and again an

6   arrow showing the direction towards the south wall.

7    Q.   And in order to -- do you know if samples

8   were collected of the blood-like spatter that was on

9   the ceiling and that's depicted in the pictures in

10  the 130 series?

11   A.   I believe samples were collected from each

12  wall, include the ceiling.

13   Q.   Do you know -- did you, yourself, collect

14  those samples or did someone else collect those

15  samples?

16   A.   No, Detective Vargas did.

17   Q.   And you were present when he collected

18  those samples?

19   A.   Yes.

20   Q.   And how was he able to collect the samples

21  from the ceiling?

22   A.   We -- in this case I'm not sure what we

23  used.  It was obviously something to elevate

24  Detective Vargas to enable him to reach the ceiling.

25  I don't remember what it was he used.

370

1    Q.   You had to step on something?

2    A.   Step on something, yes.

3    Q.   In order to get to the ceiling.  Okay.

4   You indicated that samples were collected by

5   Detective Vargas from all the walls in the bedroom,

6   correct?

7    A.   Yes.

8    Q.   I'm going to hand up a series of exhibits

9   to you starting with 131 and 131A, 132, 132A, 133,

10  133A, 134, 134A and 135, and ask you to take a look,

11  first starting with 131 and 131A.  Do you recognize

12  131?

13   A.   Yes.

14   Q.   And how is it that you are able to

15  recognize what's contained in Government's

16  Exhibit 131?

17   A.   The envelope is labeled with a Bridgeport

18  evidence label.

19   Q.   And were you -- again, you indicated you

20  were present when Detective Vargas got the samples

21  from the various walls in the bedroom, correct?

22   A.   Yes.

23   Q.   And were you present when these samples

24  were then taken back and processed as evidence?

25   A.   Yes.

371

1    Q.   And does Government Exhibit 131 indicate a

2   Bridgeport property number or exhibit number?

3    A.   Yes.

4    Q.   And what exhibit number was the Bridgeport

5   exhibit number for what's contained in Government's

6   Exhibit 131?

7    A.   That's Bridgeport Exhibit No. 37A.

8    Q.   And what is contained in Bridgeport Exhibit

9   No. 37A?

10   A.   These are two cotton swabs taken from

11  wall A in the bedroom where Ms. Johnson and Mr. Reid

12  were located.

13   Q.   And then taking a look at Government's

14  Exhibit 131A, do you recognize what's contained in

15  131A?

16   A.   Yes.

17   Q.   And what's contained in that exhibit?

18   A.   This is Bridgeport Exhibit 37B, and it's

19  two cotton swabs taken again from wall A in that

20  same bedroom.

21           MS. REYNOLDS:  Your Honor, I would offer

22  as full exhibits Government's Exhibits 131 and 131A.

23           MR. SHEEHAN:  May I inquire briefly?

24           THE COURT:  You may.

25  VOIR DIRE EXAMINATION

372

1   BY MR. SHEEHAN:

2    Q.   Detective, with respect to these two

3   exhibits, you indicated that you were present when

4   Detective Vargas collected the samples?

5    A.   That is correct.

6    Q.   Present in the apartment?

7    A.   Present in the bedroom.

8    Q.   Okay.  So you saw him collect each one of

9   these individually?

10   A.   Yes.

11   Q.   Okay.

12           MR. SHEEHAN:  No objection.

13           THE COURT:  All right, 131 and 131A are

14  full exhibits without objection.

15  CONTINUED DIRECT EXAMINATION

16  BY MS. REYNOLDS:

17   Q.   Taking a look at Government's Exhibit 132

18  and 132A, do you recognize what's contained in those

19  exhibits?

20   A.   Yes.

21   Q.   What's contained in 132?

22   A.   132 is Bridgeport Exhibit 37C, and it is

23  two cotton swabs which were collected from wall B in

24  the bedroom where Ms. Johnson and Mr. Reid were

25  located.

373

```
1      Q.   And what is contained in Government's
2  Exhibit 132A?
3      A.   That is Bridgeport Exhibit 37D, and that
4  envelope contains two cotton swabs which were taken
5  from wall B.
6           MS. REYNOLDS:  Your Honor, I would offer
7  as full exhibits Government's 132 and 132A.
8           MR. SHEEHAN:  And again, may I briefly?
9  VOIR DIRE EXAMINATION
10 BY MR. SHEEHAN:
11     Q.   And with respect to those two exhibits, you
12 were also present when they were collected?
13     A.   Yes, in the bedroom.
14          MR. SHEEHAN:  Thank you.
15          THE COURT:  All right.
16 CONTINUED DIRECT EXAMINATION BY
17 BY MS. REYNOLDS:
18     Q.   And you were present when all of the
19 blood-like blood spatter samples were collected by
20 Detective Vargas from the bedroom, correct?
21     A.   Yes.
22          THE COURT:  132 and 132A are full
23 exhibits.
24          MS. REYNOLDS:  Thank you, your Honor.
25          THE COURT:  Now we're on 133.
```

374

```
1           MS. REYNOLDS:  Yes.
2      Q.   Showing you Government's 133 and 133A, do
3  you recognize what's contained in those exhibits?
4      A.   Yes.
5      Q.   And what is that?
6      A.   Government Exhibit 133 is Bridgeport
7  Exhibit 37E, which is two cotton swabs which were
8  taken from wall C in the same bedroom.  And
9  Government Exhibit 133A is Bridgeport Exhibit 37F,
10 which are two cotton swabs also taken from wall C in
11 the same bedroom.
12          MS. REYNOLDS:  Your Honor, I would offer
13 as full exhibits, Government's Exhibits 133 and
14 133A.
15          MR. SHEEHAN:  No objection.
16          THE COURT:  Full exhibits.
17     Q.   And then showing you Government's
18 Exhibit 134 and 134A, do you recognize what's
19 contained in those exhibits?
20     A.   Yes.
21     Q.   And what is contained there?
22     A.   Government Exhibit 134 is Bridgeport
23 Exhibit 37G, which is two cotton swabs taken from
24 wall D, which is the ceiling in the same bedroom.
25 And Government's 134A is Bridgeport Exhibit 37H,
```

375

```
1  which is two cotton swabs, again, taken from a
2  sample from wall D in the bedroom.
3           MS. REYNOLDS:  Your Honor, I would offer
4  as full exhibits Government's Exhibits 134 and
5  134 A.
6           MR. SHEEHAN:  Again, no objection.
7           THE COURT:  Thank you.  No objection,
8  they are admitted.
9           MS. REYNOLDS:  Thank you, your Honor.
10     Q.   Finally showing you Government Exhibit 135,
11 do you recognize what's contained in 135?
12     A.   Yes.
13     Q.   And what's contained there?
14     A.   This is the Bridgeport Exhibit 37I, which
15 is a control sample.  So it's two cotton swabs that
16 are used as a control sample for the previous
17 exhibits.
18          MS. REYNOLDS:  I would offer that as a
19 full exhibit as well, your Honor.  That's
20 Government's 135.
21          MR. SHEEHAN:  135?
22          MS. REYNOLDS:  135 is the control.
23          MR. SHEEHAN:  No objection.
24          THE COURT:  All right, 135 is a full
25 exhibit.
```

376

```
1      Q.   I'm going to show you on your screen there,
2  can you see that on your monitor?
3      A.   Yes.
4      Q.   And I'm showing you Government's
5  Exhibit 138.  Do you recognize what's contained in
6  Government's Exhibit 138?
7      A.   Yes.
8      Q.   And what is that?
9      A.   This is a photograph of the nightstand in
10 the bedroom where Ms. Johnson and Mr. Reid were.
11 There is a yellow placard, No. 16, on the nightstand
12 next to latex gloves.
13     Q.   Okay.  And were you present when that
14 photograph was taken?
15     A.   Yes.
16     Q.   And do you know if -- well, is that a fair
17 and accurate representation of how the nightstand
18 appeared and the latex gloves on the nightstand
19 appeared?
20     A.   Yes.
21          MS. REYNOLDS:  Your Honor, I would offer
22 as a full exhibit Government's 138.
23          MR. SHEEHAN:  I'm sorry?
24          THE COURT:  138.
25          MR. SHEEHAN:  Oh, no objection.
```

377

1           THE COURT:  Full exhibit.
2      Q.   So, again, showing it now on the screen,
3  can you describe what's shown in the photograph in
4  138?
5      A.   Again, that's the nightstand in the bedroom
6  where Ms. Johnson and Mr. Reid were.  The yellow
7  placard, No. 16, is identifying what appear to be
8  latex gloves next to it.
9      Q.   And do you know whether or not those latex
10  gloves were seized as evidence?
11      A.   Yes, they were.
12      Q.   I'm going to hand up what's been demarc'd
13  Government's Exhibit 138A, and ask you to take a
14  look at that and see if you recognize what's
15  contained in that exhibit.
16      A.   Yes.
17      Q.   And how is it that you are able to
18  recognize what's contained in Government's
19  Exhibit 138A?
20      A.   It is labeled with a Bridgeport Police
21  Department evidence label.
22      Q.   And does that evidence label contain the
23  Bridgeport exhibit number that that item was given?
24      A.   It does, No. 16.
25      Q.   No. 16?

378

1      A.   Yes, right.
2      Q.   And as you look at that item, does it look
3  different than it did at the time it was seized?
4      A.   Yes, it does.
5      Q.   Can you describe what's different about it?
6      A.   Originally it was white or transparent,
7  basically, now it's stained a yellow color.
8      Q.   And, again, you were present when that item
9  was seized?
10      A.   Yes.
11      Q.   And were you present when it was further
12  processed back at the police station?
13      A.   Yes.
14      Q.   And do you know whether or not that item
15  was eventually sent to the Connecticut forensic
16  state lab for further testing?
17      A.   Yes, it was.
18           MS. REYNOLDS:  Your Honor, I would offer
19  as a full exhibit Government's 138A.
20           MR. SHEEHAN:  May I inquire?
21           THE COURT:  You may.
22  VOIR DIRE EXAMINATION
23  BY MR. SHEEHAN:
24      Q.   Did you find this item?
25      A.   This actually was in plain view when we

379

1  walked into the room.
2      Q.   So, you saw it when you went --
3      A.   Yes.
4           MR. SHEEHAN:  May I see it, please?
5      I have no objection.
6           THE COURT:  138A is a full exhibit.
7  CONTINUED DIRECT EXAMINATION
8  BY MS. REYNOLDS:
9      Q.   I'll just show you up on the screen there.
10  When you were describing that item before, this is
11  the latex glove, obviously, and you indicated that
12  it had a different color.  Can you describe that
13  again as we look at it on the screen?
14      A.   I don't know how well it's coming across
15  here, but it actually -- I guess you can see a
16  little bit the glove itself, the material seems to
17  be a yellowish color now.  And originally when it
18  was collected it had no color, I guess you would
19  just call it white or clear.
20      Q.   And do you know what changed the color of
21  this type of -- piece of evidence?
22           MR. SHEEHAN:  I'm going to object.  No
23  basis.
24           THE COURT:  The question was does she
25  know?  That's just yes or no.

380

1      A.   Yes.
2      Q.   And can you describe for us what types of
3  things would cause the latex glove to change color
4  or to have that coloring on it?
5      A.   Well, in my training I do know that dye
6  staining an item changes the color of it, and dye
7  staining is used to detect latent evidence.
8      Q.   And then I'm going to hand you -- well, let
9  me show you what I'll demarc Government's
10  Exhibit 139.  I'll put it on your screen again.
11           MS. REYNOLDS:  While I do that, get the
12  screen up, your Honor, I would ask to publish
13  Government's Exhibit 138A to the jury at this time.
14      Q.   And taking a look up on your screen there,
15  do you see a photograph on your monitor?
16      A.   Yes.
17      Q.   Do you recognize what that's a photograph
18  of?
19      A.   Yes.
20      Q.   What's that a photograph of?
21      A.   This is a photograph of the floor of the
22  bedroom where Ms. Johnson and Mr. Reid were located
23  after the mattress -- or box spring, rather, had
24  been removed from the frame.
25      Q.   And is there anything depicted in -- on the

381

1  floor there after the mattress was removed from the
2  bed frame?
3      A.   Yes, there is a white plastic bag and two
4  yellow evidence placards, No. 19 and No. 20.
5      Q.   Your Honor, I would offer as a full exhibit
6  Government's 139.
7           MR. SHEEHAN:  I have it no objection,
8  your Honor.
9           THE COURT:  All right.  Full exhibit.
10     Q.   I'm showing you Government's Exhibit 139.
11  Can you describe for the members of the jury what's
12  shown in that photograph?
13     A.   This is a photograph, again, of the floor
14  of the bedroom where Ms. Johnson and Mr. Reid were
15  located after the box spring that was on the frame
16  had been removed, and you see a white plastic bag
17  with evidence -- or placards, rather, No. 20 and No.
18  19.
19     Q.   This is the white plastic bag there?
20     A.   Yes.
21     Q.   Do you know whether or not that item was
22  seized?
23     A.   It was seized, yes.
24     Q.   And handing up 139A, do you recognize
25  what's contained in 139A?

382

1      A.   Yes.
2      Q.   And what is that?
3      A.   This is Bridgeport Exhibit 20, which is the
4  white plastic bag, and its contents as you see in
5  the picture.
6      Q.   And how is it that you are able to
7  recognize that exhibit?
8      A.   It's labeled with a Bridgeport evidence
9  label.
10     Q.   And it has Exhibit 20 on it?
11     A.   Yes.
12          MS. REYNOLDS:    Your Honor, I would
13  offer as a full exhibit Government's 139A.
14          MR. SHEEHAN:  No objection.
15          THE COURT:  Full exhibit.
16     Q.   And, again, just taking a look at 139A, it
17  has the white plastic bag as shown in the
18  photograph, correct?
19     A.   Yes.
20     Q.   And what was the contents of that bag?
21     A.   The bag was found to contain packages of
22  latex gloves.
23     Q.   I'm going to show you Government's
24  Exhibit 140.  Just take a look at your screen up
25  there.  Do you recognize what that's a photograph

383

1  of?
2      A.   Yes.
3           MR. SHEEHAN:  Could I -- I misheard.  I
4  didn't hear counsel say what number we're looking
5  at.
6           THE COURT:  140.
7           MS. REYNOLDS:    140.
8           MR. SHEEHAN:  140.  Thank you, your
9  Honor.
10          MS. REYNOLDS:    It's up on the screen.
11     Q.   It's on your monitor?
12          MR. SHEEHAN:  I was just looking for
13  mine.
14     Q.   Do you recognize what that's a photo of?
15     A.   Yes.
16     Q.   What's that a photograph of?
17     A.   That's a photograph of the floor in the
18  bedroom where Ms. Johnson and Mr. Reid were located,
19  and the small black item on the floor is a
20  multi-purpose tool.  Next to that is a yellow
21  placard, No. 17.
22          MS. REYNOLDS:    Your Honor, I would
23  offer as a full exhibit Government's 140.
24          MR. SHEEHAN:  Again, may I just inquire?
25  VOIR DIRE EXAMINATION

384

1  BY MR. SHEEHAN:
2      Q.   And I take it -- did you find No. 17?
3      A.   Again, that was in plain view --
4      Q.   Okay.
5      A.   When we first went in to the scene.
6           MR. SHEEHAN:  All right.  Thank you.  I
7  have no objection.
8      Q.   And it was as pictured in this item?
9      A.   Yes.
10          THE COURT:  140 is a full exhibit.
11  CONTINUED DIRECT EXAMINATION
12  BY MS. REYNOLDS:
13     Q.   So, again, can you just describe for the
14  jury what is seen in Government's 140?
15     A.   Again, this is the floor of the bedroom
16  where Ms. Johnson and Mr. Reid were located, and the
17  small black item next to the yellow placard, No. 17,
18  is actually a little folding multi-tool.
19     Q.   I'm going to hand up to you Government's
20  Exhibit 140A, see if you recognize what's contained
21  in that exhibit.
22     A.   Yes.
23     Q.   And what is that?
24     A.   This is the multi-tool in the picture, No.
25  17, and it's labeled with Bridgeport evidence label

**GA96**

385

1  No. 17 as well.

2  MS. REYNOLDS:  I would offer as a

3  full exhibit Government's Exhibit 139A.

4  MR. SHEEHAN:  I think it's 140, right?

5  MS. REYNOLDS:  140A.

6  MR. SHEEHAN:  No objection.

7  THE COURT:  Full exhibit.

8  MS. REYNOLDS:  And I would just ask

9  that 140A, which is the tool, and 139A, which is the

10  bag containing the Walgreens plastic shopping bag,

11  be published to the jury at this time, your Honor.

12  THE COURT:  It may be.

13  Q.  And while that is being done, let me ask

14  you, we had just seen a photograph of the bed frame,

15  and you had mentioned before the bed was removed; is

16  that correct?

17  A.  Yes.

18  Q.  And, prior to that, were some photos taken

19  of the mattress and the bed area before you removed

20  items, you or your team removed items?

21  A.  Yes, everything is photographed as we find

22  it, and then as we move on in the processing, when

23  we remove things, and as we locate new things, those

24  are photographed in place as well.

25  Q.  And so taking a look there on your monitor,

386

1  and showing you what's been marked Government's

2  Exhibit 141, do you recognize what that's a

3  photograph of?

4  A.  Yes.  That's a photograph of the box spring

5  that was in the bedroom where Ms. Johnson and

6  Mr. Reid were located.

7  MS. REYNOLDS:  Your Honor, I would

8  offer as a full exhibit Government's 141.

9  MR. SHEEHAN:  No objection.

10  THE COURT:  It's a -- 141 is a full

11  exhibit.

12  Q.  And taking a look then -- is that the

13  photograph of the box spring that was in Tina

14  Johnson and James Reid's bedroom?

15  A.  Yes, it is.

16  Q.  And, again, that's Bridgeport evidence No.

17  18, correct?

18  A.  That is correct.

19  Q.  And do you know whether or not the plastic

20  cover of the box spring was seized as evidence?

21  A.  The plastic covering is what was seized as

22  Exhibit 18.

23  Q.  And showing you what's been marked

24  Government's Exhibit 141A, do you recognize what is

25  contained in that exhibit?

387

1  A.  Yes.

2  Q.  And what is that?

3  A.  This is Bridgeport Exhibit No. 18, which is

4  the plastic cover from the box spring.

5  Q.  Okay.

6  MS. REYNOLDS:  Your Honor, I would

7  offer as a full exhibit Government's 141A.

8  MR. SHEEHAN:  No objection.

9  THE COURT:  All right, it's a full

10  exhibit.  And 141 is also a full exhibit.

11  MS. REYNOLDS:  Thank you.

12  Q.  And, just again, taking a look at 140, the

13  photograph -- 141.  In that photograph, we see -- do

14  you remember what was in this area of the plastic

15  cover of the bed or the mattress?

16  A.  I believe we did locate blood-like stains

17  on the plastic box spring cover.

18  Q.  And then taking a look further up in that

19  photograph, can -- what can you see in that portion

20  of the plastic cover for the mattress?

21  A.  There are blood-like stains at the top of

22  it near the wall as well.

23  MS. REYNOLDS:  Your Honor, this might

24  be a good time to break for lunch, if that's okay.

25  THE COURT:  We'll do that.  We'll take a

388

1  half hour lunch.  If nothing is changed, it should

2  be very pretty outside.  We'll be back at 1:30.

3  MS. DAYTON:  Your Honor, right now, can

4  we let them finish with the item, so we can take it

5  back?

6  THE COURT:  All right, all exhibits are

7  collected.  Thank you.  Leave your notebooks here.

8  Please don't discuss the case.

9  (Jury exited the courtroom)

10  THE COURT:  All right.  Is there

11  anything we will need -- Detective, you may go to

12  lunch, and be back at 1:30, please.

13  MS. RODRIGUEZ-COSS:  Yes, your Honor.

14  We had planned to present the testimony of Dr. Shah,

15  one of the medical examiner's, in the case today.

16  We had so informed the defense.  Dr. Shah has been

17  here since quarter to nine this morning.  We

18  expected her to be actually the first witness on

19  the stand interrupting the detective's testimony.

20  Defense counsel asked us for her CV this morning,

21  which they had not been able to locate.  We provided

22  that to them this morning, and they had originally

23  indicated it would not be a problem to take Dr.

24  Shah's testimony after the morning break.  Because

25  the morning break involved an objection about the

389

```
1   detective's testimony, we pushed that to lunch.
2           We would like to call Dr. Shah after
3   lunch out of order and interrupting the detective's
4   testimony, and the reason is, your Honor, Dr. Shah
5   is travelling away next week, and so we really need
6   to get her testimony in because we do not know
7   whether she will be available later on in the case.
8           THE COURT:  All right.  Are you going to
9   be finished with her by 3:00?
10          MS. RODRIGUEZ-COSS:  I believe so, your
11  Honor.  I don't intend to take more than 30 or
12  40 minutes on direct, and then however long her
13  cross-examination may take.
14          THE COURT:  All right, we need to stop
15  at 3:00 today.
16          MS. RODRIGUEZ-COSS:  All right.
17          MR. SMITH:  Your Honor, Dr. Shah, if
18  she's not finished at 3:00 -- we would need to have
19  the opportunity to cross-examine her.  I mean, then
20  she's going to leave on a trip and we don't get a
21  chance to cross her?  That's not acceptable.
22          THE COURT:  You will have a chance to
23  cross her.  Let's see how it goes.  When does she
24  leave on her trip?
25          MS. RODRIGUEZ-COSS:  She leaves, I
```

390

```
1   believe, next Tuesday, and so we are trying not to
2   bring her here the day before she leaves.
3           MR. SMITH:  Your Honor --
4           THE COURT:  But it may be necessary.
5           MS. RODRIGUEZ-COSS:  If worse comes to
6   worse, we do not complete today, we will impose on
7   her Monday morning.
8           MR. SMITH:  Your Honor, our issue --
9           THE COURT:  Let's see what happens.
10          MR. SMITH:  If I have -- could I say,
11  your Honor, I think it's more important while
12  Detective Devan is on the stand, our
13  cross-examination of Devan would occur while her
14  direct is more fresh in the minds of the jury.  Dr.
15  Shah is going to be in town on Monday.
16          THE COURT:  I don't want to -- if she
17  doesn't have to be called back on Monday in
18  preparation for a trip Tuesday, it would be less
19  disruptive to her.
20          MR. SMITH:  All right.  Thank you.
21          THE COURT:  The nature of the
22  detective's testimony has been largely the exhibits,
23  and so I think that the jurors' ability to recall
24  that testimony in relation to those exhibits will
25  not be -- shouldn't be impaired.  All right, Where
```

391

```
1   is Dr. Shah?  She's not in the room, of course.
2           MS. RODRIGUEZ-COSS:  No.
3           THE COURT:  All right.  We will be back
4   at 1:30, and we will take her out of order, and I
5   will explain that to the jurors.  Thank you.
6           (Recess)
7           THE COURT:  All right.  Are we ready for
8   the jury?
9           MS. RODRIGUEZ-COSS:  Yes, your Honor.
10          MR. SMITH:  Your Honor, if I may, before
11  I -- you bring them in, I did inform counsel I do
12  have an objection to two of the autopsy photos.
13          THE COURT:  The time for objections have
14  long passed.  I asked you for weeks whether you had
15  objection to the photographs.
16          MR. SMITH:  All right, your Honor.
17  Thank you.
18          THE COURT:  What's the objection?
19          MR. SMITH:  Your Honor, there are
20  particularly graphic photographs.  These are not
21  those that you are looking at that.  I think they
22  will inflame the jury.
23          THE COURT:  Well, autopsy photographs
24  probably are not nice viewing.  What's the
25  particular grounds here?  May I see the exhibits?
```

392

```
1           MR. SMITH:  Your Honor, for the prior
2   photos -- if I may?  All of the photographs I was
3   previously provided showed the outer portion of the
4   skulls of each of the victims with the hair shaved
5   back.  I have no objection to any of those.  James
6   Reid has two photos showing after the skull has
7   been -- actually, I think my medical terminology is
8   lacking here, but I think altered by the medical
9   examiner.
10          MS. RODRIGUEZ-COSS:  Your Honor, that is
11  not correct.  We provided counsel with all of the
12  photographs we intended to use at trial.
13          THE COURT:  Provided them when?
14          MR. SMITH:  Well, your Honor, we got the
15  exhibit book yesterday.
16          MS. REYNOLDS:      Your Honor, we made a
17  preliminary -- in our trial memorandum, we raised
18  this issue, we briefed it.  We then submitted to
19  Court and to counsel photographs that were relevant
20  to the issue of whether they were too graphic, that
21  they would be too prejudicial to introduce.  We
22  submitted a packet of bloody photographs from the
23  crime scene, and we also included autopsy photos we
24  intended to use.  And we provided those several
25  weeks ago to counsel in anticipation we would have
```

393

1  argument with regard to this issue, because we had
2  raised it in our trial brief, and they indicated, I
3  thought at one point, that they -- well, they the
4  never raised an objection. I think we raised it a
5  couple of times prior to oral argument on the
6  motions, and at the motions hearing I think they
7  said they had no objection.
8          So, those photographs, autopsy
9  photographs, were, in fact, submitted to -- in that
10  packet, copies of them, to counsel several weeks
11  ago, and I think with regard to James Reid's
12  autopsy, we've actually taken out two of the
13  photographs. We had submitted -- three of his skull
14  were just, I believe, today anticipated --
15          MS. RODRIGUEZ-COSS: We submitted four,
16  and we are actually only going to use two.
17          THE COURT: Mr. Smith?
18          MR. SMITH: Your Honor, again, I don't
19  recall four photographs being submitted to me. I
20  recall two in the packet I received and reviewed,
21  but I don't have that packet in front of me.
22          THE COURT: In the packet of photographs
23  supplied to the Court, there was a A19, 22 and 21.
24  These were, if I recall the representation, said to
25  have been provided to defense counsel at that time.

394

1  The one that's marked as A19 looks like 311. The
2  one marked as A21 looks like 312. Mr. Smith?
3          MR. SMITH: Well, perhaps, your Honor,
4  the way to handle this, then, is to ask the
5  government to proffer the relevance of these prior.
6  In that way, if the Court deems they're admissible,
7  I don't have to object during the examination.
8          THE COURT: I don't see what's
9  inadmissible about them. They are brains. The
10  medical examiner analyzed the brains. I'm not sure
11  I understand what your claim of inadmissibility is.
12          MS. RODRIGUEZ-COSS: It's actually the
13  skull, your Honor.
14          THE COURT: Pardon?
15          MS. RODRIGUEZ-COSS: It's actually the
16  skull. And it shows the fractures endured by the
17  victim on the skull. Those are not visible in any
18  other photographs.
19          THE COURT: These are the skull?
20          MS. RODRIGUEZ-COSS: Yes.
21          THE COURT: From the outside?
22          MS. RODRIGUEZ-COSS: Yes.
23          THE COURT: With the shaved head or
24  something?
25          MS. RODRIGUEZ-COSS: After the skin has

395

1  been removed.
2          THE COURT: Oh, I see. All right. I
3  really don't understand, if she testifies that this
4  is a fair and accurate description of what the skull
5  looks like when you the remove the skin, what more
6  we're supposed to do with that.
7          MR. SMITH: All right, your Honor.
8          THE COURT: All right. All right, will
9  you bring the jury in, please.
10          If you want a standing objection that
11  they are inflammatory, the record will note that.
12  Is that what you're --
13          MR. SMITH: That will be fine, your
14  Honor.
15          THE COURT: I'll hear the testimony and
16  then I'll know what your objection is.
17          (Jury entered the courtroom)
18          THE COURT: All right. Please be
19  seated, ladies and gentlemen. It sometimes becomes
20  necessary we need to take a witness out of sequence
21  because of scheduling problems, and so Detective
22  Devan will probably be back with you on Monday, but
23  we're going to interrupt her testimony for
24  Dr. Malka B. Shah, whose schedule is such that we're
25  going to take her out of order, and then we will

396

1  return to Detective Devan.
2          All right, then, Dr. Shah, will you
3  please stand, raise your right hand, and the oath
4  will be administered.
5          M A L K A   S H A H,
6  having first affirmed, was examined and testified as
7  follows:
8          THE WITNESS: My name is Dr. Malka Shah,
9  S-h-a-h, and the address --
10          THE COURT: Town of residence.
11          MS. RODRIGUEZ-COSS: Just the town.
12          THE WITNESS: Suffield.
13          THE COURT: Suffield, Connecticut?
14          THE WITNESS: Yes, yes.
15          THE COURT: All right, Ms. Rodriguez.
16  You may proceed.
17  DIRECT EXAMINATION
18  BY MS. RODRIGUEZ-COSS:
19      Q.  Dr. Shah, I think you can actually pull
20  that microphone a little bit closer to you.
21      A.  Okay.
22      Q.  Can you tell us how are you currently
23  employed?
24      A.  I am retired currently.
25      Q.  And you are retired from what?

397

1        THE COURT:  I need you to be less
2   retired from the microphone, okay?  Adjust your
3   chair if you need to.
4        THE WITNESS:  How about now?
5   Q.   All right.  It's just we need to amplify
6   your voice as much as possible so everyone in the
7   courtroom can hear you.
8   A.   Thank you.  I understand.
9   Q.   All right.  So I was asking you, you are
10  retired from what?
11  A.   From the Office of the Chief Medical
12  Examiner, where I was employed as an associate
13  medical examiner.
14  Q.   And can you tell the members of the jury,
15  what is an associate medical examiner?
16  A.   An associate medical examiner is a
17  physician who is a forensic pathologist and does the
18  autopsies, cases which are brought to the medical
19  examiner's office and determines the cause and
20  manner of the death of a deceased individual.
21  Q.   All right.  And can you tell us, Dr. Shah,
22  where you conducted your studies?
23  A.   I finished my medical school from Bombay
24  University, Bombay, India, in 1970.  I came to this
25  country, and I did my rotating internship from 1970

398

1   to '73 at Mount Sinai Hospital in Hartford from '73
2   to '77, and my residency in pathology at Hartford
3   Hospital in Hartford from '77 to '78.  I was
4   employed as a staff pathologist at Mount Sinai
5   Hospital in Hartford from --
6   Q.   Let me stop you there.  As a staff
7   pathologist at the Mount Sinai Hospital in Hartford,
8   what were your functions?
9   A.   Mainly, it involved the examination of the
10  tissue biopsies and the laboratory samples which are
11  submitted to the hospital to analyze them.  Also, to
12  perform the autopsies to determine exact cause of
13  death of the patients who were -- who had died at
14  the Mount Sinai Hospital.
15  Q.   All right.  Go ahead.  And how long were
16  you there?
17  A.   Until '78.  From '78 to '81, I took a leave
18  of absence for personal reasons.  From '81,
19  July 1st, I had been employed at the medical
20  examiner's office as an associate medical examiner.
21  Q.   All right.
22  A.   Until I retired.
23  Q.   Okay.  And so when did you retire, exactly?
24  A.   I retired on April 1st, 19 -- not 19.
25  2008.

399

1   Q.   And after joining the medical examiner's
2   office as an associate medical examiner, did you
3   receive any further training?
4   A.   No.
5   Q.   So, it was basically you were -- can you
6   tell us, what were your duties there as an associate
7   medical examiner?
8   A.   All sudden, unexpected death, which
9   occurred in the State of Connecticut, by law must be
10  reported to the medical examiner's office.  As part
11  of my duty, I will determine if the cases which are
12  reported to the medical examiner's office requires
13  an autopsy or not, and if they do require the
14  autopsy, they -- the deceased individual -- were
15  brought to the medical examiner's office, and one of
16  us did the autopsy and determined cause and manner
17  of death.
18  Q.   And when you say all sudden deaths --
19  A.   Yes.
20  Q.   -- to what are you referring?
21  A.   Any sudden death in which the known cause
22  of the individual is not known.  It could be a
23  homicide, accident, suicide, or natural death.  As
24  long as it is not witnessed by a physician, or it
25  does not have a chronic diagnosis given to the

400

1   death, it is considered a sudden, unexpected death.
2   Q.   All right.  And during the course of your
3   employment at the chief medical examiner's office
4   for the State of Connecticut, approximately how many
5   autopsies did you conduct?
6   A.   About 7,000 autopsies I performed.
7   Q.   And how many would you do per year; if you
8   recall?
9   A.   Somewhere in the range of 200 to 250
10  autopsies a year.
11  Q.   And were you required to have a board
12  certification to function as an associate medical
13  examiner?
14  A.   I was required to have a Connecticut state
15  license to work as an associate medical examiner.
16  Q.   And did you have that license?
17  A.   Yes, I did.
18  Q.   All right.
19  A.   Currently, I don't have it, though.  Sorry.
20  I retired, and I did not renew it.
21  Q.   So you are retired, right?
22  A.   Yes.
23  Q.   No intent on going back to work?
24  A.   No, I don't.
25  Q.   All right.  So, let me ask you, during the

**GA100**

401

```
1   course of your term as an associate medical examiner
2   with the chief examiner's office, how many times
3   were you called to testify in court with regards to
4   work that you performed as an associate medical
5   examiner?
6       A.  On an average, I testified once a month in
7   the entire State of Connecticut at any of the
8   counties that required my testimony.
9       Q.  All right.  What about federal court, were
10  you ever testified or qualified as an expert in
11  federal court?
12      A.  I want to say about three times or so I
13  have testified in the federal cases.
14      Q.  All right.  And when you say that you've
15  testified about once a month in courts throughout
16  the state of Connecticut, were you certified as an
17  expert medical examiner each time?
18      A.  Yes, I was.
19          MS. RODRIGUEZ-COSS:  Your Honor, we
20  would submit Dr. Shah as an expert medical examiner
21  at this time.
22          THE COURT:  Do you need any further
23  inquiry?
24  VOIR DIRE EXAMINATION
25  BY MR. SMITH:
```

402

```
1       Q.  Can you name the cases, please, you were
2   certified in?
3       A.  Pardon me?
4       Q.  The names of the cases in which you were
5   certified as an expert?
6       A.  I don't keep track of the cases that I
7   testified, no, but I was never disqualified.
8   CONTINUED DIRECT EXAMINATION
9   BY MS. RODRIGUEZ-COSS:
10      Q.  Do you recall the names of any case
11  offhand, Dr. Shah?
12      A.  No, I don't.  You know, last week I
13  testified in Hartford, but I was qualified as an
14  expert.
15  VOIR DIRE EXAMINATION
16  BY MR. SMITH:
17      Q.  And you state you were not board certified;
18  is that correct?
19      A.  Yes.
20      Q.  And not board certified as a forensic
21  pathologist?
22      A.  Yes.
23          MR. SMITH:  I have nothing further, your
24  Honor.
25          THE COURT:  All right.  You are not --
```

403

```
1           MS. RODRIGUEZ-COSS:  Just one follow-up
2   question to Mr. Smith's question, your Honor, if we
3   may.
4   CONTINUED DIRECT EXAMINATION
5   BY MS. RODRIGUEZ-COSS:
6       Q.  When you began your work at the medical
7   examiner's office, was there such a thing as a board
8   certification for medical examiner's?
9       A.  Yes, there was.
10      Q.  All right.  Were you required to have that
11  certification?
12      A.  No.
13      Q.  All right.
14          MS. RODRIGUEZ-COSS:  Nothing further,
15  your Honor.
16          MR. SMITH:  Just one more question, your
17  Honor.
18  VOIR DIRE EXAMINATION
19  BY MR. SMITH:
20      Q.  Did you attempt to get that certification?
21      A.  Yes, I did.
22      Q.  And what happened?
23      A.  I did not pass.
24      Q.  Pass the test to get the certification?
25      A.  I did not pass the certification exam.
```

404

```
1           MR. SMITH:  Thank you.
2           THE COURT:  All right.  I don't hear any
3   objection to her being qualified as an expert
4   medical examiner.
5           MR. SMITH:  No, your Honor.
6           THE COURT:  An expert, ladies and
7   gentlemen, is a person who by reason of their
8   experience and education has testimony to give and
9   opinions to render that may be of assistance to you
10  as fact finders.  Lay witnesses are not permitted to
11  give opinion testimony, and so in qualifying
12  Dr. Shah as an expert medical examiner, it is
13  qualifying her to give an opinion in that field, and
14  you are to weigh all of the criteria that you will
15  use for any witness with respect to the weight you
16  give to that evidence and credibility, et cetera.
17  So, we could call her an expert witness or an
18  opinion witness, but she, by virtue of education and
19  experience has, opinions that are beyond the ken of
20  the ordinary lay person.  Okay?
21          With that explanation, you may proceed.
22          MS. RODRIGUEZ-COSS:  Thank you, your
23  Honor.
24  CONTINUED DIRECT EXAMINATION
25  BY MS. RODRIGUEZ-COSS:
```

405

1    Q.   I want to bring you back to August of 2005.
2         MS. RODRIGUEZ-COSS:   May I approach,
3    your Honor?
4         THE COURT:   Yes.
5    Q.   I'll bring to your attention to what has
6    been marked as Government Exhibit No. 314, Dr. Shah.
7    A.   Yes.
8    Q.   Can you tell me if you recognize that
9    document?
10   A.   Yes, I do.
11   Q.   And how is it that you recognize the
12   document?
13   A.   This is the document -- it is a part of my
14   autopsy report, and it is -- this is the part of the
15   autopsy report that is prepared by me when I do the
16   autopsy and fill out the paperwork, et cetera.
17   Q.   All right.  And does it contain your
18   signature?
19   A.   Yes, it does.
20   Q.   And have you had an opportunity to review
21   that document prior to your testimony here today?
22   A.   Yes, I did.
23   Q.   All right.
24        MS. RODRIGUEZ-COSS:   Submitting, your
25   Honor, 314.

406

1         MR. SMITH:   Your Honor, may I inquire?
2         THE COURT:   You may.
3    VOIR DIRE EXAMINATION
4    BY MR. SMITH:
5    Q.   You said that's part of your report?
6    A.   Yes.  The pages that I took out separately
7    are not.  Even though it says "Autopsy Report," it
8    is not prepared by me, and that is the reason I -- I
9    say that it's not -- this will not be there in the
10   folder at the medical examiner's office.  This will
11   be in the folder.
12   Q.   So, the report that is being submitted, you
13   prepared that report, and each and every part of
14   that report?
15   A.   Yes.
16        MR. SMITH:   That's fine, your Honor.
17   A.   Secretary types it up.
18   Q.   No.  I understand what you are saying.
19        THE COURT:   All right.  314 is a full
20   exhibit.
21   CONTINUED DIRECT EXAMINATION
22   BY MS. RODRIGUEZ-COSS:
23   Q.   So, the pages that you indicate are not
24   prepared by you personally, are those documents that
25   are -- come to form part of the autopsy report

407

1    during the regular course of business of the medical
2    examiner's office?
3    A.   Only one page of it.  This one.  This is
4    prepared by Joette Devan, I think, and it's part of
5    their police report.  That is what it is.  This is
6    my report.
7         MR. SMITH:   Your Honor, may we approach?
8    We are pulling documents apart here.  May we
9    approach, your Honor?
10        THE COURT:   Yes.
11        (Sidebar conference)
12        MR. SMITH:   I don't think the government
13   submitted this to me with these pages involved.
14   They then handed it to the witness, who then began
15   to rip it apart and say this is my report and that's
16   not my report.  And this is very confusing at this
17   point.  At least we need to go back over this and
18   what is her report.
19        THE COURT:   Well, she's told you what
20   her report is, the portion that she prepared.
21        MR. SMITH:   Well, there is a report here
22   signed by Detective Joette Devan.
23        THE COURT:   She designated a portion
24   which she has signed.  That is this.  And we'll
25   clarify for the record what "this" is.

408

1         MR. SMITH:   Then I would object to
2    anything --
3         MS. RODRIGUEZ-COSS:   The question I
4    meant was what other document becomes part of an
5    autopsy report during the regular course of business
6    of the medical examiner's office, and she indicated
7    that this document does.  This document is a
8    document prepared by Detective Joette Devan
9    indicating that the victim was identified as James
10   Reid.  We've already received the testimony of
11   Detective Devan to that extent here in court today.
12   And so this is simply the manner in which the
13   detective communicates that information to the
14   medical examiner's office, and they keep this with
15   their report.
16        THE COURT:   So, she indicated that this
17   portion is her report.  This portion forms a part of
18   the report.  And then she took out the portion that
19   she said was not the report because it was the
20   Bridgeport Police Department's report.
21        MR. SMITH:   Okay.  If she makes clear
22   that this is not something she produced and it was
23   something that she received.
24        MS. RODRIGUEZ-COSS:   And she will make
25   that clear through her testimony.

409

```
1           THE COURT:  So, the report, then, 314,
2  is what she said is her report, plus what she said
3  is included with the autopsy report, and then she
4  has taken out the Bridgeport records that she says
5  are not part of it.  So, we're clear on that?
6           MS. RODRIGUEZ-COSS:  Yes.
7           THE COURT:  Let's staple that together.
8           MS. RODRIGUEZ-COSS:  Okay.
9           THE COURT:  And there will be no
10 question about adding, detracting from pages.  Okay?
11          (Sidebar conference)
12          MS. RODRIGUEZ-COSS:  Again, your Honor,
13 submitting Government Exhibit 314.
14          THE COURT:  All right.  That is what
15 Dr. Shah has testified is her autopsy report, and
16 the one additional, Detective Devan's letter, which
17 also comprises a part of the autopsy report, are in
18 this case.  Is that correct?
19          THE WITNESS:  Yes, it does.
20          THE COURT:  Okay.  And that's the
21 complete page there?
22          THE WITNESS:  Yes, it is.
23          THE COURT:  All right.  Yes.  314, that
24 consists of -- that is now a full exhibit.
25     Q.   Now, let me bring your attention now to
```

410

```
1  Government Exhibit 314, Doctor.  And what is the
2  name of the deceased?
3      A.   The name of the deceased is James E. Reid.
4      Q.   And can you walk us through the process
5  that you follow from the time that you first learned
6  that you have been tasked with performing an autopsy
7  to the time that you actually perform that autopsy.
8      A.   When I'm informed the death of a person has
9  occurred, a representative from the medical
10 examiner's office goes to the scene, and in this
11 case, an investigator, as well as one of my
12 associate medical examiner's, did go to the scene.
13 They did their investigation, took the photographs,
14 helped police officers, whatever evidence they
15 wanted to collect, and they brought the bodies back
16 with them to the medical examiner's office.
17          Once the bodies are at the medical
18 examiner's office, they remain in the mortuary, and
19 following day each pathologist is assigned to do an
20 autopsy.  In this case, I was assigned to do an
21 autopsy on Mr. James Reid.  However, when he was
22 assigned, he was not identified, so his case number
23 was unidentified male body No. 2.
24     Q.   Do you assign that particular case a number
25 within the medical examiner's office?
```

411

```
1      A.   Yes, we do.
2      Q.   And what number is that?
3      A.   In this case, it is 05-10595.  '05 is the
4  year in which -- indicates it's 2005, and the case
5  number, it is 10595.
6      Q.   And where else is that number used, Doctor?
7      A.   It is used in each and every paper that is
8  generated for the case that particular number is
9  used.
10     Q.   All right.  Now, let me go back a little
11 bit.  You indicated that one of your associate
12 medical examiner's actually responded to the scene;
13 is that correct?
14     A.   Yes, he did.
15     Q.   All right.  And do you know -- what, if
16 any, information from him did you receive prior to
17 conducting the autopsy on Mr. James Reid?
18     A.   The information that I received from the
19 associate medical examiner is that there were three
20 victims found at the scene at 215 Charles Street in
21 Bridgeport, Connecticut.  They were found bound, as
22 well as gagged, or face covered up with the duct
23 tape, and they also had head injuries, all of them.
24 And then they were transported to us.  I was also
25 provided taken Polaroid pictures by the
```

412

```
1  investigator, or the associate medical examiner at
2  the scene, and I was given those photographs also to
3  see.
4      Q.   So, I want to bring your attention to the
5  monitor there in front of you to what has been
6  marked Government's Exhibit 314A.  Do you recognize
7  that document?
8      A.   Yes, I do.
9      Q.   All right.  And is that a fair and accurate
10 depiction of what you reviewed prior to conducting
11 the autopsy of James Reid?
12     A.   Yes.
13          MS. RODRIGUEZ-COSS:  We'd offer 314A,
14 your Honor.
15          MR. SMITH:  No objection.
16          THE COURT:  All right.  That's a full
17 exhibit.
18          MS. RODRIGUEZ-COSS:  I apologize, your
19 Honor.  I didn't realize the projector goes to
20 sleep.
21          THE COURT:  It's very
22 energy-conservation minded.
23     Q.   All right.  Showing you what has been
24 marked Government's Exhibit 314-A, Doctor, can you
25 tell us, what are we looking at here?
```

413

1    A.   The top picture that has the number that
2  says, 05-10595 S2.   What it means is 2005, and the
3  case number S2 is the scene 2 picture.   In this,
4  what you -- the photograph of the scene, which
5  indicates that there is body of a male, which is
6  seen onto the -- on the far upper side of the
7  photograph, which is facedown, and a body of a
8  second victim seen face up on the lower part of the
9  photograph.   The autopsy that I performed was on the
10  male victim, which is on the upper part of the
11  photograph.
12    Q.   And what, if anything, of significance do
13  you draw from this photograph?
14    A.   That there is the gray-colored duct tape,
15  which is present in the back of the head area, as
16  well as there is a lot of blood present around the
17  shirt, as well as on the top part of the head area.
18    Q.   I'll bring your attention to the
19  photographs on the lower part of Exhibit 314A.
20    A.   That is also -- the head of the deceased
21  individual is on the lower part of the photograph,
22  and in this photograph there is a mattress-like
23  object that's almost covering him.   You can see his
24  hands, which are bound with the duct tape in the
25  back.   So, he's facedown, and you can see the

414

1  striped shirt.
2    Q.   All right.   Very good.   Now, so you receive
3  information with regards to where the apparent death
4  took place, and then you receive these Polaroid
5  photographs.   What do you proceed to do once you are
6  assigned to perform the autopsy?
7    A.   Once the autopsy is assigned to me, I
8  start the case in the morning, usually.   In this
9  case it was -- the police department detectives were
10  also present at this time of an autopsy.   I start my
11  examination with doing external examination and
12  internal examination.   Prior to that, I will take
13  the photograph as we received the body, then we
14  clean up the person and take the pictures, collect
15  the -- we also collect the evidence before cleaning
16  up the person, especially pull head samples and
17  fingernail scrapings which are needed.
18         MR. SMITH:   Your Honor, maybe we can
19  break this up a little bit.   There is a lot of
20  information.
21         MS. RODRIGUEZ-COSS:   I'm going to break
22  it up in just a minute, once the doctor completes
23  her response.
24         THE COURT:   This is what she does after
25  she gets the photographs; is that right?

415

1         MS. RODRIGUEZ-COSS:   Yes.
2         THE COURT:   Okay.   But not everything?
3         MS. RODRIGUEZ-COSS:   Not everything.
4         THE COURT:   Otherwise, we'll have a
5  narrative.
6         MS. RODRIGUEZ-COSS:   Right.
7         THE COURT:   Why don't you ask the next
8  question to redirect the response.
9    Q.   All right.   You indicated that one of the
10  first things that you do is photographs are taken of
11  the body of the deceased; is that correct?
12    A.   Yes.
13    Q.   Who takes those photographs?
14    A.   We have a photographer in the office staff
15  who takes the pictures.
16    Q.   And how do they know what pictures to take?
17    A.   I tell her to take the picture, what
18  pictures I want taken.
19    Q.   And you also stated that you conduct an
20  external examination.   Can you tell the members of
21  the jury, when you use the term "external
22  examination," what do you mean by that?
23    A.   External examination means the outside
24  examination of the deceased individual from head to
25  toe.   We usually begin with height and weight of the

416

1  person and describe the entire body.
2    Q.   All right.   So, let's do that.   Can you
3  walk us through your external examination of the
4  body of James Reid?
5    A.   Mr. Reid was 5'6 tall, weighed about
6  165 pounds.   He had injuries present on his arms as
7  well as back of the head.   He also had scars present
8  on his body.   And he had indentation marks on his
9  face and on his arms, which are more visible, which
10  is where the tapes were applied, and they were
11  removed at the scene.
12    Q.   All right.   Let me bring your attention,
13  Doctor, to what has been marked Government
14  Exhibit 306.   Can you tell me if you recognize that
15  document?
16    A.   Yes, I do.
17    Q.   And how is it that you can recognize that
18  document?
19    A.   This is a photograph that I have in my file
20  also.
21    Q.   And does it pertain to the autopsy of James
22  Reid?
23    A.   Yes, it does.
24         MS. RODRIGUEZ-COSS:   Submitting 306,
25  your Honor.

417

```
 1            MR. SMITH:  No objection.
 2            THE COURT:  All right.  306 is a full
 3   exhibit.
 4       Q.   Now, Doctor, bringing your attention to
 5   what's been marked Government Exhibit 306, can you
 6   tell the members of the jury what we're looking at
 7   here?
 8       A.   This is a face of Mr. Reid when I
 9   examined -- I saw him at the medical examiner's
10   office.  He has some indentations around his cheek,
11   upper lip and the chin area.  His mouth looks like
12   it's constricted, all because of the indentations
13   caused by the tape, which was present at the scene.
14       Q.   I'm going to try and focus in, and I'm
15   going to ask you if you can use that pointer there
16   next to you, and tell us, when you are talking about
17   indentations on his face, what you are referring to?
18       A.   The lines which are seen that I pointed out
19   right now.  Here, as well as on the other side.
20       Q.   All right.
21            MS. RODRIGUEZ-COSS:  Your Honor, can the
22   record reflect the doctor has pointed to lines
23   visible to the right and left of the deceased body?
24            THE COURT:  Well, the face.
25            MS. RODRIGUEZ-COSS:  Right.
```

418

```
 1            THE COURT:  Not the whole body.
 2            MS. RODRIGUEZ-COSS:  I'm sorry.  I stand
 3   corrected, your Honor.
 4            THE COURT:  Yes, all right.
 5            MS. RODRIGUEZ-COSS:  All right.
 6       Q.   And what else, if anything, of significance
 7   did you notice from an examination of Mr. Reid's
 8   face?
 9       A.   When I examined his lips, the upper lip
10   especially did have some bruising, and that that
11   appeared to be caused by his mouth, the mucosin, or
12   the lips, getting caught between the teeth because
13   of the duct tape which was applied to his face.
14       Q.   And did you take a photograph of that
15   injury?
16       A.   Yes, I did.
17       Q.   Did you make a note of that in your report?
18       A.   Yes, I did.
19       Q.   Okay.  And so you are saying that there
20   were abrasions in the inside portion of the mouth?
21       A.   Inside portion of the lip, upper lip, yes.
22       Q.   All right.  Any other injury that you
23   noticed on Mr. Reid's face?
24       A.   He has a small laceration on the left side
25   of his cheek also there.
```

419

```
 1       Q.   Can you -- I'm sorry.  For the benefit of
 2   the jury, can you tell us exactly where you are
 3   referring?
 4       A.   I would have to stand up for that.  Is that
 5   all right?
 6       Q.   That's fine.
 7       A.   This is the area.
 8       Q.   All right.  And during the course of your
 9   examination, were you able to determine when that
10   laceration might have been made?
11       A.   Prior to his death.
12       Q.   And once you examined the face of the
13   deceased, what did you proceed to do?
14       A.   I examined also his -- both arms, his chest
15   and abdomen, and examined also the legs, the back of
16   the head, and the back of the chest -- chest,
17   abdomen and legs.
18       Q.   All right.  Let's take the arms first.
19   What, if anything, did your examination of the arms
20   of Mr. Reid reveal?
21       A.   On his right upper arm he did have a
22   bruise, what we call is a contusion, on the front
23   part of it.  He also had some injuries on his right
24   elbows.  He also had injuries on his left elbow, and
25   it was fractured.  Where you can touch it, you could
```

420

```
 1   feel that the bones were fractured there.  And he
 2   also had some indentation marks on his -- both
 3   wrists, which were present because of the duct tape
 4   which was present, and his hands were tied from
 5   that.
 6       Q.   All right.  Let me bring your attention to
 7   what has been marked Government Exhibit 310.  And,
 8   again, Doctor, do you recognize this document?
 9       A.   Yes, I do.
10       Q.   And how is it that you recognize that
11   document?
12       A.   I have the same photograph in my file for
13   this.
14       Q.   And was that another one of the photographs
15   taken during the course of the autopsy of James
16   Reid?
17       A.   Yes, it is.
18       Q.   And is it identified with the appropriate
19   autopsy number?
20       A.   Yes, it has been.
21            MS. RODRIGUEZ-COSS:  Submitting
22   Government 310, your Honor.
23            THE COURT:  Any objection?
24            MR. SMITH:  No, your Honor.
25            THE COURT:  All right, it's a full
```

421

```
1   exhibit.
2       Q.   Doctor, we are publishing Government
3   Exhibit 310.  Can you tell us what we're looking at
4   here?
5       A.   Can you rotate it so the number, you can
6   read it, right side up, which will make it a little
7   easier?
8       Q.   Okay, rotating Government Exhibit 310.
9       A.   Thank you.  What you are seeing here is --
10  on the farthest side is the head of Mr. Reid.  What
11  you are looking at here is the elbow part from the
12  top to the bottom at the left angle here.  There is
13  a small reddish area, and the blackish area, which
14  are seen, those were the two injuries which are
15  present on his right elbow.
16      Q.   And were those injuries, in your opinion,
17  contemporaneous?
18      A.   When you say contemporaneous --
19      Q.   Where they occur at the same time.
20      A.   Yes.
21      Q.   And you indicated that there were -- I'm
22  sorry.  Could you point to the other injury?
23      A.   There is a black discolored area you can
24  see, and there is one injury which is present here.
25  Because the elbow is irregular, it is possible that
```

422

```
1   the object that struck him may have missed the
2   center part because there is a concavity between the
3   two prominences of the bones on the elbow.
4       Q.   Okay.  And, I'm sorry, you said there was a
5   contivity?
6       A.   Concavity, or there is a hollowness that
7   the elbow has, and because of the hollowness, two
8   prominent areas which got struck, which is injured,
9   and the center part, which is caved in, or hollow,
10  it did not get injured.
11      Q.   I see.  All right.  Now, let me bring your
12  attention to what has been marked Government
13  Exhibit 309.  And, again, Doctor, do you recognize
14  that document?
15      A.   Yes, I do.
16      Q.   And how is it that you recognize that
17  document?
18      A.   I have the similar picture in my folder.
19      Q.   And does that document also pertain to the
20  autopsy of James Reid?
21      A.   Yes, it does.
22      Q.   And does -- is it identified with the
23  appropriate number?
24      A.   Yes, it has been.
25           MS. RODRIGUEZ-COSS:  Submitting
```

423

```
1   Government 309, your Honor.
2            THE COURT:  If there is no objection.
3            MR. SMITH:  No objection.
4            THE COURT:  It's a full exhibit.
5       Q.   Doctor, let me bring your attention now to
6   what has been marked Government Exhibit 309.  Can
7   you tell us what we're looking at there?
8       A.   What you are looking at is the front part
9   of the right upper arm of Mr. Reid.  And there is
10  this bluish purple color area of the bruising which
11  was noted.  That's what was present on his right
12  upper arm.
13      Q.   Based on the pattern of that bruise,
14  Doctor, what, if anything, can you tell us with
15  regards to how it might have occurred?
16      A.   The trauma he received, the object that hit
17  him, it has to be a blunt object that hit him, and
18  probably had a rounder configuration since one of
19  the edges of the bruise is round.
20      Q.   Let me ask you, Doctor, when you use the
21  term "blunt trauma," what exactly do you mean?
22      A.   Any object which does not have sharp edges
23  is all blunt trauma, or is considered a blunt
24  object.  The sharp objects excluded are like knives
25  and scissors and machete and things like that, as
```

424

```
1   opposed to a two-by-four or a brick or a flat
2   surface or a table, anything is considered a blunt
3   object.
4       Q.   And then you said that this particular
5   bruise had a round configuration; is that correct?
6       A.   Yes, it does.
7       Q.   So, let me ask you this:  Could the blunt
8   object that struck Mr. Reid on his upper right arm
9   have been a bat?
10      A.   What kind of bat?
11      Q.   Aluminum bat?
12      A.   Yeah, when you said baseball bats.
13      Q.   Baseball bats.  I'm sorry, I --
14           THE COURT:  As opposed to a cricket bat.
15           MS. RODRIGUEZ-COSS:  Once again, I stand
16  corrected by the Court.  Thank you.
17      Q.   A baseball bat?
18      A.   It's consistent with it.
19      Q.   Bringing your attention to what has been
20  marked Government Exhibit 314, could you tell us
21  whether you recognize that document?
22      A.   Yes, I do.
23      Q.   And how is it that you recognize that?
24      A.   I have the similar photograph in my folder.
25      Q.   And does that document also comport to the
```

425

```
1    autopsy of James Reid?
2        A.   Yes, it does.
3            THE COURT:  I'm sorry, you said 314.
4    Have we not already --
5        Q.   I'm sorry.  Did I say --
6        A.   They both have 314.
7            MS. RODRIGUEZ-COSS:  So, that's a
8    mistake, your Honor.  We'll correct that in just one
9    second.  The Court's indulgence, your Honor.  Your
10   Honor, we have remarked the document 308.
11           THE COURT:  All right.  On the list,
12   there is a 308 already.  308.  All right, go ahead.
13           MS. RODRIGUEZ-COSS:  Just for purposes
14   of clearing the record, we're going to bring the
15   exhibit to Dr. Shah's attention again.
16           THE COURT:  All right.
17       Q.   So, Doctor, bringing your attention to what
18   has been marked Government 308, again, do you
19   recognize that document?
20       A.   Yes, I do.
21           THE COURT:  Do you have that, Mr. Smith?
22           MR. SMITH:  No, your Honor, this was not
23   provided to us.
24           MR. SHEEHAN:  We're just trying to
25   figure it out, your Honor.
```

426

```
1            THE COURT:  Ms. Rodriguez, would you
2    take the exhibit off the witness stand and show it
3    to Mr. Smith so he knows which one you are talking
4    about.
5            MR. SMITH:  Your Honor, I'm going to
6    object to this coming in.  We were not provided
7    this.
8            MS. RODRIGUEZ-COSS:  Your Honor, they --
9            THE COURT:  May I see you at sidebar?
10           (Sidebar conference)
11           MS. RODRIGUEZ-COSS:  Your Honor, it's
12   not going to be in what the Court has.  This is
13   photograph -- what we provided the Court were some
14   photographs that may be objected to because of their
15   nature.  So, we have two points to make here.  One,
16   we would like the defense instructed to stop saying
17   in front of the jury "we were not provided this"
18   because that is not correct.  They have each and
19   every one of the autopsy photographs.  What may have
20   occurred is that we inadvertently left this
21   photograph out of the exhibit binder, but we hardly
22   think that it is appropriate for defense counsel to
23   repeatedly state in front of the jury "we were not
24   provided this."  That's one.
25           MR. SMITH:  Your Honor, I apologize.
```

427

```
1            THE COURT:  Let's not do that.  If you
2    have a question over what an exhibit is, show him
3    the exhibit, take a look at it.  We -- if you need
4    to come to the witness stand to see what she's
5    looking at, that's fine, too.
6            MR. SMITH:  Your Honor, can I just ask
7    in the future -- this has been happening all day,
8    that the government has asked about things that
9    weren't in the exhibit book provided to us yesterday
10   and then suddenly they start adding --
11           THE COURT:  I don't think that's quite
12   correct.
13           MS. RODRIGUEZ-COSS:  Mr. Smith, is it
14   correct?
15           MR. SMITH:  I'm not under
16   cross-examination, counsel.
17           MS. RODRIGUEZ-COSS:  Your Honor, can I
18   just state for the record before we began the
19   examination of Dr. Shah, I handed Mr. Smith each and
20   every --
21           MR. SMITH:  She did --
22           MS. RODRIGUEZ-COSS:  -- one of the
23   photographs I'll now use with her, and he has only
24   objected to the two that were brought to the
25   attention of the Court.  That's all I wanted the
```

428

```
1    record to reflect.
2            MR. SMITH:  The record is accurate, your
3    Honor.  I did not realize this was not in the book.
4    I had looked at the exhibits we had been provided,
5    but we can --
6            THE COURT:  So you have this now.
7            MR. SMITH:  I have it now.
8            THE COURT:  And it's being marked as
9    310A?
10           MS. DAYTON:  Instead of 308, to avoid
11   confusion.
12           THE COURT:  What happened to 308 as
13   opposed to 314?  All right, 310.  Yes, there is
14   another 308.
15           MS. DAYTON:  Yeah.
16           THE COURT:  310A.  Now you know what
17   310A is.  Any objection to that?
18           MR. SMITH:  Other than not being aware
19   that it was not previously provided, at least as far
20   as my knowledge, your Honor, but I'll --
21           MS. DAYTON:  Once again, for the record,
22   it was previously provided to counsel in two
23   different forms from the autopsy --
24           THE COURT:  If you need to make a record
25   that you weren't provided with those, you need to go
```

429

1  back and look at your stuff.
2          MS. DAYTON:  And can we have the jury
3  told the defense counsel does have this?  Because it
4  looks like the defense counsel is hiding that --
5          THE COURT:  I don't know that --
6          MS. DAYTON:  He knows.
7          THE COURT:  Let's proceed, please.
8          (Sidebar concluded)
9          THE COURT:  All right.  Are we on 310A?
10         MS. RODRIGUEZ-COSS:  Yes.  We have
11  remarked it 310A.
12         THE COURT:  All right.  That's a full
13  exhibit.
14         MS. RODRIGUEZ-COSS:  We were going to
15  ask the witness again for the clarity of the record.
16         THE COURT:  Okay.  Go ahead.
17    Q.  Dr. Shah, bringing your attention to what
18  has now been marked 310A for the government, again,
19  do you recognize that document?
20    A.  Yes, I do.
21    Q.  And how is it that you recognize that
22  document?
23    A.  I have the copy of it in my records.
24    Q.  And does that document correspond to the
25  autopsy of James Reid?

430

1    A.  Yes, it does.
2          MS. RODRIGUEZ-COSS:  Your Honor, now
3  we're officially offering 310A.
4          THE COURT:  And that --
5          MR. SMITH:  No objection, your Honor.
6          THE COURT:  -- has been provided to
7  counsel before we began by representation of the
8  government.  We will now -- it is a full exhibit,
9  and you are now going to put it up?
10         MS. RODRIGUEZ-COSS:  Yes, your Honor.
11    Q.  Doctor, so, can you tell us what we're
12  looking at here?
13    A.  What you are looking at is the elbow of
14  Mr. Reid.  The upper part of it indicates the chest
15  part of his body, which is his facedown, and you can
16  see the elbow.  The two reddish-color injuries which
17  are present on the elbow are the lacerations present
18  on his left elbow.
19    Q.  All right.  And, Doctor, you indicated
20  earlier that you had -- well, what, if any, other
21  injury were you able to detect on this part of
22  Mr. Reid's body?
23    A.  When I touched the elbow area, I could feel
24  the fractured fragments of the bone, which indicates
25  to me that this trauma also caused a fracturing of

431

1  the elbow area of the deceased.
2    Q.  And is that an area that you later
3  intervene with during the course of your autopsy?
4    A.  No, I did not.
5    Q.  And why not?
6    A.  Fracturing of the elbow does not cause
7  usually a death of a person, so I did not explore
8  further than that.  Also, if it's not contributing
9  to my finding, it will be considered mutilating the
10  body of the deceased and usually not what I want to
11  do.
12    Q.  Bringing your attention, Doctor, now to
13  what has been marked as Government Exhibit 307.  Can
14  you tell me if you recognize that document?
15    A.  Yes, I do.
16    Q.  And, again, how is it that you recognize
17  that document?
18    A.  I have the similar photograph.
19    Q.  And does that document again pertain to the
20  autopsy of James Reid?
21    A.  Yes, it does.
22         MS. RODRIGUEZ-COSS:  Submitting
23  Government 307, your Honor.
24         THE COURT:  All right.  Absent
25  objection, that is a full exhibit.

432

1    Q.  Doctor, if I can bring your attention
2  now -- we're publishing Government Exhibit 307.  Can
3  you tell us what we're looking at here?
4    A.  What you are looking at is the back of
5  Mr. Reid.  He is facedown.  Towards me is his left
6  side, and on the other side is his right side.  And
7  on the top of the photograph, on the left side, the
8  reddish color, whatever you see among the black
9  here, is the injury which was present on the back of
10  his head.
11    Q.  And what, if anything, do you do to examine
12  these injuries further?
13    A.  For me, to clearly look at the injuries, I
14  did remove all the head hair, or shave the scalp
15  area, to see the extent of the injury.
16    Q.  And bringing your attention, Doctor, to
17  what has been marked Government Exhibit 308.  Can
18  you tell us if you recognize that document?
19    A.  Yes, I do.
20    Q.  And, again, how is it that you can
21  recognize that document?
22    A.  I have the same document with me in my
23  folder.
24    Q.  And, again, does that pertain to the
25  autopsy of Mr. James Reid?

433

1  A. Yes, it does.
2  Q. All right.
3       MS. RODRIGUEZ-COSS: And submitting
4  Government 308, your Honor.
5       THE COURT: Any objection, Mr. Smith?
6       MR. SMITH: No, your Honor.
7       THE COURT: 308 is a full exhibit.
8  Q. Publishing Government Exhibit 308. Doctor,
9  can you tell us what, if anything, you can conclude
10  from this photograph, or from your examination of
11  what is depicted on this photograph?
12  A. Once the head hair were shaved around the
13  injuries, or the lacerations which were present on
14  the head, that you could see the part of the left
15  ear, you can see it on the right side of this --
16  left side of the picture, that is his left ear, so
17  it gives the print of the back and the top of the
18  head area where the injuries were present.
19  Q. And how do you describe these injuries,
20  Doctor?
21  A. I describe them as lacerations, stellate
22  shaped. The largest laceration in my autopsy report
23  I described as an H-shaped letter -- H-shaped
24  laceration. And the two other laceration, which is
25  present on the right corner, and there is another

434

1  laceration present in front of this H-shaped
2  laceration, I have described them as stellate shape
3  and a linear laceration.
4  Q. And, again, how is these lacerations
5  caused?
6  A. By a blunt force trauma. Mr. Reid was
7  struck with an object which has caused these
8  injuries.
9  Q. And, Doctor, how many different -- you've
10  just described three different lacerations to us; is
11  that correct?
12  A. Yes.
13  Q. And, in your opinion, how many times was
14  Mr. Reid struck in order to cause the injuries that
15  we see here on Government Exhibit 308?
16  A. Minimum of three times, at least, he's been
17  struck. And because the center laceration is much
18  larger and had an extension on both sides of the H
19  on the top part, it's possibly two separate blows.
20  So, three to five times. That's the least that I
21  can say.
22  Q. And you indicated earlier that from the
23  Polaroid photograph you were able to observe that
24  there was duct tape at the base of Mr. Reid's skull;
25  is that correct?

435

1  A. Yes.
2  Q. And were you able to examine that area?
3  A. Yes, I was.
4  Q. And how were you able to examine that area?
5  A. To do the complete autopsy examination, I
6  do have to reflect the scalp by making incision in
7  the scalp. The front and the back part of the scalp
8  are reflected from the skull itself. And the back
9  of the scalp is reflected enough to look at the
10  lower part of the skull there.
11  Q. And did you find additional evidence of
12  fractures to Mr. Reid's skull in that particular
13  area?
14  A. Yes, I was --
15  Q. Doctor, I want to bring your attention to
16  what has been marked Government Exhibit 311. Do you
17  recognize that document?
18  A. Yes, I do.
19  Q. And how is it that you recognize that
20  document?
21  A. It has the case number, and I have the
22  similar pictures in my folder.
23  Q. And, again, does that document pertain to
24  the autopsy of Mr. James Reid?
25  A. Yes, it does.

436

1       MS. RODRIGUEZ-COSS: Offering Government
2  311, your Honor.
3       THE COURT: All right. I think that
4  is over objection.
5       MR. SMITH: Subject to our previous
6  discussion, your Honor.
7       THE COURT: All right. It's a full
8  exhibit.
9  Q. Doctor, bringing your attention to what
10  has --
11  A. In this case, can you turn it around?
12  Q. Why don't you give us the number first?
13  A. That's better.
14  Q. So, this is Government Exhibit 311 up on
15  the projector. Can you tell us what we're looking
16  at here?
17  A. What you are looking at is the back part of
18  the scalp, which is reflected, and the exposed
19  skull. The exposed skull should look uniform. What
20  is seen on the top of the picture under the number,
21  the top of the picture, or from that area where his
22  face is, and the lower part of the photograph where
23  the back of the skull of the head is, you can see
24  these small fragments and irregular area line, which
25  you see of the skull.

437

```
1              Let me get up.  In this area.  And these
2   are just small fragments of the skull that you see.
3   That is because the skull in this area is fractured,
4   and the bones got reflected along with the
5   reflection of the scalp.
6      Q.   And, Doctor, does the photograph -- your
7   physical examination of the deceased during the
8   course of your autopsy, does it allow you to
9   conclude how strongly or with what amount of force
10  the victim must have been struck for these fractures
11  to have taken place?
12             MR. SMITH:  Objection.  This was not
13  part of the notice.
14             THE COURT:  Go on to the next question,
15  please.  I'm taking the objection up.
16             MS. RODRIGUEZ-COSS:  Well, if the
17  Doctor's response -- I'm sorry.  Was the Court
18  addressing the government?
19             THE COURT:  The question is, does the
20  photograph and your physical examination allow you
21  to conclude how strongly or with what amount of
22  force the victim must have been struck for these
23  fractures to take place.  This is just yes or no.
24  Can you answer that?
25             THE WITNESS:  No.
```

438

```
1              THE COURT:  It does not?
2              THE WITNESS:  No.
3              THE COURT:  Thank you.
4      Q.   Before we go to Government Exhibit 312,
5   Doctor, why not?
6      A.   Say that again.  Could you please ask me --
7      Q.   With regards to your last response, why
8   not?
9              MR. SMITH:  Objection.  She answered she
10  couldn't determine it.
11             MS. RODRIGUEZ-COSS:  Right.
12             THE COURT:  And the question is, why
13  can't she.  Overruled.
14     A.   There is no known studies done in -- which
15  indicates what force is required to fracture the
16  skull in such a way, and because there is no
17  documentation, nobody has volunteered for it,
18  either.  So, I think it is difficult to say.  It is
19  enough force to cause the fracture of the skull.
20  So, it is little more than a bump, but it is a lot
21  more here.  Maybe you can compare it with the motor
22  vehicle accident.  That's all I can say.
23     Q.   All right.  And bringing your attention now
24  to what has been marked Government Exhibit 312.  Can
25  you tell me if you recognize that document?
```

439

```
1      A.   Yes, I do.
2      Q.   And how is it that you can recognize that
3   document?
4      A.   I have the similar photograph in my folder.
5      Q.   And, again, does that document pertain to
6   the autopsy of James Reid?
7      A.   Yes, it does.
8              MS. RODRIGUEZ-COSS:  Submitting, your
9   Honor, Government Exhibit 312.
10             THE COURT:  Would you ask her to
11  describe what it is portraying first?
12             MS. RODRIGUEZ-COSS:  All right.  If the
13  Court wishes me to do that.
14     Q.   What does the document portray or depict?
15     A.   The photograph depicts the injury which is
16  present at one end of the fracture just above his
17  left ear, which is noted in this area, and the
18  pattern of the fracture.  Here it shows that it has
19  a slightly circular pattern, and it is also
20  depressed, a fracture.  That means a part of the
21  bone which has gone within the cavity part of the
22  bone, which is lifted up, and it has a circular
23  pattern.  That is what it shows at the edge.
24             THE COURT:  This is after you have
25  removed all of the hair?
```

440

```
1              THE WITNESS:  The hair as well as the
2   scalp.  And so this is underneath the scalp, in
3   which your bone is --
4              THE COURT:  So this is scalp without any
5   visual interference by the skin or the hair?
6              THE WITNESS:  That's right.
7              MR. SMITH:  Your Honor, obviously the
8   renewed objection on the previously stated reasons.
9              THE COURT:  And that's been overruled.
10  All right, that's admitted.  312 is admitted.
11     Q.   Bringing your attention, Doctor, to what
12  has been marked Government Exhibit 312, can you tell
13  us where on the photograph you see the fracture that
14  you previously described for the Court?
15     A.   Okay.  In this photograph, the --
16     Q.   You can stand up, if it's easier.
17     A.   The lower part of the photograph in this
18  area is his -- Mr. Reid's left ear.  So, this part
19  where his face is, that part is where the back of
20  the head is.  The curvilinear fracture that I see,
21  this is the part of the fracturing of the bone which
22  is pushed in.  This one is a little lifted up, and
23  here is the round configuration which is present on
24  his skull.
25             MS. RODRIGUEZ-COSS:  Can the record
```

441

1  reflect the Doctor is pointing to the very center of
2  that photograph, your Honor?
3          THE COURT:  All right.
4      Q.  And, Doctor, you used the term "curvilinear
5  fracture"?
6      A.  Yes.
7      Q.  What does that indicate, or why do you call
8  it a curvilinear fracture?
9      A.  Because it's got a line, it has a depressed
10 appearance, and it has a curved appearance.  That's
11 why I call it curvilinear.
12     Q.  I wanted to ask you, Doctor, you stated
13 previously a baseball bat would be consistent with
14 the injuries on Mr. Reid's skull.  Can you tell if
15 that fracture was necessarily caused by a rounded
16 blunt object?
17     A.  Not necessarily, because the skull itself
18 is round.  Sometimes the linear object can cause a
19 circular fracture.
20     Q.  Because of the nature of the skull?
21     A.  Yes.
22     Q.  And so while it is consistent with a
23 rounded object, you cannot rule out other objects;
24 is that fair?
25     A.  Yes.

442

1      Q.  All right.  Now, can we go back to your
2  report, and can you tell us when you received
3  Mr. Reid's body for examination?
4      A.  I saw the body on August 25th at 9:45 a.m.
5      Q.  And when was the body received at the
6  medical examiner's office?
7      A.  It was previous day in the evening, on
8  August 24th in the evening.  The investigator, as
9  well as Dr. Camargo, left from the scene around
10 5:15.  So, it will take them a couple of hours to an
11 hour and a half to reach Farmington, and once the
12 body is reached, it is kept in the mortuary.
13     Q.  And on your report, and I believe I'm
14 referring to the first page of Government
15 Exhibit 314, which you still have there in front of
16 you; is that correct?
17     A.  Yes, I do.
18     Q.  You used the term "homicide."  Can you
19 explain to the members of the jury what you mean by
20 the use of that term?
21     A.  Homicide in a medical terminology.  Death
22 of an individual caused by another person.
23 Mr. Reid, in my opinion, is struck by another object
24 and has sustained severe enough injury to his head
25 to cause his death, and that's the reason it is

443

1  called homicide.
2      Q.  So, in other words, he didn't cause these
3  injuries to himself?
4      A.  Neither was it consistent with a motor
5  vehicle accident or a fall.
6      Q.  And, Doctor, during the course of your
7  autopsy, do you collect any evidence?
8      A.  Yes, I do.
9      Q.  And what, if anything, do you do with that
10 evidence?
11     A.  I gave some of the body fluids -- evidence
12 collected in the medical examiner's office is
13 analyzed at the medical examiner's office in our own
14 laboratory, and some of the evidence is given to
15 detectives who are present at the time of autopsy.
16     Q.  And you told us when the medical examiner's
17 office received the body and then when you conducted
18 your autopsy.  As part of your examination of Mr.
19 Reid's body, do you determine a time of death?
20     A.  No, I don't.
21     Q.  And why not, Doctor?
22     A.  He was determined death previous day, which
23 I was aware of it, so there is no need to further
24 change any timing.
25     Q.  And then do the characteristics on his

444

1  physical body give you any indication as to how long
2  Mr. Reid might have been dead?
3      A.  The most characteristics are the rigidity
4  and the lividity.  These are the after-death changes
5  that occur in a person's body.  More is the
6  rigidity, which is the stiffening of your muscles,
7  which has a chronology of stiffening up and
8  loosening up again.  Lividity, what means is the
9  discoloration of the body in the dependent areas of
10 the body where the blood pools down because there is
11 no longer a circulation in the body.  So, the blood
12 pools down to what's the gravity in the area,
13 wherever the person is lying.  If he's laying on his
14 back, it pools on the back.  If he's laying on his
15 face, it will pool on his face.  And mostly I
16 noticed were the rigidity changes or the rigor
17 mortis.
18     Q.  All right.  And do you also consider the
19 place and circumstances under which the deceased
20 died in terms of determining potential time of
21 death?
22     A.  Yes, I do.
23     Q.  And why is that?
24     A.  The changes of these, stiffening of the
25 body, or the pooling of the blood, varies a lot on

445

```
 1  the temperature and the environment in which the
 2  body is present.  Also, what is the health of the
 3  person, what is the muscular component of the
 4  person.  All of these vary according to the person
 5  who has died, and these changes vary, and that's the
 6  reason we consider that also.
 7       Q.   All right.  So, if a person, for example,
 8  died inside an enclosed apartment in August of 2005
 9  where the temperature would have been high, would
10  that affect the speed of the decomposition of the
11  body?
12       A.   Higher temperature always enhances the
13  decomposition.
14       Q.   Now, Doctor, very briefly, again, bringing
15  your attention back to Government Exhibit 314, I
16  noticed that as part of your autopsy report there
17  is -- there are two pages there.  Maybe I can make
18  it easier.  I'll show it to you on the ELMO.  We are
19  publishing Government Exhibit 314, and that's the
20  first of your report; is that correct, Doctor?
21       A.   Yes, it is.
22       Q.   Is that your signature on that page?
23       A.   Yes, it is.
24       Q.   And you have here on page 3 what is
25  entitled "Office of the Chief Examiner, Report of
```

446

```
 1  Investigation."  Can you tell us what that is?
 2       A.   That is the report of investigation
 3  where -- and that report is generated by Alfred
 4  Camargo in this case, since he was the investigator
 5  who had gone with Dr. Camford (ph) to the scene, and
 6  all of that he has documented.  Also, who were the
 7  informant, the address, and the person was
 8  identified at that time as deceased person No. 2, as
 9  well as what they did at the scene, which indicates
10  that they removed the duct tape which are present on
11  the arms, legs and the mouth, as well as the shirt,
12  which were given to the detectives at the scene.
13       Q.   And you previously indicated that on the
14  face of Mr. Reid you noticed horizontal indentations
15  that you stated would be consistent to him having
16  that duct tape there; is that correct?
17       A.   Yes.
18       Q.   Did you notice those indentations in any
19  other part of his body?
20       A.   I did notice them on his hands, on the
21  wrists.
22       Q.   Did you notice them on the feet?
23       A.   No, I did not.
24       Q.   And so, this document that you just
25  described for us was not actually generated by
```

447

```
 1  yourself, correct?
 2       A.   No.
 3       Q.   Because you were not at the scene?
 4       A.   No, I was not at the scene.
 5       Q.   So, this basically indicates what was done
 6  to the deceased at the scene?
 7       A.   Yes, it does.
 8       Q.   It would be fair to say your observations
 9  begin on page 5 of Government Exhibit 314?
10       A.   Yes, it does.
11       Q.   On page 7, Doctor, is that your signature?
12       A.   Yes, it is.
13       Q.   And then on the next page, Doctor, you
14  what is entitled the toxicology report?
15       A.   Yes, I do.
16       Q.   Can you tell us why that is attached to
17  your autopsy report?
18       A.   The specimens which were collected from
19  Mr. Reid that I tell the lab technicians to analyze,
20  so it is a part of my report because I am requesting
21  them.  However, it's the lab person who does it.
22       Q.   And is it the regular course of business of
23  the medical examiner's office to include the
24  toxicology report as part of the autopsy report?
25       A.   Yes, it is.
```

448

```
 1       Q.   And in this particular case, what did this
 2  toxicology report reflect?
 3       A.   It reflects the positive finding that
 4  Mr. Reid has cocaine present in his blood at the
 5  time of autopsy.
 6       Q.   And did that finding in any way affect your
 7  conclusion as to the cause of death?
 8       A.   No, it does not.
 9       Q.   All right.  And then after the toxicology
10  report, we see a fingerprint identification
11  statement.  Do you generate that statement?
12       A.   It is generated at the office by the
13  secretary on my instructions to fill out the
14  information and kept at the office.
15       Q.   Okay.  The physical document, you mean?
16       A.   Yes.
17       Q.   Who conducts the actual fingerprint
18  identification?
19       A.   Actual fingerprint identification in this
20  case is done by Detective Joette Devan.
21       Q.   So, you didn't conduct that identification?
22       A.   No, I don't.
23            MS. RODRIGUEZ-COSS:  I don't believe I
24  have any other questions for Dr. Shah, your Honor.
25            THE COURT:  All right.  We're going to
```

449

1  stop at 3:00 today.  Would you like to get started,
2  Mr. Smith?
3              MR. SMITH:  It's going to be -- it could
4  be rather lengthy, your Honor.
5              THE COURT:  I understand.  Why don't we
6  just maximize our last eight minutes.
7  CROSS-EXAMINATION
8  BY MR. SMITH:
9      Q.   Good afternoon, Dr. Shah.
10     A.   Good afternoon.
11     Q.   Dr. Shah, when you performed this autopsy,
12  you testified that this was attended, the autopsy
13  itself, by detectives from the Bridgeport Police
14  Department?
15     A.   Yes, it was.
16     Q.   And that was Detective Devan and Gallagher?
17     A.   Yes.
18     Q.   Okay.  Now, while they were attending the
19  autopsy, they're actually in the room with you?
20     A.   Yes, they are.
21     Q.   And you were aware that Detective Devan was
22  taking notes in regards to that?
23     A.   Yes.
24     Q.   Okay.  And when you are doing the autopsy,
25  you do discuss with Detective Devan things that are

450

1  happening while you are doing the autopsy?
2      A.   What things are happening?  I mean, I'm not
3  sure exactly what the question --
4      Q.   Do you discuss your observations?
5      A.   Yes, I do.
6      Q.   So, you do discuss your observations with
7  her during that time?
8      A.   Yes.
9      Q.   Now, the report that you entered into
10  evidence on this direct examination, and this is
11  page 6 of that report, at the bottom, where it says,
12  5 of 7, 6 of 7?
13     A.   Yes.
14     Q.   You don't have that in front of you.  I
15  apologize.
16     A.   No, I don't.  Yes, I do.
17     Q.   Okay.
18              MR. SMITH:  I'm sorry, your Honor.  May
19  I have a moment?
20              THE COURT:  Yes.
21     Q.   Now, under that section entitled "Anatomic
22  Diagnosis"?
23     A.   Yes.
24     Q.   You wrote:  "Blunt force trauma of head
25  with depressed and comminuted fractures of the

451

1  bilateral occipital and left parietal areas of the
2  skull."
3      A.   Yes.
4      Q.   And below that you wrote:  "Patterned
5  circular fracture of the left posterior parietal
6  area of the skull."
7      A.   Yes.
8      Q.   And, finally, on page 7, you concluded that
9  the cause of death was blunt traumatic head injury;
10  is that right?
11     A.   Yes.
12     Q.   This report was written in September of
13  2005?
14     A.   It was concluded in September 2005.  The
15  autopsy, when I do -- I dictate, the secretary
16  retypes it up, and by the time all the paperwork is
17  in and the final report was signed, it's
18  September 23rd.  However, the original dictation is
19  done as I'm doing the autopsy or right after the
20  autopsy.
21     Q.   Okay.  But the report itself was completed
22  by the 23rd of September?
23     A.   Yes.
24     Q.   September 2005?
25     A.   Yes.

452

1      Q.   Now, nowhere in this report does it state
2  your opinion as to what the object could be, does
3  it?
4      A.   No, it does not.
5      Q.   And you were asked more recently by the
6  U.S. attorneys to state your opinion; is that right?
7      A.   Right.  Now she was, yes.
8      Q.   Yes.  But she had contacted you prior to
9  this?
10     A.   Yes, she did.
11     Q.   Just maybe a month or two ago?
12     A.   Yes.
13     Q.   Okay.  Now, Dr. Shah, I want to talk to you
14  a little bit about some of the photos we looked at.
15  Showing you -- this is 309.  Exhibit 309?
16              MR. SMITH:  Exhibit 309, for the record.
17     Q.   This is the bruise of the upper arm of
18  James Reid?
19     A.   Yes, right side.
20     Q.   Upper right side?
21     A.   Yes.
22     Q.   That appears to be a circular bruise; is
23  that correct?
24     A.   Yes, it is.
25     Q.   And would you say that circular bruise is

453

```
 1   about how big in diameter?
 2        A.   Can I read my report?  I measured it.
 3        Q.   Sure, of course.
 4        A.   I'm reading on page 2 of 7, the first
 5   paragraph.  The -- no, I don't have -- I don't have
 6   it measured, it looks like.
 7        Q.   Okay.
 8        A.   Okay.
 9        Q.   So, we're not sure exactly, but would you
10   say from looking at the photo that looks about an
11   inch and a half to two inches?
12        A.   If you look at the picture, which has the
13   number, has the tape inches, you can just about --
14   it looks like that way about an inch, inch and a
15   half, yes.
16        Q.   And that's similar in size to the wound you
17   previously were discussing on the -- I'm sorry --
18   upper left side of Mr. Reid's skull?
19        A.   Did I measure that?  It is about one and
20   one-quarter of an inch that I measured that circular
21   diameter of the pattern of the fracture of the
22   skull.
23        Q.   I'm sorry.  Did you say one and a quarter?
24        A.   One and one quarter.
25        Q.   One and one quarter?
```

454

```
 1        A.   Yes.
 2        Q.   Now, the bruising in this photo, although
 3   it may be about an inch and a half, we're not
 4   certain.  Sometimes, the bruising goes out further
 5   than where the actual impact site was; is that
 6   correct?
 7        A.   Yes, it can.
 8        Q.   And in the center of the bruise, there
 9   appears to be three small scrapes?
10        A.   Yes.
11        Q.   Abrasions, or --
12        A.   Lacerations.
13        Q.   Lacerations?
14        A.   Yes.
15        Q.   But not very deep?
16        A.   No, this is not very deep.
17        Q.   As if the object that had created that
18   wound might have had a rough surface to it?
19        A.   It's possible.
20        MR. SMITH:  Your Honor, I know we're up
21   against our 3:00.  I do have a ways to go.
22        THE COURT:  All right.  We will then ask
23   Dr. Shah to come back on Monday at 9:30, and we will
24   proceed at that time.
25        Ladies and gentlemen, you will not sit
```

455

```
 1   tomorrow.  We will start up again at 9:30 on Monday,
 2   and we will sit all week.  Please leave your
 3   notebooks here.  Please don't discuss the case.
 4   Have a very pleasant weekend.
 5        (Jury exited the courtroom)
 6        THE COURT:  All right.  Dr. Shah, you
 7   may go.
 8        MS. RODRIGUEZ-COSS:  May I -- we have --
 9        THE COURT:  Don't discuss your testimony
10   with anyone.
11        MS. RODRIGUEZ-COSS:  Your Honor, can we
12   confer in terms of our availability?  She's just
13   indicating some information to me.  Can I confer in
14   regards to that only?
15        THE COURT:  Yes.
16        MS. RODRIGUEZ-COSS:  Your Honor, I'm
17   sorry.  We would finish her testimony first on
18   Monday; is that correct?
19        THE COURT:  First thing on Monday, yes.
20        THE WITNESS:  Thank you, your Honor.
21        THE COURT:  All right.  Then Dr. Baden.
22        MR. SMITH:  Your Honor, I spoke with
23   Dr. Baden last night, and I just need to type up the
24   actual disclosure, additional disclosure.  I am not
25   certain I would call him, but -- based on how the
```

456

```
 1   cross-examination with Dr. Shah goes but, you know,
 2   I am safe to say I probably will.  There is some
 3   additional detail in the disclosure which I can file
 4   as I leave here today.  I just need to type it up,
 5   literally.
 6        MS. DAYTON:  Dr. Baden apparently
 7   doesn't think he needs to write a report.
 8        MR. SMITH:  He's not required to under
 9   the rule.  The government has been asking for a
10   report that is not required under the rule.  It's
11   being a summary of his opinion.
12        THE COURT:  What you were going to do is
13   summarize everything he's going to testify about?  I
14   mean, your report is going to be the four corners of
15   his testimony, right?
16        MR. SMITH:  Understood, your Honor.
17        THE COURT:  Okay.
18        MS. RODRIGUEZ-COSS:  Your Honor, we
19   would like that today, or --
20        THE COURT:  I think as soon as he types
21   it you'll get it.
22        MS. RODRIGUEZ-COSS:  Because I don't
23   think the rules entitle the defense to wait until
24   they hear the testimony of our expert and
25   cross-examine our expert to then give us disclosure
```

457

```
1    on their expert.
2              THE COURT:  I understand.
3              MR. SMITH:  I've agreed to do disclosure
4    today.
5              THE COURT:  You are going to get to it
6    today?
7              MR. SMITH:  Correct, your Honor.
8              THE COURT:  All right.  It's been a long
9    time coming.
10             All right, if there is nothing further,
11   then, have a pleasant weekend, and we'll see you
12   Monday at 9:30.  Thank you.  We stand in recess.
13             (Recess at 3:05 p.m.)
14
15
16
17
18
19
20
21
22
23
24
25
```

458

```
1                     I N D E X
2
3    WITNESS                              PAGE
4    JOETTE DEVAN
5    Direct Examination by Ms. Reynolds      262
6
7        MALKA SHAH
8    Direct Examination by Ms. Rodriguez-Coss  396
9    Cross-Examination by Mr. Smith           449
10
11
12
13        I certify that the foregoing is a
14   correct transcript from the record of proceedings in
15   the above-entitled matter.
16
17             4/22/11
18             Date
19
20            /S/  Sharon Montini
21            Official Reporter
22
23
24
25
```

459

```
1          UNITED STATES DISTRICT COURT
2            DISTRICT OF CONNECTICUT
3    * * * * * * * * * * *    *
                              *
4    UNITED STATES OF AMERICA,  * Case No 6cr160(JBA)
5             Plaintiff,        *
                               *
6          vs.                 *
                               *
7    AZIBO AQUART             * April 25, 2011
8             Defendant.       *
                               *
9    * * * * * * * * * * * *    *
10            TRIAL TRANSCRIPT
11             VOLUME III
12   BEFORE:  THE HONORABLE JANET BOND ARTERTON U.S.D.J.,
                                           and jury
13   Appearances:
14   FOR THE GOVERNMENT:  ALINA REYNOLDS, ESQ
                          TRACY DAYTON, ESQ.
15                        PETER MARKLE, ESQ.
                          JACABED RODRIGUEZ-COSS
16                        United States Attorney's Office
                          915 Lafayette Blvd
17                        Bridgeport, CT 06604
18
19   FOR THE DEFENDANT  MICHAEL SHEEHAN, ESQ
     AZIBO AQUART:      Sheehan & Reeve
20                      139 Orange Street
                        New Haven CT 06510
21                      JUSTIN SMITH, ESQ.
22                      383 Orange Street
                        New Haven, CT 06511
23
24   Court Reporter:    Sharon Montini, RMR
25   Proceedings recorded by mechanical stenography,
     transcript produced by computer
```

460

```
1              THE COURT:  Good morning, counsel,
2    ladies and gentlemen, Mr. Aquart.
3              All right, all our jurors are here.
4    Please be seated.  Are we ready to begin?  I know
5    that I have a copy of the defendant's supplemental
6    16(b) disclosure.  I'll hear from the government if
7    there is a problem with that at the recess.  There
8    is a request for modification of sequestration
9    order, which I want to hear further from the
10   defendant on, and I have now the defendant's motion
11   to admit a portion of Roy Whittingham's grand jury
12   testimony.  We will take those matters up at a time
13   not involving the -- when the jury is going to be
14   here.
15             Okay, anything else before we begin?
16             MR. SHEEHAN:  No, your Honor.
17             MS. DAYTON:  No, your Honor.
18             THE COURT:  All right.  Dr. Shah is
19   back.  And, Mr. Smith, you are prepared to continue,
20   yes?
21             MR. SMITH:  Yes, your Honor.
22             THE COURT:  All right.  Please bring in
23   the jurors.
24             (Jury entered the courtroom)
25             THE COURT:  Good morning, ladies and
```

461

1 gentlemen. I hope your weekend was pleasant.
2 Please be seated. We will resume the testimony of
3 Dr. Shah, cross-examination by Mr. Smith. You may
4 proceed.
5 MR. SMITH: Thank you, your Honor.
6 M A L K A   S H A H,
7 having previously affirmed, was examined and
8 testified as follows:
9 CONTINUED CROSS-EXAMINATION
10 BY MR. SMITH:
11 Q. Good morning, Dr. Shah.
12 A. Good morning.
13 THE COURT: You are going to need to
14 move into the microphone and pull it closer to you
15 please.
16 Q. Dr. Shah, you recall last week the
17 government had asked you some questions in regards
18 to the time of death?
19 A. Yes.
20 Q. And it's my understanding you could not
21 determine the time of death; is that correct?
22 A. No, the time of death is taken when the
23 bodies were discovered.
24 Q. Okay. You had no information as to the
25 conditions inside the apartment; that is correct?

462

1 A. No, I did not.
2 Q. So you didn't know what the temperature was
3 preceding the discovery of the bodies?
4 A. Considering it was the month of August, it
5 would be warmer. I don't know whether they had the
6 AC on or not.
7 Q. And you wouldn't know anything about the
8 humidity in the apartment or anything like that?
9 A. No, I don't.
10 Q. So, it's possible that Mr. Reid may have
11 been deceased for several hours before the discovery
12 of the bodies; is that correct?
13 A. Yes.
14 Q. Dr. Shah, you testified in your opinion
15 wounds to James Reid's head were possibly consistent
16 with a baseball bat; is that correct?
17 A. Yes.
18 Q. But a baseball bat is not the only blunt
19 instrument with which those wounds would be
20 consistent, correct?
21 A. Yes.
22 Q. So, the wounds could also be consistent,
23 say, with a pipe?
24 A. Yes.
25 Q. Okay. How about a wooden table leg?

463

1 A. Less likely, unless it's a round-surface,
2 wooden leg.
3 Q. Okay. Would the wounds also be consistent
4 with something thinner than a baseball bat?
5 A. Yes.
6 Q. Okay. Such as a tire-iron type weapon?
7 A. Especially if it's the rounder part of it,
8 not the claw-type end that it has.
9 Q. And those wounds would also be consistent
10 with a hammer-type weapon, correct?
11 A. Yes.
12 MR. SMITH: I have nothing further.
13 Thank you.
14 THE COURT: All right. Redirect,
15 Ms. Rodriguez?
16 MS. RODRIGUEZ-COSS: The Court's
17 indulgence for one second.
18 REDIRECT EXAMINATION
19 BY MS. RODRIGUEZ-COSS:
20 Q. Dr. Shah, Mr. Smith asked you last week
21 with regards to the size of the fractures that you
22 had described in your medical exam report. Do you
23 recall that?
24 A. Yes, I do.
25 Q. Do the size of the fractures or the size of

464

1 the bruise, for example, that you described on the
2 upper right arm of James Reid's body have any
3 correlation with the size of the weapon used?
4 A. Yes, it can.
5 Q. In what manner?
6 A. Usually, the injuries caused by the weapon
7 are slightly larger because the impact of the weapon
8 itself on the skin injures the immediate skin and
9 soft tissue underneath, and because of the pressures
10 that are applied, the surrounding capillary may
11 break, so it will -- may indicate that the wound is
12 slightly larger. However, it will indicate that --
13 the size of the wound in that general area.
14 Q. And so taking, for example, the wound on
15 the upper right arm, the bruise, the circular bruise
16 that you described, I believe it was -- it was shown
17 by the ruler approximately an inch, an inch and a
18 half; is that correct?
19 A. Yes.
20 Q. So, would you not expect, then, the weapon
21 to be smaller -- the circumference of that weapon to
22 be smaller than that size; is that correct?
23 A. It can be. It will not be like a quarter
24 of an inch. If it is an inch to one and
25 one quarter, I cannot differentiate that.

465

1    MS. RODRIGUEZ-COSS:  Your Honor, may we
2  have Exhibit 121?
3    THE COURT:  I think all of the exhibits
4  are on the exhibit table.
5    Q.  I want to bring your attention back to
6  Exhibit 314A; specifically, to the photograph in the
7  upper left-hand corner of that exhibit.
8    A.  Yes.
9    Q.  Can you see that?
10   A.  Yes, I do.
11   Q.  All right.  And bringing your attention to
12  the area there next to James Reid's head.  Do you
13  see that area?
14   A.  Where the blue thing is, or the carpeted
15  area?
16   Q.  Where carpeted area is.
17   A.  Yes.
18   Q.  Can you see that there is specifically an
19  area where you see this sort of dark clotted
20  material or substance, if you will?
21   A.  Yes.
22   Q.  Can you tell us, if you know, what that is?
23   A.  The appearance is consistent with blood
24  which had coagulated or clotted.
25   Q.  If it was brain matter, what would you

466

1  expect that to look like?
2    MR. SMITH:  Objection, leading.
3    THE COURT:  Overruled.
4    A.  The brain matter is usually gray or pink in
5  color, and this is more reddish dark, so I do not
6  see any tissue material there.  Mostly, all I see
7  looking at it is substance which looks more like
8  blood.
9    Q.  All right.  Now, Doctor, Mr. Smith was
10  asking you about the time of death of the victims.
11  Do you recall that?
12   A.  Yes.
13   Q.  Well, let me bring your attention back to
14  your report.
15    MS. RODRIGUEZ-COSS:  Will the record
16  reflect the witness is being handed Exhibit 314,
17  your Honor?
18   Q.  And, according to your report, what time
19  were the medical examiner investigators on site?
20   A.  They arrived on August 24th at 2:30 p.m.,
21  or 1430.  That's the time that is written there.
22   Q.  And does your report reflect what time the
23  bodies were discovered?
24   A.  Yes, it does.
25   Q.  And what time was that?

467

1    A.  The bodies were discovered at 10:23 hours.
2    Q.  10:23.  So that would be 10:23 in the
3  morning?
4    A.  Yes, yes.  And the medical examiner's
5  office was notified 10:44 hours in the morning.
6    Q.  All right.  And when were the bodies
7  removed from the scene?
8    A.  The bodies were removed from the scene at
9  1715 on August 24th.  That is about 5:15 p.m.
10   Q.  All right.  So the bodies, at least from
11  the time that they were discovered 'til the time
12  that they were removed, is close to eight hours; is
13  that correct?
14   A.  Yes, it is.
15   Q.  And so then you received the bodies -- or
16  you first examined the body the next morning; is
17  that correct?
18   A.  Yes.
19   Q.  All right.  And so were the conditions of
20  the bodies -- or the body of James Reid, as you
21  examined it on August 25, 2005, with the level of
22  lividity on his body, would that have been
23  consistent with him having been killed in the early
24  morning hours of August 24th?
25   A.  Yes.

468

1    Q.  And, Doctor, I don't recall if I asked you
2  this previously, but is the chief medical examiner's
3  office for the State of Connecticut affiliated with
4  any other entity?
5    A.  Such as?
6    Q.  Well, for example, do you conduct autopsy
7  pursuant to the request of the U.S. attorney's
8  office?
9    A.  Yes.
10   Q.  Did we ask you to conduct the autopsy on
11  James Reid?
12   A.  No, because this falls in to the
13  Connecticut state statute that any sudden,
14  unexpected death, according to the State of
15  Connecticut, has to be done at the medical
16  examiner's office.
17   Q.  Would it be correct to say you are an
18  independent entity?
19   A.  Yes, we are.
20   Q.  Would the U.S. Attorney's office be able to
21  call the chief examiner's office and say we would
22  like the chief examiner's office to conduct this
23  autopsy?
24   A.  No.
25   Q.  I want to bring your attention back briefly

469

```
 1   to Government's Exhibit 311.  Do you see that there
 2   on the monitor in front of you?
 3       A.   Yes, I do.
 4       Q.   And you had explained how many blows you
 5   understood the lacerations on the visible -- on the
 6   surface of the skin -- how many blows it had taken
 7   to cause those lacerations.  Do you recall that?
 8       A.   Yes, I do.
 9       Q.   So, the area that we're looking at in this
10   photograph, to what area of the skull does that
11   correspond to?
12            MR. SMITH:  Objection.  This is outside
13   the scope of the cross-examination.  I didn't ask
14   about the number of blows, your Honor.
15            MS. RODRIGUEZ-COSS:  I'll rephrase the
16   question, your Honor.
17            THE COURT:  All right.
18       Q.   Were those blows that you previously
19   described responsible for these fractures visible on
20   this exhibit?
21            MR. SMITH:  Objection.  Same objection,
22   your Honor.
23            THE COURT:  I think it is within the
24   scope of cross in which she was asked about what she
25   could opine as the blunt instrument used.
```

470

```
 1   Overruled.
 2       A.   Yes, they are.
 3       Q.   All right.  And so this is what we see
 4   underneath those lacerations?
 5       A.   Yes, it is.
 6       Q.   All right.  And bringing your attention
 7   back to Government's Exhibit 314A, I'm referring to
 8   the upper right picture on that exhibit, and you had
 9   previously indicated there was some duct tape around
10   James Reid's head.  Do you recall that?
11       A.   Yes, I do.
12       Q.   In what area is -- corresponds to
13   underneath that duct tape?
14       A.   That probably corresponds to the upper part
15   of the neck, almost at the bottom of the head, what
16   it looks like from the photograph.
17       Q.   Would that be the area that we see in
18   Government's Exhibit 312 being shown to you here?
19       A.   No, this is higher.  This area is not
20   covered with the duct tape, no.
21       Q.   I guess here is my question:  The blows
22   that caused the lacerations visible on the surface
23   of the skin on James Reid's head, were those the
24   only blows that the skull would have received?
25       A.   Yes.
```

471

```
 1       Q.   All right.
 2            MS. RODRIGUEZ-COSS:  The Court's
 3   indulgence, your Honor?
 4            THE COURT:  Yes.
 5            MS. RODRIGUEZ-COSS:  We have nothing
 6   further.
 7            THE COURT:  Any recross?
 8            MR. SMITH:  No, your Honor.
 9            THE COURT:  All right.  Dr. Shah, you
10   are excused.  Thank you very much.  You may go.
11            THE WITNESS:  Thank you, your Honor.
12            THE COURT:  All right.  Let's return to
13   Detective Devan.
14            All right, Detective.  If you would
15   kindly resume the stand.  You remain under oath, and
16   Ms. Reynolds may examine.
17            MS. REYNOLDS:  Thank you, your Honor.
18            J O E T T E   D E V A N,
19   having Previously affirmed, was examined and
20   testified as follows:
21   CONTINUED DIRECT EXAMINATION
22   BY MS. REYNOLDS:
23       Q.   Welcome back.
24       A.   Thank you.
25       Q.   Detective, I'm going to draw your attention
```

472

```
 1   to the kitchen area of apartment 101 and ask you if
 2   you recall if you and your team searched in that
 3   area of the apartment.
 4       A.   Yes, we did.
 5       Q.   And showing you what I'll mark Government's
 6   Exhibit 116 -- 116L-1.  Do you see that on your
 7   monitor there?
 8       A.   Yes.
 9       Q.   What is that a photograph of?
10       A.   That is a photograph of the kitchen in
11   apartment 101.
12            MS. REYNOLDS:  Your Honor --
13       Q.   Well, let me show you Government's
14   Exhibit 116L-2.  What is that a photograph of?
15       A.   The sink in the kitchen.
16       Q.   And then taking a look at Government's
17   116L-3, is that just another photograph of the
18   counter area of the kitchen in apartment 101?
19       A.   Yes, it is, including the stove.
20            MS. REYNOLDS:  Your Honor, I would move
21   as full exhibits Government's Exhibits 116L-1,
22   116L-2, and 116L-3.
23            MR. SHEEHAN:  No objection.
24            THE COURT:  All right.  They are full
25   exhibits.  Thank you.
```

473

1    Q.   Taking a look first at 116L-1, if you can

2  just describe from what angle this photo is taken.

3    A.   The photo is taken just about as you enter

4  the apartment from the hallway door immediately to

5  -- straight ahead, and a little bit to the right is

6  the kitchen.  That's a view from there.

7    Q.   And then taking a look at Government's

8  116L-2, what's depicted in that photograph?

9    A.   The sink in the kitchen.

10    Q.   Okay.  And, finally, taking a look at

11  Government's 116L-3, what's shown in that

12  photograph?

13    A.   That's the kitchen as well.  It's the

14  stove.  You can see the upper cabinets, part of the

15  counter.

16    Q.   And can you just describe how it would be

17  that you and your team, again, Detective Ortiz and

18  Detective Vargas, when you focus on the kitchen,

19  what types of things would you be looking for and

20  how you would go about searching the kitchen area.

21    A.   As part of searching the apartment, each

22  room is searched individually, including the

23  kitchen, and, initially everybody is just observing,

24  again, while the video is taken, the photographs are

25  taken, and then we just take a look at anything that

474

1  is in plain view first, determining if there is

2  anything of evidentiary value.  If it is, then it

3  will be placarded and collected.

4    Q.   When you say in "plain view," what do you

5  mean?

6    A.   Just that it's right in front of you when

7  you walk in.  There is no need to touch it, it's

8  just there in front of you.

9    Q.   So, for example, looking at 116L-3, you saw

10  the -- for example, the package on the counter.

11  That's something that's in plain view?

12    A.   Plain view, yes.

13    Q.   And then if you don't see something in

14  plain view, what do you start doing at that point?

15  After you do a search for what's obviously visible,

16  what you would do?

17    A.   Again, once the photographs are taken, if

18  nothing is in plain view that we're going to

19  collect, then the search begins.  And the search

20  requires that you now open the cabinets, open the

21  drawers, look in the refrigerator, look in the oven,

22  anything that's closed to see if it's concealing any

23  other kind of evidence.

24    Q.   And you would undertake that same procedure

25  and process throughout all the rooms of the

475

1  apartment, correct?

2    A.   Yes.

3    Q.   Now, again, staying in the kitchen, do you

4  recall whether or not you located a cell phone

5  charger in the kitchen area?

6    A.   There was a cell phone charger in the

7  kitchen, yes.

8    Q.   Do you recall whether or not you or any

9  members of your team recovered a cell phone from

10  inside apartment 101?

11    A.   No, there were no cell phones located in

12  the apartment at all.

13    Q.   And with regard to the kitchen area, did

14  you recover anything of evidentiary value that then

15  you processed further?

16    A.   No, there was nothing collected from the

17  kitchen area.

18    Q.   Showing you what's already in evidence,

19  Government Exhibit 117, again, this is the

20  photograph once you walk into the apartment; is that

21  correct?  And you previously described this.  There

22  is that couch and dining room-type table with the

23  lace tablecloth?

24    A.   Yes.

25    Q.   And that area is right outside the front

476

1  door to the apartment and the kitchen area, correct?

2        MR. SHEEHAN:  Object to leading.

3        THE COURT:  Sustained.  Please rephrase.

4    Q.   Can you describe where this table and couch

5  were located in relation to the front door area and

6  the kitchen area?

7    A.   Okay, in this photo, on the right-hand

8  side -- I guess it's a little bit dark on the

9  screen, but on the right-hand side, you could see

10  the doorknob, and that's the actual door, front door

11  to the apartment.

12    Q.   So, this area where the arrow is, that's

13  the front door, correct?

14    A.   Yes.

15    Q.   And this over here to the front of the

16  photo, is that where the kitchen would be?

17    A.   Yes, it would be off of the photo down from

18  where the door is and the couch is.

19    Q.   And up -- here in this photo, there appears

20  to be -- well, you can't see it in that photo, but

21  if you look on your monitor, is there a phone?

22        MR. SHEEHAN:  I'm going to object to

23  leading.  I'm objecting to leading the witness

24  through this.

25        THE COURT:  Sustained.

477

1    Q.  Can you describe what you see in the upper
2  right-hand corner of the photograph on your monitor,
3  since we can't see it on the screen.
4    A.  It's dark even on my monitor, but it's a
5  wall phone, wall telephone.
6    Q.  And did your search include a search for
7  any land lines, telephone lines in the apartment?
8    A.  Yes.
9    Q.  And did you find any phone land lines that
10  were -- that appeared to be in working order inside
11  apartment 101?
12    A.  No.
13    Q.  Now, we previously entered into evidence
14  Government's Exhibit 167, and I'm going to hand up
15  to you at this point Government's Exhibit 166, and
16  ask you to take a look at this.  Do you recognize
17  what that is?
18    A.  Yes.
19    Q.  And what is that?
20    A.  This is a box containing two cotton swabs
21  that were collected as Bridgeport Exhibit 34 from
22  what we called wall F in the apartment.
23        MS. REYNOLDS:  Your Honor, I would move
24  as a full exhibit Government's 167.
25        MR. SHEEHAN:  May I look, your Honor?

478

1        THE COURT:  You may.  You just referred
2  to 167.  You mean 166?
3        MS. REYNOLDS:  I mean 166.  I apologize,
4  your Honor.
5        THE COURT:  Is there any objection?
6        MR. SHEEHAN:  Oh, 166.  No, there isn't.
7        THE COURT:  Full exhibit.
8        MS. REYNOLDS:  Did you say no objection?
9        MR. SHEEHAN:  There is no objection,
10  your Honor.
11        MS. REYNOLDS:  I apologize for the
12  confusion.
13    Q.  So, again, taking a look at Government's
14  166, can you describe what that is a swab of?
15    A.  This, as I said, it contains two cotton
16  swabs, which is a swab of blood-like substance,
17  which was located on wall F in the apartment.
18    Q.  Do you recall where wall F is?
19    A.  Wall F is a small section of wall between
20  the kitchen and the short hallway that leads from
21  the living room back to the bedrooms.
22    Q.  And can you describe how it is when you
23  describe -- when you refer to a swab being taken of
24  blood-like substance on a wall, for example, here on
25  wall F, can you describe what procedure you would

479

1  use to do that?
2    A.  When we decide we're going to collect a
3  swabbing of, in this case, a blood-like substance,
4  we use sterile cotton swabs that are packaged in
5  pairs in paper.  So, we open up the paper packaging.
6  We also have small tubes of sterile water that is
7  opened at that time.  The cotton swabs are dampened
8  with the sterile water and then rubbed against
9  whatever the stain is that we're trying to collect,
10  and the stain actually transfers, it's picked up by
11  the cotton swab.  And then it's boxed.  In this case
12  it was boxed in a large-type box that allows for
13  drying right within the box.  It's actually -- the
14  swabs aren't actually touching the inside of the box
15  at all.  There is a little holder inside the box, so
16  the swabs aren't touching it.  And then it's sealed
17  and turned in -- labeled and turned in as evidence.
18  And as the swabs are collected, the person
19  collecting them, in this case it was me, is wearing
20  protective equipment, gloves, mask.
21    Q.  And once the swab is collected, do you also
22  take a second one?  You mentioned there were two
23  swabs.  Do you do that?
24    A.  The swabs are taken together.  One exhibit
25  consists of two swabs.  The swabs are packaged

480

1  together in the envelope that they come in, and it's
2  just our practice we take two swabs of each sample.
3    Q.  And you mentioned you took the swab from
4  wall F, correct?
5    A.  Yes.  Yes, I did.
6    Q.  And once the swab, the blood-like substance
7  are collected using those sterile cotton swabs, once
8  you collect it and you package it, do you know what
9  happens to it then?
10    A.  Yes, it's, as I said, collected, packaged,
11  labeled, sealed with evidence tape, and then turned
12  in to the property room at the police department.
13  And, in this case, this was also further sent to the
14  Connecticut state lab for testing.
15    Q.  And do you know whether the other swabs
16  that you testified about last week were also handled
17  in that same manner and then sent to the Connecticut
18  state lab for testing?
19    A.  Yes, the swab evidence is collected in the
20  same manner.
21    Q.  Now, again focusing on that area, wall F
22  outside the kitchen there in the living room area,
23  did you -- do you recall whether you saw any other
24  damage or any other evidentiary-type evidence on
25  that wall?

481

```
 1      A.  Yes, there was.
 2      Q.  Can you describe for the members of the
 3  jury what else you saw in the area of wall F?
 4      A.  There was a section of wall F that was
 5  actually broken.  It appeared that it had been
 6  struck, and there was an indentation with cracks
 7  surrounding it.
 8      Q.  And what, if any, steps did you take when
 9  you saw that type of damage on the wall?
10      A.  Well, eventually -- that was noticeable
11  immediately upon entering the apartment, but
12  eventually, as we made our way through the apartment
13  collecting evidence and processing the scene, that
14  part of the wall was examined with an alternate
15  light source.
16      Q.  When you say an "alternate light source,"
17  can you describe what that is?
18      A.  An alternate light source can actually be
19  anything in addition to the light in the apartment,
20  whether it be natural light or light bulbs.  But
21  what we used, it was a blue light, which is a
22  different light range on the spectrum, and by using
23  that range, which I believe is in the 450-nanometer
24  range with orange goggles.  As an orange filter, you
25  can see things that aren't visible to the naked eye,
```

482

```
 1  and that way you can actually examine the surfaces
 2  to see if there is anything there that isn't
 3  immediately evident.
 4      Q.  And this would be things not in plain view,
 5  correct?
 6      A.  Well, it's actually in plain view, you just
 7  can't see it with the naked eye.  Your eye just
 8  doesn't have the ability to pick up that wavelength
 9  of light.
10      Q.  And you said you used that alternate light
11  source in that area of the wall?
12      A.  Yes.
13      Q.  And did you -- were you able to see
14  anything at that point?
15      A.  Yes.  In the section of wall that I
16  described that it looked like it had been struck,
17  and it was cracked, there was a partial handprint
18  that was visible using the alternate light source.
19      Q.  And what, if any, steps did you take at
20  that point once you determined that there was a
21  visible handprint in that area of the damage, that
22  piece of damaged wall?
23      A.  Because it was so clearly visible using the
24  alternate light source, we decided to try and just
25  remove the entire section of wall as opposed to
```

483

```
 1  trying to enhance the print at all.  In fear of
 2  damaging it, we again decided just to the remove
 3  that entire section of wall and package it to send
 4  to the lab for further examination.
 5      Q.  And was that done?
 6      A.  Yes, it was.
 7      Q.  Now, you mentioned that you bring in things
 8  like the alternate light source and other things.
 9  Well, let me ask you this:  When in the stage of
10  your search and your processing of the scene would
11  you undertake what you just described as far as
12  bringing in an alternate light source and looking
13  for things that aren't visible to the human eye?
14      A.  In this case we didn't do that until the
15  end.  Once the evidence that we were going to
16  collect in the apartment was already done and
17  collected and packaged, what we decided to do is go
18  over everything, all the surfaces, with the
19  alternate light source to just see if there is
20  anything else that we couldn't see with your naked
21  eyes that may be of interest.
22      Q.  And I'm going to draw your attention now to
23  Government's Exhibit 123 that you previously
24  testified about, and, actually, I'm going to hand
25  you Government's Exhibit 123A and ask you to take a
```

484

```
 1  look at that again.  Let me hand you a box of
 2  gloves.  Can you just take out the contents of 123A
 3  again?  On the screen, just for the record, I'm
 4  showing Government 123, which is a photograph, and
 5  that's a photograph of a blue plastic bag, and then
 6  a white shopping bag, and that's -- what are you
 7  holding in your hand right now?
 8      A.  This is the same exhibit that's being shown
 9  on the screen.  It's Bridgeport Exhibit 22,
10  Government 123A.
11      Q.  And you had previously testified that those
12  two bags were found inside of Basil's room, correct?
13      A.  Yes.
14      Q.  And they were processed as evidence in this
15  case, correct?
16      A.  Yes.
17      Q.  Now, there is a piece of duct tape that's
18  shown in Government's Exhibit 123, the photograph,
19  that was holding those, or that -- what's stuck to
20  those two paper bags.  Do you see the duct tape
21  on -- stuck on the two bags?
22          THE COURT:  These are plastic bags, are
23  they not?
24          MS. REYNOLDS:  Two plastic bags, yes.
25      A.  No, the duct tape -- I think I mentioned
```

**GA121**

485

1  that last week as well, that the duct tape is no
2  longer on the bags as it was originally collected.
3      Q.   And just taking a look at Government's 123,
4  the brown evidence bag, the brown paper evidence
5  bag, can you look inside there and see if there is
6  anything else contained inside that exhibit?
7      A.   Yes.
8      Q.   If you can pull that out.  And what else is
9  contained inside the brown paper evidence bag?
10     A.   There are two plastic baggies containing
11 the pieces of duct tape.
12          MS. REYNOLDS:  Your Honor, at this time,
13 I would mark separately as 123A-1 the smaller Ziploc
14 bag.
15          THE COURT:  She referenced two.
16          MS. REYNOLDS:  Yes, I'm going to mark
17 first the smaller 123 --
18          THE COURT:  Do you want to show
19 Mr. Sheehan which one you are doing in which way.
20          MS. REYNOLDS:  Yes.  Just for the
21 record, there was a smaller plastic Ziploc bag
22 containing a piece of duct tape which I've marked
23 for purposes of identification as Government's
24 Exhibit 123A-1.
25          MR. SHEEHAN:  I'd object, your Honor.  I

486

1  don't think there is a proper foundation.
2          MS. REYNOLDS:  And, your Honor, I would
3  move it subject to connection with the fingerprint
4  examiner John Pleckaitis, who will be examining as
5  part of the trial, but I wanted to mark it at least
6  for purposes of identification.
7          THE COURT:  Now you are marking it for
8  identification, in which case we will wait for its
9  admissibility for another witness; is that what's
10 going on?
11          MS. REYNOLDS:  Well, I'm moving it --
12 it's all part of this exhibit.  I'm moving --
13          THE COURT:  It's all part of 123A?
14          MS. REYNOLDS:  It is, and I'm moving
15 these two Ziploc bags subject to connection with the
16 fingerprint examiner at this point.
17          THE COURT:  All right.  So A-1 is a
18 smaller plastic Ziploc bag with tape, and A-2 --
19          MS. REYNOLDS:  At this point, I would
20 also mark the larger Ziploc bag with duct tape, and
21 I would mark that for purposes of identification as
22 Government's Exhibit 123A-2.
23          THE COURT:  I guess where I'm getting
24 confused, when you say you are marking them for
25 identification.  I thought you were offering them.

487

1          MS. REYNOLDS:  Well, I was actually
2  marking them while I was speaking, but I'm also
3  moving them subject to connection through the
4  testimony of fingerprint examiner John Pleckaitis.
5          THE COURT:  All right.  Noting the
6  defendant's objection, I will admit them subject to
7  that connection.  That connection -- if that
8  connection is not properly made, you may renew your
9  motion to strike those exhibits.
10          MR. SHEEHAN:  Thank you, your Honor.
11          THE COURT:  Thank you.
12     Q.   If you could just place all of those back
13 in the bag there.  Just so we're clear, when you saw
14 the blue plastic bag and white plastic bag with the
15 duct tape connected, that's how you saw what's
16 depicted.
17          MR. SHEEHAN:  Objection, leading.
18          MS. REYNOLDS:  That's fine.  I'll
19 withdraw it.
20     Q.   Taking a look at Government's Exhibit,
21 which is on the screen, 123, the photograph, what
22 does that show?
23     A.   It is a photo of the blue plastic bag and
24 the white plastic bag that are stuck together with
25 duct tape as we found it in Mr. Williams' bedroom.

488

1      Q.   And when you found that and then processed
2  that as evidence, the duct tape was connected to the
3  two bags?
4          MR. SHEEHAN:  Objection, leading.
5          THE COURT:  Sustained.  Please rephrase.
6      Q.   Where was the duct tape on the plastic
7  bags?
8      A.   The duct tape -- some of the duct tape, at
9  any rate, was actually adhering the two bags
10 together.
11     Q.   And as you look at the exhibit in court
12 here today, can you describe what the difference was
13 between what you pulled out and showed the jury with
14 regard to the duct tape and the two plastic bags
15 versus what you saw inside Basil's room in apartment
16 101?
17          MR. SHEEHAN:  Objection, asked and
18 answered.
19          THE COURT:  Overruled.  I'm going to
20 permit this in part to refresh everyone's
21 recollection since it's been several days since she
22 testified.
23          MS. REYNOLDS:  Thank you, your Honor.
24     A.   In the photograph on the screen, that's the
25 condition that the evidence was in when we found it.

489

```
1   The two plastic bags, the white one and the blue one
2   with the duct tape on the bags, and the bags were
3   stuck together with the duct tape.  And that is how
4   it was when we collected it as evidence.  That's how
5   it was collected and packaged.  Once it was turned
6   in to the property room and subsequently sent to the
7   Connecticut state lab for processing, in the
8   course of the processing apparently it changed the
9   way it looks a little bit, and as you saw when I
10  opened the package, the bags are no longer stuck
11  together.  The bags are tinted, stained a little bit
12  of a different color, and the duct tape has actually
13  been removed and packaged separately from the bags.
14      Q.   Now, I'm going to draw your attention and
15  ask you to take a look at your screen there.  I'm
16  going to show you what I'll mark Government's
17  Exhibit 121-1.  Do you recognize what that's a
18  photograph of?
19      A.   Yes.
20      Q.   And what is that a photograph of?
21      A.   That is a photograph looking into the
22  bedroom where Ms. Johnson and Mr. Reid were located,
23  taken from the hallway.
24      Q.   And is that photograph a fair and accurate
25  representation of that view looking into the room
```

490

```
1   from the hallway into the bedroom of Tina Johnson
2   and James Reid?
3       A.   Yes.
4       Q.   And at what point in your search and
5   processing of the scene was that taken?  Was that
6   before or after the bodies were removed?
7       A.   This was before.  This is one of the
8   initial photographs that were taken in the
9   apartment.
10          MS. REYNOLDS:  Your Honor, I would move
11  as a full exhibit Government's 121-1.
12          MR. SHEEHAN:  No objection.
13          THE COURT:  Full exhibit.
14          MS. REYNOLDS:  Then if your Honor could
15  dim the lights, please?  Thank you.
16      Q.   Again, can you just describe what we're
17  seeing there in Government's 121-1.
18      A.   This is a photo looking in through the
19  doorway into the bedroom where Ms. Johnson and Mr.
20  Reid were located, taken from the hallway.
21      Q.   And it's not visible on the screen, but
22  showing you sort of the middle part area.  Can you
23  look on your monitor?  Is that the body of Tina
24  Johnson?
25          MR. SHEEHAN:  Objection, leading.
```

491

```
1       Q.   What is that?
2       A.   In the center part of the photograph is
3   the --
4       Q.   This area here.
5       A.   That is the victim, Tina Johnson.
6       Q.   And where in relation to her body was the
7   victim James Reid's body?
8       A.   It would -- he would be to the left in the
9   photo.
10      Q.   In this area?
11      A.   Yes, between where -- it's difficult to see
12  on the screen, unfortunately.  It's between where
13  the bed is and the arm -- you could see the arm of a
14  sofa frame on the floor right there.
15      Q.   And then taking a look at the back of the
16  photograph where my pen is pointing, what's that?
17      A.   That is the window in the bedroom.  The
18  blinds are in the down position.
19      Q.   And do you recall whether or not there was
20  a screen on that window?
21      A.   No, there was not.
22      Q.   I'm going to show you Government's
23  Exhibit 121-7.  Can you see that up on your monitor?
24      A.   Yes.
25      Q.   And what is that a photograph of?
```

492

```
1       A.   That is a photograph of -- well, there are
2   a lot of things in that photograph.  It's a
3   photograph -- it's taken in the bedroom where
4   Ms. Johnson and Mr. Reid were located.  It's
5   actually -- I am in the right-hand side of the
6   photograph holding Ms. Johnson up so her back is
7   visible, and you can see her arms, duct tape on her
8   wrists, and also yellow placard No. 8.
9       Q.   And is that photograph a fair and accurate
10  representation of what her body and the area around
11  her body looked like when you lifted it up?
12      A.   Yes.
13          MS. REYNOLDS:  Your Honor, I would move
14  as a full exhibit Government's Exhibit 121-7.
15          MR. SHEEHAN:  No objection.
16          THE COURT:  All right, full exhibit.
17      Q.   So, taking a look then on the screen, can
18  you describe for the members of the jury what is
19  depicted in Government's Exhibit 121-7.
20      A.   Okay.  Again, it's the victim, Ms. Johnson.
21  And in the right-hand corner that's me in the Tyvek
22  suit that I described earlier.
23      Q.   This is you here?
24      A.   Yes.
25      Q.   And when you say you described that suit,
```

**GA123**

493

1    can you describe what else -- what you were wearing
2    on your head, which is not depicted on there.
3         A.    It's also -- there is a hood on the suit,
4    and a mask, as well as gloves, as you can see there.
5         Q.    The gloves you can see right here on your
6    hands, correct?
7         A.    Yes.
8         Q.    And what are you wearing on your feet?
9         A.    They're booties.  In this case it's
10   actually connected to the suit as well.  It's a full
11   head-to-toe suit.
12        Q.    And these full head-to-toe suits you are
13   wearing in this photograph, was Detective Ortiz and
14   Detective Vargas when they were processing the scene
15   with you, were they also wearing full head-to-toe
16   suits?
17        A.    Yes.
18        Q.    Now, again, taking a look at the photograph
19   in Government's Exhibit 121-7, do you see where my
20   pen is pointing there on the shoulder area of the
21   shirt of Tina Johnson?  Do you see that?
22        A.    Yes.
23        Q.    Can you describe for the members of the
24   jury what is on Tina Johnson's shirt in the area,
25   her shoulder and then her back?

494

1         A.    That is a blood spatter pattern.
2         Q.    When you say a "blood spatter pattern," can
3    you describe what that means?
4         A.    Well, in this case it's a pattern created
5    by blood actually in motion at the time that it
6    strikes a surface, in this case Ms. Johnson's shirt,
7    and it creates a pattern of spatter, which is -- it
8    looks like small droplets, basically.
9         Q.    Just zooming in on the photograph and,
10   again where my pen is, this is -- again, what is
11   that?
12        A.    That is part of the spatter pattern.  You
13   can also see voids where there is less or no
14   spatter, indicating that in this case it appears
15   that the material could have been folded so that the
16   blood in motion could not hit that part of the
17   shirt, but even on the shoulder and the back part
18   you can see spatter, and it can indicate, again, as
19   I said, blood in motion as it strikes a surface.
20   And it can also tell a lot about the motion of the
21   surface, in this case the shirt, when the blood
22   struck it, where the victim was at that time,
23   position, et cetera.
24        Q.    And, again, you previously testified last
25   week that the shirts of each one of the victims were

495

1    collected at the scene; is that correct?  Is that
2    what you testified to last week?
3         A.    Yes, they were collected.
4         Q.    Can you describe why they were collected at
5    the scene?
6         A.    As I stated last week, the duct tape and
7    the shirts of the victims were removed at the scene
8    before the victims were transported to the medical
9    examiner's office.  The reason the shirts were
10   collected was that there were spatter patterns and
11   blood patterns on the shirts, and in an effort to
12   preserve the patterns, we thought that it would be
13   best to remove them at the scene since during
14   transport a lot of times the patterns will change,
15   there will be more blood leakage and it will hide
16   some of the pattern that can be very important later
17   on.
18        Q.    And showing you -- I'll have you take a
19   look at your monitor there, Government's
20   Exhibit 121-10.  Do you recognize what that's a
21   photograph of?
22        A.    Yes.
23        Q.    And can you describe what's depicted in
24   Government's Exhibit 121-10?
25        A.    This is a photograph in the bedroom where

496

1    Ms. Johnson and Mr. Reid were located.  The
2    photograph actually shows Ms. Johnson's face and
3    Mr. Reid's head and back.  There is also a large
4    blood stain on the carpet and the material, the
5    cloth near them.
6         Q.    And is that a fair and accurate
7    representation of how that area of where the victims
8    were -- how it appeared when you were first
9    processing the scene?
10        A.    Yes, it is.
11            MS. REYNOLDS:  Your Honor, I would move
12   as a full exhibit Government's 121-10.
13            MR. SHEEHAN:  Objection.  It's
14   cumulative.
15            THE COURT:  What is unique about this?
16            MS. REYNOLDS:  Your Honor --
17            THE COURT:  121-10 is already in.
18            MS. REYNOLDS:  It's already in?  Then I
19   apologize.
20            MR. SHEEHAN:  Then no wonder it was
21   cumulative.
22            MS. REYNOLDS:  It would be cumulative.
23            THE COURT:  It's just repetitive.
24            MS. REYNOLDS:  I would refer to 121-10,
25   which is already in evidence.

497

1    Q.   Okay.  And, again, just taking a look at
2 121-10 in evidence, and focusing in this area where
3 my pen is pointing, what is that a photograph of?
4    A.   That is a photograph of Mr. Reid's body,
5 particularly the back of the shirt.
6    Q.   And what can be seen on Mr. Reid's shirt?
7    A.   They're blood-like stains both in transfer
8 pattern and spatter as well.
9    Q.   You mentioned blood-like stains.  You said
10 transfer pattern.  Can you describe what you are
11 referring to when you say "transfer pattern."
12    A.   Transfer pattern can be something from
13 contact where the blood is transferred to a surface
14 by contacting another surface that already had blood
15 on it, or in this case -- I did not examine this any
16 further, but in this case --
17         MR. SHEEHAN:  I'd object to any further
18 testimony.
19         MS. REYNOLDS:  Your Honor --
20         THE COURT:  She's describing what a
21 transfer pattern is.  Are you describing in general
22 what a transfer pattern is as opposed to this one in
23 particular?
24         THE WITNESS:  I can.
25         THE COURT:  Okay.  And then you can

498

1 apply it here, if you are able.
2         THE WITNESS:  Okay.  Thank you.
3         THE COURT:  Okay.
4    A.   So, as I said, the transfer pattern, it can
5 come from the blood being transferred from one
6 surface to another, and in this case on the shoulder
7 of Mr. Reid's shirt where it's a more solid pattern
8 of blood.
9    Q.   In this area here where my pen is pointing?
10    A.   Yes.
11    Q.   So, the shoulder, the left-hand shoulder of
12 Mr. Reid as revealed in the photograph, for purposes
13 of the record --
14    A.   Yes.
15    Q.   -- what's that?
16    A.   That could be transferred from the carpet,
17 from Ms. Johnson, or from himself, from his other --
18 his wounds.  Until it's actually examined and tested
19 at the forensic lab, just by looking at it, you
20 can't tell that.
21    Q.   And that is a different type of pattern or
22 a different type of blood versus blood spatter?
23    A.   Yes.
24    Q.   And showing -- looking at the photograph,
25 can you see areas that show blood spatter versus

499

1 what might be transfer blood?
2    A.   Yes.
3    Q.   That's this area here where my pen is
4 pointing with?
5         MR. SHEEHAN:  I'm going to object to
6 leading.
7         THE COURT:  Sustained.
8    Q.   Where is the area that shows the blood
9 spatter?
10    A.   On the back of the shirt, you can see
11 small --
12         THE COURT:  You have a pointer there, if
13 you want to use that.
14         THE WITNESS:  Sure.
15    A.   On the back of the shirt, in this area
16 where you see the small droplet-type stains, okay,
17 that falls under the category of spatter.
18    Q.   Okay.  Detective, I'm going to hand up to
19 you what's been marked Government's Exhibit 126 and
20 ask you to take a look at that.  Do you recognize
21 what's contained in Government's 126?
22    A.   Yes.
23    Q.   And what is that?
24    A.   This is a section that was cut off of the
25 mattress that was in that bedroom with -- where

500

1 Ms. Johnson and Mr. Reid were located.
2    Q.   How is it you are able to recognize
3 Government 126?
4    A.   It's labeled with Bridgeport Police
5 Department evidence label.
6    Q.   And can you see here what the Bridgeport
7 Police Department evidence number was for that item
8 contained in Government 126?
9    A.   It's Bridgeport Exhibit No. 28.
10         MS. REYNOLDS:  Your Honor, I would move
11 as a full exhibit the Government's 126.
12         MR. SHEEHAN:  I would renew my objection
13 for the same reason previously stated with respect
14 to the shirts, your Honor.
15         MS. REYNOLDS:  This is not a shirt, your
16 Honor.
17         MR. SHEEHAN:  May we approach, then?
18         THE COURT:  You may.
19         MR. REYNOLDS:  Your Honor, can we
20 publish the photos to the jury while --
21         THE COURT:  They have seen them.
22         (Sidebar conference)
23         MR. SHEEHAN:  Your Honor, I realize it's
24 not a shirt.  I think my objection to having the
25 bloodstained materials being circulated to the jury

501

```
 1   is the same as my objection with respect to the
 2   shirts.  That was the shorthand way I was trying
 3   to --
 4              THE COURT:  Are you --
 5              MS. REYNOLDS:  I am not circulating it.
 6   We are just going to demonstrate it, actually.  Not
 7   even going to open it.  We're just going to say what
 8   it is.  It's part of the mattress with blood on it.
 9              THE COURT:  So the mattress with the
10   blood is not actually being circulated?  The
11   photographs that have the blood are not actually
12   being circulated, they're being displayed on the
13   screen here?
14              MS. REYNOLDS:  We are going to ask for
15   those all to go to the jury.
16              THE COURT:  Correct, they will, yes.
17   And so your objection seems moot.
18              MR. SHEEHAN:  No, I don't think so.
19   It -- they're going to send that into the jury as
20   well, your Honor.
21              THE COURT:  So, you are talking about
22   what goes in to the jury later on?
23              MR. SHEEHAN:  Yeah.
24              THE COURT:  I'm going to overrule that
25   objection.  Thank you.
```

502

```
 1              MS. REYNOLDS:  Judge, just for the
 2   record, all of this evidence was shown to counsel on
 3   several evidence dates.  All of this evidence was
 4   photographed in place.  All of this evidence was
 5   provided in the evidence binder.  We are trying to
 6   get through a witness where counsel has seen the
 7   evidence, knows what is coming, and is raising
 8   objections, which I think at this point seem
 9   frivolous.  So, I just want to note that for the
10   record.  None of this is a surprise.  The defense
11   has been provided with all of this evidence well in
12   advance of trial, and I just want to put that on the
13   record at this point.
14              THE COURT:  All right, I'm overruling
15   the objection, and 126 will be a full exhibit.
16              (Sidebar concluded)
17              THE COURT:  All right, 126 will be a
18   full exhibit.
19       Q.   Detective, do you recall what's
20   contained -- or taking a look at the label there,
21   what's contained inside Government 126 in evidence?
22       A.   It's a section cut from the mattress on --
23   that was in the room with Ms. Johnson and Mr. Reid.
24       Q.   Okay.  Now, I'm going to hand you what's
25   been marked as Government's Exhibit 137A and ask you
```

503

```
 1   to take a look at Government's 137A.  Do you
 2   recognize what's contained in Government 137A?
 3       A.   Yes.
 4       Q.   And what is that?
 5       A.   This is a brown bag which contained
 6   Bridgeport Exhibit No. 14 which we collected as a
 7   latex glove from the first bedroom where
 8   Ms. Johnson and Mr. Reid were located.
 9       Q.   And taking a look at your screen there at
10   Government's Exhibit 137, which is already in
11   evidence, do you recognize what that's a photograph
12   of?
13              MR. SHEEHAN:  137?
14              MS. REYNOLDS:  Government's 137.
15       A.   Yes.
16       Q.   Do you recognize what that's a photograph
17   of?
18       A.   Yes.
19       Q.   What is that a photograph of?
20       A.   It's a photograph of a latex glove with
21   placard No. 14, yellow placard No. 14 next to it.
22       Q.   Again, referring to Government's 137A,
23   what's contained in that exhibit?
24       A.   This is Exhibit 14, which is depicted in
25   the photograph.
```

504

```
 1       Q.   And are there any differences between
 2   what's contained inside the plastic evidence bag
 3   with Bridgeport No. 14 as it appears today in the
 4   evidence bag versus how it appeared at the scene?
 5       A.   Yes.
 6       Q.   And can you describe what the difference
 7   is?
 8       A.   At the scene, when the evidence was located
 9   and collected, it appeared to be one latex glove,
10   and it was collected as such, it wasn't manipulated,
11   it was just collected and placed in this brown paper
12   bag.  As a result of collecting it and submitting it
13   to the Connecticut state --
14              MR. SHEEHAN:  I'm going to object to
15   anything further as to what happened at the lab as
16   being hearsay.
17              THE COURT:  Let me just first ask, is
18   137 in evidence?
19              MR. SHEEHAN:  I don't think it is, your
20   Honor.
21              THE COURT:  I don't think it is.
22              MS. REYNOLDS:  The photograph, I had it
23   marked in evidence, your Honor, but if not, I would
24   mark 137, which is the photograph, at this time, as
25   a full exhibit.
```

505

1          MR. SHEEHAN:  I have no objection to
2  that, your Honor.
3          THE COURT:  All right.
4          MS. REYNOLDS:  Thank you, your Honor.
5          THE COURT:  And 137A?
6          MS. REYNOLDS:  And 137A, I would also
7  move as -- at this point as a full exhibit.  I was
8  just having the witness describe how it appears
9  differently in the evidence bag as opposed to when
10  it was seized at the scene, which I was having her
11  to do before.
12          THE COURT:  Why don't you finish that
13  examination?
14          MR. SHEEHAN:  Your Honor, I have an
15  objection pending with respect to this witness
16  testifying about what happened at the lab.
17          THE COURT:  I think she's talking about
18  the differences between what she saw.  Well, let me
19  establish -- let me ask Ms. Reynolds to continue
20  questioning on 137A.
21          MS. REYNOLDS:  Yes, your Honor.
22      Q.  Again, taking a look at the contents of
23  137A, can you describe the difference between how it
24  appears today in the evidence bag and how it
25  appeared when it was seized back in apartment 101?

506

1      A.  Okay.  When it was seized in apartment 101,
2  we took it to be a latex glove, and that's how it
3  was labeled.  We didn't manipulate it, we didn't
4  move it, we didn't touch it any further, other than
5  to pick it up and place it in the paper bag for
6  collection.  Today, as it appears, there are
7  actually two gloves, and each of them is now
8  stained.  One is a darker color, the other one is
9  more yellowish color.
10      Q.  And other than that difference you've
11  described here today, does the contents of what you
12  collected as Bridgeport 14 and what has now been
13  marked as Government's Exhibit 137A appear to be in
14  the same condition it was in?
15      A.  Yes.
16          MS. REYNOLDS:  I would move, your Honor,
17  as a full exhibit Government's 137A.
18          MR. SHEEHAN:  I would oppose that, your
19  Honor.  I think there are substantial differences,
20  and it is not -- this witness cannot establish a
21  proper foundation with respect to the admissibility
22  of that object.
23          MS. REYNOLDS:  Your Honor, there will be
24  further connection of this item.  I can ask one
25  other question.

507

1      Q.  After it was seized and collected and
2  processed as evidence, do you know whether or not
3  these items contained inside 137A were sent to the
4  Connecticut state forensic lab for further testing?
5          MR. SHEEHAN:  I'm going to object to the
6  "items" part.  I think that -- I think what she has
7  testified to is that she collected item 14, and she
8  sent it to the lab.
9          THE COURT:  All right, what is the
10  relationship, to your knowledge, between what you
11  collected that is seen in photograph 137 and what is
12  in 137A?
13          THE WITNESS:  What's depicted in the
14  photograph is what is in Exhibit 137.
15          THE COURT:  How do you know that?
16          THE WITNESS:  It was initially packaged
17  in the original bag which my team collected and
18  packaged.
19          THE COURT:  And that's in the bag also?
20          THE WITNESS:  Yes, the paper bag is the
21  original package that the evidence was placed in,
22  and then I, for purposes of court, for the jury to
23  see, it was removed from the bag and packaged in
24  this plastic envelope.  But the items in the bag
25  were originally contained in the paper bag that's

508

1  also in this envelope.
2          THE COURT:  Although you knew it only to
3  be a single latex glove?
4          THE WITNESS:  It appeared that way at
5  the scene, yes.
6          THE COURT:  I'm going to admit that
7  subject to the connection by which -- what will that
8  be?
9          MS. REYNOLDS:  Your Honor, there will be
10  forensic lab examiners who will be testifying later
11  in the trial.
12          THE COURT:  All right.
13          MS. REYNOLDS:  Specifically, Maria
14  Warner, from the lab will be testifying, your Honor.
15          THE COURT:  Thank you.
16      Q.  I'm going to hand you Government's
17  Exhibit 142A and ask you to take a look at that.  Do
18  you recognize what's contained in Government's 142A?
19      A.  Yes.
20      Q.  And what is that?
21      A.  This is a brown paper bag which contained a
22  brown nylon stocking.
23      Q.  And taking a look at your monitor, do you
24  recognize what that's a photograph of?
25      A.  Yes.

509

1    Q.   And what is that a photograph of?

2    A.   It's a photograph of a dark-colored nylon

3 stocking.  It's actually on the box spring marked

4 with a yellow placard No. 15.

5    Q.   And does that photograph fairly and

6 accurately depict how the nylon stocking appeared on

7 the box spring when it was found inside Tina -- when

8 it was found inside apartment 101?

9    A.   Yes.

10    Q.   And where was it found?

11    A.   This was in the bedroom where Ms. Johnson

12 and Mr. Reid were located, on the box spring.

13         MS. REYNOLDS:  Your Honor, I would move

14 as a full exhibit Government's 142, which is the

15 photograph.

16         MR. SHEEHAN:  No objection to the photo.

17         THE COURT:  142A is a full exhibit.

18         MR. SHEEHAN:  No, I think it's 142 is

19 what she's offering you.

20         MS. REYNOLDS:  142 is the photograph.

21 Your Honor, at this point I'm just going to show

22 that to the jury.

23    Q.   142, can you describe --

24         THE COURT:  All right, I see.  Okay.

25 142 is a full exhibit.

510

1         MS. REYNOLDS:  Thank you, your Honor.

2    Q.   And, again, just taking a look at the

3 photograph up on the screen, can you describe for

4 the jury what that photograph shows?

5    A.   That's a close-up photograph of a

6 dark-colored nylon stocking, which was located on

7 the box spring in the bedroom marked with a yellow

8 placard No. 15, indicating Exhibit No. 15 for the

9 Bridgeport Police Department.

10    Q.   And taking a look then at 142A, which is

11 the plastic evidence bag, again, what is contained

12 in that evidence bag?

13    A.   This is a brown paper bag labeled with a

14 Bridgeport Police Department evidence label for

15 Exhibit No. 15, and also a brown nylon stocking.

16    Q.   And does the contents of 142A appear to be

17 in the same or substantially the same condition it

18 was in at the time that it was found and seized as

19 evidence from within Tina Johnson's bedroom?

20    A.   Yes, it does.

21         MS. REYNOLDS:  Your Honor, I would move

22 as a full exhibit at this time Government's 142A.

23         MR. SHEEHAN:  May I see it?  I have no

24 objection.

25         THE COURT:  142A is a full exhibit.

511

1    Q.   Again, just taking a look at the monitor

2 there, what is depicted on the monitor now, which is

3 the contents of 142A?

4    A.   That's Bridgeport Police Exhibit 15, the

5 brown nylon stocking.

6    Q.   And turning that exhibit around, is there

7 also the brown paper bag where it was originally

8 received?

9    A.   Yes.

10    Q.   And, again, this shows the label -- well,

11 what does this show?

12    A.   The larger label is the Bridgeport Police

13 Department evidence label, and the smaller

14 rectangular label underneath it is the label from

15 the Connecticut State Police Forensic Lab.

16    Q.   I'm going to hand you Government's

17 Exhibit 143A.  Taking a look then at Government's

18 143A, do you recognize what's contained in that

19 exhibit?

20    A.   Yes.

21    Q.   And what is that?

22    A.   This is a brown paper bag which contains a

23 light bulb that had blood-like stains on it.

24    Q.   And how is it that you are able to

25 recognize Government's Exhibit 143A?

512

1    A.   There is a Bridgeport evidence label on it

2 as well.

3    Q.   And taking a look at your screen, we had

4 previously entered in today a photograph,

5 Government's Exhibit 143.  Do you see that up on the

6 screen?

7    A.   Yes.

8    Q.   And what is that a photograph of?

9    A.   That's a photograph of the light bulb on

10 the floor of Mr. Williams' room.  The darker-colored

11 markings on it was blood-like stains.

12         MS. REYNOLDS:  Your Honor, at this time

13 I would move as a full exhibit Government's 143A,

14 which is the evidence bag with the light bulb.

15         MR. SHEEHAN:  I have no objection, but

16 does your Honor reflect 143 in evidence?  I didn't

17 think so.  If the government wants to offer that, I

18 would have no objection.

19         MS. REYNOLDS:  I would offer it, your

20 Honor.  I apologize, I thought it was already in.

21         THE COURT:  I don't see that as in

22 evidence.  143 and 143A, however, are now in

23 evidence absent objection.  All right.

24         MS. REYNOLDS:  Thank you, your Honor.

25    Q.   And, again, taking a look at 143, which is

513

```
1   a photograph that's depicted up on the screen, where
2   was this light bulb recovered, from which bedroom?
3        A.   This was the floor of Mr. Williams' room.
4        Q.   And what can be seen on the light bulb?
5        A.   They're blood-like transfer stains.
6        Q.   When you say "blood-like transfer stains,"
7   can you describe what you mean by a transfer stain?
8        A.   The nature of the stains on the light bulb
9   that is the blood-like substance appear to have come
10  from some sort of contact where the stains were
11  transferred to the light bulb.
12       Q.   I'm going to hand you Government's
13  Exhibit 144.  Showing you Government's Exhibit 144,
14  do you recognize what's contained in that exhibit?
15       A.   Yes.
16       Q.   And what is that?
17       A.   This is an envelope containing a hinge
18  lifter with a latent fingerprint.
19       Q.   Can you describe what a hinge lifter with a
20  latent fingerprint means?
21       A.   When a latent fingerprint is located, it
22  has to be lifted off of the surface that it's on,
23  and a hinge lifter is basically a piece of tape with
24  a clear plastic backing card, piece of plastic,
25  acetate, actually attached to the sticky paper on a
```

514

```
1   hinge.  It's just actually a fold, but they called
2   it hinge lifters.  So that the sticky tape, once
3   it's applied to the latent print that's been
4   enhanced, you stick the sticky-side tape onto the
5   enhanced fingerprint, peel it off, so it's stuck now
6   on the tape.  Then it's closed down on the clear
7   piece of acetate to preserve the print.
8        Q.   And does Government's 144 have a Bridgeport
9   evidence number?
10       A.   Yes, it does.  It's collected as Exhibit
11  No. 29 for Bridgeport.
12            MS. REYNOLDS:  Your Honor, I would move
13  as a full exhibit Government's 144.
14            MR. SHEEHAN:  No objection.
15            THE COURT:  Full exhibit.
16       Q.   And do you know whether or not once the
17  contents of Government's Exhibit 144 was collected,
18  do you know whether or not that was sent to the lab
19  for further testing?
20       A.   Yes, it was.
21            THE COURT:  You said that was Bridgeport
22  No. 29?
23            THE WITNESS:  Yes, ma'am.
24            THE COURT:  Where was that taken from?
25            THE WITNESS:  This was the window in the
```

515

```
1   bedroom where Ms. Johnson and Mr. Reid were.
2            THE COURT:  Thank you.
3        Q.   I'm going to ask you to take a look at your
4   screen again, and showing you what's been marked as
5   Government's Exhibit 148 on your monitor.  Can you
6   describe what that's a photograph of?
7        A.   That is a photograph of a small piece of
8   latex with evidence placard No. 19 next to it.
9        Q.   And do you know where that item was
10  photographed?
11       A.   Yes.
12       Q.   And where was that photographed?
13       A.   This was on the floor of the bedroom where
14  Mr. Reid and Ms. Johnson were located under the box
15  spring.
16            MS. REYNOLDS:  Your Honor, at this time,
17  I would move as a full exhibit Government's
18  Exhibit 148, which is the photograph.
19            MR. SHEEHAN:  Your Honor, I don't have
20  that in my evidence book.  I wonder if the
21  government just happens to have an extra copy of it?
22            MS. REYNOLDS:  I can show him the
23  photograph, your Honor.
24            MR. SHEEHAN:  May I have a second, your
25  Honor?  I have no objection.
```

516

```
1            THE COURT:  All right.  Full exhibit,
2   148.
3        Q.   Taking a look at the screen, can you
4   describe for the ladies and gentlemen of the jury
5   what that is a photograph of?
6        A.   That is the photograph of the small piece
7   of latex which was located on the floor of the
8   bedroom where Ms. Johnson and Mr. Reid were located
9   under the box spring marked with yellow placard No.
10  19.
11       Q.   And, again, can you describe when that item
12  was first seen, what steps you would then take to
13  document that item?
14       A.   Once we finished the initial photographs
15  and the initial search of the room, this room in
16  particular, before touching anything, everything was
17  collected that was in plain view, as we discussed
18  earlier, and then we started moving things to find
19  or look for more pieces of evidence.  Once the box
20  spring was moved, this item was located.
21       Q.   And was it photographed then first in
22  place?
23       A.   Once an item is located that we consider
24  evidence, it is photographed in place, then
25  documented through notes, and finally collected.
```

517

1    Q.   And showing you Government's Exhibit 148A,
2  do you recognize what's contained in 148A?
3    A.   Yes.
4    Q.   And what is that?
5    A.   This is the evidence bag labeled Bridgeport
6  Exhibit No. 19.
7    Q.   And does that evidence bag and evidence
8  label appear to be in the same or substantially the
9  same condition it was in at the time you collected
10 Bridgeport 19 and processed it as evidence?
11   A.   Yes, additional labels and tape have been
12 added to it as well.
13   Q.   When you say "additional labels and tape,"
14 what are the additional labels and tape contained on
15 148A?
16   A.   Well, the Bridgeport evidence label is
17 there.  There is also a state police evidence label,
18 and our initial evidence tape seal is on here, but
19 there are also additional red evidence seals on this
20 envelope as well.
21        MS. REYNOLDS:  Your Honor, I would move
22 as a full exhibit Government's 148A.
23        MR. SHEEHAN:  May I see it, your Honor?
24        THE COURT:  Yes.
25        MR. SHEEHAN:  May I briefly voir dire?

518

1        THE COURT:  You may.
2  VOIR DIRE EXAMINATION
3  BY MR. SHEEHAN:
4    Q.   Detective, there are -- you mentioned other
5  numbers on this exhibit?
6    A.   Other labels.
7    Q.   Other labels?
8    A.   Yes.
9    Q.   So, for example, this label 18, that would
10 not be a label that would be applied by you?
11   A.   No.
12   Q.   Okay.
13        MR. SHEEHAN:  I have no objection.
14        THE COURT:  148A is a full exhibit.
15        MS. REYNOLDS:  Thank you, your Honor.
16 CONTINUED DIRECT EXAMINATION
17 BY MS. REYNOLDS:
18   Q.   Taking a look at your monitor there, I'm
19 going to ask you to take a look at what's been
20 marked as Government's Exhibit 168, photograph.  Do
21 you see that photograph?
22   A.   Yes.
23   Q.   And what is that a photograph of?
24   A.   That is a photograph in the bedroom where
25 Mr. Reid and Ms. Johnson were located looking into

519

1  the room from near the doorway to the room.  It also
2  shows the box spring and the far wall and ceiling
3  with blood-like stains on it.  This is -- this photo
4  is after we started removing things from the room
5  once the initial evidence was collected, and so
6  you can see placards No. 14 and 15 in the room.
7        MS. REYNOLDS:  Your Honor, I would move
8  as a full exhibit Government's 168.
9        MR. SHEEHAN:  That's not in my book.  I
10 have no objection, your Honor.
11        THE COURT:  All right.  168 is a full
12 exhibit.
13   Q.   Just taking a look then at the screen
14 there, showing the jury Government's 168, and just
15 using, if you could, the pointer, could you point
16 out for the jury starting with the evidence placard
17 No. 14 what's depicted in that photograph?
18   A.   Evidence placard 14 would correspond to
19 Exhibit 14, which was the latex glove.
20   Q.   And then what's contained next to evidence
21 placard 15 on the mattress?
22   A.   Evidence placard 15 corresponds to the
23 nylon stocking that was located on the box spring,
24 and this is the box spring here, and, if you recall,
25 it's covered in plastic, which is how we found it.

520

1    Q.   So, you were pointing -- just for purposes
2  of the record, you were using the pointer and
3  pointing to 15, which is the nylon stocking, and
4  then below that on the floor you pointed to 14,
5  which is the latex glove that was recovered as
6  Bridgeport 14?
7    A.   Correct.
8    Q.   Then taking a look then at the cover there,
9  what can be seen on the mattress cover?
10   A.   On the plastic cover itself are blood-like
11 stains, droplets, and large spatter.
12   Q.   And do you see in the photograph any other
13 spatter depicted?
14   A.   Yes, on the wall behind the bed there is
15 also spatter patterns.
16   Q.   Can you just use the pointer?  For purposes
17 of the record, just what you are referring to?
18   A.   In this area.
19        MS. REYNOLDS:  So, for the record, your
20 Honor, just pointing to the wall behind the mattress
21 depicted in Government's 168.
22   Q.   And in the corner over here, right here,
23 what can be seen on that piece of wall or area?
24   A.   There is also spatter patterns on that,
25 continuing along with the furniture and the wall and

521

```
1   the box spring.
2       Q.   And then just going up along the wall in
3   the photograph, up towards the ceiling, what can be
4   seen in the photograph?
5       A.   Do you want me to use the pointer?
6       Q.   Yes.
7       A.   The blood-like spatter pattern continues up
8   the wall, and it's also visible on the ceiling above
9   it.
10      Q.   I'm just going to ask you to take a look at
11  your monitor again, and I'm going to show you --
12          THE COURT:  If you are starting with
13  another exhibit, I think we'll take a recess.
14          All right, ladies and gentlemen.  We'll
15  take a 15-minute recess.  Leave your books here.
16  Don't discuss the case.
17          (Jury exited the courtroom.)
18          THE COURT:  All right, why don't we take
19  a -- do you want to discuss any of the motions in
20  our recess, or shall we wait 'til lunch?
21          MR. SHEEHAN:  I would like to discuss
22  them in the recess, your Honor.
23          THE COURT:  All right, let's take a
24  five-minute recess for us.  We will be back in five
25  minutes.  Otherwise, Detective, if you would be back
```

522

```
1   in 15.  Thank you.
2           THE WITNESS:  Thank you.
3           (Recess)
4           THE COURT:  All right.  Shall we start
5   with the sequestration order?
6           MR. SHEEHAN:  Yes, your Honor.
7           THE COURT:  Who will be arguing that?
8           MR. SHEEHAN:  I am, your Honor.
9           THE COURT:  So I have read your motion.
10  Is there anything that you want to add to that?
11          MR. SHEEHAN:  No, your Honor.
12          THE COURT:  Do you want to identify who
13  it is that is sought to be included in the
14  guilt-phase courtroom proceedings?  I mean to
15  observe.
16          MR. SHEEHAN:  Specifically?
17          THE COURT:  Yes.
18          MR. SHEEHAN:  No, your Honor.  I want to
19  identify that I can have family members here, or
20  friends of Mr. Aquart, some of whom might testify in
21  the penalty phase, none of whom would be testifying
22  in the guilt phase.  And I think that under that set
23  of circumstances they should be allowed to be
24  present for purposes of portions of the guilt phase,
25  to the extent that they're able to get here, and
```

523

```
1   that there should be no restrictions on them.  And
2   I'm relying on the issues -- on the claim set forth
3   in my -- in our memorandum, including the
4   defendant's fundamental right to due process and a
5   public trial.
6           THE COURT:  All right.  Who --
7   Ms. Rodriguez for the government?
8           MS. RODRIGUEZ-COSS:  Yes, your Honor.
9   First of all, the exclusion of witnesses from the
10  trial does not violate the defendant's
11  constitutional right to a public trial.  I think
12  that is well established.
13          THE COURT:  The sequestration order
14  pertains only to those who will testify at the guilt
15  phase, right?
16          MS. RODRIGUEZ-COSS:  Well, I believe the
17  Court previously stated and we requested a
18  sequestration order of anyone who would testify
19  either at the guilt phase or at the penalty phase,
20  and I believe that what is at issue here is the
21  sequestration of witnesses which will be called by the
22  defense to testify at the penalty phase.  Now, we
23  moved in support of our motion on two bases, your
24  Honor.
25          First of all, Section 3593 specifically
```

524

```
1   provides for the presence of family of the victims
2   during the penalty phase during the trial.  It does
3   not provide for mitigation witnesses during the
4   guilt phase of the trial.  I think that is very
5   significant.  I think that demonstrates that the
6   legislature -- that Congress considered this issue
7   and did not include mitigation witnesses or
8   witnesses to be presented by the defense in penalty
9   during the guilt phase of the trial, while
10  affirmatively acting on behalf of family members of
11  the victims.
12          THE COURT:  That act is called the
13  Victim Rights Clarification Act of 1997.  Why would
14  the focus of the rights of victims evince any
15  congressional intent to --
16          MS. RODRIGUEZ-COSS:  We're not relying
17  on the Victim Rights Act, your Honor, we are relying
18  on the Federal Death Penalty Act.
19          THE COURT:  All right.
20          MS. RODRIGUEZ-COSS:  And the Federal
21  Death Penalty Act specifically provides for allowing
22  victim family members to be present during the guilt
23  phase, and it is that provision which we are
24  submitting to the Court inherently demonstrates or
25  indicates an intent to allow the victims of the
```

525

```
1   family members to be present during the guilt phase
2   of the trial.  However, the act does not address
3   mitigation witnesses.  So, in that sense, we
4   understand that the Federal Death Penalty Act itself
5   anticipates or envisions mitigation witnesses not
6   being present during the guilt phase of the trial.
7            Now, having said that, your Honor, I
8   will advise the Court, based on my own personal
9   experiences in relation to capital cases, that in
10  the past, the defendant is correct, I have seen
11  district courts permit the mother or the father of
12  the defendant to be present during the guilt phase
13  of the trial.  I think that there is a marked
14  difference between having a mother or a father
15  present during the guilt phase of the trial of the
16  defendant and having other mitigation witnesses who
17  are not family members of the defendant present
18  during the guilt phase.  At this point in time, we
19  have no idea what these witnesses will testify
20  about.  We have no idea what their testimony relates
21  to.
22           THE COURT:  But that --
23           MS. RODRIGUEZ-COSS:  Therefore, it is
24  difficult to grasp how the evidence presented during
25  the guilt phase will influence or not their
```

526

```
1   testimony.  As the defense counsel has argued
2   throughout these proceedings, mitigation evidence
3   can relate to the background of the defendant, it
4   can relate to his upbringing, but it can also relate
5   to the circumstances of the offense.  It can relate
6   to anything, really.  They can bring in here and
7   say, you know, the defendant was born prematurely,
8   that mitigates against the death penalty.  We don't
9   know what those mitigation factors are going to be
10  at this point in time.  And so, we will strongly
11  oppose anyone other than, perhaps, the parents of
12  the defendant.  And, obviously, we understand his
13  mother has passed away, but perhaps his father.  But
14  other than, you know, any immediate family member
15  being present in court, we would seriously and
16  contentiously object to any other mitigation witness
17  being present throughout the guilt part of this case
18  until such witness presents testimony in court.
19           And can I just say, defense counsel has
20  filed a motion in support of his request, and he
21  cites not a single case that envisions mitigation
22  witnesses being present during the guilt phase of
23  the trial.  And so I think we can rest on that, on
24  the absence of such precedent as something that is
25  not envisioned by the Death Penalty Act and
```

527

```
1   something that is definitely not customary in these
2   types of cases.
3            THE COURT:  Mr. Sheehan?
4            MR. SHEEHAN:  Very briefly, your Honor.
5   The authority to sequestration witnesses comes from
6   Rule 615 of the Federal Rules of Evidence.
7            THE COURT:  And you say the Federal
8   Rules of Evidence don't apply at the penalty phase.
9            MR. SHEEHAN:  I reference the fact that
10  they don't under the statute.
11           THE COURT:  Right.
12           MR. SHEEHAN:  And I think that, more
13  importantly, the policy issues behind sequestration
14  of witnesses really contemplates that witnesses
15  could be tailoring their testimony to what they had
16  previously heard.  In the context of  -- given the
17  separate proceedings at issue with both a guilt and
18  a penalty phase, and the fact that the penalty phase
19  witnesses would not be addressing issues that are
20  raised in the guilt phase, then the sequestration
21  would be inappropriate.
22           I think it's a total stretch to look at
23  what the Federal Death Penalty Statute says about
24  whether some witnesses can be present at the guilt
25  phase and to leap from that to infer an intent to
```

528

```
1   violate what is -- or to restrict what is the public
2   access to the courtroom on the part of Congress.  I
3   think the fact of the matter is that restrictions on
4   public trials, the case law is clear on that, they
5   have to be narrowly tailored to fit a very specific
6   purpose, and they have to be supported -- not just
7   general policy issues, they have to be supported by
8   a compelling need, and in the circumstances of this
9   case, there is no compelling need.
10           Indeed -- and so, given the fact that
11  the rules of evidence are not applicable, and
12  secondly, given the fact that those witnesses will
13  not be testifying about matters raised in the guilt
14  phase, and given the first -- the right to a public
15  and speedy trial, which not only applies to the
16  defendant, but also applies to members of the
17  public, I think under that circumstance, people
18  should not be precluded from being in court if they
19  wish to be.
20           MS. RODRIGUEZ-COSS:  Your Honor, what
21  counsel refers as a leap is the accepted standard of
22  statutory interpretation.  We must infer from
23  Congress having included or addressed a specific
24  issue in a case, one, that it considered it to be
25  significant, and two, where it acted on one subject
```

529

and did not act on the other, the reasonable
inference is that it did not mean to include those
other subjects. And in this case, Congress acted
affirmatively by stating quite clearly that victims'
family members could be present during the guilt
part of the case. And I believe that this is a case
under the Federal Death Penalty Act that is most
appropriate to look at the language of that act as
it applies to this situation. And then it decided
not to act affirmatively on behalf of mitigation
witnesses. Therefore, the only statutory
interpretation one can take away from that is that
Congress did not envision allowing mitigation
witnesses to be present during the guilt phase of
the trial.

On the second point that Mr. Sheehan
brings up, he is urging this Court, then, to
undertake an analysis of fairness in the sense that
he's submitting mitigation witnesses will in no way
be influenced by what they hear during the guilt
phase of the trial. Well, neither the Court nor the
government is in a position to evaluate that
argument because we have no idea, first of all, what
his mitigating factors are. We have no idea who his
mitigating witnesses are. I think if Mr. Sheehan

530

wants to rely on that second argument, then he must
place the Court in a position to fairly evaluate it,
and, therefore, we would request a proffer as to
what those mitigation factors are and who those
mitigation witnesses will be so the Court can then
undertake an appropriate analysis as to whether or
not any of those witnesses will in any way be
affected or their testimony influenced by what they
hear during the guilt part of the case. Absent such
a proffer, your Honor, I don't believe that the
Court can rely on Mr. Sheehan's second argument. I
think his motion fails on both accounts.

MR. SHEEHAN: Very briefly, your Honor.
Neither Congress nor the Court have the power to
overrule the Constitution. The Constitution
provides for very limited exceptions with respect to
the right to public trial. This, I would
respectfully submit, is not one of them, and to
argue from the negative would be an improper reading
of all of the cases with respect to limitations on
public trials.

MS. RODRIGUEZ-COSS: Your Honor, again,
and the last point we will make before we submit the
motion to the Court, witnesses are
routinely excluded from proceedings before their

531

testimony, and I think that that is because courts
recognize that a witness's testimony can be
influenced by what they hear from other witnesses,
by what they observe in court, by the exhibits that
they see, by the arguments from counsel that they
the hear. And so, in order to preserve the
integrity of the process, we routinely exclude
witnesses from the courtroom with very few
exceptions until their testimony is heard by the
jury. We see no difference in this case.

THE COURT: Now, the defendant urges a
different analysis than that which the government is
offering, and that is found in the Second Circuit's
case in Carson v. Fischer in which -- which says,
"as petitioner observed, this court takes very
seriously a defendant's right to have his family
members and friends present at his trial." The
exclusion of courtroom observers, especially a
defendant's family members and friends, even from a
part of the criminal trial, is not a step to be
taken lightly from Guzman v. Scully. A heightened
interest of exclusion of family members and friends
derives from In Re Oliver. The Supreme Court, in
1948, where the Court specifically noted a special
concern for assuring the attendance of family

532

members of the accused. Vidal v. Williams, 1994.

Carson goes on to discuss habeas relief
granted in certain pre-AEDPA cases on the ground
that exclusion of family members without a
particularized inquiry into whether the exclusion
was necessary to advance an overriding interest
violated the Sixth Amendment, English v. Artuz, in
1998, Guzman, Vidal v. Williams. Quoting English,
for example, "We concluded that the trial court
failed to satisfy the second and fourth prongs of
Waller when it refused to allow the petitioner's
family members to remain in the courtroom during an
informant's testimony, even though the informant
admitted that he would be willing to testify in
front of them. The closure was broader than
necessary, we concluded, because of that
willingness. Moreover, the trial court failed to
make adequate findings to justify the exclusion of
the petitioner's family members."

The government is not urging at this
time that family members be excluded as I understand
it. Is that correct?

MS. RODRIGUEZ-COSS: Immediate family
members, your Honor.

THE COURT: Well, I don't know what that

533

1   means.
2           MS. RODRIGUEZ-COSS:  Parents of the
3   defendant.
4           THE COURT:  What I'm reading does not
5   call it immediate family members.
6           MS. RODRIGUEZ-COSS:  Well, it's not been
7   identified what the government means by immediate.
8   It means parents and siblings.
9           THE COURT:  No, but I'm saying the
10  Second Circuit does not seem to make that
11  distinction.  Are there -- Mr. Sheehan, are there
12  family members, that is, persons related to
13  Mr. Aquart, who are here today?
14          MR. SHEEHAN:  No, your Honor, because of
15  the Court's prior ruling.
16          THE COURT:  All right.  Now that we have
17  your -- and at the time of that ruling, I don't
18  recall you making this argument, and you've now made
19  this argument since.
20          MR. SHEEHAN:  I've made this argument
21  now, your Honor.
22          THE COURT:  Yes.  It's just a matter of
23  the timing here since I have not had the opportunity
24  to do that research.
25          MR. SHEEHAN:  I understand, your Honor.

534

1           THE COURT:  All right.  But there is no
2   one here who is being excluded while I do that
3   research; is that correct?
4           MR. SHEEHAN:  There were people that
5   were excluded -- not while your Honor did the
6   research.  What happened previously is that there
7   were witnesses who were identified and then
8   excluded, and your Honor indicated that you would
9   take up that question at -- and I did not know that
10  they were here.  In fact, this was at the first day
11  of trial, I believe.  I think it was the first day.
12  It's getting a little blurry, but those two people
13  were ex -- we told them not to be present in court
14  for the rest of that day.  Since that day, nobody
15  has been here, and now we have the issue before the
16  Court.
17          THE COURT:  All right.  Let me continue
18  to research the issue.  There is nobody who is at
19  this moment going to be excluded by the
20  sequestration order; is that right?
21          MR. SHEEHAN:  As far as I know, your
22  Honor, there is nobody.
23          THE COURT:  All right.  I'll get you a
24  ruling as soon as I can.
25          MR. SHEEHAN:  Thank you, your Honor.

535

1   All right.  Let's bring the jury back in.
2           (Jury entered the courtroom)
3           THE COURT:  Please be seated, ladies and
4   gentlemen.
5           All right.  Detective Devan, you may be
6   seated.  Ms. Reynolds, you may continue.
7           MS. REYNOLDS:  Thank you, your Honor.
8   CONTINUED DIRECT EXAMINATION
9   BY MS. REYNOLDS:
10    Q.   Detective, before the break, we were
11  looking at what's in evidence, Government's
12  Exhibit 168.  I'm going to put that back up on the
13  screen.  And just asking you to focus on the blood
14  spatter on the wall there, and then on the ceiling.
15  Can you just describe for the members of the jury
16  the type of blood spatter that is depicted in those
17  photographs, what you see?
18          MR. SHEEHAN:  Your Honor, I'm going to
19  object.  I don't think this -- this witness does not
20  add anything to what the jury needs to understand.
21  She's being asked to say what she sees.  I don't
22  think that's appropriate, your Honor.
23          THE COURT:  If she knows of types -- are
24  there different type of blood spatters?
25          THE WITNESS:  Well, this is a spatter

536

1   pattern.
2           THE COURT:  Would you rephrase the
3   question?
4           MS. REYNOLDS:  Yes, your Honor.
5     Q.   Taking a look at Government's Exhibit 168,
6   the spatter pattern, can you describe that type of
7   pattern that you see, first starting on the wall?
8           MR. SHEEHAN:  Your Honor, this witness
9   has not been proffered as an expert in this area.  I
10  would object on that ground.
11          MS. REYNOLDS:  Your Honor, I'm asking
12  her to describe what's on the photograph.
13          THE COURT:  What will her description
14  add to the photograph itself?
15          MS. REYNOLDS:  Well, there are different
16  types of patterns.  There are some that are bigger,
17  some that are falling down, just that -- are just a
18  spray of blood, and I wasn't allowed to lead the
19  witness in describing those, so I'm having her
20  describe what she sees in that photograph.  There
21  are some spots that are larger, bigger, some that
22  are smaller.
23          MR. SHEEHAN:  Your Honor, the jury --
24          THE COURT:  Why is that not self-evident
25  from the picture?

**GA134**

537

```
1          MS. REYNOLDS:  Your Honor, I'm having
2   her describe it for the -- I can pass it out to the
3   jury, then.  I don't think it's that clear in the
4   courtroom, so I would ask that this photograph then
5   be published to the jury.
6          THE COURT:  All right, why don't we do
7   it that way.
8          MS. REYNOLDS:  Publishing Government's
9   168 to the jury at this time, your Honor.
10     Q.  And I'm going to ask you to take a look at
11  your monitor, Detective, and I'm going to show you
12  Government's 169.
13         MR. SHEEHAN:  May I have a second, your
14  Honor?
15         THE COURT:  Yes.
16         MS. REYNOLDS:  Your Honor, perhaps while
17  counsel is looking for the photos that were provided
18  to him, I am just going to go on to --
19         MR. SHEEHAN:  May we approach?
20         THE COURT:  No, let's not assume.
21  They're not in my book, either.
22         MS. REYNOLDS:  They're not in the
23  evidence binder.
24         MR. SHEEHAN:  May we approach, your
25  Honor?
```

538

```
1          MS. REYNOLDS:  Not in the evidence
2   binder.
3          MR. SHEEHAN:  May we approach?
4          THE COURT:  No.  Just a moment.  You may
5   look at the photograph.  It is not -- you are
6   checking to see whether it's been provided to you,
7   and you may go ahead and do that.
8          MS. REYNOLDS:  And I was going to move
9   on to another photo.
10         THE COURT:  And if you don't mind, while
11  that is going on, one of you can do that, and the
12  other can attend to the testimony with respect to
13  another photo.  Will that be satisfactory?
14         MR. SHEEHAN:  Thank you, your Honor.
15         THE COURT:  But before you say that it's
16  been provided, be sure that it's been provided,
17  because I don't have it in my notebook, either.
18         MS. REYNOLDS:  The evidence binder.  It
19  was provided in discovery, your Honor, yes.
20         THE COURT:  But the evidence binder is a
21  different thing.  That's what has the evidence
22  exhibits marked.
23         MS. REYNOLDS:  Correct.  That's been
24  added, but I will -- your Honor, I apologize.  I
25  just wanted to move on to another photo, which I've
```

539

```
1   marked Government's Exhibit 143-1, which is the
2   light bulb.  We have one photo in evidence.  This
3   one shows the same light bulb with the marker, and I
4   don't believe we had actually moved it into
5   evidence, so I was going to go try to do that at
6   this time while counsel -- to give counsel some time
7   just to clarify the record.  I can show it to the
8   witness at this time.
9          THE COURT:  Go ahead.
10     Q.  Just taking a look for purposes of the
11  record of 143-1, can you see that up on -- on your
12  monitor?
13     A.  Yes.
14     Q.  What is that a photograph of?
15     A.  That is a photograph of the light bulb on
16  the floor of Mr. Williams' room marked with yellow
17  placard No. 21.
18     Q.  And that's the same light bulb that was
19  introduced as evidence earlier this morning?
20     A.  Yes.
21         MS. REYNOLDS:  Your Honor, at this time,
22  I would move as a full exhibit Government's 143-1,
23  which is --
24         THE COURT:  And the only difference is
25  it has the placard 21?
```

540

```
1          MS. REYNOLDS:  That is correct, your
2   Honor.
3          THE COURT:  Any objection?
4          MR. SHEEHAN:  No, there is no objection
5   to that, your Honor.
6          THE COURT:  Thank you.  It's a full
7   exhibit.
8      Q.  Just put that up on the screen, just so
9   it's clear for the jury what photograph we're
10  talking about.  Showing you Government's
11  Exhibit 143-1, what is that a photograph of?
12     A.  That's a photograph of the light bulb,
13  which was found on Mr. Williams' bedroom floor with
14  the blood-like stains on it.  This one is marked
15  with yellow placard No. 21.
16     Q.  And then drawing your attention, then, back
17  into Tina Johnson's bedroom, do you recall whether
18  there was a small couch next to the closet area of
19  that bedroom when you were processing the scene?
20     A.  There was a wood frame for a couch in front
21  of the closet --
22     Q.  Okay.
23     A.  -- in the bedroom.
24     Q.  And do you recall if there were some
25  cushions that seemed to match that wood-framed couch
```

**GA135**

541

1   that were also found inside the bedroom?
2       A.  Yes, there were.
3       Q.  And then just taking a look at your monitor
4   there.  If I could ask you to take a look at what's
5   been marked Government's Exhibit 169, do you see
6   that on your screen?
7       A.  Yes.
8       Q.  And do you recognize what that's a
9   photograph of?
10      A.  Yes.
11      Q.  What is that a photograph of?
12      A.  That is the corner of the wood frame for
13  the sofa that was in the bedroom where Ms. Johnson
14  and Mr. Reid were.
15      Q.  And does that photograph fairly and
16  accurately depict what that portion of the
17  wood-frame couch looked like when you and your team
18  were processing the scene specifically within the
19  bedroom of Tina Johnson and James Reid?
20      A.  Yes.
21          MS. REYNOLDS:  Your Honor, at this time,
22  I'm not sure if the defendant has had enough time.
23  I can give them more time if they want, but I was
24  going to move as a full exhibit the photograph of
25  that wood-framed couch.

542

1           MR. SHEEHAN:  Based on the
2   representations made by counsel that that has been
3   previously provided, I don't have an objection at
4   this time.
5           THE COURT:  All right, then.  169 will
6   be a full exhibit.
7           MS. DAYTON:  Your Honor, may we
8   approach?
9           THE COURT:  No.  Let's just finish this,
10  and then I'll speak with you at the lunch break.
11          MS. DAYTON:  Thank you.
12      Q.  And then just taking a look at that
13  photograph, and I'll pop that up onto the screen.
14  Again, looking at Government's 169, can you describe
15  what's pictured in that photograph?
16      A.  This is a photo of the wood frame of the
17  sofa that was in the bedroom where Ms. Johnson and
18  Mr. Reid were located.  Actually, it was in front of
19  the closets, and it -- in this area, if I may.
20      Q.  Yes.
21      A.  This is actually the door to the room from
22  the hallway.  So this is actually right inside the
23  room, and you can see blood-like stains on the frame
24  and the part of the sofa where the cushions actually
25  lay.

543

1       Q.  Now, may I ask you to take a look at the
2   monitor and take a look at what's been already
3   admitted into evidence as Government's Exhibit 101A,
4   and just taking a look at 101A-1, which is contained
5   within 101A, what is that a photograph of?
6       A.  This is an aerial view of 215 Charles
7   Street, and it also shows the diner next door and
8   surrounding residences.
9       Q.  And just using the pointer, pointing to the
10  screen, can you just point out the diner that you
11  just mentioned and where that is in relation to the
12  apartment building of 215 Charles Street?
13      A.  This is the diner.  It's actually on the
14  corner of Charles Street and Main Street.
15          MS. REYNOLDS:  And for purposes of the
16  record, your Honor, that's the left-hand corner of
17  the photo as we look at it.
18      Q.  Can you just point out where the building
19  is?
20      A.  This is 215 Charles Street.
21      Q.  Thank you.  And I'm going to draw your
22  attention then to the diagram that's now on the
23  screen, which has been admitted into evidence as
24  Government 101A and, specifically, 101A-3, just the
25  diagram of apartment 101.  Do you see that?

544

1       A.  Yes.
2       Q.  And have you had an opportunity prior to
3   testifying to look at it this diagram and work with
4   it a little bit?
5       A.  Yes.
6       Q.  And, in fact, did you have an opportunity
7   to go to Quantico, Virginia to meet with Sandra
8   Holliday and other individuals who helped prepare
9   these graphic exhibits for courtroom presentation?
10      A.  Yes, I did.
11      Q.  Now, taking a look, then, at the diagram
12  and starting with the living room area, and do you
13  know what happens when you click onto the numbers
14  that are contained in the diagram?
15      A.  I was informed that once the diagram was
16  completed, if you clicked on the number, it will
17  show you the piece of evidence it refers to.
18      Q.  So, I'm going to start here, and can you
19  describe what I'm pointing to here?  What is this
20  area of the apartment?
21      A.  Well, that's a closet that's actually right
22  inside the entry door to the apartment.
23      Q.  And then over here where the arrow is?
24      A.  That's the kitchen.
25      Q.  And then starting -- first, I'm going to

545

```
1   start on this number.  Do you recognize what that's
2   a photograph of?
3       A.  Yes.
4       Q.  And what is that a photograph of?
5       A.  That is a photograph of the blood-like
6   stain that was collected as Exhibit No. 34 on wall F
7   in the apartment.
8       Q.  And so, when you say wall F in the
9   apartment, using the arrow here, is this wall F, the
10  wall that is right outside the kitchen area between
11  the kitchen and the living room area?
12      A.  Yes.  It's actually on this diagram a
13  little closer to where Nos. 32 and 33 are.  It's the
14  small section of wall between the kitchen and the
15  hallway that leads to the bedrooms.
16      Q.  Pointing on, then, to what's depicted as
17  No. 33 on the diagram, do you see what that is a
18  photograph of?
19      A.  Yes.
20      Q.  And that's part of wall F?
21      A.  That's also on wall F, yes.
22      Q.  And then 32, what wall is that on?
23      A.  That's wall F as well.
24      Q.  Then I'm going to move the cursor over to
25  No. 31 and ask you to describe what is depicted on
```

546

```
1   the photograph that corresponds to No. 31 on the
2   diagram.
3       A.  That looks to be the section of wall F that
4   was broken that I described earlier.
5       Q.  And that's like a close-up photo of that
6   that you described earlier in your testimony today?
7       A.  Yes.
8       Q.  And was that the section that you recovered
9   like a handprint from?
10      A.  The handprint was visible under the
11  alternate light source, yes.
12      Q.  And then taking a look at what's clicked
13  onto No. 30 now, does that show that same damage to
14  the wall F area?
15      A.  Yes, that's a little bit farther away, so
16  you can actually see the area that was damaged.
17      Q.  I'm going to move the cursor over to the
18  other side of that entryway to the living room and
19  click onto Government's Exhibit 27.  Do you
20  recognize what that's a photograph of?
21      A.  Yes.
22      Q.  Can you describe what that is?
23      A.  That is a -- that's actually the exterior
24  side of the entry door to the apartment.  It is a
25  blood-like stain that was marked off with the scales
```

547

```
1   and marked as No. 27.
2           THE COURT:  I'm sorry, where does 27
3   appear on the schematic of the apartment?  Can you
4   point your arrow on that, or the pointer?  Okay.  I
5   see it.  It's in orange.  Thank you.
6       Q.  So, again, that is the front door of
7   apartment 101?
8       A.  Yes, the exterior side.
9       Q.  You said the exterior side?
10      A.  Yes.
11      Q.  So, that's the side that goes out to the
12  hallway?
13      A.  That faces the hallway, common hallway of
14  the apartment building.
15      Q.  And then moving over to the next number,
16  No. 35 on the diagram, can you describe what
17  photograph pops up with the regard to the front door
18  of the apartment, which is No. 35 on the diagram?
19      A.  This is a photo of the interior side of the
20  door to the apartment, where the lock mechanism is,
21  and it shows also the scale marked No. 35 with a
22  small blood-like stain beneath the scale.
23      Q.  And then just moving the cursor over to
24  this oval-shaped table in the diagram.  What would
25  that correspond to?
```

548

```
1       A.  That's the representation of the table with
2   the lace tablecloth on it that was just inside the
3   door.
4       Q.  And do you recall testifying that you had
5   also seen some screws on that table, and then series
6   of photographs that we introduced with screws around
7   the door frame of the front door to apartment 101?
8       A.  Yes.
9       Q.  Do you recall whether or not you recovered
10  a drill from inside apartment 101?
11          MR. SHEEHAN:  I'm going to object to
12  leading.
13          THE COURT:  Sustained.
14      Q.  Did you recover any items -- any items, any
15  tools, from apartment 101 consistent with a drill-
16  type tool?
17      A.  No.
18      Q.  Now, moving the cursor over then, and
19  looking onto 13.  Do you see what photograph pops up
20  on the diagram?
21      A.  Yes.
22      Q.  And can you describe what that's a
23  photograph of and where it was recovered in relation
24  to the diagram?
25      A.  That's a photograph of a circular piece of
```

549

```
1   latex that's marked with yellow placard No. 13 that
2   was located under the cushion of the sofa in the
3   living room.
4        Q.   Then putting the cursor here in the middle
5   -- well, can you see where the cursor is located?
6        A.   Yes.
7        Q.   Can you describe for the members of the
8   jury what this area is inside apartment 101?
9        A.   That is the area from the living room.
10  It's a short hallway that goes back towards the two
11  bedrooms and bathroom, and there was at the time of
12  our entry a love seat in the hallway pushed against
13  the wall to the left.
14       Q.   And did you eventually, when you got to the
15  part of processing the scene where you --
16            MR. SHEEHAN:  May I just inquire briefly
17  on that, your Honor, just one point?
18            THE COURT:  Yes.
19  VOIR DIRE EXAMINATION
20  BY MR. SHEEHAN:
21       Q.   That sofa was not in that position when you
22  got in there, right?
23       A.   Yes, sir.  It was on its back.
24       Q.   And it was against the wall?
25       A.   Yes.  The way that it appears on the
```

550

```
1   diagram, it's a little bit farther away from the
2   wall.  It was actually against the wall.
3        Q.   And towards the front?
4        A.   Towards the left.  Here.
5        Q.   Okay.
6        A.   Towards this wall.
7        Q.   All right.  So that with that
8   understanding, that isn't the way it was when you
9   got there, meaning this diagram?
10       A.   It was in the same position, but I think
11  that the actual little icon of the love seat is a
12  little bit larger than the actual love seat because
13  there was room to walk on this side to get to the
14  bedrooms.
15       Q.   All right.
16       A.   So this is actually -- they're probably
17  limited by the icons that they have, but this makes
18  it look like there wasn't any room at all to walk,
19  where, actually, there was.
20  CONTINUED DIRECT EXAMINATION
21  BY MS. REYNOLDS:
22       Q.   And you and your team photographed that
23  area of the crime scene, correct?
24       A.   Before we moved it.  When we found it, yes.
25       Q.   And eventually you did move that love seat
```

551

```
1   out of the hallway area?
2        A.   Yes, to facilitate being able to move
3   around the apartment easier.
4        Q.   And showing you then what corresponds to
5   photograph --  or No. 36 on the diagram, can you
6   describe what that is?
7        A.   That was a latent print that was found on
8   the door frame to the bedroom.
9            MR. SHEEHAN:  Your Honor, may I inquire?
10  36, is that in evidence?
11            MS. REYNOLDS:  Well, this diagram is in
12  evidence, your Honor.  So most of the photographs
13  were put in --
14            MR. SHEEHAN:  Well, I understand.
15            THE COURT:  That may be, but 36 needs to
16  have separately been admitted.
17            MS. REYNOLDS:  We'll move onto this 25,
18  your Honor.  Clicking onto 25.  Do you recognize
19  what that is a photograph of?
20       A.   Yes.
21            MR. SHEEHAN:  I don't think that's in
22  evidence, either.
23            MS. REYNOLDS:  Well, I'm asking her,
24  your Honor.
25            MR. SHEEHAN:  I would ask counsel if
```

552

```
1   they're going to offer items through these photos,
2   that the photos be in evidence.
3            THE COURT:  Yes, that would be
4   appropriate.
5        Q.   Taking a look at what's depicted in
6   Government's 25 on your monitor, which I will
7   separately mark, but looking at that photograph, do
8   you recognize what that's a photograph of?
9        A.   Yes.
10       Q.   And what is depicted?
11            MR. SHEEHAN:  May I inquire, your Honor,
12  as to what -- do we have that, the number?  I just
13  don't know.
14            THE COURT:  Do you have it on your
15  monitor?
16            MR. SHEEHAN:  I see something on my
17  monitor, I do.
18            THE COURT:  That's what she's being
19  queried about.
20            MR. SHEEHAN:  Is it?
21            THE COURT:  Is it marked as 25.
22            MR. SHEEHAN:  Is it part of our exhibit
23  book?  I just don't know, your Honor.
24            MS. REYNOLDS:  Your Honor, could we
25  approach?  If this is going to be --
```

553

```
1              THE COURT:  Do you want to approach?
2              MS. REYNOLDS:  Yes, your Honor, to
3  explain what we're doing.
4              (Sidebar conference)
5              THE COURT:  Could we start with a
6  question I have about what you called 101A-3, which
7  is the schematic with the exhibit buttons.  I don't
8  have anything as 101A-3.  I have 101A, which --
9              MS. REYNOLDS:  Is the CD, and then what
10 I did was -- what went into evidence is 101A, which
11 is the entire CD, which contains these three
12 separate digitalized exhibits.  So what I did was
13 mark each one of those as 101A-1 aerial view,
14 101A-2.  You can't really mark them because they're
15 on the CD, but just for purposes of referring to the
16 three different identified exhibits.
17             THE COURT:  What was A-2?
18             MS. REYNOLDS:  A-2 is the aerial view.
19 I'm sorry.  A-2 is a 3D kind of building schematic
20 of the three floors.
21             THE COURT:  But we have not used that.
22             MS. REYNOLDS:  We're not using that.
23             MS. DAYTON:  It came in through Sandy
24 Holliday.
25             THE COURT:  But not marked as those
```

554

```
1  subcategories, it all came in as 101A?
2              MS. RODRIGUEZ-COSS:  A.
3              THE COURT:  And these are the
4  subcategories?
5              MS. REYNOLDS:  These are the
6  subcategories in 101A.  Just so it's clear what
7  we're looking at, because there is three different
8  digital exhibits on that CD.
9              THE COURT:  All right.  Now, what's
10 happening here with using those exhibits that have
11 buttons that correlate to what looks like the
12 Bridgeport exhibit numbers?
13             MS. REYNOLDS:  This is --
14             THE COURT:  If they're not in evidence
15 separately, then it seems to me you have to put them
16 into evidence.
17             MS. REYNOLDS:  Yes, your Honor, and I
18 thought most of these were in evidence.  I'll move
19 onto the ones that are in evidence, and I'm just
20 clicking on those at this point just to keep it
21 moving.
22             THE COURT:  Here you have -- I don't see
23 an Exhibit 27.
24             MS. DAYTON:  25, 26.  We'll put them in.
25             THE COURT:  I don't see an Exhibit 27.
```

555

```
1  Do you see an Exhibit 27?
2              MS. DAYTON:  No, but we were on 25.
3              MS. RODRIGUEZ-COSS:  They are not
4  necessarily in order.
5              THE COURT:  We are on 27, then we went
6  to 13.
7              MS. DAYTON:  27 was earlier, yes, your
8  Honor.  That was a picture from the front.  That was
9  from the -- just one person at a time.
10             MS. RODRIGUEZ-COSS:  I wasn't going to
11 talk.  I was just saying, they're out of order.
12             MS. DAYTON:  There was a picture of
13 blood on a --
14             THE COURT:  The record is not going to
15 be very clear unless we can associate that with
16 those exhibit numbers.
17             MS. REYNOLDS:  I can go back, and do
18 that on the ones that I just did, your Honor.
19             THE COURT:  Let's do that, because
20 otherwise we end up with references to exhibits that
21 will not show up on an exhibit list, on the
22 court's --
23             MS. REYNOLDS:  On the court's record.
24             THE COURT:  -- on the court's exhibit
25 list, on the court's list of admitted exhibits.
```

556

```
1  Okay?
2              MS. DAYTON:  I want to deal with one
3  other issue while we're here.  We dealt with
4  this with Mr. Smith the other day, and perhaps Mr.
5  Sheehan should have been at sidebar.  Over the past
6  five and a half years -- please, your Honor, for the
7  record because --
8              MR. SHEEHAN:  I'd like to do this on the
9  record, but we can do it when the jury is excluded
10 because I have some things I would like to say.
11             MS. DAYTON:  The problem is, he's
12 dirtying the jury by saying we -- they don't have
13 it.  So there is no rule anywhere that we're
14 required to turn over a separate evidence book.  We
15 did that for their convenience.  And, yes, we wish
16 they were all in there, but we have a right to
17 supplement our photos.  Every single photo we're
18 referring to has been turned over to the defense.
19 It was turned over years ago in the first discovery.
20             THE COURT:  I think the problem can be
21 overcome if -- to the extent it's not in the
22 evidence book, it just gets shown to counsel at the
23 time you make the ID.
24             MS. DAYTON:  It was, and then they stood
25 up and said, we don't have it, and that's the
```

557

1 problem, because they do have it.  So for them to do
2 that in front of the jury, the government intends to
3 call its paralegal at the conclusion of this case
4 and to admit to evidence our 300-page spreadsheet
5 which shows the items that have been turned over to
6 defense on multiple occasions in different forms at
7 their request.  Pictures, latent fingerprints,
8 photographs.
9          THE COURT:  Fine, but I think the issue,
10 you know, if you need to see the exhibit, you can
11 look at the exhibit, but don't say, it wasn't turned
12 over to us, unless you can absolutely say with
13 certainty it wasn't.  That's what we talked about
14 Friday.
15          MR. SHEEHAN:  I'd like to make a record,
16 but I'll do that after the jury is excused.
17          THE COURT:  Okay.
18          MR. SHEEHAN:  I don't need to make a
19 record at this point.
20          THE COURT:  That's fine.  Okay.  Because
21 if there is something that was not turned over, we
22 will take that up.
23          MR. SHEEHAN:  That's fine.
24          THE COURT:  Okay.
25          (Sidebar concluded)

558

1          Q.   I think when we left off we were taking a
2 look at your monitor there at the photograph with a
3 marker 25, Bridgeport marker 25.  Do you see that
4 photograph that's contained within the diagram --
5          A.   Yes.
6          Q.   -- on your monitor?
7          A.   Yes.
8          Q.   And I'm going to show you what I'll mark
9 Government's No. 159.  I'm showing it to the
10 defense.
11          MR. SHEEHAN:  Thank you.
12          Q.   And ask you if that's the same photograph
13 of the marker 25 that's contained in the diagram?
14          A.   Yes, it is.
15          Q.   And what is that a photograph of?
16          A.   This is an area of carpeting with
17 blood-like stains on it marked with yellow placard
18 No. 25.
19          MS. REYNOLDS:  Your Honor, I would move
20 as a full exhibit Government's 159 which depicts
21 Bridgeport placard 25.
22          MR. SHEEHAN:  No objection.
23          THE COURT:  Full exhibit.
24          Q.   Just showing you again up on the screen
25 with regard to the monitor, when you click onto this

559

1 diagram that was created, the No. 25, what pops up?
2          A.   It's that same photo of carpeting with
3 blood-like stains on it marked with yellow placard
4 No. 25.
5          Q.   And with regard to where that -- what area
6 we're in, can you describe where that photograph of
7 the blood-like spots on the rug are within the
8 apartment?
9          A.   I believe that's the area right at that
10 threshold to the room.  The bedroom, I'm sorry,
11 where Ms. Johnson and Mr. Reid were located.
12          Q.   Now, I'm going to start within the other
13 bedroom, and starting with the No. 1, and again,
14 what bedroom is depicted where the arrow is and to
15 the right of the photograph, right-hand corner?
16          A.   That was the room where Mr. Williams was
17 found.
18          Q.   Clicking on then to the No. 1, what is that
19 a photograph of?
20          A.   That is a photograph of Mr. Williams' head
21 with duct tape on it, and, yellow placard No. 1.
22          MR. SHEEHAN:  Could I ask, your Honor, I
23 can -- it might clarify the record if that photo
24 is -- if there is an exhibit number attached to that
25 photo.  It isn't 1, we know.  I think if the record

560

1 could reflect that, it might be a little bit
2 clearer.
3          THE COURT:  I think that's the next step
4 Ms. Reynolds is going to make here.
5          MR. SHEEHAN:  I would just request
6 before they do that that they put it on the screen
7 over there.
8          THE COURT:  But isn't that already in
9 evidence?
10          MS. REYNOLDS:  It is in evidence.
11          MR. SHEEHAN:  I don't know, your Honor,
12 and that's why I think that's what's a little
13 confusing.  There are --
14          THE COURT:  We'll do this in the right
15 order.  Bridgeport 1 is the equivalent to which
16 exhibit, Ms. Reynolds?
17          MS. REYNOLDS:  120-1 photograph.
18          THE COURT:  And that's been admitted?
19          MS. REYNOLDS:  Yes, your Honor.  All the
20 120, just for purposes of the record, because the
21 120-1, 120-2, 120-3, 120-4, 120-5, 120-6, these are
22 all photographs of the body of Basil Williams.
23 These were all admitted, and these correspond to the
24 Bridgeport numbers on the diagram.
25          MR. SHEEHAN:  But, your Honor --

561

```
1           THE COURT:  So 120-1 corresponds to
2   Bridgeport 1?
3           MR. SHEEHAN:  It doesn't.
4           MS. REYNOLDS:  Well, your Honor --
5           MR. SHEEHAN:  It doesn't, your Honor.
6           MS. REYNOLDS:  I'm going to go through a
7   series of photographs.  All the 120- photographs
8   have been added, and they're of the body of
9   Mr. Williams, and they are all in evidence.  I'm not
10  going to sit here and start matching them all up,
11  but those are all in evidence, and it's that series
12  of photographs, and I would like the witness --
13          THE COURT:  This one that's up there,
14  that is Bridgeport 1, is one of the 120 series?
15          MS. REYNOLDS:  Yes, your Honor, and
16  those have been admitted in evidence.
17          MR. SHEEHAN:  Your Honor, all I'm
18  requesting, and I think that's just sort of the
19  confusion about this.  This obviously is not 120-1,
20  and so --
21          THE COURT:  Let's --
22          MR. SHEEHAN:  If counsel could just
23  identify what the photo is, that would clarify it.
24          MS. REYNOLDS:  Your Honor --
25          THE COURT:  Yes?
```

562

```
1           MS. REYNOLDS:  What I'm attempting to
2   do, since we spent a lot of time introducing all of
3   those photos last week, is just introduce this
4   series.  This is the area of Basil Williams and his
5   body.  All of these photographs were admitted last
6   week.  I'm going to refer now just to the photos on
7   the diagram.
8           THE COURT:  I have 120-3.  Why don't we
9   use that?  That looks like it's got placard No. 1.
10          MS. REYNOLDS:  Thank you, your Honor.
11          THE COURT:  Go ahead.
12          MS. REYNOLDS:  Just -- so, I'm going to
13  continue to go through 1, 2, 3 and 4.  These are all
14  in that series of photographs.  I just want to have
15  the witness describe the diagram and what it shows.
16          THE COURT:  Okay.
17  Q.  So, again, just so it's clear.  I
18  apologize.  120-1 -- 120-3 corresponds to the photo
19  we're looking at right now on the diagram, which is
20  the body area of Basil Williams.  Is that accurate,
21  Detective?
22  A.  Yes.
23          THE COURT:  Wait, wait.  I'm sorry.
24  Yes, okay.
25          MS. REYNOLDS:  Thank you, your Honor.
```

563

```
1   Q.  I was just going to go to the next number,
2   which is on the diagram No. 2, and ask you what
3   photograph pops up -- what you see on the screen
4   now.
5   A.  That is a photograph showing Mr. Williams'
6   back, his shirt, his arms, and wrists, and hands,
7   which have duct tape, and his waist area, along with
8   Bridgeport placard No. 2 and No. 3.
9           THE COURT:  That's 120-5?
10          MS. REYNOLDS:  120-5 for purposes of the
11  record, your Honor.  Thank you.
12  Q.  And then moving on to what's depicted as
13  No. 3 in the diagram, is that just another view of
14  placard 2 and 3 and the duct tape of Mr. Williams?
15  A.  Yes.
16          MR. SHEEHAN:  Well, do you know -- I
17  realize counsel's problem, but I just don't know
18  what they're referring to there.  I don't think the
19  record reflects what they're referring to.
20          THE COURT:  Is it the same photograph
21  120-5?
22          MR. SHEEHAN:  It appears to be the same
23  photo.
24          THE COURT:  120-5 has two placards, and,
25  therefore, it's going to show up on button No. 2 and
```

564

```
1   button No. 3.
2           MR. SHEEHAN:  So it's the same photos?
3   The record will be the same photo, in other words?
4           THE COURT:  Yes.
5           MR. SHEEHAN:  Thank you, your Honor.
6   Q.  Going to No. 4 in the diagram, do you
7   recognize what that's a photograph of?
8   A.  Yes.  That's a photo of Mr. Williams'
9   ankles, and you could see his sneakers, duct tape on
10  his ankles, and placard No. 4.
11          THE COURT:  And that's 120-6.
12          MR. SHEEHAN:  Thank you, your Honor.
13  Q.  Now, I want to draw your attention up here
14  to the top of the area of the photograph, or the
15  diagram of Basil Williams' room, and the No. 22
16  appears at the top, and showing you -- clicking onto
17  that, does that photograph show the Government's --
18  what's been introduced as Government 123 in
19  evidence, the photograph of that blue plastic bag
20  and the white bag attached by the duct tape?
21  A.  Yes, and yellow placard No. 22.
22  Q.  Now, when you first testified, can you
23  describe again how it was that you approached the
24  scene with regard to where you were going to begin
25  processing the scene for evidence?  Where did you
```

565

```
 1   first start?
 2       A.   We began with the victims' bodies since the
 3   medical examiner had come down to assist with it in
 4   that area.  We began with the victims.
 5       Q.   So, those placards we started with, the
 6   lower numbers corresponds to the victim's body?
 7       A.   Yes.  They correspond with the evidence
 8   that was collected from the victim's body, yes.
 9       Q.   Moving into the other bedroom, the second
10   bedroom where Tina Johnson and James Reid were
11   found.
12            MR. SHEEHAN:  Your Honor, before we move
13   from this, could I just ask the witness a question
14   on this particular exhibit?
15            MS. REYNOLDS:  Your Honor, I'm going to
16   object.
17            THE COURT:  Isn't that what we have
18   cross-examination for?
19            MR. SHEEHAN:  Yes, but I think, your
20   Honor, there was a claim this was 120-3.  I just
21   don't -- you know, I'm just trying to follow what
22   your Honor had indicated.
23            THE COURT:  But that is what 123 is.
24            MR. SHEEHAN:  It doesn't have the
25   evidence sticker on it.  I'm just wondering what
```

566

```
 1   picture they're referring to.
 2            THE COURT:  123.
 3            MR. SHEEHAN:  That's not 123.
 4            MS. REYNOLDS:  Government 123 in
 5   evidence.
 6            THE COURT:  123 doesn't have the
 7   placard.  That's the difference.  I see what you are
 8   saying.
 9            MS. REYNOLDS:  Then it's 123-1, your
10   Honor.  We introduced two photographs.
11            THE COURT:  123-1.  All right.  That
12   would just be the same picture as 123, but with the
13   placard.
14            MS. REYNOLDS:  With the placard, your
15   Honor.
16            THE COURT:  Go ahead, then.
17            MS. REYNOLDS:  Thank you.
18       Q.   Again, I was saying, we were moving then to
19   the other bedroom, and just showing you with the
20   cursor this area, these numbers, the Bridgeport 7,
21   8, 5 and 6 here, what would be depicted in those --
22   in that area of the bedroom of Tina Johnson and
23   James Reid?
24       A.   That is where Ms. Johnson was located.
25       Q.   And then with the cursor over in this area,
```

567

```
 1   9, 10, 11, 12, what is depicted, or what would be
 2   found in that area of the bedroom of Tina Johnson
 3   and James Reid?
 4       A.   That was where Mr. Reid was located.
 5       Q.   And so, starting, then, with the area 7, 8,
 6   and then 5 and 6, and clicking on, then, to number
 7   5, do you see what's depicted which corresponds to
 8   the number 5 in the diagram?
 9            MS. DAYTON:  Your Honor, could we darken
10   the room a little?
11            THE COURT:  Yes.
12            MR. SHEEHAN:  Your Honor, I would ask
13   that we go through the procedures that your Honor
14   indicated, which are that they identify what the
15   exhibit is before they bring it up on the screen.
16            THE COURT:  Now, Ms. Reynolds, these
17   were the series that started with what?
18            MS. REYNOLDS:  These are the series,
19   your Honor, that start with 121-1, 121-2, 121-3,
20   121-4.
21            THE COURT:  All right.  Let me --
22            MS. REYNOLDS:  So the Basil Williams
23   series was 120, Tina Johnson is the 121 series,
24   which we introduced.
25            THE COURT:  We're looking for the ones
```

568

```
 1   with the placards, right?
 2            MS. REYNOLDS:  With the placards, your
 3   Honor, yes.
 4            MR. SHEEHAN:  Your Honor, I think the
 5   confusion we're having --
 6            THE COURT:  Let me just -- all right.
 7   So, you are looking at 121-4 that has placards 5 and
 8   6 in it?
 9            MS. REYNOLDS:  Yes, your Honor, 121-4.
10   Government's Exhibit 121-4, which shows placards 5
11   and 6 of the Bridgeport PD.
12            THE COURT:  All right.
13       Q.   And, Detective, does -- do the photos that
14   you took and the diagram that was created using
15   those photographs accurately reflect the position of
16   the bodies as you found them when you entered into
17   that apartment and started processing the scene?
18       A.   Yes.
19       Q.   And that goes for all three bodies that
20   were found, is that fair to say, the photographs and
21   the diagram?
22            MR. SHEEHAN:  Objection, leading.
23            THE COURT:  Sustained.
24       Q.   Do the photographs and the diagram
25   accurately reflect the position that you found all
```

**GA142**

569

```
1   three bodies?
2       A.   The photos that we just saw of Mr. Williams
3   and this photo of Ms. Johnson, yes, this is how we
4   found them when we arrived on scene.
5       Q.   And then taking a look at what I'll click
6   on No. 6 in the diagram, which shows placard 6 and
7   7, some cushions.  Do you recognize that photo as
8   well?
9       A.   Yes.
10          MR. SHEEHAN:  Again, your Honor.
11          THE COURT:  That's 121-5.
12          MR. SHEEHAN:  Is that in evidence?
13          THE COURT:  Yes.  Do you know, I can
14  only keep up with so much here.
15          MR. SHEEHAN:  I'm sorry, the same
16  problem.
17      Q.   Again 121-5, which is the next one in that
18  series, and then showing you -- clicking then to No.
19  8 placard photo, do you recognize that photo.
20      A.   Yes.
21      Q.   So, again, taking a look at what's on the
22  screen, I clicked on to No. 8 in the diagram, which
23  shows Government 121-8.  What is that a photograph
24  of?
25      A.   That's a photograph of Ms. Johnson's wrist
```

570

```
1   bound and duct taped and yellow placard No. 8.
2       Q.   And then moving up in the diagram and
3   clicking onto No. 7, which is Government's 121-6,
4   what is that a photograph of?
5       A.   It's a photograph of Ms. Johnson's ankles
6   bound and duct taped, her feet, and yellow placard
7   No. 7.
8       Q.   Again, you indicated then that these
9   numbers on the diagram 9, 10, 11 and 12, correspond
10  to the evidence that was recovered from James Reid's
11  body; is that fair to say?
12      A.   Yes.
13      Q.   So, starting then with No. 9, and clicking
14  onto that in the diagram, what does that show?
15          MS. REYNOLDS:  And just for purposes of
16  the record, that's 122-3 which is in evidence.
17      Q.   What is that a photograph of?
18      A.   That is a photograph of Mr. Reid's head and
19  shoulders with yellow placard No. 9.
20      Q.   And then if you click onto No. 10 in the
21  diagram, again, what is that a photograph of?
22      A.   That is a photograph of Mr. Reid's back,
23  and you can see his arms and wrists with the duct
24  tape and his shirt, yellow placards Nos. 10 and 11.
25          MS. REYNOLDS:  For purposes of the
```

571

```
1   record, your Honor, these are the 122 series and
2   that one shows, I think, 122-4.
3       Q.   And then clicking onto No. 11 in the
4   diagram, what does that photograph show?
5       A.   That's a photograph of Mr. Reid's wrists
6   with the duct tape on them and yellow placard
7   No. 11.
8           MS. REYNOLDS:  For purposes of the
9   record, your Honor, that's Government's 122-6.
10          MR. SHEEHAN:  Is that admitted, your
11  Honor?  Do the Court's records reflect that was
12  admitted?
13          MS. REYNOLDS:  I have that admitted on
14  4/21.
15          THE CLERK:  I show it in.
16          MR. SHEEHAN:  I'm sorry.  Thank you for
17  that clarification.
18      Q.   Then you go to the next number associated
19  with Mr. Reid's body, clicking onto No. 12, what is
20  that a photograph of?
21      A.   This photograph shows the bottom part of
22  Mr. Reid's legs, his ankles with duct tape, shoes
23  and yellow placard No. 12.
24          MS. REYNOLDS:  And just to be clear,
25  your Honor, that's 122-7 in evidence.
```

572

```
1       Q.   So, again, those lower numbers corresponded
2   to the bodies because you started there, correct?
3       A.   Yes.
4       Q.   All right.  Now, I'm going to take you
5   further into the room then, and I'm going to ask you
6   to take a look at what I'll demarc Government's
7   Exhibit 155.
8           MS. REYNOLDS:  I'm providing a copy to
9   counsel, your Honor.
10      Q.   Showing you Government's 155.  Do you
11  recognize what that's a photo of?
12      A.   Yes.
13      Q.   And what is that a photograph of?
14      A.   This is a photograph of the bedroom we've
15  been looking at where Ms. Johnson and Mr. Reid were.
16  To the left as you enter the room shows the floor,
17  the box spring and a part of the wall along with
18  yellow placard No. 14 and 15.  And you can also see
19  part of the frame of the sofa.
20          MS. REYNOLDS:  Your Honor, at this time
21  I would move as a full exhibit Government's 155.
22          MR. SHEEHAN:  No objection.
23          THE COURT:  Full exhibit.
24      Q.   And then clicking onto No. 14 in the
25  diagram, do you recognize what that's a photo of?
```

573

1    A.    Yes.
2    Q.    And what is that?
3    A.    That is a photograph of what was collected
4 as a latex glove on the floor of the bedroom where
5 Ms. Johnson and Mr. Reid were marked with yellow
6 placard No. 14.
7    Q.    And that's a close-up of that photograph,
8 or that's a close-up photo of placard 14 and the
9 latex gloves?
10   A.    Yes.
11   Q.    And showing you, moving on to No. 15 on the
12 diagram and clicking onto that.  Is that a close-up
13 photograph of the nylon you referred to and that you
14 testified earlier today about?
15   A.    Yes.
16        MS. REYNOLDS:  And your Honor,
17 Government's Exhibit 142, if that is not in
18 evidence, I have a copy to show counsel.  We moved
19 it in earlier today?  We did move it in earlier
20 today.  So, I would just for purposes of clarifying
21 the record, Government's Exhibit 142 is the
22 photograph shown at No. 15 in the diagram.
23        THE COURT:  Thank you.
24   Q.    Now, Detective, as you moved through there,
25 through the bedroom and processed evidence, I'm

574

1 going to move you then to No. 17 up here in the
2 right-hand corner of the diagram and click onto that
3 and ask you if you recognize what that's a close-up
4 photograph of?
5    A.    Yes, that's the photo of the little
6 multipurpose tool that was found on the floor of the
7 bedroom, and this photo is marked with yellow
8 placard No. 17.
9        MS. REYNOLDS:  And for purposes of the
10 record that's the folding tool that was introduced
11 into evidence as 140A and the photograph of it at
12 140.
13   Q.    And then moving over to the left-hand side
14 of the photo No. 16 on the diagram, do you recognize
15 what that's a photograph of?
16   A.    Yes.
17   Q.    And what piece of evidence was collected
18 there in the area of the nightstand.  Well, what is
19 that a photograph of?
20   A.    That's a photo of the nightstand that was
21 located in the bedroom of Ms. Johnson and Mr. Reid.
22 Specifically marked on the nightstand is latex glove
23 with yellow placard No. 16 next to it.
24        MS. REYNOLDS:  And, your Honor, that was
25 Government's Exhibit 138, and 138A was the actual

575

1 item, the actual latex glove that was recovered.
2        THE COURT:  Thank you.
3    Q.    And then clicking onto No. 18 in the
4 diagram, which appears on the bed area in the
5 middle.  Do you recognize what that's a photograph
6 of?
7    A.    Yes.
8    Q.    And what is that?
9    A.    That is a photograph of the box spring on
10 the frame in the bedroom where Ms. Johnson and
11 Mr. Reid were located with a yellow placard No. 18
12 on top of it.
13   Q.    And I'm going to show you Government's
14 Exhibit 141.  Is that the same photograph depicting
15 placard 18?
16   A.    Yes, same photograph.
17        MS. REYNOLDS:  And, your Honor, again,
18 that refers to Government's 141.
19        THE COURT:  Thank you.
20   Q.    Now, you had testified before that
21 eventually as you are processing you start removing
22 items and looking for items that aren't immediately
23 visible to the human eye, correct?
24   A.    Yes.
25   Q.    Okay.  And there came a time that you

576

1 removed that mattress that's depicted at No. 18 in
2 the diagram?
3    A.    The box spring, yes.
4    Q.    The box spring.  Sorry.  And then showing
5 you -- clicking onto No. 19.  Well, let me start
6 here.  Let me start with No. 20.
7        Do you see the picture that pops up when you
8 click onto No. 20 in the diagram?
9    A.    Yes.
10        MS. REYNOLDS:  And that is Government's
11 Exhibit 139, your Honor.
12   Q.    And what is that a photograph of?
13   A.    That's a photograph of the carpeted area
14 underneath where the box spring had been, within the
15 frame of the bed still, white plastic bag and yellow
16 placards No. 20 and No. 19.
17   Q.    And those items were seized as evidence and
18 processed as evidence, correct?
19   A.    Yes.
20   Q.    So then clicking onto No. 19, what is this
21 a photograph of?
22   A.    That's a photograph, again, of the carpeted
23 area underneath where the box spring had been.  It's
24 a small section of a latex glove, apparently in the
25 shape of the tip of a finger, with the yellow

**GA144**

577

```
1    placard No. 19.
2              MS. REYNOLDS:  Your Honor, that's
3    Government's 130 -- well, I'm sorry.  I lost track
4    of that one, one moment, your Honor.
5              I apologize.  It was put in earlier this
6    morning.  148.  Your Honor, I apologize.  Just so
7    it's clear, that's the photograph of the small
8    section, the close-up and that was moved in earlier.
9              THE COURT:  All right.
10   Q.    And then I'm going to show you what's been
11   demarced Government's Exhibit 157 and Government's
12   Exhibit -- well, let me start with Government's
13   Exhibit 156 and Government's Exhibit 157 and ask you
14   to take a look at those two photographs starting
15   with Government's Exhibit 156.  Do you recognize
16   what that's a photograph of?
17   A.    Yes.
18   Q.    And what is that?
19   A.    This is a photograph of the bedroom where
20   Ms. Johnson and Mr. Reid were after all the
21   furniture had been removed, and it's depicting
22   stains on the carpet along with placards No. 23, 24
23   and 25 further back near the door.
24   Q.    And then taking a look at Government's
25   Exhibit 157, do you recognize what that's a
```

578

```
1    photograph of?
2    A.    Yes.
3    Q.    And what is that a photograph of?
4    A.    That's a close-up photo of the area of
5    carpet with blood-like stains on it with yellow
6    placard No. 23.
7    Q.    And do both of those photographs fairly and
8    accurately depict the blood on the carpet that was
9    found after you removed the bodies and some of the
10   furniture in the room?
11   A.    Yes.
12             MS. REYNOLDS:  Your Honor, I would move
13   as full exhibits Government's 156 and 157.
14             MR. SHEEHAN:  No objection.
15             THE COURT:  Full exhibits.
16   Q.    And then clicking on in the diagram to
17   No. 23, do you recognize what is depicted in that
18   photograph?
19   A.    That's a close-up photograph of an area of
20   blood-like stain on the carpet in this bedroom that
21   we've been looking at where Ms. Johnson and Mr. Reid
22   were located.
23   Q.    And just for purposes of the record, as far
24   as where in the diagram, that's near the entryway
25   near where the two bodies were found across from the
```

579

```
1    dresser area; is that fair to say, looking at the
2    diagram?
3    A.    Yes.
4    Q.    And clicking onto No. 24 in the diagram,
5    what does that show?
6    A.    That's a close-up photograph also of
7    blood-like stains on the carpet in the bedroom where
8    Ms. Johnson and Mr. Reid were located, a little bit,
9    actually, closer to the doorway.
10   Q.    Let me just hand you Government's Exhibit
11   158 for purposes of identification and ask you to
12   add that to the photos you just looked at of the
13   blood.  Is that a fair and accurate representation
14   of placard 24, the blood-like area?
15   A.    Yes, it is.
16             MS. REYNOLDS:  Your Honor, I would also
17   move Government's Exhibit 158.
18             MR. SHEEHAN:  No objection.
19             THE COURT:  Full exhibit.
20   Q.    And that's what is shown there, correct?
21   A.    Yes, it's the same photograph that's on the
22   screen right now of No. 24.
23   Q.    I'm just going to hand you Government's
24   Exhibit 160 and ask you if you recognize that photo.
25             MR. SHEEHAN:  160?  Is that what you
```

580

```
1    said, Counsel?
2              MS. REYNOLDS:  Yes, 160.
3    Q.    And what is that a photograph of?
4    A.    This is a photo of a blood-like stain as
5    well and yellow placard No. 26.
6              MS. REYNOLDS:  Your Honor, I would move
7    as a full exhibit Government's 160.
8              MR. SHEEHAN:  No objection.
9              THE COURT:  Full exhibit.
10   Q.    And then I'm going to move to the bed area
11   here and I'm going to ask you to first take a look
12   at Government's Exhibit 161, see if you recognize
13   that photograph.
14   A.    Yes.
15   Q.    What is that a photograph of?
16   A.    This is a photograph of the mattress which
17   was located in the bedroom of Ms. Johnson and
18   Mr. Reid.  You can see blood-like stains on the
19   mattress.  There is also a blue tarp in the
20   photograph and yellow placard No. 28.
21   Q.    And handing you 162, what is that a
22   close-up photograph of?
23   A.    That is a close-up photograph of the corner
24   of the mattress with blood-like stains on it and
25   yellow placard 28.
```

581

1        MS. REYNOLDS:  Your Honor, I would move
2   as full exhibits Government's Exhibits 161 and 162.
3        MR. SHEEHAN:  Can I just look at that
4   copy of 161, please.
5        No objection.
6        THE COURT:  161 and 162 are full
7   exhibits.
8   Q.   And clicking on then to No. 28 in the
9   diagram, what is shown there?
10  A.   That's a close-up photo of the corner of
11  the mattress that was located in the bedroom near --
12  actually on Mr. Reid when we initially got there and
13  you could see blood-like spatter in the corner.
14  Q.   Now, Detective, in addition to all of the
15  photographs that were taken and all the processing
16  that was done within the scene at apartment 101,
17  were there other photographs taken of the outside of
18  the building of 215 Charles Street?
19  A.   Yes, there were.
20  Q.   And I'll hand you a series of photographs
21  starting with Government's Exhibit 102C and I'm
22  going to hand up 102C, 102D, 102E, 103.  I'm going
23  to hand those up to you, Detective, and ask you to
24  take a look at those photographs.  Starting with
25  102C --

582

1        MR. SHEEHAN:  C?
2        MS. REYNOLDS:  C, yep.
3   Q.   Do you recognize what's depicted in that
4   photograph?
5   A.   Yes.
6   Q.   And what is in that photograph?
7   A.   This is the first floor common hallway at
8   215 Charles Street.  You are in the -- you come in
9   both entry doors and in front of you would be the
10  hallway, the elevator.  You can see the corner of
11  the laundry room and there is also crime scene tape
12  across the hallway that leads to the rear of the
13  building.
14  Q.   And taking a look at 102D, do you recognize
15  what's shown in that photograph?
16  A.   Yes.  That's the common hallway, as well,
17  from a little bit of a different angle.  Again, you
18  can see the elevator, the laundry room and the
19  section of crime scene tape.
20  Q.   And then taking a look at 102E, do you
21  recognize what that's a photograph of?
22  A.   Yes.  This is the common hallway first
23  floor area, as well, looking toward the laundry room
24  and the door that leads to the interior stairway at
25  the front of the building.  Again, crime scene tape

583

1   is across the door that leads to the stairwell, and
2   you can see the edge of the crime scene tape that
3   blocks off the hallway also.
4        MS. REYNOLDS:  Your Honor, at this time
5   I would move as full exhibits Government's 102C,
6   102D, and 102E.
7        MR. SHEEHAN:  No objection.
8        THE COURT:  Full exhibits.
9   Q.   And taking a look first at what's been
10  admitted in evidence as 102C, can you describe what
11  we're seeing in that photograph.
12  A.   This is the first floor common hallway into
13  215 Charles Street, the apartment building.  To the
14  left, the gray shiny door is the elevator.  Also to
15  the left, farther back from that, is the laundry
16  room, and you see crime scene tape going across the
17  hallway that goes towards the rear of the building.
18  Q.   So, just for purposes of the record, where
19  the cursor is pointed now, what is that in the
20  middle of the photograph where the crime scene tape
21  starts?
22  A.   That's the laundry room for the first
23  floor.
24  Q.   And where in relation to the laundry room
25  of the first floor is apartment -- the doorway to

584

1   apartment 101?
2   A.   Directly across to the right.
3   Q.   So, as the cursor moves across in this area
4   right here?
5   A.   Yes.
6   Q.   And then showing you what's been admitted
7   in evidence as Government's 102D, is that just
8   another angle of that elevator and then laundry room
9   area of that first floor entry?
10  A.   Yes, it's the first floor common hallway as
11  well.
12  Q.   And again, this is the crime scene tape
13  that was seen in the other photograph also, correct?
14  A.   Yes.
15  Q.   And then showing you 102D --
16       MS. REYNOLDS:  It appears to be the same
17  photograph, your Honor.
18  Q.   So again, that's the laundry room area and
19  the elevator area.
20       MR. SHEEHAN:  I think it's the same
21  exhibit, isn't it, your Honor?
22       THE COURT:  102D, yes.
23  Q.   And then showing you Government's
24  Exhibit 102E, what is that a photograph of?
25  A.   That's the photograph of the first floor

585

```
1    common hallway entryway looking into the section of
2    the laundry room that you can see.  But farther over
3    from the laundry room is the door that leads to the
4    interior staircase, and that's been marked off with
5    crime scene tape as well.
6        Q.   And do you know where that staircase goes?
7    Do you know where that staircase goes that's in that
8    area of the building?
9        A.   I believe that staircase leads both down to
10   the parking area and upstairs to the second and
11   third floor as well.
12       Q.   And then showing you Government's
13   Exhibit 104, and 105, just have you take a look at
14   starting with 104.  Do you recognize that?
15       A.   Yes.
16       Q.   And what is depicted in Government's
17   Exhibit 104?
18       A.   This is the side of 215 Charles Street, and
19   it depicts a window with an air conditioning unit
20   underneath it.
21       Q.   And then taking a look at Government's 105,
22   what's that a photograph of?
23       A.   It's just a more direct photograph of the
24   window with the air conditioning unit underneath it
25   on the side of the apartment building.
```

586

```
1        Q.   I'm going to hand up one more photograph of
2    that area, Government's Exhibit 106, and ask you
3    what's shown in that photograph?
4        A.   This is a photograph of the side of the
5    building as well with the window, the air
6    conditioning unit, and then in the foreground of the
7    picture is the fence and a window screen.
8        Q.   And do those photographs in 104, 105 and
9    106 fairly and accurately depict the area outside of
10   Tina Johnson's bedroom window as it appeared back in
11   August of 2005 when you were processing that scene?
12       A.   Yes.
13            MS. REYNOLDS:  Your Honor, I would move
14   as full exhibits Government's 104, 105 and 106.
15            MR. SHEEHAN:  May I inquire briefly your
16   Honor.
17            THE COURT:  Yes.
18   VOIR DIRE EXAMINATION
19   BY MR. SHEEHAN:
20       Q.   Detective, 104 and 105, is it your
21   testimony that 104 and 105, are they the same
22   window?
23       A.   104 and 105 appear to be the same window,
24   yes, sir.
25       Q.   And is 106 the same window?
```

587

```
1        A.   106 is the -- I believe it's the next
2    window over.
3        Q.   Okay.  So 104 and 105 would be the room
4    where Mr. Williams' body was recovered?
5        A.   Yes.
6        Q.   And 106 then would be the room where
7    Ms. Johnson and Mr. Reid were found?
8            MS. REYNOLDS:  Your Honor, I'm going to
9    object.  This is going beyond the --
10           THE COURT:  It's not clear what window
11   these pictures depict, and so it is going a little
12   bit beyond that.
13           But they are the two windows in
14   apartment 101?
15           THE WITNESS:  Yes, and they're both on
16   the same side of the building.
17           THE COURT:  Okay.
18           MS. REYNOLDS:  And it's the exterior of
19   those windows.
20           THE COURT:  Right.
21           THE WITNESS:  Yes.
22           MR. SHEEHAN:  Thank you, your Honor, I
23   have no objection to these.
24           THE COURT:  All right.  They are full
25   exhibits.
```

588

```
1    CONTINUED DIRECT EXAMINATION
2    BY MS. REYNOLDS:
3        Q.   And taking a look at Government's 104,
4    again, can you just describe sort of the area that's
5    depicted in Government's 104.
6        A.   This is 215 Charles Street.  It's the side.
7    If you are facing the building it would be towards
8    the right.  It's the side yard and one of the
9    windows for apartment 101 with the air conditioning
10   unit underneath it.
11       Q.   And that's the window here sort of in the
12   middle of the photo, correct?
13       A.   Yes.
14       Q.   And showing you Government's 105, what is
15   that a close-up of?
16       A.   That's the close-up photo of the same
17   window.
18       Q.   And showing you Government's 106, what can
19   be seen in this photograph?
20       A.   That is a photograph of the other window
21   for apartment 101, which is on the same side of the
22   building.  This is an exterior shot.  It shows the
23   window with the air conditioning unit underneath it.
24   You can see the yard, quote-unquote, that is on the
25   side of the building.  The fence in the foreground
```

589

1  which separates the two yards, the perimeter, and on
2  the side of the fence where 215 Charles Street is,
3  is a window screen on the ground.
4     Q.   And which window of which bedroom is
5  depicted in Government's 106?
6     A.   That is the bedroom where Ms. Johnson and
7  Mr. Reid were located.
8     Q.   I'm going to hand up to you Government's
9  Exhibit 109 and Government's Exhibit 110 and
10  Government's Exhibit -- let's start with 109 and
11  110.
12        And taking a look first at Government's 109,
13  do you recognize what that's a photograph of?
14     A.   Yes.
15     Q.   And what is that a photograph of?
16     A.   This is 215 Charles Street as well.  It's
17  showing from the corner, both the front of the
18  building and the east side of the building that
19  faces toward Main Street, actually.
20     Q.   And can you take a look at Government's 110
21  and tell us what's depicted in that photograph.
22     A.   Yes, this is the side, the east side of 215
23  Charles Street that depicts the side of the building
24  and the parking area that is under -- well, under
25  part of the building and the driveway to get to

590

1  those parking spots.
2        MS. REYNOLDS:  Your Honor, at this time
3  I would offer as full exhibits Government's 109 and
4  110.
5        MR. SHEEHAN:  No objection.
6        THE COURT:  Full exhibits.
7     Q.   Showing you first up on the screen there
8  Government's Exhibit 109, can you just describe
9  what's -- and showing you with the cursor where the
10  tree is in the photo, what is that area?
11     A.   This is the front section of 215 Charles
12  Street.  Where the cursor is is actually the
13  stairway that leads to the entry doors on the first
14  floor.
15     Q.   And where the cursor is pointing now in the
16  photo to a window on the -- do you know what that is
17  a window of?
18     A.   That is the living room window of apartment
19  101.
20     Q.   And then going to the other side of the
21  photo where you can see some evidence tape, what's
22  on this side of the photo, what's depicted?
23     A.   That's the driveway that leads to the
24  parking area on the side of the building.
25     Q.   And if you were to keep going to this side

591

1  of the photo, is that -- what's the next building on
2  that side of the photo?
3     A.   The next building next door is the diner.
4     Q.   I'm going to show you Government's
5  Exhibit 111 and 112 and ask you to take a look at
6  those two photographs.
7        Starting with Government's Exhibit 111, what
8  is that a photograph of?
9     A.   Exhibit 111 is a photograph of the east
10  side of 215 Charles Street showing the parking area
11  and the door that leads to the interior stairway.
12     Q.   And then taking a look at Government's
13  Exhibit 112, what is depicted in that photograph?
14  Or what angle is that taken from?
15     A.   This is a photograph of the same side of
16  the building, the east side of the building, but
17  it's taken from the rear of the parking area looking
18  back towards the street, back towards Charles
19  Street.
20        MS. REYNOLDS:  Your Honor, at this time
21  I would move as full exhibits Government's 111 and
22  112.
23        MR. SHEEHAN:  No objection.
24        THE COURT:  Full exhibits.
25     Q.   And showing you, first starting with

592

1  Government's 111, what is that a photograph of?
2     A.   This is the east side of 215 Charles
3  Street.  It's the parking area on the side of the
4  building, and the dark rectangular area on the
5  photo, yes, where the cursor is, is the door that
6  leads to the interior staircase.
7     Q.   And again, this is an exterior parking lot
8  to the building, correct?
9     A.   Yes.
10     Q.   And then showing you Government's
11  Exhibit 112, what is depicted in Government's
12  Exhibit 112?
13     A.   This is that same driveway to the parking
14  area on the exterior side, east side of the
15  building, just this photograph is taken from the
16  back of the parking area, driveway, facing north
17  back toward Charles street the front of the
18  building.
19     Q.   So, if you go up towards the front here,
20  this is Charles Street where the cursor is, correct?
21     A.   Yes.
22     Q.   And to the right-hand side of the
23  photograph, what building is over on that side?
24     A.   That is the retaining wall, the parking
25  area of the diner that's actually on the corner of

**GA148**

593

1 Main Street and Charles Street.
2     Q.    And then to the left-hand side of the
3 photograph, that's where there is like parking area
4 for the building, correct?
5     A.    Yes, those are the exterior parking spots
6 for this apartment building.
7     Q.    Now, was there also underground parking for
8 215 Charles Street?
9     A.    Yes.
10    Q.    I'm going to show you Government's
11 Exhibit 113, 113A, and 113B and ask you to take a
12 look at those photographs.
13        And starting with Government's 113, what is
14 depicted in that photograph?
15    A.    113 is a photograph of the parking garage
16 under the building that's accessed from the driveway
17 on Charles Street.
18    Q.    Okay.  And taking a look then at the next
19 photograph.
20    A.    This is another photograph of the
21 under-building parking garage.
22    Q.    And that's actually 113A.  And then taking
23 a look at 113B, do you recognize what's in that
24 photograph?
25    A.    Yes.

594

1     Q.    And what is that a photograph of?
2     A.    This is a photograph of the parking lot
3 underneath the building from the back of the parking
4 garage facing forward toward the street.
5        MS. REYNOLDS:  Your Honor, at this time
6 I would move as full exhibits Government's 113, 113A
7 and 113B.
8        MR. SHEEHAN:  May I just inquire?
9        THE COURT:  Yes.
10 VOIR DIRE EXAMINATION
11 BY MR. SHEEHAN:
12    Q.    Detective, do you know when these photos
13 were taken?
14    A.    They were taken while we were working at
15 the crime scene.
16    Q.    Was it the first day, do you remember?
17    A.    I don't remember, I'm sorry.
18        MR. SHEEHAN:  Okay.  I don't have any
19 objection, your Honor.
20        THE COURT:  Full exhibits.
21 CONTINUED DIRECT EXAMINATION
22 BY MS. REYNOLDS:
23    Q.    Showing you Government's Exhibit 113 what
24 is shown in that photograph?
25    A.    This is a photograph of the parking lot

595

1 underneath -- or the parking garage underneath the
2 building taken from the entrance facing the road.
3     Q.    So, the entrance would be where the cursor
4 is here in the forefront of the photograph, correct?
5     A.    Yes.
6     Q.    And the parking garage goes all the way
7 back under the building; is that fair to say?
8     A.    Yes, it does.
9     Q.    And taking a look at 113A, what is depicted
10 in that photograph?
11    A.    This is the parking garage as well, toward
12 the rear of it.
13    Q.    And in this area here, 113 area, where the
14 cursor is pointing, what is that; if you know?
15    A.    That is a doorway which leads to the rear
16 staircase of the -- the rear interior staircase.
17 And there is also an exit door to the parking spaces
18 on the outside, east side of the building.
19    Q.    So, do you know whether or not you can get
20 into the apartment building through these doorways
21 located in the garage, underground garage of 215
22 Charles Street?
23    A.    That door does lead to one of the interior
24 staircases for the building.
25    Q.    And then showing you what's in evidence as

596

1 Government's 113B, can you describe what perspective
2 or what angle that photograph is taken of?
3     A.    That's the parking garage.  The angle of
4 the photograph is from the back of the garage facing
5 forward toward the street.
6     Q.    So, again, just where the cursor is, if you
7 were to go forward, this is the exit ramp from the
8 underground garage; is that fair to say?
9     A.    Yes.
10        THE COURT:  And the street when you
11 refer to it is which street?
12        THE WITNESS:  The entrance/exit to this
13 parking area is on Charles Street.
14    Q.    And then I need to hand up Government's
15 Exhibit 114 and have you take a look at that photo.
16        Do you recognize what that's a photograph
17 of?
18    A.    Yes.
19    Q.    And what is depicted in Government's 114?
20    A.    This is the underground parking area as
21 well, just as you enter from Charles Street.
22    Q.    And showing you 114A, do you recognize what
23 that's a photograph of?
24    A.    I believe this is the area that leads from
25 the parking garage to where the stairway is, the

597

```
1   interior stairway.
2                MS. REYNOLDS:  Your Honor, at this time
3   I would move as full exhibits 114 and 114A.
4                MR. SHEEHAN:  May I inquire briefly?
5                THE COURT:  Yes.
6   VOIR DIRE EXAMINATION
7   BY MR. SHEEHAN:
8        Q.   Detective, 114A, when you say -- that's
9   different from what you previously -- is that
10  different from what you previously testified to
11  about an interior door?  I think it was 113A.
12       A.   May I see that photo again?  I don't recall
13  seeing this photo before.
14               MS. REYNOLDS:  Your Honor, I'm going to
15  object.  That's different than a foundational
16  question.  I could ask her to --
17               THE COURT:  I think that's right.  Do
18  you want to ask her if there a relationship to 114A
19  and 113A or -- I'm not going to require that, but I
20  don't know whether you want to go ahead and do it.
21               MS. REYNOLDS:  I think I'll clarify more
22  just with 114 and 114A.
23               THE COURT:  That's fine.
24               Is there any objection to these exhibits.
25       Q.   114A is -- do you know what that is?  I'm
```

598

```
1   sorry.
2        A.   I believe this is the area from the parking
3   garage leading to the door -- to the interior
4   hallway, stairwell.
5                MR. SHEEHAN:  Okay.  There is no
6   objection.
7                THE COURT:  114 and 114A are full
8   exhibits.
9   CONTINUED DIRECT EXAMINATION
10  BY MS. REYNOLDS:
11       Q.   Taking a look first at 114, up on the
12  screen there, again, can you just describe what's
13  depicted in that photograph?
14       A.   This is at the very beginning of the
15  underground parking area.  To the right is the
16  doorway that leads to the stairwell.
17       Q.   And this is where the cursor is, this whole
18  area?
19       A.   Yes.
20       Q.   And again, this is when you first drive
21  into the underground garage; is that correct?
22       A.   Yes, this is taken from closer to the
23  entrance door to the underground parking area.
24       Q.   And then showing you Government's 114A,
25  what is shown in that photograph?
```

599

```
1        A.   This is the area from the parking garage
2   through the doorway to the stairway that leads to
3   the common staircase.
4        Q.   And where the cursor is here, what is that
5   area?  If you can see.
6        A.   Yeah, I can't tell if that's the stairway
7   from that angle.
8        Q.   And what is -- where the cursor is pointing
9   here in the middle of the photograph, what is that?
10       A.   That's the elevator, I believe.
11       Q.   Okay.
12               THE COURT:  If we have finished with the
13  garage area, why don't we break for lunch.
14               MS. REYNOLDS:  This would be a good
15  time, your Honor.
16               THE COURT:  Thank you.
17               All right, ladies and gentlemen, we'll be
18  back in half an hour.  Thank you very much.
19               (Jury exited the courtroom)
20               THE COURT:  If you would be back in a
21  half an hour, Detective.
22               THE WITNESS:  Yes, ma'am.
23               THE COURT:  We'll resume your testimony.
24               Counsel, would you check 121-8 and 122-4.
25  121-8 corresponds to Bridgeport Exhibit 8, I think,
```

600

```
1   and 122-4, I think corresponds to Bridgeport 10.
2   Just check whether they are in.  In fact, I would
3   ask you at periods during the trial to check with
4   Ms. Torday to make sure we've got those things that
5   are in that you think you have gotten in.  Okay?
6                MS. REYNOLDS:  Yes, your Honor.
7                MR. SHEEHAN:  Your Honor, could I just
8   say, I think the part of the complication on that
9   exhibit, the diagram, although we have photos, we've
10  never gotten a copy of the CD that has the diagram
11  as it's in.  I would also just indicate that
12  although there were some representations made at the
13  bench, in fact we did get a lot of photos from the
14  government, all with different numbers that don't
15  correspond to the numbers that are being presented
16  here.
17               THE COURT:  I understand your
18  complication.  The problem is you can't say in front
19  of the jury that the government didn't give it to
20  you.  It may be that it's hard for you to track it,
21  and we'll do what we can to help you track that, but
22  just don't say it wasn't given to you by the
23  government because it may well have and the
24  government believes it was.  If, in fact, it wasn't,
25  that will be an another matter.
```

601

```
1         MR. SHEEHAN:  Part of the problem is
2    they gave us -- which I appreciate it, it was a
3    courtesy to the Court, it was a courtesy to counsel,
4    I appreciate the fact they gave us a set of exhibit
5    books, but then they're putting on items that are
6    not in the exhibit books and they're not indicating
7    that to us.
8         THE COURT:  She's showing you those
9    exhibits that are being added as a way of
10   supplementing that.  To the extent she doesn't, then
11   you can ask to see it, okay?
12        MS. DAYTON:  Your Honor, just for the
13   record, that picture that was in contention before,
14   I believe it was Government's Exhibit 169, was
15   turned over in the summer of 2007.  We turned over
16   524 photographs.  It looks like -- I'm not sure if
17   it was July 13th or '07 or August 17th of '07.
18   We're checking that right now.  But we turned over
19   all 524 photographs, and all of the photographs
20   we're using come from those photographs.
21        MR. SHEEHAN:  But they didn't given us
22   the numbers that's corresponding.  They gave us a
23   different set of numbers, and with respect to that I
24   actually --
25        THE COURT:  I understand.
```

602

```
1         MR. SHEEHAN:  I asked counsel what the
2    other number was so I could check, and the answer
3    was, I don't know what that number is.
4         THE COURT:  That -- I understand where
5    the problem arises.
6         The first thing I want to make sure is
7    that we're not accusing the government of not
8    providing something when that may not be factually
9    correct.
10        The second will be that where the
11   government is adding a new exhibit to the exhibit
12   book, and I know there are some that you are adding
13   in because I don't have them either, just show them
14   or give them an extra copy of it.  It will make it
15   go really smoothly.
16        MS. REYNOLDS:  Yes, your Honor.
17        THE COURT:  And then that ought to take
18   care of the problem, I think.
19        MR. SMITH:  And your Honor, if I may,
20   the exhibit that the government has that had the
21   little blue numbers, I think part of the problem was
22   we weren't sure what were in those blue numbers.
23   So, would the government be able to get us a copy of
24   that CD so -- because there are other exhibits
25   within that that we're not sure what's going to pop
```

603

```
1    up and it might streamline the entire process.
2         MS. DAYTON:  The FBI CD?
3         MR. SMITH:  Yes.
4         MS. DAYTON:  Yes.
5         MS. RODRIGUEZ-COSS:  It's in evidence.
6    Now they know.
7         THE COURT:  But they can't use it.  They
8    can't use it themselves if it's in evidence, it's
9    sitting over there.
10        MR. SHEEHAN:  I don't want to disturb
11   what's in evidence.  We could just make a copy of it
12   right here, but alternatively, if you have another
13   copy.
14        MS. DAYTON:  We'll get you a copy.  We
15   may not be able to do it this second.  It was
16   reviewed by the defense.  But we'll get them a copy
17   as well.
18        THE COURT:  If there a problem I think
19   we can probably burn it, if that helps.
20        Okay, then we will be back in
21   25 minutes.  All right.  Thank you.  Stand in
22   recess.
23        (Recess)
24        THE COURT:  All right, are we ready for
25   the jury?
```

604

```
1         MS. REYNOLDS:  Yes, your Honor.  Let me
2    call the detective.
3         THE COURT:  All right.  Let's bring
4    in -- let's see.  Do we have a new piece of
5    equipment?
6         MS. REYNOLDS:  We just have to refresh
7    something on it.  So we're hooking it up again.
8         THE COURT:  Are you all set now?
9         MS. REYNOLDS:  Yes, we are.  Thank you.
10        THE COURT:  Please bring the jury in.
11        (Jury entered the courtroom)
12        THE COURT:  All right, ladies and
13   gentlemen, please be seated.  We'll resume the
14   testimony of Detective Devan by examination by
15   Ms. Reynolds.  You may proceed.
16        MS. REYNOLDS:  Thank you, your Honor.
17        Your Honor, at this time I'd like to
18   wheel in what's been previously entered into
19   evidence as Government's Exhibit 101, which is the
20   model.  I was going to ask the agents to assist me
21   in that, and then I had some questions.
22        THE COURT:  Fine.
23        MS. REYNOLDS:  Your Honor, just for
24   purposes of the record, we've wheeled in
25   Government's Exhibit 101, which is a model of the
```

605

1  building at 215 Charles Street.  We had previously
2  removed the second floor, and the agents have just
3  removed the first floor for purposes of the
4  questions I'm about to ask and then we'll put that
5  back together.
6          THE COURT:  All right.
7      Q.  Detective Devan, prior to testifying here
8  today, had you had an opportunity to review the
9  model that was created by the FBI graphics unit of
10  the building at 215 Charles Street?
11     A.  Yes.
12     Q.  And I'm just going to ask you if you could
13  exit the witness stand there with your pointer, if
14  you want to bring that along.
15         THE COURT:  Can you take your mic with
16  you?
17         THE WITNESS:  Okay.
18     Q.  Just maybe standing as close to the mic as
19  possible, if you could just show, using the pointer
20  obviously, just show the front of the model and the
21  front of the building area.
22     A.  This is the front of 215 Charles Street.
23  This is Charles Street here.  This indicates the
24  front of the building.  This is the driveway that
25  goes to the parking garage beneath the building,

606

1  which is this area in here.
2      Q.  And before we broke for lunch you were
3  describing some photographs that were taken of the
4  underground garage area.  Can you just indicate
5  where the access is from the underground garage area
6  into the building?
7      A.  This doorway here was one of the last
8  photographs that we looked at before lunch.  That
9  showed the doorway that was blocked off.  There was
10  a garbage can in front of it and crime scene tape.
11  And the other photograph is this little lobby area
12  here that leads to the elevator and the stairway for
13  the interior staircase.
14         THE COURT:  What happens if you lift
15  that up so the jury can seem where --
16         THE WITNESS:  It's actually attached to
17  the table.
18         MS. DAYTON:  Your Honor, we could lift
19  up the table.
20         THE COURT:  Can you see from where you
21  are where she's indicating?
22         Let's do that.  How is that?
23     A.  Again, this is the driveway to the
24  underground parking area.  This is the doorway here
25  that was blocked by the garbage can and crime scene

607

1  tape that goes to the little hallway area to the
2  elevator, and then the stairway, the door to the
3  stairway, the interior, that goes upstairs to the
4  first, second and third floor.
5      Q.  Just for purposes of the record, the square
6  area right in the middle there, is that the elevator
7  shaft area?
8      A.  Yes, this is the elevator here.  The
9  stairway actually comes through here and then
10  continues up from here behind the elevator up
11  through the other floors.  That is all parking
12  spaces beneath here.
13         MR. SHEEHAN:  Your Honor, if I might, I
14  think this is just the front half of the building.
15         MS. REYNOLDS:  That is correct.
16         MR. SHEEHAN:  I don't know if that was
17  clear on the record.
18         MS. REYNOLDS:  When we introduced it we
19  explained that, but I will remind the jury by asking
20  earlier question, your Honor.
21     Q.  Detective, what's depicted in the middle,
22  does it depict the whole building or just the front
23  part of the building or a half of the building?
24     A.  No, this is actually just the front part of
25  the building.  And when we put the first floor back

608

1  on it you'll be able to see better how much of the
2  building is represented by the model.
3      Q.  And then this area over here to the other
4  side of the stairwell and the elevator shaft area,
5  what is that?
6      A.  This area here would be the parking spaces
7  that we saw in the east side of the building that
8  are actually exterior parking spaces, and this is
9  the driveway leading from the -- this is the area of
10  the driveway leading from Charles Street to those
11  parking spaces.  And over here on this side would be
12  where the diner is.
13         MS. REYNOLDS:  And then I was just going
14  to ask that the first floor be placed back onto the
15  model at this time, your Honor.  Just for purposes
16  of the record, we have now placed the first floor of
17  the model back on.
18     Q.  And just showing you, can you just show
19  where apartment 101 is located?
20     A.  Okay, this is apartment 101 in the front
21  right corner from your view.
22     Q.  And showing you this window that appears
23  right above the garage, underground garage entrance,
24  what is that a window to?
25     A.  This is the window from the living room

609

1  from apartment 101.
2      Q.   And then taking a look at the right-hand
3  side, as you face the model, the right-hand side of
4  the model, there are two windows to apartment 101.
5  Can you just indicate what those two windows are of?
6      A.   This window is for this room, which is
7  Mr. Williams' bedroom, and this window is the window
8  for the bedroom where Ms. Johnson and Mr. Reid were
9  located.
10     Q.   And then can you indicate just inside the
11 apartment what the different rooms are that are
12 depicted in the model?
13     A.   Okay, this here actually is the first floor
14 lobby entryway.  And this right here is the front
15 door to the apartment.  The entry, it's a small area
16 here, and you have the closet and the kitchen right
17 to the left as you enter.  Straight ahead, this is
18 wall F, right here that we saw earlier, and this is
19 the living room area.  This is the short hallway
20 next to wall F that leads to the back two bedrooms
21 and the bathroom.  Here would be the bathroom.  As I
22 already said, this is Mr. Williams' room and this is
23 the room where Ms. Johnson and Mr. Reid were
24 located.
25     Q.   And then taking a look at the entryway to

610

1  the building, can you just show where in relation
2  the elevator and the laundry room area are to the
3  front door of apartment 101?
4      A.   This is the exterior stairway from the
5  sidewalk on Charles Street that leads to the small
6  foyer and common hallway entryway to the building on
7  the first floor.  This is the elevator right here,
8  the elevator door.  This is the laundry room door
9  right here.  This is the laundry room, and this is
10 the doorway that leads to the interior stairwell.
11          MS. REYNOLDS:  Your Honor, at the
12 conclusion, if I could just ask if the jurors would
13 be allowed to walk by and just look in.  It might
14 give them a better view now that it's been described
15 for them.
16          THE COURT:  Why don't we move it over
17 closer to the jurors.  Just because we just don't
18 have lots of space.
19          MS. REYNOLDS:  Thank you, your Honor.
20          THE COURT:  See if you can visualize
21 that better.  If you can't, raise your hand.  And
22 you can certainly stand up to look.
23          MS. REYNOLDS:  Yeah, if they could stand
24 since it is three-dimensional.
25     Q.   Just showing again what you just described

611

1  as far as --
2      A.   This is apartment 101.  This is the entry
3  door to apartment 101 from the first floor lobby
4  common hallway area.  This is the laundry room again
5  we looked at pictures of, and the door leading to
6  the stairway.
7          In the apartment, this is the kitchen,
8  which is to the left as you enter.  Right here,
9  closets.  This is, right here is wall F that
10 separates the kitchen from the short hallway that
11 goes to the back bedrooms.  This is the living room
12 area here.  Again, from the short hallway you have
13 Mr. Williams' room right here and this is the
14 bedroom where Ms. Johnson and Mr. Reid were located.
15          THE COURT:  All right, thank you.
16          Shall we just leave it right there?
17          MS. REYNOLDS:  We can leave it there.
18          THE COURT:  It might be needed for
19 cross-examination.  I don't know.
20     Q.   And just a couple more questions.
21          Again, referring to the model, as you
22 indicated before, it just shows sort of one half of
23 the building; is that fair to say?
24     A.   Yes, with the first floor back on you can
25 also see how the parking spaces, the exterior

612

1  parking spaces are on the east side of the building
2  and how the underground parking garage is usually
3  enclosed with the exception of the entry/exit door
4  from Charles Street.
5      Q.   And that outdoor parking garage in the
6  building would continue to the back, correct?
7      A.   Yes.
8      Q.   And there are other entrances in the back
9  area of the building?
10     A.   Yes.
11          MS. REYNOLDS:  Your Honor, at this time
12 I have nothing further for Detective Devan.
13          THE COURT:  Okay, cross-examination.
14          MR. SHEEHAN:  Thank you, your Honor.
15 CROSS-EXAMINATION
16 MR. SHEEHAN:
17     Q.   Good afternoon.
18     A.   Hello.
19     Q.   You mentioned that you arrived at the scene
20 at 10:54?
21     A.   It was right around 11:00 in the morning,
22 yes.
23     Q.   And the crime had been reported at what
24 time?
25     A.   The call came in just a short time later.

613

1  I would have to check my report for the exact time.
2     Q.   Well, what time was the actual call, crime
3  reported; do you know?
4     A.   The call for the crime itself came in a
5  short time before we were dispatched.
6     Q.   And your notes reflect that, don't they?
7     A.   Yes.
8     Q.   And it was 10:14 when the call came in?
9     A.   That's possible, yes.
10    Q.   And as far as you know, the police had been
11 on the scene, were on the scene when you got there,
12 right?
13    A.   Yes.
14    Q.   Now, at the point when you got there, the
15 EMTs had departed?
16    A.   Yes.
17    Q.   Did you observe them at all?
18    A.   I think they were gone by the time we got
19 there.
20    Q.   Are you sure?
21    A.   I'm not sure, but -- I'm sorry.
22    Q.   Did you observe any kind of drug packaging
23 material in the hallway when you came in?
24    A.   I don't recall that.
25    Q.   If you had observed that, would that be the

614

1  kind of item of evidence that you would have
2  collected?
3     A.   It depends on the initial information that
4  we were given when we arrived on scene.
5     Q.   Okay.  And in this case?
6     A.   In this case not necessarily, no.
7     Q.   All right.  Would you have taken pictures
8  of it?
9     A.   It probably would have been in overall
10 photographs.
11    Q.   As far as you know, were there any drug
12 packaging materials found in the entryway to the
13 apartment when you got there?
14    A.   I don't recall seeing it.
15    Q.   Is it in your report at all?
16    A.   Not that I recall, no.
17    Q.   Okay.  Do you have any doubt about that?
18    A.   No.  If it were something pertinent to our
19 investigation it would have been in my report.
20    Q.   And it isn't in your report, is it?
21    A.   I don't recall it being there, no.
22    Q.   Do you want to take a look at your report?
23    A.   I can.
24    Q.   Sure.  Do you have it?
25    A.   No, I don't.

615

1     Q.   Let me see if I've got a clean copy here
2  for you.
3            MR. SHEEHAN:  May I have one second,
4  your Honor.
5            THE COURT:  Yes.
6     Q.   Showing you a document, and I'll ask if you
7  could look at that and refresh your recollection as
8  to whether or not you made any reference to any kind
9  of drug packaging material found in the front area
10 as you came into the building -- into the apartment.
11    A.   No, I don't see any mention of it.
12    Q.   Why don't you leave that there because you
13 might find it useful for review as we're going
14 along.
15         You indicated that when you arrived there
16 Officer Laracuente was at the front?
17    A.   He was at the door to apartment 101.
18    Q.   And were there officers posted at other
19 entrances to the building?
20    A.   Yes.
21    Q.   And was there any kind of crime scene tape
22 up at the time you got there?
23    A.   Yes.
24    Q.   And would it be standard operating
25 procedure to keep a log of everybody coming in and

616

1  going out of the building once the crime scene
2  perimeter had been set up?
3     A.   As a patrol function, yes.
4     Q.   And do you have any reason to believe that
5  that was not done in this case?
6     A.   I honestly do not know.  It's a procedure,
7  but we were concerned with processing the apartment,
8  so the log of who enters the building would be a
9  patrol function.
10    Q.   Okay.  And I guess my question is, do you
11 have any reason to think that it wasn't done?
12    A.   No.
13    Q.   And you mentioned that there were a number
14 of officers on the scene when you got there?
15    A.   Yes.
16    Q.   Can you tell us again who those were,
17 please?
18    A.   Officer Kennedy was on the scene, Officer
19 Cosgrove.  There were detective bureau personnel as
20 well.  I would have to refer to see specifically who
21 was on scene.
22    Q.   Okay.  Would your notes refresh your
23 recollection?
24    A.   Yes.
25    Q.   And can you tell us then looking at your

617

```
1   notes who was at the scene?
2       A.   As I said, the detective bureau personnel
3   were on scene.  Did you want to know detective
4   bureau personnel as well?
5       Q.   Yeah.
6       A.   Captain Kerwin, who was the detective
7   bureau officer in charge at the time.  Sergeant
8   Santos and Sergeant Adiletta, both from the
9   detective bureau.  And then Detectives Winkler,
10  Martinez, DelMonte, Nandori, Davila, and Cotto.
11  Also Detective Ortiz was at the scene and then went
12  back with us again.
13          As far as patrol is concerned, Deputy
14  Chief Honis was on the scene, along with Captain
15  Craw, Lieutenant Evans and Lieutenant Daniels,
16  Sergeant Martinski, Officers Laracuente, Cosgrove
17  and Kennedy, as I already said.  Lopez, Officer
18  Lazaro, Pomales, Badolato, and Officer Rivera.
19      Q.   And since the time you got -- do you
20  know -- by the way, you mentioned, I think you
21  explained that you got there along with other people
22  from the major crime unit.
23      A.   Yes.
24      Q.   And who did you come with?
25      A.   That would have been Detective Vargas.
```

618

```
1       Q.   Okay.  And Detective Ortiz and
2   Detective Gallagher were already there?
3       A.   They -- I don't know if they were there
4   when I got there, but they got there around the same
5   time as Detective Vargas and I did because they were
6   going to go assist us.
7       Q.   And was Captain Kerwin already there when
8   you got there?
9       A.   Yes.
10      Q.   And did you -- you indicated that you went
11  into the building and you did a walk-through?
12      A.   Yes.
13      Q.   Did Captain Kerwin go in with you?
14      A.   I don't believe she went in with us, no.
15      Q.   Do you have any reason to believe she had
16  been in there before?
17      A.   She may have been.
18      Q.   Do you know which, if any of the other
19  individuals -- other police officers that you
20  mentioned had been in the building?
21      A.   I do not know who was already in the
22  building.  I know Officer Laracuente had secured
23  that apartment.
24      Q.   By the time you got there?
25      A.   Yes.
```

619

```
1       Q.   Okay.  And as to who was in or out before
2   Officer Laracuente secured it, you don't know?
3       A.   Do you mean the apartment or the building?
4       Q.   The apartment.
5       A.   Oh, the apartment.  No, it was reported to
6   us that he had secured it right -- as soon as the
7   medics had responded.
8       Q.   All right.  And your best recollection is
9   that they had departed by the time you got there?
10      A.   I believe so.
11      Q.   In fact, that's referred to in your notes,
12  isn't it, on the first --
13      A.   May I refer to it?
14      Q.   Sure.
15      A.   Thank you.  Okay.  I'm assuming they had
16  already left because I'm referring to them in the
17  past tense.
18      Q.   In fact, you say they had cleared the
19  scene?
20      A.   Okay.
21      Q.   Right?
22      A.   I had here they had responded to the scene
23  and the victims were not transported.
24      Q.   Okay.  And then you said they had already
25  cleared the scene prior to your arrival.
```

620

```
1       A.   Okay.
2       Q.   Right?  I'm looking at page 2.
3       A.   Oh, in the summary?
4       Q.   Yeah.
5       A.   Okay, I was reading the report itself.  I'm
6   sorry.
7       Q.   No problem.
8       A.   The AMR had cleared the scene, yes.
9       Q.   And your pass-through that you did with the
10  other three detectives you mentioned, this was
11  before you had donned your protective gear?
12      A.   At that point we had booties and gloves.
13      Q.   Okay.  And did you notice any protective
14  gear on Officer Laracuente?
15      A.   No.
16      Q.   Were you the only officers, you and the
17  three other officers, the other detectives that you
18  mentioned, who had on protective gear?
19      A.   Once we determined the nature of the crime
20  scene, then we wore protective gear because we were
21  going to be working in the crime scene, yes.  The
22  people who were in the crime scene unit.
23      Q.   Okay.  And none of the other officers there
24  had protective gear, correct?
25      A.   The other officers on scene weren't in the
```

621

```
1   apartment.
2       Q.   After you got there?
3       A.   Right.
4       Q.   Right?
5       A.   Uh-huh (indicating affirmatively).
6       Q.   But I'm just asking when you got there did
7   any of them have protective gear?
8       A.   No, that's not standard issue for them.
9       Q.   Okay.  And you've described that protective
10  gear as being kind of like a bunny suit?
11      A.   Yes.
12      Q.   And it's your recollection that you had
13  covering on your feet which we see in one of those
14  pictures, I think.
15      A.   Yes, that is correct.
16      Q.   Tyvek suit with gloves on?
17      A.   Yes.
18      Q.   And do you keep those gloves on throughout
19  the investigation?
20      A.   No, they're changed multiple times.
21      Q.   And you indicate that you had some kind of
22  a head covering?
23      A.   Yes.
24      Q.   And you told us you were wearing masks?
25      A.   Yes, we wear masks during the collection of
```

622

```
1   evidence and the initial processing of the scene.
2       Q.   The initial what?
3       A.   Processing.
4       Q.   Okay.  And that building, there was a lock
5   on the front door, was there not?
6       A.   On the exterior front door of the building
7   itself?
8       Q.   Yes.
9       A.   I don't know if there was a lock.  I don't
10  know if it was in working order, the front door.
11      Q.   Okay.  Was there a lock on the foyer?  How
12  did you get into the building?
13      A.   By the time we got there the doors had been
14  propped open for us.
15      Q.   Okay.  Were there also doors -- was there
16  access to the building other than through the main
17  door?
18      A.   I believe that the patrol was posted at the
19  rear garage door on the exterior side of the
20  building, the east side of the building, to escort
21  residents in and out of the building.
22      Q.   And was there a metal door at that level?
23      A.   Yes.
24      Q.   And was there also a metal door on the
25  ground level on the north side?
```

623

```
1       A.   Metal door?  On the north side of the
2   building, the only entrance is the front entrance
3   from the sidewalk, or the garage.
4       Q.   Or the garage?
5       A.   Yes.
6       Q.   And there was a metal door down there in
7   the garage?
8       A.   No, the garage door is open.
9       Q.   And so once you come in the garage, and
10  then is there a stairwell up from the garage?
11      A.   There are two.
12      Q.   Okay.  And did those doors have locks on
13  them?
14      A.   I believe they had locking mechanisms.  I
15  do not recall whether the locking mechanisms were in
16  working order or not.  That would all be in my
17  report as well.
18      Q.   Okay.  And, in fact, it is in your report;
19  is it not?
20      A.   Yes.
21      Q.   And can you tell us whether those doors had
22  locking mechanisms after looking at your report?
23      A.   Okay, according to my report there are
24  metal doors, and I believe we could see those in the
25  photos as well at the landings for both stairways,
```

624

```
1   the front stairway and the rear stairway.  It says
2   these doors do not lock.
3       Q.   Okay.  And how about the metal doors at the
4   ground -- at the parking level on the north side?
5   Is that another door?
6       A.   The metal doors at the ground levels -- the
7   front staircase?
8       Q.   Yes.
9       A.   That was closed, but not locked.
10      Q.   And what was the condition on those doors
11  as far as the locks?
12      A.   This was much less confusing when we were
13  actually looking at the doors.  The metal door at
14  the parking level the locks were broken.
15      Q.   Okay.
16      A.   The metal doors at the ground level, south
17  rear stairway were closed, but not locked.  And
18  the --
19      Q.   And did they lock?
20      A.   The one from the south stairway to the east
21  parking area does not lock, but there is no handle
22  on the outside of the door.
23      Q.   Okay.
24      A.   But it could be opened from grabbing
25  underneath the door.  So, it doesn't lock, but since
```

625

```
1   there is no handle you have to actually grab the
2   door itself to open it.
3        Q.   Is it fair to say that when you got there
4   that one could get access to that building from any
5   number of sources?
6        A.   There are several entrances.
7        Q.   And with respect to at least several of
8   those entrances, those locks were broken as of the
9   time that you got there?
10       A.   That is correct.
11       Q.   And if somebody were to go in one of those
12  unlocked doors, they would then have access to the
13  entire building?
14       A.   Yes.
15       Q.   Now, you've told us about your task in
16  terms of processing the crime scene.  And one of the
17  things that you do is you document it, right?
18       A.   Yes.
19       Q.   And the purpose of that is to make an
20  accurate record of what's found at the scene?
21       A.   Yes.
22       Q.   And where it was found?
23       A.   That's included also, yes.
24       Q.   Because the location of where an object is
25  found, that might prove to be important in the
```

626

```
1   investigation.  Right?
2        A.   Yes.
3        Q.   And in addition, you document the time that
4   you found objects.
5        A.   Not the time that the object is found, but
6   the time that it's actually collected.
7        Q.   Seized?
8        A.   Yes.
9        Q.   Okay.  And your goal is to document the
10  scene as you found it.
11       A.   Yes.
12       Q.   Document the scene as it changes.
13       A.   That's -- yes, as evidence is collected,
14  it's changed.  So, yes.
15       Q.   And record anything done while you were
16  there.
17       A.   Yes.
18       Q.   Right?
19       A.   Yes.
20       Q.   You've told us about the condition of the
21  apartment when you got there.  Did you locate any
22  keys to the apartment?
23       A.   No.
24       Q.   Did you locate any keys to the front door
25  of the apartment?
```

627

```
1        A.   No, not that I recall.
2        Q.   Your report doesn't reflect any food in the
3   refrigerator, does it?
4        A.   No, it's not in my report.
5        Q.   It does reflect that you found a number of
6   empty Vodka bottles on the floor of the apartment.
7        A.   I believe in the living room.
8        Q.   Now, you took photos of the door, did you
9   not, various photos that we've seen?  Or they were
10  taken by Detective Vargas.
11       A.   Which door?
12       Q.   The front door.
13       A.   The front door to the apartment?
14       Q.   Yes.
15       A.   Yes.
16       Q.   And those photos accurately reflected the
17  front of the door as you saw it.
18       A.   Yes.
19       Q.   And there was no indication of any kind of
20  chain lock on the door, was there?
21       A.   No.
22       Q.   You also noted that there was a deck of
23  cards at the table.
24       A.   Yes.
25       Q.   And there was a sofa that was up to the
```

628

```
1   table.  And, in fact, it was right in front of that
2   deck of cards, was it not?
3        A.   Yes.
4        Q.   Okay.  And I think that's -- if I might,
5   117A.
6             Showing you Exhibit 117, is that the deck of
7   cards on the photo there on the table?
8        A.   Yes.
9        Q.   Where my finger is pointing to?
10       A.   Yes.
11       Q.   In front of that area of the sofa, right?
12       A.   Yes.
13       Q.   And there was also a fan in the living
14  room, was there not?
15       A.   Yes.
16       Q.   And I believe we have a photo of that as
17  117F, correct?
18       A.   Yes.
19       Q.   And this was the fan in the position it was
20  initially when you came into the apartment.
21       A.   Yes.
22       Q.   And that fan was pointed in the direction
23  of the sofa, was it not?
24       A.   Yes.
25       Q.   It wasn't back against the wall, it was
```

629

```
1    just as we see it there.
2         A.   Yes, as it's in the photograph.
3         Q.   And there is another photo, 117D, and
4    again, that situates the fan in relation to the sofa
5    as you found it, correct?
6         A.   Yes.
7         Q.   And it was late August when you were there,
8    right?
9         A.   Yes.
10        Q.   And with respect to -- if that sofa had
11   been pulled up to the table, the fan was in a
12   position to be directly cooling anybody who was
13   sitting at that sofa, right?
14        A.   It seems to be in that position.
15        Q.   And that was the position as you found it?
16        A.   Yes.
17        Q.   Do you remember that there was a vodka
18   bottle located under the front edge of the sofa?
19        A.   Offhand, no, I don't recall that.  I know
20   there were a couple empty bottles located in the
21   apartment.
22        Q.   And you took a series -- there were a
23   series of photos of the crime scene that were taken,
24   were they not?
25        A.   Yes.
```

630

```
1         Q.   Some of them we've seen here today.
2         A.   Yes.
3         Q.   But -- and last week.
4         A.   Oh, yes.
5         Q.   But there were a lot of photos, right?
6         A.   Yes.
7              MR. SHEEHAN:  I wonder, if I might --
8         Ask the clerk what number we're up to.
9              THE COURT:  C.
10             MR. SHEEHAN:  C?
11        Q.   Showing you what's been marked for
12   identification as Defendant's Exhibit C.
13             MS. REYNOLDS:  Your Honor, just for the
14   record, we have no objection to the photograph
15   coming into evidence.
16             MR. SHEEHAN:  Thank you, your Honor.
17             THE COURT:  Then it will be a full
18   exhibit.  Why don't you describe it.  Or do you want
19   to put it on the presenter.
20             MR. SHEEHAN:  Yes, I'll put it on.
21        Q.   Defendant's Exhibit C, that is also a
22   picture taken at the time that you came in the
23   apartment and before items were moved.
24        A.   Yes.
25        Q.   That was taken.
```

631

```
1         A.   Yes.
2         Q.   And, again, that reflects an empty liquor
3    bottle under the corner of the sofa adjacent to that
4    chair, does it not?
5         A.   Yes.
6         Q.   And at the top part of the photo up here
7    where my finger is, that is the table that we're
8    talking about.
9         A.   The same table, just inside the entry door.
10        Q.   And it's fair to say, is it not, that was a
11   pretty small living room?
12        A.   Yes.
13        Q.   You testify that you later moved that love
14   seat to get better access to the bedrooms.
15        A.   Yes.
16        Q.   Right?  And your photo, which was
17   Exhibit 170, that is a picture of the hallway with
18   the love seat removed from it.  I don't expect you
19   to remember.  If you did.
20             Okay, this is Exhibit 170.  And that's after
21   you had taken out the love seat, right?
22        A.   Yes.
23        Q.   And you'd restored the sofa, which appears
24   over here on the right-hand side of the screen, you
25   had restored that to where you thought its original
```

632

```
1    position was.
2         A.   Yes.  We just moved it out of the way.  We
3    think that's where it had initially been.
4         Q.   And you could kind of tell because of the
5    marks on the floor and how the rug looked, right?
6         A.   The wear patterns on the rug, yes.
7         Q.   And, in fact, is it fair to say where you
8    put the sofa was about the only apparent place for
9    it in that room?
10        A.   In the living room?
11        Q.   Right.
12        A.   There wasn't much other room, yes.
13        Q.   And what did you do with the love seat?
14        A.   I think the love seat was temporarily moved
15   into the living room so that we could walk around
16   towards the bedrooms more easily.
17        Q.   Okay.  You just plunked it in there to get
18   it out of the way.
19        A.   Yes.
20        Q.   There was no apparent place for that love
21   seat in the living room, was there?
22        A.   It didn't seem to be.
23        Q.   Other than the hole in the wall and the
24   fact that that sofa had been pulled up to the table,
25   the living room did not appear to you to be in any
```

633

```
1   kind of disarray, did it?
2       A.  No.
3       Q.  Now, were those playing cards seized?
4       A.  No, they were not.
5       Q.  At some point in time you testified that a
6   fragment of latex glove was recovered from the
7   living room under the cushion, right?
8       A.  Yes.
9       Q.  And I asked you a couple of times, but
10  thinking about it since the last time I asked you,
11  do you remember who it was who actually first found
12  that?
13      A.  It was either Detective Vargas, Detective
14  Ortiz or myself.  We were the only ones in there at
15  that point.  So, which one of the three of us, no.
16      Q.  And you have no independent recollection as
17  to who did it.
18      A.  As to who actually lifted the cushion?
19      Q.  Yeah.
20      A.  No.
21      Q.  And your notes don't reflect that, do they?
22      A.  No.
23      Q.  Do your notes tell us when it was seized?
24      A.  That would be actually in the evidence
25  report, not my report.
```

634

```
1       Q.  Okay.  You mentioned the evidence report,
2   but in addition to the evidence report, you had
3   notes, didn't you?
4       A.  My own handwritten notes, yes.
5       Q.  And the reason why you take those notes is
6   so that you will remember what happened, correct?
7       A.  Yes, I refer to the notes in order to write
8   my report.
9       Q.  All right.  I'm sorry, one second.
10          And would looking at your notes refresh your
11  recollection as to what time it was that that latex
12  glove was recovered?
13      A.  It should.
14      Q.  Okay.
15          MS. REYNOLDS:  Your Honor, if we can
16  just be clear as to which latex glove and what
17  Government's Exhibit number so it's clear for the
18  record.
19          MR. SHEEHAN:  Fair enough.
20      Q.  What I'm talking about is the latex glove
21  you originally identified as Bridgeport Police
22  Department 13.  And I think that would be 1 --
23          MS. REYNOLDS:  36A, your Honor, for the
24  record.
25      Q.  136A.  But 13 was the number that the
```

635

```
1   Bridgeport Police Department assigned to that,
2   right?
3       A.  Yes.
4       Q.  Let me show you this document, and just on
5   your notes, and ask if it refreshes your
6   recollection as to what time it was that fragment
7   was recovered?
8       A.  Yes.
9       Q.  Can you tell the jury when it was that that
10  was found?
11      A.  1752 hours.
12      Q.  And what does that 1752 mean?  That's 1752,
13  that's like six o'clock or something, ten of six
14  something?  That's military time.
15      Right, 5:52.
16      Q.  Are your notes reflecting the fact that it
17  was found or the fact -- the time it was ultimately
18  seized?
19      A.  The time it was collected as evidence.
20      Q.  There were other objects that were found
21  under those cushions, were there not?
22      A.  I don't recall.
23      Q.  If I might, I'm going to show you
24  Defendant's Exhibit D for identification and ask if
25  that was also a photo that was taken of that couch
```

636

```
1   after it had been removed to the wall?
2       A.  Yes.
3           MS. REYNOLDS:  And your Honor, again, we
4   would have no objection to that photo.
5           THE COURT:  Are you offering it?
6           MR. SHEEHAN:  Yes, I am, your Honor.
7           THE COURT:  Full exhibit.
8       Q.  Showing you Exhibit D, that has the
9   fragment of latex which is where my finger is
10  pointing, right?
11      A.  Yes.
12      Q.  And it also has what appears to be a kind
13  of -- what is that next to the -- small flashlight?
14      A.  It appears to be a flashlight.
15      Q.  What is it that's down below that?
16      A.  I honestly can't tell.
17      Q.  Do you know if there was any effort to
18  seize either one of those objects?
19      A.  They were not seized.
20      Q.  And I take it since they weren't seized
21  they weren't sent off for testing.
22      A.  No, they weren't.
23      Q.  Now, you indicated that the duct tape was
24  removed at the scene by Detective Ortiz and
25  Inspector Carmago?
```

637

```
1      A.   Yes, from the medical examiner's office.
2      Q.   Yes?
3      A.   Yes.
4      Q.   Do you recall whether Inspector Carmago
5  also had on a protective suit?
6      A.   I believe he did.
7      Q.   Are you sure?
8      A.   Yes.
9      Q.   All right.  And that process involved
10 moving the victims, did it not, to remove the duct
11 tape?
12     A.   Yes.
13     Q.   And then that duct tape was removed from
14 their heads and their hands and their wrists?
15     A.   Yes.
16     Q.   One of the reasons you mentioned that you
17 seized the duct tape is that it could -- sometimes
18 it's been known to collect hairs, right?
19     A.   It can, yes.
20     Q.   Did you observe any hairs on the duct tape
21 that was removed?
22     A.   I didn't examine the duct tapes either on
23 the victims or after it was removed.  It was just
24 immediately packaged.
25     Q.   So, that wasn't something you were looking
```

638

```
1  at while -- in fact, you weren't involved with
2  removing it, as I understand it.
3      A.   No, other than being present for
4  documentation purposes.
5      Q.   Okay.  And then I want to ask you about
6  your search of the southwest bedroom.  That was the
7  bedroom where Ms. Johnson and Mr. Reid's bodies were
8  recovered.
9      A.   Okay.
10     Q.   You found objects on that sofa in the
11 bedroom, did you not?
12     A.   I --
13     Q.   Do you remember?
14     A.   I really don't recall.
15     Q.   Showing you Exhibit E, is that a photo of
16 the objects that were on the sofa in the southwest
17 bedroom?
18     A.   Yes.
19          MR. SHEEHAN:  I would offer it at this
20 time, your Honor.
21          MS. REYNOLDS:  No objection.
22          THE COURT:  All right, full exhibit.
23 You used the term "southwest bedroom," can you also
24 identify --
25          MR. SHEEHAN:  Yes, I'm sorry.
```

639

```
1          THE COURT:  Thank you.
2      Q.   That was the bedroom where the bodies of
3  Ms. Johnson and Mr. Reid were recovered, right?
4      A.   Yes.
5      Q.   And can you tell us what the various
6  articles were that you observed on -- that were
7  found on the sofa at that time?
8      A.   Well, as you can see in the picture, there
9  are several miscellaneous items, including a
10 cigarette pack, an ashtray and a lighter, a pair of
11 scissors, a white cloth of some kind, and a penny.
12     Q.   What's -- can you tell me what this object
13 is that my finger is pointing to here?
14     A.   I really don't want to guess, and I can't
15 see it clearly enough.
16     Q.   Okay.  Are you familiar with crack pipes?
17     A.   Yes.
18     Q.   Can you tell us what a crack pipe is?
19     A.   A crack pipe is a device constructed of a
20 clear, usually glass, tube, and then copper wire
21 of -- like a little wall of copper wire is placed in
22 it as well, and it's used for smoking crack.
23     Q.   And is this what a crack pipe looks like?
24     A.   It could be.  It could be.  Like I said, I
25 just can't see it clearly enough and I don't want to
```

640

```
1  guess and say the wrong thing.  But it's consistent.
2      Q.   With being a crack pipe?
3      A.   Yes.
4      Q.   Were any of these items, either the
5  cigarettes or the scissors or the crack pipe -- or
6  that object that appears to be consistent with being
7  a crack pipe, were any of those seized; as far as
8  you know?
9      A.   No, they weren't.
10     Q.   Since they weren't seized, as far as you
11 know, they wouldn't have been sent to the lab for
12 testing.
13     A.   No.
14     Q.   Now, we've talked about your reason for
15 making reports and getting -- that's the same reason
16 why you get photo and video documentation, right?
17 You can't be expected to remember all of the
18 details.
19     A.   No, especially five and a half years later.
20     Q.   And you talked about the process of taking
21 pictures of things.  And, for example, we saw 122-7.
22 And 122-7, that was a photo that you took of
23 Mr. Reid's -- of the duct tape on Mr. Reid's feet
24 before his body was removed from that bedroom,
25 right?
```

641

```
1      A.   Yes.
2      Q.   The photos that you've shown us of 153 --
3           MR. SHEEHAN:  Oh, you might have some
4  over there.  I was looking for 150 --
5           MS. REYNOLDS:  153.
6           MR. SHEEHAN:  Yes.  That's a crime scene
7  photo.  I'm sorry, this is part of my confusion.
8      Q.   The photos of Bridgeport Police Exhibit 14,
9  that's the glove I was asking about.
10          MS. REYNOLDS:  There is a photographs,
11 137 shows a photograph of Exhibit 14, if that's
12 helpful to counsel.
13          MR. SHEEHAN:  Thank you.  I appreciate
14 that.  Let me take a look at it, see if that's the
15 same one I have.
16          MS. REYNOLDS:  Your Honor, I have a
17 photo of 137, Government's 137.
18          MR. SHEEHAN:  Thank you, Counsel.
19     Q.   This photo of No. 14, that was taken after
20 you had -- after Mr. Reid and Ms. Johnson's bodies
21 had been removed from the scene, is it not?
22     A.   Yes.
23          MR. SHEEHAN:  Counsel reminded me I
24 didn't identify it by Exhibit No. 137.
25     Q.   And do you recall who it was who initially
```

642

```
1  located Bridgeport Police Department Exhibit 14?
2      A.   14 was actually in place where it was, so
3  it was in plain view.
4      Q.   And you made a note when that was found,
5  did you not?
6      A.   Probably when it was seized.
7      Q.   And in your initial note as to where that
8  object was seized, you indicated that that was found
9  under the head of the bed, right?
10     A.   Yes.
11     Q.   Okay.  You didn't find it -- that was what
12 your note said.
13     A.   I consider that under -- I mean it's not
14 all the way under, but it's still under the side of
15 the bed.
16     Q.   And in your notes it was under the bed,
17 right?  Under the head of the bed.
18     A.   I could have written that.
19     Q.   Do you have any doubt about it?
20     A.   No.  But as I said, I consider that to be
21 under the bed because it's not in the middle of the
22 room.  You know, it's actually partially under the
23 bed.  I didn't write "partially."
24     Q.   Let me show you this page of your notes and
25 ask if that refreshes your recollection as to what
```

643

```
1  you wrote.
2           MS. REYNOLDS:  I object.  I don't think
3  she said she didn't remember.  I think she said
4  that's what she wrote and then she explained her
5  answer.
6           THE COURT:  Well, she said she doesn't
7  have any doubt about that.
8           MR. SHEEHAN:  About what she wrote.
9           THE COURT:  Right.
10          MR. SHEEHAN:  I'm sorry, your Honor.
11          THE COURT:  What's the question that's
12 pending for her?
13     Q.   The question is, your notes reflect that
14 you found it under the head of the bed.
15     A.   Yes.
16     Q.   Okay.  Your notes don't say anything about
17 it being protruding from under the head of the bed,
18 do they?
19     A.   I probably wouldn't get that specific in
20 just my notes, no.
21     Q.   Isn't it a fact that that had to be pulled
22 out from under the bed to take a picture of it?
23     A.   I don't believe that it was.
24     Q.   In your experience are latex gloves kind of
25 part of the tools of the trade in drug processing?
```

644

```
1      A.   I don't know that.
2      Q.   Do you commonly find it in places where
3  people are packaging drugs?
4      A.   I'm really not all that often in drug
5  factory situations.  That's not really the scenes
6  that we're called to.  So, I don't know what would
7  be common for that.
8      Q.   Okay.  Now, you told us about the items
9  that were recovered in the other bedroom, in the
10 northwest bedroom where Mr. Williams' body was
11 found.
12     A.   Yes.
13     Q.   And one of the pictures that you were asked
14 to identify, I think that is 120-1, when you were
15 asked to identify that picture you said that that
16 was a picture of Mr. Williams' body as you found it.
17     A.   Yes.
18     Q.   In fact, his body -- this isn't how it
19 looked when you first came in that room, is it?
20     A.   As far as my recollection is concerned,
21 yes.
22     Q.   When you went into that bedroom,
23 Mr. Williams had a cover on his back, did he not?
24     A.   I don't recall that offhand.
25     Q.   And there was a pillow at the side of his
```

645

```
1    head.
2         A.   I believe so.
3         Q.   And -- you think so?
4         A.   I believe so.
5         Q.   And in that photo we just looked at, 120,
6    that doesn't reflect any pillow, does it, 120-1?
7         A.   I didn't notice it in the photo, no.
8         Q.   Is there --
9         A.   No.
10        Q.   Okay.  So had that pillow been removed
11   before that picture was taken?
12        A.   Apparently, yes.  Apparently it was just to
13   get a better photo of Mr. Williams' head.  So I
14   guess the pillow had been moved away so we could see
15   the victim better.
16        Q.   And in fact, other photos in that bedroom,
17   they reflect the fact that that pillow had been
18   moved, do they not?
19        A.   Which -- I don't know which photos you are
20   referring to.
21        Q.   Well, let's see if we can find the first
22   one.
23             MR. SHEEHAN:  Can I have one second,
24   your Honor?
25             THE COURT:  Yes.
```

646

```
1             MR. SHEEHAN:  Your Honor, I would offer
2    at this time Defendant's Exhibit H.
3             MS. REYNOLDS:  No objection.  I think
4    we're up to F.
5             MR. SHEEHAN:  Oh, F.  I'm jumping really
6    far ahead.
7             THE COURT:  All right.  And it will be
8    admitted as a full exhibit.  Let's have a
9    description from the witness.  I understand there is
10   no objection.
11            MR. SHEEHAN:  Yes, I'm going to ask
12   Detective Devan if she can identify this photo,
13   Defendant's Exhibit F.
14        Q.   And if you can tell us if that was the
15   picture of Mr. Williams when you first came in the
16   room?
17        A.   That's a photo of Mr. Williams, yes, from
18   the hallway looking into the bedroom.
19        Q.   Correct?
20        A.   Yes.
21        Q.   And there in that picture we do see a
22   pillow located next to his head.
23        A.   Yes, that is my mistake.  In this photo you
24   can see this was before Mr. -- this is upon arrival,
25   the initial photos that were taken.
```

647

```
1         Q.   Okay.  And similarly, there is the blanket
2    on his back.
3         A.   Correct.
4         Q.   And so that pillow and that cover, those
5    were subsequently removed for purposes of taking the
6    next picture, 120-1.
7         A.   Yes, to more clearly show the victim.
8         Q.   Okay.  Then at some point in time when
9    we got to 120-2, placards were put up, right?
10        A.   That would be the next step.
11        Q.   And this is Government's Exhibit 120-2, and
12   we can see the various placards have been put up,
13   placards 1 through 4, right?
14        A.   Yes.
15        Q.   And I'm going to ask you just to take a
16   look again for purposes of -- take a look again at
17   Defendant's Exhibit F, and then I'm going to ask
18   you, do you see right at the top with respect to
19   Government's Exhibit 120-2, do you see right up at
20   the top of Mr. Williams' head there is what appears
21   to be a bag there?
22        A.   Yes.
23        Q.   Can you tell us where that bag came from?
24        A.   No.  It had to be -- I mean, right in that
25   vicinity.  If it got mover over when we moved maybe
```

648

```
1    the pillow or the blanket, I don't know.
2             THE COURT:  Would you point on the
3    picture what you are referring to?  The white.
4         Q.   Do you see where my finger is pointing
5    here, that appears to be a white bag.
6         A.   Yes.
7         Q.   And that appears to have been moved into a
8    position next to Mr. Williams' head, right?
9         A.   I don't know if it was moved there.
10        Q.   Okay.  When you look at Exhibit 120, you
11   see that there is the area, 120-1, this appears to
12   be a dark area of perhaps blood or other bodily
13   fluid from Mr. Williams.
14        A.   Yes.
15        Q.   And there is no bag there, is there?
16        A.   No.
17        Q.   But by the time 120-2 is taken, now there
18   is.
19        A.   Yes.
20        Q.   And if we look at 120 -- in fact, looking
21   at 120-2, doesn't it appear that that bag was placed
22   directly on those stains at the side of
23   Mr. Williams' head?
24        A.   From that angle I can't tell exactly where
25   his head is.
```

649

1    Q.   Now, when it comes to Bridgeport Exhibit
2    No. 22, that was Government's Exhibit 123A.  This is
3    the bag that was -- you testified was found in the
4    northwest bedroom, right?
5    A.   Yes.
6    Q.   You told us that that bag was picked up by
7    Detective Gallagher.
8         MS. REYNOLDS:  Your Honor, just to be
9    clear, there are two bags that are -- if we can just
10   describe what's contained in 123A.
11        MR. SHEEHAN:  Sure, I'm happy to clarify
12   that, your Honor.
13   Q.   There were two bags found -- two bags
14   appear in Government's Exhibit 123, right?
15   A.   Yes.
16   Q.   Those were the bags that you told us were
17   actually joined together by duct tape, right?
18   A.   Yes.
19   Q.   At the time you found them.
20   A.   Right.
21   Q.   And you told us on Thursday that those were
22   picked up by Detective Gallagher and then put right
23   down in the same place where he found it.
24   A.   Yes.  I mean, not exactly.  He picked them
25   up while we were going through items in

650

1    Mr. Williams' room and when we determined that it
2    was of evidentiary value, it was placed right back
3    down.
4    Q.   Are you saying it wasn't put down in the
5    same place he found it?
6    A.   It was within arm's reach of where he was
7    standing.  That's as much as I can say.
8    Q.   In fact, there was nothing -- if we look at
9    Defendant's Exhibit F, there was nothing in this
10   area?
11   A.   Yes.
12   Q.   Right?
13   A.   Yes.
14   Q.   But that's where the photos were taken of
15   exhibit -- Bridgeport Exhibit 22.
16   A.   Yes.
17   Q.   Showing you Government's Exhibit 123, this
18   is the two bags, correct?
19   A.   Yes.
20   Q.   And they're now being photographed in a
21   different location in that room, are they not?
22   A.   That's the location where Detective
23   Gallagher put it down after he picked it up, which
24   is right next to where he picked it up from.
25   Q.   And what's this object here next to it?

651

1    A.   It appears to be a sock.
2    Q.   Where did that come from?
3    A.   As I said, we were going through the items
4    in Mr. Williams' room, so we were picking up one
5    thing at a time to see what it is and identify its
6    value, if any.
7    Q.   And what's this object up here?
8    A.   It appears to be a remote, remote control.
9    Q.   Where did that come from?
10   A.   It was in Mr. Williams' room among his
11   things.
12   Q.   Well, who put it over here next to 22?
13   A.   I don't know.  It could have just landed
14   there when we were going through things.  As I said,
15   the bag was just picked up, identified, and placed
16   down to photograph.  Many things were being moved as
17   we searched.
18   Q.   Were objects being moved into places where
19   there was biological evidence?
20   A.   Not purposely.  There is -- I don't believe
21   that that was where Mr. Williams had been.
22   Q.   You don't believe that 120-1 was where
23   Mr. Williams had been?
24        MS. REYNOLDS:  Objection, your Honor.
25   That wasn't the photo he was showing before with the

652

1    remote control.
2         MR. SHEEHAN:  Fair enough, Counsel.  I
3    apologize for that.
4    Q.   120-1, that's the photo we looked at as far
5    as Mr. Williams, right?
6    A.   Yes.
7    Q.   And there is what appears to be biological
8    evidence right around there.
9    A.   Yes.
10   Q.   And if we look at 120-2, although I
11   understand you are not quite certain exactly where
12   that was, that bag now appears in that same area,
13   does it not?
14   A.   In the area, yes, of Mr. Williams.
15   Q.   Right.  In the area of his head.
16   A.   Yes.
17   Q.   In the area where the biological material
18   was.
19   A.   In the area, yes.
20        MR. SHEEHAN:  May I have one second,
21   your Honor?
22        THE COURT:  Yes.
23        MR. SHEEHAN:  Your Honor, I wonder if I
24   could have the lights go down a little bit.
25   Q.   Showing you what is marked as 120 --

653

1 Government's Exhibit 120-3, that is -- it does
2 appear that there was -- that white bag was placed
3 right on top of that biological material, does it
4 not?
5    A.   Again, I can't say it was placed there,
6 indicating that we purposely put it there. I can't
7 say that. The pillow was moved. You know, the bag
8 could have been under the pillow. I don't know.
9    Q.   Okay. And the pillow was moved before
10 120-1 was taken.
11   A.   Yes.
12   Q.   And if, in fact, this material up at the
13 top, this blue, what seems to be a piece of blue
14 plastic and a piece of white plastic, if that's the
15 same as the bag, you don't know.
16   A.   The blue to me looks like plastic. The
17 white does not look like plastic to me. You know,
18 that looks like material.
19   Q.   Okay. But as to how this white bag got
20 there, and got them meaning with reference to
21 120-3, you don't know.
22   A.   No. Specifically, no.
23   Q.   You've told us, I believe, about the
24 handprint recovered on the dented area in the living
25 room wall.

654

1    A.   Yes.
2    Q.   And that was sent out for analysis.
3    A.   Yes, it was.
4    Q.   And the prints on the ledge of the window,
5 those were sent out for analysis.
6    A.   I believe -- I don't know that there were
7 prints recovered from the window ledge.
8    Q.   I think you told us about the lift, the
9 hinge.
10   A.   That was on the window.
11   Q.   Oh, on the window itself?
12   A.   I believe it was on the window. The
13 interior side of the window.
14   Q.   Do your notes reflect that?
15   A.   They should.
16   Q.   All right. Let's take a look.
17       Looking at those notes, do they tell you
18 where that was recovered?
19   A.   Yes.
20   Q.   And where is that?
21   A.   The window in the southwest bedroom. So,
22 that would be the bedroom where Ms. Johnson and
23 Mr. Reid were.
24   Q.   All right.
25       MS. REYNOLDS: Just so the record is

655

1 clear, could we have for the record what she looked
2 at, which is her property report, not her notes.
3       MR. SHEEHAN: I actually think she
4 looked at her report.
5       THE COURT: What are you looking at?
6       THE WITNESS: It's my crime scene
7 report. Page 9, actually.
8    Q.   Okay. And do you recall that you
9 recovered -- actually let me go back.
10      You checked out that crime scene for a total
11 of three days.
12   A.   Yes.
13   Q.   And you recovered various items of
14 interest.
15   A.   Yes.
16   Q.   And you used sophisticated equipment, like
17 your lighting, special lighting to look for things.
18   A.   Yes.
19   Q.   And you were looking for, among other
20 things, trace evidence, biological evidence.
21   A.   Yes, in general. Yes, not specifically
22 with the light, but yes.
23   Q.   And in the course of that investigation,
24 you recovered one small, like, hair-like fiber in a
25 crack on the top of the damaged area in the wall,

656

1 right?
2    A.   Yes.
3    Q.   And you didn't recover or seize any long
4 hairs from the apartment?
5    A.   I'm sorry, any?
6    Q.   You did not recover or seize any long hairs
7 from the apartment.
8    A.   Long hairs? No.
9    Q.   The only hair that your notes reflect that
10 was actually seized was from that little portion of
11 the wall.
12   A.   Yes.
13   Q.   Right? And as far as what was sent for
14 testing, to your knowledge, were any other hairs
15 recovered that were then subsequently sent out for
16 testing?
17   A.   No, to the best of my recollection we
18 didn't collect any other hairs to send for testing.
19      MR. SHEEHAN: I don't have any further
20 questions, your Honor.
21      THE COURT: All right, redirect.
22      MR. SHEEHAN: And I'm going to
23 apologize. I wonder if I might just put this back
24 together rather than trying to -- it will just take
25 a minute, to get this stuff out of the way for

657

```
1    counsel since I've piled it all on the table.
2            THE COURT:  Is that possible to do back
3    at your table?
4            MR. SHEEHAN:  It might be if counsel
5    does not --
6            THE COURT:  Are you going to need those,
7    Ms. Reynolds?
8            MS. REYNOLDS:  I'm sorry.
9            THE COURT:  Will you need the exhibits
10   that he used?
11           MS. REYNOLDS:  I think I have copies of
12   them, your Honor.  So I can use my copies.
13           THE COURT:  All right.
14           MR. SHEEHAN:  I will get this out of
15   counsel's way then.  Thank you, your Honor.
16           THE COURT:  Thank you.  And then when
17   you finish with exhibits would you put them back --
18           MR. SHEEHAN:  I will, your Honor, thank
19   you.
20   REDIRECT EXAMINATION
21   BY MS. REYNOLDS:
22     Q.   Detective, you were asked some questions
23   about the living room and the couch and the kitchen
24   or the dining room table and the fan.  I'm just
25   going to show you what was in evidence as Government
```

658

```
1    Exhibit -- starting 117F.
2            Again, that's, that's the picture of the
3    fan, correct?
4      A.   Right, yes.
5      Q.   And again, underneath on the bottom part of
6    that photo, what did you find when you processed
7    that area of the living room?
8      A.   That was a piece of wood trim that we
9    found.  We're pretty sure it came from the front
10   door.  The interior side of the front door was
11   missing its trim.
12     Q.   And showing you Government's Exhibit 116K,
13   once you moved that couch back to what appeared to
14   be an area, you know, against the wall, what is
15   depicted in 116K on the living room rug there?
16           MR. SHEEHAN:  I'm objecting, your Honor.
17   That's outside the scope of the cross.
18           THE COURT:  There was cross-examination
19   about where couches were moved.  I think this is
20   appropriate.
21     Q.   So, did you find -- what did you find in
22   what's depicted in 116K had been underneath the
23   couch once you moved it?
24     A.   Closer to the top of the photo is the long
25   piece of trim that was shown in the previous photo.
```

659

```
1    And then in the foreground was a smaller piece of
2    wood that actually still had the strike plate
3    attached to it from the front door.
4      Q.   When you say the strike plate?
5      A.   Yes, that's what I call it.  I don't know
6    if that's the actual term.  It's the little bracket
7    that the lock from the knob fits into.
8      Q.   And that appeared to be -- these portions
9    of wood frame that were found underneath the couch
10   once it was moved back against the wall, do these
11   appear to be consistent with the damage to the front
12   door of apartment 101?
13     A.   Yes.
14     Q.   And just showing you, zooming back out
15   again, in Government's Exhibit 116K, is that fan --
16   do you see that at the top of the photograph?
17     A.   Yes.
18     Q.   Does that appear to be -- or do you know
19   whether or not that was a rotating type fan?
20     A.   I don't know.  It wasn't on while we were
21   in the apartment.
22     Q.   And do you know if there was air
23   conditioning in the apartment?
24     A.   There were air conditioning units, but
25   those were not on either while we were there.
```

660

```
1      Q.   And then, Detective, you were asked some
2    questions about the photographs of Basil Williams.
3    And showing you first Government's Exhibit 120-2,
4    again, this photograph shows Basil Williams' body
5    once the placards are placed, correct?
6            MR. SHEEHAN:  I'm going to object to
7    leading.
8            THE COURT:  Sustained.
9      Q.   What does this photograph show?
10     A.   This is a photo of Mr. Williams with
11   placards 1, 2, 3 and 4 also visible in the photo.
12     Q.   And what, again, was the purpose of placing
13   the placards in a photograph once you take that
14   photograph?
15     A.   The purpose of the placards is to identify
16   the items that are going to be seized as evidence.
17     Q.   And do you recall with regard to placard
18   No. 1, what piece of evidence or pieces of evidence
19   placard No. 1, Bridgeport Exhibit No. 1, was in
20   reference to?
21           MR. SHEEHAN:  I'm going to object.
22   That's outside the scope of the cross.
23           THE COURT:  Your claim?
24           MS. REYNOLDS:  Your Honor, there were
25   extensive questions about these photos and when
```

661

1  these photos were taken, what angle.
2            THE COURT:  I'll permit it.
3            MS. REYNOLDS:  Thank you.
4       Q.   So, again, do you recall with regard to
5  placard No. 1, what that was in reference to?
6       A.   I believe that was the duct tape that was
7  removed from Mr. Williams' head and face.
8       Q.   And in Government's Exhibit 120-2, are you
9  able to see Mr. Williams' head in this photograph?
10      A.   Not from that angle.
11      Q.   Did you and your team take other angles of
12 the body once the placards were in place to further
13 document those placards and what they referred to?
14      A.   I would say yes, just because that's normal
15 procedure, but because that area was so tight I
16 can't say for sure there were.
17      Q.   But we've seen several other photographs
18 that were already --
19      A.   Yes.
20      Q.   The 120 series I'll refer to it as.
21      A.   Yes.
22      Q.   And showing you, first of all, another
23 photo you were shown during cross-examination, which
24 is 120-1.  This photograph, from which angle is this
25 photograph taken?

662

1       A.   This photograph is taken almost directly
2  over the top of Mr. Williams' upper body.
3       Q.   And, again, this photograph shows his head
4  at a closer angle, correct?
5       A.   Yes.
6       Q.   And this photograph, when was it taken in
7  relation to when the placards were placed?  In other
8  words, do you see any placards in this photograph?
9       A.   No, it was -- it could have either been
10 taken before the placards were ever placed as
11 identification shots, and since there was the pillow
12 that was in place when we first arrived and the
13 blanket, these photos are normally taken before the
14 placards are placed.  If -- however, before the
15 evidence is actually collected, in this case the
16 duct tape had to actually be removed, if we thought
17 it was necessary to take a clearer shot of that
18 particular piece of evidence, then that would have
19 been done, too.
20           So, I can't answer whether it was before
21 or after the placards were placed for this specific
22 picture.  Normally it would be before.
23      Q.   And, again, showing you Government's 120-2,
24 when you said before the pillow was removed, is that
25 the pillow that's depicted in Government's 120-2 in

663

1  the back of the photo, the white pillow with some
2  blood stains on it?
3       A.   Yes.
4       Q.   And do you recall approximately where that
5  pillow was before it was removed so the placards
6  could be placed and the photographs of the body
7  could be taken?
8       A.   I believe it was on his head, upper body
9  area.
10      Q.   And, again, when you and your team were in
11 there taking these photographs and then removing
12 items so you could take other angles and other
13 photographs, did you have your full bunny suit, as
14 you called it, your full protective gear on?
15      A.   Yes.
16      Q.   And did Detective Vargas and Detective
17 Ortiz also have their full suits on when the
18 photographs of Basil Williams' body and then items
19 near his body were found and collected as evidence?
20      A.   Yes.
21      Q.   And you said early on when you started here
22 in Basil Williams' room, Detective Gallagher was
23 also assisting you at the beginning of the
24 processing of the crime scene.
25           MR. SHEEHAN:  I'll object to the leading

664

1  form of the question.
2            MS. REYNOLDS:  I'll rephrase it, your
3  Honor.
4       Q.   Was Detective Gallagher also assisting you
5  with regard to the evidence collection relating to
6  the body of Basil Williams?
7       A.   He did not assist in the evidence
8  collection, no, but he was present on the first day
9  for the first portion of the day assisting with the
10 general processing of the scene.
11      Q.   And on that first day when
12 Detective Gallagher was the assisting in the general
13 processing, do you recall whether or not he had full
14 protective gear on?
15      A.   Yes, he did.
16      Q.   And then, again, referring to the top of
17 Government's 120-2, where the pillow is seen in this
18 photograph, can you see what's underneath that
19 pillow?
20      A.   It appears to be a white bag.
21      Q.   Are you able to see from this photo what's
22 behind that pillow or underneath the pillow on the
23 other side of the pillow?
24      A.   Not -- no, not in this photo.
25      Q.   And, again, with regard to the blue plastic

665

```
1    bag that was attached with duct tape to a white
2    plastic shopping bag, that's Government's 120 --
3    that's in evidence as Government's Exhibit 123A,
4    when you saw that exhibit and opened it here, is
5    there any doubt that that's the -- those are the two
6    bags and the duct tape connecting the two bags that
7    was seized from Basil Williams' room when you were
8    processing the scene?
9        A.   No, no doubt.
10           MS. REYNOLDS:  Can I just have a moment,
11   your Honor?
12           THE COURT:  Yes.
13           MS. REYNOLDS:  Nothing further.  Thank
14   you, your Honor.
15           THE COURT:  Will there be redirect?
16           MR. SHEEHAN:  Yes, very briefly your
17   Honor.
18           THE COURT:  I mean recross, excuse me.
19           MR. SHEEHAN:  G?  Defendant's Exhibit G.
20           THE COURT:  Yes.  I take it this is
21   offered without objection.
22           MR. SHEEHAN:  Yes, it is.
23           MS. REYNOLDS:  No objection.
24           MR. SHEEHAN:  May the record reflect
25   Defendant's Exhibit G.
```

666

```
1    RECROSS EXAMINATION
2    BY MR. SHEEHAN:
3        Q.   And I would ask, Detective Devan, that's
4    another photo taken looking down at Mr. Williams'
5    head; is it not?
6        A.   Yes, from standing on the other side of
7    him.
8        Q.   Okay.  And there is no evidence placards by
9    his head yet, is there?
10       A.   No.
11       Q.   And there is nothing between his head and
12   this white surface here and this blue bag -- blue
13   piece of plastic, whatever that is, this blue thing
14   over here, is there?
15       A.   No, not in this photo.
16       Q.   And this was in your opinion -- this is an
17   accurate photo as to the condition as to what was
18   observed after the pillow was removed from the side
19   of Mr. Williams' head?
20       A.   Yes.
21       Q.   And there is no plastic bag lying in any of
22   the biological -- what appears to be biological
23   materials next to his head?
24       A.   No.
25           MR. SHEEHAN:  I have no further
```

667

```
1    questions, your Honor.
2            THE COURT:  All right.  Anything
3    further, Ms. Reynolds?
4            MS. REYNOLDS:  No, your Honor.
5            THE COURT:  Oh, very good.  You came in,
6    you all, just on time.  Look at that.
7            Ladies and gentlemen, you are excused for
8    the day.  We'll see you tomorrow at 9:30.  Please
9    leave your notebooks here.  Do not discuss the case.
10   Have a pleasant afternoon.
11           (Jury exited the courtroom)
12           THE COURT:  All right.  Detective, you
13   are excused.  You may step down.
14           THE WITNESS:  Thank you.
15           THE COURT:  Do I surmise we will start
16   tomorrow with Detective Paul Ortiz?
17           MS. DAYTON:  We just have to figure out
18   schedules.  We have witnesses here that we thought
19   we'd get on today.
20           THE COURT:  You thought you would get
21   Ortiz and Simpson on today.
22           MS. DAYTON:  Yeah.  So, Officer Simpson
23   is here and we need to talk to him and -- but Ortiz
24   will be on tomorrow and Hodges will be on tomorrow,
25   and Simpson might come in the afternoon.
```

668

```
1            THE COURT:  Hodges will be on tomorrow?
2            MS. DAYTON:  Yes.
3            THE COURT:  Anyone else you expect.
4            MS. DAYTON:  Probably Frank Riccio.
5            THE COURT:  Okay.  So that will fill out
6    the day, you believe?
7            MS. RODRIGUEZ-COSS:  I think so.
8            THE COURT:  All right, very good.  If
9    you would -- we will stand in recess.  If you would
10   kindly give me 20 more minutes I will try to be
11   finished with a ruling on the sequestration order.
12           MR. SHEEHAN:  Thank you, your Honor,
13   that will be very helpful.  And I don't know, I
14   don't think Mr. Aquart needs to be here for that.
15           THE COURT:  I agree.  You may be
16   excused.
17           Thank you.  We stand in recess.
18           (Recess)
19           THE COURT:  All right, please be seated,
20   counsel.
21           The defendant, Azibo Aquart, has moved
22   for modification of the sequestration order in his
23   motion No. 760.  Requesting modification of the
24   sequestration order he requested to allow his
25   penalty phase mitigation witnesses to be present in
```

669

```
1    the courtroom during the guilt phase of the trial.
2          At defendant's request certain defense
3    team people were already exempted.  Only one, Jay
4    Jay Gonzalez, was present in court, and defendant
5    asked him or her to leave "just in case," even
6    though it was not anticipated that this person would
7    be a penalty phase witness.
8          MR. SHEEHAN:  Your Honor, I don't think
9    there was anybody -- if that was --
10         THE COURT:  The transcript says you were
11   going to ask someone called Jay Jay Gonzalez to
12   leave.
13         MS. RODRIGUEZ-COSS:  That's the
14   government agent, and he was --
15         MR. SHEEHAN:  Your Honor, the people --
16         THE COURT:  That was not your witness?
17         MR. SHEEHAN:  No.  There were two
18   people -- there were two people in court who were
19   prospective defense witnesses, I believe one was
20   Nadyne Nelson and the other person was Debra sobers.
21         MS. RODRIGUEZ-COSS:  I think he
22   mentioned three before.
23         MR. SHEEHAN:  There might have been a
24   third person.
25         THE COURT:  In any event, there were
```

670

```
1    three people present who may well have been penalty
2    phase witnesses.
3          MR. SHEEHAN:  Correct.
4          THE COURT:  And who at that time you
5    said you would be inviting to leave the courtroom in
6    light of the sequestration order that you had
7    requested.
8          MR. SHEEHAN:  Well, I asked for a
9    sequestration order, your Honor.  Then I alerted the
10   Court to the fact that, number one, I was asking to
11   have people from the penalty phase exempt, which I
12   had not referenced, and in fact I indicated I didn't
13   -- at the time I asked for the sequestration order I
14   did not know that there was anybody from the -- I
15   didn't know that there was anybody from the penalty
16   phase here.  I didn't think about the penalty phase.
17   When I realized that I had penalty phase people
18   here, I alerted the Court to that fact and I asked
19   to have the sequestration order modified.
20         At that point in time the government
21   objected and the issue was raised as to whether
22   these people should be here or not.  I believe my
23   recollection was that what happened at that point
24   was the Court took under advisement what ruling, if
25   any -- the Court noted that it was not -- I did not
```

671

```
1    intentionally have these people here, but that they
2    then -- they were then directed to leave.  I,
3    frankly, thought that they were directed to leave at
4    your Honor's direction because my motion for
5    modification of -- oral motion for modification of
6    the sequestration order at that time was denied.  It
7    has been objected to by the government.
8          It came up in two stages, your Honor.
9    The first stage was my motion -- my representation
10   at the bench right before we started about
11   sequestration, and then suddenly it was brought to
12   my attention that I had a couple of witnesses here.
13   I believe that the government noticed it or asked
14   me, and then I conferred with Ms. Bulkin and I
15   learned that, in fact, those people were here.  And
16   that's when -- that's when it all started.  It
17   probably was at the recess, I think.
18         THE COURT:  All right, at the time you
19   made the request for the sequestration order is not
20   the time you requested any sort of modification.  So
21   I'm merely reflecting at the time you requested the
22   sequestration order you requested to have your
23   defense team people present.
24         MR. SHEEHAN:  Yes, your Honor.
25         THE COURT:  Thereafter you made an oral
```

672

```
1    motion which has been followed up with 760, that is,
2    your motion for modification of the sequestration
3    order.  Is that correct?
4          MR. SHEEHAN:  That is correct, your
5    Honor.
6          THE COURT:  The defendant argues that
7    Federal Rule of Evidence 615 under which the Court
8    issued the sequestration order at defendant's
9    request doesn't apply in this instance because the
10   witnesses he seeks to exempt from the order may
11   testify only during the penalty phase and will not
12   be testifying in the guilt phase. "In cases governed
13   by the Federal Death Penalty Act, 18, United States
14   Code, 3593, the Federal Rules of Evidence do not
15   apply at the penalty phase." United States v. Fell,
16   531 F.3d 196, at 219, Second Circuit 2008.
17         The Federal Death Penalty Act provides:
18   "Information is admissible regardless of its
19   admissibility under the rules governing admission of
20   evidence at criminal trials except that information
21   may be excluded if its probative value is outweighed
22   by the danger of creating unfair prejudice,
23   confusing the issues, or misleading the jury.  For
24   the purposes of the preceding sentence, the fact
25   that a victim, as identified in Section 3510,
```

673

1  attended or observed the trial shall not be
2  construed to pose a danger of creating unfair
3  prejudice, confusing the issues, or misleading the
4  jury." 18 U.S.C. 3593.
5        The government refers to the FDPA's
6  explicit provision that when victims attend the
7  guilt phase their testimony during the penalty phase
8  does not create the prejudice, confusion or
9  misleading of the jury, and argues that because the
10 FDPA does not also refer to the defendant's
11 mitigation witnesses, it should be inferred that
12 Congress intended their exclusion at the guilt
13 phase.
14       Courts have declined to preclude the
15 testimony of penalty phase witnesses who violated
16 guilt phase sequestration orders "in light of the
17 critical nature of mitigating evidence in a death
18 penalty case."  Dutton v. Brown, 812 F.2d 593 at 601
19 from the Tenth Circuit, 1987.  See also Cobb v.
20 State, from the Georgia Supreme Court, 244 Ga. 355,
21 from 1979, finding the trial court erred in
22 mechanistically applying the sequestration order
23 during the sentencing phase of a death penalty
24 trial.  From the Alaska Supreme Court in Ex Parte
25 Faircloth, 471 -- I meant to say the Alabama Supreme

674

1  Court, 471 So. 2d 493 AT 496, "An accused may not be
2  deprived of a witness's testimony solely because a
3  witness disobeyed a sequestration order when that
4  deprivation would violate the accused's
5  constitutional rights."  In Dutton, the Tenth
6  Circuit suggested the alternative to the preclusion
7  of testimony of the mitigation witnesses who
8  attended the guilt phase to be allowing the witness
9  to testify "and then instructing the jury that she
10 was present during the guilt proceeding". . .
11 "Approach which would have permitted the jury to
12 assess the witness's credibility while, at the same
13 time, allowing the defendant to present crucial
14 mitigating evidence."  812 F.2d at 601.
15       Because a Federal Death Penalty Act case
16 is, in essence, two trials, and Rule 615 does not
17 require a blanket exclusion of mitigation of
18 witnesses' attendance during the guilt phase, the
19 defendant argues that partial courtroom closure to
20 prohibit mitigation witnesses, many of whom are
21 family members, from attending the guilt phase would
22 violate his Sixth Amendment rights to a public
23 trial."  From Smith v. Hollins, 448 F.3d 533 at 539,
24 Second Circuit 2006, "Intrinsic to the public trial
25 right is an individual's right to have family

675

1  members and friends present at his trial, a right
2  that the Second Circuit takes very seriously."
3        In Waller v. Georgia, the Supreme Court
4  explained that a court may be closed to the public
5  only where:  1, the party seeking to close the
6  hearing advances an overriding interest that is
7  likely to be prejudiced; 2, the closure is no
8  broader than necessary to protect that interest; 3,
9  the trial court considers reasonable alternatives to
10 closing the proceeding; and 4, the trial court makes
11 findings adequate to support the closure."  467 U.S.
12 39 at 48, 1984.
13       The Second Circuit has since extended the
14 reasoning of Waller and the Waller standard to
15 partial limited closures of the court, including to
16 specific individuals.  See Carson v. Fischer, 421
17 F.2d 83, Second Circuit 2005.  See also Yung v.
18 Walker, 341 F.3d 104 from the Second Circuit in
19 2003.
20       The government argues that without a
21 proffer of which mitigation witnesses will testify
22 as to what in the penalty phase, the Court cannot
23 make this assessment.  However, even if the
24 government argues that the overriding interest in
25 the sequestration of mitigation witnesses is the

676

1  same purpose -- is the same as the purpose of Rule
2  615, that is, to prevent mitigating witnesses "from
3  tailoring their testimony to that of a prior witness
4  and to aid in the detection of dishonesty," see U.S.
5  v. Collins, 340, F.3d 672 at 681, 8th Circuit 2003,
6  the government has not explained how mitigation
7  witnesses' presence during the guilt phase would
8  create a risk that they would tailor their testimony
9  about the defendant's background and childhood,
10 presumably before the alleged Aquart organization
11 existed and having nothing to do with guilt.
12       The government further has failed to
13 explain how sequestration of mitigation witnesses is
14 necessary to promote an interest in avoiding
15 tailoring of such testimony in the face of less
16 restrictive options, such as the instruction used in
17 Dutton.
18       In light of the Sixth Amendment concerns
19 and because the defendant's penalty phase witnesses
20 would not likely be precluded from testifying at the
21 penalty phase even if they violated the
22 sequestration order, the Court concludes that the
23 sequestration order is properly modified and the
24 defendant's friends and family will be exempted from
25 it for the guilt phase whether or not they may be

677

```
1   called to testify at the penalty phase.  The
2   requests for instructions on this issue will be
3   considered when counsel submit their requests for
4   charge.  The defendant's motion is granted.
5            MS. RODRIGUEZ-COSS:  Your Honor, may we
6   briefly address the Court?
7            THE COURT:  No, I'm not going to just --
8   when I make a ruling, Ms. Rodriguez, I don't want
9   you to stand up and say "I move for
10  reconsideration."  If you want to move for
11  reconsideration, do it in writing.  Okay?
12           MS. RODRIGUEZ-COSS:  Very well.  It's
13  just that the Court said we had failed to address a
14  particular issue.  I was intending on addressing the
15  issue that the Court --
16           THE COURT:  If you think it changes the
17  outcome of this ruling, that's fine.  But your
18  argument had been that it was the defendant's burden
19  to make essentially the case -- the negative of the
20  case that I believe the government has to show.  And
21  while we're speaking of requests for charge, may I
22  please have them by the close of business Friday.
23           MS. REYNOLDS:  Charge on the penalty
24  phase -- I mean on the guilt phase?
25           THE COURT:  Yes, the guilt phrase.
```

678

```
1   Thank you very much.
2            MS. RODRIGUEZ-COSS:  And we will address
3   -- do as the Court instructed and address the issue
4   in writing.  May we know who these witnesses are?  I
5   think their presence during the guilt phase would be
6   relevant to their credibility when they testify in
7   penalty.
8            THE COURT:  You'll know who they are
9   because you see them here.
10           MS. RODRIGUEZ-COSS:  Your Honor, quite
11  frankly --
12           THE COURT:  I don't know the defendants
13  have to announce who -- do they have announce who
14  their witnesses are?
15           MS. RODRIGUEZ-COSS:  Generally -- we are
16  in the process of drafting a motion.  Generally
17  prior to the penalty phase we do get notice of what
18  the mitigation factors will be, we get a general
19  list of who the mitigation witnesses will be some
20  time prior to the beginning of the penalty phase.  I
21  just think in all fairness for the government we
22  would be entitled to know who in the courtroom will
23  be a penalty phase witness for the defense.
24           THE COURT:  I will let you argue what
25  you obviously wish to argue.  You will have seen the
```

679

```
1   people in the courtroom.
2            MS. RODRIGUEZ-COSS:  Well, that's the
3   thing, your Honor.
4            THE COURT:  By the time of the penalty
5   phase.
6            MS. RODRIGUEZ-COSS:  In all fairness, we
7   don't sit at counsel table looking behind the
8   defense.  People come in and out all the time and
9   we're unaware of that.  I think it would be an
10  unreasonable burden to place on the government for
11  us to identify every person that comes into the
12  courtroom short of us having one of our agents
13  actually take note of every person who comes in the
14  courtroom, in which case I'm sure we'll get an
15  allegation from the defense we're harassing their
16  witnesses.  So, I don't think it's an unreasonable
17  request to have the defense identify who their
18  witnesses who are present during the guilt phase.
19           THE COURT:  I will let you put all of
20  that in a motion with authority, the defendant can
21  respond.  If the defendant chooses to identify those
22  witnesses, some or all of them, then that can be
23  contained in your response, but with respect to no
24  further closure of the courtroom as to those
25  witnesses, I wanted to get that ruling out now.  But
```

680

```
1   we'll consider it upon further motion if there is to
2   be yet further modification.
3            Thank you.  We stand in recess.
4            (Proceedings concluded 4:25)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

681

```
1                 I N D E X

2

3    WITNESS                              PAGE

4    MALKA SHAH

5    Continued Cross-Examination by       461
     Mr. Smith
6
     Redirect Examination by              463
7    Ms. Rodriguez-Coss

8

9    JOETTE DEVAN

10   Continued Direct Examination by      471
     Ms. Reynolds
11

12   Cross-Examination by Mr. Sheehan     612

13   Redirect Examination by Ms. Reynolds 657

14   Recross-Examination by Mr. Sheehan   666

15

16
```

```
17          I certify that the foregoing is a

18   correct transcript from the record of proceedings in

19   the above-entitled matter.

20

21                     4/26/11

22                      Date

23

24              /S/  Sharon Montini

25                Official Reporter
```

682

```
1                 UNITED STATES DISTRICT COURT

2                   DISTRICT OF CONNECTICUT

3    * * * * * * * * * * * *      *
                                  *
4    UNITED STATES OF AMERICA,  * Case No 6cr160(JBA)
                                  *
5               Plaintiff,       *
                                  *
6         vs.                    *
                                  *
7    AZIBO AQUART             * April 26, 2011
                                  *
8               Defendant.       *
                                  *
9    * * * * * * * * * * * *      *

10                    TRIAL TRANSCRIPT

11                     VOLUME IV

12   BEFORE:  THE HONORABLE JANET BOND ARTERTON U.S.D.J.,
                                            and jury
13   Appearances:
14   FOR THE GOVERNMENT:   ALINA REYNOLDS, ESQ
                           TRACY DAYTON, ESQ.
                           PETER MARKLE, ESQ.
15                         JACABED RODRIGUEZ-COSS
16                         United States Attorney's Office
                           915 Lafayette Blvd
17                         Bridgeport, CT 06604

18
     FOR THE DEFENDANT    MICHAEL SHEEHAN, ESQ
19   AZIBO AQUART:        Sheehan & Reeve
                          139 Orange Street
20                        New Haven CT 06510

21                        JUSTIN SMITH, ESQ.
                          383 Orange Street
22                        New Haven, CT 06511

23

24   Court Reporter:      Sharon Montini, RMR

25   Proceedings recorded by mechanical stenography,
     transcript produced by computer
```

683

```
1          THE COURT:  Good morning, Counsel,

2    ladies and gentlemen.  Mr. Aquart.

3          THE DEFENDANT:  Good morning.

4          THE COURT:  A couple things before we

5    bring in the jury.  On Thursday, May 5th, I will

6    need to end no later than 2:30.  Do you want to

7    begin earlier that day in order to have a longer

8    day?  You don't have to let me know right now, but

9    that's at issue.  And we will not be sitting the

10   next day.

11         Next, the defendant has given a proposed

12   limiting instruction for uncharged acts.  I take it

13   this has applicability today only potentially if we

14   get to Mr. Hodges.

15         Is that right, Mr. Smith.

16         MR. SMITH:  That's correct, your Honor.

17         MS. DAYTON:  We're starting with

18   Mr. Hodges, your Honor.

19         THE COURT:  All right.  Have you had a

20   chance to look at limiting instruction?  Let me ask

21   you.

22         MR. SMITH:  I filed it this morning,

23   your Honor.  I apologize.  I just handed a copy to

24   the government.  I intended to do that when I first

25   arrived, but it slipped my mind.
```

684

```
1          THE COURT:  So, when do you contemplate

2    that this would be given?

3          MR. SMITH:  I think at the conclusion of

4    the testimony, your Honor, since we don't know

5    exactly what the testimony would be.

6          THE COURT:  Does the government

7    anticipate that Mr. Hodges' testimony will involve

8    both uncharged crimes?

9          MS. RODRIGUEZ-COSS:  Yes.

10         THE COURT:  Uncharged crimes related to

11   the racketeering enterprise, the drug conspiracy,

12   and is he a witness on the gun in the car?

13         MS. DAYTON:  No.

14         MS. RODRIGUEZ-COSS:  Yes to the Court's

15   first question.

16         THE COURT:  For the first two?

17         MS. DAYTON:  Yes.

18         THE COURT:  All right.  I know you

19   haven't had a chance to look at this, but would you

20   consider both its substance and its timing?

21         MS. RODRIGUEZ-COSS:  Yes.

22         THE COURT:  So, I won't do anything

23   right now.  Is there anything else before we bring

24   in the jury?

25         MS. DAYTON:  Your Honor, Mr. Riccio --
```

685

```
 1              THE COURT:  Yes.
 2              MS. DAYTON:  -- is Mr. Hodges' attorney.
 3   Mr. Riccio is going to be a witness right after
 4   Mr. Hodges.  I've spoken with the defense.  They do
 5   not have an objection to Mr. Riccio being present
 6   while Mr. Hodges testifies because the bulk of
 7   Mr. Riccio's testimony is, I'm an attorney, I
 8   represent Hodges, I was there for proffers, pleas,
 9   and I received this letter and this is what the
10   letter says.  That's his direct.  And so it can't be
11   influenced by what Mr. Hodges says.
12              THE COURT:  You are in agreement,
13   Mr. Smith?
14              MR. SMITH:  That is correct, your Honor.
15              THE COURT:  All right, then that sounds
16   fine.  We will have Mr. Riccio in attendance while
17   his client testifies.
18              Anything else before we begin?
19              MS. DAYTON:  No, your Honor.
20              THE COURT:  All right then, we'll bring
21   in the jury.
22              (Jury entered the courtroom)
23              THE COURT:  Good morning, ladies and
24   gentlemen.  How are you today?  Please be seated.
25              All right, I will ask the government to
```

686

```
 1   please call its next witness.
 2              MS. DAYTON:  Thank you, your Honor.  The
 3   government calls Frank Hodges.
 4              THE COURT:  All right, Mr. Hodges, would
 5   you please come over to the witness stand over here.
 6              Will you please remain standing, raise
 7   your right hand and the oath will be administered to
 8   you.
 9         F R A N K   H O D G E S,
10   Having first affirmed, was examined and testified as
11   follows:
12              THE WITNESS:  Frankie Hodges,
13   H-O-D-G-E-S, Bridgeport, Connecticut.
14              THE COURT:  All right, you may proceed,
15   Ms. Dayton.
16              MS. DAYTON:  Thank you.
17   DIRECT EXAMINATION
18   BY MS. DAYTON:
19    Q.   Good morning, Mr. Hodges.
20    A.   Good morning.
21    Q.   How are you?
22    A.   Okay.
23    Q.   Why don't you scoot the microphone a little
24   bit closer to you so we can all hear you.
25              THE COURT:  You can also move the neck
```

687

```
 1   up to --
 2              MS. DAYTON:  There you go.
 3              THE COURT:  -- really capture you.
 4              THE WITNESS:  Yes, ma'am.
 5    Q.   Thank you.  You said your name is Frank
 6   Hodges?
 7    A.   Yes.
 8    Q.   Did you ever go by any other names?
 9    A.   Steve.
10    Q.   Why Steve?
11    A.   As a ploy to, you know, not give my legal
12   name out there when I was doing what I was doing.
13    Q.   Okay.  And who gave you the name Steve?
14    A.   I just made it up.
15    Q.   How old are you?
16    A.   Forty-eight.
17    Q.   And when is your birthday?
18    A.   (Redacted) '63.
19    Q.   Where were you born?
20    A.   Bridgeport, Connecticut.
21    Q.   Where did you grow up?
22    A.   Bridgeport.
23    Q.   The what area of Bridgeport?
24    A.   West end, PT Barnum.
25    Q.   What is PT Barnum?
```

688

```
 1    A.   Housing project.
 2    Q.   At some point did you move away from PT
 3   Barnum?
 4    A.   Yes, I moved to Sanford Avenue, Mother's
 5   Day, '79.
 6    Q.   1979?
 7    A.   Yes, ma'am.
 8    Q.   Who did you live with while you were
 9   growing up?
10    A.   Family; mother, brothers and sisters.
11    Q.   And how many brothers and how many sisters
12   do you have?
13    A.   I have four sisters and three brothers.
14   Well, I had three brothers.  My oldest brother died.
15    Q.   Your oldest brother passed away?
16    A.   Yes, ma'am.
17    Q.   We did that occur?
18    A.   2007.
19    Q.   Where did you go to high school?
20    A.   Bassick High.
21    Q.   Did you graduate?
22    A.   Yes, ma'am.
23    Q.   Did you go to college after that?
24    A.   I went to several schools, but I spent two
25   years at Housatonic.
```

**GA172**

689

```
1      Q.    What were you studying at Housatonic?
2      A.    Business engineering -- mechanical
3   engineering.  Excuse me.
4      Q.    Mechanical engineering.  You said you went
5   to several other schools, what other schools did you
6   go to for college-related studies?
7      A.    I went to North Carolina NT (ph), CPI,
8   Bridgeport Engineering.  And currently I'm in Green
9   Up Program, Green Up Bridgeport program for
10  environmental studies.
11     Q.    Green Up Bridgeport program?
12     A.    Yes, ma'am.
13     Q.    You are currently doing that?
14     A.    Yes, ma'am.
15     Q.    And what is CPI?
16     A.    Computer Processing Institute.
17     Q.    Did you ever work in computers?
18     A.    Yes, ma'am.
19     Q.    When did you do that?
20     A.    I'm not sure of the date, but -- I'm not
21  sure of the year, but I worked as a computer
22  operator in Stamford.
23     Q.    Was this during the college time period --
24     A.
25     Q.    -- or more recently.
```

690

```
1      Q.    Okay.  At some point did you move out of
2   Connecticut?
3      A.    I moved to North Carolina for a while when
4   my father was ill.  Then I moved back to Bridgeport.
5      Q.    How long were you in North Carolina?
6      A.    Around five years.
7      Q.    And you said while your father was ill?
8      A.    Yes, ma'am.
9      Q.    Is your father still alive?
10     A.    No, he passed in 2000.
11     Q.    While you were in North Carolina, were you
12  working?
13     A.    Yes.
14     Q.    What did you do?
15     A.    Well, I was in a rural area, so I worked as
16  a cook.  I got work, whatever work I could.
17     Q.    So, there wasn't a lot of computer
18  processing jobs there?
19     A.    No, ma'am.
20     Q.    Okay.  And when you moved back to
21  Bridgeport, did you start working again?
22     A.    I had several jobs just getting whatever I
23  can.
24     Q.    What types of jobs?
25     A.    Well, cooking.  And I worked as a nurse's
```

691

```
1   aide, more cooking, some stock work.
2      Q.    Various things?
3      A.    Yes.
4      Q.    Have you ever used drugs?
5      A.    Yes, I have.
6      Q.    What is the first type of drug you ever
7   used?
8      A.    The first drug I used was marijuana.
9      Q.    About how old were you when you started
10  smoking marijuana?
11     A.    About 17.
12     Q.    Was it recreational use?
13     A.    Yes.
14     Q.    At some point did you start using a heavier
15  drug than marijuana?
16     A.    I had started using cocaine '84, '85.
17     Q.    And is that powder cocaine?
18     A.    Yes, ma'am.
19     Q.    The type that you snort?
20     A.    Yes.
21     Q.    And at some point did you get involved in
22  selling drugs?
23     A.    Yes, I did.
24     Q.    About when was that?
25     A.    '97, I believe it was.
```

692

```
1      Q.    In the '90s?
2      A.    Yes.
3      Q.    And how did you first get involved in
4   selling drugs?
5      A.    I used to use late at night, hanging out
6   with -- or getting to know people and hanging out.
7   And then I figured I could make money while I'm out
8   there, while I'm using.
9      Q.    So, where were you hanging out?
10     A.    In Greens Apartments.
11     Q.    And where are the Greens Apartments
12  located?
13     A.    In Bridgeport, Connecticut.
14     Q.    And is that close to where you were living?
15     A.    Yes, ma'am.
16     Q.    How did you know to go to the Greens
17  Apartments to buy coke?
18     A.    Just running into various people and, you
19  know, word-of-mouth, and it's over here, it's over
20  there.  Just other people directed me.
21     Q.    And when you decided that you could make
22  some money selling drugs, who did you get them from;
23  if you recall?
24     A.    Actually I dealt with one person, his name
25  was -- I don't know his real name, I just called him
```

**GA173**

693

```
1   Flirt.
2       Q.   What would you call him?
3       A.   Flirt.  But I don't know his real name.
4       Q.   And how long did you work with him selling
5   coke?
6       A.   Three, four months.
7       Q.   What happened?
8       A.   Well, actually it was like off and on.  It
9   was longer than that, but I mean, I got
10  incarcerated, came back out and couldn't find a job,
11  so I wind up falling back into the same trade.
12      Q.   When did you -- after three or four months
13  you first got incarcerated?
14      A.   Right.
15      Q.   And what were you arrested for?
16      A.   Possession with intent to sell.
17      Q.   Did you plead guilty?
18      A.   Yes, I did.
19      Q.   And you went to jail?
20      A.   Yes, I did.
21      Q.   How much time did you spend in jail; if you
22  remember?
23      A.   Well, I got sentenced to two years, and I
24  think I did maybe a year and a half.
25      Q.   And when you got out you said you tried to
```

694

```
1   find a job?
2       A.   Couldn't.
3       Q.   You didn't?
4       A.   Couldn't find a job, so back in the same,
5   you know, back in the same trade.
6       Q.   Okay.  And when you -- were you selling
7   coke or crack now?
8       A.   Crack.
9       Q.   And what's the difference between coke and
10  crack?
11      A.   Coke and crack is -- well, coke is a powder
12  form and crack is a harder substance.  It's the same
13  substance, but just in a harder form.
14      Q.   Do you know how to turn powder cocaine into
15  crack cocaine?
16      A.   Yes, I do.
17      Q.   Without giving a biology lesson, could you
18  just generally state how you do that?
19      A.   You take the powder cocaine and you mix it
20  with baking soda and water, bring it to a boil over
21  some heat, and then once it gels, you just add water
22  to it and shake it 'til get it into a rock form.
23      Q.   Who taught you how to do that?
24      A.   I can't remember.  I mean, it's been so
25  long I can't remember.
```

695

```
1       Q.   Okay.  By the time you started selling
2   crack, were you smoking crack as well?
3       A.   Yes.
4       Q.   How often each day would you smoke crack?
5       A.   How often each day?  Wow, I would say out
6   of 24 hours maybe 10 to 12.
7       Q.   Is it fair to say you were heavily
8   addicted?
9       A.   Yes, ma'am.
10      Q.   Were you arrested again for selling crack
11  cocaine?
12      A.   Yes, I was.
13      Q.   Do you know when that was?
14      A.   '97.  I don't remember the date.
15      Q.   And did you go to jail again?
16      A.   Yes, I did.
17      Q.   How long did you go to jail for?
18      A.   I believe it was three years.
19      Q.   When you got out -- did you do any
20  rehabilitation while you were in there?
21      A.   Yes, I did.
22      Q.   Did it work?
23      A.   Yeah, it worked for a while, but I mean
24  it's just hard finding a job when you have the
25  stipulation of a convict with a habit.  So you just
```

696

```
1   fall back into the same old trade.  You need money
2   to survive.
3       Q.   So, when you got out that time you started
4   selling again?
5       A.   Yes.
6       Q.   And did you go back to prison again?
7       A.   Yes, I did.
8       Q.   Drawing your attention to 2004, were you
9   familiar with the Charles Street area?
10      A.   Yes, I was.
11      Q.   And how were you familiar with that area?
12      A.   Well, I used to live on Wheeler Street,
13  right around the corner from Charles with an
14  ex-girlfriend.
15      Q.   And how did living on Wheeler Street make
16  you familiar with Charles Street?
17      A.   Well, it's right around the corner, so it's
18  right in the general area.
19      Q.   I'm going to show you what's in evidence as
20  Government's Exhibit 102.  It should come up on the
21  screen.  You can look at your screen right in front
22  of you, behind your --
23      A.   Okay.
24      Q.   Do you recognize what that's a picture of?
25      A.   Yes, 215 Charles Street.
```

697

```
1     Q.   And what is right there?
2     A.   The doorway.
3     Q.   In the middle of the picture a little bit
4  to the left.  And what is this large dark area at
5  the bottom of the middle of the picture?
6     A.   The underground parking lot.
7     Q.   And do you know who lived in this first
8  apartment over here to the right?
9     A.   Basil.  I don't know his last name.
10    Q.   And do you know if anyone lived there with
11 him?
12    A.   Tina.  Tina and Tippy.  Well, Tina and -- I
13 can't think of his name.  But Tina and Tippy.
14    Q.   Tippy is how you knew him?
15    A.   Yes.
16    Q.   What was Tippy's relationship to Tina?
17    A.   They were boyfriend and girlfriend.
18    Q.   And showing you Government's Exhibit 109,
19 do you recognize what this is a picture of?
20    A.   Charles Street.
21    Q.   And this is the side here.  Do you know
22 what's immediately to the left of Charles Street as
23 you are looking -- of the Charles Street building as
24 you are looking at it?
25    A.   The diner.
```

698

```
1     Q.   What's the name of the diner; if you know?
2     A.   I want to say Colonial.
3     Q.   Okay.  Thank you.
4          So, approximately -- well, had you ever been
5  inside Charles Street?
6     A.   Yes, I have.
7     Q.   And when was the first time you were in
8  that area, in the apartment?
9     A.   Me and my girlfriend, we moved from
10 Wheeler -- well, the street over, we moved to the
11 other side of town, and I used to walk through going
12 to my mother's house, and I ran into Tippy.  And I
13 had previously knew Tippy from when I lived around
14 the corner.  So, he brought me over there.
15    Q.   He brought you into Charles Street?
16    A.   Yes.
17    Q.   And you said you knew him from where?
18    A.   When I lived around the corner.  I used to
19 see him, me and him used to speak, but we never
20 interacted with each other.  But we knew each
21 other's face and everything.
22    Q.   When you went in, where did Tippy bring
23 you?
24    A.   211, Pops' house.
25    Q.   Pops' house.  Do you know -- and you said
```

699

```
1  211.  Is that an apartment?
2     A.   Yes.
3     Q.   And do you know Pops' real name?
4     A.   James Rucker.
5     Q.   And I'm going to show you what's been
6  marked Government's 229 for purposes of
7  identification.  Do you recognize who that is a
8  picture of?
9     A.   James Rucker.
10    Q.   And that's the person you called Pops?
11    A.   Yes, ma'am.
12         MS. DAYTON:  Your Honor, move
13 Government's Exhibit 229 into evidence, please.
14         MR. SMITH:  No objection.
15         THE COURT:  Full exhibit.
16    Q.   And you went to Pops' apartment?
17    A.   Yes.
18    Q.   When you went into Pops' apartment, what
19 were you doing there?
20    A.   Smoking crack, getting high.
21    Q.   With who?
22    A.   That particular time I got high with Tippy.
23    Q.   Was anyone else in the apartment that first
24 time; if you remember?
25    A.   I mean, there were several people there.
```

700

```
1  There was always several people there.  There -- it
2  was never really vacant, so...
3     Q.   Okay.  After you went there, smoked crack
4  the first time, did you go back there again?
5     A.   Yes, I did.
6     Q.   Once or several times?
7     A.   Several times.
8     Q.   The next time you went back there, was it
9  soon after the first time?
10    A.   Yes, it was.
11    Q.   And what drew you back there?
12    A.   I had -- when I went there I ran into a
13 friend named Venro Fleming that I knew from PT.
14    Q.   From when you were little?
15    A.   Yes.
16    Q.   And you said you ran into him.  Was that
17 outside or inside the apartment?
18    A.   Inside the apartment.
19    Q.   Okay.  And so running into Venro, how did
20 that make you go back there?
21    A.   Well, it made me feel comfortable because I
22 knew somebody that I grew up with, so...
23    Q.   Okay.  I'm going to show you what's been
24 marked Government's Exhibit 223 for identification.
25 Do you recognize who that's a photo of?
```

**GA175**

701

1    A.    Venro Fleming.
2         MS. DAYTON:  Your Honor, move 223 into
3    evidence, please.
4         MR. SMITH:  No objection.
5         THE COURT:  All right, 223 is a full
6    exhibit.
7    Q.    And when you went back, what was Venro
8    doing inside of apartment 211?
9    A.    He was selling drugs.
10   Q.    What kind of drugs?
11   A.    Selling crack cocaine.
12   Q.    And did you see what sort of quantities he
13   was selling it in?
14   A.    It was in little baggies, regular bag, and
15   they were -- actually they were dime bags in little
16   cellophane plastic bags.
17   Q.    What's a dime bag?
18   A.    It's ten dollars amount of crack cocaine.
19   Q.    And you said a little cellophane bag.  How
20   little?  Like a sandwich bag or littler?
21   A.    Like a sandwich bag, but smaller.
22   Q.    How small?  Can you use your fingers to
23   show?
24   A.    About like that.
25        MS. DAYTON:  Indicating about an inch,

702

1    for the record, your Honor.
2    Q.    And when you went back up there and Venro
3    was selling, did you seem him sell to one person or
4    lots of people?
5    A.    Lots of people.
6    Q.    About how long did you spend in there?
7    A.    I started frequently hanging out with Venro
8    and, you know, just sort of, I mean, helping him
9    out.  I seen that he was, you know, opening the
10   door, taking care of people, so I would open the
11   door for him and he would take care of the people
12   and I would open the door to let them out.
13   Q.    So, you started assisting him?
14   A.    Right.
15   Q.    What time period was this?  What year?
16   A.    Early 2004.
17   Q.    And when you said you went there a lot,
18   like once a week, once a day?
19   A.    Maybe two, three times a week until it
20   became more frequent.
21   Q.    And while you were there helping Venro open
22   the door, were you also smoking crack?
23   A.    Yes, ma'am.
24   Q.    And was Venro, too?
25   A.    Yes, ma'am.

703

1    Q.    Was anyone else assisting Venro to sell or
2    anyone else selling out of that apartment at that
3    time?
4    A.    At that particular time?  I mean, Pops
5    would sell.  Every now and then there was different
6    people selling.
7    Q.    Who were the other people selling?
8    A.    Pops.  Well, James, Venro, Connie, and then
9    I started selling myself.
10   Q.    When, approximately, did you start selling?
11   A.    Sometime, 2004.  Venro wind up being
12   missing in action and I was asked to -- you know, if
13   I wanted to take his spot until he got back.
14   Q.    Okay.  You said Venro went missing in
15   action.  Do you know what happened to him?
16   A.    I don't know what happened.  He just left.
17   I don't know where he went.
18   Q.    You didn't hear what happened to him?
19   A.    Not at that --
20        MR. SMITH:  Objection, hearsay.
21        THE COURT:  Well, the question was did
22   he hear what happened, not what did he hear.  So,
23   I'm going to overrule the objection.
24        Did you hear what happened to him?
25   That's just a yes or no question.

704

1         THE WITNESS:  No, I didn't.
2    Q.    And when Venro went missing in action, did
3    anyone immediately take over for him?
4         MR. SMITH:  Objection.  Asked and
5    answered.
6         THE COURT:  I'm going to permit the
7    question.
8    Q.    Did anyone start selling drugs for him in
9    his place?
10   A.    I did.
11   Q.    You said you were asked to.  Who asked you
12   to do that?
13   A.    D.
14   Q.    Do you see D in this courtroom today?
15   A.    Right here.
16   Q.    You are pointing over at this table.  Could
17   you indicate what the person named D is wearing?
18   A.    Blue shirt, tie.
19   Q.    And is he wearing a jacket, or no?
20   A.    No jacket.
21        MS. DAYTON:  Indicating the defendant
22   for the record, your Honor.
23        THE COURT:  The record may reflect he's
24   indicating Mr. Aquart.
25        MS. DAYTON:  Thank you.

705

1    Q.   Did you know D at that time by any other
2   name?
3    A.   No, ma'am.
4    Q.   Prior to D asking you if you wanted to sell
5   drugs, had you ever met him before?
6    A.   I've seen him, but never -- we never were
7   actually introduced, but I seen him and I was told
8   who he was, but we were never really introduced.
9    Q.   Where had you seen him?
10   A.   211.
11   Q.   Once or more than once?
12   A.   Two or three times.
13   Q.   On those occasions when you saw him in
14  apartment 211, what was the defendant doing?
15   A.   Collecting money, dropping off drugs.
16   Q.   And who was he collecting money from?
17   A.   At the time it was Venro.
18   Q.   And who was he dropping off drugs to?
19   A.   Venro.
20   Q.   And are those the same drugs that you would
21  later smoke?
22   A.   Yes.
23   Q.   Crack?
24   A.   Yes.
25   Q.   When you had the conversation with the

706

1   defendant, what did he say to you with respect to
2   whether or not you wanted to sell crack?
3    A.   Well, he just asked me where was Venro, and
4   I told him I didn't know.  So, I guess it was
5   getting late and he had something else to do, so he
6   asked me if I wanted to do his -- he asked me if I
7   wanted to sell the drugs, and I said yeah.
8    Q.   What did he give you?
9          MR. SMITH:  Objection.  Foundation for
10  that question.
11         THE COURT:  Pardon me?
12         MR. SMITH:  Can we have a foundation for
13  that question.  Did he give him anything?
14   Q.   Did he give you drugs?
15   A.   Yes, he did.
16   Q.   What did he give you?
17   A.   Crack cocaine.
18   Q.   And did he give you a big rock or did he
19  give you bags?  How did he give it to you?
20   A.   Bags.
21   Q.   Do you recall if they were packaged in any
22  particular manner?
23   A.   The same way I talked about earlier.
24   Q.   And was there a set number of bags that he
25  gave you?

707

1    A.   Like 35.
2    Q.   Was there -- were they just loose, or how
3   was it?
4    A.   They were loose.
5    Q.   And he just handed you 35 loose bags?
6    A.   Oh, no, they were loose.  They were loose
7   themselves, but they were in a bag containing them.
8    Q.   And what quantity was in each small bag?
9    A.   $10 amount.
10   Q.   So, it's worth about $350?
11   A.   Yes, ma'am.
12   Q.   Do you know, based upon your experience
13  selling drugs over the course of the year, do you
14  know about what quantity would be in that group of
15  35 bags if you totaled it together?
16   A.   About 3 1/2 grams.
17   Q.   About 3 1/2 grams?
18   A.   Yes, ma'am.
19   Q.   And is there a street name for that
20  quantity of 3 1/2 grams?
21   A.   Eight ball.
22   Q.   An eight ball?
23   A.   Yes, ma'am.
24   Q.   Now, you started selling out of the
25  apartment after he gave you this pack?

708

1    A.   Yes, ma'am.
2    Q.   And what hours did you sell?
3    A.   Twenty-four/seven.  All day, all night.
4    Q.   You stopped going home?
5    A.   Yes, I did.
6    Q.   Why?
7    A.   Well, I actually -- actually I stopped
8   because I told him that I would, and it was just the
9   traffic was just ongoing, it was like never-ending.
10   Q.   The drug traffic?
11   A.   Yes.
12   Q.   So would you sell all 35 of those bags in
13  one day?
14   A.   Yes, I would.
15   Q.   What happened when you ran out of drugs?
16   A.   I would get another package.
17   Q.   From who?
18   A.   I started getting another package from him
19  until I started getting it from someone else.
20   Q.   When you say "him," you mean who?
21   A.   The defendant.
22   Q.   So would you sell more than one pack in a
23  day?  At the beginning when you started selling, do
24  you think you would sell more than one package of 35
25  in a day?

**GA177**

709

```
1        A.    Yes.
2        Q.    Approximately how many packages of 35 would
3   you sell in a day?
4        A.    Average?
5        Q.    Average.
6        A.    Average day would be four or five, six.
7        Q.    So, in each of those was 3 1/2 grams?
8        A.    Yes.
9        Q.    Now, did -- after you started selling, did
10  Venro ever come back?
11       A.    He came back later.  Months later.
12       Q.    Did you speak to him?
13       A.    Yes, I did.
14       Q.    And did you ask him why he left?
15             MR. SMITH:  Objection.
16             THE COURT:  Just yes or no.  Did you ask
17  him --
18             THE WITNESS:  Yes, I did.
19             THE COURT:  -- why he left?
20       Q.    Did he tell you?
21       A.    Yes, he did.
22             MR. SMITH:  Objection.
23       Q.    What did he tell you?
24             MR. SMITH:  Objection, hearsay.
25             THE COURT:  May I see you at sidebar,
```

710

```
1   please.
2             (Sidebar conference)
3             THE COURT:  Good morning.
4             MS. DAYTON:  Your Honor, the government
5   submits this is admissible as a co-conspirator
6   statement.  It's made during the course of the
7   conspiracy by one conspirator to a second
8   conspirator.  He is -- the proffer is he's going to
9   tell him that D beat him up.
10            MR. SMITH:  Your Honor, by this
11  witness's own testimony Venro has now been gone for
12  months.  It's not clear he's part of the conspiracy
13  any longer.  Therefore, it's not a co-conspirator
14  statement to another co-conspirator.  And it's --
15  they're not made in the course of the conspiracy.
16            MS. DAYTON:  There is no -- there is
17  nothing to suggest that at this juncture that Venro
18  had withdrawn from the conspiracy.  In fact, he came
19  back.  That's the point.  He walks back into 211.
20            MR. SMITH:  That does not mean he's
21  renewing his conspiracy, your Honor, that bare fact.
22            THE COURT:  So, we have Venro selling
23  for the defendant beforehand.
24            MR. SMITH:  Correct.
25            THE COURT:  Hodges helping Venro.
```

711

```
1             MR. SMITH:  Right.
2             THE COURT:  Hodges taking over at
3   defendant's request.
4             MR. SMITH:  After Venro apparently
5   disappears.
6             THE COURT:  After Venro, to Mr. Hodges'
7   knowledge, is, as he calls it, missing in action,
8   doesn't know why.  Venro returns to 211 where the
9   drug dealing is going on.  Is the evidence that he
10  picks up with the drug dealing?
11            MS. DAYTON:  The evidence is he comes
12  back on several occasions, not just from this
13  witness, but he'll say he came back, he told him he
14  got beat up by D.  And other witnesses will testify
15  about Venro's presence and how often he was in the
16  building after that.
17            THE COURT:  So why -- so, Mr. Smith, you
18  claim that Venro's statements after he returned to
19  the apartment where he used to deal drugs for the
20  defendant is not a statement in the course of the
21  drug conspiracy of which he had previously been a
22  member?
23            MR. SMITH:  Correct.  Nor designed to
24  further the course of the conspiracy.  He's simply
25  reciting something that allegedly happened to him.
```

712

```
1   And I think the case law is clear in those cases
2   where one -- either one conspirator or someone
3   outside the conspiracy is reciting simple facts of
4   things that occurred.
5             THE COURT:  What case law?
6             MR. SMITH:  I believe it's in our brief,
7   your Honor.  I do not have it here.
8             THE COURT:  Which brief?
9             MS. DAYTON:  No, you did not respond on
10  the co-conspirator statements.  In fact, you
11  submitted and said that you would have a Geaney
12  hearing at the end and you would not argue against
13  any of government's --
14            MR SMITH:  I did not say we would have a
15  Geaney hearing at the end.  I never relinquished our
16  right to object to certain statements.
17            THE COURT:  I just want to know what
18  authority you say supports your position that this
19  is not a statement of a co-conspirator and, thus,
20  inadmissible when it seems evident from the record
21  so far that they were all co-conspirators in the
22  defendant's drug operation at 211.
23            MR. SMITH:  Again, your Honor, I
24  think -- the elements of the co-conspirator
25  statements, it has to be made during the course of
```

713

```
1    the conspiracy by a member of the conspiracy for the
2    purpose of furthering the conspiracy.  We haven't
3    established that he's a member of the conspiracy at
4    this point.  We haven't established that he's
5    furthering the conspiracy at this point by this
6    statement.
7           THE COURT:  If he returns to the place
8    of the dealing, why does not that establish that he
9    is -- that he is a part of the conspiracy?
10          MR. SMITH:  Perhaps he returned to say
11   hello to his old friend or to purchase crack cocaine
12   himself.  But just purchasing crack cocaine does not
13   necessarily make him a member of the conspiracy.
14          MS. DAYTON:  The evidence is going to
15   show Fleming returned and D beat him up because he
16   said Venro still owed him money from drug dealing.
17   That's what Venro Fleming will testify to.
18          MR. SMITH:  Then Venro Fleming can
19   testify to that.
20          MS. DAYTON:  But so can he.  Just
21   because Venro Fleming can testify to it doesn't mean
22   that this one can't.  It's not going to be in-depth,
23   he's going to say something to the effect D beat him
24   up because he messed up money, which is a common
25   refrain throughout the course of the trial.
```

714

```
1           THE COURT:  I guess I don't understand
2    the defendant's position that this is not an
3    admissible co-conspirator statement.  You say that
4    it is not in furtherance of the conspiracy.  What is
5    the government's response to that?
6           MS. DAYTON:  That it is.  That they
7    warned each other about messing up D's money and
8    what happens to you if you do.  They also warned
9    each other about selling someone else's drugs there
10   and all sorts of things because D had several rules,
11   the defendant, and they would tell each other about
12   what happened.
13          THE COURT:  It seems to me that the
14   government position is the correct position.  I'm
15   going to permit him to testify.  I think that in the
16   event the proffer given by the government is not
17   quite as -- proved quite as sweeping, nonetheless,
18   if Venro is going to be testifying, there is minimal
19   prejudice through admission of this statement.
20          So I'm going to permit the statement over
21   the defendant's objection as a statement made in --
22   as a co-conspirator, one to another, about aspects
23   of that conspiracy, that drug conspiracy; namely,
24   the discipline invoked by the defendant.  So, I
25   think that's, assuming that the government proves
```

715

```
1    what it says it's going to prove, that that is a
2    part of the conspiracy and is admissible as a
3    co-conspirator statement and thus not subject to the
4    hearsay rule.
5           MS. DAYTON:  Thank you.
6           THE COURT:  Thank you.
7           (Sidebar concluded)
8           THE COURT:  You may proceed.
9           MS. DAYTON:  Thank you.
10   Q.   So, when Venro came back --
11   A.   Yes.
12   Q.   -- what did he tell you that had happened
13   to him?
14   A.   I believe it was some money issue, that he
15   had got assaulted by D.
16   Q.   And Venro told you that?
17   A.   Yes.
18   Q.   And let me ask you, was there a woman named
19   Jackie Bryant that was hanging around at this point?
20   A.   Yes.
21   Q.   And what did Jackie Bryant do for a living?
22   A.   At one time she sold for D also.
23   Q.   And was that before or after Venro?
24   A.   I think it was before Venro.
25   Q.   And was she still hanging out at the
```

716

```
1    apartment at the time that Venro was selling there?
2    A.   She was in and out.  Not as frequent, but
3    in and out.
4    Q.   Okay.  I'm going to show you what's marked
5    as -- one moment, please -- Government's Exhibit 214
6    for identification.  Do you recognize who this is?
7    A.   Jackie.
8           MS. DAYTON:  Your Honor, the government
9    moves 214 into evidence.
10          THE COURT:  Any objection?
11          MR. SMITH:  No objection, your Honor.
12          THE COURT:  All right, 214 is a full
13   exhibit.
14   Q.   And did you ever buy drugs from Jackie
15   Bryant?
16   A.   Yes, I did.
17   Q.   When, approximately, was that?
18   A.   Sometime before -- I mean, sometime in that
19   same area.
20   Q.   When you were buying from Venro?
21   A.   Yes.
22   Q.   And do you -- let me ask you a different
23   question.
24          While you were selling, you said you were
25   selling 24 hours a day, seven days a week.  Did you
```

717

```
1   have regular customers?
2        A.   Yes, I did.
3        Q.   And who were some of your regular
4   customers?
5        A.   Carlos, Chon (ph), Tara, Stephanie, Mike,
6   Tina, Tippy, Jackie when she come through, Kat.
7        Q.   Now, you mentioned Tina.  Is this the Tina
8   that you spoke about before who lived downstairs?
9        A.   Yes, it is.
10       Q.   And is this the Tina who was later
11  murdered?
12           MR. SMITH:  Objection.  That hasn't been
13  established, your Honor.
14           MS. DAYTON:  Actually, I think it has
15  been established.
16           THE COURT:  I think the medical
17  examiner's testimony established that.  Overruled.
18       A.   Yes, it is.
19           MS. DAYTON:  Your Honor, at this point
20  the government would move Government's Exhibit 252
21  into evidence.
22           MR. SMITH:  No objection.
23           THE COURT:  All right, that's a full
24  exhibit.
25       Q.   And is that Tina Johnson?
```

718

```
1        A.   Yes, it is.
2        Q.   And you said Tina lived downstairs in the
3   building?
4        A.   Yes, she did.
5        Q.   Did she live there all the time?
6        A.   No, she didn't.  Well, when I first started
7   selling she didn't live there, she used to come
8   through, but then --
9        Q.   Do you know where she did live at that
10  point?
11       A.   I don't know if it was Shelton, but it
12  was -- I don't think it was in Bridgeport.  I think
13  it was Shelton.
14       Q.   And she used to come through to Charles
15  Street?
16       A.   Yes.
17       Q.   And do you know why she would come through
18  to Charles street?
19       A.   To see Basil and to get high.
20       Q.   And she would get high where?
21       A.   In 211.  Or sometimes she would go to
22  Basil's house, wherever she felt like she wanted to
23  be at.
24       Q.   I'm going to show you a picture that's been
25  marked 254 for the purposes of identification.  Do
```

719

```
1   you recognize who that is a photo of?
2        A.   Basil.
3            MS. DAYTON:  Your Honor, at this point
4   the government would move Government's Exhibit 254
5   into evidence.
6            MR. SMITH:  No objection.
7            THE COURT:  All right, 254 is a full
8   exhibit.
9            MS. DAYTON:  Thank you.
10       Q.   So that's a picture of Basil Williams?
11       A.   Yes, ma'am.
12       Q.   Do you know if Tina had a job?
13       A.   Well, she was a home health aide, but I
14  think her client died and she was waiting for work.
15       Q.   So -- all right.  So she would come by,
16  she'd get drugs, sometimes smoke?
17           MR. SMITH:  Objection, leading.
18           THE COURT:  Sustained.
19       Q.   Earlier you stated that when you ran out of
20  drugs that you would call for more drugs.
21       A.   Right.
22       Q.   You mentioned there was someone else other
23  than the defendant you called.  Who was that someone
24  else?
25       A.   First it was Squeaky, then it was Womble.
```

720

```
1        Q.   And who is Squeaky?
2        A.   He worked for D.
3        Q.   Do you know what his relationship was to D?
4        A.   As other than an employee, I have no idea.
5        Q.   How did you actually get in touch with him?
6        A.   He would come by or I would call him.
7        Q.   And what would he bring you?
8        A.   Another package, the same amount.
9        Q.   Were they always packaged in the same way?
10       A.   Yes.
11       Q.   Throughout your time working there?
12       A.   Yes.
13       Q.   I'm going to show you what's been marked as
14  Government's Exhibit 221 for identification.  Do you
15  recognize who this is a picture of?
16       A.   Squeaky.
17           MS. DAYTON:  221.  Your Honor,
18  government would move 221 into evidence.
19           MR. SMITH:  No objection, your Honor.
20           THE COURT:  All right, full exhibit.
21           MS. DAYTON:  Thank you, your Honor.
22       Q.   That's Squeaky?
23       A.   Yes, ma'am.
24       Q.   About how long was it that you were getting
25  resupplied by Squeaky?  How long did that go on for?
```

721

```
1    A.   Not long.  I would say three, four months.
2    Q.   And what happened?  Where did Squeaky go?
3    A.   He got incarcerated.
4    Q.   He was incarcerated?
5    A.   Yeah, on another charge.
6    Q.   Okay.  And after Squeaky who would you call
7  when you the needed more drugs?
8    A.   Womble.
9    Q.   Womble?
10   A.   Yes.
11   Q.   Do you know Womble's whole name?
12   A.   No, I don't.
13   Q.   How did you meet Womble?
14   A.   I met Womble through Squeaky.
15   Q.   Who had introduced you to Squeaky?
16   A.   The defendant.
17   Q.   The defendant, okay.  So Squeaky introduced
18 you to Womble.  Do you know approximately what time
19 period this was?
20   A.   If I'm not mistaken early, '0 -- no, it
21 couldn't be early '05.  Yeah, about early '05.
22   Q.   Early 2005?
23   A.   Yes.
24   Q.   I'm going to show you what's been marked
25 Government's Exhibit 210 for identification.  Do you
```

722

```
1  recognize who that is a photo of?
2    A.   Womble.
3         MS. DAYTON:  Your Honor, at this point
4  the government would request to move 210 into
5  evidence.
6         MR. SMITH:  No objection.
7         THE COURT:  Full exhibit.
8    Q.   And when Womble started bringing you the
9  drugs, were they also packaged in the same way?
10   A.   Yes.
11   Q.   When you finished -- how much would you
12 sell that whole pack for, the 35 or so little bags?
13        MR. SMITH:  Objection.  Asked and
14 answered.
15        THE COURT:  This is at a different point
16 in time than he initially discussed?
17        MS. DAYTON:  This is at the Womble
18 point.
19        THE COURT:  That may be different.
20   Q.   How much did you sell it for?
21   A.   The same thing.
22   Q.   Okay.
23   A.   I'm sorry, $10.
24   Q.   $10 each little bag.  And how much for the
25 whole bag?
```

723

```
1    A.   350.
2    Q.   What did you make out of that?
3    A.   $100.
4    Q.   Out of every pack?
5    A.   Yes.
6    Q.   So, who did you give the other money to?
7    A.   Womble.
8    Q.   And did you ever give it to anyone but
9  Womble?
10   A.   Besides the defendant?
11   Q.   You also gave it to the defendant?
12   A.   And Squeaky, yes.
13   Q.   And Squeaky?
14   A.   Yes.
15   Q.   And was the $100 given to you actually as
16 $100 in cash or was it given to you in drugs?  How
17 was it given to you?
18   A.   Drugs.  And I could -- it was given to me
19 in drugs.  I would just take my percent, my
20 percentage, and I could either make the $100 or I
21 could do what I wanted with it.
22   Q.   Okay.
23   A.   But --
24   Q.   So, when you said you would make the $100,
25 how would you make the $100 with the drugs?
```

724

```
1    A.   Sell it.
2    Q.   And if you did something else with it, what
3  did you do with it?
4    A.   Smoke it.
5    Q.   What did you usually do with it?
6    A.   Sometimes I did both.
7    Q.   Was there ever a time where you called for
8  drugs and no one actually brought it to you, like
9  you had to go get it?
10   A.   Yes.
11   Q.   And where would you go pick it up from?
12   A.   I would go to Womble's house.
13   Q.   Where did Womble live?
14   A.   Freemont Street.
15   Q.   Freemont?
16   A.   Yes.
17   Q.   And where is that?
18   A.   Fairmont Street.
19   Q.   Fairmont?
20   A.   Fairmont.
21   Q.   Where is that?
22   A.   Not far from Charles.
23   Q.   So, in Bridgeport?
24   A.   Yes, in Bridgeport.  Excuse me.
25   Q.   Is there any major landmarks by it?
```

725

1  A. Across the street from the jailhouse.

2  Q. From the jail.  Okay.  And if you went to

3 Womble's house, would you pick it up at his house

4 from Womble?

5  A. Sometimes.

6  Q. And who else?

7  A. If he wasn't there his -- if he wasn't

8 there, his girl would give it to me.

9  Q. Do you know his girl's name?

10  A. Sherrell.

11  Q. Do you know her last name?

12  A. No, I don't.

13  Q. Did you ever get drugs from anywhere else

14 besides from Womble or D handing them to you, or

15 Sherrel or Little Man, anywhere else?

16  A. No.

17  Q. How much, like at the high point of your

18 drug dealing there, how much were you making a day?

19  A. Me myself?

20  Q. Yeah.

21  A. On a good day?

22  Q. Yeah.

23  A. I could make close to a thousand dollars.

24  Q. Okay.  So, you could sell up to ten

25 packages of those little 35s?

726

1  A. Yes.

2  Q. Did you save any money?

3  A. No, I didn't.

4  Q. At some point did anyone else start selling

5 out of the apartment where you were selling?

6  A. Out of 211?

7  Q. Yes.

8  A. Juanita, James.

9  Q. James?

10  A. Rucker.

11  Q. Rucker.  And do you know Juanita's last

12 name?

13  A. Hopkins.

14  Q. And did Juanita go by any other name?

15  A. Vanessa.

16  Q. Why did she go by Vanessa?

17  A. Well, the same as myself.  You just don't

18 want your legal name called out in the middle of the

19 night.  So, I gave her the name Vanessa.

20  Q. You gave it to her?

21  A. Yes, ma'am.

22  Q. So, you don't want someone yelling your

23 real name down the hall when they're looking for

24 drugs?

25  A. Right.

727

1  Q. I'm going to show you what's been marked

2 Government's Exhibit 213 for identification.  Do you

3 recognize this person?

4  A. Yes, I do.

5  Q. Who is that?

6  A. Juanita.

7  Q. Did you call her Juanita or did you call

8 her Vanessa?

9  A. I called her Nessa.

10  Q. Nessa?

11  A. Right.

12    MS. DAYTON:  Your Honor, at this point

13 the government would move 213 into evidence.

14    THE COURT:  Full exhibit, absent

15 objection.

16  Q. Did you and Juanita sell drugs at the same

17 time from that apartment?

18  A. At the same time or -- we both got a

19 package and we both selling it?  No.

20  Q. How did it work?

21  A. I would sell a package and she would sell a

22 package or vice-versa.

23  Q. Did you see who was giving Juanita the

24 drugs to sell?

25  A. She was getting it from the same place I

728

1 was, Womble.

2  Q. And who determined the shifts, like who was

3 going to sell first, who was going to sell second?

4  A. Well, I mean, it was pretty much me, but

5 then, you know, if I got tired she would do it.  And

6 if she needed to make a little more money, then

7 Womble would tell me to let her do two, do three,

8 whatever.  And then I would take over when she gets

9 tired or whatever.

10  Q. Was the defendant involved in the

11 day-to-day sales?

12  A. In the day-to-day?  I can't actually say

13 that, but, I mean, I don't know because, you know,

14 he was in and out.  He wasn't there that frequently,

15 but then, you know, he would just pop up whenever he

16 felt like it.

17  Q. When you said he just popped up whenever he

18 felt like it, how often was that?  Was it once a

19 week, every day?

20  A. Not every day.  Like maybe three times a

21 week he would just show up unexpectedly.

22  Q. And would that be in the morning, at night?

23  A. Mostly at night.

24  Q. Okay.  And you said when you least expected

25 it.  What do you mean by that?

**GA182**

729

```
1      A.   Anywhere between 12:00 in the morning and
2   6:00 in the morning he would show up.
3      Q.   And what would he do?  What would the
4   defendant do when he came to the apartment?
5      A.   After I starting getting the drugs from
6   Womble he would just come and check on things and
7   see what was going on, see who was in the house, who
8   wasn't in the house and see how the operation was
9   going.
10     Q.   Do you know where the defendant lived?
11     A.   No, I don't.
12     Q.   Did he ever talk to you about apartments or
13  setting up apartments or anything like that?
14     A.   No.  He did ask me to put utility's bill in
15  my name.
16     Q.   Say that again?
17     A.   He asked me to put a utility's bill in my
18  name.
19     Q.   Did you?
20     A.   Yes.
21     Q.   For him?
22     A.   Yes.
23     Q.   Where was that?
24     A.   I believe it was Arch Street.
25     Q.   Do you know if the defendant drove?
```

730

```
1      A.   I seen him in a burgundy Cadillac or blue
2   Cadillac.
3      Q.   Different cars?
4      A.   Yes, ma'am.
5      Q.   Were there any rules the defendant imposed
6   on the sellers?
7      A.   The first rule is don't mess up his money.
8   Don't let too many people hang out, you know, and
9   just keep kind of order in the house and take care
10  of James.
11     Q.   Take care of James?
12     A.   Take care of James.
13     Q.   James Rucker?
14     A.   Yes, ma'am.
15     Q.   Did they have a special relationship?
16     A.   Yes, you could say that.
17     Q.   What was the nature of the relationship?
18     A.   He just pretty much looked out for him.
19  You know, he would give him his own stuff to smoke,
20  and if he needed some money for groceries or
21  something like that, he would give it to him.
22     Q.   The defendant would give it to Rucker?
23     A.   Yeah, or --
24     Q.   And that was Rucker's apartment, right?
25     A.   Yes.  Or if -- he told me, you know, if
```

731

```
1   James wanted something, he would just say, give him
2   this, and that would take care -- give him two or
3   three, and I would take that out of what I owed him.
4      Q.   Two or three what?
5      A.   Bags of crack.
6      Q.   And you would, you said -- would you take
7   that out of what you owed D?
8      A.   Yes.
9      Q.   Did you ever have a problem with D?
10     A.   Yes, we had one altercation.
11     Q.   What happened?  What was the basis of it?
12     A.   I had -- I had borrowed some money that --
13  I had borrowed some of his money to help out my
14  girlfriend, and I tried to replace his money by
15  getting some other cocaine, not his, but somebody
16  else's to replace it, and I got -- during the
17  process I got caught.  Well, Womble found out and
18  Womble called D and D came back and --
19     Q.   And what happened when D came over?
20     A.   I got assaulted.
21     Q.   When you say you got assaulted, what
22  happened?
23     A.   I got beat up.  I had a fractured nose and
24  cracked rib.
25     Q.   Who beat you up?
```

732

```
1           MR. SMITH:  Your Honor, may we approach
2   briefly?
3           THE COURT:  Yes.
4           (Sidebar conference)
5           MR. SMITH:  I understand that I said
6   earlier that perhaps at the end of the witness's
7   testimony that a limited instruction would be
8   appropriate, but on reflection I think either now or
9   immediately upon finishing this section of the
10  testimony it would be appropriate for the jury to
11  hear.
12          THE COURT:  So, here is my concern.  If
13  there are more uncharged crimes to go, I don't want
14  to keep giving the same instruction.
15          MS. DAYTON:  We also object because we
16  haven't had a chance to review it.  It was just
17  submitted to us this morning.
18          THE COURT:  There will be a limiting
19  instruction --
20          MS. DAYTON:  That's fine.
21          THE COURT:  -- at some point.  Why don't
22  I tell them that I'm going to be giving them a
23  limited instruction with respect to this testimony.
24          MS. DAYTON:  So, here is the thing
25  though.  We agree there will be a limiting
```

**GA183**

733

```
1   instruction, but this does go to prove the
2   conspiracy, the charged conspiracy and the
3   racketeering enterprise, so we actually object to
4   what they have in there.  So, if we can just keep it
5   very --
6           MR. SMITH:  I think the instruction says
7   this goes to prove the racketeering.
8           MS. DAYTON:  Right, but then it says it
9   doesn't prove the motive, which isn't necessarily
10  true.
11          MR. SMITH:  Well, your Honor, that's the
12  entire issue we have.
13          THE COURT:  Let's -- how much longer is
14  his direct?
15          MS. DAYTON:  Half hour.
16          THE COURT:  So what we'll do is, at the
17  end of the direct we'll take a break and then one of
18  the government team will have read the limiting
19  instruction and we'll have colloquy about what the
20  substance should be.  And that may also be an
21  appropriate time to give that instruction before you
22  begin your cross.  How about that?
23          MR. SMITH:  Okay.
24          THE COURT:  Okay.
25          (Sidebar concluded)
```

734

```
1   Q.   I apologize.
2        Okay, so you were assaulted by whom?
3   A.   D.
4   Q.   The defendant?
5   A.   Yes, ma'am.
6   Q.   And what did he do to you when he assaulted
7   you?
8   A.   I was sitting on the couch and I was hoping
9   to speak to him to explain the situation to him.
10  And all I seen was him walking towards me, and I was
11  hoping that -- I had the impression we were going to
12  be able to talk, and before I knew it, he just
13  started beating me.
14  Q.   And where did he beat you, where on your
15  body?
16  A.   My eye.  And I don't know after that
17  because I tried to get away and I don't remember.
18  Q.   What were your injuries?
19  A.   I had a fractured nose, the nasal bone or
20  something, something with the sinus, and a cracked
21  rib.
22  Q.   And did you go to the hospital?
23  A.   Yes, I did.
24  Q.   Did you go that day?
25  A.   No, I didn't.
```

735

```
1   Q.   Why not?
2   A.   I was -- you know, I was hoping that it
3   would heal and, you know, it wouldn't be a problem,
4   but the pain was -- the pain just wouldn't go away.
5   Q.   So how long after the assault did you go to
6   the doctor?
7   A.   I believe it was a week.  I'm not -- it was
8   close to a week.  No longer than a week.
9   Q.   And when you went, did you -- were you
10  honest with the doctors about what had happened to
11  you?
12  A.   No, I wasn't.
13  Q.   Why not?
14  A.   I didn't want to make matters worse and,
15  you know, I didn't want to -- you know, I just
16  didn't want to make matters worse.
17  Q.   What do you mean by that, you didn't want
18  to make matters worse?
19  A.   Well, I didn't want to tell them I got
20  assaulted, and then the police would get involved,
21  and, you know, that would lead into my illegal
22  activity.  So, I just told them I got into a car
23  accident.
24  Q.   A car accident?
25  A.   Yes.
```

736

```
1   Q.   And you received treatment at the hospital?
2   A.   Yes, I did.
3           MS. DAYTON:  Your Honor, at this time
4   the government has a stipulation and medical records
5   that it would like to enter into evidence.
6           THE COURT:  All right, that stipulation
7   has been signed by counsel for both sides?
8           MS. DAYTON:  Yes, it has, in the
9   presence of the defendant.
10          MR. SMITH:  Yes, your Honor.
11          THE COURT:  All right, and then do you
12  wish to read that stipulation?
13          MS. DAYTON:  Yes, your Honor.
14          THE COURT:  A stipulation, ladies and
15  gentlemen, sets forth a fact as to which there will
16  be no further evidence as both sides agree to its
17  accuracy.  It will be evidence that will be with you
18  in the jury room during your deliberations, but the
19  stipulation will be read to you now and also on it
20  is on the screen.
21          MS. DAYTON:  Thank you, your Honor.  "It
22  is hereby stipulated and agreed by and between the
23  United States of America, by Assistant United States
24  Attorney Tracy Dayton, and the defendant, Azibo
25  Aquart, and by his attorneys, Michael Sheehan and
```

**GA184**

737

```
1   Justin Smith, as follows:  If called to testify,
2   Marie Cohen, custodian of records for Bridgeport
3   Hospital in Bridgeport, Connecticut, would state
4   that Government Exhibit 246 is a fair and an
5   accurate copy of medical records maintained in the
6   ordinary course of business by Bridgeport Hospital
7   for medical treatment provided to Frank Hodges on
8   May 1st, 2005.
9           "It is hereby stipulated and agreed that
10  Government Exhibit 246 and this stipulation which is
11  marked 246A-1 are admissible in evidence."
12          And it's signed by me, Justin Smith,
13  Esquire and Michael Sheehan, Esquire.
14          THE COURT:  And does that have a
15  government exhibit number on that?
16          MS. DAYTON:  246A-1, your Honor.
17          THE COURT:  All right.  So the
18  stipulation is 246A-1 and then the Bridgeport
19  medical records for Mr. Hodges for May 1st, '05, is
20  246.
21          MS. DAYTON:  Yes, these are them, your
22  Honor.
23          THE COURT:  All right.  Then by
24  stipulation they are full exhibits.  Thank you.
25          MS. DAYTON:  We'll just move to admit
```

738

```
1   these, your Honor.  They can be reviewed later.
2       Q.   Okay.  You mentioned Juanita Hopkins
3   earlier who is still up on the screen that you
4   called Nessa.  Did you meet her for the first time
5   at Charles Street?
6       A.   No, I had grew up with her in PT also.
7       Q.   In PT Barnum?
8       A.   Yes.
9       Q.   So, you have known her for years?
10      A.   Right.
11      Q.   And what was Juanita Hopkins doing at
12  Charles Street?
13      A.   Actually her daughter lived down the hall.
14      Q.   Do you know in which apartment?
15      A.   215, I think it was.  213, 14.
16      Q.   So, on the second floor as well?
17      A.   Right.
18      Q.   And was Ms. Hopkins living with her
19  daughter?
20      A.   For a period.
21      Q.   And then what happened?
22      A.   She wind up just staying at 211 with me.
23      Q.   And doing what?
24      A.   Selling drugs.
25      Q.   Do you know if Ms. Hopkins ever had a
```

739

```
1   problem with the defendant?
2       A.   Yes, she did.
3       Q.   And what happened?  Were you there?
4       A.   No, I wasn't.
5       Q.   Okay, were you there before it occurred?
6       A.   No, I wasn't.
7       Q.   What did you hear happened?
8       A.   Well, she told me that he hit her because
9   she owed him, she had messed up some money.
10      Q.   And after that -- do you know if
11  Ms. Hopkins has any siblings?
12      A.   She has several, but John-John used to come
13  see her.
14      Q.   Do you know John's full name?
15      A.   No, I don't.  We just called him John-John.
16      Q.   Did you know him from PT Barnum as well?
17      A.   Yes, ma'am.
18      Q.   I'm going to show you what's been marked as
19  Government's Exhibit 224 for identification.  At
20  least I think I'm going to do that.  Do you
21  recognize that person?
22      A.   John-John.
23      Q.   And this is the person you were just
24  referring to that's one of Juanita's siblings?
25      A.   Yes, ma'am.
```

740

```
1           MS. DAYTON:  Your Honor, we would move
2   Government's Exhibit 224 into evidence.
3           MR. SMITH:  No objection.
4           THE COURT:  All right, full exhibit.
5       Q.   And you said John-John would come over to
6   visit?
7       A.   Yes.
8       Q.   What did John-John do for a living?
9       A.   He sold drugs also.
10      Q.   What kind of drugs?
11      A.   Crack cocaine.
12      Q.   Anything else?
13      A.   Sometimes dope.
14      Q.   What is dope?
15      A.   Heroin.
16      Q.   That's just another name for it?
17      A.   Yes, ma'am.
18      Q.   And did John-John also use drugs?
19      A.   Yes, he did.
20      Q.   When he would come over to apartment 211,
21  what would he do in the apartment?
22      A.   Just sit and talk for a minute, because he
23  didn't stay long, you know, because he had -- I
24  guess he had his own agenda.  But, you know, he
25  would see his niece, come see his sister.
```

741

1  Q.  His sister being Juanita Hopkins?
2  A.  Yes, ma'am.
3  Q.  Did you ever see the defendant have a
4  problem with John-John?
5  A.  No, I didn't see it, but when I came in the
6  apartment something had happened.
7  Q.  What happened?
8  A.  I came in the apartment -- well, I was in
9  the hallway and John-John -- I was in the hallway
10  and they called me into the house.
11  Q.  Who is they?
12  A.  Womble called me in the house because him
13  and D were in there, because I knew I left Juanita
14  and John-John in there, and D and Womble came in,
15  but I was in the hallway.  So, they called me in
16  there in the apartment.  John-John was bleeding from
17  the head.
18  Q.  Was Juanita hurt, too?
19  A.  Not at that particular time.
20  Q.  So, John-John was bleeding from the head?
21  A.  Right.
22  Q.  Did you hear D or Womble say anything to
23  John-John?
24  A.  Womble asked him if he wanted a ride to the
25  hospital and he declined.

742

1  Q.  Okay.
2  A.  But from my understanding it was like he
3  had the impression that John-John was selling drugs
4  in his -- well, in 211, and we told him he wasn't.
5  Q.  So the defendant had the impression that
6  John-John was selling drugs in 211?
7  A.  Yes.
8  MR. SMITH:  Objection, leading.
9  MS. DAYTON:  I was just clarifying.
10  THE COURT:  Why don't you ask that
11  question a different way, please.
12  Q.  So, can you repeat what you said?  What was
13  the defendant's impression?
14  A.  He had the impression that John-John was
15  selling drugs at 211 and we told him that he wasn't.
16  Q.  Did the defendant believe you?
17  A.  Obviously not.
18  Q.  Okay.  You say obviously not why?
19  A.  Because he hit him with a gun.
20  Q.  He hit him with a gun?
21  A.  Yes.
22  Q.  Did you see the gun?
23  A.  Yes, I did.
24  Q.  What did it look like?
25  A.  I believe it was a Mac-10.  I'm not real --

743

1  I'm not a gun person, but I believe it was a Mac-10.
2  Q.  So, was it a small gun or a big gun?
3  A.  A big gun.
4  Q.  And did the defendant and Womble have guns,
5  or just the defendant?
6  A.  Just the defendant.
7  Q.  After Womble offered John-John a ride to
8  the hospital, what happened?
9  A.  John-John declined and everyone left.
10  Q.  Did you ever see John-John again after
11  that?
12  A.  Yes, I did.
13  Q.  And do you know if he had any medical
14  treatment?
15  A.  I think he had a few stitches.
16  MR. SMITH:  Objection.
17  THE COURT:  Basis?
18  MR. SMITH:  Relevance, and it's hearsay,
19  your Honor.
20  MS. DAYTON:  I'll move on.
21  THE COURT:  I will sustain the
22  objection, strike the answer, and ask the government
23  to move to the next question.
24  MS. DAYTON:  Thank you, your Honor.
25  Q.  Did you ever get arrested in the building?

744

1  A.  Yes, I did.
2  Q.  How many times?
3  A.  Three, I believe.
4  Q.  When was the first time that you recall
5  getting arrested?
6  A.  The day before Christ -- New Year's -- day
7  before Thanksgiving.
8  Q.  Day before Thanksgiving?
9  A.  Right.  I believe it was 2004, if I'm not
10  mistaken.
11  Q.  2004, okay.  And what were you doing?
12  Well, where in the building were you?
13  A.  In 211.
14  Q.  And what were you doing in there?
15  A.  At that -- when I got arrested, I was
16  sleeping on the couch.
17  MR. SHEEHAN:  I'm sorry, I could --
18  THE COURT:  Sitting on the couch.
19  MS. DAYTON:  I think he said sleeping.
20  THE COURT:  He did say sleeping on the
21  couch.
22  Q.  And who entered the apartment?
23  A.  Like I say, I was asleep, but the police
24  wokened (sic) me and they were in the apartment so I
25  assume that the police came in through the door,

745

```
1   so...
2       Q.   Did you get charged in that case?
3       A.   No.
4       Q.   What happened?  Did you get taken to jail?
5       A.   I got taken to jail.
6       Q.   And what happened?
7       A.   I bonded myself out.  Well, I got bonded
8   out.
9       Q.   Who bonded you out?
10      A.   A family friend.
11      Q.   And were you required to go back to court
12  on that case?
13      A.   Yes.  And then they nolled it.
14      Q.   What's that mean, they nolled it?
15      A.   Well, they threw it out.
16      Q.   So, you didn't get a lasting charge from
17  that case?
18      A.   Right.
19      Q.   Who else got arrested with you that day?
20      A.   Venro and James.
21      Q.   James Rucker?
22      A.   Right.
23      Q.   When was the second time that you got
24  arrested in that apartment?
25      A.   I believe it was -- I don't know the date,
```

746

```
1   but I believe that was when Squeaky had took the
2   rap.  But I'm not sure.  I knew Squeaky had took the
3   rap on occasion.
4       Q.   What happened?  Who was in the apartment
5   with you?
6       A.   Me, Juanita, James, Squeaky, Darlene, and I
7   don't recall anyone else.
8       Q.   And who entered the apartment?
9       A.   Police.
10      Q.   And when they enter, do they knock and say
11  hi, could you the open the door?
12      A.   No.
13      Q.   What happened?
14      A.   They just came to the door.
15      Q.   So, they banged down the door?
16      A.   Right.
17      Q.   And was anyone selling drugs in the
18  apartment when they did this?
19      A.   At the moment Squeaky was.
20      Q.   And who got arrested?
21      A.   He did.
22      Q.   Did you get arrested, too?
23      A.   I think I did go downtown.
24      Q.   Do you know if any drugs were found on that
25  day?
```

747

```
1       A.   Yeah, they found some drugs in a ceramic
2   rabbit.
3       Q.   What kind of ceramic rabbit?
4       A.   Just a ceramic rabbit you put on the table.
5       Q.   Was this a common place where you store
6   drugs?
7       A.   Sometimes.
8       Q.   I'm going to show you what's been marked
9   for reference as Government's Exhibit 251.  Do you
10  recognize what this is a picture of?
11      A.   It's --
12      Q.   It's not coming up.  That's very
13  unfortunate.
14      A.   That's the rabbit.
15           MS. DAYTON:  Your Honor, Government
16  would move 251 into evidence.
17           MR. SMITH:  No objection.
18           THE COURT:  Full exhibit.
19           MS. DAYTON:  Thank you.
20      Q.   That's the bunny?
21      A.   Yes, ma'am.
22      Q.   And did it come apart?  How did you store
23  drugs in there?
24      A.   It's a hole in the bottom of it.
25      Q.   A hole in the bottom?
```

748

```
1       A.   Yes, ma'am.
2       Q.   Like a piggybank?
3       A.   I guess you could say that.  It's sort of
4   like, you know, with a plug, yes, a piggy bank, yes.
5       Q.   How did you get out of jail that time?
6       A.   I got bonded out.
7       Q.   By who?
8       A.   The defendant.
9       Q.   And after you got bonded out, did you go
10  back to selling drugs in apartment 211?
11      A.   Yes, I did.
12      Q.   And did you ever get arrested in there
13  again?
14      A.   Yes, I did.
15      Q.   When was that?
16      A.   I don't recall the date, but it was, we
17  got -- instead of going down to the department, we
18  went to River Street.
19      Q.   Where is River Street?
20      A.   River Street in Bridgeport, Connecticut.
21      Q.   What's at River Street?
22      A.   Like a task force, TNT, where, you know,
23  SWAT team or something like you want to call it.
24      Q.   Who were you arrested with this time?
25      A.   At that time it was me, James, Shirley,
```

**GA187**

749

1  someone else, I can't think of her name, Maria, and
2  someone else.  Several people.
3      Q.   So, there were a lot of people in the
4  apartment?
5      A.   Yes.
6      Q.   How did you get out of jail that time?
7      A.   I got bonded out.
8      Q.   Who bonded you out?
9      A.   The defendant.
10     Q.   Did you have to pay him back for bonding
11 you out?
12     A.   Yes, I did.
13     Q.   And how did you pay him back?
14     A.   Instead of me -- instead of me getting my
15 $100, I would either get a portion or some --
16 sometimes, you know, if -- sometimes I wouldn't get
17 nothing, but sometimes I would get some, but not my
18 400.
19     Q.   So, you paid back out of your profits?
20     A.   Right.
21     Q.   Due to the number of raids and law
22 enforcement activity in the building, was any --
23 were any measures taken to sort of prevent getting
24 caught by law enforcement?
25     A.   During the later stages we had a lookout in

750

1  another apartment.
2      Q.   What apartment was that?
3      A.   I think the number is 201.
4      Q.   If I showed you a model of the building,
5  would you be able to point to where it was?
6      A.   Yes, ma'am.
7          MS. DAYTON:  Your Honor, if I may ask
8  our kind helpers -- helper.
9          THE COURT:  Are you going to make it
10 past our jurors safely?
11         MS. DAYTON:  I hope so.  Your Honor, may
12 I ask the witness to stand up and come over and
13 point?
14         THE COURT:  Yes.  Would you bring the
15 microphone with you so you will continue to be
16 amplified.  It's wireless.  Thank you.  And you can
17 either hold it or find a surface to put it on.
18     Q.   Okay.  Do you recognize what this is?
19     A.   211 -- 215 Charles Street.
20         MS. DAYTON:  For the record, this is
21 Government Exhibit 101.
22     Q.   And this part facing the jury, what is this
23 on the model?
24     A.   Just a little landscaped entrance, Basil's
25 apartment.

751

1      Q.   Okay.  Indicating as you look at the model
2  on the right side, on what floor is this?
3      A.   First floor.
4      Q.   Basil's apartment?
5      A.   Yes, ma'am.
6      Q.   Okay.  And what's under the building here?
7      A.   Parking garage.
8          MS. DAYTON:  Indicating in the middle of
9  the model, your Honor.
10     Q.   And can you point on here to where the
11 lookout apartment is?
12     A.   First door on your left from the elevator.
13     Q.   So, indicating, as you look at the model,
14 the closest to the jury, the first door on the left.
15 So, this area right here on the left of the model?
16     A.   Yes, ma'am.
17     Q.   At this first door.  And where was
18 apartment 211 in relation to the lookout apartment?
19     A.   211 was --
20         THE COURT:  You can stand up, ladies and
21 gentlemen, if that will help you see this.  If you
22 can't see it, let me know.
23     Q.   So, just repeating for the record, so this
24 is the lookout apartment, the first on the left side
25 as you guys are facing it with the first door right

752

1  here.  What is this right here?
2      A.   Hallway.
3      Q.   A hallway down the center.  And where is
4  apartment 211?
5      A.   Right here.
6      Q.   The third apartment on the right?
7      A.   Yes.
8      Q.   Coming from the front of the building?
9      A.   Yes, ma'am.
10     Q.   And what is this in the center going down
11 next to the elevator?
12     A.   Stairwell.
13     Q.   How many floors was the apartment building?
14     A.   Three.
15     Q.   So this only represents two of the floors?
16     A.   Yes, ma'am.
17     Q.   Okay.  Thank you.  You can go ahead and
18 take your seat.
19         Do you know why -- well, who lived in that
20 apartment?
21         THE COURT:  Which one?
22         MS. DAYTON:  I'm sorry.
23     Q.   Who lived in the lookout apartment?
24     A.   Judy.  I don't know her last name.
25     Q.   I'm going to show you what's been marked

753

1  217, Government's Exhibit 217 for reference.  Do you
2  recognize who that is a photo of?
3      A.  Judy.
4      Q.  And she's the person who lived there?
5      A.  Yes, ma'am.
6      Q.  And did she live with anyone else NOTE?
7      A.  Her boyfriend, Ralphie.
8      Q.  Ralphie?
9          MS. DAYTON:  Your Honor, at this point
10  we move 217 into evidence.
11          MR. SMITH:  No objection.
12          THE COURT:  Full exhibit.
13      Q.  So, that's Judy?
14      A.  Yes, ma'am.
15      Q.  And I'm going to show you another photo.
16          MS. DAYTON:  We can leave the lights off
17  for a second, your Honor.
18      Q.  Do you recognize who Government's
19  Exhibit 218 is?
20      A.  Ralphie.
21      Q.  That's Judy's boyfriend?
22      A.  Yes, ma'am.
23          MS. DAYTON:  Your Honor, if we could
24  move 218 into evidence.
25          MR. SMITH:  No objection.

754

1          THE COURT:  All right, it's a full
2  exhibit.
3      Q.  Did they live there, just the two of them,
4  or did they have anyone else in the apartment?
5      A.  Just the two of them.
6      Q.  Do you know why apartment -- that
7  front-facing apartment was chosen?
8      A.  It looked over -- it looked out, the living
9  room window looked out the door entrance, the
10  entrance door, and the side bedroom window looked
11  towards the underneath -- the parking lot on the
12  side and off to Main Street.
13      Q.  How did that help?
14      A.  You could basically see who is coming, when
15  they're coming.  You can pretty much see who is
16  coming into the building, even if they just go from
17  -- to the parking lot on the side or the
18  underground.  It depends which window you are at.
19      Q.  Is there any way to communicate between the
20  lookout apartment and apartment 211?
21      A.  Telephone.  Cell phones.
22      Q.  Cell phones.  Did you, in fact, ever get
23  calls, warning calls?
24      A.  A few.
25      Q.  Were Judy and Ralphie the lookouts or were

755

1  there other lookouts?
2      A.  Other lookouts.
3      Q.  Do you know any of their names?
4      A.  Just Stone and Bear.
5      Q.  If you can look at your screen.  Do you
6  recognize who is depicted in Government's
7  Exhibit 215?
8      A.  Bear.
9          MS. DAYTON:  Your Honor, we would move
10  this into evidence.
11          MR. SMITH:  No objection.
12          THE COURT:  215 is a full exhibit.
13      Q.  Did you know -- well, do you know who
14  brought Bear to work at that apartment?
15      A.  The defendant, as far as I know.
16      Q.  And did you ever talk to Bear?
17      A.  I talked to him.
18      Q.  What sort of hours did the lookouts work in
19  the apartment?
20      A.  It was more of an eight-hour shifts,
21  sometimes 12.
22      Q.  And where in the apartment, in the lookout
23  apartment, would they sit while they did their
24  shift?
25          MR. SMITH:  Objection.  It calls for

756

1  speculation without a basis of knowing where.
2          THE COURT:  Would you find out if he
3  knows.
4          MS. DAYTON:  Sure.
5      Q.  Did you ever go into Judy's apartment?
6      A.  Yes, I did.
7      Q.  Once, more than once?
8      A.  More than once.
9      Q.  Were you ever in there while any of the
10  lookouts were in the apartment?
11      A.  Yes, I was.
12      Q.  And what would you do in the lookout
13  apartment?
14      A.  Just look, smoke.
15      Q.  Hang out?
16      A.  Hang out.
17      Q.  And do you know based on your personal
18  observation where the lookouts would sit?
19      A.  The window has an air vent right under it
20  and they would either sit there or pull up a chair.
21      Q.  Do you know Bear's real name?
22      A.  No, I don't.
23      Q.  You mentioned two people.  I'm going to
24  show you one more picture.  This has been marked
25  Government's Exhibit 216.  Do you recognize who this

757

```
 1   is?
 2       A.   Stone.
 3            MS. DAYTON:  Your Honor, requesting to
 4   move 216 into evidence.
 5            MR. SMITH:  No objection.
 6            THE COURT:  Full exhibit.
 7            MS. DAYTON:  Thank you, your Honor.
 8       Q.   Do you know what period of time Bear and
 9   Stone were working as lookouts?
10       A.   Sometime -- they were just doing their
11   shift sometimes.  They weren't there too frequently
12   together, but sometimes they were.  But it's more or
13   less like early in the morning 'til late at night.
14   Say, 7:30, eight o'clock in the morning 'til
15   sometime after 12:00.
16       Q.   So, long.
17       A.   Yeah, one would come in at 8:00 and leave
18   at 4:00 and another one would work from 4:00 to
19   12:00.
20       Q.   Directing you to the summer of 2005, was
21   there anyone else selling crack in the Charles
22   Street building at that time?
23       A.   Besides myself and Juanita?  Tina.  Tina
24   started.
25       Q.   Tina started.  And where was she selling
```

758

```
 1   from?
 2       A.   Downstairs in Basil's house.
 3       Q.   The downstairs apartment that you pointed
 4   out on the right side?
 5       A.   Right.
 6       Q.   First floor of the model?
 7       A.   Yes.
 8       Q.   Have you ever been in that apartment?
 9       A.   Yes, I have.
10       Q.   What did you do there?
11       A.   Played cards, hang out, smoke, drink.
12       Q.   You were friendly with them?
13       A.   Yes.
14       Q.   And do you know what Tina's relationship
15   was to Basil?
16       A.   I believe she -- prior to -- prior to
17   moving in that she took care of his wife before she
18   passed, and she developed a relationship with him
19   and it just kept on going.
20       Q.   Had you known Basil prior to going to
21   Charles Street?
22       A.   Yes, ma'am.
23       Q.   Where did you know him from?
24       A.   I met him at a friend's house in Cambridge.
25       Q.   Where is Cambridge?
```

759

```
 1       A.   Right down -- right on Main Street.  Down
 2   the street from Charles.
 3       Q.   So, just while you were visiting there?
 4       A.   Yes.
 5       Q.   Were you friendly with him?
 6       A.   Yes, I was.
 7       Q.   And what was Basil like?
 8       A.   Kind-hearted.  He was a nice person.
 9       Q.   Did he sell drugs?
10       A.   No, he didn't.
11       Q.   Did he smoke crack?
12       A.   No, he didn't.
13       Q.   And do you know if he used any drugs?
14       A.   He would smoke his weed, and he used to
15   drink, but I don't know if he was a Jamaican.  I
16   don't know if it was his religion or -- I don't know
17   if that's what he did.
18       Q.   He didn't smoke crack?
19       A.   He didn't smoke crack.
20       Q.   How did you know Tina started selling
21   drugs?
22       A.   She told me she was.
23       Q.   Did she tell you why?
24       A.   Yes, she did.
25       Q.   Why?
```

760

```
 1       A.   Because she didn't like what I had, what I
 2   was selling.
 3       Q.   What do you mean by that?
 4       A.   She didn't like the product of crack
 5   cocaine that I was selling.
 6       Q.   The quality?
 7       A.   Yes, she didn't like it.
 8       Q.   Were you smoking the same crack that she
 9   was smoking -- that you were selling?
10       A.   At that particular time?
11       Q.   Yeah.
12       A.   No.
13       Q.   What was wrong with the quality?
14       A.   It just wasn't no good.
15       Q.   Was she the only person that complained?
16       A.   Not at all.
17       Q.   Did you talk to either Womble or the
18   defendant about the fact that the quality of the
19   crack was low?
20       A.   Yes, I did.
21       Q.   Who did you talk to?
22       A.   I believe I talked to both of them.
23       Q.   What did you tell the defendant?
24       A.   That -- I told him that it's no good and
25   it's not moving.
```

761

```
1    Q.   What did the defendant tell you?
2    A.   It got to go, got to sell it.
3    Q.   Did you try to sell it?
4    A.   Yes, I did.
5    Q.   Were you able to?
6    A.   Eventually.
7    Q.   But slowly?
8    A.   Very slowly.
9    Q.   Now, you said Tina was selling drugs.  Did
10   you buy any drugs from her?  Or did you try her
11   drugs?
12   A.   Yes, I did.
13   Q.   Were they better quality?
14   A.   Yes, they were.
15   Q.   So, is it -- at that time were the sales
16   the same as they had been before or were they more
17   or less?
18   A.   Mines?
19   Q.   Yeah.
20   A.   Less.
21   Q.   And did Tina's selling have any effect on
22   your selling?
23        MR. SMITH:  Objection, calls for
24   speculation.
25        THE COURT:  Why don't we establish what
```

762

```
1    basis he would know.
2         MS. DAYTON:  Okay.
3    Q.   Did you see customers going to Tina?
4    A.   Yes, I did.
5    Q.   Did you recognize any of those customers?
6    A.   Yes, I did.
7    Q.   How did you recognize them?
8    A.   Because they used to come get it from me.
9    Q.   So did Tina's selling have an impact on
10   your ability to sell?  Or on your sales, I should
11   say.
12   A.   To an extent, yes, it just slowed it down,
13   but yes, it did.
14   Q.   Did you talk to the defendant or to Womble
15   about that fact, that Tina's sales were -- Tina was
16   taking some of the customers?
17   A.   No, I didn't.
18   Q.   Do you know if -- did you ever hear Womble
19   or the defendant talk about that?
20        MR. SMITH:  Objection, hearsay.
21        THE COURT:  Did he ever hear Womble or
22   the defendant talk about whether Tina's drug sales
23   impacted theirs?
24        MS. DAYTON:  Right.
25        THE COURT:  I'm going to overrule the
```

763

```
1    objection.
2    Q.   Go ahead.
3    A.   Well, he -- I was asked if she was selling
4    something and I told him yes.
5    Q.   Who asked you?
6    A.   Both of them.
7    Q.   Asked you if Tina was selling?
8    A.   Yes.
9    Q.   And you told them yes?
10   A.   Yeah, and, you know, they just -- you know,
11   is such and such going by there?  I seen such and
12   such coming in the building, did they come up here?
13   No, they didn't.  So they must have went downstairs.
14   Q.   So, you had that discussion?
15   A.   Yes.
16   Q.   At around this time, did Womble's position
17   in the organization change?
18   A.   A little.
19   Q.   What happened?
20   A.   He just became missing at some point in
21   time.
22   Q.   What do you mean missing?
23   A.   Just wasn't around.
24   Q.   Was this before or after Tina and James and
25   Basil were murdered?
```

764

```
1    A.   A little before.
2    Q.   A little before.  Okay.
3    A.   Like a week or two before.
4    Q.   Okay.  I want to draw your attention to the
5    weekend --
6         MS. DAYTON:  Your Honor, the witness
7    needs a bathroom break.
8         THE COURT:  All right.  Why don't we
9    take a -- take our morning break then at this point.
10   Leave your notebooks in the courtroom, please.
11        (Jury exited the courtroom)
12        MS. DAYTON:  May the witness --
13        THE COURT:  Yes.
14        All right, anything before our break?
15   Why don't we take a five-minute break, give the
16   government a chance to look at that limiting
17   instruction and then we can discuss that when we
18   return.  Would that suit you?
19        MS. DAYTON:  Yes, your Honor.  Thank
20   you.
21        (Recess)
22        THE COURT:  Please be seated.  What is
23   the government's position with respect to the
24   defendant's requested limiting instruction?
25        MS. RODRIGUEZ-COSS:  Your Honor, we have
```

**GA191**

765

1   no objection to the limiting instruction with the
2   exception of the last phrase for both instruction
3   one and -- I guess we'll call it -- they're not
4   numbered, but we'll call it instruction 1 and
5   instruction 2.
6           Instruction 1 being, for instance,
7   involving crimes offered to prove the racketeering
8   enterprise.  We would object to the last phrase in
9   the second paragraph beginning with "or as evidence
10  that he committed or participated in the murders of
11  Tina Johnson, James Reid, or Basil Williams."  That's
12  entirely for the jury to decide.
13          I think what the government or the
14  defendant is entitled to is an instruction that this
15  evidence is not being submitted to prove bad
16  character or general propensity to engage in acts of
17  violence.  We suggest the instruction should end
18  there.
19          Clearly, the commission of the assaults
20  is the manner and means in which the defendant
21  carried out the functions of the enterprise.  The
22  fact that he committed assaults against James Reid,
23  Tina Johnson or Basil Williams is entirely for the
24  jury to decided based on a totality of the evidence.
25  So we would object to that phrase at the end of that

766

1   instruction as well as at the end of instruction No.
2   2.
3           THE COURT:  How shall we describe-- "the
4   government has offered evidence that the defendant
5   assaulted"?
6           MS. RODRIGUEZ-COSS:  That was my next
7   question.  I don't know what the defense intends
8   to -- evidence that the defendant assaulted Frank
9   Hodges?  I believe he testified to the assault
10  against Juanita Hopkins, the assault against John
11  Sullivan.
12          THE COURT:  Oh, is that John-John?
13          MS. RODRIGUEZ-COSS:  Right.  I guess we
14  could refer to how he identified these individuals.
15  I do understand he said Juanita Hopkins and he only
16  identified John Sullivan as John-John, that is
17  correct.
18          THE COURT:  And Venro.
19          MS. RODRIGUEZ-COSS:  And Venro Fleming,
20  right.
21          THE COURT:  All right, Mr. Sheehan, is
22  that how you want me to specify the evidence that's
23  limited, the uncharged conduct?
24          MR. SHEEHAN:  Well, your Honor, I would
25  first say I object to the government's eviscerating

767

1   any significance to the limiting instruction.
2           THE COURT:  Let's talk about a
3   description of what it is that should go in that
4   bracket.
5           MR. SHEEHAN:  Your Honor, "the
6   government has offered evidence that the defendant
7   engaged in certain assaults as testified to by
8   Mr. Hodges."  I think --
9           MS. RODRIGUEZ-COSS:  That's fine.
10          MR. SHEEHAN:  I think that would be
11  fine.  "If you choose to credit that evidence" --
12  "the fact is, if you choose to credit that evidence,
13  Mr. Aquart has not been charged with committing
14  those crimes, and that evidence" --
15          MS. RODRIGUEZ-COSS:  I'm sorry, can I
16  just --
17          THE COURT:  Wait just a second.
18          MS. RODRIGUEZ-COSS:  He's altering it,
19  so I'm writing it down.
20          MR. SHEEHAN:  "And that evidence is
21  being offered only for the limited purpose."
22          THE COURT:  So you said "if you" --
23          MR. SHEEHAN:  "Choose to credit that
24  evidence."  Essentially the purpose of the limiting
25  instruction --

768

1           THE COURT:  I'm sorry, where is the "if
2   you choose to credit the evidence."  Where is that
3   going?
4           MS. RODRIGUEZ-COSS:  After the first
5   sentence.
6           MR. SHEEHAN:  Right.  After he has --
7   "The government has offered evidence that the
8   defendant committed certain assaults through the
9   testimony of Mr. Hodges."
10          MS. RODRIGUEZ-COSS:  Every time you read
11  it you change it.
12          MR. SHEEHAN:  I'm sorry.
13          MS. RODRIGUEZ-COSS:  Every time you read
14  it you change it.  "As testified to by" or --
15          MR. SHEEHAN:  What did I say the first
16  time?  I don't remember.
17          MS. RODRIGUEZ-COSS:  You said "as
18  testified to by."
19          MR. SHEEHAN:  "As testified to," is that
20  okay by you?
21          MS. RODRIGUEZ-COSS:  Either one is okay,
22  I just want to get one version.
23          THE COURT:  I'm sorry, "if you choose to
24  credit this testimony," it's just hanging out there.
25  What does it go to?

769

```
 1            MR. SHEEHAN:  You're instructed -- then
 2   you could just say "you are instructed that
 3   Mr. Aquart has not been charged with committing."
 4            THE COURT:  No, but what if "you choose
 5   to credit this testimony" is --
 6            MR. SHEEHAN:  "Is up to you."  Why don't
 7   we just say "it's up to you."
 8            MS. RODRIGUEZ-COSS:  How about -- I
 9   understand what the Court is saying, it doesn't
10   really flow.  How about "if you choose to credit
11   this testimony" be included in the second paragraph?
12            MR. SHEEHAN:  I think that would be
13   fine.
14            MS. RODRIGUEZ-COSS:  After the first
15   sentence.
16            THE COURT:  "If you choose to credit
17   this testimony you may consider it" --
18            MS. RODRIGUEZ-COSS:  "For a limited
19   purpose."
20            THE COURT:  -- "only for this limited
21   purpose."
22            MS. RODRIGUEZ-COSS:  I think that works
23   better.
24            MR. SHEEHAN:  I agree.
25            THE COURT:  Now, the part "you can't
```

770

```
 1   consider it as evidence that he committed or
 2   participated in the murders," that doesn't sound
 3   correct to me.
 4            MR. SHEEHAN:  It's the only thing that
 5   makes sense, your Honor, respectfully, because if --
 6            THE COURT:  Then it's not relevant and
 7   wouldn't come in in this case.
 8            MR. SHEEHAN:  No, what they're claiming
 9   is that this evidence comes in to prove that there
10   was a racketeering activity.  I take it they're
11   not -- that they're not saying because a person
12   committed assault, an uncharged assault, therefore,
13   it is more likely that they committed the murders.
14   Because that is exactly what propensity evidence
15   prohibits.
16            MS. RODRIGUEZ-COSS:  That is not what
17   the government is arguing.  The government is
18   arguing the murder is an act in a chain of violent
19   events committed by the defendant in furtherance of
20   the drug conspiracy and the enterprise.  And so,
21   I've never seen this instruction as directing the
22   jury to a specific finding of fact, much less to
23   whether they can consider it or not in determining
24   guilt or innocence in a particular charge in a
25   particular count of the indictment.
```

771

```
 1            THE COURT:  What if we just added "it's
 2   not evidence of Mr. Aquart's propensity to engage in
 3   any acts of violence"?
 4            MS. RODRIGUEZ-COSS:  That's fine, your
 5   Honor.
 6            MR. SHEEHAN:  But, your Honor, that --
 7   respectfully, I think that leaves everything hanging
 8   out there because what -- what I take it the
 9   government is asking and is seeking to ultimately
10   argue, and the hope that we have in terms of this
11   limiting instruction is that the jury will follow
12   the law in this regard, is that those prior acts,
13   even if they're credited, do not establish that
14   Mr. Aquart committed this murder.  The murder -- the
15   acts may establish that there was a racketeering
16   enterprise, but ultimately the question is whether
17   or not Mr. Aquart committed this murder that he's
18   charged with.  And if you are going from the acts --
19   if you are looking at the acts trigger into the
20   murder, then it's just plain propensity.
21            MS. RODRIGUEZ-COSS:  No, your Honor, not
22   just that, that he committed these acts and that
23   they help establish the existence of a conspiracy
24   and the enterprise, but they also establish the
25   manner and means that the defendant utilized in
```

772

```
 1   order to carry on the business of the conspiracy and
 2   the enterprise, and the murders were just one more
 3   act.
 4            So, we do not rely to establish
 5   propensity; however, we rely on those acts to
 6   establish motive.  This is part and parcel with how
 7   he conducted the business of his drug trafficking
 8   enterprise, and the jury is certainly entitled to
 9   weigh it from that perspective.
10            THE COURT:  So are you proposing,
11   Ms. Rodriguez, that at the end of the first
12   paragraph that it should be that "the government
13   offers this only as evidence that the racketeering
14   enterprise" -- is it the racketeering enterprise
15   existed or the racketeering enterprise and the drug
16   conspiracy?
17            MS. RODRIGUEZ-COSS:  Well, they
18   separated --
19            THE COURT:  Are we adding motive in
20   here?
21            MS. RODRIGUEZ-COSS:  No, we're not
22   suggesting that we add motive.
23            THE COURT:  You just said it was motive,
24   that the government was claiming that it shows
25   motive.
```

**GA193**

773

1    MS. RODRIGUEZ-COSS:  Yeah, I think so,
2  your Honor.  I think we can add motive in there
3  without affecting the instruction.
4        THE COURT:  So then it would read -- let
5  me propose this:  If we say that "it is not as
6  evidence of general propensity to engage in any acts
7  of violence."  In the final instructions we can
8  further debate about how much more elaboration we
9  should have.  But this at least gets out the point
10 for them that it is not evidence of bad character or
11 propensity to violence for now.  Because I'm not at
12 all sure that there isn't a better way, a more
13 accurate way, to refine it in relation to the
14 ultimate question of whether he committed or
15 participated in the murders.
16       I'm not quite sure I understand the
17 government's position.  So, if it would say, for
18 now, "the government has offered evidence that the
19 defendant committed certain assaults as testified to
20 by Mr. Hodges.  If you choose to credit" -- oops,
21 "Mr. Aquart has not been charged with committing
22 these crimes and the evidence is admitted" --
23       MR. SHEEHAN:  "Being offered."
24       THE COURT:  Being offered or is
25 admitted?  I don't care.

774

1        MR. SHEEHAN:  I think "being offered" I
2  would prefer, your Honor.
3        THE COURT:  "Is being offered only for a
4  limited purpose, that is, as evidence that a
5  racketeering enterprise existed as alleged by the
6  government and of its alleged nature, scope and
7  methods of activity and defendant's motive.  You may
8  consider it only for this limited purpose.  You may
9  not consider it as evidence of Mr. Aquart's bad
10 character or general propensity to engage in any
11 acts of violence.  I will give you further
12 instruction on this limitation at the end."
13       MS. RODRIGUEZ-COSS:  Does the Court wish
14 to combine 1 and 2, your Honor?
15       MR. SHEEHAN:  Your Honor, may I just
16 say, I think you are -- the government -- the
17 suggestion that we inject motive really then is the
18 propensity issue.
19       THE COURT:  Then we'll take that out.
20 It wasn't what the government originally wanted and
21 to the extent it -- so I think that's what I was --
22 "is as evidence that a racketeering enterprise
23 and/or drug conspiracy existed."  So we'll just
24 combine the two.
25       MS. RODRIGUEZ-COSS:  Yes, ma'am.

775

1        MR. SHEEHAN:  Well, if your Honor is
2  rejecting our request to add in the evidence, the
3  last sentence, then as a fallback position
4  reserve -- you know, with the record reflecting that
5  I wanted that sentence there, then I will, you
6  know -- I just --
7        THE COURT:  I think the term "any acts
8  of violence" covers without specifying the murders,
9  but it may need to be specifically identified as
10 such when we have thought that through carefully in
11 the final instructions.  And I'll tell them that
12 more is coming.  So, you may ultimately persuade me
13 that that is correct, but I'm not yet persuaded and
14 I need to give some limiting instruction.
15       MR. SHEEHAN:  Again, I think -- as a
16 fallback position, recognizing that your Honor has,
17 in essence, ruled against me on my request that the
18 limiting instruction include the language that we
19 requested.
20       THE COURT:  Thus far.
21       MR. SHEEHAN:  I will --
22       THE COURT:  Thus far.
23       MR. SHEEHAN:  Thus far.
24       THE COURT:  I have not ruled against you
25 entirely.

776

1        MR. SHEEHAN:  Yes, exactly.  Thus far, I
2  will take a quarter of a loaf without agreeing that
3  it's going to solve the problem.
4        THE COURT:  All right, that also
5  behooves you to get these things to us a little
6  earlier so that we have more thinking time.  I can
7  do one of two things.  I can either delay giving the
8  instruction until I've refined it or we can do it
9  this way.
10       MR. SHEEHAN:  I think you should do it
11 this way, your Honor.  Again --
12       THE COURT:  There may be another
13 occasion with another witness by which time we have
14 reached a better refinement.  Okay.  Let's do it
15 that way.
16       MR. SHEEHAN:  Thank you, your Honor.
17       MS. RODRIGUEZ-COSS:  There is a third
18 instruction.  I don't know if the Court -- I guess
19 that is not applicable right now.
20       THE COURT:  It's not applicable with
21 this witness.
22       All right, we are ready for the jury.
23 And this instruction will be given when Mr. Hodges'
24 direct is concluded.  Would you bring him back,
25 please.

777

```
 1              (Jury entered the courtroom.)
 2              THE COURT:  All right, please be seated,
 3  ladies and gentlemen.  Mr. Hodges, you remain under
 4  oath.  Ms. Dayton you may proceed.
 5              MS. DAYTON:  Thank you, your Honor.
 6     Q.   Mr. Hodges, I'm going to show you a photo.
 7  Who is this?
 8     A.   It's me.
 9     Q.   That's you?
10     A.   Yes, ma'am.
11     Q.   In Government's Exhibit 212, is this one of
12  your booking photos?
13     A.   Yes, it is.
14              MS. DAYTON:  Your Honor, may I move 212
15  into evidence.
16              THE COURT:  All right?
17              MR. SMITH:  No objection.  I'm sorry.
18              THE COURT:  That is a full exhibit.
19     Q.   I just wanted to ask you one more question
20  about the arrests at 215 Charles.  You said during
21  the first one you were sleeping on the couch?
22     A.   Right.
23     Q.   During the second one what were you doing?
24     A.   I was sitting on the couch.
25     Q.   But had you been selling drugs?
```

778

```
 1     A.   Earlier that day, but not at that
 2  particular time.
 3     Q.   Not at that moment?
 4     A.   Right.
 5     Q.   What about the third time, where were you?
 6     A.   I was in the shower.
 7     Q.   And what happened that time?
 8     A.   I was in the shower and the next thing I
 9  know the police were telling me to come out the
10  shower.  So they just apparently just busted in the
11  house and told me to get out the shower, butt naked.
12     Q.   And did you have drugs -- well, obviously
13  you didn't have them on you in the shower, but did
14  you have drugs around you at that point?
15     A.   No.
16     Q.   Okay.  What about in your clothing?
17     A.   No.
18     Q.   Do you know if the police found drugs that
19  day?
20     A.   I don't recall.  I don't think they did.
21     Q.   But you don't recall?
22     A.   No.
23     Q.   I want to draw your attention to the
24  weekend before Tina, James and Basil were murdered,
25  a few nights before.  Were you at apartment -- were
```

779

```
 1  you at 215 Charles Street the weekend before the
 2  murders?
 3     A.   Yes, I was.
 4     Q.   What were you doing there?
 5     A.   At that particular time I was selling
 6  drugs.
 7     Q.   And drawing your attention to the Saturday
 8  night before.  Were you selling drugs at that time?
 9     A.   Yes, I was.
10     Q.   And do you recall who was in the apartment
11  with you?
12     A.   Me, Juanita, Shirley, James, Jackie came
13  later, and Doris.
14     Q.   When Jackie -- that's Jackie Bryant that
15  you talked about earlier?
16     A.   Yes.
17     Q.   When Jackie came, did you speak to her
18  about anything?
19     A.   Yes.  Doris came in first and she said that
20  she seen -- she wanted to get some -- she wanted to
21  buy some drugs from me and get out quick because she
22  seen some suspicious figures in the building or in
23  the parking lot, somewhere around the building.  So
24  she wanted to get hers and go, and then, like, five
25  minutes before she left, four or five minutes after
```

780

```
 1  she got there, that's when Jackie came in and said
 2  the same thing.
 3     Q.   That she too had seen suspicious people?
 4     A.   Yes.
 5     Q.   What did you do based upon what they said
 6  to you?
 7     A.   I -- the drugs I had, I just put them
 8  somewhere not on me and not easy to be found.
 9     Q.   Why?
10     A.   Because I didn't know who it was.
11     Q.   What did you think might be happening?
12     A.   I figured somebody might becoming to rob,
13  rob me, rob us.
14     Q.   Rob the drugs?
15     A.   Right.
16     Q.   Did anyone else come to the apartment after
17  that?
18     A.   Well, they came in and, you know, we locked
19  the door, and there was a knock at the door and I
20  looked out the peekhole and it was D.
21     Q.   The defendant?
22     A.   Yes.
23     Q.   You saw him through the peekhole?
24     A.   Yes.
25     Q.   And what did you do?
```

781

```
1    A.    Opened the door for him.
2    Q.    Did he come in?
3    A.    No.
4    Q.    What did he say to you?
5    A.    He didn't say anything.  He just motioned
6  for me to come out in the hallway.
7    Q.    Did you?
8    A.    Yes, I did.
9    Q.    And when you went out in the hallway, what
10 happened?
11   A.    He put his arm around my shoulder, I
12 thought he was -- you know, wanted to tell me
13 something, but he said he wanted me to go downstairs
14 and knock on the door and if they open the door to
15 get out the way.
16   Q.    Did he tell you specifically what door he
17 wanted you to knock on?
18   A.    No.
19   Q.    Did you know what door the defendant wanted
20 you to knock on?
21   A.    Yeah.  I mean, it was sort of kind of
22 self-explanatory.  I mean, there was nobody else
23 down there that he was -- he would want to see.
24   Q.    And when you say it was self-explanatory,
25 who did you believe it to be?
```

782

```
1    A.    Basil's door.
2    Q.    Why?
3    A.    Because that's where Tina -- that's where
4  she was selling at.
5    Q.    So, why would the defendant want to knock
6  on Tina's door?
7         MR. SMITH:  Objection.  Asked and
8  answered.
9         THE COURT:  Did he -- is the question
10 did he say why he wanted to knock on Tina's door?
11        MS. DAYTON:  That wasn't the question.
12        THE COURT:  Okay.
13        MS. DAYTON:  But it can be.
14        THE COURT:  Let's understand what the
15 question is then.
16        MS. DAYTON:  Okay.
17   Q.    Well, how about this:  What was your
18 understanding of why you were supposed to knock on
19 the door?
20   A.    Well, he told me if they knock -- he wanted
21 me to knock on the door and if they open the door to
22 just get out the way.  And it was just my
23 understanding it wasn't going to be nice.
24   Q.    How was the defendant dressed?
25   A.    He had on black jeans, I believe there was
```

783

```
1  a bandana around his neck.
2         MR. SHEEHAN:  I'm sorry, I couldn't hear
3  the last thing he said.
4    A.    Bandana around his neck and gloves, plastic
5  gloves.
6    Q.    Plastic gloves?
7    A.    Yes.
8    Q.    On his hands?
9    A.    Yes.
10   Q.    Was the defendant alone or with other
11 people?
12   A.    We started walking down the hall by
13 ourselves, and as I was going down the -- as I was
14 going down the stairs walking by the laundry room, I
15 could see at least three figures, but I didn't look
16 in -- I didn't look directly in anyone's face.
17   Q.    So, you saw three other figures?
18   A.    Right.
19   Q.    In addition to the defendant?
20   A.    Right.
21   Q.    And they were in the laundry room or by the
22 laundry room?
23   A.    They were in the laundry room on the second
24 floor when he came and got me.
25   Q.    Okay.
```

784

```
1    A.    Then when I went downstairs they stayed in
2  the stairwell.
3    Q.    Behind you?
4    A.    Right.
5    Q.    Did you turn around and look at them?
6    A.    No.
7    Q.    Why not?
8    A.    Because if I didn't see them I hope they
9  didn't see me.  Then if they didn't recognize me, I
10 didn't recognize them, I was hoping, because it had
11 the appearance that it wasn't going to be a joyous
12 occasion, so I just, you know -- I didn't see you, I
13 didn't see you.
14   Q.    You are trying to stay out of it?
15   A.    Exactly.
16   Q.    When you got downstairs, what did you do?
17   A.    Well, I mean, it was like 4:30 in the
18 morning, four -- it was late, early morning, and the
19 hallways echo at that time.  So I knocked hard
20 enough for the echo so it appeared I was knocking
21 harder than I was, and no one answered.
22   Q.    Why didn't you knock louder?
23   A.    Because I didn't want nobody to answer the
24 door.
25   Q.    What did you think was going to happen if
```

**GA196**

785

```
1    someone answered the door?
2              MR. SMITH:  Objection, relevance.
3              MS. DAYTON:  It goes to explain his
4    actions.
5              THE COURT:  Overruled.
6        Q.   Go ahead.
7        A.   I just knew it wasn't going to be a joyous
8    -- it wasn't going to be good.
9        Q.   But no one answered the door?
10       A.   Right.
11       Q.   Well, which apartment did you in fact knock
12   on the door?
13       A.   Basil's.  I believe it's 101.
14       Q.   And that's the one you pointed out on the
15   model?
16       A.   Yes, ma'am.
17       Q.   Lower right-hand side?
18       A.   Right.
19       Q.   When no one answered, what did you do?
20       A.   I went back to the stairwell and told him
21   nobody answer.
22       Q.   Told who?
23       A.   D.
24       Q.   And did he say anything to you?
25       A.   No, he just said, "That's all right, okay."
```

786

```
1    He just said "okay."
2        Q.   What did you do after that?
3        A.   I went back upstairs to 211.
4        Q.   To 211?
5        A.   Yes.
6        Q.   Did you talk to anyone when you got inside?
7        A.   Juanita.
8        Q.   What did you tell her?
9        A.   I just told her what happened.
10       Q.   And what did she tell you?
11       A.   She just gasped, like, you know, she was
12   worried.
13       Q.   Did you stay in 211 for a long time after
14   that?
15       A.   No, I left earlier that morning -- or later
16   that morning.
17       Q.   Approximately what time; if you know?
18       A.   About 7:30.
19       Q.   A.m.?
20       A.   Yes, ma'am.
21       Q.   Where were you going?
22       A.   Home.
23       Q.   What were you going to do at home?
24       A.   I had an appointment to go to church.
25       Q.   With who?
```

787

```
1        A.   My goddaughter and her mother.
2        Q.   So, that was Sunday morning?
3        A.   Yes, ma'am.
4        Q.   When you left, did you see anyone as you
5    walked out of the door?
6        A.   I seen Tina out the window.
7        Q.   Did you tell her about what had happened
8    the night before?
9        A.   No.
10       Q.   Why?
11       A.   I just -- I really wanted to stay out of
12   it.  So I just said no -- I mean, I didn't say
13   anything.  I mean, 'cause she knew what she was
14   doing and she knew that sooner or later it was going
15   to become a problem or a situation with him.  So, it
16   was like she apparently knew what she was up to,
17   what she was in for, you know.
18       Q.   For murder?
19       A.   I didn't -- I don't think she expected
20   that.
21       Q.   The night before the actual murders were
22   you at apartment 211?
23       A.   Yes, I was.
24       Q.   You were in the building?
25       A.   I was in the building.
```

788

```
1        Q.   And what were you doing?
2        A.   Actually, I was downstairs in apartment
3    102.  A friend was leaving, he was going to Jersey,
4    so...
5        Q.   What's the friend's name?
6        A.   Boozine.
7              MS. DAYTON:  That's B-O-O-Z-I-N-E for
8    the record.
9        Q.   Boozine?
10       A.   Yes.
11       Q.   And he lived right next door to Tina and
12   Basil and Tippy?
13       A.   Right.
14       Q.   And you said he was going to New Jersey,
15   like moving away?
16       A.   He wasn't moving, but he was just going --
17   he was going to be away for a week or two, a while.
18   I'm not sure of the time span, but he was leaving to
19   go to Jersey.
20       Q.   What were you guys doing in the apartment?
21       A.   Just talking, laughing.
22       Q.   How late do you think you were there?
23       A.   I think I was there 'til like 11:30, 12:00,
24   maybe 1:00 at the latest.
25       Q.   And then where did you go?
```

789

```
1     A.   I went to 211.
2     Q.   When you went up to 211, was anyone in the
3   apartment?
4     A.   Juanita, James and another young lady.  I
5   can't think of her name right now.
6     Q.   What did you do once you got to 211?
7     A.   She had -- I was downstairs and she had
8   called me upstairs because she wasn't feeling well.
9     Q.   Who is she?
10    A.   Juanita.
11    Q.   Okay.
12    A.   And she asked me to, you know, finish.  She
13  wanted me to finish selling what she had.
14    Q.   The crack?
15    A.   Yes, ma'am.
16    Q.   Okay.  And did you do that?
17    A.   Yes, ma'am, I did.
18    Q.   And after you finished selling it, what did
19  you do?
20    A.   I went to sleep.
21    Q.   Do you know what time you woke up the next
22  day?  Approximately.
23    A.   Time?  I have no idea.  It was early.  It
24  was morning, but -- it was before 12:00.
25    Q.   What happened when you woke up?
```

790

```
1     A.   Juanita woke me up.
2     Q.   For why -- why?
3     A.   Because they were police in the building,
4   around the building, and she said something happened
5   downstairs.
6     Q.   So, what did you do?
7     A.   I got up.
8     Q.   Did you leave the apartment?
9     A.   Not immediately, but eventually I left to
10  get me something to eat.
11    Q.   When you left the apartment, did you see
12  anyone in the building?
13    A.   No.  Me, James, and Juanita were leaving,
14  and then Officer DelMonte stopped us.
15    Q.   DelMonte?
16    A.   Yes, he did.
17    Q.   When he stopped you, what did he want?
18    A.   He was asking us about did we see anybody,
19  did we know anything about what happened downstairs.
20  And I guess by this time it was apparent that they
21  had -- they were murdered or they were killed
22  because then he asked us if we knew anything and we
23  said no.
24    Q.   Was that the truth, that no, you knew
25  nothing?
```

791

```
1     A.   Yes, it was.
2     Q.   So, you knew nothing about the actual
3   murders?
4     A.   Right.
5     Q.   Did you tell them anything about the drug
6   organization in the building?
7     A.   No, I didn't.
8     Q.   Not at that time?
9     A.   No.
10    Q.   So, after you left you said you went to get
11  something to eat.  Did you come back?
12    A.   Yes, I did.
13    Q.   And where did you go?
14    A.   Back to 211.
15    Q.   Who were you there with?
16    A.   Me, Juanita, Shirley, the other young lady,
17  James.  I think that's about it.
18    Q.   What were you guys doing?
19    A.   Getting high.
20    Q.   Smoking crack?
21    A.   Yes.
22    Q.   In the building?
23    A.   Yes.
24    Q.   With police in the building?
25    A.   Yes.
```

792

```
1     Q.   You weren't worried about getting caught?
2     A.   Yes and no.  But, I mean, they weren't
3   focused on upstairs at that point in time.
4     Q.   At some point did you or Juanita receive a
5   call?
6     A.   Yes, she got a call after a knock at the
7   door.
8     Q.   Someone knocked at the door?
9     A.   Yes.
10    Q.   Who opened the door?
11    A.   I think Shirley did.
12    Q.   And when the door opened, who was standing
13  there?
14    A.   A gentleman I never seen before.
15    Q.   What did he look like?
16    A.   Braids, dark complexion.
17    Q.   Shirt braids, long braids?
18    A.   About to here.
19    Q.   Okay.  And did he identify himself in any
20  way?
21    A.   No.  Not to me.
22    Q.   To anyone in the room?
23    A.   No, I think Juanita knew who he was, but I
24  mean, it was told to me that it was his brother.
25    Q.   Okay.  I'm going -- when you say "his
```

793

```
1   brother," whose brother?
2        A.   D's brother.
3        Q.   The defendant's brother?
4        A.   Yes.
5        Q.   I'm going to show you what's been
6   previously marked for identification as Government's
7   Exhibit 207.  Do you see that photo?
8        A.   Yes, ma'am.
9        Q.   Do you recognize who that person is?
10       A.   It's the one who came to the door.
11            MS. DAYTON:  Your Honor, the government
12   would ask to move 207 into evidence.
13            MR. SMITH:  No objection.
14            THE COURT:  It's a full exhibit.
15            MS. DAYTON:  Thank you, your Honor.
16       Q.   When this person in 207 came to the door,
17   what did he say?
18       A.   He didn't speak directly to me, but he said
19   he came to get that from Juanita.
20       Q.   Came to get that from Juanita?
21       A.   Yeah.
22       Q.   And what did Juanita give him?
23       A.   She gave him money.
24       Q.   You said Juanita got a call.  Do you know
25   from whom?
```

794

```
1        A.   No, I mean, he talked -- this gentleman
2   talked to Juanita and Juanita talked, so I took it
3   it was D.
4        Q.   So, both the person in 207 and Juanita got
5   on the phone with whoever Juanita was speaking with?
6        A.   Right.
7        Q.   And did this guy come into the apartment?
8        A.   Yes, he did.
9        Q.   Did he -- what did he do once he came
10   inside 211?
11       A.   Nothing, he just came in and they had their
12   little short conversation, he got the money and
13   left.
14       Q.   Okay.  After he left, this guy in 207, what
15   did you do?
16       A.   What did I do?
17       Q.   Yeah, what did you and Juanita do?
18       A.   Nothing, just continue getting high.  We
19   talked about what happened downstairs and, you know,
20   at that point in time we didn't know exactly what
21   happened.  It appeared that they were killed, they
22   were murdered, but, you know, we just, you know,
23   speculating, and like, I said, I wasn't there, I
24   don't know.
25       Q.   At some point did you leave to go get more
```

795

```
1   drugs?
2        A.   That would be when I went to get something
3   to eat.
4        Q.   Can you speak up a little bit?
5        A.   Oh, sorry.
6        Q.   You said you did that when you went to get
7   something to eat?
8        A.   Yes, ma'am.
9        Q.   And who did you get those drugs from?
10       A.   A friend of Juanita's.
11       Q.   Why?  Was that usual to get drugs from
12   someone else other than the defendant?
13       A.   At that particular time, yeah, because the
14   product that he had was no good.
15       Q.   So, who did you get the other drugs from?
16       A.   I don't know his name.  A gentleman -- it
17   was Juanita's friend.
18       Q.   How much did you get?
19       A.   About a gram.
20       Q.   And when you got the gram, what did you do
21   with it?
22       A.   Cooked it up.
23       Q.   You cooked it up?
24       A.   Yes, ma'am.
25       Q.   Where?
```

796

```
1        A.   In 211.
2        Q.   Even with the police milling about?
3        A.   Yes, ma'am.
4        Q.   And you didn't think they were going to
5   smell it or --
6        A.   They weren't focused on 211 at that
7   particular time, so...
8        Q.   Why did you cook up crack in the building
9   at that time?
10       A.   I guess the power of addiction.
11       Q.   The power of addiction?
12       A.   Yes.
13       Q.   At some point later that day, did you go
14   over to Judy's apartment, the lookout apartment?
15       A.   After that -- well, several hours after
16   that, James left, Juanita left, and I was -- I fell
17   asleep.  So, and it was like -- it was early
18   morning, and I went to Judy's house because when I
19   woke up nobody was there.  So I woke up and I went
20   to let James know I was leaving.  And there was
21   nobody in the apartment, so I couldn't lock it.  So,
22   I went to Judy's house and this young man told me
23   that he, James, was upstairs on the third floor.
24       Q.   The person in 207 was in the lookout
25   apartment?
```

797

1    A.   Excuse me?

2    Q.   This person that you are pointing to in

3   207?

4    A.   Yes.

5    Q.   He was in the lookout apartment?

6    A.   Yes, he was.

7    Q.   And he told you that James Rucker was

8   upstairs?

9    A.   Right, on the third floor.

10   Q.   Did you go upstairs to find Rucker?

11   A.   Yes, I did.

12   Q.   What did you tell him?

13   A.   I just told him I was leaving.

14   Q.   Have you, since that time after the

15   murders, did you continue to sell drugs there?

16   A.   No.

17   Q.   Did you stop immediately?

18   A.   I had, actually I had stopped prior to

19   that, but, you know, Juanita asked me because she

20   was sick, and she asked me to do that, so it was

21   like, she had maybe, like, six left.  So, I knew

22   that wouldn't -- you know, it wouldn't take forever

23   to get rid of those, so...

24   Q.   Six little bags?

25   A.   Yeah.  I mean, even if I didn't sell them I

798

1   was going to sleep anyway, so either I had them when

2   I woke up or I didn't.

3    Q.   When is the last time you saw Juanita?

4    A.   Besides court?

5    Q.   Besides in court, yes.

6    A.   I think that might have been it.

7    Q.   So, in August of 2005?

8    A.   Yes, ma'am.

9    Q.   What about James Rucker, Pops?

10   A.   We were both incarcerated in Rhode Island

11   together.

12   Q.   How long were you incarcerated?

13   A.   Four years.

14   Q.   When did you get arrested?

15   A.   I got arrested October, September 23rd,

16   2005.

17   Q.   So, about a month after the murders?

18   A.   Right.

19   Q.   And when you were arrested, were you read

20   your Miranda rights?

21   A.   I believe so.

22   Q.   And did you waive your rights and agree to

23   speak with the police officers?

24   A.   Yes, I did.

25   Q.   And did you -- what types of things,

799

1   generally, did you talk to them about?

2    MR. SMITH:  Objection.  Hearsay.  He's

3   discussing what he told the police back then?

4    THE COURT:  What he told the police.

5   Why is that hearsay?

6    MR. SMITH:  It's an out of court

7   statement, your Honor.

8    THE COURT:  By an unavailable witness?

9   Overruled.

10   MS. DAYTON:  I can move on.  It was just

11   general.

12   Q.   Did you talk to them about illegal

13   activity?

14   A.   No, but I told them prior to that night,

15   because they were -- you know, they weren't -- they

16   weren't actually grilling me about the illegal

17   activity, they was grilling me about the situation

18   on the first floor.

19   Q.   And you were arrested, and what were you

20   charged with?

21   A.   Conspiracy.

22   Q.   Conspiracy to what?

23   A.   Sell 50 grams or more.

24   Q.   Of?

25   A.   Cocaine.

800

1    Q.   Conspiracy to sell 50 grams or more of

2   cocaine or crack cocaine?

3    A.   Crack cocaine.

4    Q.   And did you eventually plead guilty to that

5   charge?

6    A.   Yes, I did.

7    Q.   Do you know about how long after you were

8   arrested that you pled guilty?

9    A.   I think a year.

10   MS. DAYTON:  Your Honor, may I approach?

11   THE COURT:  Yes.

12   MS. DAYTON:  Your Honor, for the record

13   this is Government's Exhibit 235.

14   Q.   Showing you that document, do you recognize

15   what that is?

16   A.   Plea agreement.

17   Q.   Okay.  And what did you plead guilty to?

18   A.   20 to life.

19   Q.   20 to life?

20   A.   Yes.

21   Q.   Okay.  And that's the sentence you are

22   facing?

23   A.   Yes, ma'am.

24   Q.   And what's the actual charge?  Is it the

25   conspiracy charge?

801

```
1      A.   Yes.
2      Q.   Yes?  Okay.  And that's the conspiracy to
3   possess with intent to distribute 50 grams or more
4   of crack cocaine?
5      A.   Yes, ma'am.
6      Q.   And if you could turn to the second to last
7   page and the last page, tell me if those are your
8   signatures.
9      A.   Yes, ma'am.
10     Q.   And is that your actual plea agreement?
11     A.   Yes, it is.
12          MS. DAYTON:  Your Honor, if we may move
13  Government's Exhibit 235 into evidence.
14          MR. SMITH:  No objection.
15          THE COURT:  Full exhibit.
16     Q.   On the same day that you pled guilty to the
17  plea agreement, did you also enter into another
18  agreement with the government?
19     A.   Yes, I did.
20          MS. DAYTON:  235A.  May I approach, your
21  Honor?
22          THE COURT:  You may.
23     Q.   Showing you what's been marked 235A for
24  identification, do you recognize what that is?
25     A.   Yes.
```

802

```
1      Q.   Can you turn to the last page of that.
2      A.   Yes, ma'am.
3      Q.   And what is that document?
4      A.   Actually it's a plea agreement for me just
5   to tell the truth and that my sentence is not -- you
6   know, I have no -- I get no -- my sentence is
7   determined to the sentencing judge and not the
8   prosecution.  So as long as I tell the truth.
9      Q.   Is that your cooperation agreement?
10     A.   Yes, it is.
11          MS. DAYTON:  Your Honor, may I move 235A
12  into evidence.
13          MR. SHEEHAN:  No objection.
14          MR. SMITH:  No objection.
15          THE COURT:  Absent objection, it's a
16  full exhibit.
17          MS. DAYTON:  Thank you, your Honor.
18     Q.   So, why did you cooperate with the
19  government?
20     A.   I don't want to do 20 years or life.  So,
21  to get some help.
22     Q.   So how are you hoping that cooperating and
23  testifying will help you?
24     A.   I'm hoping that the four years that I
25  already done is enough.
```

803

```
1      Q.   Okay.
2      A.   Will be enough.
3      Q.   And do you know who makes that decision
4   about how much time you spend in jail?
5      A.   The sentencing judge.
6      Q.   Okay.  Thank you.
7          MS. DAYTON:  May I have one moment, your
8   Honor?
9          THE COURT:  Yes.
10          MS. DAYTON:  The government has nothing
11  further at this time, your Honor.
12          THE COURT:  All right.  Before you begin
13  cross-examination, Mr. Smith, I want to give the
14  jurors a limiting instruction with respect to the
15  testimony that Mr. Hodges has given so far.
16          Do you remember I told you there will be
17  some evidence that will be in only for limited
18  purposes and I would instruct you on what that
19  limitation is.  And so this is the first such
20  limiting instruction.
21          The government has offered evidence that
22  the defendant, Azibo Aquart, committed certain
23  assaults as testified to by Mr. Hodges.  Mr. Aquart
24  has not been charged with committing these crimes,
25  and this evidence is offered only for a limited
```

804

```
1   purpose, that is, as evidence that a racketeering
2   enterprise and/or a drug conspiracy existed as the
3   government alleges and of its alleged nature, scope
4   and methods of activity.
5          If you choose to credit this testimony,
6   you may consider it only for this limited purpose.
7   You may not consider it as evidence of Mr. Aquart's
8   bad character or general propensity to engage in any
9   acts of violence.  I hope to give you more extended
10  instructions on this limitation later in the final
11  instructions.  But for now, you should understand
12  that it is for the limited purpose of evidence of
13  the claimed racketeering enterprise and/or drug
14  conspiracy.
15          All right then, with that instruction in
16  mind, which will apply to all of Mr. Hodges'
17  testimony.
18          Mr. Smith, will you be cross-examining?
19          MR. SMITH:  Yes, your Honor.
20          THE COURT:  All right, you may proceed.
21  CROSS-EXAMINATION
22  BY MR. SMITH:
23     Q.   Mr. Hodges, you weren't born a drug dealer,
24  were you?
25     A.   No, I wasn't.
```

**GA201**

805

```
1    Q.   Your parents were not drug dealers?
2    A.   No, they weren't.
3    Q.   Your brothers and sisters, none of them
4  dealt drugs?
5    A.   Not at all.
6    Q.   And you graduated from high school?
7    A.   Yes, I did.
8    Q.   And you went to college?
9    A.   Some, yes, I did.
10   Q.   North Carolina?
11   A.   Yes.
12   Q.   Housatonic Community College?
13   A.   Yes.
14   Q.   You got special training in computers?
15   A.   Yes.
16   Q.   You got certified in that trade?
17   A.   Yes.
18   Q.   You'd also told the agents about other jobs
19 that you held, correct?
20   A.   Yes.
21   Q.   And one of the jobs you told them that you
22 held was as a substitute teacher in math and science
23 in the Bridgeport public schools?
24   A.   I did.
25   Q.   You told them that?
```

806

```
1    A.   Yes, I did.
2    Q.   That was not true, was it?
3    A.   Yes, it was.  I was a substitute teacher.
4    Q.   Do you recall being a substitute teacher in
5  the Bridgeport schools?
6    A.   Yes, I do.
7    Q.   Actually teaching math and science classes?
8    A.   Yes.
9    Q.   Okay.  I want to see if something refreshes
10 your recollection as to that.
11        MR. SMITH:  Could we bring up DG 08045.
12        MS. DAYTON:  Your Honor, I haven't seen
13 this.
14        MR. SHEEHAN:  Turn off the screen.
15        MR. SMITH:  The screen is off.
16        MS. DAYTON:  I would ask that the
17 government be shown --
18        MR. SMITH:  It's being brought up on the
19 screen.
20        THE COURT:  Do you have a copy of that?
21        MS. DAYTON:  No, we've been given
22 nothing.
23   Q.   Do you see that?
24   A.   It's not true.
25   Q.   I'm sorry, its --
```

807

```
1    A.   It's not true.
2    Q.   That's not true.  Meaning, this document is
3  not correct and you actually worked as a substitute
4  teacher in Bridgeport?
5    A.   Yes, I did, because --
6    Q.   Okay.  Let's move on.
7    A.   Excuse me.  Before -- I mean, now they have
8  placement tests where you have to take a test.
9  Before it wasn't a test, as long as you had some
10 college background you could substitute.
11   Q.   So, Mr. Hodges, you are saying that this
12 document that says you did never work --
13        THE COURT:  Wait, this is not in
14 evidence.
15        MS. DAYTON:  Objection.  Could we
16 approach actually for a moment, please?
17        THE COURT:  Yes.
18        (Sidebar conference)
19        MS. DAYTON:  The government would like
20 to note that despite Lord knows how many requests
21 for discovery from the defense, including in front
22 of your Honor, it's been represented many times that
23 they have no documents and no evidence to turn over
24 to us.  We put our first cooperating witness on and
25 they have a document marked which means they had it
```

808

```
1  before today.
2        At this time I would ask them to turn
3  over all documents that they intend to use.  We have
4  made motions, we have made them in writing, we have
5  made them verbally, and they represented to your
6  Honor several times that they had no evidence, and
7  that is not true apparently.
8        MR. SMITH:  Your Honor, this document is
9  being used for impeachment.  I'm not moving it as an
10 exhibit at this time.
11        MS. DAYTON:  It doesn't matter.
12        THE COURT:  Why wasn't it turned over to
13 the government before?
14        MR. SMITH:  Your Honor, it's being used
15 for purposes of impeachment.  It's not part of our
16 case-in-chief.  It's not part of documents in
17 evidence that we intend to introduce in our
18 case-in-chief at trial.
19        MS. DAYTON:  That's not how Rule 16
20 works.  If you have documents that you intend to
21 present, whether or not they're introduced at trial,
22 they are supposed to be turned over.
23        MR. SMITH:  I'm showing the witness the
24 document.  I'm not moving it in as an exhibit.
25        THE COURT:  All right, but you can't --
```

809

```
1   if you are not moving it into evidence --
2           MR. SMITH:  I make no further --
3           THE COURT:  You can't represent what it
4   says.
5           MR. SMITH:  That's fine, your Honor,
6   I'll move on.
7           MS. DAYTON:  We're making a discovery
8   motion now.  We want all documentary evidence and
9   all photographs, as we've asked for for the past
10  four years and have been provided not one piece of
11  paper ever.
12          MR. SMITH:  Again, your Honor, Rule 16
13  says all evidence you intend to introduce in your
14  case-in-chief.  This is not evidence I'm intending
15  to introduce in the case-in-chief.
16          THE COURT:  What language are you
17  referring to?
18          MR. SMITH:  May I retrieve the rule,
19  your Honor?  They're asking about Rule 16, your
20  Honor, about discovery.  I'm not sure.
21          This is Rule 16(b)(1) B -- I'm sorry,
22  (b)(1)(A)(2), your Honor, that the defendant intends
23  to use the item in the defendant's case-in-chief at
24  trial.  I had no intention of using it in my
25  case-in-chief unless Mr. -- or using -- it's
```

810

```
1   actually impeachment, your Honor, but I would
2   imagine that I would move to have this admitted with
3   proper foundation from the Bridgeport public schools
4   because he's denied the information contained there.
5           MS. DAYTON:  You can't prove up
6   extraneous things.
7           MR. SMITH:  You can prove up
8   extraneous --
9           MS. DAYTON:  No, you can't.
10          MR. SMITH:  Your Honor, you can prove
11  inconsistent statements with extraneous information.
12          THE COURT:  We are going to leave the
13  issue of whether or not -- well, let me start with
14  this.  Is it correct that you have nothing to turn
15  over to the government that you would use in your
16  case-in-chief, that is, other than for impeachment
17  purposes, which you believe is an exception?
18          MR. SMITH:  Yes, your Honor.
19          THE COURT:  And there is nothing else.
20          MR. SMITH:  No, your Honor.
21          THE COURT:  I'll take the issue up
22  later.  You are not offering this document.  You
23  can't question from it.  If he doesn't change his
24  testimony --
25          MR. SMITH:  Understood.
```

811

```
1           THE COURT:  -- you just have to move on.
2   Thank you.
3           MS. DAYTON:  I would ask that he move on
4   now because he already said it wasn't right.
5           (Sidebar concluded)
6           THE COURT:  All right, if you would
7   kindly move to the next question.
8   Q.  Mr. Hodges, you've been in the drug trade,
9   as you call it, for many years?
10  A.  Yes, sir.
11  Q.  And in the drug trade you essentially have
12  an endless supply of customers?
13  A.  If you want to say that.
14  Q.  You have an endless supply of customers.
15  A.  I have?  Yes.
16  Q.  And nobody every forced you to use drugs.
17  A.  No.
18  Q.  And despite your college and your training,
19  you chose to become a drug dealer.
20  A.  Yes, I did.
21  Q.  And you've been doing that for quite a
22  while.
23  A.  Yes, I did.
24  Q.  Okay.  When you deal drugs, Mr. Hodges,
25  there are risks that you take on, right?
```

812

```
1   A.  Yes, sir.
2   Q.  There is a risk that you could be arrested.
3   A.  Yes.
4   Q.  Yes?  Put in prison.
5   A.  Yes.
6   Q.  The risk of being robbed.
7   A.  Yes.
8   Q.  This is a cash business, right?
9   A.  Yes, it is.
10  Q.  You can't call the cops if something
11  happens, right?
12  A.  Right.
13  Q.  Because you are doing something illegal by
14  selling the drugs.
15  A.  Yes, sir.
16  Q.  And people buying the drugs are doing
17  something illegal by buying them.
18  A.  Yes, sir.
19  Q.  And the people who buy drugs, Mr. Hodges,
20  they're addicted to drugs, correct, many of them?
21  A.  Yes.
22  Q.  And if they don't have the money to buy
23  those drugs, they still need those drugs.
24  A.  Right.
25  Q.  So, they've got to get the money somehow.
```

**GA203**

813

```
1        A.   Right.
2        Q.   They could steal the money somehow, right?
3             MS. DAYTON:  Objection.  It calls for
4   speculation.
5             MR. SMITH:  Your Honor, he's testified
6   about his knowledge of the drug trade.
7             THE COURT:  Overruled.
8        Q.   So, they could steal the money from
9   somewhere, correct?
10       A.   Correct.
11       Q.   Or they could rob the dealer.
12       A.   Correct.
13       Q.   Because you get both drugs, right --
14       A.   Right.
15       Q.   -- and cash?
16       A.   Right.
17       Q.   And of course you can always find another
18  dealer.
19       A.   True.
20       Q.   And you knew about all of this when you
21  started dealing drugs, right?
22       A.   Yes, sir.
23       Q.   And you were willing to assume these risks.
24       A.   Yes.
25       Q.   Okay.  And that's because you had access to
```

814

```
1   drugs for your own use, right?
2        A.   Yes.
3        Q.   And the money was good.
4        A.   Yes.
5        Q.   Some days you were taking home a thousand
6   dollars a day worth of drugs or cash, right?
7        A.   Right.
8        Q.   Let's talk about your record.
9             In 1995 you were convicted for possession of
10  narcotics, correct?
11            MS. DAYTON:  Can we approach again?  I
12  apologize.  We're spending the whole trial at
13  sidebar, but this is an issue.
14            THE COURT:  All, right.  I'll see you.
15            (Sidebar conference)
16            MS. DAYTON:  So, counsel and I had had a
17  discussion about convictions that were over ten
18  years old and I had said with respect to John Taylor
19  only, that we weren't objecting to them bringing in
20  convictions that were over ten years old, but for
21  any other witness we were not agreeing to them
22  getting into the convictions and they needed to make
23  a motion about it.  No motion was made on any
24  witness for any convictions that were over ten years
25  old.  And 1995 is over ten years ago.
```

815

```
1             MR. SMITH:  Your Honor, I believe the
2   rules don't take account time in prison, excludes
3   the time the witness was incarcerated.  Mr. Hodges
4   has been incarcerated from 2005 to '10.  Perhaps.
5   I'm not sure when he was incarcerated, but we have
6   his own testimony, for periods of two and three --
7   almost three years.  So we're talking about almost a
8   ten-year span of time between now, going back to
9   1995, which would allow me to get into those
10  convictions because they don't fall under the rule
11  of being strictly over ten years old.
12            MS. DAYTON:  I don't think that's the
13  rule.
14            THE COURT:  Where would I find that
15  construction?
16            MR. SMITH:  I believe it's within the
17  rule, your Honor.  I have the rule.
18            THE COURT:  We could take lunch now.
19            MS. DAYTON:  Just let them finish this
20  guy.  I'll stop objecting.
21            MR. SMITH:  Your Honor, I'm looking at
22  609(b), the conviction of this rule is not
23  admissible if the period more than ten years has
24  elapsed since the date of the conviction or the
25  release of the witness from the confinement posed
```

816

```
1   for that conviction.
2             MS. DAYTON:  So it's been over ten
3   years.
4             THE COURT:  He's been -- so how do you
5   say that that means you take the years of
6   incarceration out of the counting time?
7             MR. SMITH:  Your Honor, the purpose of
8   the rule -- otherwise the rule would be if someone
9   you could only count one conviction if, let's say
10  someone had five convictions and the last one puts
11  them in prison for over ten years, and then you are
12  left -- and they just get out and come and testify,
13  now you are left with one possible conviction
14  because that's within ten years, all other
15  convictions do not apply.
16            MS. DAYTON:  So, that's not true because
17  you are left with that without making a motion, but
18  if you make a motion pursuant to the rule to admit
19  it, you may get an exception, but there is no
20  exception written into the rule.  And Mr. Smith and
21  I specifically discussed this issue and no motion
22  was made and the government does not consent.
23            THE COURT:  So, the rule seems to relate
24  to the latter of confinement imposed for that
25  conviction or the date of that conviction.
```

**GA204**

817

```
1        MR. SMITH:  The problem, your Honor, is
2   we have intervening periods of incarceration which
3   means there is no way --
4        THE COURT:  But that's what is permitted
5   under the rule without motion, is the later of -- is
6   evidence of a conviction of more than ten years
7   since either the date of the conviction, which this
8   is, '95 is, or the release from that confinement.
9   He's clearly been out since then.  Unless the court
10  determines in the interest of justice that the
11  probative value of the conviction supported by
12  specific facts and circumstances substantially
13  outweighs its prejudicial effect.
14       MR. SMITH:  And I would rely on that
15  second part as well, your Honor.  Mr. Hodges already
16  discussed his record with the government.  He's
17  opened the door to his record.
18       MS. DAYTON:  First of all, he didn't go
19  to custody in '95, it was mere possession and --
20       MR. SMITH:  Still a felony possession.
21       THE COURT:  So what do you do with the
22  part of the rule that says evidence of a conviction
23  more than ten years old as calculated herein is not
24  admissible unless the proponent gives to the adverse
25  party sufficient advanced written notice of such
```

818

```
1   intent to use such evidence to present the adverse
2   party with a fair opportunity to contest the use of
3   such evidence.
4        MR. SMITH:  Your Honor, then if that's
5   that part, and it's not -- the motion is not before
6   the Court, I would make the motion now.  But again,
7   Mr. Hodges put his record into evidence.  He
8   testified about his convictions and now the
9   government doesn't want us to know about any of his
10  convictions.
11       MS. DAYTON:  That's not true.  He
12  testified about his drug dealing and that he had
13  been arrested.  We didn't get into convictions.  So,
14  this is not fair notice.
15       MR. SMITH:  He talked about serving
16  time, your Honor.  To say he didn't talk about his
17  convictions is really quite ridiculous.
18       MS. DAYTON:  He did on the conviction
19  say he did three years.
20       THE COURT:  I'm going to ask you to move
21  on.  Do you know how long your cross-examination
22  will be?
23       MR. SMITH:  Perhaps it could be an hour,
24  your Honor.
25       THE COURT:  All right, we'll probably
```

819

```
1   have to break for lunch.
2        MR. SMITH:  Okay.
3        THE COURT:  And then I'll consider your
4   argument further, if you have anything in addition
5   to add.
6        (Sidebar concluded)
7   Q.   We'll come back to your record, Mr. Hodges.
8        MS. DAYTON:  Your Honor, we'd ask for
9   that statement to be stricken from the record.
10       THE COURT:  We will decide whether we
11  come back to the record.
12       MR. SMITH:  Well, your Honor, I would
13  say that --
14       THE COURT:  Let's just move on.
15       MR. SMITH:  I'll move on, your Honor.
16       THE COURT:  Thank you.
17  Q.   So, Mr. Hodges, you talked about spending
18  time in prison, correct?
19  A.   Yes, sir.
20  Q.   And you were in prison for a while in this
21  case?
22  A.   Yes, sir.
23       THE COURT:  Sir, you need to move closer
24  to the microphone.  Thank you.
25  Q.   And you are out of prison.
```

820

```
1   A.   At the present moment.
2   Q.   And you don't want to go back.
3   A.   Of course not.
4   Q.   The food is bad there.
5   A.   Among other things.
6   Q.   And every aspect of your life is
7   controlled.
8   A.   Yes, it is.
9   Q.   24 hours a day.
10  A.   Yes, it is.
11  Q.   And you are away from your friends and
12  family while you are there.
13  A.   Yes, sir.
14  Q.   And you only see them if they happen to
15  come see you, right?
16  A.   Yes, sir.
17  Q.   And you miss their birthdays and
18  Christmasses and Thanksgivings?
19  A.   Yes, sir.
20  Q.   And if you are put in prison far away from
21  Bridgeport, you might not see your family members at
22  all.
23  A.   True.
24  Q.   And your understanding is that in federal
25  cases you get put in prison a long way away, don't
```

821

```
1   you?
2       A.   Like myself, yes.
3       Q.   And prison is a dangerous place, isn't it?
4       A.   Yes, it is.
5       Q.   And you are always looking over your
6   shoulder.
7       A.   Yes, sir.
8       Q.   Now, at some point you were staying in
9   apartment 211; is that right?
10      A.   Yes, sir.
11      Q.   Now, Charles Street is not a nice building,
12  is it?
13      A.   No.
14      Q.   The building is dirty.
15      A.   Yes, it was.
16      Q.   The hallways are dirty.
17      A.   I tried to keep it clean.
18      Q.   The elevator didn't work.
19      A.   No, it didn't.
20      Q.   The doors to the building didn't lock.
21      A.   No, it didn't.
22      Q.   Anyone could get in there day or night.
23      A.   Yes, sir.
24      Q.   Customers didn't have to get buzzed in to
25  the building through the front door, right?
```

822

```
1       A.   No, sir.
2       Q.   They would just show up at your door,
3   right?
4       A.   Yes, sir.
5       Q.   That's because they could just walk right
6   into the building.
7       A.   Right.
8       Q.   And 211 wasn't just where drugs were sold,
9   right?
10      A.   Say that again.
11      Q.   People used drugs there as well.
12      A.   Yes, sir.
13      Q.   So they would come in, they'd buy the
14  drugs, and they'd often sit down and smoke them
15  right there.
16      A.   Yes, sir.
17      Q.   Okay.  And prostitutes would use that
18  building as well.
19      A.   Yes, sir.
20      Q.   Now, you were arrested at Charles Street in
21  November of 2004.
22      A.   Yes.
23      Q.   You came back and kept dealing, right?
24      A.   I wasn't dealing when I was in -- in 2004.
25  I was on the couch.
```

823

```
1       Q.   Okay.  But you came back to apartment 211.
2       A.   Yes, I did.
3       Q.   And then you got arrested in March of 2005.
4       A.   Yes, I did.
5       Q.   And you came back and you are still dealing
6   drugs.
7       A.   Yes.
8       Q.   And then you get arrested in July of 2005.
9       A.   Yes.
10      Q.   And you were still dealing drugs after
11  that.
12      A.   Yes.
13      Q.   And when you were at 215 Charles, you had
14  lots of suppliers.
15      A.   I have had lots of suppliers, no.
16           MR. SMITH:  Could we bring up DG 998,
17  please?
18           MS. DAYTON:  Objection, it's not been
19  provided to the government.
20           MR. SMITH:  Your Honor, this has been
21  provided to the defense by the government.
22           MS. DAYTON:  If we could just see what
23  it is.
24           MR. SMITH:  Of course.
25      Q.   Directing your attention to the first
```

824

```
1   paragraph, Mr. Hodges.
2           MR. SMITH:  And for the Court's --
3           THE COURT:  This is not marked as -- how
4   are you marking this?
5           MR. SMITH:  I could mark it for
6   identification, your Honor.
7           THE COURT:  We're at Defendant's H.
8           MR. SMITH:  Defendant's H.
9       Q.   So, Mr. Hodges, you had other persons from
10  whom you purchased cocaine, correct?
11      A.   Correct.
12      Q.   And that would be Ricky Irby (ph)?
13      A.   He's one.
14      Q.   A person named T?
15      A.   I don't know T.
16      Q.   You don't know T.  You didn't tell the
17  agents you purchased from a guy named T?
18      A.   If I did, I don't recall.
19      Q.   Would something refresh your memory?
20      A.   Excuse me?
21      Q.   Would something refresh your memory?
22      A.   Sure.
23      Q.   Would looking at that document there
24  refresh your memory, the first paragraph?
25      A.   I never bought anything from Boozine.
```

825

```
1   Boozine sold dope.  I didn't sell dope.  I didn't
2   buy nothing from Juanita's brother neither.
3      Q.  So, you are saying that you did not tell
4   the agents that you purchased from Ricky Irby, T,
5   Juanita Hopkins' brother and Boozine?
6      A.  If I --
7           MS. DAYTON:  Objection.  Misstates his
8   testimony.
9           THE COURT:  Just ask -- without
10  reference to the document, ask him whether or not he
11  told agents that.
12     Q.  Did you tell agents that you sold or that
13  you purchased cocaine from Boozine?
14     A.  No, I didn't.
15     Q.  Okay.
16          MR. SMITH:  Your Honor, I would move to
17  admit the Defendant's Exhibit H, prior inconsistent
18  statement.
19          MS. DAYTON:  Objection.
20          THE COURT:  All right, we're going to
21  take that up at the lunch break.  Do you want to
22  take the lunch break now or do you want to continue?
23          MR. SMITH:  We can continue, your Honor.
24          THE COURT:  All right, let's continue
25  and I'll --
```

826

```
1           MR. SMITH:  Just a moment, your Honor.
2           Your Honor, for the moment I'll withdraw
3   that until that could be subject to connection with
4   the agent to whom the statement was made.
5           THE COURT:  All right.  So you are not
6   pressing for its admission at this time.
7           MR. SMITH:  No, your Honor.  It can be
8   marked for identification as H.
9           THE COURT:  Very well.  All right.
10     Q.  So while you were selling at Charles
11  Street, you were making a lot of money, correct?
12     A.  I was making some, yes.
13     Q.  Some?
14     A.  Yes, some.
15     Q.  $400 a day, on average.
16     A.  Compared to what I was turning in, some.
17     Q.  Well, you were testifying that you were
18  selling four to five packs a day.
19     A.  Yes.
20     Q.  That's 4 or $500 a day.
21     A.  Okay.
22     Q.  Okay or yes?
23     A.  Yes.
24     Q.  Okay.  And you weren't paying any taxes on
25  that.
```

827

```
1      A.  No, I wasn't.
2      Q.  Okay.  Now, as far as drug sales, apartment
3   211 was not the only place to purchase drugs in the
4   area, right?
5      A.  True.
6      Q.  There were dealers just on the other side
7   of Main Street.
8      A.  At one point in time.
9      Q.  And that's only about a block away.
10     A.  Right.
11     Q.  You knew about them.
12     A.  I heard about them.  I never end up meeting
13  with them or -- I never knew who it was either.
14     Q.  But you knew about them.
15     A.  I've heard about them.  I didn't know about
16  them.
17     Q.  Well, they knew about you, too.  If you'd
18  heard about them, they would have heard about you,
19  correct?
20          MS. DAYTON:  Objection.  It calls for
21  speculation.
22          THE COURT:  Sustained.
23     Q.  Now, there were customers coming in and out
24  of Tina's apartment, correct?
25     A.  Correct.
```

828

```
1      Q.  And people used drugs in her apartment,
2   too?
3      A.  Yes, sir.
4      Q.  Just like in 211?
5      A.  Yes, sir.
6      Q.  So she was exposed to the risk of being
7   robbed just like you were.
8      A.  Yes.
9      Q.  And other people sold drugs in the
10  building, correct?
11     A.  Not all.
12     Q.  Boozine sold drugs.
13     A.  He sold dope, he didn't sell crack.
14     Q.  Boozine sold dope --
15     A.  Right.
16     Q.  -- in the building.
17     A.  Not directly in the building, but
18  sometimes, yeah, I could -- yes.  Yes, he did.
19     Q.  And his apartment was right next to Tina's.
20     A.  Yes, it was.
21     Q.  And you testified initially that Tina
22  Johnson and James Reid were customers of yours.
23     A.  Yes.
24     Q.  And eventually you got to be friendly with
25  them.
```

829

1    A.    Yes.
2    Q.    And then Tina started to sell her own
3 crack.
4    A.    Yes, she did.
5    Q.    And you talk about it being a bad batch of
6 crack; is that right?
7    A.    Yes, sir.
8    Q.    And at one point -- well, withdraw that.
9         In your interviews -- you were interviewed
10 several times, right?
11    A.    Yes, I was.
12    Q.    In all of your interviews you never told
13 the agents that the reason Tina was getting
14 customers was because your crack was bad, correct?
15    A.    No, it's not correct.
16    Q.    You believe you told the agents in your
17 prior interviews that the reason Tina was getting
18 customers was because there was a bad batch of crack
19 coming out of 211.
20    A.    Yes, sir.
21    Q.    Okay.  You also talked about you went to
22 211 -- I'm sorry, 101 at one point to buy crack.
23    A.    I didn't actually buy it.
24    Q.    You stole it.
25    A.    No, I didn't.

830

1    Q.    You robbed Velma for the crack.
2    A.    I robbed Velma?  No, I didn't.
3    Q.    You didn't go to 101 and rob Velma of
4 crack.
5    A.    No, I didn't.
6    Q.    Okay.  And you didn't do that at Womble's
7 direction.
8    A.    No.
9    Q.    Okay.  So, you knew from the raids that the
10 police were on to apartment 211, right?
11    A.    Yes.
12    Q.    But you kept dealing anyway.
13    A.    Yes.
14    Q.    And that's because it's a lucrative source
15 of business for you.
16    A.    No, I had a debt to pay and that was the
17 only way to pay it.
18    Q.    I'm sorry, I couldn't hear you.
19    A.    I had a debt to pay and that was the only
20 way to pay it.
21    Q.    You had a debt to pay.
22    A.    Yes.
23    Q.    I see.
24    A.    For him bonding me out of jail.
25    Q.    You were still making four to $500 a day?

831

1    A.    Not always.
2    Q.    Sometimes a thousand dollars a day?
3    A.    Not always.  Because I had to pay him.  He
4 had to get his money.  So either I was not getting
5 my $100 and it was going back to him or he would let
6 me get half of that and the other the half would go
7 to him.  So I was still paying my debt to him.
8    Q.    I see.  And did you see Mr. Aquart come to
9 the jail and bail you out?
10    A.    Once.
11    Q.    He himself signed the bond paperwork.
12    A.    I don't know who signed the paperwork, but
13 he picked me up.
14    Q.    All right.  But, in any event, you didn't
15 want the business to stop, you were still making
16 money.
17    A.    Because I had a debt to pay.
18    Q.    You were still making money, yes or no?
19    A.    At some point in time, yes.
20    Q.    So after your arrest in July, you went to
21 Officers Clayton and Q, right?
22    A.    Yes.
23    Q.    And you agreed to purchase drugs for them?
24    A.    Yes, I did.
25    Q.    Because one of your tricks for staying in

832

1 business is you snitched to the police?
2    A.    No.  I never got in touch with them, so we
3 never -- that never transpired.
4    Q.    But you agreed to do that?
5    A.    Yes, I did, but it never transpired.
6    Q.    I understand it maybe never transpired, but
7 you promised to do that for them.
8    A.    Okay.
9    Q.    Correct?
10    A.    Yes, I did.
11    Q.    And that's a way of getting out of a jam,
12 right?
13    A.    Yes, it is.
14    Q.    And it's a way to take the heat off
15 yourself.
16    A.    Yes, it is.
17    Q.    You didn't tell them that you were going to
18 continue dealing drugs at 211, though, did you?
19    A.    They knew it.
20    Q.    When they agreed to work with you as an
21 undercover purchaser of narcotics, they knew you
22 were going to continue to sell narcotics at 211.
23    A.    Yes.
24    Q.    And they were okay with that.
25    A.    That's what they told me.

**GA208**

833

1   Q.   Okay.  Did you tell them you were taking
2   home $400 a day?
3   A.   No, we didn't talk money amounts.
4   Q.   The fact that you weren't paying taxes on
5   any of that.
6   A.   Not at all.
7   Q.   And at that point you never said anything
8   about D, did you?
9   A.   No, I didn't.
10  Q.   So you made them a promise to give them
11  something they wanted, correct?
12  A.   Right.
13  Q.   And that was because you needed to get out
14  of trouble.
15  A.   Yes.
16  Q.   Let's talk about the night before the
17  murders.  You said you were down in Boozine's
18  apartment?
19  A.   Yes, I was.
20  Q.   You came back to 211.
21  A.   Yes, sir.
22  Q.   And you went to sleep.
23  A.   Yes, I did.
24  Q.   You told the agents you took some Benadryl
25  and went to sleep.

834

1   A.   Yeah, I went to sleep.
2   Q.   And that you took some Benadryl.
3   A.   Okay.
4   Q.   Correct?
5   A.   Correct.
6   Q.   That's what you told the agents.
7   A.   Yes.
8   Q.   Okay.  So let's talk about the morning of
9   the homicides.  Now, you wake up that morning to
10  discover that the police are all over the building,
11  correct?
12  A.   Correct.
13  Q.   And after Juanita tells you about the
14  murders, you go out to breakfast.
15  A.   Yes.
16  Q.   And you went with Juanita and Pops.
17  A.   Yes, sir.
18  Q.   Do you remember telling the agents you went
19  with Patricia as well?
20  A.   Patricia?
21  Q.   Yes.
22  A.   I don't know Patricia.
23  Q.   Okay.  You didn't tell the agents you went
24  out with Patricia as well.
25  A.   I don't recall a Patricia being there.

835

1   Q.   All right.  But you came back to 211.
2   A.   Yes, sir.
3   Q.   After you purchased more drugs.
4   A.   Yes, sir.
5   Q.   And police are still all over the building.
6   A.   Yes, sir.
7   Q.   And you walked right in the main door.
8   A.   Yes, sir.
9   Q.   Right past the police.
10  A.   Yes, sir.
11  Q.   Police were asking for people's names.
12  A.   Yes, sir.
13  Q.   Asked where you were going.
14  A.   Yes, sir.
15  Q.   And there's yellow tape set up around
16  apartment 101.
17  A.   Actually, no, we didn't go in the main
18  door.  We went around the side.
19  Q.   But you still saw the police, correct?
20  A.   Yes, sir.
21  Q.   You didn't tell any of those officers you
22  passed about anything that had happened in the
23  building.
24  A.   Not at all.
25  Q.   And you were questioned by

836

1   Detective DelMonte?
2   A.   Yes, sir.
3   Q.   And you told him nothing unusual happened.
4   A.   No, I didn't know.  No, nothing unusual
5   happened.  Nothing I knew of.  I was asleep.
6   Q.   And you didn't say anything about seeing
7   men dressed in black in the building a few days
8   before.
9   A.   Not at all.
10  Q.   So, you and Juanita left again later.
11  A.   No, she left, I didn't.
12  Q.   You didn't leave the building twice that
13  day.
14  A.   No, the second time I left was later that
15  morning -- early the next morning when I went home.
16  Q.   In any event, you bought crack cocaine?
17  A.   Yes, sir.
18  Q.   You came back to the building.
19  A.   Yes, sir.
20  Q.   You are in 211, you are cooking it up.
21  A.   Yes, sir.
22  Q.   You are smoking it.
23  A.   Yes, sir.
24  Q.   You are still selling it as well.
25  A.   I wasn't selling it.  She didn't have

**GA209**

837

```
 1   nothing to sell anyway because she turned in her
 2   money to his brother.  So she didn't have nothing to
 3   sell.
 4        Q.   So, after that, the day of the murders,
 5   eventually the police left the building.
 6        A.   Yes.
 7        Q.   And you thought at that point you are out
 8   of trouble.
 9        A.   I had nothing to do with downstairs anyway,
10   so I didn't think I was in trouble.
11        Q.   Police were all over the building that day,
12   correct?
13        A.   Correct.
14        Q.   And you are up there cooking in 211.
15        A.   Yes.
16        Q.   And you thought, humph, they might come in
17   here.
18        A.   It's a possibility, but they weren't
19   focused on 211.
20        Q.   But as far as after the day of the murders,
21   the coast was clear, more or less.  The cops didn't
22   keep coming back to the building every day.
23        A.   I don't know, I wasn't there.
24        Q.   Okay.  You were gone.
25        A.   Yes.
```

838

```
 1        Q.   All right.  But then Detective DelMonte and
 2   Officer Ander (ph) came back looking for you, right?
 3        A.   At 211, I wasn't there.
 4        Q.   No, but they came and found you.
 5        A.   At court.
 6        Q.   They found you, correct?
 7        A.   Yes, they did.
 8        Q.   August 30, 2005.
 9        A.   Okay.
10        Q.   One week later.  Right?
11        A.   I don't know the date.  So, I mean, I seen
12   them.  The next time I seen DelMonte was in court.
13        Q.   But you saw them.
14        A.   Yes.
15        Q.   And you knew then you are in big trouble.
16        A.   No, I mean, because he asked me what did I
17   know.  I told him I didn't know anything.  So then
18   when I seen him in court he was, like, why didn't
19   you come see me?  I don't have nothing to tell you
20   because I don't know.
21        Q.   You recall you were interviewed by them.
22        A.   Yes.
23        Q.   On August 30, 2005.
24        A.   I don't know the date.
25        Q.   But you recall being interviewed by them.
```

839

```
 1        A.   Yes.
 2        Q.   Sitting down in the police department and
 3   giving an interview.
 4        A.   Yes, sir.
 5        Q.   Okay.  Now, at that point you wanted them
 6   off your back.
 7        A.   Exactly.
 8        Q.   And that's just like the time that you told
 9   Clayton and Officer Q, I'll snitch for you, but that
10   was your way of getting out of trouble, right?
11        A.   Exactly.
12        Q.   Because you knew Tippy and Tina and Basil
13   were dealing out of 101, right?
14        A.   Right.
15        Q.   And you also had seen Rodney Womble argue
16   with them about that, correct?
17        A.   Not that I recall.
18        Q.   You never saw Womble argue with them.
19        A.   Not that I recall.
20        Q.   And you are not aware of Womble threatening
21   the people in 101.
22        A.   Not that I recall.
23        Q.   Okay, but you knew that the sales were
24   being cut into, according to you, at 211, right?
25        A.   Yes.
```

840

```
 1        Q.   Okay.  But on that first interview with
 2   DelMonte, the police were pressing you about D,
 3   right?
 4        A.   Yes.
 5        Q.   So, when you thought that that was your way
 6   out of trouble, all you had to do was tell them
 7   something about D.
 8        A.   Yes.
 9        Q.   And in all of the previous arrests at 211,
10   November, March, July, you never said anything about
11   D.
12        A.   Right.
13        Q.   But now the heat was on, right?
14        A.   Yes.
15        Q.   Okay.  And you told them on the 30th that
16   you had been dealing out of that apartment for a
17   long time, eight months.
18        A.   Okay.
19        Q.   Correct?
20        A.   I don't recall the date, but yeah, okay,
21   eight months.
22        Q.   Okay.  And you told them that you were
23   doing that for D.
24        A.   Yes.
25        Q.   You told them you'd make $100 per package?
```

841

1      A.    Yes.
2      Q.    And you told them you'd sell maybe two to
3  three packages a week.
4      A.    At that time, yes, I did.
5      Q.    So on the 30th you told them you'd sell two
6  to three packages a week.
7      A.    At that time I did.
8      Q.    On August 30th.
9      A.    Right.
10     Q.    During that interview.  Okay.  Now,
11 DelMonte wanted to see -- went to see you to tie D
12 into the killings, correct?
13     A.    Yes.
14     Q.    So then you told them what you saw and that
15 you saw D at the building a few days before the
16 killings, right?
17     A.    Yeah.
18     Q.    And you also told them that D had hit you
19 in the head with a gun.
20     A.    I didn't tell them that he hit me in the
21 head with a gun.  I didn't tell them that.
22           MR. SMITH:  Could we bring up DG 957.
23     Q.    Turning your attention to the last
24 paragraph.
25           MS. DAYTON:  Your Honor, we object.  The

842

1  witness said he did not say that and showing him a
2  document that the witness did not create the
3  defendant is just --
4           THE COURT:  You have his testimony.  He
5  didn't say that to the officer.
6           MR. SMITH:  Okay.  We can move on, your
7  Honor.
8           THE COURT:  Okay, thank you.
9           MR. SMITH:  Take this down, please.
10 Thank you.
11     Q.    So, to confirm, you never told DelMonte
12 that D had hit you with a gun.
13     A.    I don't recall telling anybody that D hit
14 me with a gun.
15     Q.    Well --
16     A.    Not me myself.
17     Q.    Well, you didn't or you don't recall?
18     A.    I don't recall.  I didn't tell anyone that
19 D hit me with a gun.
20     Q.    I'm unclear.  You didn't tell him?
21     A.    I did not tell anyone that D hit me with a
22 gun.
23     Q.    Okay.  So, you went through this interview
24 with Detective DelMonte, correct?
25     A.    Correct.

843

1      Q.    And after admitting to him all the drugs
2  you had sold, right?
3      A.    Right.
4      Q.    They let you go.
5      A.    Right.
6      Q.    They didn't arrest you right there.
7      A.    No, they didn't.
8      Q.    And in that interview you didn't tell them
9  anything about Rodney Womble, did you?
10     A.    No.
11     Q.    Now, you were not arrested until
12 September 23rd, correct?
13     A.    Correct.
14     Q.    And this was about three weeks later.
15     A.    Correct.
16     Q.    All right.  And this time you were arrested
17 not by the state authorities but by the feds.
18     A.    Yes.
19     Q.    Now, you are an educated person.
20     A.    Yes, sir.
21     Q.    And you'd been selling drugs for a long
22 time.
23     A.    Yes, sir.
24     Q.    You grew up in PT Barnum?
25     A.    Yes, sir.

844

1      Q.    Lots of drugs there.
2      A.    Yes, sir.
3      Q.    And you knew a lot of people over your
4  lifetime who had been arrested for dealing drugs,
5  correct?
6      A.    Yes, sir.
7      Q.    And there is a big difference between a
8  state drug charge and a federal drug charge.
9      A.    Yes, sir.
10     Q.    And you knew that.
11     A.    Yes, sir.
12     Q.    Federal time is much more serious, right?
13     A.    Yes, sir.
14     Q.    And that crack cocaine was probably the
15 worst drug you could get busted for by the feds,
16 right?
17     A.    Yes, sir.
18     Q.    That's because 50 grams or more of crack,
19 it's a minimum of ten years in prison, right?
20     A.    Right.
21     Q.    And that's something they just told you
22 when you got arrested on 9/23, right?
23     A.    Right.
24     Q.    Now, you'd been dealing out of Charles
25 Street for a long time.

845

```
1       A.   Right.
2       Q.   Way more than 50 grams.
3       A.   Yes.
4       Q.   And for you, things were a lot worse than
5  just maybe ten-year mandatory minimum, right?
6       A.   Twenty to life.
7       Q.   You were looking at possibly a life
8  sentence.
9       A.   Correct.
10      Q.   And on August 30th you'd given DelMonte a
11 full confession as to your dealing in drugs.
12      A.   Correct.
13      Q.   Right?
14           And in that same confession, again, you
15 didn't mention anything about Womble, right?
16      A.   Right.
17      Q.   So, you really hadn't talked yourself out
18 of a mess on August 30th, did you, when you talked
19 to DelMonte?
20      A.   Apparently not.
21      Q.   In fact, you talked yourself into the mess.
22      A.   Okay.
23      Q.   And you couldn't take back what you said,
24 correct?
25      A.   Correct.
```

846

```
1       Q.   Because otherwise it's life in prison.
2       A.   Correct.
3       Q.   And that's what the agents were telling
4  you.
5       A.   Correct.
6       Q.   Okay.  Now, you were interviewed, as you
7  talked about, several times after your arrest,
8  correct?
9       A.   Yes, sir.
10      Q.   September 23, 2005, day of your arrest.
11      A.   Yes.
12      Q.   Five days later on September 28, 2005.
13      A.   Yes.
14      Q.   Again on October 11, 2005.
15      A.   Yes.
16      Q.   January 10, 2006.
17      A.   Okay.
18      Q.   April 4, 2006.  Yes?
19      A.   I don't remember dates, so I'm just
20 listening to you.
21      Q.   Do you disagree with anything I'm saying?
22      A.   I have been interviewed several times.  So,
23 I don't know dates.  I never wrote them down or
24 anything.
25      Q.   But in addition to all of the times you've
```

847

```
1  been interviewed, which is several, you also met
2  with the U.S. attorneys shortly before your
3  testimony here today.
4       A.   Yes.
5       Q.   A few times.
6       A.   Yes, I did.
7       Q.   Okay.  Let's talk about when you say that
8  he assaulted you.
9           We've already confirmed that you did not
10 tell Detective DelMonte that D hit you with a gun,
11 correct?
12      A.   Correct.
13      Q.   But in your first interview when you were
14 arrested -- now, you say it was his hands that he
15 hit you with.
16      A.   Yes, it was.
17      Q.   Okay.  And then most recently you say you
18 had to go to the hospital with broken ribs.
19      A.   Cracked rib.
20      Q.   Cracked ribs.  You never said anything to
21 any of the agents prior to that about cracked ribs,
22 did you?
23      A.   No, I didn't.
24      Q.   You didn't?
25      A.   No, I didn't.
```

848

```
1       Q.   Okay.  Now, at the hospital you told the
2  staff that you were in a car accident.
3       A.   Yes, sir.
4       Q.   It wasn't just a general statement about
5  being a car accident, there was detail to that
6  statement, wasn't there?
7       A.   I don't recall.  I just know I told them I
8  was in an accident.
9       Q.   You told them you were a passenger in the
10 accident.
11      A.   I don't recall.  But yeah, it was an
12 accident.
13      Q.   Do you say you didn't tell them that?
14      A.   I told them I was in an accident.  I don't
15 know.  I don't recall if I told them I was driving
16 or a passenger.
17           MR. SMITH:  Let's bring up DG 08070.
18           Your Honor, I believe this is already an
19 exhibit.  It's part of the medical records that were
20 entered and stipulated to.
21           THE COURT:  So that we would find that
22 then in?
23           MR. SMITH:  That would be page, I
24 believe, 4.
25           THE COURT:  So --
```

849

```
 1          MR. SMITH:  Those medical records.
 2          THE COURT:  It's in Exhibit 246.
 3          MR. SMITH:  I believe that's correct.
 4          THE COURT:  All right.
 5          MR. SMITH:  Could we bring that on the
 6   screen, your Honor?
 7          THE COURT:  Yes.
 8     Q.  Do you see the screen in front of you,
 9   Mr. Hodges?
10     A.  Yes, sir.
11     Q.  And you can see that part where it says:
12   "Patient in a motor vehicle accident three days
13   ago."
14     A.  Okay.  Yes, sir.
15     Q.  "Front seat passenger."
16     A.  Okay.
17     Q.  "No seatbelt."
18     A.  Right.
19     Q.  "No air bags."
20     A.  Right.
21     Q.  "Hitting the dashboard."
22     A.  Yes, sir.
23     Q.  You told them all that.
24     A.  Yes, I did.
25     Q.  It wasn't just a car accident, it was that
```

850

```
 1   kind of detail, correct?
 2     A.  Yes.
 3     Q.  Now, when you were arrested in
 4   September 23, 2005, you told the agents that the
 5   assault by D took place a few months ago, a few
 6   months prior to the interview?
 7     A.  Yes.
 8     Q.  That would be in the late spring or early
 9   summer, right?
10     A.  A few months.  It all depends on what you
11   consider a few months.
12     Q.  Well, in a later interview you told the
13   agents that the assault occurred in January of 2005,
14   correct?
15     A.  I don't recall.
16     Q.  Would there be something that would refresh
17   your memory as to that?
18     A.  Sure, if you have it.
19          MR. SMITH:  Could we please bring up
20   DG 999?
21     Q.  I'm looking at the fifth paragraph down
22   from the top.
23          THE COURT:  And the question is whether
24   this refreshes his recollection?
25          MR. SMITH:  Yes.
```

851

```
 1          THE COURT:  All right, don't testify
 2   from the document, it's not in evidence.  But if it
 3   refreshes your recollection testify from your
 4   refreshed recollection.  All right?
 5          THE WITNESS:  Excuse me?
 6          THE COURT:  Don't just testify what that
 7   document says, it's not in evidence.  It's used to
 8   refresh your recollection.  If it does refresh your
 9   recollection, then you can testify to what you
10   remember because you have read that.  Okay?
11          THE WITNESS:  Yes, ma'am.
12     Q.  Do you see where I'm talking about,
13   Mr. Hodges, the fifth paragraph down from the top?
14     A.  Yes.
15     Q.  Does that refresh your recollection as to
16   what you told the agents?
17     A.  I don't recall.  I mean, if I said it.
18     Q.  Does it refresh your recollection as to
19   what you told the agents?
20          MS. DAYTON:  Objection.  Asked and
21   answered.
22          THE COURT:  He said it doesn't refresh
23   his recollection.
24     Q.  So, you don't deny saying that to the
25   agents.
```

852

```
 1          MS. DAYTON:  Objection.
 2          THE COURT:  Sustained.
 3     Q.  Now, you talked about different reasons you
 4   say that you were assaulted.  You told the agents on
 5   September 23rd of 2005 the reason you were assaulted
 6   was because Pops had told D that you were dealing
 7   for somebody else.
 8          THE COURT:  Is that a question?
 9     Q.  Correct?
10     A.  I don't recall.
11     Q.  Would there be something that would refresh
12   your memory as to that?
13     A.  I mean, I probably could have said it, but
14   the reason that I was assaulted was because Womble
15   called D because he saw what I had and it wasn't
16   what he gave me.
17     Q.  You told the agents that Pops told D that
18   you were dealing for somebody else, yes or no?
19     A.  He could have said that.  Pops could have
20   said that.
21     Q.  No.  You, sir.
22     A.  I told him Pops said that?
23          MS. DAYTON:  Objection.
24          THE COURT:  Overruled.
25     Q.  You said that to the agents.
```

853

1    A.   I don't recall.

2    Q.   Would there be something that would refresh

3  your recollection as to that?

4    A.   If you have it.

5         MR. SMITH:  Could we please bring up

6  994.

7         THE WITNESS:  Okay.

8    Q.   Does that refresh your recollection about

9  what you told the agents on September 23, 2005?

10   A.   Yes, sir.

11   Q.   And did you, in fact, tell them that Pops

12  had told D that you were dealing for somebody else?

13   A.   Yes, sir.

14   Q.   And again on September 23rd you didn't

15  mention anything about Womble being there at the

16  assault, correct?

17   A.   Correct.

18   Q.   And it was only after September 28, 2005,

19  that you said he was there.

20   A.   Right.

21   Q.   But he didn't participate in the assault.

22   A.   Well, I don't recall who participated.  I

23  just remember the defendant hitting me.  So if he

24  participated or not, I said that before, that I

25  don't recall.  I don't know.  I remember him hitting

854

1  me, and that's the last thing I knew because I was

2  trying to get away.

3    Q.   All right.  But later in a much more recent

4  interview, January 28, 2011, you told the agents

5  that the reason for your assault was that Womble saw

6  you packaging other people's cocaine and then called

7  Azibo.

8    A.   That I had someone else's cocaine to make

9  up the money.

10   Q.   You told the agents that you -- that Womble

11  saw you packaging someone else's cocaine.

12   A.   Not that particular time, but yeah, I had

13  someone else's cocaine, yes, I did.

14   Q.   And that's different than what you told the

15  agents on September 23, 2005.

16   A.   Probably so, after it became more clearer

17  to me after I became more -- it came -- you know,

18  reflecting on it.

19   Q.   And this became more clear to you after

20  your several interviews with the agents.

21   A.   Yes.

22   Q.   Okay.  Now, about seeing the men in black

23  in that building, Mr. Hodges.  The police first

24  asked you about this on August 30, 2005, correct, in

25  that very first interview with DelMonte?  Not at the

855

1  building that day, but the later one.

2    A.   Yes.

3    Q.   And then you were asked about this again,

4  correct?

5    A.   Correct.

6    Q.   And that was on September 23rd, the next

7  interview after you were arrested by the feds.

8    A.   Correct.

9    Q.   Okay?  And you gave them a time that this

10  happened, correct?

11   A.   Say 4:30.

12   Q.   You told them between 4:30 a.m. and

13  6:00 a.m., correct?

14   A.   Correct.

15   Q.   But then they had you write out a statement

16  in your own handwriting.

17   A.   Yes.

18   Q.   And you recall that?

19   A.   Yes, I do.

20   Q.   That's just a couple days later on

21  September 26, 2005.

22   A.   Yes.

23   Q.   And in that handwritten statement you wrote

24  5:30 a.m.

25   A.   Right.

856

1    Q.   Correct?

2    A.   Correct.

3    Q.   Now, just two days later they questioned

4  you again.

5    A.   Right.

6    Q.   And this time the timeframe changed again

7  from 4:30 a.m. to 6:00 a.m., right?

8    A.   Yes.

9         MS. DAYTON:  Objection, vague.  Is that

10  a timeframe between that time period or --

11   Q.   You told them the time was between 4:30 and

12  6:00 a.m.

13   A.   Correct.

14   Q.   And then you were interviewed again on

15  October 11, 2005, correct?

16   A.   Correct.

17   Q.   Now the time went from 4:00 a.m. to

18  5:30 a.m.

19   A.   Correct.

20   Q.   And then on January 10, 2006, it went from

21  4:00 a.m. to 7:00 a.m.

22   A.   No, I don't believe it was 7:00 a.m.

23  because I left 7:00, 7:30.

24   Q.   You didn't tell the agents on January 10,

25  2006, that this occurred between 4:00 and 7:00 a.m.?

**GA214**

857

1    A.   I don't recall.

2    Q.   Would there be something that would refresh

3 your memory as to that?

4    A.   I mean, if you have it, it's still in the

5 timeframe of 4:30 and 6:00, but I know I left

6 between 7:00 and 7:30.

7    Q.   Are you denying you told the agents 4:00 to

8 7:00 a.m.?

9    A.   I don't recall what time I told them.

10    Q.   Would there be something that would refresh

11 your memory as to what you told the agents?

12    A.   If you have it.

13         MR. SMITH:  Could you please bring up

14 8063.

15    Q.   Does that third line refresh your memory?

16    A.   It's not my handwriting, so...

17    Q.   I understand it's not your handwriting.

18 Does it refresh your memory?

19    A.   They could put what they want.  I know I

20 left between 7:00 and 7:30.

21    Q.   Okay.  So you think the agents just wrote

22 down whatever they felt like writing down?

23    A.   I mean --

24         MS. DAYTON:  Objection.

25         THE COURT:  Overruled.

858

1    A.   They set up a timeframe.

2    Q.   They set up the timeframe?

3    A.   They -- it doesn't change the fact that I

4 left between 7:00 and 7:30.  It doesn't change the

5 fact that I seen him between 4:30 and 6:30, and

6 7:00.  I seen him prior to me leaving.

7    Q.   Even though you have signed a statement

8 saying it was 5:30 a.m.?

9    A.   It's still before I left.

10    Q.   Okay.  But the agents helped you with that

11 timeframe, correct?

12    A.   They wrote it down.

13    Q.   Okay.

14         THE COURT:  It's a little after 1:00.

15 Shall we break for lunch.

16         All right, ladies and gentlemen.  We will

17 have at least a half hour lunch.  Please leave your

18 notebooks here, please don't discuss the case.

19         (Jury exited the courtroom.)

20         THE COURT:  All right, counsel, we'll

21 take our lunch first, but I want to summarize what

22 it is that we need to go over, if anything, before

23 we resume with the jury after lunch:  The issue of

24 whether the defendant -- excuse me, whether Mr.

25 Hodges' 1995 conviction can be inquired into or

859

1 whether it is time-barred under the provisions of

2 609, and then the other question -- are you still

3 pressing the issue of the Board of Education letter?

4         MR. SMITH:  Well, your Honor, I think

5 that would have to come in through another witness.

6         THE COURT:  All right, and the question

7 there will be whether that is permitted under

8 608(b), and so I will hear you on that, that is,

9 specific instances of the conduct of a witness for

10 the purpose of attacking or supporting a witness's

11 character for truthfulness other than conviction of

12 a crime, as provided in Rule 609, may not be proved

13 by extrinsic evidence.  They may, however, in the

14 discretion of the Court -- so forth.  That rule.

15         Anything else?  That brings us

16 up-to-date.  All right then, we'll be back in

17 25 minutes.  Thank you.

18         (Recess)

19         THE COURT:  Please be seated.  So the

20 matter that remains before Mr. Hodges comes back is

21 Mr. Hodges' 1995 conviction.

22         Do you want to be heard any further on

23 that?

24         MR. SMITH:  No, you Honor, it appears

25 that it is just outside the ten years from the date

860

1 of arrest in the pending matter by ten days.  I do

2 think it is relevant and probative in that Mr.

3 Hodges in his plea agreement admitted to a prior

4 felony which enhanced his sentence from a 10-year

5 mandatory minimum to a 20-year mandatory minimum.

6 He does have another conviction in 2000 that

7 similarly could have enhanced his sentence to life.

8 So, I do certainly plan on talking about '97 to

9 2000.

10         THE COURT:  And I don't understand the

11 government to be objecting to that.

12         MS. DAYTON:  Nope.

13         THE COURT:  The problem with the earlier

14 analysis is that the ten-year rule relates to ten

15 years elapsed since the date of conviction or

16 release of the witness from confinement imposed for

17 that conviction, which doesn't apply here, and to

18 get an independent exception from that through the

19 Court requires advanced written notice of intent to

20 use, which we don't have.

21         So, let's proceed on what you have.  And

22 you have examined him already with respect to the

23 amount of time he faces, and he faces it because of

24 his prior convictions.  It seems to me that that

25 suffices for showing a bias, which is what you are

861

```
1   looking at, right?
2          MR. SMITH:  Well, your Honor, I don't
3   recall testimony about -- I know he talked about the
4   one conviction, but I don't know he talked about the
5   2000 conviction in his direct.  I would still ask to
6   be able to go over both convictions with him.
7          THE COURT:  Well, you have in evidence
8   his plea agreement.
9          MR. SMITH:  I do.
10         THE COURT:  His plea agreement will have
11  some analysis of the guidelines and the career
12  offender and so forth.  Is he in a career offender
13  category?
14         MR. SMITH:  Yes.
15         THE COURT:  And he's in a career
16  offender category because of a certain number of
17  prior drug or violent convictions?
18         MR. SMITH:  Correct.
19         THE COURT:  So without specifying,
20  that's what the situation is that he faces.
21         MR. SMITH:  Yes, your Honor, but he
22  still suffered two convictions which I think I
23  should be allowed to query him on.  The fact of the
24  convictions aren't just for this case, they are
25  convictions which the rules recognize.
```

862

```
1          THE COURT:  That's what I'm saying is he
2   has two prior convictions which, when counted in the
3   context of sentencing for this offense, put him in a
4   career offender category warranting life.  That's
5   different from the specific convictions themselves.
6          MR. SMITH:  But, your Honor, the
7   convictions -- -- your Honor, I am talking
8   specifically asking him questions about '97 and
9   2000, those actual convictions:  "You were convicted
10  on."
11         THE COURT:  And the government is not
12  objecting to that.
13         MR. SMITH:  That's my understanding.  I
14  wanted to be sure we were talking about the same
15  thing and not the '95.
16         THE COURT:  The '95 doesn't count
17  towards the -- is it a career offender or armed
18  career offender he's looking at?
19         MR. SMITH:  I believe it was career
20  offender, your Honor.
21         THE COURT:  So I think we're all set
22  then.
23         MR. SMITH:  Your Honor, just so we don't
24  have a surprise, Mr. Hodges also has a 19 -- or
25  sorry, 2003 larceny conviction which I plan to ask
```

863

```
1   him about.
2          THE COURT:  But that's within the
3   timeframe.
4          MR. SMITH:  Yes.  Certainly within ten
5   years of his arrest in this case.
6          THE COURT:  Right.  Wait a minute.
7          MS. DAYTON:  I just want to note for the
8   record Mr. Hodges is not charged as a career
9   offender.  He is an 851 -- a potential 851.  It's
10  not a career offender.
11         THE COURT:  Okay, I didn't know.  I had
12  not actually seen his plea agreement.
13         MS. DAYTON:  Right.  So, I just didn't
14  want him questioned about a career offender because
15  that's a term of art.
16         THE COURT:  Right.
17         MR. SHEEHAN:  Well, your Honor, he is a
18  career offender.
19         MS. DAYTON:  Again, he's not.  That is
20  up to the judge to make a determination, and that
21  judicial determination has not been made.  And, in
22  fact, the government is not even sure they can prove
23  up the 851 based upon all of the law that has
24  elapsed since 2006.
25         THE COURT:  Savage as it may be.
```

864

```
1          MS. DAYTON:  Yes, true, as that goes.
2          THE COURT:  Is there any dispute about
3   the 2003 larceny conviction?
4          MS. DAYTON:  May I just have one moment,
5   your Honor.  I don't think so.  That's a misdemeanor
6   for which he did no time.
7          THE COURT:  So, isn't it admissible if
8   it's punishable by more than one year?
9          MR. SMITH:  Your Honor, if it involves
10  -- the crime involves dishonesty, it's also
11  admissible.
12         MS. DAYTON:  It's a Larceny Six.
13         MR. SMITH:  It's a theft.  The elements
14  of the crime are dishonesty.
15         THE COURT:  I'm going to permit you to
16  examine on it.  So, we've got smooth sailing now for
17  cross-examination?
18         MR. SMITH:  We'll do our best.
19         MS. DAYTON:  It will be lovely.
20         THE COURT:  All right, we'll bring back
21  the jury and Mr. Hodges.
22         (Jury entered the courtroom.)
23         THE COURT:  All right, good afternoon,
24  ladies and gentlemen.  I know by now you are
25  concluding that we operate in a time warp.  We don't
```

865

```
1   really.  We are trying to conserve time, not on your
2   time, in order to be able to move things along.  I
3   know it was a lovely day and you would have loved to
4   stay out longer, but here you are.
5          Please be seated.  We'll resume
6   cross-examination of Mr. Hodges by Mr. Smith.
7          MR. SMITH:  Thank you, your Honor.
8       Q.   Mr. Hodges, before the break we were
9   talking about people dressed in black.
10      A.   Yes.
11      Q.   When you were questioned on August 30,
12  2005, about this, you told Detective DelMonte that D
13  had you go downstairs and knock on 101 and that
14  three other males were dressed in black inside the
15  laundry room.
16      A.   Correct.
17      Q.   And that's the laundry room across from
18  101?
19      A.   No, I seen them in the laundry room going
20  down the stairs on the second floor.
21      Q.   You told Detective DelMonte, correct, that
22  you went downstairs and saw the three men inside the
23  laundry room across from 101?
24      A.   No.
25      Q.   You didn't tell him that?
```

866

```
1       A.   No.
2       Q.   Okay.  Isn't it true, Mr. Hodges, that in
3   no interview prior to January of 2010 did you tell
4   the agents that you had seen these gentlemen in the
5   second floor laundry room?
6       A.   Can you repeat that.
7       Q.   It wasn't until January 2010 that you told
8   any agent who interviewed you about seeing these men
9   on the second floor laundry room?
10      A.   No.
11      Q.   And you never told DelMonte that you saw
12  them on the first floor laundry room?
13      A.   Correct.
14      Q.   Okay.  When you were interviewed on
15  August 30th about this, you didn't say that Jackie
16  was there at all in the building that night?
17      A.   Okay.
18      Q.   Correct?
19      A.   I don't recall.
20      Q.   Okay.  And, again, on September 23, 2005,
21  you didn't mention Jackie at all, correct?
22      A.   I don't recall.  It's so long ago.  I mean,
23  I told them what I told them.
24      Q.   Okay.
25      A.   I mean, of course after a period of time of
```

867

```
1   reflecting on it I got the story straight.
2       Q.   You got the story straight?
3       A.   Right.
4       Q.   Okay.  It wasn't until September 28th of
5   2005 that you mentioned Jackie Bryant, correct?
6       A.   I don't recall.  I don't know when I
7   included her because I know it was Doris and Jackie.
8   That's the only two who came in the apartment.
9       Q.   But when the agents interviewed you they
10  told you they had already talked to Jackie?
11      A.   Okay.
12      Q.   Correct?
13      A.   I don't recall.  I don't recall what they
14  asked me.
15      Q.   Okay.  Now, on August 30th you told
16  Detective DelMonte that D and the three other men
17  you saw were wearing black?
18      A.   Yes.
19      Q.   And on August -- I'm sorry, September 23rd
20  they asked you for a full description of what D was
21  wearing, correct?
22      A.   Correct.
23      Q.   You told them what you remembered about
24  that night, right?
25      A.   Yes, sir.
```

868

```
1       Q.   You would have told them what you had
2   remembered about that night?
3       A.   Yes, sir.
4       Q.   And you told them in that interview you
5   didn't look at their faces, right?
6       A.   Correct.
7       Q.   And then you signed a statement on
8   September 26, 2005, correct?
9       A.   Correct.
10      Q.   And in that statement you wrote D was with
11  three other guys dressed in black.
12      A.   Correct.
13      Q.   And the police asked you to write that
14  statement?
15      A.   Correct.
16      Q.   And they signed it below you.
17      A.   Yes.
18      Q.   It wasn't until September 28th that you
19  then told the agents that they were wearing
20  bandanas.
21      A.   Okay.
22      Q.   Correct?
23      A.   I don't recall.  I mean, after some type of
24  reflection, I mean, a lot of things come back to
25  you, so --
```

869

```
1      Q.   After lots of reflection?
2      A.   Yeah, when you do other things.  Some
3  things you want to put out your mind and you don't
4  have nothing to do with it, you want to get rid of
5  it, you don't think about it, but when you continue
6  to reflect on it, things come back to you.
7      Q.   So, you also told them on September 28th
8  that they were now wearing rubber gloves?
9      A.   Yes.
10     Q.   That wasn't in your signed statement?
11     A.   Okay.
12     Q.   Correct?
13     A.   Correct.
14     Q.   And you didn't say anything to DelMonte
15  about bandana and rubber gloves either, did you?
16     A.   No, I didn't.
17     Q.   Okay.  You talked about what D said to you
18  about knocking on the door, correct?
19     A.   Correct.
20     Q.   You didn't tell that to DelMonte on
21  August 30th, did you?
22     A.   I don't recall what I told him.
23     Q.   You didn't tell him that on September 23rd
24  either?
25     A.   I don't recall what I told him.
```

870

```
1      Q.   They didn't record any of these interviews,
2  did they?
3      A.   Not to my knowledge.
4      Q.   And they didn't videotape of any these
5  recordings -- these sessions?
6      A.   Not to my knowledge.  I believe they just
7  wrote down what they remembered after I left.
8      Q.   Okay.  Now, when you first got arrested you
9  were in Bridgeport Correctional, correct?
10     A.   When I first got arrested?
11     Q.   In this case.
12     A.   When I got arrested for this case was I
13  already in Bridgeport Corrections?
14     Q.   No, I'm sorry, maybe I wasn't clear.  When
15  you first got arrested for this case, for the
16  federal case --
17     A.   Yes.
18     Q.   -- they put you in Bridgeport Correctional?
19     A.   Yes, sir.
20     Q.   Rodney Womble was also in that facility,
21  correct?
22     A.   I have no idea.
23     Q.   Now, before you were arrested, you had been
24  selling drugs at 215 Charles Street, right?
25     A.   Yes, sir.
```

871

```
1      Q.   And you knew Rodney Womble pretty well?
2      A.   I guess you could say.  I mean, I know him
3  from being in contact with him, but, I mean as well
4  as -- I mean, I don't know his background and his
5  history, no, I don't.
6      Q.   Well, he was making deliveries to you every
7  day?
8      A.   Yeah, but I don't know his background or
9  his history.  I know -- just know him from making
10  our transactions.
11     Q.   Bu you knew who his girlfriend Sherrell
12  was?
13     A.   Yes.
14     Q.   And you would call Mr. Womble on the phone
15  to get the drugs?
16     A.   Yes, sir.
17     Q.   And he would pick up the money from you?
18     A.   Or I would bring it by.
19     Q.   You would go to his house?
20     A.   Yes, sir.
21     Q.   And sometimes Sherrell would take the
22  money?
23     A.   Yes, she would.
24     Q.   And the drugs?  She would give you the
25  drugs?
```

872

```
1      A.   Yes.
2      Q.   And you told the agents that Rodney Womble
3  told you to keep a table leg in apartment 211?
4      A.   Yes.
5      Q.   And that table leg was long and round?
6      A.   Yes.
7      Q.   It had a square top to it?
8      A.   Yes, it did.
9      Q.   It had some tape wrapped around it?
10     A.   I don't remember.  But I know, yeah, its
11  head was big and it was round, yes, and it had the
12  screws at the top of it.
13     Q.   Screws at the top?
14     A.   Yes.
15     Q.   And Mr. Womble told you to keep that table
16  leg there?
17     A.   Yes.
18     Q.   Now, again, on August 30, 2005, you didn't
19  mention again Rodney Womble to the agents, right?
20     A.   No.
21     Q.   And you didn't say anything about Big Man?
22     A.   Not that I recall.
23     Q.   Big Man is Rodney Womble, right?
24     A.   Yes.
25     Q.   And again, on September 23rd, you didn't
```

873

1  say anything to him about the agents?
2      A.   Not that I recall.
3      Q.   And then when you finally did talk to the
4  agents you told them that he was out of town at the
5  time of the murders?
6      A.   From my knowledge.  That's what I was told.
7      Q.   And you believe he was out of town?
8      A.   From my knowledge.  That's what I was told.
9  So, I didn't see him.  I didn't see him in town.
10     Q.   And, again, you claim you never threw a
11 table leg to Rodney Womble during an argument with
12 Tina Johnson?
13     A.   Exactly.
14     Q.   I want to go back to talking to you a
15 little bit about your prior convictions.  You were
16 arrested in -- you were convicted in 1997 for sale
17 of narcotics, right?
18     A.   Yes, sir.
19     Q.   And you were sentenced to two years in
20 prison?
21     A.   Yes.
22     Q.   You got out of prison, right?
23     A.   Yep.
24     Q.   And went back to selling drugs?
25     A.   Yes, sir.

874

1      Q.   So in March of 2000 you were arrested
2  again, correct?
3      A.   Correct.
4      Q.   And you were convicted in July of 2000 for
5  sale of narcotics?
6      A.   Yes.
7      Q.   And you were sentenced to prison for three
8  years?
9      A.   Yes.
10     Q.   And you got out of prison?
11     A.   Yes.
12     Q.   And you were convicted of a Larceny Six on
13 June 17, 2003?
14     A.   Yes.
15     Q.   And that was in connection with your job?
16     A.   Yes.
17     Q.   You were fired from that job?
18     A.   Mutual agreement.  Fired, if you want to
19 say.
20     Q.   But it was over the larceny?
21     A.   Yes.
22     Q.   Okay.  Now, you served -- we talked about
23 some time on this case?
24     A.   Yes.
25     Q.   And when you pled guilty, those prior

875

1  convictions we talked about, the agents told you
2  that was trouble for you?
3      A.   Per guidelines, yes.
4      Q.   Right, because they could mean that the
5  government could choose to file enhancements that
6  would mean you would spend the rest of your life in
7  prison if you were convicted?
8      A.   Yes, sir.
9      Q.   And you knew that?
10     A.   Yes, sir.
11     Q.   When you were talking to the agents?
12     A.   Yes, sir.
13     Q.   Now, eventually in this case you were
14 released on bond?
15     A.   Yes.
16     Q.   That's a couple -- about a year go now?
17     A.   Yes.  No, close to two.
18     Q.   Close to two years.  Okay, so you served
19 only about four years; is that right?
20     A.   Correct.
21     Q.   Now, you made promises to the government
22 when you got out on bond, right?
23     A.   Yes, sir.
24     Q.   And you made promises to government when
25 you pled guilty.

876

1      A.   Yes, sir.
2      Q.   And you made promises to the court.
3      A.   Yes, sir.
4      Q.   And one of the promises you made to the
5  court was not to break the law.
6      A.   Yes, sir.
7      Q.   Because you knew if you broke the law the
8  all deals could be off.
9      A.   Exactly.
10     Q.   And -- but that would be up to the
11 government.
12     A.   Yes.
13     Q.   But then you broke the law.
14     A.   Yes.
15     Q.   You had two positive drug tests, right?
16     A.   Yes, I did.
17     Q.   And you were confronted with these tests by
18 your probation officer.
19     A.   Yes, I was.
20     Q.   Nicole Owens?
21     A.   Yes.
22     Q.   And when you were confronted with these
23 results you lied to her, didn't you?
24     A.   Yes, I did.
25     Q.   So multiple lies to a court officer; is

877

```
1    that right?
2         A.   Yes.
3         Q.   But the magistrate didn't lock you up.
4         A.   No.
5         Q.   For violating your bond.
6         A.   No.
7         Q.   And the government didn't pull the deal.
8         A.   No.
9         Q.   Even though you committed a crime.
10        A.   No.
11        Q.   And they told you you have to admit to the
12   usage.
13        A.   Well, they put me in a program.
14        Q.   The government told you you had to admit to
15   using drugs.
16        A.   Exactly.
17        Q.   While on bond.
18        A.   Yes.
19        Q.   Otherwise you are no good to them as a
20   cooperator.
21        A.   Right.
22        Q.   And it was only then that you admitted
23   usage to the drugs.
24        A.   Yes.
25        Q.   And then you said -- it was at that point
```

878

```
1    that you said you relapsed.
2         A.   Yes.
3         Q.   Because previously you denied using at all.
4         A.   Right.
5         Q.   So when you knew that was what you had to
6    say and you wouldn't get hurt by it, then you knew
7    that your lies didn't matter, right?
8         A.   That my lies didn't matter?
9         Q.   Right.
10        A.   No, I had to tell the truth.  I had to
11   admit to my transgressions, my faults, my relapses
12   my usage.
13        Q.   But you were allowed to lie to the court
14   officer.
15             MS. DAYTON:  Objection.
16             THE COURT:  It's cross-examination.
17             MS. DAYTON:  Allowed by whom?  He just
18   testified that he told the truth about it.
19             THE COURT:  Could you clarify your
20   question, Mr. Smith.  And in particularly who "court
21   officer" is.
22        Q.   You lied to Nicole Owens, correct?
23        A.   Initially, yes, I did.
24        Q.   And then the government said you can't do
25   that, right?
```

879

```
1         A.   The government?
2         Q.   Yes.
3         A.   I admitted to Nicole on our own.  There
4    wasn't no prosecution.  There wasn't nobody from the
5    government involved when I admitted to her.  Me and
6    her talked.  I don't know if you include her as part
7    of the government, but me and her hashed things out,
8    then she explained certain things to me.  So, I
9    admitted to her.  Now, is anybody from the
10   prosecutor table sitting there that was in the room
11   with us?  No.
12        Q.   But you met with the government after that?
13        A.   Yes.
14        Q.   And they didn't tell you they were pulling
15   the deal for you using drugs, right?
16        A.   Right.
17        Q.   Which means you possessed drugs.
18        A.   Yes.
19        Q.   Correct?  And was illegal.
20        A.   Yes.
21        Q.   And that was a new crime.
22        A.   Yes.
23        Q.   Under the cooperation agreement --
24        A.   Yes.
25        Q.   -- if you commit a new crime the government
```

880

```
1    can pull the deal.
2         A.   Yes.
3         Q.   They didn't do that.
4         A.   No.
5         Q.   And you are here testifying today under
6    that cooperation agreement.
7         A.   Yes, sir.
8         Q.   And you sincerely hope that you don't have
9    to go back to prison, correct?
10        A.   Correct.
11        Q.   And, in fact, you are expecting that if all
12   goes well you won't go back to prison.
13        A.   Exactly.
14             MR. SMITH:  May I have just a moment
15   your Honor?
16             THE COURT:  Yes.
17        Q.   Just one other thing.  Mr. Hodges, when
18   you -- you said that the person who came to the
19   apartment the morning of the murders had dreads
20   about this long --
21        A.   Yes.
22        Q.   -- you indicated.  That's shoulder length?
23        A.   Yeah, about shoulder length.
24        Q.   Okay.
25        A.   Or they could have been pulled back.  But I
```

881

```
1    mean -- he had a hat on, so, I mean it could have
2    been just one braid just straight back hanging off
3    his shoulders.  But they longer than mines.
4         Q.   Okay.  When you were shown a photo of him,
5    the agents didn't show you a photo lineup, did they?
6         A.   I saw the photo here, so --
7         Q.   No, I know that, but they didn't show you
8    that photo along with eight other photos?
9         A.   No, they didn't.
10        Q.   They just showed you that photo?
11        A.   Yes.
12        Q.   And said, is that the guy who appeared
13   there that morning?
14        A.   Yes.
15        Q.   And you said yes, correct?
16        A.   Yes, yes.
17             MR. SMITH:  I have nothing further, your
18   Honor.  Thank you.
19             THE COURT:  All right, redirect.
20             MS. DAYTON:  Thank you, your Honor.
21   REDIRECT EXAMINATION
22   BY MS. DAYTON:
23        Q.   Good afternoon, Mr. Hodges, again.
24        A.   Good afternoon.
25        Q.   Mr. Hodges, were you shown a lot of
```

882

```
1    photographs?
2         A.   I was shown several.
3         Q.   Sort of like you were in court today?
4         A.   Yes.
5         Q.   And when you were shown those photographs,
6    were you told who the people were in the
7    photographs?
8         A.   Not at all.
9         Q.   Were you asked if you recognized them?
10        A.   Just if I recognized them or if I knew who
11   was who.  Not that, you know, is this such and such.
12   No one asked me is this that person or that person.
13   Just is this who this is, who this is, and this who
14   this is, so --
15        Q.   And were there some photographs that you
16   just didn't recognize?
17        A.   Yes, sir -- yes, ma'am.
18        Q.   And did the government tell you who those
19   people were?
20        A.   Not at all.
21        Q.   Counsel asked you a number of questions
22   about you being interviewed by first Detective
23   DelMonte and then by the FBI and then by the FBI
24   with the government.  Do you remember that series of
25   questions?
```

883

```
1         A.   Yes.
2         Q.   Okay.  And you recall that you were
3    arrested on September 23rd of 2005?
4         A.   Yes, ma'am.
5         Q.   Before you were arrested, like when you
6    spoke to Detective DelMonte in August of 2005, did
7    you --
8         A.   Right.
9         Q.   -- did you have an attorney?
10        A.   No, I didn't.
11        Q.   When you got arrested by the feds, as Mr.
12   Smith said, did you get an attorney appointed to
13   you?
14        A.   Mr. Riccio.
15        Q.   Is he in court today?
16        A.   Yes, he is.
17        Q.   Okay.  And after Mr. Riccio began
18   representing you, did you meet with agents and the
19   government?
20        A.   Yes.
21        Q.   And you were asked several questions about
22   an interview that occurred five days after your
23   arrest on September 28, 2005.  Do you remember that?
24        A.   Yes.
25        Q.   When you met with the government and the
```

884

```
1    agents then, did the agents take notes?
2         A.   I think so.
3         Q.   Did you review those notes?
4         A.   No, ma'am.
5         Q.   Did you review their report for accuracy?
6         A.   Not at all.
7         Q.   So, you don't know if they wrote down what
8    you said correctly?
9         A.   Yes, ma'am, I don't have any idea if they
10   wrote it down correctly or not.
11        Q.   When you were interviewed on that day in
12   September 28, 2005, did you talk about the
13   defendant?
14        A.   Yes.
15        Q.   Did you talk about Womble?
16        A.   The little bit that I know about the
17   transactions, and that's about it.
18        Q.   About drug dealing?
19        A.   Yes.
20        Q.   And the other people you identified, Little
21   Man, Juanita Hopkins, Jackie Bryant, James Rucker,
22   the people whose photographs we went through, did
23   you talk about all of those people?
24        A.   Just our dealing.  What we had dealing --
25   my dealings with them, to what extent it was.
```

**GA221**

885

```
1      Q.   Was that first interview with your attorney
2  and prosecutors and the agents, would you say that
3  was longer or shorter than your interview with
4  Detective DelMonte a month earlier?
5      A.   Longer.
6      Q.   Significantly longer?
7      A.   Yes.
8      Q.   Now, did the agents tell what to you to say?
9      A.   No, ma'am.
10     Q.   Did the government tell you what to say?
11     A.   No, ma'am.
12     Q.   You have a cooperation agreement with the
13 government that counsel just asked you about?
14     A.   Yes, ma'am.
15     Q.   And you have violated that by using drugs;
16 is that correct?
17     A.   Yes, ma'am.
18     Q.   How long have you been struggling with your
19 addiction?
20     A.   Off and on -- well, first time was like
21 when I first got home and I ran into -- actually I
22 run into one of Juanita's cousins and they had said
23 that, you know, whoever is involved, they're coming
24 after the whole family.  So, it was like -- you
25 know, it's just I never put -- all of my dealings, I
```

886

```
1  never put my family in harms way, and it was, what
2  have I got my family into.  So, it was just panic
3  attack, nervous reactions, you know, just being in
4  the situation.
5      Q.   And you used drugs?
6      A.   Yes.
7      Q.   And you had another incident where you used
8  drugs?
9      A.   Yes.
10     Q.   Was there something that provoked the
11 second relapse?
12     A.   A family death.  It just sudden, just all
13 of a sudden it was just, wow, throat cancer, just
14 thought it was recession (sic) and just took him
15 right out.
16     Q.   Okay.  Are you clean as you sit here right
17 now?
18     A.   Yes, ma'am.
19     Q.   Are you in treatment still?
20     A.   Yes, ma'am.
21     Q.   Do you sell drugs still?
22     A.   No, ma'am.
23     Q.   Have you sold drugs since September of 2005
24 when you were arrested.
25     A.   Not at all.
```

887

```
1      Q.   You've been asked a lot of questions about
2  prison.  Were you locked in your cell 24 hours a
3  day?
4      A.   No, ma'am.
5      Q.   Did you have any recreation?
6      A.   Some.  Not a lot.  Just no bigger than this
7  room.
8      Q.   A basketball court?
9      A.   Smaller than this room.
10     Q.   And are you allowed to go outside?
11     A.   When the weather permits.
12     Q.   Which is sort of like everybody, right?
13     A.   Yes.
14     Q.   And did you eat three meals a day, good
15 food or not?
16     A.   Yes.
17     Q.   And were you allowed to socialize with
18 other people, talk to other people?
19     A.   Yes.
20     Q.   Did you watch TV?
21     A.   Yes.
22     Q.   But fair to say, regardless of what you
23 were allowed to do, you don't want to go back.
24     A.   Exactly.
25     Q.   So, you have this cooperation agreement.
```

888

```
1  And what does that agreement require you to do?
2      A.   Just to tell the truth to the best of my
3  ability.
4      Q.   I'm going to ask you one more question.
5  Counsel talked to you a lot at the beginning about
6  assuming the risk of certain things happening to
7  you.  Like you said, you assumed the risk of getting
8  robbed.
9      A.   Right.
10     Q.   Or getting arrested.
11     A.   Yes.
12     Q.   Did you assume the risk that you would be
13 bound and gagged with duct tape and bludgeoned to
14 death with a baseball bats?
15          MR. SMITH:  Object.
16          THE COURT:  Sustained.
17          MS. DAYTON:  I have nothing further,
18 your Honor.  Thank you.
19          Thank you, Mr. Hodges.
20          THE COURT:  Any recross.
21 RECROSS-EXAMINATION
22 BY MR. SMITH:
23     Q.   Mr. Hodges, the U.S. attorney was asking
24 you about your cooperation agreement.  It's your
25 understanding that if the government doesn't believe
```

889

```
1   you the deal is off.
2       A.   Well, it's all up to the sentencing judge,
3   so --
4       Q.   But the cooperation agreement, if the
5   government doesn't believe you've testified
6   truthfully, they can pull the deal.
7       A.   Yes.
8            MR. SMITH:  Okay, nothing further, your
9   Honor.
10           THE COURT:  All right, anything further?
11           MS. DAYTON:  No.  Thank you, your Honor.
12           THE COURT:  All right, thank you, Mr.
13  Hodges.  You may step down.  You are excused.  Will
14  the government please call its next witness.
15           MS. DAYTON:  We're actually going to
16  call Frank Riccio, your Honor.
17           THE COURT:  All right.
18            F R A N K   R I C C I O,
19  Having first affirmed, was examined and testified as
20  follows:
21           THE WITNESS:  Yes, Frank Riccio,
22  r-i-c-c-i-o, (address redacted).
23           THE COURT:  Not your address, just your
24  town of residence.
25           THE WITNESS:  My practice law is in
```

890

```
1   Bridgeport, Connecticut.
2            THE COURT:  You may proceed.
3            MS. DAYTON:  Thank you.
4   DIRECT EXAMINATION BY
5   BY MS. DAYTON:
6       Q.   Good afternoon, Mr. Riccio.  How are you?
7       A.   Good afternoon.
8       Q.   What do you do for a living?
9       A.   I practice law.
10      Q.   How long have you done that?
11      A.   Since 1968.
12      Q.   Okay.  So you started, what, yesterday, the
13  day before?
14      A.   A couple weeks ago.
15      Q.   Do you have your own practice or do you
16  practice with somebody?
17      A.   I have my own practice, but my son is part
18  of that practice with me.
19      Q.   What's his name?
20      A.   His name is Frank Jr.
21      Q.   Frank Riccio Jr.?
22      A.   Frank Riccio Jr.
23      Q.   And do you represent someone in this case?
24      A.   Absolutely, Frankie Hodges.
25      Q.   How long have you represented him?
```

891

```
1       A.   Since the day of his presentment before
2   Magistrate Margolis I believe.
3       Q.   So since September of 2005?
4       A.   Correct.
5       Q.   You've been with him the whole time?
6       A.   I have.
7       Q.   And were you present with him when he was
8   arraigned on the indictment in this case?
9       A.   I was.
10      Q.   And were you present with him when he pled
11  guilty?
12      A.   I was.
13      Q.   And were you present with him when he pled
14  guilty -- or signed the cooperation agreement?
15      A.   Yes.
16      Q.   And have you been present with him at all
17  of the government interviews of Mr. Hodges?
18      A.   Each and every one.
19      Q.   Do you know this person sitting right here
20  in the middle in the blue shirt with the long hair?
21      A.   I can't see him.  But I didn't recognize
22  him when I walked by.  No.
23      Q.   You don't know him, okay.  Have you ever
24  heard the name Azibo Aquart?
25      A.   I have heard the name, yes.
```

892

```
1       Q.   And how have you heard that name?
2       A.   It arose during the course of the -- what
3   I've learned about the drug dealing of Mr. Hodges,
4   from which he originally --
5            MR. SHEEHAN:  Well, I'm going to object
6   to that, your Honor.  I think it's eliciting -- if
7   he wants to say I know he's a defendant in this
8   case, that's fine.  Anything else would be eliciting
9   hearsay.
10           MS. DAYTON:  It's not offered for the
11  truth of the matter asserted.
12           MR. SHEEHAN:  Whether it's offered for
13  the truth --
14           THE COURT:  Okay, you are going to need
15  to make more specific from the question what it is
16  that will reveal the purpose of the question.
17           MS. DAYTON:  Okay.
18      Q.   Did you receive a letter from someone named
19  Azibo Aquart?
20      A.   I did.
21           MR. SHEEHAN:  I'm going to object, your
22  Honor.  I don't think there is a proper foundation
23  for him to answer that question.
24           MS. DAYTON:  And I would like to
25  approach.
```

**GA223**

893

```
1              THE COURT:  All right.
2              (Sidebar conference)
3              MR. SHEEHAN:  Your Honor, they're
4    intending, I take it, to offer a letter that was
5    sent to Mr. Riccio.  I don't think that they can
6    establish that that letter came from Mr. Aquart
7    through Attorney Riccio.  Attorney Riccio does not
8    know Mr. Aquart, he's not familiar with his
9    handwriting.  It would be -- he's not a proper
10   person to authenticate this letter.  If they want to
11   mark it for identification, that's fine.
12             MS. DAYTON:  Your Honor, first of all,
13   counsel has had this letter for some time and has
14   failed to object to it.  We talked about it, we had
15   a motion about what letters we sought to admit, and
16   this was one of them listed from the jump, and there
17   was no objection raised, number one.
18             Number two, the letter is written from
19   Azibo Aquart at Cheshire and lists his prisoner
20   number.  He says "my name is Azibo Smith," which is
21   the other name he goes by because his mother was
22   named Smith.  He signs it with his name and he
23   discusses Frank Hodges and the building.  It is
24   admissible.  How much -- they may say it has not a
25   lot of weight, but it's admissible.
```

894

```
1              THE COURT:  Okay, you say that because
2    he doesn't know the signature of Mr. Aquart that
3    this letter is not admissible, it's lacking a
4    foundation.
5              MR. SHEEHAN:  Yes, your Honor.
6              THE COURT:  And if his testimony is that
7    he received this letter in this form purporting to
8    be from an Azibo Aquart, why is that not relevant?
9              MR. SHEEHAN:  Purporting to be?
10             THE COURT:  Yes.
11             MR. SHEEHAN:  I don't think that makes
12   it relevant, your Honor.  It would be relevant if it
13   was from Mr. Aquart arguably.
14             THE COURT:  Well, is it not arguably
15   from Mr. Aquart?
16             MS. DAYTON:  Yes.
17             MR. SHEEHAN:  I don't think they've
18   established a proper foundation that it is.
19             THE COURT:  If they establish the
20   foundation that he got a letter from someone with a
21   particular inmate number.
22             MR. SHEEHAN:  Anybody could --
23             THE COURT:  From a prison.
24             MR. SHEEHAN:  Anybody could use that
25   inmate number.  Just like anybody could use my name
```

895

```
1    or your name.
2              MS. DAYTON:  First of all, they could
3    cross him on this.  Secondly, this should have been
4    objected to months ago when we had in limine
5    motions, and it wasn't.  And the letter --
6              THE COURT:  Let's work on the substance
7    of the objection.  Why isn't it an appropriate area
8    for cross-examination that he's never met him, he's
9    never seen any documents from him, he's never talked
10   to him, he doesn't have any idea whether this was
11   really sent to him by Azibo Aquart or somebody
12   trying to set him up?  Why is that not the
13   appropriate way to get to what you claim is a lack
14   of foundation?  The foundation being I received this
15   letter, this is the form I received it, this is the
16   envelope I received it in, this is the date I
17   received it.
18             MR. SHEEHAN:  The question, your Honor,
19   assumes he received the letter from Azibo Aquart.
20   They didn't ask him did you get a letter.  They're
21   operating -- they're asking him to conclude that he
22   got a letter from somebody named Azibo Aquart.  What
23   he did was he got a letter.  I don't think that this
24   witness can testify that he got a letter from Azibo
25   Aquart.  I don't think that there is proper
```

896

```
1    foundation for that.  I think that -- and otherwise
2    I don't think it's admissible.  I don't think it
3    becomes a matter of argument that -- I'm arguing
4    against something that's not admissible.
5              THE COURT:  So, if the basis of the
6    offer is that he received mail from an inmate in a
7    Connecticut correctional facility.
8              MR. SHEEHAN:  Well, I don't know if he
9    got it from an inmate.  He got it --
10             THE COURT:  But it says -- it was
11   stamped.
12             MR. SHEEHAN:  Do you know what, I really
13   don't interrupt you, do I?
14             THE COURT:  Please.  Please.
15             MS. DAYTON:  I talked to Justin about
16   this this morning and I said we made copies for the
17   entire jury, can we hand it out.  He had no
18   objection.  So this comes as a bit of a surprise to
19   the government.
20             MR. SHEEHAN:  Well, I'm sorry you are
21   surprised.
22             THE COURT:  It seems to me that it bears
23   its own indicia that it came from an inmate at a
24   correctional facility.  And I'm pointing to the
25   envelope.
```

**GA224**

897

1          MR. SHEEHAN:  I see that, your Honor.
2          THE COURT:  And then thereafter it
3    contains information that appears on here.  I take
4    it this is just a photocopy of the envelope.
5          MS. DAYTON:  Yep.
6          THE COURT:  So that wasn't received.
7          MS. DAYTON:  No, he faxed it like that
8    to the U.S. attorney's office.
9          THE COURT:  I'm not seeing the basis for
10   excluding this.  I certainly will let you
11   cross-examine on this, but I don't see the basis for
12   excluding it as having been received from an inmate
13   who signed as Azibo Aquart so long as the question
14   is not did he receive it from Azibo Aquart.
15         MS. DAYTON:  Okay.
16         THE COURT:  Okay.
17         MS. DAYTON:  I have made copies, as I
18   said, for the jury, it's very small print, to hand
19   out as we go through it.  It's very difficult to
20   read on an ELMO or anything else, and I'm going to
21   seek to admit it into evidence and to publish it,
22   not by having each one look at it, but giving it,
23   much like we would a transcript.
24         THE COURT:  And would you make sure the
25   copies get collected.

898

1          MS. DAYTON:  Of course.  Thank you.
2          (Sidebar concluded)
3    Q.   I apologize for the break.  Did you receive
4    a letter from an inmate?
5    A.   Yes.
6    Q.   And what prison did it come from?
7    A.   It came from Cheshire Correctional in
8    Cheshire, Connecticut.
9    Q.   And did the -- was there an inmate name on
10   there?
11   A.   Yes, the name on the envelope and also the
12   letter is Azibo Aquart, Inmate No. 252837.
13   Q.   And the name is on the outside of the
14   envelope; like a return address, in other words?
15   A.   Yes.
16   Q.   And to whom was the letter addressed?
17   A.   It was addressed to me.
18   Q.   How many pages long is the letter?
19   A.   It's two, I believe.  Actually -- yeah,
20   it's two, and the third page happens to be just a
21   photocopy of the envelope.
22   Q.   Is that an accurate representation -- or is
23   that the actual letter that you got?
24   A.   That is the actual letter I received.
25   Q.   How did it get to court today?

899

1    A.   I brought from my office.  I hadn't touched
2    it since 2006 when I faxed it up to the U.S.
3    attorney's office, Mr. Glasser.
4    Q.   A previous U.S. attorney?
5    A.   Previous U.S. attorney.  And it's been in
6    my file since.
7    Q.   And you brought it to court today?
8    A.   I brought it to court today.
9          MS. DAYTON:  Your Honor, at this point I
10   would ask that the letter be admitted into evidence
11   it's Government's Exhibit 512.
12         MR. SHEEHAN:  My objection remains the
13   same, your Honor.
14         THE COURT:  Thank you.  All right, over
15   objection, it is admitted.
16         MS. DAYTON:  Your Honor, at this time
17   I'm going to ask to publish it to the jury.  As we
18   discussed at sidebar, I'll hand out copies because
19   it's small print.
20         THE COURT:  You may.
21         Ladies and gentlemen, you will need to
22   make sure you don't leave the courtroom today with
23   the copy.  You will have the original 512 in the
24   jury room with when your deliberation.
25   Q.   You have the original in front of you?

900

1    A.   I do.
2    Q.   So, pointing to law offices of Mr. Frank J.
3    Riccio, is that your address still?
4    A.   It is.
5    Q.   And where on the letter do you see that it
6    comes from a Connecticut correctional facility?
7          MR. SHEEHAN:  I'm going to object, your
8    Honor.  He's characterizing the document.  The jury
9    can look at the document.  He doesn't need Attorney
10   Riccio to explain what the document says in front of
11   the jury.
12         THE COURT:  All right.
13         MS. DAYTON:  Your Honor, I think that
14   some people are not familiar with mail from prisons.
15         THE COURT:  If you want to -- your
16   question is how does he know it comes from --
17         MS. DAYTON:  A correctional facility.
18         THE COURT:  -- a correctional facility.
19   Ask that question.
20   Q.   How did you know?
21   A.   Because of what is on the left, upper left
22   front of the envelope.
23   Q.   Right here?
24   A.   Correct.
25   Q.   And this number here, is that the one that

901

1　you were reading?
2　　A.　Yes, and I compared that with the one
3　inside the letter.　It's the same number.
4　　Q.　And that's what you referred to as the
5　inmate number?
6　　A.　Correct.
7　　Q.　Opening the letter to the first page it
8　refers to Frank Hodges.　That's your client that you
9　were just discussing?
10　　A.　It is.
11　　Q.　I just wanted to ask you a couple
12　questions.　Here, paragraph two, it says "I don't
13　know if you recall, but I was trying to obtain your
14　services for my own defense."　Were you contacted by
15　the defendant?
16　　A.　Do you know, I do not recall.　Every time
17　an indictment comes down if we get a CJA appointment
18　from the court, there is -- multiple defendants,
19　many times their families will call to determine if
20　you are available to represent them.　So, it's
21　possible.　Do I remember?　No, I don't.
22　　Q.　Can you represent two defendants in one
23　case?
24　　A.　No, you cannot.
25　　Q.　And was this defendant charged with Frank

902

1　Hodges?
2　　A.　Yes, in the initial indictment, correct.
3　　Q.　In the drug conspiracy?
4　　A.　Drug conspiracy.
5　　Q.　In the third paragraph it talks about
6　official reports you were probably unaware of.　Do
7　you see that?
8　　A.　Yes.
9　　Q.　Do you know what the writer is speaking
10　about there?
11　　　　MR. SHEEHAN:　I'm going to object your
12　Honor.　He can't characterize what the writer is
13　speaking about. The jury can read the report.
14　　　　THE COURT:　I'll sustain the objection.
15　　Q.　The writer of this gave you some advice.
16　Did you follow it?
17　　A.　Never.
18　　Q.　And just turning to the last page, the
19　writer asked you to send a letter or a
20　self-addressed stamped envelope to him for some
21　items.　Did you do that?
22　　A.　Did not.
23　　Q.　Did you write down here "Azibo Aquart" and
24　the inmate number and "Cheshire" and all this?
25　　A.　No, I did not.

903

1　　Q.　So it came like this?
2　　A.　As far as I can recall.
3　　Q.　And you didn't sign this "truly yours," the
4　signature underneath?
5　　A.　Oh, no.
6　　　　MS. DAYTON:　Your Honor, at this time I
7　would just ask that the jury be given time to read
8　the letter.
9　　　　THE COURT:　All right, are you all
10　finished?　Would you hand the copies up, please, to
11　Ms. Torday.
12　　Q.　Mr. Riccio, there is a stamp at the bottom
13　of the first page.
14　　A.　Yes.
15　　Q.　What is that?
16　　A.　It's a date stamp.　Every piece of
17　correspondence that comes into my office is stamped
18　with the date and the year that it comes in.　The
19　month, date and year.
20　　Q.　When did you receive this letter?
21　　A.　September 13, 2006.
22　　Q.　Okay.　And then just turning your attention
23　back to the front page, have you ever had a client
24　at Cheshire Correctional Institute?
25　　A.　I have, yes, many times.

904

1　　Q.　Many times?
2　　A.　Many times.
3　　Q.　And is this what the mail looks like when
4　it comes from that location?
5　　A.　Yes.
6　　Q.　And is this where Cheshire Correctional is?
7　Is this the proper address, 900 Highland Avenue?
8　　A.　It is.
9　　Q.　In Cheshire, Connecticut?
10　　A.　It is.
11　　Q.　Thank you.
12　　　　MS. DAYTON:　I have nothing further at
13　this time, your Honor.
14　　　　THE COURT:　All right,
15　cross-examination.
16　CROSS-EXAMINATION
17　BY MR. SHEEHAN:
18　　Q.　Good afternoon, Attorney Riccio.
19　　A.　Good afternoon, Mr. Sheehan.
20　　Q.　How are you doing?
21　　A.　I'm doing fine.
22　　Q.　Good.　Attorney Dayton asked you about your
23　representation of Mr. Hodge.
24　　A.　Yes.
25　　Q.　Mr. Hodges.　And in the course of that

**GA226**

905

```
1   representation, you had multiple sit-downs with the
2   government, did you not?
3       A.   That is correct.
4       Q.   And did you ever -- were you ever provided
5   a copy of the 302s, the government reports of those
6   sit-downs?
7       A.   Those are never provided.
8       Q.   Okay.  And when your client was arrested on
9   September 23rd, you got evidence -- you talked to
10  the government about the posture of the case, did
11  you not?
12      A.   Yes.  As we normally do, yes.
13      Q.   And you were aware at that point in time
14  that your client had already given a statement to
15  the police back on August 30th.
16      A.   Not until after the presentment.
17      Q.   Okay.  By the time the presentment was
18  over, you knew that he had already given a
19  statement?
20      A.   Sometime during that day, yeah, that is
21  correct.
22      Q.   And in the course of that statement, you
23  had been informed that he had basically --
24      A.   Given it up.
25      Q.   Given it up?
```

906

```
1       A.   Right.
2       Q.   And you knew, as an experienced federal
3   practitioner, that at that point in time, with Mr.
4   Hodges' record, he was really looking at life
5   potentially?
6       A.   Well, we didn't have the guidelines at that
7   point, we hadn't factored them in, but it was -- he
8   was -- it was either going to be a 10- or 20-year
9   mandatory minimum.
10      Q.   Okay.  And if he had two prior convictions?
11      A.   It would be --
12      Q.   Life, right?
13      A.   Yes.
14      Q.   And that was the situation as of very early
15  in the case for Mr. Hodges?  That's what he was
16  looking at?
17      A.   That is correct.
18           MR. SHEEHAN:  I don't have any further
19  questions.
20           THE COURT:  Anything further?
21           MS. DAYTON:  No.  Thank you, your Honor.
22           THE COURT:  All right, thank you,
23  Attorney Riccio.  You may step down.  You are
24  excused.
25           All right, will you please call your
```

907

```
1   next witness.
2            MS. RODRIGUEZ-COSS:  Yes, your Honor.
3   The government calls Officer Orlando Rosado.
4            THE COURT:  All right, sir, would you
5   please take the witness stand, remain standing,
6   raise your right hand.
7         O R L A N D O   R O S A D O
8   Having first affirmed, was examined and testified as
9   follows:
10           THE WITNESS:  Orlando Rosado,
11  r-o-s-a-d-o, and 300 Congress Street, Bridgeport,
12  Connecticut.
13           THE COURT:  That's your business
14  address?
15           THE WITNESS:  Yes.
16           THE COURT:  Okay.
17  DIRECT EXAMINATION
18  BY MR. RODRIGUEZ-COSS:
19      Q.   Officer Rosado, where are you currently
20  employed?
21      A.   I'm currently employed for the City of
22  Bridgeport Police Department.
23      Q.   And how long have you been employed in that
24  capacity?
25      A.   Approximately 13 years.
```

908

```
1       Q.   All right.  And where are you currently
2   assigned, to what division?
3       A.   I'm currently assigned to tactical
4   narcotics.
5       Q.   What are your duties with the unit of
6   tactical narcotics?
7       A.   My duties primarily are investigating
8   narcotics sales and activities within the City of
9   Bridgeport.
10      Q.   And how long have you been with that unit?
11      A.   Approximately eight years.
12      Q.   All right.  So, I want to bring your
13  attention to March 31st of 2005.  Were you assigned
14  to the tactical narcotics unit at that time?
15      A.   Yes.
16      Q.   Can you tell the members of the jury, what
17  were your duties on March 31, 2005?
18      A.   I was assigned as the evidence recovery
19  officer.
20      Q.   For what?
21      A.   For an investigation at an apartment 215
22  Charles Street.
23      Q.   And do you recall what apartment you were
24  going to intervene at?
25      A.   211.
```

**GA227**

909

```
1    Q.   And what was the nature of your
2  intervention that date?
3    A.   We had a search warrant, and my specific
4  job was to take evidence that was recovered from the
5  apartment.
6    Q.   Okay.  And did you actually execute that
7  search warrant on that day?
8    A.   Yes, it was executed.
9    Q.   Can you describe to the members of the jury
10 what happened once you arrived at apartment 211 at
11 215 Charles Street?
12   A.   Once we arrived there, we knocked on the
13 apartment door.  After getting no response, an entry
14 was made.  There were six people in the apartment
15 and they were all detained.
16   Q.   So, when you say a forced entry was made,
17 can you be more specific?
18   A.   We used, I guess, a battering ram to hit
19 the door.
20   Q.   I see.  So, there were people inside the
21 apartment?
22   A.   Yes.
23   Q.   All right.  And once you made entry, what
24 did you do?
25   A.   Well, once we made entry, we secured the
```

910

```
1  apartment for persons within the apartment.  They
2  were patted down and then placed in one area to
3  contain them.
4    Q.   All right.  And what, if anything, of
5  significance did you seize within the apartment that
6  day?
7    A.   There was drug paraphernalia, and then we
8  located a ceramic rabbit that contained 33 Ziploc
9  bags of what later turned out to be cocaine.
10       MR. SHEEHAN:  I'm going to object.
11 There never was any testing in this case.
12       MS. RODRIGUEZ-COSS:  May I inquire your
13 Honor?
14       THE COURT:  The objection is sustained,
15 the answer is struck and you may establish the
16 foundation for that.
17       MS. RODRIGUEZ-COSS:  Yes, ma'am.
18   Q.   First of all, how many times have you been
19 involved in a search and seizure operation where you
20 have had the opportunity to seizure crack cocaine?
21   A.   Hundreds.
22   Q.   And how many opportunities have you had
23 yourself to personally examine that evidence?
24   A.   Close to hundreds.
25   Q.   And have you received any training to
```

911

```
1  conduct any sort of field testing on narcotics that
2  you seized during your search and seizures?
3    A.   Yes.
4    Q.   And what sort of training have you
5  received?
6    A.   Training through my academy how to test
7  various narcotics with testers that we have.
8    Q.   And can you describe -- when I use the term
9  "field test," Officer Rosado, can you describe to
10 the members of the jury what I'm referring to.
11   A.   A field test is a test that we do that
12 determines the type of narcotic that we've located.
13 It's -- usually we take a small sample, we place it
14 in a tube and then it either tests positive for
15 whatever narcotics we've seized.
16   Q.   And approximately in how many occasions
17 have you conducted such field tests on narcotics
18 that you have seized?
19   A.   Hundreds.
20   Q.   And specifically -- now bringing your
21 attention to the items that you seized, the 33
22 baggies that you seized on March 31, 2005, did you
23 conduct a field test on that?
24   A.   Yes.
25   Q.   All right.  And what was the result of that
```

912

```
1  field test?
2    A.   It was positive.
3        MR. SHEEHAN:  Your Honor, I'm going to
4  object.  May we approach?
5        THE COURT:  Yes.
6        (Sidebar conference)
7        MR. SHEEHAN:  Your Honor, as counsel
8  well knows, a field test does not establish the
9  presence of cocaine.  There was never any lab
10 testing done on these materials.  The materials were
11 destroyed.
12       MS. RODRIGUEZ-COSS:  Your Honor, a field
13 test provides an initial indication as to the
14 substance of -- that's contained in the material,
15 whether it's cocaine, whether it's heroin or whether
16 it's marijuana.  Now, counsel may argue that it goes
17 to the weight of the testimony, but certainly not to
18 the admissibility.  He is a trained officer who has
19 conducted such a field test on many occasions.  It
20 is something that is regularly used by officers to
21 identify the substance that they are dealing with,
22 and certainly he can testify as to what the result
23 of the field test was.
24       MR. SHEEHAN:  And, your Honor, as the
25 government knows, while a field test is used, it's
```

913

1    not evidence of the presence of cocaine.  The
2    evidence has to come through the lab tests which
3    were not done in this case.  They can't
4    short-circuit the whole process.
5            MS. RODRIGUEZ-COSS:  That is absolutely
6    not correct.
7            THE COURT:  Okay, is it not correct that
8    police training takes the field test results and
9    calls it a presumptive positive?
10           MR. SHEEHAN:  They do, your Honor.
11           THE COURT:  And --
12           MR. SHEEHAN:  But that's why they send
13   it to the lab.
14           THE COURT:  Okay.  And then your
15   cross-examination is it's not conclusive, it was
16   never sent to the lab and it was destroyed.
17           MR. SHEEHAN:  But he's now testifying --
18   if he's testifying that it's cocaine, he has to have
19   an appropriate basis for that, and the presumption
20   does not establish.
21           THE COURT:  It's presumptively cocaine.
22           MR. SHEEHAN:  According to the police,
23   but that doesn't make it -- that doesn't make it
24   admissible as cocaine.
25           MS. RODRIGUEZ-COSS:  Your Honor?

914

1            THE COURT:  But --
2            MR. SHEEHAN:  They have their own
3    standards.  They set their standards, but they're
4    not scientific standards, your Honor.
5            THE COURT:  But --
6            MR. SHEEHAN:  It's --
7            THE COURT:  When you say it's not
8    admissible as cocaine, you are not offering the
9    drugs, are you?
10           MS. RODRIGUEZ-COSS:  No, we're not
11   bringing in the narcotics.  We don't have them.
12           THE COURT:  They were destroyed.
13           MS. RODRIGUEZ-COSS:  Right.
14           MR. SHEEHAN:  What they're offering
15   through this officer is the testimony that it was,
16   in fact, cocaine.  There're no bones about it,
17   that's what they're offering.
18           THE COURT:  That it tested -- it gave a
19   presumptive positive for the presence of cocaine.
20           MR. SHEEHAN:  But that's only relevant
21   if it is cocaine.
22           MS. RODRIGUEZ-COSS:  No, it is a 701 lay
23   person's opinion as to what it was, your Honor.  I
24   will ask him whether -- what the result of the test
25   was and I will ask him based on his experience and

915

1    the many interventions he's had where he has seized
2    crack cocaine whether he believed the substance was
3    crack cocaine.  That is a lay person's opinion under
4    701, completely admissible.  Jurisprudence has gone
5    as far as admitting the opinion of a crack user with
6    respect to whether or not a particular substance
7    that was seized by the police was crack cocaine.
8            THE COURT:  They might be experts.
9            MR. SHEEHAN:  And they're using it, so
10   they're talking about how it impacts on them.  He's
11   picking up something.  That doesn't establish that
12   it's cocaine.  The lay opinion doesn't tell you that
13   it's cocaine any more than it tell you that, you
14   know, it's blood.
15           MS. RODRIGUEZ-COSS:  And maybe that is
16   something Mr. Sheehan would like to cross-examine
17   Officer Rosado about.
18           MR. SHEEHAN:  They don't get -- in other
19   words, you set it up so -- I'm set up so I'm
20   fighting something that's not admissible.
21           MS. RODRIGUEZ-COSS:  No, it is
22   admissible.
23           MR. SHEEHAN I don't want to take on the
24   burden.
25           THE COURT:  He can testify to its

916

1    appearance.
2            MR. SHEEHAN:  I think he has.
3            THE COURT:  He can testify -- well, no
4    he just said that they seized 33 Ziplocs with
5    something in them and drug paraphernalia.  It just
6    seems to me that this is what he did.  It's not --
7    I'm not sure whether this is an opinion so much as
8    the result of his training in how to do a field
9    test.  That's what he did, and he's not going to be
10   permitted to testify that it was cocaine, that it
11   was crack, just that it field tested for the
12   presence of cocaine.
13           MR. SHEEHAN:  And so when your Honor
14   says he's not going to be allowed to testify that it
15   was cocaine and then sets up --
16           THE COURT:  I guess I don't quite
17   understand why a field test result showing the
18   presence of cocaine isn't admissible for that
19   purpose.
20           MR. SHEEHAN:  Because a field test does
21   not show the presence of cocaine, what the --
22           THE COURT:  Why do you say that?
23           MR. SHEEHAN:  Because that's why we send
24   it to the lab.
25           THE COURT:  That confirms for sure.

917

```
1              MR. SHEEHAN:  No.
2              THE COURT:  But I don't understand why
3   you are saying -- the field test does something.
4              MR. SHEEHAN:  Yes.
5              THE COURT:  It's sensitive to whatever
6   it is that's in cocaine.
7              MR. SHEEHAN:  It's sensitive to a whole
8   variety of things, your Honor, some of which may be
9   cocaine.  But that's why we have to send it to the
10  lab, to determine whether or not it is cocaine, and
11  that's why you can't have a prosecution that is just
12  based on field tests.
13             THE COURT:  But he's not being
14  prosecuted for these --
15             MR. SHEEHAN:  Yes.
16             THE COURT:  -- drugs.
17             MR. SHEEHAN:  Sure he is.  They're
18  alleging that these drugs were seized in the course
19  of the conspiracy and that this was cocaine and
20  they've got 2.3 grams, or whatever they've got, and
21  they're going to ask the jury to infer this is in
22  the scope of the conspiracy at 211 and this is
23  cocaine and it's two grams, now we have 48 more to
24  go.
25             MS. RODRIGUEZ-COSS:  I think counsel's
```

918

```
1   argument is misguided.  How the prosecution chooses
2   to prove its case is up to the prosecution.
3              THE COURT:  No, no, it has to do with
4   admissibility.  So what I'm interested in, though,
5   is why it is you say if he can't testify about field
6   test results --
7              MR. SHEEHAN:  He can say --
8              THE COURT:  Is it in his report that he
9   did this?
10             MR. SHEEHAN:  Yeah, he can say I did a
11  field test, but if he's going to conclude from the
12  field test -- if the jury is concluding from the
13  field test --
14             THE COURT:  If he said he did a field
15  test, it turned yellow, my training and so forth
16  says if it turns yellow.
17             MR. SHEEHAN:  Send it to the lab.
18             THE COURT:  It's presumptive.
19             MR. SHEEHAN:  Well, I don't think they
20  can say that it's presumptive.  I think my field
21  test tells me if it's yellow I send it to the lab.
22             THE COURT:  But --
23             MR. SHEEHAN:  He can't establish and
24  convey to the jury his opinion that it was cocaine.
25             THE COURT:  Well, I'd like to know more
```

919

```
1   about this.  What he is trained as to the field
2   tests, how they do them, what they're able to
3   conclude from them, what they're required to do,
4   because I think that may be of assistance in
5   answering the question that's framed by your
6   objection.
7              MS. RODRIGUEZ-COSS:  We have one in
8   court.
9              MR. SHEEHAN:  I think the ultimate legal
10  question for your Honor is the fact that these tests
11  do not establish the presence of cocaine.
12             THE COURT:  Do you have authority that
13  that is -- that a field test --
14             MR. SHEEHAN:  Yeah, I'm happy to look
15  for that authority.  I am familiar with that whole
16  area because that's why they send them to the lab.
17  That was the whole hubbub, your Honor may recall,
18  about whether the lab tests have to come in.  We
19  can't short-circuit the whole lab procedure.
20             THE COURT:  That was much more of a
21  testimonial type of question.
22             MR. SHEEHAN:  Yeah, but this is the same
23  thing.
24             THE COURT:  That the person who did the
25  testing had to come in and testify.
```

920

```
1              MR. SHEEHAN:  I understand, but this is
2   not -- what we're really testing for here is not the
3   presence of cocaine.  What he's testing for on these
4   presumptive tests is whether there is a -- whether
5   they can exclude them as not being cocaine.  If they
6   exclude them, then they're dupe bags, or whatever
7   they may well be, but as a practical matter if -- he
8   can't carry the burden.
9              THE COURT:  I want more foundation on
10  what the field test is, does, before I answer this
11  question.
12             MS. RODRIGUEZ-COSS:  We will do that,
13  but can we just place on the record that counsel is
14  completely incorrect on the jurisprudence.  This is
15  admissible.
16             MR. SHEEHAN:  I don't mind it being on
17  the record that she thinks I'm completely incorrect.
18  That I would be the highest praise.
19             MS. RODRIGUEZ-COSS:  I don't interrupt
20  you.
21             THE COURT:  I would like to have some
22  authority from one side or the other on this.
23             (Sidebar concluded)
24  Q.   Officer Rosado, I would bring your
25  attention to what has been marked Government
```

921

```
1   Exhibit 251-4.
2            MR. SHEEHAN:  May I ask what number that
3   was?
4            THE COURT:  251-4.
5       Q.  Can you tell me if you recognize that item?
6       A.  Yes.
7       Q.  And how do you recognize it?
8       A.  This is the Narco test kit that we use to
9   test for cocaine.
10      Q.  Did you bring that to court with you today?
11      A.  Yes.
12           MS. RODRIGUEZ-COSS:  Submitting
13  Government's Exhibit 251-4, your Honor.
14           MR. SHEEHAN:  I would object.  I think
15  it's irrelevant.
16           THE COURT:  I'm going to admit it
17  subject to connection.
18      Q.  Very good.  Now, Agent Rosado, you said
19  this is the test kit you use when you conduct a
20  field test on a suspected narcotics substance; is
21  that correct?
22      A.  Yes.
23      Q.  Can you please pull that out and show the
24  members of the jury exactly what we're talking about
25  and the process that you go through when conducting
```

922

```
1   a field test.
2       A.  Inside the box there is this tube with I
3   guess two glass capsules inside it.  What we do is
4   remove the top end of it, place a small amount of
5   whatever substance we're testing, in this case it
6   was cocaine, place the cap back on, I would break
7   this bottom capsule, I would shake it.  If it turns
8   blue it's indicative of cocaine, and I would break
9   the top capsule, shake that, sometimes the cocaine
10  turns white, usually some other material might be
11  mixed with it, and if it stays blue it's a positive
12  result for cocaine.
13      Q.  All right.  And so do you use this test kit
14  to testify for any other substance?
15      A.  No, this one is primarily for cocaine.
16      Q.  Don't loose the evidence, please.
17  Primarily for cocaine; is that correct?
18      A.  Yes.
19      Q.  And in this case you indicated -- or let me
20  ask you this:  Bringing again your attention to the
21  substance that you seized at apartment 211 on
22  March 31, 2005, what was the result when you
23  conducted a field test on that substance?
24           THE COURT:  You mean in terms of color.
25           MS. RODRIGUEZ-COSS:  Yes, ma'am.
```

923

```
1       A.  It was a blue color.
2       Q.  Now, you said that you have been involved
3   in hundreds of searches and seizures where you have
4   seized crack cocaine; is that correct?
5       A.  Yes.
6       Q.  All right.  And so bringing your attention
7   again to the -- did you say 33 baggies that day?
8   How many baggies?
9       A.  It was 33 Ziploc baggies.
10      Q.  33 Ziploc baggies.  Bringing your attention
11  to those 33 Ziploc baggies that you seized on
12  March 31st at apartment 215 Charles Street, based on
13  your experience, what was -- what were they?
14           MR. SHEEHAN:  Objection.
15      Q.  Or what was contained within them?
16           MR. SHEEHAN:  Objection.
17           THE COURT:  I'm going to sustain that.
18           MS. RODRIGUEZ-COSS:  Pursuant to 701.
19           THE COURT:  Yes, he did not field test
20  all 33 bags by his testimony.
21           MS. RODRIGUEZ-COSS:  No, I'm not
22  referring to a field test, your Honor.  Based on his
23  training and experience, having conducted hundreds
24  of seizures of crack cocaine in the past, what is in
25  his opinion what were they.
```

924

```
1            MR. SHEEHAN:  Objection, your Honor.
2            THE COURT:  I'm going to sustain the
3   objection for now.  Counsel have been invited to
4   submit authority.  We'll take that testimony up
5   after you've done that.
6            MS. RODRIGUEZ-COSS:  Very well, your
7   Honor.
8       Q.  Bringing your attention to what has been
9   marked Government Exhibit 251-2, can you tell me if
10  you recognize what is depicted in that document.
11      A.  I recognize some of the items.
12           MR. SHEEHAN:  I'm sorry, I didn't.
13      A.  Yes.
14      Q.  And is that an accurate depiction of what
15  it intends to depict -- to show?
16      A.  Yes.
17      Q.  All right.
18           MS. RODRIGUEZ-COSS:  Submitting 251-2,
19  your Honor.
20           MR. SHEEHAN:  I don't know, what are you
21  saying that it is?  May I ask?
22           MS. RODRIGUEZ-COSS:  Do you want me to
23  go into the contents of the item?
24           MR. SHEEHAN:  I don't know what he was
25  saying that it was.
```

925

```
1        Q.   What is Government Exhibit 251-2?
2        A.   It's a picture showing a plastic baggy, a
3   pill bottle, a crack pipe, some -- it's called
4   copper, like a filter.
5        Q.   And where was the photograph taken?
6        A.   It was taken at apartment 211.
7        Q.   And when was that taken?
8        A.   March 31st.
9             MR. SHEEHAN:  I have no objection, your
10  Honor.
11            THE COURT:  251-2 is a full exhibit.
12       Q.   Bringing your attention now to what has
13  been marked Government Exhibit 251-3, do you
14  recognize what is depicted in that document?
15       A.   Yes.
16       Q.   All right.  And, again, how do you
17  recognize that?
18       A.   This is a picture that was taken from
19  apartment 211.
20       Q.   And was that also during your search on
21  March 31, 2005?
22       A.   Yes.
23            MS. RODRIGUEZ-COSS:  Offer into evidence
24  251-3, your Honor.
25            MR. SHEEHAN:  No objection.
```

926

```
1             THE COURT:  Full exhibit.
2        Q.   Bringing your attention to what has been
3   marked 251-2, Officer Rosado, can you tell the
4   members of the jury what we're looking at here.
5        A.   You are looking at a picture that contains
6   drug paraphernalia.
7             THE COURT:  Can you focus this picture,
8   or was it out of focus, the picture?
9             MS. RODRIGUEZ-COSS:  I think it might
10  have been a little out of focus originally, your
11  Honor.  I don't know that I can.
12            THE COURT:  All right.
13            MS. RODRIGUEZ-COSS:  Does that help?
14            THE COURT:  No.
15            MS. RODRIGUEZ-COSS:  We'll publish
16  afterwards, your Honor, if we may.
17       Q.   So, you are saying it depicts drug
18  paraphernalia.  Can you be more specific?  I think
19  there is a pointer there behind you.  If you can use
20  that to tell us exactly what you are referring to.
21       A.   Right here, this is the crack pipe.  This
22  is the plastic baggies that normally would contain
23  the drugs.  And this is copper element or filter
24  that's used for the crack pipe when they place the
25  crack cocaine in it to smoke.
```

927

```
1        Q.   So, the copper you are pointing to there in
2   the middle of the photograph is used to actually
3   place inside a crack pipe?
4        A.   Yes.
5        Q.   And when you refer to a "crack pipe," what
6   are you referring to?
7        A.   I'm referring to a glass tube.
8        Q.   Okay.  And was this some of the
9   paraphernalia you indicated earlier was seized
10  during your search?
11       A.   Yes.
12       Q.   Bringing your attention now to what has
13  been marked Government Exhibit 251-3.  Can you tell
14  us what we're looking at here.
15       A.   This is a picture that was taken from the
16  same apartment, and this contains the plate with --
17  you can't really tell too much, but the crack
18  cocaine is there.
19       Q.   And why was that plate significant to you
20  as a narcotics officer?
21       A.   The plate is usually used to cut the
22  narcotic, let's say crack cocaine, into smaller
23  pieces, and then the smaller pieces are placed into
24  small Ziploc bags and then they're sold.
25            MS. RODRIGUEZ-COSS:  I want to bring the
```

928

```
1   Officer's attention to Government Exhibit 251, your
2   Honor, which should appear momentarily.
3        Q.   All right, I would bring your attention to
4   what has been marked Government Exhibit 251, Officer
5   Rosado.  Do you recognize what is depicted in that
6   photograph?
7        A.   Yes.
8        Q.   How do you recognize that?
9        A.   This is a picture of a ceramic rabbit that
10  was found at the apartment.
11       Q.   And why was that rabbit significant to you?
12       A.   That rabbit contained the 33 bags of crack
13  cocaine.
14            MR. SHEEHAN:  I'm going to object, your
15  Honor, to the last characterization.
16            THE COURT:  I'm going to ask you to not
17  characterize what was in there other than what you
18  found in the apartment.
19            MS. RODRIGUEZ-COSS:  I believe that's
20  already in evidence, the testimony of Mr. Frank
21  Hodges.
22            THE COURT:  It may be.
23       Q.   In any event, Officer Rosado, can I ask
24  you, the baggies that you were referring to that you
25  found inside the rabbit, are they visible on the
```

929

```
1    photograph?
2        A.   Yes.
3        Q.   Can you tell us where they are?
4        A.   They're right here.
5        Q.   Now, let me bring your attention to what
6    has already been marked Government Exhibit 102.  Can
7    you tell us if you recognize what is depicted in
8    that photograph?
9        A.   That's the front of 215 Charles Street.
10       Q.   All right.  And just one more question
11   before I bring your attention to a different date.
12   That substance that you seized on March 31, 2005,
13   did you have an opportunity to obtain a weight for
14   that substance?
15       A.   Yes.
16       Q.   What was that?
17       A.   I believe it was over 3 grams.
18       Q.   All right.  Is there a place where you
19   record that information?
20       A.   We place it on our report.
21       Q.   So, if I were to show you your report, do
22   you think that may refresh your recollection as to
23   the exact weight of the substance?
24       A.   Yes.
25       Q.   All right, can you just take a few moments
```

930

```
1    to review the document and then I'll ask you again.
2            Has the document been helpful in
3    refreshing your recollection as to what the amount
4    was that the substance weighed.
5        A.   Yes.
6        Q.   How much was that?
7        A.   3.3 grams.
8        Q.   Now, once you found these items, you had
9    indicated earlier in your testimony that you found
10   some individuals in the apartment.  Do you recall
11   that?
12       A.   Yes.
13       Q.   Did you arrest anyone?
14       A.   Yes, several people were arrested.
15       Q.   Do you recall any of those individuals?
16       A.   I recall Frankie Hodges, I believe James
17   Rucker, and again, I can't recall the other parties'
18   names.
19       Q.   Bringing your attention to what has been
20   marked Government Exhibit 212, do you recognize who
21   is depicted in that photograph?
22       A.   Yes.
23       Q.   Who is that?
24       A.   That's Frankie Hodges.
25       Q.   And bringing your attention now to what has
```

931

```
1    been marked Government Exhibit 229, do you recognize
2    the individual in that photograph?
3        A.   Yes.
4        Q.   Who is that?
5        A.   That's Mr. James Rucker.
6        Q.   And how did you know -- how do you know
7    James Rucker?
8        A.   He was arrested at the apartment at the
9    time.
10       Q.   Were you familiar with him before?
11       A.   We've heard of the name.
12       Q.   You'd heard of the name?
13       A.   Yeah.
14       Q.   But you weren't familiar with him?
15       A.   No.
16       Q.   How about Frank Hodges, were you familiar
17   with him before his arrest on March 31st?
18       A.   No.
19       Q.   Okay.  I'll bring your attention now to
20   July 1st, 2005.  Can you tell the members of the
21   jury, what were the nature of your duties on that
22   day?
23       A.   I was assigned as the entry team member for
24   a search warrant.
25       Q.   To be executed where?
```

932

```
1        A.   Same place, apartment 211.
2        Q.   At 215 Charles Street?
3        A.   Yes.
4        Q.   And tell us what happened?
5        A.   We went to the apartment, knocked on the
6    door, we got no response, forced entry was made.
7        Q.   And when you entered the apartment, what,
8    if anything, did you encounter?
9        A.   There was six people there.  The same
10   thing, we detained them and then a search conducted.
11       Q.   And what, if anything, of significance did
12   you seize on July 1st, 2005?
13       A.   We also seized 22 bags of the crack
14   cocaine.
15           MR. SHEEHAN:  Objection, your Honor.
16       Q.   Would that be suspected crack cocaine?
17       A.   Yes.
18           MR. SHEEHAN:  I'm going to object, your
19   Honor.
20           THE COURT:  May I see you at sidebar.
21           MR. SHEEHAN:  Yes, your Honor.
22           (Sidebar conference)
23           THE COURT:  So he seizes what he
24   suspects to be crack cocaine.  What's wrong with
25   that?
```

933

1          MR. SHEEHAN:  Because it's a conclusion
2     that it's crack cocaine.  There is no proper
3     foundation for that.  It's just his opinion.  I
4     think it's the same issue we're having with the
5     other officer.  We know it's the same issue.
6          THE COURT:  We have him testifying as to
7     the paraphernalia, the blue test, the packaging, and
8     on top of that there is Mr. Hodges' testimony that
9     there was crack cocaine.  Why doesn't that render
10    this admissible?  I'm back in March.  Now, we have a
11    search of the same apartment, he's finding -- did he
12    do a field test on this?
13         MS. RODRIGUEZ-COSS:  No, and I'm going
14    to ask him that.  He did not and he wasn't present
15    for it.  He'll say that.
16         THE COURT:  He wasn't present for what?
17         MS. RODRIGUEZ-COSS:  For the field test.
18         MS. DAYTON:  Can he just --
19         MS. RODRIGUEZ-COSS:  On July 1st, 2005.
20         MS. DAYTON:  What if he just says what
21    the item looks like, white, rock-like substance that
22    resembled rock cocaine.
23         MS. RODRIGUEZ-COSS:  I can say that, and
24    I will.  The Court had asked us to --
25         THE COURT:  If that is not an opinion,

934

1     it is a description.
2          MR. SHEEHAN:  Of what, crack cocaine?
3          MS. RODRIGUEZ-COSS:  Of the item he
4     seized.
5          MR. SHEEHAN:  No, it isn't.  It's a
6     statement of fact as to what --
7          THE COURT:  If he testifies that he
8     finds -- is it white or is it yellow?
9          MS. DAYTON:  Off white, rock-like
10    substance.
11         THE COURT:  Rock-like substance.
12         MR. SHEEHAN:  He can say that.
13         MS. DAYTON:  That it resembled crack
14    cocaine.  But he won't say it is crack.
15         THE COURT:  Then what happens when we
16    are at the quantifying stage?  Are you claiming this
17    as part of the 50 grams or is there other evidence?
18         MS. RODRIGUEZ-COSS:  No.  No, am I
19    claiming that this may be part of the 50 grams?
20         THE COURT:  Yes.
21         MS. RODRIGUEZ-COSS:  The 22 baggies they
22    seized on July 1st, 2005?
23         THE COURT:  Right.
24         MS. RODRIGUEZ-COSS:  Sure.  Why not?
25         THE COURT:  Well, then it has to be

935

1     proved to be crack cocaine.
2          MS. RODRIGUEZ-COSS:  Right, and there is
3     nothing --
4          THE COURT:  But you don't have anything
5     that says it's crack cocaine other than his --
6          MS. RODRIGUEZ-COSS:  Well, I will once I
7     produce the case to the Court and the Court admits
8     the lay opinion.
9          MS. DAYTON:  We don't have to come in
10    with lab reports to prove --
11         MS. RODRIGUEZ-COSS:  We've gone over
12    that.
13         THE COURT:  It seems to me that what he
14    can testify to is what he observed and that in his
15    experience it looked like crack cocaine.
16         MS. RODRIGUEZ-COSS:  Right.
17         THE COURT:  I don't see what's wrong
18    with that.
19         MS. RODRIGUEZ-COSS:  And we have the
20    door open to him testifying in addition to that,
21    subject to us making a showing to the Court that it
22    is admissible, correct?
23         THE COURT:  He seems to have already
24    testified to it.
25         MR. SHEEHAN:  Your Honor, I think that

936

1     that is -- I think there is a problem with that.
2          THE COURT:  Do you know, this is a
3     subject we could have discussed a long time ago.
4     I'm troubled by the fact that I am keeping this jury
5     waiting on subjects that are important objections
6     for which I'm offered no authority by either side.
7          I'm going to permit him to testify on
8     what he saw and what it resembled from his past
9     experience, and beyond that, we'll see whether he
10    can say anything more.
11         (Sidebar concluded)
12    Q.   Officer Rosado, can you describe exactly
13    what was seized on July 1st, 2005, the substance you
14    suspected was crack cocaine.  Can you physically
15    describe what it looked like?
16    A.   It would be off white, rock-like, granular
17    at times.
18    Q.   And contained within what, if anything?
19    A.   It's usually within a Ziploc bag.
20    Q.   Is that how it was packaged on July 1st,
21    2005?
22    A.   Yes.
23    Q.   And did you effect any arrests at 211,
24    apartment 211 on 215 Charles Street on July 1st,
25    2005?

**GA234**

937

```
1    A.    Yes, people were arrested.
2    Q.    I'm sorry?
3    A.    Yes.
4    Q.    Oh, okay.  And who did you arrest?
5    A.    Frankie Hodges was arrested that day, James
6  Rucker, and I believe several other people.  I just
7  don't know off the top of my head.
8    Q.    And where did you locate Mr. Hodges that
9  day?
10    A.    He was coming out of the shower.
11    Q.    And was it you that actually seized him
12  coming out of the shower?
13    A.    Yes.
14    Q.    And in relation to Mr. Hodges, where were
15  the 22 baggies of suspected crack cocaine?
16         MR. SHEEHAN:  Well, your Honor, I'm
17  going to object to the form of the question.
18         THE COURT:  Sustained.
19    Q.    In relation to Mr. Frank Hodges, where did
20  you locate the 22 Ziploc baggies that you seized?
21         MS. RODRIGUEZ-COSS:  Is that --
22         THE COURT:  That's fine.
23    A.    They were seized inside a blue shorts,
24  jeans from in the bathroom.
25    Q.    Okay.  In the same bathroom he was taking a
```

938

```
1  shower in?
2    A.    Yes.
3    Q.    All right.  Were you the seizing officer on
4  July 1st, 2005?
5    A.    No.
6    Q.    All right.  Did you conduct a field test on
7  the substance that was seized on July 1st, 2005?
8    A.    No.
9    Q.    Was a field test conducted nonetheless?
10    A.    Yes.
11    Q.    Were you present for that field test?
12    A.    No.
13    Q.    Thank you.  Now, did you talk to -- without
14  telling me what, if anything, was said, did you talk
15  to Frank Hodges after his arrest on July 1st, 2005?
16    A.    Yes.
17    Q.    And what, if anything, did you tell him?
18    A.    Well, we normally would interview people
19  after they get arrested and they get processed and
20  we try to develop intelligence into other
21  apartments, other people dealing drugs, and then
22  what I would tell him, if they wanted help with
23  their court case or a lower bond, provide me the
24  information.  I will provide them with my cell phone
25  number and then I would ask them if you want
```

939

```
1  consideration or you want help with your current
2  case, you call me and I would -- we would
3  essentially turn them into a confidential informant.
4    Q.    And did you make those expressions to Mr.
5  Hodges after his arrest in July 2005?
6    A.    Yes.
7    Q.    And did anything transpire after that?  In
8  other words, did anything materialize as a result of
9  that conversation?
10    A.    No.
11         MS. RODRIGUEZ-COSS:  Now, can I have the
12  witness briefly, your Honor, step down and look at
13  the model that has been marked Government
14  Exhibit 101.
15    Q.    Officer Rosado, if I can have you step down
16  here.  First of all, do you recognize what has been
17  marked Government Exhibit 101?  Do you recognize
18  that?
19    A.    Yes.
20    Q.    And what are we looking at here?
21    A.    You are looking at the front entrance to
22  215 Charles Street.
23    Q.    And can you just tell the members of the
24  jury where is apartment 211 located within
25  Exhibit 101.
```

940

```
1    A.    211 is located on the second floor.  The
2  second apartment, right here.
3         MS. RODRIGUEZ-COSS:  So, can the record
4  reflect he's pointing to the last apartment forming
5  part of Exhibit 101 on the right-hand side, your
6  Honor.
7         Is that accurate, counsel?
8         MR. SHEEHAN:  Yes.
9    Q.    All right.
10         MR. SHEEHAN:  The second apartment in,
11  right?
12         MS. RODRIGUEZ-COSS:  Well, okay.  He
13  pointed to the third apartment I guess on the
14  right-hand side if you go from the front of the
15  building to the back.
16         MR. SHEEHAN:  You are right, it is the
17  third apartment on the right-hand side.
18         THE COURT:  The last apartment on the
19  right he said.
20         MS. RODRIGUEZ-COSS: Very well.  Thank
21  you.
22    Q.    Just one more question.  How long normally
23  does the Bridgeport Police Department maintain
24  narcotics evidence once it's been -- after it's been
25  seized, approximately?
```

941

1    A.  I'm not sure how long.  Depending on the
2  case.  But once the case is disposed of, shortly
3  thereafter most narcotics evidence are destroyed.
4    Q.  It's not something that the police hangs on
5  to long-term?
6    A.  No.
7      MS. RODRIGUEZ-COSS:  The Court's
8  indulgence, your Honor.
9      We don't have anything further for
10 Officer Rosado, your Honor.
11     THE COURT:  All right,
12 cross-examination.
13     MR. SHEEHAN:  We'll be more than two
14 minutes.
15     THE COURT:  That's all right, we can
16 start.
17 CROSS-EXAMINATION
18 BY MR. SHEEHAN:
19   Q.  Officer Rosado, when you went in that
20 apartment on the first day, that was in March,
21 right?
22   A.  Yes.
23   Q.  Had you been in there previously?
24   A.  Inside the apartment?
25   Q.  The building itself?

942

1    A.  Yeah, I've been in the building before.
2    Q.  And how did you get into the building; if
3  you remember?
4    A.  That day?
5    Q.  Yeah.
6    A.  I believe we went through one of the side
7  doors by the garage.
8    Q.  And was that door locked?
9    A.  No, I believe it was open.
10   Q.  Okay.  And from there how did you get to
11 the -- did you have to batter down any doors in
12 order to get from the outside up to the second
13 floor?
14   A.  I don't believe so, no.
15   Q.  Okay.  And the other times that you have
16 been in that building, how did you get in there
17 previous to March?
18   A.  If the front door was open, I would use the
19 front door.
20   Q.  Okay.
21   A.  If the side door was open, I would use the
22 side door.
23   Q.  Was the front door frequently open when you
24 went there?
25   A.  I would say the times I've went there,

943

1  yeah.
2    Q.  Most of the time?
3    A.  Yes.
4    Q.  Okay.  You never had to batter down one of
5  the exterior doors to get in there, did you?
6    A.  No.
7    Q.  And what time did you go in on the first
8  day?
9    A.  March?
10   Q.  Yeah.
11   A.  It was after midnight.
12   Q.  I'm sorry?
13   A.  After midnight, I believe.
14   Q.  Okay.  And the building was still wide open
15 at that time, at least until you got to the second
16 floor?
17   A.  Yeah, it was open I believe.  Yes.
18   Q.  And, similarly, when you went in the
19 building in July, how did you get in there?
20   A.  I'm not sure if we went through the side
21 entrance or through the front entrance.
22   Q.  And, again, was it -- was the door locked?
23   A.  I don't recall.
24   Q.  Did you have to break down any doors before
25 you got to the second floor?

944

1    A.  I don't think so, no.
2    Q.  Okay.  And what time of day was that?
3    A.  I believe it was in the afternoon.
4    Q.  All right.  And you indicated that when you
5  went in that apartment on the first day, there were
6  a number of people there, meaning apartment 211?
7  The first day again.
8    A.  March?
9    Q.  March, yeah.
10   A.  Yes.
11   Q.  And how many people were there?
12   A.  I believe there were six.
13   Q.  And you found various items of drug
14 paraphernalia?
15   A.  Yes.
16   Q.  In plain view?
17   A.  Yes.
18   Q.  And some people were actually -- appeared
19 to be smoking crack in the apartment at that time?
20   A.  Well, not that I could recall.
21     MR. SHEEHAN:  If I might have one
22 second.
23     THE COURT:  All right, why don't we stop
24 for the day.
25     Ladies and gentlemen, we'll see you

**GA236**

945

```
1    tomorrow at 9:30.  Thank you very much.  Please
2    leave your notebooks here.  Please don't discuss the
3    case.
4              (Jury exited the courtroom)
5              THE COURT:  All right, Officer, will you
6    kindly be back at 9:30 tomorrow.
7              THE WITNESS:  Yes.
8              THE COURT:  And don't discuss your
9    testimony with anyone.
10             THE WITNESS:  Okay.
11             THE COURT:  Thank you.  You are excused.
12             All right, who will our witnesses be
13   tomorrow?
14             MS. DAYTON:  Well, him.  Bill Simpson,
15   Paul Ortiz, Jackie Bryant, possibly Venro Fleming.
16   We may start Rodney Womble.  We'll see how far we
17   get.  I doubt it.
18             THE COURT:  All right, I realize it's a
19   little early to be asking this, but how are we doing
20   on time, and specifically do you have anyway of
21   estimating what the week will be that we will off if
22   there is to be a second phase?
23             MS. DAYTON:  We think the week of
24   May 16th we may have off.
25             THE COURT:  The week of May 16th?
```

946

```
1              MS. DAYTON:  That's what we're hoping.
2    It's hard to tell because we don't know how long
3    cross-examination will be.
4              THE COURT:  Of course.  Any reason to
5    think that's off?
6              MR. SHEEHAN:  No, your Honor.
7              THE COURT:  All right.
8              MR. SHEEHAN:  I'm not sure it's on, but
9    I don't have a reason to think it's off.
10             THE COURT:  I just need to schedule
11   other things that are backing up and I am wondering
12   if I could safely do that.
13             All right, then.
14             MR. SHEEHAN:  Your Honor, could I just
15   indicate, yesterday we were given the witnesses for
16   today, which really was Mr. Hodges.  We were told
17   one witness for tomorrow, which was Rodney Womble.
18   There has been no mention of Mr. Fleming or Ms.
19   Bryant.
20             THE COURT:  But we have still Detective
21   Ortiz and Officer Simpson left over from yesterday.
22             MR. SHEEHAN:  We do, your Honor.  I'm
23   just saying if we're trying to give 72 hours notice,
24   we're not really -- we're kind of falling behind.
25             MS. DAYTON:  Your Honor, we're doing the
```

947

```
1    best we can.  We have to -- we thought Rodney Womble
2    would be here today, and there has been a lot of
3    objections, a lot of sidebars, and we had to cancel
4    a takeout order.  We have lined up agents to pick
5    people up to help the marshals because there is
6    extra security.  There is a lot of moving parts.
7              THE COURT:  I understand.
8              MS. DAYTON:  So we've had to change the
9    order, not necessarily to our benefit, and it's not
10   -- we're not doing it to mess with the defense,
11   we're doing it to try to keep witnesses moving.
12             THE COURT:  Would you be calling Ortiz?
13             MR. SHEEHAN:  But, your Honor --
14             THE COURT:  -- after you finish with
15   Ross?
16             MS. DAYTON:  Yes.
17             MR. SHEEHAN:  Your Honor?
18             THE COURT:  Then we'll just see where we
19   get to.
20             MR. SHEEHAN:  But one concern I have,
21   they told us Womble is tomorrow.  Now they're saying
22   Womble is going to be today.
23             MS. DAYTON:  No, we originally thought
24   we would get to Womble today.  We realized we
25   weren't going to when Joette Devan was going so
```

948

```
1    slowly, so we put him 'til tomorrow.  But we have
2    witnesses who have come from out of town.
3              THE COURT:  So will Womble be on before
4    Bryant and Fleming?
5              MS. DAYTON:  It wasn't the plan.  The
6    plan was to try to put Bryant and Fleming on, who
7    both live out of town and who both had to be flown
8    in.  We're trying to get them on and get them off,
9    send them back home.
10             MR. SHEEHAN:  I guess my only concern,
11   your Honor, we really have about ten hours notice on
12   Fleming and Bryant.
13             MS. DAYTON:  So, we turned over 3500
14   materials six weeks before trial.
15             MR. SHEEHAN:  No, I know they did.  Do
16   you know --
17             THE COURT:  Are you saying that you are
18   not going to be prepared to examine Brian and
19   Fleming?
20             MR. SHEEHAN:  Your Honor, I think we
21   can -- I don't know, your Honor.  I just am -- the
22   Court set what I think was a wise plan of 72 hours
23   notice.  While it is true that they turned over 3500
24   material, the 3500 material is approximately
25   5,000 pages.  More than 5,000 pages.  Now, it's true
```

949

```
1   we had some of that material before, different Bate
2   stamp number, a different way of figuring it out.
3          THE COURT:  Why don't we do this.  If
4   you are not prepared to examine Bryant and/or
5   Fleming because of the amount of 3500 material, you
6   let me know in the morning.  We'll have other people
7   to fill in, and who knows whether we'll get to them
8   anyhow.
9          MS. DAYTON:  For the record, I believe
10  there are two reports for each Bryant and Fleming,
11  and then Ms. Bryant also has a grand jury transcript
12  that's maybe 20 pages long.  That's it.  It's not
13  like Mr. Womble who is a book full of stuff.
14         THE COURT:  All right, so that may not
15  then present a problem for the defense.
16         All right then, I'll see you tomorrow at
17  9:30.  Thank you.
18         MR. SMITH:  Oh, your Honor, I'm so
19  sorry.  I do have a housekeeping matter.  There is
20  this disk that the government -- we had talked about
21  yesterday about making a copy of.  The government
22  says they have to have access to that disk to take
23  it and make a copy.  I presume the government
24  obviously would not alter it in any way except to
25  make the copy for us.  I would ask the Court's
```

950

```
1   permission they be allowed to take it.
2          MS. REYNOLDS:  Your Honor, the copy --
3   my understanding, I just spoke to our paralegal Ann
4   Tennero (ph), she's going to go over right now, it
5   should be on ready.
6          THE COURT:  Okay.
7          MS. REYNOLDS:  I also want to put on the
8   record we turned over some evidence for our evidence
9   binder of three additional photographs that we
10  intend to introduce through Detective Ortiz.  I have
11  provided copies of those with the exhibit numbers
12  which we will give them, and I have copies for the
13  Court's binder and for the courtroom deputy.
14         THE COURT:  All right then, we stand in
15  recess.
16         (Proceedings concluded 3:40 )
17
18
19
20
21
22
23
24
25
```

951

```
1                  I N D E X
2
3   WITNESS                              PAGE
4   FRANK HODGES
5   Direct Examination by Ms. Dayton     686
6   Cross-Examination by Mr. Smith       804
7   Redirect Examination by Ms. Dayton   881
8
9   FRANK RICCIO
10  Direct Examination by Ms. Dayton     890
11  Cross-Examination by Mr. Sheehan     904
12
13  ORLANDO ROSADO
14  Direct Examination by Ms. Rodriguez-Coss  907
15  Cross-Examination by Mr. Sheehan     941
16
17         I certify that the foregoing is a
18  correct transcript from the record of proceedings in
19  the above-entitled matter.
20
21                  4/26/11
22                   Date
23
24             /S/  Sharon Montini
25              Official Reporter
```

952

```
1              UNITED STATES DISTRICT COURT
2                DISTRICT OF CONNECTICUT
3   * * * * * * * * * * *    *
4   UNITED STATES OF AMERICA,  * Case No 6cr160(JBA)
5              Plaintiff,      *
6       vs.                    *
7   AZIBO AQUART             * April 27, 2011
8              Defendant.      *
9   * * * * * * * * * * * *    *
10                TRIAL TRANSCRIPT
11                  VOLUME V
12  BEFORE:  THE HONORABLE JANET BOND ARTERTON U.S.D.J.,
                                            and jury
13  Appearances:
14  FOR THE GOVERNMENT:  ALINA REYNOLDS, ESQ
                         TRACY DAYTON, ESQ.
15                       PETER MARKLE, ESQ.
                         JACABED RODRIGUEZ-COSS
16                       United States Attorney's Office
                         915 Lafayette Blvd
17                       Bridgeport, CT 06604
18
19  FOR THE DEFENDANT    MICHAEL SHEEHAN, ESQ
    AZIBO AQUART:        Sheehan & Reeve
                         139 Orange Street
20                       New Haven CT 06510
21                       JUSTIN SMITH, ESQ.
                         383 Orange Street
22                       New Haven, CT 06511
23
24  Court Reporter:    Sharon Montini, RMR
25  Proceedings recorded by mechanical stenography,
    transcript produced by computer
```

953

1    THE COURT:  All right, good morning,
2 ladies and gentlemen.  Good morning, Mr. Aquart.
3 Counsel, please be seated.
4    MS. DAYTON:  Good morning.
5    MR. SHEEHAN:  Good morning, your Honor.
6    THE COURT:  Before we bring in our jury,
7 one of the jurors, No. 14, has spoken to Ms. Torday
8 and has a daughter who is a junior in college who is
9 interested in forensic photography.
10    MS. DAYTON:  Yes.
11    THE COURT:  And he wants to know if it
12 would be all right if she came and listened in the
13 trial.  I think this is a terrible idea, but I'm
14 quite sure that she has a right to be here in this
15 trial.  She would also have the opportunity,
16 therefore, to be present for all the arguments made
17 in court perhaps with respect to evidentiary issues
18 outside the hearing of the jury.  And if, in fact,
19 she lives with her father, the opportunity for
20 inadvertent communications is rampant.  Do you have
21 any views on this?
22    MR. SHEEHAN:  It sounds like a terrible
23 idea.
24    THE COURT:  Yeah, my thought exactly.
25    MR. SHEEHAN:  And, frankly, it's a

954

1 terrible idea and I don't think that there is much
2 that we can --
3    THE COURT:  I think that the way to
4 approach it is that it may require his
5 disqualification as a juror if she attends.  It's
6 her choice to attend, but it may result in his
7 disqualification.
8    Pardon?
9    MS. DAYTON:  I mean, what we're talking
10 about here is obviously we can't say to someone you
11 can't be in the courtroom.
12    THE COURT:  Exactly.
13    MS. DAYTON:  And so -- but I think it
14 would also be difficult to relay to him, fine, you
15 can do that, but if you do that we're going to
16 disqualify you because that almost feels like
17 threatening in some manner.
18    You know, maybe we can just remind the
19 jurors about their duty not to speak with anyone
20 about the trial, not to discuss with anyone.  I
21 don't know, it's a very prickly situation.
22    MS. RODRIGUEZ-COSS:  I think we can
23 discourage it, but I don't believe that we should
24 forbid it.
25    THE COURT:  Well, I know we can't forbid

955

1 her to come to our open courtroom.
2    MR. SHEEHAN:  I think, your Honor, I
3 would have no objection -- this is juror NO. 13?
4    THE COURT:  Yes.
5    MS. RODRIGUEZ-COSS:  14.
6    THE COURT:  I think it's 13.
7    MS. RODRIGUEZ-COSS:  I thought the Court
8 said 14.
9    MS. DAYTON:  The thing is, we presume
10 jurors follow the instructions.
11    THE COURT:  I know that, but it's the
12 inadvertence.  I'm quite sure there would be no
13 purposeful -- 13.
14    MR. SHEEHAN:  Maybe we could tell her
15 over at the Superior Court there is another trial
16 going on.
17    THE COURT:  They haven't started
18 evidence.
19    MR. SHEEHAN:  No, they haven't started
20 evidence, I realize that.  Perhaps your Honor could,
21 and I would have no objection to that, if your Honor
22 were to just meet privately with juror No. 13 and
23 kind of talk it through and see what your considered
24 thoughts are at the conclusion of that.
25    MS. DAYTON:  Or maybe we can bring the

956

1 juror out, ask him --
2    THE COURT:  I prefer to do it that way.
3    MS. DAYTON:  I don't think ex parte is a
4 good idea.
5    THE COURT:  Well, you can do that.
6    MS. DAYTON:  Right.  If we could just
7 say:  Does your daughter live with you?  How often
8 do you see her?  And you need not to speak to
9 her.  Just a reminder.
10    THE COURT:  And then he would have to
11 report if there has been any inadvertent slip.
12    MS. DAYTON:  Yes.
13    MS. RODRIGUEZ-COSS:  That's right.
14    MS. DAYTON:  Because it's sort of like
15 the jurors could be reading the papers, we don't ask
16 them every day.  The jurors could be watching the
17 news, going online.  We presume they're not doing
18 what they're told not to do.  So there is really no
19 true difference between those two things.
20    MR. SHEEHAN:  Well, actually state
21 court, the matters where I've been involved where
22 there has been ongoing publicity, the judge has
23 regularly asked people if they've seen anything.
24 But we haven't had any right now.
25    THE COURT:  All right, would you ask

957

```
1   No. 13 to come out here.
2                (Juror entered the courtroom)
3           THE COURT:  All right.  Good morning,
4   sir.  How are you?
5           JUROR:  Fine, thanks.
6           THE COURT:  I understand you have a
7   daughter in college who is interested in forensic
8   photography.
9           JUROR:  Correct.
10          THE COURT:  Does she live with you?
11          JUROR:  She does.
12          THE COURT:  And she has an interest in
13  attending certain aspects of this trial.
14          JUROR:  She asked if she could.
15          THE COURT:  Well, it is a bedrock
16  principle that we have open courtrooms unless there
17  is some compelling reason to close some or all of
18  it, and no alternative.  So, she certainly is a
19  member of the public entitled to come.
20          JUROR:  Okay.
21          THE COURT:  Here is what the problem is.
22          JUROR:  I understand.
23          THE COURT:  There are certain issues
24  that are issues of law that have argument that are
25  made in open court, but outside the presence of the
```

958

```
1   jury, and members of the public hear this.  And
2   there is a reason why they're not within the hearing
3   of the jury, because it's not part of their
4   province, and it may have to do with admissibility
5   of certain evidence, which is a matter of law which
6   I need to decide.  There would be a risk -- and of
7   course you remember, and I have no doubt you adhere
8   to, the principle that you don't discuss this case
9   with anybody.
10          JUROR:  Of course.
11          THE COURT:  It's that risk of an
12  inadvertent remark or disclosure that would be of
13  concern.  And if there were to be such an
14  inadvertent comment, either by your daughter to you
15  or vice-versa, you would need to report that in
16  writing the next trial day that we sit.
17          JUROR:  I understand.
18          THE COURT:  And then we would need to
19  make a determination of what the impact of that is.
20          JUROR:  Okay.
21          THE COURT:  So that's the issue, and
22  that would be the problem, potential problem that I
23  would see with that.  So would you have any
24  reluctance in reporting any kind of communication
25  between your daughter and you in anything related to
```

959

```
1   this case if she attended trial?
2           JUROR:  I would not, but I also
3   understand the appearance that you are concerned
4   about.  And if that is an issue, I certainly don't
5   mind nixing it.  She can go find another trial to
6   watch.  I understand that wholeheartedly, it's just
7   the appearance.
8           THE COURT:  Well, I am not in any way
9   suggesting that she can't come.
10          JUROR:  Okay.
11          THE COURT:  I'm going to leave that up
12  to her, but you can explain your special duties and
13  responsibilities as a juror, and I will leave that
14  to you.  Okay?
15          JUROR:  Fair enough.  Thank you.
16          THE COURT:  All right.
17              (Juror exited the courtroom)
18          THE COURT:  Let's see, if there is
19  nothing further.
20          MR. SHEEHAN:  There is one further item,
21  your Honor.  And I apologize to the Court.  I just
22  ran out of gas.  But on the issue where we have been
23  dealing with Officer Rosado on the testing issue, I
24  did not file anything in writing.  The only case I
25  found that really -- the case law on -- I did not
```

960

```
1   find a case that is directly on point in terms of
2   what an officer can testify to.  I think that there
3   is a relatively recent Connecticut state court case
4   that talked about this, and that was State v.
5   Singleton, which is 81 Connecticut Appeals 409,
6   decided in 2004.
7           Now, that case is different in that what
8   was at issue in that case was whether that field
9   test provided sufficient evidence to sustain a
10  violation of probation, and the court there
11  concluded that it didn't.  There are other cases
12  that I have seen where they have talked about
13  presumptive tests, but I have never found a case
14  that was directly on point in terms of whether the
15  officers could testify on that basis.
16          One of the things, however, that did
17  become clear to me in looking at those cases is that
18  when the officer is testifying in that context, it
19  is as an expert, and there was no notice that
20  Officer Rosado or Officer Sampson or -- or Officer
21  -- any of the other officers were going to be
22  testifying as experts as to their opinion.  I did
23  look up the test, I just looked on the Internet with
24  respect to the Narc Four Test that appears to be
25  used by Officer Rosado in his -- at least as
```

961

1 referenced in his police report. And generally in
2 their own publications they indicate that a forensic
3 laboratory is required. Although they say
4 presumptive identification is generally recognized
5 as a component of probable cause, they go on to
6 state, and I think it makes sense, but that a
7 forensic laboratory is required to qualitatively
8 identify an unknown substance.
9          So, I think in the context of this case,
10 while Officer Rosado, I think, could testify that he
11 conducted a presumptive test, he could not testify
12 as to his opinion that it was crack cocaine.
13          Interestingly, the case I cited to you
14 about Singleton, really was focusing a lot on the
15 differences between crack and powder cocaine, and
16 one of the features that was discussed in -- I
17 noticed that -- and indeed in Officer Rosado's
18 testimony, the test, he described it tests for the
19 presence of cocaine. I don't think that that test
20 distinguishes between cocaine and crack. And as the
21 Court knows, you know, all the congressional
22 hearings on this issue, we obviously have very
23 different penalty structures with respect to crack
24 and cocaine.
25          So I think that, accordingly, my

962

1 objection is to the officer testifying to his
2 opinion that it is cocaine and certainly to his
3 opinion that it is crack cocaine based upon his
4 assessment of the results of the presumptive test.
5 I don't think that there has been any -- I also
6 think he's testifying as an expert and that we did
7 not have notice that he was going to do that.
8          THE COURT: All right.
9          MS. RODRIGUEZ-COSS: Your Honor, the
10 case of States v. Paiva, that's spelled p-a-i-v-a,
11 codified at 892 F.2d 148 from the First Circuit, is
12 directly on point as to the issue at hand here,
13 where the First Circuit held after a very thorough
14 discussion of Rule 701, that a field test conducted
15 by an officer is admissible and that such testimony
16 is actually lay opinion testimony under 701.
17          Coincidentally enough in Paiva, it also
18 allowed the opinion of a person who had found
19 cocaine, and based on her personal knowledge and
20 experience testified that she thought the substance
21 that she had found was in fact cocaine. Now, in
22 that case specifically it dealt with the daughter of
23 a person in the case who had found a baggie of white
24 powder in a closet, and based on her observation of
25 the package and her actually having tasted the

963

1 substance, she was allowed to testify that in her
2 opinion it was cocaine.
3          So, we also would like to refer the Court
4 to the cases of United States v. Walker, 262 F.
5 App'x 303, United States v. Cox, c-o-x,
6 59 F. App'x 437.
7          THE COURT: Wait a minute. All right.
8          MS. RODRIGUEZ-COSS: United States v.
9 Morales, m-o-r-a-l-e-s, codified at 8:304 F.2d 35.
10 These are all Second Circuit cases where, although
11 the holding that a field test was admissible under
12 Rule 701 was not central to the holding of the case,
13 they're all cases involving the admissibility of a
14 field test and testimony by a law enforcement
15 officer pursuant to that field test. And it is
16 discussed in each of those opinions, none of which
17 indicate that there was a problem with the
18 admissibility of that field test or admitting the
19 opinion of the officer based on the field test as to
20 what the substance was.
21          THE COURT: All right. Now, I have
22 admitted the testimony of the field test.
23          MS. RODRIGUEZ-COSS: Correct.
24          THE COURT: I have permitted him to
25 testify on what -- how he does it and what it shows

964

1 and what it's testing for. And what happened here,
2 it turned blue, and I read the instructions on the
3 box that say it's testing for the presence of
4 cocaine and several other A-I-N-E chemicals.
5          Although it is a little more detailed in
6 the instructions on the box of the exhibit about if
7 its flakes left or totally dissolved what that
8 means, and I think it's undisputed that it's not
9 conclusive for the presence of cocaine, but it is an
10 indication that cocaine may be present. And that
11 was what the Court concluded in U.S. v. Blotcher
12 from the Eastern District of North Carolina. I'm
13 sorry, from the Fourth Circuit at 92 F.3d 1182, and
14 it reviewed the district court's ruling permitting
15 the officer who conducted the field test to testify
16 as to its results because the field test was
17 customarily used by officers in the field and
18 reliably, although not conclusively, indicated the
19 presence of cocaine. There was also five other
20 witnesses that the defendant distributed crack
21 cocaine and an officer who testified he found a
22 white substance with pebbles in an apartment used by
23 the defendant even without the test. And,
24 therefore, the court found the officer's testimony
25 as to field test was admissible to the extent it

965

```
1   tended to confirm the presence of cocaine.  The
2   Fourth Circuit concluded that was not abuse of
3   discretion referencing Paiva.  And there is
4   discussion of the 403 balancing as well.
5          While that is not -- so that is -- we are
6   at least partway there in terms of the test results
7   have been admitted and what the significance of
8   those test results were to Officer Rosado.  So, I
9   think that what remains is whether he can give his
10  opinion as to whether that was cocaine and whether
11  or not that was crack cocaine.
12         The test doesn't test for crack cocaine,
13  it just tests for the presence of cocaine in some
14  form, right.
15         MS. RODRIGUEZ-COSS:  That is correct,
16  your Honor.
17         THE COURT:  All right.  So, he has
18  already testified that this test tests for the
19  presence of cocaine.  If it's blue, cocaine is
20  present.  What more would you add?
21         MS. RODRIGUEZ-COSS:  To Mr. Rosado's
22  testimony?
23         THE COURT:  Yes.
24         MS. RODRIGUEZ-COSS:  I believe that
25  after he explained the test kit and said that he
```

966

```
1   puts the powder in and it turned blue, and then I
2   said, and what does that indicate, and there was an
3   objection.  And I believe the Court did not allow
4   him to answer that last question.  We would ask that
5   we be allowed to ask him what this blue indicated.
6          THE COURT:  My notes say that he said
7   field test on suspected narcotics, if it's blue it's
8   positive for cocaine and the blue color resulted.
9          MS. RODRIGUEZ-COSS:  All right.  Okay.
10         THE COURT:  I don't know what more you
11  want.  He's not going to give an opinion it's
12  cocaine because it's just an indication that cocaine
13  may be present.
14         MS. RODRIGUEZ-COSS:  Right.  So we
15  would, again, based on the cases that we cited, your
16  Honor, we'd also refer the Court to the amendments
17  of Rule 701 where they state that courts have
18  permitted lay witnesses to testify that the
19  substance appeared to be a narcotic so long as a
20  foundation of familiarity with the substance is
21  established.  And it's citing United States v.
22  Westbrook, 896 F.2d 330.  Again, United States v.
23  Paiva, also a person was allowed to testify as to
24  what they believed the substance was based on their
25  familiarity with the substance.  In United States v.
```

967

```
1   -- I'm not sure how to pronounce --
2          THE COURT:  Do you know what, I will
3   look at these cases, but it's now ten o'clock.  I
4   would have expected to have received something from
5   you so that I could have read them last night.
6   Let's just proceed as best we can, the scope being
7   that he can tell you how do the test, what the test
8   is for, what he's trained to do on the test, and
9   what his test results were.  And that he has already
10  testified to.  And the weights, he's given the
11  weights.  All right, so we will proceed on that.
12         And Mr. Sheehan, is it your position that
13  notice of a 701 lay expert opinion is also required?
14         MR. SHEEHAN:  Yes, your Honor.
15         THE COURT:  Would that be an expansive
16  reading of Rule 701?
17         MR. SHEEHAN:  I think it probably would.
18         THE COURT:  All right, let's proceed.
19  And we will be guided by those parameters.
20         Okay, bring the jury in.
21         MR. SHEEHAN:  Well, your Honor, let me
22  go back.  Isn't it really -- I mean, I realize I --
23         THE COURT:  Do you know what?
24         MR. SHEEHAN:  Isn't it based on
25  scientific, technical or other specialized
```

968

```
1   knowledge?
2          THE COURT:  Or it's not.
3          MR. SHEEHAN:  He's shaking the can.
4   He's relying on the test.
5          THE COURT:  It's something that a person
6   simply trained on how to use the kit could do.
7   That's why I've stopped short on any conclusion
8   beyond what the blue was supposed to mean.  Okay.
9          MR. SHEEHAN:  I just -- I just withdraw
10  my agreement that it was an expansive reading, but I
11  understand your Honor's ruling and I won't pursue it
12  any further.
13         THE COURT:  What you are really saying
14  is he's a 702 witness.  You are not saying the
15  notice is required under 701 because the opinion
16  can't be based on scientific, technical or other
17  specialized knowledge.
18         MR. SHEEHAN:  I'm saying he's not under
19  701.
20         THE COURT:  That's what I thought you
21  were saying.
22         MR. SHEEHAN:  You are right.
23         THE COURT:  And 702 requires notice.
24         MR. SHEEHAN:  Right.
25         THE COURT:  I think we're all set.
```

969

```
 1   Okay.
 2              (Jury entered the courtroom)
 3              THE COURT:  Good morning.  Please be
 4   seated.  We will continue with Officer Rosado.
 5              Sir, you remain under oath.  And
 6   Mr. Sheehan may continue his cross-examination.
 7          O R L A N D O   R O S A D O
 8   Having previously affirmed, was examined and
 9   testified as follows:
10   CONTINUED CROSS-EXAMINATION
11   BY MR. SHEEHAN:
12       Q.   Good morning, Officer.
13       A.   Good morning.
14       Q.   I want to kind of stop -- cut off what I
15   was asking you for a moment and go back to
16   something.
17            You have indicated in your testimony that
18   when you went to the apartment -- when you
19   participated in that seizure on July 1st, that you
20   had a conversation with Mr. Hodges about
21   cooperation.
22       A.   Yes.
23       Q.   Are you Officer Q?
24       A.   Yes.
25       Q.   Okay.
```

970

```
 1       A.   That's my name.
 2       Q.   And let me ask you this:  Do you recall
 3   Mr. Hodges offering to make certain buys for you?
 4       A.   No.
 5       Q.   Did you -- when you had this discussion
 6   with Mr. Hodges, did you give him permission to
 7   continue selling narcotics out of apartment 211?
 8       A.   No.
 9       Q.   Did you tell him, hey, look, if you get me
10   a couple of buys I won't bother you with the
11   operation you got going on here?
12       A.   No.
13       Q.   Would that be part of your standard
14   operating procedure, to tell people that you just
15   arrested that they can continue to commit crimes if
16   they provide you with any kind of information?
17       A.   No.
18       Q.   Did Mr. Hodges at that point in time when
19   he was offering to make certain buys, did he -- and
20   I don't want to ask you exactly what he said, but
21   did he suggest to you that there were other people
22   in the building that were dealing drugs that he was
23   aware of that he could make buys from?
24       A.   I don't recall that conversation, no.
25       Q.   And I take it if he had asked for
```

971

```
 1   permission you wouldn't have given it to him, right?
 2       A.   No, no.
 3       Q.   Now, on your -- in your testimony there
 4   were the two searches.  And the first one was in
 5   March.  And I believe you testified that you
 6   tested -- you did a kind of a test on the material
 7   that you found in the apartment, right?
 8       A.   Yes.
 9       Q.   Now, I'm not asking you about the results
10   of that test, but I just want to ask you, that
11   requires you to remove a little bit of the material
12   from one of the baggies, right?
13       A.   Yes.
14       Q.   And that's what you used to do that test?
15       A.   Yes.
16       Q.   Okay.  At no point in time did you remove
17   all of the material from all of the baggies, did
18   you?
19       A.   No.
20       Q.   And so whatever material was in the other
21   bags stayed there, right?  I mean, you just took it
22   to the evidence locker, I take it?
23       A.   Yes.
24       Q.   And the standard procedure would be that
25   those materials would then be sent -- well,
```

972

```
 1   particularly if a case was going to trial, they
 2   would be sent to the state lab for analysis, right?
 3       A.   Yes.
 4       Q.   And in this context, these packages were
 5   not sent to the state lab, were they?
 6       A.   Not to my knowledge.
 7       Q.   And at no point in time did you remove all
 8   of the material from the baggies, right?
 9       A.   No.
10       Q.   So, when you testified as to the weight of
11   the material that you found in the apartment, that
12   was what they call the total gross weight, right?
13       A.   Yes.
14       Q.   T-G-W?
15       A.   Yes.
16       Q.   And in that total gross weight, what you
17   are doing is you are taking that bag with the bags
18   inside it, you are putting it on a scale and you are
19   recording whatever that reflects, right?
20       A.   Usually I wouldn't test the -- let's say it
21   was in a sandwich bag, I would just test the ZipLoc
22   bags.
23       Q.   Okay.  You pile all of those ZipLoc bags on
24   the scale and that's the total gross weight, right?
25       A.   Yes.
```

973

```
1     Q.   And so that total gross weight consists of
2   the bags, the ZipLoc bags, and whatever is in them,
3   right?
4     A.   Yes.
5     Q.   All right.  It doesn't tell us what is
6   actually in the bags, does it, as far as the weight,
7   because it's including the weight of the bags,
8   right?
9     A.   Yeah.
10    Q.   Yeah.  And, in fact, sometimes when it goes
11  to the lab, you are familiar with their procedures,
12  they separate it out and they weigh the -- they
13  distinguish between the bag and the substance,
14  right?
15    A.   I'm not sure how they operate up there.
16    Q.   All right.  And on that day, on March 30th,
17  you found six people in that apartment, right?
18    A.   Yes, there were six people there.
19    Q.   And you found -- you ended up seizing --
20         THE COURT:  I'm sorry, is it March 30th
21  or 31st?
22         MR. SHEEHAN:  I believe it's March 30th
23  but I might have misspoken.  It appears to be.
24    Q.   Do you remember, Officer, from your notes?
25    A.   The date?
```

974

```
1     Q.   Yeah.
2     A.   It was the 30th into the 31st.
3     Q.   Oh, okay.  It started late at night.
4     A.   Yes.
5     Q.   And it just leaped over into the next day.
6   Okay.  I take it you found -- six people were
7   arrested, right?
8     A.   I believe so, yes.
9     Q.   And you recovered a total of nine pipes,
10  did you not?
11    A.   I don't recall the total amount of pipes.
12    Q.   Okay, would looking at your -- at the
13  report refresh your recollection as to the amount of
14  pipe?
15    A.   Yes, sir.
16    Q.   I'm going to test my technical capabilities
17  here.
18         THE COURT:  Are you showing him this to
19  refresh his recollection?  It's not an exhibit then.
20         MR. SHEEHAN:  No, it's not an exhibit,
21  but I'll just hand it to Officer Rosado.
22         MS. RODRIGUEZ-COSS:  We have no
23  objection if he wants to submit it.
24         Do you want to submit it?
25         MR. SHEEHAN:  No.
```

975

```
1          THE COURT:  It's just being used to
2   refresh recollection.
3          The question is whether reading that
4   report refreshes your recollection of how many crack
5   pipes were found at the scene.
6          THE WITNESS:  Yes.
7          THE COURT:  Does it refresh your
8   recollection?
9          THE WITNESS:  Yes.
10         THE COURT:  How many were there?
11         THE WITNESS:  There was nine.
12    Q.   And you don't need glasses to read yet, do
13  you?
14    A.   Not yet.  Close.
15    Q.   And you did a thorough search of the
16  apartment, did you not?
17    A.   Yes.
18    Q.   Because, in fact, you were searching it
19  pursuant to a search warrant, right?
20    A.   Yes.
21    Q.   And do you remember how much cash you
22  recovered at that time?
23    A.   This was in March?
24    Q.   Yes.
25    A.   I want to say maybe $260.
```

976

```
1     Q.   Well, in fact, it was zero, wasn't it?
2          MS. RODRIGUEZ-COSS:  I'm sorry, is
3   counsel asking a question or --
4          MR. SHEEHAN:  I'm asking.
5          MS. RODRIGUEZ-COSS:  We had no objection
6   to the report being admitted; we do have an
7   objection to counsel testifying.
8          THE COURT:  The question was followed up
9   by "wasn't it."
10         MR. SHEEHAN:  Yeah.
11         THE COURT:  Why don't you ask the
12  question again, please.
13    Q.   It was -- there was zero cash recovered at
14  that search, right?  There were two searches, right?
15    A.   There were two search warrants executed,
16  yes.
17    Q.   Well, let me show you, just to see if this
18  refreshes your recollection as to the timing.  This
19  is referencing the March seizure.
20    A.   Yes.
21    Q.   Okay.  So, in March there was no money
22  found there, right?
23    A.   No money.
24    Q.   And money is something that is commonly
25  seized if it appears to be the proceeds of drug
```

977

```
1   trafficking activity, right?
2       A.   Yes.
3       Q.   Because, among other things -- well, A,
4   it's evidence of drug trafficking, right?
5       A.   Yes.
6       Q.   And, B, it's subject to forfeiture.
7       A.   Yes.
8       Q.   And forfeiture means it basically goes back
9   to the -- it goes to the state, right, that amount
10  of money?
11      A.   I believe so, yes.
12      Q.   And on July 1st when you searched -- and I
13  have to grab this other file.  I'm sorry.
14           Again, there were six people.
15      A.   Yes.
16      Q.   Different people this time, though, right?
17  Some of them anyway.
18      A.   I believe so.
19      Q.   Okay.  And again, there were numerous pipes
20  that were -- what appeared to be smoking pipes that
21  were recovered.
22      A.   I would have to refer to the report.
23      Q.   Let me show you your -- actually, this
24  isn't your report.  I don't want to mislead you on
25  that.  Let me show you what is represented to be the
```

978

```
1   report.
2            THE COURT:  All right, materials that
3   are used to refresh a witness's recollection aren't
4   in evidence.  A witness isn't testifying from that
5   document.  But it is -- a witness may use anything
6   to refresh his or her recollection.  And then if
7   that recollection is, in fact, refreshed, then they
8   can testify to you from the refreshed recollection.
9            I want to make clear about that.  So it
10  doesn't really matter what that is, you can just
11  show it to him and see if that refreshes his
12  recollection.
13           MR. SHEEHAN:  Okay.
14           THE COURT:  And that has -- go ahead.
15      Q.   And, in fact, on that day in July, instead
16  of being the evidence guy, you were the ram, right?
17      A.   Well, I was assigned to the ram.
18      Q.   Let me show you that report and ask you if
19  that refreshes your recollection.
20      A.   I'm sorry, what was the question?
21      Q.   I think the question was that there were a
22  lot of -- there were -- again, there were various
23  pipes that -- glass pipes that were recovered there,
24  right?
25      A.   Yes.
```

979

```
1       Q.   Some of these pipes were in people's
2   pockets, weren't they?
3       A.   I believe so.
4       Q.   Some were on the floor next to people when
5   the search took place?
6       A.   I don't recall.  I'm sorry.
7       Q.   Okay.  And on that the occasion there was
8   currency seized, was there not?
9       A.   Yes.
10      Q.   And the total amount of that was $290.
11      A.   Yes.
12           MR. SHEEHAN:  I don't have any further
13  questions.  Thank you very much.
14           THE COURT:  Redirect.
15  REDIRECT EXAMINATION
16  MS. RODRIGUEZ-COSS:
17      Q.   So, as a narcotics agent executing a search
18  warrant for drugs and drug paraphernalia, when you
19  go into an apartment like apartment 211 at 215
20  Charles Street, what do you look for?
21      A.   We're looking for narcotics evidence
22  usually or related to that.
23      Q.   And when you say "narcotics evidence," you
24  are talking about what?
25      A.   Crack pipes, crack cocaine and cocaine, and
```

980

```
1   marijuana, those copper filters.
2       Q.   So narcotics or anything related to the use
3   of narcotics; is that correct?
4       A.   Yes.
5       Q.   All right.  And counsel asked you about
6   whether the narcotics, after you field test them,
7   are usually sent to the state lab, correct?
8       A.   Well, we fill out the form, it goes to the
9   property division.  I believe if it's going to go to
10  trial, I believe the court asks it to go to the lab,
11  to get tested to the lab.
12      Q.   So, if the case is actually going to
13  progress to trial, then the narcotics are sent to
14  the state lab for further testing.
15      A.   I believe that's how it goes.
16      Q.   Is that to avoid unnecessary work by the
17  lab when the case is not going to progress to trial?
18           MR. SHEEHAN:  Objection.
19           THE COURT:  Sustained.
20      Q.   If you know, Agent Rosado, why is that?
21           MR. SHEEHAN:  Objection.
22           MS. RODRIGUEZ-COSS:  If he knows.
23           THE COURT:  He said he doesn't know what
24  the state lab does.
25           MS. RODRIGUEZ-COSS:  No, no, that was
```

981

```
1    not my question.  If he knows why is it that the
2    court waits to see if a case is going to go to trial
3    to request the testing.
4           MR. SHEEHAN:  Objection.
5           THE COURT:  Sustained.
6       Q.   All right.  Do you know whether the arrest
7    of Frankie Hodges either on March 31st or July 1st
8    progressed to trial?
9       A.   No.
10      Q.   You indicated previously during your
11   testimony that you did have a conversation with
12   Frank Hodges after the July 1st, 2005, arrest,
13   correct?
14      A.   Yes.
15      Q.   And I had asked you what you told him.
16      A.   I told him what I told everyone that gets
17   arrested, try to develop more narcotics
18   intelligence, try to find out who the person might
19   be buying the drugs that they had at the time.
20      Q.   All right.  And you said that -- okay.  Let
21   me ask you this:  When do you see Frank Hodges
22   again?
23      A.   After that arrest?
24      Q.   After the arrest.
25      A.   Yesterday.
```

982

```
1       Q.   Here in court?
2       A.   Yes.
3       Q.   All right.  So it would be fair to say you
4    never conducted any affirmative investigation
5    involving the use of Mr. Hodges as an informant.
6       A.   No.
7       Q.   All right.  Do you know if he continued to
8    sell narcotics after July 1st, 2005?
9           MR. SHEEHAN:  Objection.
10          THE COURT:  Well, that's a yes or no
11   question.  Do you know?
12          THE WITNESS:  No.
13      Q.   If you had observed Mr. Hodges selling
14   narcotics, what would you have done?
15      A.   We would have placed him under arrest.
16      Q.   Now, generally speaking, Agent Rosado, how
17   often do you find individuals that you've placed
18   under arrest for the sale of narcotics continue to
19   sell narcotics afterwards?
20          MR. SHEEHAN:  I'm going to object, your
21   Honor.
22          THE COURT:  Basis?
23          MR. SHEEHAN:  Your Honor, A, it's
24   irrelevant; and B, I don't think it has -- A, it's
25   irrelevant and B, it's irrelevant.
```

983

```
1           THE COURT:  I'll sustain it on
2    relevance.
3       Q.   Just one more question.
4           You indicated that Mr. Hodges was not the
5    only individual arrested on March 31, 2005, at the
6    apartment at 211 215 Charles Street; do you recall
7    that?
8       A.   Yes.
9       Q.   Do you recall who else was arrested?
10      A.   I remember James Rucker.  I just don't
11   remember the other persons' names.
12      Q.   If I give you an opportunity to review the
13   report from that day, would that refresh your
14   recollection?
15      A.   It would help, yes.
16      Q.   Just take a few minutes to review that.
17          Does that refresh your recollection as to
18   who else?
19      A.   It does, but I may forget some of their
20   names.
21      Q.   Well, who do you remember?
22      A.   Roberto Delmoral, Jimmy Epps, Tyler Bember,
23   Juanita Hopkins, Frankie Hodges, James Rucker.  I
24   think that's it.
25      Q.   All right.  And one last question,
```

984

```
1    Agent Rosado.  When you make an arrest such as the
2    arrest that you described either on March 31, 2005,
3    or July 1st, 2005 -- in those two instances you
4    arrested Frank Hodges; is that correct?
5       A.   Yes.
6       Q.   When you make an arrest like that, if the
7    case proceeds to trial, are you generally called to
8    testify at that trial?
9           MR. SHEEHAN:  Objection, irrelevant.
10          THE COURT:  Sustained.
11      Q.   Were you called ever to testify pursuant to
12   your work conducted on March 31st or July 1st, 2005?
13          MR. SHEEHAN:  Objection, irrelevant.
14          THE COURT:  You mean in Mr. Hodges'
15   cases?
16          MS. RODRIGUEZ-COSS:  Yes, ma'am.
17          THE COURT:  Overruled.
18      A.   Yes, I believe I was called.
19      Q.   To testify during a trial?
20      A.   I guess to talk to the prosecutor about the
21   case.
22      Q.   Okay.  So, did you ever testify the way you
23   are doing today here in court?
24      A.   No.
25          MS. RODRIGUEZ-COSS:  We have nothing
```

**GA246**

985

```
1    further, your Honor.
2              THE COURT:  Any recross?
3              MR. SHEEHAN:  Just briefly.
4    RECROSS-EXAMINATION
5    BY MR. SHEEHAN:
6      Q.  Counsel asked you about what you're looking
7    for when you execute a search warrant in a narcotics
8    case, right?
9      A.  Yes.
10     Q.  And when you execute a search warrant what
11   you do is you go to a judge and you ask the judge
12   for permission to seize certain property, right?
13     A.  Yes.
14     Q.  And you make a listing of the kind of
15   property that you think you might find there that
16   would be relevant in your investigation, right?
17     A.  A list of the items we seized?
18     Q.  Well, when you make your application, you
19   say that certain property is likely to be there.
20     A.  Yeah, I believe that's in the body, yes.
21     Q.  And among them are monies, right?
22     A.  Yes.
23     Q.  Financial records?
24     A.  Yes.
25     Q.  And in this case, at least as to the
```

986

```
1    March 30-31st search, the one that went over
2    midnight, you didn't find any monies or financial
3    records, did you, that you seized?
4      A.  No.
5              MR. SHEEHAN:  I have no further
6    questions.
7              THE COURT:  All right then, anything
8    further?
9              MS. RODRIGUEZ-COSS:  Yeah, the Court's
10   indulgence, your Honor.
11   RE-REDIRECT EXAMINATION
12   BY MS. RODRIGUEZ-COSS:
13     Q.  Agent Rosado, counsel just asked you about
14   the search warrant that you obtained.  On the
15   March 30, 2005 -- March 31st, 2005 search, were you
16   the affiant on the search warrant?
17             THE COURT:  Meaning were you the person
18   who wrote the affidavit and signed it under oath.
19     A.  I know I was the affiant on one of them.
20   I'm not sure which one of the two it was.
21     Q.  If I showed you the affidavit pursuant to
22   that search warrant, would that refresh your
23   recollection?
24     A.  Yes.
25     Q.  All right.  When you requested that search
```

987

```
1    warrant, what is the procedure?
2              MR. SHEEHAN:  I'm going to object, your
3    Honor.  It's outside the scope of my -- my recross
4    really was reflecting -- it was very narrow and this
5    is outside the scope of that.
6              THE COURT:  I think that's right.
7              MS. RODRIGUEZ-COSS:  Very well.
8      Q.  So with regards to the question asked by
9    counsel, he asked what you were looking for,
10   correct?
11     A.  Yes.
12     Q.  Who were you targeting?
13             MR. SHEEHAN:  Objection, outside the
14   scope of my examination, of my questioning.
15             MS. RODRIGUEZ-COSS:  It goes to
16   completeness.  He wasn't just looking for --
17             THE COURT:  When you do a search
18   pursuant to a warrant for narcotics, what are you
19   looking for.  It was a general question, it wasn't
20   specific in this case.
21             MR. SHEEHAN:  Correct.
22             THE COURT:  You may question on that
23   line.
24             MS. RODRIGUEZ-COSS:  So is the Court
25   sustaining the objection as to who he was targeting?
```

988

```
1              THE COURT:  Correct, as to this arrest
2    warrant, yes.
3              MS. RODRIGUEZ-COSS:  We have nothing
4    further.
5              THE COURT:  Okay, thank you.  All right,
6    sir, you are excused.  You may step down.
7              Will the government please call its next
8    witness.
9              MR. MARKLE:  Yes, your Honor, the
10   government would call Detective Paul Ortiz.
11             THE COURT:  Detective Ortiz, would you
12   please come over to the witness stand over here.
13             THE WITNESS:  Yes, ma'am.
14             THE COURT:  Please remain standing and
15   Ms. Torday will administer the oath to you.
16             P A U L   O R T I Z
17   Having first affirmed, was examined and testified as
18   follows:
19             THE WITNESS:  My name is Paul Ortiz.
20   Last name is spelled o-r-t-i-z, town of residence is
21   Bridgeport.
22             THE COURT:  All right, you may proceed,
23   Mr. Markle.
24             MR. MARKLE:  Thank you, your Honor.
25   DIRECT EXAMINATION
```

989

```
1   BY MR. MARKLE:
2       Q.   Good morning, Detective Ortiz.
3       A.   Good morning, sir.
4       Q.   Could you tell the ladies and gentlemen how
5   you are employed?
6       A.   I'm a detective with the Bridgeport Police
7   Department.
8       Q.   And for how long have you been a Bridgeport
9   police officer?
10      A.   Twenty years now.
11      Q.   And when did you become a detective?
12      A.   In June of 1999.
13      Q.   And prior to that were you a patrol
14  officer?
15      A.   Yes, sir, I was.
16      Q.   And at any time during your service with
17  the Bridgeport Police Department, were you a member
18  of the crime scene unit?
19      A.   Yes, sir, I was.
20      Q.   And when did you become a member of the
21  crime scene unit?
22      A.   The latter part of 2001.
23      Q.   And for how long were you a member of the
24  crime scene unit?
25      A.   Like eight years.
```

990

```
1       Q.   And what's your present -- who are you
2   presently assigned to, what unit?
3       A.   The ATF task force.
4       Q.   And what is the ATF task force?
5       A.   It's a federal bureau -- alcohol, tobacco
6   and firearms and explosives.
7       Q.   And what are your responsibilities with
8   them?
9       A.   I work directly with the agents, and we
10  concentrate on illegal guns that are being on the
11  streets of Bridgeport.
12      Q.   And back when you were with the crime scene
13  unit, did you receive any special training in
14  regards to your work with the crime scene unit?
15      A.   Yes, sir, I did.
16      Q.   And what sort of training did you receive?
17      A.   I've been to three crime scene schools,
18  basic, intermediate and advanced.  And those are by
19  the University of North Florida.  I've been to a
20  course on fingerprint analysis, blood spatter
21  school, and also a methods of instruction.  I'm
22  certified to teach crime scene to first responders
23  anywhere in the country.
24      Q.   You, yourself, teach?
25      A.   Yes, sir.
```

991

```
1       Q.   And were you trained in the obtaining and
2   preservation of evidence from crime scenes?
3       A.   Yes, sir.
4       Q.   That was part of all three of these
5   schools, I would assume.
6       A.   That is correct, sir.
7       Q.   And in regards to your experience, have you
8   in the course of working with the crime scene unit
9   alone, not in your overall Bridgeport work,
10  approximately how many crime scenes did you respond
11  to as a member of the unit?
12      A.   Crime scene, close to a thousand maybe.
13      Q.   And those involved varied types of crimes?
14      A.   Yes, all types of crimes, correct.
15      Q.   And approximately how many homicide scenes
16  have you responded to as a member of the unit?
17      A.   Close to 200.
18      Q.   And directing your attention to 2005 when
19  you were assigned to the crime scene unit, who else
20  was in the crime scene unit at that time?
21      A.   At that time it was Detective Joette Devan,
22  Detective Ricardo Vargas, and, let's see, Detective
23  Joseph Gallagher.
24      Q.   And directing your attention to August 24,
25  2005, do you recall responding to a crime scene on
```

992

```
1   that date?
2       A.   Yes, sir.
3       Q.   And what did you -- where did you respond
4   to?
5       A.   It was Charles Street.
6       Q.   And did you respond along with other
7   members of the crime scene unit?
8       A.   Yes, sir.
9       Q.   I'm going to show you what's been marked
10  Government Exhibit 102 and ask you if you recognize
11  what's depicted in this photograph.
12      A.   Yes, that's the complex that we went to the
13  crime scene, Charles Street, 201 (sic) Charles
14  Street.
15      Q.   And when you responded there on August 24,
16  2005 --
17      A.   Yes, sir.
18      Q.   -- upon arrival were other members of the
19  crime scene unit with you or already present?
20      A.   They were with me, correct.
21      Q.   And were you the first to arrive of the
22  crime scene unit personnel?
23      A.   I was the first to arrive, correct.
24      Q.   So you came in separate vehicles?
25      A.   We did.
```

993

```
1      Q.   And had the crime scene already been
2   secured?  Were there other officers there?
3      A.   It was secured.  There were officers there
4   present.
5      Q.   And how is it -- how was it secured when
6   you arrived there?
7      A.   There was crime scene tape along Main
8   Street and Charles.  Then also there is crime scene
9   tape along the parking lot area of this complex.
10  There is officers -- there was an officer at the
11  front door of the apartment that we entered.
12     Q.   So, it's fair to say that there was limited
13  access to the 215 Charles Street at that time?
14     A.   Yes.
15          MR. SHEEHAN:  I'm going to object to the
16  leading.
17     Q.   Was there open access to 215 Charles Street
18  on August 24, 2005, when you arrived?
19     A.   No, there wasn't.
20     Q.   And did you obtain -- did you get access to
21  the apartment building?
22     A.   I did, sir.
23     Q.   And how were you dressed when you accessed
24  215 Charles Street?
25     A.   Initially, when I first --
```

994

```
1      Q.   Initially.
2      A.   I was dressed in my crime scene uniform.  I
3   looked through the door, observed a couple bodies,
4   and I walked out.
5      Q.   And was that -- what apartment number was
6   that when you looked in?
7      A.   It was 101.
8      Q.   When you say in a crime scene uniform, what
9   kind of attire is that?
10     A.   They're military style paints BDUs, they're
11  called, and it was summertime, so we're allowed to
12  wear polo shirts.
13     Q.   And when you observed that, the crime
14  scene, from looking in through the door, did you
15  enter apartment 101?
16     A.   Just one foot.  I stepped one foot inside
17  the apartment and walked out.
18     Q.   And after seeing whatever you saw, did
19  you -- what, if anything, did you do?
20     A.   At that point I told my other members of my
21  unit that there was multiple bodies there and I
22  obtained a search warrant to enter the apartment.
23     Q.   And did you go to a state Superior Court
24  judge to get a search warrant?
25     A.   Yes, I did.
```

995

```
1      Q.   And were you the affiant on that search
2   warrant?
3      A.   Yes, I was.
4      Q.   And we just heard some discussion of a
5   search warrant.  You prepared a document that you
6   believe gave you reason to enter that apartment?
7      A.   That is correct.
8      Q.   And it was reviewed by that judge?
9      A.   Yes, sir.
10     Q.   And was it signed on that same day?
11     A.   Yes, it was.
12     Q.   And did it -- what did it allow you to do?
13     A.   It allowed --
14          MR. SHEEHAN:  Object.  I think what the
15  search -- I think it's irrelevant, your Honor.  He
16  has a legal search.  I think in that context we
17  don't need to know what the search warrant is
18  authorizing.
19          THE COURT:  I'm going to permit the
20  question.  There has been a great deal of discussion
21  about the search warrant.
22          Do you want to have him explain what a
23  search warrant authorizes him to do?  Is that your
24  question?
25          MR. MARKLE:  Yes, your Honor.
```

996

```
1          THE COURT:  Go ahead.
2      A.   It allows myself and members of the crime
3   scene unit to take evidence from the residence.
4      Q.   And did you, in fact, prepare to do that?
5      A.   Yes, sir, I did.
6      Q.   And did you, in fact, do that?
7      A.   Yes, sir.
8      Q.   And now once you had the search warrant and
9   were authorized to enter the apartment, what, if
10  anything -- how were you dressed at that time?
11     A.   Okay, at that point we put on what we call
12  a Tyvek suit.  It's a protective gear, place shoe
13  covers over your shoes, and the Tyvek suit with the
14  hat.
15     Q.   And what was the purpose of putting on that
16  attire?
17     A.   So that you don't bring anything into a
18  crime scene.  There is a principle that was made by
19  a scientist called Dr. Lockhart, and what he
20  explains is whenever you enter a crime scene you
21  leave something behind and whenever you exit you
22  take something with you.  So that's why you want to
23  protect yourself with a sterile -- sterile clothing.
24     Q.   And did you bring any other -- did you have
25  any equipment or items with you when you entered
```

997

```
1  apartment 101?
2      A.   When we first entered?  No.  It was just an
3  initial search at that point to look.
4      Q.   Tell us what you do.  What do you mean by
5  initial search?
6      A.   The first thing you do is you walk in, see
7  what you have, what kind of crime scene you have,
8  and then you go outside.  And then we'll discuss
9  what we're going to need to go further with our
10 search.
11     Q.   Now, you just said if you go in and out you
12 want to keep it -- you don't want -- want a sterile
13 environment.
14     A.   That is correct, sir.
15     Q.   Do you change your clothes?
16     A.   You have to every time you leave.
17     Q.   So, you take off the suit you wore in?
18     A.   You take off the suit, put a new suit on.
19     Q.   After making that assessment, putting on a
20 new suit, did you go back into apartment 101?
21     A.   We did.
22     Q.   Did you have anything with you at that
23 time?
24     A.   Yes, a camera so the area could be
25 photographed, video camera to videotape.
```

998

```
1      Q.   And did you all have -- who went into the
2  apartment at that time?
3      A.   Myself, Joette Devan, Ricardo Vargas.
4      Q.   And did you all have distinctive
5  responsibilities in regard to the crime scene?
6      A.   Yes, we did.
7      Q.   What was Detective Devan's?
8      A.   Hers was to record.  So, hers was to do the
9  report, take notes.
10     Q.   And how about Detective Vargas?
11     A.   Detective Vargas was photography.
12     Q.   And what was your responsibility?
13     A.   Mine was the evidence.
14     Q.   And when you say "the evidence," what do
15 you mean?  What is your responsibility in regards to
16 the evidence?
17     A.   I'm what they call the custody officer.
18 So, whatever the evidence is that's taken, I have to
19 document that and take possession of the evidence.
20     Q.   And do you just take that into your hands
21 and put it in your car or your vehicle, or how do
22 you do that?
23     A.   No, I put it in the -- bags, or whatever
24 type of evidence that needs to be seized has to be
25 put in a specific type of either a bag or a paint
```

999

```
1  can or a sterile paint can, anything like that, to
2  that effect, a plastic bag.
3      Q.   And were you prepared?  Did you have that
4  sort of equipment, those containers with you?
5      A.   Yes, sir.
6      Q.   Did you bring them into 101?
7      A.   Yes, sir.
8      Q.   And when you say a "paint can," is it -- we
9  saw paint cans.  Are they regular paint cans or
10 something special?
11     A.   They're what they call forensic paint cans.
12     Q.   And what does that mean?
13     A.   It means they're sterile.  It's not like --
14 it's you have to break a seal to open it up.
15     Q.   And different pieces of evidence demand
16 different types of containers?
17     A.   That is correct.
18     Q.   For proper preservation?
19     A.   For preservation, correct, to avert -- to
20 avoid any contamination like mold or something.
21     Q.   And was any evidence obtained from
22 apartment 101, physically seized, by any person
23 other than you?
24     A.   No, sir.
25     Q.   And was any piece of evidence seized that
```

1000

```
1  was taken into your possession -- was it taken into
2  your possession prior to it being photographed?
3      A.   No.
4      Q.   And is that standard operating procedure?
5      A.   That is correct.
6      Q.   And was that followed on August 24th, 25th
7  and 26th of 2005?
8      A.   Yes, sir.
9      Q.   Once you and the other members of the crime
10 scene unit entered apartment 101, was anyone else
11 allowed into the crime scene during the course of
12 your search?
13     A.   Well, other than the medical examiner, who
14 came with his assistant.  When he comes in -- when
15 he came in, rather, he was escorted in.
16     Q.   Was the chief of police, the deputy chief,
17 captains, anyone else that didn't have a
18 responsibility at the crime scene allowed in?
19     A.   No, not at all.
20     Q.   Were any tenants allowed in?
21     A.   No.
22     Q.   Have you had an opportunity to review the
23 items of evidence that you seized during the course
24 of your search on those three days?
25     A.   Yes, sir, I have.
```

1001

1   Q.   Did you -- were you present when that
2   evidence was shown or provided for defense counsel
3   to inspect?
4   A.   Yes.
5   Q.   And you sat through that presentation?
6   A.   Yes, I did.
7   Q.   And did you view the evidence again when it
8   was gathered in preparation of trial?
9   A.   Yes, sir, I did.
10  Q.   And where was the evidence that you seized
11  on those three days initially maintained?
12  A.   It was maintained at the Bridgeport police
13  property room.
14  Q.   And where did it go after that; if you
15  know?
16  A.   After that it went to the state lab for
17  analysis.
18  Q.   Other than items that were examined by the
19  forensic lab, when you viewed the evidence, those
20  two prior times since the seizure, were they -- did
21  they appear to be in substantially the same
22  condition and packaging as you packaged them on
23  August 24th, 25th and 26th?
24  A.   Yes, sir.
25  Q.   And you -- how many days did the search

1002

1   take?
2   A.   The search took three days.
3   Q.   And if on August 24th, 2005, it came to the
4   end of the day of the searching, what was done with
5   the evidence on that day?  Was it left at the scene
6   or was it taken?
7   A.   No, it was taken.  I took possession of it
8   then and I took it with me.
9   Q.   So, at the end of August 24th, 2005, what
10  was done with the evidence that had been seized up
11  until the time you ended that search?
12  A.   I took it back to Bridgeport police crime
13  scene unit.  We have a locker there, which I'm the
14  only -- whoever is in charge of the evidence is the
15  only one with the key.  There is only one key to a
16  locker.
17  Q.   And who had that key?
18  A.   I did.
19  Q.   And was the same done with the evidence
20  seized on August 25, 2005?
21  A.   Yes, sir.
22  Q.   And the same with August 26, 2005?
23  A.   Yes, sir.
24  Q.   Now, upon entering apartment 101, did you
25  observe the condition of the front door?

1003

1   A.   Yes, sir.
2   Q.   Is there any other door by which you can
3   access that apartment?
4   A.   No, there isn't.
5   Q.   And would you describe it as a large,
6   medium or small apartment?
7   A.   It's a small apartment.
8   Q.   And if you recall what the temperature was,
9   was it hot, warm, cold?
10  A.   It was real hot.
11  Q.   And was the air conditioning on or off?
12  A.   It was off.
13  Q.   And what did you observe as to the
14  condition of the front door?
15  A.   The front door had been smashed open.
16  Q.   And how did you know that?  What did you
17  observe?
18  A.   We observed the strike plate of the door
19  was on the interior of the floor underneath a couch.
20  Q.   The strike plate?
21  A.   The strike plate is the interior blocking
22  mechanism of the door.
23  Q.   And did you observe anything about the
24  frame of the door?
25  A.   Yeah, there was dry -- drywall screws

1004

1   screwed into the interior part of the door.
2   Q.   And do you recall what color those screws
3   were?
4   A.   They were black.
5   Q.   And did you see similar screws anywhere
6   else in the apartment?
7   A.   Yes, sir.
8   Q.   And do you recall where?
9   A.   They were on a table next to the door,
10  interior door.
11  Q.   Was that table -- how far away from the
12  door would that be?
13  A.   It was right next to the door, so, five
14  feet maybe.
15  Q.   And did you, during the course of the three
16  days of searching apartment 101, ever find a drill
17  in that apartment?
18  A.   No, we did not.
19  Q.   Did you ever find any baseball bats in that
20  apartment?
21  A.   No, sir.
22  Q.   Did you ever find any bloody clothing other
23  than the victims' in that apartment?
24  A.   No, sir.
25  Q.   During the course of the three-day search,

1005

```
1   did you find a cell phone charger?
2        A.   Yes, we did.
3        Q.   During the course of the three-day search,
4   did you ever find a cell phone in that apartment?
5        A.   No, we did not.
6        Q.   Now, as to the screws in the door, you say
7   they were on the interior.
8        A.   The interior, correct.
9        Q.   And did they attach the door to anything?
10  Were they -- could you describe how they were in the
11  door?
12       A.   They were screwed into the door.  So, into
13  the door frame.
14       Q.   So it would hold the door?
15       A.   So it would hold the door closed.  You
16  wouldn't be able to access the door.
17       Q.   Now, as to the front door, was there
18  evidence that was subsequently -- did you label your
19  evidence?
20       A.   Yes, sir, I did.
21       Q.   And you gave it your own exhibit number?
22       A.   Yes.
23       Q.   And whose responsibility was that?
24       A.   That's my responsibility.
25       Q.   And do you recall on the front door whether
```

1006

```
1   there was evidence that was labelled Bridgeport
2   Exhibit 35?
3        A.   Yes, sir.
4             MR. MARKLE:  Just a moment, your Honor.
5        Q.   Detective Ortiz, showing you Government's
6   Exhibit 167, do you recognize that item?
7        A.   Yes, sir.
8        Q.   And what do you recognize that to be?
9        A.   It's the swabs of the door lock.
10       Q.   And from what door were those swabs taken?
11       A.   This is the interior of the entrance door.
12       Q.   And when you say by the lock, could you
13  describe that for us?  Where were those swabs taken?
14  Where exactly were they located?
15       A.   The interior door.  Actually -- excuse me.
16       Q.   I'm going to show you -- maybe this will
17  help.
18            Showing you what's been marked 165, do you
19  see that on your monitor?
20       A.   Yes, sir.
21       Q.   Is that the interior lock you are referring
22  to?
23       A.   Yes, sir.
24       Q.   Why is the ruler in that photograph?
25       A.   It's a scale.  It's to show the size of the
```

1007

```
1   blood-like substance that's on the lock.
2        Q.   And although it's very difficult to see on
3   165 on the screen, did you observe a blood-like
4   stain on the door just above the lock?
5        A.   Yes, sir.
6        Q.   And is that what your Exhibit 35, our
7   Exhibit 167, is a swab of?
8        A.   Yes, it is.
9        Q.   And was that evidence originally marked
10  incorrectly?
11       A.   Yes, it was.
12       Q.   And did it indicate it was found -- where?
13       A.   It indicated on the evidence it was
14  actually found on a wall.
15       Q.   And is that correct or not?
16       A.   It was not correct.
17       Q.   And did you discover that mistake was made
18  prior to trial?
19       A.   Yes, it was.
20       Q.   And did you do anything to correct that
21  mistake?
22       A.   I did.
23       Q.   And when did you discover that?  Was it a
24  while ago or. . .
25       A.   It was years ago.
```

1008

```
1        Q.   And what did you do to correct that error
2   to where it was found?
3        A.   I wrote a memo to my captain notifying her
4   of the mistake that I made.
5        Q.   And is there any question in your mind that
6   your Exhibit 35, Government's Exhibit 167, was found
7   on the interior of the front door by the lock?
8        A.   Yeah, that's where it was found, correct.
9        Q.   Now, where in relation to the screws in the
10  door was the deadbolt lock in the lock that's
11  depicted in 165?
12       A.   It's above and to the right and left of
13  that lock.
14       Q.   That's where the screws were in the door
15  frame?
16       A.   That's where the screws were, correct.
17       Q.   And in the course of conducting your search
18  or after your search, do you prepare a property
19  report?
20       A.   I do, sir.
21       Q.   What is the purpose of that report?
22       A.   It shows the time the evidence is
23  collected, the date, the location, and it also
24  describes the evidence that was collected.
25       Q.   And do you also prepare -- or does one of
```

1009

1 the members of the unit prepare what is called a
2 crime scene report narrative?
3    A.   Yes, sir.
4    Q.   And what is the purpose of that?
5    A.   The narrative just gives you more detail of
6 the actual scene and where the evidence is located.
7    Q.   And have you reviewed the crime scene
8 report narrative that was dated August 28, 2005?
9    A.   Yes, sir.
10    Q.   And does that accurately indicate where
11 your Exhibit 35, our Exhibit 167, was located?
12    A.   Yes, it does.
13    Q.   And that is as you've just testified?
14    A.   Right, on the lock.
15    Q.   Now, in conducting the search, what were
16 the first items that you took into -- that you dealt
17 with and took into evidence?
18    A.   It was duct tape that was found on the
19 victim -- victims.
20    Q.   And do you recall whether it was -- whether
21 you first went -- how many victims were found in the
22 apartment?
23    A.   There was three victims.
24    Q.   And was there a room where there was only
25 one victim?

1010

1    A.   That is correct, sir.
2    Q.   And a room where there were two victims?
3    A.   Yes, sir.
4    Q.   Did you subsequently learn that Basil
5 Williams was the victim who was alone in the room?
6    A.   That is correct, sir.
7    Q.   Did you proceed to conduct a search of the
8 room in which Mr. Williams was found?
9    A.   Yes, sir.
10    Q.   And in the course -- what was the first
11 thing you did in regards to Mr. Williams?
12    A.   In terms of collecting the evidence?
13    Q.   Yes.
14    A.   Myself, the medical examiner, and the
15 medical examiner's investigator -- well, I was the
16 one who actually made the incisions, the cut into
17 the duct tape to remove the duct tape from the
18 victims' bodies.
19    Q.   I want to show you what's been marked
20 Government's Exhibits 120A, 120A-1, 120B, 121C,
21 120C-1, 120D, and 120D-1.  I'd ask you to take a
22 look at those various items.  I'm going to ask if
23 you recognize them.
24    A.   Yes, sir.
25    Q.   And how do you recognize those items,

1011

1 Detective?
2    A.   These are the items I collected at the
3 scene from the victims.
4    Q.   How can you tell that those were the items
5 that were seized from 101 Charles Street on
6 August 24, 2005?
7    A.   It's the packaging I used, my initials, and
8 also the label that I created.
9    Q.   And so the white label on each of those
10 items is a Bridgeport Police Department label?
11    A.   That is correct, sir.
12    Q.   And your initials or your name is on every
13 one of those items?
14    A.   Yes, sir.
15    Q.   And does it reflect the date and time that
16 it was seized?
17    A.   Yes, it does.
18    Q.   And does it reflect the location from which
19 it was seized?
20    A.   Yes, sir, it does.
21    Q.   And does it reflect what the item is, a
22 summary or a description of the item?
23    A.   Yes, it does.
24    Q.   Now, in regards to the plastic -- let me
25 just -- this is 120A-1, 120C-1, and 120D-1, do you

1012

1 know how these items -- what's contained in those
2 plastic envelopes?
3    A.   This is the duct tape that was removed from
4 the victims, which I removed from the victims.
5    Q.   And did you personally do that?
6    A.   Yes, sir, I did.
7    Q.   Did you literally -- how did you do that?
8    A.   With a pair of sterile scissors, I cut, I
9 made cuts, made a cut through the duct tape and
10 pried it off the victim's face, arms and ankles.
11    Q.   And what was originally done with the duct
12 tape?
13    A.   It was --
14    Q.   After it was taken off the victim?
15    A.   Sure.  It was placed in a sterile paint
16 can, forensic can.
17    Q.   And do you know how it was removed from
18 that paint can?
19    A.   The lab.
20    Q.   And then did you subsequently remove it --
21 was it put back in the paint can?
22    A.   It was, yes, sir.
23    Q.   How did it get into the plastic bags in
24 which it's now maintained?
25    A.   I removed it from the plastic -- excuse me.

**GA253**

1013

```
 1   I removed it from the paint cans and put it in these
 2   plastic bags with the heat seal on top.
 3       Q.   And you personally do that?
 4       A.   Yes, I did.
 5       Q.   Where did you do that?
 6       A.   This was done at the FBI building.
 7       Q.   And is that duct tape that was -- where was
 8   that duct tape found on the victim Basil Williams?
 9       A.   Basis Williams, it was found on his head,
10   his wrists and his ankles.
11       Q.   And was the clothing, any of the clothing
12   of Mr. Williams taken?
13       A.   Yes, sir.
14       Q.   And is that included in the exhibits I just
15   mentioned?
16       A.   Yes, it is.
17       Q.   In the brown paper bag that you're holding?
18       A.   Yes, sir, it is.
19       Q.   And is that in exactly the same condition
20   as when you -- is that the packaging material you
21   put it in?
22       A.   Yes, it is.
23       Q.   And it also bears your name, date and time?
24       A.   Correct, and my initials on the seal on the
25   back.
```

1014

```
 1       Q.   Now -- thank you.
 2       What did you next proceed to do after you
 3   had attended to the duct tape and the clothing of
 4   Mr. Williams?
 5       A.   We then went into the next bedroom and we
 6   followed the same process with the other two
 7   victims.
 8       Q.   And did you learn that one of those victims
 9   was a person by the name of Tina Johnson?
10       A.   Yes, sir.
11       Q.   And was she the only female victim in that
12   room?
13       A.   Yes, sir, she was.
14       Q.   Was there another victim in that room?
15       A.   There was.
16       Q.   And as to the victim Tina Johnson, did you
17   remove the duct tape?
18       A.   Yes, sir, I did.
19       Q.   Where was the duct tape on Tina Johnson?
20       A.   Again, it was across her mouth, she had a
21   piece above her eyes, and she had duct tape around
22   her wrists and on her ankles.
23       Q.   And did you remove all of that duct tape?
24       A.   Yes, sir, I did.
25       Q.   And did you remove any of her clothing?
```

1015

```
 1       A.   Yes, sir.
 2       Q.   And what did you remove?
 3       A.   It was a shirt that she had on.
 4       Q.   And for what reason did you remove the
 5   shirt?
 6       A.   It was because of blood spatter.  There was
 7   a pattern of blood spatter on her shirt, so we
 8   wanted to take it off so that it wouldn't be -- so
 9   it wouldn't be damaged or tainted with further blood
10   from her.
11       Q.   As to the duct tape, did you place -- what
12   did you do with it?
13       A.   The duct tape was then put in a forensic
14   can, paint can.
15       Q.   And if you look at Exhibits 121A, 121A-1,
16   120B, 121C, 120C-1, 121D and 121D-1, and I'm going
17   to ask you again if you recognize all of those
18   exhibits?
19           MR. SHEEHAN:  Your Honor, I'm going to
20   object to the compound nature of the question.
21           MR. MARKLE:  You want me to do it one by
22   one?
23           MR. SHEEHAN:  I think if he's going to
24   go through them one-by-one it makes sense to do it
25   that way, your Honor.
```

1016

```
 1           THE COURT:  Go ahead.
 2           MR. MARKLE:  I'm not sure I have to,
 3   your Honor.
 4           THE COURT:  All right.
 5           MR. MARKLE:  If counsel wants to go
 6   through them --
 7           THE COURT:  The question is, if you will
 8   look at all of those exhibits and indicate whether
 9   you recognize them, then there will be further
10   questioning about the individual exhibits.
11           Would you do that, please, sir.
12           THE WITNESS:  Yes, ma'am.
13           THE COURT:  Okay, go ahead, do that.
14           THE WITNESS:  Which one would you like
15   me to start with?
16           THE COURT:  Look at them all.
17           THE WITNESS:  Okay, I did.
18           THE COURT:  And you recognize them all?
19           THE WITNESS:  Yes, ma'am.
20           THE COURT:  All right, Mr. Markle, you
21   may proceed.
22       Q.   As to Exhibit 121A, can you find that one?
23       A.   Yes.
24       Q.   Do you recognize that exhibit?
25       A.   Yes, sir, I do.
```

1017

```
1   Q.   How do you recognize that exhibit?
2   A.   It's the duct tape I removed from the
3   victim.
4   Q.   And how did that end up in the plastic bag
5   in which it's contained?
6            THE COURT:  Which victim are you
7   referring to?
8            THE WITNESS:  It's Tina Johnson.
9            THE COURT:  Okay.
10  A.   I'm sorry.  I put the duct tape in the --
11  in this plastic bag and heat sealed the bag.
12  Q.   And does it appear that it was never opened
13  again?
14  A.   That is correct, sir.
15  Q.   And could you look at 121A-1.
16  A.   Yes, sir.
17  Q.   Do you recognize that exhibit?
18  A.   Yes, sir.
19  Q.   What is that?
20  A.   It's duct tape also.
21  Q.   And was that taken off of the victim Tina
22  Johnson?
23  A.   Yes, sir.
24  Q.   And do you know how it got into that
25  plastic bag?
```

1018

```
1   A.   I put it in that plastic bag.
2   Q.   And is it sealed, heat sealed?
3   A.   Yes, it is, sir.
4   Q.   Has it been opened since you heat sealed
5   it?
6   A.   No, sir.
7   Q.   And do you see Exhibit 121B?
8   A.   Yes, sir.
9   Q.   Do you recognize that exhibit?  Do you
10  recognize that?
11  A.   Yes, I do, sir.
12  Q.   Do you know what's in that paper bag?
13  A.   Yes, sir.
14  Q.   And does that appear to be your Bridgeport
15  police label?
16  A.   Yes, it does, sir.
17  Q.   Time, date and person and description of
18  the evidence.
19  A.   Yes, sir, it does.
20  Q.   And do you know what's -- what is in there?
21  A.   It's a shirt that was removed from Tina
22  Johnson.
23  Q.   Looking at Exhibit 121C, do you see that
24  exhibit?
25  A.   Yes, sir.
```

1019

```
1   Q.   Do you recognize that exhibit?
2   A.   Yes, sir.
3   Q.   And what is that?
4   A.   It's a paint can.
5   Q.   And was that one of the paint cans that the
6   duct tape was placed into when you seized it on
7   August 24, 2005?
8   A.   Yes, sir, it is.
9   Q.   And after that was put in the paint can, as
10  was done with all of the other duct tape, was it
11  sealed?
12  A.   Yes, sir, it was.
13  Q.   And was it maintained at the Bridgeport
14  Police Department?
15  A.   Yes, sir.
16  Q.   And subsequently made its way to the
17  forensic laboratory.
18  A.   That is correct, sir.
19  Q.   121C-1, do you see that exhibit?
20  A.   Yes, sir.
21  Q.   And what is that?
22  A.   It's the duct tape that was in the paint
23  can.
24  Q.   Do you know how it got in the plastic bag?
25  A.   Yes, sir.  I put it in the plastic bag.
```

1020

```
1   Q.   And did you heat seal that?
2   A.   Yes, sir, it's heat sealed.
3   Q.   And does it appear it was never opened
4   again?
5   A.   That is correct, sir.
6   Q.   121D and 121D-1, do you recognize those
7   exhibits?
8   A.   Yes, sir.
9   Q.   And what are they?
10  A.   They were -- they're forensic cans.
11  Q.   What we're calling paint cans?
12  A.   Paint cans, yes.
13  Q.   Sterile paint cans?
14  A.   Yes, sir.
15  Q.   How were they used in regards to this
16  investigation?
17  A.   The duct tape that was removed from the
18  victims were put into those cans.
19  Q.   Thank you.
20       I would ask you to look in this box of
21  evidence and inspect those items and tell us if you
22  recognize any or all of those pieces of evidence.
23       Have you taken a look at those exhibits?
24  A.   Yes, sir.
25  Q.   Do you recognize each and every one of
```

1021

```
 1   them?
 2       A.   Yes, I do, sir.
 3       Q.   Let's take Exhibit 122A.  Do you see that
 4   there?
 5       A.   Yes, sir.
 6       Q.   And what is that?
 7       A.   This is the forensic can.
 8       Q.   And was that can used in the course of your
 9   investigation?
10       A.   Yes, it was.
11       Q.   And did that pertain to the victim James
12   Reid?
13       A.   Yes, sir, it does.
14       Q.   And was he found in the same bedroom dead
15   with Tina Johnson?
16       A.   Yes, sir.
17       Q.   And what was done in regards to Mr. Reid
18   initially?
19       A.   Initially the duct tape, I removed the duct
20   tape for him.
21       Q.   Was there duct tape on his head?
22       A.   It was on his head, covering his face, on
23   his wrist, and also on his ankles.
24       Q.   Was his head wrapped in duct tape similar
25   to Tina Johnson or similar to Basil Williams or to
```

1022

```
 1   neither?
 2       A.   More like Basil Williams.
 3       Q.   So, virtually his entire head was wrapped.
 4       A.   Yes, sir.
 5       Q.   Was any part of his face exposed?
 6       A.   I believe his nose.
 7       Q.   And that duct tape was the duct tape that
 8   was seized from Mr. Reid's head?  Or do you know
 9   what went into 122A?
10       A.   Yes, sir.
11       Q.   And that was the duct tape from where?
12       A.   It was from his face and his head.
13       Q.   And do you see the duct tape -- do you see
14   the exhibit which contains the duct tape that was
15   originally contained in 122A?
16       A.   Yes, sir.
17       Q.   And what exhibit number is that?
18       A.   It's 122A-1.
19       Q.   And do you recognize that duct tape?
20       A.   Yes, sir, I do.
21       Q.   Do you know how it got into that plastic
22   bag?
23       A.   I'm the one who put it into plastic bag.
24       Q.   Heat sealed and never been opened?
25       A.   Heat sealed and never opened since.
```

1023

```
 1       Q.   Do you see Exhibit 122B?
 2       A.   Yes, sir.
 3       Q.   What is that?
 4       A.   It's the forensic can.
 5       Q.   And do you know what was placed into
 6   Exhibit 122B?
 7       A.   Yes, sir, it's the duct tape.
 8       Q.   And the duct tape from Mr. Reid's ankles or
 9   hands?
10       A.   It's from -- this is from his ankle --
11   excuse me -- yes, ankles.  I'm sorry.
12       Q.   Do you see the corresponding duct tape from
13   Mr. Reid's ankles?
14       A.   Yes, sir.
15       Q.   What exhibit number is that?
16       A.   It's 122D-1.
17       Q.   And is that in a plastic bag at this time?
18       A.   Yes, it is.
19            MR. SHEEHAN:  I'm sorry, may I -- did
20   counsel say D or B?
21            THE COURT:  You said D.
22            MR. SHEEHAN:  Okay.
23       Q.   Is that correct, is that D?
24       A.   That's correct, sir, 122D-1.
25       Q.   And was that sealed by you?
```

1024

```
 1       A.   Yes, sir.
 2       Q.   And was it heat sealed?
 3       A.   Yes, sir.
 4       Q.   Has it ever been opened?  Can you see if
 5   it's been opened?
 6       A.   It has not been opened.
 7       Q.   And the remaining, is there another paint
 8   can?
 9       A.   Yes, sir.
10       Q.   And what exhibit number does that have?
11       A.   This is 122C.
12       Q.   And do you recognize that?
13       A.   Yes, sir.
14       Q.   And was duct tape placed in 122C?
15       A.   Yes.
16       Q.   And do you know the duct tape from what
17   victim and from what part of his body?
18       A.   Yes, this is from his wrist.  This is James
19   Reid.
20       Q.   And do you see the actual duct tape that
21   was taken from Mr. Reid's wrists?
22       A.   Yes, sir.
23       Q.   And what exhibit number is that?
24       A.   It's 122C-1.
25       Q.   And is that in a plastic bag at this time?
```

**GA256**

1025

```
 1    A.   Yes, it is.
 2    Q.   Prepared by you?
 3    A.   Yes, sir.
 4    Q.   And heat sealed by you?
 5    A.   Yes, sir.
 6    Q.   And was that ever opened?
 7    A.   It has not been opened.
 8    Q.   Thank you.
 9         And all of these items were secured by you
10   in the paint cans originally.
11    A.   That is correct, sir.
12    Q.   And all of the items when they were
13   repackaged were repackaged not only in your
14   presence, but by you.
15    A.   By me, that is correct.
16         MR. MARKLE:  Your Honor, I'm going to
17   move to some other evidence.  I don't know if you
18   want to take the break.
19         THE COURT:  Maybe this is a good time to
20   take a break.
21         All right, we'll take a 15-minute break.
22   We'll say 15 minutes loosely.
23         (Jury exited the courtroom)
24         THE COURT:  Detective Ortiz, you may
25   step down.  We'll be back in 15 minutes.  Don't
```

1026

```
 1   discuss your testimony.
 2         THE WITNESS:  Thank you, your Honor.
 3         THE COURT:  All right.  Before we break,
 4   I might note on the issue of identification of drugs
 5   at trial, the matter of Singleton in the case that
 6   the defendant cites, the Connecticut Supreme Court
 7   has expressly said the opinion of the appellate
 8   court should not be followed in future cases.
 9         MR. SHEEHAN:  Okay, sorry for citing it
10   then, your Honor.  I saw that it had been reversed
11   as just being moot.
12         THE COURT:  They seem to not agree with
13   it.
14         MR. SHEEHAN:  All right.
15         THE COURT:  All right, we'll stand in
16   recess.
17         (Recess)
18         THE COURT:  All right, then, please be
19   seated.
20         And I have instructed the marshals to
21   take the jurors out to the back terrace for smoking
22   and fresh air at breaks because spectators in the
23   courtroom are on the front stairs.  At lunch we
24   won't have that problem because they'll all go off
25   in their respective areas.
```

1027

```
 1         MS. DAYTON:  Thank you, your Honor.
 2         THE COURT:  So if you can keep an eye
 3   out to make sure the right people are smoking in the
 4   right places; if smoke they must.
 5         MR. SMITH:  Through the mouth, I assume,
 6   your Honor.
 7         THE COURT:  We don't care whether they
 8   inhale.
 9         MR. SHEEHAN:  We're dating ourselves,
10   your Honor.  Most people won't even remember that
11   joke pretty soon.
12         MS. DAYTON:  What are you talking about?
13   I don't remember it.
14         THE COURT:  Well, I'm sorry for your
15   memory.
16         All right then, let's bring them in.
17         (Jury entered the courtroom.)
18         THE COURT:  All right, please be seated,
19   ladies and gentlemen.  We'll continue with
20   examination of Detective Ortiz by Mr. Markle.
21         MR. MARKLE:  Thank you, your Honor.
22    Q.   Detective Ortiz, I'm going to show you
23   what's been marked Government Exhibit 101B.
24         MR. MARKLE:  And this has been shown to
25   counsel and there is no objection on it, your Honor.
```

1028

```
 1         THE COURT:  101B?
 2         MR. MARKLE:  101B.  It's an add-on.
 3         THE COURT:  Without objection, it's a
 4   full exhibit.
 5    Q.   Do you recognize this diagram, Detective?
 6    A.   Yes, sir, I do.
 7    Q.   And have you see this before?
 8    A.   I have.
 9    Q.   And is this a true and accurate diagram,
10   sketch of the apartment 101?
11    A.   Yes, it is.
12    Q.   And the numbers on there we've heard about
13   before.  What do those represent?
14    A.   It represents the placement of the evidence
15   that was collected that day at that scene.
16    Q.   And you testified before -- earlier that
17   you first went into the bedroom where Basil Williams
18   was found; is that correct?
19    A.   That is correct.
20    Q.   And where on the diagram or sketch would
21   that bedroom be?
22    A.   It's the bedroom to the --
23    Q.   There is a pointer right by your back.
24   Could you just point to that?
25    A.   It's this bedroom here.
```

1029

```
1     Q.   So that's the bedroom closest to you as you
2  look at the sketch on the wall.
3     A.   Yes, sir.
4     Q.   Thank you.
5          And in regards -- did you give that bedroom
6  a name, northwest, southwest?
7     A.   Yes, sir, we did.
8     Q.   Is that the northwest bedroom?
9     A.   Yes, it is.
10    Q.   And in the northwest bedroom were any items
11 of evidence seized from there other than the duct
12 tape and the shirt from Mr. Williams?
13    A.   Yes, there was.
14    Q.   And I am going to show you what's been
15 marked Exhibit 123A.  Ask you to take a look at
16 Government's Exhibit 123A and ask you if you
17 recognize that item?
18    A.   Yes, sir, I do.
19    Q.   And how do you recognize that?
20    A.   This is the evidence that was seized in
21 that bedroom which I took custody of.
22    Q.   And do you know what's maintained in that
23 paper bag -- obviously that's been opened.  When you
24 originally seized the evidence, did you seal it in
25 that paper bag?
```

1030

```
1     A.   Yes, I did.
2     Q.   And what constituted the evidence known as
3  Exhibit 123A?
4     A.   The actual evidence, it's two plastic bags
5  and duct tape.  Two sections of duct tape.
6     Q.   I'm going to show you a photograph that's
7  marked Government's Exhibit 120-7 for
8  identification.  At this point, I'd ask you if you
9  recognize that photograph?
10    A.   I do.
11         MR. SHEEHAN:  120-7 or 127, I'm sorry.
12         MR. MARKLE:  120-7, sorry.
13    A.   I do, sir.
14    Q.   What is that a photograph of?
15    A.   This is that same bedroom, the northwest
16 bedroom, and on the ground is Basil Williams.
17    Q.   And is that a true and accurate depiction
18 of Basil Williams and items surrounding him when you
19 found him on August 24, 2005?
20    A.   Yes, sir, it is.
21         MR. MARKLE:  I would offer Government's
22 120-7, your Honor.
23         MR. SHEEHAN:  No objection.
24         THE COURT:  Full exhibit.
25    Q.   Now, as you look at that photograph, do you
```

1031

```
1  see anything over the back of Mr. Williams?
2     A.   Yes, sir, I do.
3     Q.   And what is that?
4     A.   It's a blanket.
5     Q.   And is that -- was that blanket on him or
6  placed on him by you or members of the crime scene
7  unit?
8     A.   No, it was on him when we arrived.
9     Q.   And when that blanket was eventually
10 lifted, was there anything that you noticed?
11    A.   Yes.  Underneath you could see -- well, his
12 arms are duct tied -- duct taped together.
13    Q.   And that's the duct tape you previously
14 testified about.
15    A.   That is correct, sir.
16    Q.   And next to his head, what's that white
17 item?
18    A.   It's a pillow.
19    Q.   And was anything found near or under that
20 pillow?
21    A.   Yes, sir, there was.
22    Q.   And what was that?
23    A.   It's the plastic bags that are in my hand
24 now.
25    Q.   And were those plastic bags -- did you
```

1032

```
1  seize them before this photograph was taken or after
2  it?
3     A.   After, sir.
4     Q.   And did you in fact seize them yourself or
5  did someone else?
6     A.   No, I seized them, sir.
7     Q.   And did you -- and what was there?  There
8  was a blue plastic bag?
9     A.   It was a blue plastic bag, correct.
10    Q.   Was there anything else?
11    A.   There was a white plastic bag.  There was a
12 section of duct tape that was holding those two bags
13 together.
14    Q.   And in regards to those bags, were they
15 placed in the paper bag that you hold in your hand
16 right now?
17    A.   I'm sorry?
18    Q.   Were they placed in the paper bag that you
19 are holding right now?
20    A.   I placed them in the paper bag.
21    Q.   And they were maintained as you indicated
22 the other evidence was maintained?
23    A.   That is correct, sir.
24    Q.   And you indicated that you took the shirt
25 of Mr. Williams as evidence previously, correct?
```

**GA258**

1033

1  A.  Yes, sir.
2  Q.  Is that shirt depicted in the photograph?
3  A.  Yes, it is.
4  Q.  And it appears to be multicolor shirt?
5  A.  Yes.
6  Q.  And did you turn him over and unbutton the
7  shirt and remove it?  Or how was that done?
8  A.  Yes, that's what we did.
9  Q.  Did any portion of the shirt -- did you
10 have to cut any portion of the shirt to remove it?
11 A.  I don't believe we did, no.  We took it as
12 is.
13 Q.  And the duct tape that's depicted in the
14 photograph around his head, was that -- you
15 indicated that you cut that off with sterile
16 scissors?
17 A.  Yes, sir.
18 Q.  As you did with the other duct tape
19 around and on his body.
20 A.  Yes, sir, I did.
21 Q.  Can you describe, was that easy to do or
22 difficult?
23 A.  No, it was very difficult.  The tape was
24 real tight, so to get the scissors -- you had to
25 manipulate the scissors to get underneath the tape

1034

1  and cut.  And then to remove the duct tape, as you
2  can imagine, it's very tight, so you had to pry it
3  from his skin and his hair.
4  Q.  Could you simply put a scissors under
5  the -- between his skin and under the duct tape,
6  just slide it right in, or not?
7  A.  No, no.
8  Q.  It was that tight.
9  A.  It was that tight, yes.
10 Q.  Was that true for his wrists as well?
11 A.  Yes, sir.
12 Q.  Was it equally true for his ankles?
13 A.  Yes, sir.
14 Q.  I'm going to show you what's been marked
15 Government Exhibit 143A, ask you if you recognize
16 the package I'm handing you, 143A?
17 A.  Yes, sir.
18 Q.  And what is that?
19 A.  It was a light bulb that was also found in
20 that room.
21 Q.  And that was seized as evidence?
22 A.  Yes, sir, it was.
23 Q.  And was that put into the paper bag into
24 which it is now maintained?
25 A.  Yes, sir, it was.

1035

1  Q.  And it appears to have not been opened
2  since.
3  A.  That is correct, sir.
4  Q.  Other than lab testing.
5  A.  Other than lab testing on it.
6  Q.  Did you proceed to what was known as the
7  south -- what was it?  Do you know?  The second
8  bedroom?
9  A.  Southeast.
10 Q.  Southeast?
11 A.  Correct.  The second bedroom.
12 Q.  And that was the bedroom where Ms. Johnson
13 and Mr. Reid were found.
14 A.  That is correct, sir.
15 Q.  And showing you Government Exhibit 126, do
16 you recognize that item?
17 A.  Yes, sir, I do.
18 Q.  And how do you recognize that?
19 A.  It's the portion of the mattress that I cut
20 from the bed.
21     MR. MARKLE:  May I just have one moment,
22 your Honor?
23 Q.  I'm going to show you what's been marked
24 Government's 124 for identification and ask you,
25 Detective, if you recognize what's depicted in that

1036

1  photograph?
2  A.  Yes, sir, I do.
3      MR. SHEEHAN:  I'm sorry, counsel, what
4  number?
5      THE COURT:  124.
6      MR. MARKLE:  This has not been offered.
7  This is not in evidence yet.
8      MR. SHEEHAN:  I'm sorry.
9  Q.  Do you recognize what's depicted in
10 Government's 124 for identification?
11 A.  Yes, sir, I do.
12 Q.  And what is that?
13 A.  It's a photograph of both victims, Tina --
14 Tina Johnson and James Reid.  Also in the photograph
15 is the bed -- excuse me, the mattress is to the
16 right, the box spring is on the bottom portion, and
17 there is two rings that are on the box spring.
18     MR. MARKLE:  Offer Government's
19 Exhibit 124 as a full exhibit, your Honor.
20     MR. SHEEHAN:  No objection.
21     THE COURT:  Full exhibit.
22 Q.  Detective Ortiz, again you indicated that
23 -- previously indicated that you took the shirts --
24 the shirt off of victim Tina Johnson; is that
25 correct?

1037

1    A.    That is correct, sir.

2    Q.    And again, was that removed -- do you

3    recall whether or not you had to cut the shirt in

4    any way?

5    A.    No, I did not, sir.

6    Q.    And how about the shirt of the victim James

7    Reid?

8    A.    Also taken by myself and not cut.

9    Q.    And those are the same shirts that were

10   placed in the paper bags that you previously

11   identified.

12   A.    That is correct, sir.

13   Q.    As depicted in the photograph.

14   A.    Yes, sir.

15   Q.    And you indicated there are two rings on

16   the edge of the mattress.

17   A.    Yes, sir.

18   Q.    Was there any other jewelry that you

19   noticed in the apartment?

20   A.    There was other pieces of jewelry, correct,

21   sir.

22   Q.    And were there -- did you notice any

23   pocketbooks or any items, anything like that in the

24   apartment?

25   A.    There was a pocketbook, yes.

1038

1    Q.    Did it appear to be tampered with, gone

2    through, emptied?

3    A.    No, it was intact.

4    Q.    How about dresser drawers in the apartment,

5    did they appear to be the subject of someone going

6    through them?

7    A.    No, not at all, sir.

8    Q.    Now, this is again the southwest bedroom,

9    correct?

10   A.    That is correct.

11   THE COURT:  Are we calling it southeast

12   or southwest?

13   THE WITNESS:  I'm sorry, it is

14   southeast.  It is southeast.  There is only two

15   bedrooms.

16   THE COURT:  We have northwest.

17   THE WITNESS:  And southeast, that is

18   correct.

19   Q.    It's the second bedroom.

20   THE COURT:  Whatever it is called, it's

21   southeast.  Okay.

22   Q.    Did you observe the walls in that second

23   bedroom?

24   A.    Yes, sir.

25   Q.    And did you -- what did you observe about

1039

1    the walls in that room?

2    A.    There was blood spatter on the walls, on

3    three of the walls.

4    Q.    And was anything done in regard to that

5    blood spatter?

6    A.    It was, sir.  It was photographed and swabs

7    were taken of the blood.

8    Q.    And, I'm sorry, I didn't ask you, but

9    again, the duct tape was depicted in the previous

10   photograph around the two victims.

11   A.    Yes, sir, it was.

12   Q.    And again, as to their heads, ankles and

13   wrists, was any of the duct tape on any of the

14   victims loosely wrapped?

15   A.    No, it was very tight.  Very tight.

16   Q.    It's true as to all three victims?

17   A.    That is correct, sir.

18   Q.    True as to all three victims heads?

19   A.    Yes, sir.

20   Q.    Ankles and wrists?

21   A.    Yes, sir.  Correct.

22   Q.    And I'm going to show you what's been

23   marked -- do you recall, were the walls given

24   numbers?  Or how did you indicate which wall was

25   which wall?

1040

1    A.    They were given letters.

2    Q.    So in the --

3    MR. SHEEHAN:  Your Honor, could I make a

4    suggestion that we just call that the southwest

5    bedroom, because that's really more consistent with

6    the diagram.  It just gets a little confusing

7    otherwise.  And I think he asked other questions, if

8    we move it up a little bit we see that that's the

9    west side.

10   MR. MARKLE:  I did refer to it as that,

11   but that's fine.  Southwest bedroom we can designate

12   that.

13   THE COURT:  Can you live with southwest

14   bedroom?

15   THE WITNESS:  Yes, absolutely.

16   THE COURT:  That northwest is

17   Mr. Williams and southwest is Ms. Johnson and

18   Mr. Reid's.

19   THE WITNESS:  Yes.

20   THE COURT:  We have our nomenclature

21   straight.

22   MR. SHEEHAN:  No problem.

23   THE WITNESS:  No problem.

24   Q.    In the designated southwest bedroom, did

25   you inspect the walls?

1041

1   A.   Yes, sir.

2   Q.   And there was blood spatter.

3   A.   There was blood spatter, correct.

4   Q.   And going first to what we'll call -- what

5   you called wall A.

6   A.   Yes, sir.

7   Q.   Do you see that on Government's

8   Exhibit 101B?

9   A.   Yes, sir.

10   Q.   And what, if anything, was observed on

11   wall A?

12   A.   There was blood spatter on the wall.

13   Q.   And were swabs taken of that blood spatter?

14   A.   Yes, sir.

15   Q.   And could you just explain how you do the

16   swabbing?

17   A.   Sure.  The section that's going to be

18   swabbed, what we do is we take sterile cotton swabs,

19   take them out of the package, they're dabbed in

20   sterile water on those just to moisten the tip of

21   it, and then you scrape or you dab the section

22   that's going to be swabbed.  Those need to be air

23   dried, so you put them in a box where they're air

24   dried, and once they're air dried you seal the box.

25   Q.   I wanted to show you what's been marked

1042

1   Government's Exhibit 154 for identification, ask you

2   if you recognize that photograph?

3   A.   Yes, I do.

4   Q.   And what wall is that in the southwest

5   bedroom?

6   A.   The wall is going to be wall A.

7   Q.   And is that the blood spatter you are

8   referring to?

9   A.   That is correct, sir.

10   MR. MARKLE:  I would offer that, your

11   Honor, as a full exhibit.

12   MR. SHEEHAN:  I think this is cumulative

13   of the other items that are in.

14   MR. MARKLE:  I don't think so, your

15   Honor.  And it also shows the placard.  So it's more

16   readily identifiable.

17   THE COURT:  Yes, I don't think there is

18   any confusion that will arise from it, but this is

19   wall A and it is with placards 14 and 15.  It's a

20   full exhibit.

21   MR. MARKLE:  Thank you, your Honor.

22   Q.   Detective, as the Judge just indicated, the

23   photograph that's up on the screen at this time

24   shows placards 14 and 15, representing evidence

25   seized by you.

1043

1   A.   Yes, sir.

2   Q.   And that is, in fact, wall A.  As we look

3   at the photograph, that's wall A directly in front

4   of you.

5   A.   That is correct, that's wall A.

6   Q.   And to the left of the blood spatter, what

7   does that appear to be?

8   A.   A dresser drawer.

9   Q.   And was that in that place when you entered

10   that southwest bedroom?

11   A.   Yes, sir.

12   Q.   I'm going to ask you to take a look at

13   Government's Exhibit 131 and 131A, and I'll ask you

14   if you recognize those items.

15   A.   Yes, sir, I do recognize them.

16   Q.   And what do you recognize those to be?

17   A.   These are the cotton swabs that were taken

18   from the blood spatter that's on the walls.

19   Q.   And did you proceed to what was designated

20   wall B?

21   A.   Yes, sir.

22   Q.   And wall B is depicted on Government's

23   Exhibit 101B; is that correct?

24   A.   That is correct, sir.

25   Q.   And wall B shows there is a closet -- or

1044

1   describe wall B.

2   A.   Wall B is the top portion of the room.  As

3   you enter the bedroom it's on the left-hand side if

4   you were to enter, and it's the wall where -- with

5   the closet.

6   Q.   And was there blood spatter observed there?

7   A.   Yes, sir.

8   Q.   And did you actually take swabs of that?

9   A.   Yes, sir.

10   Q.   Showing you what's been marked Government's

11   Exhibit 130 and 132A, and I'd ask you if you

12   recognize these two exhibits?

13   A.   Yes, sir, I do.

14   Q.   What do they appear to be?

15   A.   These are also swabs of the -- of blood

16   that was taken from the wall of wall B.

17   Q.   And they would be allowed to dry, placed in

18   the box and sealed?

19   A.   Yes, sir.

20   Q.   And then would they be packaged similar to

21   how they are packaged now?

22   A.   Yes, sir.

23   Q.   So, they're in substantially the same

24   condition as when you sealed them yourself on

25   August 24th, 25th and 26th.

1045

1    A.    That is correct, sir.
2    Q.    Do you see what's depicted as wall C in the
3 diagram?
4    A.    Yes, sir.
5    Q.    And where is that?  If you could just point
6 it out.
7    A.    Sure.  Wall C is going to be this wall
8 right here.
9    Q.    Okay.
10    A.    As you enter the room it's the wall on the
11 right-hand side.
12    Q.    And in regards -- was there any blood
13 spatter on that wall?
14    A.    Yes, sir, there was.
15    Q.    And were swabs samples taken of that wall?
16    A.    Yes, sir, there was.
17    Q.    Showing you what's been marked Government's
18 Exhibit 133 and 133A, ask you if you recognize
19 what's contained in those packages?
20    A.    Yes, sir, I do.
21    Q.    And how do you recognize those?
22    A.    These are swabs that were taken from that
23 wall of the blood.
24    Q.    And is that how they were packaged by you?
25    A.    Yes, sir, it is.

1046

1    Q.    And do they, like all the other evidence
2 that we've talked about, bear a Bridgeport seal?
3    A.    Yes, it does.
4    Q.    With name, location, date of seizure?
5    A.    Yes, and time.
6    Q.    And description.
7    A.    And description, correct, sir.
8    Q.    Now, was there, to be even further
9 misleading, something called wall D?
10    A.    Yes, sir, there is.
11    Q.    And what is wall D in fact?
12    A.    Wall D is actually the ceiling.
13    Q.    So the ceiling of the southwest bedroom?
14    A.    Yes.
15    Q.    Did you observe blood spatter there?
16    A.    Yes, sir.
17    Q.    And what was done in regards to that blood
18 spatter?
19    A.    It was photographed, and also there was
20 swabbings taken of the blood from the ceiling also.
21    Q.    I'm going to show you what's been marked
22 Government Exhibit 134 and 134A and ask you if you
23 recognize those two exhibits.
24    A.    Yes, sir.
25    Q.    And what are they?

1047

1    A.    They are swabs taken of the blood.
2    Q.    From?
3    A.    From the ceiling D.
4    Q.    And are they in substantially -- is that
5 how they were packaged by you?
6    A.    Yes, sir, it is.
7    Q.    And in substantially the same condition as
8 when you seized them?
9    A.    Yes, sir.
10    Q.    And were those sent to the forensic lab?
11    A.    Yes, they were.
12    Q.    And further testing was done, obviously; is
13 that correct?
14    A.    There was, sir.
15    Q.    That's true of all of the swabs?
16    A.    Yes, sir.
17    Q.    Now, is there -- I'm sorry if you mentioned
18 already, is there a control swab done?
19    A.    Yes, sir.
20    Q.    And what does that mean?
21    A.    A control is -- basically all it is is you
22 take a sterile cotton swab, and whatever sterile
23 water you use, you want to be able to show the lab
24 the consistency of that sterile water.  So, once you
25 apply the sterile water on, you wait for it to dry,

1048

1 and then you package it.  And that's how it's sent
2 to the lab along with the samples you are going to
3 send with it.
4    Q.    So, as to each swab, we were saying swabs,
5 right, plural?
6    A.    Right, plural.
7    Q.    Are there always two swabbings done?
8    A.    Yes, there is.  There is two cotton swabs
9 per packaging.
10    Q.    And they're sterile cotton swabs.
11    A.    They're sterile cotton swabs, correct.
12    Q.    And the control swab is sterile as well,
13 obviously.
14    A.    Yes, sir.
15    Q.    And you use the same water that you dip the
16 ones that you actually take the sample in with the
17 control swab.
18    A.    That is correct.
19    Q.    And all of that is submitted -- it's
20 sealed.
21    A.    It's sealed.
22    Q.    And then submitted to the forensic lab.
23    A.    Yes, that is correct.
24    Q.    And in regards to the blood, the ceiling on
25 wall D, the ceiling --

**GA262**

1049

1   A.   Yes.
2   Q.   -- in the southwest bedroom, approximately
3   how high was the ceiling?
4   A.   It's about eight and a half, maybe nine
5   feet.
6   Q.   And could you stand up and take those
7   swabs?
8   A.   I'm too short.  But what we do is we take a
9   -- we have a two-step ladder, and you can reach up
10  from the two-step ladder and swab it from there.
11  Q.   And in regards to wall C in the southwest
12  bedroom, was there any item of the furniture along
13  that wall?
14  A.   There was.
15  Q.   What was that?
16  A.   It was a dresser drawer, a bureau.
17  Q.   And was that dresser ever moved?
18  A.   Yes.
19  Q.   By who?
20  A.   By myself and Detective Vargas, we moved it
21  out.
22  Q.   And was there any blood detected where that
23  dresser -- behind that dresser?
24  A.   No, there wasn't.
25  Q.   Was that virtually the only spot without

1050

1   blood in that room?
2   A.   That is correct.
3   Q.   I want to show you what's been marked
4   Government's Exhibit 135 and ask you if you
5   recognize what's contained in that plastic envelope?
6   A.   Yes, sir.
7   Q.   And what do you recognize that to be?
8   A.   This is the control sample of the sterile
9   water that we used.
10  Q.   And packaged similar to the way you sent it
11  to the lab.
12  A.   Yes, sir, it is.
13  Q.   Now, in regards -- staying in the southwest
14  bedroom, do you recall whether or not you came upon
15  any latex gloves?
16  A.   Yes, sir, we did.
17  Q.   And do you recall where they were located?
18  A.   Yes, it was on the floor next to the bed.
19  Q.   I'm going to show you what's been marked
20  Government Exhibit 137A and ask you if you recognize
21  the item contained in that envelope, in that
22  plastic?
23  A.   Yes, sir.
24  Q.   And how is that described?
25  A.   It's one latex glove.

1051

1   Q.   And does it give the location where that
2   was seized from?
3   A.   Yes, sir.
4   Q.   And what's that location?
5   A.   It was found on the floor at the head of
6   the bed closest to the wall -- closer to wall A in
7   the southwest bedroom within apartment 101, 215
8   Charles Street.
9   Q.   And does that have a Bridgeport exhibit
10  number?
11  A.   Yes, it does, sir.
12  Q.   What would that be?
13  A.   It's Bridgeport Exhibit 14.
14  Q.   So, that would be depicted on the diagram
15  that's on the screen right now as No. 14.
16  A.   Yes, sir.
17  Q.   Closest to wall A.
18  A.   Yes, sir.
19  Q.   And showing you Government's Exhibit 138A,
20  ask you if you recognize this item?
21  A.   Yes, sir, I do.
22  Q.   And what is contained in there?
23  A.   It's one latex glove.
24  Q.   And that, like the other glove, other than
25  the discoloration caused by the lab, is in

1052

1   substantially the same condition as when you found
2   it?
3   A.   Yes, sir, it is.
4   Q.   Was that seized in the course of the
5   three-day search in apartment 101?
6   A.   That is correct, sir.
7   Q.   And where was that latex glove located?
8   A.   It was found in the nightstand located in
9   the southwest -- the corner in the southwest bedroom
10  closest to wall A.
11  Q.   And seized by you.
12  A.   Seized by me.
13  Q.   And placed in the plastic or the paper bag.
14  A.   It was placed in a paper bag.
15  Q.   And then it was sent to the forensic lab.
16  A.   Yes, sir.
17  Q.   Okay.  Thank you.
18  Showing you Government's Exhibit 139A, do
19  you recognize what's contained in that plastic bag?
20  A.   Yes, sir, I do.
21  Q.   And what is that described as?
22  A.   It's one white plastic bag containing latex
23  gloves.
24  Q.   And did that contain multiple latex gloves?
25  A.   Yes, it did.

1053

1  Q.  And do you recall seizing that item?
2  A.  Yes, sir, I do.
3  Q.  And do you recall from where that item was
4  seized?
5  A.  Yes, sir.
6  Q.  And where was that?
7  A.  It was in that same bedroom.
8  Q.  And what Bridgeport exhibit number does
9  that bear?
10  A.  It's Exhibit No. 20.
11  Q.  No. 20?
12  A.  Yes.
13  Q.  So, it's right in the middle.
14  A.  Underneath the bed, correct, sir.
15  Q.  It's shown as in the middle of 101B, but
16  that's the bed.
17  A.  Yes, sir.
18  Q.  And it was found under the bed.
19  A.  That is correct, sir.
20  Q.  And is that in substantially the same
21  condition, other than it's been taken out by the
22  lab --
23  A.  Yes, sir.
24  Q.  -- as when you found it?
25  A.  Yes, sir.

1054

1  Q.  Showing you Government's 140A, do you
2  recognize what's contained in that plastic bag?
3  A.  Yes, sir, I do.
4  Q.  And what is that?
5  A.  It's a folding multi-tool.
6  Q.  And is that in substantially the same
7  condition as when you found it?
8  A.  Yes, sir, it is.
9  Q.  And did you seize it?
10  A.  Yes, sir, I did.
11  Q.  And did you place it in that paper bag?
12  A.  Yes, sir, I did.
13  Q.  And that paper bag is maintained within the
14  plastic.
15  A.  Yes, sir.
16  Q.  And that was everything that you described
17  before, put in your evidence locker and then sent to
18  the forensic lab.
19  A.  Yes, sir.
20  Q.  Showing you the Exhibit 141A, do you
21  recognize this large paper bag?
22  A.  Yes, sir, I do.
23  Q.  And how do you recognize that?
24  A.  It's the plastic cover for the box spring
25  that was within that bedroom.

1055

1  Q.  Within the southwest bedroom.
2  A.  Yes, sir.
3  Q.  And was a portion of that submitted to the
4  state lab for forensic testing?
5  A.  Yes, it was.
6  Q.  And is that the paper bag that you
7  originally took the -- took it and placed it in?
8  A.  Yes, sir, it is.
9  Q.  And other than being opened by the lab, is
10  that in substantially the same condition as when you
11  seized it?
12  A.  Yes, it is.
13  Q.  And packaged it?
14  A.  Yes, sir.
15  Q.  Showing you Government's Exhibit 140 --
16  sorry.
17      Showing you what's been marked Government
18  Exhibit 143A, do you recognize this item?
19  A.  Yes, sir.
20  Q.  And what is that item?
21  A.  It's a brown nylon stocking.
22  Q.  And do you know where that item was seized
23  from?
24  A.  Yes, sir.
25  Q.  And where was that?

1056

1  A.  It's in that same bedroom.
2  Q.  And you can actually see the nylon stocking
3  in that exhibit wrapping?
4  A.  Yes, sir.
5  Q.  Is that in substantially the same condition
6  as when you seized it?
7  A.  Yes, sir, it is.
8  Q.  Showing you Government's Exhibit 148A, do
9  you recognize 148A?
10  A.  Yes, sir.
11  Q.  And how do you recognize that?
12  A.  It's a section of latex.
13  Q.  And does that bear any Bridgeport sealing
14  information?
15  A.  Yes, it does, it's our label.
16  Q.  And again, what's contained on the label
17  for 148A?
18  A.  Sure, it's the item number, the exhibit
19  number.
20  Q.  What exhibit number is it?
21  A.  It's going to be Bridgeport Exhibit No. 19.
22  Q.  So, that's depicted in 101B.
23  A.  That is correct, sir.
24  Q.  Okay.  And what else is on there?
25  A.  The location.  It's found under the bed.

1057

```
1   The times, the date it was -- and my initials are on
2   the outside of the bag.
3       Q.   Which date was that item found on?
4       A.   This was found on August 24, 2005.
5       Q.   First day of your search?
6       A.   First day of the search.
7       Q.   And that is a section of latex glove -- how
8   is it described?
9       A.   It's described as one section of latex
10  glove -- of latex, rather.
11      Q.   Did you also proceed to search the living
12  room or the main room of the apartment 101?
13      A.   Yes, sir.
14      Q.   And did you have occasion to seize evidence
15  in that area of the apartment?
16      A.   Yes, sir, we did.
17      Q.   And I'm going to show you what's been
18  marked Exhibit 136A and ask you if you recognize
19  that item?
20      A.   Yes, sir.
21      Q.   And what is that?
22      A.   It's one partial latex glove.
23      Q.   And where was that seized from?
24      A.   This was found -- it was seized under the
25  cushion.
```

1058

```
1           MR. SHEEHAN:  Well, your Honor, I'm
2   going to ask that he set forth his personal
3   knowledge on this question.
4           THE COURT:  So, the question was where
5   was that seized from.  Do you know where that was
6   seized from --
7           THE WITNESS:  Yes.
8           THE COURT:  -- or are you just recording
9   it on the --
10          THE WITNESS:  No, I know where it was
11  seized from.
12      Q.   How do you know where that was seized from
13  Detective?
14      A.   It was a piece of evidence that I seized.
15      Q.   Without looking at the label, could you
16  tell us where that was seized from?
17      A.   Yes, it was underneath the cushion of the
18  couch that was in the living room.
19      Q.   And was that couch -- where was that couch
20  in that living room?
21      A.   If I was -- if I can look at the diagram.
22      Q.   Is it depicted on Government's 101B?
23      A.   Yes, sir.
24      Q.   Could you point out where it is?
25      A.   Sure.  It's -- the couch is here.
```

1059

```
1       Q.   Marked No. 13?
2       A.   Yes.
3       Q.   Is there an exhibit number on the item I
4   just handed to you?
5       A.   There is an exhibit number.
6       Q.   And what's that number?
7       A.   No. 13.
8       Q.   So, Bridgeport Exhibit 13 is depicted on
9   Government 101B?
10      A.   Yes, sir.
11      Q.   And that was found -- again, where was it
12  found?
13      A.   It was in the living room, the couch is in
14  the living room.  The exhibit was underneath the
15  cushion.
16      Q.   And does that exhibit appear to be in
17  substantially the same condition -- is that the same
18  packaging you placed it into that's in the plastic
19  bag?
20      A.   Yes, sir, it is.
21      Q.   And substantially the same condition as
22  when you found it on August 24th.
23      A.   Yes, sir.
24      Q.   Was it actually evidence placard -- was it
25  found on August 24th or 25th or 26th; do you know?
```

1060

```
1       A.   It was found the 24th.
2       Q.   Now, you indicated -- as to the front door,
3   we talked about that when you first started.  Was
4   there any blood-like substance on the front door of
5   the apartment?
6       A.   There was, sir.
7       Q.   And you talked about the interior swabbing
8   that you did?
9       A.   That is correct.
10      Q.   Was there any exterior swabbing done?
11      A.   There was.
12      Q.   And I'm going to show you Government's
13  Exhibit 125, ask you if you recognize that item?
14      A.   Yes, sir, I do.
15      Q.   And do you recall where on the front door,
16  on the exterior of the front door, the blood was
17  found?
18      A.   It was on the exterior.
19      Q.   Do you remember precisely where?
20      A.   No, I couldn't tell you exactly where.
21      Q.   And was that swabbing conducted the same
22  way as you previously testified the swabbing was
23  done in the bedroom?
24      A.   Yes, sir.
25      Q.   And was it maintained and sealed in the way
```

1061

```
1    it appears to be packaged now?
2        A.   Yes, sir, it is.
3        Q.   Sent to the lab in substantially the
4    condition it is in now?
5        A.   Yes, sir.
6        Q.   And I'm going to show you -- were control
7    swabs also done as to that front door swabbing?
8        A.   Yes, sir, there was.
9        Q.   And showing you Government's Exhibit 125A,
10   do you recognize that item?
11       A.   Yes, sir.
12       Q.   And what is that?
13       A.   This is the control from that one sample
14   that we collected.
15       Q.   And was that packaged the way it appears to
16   be packaged now by you?
17       A.   Yes, sir.
18       Q.   And was it sent to the forensic lab in
19   substantially that condition?
20       A.   Yes, sir.
21       Q.   Do you recall whether there was any
22   blood-like substance on any wall of the -- what I'm
23   calling the living room area?
24       A.   There was.
25       Q.   And was that wall -- did you designate that
```

1062

```
1    wall by letter?
2        A.   Yes, we did.
3        Q.   What was that?
4        A.   That was wall F.
5        Q.   So again, on 101B, wall F -- could you just
6    point it out?  Because some of this is difficult to
7    find.  And were cotton swabs, were sterile swabs
8    used for that substance?
9        A.   Yes, sir.
10       Q.   Showing you what's been marked Government's
11   Exhibit 166 -- I'll just show you 166.  Do you
12   recognize that item?
13       A.   Yes, sir.
14       Q.   And is that a -- that swabbing package
15   the way you packaged it and delivered it to the
16   forensic lab?
17       A.   Yes, it was.
18       Q.   Was there a further swabbing?  You
19   indicated on the front door near the doorknob
20   earlier?
21       A.   That is correct, sir.
22       Q.   Was that swabbed?
23       A.   It was swabbed.
24       Q.   Showing you Government's Exhibit 167, do
25   you recognize that exhibit?
```

1063

```
1        A.   Yes, sir.
2        Q.   And what is that?
3        A.   This is the swab of the door lock.
4        Q.   And was that packaged the way it is and
5    sent to the forensic lab for further testing?
6        A.   Yes, it was.
7        Q.   And as to each and every piece of evidence
8    we've talked about, did you personally take those
9    into your possession?
10       A.   Yes, I did.
11       Q.   And did you -- were you the first person to
12   ever package them in any sort of way?
13       A.   Yes.
14       Q.   Were any rolls of duct tape found in the
15   course of your search of the crime scene?
16       A.   No, sir.
17       Q.   And -- as to the duct tape found on Tina
18   Johnson, James Reid and Basil Williams, were they
19   different colored duct tape on any of the three
20   victims?
21       A.   They were the same color.
22       Q.   So, their heads, hands and ankles -- heads,
23   wrists, and ankles all bore the same color duct
24   tape.
25       A.   Yes, sir.
```

1064

```
1        Q.   And each victim's duct tape matched the
2    others?
3             MR. SHEEHAN:  I'm going to object.
4        Q.   In terms of color?
5             MR. SHEEHAN:  I'll object as to leading.
6             THE COURT:  And he's going to rephrase.
7             MR. MARKLE:  I'll withdraw.
8        Q.   How was the victim -- what was the color of
9    victim Basil Williams' duct tape around his head?
10       A.   It was gray.
11       Q.   Around his ankles?
12       A.   Gray.
13       Q.   Around his wrists?
14       A.   Gray.
15       Q.   Tina Johnson, was the duct tape -- what
16   color was the duct tape around her head?
17       A.   Gray.
18       Q.   What color was the duct tape around her
19   wrists?
20       A.   Gray.
21       Q.   And the duct tape around her ankle?
22       A.   Gray.
23       Q.   And James Reid, did he have duct tape
24   around his head?
25       A.   Yes.
```

1065

1  Q.  What color?
2  A.  It was gray.
3  Q.  How about his wrists?
4  A.  It was gray.
5  Q.  How about his ankles?
6  A.  Yes, it was gray.
7  Q.  Now, when your search ended at the close --
8  after you were done on August 24, 2005, how was the
9  scene -- was the scene secured?
10  A.  Yes, sir, it was.
11  Q.  And how was it secured?
12  A.  There is two ways.  There is a police
13  officer that stands right outside the door, and the
14  second way, we put a piece of evidence tape along
15  the door and the door frame.
16  Q.  And on the morning of August 24th -- or on
17  August 25, 2005, did you resume your search?
18  A.  Yes, sir.
19  Q.  And at the end of that day how was the
20  scene secured?
21  A.  Again, there is another police officer
22  who's going to guard that door and there is a
23  section of evidence tape that's put across the door.
24  Q.  Showing you Government's Exhibit 172, do
25  you recognize what's depicted in that photograph?

1066

1  A.  Yes, sir, I do.
2  Q.  And is that a true and accurate depiction
3  of the way the door was secured to apartment 101 at
4  the end of your search on day 1?
5  A.  Yes, sir, it is.
6  MR. MARKLE:  I would offer that, your
7  Honor.
8  MR. SHEEHAN:  No objection.
9  THE COURT:  All right, that 172 is a
10  full exhibit.
11  Q.  And Detective Ortiz, could you just --
12  again, there is yellow taped zigzagged, almost in a
13  Z, across the door.  Is that placed by you or --
14  A.  Yes, sir, it was placed by me.
15  Q.  What does that say on it?
16  A.  "Police."  It says police line.
17  Q.  And was that placed there before or after
18  the search is completed for that day?
19  A.  It's after the search.
20  Q.  How about the red stickers that are on the
21  door, what are those?
22  A.  Those are biohazard stickers.
23  Q.  And who placed those on the door?
24  A.  I did, sir.
25  Q.  And then in the -- towards the top left we

1067

1  see what appears to be some red type of tape.
2  A.  That is correct, sir.
3  Q.  And what is that?
4  A.  That's red evidence tape.
5  Q.  And who placed that on the door?
6  A.  I do, sir.
7  Q.  And what's the purpose of doing that?
8  A.  So that you know if the apartment has been
9  entered or tampered with.
10  Q.  Does it go from the door to the wall across
11  the frame to the wall?
12  A.  Yes, to the doorjamb across the door.
13  Q.  Showing you what's been -- what's 171 for
14  identification, do you recognize that photograph?
15  A.  Yes, sir, I do.
16  Q.  And is that a true and accurate depiction
17  of the crime scene after you would complete day one
18  or day two of the search?
19  A.  That is correct, sir.
20  Q.  And that is, again, the exterior of the
21  door to 101.
22  A.  Yes, sir.
23  MR. MARKLE:  I would offer it as a full
24  exhibit, your Honor.
25  MR. SHEEHAN:  No objection.

1068

1  THE COURT:  Full exhibit.
2  Q.  Looking at 171, Detective Ortiz, is that a
3  close-up of the tape that we previously saw?
4  A.  Yes, sir, it is.
5  Q.  And again, the red tape, it looks like it
6  has some writing on it.  What is put on the red
7  tape?
8  A.  It's the time that we leave and our
9  initials, the three of our initials are on the tape
10  also.
11  Q.  So, it has the date, the time, and your
12  initials.
13  A.  That's correct, sir.
14  Q.  Again, what is the purpose of that red tape
15  placed on the door?
16  A.  So that we know the apartment has not been
17  entered.
18  MR. MARKLE:  Your Honor, as to 136A, in
19  light of Detective Ortiz's testimony, I would offer
20  that as a full exhibit at this time.
21  MR. SHEEHAN:  May I voir dire, your
22  Honor?
23  THE COURT:  Yes.
24  VOIR DIRE EXAMINATION
25  BY MR. SHEEHAN:

1069

1    Q.    Detective Ortiz, you were the person in
2  charge of seizing the evidence, right?
3    A.    That is correct, sir.
4    Q.    And seizing is the point when it's sort of
5  formally put into the bag and sealed.
6    A.    Yes, sir.
7    Q.    Did you take any notes of -- in the course
8  of your processing of this crime scene?
9    A.    No, sir.
10    Q.    Okay.  Do you recall, sir, who it was who
11  actually found Exhibit 130 --
12          MR. MARKLE:  6A.
13    Q.    -- 6A?
14    A.    No, sir.
15          MR. SHEEHAN:  I renew my objection, your
16  Honor.
17          MR. MARKLE:  Your Honor, if I could ask
18  a few questions.
19  CONTINUED DIRECT EXAMINATION
20  BY MR. MARKLE:
21    Q.    Detective Ortiz, in regards to each and
22  every piece of evidence, including 136A, was it --
23  regardless of who found it, was it left in place
24  until you saw it?
25    A.    Yes, sir.

1070

1          MR. SHEEHAN:  I'm going to object, your
2  Honor, because he can't obviously testify to that.
3  He doesn't know of his personal knowledge.
4          THE COURT:  You can cross-examine on
5  that.  But the issue is he did not -- you did not
6  find it.
7          THE WITNESS:  I'm not sure if I did.
8  There was only three of us searching.
9          THE COURT:  And the procedures when
10  something is found are what?
11          THE WITNESS:  The custody officer, which
12  was myself, is called to the area.
13          THE COURT:  All right.  Is that what
14  happened here?
15          THE WITNESS:  Yes, sir -- I mean yes,
16  ma'am, I'm sorry.  I'm so used to talking to him.
17          THE COURT:  It hasn't happened in a
18  while.  A little like southeast.
19          THE WITNESS:  Yes.
20          THE COURT:  I'm going to admit 136A over
21  objection.
22          MR. MARKLE:  Thank you, your Honor.
23    Q.    Detective Ortiz, in regards to 136A, does
24  it have a Bridgeport number?
25    A.    Yes, sir, it does.

1071

1    Q.    And what number is it?
2    A.    It's Exhibit No. 13.
3    Q.    And if I showed you your property report,
4  does that indicate who seized the exhibit?
5    A.    Yes, sir, it does.
6    Q.    Not necessarily who found it, but who
7  seized it.
8    A.    Who seized it, correct.
9    Q.    And do you need that to refresh your
10  recollection as to who seized it?
11    A.    No, I do not.
12    Q.    Who was that?
13    A.    That was myself.
14    Q.    And is that in substantially the same
15  condition as when you seized it, placed it in the
16  paper bag, and then sealed it to be given to the
17  forensic lab?
18    A.    Yes, sir.
19    Q.    Thank you.
20          Now, Detective Ortiz, after the search of
21  apartment 101 was completed on the third day, was
22  there a search ever done or was a search conducted
23  of the exterior of the property?
24    A.    Yes, sir.
25    Q.    And was there a dumpster in the parking

1072

1  area?
2    A.    There is.
3    Q.    Was that searched?
4    A.    Yes, it was.
5    Q.    Was anything of evidentiary value located
6  in there?
7    A.    No.
8    Q.    Were drains in and around the area of 215
9  Charles Street searched?
10    A.    Yes.
11    Q.    Was anything of evidentiary value found?
12    A.    No.
13    Q.    Were sewers searched?
14    A.    Yes.
15    Q.    Again, was any evidence seized from those
16  sewers?
17    A.    No, there was not.
18    Q.    Was anything observed on the outside of the
19  apartment that was of significance to you or the
20  investigators?
21    A.    No.
22    Q.    There were no items seized?
23    A.    No.
24    Q.    Did you observe the window, the windows on
25  the outside of the apartments?

1073

1    A.   Yes.
2    Q.   And were any of the windows open when you
3  were in doing your search?
4    A.   The bedroom window was open.
5    Q.   In the southwest bedroom?
6    A.   Southwest bedroom.
7    Q.   And was that opened by you or other members
8  of the crime scene unit or had it been opened?
9    A.   It had been opened prior to us arriving.
10   Q.   Prior?
11   A.   Prior to us coming there, yes.
12   Q.   Did you observe whether or not there was a
13 screen intact in that window or not?
14   A.   The screen was actually on the ground
15 outside the building.
16   Q.   And were there attempts towards the end of
17 the search of the inside to locate or identify any
18 latent fingerprints?
19   A.   There were.
20   Q.   A latent fingerprint, can you just explain
21 what that is?
22   A.   Sure.  It's a fingerprint that's left
23 behind by someone.  It's created from amino acids
24 that your body secretes, amino acid oils.  If you
25 touch the inside of your nose -- the outside of it,

1074

1  rather, it leaves like a little oil.  That's what is
2  called latent print, whatever is left behind.
3    Q.   And that's as opposed to a known print.  A
4  latent print is a print, but you are not sure who it
5  belongs to?
6    A.   That is correct.
7    Q.   And dusting and techniques were used to try
8  to locate or discover any latent prints.
9    A.   That is correct, sir.
10   Q.   And, again, that was in your presence.
11   A.   Yes.
12   Q.   And as you indicated, was any drill found
13 in the apartment inside or outside?
14        MR. SHEEHAN:  Objection, asked and
15 answered.
16        MR. MARKLE:  I didn't ask about outside.
17        THE WITNESS:  I'm sorry, one more time.
18        THE COURT:  Let's just limit the
19 question to outside.
20   Q.   Was any drill found during the course of
21 your search of the exterior?
22   A.   No.
23   Q.   Was any bloody clothing found during the
24 course of the exterior search?
25   A.   No.

1075

1    Q.   Were any baseball bats found during the
2  course of the exterior search?
3    A.   No.
4    Q.   Was any duct tape found during the course
5  of your exterior search?
6    A.   No.
7    Q.   And as to all the evidence assigned a
8  Bridgeport exhibit number, there was a placard that
9  went with it for the purposes of crime scene
10 photography.
11   A.   Yes.
12   Q.   And was each and every piece of evidence
13 photographed in place prior to you taking it in,
14 then putting it in any kind of a container?
15   A.   That is correct.
16   Q.   And was a record kept of all the evidence
17 that went into your Bridgeport property room, went
18 in and out, and where it went to?
19   A.   Yes, sir.
20   Q.   And is there limited access to both your
21 crime scene unit, property room, your Bridgeport
22 property room, and the FBI property room, to your
23 knowledge?
24   A.   That is correct.
25   Q.   And if evidence goes to the FBI, is that

1076

1  documented?
2    A.   Yes, it is.
3    Q.   And if it goes to the forensic lab, is that
4  documented?
5    A.   Yes, sir.
6        MR. MARKLE:  I have no further
7  questions.  Thank you, your Honor.
8        THE COURT:  All right,
9  cross-examination.
10        MR. SHEEHAN:  Thank you, your Honor.
11 CROSS-EXAMINATION
12 BY MR. SHEEHAN:
13   Q.   Good afternoon.
14   A.   Good afternoon, sir.
15   Q.   I want to ask you first about the process
16 that you use with respect to when you are coming to
17 the crime scene.  You told us you were the first
18 crime scene officer there.
19   A.   That is correct, sir.
20   Q.   And you said that you basically put one
21 foot in the area of the apartment and then backed
22 out.
23   A.   That is correct, sir.
24   Q.   And you told us that you were there with
25 Detective Vargas and Detective Devan.

1077

1    A.   That is correct.
2    Q.   And how about Detective Gallagher, was he
3  part of that as well?
4    A.   He was -- superficially, right in the
5  beginning, maybe a couple of hours.  But he didn't
6  do any searching or anything.  He had no assignment
7  to this case at all.
8    Q.   But he was in and out of there with you
9  initially, right?
10   A.   That is correct, sir.
11   Q.   And when you got there, was Captain Kerwin
12 already there at the scene?
13   A.   She was in the street, yes, sir.
14   Q.   Okay.  And Officer Laracuente was at the
15 door.
16   A.   He was at the door, correct, sir.
17   Q.   Did you know whether anybody had been in or
18 out of that apartment before you got there?
19   A.   I'm not sure, sir.
20   Q.   And there were a number of other officers
21 involved as well, correct?
22   A.   That is correct, sir.
23   Q.   And they were -- they had various differing
24 functions.
25   A.   That is correct, sir.

1078

1    Q.   So, setting up, for example, some officers
2  would have set up a crime scene perimeter.
3    A.   That is correct, sir.
4    Q.   And that -- they would record who is coming
5  in and out of the apartment.
6    A.   Yes, sir.
7    Q.   Because you obviously -- the building, you
8  wouldn't want people in the -- you would want to
9  control access to the building, right, to the extent
10 that you could?
11   A.   For a little while.
12   Q.   Yeah, for a little while.
13   A.   They have to enter their own apartments.
14   Q.   Right.  And so the process is, if people
15 are coming from the outside, they basically get
16 escorted to their apartments so that they don't get
17 down into the crime scene area.
18   A.   That is correct, sir.
19   Q.   Now, you mentioned to us about the Tyvek
20 suits that you wear.
21   A.   That is correct, sir.
22   Q.   Where do you put -- actually, let me go
23 back on your first entry to the apartment.
24   A.   Yes, sir.
25   Q.   You took one step in.

1079

1    A.   Yes, sir.
2    Q.   And then you went back out.
3    A.   Yes, sir.
4    Q.   Did you go through the apartment initially
5  with Detectives Devan and Detective Vargas?
6    A.   No, sir.
7    Q.   Okay.  When you say one foot in, literally
8  just one foot inside the door?
9    A.   Yes, it's a small apartment, so I just need
10 to know how many rooms.  For a search warrant you
11 need to know, you have to describe the area you are
12 going to search.
13   Q.   So, you were not even able to observe any
14 bodies from that -- from that where you came in,
15 right?
16   A.   Yes.  I was able to, yes.
17   Q.   Okay.  So then obviously you went through
18 the living room and to the two bedrooms where the
19 bodies were.
20   A.   No, no, sir.  No, I stepped in the
21 apartment.  It's a small apartment, so if you were
22 to just literally step in, you can look down a hall
23 and into the southwest bedroom and you can see --
24 you could observe people lying there.
25   Q.   But you couldn't see, for example, where

1080

1  Mr. Williams was.
2    A.   No.
3    Q.   Okay.  And then your testimony is you went
4  out and at that point you met with the other
5  detectives who were going to do the crime scene
6  processing.
7    A.   Yes, sir.
8    Q.   And then you put on your Tyvek suits.
9    A.   I went and secured a search warrant, and
10 when I got the judge to sign it, then I came back to
11 the scene and then we put on Tyvek suits.
12   Q.   And where do you put on the Tyvek suits?
13   A.   In the -- we have a crime scene van.  So,
14 in the back of the crime scene van.
15   Q.   And then basically you come -- you suit up
16 and then all of you come in to the unit, right?
17   A.   Yes, sir.
18   Q.   And the Tyvek suits that you've described
19 to us, there is kind of a bootie arrange -- do you
20 wear boots?
21   A.   We do.  Shoe covers.
22   Q.   And then there is a full body suit, right?
23   A.   That is correct, sir.
24   Q.   And do you have gloves on?
25   A.   Yes, latex gloves.

1081

1    Q.  And then kind of a hat arrangement.
2    A.  Yes.
3    Q.  You don't have masks on, do you?
4    A.  You had to with that scene because there
5 was a lot of blood.
6    Q.  Okay.  And your recollection is that you
7 did?
8    A.  Yes, sir.
9    Q.  All right.  And would you put the hat on
10 before you came into the apartment?
11    A.  Yes, sir.
12    Q.  All right.
13          MR. SHEEHAN:  Your Honor, I have one
14 document -- may I approach the bench?
15          THE COURT:  Yes.
16          (Sidebar conference)
17          MR. SHEEHAN:  I have a short section of
18 a video clip that I would like to show the
19 detective.  It is not in evidence.  I don't think
20 the jury -- but I don't have a way of showing it to
21 him that would just pop up on his screen, I don't
22 think.  So, I'm wondering if I could just --
23          THE COURT:  Does he mark the video of
24 the scene?  I mean, can he identify it from the
25 labelling?

1082

1          MR. SHEEHAN:  No, it's not a -- it's the
2 television coverage of people coming in and out of
3 the apartment.
4          MS. REYNOLDS:  Television coverage?
5          MR. SHEEHAN:  Yeah.  And I would like to
6 show that to him to ask him if in fact that is the
7 kind of suit that he's talking about, because there
8 is no -- there doesn't appear to be a hat or any
9 kind of mask on.
10          MR. MARKLE:  We'd like to see that, your
11 Honor, before -- I don't even know what day, time.
12          THE COURT:  Go on to something else and
13 we'll come back to that.
14          (Sidebar concluded)
15    Q.  Do you recall, when you were removing the
16 duct tape, were you assisted by Inspector Carmago
17 from the medical examiner's unit?
18    A.  Yes, Camargo.
19    Q.  Camargo, I'm sorry.
20      And how did you divide the labor in that
21 process between the two of you?
22    A.  Well, I did all the cutting and he just
23 told me where to cut exactly.
24    Q.  Okay.  And he was similarly suited --
25    A.  Yes, he was.

1083

1    Q.  -- I take it.
2          MR. SHEEHAN:  May I have one second,
3 your Honor?
4    Q.  I want to ask you to take a look at 120 --
5 I'm sorry, Defendant's Exhibit F, and that's another
6 photo, is it not, of Mr. Williams' body in the
7 northwest bedroom?
8    A.  Yes, sir.
9    Q.  And that's what it looked like at the time
10 that you came into the bedroom, right?
11    A.  That's what it looked like, yes, sir.
12    Q.  And the pillow that appears to be next to
13 where my finger is indicating, that was the pillow
14 that was next to Mr. Williams' head?
15    A.  Yes, sir.
16    Q.  And there was nothing on the floor in this
17 area -- an area to the right of that little air unit
18 that might a -- I've just indicated.
19    A.  Yes, sir.
20    Q.  There was nothing there, right?
21    A.  Not that I could see, no.
22    Q.  And then at some point in time -- I'm going
23 to show you Defendant's Exhibit G, another photo was
24 taken again of Mr. Williams' head, right?
25    A.  Yes, sir.

1084

1    Q.  And there was nothing -- at that point in
2 time obviously the blanket, I think that's the
3 blanket -- is that the blanket where my finger is
4 indicating?
5    A.  Yes, sir, it is.
6    Q.  That blanket had been removed, right?
7    A.  Yes, sir.
8    Q.  And the pillow that was next to
9 Mr. Williams' head had been removed, right?
10    A.  Yes, sir.
11    Q.  And there is nothing between Mr. Williams'
12 head and this plastic, these plastic items here on
13 the lower left-hand side, what appears to be plastic
14 or cloth or whatever.
15    A.  Correct, sir.
16    Q.  Right?
17    A.  Yes, sir.
18    Q.  At another point in time -- I'm going to
19 need to --
20          MR. SHEEHAN:  May I have one second,
21 your Honor? I need to find an exhibit.
22    Q.  Showing you, and I apologize, what is
23 120 -- Government's Exhibit 120-2.
24      That is a photo where the evidence placards
25 have since been added, correct?

1085

```
1    A.   That is correct, sir.
2    Q.   And so is it fair for us to infer that
3  Defendant's Exhibit G, which does not bear the
4  similar evidence placards, this would have been
5  taken before those placards were put down?
6    A.   Yes, sir.
7    Q.   Okay.  And in Government's Exhibit 120-2,
8  it appears that the pillow has been moved, right?
9    A.   Yes, sir.
10    Q.   And now a white bag has been placed in the
11  area next to marker No. 1, does it not?
12    A.   There is a white bag there.
13    Q.   Okay.  And that white bag was not in
14  reference when we were looking at Defendant's
15  Exhibit G, was it?
16    A.   Looking at this angle it could be that
17  plastic bag that's right there.  There is a blue bag
18  and right next to it is a white bag, so it could be
19  that.
20    Q.   It could be that.
21    A.   It could be.
22    Q.   In which case were that, it would appear
23  that that bag was then moved over into the area next
24  to Mr. Williams' head, right?
25    A.   Well, I'm not -- no.  If the pillow is
```

1086

```
1  moved, maybe the plastic bag moved also.  I don't
2  understand the question you are asking me.
3    Q.   Well, I guess what I'm asking you, sir, is
4  that when you look at Defendant's Exhibit -- I'm
5  sorry, Government's Exhibit 120-3, which is now
6  before you, and that's a little bit -- it appears
7  that the placard No. 1 has been added, right?
8    A.   Yes, sir.
9    Q.   And obviously that's referencing the duct
10  tape on Mr. Williams' head, right?
11    A.   Yes, sir.
12    Q.   But in addition, this bag here now appears
13  to have been moved into the scene.
14    A.   Yes, sir.
15    Q.   Okay.  And that would have been -- all
16  right.  And, in fact, isn't it fair, sir, that it
17  appears that that bag was moved on top of what
18  appears to be biological -- or what may be
19  biological material?
20    A.   The bag has been -- yeah, the bag is next
21  to it.
22    Q.   Indeed, it seems to be on top of it,
23  doesn't it?
24    A.   Yes, sir.
25    Q.   And it was not on top of it when we saw
```

1087

```
1  what was Defendant's Exhibit G, correct?
2    A.   That is correct, sir.
3    Q.   Now, were you involved in processing the --
4  do you know who moved the bag?
5    A.   No, sir.
6    Q.   But the only people who had access to the
7  site at that time were officers of the Bridgeport
8  police, correct?
9    A.   That is correct, sir.
10    Q.   And that would be you and Vargas and Devan.
11    A.   That is correct, sir.
12    Q.   And maybe Gallagher depending on when the
13  pictures were taken.
14    A.   Correct, sir.
15    Q.   Okay.  Do you have any -- you indicated you
16  didn't take any notes, right?
17    A.   That is correct, sir.
18    Q.   And that would then have been Detective
19  Devan's province, because she was going to write the
20  report?
21    A.   Yes, sir.
22    Q.   All right.  And as far as the glove, what
23  appeared to be the one latex glove that was
24  recovered, seized by you from the southwest bedroom,
25  do you recall who it was who first found that glove?
```

1088

```
1    A.   No, sir.
2    Q.   And do you know whether or not that glove
3  was removed from the bed for purposes of taking the
4  picture, removed from under the front of the bed?
5    A.   No, no, sir.
6    Q.   You don't know.
7    A.   No, I'm not understanding your question.
8    Q.   Okay.  Let me show you a photo -- excuse me
9  one second.
10         MR. SHEEHAN:  May I ask the clerk what
11  number I'm on?
12         THE COURT:  I.
13         MR. SHEEHAN:  I.  And again, I
14  apologize, your Honor.  I think this is going to be
15  a duplicate of one that we saw, but it's -- frankly,
16  it's sometimes easier for me to do it off this one.
17         THE COURT:  154.
18    Q.   You've got a placard there next to number
19  14, right?
20    A.   That's true.
21    Q.   And you recall that is the, what at the
22  time you identified, as the one latex glove?
23    A.   Yes, sir.
24    Q.   And this photo was taken, obviously, after
25  the scene had been -- Mr. Williams -- the bodies had
```

1089

1 been removed from the scene?
2      A.   That is correct.
3      Q.   Okay.  I guess what my question to you is,
4 do you know of your personal knowledge whether
5 object No. 14, was that -- well, you weren't the
6 first person to find it, right?
7      A.   I'm not sure, sir.  There was only three of
8 us searching.  We were searching all together, so
9 we're in the same room at all times.
10     Q.   And you don't know whether or not that was
11 taken out from under the head of the bed for
12 purposes of the picture taking of it?
13     A.   No, the picture of the evidence is going to
14 be where it was found.
15     Q.   Always?
16     A.   Always.
17     Q.   Was that true for No. 22, Bridgeport No.
18 22?
19     A.   What's No. 22?
20     Q.   That is the blue and the white bags that
21 were attached by the duct tape.
22     A.   That's where we found it, correct, sir.
23     Q.   But do you remember?
24     A.   Yes, it could have been moved, yes.
25     Q.   Right?

1090

1      A.   I know what you are saying, yes.
2      Q.   In fact, we know that, do we not, that that
3 object had to have been moved --
4      A.   Yes, sir.
5      Q.   -- before the picture was taken?
6      A.   Yes, sir.
7      Q.   Okay.  And so the -- similarly, with
8 respect to what is Bridgeport 14, you don't know
9 whether or not that was moved also just for purposes
10 of getting a better picture of it?
11     A.   No, sir.
12     Q.   And I apologize because my question had the
13 -- all right.  So the answer is you don't know
14 whether or not it was moved?
15     A.   It was not.
16     Q.   You know that it was not?
17     A.   No, no, I'm agreeing with you.
18     Q.   Oh, okay.  I'm sorry.
19     A.   If it was moved.
20     Q.   Let me ask you about one item that I
21 believe is referenced in your various reports.  You
22 attended the autopsies, did you not, as well?
23     A.   I did not.
24     Q.   Oh, okay.  That was just Detective Devan
25 did that?

1091

1      A.   Yes, I believe so.
2      Q.   Okay.
3           MR. SHEEHAN:  Your Honor, other than
4 that item that I have to go over with you, I have
5 nothing further of Detective Ortiz.
6           THE COURT:  Why don't we take an earlier
7 lunch?
8           MR. SHEEHAN:  If we take a slightly
9 earlier break, I'd appreciate that.
10          THE COURT:  We'll be back in a half an
11 hour.  Leave your notebooks here.  Please don't
12 discuss the case.  Do you know what, let's make it
13 1:30 because we've got something to do.  1:30.
14          (Jury exited the courtroom)
15          THE COURT:  All right.  Do you want to
16 do that right now?
17          MR. SHEEHAN:  Yes, I would like to, your
18 Honor.
19          THE COURT:  And will you need Detective
20 Ortiz to identify whether that's a fair and accurate
21 representation?
22          MR. SHEEHAN:  Yes, I do, your Honor.
23          THE COURT:  Shall we have him stay,
24 then?
25          MR. SHEEHAN:  I would ask that he stay.

1092

1           THE COURT:  Okay.  If you'd kindly be
2 seated.
3           Before I forget, if I could ask
4 government counsel, when you are speaking among
5 yourselves, you are very, very close to that last
6 juror there.  Please speak very quietly, if you must
7 speak at all, because she's watching.
8           MR. SHEEHAN:  Your Honor, at this time,
9 what I would like to do is show Detective Ortiz the
10 first section of some TV coverage.
11          THE COURT:  Go ahead.
12          MR. SHEEHAN:  Could I ask that we put
13 that up, and I'm hoping it will come out on -- will
14 that come out on your screen there?
15          THE WITNESS:  It does.
16          THE COURT:  Do you want to just do it on
17 the screens?
18          MR. SHEEHAN:  Well, actually, it's fine
19 either way, your Honor.
20          THE COURT:  All right.  Go ahead.  Could
21 I ask you, this will be Defendant's J for
22 identification?
23          MR. SHEEHAN:  Yes, your Honor.  And I
24 have a copy that I will provide to the government.
25          MS. DAYTON:  Your Honor, I would just

**GA273**

1093

```
1   like to note for the record that if counsel gave us
2   things before trial, we actually wouldn't have a
3   delay in the trial.
4              THE COURT:  That may be true.  It's
5   impeachment evidence.  I encourage efficiency, but I
6   understand that impeachment evidence is something
7   that is -- can be held close to the chest.
8   BY MR. SHEEHAN:
9      Q.   Detective Ortiz, when --
10             MR. SHEEHAN:  Could we just back that a
11  little in the same frame up there?  I guess we
12  backed it right out of existence.
13             MS. REYNOLDS:  He has a hat on.
14             MS. DAYTON:  He has a hat on.
15     Q.   I'm going to just ask -- perhaps I could
16  ask the witness.
17             MR. SHEEHAN:  Could we keep going up the
18  stairs?  Okay.
19     Q.   Is that -- in the beginning, not this part.
20  In the beginning, is that a picture of the suits
21  that you were wearing on that day?
22     A.   Similar, yes.
23     Q.   Okay.  And I don't know if you saw the news
24  coverage, but was that you?
25     A.   I don't know if it was -- I don't know who
```

1094

```
1   it was.
2      Q.   Okay.  And is there a -- were you wearing a
3   mask in that?
4      A.   I'm not sure.  I didn't really see it.
5      Q.   Could I ask you again, perhaps, just to
6   take a look at it and see?
7      A.   I'm not sure.
8      Q.   Can't tell?
9      A.   Can't tell.
10     Q.   Okay.
11     A.   It was quick.
12             MR. SHEEHAN:  So, what I would do at
13  this time, your Honor, is I have no further
14  questions for Detective Ortiz.  I can make that
15  representation when the jury comes back.  I am going
16  to offer this as -- for identification as
17  Defendant's Exhibit --
18             THE COURT:  J.
19             MR. SHEEHAN:  J, a copy of that, and,
20  actually, with the Court's permission, I'm going to
21  make yet one more copy of that so I can give one to
22  the government.
23             THE COURT:  All right.  But it's not to
24  be used -- it's not going to be used with Detective
25  Ortiz.
```

1095

```
1              MR. SHEEHAN:  No, it's not, your Honor.
2              THE COURT:  All right, then.  So, we
3   will then resume with redirect after lunch.  All
4   right.
5              MR. SHEEHAN:  Thank you, your Honor.
6              THE COURT:  Very good.  Thank you.
7              (Recess)
8              THE COURT:  Please be seated.  Where is
9   Detective Ortiz?
10             MR. SHEEHAN:  He's right outside.
11             THE COURT:  Would you bring him in,
12  please?  And bring the jury in.
13             (Jury entered the courtroom)
14             THE COURT:  All right.  Please be
15  seated, ladies and gentlemen.  I understand that the
16  defendant has completed cross-examination of
17  Detective Ortiz.
18             MR. SHEEHAN:  That is correct, your
19  Honor.
20             THE COURT:  All right, then.
21  Mr. Markle, redirect --
22             MR. MARKLE:  Thank you, your Honor.
23  REDIRECT EXAMINATION
24  BY MR. MARKLE:
25     Q.   Detective Ortiz, a few questions.  At the
```

1096

```
1   time you conducted your search on August 24th, 25th,
2   and 26th of 2005, did you have any suspects in mind?
3      A.   No, sir.
4      Q.   Was everyone a suspect at that time?
5      A.   Yes, sir.
6      Q.   And your obtaining, discovering, collecting
7   evidence was done with no specific target or suspect
8   in mind?
9      A.   That's correct, sir.
10     Q.   And was the defendant Azibo Aquart given
11  access to the apartment at any time on August 24, 25
12  or 26, 2005?
13     A.   No, sir.
14     Q.   Was he allowed in there to touch any
15  objects, any plastic bags, any latex gloves, or
16  anything?
17     A.   No, sir.
18             MR. SHEEHAN:  Your Honor, it's outside
19  the scope of the cross.
20             MR. MARKLE:  I don't think that's true,
21  your Honor.
22             THE COURT:  It has to do with if he had
23  access or didn't have access.
24             MR. SHEEHAN:  Your Honor, he testified
25  nobody did.
```

1097

```
1    THE COURT:  That's fine.
2         MR. SHEEHAN:  So, now he's going into
3  these.
4         THE COURT:  Redirect is, therefore,
5  within the scope of the cross.
6         MR. MARKLE:  Thank you, your Honor.
7    Q.   Was the defendant -- did he have the
8  ability, or did anyone else have the ability, other
9  than crime scene unit members, to move any piece of
10 evidence that was found on August 24th?
11        MR. SHEEHAN:  Object to the form of the
12 question.  Leading.
13        MR. MARKLE:  It's a yes or no.  I don't
14 think that's leading, your Honor.
15        THE COURT:  It's compound.  Why don't
16 you rephrase it?
17   Q.   Did the defendant have access to the
18 apartment on August 24, 25 or 26?
19   A.   No, sir.
20   Q.   Did he have the ability to touch any
21 evidence that was found on August 24, 25 or 26?
22   A.   No, sir.
23   Q.   Did he have the ability or opportunity to
24 move any items after you began your search on
25 August 24, 25 or 26?
```

1098

```
1         MR. SHEEHAN:  Objection, it's asked and
2  answered.  If he wasn't in there, he couldn't be
3  doing these things.  It's repetitive, asked and
4  answered.
5         THE COURT:  Overruled.
6    Q.   You could answer that.
7    A.   No, sir.
8    Q.   And was any other person -- let me ask you
9  this:  Was Azibo Aquart allowed onto the crime scene
10 after you began your search until you ended it?
11        MR. SHEEHAN:  Objection, asked and
12 answered.
13        MR. MARKLE:  I want to be specific, your
14 Honor.
15        THE COURT:  He's not been asked.
16        MR. SHEEHAN:  He said nobody was allowed
17 on the scene.
18        THE COURT:  That's all right.  I'm going
19 to permit him to examine.
20   A.   No, sir.
21   Q.   Was Efrain Johnson allowed to access the
22 scene from the time you started the search 'til the
23 time you ended the search?
24   A.   No, sir.
25   Q.   Was John Taylor allowed to access the scene
```

1099

```
1  from the time you began the search until the time
2  you ended it?
3    A.   No, sir.
4         MR. MARKLE:  No further questions, your
5  Honor.  Thank you.
6  RECROSS-EXAMINATION
7  BY MR. SHEEHAN:
8    Q.   Detective Ortiz, do you know a woman by the
9  name of Marie Warner?
10   A.   Yes, I do.
11   Q.   Was she allowed to access the scene?
12   A.   No, sir.
13   Q.   Okay.
14        MR. SHEEHAN:  I have no further
15 questions.
16        THE COURT:  All right then, if there is
17 nothing further, Detective Ortiz, you may step down.
18 You are excused.
19        Will the government please call its next
20 witness.
21        MS. DAYTON:  The government calls
22 Jackie Bryant, your Honor.
23        THE COURT:  Ms. Bryant, would you please
24 come over here to the witness stand, and will you
25 please remain standing while the oath is
```

1100

```
1  administered to you.
2  J A C Q U E L I N E   B R Y A N T   B U L E R I N,
3  having first affirmed, was examined and testified as
4  follows:
5         THE WITNESS:  My name is Jacqueline
6  Bryant Bulerin, B-u-l-e-r-i-n.
7         THE COURT:  Your town of residence?
8  State your residence?
9         THE WITNESS:  South Boston, Virginia.
10        THE COURT:  All right.  You may proceed.
11 DIRECT EXAMINATION
12 BY MS. DAYTON:
13   Q.   Good afternoon, Ms. Bryant.
14   A.   Good afternoon.
15   Q.   How are you doing?
16   A.   Fine.
17   Q.   You can pull the microphone a little bit
18 closer to you so everyone will be able to hear you.
19   A.   Okay.
20   Q.   Ms. Bryant, other than Jackie, do you go by
21 any other names?
22   A.   No.  They used to call me J. Boogie.
23   Q.   J. Boogie?
24   A.   Yeah.
25   Q.   How did you get that name?
```

1101

1    A.    That's just a street name.
2    Q.    When were you born?
3    A.    (Redacted) 1960.
4    Q.    Where were you born?
5    A.    New Britain, Connecticut.
6    Q.    Where did you live while you were growing
7  up?
8    A.    I grew up in Father Panik Village.
9    Q.    Where is Father Panik Village?
10    A.    Bridgeport, Connecticut.
11    Q.    What type of location is Father Panik
12  Village?
13    A.    It's the projects.
14    Q.    Okay.
15    A.    A bad project.
16    Q.    You had a look on your face.  Okay.  Who
17  lived with you in your home in Bridgeport?
18    A.    My mother, my sisters and brothers.
19    Q.    How many sisters and how many brothers?
20    A.    I had two brothers, but one passed, and two
21  sisters.
22    Q.    Where was your father?
23    A.    Who knows.
24    Q.    He wasn't really a part of your life?
25    A.    No, he wasn't.

1102

1    Q.    Did you go to high school in Bridgeport?
2    A.    Yes, I did.
3    Q.    Did you finish high school in Bridgeport?
4    A.    Well, I dropped out, but I later got my
5  GED.
6    Q.    Why did you drop out?
7    A.    I started running with the wrong people,
8  and I just stopped.
9    Q.    Didn't finish?
10    A.    No.
11    Q.    Do you have children?
12    A.    I have two.
13    Q.    How old are they?
14    A.    Thirty-five and thirty-four.
15    Q.    So, how old were you when you had your
16  children?
17    A.    I was 14 going on 15 when I had my first
18  child, 16 going on 17 when I had my second.
19    Q.    Are you married now?
20    A.    Yes, I am.
21    Q.    And when did you get married?
22    A.    I got married in January, January the 2nd
23  of this year.
24    Q.    You said you eventually got a high school
25  diploma.  Did you go on to college?

1103

1    A.    Yes, I have two years of college.
2    Q.    And did you get any sort of degree or
3  certificate?
4    A.    No, I didn't carry it through.
5    Q.    Do you have any sort of working
6  certificate?
7    A.    Yes, I have a nurse's aid certificate.
8    Q.    And when did you get that?
9    A.    1996.
10    Q.    Why did you choose that job?
11    A.    I like being a caregiver.
12    Q.    Are you working right now?
13    A.    No, I'm not.
14    Q.    Why not?
15    A.    Last year I had heart trouble.
16    Q.    Are you under a doctor's care?
17    A.    Yes.
18    Q.    Do you do any volunteer work?
19    A.    Yes, I volunteer at my church.  Very active
20  with my church.
21    Q.    While you were growing up, did your mom
22  work?
23    A.    No, she didn't.  She was on welfare.
24    Q.    Did she earn money in any other manner?
25    A.    Later.  In later years, she begun selling

1104

1  drugs.
2    Q.    And have you ever used drugs?
3    A.    Yes, I have.
4    Q.    How old were you when you started using
5  drugs?
6    A.    Probably like 26 or something like that.
7    Q.    Was there something that -- what drug did
8  you start by using?
9    A.    I started -- I smoked reefer first.  My
10  brother touched a live wire and died, and I began
11  smoking crack.
12    Q.    And when was that?
13    A.    That was '86.
14    Q.    When you say reefer, what do you mean?
15    A.    Marijuana.
16    Q.    And you said your brother died and you
17  started smoking crack.  What was the relationship
18  between those two things?  Why did his death cause
19  you to start smoking crack?
20    A.    I wanted to numb the pain, and I thought
21  that might -- would help.  It didn't, but --
22    Q.    Well, how does smoking crack make you feel?
23    A.    It's kind of hard to describe.  It will
24  just take your mind to something that you think is a
25  happy place, where you are just loose, like a loose

**GA276**

1105

1 canon, I guess, and you don't think about whatever
2 is going on in your life.
3     Q.   Okay.  How long does the actual high last?
4     A.   The initial feeling is like two to
5 three minutes, but the body effects is longer.
6     Q.   Do you develop a tolerance for crack?
7     A.   Once you take that first hit it will make
8 you want more and more and more, but without taking
9 that first hit, you don't desire it.
10     Q.   So -- but once you start --
11     A.   Once you start, more and more.  You want as
12 much as you can possibly get.
13     Q.   And you started smoking crack in 1986, you
14 said?
15     A.   Yes.
16     Q.   Are you clean now?
17     A.   Yes, I am.
18     Q.   How long have you been clean?
19     A.   A year and a half.
20     Q.   So in that -- between 1986 and, say, a
21 little over a year ago, were you addicted to crack?
22     A.   Off and on.
23     Q.   So you had periods when you weren't?
24     A.   Yes, I did.
25     Q.   I'm going to show you a picture that's in

1106

1 evidence.
2     A.   Why did you show me that picture?  I was a
3 mess at that time.
4     Q.   I'm just waiting for it to come up.
5     A.   I see it.
6         MS. DAYTON:  I don't think it's on.
7     A.   They don't need to see that.
8     Q.   Okay, why don't we show it to them anyway.
9 I think they've already seen it.  Who is it in the
10 photo that's going to come up in a minute?
11     A.   I want to say my evil twin, but that's me.
12     Q.   And --
13         THE COURT:  What exhibit are you
14 referring to?
15         MS. DAYTON:  I'm sorry, your Honor.
16 214.  It's in evidence already.
17     Q.   And do you know approximately when -- do
18 you have any idea when this was taken?
19     A.   I can't remember.
20     Q.   Okay.
21         MS. DAYTON:  If we can dim the lights
22 for a moment, your Honor?
23     Q.   So, how did you think you looked at that
24 time?
25     A.   Well, look at that now, I look terrible.

1107

1 But at that time I thought I was looking good.
2     Q.   Okay.  All right.  While you were using
3 crack, did there come a time at which you started to
4 sell crack?
5     A.   Yes.
6     Q.   And approximately when did you -- well, did
7 you only sell crack or have you ever sold another
8 drug?
9     A.   I've sold what they would call P-Dope,
10 which is fake heroin, and I sold crack.
11     Q.   What do you mean by fake heroin?
12     A.   I guess the synthetic -- I don't -- you
13 know.
14     Q.   But it still has an effect on the body?
15     A.   Yes.
16     Q.   And you sold crack.  Where did you first
17 start selling drugs, what area?
18     A.   I first started selling crack in Father
19 Panik.
20     Q.   And about how long were you selling in
21 Father Panik?
22     A.   I don't know.  A couple of years.
23     Q.   Did you work for one person in particular,
24 or were you sort of a --
25     A.   Well, at the time I was working for family

1108

1 members.
2     Q.   Who were the family members?
3     A.   They were my nephews.
4     Q.   So you were selling crack for your nephews?
5     A.   Yes.
6     Q.   Were you using and selling at the same
7 time?
8     A.   Yes.
9     Q.   And where would you sell?  On the street,
10 in your house?
11     A.   Father Panik had different hallways.  I
12 would be in various hallways.
13     Q.   And --
14     A.   I didn't sell at my house.
15     Q.   And what sort of quantities were you
16 selling in?
17     A.   In the -- back then it was $5 a capsule.
18     Q.   A capsule?  What's a capsule?
19     A.   A little vial.
20         MS. DAYTON:  Indicating, for the record,
21 the witness holding her fingers about an inch apart.
22     Q.   What's it made out of?
23     A.   I believe it was made out of plastic, the
24 top that goes on top of it.
25     Q.   And what quantity of crack was in each

1109

```
1   vial?
2        A.   You mean weight-wise?
3        Q.   Weight.
4        A.   I don't know.  I don't know.
5        Q.   How much did they cost?
6        A.   They cost $5 then.
7        Q.   So, you weren't packaging them yourself?
8        A.   No, I wasn't.
9        Q.   Were you working while you were selling
10  crack?
11       A.   No.
12       Q.   At some point, did you move out of Father
13  Panik Village?
14       A.   Yes.
15       Q.   And where did you move to?
16       A.   I moved to Lafayette Street.
17       Q.   Who did you live with there?
18       A.   My mother.
19       Q.   And did you get clean around this time
20  period?
21       A.   Well, in between I got clean off and on
22  plenty of times.
23       Q.   Would you go to programs to do that?
24       A.   Sometimes on my own.  I been to a couple
25  outpatients, and I also been to an inpatient.
```

1110

```
1        Q.   At some point did you move to the Cambridge
2   apartments?
3        A.   Yes.
4        Q.   And who were you living with there?
5        A.   I was living with my boyfriend at the time.
6        Q.   And where is the Cambridge apartments
7   located?
8        A.   It's on the Main Street.
9        Q.   In what city?
10       A.   Bridgeport.
11       Q.   And at that time when you were living with
12  your boyfriend, were you using drugs?
13            THE COURT:  Can we have a time frame?
14  That time is not specific.
15            MS. DAYTON:  Sure.
16       Q.   About what year was this?
17       A.   2002, 2003.
18       Q.   Were you clean, sober, at that point?
19       A.   Yes, at first I was.
20       Q.   And what happened?
21       A.   I ran into a girl that I knew previously,
22  and I visited her, she was getting high, I started
23  getting high.
24       Q.   And when you say "getting high," you mean
25  smoking crack?
```

1111

```
1        A.   Smoking crack.
2        Q.   Where were you getting high with her?
3        A.   At first I was getting high at her house.
4   She lived with this man that I called my
5   grandfather, and I used to get high there.  I sent
6   her one day to get me some crack, she never came
7   back.
8        Q.   So, what did you do?
9        A.   So, I went to find her.
10       Q.   Where?  How did you know where to find her?
11       A.   People talk, and I asked questions, and
12  they directed me to Charles Street.
13       Q.   Charles Street?
14       A.   Yes.
15       Q.   Where on Charles Street?
16       A.   215.
17       Q.   215 Charles Street?
18       A.   I believe that's the area.
19       Q.   You said people talk.  How did they
20  describe the location to you?
21       A.   Well, they told me all I had to do was go
22  by the diner and it would be the big gray house
23  behind it, which was easy to find.
24       Q.   Okay.  I'm going to show you a picture
25  that's in evidence as Government's Exhibit 102.  Do
```

1112

```
1   you recognize what this is a picture of?
2        A.   That's the building I'm talking about.
3   That's Charles Street.
4        Q.   And when you went to Charles Street, where
5   in particular in the building did you go?
6        A.   I went to the second floor.
7        Q.   What apartment?
8        A.   211.
9        Q.   Can you describe where in the building 211
10  is?
11       A.   Walking through it?
12       Q.   Yeah.
13       A.   Okay.  You go up them stairs, there is a
14  doorway where some more stairs is that will take you
15  up.  That will just -- them stairs will just take
16  you to the first floor.  You have to go up another
17  set of stairs.  Come out the stairs, you go around a
18  corner and walk down the hall sort of, and 211 is on
19  the right-hand side.
20       Q.   Is it the first, second, third apartment?
21       A.   Third, I believe.
22       Q.   Okay.  And when you got to apartment 211,
23  did you go in?
24       A.   Yes, I did.
25       Q.   What did you find inside?
```

1113

1     A.   I found the girl I was looking for.
2     Q.   And what was she doing?
3     A.   She was playing cards at the time.
4     Q.   Was anyone else in the apartment?
5     A.   There was a lot of people.  I can't tell
6 you each individual person that was there, but there
7 was a lot of people inside.
8     Q.   What were they doing?
9     A.   Getting high, smoking crack and playing
10 cards.
11     Q.   Okay.  Was anyone selling crack from that
12 location?
13     A.   Yes.
14     Q.   One person, two people?
15     A.   I think at the time there was two.
16     Q.   Do you recall their names?
17     A.   One I think is Slim.  It probably wasn't
18 his real name, but Slim, and the other one, I can't
19 remember his name.
20     Q.   Do you know whose apartment it was?
21     A.   Pops.
22     Q.   Do you know Pops' real name?
23     A.   James Rucker.
24     Q.   I'm going to show you what's in evidence as
25 Government's Exhibit 229.  Do you know who that is?

1114

1     A.   That's Pops.
2     Q.   He leased that apartment?
3     A.   As far as I know, yes.
4     Q.   Was that -- that day that you went there,
5 was that the only time you were ever in that
6 apartment?
7     A.   No.  No, it wasn't.
8     Q.   What happened after that day?
9     A.   I became friends with Pops, and he told me
10 I could come anytime, and so I started going myself
11 to cop -- to buy drugs.
12     Q.   Is that what "to cop" means, to buy drugs?
13     A.   Yes.
14     Q.   And when you would go in to buy drugs, from
15 whom would you buy it?
16     A.   Slim and the other one.
17     Q.   Okay.  He's the one whose name -- Slim and
18 one whose name you don't remember?
19     A.   Yes.
20     Q.   Is the Charles Street building secured,
21 like a locked building?
22     A.   Well, sometimes the front door would be
23 locked, but you can go in from under the parking
24 garage, or on the other side of the building, there
25 is some doors down there.  Them doors was generally

1115

1 open.
2     Q.   On which side of the building were there
3 doors?
4     A.   On both sides, actually.  You can go
5 underneath the parking garage and there is a door
6 that will bring you -- there is two, as a matter of
7 fact, one in the front and one in the back, and an
8 elevator.
9     Q.   I'm going to show you what's been marked
10 Government's 111.  Do you recognize what this is a
11 picture of?
12     A.   That's the side of the house.
13     Q.   That's the side of the building?
14     A.   That's the side towards the diner.
15     Q.   Okay.  And do you see the doors that you
16 are talking about, or the door, one of the doors?
17     A.   Yes, I do.
18     Q.   And was that door generally locked?
19     A.   From this view I can't tell if that's the
20 front or the back because there is two.  But the one
21 in the front was generally locked, but the one in
22 the back was always unlocked.
23     Q.   So you could go in through that and get
24 into the building?
25     A.   Yes.

1116

1     Q.   Did you start spending a lot of time in
2 apartment 21?
3     A.   Eventually, yes.
4     Q.   And by a lot, how much time?
5     A.   Hours.
6     Q.   Okay.
7     A.   Hours.
8     Q.   Every day?
9     A.   Sometimes, I would stay overnight there.
10 Yeah, it became every day.
11     Q.   Did you become friendly with anyone in the
12 building -- I mean, anyone in that apartment?
13     A.   Basically, everyone.
14     Q.   Do you recall some of the people that you
15 started becoming friends with?
16     A.   Well, Pops, Tina, Tippy, Judy.
17     Q.   Judy?
18     A.   And whoever would come by.
19     Q.   Do you know Tina's last name?
20     A.   I can't recall it right now.
21     Q.   Are you a little nervous today?
22     A.   A little.
23     Q.   Okay.  I'm going to show you a picture, and
24 if you can tell me if you recognize this person.
25 It's Government's Exhibit 252.

1117

```
1    A.   Tina.
2    Q.   That's your friend Tina?
3    A.   Yeah.
4    Q.   And who was Tippy?  What was Tippy's real
5  name, if you know it?
6    A.   James.
7    Q.   Okay.  Do you know, was James -- did he
8  have any relation to Tina?
9    A.   He was her boyfriend.
10   Q.   I'm going to show you what's been marked
11 for reference as Government's Exhibit 253.  Do you
12 recognize this person?
13   A.   Yes.
14   Q.   Who is that?
15   A.   Tippy.
16        MS. DAYTON:  Your Honor, if I may move
17 253 into evidence.
18        THE COURT:  Absent objection.
19        MR. SMITH:  No objection.
20        THE COURT:  It's a full exhibit.
21   Q.   And did Tina live in the building when you
22 first met her?
23   A.   No, she didn't.
24   Q.   Do you know where she lived?
25   A.   Ansonia, or in that area.
```

1118

```
1    Q.   Okay.  And what was she doing at the
2  building?
3    A.   She would come to visit.  We got high
4  together.
5    Q.   You guys would smoke crack together?
6    A.   Yeah.
7    Q.   And what about Tippy?
8    A.   Him, too.
9    Q.   Did Tina come often?
10   A.   At first, she would probably come maybe
11 once a week, maybe once every other, two weeks.  She
12 didn't come a lot at first.
13   Q.   And then what happened?
14   A.   It became more.  She came more after a
15 while.
16   Q.   Okay.  When she started coming more, would
17 she always be in 211?
18   A.   No.  Basil lived on the first floor.
19   Q.   Who is Basil?
20   A.   A friend.  I can't describe him no other
21 way.
22   Q.   A friend of yours?
23   A.   He was a friend of mine, he was a friend of
24 Tina's.  I believe Tina knew him prior.
25   And she would spend time in his apartment
```

1119

```
1  as well?
2    A.   Yes.
3    Q.   And where did Basil live within the
4  building?
5    A.   Towards the front of the building on the
6  first floor.
7    Q.   I'm going to show you what's in evidence as
8  Government's Exhibit 254.  Do you recognize this
9  person?
10   A.   Yes, I do.
11   Q.   And who is that?
12   A.   That's Basil.
13   Q.   Okay.  So, did Basil smoke crack?
14   A.   No, he didn't.
15   Q.   Did he sell crack?
16   A.   No, he didn't.
17   Q.   Did Tippy smoke crack?
18   A.   Yes, he did.
19   Q.   Did he sell crack?
20   A.   Yeah.
21   Q.   He did?
22   A.   Well, he helped Tina.
23   Q.   Helped Tina?
24   A.   So, yeah.
25   Q.   And Tina sold crack at some point?
```

1120

```
1    A.   Yes.
2    Q.   Was she selling in the beginning there?
3    A.   No.
4    Q.   At some point did you start selling in that
5  building?
6    A.   Yes.
7    Q.   And how did that come to be?
8    A.   The cops came one day to raid James'
9  apartment.
10   Q.   When you say James, you mean?
11   A.   I mean Pops.
12   Q.   Pops.  They raided 211?
13   A.   Yes.
14   Q.   Okay.
15   A.   And I believe his name is Junior.
16   Q.   Junior?
17   A.   Don't quote me on that.  Got scared.
18 Anyway, the crack that he had -- because he was
19 selling, the crack that he had left, he gave to me.
20   Q.   What did you do with them?
21   A.   I smoked them.
22   Q.   Okay.  And how many were there?
23   A.   Ten, maybe.
24   Q.   And after you smoked them, what happened?
25   A.   What happened?  I don't know.
```

1121

```
1    Q.   Well, how did that lead to you selling
2  crack in the building?
3    A.   One day D came.
4    Q.   Who is D?
5    A.   Him.
6    Q.   Can you please point to the person that you
7  are talking about and say what that person's
8  wearing?
9    A.   A blue sweater.  A blue sweater and a blue
10 shirt.
11        MS. DAYTON:  Indicating the defendant
12 for the record, your Honor.
13        THE COURT:  It may.
14   Q.   And you referred to him as D?
15   A.   Yes, that's what I knew him as.
16   Q.   So, you said D came.  And what happened?
17   A.   I don't know if he liked how I carried
18 myself or however, but it ended up I started selling
19 for him.
20   Q.   How did it happen you started selling for
21 him?
22   A.   I can't remember the exact conversation,
23 but I know I started selling for him.  I don't know
24 if he said would you like to or if I asked him, but
25 I remember I started selling for him.
```

1122

```
1    Q.   And did the defendant give you drugs to
2  sell?
3    A.   Yes.
4    Q.   And how -- what type of drug, first of all?
5    A.   Crack.
6    Q.   And how do you know it was crack?
7    A.   Because I smoked crack.
8    Q.   So did you smoke sometimes the drugs the
9  defendant would give you?
10   A.   Yes.
11   Q.   And did you get high from it?
12   A.   Yes.
13   Q.   So, you know it was crack?
14   A.   Yes.
15   Q.   And when he gave you the crack, did he give
16 it to you in one big ball, or did he give it to you
17 in vials or bags?  How did he give it to you?
18   A.   In packs.
19   Q.   Can you describe what a pack is?
20   A.   A pack had 36 -- 36 slabs in them.
21   Q.   And what is a slab?
22   A.   It's a little baggie that has crack in it.
23   Q.   And when you say little, how little?
24   A.   Maybe about that big.  A square bag.
25   Q.   A little --
```

1123

```
1    A.   About that big.
2        MS. DAYTON:  Indicating about an inch
3  again, your Honor, with her fingers and saying a
4  square bag.
5    Q.   And are they made of paper, plastic?
6    A.   They were made of plastic.
7    Q.   Like a tiny sandwich bag or something?
8    A.   Exactly.
9    Q.   And how are they sealed?
10   A.   There is a clasp, like a baggy that you
11 snap closed.
12   Q.   Like a Ziploc?
13   A.   Yeah, but with no zipper.  It fastens like
14 that, then a -- then it would be burnt on the top.
15   Q.   Why is it burnt on the top?
16   A.   So you can't dip.
17   Q.   What does that mean?
18   A.   So that you can't take a person's product
19 and take some out and seal it back and then sell it.
20   Q.   So, it's to protect from someone stealing
21 some of the drugs?
22   A.   Exactly.
23   Q.   So you said that he would give you a pack.
24 And how many bags were in the pack?
25   A.   Thirty-six.
```

1124

```
1    Q.   And how much did each bag cost, the little
2  tiny bags?
3    A.   $10.
4    Q.   And the 36 bags together, do you know about
5  how much weight just in crack it would be?
6    A.   About a three and a half.
7    Q.   Is there a street name for a three and a
8  half?  Well, three and a half what?
9    A.   Ounces, or grams.  Probably grams.
10   Q.   So, the smaller quantity?
11   A.   Yeah, probably grams.
12   Q.   So is there a street name for three and a
13 half grams of crack?
14   A.   That is the -- 8-ball.
15   Q.   An 8-ball.  Okay.  And so -- but it was --
16 did you break it down into little bags or he gave it
17 to you that way?
18   A.   He brought it to me that way.
19   Q.   And when he gave -- when the defendant gave
20 you the drugs, would he just hand you the 36 bags
21 kind of loose, or how were they?
22   A.   No, the 36 bags would be in another plastic
23 bag, which would be tied.
24   Q.   All right.  Now, did you earn money from
25 selling the drugs?
```

1125

1    A.    Yes.

2    Q.    How much did you earn?

3    A.    Well, I had a choice, I could either sell

4  and make money or I can keep the drugs.  I earned

5  ten of them.

6    Q.    You earned ten what?

7    A.    Slabs off of 36.

8    Q.    Out of every 36?

9    A.    I have to pay him for 26 of them, and the

10  other ten would be mine.

11    Q.    So you paid the defendant for 26 of the

12  slabs?

13    A.    Yes.

14    Q.    And how much money did you actually give

15  him out of each pack?

16    A.    Two hundred sixty.

17    Q.    And you said you could either take money --

18    A.    Uh-huh (indicating affirmatively.)

19    Q.    And how much money would that be?

20    A.    It would be $100.

21    Q.    Or you could take how many slabs?

22    A.    Or I could take ten slabs.

23    Q.    And why would you choose to take the ten

24  slabs versus $100?

25    A.    Because I smoked.

1126

1    Q.    And how did you usually choose to get paid?

2    A.    Sometimes it would be money, sometimes I

3  would just smoke them.

4    Q.    Did you get to pick which ones you wanted?

5    A.    Of course.

6    Q.    And how would you pick?

7    A.    I would open it up, take the biggest ones.

8    Q.    Take the ten biggest ones?  You have to

9  answer out loud.

10    A.    I'm sorry.

11    Q.    Is that a yes?

12    A.    Yes, I would take the biggest ones out.

13    Q.    And would you sell a whole pack in a day?

14    A.    Yes.  More than a pack.

15    Q.    When you ran out of the first pack, how did

16  you get more drugs?

17    A.    Well, I usually had more than one pack at a

18  time.

19    Q.    D would give you more than one pack at a

20  time?

21    A.    Yes.

22    Q.    And what would happen when you ran out?

23    A.    When I ran out, I would call him and tell

24  him I was out, but I would always call him before I

25  ran out.  When I got to the end of my last pack,

1127

1  maybe 10, 15, I would call him and let him know

2  where I was standing, and he would bring me more.

3    Q.    And did you call and say I ran out of

4  crack, could you bring me some more crack?

5    A.    No, I might say I need some more shoes, I

6  need some more shirts, or whatever I would say.  He

7  would know what I mean.

8    Q.    Why did you say it like that instead of

9  using narcotic language?

10    A.    Because drug dealers got a code, I guess,

11  you know.

12    Q.    Okay.  And you said that he would bring

13  you -- the defendant would bring you more drugs.

14    A.    Yes.

15    Q.    Did the defendant ever send someone else to

16  bring you drugs?

17    A.    Yes.  Somebody else used to bring me some,

18  too.

19    Q.    Who was that?

20    A.    We called him Baby Boy at the time.

21    Q.    I'm going to show you what's in evidence as

22  Government's Exhibit 221.  Do you recognize who this

23  person is?

24    A.    Baby Boy.

25    Q.    That's him?

1128

1    A.    Yes.

2    Q.    Do you know what Baby Boy's relationship is

3  to the defendant, if any?

4    A.    No, I don't.

5    Q.    Was Baby Boy his own dealer or did he work

6  with the defendant somehow?

7    A.    I believe at the time he was his

8  lieutenant, I guess you call it.

9    Q.    He was the defendant's lieutenant?

10    A.    Yes.

11    Q.    And what exactly do you mean by that?

12    A.    A lieutenant is the one who is responsible

13  for making sure me as a worker has my supply,

14  whatever I needed.

15    Q.    And did the defendant always bring you your

16  supply or send Baby Boy to bring you your supply at

17  the building, or did you sometimes get it from the

18  defendant at other locations?

19    A.    Sometimes at other locations.

20    Q.    Like what?

21    A.    Maybe underneath the building next door,

22  maybe in the parking lot from the diner, maybe at

23  Nick's Diner, or he would tell me where it was

24  located.  Sometimes he would hide them in the

25  building and when I finished he would say, okay,

1129

1 well, go look in the laundry room behind such and
2 such and you'll find the bags, or right in the house
3 on the shelf.
4    Q.   So, the defendant would tell you he had hid
5 drugs somewhere in the building?
6    A.   Exactly.
7    Q.   And when you met with the defendant outside
8 of the building, did you guys just meet on the
9 street or would you meet in a car?
10   A.   I'm not real good with cars.  An SUV.
11   Q.   The defendant or you had an SUV?
12   A.   The defendant had an SUV, and I would come
13 to his truck.
14   Q.   It was a truck.  What color?
15   A.   Black.
16   Q.   Do you know what kind it was, or just an
17 SUV?
18   A.   Maybe a Cadillac.
19   Q.   A big --
20   A.   It was nice.
21   Q.   A big, nice black truck?
22   A.   Yes.
23   Q.   And how did the defendant actually get his
24 money from you?
25   A.   I would give it to him.  I hand it to him.

1130

1    Q.   So he would actually pick it up directly
2 from you?
3    A.   Yes.
4    Q.   And did you just shove it in your pockets,
5 did you keep it organized in some way?
6    A.   Shove what, the money?
7    Q.   The money.
8    A.   No, I organized it.  For one pack, I would
9 have all of that money together.  It depends on how
10 many packs I have.  And then I would flip them back
11 and forth, each set, so that now it can be counted
12 easily.
13   Q.   Okay.  Was apartment 211 -- okay.  What
14 time period is this?  Like about -- what year is
15 this that we're talking about that you were selling
16 in apartment 211 for the defendant?
17   A.   2003, 2004.  In that time frame.
18   Q.   And in that time frame was apartment 211
19 busy?
20   A.   Yes.
21   Q.   Okay.
22   A.   Yes.
23   Q.   So there were a lot of customers?
24   A.   Yes.
25   Q.   What hours did you work?

1131

1    A.   Twenty-four.
2    Q.   So, did you just start living in apartment
3 211?
4    A.   Yes, I did.
5    Q.   Where did you sleep?
6    A.   Whenever I did sleep, on the couch.  I
7 usually didn't sleep.
8    Q.   And did you smoke crack while you were
9 selling?
10   A.   Yes, I did.
11   Q.   How many times a day do you think you
12 smoked crack?
13   A.   Twenty.
14   Q.   How many hits of crack do you get off one
15 of those little $10 bags?
16   A.   Me personally?  One.
17   Q.   So, you smoked a lot.
18   A.   Yes, I did.
19   Q.   The volume of customers, was it one an
20 hour, one a half hour, one every ten minutes?
21   A.   No, it was a high volume of customers.
22 Sometimes the door would just constant -- I wouldn't
23 have time to sit down and do anything, it was
24 constant knocking.  And then sometimes it wouldn't.
25   Q.   So on your average day, about how many

1132

1 packs of 36 packs would you sell?
2    A.   Ten, maybe.
3    Q.   A lot?
4    A.   It was a lot.
5    Q.   So, ten packs.  If there're three and a
6 half grams each, like, 35 grams of crack a day?
7    A.   Yes.
8    Q.   Did you -- were there slower days?
9    A.   Yes, they was.
10   Q.   And were there busy days?
11   A.   Yes, there was.
12   Q.   Were all of the customers local people?
13   A.   No.
14   Q.   Explain what you mean.
15   A.   People would come from maybe Milford or --
16 I know they wasn't from Bridgeport.  I could
17 remember a particular customer who used to come, and
18 she used to buy quite a bit at a time, and I used to
19 sort of cater to her.  I would make sure the house
20 was comfortable, make sure there was nobody there to
21 beg her for hits, have somebody who will run to the
22 store for her to get beers, cigarettes, whatever she
23 need, as long as she was comfortable.
24   Q.   Did she let you know if she was coming?
25   A.   He would let me know if she was coming.  I

**GA283**

1133

```
1   guess she would call him first because she --
2       Q.   When you say "he," you are looking at the
3   defendant?
4       A.   Yes.  Because she bought a lot, so to make
5   sure I could accommodate her, I guess she would
6   pre-call, and then he would call me and let me know
7   such and such is coming and am I ready for her.
8       Q.   When you say "a lot," what sort of -- I
9   mean --
10      A.   Sometimes she used to come and buy two to
11  three packs at a time.
12      Q.   So close to $1,000 worth of crack at a
13  time?
14      A.   Yes, yes.
15      Q.   Were you making a lot of money at this
16  time?
17      A.   Actually, I was.
18      Q.   What were you doing with your money?
19      A.   Most of it smoking it, but I bought
20  clothes.  I like clothes.
21      Q.   Do you have any money left?
22      A.   No, I used to smoke crack.  I'm not --
23      Q.   You spent it all?
24      A.   Or smoked it.
25      Q.   Okay.  How long do you think you sold crack
```

1134

```
1   for D, for the defendant?
2       A.   I don't know, three, four months.  I don't
3   know.  I really couldn't tell you exact time.
4       Q.   I'm going to draw your attention to
5   November of 2004.  Did you have a problem with the
6   defendant around that time?
7       A.   Yeah, yeah.
8       Q.   What happened?  What was the basis of the
9   problem?
10      A.   The problem was he came to collect, and I
11  was short one -- on my money.
12      Q.   How short?
13      A.   100-something dollars, I believe it was.
14      Q.   Okay.
15      A.   Anyway --
16      Q.   Why were you short?
17      A.   Because I smoked the crack.
18      Q.   Okay, so what happened?
19      A.   So, he told everyone to leave out the house
20  and --
21           MS. DAYTON:  Indicating the defendant
22  for the record, your Honor.
23      A.   And he went back in the hallway.  Baby Boy
24  comes in.  Baby Boy told me cover my face because he
25  didn't want to hit me in my face, and Baby Boy
```

1135

```
1   started hitting on me, hitting on me.  Anyway, Baby
2   Boy left back out.  D comes in.  When D comes in, D
3   starts hitting me.  So, we're scuffling and
4   whatever.
5       Q.   You're --
6       A.   We're scuffling.  I don't know if he
7   knocked me out or I fell out, but anyway, when I
8   woke -- when I woke up, my leg was busted open, my
9   knee.  I had a ceramic ashtray that I used to have
10  on the table.  The ashtray, when I woke up, the
11  ashtray was in pieces, and there with blood on it,
12  so I believe that's what he hit me with.
13      Q.   When you -- go ahead.  When you say the
14  defendant hit you, was he hitting you, slapping you,
15  was he punching you, kicking you?
16      A.   Punching.  Punching me.
17      Q.   So you wake up.  Are you bleeding?
18      A.   Yes, badly.
19      Q.   And what happens?
20      A.   I wake up, and Pops is over me, and Pops is
21  saying, "That's enough, that's enough, leave her
22  alone."  Pops helped me to the couch.  He goes gets
23  a towel, or whatever, and he wraps it around my leg,
24  and I'm saying, "I need to go to the hospital," but
25  for some reason -- I don't know if I was drugged, I
```

1136

```
1   don't know what it was, but I could not get up.
2            I stayed in that house two, maybe three
3   days.  I can't remember exact.  And the boy I was
4   going with at the time called my daughter and told
5   my daughter, "Something ain't right because your mom
6   calls me every day and she hasn't called me."  So,
7   my daughter in turn come to the building with the
8   police.
9       Q.   So, the police showed up?
10      A.   The police showed up at the door.  When
11  they come in the door, I'm on the couch.  They took
12  a brief statement, and I went to the hospital.
13      Q.   Okay.  Did you tell them you had been
14  assaulted by the defendant?
15      A.   Yes.
16      Q.   And you -- which hospital did you go to?
17      A.   I went to Bridgeport Hospital.
18      Q.   And what sort of treatment did you get
19  there?
20      A.   They stitched my leg up.  It was sort of a
21  little bit of rehabilitation.  I had to walk with a
22  walker because I couldn't bend my leg.  It wasn't no
23  long stay or anything, but I couldn't walk like
24  normally.
25      Q.   Do you have scars from that?
```

1137

```
1    A.  Yes.
2         MS. DAYTON:  Your Honor, I would ask
3    that Ms. Bryant be allowed to show the jury her
4    scars from her assault on her leg.
5         MR. SMITH:  No objection, your Honor.
6         THE COURT:  All right, Ms. Bryant, would
7    you come out here, what we call the well of the
8    courtroom.  Ladies and gentlemen, you may stand up
9    if you need to.
10   Q.  We don't mean to embarrass you.
11   A.  That's all right.  I have stockings on.
12   Q.  You have stockings on?
13   A.  (Indicating).
14   Q.  Okay.  And you stayed overnight?
15   A.  Yes.
16        MS. DAYTON:  Your Honor, at this time
17   the government has a stipulation that we'd ask to
18   read into evidence, and medical records, your Honor.
19        THE COURT:  All right.  The stipulation
20   is marked as what exhibit?
21        MS. DAYTON:  Government 245A, your
22   Honor.  It's been signed by the government and by
23   both defense counsel in the presence of the
24   defendant.
25        THE COURT:  All right.
```

1138

```
1         MS. DAYTON:  "It's hereby stipulated and
2    agreed by and between the United States of America,
3    by Assistant United States Attorney Tracy Lee
4    Dayton, and the defendant, Azibo Aquart, by his
5    attorneys, Michael Sheehan and Justin Smith, as
6    follows:  If called to testify, Marie Cohen, a
7    custodian of records for Bridgeport Hospital in
8    Bridgeport, Connecticut, would state that Government
9    Exhibit 245 is a fair and accurate copy of medical
10   records maintained in the ordinary course of
11   business by Bridgeport Hospital for medical
12   treatment provided to Jackie Bryant in
13   November 2004.
14        "It is hereby stipulated and agreed that
15   Government Exhibit 245 and this stipulation are
16   admissible in evidence."
17        And it's signed by me, Tracy Lee Dayton,
18   Assistant United States Attorney, Michael Sheehan,
19   Esquire, and Justin Smith, Esquire.
20        Your Honor, here are the records
21   themselves.
22        THE COURT:  All right.  So they are 245.
23        MS. DAYTON:  Yes, your Honor.
24        THE COURT:  And they -- and 245A are
25   full exhibits.
```

1139

```
1         MS. DAYTON:  Thank you, your Honor.  I
2    will pass these up to the clerk.
3    Q.  Ms. Bryant, when you were at the hospital,
4    did you -- what did you tell them about how you had
5    been hurt?
6    A.  I told them that I was short on money and
7    he beat me up.
8    Q.  You told that to the police or to the
9    hospital or to both?
10   A.  Both.
11   Q.  And -- okay.  After the defendant beat you
12   up, did you continue to sell drugs for him?
13   A.  No.
14   Q.  But did you continue to hang out in
15   apartment 211?
16   A.  Eventually, I did.
17   Q.  Do you know if somebody took over your
18   position selling drugs from apartment 211?
19   A.  Yes, I do.
20   Q.  And who took over your position?
21   A.  Frank.
22   Q.  Do you know Frank's last name?
23   A.  Hodges.
24   Q.  And do you know if it was just him or
25   anyone else working with him?
```

1140

```
1    A.  Nessa.
2    Q.  Do you know Nessa's real name or is that --
3    A.  Juanita.
4    Q.  And how do you know that they were working
5    for the defendant?
6    A.  Because the defendant still was coming
7    doing the same thing he was doing with me.
8    Q.  What do you mean by that?
9    A.  Bringing drugs, picking up money.
10   Q.  Showing you what's marked Government's
11   Exhibit 212.  Do you recognize who that person is?
12   A.  Frank.
13   Q.  That's Frank?
14   A.  That's Frank.
15   Q.  And showing you 213.  Who is that?
16   A.  That's Nessa.
17   Q.  How often would you see the defendant come
18   and bring drugs to either -- did you see him give it
19   to both Nessa and Frank, or just to one or the
20   other?
21   A.  That part I couldn't tell you.
22   Q.  Who did you see --
23   A.  I just know that it was still the same
24   operation.
25   Q.  How do you know?
```

1141

```
1    A.   Because it was still the same house, it was
2   still the same drugs.  He wouldn't have been coming
3   to go bring -- he wouldn't have been involved if it
4   was for somebody else, so --
5    Q.   Does the defendant smoke crack?
6    A.   Not that I know of.
7    Q.   You never seen him smoke crack?
8    A.   Never.
9    Q.   Was Baby Boy still hanging around at this
10  time?
11   A.   After I got beat up?
12   Q.   Yes.
13   A.   No.  Baby Boy had left not far after I got
14  beat up.  I believe he went to jail.  I'm not sure,
15  but I know I didn't see him anymore.
16   Q.   Had someone took over as the defendant's
17  lieutenant?
18   A.   Yes.
19   Q.   Who was that?
20   A.   I know him by Womble.
21   Q.   I'm going to show you Government's
22  Exhibit 210.  Do you recognize this person?
23   A.   Womble.
24   Q.   Where would you see Womble?
25   A.   In the apartment.
```

1142

```
1    Q.   What would Womble be doing in the
2   apartment?
3    A.   Usually when I come he would be hanging
4   around, but I know that he was the lieutenant, he
5   would bring drugs.
6    Q.   He would bring drugs to whom?
7    A.   To Frank or Nessa.
8    Q.   You said that you think Baby Boy went into
9   custody.  Were there a lot of raids at this
10  apartment building?
11   A.   While I was working, no.
12   Q.   What about afterwards, when you were
13  hanging out there?
14   A.   Afterwards, there were a couple.
15   Q.   Did you ever get arrested in those raids?
16   A.   No, I didn't.
17   Q.   Do you know if the raids caused business to
18  slow down at all, meaning the drug business?
19        MR. SMITH:  Objection.  Basis of
20  knowledge for this.
21        THE COURT:  I'll permit -- well, yes or
22  no is the first part.  Do you know if the raids
23  caused the drug business to slow down?
24        THE WITNESS:  Yes.
25   Q.   How do you know?
```

1143

```
1    A.   Because less people were coming.
2    Q.   Did the defendant set up any sort of
3   process to detect law enforcement coming?
4    A.   I don't know if he had one in place when I
5   was working, but after I was working, I know Judy --
6    Q.   Who is Judy?
7    A.   Her apartment -- Judy lived on the second
8   floor in the front of the building.  I know her
9   apartment was used as a lookout place.
10   Q.   And how do you know that?
11   A.   Because Judy was my friend, too, and me and
12  her smoked, and I went in her house a few times.  It
13  was some boys that came.  I don't know their names,
14  because I was, like, out of the game then, so that
15  wasn't important to me at the time.  I was really
16  smoking crack, so it didn't matter.  But what they
17  would be doing whenever I went was sitting and
18  looking out the window.
19   Q.   In Judy's apartment?
20   A.   Yes.
21   Q.   I'm showing you what's been marked
22  Government's Exhibit 217.  Do you recognize this
23  person?
24   A.   Judy.
25   Q.   Who did she live with, if anyone?
```

1144

```
1    A.   She had a boyfriend.
2    Q.   Do you remember his name?
3    A.   I can't think -- it begin with an R.  I
4   can't think of it right now.
5    Q.   And what did he look like?
6    A.   Puerto Rican.
7    Q.   You knew him as well?
8    A.   Yes.  Rafael.
9    Q.   Showing you Government's Exhibit 218.
10   A.   That's him.
11   Q.   Now, how do you know that -- was Judy
12  involved in the organization, or did she just let
13  her apartment be used?
14        MR. SMITH:  Objection to the language
15  "organization."
16        THE COURT:  Sustained.
17   Q.   Was Judy involved with the defendant's drug
18  dealing or did she just allow her apartment to be
19  used?
20   A.   As far as I know she just let her apartment
21  be used.
22   Q.   And did Judy ever come in to apartment 211?
23   A.   Lots of times.
24   Q.   What would she do there?
25   A.   Smoke crack.
```

1145

```
1    Q.   Did you ever see Frank or Vanessa, Nessa,
2  have a problem with the defendant?
3    A.   Yes.
4    Q.   Who?  Which one?
5    A.   Frank.  Frank.
6    Q.   What did you see?
7    A.   I think Frank was double juggling.
8    Q.   What's --
9    A.   Meaning he was selling for D and someone
10 else at the same time.  D came in the house one day,
11 211, and either Frank was bagging up or he had the
12 crack on a plate getting ready to.  Anyway, he know
13 that's not his.
14   Q.   The defendant knows it's not his?
15   A.   Exactly.  And he immediately said for all
16 of us to leave out the apartment.
17   Q.   Who said that?
18   A.   D.  Him.
19   Q.   Okay, and what happened?
20   A.   We left out of the apartment.  Me and a
21 girl named Mary stood across the street.  We waited
22 until we seen D leave the apartment building, and
23 when he left the building, we went upstairs to see
24 what was going on.  When we got there, Frank was
25 laying on the couch, and he was beat up bad.
```

1146

```
1    Q.   When you say he was beat up bad, what could
2  you see about him?
3    A.   He looked like a monster.  His head was
4  swole (sic), his eyes were swole.  Everything about
5  him was just swole.
6    Q.   And, Nessa, do you know if she ever had a
7  problem with the defendant?
8    A.   I'm not sure.  I can't remember him doing
9  anything to her.
10   Q.   Are you familiar with any of Nessa's family
11 members?
12   A.   Her daughter lived on the second floor in
13 that building.  I can't remember which apartment at
14 the time, but I met her.
15   Q.   And do you --
16   A.   Also her brother.
17   Q.   Also her brother?
18   A.   Yeah.  I don't know if he was her real
19 brother or she just called him her brother.
20   Q.   What's his name?
21   A.   His name was Johnny.  We called him
22 John-John.  I went to school with him, so I knew him
23 well.
24   Q.   You have known him for a long time?
25   A.   Yes.
```

1147

```
1    Q.   Do you know what John-John does for a
2  living, or did for a living back at this time?
3    A.   Sold drugs.
4    Q.   Do you know what kind of drugs John-John
5  sold?
6    A.   Crack.
7    Q.   Showing you Government 224.  Do you
8  recognize that person?
9    A.   Yes, that's John-John.
10   Q.   Was -- did you ever see John-John in
11 apartment 211?
12   A.   Yes, I did.
13   Q.   And what would he -- was it once, more than
14 once?
15   A.   Lots of times.
16   Q.   What would he come over there for?
17   A.   To see his sister, for one, and also to
18 sell some drugs if he could.
19   Q.   Did you ever see the defendant have a
20 problem with John-John?
21   A.   Yes.  Once again, he told us to leave out
22 the house.
23   Q.   Did you leave?
24   A.   Yes.
25   Q.   Do you know who was in the apartment before
```

1148

```
1  the defendant told you all to leave?
2    A.   I can't recall everyone.
3    Q.   Do you remember anyone other than --
4    A.   I remember me, Pops, Vanessa, Frank,
5  John-John, and I think a girl named Shirley.
6    Q.   Okay.  And what happened?
7    A.   I believe the defendant came in and asked
8  him was he selling drugs in his spot.  Of course --
9    Q.   When you say "in his spot," what do you
10 mean?  The defendant's spot?
11   A.   In his place of business.  Anywhere
12 somebody start selling, they consider that their
13 spot.
14   Q.   So the defendant asked John-John if he was
15 selling in his spot?
16   A.   Yes.
17   Q.   What happened next?
18   A.   I believe John-John said no.  But I don't
19 know if he seen someone leaving that had John-John's
20 stuff or it was just word of mouth, but, anyway, he
21 told all of us to leave, and we left.
22        MR. SMITH:  Your Honor, I'm going to
23 object to any further hearsay statements coming in
24 this defendant's -- I'm sorry -- this witness's
25 testimony.
```

1149

```
1     THE COURT:  All right.  Let's just sort
2  this out question by question.
3     Q.   So the defendant told you all to leave.
4  Did you leave?
5     A.   Yes, we did.
6     Q.   What's the next thing that happened?
7     A.   The next thing that happened, I went
8  downstairs.  I went to Basil's house, and I was
9  looking out the window, and when I was looking out
10 the window I seen John-John leaving out of the
11 building holding his ear.
12    Q.   And did you notice anything about
13 John-John's ear?
14    A.   He was bleeding.
15    Q.   And you were indicating your right ear.  Do
16 you remember it being his right ear?
17    A.   It was this ear, because he went this way.
18    Q.   You mentioned Tina Johnson earlier.  You
19 were friends with Tina?
20    A.   Yes.
21    Q.   Okay.  You said that -- you mentioned Tina
22 started selling crack?
23    A.   Yes.
24    Q.   About when, if you remember, did she start
25 selling crack?
```

1150

```
1     A.   Maybe the summer of -- maybe the summer of
2  2005.
3     Q.   The summer she died?
4     A.   Yes, the summer she died.  Definitely.
5     Q.   That's the summer she started selling?
6     A.   Yes.
7     Q.   And do you know how she first started
8  selling drugs?  Were you close with Tina?
9     A.   Very.
10    Q.   Go ahead.  How did she first start selling
11 drugs?
12    A.   I don't know if it was a raid.  This part
13 I'm not too sure of.  I don't know if it was a raid,
14 or the defendant -- yeah, I remember.  He just had
15 some garbage crack at the time.
16    Q.   "He" being the defendant?
17    A.   Yes.
18    Q.   And when you say "garbage crack," what do
19 you mean by that?
20    A.   Meaning the crack that they were selling at
21 that apartment at the time was garbage, not good.
22 Not good at all.
23    Q.   Okay.  And what happened?
24    A.   Tina got her own crack, which was better
25 than that crack.
```

1151

```
1     Q.   Do you know about -- do you know about how
2  much she got?
3     A.   A three and a half.
4     Q.   Okay.  Three and a half grams like you were
5  talking about of --
6     A.   Exactly.
7     Q.   And do you know how much she paid for it?
8     A.   One hundred twenty-five, maybe.
9     Q.   Was that the cost of --
10    A.   At the time, yes.
11    Q.   If you buy in bulk, is it less expensive?
12    A.   Yes.
13    Q.   So once you break it up into smaller
14 packages, it becomes -- wait.  It's less expensive
15 to buy in bulk, more expensive once you break it up
16 into little packages?
17    A.   Exactly.
18    Q.   So she bought three and a half grams for
19 $125?
20    A.   Yes.
21    Q.   How do you know that's how much she bought?
22 Were you involved at all?
23    A.   Not at the time.  Not at the time.
24    Q.   What did Tina do with the three and a half
25 grams?
```

1152

```
1     A.   We broke it up and bagged it.
2     Q.   We?
3     A.   I helped her, yes.
4     Q.   You helped her with that?
5     A.   Yes.
6     Q.   What sort of bags did you put it in?
7     A.   Clear baggies.  Little plastic bags.
8     Q.   The same type of little baggies?
9     A.   Yes.
10    Q.   What happened next?
11    A.   We starting selling -- she started selling
12 at first.  Eventually, she helped me get my own
13 three and a half.  So, then we both had some.
14    Q.   And when you were bagging up three and a
15 half grams, about how many little baggies would you
16 get?
17    A.   Sometimes -- it would vary.  It depend.
18 Sometimes 30, sometimes 40 baggies.
19    Q.   Baggies.  And how much did each of the
20 little baggies cost?
21    A.   $10.
22    Q.   And so where were the two of you selling
23 from at that point?
24    A.   Basil's house.
25    Q.   So, apartment 101?
```

**GA288**

1153

```
1    A.   Yes.
2    Q.   And were you selling a lot?  Or how much
3  were you selling?
4    A.   We were selling what -- whatever we would
5  cop.  If we bought three and a half, we would sell
6  that three and a half.
7    Q.   And would you smoke any of it?
8    A.   Of course.
9    Q.   So, how did it work?
10   A.   When we bagged up our baggies, we would try
11 to at least double whatever we paid.  If we paid
12 125, we would definitely try to get 300 so that the
13 next time we bought some we could at least get two.
14   Q.   Okay.
15   A.   Anything over that, we had the option to
16 smoke or sell.  So, we were smoking at our leisure.
17   Q.   Where were you living at this point while
18 you were selling with Tina?
19   A.   I was living in Basil's house.
20   Q.   So, you started living there with her?
21   A.   Yes.
22   Q.   And how long did you live in Basil's house
23 with her?
24   A.   I'm not sure.  The whole time that we were
25 selling, basically.
```

1154

```
1    Q.   So was it a few weeks, a few months?
2    A.   I want to say months.  I want to say at
3  least three months.  I don't know.
4    Q.   Okay.  So you sort of went from 211 to
5  apartment 101?
6    A.   Yes.
7    Q.   Jumping off track for a minute, can you
8  describe Basil's apartment?
9    A.   In detail?
10   Q.   Yeah.
11   A.   Like, how it was set up?
12   Q.   Yes, please.
13   A.   Okay.  You would come in the front door,
14 the front door, the door would open like this.
15   Q.   Open to the right?
16   A.   Yes.
17        MS. DAYTON:  The witness indicated.
18   A.   Yes.  Immediately to your left, there is a
19 closet.  Straight ahead of that is the kitchen.  If
20 you was going this way, there is a little wall, a
21 separation.  The living room would be right here.
22   Q.   The living room?
23   A.   Do you want to know the furniture, too?
24   Q.   Is the living room off to your left or your
25 right as you walk into the front door?
```

1155

```
1    A.   Your right.
2    Q.   Okay.  Yes.  Do you recall the furniture
3  that was in that room?
4    A.   Yeah.  Up against the wall over here is a
5  couch.
6    Q.   A small couch or a big couch?
7    A.   A long couch.  A regular couch.
8    Q.   Okay.  How do you know that there is a
9  couch there?
10   A.   That's where I used to sleep.
11   Q.   Okay.  What else was in that room?
12   A.   I want to say there was something over here
13 on the side of the couch, but I can't really
14 remember.  The window is here.
15        MS. DAYTON:  Indicating at the end of
16 the room to the far right, your Honor.
17   A.   The TV is in the corner over here.
18        MS. DAYTON:  Indicating if you are
19 looking out the window to the right of the window.
20   A.   There is a little stereo over here.
21   Q.   Stereo?
22   A.   Yeah.
23   Q.   Coming -- are you coming back towards the
24 door now?
25   A.   Yes, I'm coming back towards the door.
```

1156

```
1  There is a chair, a regular chair.
2    Q.   Against the wall?
3    A.   Yes.
4    Q.   Okay.
5    A.   Then there is the table.
6    Q.   Where is the table in the room?
7    A.   The table is like right behind the door,
8  sort of.
9    Q.   So if you just walked in the door, would
10 the table be to your left or to your right?
11   A.   The table would be to your right.
12   Q.   What was that table used for?
13   A.   We played cards on it, we bagged up on it.
14   Q.   Okay.  Were there chairs by that table?
15   A.   Yes, I'm thinking two, but it was some bar
16 stools or something in the house.
17   Q.   Some bar stools, you said?
18   A.   Yeah.
19   Q.   Okay.  And I'm going to show you what's in
20 evidence as Government's Exhibit 116K.  Do you see
21 that?
22   A.   Yeah, I could.
23   Q.   Aside from the white items on the floor in
24 the middle of the room, is that an accurate
25 representation of the living room at Basil's house?
```

1157

```
1    A.   Yeah.  Things are a little different, but
2  yeah.  Yeah.
3    Q.   Do you see where the big couch is on the
4  left?
5    A.   Yes.
6    Q.   Is that the couch you were talking about?
7    A.   Yes.
8    Q.   And the table on the right, is that the
9  table you were talking about?
10   A.   Yes.
11   Q.   When you played cards at the table, did you
12 ever pull the couch across the room, the big white
13 couch across the room to that white table?
14   A.   Never.
15   Q.   There were chairs to sit around the table?
16   A.   Yes.
17   Q.   And you mentioned there were some stools or
18 something?
19   A.   Yes.
20   Q.   And was the door drilled shut when you
21 lived there?
22   A.   No.
23   Q.   Okay.  And if you could go ahead and
24 describe the rest of the house.  What's off the
25 living room?
```

1158

```
1    A.   Right on the side of the couch begins the
2  hallway, what little hallway they was.  To the
3  right, straight back a little, is the bathroom.
4    Q.   To the right, you said?
5    A.   Yes.  As soon as you pass the couch, to the
6  right is the bathroom.  Right next to the bathroom
7  is Basil's room.  There is a little wall in between,
8  it's the other room.  And that's the house.
9    Q.   And who -- so Basil's room was on the right
10 closer to the bathroom?
11   A.   Right.
12   Q.   And who lived on the left?
13   A.   Tina slept in that room.
14   Q.   And did she stay in there by herself, or
15 with someone else?
16   A.   Tippy might be in there sometimes, but, you
17 know, it was Tippy and Tina.
18   Q.   Was there any furniture --  you said what
19 little hallway there was.  Was there any furniture
20 in the hallway?
21   A.   I think it was a little table like on the
22 wall, but I'm not really sure.
23   Q.   Okay.  Was there like a large floral couch
24 in the middle of the hallway?
25   A.   No.
```

1159

```
1    Q.   Okay.  So, you said that you and Tina were
2  selling drugs.  Were you selling from apartment 101?
3    A.   Yes.
4    Q.   And would any of the customers that bought
5  from 211 buy from you guys in 101?
6    A.   Yes.  Yes.
7    Q.   A lot, or different --
8    A.   A lot.
9    Q.   Did this ever cause an issue with the
10 defendant?
11   A.   Yes.
12   Q.   What happened?
13   A.   He told us we'd better stop, stop selling,
14 he wasn't going to tell us anymore.
15   Q.   Where did this conversation occur, if you
16 remember?
17   A.   That conversation occurred at Tina's.
18   Q.   Inside the house?
19   A.   Yes.
20   Q.   Who else was there besides you?  Was Tina
21 there?
22   A.   Yes.
23   Q.   And you were there?
24   A.   Yes.
25   Q.   Was anyone else there?
```

1160

```
1    A.   Tippy and Basil.
2    Q.   What did you understand him to mean by,
3  you'd better stop, I'm not going to tell you
4  anymore?
5    A.   To my understanding, he meant that we'd
6  better stop selling drugs.
7    Q.   Did anyone else ever talk to you and Tina
8  about selling drugs in the building?
9    A.   Yes.
10   Q.   Who?
11   A.   Womble.
12   Q.   And what did Womble say to you?
13   A.   Womble said we'd better stop doing that,
14 that he was going to slap everybody's face that came
15 to our door instead of going upstairs.  He didn't do
16 it, but he threatened us anyway.
17   Q.   Okay.  Were there any other discussions or
18 confrontations with either the defendant or Womble?
19   A.   Womble?
20   Q.   Either the defendant or Womble?
21   A.   I could recall a time where D was standing
22 like where the parking garage goes down yelling up
23 at us at the window saying we'd better quit, we'd
24 better quit, he's not playing.  That made Tina react
25 kind of real mad.  She went outside, but he was gone
```

1161

```
1    already.
2         Q.    Did you go outside, too?
3         A.    No, I didn't.
4         Q.    About how long was this happening before
5    the actual murders?
6         A.    Not long.  Not long.
7         Q.    Did you ever see the defendant at Tina's
8    apartment again after that, or Basil's apartment?
9         A.    One time I was sitting inside and a
10   customer, I want to say a customer, came to the
11   door.
12        Q.    Male or female?
13        A.    A female came to the door.  Well, anyway,
14   when she opened the door, D appeared and came around
15   her.  Tina immediately slammed the door.  So, that
16   was the last time I think that I basically seen him
17   in that area, you know, around her apartment.
18        Q.    Did you know Tina's family?
19        A.    I knew her daughter Tavia.  I met her sons
20   a few times.  And I also met the other daughter, but
21   I knew Tavia the best.
22        Q.    Would they come to the house?
23        A.    Always.  Always.
24        Q.    Okay.  All three of them, or Tavia and the
25   son?
```

1162

```
1         A.    Tavia the most, and then the son.
2         Q.    Okay.
3         A.    The other daughter I seen previously.  But
4    Tavia would come probably every day.
5         Q.    And what about the son?
6         A.    Probably three times a week or something.
7    They came frequently to check up on they mother.
8         Q.    Shortly before Tina and Basil and James
9    were murdered, you were still hanging out at the
10   building?
11        A.    Well, after -- I always hung at the
12   building, regardless.  Tina was my best friend.
13   After they begin threatening us, me and Tina kind of
14   had a little argument because it scared me.  It was
15   enough, you know, and I was -- my thing was we could
16   have just went outside and sold.  Let him have the
17   building.  But he couldn't do nothing to us on
18   outside the building because the building -- the
19   sidewalks was not his.  Well, anyways, we disagreed.
20        Q.    You and Tina disagreed?
21        A.    We disagreed.  And she remained selling
22   inside, and I went outside.  We had words.  But we
23   did get the opportunity to, you know, make up.
24        Q.    When you had words, did you start sleeping
25   somewhere else?
```

1163

```
1         A.    At my grandfather's house.
2         Q.    The gentleman you said you call your
3    grandfather?
4         A.    Yes.
5         Q.    Who lives in Cambridge?
6         A.    Yes.
7         Q.    How far away is Cambridge from Charles
8    Street?
9         A.    The next block to the left.
10        Q.    Were you still coming back and forth?
11        A.    Yes, I was.  My clothes still remained
12   there.  So I would come there and change my clothes
13   and everything, sit down, we'd talk.  We still hung
14   out, regardless.
15        Q.    A couple nights before the murders, were
16   you at the Charles Street building?
17        A.    Yes, I was.
18        Q.    And did you get there by walking, driving?
19   How did you get there?
20        A.    I walked.
21        Q.    And did you see anything that drew your
22   attention?
23        A.    Yes, I did.  I was getting ready to go
24   inside to buy some drugs.  I always cut behind the
25   diner, it's like a shortcut.  Anyway, there was some
```

1164

```
1    guys at a car.  I don't know what made me notice
2    them, but I know I noticed them, and they noticed
3    me.  It slowed me down some.  Anyway, when I did
4    eventually go inside of the building, I noticed
5    these guys coming down the first floor hallway, and
6    what real really made me notice them was their
7    appearance, you know, the way they was dressed.
8         Q.    How were they dressed?
9         A.    They was dressed in black.
10        Q.    I'm going to show you a photo that's
11   Government's Exhibit 110.  Do you recognize what
12   this is a photo of?
13        A.    Yes, that's the side of the house.
14        Q.    The side of the Charles Street --
15        A.    That's the side where the diner is.  That's
16   the side I was saying I was coming through, but I
17   was on the opposite side of the wall.
18        Q.    So the left side of the wall?
19        A.    Yes.
20        Q.    Okay.  And where were the people that you
21   saw?
22        A.    They was on the same side I was.
23        Q.    Okay.  And so you were cutting through that
24   area.  And how did you then walk into the building?
25   Did you go in a side door, the front door?
```

**GA291**

1165

```
1    A.   I went up the front stairs.
2    Q.   So you walked down along the wall?
3    A.   Actually, what I did was walked down to the
4   parking lot like I was getting on the phone.  This
5   is what slowed me.  I acted like I was talking to
6   somebody on the phone, but I wasn't, I was just
7   trying to be nosy.  After I left, the phone -- the
8   phone is right there in front of the wall.  I went
9   to the stairs and went up the stairs.
10   Q.   In the front of the building?
11   A.   In the front of the building.
12   Q.   And those are the stairs that we saw
13  earlier in Government's Exhibit 102?
14   A.   Them stairs.
15   Q.   Okay.  To the left side of the garage?
16   A.   Excuse me?
17   Q.   To the left side of the garage, I think
18  they are?  The front door of the building?
19   A.   Yes, yes.
20   Q.   So you went in, and you said that you saw
21  some people in the building dressed all in black?
22   A.   Yes, I seen three males.
23   Q.   So what did you do after you saw those
24  people?
25   A.   Well, it startled me, so I wasn't sure if I
```

1166

```
1   should leave or what, but by me smoking crack at the
2   time, of course I still kept going.  I ran up the
3   stairs.  I knocked on the door.  I went inside, and
4   I told them, I said, "Give me two.  Give me two.
5   Hurry up, because somebody is coming.  They going to
6   rob y'all."
7    Q.   Who did you say this to?
8    A.   I said that to Frank.
9    Q.   So you thought the people in the building
10  might be coming to rob Frank?
11   A.   Yes, that's what I thought.  He didn't
12  think they was going to do anything to Tina because
13  Tina closes at 12:00.  You can't get in her house.
14   Q.   So, she stopped selling drugs at 12:00?
15   A.   Yes.
16   Q.   Frank didn't stop selling drugs at 12:00?
17   A.   No.
18   Q.   So, when you told Frank they are going to
19  rob you, what did he do?
20   A.   He didn't do anything.  It made him aware,
21  actually.  It made him aware.  I smoked one, and I
22  gave them one.  When I finished lighting my stem,
23  there was a knock on the door, and it was D.  Now
24  usually when D sees me in that apartment, he says,
25  "Get out, get out.  I don't want you in here."  He
```

1167

```
1   didn't say nothing to me at all.  That got me to
2   thinking.  So, after I finish doing what I was
3   doing, I left.
4    Q.   Okay.  And you said D knocked -- let me go
5   back for a second.  What's a stem?
6    A.   That's what you smoke crack out of.
7    Q.   And what's it look like?
8    A.   It's a long glass -- it's actually a tubing
9   for like fuses or something like that.
10   Q.   And you put the crack in one end?
11   A.   Yeah.  You put some Chore Boy and you put
12  crack on top of it.  It stops the crack from just
13  sliding through the stem.
14   Q.   Like a filter?
15   A.   Sort of a filter, exactly.
16   Q.   So, when the defendant knocked on the door.
17  Who answered the door?
18   A.   Frank.
19   Q.   And did they speak to one another?
20   A.   Yes, he came in and said something to
21  Frank.  Whatever he said, frank in turn goes out the
22  door with him.
23   Q.   With the defendant?
24   A.   Yes.
25   Q.   And then you said you smoked your crack,
```

1168

```
1   and then you walked out?
2    A.   Yes.
3    Q.   And where did you go?
4    A.   I left out the building.  I went down the
5   stairs to go out the front door.
6    Q.   What did you see, if anything, when you
7   walked out?
8    A.   When I left out, Frank was knocking on
9   Tina's door.
10   Q.   Did you see the defendant or anyone else at
11  that time?
12   A.   No, I didn't, but there is some stairs that
13  go all the way down to the garage, you go to the
14  garage, and the bottom stair creaks when you step on
15  it, and I heard the creak, so I know somebody else
16  was downstairs.
17   Q.   Okay.  Did you ever see Tina again after
18  that?
19   A.   No.
20   Q.   And when you left that night, where did you
21  go?
22   A.   I went back to grandpa's house.
23   Q.   Were you interviewed by the police a few
24  days after the murders?
25   A.   Yeah, yes.
```

**GA292**

1169

```
 1    Q.   And did you admit that you had been selling
 2  drugs for the defendant?
 3    A.   Yes.
 4    Q.   Did you tell them, generally, about stuff
 5  you've talked about today?
 6    A.   Yes.
 7    Q.   Were you ever arrested?
 8    A.   Yes, I was.
 9    Q.   On this case?
10    A.   On this case.
11    Q.   Like in relation to this?
12    A.   No.
13    Q.   Are you still selling crack?
14    A.   No.
15    Q.   And you don't live in the area anymore?
16    A.   No, I don't.  I don't even smoke no more.
17    Q.   I want to show you a picture.  It's
18  Government's Exhibit 207.  Do you recognize that
19  person?
20    A.   I believe that's his brother.
21    Q.   Whose brother?
22    A.   D's.
23    Q.   Have you -- you've met this person?
24    A.   Yes, I have.
25    Q.   Where did you meet him?
```

1170

```
 1    A.   I met him on Charles Street.
 2    Q.   How did it come to be that you met him?
 3    A.   After the murders, my family wanted me to
 4  get away from the area, so I went to South Carolina
 5  for a week, two weeks.  When I got back from South
 6  Carolina, my grandfather told me that somebody had
 7  been looking for me and he wanted me to get in touch
 8  with him, and other people had told me that he was
 9  looking for me.  And I found out that that was
10  supposed to have been D's brother.
11    Q.   Okay.
12    A.   Anyway, I finally did get a chance to meet
13  him.  I wasn't going to hide from him or nothing.
14  So, he told me that if I dropped the charge --
15         MR. SMITH:  Objection, your Honor, this
16  is hearsay.
17         THE COURT:  How so?
18         MR. SMITH:  Well, it's also
19  nonresponsive to the question.  The question is, how
20  did she come to see him.  May we approach?
21         THE COURT:  Let's get the question --
22         MS. DAYTON:  I'll ask another question.
23    Q.   Where did you see this person?
24    A.   I seen him at 211.
25    Q.   And did the person in 207 speak to you?
```

1171

```
 1    A.   Yes, he did.
 2    Q.   What did he say to you?
 3         MR. SMITH:  Objection.  May we approach?
 4         THE COURT:  You may.
 5         (Sidebar conference)
 6         MR. SMITH:  Your Honor, I don't believe
 7  this is a co-conspirator statement within the rule.
 8  The conspiracy at this point, by the government's
 9  own charging document, is over, and this is Azikiwe
10  Aquart making a statement to someone after the
11  conspiracy; therefore, it's not made during the
12  course of the conspiracy and in furtherance of the
13  conspiracy.
14         MS. DAYTON:  Your Honor, the indictment
15  charges on or about that date.  We are not confined
16  to specific dates, number one.  Number two, this
17  statement relates exactly to the conspiracy because
18  what the testimony is going to be is that Azikiwe
19  Aquart offered her money to drop the charges against
20  his brother.
21         MS. REYNOLDS:  Your Honor, can I just
22  interrupt a second?  As I walked up here, the
23  witness asked if she could go to the bathroom.
24         THE COURT:  Do you want to take a
25  recess?
```

1172

```
 1         (Sidebar concluded)
 2         THE COURT:  We're going to take a
 3  five-minute recess, ladies and gentlemen.
 4         (Jury exited the courtroom)
 5         MS. DAYTON:  Your Honor, I'm just going
 6  to let the witness go to the bathroom.
 7         THE COURT:  That's fine.
 8         MS. DAYTON:  Your Honor, did we want to
 9  address the issue?
10         THE COURT:  Yes.  I was just looking
11  back at the indictment.
12         MS. DAYTON:  The indictment charges
13  until August 24, 2005, but it says "on or about,"
14  and the testimony is going to be that basically
15  right after the defendant is arrested Azikiwe
16  Aquart -- can you make sure the witness doesn't come
17  back in?  Thank you.  Sorry, your Honor.  I just
18  didn't want her to walk in on it.
19         That Azikiwe Aquart approached her and
20  offered her money and drugs not to, quote-unquote,
21  press the assault charges against the defendant.
22  And the government believes that is unequivocally a
23  co-conspirator statement in furtherance of the
24  course of the conspiracy.
25         MR. SMITH:  Your Honor, the government
```

**GA293**

1173

1 was free to charge this conspiracy beyond
2 August 24th. They picked a very specific date for a
3 reason. They decided at that point the conspiracy
4 was over. So, if they had wanted to charge it into
5 September, October, November, they were free to do
6 so. They chose not to do so. The conspiracy is
7 over, and under the rule it's not in furtherance of
8 the conspiracy. It's not made during the
9 conspiracy.
10          MS. DAYTON: Your Honor, the case law
11 supports "on or about" means that it doesn't have to
12 be a complete cessation on August 24, 2005. The
13 government did not stop investigating this case,
14 still has not stopped investigating this case. We
15 could not have gone back and amended the indictment
16 after, you know -- at such a late date after we
17 learned of particular evidence, but the indictment
18 specifically says on or about. This is not four
19 years after the fact, it's within weeks of the
20 murder.
21          THE COURT: But how is it -- when it's
22 charged -- the conspiracy to murder in aid of
23 racketeering is charged as "did unlawfully,
24 willingly and knowingly conspire to murder Tina
25 Johnson and her associates." How is it that the

1174

1 murder is not the end of the conspiracy?
2          MS. DAYTON: Your Honor, the drug
3 conspiracy. And he's also acting to cover up the
4 conspiracy. You know, number one, Azikiwe Aquart is
5 moving -- he's acting in a manner to protect another
6 member of not only the racketeering enterprise, but
7 of the narcotics trafficking conspiracy. He's
8 attempting to get her to drop the charges. There is
9 going to be additional evidence that comes in,
10 including a letter where the defendant blames Jackie
11 Bryant for all of his troubles, saying she's making
12 all of this up. There is also phone calls where
13 there is discussion about trying to get her to drop
14 the charges.
15          So, this is -- and those two occurred
16 after August 24, 2005, but case law indicates that
17 up to six months after the conspiracy that things
18 can be considered in the course -- or in furtherance
19 of the conspiracy because they're acting in such a
20 way to protect its members, to prevent them from
21 getting prosecuted, to prevent detection, further
22 detection by law enforcement, and at the time that
23 these statements were made, the defendant and his
24 brother were still being investigated for these
25 homicides and for the narcotics trafficking.

1175

1          THE COURT: Anything further, Mr. Smith?
2          MR. SMITH: Your Honor, again, I would
3 just note that there were multiple indictments in
4 this case. I don't know how -- originally, it was a
5 drug case, and all of the co-defendants pled to a
6 drug conspiracy that the government claimed ended on
7 August 24, 2005. So, again, it's not in
8 furtherance, it's not during, and --
9          THE COURT: Why is it not in
10 furtherance?
11          MR. SMITH: Well, perhaps, your Honor,
12 arguably in furtherance, but it's certainly not
13 during the course of the conspiracy.
14          THE COURT: Well --
15          MR. SMITH: And further --
16          MS. DAYTON: Your Honor, it is the
17 government's contention that this is during the
18 course of the conspiracy. We can request to amend
19 interlineation right now, but the indictment
20 specifically says on or about, so the government
21 believes it's unnecessary. The defense has numerous
22 prison tapes that also occur after the time of
23 August 24, 2005, that the government also contends
24 were made in furtherance of the conspiracy. They
25 have been on notice that the government believed

1176

1 that there were still acts being taken in
2 furtherance of the conspiracy as part of the
3 conspiracy post-August 24, 2005. So, I don't think
4 this is an unfair surprise issue about the timing of
5 it. And so -- and the government will stop.
6          THE COURT: You mentioned many cases.
7 Would you like to give me one citation?
8          MS. DAYTON: I can look them up. Could
9 I do that this very second? No, I can't off the top
10 of my head.
11          THE COURT: But --
12          MS. DAYTON: But there is case law that
13 says up to six months out, your Honor.
14          THE COURT: So, Mr. Smith, we charge the
15 jury that the phrase "on or about" a particular date
16 does not require that the government prove things
17 happen on a specific date so long as it's in the
18 area of that date. Why, if the testimony here is, I
19 gather, a couple weeks after the murders, why would
20 that -- do you have case law that says that is
21 improperly either varying the indictment or no
22 longer a co-conspirator statement -- a conspiracy in
23 effect in which the statement was in furtherance of
24 it; that is, as the government claims, to prevent
25 detection or avoid prosecution?

1177

1 　　　　MR. SMITH: Well, your Honor, first of
2 all, the statement itself is talking about charges.
3 At the time that these statements were made,
4 Mr. Aquart, the only charges he faced were assault
5 charges.
6 　　　　MS. DAYTON: Against Jackie Bryant.
7 　　　　MR. SMITH: Against Jackie Bryant.
8 　　　　THE COURT: But the indictment alleges
9 that there were acts of violence perpetrated in a
10 conspicuous manner to maintain control over members
11 of the enterprise and deal with anyone who posed a
12 threat. So, why is the undertaking by the person
13 that she is describing, who she believes is the
14 defendant's brother, who is charged as a
15 co-conspirator, why is it that statements that he is
16 making for the purpose of protecting his brother
17 and -- protecting his brother from the prosecution
18 of one of these assaults not in furtherance of the
19 racketeering and drug conspiracies?
20 　　　　MR. SMITH: Well, your Honor, it was
21 charged as assault. There was no drug case in
22 existence, at least from the government's point of
23 view, or in my client's mind, at that point.
24 　　　　THE COURT: That may be, but if we look
25 below that as to what was going on, it was the

1178

1 assault that Ms. Bryant testifies was made by the
2 defendant against her for shorting him on the drug
3 sales. So, whatever the pending charge was isn't
4 really the important thing, it's that it arises out
5 of one of these assaults for the purpose of
6 protecting and expanding.
7 　　　　MR. SMITH: Well, your Honor, again, my
8 opinion, this was not made during the conspiracy,
9 and we'll just stand on the objection.
10 　　　　THE COURT: I think that's not correct.
11 　　　　MR. SMITH: We understand, your Honor.
12 　　　　THE COURT: I'm going to take a
13 five-minute recess, though.
14 　　　　MS. DAYTON: Your Honor, can I ask one
15 question? Ms. Bryant is from out of town, and I've
16 spoken with Mr. -- I'm done with her in five
17 minutes, and Mr. Smith said his cross is not that
18 long of her. Can we go until it's done so we can
19 actually release her to go home?
20 　　　　MR. SMITH: I have no objection to
21 finish the witness today, your Honor. Yeah, but, of
22 course, I don't want to be barred by the 3:30 time
23 limit.
24 　　　　MS. DAYTON: That's what I'm saying. If
25 we had to run a few minutes late, would we be

1179

1 permitted to do so?
2 　　　　MR. SMITH: Well, your Honor, I don't
3 want to be tied to any specific time to cross a
4 witness because I don't know exactly what she would
5 say with regard to my questions. I'm prepared to go
6 as long as the Court is allowed, unless we try to
7 bring her back tomorrow.
8 　　　　THE COURT: As of yesterday, there was
9 some rescheduling, so you can go further. You can
10 go through the rest of the afternoon, but I don't
11 know what the jurors' issues are. So, let me ask
12 them when they come back and tell them that we would
13 like to keep going and finish with this witness.
14 　　　　MS. DAYTON: Thank you, your Honor.
15 　　　　THE COURT: And how long do you estimate
16 that will take, Mr. Smith?
17 　　　　MR. SMITH: Well, the government has
18 estimated five minutes. I mean, my initial cross, I
19 would have estimated at 20, 25.
20 　　　　THE COURT: So, if I told them 4:00,
21 that's about right. I don't want to rush them.
22 　　　　MR. SMITH: But if you could tell them
23 please don't take that as the hard and fast deadline
24 because it could go longer, so if somebody
25 absolutely has to get out of here --

1180

1 　　　　THE COURT: I'll just see if there is
2 somebody who has get out at some particular time.
3 Let's take a five-minute recess.
4 　　　　(Recess)
5 　　　　THE COURT: So, if I understand the
6 sequence here, it is that -- Ms. Bryant, would you
7 mind staying out of the courtroom for just a moment,
8 please? Thank you.
9 　　　　It is that Ms. Bryant had been away in
10 South Carolina, she comes back, Azikiwe Aquart
11 approaches her, Azibo Aquart has been arrested and
12 is detained.
13 　　　　MS. DAYTON: Yes, he's arrested like
14 September 6th of 2005.
15 　　　　THE COURT: And this is after that.
16 　　　　MS. DAYTON: Yes, it's shortly after
17 that. And he's arrested for the assault.
18 　　　　THE COURT: So the enterprise can't be
19 going on because he's arrested.
20 　　　　MS. DAYTON: That's not true. That's
21 like saying the Gambino enterprise ends because John
22 Gotti gets arrested. Of course, the enterprise can
23 continue. Other people are still out there engaged
24 in the enterprise and doing what they're trying to
25 do, and, in fact, part of her testimony is going to

1181

```
1   be that Azikiwe Aquart was trying to restart things
2   at 211 and talking to someone about securing the
3   door there.
4              THE COURT:  That might be another trial,
5   right?
6              MS. DAYTON:  Azikiwe's trial is going to
7   be a different trial, yeah.  So -- but the
8   enterprise can continue going on, and he's working
9   to protect another member of the organization, and
10  the drug charges have not yet been brought at that
11  time, the murder charges have not yet been brought
12  at that time, and he's trying to work to protect his
13  brother.  And Azibo --
14             THE COURT:  Because there are some cases
15  that are talking about a concealment phase and that
16  statements made in a concealment phase are not
17  admissible as co-conspirator statements.
18             MS. DAYTON:  Your Honor, but the
19  defendant, number one, was still engaged with what
20  was going on on the street.
21             THE COURT:  He was in jail.  He wasn't?
22             MS. DAYTON:  Your Honor, with all due
23  respect, criminals can still commit crimes in jail.
24             THE COURT:  I don't have any basis for
25  that.  I don't have a basis --
```

1182

```
1              MS. DAYTON:  So, he's on the phone, "he"
2   being the defendant, talking to Azikiwe Aquart about
3   crack, and he's saying to him, for instance, did you
4   go get the crack back from John Taylor?  Did you do
5   this with it?  Did you get this money from -- he's
6   writing letters to people telling them what to say.
7              THE COURT:  Did any of those phone calls
8   or letters say did you talk to Jackie Bryant?
9              MS. DAYTON:  Yes.  There is a call
10  between the defendant and -- I believe, it's between
11  Azikiwe Aquart, or it's Shante Pettway.  I can't
12  remember.  It's Shante where they're talking about
13  that she says she can't not press charges, which is
14  exactly what Jackie Bryant is going to say.
15             THE COURT:  So, what you can do here is
16  establish that she had pressed charges.
17             MS. DAYTON:  What she says is:  I'm not
18  pressing the charges, the state is pressing the
19  charges.  I can't drop charges.  But she had
20  reported it to the police.
21             THE COURT:  That she had reported it to
22  the police that the defendant had beat her up after
23  the murders and she returned from South Carolina,
24  Azikiwe Aquart, who she knew to be his brother,
25  approached her.
```

1183

```
1              MS. DAYTON:  Yes.
2              THE COURT:  And apart from what he said,
3   then what happened?
4              MS. DAYTON:  You don't want me to tell
5   you what he said?  He asked her to drop the charges,
6   and she said -- and he said, we'll give you $5,000
7   and all the crack you can smoke if you drop the
8   charges, and she basically said, I can't drop
9   charges.
10             THE COURT:  So the testimony could be
11  that he asked her to do something and she either
12  refused or couldn't do it.
13             MS. DAYTON:  But why, your Hono?  It's a
14  statement made in furtherance.
15             THE COURT:  That's the argument here.
16  I'm just trying to see because you haven't given me
17  -- you haven't given me any authority that --
18             MS. DAYTON:  Your Honor --
19             THE COURT:  -- pulls this within there.
20             MS. DAYTON:  Your Honor, the jury
21  instruction that you give to the jury explains that
22  on or about does not mean August 24, 2005.
23             THE COURT:  I am aware.
24             MS. DAYTON:  And so under that theory,
25  how we're going to instruct the jury this could fall
```

1184

```
1   under it --
2              MR. SMITH:  Your Honor, if I might make
3   a suggestion?
4              MS. DAYTON:  Let's just finish her.
5              MR. SMITH:  Because now I can tell we're
6   going to be stretching a ways into this.
7              THE COURT:  The question is narrowed
8   down.  Are acts of concealment of criminal
9   objectives part of the furtherance of that
10  conspiracy such that the hearsay exception applies.
11  And you don't have any authority, any case that says
12  that it doesn't apply.
13             MR. SMITH:  Nor do I know we have one
14  necessarily yet that says it does.
15             THE COURT:  Well, analytically, it seems
16  a bit odd to consider that statements made to cover
17  up an objective of the conspiracy, that is, to
18  maintain order and discipline in the drug
19  organization, should be truncated from the whole
20  purpose of the co-conspirator exception.
21             MS. DAYTON:  I can give you a Seventh
22  Circuit case.
23             THE COURT:  Can you give me a copy of
24  it?
25             MS. DAYTON:  I'm just looking at it in a
```

1185

1 book, so no, I can't right now, your Honor.  But it
2 says that statements satisfy the in furtherance
3 element when it is part of the information flow
4 between conspirators helping to perform each role.
5 Statements may be admitted that are outside the time
6 of the indictment, U.S. v. Godinez, 110 F.3d 448 7th
7 Circuit.  It's a 1997 case.
8          MR. SMITH:  I would simply point out
9 that that says between conspirators.
10         MS. DAYTON:  Well, it's talking about
11 different -- there was a comma between those things.
12         MR. SHEEHAN:  Your Honor, we have the
13 jury -- we can look at this.  We can get it.
14         THE COURT:  No, I want to see if we can
15 send her home.  Did you have a copy of that for me?
16         MS. DAYTON:  No, your Honor, I'm looking
17 at a book.  Attempts to conceal is the conspiracy,
18 or in furtherance of it, there is U.S. v. Roldan,
19 R-o-l-d-a-n, dash Zapata, 916 F.2d 795.  It's a
20 Second Circuit case from 1990.  The common objective
21 of preventing convictions is in furtherance of it.
22 U.S. v. Mayberry, 896 F.2d 117 8th Circuit, 1990,
23 avoidance of detection by law enforcement personnel
24 is the object of every conspiracy.
25         THE COURT:  So, what we don't have is

1186

1 any evidence that there is an agreement among the
2 conspirators to continue to act, to cover up, as
3 opposed to one brother for another.  It seems to me
4 that if you want to get this witness finished today,
5 that we should proceed with setting all the
6 foundation without the substance of what is said,
7 and the inferences can be drawn from the phone calls
8 or letters or whatever will come in later as to what
9 the substance of that communication was.
10         MS. DAYTON:  We'd rather bring her back
11 tomorrow.  Thank you, your Honor.
12         THE COURT:  Okay.  All right, then.
13 Let's bring the jury in.
14         MS. DAYTON:  We'll bring the witness in
15 first just to have her here, or no?
16         THE COURT:  We'll just let her go.
17         (Jury entered the courtroom)
18         THE COURT:  All right, ladies and
19 gentlemen.  You don't need to sit down, because it
20 is 3:30.  I was going to ask you if you would be
21 able to stay a little bit later in hopes that we
22 might be able to finish with this witness, but we
23 won't be able to, and so we'll just reconvene
24 tomorrow at 9:30.  And Ms. Bryant will continue to
25 testify at that time.

1187

1          All right.  Have a pleasant afternoon.
2 Don't discuss the case.  And leave your notebooks
3 here.  Thank you.
4          (Jury exited the courtroom)
5          THE COURT:  All right.  Your considered
6 analysis on this as soon as you can give it to me
7 will be appreciated.  Thank you very much.  We will
8 stand in recess.
9          (Proceedings concluded at 3:30)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1188

1                    I N D E X
2
3 WITNESS                                    PAGE
4 ORLANDO ROSADO
5 Continued Cross-Examination by Mr. Sheehan    969
6 Redirect Examination by Ms. Rodriguez-Coss    979
7 Recross-Examination by Mr. Sheehan            985
8 Re-Redirect Examination by                    986
  Ms. Rodriguez-Coss
9
10 PAUL ORTIZ
11 Direct Examination by Mr. Markle              988
12 Cross-Examination by Mr. Sheehan             1076
13 Redirect Examination by Mr. Markle           1095
14
15 JACKIE BRYANT
16 Direct Examination by Ms. Dayton             1100
17
18          I certify that the foregoing is a correct
19 transcript from the record of proceedings in the
20 above-entitled matter.
21                    4/26/11
22                     Date
23
24               /S/  Sharon Montini
25               Official Reporter

1189

```
1              UNITED STATES DISTRICT COURT

2                DISTRICT OF CONNECTICUT

3    * * * * * * * * * * *     *
                               *
4    UNITED STATES OF AMERICA, * Case No 6cr160(JBA)
                               *
5              Plaintiff,      *
                               *
6         vs.                  *
                               *
7    AZIBO AQUART,             * April 28, 2011
                               *
8              Defendant.      *
                               *
9    * * * * * * * * * * * *   *

10                  TRIAL TRANSCRIPT

11                    VOLUME VI

12   BEFORE:  THE HONORABLE JANET BOND ARTERTON U.S.D.J.,
                                           and jury
13
     Appearances:
14   FOR THE GOVERNMENT:  ALINA REYNOLDS, ESQ
                          TRACY DAYTON, ESQ
15                        PETER MARKLE, ESQ.
                          JACABED RODRIGUEZ-COSS
16                        United States Attorney's Office
                          915 Lafayette Blvd
17                        Bridgeport, CT 06604

18
     FOR THE DEFENDANT    MICHAEL SHEEHAN, ESQ
19   AZIBO AQUART:        Sheehan & Reeve
                          139 Orange Street
20                        New Haven CT 06510

21                        JUSTIN SMITH, ESQ.
                          383 Orange Street
22                        New Haven, CT 06511

23

24   Court Reporter:    Sharon Montini, RMR

25   Proceedings recorded by mechanical stenography,
     transcript produced by computer
```

1190

```
1              THE COURT:  Good morning, Counsel,

2    ladies and gentlemen.  Mr. Aquart.

3              Before we bring Ms. Bryant back we have

4    the issue related to whether statements made by

5    Azikiwe Aquart to Jackie Bryant several weeks after

6    the murder of Tina Johnson and others, in which it

7    is proffered that Azikiwe offers to pay Bryant money

8    in exchange for her withdrawing her assault

9    complaint against Azibo Aquart, who she claimed

10   injured her when she -- who she claimed injured her

11   when she shorted him on drug sales proceeds.

12             The defendant has objected to the

13   admission of this statement by Azikiwe Aquart as

14   hearsay claiming that these statements were not made

15   in the course of or in furtherance of a conspiracy

16   which the defendant claims ceased on August 24,

17   2005, as pled in the indictment.

18             The government urges their admissibility

19   as non-hearsay under Rule 801(d)(2)(E) as a

20   statement by a co-conspirator of a party during the

21   course of and in furtherance of the conspiracy.

22             The Fourth Superseding Indictment charges

23   two conspiracies, the conspiracy to murder in aid of

24   racketeering charged in Count One and conspiracy to

25   possess with the intent to distribute 50 grams or
```

1191

```
1    more of crack cocaine in Count Eight, to which the

2    government alleges the murders of the three victims

3    are related in Counts Five through Seven.

4              For Azikiwe's statements to be admissible

5    the government must show that the statements were

6    made during the course of the conspiracy and in

7    furtherance of it, as set forth in Bourjaily v.

8    U.S., 483 U.S. 171 at 181, 1987, and U.S. v.

9    Maldonado-Rivera, 922 F.2d 934 at 958 (2d Cir.

10   1990).

11             This exception to the hearsay exclusion

12   does not apply "during a subsequent period when the

13   conspirators were engaged in nothing more than

14   concealment of the criminal enterprise," Dutton v.

15   Evans, 400 U.S. 74 at 81, citing Lutwak v. United

16   States, 344 U.S. 604 and Krulewitch v. U.S., 336

17   U.S. 440.

18             The advisory notes on Rule 801(d)(2)(E)

19   explain that "the rule is consistent with the

20   position of the Supreme Court in denying

21   admissibility to statements made after the

22   objectives of the conspiracy have either failed or

23   been achieved."

24             While it may be argued that the

25   conspiracy to murder in aid of racketeering charged
```

1192

```
1    in Count One may have concluded on August 24, 2005

2    when the murders were committed, as noted in U.S. v.

3    Gotti, 644 F. Supp. 370, a conspiracy once initiated

4    continues to exist until it is abandoned or

5    otherwise terminated by some affirmative act.  See

6    U.S. v. Rucker, 586 F.2d 899.

7              The conspiracy relevant to Azikiwe's

8    statements is the drug conspiracy which was charged

9    to have ended in or about August 2005, and did not

10   end on August 24, 2005, particularly given the

11   evidence and theory that the murders were allegedly

12   committed to facilitate continuation of the drug

13   conspiracy by removing competition.

14             Thus, the question is whether Azikiwe's

15   efforts to bribe Bryant to discontinue criminal

16   charges against Azibo Aquart, inferentially so that

17   he would be released from detention to return to his

18   drug trafficking operations, is in furtherance of

19   the drug conspiracy.  This statement, as proffered,

20   does not appear to fall within the preclusion of

21   "mere idle chatter" identified in U.S. v. Paone as

22   not in furtherance of a conspiracy, 782 F.2d 386,

23   but instead a statement designed to induce "a

24   listener's assistance" found in U.S. v. Simmons, 923

25   F.2d 934, to satisfy the in furtherance requirement
```

1193

```
1   of the rule.
2          Given the allegations in evidence that
3   Azibo Aquart was central to the drug conspiracy, and
4   being arrested and detained on charges of assaulting
5   Bryant, limited his ability to continue to
6   participate in the conspiracy by managing the drug
7   operation, the Court is satisfied that the
8   government has established or by its proffer will
9   establish adequately that Azikiwe's statements
10  intended to induce Bryant to drop charges against
11  Azibo Aquart were in furtherance of the drug
12  conspiracy, particularly where the ongoing nature,
13  as the government represents in its memorandum, will
14  be demonstrated further by evidence from Taylor, the
15  defendant's statements and inferences to be drawn
16  from Bryant's testimony.  Accordingly, the
17  government's motion to admit the co-conspirator
18  statements will be granted.
19         All right, shall we bring in Ms. Bryant?
20         MR. SMITH:  Your Honor, before we do
21  that, the government has informed me that they're
22  planning on, in the continuation of their direct, to
23  ask Ms. Bryant to again show the scar to the jury
24  without the stockings she was wearing yesterday,
25  apparently.  I object to that.  We have the medical
```

1194

```
1   records in evidence.  She did show to the jury, it
2   wasn't invisible through the stockings.  I think
3   it's cumulative at this point.
4          THE COURT:  Your objection is overruled.
5          All right, please bring in Ms. Bryant and
6   bring in the jury.
7          (Jury entered the courtroom)
8          THE COURT:  Good morning, ladies and
9   gentlemen.  Please be seated.  Nice to have you
10  back.  We will continue with the examination of
11  Ms. Bryant.
12         Good morning, Ms. Bryant.
13         THE WITNESS:  Good morning.
14         THE COURT:  You remain under oath and
15  Ms. Dayton will continue examination.
16         You may proceed.
17         MS. DAYTON:  Thank you, your Honor.
18  J A C Q U E L I N E   B R Y A N T   B U L E R I N,
19  Having previously affirmed, was examined and
20  testified as follows:
21  CONTINUED DIRECT EXAMINATION
22  BY MS. DAYTON:
23     Q.  Good morning, Ms. Bryant.
24     A.  Good morning.
25     Q.  Ms. Bryant, yesterday when we left off --
```

1195

```
1   actually, let me just pull up a picture here.  We
2   were talking about the person that you described to
3   be the defendant's brother.
4      A.  Yes.
5          MS. DAYTON:  Get that picture back up.
6   There we go.
7      Q.  And you noted that you had been told when
8   you got back from South Carolina that he was looking
9   for you.
10     A.  Yes.
11     Q.  Did you, in fact, meet this individual?
12     A.  Yes, I did.
13     Q.  And where did you meet him?
14     A.  On Charles Street.
15     Q.  Charles Street.  Where?
16     A.  211 Charles Street in Pops' apartment.
17     Q.  What were you doing in Pops' apartment at
18  that time?
19     A.  Getting high.
20     Q.  And what did this individual do with
21  respect to you when he -- he came into the
22  apartment?
23     A.  Yes.
24     Q.  And did he say something to you?
25     A.  First he said, "Oh, you are the famous
```

1196

```
1   Jackie."  I said, "Yeah."  I said, "You are D's
2   brother?"  And he said, "Yeah."  He didn't say much
3   to me after that.  He left.  I seen him another
4   time.
5      Q.  Okay, what happened?
6      A.  The next time I seen him?
7      Q.  Actually, I'm sorry, before I go on, aside
8   from introducing himself to you, what was this
9   individual doing in the apartment on that day?
10     A.  Well, I'm not sure, but my thoughts was
11  that he was going to start selling it.
12         MR. SMITH:  Objection.
13     Q.  What did you see him doing?
14     A.  What did I see him doing?  He had slabs, so
15  he was going to sell.
16     Q.  Slabs?
17     A.  Crack.
18     Q.  The packages you described?
19     A.  Yes.
20     Q.  And did you see him speaking with anyone
21  else in the apartment on that day?
22     A.  The people that was already there when I
23  came.
24     Q.  And what were they speaking about, if you
25  know?
```

1197

```
1    A.   The product he had.
2    Q.   When was the next time that you saw the
3  defendant's brother?
4    A.   Probably the next day.
5    Q.   And where was that?
6    A.   At the same place.
7    Q.   In 211?
8    A.   Yes.
9    Q.   And did this individual speak to you again?
10   A.   Yes, he did.  This time he told me if I
11 would drop the charges against D, that they would
12 give me $5,000 and all the crack that I could smoke.
13   Q.   And do you know what charges he was talking
14 about?
15   A.   The charges for my leg.
16   Q.   Did you respond back to this person?
17   A.   Yes, I did.  I said I couldn't drop the
18 charges and even if I did that the state would take
19 over anyway.
20   Q.   Was there any further discussion?
21   A.   No.
22   Q.   Did you see this individual doing anything
23 else in the apartment that day?
24   A.   No, I left.
25   Q.   Yesterday we tried to show your scars to
```

1198

```
1  the jury.
2    A.   Yeah.
3    Q.   Are you wearing stockings today?
4    A.   No, not today.
5    Q.   Can we have you try again?
6         MS. DAYTON:  Your Honor, with your
7  permission?
8         THE COURT:  Yes.
9         MS. DAYTON:  Thank you.
10   Q.   Okay, down above the right knee and all the
11 way down to the side of the right knee.
12        MS DAYTON:  You can stand up if you need
13 to.
14   Q.   Thank you.
15   A.   You are welcome.
16   Q.   Did you have any of those marks on your
17 legs prior to the assault by the defendant?
18   A.   No.
19   Q.   Did you ever go back to selling drugs
20 again?
21   A.   No.
22   Q.   And with respect -- you said yesterday that
23 you sold drugs for the defendant, crack for the
24 defendant for three or four months.  In total, how
25 much would you, in terms of weight, how much would
```

1199

```
1  you estimate that you sold for him?
2         MR. SMITH:  Asked and answered.
3  Yesterday she testified about the quantity she sold.
4         THE COURT:  I'm going to permit the
5  question.  I suppose everybody could do the math,
6  but let's have your estimate of in total how much
7  weight you estimated you sold for the defendant.
8    A.   I'm trying to do the math in my head.
9    Q.   You've never added it up.
10   A.   Not really.  I didn't.
11   Q.   Do you think it was more than 100 grams?
12        MR. SMITH:  Objection.  She's already
13 testified she's not sure about the amount.
14        THE COURT:  Sustained.
15   Q.   Okay.  Thank you.
16        MS. DAYTON:  I have nothing further at
17 this time.
18        THE COURT:  All right.
19 Cross-examination, Mr. Smith.
20        MR. SMITH:  Thank you, your Honor.
21 CROSS-EXAMINATION
22 BY MR. SMITH:
23   Q.   Hi, Ms. Bryant.
24   A.   Hello.
25   Q.   My name is Justin Smith.  I'm one of the
```

1200

```
1  attorneys representing Azibo Aquart.  I need to ask
2  you some questions.
3    A.   All right.
4    Q.   You understand that?
5    A.   Yes.
6    Q.   Okay.  You talked yesterday about growing
7  up in Father Panik.
8    A.   Yes, I did.
9    Q.   That's a housing project in Bridgeport.
10   A.   Yes, it was.
11   Q.   It was a rough area in Bridgeport.
12   A.   Yeah, it was.
13   Q.   And growing up you had witnessed people
14 using drugs.
15   A.   Yes, I did.
16   Q.   And you witnessed people selling drugs.
17   A.   Yes, I did.
18   Q.   You witnessed violence as well.
19   A.   Had I witnessed violence?
20   Q.   Growing up in Father Panik.
21   A.   Of course.
22   Q.   Shootings?
23   A.   Yes.
24   Q.   And you said at some point your mother
25 began to deal drugs; is that right?
```