# 12-5086

*To Be Argued By:*
Tracy Lee Dayton

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

## Docket No. 12-5086

―――――

UNITED STATES OF AMERICA,
*Appellee,*

-vs-

AZIBO AQUART, aka D, aka Dreddy, aka Jumbo,
aka Azibo Smith, aka Azibo Siwatu Jahi Smith,
*Defendant-Appellant,*

(For continuation of caption, see inside cover)

―――――

ON APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF CONNECTICUT

### GOVERNMENT APPENDIX-VOLUME II (GA301 – GA600)

DEIRDRE M. DALY
*United States Attorney*
*District of Connecticut*

TRACY LEE DAYTON
JACABED RODRIGUEZ-COSS
SANDRA S. GLOVER
*Assistant United States Attorneys*

LESLIE R. CALWELL
*Assistant Attorney General*

SUNG-HEE SUH
*Deputy Assistant*
*Attorney General*

DAVID M. LIEBERMAN
*Attorney*
*Criminal Division*
*Appellate Section*

AZIKIWE AQUART, aka Zee, Nathaniel Grant, aka
Correctional Officer Stone, EFRAIN JOHNSON,

*Defendants.*

# TABLE OF CONTENTS

Trial Transcript – Volume I dated April 20, 2011 ....................................... GA1

Trial Transcript – Volume II dated April 21, 2011 .................................... GA65

Trial Transcript – Volume III dated April 25, 2011 ................................. GA115

Trial Transcript – Volume IV dated April 26, 2011 ................................. GA171

Trial Transcript – Volume V dated April 27, 2011 ................................... GA238

Trial Transcript – Volume VI dated April 28, 2011 ................................. GA298

Trial Transcript – Volume VII dated April 29, 2011 ............................... GA355

Trial Transcript – Volume VIII dated May 2, 2011 ................................. GA423

Trial Transcript – Volume IX dated May 3, 2011 .................................... GA494

Trial Transcript – Volume X dated May 4, 2011 ..................................... GA547

Trial Transcript – Volume XI dated May 5, 2011 .................................... GA605

Trial Transcript – Volume XII dated May 9, 2011 ................................... GA655

Trial Transcript – Volume XIII dated May 10, 2011 ............................... GA707

Trial Transcript – Volume XIV dated May 11, 2011 ............................... GA767

Trial Transcript – Volume XV dated May 12, 2011 ................................. GA819

Trial Transcript – Volume XVI dated May 13, 2011 ............................... GA850

Trial Transcript – Volume XVII dated May 16, 2011 .............................. GA893

Trial Transcript – Volume XVIII dated May 17, 2011 ............................ GA952

Trial Transcript – Volume XIX dated May 18, 2011 ............................. GA1008

## TABLE OF CONTENTS (cont'd)

Trial Transcript – Volume XX dated May 20, 2011 ................................ GA1036

Trial Transcript – Volume XXI dated May 23, 2011 ............................. GA1089

Transcript of Guilt Phase Charge Conference – Volume I
    dated May 13, 2011 .............................................................................. GA1097

Transcript of Guilt Phase Charge Conference – Volume II
    dated May 18, 2011 .............................................................................. GA1124

Guilt Phase Verdict Form dated May 23, 2011 ..................................... GA1137

Trial Transcript – Volume XXII dated May 31, 2011 ............................ GA1140

Trial Transcript – Volume XXIV dated June 1, 2011 ............................ GA1201

Trial Transcript – Volume XXV dated June 2, 2011 ............................. GA1237

Trial Transcript – Volume XXVI dated June 3, 2011 ............................ GA1285

Trial Transcript – Volume XXVII dated June 6, 2011 ........................... GA1342

Trial Transcript – Volume XXVIII dated June 7, 2011 ......................... GA1404

Trial Transcript – Volume XXIX dated June 13, 2011 .......................... GA1435

Trial Transcript – Volume XXX dated June 14, 2011 ........................... GA1472

Trial Transcript – Volume XXXI dated June 15, 2011 .......................... GA1479

Transcript of Penalty Phase Charge Conference – Volume I
    dated June 6, 2011 ............................................................................... GA1483

Transcript of Penalty Phase Charge Conference – Volume II
    dated June 7, 2011 ............................................................................... GA1502

Special Verdict Form (Penalty Phase) dated June 15, 2011 ................. GA1523

Motion for Mistrial dated May 23, 2011 ................................................ GA1537

# <u>TABLE OF CONTENTS</u> (cont'd)

Ruling on Defendant's Motion for a Mistrial dated February 21, 2012  GA1542

Transcript of John Taylor's Guilty Plea dated October 18, 2010 ........... GA1555

Transcript of John Taylor' Sealed Cooperation Agreement Plea
    Dated October 18, 2010 ..................................................................... GA1565

Transcript of John Taylor's Sentencing Hearing dated April 16, 2012 . GA1569

Trial Transcript of Efrain Johnson – Volume VII dated February 16, 2012
    [Testimony of John Taylor] ............................................................. GA1580

Trial Transcript of Efrain Johnson – Volume VIII dated February 17, 2012
    [Testimony of John Taylor] ............................................................. GA1643

Trial Transcript of Efrain Johnson – Volume IX dated February 21, 2012
    [Testimony of Lashika Johnson] ..................................................... GA1712

Failed Change-of-Plea Hearing Transcript of Efrain Johnson
    dated March 8, 2011 ........................................................................ GA1731

Transcript of Azikiwe Aquart Change of Plea dated August 26, 2011 .. GA1742

Government Exhibit 100A ...................................................................... GA1751

Government Exhibit 102A ...................................................................... GA1754

Government Exhibit 109 ........................................................................ GA1755

Government Exhibit 110 ........................................................................ GA1756

Government Exhibit 111 ........................................................................ GA1757

Government Exhibit 112 ........................................................................ GA1758

Government Exhibit 114 ........................................................................ GA1759

Government Exhibit 116G ...................................................................... GA1760

## TABLE OF CONTENTS (cont'd)

Government Exhibit 116H ........................................................................ GA1761

Government Exhibit 116I ......................................................................... GA1762

Government Exhibit 116J ......................................................................... GA1763

Government Exhibit 117H ........................................................................ GA1764

Government Exhibit 117J ......................................................................... GA1765

Government Exhibit 120-1 ........................................................................ GA1766

Government Exhibit 120-2 ........................................................................ GA1767

Government Exhibit 120-3 ........................................................................ GA1768

Government Exhibit 120-5 ........................................................................ GA1769

Government Exhibit 120-6 ........................................................................ GA1770

Government Exhibit 121-4 ........................................................................ GA1771

Government Exhibit 121-6 ........................................................................ GA1772

Government Exhibit 121-8 ........................................................................ GA1773

Government Exhibit 121-10 ...................................................................... GA1774

Government Exhibit 122-3 ........................................................................ GA1775

Government Exhibit 122-5 ........................................................................ GA1776

Government Exhibit 122-7 ........................................................................ GA1777

Government Exhibit 123-1 ........................................................................ GA1778

Government Exhibit 124 ........................................................................... GA1779

Government Exhibit 127 ........................................................................... GA1780

<u>TABLE OF CONTENTS</u> (cont'd)

Government Exhibit 128A..................................................................GA1781

Government Exhibit 129A..................................................................GA1782

Government Exhibit 129B..................................................................GA1783

Government Exhibit 130 ...................................................................GA1784

Government Exhibit 136 ...................................................................GA1785

Government Exhibit 137 ...................................................................GA1786

Government Exhibit 139 ...................................................................GA1787

Government Exhibit 140 ...................................................................GA1788

Government Exhibit 164 ...................................................................GA1789

Government Exhibit 165 ...................................................................GA1790

Government Exhibit 231A..................................................................GA1791

Government Exhibit 245 ...................................................................GA1792

Government Exhibit 246 ...................................................................GA1801

Government Exhibit 247 ...................................................................GA1807

Government Exhibit 247A..................................................................GA1817

Government Exhibit 249 ...................................................................GA1822

Government Exhibit 263 ...................................................................GA1828

Government Exhibit 264 ...................................................................GA1837

Government Exhibit 273 ...................................................................GA1847

Government Exhibit 274 ...................................................................GA1850

## TABLE OF CONTENTS (cont'd)

Government Exhibit 275 ........................................................................GA1852

Government Exhibit 276 ........................................................................GA1860

Government Exhibit 277 ........................................................................GA1864

Government Exhibit 278 ........................................................................GA1866

Government Exhibit 279 ........................................................................GA1868

Government Exhibit 300 ........................................................................GA1870

Government Exhibit 300A ......................................................................GA1871

Government Exhibit 301 ........................................................................GA1872

Government Exhibit 302 ........................................................................GA1873

Government Exhibit 305 ........................................................................GA1874

Government Exhibit 306 ........................................................................GA1888

Government Exhibit 307 ........................................................................GA1889

Government Exhibit 308 ........................................................................GA1890

Government Exhibit 314 ........................................................................GA1891

Government Exhibit 315 ........................................................................GA1906

Government Exhibit 316 ........................................................................GA1907

Government Exhibit 319 ........................................................................GA1908

Government Exhibit 322 ........................................................................GA1909

Government Exhibit 400 ........................................................................GA1924

TABLE OF CONTENTS (cont'd)

Government Exhibit 403 ........................................................................GA1925

Government Exhibit 404 ........................................................................GA1926

Government Exhibit 414 ........................................................................GA1927

Government Exhibit 424 ........................................................................GA1928

Government Exhibit 433 ........................................................................GA1929

Government Exhibit 435 ........................................................................GA1930

Government Exhibit 447 ........................................................................GA1931

Government Exhibit 451 ........................................................................GA1932

Government Exhibit 464 ........................................................................GA1933

Government Exhibit 465 ........................................................................GA1934

Government Exhibit 467 ........................................................................GA1935

Government Exhibit 506 ........................................................................GA1936

Government Exhibit 514 ........................................................................GA1939

Government Exhibit 3 ............................................................................GA1943

Government Exhibit 4 ............................................................................GA1944

Government Exhibit 9 ............................................................................GA1945

Government Exhibit 12A........................................................................GA1952

1201

```
1    A.   She sold reefer at one time.  Marijuana.
2    Q.   Okay.  Was that pretty normal in that area?
3    A.   Yes, it is.
4    Q.   And, in fact, you said at some point you
5    began to sell drugs, too; is that right?
6    A.   Yes, it is.
7    Q.   And at one point you actually were working
8    for your nephews?
9    A.   Yes, I was.
10   Q.   Okay.  So you are pretty familiar with what
11   life was like there in Bridgeport over the past
12   30 years or so.
13   A.   Yes.
14   Q.   And it's a rough town.
15   A.   It can be.
16   Q.   Now, you'd been interviewed by the police
17   between when you were injured in 2004 and up to
18   today a few times, correct?
19   A.   Yes.
20   Q.   Okay.  And the police had come to the
21   apartment in November 2004, right --
22   A.   Yes.
23   Q.   -- when your knee was injured.  And you
24   admitted to the police at that point that you had
25   been dealing drugs, right?
```

1202

```
1    A.   Yes, I did.
2    Q.   But they didn't arrest you then, right?
3    A.   No, they didn't even help me.
4    Q.   Okay.  They took a statement from you?
5    A.   Basically.  Actually they took a statement
6    from my daughter.
7    Q.   Okay.
8    A.   Actually.
9    Q.   But you talked to the police as well.
10   A.   Briefly.
11   Q.   Briefly, okay.
12        And then in August of 2004 you were
13   interviewed by the detectives in this case shortly
14   after the murders.
15   A.   Yes.
16        THE COURT:  2005?
17        MR. SMITH:  I'm sorry, I apologize, your
18   Honor, you are right.
19        THE WITNESS:  I noticed that.
20   Q.   August 2005.  If I say something that's not
21   correct, you should correct me.
22   A.   You had the wrong number, but you was
23   right.
24   Q.   In that interview, that was a statement;
25   they took down what you were saying?
```

1203

```
1    A.   Yes.
2    Q.   And they allowed you to read over it and
3    make sure it was correct?
4    A.   Yes.
5    Q.   And then you signed it?
6    A.   Yes.
7    Q.   And you affirmed that it was correct?
8    A.   Yes.
9    Q.   Okay.  In that interview, in that
10   statement, you again admitted to them that you were
11   selling drugs?
12   A.   Yes.
13   Q.   And they didn't arrest you then.
14   A.   No.
15   Q.   They didn't seem to be interested in
16   arresting you, right?
17   A.   No, they did.
18   Q.   Okay.  They really wanted to talk to you
19   about D, right?
20   A.   Yes.
21   Q.   And they had come and found you, right?
22   A.   Yeah.
23   Q.   You didn't just walk into the police
24   station one day.
25   A.   No.
```

1204

```
1    Q.   And then a couple months later, in November
2    of 2005, you testified in front of the Grand Jury,
3    right?
4    A.   Yes, I did.
5    Q.   And before you testified in front of the
6    Grand Jury you met with one of the U.S. attorneys,
7    someone from their office?
8    A.   More than likely.
9    Q.   Okay.  And at the beginning of your Grand
10   Jury testimony, do you recall that you were read
11   your rights?
12   A.   Yes.
13   Q.   And that's where they advised you that
14   anything you say could be used against you.
15   A.   Yes.
16   Q.   And your understanding of the reason that
17   they did that was because in your testimony you were
18   likely to admit under oath about dealing drugs,
19   right?
20   A.   I was going to tell them whatever happened.
21   I was going to tell the truth.
22   Q.   Okay.  And, in fact, you did tell the Grand
23   Jury that you were dealing drugs, right?
24   A.   Yes.
25   Q.   But you weren't expecting to get arrested
```

**GA301**

1205

```
1   for that, right, or charged?
2       A.  I didn't think that was possible for
3   something that already had happened.
4       Q.  Okay.  But they never told you you were
5   going to be arrested if you admit to this.
6       A.  No, they didn't.  Am I going to get
7   arrested?
8       Q.  Right?
9       A.  No, I said am I going to get arrested now?
10      Q.  That's not my decision, ma'am.
11      A.  Oh, okay.  All right.
12      Q.  But no one from the U.S. attorney's office
13  in the last couple of days has told you you were
14  going to be arrested for anything, correct?
15      A.  No.
16      Q.  Okay.  When you testified at the Grand Jury
17  you talked about selling drugs for D, correct?
18      A.  Yes.
19      Q.  And you kind of went into some detail.  You
20  told them that you got packs that had 36 baggies.
21      A.  Yes.
22      Q.  And that each baggie sold for $10.
23      A.  Yes.
24      Q.  And you told them that you were selling 700
25  individual baggies per day from apartment 211.
```

1206

```
1       A.  I don't know if I said 700 per day, but I
2   know I told them I sold.
3       Q.  But if the Grand Jury transcript showed
4   that you said 700 per day, you'd agree with that?
5       A.  I would agree.
6       Q.  Okay.  So that's 700 times ten, that's
7   $7,000 a day.
8       A.  Possibly.
9       Q.  Okay.  And you said if not more than that.
10      A.  If not more.
11      Q.  Okay.  Now, do you remember that you said
12  you were briefly interviewed by the police when they
13  came to see you in November 2004?
14      A.  For my knee?
15      Q.  Right.
16      A.  Yes.
17      Q.  Okay.  Did you tell the police officer that
18  you had been assaulted when you had arrived at the
19  apartment after you were finished selling drugs
20  somewhere else?
21      A.  No.
22      Q.  Okay.  You didn't tell them that?
23      A.  No.
24      Q.  Okay.  But then -- let me withdraw that.
25          When you went to your interview for the
```

1207

```
1   statement you gave to the police shortly after the
2   murders -- let me take that back.
3           When you testified at the Grand Jury you had
4   talked to them about Baby Boy; is that right?
5       A.  Yes.
6       Q.  And the fact that he had assaulted you.
7       A.  Yes.
8       Q.  They didn't show you any photos of Baby Boy
9   at the Grand Jury?
10      A.  They didn't show me -- I don't believe they
11  did.  I can't remember.
12      Q.  Okay.  They really just wanted to talk to
13  you about D at that point?
14      A.  I don't know if that's all they wanted to
15  talk to me about, but that's what they mostly talked
16  about.
17      Q.  And when the police officer came in
18  November 2004 when you hurt your knee, when your
19  knee was hurt, you told the officer you were
20  assaulted because you were short $20.
21      A.  I don't recall saying $20.
22      Q.  Okay.
23      A.  But I did say that it was because I was
24  short.  But actually my daughter brought the police.
25  I never brought the police.  My daughter came to the
```

1208

```
1   apartment with the police, and that's how it all
2   came about.
3       Q.  Because you weren't going to go out and
4   talk to the police on your own.
5       A.  I couldn't get out.  I don't know what was
6   wrong with me, but I couldn't get up and leave.
7       Q.  Okay.  And talking a little bit about
8   yesterday, you said the assault started with
9   Baby Boy, right?
10      A.  Exactly.
11      Q.  And at some point you passed out?
12      A.  Not until D started hitting me.
13      Q.  Okay.
14      A.  I was --
15          THE COURT:  Actually if you get too
16  close you get --
17      A.  I was wide awoke (sic) when Baby Boy was
18  hitting me.
19      Q.  But at some point you said you did pass
20  out.
21      A.  Yes.
22      Q.  And when you woke up, that's when you found
23  that you had the injury to your knee.
24      A.  Yes.
25      Q.  All right.  And it wasn't clear to me
```

**GA302**

1209

```
1    yesterday what time it was in the evening that you
2    saw these men in black in the hallway.
3        A.   I didn't say an exact time, but it was
4    after 2:00 or 3:00 in the morning.
5        Q.   Around 2:00 or 3:00 in the morning?
6        A.   Yes.
7        Q.   And you talked a little bit about what you
8    saw yesterday when you went to Charles Street that
9    night, and I think you talked about seeing these men
10   in the parking lot.
11       A.   I believe I seen the same men.
12       Q.   Okay.  And that's on the diner side of the
13   building?
14       A.   Yes, sir.
15       Q.   But when -- on August 27th when the
16   detectives interviewed you, you never mentioned
17   seeing them before you went into the building; is
18   that correct?
19       A.   I don't recall if I said it to them or not.
20       Q.   Okay.  So that night you had said you had
21   gone into 211; is that right?
22       A.   Yes.
23            THE COURT:  I'm sorry, by "that night"
24   you are referring to what date?
25            MR. SMITH:  I'm sorry.
```

1210

```
1        Q.   The night you had seen these men in the
2    hallway.
3        A.   Yes.
4        Q.   And when was that again?  Do you have any
5    idea when it was --
6        A.   I'm not sure of the date.
7        Q.   -- in relation to the murders?
8        A.   Maybe two to three days before it, in that
9    timeframe.
10       Q.   Okay.  And you had gone up to 211 because
11   you were going to smoke some crack.
12       A.   Yes, I was.
13       Q.   And you talked about D coming to the door.
14       A.   Yes, I did.
15       Q.   But in your interview just a couple days
16   after the murders you didn't tell the police that D
17   came to the door that night.
18       A.   Maybe they didn't ask me that.  I don't
19   know why I didn't tell them, but I told them at one
20   point.
21       Q.   So, you agree -- well, are you saying you
22   did tell them that night?
23       A.   No, that's not what I said.  I said I don't
24   remember if I told them that night or not, but I
25   know at one point I did.
```

1211

```
1        Q.   During the interview?
2        A.   Once again, I don't know it was during the
3    interview or not.  But I know I told them what
4    happened.
5        Q.   Okay.  But do you agree that it's not in
6    your statement?
7        A.   I don't remember if it was or not, sir.
8        Q.   Would you like to take a look at your
9    statement?
10       A.   If you want to show it to me, sure.
11       Q.   Okay.  If you take a look at that, Ms.
12   Bryant.
13       A.   Sure.
14            MR. SMITH:  This is her statement of
15   August 27, 2005, your Honor, to the Bridgeport
16   Police Department.
17            THE COURT:  All right.  We'll mark that
18   as J. Defendant's J for ID -- K for ID.
19       A.   What was your question again?
20       Q.   That it's not in your statement that you
21   told -- you didn't tell the police that night -- or
22   that day when you were interviewed on August 27th.
23       A.   That I didn't tell them I seen the men?
24       Q.   That you saw D come to apartment 211.
25       A.   Okay.  Okay, I guess so.
```

1212

```
1        Q.   So -- well, I mean, I want to give you time
2    to look through and make sure.  I'm not trying to
3    put words in your mouth.  I want to make sure this
4    is correct.
5        A.   Sir, I'm not sure about the interview, but
6    I do remember saying, stating to, if it was the
7    police or the FBI or -- I don't know who it was, but
8    I did tell someone that I thought it was strange
9    that when I went up there to cop, after I told them
10   I seen the men, that it was strange for him to come
11   to the apartment and not tell me to get out because
12   he always tell me to get out.  So sometime in there
13   I told them that D came to the door.
14       Q.   Right, but you didn't tell them that on
15   August 27th.  Do you agree with that?
16       A.   I guess so.  I guess so.
17       Q.   Maybe I was a little quick on taking that
18   statement away.  In that same statement you talked
19   yesterday -- I'll go back.  Withdraw that.
20            You talked yesterday about when you left the
21   building you saw Mr. Hodges knocking on the door of
22   101.
23       A.   Yes, I did.
24       Q.   Okay.  But, again, in that same statement
25   to the police you didn't tell them that, the one you
```

**GA303**

1213

1 were just looking at.
2    A.   Sir, at that time I don't know if every
3 little detail was just popping in my mind freshly or
4 whatever, but I do know things that happened.  I
5 don't know when I told them or what statement, but I
6 know it was told.  That's all I can tell you.  I
7 don't recall exact statements, who I talked to.  I
8 talked to so many people.
9    Q.   Well, you were asked when you left the
10 apartment did you see anything else when you left
11 the building, and you answered "No, I just walked
12 out the front."
13    A.   I can't remember just leaving it like that.
14 So, I don't know what you want me to say to you,
15 sir.
16    Q.   Well, we talked about the fact that you had
17 a chance to read this back over after the police
18 interviewed you, right?
19    A.   Right.
20    Q.   And on each page you signed it, correct?
21    A.   Correct.
22    Q.   And you said that this is true to the best
23 of your knowledge and belief.
24    A.   True.  But, do you know, in life sometimes
25 things that happen you might leave out a detail, but

1214

1 then all of a sudden you remember it, so you say it.
2 That's one of them things in life.
3    Q.   But you agree you didn't tell the police
4 that that night.
5    A.   Once again, I don't recall if I did or not.
6    Q.   Okay.  Would something refresh your memory?
7    A.   You can show me all you want to.  I know I
8 did.  It's not going to make my answer change.  I
9 don't know if I said it that night or the next
10 night.  That's all I can tell you.  I know it was
11 said.
12    Q.   Okay.  But it wasn't said that night -- I
13 mean, that day.
14         MS. DAYTON:  Objection.
15    A.   You're repeating.
16         THE COURT:  I think we've gotten over
17 that.
18         MR. SMITH:  I'll move on.
19    Q.   You are familiar with Mr. Womble, Rodney
20 Womble.
21    A.   I know of him.
22    Q.   You know of him.  You've seen him?
23    A.   Yes, I have.
24    Q.   On several occasions?
25    A.   Yes.

1215

1    Q.   Okay.  Because he'd had a confrontation
2 with Tina.
3    A.   Yes.
4    Q.   He's a big guy, right?
5    A.   Yes.
6    Q.   Tall?
7    A.   Sort of.
8    Q.   Very heavy?
9    A.   Yeah.
10    Q.   Big as me, maybe bigger?
11    A.   Maybe.  Yeah, maybe.
12    Q.   The men you saw that night in Charles
13 Street, were any of them as big as Mr. Womble?
14    A.   To be honest with you, I could tell you the
15 frame size of the first one.  It was sort of like a
16 line, sort of.  The ones behind him, I could not
17 tell you, but the first one was a small built
18 person.
19    Q.   Okay.  You had talked a little bit about
20 yesterday Womble saying he was going to come in
21 there and slap people.
22    A.   Yes, I did.
23    Q.   You were talking about apartment 101?
24    A.   Yes.
25    Q.   Okay.  Do you remember telling the Grand

1216

1 Jury he also said that Tina was going to get hers?
2    A.   Yes, I remember saying that.  I remember
3 saying that.
4    Q.   And that was coming from Womble, right?
5    A.   Yes.
6    Q.   You talked also about a time when D was in
7 the entryway to the garage of Charles Street and
8 Tina was up in the window at 101.
9    A.   Yes.  Yes.
10    Q.   And that D had yelled up to Tina to stop
11 selling; is that right?
12    A.   Basically I don't remember his exact words,
13 but it was basically we needed to stop doing what we
14 was doing.
15    Q.   And this was, what, a week before the
16 murders or so?
17    A.   Give or take.
18    Q.   Do you think it's a week?
19    A.   Give or take.
20    Q.   Not the day before, right?
21    A.   Definitely not the day before.
22    Q.   Okay.  And you recall, again, you testified
23 in the Grand Jury, right?
24    A.   Yes, I did.
25    Q.   But at the Grand Jury you never said this?

**GA304**

1217

1    A.    Maybe it wasn't asked.  I don't know.
2    Q.    But you agree you didn't say that to the
3  Grand Jury.
4    A.    I don't remember everything I said at the
5  Grand Jury.
6    Q.    Okay.  When you -- you talked today about
7  D's brother coming to apartment 211; is that right?
8    A.    Yes.
9    Q.    This was a couple of weeks after the
10 murders.
11   A.    Yes, it was.
12   Q.    And who was in the apartment when he came
13 there?
14   A.    I can't recall everyone that was in there,
15 but I know I was in there, Pop was in there, a
16 friend of mines (sic) named Jackie, and other than
17 that I can't really tell you.
18   Q.    So it was you, Pop and Jackie you said.
19 And someone else?  I'm sorry.
20   A.    There could have been more people.  I
21 couldn't tell you exactly who they was.
22   Q.    Okay.  And the second time he came into the
23 apartment, who was there?
24   A.    I believe it was just me, Pop and Jackie.
25   Q.    Do you know Jackie's name?

1218

1    A.    Jackie.
2    Q.    I mean Jackie, her full name.
3    A.    I don't recall her last name.
4    Q.    So, a couple weeks after the murders.  This
5  is early September 2005 that this happened?
6    A.    It was in 2005.  I can't say the exact
7  month.
8    Q.    Well, I think yesterday you talked about
9  going down south for a couple of weeks maybe.
10   A.    I went down south for like two weeks.
11   Q.    And this happened after you got back?
12   A.    Yep.
13   Q.    Shortly after?
14   A.    In fact, the next day when I got back.  The
15 day after I got back.
16   Q.    So, about two weeks after the murders, give
17 or take?
18   A.    Give or take.
19   Q.    And, again, you testified in front of the
20 Grand Jury on November 2nd, 2005, correct?
21   A.    Yes.
22   Q.    And, again, in that testimony you said
23 nothing about this incident.
24        MS. DAYTON:  Objection.
25        MR. SMITH:  I can rephrase the question.

1219

1         THE COURT:  All right, why don't you
2  rephrase it, we'll see if there remains an
3  objection.
4    Q.    Did you tell the Grand Jury about this?
5         MS. DAYTON:  Objection.
6         THE COURT:  May I see you at sidebar.
7         (Sidebar conference)
8         THE COURT:  Basis for the objection?
9         MS. DAYTON:  The defendant needs to
10 establish first she was asked the question.  A
11 witness can't just -- they don't testify by
12 colloquy.  So if she wasn't asked a question she
13 couldn't have told them about it.  So he needs to
14 ask her, in order to properly impeach her, were you
15 asked this question.  Because just to say you didn't
16 say anything about it is sort of like it's a
17 non-question.
18        THE COURT:  As she notes, perhaps I
19 wasn't asked.  All right, can you direct her to a
20 question at which she would have been expected to
21 respond with the information that she gave in her
22 testimony?
23        MR. SMITH:  It will take me a moment to
24 look through it, but yes, your Honor.
25        MR. SHEEHAN:  Your Honor, there is no

1220

1  specific question, but the point is she was
2  testifying in front of the Grand Jury about the
3  circumstances of the involvement --
4         THE COURT:  I understand.
5         MR. SHEEHAN:  --  in the case.
6         THE COURT:  So if there is a question
7  that says tell me what happened, maybe that's the
8  appropriate basis, but let's have -- let's at least
9  have a foundation that she had the opportunity to
10 have given this information and failed to do so.
11        MR. SMITH:  Again, your Honor, if I can
12 have a couple of minutes.
13        THE COURT:  Sure.
14        (Sidebar concluded)
15        MR. SMITH:  I apologize, ladies and
16 gentlemen, this is taking me a moment to review some
17 materials.
18        THE COURT:  We will sit only 'til
19 three o'clock today, but I may make it up later on.
20 But I'll give you warning on that if I can.
21        MR. SMITH:  I don't know if your Honor
22 wants me to approach again with the question that I
23 think is appropriate.
24        THE COURT:  You can read it.
25   Q.    Towards the end of your --

GA305

1221

1        MR. SMITH: This is page 31. I'm sorry.
2   Q. You were asked, "Ms. Bryant, but you've
3 provided this Grand Jury information that you are
4 aware of that's the truth?"
5   A. Yes.
6   Q. And your answer was "Yeah, I mean that's
7 what I know. That's everything I know."
8   A. I'm not sure if I did or not, but if that's
9 what you say.
10   Q. Could I show that to you?
11   A. Sure, sure. Okay.
12   Q. That was your answer? That was everything
13 you knew?
14   A. No, that was my answer at the time.
15   Q. Okay.
16        MR. SMITH: I'm sorry, your Honor, may I
17 have a moment?
18        THE COURT: Sure.
19   Q. And so, again, when you say "that's
20 everything I know," that's what you said at the
21 Grand Jury.
22   A. I don't think I could possibly tell you
23 everything I know because I am always going to think
24 of something else.
25   Q. But again, you didn't say anything in the

1222

1 Grand Jury about seeing Azikiwe.
2   A. I suppose not, sir.
3        MR. SMITH: Your Honor, at this time I
4 would move to admit Ms. Bryant's -- this portion of
5 the Grand Jury transcript which we can redact as
6 necessary, and also her statement to the Bridgeport
7 Police Department.
8        THE COURT: With respect to the Grand
9 Jury, you are talking about that question and answer
10 that you just read?
11        MR. SMITH: Yes.
12        MS. DAYTON: Your Honor, the government
13 does not believe that's an inconsistent statement,
14 but the government's more than happy to have her
15 entire Grand Jury transcript admitted in evidence.
16        THE COURT: Shall we do that?
17        MR. SMITH: I don't think it's
18 necessary, your Honor. It's not what I
19 cross-examined her on.
20        THE COURT: I'll tell you what, why
21 don't we discuss this later as to which portion, all
22 or part of the Grand Jury testimony should come in.
23 And then with respect to the police statement, does
24 the government have a -- has the government taken a
25 position?

1223

1        MS. DAYTON: Did he seek to admit that
2 too?
3        THE COURT: Yes.
4        MS. DAYTON: I didn't hear that part.
5 The entire statement or?
6        THE COURT: Yes, I gather so.
7        MR. SMITH: Based on the fact that there
8 is no mention in that statement of certain facts.
9        MS. DAYTON: But --
10        THE COURT: We will take up the
11 arguments of this outside the presence of the jury
12 and not on their time.
13     Okay, anything further, Mr. Smith?
14        MR. SMITH: No, your Honor, thank you.
15        THE COURT: Thank you. Redirect.
16        MS. DAYTON: Thank you, your Honor.
17 REDIRECT EXAMINATION BY
18 BY MS. DAYTON:
19   Q. Good morning, again.
20   A. Good morning.
21        MS. DAYTON: What did you mark the Grand
22 Jury testimony?
23        THE COURT: We'll mark that as
24 defendant's --
25        MS. DAYTON: We can mark the entire

1224

1 thing as the Government's 3500 JB-2 as it's marked
2 in the 3500 material, your Honor.
3        THE COURT: I need to sort this out.
4 The portion that Mr. Smith -- that question and
5 answer Mr. Smith used is Defendant's L for
6 identification. If something other than that is
7 coming in, we'll mark that separately, okay?
8        MS. DAYTON: Thank you. I am going to
9 seek to show this entire document to the witness,
10 though, your Honor.
11        THE COURT: You may.
12        MS. DAYTON: Okay. So I'll mark it for
13 identification 3500 JB-2 as its marked.
14   Q. Ms. Bryant, do you know what time you
15 started testifying for the Grand Jury on
16 November 2nd, 2005?
17   A. I don't remember the exact time.
18   Q. And do you know what time you finished?
19   A. No.
20   Q. So you don't know how long you were
21 testifying for in total?
22   A. No, I don't.
23   Q. If I showed you the times would that help
24 refresh your memory?
25   A. Possibly.

1225

```
1    MS. DAYTON:  Your Honor, if I may
2  approach?  And I'm going to be using the Grand Jury
3  transcript.
4    Q.   This is page 1, it has a time, and page 36.
5    A.   Possibly that's right.
6    Q.   And how long is that?
7    A.   Thirty-five minutes.
8    Q.   So, significantly shorter than you were
9  testifying in here the last two days?
10   A.   Yes.
11   Q.   Okay.  Do you remember counsel asking you
12 some questions about your daughter's statement to
13 the police on the day you were assaulted?
14   A.   Yes, I do.
15   Q.   And there was a statement he asked you
16 about whether or not you said you owed D $20.  You
17 said your daughter may have said that.
18   A.   May have.
19   Q.   Did you talk to -- actually, let me try
20 that again.
21        You talked to the police on August 27, 2005;
22 is that correct?
23   A.   Yes.
24   Q.   You were interviewed by them.  That's the
25 statement the defense asked you about.
```

1226

```
1    A.   Yes.
2    Q.   Do you remember how much money you told
3  them that you actually owed the defendant?
4    A.   100-something dollars.
5    Q.   This is --
6        MS. DAYTON:  You marked this as well?
7        MR. SMITH:  I think this would be M,
8  your Honor.  Am I correct about that?
9        MS. DAYTON:  If I may approach, your
10 Honor?
11       THE COURT:  You may.
12   Q.   Directing your attention to page 5 of 6,
13 how much did you tell them that you owed the
14 defendant?
15       MR. SMITH:  Objection.  She asked if it
16 would refresh her memory, she's not asking her to
17 read from the document.
18   Q.   Does that refresh your memory?
19   A.   Yes.
20       THE COURT:  That police statement has
21 already been marked K for identification.
22       MS. DAYTON:  Yes, and this is page 5 of
23 6.
24       THE COURT:  All right.
25   Q.   What did you tell them?
```

1227

```
1    A.   Excuse me?
2    Q.   How much did you tell them you owed the
3  defendant?
4    A.   $185.
5    Q.   And then you were asked about testifying in
6  the Grand Jury, and if you, in fact, told the Grand
7  Jury how much money you owed the defendant.
8    A.   Yes, I believe that's how much I told them,
9  too.
10   Q.   Do you remember exactly what you said?
11   A.   I might have said 16, 17 cracks or
12 something, and they asked me the value, and that's
13 what it was.  Something like that.
14   Q.   If I showed you your statement, would that
15 refresh your memory?
16   A.   Sure.
17   Q.   Your Grand Jury testimony, excuse me.
18 Drawing your attention to page 10 of the document,
19 line --
20       MS. DAYTON:  Line 14, your Honor, and
21 15.
22       THE WITNESS:  All right.
23   Q.   Does that refresh your memory?
24   A.   Yeah.  Yes.
25   Q.   What did you tell them?
```

1228

```
1    A.   I told them over $100 and he beat me up.
2    Q.   And then at the Grand Jury -- well, counsel
3  asked you some questions about whether when you were
4  interviewed on August 27th of 2005 you told the
5  police about seeing the defendant in apartment 211.
6  Do you remember him asking you about that?
7    A.   Yes.
8    Q.   Do you know if you were asked questions
9  about that in the Grand Jury?
10   A.   I don't recall that.
11   Q.   If I showed you your Grand Jury testimony,
12 would that perhaps refresh your memory?
13   A.   Yes, it would.
14   Q.   Okay.
15       MS. DAYTON:  Your Honor, may I approach?
16       THE COURT:  You may.
17       MS. DAYTON:  Showing the witness
18 page 18, your Honor, lines 21, 22, 23.
19   Q.   If you could read that to yourself, see if
20 it refreshes your memory.  Does that refresh your
21 memory?
22   A.   Yeah.
23   Q.   So, what did you tell the Grand Jury?
24   A.   I didn't know what you was talking about.
25       THE COURT:  Did she tell the Grand Jury
```

**GA307**

1229

```
1    about what?
2        Q.   Did you tell the Grand Jury --
3            MS. DAYTON:  I'm sorry, your Honor.
4        Q.   Did you tell the Grand Jury about seeing D
5    knocking on -- or having D come to apartment 211 and
6    knock on the door?
7        A.   Yes.
8        Q.   What else did you tell them that you
9    thought was strange about it?
10           MR. SMITH:  Objection.  That wasn't part
11   of the question of what her memory needed to be
12   refreshed about.
13           THE COURT:  But she's now speaking from
14   refreshed memory.
15           MS. DAYTON:  Yes.
16           MR. SMITH:  Well, the question
17   specifically was do you remember talking to the
18   Grand Jury about coming to -- D coming to the
19   apartment.
20           MS. DAYTON:  Your Honor, there has been
21   a claim of recent fabrication, and pursuant to 801
22   we are entitled to put in a prior consistent
23   statement.
24           THE COURT:  The clarification is did she
25   tell the Grand Jury A, did she tell the Grand Jury
```

1230

```
1    more than A; is that it?
2            MS. DAYTON:  Yes.
3            THE COURT:  Go ahead.
4        Q.   What did you tell -- if you recall or if
5    this refreshed your memory, what did you tell the
6    Grand Jury about D knocking on the door at 211?
7        A.   I said usually when he comes and I'm in the
8    house he says "get out."  He said nothing to me at
9    that time.
10       Q.   And that's what you explained.
11       A.   And that was strange to me.
12       Q.   And that's what you explained to the Grand
13   Jury.
14       A.   Yes.
15           MR. SMITH:  I'm going to object and have
16   her read the answer she gave to the Grand Jury.
17           THE COURT:  Okay.
18           MS. DAYTON:  I can read it in.
19           THE COURT:  Page and line, please.
20           MS. DAYTON:  Sure.  It's page 18
21   starting line 20.  "Answer:  I smoked mine, yeah,
22   and I gave them one splift (ph)."
23           THE WITNESS:  Split.
24           MS. DAYTON:  Yeah, I think it was split.
25   The witness is correcting.
```

1231

```
1            "But D came in the door.  Now, usually
2    when I'm in there he'll say, you know, 'who got to
3    leave.'  He didn't say nothing.  He said something
4    to Frank.  I said 'Let me leave before this boy
5    starts something.'  But him and Frank had went out
6    the door already.  I said 'I'm going to leave.'
7            "So I'm going down the stairs.  All
8    right.  If you go down the stairs it also goes in
9    the basement, but the basement stairs creak.  You
10   can hear when someone goes downstairs.  When I'm
11   going to the door to go out the front door I hear
12   somebody."
13           MR. SMITH:  Your Honor?
14           MS. DAYTON:  This is her answer.  "I
15   hear somebody going down to the basement, so I don't
16   know who it is, but I assumed it was D.  Frank is
17   knocking on Tina's door.  I didn't even question
18   it."
19           That's the end of the answer and it ends
20   on page 19 at line 10 -- line 9, excuse me.
21       Q.   And then I just had one other thing to ask.
22   When you testified in the Grand Jury in November of
23   2005, is the defendant the only person that you
24   talked to the Grand Jury about?
25       A.   No.
```

1232

```
1        Q.   And is the defendant the only person that
2    the U.S. attorney asked you about?
3        A.   No.
4        Q.   Were you asked about Frank?
5        A.   Yes.
6        Q.   And Vanessa?
7        A.   Yes.
8        Q.   And Womble?
9        A.   Yes.
10       Q.   In fact, shown a picture of Womble?
11       A.   Yes.
12       Q.   Baby Boy?
13       A.   I can't recall.  I can't recall them
14   showing me Baby Boy.
15       Q.   Did you talk about Baby Boy, though?
16       A.   I believe I did.
17       Q.   Pop?
18       A.   Yes.
19       Q.   John-John?
20       A.   Yes.
21       Q.   Tina?
22       A.   Yes.
23       Q.   Basil?
24       A.   Yes.
25       Q.   James?
```

1233

1   A.   Yes.

2   Q.   Yourself?

3   A.   Yes.

4   Q.   Thank you.

5        MS. DAYTON:  I have nothing further,

6   your Honor.

7        THE COURT:  All right, any recross?

8   RECROSS-EXAMINATION BY

9   BY MR. SMITH:

10  Q.   Ms. Bryant?

11  A.   Yes.

12  Q.   When was the first time you told anyone

13  from the government or the police about seeing

14  Azikiwe in the apartment two weeks after the

15  murders?

16  A.   About seeing who?

17  Q.   Azikiwe, D's brother.

18  A.   When is the first time I told them about

19  him?  I'm not sure of the exact time that I told --

20  I can't tell you.  I can't tell you.

21  Q.   You told them about it a couple of days ago

22  when you arrived here from out of town, though, yes?

23  A.   I believe I told someone before that.

24  Q.   Who?

25  A.   A government agency, most likely.

1234

1   Q.   Do you recall who?  A name?

2   A.   No, I can't.  I can't remember your name.

3   Q.   Fair enough.  Where did this happen?

4   A.   Where did what happen?

5   Q.   When you told them this, where were you

6   when this happened?

7   A.   If I'm not mistaken, I was talking to an

8   FBI agent.

9   Q.   Okay.  Where?

10  A.   I believe it was in the laundry room at

11  211.  I think that's the first time I said it.  I

12  believe.

13  Q.   When?

14  A.   When I first talked to him.  I can't give

15  you an exact date.

16  Q.   Okay.  Just a moment.  Isn't it true,

17  Ms. Bryant, that the first time you said anything

18  about this to the FBI was this week?

19  A.   Sir, I believe it's the first time it was

20  written down and it was talked about.

21  Q.   So you are saying that you are denying that

22  the first time you ever told an FBI agent about this

23  was this week?

24  A.   I'm not saying that because I know I did

25  talk about it prior.  I'm saying it's the first time

1235

1   I believe it was written down and talked about.

2   Q.   Okay.  Thank you.

3   A.   You are welcome.

4        MR. SMITH:  I'm sorry.

5        MS. DAYTON:  Just one -- are you done?

6        MR. SMITH:  No, not quite.

7        MS. DAYTON:  I'm sorry.

8   Q.   But the agents who you talked to and who

9   wrote it down, they're sitting here in the courtroom

10  today?

11  A.   I'm not sure, sir.

12  Q.   Do you see either one of these gentleman

13  back here?

14  A.   Excuse me.  The first person I seen write

15  it down and talk about it was Tracy, Tracy

16  acknowledged it.

17  Q.   Ms. Dayton?

18  A.   Yes.

19  Q.   Was one of these gentlemen there, these FBI

20  agents?

21  A.   Whether they were when I made the

22  statement?

23  Q.   Yes, when you were talking to Ms. Dayton.

24  A.   Oh, yes, yes.

25  Q.   They were there?

1236

1   A.   Not "they," he.

2   Q.   The short-haired gentlemen?

3   A.   No, Dave was there.  No.

4   Q.   Oh, Dave.  Okay, thank you.

5   A.   You are welcome.

6        MS. DAYTON:  Thank you, your Honor.

7   Sorry I jumped the gun there.

8   RE-REDIRECT EXAMINATION

9   BY MS. DAYTON:

10  Q.   Your Honor -- excuse me.  Ms. Bryant.

11  A.   Yes.

12  Q.   Do you remember when you testified in Grand

13  Jury being asked questions about meeting the

14  prosecutor at Charles Street?

15       MR. SMITH:  Objection.  This is outside

16  the scope of the redirect -- I mean the recross,

17  your Honor.

18       THE COURT:  I'm going to let her

19  continue because I think it may not be.  It has to

20  do with when she told anyone about the defendant's

21  brother.

22       MS. DAYTON:  It has to do with whether

23  or not she was actually interviewed and spoken to at

24  the Charles Street building, not exactly what was

25  said, but that she, in fact, was interviewed.

1237

```
1    THE COURT:  All right.
2    MS. DAYTON:  Yes.
3    THE COURT:  I'm going to permit it.
4    Q.  Do you remember whether or not you spoke
5  about that?
6    A.  I'm quite sure I did.
7    Q.  If I showed you the Grand Jury transcript,
8  would that help refresh your memory?
9    A.  Yes, yes.
10   MR. SMITH:  She didn't say she didn't
11 remember.  She was sure she did.  So how are we
12 refreshing her memory?
13   Q.  Do you know exactly what your testimony was
14 with respect to --
15   A.  I don't remember exactly what it was.
16   MR. SMITH:  Your Honor, she already
17 testified she remembers talking to the person.
18   THE COURT:  And --
19   MS. DAYTON:  Your Honor --
20   THE COURT:  And you say there was no
21 question that she never said that to the Grand Jury?
22   THE WITNESS:  Exactly.
23   THE COURT:  I thought that was something
24 you had asked her.
25   MS. DAYTON:  Your Honor, there was
```

1238

```
1  questions about whether or not she was actually
2  interviewed at the Charles Street building, and
3  there is actually questions related exactly to that
4  interview at the Charles Street building.
5    THE COURT:  All right, all right.  I
6  think that was the gist, if not the specific, of
7  your questioning.
8    MR. SMITH:  I understand, your Honor,
9  but she's trying to put the Grand Jury transcript in
10 front of her.  She did not -- she didn't deny it.
11   THE COURT:  So, the question is did she
12 tell the Grand Jury -- what did she tell the Grand
13 Jury about having met with law enforcement agents?
14   MS. DAYTON:  Yes.
15   THE COURT:  Do you remember?
16   THE WITNESS:  Not word for word, but I
17 do recall that I mentioned this before.
18   That was the point, right?  You said I
19 didn't, but I did.
20   Q.  Okay.  Do you remember Assistant United
21 States -- former United States Attorney James
22 Glasser?
23   A.  Yeah.
24   Q.  And do you remember being interviewed by
25 him at the Charles Street building?
```

1239

```
1    A.  Yes.
2    Q.  And was he in the presence of law
3  enforcement at that time?
4    A.  Truthfully, Tracy, I don't remember, but I
5  believe he was.
6    MS. DAYTON:  Okay, your Honor, the
7  government would just, once again, seek to admit the
8  entire Grand Jury testimony.
9    THE COURT:  I'LL take that up outside
10 the presence of the jury.
11   MS. DAYTON:  Thank you.
12   THE COURT:  Is there anything else from
13 this witness?
14   MS. DAYTON:  No, thank you.
15   THE COURT:  All right, Ms.
16 Bryant-Bulerin, you may go.  You are excused.
17   Please call your next witness.
18   MR. SHEEHAN:  Your Honor, before we do
19 that, could we approach?
20   THE COURT:
21   (Sidebar conference)
22   MR. SHEEHAN:  Your Honor, while this is
23 fresh, I believe that we are entitled to a
24 stipulation from the government that prior to the
25 meeting that she alleged with the government,
```

1240

```
1  Ms. Bryant had never told anybody in law enforcement
2  about Azikiwe Aquart.  And I believe that because
3  the problem we're in now, short of calling Attorney
4  Glasser, calling Ms. Dayton, calling all of the
5  agents on that point, I know that it didn't happen.
6    THE COURT:  What didn't happen?
7    MR. SHEEHAN:  She had never --
8    MS. DAYTON:  Could we do this outside
9  the presence of the jury?  Can we just move on to
10 the next witness?
11   MR. SHEEHAN:  The reason why I don't
12 want to move on to the next witness at this moment
13 is because I think it is appropriate that this be
14 established now when the memory is fresh in their
15 minds.
16   THE COURT:  Here is the problem.  I have
17 the benefit of a transcript in just a few minutes
18 and we can sort out what the problem seems to be.  I
19 don't think that anybody is required to enter into a
20 stipulation.
21   MR. SHEEHAN:  Well, I --
22   THE COURT:  So the question is if there
23 is a limiting instruction of some sort that you are
24 requesting, but for now it seems to me that the back
25 and forth about when she first met with law
```

1241

```
1   enforcement and when she first told anyone about the
2   defendant's brother being in 211 has been hashed out
3   as best counsel are going to be able to do.
4           MR. SHEEHAN:  The fact is with this
5   witness, your Honor, the jury is left with a
6   misapprehension, which under Brady should be
7   disclosed, and that misapprehension is that she may
8   have told the government prior to the meeting with
9   Ms. Dayton about this specific issue, about Azikiwe.
10  And the reason I raise that is because it was
11  announced to us as a new fact, that they had just
12  learned about this, and there are no reports, no
13  notes, nothing that references anything previously.
14  So, if the jury is going away with the apprehension
15  that, oh, she may have told that to law enforcement,
16  that would be -- that would be wrong and incorrect.
17          THE COURT:  Let me ask you whether or
18  not that issue is covered in the issue of whether
19  the police -- her police statement from August 27th
20  and her Grand Jury testimony should come in as a
21  full exhibit.  I'm going to address it in that
22  context.
23          MR. SMITH:  No, your Honor, because
24  those don't cover what she told either James Glasser
25  or law enforcement.  August 27th predates the
```

1242

```
1   meeting with --
2           THE COURT:  But you haven't -- I think
3   that you've got something of apples and oranges
4   going on here.  The question is when did she first
5   tell anybody that Azikiwe was there.  The other
6   question is when did she first meet with law
7   enforcement.
8           MR. SMITH:  Well, I think Mr. Sheehan's
9   point is taken is.  The government is trying to
10  suggest somehow she did tell law enforcement by
11  meeting with them.
12          THE COURT:  Suggestion is one thing, but
13  that's not really what the questions were.  The
14  questions weren't did you tell Glasser about
15  Azikiwe; it was did you meet with him at 215.
16          MR. SHEEHAN:  Your Honor, from the Grand
17  Jury -- that wasn't the issue.  We know from her
18  testimony both on direct and on cross, we know that
19  she met with law enforcement.  We've got the
20  statement in August.  We know that she met with law
21  enforcement before she met with the Grand Jury.
22  She's admitted that.  That's not an issue.  The real
23  issue is prior to two days ago she had never told
24  anybody about the story about Azikiwe.
25          MS. DAYTON:  So here --
```

1243

```
1           MR. SHEEHAN:  And that's why it's --
2           MS. DAYTON:  Can the government actually
3   say something here?
4           So, I came in and I told them that I met
5   Ms. Bryant for the first time on Monday night and I
6   interviewed her, and she told me this, and I came in
7   and said that.  There have been umpteen FBI agents
8   on this case, and, like, six different prosecutors.
9   There is no theory under which the government would
10  stipulate this was never said to anyone before.
11  There are reports, there are God knows again how
12  many reports.  I have spoken to Michael Syrax, once
13  he was an FBI agent on this case.
14          THE COURT:  I'm not going to direct any
15  stipulation.  Whether or not there is anything else
16  to be done, can be taken up.  But I'm not going to
17  direct any sort of stipulation on something --
18          MR. SHEEHAN:  My concern, your Honor, is
19  this:  I believe that the government -- that this
20  was new information to the government and I believe
21  that under Brady, as well as their ethical
22  obligations, they have obligation to inform the
23  tribunal of that fact and that the jury should not
24  be allowed to speculate on that set of
25  circumstances.
```

1244

```
1           THE COURT:  Okay, we'll take up your
2   argument.
3           (Sidebar concluded)
4           THE COURT:  And who are you?
5           THE WITNESS:  Your Honor, William
6   Simpson.
7           MR. SHEEHAN:  You are a quiet officer.
8           MS. DAYTON:  He snuck in.
9           THE COURT:  All right, would you please
10  stand up and be sworn.
11          W I L L I A M   S I M P S O N,
12  Having first affirmed, was examined and testified as
13  follows:
14          THE WITNESS:  William Simpson,
15  S-i-m-p-s-o-n, Milford, Connecticut.
16          THE COURT:  You may proceed.
17          MS. DAYTON:  Thank you.
18  DIRECT EXAMINATION
19  BY MS. DAYTON:
20  Q.   Good morning.
21  A.   Good morning.
22  Q.   What do you do for a living?
23  A.   I work for the Bridgeport Police
24  Department.
25  Q.   How long have you been a police officer?
```

**GA311**

1245

```
1    A.    Eleven years.
2    Q.    What did you do before that?
3    A.    I have been in the United States Army
4  reserves for 18 years.
5    Q.    And were you deployed prior to?
6    A.    Yes.
7    Q.    What is your assignment at the police
8  department?
9    A.    Currently I operate as a K-9 officer.
10   Q.    What --
11   A.    On midnights.
12   Q.    What does that mean?
13   A.    I have a canine that's utilized for
14 tracking and apprehension.
15   Q.    Tracking and apprehension of what?
16   A.    Humans, people.
17   Q.    And what unit are you assigned to?
18   A.    Currently I'm with the K-9.
19   Q.    It's its own unit?
20   A.    Yes.
21   Q.    Where were you assigned before that?
22   A.    About eight years ago I was with the
23 tactical narcotics team as an undercover officer.
24   Q.    And what is the tactical narcotics team?
25   A.    It's a team that specializes in
```

1246

```
1  street-level narcotics dealings and investigations.
2    Q.    In Bridgeport, Connecticut?
3    A.    In Bridgeport Connecticut, yes.
4    Q.    Does it go by TNT?
5    A.    TNT, yes.
6    Q.    How long were you with that group?
7    A.    Approximately 18 months.
8    Q.    Were you assigned to them in November of
9  2004?
10   A.    Yes.
11   Q.    And you say you were assigned as an
12 undercover officer?
13   A.    Yes.
14   Q.    If you'll forgive me, you don't look like
15 one.  Did you look different then?
16   A.    Yes.
17   Q.    What did you look like?
18   A.    Unclean, like unshaven.  Not dirty, but,
19 you know, the appearance would be not as of what I
20 am right now.
21   Q.    So, you didn't have buzzed hair?
22   A.    No.
23   Q.    And you weren't clean-shaven?
24   A.    I was not.
25   Q.    And I assume you were not wearing a police
```

1247

```
1  uniform.
2    A.    Correct.
3    Q.    Drawing your attention -- well, actually,
4  are you familiar with 215 Charles Street?
5    A.    Yes.
6    Q.    And how are you familiar with that
7  location?
8    A.    215 Charles Street was a known drug
9  location that was considered a --
10         MR. SHEEHAN:  I'm going to object to
11 anything further, your Honor.
12         THE COURT:  You asked if he was familiar
13 with it.
14   Q.    Did you go to that location on November 24,
15 2004?
16   A.    Yes.
17   Q.    What was your purpose for going there?
18   A.    I was sent in to buy narcotics.
19   Q.    Who did you go with?
20   A.    I went with the tactical narcotics team.
21   Q.    I'm going to show you a picture that's in
22 evidence as Government's Exhibit 102.  It should
23 come up on your little screen.  Or not.
24         Do you recognize what that is?
25   A.    Yes, that's 215 Charles.
```

1248

```
1    Q.    And is that the location you went to?
2    A.    Yes.
3    Q.    And you said you went with the tactical
4  narcotics team.  How many other people is that?
5    A.    The whole team could range between eight
6  and 10 people.
7    Q.    Do you recall some of the officers who were
8  with you on that particular day?
9    A.    Yes, Luis Batista was my ghost.
10   Q.    What does that mean, your ghost?
11   A.    Usually when you are operating undercover
12 you have a person that shadows you, stays back to
13 watch you, like physically keeps eyes on you, make
14 sure nothing happens to you.
15   Q.    And when you act as an undercover officer,
16 are you -- do you wear any sort of recording or
17 monitoring or any electronic --
18   A.    Yes, it's a KELdevice.
19   Q.    What's a KEL?
20   A.    It's not a recorder, it's a box that has a
21 wire so your ghost and the team that is stationed
22 around could hear everything that's going on.
23   Q.    So, it's like monitoring, basically?
24   A.    Yes.
25   Q.    When you went to 215 Charles Street, did
```

1249

```
1    you go inside the building?
2         A.   Yes.
3         Q.   How did you get inside?
4         A.   Through the basement.  That's like an
5    underground garage.
6         Q.   Okay.
7         A.   And it has a stairwell that leads up the
8    center?
9         Q.   You have to go in through a door from the
10   garage.
11        A.   Yes.
12        Q.   Was it locked?
13        A.   I don't believe so.
14        Q.   When you went inside, did you go by
15   yourself or with someone else?
16        A.   No, actually the whole team followed up
17   behind me.
18        Q.   And what location inside the building did
19   you go?
20        A.   It was apartment 211.
21        Q.   Where is that?
22        A.   On the second floor.
23        Q.   When you went to the door, was it closed?
24        A.   Yes.
25        Q.   And did you actually go to the door by
```

1250

```
1    yourself or did the whole team show up?
2         A.   This operation was a little bit different
3    from some --
4              MR. SHEEHAN:  Object.  It's
5    non-responsive.
6              THE COURT:  Did you actually go to the
7    door by yourself or did the whole team show up?
8              THE WITNESS:  Well, I knocked on the
9    door my myself.  The team was standing probably
10   about five feet behind me.
11        Q.   And is that usually where they stood?
12        A.   No.
13        Q.   Why was this different?
14        A.   Because the area was extremely dangerous,
15   is the only way I can explain it.
16        Q.   When you knocked on the door, did someone
17   answer?
18        A.   Yes.
19        Q.   Who answered?
20        A.   It was -- you have my report.  It was
21   Fleming, I believe.
22        Q.   Okay.  I'm going to show you a picture
23   that's in evidence as Government's Exhibit 223.  Do
24   you recognize this person?
25        A.   Yes.
```

1251

```
1         Q.   And how do you recognize him?
2         A.   That is Fleming.  He's the one who answered
3    the door.
4         Q.   And when he answered the door, what, if
5    anything, did you say to him?
6         A.   I asked him if he could hook me up.
7         Q.   What do you mean by that?
8         A.   Sell me narcotics.
9         Q.   What did Fleming say to you?
10        A.   He asked me to come inside.
11        Q.   Did you go inside?
12        A.   Yes.
13        Q.   And what happened when you stepped inside?
14        A.   He asked me again what I wanted and I asked
15   him -- I believe the term at the time was slabs, two
16   dimes.
17        Q.   What does that mean, slabs and dimes?
18        A.   Slabs is street terminology for crack
19   cocaine.
20        Q.   And what are dimes?
21        A.   Two $10 bags.
22        Q.   And when you told him you wanted slabs and
23   dimes, or two dime slabs, I presume, what did he
24   say?
25        A.   He said okay.
```

1252

```
1         Q.   And what happened next?
2         A.   He went to close the door and kind of brace
3    me in there, and I kind of said, "what are you
4    doing," and at that point that's when the team came
5    in.
6         Q.   Was the team supposed to come in right
7    then?
8         A.   Not usually, no.  They would let me -- you
9    know, they would let me secure the buy, but he was
10   trying to brace the door, so they came in.
11        Q.   For your safety?
12        A.   Yes.
13        Q.   After you requested the drugs -- after you
14   requested the drugs, did Mr. Fleming show you
15   anything or give you anything?
16        A.   Yeah, he had an -- it's like a key holder
17   that you would stick underneath your car with a
18   magnet that you could put a key in, that's where the
19   narcotics were located.
20        Q.   Where did he get the little box from?
21        A.   I believe it was his pocket.
22        Q.   And did you see him open it?
23        A.   I don't think he had a chance to open it as
24   I recall.
25        Q.   And what happened once the -- well, did you
```

**GA313**

1253

```
1   give him any money?
2       A.   I had the marked $20 bill.  I didn't get a
3   chance to complete the deal.
4       Q.   What is a marked $20 bill?
5       A.   They give me money and they photocopy the
6   money and they would mark it so they would have all
7   of the serial numbers.  So, when the buy is
8   completed and they end up making the arrest they
9   have -- well, I have the narcotics that I secured
10  and he has the marked bills.
11      Q.   Okay.  But did you actually give him the
12  money?
13      A.   I did not.
14      Q.   And he never had a chance to give you the
15  drugs.
16      A.   Correct.
17      Q.   So when the team came in the door, what
18  happened?
19      A.   I fled the room to act, "oh, my God, the
20  cops are here," and ran down the hall.
21      Q.   Did they arrest you?
22      A.   They did not.  I pretended to flee and get
23  away.
24      Q.   Did they arrest Mr. Fleming?
25      A.   Yes, they did.
```

1254

```
1       Q.   Have you been on any other raids at 211
2   Charles Street?
3       A.   Yes, there was a couple.  I had gotten
4   injured working undercover about six months into it,
5   so they put me on the regular TAC team because I had
6   gotten burnt.  So I was the ram guy.  So I believe I
7   rammed the door there.
8       Q.   What's that mean, you got burnt?
9       A.   I got made.  Everyone knew I was a cop at
10  that point so I couldn't work undercover anymore.
11      Q.   So, you dealt with the ram?
12      A.   Yes.
13      Q.   And what's a ram?
14      A.   The ram is the breaching tool that we use
15  to get through doors.
16      Q.   When they're locked?
17      A.   Yes.
18      Q.   Okay.  Thank you.
19           MS. DAYTON:  I have nothing further at
20  this time, your Honor.
21           THE COURT:  All right,
22  cross-examination?
23  CROSS-EXAMINATION
24  BY MR. SHEEHAN:
25      Q.   Good morning, officer Simpson.
```

1255

```
1       A.   Good morning.
2       Q.   On that November purchase, you indicated
3   that you knocked on the door and Mr. Fleming came to
4   the door.
5       A.   Yes.
6       Q.   And he asked you what's up.
7       A.   Yes.
8       Q.   And then he -- you asked, you needed slabs
9   and two dimes.
10      A.   Well, I asked him if he could hook me up
11  first.
12      Q.   Right.
13      A.   The terminology is always changing, so I'm
14  sure it's different now, but --
15      Q.   All right.  And you went in the apartment
16  and left the door slightly ajar, right?
17      A.   Yes.
18      Q.   And then you again repeated what you
19  wanted.
20      A.   Yes.
21      Q.   And then Mr. Fleming took out a little
22  black case.
23      A.   Yes.
24      Q.   And that had two little baggies in it.
25      A.   I believe.  I didn't secure the evidence,
```

1256

```
1   sir.
2       Q.   Okay.  But in your report you describe two
3   little baggies, right?
4       A.   Okay.
5       Q.   Did you?
6       A.   Yes.
7       Q.   Okay.  And then in your report you said you
8   went to hand him the $20 and that's the point when
9   Officer Batista came in?
10      A.   Yes.
11      Q.   You didn't say anything in your report
12  about him trying to brace the door or anything like
13  that.
14      A.   I have an answer for me.  If you let me, I
15  have --
16      Q.   Well, why don't you answer my question
17  first.
18      A.   Okay.
19      Q.   And see if I'm reading your report
20  correctly.
21      A.   Okay.  Yeah.
22      Q.   My question is, you didn't say anything
23  about him bracing the door in your report, did you?
24      A.   No.
25      Q.   Okay.  Now, when you got there, on both
```

1257

1 occasions that you talked about, did you have to
2 break down any of the exterior doors?
3     A.   The second time.
4     Q.   Meaning the door to 211.  Right?
5     A.   I'm sorry, I didn't understand the
6 question.  You mean entering?
7     Q.   My question wasn't very good.
8         I meant you got into the building, I take
9 it, on both occasions.
10     A.   Yes.
11     Q.   Without having to break down any doors,
12 correct?  Right?
13     A.   Correct.
14     Q.   Once you got into the building you were
15 able to get up basically right to the door of 211.
16 You had free access within the building.
17     A.   Yes, it's a common hallway.
18     Q.   So, there is no locked doors on the
19 stairway.  Once you get in the building you have
20 basically free run of the building, right?
21     A.   Yes.  I don't know if that's by design or
22 if that was just because the doors weren't locking
23 at the time.
24     Q.   Okay.
25     A.   But usually in an apartment like that you

1258

1 are supposed to gain access through like a code or
2 something, but for some reason we were able to just
3 get into 215.  And a lot of times, like at Sanford
4 Place, they'll rig the doors so people can just go
5 in.
6     Q.   Okay.
7     A.   But usually those are supposed to be
8 secured, especially with a common hallway.
9     Q.   But this building at the times that you
10 went in it was not secured, was it?
11     A.   Correct.
12         MR. SHEEHAN:  I have no further
13 questions.
14         THE COURT:  Anything further?
15 REDIRECT EXAMINATION
16 BY MS. DAYTON:
17     Q.   Mostly I'm just curious as to what your
18 answer was as to why you didn't put in your report
19 they tried to brace the door.
20     A.   Because at the time with the two-by-four,
21 it didn't really phase me at the time.  And then
22 when I got on the SWAT team, like five years ago,
23 and we practiced breaching and everything else --
24         MR. SHEEHAN:  I'm going to object, your
25 Honor, as to what his reflections are at this time.

1259

1 That's irrelevant.
2         MS. DAYTON:  Your Honor, he was asked
3 why he didn't put it in his report.
4         THE COURT:  I'm going to --
5         MR. SHEEHAN:  I didn't ask why he didn't
6 put it --
7         THE COURT:  I'm going to sustain the
8 objection.
9         MS. DAYTON:  All right.  Nothing
10 further.
11         THE COURT:  Thank you, Officer.  You may
12 step down.  You are excused.
13         THE WITNESS:  Thank you.
14         THE COURT:  Please call your next
15 witness.
16         MS. DAYTON:  Your Honor, it's 11:00, do
17 you want to take a break?
18         THE COURT:  We'll go about ten minutes
19 more.
20         MR. SHEEHAN:  Your Honor, I think before
21 the next witness I have a motion.
22         THE COURT:  All right, we can take our
23 break after all.
24         (Jury exited the courtroom.)
25         MR. SHEEHAN:  Your Honor, I believe the

1260

1 government's next witness is Mr. Fleming.
2         THE COURT:  All right.  Is that right,
3 Mr. Fleming is next?
4         MS. RODRIGUEZ-COSS:  Yes, ma'am.
5         THE COURT:  So I have the defendant's
6 motion in limine, I have the government's response.
7         MR. SHEEHAN:  There was a response?
8         THE COURT:  Pardon?
9         MS. RODRIGUEZ-COSS:  It should have been
10 e-mailed to you this morning.
11         MR. SHEEHAN:  I have not been back to my
12 office to get the response.
13         THE COURT:  All right, why don't I give
14 you a copy.  We'll take a five-minute recess and
15 then I'll hear you.  Okay.
16         MR. SHEEHAN:  Thank you, your Honor.
17         (Recess)
18         THE COURT:  All right, Counsel, we have
19 the issue before us as to whether or not the letter
20 which Venro Fleming has just given to the government
21 from the defendant should be -- which reference
22 defense investigator's questioning of Mr. Fleming
23 should be precluded, as well as the portions of that
24 letter referencing statements claimed to have been
25 made to the defendant by the defense investigator or

1261

1 which otherwise exposed to the jury the theories or
2 strategies of the defense team.
3          MS. RODRIGUEZ-COSS:  Your Honor, I'm
4 sorry, I don't believe there are any statements by
5 the investigator to the witness.  I think it's the
6 other way around.
7          THE COURT:  I'm just reading from the
8 motion.
9          All right, so Mr. Sheehan, precisely
10 what is it that you seek to have precluded from
11 Venro Fleming's testimony, which I gather will be
12 the next witness.
13          MR. SHEEHAN:  First of all, your Honor,
14 I'm seeking to preclude the government on their
15 direct from asking Mr. Fleming about what he told
16 the defense investigators.  I think that it would
17 be -- that's a hearsay statement.
18          THE COURT:  Let me just stop you there,
19 if I may.  Is it the government's intention to query
20 Mr. Fleming about what he told defense investigators
21 or simply relying on what is in Mr. Aquart's letter?
22          MS. RODRIGUEZ-COSS:  Our intention, your
23 Honor, was only to ask Mr. Fleming whether, as is
24 referenced in the letter, whether he actually met
25 with the defense investigator and whether he told

1262

1 that investigator anything different than what he
2 told the government.  That was all.  Those are the
3 only two questions we intended to ask.  Obviously
4 that may change on redirect, depending on what the
5 cross-examination is.
6          MR. SHEEHAN:  Well, your Honor, the
7 problem with that is what happens and what the
8 government is hoping happens is the following:  If
9 Mr. Fleming were to say I told the defense
10 investigator everything that I told the government,
11 then I take it what the government is then going to
12 say is where "I know how you told the truth."  So,
13 basically the defense investigator is then becoming,
14 in essence, a witness as to what exactly was told to
15 him.
16          I mean, they have enough material in
17 here in many respects to make the arguments that I
18 can reasonably anticipate are coming, but as far as
19 bringing in the defense investigator, then we have
20 Mr. Fleming saying, well, I told the defense
21 investigator everything that I told the government.
22          Whatever he told the government is also
23 irrelevant because it's only relevant as to what he
24 says here in court today, unless what he says to the
25 government is in some way impeached.  So I think --

1263

1          THE COURT:  So if all the government is
2 asking, though, is whether he told the defense
3 investigator anything different than what he told
4 the government's investigator, how do you get to
5 that?
6          MR. SHEEHAN:  I think I get to that by
7 making what to me, which is an extremely logical,
8 completely powerful leap or a connection between
9 him -- first of all, A, it's irrelevant what he said
10 to either one of us.  So on that basis I would
11 object to it.  B, it's irrelevant.  It's hearsay as
12 to what he said to either one of us.  I would object
13 to that on that basis.  As to whether or not he even
14 had a conversation, that's irrelevant, with the
15 defense investigators.  And then we're getting into
16 a battle as to whether or not he said exactly the
17 same thing to the defense investigators.
18          But more importantly, what they're really
19 trying to do here is bring in and link that up to "I
20 know how good you did with the investigator and how
21 you told the truth."  So then I'm in the position of
22 basically putting the entire defense strategy at
23 issue and it adds nothing except --
24          THE COURT:  That's the leap I'm not
25 quite understanding.

1264

1          MR. SHEEHAN:  Well, respectfully, your
2 Honor, I think someone looking at this letter would
3 very likely infer that by -- essentially what
4 Mr. Aquart is doing in this letter is adopting as
5 truth what he was told by the defense investigator.
6 He wasn't told anything by the defense investigator,
7 he was told by counsel.
8          Now, then I'm in the loop as to saying
9 what I said to Mr. Aquart and I'm being
10 cross-examined or Mr. Smith or both of us, and there
11 you've got a new case because I can't be a witness
12 in this case nor can Mr. Smith.  And what does it
13 really add to this letter?  It adds that level of
14 confusion.  I mean, I think in this letter it is
15 quite clear what Mr. Aquart appears to be -- is
16 saying here, and I'm not taking out any substantive
17 parts.  What I am taking out is the parts where he
18 references our involvement because if he does that,
19 then we're in the soup.
20          THE COURT:  So --
21          MR. SHEEHAN:  Or out of the soup.
22          THE COURT:  In other words, there is no
23 problem with a question that he met with defense
24 investigators and he met with government
25 investigators.  It's the next step that you have a

**GA316**

1265

```
1   problem with, and that is whether he told each
2   anything different than he told the other.
3              MR. SHEEHAN:  Well, the first is only
4   relevant with respect -- in tandem, your Honor.  I
5   mean, if they're basically -- I anticipate the
6   following:  And here is where -- the road we're
7   walking down.  Well, gee, Mr. Fleming, when was it
8   that you met with the defense?  Oh, I see.  And
9   wasn't it shortly thereafter that you happened to
10  get this letter?  Oh, what a coincidence, I'm just
11  stunned.  And then from there we're off to the
12  races.
13             THE COURT:  Why are we off to the races?
14             MR. SHEEHAN:  Well, I'm off to the races
15  because at that moment in time suddenly my ability
16  to represent Mr. Aquart is just lost.
17             THE COURT:  At least what occurs to me
18  when I read the letter, which is what I thought this
19  motion in limine was about, is your concern that the
20  jury would misunderstand -- the only time the
21  lawyers are mentioned is "my lawyer gave us all the
22  paperwork."  And it seemed to me that it would be
23  entirely appropriate for me to charge the jury that
24  you have a constitutional obligation to do that,
25  that any lawyer has a constitutional obligation to
```

1266

```
1   share all paperwork about a case with his or her
2   client and that failure to do that could result in a
3   violation of a defendant's constitutional right to
4   representation.  And that that elevation would
5   eliminate any negative inference.  And if you wished
6   I can add and, thus, there is no -- the
7   communications otherwise are confidential, but there
8   is no negative inference to be drawn.
9              MR. SHEEHAN:  Your Honor, I think
10  perhaps maybe my motion was not as clear as it could
11  have been.
12             THE COURT:  Well --
13             MR. SHEEHAN:  Or perhaps it's not -- I
14  am not seeking -- I think we're stuck with this.  As
15  far as the letter is concerned, my motion really
16  addresses the parts of that letter that I believe
17  implicate our involvement in the case.
18             THE COURT:  So, but you don't seek --
19  but I thought you were seeking to strike parts of
20  it.
21             MR. SHEEHAN:  Yes, I am.
22             THE COURT:  But --
23             MR. SHEEHAN:  But they're very small
24  parts of it.
25             THE COURT:  But --
```

1267

```
1              MR. SHEEHAN:  And there are parts --
2              THE COURT:  I don't understand why we
3   would strike the part that says -- actually my copy
4   is a little cut off on the edge, but I'm
5   interpreting --
6              MR. SHEEHAN:  I think it's all cut off
7   on the edge, and I guess we haven't gotten the
8   original yet, but I think we can pretty much deduce
9   what it says.
10             The first one I'm concerned about is "I
11  heard how good you did with the investigator."
12             THE COURT:  Is it "here" or "our"?
13             MR. SHEEHAN:  I think it's probably
14  "our," now that your Honor points out the O.  And
15  "how you told the truth."
16             THE COURT:  Yes.  What's wrong with
17  that?
18             MR. SHEEHAN:  Because clearly that
19  information is getting to Mr. Aquart by the lawyers.
20  How else?
21             MS. RODRIGUEZ-COSS:  So?
22             THE COURT:  But I don't understand.
23             MR. SHEEHAN:  So, now we, the lawyers,
24  are now privy with the truth.  And we, the lawyers,
25  are standing up as advocates for Mr. Aquart.  And
```

1268

```
1   being privy with the truth, we're cooking up these
2   various theories as to why Mr. Aquart should not be
3   convicted.  Mr. Aquart knows the truth and the
4   lawyers know the truth.  And your Honor can give as
5   many instructions that the lawyers have a
6   constitutional obligation, but I think if your Honor
7   says -- I think if the jury says, well, do you know
8   what, those lawyers knew the truth, and what they
9   were trying to do here was pull this whole bag of
10  wool over our head, that inures badly not -- I don't
11  care about -- it's not a matter of my reputation,
12  that's not the issue, it inures badly to my ability
13  to be an effective advocate for Mr. Aquart.  And
14  that's really what this says.  That communication --
15             THE COURT:  Is there any other portion
16  of this that you have a position on?
17             MR. SHEEHAN:  Well, I start with that
18  one.  And then the next one I have is "now that we
19  found you."
20             MS. RODRIGUEZ-COSS:  Can we take one at
21  a time, your Honor, or does the Court wish to --
22             THE COURT:  I want to see what the
23  universe is here.  "Now that we found you."  Got it.
24  I remember, yes.
25             MR. SHEEHAN:  And again, it's the "we
```

1269

1 found you" part that I am objecting to.  And then
2 the -- on the first page the other section is where
3 "my lawyer gave us all the paperwork."
4        THE COURT:  Yes, I addressed that.
5 Okay, go ahead.
6        MR. SHEEHAN:  And then on the last page,
7 the part where he says "I know you kind of already
8 said you were working for me and that you think you
9 took over Jackie's spot and Frankie and Vanessa took
10 over yours, don't worry about that.  You still did
11 good because it was to our guy who you said it to,
12 and he wants to keep you and all the rest of us out
13 of jail as long as he doesn't feel like we're
14 playing with him.  That's why it's better never to
15 tell anyone we spoke."
16        And then he says here, "you also admitted
17 to him," meaning the lawyer, I mean the
18 investigator, which then goes to the lawyer, "you
19 also admitted to him you were tired and partying a
20 lot back then and it was long ago."
21        Now, I take it the government is -- maybe
22 I shouldn't attribute my own thinking on this
23 because I've never been on that side, but it seems
24 to me the argument likely that a jury would look at
25 this and say, oh, okay, so here is this cook-up

1270

1 plan that's coming from the lawyers and the
2 investigator to basically get Mr. Fleming to recant
3 his story.  I know they're arguing this is a cook-up
4 plan that is coming from Mr. Aquart.
5        MS. RODRIGUEZ-COSS:  That's right.
6        MR. SHEEHAN:  That doesn't even need my
7 devious mind on it.  But I think they're also
8 arguing that I think a jury in looking at this is
9 very likely to infer that the lawyers are in on it.
10 And once that happens, your Honor, then I have to --
11 that puts it in an impossible situation.  My
12 investigator is really part of my team.
13        THE COURT:  He's not a lawyer.
14        MR. SHEEHAN:  He is not a lawyer, but he
15 has to operate under my supervision.
16        THE COURT:  It is not uncommon that
17 investigators are called to testify.
18        MR. SHEEHAN:  No, an investigator can be
19 called to testify.  That's very clear.  But when
20 what is going on is that the circuitry is going to
21 the client -- through the client, that's how we get
22 pulled into it.  And this adds to nothing, your
23 Honor, except prejudice.  Unfair, undue prejudice is
24 what is at issue here.
25        With these redactions that I've

1271

1 suggested -- I mean, it still has all of their
2 elements except that it is cured, to the extent it
3 matters, which I think that it does, I think it's
4 cured the inference that the jury may very well
5 draw, which is, well, the lawyers are in on all of
6 this.
7        THE COURT:  All right, now the
8 government's memorandum indicates that the purpose
9 of the letter is that the defendant was threatening
10 Fleming, that that's evidence of consciousness of
11 guilt, and that he is trying to coach Fleming.  He's
12 trying to get him to redact what he said; he's
13 trying to get him to put it on Bryant.
14        Any other purpose that the government
15 has?
16        MS. RODRIGUEZ-COSS:  Yes, ma'am.  I
17 think in addition to the several statements in the
18 letter, and very specifically one of the statements
19 that the defense is seeking to redact, the
20 parentheses "now that we found you," constitute
21 threats.  I think that the letter is full of
22 admissions.  The very statement the defense wants to
23 redact from the letter where he says that "I know
24 you spoke to our investigator and how you told the
25 truth," is an admission by the defendant that he

1272

1 was, in fact, dealing narcotics with Mr. Venro
2 Fleming.
3        When he says later on, another section
4 that Mr. Sheehan just referred to, where he says "I
5 know you already told my investigator that you are
6 working for me and that you took Jackie's spot and
7 Frankie and Vanessa took your spot," those are
8 admissions.
9        THE COURT:  I don't think those are
10 disputed, those are coming in.
11        MR. SHEEHAN:  No, I --
12        MS. RODRIGUEZ-COSS:  I thought he was --
13        THE COURT:  Those he was unhappy
14 about --
15        MR. SHEEHAN:  No, no, your Honor, I'm
16 sorry then.  The ones I'm objecting to, that is
17 included among the ones.
18        MS. RODRIGUEZ-COSS:  That's what I
19 thought.
20        MR. SHEEHAN:  Because that's the
21 particular one here where it says, "Don't worry
22 about that.  You all did good because it was to our
23 guy you said it and he wants to keep you and the
24 rest of us out of jail."
25        MS. RODRIGUEZ-COSS:  Right.

**GA318**

1273

```
1    THE COURT:  But not all the other
2    business about how to testify so as not to
3    constitute conspiracy?
4        MR. SHEEHAN:  No, no.  What can I say
5    except I'd like it to go away, but here it is.
6        MS. RODRIGUEZ-COSS:  So to complete our
7    position, your Honor, it constitutes -- they're
8    threats.  It constitutes obstruction of justice in
9    the sense that he is attempting to get a witness to
10   redact or retract from what he has already stated
11   and testified to, something that is not truthful.
12   It constitutes admissions on his part in the sense
13   that he is, throughout the letter, mentioning
14   individuals who have testified in this case,
15   individuals who will testify in this case, who the
16   government is alleging were co-conspirators of the
17   defendant.  He's acknowledging knowing them.  He's
18   acknowledging --
19       THE COURT:  I understand that.
20       MS. RODRIGUEZ-COSS:  All right.
21       THE COURT:  That's why the letter is
22   very damaging.
23       MS. RODRIGUEZ-COSS:  Right.
24       THE COURT:  But what I'm trying to
25   understand is why do you need the little parts the
```

1274

```
1    defendant's -- that defense counsel says implicates
2    them.
3        MS. RODRIGUEZ-COSS:  All right.  So
4    we'll go --
5        THE COURT:  So it's just --
6        MS. RODRIGUEZ-COSS:  We'll go
7    one-by-one.  "I heard how good you did with our
8    investigator and how you told the truth."  I think
9    we need that to establish that he is intending -- or
10   later on coaching the witness to say something that
11   he knows is not true because it's something
12   different than what the witness told his
13   investigator.  All right?  The government
14   understands.
15       THE COURT:  Wait a minute, because it's
16   different than what the witness told the
17   investigator.  Where do you get that?
18       MS. RODRIGUEZ-COSS:  Because he says
19   later on, I know you told my investigator -- let me
20   find the specific portion.
21       THE COURT:  You mean what he wants him
22   to tell.
23       MS. RODRIGUEZ-COSS:  Right, exactly.
24   What he wants the witness to testify to or to say to
25   law enforcement is different than what the witness
```

1275

```
1    said to the investigator, and he knows that.  He's
2    very conscious of that.
3        THE COURT:  Go to the next part.
4        MS. RODRIGUEZ-COSS:  All right.  Where
5    he says "man to man" -- this is still first
6    paragraph of the letter, and I will begin that
7    statement, your Honor, because I think it has to be
8    taken into context.  And really the sentence, the
9    prior sentence puts it in context.  He says "If you
10   cannot forgive me, I respect that also.  But I know
11   you are smart enough that even if it's to help
12   yourself for your own safety, you'll listen,
13   because, man to man, if I didn't try to warn you
14   about certain things you should know about (now that
15   we found you) I wouldn't be real."
16       THE COURT:  I understand.  That's the
17   threat.  Okay.
18       MS. RODRIGUEZ-COSS:  Very well.
19       THE COURT:  What's the next one?
20       MS. RODRIGUEZ-COSS:  Well, is the next
21   statement -- the one with the attorney papers, your
22   Honor, I agree completely with the Court.  I think
23   it is the professional responsibility, if not the
24   constitutional responsibility of defense counsel to
25   share --
```

1276

```
1        THE COURT:  Well it is, but why --
2        MS. RODRIGUEZ-COSS:  -- all information.
3        THE COURT:  Why is it necessary?  Why
4    run the risk of keeping that in there when it
5    doesn't necessarily add so much?
6        MS. RODRIGUEZ-COSS:  Well, how else
7    would -- how else would we establish that he knows
8    that the witness was interviewed and that he knows
9    what the witness said?
10       THE COURT:  Well, see, that's exactly
11   what Mr. Sheehan's problems is.  It could be the
12   investigator telling him that.
13       MS. RODRIGUEZ-COSS:  Well, all right,
14   your Honor, if the Court allows us to leave in the
15   portion where it says "I heard how good you did with
16   our investigator," then we would have no problem
17   with just striking the part that says my attorney
18   gave us the paperwork -- or "gave me the paperwork."
19       THE COURT:  Yes.  I mean it seems --
20       MS. RODRIGUEZ-COSS:  Right.
21       THE COURT:  -- excessive.  It takes away
22   any inference that it is other than an investigator,
23   and it means that our guy, or whatever it is, is
24   only referenced as the investigator, and it doesn't
25   implicate anything that the defendant's counsel
```

1277

```
1   provided to him that is in any way motivating his
2   attempting to, as the government characterizes it,
3   threaten, redact, coach, change testimony.
4           Doesn't that seem right, Mr. Sheehan?
5           MR. SHEEHAN:  No.
6           THE COURT:  It may not totally satisfy
7   you, but it seems --
8           MR. SHEEHAN:  I'm not even a smidge
9   satisfied with that, your Honor, because, in fact,
10  it totally lets the elephant into the room and the
11  only thing we have is the peanut sitting on the
12  outside.  I think that what the problem with that,
13  your Honor, is, that I don't think jurors leave
14  their common sense at the doorway.  We tell them not
15  to.  I think that jurors understand that
16  investigators talk to counsel.
17          THE COURT:  Let me ask you this:  If a
18  witness told your investigator that your client
19  admitted doing the murders.
20          MR. SHEEHAN:  Okay.
21          THE COURT:  Are you saying that that
22  witness couldn't be examined about what the
23  defendant said to him?
24          MR. SHEEHAN:  Which witness, your Honor?
25          THE COURT:  A witness.  A witness who is
```

1278

```
1   interviewed by your investigator.
2           MR. SHEEHAN:  Well, if that witness
3   told -- if that witness told my investigator that,
4   for example, let's say he said Mr. Aquart
5   admitted committing the crime.  Of course he could
6   be examined on that.  But he could not be examined
7   on, and it would be hearsay, well, did you tell that
8   to the defense investigators?  Now, if I went in and
9   I said to him, well, didn't you tell my defense
10  investigator that he didn't do that?  Well, that's
11  the impeachment situation.  But to put in a prior
12  consistent state -- just starting right off the bat
13  with a prior consistent statement, that's not
14  admissible.  Only it's admissible to rebut a
15  suggestion of recent fabrication.
16          THE COURT:  So --
17          MR. SHEEHAN:  They don't want this in
18  for that.  What they want this in for is the link
19  that Mr. Aquart, having heard this from his lawyers,
20  is acknowledging that that's the truth.
21          THE COURT:  Right.
22          MR. SHEEHAN:  Well, if Mr. Aquart --
23          THE COURT:  That's kind of significant,
24  isn't it?  What's wrong with that?
25          MR. SHEEHAN:  The problem is that --
```

1279

```
1   what's wrong with that is that it basically pulls
2   all of these people into the loop.  And what --
3   first of all, we don't know from this what he said
4   to the defense investigator and I -- and that's not
5   something that I'm offering.  And they can't get it.
6           MS. RODRIGUEZ-COSS:  Your Honor, it may
7   pull --
8           MR. SHEEHAN:  That's not admissible
9   evidence.
10          MS. RODRIGUEZ-COSS:  Your Honor, there
11  are two things here.  It may pull the defense
12  investigator into the loop.  It's certain not going
13  to pull Mr. Sheehan into the loop.  And if it pulls
14  the defense investigator into the loop, it is no
15  different of how Mr. Sheehan throughout
16  cross-examination in this case has pulled FBI agents
17  into the loop.
18          THE COURT:  It is different because he
19  represents the defendant.
20          MS. RODRIGUEZ-COSS:  Well, your Honor,
21  we beg to differ on that.
22          THE COURT:  Okay, we differ on that, but
23  I disagree on that.
24          MS. RODRIGUEZ-COSS:  The second point I
25  was going to make --
```

1280

```
1           THE COURT:  The question is --
2           MS. RODRIGUEZ-COSS:  Why is he on the
3   witness list for the defense then, your Honor?
4           MR. SHEEHAN:  Your Honor, the reason
5   he's on the witness list is because if we needed him
6   to prove up some impeachments, then we would offer
7   him.  The other reason he's on the witness list is
8   the same reason that the U.S. attorney's name is
9   mentioned, so that if people happen to know him, if
10  jurors happen to know him.  And our witness list is
11  not their witness list by any means.  We have no
12  obligation to provide a witness list, unlike the
13  government.  And when we put somebody on it, it's so
14  that the jurors know that if they happen to know Mr.
15  Udvardi, then they could indicate that.
16          MS. RODRIGUEZ-COSS:  Your Honor, we go
17  back to what we represented to the Court at the
18  beginning, it is not the intent of the government to
19  pull the defense investigator into this case.  I am
20  not going to stand here and ask Mr. Fleming, did you
21  tell the defense investigator this, did you tell the
22  defense investigator that.  I don't care what he
23  told the defense investigator.  What is stated in
24  the letter is an admission by the defendant, and now
25  the defendant cannot make an admission in writing --
```

1281

```
1    THE COURT: Okay, here is what I think I
2  will do. The admission part is what is important to
3  the government. If there is a minor redaction that
4  says "I heard how you told the truth. Thank you,
5  I'm grateful to you for that." You have got your
6  admission. We have got the admission to the defense
7  investigator out of there. The "now that we found
8  you" just remains ambiguous, and as does --
9    MS. RODRIGUEZ-COSS: I don't --
10   THE COURT: And it just remains. And
11 "our guy" is ambiguous.
12   MS. RODRIGUEZ-COSS: And, your Honor,
13 the letter is not ambiguous. The letter is very
14 clear and why should the government --
15   THE COURT: It's not any less clear.
16   MS. RODRIGUEZ-COSS: Yes, it is, the
17 Court just said that it is aim -- striking
18 "investigator" from the letter makes it ambiguous.
19 And so if I'm going to argue to this Court that the
20 defendant made a direct threat to this witness --
21   THE COURT: But you make your threat
22 without implicating the investigator. Why does the
23 threat not remain?
24   MS. RODRIGUEZ-COSS: So, "because now
25 that we found you," so how did they find him? Why
```

1282

```
1  should that remain ambiguous. Why should our case
2  in any respect and to any extent remain ambiguous
3  when we are in a position to prove it clearly? That
4  now, in order to resolve an alleged prejudice which,
5  we are alleging does not exist, now the Court is
6  intending on prejudicing the government's case. And
7  I submit to the Court, very respectfully, that's not
8  a solution.
9    THE COURT: Why is it that you don't
10 think that this is, in fact, more harmful to the
11 defendant as to who the "we" is? The others?
12   MS. RODRIGUEZ-COSS: It's not harmful
13 because he says who the "we" is. It's his
14 investigator.
15   THE COURT: You are not listening to
16 what I'm saying.
17   MS. DAYTON: Can we have one moment?
18   THE COURT: Yes. Were this not a death
19 penalty case I would conceivably be less
20 apprehensive about the credibility of the defense
21 counsel. But it is critically important, and I
22 cannot let there be anything that is going to
23 potentially tarnish their credibility, which is
24 conceivable here. And I think that the better
25 course, therefore, is -- is the course that gives
```

1283

```
1  the government everything they want from this
2  letter, all the evidence of admission, threat,
3  coaching, attempted retraction, with none of the
4  downside if we redacted in those two places and only
5  those two places. So, that's what we're going to
6  do.
7    MS. RODRIGUEZ-COSS: Very well, your
8  Honor.
9    THE COURT: Then are we ready for the
10 witness?
11   MS. RODRIGUEZ-COSS: Yes. Yes, ma'am.
12 Can we, just for the completeness of the record,
13 state that the government had no intent, and bears
14 no intent, nor did it ever, just from what is stated
15 in this letter, to argue as Mr. Sheehan has urged
16 the Court we may argue later. I don't believe this
17 letter -- in fact, I think the letter makes very
18 clear that this is something that the defendant is
19 undertaking on his own without the knowledge of his
20 investigator or his attorney, and it was never our
21 intent, and nor did we ever infer, that the defense
22 had any knowledge about this.
23   THE COURT: I take note of that. I
24 don't think defense counsel did, and the record
25 should be crystal clear on that. My concern is that
```

1284

```
1  which jurors speculate about it. And it's just way
2  too important to -- that's why we appoint two
3  counsel, it's the precautions that we take.
4    MS. RODRIGUEZ-COSS: So we are ready for
5  the witness, your Honor. However, we will need a
6  recess before I actually go into this document. So
7  we'll need a recess at some point before I actually
8  go into the subject matter. I think lunchtime may
9  be that recess because not only do we need to redact
10 the document, but we need to advise the witness not
11 to mention that he met with the investigator.
12   THE COURT: All right. But you have a
13 whole lot of other things to ask Mr. Fleming.
14   MS. RODRIGUEZ-COSS: Yes, I do
15 absolutely. I can absolutely start and I think
16 probably it may take us to lunch.
17   THE COURT: All right, very good. Thank
18 you very much.
19   (Jury entered the courtroom.)
20   THE COURT: All right, please be seated,
21 ladies and gentlemen.
22   All right, sir, if you will kindly stand.
23 Somebody has a bad back.
24   THE WITNESS: Yes.
25   THE COURT: And raise your right hand
```

1285

```
1   and Ms. Torday will swear you in.
2            V E N R O   F L E M I N G,
3   Having first affirmed, was examined and testified as
4   follows:
5            THE WITNESS:  Venro Fleming.
6            THE COURT:  Sir, all right, you've got
7   to pull the microphone towards you.
8            MS. RODRIGUEZ-COSS:  If it's easier,
9   Mr. Fleming, lay back in the chair and hold the
10  microphone.
11           May he be allowed to do that, your
12  Honor?
13           THE COURT:  Sure.
14           THE WITNESS:  Venro Fleming,
15  F-l-e-m-i-n-g, junior.
16           THE COURT:  Town of residence.
17           THE WITNESS:  Applewood, South Carolina.
18           THE COURT:  Is it easier for you if you
19  just hold the microphone in your hand and sit back
20  in the chair?
21           THE WITNESS:  It bothers me either way.
22           THE COURT:  All right, then could you
23  bother towards the mic.
24           THE WITNESS:  Okay.
25           MR. SHEEHAN:  Your Honor, perhaps
```

1286

```
1   Mr. Fleming would like us just to move the chair a
2   little forward for him.
3            THE COURT:  Let's do that.
4            Is that slightly better?
5            THE WITNESS:  That's a little better.
6            THE COURT:  Good, thank you.
7   DIRECT EXAMINATION
8   BY MS. RODRIGUEZ-COSS:
9     Q.   If after 15, 20 minutes you wish to stand
10  up and stretch your back just let us know.
11    A.   Okay, all right.
12    Q.   Mr. Fleming, could you tell the ladies and
13  gentlemen of the jury where you were born?
14    A.   South Carolina, Newberry (ph), South
15  Carolina.
16    Q.   And until when did you live there?
17    A.   Until 1966 we moved here.
18    Q.   Where did you move in 1966?
19    A.   To Bridgeport, Connecticut.
20    Q.   To Bridgeport Connecticut?
21    A.   Yes.
22    Q.   And where in Bridgeport did you go live?
23    A.   First it was Father Panik Village and then
24  PT Barnum.
25    Q.   And what sort of residential areas are
```

1287

```
1   those?
2     A.   Projects.
3     Q.   And did you attend school in Bridgeport?
4     A.   Yes.
5     Q.   What schools did you attend?
6     A.   Waltersville, Longfellow, Whittier,
7   Bassick.
8     Q.   And Bassick is a high school; is that
9   correct?
10    A.   Yes.
11    Q.   Did you complete high school?
12    A.   No.
13    Q.   Until when did you attend Bassick High
14  School?
15    A.   Ninth grade.
16    Q.   Until ninth grade?
17    A.   Yes.
18    Q.   Why did you leave?
19    A.   My reading wasn't that well and I had a
20  kid, so I quit.
21    Q.   And what did you do after you quit high
22  school?
23    A.   I worked at a car wash and factories.
24    Q.   Did you ever pursue any additional training
25  after high school?
```

1288

```
1     A.   Well, I studied at home for diesel
2   mechanic.
3     Q.   And are you, in fact, a mechanic?
4     A.   Yes, I work on cars as -- yes.
5     Q.   Is that how you earn your living now?
6     A.   I don't really work.  I'm on disability,
7   but I work on cars in between the time that my back
8   will let me.  Yes, that's how I make a living.
9     Q.   All right.  Mr. Fleming let me ask you,
10  sometime after you quit high school, did you begin
11  to use drugs?
12    A.   Not right away.  It was alcohol, weed, and
13  I think I was like 27, 28 when I got into drugs,
14  heavier drugs.
15    Q.   When you use the term "weed" what are you
16  referring to?
17    A.   Reefer, marijuana.
18    Q.   And when you use the term "drugs" to what
19  are you referring?
20    A.   Crack cocaine.
21    Q.   So, sometime in your late twenties you
22  started using crack cocaine?
23    A.   Yes.
24    Q.   All right.  And where would you buy that
25  crack cocaine?
```

1289

```
1    A.   Various places.
2    Q.   All right.  I want to bring your attention
3  to what has already been marked Government Exhibit
4  No. 102.  And it should be coming up there on that
5  monitor in front of you.  Could I ask you, could you
6  put on those glasses.  Thank you.
7         Do you recognize what is depicted in that
8  photograph?
9    A.   Yes, that's the building on Charles street.
10   Q.   Are you familiar with that building?
11   A.   Yes.
12   Q.   Can you tell the members of the jury how
13 you first became familiar with that building on
14 Charles Street?
15   A.   A young lady used to take me by there to
16 get drugs.
17   Q.   And --
18   A.   She would go get them for me.
19   Q.   Do you remember who that young lady was?
20   A.   Mary Wilson.
21   Q.   And how do you know Ms. Mary Wilson?
22   A.   We have a kid together.
23   Q.   Now, Mr. Fleming, I want to bring your
24 attention to what has been marked Government
25 Exhibit 225.
```

1290

```
1    A.   Yes, that's Mary Wilson.
2    Q.   All right.  And you said she would bring
3  you by there to get drugs.  Can you tell us how
4  exactly you would go about doing that?
5    A.   Well, she would walk upstairs and I would
6  wait outside.
7    Q.   Do you know where upstairs she was walking
8  to?
9    A.   Not at the beginning.
10   Q.   Did there come a time when you did become
11 aware of that?
12   A.   Yes.
13   Q.   And how so?
14   A.   I went up there myself with her.
15   Q.   And when you went up there yourself with
16 her, where did you go?
17   A.   To the second floor.
18   Q.   To the second floor.  Where on the second
19 floor, specifically?  What's on the second floor?
20   A.   Crack cocaine was on the second floor in
21 James Rucker's house -- apartment.
22   Q.   So, you went to an apartment on the second
23 floor.
24   A.   Right.
25   Q.   And you mentioned the names James Rucker.
```

1291

```
1  Who is Mr. James Rucker?
2    A.   He's the one person who owned the
3  apartment.
4    Q.   So bringing your attention to what has been
5  marked Government Exhibit No. 229, do you recognize
6  the individual in that photograph?
7    A.   Yes.
8    Q.   Who is that?
9    A.   James.
10   Q.   And you went to this apartment and you met
11 James.  And what did you do there?
12        Well, let me ask you first:  The first time
13 that you went there, Mr. Fleming, what did you see?
14 What did you observe?
15   A.   Well, I didn't really observe nothing
16 because I went in, got what I wanted, and I left.
17   Q.   Did there come a time where you actually
18 entered that apartment?
19   A.   So, a little while later I went there and
20 there was -- I would see the drugs, buy drugs from
21 there, and sometime I would sit there and get high
22 also.
23   Q.   And when you would sit there and get high,
24 where would you do that?
25   A.   Anywhere.  It's like the living room,
```

1292

```
1  kitchen.
2    Q.   And would you be the only person in that
3  apartment doing that?
4    A.   Not all the time.
5    Q.   How many other people would there be in
6  that apartment at any particular time?
7    A.   Maybe ten.
8    Q.   And what would those people be doing?
9    A.   Smoking.
10   Q.   And when you say "smoking," smoking what?
11   A.   Smoking crack cocaine.
12   Q.   Is that -- let me ask you something.  You
13 said you went there and you would buy crack cocaine.
14   A.   Yes.
15   Q.   And then get high.  Who would you buy that
16 crack cocaine from?
17   A.   At the time I didn't know the person's
18 name.
19   Q.   Can you tell me whether it was a man or a
20 woman?
21   A.   First it was a man and then it was a woman.
22   Q.   And do you remember the woman's name?
23   A.   Jackie.
24   Q.   Bringing your attention to what has been
25 marked Government Exhibit 214.  Do you recognize the
```

1293

```
1   person in that photograph?
2        A.   Yes.
3        Q.   Who is that?
4        A.   That's Jackie.
5        Q.   And how often did you buy crack cocaine
6   from her?
7        A.   Maybe three, four times a day.
8        Q.   Three, four times a day?
9        A.   Yes.
10       Q.   And what year are we talking about,
11  Mr. Fleming?
12       A.   I'm bad with years so -- 2004 or '3, one of
13  them.
14       Q.   And we'll go back to that in a little bit.
15            So, you would buy crack cocaine from her
16  three or four times a day, I think you said.
17       A.   Yes.
18            MR. SHEEHAN:  Objection.  Leading.
19            MS. RODRIGUEZ-COSS:  I'm just taking him
20  back.
21       A.   Yes.
22            THE COURT:  Overruled.
23       Q.   All right.  And these other individuals
24  that would also hang out around that apartment and
25  get high, were they also purchasing crack cocaine
```

1294

```
1   from Ms. Bryant -- I'm sorry -- from Jackie?
2            MR. SHEEHAN:  Objection, leading.
3            MS. RODRIGUEZ-COSS:  I'll rephrase.
4            THE COURT:  Overruled.  Go ahead,
5   rephrase.
6            MS. RODRIGUEZ-COSS:  Very well.
7        Q.   These other individuals you stated would
8   also be getting high in this apartment?
9        A.   Well, they wouldn't always be there and I
10  don't know if they would buy from there or not, but
11  sometimes I see them buy from them.
12       Q.   So, sometimes you would see other people
13  other than yourself --
14       A.   Yes.
15       Q.   -- purchase crack cocaine from Jackie?
16       A.   Yeah.
17       Q.   Now, where were you living when you were
18  going over to Charles Street to purchase crack
19  cocaine?
20       A.   I was living on Main Street.
21       Q.   You were living on Main Street.
22       A.   25-28 Main Street.
23       Q.   And until when did you live there?
24       A.   Until I moved in with James.
25       Q.   So there came a time where you actually
```

1295

```
1   moved in with James?
2        A.   We had to move out of the place because we
3   couldn't keep the bills up.
4        Q.   Who is "we"?
5        A.   Mary and myself.
6        Q.   So, were Mary and you a couple?
7        A.   At one time, yes.
8        Q.   And do you recall when it was that you and
9   Mary actually moved into apartment -- into James's
10  apartment?
11       A.   I think it was 2004.  '4 or '3.  One of
12  them.  It's been so long.  I couldn't really
13  remember.
14       Q.   Okay.  When you moved in with James, what
15  would you do?
16       A.   At first I would just sit there getting --
17  drinking and smoking crack cocaine.
18       Q.   And what was happening at that apartment?
19       A.   We was getting high in there.
20       Q.   And in addition to getting high, where were
21  the drugs that you were getting high from coming
22  from?  Where were you getting it?
23       A.   Pardon me?
24       Q.   Who were you buying it from?
25       A.   Jackie.
```

1296

```
1        Q.   Okay.
2        A.   At one time.
3        Q.   All right.  Now, you said that at first you
4   were just living there; is that correct?
5        A.   Yes.
6        Q.   And did Jackie also live there?
7            MR. SHEEHAN:  Objection, leading.
8        Q.   Where did Jackie live; if you know?
9        A.   She -- I don't think she was staying there.
10  Maybe she was.  I don't really know.
11       Q.   Let me ask you this, Mr. Fleming:  Until
12  when did Jackie continue to sell narcotics, if you
13  know, from James' apartment?
14       A.   I think it was 2004 when I was -- when I
15  moved in she wasn't selling there, and I don't know
16  who was selling when I moved in, but shortly after I
17  moved in, then I started selling crack cocaine
18  there.
19       Q.   You started selling it?
20       A.   Correct.
21       Q.   Why did Jackie stop selling; if you know?
22       A.   I really didn't know.
23       Q.   Did something happen to Jackie that caused
24  her to leave the apartment?
25            MR. SHEEHAN:  Objection, leading.  He
```

**GA324**

1297

```
1    said he didn't know.
2                  THE COURT:  No, it's a different
3    question.  Did something happen that caused Jackie
4    to leave the apartment.
5                  MR. SHEEHAN:  Your Honor, the first
6    question was did he know why she left and he said no
7    and then we now ask the same question again.
8                  THE COURT:  I'm going to overrule the
9    objection.
10       A.   What's the question again?
11       Q.   Did something happen to Jackie that caused
12   her to leave the apartment?
13       A.   Her leg got cut.  I guess that's why she
14   left.  I don't know, maybe she just left on her own.
15       Q.   All right.  Can you tell us about that,
16   though?  How do you know that her leg got cut?
17       A.   She told me about it.
18       Q.   Did you see her leg?
19       A.   Yeah.
20       Q.   Can you tell us what you observed?
21       A.   It was a cut on her knee, on her knee.
22       Q.   How do you know that?  You saw the leg.
23   How did that affect her?
24       A.   I had to help her go to the bathroom and
25   stuff.  I carried her.
```

1298

```
1        Q.   So, you used to have -- you carried her to
2    the bathroom; is that right?
3        A.   Yes.
4                  MR. SHEEHAN:  Objection, leading.
5                  MS. RODRIGUEZ-COSS:  Very well, your
6    Honor.  I am sorry.  I apologize.  We will withdraw
7    it.
8        Q.   Did she tell you who hit her?
9                  MR. SHEEHAN:  I'm going to object, your
10   Honor, assumes a fact not in evidence.
11                 THE COURT:  Sustained.
12       Q.   What, if anything, did Ms. -- what, if
13   anything, did Jackie tell you about how she got hurt
14   in the leg?
15       A.   She said D cut her on her leg.
16       Q.   Do you know who D is?
17       A.   Yes, right there.
18       Q.   Can you tell us, is D present in court
19   today?
20       A.   Yes.
21       Q.   Can you tell us where he's sitting and what
22   he's wearing?
23       A.   A blue shirt, tie.
24                 THE COURT:  Indicating Mr. Aquart, yes.
25       Q.   All right.
```

1299

```
1            After Jackie left, what did you begin to do?
2        A.   Well, a couple weeks --
3                  MR. SHEEHAN:  Your Honor, I'm going to
4    object.  I think -- I object to the form of the
5    question.  He's testified that she was not living
6    there anyway.  So I'm not sure what "after she
7    left," what timeframe that's referencing.
8                  MS. RODRIGUEZ-COSS:  I'll rephrase, your
9    Honor.
10       Q.   After the incident when you observed
11   Jackie's knee hurt, what did you begin to do?
12                 MR. SHEEHAN:  I object to that because I
13   think he's already said I think -- may we approach
14   on this, your Honor?
15                 THE COURT:  No, I'm going to -- the
16   question is:  After you saw Jackie's knee hurt, did
17   you begin to do something different than you had
18   done before?
19                 THE WITNESS:  No, ma'am.
20                 THE COURT:  Okay.  Next question.
21       Q.   Did there come a time when you had a
22   conversation with the defendant?
23       A.   A couple weeks later I guess I had a
24   conversation with him.  Yeah, I talked to him.
25       Q.   And what was the nature of that
```

1300

```
1    conversation?
2        A.   He asked me did I want to -- want to make
3    some money.
4        Q.   And what did you understand by that?
5        A.   Drugs, want to make some money selling
6    drugs.
7        Q.   And what did you tell him?
8        A.   I thought about it and I took the job.
9        Q.   Why did you take the job?
10       A.   Because I was broke.  I didn't have no job.
11       Q.   All right.
12       A.   And it was an easy way to get high.
13       Q.   And did you, in fact, begin to sell
14   narcotics for the defendant?
15       A.   Yes.
16       Q.   And where would you sell those narcotics?
17       A.   Out of the apartment.
18       Q.   James Rucker's apartment?
19       A.   Yes.
20       Q.   And how exactly is it that you would go
21   about doing that?  First of all, let me ask you, how
22   would you obtain those narcotics the first time that
23   you sold?
24       A.   Yes, he brung (sic) it to me.
25       Q.   What did he bring to you?
```

**GA325**

1301

```
1    A.    Crack cocaine.
2    Q.    And how did he bring that to you?
3    A.    In little bags in a big bag.
4    Q.    When you say little bags, can you be a
5  little more specific what you are referring to to
6  the jury, Mr. Fleming.
7    A.    They're like -- it's plastic, it's a bigger
8  bag with little plastic bags inside of them, about
9  as big as my fingernail.
10        MS. RODRIGUEZ-COSS:  For the record,
11 indicating about three-quarters of an inch.
12    Q.    Would that be correct, Mr. Fleming?
13    A.    Yes.
14    Q.    So, he would bring you little plastic bags
15 inside a bigger bag?
16    A.    Right.
17        MR. SHEEHAN:  Objection, leading.
18        THE COURT:  Sustained.
19    Q.    Those little plastics bags you just
20 described, where would they be contained?
21    A.    Sometimes they would be in various spots in
22 the building.
23    Q.    Okay, but let's go back first to what he
24 gave you.  How many of those little bags did he give
25 you?
```

1302

```
1    A.    Thirty-six.
2    Q.    And those 36 little baggies, would he give
3  them to you loose?  Do you need to stand up?
4    A.    I'm all right.
5    Q.    Would he give them to you, like, loose, or
6  where would they be --
7    A.    They would be inside another bag, a little
8  bigger bag, and 36 other bags would be inside that
9  bag.
10    Q.    And what would those 36 baggies contain?
11    A.    Crack cocaine.
12    Q.    And how do you know that it was crack
13 cocaine?
14    A.    Because I used to smoke it.
15    Q.    And so what were you supposed to get paid?
16    A.    $150.
17    Q.    And how would you be paid?
18    A.    Sometime I would sell the crack cocaine and
19 I would make the money off of it and that's how I
20 would get paid.  Sometime I would smoke the crack
21 cocaine.
22    Q.    All right.  And you stated earlier
23 something about other places in the building.  What
24 were you referring to?
25    A.    Various places and spots that he would put
```

1303

```
1  it, I mean stash that.
2    Q.    Let me bring your attention to --
3    A.    Like the doorway, the car, behind the
4  dumpsters, places like that.
5    Q.    Let me bring your attention to what has
6  been marked Government Exhibit 102A.  Do you
7  recognize what is depicted in that photograph?
8    A.    That's the staircase and the driveway, the
9  parking lot.
10    Q.    And can you see in that photograph some of
11 the places where you would find these packages of
12 crack cocaine stashed?
13    A.    Not -- they would be underneath the
14 driveway, the parking lot.
15    Q.    Underneath the driveway that's visible
16 there on the front of the photograph.
17    A.    Yes, right there.
18    Q.    Let me bring your attention to what has
19 been marked Government Exhibit 109.  Do you
20 recognize what is depicted in that photograph?
21    A.    That's the parking -- back parking lot of
22 the side of the building.
23    Q.    All right.  And do you see on that
24 photograph any other places where you would find
25 some of these packages of crack cocaine?
```

1304

```
1    A.    Sometimes the dumpster from the back in the
2  corner back there, it would be back there sometimes.
3  And there is a doorway on the end, it would be up in
4  the top of the doorway.
5    Q.    And when you mentioned that there is a
6  dumpster further back, you are saying at the end of
7  that alleyway that's visible there on the left-hand
8  side of that photograph.
9    A.    Yes.
10    Q.    All right.  And once you conducted the
11 sales, Mr. Fleming, who would you give that money to
12 that you made?
13    A.    Little Man, sometimes D.
14    Q.    Let me bring your attention to what has
15 been marked Government Exhibit 221.  Do you
16 recognize the individual in that photograph?
17    A.    Yes.
18    Q.    Who is that?
19    A.    Little Man.
20    Q.    Is that the person you referred as having
21 given money to from the sales of crack cocaine?
22        MR. SHEEHAN:  Objection, leading.
23    A.    Yes.
24        THE COURT:  Overruled.
25    Q.    And Mr. Fleming, let me ask you, when you
```

1305

```
1    were selling crack cocaine at James Rucker's
2    apartment, did you know him by any other names, by
3    the way?
4        A.   No.
5        Q.   You always called him James?
6        A.   Sometimes we call him Pops.
7        Q.   Sometimes you'd call him Pops?
8        A.   Yeah.
9        Q.   Did you know the defendant by any other
10   name other than D?
11       A.   No.
12       Q.   And who else in addition to yourself, if
13   anyone, would sell crack cocaine when you were
14   selling crack cocaine there?
15       A.   No one.
16       Q.   All right.  When you were selling crack
17   cocaine at that apartment, you were the only person
18   selling?
19       A.   Yes.
20       Q.   Did anyone help you?
21       A.   No.  Sometime I would have Hodges, Hodges
22   watch the door for me.
23       Q.   Sometimes you would have Hodges watch the
24   door for you?
25       A.   Yeah.
```

1306

```
1            MR. SHEEHAN:  Objection, leading and
2    repetitive.
3            THE COURT:  It is.  Sustained.
4            MS. RODRIGUEZ-COSS:  Yes, your Honor.
5        Q.   Now, bringing your attention to what has
6    been marked Government Exhibit 212, do you recognize
7    the person in that photograph?
8        A.   Yes.
9        Q.   Who is that?
10       A.   That's Hodges.
11       Q.   And did he live there with you?
12       A.   Sometime he stayed nights.
13       Q.   And where did you know Hodges from?  How
14   did you meet him?
15       A.   We grew up together out in PT Barnum.
16       Q.   And when was the last time that you had
17   seen him before you started selling drugs at James'
18   apartment?
19       A.   I don't remember.
20       Q.   You don't remember?
21       A.   It was a long time ago.
22       Q.   Would it be fair to say you hadn't seen him
23   since he was small?
24       A.   Yes.
25           MR. SHEEHAN:  Objection, leading.
```

1307

```
1            THE COURT:  Sustained.
2        A.   So --
3            THE COURT:  Sustained.
4        Q.   How old was Hodges, approximately, the last
5    time you saw him before you started selling
6    narcotics at James' apartment?
7        A.   Maybe six to eight.
8        Q.   And when Hodges would come to James'
9    apartment, who, if anyone else, would come with him?
10       A.   Pretty much just him.
11       Q.   Just him?
12       A.   Yes.
13       Q.   Did there come a time when he began to live
14   there?
15       A.   Maybe after I left.
16       Q.   Let me do this --
17       A.   Okay, he was there one night when I got
18   arrested, they raided the place.  He was there that
19   night when they raided the place when I was there.
20   So every now and then he would stay at night there.
21       Q.   I will go to that in one second.  Let me
22   first bring to your attention to what has been
23   marked Government Exhibit 213.
24           Do you recognize the person in that
25   photograph?
```

1308

```
1        A.   Yes.
2        Q.   Who is that?
3        A.   I can't remember her name, but I know the
4    face.
5        Q.   Okay.
6        A.   Oh, Vanessa.
7        Q.   Vanessa?
8        A.   Yes, I think that's her name, Vanessa.
9    Yes.
10       Q.   How about this person?
11       A.   That's me.
12       Q.   That's you?
13       A.   That's me, yes.
14       Q.   You were telling us or you mentioned
15   earlier that there was a raid on that apartment
16   while you were there.
17       A.   Yes.
18       Q.   Can you tell us what happened that day?
19       A.   Well, a guy came in and asked me for
20   something.  I sold it to him.
21       Q.   Was he a known customer?
22       A.   No.
23       Q.   Had you seen him before?
24       A.   No.
25       Q.   Okay.  What did he ask you for?
```

1309

1    A.    Crack cocaine, did I have crack cocaine.

2    Q.    Yes.

3    A.    And then another guy came in, and later on

4    I found out he was the police.

5    Q.    Well, tell the members of the jury what

6    actually happened when that second person came to

7    the door.

8    A.    He said some kind of signal and a bunch of

9    cops came in in plain clothes, and I thought

10   somebody was trying to rob me, so I got to throwing

11   them.  So then a guy walked in with a suit on, I

12   stopped.

13   Q.    When you say a guy walked in with a suit

14   on.

15   A.    An officer.

16   Q.    With a police uniform on?

17   A.    Yes, with a police uniform on.

18   Q.    When you saw the person with the police

19   uniform, what did you do?

20   A.    I stopped fighting them.  Well, throwing

21   them around.

22   Q.    And the little baggies of crack cocaine

23   that you mentioned you would sell, where would you

24   keep them?

25   A.    A little magnet box behind the

1310

1    refrigerator.

2    Q.    And did you go get -- and so explain to me

3    the process.  Customers come in the --

4    A.    I reached behind it when he asked me did I

5    have anything.  I reached behind, and he kept asking

6    me and asking me, and I was half asleep, so I just

7    reached back there and pulled it out, and that's

8    when they all came in.

9    Q.    And do you recall when that was that you

10   got -- let me ask you this:  Were you arrested?

11   A.    Yes.

12   Q.    Okay.  Do you recall when you were

13   arrested?

14   A.    I'm bad at this stuff, it's been so long

15   ago.

16   Q.    Let me do this.  Let me bring your

17   attention to what has been marked Government

18   Exhibit 255.  Take a look at that document tell me

19   whether you recognize that.

20   A.    Yes.

21   Q.    And how is it that you recognize that?

22   A.    This is the police report.

23   Q.    Do you see a signature on that document?

24   A.    Yes.

25   Q.    And do you recognize the signature?

1311

1    A.    It's mine.

2    Q.    That's your signature on that document?

3    A.    Yes.

4          MS. RODRIGUEZ-COSS:  Submitting

5    Government Exhibit 255, your Honor.

6          MR. SHEEHAN:  No objection.

7          THE COURT:  Full exhibit.

8    Q.    When you were arrested, did the police

9    advise you of your rights?

10   A.    Yes.

11   Q.    Bringing your attention then on the monitor

12   there in front of you to what has been marked

13   Government Exhibit 255.  Is that your signature

14   there at the bottom of that document?

15   A.    Yes.  Yes.

16   Q.    And to the right-hand side, there,

17   Mr. Fleming, is the date and time?

18   A.    11/22/04.

19   Q.    Is that 11/22?

20   A.    11/ -- 11/24.

21   Q.    11/24/04?

22   A.    '04.  3:31 p.m.

23   Q.    All right.  And did they advise you of your

24   rights the day, the same day you were arrested?

25   A.    Well, not at the house, but once I got to

1312

1    the jailhouse they read me my rights.

2    Q.    So, is this what that is?  Is that a notice

3    of rights?

4    A.    Yes.

5    Q.    All right.  Now, so you were arrested on

6    November 24, 2004.  What happened after your arrest?

7    A.    I was going to court and I put myself in a

8    program so -- because they was talking about giving

9    me 20 years.  Then they put me on probation and I --

10   that's when I left that area.

11   Q.    So, let's take it a piece at a time.  Once

12   you were arrested you were brought to court.  How

13   long did you stay in court that time?  How many

14   days?

15   A.    I think it was a couple of months.

16   Q.    You think it was a couple of months you

17   stayed in jail?

18   A.    No, go back and forth to court.

19   Q.    Oh, okay.  Going back and forth to court.

20   But I guess what I'm --

21   A.    I stayed in jail for, like, three days.

22   Q.    All right.  I guess that's perhaps what I

23   should have said.  Did you make bail?

24   A.    Well, somebody bond me out.

25   Q.    Someone bonded you out?

1313

1    A.   Yeah.

2    Q.   Who bonded you out?

3    A.   Some girl, and D was in the car.  I don't

4  know exactly who bond me out.

5    Q.   So, you don't know the person who bonded

6  you out?

7        MR. SHEEHAN:  Objection, leading.

8    A.   No.

9        THE COURT:  Sustained.

10   Q.   Did you know the person who bonded you out?

11   A.   No.

12   Q.   And when you came out of the courthouse

13 after you were bonded out, where did you go?

14   A.   I went back to James' apartment.

15   Q.   And how did you get there?

16   A.   Well, D and the young lady took me over

17 there.

18   Q.   So, the defendant picked you up in his car?

19       MR. SHEEHAN:  Objection, leading.

20   A.   I don't know if it's his car or the young

21 lady's car.

22       THE COURT:  Excuse me just one moment.

23 Sustained.  Would you please rephrase your question.

24       MS. RODRIGUEZ-COSS:  Yes, ma'am.

25   Q.   How did the defendant bring you back to

1314

1  James' apartment?

2    A.   It could have been his car or the young

3  lady's car, I don't remember whose car it was

4  because I just got in because I was so glad to get

5  out of jail.  I don't remember whose car.  Nobody

6  told me.

7    Q.   Do you remember the car?

8    A.   It was blue or either black.  I don't

9  remember exactly the name of the car.

10   Q.   And when you went back into James'

11 apartment, what did you do?

12   A.   I had Thanksgiving.  I ate Thanksgiving

13 dinner.

14   Q.   Okay.  Did you continue to sell narcotics

15 after you were arrested?

16   A.   Oh, a couple -- maybe a couple -- maybe a

17 month or something after that, and then I left the

18 whole scene.

19   Q.   Okay.  And when you said you left the whole

20 scene, what do you mean?

21   A.   I was out of -- off of Main Street.  I was

22 living with my brother.

23   Q.   Okay.

24   A.   And I left all the drugs and everything

25 alone because --

1315

1    Q.   Why did you do that?

2    A.   Because I didn't want to go to jail and

3  violate my probation.

4    Q.   All right.  And where did you go live?

5    A.   I went to my brother, live with my brother.

6  While I was on probation I lived with my brother.

7  And then after my probation was over, I went to

8  Waterbury to live with my son.

9    Q.   Let me ask you something before we move on.

10       When you were selling at James' apartment,

11 the packages that you got from the defendant, how

12 many packages, approximately, would you sell in a

13 day?

14   A.   Maybe three to four.

15   Q.   Maybe three to four?

16   A.   Yes.

17   Q.   And how would you -- would you have three

18 or four packages with you while you were selling?

19   A.   No.

20   Q.   How did that work?

21   A.   Well, I would call and say I'm getting low

22 and they would tell me where to go to get the stuff.

23 Like I said, in the parking lot or a door or the

24 dumpster behind the building.

25   Q.   And what phone would you use to call?

1316

1    A.   It was a phone someone gave, one of them

2  gave me.

3    Q.   When you say "it was a phone one of them

4  gave me," who are you referring to?

5    A.   Little Man or D gave it to me.  I don't

6  remember exactly which one.

7    Q.   And who were some of the customers that you

8  remember, crack customers that you had when you were

9  selling at James' apartment?

10   A.   Well, the people I really didn't get to see

11 them or know them because I didn't want to get to

12 know anybody.

13   Q.   Okay.  Let me bring your attention to what

14 has been marked --

15       MS. RODRIGUEZ-COSS:  The Court's

16 indulgence.

17   Q.   Bring your attention to --

18   A.   That's Tina.

19   Q.   -- for the record, Government Exhibit 252.

20 You know this person as Tina?

21   A.   Yes.

22   Q.   How do you know Tina?

23   A.   From James' apartment.

24   Q.   Why would Tina be there?

25   A.   She would come in and smoke crack cocaine,

**GA329**

1317

```
1    play spades.
2        Q.    Play spades?
3        A.    Yes.
4        Q.    And did Tina live at 215 Charles Street?
5        A.    Every now and then she would spend the
6    night there.
7        Q.    But was that her residence?
8        A.    No.
9        Q.    Do you know where she lived?
10       A.    All I know, she was telling me in the
11   valley, wherever the valley is at.
12       Q.    You don't know where the valley is at?
13       A.    No.
14       Q.    And let me bring your attention to what has
15   been marked Government Exhibit 253.  Do you
16   recognize --
17       A.    That's Tippy.
18       Q.    And how do you know Tippy?
19       A.    The same.  The same, by the same way, by
20   him coming over and smoking crack cocaine, playing
21   spades.
22       Q.    Okay.  Bring your attention to what has
23   been marked Government Exhibit 254.  Do you
24   recognize the person in that photograph?
25       A.    That's Basil.
```

1318

```
1        Q.    And how do you know Basil?
2        A.    Well, he would come up and visit James
3    every now and then.
4        Q.    And where did Basil live?
5        A.    Downstairs.
6        Q.    Downstairs in the same building?
7        A.    Yes.
8        Q.    And did Tina -- did you know if Tina or
9    Tippy or Basil, did you know them ever to sell crack
10   cocaine themselves?
11       A.    No.
12       Q.    Did you know Basil to use crack cocaine?
13       A.    No, he didn't use crack cocaine.
14       Q.    Okay.  Did you know the defendant to use
15   crack cocaine?
16       A.    I never seen him use anything, any type of
17   drug.
18       Q.    Now, you mentioned that after your arrest
19   you went on probation and you left James' apartment,
20   went to live with your brother.
21       A.    And my son.  It was my son.
22       Q.    And later with your son.
23       A.    Right.
24       Q.    Did you ever go back to visit James?
25       A.    Yes, I went to visit James one day.
```

1319

```
1        Q.    You went to visit James one day?
2        A.    Yes.
3        Q.    What happened?  Let me ask you first,
4    before you tell me what happened, how long after you
5    had left did you go back to visit James?
6        A.    It had to be a couple of months before I
7    went back.
8        Q.    Okay.
9        A.    I just went back to visit him because me
10   and him was real close, and I was there for a while,
11   and I was drunk, and D came in, he went in the back
12   and talked to Pop, and he came out and he was
13   talking to me and he pushed me.  It felt like a
14   push, but after I seen people's work from the
15   medical files, he hit me.
16       Q.    Well, tell us first what you remember
17   happened.
18       A.    All I remember, he talking to me and he
19   pushed me.
20       Q.    He pushed you?
21       A.    Yeah.
22       Q.    When he pushed you, what did you do?
23       A.    I fell back, and I got back up and I asked
24   him why is he pushing me.
25       Q.    And what did he do?
```

1320

```
1        A.    He just stood there.
2        Q.    And what did you do?
3        A.    I asked him again why is he pushing me, and
4    I went back and I got up again.  Then I said, "I'm
5    tired of this.  I'm leaving."
6        Q.    Did he say anything to you before he
7    started pushing you?
8        A.    Something about I owe him some money or
9    something.  I said, "I don't owe you any money."
10       Q.    Did you owe him any money?
11       A.    Not to my knowledge, no.
12       Q.    Do you know why he thought you owed him
13   money?
14       A.    Something got -- some crack cocaine got
15   missing and I got -- Little Man and myself got
16   accused for it.  That's it.
17       Q.    All right.  And so and what happened after
18   you decided, you know, I don't want any part of this
19   and decided to leave the apartment, what did you do?
20       A.    I left and went to one of my friend, my
21   brother friend house.
22       Q.    Where is that?
23       A.    On Main Street also.  And he said, "What
24   happened to you?"  I said, "Nothing."  He took me --
25   I went to the bathroom, I seen my face, and then he
```

1321

1    called my brother and my brother took me to the
2    emergency room.
3        Q.   When you went into the bathroom and you saw
4    your face, what did you see -- what was your reaction?
5    What did you see?
6        A.   I was -- he hit me and I'm saying he pushed
7    me all the time.  I thought he was pushing me, but
8    he hitted (sic) me.
9        Q.   And why did you conclude that he hit you
10   when you looked at your face?
11       A.   For, I guess for no reason, I thought,
12   because I didn't owe him anything, so.
13       Q.   No, no, I mean you looked in your face in
14   the mirror and you said "he hit me."  Why did you
15   think he hit you after you looked at yourself in the
16   mirror?
17       A.   I guess because of the money.
18       Q.   What did you look like, tell us, your face?
19       A.   Oh, my face, it had a scar here and my lip
20   was all messed up.
21       Q.   All right.  And what did you do then?
22       A.   That's when my brother came.  He called my
23   brother and my brother asked me -- took me to the
24   emergency room, and from the emergency room he took
25   me to his house.

1322

1        Q.   Okay.
2        A.   And I stayed there and kept going to the
3    outpatient, to the program.
4        Q.   So, let's go back a little bit to the
5    emergency room.
6             What did you tell the people at the
7    emergency room had happened to you?
8        A.   I told them I was ashamed, because I took
9    up martial arts and I took up boxing, and it felt
10   like he pushed me, but I didn't know he had hit me,
11   and I was embarrassed and I told them I got jumped.
12       Q.   So, did you report the incident to the
13   police?
14       A.   No.
15       Q.   Why not?
16       A.   I just didn't want them in my business, and
17   I was tired of it.  I was through with it.  I just
18   wanted to be left alone.
19       Q.   Okay.
20            MS. RODRIGUEZ-COSS:  Well, your Honor,
21   at this time we would like to read into the record a
22   stipulation between the parties.
23            THE COURT:  All right.
24            MS. RODRIGUEZ-COSS:  Stipulation has
25   been marked Government Exhibit 249A.  And it reads:

1323

1    "It is hereby stipulated and agreed by and between
2    the United States of America, by Assistant United
3    States Attorney Tracy Dayton, and the defendant
4    Azibo Aquart, by his attorneys Michael Sheehan and
5    Justin Smith as follows:  If called to testify,
6    Ellen Burquist, a custodian of records for the St.
7    Vincent's Medical Center in Bridgeport, Connecticut
8    would state that Government Exhibit 249 is a fair
9    and accurate copy of medical records maintained in
10   the ordinary course of business by St. Vincent's
11   Medical Center for medical treatment provided to
12   Venro Fleming on February 5, 2005."
13            And it is signed by Ms. Dayton and the
14   defense counsel in this case, your Honor.  I'm
15   sorry.  "It is hereby stipulated and agreed that
16   Government Exhibit 249 and this stipulation are
17   admissible evidence."
18            THE COURT:  All right, 249A, 249 are
19   full exhibits.
20       Q.   Bringing your attention now, Mr. Fleming,
21   to what has been marked Government Exhibit 249, can
22   you tell us what your birthday is?
23       A.   9/8/53.
24       Q.   9/8/53.  So, how old were you when you went
25   to the hospital after the defendant hit you?

1324

1        A.   I think I was 50, 51.  I was 51.  Up there.
2        Q.   And you said you had an opportunity to
3    review the medical records --
4        A.   Yes.
5        Q.   -- that pertained to that visit to the
6    emergency room; is that correct?
7        A.   Yes.
8        Q.   Do you remember what they told you you had,
9    if anything?
10       A.   Not -- I can't remember.  It was so long
11   ago I don't remember.  I even forgot about this
12   happening as far as --
13       Q.   Let me bring the your attention to the
14   second page of Government Exhibit 249.
15       A.   Now, this is the time when I said he pushed
16   me and I didn't know all of this right here happened
17   because I didn't have no mirror to see it, and
18   that's when --
19       Q.   When you say you didn't know that all this
20   happened, what exactly are you referring to?
21       A.   The scar on my eye and my lip.
22       Q.   Okay.
23       A.   Busted.
24       Q.   So, the medical records note a swollen lip,
25   right?

1325

```
1    A.   Yes.

2    Q.   And a cut underneath your eye?

3    A.   Yes.

4    Q.   And bringing your attention to page 5 of

5  Government Exhibit 249, were X-rays taken of you

6  that day?

7    A.   I think so.  I don't remember, but I think

8  so.

9    Q.   And does that page indicate that there was

10 a fracture noted at the anterior wall of your right

11 maxillary sinus?

12         MR. SHEEHAN:  I'm going to object.  The

13 document speaks for itself.

14         THE COURT:  Do you want to read in the

15 document?

16         MS. RODRIGUEZ-COSS:  That's what I was

17 attempting to do.

18    Q.   Does page 5 not say there was a depressed

19 fracture noted at the anterior wall of right

20 maxillary sinus.  Do you recall that?

21    A.   Yes.

22    Q.   So, did you leave the hospital with

23 prescriptions?

24    A.   Yes.

25    Q.   Do you recall what they prescribed?
```

1326

```
1    A.   I think I had Percocet, oxycodone, and

2  some --

3    Q.   Did they also give you an antibiotic?

4    A.   Yes, that's what I was trying to say,

5  antibiotic.

6         MS. RODRIGUEZ-COSS:  The Court's

7  indulgence, your Honor?

8    Q.   Now, you said that you told the medical

9  personnel at the hospital that someone jumped you.

10 Was that true?

11    A.   No.

12         MS. RODRIGUEZ-COSS:  Your Honor, may I

13 approach?

14         THE COURT:  Yes.

15         (Sidebar conference.)

16         MS. RODRIGUEZ-COSS:  I would move to the

17 letter at this time.  I don't know if the Court

18 wants to take an early lunch today, recess.

19         MS. DAYTON:  That's for you.  I just

20 wanted to make sure you had it.

21         MR. SHEEHAN:  Oh, I do.

22         MS. DAYTON:  I think I took out more

23 than you said to.

24         MR. SHEEHAN:  Or that she said.

25         MS. DAYTON:  I think I overdid it.
```

1327

```
1         MS. RODRIGUEZ-COSS:  I don't remember,

2  so I just wanted to compare it.

3         THE COURT:  You over-redacted, do you

4  want to live with that or not?

5         MR. SHEEHAN:  I'm sorry?

6         THE COURT:  There are only two

7  statements that I had required to be redacted, were

8  the second and third line on the first page.

9         MS. RODRIGUEZ-COSS:  That is correct.

10         THE COURT:  Part of the line on the

11 ninth up from the bottom.  I think that was all.

12         MS. RODRIGUEZ-COSS:  Oh, okay.  Okay.

13         MS. DAYTON:  We'll live with the last

14 one, right.

15         MS. RODRIGUEZ-COSS:  Yeah, yeah.

16         MS. DAYTON:  We'll take out the third

17 one, too, because it was a reference to our guy

18 trying to keep us out of jail, and under your

19 Honor's theory we thought it might be assumed as

20 Mr. Sheehan, so we took it out.

21         THE COURT:  Thank you.  That makes

22 sense.

23         MS. DAYTON:  We're trying to be kind.

24         THE COURT:  No, one cannot be too

25 careful.
```

1328

```
1         MS. DAYTON:  That's what we're trying to

2  be.

3         THE COURT:  Are you going right into

4  that now?

5         MS. RODRIGUEZ-COSS:  That's what I have

6  left in his direct and so --

7         THE COURT:  So we'll take an early

8  lunch.

9         (Sidebar concluded)

10         Ladies and gentlemen, we'll take an

11 early lunch.  We'll be back at ten past one.  The

12 usual instructions.

13         (Jury exited the courtroom.)

14         THE COURT:  All right, Mr. Fleming,

15 we're going to take a half hour lunch break.  There

16 is one matter that you are permitted to speak to the

17 government about with respect to a letter that you

18 will be questioned about.  Okay.

19         THE WITNESS:  Yes, ma'am.

20         THE COURT:  Other than that, please

21 don't discuss your testimony with anyone.

22         THE WITNESS:  Yes, ma'am.

23         THE COURT:  Anything else before we

24 recess?

25         MS. DAYTON:  No, thank you, your Honor.
```

**GA332**

1329

```
1    THE COURT:  Thank you.
2    (Recess)
3    THE COURT:  Please be seated, Counsel.
4  Mr. Fleming, if you will take the stand.  And we'll
5  bring the jury in.
6    Before we bring the jury in, may I ask
7  the government's counsel, is there a need to
8  actually ask witnesses their full birth date?
9  Because we just have to redact that back from the
10 transcript.
11   MS. RODRIGUEZ-COSS:  The reason I asked
12 Mr. Fleming, I wanted to make sure that it
13 corresponded to the birthday on the medical records.
14 The answer is no, there is no need to ask that.
15   THE COURT:  It needs to be taken off any
16 of the publicly filed exhibits.
17   MS. RODRIGUEZ-COSS:  But that's --
18   THE COURT:  In any event --
19   MS. RODRIGUEZ-COSS:  That was one --
20 that's the reason I did it with Mr. Fleming, your
21 Honor.
22   THE COURT:  All right, please bring in
23 the jurors.
24   (Jury entered the courtroom)
25   THE COURT:  Please be seated, ladies and
```

1330

```
1  gentlemen.
2    Continued examination of Mr. Fleming by
3  Ms. Rodriguez.
4    MS. RODRIGUEZ-COSS:  Thank you, your
5  Honor.
6    Q.   Mr. Fleming, I want to bring your attention
7  to what has been marked Government's Exhibit 514.
8    MR. SHEEHAN:  Subject to my previous
9  comments, your Honor.
10   THE COURT:  Yes.
11   Q.   Mr. Fleming, can you please take a look at
12 this document and tell me if you recognize that?
13   A.   Yes.
14   Q.   And how is it that you recognize that?
15   A.   It's a letter been wrote to me two years
16 ago.
17   Q.   And how does that document come to be in
18 court today?
19   A.   I forgot about it.  I had it in --
20   Q.   Did you ask someone to send you that?
21   A.   My wife.
22   Q.   And did she do that?
23   A.   Yes.
24   MS. RODRIGUEZ-COSS:  Submitting
25 Government Exhibit 514, your Honor.
```

1331

```
1    THE COURT:  It's a full exhibit,
2  pursuant to our earlier ruling.
3    MS. RODRIGUEZ-COSS:  Yes, ma'am.  I
4  apologize for that, your Honor.
5    Q.   All right, bringing your attention, what we
6  can now see is Government Exhibit 514.  What are we
7  looking at here, Mr. Fleming?
8    A.   That's the envelope.
9    Q.   That's the envelope that you --
10   A.   That the letter came in.
11   Q.   Okay.  And who is the letter from?
12   A.   D. Foster.
13   Q.   And when you read D. Foster, when you
14 received this letter, who did you think D. Foster
15 was?
16   A.   At the time I didn't know until I started
17 reading the letter.
18   Q.   Okay.  And when you read the letter, who is
19 the letter from?
20   A.   From D.
21   Q.   The defendant in this case?
22   A.   Yes.
23   Q.   All right.  And the name here, we see that
24 the letter is addressed to?
25   A.   V. Fleming.
```

1332

```
1    Q.   Is that you?
2    A.   Yes.
3    Q.   And is that your address?
4    A.   Yes.
5    Q.   And down here, there is a stamp on the
6  upper right-hand corner that I'm showing you right
7  now.
8    A.   Yes.
9    Q.   What does that stamp say?
10   A.   Mailed from -- I can't pronounce that word.
11   Q.   Is that Wyatt, Wyatt Detention Facility?
12   A.   Yes.
13   Q.   Can you see that clear or do you need to
14 come closer to the screen?  If you need to come
15 closer to the screen, you let me know.
16   A.   I can see it.  Yes, that's what it is.
17   Q.   Now, let's go to the first page of this
18 letter.
19   You said you got it two years ago.  What's
20 the date on the letter?
21   A.   10/14/09.
22   Q.   And it says there at the top, "Dear Vee."
23 Who is Vee?
24   A.   That's me.
25   Q.   That's you?
```

1333

```
1    A.   That's for Venro.
2    Q.   And you could see there in the second line
3  it says "I heard how good you did and how you told
4  the truth.  Thank you."
5         Do you see that?
6    A.   Yes.
7    Q.   And then in the next paragraph --
8         MS. RODRIGUEZ-COSS:  The Court's
9  indulgence, your Honor.
10   Q.   In the next paragraph, it says "Something
11 you never got to know is that I have been put my
12 pride aside years ago with you and have been waiting
13 for the chance to try to make things right between
14 us.  I hope you don't take it the wrong way that all
15 of a sudden I'm telling you now.  I know you weren't
16 like everyone else and I shouldn't have treated you
17 that way."
18        What was D referring to there?
19        MR. SHEEHAN:  I'm going to object to
20 that, your Honor.
21   Q.   What did you understand --
22        MR. SHEEHAN:  Form of the question.
23   Q.   What did you understand that the defendant
24 was referring to there when he said "I shouldn't
25 have treated you that way"?
```

1334

```
1    A.   I guess like everyone else he treated.  I
2  don't know.
3    Q.   Okay.  When was the last time that you saw
4  the defendant before today?
5    A.   Never.  Not since the accident.
6    Q.   The what?
7    A.   Not since the accident when I went to the
8  hospital.
9    Q.   Okay.  Did you call it an accident?
10        MR. SHEEHAN:  I'm going to object, your
11 Honor.  I'm going to object to leading.  I'm going
12 to object to the continual repetition of questions.
13        THE COURT:  Okay, your objection is
14 sustained on leading.  It is not, however, otherwise
15 because it's too general.  You'll have to raise it
16 as you go along.
17        All right, you referred to not since the
18 accident when I went to the hospital.  And what is
19 the next question?
20   Q.   When you say "accident," what do you mean,
21 Mr. Fleming?
22   A.   Okay, like when I said he pushed me, now I
23 know that after the medical, it was an accident and
24 he hit me.  I thought he pushed me, that's what I
25 mean.
```

1335

```
1    Q.   Do you think that he pushed you by
2  accident?
3    A.   No.
4    Q.   And since that day -- and when is the next
5  time that you saw the defendant?
6    A.   Today.
7    Q.   Okay.  And then further down the defendant
8  writes "if you can forgive me" -- let me try to
9  point to where I'm reading.  "If you can forgive me,
10 and take in what I have to say in this letter, I
11 could not be more thankful.  If you cannot forgive
12 me, I respect that also.  But I know you're smart
13 enough that even if it's to help yourself for your
14 own safety, you'll listen.  Because man to man, if I
15 didn't try to warn you about certain things you
16 should know about (now that we found you) I wouldn't
17 be real."
18        What did you understand the defendant to
19 mean by those words, Mr. Fleming?
20   A.   At the beginning it was like apologizing to
21 me and then it seemed like all of a sudden now he
22 wants to threaten me and I don't know why.  And, yes
23 I forgive him.  That's what I said when I read the
24 letter.
25   Q.   When you read the letter and you read those
```

1336

```
1  words, you forgave him.
2    A.   Yes.
3    Q.   And in the next paragraph at the beginning
4  of the next paragraph the defendant writes, starting
5  with "I don't know."
6         "I don't know if you know or remember that
7  you don't have to talk to anybody about this stuff.
8  But if you choose to, you should be ready and know
9  that Jackie put you in it and she is somebody you
10 cannot make sound like someone should believe her or
11 take anything she says serious at all."
12        MR. SHEEHAN:  I'm going to object to the
13 way counsel is reading the letter.
14        THE COURT:  Just read it straight,
15 clearly, but just without any inflection, please.
16        MS. RODRIGUEZ-COSS:  Very well, your
17 Honor.  Yes, ma'am.
18        THE COURT:  Okay.
19   Q.   When the defendant says, makes a reference
20 to "Jackie," do you know who he's referring to?
21   A.   Yes, the Jackie who was just on the picture
22 up there.  Yes, that's Jackie.
23   Q.   Bringing your attention again to
24 Government's Exhibit 214.  That's the Jackie you
25 understand he was referring to?
```

**GA334**

1337

```
1    A.   Yes.
2    Q.   All right.  And when he says "you should
3  know Jackie put you in it," what did you understand
4  him to mean by that?  What did Jackie put you in?
5    A.   I guess what's going on right now.  I don't
6  know.  Like that's it, I guess what's going on right
7  now.
8    Q.   Did you understand that Jackie put you in
9  something?
10        MR. SHEEHAN:  Objection.  It's the same
11 question.
12        THE COURT:  He's answered the question.
13   Q.   Let me ask you, Mr. Fleming, the defendant
14 then in that same paragraph writes, "You can't act
15 like you know any of what I'm telling you."  And
16 then in very tiny letters here writes, "We never
17 spoke about any of this.  And I never contacted you
18 personally."
19        Did you ever contact or have any contact
20 with the defendant personally or otherwise?
21   A.   No.
22   Q.   Since the last time that you saw him, have
23 you had any contact with him personally or
24 otherwise?
25   A.   No.
```

1338

```
1    Q.   Later on in that same paragraph the
2  defendant writes --
3        MS. RODRIGUEZ-COSS:  I'm sorry, your
4  Honor.  I'm trying to find it in two places at the
5  same time.
6    Q.   Starting here, "She told the police you and
7  him was holding her hostage and would not let her
8  leave that time she thought they were raiding the
9  apartment, but was there for her and she claimed I
10 hit her" and this says, parentheses, "you told them
11 she came like that off the street from tricking or
12 whatever."
13        What is the defendant referring to in that
14 sentence, Mr. Fleming?
15        MR. SHEEHAN:  Objection to the form of
16 the question.
17   Q.   What do you understand the defendant is
18 referring to in that sentence?
19   A.   If you read that again.
20   Q.   Yes.  "She told the police you and him was
21 holding her hostage and would not let her leave that
22 time she thought they were raiding the apartment.
23 But was there for her and she claimed I hit her."
24 And then it says, parentheses, "you told them she
25 came like that off the street from tricking or
```

1339

```
1  whatever."
2    A.   Now, the part where -- she could leave when
3  she wanted to, nobody holding her hostage.
4    Q.   First tell me to what incident you
5  understood the defendant was referring to there in
6  that sentence?
7    A.   Well, but that sentence, that's when she
8  was telling me that she got cut, but I lied about
9  that because I was -- I wasn't saved.  Now I'm
10 saved, so I'm telling the truth so I won't have no
11 nothing on my mind going.
12   Q.   What did you lie about?
13   A.   And the part down here where she came from
14 the street like that.
15   Q.   Who did you say that to?
16   A.   The police.  The investigator.  The police.
17   Q.   When the police came to the apartment --
18   A.   The police came to the apartment.
19   Q.   -- you told them she had come how from the
20 street?
21   A.   Well, the way she was cut on her leg.
22   Q.   Okay.  And was that true?
23   A.   About the cut?
24   Q.   About the fact that she had come like that
25 from the street --
```

1340

```
1    A.   No.
2    Q.   -- was that true?
3    A.   No.
4    Q.   Why did you lie to the police?
5    A.   I was scared and I didn't want to get my
6  probation revoked, and that's why I said it.  And I
7  didn't want to be questioned anymore about it.
8    Q.   All right.  Okay.  And later on in that
9  same paragraph the defendant writes "She got me tied
10 up with everybody from over there and some other
11 people I don't even know, like that, and are trying
12 to give us the death penalty because Jackie told the
13 feds that Basil's apartment on the first floor was
14 really Tina's apartment and her and Tippy was big
15 time drug dealers and she started working for them
16 and Pops' house didn't like it and that's why they
17 die."
18        When you read that part of the letter, did
19 you know what the defendant was talking about?
20   A.   No, at that time I wasn't there.
21   Q.   Okay.
22   A.   I was in Waterbury at that time.
23   Q.   When did you find out that Tina and Tippy
24 and Basil had been killed?
25   A.   Well, I had to go to the program and I had
```

1341

```
1   time to, like, hang out for a little while, so I
2   went by my brother Joe and he read the paper and
3   told me about it.  Other than that, I didn't know
4   anything about it.
5       Q.   And did you see Jackie after you left and
6   stopped selling drugs at James' apartment?  Did you
7   see Jackie again?
8       A.   I seen Jackie maybe six, eight months
9   later.
10      Q.   Where?
11      A.   On Fairfield Avenue.
12      Q.   Did you talk for long?
13      A.   Briefly.
14      Q.   And other than that, have you maintained
15  contact with her?
16      A.   No, I haven't seen her until today when she
17  passed by.
18      Q.   She passed by today leaving the courtroom.
19      A.   Yes, that's when I see her.
20      Q.   Now, bringing your attention to the top of
21  the second page of that letter, where it says
22  "Blackie is just a liar and she be so high half the
23  time she don't even remember her own name.  I don't
24  know what happened in there, but everybody knows the
25  story that is being told ain't true.  Tippy and Tina
```

1342

```
1   can't sell no drugs, not seriously, you know that.
2   You know how they get at that table."
3           Let me ask you first, what table, if you
4   know, is the defendant referring to?
5       A.   It's a table in the house, we sit there and
6   play spades.
7       Q.   And what else do you do at that table, or
8   did you do?
9       A.   And we sit there high off of crack cocaine.
10      Q.   And I believe I asked you this before, but
11  again, did you ever know Tina and Tippy to sell
12  drugs?
13           MR. SHEEHAN:  Objection, asked and
14  answered.
15      A.   No.
16           MR. SHEEHAN:  Objection.
17           MS. RODRIGUEZ-COSS:  I'll move on.
18           THE COURT:  I'm going to -- let's just
19  move on.
20           MS. RODRIGUEZ-COSS:  Yes, ma'am.
21      Q.   Now, at the beginning of the second
22  paragraph on page 2 of Government Exhibit 514, the
23  defendant writes "We was all going to trial before.
24  Now it's just me, my brother," parentheses, "who
25  ain't got shit to do with over there, and some other
```

1343

```
1   guys we don't even know from up there."
2           My question to you is, Mr. Fleming, did you
3   know the defendant's brother?
4       A.   No.
5       Q.   Did you ever meet him?
6       A.   No, not to my knowledge.
7       Q.   Did the defendant every introduce anyone to
8   you as his brother?
9       A.   Not to my knowledge, no.
10      Q.   And again, in that same paragraph,
11  mid-paragraph, the defendant writes "You be careful.
12  They're trying to give everybody who used to be
13  around the building" -- let me zoom out.  I'm trying
14  to zoom in so it's clearer, but -- "who used to be
15  around the building a bunch of time because the feds
16  is saying that we're a gang and everyone worked for
17  D and that it was only one D over there."
18           Did you ever know any other D at 215 Charles
19  Street?
20      A.   This young lady who used to come over there
21  they called her D.
22      Q.   What was her name?
23      A.   Her name was Doris.
24      Q.   What did she used to do when she came over
25  there?
```

1344

```
1       A.   Come in and smoke crack cocaine and play
2   cards.
3       Q.   Did you ever see her do anything else?
4       A.   Not to my knowledge, no.
5       Q.   So, if I were to ask you was there any
6   other person named D who sold drugs at 215 Charles
7   Street other than the defendant, what is your
8   answer?
9           MR. SHEEHAN:  Objection, form of the
10  question.
11          THE COURT:  Overruled.  Do you
12  understand the question?
13      A.   Well, he wasn't selling drugs there, I was
14  selling drugs there.  That's pretty much --
15      Q.   Did you ever see the defendant sell drugs
16  himself at James'?
17      A.   No.
18      Q.   James' apartment?
19      A.   No.
20      Q.   But the drugs that you sold, where did they
21  come from?
22      A.   Well, different people would call on the
23  phone and tell me where to go get the stuff at.
24      Q.   Who asked you to sell drugs at James'
25  apartment?
```

**GA336**

1345

1    A.   At the beginning?
2    Q.   Uh-huh (indicating affirmatively).
3    A.   D asked me did I want to make some money.
4    Q.   Okay.
5    A.   That's about it.
6    Q.   What did you understand by that?
7    A.   I'll sell drugs.
8    Q.   And who did you understand was -- or what
9  did you understand was his position in that whole
10 operation going on there in James' apartment?
11   A.   He just bringing drugs, tell me where they
12 at, and I go pick them up.  One of the other fellows
13 was telling me, I don't know who it was, I was
14 talking to on the phone, I just go get wherever they
15 say the stuff was at.
16   Q.   And who owned those drugs?  Who did they
17 belong to?  Let me ask you this:  Who did you give
18 the money to?
19   A.   Little Man and D.
20   Q.   Okay.  And was there anyone else named D
21 that you would give money to --
22   A.   No.
23   Q.   -- for drugs that you sold?
24   A.   No.
25   Q.   Later on in that same paragraph up here,

1346

1  defendant writes "The only way out of this is to
2  prove we are not a gang and no one worked for me."
3  Parentheses "anybody else, but me."  And there is a
4  symbol there indicating sort of a sad face.  "They
5  just come and went and did their own thing.
6  Everyone did their own thing."
7        What did you understand the defendant was
8  trying to tell you in that sentence?
9    A.   Pretty much he was telling me the -- kind
10 of like telling me what to say.
11   Q.   Telling you what to say to whom?
12   A.   The people who I'm talking to.  You, I
13 guess, and the officers.
14   Q.   Law enforcement?
15   A.   Yeah.
16   Q.   All right.  And then he continues, "The
17 charge is conspiracy.  It means when two or more
18 people get together to do something illegal.  If
19 people were doing what they do on their own, there
20 is no conspiracy and we can't all be guilty.  If
21 Jackie or Frankie (who's trying to claim you get him
22 in it) sends the feds to find you and they try to
23 scare you about that case you caught" in the -- "in
24 there while talking to you, just tell them straight
25 up that you were on your own like everyone else in

1347

1  there, trying to get high and help Pop with a little
2  rent so you could stay like we worked out."
3        First let me ask you, when he refers to
4  Frankie and Jackie, who do you understand he's
5  referring to?
6    A.   Hodges and Jackie with the pictures, the
7  two pictures up there.
8    Q.   All right.  The person you previously
9  identified in Government Exhibit 214, Jackie?
10   A.   Yes.  That's Hodges.
11   Q.   Bringing your attention again to Government
12 Exhibit 212.  Is that the Frankie you were talking
13 about?
14   A.   Yeah.  I call him Hodges.  I forgot his
15 first name.  But I know his last name Hodges.
16   Q.   All right.  And going back to the letter
17 now.  Did you in fact help Pops out with the rent?
18   A.   Well, I gave him drugs sometime for staying
19 there.
20   Q.   All right.
21   A.   And sometime I gave him money.
22   Q.   And why did you do that?
23   A.   Because I needed somewhere to stay.  It was
24 cold, and so I gave him the money so I could stay,
25 and the drugs so I could stay there.

1348

1    Q.   And when the defendant says in parentheses
2  "like we worked out," what do you understand he's
3  referring to there?
4    A.   That I paid Pop for staying there.
5    Q.   Let me ask you this:  What agreement, if
6  any, had you worked out with the defendant?
7    A.   That I would pay Pop while I'm staying
8  there.
9    Q.   Was that the only agreement you had with
10 the defendant?
11   A.   Yeah.  That, and selling drugs for him.
12 That's it.
13   Q.   All right.  So the only two agreements you
14 had was paying Pops and selling drugs?
15   A.   Yeah.
16        MR. SHEEHAN:  Objection, that's
17 repetitive.
18        MS. RODRIGUEZ-COSS:  Moving on.
19        THE COURT:  Overruled.
20   Q.   Going to the top of page 3, the defendant
21 writes -- well, first of all, before I go to the top
22 of page 3, see if I can bring that document in to
23 you.  I'm going to separate the page so I can bring
24 that last --
25        Can you see that upper left-hand corner

1349

```
 1   there.  PS --
 2              MS. RODRIGUEZ-COSS: This is upper
 3   left-hand corner of the third page of Government
 4   Exhibit 514, for the record.
 5       A.   Yes, I see it.
 6       Q.   "PS, I hope by next September we'll be out
 7   there around our birthdays to celebrate.  Happy
 8   belated birthday."
 9              When is your birthday?
10       A.   September 8th.
11       Q.   Do you know when the defendant's birthday
12   is?
13       A.   No, not really.  He probably told me, but I
14   probably forgot.
15       Q.   And then over to the right corner of --
16   upper corner of page 3, we see a name and a number
17   and an address, and then there are some letters have
18   been cut off of this copy.  Do you see that there?
19       A.   Yes.
20       Q.   Do you recall what that said?
21       A.   No, I can't remember.
22       Q.   Have you ever seen this name before?
23       A.   No, ma'am.
24       Q.   Are you familiar with it?
25       A.   No.
```

1350

```
 1       Q.   Okay.  At the end of the letter does the
 2   defendant ask you to do something?
 3       A.   Call him or either write him back.
 4       Q.   And where were you supposed to write to
 5   him?
 6       A.   I guess the address up there.  That's the
 7   only address there, so I suppose that's where I was
 8   supposed to write back to him, but I did not call or
 9   write him back.
10       Q.   But you didn't call or write him back?
11       A.   No, it was like when I said I was done with
12   it, I was done with it.  And I was like, why is he
13   writing me?  You know, he don't owe me nothing.  I
14   was done with it, and I put the letter away, and it
15   just -- my cousin told my aunt's sister that --
16       Q.   Let me stop.  I need to put a question to
17   you first.  Why did you hang on to a letter -- or do
18   you even remember whether you hung on to the letter?
19       A.   Something tell me -- for some reason told
20   -- I had put it in the garbage, and something told
21   me to save this letter for some reason.  So, I went
22   back in the garbage and put it away.
23       Q.   When did you look at it next after
24   receiving it?
25       A.   The other day.
```

1351

```
 1       Q.   The other day when?
 2       A.   At the office.
 3       Q.   Okay.
 4       A.   When my wife mailed it -- faxed it to you.
 5       Q.   And you hadn't looked at it since you first
 6   got it two years ago?
 7       A.   No.  I forgot I had the letter.
 8       Q.   Let me bring your attention to the top of
 9   the page here.  The defendant writes, "Anyway, you
10   don't want to keep saying you were working for
11   somebody or you were down with this gang because
12   that's conspiracy.  They can bring you into this
13   case like they did everybody else.  If I see you in
14   a courthouse, I want it to be because you wanted to
15   let them know they got it all wrong and this is how
16   things really went, not because you said the wrong
17   thing and they got you in handcuffs next to us
18   trying to ruin your life, too.  You feel me?"
19              Let me ask you first, with regards to
20   that part of the letter, what did understand the
21   defendant meant by you "don't want to keep saying
22   you were working for somebody."
23       A.   I guess he didn't want his name mentioned,
24   I guess.
25       Q.   Have you ever denied that you were selling
```

1352

```
 1   drugs for D out of James' apartment?
 2       A.   No.
 3       Q.   And were you at all concerned when you
 4   received this letter that the federal government
 5   would be coming out for you or to investigate you or
 6   to arrest you?
 7       A.   No, because when I got out of jail, what --
 8   the three days I get out of jail, I get through with
 9   court, everything was behind me, so I wasn't
10   worrying about anything.
11       Q.   And he goes on and says after "you feel
12   me," "Mary should be told these things, too.  If you
13   guys are still in touch, anybody from over there,
14   let them know the deal if you care about them and
15   are in touch."
16              Who is he referring to when he says
17   "Mary should be told these things" also or "too."
18       A.   That's my kid's mother, Mary.  That's --
19       Q.   Is that who we see on Government
20   Exhibit 225?
21       A.   Yes.
22              MS. RODRIGUEZ-COSS:  Your Honor, we
23   mistakenly -- I think we believed that this was in
24   evidence or had been offered, and it may not have
25   been, and we definitely offer it in evidence at this
```

1353

```
1   time.
2           THE COURT:  I think it was accepted
3   earlier this morning.
4           MS. RODRIGUEZ-COSS:  All right, very
5   well.  Thank you.
6       Q.  And did you tell anyone about the letter?
7       A.  No.
8       Q.  Did you do what he asked you to do?
9       A.  No.  I was done with it and I wasn't
10  getting back into it.  To tell you the truth, I hate
11  I'm here now.
12      Q.  I'm sorry?
13      A.  To tell you the truth, I hate I'm here now.
14  My past just caught up with me.  That's all.
15      Q.  And why are you here?
16      A.  I guess to testify about what happened back
17  then.
18      Q.  Well --
19      A.  From about the drugs.  That's why I'm here.
20  About myself.  I don't know anything else about it.
21      Q.  I guess what I'm asking, were you sent a
22  subpoena?
23      A.  Yes, ma'am.  That's what got me here, a
24  subpoena.
25      Q.  And then in the next -- in the first full
```

1354

```
1   paragraph of page 3, the defendant writes, "I know
2   you kind of already said you were working for me and
3   that you think you took on Jackie's spot and Frankie
4   and Vanessa took over yours.  Don't worry about
5   that, you still did good."
6           Again, who is he referring to there when
7   he says "Jackie."
8       A.  The young lady who was in the picture
9   earlier.
10      Q.  And when he says "Frankie" and "Vanessa"?
11      A.  The two people who was in the picture
12  earlier.
13      Q.  That you identified earlier in your
14  testimony?
15      A.  Yes.
16      Q.  And later on in that paragraph the
17  defendant writes, "That's why it's better to never
18  tell anyone we spoke.  And if you want to write me
19  some day or tell me about yourself, or even ask a
20  question, put a fake name on the envelope.  I'll
21  know it's you, trust me."
22          Did you ever write him?
23      A.  No.
24      Q.  Did you ever tell anyone that you had
25  received this letter?
```

1355

```
1       A.  Well, I told my brother, my wife, and
2   that's it.
3       Q.  So, aside from -- how many brothers do you
4   have?
5       A.  I have six under me.
6       Q.  Okay.
7       A.  And a sister.
8       Q.  Who did you tell, which one of the six
9   brothers?
10      A.  Eddie Fleming.
11      Q.  So, other than Eddie and your wife, did you
12  ever tell anyone you received this letter?
13          MR. SHEEHAN:  Objection.  Asked and
14  answered.
15      A.  No.
16          THE COURT:  Sustained.
17          MS. RODRIGUEZ-COSS:  I'm sorry, I was
18  just clarifying it with the name.  That's all.
19  We'll move on.
20      Q.  And then further down in that same
21  paragraph the defendant writes "Whenever you are not
22  sure what to say with police, court or anything, and
23  you don't want to lie, just say you don't remember.
24  No one can get mad at you for not remembering
25  everything, ever.  Just go 'what, you want me to
```

1356

```
1   lie?'  I don't remember.  They have to leave it
2   alone."
3           What did you understand the defendant
4   was trying to tell you in that sentence?
5       A.  From what I get out of it, he's telling me
6   forget anything I know.
7       Q.  I'm sorry, I didn't quite hear you.
8       A.  What I'm getting out of it, forget anything
9   I know.
10      Q.  Did you --
11      A.  Pretty much lie.
12      Q.  And did you intentionally try to or did you
13  during your testimony say you didn't remember
14  something when you in fact remembered it?
15      A.  No.
16      Q.  And he continues later on in that same last
17  paragraph of page 3, "If it ever comes up again,
18  never make Jackie sound like a drug dealer, only a
19  prostitute/addict who always came around to buy and
20  acted like she was looking for D or waiting for him,
21  and she was around before you, so that's why you
22  thought she used to work for him or something."
23          Was Jackie a drug dealer, Mr. Fleming?
24      A.  Well, I bought drugs from her.
25      Q.  So she sold drugs?
```

1357

```
1    A.   Yes.
2    Q.   And there isn't really a signature there at
3  the end.  Is there?  The defendant --
4         MR. SHEEHAN:  I'm asking if counsel is
5  testifying here?  I would object if she is.
6         MS. RODRIGUEZ-COSS:  I'm sorry, I
7  apologize.  You are right.  Strike that, your Honor.
8    Q.   Do you see a signature on the last page of
9  Government Exhibit 514?
10   A.   No.
11   Q.   In fact, what we see is, "I hope you got
12 the message, God bless."
13        Did you get the message, Mr. Fleming?
14 What message do you think the defendant was trying
15 to give you?
16        MR. SHEEHAN:  I'm going to object, your
17 Honor, form of the question.
18        THE COURT:  You can rephrase the
19 question.
20   Q.   What message did you understand the
21 defendant was trying to give you?
22   A.   Pretty much just to lie.  Did I get the
23 message?  What message?
24   Q.   And so you stated earlier that you were
25 saved?
```

1358

```
1    A.   Yes.
2    Q.   Did I hear you correctly?
3    A.   Yes, I'm a deacon at church now.
4    Q.   In what church?
5    A.   The Embassy of King Jesus.
6    Q.   And how long have you been a member of that
7  church?
8    A.   I just recently became a member there about
9  four months ago, but I was in another church.  I got
10 my deacon license and stuff.  I was in there for
11 almost two years.
12   Q.   How long have you been clean?
13   A.   About three years.
14   Q.   Just one last question Mr. Fleming.  When
15 you went to the hospital in February of 2005, had
16 you gone to the emergency room or to a hospital for
17 any other reason around that time?
18   A.   Not to my knowledge.  I don't remember.
19        MS. RODRIGUEZ-COSS:  We have no other
20 questions for Mr. Fleming, your Honor.
21        THE COURT:  Thank you.
22 Cross-examination.
23 CROSS-EXAMINATION
24 BY MR. SHEEHAN:
25   Q.   Good afternoon, Mr. Fleming.
```

1359

```
1    A.   How you doing, sir?
2    Q.   I'm doing okay.
3    A.   God bless you.
4    Q.   But how are you?
5    A.   My back bother me a little from sitting
6  here.
7    Q.   Do you need to stretch or are you --
8    A.   It just hurts.
9    Q.   Okay.
10   A.   Constantly.
11   Q.   How long have you had that back problem?
12   A.   Since I got clean, clean.  It's been
13 bothering me for over seven years now.
14   Q.   Do you think --
15        THE COURT:  Mr. Sheehan, would you pull
16 the microphone back over in front of you, please.
17        MR. SHEEHAN:  This one?
18        THE COURT:  Yes.
19        MR. SHEEHAN:  How is that?
20        THE COURT:  I don't know.  I'll know
21 when you speak.
22   Q.   Can you hear me okay, Mr. Fleming?
23   A.   Yes, sir.
24   Q.   All right.  It's kind of an irony now that
25 you are clean and now your back really hurts, isn't
```

1360

```
1  it?
2    A.   Well, it's from when I was working on cars
3  also on the ground, the cold up here.
4    Q.   Yep.
5    A.   I used to do mechanic work and I would work
6  on cars on the cold ground in the snow, just clear
7  the area out and do what I had to do.
8    Q.   It sounds like you grew up in the south and
9  then came up here when you were about 13 or so?
10   A.   Yes, sir.
11   Q.   And then at that point you and your family
12 moved to -- did you say PT?
13   A.   First Father Panik and then PT Barnum.
14 That's where I really growed (sic) up, out at PT
15 Barnum.
16   Q.   And both Father Panik and PT Barnum were
17 housing projects in Bridgeport, were they not?
18   A.   Yes.
19   Q.   And they were both places where mostly poor
20 people lived, right?
21   A.   Pretty much.
22   Q.   Poor people of color?
23   A.   Yes.
24   Q.   And is it fair to say that in your youth
25 there were a lot of drugs around?
```

1361

```
1   A.   Well, when I was coming up as a kid I
2   wasn't allowed to be out that late and stuff, so I
3   wouldn't know at that point.  When I got into drugs
4   and stuff I was like 17, 18 years old.
5   Q.   So your parents were able to shelter you?
6   A.   Yes.
7   Q.   And all of your brothers and sisters?
8   A.   Yes, sir.
9   Q.   And in your family, are you the only one
10  who has really battled with drugs and addictions?
11  A.   Well, one time all of us was messing with
12  drugs except two was in the service, and then they
13  all quit and I was the only one struggling.
14  Q.   Okay.  And if you were -- if you were
15  thinking about it, how did you get saved?
16  A.   I just went and one day -- well, how it
17  started, it's like I got saved, and what happened
18  was one night I was in church and I was talking in
19  tongue and imitating my pastor and God slayed (sic)
20  me on the floor, and I got up, he slayed me
21  again, I got up, and I said a word I shouldn't have
22  said in church, so then my pastor said that I was
23  saved.
24  Q.   And since then you've been clean?
25  A.   Yes, sir.  Don't smoke, don't drink, don't
```

1362

```
1   go out.  All I do is go to church and go home.
2   Q.   Okay.  And the community you live in, you
3   have good friends down there?
4   A.   Mostly my family is in the area.
5   Q.   And when you got arrested, I think we saw
6   that was in November -- late November 24th of 2004.
7   You indicated that you went back to 211 Charles for
8   a little bit, right?
9   A.   Well, I went to visit then.  I didn't go
10  back to stay or nothing, just to visit.
11  Q.   I'm sorry, 215 Charles is what I meant.
12  A.   Yeah.
13  Q.   You were on kind of a probationary period
14  and that's what allowed you to get your record
15  cleaned up?
16  A.   Yes.
17  Q.   And you indicated that when you left 215
18  Charles you went to your brother's house, right?
19  A.   Right.
20  Q.   And then to your son's house?
21  A.   Yes, sir.
22  Q.   And was your brother clean?
23  A.   Yes, sir.
24  Q.   And was your son clean?
25  A.   Yes, sir.
```

1363

```
1   Q.   And do you think they're part of your being
2   clean today?
3   A.   Yes, sir.
4   Q.   And are you still active in meetings and
5   stuff like that?
6   A.   Well, my God is keeping me away from stuff
7   like that.
8   Q.   Okay.
9   A.   Because I fast and I pray and I read the
10  Bible, and that's keeping my mind off of drugs and
11  all the other stuff out there.
12  Q.   All right.  And is it fair to say that when
13  you were in Bridgeport before you got saved, in that
14  period of time that you were involved in using
15  drugs, it had a very strong hold on you?
16  A.   At the beginning yes, but then when I went
17  to probation I stayed clean because I didn't want to
18  do those 20 years in prison.
19  Q.   Okay.
20  A.   So if I went back to court and they had a
21  dirty urine on me from the program, I would have
22  went to jail for 20 years.  So, I kept clean.
23  Q.   Maybe in some ways it was a good thing you
24  got arrested.
25  A.   In a way, yes.  God works in mysterious
```

1364

```
1   ways.
2   Q.   And when -- I'm a little bit confused about
3   the timeline, and I think it's probably -- that
4   seems like a whole lifetime away, doesn't it, what
5   was going on then?
6   A.   Pretty much.
7   Q.   Let me ask you, when you saw the picture of
8   this guy, 223, you kind of laughed, just like you
9   are doing right now.
10  A.   Yeah, because it's -- right now it's funny
11  to me.
12  Q.   He's just somebody else?
13  A.   Yes, it's a whole entire different person.
14  That's why I laughed, because that's a rough-looking
15  person.
16  Q.   Were you a rough guy in those days or more
17  just a rough-looking guy?
18  A.   I guess I was just a rough-looking guy back
19  in those days.
20  Q.   All right.  And other than this incident
21  that you talked about when you ended up going to the
22  hospital, did you have any problems with D?
23  A.   Not really, no.
24  Q.   Okay.  You have testified -- and I'm
25  working on this chronology here.  You got arrested
```

1365

```
1   in late November just before Thanksgiving, right?
2       A.   Yes.
3       Q.   And you had been dealing out of 215 Charles
4   Street for about six months before that?  Is that
5   your estimate?
6       A.   I guess, something like that.
7       Q.   Okay.  And the person who was there before
8   you, was that Jackie?
9       A.   Yes.
10      Q.   Okay.  And once you started dealing there,
11  she was not dealing out of that apartment, as far as
12  you know, right?
13      A.   As far as I know, no.
14      Q.   I gather from what you've told us today
15  that you had -- it sounds like you had kind of a
16  number of demons on your back in those days.
17      A.   Yes, sir.
18      Q.   And one of them was obviously the drugs
19  that you were using, right?
20      A.   Yes, that's one of them.
21      Q.   And it sounds like alcohol was an issue?
22      A.   Alcohol, that's -- all of it come together.
23  It play a part together.
24      Q.   Okay.  And was marijuana part of that?
25      A.   Yes, sir, I mentioned that earlier also.
```

1366

```
1       Q.   You did?
2       A.   Yes, sir.
3       Q.   And the day that, it looks like -- this
4   medical incident where you went to the hospital,
5   that appears to be in February of 2005.  So, that's
6   about two to three months after you got arrested.
7   Does that sound about right?
8       A.   Pretty much to my recollection, yes, sir.
9       Q.   And you mentioned that when this incident
10  happened, you were at -- you were visiting with
11  James?
12      A.   Yes, sir.
13      Q.   Were you good friends with James?
14      A.   Yes, sir.
15      Q.   And you had been -- was James a drug user
16  at that time?
17      A.   Yes, sir.
18      Q.   But you weren't using then because you were
19  on --
20      A.   Exactly.
21      Q.   -- probation, right?
22      A.   Exactly.
23      Q.   But you still were drinking, right?
24      A.   Yes, sir.  No.
25      Q.   No?
```

1367

```
1       A.   The outpatient thing, I was going there for
2   crack cocaine, not cocaine.
3       Q.   Oh, okay.  And at the outpatient thing,
4   they test your urine for cocaine, right?
5       A.   Right.
6       Q.   And do you think you were substituting for
7   the cocaine?  Were you using the alcohol as kind of
8   an extra crutch?
9       A.   No.
10      Q.   Do you think that you would have been kind
11  of high when you were there at James' house on that
12  day?
13      A.   No.
14      Q.   All right.  Not high from alcohol?
15      A.   Oh, from alcohol, yeah.
16      Q.   Okay.
17      A.   Not from the crack cocaine.
18      Q.   No, no.  You think you could have been like
19  intoxicated?
20      A.   No, I wasn't intoxicated.  I was high off
21  of the alcohol.
22      Q.   All right.  How about drunk?
23      A.   No, I wasn't drunk because I was aware what
24  was going on.  That's why I felt like a push when he
25  hit me, but I didn't realize at that time he hit me.
```

1368

```
1       Q.   Okay.
2       A.   Until I seen the medical records.
3       Q.   And that's what I'm trying to figure out.
4   You felt like you got pushed, right?
5       A.   Right.  See, like when you boxing you get
6   hit, when you take a shot, you get hit.  And I guess
7   when he hit me, it hit me hard enough to do damage
8   to me at the time because I was feeling it.  I think
9   that's why I felt like it was a push to me.
10      Q.   And then you kind of -- you went back down
11  on the sofa?
12      A.   Yes, I sit down.  It felt like that's what
13  he did to me.
14      Q.   And then it will really wasn't until -- you
15  walked from there to your friend's house?
16      A.   My brother's friend's house.
17      Q.   Your brother's friend's?
18      A.   They worked together, yes, sir.
19      Q.   How far away did he live?
20      A.   Maybe a block away.
21      Q.   Okay.  And it was --
22      A.   Matter of fact, it's the diner here, the
23  next street over, and the apartment house right
24  there.
25      Q.   So, it was a pretty short distance?
```

1369

```
1    A.   Yeah.
2    Q.   And that's when you noticed --
3    A.   After he told me how my face looked, I
4  looked in the mirror and I seen it, and he called my
5  brother and he took me to the hospital.
6    Q.   Okay.  Now, the time that you recall that
7  Jackie -- where you -- Jackie had her leg cut,
8  right?
9    A.   Yes, sir.
10   Q.   Were you at the apartment when Jackie's leg
11 got cut?
12   A.   I wasn't in the apartment.
13   Q.   Okay.  You subsequently came back to the
14 apartment and found her there.
15   A.   Right.  While she was there, yes, sir.
16   Q.   She wasn't working -- she wasn't selling
17 out of 215 Charles at that time, was she?
18   A.   No.
19   Q.   And, in fact, it sounds like you had been
20 there for a number of months before that, right?
21   A.   Well, buying drugs, yeah.
22   Q.   And selling, too?
23   A.   No, not before then.  It was after she
24 stopped.
25   Q.   Okay, that's what I'm trying to get a
```

1370

```
1  little bit of a fix on here.  Because you sold for a
2  number of months.  Your testimony is that you sold
3  for a number of months before you got arrested,
4  right?
5    A.   Yeah.
6    Q.   So you got arrested in late November of
7  2004.  We know that from that.
8    A.   From the report, police report.
9    Q.   Right.  So, let's say -- would you say that
10 you had been working there maybe for, you know,
11 June, July, August, September, October, November,
12 six months or so?
13   A.   Maybe.
14   Q.   Okay.
15   A.   It's been a while.  Maybe, yes.  I don't
16 know.
17   Q.   Okay.  But it was some period of time,
18 right?
19   A.   Yeah.
20   Q.   And so if the incident with Jackie, the one
21 that you remember, if that happened in early
22 November of 2004, she wouldn't have been working
23 there at that time, right?
24   A.   No, sir.
25   Q.   Okay.  And, in fact --
```

1371

```
1    A.   Not to my knowledge, that I remember, she
2  wasn't working then.
3    Q.   Okay.  And do you remember the date that
4  that happened?
5    A.   No, sir.  I can't remember some of my kids'
6  birthday.
7    Q.   I have that same problem, too.
8    A.   That was years ago.  So, no, I don't
9  remember.
10   Q.   I'm going to show you on the second --
11 third page of Government Exhibit 245.
12   A.   Excuse me, can you bring the focus in a
13 little more, please.
14   Q.   Yep, I'm going to bring it in.
15   A.   Thank you.
16   Q.   And I'm going to -- these are the medical
17 records for Ms. Bryant.  Jacqueline Bryant right
18 here.
19   A.   Okay.
20   Q.   And at the top it says 11/17/04.  So that
21 was about a week before you got arrested?
22   A.   Okay.
23   Q.   And at that point in time you're certain
24 that Ms. Bryant was not selling out of Charles
25 street, right?
```

1372

```
1    A.   To my recollection, no.
2    Q.   And if I recall your testimony, you said
3  that when the police came to the apartment you told
4  them that Ms. Bryant had come to the apartment with
5  her leg like that, right?
6    A.   Yes, sir.
7    Q.   In fact, while you were at the apartment
8  with Ms. Bryant, nobody ever kept her hostage there,
9  did they?
10   A.   Not to my knowledge, no.
11   Q.   And --
12   A.   She could leave any time she wanted to.
13   Q.   And you were there all the time, right?
14   A.   Most of the time, yeah.
15   Q.   Can I ask you just a little bit -- you
16 mentioned about that raid.  I'll try to be short.
17 You mentioned about that raid in late November and
18 you said that you thought --
19   A.   I thought they was --
20   Q.   A bunch of people came in?
21   A.   A bunch of people trying to rob me.
22   Q.   Had you ever been robbed in the course of
23 being a drug dealer?
24   A.   Well, some people came in, like five people
25 came in with .45s and they robbed me.  That was I
```

**GA343**

1373

```
1   think shortly after the raid because I stayed there
2   for like maybe a month, maybe two months after the
3   raid and I sold some more, and then after that I got
4   out of there.
5        Q.   Okay.  And that building was -- while you
6   were selling in that building, that was really like
7   an -- almost like a drugstore, wasn't it?
8        A.   Pretty much.
9        Q.   People had access to that building day and
10  night?
11       A.   Yes.
12       Q.   And do you know whether there were other
13  drugs being sold out of that building?
14       A.   Not to my knowledge.
15       Q.   Okay.  But how did it work?  Somebody would
16  just knock on the door?
17       A.   Exactly.  And you open the door, ask them
18  what they want, give them what they want, either
19  they go or stay and get high.
20       Q.   I just had one other question.  When you
21  did -- remember when this chapter of your past --
22  when the government agents came to see you back on
23  March 22nd?
24       A.   March 22nd?
25       Q.   I'm sorry, I think it was March 21st, 2011.
```

1374

```
1   Didn't they come to see you at your residence?
2        A.   The FBI?
3        Q.   Yeah.
4        A.   I think that's when it was.
5        Q.   Yeah.  And they asked you a lot of
6   questions just like happened here, right?
7        A.   Yeah, I been answering a lot of questions
8   lately.
9        Q.   All right.  And one of the questions they
10  asked you, did they not, was how much product you
11  were selling?
12       A.   Yes.
13       Q.   Do you remember telling them that you would
14  sell about two to three bags of -- two to three bags
15  -- you know, bags?
16       A.   Of crack cocaine.
17       Q.   Yeah, a week?
18       A.   Something like that.
19       Q.   Okay, Mr. Fleming, I hope you feel better.
20  Thank you.
21       A.   Thank you, sir.  You have a blessed day.
22       Q.   You, too.
23            THE COURT:  Anything further on
24  redirect?
25  REDIRECT EXAMINATION
```

1375

```
1   BY MS. RODRIGUEZ-COS:
2        Q.   Just a question, Mr. Fleming.  When Jackie
3   told you that the defendant hit her -- do you
4   remember that?
5        A.   She was telling me that he cut her on her
6   leg.
7        Q.   Okay.  When she told you that the defendant
8   cut her on her leg, did she tell you why?
9        A.   Because of some money.
10       Q.   Because of some money?
11       A.   Yeah.
12       Q.   Did she mess up some money?
13       A.   I think -- yeah.
14            MS. RODRIGUEZ-COSS:  Nothing further,
15  your Honor.
16            THE COURT:  All right anything further?
17            You may go, sir.  Carefully, slowly.
18  You are excused.
19            Please call your next witness.
20            MR. MARKLE:  The government will call
21  Rodney Womble, your Honor.
22            MS. DAYTON:  Your Honor the marshals
23  have to bring him in, which is what the delay is.
24            Your Honor, may we approach for one
25  moment?
```

1376

```
1            THE COURT:  Yes.
2            (Sidebar conference).
3            MS. DAYTON:  Your Honor, we would ask
4   that the marshals be directed not to bring witnesses
5   in in cuffs.  We don't bring the defendant in in
6   cuffs.  I've never seen that happen before in
7   15 years.
8            THE COURT:  Slow to raise it now, isn't
9   it?
10           MS. DAYTON:  But with further witnesses.
11           MR. SHEEHAN:  I'm asking for a mistrial,
12  your Honor.  I think that the fact that he comes in
13  in cuffs, I think it overemphasizes the situation.
14  I think it prejudices the defendant.
15           THE COURT:  Any motion for mistrial, I
16  need it in writing and the grounds and the
17  authority.
18           MR. SHEEHAN:  Thank you.
19           (Sidebar concluded).
20           THE COURT:  Sir, would you please stand
21  and raise your right hand, the oath will be
22  administered to you.
23           R O D N E Y   W O M B L E
24  Having first affirmed, was examined and testified as
25  follows:
```

1377

1       THE WITNESS:  My name is Rodney Womble,
2 w-o-m-b-l-e, Bridgeport.
3 DIRECT EXAMINATION
4 BY MR. MARKLE:
5     Q.  Mr. Womble, can you either move yourself or
6 move the microphone so you are speaking into it.
7       THE COURT:  All right, you may proceed.
8     Q.  Good afternoon, Mr. Womble.  Mr. Womble, I
9 need you to speak up into the microphone, okay?
10     A.  Uh-huh (indicating affirmatively).
11     Q.  How old are you?
12     A.  I'm 43.
13     Q.  And you indicated that your last address
14 was Bridgeport, Connecticut?
15     A.  Yeah.
16     Q.  Where did you last live in Bridgeport,
17 Connecticut?
18     A.  86 Fairmont.
19     Q.  Again, just lean forward a little.
20     A.  86 Fairmont.
21     Q.  Thank you.  Are you incarcerated?
22     A.  Yeah.
23     Q.  You are in jail?
24     A.  Yes.
25     Q.  You've been in jail for a while?

1378

1     A.  Yes.
2     Q.  How long?
3     A.  Over five years.
4     Q.  And during that five years, have you been
5 in jail that entire five years or bits and pieces?
6     A.  No, five years straight.
7     Q.  And where were you born, Mr. Womble?
8     A.  In Bridgeport.
9     Q.  And where were you raised?
10     A.  In Bridgeport.
11     Q.  And did you ever leave Bridgeport for any
12 substantial period of time?
13     A.  No.
14     Q.  Did you go to high school?
15     A.  Yeah.
16     Q.  Where did you go to high school?
17     A.  Central High.
18     Q.  Central?
19     A.  Central High.
20     Q.  Lean up a little bit.  You've been here all
21 day waiting to testify?
22     A.  Yeah.
23     Q.  Held in a cell in the building?
24     A.  Yeah.
25     Q.  And did you graduate from Central High?

1379

1     A.  No.
2     Q.  How far did you get in high school?
3     A.  Eleventh grade.
4     Q.  Did you finish 11th grade or did you drop
5 out?
6     A.  Yeah, I finished 11th grade.
7     MR. SMITH:  Your Honor, I'm going to
8 object to the leading nature of the questions.
9     THE COURT:  Sustained.
10     Q.  Are you married?
11     A.  No.
12     Q.  Do you have children?
13     A.  No.
14     Q.  Were you -- prior to being incarcerated
15 five years ago, what was your last legitimate
16 employment?
17     A.  WJ Detailers.
18     Q.  WJ?
19     A.  WJ Detailer.
20     Q.  What kind of work was that?
21     A.  Car wash.  Car wash, detailer.
22     Q.  And for how long did you work there,
23 approximately?
24     A.  Not even -- close to a year.  Maybe a year.
25     Q.  About a year.  Do you know Azibo Aquart?

1380

1     A.  Yeah.
2     Q.  And do you see him in court?
3     A.  Yeah.
4     Q.  Could you just identify what he's wearing?
5     A.  Blue shirt right there.
6     Q.  Does he have on a tie or no tie?
7     A.  Yeah, a tie.
8     MR. MARKLE:  May the record indicate
9 he's indicated the defendant, your Honor?
10     THE COURT:  Yes.
11     Q.  Did you know him before you worked at WJ
12 Detailing?
13     A.  No.
14     Q.  You had never talked to him, met him, seen
15 him?
16     A.  No.
17     MR. SMITH:  Objection, leading.
18     MR. MARKLE:  It's not leading, your
19 Honor.  I'm asking him whether he's ever talked to
20 him.  That doesn't indicate a yes or no answer that
21 I'm looking for.
22     MR. SMITH:  It's asked and answered.  He
23 didn't know him before WJ Detailing.
24     THE COURT:  Ask your question again, Mr.
25 Markle.

1381

```
 1     Q.   I'll break it down.  Did you ever see him
 2  before WJ Detailing?
 3     A.   No.
 4     Q.   Did you ever talk to him before you saw him
 5  or talked to him at WJ Detailing?
 6     A.   No.
 7     Q.   Prior to working at WJ Detailing, did you
 8  have another job?
 9     A.   Yeah.
10     Q.   Where did you work?
11     A.   I worked at Sacred Heart University.
12     Q.   What kind of work was that?
13     A.   Short order cook over there.
14     Q.   And for about how long did you work there?
15     A.   From February '04 to maybe August '04.
16     Q.   And was it after -- did you start at WJ
17  Detailing right after that, or was there a break?
18     A.   Yeah, a few months after then I started
19  working there.
20     Q.   Do you recall when you were arrested in
21  regards to your present incarceration, the present
22  case?
23     A.   Yeah.
24     Q.   Do you remember the date?
25     A.   September 8th.
```

1382

```
 1     Q.   What year?
 2     A.   2005.
 3     Q.   September 8, 2005?
 4     A.   2005.
 5     Q.   And do you remember -- do you know what you
 6  are charged with?
 7     A.   Yeah.
 8     Q.   And what are you charged with?
 9     A.   Conspiracy to distribute 50 grams or more
10  crack cocaine.
11     Q.   And was a lawyer appointed for you when you
12  were arrested?
13     A.   Yeah.
14     Q.   And have you -- are you awaiting trial or
15  have you pled guilty?
16     A.   Yeah, I pled guilty.
17     Q.   And you are awaiting not a trial, but a
18  sentencing?
19     A.   A sentencing, yeah.
20     Q.   Have you been sentenced yet?
21     A.   No.
22     Q.   And what do you face for a sentence?
23     A.   Twenty years.  Twenty to life, actually.
24     Q.   So when you say 20 to life, what's the 20?
25     A.   The minimum I could get.
```

1383

```
 1     Q.   And the life is?
 2     A.   The max.
 3     Q.   And have you entered into what's called a
 4  plea agreement with the government?
 5     A.   Yeah.
 6     Q.   And have you also -- was that with your --
 7  with the advice of your counsel, talking to him?
 8     A.   Yeah, with my lawyer.  Yeah.
 9     Q.   And have you entered into what's known as a
10  cooperation agreement?
11     A.   Yes.
12     Q.   And, again, were those after you had --
13  while you've had a lawyer?
14     A.   Yes.
15     Q.   Have you had a lawyer since the day you
16  were arrested until today?
17     A.   Yeah, the first day maybe.
18     Q.   I'm sorry?
19     A.   Yes, since the first day.
20     Q.   And have you ever met with government
21  attorneys or law enforcement without your attorney
22  being present?
23     A.   No.
24     Q.   And, Mr. Womble, do you know what your
25  sentence will be?
```

1384

```
 1     A.   No.
 2     Q.   Have any promises been made in regards to
 3  what your sentence will be?
 4     A.   No.
 5     Q.   By any government attorneys?
 6     A.   No.
 7     Q.   By any law enforcement agents?
 8     A.   No.
 9     Q.   By your attorney?
10     A.   No.
11     Q.   By anyone?
12     A.   Nobody.
13     Q.   And after you were arrested, were you
14  released on bond at any time?
15     A.   No.
16     Q.   And after you entered your guilty plea,
17  were you released on bond at any time?
18     A.   No.
19     Q.   After you entered into that cooperation
20  agreement, were you released on bond?
21     A.   No.
22     Q.   Now, you indicated you were arrested
23  September 8th of 2005.  Had you previously been
24  arrested and convicted of sale of drugs May 2nd,
25  2000?
```

**GA346**

1385

```
1    A.   Yeah.
2    Q.   And that was a sale of drugs, felony
3  conviction, that you had before this?
4    A.   Yes.
5    Q.   And prior to your arrest in this case, did
6  you ever use marijuana?
7    A.   Yeah.
8    Q.   Have you used marijuana since your arrest?
9    A.   No.
10   Q.   Prior to your arrest, did you use cocaine
11 or crack cocaine?
12   A.   Yeah.
13   Q.   Both?
14   A.   No, just cocaine.
15   Q.   Never crack cocaine?
16   A.   No.
17   Q.   Have you used cocaine since your arrest in
18 2005?
19   A.   No.
20   Q.   Since your arrest, have you used any
21 illegal drugs?
22   A.   No.
23   Q.   Now in growing up -- you said you grew up
24 in Bridgeport, Connecticut.
25   A.   Yeah.
```

1386

```
1    Q.   And did you live with your mom and dad?
2    A.   My mom, yeah.
3    Q.   And where was your dad?
4    A.   My dad got killed when I was maybe two
5  years old, three years old.
6    Q.   He was killed?
7    A.   He was killed, yeah.
8    Q.   So were you raised only by your mom?
9    A.   Yeah.
10   Q.   And how would you describe your upbringing?
11   A.   I had a fairly decent upbringing.
12   Q.   Did your mom work?
13   A.   Yeah.
14   Q.   What job?  What did she do?
15   A.   She was a nurse.
16   Q.   And did she work full-time?
17   A.   Yeah.
18   Q.   And how many brothers and sisters did you
19 have?
20   A.   I have one older sister -- one older
21 sisters and two brothers.
22   Q.   And they all lived with you while you were
23 being raised?
24   A.   Yeah.
25   Q.   Now, while you were in prison for the last
```

1387

```
1  five years, have you gotten into trouble in prison?
2    A.   Minor.
3    Q.   What do you mean minor?
4    A.   I got in trouble for being out of place,
5  sleeping in somebody's bed when they're in court.
6    Q.   Were you in somebody else's cell?
7    A.   No, I was sleeping -- it was overflow.  The
8  jail was crowded, I was sleeping on the floor at the
9  time, I had a cot on the floor.  Instead of me
10 getting on the floor, I got in somebody's bed when
11 they went to court.  So I got in my somebody's bed.
12   Q.   So, you got a disciplinary ticket; is that
13 what they call it?
14   A.   Out of place ticket.
15   Q.   Any other violations?
16        MR. SMITH:  Objection to this line
17 questioning.  What's the relevance of this?
18        THE COURT:  It's not irrelevant.  It's
19 background.  I'll permit it.
20   Q.   Any other violations?
21   A.   Yeah, I just got one not too long ago for
22 having a pair of head trimmers that a friend of mine
23 left me when he went home.
24   Q.   You were not supposed to have those?
25   A.   No.
```

1388

```
1    Q.   That's the only violations?
2    A.   Yeah.
3    Q.   While you were in prison, either from your
4  2000 conviction or this one, did you ever earn your
5  GED?
6    A.   Yeah.
7    Q.   And was that while you were in prison?
8    A.   Yes.
9    Q.   And did you complete that?
10   A.   Yeah.
11   Q.   Have you held any jobs while you've been in
12 prison?
13   A.   Yeah.
14   Q.   What kind of jobs?
15   A.   Various tier man jobs, cleaning up the jail
16 and laundry jobs.
17   Q.   Do you get paid for that?  Or what's the
18 benefit?
19   A.   Get paid.
20   Q.   Now, following your conviction in 2000, did
21 there come a time when you were released from prison
22 on that charge?  Did you go to prison on that
23 conviction?
24   A.   Yeah.
25   Q.   And for how long did you stay in prison?
```

**GA347**

1389

```
1    A.   I got out 2003.
2    Q.   And when you were released, did you go home
3  or --
4    A.   No, I went to the halfway house.
5    Q.   A halfway house?
6    A.   The halfway house, yeah.
7    Q.   And where was that?
8    A.   Isaiah House in Bridgeport.
9    Q.   And were there rules and regulations
10 regarding the halfway house?
11   A.   Had to find a job.
12   Q.   You what?
13   A.   Had to find a job.
14   Q.   Did you find a job?
15   A.   Yeah.
16   Q.   What job was that?
17   A.   I was working at Sacred Heart.
18   Q.   So, you got the job at Sacred Heart as part
19 of your parole conditions?
20   A.   Yes.
21   Q.   And did you report that job to your parole
22 officer?
23   A.   Yeah.
24   Q.   Were you reporting to someone?
25   A.   Yeah, my parole officer.  Yes.
```

1390

```
1    Q.   And how often would you report?
2    A.   It started out once every week and it
3  graduated to one every month.
4    Q.   And during that time were you using any
5  drugs?
6    A.   No.
7    Q.   Were you selling any drugs?
8    A.   No.
9    Q.   Of any type?
10   A.   No.
11   Q.   And where were you -- so how long were you
12 in the halfway house?
13   A.   Six month.
14   Q.   And what happened at the end of that six
15 months?
16   A.   They let me go home.  They released me from
17 the halfway house.
18   Q.   So were you free to go live where you
19 wanted at that point?
20   A.   Yeah.
21   Q.   And where did you go live?
22   A.   I lived with a friend of mine for a few
23 months.
24   Q.   And in what city?
25   A.   In Bridgeport.
```

1391

```
1    Q.   And during that time were you using drugs?
2    A.   No.
3    Q.   Were you selling drugs?
4    A.   No.
5    Q.   And were you continuing to report to your
6  parole officer?
7    A.   Yeah.
8    Q.   That continued throughout this period?
9    A.   Yeah.
10   Q.   And for about how long did you live -- what
11 was your friend's name?
12   A.   Al.
13   Q.   And how long did you live with him?
14   A.   About three or four months.
15   Q.   And after that did you move out?  Or where
16 did you go?
17   A.   Yeah, I moved with my girlfriend Sherrell.
18   Q.   Do you know Sherrell's last name?
19   A.   Randolph.
20   Q.   How did you meet Sherrell?
21   A.   I knew her all along.  I've always known
22 her.  I've known her for years.
23   Q.   But you'd not had a relationship with her?
24   A.   Not 'til then.
25   Q.   Do you recall when you met her and started
```

1392

```
1  a relationship?
2    A.   May.
3    Q.   May of?
4    A.   May of 2003.
5    Q.   Okay.  Well, when you were released -- when
6  were you released from the halfway house?
7    A.   February 2003.
8    Q.   2003?
9    A.   February 2004.
10   Q.   Okay.
11   A.   February 2004.
12   Q.   All right.  And is it after that or before
13 that you met Sherrell?
14   A.   I met Sherrell after that.  May 2004.
15   Q.   So it was May.  How do you remember May?
16   A.   Because it was my birthday.  I met her
17 around my birthday time.
18   Q.   Did you start to live with her right away?
19   A.   Yeah.  Right away, yeah.
20   Q.   And so around May of 2004?
21   A.   Yeah.
22   Q.   And where was it -- did you find the
23 apartment or did --
24   A.   No, she had her own apartment.  I was
25 living with her.
```

**GA348**

1393

```
1    Q.   And where was that?
2    A.   86 Fairmont street.
3    Q.   And during that time were you using any
4  kind of drugs?
5    A.   No.
6    Q.   Were you selling any kind of drugs?
7    A.   No.
8    Q.   And were you working at Sacred Heart
9  University?
10   A.   Yeah.
11   Q.   And for approximately how long did you work
12 at Sacred Heart University after moving in with
13 Sherrell?
14           MR. SMITH:  Objection.  Asked and
15 answered.
16           MR. MARKLE:  I'm trying to put it in
17 context.
18           THE COURT:  I'm going to permit the
19 question.
20   A.   Maybe three more months afterward.
21   Q.   And approximately how long after that did
22 you start working at WJ Detailing?
23   A.   Maybe four more months after.
24   Q.   So, do you recall whether it was warm out,
25 cold out, hot out when you started working at WJ?
```

1394

```
1    A.   It was cold out.
2    Q.   Cold?
3    A.   Yeah.
4    Q.   And do you remember, was that employment --
5  were you reporting that to your parole officer?
6    A.   Yeah.
7    Q.   And at that point were you using any drugs?
8    A.   No.
9    Q.   Were you selling any drugs?
10   A.   No.
11   Q.   And how many days a week would you work at
12 WJ Detailing?
13   A.   Six.
14   Q.   And what were your hours?
15   A.   I would go in at 9:00 and leave like maybe
16 4:00, 5:00 in the afternoon.
17   Q.   And was that a real job?  Were you really
18 working?
19   A.   Yeah.
20   Q.   It wasn't just to please your parole
21 officer?
22   A.   No, I was working.
23   Q.   And were you getting paid?
24   A.   Yeah.
25   Q.   And you indicated that you met the
```

1395

```
1  defendant while you were working there?
2    A.   Yeah.
3    Q.   And was he working there?
4    A.   No.
5    Q.   Was he -- when you say "no," did you ever
6  see him wash a car there?
7    A.   No.  Not unless it was busy or something
8  like that.  He was there to help out.  He would help
9  out.
10   Q.   So, you worked from 9:00 to 4:30?
11   A.   Yeah.
12   Q.   Would you wash cars throughout that period
13 of time?
14   A.   All day, yeah.
15   Q.   And would the defendant wash cars during
16 that time?
17   A.   No.
18   Q.   And did you know him to talk to him at that
19 point, when you first started there?
20   A.   No, not at first.
21   Q.   Now, do you recall a time when you began to
22 talk to one another?
23   A.   Yeah.
24   Q.   Do you remember whether -- you said it was
25 cold.  Was it before or after Christmas?
```

1396

```
1    A.   It was before Christmas.
2    Q.   And do you know if it was before or after
3  Thanksgiving?
4    A.   It was after Thanksgiving.
5    Q.   Okay.  So, in between November and
6  December?
7    A.   Yeah.
8    Q.   25th of 2004?
9    A.   Yeah.
10   Q.   You spoke to the defendant for the first
11 time?
12   A.   Yeah.
13   Q.   And did there come a time when he asked you
14 about -- well, tell me, did there come a time when
15 he talked to you about selling drugs?
16   A.   Yeah.
17   Q.   And how did that conversation come up?  Was
18 it just out of the blue?
19   A.   No, I was arguing on the phone, actually,
20 with Sherrell.  We wasn't arguing.  We was having
21 money problems and she was complaining about money,
22 and we both was going back and forth with each other
23 and he just -- he was there at the time and he said
24 he had a spot for me to make some money if I wanted
25 to make some money.
```

1397

```
1    Q.   And was Sherrell working at that time?
2    A.   No.
3    Q.   So, were you having money trouble?
4    A.   Yeah.
5    Q.   And he overheard this conversation?
6    A.   Yeah.
7    Q.   He wasn't a part of it, was he?
8    A.   No.
9    Q.   And when he said you want a spot --
10   A.   Yeah.
11   Q.   -- what did that mean to you?
12   A.   It sounded like a drug spot.  I mean, a
13 spot to sell drugs in.
14   Q.   You'd been involved in --
15   A.   Yeah, I been involved in drugs for a long
16 time.
17   Q.   Did you understand what he was talking
18 about?
19   A.   Yeah.
20   Q.   What did you say?
21   A.   I said all right.
22   Q.   And what did he say?
23   A.   We exchanged numbers and he said that night
24 he's going to call me.
25   Q.   And did you give him your number?
```

1398

```
1    A.   Yeah.
2    Q.   And did he call you?
3    A.   Yeah.
4    Q.   And did you talk to him that night?
5    A.   Not that night, no.  I didn't answer.
6    Q.   And why didn't you talk to him that night?
7    A.   Because I was -- Sherrell was like it
8 wasn't a good idea and she didn't think I should go
9 along with it.  So, I just didn't answer, I stayed
10 in the house that night.
11   Q.   So, you just didn't answer?  The
12 defendant's phone call, did you not answer it?
13   A.   No, I just didn't answer it.
14        MR. SMITH:  Objection, asked and
15 answered.
16        THE COURT:  I'm not sure what the answer
17 is, though.
18        You may ask the question.
19   Q.   Did you answer the defendant's phone call?
20   A.   No, I didn't answer the first time, no.
21   Q.   Did you see him at work the next day?
22   A.   Yeah.
23   Q.   At WJ's?
24   A.   Yes, WJ's.
25   Q.   And did you have any conversation?
```

1399

```
1    A.   Yeah, he just asked how come I didn't
2 answer the phone last night.
3    Q.   What did you tell him?
4    A.   I said -- I just told him I just didn't.
5 It wasn't no big conversation about why I didn't.
6    Q.   And did you just go back to work or did you
7 have further conversation?
8    A.   He just said he would call me tonight,
9 which was that night.
10   Q.   He, the defendant, said he would call you?
11   A.   That day, which was that night.
12   Q.   Did you have his phone number at that time?
13   A.   Yeah.
14   Q.   And so that night did you call him?
15   A.   No.
16   Q.   Did he call you?
17   A.   Yeah.
18   Q.   And what did he say at that time?
19   A.   Told me to meet him at the diner, diner on
20 -- I forgot the name, but the diner on Main Street.
21   Q.   And did you know at the time what diner?
22   A.   Yeah, because he told me.
23   Q.   The diner?
24   A.   The diner on Main Street.
25   Q.   And did you go to meet him?
```

1400

```
1    A.   Yeah.
2    Q.   So the first night you didn't answer the
3 phone call?
4        MR. SMITH:  Objection.
5        MR. MARKLE:  Your Honor, maybe it's
6 clear to the entire courtroom, but I'm just trying
7 to clarify, at least for myself.  I don't think
8 there is anything wrong with trying to get it in the
9 right chronology.
10        THE COURT:  Go ahead.
11   Q.   First night you did not answer the phone;
12 is that correct?
13   A.   No, I didn't.
14   Q.   Second night you did and you met with the
15 defendant?
16   A.   Yeah.
17   Q.   And who else?
18        MR. SMITH:  Objection.  He's simply
19 repeating this witness's testimony, your Honor.
20        THE COURT:  Overruled.
21   Q.   Who else was present at the diner?
22   A.   I don't know.  There was different people
23 at the diner.  Everybody, people that -- patrons of
24 the diner.
25   Q.   Was anybody else privy -- sitting with you
```

**GA350**

1401

```
 1   at the table?
 2        A.   Oh, no.
 3        Q.   -- to hear what you talked about?
 4        A.   No.
 5        Q.   Did you actually eat at the diner or just
 6   meet at the diner?
 7        A.   We met at the diner.
 8        Q.   And did you sit and talk, or not?
 9        A.   Yeah.
10        Q.   And what did you talk about?
11        A.   He just told me that he had a spot right
12   there.  He pointed to the building, building behind
13   the diner.  He said he had a spot back right there
14   in this building and he's going to bring me up
15   there.
16        Q.   And what did he do?
17        A.   He just brought me up there.
18        Q.   That same night?
19        A.   Yeah.
20        Q.   And about what time was this at?
21        A.   About 11:00, 12:00, 1:00.  Somewhere around
22   there.
23        Q.   And had you ever been inside that building
24   before?
25        A.   No, not before that day.
```

1402

```
 1        Q.   And did anyone else go with you and the
 2   defendant as you went into the building?
 3        A.   No.
 4        Q.   Where did you go in the building?
 5        A.   He took me to the second floor, Pops'
 6   house.
 7        Q.   Did you know where to go in the building?
 8        A.   No.  No, I didn't know where I was going.
 9        Q.   Who did you follow?
10        A.   I was behind Dready.
11        Q.   Dready.  Is that what you referred to the
12   defendant as?
13        A.   Yeah, D.
14        Q.   D?
15        A.   Yeah.
16        Q.   Or Dready?
17        A.   Dready, yeah.
18        Q.   Is that how you would refer to him in 2004
19   and 2005?
20        A.   Yeah.
21        Q.   And you indicated that -- did you go to a
22   specific apartment?
23        A.   Pops' apartment.
24        Q.   Do you remember what number apartment it
25   was?
```

1403

```
 1        A.   It was 215.
 2        Q.   215 Charles Street?
 3        A.   Yeah, that was the building.  I don't
 4   remember the exact door number that he lived in,
 5   but --
 6        Q.   And did you know Pops before that night?
 7        A.   No.
 8        Q.   And who told you his name was Pops?
 9        A.   D.
10        Q.   And did you actually meet Pops?
11        A.   Yeah.
12        Q.   And did you learn whether or not he lived
13   there?
14        A.   Yeah.
15        Q.   And did he?
16        A.   Yeah, he lived there.
17        Q.   And what were you -- what was your
18   conversation when you went inside the apartment?
19             MR. SMITH:  Objection.  Could he
20   establish a little more foundation about was there a
21   conversation, what was the conversation.
22             THE COURT:  Go ahead.
23        Q.   Mr. Womble, did you and the defendant have
24   a conversation that night?
25        A.   Yeah.
```

1404

```
 1        Q.   Inside apartment, the apartment at 215
 2   Charles Street?
 3        A.   Yeah.
 4        Q.   And was anyone else involved in that
 5   conversation?
 6        A.   No.
 7        Q.   Did it have to do with drug dealing?
 8        A.   Yeah.
 9        Q.   What was the conversation?
10             MR. SMITH:  Objection to the leading.
11   What was the conversation, is the question.
12             THE COURT:  You wanted the foundation,
13   he's laying the foundation.
14             You may go ahead.
15        Q.   What was the conversation, Mr. Womble?
16        A.   It was just basically he just had some
17   crack in his hands, he said, "this is dime bags of
18   crack," and just gave them to me.
19        Q.   He had the crack right there?
20        A.   Yeah.
21        Q.   And how was it packaged?
22        A.   In dime bags.
23        Q.   And could you just describe what a dime bag
24   is?
25        A.   It's little glassine bags, like, I don't
```

**GA351**

1405

```
1   know, little 11-by-11 glassine bags.
2       Q.   I mean you are pinching -- you are putting
3   your finger --
4       A.   Like little small bags.  That's the only
5   way I can describe them.  I don't know.
6       Q.   Indicating about an inch or so?
7       A.   Yeah, a little small bag.
8       Q.   How much is a dime bag worth?
9       A.   $10.
10      Q.   And what's in it?
11      A.   Crack; $10 worth of crack.
12      Q.   And how many dime bags did he give you?
13      A.   I don't remember the first night how many
14  was in the bag.  I don't.
15      Q.   Were there going to be other nights he gave
16  you drugs?
17      A.   Yeah.
18      Q.   And other days that he supplied you with
19  drugs?
20      A.   Yeah.
21      Q.   And on those future days and nights, how
22  many -- was there a standard amount of bags?
23      A.   It was usually 46 in a bag; 46 dime bags in
24  there.
25      Q.   And how much was each bag worth?
```

1406

```
1       A.   $10.
2       Q.   And how were they -- were they packaged the
3   same way you just described?
4       A.   Yeah, yeah.
5       Q.   Were all of those dime bags like loose and
6   thrown about or maintained in something else?
7       A.   They was -- all the small dime bags was in
8   one big sandwich bag.  Forty-six in a sandwich bag.
9       Q.   Now, when you were in the apartment and had
10  this conversation, was Pops involved in the
11  conversation?
12      A.   No.
13      Q.   Did Pops supply you with any drugs?
14      A.   No.
15      Q.   Did Pops give you any instructions about
16  selling?
17      A.   No.
18      Q.   Only the defendant?
19      A.   Yeah.
20      Q.   And do you know whether or not he had a key
21  to the apartment?
22      A.   I don't -- no, I don't know.
23      Q.   Did you?
24      A.   No.
25      Q.   And when you -- who set the price for the
```

1407

```
1   crack cocaine?  Did you decide how much to charge?
2       A.   No.  I automatically knew they was $10 bags
3   from my prior experience selling drugs.
4       Q.   Did you know how much you would make for
5   selling it?
6       A.   No, not the first time I didn't.
7       Q.   You didn't enter into any written contract
8   or anything like that?
9       A.   No.
10      Q.   After he gave you the drugs, after the
11  defendant gave you the drugs, what, if anything,
12  happened?
13      A.   I stayed in the house and he left.  He went
14  downstairs and said he would be outside.
15      Q.   And when you stayed in the house, was
16  anyone else there?
17      A.   Pop was there.
18      Q.   And did any customers come that night?
19      A.   Yeah.
20      Q.   About approximately what time was this now?
21      A.   This was between 11:00 and 1:00.  Somewhere
22  around there.
23      Q.   And did you sell any crack cocaine that
24  very night?
25      A.   Yeah.
```

1408

```
1       Q.   And how would you know customers were to be
2   served?
3       A.   He actually called me a couple of times,
4   said he had some people who was coming up.
5       Q.   Who called you?
6       A.   D actually called me a couple times that
7   night.
8       Q.   And did you have a cell phone?
9       A.   Yeah.
10      Q.   And did he have a cell phone?
11      A.   Yeah.
12      Q.   And is that how he talked to you?
13      A.   Yeah.
14      Q.   And after he would call you, would somebody
15  show up at the door?
16      A.   Yes.
17      Q.   And did you actually sell crack cocaine to
18  them?
19      A.   Yeah.
20      Q.   And do you recall approximately how much
21  you sold that first night?
22      A.   I don't remember.  It wasn't many.  About
23  maybe 10, 11, if that.
24      Q.   And when you were done -- well, what time
25  did you work from that first night?
```

**GA352**

1409

1    A.    I stayed there all night until the next
2  morning.  Maybe eight o'clock the next morning.
3    Q.    And what did you do that next morning when
4  you were ready to leave?
5    A.    He was -- Dready was downstairs waiting,
6  and I just got in the car with him and he took me to
7  WJ and I went to work after that.
8    Q.    He was outside where?
9    A.    Outside Charles Street waiting.
10   Q.    And did he have a car at that time?
11   A.    Yeah.
12   Q.    Do you remember what kind of car?
13   A.    A Cadillac.
14   Q.    And do you remember what year it was?
15   A.    It had to be '04 maybe.
16   Q.    '04?
17   A.    Yeah.
18   Q.    And did you have a car?
19   A.    Yeah.
20   Q.    And what kind of car did you have?
21   A.    I had a Cadillac also.
22   Q.    What year was yours?
23   A.    It was like '92.
24   Q.    '92?
25   A.    Yeah.

1410

1    Q.    And when you got in the defendant's car,
2  did you still have drugs on you?
3    A.    Yeah.
4    Q.    Did you have money on you?
5    A.    Yeah.
6    Q.    And what did you do with the drugs?
7    A.    I gave the drugs back to him.
8    Q.    So, you gave him the crack.  How much crack
9  did you have left?
10   A.    I don't remember.  I don't remember how
11 much was left, but I know there was some left,
12 though.
13   Q.    And you gave that to the defendant?
14   A.    Yeah.
15   Q.    Was anyone else in the car?
16   A.    No.
17   Q.    And did you give him the money?
18   A.    No.  He told me -- I was handing it to him,
19 he told me to keep the money the first night.
20   Q.    He told you to keep the money?
21   A.    Keep the money, yeah.
22   Q.    Now, you said you then went to the car
23 wash.  Did you keep working at the car wash?
24   A.    Yeah, I stayed working there.
25   Q.    And did you work at the car wash up until

1411

1  close in time to your arrest on this case?
2    A.    Yeah, maybe a few weeks before I got
3  arrested I stopped.
4    Q.    Did you continue to have a relationship
5  with Dready, or D, in the drug world?
6    A.    Yeah.
7    Q.    You worked for him?
8    A.    Yeah.
9    Q.    Did you continue to sell for him?
10   A.    Yeah.
11   Q.    And how many days a week would you go to
12 215 Charles Street to Pops' apartment and sell
13 drugs?
14   A.    Every day.
15   Q.    And from what hours -- at the beginning,
16 what hours did you work for D?
17   A.    From maybe eleven o'clock until eight.
18 Eleven o'clock at night until about eight o'clock in
19 the morning.
20   Q.    Now you sold drugs in the past without D,
21 right?
22   A.    Yeah.
23   Q.    Did you sell more or less crack cocaine
24 with D or before you met D?
25   A.    I sold more with him.

1412

1    Q.    So, you would go to work at the car wash.
2  What time would you leave the car watch?
3    A.    Maybe five, six o'clock, four.  Whenever I
4  got tired enough to leave.  I don't know.
5    Q.    And then where would you go?
6    A.    Go home.
7    Q.    And then where would you go?
8    A.    I would go home, go to sleep, and then I
9  would go back to Charles Street later on at night.
10   Q.    So you were working one legitimate shift
11 and one illegitimate shift?
12   A.    Yeah.
13   Q.    Every day?
14   A.    Yeah.
15   Q.    And was anyone else selling from the
16 apartment, Pops' apartment?
17   A.    Yeah.
18   Q.    So when you arrived there after going home,
19 sleeping, and then you would go over there, was
20 anyone working selling crack cocaine when you got
21 there?
22   A.    Yeah.
23   Q.    And who was that?
24   A.    Squeaky.
25   Q.    And how did you know who Squeaky was?  How

**GA353**

1413

```
1   did you meet Squeaky?
2       A.   Just met him when I got there in the
3   apartment.
4       Q.   Were you introduced to him by anyone or did
5   you just introduce yourselves?
6       A.   I don't remember if I was actually
7   introduced to him.  I don't remember.
8       Q.   And what would happen when you came in?
9   What would Squeaky do?
10      A.   Squeaky would leave.
11      Q.   What happened to the cocaine he still
12  hadn't sold during his shift?
13      A.   He would take it with him.
14          MR. SMITH:  I'm going to object to the
15  leading again.
16          THE COURT:  I don't see what's leading
17  about it.
18      Q.   You can answer that.  What would Squeaky do
19  with the crack cocaine he had not sold?
20      A.   He would take it with him.
21      Q.   And how did -- how did you have crack
22  cocaine to sell when you got there?
23      A.   Sometimes he would hand it to me, Squeaky
24  would hand it to me personally, or sometime he would
25  tell me it was in the house, someplace where he left
```

1414

```
1   it in the house, just get it out of the house.
2       Q.   What you do mean it was in the house?
3       A.   He would stash it around Pops' house, a few
4   -- couple stash spots around the house.
5       Q.   How did you know this was D, or Dready's,
6   crack cocaine he was selling?
7       A.   Because it was his spot.
8       Q.   And after you would work your shift --
9   again, you would work until the very early morning?
10      A.   Yeah.
11      Q.   When did you stop?
12      A.   Yeah, like seven, eight o'clock.
13      Q.   And approximately how many packages of
14  crack cocaine would you sell during that shift?
15      A.   It all depend on what kind of nights it
16  was.  Some nights I sold one, some nights I sold
17  five.  It all depend what day it was, how busy it
18  was.
19      Q.   Were you ever without crack cocaine?
20      A.   No, never without.
21      Q.   Did you ever call D and say I need it and
22  he said I don't have it?
23      A.   No.
24      Q.   It was a steady supply?
25      A.   Yeah.
```

1415

```
1       Q.   Did you -- so when you finished your shift,
2   if you had crack cocaine left over, what would you
3   do with it?
4       A.   I would take it home.
5       Q.   And what would you do with the money that
6   you made from selling the crack?
7       A.   I would hold on to it until I finished it
8   or until he came by and picked it up.
9       Q.   Until who came by?
10      A.   Until D came by and picked it up.
11      Q.   Did you ever give the money to anyone else?
12      A.   Yeah, I used to give it to Squeaky and he
13  used to -- he used to hand me the packs in return.
14  I hand him the money, he hand me the drugs.
15      Q.   And were there other times you gave it
16  directly to the defendant?
17      A.   Yeah.
18          THE COURT:  All right, it's three
19  o'clock.  We need to stop.
20          All right, Mr. Womble, you'll need to
21  return tomorrow to complete your testimony.
22          Ladies and gentlemen, would you kindly
23  wait for just a moment in your jury room.  Ms.
24  Torday has checks for you so we don't have to take
25  the time to be mail them out to you.  We will see
```

1416

```
1   you tomorrow.
2           (Jury exited the courtroom.)
3           THE COURT:  All right, we're in recess.
4           Will we do anything more than Mr. Womble
5   tomorrow?
6           MR. MARKLE:  We hope so.
7           MS. REYNOLDS:  We have Judith Rivera who
8   came in from out of town, so we would like to get to
9   her.  And also possibly Sherrell Randolph.  So --
10  and we have other people coming in.
11          THE COURT:  All right.
12          MS. REYNOLDS:  Just in case we pick up
13  the pace.
14          THE COURT:  Fine.  Anything else before
15  we recess?
16          MS. DAYTON:  Just for the record, the
17  marshals have indicated that either we'll remove the
18  jury before the witness comes in or the witness will
19  not be cuffed to come in.
20          THE COURT:  All right, if there is
21  nothing further, we will stand in recess.
22          See you tomorrow.
23          (Proceedings concluded 3:05)
24
25
```

1417

```
 1            I N D E X
 2
 3   WITNESS                                    PAGE
 4   JACQUELINE BRYANT-BULERIN
 5   Continued Direct Examination by Ms. Dayton  1194
 6   Cross-Examination by Mr. Smith              1199
 7   Redirect Examination by Ms. Dayton          1223
 8   Recross-Examination by Mr. Smith            1233
 9   Re-Redirect Examination by                  1236
     Ms. Rodriguez-Coss
10
11   WILLIAM SIMPSON
12   Direct Examination by Ms. Dayton            1244
13   Cross-Examination by Mr. Sheehan            1254
14
15   VENRO FLEMING
16   Direct Examination by Ms. Rodriguez-Coss    1285
17   Cross-Examination by Mr. Sheehan            1358
18   Redirect Examination by Ms. Rodriguez-Coss  1374
19
20   RODNEY WOMBLE
21   Direct Examination by Mr. Markle            1376
22
23
24
25
```

1418

```
 1        I certify that the foregoing is a correct
 2   transcript from the record of proceedings in the
 3   above-entitled matter.
 4                    4/29/11
 5                     Date
 6
 7              /S/  Sharon Montini
 8              Official Reporter
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1419

```
 1           UNITED STATES DISTRICT COURT
 2              DISTRICT OF CONNECTICUT
 3   * * * * * * * * * * * *    *
                                *
 4   UNITED STATES OF AMERICA,  *  Case No 6cr160(JBA)
                                *
 5           Plaintiff,         *
                                *
 6        vs.                   *
                                *
 7   AZIBO AQUART              *  April 29, 2011
                                *
 8           Defendant.         *
                                *
 9   * * * * * * * * * * * *    *
10              TRIAL TRANSCRIPT
11               VOLUME VII
12   BEFORE:  THE HONORABLE JANET BOND ARTERTON U.S.D.J.,
                                         and jury
13
     Appearances:
14   FOR THE GOVERNMENT:  ALINA REYNOLDS, ESQ
                          TRACY DAYTON, ESQ.
15                        PETER MARKLE, ESQ.
                          JACABED RODRIGUEZ-COSS
16                        United States Attorney's Office
                          915 Lafayette Blvd
17                        Bridgeport, CT 06604
18
     FOR THE DEFENDANT    MICHAEL SHEEHAN, ESQ
19   AZIBO AQUART:        Sheehan & Reeve
                          139 Orange Street
20                        New Haven CT 06510
21                        JUSTIN SMITH, ESQ.
                          383 Orange Street
22                        New Haven, CT 06511
23
24   Court Reporter:    Sharon Montini, RMR
25   Proceedings recorded by mechanical stenography,
     transcript produced by computer
```

1420

```
 1        THE COURT:  Good morning, counsel,
 2   ladies and gentlemen.  Before Mr. Aquart arrives, do
 3   we have any other matters to take up?
 4        MS. DAYTON:  No, your Honor.
 5        THE COURT:  Do you have any
 6   anticipation --
 7        MS. DAYTON:  Your Honor, there is one
 8   minor issue.  There is an individual here, Mr.
 9   Lovejoy, who is an investigator for the defense.
10   There was a joint defense before.  While Azibo
11   Aquart's team has indicated that they're not likely
12   to call him, he was on the witness list that was
13   given to the jurors.  He is going to be a witness in
14   Azikiwe Aquart's case, potentially, and the
15   government would ask that he be excluded during a
16   witness's testimony.
17        THE COURT:  But if he's not going to be
18   a witness in this case --
19        MS. DAYTON:  He's on the witness list.
20        THE COURT:  Well, if he's here, he's not
21   going to be a witness in this case.
22        MS. DAYTON:  Okay, I'm just putting it
23   on the record, your Honor.
24        THE COURT:  Okay.
25        MS. DAYTON:  Because we had issues about
```

1421

```
1    sequestration.
2              MR. SHEEHAN:  That's fine, your Honor.
3              THE COURT:  Okay.  Well, he has a right
4    to be here if he's not going to be a witness.
5              MS. DAYTON:  That's fine.  Yeah.
6              THE COURT:  All right, Mr. Sullivan?
7              MR. SULLIVAN:  Yes.  Good morning, your
8    Honor.
9              THE COURT:  Good morning.
10             MR. SULLIVAN:  I would ask, though, is
11   the government going to claim in the next trial this
12   is somehow in violation of a sequestration order?
13             THE COURT:  No.  No, because it's a
14   sequestration order in this case.
15             MS. DAYTON:  I wouldn't claim it a
16   violation, but if Mr. Lovejoy were to take the stand
17   he would be asked if he sat here during Womble's
18   testimony.
19             THE COURT:  Sure.
20             MS. DAYTON:  Okay.
21             THE COURT:  All right then.
22             Good morning, Mr. Aquart.
23             THE DEFENDANT:  Good morning.
24             THE COURT:  Are we ready to begin?
25             MS. DAYTON:  Can we bring -- let's bring
```

1422

```
1    the witness out now.
2              THE COURT:  Good morning, Mr. Womble.
3              THE DEFENDANT:  Good morning.
4              THE COURT:  All right, we'll bring in
5    the jury.
6              (Jury entered the courtroom.)
7              THE COURT:  All right, good morning,
8    ladies and gentlemen, on this totally gorgeous
9    morning.  Please be seated.  And we will continue
10   examination of Mr. Womble by Mr. Markle.
11             MR. MARKLE:  Thank you, your Honor.
12             R O D N E Y   W O M B L E
13   Having previously affirmed, was examined and
14   testified as follows:
15   CONTINUED DIRECT EXAMINATION
16   BY MR. MARKLE:
17        Q.  Good morning, Mr. Womble.
18        A.  Good morning.
19        Q.  Mr. Womble, yesterday you had mentioned
20   that you lived on Fairmont Street in Bridgeport.
21        A.  Yeah.
22        Q.  In 2004 and 2005.
23        A.  Yeah.
24        Q.  And approximately how far was Fairmont,
25   your Fairmont apartment, from the Charles Street
```

1423

```
1    apartments?
2         A.  Two blocks, two and a half blocks.
3         Q.  So, it was a fairly easy walk.
4         A.  Yeah, walking distance.  Yeah.
5         Q.  And who lived there with you?
6         A.  Sherrell.
7         Q.  I'm going to show you a photograph that's
8    been marked Government's Exhibit 211 and ask you if
9    you recognize on your monitor who that is.
10        A.  That's Sherrell.
11        Q.  That's Sherrell?
12        A.  Yeah.
13        Q.  And that's who you lived with?
14        A.  Yeah.
15        Q.  And I'm going to ask you to look at another
16   photograph, and if you recognize what that depicts.
17        A.  Yeah.
18        Q.  Government's Exhibit 200.
19        A.  Yeah, that's where I lived at.
20        Q.  Is that Fairmont Street?
21        A.  86 Fairmont, yeah.
22        Q.  And that's where you lived with Sherrell?
23        A.  Yeah.
24        Q.  And back in 2004, 2005, when you lived with
25   Sherrell, how did she refer to you?  Did she call
```

1424

```
1    you Rodney, Rodney Womble?  How did she refer to
2    you?
3         A.  Womble.
4         Q.  Womble?
5         A.  Yeah.
6         Q.  And how did the defendant refer to you?
7         A.  Big Man.
8         Q.  Big Man?
9         A.  Big Man.
10        Q.  And how did you refer to the defendant?
11        A.  D.
12        Q.  And going back to selling on the -- you
13   were telling us that you worked what I call the late
14   shift?
15        A.  Yeah.
16        Q.  And how many packages of crack cocaine
17   would you get at a time to sell during the late
18   shift?
19        A.  Is started out with just one a night.  One
20   package a night of 46.
21        Q.  I'm sorry?
22        A.  One package a night of 46 cracks.
23        Q.  And did it ever change in the number of
24   bags that you received in the package?  Was it
25   always 46 bags?
```

1425

```
1     A.   Yeah.
2     Q.   And who did you get that from?
3     A.   From D.
4     Q.   And what would happen if you ran out?  What
5  if you sold all 46?
6     A.   I would call him and tell him I didn't have
7  anymore.
8     Q.   And who would come and give you more?
9     A.   I would meet him or he would come by my
10 house and drop it off.
11    Q.   And who?  When you say "he"?
12    A.   D.
13    Q.   Did anyone else at that time deliver the
14 crack cocaine to you if you ran out?
15    A.   Yeah.
16    Q.   Who was that?
17    A.   Squeaky used to.  Squeaky used to exchange
18 back and forth.
19    Q.   I'd ask you to look at this photograph.  Do
20 you recognize the person depicted in Government's
21 Exhibit 220?
22    A.   That's Woby (ph).
23    Q.   And is that -- did he work any of the
24 shifts?
25    A.   Yeah.
```

1426

```
1     Q.   And which shift did he work?
2     A.   In the morning when I would leave, he would
3  come.
4     Q.   And what would he do when he came in?
5     A.   He would just come and prepare to sell his
6  crack that he had.
7          THE COURT:  Are you offering 220?
8          MR. MARKLE:  I thought that was in, your
9  Honor.  I would offer it, yes.
10         THE COURT:  Absent objection, it's a
11 full exhibit.
12         MR. SMITH:  No objection.
13         MR. SHEEHAN:  Your Honor, I think that's
14 probably true for the previous exhibit.
15         THE COURT:  Actually, I just checked, it
16 is apparently in.
17         MR. SHEEHAN:  Oh, okay.
18         THE COURT:  Ms. Torday advises.  211 you
19 mean?
20         MR. SHEEHAN:  Yes, your Honor.
21    Q.   Mr. Womble, looking at Government's
22 Exhibit 221, do you recognize that individual?
23    A.   Yeah.
24    Q.   And who is that?
25    A.   That's Squeaky.
```

1427

```
1     Q.   Squeaky?
2     A.   Squeaky.
3     Q.   Just speak up a little bit.
4     A.   Squeaky.
5     Q.   Thank you.  And that's the person you said
6  was doing the shift before you?
7     A.   Yeah.
8     Q.   And were you ever present when Squeaky was
9  selling crack cocaine?
10    A.   Yeah.
11    Q.   Would you remain in the apartment?
12    A.   I would hang around for a little while
13 before I left.
14    Q.   And would the same be true with Woby?
15    A.   Yeah.
16    Q.   So you actually saw them selling crack
17 cocaine?
18    A.   Yeah, I would hang around.
19    Q.   And do you know how many packages of crack
20 cocaine Squeaky would sell during his shift?
21    A.   No, I don't know that.
22    Q.   How about Woby?
23    A.   No.
24    Q.   From December of 2005 to August of 2005,
25 did you ever get crack cocaine from anyone other
```

1428

```
1  than the defendant?
2     A.   No.
3     Q.   Did you --
4          THE COURT:  December '04 to August of
5  '05?
6          MR. MARKLE:  I'm sorry, yes, your Honor.
7          THE COURT:  Is that what you mean?
8          MR. MARKLE:  Yes.  Thank you.
9     Q.   Is your answer still the same?
10    A.   No, I was getting it from him.
11    Q.   And did you ever sell for anyone other than
12 the defendant during that period of time?
13    A.   No.
14    Q.   Did you ever deliver drugs for anyone other
15 than the defendant during that time?
16    A.   No.
17    Q.   Did you ever collect money for anyone other
18 than the defendant during that time?
19    A.   No.
20    Q.   For how long a period of time did you work
21 that shift from 11:00 p.m. to about 8:00 a.m.?
22    A.   Maybe a few weeks.  Maybe about a month at
23 the most.
24    Q.   I'm sorry?
25    A.   Maybe a month.  A month.
```

1429

```
1    Q.   And did Squeaky continue to work for the
2  defendant during that time?
3    A.   He worked for him, yeah, but they had some
4  sort of argument and Squeaky never came back around
5  again.  I haven't seen him.  He wasn't -- he
6  wasn't -- he wasn't there where he supposed to be at
7  before I came, so --
8    Q.   You mean before you came on to your shift?
9    A.   Before I came on to the building, yeah,
10  eleven o'clock, twelve.
11    Q.   Did that create a problem between Squeaky
12  and the defendant?
13    A.   No.
14    Q.   Did Squeaky continue to work for the
15  defendant?
16    A.   No, he had stopped.
17    Q.   And that was about a month after you had
18  started?
19    A.   Yeah.
20    Q.   And how about Woby, did he continue?
21    A.   No.
22    Q.   Do you know why he stopped?
23    A.   No, I don't know.
24    Q.   Well, what happened?  Well, first of all,
25  did you pay Woby and Squeaky?
```

1430

```
1    A.   Did I pay them?
2    Q.   Yeah.
3    A.   No.
4    Q.   Who paid them?
5    A.   I don't know.
6    Q.   For their work at Charles Street, do you
7  know who paid them?
8    A.   No, I don't know.
9    Q.   But it wasn't you?
10    A.   No.
11    Q.   And after they stopped working there, did
12  your role in the operation change?
13    A.   Yeah.
14    Q.   And how did it change?
15    A.   I became the lieutenant of the build -- I
16  say the "building," I mean 215.  I'm just so used to
17  calling it the building.  Of the building.
18    Q.   But just your -- that apartment?
19    A.   Yeah.
20    Q.   Or any other apartments?
21    A.   No, just that apartment at first.
22    Q.   And who made you the lieutenant?
23    A.   Dreddy.
24    Q.   And did he tell you what your role would be
25  as a lieutenant for him?
```

1431

```
1    A.   Just -- yeah.
2    Q.   And what was your role now?
3    A.   Just he hand me the drugs and I hand them
4  to Frankie and -- actually, Frankie.
5    Q.   And let me show you -- well, did you take
6  on that role?
7    A.   Yeah.
8    Q.   And did you make more money or less money
9  for --
10    A.   More.
11    Q.   -- taking on that role?
12    A.   More.
13    Q.   More?
14    A.   Yeah, more.
15    Q.   And who paid you for that role?
16    A.   D.
17    Q.   Did anyone else ever pay you?
18    A.   No.
19    Q.   And how much were you paid for being a
20  lieutenant for D?
21    A.   Well, I get paid in -- it's hard to
22  explain, but I got paid in drugs, and I had to sell
23  the drugs in order to get the money.
24    Q.   So explain what you mean you were paid in
25  drugs.  How much drugs were you given?
```

1432

```
1    A.   In a 46, say in a package of 46, that's one
2  package, I would get maybe three or four for myself.
3  So, I would give them to Frankie to sell them in
4  order to get my money.
5    Q.   So three or four packages?
6    A.   Of 46, yeah.
7    Q.   Forty-six bags?
8    A.   Yeah.
9    Q.   Would be your profit?
10    A.   Yeah.
11    Q.   So, it was a substantial amount of money?
12    A.   Yeah.
13    Q.   And you would have -- you said Frankie
14  would sell yours?
15    A.   Yeah.
16    Q.   And then that money didn't go back to D?
17    A.   No.
18    Q.   But what happened to the other money, the
19  rest of the bags sold, who did that go to?
20    A.   That was his money.
21    Q.   The defendant's?
22    A.   Yeah, that was Dreddy's money.
23    Q.   Did he get more money out of the package
24  than you did or did you make more?
25    A.   He got more.
```

1433

```
1    Q.   Before you became a lieutenant, was there a
2   period of time where you were selling more than just
3   from 11:00 to 8:00 a.m.?  Did you have to fill in
4   for Squeaky and Woby?
5    A.   Yeah, I did a couple of times.
6    Q.   But not for too long a period of?
7    A.   No, not for too long.
8    Q.   And then you mentioned Frankie came on the
9   scene.  Do you remember who hired Frankie?
10   A.   Dreddy did.
11   Q.   Did you know Frankie before?
12   A.   No, not before.
13   Q.   Had you ever met him before?
14   A.   No, not before I started dealing with
15  Charles Street.
16   Q.   Did you decide he should be somebody who
17  participated in the operation?
18   A.   No.
19        MR. SMITH:  Objection, leading.
20        THE COURT:  Overruled.
21   Q.   Did you?
22   A.   No.
23   Q.   Did you have any discussion about that with
24  Dreddy?
25   A.   No.
```

1434

```
1    Q.   And so he was hired by Dreddy alone?
2    A.   Yeah.
3    Q.   And what was Frankie's role in the
4   operation?
5    A.   To sell the cracks.  To sell the drugs.
6    Q.   From apartment at 211?
7    A.   Yeah, Pops' house.
8    Q.   And showing you -- can you see the person
9   depicted in Government's Exhibit 212?
10   A.   Yeah, that's Frankie.
11   Q.   That's the person you know as Frankie?
12   A.   Yeah.
13   Q.   And did Frankie sell alone or did he have
14  anyone else helping him?
15   A.   Frankie sold alone for a while, he'd stay
16  up for a couple of days, and then he would go to
17  sleep, and that's how Vanessa got involved.
18   Q.   I'm sorry?
19   A.   That's how Vanessa got involved.
20   Q.   And do you know -- is that how you referred
21  to her, as Vanessa?
22   A.   Yeah, Vanessa.
23   Q.   Do you know her real name or if that's her
24  real name?
25   A.   That's what I called her.  That's what she
```

1435

```
1   was known by to me.
2    Q.   Did you hire Vanessa?
3    A.   No.
4    Q.   Did you bring her into apartment 211?
5    A.   No.
6    Q.   Do you know who hired her?
7    A.   She just -- she just took on the role by
8   herself.  When he fell asleep, she just took up the
9   role.  She would pick up the slack when he went to
10  sleep.  So that's how she came onboard.
11   Q.   And did she do this for free or did she
12  earn money doing this?
13   A.   She was paid.
14   Q.   And did you pay her?
15   A.   No.
16   Q.   Who paid her?
17   A.   D.
18   Q.   Showing you Government's Exhibit 213, do
19  you recognize the person in that photograph?
20   A.   Yeah, Vanessa.
21   Q.   That is Vanessa?
22   A.   Yeah.
23   Q.   And what hours did Frankie, with the help
24  of Vanessa, work out of apartment 211 selling crack
25  cocaine?
```

1436

```
1    A.   All day.
2    Q.   All day?
3    A.   All day.
4    Q.   How about night?
5    A.   All day.  All 24 hours; all day and night.
6    Q.   And did customers come in and out of
7   apartment 211 all day and all night?
8    A.   All day.  All day.
9    Q.   Was it a steady flow or just one every
10  couple of hours?
11   A.   It all depends how the flow went, how busy
12  it was.  Sometime it was a steady flow, but sometime
13  it would take a couple of hours.
14   Q.   When it was a steady flow, give us an idea
15  how many people would come in to the apartment in an
16  hour?
17   A.   You might sell a whole 46 in one hour.  You
18  might sell a whole bag in one hour.
19   Q.   Did some customers buy more than one bag?
20   A.   Yeah.
21   Q.   How many bags would an average customer
22  purchase?
23   A.   Average one, about two or three.  We had
24  some people come that would buy maybe eight, nine,
25  ten.
```

**GA359**

1437

```
 1    Q.   Now, when you gave the crack cocaine -- you
 2  got the crack cocaine from the defendant, where
 3  would you meet him to get the crack cocaine?
 4    A.   Sometime at his house.
 5    Q.   At his?
 6    A.   Sometime at his house.
 7    Q.   Do you know where he lived?
 8    A.   On Read Street.
 9    Q.   And I will show you - do you recognize
10  what's depicted in Government's Exhibit 202?
11    A.   That's Dreddy's house.
12    Q.   Dreddy's house?  You have to speak up a
13  little bit.
14    A.   Yeah, that's where he lived.
15    Q.   Is that the house he lived in?
16         THE COURT:  202 is not in.
17         MR. SMITH:  Can we just do what we were
18  doing, where we shows the witness first, and just do
19  that.
20         THE COURT:  You are offering this now?
21         MR. MARKLE:  I am.  I'm sorry.
22         MR. SMITH:  No objection.
23         THE COURT:  It's been identified.  202
24  is a full exhibit.
25    Q.   And that's where you would meet Dreddy to
```

1438

```
 1  get crack cocaine?
 2    A.   Yeah.  Sometimes, yeah.
 3    Q.   And where else would you meet him?
 4    A.   He would come to my house sometime or I
 5  would go meet him on the street somewhere.
 6    Q.   And in terms of paying Frankie, do you know
 7  how much Frankie was paid for working day and night
 8  at apartment 211 for the defendant?
 9         MR. SMITH:  Objection to the form.
10         THE COURT:  Sustained.
11    Q.   Do you know how much he was paid?
12    A.   Yeah, Frankie used to get maybe one pack of
13  46, or maybe two.  It would all depend.
14    Q.   So, when you say he would get one pack or
15  two, that would be -- whatever he sold that for
16  would be his profit?
17    A.   Yeah, yeah.
18    Q.   And if he smoked it he had no profit?
19    A.   No, that was his problem.
20    Q.   It was up to him?
21    A.   Yeah.
22    Q.   And who decided he would get one pack or
23  two packs?
24    A.   D.
25    Q.   Did you have any say in what he was paid?
```

1439

```
 1    A.   No.
 2    Q.   Did you ever discuss that with the
 3  defendant?
 4    A.   No.
 5    Q.   You just knew how much money you had to get
 6  back from Frankie?
 7    A.   Well, when he got paid I didn't get no
 8  money back from him.  I didn't have to get no money,
 9  because that was his pay.
10    Q.   But if Frankie was given his pack -- how
11  much would you give Frank each day, or each shift,
12  to sell?  How many packs?
13    A.   One.  Like I said, it all depends how busy
14  it was.  It was one.  Most of the time it was one.
15  When he finished, I would go give him another one.
16    Q.   Why did you give him only one if you knew
17  he could sell two or three during the course of the
18  day?
19    A.   That was his -- that was D's call.
20    Q.   So every time you gave him a pack, would
21  you get money for the previous one?
22    A.   Yeah.
23    Q.   And what would you do with that money?
24    A.   Just hold on to it until --
25    Q.   And was that your money to spend?
```

1440

```
 1    A.   No, no, no.
 2    Q.   Was that your money to keep?
 3    A.   No.
 4    Q.   What did you do with that money eventually?
 5    A.   I would hold it until all of the packs I
 6  had was done, and then I would call him and tell him
 7  we're done and he would come and get the money.
 8    Q.   Who would you call?
 9    A.   D.
10    Q.   Could anyone come in to apartment 211 and
11  start selling crack cocaine?
12    A.   No.
13    Q.   Who decided who could sell and who couldn't
14  sell from apartment 211?
15    A.   D.
16    Q.   Were there any other apartments at Charles
17  street that were used in regards to your drug
18  operation?
19    A.   Yeah.
20    Q.   And what apartment was that?
21    A.   This lady Judy, I forgot the number of the
22  door, but Judy was her name.
23    Q.   And let me show you.  Do you recognize the
24  woman depicted in that photo?
25    A.   Yeah, that's Judy.
```

1441

1      MR. MARKLE:  I believe it's been put in,
2  your Honor.
3      THE COURT:  It is.
4   Q.   That's Judy?
5   A.   Judy, yeah.
6   Q.   Do you know her full name?
7   A.   No, I just knew her Judy.
8   Q.   And you said there was an apartment that
9  Judy had?
10  A.   Yeah.
11  Q.   How was that used in regards to your drug
12 operation?
13  A.   It was used for the lookout.  Actually, a
14 lookout apartment.
15  Q.   And what do you mean by a "lookout
16 apartment"?
17  A.   Dreddy had a couple of people up there
18 looking out.  You know, her apartment was facing the
19 front of the building, so just in case anything was
20 -- like police came or any kind of riot, anything
21 was going on, they would know first what was going
22 on.
23  Q.   And did you know Judy before you started
24 working for the defendant?
25  A.   No.

1442

1   Q.   And are you the one who asked Judy if you
2  could use her apartment?
3   A.   No.
4   Q.   Did you put people -- did you decide who
5  would be in her apartment?
6   A.   No.
7   Q.   To act as lookouts?
8   A.   No.
9   Q.   Who did that?
10  A.   Dreddy.
11  Q.   And was that apartment in a good location
12 to do that?
13  A.   Yeah.
14  Q.   And you said it looked out on what street?
15  A.   On the front of Charles Street.  From the
16 front you see Charles Street and Main Street.
17  Q.   And who advised you that you now had a
18 lookout apartment?  How did you learn of that?
19  A.   Dreddy told me.  He had two people up
20 there.
21  Q.   And do you remember who those two people
22 were who acted as lookouts?
23  A.   One guy's name was Stone and one guy's name
24 was Bear.
25  Q.   Do you recognize the person in Government's

1443

1  Exhibit 215?
2   A.   Yeah, that's Bear.
3   Q.   Is that how Bear -- is that how he appeared
4  when he was acting as a lookout on behalf of
5  Dreddy's operation?
6   A.   Yeah, that's Bear.
7      MR. MARKLE:  I believe it's in, your
8  Honor, but I've lost track, to be honest, so I'll
9  offer it.
10  Q.   And did he act as a lookout?
11  A.   Yeah.
12  Q.   And for how long a period of time did he
13 act as a lookout?
14  A.   He was up there maybe two, three months.
15  Q.   And you indicated that there was another
16 individual who participated as a lookout?
17  A.   Yeah.
18  Q.   For the same period of time?
19  A.   Yeah.
20  Q.   And did you know this individual before you
21 started working for Dreddy?
22  A.   No.
23  Q.   And did you decide that this person would
24 be a lookout?
25  A.   No.

1444

1   Q.   Did you hire him?
2   A.   No.
3   Q.   Who did?
4   A.   Dreddy.
5   Q.   And do you see Government's Exhibit 216?
6   A.   Yeah.
7   Q.   Is that -- do you recognize that person?
8   A.   That's Stone.
9   Q.   Stone?
10  A.   Stone.  Stone.
11  Q.   And that was the other lookout?
12  A.   Yeah.
13     MR. MARKLE:  Offer 216, your Honor.
14     THE COURT:  I think it's already in.
15 It's in.
16  Q.   And do you know how much Stone and Bear
17 were paid?
18  A.   Maybe two packs.  Like 46 --  I say
19 "packs."  Forty-six is in a pack.  Maybe two every
20 week.
21  Q.   Again, did you decide how many packs to
22 give them for acting as a lookout?
23  A.   No.
24  Q.   Who told you how much to pay them?
25  A.   Dreddy.

1445

```
1    Q.   And how often were they in Judy's
2  apartment?
3    A.   Every day.
4    Q.   And how would they communicate with the
5  people in apartment 211?
6    A.   Everybody had cell phones.
7    Q.   And who provided the cell phones?
8    A.   Dreddy.
9    Q.   And was Judith paid for allowing her
10 apartment to be used that way?
11   A.   I don't know.  I never paid her.
12   Q.   You didn't pay her?
13   A.   No.
14   Q.   You know that Stone and Bear were paid
15 because how?
16   A.   I paid them.
17   Q.   Now, Mr. Womble, if you weren't available
18 to deliver the crack cocaine to apartment 211, would
19 the operation shut down?
20   A.   No.
21   Q.   What would happen?
22   A.   I would -- most of the time I would call
23 Sherrell.  My girlfriend, Sherrell, used to bring it
24 back and forth.
25   Q.   And did she know where the -- how would she
```

1446

```
1  obtain the crack cocaine?
2    A.   Well, I had it in my house and I would tell
3  her where it was at and she would just get it and
4  bring it there, or they would come by the house and
5  exchange it that way.
6    Q.   And where would you keep it in your house?
7    A.   I had a coffee can, a hollowed out coffee
8  can on the bottom; unscrew it and it was hollow
9  inside.
10   Q.   I want to show you what's been marked
11 Government's Exhibit 200F for Identification, ask if
12 you recognize that item.
13   A.   Yeah, it's a can like that.
14   Q.   Okay.  And it was hollowed out?
15   A.   Yeah.
16   Q.   Meaning it had a secret compartment area?
17   A.   Unscrew the bottom of it, yes.
18   Q.   Is that the can that you had?
19   A.   I don't know if this is the can.
20   Q.   If you unscrewed the bottom, would that
21 help you know if that's it?
22   A.   It may be.
23   Q.   Well, why don't you unscrew the bottom.
24   A.   Yeah, it was a can just like this one.
25 Exactly like this one.
```

1447

```
1          MR. MARKLE:  I would offer that, your
2  Honor.
3          MR. SMITH:  Your Honor, I'm going to
4  object.  He said it's a can just like that.
5          MR. MARKLE:  I offer it subject to
6  connection, your Honor, 200F for Identification at
7  this point only.
8    Q.   That's exactly like the can you had in your
9  home?
10   A.   Yeah.
11   Q.   And it has the same bottom false
12 compartment you had in your home?
13   A.   Yeah.
14   Q.   Was there anything else that you kept the
15 crack cocaine in, any other kind of containers?
16   A.   I had a candle also.  A candle; hollowed
17 out candle the same way.
18   Q.   Any other items?
19   A.   No.
20   Q.   And did Sherrell know that the coffee can
21 would sometimes contain crack cocaine?
22   A.   Yeah, she knew.
23          MR. SMITH:  Objection -- sorry,
24 withdrawn.
25   Q.   How did Sherrell know where to get the
```

1448

```
1  crack cocaine from?
2    A.   I would tell her.
3    Q.   And when she would deliver crack cocaine,
4  did she ever have occasion to collect money?
5    A.   Yeah.
6    Q.   And what would she do with the -- was the
7  money the drug proceeds from drug sales?
8    A.   Yeah.
9    Q.   What would she do with that money?
10   A.   She would know just to hold on to it.  I
11 just kept it -- well, on top of the dresser,
12 wherever.  I just put a rubber band and hold on to
13 it.
14   Q.   So, she would give it to you?
15   A.   Yeah, she make sure I got it to hold on to.
16   Q.   And you would hold on to it until you gave
17 it to who?
18   A.   Dreddy.
19   Q.   And who would Sherrell give the crack
20 cocaine to?
21   A.   Frankie or Vanessa.
22   Q.   Was anyone else working, selling there
23 during the time you were bringing the crack cocaine
24 over as the lieutenant?
25   A.   No.
```

**GA362**

1449

```
1     Q.    Would you ever give, or Sherrell give,
2   crack cocaine to the sellers before they paid you or
3   her for the packages they already sold?
4     A.    Not unless I told her to.  But she
5   wouldn't.
6     Q.    Did you know a person by the name of -- who
7   was referred to as Pops?
8     A.    Yeah.
9     Q.    Do you recognize the person depicted in
10  Government 229?
11    A.    Yeah, that's Pop.
12    Q.    And do you know where he lived?
13    A.    On Charles Street.
14    Q.    In what apartment?
15    A.    In the apartment that we was using.
16    Q.    And do you know, what was Pops' role in the
17  operation?
18    A.    Just using his apartment.
19    Q.    And did you know Pops before you ever
20  entered Charles street?
21    A.    No.
22    Q.    Did you know Pops before you ever met the
23  defendant?
24    A.    No.
25    Q.    Did you ask Pops if you could use his
```

1450

```
1   apartment to sell drugs from?
2     A.    No.
3     Q.    Do you know who arranged that?
4     A.    Dreddy.  It was already arranged when I
5   came on board.
6     Q.    Do you know if Pops is still living?
7     A.    I heard he died.
8     Q.    You don't know?
9     A.    I don't know for sure.
10    Q.    And was Pops paid for the use of his
11  apartment?
12    A.    I never paid him.  Like I used to buy
13  groceries for him, you know, make sure he got
14  cigarettes and stuff he needed.  I never actually
15  paid him money or nothing.
16    Q.    Did Dreddy know that you did that?
17    A.    Yeah.
18    Q.    How did he know that?
19    A.    He used to tell me to do it sometime, but
20  sometime I took it upon myself when I seen there
21  wasn't no food in the house.
22    Q.    So groceries, cigarettes.  Anything else?
23    A.    Yeah, whatever he needed.  Yeah.
24    Q.    Did you ever have occasion to help package
25  or bag up crack cocaine?
```

1451

```
1     A.    Yeah.
2     Q.    And was that during the same time period?
3     A.    Yeah.
4     Q.    And while -- was it while you were working
5   for Dreddy?
6     A.    Yeah.
7     Q.    And did that have anything to do with
8   Dreddy?
9     A.    Yeah.
10    Q.    What did you -- how did that become about?
11  How many times did you package up or bag up crack
12  cocaine?
13    A.    Maybe two or thee.  I tried not to do it
14  because it was too -- sitting there doing that took
15  a long time, so I tried not to do it unless he
16  really, really needed me to do it.
17    Q.    So, it's --
18    A.    A long process, yeah.
19    Q.    Thank you.  And who asked you to
20  participate in that process?
21    A.    Dreddy.
22    Q.    And were you paid for doing that?
23    A.    No.
24    Q.    It was part of your role as a lieutenant?
25    A.    Yeah.
```

1452

```
1     Q.    And who else was present the first time you
2   did it?
3           MR. SMITH:  Objection, leading.
4     Q.    Was anyone else present when you did it?
5     A.    No.
6     Q.    So, who was present when you packaged crack
7   cocaine?
8     A.    Just me and Dreddy.
9     Q.    Just you and the defendant?
10    A.    Yeah.
11    Q.    And where did you do that?
12    A.    We did it on Read Street, and he had
13  another apartment on -- I want to say Hallet or
14  Pembroke, somewhere around there.
15    Q.    While you mention that, let me show you, do
16  you recognize what's depicted in Government's 204?
17    A.    Yeah.
18    Q.    And what is that?
19    A.    That's the apartment on the second floor --
20  the first floor right there.
21    Q.    That's the apartment?
22    A.    We used to go there and bag up.
23    Q.    That's the other place you bagged up?
24    A.    Yeah.
25          MR. MARKLE:  Offer Government's
```

**GA363**

1453

```
1   Exhibit 204 as a full exhibits, your Honor.
2           MR. SMITH:  No objection.
3           THE COURT:  All right, it's a full
4   exhibit.
5       Q.   And who had the apartment in the building
6   shown in Government's 204?
7       A.   That was Dreddy's apartment.
8       Q.   And you said it was on the second floor of
9   that building?
10      A.   Well, actually you had to go up the stairs,
11  but it was the first -- where the set of windows is
12  at right there.
13      Q.   And you've been there on a number of
14  occasions, or one?
15      A.   Been there a few times.  Quite a few.
16      Q.   You'd been there quite a few?
17      A.   I been there several times.
18      Q.   And one time or more than one did you bag
19  up crack cocaine?
20      A.   More than once.
21      Q.   When we're talking about packaging or
22  bagging up, can you explain the process?
23      A.   He have a table, a plate full of crack
24  cocaine on the table, and we just sit there, out of
25  a big block, we would chop it up into smaller
```

1454

```
1   blocks, put it in smaller pebbles, put it in the
2   bags.
3       Q.   How did you chop it up?
4       A.   Razors.
5       Q.   Did you bring the big batch of crack
6   cocaine to that package session?
7       A.   No, it was there.
8       Q.   Who did?
9       A.   It was there.  Dreddy did.
10      Q.   And who provided what you chopped it up
11  with?
12      A.   Dreddy.
13      Q.   And who provided the bags that you put it
14  in?
15      A.   Dreddy.
16      Q.   And who took possession of that crack
17  cocaine after it was packaged?
18      A.   Dreddy.
19      Q.   Did you -- would you wear gloves or masks
20  or were any special items used when you did this?
21      A.   I wore gloves maybe once or twice while I
22  was there.
23      Q.   What kind of gloves?
24      A.   Rubber latex glove.
25      Q.   And how long would the process take?
```

1455

```
1       A.   A couple hours.  A few hours.
2       Q.   And how many small bags of crack cocaine
3   did you prepare during that session?
4       A.   I never counted.  We just bag it up and
5   throw them into a big pot or something, big bowl,
6   whatever was on the table.
7       Q.   Would you say it was more than ten?
8       A.   Yeah, a lot more than ten.  Enough to bag
9   up maybe three or four packs of 46.
10      Q.   So, we're talking hundreds of bags.
11      A.   Yeah.
12      Q.   Did you ever cook up crack cocaine -- or
13  cocaine and make it into crack cocaine?
14      A.   Excuse me?
15      Q.   Did you ever cook up cocaine?
16      A.   Yeah.  Yeah, I did it.
17      Q.   And did you do that with the defendant, or
18  not?
19      A.   No, I did it on my own.
20      Q.   And was that before you were involved with
21  the defendant or after?
22      A.   Yeah, yeah.
23      Q.   Before?
24      A.   Before.
25      Q.   Did you ever participate in that procedure
```

1456

```
1   with the defendant?
2       A.   No.
3       Q.   Did you ever package up marijuana?
4       A.   Yeah.
5       Q.   Was that during this time or --
6       A.   Yeah, yeah.
7       Q.   And whose marijuana was that?
8       A.   I had got some marijuana from Dreddy.
9       Q.   And how was that packaged?
10      A.   He gave me -- I want to say little gum ball
11  -- balls that go into -- you might put a quarter in
12  the gum ball machine and the big plastic thing come
13  out of that.  We had those.
14      Q.   Did you have any of those gum ball
15  containers?
16      A.   Yeah, I had one bag over there.
17      Q.   How did you get that bag?
18      A.   Dreddy gave it to me.
19      Q.   I want to show you Government's 200B and
20  ask you just if you recognize those items.
21      A.   Yeah.
22      Q.   And are those substantially the same as the
23  gum ball containers that he provided?
24      A.   Yeah.
25          MR. MARKLE:  I would ask that that be
```

1457

1    marked for identification at this time, your Honor.
2         THE COURT:  Yes.
3         MR. SMITH:  What was that number?
4         THE COURT:  200B.
5         MR. SMITH:  Thank you.
6    Q.   Now, you said there was more than one
7    packaging session.  The second time you participated
8    in bagging or packaging crack cocaine, do you recall
9    where that was?
10   A.   Probably at the same spot.  I forgot the
11   name, Pembrooke, Hallet, whatever the street was.
12   This apartment right here.
13   Q.   You are pointing to Government's 204?
14   A.   This apartment the right here.
15   Q.   Who was present this time?
16   A.   It was me and him.  Me and Dreddy.
17   Q.   And was the same procedure followed?
18   A.   Yeah, the same.
19   Q.   Did you provide the crack cocaine this
20   time?
21   A.   No.
22   Q.   Who did?
23   A.   Dreddy.
24   Q.   And was there ever a time when you
25   participated in bagging or packaging and Sherrell

1458

1    was present?
2    A.   Yeah.
3    Q.   And was that just you and Sherrell?
4    A.   No, Sherrell and Sherrell's sister Diane.
5    Q.   Was it just the three of you?
6    A.   It was me, Dreddy, Sherrell, her sister
7    Diane, and it was another girl.
8    Q.   And who would decide it was time to
9    participate in a packaging or bagging session?
10   A.   Dreddy.
11   Q.   And who decided to have Sherrell and her
12   sister come?
13   A.   Dreddy.
14   Q.   And was Sherrell paid for doing that?
15   A.   Yeah.
16   Q.   Was her sister paid?
17   A.   Yeah.
18   Q.   Did you pay them?
19   A.   No.
20   Q.   Who did?
21   A.   Dreddy.
22   Q.   And do you know how many times Sherrell
23   participated in bagging, or packaging?
24   A.   Maybe twice.
25   Q.   Now, Mr. Womble, did you own or possess any

1459

1    firearms, guns or weapons?
2    A.   I didn't own any, but I possessed them.
3    Q.   And did Azibo Aquart, the defendant,
4    possess any guns, to your knowledge?
5    A.   Yeah.
6    Q.   And how do you know that?
7    A.   They were laying around the houses.  In his
8    apartment on Read Street, I would go to help bag up,
9    or whatever, I would see them laying around, or
10   whatever.
11   Q.   Would you see a gun at Government's
12   Exhibit 204, at that apartment?
13   A.   Yeah.
14   Q.   And it was not your gun?
15   A.   No.
16   Q.   It was the defendant's?
17   A.   Yeah.
18   Q.   And on Read Street you would see guns?
19   A.   Yeah.
20   Q.   Do you recall what kind of guns you saw?
21   A.   .9mm, revolvers.  Many different guns.
22   Different kinds of guns.
23   Q.   Would they be out in the open or hidden
24   away?
25   A.   Some out in the open, some I might open a

1460

1    drawer to grab something and there might be one.
2    Q.   Would you see ammunition?
3    A.   Yeah, I seen it.
4    Q.   And did you ever take possession of a gun?
5    A.   Yeah.
6    Q.   And how did that come about?  Why did you
7    take possession of a firearm?
8    A.   One day I was in the Terrace and Dreddy was
9    coming through the Terrace and he had his -- he was
10   driving his truck, he had a back taillight out of
11   his truck, and I told him -- I don't think he knew
12   the back taillight was out, so I told him the back
13   taillight was out.  So, he had a gun in the car, he
14   had a machine gun, a Mac-10 machine gun in the car,
15   so he gave it to me and I took it to my house.
16   Q.   And why would he want to get the gun out of
17   the car because he has a broken taillight?  What's
18   the relationship?
19   A.   Maybe because he didn't want the police to
20   pull him over with a broken taillight in the back.
21   Q.   What did you do with that gun?
22   A.   I brung it to my house.
23   Q.   What kind of gun was that?
24   A.   I believe it was a Mac-10, a machine gun.
25   Q.   And where did you put it in your house?

1461

```
1    A.   I had a dresser, like a tall dresser in my
2   house, and the bottom was empty, so I put it
3   underneath the bottom of the dresser.
4    Q.   And do you know what happened to that gun?
5    A.   Yeah, I threw it away.
6    Q.   And how did it come about that you threw it
7   away?
8    A.   I got -- actually got chased by the police
9   and I had it in the car and I dumped it out the
10  window.
11   Q.   And were you chased because you were in
12  possession of a gun?
13   A.   Yeah, I was in possession of that gun.
14   Q.   And when you threw it out of the car, did
15  you ever see it again?
16   A.   No.
17   Q.   Did you socialize with the defendant or was
18  it just a business relationship?
19   A.   It was business.
20   Q.   Would you go to clubs with the defendant?
21   A.   Never, no.
22   Q.   Would you sit around his house in 204 or
23  Read Street and just hang out?
24        MR. SMITH:  Objection, asked and
25  answered.  He's asked him several times.  He's
```

1462

```
1   already said he didn't socialize with him.
2        MR. MARKLE:  I asked about clubs.
3        THE COURT:  I think there're different
4   aspects of that.  I'm going to permit the question.
5    Q.   Would you sit around at Read Street and
6   spend hours with the defendant?
7    A.   No.
8    Q.   Other than bagging sessions?
9    A.   No.
10   Q.   How about Hallet Street?
11   A.   No.
12   Q.   Did you ever travel out of state together?
13   A.   Yeah, one time.
14   Q.   Only one time?
15   A.   One time.
16   Q.   Where did you go?
17   A.   We just went to New York.
18   Q.   And what was the purpose?
19   A.   He took me -- well, my birthday '05 -- May
20  30th my birthday.  '05 I went to New York with him
21  and just spent money shopping.
22   Q.   Did he buy clothes for you?
23   A.   Yeah.
24   Q.   Now, back to Charles Street.  Were you
25  aware of any raids at Charles Street?
```

1463

```
1    A.   Yeah.
2    Q.   And how many raids?  How many times were
3   you aware Charles Street was raided?
4    A.   Twice.
5    Q.   And do you remember when the first one was?
6    A.   No, I don't remember the date when it was
7   exactly.
8    Q.   Do you remember how you learned about that?
9    A.   Yeah, Frank called me and told me.
10   Q.   Frank who we saw in the photo before?
11   A.   Yeah, Frankie called me and told me.
12   Q.   And where did he call you from?
13   A.   From the apartment.
14   Q.   And they let him make a phone call?
15   A.   No, actually I guess it took them a couple
16  of times with the battering ram to hit the door
17  down.  The first time he called and told me they
18  raiding the house, raiding the apartment.
19   Q.   So as the raid was happening you got a
20  call?
21   A.   Yeah, yeah.
22   Q.   You weren't there?
23   A.   No, I was home.
24   Q.   And why did he call you?
25   A.   Because I was his lieutenant.
```

1464

```
1    Q.   And what did you learn whether or not
2   anyone was arrested?
3    A.   Everybody in the house was arrested.
4   Frank.
5    Q.   Do you remember who was arrested?
6    A.   I know Frank, Vanessa, Pop.  I don't know,
7   I know those three were.
8    Q.   What did you do after you found out they
9   were arrested?
10   A.   Called Dreddy and told him.
11   Q.   Why did you call Dreddy?
12   A.   I worked for him.  He was the boss, so I
13  had to report to him, tell him what was going on,
14  let him know what was going on.
15   Q.   And what did you do?
16   A.   I called him, I told him the house, the
17  apartment just got raided.
18   Q.   What did he tell you?
19   A.   "I'll take care of it."
20   Q.   And did he take care of it?
21   A.   Yeah.
22   Q.   What did he do?
23   A.   He bond them out.
24   Q.   And were all three bonded out?
25   A.   Yeah.
```

**GA366**

1465

```
1    Q.   And do you know who got bonded out first,
2  second or third, or all at the same time?
3    A.   No, Pop got bonded out first both times.
4    Q.   And you said there was a second raid.  Do
5  you remember when that was exactly?
6    A.   No, I don't remember exactly.
7    Q.   It was -- were you still a lieutenant?
8    A.   Yeah.
9    Q.   And was Dreddy still the boss?
10   A.   Yeah.
11   Q.   And how did you learn about that raid?
12   A.   The same way, Frank called me.
13   Q.   And was that before, during or after the
14 raid?
15   A.   During, actually.  During the raid.  Right
16 before.  The same situation, before they actually
17 knocked the door down.
18   Q.   And did you talk to anyone?  Once you got
19 that call from Frankie, what did you do?
20   A.   I called Dreddy.
21   Q.   And what did you guys discuss?
22   A.   The same thing.  I just told him the
23 apartment got raided.  He didn't answer that first
24 day.  I went by the next day, I went by his
25 apartment the next day, I was going to work, and
```

1466

```
1  told him.
2    Q.   So, you called him and he didn't answer the
3  phone?
4    A.   No, he didn't answer that night.
5    Q.   Was it late at night; do you remember?
6    A.   I don't remember exactly what time.
7    Q.   And did you actually see him the next day
8  or call him the next day?
9    A.   I seen him the next day.
10   Q.   And at that time did you talk about the
11 raid?
12   A.   Yeah, I just -- I was on my way going to
13 work, I stopped at his house on Read Street and he
14 answered the door and I told him the house just got
15 raided.
16   Q.   On your way to work?
17   A.   WJ's.
18   Q.   At the car wash?
19   A.   At the car wash, yeah.
20   Q.   And what did he tell you when you told him
21 there had been a raid the night before?  What did
22 Dreddy tell you?
23   A.   "I'll take care of it."
24   Q.   And did he take care of it?
25   A.   Yeah.
```

1467

```
1    Q.   And what did he do?
2    A.   He got them out.
3    Q.   Did you have anything to do with getting
4  them out?
5    A.   No.
6    Q.   Did you help -- did you ever meet with the
7  bondsman, or not?
8    A.   The next day -- yeah, he tried to bond them
9  out.  He bonded them out, but it was too late in the
10 night to get them out from the jail, so they told
11 him he had to come back the next morning.  So, he
12 gave me the money and then I called the bondsman the
13 next morning.  I live right across the street from
14 the jail, so I called him the next morning before I
15 went to work, he met me at the jail, and I just paid
16 the bond for them.
17   Q.   So, you could meet the bondsman right there
18 at the jail and get the people out?
19   A.   Yes.
20   Q.   If you have the right amount of money?
21   A.   Yeah.
22   Q.   And the money came from you?
23   A.   No, from Dreddy.
24   Q.   From Dreddy to you to the bondsman?
25   A.   Yeah.
```

1468

```
1    Q.   And who got out?
2    A.   They all got out.
3    Q.   Were there rules about working at Charles
4  Street?
5    A.   No.
6    Q.   Could you sell other people's crack?
7    A.   Oh, no, no, you couldn't sell nobody's.
8  They had to sell what I gave them.  They sell what I
9  gave them.
10   Q.   And what you gave them came from who?
11   A.   From D.
12   Q.   And could they take crack that you gave
13 them that came from D for their own use to sell or
14 just use however he or she just wanted?
15   A.   No.
16   Q.   Could you allow anyone to sell from that
17 apartment?
18   A.   No.
19   Q.   Was this just talk, these rules, or was
20 anyone ever disciplined or punished for violating
21 them?
22        MR. SMITH:  Objection, leading.
23        THE COURT:  Sustained.
24   Q.   Did you ever see the consequences of
25 violating any of these rules?
```

**GA367**

1469

```
1     A.    Yeah.
2     Q.    And what were the consequences?
3     A.    I seen Frankie get beat up one time.
4     Q.    And how did that come about?  How did --
5   why did Frankie get beat up?
6     A.    Actually I was coming from the club one
7   night, I was drunk, I came out, and I would stop by
8   there before I go home, make sure they all right so
9   they won't bother me while I'm home.  So, I stopped
10  by there, make sure Frankie's all right.  So I go
11  in, I see all of the customers sitting in Pops'
12  living room just waiting around.  I asked them,
13  "What's going on?  What's everybody waiting on?"
14  So, I go in the back room.  Pops there, was in his
15  room.  I go in the back room, I seen Frankie cutting
16  up a rock of coke -- a rock of crack.
17    Q.    And what's unusual about that?
18    A.    He never had to do that because everything
19  I gave him was already bagged up.
20    Q.    And so what did you conclude from seeing
21  that?
22    A.    That he got it from somebody else.
23    Q.    And did you assault Frankie?
24    A.    No, I didn't.
25    Q.    And so what did you do when you saw he was
```

1470

```
1   violating the rules?
2     A.    I called Dreddy.
3     Q.    And why did you call Dreddy?
4     A.    I called just to let him know what was
5   going on.
6     Q.    And did you tell him?
7     A.    Yeah.
8     Q.    And what happened after you spoke to
9   Dreddy?
10    A.    Dreddy was there in like maybe two minutes.
11  So, I figured he was around the area somewhere,
12  anyways.  So, he was there.
13    Q.    He was where in two minutes?
14    A.    He was in the building quick.  He was at
15  Pops' house quick.
16    Q.    And did he enter the building?
17    A.    Yeah.
18    Q.    Did he enter the apartment?
19    A.    Yeah.
20    Q.    And who else was there?
21    A.    It was a few customers still sitting.
22    Q.    Did everybody stay inside?
23    A.    No, he made everybody get out.
24    Q.    Who told everyone to leave?
25    A.    Dreddy.  When he came in, everybody left
```

1471

```
1   out.
2     Q.    Did you leave?
3     A.    No.
4     Q.    Was Vanessa there?
5     A.    Yeah.  Me, Vanessa, and there was another
6   girl in the corner.  I forgot who she was.  Me,
7   Vanessa and Pop was in his room.
8     Q.    Who stayed in the apartment?
9     A.    It was me, Frank, Dreddy, Vanessa, and
10  there was another girl, and Pop in the room.  And
11  that was it.
12    Q.    And what, if anything, did you see the
13  defendant do in regards to Frankie?
14    A.    Well, he just came in and asked what was
15  going on, and Frankie told him, and he just starts
16  beating him up.
17    Q.    Did Frankie admit that he had other crack
18  cocaine?
19    A.    Yeah.
20    Q.    And did the defendant ask him to explain
21  why, or anymore conversation?
22    A.    No, no.
23    Q.    And how did he beat him up?
24    A.    With his fists.
25    Q.    And in the body or the head?
```

1472

```
1     A.    Head, body, face.
2     Q.    Did you see this?
3     A.    Yeah.
4     Q.    Did you stop it?
5     A.    No.
6     Q.    Did you participate?
7     A.    No.
8     Q.    Why didn't you stop it?
9     A.    It's not my place.  It wasn't my place to
10  stop it.  He's the boss, so I can't -- he's calling
11  the shots.
12    Q.    Did the defendant remain in the building
13  after he assaulted Frank?
14    A.    No, he left.
15    Q.    Did he say anything before he left?
16    A.    No, not that I remember.
17    Q.    Did you stay in the building?
18    A.    Yeah.
19    Q.    Did you stay in the apartment?
20    A.    Yeah.
21    Q.    Did you do anything with Frank?
22    A.    I asked him did he want to go to the
23  hospital.
24    Q.    Asked him if he wanted to?
25    A.    Yeah, asked him did he want to go to the
```

**GA368**

1473

```
1   hospital.
2       Q.   And did he?
3       A.   No, he just said he would just lay down.
4       Q.   Was he bleeding?
5       A.   Yeah, bad.
6       Q.   He was clearly injured?
7       A.   Yeah.
8       Q.   Did you ever cover -- were Frank or Vanessa
9   ever short on the money?
10      A.   Yeah.
11      Q.   And what does that mean to be short on the
12  money?
13      A.   Instead of -- well, out of 46, they would
14  have to give me 260 -- out of 46 they would have to
15  give me the $360 out of the 46 dime bags of crack I
16  gave them.
17      Q.   Two hundred sixty out of 46?
18      A.   Three hundred sixty.
19      Q.   Three-hundred sixty dollars they had to
20  give you?
21      A.   Yeah.
22      Q.   And the other was their $100 profit?
23      A.   Yeah, yeah.
24      Q.   Either in crack or money?
25      A.   Yeah.
```

1474

```
1       Q.   So, what happened?  So, when they're short,
2   they don't have 360, is that what you mean by short?
3       A.   Yeah, sometimes they give me 300, sometimes
4   320.  It wasn't too short, but most of the time it
5   was.
6       Q.   Every time that happened, did you tell the
7   defendant?
8       A.   No.
9       Q.   Why did you not tell them?
10      A.   I just figured I was working with them and
11  we can clean it up within ourselves.  We can clean
12  it up within ourselves.
13      Q.   What happened if the money was short?
14      A.   I would just give them another one, and the
15  first few dollars they give me, to make up what was
16  short, I put it with that, and just going like that.
17      Q.   Did you ever see anyone else assaulted in
18  apartment 211?
19      A.   Yeah.
20      Q.   Who was that?
21      A.   I don't know his name.  Vanessa's brother.
22  I don't know his name.
23      Q.   And were you present at Charles Street?
24  Tell us -- let me ask you this:  Do you remember
25  exactly when that was?
```

1475

```
1       A.   I don't remember exactly when it was.
2       Q.   Did you know Vanessa's brother?
3       A.   No.
4       Q.   Had he been at the apartment before?
5       A.   Yeah.
6       Q.   And is that the only way you recognized
7   him?
8       A.   Yeah.
9       Q.   Was he selling crack cocaine?
10      A.   Not that I know of.
11      Q.   And do you know -- how do you know he was
12  assaulted?
13      A.   I walked in and seen him bleeding from the
14  side of his head.
15      Q.   And did you see Dreddy there?
16      A.   Yeah, he was standing there with a gun in
17  his hand.
18      Q.   What kind of gun?
19      A.   A Mac machine gun.
20      Q.   Did he say anything to Vanessa's brother?
21      A.   Yeah, he was talking junk to him, shit to
22  him, like, "I told you don't be here in this
23  building.  Stay the fuck out of here."
24      Q.   Don't be in the building?
25      A.   "I told you don't come to this apartment.
```

1476

```
1   Don't hang around the building."
2       Q.   Did you see anyone else near Vanessa's
3   brother with a gun?
4            MR. SMITH:  Objection, leading.
5       Q.   Did see anyone else next to Vanessa's
6   brother?
7       A.   No, he was sitting on the couch by himself.
8       Q.   Did you see anyone else telling him he
9   shouldn't come around here?
10      A.   No.
11      Q.   Did you hear anyone else talking to
12  Vanessa's brother?
13      A.   No.
14      Q.   Did you see anyone else with a gun?
15      A.   No.
16      Q.   Did you see anyone bleeding except for
17  Vanessa's brother?
18      A.   That was it.
19      Q.   Where was he bleeding from?
20      A.   I walked in the apartment, from this side
21  of his head.
22      Q.   So, you didn't see him actually get hit?
23      A.   No, I just walked in and seen a bunch of
24  blood coming down his head.
25      Q.   Did you talk to the defendant after about
```

**GA369**

1477

```
 1   it?
 2       A.   No, he left.
 3       Q.   Where did he go?
 4       A.   I don't know where he went.  He just left,
 5   left the apartment.
 6       Q.   What was Vanessa doing?
 7       A.   In the corner crying, a black eye.
 8       Q.   She had a black eye?
 9       A.   Yeah.
10       Q.   When you had previously seen her, did she
11   have a black eye?
12       A.   No.  Not before I left, no.
13       Q.   Did you hit Vanessa?
14       A.   No, I didn't.
15       Q.   Did you hit her brother?
16       A.   No.
17       Q.   Did you ever see her brother again?
18       A.   No.
19       Q.   When you would be in the defendant's
20   apartment on Read Street, did you ever see -- do you
21   know who he lived with?
22       A.   By hisself (sic).
23       Q.   Did you ever see drugs in that -- crack
24   cocaine in his apartment, other than bagging, when
25   you were there?
```

1478

```
 1       A.   Yeah.
 2            MR. SMITH:  Objection, asked and
 3   answered.
 4            THE COURT:  Overruled.
 5            MR. MARKLE:  Thank you.
 6            THE COURT:  This is other than the drugs
 7   that he was bagging, is that the distinction?
 8            MR. MARKLE:  Exactly your Honor.
 9            THE COURT:  All right, go ahead.
10       Q.   Other than the bagging, the times you
11   bagged up crack cocaine, did you see crack cocaine
12   in the defendant's apartment?
13       A.   Yeah.
14       Q.   And substantial amounts or small amounts?
15       A.   It was a lot.
16       Q.   And was it already bagged or was it just in
17   chunks?
18       A.   Most of the time it was just in chunks,
19   but --
20       Q.   And did you see packaging material in his
21   apartment?
22       A.   Yeah.
23       Q.   Did you see money in his apartment?
24       A.   Yeah.
25       Q.   Large quantities or small amounts?
```

1479

```
 1       A.   It was a lot.
 2       Q.   Like how much?
 3       A.   Like I don't know exactly how much, I
 4   couldn't put a price on it, but it was a lot of
 5   bundles, like the money I paid him.
 6       Q.   Was it bundled or wrapped?  Was it bundled
 7   in any certain way?
 8       A.   In a rubber band.  Like the way I would
 9   give it to him.  Like the way I would bundle 360 in a rubber band
10   separately and just hand it to him.
11       Q.   There was more than one of those wrappings
12   of $360?
13       A.   Yeah.
14       Q.   More than ten?
15       A.   Yes, at times.
16       Q.   Now, did you continue as the defendant's
17   lieutenant until August of 2005?
18       A.   Yeah.
19       Q.   And did your relationship change in 2005 in
20   any way?
21       A.   Yeah.
22       Q.   In August?
23       A.   Yeah.
24       Q.   And why was that?
25       A.   It changed because I actually got rid of a
```

1480

```
 1   gun that he had owned, a machine gun.  The gun that
 2   I threw out the window.
 3       Q.   The gun you threw out when the police
 4   chased you?
 5       A.   Yeah, yeah.
 6       Q.   And why was that a problem?
 7       A.   It was his gun.
 8       Q.   And you didn't just go and tell him I had
 9   to throw your gun away?
10       A.   No, I didn't.
11       Q.   Why not?
12       A.   I just didn't.  I didn't tell him.  I was
13   actually ducking and dodging him for a little while.
14       Q.   And did you offer him -- did you say I lost
15   your gun, I'll pay you for it?
16       A.   No.
17       Q.   Why not?
18       A.   I just didn't.
19       Q.   And did the defendant ever ask you for that
20   gun?
21       A.   Yeah.
22       Q.   And what did you tell him?
23       A.   At first I told him -- well, the first
24   initial conversation -- not the first one.  When
25   things started really getting shaky between us, he
```

**GA370**

1481

```
1   asked me for the gun one night.  I told him I was at
2   my mother's house, and I told him I was just there
3   waiting for my brother or somebody to come to the
4   house and let me in and I would grab it.
5        Q.   This is after you had gotten rid of it?
6        A.   Yeah, I already got rid of it.
7        Q.   You said the police chased you.  How did
8   they know you had a gun?
9        A.   I went to a club with it.  Actually, a
10  friend of mine, Steve Haley, he got jumped in the
11  club maybe a week or two prior to all this
12  happening.
13       Q.   And after he got -- your friend got
14  jumped --
15       A.   Yeah.
16       Q.   -- what did you do?
17       A.   I went back to the club, and we stayed over
18  -- the next week I went back to the club, we sat
19  there, see if the dudes came back that jumped him,
20  but they never came that week.  But the following
21  week after that we went in the club, we were
22  drinking and everything, and then I seen one of the
23  guys.  So I go home to get the gun, come back to the
24  club.
25       Q.   And that was Dreddy's gun, but you got it
```

1482

```
1   and had it at the club that night?
2        A.   Yeah.
3        Q.   And then the police chased you from the
4   club.
5        A.   Yeah, exactly.
6        Q.   Did you know the people who lived on the
7   first floor at Charles Street?
8        A.   Yeah.
9        Q.   Did you know Tina Johnson?
10       A.   Yeah.
11       Q.   Did you know James Reid?
12       A.   Yeah.
13       Q.   And did you know Basil Williams?
14       A.   Yeah.
15       Q.   And how did you first get to know them?
16       A.   Just by them coming upstairs to buy crack
17  from 211.
18       Q.   And did all of them -- were all of them
19  users or buyers, or not?
20       A.   I know Tina and Tippy was.  I don't know
21  about Basil.
22       Q.   And did you know Tina Johnson's son?
23       A.   I seen him, but I don't know him.
24       Q.   Do you remember, would he ever come in to
25  apartment 211, your apartment?
```

1483

```
1        A.   No.
2        Q.   Do you remember whether you saw him more or
3   less often in July and August of 2005?
4        A.   I think I only seen him maybe twice the
5   whole time.
6        Q.   And was that around --
7        A.   July.
8        Q.   And did you ever go into apartment 101,
9   their apartment?
10       A.   Yeah.
11       Q.   And why would you go into their apartment?
12       A.   I just went in there sometimes.  I just go
13  in there just to mess around with Tina and Tippy,
14  just go shoot the breeze with them.
15       Q.   So, you were on good terms with them at
16  that point?
17       A.   Yeah.
18       Q.   Did you ever see the defendant go into
19  apartment 101?
20       A.   No.
21       Q.   Did there come a time when they stopped
22  buying -- they stopped being customers of yours?
23       A.   Yeah.
24       Q.   And do you know about when that was?
25       A.   I don't know exactly the date, but I know
```

1484

```
1   it was a time when we had a bad batch of crack
2   cocaine, it wasn't as good as the previous times we
3   had, so --
4        Q.   It's around the same time that you and D
5   have a bad batch of crack cocaine?
6        A.   Yeah.
7        Q.   And when you say a "bad batch," what do you
8   mean?
9        A.   The crack cocaine -- the crack wasn't good.
10       Q.   And was that good or bad for sales?
11       A.   It was bad.
12       Q.   And how did you know it was a bad batch?
13       A.   Because the customers complained a lot.
14  They used to say this ain't no good.  "This is
15  garbage," is what they said.
16       Q.   And that was not good for business?
17       A.   No.
18       Q.   And how -- why do you remember that it was
19  at that same time that Tina and James, the
20  relationship, they weren't customers anymore?
21       A.   Because they started actually selling
22  crack.
23       Q.   And how did you learn that they actually
24  started selling crack?
25       A.   I used to see the customers, instead of
```

1485

1 coming to the second floor, they would stop on the
2 first floor.
3      Q.   And you actually observed that?
4      A.   Yeah.
5      Q.   And would you talk to Frank or Vanessa
6 about that?
7      A.   Yeah.
8      Q.   And what did they tell you?
9      A.   They told me that she was selling crack.
10     Q.   And were Frank and Vanessa getting rid of
11 as many packs as they were before?
12     A.   No.
13     Q.   And did you tell anyone about this problem?
14     A.   Yeah.
15     Q.   Who did you tell?
16     A.   I told Dreddy.
17     Q.   Why did you tell Dreddy?
18     A.   I wanted to let him know what was going on
19 in the building.
20     Q.   And what did he say?
21     A.   He would take care of it.
22     Q.   Did he ask you to take care of it?
23     A.   No.
24     Q.   Do you recall a period of time prior to the
25 murders happening when Dreddy went down south?

1486

1      A.   Yeah.
2      Q.   And do you remember about how long he was
3 gone for?
4      A.   About a week or so.
5      Q.   And prior to his going away, did he -- how
6 did you know he went away?
7      A.   Well, I didn't know until Willy -- well,
8 the person I was working for at the car wash, he had
9 mentioned someone had broke in to the cars, and he
10 had called Dreddy and told him -- and told him
11 somebody broken into the cars.
12     Q.   And that's how you learned he was down
13 south?
14     A.   Yeah.
15     Q.   Did you have enough packages of cocaine at
16 the time he was away?
17     A.   Yeah, I had a lot.
18     Q.   How many did you have for that week?
19     A.   Maybe 15; 13, 15.
20     Q.   And who did that crack cocaine come from?
21     A.   Dreddy.
22     Q.   And was that the poor quality crack?  Were
23 you still dealing with that problem?
24     A.   No.  No, I think that was already gone.
25     Q.   And once you got rid of the bad batch, did

1487

1 business start to pick up again?
2      A.   Yeah, a little.  It came back to normal,
3 but -- it came back to normal.  Not to normal, but
4 it was better than it was when we had the bad batch.
5      Q.   Were some customers still going to
6 apartment 101, Tina's apartment?
7      A.   Yeah.
8      Q.   While the defendant was down south -- or do
9 you know where he was?
10     A.   No, I don't know.
11     Q.   Did you talk to him while he was out of
12 state on the phone?
13     A.   Once, I believe.
14     Q.   Did you talk to him -- during that time
15 that he was away, did you have an argument with Tina
16 Johnson?
17     A.   Yeah.
18     Q.   And what was that argument about?
19     A.   About her selling drugs in the building.
20     Q.   And what was -- what kind of argument did
21 you have?  Was it face-to-face?
22     A.   Yeah.  Face-to-face, yeah.
23     Q.   And were other people around?
24     A.   Yeah.
25     Q.   And was it inside or outside?

1488

1      A.   Inside the foyer of the building.
2      Q.   And what did you say to her?
3      A.   I asked her was she selling drugs.
4      Q.   What did she say to you?
5      A.   She said "Yeah."
6      Q.   What did you say to her?
7      A.   I said, "All right."  I just walked away.
8      Q.   Why were you asking her?
9      A.   I knew, but I wanted to hear it from her.
10     Q.   And what did you do when you heard her
11 confirm that she was selling crack?
12     A.   I told Dreddy that.
13     Q.   And what did Dreddy tell you?
14     A.   "I'll take care of it."
15     Q.   Did he tell you to go over there and take
16 care of it?
17     A.   No.
18     Q.   Do you know what he meant when he said
19 "I'll take care of it"?
20     A.   No, that was just his word for everything,
21 "I'll take care of it."
22     Q.   Did you ever have any further words with
23 Tina Johnson?
24     A.   Yeah.
25     Q.   When was that?

1489

```
1    A.   I had an argument with her not too long
2   after it.  I don't know.  Well, after that I had
3   another argument with her.
4    Q.   And what caused that argument?
5    A.   I was walking into the building, I was
6   going to the third floor, I was -- a guy from the
7   third floor, he wanted a bundle of dope, and he
8   called me on my phone and asked me could I get a
9   bundle of dope, and I told him yeah.  So, I had a
10  friend of mine from the Terrace bring me back over
11  to the building to bring this guy his dope.
12        So that's -- what happened, I got out
13  the car, going into the building, going to go
14  upstairs to the building, and I spit.  Like her
15  window is right -- Tina's window is right here, the
16  stairs is right here, so it was pretty close, and
17  Tippy was leaning out the window.  So, I spit, not
18  at him but like on the ground, like, but to him I
19  figured he's thinking I probably -- he thought I was
20  spitting at him.  So, I go in the building and Tina
21  is already out in my face going crazy on me.
22   Q.   Tina was yelling at you?
23   A.   Yeah, yeah, yeah.
24   Q.   And Tippy was James Reid?
25   A.   Yeah.  What I know him, I know him by
```

1490

```
1   Tippy.
2    Q.   You know him as Tippy?
3    A.   Yeah.
4    Q.   Did you yell back at Tina?
5    A.   Yeah, I did.
6    Q.   And it was not nice words?
7    A.   No, we went back and forth, "fuck you," and
8   you know, "bitch," and she said, "fuck you, too,"
9   and, "ain't nobody selling if I can't sell."  We had
10  some heated words.
11   Q.   And did you threaten her?
12   A.   Yeah, I had a stick in my hand.  I had a
13  table leg.
14   Q.   Where did you get the table leg from?
15   A.   Vanessa had -- or Frank, I don't remember
16  which one, they threw it down off the landing to the
17  first floor.
18   Q.   And did you hit her with that table leg?
19   A.   No, I didn't hit her.  No.
20   Q.   Did you hit Tippy with it?
21   A.   No.
22   Q.   Did you swing it?
23   A.   No.  I just held it there just to
24  intimidate her even more, but she wasn't going for
25  it.
```

1491

```
1    Q.   Did she run away from you?
2    A.   No.
3    Q.   Did Tippy run away?
4    A.   No.
5    Q.   Did you continue to have words?
6    A.   For a couple more minutes we argued back
7   and forth, but the guy I was with told me to come
8   on, don't be arguing in front of them, let's go.
9    Q.   And do you recall, did Sherrell know about
10  this argument?
11   A.   Yeah, I was on the phone with her,
12  actually.
13   Q.   You were on your cell phone?
14   A.   I was on the phone with her at first.  She
15  heard us arguing.  I hung up the phone with her.
16   Q.   And what did you -- how did it end?  Did
17  you say -- what did you say to Tina?
18   A.   That was it.  She said "If I can't sell
19  nobody is selling."  We just going back and forth,
20  "Fuck you, bitch."  She say, "Fuck you, too," and
21  "Ain't nobody selling if I can't sell."  So that was
22  it.
23   Q.   After you had this argument, what did you
24  do with the table leg?
25   A.   I threw it back upstairs to Frankie.
```

1492

```
1    Q.   And did you go -- did the defendant ever
2   learn about this argument?
3    A.   Yeah.
4    Q.   And how did he learn about it?
5    A.   That's the time I talked to him and I told
6   him.
7    Q.   And what did you tell him happened?
8    A.   I told him I had an argument with Tina.  He
9   asked me what was going on in the building.  I told
10  him I had an argument with Tina.  And he said, "Did
11  anybody hear?  Was anybody around?"  It was a lot of
12  people around, but --
13   Q.   Did you tell him that?
14   A.   Yeah, yeah.
15   Q.   And what did he say?
16   A.   "I'll take care of it."  I just left, left
17  it like that.
18   Q.   And did you ever see Tina again after that?
19   A.   No.
20   Q.   Did you ever see Tippy again after that?
21   A.   No.
22   Q.   Basil?
23   A.   No.
24   Q.   Do you know when the defendant came back
25  from his trip?
```

1493

```
1     A.   I don't know exact date, but he had called
2   me when he got back.  I had a bunch of packs.  He
3   wanted me to bring the money.  He wanted the money
4   then.
5     Q.   So, he wanted to see you?
6     A.   Yeah.
7     Q.   And that's because you had a week's worth
8   of sales?
9     A.   Yeah, yeah.
10    Q.   And when he called you, did you answer?
11    A.   Yeah.
12    Q.   And did you see him?
13    A.   Yeah.
14    Q.   Where did you meet?
15    A.   I met him at a Brazilian restaurant.
16    Q.   In Bridgeport?
17    A.   Yeah, in Bridgeport.
18    Q.   Who was else there?
19    A.   Some other guy.  I don't know who it was.
20  I don't know who the other guy was.
21    Q.   And did you and the defendant talk while
22  you were there?
23    A.   Yeah.
24    Q.   Did you eat?
25    A.   No.
```

1494

```
1     Q.   Did you sit?
2     A.   Yeah.
3     Q.   And did the other guy sit with you?
4     A.   No, as soon as I walked in he got up and
5   started playing the video games that was in the
6   corner.
7     Q.   Do you know who that person is?
8     A.   No, I never seen his face.  I don't know
9   who it was.
10    Q.   What did you do when you sat and talked to
11  the defendant?  What did you talk about?
12    A.   He asked me what was going on and how is
13  things going, and I let him know it's still kind of
14  slow, Tina still selling.
15    Q.   Sales kind of slow?
16    A.   Yeah.
17    Q.   Tina still selling?
18    A.   He asked me.  That's what it was.  He asked
19  me was she still selling, they still selling on the
20  first floor, and I said yeah.  That's how it went.
21    Q.   And you had said that you had lost his --
22  got rid of his gun and didn't want to deal with
23  that, right?  That was a problem?
24    A.   Yeah.
25    Q.   So why did you meet with him on this night?
```

1495

```
1     A.   To give him his money.
2     Q.   And you said you were trying to avoid him.
3   Could you avoid him on this night?
4     A.   No, no.
5     Q.   How much money did you have?
6     A.   Maybe enough for 10 or 11 packs, 46.
7   Three-hundred sixty like 14 times, 13 times.
8     Q.   And did you hand him the money right there
9   in the Brazilian restaurant?
10    A.   No, I put in his car.
11    Q.   Whose car?
12    A.   His car.
13    Q.   What kind of car was that?
14    A.   Cadillac.
15    Q.   And how did you get in the car?
16    A.   The door was open.  He told me just throw
17  it in the car.
18    Q.   Where did you put the money?
19    A.   Just threw it on the back seat.
20    Q.   Was it wrapped or opened?
21    A.   I had it in a black plastic bag.
22    Q.   And had you -- did you count it in front of
23  him or show it in front of him?
24    A.   No, I just gave it to him.  I put it in the
25  car, rather.
```

1496

```
1     Q.   And while you were there, did the defendant
2   ask you to do -- did you have any further
3   conversation with the defendant?
4     A.   Yeah.
5     Q.   And what was that?
6     A.   He asked me to stop at Modell's and get a
7   bat on my way going back to the Terrace.
8     Q.   A bat?
9     A.   A bat.
10    Q.   What kind of bat?
11    A.   He said pick up a bat.
12    Q.   Like a baseball bat?
13    A.   A baseball bat, yeah.
14    Q.   And did you ever give the defendant a
15  baseball bat?
16    A.   No.
17    Q.   Did you ever buy a baseball bat?
18    A.   Yeah.
19    Q.   And whose money did you use to buy the bat?
20    A.   His money.  He gave me 60 bucks to go buy a
21  bat.
22    Q.   And when you left there, did you go to
23  Modell's?
24    A.   Yes.
25    Q.   And did you buy a baseball bat?
```

1497

```
1    A.   Yeah.
2    Q.   And did it cost $60?
3    A.   No.
4    Q.   How much did it cost?
5    A.   Twenty-five, thirty bucks.
6    Q.   Pay in cash?
7    A.   Yeah.
8    Q.   Give him back the rest of the money?
9    A.   No.
10   Q.   Did you ever see the defendant again?
11   A.   After that, no.
12   Q.   So you never gave him the bat?
13   A.   No.
14   Q.   What did you do with the bat?
15   A.   It was in my house.  I just threw it in my
16   room, threw it in the bedroom.
17   Q.   Did he ever come over and get it?
18   A.   No.
19   Q.   And you never met with him to give it to
20   him?
21   A.   No.
22   Q.   And you said you never saw him again?
23   A.   After that night, no.
24   Q.   So, was the next time you ever saw him
25   again in court yesterday?
```

1498

```
1    A.   Yes.
2    Q.   Did you ask him why you had to go buy a
3    bat?
4    A.   No, I didn't ask him.
5    Q.   Would there be times the defendant would
6    come to your apartment?
7    A.   Yeah.
8    Q.   And did he have keys to your apartment?
9    A.   No.
10   Q.   Would he leave drugs in or about your
11   apartment?
12   A.   Yeah.
13   Q.   And where would he leave the drugs?
14   A.   He used to leave them on the porch.  We had
15   a porch, big flower pot on the porch, old flower
16   pot.  He used to stick them in the dirt or on the
17   flower pot somewhere.
18   Q.   Anywhere else on the premises?
19   A.   It was one time I ran out and I called, I
20   needed some more, he told me it was in the house.
21   Q.   And was it already in the house?
22   A.   Yes.
23   Q.   And did you find it?
24   A.   Yeah.
25   Q.   Where he told you it would be?
```

1499

```
1    A.   Yeah, in the pantry, in the kitchen in the
2    pantry.
3    Q.   And you found crack cocaine in there?
4    A.   Yeah.
5    Q.   Now, do you know how he got in that day?
6    A.   No, I don't.
7    Q.   Did you have all the money you owed the
8    defendant for that week he was away when you met him
9    at the Brazilian restaurant?  I know I'm going back
10   and forth.  Back at the Brazilian restaurant, the
11   money you placed in his car, did you have the right
12   amount of money?
13   A.   No, no, no.
14   Q.   Were you, what we talked about before --
15   A.   It was short.  Yeah, some was short, some
16   wasn't.
17   Q.   Did you tell him it was short?
18   A.   Not until he called me.  I didn't tell him
19   when I gave it to him it was, no.
20   Q.   Were you hoping he wasn't going to notice?
21   A.   I know he was going to notice when he
22   counted it.
23   Q.   But you didn't tell him?
24   A.   No, I didn't.
25   Q.   Did you have a conversation about it being
```

1500

```
1    short?
2    A.   Yeah, he called and asked me how come some
3    of the money is short.
4    Q.   Was this before or after you purchased the
5    baseball bat?
6    A.   After.
7    Q.   Did you tell him, by the way, I bought the
8    baseball bat?
9    A.   No.
10   Q.   No conversation?
11   A.   No, sir.
12        MR. SMITH:  Objection with the leading.
13        THE COURT:  Sustained.
14   Q.   So when he asked you about the money being
15   short, what did you tell him.
16   A.   I told him that I gave Pop some out of
17   every pack, maybe three or four out of every pack.
18   Q.   And why did you say that?  Was that true?
19   A.   No.
20   Q.   Why did you say that?
21   A.   Some of it was true, yeah.  Some of it,
22   yeah.
23   Q.   You had given some to Pops?
24   A.   Yeah.
25   Q.   But not enough to make up for the shortage?
```

**GA375**

1501

```
 1      A.   No.
 2      Q.   What had happened with the -- what
 3  happened?  Why was it short?
 4      A.   Between me and Frankie and Vanessa, we all
 5  just messed up.  The money just got messed up.  The
 6  money just got spent, used.  Me and Sherrell used it
 7  for our -- what we was doing.
 8      Q.   Why didn't you tell him that?
 9      A.   It was easier for me to tell him I gave it
10  to Pop.
11      Q.   And did he accept that excuse?
12      A.   Yeah.
13      Q.   Did the defendant ever -- did he ever have
14  a conversation with you again about his gun, getting
15  his gun?
16      A.   After that night I told him it was at my
17  mother's house, I think that was the last time I
18  ever spoke to him, period.
19      Q.   Did you ever go inside Charles Street after
20  you met with defendant -- after you met at the
21  Brazilian restaurant, did you ever go back to
22  Charles Street?
23      A.   No, I don't think I did, no.
24      Q.   Do you recall -- why did you stop going to
25  Charles Street?
```

1502

```
 1      A.   At that time I just -- well, I knew I got
 2  rid of the gun, I knew some of the money was short,
 3  I just didn't want to run into him for no
 4  confrontation.
 5      Q.   Were there times during that, after you met
 6  with him at the restaurant and before -- in between
 7  that time and the murders, were there times that the
 8  defendant called you on the phone?
 9      A.   Yeah, he called me.
10      Q.   And did you answer those calls or avoid
11  those calls?
12      A.   Avoid them.
13      Q.   So you did not answer them?
14      A.   No, I never answered them.
15      Q.   Did he leave you messages?
16      A.   No.
17      Q.   How did you know he was calling you?
18      A.   Because his name would show up on my phone.
19      Q.   Did you continue working at the car wash
20  with him?
21      A.   When?
22      Q.   After you met at the Brazilian restaurant
23  til the time of the murders, did you keep seeing him
24  at the car wash?
25      A.   No, I never went back to the car wash
```

1503

```
 1  either, no.
 2      Q.   How did you learn about the murders of
 3  Tina, Basil and James?
 4      A.   Sherrell's mother actually called the next
 5  morning.
 6      Q.   And where were you?
 7      A.   I was home.
 8      Q.   Home, Fairmont Street?
 9      A.   I was home on Fairmont, yeah.  I had just
10  woke up and she called and told us.
11      Q.   Who were you home with that night?
12      A.   Me and Sherrell.
13      Q.   And you said her mother called?
14      A.   Yeah, her mother called Sherrell.
15      Q.   And what did you -- what did Sherrell tell
16  you?
17      A.   Her mother just told Sherrell to turn on
18  the news, that building that I be in, some people
19  got killed in there.
20      Q.   How did her mother know that's a building
21  that you would be in?
22      A.   Because her mother -- sometime her mother
23  would come by, sit around and talk to Sherrell.
24  When she leaving, instead of me walking, driving my
25  own car, I would have her drop me off over there and
```

1504

```
 1  I would walk there.
 2      Q.   So, Sherrell's mother would sometimes give
 3  you a ride?
 4      A.   I told her to drop me off at the diner, but
 5  she kind of figured I was going there.
 6      Q.   When you learned about -- was that the
 7  first time you learned about the murders of these
 8  three people?
 9      A.   Yeah.
10      Q.   You had not heard anything from Frank,
11  Vanessa, Dreddy, anyone else?
12      A.   No, no.
13      Q.   Did you know Efrain Johnson, a person named
14  Efrain Johnson?
15      A.   No.
16      Q.   Did you know a person named John Taylor?
17      A.   No.
18      Q.   Did you know Azikiwe Aquart, the
19  defendant's brother?
20      A.   No.
21      Q.   Or Zee?
22      A.   No.
23      Q.   Did you ever hear of a person known as Zee?
24      A.   Yeah, a heard Zee that day.  That day that
25  the murders happened, I heard that day.
```

**GA376**

1505

```
1    Q.   How did you hear about Zee?
2    A.   Actually, I called Vanessa, I called Frank
3  on the phone, I didn't know what was going on.  I
4  just woke up, I didn't know what was going on, so I
5  didn't know if it was them hurt or what was going
6  on.  So, I called them to see if they was all right,
7  and I don't know if it was Vanessa -- I think it was
8  Vanessa that I was talking to on the phone.
9    Q.   What did she say?
10   A.   She said that Dreddy was there that night,
11 and I was more concerned about did they have any
12 drugs in the building, in the apartment, because
13 there was a lot of police there.  I'm telling them
14 to get rid of all of the drugs they got before the
15 police go in there and they get arrested again.
16   Q.   How did the name Zee come up?
17   A.   She told me that Dreddy was in the building
18 that night, he dropped some cracks off and they had
19 to give the money to Zee because he was in Judy's
20 apartment.
21   Q.   That he was in Judy's apartment?
22   A.   Zee was in Judy's apartment, yeah.
23   Q.   She had given some money to him?
24   A.   She was supposed to give the money to him.
25   Q.   And before that, had you ever heard of a
```

1506

```
1  person by the name of Zee?
2    A.   No.
3    Q.   To your knowledge, did you ever speak to
4  any of those people, Efrain Johnson, John Taylor or
5  Zee, in person or on your cell phone?
6    A.   Never.
7    Q.   You said that Tina Johnson's drug sales
8  were interfering with your operation?
9           MR. SMITH:  Objection with the leading.
10          THE COURT:  Sustained.
11   Q.   Was the defendant still making money during
12 the time that Tina Johnson was selling drugs?
13   A.   Yeah.
14   Q.   A good amount of money?
15   A.   No, she wasn't selling that much drugs.
16 Like I told him at one time, she's only selling
17 enough to support her own habit and enough to buy --
18 you know just to keep her own self satisfied, which
19 wasn't wrong, I don't think, because why buy
20 something that's no good when she could -- you know.
21   Q.   You told that to the defendant?
22   A.   Yeah, I had told it to him.
23   Q.   To your knowledge, did Basil Williams ever
24 sell drugs?
25   A.   No.
```

1507

```
1    Q.   To your knowledge, did James Reid ever sell
2  drugs?
3    A.   No.
4    Q.   Were you -- after you gave the defendant --
5  let me ask you this:  After you met with him at the
6  Brazilian restaurant, were you still acting at his
7  lieutenant in the drug operation?
8    A.   No.
9    Q.   And you said that there is -- in every pack
10 there is all the smaller bags?
11   A.   Yeah.
12   Q.   Do you know how much the bags weighed?
13   A.   No, you don't sit there and weigh them out.
14 You just put enough, by eye, that's enough for $10.
15   Q.   When you met at the Brazilian restaurant,
16 do you know how long before that was -- before you
17 heard about the murders?
18   A.   Soon after.
19   Q.   I'm sorry?
20   A.   Soon after.  Not too long after.
21   Q.   Within days?
22   A.   A week might be too long.  Days, a week.
23 Seven days might have been too long.
24   Q.   After the murders, after you found out that
25 three people had been murdered, where did you
```

1508

```
1  continue -- where did you live?
2    A.   Still on Fairmont.
3    Q.   Did you ever leave Fairmont?
4    A.   No.
5    Q.   Did you continue -- who did you continue to
6  live with?
7    A.   Sherrell.
8    Q.   And did you ever leave town?
9    A.   No.
10   Q.   Leave Bridgeport?
11   A.   No.
12   Q.   In fact, were you arrested in Bridgeport?
13   A.   Yeah.
14   Q.   And when you were arrested, did you have --
15 what were you arrested for?
16   A.   I was selling crack.  Possession of
17 narcotics.
18   Q.   And was that Dreddy's crack at that time?
19   A.   No.
20   Q.   That had nothing to do with him?
21   A.   No.
22   Q.   And, Mr. Womble, have you been represented
23 by an attorney since the day of your arrest?
24   A.   Yeah.
25   Q.   And every time that you met with government
```

**GA377**

1509

```
1    attorneys or agents, was your attorney present?
2                MR. SMITH:  Objection, asked and
3    answered yesterday.
4        A.    Yeah.
5                THE COURT:  I don't remember.  Let's
6    just go ahead.
7        Q.    Were you ever told what to say by any
8    government attorney, your attorney or law
9    enforcement?
10       A.    To tell the truth.
11       Q.    Anything else?
12       A.    No, that was it.
13       Q.    Were any promises made to you?
14       A.    No.
15       Q.    And after you testify today, what happens?
16       A.    I'm hoping that -- I'm praying that I get
17   leniency on my sentence.
18       Q.    Do you go home or do you go back to prison
19   after today?
20       A.    Go back to jail.
21       Q.    And who is going to determine what your
22   sentence will be?
23       A.    The Judge.
24       Q.    Does the government decide?
25       A.    No.
```

1510

```
1        Q.    Do the agents?
2        A.    No.
3        Q.    Does your attorney?
4        A.    No.
5        Q.    Do you?
6        A.    No.  I wish.
7                MR. MARKLE:  I have no further
8    questions.  Thank you.
9                THE COURT:  All right, shall we take --
10               MR. MARKLE:  I'm sorry.  Thank you.  I
11   would like just to offer the plea agreement and
12   cooperation agreement, your Honor.
13               MR. SMITH:  No objection.
14               THE COURT:  Yes.  The numbers are what?
15               MR. MARKLE:  The plea agreement is 234
16   and the cooperation agreement is 234A.
17               THE COURT:  All right, they are full
18   exhibits.
19               MR. MARKLE:  If I can just show him.
20               THE COURT:  Sure.
21       Q.    Mr. Womble, showing you what's been marked
22   Government's Exhibit 234, do you recognize that
23   written document?
24       A.    Yeah.
25       Q.    And is that what's known to you as a plea
```

1511

```
1    agreement?
2        A.    Yeah.
3        Q.    And on the last page, does it have your
4    signature?
5        A.    Yeah, that's my signature.
6        Q.    And 234A, is that what's known to you as a
7    cooperation agreement?
8        A.    Yep.
9        Q.    And do you remember reviewing that, reading
10   it?
11       A.    Yeah.
12       Q.    Signing it?
13       A.    Yeah.
14       Q.    And does the last page have your signature?
15       A.    Yeah.
16       Q.    Thank you.
17               MR. MARKLE:  Thank you, your Honor.
18               THE COURT:  All right, do you want to
19   start or shall we take a recess first?
20               MR. SMITH:  Your Honor, we can probably
21   take a recess and then when we return if we could
22   speak with the Court outside the presence of both
23   the jury and Mr. Womble.
24               THE COURT:  That's fine.  All right, so
25   we'll take a 15-minute recess now.
```

1512

```
1                (Jury exited the courtroom.)
2                THE COURT:  All right, counsel, why
3    don't we take a five-minute recess so I can hear
4    your matter.
5                MR. SHEEHAN:  Your Honor, I've just
6    given a copy of a motion in limine to the government
7    about Mr. Womble's testimony.  I would like to
8    provide the original to the Court.
9                THE COURT:  All right, thank you.
10               MR. MARKLE:  Your Honor, I don't
11   understand why this motion is handed to me now other
12   than to --
13               THE COURT:  Other than it wasn't handed
14   you to before?
15               MR. MARKLE:  No, it certainly wasn't,
16   your Honor.  I'm reading it and maybe the government
17   doesn't need much time to respond, but I will be
18   shocked if we don't.
19               THE COURT:  All right.
20               MR. MARKLE:  Thank you.
21               (Recess)
22               THE COURT:  Please be seated, counsel.
23               All right, let me start by understanding
24   exactly what the defendant's motion seeks.  You
25   seek -- let me just hear you.  Go ahead.
```

1513

```
1    MR. SHEEHAN:  Your Honor, what we are
2  seeking to do is to cross-examine Mr. Womble with
3  respect to his lies under oath in the context of a
4  murder investigation.
5    THE COURT:  When you say "cross-examine
6  him regarding his lies under oath," I understand
7  that.  What are you proposing that you seek leave
8  from Court to do.
9    MR. SHEEHAN:  Well, the first thing,
10  your Honor, is that we're asking leave to do that.
11  And the reason why we're asking that leave is, A,
12  maybe that was imprudent on our part, but we
13  anticipated that there might be some objection to
14  that.  And under Rule 608, specific instances of
15  conduct, in the discretion of the court, if
16  probative of truthfulness, may be inquired.
17    THE COURT:  Inquired into, yes.  And
18  earlier in the rule it says that specific instances
19  of the conduct of a witness for the purpose of
20  attacking a witness's character for truthfulness,
21  other than conviction, may not be proved with
22  extrinsic evidence.  So that's what I'm trying to
23  understand what it is you want to do.
24    MR. SHEEHAN:  We want to do both, your
25  Honor.  And --
```

1514

```
1    THE COURT:  Why is it --
2    MR. SHEEHAN:  The reason why we want to
3  do the second part in terms of putting on extrinsic
4  evidence is, under Rule 404(b), that we believe that
5  his conduct in this regard is admissible impeachment
6  evidence, and that to the extent that 608 is not a
7  barrier, if that evidence comes in under other, and
8  then thirdly we're arguing if the Court finds it is
9  not covered by 404(b), and extrinsic evidence is
10  barred by Rule 608(b), we're asking the Court to
11  find that Rule 608(b) is an unconstitutional
12  violation of Mr. Aquart's rights under the Fifth and
13  Sixth Amendment with respect to confrontation.
14    THE COURT:  I don't see any authority in
15  your brief that suggests any court has found that.
16    MR. SHEEHAN:  Not yet, your Honor.
17    THE COURT:  All right, let's start, Mr.
18  Markle, with the first part.  Is there -- what is
19  the government's position with respect to defense
20  counsel's opportunity to inquire into this prior act
21  of apparent perjury somewhere in the early '90s?
22    MR. MARKLE:  I think along the lines of
23  inquiry, if I read it right, the government would
24  agree that inquiry could be made, but that extrinsic
25  evidence would be absolutely prohibited.  And I
```

1515

```
1  would note, your Honor, the government has just read
2  this in the last ten minutes, as your Honor has.
3  There is a 100-page transcript that the government
4  has not had adequate time to review, a five-page
5  statement, and a lot of allegations that I don't
6  think have any validity.  But to your Honor's
7  question, inquiry would be permissible, extrinsic
8  evidence would be prohibited.
9    THE COURT:  All right.  So, Mr. Sheehan,
10  I think the rule is pretty clear that you can -- and
11  I will give you leave to inquire into Mr. Womble's
12  prior perjury, but there does not seem to be any
13  exception under the rule to the principle and the
14  explicit statement in Rule 608(b) that it may not be
15  proved by extrinsic evidence.
16    So, let's move to your argument under
17  404(b).  How does that work?
18    MR. SHEEHAN:  Your Honor, under 404(b),
19  we -- Mr. Womble's history of perjury?
20    THE COURT:  When you say "history of
21  perjury," you mean anything other than this instance
22  of perjury in the Newsome case?
23    MR. SHEEHAN:  Yes.
24    THE COURT:  There are --
25    MR. SHEEHAN:  I have nothing other than
```

1516

```
1  the history.  I have nothing other -- as far as I
2  know, nothing other than what Mr. Womble did in this
3  particular case which consisted of either a series
4  of lies, or one lie.  I'm not sure, frankly, which
5  it was.
6    THE COURT:  All right.
7    MR. SHEEHAN:  In any case --
8    THE COURT:  The claim is that he told
9  the police things about the shooting that was
10  inconsistent with his testimony at trial or --
11    MR. SHEEHAN:  Well, it's more than that,
12  your Honor.  It's he told the things -- he told
13  things to the police which under oath at trial he
14  specifically repudiated.
15    THE COURT:  I understand, but that's
16  what we're talking about.
17    MR. SHEEHAN:  Yes, your Honor.
18    THE COURT:  So how does that fit under
19  404(b)?
20    MR. SHEEHAN:  Your Honor, I think under
21  404(b) it is a -- we are arguing that this is a
22  similar act.  And it is also relevant as to his
23  state of mind in signing the proffer agreement.
24    THE COURT:  When you say a "similar
25  act," I don't understand what you mean.  Doesn't
```

1517

```
1  that similar act mean that he lied here?
2          MR. SHEEHAN:  I think that it means that
3  when he is signing the proffer agreement and when he
4  is signing the cooperation agreement and when he is
5  telling the government that he is telling the truth,
6  his prior actions indicate that that is not -- that
7  is subject to question.
8          THE COURT:  So, why is it that he can't
9  be examined on the fact that he made this sworn
10 signed statement to the police in the Newsome matter
11 under pains of perjury, and then the examination is
12 he then perjured himself, and the same as he has
13 here in his plea agreement and cooperation agreement
14 been similarly -- and wasn't prosecuted for perjury,
15 and was similarly warned that he -- his dissembling
16 could subject him to prosecution for perjury.  What
17 more than that is your -- anything more than that is
18 your intent?
19         MR. SHEEHAN:  Actually I guess what I'm
20 trying to do, your Honor, is anticipate the
21 possibility that Mr. Womble will not admit these
22 acts.
23         THE COURT:  All right, and you have
24 documents in the event he has a loss of memory to
25 assist him.
```

1518

```
1          MR. SHEEHAN:  We do have documents to
2  assist him.
3          THE COURT:  So what precisely is it,
4  other than your questioning, that you are seeking to
5  admit as extrinsic evidence?
6          MR. SHEEHAN:  Actually --
7          THE COURT:  A 200-pound -- 200-page
8  transcript?  So, what exactly?
9          MR. SHEEHAN:  Your Honor, I think maybe
10 my motion in that regard might be premature because
11 we don't know what Mr. Womble is going to say.
12         THE COURT:  Right.
13         MR. SHEEHAN:  And if, in fact, Mr.
14 Womble admits the specific statements that we are
15 asking him about, then it may well be that we don't
16 need to do anything.  In that case I don't even
17 think -- I think our constitutional claim, novel
18 constitutional claim, the newly developing
19 constitutional claim, however we want to
20 characterize it, we don't get to that.
21         THE COURT:  All right.  But if we get to
22 something, do you have something that is marked ID?
23         MR. SHEEHAN:  We do, your Honor.
24         THE COURT:  And what is it?
25         MR. SHEEHAN:  We have a transcript.  We
```

1519

```
1  have the police statement which is the five-page
2  report.
3          THE COURT:  Now, presumably there is --
4  the whole thing is perjury?
5          MR. SMITH:  Well, your Honor, we could
6  -- and I have identified by Bates number, our own
7  Bates numbering system, which specific pages, and I
8  could reference those in the record.  And then if,
9  in fact, the Court were to rule that those were
10 admissible as exhibits, we would just admit those.
11         THE COURT:  Should I see them?
12         MR. SMITH:  Although the police
13 statement, I mean, it's not that long, so perhaps
14 that would just go in as a full exhibit.  The
15 specific pages, your Honor, I'll pull these out for
16 you.
17         THE COURT:  Let me ask you this, Mr.
18 Smith:  If Mr. Womble's testimony is contrary to
19 what you believe those documents show, and if you
20 were given -- if they were admitted, which I
21 understand is disputed, they would just come into
22 evidence, you won't need the witness here, right?
23         MR. SMITH:  If he were to admit to them,
24 your Honor?  I'm sorry.
25         THE COURT:  If they were to come in to
```

1520

```
1  evidence -- I don't want you shuffling through the
2  papers right now.  I just want to get going.
3          MR. SMITH:  He wouldn't have to be here,
4  no.
5          THE COURT:  So why don't we wait on
6  that.  I understand the sequence here.  Okay, the
7  government does not object to your inquiring into
8  this specific act of untruthfulness.  I will permit
9  it, so why don't we just begin.  Okay?
10         (Jury entered the courtroom.)
11         THE COURT:  All right, please be seated,
12 ladies and gentlemen.
13         Cross-examination, Mr. Smith.
14         MR. SMITH:  Your Honor, this will be
15 very brief.  May we approach?
16         THE COURT:  Yes.
17         (Sidebar conference)
18         MR. SMITH:  I apologize, your Honor, I
19 need to bring this up.  It's an unrelated issue.
20 The government has disclosed to us somewhere around
21 40 hours of recorded jail conversations of Mr.
22 Womble.  I have excerpted maybe eight of those, very
23 brief, 10 to 12 seconds.  We have a logistical
24 problem in that if he denies certain facts, I would
25 have to play those, but what I would propose is that
```

1521

```
1    I go past that and I would just note that point and
2    then when we have a break and the jury is out, Mr.
3    Womble can listen to those.  Because he has to be
4    confronted with them, but we can't do it in front of
5    the jury.
6              THE COURT:  All right.
7              MR. SMITH:  And then if he, in fact,
8    admits them or denies them, we can go back.
9              THE COURT:  All right.
10             (Sidebar concluded)
11   CROSS-EXAMINATION
12   BY MR. SMITH:
13        Q.   Hi, Mr. Womble.
14        A.   Hi.
15        Q.   I'm Attorney Justin Smith, one of the
16   attorneys representing the defendant.  I want to
17   take you back to September 8, 2005, okay?
18        A.   Okay.
19        Q.   Could you --
20        A.   Yeah.
21        Q.   -- respond?
22        A.   Yeah.
23        Q.   Thanks.  That's the date of your arrest,
24   right?
25        A.   Yeah.
```

1522

```
1         Q.   And you're in an apartment in Bridgeport.
2         A.   Yeah.
3         Q.   And you are sitting at the dining room
4    table.
5         A.   Yeah.
6         Q.   And the cops come in.
7         A.   Yeah.
8         Q.   And they search you.
9         A.   Yeah.
10        Q.   And you've got 27 packets of crack in your
11   pocket.
12        A.   Yeah.
13        Q.   That weighs about 4.4 grams.
14        A.   Yeah.
15        Q.   At this point you know you are in big
16   trouble.
17        A.   Yeah.
18        Q.   You have a prior drug conviction.
19        A.   Yeah.
20        Q.   A 2000 sale of narcotics, right?
21        A.   Yeah.
22        Q.   And you were sentenced to that for six
23   years.
24        A.   Yeah.
25        Q.   But you only served about three.
```

1523

```
1         A.   Yeah.
2         Q.   Okay.  So you owe about three years on
3    parole.
4         A.   Yeah.
5         Q.   And now you've got a new drug case on top
6    of it.
7         A.   Yep.
8         Q.   And you've got the prior drug conviction.
9         A.   Yeah.
10        Q.   Now, you only been out of prison a couple
11   years at this point.
12        A.   Yeah, I got out '04.  Yeah.  '03.
13        Q.   And now you are back in the soup here
14   looking at going back to prison.
15        A.   Yeah.
16        Q.   And, of course, you don't want to go back
17   to prison.
18        A.   No.
19        Q.   Okay.  Like you talked about.
20        A.   Yeah.
21        Q.   Because, in fact, you hate being in prison.
22        A.   Who don't?  Yeah.
23        Q.   It's a terrible place.
24        A.   Yeah.
25        Q.   It's dangerous there.
```

1524

```
1         A.   Yeah.
2         Q.   You can't do what you want when you want.
3         A.   Nope.
4         Q.   You can't eat what you want when you want.
5         A.   Nope.
6         Q.   They don't let you go outside when you
7    want.
8         A.   Nope.
9         Q.   If they do, it's for a very short period of
10   time.
11        A.   Yep.
12        Q.   So, when you are in that kitchen, at that
13   point you really have one goal, right, and that's to
14   try to protect yourself?
15        A.   Yeah.
16        Q.   Okay.  And try to keep yourself out of
17   prison.
18        A.   Yeah.
19        Q.   So, what you do is you lie to the cops.
20        A.   Yeah.
21        Q.   Because you told the cops you walked into
22   the apartment, right?
23        A.   Yeah.
24        Q.   And that you saw 25 or 30 bags of crack
25   lying on the floor.
```

**GA381**

1525

```
1    A.   Yeah.
2    Q.   That you picked them up.
3    A.   Yeah.
4    Q.   Put them in your pocket.
5    A.   Yep.
6    Q.   Because you were going to wait for the
7  owner to get off the phone to give them back to her.
8    A.   Yep.
9    Q.   It wasn't a great lie, was it?
10   A.   No.
11   Q.   It was the best you could do on the spot.
12   A.   Right.
13   Q.   So, to keep yourself out of prison, you
14 said that that crack belonged to someone else.
15   A.   Yeah, to the owner of the house.
16   Q.   But it didn't work.  The lie, I mean.
17   A.   No.
18   Q.   Because things got worse for you at that
19 point.
20   A.   Yeah.
21   Q.   Because they took you over to the state
22 police barracks.
23   A.   Yes.
24   Q.   At that point you had been arrested by the
25 state authorities.
```

1526

```
1    A.   Yeah.
2    Q.   And then the FBI arrives.
3    A.   Yeah.
4    Q.   And I think a couple times today you talked
5  about each time you met with agents of the
6  government you had an attorney.
7    A.   Yeah.
8    Q.   But correct me if I'm wrong, that very
9  first interview that night of your arrest you didn't
10 have an attorney there with you.
11   A.   No, except the first time.
12   Q.   Okay.  So any time after that you did have
13 your attorney.
14   A.   Yeah.
15   Q.   Okay.  So, now the FBI comes to the
16 barracks.
17   A.   Yep.
18   Q.   And you have been arrested with crack on
19 you.
20   A.   Yep.
21   Q.   You've got a criminal record.
22   A.   Yep.
23   Q.   You are on parole.
24   A.   Yep.
25   Q.   And that very first interview they started
```

1527

```
1  asking you about the murders at Charles Street.
2    A.   Yeah.
3    Q.   And just a few days before you got arrested
4  you had seen Frank Hodges in the project.
5    A.   In the project?
6    Q.   In the Greens project?
7    A.   No.
8         THE COURT:  Mr. Womble, you need to move
9  closer to the microphone, please.
10   A.   I'm sorry, no.
11        THE COURT:  I'm sorry, you are referring
12 to a few days before September 8th?
13   Q.   Just a few days before September 8th you
14 had seen Frank Hodges while you were still out.
15   A.   I don't remember seeing him.  I don't think
16 so.
17   Q.   Would there be something that could refresh
18 your memory?
19   A.   Maybe.  I don't know.
20        MR. SMITH:  Could we pull up DG 3330.
21   Q.   Do you see that document in front of you?
22   A.   Yeah.
23   Q.   The second to last paragraph, the top of
24 the paragraph that's highlighted there?
25   A.   Yeah.
```

1528

```
1    Q.   Does that refresh your memory?
2    A.   If that's what it is.  If that's what it
3  said.  I don't remember, but if that's what it says,
4  that's what it is.
5         THE COURT:  You are not just supposed to
6  testify from what it says because that's not in
7  evidence.  If it assists you in refreshing your
8  memory.
9         THE WITNESS:  No, it don't.
10        THE COURT:  Okay.
11   Q.   Okay.  Now, when you were in that very
12 first interview with the police, they told you, the
13 FBI agents, they told you that someone else said you
14 were there.
15   A.   Yeah.
16   Q.   So, other people had been talking.
17   A.   Yeah.
18   Q.   And they even showed you some paperwork in
19 regards to this.
20   A.   I don't remember they showed me no
21 paperwork.  They was just most of the time talking
22 to me.
23   Q.   Did they show you some paperwork of what
24 other people had said already?
25   A.   No, no they did not.
```

**GA382**

1529

```
1    Q.   They did not?
2    A.   No.
3         MR. SMITH:  This is one of those points
4    we'll have to come back to that we discussed at
5    sidebar.
6    Q.   But you knew other people were already
7    talking, right?
8    A.   Yeah.
9    Q.   Including Frank.
10   A.   I didn't know who was talking at the time
11   at the first -- I didn't know who it was, but I knew
12   somebody was.
13        MR. SMITH:  This may be another point we
14   may have to come back to, your Honor.
15   Q.   But you knew that they had already said you
16   were the one giving them drugs.
17   A.   Yeah.
18   Q.   Okay.  And just based on that, the FBI and
19   the police were telling you you are going in for a
20   long time.
21   A.   Yeah.
22   Q.   But you had a way out, a way out of the
23   mess.
24   A.   At the time, no.
25   Q.   They didn't say that -- offer to have you
```

1530

```
1    cooperate in that first interview?
2    A.   No.
3    Q.   They didn't say you can?
4    A.   They just sat down.  They just started
5    talking.
6    Q.   Okay.  And you just talked to them.
7    A.   Yeah.
8    Q.   Okay.  But you knew that they wanted you to
9    talk about Dreddy.
10   A.   Yeah, about what happened on Charles
11   Street.
12   Q.   And it really all boiled down to Dreddy,
13   didn't it?
14   A.   Yeah.
15   Q.   They really wanted him.
16   A.   Yeah.
17   Q.   And of course at this point you had already
18   admitted to dealing drugs, right?
19   A.   Yeah.
20   Q.   So, for you there is no turning back.
21   A.   No.
22   Q.   So, now you are involved in a murder
23   investigation.
24   A.   Yeah.
25   Q.   And of course you went to jail that night.
```

1531

```
1    A.   Yeah.
2    Q.   And shortly -- a little bit after you get a
3    lawyer.
4    A.   Yeah.
5    Q.   But you are still sweating it at this
6    point, right?
7    A.   Yeah.
8    Q.   And after meeting with your lawyer you
9    learn about the federal system.
10   A.   Yeah.
11   Q.   It's the big leagues.
12   A.   Yeah.
13   Q.   You had only been in the state system
14   before that, right?
15   A.   Yeah.
16   Q.   Then the longest you had ever done in
17   prison before was three years.
18   A.   Yeah.
19   Q.   And so you learn that with your record you
20   are looking at life --
21   A.   Yeah.
22   Q.   -- in prison.
23   A.   Yeah.
24   Q.   And you learn that in the federal system
25   life means life.
```

1532

```
1    A.   Yeah.
2    Q.   And you already know that other people are
3    talking.
4    A.   Yeah.
5    Q.   About you and the drugs.
6    A.   Yes.
7    Q.   About you being around the murders?
8    A.   Yeah.
9    Q.   So this is a problem for you.
10   A.   Yeah.
11   Q.   And you know that, right?
12   A.   Yeah.
13   Q.   Because you spent a lot of time at Charles
14   Street.
15   A.   Yeah.
16   Q.   And you knew all about 211, apartment 211.
17   A.   Yeah.
18   Q.   And you knew about apartment 101.
19   A.   Yeah.
20   Q.   Because that's where the people who got
21   murdered lived, right?
22   A.   Yeah.
23   Q.   You also knew at this point you threatened
24   those people.
25   A.   Yeah.
```

**GA383**

1533

```
1     Q.   And you threatened them in public.
2     A.   Yeah.
3     Q.   People had seen this.
4     A.   Yeah.
5     Q.   In fact, they had seen you threaten Tina
6  with a table leg.
7     A.   Yeah.
8     Q.   And as far as you knew, the FBI already
9  knew about these people.
10    A.   Yeah.
11    Q.   These witnesses.
12    A.   Yeah.
13    Q.   And of course you want to get out of prison
14 as quickly as possible.
15    A.   Yeah.
16    Q.   Because you knew you couldn't spend your
17 life in prison.
18    A.   No.
19    Q.   Even 20 years is too much.
20    A.   Yeah.
21    Q.   Even ten.
22    A.   Yeah.
23    Q.   At the time you even felt that five was the
24 most you could do.
25    A.   No, I wouldn't say that.
```

1534

```
1     Q.   Okay.  Well, we'll come back to that.
2          MR. SMITH:  That's another point, your
3  Honor, we discussed.
4          MR. MARKLE:  Your Honor, I object.
5          THE COURT:  Sustained.
6     Q.   And the only way out of your mess was to
7  cooperate.
8     A.   Yeah.
9     Q.   And tell the government what they wanted to
10 know.
11    A.   To tell the truth.
12    Q.   They wanted you talk about Dreddy.
13    A.   They wanted the truth.
14    Q.   But you already testified they were asking
15 about Dreddy.
16    A.   Yeah, but they didn't start off talking
17 about it.  They started talking off about my
18 involvement with Charles Street.
19    Q.   Okay.  But you also knew that you needed to
20 talk relatively quickly, right?  Meaning you
21 couldn't wait around and decide whether you were
22 going to help them.
23    A.   No.
24    Q.   Because then it's too late, the deal is
25 off.
```

1535

```
1     A.   Yeah.
2     Q.   Because they've already got other people to
3  talk.
4     A.   Yeah.
5     Q.   So, you've got to take advantage of this
6  opportunity.
7     A.   Yeah.
8     Q.   So, the next meeting with the government is
9  on September 20, 2005.  And your lawyer is there,
10 correct?
11    A.   Yeah.
12    Q.   And you sign a proffer agreement at that --
13    A.   Yeah.
14    Q.   At that point.  And you start talking.
15    A.   Yeah.
16    Q.   Because that's your way out.
17    A.   Yep.
18    Q.   Your way out of prison.
19    A.   Yeah.
20    Q.   Now, later you did in fact plead guilty,
21 right?
22    A.   Yeah.
23    Q.   And you signed a plea agreement with the
24 government.
25    A.   Yeah.
```

1536

```
1     Q.   Okay.  This is Government's Exhibit 234.
2  And there was a guideline stipulation, right?
3     A.   Yep.
4     Q.   And the government explained -- or your
5  lawyer.  You knew what the guidelines were?
6     A.   Yeah.
7     Q.   They're the federal --
8     A.   Yeah.
9     Q.   -- guidelines that control sentencing.
10    A.   Yeah.
11         THE COURT:  They advise sentencing.
12         MR. SMITH:  I'm sorry, the Court is
13 correct, they do advise.  They used to control.
14    Q.   So, they advise the Court as to what the
15 sentence should be.
16    A.   Yeah.
17    Q.   But the Court is not bound by that.
18    A.   Yeah.
19    Q.   Correct?  And you understood when you made
20 this agreement that you were -- at the very last
21 line there in the bottom, you qualified as a career
22 offender.
23    A.   Yes.
24    Q.   And what that meant is that with your
25 record you were in the highest criminal history
```

**GA384**

1537

1 category under the guidelines.
2     A.   Yes.
3     Q.   And an extremely high offense level.
4     A.   Yeah.
5     Q.   And that resulted in that 262 to
6 327 months.
7     A.   Yeah.
8     Q.   And that's roughly 22 years at the low end.
9     A.   Yeah.
10     Q.   In addition, you had pled guilty to a
11 20-year mandatory minimum.
12     A.   Yeah.
13     Q.   But there is only one way out of that
14 20-year mandatory minimum for you, right?
15     A.   Yeah.
16     Q.   And that's cooperation.
17     A.   Yeah.
18     Q.   So you also signed a cooperation agreement,
19 right?
20     A.   Yeah.
21     Q.   And that agreement is really like a
22 contract, right?
23     A.   Yeah.
24     Q.   You have to do certain things?
25     A.   Yeah.

1538

1     Q.   Under that agreement, right?
2     A.   Right.
3     Q.   And if you do those certain things, the
4 government says they'll do certain things?
5     A.   Yeah.
6     Q.   Right?  So, what you have to do is provide
7 substantial assistance to the government in the
8 prosecution of another.
9     A.   Yeah.
10     Q.   That's the language in the cooperation
11 agreement.
12     A.   Yeah.
13     Q.   But under that agreement the government
14 gets to decide what substantial assistance is,
15 right?
16     A.   Yeah.
17     Q.   And it's only that if they decide that
18 you've provided substantial assistance, right --
19     A.   Yeah.
20     Q.   -- then they'll file a motion with the
21 court, right?
22     A.   Yeah.
23     Q.   And they'll ask the Judge to give you less
24 time.
25     A.   Yeah.

1539

1     Q.   Okay.  And you're expecting that after your
2 testimony here they will in fact file that motion,
3 right?
4     A.   I'm hoping.
5     Q.   And you might even walk out of here with
6 time served.
7     A.   It's up to the Judge.  I don't --
8     Q.   But that's what you are hoping for.
9     A.   If that's what she want to sentence me to.
10 It's her call.
11     Q.   I understand it's her call, but it's what
12 you are hoping.
13     A.   I'm hoping for as less time as possible.
14     Q.   Time served.
15     A.   Less time as possible.  Time served, so be
16 it.
17     Q.   You know this has happened for other people
18 in Bridgeport.
19     A.   Yes.
20     Q.   You knew about Booby Rogers.
21     A.   Yeah.
22     Q.   He got a ten-year sentence and then he was
23 out walking around?
24     A.   Yeah.
25     Q.   Now, Mr. Womble, this is not the first time

1540

1 you've been involved in a murder investigation, is
2 it?
3     A.   No.
4     Q.   You were a witness in another case?
5     A.   Yeah.
6     Q.   And that was a murder that happened in
7 Bridgeport in 1992.
8     A.   Yeah.
9     Q.   And you were at the scene.
10     A.   Yeah.  I was walking by, yeah.
11     Q.   And the police came to you the day after
12 that murder, right?
13     A.   Yeah.
14     Q.   And right after the cops came to see you,
15 you told them who did it, who did the shooting.
16     A.   Yeah.
17     Q.   And you told them that Shawn Newsome did
18 the shooting.
19     A.   Yeah.
20     Q.   And he killed a man named Lorenzo.
21     A.   Yeah.
22     Q.   So you told the cops this story, right?
23     A.   Yeah.
24     Q.   In fact, you signed a sworn statement as to
25 what you say you saw that night.

**GA385**

1541

```
1    A.    Yeah.
2    Q.    And you walked out of the police station.
3    A.    Yeah.
4    Q.    You didn't go to jail.
5    A.    No.
6    Q.    Even though you had pending cases, they let
7  you walk away.
8    A.    I didn't have any pending cases there.
9    Q.    Okay.  But you didn't get charged with
10 anything.
11   A.    No.
12   Q.    And you knew that the cops would rely on
13 that statement in their investigation, right?
14   A.    Yeah.
15   Q.    And of course you knew it was a crime to
16 make a false statement to the police.
17   A.    Yeah.
18   Q.    But after you walked out of the station, as
19 far as you were concerned, it was over with, right?
20   A.    Yeah.
21   Q.    But it wasn't over with.
22   A.    No.
23   Q.    Because then you were called as a witness
24 in the murder trial.
25   A.    Yeah.
```

1542

```
1    Q.    So you went into court.
2    A.    Yeah.
3    Q.    You took an oath to tell the truth.
4    A.    Yeah.
5    Q.    Just like you did today.
6    A.    Yeah.
7    Q.    And in court you said you lied to the cops.
8    A.    I don't remember.
9    Q.    You don't remember?  Let's see if something
10 will refresh your memory.
11         MR. SMITH:  Could we bring up DD 2088.
12   Q.    Do you see that first two lines, A and Q?
13         MR. SMITH:  The top of the page.  I'm
14 sorry.
15   A.    Yeah.
16   Q.    Does that refresh your memory what you said
17 in court?
18   A.    I don't remember.  If that's what it says.
19 I don't remember it, though.  It's been so long, I
20 don't remember.
21   Q.    Okay.  And, in fact, you told them that you
22 didn't see Shawn Newsome anywhere near the crime
23 scene that night.  That's what you said in court.
24   A.    No.
25   Q.    You didn't say that?
```

1543

```
1    A.    I don't believe I did.  I don't remember if
2  I did or if I didn't.
3    Q.    Well, either you didn't or you don't
4  believe?
5    A.    I don't remember.
6          MR. SMITH:  Could we bring up DD 0213.
7    A.    Okay.
8    Q.    Do you see near the bottom of the page?
9    A.    Yeah.
10   Q.    The last four lines.
11   A.    Yeah.
12   Q.    Does that refresh your memory as to what
13 you told the Court -- told the jury in that case?
14   A.    I don't remember.  It's been so long, I
15 don't remember.
16   Q.    You explained in your testimony why you
17 lied to the police, right?
18   A.    Excuse me?
19   Q.    You explained in your testimony in that
20 trial to a jury why it is you had lied to the
21 police.
22   A.    Again, that was so long ago.  I don't
23 remember that.  I just remember taking the stand,
24 and I don't remember everything that was said in
25 court.
```

1544

```
1    Q.    Okay.  Is there something that would
2  refresh your memory as to that?
3    A.    Like I said, it been so long ago I don't
4  remember.
5          MR. SMITH:  Could we bring up DD 0214.
6    Q.    Do you see the middle of the page?
7    A.    Yeah.  Yeah, I remember.
8    Q.    Do you remember saying that?
9    A.    I don't remember saying that.  It's been so
10 long I don't remember exactly what I said in court
11 then.  It's been so long ago.
12   Q.    After this -- after you testified, you were
13 never prosecuted for lying to the police?
14   A.    No.
15   Q.    You were never prosecuted for perjury?
16   A.    No.
17   Q.    You just walked away from the whole thing?
18   A.    No, I went to jail.  I was in jail at the
19 time of this.  I was in jail at the time.
20   Q.    I understand, but you, in connection with
21 your testimony in these matters, you were not
22 prosecuted?
23         THE COURT:  "These matters" being?
24   Q.    Your statement to the police and your
25 statements in court.
```

1545

```
1    A.   No.
2    Q.   Do you admit, Mr. Womble, lying in court in
3  that trial?
4    A.   I don't remember lying to them.
5    Q.   I'm sorry?
6    A.   I don't remember lying to them.  I don't
7  remember nothing I said to them then.
8    Q.   You don't remember whether you lied or not?
9    A.   I don't remember nothing about that case,
10 just knowing that I took the stand and that was
11 that.  I don't remember nothing that had anything to
12 do with the case.
13   Q.   You seem to remember everything you told
14 the police.
15   A.   Excuse me.
16   Q.   When I was asking you about what you told
17 the police, you remembered all of that.
18   A.   I don't understand.
19   Q.   Wasn't I asking you didn't you tell the
20 police you saw Shawn shoot him and you said yeah, I
21 remember telling the police that?  You agreed with
22 me.
23   A.   You didn't ask me did Shawn shoot him.  You
24 never said that.  I don't think you said that to me
25 just now.
```

1546

```
1    Q.   You told the police in regards to that
2  shooting Shawn pulled out the gun and shot Lorenzo.
3    A.   All right.
4    Q.   Correct?
5    A.   All right, yeah.
6    Q.   And when you went to court you told the
7  court you did not see Shawn out there that night.
8    A.   I didn't see Shawn out there fighting the
9  guys that night.  That's probably -- because there
10 was a big fight before Shawn got out the car and
11 shot him.
12   Q.   So, are you saying in your grand jury
13 testimony -- in your testimony in this previous
14 trial that you did testify that you saw Shawn shoot
15 Lorenzo?
16   A.   I believe I did.
17        MR. SMITH:  Your Honor, I don't want to
18 have to do, but I would have to show Mr. Womble his
19 entire testimony to see if he can point to me where
20 in fact he says that.
21        THE COURT:  I don't think he has to do
22 that.
23        MR. SMITH:  Then I would offer his
24 testimony as an exhibit.
25        THE COURT:  Are you marking this as
```

1547

```
1  Defendant's M for ID?  Do you want to show him
2  anything to -- all right, he doesn't have an
3  unrefreshed recollection.
4        MR. SMITH:  I believe his testimony was
5  he didn't believe he --
6        THE COURT:  Ask him the question again,
7  would you.
8    Q.   Did you tell the jury in your previous
9  testimony in the Shawn Newsome murder case that you
10 in fact saw Shawn shoot Lorenzo?
11   A.   I don't remember, man.  I don't remember.
12 I don't remember.
13   Q.   Again, do you think looking at the
14 transcript would refresh your memory?
15   A.   Again, it was so long ago.  I don't
16 remember nothing that happened.  It was '92, I don't
17 remember that far back.  It happened, I pushed it
18 out, and that was it, I got rid of it, I didn't
19 think no more about it on.
20        MR. SMITH:  Can I have just a moment,
21 your Honor.
22   Q.   Did you tell that jury, after you were
23 asked:  "What was Shawn doing?"  "I don't think
24 Shawn was there at the time they was fighting him."
25   A.   I don't remember.
```

1548

```
1    Q.   And would looking at the transcript refresh
2  your memory?
3    A.   No, because I don't remember.
4    Q.   Did you tell the jury --
5        MR. MARKLE:  I'm going to object your
6  Honor.  This document is not in evidence.
7        THE COURT:  This is just a question.
8    Q.   Do you recall telling the jury after being
9  asked:  "Do you remember telling the police that you
10 saw Shawn scuffling with -- against Lorenzo?  "Yeah,
11 I do."
12   A.   I don't remember.
13   Q.   Would looking at the transcript refresh
14 your memory?
15   A.   Again, it's been so long ago I don't
16 remember what happened with that case.
17   Q.   Did you tell the jury after being asked:
18 "What did you see Shawn -- when they were fighting
19 you don't think Shawn -- is it your testimony now
20 that you don't think Shawn was there?"  Did you tell
21 the jury:  "I don't think he was there while they
22 was fighting, no."
23        Did you tell that to the jury there?
24   A.   Again, I don't remember, man.  I honestly
25 don't remember what happened then.
```

**GA387**

1549

```
1        MR. MARKLE:  Your Honor, I don't think
2   -- there is no objection to the transcript, rather
3   than proceeding in this way, the transcript being
4   presented as a full exhibit.
5        MR. SMITH:  I would also move to move in
6   the sworn statement to the police department on the
7   same basis, your Honor.
8        MR. MARKLE:  No objection.
9        THE COURT:  All right, Defendant's M,
10  which is the transcript of his testimony in the
11  Newsome trial in 1994.
12       MS. DAYTON:  '92.
13       THE COURT:  '92, sorry.  And Defendant's
14  N will be his police statement also in relation to
15  the police investigation of the Lorenzo murder in
16  '92, or whenever it was.
17       Q.  Showing you what's been admitted as
18  Defendant's Exhibit N, Mr. Womble, you can see that
19  the bottom paragraph.
20       A.  Yeah, I can see it.
21       Q.  You were asked:  "Please tell me in your
22  own words what the occurred last night."
23       A.  Yeah.
24       Q.  And you said:  "All the young boys were out
25  there behind the bus, the food bus, they were all
```

1550

```
1   scuffling against Lorenzo.  Shawn Newsome, Jerry
2   Fleming, Fats, Major, they were all hitting on him.
3   For what reason, I don't know.  Shawn poured beer on
4   him trying to entice him to fight.  Lorenzo knew he
5   couldn't fight five of them, so he kept backing up.
6   Major tried to help him in the end.  He told Lorenzo
7   to run, but Shawn pulled out the gun and shot
8   Lorenzo.  They were only three or four feet away."
9   Correct?
10       A.  Yeah, that's what it says.
11       Q.  That's what you told the police?
12       A.  That's what it says, but I don't remember.
13  That's what it says.
14       Q.  I don't -- I'll come back to that in a
15  minute, Mr. Womble.  You continue:  "A blue Regal
16  was parked right there and Shawn jumped in and drove
17  away.  He came back later in another car.  The car
18  he came back in was a dark blue car, maybe an older
19  New Yorker.  He just kept driving up and down the
20  street drinking and smoking."
21            That's what you told the police?
22       A.  Yeah, that's what it said.
23       Q.  You were asked:  "Where were you when the
24  shooting occurred?"  I was in the walkway of the
25  first parking lot right by the front of the food
```

1551

```
1   bus.  I was about a bus length away from Lorenzo
2   when he got shot."
3            Right?
4        A.  Yeah, that's what it says.
5        Q.  "Were you friends with Lorenzo?"  "Yes, we
6   were just talking before it happened about an hour
7   before."
8            That's what you were asked, correct?
9        A.  Yeah.
10       Q.  And that was your answer?
11       A.  Yeah.
12       Q.  You were asked to describe Shawn.
13  "Describe Shawn to me."  Answer:  "About my
14  complexion, about 5'10, medium-husky build, clean
15  face.  I don't think he's no more than 20."
16            Right?
17       A.  Yeah.
18       Q.  "What was he wearing last night?"  "I think
19  a pair of jeans and a blue Starter jacket."
20            That's what you told them, right?
21       A.  Yes, that's what it says.
22       Q.  "What type of gun did he have?"  "I really
23  couldn't make it out what kind it was, but it
24  sounded like a .38."
25            You told them that, right?
```

1552

```
1        A.  Yes, that's what it said.
2        Q.  "How many shots were fired?"  "Two, one
3   after another."
4            You told them that, right?
5        A.  Yes, that's what it says.
6            THE COURT:  Are you asking him whether
7   he remembers saying this or that you are reading it?
8            MR. SMITH:  I'm confirming this is what
9   he told the police.
10           THE COURT:  But that's not what he's
11  answering.  He's saying this is what it says.  So,
12  if you want to read it to the jury, you can read it
13  to the jury, but if you want to go through each of
14  these and see if he remembers that, those are two
15  separate things.
16           MR. SMITH:  I'm asking if he said these
17  things to the police.
18           THE COURT:  Do you understand that to be
19  the question?
20           THE WITNESS:  Yeah.
21           THE COURT:  Do you remember if you said
22  those things?
23           THE WITNESS:  I don't remember saying
24  it, but that's what it says here.  I don't remember
25  saying it.  Like I said, it's so long ago from --
```

1553

```
1         MR. SMITH:  I understand he doesn't
2  remember, your Honor.  I'm asking if he's disputing
3  this is his statement to the police.
4         THE COURT:  I don't know what the
5  difference is.
6     Q.  Are you saying you didn't say these things
7  to the police?
8     A.  No, I'm saying that's what it says I said
9  right there.  So, evidently I had to say it because
10 if it's there.
11    Q.  So, you said it?
12    A.  Evidently I had to say it if it's there.  I
13 don't remember saying it.  I can't say I remember
14 saying it, though.
15    Q.  You don't deny saying it?
16    A.  I don't remember saying it either.
17    Q.  Look at this line.  "Did Shawn have the gun
18 out the entire time they were arguing?"  "No, he
19 pulled it out of his hoodie pockets right before he
20 used it."
21         You told the police that.
22    A.  That's what it says.
23    Q.  You don't deny saying that to the police?
24    A.  I don't remember saying that.  Like I said,
25 it's been so long since this happened.  This is '92.
```

1554

```
1  I don't remember everything that went on that night
2  20 years ago almost.  I don't remember that.
3         MR. SMITH:  I'd like to just read this
4  to the jury, your Honor?
5         THE COURT:  You may.  And you are
6  reading from Defendant's N.
7         MR. SMITH:  Yes, that is correct.  I'm
8  carrying on from where we were talking about
9  earlier.
10         "Approximately what time was it when the
11 shooting occurred?"
12         "I think about 10:30, quarter to
13 11:00 p.m."
14         "Did Shawn have the gun out the entire
15 time they were arguing?"
16         "No, he pulled it out of his hoodie
17 pockets right before he used it."
18         "Did anyone else have a gun?"
19         "No, not that I know of."
20         "Did you know Shawn to carry guns?"
21         "Yes, different kinds."
22         "How long have you known Shawn?"
23         "A few years."
24         "Where is he staying now?"
25         "Somewhere across from building 10, one
```

1555

```
1  of the complexes."
2         "Who is Jerry Fleming?"
3         I know him about five or six years.
4  Dark-skinned, about 5'2, about medium build.  He
5  only about 16, 17.  He lives by the first parking
6  lot."
7         "Do you remember what he was wearing
8  last night?"
9         "No."
10         "Where did you go after the shooting?"
11         Back into my friend's house, 341C
12 Trumbull Avenue.  I stayed there for a while."
13         "Do you know Fats' real name?"
14         "No."
15         "What's he look like?"
16         "Lighter skin than me and Shawn.  No
17 older than 18.  Kind of heavy.  He's Shawn's
18 brother.  He has always got a hat on and he's about
19 5'10 I guess."
20         "How about Major, do you know his real
21 name?"
22         "I don't know.  I don't really know
23 nothing about him.  I only seen him around once in a
24 while?"
25         "Rodney, I'm going to show you a photo
```

1556

```
1  array consisting of six blacks males.  Do you
2  recognize any of them?"
3         "Yes, No. 2."
4         "Who is No. 2?"
5         "Shawn Newsome, the one who shot Lorenzo
6  last night."
7         "Are you positive?"
8         "Yes."
9         "Are you positive also that a Jamont
10 Best was not out there last night?"
11         "No, I just didn't see him if he was."
12         "Describe the blue car that Shawn got
13 into after the shooting."
14         "Dark blue, dark tint on the window.
15 It's in good condition.  A Regal."
16         "Do you know why they all jumped on
17 Lorenzo?"
18         "There was no reason.  I guess he
19 wouldn't buy any drugs off of them?
20         "Is that the reason Shawn shot him?"
21         "I don't know.  They were all drunk."
22         "I'm going to show you another photo
23 array consisting of six black males.  Do you
24 recognize any of them?"
25         "Yes, No. 4."
```

1557

```
1        "Who is that?"
2        "That's Jerry Fleming."
3        "What did he do during the shooting last
4   night?"
5        "He was just part of the fight before
6   Shawn shot."
7        "Also, please sign the backs of the two
8   photos you identified."
9        "Okay."
10       "Also, would you sign and date and
11  circle the photocopies of the array."
12       "Yes."
13       "Was Lorenzo with anyone?"
14       "His brother, but he ran away before he
15  got shot.  His brother's name is Ricky Shepard."
16       "Have you seen Shawn, Jerry ,Fats or
17  Major since last night?"
18       "No, I just came out when you saw me."
19       "Do you have anything further you would
20  like to add to this statement?"
21       "No."
22       "After reading this statement and
23  finding it to be as you told me, will you sign it?"
24       "Yes."
25       Ended 1430 hours.
```

1558

```
1        That's your signature, Mr. Womble?
2   A.   Yeah.
3   Q.   That says "Subscribed and sworn before me
4   this 5th day of March 1992 under the authority of
5   the Connecticut General Statutes 1- 24."
6   A.   Yeah.
7   Q.   Somebody signed it from the Bridgeport
8   Police Department underneath your signature.
9   A.   Yeah.
10       MR. SMITH:  This is from Defendant's M,
11  the transcript, your Honor?
12       THE COURT:  Defendant's M, yes.
13       MS. DAYTON:  Your Honor, it's not a
14  clean copy.  We'd ask that a clean copy be shown to
15  the jury.
16       MR. SMITH:  This is the copy we received
17  from the attorney who did the appeal for Shawn
18  Newsome, your Honor.  It is the copy that he had.
19  There was no original transcript available.  It had
20  long since been destroyed pursuant to state law.
21       THE COURT:  All right, ladies and
22  gentlemen, I'm going to ask you to attach no
23  significance to these lines or circlings or anything
24  that weren't made by anybody involved in this case.
25  Okay, it appears that we'll just have to not pay
```

1559

```
1   attention to them.  I am asking you to do that.
2        All right, go ahead.
3   Q.   You were asked, Mr. Womble:  "Can you tell
4   us in your own words, Rodney, without looking at the
5   statement, what you remember them doing?"
6        "They were hitting on him at the time."
7        "The Court:  Sorry?"
8        "They were fighting him."
9        "And when you say 'fighting him,' what
10  do you mean?"
11       "Hitting on him and beating him up."
12       "Anyone using weapons?"
13       "Your Honor:  I would object."
14       "No."
15       "I would like to know who we're talking
16  about here.  He's mentioned four different people.
17       "That's a fair statement, I think.
18  Let's see what we can find out about it."
19       "Okay, is it fair to say there were two
20  sides fighting?"
21       "Objection."
22       "It's preliminary, your Honor."
23       "Yes, I think it is, I'll permit it."
24       "Exception, please."
25       "Two sides fighting here?"
```

1560

```
1        "Excuse me?"
2        "Two sides fighting here, or was -- how
3   many people were fighting in total?"
4        "There was quite a few of them.  On here
5   there is four.  But there was quite a few."
6        "What was Shawn doing?"
7        "I don't think Shawn was there at the
8   time they was fighting him."
9        "Do you remember telling the police that
10  you saw Shawn scuffling with -- against Lorenzo?"
11       "Yeah, I do."
12       "What did you see Shawn -- when they
13  were fighting, you don't think Shawn -- is it your
14  testimony now you don't think Shawn was there?"
15       "I don't think he was there while they
16  was fighting, no."
17       "And what time did you see Shawn?"
18       "I didn't see him."
19       "And why did you mention his name to the
20  police?"
21       "Because I told them I heard it the next
22  day that -- that he was the one that did it and I
23  was -- and I had just mentioned his name just to
24  hurry up and get out of the police station real
25  quick?"
```

**GA390**

1561

```
 1            Your words, Mr. Womble?
 2     A.   If that's what it says.
 3     Q.   And again, you were never prosecuted for
 4  lying to the police, were you?
 5     A.   No.
 6     Q.   And you were never prosecuted for lying in
 7  court?
 8     A.   No.  I don't remember lying to the court.
 9     Q.   You weren't lying to the court?
10     A.   I don't remember lying to the court.
11     Q.   Okay, let's move on.  It's tough to keep
12  track of lies, isn't it?
13     A.   It's tough to keep track of something that
14  happened so long ago.  It's been so long, I don't --
15     Q.   So you lied before, right?
16     A.   Yeah.
17     Q.   You've lied to the cops?
18     A.   Yeah.
19     Q.   You maybe even lied in court?
20     A.   Yeah.
21     Q.   And again, it's the tough to keep your
22  stories straight?
23     A.   Yeah.
24     Q.   Okay.  And it's really tough to keep a
25  story straight over the course of several years?
```

1562

```
 1     A.   Yeah, it's so long ago.
 2     Q.   It's been six years since you were
 3  arrested?
 4     A.   Yeah.
 5     Q.   And you've been interviewed multiple times
 6  by the FBI?
 7     A.   Yes.
 8     Q.   People from the U.S. attorney's office?
 9     A.   Yep.
10     Q.   You were interviewed on September 8, 2005?
11     A.   Yep.
12     Q.   You were interviewed on September 20, 2005?
13     A.   I don't remember the days, but I remember I
14  was interviewed a lot.
15     Q.   You were interviewed on October 28, 2005?
16     A.   Again, I don't remember all the dates that
17  I was called.  I don't remember all the dates I was
18  called down, but I was interviewed a lot.
19     Q.   And you were interviewed on March 7, 2006?
20     A.   I don't remember the dates.
21     Q.   You were interviewed at least ten times?
22     A.   Probably more than that.  I don't know, it
23  was a lot.
24     Q.   Probably more than that?
25     A.   It was a lot.
```

1563

```
 1     Q.   And of course you met with the U.S.
 2  attorneys more recently to prepare for your
 3  testimony today?
 4     A.   Yeah.
 5     Q.   Okay.  And it's tough to remember what you
 6  told them each time, right?
 7     A.   Yeah.
 8     Q.   And because it's tough to keep track of
 9  what you told them and when you told them, the story
10  starts to change, right?
11     A.   In the beginning it changed a lot, yeah.
12  In the beginning when I first sat down with them it
13  changed a lot.
14     Q.   It changed a lot, didn't it?
15     A.   When I first sat down with them it changed
16  a lot.
17     Q.   Okay.  For instance, you were talking
18  yesterday about how you met Azibo, him offering you
19  a job?
20     A.   Yeah.
21     Q.   And you went into some detail about he gave
22  you his phone number, he tried calling you, you
23  didn't answer his call, right?
24     A.   Yeah.
25     Q.   You remember all that?
```

1564

```
 1     A.   Yeah.
 2     Q.   That was just yesterday.  On January 21st,
 3  2010, you told the agents that when Azibo overheard
 4  this discussion with Sherrell, that same night you
 5  walked over to the diner and right over to Charles
 6  Street and started working.
 7     A.   No, not the same night.  The next night.
 8     Q.   You didn't tell the agents that on
 9  January 21st, 2010, that the same night that Azibo
10  offered you a job, you began to work?
11     A.   If I did, it was a mistake that I did.  I
12  know I didn't go the first night.
13     Q.   Would it refresh your memory as to what you
14  told the agents if you were to look at something?
15     A.   You can show it, I'll see.
16          MR. SMITH:  DG 3361, third paragraph.
17  Could we highlight that, please.  And then the next
18  paragraph, please.
19     Q.   Do you see where I'm looking at here, Mr.
20  Womble, the fourth line down?  You told the agents
21  you started work that night.
22     A.   If I did, it was a mistake.  I went the
23  next night.  I know I didn't go the first night that
24  he called.
25     Q.   Okay.
```

1565

```
1            MR. SMITH:  You can take that down,
2   please.
3       Q.  You talked some about the quantity of drugs
4   being sold at Charles Street, right?
5       A.  Yeah.
6       Q.  More than ten packs a week.
7       A.  Sometimes.
8       Q.  How much was being sold, Mr. Womble?
9       A.  Excuse me?
10      Q.  How much was being sold?
11      A.  How much was being sold on Charles Street?
12      Q.  Yeah, in a typical week.
13      A.  It all depends on how busy it was for the
14  week.  Might sell five one week, might sell ten one
15  week.  It all depends how the customers came.
16      Q.  So, five to ten would be an average week.
17      A.  It could.
18      Q.  And that was over the period of time you
19  were there.
20      A.  A week, yeah.
21      Q.  In that interview January 2010, you told
22  the agents you were averaging somewhere between 21
23  to 27 packs a week.
24      A.  I don't think it was ever that many.
25            MR. SMITH:  Well, look at DG 3362,
```

1566

```
1   please.
2            MR. MARKLE:  Your Honor, I'm not sure
3   what the purpose of showing this is.  It's not his
4   statement.  I think that should be clear to the
5   jury.
6            MR. SMITH:  All right, that's fine.
7       Q.  Did you tell the agents that you were
8   selling anywhere from 21 to 27 packs a week out of
9   Charles Street?
10      A.  I don't remember saying that.
11      Q.  Would there be something that would refresh
12  your memory as to that?
13      A.  Maybe.  I don't remember saying it, though.
14  I don't know.  Probably.  I don't know.  I know I
15  don't remember saying it.
16      Q.  Again, tough to keep track of all of the
17  things you told them, right?  But you knew -- you'd
18  learned in the course of this case that the more
19  crack, the higher the sentence.
20      A.  No, because I was already charged with
21  50 grams or more.  So that was my charge, so --
22      Q.  But the guidelines could be higher the more
23  crack there is.
24      A.  It was already 50 grams.  I was charged
25  with 50 grams at the time.  So, my guidelines was 20
```

1567

```
1   to life still.  It didn't matter whether it was five
2   grams or 100 grams, it didn't matter.
3       Q.  But you pled guilty to a specific amount,
4   correct?  If it didn't matter, why did you plead
5   guilty to it?
6       A.  Fifty grams or more, that was my
7   original --
8       Q.  Didn't you stipulate in your plea agreement
9   that it was foreseeable to you that between
10  500 grams and 1.5 kilograms of cocaine base was
11  distributed?
12      A.  Yeah, that was through the whole
13  conspiracy.  That was from the time I started until
14  the time -- the whole thing.
15      Q.  Right.
16      A.  Yeah.
17      Q.  So, you knew the higher the quantity, the
18  more time could be involved.
19      A.  I just knew what it was.  That's how my
20  guidelines -- I know my guidelines was 20 to life.
21  That's all I knew.
22      Q.  Okay.  So, in that first interview with
23  your lawyer there on September 20, 2005, you signed
24  the proffer agreement, right?
25      A.  Yeah.
```

1568

```
1       Q.  And at that point you know you are
2   protected, right?
3       A.  As long as I told the truth, yeah.
4       Q.  Well, anything you said couldn't be used
5   against you.  That was your understanding?
6       A.  No, no.
7            MR. SMITH:  I think this will be
8   Defendant's O, your Honor, marked for
9   identification.
10           THE COURT:  Yes.
11           MR. MARKLE:  Your Honor, if it's for
12  identification, I have no objection to it being a
13  full exhibit.
14           MR. SMITH:  I would move it.  I was
15  going to ask him to identify it, but if it's a full
16  exhibit -- or not objected to, I'll put it up.
17           THE COURT:  Defendant's O is a full
18  exhibit absent objection.
19      Q.  Your proffer agreement, Mr. Womble?
20      A.  Yeah.
21      Q.  That paragraph 2 says any statements made
22  by Rodney Womble at this meeting will not be offered
23  against him in the government's direct case in the
24  federal criminal case pending against him unless you
25  breach this agreement?
```

1569

1    A.    Yeah.
2    Q.    So, you are protected about what you said.
3          MR. MARKLE:  Your Honor, that's
4 misleading unless you read paragraph 8.
5          MR. SMITH:  Mr. Markle is allowed to the
6 redirect.
7          MR. MARKLE:  I don't want to wait an
8 hour to redirect, your Honor.
9          THE COURT:  Okay, you are asking him a
10 question -- his answer to an earlier question
11 indicates that there is -- which was "no," is
12 contrary to this paragraph.
13         MR. SMITH:  Yes.
14         THE COURT:  So why not put the whole
15 thing before him.
16         MR. SMITH:  The entire document?
17         THE COURT:  Sure.
18         MR. SMITH:  I can do that.
19    Q.    Have you had a chance to look at that, Mr.
20 Womble?
21    A.    I just skimmed back over it.
22    Q.    I'll put this back up on the screen for a
23 moment.  Is it your understanding, Mr. Womble, in
24 paragraph 2 that any statements you made to the
25 government would not be offered against you in its

1570

1 direct federal case against you?
2    A.    Yeah.
3    Q.    That was explained to you?
4    A.    Yeah.
5    Q.    You understood that?
6    A.    Yeah.
7    Q.    And that was subject to the paragraph 8.
8 Paragraph 8, it is understood that nothing in this
9 agreement shall be construed to protect Rodney
10 Womble from prosecution for perjury, false statement
11 or obstruction of justice, or any other offense he
12 commits after the date of this agreement, and the
13 statements and information he provides at this
14 meeting may be used against you without limitation
15 in any such prosecutions.  If the government that
16 determines that Rodney E. Womble has intentionally
17 provided false, misleading, inaccurate statements at
18 this meeting, then this agreement is null and void.
19         So you understand that as well.
20    A.    Yeah.
21    Q.    But it was up to the government to
22 determine whether your statements were false?
23    A.    Yeah.
24    Q.    Not you?
25    A.    Yeah.

1571

1    Q.    Okay.  So, now you've got this agreement?
2 Right, by September 20th you've got this agreement?
3    A.    Yeah.
4    Q.    And you know that what you say can't be
5 used against you.
6    A.    Yeah.
7    Q.    And you knew that the agents really wanted
8 Dreddy, the defendant, right?
9    A.    Yeah.
10    Q.    In fact, they had told you at one point
11 that if they couldn't get him on the murders they
12 wanted to give him for the drugs.
13    A.    I don't remember them saying that.
14    Q.    Okay, we'll come back to that.
15         MR. MARKLE:  Your Honor, I'm going to
16 object to this coming back to.
17         THE COURT:  Sustained.
18    Q.    So, for you, if they really wanted him at a
19 minimum on the drugs, why not increase the amount of
20 drugs, right?
21    A.    Excuse me?  I don't understand.
22    Q.    Well, if the agents really wanted the
23 defendant, it really didn't matter what you said,
24 but you really wanted to help them get him.
25    A.    No.

1572

1    Q.    Well, you knew that by talking to them you
2 were helping yourself.
3    A.    Yeah.  Helping myself, yeah.
4    Q.    And the more you could tell them about him,
5 the better for you.
6    A.    I just told my involvement with him.
7    Q.    Right, but here today you were talking
8 about five to ten packs a week?
9    A.    Some weeks it could have been five.  It all
10 depend how busy the day went.
11    Q.    But then in January you said 21 to 27
12 packs.
13    A.    I don't think it could have been that many.
14 But it could have been up there for a week.  It
15 could have been.  It could have been more than five
16 or ten.  It could have been a lot more than five or
17 ten, depending how busy the week was.
18    Q.    You had said that the only person you were
19 getting crack from was Azibo?
20    A.    Yeah.
21    Q.    You told the agents in one of your
22 interviews that you purchased crack -- or cocaine
23 from other people?
24    A.    For my personal use.
25    Q.    From Timalin (ph)?

1573

```
 1    A.   For my personal use.
 2    Q.   From the person Timalin?
 3    A.   Yeah.  Well, how could I say -- when the
 4  money started getting funny, I copped from him,
 5  other people, just to make up his money.
 6    Q.   So, you did buy cocaine from Timalin?
 7    A.   Yeah, I have.
 8    Q.   And a guy named Troop?
 9    A.   Yeah.
10    Q.   And your nephew Kendall?
11    A.   Never cocaine from them, from Troop or
12  Kendall.  Never crack from them.
13    Q.   But crack from Timalin?
14    A.   Yeah.
15    Q.   And you knew how to convert powder into
16  crack?
17    A.   Yeah.
18    Q.   You talked about going to this apartment on
19  Hallet Street.  And on September 20, 2005, you told
20  the agents you had been there three to four times.
21    A.   Yeah.
22    Q.   And that you had only been inside once.
23    A.   I don't remember saying that.
24    Q.   Would something refresh your memory?
25    A.   Maybe so.  I don't know.
```

1574

```
 1        MR. SMITH:  Let me look at DG 3340.  The
 2  first full paragraph at the bottom.  I'm sorry, the
 3  first full paragraph from the top, at the bottom of
 4  that paragraph.
 5    Q.   Do you see that last sentence?
 6    A.   Yeah.
 7    Q.   Does that refresh your memory as to what
 8  you told the agents with looking at it?
 9    A.   Yeah, I might have said it.
10    Q.   You might have said it.  Did you say it?
11    A.   I don't remember saying it, but I might
12  have said it.
13    Q.   Okay.  In that same interview you did not
14  tell the agents that you had seen any guns inside
15  that apartment.
16    A.   Maybe.
17    Q.   You maybe told them that?
18    A.   Yeah.
19    Q.   Okay.  Did you tell them or did you not
20  tell them that you had seen any guns?
21    A.   I'm quite sure I did.  At the beginning I
22  told them a lot of stuff that wasn't -- I didn't
23  tell -- I wasn't really on board with what they was
24  doing at the beginning.  I actually told them a lot
25  of lies at the beginning.
```

1575

```
 1    Q.   Lots of lies?
 2    A.   Yeah.  At the beginning I wasn't truthful
 3  about a lot of things that I was involved in.
 4    Q.   You talked about you ending your
 5  relationship with Azibo.
 6    A.   Yeah.
 7    Q.   Something to do with losing a gun.
 8    A.   Yeah.
 9    Q.   On September 8, 2005, you told the agents
10  the reason you ended your relationship with Azibo
11  was because you were missing three packages of crack
12  cocaine.
13    A.   Right.
14    Q.   Correct?
15    A.   I might have said that.
16    Q.   Might have or you did?
17    A.   I might have said it.  I don't remember.
18    Q.   If the agent said you said it, you wouldn't
19  disagree?
20    A.   I don't remember.  This is '05.  Like I
21  said, at the beginning I said a lot of things that
22  wasn't true, at the beginning.
23    Q.   Are you saying you don't remember saying it
24  or that you did not say it?
25    A.   I don't remember saying it.
```

1576

```
 1        MR.  SMITH:  Could we bring up DG 3330.
 2  The last paragraph.
 3    Q.   Do you see that first sentence?
 4    A.   Yeah.
 5    Q.   Does that refresh your memory as to what
 6  you told the agents?
 7    A.   It's what it says.  I don't remember saying
 8  it, though.
 9        MR. SMITH:  Let me take that down.
10    Q.   You later told the agents that the packs
11  were missing because they had been stolen from your
12  apartment during a party there.
13    A.   Yeah.
14    Q.   And then later you changed the story again.
15  This time you said that the real reason you ended
16  the relationship was because you lost the firearm,
17  right?
18    A.   Yeah.
19    Q.   Not that you had lost any drugs.
20    A.   Yeah.
21    Q.   Or that they had been stolen from your
22  apartment.
23    A.   Yeah.
24    Q.   So on one occasion you said you lost the
25  drugs, right?
```

1577

```
1    A.   Yeah.
2    Q.   Another occasion you said you lost the gun.
3    A.   Yeah.
4    Q.   And then in another interview you kind of
5  put those two together.
6    A.   All right.
7    Q.   Right?
8    A.   I might have.
9    Q.   They told you you told them two different
10 stories about this.
11   A.   Yeah.
12   Q.   And you had to explain that.
13   A.   Yeah.
14   Q.   So, then it became both.
15   A.   Yeah.
16   Q.   And now we're back to just losing the gun
17 today.
18   A.   Yeah.  That's the truth.  That's the truth
19 about the gun.
20   Q.   Okay.  And when you told that third version
21 you said that -- you told the agents one of the
22 reasons was because you were using Azibo's crack.
23   A.   No, I never told them I was using crack.
24   Q.   You never told the agents you were using
25 crack?
```

1578

```
1    A.   No, cocaine.
2         MR. SMITH:  Could we look at DG 3356.
3  Could we look at that second paragraph, please.
4  Highlight that.
5    Q.   You were using Azibo's product.
6    A.   No, drugs.  Coke.
7    Q.   Your coke?
8    A.   Coke.  I was using drugs myself.  Drugs.
9    Q.   What happened when the agents said, hey,
10 wait a minute, you've told us two different stories?
11   A.   I told them a lot of stories in the
12 beginning, man.
13   Q.   And then they came back to you later and
14 said you've told us different stories.
15   A.   I wasn't comfortable talking to them for a
16 good while.  I didn't believe what they was telling
17 me.  I wasn't comfortable with the whole situation
18 at first.  So, I was just saying anything just to
19 get it over with.
20   Q.   So, those early interviews --
21   A.   Yeah, at the time.  Yeah.
22   Q.   The first year or so?
23   A.   Yeah, a few times the first year when we
24 first met.
25   Q.   Even though you'd signed a proffer
```

1579

```
1  agreement saying you'd agreed to tell the truth.
2    A.   Yeah.
3    Q.   Have they pulled the deal on you yet?
4    A.   No.
5    Q.   Even though they knew you were lying.
6    A.   I don't know if they knew I was lying at
7  the time then.
8    Q.   They know now?
9    A.   Yeah, they know now.
10   Q.   Are you expecting they're going to pull the
11 deal on you?
12   A.   They know that I was lying then because I
13 finally came to terms with what was going on and I
14 decided to sit down, and just I felt comfortable,
15 just started telling the truth about everything.
16   Q.   Did you ever threaten to pull the deal?
17   A.   No.
18   Q.   Not once even after they confronted you?
19   A.   Not that I remember.
20   Q.   Okay.  All right, so let's go back to some
21 of the stories.  You talked about losing this gun,
22 right?
23   A.   Yeah.
24   Q.   And the reason you told them that story is
25 because you knew there were witnesses to that, too,
```

1580

```
1  right?
2    A.   To?
3    Q.   To the night you were at the club with the
4  gun.
5    A.   Yeah.
6    Q.   Lots of witnesses to that.
7    A.   Yeah, a lot of people seen me.
8    Q.   A club full of people?
9    A.   A lot of people seen me with the gun.
10   Q.   So, the very first time you are interviewed
11 about this is on the night of your arrest, right?
12   A.   Yeah.
13   Q.   And you told the agents you lost Azibo's
14 gun?
15   A.   Yeah.
16   Q.   But you told them it was a .9mm?
17   A.   Trying to minimize the big -- it was a
18 machine gun, Mac-10 machine gun.
19   Q.   So you lied?
20   A.   Yeah.
21   Q.   And you told that that you left the gun in
22 the car when you got pulled over by the police after
23 you left the club.
24   A.   After I got pulled by the police the gun
25 was already out the car.
```

1581

```
1    Q.   But you told the police in that very first
2  statement that the way you lost the gun was that
3  after you got pulled over by the police you left the
4  gun in the car and the car got impounded.
5    A.   No, I would have been charged with the gun
6  if the gun was still in the car.  I threw the gun --
7  before I got pulled over I threw the gun out.
8    Q.   You didn't tell the agents you left the gun
9  in the car after you got pulled over?
10   A.   I don't remember saying that to them.
11   Q.   Would something refresh your memory as to
12 that?
13   A.   Yeah, I mean --
14        MR. SMITH:  DG 3336, please.  I might
15 have that incorrect.  I'm sorry, it's DG 3331.  And
16 it's second paragraph from the bottom.
17   Q.   Do you see the last sentence there.  Does
18 that refresh your recollection as to what you told
19 the agents that night?
20   A.   That's not true, though.  If I would have
21 got pulled over with the gun I would have got
22 charged for the gun in the car.
23   Q.   They pointed that out to you later?
24   A.   I don't remember it, but I know if I would
25 have got pulled over with the gun I would have got
```

1582

```
1  charged for the gun.
2    Q.   So, are you saying you did not say that to
3  the agents?
4    A.   No, that's what it says, I must have.  I
5  mean, if it's documented I guess I would have had to
6  say it.
7        MR. SMITH:  Okay, take that down.
8    Q.   In that very first interview when you were
9  telling the story about losing the .9mm, you never
10 said anything about Azibo calling and looking for
11 the gun or trying to get the gun back?
12   A.   No, because it happened after that.
13   Q.   Azibo was trying to get the gun back after
14 the September 8th arrest of you?
15   A.   No, no, no.
16   Q.   Okay, I'm a little confused.
17   A.   I'm confused about what you are said.
18   Q.   Okay, I'll go back.  Maybe my question
19 wasn't very clear.  You talked about after you lost
20 the gun that the defendant was trying to find you to
21 get the gun back, or tried to call you.
22   A.   Yeah.
23   Q.   In that very first interview on
24 September 8, 2005, you never said anything like that
25 to the agents.
```

1583

```
1    A.   I don't think they asked a question like
2  that.  I don't think they asked me that.
3    Q.   You talked about witnessing Vanessa and her
4  brother.  You saw them beat up; is that right?
5    A.   I didn't say I witnessed.  I said I walked
6  in and it had already happened.
7    Q.   Okay.  In your very first interview on
8  September 8, 2005, you told the agents you had in
9  fact witnessed this assault.
10   A.   Yeah, at the beginning.  I said a lot of
11 things at the beginning that wasn't truthful at the
12 beginning when they started interviewing me.
13   Q.   Okay.  But that was a lie?
14   A.   I said a lot of things that wasn't true at
15 the beginning.
16   Q.   And you also told the agents that they had
17 been assaulted with a table leg.
18   A.   That who was assaulted?
19   Q.   Vanessa and her brother.
20   A.   I don't remember saying that.  I remember
21 him -- saying that I know he had a gun in his hand
22 when I walked in and her brother was bleeding from
23 the side of his head.
24   Q.   Do you remember saying that?
25   A.   No.
```

1584

```
1        MR. SMITH:  Could we bring up DG 3338.
2  Thank you.  The middle part.
3    Q.   The middle part of that paragraph, does
4  that refresh your memory about what you told the
5  agents?
6    A.   That's what I said, if this is the
7  document, that's what I said.
8    Q.   So, it was a table leg then, correct?
9        THE COURT:  This is not -- this is being
10 shown to you to see if it refreshes your recollection
11 on something that you said you didn't remember.
12 It's not in evidence.  You shouldn't read it and
13 testify just from it.  But only from your refreshed
14 recollection.  Okay.
15       THE WITNESS:  Okay, ma'am.
16   Q.   Now, your girlfriend is Sherrell, right?
17   A.   Yeah.
18   Q.   And in those early days you knew it was
19 only a matter of time before the agents came after
20 her?
21   A.   Yeah.
22   Q.   Because you had stored crack at your house?
23   A.   Yeah.
24   Q.   And guns?
25   A.   Yeah.
```

1585

```
1    Q.  And money?
2    A.  Yes.
3    Q.  And you had already told the agents about
4  all of that?
5    A.  Yeah.
6    Q.  You also knew that Frankie and Vanessa were
7  talking to the police, right?
8    A.  I didn't know if they were or not.  I don't
9  know who else, but I know somebody was.
10   Q.  But you knew Frankie and Vanessa had seen
11  Sherrell at Charles Street?
12   A.  Yeah.
13   Q.  Because she delivered crack to them.
14   A.  Yeah.
15   Q.  And of course when you got arrested that
16  was unexpected.
17   A.  Yeah.
18   Q.  And you didn't have time to get rid of
19  things that might have been left at the house.
20   A.  Yeah.
21   Q.  And after your arrest you were talking to
22  Sherrell on the phone, correct?
23   A.  Yeah, I talked to her a few times.
24   Q.  A lot?
25   A.  I talked to her.
```

1586

```
1    Q.  Almost every day for a while you'd call
2  from the jail and talk to her.
3    A.  Yeah.
4    Q.  And you were aware that those calls were
5  being recorded.
6    A.  Yeah.
7    Q.  And of course you were worried that the
8  police were eventually going to search your place.
9    A.  Yeah.
10   Q.  And, in fact, you learned from Sherrell
11  that there was a trooper near the house.  She had
12  seen a trooper, state trooper near the house.
13   A.  Yeah, I believe she told me that.
14   Q.  So, one of the things you told her to do
15  was take some things in your apartment, put them in
16  a bag and throw them over a fence.
17   A.  Yeah.
18   Q.  Okay.  Because you didn't want any evidence
19  when the police finally did come in?
20   A.  Yeah.
21   Q.  Mr. Womble, I want to take you back just a
22  moment.  We talked about the gun.  You said there
23  was an altercation at the club, right?
24   A.  Yeah.
25   Q.  You didn't have the gun with you when it
```

1587

```
1  started.
2    A.  No.
3    Q.  You went home.
4    A.  Yeah.
5    Q.  You got it.
6    A.  Yeah.
7    Q.  You went back to the club.
8    A.  Yeah.
9    Q.  And you threatened to shoot somebody.
10   A.  I pulled it out.  I wasn't going to shoot.
11  I pulled it out to threaten him with it.
12   Q.  Okay.  And then as you are driving away you
13  threw it out.
14   A.  Yeah.
15   Q.  Okay.  Now, you talked about Tina Johnson.
16  You knew who she was, right?
17   A.  Yeah.
18   Q.  You knew she was selling crack.
19   A.  Yeah.
20   Q.  And you found that out all on your own.
21   A.  Yeah.
22   Q.  You testified to that.
23   A.  Yeah.
24   Q.  September 8, 2005, in your very first
25  interview after your arrest, you told the agents
```

1588

```
1  that the defendant had told you she was selling
2  crack, right?
3    A.  Yeah.  My -- yeah.
4    Q.  Because you had to get yourself out of that
5  situation, right?
6    A.  She did tell me.
7    Q.  No, that the defendant told you about her
8  selling crack.  Maybe my question wasn't clear.
9  I'll go back.  You testified here that you found out
10  that Tina was selling crack.  You found out
11  directly, right?
12   A.  From Vanessa and Frank maybe.
13   Q.  Okay.  But in that very first interview on
14  September 8, 2005, you told the agents you found out
15  from the defendant, that he told you about it.
16   A.  All right.
17   Q.  Correct?
18   A.  Yeah, in the beginning, '05, 2005, I was --
19  this is something new to me.  All of this was new.
20  I told them anything.  I told them -- again, I told
21  them a lot of different things that wasn't true.
22   Q.  You told them whatever you had to tell them
23  to protect yourself.
24   A.  Yeah, I did.  I lied.  I lied.
25   Q.  Because in that very first interview --
```

1589

```
1   well, let's go back.  You talked about threatening
2   Tina Johnson here, right?
3       A.  We had an argument.  I had the stick in my
4   hand.  It was an intimidation thing.  I wasn't
5   threatening her.  Like, intimidation.  Trying to
6   intimidate her.
7       Q.  Like intimidating someone in a club with a
8   gun.
9       A.  Yeah, like intimidate.  Yeah.
10      Q.  Okay.  But you didn't always tell the
11  agents about these arguments, did you?
12      A.  I don't understand.
13      Q.  Well, on September 8, 2005, the night of
14  your arrest, you told them that you had an agreement
15  with the defendant that you would not argue with
16  anyone in the building, it was bad for business?
17      A.  I don't understand.  I don't understand,
18  sir.
19      Q.  You did not admit to the agents in your
20  very first interview that you had had any arguments
21  or intimidation of Tina.
22      A.  I said --
23          THE COURT:  You need to put it in a
24  question form.
25      Q.  Did you tell the agents in your very first
```

1590

```
1   interview the night of your arrest that you had
2   argued with or intimidated Tina with a table leg?
3       A.  Like I said, in the beginning I told them a
4   lot of different things that wasn't right, that
5   wasn't true.
6       Q.  And, in fact, you were very specific with
7   the agents.  You told the agents that you had an
8   agreement with the defendant I'm not going to argue
9   with anybody in the building because it attracts
10  attention.
11      A.  I might have said it.  Again, like I said,
12  I told them a lot of things in the beginning.  Of
13  course that's the first couple days, the first day I
14  came to jail, all of this stuff was new to me.
15      Q.  Okay.  You confronted customers coming out
16  of Tina's apartment, right?
17      A.  I don't think I did.  I don't remember I
18  did.  I don't think I did.
19      Q.  In fact, you had robbed some of these
20  customers from the crack they just purchased from
21  Tina.
22      A.  Never.
23      Q.  Never?  You are certain of that?
24      A.  I never took nothing from nobody coming out
25  from Tina.
```

1591

```
1       Q.  But it was you who was the person who was
2   arguing, intimidating Tina Johnson in regards to her
3   selling from apartment 101.
4       A.  Yeah.  We had an argument, yeah.
5       Q.  And she told you that if she couldn't sell,
6   nobody was going to sell.
7       A.  Nobody.  Exactly yes.
8       Q.  Because she would call the police?
9       A.  Yes.
10      Q.  And shut the place down?
11      A.  Yes.
12      Q.  And when you had this confrontation with
13  Tina, this was not a calm conversation, right?
14      A.  No, it was loud.  We argued.
15      Q.  It was a shouting match?
16      A.  Yeah.
17      Q.  She screaming at you, you are screaming at
18  her?
19      A.  Yeah.
20          MR. SHEEHAN:  May I have just a moment,
21  your Honor?
22          THE COURT:  Yes.
23          MR. SMITH:  Your Honor, I do have more
24  time here, and I don't know if we'll be able to
25  finish.  If the Court wants to take a break.
```

1592

```
1           THE COURT:  Let's take our lunch break.
2   All right, ladies and gentlemen.  We'll take a half
3   an hour.
4           (Jury exited the courtroom.)
5           THE COURT:  All right, Mr. Womble, you
6   are excused.  Please don't discuss your testimony
7   with anyone until you return after lunch.  All
8   right?
9           THE WITNESS:  Yes.
10          THE COURT:  Anything before we take our
11  lunch break?
12          MR. SHEEHAN:  No, your Honor, not from
13  the defense.
14          MR. SMITH:  No your Honor.
15          THE COURT:  Very well, thank you very
16  much.  We stand in recess.
17          (Recess)
18          THE COURT:  All right, counsel, ladies
19  and gentlemen, please be seated.  Please bring in
20  the jury.
21          (Jury entered the courtroom.)
22          THE COURT:  Please be seated, ladies and
23  gentlemen.  Continue cross-examination by Mr. Smith
24  of Mr. Womble.
25          MR. SMITH:  Thank you, your Honor.
```

1593

```
1    Q.   Now, Mr. Womble, you've told us about a lot
2    of your lies here, okay, and that that first year
3    you were telling the agents lots of lies, right?
4    A.   Yeah.
5    Q.   And that's after you had signed the proffer
6    agreement agreeing to tell the truth, correct?
7    A.   Yeah.
8    Q.   Okay.  So you're lying about things you
9    said to protect yourself, right?
10   A.   Yeah.
11   Q.   Until you came to learn how it worked.
12   A.   Yeah.
13   Q.   None of these interviews with the agents
14   were audio taped, right?
15   A.   No, I don't think so.
16   Q.   None were videotaped.
17   A.   No.
18   Q.   They didn't have you write out any
19   statements and sign them.
20   A.   No.
21   Q.   They didn't have you swear to any signed
22   statements.
23   A.   No.
24   Q.   And when they realized you had lied they
25   would confront you, right?
```

1594

```
1    A.   Yeah.
2    Q.   And then once you changed your story, all
3    was good again.
4    A.   Yeah.
5    Q.   And then they would tell you that the
6    things you told them didn't quite fit with what
7    other people were telling them, right?
8    A.   They never said it that way, but they knew
9    I wasn't telling the truth.
10   Q.   They told you that other people had told
11   them something else.
12   A.   Yeah.
13   Q.   And then when you changed your story to fit
14   what the other people had said, then it was all okay
15   again, right?
16   A.   It wasn't no problem.
17   Q.   No problem after that.  Let's talk about
18   this baseball bat.
19        In your first very interview in September 8,
20   2005, you never said anything to the agents about a
21   baseball bat, correct?
22   A.   I guess.  They probably didn't ask me
23   nothing about it.  That's probably why I didn't.
24   Q.   You weren't going to tell them anything
25   they didn't ask you about?
```

1595

```
1    A.   At the beginning, no.
2    Q.   On September 20, 2005, after you are there
3    with your lawyer for the proffer agreement, you
4    never said anything about the baseball bat.
5    A.   They still probably didn't ask me that.  I
6    don't remember exactly.
7         THE COURT:  You need to move to the
8    microphone, please.
9    A.   I still don't remember what happened that
10   day.
11   Q.   In your third interview on October 28,
12   2005, you said nothing about a baseball bat.
13   A.   I don't remember saying it, no.
14   Q.   And in your fourth interview on March 7,
15   2006, you said nothing about a baseball bat, right?
16   A.   They probably didn't ask.
17   Q.   But eventually they asked you about a
18   baseball bat.
19   A.   Yeah.
20   Q.   And they specifically said the words
21   "baseball bat" to you.
22   A.   I actually told them about a bat before
23   they mentioned it to me.
24   Q.   Oh, I see.  Okay, but you didn't tell them
25   about that on any of those five previous interviews.
```

1596

```
1    A.   No, as I said at the beginning, I wasn't
2    telling the truth about a lot of stuff at the
3    beginning.
4    Q.   So, then you tell them the story about the
5    bat, right?
6    A.   Yeah.
7    Q.   And you went to a sporting goods store,
8    right?
9    A.   Yeah.
10   Q.   Took it home, right?
11   A.   Yeah.
12   Q.   You, but you didn't give it to the
13   defendant.
14   A.   No.
15   Q.   And no one of course went with you to
16   purchase this baseball bat.
17   A.   No, I was by myself.
18   Q.   You didn't produce a receipt for the agents
19   for this baseball bat.
20   A.   No.
21   Q.   And somehow it mysteriously disappeared
22   from your apartment.
23   A.   I just left it there.  For all I know it
24   could still be there.  All I know, I brung [sic] it
25   to the house and left it in the house.
```

1597

```
1    Q.   The agents searched your apartment when
2    they arrested Sherrell.
3    A.   All right.
4    Q.   They didn't recover a bat.
5    A.   I don't know what happened to the bat.
6    Q.   Let's talk about this argument with Tina
7    with the table leg.  You told this jury that this
8    argument occurred while Azibo was down south,
9    correct?
10   A.   Yeah.
11   Q.   Now, the first time you told the agents
12   about this argument, you told them that this
13   argument occurred three to four days after you met
14   Azibo at the Brazilian restaurant, right?
15   A.   Yeah.
16   Q.   And you met Azibo at the Brazilian
17   restaurant after he returned from down south.
18   A.   Yeah.
19   Q.   And when you told the agents this, you were
20   very specific.  You said that the day that you met
21   Azibo at the Brazilian restaurant was August 20,
22   2005.
23        THE COURT:  Is that a question?
24   Q.   Correct?
25   A.   I believe.  I don't remember the exact
```

1598

```
1    date, but I remember I said it.
2    Q.   Well, you told the agents you remember that
3    day because it was the Gardens Terrace reunion day.
4    A.   Yes, all right.
5    Q.   You remember that?
6    A.   Yeah, I remember it was the Terrence
7    reunion.
8    Q.   So, three to four days after August 20th
9    when you had the argument with Tina, that's
10   August 23rd.
11   A.   Uh-huh (indicating affirmatively).
12   Q.   One day before the murders.
13   A.   Uh-huh (indicating affirmatively).
14   Q.   Not while Azibo is down south.
15   A.   I must have had the days, the time and days
16   mixed up then.  Then it had to be before then.
17   Q.   Okay.  This table leg, good sized, right?
18   A.   Yeah.
19   Q.   Long?
20   A.   Yeah.
21   Q.   Rounded at the bottom?
22   A.   Yeah.
23   Q.   Square at the top?
24   A.   Yeah.
25   Q.   It had tape wrapped around it.
```

1599

```
1    A.   I don't remember the tape, but...
2    Q.   It had a screw sticking out of it.
3    A.   Yeah, I don't remember.  It might have.  I
4    don't remember that, though.
5    Q.   But it was good for intimidating people,
6    right?
7    A.   Yeah.
8    Q.   And let's talk in a little more detail
9    about your threats to Ms. Johnson with this table
10   leg.
11        MR. MARKLE:  Your Honor, I'm going to
12   object to the preparatory comments.  There should be
13   questions and answers.
14        THE COURT:  Yes, please.
15        MR. MARKLE:  Not what we're going to
16   talk about.
17   Q.   You went to Charles Street, correct?
18   A.   Yeah.
19        THE COURT:  I'm sorry, what day are you
20   talking about?
21   Q.   This is the day of the argument with Tina,
22   right?
23   A.   Yeah.
24   Q.   You are walking up the front steps.
25   A.   Yeah.
```

1600

```
1    Q.   You spit on the ground.
2    A.   Yeah.
3    Q.   James Reid is hanging out the front window
4    of the apartment.
5    A.   Yeah.
6    Q.   He sees that.
7    A.   Yeah.
8    Q.   He thinks you are disrespecting him.
9    A.   Yeah.
10   Q.   So as you get in the lobby, Tina comes out
11   of the apartment.
12   A.   Yeah.
13   Q.   And she's yelling at you.
14   A.   Yeah.
15   Q.   And you are yelling at her.
16   A.   Yeah.
17   Q.   It's not a big lobby, right?
18   A.   No.
19   Q.   You are pretty close together.
20   A.   Yeah.
21   Q.   You are face-to-face.
22   A.   Yeah.
23   Q.   Screaming at one another.
24   A.   Yeah, we was arguing.
25   Q.   You then went upstairs to the third
```

1601

```
1    floor --
2        A.    Yeah.
3        Q.    -- to deliver the heroin you talked about.
4        A.    Yeah.
5        Q.    And on the way back down you stopped in
6    apartment 211.
7        A.    Yeah.
8        Q.    To get the table leg.
9        A.    Yeah.
10       Q.    But you couldn't find it, right?
11       A.    Right.
12       Q.    That's what you told the agents.
13       A.    No, I couldn't.
14       Q.    Because you weren't done with Tina.
15       A.    No, she was -- no.
16       Q.    You needed the table leg because you were
17   going to go back and confront Tina again.
18       A.    No, if she was in the hallway I would have,
19   but -- well, which she was.  I went back downstairs.
20   But I didn't have it when I went downstairs.  I was
21   on my way out the door.  I didn't have it then.  She
22   was still in the hallway, though.
23       Q.    You get downstairs, it's your testimony
24   that Tina was in the hallway.
25       A.    Yeah.
```

1602

```
1        Q.    You told the agents she wasn't and that you
2    banged on the door of apartment 101.
3        A.    No, on my way back downstairs, no.
4        Q.    You deny telling the agents when you
5    returned to the lobby Tina was not there and you had
6    to bang on the apartment door to get her to come
7    out?
8        A.    No, she was already outside.  I didn't have
9    to bang on the door.
10       Q.    Okay, but she's there in the lobby, right?
11       A.    Yeah.
12       Q.    And you, again, you start yelling at her.
13       A.    She start arguing.  We just start arguing
14   back and forth.
15       Q.    You are yelling at her.
16       A.    Yeah.
17       Q.    She's yelling at you.
18       A.    Yeah.
19       Q.    And then you say Frankie throws you the
20   table leg.
21       A.    Yeah.
22       Q.    And he threw it to you because there was a
23   little lobby area up above --
24       A.    Yeah.
25       Q.    -- that he could throw it right down to
```

1603

```
1    you.
2        A.    Yeah.
3        Q.    And Frankie did that.
4        A.    Frankie or Vanessa did.  I don't remember
5    which one it was that day.
6        Q.    One of them did?
7        A.    Yeah, one of them.
8        Q.    Because they knew you wanted that table
9    leg.
10       A.    They knew I came -- I was looking for it,
11   yeah.
12       Q.    And you wanted it to threaten Tina.
13       A.    I would say intimidate her with it, yeah.
14       Q.    And this argument was so heated that the
15   person you were with heard it from outside the
16   building.
17       A.    Yeah.
18       Q.    And he had to come in.
19       A.    Yeah.
20       Q.    And convince you to leave.
21       A.    He didn't convince me, he said, "come on,
22   let's go, you don't need to be arguing."  So I
23   turned around and left.
24       Q.    Because the police might come for an
25   argument like that.
```

1604

```
1        A.    Yeah.
2        Q.    And see you holding a table leg and
3    threatening another person.
4        A.    They could have.
5              MR. SMITH:  I have nothing further.
6              THE COURT:  All right, redirect.
7    REDIRECT EXAMINATION
8    BY MR. MARKLE:
9        Q.    Mr. Womble, have you ever seen any report
10   that was prepared of any of the ten or so interviews
11   that were conducted of you?
12       A.    No.
13       Q.    Have you ever read those reports?
14       A.    Never, no.
15       Q.    Have you ever corrected those reports?
16       A.    No.
17       Q.    Edited them?
18       A.    No.
19       Q.    Have you seen any other people's reports --
20       A.    No.
21       Q.    -- about their testimony or what they said
22   to the police or the agents?
23       A.    No.
24       Q.    Have you been present in the courtroom when
25   any other witnesses have testified?
```

**GA401**

1605

```
1    A.   No.
2    Q.   Are you aware of the testimony of any
3  witnesses that have come before you in this
4  courtroom?
5    A.   No.
6    Q.   Did you ever give any written statements to
7  the FBI --
8    A.   No.
9    Q.   -- in regards to this case?
10   A.   No.
11   Q.   Going back to the other case, the other,
12 the murder trial that you testified in, were you
13 ever a suspect in that case?
14   A.   No.
15   Q.   Were you ever charged in that case?
16   A.   No.
17   Q.   Were you simply a witness in that case?
18   A.   Yeah.
19   Q.   Were you involved in that murder in any
20 way?
21   A.   No.
22   Q.   And that was in 1992 that that occurred; do
23 you remember when?
24   A.   I don't remember when.  I know court was
25 '92.  I just seen November.
```

1606

```
1    Q.   Did you leave town so you wouldn't have to
2  testify in that case?
3    A.   Yeah.
4    Q.   Why didn't you want to testify?
5    A.   I didn't want to be labelled or, you know,
6  people snitch, and all these other things that go
7  along with it.
8    Q.   What's wrong with being labelled a snitch?
9    A.   It's not good.  It's definitely not good.
10   Q.   Not good.
11   A.   No, it's not good.
12   Q.   Why, what does it mean on the street?
13   A.   No credibility out there.  Ain't nobody
14 want to mess with you or be involved with you or
15 anything like that no more.
16   Q.   And if you want to be engaged in drug
17 dealing, is it good to be known as a snitch?
18   A.   No.
19   Q.   Does it put an end to your efforts to be a
20 drug dealer?
21   A.   Definitely.
22   Q.   But did you -- you were brought back and
23 forced to testify, correct?
24   A.   Yeah.
25   Q.   And you did testify, correct?
```

1607

```
1    A.   Yeah, yeah.
2    Q.   And was the defendant convicted in that
3  trial?
4    A.   Yeah.
5    Q.   And you've lied in the past, correct?
6    A.   Yeah.
7    Q.   And you've lied to agents involved in this
8  case, correct?
9    A.   Yeah.
10   Q.   And as you said, it's not good to be known
11 as a snitch, correct?
12   A.   Yes.
13   Q.   Was this a simple process coming here and
14 testifying truthfully today?
15   A.   No, it's not.
16   Q.   Is it something you enjoy doing?
17   A.   No.
18   Q.   Is this something you asked to be able to
19 do?
20   A.   No.
21   Q.   And was it difficult sitting down with FBI
22 agents and telling the whole truth and nothing but
23 the truth?
24   A.   No, it's hard.  It's hard right now.  It's
25 hard.
```

1608

```
1    Q.   Are you able to do it today?
2    A.   Yeah.
3    Q.   And whether you met with the defendant on
4  the first night he offered you a spot or the second
5  night, from there after did you always work for the
6  defendant?
7    A.   Yes.
8    Q.   And no one else during 2004 and 2005.
9    A.   No.
10   Q.   From day one, even though it was hard,
11 until now, did you always tell the agents whose drug
12 operation you were involved in?
13         MR. SMITH:  Objection, leading.
14         THE COURT:  I don't think that's
15 leading.  Overruled.
16         But is the question did he tell him that
17 at every single interview?  Maybe you should clarify
18 the question.
19         MR. MARKLE:  Thank you, your Honor.
20   Q.   Let me ask you that way.
21         At every single interview did you always
22 tell the agents whose drug operation you were
23 working for?
24   A.   Yeah.
25   Q.   Did you tell them who the boss was?
```

**GA402**

1609

```
1    A.    Yeah.
2    Q.    And who was that?
3    A.    Dreddy.
4    Q.    And did that ever change?
5    A.    No.
6    Q.    And did you ever lie about that?
7    A.    No.
8    Q.    Was that the truth from day one until now?
9    A.    Yeah.
10   Q.    And was Frankie and Vanessa, did you always
11   say they were the people selling for you and Dreddy?
12   A.    Yeah.
13   Q.    And was that the truth?
14   A.    Yes.
15   Q.    From day one until now?
16   A.    Yeah.
17   Q.    And was there always a drug operation at
18   211 Charles Street from the time you started in
19   December '04 until August of '05?
20   A.    Yeah.
21   Q.    And was Dreddy always the boss of that drug
22   operation?
23   A.    Yeah.
24   Q.    Was that the truth then?
25   A.    Excuse me?
```

1610

```
1    Q.    Was that the truth then when you first
2    spoke with the agents?
3    A.    Yeah.
4    Q.    And is that the truth now?
5    A.    Yeah.
6    Q.    And did that ever change?
7    A.    No.
8    Q.    Now, in regards to your cooperation
9    agreement -- do you remember that?  234A was the
10   exhibit number.  Do you remember just seeing that?
11   A.    Yeah.
12         MR. SMITH:  We did have it, your Honor,
13   it was at the podium.  It should be here.
14   Q.    Let me ask you this, Mr. Womble:  Do you
15   remember reviewing that cooperation agreement?
16   A.    Yeah.
17   Q.    Anywhere in that cooperation agreement, did
18   it say you have to say something about the
19   defendant?
20   A.    No.
21   Q.    Did it say you have to give damaging
22   testimony about the defendant?
23   A.    No.
24   Q.    What did it say you had to do?
25   A.    Tell the truth.
```

1611

```
1    Q.    And even if you told the truth and it
2    doesn't have anything to do with Dreddy, would you
3    still get consideration?
4    A.    Hopefully.
5         MR. SHEEHAN:  Objection.  It calls for
6    conjecture.
7    Q.    What do you understand, Mr. Womble, the
8    government would do.
9         MR. MARKLE:  And your Honor, if one
10   attorney questions, it's my understanding they
11   should object.
12        THE COURT:  That is correct.  It's
13   applicable to both sides.
14        MR. SHEEHAN:  I apologize, your Honor.
15        MR. MARKLE:  Thank you, your Honor.
16   Q.    What did you understand the agreement to
17   mean?
18   A.    That I needed to tell the truth.
19   Q.    And if it meant telling the truth that
20   nothing -- you said this had nothing to do with
21   Dreddy; is that what you had to do?
22   A.    Yes, I had to tell the truth.
23   Q.    So, why did you tell us all about Dreddy
24   and how he was the boss?
25   A.    Because he was the boss.
```

1612

```
1    Q.    Did Dreddy ever say, hey, Womble, you lied
2    in 1992 to the police --
3         MR. SMITH:  Objection.
4    Q.    -- you can't work for me?
5    A.    Excuse me?
6         MR. SMITH:  Objection, leading, form.
7         THE COURT:  Sustained.
8    Q.    Did Dreddy every voice any upset about what
9    you did in 1992 regarding Shawn in that murder case?
10        MR. SMITH:  Objection.  Assumes he knows
11   about it.
12        THE COURT:  I'm going to permit him to
13   answer the question, but perhaps it's better put,
14   did the subject of the 1992 murder case ever come up
15   between them.
16        MR. MARKLE:  Thank you.
17   Q.    Did the subject of the 1992 murder case in
18   your testimony ever come up between you and Dreddy?
19   A.    No.
20   Q.    Did he ever raise any issue about you being
21   a snitch?
22   A.    No, he didn't.  I don't think he knew about
23   it then.
24   Q.    Did you front that out, tell him about it?
25   A.    No.
```

**GA403**

1613

1     Q.  Did you let him know I testified in a
2 murder case?
3     A.  No.
4     Q.  You were asked about speaking to the FBI.
5 Do you remember in December of -- I'm sorry, on
6 September 8th of '05, that you said you met a
7 person -- met a person known as Azibo Smith or
8 Dreddy?
9     A.  Yeah.
10     Q.  And that approximately for one year you and
11 he worked at W.J. Detailing?
12           MR. SMITH:  Objection, leading.
13           THE COURT:  Sustained.
14     Q.  Do you remember telling the agents that you
15 sold cocaine, crack cocaine or cocaine base for
16 Dreddy?
17           MR. SMITH:  Objection, same.
18           THE COURT:  Sustained.
19     Q.  You said when you were interviewed and
20 agents confronted you, you were confronted with
21 things that weren't true.  Did you then change them
22 to be other lies or did you tell the truth?
23     A.  I started telling the truth after a while.
24     Q.  And was it -- you indicated that then
25 things were okay.  Were things okay when you just

1614

1 changed your story or when you told the truth?
2     A.  When I started telling the truth.
3     Q.  Mr. Womble, why did you tell the -- why did
4 you take all the drug proceeds and give them to the
5 defendant?
6     A.  Because those was his drugs.
7     Q.  And why did you tell him about Frank Hodges
8 selling someone else's drugs?
9           MR. SMITH:  Objection, leading.  And
10 it's outside the cross, your Honor.
11           MR. MARKLE:  I would submit it's not
12 leading and I think it's not outside the cross.
13           THE COURT:  It references his prior
14 testimony.  I'm going to permit the question.
15           MR. MARKLE:  Thank you.
16     Q.  Why did you tell the defendant about Frank
17 Hodges selling someone's drugs?
18     A.  Because he was the boss.  I let him know
19 what was going on.
20     Q.  Why did you tell the defendant about Tina's
21 selling of crack cocaine?
22     A.  The same thing.  I wanted to let him know
23 what was going on.
24     Q.  And how were you supporting yourself and
25 Sherrell from December of 2004 to August of 2005?

1615

1     A.  Selling crack.
2     Q.  And who did you rely on for the crack that
3 you sold and supported yourself with?
4     A.  Dreddy.
5     Q.  Now, you said you lied in the past to help
6 yourself.  And what happens -- what's your
7 understanding if you lie now?
8     A.  I know I be in more trouble than I am now.
9     Q.  Will it in any way help you to lie at this
10 point?
11     A.  No.
12     Q.  Will it hurt you?
13     A.  It will hurt me, yeah.
14     Q.  Mr. Womble, did you tell the defendant that
15 drug sales were slowing down in August of 2005?
16           MR. SMITH:  Objection, leading.
17           THE COURT:  Sustained.
18     Q.  Did you report to the defendant on the
19 status of drug sales in August of 2005?
20           MR. SMITH:  Objection, same.
21           THE COURT:  Overruled.
22     Q.  You can answer that.
23     A.  Say it again, please.
24     Q.  Did you report to the defendant the status
25 of drug sales in August of 2005?

1616

1     A.  Yeah.
2     Q.  And did you tell him that -- did you tell
3 the defendant that Tina was selling drugs in August
4 of 2005?
5           MR. SMITH:  Objection.
6           THE COURT:  I'm going to sustain the
7 objection on that.
8     Q.  Did you speak to him about Tina's drug
9 sales in August of 2005?
10     A.  Yeah.
11     Q.  What did the defendant say when you told
12 him about Tina?
13     A.  That he would take care of it.
14     Q.  And is it fair to say that a short time
15 later you found out that three people had been
16 killed?
17           MR. SMITH:  Objection.
18           THE COURT:  Sustained.
19     Q.  How long after that did you hear that three
20 people had been killed in apartment 101?
21     A.  It wasn't long.  It wasn't long after.
22           MR. MARKLE:  Thank you Mr. Womble.
23 Nothing further, your Honor.
24           THE COURT:  All right.  Recross.
25           MR. SMITH:  Just a moment, your Honor,

**GA404**

1617

```
1   please note.
2   RECROSS-EXAMINATION
3   BY MR. SMITH:
4       Q.   You said you didn't want to be here today,
5   Mr. Womble.
6       A.   Excuse me?
7       Q.   You said you didn't want to be here today.
8       A.   No.
9       Q.   Did you want to be there back on
10  September 20, 2005?
11      A.   Did I?
12      Q.   In that meeting with the agents.
13      A.   No.
14      Q.   But you asked for that meeting with the
15  agents.
16      A.   Yeah.
17      Q.   Right?
18      A.   Yeah.
19      Q.   It says so in your proffer agreement.
20      A.   Yeah.
21      Q.   "This meeting has been requested by the
22  Rodney Womble for the purpose of discussing evidence
23  of criminal wrongdoing."
24      A.   Yep.
25      Q.   You told a lot of lies early on, right,
```

1618

```
1   Mr. Womble?
2       A.   Yep.
3       Q.   And those lies don't hurt you now, do they?
4       A.   No.
5       Q.   Lies only hurt you if you tell the lie and
6   the government cares enough about it to not file a
7   motion with the Court, right?
8       A.   I don't understand the question.
9       Q.   You're counting on the fact that the
10  government will file a motion with the Court, right?
11      A.   Yeah.
12      Q.   And recommend less time for you, right?
13      A.   Yes.
14      Q.   So, again, the lies you tell, they don't
15  hurt you unless the government decides not to file
16  that motion, right?
17      A.   Yeah.
18      Q.   And it's the government who determines
19  whether you lied or not, right?
20      A.   Yeah.
21      Q.   Okay.
22           MR. SMITH:  Nothing further, your Honor.
23           THE COURT:  Any re-redirect?
24           MR. MARKLE:  No, your Honor.
25           THE COURT:  All right, Mr. Womble, thank
```

1619

```
1   you.  You are excused.  You may step down.
2            Will government please call its next
3   witness, please.
4            MS. REYNOLDS:  Yes, your Honor, the
5   government calls Judith Rivera.
6            THE COURT:  All right, Ms. Rivera,
7   please come to the witness stand over here.  And
8   when you get there, please remain standing, the oath
9   will be administered to you.
10           J U D I T H   R I V E R A
11  Having first affirmed, was examined and testified as
12  follows:
13           THE WITNESS:  Judith Rivera.  I live in
14  Florida.
15           THE COURT:  Can you spell your last
16  name, please.
17           THE WITNESS:  R-i-v-e-r-a.
18           THE COURT:  All right, you may proceed
19  Ms. Reynolds.
20           MS. REYNOLDS:  Thank you, your Honor.
21  DIRECT EXAMINATION
22  BY MS. REYNOLDS:
23      Q.   Ms. Rivera, can I ask you just to move your
24  chair up so you are close to the microphone and we
25  can hear you.
```

1620

```
1       A.   Thank you.
2       Q.   Are you currently working?
3       A.   Yes.
4       Q.   And what is it that you do?
5       A.   I'm a medical assistant at a family
6   practice.
7       Q.   You have to put that microphone right up to
8   your mouth so we can hear you.
9            You said you are a medical assistant at a
10  family practice?
11      A.   Correct.
12      Q.   And when did you become a medical
13  assistant?
14      A.   Two years ago.
15      Q.   Two years ago.  And what did you have to do
16  in order to become a medical assistant?
17      A.   I went to school, went to school full-time
18  and worked part-time.
19      Q.   When you worked part-time, were you working
20  in that field to get some experience?
21      A.   No, I was working at Target, at the produce
22  department.
23      Q.   So, prior to becoming a medical assistant
24  you were working at Target.
25      A.   Yes.
```

1621

```
1     Q.   And how long did you work at Target?
2     A.   I worked at Target for three and a half
3   years.
4     Q.   And then you started going to school at the
5   same time that you were working at Target.
6     A.   Correct.
7     Q.   And that's when you got your medical
8   assistant certificate.
9     A.   Yes.
10    Q.   And what types of duties and
11  responsibilities do you have as a medical assistant
12  at the medical practice you work at?
13    A.   I have to educate the patients, I assist in
14  small procedures with the provider.  I draw blood,
15  injections.
16    Q.   And you do all of those procedures
17  yourself?
18    A.   Yes.
19    Q.   Ms. Rivera, how old are you?
20    A.   Forty-nine.
21    Q.   And where were you born?
22    A.   Queens, New York.
23    Q.   Where did you grow up?
24    A.   The Bronx.
25    Q.   And did you go to school in the Bronx?
```

1622

```
1     A.   Yes.
2     Q.   How far did you get in school?
3     A.   Ninth grade.
4     Q.   What happened in 9th grade?
5     A.   I got pregnant with my first child, so I
6   dropped out of school.
7     Q.   And did there come a time at some point
8   that you and your family moved to Connecticut for a
9   while?
10    A.   Yes.
11    Q.   About how old were you when you first moved
12  to Connecticut?
13    A.   I was about in my teens, 16, 18, around
14  there.
15    Q.   And at that time was your first son living
16  with you and your mom?
17    A.   Yes.
18    Q.   After that, did you move back to New York
19  for a while?
20    A.   For a little bit, yes.
21    Q.   And eventually did you then move back to
22  Connecticut?
23    A.   Back to Connecticut.
24    Q.   Yes.  And when you moved back to
25  Connecticut from New York, where did you go to live?
```

1623

```
1     A.   I was living in Pembroke in Bridgeport.
2     Q.   In Bridgeport?
3     A.   Yes.
4     Q.   And who were you living with at that time
5   when you moved back to Connecticut?
6     A.   With my mom, my son and my brother.
7     Q.   When you were in your teenage years and
8   into your early 20s, did you use drugs?
9     A.   Yes.
10    Q.   Okay.  And when did you first start using
11  drugs?
12    A.   I was young.  I started -- practically it
13  was more drinking, and drinking followed cocaine on
14  and off.
15    Q.   You started first using alcohol.
16    A.   Yes.
17    Q.   And then you eventually started using some
18  drugs.
19    A.   Yes.
20    Q.   And what type of drugs did you start using
21  when you were young?
22    A.   Cocaine.
23    Q.   Is that powder cocaine or crack cocaine?
24    A.   Both.
25    Q.   Now, drawing your attention to when you
```

1624

```
1   were first living in -- was it East Pembroke or
2   Pembroke?
3     A.   Pembroke.
4     Q.   Eventually did something happen to your
5   first son?
6     A.   Yes.  He was staying with my mom and he was
7   playing Russian roulette, he was 14, and he passed
8   away.
9     Q.   He shot and killed himself?
10    A.   Yes.
11    Q.   After that did there come a time that you
12  eventually got married?
13    A.   Yes, 1993 I got married, got cleaned up.
14    Q.   When you say you got cleaned up, what do
15  you mean?
16    A.   I stopped using drugs.  Got a job, was
17  steady on my job, a home, a wife, and then I had my
18  second child.
19    Q.   And when you say you got a job, where were
20  you working at that time?  After you got married and
21  got cleaned up, where did you work?
22    A.   I was working at an a literature company.
23    Q.   Like a printing company?
24    A.   Yes, a printing company.
25    Q.   Do you recall the name of the company?
```

**GA406**

1625

```
1    A.   L.P. MacAdams.
2    Q.   L P?
3    A.   L.P. MacAdams.
4    Q.   And where was that company?
5    A.   That company is located in Bridgeport.
6    Q.   What did you do at that printing company?
7    A.   I was a production supervisor.
8    Q.   And what types of things did you have to do
9    as a production supervisor?
10   A.   I had to take care of hiring personnel,
11   quoting on jobs, make sure that orders went out on
12   time, jobs got done on time.
13   Q.   How long did you work at the printing
14   company in Bridgeport?
15   A.   Eight years.
16   Q.   Drawing your attention to approximately
17   1998, 1999, that time period, did there come a time
18   that you started drinking again?
19   A.   '98, '99, yes.
20   Q.   And what happened when you started drinking
21   again?
22   A.   I lost my job.  I lost my husband because
23   we started having problems and went into a divorce,
24   lost my home.
25   Q.   And at that time when you lost your job and
```

1626

```
1    you lost your home and went through the divorce, did
2    you also start using drugs again?
3    A.   I started drinking alcohol, and then came
4    the drugs, the cocaine again.
5    Q.   And did you use cocaine and crack cocaine
6    at that time?
7    A.   It started with only the coke, and then
8    yeah, then I got very addicted to crack cocaine.
9    Q.   Where did you start living or hanging out
10   at that time when you started using alcohol and
11   crack cocaine again?
12   A.   I started coming back and forth, went to
13   New York with my cousins and came back to
14   Bridgeport, until I just permanently stayed in
15   Bridgeport and just got --
16   Q.   I'm sorry what?
17   A.   Got sunk into the drugs.
18   Q.   Got sunk in the drugs.  So were you living
19   at different places during that time period, didn't
20   really have a home?
21   A.   Practically.
22   Q.   I'm going to draw your attention to around
23   April of 2005, into 2005, and ask you if eventually
24   you moved to a building located at 215 Charles
25   Street in Bridgeport, Connecticut?
```

1627

```
1    A.   Yes.
2    Q.   Who did you move there with?
3    A.   Rafael.
4    Q.   And who is Rafael?
5    A.   He's my husband, boyfriend.
6    Q.   And where at 215 Charles Street did you
7    move?  What apartment?  Do you remember?
8    A.   202, second floor.
9    Q.   When you moved there, and you said it was
10   apartment 202 on the second floor.  Where in the
11   building is that apartment located, in the front or
12   the back?
13   A.   It has some to the front, window to the
14   front, and window to the back -- or the side.  I
15   mean, it's -- it was towards the front entrance, one
16   of the windows, and the other window is towards East
17   Main.
18   Q.   And showing you first what's up on the
19   screen now as Government's Exhibit 102, which is
20   already in evidence, and there is a picture on your
21   monitor, if that's easier, or up on the big screen.
22   Do you recognize what that's a photograph of?
23   A.   That's the building where I lived.
24   Q.   That's the building at 215 Charles Street?
25   A.   Yes.
```

1628

```
1    Q.   And let me show you Government's
2    Exhibit 109, and ask you to take a look at that.
3    And you see that tree there in the front of the
4    building?
5    A.   Yes.
6    Q.   Right there where the arrow is pointing.
7    Was your apartment on the second floor, kind of
8    behind that tree at the front of the building?
9    A.   Yes.
10   Q.   And was there a living room window in the
11   front of your apartment?
12   A.   Correct.
13   Q.   And that window, what street did that
14   window look out onto?
15   A.   Charles.
16   Q.   Which is the street right here, right?
17   A.   Right.
18   Q.   And then you said there is some bedroom
19   windows on the side of your apartment.  Is that what
20   you said before?
21   A.   Yes, which should be on this side.
22   Q.   So, taking a look at the photograph in
23   Government's Exhibit 109, and just where that arrow
24   is, are those the bedroom windows of your apartment
25   at 202?
```

**GA407**

1629

```
1    A.   Yes.
2    Q.   And those look out over the diner onto Main
3 Street?
4    A.   Yes.
5         MR. SHEEHAN:  I'm going to object to
6 leading, your Honor.
7    Q.   Well, if you were to look out from the
8 bedroom windows of apartment 202 what would you see?
9 What area?
10    A.   I would see the diner, Main Street.
11    Q.   And then just showing you Government's
12 Exhibit 110, again, just another angle, does that
13 also show -- I'm going to use the pointer here.  The
14 arrow, those are the bedroom windows of 202.
15    A.   Correct, right.
16    Q.   Now, you said you moved there with Rafael.
17 What's Rafael's last name?
18    A.   Melendez.
19    Q.   And are you still currently with Rafael?
20    A.   Yes.
21    Q.   I'm showing you Government's Exhibit 218
22 which is in evidence.  Do you recognize who that is?
23    A.   Rafael.
24    Q.   When the two of you moved to apartment 202
25 on Charles Street, did you move there with anyone
```

1630

```
1 else or was it just the two of you?
2    A.   Just the two of us.
3    Q.   You said you had another son.  About how
4 old was your son at that time when you moved to
5 Charles Street?
6    A.   He was around eight or nine.
7    Q.   And what happened with your son at that
8 time when you moved to Charles Street?
9    A.   I moved there for the reason of trying to
10 shape up and clean up and get my son, because at
11 that moment they had removed him from my custody.
12    Q.   When you say they had removed him, who had
13 removed him from your custody?
14    A.   DCF.
15    Q.   And did you get custody of your son at that
16 time when you moved to Charles Street?
17    A.   No, that's when I totally lost custody.
18    Q.   And was that because you were using drugs?
19    A.   Yes.
20    Q.   Were you working at that time?
21    A.   No.
22    Q.   And what type of drugs were you using at
23 that time when you moved to Charles Street?
24    A.   Crack cocaine and alcohol.
25    Q.   How often were you using crack cocaine when
```

1631

```
1 you moved into the Charles Street apartments in
2 2005?
3    A.   All day.
4    Q.   And when you say "all day," how many bags,
5 little baggies of crack cocaine would you use a day;
6 if you remember?
7    A.   Exactly the amount of quantity, I don't
8 remember, but I was high all the time.
9    Q.   Where would you get your drugs that you
10 were using?  Where would you get the crack cocaine?
11    A.   I would get them from -- first I would get
12 them outside from previous locations, and then when
13 I moved there, I started getting it from across the
14 hall.
15    Q.   When you say "across the hall," what are
16 you referring to?  What would you go?
17    A.   I would go down the hall right on my floor
18 and get them from Pops' house.
19    Q.   Is that on the second floor?
20    A.   Yes.
21    Q.   And you mentioned you would get it from
22 Pops' house?
23    A.   Yes.
24    Q.   Showing you Government's Exhibit 229, which
25 is in evidence, do you recognize who that is a
```

1632

```
1 photograph of?
2    A.   That's Pops.
3    Q.   When you would go to Pops' apartment to get
4 crack cocaine, did you see any other people inside
5 the apartment?
6    A.   There was always a lot of people.
7    Q.   And who would you get the crack cocaine
8 from when you would go to Pops' apartment to get
9 your crack?
10    A.   From Vanessa, Frankie.
11    Q.   How was the crack cocaine packaged that you
12 purchased from Vanessa or Frankie from inside Pops'
13 apartment?
14    A.   In a little clear bag.
15    Q.   When you say a little bag, is that like a
16 little plastic sandwich bag with a zip?
17    A.   Yes.
18    Q.   And how much would you pay for those little
19 clear baggies of crack cocaine?
20    A.   $10.
21    Q.   For each bag?
22    A.   Yes.
23    Q.   You said you were using the crack cocaine
24 at that time all day.  When you would use the crack
25 cocaine, can you describe what effect it would have
```

1633

1 on you, how it would make you feel when you would
2 get high?
3     A.   It would make me feel more energized.  I
4 was looking for a pick up because I drank a lot of
5 alcohol, so when I took the crack that made me feel
6 more awake.
7     Q.   You said -- you mentioned you would get the
8 crack from inside Pops' apartment from Frank.  Let
9 me show you Government's Exhibit 212, which is in
10 evidence.  Do you recognize who that is?
11     A.   Frankie.
12     Q.   And you mentioned you also got crack
13 cocaine from Vanessa.
14     A.   Right.
15     Q.   Showing you Government's Exhibit 213.
16          Do you recognize who's depicted in
17 Government's 213?
18     A.   Vanessa.
19     Q.   And how often would you go over to Pops'
20 apartment and get crack from either Frankie or
21 Vanessa?
22     A.   All the time.
23     Q.   Do you recall if you got crack from anyone
24 else from inside Pops' apartment other than Frankie
25 and Vanessa?  Did you buy from anybody else?

1634

1     A.   I don't recall.
2     Q.   Do you remember meeting any other people
3 inside apartment -- Pops' apartment?
4     A.   Yes.
5     Q.   Who are some of the other people that you
6 met inside Pops' apartment when you would go buy
7 crack cocaine?
8     A.   I met Jackie, I met Big Man, D.
9     Q.   You say you met D.  Did you know D by any
10 other name?
11     A.   No.
12     Q.   Just D?
13     A.   Just D.
14     Q.   The person you are referring to as D, do
15 you see him in court here today?
16     A.   Yes.
17     Q.   And can you just indicate what he's wearing
18 and where he's sitting, for the record?
19     A.   He's sitting to my left and he's wearing a
20 striped tie and ivory shirt.
21          MS. REYNOLDS:  Indicating the defendant,
22 for the record, your Honor.
23          THE COURT:  Yes.
24     Q.   Now, you said you met D.  Did you meet him
25 inside Pops' apartment?

1635

1          MR. SHEEHAN:  Objection, leading.
2     A.   Yes.
3          MS. REYNOLDS: Just getting back to where
4 we were.
5     Q.   Where did you meet D?
6     A.   Pops' apartment.
7     Q.   And how did you meet him?  Did someone
8 introduce you?
9     A.   Yes.
10     Q.   Do you recall who introduced you to D?
11     A.   Vanessa.
12     Q.   And you mentioned that you also met a woman
13 by the name of Jackie.
14     A.   Correct.
15     Q.   And that -- where was that that you met
16 Jackie?
17     A.   At Pops' house.
18     Q.   And showing you Government's Exhibit 214,
19 which is in evidence, do you recognize who that's a
20 photograph of?
21     A.   Jackie.
22     Q.   You also mentioned an individual you
23 referred to as Big Man.  Did you know Big Man's real
24 name?
25     A.   No.

1636

1     Q.   Where did you meet Big Man?
2     A.   Vanessa's -- at Pops'.
3     Q.   At Pops'.  And who introduced you to Big
4 Man?
5     A.   Vanessa.
6     Q.   And showing you Government's Exhibit 210,
7 do you recognize who that's a photograph of?
8     A.   Big Man.
9     Q.   Now, again, drawing your attention to then
10 the summer of 2005, were you still living at the
11 Charles Street apartments in the summer of 2005?
12     A.   Yes, that's when I got evicted.
13     Q.   Well, before we get to when you got
14 evicted, throughout the summer months, June, July,
15 August, were you living at Charles Street?
16     A.   Yes.
17     Q.   And who were you living there with?  Were
18 you still living with Rafael?
19     A.   Rafael.
20     Q.   You said you had met the defendant through
21 Vanessa at Pops' apartment.  Did you see the
22 defendant after that first time that you met him at
23 Pops' apartment?  Did you see D again?
24     A.   Yes.
25     Q.   And where did you see him after that first

1637

```
1    time that you met him?
2        A.   My apartment.
3        Q.   Did there come a time in the summer of 2005
4    that people started using your apartment as part of
5    the selling that was going on at Pops' house?
6             MR. SHEEHAN:  Objection, leading.
7             THE COURT:  Sustained.
8        Q.   Can you describe whether or not your
9    apartment was being used?
10       A.   Yes, it was.
11       Q.   And tell us how it was that your apartment
12   was being used.
13       A.   People was staying at the window watching
14   out.
15       Q.   When you say "people were staying at the
16   window watching out," do you know who these people
17   were?
18       A.   It was different persons.
19       Q.   And when you say they were "watching out,"
20   specifically, can you describe for the jury what
21   they would do when they were inside your apartment
22   watching out?
23       A.   They would call one another.
24       Q.   When you say "they would call one another,"
25   how would they call one another?
```

1638

```
1        A.   I believe it was by walkie-talkie or phone.
2        Q.   Walkie-talkie or phone.  A cellphone?
3        A.   Yes.
4        Q.   Were these people men or women?
5        A.   Men.
6        Q.   Do you recall the names of any of the
7    people that would come to your apartment and watch
8    out the window?
9        A.   Yes.
10       Q.   Who were some of the people that you recall
11   started coming to your apartment to watch out the
12   window?
13       A.   Zee.
14       Q.   Well, let's start with, you said Zee?
15       A.   Yeah.
16       Q.   Let me show you Government's Exhibit 207.
17   Do you recognize who that is?
18       A.   Zee.
19       Q.   And did you know whether or not Zee was
20   related in any way to the defendant, D?
21       A.   At that time, no.
22       Q.   And how would Zee get into your apartment
23   when he would come and look out the window?
24       A.   They had keys.
25       Q.   When you say "they had keys," how did they
```

1639

```
1    get keys to your apartment?
2        A.   Change a lock.
3        Q.   Who changed the locks to your apartment?
4        A.   I believe it was Big Man or -- I'm not
5    sure.
6        Q.   You didn't change the locks to your
7    apartment.
8        A.   No.
9        Q.   At that time when they changed the locks to
10   your apartment and started coming in to look out the
11   window, did you have keys to your apartment?
12       A.   No.
13       Q.   How would you get into your apartment after
14   they started using it to look out?
15       A.   For a time the apartment was always open,
16   the door.  The lock wasn't working, it was always
17   open.
18       Q.   And did there come a time that they fixed
19   the lock?
20       A.   The lock, right.
21       Q.   So, how would you get in if you didn't have
22   keys and the door was locked?
23       A.   I had to get a key.
24       Q.   Did you get a key?
25       A.   Yes.
```

1640

```
1        Q.   Who gave you a key to your apartment?
2        A.   I believe it was Big Man.
3        Q.   So, can you describe how it was that Zee
4    and these other people started using your apartment.
5    How did that come about?  Did you have any
6    discussions with anyone?
7        A.   They had offered to pay the rent and
8    provide food, and I agreed.
9        Q.   When you say "they had offered to pay the
10   rent and provide food," did that mean your rent and
11   food for you?
12       A.   Yes.
13       Q.   Yes?
14       A.   Correct.
15       Q.   When you say they offered that to you, who
16   is "they"?
17       A.   Vanessa, Big Man, Frankie and D.
18       Q.   And did they offer you anything else for
19   use of your apartment?
20       A.   At that moment, yes, I was supposed to get
21   drugs also.
22       Q.   Who told you that you would get drugs also?
23       A.   D and Big Man.
24       Q.   Now, did you, in fact, get drugs from the
25   defendant, D, in exchange for letting him use your
```

**GA410**

1641

```
 1    apartment?
 2         A.   Like twice.
 3         Q.   How many times?
 4         A.   Like twice.
 5         Q.   Do you recall how much he gave you?
 6         A.   Two to three dime bags.
 7         Q.   Two to three individual dime bags?
 8         A.   Uh-huh (indicating affirmatively).
 9    Correct.
10         Q.   And do you recall whether or not you got
11    drugs from anybody else after they started using
12    your apartment as a lookout?
13         A.   I also got some from Zee.
14         Q.   And Zee is the person in Government's
15    Exhibit 207.
16         A.   Correct.
17         Q.   Do you recall how much drugs Zee gave you?
18         A.   A bag here and there.
19         Q.   A baggie here and there?
20         A.   Yes.
21         Q.   Do you recall whether you -- you mentioned
22    you had seen D again inside your apartment.  You
23    said that a little while ago, D, the defendant, came
24    to your apartment.
25         A.   Yes.
```

1642

```
 1         Q.   Do you recall approximately how many times
 2    you saw D inside your apartment?
 3         A.   Like three times.
 4         Q.   And when you saw D inside your apartment,
 5    do you remember if he was with anyone?
 6         A.   Just one time there was, like, guys there
 7    with him.
 8         Q.   Do you recall what any of these guys --
 9    well, do you recall how many guys were with him at
10    one time?
11         A.   I think three, four.
12         Q.   Do you recall who any of those guys were?
13         A.   They were big guys.  I'm not sure of their
14    names.
15         Q.   Do you recall how they were dressed, those
16    guys that D was with?
17         A.   They were dressed in hoodies.
18         Q.   In hoodies.  What's a hoodie?  Their heads
19    were covered?
20         A.   The hoodies, the sweaters.
21         Q.   And the person, Zee, who is shown in
22    Government's Exhibit 207, do you recall how he would
23    usually dress when you would see him inside your
24    apartment looking out?
25         A.   With a hoodie.
```

1643

```
 1         Q.   Do you know whether or not he had long
 2    dreads?
 3         A.   Yes.
 4              MR. SHEEHAN:  Objection, leading.
 5              MS. REYNOLDS:  Asked her if she knew
 6    whether or not.
 7              THE COURT:  Did you observe his hair?
 8              THE WITNESS:  Yes.
 9              THE COURT:  What did it look like?
10              THE WITNESS:  Dreads.
11         Q.   And on occasion did he wear anything to
12    cover up his long dreads?
13         A.   It would be in a hoodie.
14         Q.   It would be inside, tucked inside the
15    hoodie?  Yes?
16         A.   Yes.
17         Q.   Now, you mentioned in addition to Zee,
18    there were some other individuals that would also
19    act as lookouts from inside your apartment.  Did you
20    testify to that before, there were other people?
21         A.   Yes.
22         Q.   Showing you what's in evidence as
23    Government's Exhibit 216, do you recognize the
24    person in that photograph?
25         A.   Yes.
```

1644

```
 1         Q.   And do you know that person's name?
 2         A.   I do know the person's name, but at this
 3    moment I can't remember it.
 4         Q.   Okay.  How is it that you know the person
 5    or recognize the person who is in Government's
 6    Exhibit 216?  Where do you know him from?
 7         A.   From the window.
 8         Q.   When you say "from the window," the window
 9    of your apartment?
10         A.   Correct.
11         Q.   When you talk about these -- the person in
12    216 and Zee and these people at the window, which
13    window in your apartment did they usually look out
14    from?
15         A.   The window where the tree was at.
16         Q.   Is that the living room window?
17         A.   The living.
18         Q.   That looks out onto the front of Charles
19    Street.
20         A.   Correct.
21         Q.   And when they would be looking out from
22    that window, what would they do?
23         A.   They were looking out for people to go to
24    Pops' house to buy.
25         Q.   You mentioned before that you saw them with
```

1645

1 either walkie-talkies or cellphones.
2     A.   Or cellphones.
3     Q.   Did you ever see them use those cellphones
4 or walkie-talkies?
5     A.   Yes.
6     Q.   Do you know who they were calling with
7 walkie-talkies or cellphones?
8     A.   Pops' house.
9     Q.   Did anyone pay your rent during this time
10 period when they started using your apartment as the
11 lookout apartment?
12     A.   No.
13     Q.   Did anyone -- do you recall if anyone
14 bought you any groceries during that time period?
15     A.   One time.
16     Q.   Who bought you groceries?
17     A.   Big Man.
18     Q.   Did you get anything else for use of your
19 apartment other than the drugs from the defendant,
20 from Zee, and the groceries?
21     A.   No.
22     Q.   How often did -- well, did there come a
23 time you started staying less and less at your own
24 apartment?
25     A.   Yes.

1646

1     Q.   Where were you staying after they started
2 using your apartment as the lookout apartment?
3 Where would you sleep?
4     A.   I would stay out in the street.  I would --
5 always out in the street.  I would be on the other
6 side of town where I used to live before, with
7 friends, in clubs.  Out.
8     Q.   And you were using crack all day every day?
9     A.   All day, all night.  I used to stay days in
10 that condition.
11     Q.   Was Rafael also using crack at that time?
12     A.   Yes, he was.
13         MS. REYNOLDS:  Did you want to just take
14 a break, your Honor?
15         THE COURT:  There is water there also.
16         THE WITNESS:  Sorry.
17         MS. REYNOLDS: That's okay.
18         THE COURT:  Are you ready to proceed or
19 do you want a recess?
20         THE WITNESS:  I'm fine, thank you.
21         THE COURT:  All right, you may proceed.
22         MS. REYNOLDS:  Thank you, your Honor.
23     Q.   Did you at some point meet Basil and the
24 people that lived downstairs in apartment 101 of
25 Charles Street?

1647

1     A.   Yes.
2     Q.   And did you at some point hang out a little
3 bit with Basil?  How did you get to know Basil?
4     A.   I would see Basil most of the time in the
5 parking area of the house.  He would drink, he would
6 go out there and drink with the other -- some other
7 buddies.
8     Q.   And did you sometimes go out there and
9 drink with Basil in the parking lot area of 215
10 Charles Street?
11     A.   Yes.
12     Q.   Did you ever buy crack from Basil?
13     A.   No.
14     Q.   Did you ever see Basil using crack or
15 anything other than drinking alcohol?
16     A.   No.
17     Q.   And did you come to meet Tina and Tippy,
18 the two people or couple that was living with Basil
19 at that time period in the summer of 2005?
20     A.   Yes.
21     Q.   And showing you Government's Exhibit 252,
22 do you recognize who that is?
23     A.   That's Tina.
24     Q.   And showing you Government's Exhibit 253,
25 do you recognize who's shown in that photograph?

1648

1     A.   Tippy.
2     Q.   Did you have occasion to go down to
3 apartment 101 and buy crack from apartment 101?
4     A.   I did.
5     Q.   About how many times did you go down there
6 to buy crack; if you recall?
7     A.   Once.
8     Q.   One time.  And who did you get the crack
9 from that you bought from apartment 101?
10     A.   From Jackie.
11     Q.   From Jackie.  Okay.  And that's the person
12 you identified before in Government's Exhibit 214
13 that I'm showing now?
14     A.   Yes.
15     Q.   So she was down -- at some point she was
16 down in apartment 101?
17     A.   Yes.
18     Q.   I'm going to draw your attention to the
19 morning of the murders and ask you -- a little
20 before that, were you -- did you spend the night,
21 that night in your apartment?
22         MR. SHEEHAN:  Objection, leading.
23     Q.   Where did you sleep the night before the
24 murders happened?
25     A.   In my apartment.

1649

```
1    Q.   And that's in 202 in Charles Street?
2    A.   Correct.
3    Q.   Was Rafael with you that night?
4    A.   Yes.
5    Q.   Do you recall hearing anything unusual that
6    night when you were -- in the middle of the night?
7    A.   Late in the night we heard footsteps, the
8    running up the stairs, and I looked -- I remember
9    looking out the window and everything was clear.
10   Rafael went to see out the door, but there was
11   nothing either.
12   Q.   And did you go back to sleep at that point?
13   A.   Yes.  We stayed in the room.
14   Q.   You stayed in the room.  The next morning,
15   do you recall how it was that you were awakened?
16   A.   I was awakened by Zee.  He had knocked on
17   the bedroom door.
18   Q.   Zee knocked on your bedroom door?
19   A.   Yes.
20   Q.   And what happened next?
21   A.   I opened the door, and I guess he just
22   wanted to see who was there.  I was in the room, and
23   when I came out he was gone.  I went downstairs,
24   I wanted to get something to get high.  I knocked on
25   Tina's apartment, nobody opened, so the lady next
```

1650

```
1    door -- they also used to sell drugs there.
2    Q.   What drugs did they sell next door to
3    Tina's apartment, what type of drugs?
4    A.   Heroin.
5    Q.   Heroin?
6    A.   And sometimes crack.  She opened the door,
7    and she didn't have anything either and she told me
8    that they must have been sleeping because they were
9    fighting, she heard them fighting, there was a
10   commotion.
11        MR. SHEEHAN:  Objection.
12   Q.   Without telling us --
13        THE COURT:  Excuse me, I can't hear you.
14        MR. SHEEHAN:  Objection, your Honor.
15        THE COURT:  Basis?
16        MR. SHEEHAN:  Hearsay.  She is starting
17   to talk about what the person next door was saying
18   to her.
19        THE COURT:  Do you claim that?
20        MS. REYNOLDS:  Your Honor, not for the
21   truth of the matter asserted but I'll just move on.
22        THE COURT:  All right.
23   Q.   So, you spoke to the woman who lived next
24   door to Tina's apartment?
25   A.   Yes.
```

1651

```
1    Q.   And what did you do after you spoke to her?
2    Where did you go?
3    A.   I went back upstairs.
4    Q.   Were you able to get -- did anyone respond
5    when you knocked on Tina's apartment door?
6    A.   No.
7    Q.   Did it seem any different than on other
8    early mornings when you would go down to try to get
9    crack cocaine to get high?
10        MR. SHEEHAN:  I'm going to object, your
11   Honor.
12   A.   No.
13        MR. SHEEHAN:  There is no suggestion she
14   ever went down except for one occasion.
15        THE COURT:  Would you rephrase.
16        MR. SHEEHAN:  The form of the question.
17        MS. REYNOLDS:  Yes.
18   Q.   When you went down to knock on Tina's door
19   that morning, did you see anyone?  Did you see
20   anyone else in that area of apartment 101?
21   A.   No.
22   Q.   Did you hear anything?
23   A.   No.
24   Q.   What did you do after you spoke to the
25   woman who lived next door?
```

1652

```
1    A.   I went back upstairs.
2    Q.   And when you went back upstairs, was
3    anybody else in your apartment at that time?
4    A.   No.
5    Q.   When was it that Zee had left your
6    apartment; if you know?
7    A.   After he knocked on the door, he knew that
8    I was there, when I came out, he wasn't there.
9    Q.   What happened next after you went back
10   upstairs to your apartment?  What did you do next?
11   A.   I stayed in my room, and I was doing what I
12   usually do, trying to scrape up something to get
13   high, and like mid in the morning I hear, like,
14   crying and screaming, and then all of a sudden there
15   is a lot of commotion outside.
16   Q.   When you say you heard crying and
17   screaming, did you look out your window at that
18   time?
19   A.   Yes.
20   Q.   Did you see anyone?
21   A.   I believe I seen Tina's son.
22   Q.   Had you seen him prior to that morning?
23   A.   I seen him once in the garage.
24   Q.   And what did you see Tina's son doing at
25   that time when you looked out your window?
```

**GA413**

1653

1   A.   He was crying.
2   Q.   What, if anything, did you do next at that
3   point?
4   A.   I was at the window and that's when
5   everybody started gathering, and it turned into a
6   big commotion outside.  Then I went downstairs, I
7   wanted to go to the store, and I couldn't go out to
8   the front entrance, I had -- somebody directed me
9   through the side door.
10  Q.   When say you couldn't go out through the
11  front entrance, you mean the front entrance to the
12  building?
13  A.   Yes.
14  Q.   Why couldn't you go out through the front
15  entrance at that time?
16  A.   Because the cops were there and they had
17  blocked the area.
18  Q.   And you said you were directed to go out
19  another doorway --
20  A.   Yes.
21  Q.   -- from the building.  Who directed you to
22  do that?
23  A.   One of the officers.
24  Q.   And did you go out that other door?
25  A.   Yes.

1654

1   Q.   And where did you go after you --
2   A.   That's when I went out into the street.  I
3   seen Jackie and she told me what had happened.
4   Q.   And did you eventually go to the store?
5   A.   Yes.
6   Q.   Were you able to get back into your
7   building?
8   A.   Yes, the same way.
9   Q.   When you say "the same way," you were
10  directed to go in the back entrance.
11  A.   Correct.
12  Q.   Were there still police officers there at
13  the time?
14  A.   Yes.
15  Q.   You had mentioned that Zee and the others
16  who were lookouts would use, sometimes, cellphones.
17  Did they ever give you a cellphone to use?
18  A.   I had borrowed -- a phone that was always
19  on the sill, I asked for it, it was always in the
20  windowsill, one of the phones, because me and Rafael
21  were going away to a hotel and --
22  Q.   Did they give you one of the cellphones
23  from the windowsill area?
24  A.   Yes.
25  Q.   And did you take it with you?

1655

1   A.   Yes, I did.
2   Q.   Were you able to use it?
3   A.   No, it died.
4   Q.   Okay.
5   A.   It didn't have no minutes.
6   Q.   And when you say that there were cellphones
7   on the windowsill area, do you remember about how
8   many phones would be in that area of the window?
9   A.   Sometimes two, three.
10  Q.   Now, I'm going to draw your attention to
11  November of 2005.  Were you arrested and charged
12  with federal narcotics offense at that time?
13  A.   Yes.
14  Q.   And after you were arrested, were you
15  appointed a lawyer?
16  A.   Yes.
17  Q.   And your lawyer, Tara Knight, is she still
18  your lawyer today?
19  A.   Correct.
20  Q.   And after you were arrested, were you
21  released to a drug treatment program?
22  A.   Yes.
23  Q.   What drug treatment -- what program did you
24  go to?
25  A.   Crossroads in New Haven.

1656

1   Q.   And did you successfully complete that
2   program?
3   A.   Yes, I did.
4   Q.   And I'm going to draw your attention to
5   September 21st of 2006, and ask you if you remember
6   on that day pleading guilty before Judge Dorsey to
7   an offense called maintaining a drug-involved
8   premises.  Do you recall pleading guilty to that
9   offense?
10  A.   Yes.
11  Q.   And did you also at that time on
12  September 21st, 2006, enter into what's known as a
13  cooperation agreement with the government?
14  A.   Yes.
15  Q.   I'm going to show you first your written
16  plea agreement, and also your cooperation agreement.
17  Just see if you recognize those documents.
18       Starting with what's been marked
19  Government's Exhibit 239, is that your plea
20  agreement?
21  A.   Yes.
22  Q.   And you signed that?  Is that your
23  signature on the last page and your attorney's
24  signature?
25  A.   Yes.

**GA414**

1657

```
1    Q.   And James Glasser was the prosecutor at the
2  time.
3    A.   Yes.
4    Q.   And then showing you Government's
5  Exhibit 239A, is this the other agreement, the
6  cooperation agreement that you entered into?
7    A.   Correct.
8    Q.   And again, that's -- turning to the last
9  page, that's signed by you and by your attorney and
10 by the prosecutor.
11   A.   Yes.
12   Q.   And it's actually dated on the signature
13 line, September 22nd, correct?
14   A.   Correct.
15   Q.   2006?
16   A.   Correct.
17        MS. REYNOLDS:  Your Honor, there is no
18 objection by the defense to offering these at this
19 time, so I would offer 239, which is the plea
20 agreement, and 239A, which is the cooperation
21 agreement.
22        THE COURT:  All right, they are full
23 exhibits.
24        MS. REYNOLDS:  Thank you, your Honor.
25   Q.   Ms. Rivera, since your arrest in this case
```

1658

```
1  and since completing the Crossroads program, have
2  you been clean that whole time?
3    A.   Yes.
4    Q.   And did you eventually relocate to Florida?
5    A.   Yes.
6    Q.   And you went with Rafael to Florida.
7    A.   Yes.
8    Q.   And has Rafael been clean this whole time
9  since your arrest?
10   A.   Yes.
11   Q.   And what was the reason that you relocated
12 to Florida, the main reason you relocated to
13 Florida?
14   A.   To reunite with my son.
15   Q.   And did you get custody of your son back?
16   A.   Yes.
17   Q.   And Ms. Rivera, what's your understanding
18 of the cooperation agreement that you entered into
19 with the government?  What do you have to do?
20   A.   Tell the truth.
21   Q.   And what do you hope happens as a result of
22 cooperating with the government in this case?
23   A.   I just hope this fades away.
24        MS. REYNOLDS:  I have no further
25 questions, your Honor.
```

1659

```
1         THE COURT:  All right,
2  cross-examination.
3  CROSS-EXAMINATION
4  BY MR. SHEEHAN:
5    Q.   Hi, Ms. Rivera.
6    A.   Hi.
7    Q.   My name is Michael Sheehan.  I'm one of the
8  lawyers for Mr. Aquart.
9         It sounds like before you've got to Charles
10 Street you had been pretty deeply enmeshed in the
11 drug world, had you not?
12   A.   I was an addict already.
13   Q.   And you had a pretty severe problem with
14 alcohol as well.
15   A.   Correct.
16   Q.   And that problem with alcohol was such that
17 you really were experiencing blackouts for quite a
18 bit of the days, right?
19   A.   On occasions I was.
20   Q.   And you told the probation officer you had
21 numerous blackouts from your drinking in 2005,
22 right?
23   A.   Yeah.  Yes.
24   Q.   And that was correct?
25   A.   Correct.
```

1660

```
1    Q.   Yep.  And you've told us about using crack
2  and basically drinking all day long during this
3  period in 2005, right, since you moved to Charles
4  Street?
5    A.   In 2005?
6    Q.   Well, back when you -- when you moved into
7  the Charles Street apartment, you were using crack
8  all day long, right?
9    A.   Correct.
10   Q.   And you were drinking all day long.
11   A.   Correct.
12   Q.   And now things are better.
13   A.   Thank the good Lord.
14   Q.   And one of the things that pushed you sort
15 of to the end of the rope as far as your own
16 addiction was when they took your son away.
17   A.   Correct.
18   Q.   And he's back.
19   A.   Yes.
20   Q.   So in some ways you've got another chance,
21 right?
22   A.   I thank the Lord for that day, every day.
23   Q.   Now, that building at Charles Street, based
24 on your experience in it, had a lot of drugs in
25 there, didn't it?
```

**GA415**

1661

```
1    A.   Yes.
2    Q.   You've told us how you didn't have a key
3  for part of the time, but, in fact, you didn't even
4  really need a key to get into the building, did you?
5    A.   The building?
6    Q.   Yeah.
7    A.   No.
8    Q.   Okay.  Either the front door might be open
9  or you could come in through the basement or through
10 the side doors.
11   A.   Correct.
12   Q.   And there were people in there milling
13 around all day and all night, right, it sounds like?
14   A.   Milling?
15   Q.   Well, kind of coming in and buying drugs,
16 among other things?
17   A.   Correct.
18   Q.   And there was heroin on the third floor.
19   A.   On the first floor.
20   Q.   Okay.  And Tina had, at some point in time,
21 starting selling crack on the first floor, too.  So
22 we had heroin and crack being sold on the first
23 floor.
24   A.   Correct.
25   Q.   And then you've testified about apartment
```

1662

```
1  211.
2    A.   Yes.
3    Q.   And do you remember telling about drugs on
4  the third floor?
5    A.   That's the last floor?
6    Q.   The top floor, yep.
7    A.   Yes.
8    Q.   Okay.  And -- and there was other illegal
9  activity in that building as well, right?
10   A.   Yes.
11   Q.   And on August 25th you found out about the
12 killings downstairs, right?
13   A.   Correct.
14   Q.   You told us how your recollection is that
15 Zee knocked on the door.
16   A.   Correct.
17   Q.   Then he seems to have left, right?
18   A.   Yes.
19   Q.   And then you've talked to us about you
20 going through the building.
21   A.   Downstairs.
22   Q.   Downstairs, looking for drugs.
23   A.   Uh-huh (indicating affirmatively).
24   Q.   Did you look for drugs across the hall,
25 too?
```

1663

```
1    A.   I believe I did.
2    Q.   And how about on the third floor as well?
3    A.   I don't recall.
4    Q.   Okay.  Given all the drugs and the alcohol
5  that you were using during that time, it's pretty
6  easy to forget things, isn't it?
7    A.   Well -- yes.
8    Q.   And, in fact, that's kind of why, in part,
9  you used the drugs and the alcohol, to forget
10 things, right?
11   A.   Yes.
12   Q.   Okay.  Now, after you went outside the
13 building you found out that your -- that the people
14 downstairs had been murdered, right?  You heard that
15 from the other people outside.
16   A.   Yes, I did.
17   Q.   And then you went to the store.
18   A.   Yes.
19   Q.   Do you remember what you bought at the
20 store?
21   A.   Beer.
22   Q.   And then when you came back to the
23 building, you were escorted into the building by a
24 police officer, right?
25   A.   Correct.
```

1664

```
1    Q.   And do you remember what time of day that
2  was?
3    A.   It was sunny.  It was bright out.
4    Q.   Okay.  It was about 11:30 in the morning?
5    A.   I don't recall the time exactly.
6    Q.   How long did it take you -- how long did
7  you stay with the group outside?
8    A.   I would say a few minutes.  I'm not sure on
9  the time.
10   Q.   Okay.  Was it about 15 minutes?
11   A.   I know I talked to Jackie, I stayed there,
12 I was trying to look and see what's happening, and
13 then I went to the store.
14   Q.   Do you remember, were you out in the front
15 of the building or on the side?
16   A.   On the side.
17   Q.   Okay.  And do you remember if you stayed
18 there until they brought out Tina and Tippy and
19 Basil's bodies?
20   A.   They were bringing out bodies, yes.
21   Q.   And that was, at least as you recall it
22 now, that was before you went back into the
23 building.
24   A.   I'm not sure if it was while I was looking
25 out the window or while I was downstairs.
```

1665

```
1   Q.   Okay.  Do you think it was before you
2  brought the beer back to your apartment?
3   A.   I don't remember.
4   Q.   But on the day that the police escorted you
5  back into the building, you didn't say anything to
6  them about any of the criminal activity in that
7  building, did you?
8   A.   Nobody asked me.
9   Q.   Did anybody knock -- any police officers
10 knock on your door that day that you can recall?
11  A.   I don't remember.
12  Q.   All right.  And shortly after the -- do you
13 remember when it was that you actually got evicted
14 from Charles Street?
15  A.   I know it was in 2005, but I'm not sure
16 exactly.  I just remember when I got arrested in
17 2005 and -- I think it was.
18  Q.   So, let's use that as a front end -- well,
19 actually, let me give you a couple other dates that
20 might be helpful for you.  Do you remember that you
21 were in jail from July 28th to August 11th?
22  A.   I got arrested a couple of times.  I'm not
23 sure on dates exactly.
24  Q.   Okay.  Do you think that looking at a
25 document might help you to remember that?
```

1666

```
1   A.   Maybe.
2   Q.   Okay.  I'm going to show you a document,
3  just ask if you can look at that document and see if
4  that document in any way refreshes your recollection
5  about when it was that you were in and out of jail
6  in July and August of 2005.
7   A.   I remember being arrested for a violation,
8  having dirty urine, going to court high, but I don't
9  recollect the dates exactly, like to say, yeah, it
10 was exactly this date or that date.
11  Q.   Okay.  In fact, this had to do with your
12 assault case.
13         MS. REYNOLDS:  Objection, your Honor.
14         THE COURT:  Sustained.
15         MS. REYNOLDS:  Objection.
16         THE COURT:  Sustained.
17  Q.   Does that refresh --
18         THE COURT:  That document is not in
19 evidence.
20         MR. SHEEHAN:  I would offer it, your
21 Honor.
22         MS. REYNOLDS:  Objection.
23         MR. SHEEHAN:  It's a document provided
24 to me.
25         THE COURT:  She has not identified it.
```

1667

```
1         MR. SHEEHAN:  May we approach?
2         THE COURT:  You may.
3         (Sidebar conference)
4         MR. SHEEHAN:  This is a document that
5  was provided to me by the government that reflects
6  the dates that Ms. Rivera was in prison.
7         THE COURT:  All right.
8         MR. SHEEHAN:  And I'm offering it.
9         MS. REYNOLDS:  For what purpose?
10         MR. SHEEHAN:  To show the dates that she
11 has been in prison.
12         THE COURT:  I don't think -- there is no
13 foundation for it.  It's not a self-authenticating
14 document.
15         MS. REYNOLDS:  And her convictions are
16 not for impeachment.
17         MR. SHEEHAN:  I'm not offering --
18         MS. REYNOLDS:  That's obviously going to
19 show her assault was a misdemeanor.  It doesn't come
20 in.  It doesn't go to her credibility.
21         THE COURT:  One person only.
22         MS. DAYTON:  Sorry.
23         MR. SHEEHAN:  Your Honor, this is a
24 document that was given to us by the government.
25         THE COURT:  That's fine.  That doesn't
```

1668

```
1  make it admissible.
2         MS. REYNOLDS:  We gave you a lot of
3  documents.  She said it doesn't refresh her
4  recollection.  She's admitted that she was in and
5  out of jail, she doesn't know what dates.  That's
6  the extent of it.  It doesn't go to her credibility.
7         MR. SHEEHAN:  I'll mark it for
8  identification.
9         THE COURT:  The document will be marked
10 for identification.
11         MR. SHEEHAN:  Your Honor, I would mark
12 it for identification.
13         (Sidebar concluded)
14         THE COURT:  The document will be marked
15 Defendant's P for identification.  You may proceed.
16  Q.   Do you remember as we speak now any dates
17 when you were in prison in the summer of 2005?
18  A.   I know I was arrested a couple times.
19 Exactly the dates, that's what I don't remember.
20         THE COURT:  The question is were you in
21 jail?
22         THE WITNESS:  Yes.
23  Q.   Okay.  And do you remember when the police
24 first contacted you about this case?
25  A.   When they first contacted me?
```

1669

```
1    Q.   Let me put it this way.  Do you know
2  Detective DelMonte from the Bridgeport Police
3  Department?
4    A.   DelMonte, yes.
5    Q.   Okay.  Do you remember Detective DelMonte
6  stopping you in the area of Clarence Street --
7    A.   Yes.
8    Q.   -- and asking you questions about the case?
9    A.   Yes.
10    Q.   Okay.  And do you remember when that was?
11    A.   Exactly when, no.
12    Q.   Do you think looking at a document might
13  help you to remember when that was?
14    A.   I could try.
15    Q.   Okay.  I'm just going to show you a
16  document, ask you to look at it and see if it
17  refreshes your recollection as to when it was that
18  you met with Detective DelMonte -- or Detective
19  DelMonte actually met with you.
20    A.   I can't recall that.
21    Q.   It doesn't refresh your recollection.
22         THE COURT:  You need to say yes or no,
23  please.
24         THE WITNESS:  No.
25    Q.   Do you recall any conversations with
```

1670

```
1  Detective DelMonte about what happened at 215
2  Charles between the time of the murders and the time
3  that you were ultimately arrested?
4    A.   The time that I remember was the time that
5  I got arrested.  It was the same detective that had
6  stopped me on Clarence Street.
7    Q.   But do you remember anything that you may
8  have told the detective on Clarence Street when he
9  asked you questions about it?
10    A.   At this point, no.
11    Q.   Okay.
12    A.   I just don't recall.
13    Q.   All right.  And do you remember talking to
14  Detective DelMonte about how you were smoking crack
15  in the building before you got arrested?
16    A.   I got arrested at my sister-in-law's.
17    Q.   In November, correct?
18    A.   Yeah.
19    Q.   November of 2005, right?
20    A.   I was trying to go to a program across the
21  street from my sister-in-law's, and that's when I
22  got arrested.
23    Q.   Okay.  And what I'm asking is, do you
24  remember the date when the murders took place?
25    A.   Exactly the dates, no.
```

1671

```
1    Q.   Okay.  And the period of time between the
2  murders and when you got arrested, that's where I'm
3  really trying to focus, see if you recall.
4         In that space in between, do you remember at
5  some point talking to Detective DelMonte on
6  Clairmont Street -- Clarence Street?  I'm sorry.
7    A.   I remember talking to him, I was very -- I
8  was very high at that moment.  I vaguely remember.
9    Q.   Okay.  And so on November 8th you got
10  arrested -- was that the date?
11         MS. REYNOLDS:  November 5th, your Honor.
12         MR. SHEEHAN:  November 5th, okay.
13    Q.   Do you recall the date, you, yourself?
14    A.   I recall it was November.
15    Q.   In November?
16    A.   2005.
17    Q.   And thereafter you -- were you high at that
18  point?
19    A.   When I was arrested?
20    Q.   Yeah.
21    A.   Yes.
22    Q.   And was that also the combination of drugs
23  and alcohol?
24    A.   Yes.
25    Q.   And then Attorney Knight got appointed to
```

1672

```
1  represent you, right?
2    A.   Yes.
3    Q.   And you gave a statement to the police,
4  right?  Not that day, but a couple days later you
5  met with the police and Attorney Knight.
6    A.   Yes.
7    Q.   Do you remember what date it was?
8    A.   No, I don't remember.
9    Q.   How were you feeling at that point when you
10  met with the police with Attorney Knight?  You'd
11  been in jail for a couple of days.
12    A.   I'm trying to remember.  When I met my
13  attorney I was in jail.
14    Q.   Did they bring you to the courthouse in
15  Bridgeport?
16    A.   Yes.
17    Q.   Okay.  And Attorney Knight met you there at
18  the courthouse?
19    A.   Yes.
20    Q.   And you went into the -- one of the -- do
21  you remember if you went into the U.S. Attorneys'
22  office or into one of the witness rooms?
23    A.   A witness room?
24    Q.   Well --
25    A.   A little room.
```

**GA418**

1673

```
1    Q.   Well, do you remember where in the -- was
2  it at the federal courthouse?
3    A.   Yes.
4    Q.   Okay.  And when you went there --
5         MR. SHEEHAN:  Actually, may I have one
6  second, your Honor?
7         THE COURT:  Yes.
8    Q.   In fact, we made a mistake.  It was the
9  11th that you were arrested, wasn't it?
10        MS. REYNOLDS:  Of November, your Honor.
11   Q.   Of November?
12   A.   I know it's in November.
13   Q.   Okay.  And would looking at a document
14 maybe help you to remember what date it was?
15        MS. REYNOLDS:  Your Honor, we'll
16 stipulate.
17        THE COURT:  If you've just agreed it's
18 November 11, 2005.
19        MR. SHEEHAN:  Okay.
20        THE COURT:  Do we need to do any more?
21        MR. SHEEHAN:  No, no, we don't.  That's
22 fine, your Honor.
23   Q.   And so in that first meeting with the
24 detectives, do you remember being given a Miranda
25 warning?  Did they ask you to sign a Miranda
```

1674

```
1  warning?
2    A.   Can you please explain to me Miranda
3  warning.
4    Q.   Maybe I what I could do is this.  Let me
5  show you this document and ask if that helps you to
6  remember.  If you need to -- did they give you any
7  papers to sign?
8         THE COURT:  While she's looking at that,
9  may I see counsel, please.
10        (Sidebar conference).
11        THE COURT:  It's 3:30.  How much longer
12 do you intend to be with her?
13        MR. SHEEHAN:  It's going more slowly
14 than I thought it would, your Honor.  I don't know
15 exactly.
16        MS. REYNOLDS:  I would ask that we
17 continue and complete this witness if it's possible,
18 your Honor.  She came in from out of town.
19        THE COURT:  I understand that.
20        MS. REYNOLDS:  We would have to bring
21 her back Monday.  We did that last week with
22 Dr. Shah and we asked one question, and it's not
23 fair.
24        THE COURT:  Do you think maybe we
25 could -- well, I'm going to ask the jury if they can
```

1675

```
1  stay.
2         (Sidebar concluded)
3         THE COURT:  Ladies and gentlemen, would
4  you -- is there anyone who cannot stay?  Is there
5  anyone that needs to leave right at 3:30?
6         JUROR:  I have --
7         THE COURT:  Can you make a call?
8         JUROR:  I would like -- I have that
9  conference that I was going to go to.  I did want to
10 get up to Providence as soon as I can.
11        THE COURT:  Okay.  Let's take a
12 five-minute recess and see where we are.
13        (Jury exited the courtroom.)
14        THE COURT:  Ms. Rivera, we'll take just
15 a five-minute recess and then you'll come back here
16 please.  And don't talk to anybody about your
17 testimony.  All right.
18        MR. SHEEHAN:  Your Honor, I do not think
19 it appropriate that my cross-examination be
20 curtailed.  I understand there are witness
21 convenience issues.
22        THE COURT:  I think it's possible you
23 could speed it up because there are large silences
24 between your questions, and your questions seem to
25 be pursuing areas in which she tells you she doesn't
```

1676

```
1  have memory.  I'm not going to -- I'm not going to
2  hasten your cross-examination, but merely suggest
3  that it would be possible to speed it up.
4         However, there is that juror that we
5  promised she could leave to get to her conference at
6  3:30.  I mean she could leave at 3:30, so I don't
7  think there is anything we can do about that.  If
8  you have a couple more questions when we come back,
9  or I'll just tell them.  I also want to ask you, I
10 have a suspicion we might be falling a little
11 behind.  I can sit on Monday until 4:30 if the
12 jurors can do that.  Will that suit you all?
13        MS. REYNOLDS:  Yes, your Honor.
14        MR. SHEEHAN:  That will be fine, your
15 Honor.  But my -- I cannot make a commitment, your
16 Honor.
17        THE COURT:  To 4:30 on Monday?
18        MR. SHEEHAN:  4:30 on Monday, sure.
19        THE COURT:  That's the only commitment I
20 wanted.
21        MR. SHEEHAN:  Okay, you got me.
22        THE COURT:  Thank you very much.  A
23 five-minute recess.
24        I'm being told juror No. 17 -- oh,
25 Wednesday.
```

1677

```
1    (Recess)
2         THE COURT:  All right, is the witness
3    being brought in?  Please bring the jury in.
4         (Jury entered the courtroom.)
5         MR. SHEEHAN:  Your Honor, may we
6    approach for a second.
7         THE COURT:  Yes.
8         (Sidebar conference)
9         MR. SHEEHAN:  Your Honor, in light of
10   the juror's statement, I don't think it's fair to
11   the defendant to continue this beyond 3:30.
12        THE COURT:  I'm not going to.
13        MR. SHEEHAN:  Okay.
14        THE COURT:  I said I was going to let
15   her --
16        MR. SHEEHAN:  All right.
17        (Sidebar concluded)
18        THE COURT:  Don't have a seat.  I did
19   promise juror No. 7 if she would make arrangements
20   about her conference so she could serve on this jury
21   we would let her out at 3:30, so we will do that.
22        But I have a question.  Can we sit 'til
23   4:30 on Monday?  No, you can't do that?
24        JUROR:  I can't.
25        THE COURT:  If there is one who can't,
```

1678

```
1    we can't.  We will adjourn then at 3:30.
2         All right, have a very nice weekend.
3    See you Monday.  Don't discuss the case.
4         MR. SHEEHAN:  Just, your Honor, before
5    they go, may I just approach on one issue?
6         THE COURT:  And on the 5th, on May 5th I
7    want you to please be here at nine o'clock because
8    we're only going to sit 'til 2:30.  That's Thursday,
9    May 5th.  And right now I don't have any other
10   changes.
11        JUROR:  What was the starting time on
12   May 5th?
13        THE COURT:  Nine o'clock on Thursday,
14   May 5th.  All right?  All right.  Thank you very
15   much.  Have a pleasant weekend.
16        (Jury exited the courtroom.)
17        THE COURT:  Ms. Rivera, we're going to
18   need to ask you to come back on Monday at 9:30.
19        MS. REYNOLDS:  Judge, we will extend our
20   arrangements for her to stay here.  But the cost for
21   the taxpayers --
22        THE COURT:  Well, it happens.
23        MR. SMITH:  Your Honor?
24        MS. REYNOLDS:  Can I excuse the witness?
25        THE COURT:  Yes, you may go.  Please
```

1679

```
1    don't discuss your testimony with anyone.  And we'll
2    see you to continue your testimony on Monday at
3    9:30.
4         MS. DAYTON:  Your Honor, but someone
5    from the U.S. attorney's office will have to be
6    speaking with Ms. Rivera regarding changing hotels,
7    and she's here with her child, I mean, so we can't
8    not speak to her at all.
9         THE COURT:  I said don't discuss her
10   testimony.
11        MS. DAYTON:  No.  I just wanted to put
12   it on the record.  So if they see us speaking with
13   her we're not talking about the case.
14        MR. SHEEHAN:  I understand that, your
15   Honor.  Thank you.  Thank you, Counsel.
16        THE COURT:  All right.  Is there
17   anything else before we recess?
18        MR. SMITH:  Your Honor, we do have a
19   housekeeping from yesterday with Ms. Bryant.  There
20   were two exhibits marked for identification that
21   were actually not moved in.  There was some
22   disagreement about what should be moved in.
23        MS. DAYTON:  I don't have it all here,
24   your Honor, perhaps we can deal with this on Monday
25   because I don't have the whole transcript here with
```

1680

```
1    me.
2         THE COURT:  What are the exhibits at
3    issue?
4         MR. SMITH:  Your Honor, one was the
5    statement of Ms. Bryant to the Bridgeport Police
6    Department.
7         THE COURT:  What number?
8         MR. SMITH:  I want to say --
9         THE COURT:  We have K for identification
10   which was her statement to the police on August 27,
11   '05.
12        MR. SMITH:  That is correct.
13        THE COURT:  We have L for
14   identification, which is the Grand Jury transcript.
15        MR. SMITH:  The L for identification,
16   your Honor, was the --
17        THE COURT:  Grand jury transcript.
18        MR. SMITH:  The Grand Jury transcript.
19   But there was a disagreement.  I had moved to just
20   enter the page dealing -- the page dealing with her
21   question and answer in regards to whether she had
22   ever told the Grand Jury --
23        THE COURT:  Is this the same issue as
24   with Mr. Whittingham?
25        MR. SMITH:  I believe it is.
```

1681

```
1         MS. DAYTON:  The government, because of
2   how it was parsed for Ms. Bryant, the government
3   requested that the whole document be moved in.
4   We're not objecting to the Grand Jury transcript,
5   we're objecting to it in the bits and pieces because
6   she wasn't, in the government's view, properly
7   impeached.  It wasn't, were you asked this question,
8   did you give this answer, it was little bits and
9   pieces.  And government said if the entire
10  transcript goes in under the rule of completeness,
11  then that's fine; but otherwise, we disagree because
12  we don't believe it was proper impeachment.
13        THE COURT:  Does that represent a
14  resolution for the defendant or no?
15        MR. SMITH:  I think the entire
16  transcript confuses the issue, actually, because she
17  was asked at the end of the thing did she tell the
18  truth and she said her answer was "I've told you
19  everything I know."
20        THE COURT:  Yes.
21        MR. SMITH:  I'm not sure what more we
22  would need besides that unless we want to put the
23  entire transcript in to show she didn't say that in
24  the Grand Jury.  I mean, if the government wants to
25  show that it's truly not in the Grand Jury
```

1682

```
1   transcript anywhere through that, then we could do
2   that.
3         MS. DAYTON:  Yes, the government does
4   want to put the whole transcript in.
5         MR. SHEEHAN:  Your Honor, the transcript
6   should not come in as substantive evidence.
7         THE COURT:  Okay.  I'll tell you what.
8   You all need to give me some authority and briefing
9   and analysis on exactly what your position is.  I
10  find that when you put it in writing the positions
11  become much more clarified.
12        MS. DAYTON:  Your Honor, the other issue
13  that we'd like to raise is in the government's
14  opinion, also, the defense has twice violated Rule
15  609.  The other day they asked Mr. Hodges about a
16  1995 conviction which clearly fell outside of the
17  ten-year period without giving any prior notice to
18  the government, and today Ms. Rivera was asked about
19  a misdemeanor assault which is clearly not within
20  609.  And we would ask that the Court direct counsel
21  to follow the proper rules of evidence.
22        THE COURT:  Yes, why were you asking her
23  about her misdemeanor?
24        MR. SHEEHAN:  Your Honor, I wasn't
25  asking her about the conviction.  In fact, she
```

1683

```
1   wasn't convicted at that point in time.  She was
2   approached by a Bridgeport police officer.
3         THE COURT:  You said, well, you were
4   arrested for assault.
5         MR. SHEEHAN:  She was, your Honor.
6         THE COURT:  But why does that come in?
7         MR. SHEEHAN:  Because that was pending
8   against her at the time she started her cooperation
9   in the case.
10        THE COURT:  But what relevance does that
11  have?
12        MR. SHEEHAN:  That's her motive, in
13  part, to please the prosecution, and ultimately,
14  that case gets nolled.
15        MS. DAYTON:  Your Honor, that is such a
16  stretch, and there was no notice given and it's
17  totally improper.
18        MR. SHEEHAN:  There doesn't have to be
19  notice to ask a person about specific acts.
20        MS. REYNOLDS:  That's an arrest.
21        THE COURT:  What do you mean, specific
22  acts?
23        MR. SHEEHAN:  In this case.
24        THE COURT:  The assault doesn't have
25  anything to do with this case, I take it?
```

1684

```
1         MR. SHEEHAN:  Well, in fact, it does,
2   kind of.  She assaulted Mary Wilson in the context
3   of all of the confusion in the crack house.
4         MS. DAYTON:  It has nothing to do with
5   this case, your Honor is correct.  She has been
6   arrested for it.  I mean, she hadn't been charged
7   with it.  She had no idea that the federal
8   government was taking a look at her.  So, to suggest
9   that she was somehow giving information to curry
10  favor with the federal government is beyond a
11  stretch, it's impossible.  She had no idea.
12        MR. SHEEHAN:  She started by cooperating
13  with the Bridgeport police when she had a Bridgeport
14  arrest pending against her.  She had two charges
15  pending against her.  She had been in jail on both
16  of those charges.  One of those charges was a
17  failure to appear, and the other one was assault
18  with a deadly weapon.  Ultimately, those cases got
19  dropped.  The charges on those got reduced.  But at
20  the time she --
21        THE COURT:  In relation to her
22  cooperation in this case?
23        MR. SHEEHAN:  I don't know, your Honor,
24  I know that she went in on -- she started
25  cooperating in the Bridgeport investigation on
```

1685

```
1    October 6th of 2005.
2            MS. DAYTON:  The answer is no, having
3    nothing to do with this investigation.
4            MR. SHEEHAN:  Well --
5            THE COURT:  Don't you have to --
6            MR. SHEEHAN:  No, I don't have to --
7            THE COURT:  -- show some relationship
8    between the two?
9            MR. SHEEHAN:  She knew about those cases
10   and she knew that the police were there knocking --
11   or stopping her on Clarence Street.
12           MS. REYNOLDS:  Those cases did not
13   result in a felony conviction and only that would be
14   proper impeachment, your Honor.
15           MR. SHEEHAN:  Precisely wrong.  I
16   disagree on that completely, your Honor.
17           THE COURT:  All right.  So you are not
18   claiming that the existence of the arrests for which
19   she wasn't convicted goes to her truth-tellingness
20   or impeaches her testimony.
21           MR. SHEEHAN:  No.
22           THE COURT:  You claim that because she
23   had charges pending at the time that -- what
24   happened in this case.
25           MR. SHEEHAN:  At the time that she
```

1686

```
1    started cooperating in the case.  And more
2    importantly, and in addition, your Honor, for some
3    significant chunks of this period of time which
4    she's talking about, which is the period between
5    April and August of 2005, she was in jail.
6            THE COURT:  Well, I certainly don't know
7    that from her testimony.
8            MR. SHEEHAN:  I know you don't know that
9    from the testimony.  I know that.  The government
10   knows that.  Everybody knows that, except we don't
11   have that here yet.  It's not disputed.  It's a
12   fact.
13           THE COURT:  Well, whether or not it
14   comes in is a different issue.
15           MR. SHEEHAN:  That may be a different
16   issue, but it seems to me --
17           THE COURT:  So the issue here is -- and
18   609 does not require you to give notice unless it's
19   a more than ten-year old conviction, I believe.  So
20   the government's view that you needed to give notice
21   doesn't seem to me correct.
22           MS. REYNOLDS:  It has to be a
23   conviction, though.  He's --
24           THE COURT:  But he's not offering the
25   conviction because there wasn't one.
```

1687

```
1            MR. SHEEHAN:  Right.
2            THE COURT:  He's offering the fact of
3    the arrest.
4            MS. REYNOLDS:  That's not relevant.
5            MR. SHEEHAN:  The pending charges.
6            THE COURT:  As bias and motive in the
7    cooperation agreement.
8            MS. REYNOLDS:  And he's --
9            MR. SHEEHAN:  At the time that she
10   started cooperating in the case which well preceded
11   the cooperation agreement, as far as we can figure
12   out.
13           THE COURT:  I thought you said that they
14   were pending when the cooperation agreement was --
15           MR. SHEEHAN:  They were.
16           THE COURT:  -- entered into.
17           MR. SHEEHAN:  Those charges didn't
18   really get resolved until 2006.  But the practical
19   thing that's going on here is that at the time she
20   starts cooperating, she's got these charges pending
21   against her.
22           THE COURT:  But those are state charges.
23           MR. SHEEHAN:  Yeah.
24           THE COURT:  So what does the federal
25   cooperation have to do with the state charges?
```

1688

```
1            MR. SHEEHAN:  Everything.
2            THE COURT:  How so?  Does it say so in
3    the cooperation agreement?
4            MR. SHEEHAN:  No, it doesn't, it's
5    not -- it doesn't work that way.  I think the
6    reality of how it works is --
7            THE COURT:  Do you know what?
8            MR. SHEEHAN:  Is that when you have
9    one -- and in fact in this case it wasn't like New
10   London or New Zealand, these are the very same
11   people that are -- this is the Bridgeport police
12   that are initially investigating the murders, then
13   it gets handed over to the feds.
14           THE COURT:  Let me ask you where you
15   intend to draw the line between speculation that it
16   made a difference in her cooperation and some fact
17   from which it can be inferred that it made a
18   difference in her cooperation?
19           MR. SHEEHAN:  I think ultimately it all
20   goes into the mix, your Honor, that the jury
21   decides.
22           THE COURT:  Not everything goes into a
23   mix.  It has to have some relationship.  But what I
24   lack so far is any foundation for all of these
25   little bits and pieces, none of which she remembers.
```

1689

```
1   And that seems to me to be the main problem here.
2   So, you may argue that, but in fact if she doesn't
3   remember this, it seems to me it's an argument that
4   is --
5              MR. SHEEHAN:  When --
6              THE COURT:  -- not backed up by
7   evidence.
8              MR. SHEEHAN:  When she says I don't
9   remember that, that's not an established fact.
10             THE COURT:  I understand that.  It
11  doesn't provide a foundation for the inference that
12  you seek to have drawn as the admissibility of some
13  other things.  That's all I'm saying.  So, you, for
14  instance, have offered P, and I really don't know
15  what P is, it looks like maybe an NCIC report or
16  something.
17             MR. SHEEHAN:  No, P is the correction
18  department movement sheets.  And what that reflects
19  is when an inmate is in the state Department of
20  Corrections, and in this case Exhibit P
21  demonstrates, as the government well knows, that she
22  was arrested on July 28th; she was discharged on
23  August 11th; she was subsequently readmitted to
24  court -- to York on September 8th; she was
25  discharged on September 21st.  And that was -- and
```

1690

```
1   then in that context, with those things sitting
2   behind her, on October 6th she was approached by
3   Detective DelMonte.
4              Now, I agree, she says she doesn't
5   remember anything, but she obviously remembers some
6   things or she wouldn't be here.
7              MS. REYNOLDS:  She admitted she was in
8   jail.
9              THE COURT:  So what is pending?  Nothing
10  is pending, right?
11             MR. SHEEHAN:  Nope.
12             THE COURT:  Okay.  Have a nice weekend.
13             (Proceedings concluded at 3:55 p.m.)
14
15
16
17
18
19
20
21
22
23
24
25
```

1691

```
1                    I N D E X
2
3   WITNESS                                   PAGE
4   RODNEY WOMBLE
5   Continued Direct Examination by Mr. Markle  1422
6   Cross-Examination by Mr. Smith              1521
7   Redirect Examination by Mr. Markle          1604
8   Recross-Examination by Mr. Smith            1617
9
10  JUDITH RIVERA
11  Direct Examination by Ms Reynolds           1619
12  Cross-Examination by Mr. Sheehan            1659
13
14
15            I certify that the foregoing is a correct
16  transcript from the record of proceedings in the
17  above-entitled matter.
18                    4/30/11
19                     Date
20
21                /S/  Sharon Montini
22                 Official Reporter
23
24
25
```

1692

```
1               UNITED STATES DISTRICT COURT
2                DISTRICT OF CONNECTICUT
3   * * * * * * * * * * * *      *
                                 *
4   UNITED STATES OF AMERICA,    *  Case No 6cr160(JBA)
                                 *
5              Plaintiff,        *
                                 *
6        vs.                     *
                                 *
7   AZIBO AQUART                 *  May 2, 2011
                                 *
8              Defendant.        *
                                 *
9   * * * * * * * * * * * *      *
10                    TRIAL TRANSCRIPT
11                    VOLUME VIII
12  BEFORE:  THE HONORABLE JANET BOND ARTERTON U.S.D.J.,
                                            and jury
13  Appearances:
14  FOR THE GOVERNMENT:   ALINA REYNOLDS, ESQ
                          TRACY DAYTON, ESQ.
15                        PETER MARKLE, ESQ.
                          JACABED RODRIGUEZ-COSS
16                        United States Attorney's Office
                          915 Lafayette Blvd
17                        Bridgeport, CT 06604
18
19  FOR THE DEFENDANT     MICHAEL SHEEHAN, ESQ
    AZIBO AQUART:         Sheehan & Reeve
20                        139 Orange Street
                          New Haven CT 06510
21
                          JUSTIN SMITH, ESQ.
22                        383 Orange Street
                          New Haven, CT 06511
23
24  Court Reporter:   Sharon Montini, RMR
25  Proceedings recorded by mechanical stenography,
    transcript produced by computer
```

1693

```
 1            THE COURT:  Good morning, counsel, Mr.
 2   Aquart, ladies and gentlemen.  Please be seated.
 3            Ms. Rivera is here and ready to go?
 4            MS. DAYTON:  She is.
 5            MS. REYNOLDS:  She is in the hallway.
 6   Shall I bring her in, your Honor?
 7            THE COURT:  Let me first do one thing
 8   with you.  One of the jurors, No. 9, made inquiry of
 9   Ms. Torday about whether jurors can ask questions,
10   and the answer was sometimes in a civil case, not in
11   a criminal case, but I wondered whether you would
12   like the opportunity to have them just submit
13   written questions and then you can address the
14   subject matter in your inquiries -- in your further
15   evidence or your questions.
16            MR. SHEEHAN:  No, your Honor.
17            MS. DAYTON:  I guess that pretty much
18   covers it.
19            THE COURT:  I will indicate to the jury
20   that they should -- that there are a variety of
21   reasons why evidence is presented the way the
22   evidence is presented and that they should be
23   patient to wait til all the evidence is in and then
24   decide it only on the basis of what evidence there
25   is.
```

1694

```
 1            All right then, we will bring both Ms.
 2   Rivera and the jury in.
 3            (Jury entered the courtroom.)
 4            THE COURT:  All right, good morning,
 5   ladies and gentlemen.  Please be seated.  We are now
 6   in May.
 7            I know that one of you has expressed --
 8   has inquired as to whether the jurors can ask
 9   questions, and the answer is no because there are a
10   variety of legal issues that bear significantly on
11   what evidence is presented and how it is presented,
12   and there is a risk that the distinction between
13   fact and law may get confused.
14            But I would ask you to remember that
15   evidence is presented in consecutive form, not all
16   at one time, and we have a ways to go in terms of
17   the presentation of evidence.  So I would ask you
18   to, again, keep an open mind and perhaps your
19   questions will later be answered.  But also please
20   remember that you will be deciding the case on the
21   basis of just what the evidence is that's presented
22   to you.  So, I hope that will answer your question.
23            We will resume the cross-examination of
24   Ms. Rivera.
25            Good morning, Ms. Rivera.
```

1695

```
 1            THE WITNESS:  Good morning.
 2            THE COURT:  You remain under oath by Mr.
 3   Sheehan.
 4            You may proceed.
 5            MR. SHEEHAN:  Thank you your Honor.
 6         J U D I T H   R I V E R A
 7   Having previously affirmed, was examined and
 8   testified as follows:
 9            MR. SHEEHAN:  Thank you, your Honor.
10   CONTINUED CROSS-EXAMINATION
11   BY MR. SHEEHAN:
12     Q.   Good morning, Ms. Rivera.
13     A.   Good morning.
14     Q.   You had been asked in your direct
15   examination if you knew Tina and Tippy and Basil.
16   Do you remember that question?
17     A.   Correct, yeah.
18     Q.   And what did you know about them?
19     A.   I know they lived on the first floor.
20     Q.   And had you observed them?
21     A.   I'd see them when I come in and out of the
22   building.
23     Q.   And did you have an impression about them?
24     A.   They were just neighbors.  I mean, I didn't
25   know them on a personal level.
```

1696

```
 1     Q.   Okay.  Had you ever observed them arguing?
 2     A.   Tina, may she rest in peace, she used to be
 3   a little loud.  I remember that.
 4     Q.   Okay.  Do you have any recollections of
 5   having observed any arguments between Tina and the
 6   person that you described as Big Man?
 7     A.   There was an occasion.
 8     Q.   An occasion?
 9     A.   Uh-huh (indicating affirmatively).
10     Q.   And do you remember when that was?
11     A.   No, sir.
12     Q.   And do you remember what you observed?
13     A.   I just heard shouting.
14     Q.   And do you remember what the shouting was
15   about?
16     A.   Not really.
17     Q.   Okay.
18     A.   I can't recall that.
19     Q.   Do you remember being asked by the agents
20   about that at any time?
21     A.   I believe so.
22     Q.   Okay.  And do you remember what you told
23   them?
24     A.   Not exactly.  I mean, I just don't
25   remember, you know, pinpoint words and times and --
```

1697

```
1    Q.   Do you remember if the argument had
2  anything to do with Tina selling drugs out of 101?
3    A.   I don't know, sir.
4    Q.   Do you think looking at a document might
5  refresh your recollection on that point?
6    A.   I could try.
7    Q.   And I would ask -- let's see.  Let me show
8  you this document and ask if you can look at this
9  paragraph and see if that refreshes your
10 recollection.
11          THE COURT:  About what she told the
12 agents the argument --
13          MR. SHEEHAN:  Had to do with.
14          THE COURT:  Had to do with?
15          MR. SHEEHAN:  Yes.
16   A.   This paragraph here?
17   Q.   Yes, just that paragraph there.
18          THE COURT:  And the question is not what
19 that says, just does that refresh your recollection
20 on your discussion with the agent as to what the
21 argument was about.
22   A.   I do remember there was AN argument, but
23 what it was about exactly or -- it was loud, it was
24 shouting.  What was it about?  I'm not sure.
25          THE COURT:  Okay.
```

1698

```
1    Q.   Okay.  And you don't remember what you may
2  have told the agents about it?
3    A.   At this point I don't, sir.
4    Q.   Now, we talked -- I asked you some
5  questions last time about your dealings with the
6  police in the context of this case.  When you first
7  were escorted back into your apartment on the day of
8  the murders, you were escorted back by a policeman,
9  right?
10   A.   Correct.
11   Q.   But he didn't ask you any questions on that
12 day?
13   A.   All they were asking us for was IDs to go
14 back into the building.
15   Q.   But nothing about drug dealing in the
16 building, for example?
17   A.   I don't remember anybody questioning me.
18   Q.   Okay.  And then at a later date you were
19 stopped by Detective DelMonte on Clarence Street.
20 Do you remember that?
21   A.   I vaguely remember Clarence Street, yes.
22   Q.   And that was before you were arrested,
23 right?
24   A.   Yes.
25   Q.   Or are you not sure about that?
```

1699

```
1    A.   Well, when I was arrested on -- the last
2  time I was arrested I went to a program.  I went to
3  jail.  I never had any contact or outside contact.
4    Q.   So, you got arrested on November 11th.  You
5  remember the day you got arrested?
6    A.   November.  I remember exactly the day?  I
7  don't, sir.
8    Q.   Okay.  And what time -- trying to get -- do
9  you remember at all even meeting -- even talking to
10 a police officer before they arrested you, but after
11 the murders?
12   A.   I don't remember.
13   Q.   Okay.  And when you got arrested on
14 November 11th, at that time you had some pending
15 state cases against you, right?
16   A.   Pending state cases?
17   Q.   Well, you were out on bond on some state
18 matters, right?
19          THE COURT:  This is in November of 2005?
20          MR. SHEEHAN:  Yes, your Honor.
21   Q.   Do you remember that?
22   A.   I know they -- yeah, I know they arrested
23 me again because of that.
24   Q.   Well, you had -- that's right.  At one
25 point you had been arrested because of the state
```

1700

```
1  case, right?
2    A.   Right.
3    Q.   That was back before -- back in July?
4    A.   What exactly the days -- I don't remember
5  days exactly, or months.  I know I was arrested a
6  couple of times.
7    Q.   One of them had to do with a stabbing
8  incident?
9          MS. REYNOLDS:  Objection, your Honor.
10   Q.   With Mary Wilson?
11          MS. REYNOLDS:  Objection.
12          THE COURT:  I'm going to sustain the
13 objection, but ask you just to rephrase the question
14 and then if necessary I'll see you at sidebar.
15   Q.   Do you remember having been arrested
16 involving a stabbing incident?
17   A.   Yes.
18          MS. REYNOLDS:  Objection, your Honor,
19 relevance.
20          THE COURT:  May I see you at sidebar.
21          (Sidebar conference)
22          THE COURT:  Your objection?
23          MS. REYNOLDS:  My objection is that this
24 is improper impeachment.  The assault was not a
25 conviction.  It resulted in a nolle of the case.  It
```

1701

```
1   was originally a misdemeanor.  Well, it was subbed
2   down to a misdemeanor.  Ultimately it did not result
3   in a felony conviction.  To the extent that there is
4   some claim that it somehow goes to her credibility,
5   assault being used to impeach the credibility of a
6   witness, it's not a larceny, it's not anything that
7   goes to impeachment or credibility.
8            THE COURT:  Mr. Sheehan?
9            MR. SHEEHAN:  I think the fact that she
10  was out on bail on those cases at that time goes to
11  her bias and willingness to cooperate with the
12  police when she was arrested.
13           THE COURT:  Why is it necessary to get
14  into the nature of the arrest as opposed to she had
15  been arrested and those charges were still pending
16  at the time, I gather, of the murder.
17           MR. SHEEHAN:  Yes.
18           THE COURT:  And then still pending after
19  the murder.
20           MR. SHEEHAN:  But she doesn't --
21           THE COURT:  And she said something about
22  that's why she got arrested again in November, was
23  because of those cases.
24           MR. SHEEHAN:  Big problems.
25           THE COURT:  Well --
```

1702

```
1            MS. REYNOLDS:  They weren't that big.
2   They were all resolved with nolles.
3            MR. SHEEHAN:  They were big at that
4   time.
5            THE COURT:  When were they resolved?
6            MR. SHEEHAN:  In 2006.
7            THE COURT:  So, why do you have to go
8   into the nature of the arrest as opposed to you had
9   been arrested, that case was still pending, et
10  cetera, et cetera.
11           MR. SHEEHAN:  Because, your Honor, it
12  does make a difference as to the gravity of the
13  crimes.
14           THE COURT:  But that presumes a
15  conviction.
16           MR. SHEEHAN:  No, it doesn't.  It just
17  presumes the gravity of the charges, your Honor.
18  Frankly, if somebody is arrested on, in this case,
19  Assault Two, which is assault with a deadly weapon,
20  which is a class D felony, they have more of an
21  incentive to tell the police what they -- what the
22  police appear to want to hear than if someone has a
23  pending traffic ticket.
24           THE COURT:  Here is the problem.  And
25  perhaps there is a way to resolve it.  You certainly
```

1703

```
1   may inquire about her pending legal troubles as
2   potential for bias and motive to say what she may
3   have thought the police wanted to hear.
4            MR. SHEEHAN:  Right.
5            THE COURT:  But the problem is that when
6   you get into the specifics of it, it then is being
7   used in the way a conviction would be used, and that
8   is to assail her credibility for truth-tellingness
9   as opposed to her motivation to be helpful to the
10  police.  And so if her motivation is the same if she
11  had troubles with the police and she was never
12  convicted of Assault Two with a Dangerous Weapon,
13  then it seems to me that that is not an accurate
14  piece of information for the jury to use in
15  assessing her credibility.
16           MR. SHEEHAN:  But, your Honor,
17  credibility comes in many components.  One issue on
18  credibility is bias.  Another issue on credibility
19  is straight convictions.  Where there is an overlap
20  I think that under the Constitution I have the right
21  to explore bias.
22           THE COURT:  And I'm letting you explore
23  bias.
24           MR. SHEEHAN:  And in order to understand
25  bias I think that the -- you have to know generally
```

1704

```
1   the gravity of the charges that were pending.  There
2   were two felony charges pending against her.  She
3   had a failure to appear, which is a felony.
4            THE COURT:  It's a felony because --
5            MR. SHEEHAN:  And the underlying offense
6   she had been charged with is a felony.  And she had
7   those two matters.  And so when they came to see her
8   on that day with the federal charges, she now had
9   three, and I think that -- what we know is she's
10  admitted, she's admitted to the government --
11  certainly she's admitted the stabbing incident.  She
12  had an explanation for it, ultimately it gets
13  nolled, but I think that that doesn't happen until
14  well after she's cooperated on November 11th.
15           MS. DAYTON:  Your Honor, the jurors can
16  hear this because I can hear it.  Can we maybe
17  dismiss them?  Because I can hear Mr. Sheehan from
18  where I'm sitting and I'm practically in the jury
19  box.
20           THE COURT:  I'm going to resolve the
21  issue right here.  I think on a 403 balance of risk
22  of confusion or misleading the jury versus the
23  defendant's right to fully cross-examine the
24  motivation and bias of the witness, that you are
25  fully permitted to explore that she had one, two or
```

1705

```
1    three pending charges at the time the government
2    came to speak to her and that she was concerned
3    about getting them resolved in a way that wouldn't
4    put her in jail.  I do not think that the actual
5    nature of the charges will be other than misleading
6    because of their tendency to permit improper
7    credibility determinations to be made on
8    non-convictions, and secondly, because we're not
9    going to do a satellite trial of her -- the charges
10   that eventually were dismissed.
11            MR. SHEEHAN:  Can I make this
12   suggestion, your Honor?  She's indicated she doesn't
13   remember what the charges were.  How do I
14   establish -- perhaps what I would suggest is this:
15   She had two pending felony charges against her.  If
16   the answer to that is I don't remember, is your
17   Honor precluding me from asking her to remember,
18   reminding her what they are, or can we simply agree
19   that she did have two pending felony charges against
20   her.
21            THE COURT:  Well, you can use whatever
22   you want to refresh recollection, but you can't move
23   her lack of memory by the admission of something she
24   doesn't remember.
25            MR. SHEEHAN:  She remembers stabbing
```

1706

```
1    Mary Wilson.
2            MS. REYNOLDS:  But that's not -- your
3    Honor.
4            MR. SHEEHAN:  She clearly remembers
5    stabbing Mary Wilson.
6            THE COURT:  That's fine, that is not
7    shown to have relevance here.
8            MR. SHEEHAN:  No, but that's how it
9    triggers it to the felony, your Honor.
10           THE COURT:  Fine, but you we're not
11   going to have that satellite litigation.  That's the
12   problem that you are getting in to.  Because you go
13   there and then we go through the whole litany about
14   how it's subbed down, how it's eventually nolled,
15   and it doesn't matter.  What you want is her state
16   of mind at the time she spoke to them, the federal
17   agents in November.  That's what is relevant.
18           MR. SHEEHAN:  But the way -- your Honor,
19   there is no difference between a traffic offense --
20           THE COURT:  Yes, there is.
21           MR. SHEEHAN:  Okay.  Well --
22           MS. REYNOLDS:  Your Honor, I would ask
23   that the questions and answers referencing the
24   assault be stricken from the record.
25           THE COURT:  I'm not going to strike
```

1707

```
1    them, but I'm going to instruct you to inquire
2    without further inquiry as to the nature of the
3    charge.  She can agree with you that they were
4    serious charges, she can agree with you that if she
5    -- I mean, I have no idea.
6            MR. SHEEHAN:  Okay.
7            (Sidebar concluded)
8    Q.   Thank you, Ms. Rivera.  At the time that
9    you were arrested, you had a couple of serious state
10   charges against you, didn't you?
11   A.   Yes.
12   Q.   And when you got arrested on November 11th,
13   that was the federal case, right, the federal
14   charges?
15   A.   Right.
16   Q.   And that was basically maintaining an
17   apartment in association with a drug business?
18   A.   Correct.
19   Q.   That's a serious charge, isn't it?
20   A.   Yes.
21   Q.   In fact, the maximum penalty on that was
22   20 years, wasn't it?
23   A.   Correct.
24   Q.   Okay.  So, at the time you were arrested
25   you did want to cooperate with the police, didn't
```

1708

```
1    you?
2    A.   Yes.
3    Q.   And you wanted to tell them everything that
4    you knew, right?
5    A.   Correct.
6    Q.   And those police officers who arrested you,
7    they were kind to you, weren't they?
8    A.   Correct.
9    Q.   And, in fact, when they arrested you, you
10   even said that you were willing to talk to them
11   without having your lawyer there, right?
12   A.   I don't remember.
13   Q.   Okay.  And would a document refresh your
14   recollection on that point perhaps?
15   A.   Yes.
16   Q.   Okay.  I'm going to show you this document
17   and ask you to read it with particular attention --
18   just sort of read it, take as long as you need, but
19   I'm really wondering, I'm asking you to focus here
20   on the question No. 6.
21           THE COURT:  The question is does it
22   refresh your recollection as to whether or not you
23   were willing to talk to the police officers who
24   arrested you without having your lawyer there.
25           MS. REYNOLDS:  Your Honor, I have no
```

1709

```
1   objection to this Miranda form going into evidence.
2           MR. SHEEHAN:  Perhaps that's an easier
3   way of doing this, your Honor.
4           THE COURT:  So that will be Defendant's
5   Q.
6           MR. SHEEHAN:  I'm just going to put it
7   up on the screen.
8       Q.   Looking at Defendant's Exhibit Q, paragraph
9   6, you told the police officers that you did not
10  wish the presence of a lawyer at that time, didn't
11  you?
12      A.   It's signed by me.
13          THE COURT:  She says it's signed by her.
14  Go ahead.
15      Q.   Yes, it is.  And did you understand what
16  you were signing when you signed it?
17      A.   Today I do.  At that time I am not sure if
18  I did.
19      Q.   Okay.  And after you signed this document,
20  the police asked you questions about what had
21  happened there at 215 Charles, didn't they?
22      A.   After I signed it?
23      Q.   Yeah.
24      A.   I believe yes, because there was a lot of
25  questioning back and forth on different occasions.
```

1710

```
1   I don't remember exactly which one you are relating
2   to or if it was after.
3       Q.   How many times do you recall meeting with
4   police about the murders at Charles Street?
5       A.   Exactly the numbers of times, I don't
6   remember.  I remember that I was arrested a few
7   times, and everything was basically all the same
8   thing.
9       Q.   Okay.  After you were initially arrested
10  you did meet -- do you remember meeting with the
11  police on that occasion?
12          MS. REYNOLDS:  Objection, your Honor.
13          MR. SHEEHAN:  I'm sorry, I think that
14  question is confusing.
15      Q.   After --
16          MR. SHEEHAN:  And I withdraw it.
17      Q.   After you were arrested on the federal
18  charges about using your apartment for -- allowing
19  your apartment to be used for drugs, for a drug --
20  in connection with drugs, after you were arrested on
21  that, how many times have you met with police about
22  the drug and murder investigation?
23      A.   All the time I met with police I got
24  arrested, I went to court.  I got arrested every I
25  time went to jail.
```

1711

```
1       Q.   Okay.  Well --
2           MS. REYNOLDS:  Your Honor, perhaps if we
3   could clarify "police," because there are federal
4   agents and police.
5           THE COURT:  Federal agents are not
6   called police.  So, if you are making the
7   distinction between the Bridgeport police and the
8   state -- excuse me, federal agents, perhaps that
9   should be clear.
10          MR. SHEEHAN:  Okay.
11      Q.   Do you remember on that first time that you
12  were arrested on the federal charges that was by the
13  Bridgeport police; was it not?
14      A.   I'm not sure.
15      Q.   There was also a federal agent there by the
16  name of Michael Syrax; was there not?
17      A.   Repeat the question, please.
18      Q.   I said there was also a federal agent there
19  by the name of Michael Syrax?
20      A.   Yes.
21      Q.   Okay.  Let's start with that one.  You'd
22  just been arrested and they brought you to the
23  Bridgeport Police Department, right?
24      A.   Okay.
25      Q.   You executed -- you signed Plaintiff's
```

1712

```
1   Exhibit Q.  That was the document we just looked at
2   here, right?
3       A.   That was signed by me.
4       Q.   Does 10:30 in the morning sound about right
5   as to the time?
6       A.   I'm not sure.
7       Q.   Okay.  But were you aware that that was a
8   holiday?
9       A.   No.
10      Q.   Okay.  In any case, after you signed this
11  document, they asked you questions, right?
12      A.   Correct.
13      Q.   All right.  So, let's call that No. 1
14  meeting with federal and state lawyers -- not
15  lawyers -- federal and state police, right?
16      A.   Okay.
17      Q.   All right.  And then the -- then since that
18  time, after that, have you met again with federal --
19  well, let's start with have you met again with any
20  federal law enforcement?
21      A.   Since that time?
22      Q.   Yeah, since after November 11th of 2005?
23      A.   Yes.
24      Q.   Okay, so my question is, how many times?
25      A.   Counting from that time?
```

**GA428**

1713

```
1    Q.   Yep.
2    A.   Twice.  I'm not sure the amount of times.
3    Q.   Okay, let's start with the first time.  You
4  were interviewed and you were shown pictures, were
5  you not?
6    A.   Correct.
7    Q.   And what they were asking you was about the
8  night -- about when -- about the murder, right?  Let
9  me withdraw that question, try to make it clear.
10        What they were asking you about was what
11 you knew about drugs and the murder, the murders, at
12 Charles Street, correct?
13   A.   Correct.
14   Q.   Okay.  And you testified on Friday that on
15 the morning when the bodies were discovered you had
16 been awoken by Zee, right?
17   A.   Correct.
18   Q.   And that you then went to look for drugs?
19   A.   Correct.
20   Q.   And when you came back to the apartment Zee
21 was gone.
22   A.   Correct.
23   Q.   And then you heard the commotion outside,
24 right?
25   A.   Yes.
```

1714

```
1    Q.   And you went out to investigate and go to
2  the store, right?
3    A.   I went out to the store, yes.
4    Q.   Okay.  Now, you didn't see Zee again on
5  that day, did you?
6    A.   I don't remember.
7    Q.   Where was Rafael when you were woken up on
8  that day?
9    A.   He was with me.
10   Q.   With you?
11   A.   Yes.
12   Q.   And then I want to go back to you being
13 arrested and showing you a photograph.  Among the
14 photographs that the police showed you was one of
15 Mr. Aquart, right?
16   A.   Correct.
17        MS. REYNOLDS:  Just clarify which
18 Aquart.
19   Q.   Azibo Aquart?
20   A.   Correct.
21   Q.   And the police were asking you about him,
22 right?
23   A.   Yes.
24   Q.   Do you have any recollection of how many
25 photos were shown to you on that date?
```

1715

```
1    A.   There were quite a bit of photos.
2    Q.   Do you remember if any of the other people
3  in those photos had long dreadlocks?
4    A.   Yes.
5    Q.   In fact, the police on that date appeared,
6  to you anyway, to be quite keen about focussing on
7  D, did they not?
8        MS. REYNOLDS:  Objection, your Honor.
9        THE COURT:  Sustained.  You may
10 rephrase.
11   Q.   Did you understand the police on that date
12 to be asking you a lot of questions about D?
13   A.   Yes.
14   Q.   Okay.  But on that date, November 11th when
15 you met with the police, you said nothing to them
16 about D having been in your apartment with three or
17 four other men, did you?
18   A.   I don't remember.
19   Q.   Would reviewing a document be helpful in
20 refreshing your recollection about whether you told
21 the police on that date anything about D having been
22 in your apartment with three or four other men?
23   A.   It's been -- he was there with other men.
24 I don't recall what date or when, what time, how
25 it -- I can't remember that far.
```

1716

```
1    Q.   Okay.  And is it fair to say then that you
2  don't remember whether you told the police on
3  November 11th of 2005 anything about what you now
4  recall as D having been in the apartment?
5    A.   That's fair to say, yes.
6    Q.   Do you think you might have told the police
7  on that date, November 11th, about that fact?
8    A.   I'm not sure exactly what did I say in that
9  time or whatever.  I just remember bits and pieces.
10   Q.   Okay.  Is it fair to say that your life at
11 Charles Street was pretty much a wreck?
12   A.   I don't recall that a life.
13   Q.   You don't recall it as a life?
14   A.   Yeah.
15   Q.   Now, on November 14, 2005, you were
16 initially brought into court, in federal court, were
17 you not?
18   A.   What was the date again?
19   Q.   November 14th?
20   A.   Of 2005?
21   Q.   Yep.
22   A.   Yes.
23   Q.   Okay.  And then from there you went right
24 to Crossroads, right?
25   A.   Yes.
```

**GA429**

1717

1    Q.   How long were you at Crossroads?
2    A.   Six months.
3    Q.   And that was where you started putting your
4    life back together?  Right?
5    A.   Correct.
6    Q.   And then when you were released from
7    Crossroads you got a job at Targets?
8    A.   Correct.
9    Q.   And then at some point in time you got a --
10   you were able to move to Florida where you live now,
11   right?
12   A.   Yes.
13   Q.   And first you got a job doing something
14   else in Florida, right?
15   A.   I was relocated to Target in Florida.
16   Q.   Okay.  And you've been in Florida ever
17   since, right?
18   A.   Correct.
19   Q.   The first time that you met with the
20   federal agents after you were released -- well, did
21   you ever meet with any federal law enforcement while
22   you were at Crossroads?
23   A.   I'm not sure.  I think so.  I'm not sure.
24   Q.   Okay.  You met with federal agents in
25   February of 2010, did you not?

1718

1    A.   February of 2010?
2    Q.   A little bit more than a year ago?
3    A.   Yes.
4    Q.   Okay.  Was that the first time that you met
5    with the federal agents with your lawyer with you?
6    A.   I think so.  Yes.
7    Q.   And isn't it a fact that the first time
8    that you said anything to the federal agents about
9    remembering that D had been in your apartment with
10   two unknown males was at that February 2010 meeting?
11   A.   Yes.
12   Q.   Okay.  And in those five -- in those four
13   and a half years, you had never mentioned that to
14   the agents, had you?
15   A.   I'm not sure if I did or if I didn't.
16   Q.   To your knowledge Rafael was not arrested,
17   was he?
18   A.   No, he wasn't.
19   Q.   And you and Rafael were sharing the
20   apartment together, were you not?
21   A.   Correct.
22   Q.   And did the police ever make any promises
23   to you about Rafael?
24   A.   No.
25   Q.   Did the police ever tell you that Rafael

1719

1    gave statements to the police?
2    A.   I know they questioned him.
3    Q.   Did the police tell you that?
4    A.   He told me that.
5    Q.   Okay.  And were you ever told that Rafael
6    had been called before a grand jury?
7    A.   He also told me that.
8    Q.   Did you ever talk to Rafael about what had
9    happened -- what he was questioned about?
10   A.   I don't remember.
11   Q.   And did Rafael ever talk to you, tell you
12   what they asked him?
13   A.   I mean, we talked about things, but I don't
14   remember exactly, you know.
15   Q.   Is it fair to say that your memories of
16   what were happening in your life in August of 2005
17   are very, very cloudy?
18   A.   Yes.
19         MR. SHEEHAN:  I have no further
20   questions of Ms. Rivera.
21         THE COURT:  Redirect.
22   REDIRECT EXAMINATION
23   BY MS. REYNOLDS:
24   Q.   Good morning, Ms. Rivera.  I wanted to --
25   A.   Good morning.

1720

1    Q.   -- ask you a few questions.  You were just
2    asked about some meetings that you've had with law
3    enforcement agents and with police officers, and I
4    just wanted to go back to some of that that counsel
5    has been asking you about.  In those meetings, did
6    you give information about other people in addition
7    to the defendant?  Did you talk about other people
8    who were selling drugs at Charles Street?
9    A.   Correct.
10   Q.   Who else did you talk about?  Who were some
11   of the people that you told the agents about in
12   addition to the defendant?
13         MR. SHEEHAN:  Objection.  It's outside
14   the scope of the cross.
15         THE COURT:  Overruled.  There was
16   discussion about what she talked to the agents about
17   and whether she talked to them about the defendant.
18   I think this is proper redirect.
19   Q.   Do you remember some of the other people
20   that you gave information to the agents about with
21   regard to Charles Street and what was going on
22   there?
23   A.   Yes.
24   Q.   Who were some of the other people that you
25   told the agents about?

1721

```
 1      A.    Frankie, Vanessa, Big Man, Zee, the people
 2   in the pictures that I don't recollect their name.
 3      Q.    And you mentioned they showed you a lot of
 4   pictures?
 5      A.    Yes.
 6      Q.    All right.  And, Ms. Rivera, you were asked
 7   last week by Mr. Sheehan on Friday about your rent
 8   and being evicted, and you were asked several
 9   questions about what happened at the end when you
10   were evicted from the Charles Street apartment.  Do
11   you remember those questions?
12      A.    Yes.
13      Q.    Do you remember how much your rent was at
14   the Charles Street apartments?
15             MR. SHEEHAN:  Objection, outside the
16   scope of the cross.
17             MS. REYNOLDS:  Your Honor, he asked
18   several questions about being evicted, paying rent,
19   you didn't pay your rent.
20             THE COURT:  I think it's a fair
21   extension of that.  Go ahead.
22             Do you remember what your rent was.
23      A.    Six hundred.
24      Q.    Six hundred dollars a month?
25      A.    Yes.
```

1722

```
 1      Q.    And whose name was on the lease?
 2      A.    My name.
 3      Q.    And did you pay the $600 a month?
 4      A.    No.
 5      Q.    All right.  And what was your understanding
 6   after you had those meetings with the defendant and
 7   Big Man and the others who was going to pay the
 8   rent?
 9             MR. SHEEHAN:  Objection.  That's outside
10   the scope of the cross.  I never inquired into any
11   meetings, your Honor.
12      Q.    Well, what was your understanding of who
13   was going to cover your rent after they started
14   using your apartment as the lookout apartment?
15             MR. SHEEHAN:  Objection, beyond the
16   scope of the cross.
17             THE COURT:  I'll sustain the objection.
18      Q.    Did anyone else pay your rent?
19             MR. SHEEHAN:  Objection, outside the
20   scope of the cross.
21             THE COURT:  Overruled.
22      Q.    Did anyone else pay your rent, Ms. Rivera?
23      A.    No.
24      Q.    And you were in fact evicted from that
25   apartment?
```

1723

```
 1      A.    Yes.
 2      Q.    Now, in that time period -- well, you were
 3   asked a lot of questions about your arrest, your
 4   federal arrest, do you remember, the November 2005
 5   arrest?
 6      A.    Correct.
 7      Q.    And you came in and you started giving
 8   statements to the officers and to the agents at that
 9   time, correct?
10             MR. SHEEHAN:  Objection, leading.
11             THE COURT:  Sustained.
12             MS. REYNOLDS:  I'm just getting back to
13   that line of questioning, your Honor.  But I will
14   rephrase.
15      Q.    Did you provide anything when you were
16   arrested to the agents?  Do you remember if they
17   recovered anything from you?
18             MR. SHEEHAN:  I'm going to object.
19   That's outside the scope of the cross.
20      A.    Yes.
21             THE COURT:  I'm sorry?
22             MR. SHEEHAN:  I'm sorry, that's outside
23   the scope of the cross.
24             THE COURT:  Overruled.  The subject of
25   what happened when she was arrested and her
```

1724

```
 1   interactions with agents was part of -- within the
 2   scope of cross.
 3      Q.    So, you did provide some things to the
 4   agents?  After you were arrested you turned over
 5   some items?
 6      A.    Yes.
 7      Q.    Do you remember what you turned over?
 8      A.    A phone.
 9      Q.    A phone?
10      A.    Yes.
11      Q.    Was that a cell phone?
12      A.    A cell phone.
13             MR. SHEEHAN:  Objection, leading.
14             THE COURT:  Sustained.  Don't lead,
15   please.
16             MS. REYNOLDS:  Yes, your Honor.
17      Q.    What phone did you turn over to the agents?
18      A.    It was the cell phone that I had borrowed.
19      Q.    And who had you borrowed that cell phone
20   from?
21             MR. SHEEHAN:  Objection, outside the
22   scope of the cross.
23             THE COURT:  Overruled for the same
24   reason.
25      A.    From Zee.
```

**GA431**

1725

```
1    Q.   And where had you seen that cell phone
2    before?
3    A.   In the windowsill.
4    Q.   And do you remember if you gave the agents
5    anything else at the time of your federal arrest,
6    provided them with anything else?
7    A.   I'm not sure.
8    Q.   Ms. Rivera, did you -- when you were living
9    at Charles Street that summer of 2005, did you keep
10   a calendar, a datebook?
11           MR. SHEEHAN:  Objection, outside the
12   scope of the cross.
13           THE COURT:  What are you claiming this
14   relates to on cross?
15           MS. REYNOLDS:  Remembering dates, your
16   Honor.
17           THE COURT:  All right, sustained -- I
18   mean, overruled.
19   Q.   Did you have a datebook or a calendar?
20   A.   A little notebook.
21   Q.   A little notebook.  Did you write down all
22   of your appointments with people in that notebook?
23   A.   I write numbers.
24   Q.   Phone numbers?
25   A.   Yes.
```

1726

```
1            MR. SHEEHAN:  Objection, leading.
2    Q.   Well, what type of numbers did you write?
3            THE COURT:  Wait, let's take care of the
4    objection.  I'm going to sustain the objection.
5            What sort of numbers did you write in
6    your notebook.
7    A.   People's numbers, phone numbers.
8    Q.   Did you write down or have any other
9    calendars or notebooks where you put down
10   appointments that you kept throughout that summer of
11   2005?
12           MR. SHEEHAN:  Objection, outside the
13   scope of the cross.
14   A.   I don't remember.
15           THE COURT:  It has to do with her
16   ability to remember.  I'm going to overrule your
17   objection.
18   Q.   Did you, when you would meet with somebody,
19   go back and write in your notebook that you just met
20   with that person?
21           MR. SHEEHAN:  Objection, leading.
22           THE COURT:  Sustained.
23   Q.   Let me just ask you one more question about
24   this.  Do you know if you kept a notebook where you
25   wrote down all your appointments throughout the
```

1727

```
1    summer of 2005?
2            MR. SHEEHAN:  Objection, leading.
3            MS. REYNOLDS:  That's yes or no.
4            THE COURT:  Overruled.
5    A.   I remember a little notebook that I wrote,
6    yeah, things, numbers.  Not exactly what I wrote
7    there, but yes.
8    Q.   Did you -- okay.  Other than phone numbers,
9    do you remember writing anything else down in those
10   notebooks?
11   A.   That I can remember.  I'm not sure.
12   Q.   In the cell phone that you borrowed, did it
13   have a calendar in it that you could write down your
14   appointments or plug in your appointments into the
15   cell phone?  Did you do that?
16           MR. SHEEHAN:  Objection, leading.
17           MS. REYNOLDS:  It's not leading, your
18   Honor.  It's yes or no.  It's not suggesting the
19   answer.
20           THE COURT:  I'm going to overrule the
21   objection.
22   Q.   Do you remember in the cell phone writing
23   down appointments?
24   A.   I just took the phone for one call, only
25   for one purpose, to call my son, and the phone died.
```

1728

```
1    It didn't have no minutes.  I didn't have no
2    charger.  I didn't really know much about phones,
3    cell phones at that time.
4    Q.   And, again, drawing your attention to
5    September of 2006, it was in that month that you
6    pled guilty to maintaining a drug involved premises,
7    a federal felony offense.  Do you remember that?
8    A.   Yes.
9    Q.   And it was at that same time that you
10   signed a cooperation agreement.  Do you remember
11   that?
12   A.   Correct.
13   Q.   And what do you know happens as a result --
14   well, let me ask you this:  What do you have to do
15   with regard to those two agreements?  What's your
16   understanding of what you have to do to abide by
17   those plea and the cooperation agreements?
18           MR. SHEEHAN:  Objection, outside the
19   scope of the cross.
20           THE COURT:  Sustained.
21           MS. REYNOLDS:  Your Honor, there was
22   extensive questioning about her -- that's fine.
23           I think you explained it before.  Thank
24   you, Ms. Rivera.
25           There is nothing further.
```

1729

1    MR. SHEEHAN:  Your Honor, I would ask
2    that counsel's remarks be stricken.
3         THE COURT:  They may be.
4         Do you have any further
5    cross-examination?
6         MR. SHEEHAN:  No, I do not, your Honor.
7         THE COURT:  All right, Ms. Rivera, you
8    are excused.  You may step down.  You may go.  Thank
9    you.
10        THE WITNESS:  Thank you, your Honor.
11        THE COURT:  Will the government please
12   call its next witness.
13        MS. RODRIGUEZ-COSS:  Your Honor,
14   government calls Dr. Frank Evangelista.
15        THE COURT:  Yes, sir, would you please
16   take the stand and remain standing.
17        F R A N K   E V A N G E L I S T A
18   Having first affirmed, was examined and testified as
19   follows:
20        THE WITNESS:  My name is Frank E.
21   Evangelista, e-v-a-n-g-e-l-i-s-t-a, and I live in
22   North Granby, Connecticut.
23        THE COURT:  All right, you may proceed,
24   Ms. Rodriguez.
25        MS. RODRIGUEZ-COSS:  Thank you, your

1730

1    Honor.
2    DIRECT EXAMINATION
3    BY MS. RODRIGUEZ-COSS:
4    Q.   Doctor, if you can, pull that microphone a
5    little bit closer to you.  There you go.  So we can
6    hear you clearly now.
7         Can you tell us how you are currently
8    employed.
9    A.   Right now I'm a medical examiner, state
10   medical examiner for the State of Connecticut,
11   Farmington, Connecticut.
12   Q.   And how long have you been employed in that
13   capacity?
14   A.   Well, here in Connecticut I've been
15   employed since October 2004.
16   Q.   Okay.  Can you tell the members of the jury
17   what is a medical examiner.  What's the nature of
18   your duties?
19   A.   Well, our duties, or my duties, is to
20   perform autopsies and examinations to determine
21   cause and manner of death for deaths that occur
22   outside of a doctor's presence.
23   Q.   And is that the same thing as otherwise
24   referred to as forensic pathologist?
25   A.   Yes.

1731

1    Q.   All right.  And prior to being employed for
2    the State of Connecticut, where were you employed?
3    A.   I worked for the headquarter's office of
4    the chief medical examiner for the Commonwealth of
5    Massachusetts.  The office was in Boston.
6    Q.   And can you tell us how long you were
7    employed for the Commonwealth of Massachusetts in
8    that capacity?
9    A.   From July 2001 until September 2004.
10   Q.   And was it in 2004 that you joined the
11   medical examiner's office at the State of
12   Connecticut?
13   A.   Yeah, switching from September, and
14   starting October here in Connecticut.
15   Q.   And have you been employed for the State of
16   Connecticut ever since?
17   A.   Yes, I have.
18   Q.   Can you tell us, Doctor, where you received
19   your training, where you conducted your studies?
20   A.   I got my Bachelor's degree in biology at
21   Boston College from 1987 to 1991.  I then did four
22   years of medical school at Georgetown University in
23   Washington D.C. from '96 to -- no, from 90 -- sorry,
24   '92 to '96.  Then I did a five-year combined
25   anatomic and clinical pathology residency at the

1732

1    Beth Israel Deaconess Hospital in Boston.  Then I
2    stayed in Boston for one year and did a forensic
3    fellowship, which was sponsored by the Beth Israel
4    Hospital, and I got my board certification in
5    anatomic, clinical and forensic pathology.
6    Q.   And was it after that that you went to work
7    for the Commonwealth of Massachusetts?
8    A.   Yes.
9    Q.   And during the course of your career,
10   Doctor, approximately how many autopsies have you
11   conducted?
12   A.   Somewhere between 4,000, 5,000.  Around
13   that.
14   Q.   And with the State of Connecticut in
15   particular, how many autopsies do you conduct a
16   year, approximately?
17   A.   About 450 a year about.  So, times seven
18   years.
19   Q.   And have you testified previously as an
20   expert medical examiner in court?
21   A.   Yes, I have.
22   Q.   And approximately how many times?
23   A.   Probably a hundred, a little more.  It's
24   hard to remember.  A lot.
25   Q.   And has that been in state court only or

1733

```
1    have you also been qualified as an expert in federal
2    court?
3         A.   Just state court.
4         Q.   All right.
5         A.   Only state court.
6         Q.   In different counties in Connecticut?
7         A.   Yes.
8              MS. RODRIGUEZ-COSS:  Your Honor, at this
9    time we would move Dr. Evangelista, to be qualified
10   as an expert medical examiner in forensic pathology.
11             THE COURT:  Any questions, Mr. Smith?
12             MR. SMITH:  No.  No objection, your
13   Honor.
14             THE COURT:  All right, and I earlier
15   described what it means to be an expert witness.
16   They're entitled to give their opinion in the hopes
17   that that will be useful to you in your duty to find
18   the facts.
19             All right, you may proceed.
20             MS. RODRIGUEZ-COSS:  Thank you, your
21   Honor.
22        Q.   Doctor, can you tell us how cases are
23   assigned at the chief medical examiner's office.
24        A.   Assigned to the doctors or to the state?
25        Q.   To the -- well, both.  Thank you.
```

1734

```
1         A.   Well, a death is called in by the police or
2    hospitals, or whoever, and the information is taken
3    by our office, and it's run by -- or presented to
4    one of the doctors, and the body is either brought
5    in or released to their own doctor or to a funeral
6    home.  Once the bodies are actually accepted to come
7    into our office, they are assigned sort of by order.
8    Whoever has done the most cases the day of -- like
9    in the morning, the person with the most cases is
10   last on the list to be assigned cases.  So, they try
11   to keep it even.
12        Q.   All right.  Now, I want to bring your
13   attention to what has been marked Government
14   Exhibit 322.  And can you tell me, Dr. Evangelista,
15   whether you recognize that document?
16        A.   Yes, I do.
17        Q.   How is it you recognize that document?
18        A.   This is -- well, it's a copy of the report
19   from our Office of the Chief Medical Examiner for
20   this autopsy.
21        Q.   And specifically with regards to
22   Exhibit 322, who prepared this particular report?
23        A.   Well, three pages into this document, page
24   1 through 6, the autopsy report that I prepared, and
25   I signed the first page.  The second two pages in
```

1735

```
1    this thing, 2 and 3, were by someone else.
2         Q.   But does that document comprise normally
3    what is kept during the regular course of business
4    at the medical examiner's office as your autopsy
5    report?
6         A.   Yes, it does.
7              MS. RODRIGUEZ-COSS:  We would submit
8    Government's Exhibit 322, your Honor.
9              MR. SMITH:  No objection.
10             THE COURT:  Full exhibit.
11        Q.   All right.  Now, Doctor, can you tell us,
12   this particular autopsy report, who does it pertain
13   to?  Who was the subject?
14        A.   The decedent?
15        Q.   The deceased, yes.
16        A.   Tina D. Johnson.
17        Q.   And when did you conduct this autopsy?
18        A.   It was August 25th, year 2005.
19        Q.   And how, if in any way, is this particular
20   autopsy identified within your office?
21        A.   Well, it's assigned its own case number.
22   Assigned by our office.
23        Q.   What is the case number for Tina Johnson?
24        A.   This one here is 2005-10596.
25        Q.   And how is that number relevant?  What do
```

1736

```
1    you use that number for, Doctor?
2         A.   Documentation of the case.
3         Q.   And that would include what?
4         A.   Autopsy report.  Any other paperwork or
5    information for this person, it falls under this
6    number.  This is the case number.
7         Q.   And let me ask you, Doctor, prior to
8    beginning -- I'm sorry, you said that you -- when
9    did you conduct the autopsy?  I'm sorry, did I ask
10   you that?
11        A.   August 25th, the year 2005.
12        Q.   August 25th.  And according to your report,
13   when did the deceased pass away?
14        A.   Well, I don't have that in my report, so
15   the case -- this case information, I didn't prepare
16   that part.  So, I'd have to refer to other -- it's
17   not my 1 through 6 of the autopsy.
18        Q.   Where is that --
19        A.   The time is not included in my --
20        Q.   Where is that information included?
21        A.   It's in the case information.  Like we call
22   it the verbal, but it's not part of this here.  So I
23   would have to look at what the investigator wrote on
24   his.
25        Q.   Okay, would you do that for us.
```

1737

1    A.   I'm going to refer to my notes to do this
2  here.  According to the investigator's report, the
3  death was determined by the police, it says here
4  August 25th, year 2005, at 10:23.  I think that's
5  a.m.
6    Q.   Okay.  And that second page of Government
7  Exhibit 322 that you are looking at, can you tell us
8  what that is.
9    A.   This is a report that's prepared by an
10 investigator, one of our non-doctors who goes to the
11 scene to compile the evidence -- not the evidence,
12 the information regarding the death, and they put it
13 into a report.
14   Q.   And does it say that the death was reported
15 August 25th or August 24th?
16   A.   Here it says death reported date 8/24 2005.
17   Q.   8/24, okay.  I thought you had said 8/25.
18 So the death was reported on 8/24 2005.  And can you
19 determine from that particular document you are
20 looking at right now, again, the second page of
21 Exhibit 322, whether your investigator actually
22 responded to the scene?
23   A.   Yes, this is his report from his scene
24 investigation.
25   Q.   Okay.  And then what information do you

1738

1  receive, Doctor, before you actually begin to
2  conduct the autopsy?
3    A.   I receive sort of generalized information
4  regarding the death.
5    Q.   Okay.  And do you recall what that
6  information was in this particular case?
7    A.   No, I don't.
8    Q.   Let me bring to your attention what has
9  been marked Government Exhibit 323.  And do you
10 recognize that document?
11   A.   No, I do not.
12   Q.   Does your record or your file, would it
13 contain photographs of the deceased at the scene?
14   A.   Mine does not.
15   Q.   Yours do not?
16   A.   No.  My part of this investigation includes
17 just the autopsy report from when the body gets to
18 our office.  Anything about the scene, I didn't go
19 to, I didn't look at the pictures of the scene.
20 They don't -- I don't use them to do my autopsy
21 report.  I never do.
22   Q.   So, in this particular case you don't
23 remember examining any photographs from the scene
24 prior to conducting your autopsy?
25   A.   That is correct.

1739

1    Q.   Let me bring this back to your attention,
2  Doctor.  Are those photographs identified with the
3  autopsy number?
4    A.   It appears that they are, the top two.
5  05-10596 S1 and S2.
6    Q.   Would that indicate that they came from
7  your file?
8    A.   Or they were received and placed in our
9  file and put that number on to go along with the
10 case.  Just like everything else that pertains to
11 this woman, it gets this case number.  So, if these
12 photos came from police or someone else, I don't
13 know because I never saw these and it's not part of
14 my report.
15   Q.   So, let's go to your report, Doctor.  What
16 is the first thing that you do when you begin to
17 conduct the autopsy?
18   A.   I examine the body, how it came from the
19 scene, including photographs of the body with and
20 without clothing.  We do the same thing.  The body
21 is photographed with the case number that's assigned
22 clearly shown.  The body is photographed, both
23 sides, with the clothing on, then the clothing is
24 removed.  And then the body is weighed and measured,
25 rephotographed, then washed.  Then evidence is

1740

1  collected.  In this case, or in cases of homicides,
2  we collect evidence.  And then any sort of external
3  features of the body, we do an external exam first
4  after the other photos are done looking for hair
5  color, eye color, natural teeth, scars, tattoos, any
6  kind of, like, body features that go into a report.
7    Q.   And then do you then proceed to examine for
8  any signs of injuries or trauma?
9    A.   Yes, as part of the external examination.
10   Q.   And in this case can I bring your attention
11 to page 2 of your report where you describe the
12 trauma you found on the head of Tina Johnson.
13   A.   Yes, I'm there.
14   Q.   And can you tell the members of the jury
15 what your examination of the head of Tina Johnson
16 revealed.
17   A.   Well, this person had multiple features of
18 blunt trauma on her head with some internal injury
19 corresponding to this external injury.
20   Q.   Let me bring to your attention to what has
21 been marked Government Exhibit 315.  Do you
22 recognize that document?
23   A.   Yes, I do.
24   Q.   And is that one of the photographs taken in
25 the course of your autopsy?

1741

1    A.   Yes, it is.
2          MS. RODRIGUEZ-COSS:  Submitting
3    Government Exhibit 315, your Honor.
4          MR. SMITH:  No objection.
5          THE COURT:  Full exhibit.
6          MS. RODRIGUEZ-COS:  Publishing
7    Government Exhibit 315, your Honor.
8    Q.   Now, Doctor, can you walk us through the
9    injuries or lacerations that you identified on Tina
10   Johnson during the course of your autopsy.
11   A.   From this photograph here?
12   Q.   Yes.
13   A.   This -- actually the case number is on
14   there.  If you see, that's the case number right
15   there to say this goes along with this case.  We
16   call this the identification photograph where we put
17   the case number on the chest and we photograph the
18   face.  That's what we did in this case here.
19   Q.   You actually have a pointer right there and
20   you should feel free and stand up and use it if that
21   would assist you.
22   A.   Okay, so this is a photograph of this
23   person's face, sort of up close, with our case
24   05-10596, showing this sort of star-shape injury.
25   This is a laceration, which is a type of blunt force

1742

1    to the mid-forehead, mid, sort of left forehead,
2    with another laceration here.  I think this is an
3    abrasion or laceration here.  It's hard to see with
4    this picture.
5    Q.   Can you describe, are you saying -- when
6    you said "another laceration here," you are
7    referring to the right side -- well, actually the
8    left side of her nose?
9    A.   Her left, your right.
10   Q.   Right.
11   A.   Side of the photograph.  It's difficult.
12   So this is blunt trauma, laceration.  This sort of
13   blue color here, this is a contusion, or a bruise,
14   here under the left eye, with more injury on her
15   left eyelid, left eyebrow or left forehead here.
16   So, just in this one picture here we see multiple
17   features of blunt trauma to this person's face,
18   mainly on the left side.
19   Q.   And, Doctor, were you able to determine
20   whether this laceration that we see here resulted in
21   any sort of fracture to the skull?
22   A.   Well, there were multiple fractures in the
23   skull.  You can't say which impact site caused the
24   fracture because it's a solid thing where this could
25   -- the force could go through and fracture the

1743

1    skull.  I just don't know if this one by itself
2    caused a fracture.  I don't know, but it may have.
3    Q.   Okay.
4    A.   There are fractures in the skull on the
5    left side.
6    Q.   We'll go over those fractures in a bit.
7    Let me ask you this:  This lacerations that we see
8    here and on the left eye of the victim, could those
9    lacerations have been caused, in your opinion,
10   Doctor, by a fist?
11   A.   Some could have, but I don't believe this
12   one did.
13         MS. RODRIGUEZ-COSS:  For the record, the
14   Doctor's pointing to the star-shaped laceration in
15   the middle of the forehead, your Honor.
16   Q.   Why not, Doctor?
17   A.   Well, it's very large and it has features
18   of like a star shape where it's more of -- it's
19   spreading.  I think that a fist, if it hit the face,
20   it may cause a black eye, but I don't think that --
21   in my opinion it wouldn't -- I may be wrong, but I
22   don't think that it will cause a laceration as big
23   as that with a fist.
24   Q.   And you used the term -- go ahead.
25   A.   Unless it was like brass knuckles or

1744

1    something on the fist that could do that.
2    Q.   All right.
3    A.   My opinion.
4    Q.   And you said that -- you used the term
5    "blunt force trauma."  Can you tell us what you mean
6    by that.
7    A.   Blunt force trauma is just a description of
8    basically three injuries, or three types of
9    injuries:  Abrasions or scraps; lacerations like
10   this; or tears or crushing or ripping of the skin.
11   So, we got abrasions, lacerations, and the blue is
12   contusions or bruises.  That's blunt trauma;
13   abrasions, lacerations, contusions.  And she has
14   each of those on her face.
15   Q.   On her face.  And what else were you able
16   to -- you can have a seat.  What else -- or what
17   other signs of injury did you find upon examining
18   the face of Ms. Johnson?
19   A.   Just the face, or the head?
20   Q.   Well, the head -- well, let me direct you
21   to her mouth.  Did you find any other sign of
22   injury?
23   A.   Yeah, if you lifted up -- we have pictures
24   of the lip lifted up.  There was a bruise or
25   contusion, blunt trauma, inside the mouth.  The

1745

```
1    upper lip, it's a blue contusion inside the mouth.
2        Q.   Doctor, let me bring to your attention what
3    has been marked Government Exhibit 325, and ask you
4    whether you recognize that document.
5        A.   Yes, I do.
6        Q.   And is that, again, another of the
7    photographs taken during your autopsy?
8        A.   Yes, it is.
9        Q.   And is it identified with the autopsy
10   number corresponding to Ms. Tina Johnson?
11       A.   That is correct, yes.
12            MS. RODRIGUEZ-COSS:  Submitting, your
13   Honor, Government 325.
14            THE COURT:  All right, hearing no
15   objection.
16            MR. SMITH:  No.  I'm sorry, your Honor,
17   no objection.
18            THE COURT:  It's a full exhibit.
19       Q.   Bringing to your attention, Doctor, what
20   has been marked Government Exhibit 325.  Can you
21   tell us what we're looking at here?
22       A.   This is a photograph with the case number.
23   Inside of the mouth, these are the teeth here.  This
24   is the upper jaw with the lip pulled up showing this
25   red-blue discoloration.  This is a contusion.  It's
```

1746

```
1    blunt trauma to the mouth.
2        Q.   When you say "blunt trauma to the mouth,"
3    something hit Ms. Johnson in that area; is that
4    correct?
5        A.   Yeah, either something hit the body or the
6    body hit something firm or something firm hit the
7    body.
8        Q.   All right, bringing your attention to what
9    has been marked Government Exhibit 324, can you tell
10   us if you recognize that document.
11       A.   Yes, I do.
12       Q.   And, again, is that another one of the
13   autopsy photographs taken during the course of the
14   autopsy of Ms. Tina Johnson?
15       A.   Yes, it is.
16       Q.   Is it identified with the appropriate
17   number?
18       A.   With our case number, yes.
19            MS. RODRIGUEZ-COSS:  Submitting, your
20   Honor, Government Exhibit 324.
21            MR. SMITH:  No objection.
22            THE COURT:  Full exhibit.
23       Q.   Bringing your attention, Doctor, to what we
24   have now marked Government Exhibit 324.  Can you
25   tell us what we're looking at here.
```

1747

```
1        A.   Okay, this is another photograph of this
2    person's face.  The hands here are opening up the
3    eyes to show what the eyes looked like here.  And
4    again, with the same laceration in the forehead we
5    looked at before.  Over here you can see the left
6    eye, it's all bleeding and bloody in there.  That's
7    injury to the left eyeball itself there.  But on the
8    right, we still sort of see some of the white of the
9    eye here.  But this photograph is to show the little
10   dots of mucosa or the lining of the eyelid on the
11   right side.  These are petechia hemorrhages.
12   They're small little pinpoint, dot-like hemorrhages
13   of the mucosa of the eye on the right.  They may be
14   there on the left eye, too, but it's so bloody they
15   may be masked or covered up by the bleeding from the
16   blunt trauma that occurred to that eye.  But we can
17   definitely see them here.  It's kind of tough for
18   you guys in this sort of picture, but they're there,
19   the little dots.
20            THE COURT:  I'm sorry, I did not lower
21   the lights.  Does that make it any better?
22            MS. RODRIGUEZ-COSS:  Actually, it does
23   make it somewhat better.
24       Q.   And these petechia that you have described
25   as tiny pink dots that are visible on the right eye
```

1748

```
1    of Ms. Johnson, what can cause these dots to appear?
2        A.   Well, it's sort of -- some sort of
3    compression to the neck or to the -- there is
4    pressure coming up into the head.
5        Q.   So, if the victim had been gagged, could
6    that be a result of the victim having been gagged?
7        A.   Yes, if they are coughing or creating
8    pressure inside their head, these little hemorrhages
9    can occur just by the pressure and the flow of
10   blood.
11       Q.   Now, Doctor, bringing your attention to
12   what has been marked Government Exhibit 316, can you
13   tell me if you recognize that document.
14       A.   Yes, I do.
15       Q.   And, again, is that another one of the
16   photographs taken during the course of the autopsy
17   of Ms. Tina Johnson?
18       A.   Yes, it is.
19            MS. RODRIGUEZ-COSS:  Submitting 316,
20   your Honor.
21            MR. SMITH:  No objection.
22            THE COURT:  Full exhibit.
23       Q.   Doctor, bringing your attention to what has
24   now been marked Government Exhibit 316.  Can you
25   tell us what we're looking at here.
```

**GA437**

1749

```
1    A.   Okay, this is a photograph of the backside,
2  the back left side of her head.  This is the back of
3  the left ear here with the case number.  And it's
4  kind of -- this is hair, this dark spot, and we've
5  shaved the hair away to demonstrate these injuries
6  to the back of the left side of the head.  So,
7  again, this is the back of the head, the left ear
8  pulled forward, showing these multiple lacerations.
9  One here, this is two, three.  It's hard to see
10  because it's kind of dark.
11      MS. RODRIGUEZ-COSS:  Can we darken the
12  lights any further?
13      A.   These are lacerations.
14      Q.   So, again, Doctor we're looking at the left
15  side of the victim's head; is that correct?
16      A.   Backside.  Left backside of the head, yeah.
17      Q.   And we see at least three separate
18  lacerations; is that right?
19      A.   Yes.
20      Q.   One, two, and then three?
21      A.   That is correct.
22      Q.   All right.  And, Doctor, let me ask you,
23  from examining the wounds on the surface of the
24  victim's head, can you determine with what kind of
25  force the victim was hit or struck?
```

1750

```
1        MR. SMITH:  Objection.
2        MS. RODRIGUEZ-COSS:  Can you determine,
3  your Honor?
4        THE COURT:  Basis?  Let's hear whether
5  he can.
6        MR. SMITH:  Well, if he can, I'll wait
7  for the next question.
8        THE COURT:  Can you make that
9  determination of what kind of force the victim was
10  hit or struck with to make those wounds that are
11  seen on the photograph?
12        THE WITNESS:  Well, I really don't
13  understand the question because --
14      Q.   How hard?
15      A.   Oh, no, I can't say that.  Enough to do
16  this.
17      Q.   All right.
18      A.   But I can't give like a number or like
19  extreme --
20      Q.   Right.  So, is it your opinion, then, you
21  can't say to 100 percent of certainty how hard she
22  was struck, but hard enough to cause the wounds?
23        MR. SMITH:  Objection, leading.
24        THE COURT:  Sustained.
25        MS. RODRIGUEZ-COSS:  He's an expert,
```

1751

```
1  your Honor.
2        THE COURT:  Sustained.  That doesn't
3  mean you can lead him.
4        MS. RODRIGUEZ-COSS:  I would submit to
5  the Court it's impossible to lead him.  He's an
6  expert.
7        MR. SMITH:  I would object.
8        THE COURT:  Would you like to argue
9  about this some more or would you like to ask your
10  next question.
11        MS. RODRIGUEZ-COSS:  I'm going to ask my
12  next question, your Honor.  I apologize.
13      Q.   Doctor, if the victim fell on the floor,
14  would she sustain these kind of injuries?
15      A.   Well, how far of a fall?
16      Q.   Very well.  Point very well taken.  Thank
17  you, Doctor.
18        All right, let me bring your attention
19  to what has been marked --
20        MS. RODRIGUEZ-COSS:  The Court's
21  indulgence, your Honor.
22      Q.   Government's Exhibit 318.  Do you recognize
23  that document, Doctor?
24      A.   Yes, I do.
25      Q.   And, again, is that one of the photographs
```

1752

```
1  taken during Ms. Johnson's autopsy?
2      A.   Yes, it is.
3      Q.   All right.
4        MS. RODRIGUEZ-COSS:  Submitting
5  Government Exhibit 318.
6        MR. SMITH:  No objection.
7        THE COURT:  Full exhibit.
8      Q.   Showing you, Doctor, what has now been
9  marked Government Exhibit 318, can you tell us what
10  we're looking at here.
11      A.   Okay, so this is a photograph of the
12  posterior, the back -- sort of the mid-back of the
13  head here with the hair again shaved.  Here is the
14  hair, shaved skin showing two separate lacerations.
15  This is the back of the neck, or upper back, here.
16  This person is pronated, face down in the
17  photograph, to demonstrate the injuries to the back
18  of the head.
19      Q.   All right.  Now, Doctor, you've described
20  these two lacerations here.  Correct?  And you
21  described two previous lacerations visible here.
22  And you've described additional lacerations visible
23  on the face of the victim.  My question to you is,
24  Doctor, approximately how many times was this victim
25  struck?
```

1753

```
1    A.   Well, if each one of these lacerations that
2    I counted occurred by themselves from one strike, or
3    one episode of blunt force trauma, I counted about
4    nine, nine separate lacerations.  These back here
5    seem to be the one -- the ones in the back of the
6    head and the left side of the head, back of the
7    head, seem to be separate.  So, we have three, four,
8    five, and the front -- the mid-forehead and eye
9    could be the same, that could be six.  The nose
10   seven, the mouth eight.  It's hard to say exactly
11   how many.  It was more than one, and it was multiple
12   blunt force trauma to the head, including the front
13   of the face and the back of the head.
14        And in terms of the amount of force,
15   again looking at the laceration itself doesn't kind
16   of give me any estimate or judgment of how much
17   force was used, but inside the skull the bone is
18   fractured in multiple locations underlying these
19   lacerations on the left side of the head and the
20   back of the head, and that doesn't happen with just
21   a glancing blow.  This is significant force to cause
22   the skull to fracture in the way that it did.
23    Q.   And you indicated before that you
24   determined there were three fractures on the skull
25   of Ms. Johnson's skull; is that correct?
```

1754

```
1    A.   Yes.
2    Q.   Let me bring your attention to what has
3    been marked Government Exhibit 326, and ask you if
4    you recognize that document.
5    A.   Yes, I do.
6    Q.   And, again, is that one of the documents --
7    or one of the photographs taken during the autopsy
8    of Ms. Tina Johnson?
9    A.   Yes, it is.
10        MS. RODRIGUEZ-COSS:  Submitting, your
11   Honor, Government Exhibit 326.
12        MR. SMITH:  No objection.
13        THE COURT:  Full exhibit.
14    Q.   Doctor, showing you Government Exhibit 326,
15   can you tell us what we're looking at here.
16    A.   Okay, so this is now a photograph of the
17   skull, like the inside of the skull, looking down.
18   If the top part of the skull is taken off and the
19   brain is removed, this is the base of the skull, or
20   the bottom part where the brain kind of sits.  And
21   this is the left shoulder.  So, here is the left
22   side of the body, the right side of the body, the
23   back is over here, the front is up there.  So, the
24   face is up here.
25        And these dark lines here, this is --
```

1755

```
1    this is a fracture.  We have normal bone, normal
2    bone, but looking at this big sort of fracture, or
3    black line here that extends up to here and is down
4    over here, is another fracture around here.  And
5    then that's all I can really see in this picture
6    here.  This one, this one, and these over here.
7    These are multiple skull fractures on the left base
8    of the skull.
9    Q.   And you indicated before during the course
10   of your testimony that blunt force trauma means
11   being hit by something solid; is that correct?
12    A.   Sort of, yes.
13    Q.   Well, you tell us, please.  What does it
14   mean?
15    A.   Blunt force trauma, again, is either the
16   body is struck by something firm or the body strikes
17   something firm.  Like there is no diagnostic injury
18   to say that this would be either from being struck
19   or from the body striking something firm.
20    Q.   And can you determine from examining the
21   injuries and the fractures on the skull of Tina
22   Johnson what sort of object might have been used to
23   inflict these injuries?
24    A.   I cannot.
25    Q.   You cannot.  Why not, Doctor?
```

1756

```
1    A.   Because there is no characteristic injury
2    to explain one type of weapon.  One weapon can cause
3    a whole variety of wounds, or multiple weapons can
4    cause -- make the same wound or the same shape of
5    the wound.  It could be caused -- one weapon can
6    cause multiple different injuries or multiple
7    weapons can cause the same injury.  There is no way
8    that I can say what instrument was used or weapon to
9    cause these injuries.
10    Q.   All right.  Could it have been a bat?
11    A.   It may have been.
12    Q.   All right.
13    A.   I mean, it could have been, yes.  Sorry.
14    Q.   Now, let me bring your attention to --
15   well, let me ask you this:  Aside from the victim's
16   head, did you locate any other fractures on her
17   body?
18    A.   Well, the other injury, excluding the head,
19   was there was a broken wrist on the left side.
20    Q.   Bringing your attention to what has been
21   marked Government Exhibit 317, Doctor, and ask you
22   if you recognize that document.
23    A.   Yes, I do.
24    Q.   And is that, again, a photograph taken
25   during the course of your autopsy of Ms. Tina
```

**GA439**

1757

```
1   Johnson?
2        A.   Yes, it is.
3             MS. RODRIGUEZ-COSS:  Submitting
4   Government Exhibit 317, your Honor.
5             MR. SMITH:  No objection.
6             THE COURT:  Full exhibit.
7        Q.   Doctor, bringing your attention to what has
8   been marked Government Exhibit 317, can you tell us
9   what we're looking at here.
10       A.   This is a photograph of the backside of
11  this person's left hand.
12       Q.   And --
13       A.   With the case number at the bottom.
14       Q.   And how did you determine that she had a
15  broken left wrist?
16       A.   When you moved -- when you palpate it,
17  actually it makes a crunching sound inside, and it
18  kind of moves freely.  And so it's a fractured
19  wrist.  It doesn't really show in this picture
20  because it's a static picture of just the hand, but
21  inside the hand, when you move it, it cracks.
22       Q.   Okay.
23       A.   It was documented as a fractured wrist.
24       Q.   And these marks that we see here, do you
25  know what they are indicative of, if anything?
```

1758

```
1        A.   Those are lines.  Probably lividity of the
2   hand.  If you pull your hand back, you'll see
3   everyone makes those same lines.  It's probably just
4   from the hand being pushed back for some time, it is
5   making a line like that.  I think it's just
6   lividity.
7        Q.   Doctor, if the victim's hand had been tied
8   with duct tape, could those marks also be indicative
9   of that?
10       A.   Yeah.  Again, lividity, just the position
11  of the hand or pressure on the hand.  It's just
12  marks of lividity.
13       Q.   And you don't actually go into the specific
14  part of the body to confirm or photograph the
15  fracture.  Why not?
16       A.   Because it was a palpable fracture and it
17  wasn't -- I never do that.
18       Q.   All right.  Is that because it doesn't
19  affect the cause of death?
20       A.   That is correct.
21       Q.   All right.  Did you observe any defensive
22  wounds on the body of Ms. Johnson?
23       A.   Well, defensive wounds meaning injuries to
24  the hands?  That photograph was taken to show that
25  the backside of the hand, there is no abrasions or
```

1759

```
1   cuts or lacerations.  It's kind of a photograph just
2   to show the hands.  I do it in almost all of my
3   cases.  So, there weren't any -- besides the broken
4   wrist, which if you want to consider that to be a
5   defense wound, it may be, but there was no other
6   lacerations or blunt trauma, abrasions, bruises to
7   the hands.
8        Q.   All right.  And were there any other
9   lacerations, contusions, bruises to the rest of
10  Ms. Johnson's body?
11       A.   Not that I -- no, there were not.
12       Q.   Now, Doctor, is it part of your process of
13  conducting an autopsy to request a toxicology
14  report?
15       A.   Yes, it is.
16       Q.   And in this particular case, what, if
17  anything, did the toxicology report indicate?
18       A.   There was a detectable level of cocaine in
19  the blood.
20       Q.   And again, Doctor, does that information
21  affect your conclusion as to the cause of death?
22       A.   No, it does not.
23       Q.   And bringing your attention again, Doctor,
24  to your report, Government Exhibit 322, you indicate
25  that the cause of death is blunt force trauma.  And
```

1760

```
1   then you indicate that the manner of death is
2   homicide.  Can you explain what you mean by the term
3   "homicide" when you list it as the manner of death?
4        A.   Well, just by definition a person's life is
5   taken by another person.
6        Q.   So, in your opinion Ms. Johnson did not
7   cause these injuries to herself?
8        A.   That's correct.
9        Q.   All right.
10            MS. RODRIGUEZ-COSS:  The Court's
11  indulgence, your Honor.
12            We don't have any further questions for
13  Dr. Evangelista.
14            Thank you, Doctor.
15            THE COURT:  Shall we take a recess
16  before you begin cross-examination, Mr. Smith?
17            MR. SMITH:  That will be fine, your
18  Honor.
19            THE COURT:  We'll take a 15-minute
20  recess.
21            (Jury exited the courtroom.)
22            THE COURT:  All right, will there be
23  anything before we take our recess?
24            MS. REYNOLDS:  No, your Honor.
25            MR. SMITH:  No, your Honor.
```

1761

```
1         THE COURT:  We stand in recess.
2         (Recess)
3         THE COURT:  All right, are we ready for
4  the jury?
5         MS. DAYTON:  Yes.
6         THE COURT:  Please bring them in.
7         (Jury entered the courtroom.)
8         THE COURT:  All right, please seated,
9  ladies and gentlemen.  We'll have cross-examination
10 of Dr. Evangelista by Mr. Smith.
11 CROSS-EXAMINATION
12 BY MR. SMITH:
13    Q.   Good morning, Dr. Evangelista.
14    A.   Good morning.
15    Q.   I'm Justin Smith.  I'm one of the attorneys
16 who represents Azibo Aquart.  One of the things that
17 was done at the autopsy was the collection of
18 fingernails from Ms. Johnson?
19    A.   That is correct.
20    Q.   And that was from both the left and the
21 right hand?
22    A.   That is correct.
23    Q.   And that's reflected in your report as
24 well?
25    A.   Yes.
```

1762

```
1     Q.   The wounds that you talked about to
2  Ms. Johnson's head, both the face and the head,
3  those were consistent with possibly having been
4  inflicted by a baseball bat?
5     A.   A firm object such as a baseball bat could
6  cause these types of injuries.
7     Q.   So, a baseball bat is not the only thing
8  that could have caused these?
9     A.   That is correct.
10    Q.   It could be other blunt objects?
11    A.   That is correct.
12    Q.   Like a pipe?
13    A.   A firm object such as a pipe.
14    Q.   Okay.  Could it include a wooden table leg?
15    A.   Again, a firm object.  There is no definite
16 one object that can cause these wounds.
17    Q.   And so, in short -- well, let me ask one
18 other thing.  Basically all you can say is it's a
19 firm object?
20    A.   That is correct.
21    Q.   And it's not necessarily even as wide or as
22 long as a baseball bat, the object that caused the
23 wounds?
24    A.   It doesn't have to be.  It's -- whatever
25 object caused these wounds was a firm object.  I
```

1763

```
1  can't tell you -- it's not a flat object like a big
2  piece of wood like -- these are more lacerations
3  that were caused by a firm object; not flat, like
4  falling to the floor.  These are crushing
5  lacerations from a firm weapon, and I don't know
6  which weapon it was.
7     Q.   Okay.  And it's not more likely to be a
8  baseball bat than any other firm object?
9     A.   That is correct.
10        MR. SMITH:  I don't think I have any
11 other questions.  Thank you.
12        THE COURT:  All right, redirect.
13        MS. RODRIGUEZ-COSS:  No, your Honor.  We
14 don't have anything further.
15        THE COURT:  All right, Mr. Evangelista,
16 thank you very much.  You are excused.  You may step
17 down.
18        Please call your next witness.
19        You can just leave the exhibit there.
20        MR. MARKLE:  Yes, your Honor, the
21 government would call Sherrell Randolph.
22        THE COURT:  Ms. Randolph, that's the
23 witness stand there, would you please take it and
24 remain standing while the oath is administered to
25 you.
```

1764

```
1         S H E R R E L L   R A N D O L P H,
2  Having first affirmed, was examined and testified as
3  follows:
4         THE WITNESS:  Sherrell Randolph,
5  r-a-n-d-o-l-p-h, 117 --
6         THE COURT:  No, just your town of
7  residence.
8         THE WITNESS:  Bridgeport, Connecticut.
9         THE COURT:  Thank you.
10        All right, Mr. Markle, you may proceed.
11        MR. MARKLE:  Thank you, your Honor.
12 DIRECT EXAMINATION
13 BY MR. MARKLE:
14    Q.   Good morning, Ms. Randolph.
15    A.   Good morning.
16    Q.   Ms. Randolph, you are presently living in
17 Bridgeport?
18    A.   Yes.
19    Q.   And for how long have you lived in
20 Bridgeport, Connecticut?
21    A.   All my life.
22    Q.   Have you ever lived anywhere else?
23    A.   No.
24    Q.   So you grew up in Bridgeport?
25    A.   Yes.
```

1765

```
1    Q.   Move up.  Move the microphone, move your
2  seat up a little bit.
3            And how old are you, Ms. Randolph?
4    A.   Forty.
5    Q.   And who do you live with presently?
6    A.   My mom.
7    Q.   And anyone else?
8    A.   My daughter.
9    Q.   And how old is your daughter?
10   A.   Seventeen.
11   Q.   And do you have any other children?
12   A.   Yes.
13   Q.   And how many?
14   A.   Five.
15   Q.   But they're not living -- are they grown?
16   A.   They're grown.
17   Q.   And how far did you go in school, Ms.
18  Randolph?
19   A.   Tenth grade.
20   Q.   Did you complete 10th grade?
21   A.   Yes.
22   Q.   And did you ever get your GED or
23  equivalency?
24   A.   Yes.
25   Q.   Did you complete that?
```

1766

```
1    A.   Yes.
2    Q.   And when did you get that?  Recently or --
3    A.   A long time.  A while ago.  A couple years
4  ago.
5    Q.   A while ago?
6    A.   '95, '96.
7    Q.   And, again, if you can just speak into the
8  microphone so everyone can hear you.  Are you
9  presently working?
10   A.   Yes, I am.
11   Q.   Where do you work?
12   A.   3PL.
13   Q.   What kind of job is that?
14   A.   Customer service.
15   Q.   And for how long have you been employed
16  there?
17   A.   A week.
18   Q.   How long?
19   A.   A week.
20   Q.   And before that did you have a job?
21   A.   Yes, I did.
22   Q.   And where was that?
23   A.   Northeast Electronics.
24   Q.   And how long did you work there for?
25   A.   Fifteen months.
```

1767

```
1    Q.   And what type of work did you do at
2  Northeast Electronics?
3    A.   Assembly.
4    Q.   And what hours did you work at Northeast
5  Electronics?
6    A.   8:00 to 4:30.
7    Q.   Every day?
8    A.   Yes, Monday through Friday.
9    Q.   How about your present position?
10   A.   Monday through Friday, 9:00 to 5:30.
11   Q.   So, we've already interrupted your new work
12  schedule.
13   A.   Yes.
14   Q.   Sorry.
15   A.   That's okay.
16   Q.   Ms. Randolph, were you charged in regards
17  to the present case?
18   A.   Yes, I was.
19   Q.   Do you know what the charges are?
20   A.   Distributing.
21   Q.   And are those still -- are you -- have you
22  been sentenced yet?
23   A.   No, I have not.
24   Q.   And do you recall when you were arrested on
25  the charges?
```

1768

```
1    A.   In 2005.  October or August.  I'm not sure.
2    Q.   After you were arrested, did you -- did you
3  stay in jail or were you released on bond?
4    A.   I stayed in.
5    Q.   And eventually did you get out on bond?
6    A.   Yes, I did.
7    Q.   How long after you were arrested?
8    A.   Three days.
9    Q.   And were there conditions set on your bond
10  release?
11   A.   Yes, there was.
12   Q.   And there still are?
13   A.   Yes, they are.
14   Q.   And did there come a time when you decided
15  to plead guilty to the charges?
16   Q.   And you pled guilty to conspiring to
17  distribute crack cocaine?
18   A.   Yes.
19   Q.   And did you ever enter into a plea
20  agreement?
21   A.   Yes.
22   Q.   And a cooperation agreement?
23   A.   And a cooperation agreement, yes.
24   Q.   Did you have an attorney when you did that?
```

**GA442**

1769

1    A.   Yes, I did.
2    Q.   Now, prior to your arrest, had you used
3  drugs?
4    A.   Yes.
5    Q.   And what kind of drugs had you used?
6    A.   Marijuana.
7    Q.   And any other drugs before you were
8  arrested?
9    A.   No.
10   Q.   Did you ever use cocaine?
11   A.   Yes.
12   Q.   Before or after your arrest?
13   A.   After I was arrested.
14   Q.   When you were arrested on the federal
15 charges --
16   A.   Yes.
17   Q.   -- did you use cocaine before or after
18 that?
19   A.   Before it.
20   Q.   Okay.  Since you've been arrested have you
21 used cocaine?
22   A.   Yes.
23   Q.   But -- okay, we'll get to that.  When you
24 indicated you had conditions -- when you were
25 released, you had conditions of your bond, correct?

1770

1    A.   Yes, I did.
2    Q.   Was there anything about using drugs in
3  those conditions?
4    A.   Yes, there was.
5    Q.   And what was the condition?
6    A.   That I was to refrain from using any
7  narcotics.
8    Q.   And did you violate that condition?
9    A.   Yes, I did.
10   Q.   And did that get reported to the court?
11   A.   Yes, it did.
12   Q.   And did you get punished for that?
13   A.   Yes, I did.
14   Q.   Were you allowed to stay out on bond?
15   A.   No, I was not.
16   Q.   What happened the first time?
17   A.   They revoked the bond and put me in jail.
18   Q.   And when they revoked it you went back to
19 prison?
20   A.   Yes.
21   Q.   For how long?
22   A.   Twelve days.
23   Q.   And were you eventually again released?
24   A.   Yes, I was.
25   Q.   Did you have conditioned?

1771

1    A.   Yes, I did.
2    Q.   And did those prohibit you from using
3  drugs?
4    A.   Yes, they did.
5    Q.   And did you violate those conditions?
6    A.   Yes, I did.
7    Q.   Did you have a severe drug addiction at the
8  time?
9    A.   Yes, I did.
10   Q.   Was that reported to the court?
11   A.   Yes.
12   Q.   And this is after you had pled guilty and
13 decided to cooperate?
14   A.   Yes.
15   Q.   Did you have to go back to prison?
16   A.   Yes, I did.
17   Q.   How long?
18   A.   Fifty-five days.
19   Q.   You remember the exact amount of days?
20   A.   Yep.
21   Q.   Would that be -- let me ask you this:  Did
22 you then get released again?
23   A.   Yes.
24   Q.   What happened when you got release that
25 time?

1772

1    A.   I didn't violate it anymore.
2    Q.   How come?  Did you do anything to help
3  yourself?
4    A.   Yes, I went to different treatment centers
5  and I got treatment.
6    Q.   And how many drug rehabilitation programs
7  did you go in to over the course of the time you've
8  been on release?
9    A.   Five.  About four or five.
10   Q.   Do you remember the name of the first one
11 you went to?
12   A.   Yes, I do.
13   Q.   What was that?
14   A.   Stonington.
15   Q.   And was that inpatient or outpatient
16 treatment?
17   A.   Inpatient.
18   Q.   So how long were you there for?
19   A.   Thirty days.
20   Q.   And did you successfully complete that?
21   A.   Yes, I did.
22   Q.   So -- but you then went to another program?
23   A.   Yes.
24   Q.   And why was that?
25   A.   Because it was only 30 days in Stonington,

**GA443**

1773

```
1    I needed longer.
2       Q.  And do you remember the name of the second
3    one you went to?
4       A.  Yes, I do.
5       Q.  What was that?
6       A.  Crossroads.
7       Q.  And was that inpatient or outpatient?
8       A.  Inpatient also.
9       Q.  So, you were there on the premises, you
10   couldn't leave?
11      A.  No.
12      Q.  And did you successfully complete that
13   program?
14      A.  Yes, I did.
15      Q.  And how long was that?
16      A.  Six months.
17      Q.  And did you then enter into another
18   program?
19      A.  Yes, I did.
20      Q.  So if you successfully completed the first
21   two, why the third?
22      A.  Because I still was using drugs.
23      Q.  I'm sorry?
24      A.  I still was doing -- I still was on
25   narcotics.
```

1774

```
1       Q.  So, even though you would successfully
2    complete a program you were going back to using?
3       A.  Yes.
4       Q.  What was the third program?
5       A.  Daytop.
6       Q.  Was that inpatient or outpatient?
7       A.  Inpatient.
8       Q.  How long was that for?
9       A.  Six months.
10      Q.  And were you able to successfully complete
11   that program?
12      A.  Yes.
13      Q.  And then did you go to -- was there a
14   fourth or -- you said four or five.  Is there
15   another one?
16      A.  Yes.
17      Q.  And what's the next program?
18      A.  I went straight from Daytop, still
19   treatment, six months ended, I went straight to
20   Minnesota for additional treatment.
21      Q.  Minnesota you went?
22      A.  Yes.
23      Q.  And for how long was that?
24      A.  Six months also.
25      Q.  And was that inpatient or outpatient?
```

1775

```
1       A.  Inpatient.
2       Q.  And did you successfully complete that
3    program?
4       A.  Yes, I did.
5       Q.  And since you were in the program in
6    Minnesota, have you resumed your use of drugs?
7       A.  No.
8       Q.  Have you used -- when did you complete
9    that?
10      A.  In May of 2009.
11      Q.  And since that date, have you used any kind
12   of drug?
13      A.  None.
14      Q.  Marijuana?
15      A.  No.
16      Q.  Cocaine?
17      A.  No.
18      Q.  Crack cocaine?
19      A.  No.
20      Q.  Heroin?
21      A.  No.
22      Q.  Have you abused or used alcohol since then?
23      A.  No.
24      Q.  And did you also receive counseling in
25   addition to the drug rehabilitation?
```

1776

```
1       A.  Yes.
2       Q.  And are you subject to random testing for
3    drug use?
4       A.  Yes, I am.
5       Q.  And who conducts that?
6       A.  The United States probation office.
7       Q.  And that's the same testing that got you
8    caught back early on?
9       A.  Yes.
10      Q.  And since you completed the Minnesota
11   program, have you been tested?
12      A.  Yes.
13      Q.  More than once?
14      A.  Yes.
15      Q.  A lot of times?
16      A.  Yes.
17      Q.  And you have been found to have violated
18   those conditions?
19      A.  No.
20      Q.  Now, going back to April 2000 -- well,
21   going back to 2005, did you know a person by the
22   name of Rodney Womble?
23      A.  Yes, I did.
24      Q.  And how did you know Mr. Womble?
25      A.  He was my current boyfriend; my boyfriend
```

1777

```
 1  at the time.
 2      Q.    Before he became your boyfriend, did you
 3  know him?
 4      A.    Yes.
 5      Q.    And from childhood or --
 6      A.    Just friends.
 7      Q.    Just as friends?
 8      A.    As friends.
 9      Q.    And there came a time when you started
10  dating one another?
11      A.    Yes.
12      Q.    And do you remember when that was?
13      A.    May 30, 2005.
14      Q.    And how do you remember that date
15  specifically?
16      A.    We started dating on his birthday.
17      Q.    His birthday?
18      A.    His birthday.
19      Q.    And did you continue to have a relationship
20  after that first date?
21      A.    Yes.
22      Q.    And did there -- where did you live at the
23  time?
24      A.    86 Fairmont Street.
25      Q.    And do you know where Mr. Womble was living
```

1778

```
 1  at the time?
 2      A.    Stephen Street in Bridgeport.
 3      Q.    And who were you living with at that time?
 4      A.    Me and my children.
 5      Q.    And did there come a time when Mr. Womble
 6  moved into your apartment?
 7      A.    Yes.
 8      Q.    About how long after you started dating?
 9      A.    Maybe a month or -- a month.
10      Q.    And that was at the Fairmont Street
11  apartments?
12      A.    Yes.
13      Q.    Now, are you familiar with the Charles
14  Street apartments?
15      A.    Yes, I am.
16      Q.    Before you met Mr. Womble, were you
17  familiar with the Charles Street apartments?
18      A.    No, I was not.
19      Q.    Had you ever been to Charles Street
20  apartments?
21      A.    No.
22      Q.    And about how far from you were -- from
23  your apartment were those apartments?
24      A.    Maybe three, four blocks.
25      Q.    When you first met Mr. Womble, was he
```

1779

```
 1  working?
 2      A.    Yes, he was.
 3      Q.    Do you recall where?
 4      A.    At Sacred Heart University.
 5      Q.    Do you know what he was doing there?
 6      A.    He was a cook.
 7      Q.    And after he -- did there come a time when
 8  he stopped working there?
 9      A.    Yes.
10      Q.    And do you know if he got another job?
11      A.    Yes.
12      Q.    And where was that?
13      A.    At a car wash.
14      Q.    Do you remember the name of it?
15      A.    No.
16      Q.    And was it -- where was it?
17      A.    On Elizabeth Street.
18      Q.    In Bridgeport?
19      A.    In Bridgeport.
20      Q.    When I say "Mr. Womble," what did you refer
21  to him as, Mr. Womble, Rodney Womble?  How did you
22  refer to him?
23      A.    Womble.
24      Q.    Just Womble?
25      A.    Uh-huh (indicating affirmatively).
```

1780

```
 1      Q.    And did you hear other people refer to him
 2  by any other name?
 3      A.    Yes.
 4      Q.    What was that?
 5      A.    Big Man.
 6      Q.    Did you ever call him Big Man?
 7      A.    No.
 8      Q.    Did you -- at the time when you met Rodney
 9  Womble, did you know Azibo Aquart?
10      A.    No, I did not.
11      Q.    Did you know a person by the name of D or
12  Dreddy?
13      A.    No.
14      Q.    Did you eventually meet a person who you
15  knew as D or Dreddy?
16      A.    Yes.
17      Q.    What did you know him as?
18      A.    Dreddy.
19      Q.    Do you see Dreddy in the courtroom today?
20      A.    Yes.
21      Q.    And can you just tell us what he's wearing?
22      A.    A burgundy shirt with a tie.
23         MR. MARKLE:  May the record indicate
24  she's identified the defendant, Azibo Aquart?
25         THE COURT:  It may.
```

**GA445**

1781

1    Q.   And you never met him before you met Mr.
2  Womble?
3    A.   No, I don't.
4    Q.   And how did you meet Dreddy?
5    A.   Through Womble.
6    Q.   And do you remember being introduced to
7  him?  Or do you remember where you first met him?
8    A.   No, I don't.
9    Q.   Do you know whether or not Dreddy worked at
10 the car wash?
11   A.   Yes.
12   Q.   And how do you know that?
13   A.   Because I seen him in the car wash when I
14 went down there.
15   Q.   You would go to the car wash?
16   A.   Yes, I would.
17   Q.   And why would you go to the car wash?
18   A.   Just to make sure my boyfriend was working.
19   Q.   See if Womble was working?
20   A.   Yes.
21   Q.   And was Womble working?
22   A.   Yes, he was.
23   Q.   And when you would go there, did you see
24 Dreddy working?
25   A.   No.

1782

1    Q.   Did you see Dreddy there?
2    A.   Yes.
3    Q.   Prior to Womble, Mr. Womble starting to
4  work at the car wash, do you know whether or not he
5  was selling drugs while he lived with you?
6    A.   No.
7    Q.   To your knowledge was he selling drugs?
8    A.   Not before the car wash, no.
9    Q.   Sometime after he started working at the
10 car wash -- well, let me ask you, at that time were
11 you or Mr. Womble using drugs?
12   A.   Yes.
13   Q.   What kind of drugs?
14   A.   Cocaine.
15   Q.   And do you know how much money Mr. Womble
16 earned from working at the car wash?
17   A.   No.
18   Q.   Were you working at the time?
19   A.   No, I was not.
20   Q.   And were you supporting yourself -- how
21 were you supporting yourself and your children?  Was
22 it based on the car wash money?
23   A.   Yes.
24   Q.   Was money an issue at that time between you
25 and Mr. Womble?

1783

1    A.   Yes.
2    Q.   The lack of it was an issue?
3    A.   The lack of it, yes.
4    Q.   Did there come a time when you learned that
5  Mr. Womble was selling drugs?
6    A.   Yes.
7    Q.   And you indicated that was during the
8  period of time he was at the car wash?
9    A.   Yes.
10   Q.   And when you learned that, was money less
11 of an issue or more of an issue?
12   A.   Less of an issue.
13   Q.   Fair to say there was more money available
14 to you?
15   A.   Yes.
16   Q.   And your children?
17   A.   Uh-huh (indicating affirmatively).
18   Q.   And Mr. Womble?
19   A.   Yes.
20   Q.   And did you learn what type of drug Mr.
21 Womble was selling?
22   A.   Yes, I did.
23   Q.   And what type?  What was it?
24   A.   Crack cocaine.
25   Q.   And did you learn who Mr. Womble was

1784

1  getting the crack cocaine from?
2    A.   Yes.
3    Q.   And who was it?
4    A.   Dreddy.
5    Q.   Dreddy, the defendant?
6    A.   Yes.
7    Q.   Prior to working with the defendant at the
8  car wash, did Mr. Womble ever mention the Charles
9  Street apartments to you?
10   A.   Yes.
11   Q.   What --
12   A.   Prior?
13   Q.   Prior.
14   A.   No, never.
15   Q.   Prior to working with Dreddy, did he ever
16 go to the Charles Street apartments, to your
17 knowledge?
18   A.   No.
19   Q.   After he began working with Dreddy at the
20 car wash, did he ever mention the Charles Street
21 apartments?
22   A.   Yes.
23   Q.   Often or not!  Let me -- I'll withdraw
24 that.  How would that come up, the Charles Street
25 apartments?  What would Womble say?

**GA446**

1785

```
1    A.   "I will be back, I'm going to Charles
2  Street."
3    Q.   Just that he was going to go there?
4    A.   He was going to Charles Street.
5    Q.   Did he ever go to Charles Street apartments
6  after he began -- after he associated with Dreddy,
7  would Womble go to the Charles Street apartments?
8    A.   Yes.
9    Q.   Prior to Womble beginning to sell drugs,
10 did Dreddy ever come to your apartment?
11   A.   No.
12   Q.   After Womble, Mr. Womble started selling
13 drugs, did the defendant come to your apartment?
14   A.   Yes.
15   Q.   On more than one occasion?
16   A.   Yes.
17   Q.   On a lot of occasions?
18        MR. SMITH:  Objection, leading.
19   Q.   How many occasions -- withdraw it.
20 Approximately how many times did the defendant come
21 to your apartment at Fairmont?
22   A.   Numerous times.
23   Q.   Numerous?
24   A.   Numerous.  A lot of types.
25   Q.   Did you learn why Mr. Womble was going to
```

1786

```
1  the Charles Street apartments?
2    A.   Yes.
3    Q.   And what was the purpose of him going
4  there?
5    A.   To deliver crack cocaine to Charles Street.
6    Q.   And did you learn the purpose of the
7  defendant coming to your apartment?
8    A.   Yes.
9    Q.   And what was the purpose?
10   A.   For him to give Womble the drugs to take to
11 Charles Street apartments.
12   Q.   And did the defendant ever come to get
13 money from you or Mr. Womble?
14   A.   Yes.
15   Q.   Numerous occasions?
16   A.   Yes.
17   Q.   When would the defendant usually come to
18 your apartments to either give the drugs to Womble
19 or get the money?  What time of the day or the
20 night?
21   A.   In the evening time.  Like after he got off
22 work.
23   Q.   I'm sorry?
24   A.   After Womble had got off work.
25   Q.   Prior to Mr. Womble working for the --
```

1787

```
1  selling the drugs for the defendant, had you known
2  Frank Hodges?  Did you ever know Frank Hodges before
3  that?
4    A.   No, I did not.
5    Q.   Did you know a woman by the name of
6  Vanessa?
7    A.   Not before, no.
8    Q.   Did you know Pops?
9    A.   No.
10   Q.   You never met them before?
11   A.   No.
12   Q.   You never met them through Mr. Womble?
13   A.   After he started going to Charles Street I
14 met them; not before, though.
15   Q.   And after you learned that the defendant
16 was -- I mean that Mr. Womble was distributing crack
17 for the defendant, did you eventually meet Frank?
18   A.   Yes, I did.
19   Q.   And Vanessa?
20   A.   Yes.
21   Q.   And Pops?
22   A.   Yes.
23   Q.   Do you know how -- do you know what
24 quantity of drugs the defendant would bring to Mr.
25 Womble?
```

1788

```
1    A.   Yes.
2    Q.   And what was it?
3    A.   Sandwich bags of 36 cracks.
4    Q.   Sandwich bags with 36 bags?
5    A.   Thirty-six bags.  Little bags inside.
6    Q.   Do you know if he brought one or more of
7  the larger sandwich bags?
8    A.   Yes.
9    Q.   Was it more?
10   A.   More.
11   Q.   Do you know how many?
12   A.   At least three to four each time he came.
13   Q.   And each of those contained 36 bags of
14 crack?
15   A.   Yes, it did.
16   Q.   And how do you know how much crack cocaine
17 was in each of those larger bags?
18   A.   Because when Womble was working at the car
19 wash, and if Frank or Vanessa came to the house, I
20 would have to get it and count out 36 of them before
21 I handed it -- let them see me count 36 before I
22 handed it to them so they would know it's correct.
23   Q.   So, there came a time when you helped
24 distribute the crack cocaine?
25   A.   Yes.
```

1789

```
1    Q.   And who told you to do that?
2    A.   Womble.
3    Q.   And where did Womble get that crack cocaine
4  from?
5    A.   Dreddy.
6    Q.   And you would count it before you gave it
7  to Frank?
8    A.   Yes.
9    Q.   And you made sure there were 36 bags?
10   A.   Yes.
11   Q.   And did you ever give it to anybody else?
12   A.   Vanessa.
13   Q.   And would you do the same thing for her?
14   A.   Yes.
15   Q.   And would they in turn give you anything
16 for the crack cocaine?
17   A.   Yes.
18   Q.   What?
19   A.   They would give me 350 -- they would give
20 $310.
21   Q.   Three hundred ten?
22   A.   Uh-huh (indicating affirmatively).
23   Q.   So, they took a portion of the money?
24   A.   Yes.
25          MR. SMITH:  Objection, leading.
```

1790

```
1          MR. MARKLE:  Withdraw it.
2    Q.   They gave you 310?
3    A.   Yes.
4    Q.   Do you know how much each bag sold for?
5    A.   Ten dollars.
6    Q.   So, if you gave them 36, that would be how
7  much?
8    A.   Three hundred sixty.
9    Q.   Thank you.  And did you use that money for
10 your own spending?
11   A.   No.
12   Q.   Did you use it for your children?
13   A.   No.
14   Q.   Did you have -- could you do anything you
15 wanted with that money?
16   A.   No.
17   Q.   What did you do with that money?
18   A.   Put it to the side until Rodney came home
19 and handed it to him.
20   Q.   And what did Mr. Womble do with that money?
21   A.   He would hold it until Dreddy called and
22 then he would bring it downstairs to him.
23   Q.   Did you ever see Mr. Womble give the money
24 to anybody other than Dreddy?
25   A.   No.
```

1791

```
1    Q.   Did he ever tell you to give the money to
2  anyone other than Dreddy?
3    A.   No.
4    Q.   Did you ever personally give the money to
5  Dreddy?
6    A.   No.
7    Q.   Did you ever see him get the crack cocaine
8  from anyone other than Dreddy?
9    A.   No.
10   Q.   Did you ever get the crack cocaine from
11 anyone else?
12   A.   No.
13   Q.   And where would you -- you said you kept
14 the money.  Where would you keep the money until you
15 gave it to Womble?
16   A.   Just in the house.
17   Q.   Any particular place?
18   A.   No.
19   Q.   And how about the crack cocaine, do you
20 know where that was maintained in the house?
21   A.   Yes.
22   Q.   And where was that?
23   A.   In the headboard of my bed inside of a
24 happy face can.
25   Q.   I'm going to show you have what's been
```

1792

```
1  marked Government Exhibit 200A, ask you if you
2  recognize that can.
3    A.   Yes.
4    Q.   Do you recognize that?
5    A.   Uh-huh (indicating affirmatively).
6    Q.   Is that the can that was in your home?
7    A.   Yes, yes.
8    Q.   And what happened with this can?
9    A.   When Womble would come upstairs he would
10 drop the bags of cracks inside that can.
11   Q.   And sometimes would you take the bag of
12 crack out of there to give to Frank or Vanessa?
13   A.   Yes.
14   Q.   And would Frank or Vanessa come to your
15 house or would you go to Charles Street?
16   A.   They would always come to me.
17   Q.   Did you ever go to Charles Street?
18   A.   Yes, I did.
19   Q.   Did you go there to distribute drugs?
20   A.   No, I did not.
21   Q.   And do you remember when the police came to
22 your apartment?
23   A.   Yes.
24   Q.   And did they take this -- did you show them
25 what's been marked 200A, the can with the colors and
```

**GA448**

1793

1    smiley faces?
2        A.    Yes.
3        Q.    And what did you tell them about this can
4    at that time?
5        A.    That's the can where the drugs were held
6    in.
7        Q.    You told the police that then?
8        A.    Yes.
9              MS. RODRIGUEZ-COSS:  Offer 200A, your
10   Honor.
11             MR. SMITH:  No objection.
12             THE COURT:  200A is a full exhibit.
13       Q.    Were the drugs maintained in any other
14   cannisters?
15       A.    Maxwell House cannister.
16       Q.    Showing you what's been marked Government's
17   Exhibit 200F, do you recognize that can?
18       A.    Yes.
19       Q.    And does it have something secret about it?
20       A.    Yes, it does.
21       Q.    And what is that?
22       A.    The bottom comes out of it.
23       Q.    And so if I twist that off, there is a
24   false compartment or area?  There's an area you
25   could put things?

1794

1        A.    Yes.
2        Q.    And is that the compartment?
3        A.    Yes.
4        Q.    How did you use it?
5        A.    To put drugs.
6        Q.    What would you put in there?
7        A.    The drugs would be stored in there.
8        Q.    Those are the drugs that Dreddy brought to
9    your house?
10       A.    Yes.
11       Q.    And then Womble brought over -- or you gave
12   to Frank?
13       A.    Yes.
14             MS. MARKLE:  I would offer 200F, your
15   Honor.
16             THE COURT:  All right, absent
17   objection --
18             MR. SMITH:  No objection.
19             THE COURT:  -- it is a full exhibit.
20       Q.    What happened with that can?  How did that
21   end up here?
22       A.    I gave it to the police when they came to
23   the door.
24       Q.    Did you show them that?
25       A.    Yes, I did.

1795

1        Q.    And did you tell them how it was used?
2        A.    Yes, I did.
3        Q.    The same thing you told us here today?
4        A.    Yes.
5        Q.    I'll show you one other item marked
6    Government's Exhibit 200B.  Do you recognize what's
7    in that plastic bag?
8        A.    Yes.
9        Q.    How do you recognize those?
10       A.    Those were in my house in a garbage can.
11       Q.    Do you know how those ended up in your
12   house?
13       A.    Rodney brought them in.
14       Q.    Do you know where he got them from?
15       A.    Dreddy.
16       Q.    Did he tell you what the purpose of the
17   capsules in 200B were?
18       A.    No.
19       Q.    Do you know what the purpose of these is?
20       A.    Yes.
21       Q.    How do you know?
22       A.    Because I bought marijuana before packaged
23   up inside one of those before.
24       Q.    They're used to package marijuana?
25       A.    Yes.

1796

1        Q.    Do you know how these ended up here in
2    court or in the possession of the police?
3        A.    Yes.
4        Q.    How?
5        A.    They found them.
6        Q.    Did you show them to them?
7        A.    No.
8        Q.    They found them where?
9        A.    Inside a garbage can.
10       Q.    Where?
11       A.    In my bedroom.
12             MS. MARKLE:  Offer 200B.
13             MR. SMITH:  No objection.
14             THE COURT:  All right, absent objection,
15   200B is a full exhibit.
16       Q.    Did you ever give the crack cocaine to
17   anyone other than Frank or Vanessa?
18       A.    No.
19       Q.    And was that -- when was that?  Was that in
20   2005?
21       A.    Was what in 2005?
22       Q.    Did you help distribute the crack cocaine
23   while you were still living with Mr. Womble?
24       A.    Yes, I did.
25       Q.    And was that in 2005?

**GA449**

1797

```
1      A.  Yes, it was.
2      Q.  And approximately how many times would you
3  give crack cocaine to Frank?
4      A.  Once to twice a day.
5      Q.  Did that go on for days, weeks or month?
6      A.  It went on for as long as Womble worked at
7  that car wash.
8      Q.  And during that time, would you do it every
9  day or only at certain times or certain days?
10     A.  Every day.
11     Q.  And did you collect the money or the
12 profits from the drugs?
13     A.  Yes, I did.
14     Q.  And would that be just as often?
15     A.  Yes, it would.
16     Q.  And would you give Frank or Vanessa -- how
17 many packs of crack cocaine would you give them when
18 they came?
19     A.  I would give them one package of 36 cracks.
20     Q.  One package of 36?
21     A.  Yes.
22     Q.  And in return you would get how much money?
23     A.  $310.
24     Q.  If they didn't have the money, would you
25 give them the package?
```

1798

```
1      A.  No, I would not.
2      Q.  Did they always have the right amount of
3  money?
4      A.  No, they did not.
5      Q.  If they didn't have the right amount of
6  money, what would you do?
7      A.  I would call Womble at work.
8      Q.  And what would you say?
9      A.  I would tell him that Frank or Vanessa is
10 at the house, but they don't have $310, what do you
11 want me to do.
12     Q.  And what would be the usual reply?
13     A.  Give the phone to Frank or Vanessa.
14     Q.  So, he would talk to them?
15     A.  Yes, he would.
16     Q.  After he would talk to them, did you give
17 them drugs or not?
18     A.  I did.
19     Q.  Did you take any out of the package or
20 would you give them 36 --
21     A.  I would give --
22         MR. SMITH:  Objection, leading.
23     A.  I would give them 36.
24         THE COURT:  You didn't finish your
25 question.  Did you want to rephrase your question.
```

1799

```
1          MR. MARKLE:  Yes, your Honor.
2          THE COURT:  All right.
3      Q.  After they spoke to Womble, would you take
4  any of the crack out of the main bag?
5      A.  No, I would not.
6      Q.  Would you offer -- would you talk to Dreddy
7  on the phone?
8      A.  No.
9      Q.  Do you remember talking to Dreddy on the
10 phone?
11     A.  Just one time that I can recall.
12     Q.  And was that one time anything -- what was
13 that?  Why did you talk to him on the phone?
14     A.  He was on vacation and he had wanted me to
15 go to Charles Street and walk the hall just to see
16 who was in the halls.
17     Q.  So how did that -- did he call you or did
18 you call him?
19     A.  I called me.
20     Q.  And what did he ask you to do?
21     A.  To go over to Charles Street and see who
22 was in the hallways.
23     Q.  And did you do that?
24     A.  Yes, I did.
25     Q.  Where was Mr. Womble at the time?
```

1800

```
1      A.  I'm not sure.
2      Q.  Did he ask for Mr. Womble?
3      A.  No.
4      Q.  And when you went over there, did you have
5  a cell phone?
6      A.  Yes, I did.
7      Q.  Do you remember your cell phone number?
8      A.  No, I'm not sure.
9      Q.  Do you remember whether Mr. Womble had a
10 cell phone?
11     A.  Yes.
12     Q.  Do you remember his cell number?
13     A.  No.
14     Q.  Do you remember going over to Charles
15 Street the time the defendant asked you to?
16     A.  Yes.
17     Q.  And what did you do when you got there?
18     A.  I walked the first floor halls and back up
19 to the second floor.
20     Q.  And did you talk to him again?
21     A.  Yes.
22     Q.  And did you call him or did he call you?
23 Do you remember?
24     A.  I'm not sure.
25     Q.  And what did you tell him?
```

1801

```
1      A.   That the halls were clear except there was
2  one guy just walking through it, and he said that
3  was okay, he knew who it was.
4      Q.   Did you describe that guy?
5      A.   Yes, I did.
6      Q.   And then did you stay there or did you
7  leave?
8      A.   I left.
9      Q.   Now, you said you -- why would you go to
10 Charles Street if not to distribute crack cocaine
11 other than that time?
12     A.   To make sure Womble was where he said he
13 was going to be.
14     Q.   And was Mr. Womble there?
15     A.   Yes, he was.
16     Q.   So you were kind of checking up on him?
17     A.   Yes, I was.
18     Q.   And did you ever see the defendant at
19 Charles Street?
20     A.   One time.
21     Q.   And what was that one time you saw him?
22 Did you see him coming or going?
23     A.   Leaving.
24     Q.   And did you go to Charles Street after --
25 as he was leaving, where were you?
```

1802

```
1      A.   I was at the door of Pops', at Charles.  I
2  was at his door.  As I got knocked, Dreddy was
3  coming out, and I went in.
4      Q.   And when you went in -- well, when the
5  defendant came out, did you see anything unusual
6  about him?
7      A.   No.
8      Q.   Was he bleeding?
9      A.   Dreddy?  No.
10     Q.   He did he appear to be hurt?
11     A.   No.
12     Q.   Did he say anything?
13     A.   No.
14     Q.   And when you went inside, did you see
15 anything out of the ordinary?
16     A.   Yes.
17     Q.   What did you see?
18     A.   I saw Frank all beat up.
19     Q.   All beat up?
20     A.   Yes.
21     Q.   When you say "all beat up," what did you
22 see about Frank?
23     A.   His face was swollen and his mouth was
24 busted.  His face was really big; it was beat up.
25     Q.   And was he sitting down, lying down,
```

1803

```
1  standing up?
2      A.   He was sitting in a chair.
3      Q.   And do you recall whether or not he was
4  bleeding?
5      A.   No, I don't recall that.
6      Q.   Did you -- who else was there at that time?
7      A.   Rodney.
8      Q.   And did he have any blood on him or any
9  injuries?
10     A.   No.
11     Q.   Was anyone else there?
12     A.   I didn't see anyone else there.
13     Q.   And did you find out what happened to
14 Frank?
15     A.   Yes.
16          MR. SMITH:  Objection; hearsay.
17          THE COURT:  Well, we haven't gotten
18 there.  Yes, she found out.
19     Q.   How did you find out?
20          MR. SMITH:  Objection if it involves
21 hearsay.
22          MR. MARKLE:  Well, it doesn't involve
23 hearsay yet.
24          THE COURT:  How did you find out?
25          THE WITNESS:  Through Womble.
```

1804

```
1      Q.   And did Womble tell you what happened?
2      A.   Yes, he did.
3      Q.   Did you ever see the defendant with a
4  firearm?
5      A.   Dreddy?  Yes.
6      Q.   And when did you see him with a firearm?
7      A.   The day he came to my house to pick it up.
8      Q.   On Fairmont Street?
9      A.   Yes.
10     Q.   And why did you have a firearm that he was
11 picking up?  Was it yours?
12     A.   No, it was not.
13     Q.   Was it Womble's?
14     A.   No, it was not.
15     Q.   Whose was it?
16     A.   It was Dreddy's.
17     Q.   And why did you have it at your apartment?
18     A.   Womble put it there.
19     Q.   And did you know it was there?
20     A.   Yes, after a while I know.
21     Q.   And how do you recall -- do you recall
22 anything specific about the day the defendant came
23 to pick it up?
24     A.   Yes.
25     Q.   Was Womble present?
```

1805

```
 1      A.   No, he was not.
 2      Q.   What do you recall about that?
 3      A.   That he was -- Dreddy he was dressed really
 4  nice.  I believe he say he was on his way to a
 5  wedding.
 6      Q.   He was dressed nice on the way to a
 7  wedding?
 8      A.   To a wedding.
 9      Q.   And do you know if he was going to a
10  wedding or not?
11      A.   No.
12      Q.   You just know he was dressed up.
13      A.   He was dressed nice.
14      Q.   And do you know what kind of gun it was
15  that he came to pick up?
16      A.   Yes.
17      Q.   What kind?  Do you know what it looked
18  like?
19      A.   A silver gun.
20      Q.   What's that?
21      A.   Silver and black, with a black handle,
22  silver.
23      Q.   Did he actually take the gun from your
24  apartment?
25      A.   Yes, he did.
```

1806

```
 1      Q.   And did he leave with the gun?
 2      A.   Yes, he did.
 3      Q.   And did you have any conversation about the
 4  gun?
 5      A.   Yes.
 6      Q.   What was that?
 7      A.   I asked him where he was going.  He told me
 8  -- I'm pretty sure he told me he was going to a
 9  wedding.  And I asked him, "Why would you need a gun
10  to go to a wedding?"  And he told me not having his
11  gun on him is like -- it's like not having his left
12  shoe on his foot or something.  He made a reference
13  to it.  But he felt naked without it.
14      Q.   And he left with the gun?
15      A.   Yes, he did.
16      Q.   Now, had there been another gun at your
17  apartment?
18      A.   Yes.
19      Q.   And do you know where that gun came from?
20      A.   Yes.
21      Q.   Who?
22      A.   Dreddy.
23      Q.   And you didn't give him that gun.  Do you
24  know what happened to that gun?
25      A.   Yes.
```

1807

```
 1      Q.   What happened to that gun?
 2      A.   Womble took it out the house and never
 3  brought it back in.
 4      Q.   Do you know why Womble took it out of the
 5  house?
 6      A.   Yes.
 7      Q.   Why?
 8      A.   Because he had had an argument earlier that
 9  night with a guy in a club.
10      Q.   And do you know what he did with that gun
11  after having that argument?
12      A.   Yes.
13      Q.   What?
14      A.   He threw it.
15      Q.   At the club do you know what he did with
16  the gun?
17      A.   No.
18      Q.   You just know he left with the gun?
19      A.   Yes.
20      Q.   And then later that night did Womble come
21  home?
22      A.   Yes, he did.
23      Q.   Did he have a car?
24      A.   No.
25      Q.   Did he have a gun?
```

1808

```
 1      A.   No.
 2      Q.   And what did he tell you he did with the
 3  gun?
 4           MR. SMITH:  Objection, hearsay.
 5           MR. MARKLE:  I think it's in furtherance
 6  of, your Honor.
 7           THE COURT:  Do you want to be heard at
 8  sidebar?
 9           (Sidebar conference)
10           THE COURT:  Your objection?
11           MR. SMITH:  Well, again, I don't believe
12  this is in furtherance of the conspiracy, your
13  Honor.  How is simply reporting that "I threw away
14  the defendant's gun" in furtherance?
15           MR. MARKLE:  Well, it's apprising a
16  co-conspirator of the status of things, including
17  weapons.  It would be like I threw away the drugs.
18           MR. SMITH:  I think it falls under the
19  idle charter part of this, your Honor.
20           THE COURT:  Well, if the gun was
21  originally supplied by the defendant, it was in
22  Womble's apartment for a while, it went out of the
23  apartment, there is then discussion about where the
24  gun is, the gun was used previously as a tool of the
25  trade, it seems to me it parses it awfully fine to
```

**GA452**

1809

```
1   say that's not a co-conspirator statement in
2   furtherance of the conspiracy; that is, where is the
3   gun.  Is it still in active play as a tool of the
4   trade.  What's wrong with that analysis?
5        MR. SMITH:  Other than, your Honor, the
6   idea of in furtherance of a conspiracy is it has to
7   in some way furthering the conspiracy, have an
8   effect on the listener.  What effect is this going
9   to have?  Where is the gun?  I threw it out the
10  window.  At this point there is -- really it's just
11  reporting a fact.  It's idle chatter I think, but
12  whatever the ruling --
13        THE COURT:  Why is this not idle
14  chatter?
15        MR. MARKLE:  Well, I think appraising a
16  co-conspirator, just like you said, your Honor, of
17  the whereabouts of a gun, letting her know it's no
18  longer in the apartment, it's no longer available to
19  them, it's what happened to it.
20        THE COURT:  I think it's significantly
21  more than idle chatter.  I'm going to permit it.
22        (Sidebar concluded)
23   Q.  Ms. Randolph, you could answer that.  What
24  did he tell you happened to the gun?
25   A.  That he threw it.
```

1810

```
1    Q.   Did he tell you where he threw it?
2    A.   Yes.
3    Q.   And where?  Did he give you a specific
4   area?
5    A.   On Norton Street.
6    Q.   And did you and Mr. Womble do anything in
7   regards to that gun after he came home?
8    A.   Yes.  The next morning we did.
9    Q.   What did you do the next morning?
10   A.   Went back to see if we could find it.
11   Q.   And did you go to that area he said he
12  threw it?
13   A.   Yes.
14   Q.   Were you able take find it?
15   A.   No.
16   Q.   And when you were arrested, did you tell
17  the police about that?
18   A.   Yes.
19   Q.   And do you recall doing anything with the
20  police in regards to where that gun was thrown?
21   A.   I told them where I threw it at -- I told
22  him where Rodney threw it at.
23   Q.   So they could go and look for it?
24   A.   So they could look.
25   Q.   Do you know if that gun was ever found?
```

1811

```
1    A.   No, I don't.
2    Q.   Was Mr. Womble concerned about throwing
3   that gun away?
4    A.   Yes.
5        MR. SMITH:  Objection, relevance.
6        THE COURT:  Sustained.
7    Q.   Did Mr. Womble voice any concern about the
8   gun missing?
9    A.   Yes.
10       MR. SMITH:  Objection.
11   Q.   What did he say about the gun?
12       MR. SMITH:  Objection, hearsay.
13       THE COURT:  I think it's the same
14  analysis as earlier.  I'm going to overrule the
15  objection.
16       MR. SMITH:  Well, then it's -- is it --
17  I guess I'm confused about what question we're
18  asking.  If it's about the same subject matter of
19  throwing the gun away, that's asked and answered.
20       THE COURT:  I think you need to ask the
21  question a different way, Mr. Markle.
22       MR. MARKLE:  Okay.
23   Q.   After the gun was thrown out -- well, let
24  me ask you this:  Was there any ammunition in your
25  home?
```

1812

```
1    A.   Yes, there was.
2    Q.   And did Mr. Womble or the defendant ever
3   take that ammunition out of the house?
4    A.   No, they did not.
5    Q.   What happened to that ammunition?
6    A.   I got rid of it.
7    Q.   Did you ever have occasion to bag up or
8   package cocaine, crack cocaine?
9    A.   Yes.
10   Q.   And how many times did you participate this
11  that?
12   A.   Twice.
13   Q.   And was that -- who asked you to
14  participate in bagging up crack cocaine those two
15  times?
16   A.   Dreddy.
17   Q.   Dreddy both times?
18   A.   Yes.
19   Q.   And where did you actually package up or
20  bag up crack cocaine?
21   A.   On Hallet Street.
22   Q.   Hallet Street?
23   A.   Hallet Street.
24   Q.   And who else was there?  The first -- let's
25  take the first time.  Do you remember specifically
```

**GA453**

1813

```
1    when it was?
2        A.  No.
3        Q.  Was it while Dreddy and Mr. Womble still
4    worked at the car wash?
5        A.  Yes, it was.
6        Q.  Was it while they were still engaged in
7    drug dealing?
8        A.  Yes.
9        Q.  And who else was there the first time?
10       A.  It was me, Dreddy, my sister Diane, and
11   another girl Samantha.
12       Q.  And was Mr. Womble present at that time?
13       A.  No, he was not.
14       Q.  And how did you get there?
15       A.  Womble dropped me off there.
16       Q.  And how did you -- did you go with all of
17   the other people, or were they already there?  Or
18   how did they get there?
19       A.  Me and my sister Diane went together.  When
20   we got there, the other people left.
21       Q.  And did you have a key to the apartment?
22       A.  No, I did not.
23       Q.  And what apartment, do you remember; first
24   floor, second floor?
25       A.  I guess second floor.
```

1814

```
1        Q.  And when you got there, were you able to
2    get in?
3        A.  Yes, I was.
4        Q.  Who let you in?
5        A.  Dreddy did.
6        Q.  And is there any question in your mind that
7    Dreddy was there?
8        A.  No.
9        Q.  And when you got there, did you bring the
10   crack cocaine?
11       A.  No, it was already there.
12       Q.  Did you bring the materials needed to bag
13   it up?
14       A.  No, I did not.
15       Q.  Who brought those?
16       A.  They were already at the house.
17       Q.  And do you know whose apartment it was?
18       A.  Yes.
19       Q.  Whose?
20       A.  Dreddy's.
21       Q.  And explain what you did when you got
22   there.
23       A.  When I got there he had us have a seat and
24   he took a rock and he showed us how to break it up,
25   put it in the bag, burn the bag.  He showed it just
```

1815

```
1    how to package it, how he wanted it.
2        Q.  Had you ever done this before?
3        A.  No, I had not.
4        Q.  "He" being the defendant, Dreddy, showed
5    you how?
6        A.  Yes, he did.
7        Q.  When you say a "rock," was it a large piece
8    of crack, small?  About how big?
9        A.  A rock.
10       Q.  A couple inches?  A rock?
11       A.  A rock.
12       Q.  A small rock?
13       A.  Yes.
14       Q.  And what did you do with it?
15       A.  I crumbled it down.  Crumbled it up and put
16   it in the bags.
17       Q.  With what?
18       A.  I broke it up with a razor blade and put it
19   in a bag with a straw and then I sealed it with the
20   lighter.
21       Q.  And the bag would be how big?
22       A.  Tiny.
23       Q.  About like a half an inch at most?
24       A.  Yes.
25           MR. SMITH:  Objection to the leading.
```

1816

```
1            MR. MARKLE:  I'm not leading.  I'm
2    trying to describe what she's showing with her
3    fingers.
4            THE COURT:  That's not how the question
5    was.  You said:  Is it like a half an inch at most.
6    Is that what you are saying?
7            THE WITNESS:  Yes.
8            MR. MARKLE:  I'm sorry, I should have
9    made it clear.
10       Q.  That's what you were indicating, about that
11   much?
12       A.  A little bag.
13       Q.  Which I described as a half an inch?
14       A.  Yes.
15       Q.  And what was your sister doing?
16       A.  The same thing.
17       Q.  And what was the other person doing?
18       A.  She just was standing there.  Her and
19   Dreddy left after Dreddy showed us how to do it.
20       Q.  Did you wear any gloves or anything when
21   you did this?
22       A.  No.
23       Q.  And what did you do with the little bags
24   after you put the crack cocaine in the smaller bag?
25   What did you do with the small bags?
```

1817

```
1    A.   Threw them into a bigger bag.
2    Q.   You said you sealed them.  How did you seal
3  them?
4    A.   I pushed them shut and took the lighter and
5  sealed it, sealed the plastic so no one could open
6  it and mess with it.
7    Q.   So, it's like melted a little bit?
8    A.   Yes.
9    Q.   Who told you to do that?
10   A.   Dreddy.
11   Q.   And then you would put them in another bag?
12   A.   Yes.
13   Q.   And for how long did you do this,
14  participate in this process?
15   A.   Hours.
16   Q.   Did Dreddy come back to the apartment?
17   A.   Yes, he did.
18   Q.   Only when you were done, periodically, or
19  what?
20   A.   When we were done.
21   Q.   And how did he know when you were done?
22   A.   I'm not sure.  I don't remember if I called
23  him or he just -- I'm not sure.
24   Q.   Do you know how many small bags you made of
25  crack cocaine during those few hours?
```

1818

```
1    A.   No.
2    Q.   About how many?
3    A.   A lot.  A sandwich bag that -- grocery
4  store bag that you go to the store and get a grocery
5  store bag, we probably filled the bag.  I had a bag,
6  my sister had a bag.  We just did you it in a bag.
7    Q.   Filled a grocery bag with bags of 36?
8    A.   We didn't separate them as 36.  We just
9  threw them -- package them and threw them in the
10  bag.
11   Q.   So, almost two grocery bags full?
12   A.   Yes.
13   Q.   And were these what -- are these small bags
14  that you are describing the kind you mentioned
15  before, the $10 bags?
16   A.   Yes.
17   Q.   And did you leave the apartment with those
18  bags?
19   A.   No, I did not.
20   Q.   Did your sister leave the apartment?
21   A.   No.
22   Q.   Where were the bags left when you left?
23   A.   In the apartment.
24   Q.   In Dreddy's apartment?
25   A.   Yes.
```

1819

```
1    Q.   And were there clothes or furniture in that
2  apartment?
3    A.   There was furniture in the living room.
4    Q.   Did you see any other items associated with
5  drugs?
6    A.   I saw a gun.
7    Q.   You saw a gun?
8    A.   Yes.
9    Q.   Where did you see the gun?
10   A.   In the cushion of the chair.  When I sat,
11  the gun was in the chair.
12   Q.   Did you say anything about that?
13   A.   Yes.
14   Q.   Who did you tell about the gun?
15   A.   Dreddy.
16   Q.   And what did -- did he do anything?
17   A.   He came and he picked it up and he put
18  it -- he took it.  He took it.  I don't know what he
19  did with it.
20   Q.   And do you remember what that gun looked
21  like?
22   A.   The kind of gun that opens up and you put
23  the bullets in, slap it this way.
24   Q.   Were you paid for doing this couple hours
25  of work?
```

1820

```
1    A.   Yes, I was.
2    Q.   And who paid you?
3    A.   Dreddy paid me.
4    Q.   And how much did he pay you?
5    A.   100 and -- 125 and 175.  Somewhere in
6  between there.  I'm not sure, 125 or 175.
7    Q.   Did he pay you directly?
8    A.   Yes, he did.
9    Q.   Handed you the cash?
10   A.   Yes, he did.
11   Q.   How about your sister?
12   A.   He paid her directly.
13   Q.   Was the other woman paid, to your
14  knowledge?
15   A.   She wasn't there with us.
16   Q.   So, she didn't really work then.
17   A.   She didn't do anything.
18   Q.   Now, you said there was a second time,
19  correct?
20   A.   Yes.
21   Q.   So -- let me go back.  You left with no
22  crack cocaine on you, just money.
23   A.   Yes.
24   Q.   The second time, about how long after the
25  first time was this?
```

**GA455**

1821

1    A.    I'm not sure.
2    Q.    And the same period of time, though?
3    A.    Yes.
4    Q.    And where did you go?
5    A.    Hallet Street.
6    Q.    And who asked you to participate?
7    A.    Dreddy.
8    Q.    And who went this time?
9    A.    Just me.
10   Q.    Just you?
11   A.    Just me.
12   Q.    And how did you get to Hallet Street?
13   A.    Dreddy.
14   Q.    And how did you get inside Hallet Street?
15   A.    Dreddy.
16   Q.    And did you bring the crack with you this
17   time?
18   A.    No.
19   Q.    Did you bring the packaging materials this
20   time?
21   A.    No.
22   Q.    Where was it?  Who brought it?
23   A.    It was already at the house when I got
24   there.
25   Q.    And how did you get into the house?

1822

1    A.    Dreddy let me in.
2    Q.    And what did you do this time?
3    A.    The second -- I just opened the bags.  Just
4    pulled the bags open.
5    Q.    Just the little bags?
6    A.    Yes.
7    Q.    Just actually unseal them?
8    A.    Just opening them, yes.
9    Q.    Did that take a long time?
10   A.    Yes.
11   Q.    How many little bags did you open?
12   A.    A lot.
13   Q.    When you say "a lot," what do you mean?
14   A.    A grocery store bag full of nothing but
15   open bags inside of them.  I opened them, put them
16   in grocery bag.
17   Q.    The little bags that I was saying --
18   A.    The half inch bags, yes.
19   Q.    Thank you.  And did you put any crack
20   cocaine into them that time?
21   A.    No, I did not.
22   Q.    And were you paid for that?
23   A.    Yes, I was.
24   Q.    And how much were you paid?
25   A.    Between 125, 175.

1823

1    Q.    You are not sure exactly how much it was?
2    A.    I'm not sure.
3    Q.    Regardless of the money, who paid you?
4    A.    Dreddy paid me.
5    Q.    Any doubt he paid you?
6    A.    No.
7    Q.    Anyone else present during that time?
8    A.    No.
9    Q.    Did you ever participate in that again?
10   A.    No, I did not.
11   Q.    Did you learn why you were not invited
12   back?
13   A.    Yes, I did.
14   Q.    And who told you why?
15   A.    Dreddy told me why.
16   Q.    And what reason did he give you for not
17   having you package crack cocaine for him again?
18   A.    Because when we made the bags, he made the
19   first few bags to show us what they should look
20   like, but we made them bigger than -- we put too
21   much crack inside the bags.
22   Q.    The first time you did this?
23   A.    The first time, yes.
24   Q.    So, you were not invited back to do that?
25   A.    No.

1824

1    Q.    Never paid by Dreddy to do that?
2    A.    No, not again.
3    Q.    And he's the one who told you they were too
4    big?
5    A.    Yes.
6    Q.    What kind of vehicle did Dreddy drive?
7    A.    A Cadillac.
8    Q.    Was it a new Cadillac or an old Cadillac?
9    A.    Yes, a new one.  It was shorter, a short
10   one.
11   Q.    What kind of car did Rodney Womble drive?
12   A.    A Cadillac.
13   Q.    Was it a new one or an old one?
14   A.    An old one.
15   Q.    Did you ever give the defendant, Dreddy, a
16   cell phone?
17   A.    Yes, I did.
18   Q.    And why was that?
19   A.    Because I had went to get a cell phone from
20   Cingular and I was approved for four additional
21   lines, so I gave them to Dreddy, three of the lines
22   to Dreddy.
23   Q.    Why did you give -- why did you give him
24   phones?
25   A.    Because he was going to pay the bills for

**GA456**

1825

```
1    the phones.
2        Q.    Did he pay the bills for your own phone?
3        A.    Yes, he did.
4        Q.    How do you know that?
5        A.    Because we went together to the Cingular
6    store to pay them.
7        Q.    Were the phones in his name, your name or
8    someone else's name?
9        A.    My name.
10       Q.    Did he eventually stop paying the bills?
11       A.    Yes.
12       Q.    And was there quite an outstanding bill at
13   some point?
14       A.    Yes, there was.
15             MR. SMITH:  Objection to the leading.
16             THE COURT:  Sustained.
17       Q.    Did you know a person by the name of Tina
18   Johnson?
19       A.    No, I did not.
20       Q.    Did you ever meet a person by the name of
21   Tina Johnson?
22       A.    No, I did not.
23       Q.    Did you -- were you ever aware of a
24   conflict between Mr. Womble and a person over at
25   Charles Street?
```

1826

```
1        A.    Yes, I was.
2        Q.    Did you know the person's name?
3        A.    I knew the person's name because I happened
4    to be on the phone as he was saying the person's
5    name.
6        Q.    And you said you were on the phone.  Who
7    were you on the phone with?
8        A.    Womble.
9        Q.    And what happened while you were on the
10   phone with him?
11       A.    While we were on the phone he was banging
12   on the door, and while he's banging on the door he's
13   yelling, "Tina, open the door."  And I can't hear
14   what she's yelling, so I didn't hear.  He says to
15   me, "Sherrell, I'm going to have to call you back, I
16   need to call Dreddy."
17       Q.    He said, "I'll have to call you back, I
18   need to call Dreddy"?
19       A.    Yes.
20       Q.    And did he get off the phone at that time?
21       A.    Yes, he did.
22       Q.    Before that did you hear him having words
23   with anybody?  Or what did you hear from his side of
24   the conversation?
25       A.    From his side of the conversation all I
```

1827

```
1    hear him saying for Tina to open the door, and then
2    I hear him saying "Do you think we playing with you?
3    You think we playing with you?  And then he tell me,
4    "I have to call you back, let me call Dreddy."
5        Q.    And do you know whether he called Dreddy?
6        A.    No, I do not.
7        Q.    Did you ever talk to him about whether he
8    talked to Dreddy?
9        A.    No.
10       Q.    Now, around that same time, was that around
11   the time that the gun was missing, the gun was
12   thrown out?
13       A.    Yes.
14       Q.    And how was -- was there ever a time while
15   you were living with Mr. Womble that business wasn't
16   as good as it used to be?
17       A.    Yes.
18       Q.    And do you remember about when that was?
19       A.    Yes, in August.
20       Q.    In August.  And do you remember about when
21   the gun was thrown out the window?
22       A.    No, I don't remember.
23       Q.    Do you remember whether they were around
24   the same time?
25       A.    I'm not sure.
```

1828

```
1        Q.    When business wasn't so good in August, do
2    you remember what was happening with the drug
3    business?
4        A.    Womble had decided that he was not going to
5    go to Charles Street anymore, that he was not going
6    to sell drugs.
7        Q.    And did he tell you why?
8        A.    No.  If he did, I don't recall why.
9        Q.    And was there in fact a time when it
10   appeared that Mr. Womble was not going to Charles
11   Street?
12       A.    Yes.
13       Q.    And how did you know that?
14       A.    Because he was at the house.  He wasn't
15   going to Charles Street or to the car wash, he just
16   was in the house.
17       Q.    And would you see Frank come over the house
18   to get drugs?
19       A.    Nope.
20       Q.    Vanessa?
21       A.    No.
22       Q.    Anyone?
23       A.    No one.
24       Q.    Did you see Dreddy coming over?
25       A.    No, he had stopped coming by.
```

**GA457**

1829

```
1    Q.   Would Dreddy call the house?
2    A.   Nope.
3    Q.   Do you know whether or not he called
4  Womble?
5    A.   No, I don't know.
6    Q.   And you said that Mr. Womble even stopped
7  going to the car wash?
8    A.   Yes.
9    Q.   And do you know why he stopped?
10   A.   No.
11   Q.   Did you -- after that point in time, did
12 you ever go over to Charles Street?
13   A.   No, I did not.
14   Q.   Did you ever meet with Frank or Vanessa
15 again?
16   A.   Nope.
17   Q.   Did you ever participate with Dreddy in any
18 bagging or packaging?
19   A.   No, I did not.
20        MR. SHEEHAN:  Your Honor, I wonder at
21 this point, could I just briefly approach.
22        (Sidebar conference)
23        MR. SHEEHAN:  May I inquire why the
24 marshal seems to feel the need to be standing up
25 hovering right behind us there?
```

1830

```
1         THE COURT:  I don't have an answer.
2         MR. SHEEHAN:  I don't -- I sure don't
3  want to ask in front of the jury why, but I don't
4  think it's appropriate.
5         THE COURT:  Why don't we take care of it
6  at the lunch break, okay?
7         MR. SHEEHAN:  Well, I just noticed it,
8  but it's been --
9         MR. MARKLE:  I didn't notice it.
10        THE COURT:  He's been standing there.
11        MR. MARKLE:  It might be a bad leg or
12 something.
13        THE COURT:  Why don't you go back and
14 I'll ask the marshal.
15        (Sidebar concluded).
16        THE COURT:  Please continue, Mr. Markle.
17        MR. MARKLE:  Thank you, your Honor.
18   Q.   Ms. Randolph, showing you Government
19 Exhibit 200, do you recognize that photograph?
20   A.   Yes, I do.
21   Q.   And what is that?
22   A.   My apartment on 86 Fairmont.
23   Q.   That's where you lived with Mr. Womble?
24   A.   Yes.
25   Q.   And for what period of time did you live
```

1831

```
1  there with him?
2    A.   Just a couple of months with him.  Just a
3  couple months.
4    Q.   In 2005?
5    A.   2005.
6    Q.   August 2005 were you living there with him?
7    A.   Yes, we were.
8    Q.   And up until the time of his arrest?
9    A.   We lived there.
10   Q.   Do you recognize what's shown in
11 Government's Exhibit 204?
12   A.   Yes, I do.
13   Q.   And what is that?
14   A.   That's the place on Hallet Street where I
15 bagged up drugs.
16   Q.   Where you bagged up crack cocaine?
17   A.   Yes.
18   Q.   And you indicated on the second floor of
19 that building?
20   A.   Yes.
21   Q.   And that was both times with the defendant?
22   A.   Yes.
23   Q.   Showing you Government's Exhibit 210, do
24 you recognize that individual?
25   A.   Yes, I do.
```

1832

```
1    Q.   Who is that?
2    A.   That's Rodney Womble.
3    Q.   Showing you Government's Exhibit 212, do
4  you recognize that individual?
5    A.   Yes, I do.
6    Q.   Who is that?
7    A.   That's Frank.
8    Q.   Government's Exhibit 213, do you recognize
9  her?
10   A.   Yes, I do.
11   Q.   Who is that?
12   A.   Vanessa.
13   Q.   Do you recognize the woman depicted in
14 Government 214?
15   A.   Yes, I do.
16   Q.   Who is that?
17   A.   Jackie.
18   Q.   How did you know her?
19   A.   I've known her for a very long -- since I
20 was a child I've known her.
21   Q.   Did you ever sell -- I mean provide crack
22 cocaine to her?
23   A.   No, I did not.
24   Q.   Or collect money from her?
25   A.   No, I did not.
```

1833

```
1    Q.   Now, in regards to your plea of guilty, Ms.
2  Randolph, you indicated that you're awaiting
3  sentencing, correct?
4    A.   Yes I am.
5    Q.   Have you been promised any specific
6  sentence from anyone?
7    A.   No, I have not.
8    Q.   Any government member?
9    A.   No.
10   Q.   Any law enforcement person?
11   A.   No.
12   Q.   Your own attorney?
13   A.   No.
14   Q.   You've been represented the entire time by
15 an attorney?
16   A.   Yes.  Yes, I have.
17   Q.   And he's been with you whenever you've met
18 with government attorneys or law enforcement?
19   A.   Yes, he has.
20   Q.   And do you know -- you are aware you face a
21 mandatory five and a maximum of what?
22   A.   Forty.
23   Q.   Forty?
24        MR. SMITH:  Object to the leading.
25        THE COURT:  Sustained.
```

1834

```
1    Q.   Do you know what your sentence will be?
2    A.   No, I do not.
3    Q.   And what were you told would happen if you
4  cooperated?
5        MR. SMITH:  Objection.
6    Q.   What is your understanding that will happen
7  based on your cooperation?
8    A.   My understanding is if I tell the truth
9  that the Judge will have -- would be lenient with
10 me.  I mean, I didn't get an understanding of that.
11 Just to tell the truth.
12   Q.   What are you hoping will happen?
13   A.   I'm hoping the Judge will be easy on
14 sentencing.
15   Q.   I forgot to show you one picture.   Do you
16 recognize that photograph?
17   A.   Yes.
18   Q.   Who is that?
19   A.   That was me.
20   Q.   That's you?
21   A.   Yes.
22   Q.   Is that how you appeared in 2005?
23   A.   Yes.
24   Q.   Not -- well, you've changed?
25   A.   Tremendously.
```

1835

```
1        MR. SMITH:  Objection.
2    Q.   Would you say you have changed, Ms.
3  Randolph?
4    A.   Yes, I would.
5    Q.   Would you say you've changed for the
6  better?
7    A.   Yes, I have.
8        MR. SMITH:  Objection.
9        THE COURT:  Basis for the objection?
10       MR. SMITH:  Relevance, your Honor.
11       THE COURT:  Overruled.
12   Q.   You could answer.
13   A.   Yes, I have changed for the better since
14 then.
15   Q.   Do you feel in a better state of mind today
16 than then?
17   A.   Yes.
18   Q.   How did you learn about the murders, Ms.
19 Randolph?
20   A.   I was home.  I was asleep.  My mom, the
21 phone was ringing it was my mom, and she said that I
22 need to turn the TV on to Channel 12 because
23 something has happened on Charles Street.  So, I
24 said "okay," and I hung up with her and turned the
25 TV on, and when I noticed the news, they were in
```

1836

```
1  front of the actual Charles Street building where
2  Womble would go.  I woke him up and told him to
3  watch the news.
4    Q.   So, when you saw it, you weren't worried
5  about of -- well, were you worried about Mr. Womble?
6    A.   No, because we had already left Charles
7  Street alone.
8    Q.   Where was he that morning when you heard
9  the news?
10   A.   Asleep.
11   Q.   Next to you?
12   A.   Next to me.
13   Q.   And what did you do after you woke him?
14   A.   He asked me to go up there and see exactly
15 what happened.  So, I walked over there.
16   Q.   You went over there?
17   A.   Uh-huh (indicating affirmatively).
18   Q.   And how did you -- did you find out further
19 information when you got there?
20   A.   Not at the time I did not.
21   Q.   And what did you do?
22   A.   I went back home and I told him that I
23 don't know anyone out there, so how am I going to
24 find out information.  So he got dressed and we
25 walked over there.  And that's when the lady Jackie
```

**GA459**

1837

1 came and told us what happened.
2    Q.   And did she tell you that -- what did she
3 tell you?
4    A.   She --
5         MR. SHEEHAN:  Objection.
6         THE COURT:  Sustained.
7         MR. MARKLE:  I'll withdraw it.
8    Q.   Were you with Mr. Womble at that time?
9    A.   Yes, I was.
10   Q.   And where did you guys go, if anywhere?
11   A.   We went to Charles Street, to the Dominoes
12 pizza diagonally across Charles Street.  We didn't
13 actually go up on Charles Street.
14   Q.   And did you have any discussion about the
15 murders?
16   A.   Yes, we did.
17   Q.   And did Mr. Womble ever indicate that he
18 participated in those murders?
19         MR. SMITH:  Objection.
20         THE COURT:  Sustained.
21   Q.   Did you have any conversation about them?
22   A.   Yes.
23   Q.   And what was your conversation?
24         MR. SMITH:  Objection.
25         THE COURT:  I'm going to sustain.

1838

1 That's not -- that's hearsay.
2    Q.   Did you -- do you still have a relationship
3 with Mr. Womble?
4    A.   No, I do not.
5    Q.   And when did your relationship with him
6 end?
7    A.   When he went to jail.
8    Q.   And did you talk to him while he was in
9 jail?
10   A.   Yes, I did.
11   Q.   And how would you -- by phone?
12   A.   Yes.
13   Q.   And did you write letters to one another?
14   A.   Yes, we did.
15   Q.   And do you know -- approximately when was
16 the last time you spoke or wrote a letter to Mr.
17 Womble?
18   A.   Five years or better.
19   Q.   Five years or better.  Sometime ago?
20   A.   Yes.
21   Q.   Did you ever have any further discussion
22 with Mr. Womble about the gun that was thrown out?
23   A.   No, not that I --
24   Q.   Do you know whether or not he ever told
25 Dreddy about what he did with the gun?

1839

1    A.   I don't know if he told him.
2    Q.   Do you know if he ever told Dreddy anything
3 about the gun?
4    A.   I don't know.
5    Q.   Did you ever see Dreddy after -- well, you
6 said about -- well, I'm not sure when.  Sometime
7 before the murders Womble stopped dealing?
8    A.   Two weeks before I believe it was.
9    Q.   Did you ever see Dreddy after that?
10   A.   No, I did not.
11   Q.   Have you ever seen him before you -- since
12 then until today?
13   A.   Until -- no.
14   Q.   Did you know a person by the name of John
15 Taylor?
16   A.   No.
17   Q.   Did you know the defendant's brother
18 Azikiwe Aquart, or Zee?
19   A.   No.
20   Q.   Did you know -- did you know Efrain
21 Johnson?
22   A.   No.
23   Q.   Never met them through Womble?
24   A.   If I did meet them through Womble, maybe
25 you are saying their government name.  I probably

1840

1 met them under a different name.  But not that I
2 know of, no.
3    Q.   But those names mean nothing to you?
4    A.   Nothing at all.
5         MR. MARKLE:  If I may just have one
6 moment, your Honor.
7         THE COURT:  Yes.
8    Q.   Ms. Randolph, I'm going to show you what's
9 been marked Government's Exhibit 237 and ask you if
10 you recognize that document.
11   A.   Yes, I do.
12   Q.   And on the last page, do you recognize the
13 signature?
14   A.   Yes, I do.
15   Q.   And whose signature is amongst the four
16 signatures on that last page?
17   A.   Mines (sic).
18   Q.   Is that the plea agreement we talked about
19 briefly before?
20   A.   Yes, it is.
21   Q.   Showing you Government's Exhibit 237A, do
22 you recognize that document?
23   A.   No.
24   Q.   Do you recognize the signature?
25   A.   Yes, I do.

**GA460**

1841

```
1    Q.   Whose signature is on that?
2    A.   It's mines (sic).
3    Q.   If you take a look, tell me if that's the
4  cooperation agreement that you talked about briefly
5  before.
6    A.   Yes, it is.
7    Q.   Do you recognize that?
8    A.   Uh-huh (indicating affirmatively).
9    Q.   Do you remember reviewing that with your
10 attorney?
11   A.   Yes.
12   Q.   And signing it in open court?
13   A.   Yes.
14   Q.   And those are the only two agreements that
15 you have with the government; is that correct?
16   A.   Yes it is.
17        MR. MARKLE:  I would offer 237 and 237A,
18 your Honor.
19        THE COURT:  Full exhibits.
20   Q.   Showing you Government's Exhibit 207, do
21 you recognize the person in that photograph?
22   A.   No, I do not.
23        MR. MARKLE:  I would offer 207, your
24 Honor.
25        THE COURT:  I think it's already in.
```

1842

```
1        MR. MARKLE:  It is.
2        MR. SMITH:  Okay.  I'll take the
3  Court's --
4    Q.   So, the person shown in Government's
5  Exhibit 207, you do not recognize that person?
6    A.   No.
7    Q.   Do you see the person depicted in
8  Government's Exhibit 208?
9    A.   Yes, I do.
10   Q.   Do you recognize that person?
11   A.   No, I do not.
12        MR. MARKLE:  I would offer 208.
13        MR. SMITH:  If she doesn't recognize it.
14 I'm not sure that one is in.  Is it?
15        THE COURT:  Let's mark it for
16 identification.
17        MR. SMITH:  Thank you, your Honor.
18   Q.   Showing you the person depicted in
19 Government's Exhibit 209 for identification, do you
20 recognize that person?
21   A.   No, I do not.
22   Q.   Never seen that person before?
23   A.   No, I have not.
24   Q.   Thank you.
25        MR. MARKLE:  No further questions, your
```

1843

```
1  Honor.
2        THE COURT:  All right,
3  cross-examination.
4  CROSS-EXAMINATION
5  BY MR. SMITH:
6    Q.   Hi, Ms. Randolph.
7    A.   Hi.
8    Q.   My name is Justin Smith.  I'm one of the
9  attorneys representing the defendant in this matter.
10 Take you back a little bit.  You were arrested in
11 this case on October 21, 2005, right?
12   A.   Yes, I was.
13   Q.   Okay.  And you weren't expecting that to
14 happen?
15   A.   No, I was not.
16   Q.   Because the police showed up at your door
17 with a search warrant, right?
18   A.   No, they did not.
19   Q.   But they showed up at your door?
20   A.   Yes, they did.
21   Q.   And you weren't expecting that.
22   A.   No, I was not.
23   Q.   And you gave them permission to search the
24 house.
25   A.   Yes, I did.
```

1844

```
1    Q.   But they came into the house, right?
2    A.   Yes.
3    Q.   Did they put you in handcuffs?
4    A.   At the end, just before they put me in the
5  car they did.
6    Q.   Okay.  But they sat you down.
7    A.   Yes.
8    Q.   And they wanted to know about Mr. Womble,
9  right?
10   A.   Yes.
11   Q.   But they wanted to know about D, or Dreddy?
12   A.   I'm not sure exactly what they wanted.  I
13 don't remember what they wanted when they came to
14 the door.
15   Q.   Okay.
16   A.   I'm not sure.
17   Q.   But you did agree to speak to them, right?
18   A.   Yes, I did.
19   Q.   Okay.  And I think you said earlier that
20 you had your lawyer with you every time you spoke to
21 them?
22   A.   Yes.
23   Q.   But you didn't have your lawyer that first
24 day, correct?
25   A.   Correct.
```

1845

```
1    Q.   Okay.  But at the moment that they came
2   through the door, even though you weren't expecting
3   them to be there that day, you had a pretty good
4   idea what was going on, right?
5    A.   Not until -- no, I had no clue what they
6   were --
7    Q.   You had no idea why they were there.
8    A.   No.
9    Q.   But you had been speaking to Womble after
10  he was arrested, right?
11   A.   Yes, I was.
12   Q.   And you guys were on the phone --
13   A.   Yes.
14   Q.   -- nearly every day.
15   A.   If you -- yes.
16   Q.   And sometimes more than once a day.
17   A.   Uh-huh (indicating affirmatively).
18   Q.   And you were discussing his situation.
19   A.   Him being in jail?
20   Q.   Yes.
21   A.   Yes.
22   Q.   And he was discussing with you what he
23  knew.
24   A.   Yes.
25   Q.   And what you had learned from him was that
```

1846

```
1   he was facing a lot of time in prison.
2    A.   No.  When I talked to Womble on the phone
3   when he first went to jail I had no idea that Womble
4   went to jail tied up with Charles Street.  I thought
5   he went to jail because he happened to be at a house
6   that the Bridgeport police raided in Trumbull
7   Gardens.
8    Q.   So, he wasn't talking to you about Charles
9   Street at all?
10   A.   I can't recall at all, no.  I don't recall
11  that.
12   Q.   So, he wasn't talking to you that he could
13  be facing life in prison?
14        MR. MARKLE:  Your Honor, can we have a
15  --
16   A.   If he was, I don't --
17        THE COURT:  Excuse me?
18        MR. MARKLE:  There were a number of
19  calls over a long period of time.
20        THE COURT:  Do you want to focus the
21  time of the calls?  I take it this is before her
22  arrest.
23        MR. SMITH:  Yes.
24        THE COURT:  On October 21, '05.
25        MR. SMITH:  Correct.
```

1847

```
1        THE COURT:  Okay, did you understand
2   that was the timeframe?
3        THE WITNESS:  No.
4        THE COURT:  Why don't we go back and fix
5   that.
6    Q.   You recall that Womble gets arrested.
7    A.   Yes, I do.
8    Q.   And there was a period of time until you
9   got arrested.
10   A.   Yes.
11   Q.   Correct?
12   A.   Yes.
13   Q.   And that would have been October 21, 2005?
14   A.   Yes.
15   Q.   And it's during that time period that you
16  were speaking to Womble on the phone, correct?
17   A.   Yes.
18   Q.   So, he would call you from the jail?
19   A.   Yes.
20   Q.   These were collect calls, right?
21   A.   Yes, they were.
22   Q.   And they're being recorded.
23   A.   Yes, they are.
24   Q.   And so, again, during that time period, do
25  you recall Mr. Womble telling you or informing you
```

1848

```
1   that he could serve life in prison?
2    A.   No, I don't recall.  He could have said it,
3   I just don't recall.  It's so long ago.  I don't
4   recall it.
5    Q.   Okay, there might be something that could
6   refresh your memory?
7    A.   Okay.
8    Q.   Okay.  And you also learned from Mr. Womble
9   in those conversations, didn't you, that the agents
10  really wanted Dreddy?
11   A.   I don't recall.
12   Q.   You don't recall?
13   A.   I don't.
14   Q.   And you also discussed with -- you also
15  learned from Womble that he was a suspect in the
16  murders, correct?
17   A.   Yes.
18   Q.   Okay.
19   A.   I don't --
20   Q.   But you do recall that?
21   A.   No, not really.  I don't.
22   Q.   I'm sorry?
23   A.   I don't recall the conversations that I had
24  with him over the phone because it's been so -- I
25  can't remember those phone calls.  Honestly, I just
```

**GA462**

1849

```
1    don't.
2        Q.   Okay.  But you did know at this point, did
3    you not, that Womble was discussing the possibility
4    of cooperation?
5        A.   I remember -- I remember a conversation,
6    him saying he was going to cooperate with the
7    government.  Yes, I do remember.
8        Q.   And you also knew at this time, at the time
9    of your arrest, that Frankie and Vanessa had been
10   arrested in connection with the case.
11       A.   I didn't know Vanessa was arrested until
12   the day I got arrested and I actually got arrested
13   and saw her in jail.
14       Q.   But you knew Frankie had been arrested.
15       A.   No, I did not.
16       Q.   So, you didn't know either of them had been
17   arrested.
18       A.   No.
19       Q.   But you knew what you had done.
20       A.   Yes, I did.
21       Q.   And you knew that Womble was going to have
22   to tell them about you.
23       A.   Yes.
24       Q.   Okay.  Now, before you got arrested, you
25   were still having a relationship with Womble,
```

1850

```
1    correct?
2        A.   Before I got arrested?
3        Q.   Yes.
4        A.   I was still having a relationship with
5    Womble?  Yes.
6        Q.   Because it was your hope he would get
7    out --
8        A.   Yes.
9        Q.   -- of prison.
10       A.   Yes.
11       Q.   And you would continue to live together.
12       A.   Yes.
13       Q.   And you wanted to help to get him out of
14   prison, right, if you could?
15       A.   Help?  I don't recall help because I don't
16   recall him having a bond, so no.
17       Q.   But you wanted him out of prison?
18       A.   Yes, of course I did.
19       Q.   Okay.
20       A.   Yes.
21       Q.   And you knew that prior to his arrest
22   Womble had kept drugs in the apartment?
23       A.   Yes, I did.
24       Q.   And guns?
25       A.   Yes.
```

1851

```
1        Q.   And cash?
2        A.   Yes.
3        Q.   And he was worried that the police might
4    come to the apartment.
5        A.   I don't understand.  What do you mean he
6    was worried about?
7        Q.   Womble was concerned that the police might
8    come to the apartment, right?
9        A.   While he was still out of jail?
10       Q.   No, while he was in jail.
11       A.   While he was in jail there was no drugs or
12   cash kept in the apartment.  I'm sorry.
13       Q.   Okay.  But Womble did ask you, did he not,
14   in one of your conversations to put something in a
15   bag and throw it over a fence?
16       A.   I don't recall that.
17       Q.   Okay.
18       A.   I don't recall.
19       Q.   All right.  So, on the day of your arrest
20   -- let me withdraw that.  On the day of your arrest
21   you learned from the agents that they knew about
22   you.
23       A.   Yes.
24       Q.   They knew about you delivering drugs to
25   Frank.
```

1852

```
1        A.   Yes.
2        Q.   And to Vanessa.
3        A.   Yes.
4        Q.   And they knew that it was a lot of drugs.
5        A.   I don't know if I remember -- yes, yes,
6    they knew it was drugs.
7        Q.   And you learned from them that because you
8    had been delivering those drugs you were facing a
9    lot of time yourself.
10       A.   Yes.
11       Q.   Like at least ten years.
12       A.   No, they said anywhere from five to
13   40 years.
14       Q.   Five to 40.  A lot of time.
15       A.   A lot.
16       Q.   They didn't tell you you faced a mandatory
17   minimum of ten years possibly?
18       A.   If they did, I don't recall it.
19       Q.   Okay.
20       A.   If they did.
21       Q.   They were also asking you about Dreddy,
22   right?
23       A.   Yes.
24       Q.   Lots of questions about Dreddy?
25       A.   I don't remember like if it was a lot of
```

1853

```
1   questions or -- I don't remember.  Honestly, it's
2   been a long time.
3       Q.   All right.  Well, at some point they take
4   you over to court, right?
5       A.   Yes.
6       Q.   And then you get a lawyer?
7       A.   Yes.
8       Q.   And you learn from your lawyer that this is
9   really serious.
10      A.   Yes.
11      Q.   You could be looking at some really serious
12  time.
13      A.   Yes.
14      Q.   You've already admitted to the agents your
15  involvement in the drugs.
16      A.   Yes.
17      Q.   And you'd never been to prison, right?
18      A.   No.
19      Q.   So, you are really scared at this point?
20      A.   Yes.
21      Q.   Okay.  But you learn there is a way to get
22  you out of the mess that Womble put you in, right?
23      A.   A way to get me out of it?
24      Q.   Well --
25      A.   No.
```

1854

```
1       Q.   A way to -- well, a way to maybe not serve
2   time in prison.
3       A.   I didn't know if there is a way I could not
4   serve time, no.
5       Q.   Are you serving time in prison now?
6       A.   No, I'm out on bond.
7       Q.   And altogether you served maybe a few
8   months in prison before today.
9       A.   Yes.
10      Q.   Even though you pled to something that was
11  a five-year mandatory minimum.
12      A.   Yes.
13      Q.   And you understand five-year mandatory
14  minimum to mean no less than five years?
15      A.   Yes.
16      Q.   But you haven't served anywhere near that.
17      A.   No.  I assume I haven't served it because
18  the case isn't over yet.
19      Q.   So, you are expecting to go back to prison
20  after you testify today?
21      A.   I'm expecting to go back to prison?  No.
22      Q.   No.  You are expecting to stay out.
23      A.   No, I'm expecting for the Judge to just
24  have leniency on me when she sentence me.
25      Q.   Okay.  But your hope is you would stay out.
```

1855

```
1       A.   Yes.
2       Q.   Okay.  And you are hoping that you won't
3   show up on the day of sentencing and the Judge says
4   now you are going back to jail.
5       A.   Yes, that's what I'm hoping.
6       Q.   But your lawyer explained to you that a way
7   to hopefully not serve a lot of time and have that
8   leniency --
9       A.   Yes.
10      Q.   -- is to cooperate.
11      A.   Tell the truth, yes.
12      Q.   Okay.  And so you asked for a meeting with
13  the government.
14      A.   Yes.
15      Q.   And you signed a proffer agreement, right?
16      A.   A what agreement?
17      Q.   The proffer agreement.  It's an agreement
18  that protects you.  It says what you tell the
19  government won't be used against you.
20      A.   Yes.
21      Q.   So you had already at this point told the
22  agents about your involvement.
23      A.   Yes.
24      Q.   Right?
25      A.   Yes.
```

1856

```
1       Q.   And did you learn through your cooperation
2   with the government that 50 grams or more of crack
3   carries a ten-year mandatory minimum?
4       A.   Maybe I did.  I don't remember if -- I
5   don't remember what -- we talked about so many
6   times, I don't remember.
7       Q.   Okay.  But eventually you did plead guilty,
8   right?
9       A.   Yes, I did.
10      Q.   And the government worked it out so you
11  could plead guilty to the five-year mandatory
12  minimum.
13      A.   Yes.
14      Q.   And you also entered into the cooperation
15  agreement, right?
16      A.   Yes.
17      Q.   And that means the Judge can give you less
18  than five years mandatory minimum, correct?
19      A.   Yes.
20      Q.   And, again, maybe you don't have to go back
21  to prison at all.
22      A.   I hope.  That's what I hope.
23      Q.   But that cooperation agreement had certain
24  conditions, right?
25      A.   Yes, it did.
```

**GA464**

1857

```
1    Q.   And one of the conditions was not to commit
2    any new crimes.
3    A.   Yes.
4    Q.   And you knew that possessing and using
5    drugs was a crime.
6    A.   Yes.
7    Q.   Okay.  And when you got arrested you got
8    out on bond, right, shortly thereafter?
9    A.   Yes.
10   Q.   And in that bond you made some promises to
11   the court.
12   A.   Yes, I did.
13   Q.   And you understood if you broke the promise
14   you could go back to jail.
15   A.   Yes.
16   Q.   So one of the promises you made was not to
17   have any contact with co-defendants.
18   A.   Co-defendants?
19   Q.   Meaning people who are also charged in the
20   case.
21   A.   Yes.
22   Q.   You knew you weren't supposed to do that.
23   A.   I don't even know who the co-defendants
24   are.  I don't know who co-defendants are.  I don't
25   understand what you mean by co-defendant.
```

1858

```
1    Q.   You understand that the government charged
2    you as part of a drug conspiracy, right?
3    A.   Yes.
4    Q.   And there were other people involved in
5    that conspiracy.
6    A.   Yes.
7    Q.   So, those are the people I'm talking about
8    when I say co-defendants.
9    A.   Okay, yes.
10   Q.   And one of the promises that you made to
11   the court is that you wouldn't have any contact with
12   those co-defendants.
13   A.   Okay.
14   Q.   And that included Womble, correct?
15   A.   Yes.
16   Q.   Okay.  But after you got out on bond, you
17   continued to have contact with Womble?
18   A.   Yes, I did.
19   Q.   So, right there you broke one of the
20   promises to the court.
21   A.   If you say I did.  I don't see it as
22   breaking -- Womble?  Yes, if you say I did.
23   Q.   Well, we just discussed --
24   A.   Exactly.
25   Q.   -- one of the things you promised the court
```

1859

```
1    as part of your bond --
2    A.   Is to stay away, yes.
3    Q.   Don't have any contact with co-defendants.
4    A.   Yes.
5    Q.   And we've established Mr. Womble was a
6    co-defendant.
7    A.   Okay.
8    Q.   Right?
9    A.   Yes.
10   Q.   So, when you had contact with him after
11   your bond was instated --
12   A.   Right.
13   Q.   -- you broke your promise to the court.
14   A.   Yes, I did.
15   Q.   Okay.  And one of the other promises again
16   was not to use drugs.
17   A.   Yes.
18   Q.   And that you would go to any programs they
19   designated for you.
20   A.   Yes.
21   Q.   And you would abide by those rules of --
22   A.   Yes.
23   Q.   -- the programs rules.
24   A.   Yes.
25   Q.   Right?  But then you broke those promises,
```

1860

```
1    correct?
2    A.   Yes.
3    Q.   Because you tested positive for cocaine,
4    correct?
5    A.   Yes, I did.
6    Q.   And possession and use of cocaine is a
7    crime.
8    A.   Yes, it is.
9    Q.   And you also walked away from one of your
10   treatment programs, right?  Or you stopped going I
11   should say.  I apologize.
12   A.   Yes.
13   Q.   You stopped going?
14   A.   Yes.
15   Q.   So you didn't successfully complete all of
16   your programs.
17   A.   Yes, I did.
18   Q.   Okay, so you are saying that you did not
19   fail to report to the Regional Outpatient Center in
20   Bridgeport?
21   A.   The Regional?  I don't know what --
22   outpatient program?
23   Q.   Right.
24   A.   I was to finish -- Nicole had -- my
25   probation officer had violated me and put me in
```

1861

```
1    jail, so I couldn't complete the outpatient.  I
2    didn't complete the outpatient, no.  All inpatients
3    I did.
4        Q.   So you are saying you were not in the
5    Regional Outpatient Center in Bridgeport?
6        A.   Yes, I was in there.
7        Q.   Right.
8        A.   But then I gave a dirty urine so that made
9    me not to be able to go back.  I got violated and I
10   believe I went to jail for the 55 days.
11       Q.   But you stopped going to that treatment
12   program.  That was also a basis for the violation.
13       A.   I stopped going because I gave a dirty
14   urine and my probation officer was about to violate
15   me -- was violating me.
16       Q.   So you did go back to jail?
17       A.   Yes.
18       Q.   But then you got another chance.
19       A.   Yes.
20       Q.   You were let out --
21       A.   Yes.
22       Q.   -- to go to another program.
23       A.   Yes.
24       Q.   And you violated the rules of that program.
25       A.   Which program was this?
```

1862

```
1        Q.   This was the Apt Foundation in Bridgeport.
2        A.   The Apt Foundation?  Daytop?
3        Q.   Daytop?
4        A.   I don't know what Apt Foundation is.
5        Q.   Daytop?
6        A.   Yes.
7        Q.   You had a relationship with a male patient
8    there?
9        A.   Yes, I did.
10       Q.   Okay.  But then you could have gone back to
11   jail for that, right?  I mean, you violated the
12   conditions again.
13       A.   Yes.
14       Q.   But they sent you to another treatment
15   program, right?
16       A.   No, they put be back in the same one
17   that -- the Daytop.  I went back there.
18       Q.   But eventually then you went Minnesota?
19       A.   Right.  From Daytop, yes.
20       Q.   So, you got another chance?
21       A.   Yes.
22       Q.   And each time you got another chance the
23   probation officer thought you should have a chance,
24   right?
25       A.   Yes.
```

1863

```
1        Q.   And the prosecutor thought you should have
2    a chance, too?
3        A.   I don't know about the prosecutor.  I know
4    my probation officer thought I should have another
5    chance.
6        Q.   So, you don't think the prosecutor ever
7    asked that you get another chance?
8        A.   No, they were the ones that's put me in
9    jail.  They were the ones that let me go.
10       Q.   They did?  The judge didn't put you in
11   jail?
12       A.   Well, when I went to court they read it off
13   and I went to jail.
14       Q.   Okay.
15       A.   I don't see them giving me a chance.
16       Q.   But each time you broke your promise.
17       A.   Yes.
18       Q.   And each time you possessed and used
19   drugs --
20       A.   Yes.
21       Q.   -- they never pulled the deal.  They never
22   ripped up your cooperation agreement, right?
23       A.   No, they did not.
24       Q.   And they never threatened to do that, did
25   they?
```

1864

```
1        A.   Not that I remember, no.
2            MR. SMITH:  Could I have just a moment,
3    your Honor.
4            THE COURT:  Yes.
5            MR. SMITH:  Your Honor, may we approach?
6            THE COURT:  Why don't we send you all to
7    lunch and we'll be back in a half an hour.
8            (Jury exited the courtroom.
9            THE COURT:  All right, Ms. Randolph, you
10   are excused for lunch for half an hour.  Please
11   don't discuss your testimony with anyone.
12           THE WITNESS:  Yes.
13           THE COURT:  Thank you.
14           All right, Mr. Smith.
15           MR. SMITH:  Your Honor, there are some
16   phone calls I would need to confront her with,
17   either to refresh her memory or denials.  We would
18   have to do that outside the presence of the jury.
19   Perhaps when we comes back from lunch before we
20   bring the jury in we can do that.
21           THE COURT:  Why is it -- I see what you
22   are saying.
23           MR. SMITH:  I asked her about certain
24   conversations she had with Mr. Womble.  She claimed
25   a failure of memory.
```

1865

```
 1          THE COURT:  So these are being used to
 2   refresh her recollection, correct?
 3          MR. SMITH:  Correct.
 4          THE COURT:  Would you tell the jury
 5   we'll have a 45-minute lunch.  We'll be back at
 6   1:30.  That's when I think she'll be back.  And you
 7   will be all set up by then?
 8          MR. SMITH:  Yes.  Thank you.
 9          THE COURT:  We'll stand in recess.
10          (Recess)
11          THE COURT:  Ms. Randolph, is she coming
12   back.
13          MR. MARKLE:  Your Honor, over the lunch
14   we were thinking about it.  I'm not sure what the
15   offer is, it sounds to me like this is going to
16   elicit a hearsay response that's going to be
17   objectionable anyway, so I'm not sure what counsel
18   is offering this for.
19          THE COURT:  You indicated, I thought,
20   Mr. Smith, it was to refresh her recollection on
21   things that Mr. Womble had told her in her calls to
22   him when he was in jail.
23          MR. SMITH:  That is correct.
24          THE COURT:  Why is that admissible?
25          MR. SMITH:  It's her basis of knowledge,
```

1866

```
 1   your Honor, is what I was asking her, about things
 2   that she knew at the time she was speaking for the
 3   first time to the federal agents at her arrest.  It
 4   goes to her state of mind in regards to her
 5   cooperation and her motives for doing so.
 6          THE COURT:  But you are not asking her
 7   what he said.
 8          MR. SMITH:  She said --
 9          THE COURT:  That's hearsay.
10          MR. SMITH:  Well, she is saying she
11   doesn't have specific memories of things that she
12   knew from Mr. Womble, and I'm asking if after
13   hearing this conversation, or this piece of
14   conversation, does she in fact recall then, knowing
15   that's from Mr. Womble, and that being what she knew
16   at the time.
17          THE COURT:  Without the specifics as to
18   what Mr. Womble told her?
19          MR. SMITH:  No, it would be the
20   specifics.  It's the phone call.
21          THE COURT:  Mr. Markle?
22          MR. SMITH:  It's not for the truth of
23   the matter asserted, your Honor, it's for her state
24   of mind.
25          MR. MARKLE:  I think it is, your Honor.
```

1867

```
 1   It is for the truth of the matter.  That's why
 2   they're claiming it's relevant.  But it's hearsay.
 3   It's what Mr. Womble told Ms. Randolph outside of
 4   court.
 5          MR. SMITH:  And they are things
 6   Mr. Womble testified to on Friday, your Honor, and
 7   they're the things --
 8          MR. MARKLE:  It's still hearsay, your
 9   Honor.
10          THE COURT:  That doesn't change its
11   character.
12          MR. SHEEHAN:  Your Honor, the issue
13   is --
14          THE COURT:  Are we're going to have two
15   voices on this?
16          MR. SMITH:  Your Honor, it is relevant.
17   It is the fact that she says I don't remember.  I
18   asked her.
19          THE COURT:  So you can refresh her
20   recollection and then she can tell you whether --
21          THE COURT:  She recalls.
22          THE COURT:  -- whether she recalls things
23   that concerned her about the amount of trouble she
24   was in, and that that was the -- what she had in her
25   mind when she was talking with the government,
```

1868

```
 1   without what he said to her.  Because I think what
 2   he says to her is hearsay and is not --
 3          MR. SMITH:  Right.  I mean, what -- I
 4   mean, but she has to hear that.  I can't parse out.
 5          THE COURT:  And if she doesn't remember
 6   it, then we're done.  Right?
 7          MR. SMITH:  At that point I guess we're
 8   done.
 9          THE COURT:  Let's bring her in and let's
10   play them.
11          Remind her what she's to have her
12   recollection refreshed about, please.
13          All right, Ms. Randolph.
14          THE WITNESS:  Yes.
15          THE COURT:  If you would kindly return
16   to the stand.  Mr. Smith is going to go over with
17   you certain areas of your testimony in which you did
18   not have a current memory or recollection,
19   particularly related to conversations you had with
20   Mr. Womble when he was in jail.
21          THE WITNESS:  Okay.
22          THE COURT:  He's going to play you
23   some -- tell you what -- remind you what you did not
24   have a recollection on.  If you now have a
25   recollection, then that's fine; if not, he's going
```

1869

```
1   to play tapes.  If they -- of those calls.  If they
2   refresh your recollection, then you can say so.  If
3   they still don't refresh your recollection, then we
4   just go on.  Okay?
5                 THE WITNESS:  Yes.
6                 THE COURT:  So will you direct her
7   attention to assure that the area of your
8   questioning remains an area she doesn't have
9   recollection of.
10               MR. SMITH:  Yes, your Honor.
11       Q.   Ms. Randolph, you recall that I was asking
12  you whether you were aware before you got arrested,
13  from your conversations with Mr. Womble, that the --
14  that you knew at that time that the agents really,
15  really wanted Dreddy.  Correct?
16               THE COURT:  You need to speak into the
17  mic.
18       Q.   You recall I asked you that question?
19       A.   Yes, I recall you asked me that.
20       Q.   So, do you recall knowing that?
21       A.   (Nods no).
22       Q.   We're going to play something for you and
23  we're going to see if that refreshes your memory.
24               MR. MARKLE:  Your Honor, I'm not sure
25  she's saying her memory needs to be refreshed.  She
```

1870

```
1   does not recall that.
2                 THE COURT:  Could you clarify,
3   Ms. Randolph, whether you are saying that that was
4   not the case at the time, that "the agents really,
5   really wanted Dreddy," or that you don't remember
6   whether or not it was the case.
7                 THE WITNESS:  I don't remember if that
8   was the case.
9                 THE COURT:  All right.
10       Q.   Would perhaps listening to a piece of a
11  conversation refresh your memory?
12       A.   Well, just play them.  She
13  doesn't know whether they will or not.
14               MR. SMITH:  So, this is 2B.  This is a
15  call from 9/16/05 at the 730 mark.  I'm sorry, the
16  2B call is the seven-minute mark.  That's fine.
17               (Tape played)
18       Q.   Does that refresh your memory about what
19  you knew at the time?
20               THE COURT:  You need to say "no," not
21  just shake your head.
22       A.   It doesn't.  It doesn't.  I could -- no, it
23  doesn't refresh my memory.  I don't recall that
24  conversation.
25       Q.   All right.  So, let's go on to 4C.  You
```

1871

```
1   recall that I -- before the lunch break had asked
2   you whether you recalled having gotten rid of
3   something for Womble, putting something in a bag and
4   throwing it over a fence.
5       A.   Yes.
6       Q.   And you didn't recall that.
7       A.   I recall doing that myself.  I don't recall
8   him telling me to do it.  I know I did that actual
9   act of getting it, putting it in a bag and throwing
10  it over the fence, yes.  But what I don't recall is
11  if he told me to do it or I just did it.
12       Q.   Okay.
13       A.   But I did package it and throw it over the
14  fence, yes, I did.
15       Q.   Okay.  Would listening to the call help
16  your memory of whether he told you to do that?
17       A.   Yeah.
18               MR. SMITH:  Why don't we play that as
19  well.
20               (Tape played)
21       Q.   Does that refresh your memory about whether
22  Mr. Womble told you to throw it over the fence?
23       A.   No.  I remember the whole entire
24  conversation with my sister about the guy.  I recall
25  that so fresh in my mind because I reported that to
```

1872

```
1   the government.  But I do not recall Womble telling
2   me to put it in a bag and throw it.  I know I did do
3   that, but I don't recall him saying it to me to do
4   it.  But I did do it.
5       Q.   You don't deny that's your voice --
6       A.   No, I don't.
7       Q.   -- on the telephone call?
8       A.   No.
9       Q.   Or the one before it?
10       A.   No.
11               MR. SMITH:  Your Honor, I would offer
12  both of those as exhibits.
13               MR. MARKLE:  The government would
14  object, your Honor.  If she recalls she can testify
15  to what happened.
16               THE COURT:  I don't understand how
17  they're admissible, Mr. Smith.
18               MR. SMITH:  Your Honor, these are --
19  she's saying I don't recall.
20               THE COURT:  Right.
21               MR. SMITH:  But these are clearly her
22  statements.  They are her recorded statements.
23  They're inconsistent with what she testified to in
24  the sense that she doesn't remember, but it's
25  clearly her voice on the phone, and that's
```

1873

```
 1   inconsistent with not knowing whether or not Womble
 2   told her to throw something over the fence.
 3              THE COURT:  Not remembering?  Why is it
 4   inconsistent?
 5              MR. SMITH:  Because it's clearly her
 6   voice and her statement.  She may not recall that,
 7   but it's her statement.  She's admitted it's her
 8   voice.
 9              MR. MARKLE:  That is not inconsistent,
10   your Honor.  I mean, not recalling specific
11   conversations doesn't mean it's inconsistent.
12              THE COURT:  You need to use the mic.
13              MR. MARKLE:  Having no recall or lack of
14   recall is not inconsistent, your Honor, and she
15   couldn't testify to what happened.  If the issue is
16   what happened with the item that was thrown over the
17   fence or thrown out, she has a recollection of that
18   and can testify to that in front of the jury.
19              MR. SMITH:  Well, now she does recall
20   that the agents wanted Dreddy.  Is that correct?
21              THE COURT:  No, it's not what she said.
22   I think that her lack of recollection, your
23   inability to refresh it with materials, means we
24   have to move on to the areas where she does have
25   recollection.  And that will include that she did
```

1874

```
 1   throw something over the fence, just not recalling
 2   that Mr. Womble told her -- whether Mr. Womble told
 3   her to do that.
 4              All right.  Are we ready to have the jury
 5   back or are there more areas?
 6              MR. SMITH:  No, that's it, your Honor.
 7              THE COURT:  Okay.  There is a -- I have
 8   an e-mail from Ms. Dayton to Ms. Torday.  Is this
 9   intended to be something for me to address?
10              MS. DAYTON:  Yes, your Honor, we would
11   ask that if you could address it.
12              Ms. Randolph -- and I don't mean to speak
13   about it as if you are not here -- was fired today.
14   She started a job last Tuesday.  She was here all
15   day Friday waiting to be called to the stand, but we
16   never got to her.  She was here under subpoena.
17   She's here under subpoena again today.  The
18   government had sent a letter to their human
19   resources saying that she was here under subpoena.
20   This morning when she left to come here it was fine,
21   and then they left her a voice mail message saying
22   don't come back to work because of your absences,
23   and the only absences were the ones compelled by the
24   legal subpoena for her to be here.  And so they
25   violated the law.
```

1875

```
 1              And, you know, Ms. Randolph is not going
 2   to have a lot of standing.  She just started there a
 3   couple of days ago, but we thought perhaps a call
 4   from you, your Honor, would explain to them or
 5   clarify to them they've violated the law.  And I've
 6   spoken to counsel about it and they have no
 7   objection.
 8              THE COURT:  I think that is very close,
 9   unfortunately, to the area of the code of judicial
10   conduct of a court using its -- a judge using her
11   position for the benefit of a private person,
12   another person.
13              MS. DAYTON:  Even if --
14              THE COURT:  You have a clear record here
15   of the timing.  It's clear that Ms. Randolph
16   certainly thought she had a job when she arrived
17   here this morning.  She testified that she had this
18   job with 3PL customer service for one week, and she
19   is just now finding out that she's been fired.  As
20   you say, there are laws to protect this and
21   presumably she has the full benefit of them.
22              MS. DAYTON:  Your Honor, then we would
23   ask that you appoint Ms. Randolph an attorney, or
24   continue Frank O'Reilly as her attorney for this
25   purpose.  He's appointed for her criminal case.
```

1876

```
 1              THE COURT:  There is a procedure to go
 2   through under the statute which I will pay immediate
 3   attention to when it's done, and if -- so I will
 4   tend to that promptly.
 5              MS. DAYTON:  Thank you, your Honor.
 6              THE COURT:  Okay.
 7              MS. DAYTON:  Thank you.
 8              THE COURT:  Mr. O'Reilly, are you
 9   prepared to do -- to make the submission on her
10   behalf?
11              MR. O'REILLY:  I am, your Honor.  I'll
12   do what I can.  I'm not an employment lawyer, but I
13   will certainly do whatever I can to help her in this
14   situation.  I think it's a --
15              THE COURT:  I think a review of the
16   statutes would probably give you the basis and
17   procedures to utilize.
18              MR. O'REILLY:  I will do it, your Honor.
19              THE COURT:  Okay.
20              MR. O'REILLY:  For sure.  Thank you.
21              THE COURT:  If there is anything else
22   that you think the Court can do in the course of
23   ensuring that this trial runs appropriately, I'd be
24   happy to hear it.
25              MS. DAYTON:  Thank you, your Honor.
```

**GA469**

1877

```
 1              THE COURT:  All right, let's bring in
 2  the jury.
 3              (Jury entered the courtroom)
 4              THE COURT:  Please be seated, ladies and
 5  gentlemen.  Cross-examination of Ms. Randolph will
 6  continue with Mr. Smith.
 7      Q.   Ms. Randolph, you were asked just a little
 8  bit ago about something refreshing your memory about
 9  whether or not you did bag something up and throw it
10  over a fence.  And you did do that, correct?
11      A.   Yes, I did.
12      Q.   Now, you talked about going to Charles
13  Street one day and seeing Mr. Hodges.
14      A.   Yes.
15      Q.   And seeing that he had been beat up
16  somehow.
17      A.   Yes.
18      Q.   Your very first interview on the day of
19  your arrest, you didn't mention this to the agents
20  at all, correct?
21      A.   No, I did not.
22      Q.   And then on November 18, 2005, you told the
23  agents you did see him one day, right?
24      A.   Yes.
25      Q.   And that his face looked really bruised up,
```

1878

```
 1  right?
 2      A.   Yes.
 3      Q.   But then they asked you about this again,
 4  right, February 11, 2010?
 5      A.   Okay.
 6      Q.   Correct?
 7      A.   I'm not sure what day they -- dates.
 8      Q.   But you were interviewed about a year ago.
 9      A.   Yes.
10      Q.   Your attorney was --
11      A.   There, yes.
12      Q.   You recall that?
13      A.   Yes.
14      Q.   And in that interview you said you saw
15  Dreddy leaving the apartment.  And then you said --
16  you told the agents that Dreddy said to you that he
17  just got done beating up Hodges.
18      A.   No, Dreddy never said that to me.
19      Q.   But you told the agents he did.
20      A.   If I did, it must have been the way they
21  asked me and I answered it.  He never told me that
22  he beat Frank up.
23      Q.   Okay.
24      A.   Never.
25      Q.   All right.  I was a little unclear as to
```

1879

```
 1  why Mr. Womble was no longer seeing Dreddy.
 2      A.   I don't know why Womble stopped seeing
 3  Dreddy.
 4      Q.   Okay.  But you told the agents about this,
 5  right?
 6      A.   I told them that he stopped having dealings
 7  with Charles Street at least two weeks before.
 8      Q.   Right, but you also told them why.
 9      A.   I don't remember if I did.
10      Q.   Well, in your first interview with your
11  lawyer there, you explained that it was because
12  Womble lost the gun.
13      A.   I assumed because Womble lost the gun
14  that's why he stopped.
15      Q.   But when you told them that, you told them
16  that Womble was at this club one night, right?  And
17  that you were at the club.
18      A.   Okay.
19      Q.   Correct?
20      A.   Yes, I guess so.  It's been so long I don't
21  remember like dates and what -- I don't recall all
22  of this.
23      Q.   Were you at the club?
24      A.   On which day?
25      Q.   The night Womble lost the gun.
```

1880

```
 1      A.   No, I wasn't -- I don't recall being at the
 2  club that night.
 3      Q.   You don't recall telling the agents that an
 4  ex-boyfriend threatened you at the club?
 5      A.   I could have said that.  I don't know.
 6      Q.   Well, let's see if you remember.
 7              MR. SMITH:  Can we bring up DG 2192.
 8  The bottom paragraph there.
 9      A.   Okay.
10      Q.   So, you did tell the agents you were at the
11  club.
12      A.   Yes, I did.
13      Q.   And that an ex-boyfriend threatened you.
14      A.   I don't recall.  This statement, I remember
15  saying this, but -- yes.
16      Q.   So, you do recall telling the agents that?
17      A.   Yes.
18      Q.   And you remember telling the agents that
19  Womble went home and got the Mac.
20      A.   Mac?
21      Q.   He got a firearm.
22      A.   A gun.  Okay.
23      Q.   Correct?
24      A.   Yes.
25      Q.   And came back to the club, correct?
```

**GA470**

1881

```
1     A.   Yes.
2     Q.   And threatened to shoot the guy.
3     A.   Yes.
4     Q.   You told the agents all of this.
5     A.   Yes.
6     Q.   And that Womble then threw the gun out the
7  window of the car.
8     A.   Yes.
9     Q.   And that Azibo later asked for this gun.
10    A.   Yes.
11    Q.   You told the agents that, correct?
12    A.   Yes.
13    Q.   And that Womble started to avoid him?
14    A.   Yes.
15    Q.   Okay.  Then they asked you about this
16 again, why Azibo ended his relationship with Womble,
17 right?
18    A.   Yes.
19    Q.   And this was last year in 2010 they asked
20 you about that.
21    A.   Yes, I guess so.
22    Q.   And when you told them that time, you told
23 them the real reason that the relationship ended was
24 a falling out over money.
25    A.   You know, I have no clue why Dreddy and
```

1882

```
1  Womble stopped dealing with each other.  I can
2  assume why Dreddy and Womble -- either the gun or
3  the money.  I assume that's why they fall out.
4  Womble never told me and Dreddy never told me why
5  they stopped dealing with each other.  For me
6  assuming, yes, it was either money or that gun that
7  was missing.
8     Q.   But you told them on one occasion it was
9  the gun and then you told them just more recently it
10 was the money.
11    A.   Okay.  Either/or.
12    Q.   Correct?
13    A.   Yes.
14         MR. SMITH:  Just a moment, your Honor.
15         I have nothing further, your Honor.
16 Thank you.
17         THE COURT:  Thank you.  Redirect.
18 REDIRECT EXAMINATION
19 BY MR. MARKLE:
20    Q.   Ms. Randolph, in regards to the incident at
21 the nightclubs, had you seen an ex-boyfriend when
22 you were there?
23    A.   Yes.
24    Q.   And were you afraid of him?
25    A.   Yeah, of course.
```

1883

```
1     Q.   Why were you afraid of him?
2     A.   Because he had shot me earlier.  He had
3  shot me.
4     Q.   How long ago had that happened?
5     A.   In '91, I believe he shot me.
6     Q.   And that's the person that Mr. Womble
7  confronted?
8     A.   Yes.
9     Q.   And Mr. Womble was aware of what he had
10 done to you before, correct?
11    A.   Yes, he was.
12    Q.   When you say you assumed it was the gun or
13 the money, was there a problem with the gun?
14    A.   Yes, there was.
15    Q.   And what was the problem?
16    A.   That Womble had took it out the house
17 without Dreddy's permission and threw it.
18    Q.   And was it Mr. Womble's gun to do what he
19 wanted with?
20    A.   No, it was not.
21    Q.   Whose gun was it?
22    A.   Dreddy's.
23    Q.   And was there a problem with the money?
24    A.   Yes, there was.
25    Q.   And what was the problem with the money?
```

1884

```
1     A.   That it was coming up short.
2     Q.   And whose money was it?
3     A.   Dreddy's.
4     Q.   Was it Mr. Womble's money to do with what
5  he wanted with it?
6     A.   No, it was not.
7     Q.   And who would he have to answer to about
8  the gun?
9     A.   Dreddy.
10    Q.   And who about the money?
11    A.   Dreddy.
12    Q.   Now, did you ever give a signed sworn
13 statement to the police?
14    A.   No.
15    Q.   So, the exhibits, the things you've been
16 looking at are not your own statements, are they?
17    A.   No.
18    Q.   Do you even know what those are you are
19 being shown?
20    A.   No.
21    Q.   Are those reports you have read before?
22    A.   No.
23    Q.   Did you have a chance to correct them, see
24 them, change them?
25    A.   No, I did not.
```

**GA471**

1885

```
1    Q.   When you were asked about this item being
2   thrown over the fence -- do you recall that?
3    A.   Yes, I do.
4    Q.   What was thrown over the fence?
5    A.   A box of bullets that Dreddy had left in
6   the house.
7    Q.   Where were those bullets or ammunition
8   kept?
9    A.   Underneath my dresser, a compartment
10  underneath it, underneath the dresser.
11   Q.   And how do you know those belonged to
12  Dreddy?
13   A.   Because Womble said these are Dreddy's.
14   Q.   How did you know to get rid of them?
15   A.   Because -- I knew to get rid of them
16  because the murders that happened, Womble is in
17  jail, there is no need for the bullets to be in the
18  house, so I just got rid of them.
19   Q.   And how did you get rid of them?
20   A.   I put them -- they were already in a brown
21  paper bag.  I put them into another plastic bag,
22  tied them up, and threw them over the fence of my
23  backyard.
24   Q.   And you are not denying you threw them out
25  of your house?
```

1886

```
1    A.   No.
2    Q.   And you talked to Womble about doing that?
3    A.   I'm not sure.
4    Q.   You don't remember that?
5    A.   I told him that I did that then.
6    Q.   But you know that you took the bullets and
7   threw them out.
8    A.   Yes, I did.
9    Q.   And you said when the police came there
10  were no drugs found in your apartment; is that
11  correct?
12   A.   Yes.
13   Q.   Is that because you threw them out?
14   A.   No, because we hadn't had drugs in there at
15  least two weeks before the Charles Street thing
16  happened because Womble had left it alone.  So there
17  was no drugs in there.
18   Q.   How about money in the house?
19   A.   None.
20   Q.   When you were asked questions by the police
21  you were asked about Dreddy, correct?
22   A.   I'm not sure I was asked about him.
23   Q.   Do you remember being asked about Womble?
24   A.   I'm not sure.
25   Q.   Do you remember who they asked you about?
```

1887

```
1    A.   When they came to the house and they stated
2   who they were, I knew what they wanted.  That's why
3   I went and grabbed the stuff to give to them because
4   I knew what they wanted.  But I don't remember them
5   asking about me doing nothing, Dreddy or Womble.  I
6   don't remember.
7    Q.   And did you tell them about Dreddy?
8    A.   I don't remember.
9    Q.   You don't remember what you told them at
10  that time?
11   A.   Right.  At that time when they were at my
12  house, I have no clue.
13   Q.   Do you remember telling them that you were
14  involved in drug dealing?
15   A.   Yes.
16   Q.   And showing them where the various items
17  were that were used?
18   A.   Yes.
19   Q.   Now, in regard, Ms. Randolph, to your
20  violations, each time you broke a promise or
21  condition of your release, were you brought back
22  before the Court?
23   A.   Yes.
24   Q.   And your probation officer caused that to
25  happen?
```

1888

```
1    A.   Yes, she did.
2    Q.   And there was a prosecutor in the
3   courtroom.
4    A.   Yes, there was.
5    Q.   And on two of those occasions you went back
6   to jail, correct?
7    A.   Yes, I did.
8    Q.   So, do you think you got a break when you
9   broke those promises?
10   A.   No, I went to jail.
11   Q.   Had you ever been to jail before?
12   A.   Never.
13   Q.   The longest amount of time you ever did for
14  violating one of those conditions, is that the
15  longest?
16   A.   Yes, 55 days was long, yes.
17   Q.   And before you violated these conditions,
18  before your federal arrest, had you ever served any
19  time in prison?
20   A.   Never.
21   Q.   In jail?
22   A.   No.
23   Q.   And every time that you weren't put in jail
24  were you put into an inpatient program?
25   A.   Yes.
```

**GA472**

1889

```
1              MR. MARKLE:  I have no further
2    questions.  Thank you, your Honor.
3              THE COURT:  All right.  Mr. Smith
4    anything further?  It will be recross.
5              MR. MARKLE:  Your Honor, I do have one
6    other question, so can I just ask it before recross
7    starts?
8              THE COURT:  Would you mind stepping
9    aside?
10             MR. SMITH:  Maybe after I hear what the
11   question is, we'll see.
12        Q.   Ms. Randolph, you said that the morning you
13   heard about the murders you were sleeping and were
14   told by your mother.
15        A.   Yes.
16        Q.   Wakened by your mother.
17             MR. SMITH:  Object.  This is outside the
18   scope of my cross.  I didn't ask about that line.
19             MR. MARKLE:  I think there were
20   questions, though, asked about Mr. Womble being a
21   suspect, your Honor, and this goes to that issue.
22             THE COURT:  My notes don't reflect that
23   as being the subject of cross-examination, but I may
24   have left something out.
25             MR. MARKLE:  I'm sorry, your Honor?
```

1890

```
1              THE COURT:  I may have left something
2    out of my notes, but I don't have that as a subject
3    of cross-examination.
4              MR. SMITH:  My objection stands, your
5    Honor.  It's outside the scope of my cross.
6              THE COURT:  All right.  Sustained.  I'm
7    going to sustain the objection.
8         Q.   Do you recall the evening of August -- the
9    night of August 24, 2005, the day -- when you
10   learned about the murders, do you remember the night
11   before that, that night?
12        A.   Yes, I do.
13        Q.   And do you recall -- how can you recall
14   that evening, that night -- do you remember the late
15   morning hours of that night?
16        A.   Yes.
17        Q.   And how do you recall that?
18             MR. SMITH:  I'm going to object again.
19   Outside the scope.
20             THE COURT:  Let me see where we're going
21   with this.
22             MR. MARKLE:  Your Honor, I'll have to
23   look at my notes.  I thought that questions were
24   asked about Mr. Womble being a suspect.
25             MR. SMITH:  I thought she said she had
```

1891

```
1    no memory of that.
2              THE COURT:  If that wasn't in your
3    direct it must have been in his cross because the
4    subject came up.
5              MR. MARKLE:  Yes, your Honor.  And I
6    didn't take notes during my direct, so I can't
7    promise you it's there, but...
8              THE COURT:  You remember what you asked.
9    Why don't you go ahead and ask the question
10   directly.
11        Q.   The early morning hours of August 24, 2005,
12   do you recall that date?
13        A.   Yes, I do.
14        Q.   And why do you recall what was going on at
15   your apartment that night?
16        A.   Because me and Womble were up all night
17   getting high.
18        Q.   Getting high?
19        A.   Yes.
20        Q.   And do you remember anything unusual about
21   that?  I mean, you would get high on other nights,
22   correct?
23        A.   Uh-huh (indicating affirmatively).
24        Q.   Was there anything about that night that
25   you remember?
```

1892

```
1         A.   Specific, no.
2         Q.   How did you -- what were you trying to get
3    high with?
4              MR. SMITH:  Objection.
5         A.   We were trying --
6              MR. SMITH:  Leading.
7              MR. MARKLE:  She said she was getting
8    high and I asked what kind of drug she was trying to
9    get high on.
10             THE COURT:  Go ahead.
11        Q.   Was it a drug you were trying to get high
12   on?
13        A.   Yes.
14        Q.   What kind?
15        A.   Coke.  Cocaine.
16        Q.   And did you have a supplier of cocaine?
17        A.   Yes, we did.
18        Q.   And who was that?
19        A.   I don't recall his name, but we were
20   calling him and --
21        Q.   Do you remember calling him that night?
22        A.   Yes.
23        Q.   And did he actually come with cocaine?
24        A.   No.
25        Q.   Did he come to your apartment?
```

1893

```
1     A.    No.
2     Q.    Did Mr. Womble ever leave your apartment?
3     A.    No.
4     Q.    Were you able to get cocaine that night?
5     A.    Nope.
6     Q.    Did you do cocaine that night?
7     A.    No.
8     Q.    And do you remember Mr. Womble then going
9  to sleep with you?
10    A.    Yes.
11    Q.    Do you know if he left at any time during
12 that night?
13    A.    No.
14    Q.    Thank you.
15 RECROSS-EXAMINATION
16 BY MR. SMITH:
17    Q.    How is it you are getting high if you don't
18 have any cocaine and couldn't get any?
19    A.    We were trying to get high that night.  The
20 dude we kept calling wouldn't -- didn't answer his
21 phone.
22    Q.    You testified you were getting high --
23    A.    Uh-huh (indicating affirmatively).
24    Q.    -- in response to the government's
25 questions.
```

1894

```
1     A.    Exactly.
2     Q.    Getting high, not trying to get high.
3            MR. MARKLE:  No, your Honor, that's not
4  what she said.
5            THE COURT:  That's not correct.  You
6  were up all night trying to get high?
7            THE WITNESS:  Trying to get high.
8     Q.    And when I asked you if you remember being
9  at the club you didn't at first, correct?
10    A.    Correct.
11    Q.    And then when the government asked you
12 suddenly remembered all kinds of details about it,
13 correct?
14    A.    No.  When you showed it to me on the screen
15 and I actually read it and I seen Wingsmith's (ph)
16 name in there, yes, I remembered that incident
17 happening.
18    Q.    Okay.
19    A.    I remembered it when you showed it to me.
20    Q.    And you remember Womble coming to the club
21 and threatening to shoot him?
22    A.    Yes, I do.
23            MR. SMITH:  Nothing further your Honor.
24 Thank you.
25            THE COURT:  Thank you very much.  You
```

1895

```
1  are excused.
2            Will the government please call its
3  next witness.
4            MR. MARKLE:  Yes, your Honor, the
5  government calls Virgil Procaccini.
6            THE COURT:  All right, Mr. Procaccini,
7  if you will kindly remain standing, Ms. Torday will
8  administer the oath.
9       V I R G I L   P R O C A C C I N I
10 Having first affirmed, was examined and testified as
11 follows:
12            THE WITNESS:  My name is Virgil
13 Procaccini, P-r-o-c-a-c-c-i-n-i, Newtown,
14 Connecticut.
15            THE COURT:  You may proceed.
16 DIRECT EXAMINATION
17 BY MR. MARKLE:
18    Q.    Good afternoon.
19    A.    Good afternoon.
20    Q.    Mr. Procaccini, could you tell us how you
21 are presently employed?
22    A.    I am currently employed down in Wilton
23 doing corporate security.
24    Q.    And for how long have you been doing
25 corporate security?
```

1896

```
1     A.    The past year and a half.
2     Q.    And prior to that, how were you employed?
3     A.    By the Connecticut State Police.
4     Q.    And prior to that, how were you employed?
5     A.    By the Easton Police Department.
6     Q.    And for how long were you -- is that where
7  you began your law enforcement experience?
8     A.    Yes.
9     Q.    And how long were you with the Easton
10 Police Department?
11    A.    For five years.
12    Q.    And how long were you with the Connecticut
13 State Police?
14    A.    Twenty-two.
15    Q.    And in your time with the state police,
16 were you ever assigned to any specific units at the
17 state police?
18    A.    Yes, I was assigned to the Statewide
19 Narcotics Task Force.
20    Q.    What is the Statewide Narcotics Task Force?
21    A.    That's a state police run drug enforcement
22 unit that is composed of local officers from the
23 towns in addition to the state police.
24    Q.    And for how long -- what's the primary
25 responsibility of the statewide task force?
```

**GA474**

1897

1    A.   We investigate any individuals involved
2  with the selling of narcotics, distributing
3  narcotics, so forth.
4    Q.   Primarily narcotics investigations?
5    A.   Correct.
6    Q.   And in your capacity as a Connecticut state
7  trooper and officer, did you receive training in law
8  enforcement?
9    A.   Yes.
10   Q.   And could you give us a brief overview of
11 some of the training?  Did you go to the state
12 police academy?
13   A.   Yes, I did.
14   Q.   What does that entail?
15   A.   That entails all sorts of training
16 involving laws of arrest, search and seizure, motor
17 vehicle law, so forth.
18   Q.   And did you ever go to what's known as
19 basic drug investigation school?
20   A.   Yes, I did.
21   Q.   Seminar?
22   A.   Yes.
23   Q.   Where is that training done?
24   A.   That's held in Meriden at the state police
25 academy.

1898

1    Q.   And does that regard all aspects of drug
2  investigations?
3    A.   Pretty much.
4    Q.   Is there an advanced course in that drug
5  investigations?
6    A.   Yes.
7    Q.   Did you attend that course?
8    A.   Yes.
9    Q.   Successfully complete those?
10   A.   Yes.
11   Q.   And what kind of things are taught at that?
12   A.   They teach you how to investigate covertly;
13 they teach you how to utilize informant information;
14 they teach you basic principles involving search and
15 seizure.
16   Q.   And have you been trained in the detecting
17 and obtaining, preserving evidence in a drug case or
18 other types of cases?
19   A.   Yes.
20   Q.   And have you ever participated as an
21 undercover officer in any drug investigation?
22   A.   Yes, I have.
23   Q.   Have you -- were you assigned to a unit
24 that's called TNT in Bridgeport area?
25   A.   Yes, I was.

1899

1    Q.   And what is that -- what did you do as part
2  of the TNT squad?
3    A.   TNT stands for tactical narcotics team.
4  That's a uniformed police presence in Bridgeport
5  that focuses on street-level narcotics dealers.
6    Q.   And were you also involved in an operation
7  known as Safe Streets?
8    A.   Yes, I was.
9    Q.   And what is that?  What is the
10 responsibility of that Safe Streets initiative?
11   A.   That was a program back in 1990, I believe,
12 where I was assigned to work with the Bridgeport TNT
13 unit on a daily basis conducting street-level drug
14 investigations.
15   Q.   So, is it fair to say that you've engaged
16 in drug investigations from virtually every
17 perspective, street investigations to lengthy
18 investigations, undercover to evidence seizure?
19   A.   Yes, I have.
20   Q.   And so for the last 16 years while you were
21 a Connecticut state police officer, were you
22 primarily involved in just drug investigations?
23   A.   Yes, I was.
24   Q.   And have you participated previously in
25 preparing arrest warrants in regard to drug

1900

1  investigations?
2    A.   Yes.
3    Q.   And search warrants?
4    A.   Yes.
5    Q.   And you have executed arrest and search
6  warrants?
7    A.   Yes.
8    Q.   How many times would you say you've been
9  involved, investigations where search warrants have
10 been executed?
11   A.   Several hundred times.
12   Q.   The same true for arrest warrants?
13   A.   Yes.
14   Q.   Now, in terms of -- let me draw your
15 attention to November 29, 2005.  Have you reviewed
16 some reports regarding an investigation conducted on
17 that date?
18   A.   Yes, I have.
19   Q.   And do you recall participating in an
20 investigation conducted on that date?
21   A.   Yes.
22   Q.   And at that time who were you working for?
23   A.   The Connecticut State Police.
24   Q.   And were you a member of the Statewide
25 Narcotics Task Force?

**GA475**

1901

```
1    A.  Yes, I was.
2    Q.  And do you recall who else was involved in
3  that investigation?
4    A.  Yes.
5    Q.  And who was that?
6    A.  Detective John Andrews.
7    Q.  And what police department is he affiliated
8  with?
9    A.  The Bridgeport Police Department.
10   Q.  And in regards to November 29, 2005, do you
11 recall whether or not any search warrants were
12 obtained?
13   A.  Yes.
14   Q.  And more than one?
15   A.  Yes.
16   Q.  And were those signed by a state Superior
17 Court judge?
18   A.  Yes.
19   Q.  And do you recall, did one of those
20 warrants have to do with 1912 Boston Avenue?
21   A.  Yes.
22   Q.  And what did it have to do with 1912 Boston
23 Avenue?
24   A.  That was the location that we determined to
25 be a stash house for the suspect that we were
```

1902

```
1  conducting the search warrants on.
2    Q.  And what were you authorized by a state
3  Superior Court judge to search for?
4    A.  We were authorized to search the second
5  floor apartment at 1912 Boston Avenue.
6    Q.  And the items or evidence that you were
7  searching for were -- just in general, were what?
8    A.  They would have been narcotics, cocaine,
9  packaging materials, scales, any other kind of
10 documentation that would support a drug
11 organization.
12   Q.  And do you recall going to 1912 Boston
13 Avenue on November 29, 2005?
14   A.  Yes.
15   Q.  And I'm going to show you what's been
16 marked --
17        THE COURT:  I'm sorry, 1912 Boston
18 Avenue where?
19   Q.  Where?
20   A.  In Bridgeport.
21        MR. MARKLE:  Thank you, your Honor.
22   Q.  And do you know whose residence that was?
23   A.  Yes.
24   Q.  And who was that?
25   A.  Selina Bember.
```

1903

```
1    Q.  And do you know approximately what time you
2  went to that location?
3    A.  Yes.
4    Q.  And what time did you go to that location?
5    A.  It was about three o'clock when we executed
6  the warrant.
7    Q.  And were you alone or were you with other
8  police officers?
9    A.  I was actually in the same vehicle as
10 Detective John Andrews.
11   Q.  And how were you dressed at that time?
12   A.  I was dressed in police-issued raid gear
13 which clearly identifies myself as a police officer.
14   Q.  So you were not undercover or in plain
15 clothes.
16   A.  No.
17   Q.  Were the other members of the team
18 executing the search warrant?
19   A.  No.
20   Q.  They were -- was everybody identifiable as
21 police officers?
22   A.  Absolutely.  It's policy.
23   Q.  And do you recall how you gained -- well,
24 as you approached the building, what, if anything,
25 happened?
```

1904

```
1    A.  Well, as we approached the building the
2  suspect known to us as Willy Jackson and the female
3  Selina Bember exited the residence and were standing
4  in the driveway.
5    Q.  What, if anything, happened with regards to
6  them?
7    A.  Detective Andrews gave authorization for
8  police to move in and effect the arrest.
9    Q.  Did you have arrest warrants for those two
10 individuals?
11   A.  We had a warrant for Willy Jackson.
12   Q.  And did you then proceed to go to 1912
13 Boston Avenue, Bridgeport, Connecticut, the actual
14 premises?
15   A.  Yes, after they were secured.
16   Q.  And showing you what's been marked
17 Government's Exhibit 201, do you see that on your
18 screen?  I hope.
19   A.  No.  Yes, I do.
20   Q.  Do you recognize that apartment building?
21   A.  Yes, I do.
22   Q.  And what do you recognize that to be?
23   A.  That is 1912 Boston Avenue in Bridgeport.
24        MR. MARKLE:  I would offer that full
25 exhibit, your Honor.
```

**GA476**

1905

```
1    MR. SMITH:  No objection.
2    THE COURT:  Full exhibit.
3    Q.   And do you recall -- you indicated which
4  floor were you authorized to search?
5    A.   The second floor.
6    Q.   And do you see where you entered that
7  building?
8    A.   Yes.
9    Q.   And is it depicted in 201, in the
10 Exhibit 201?
11   A.   Oh, yes, it is.
12   Q.   Well, I only see one door, is that the door
13 you went in?
14   A.   No, there is actually two doors there.  The
15 second door is, I think, behind the column.
16   Q.   I see.  Yes.  Did you enter -- which door
17 did you enter?
18   A.   I believe we went into the right door, the
19 front right door.
20   Q.   The one I can see?
21   A.   Yes.
22   Q.   We can see?
23   A.   Yes.
24   Q.   Did you force your way in or did you just
25 open it?
```

1906

```
1    A.   We forced our way.  After we announced our
2  presence, nobody answered the door, so we forced it
3  open.
4    Q.   And where did you proceed to go?
5    A.   Up the stairs to the second floor landing.
6    Q.   And was anyone -- how did you gain entry
7  into the second floor apartment?
8    A.   Again we knocked and announced our
9  presence, nobody answered the door, so we forced
10 that door in.
11   Q.   And was anyone inside?
12   A.   Yes.
13   Q.   And how many people?
14   A.   There was a girl by the name of Shante and
15 a young baby.
16   Q.   Do you remember -- what do you mean a young
17 lady?
18   A.   A girl named Shante and a baby.
19   Q.   Oh, and a baby.  I'm sorry.  And what did
20 you do in regards to the woman named Shante?
21   A.   She was secured where she was located and
22 the rest of the officers, you know, scoured about
23 the apartment to make sure there is nobody else in
24 there.  And once we deemed it safe and that nobody
25 else was there, commenced our process of searching
```

1907

```
1  the apartment.
2    Q.   And no one else was located?
3    A.   No.
4    Q.   And did you have a -- one of the trained
5  dogs with you at that time?
6    A.   Yes.
7    Q.   And was the dog used to search?
8    A.   Yes.
9    Q.   And what were you -- was anyone -- once you
10 secured the premises, was anyone allowed to enter
11 once you started your search other than law
12 enforcement?
13   A.   At one point they brought the lady up from
14 downstairs, Selina Bember.  She was brought back
15 upstairs.
16   Q.   Is that before the search, during the
17 search, or after the search?
18   A.   Not sure.
19   Q.   Was anyone allowed to touch anything inside
20 the apartment other than law enforcement?
21   A.   No.
22   Q.   Was Ms. Bember and Shante -- do you
23 remember her last name?
24   A.   I'm not sure.
25   Q.   Were they allowed to touch or move any
```

1908

```
1  items?
2    A.   No.
3    Q.   After entry was -- once the place was
4  secured, what was your responsibility in regards to
5  this search warrant?
6    A.   I was the designated evidence officer.
7    Q.   What does that mean?
8    A.   That means I was responsible for receiving
9  any evidence that the officers find as they're
10 searching the apartment, logging it in, and bagging
11 and tagging, as we call.
12   Q.   And were photographs taken of the evidence?
13   A.   Some.
14   Q.   In place?
15   A.   I believe so.  But I wasn't responsible for
16 photographs.
17   Q.   When you would seize the items, would
18 you -- would they be brought to you or would you go
19 to the items?
20   A.   It depended.
21   Q.   And how did you know where an item came
22 from?
23   A.   The officer who found it would make himself
24 known, usually by calling for me, and then I would
25 either -- I would go and observe the evidence and
```

**GA477**

1909

1  either tell him to bring it back to my table where I
2  was set up or I may just take it from that location.
3      Q.   And did you maintain a flow sheet or record
4  of the evidence that was seized?
5      A.   Yes.
6      Q.   And what kind of information is contained
7  on the flow sheet?
8      A.   Basic description of the evidence, the time
9  it was located, who located it, and where.  And it's
10 given an exhibit number.
11     Q.   So you can keep track of your own exhibit
12 number?
13     A.   Correct.
14     Q.   And is an evidence report also prepared?
15     A.   Yes.
16     Q.   Once the evidence is brought to your
17 attention and you either retrieve it or it's placed
18 in front of you, what would you do with it once it's
19 logged in?
20     A.   Once it's logged in, I kept it in my
21 custody.
22     Q.   And what would you then do with it?
23     A.   Then it would be transported back to the
24 state police facility where we would, you know, do
25 more extensive review of the evidence, sometimes

1910

1  have to weigh it, count bullets, so forth and so on.
2  And then from that point it's actually stored at a
3  statewide narcotics facility.
4      Q.   Do you recall searching -- well, in the
5  course of your search, was there what's described as
6  a porch area of the home located?
7      A.   Yes.
8      Q.   And is that depicted in Government's
9  Exhibit 201?
10     A.   Yes, it is.
11     Q.   And could you just point out -- there is a
12 pointer right next to you.  Can you just show us on
13 the screen what area you are referring to?
14     A.   Sure.
15     Q.   Okay.  So right on the second floor right
16 in the middle of photograph 201?
17     A.   Correct.  Yes.
18     Q.   And what -- was that a porch?
19     A.   Yes.
20     Q.   It's closed in, though.
21     A.   It's an enclosed porch.  It's part of the
22 second floor apartment.
23     Q.   And was that area of the home searched?
24     A.   Yes.
25     Q.   And do you know whether or not any items of

1911

1  evidentiary value were located there?
2      A.   Yes.
3      Q.   And how do you know that?
4      A.   Because I was there, I was the evidence
5  collection officer.
6      Q.   Did you actually go on the porch?
7      A.   Yes.
8      Q.   And what brought your attention to the
9  porch area?
10     A.   One of the officers who was searching the
11 porch, you know, called out that he had something he
12 felt was evidence.
13     Q.   And did you respond to that?
14     A.   I did.
15     Q.   And what did you observe?
16     A.   There was a blue plastic container on the
17 floor that contained a nylon bag.
18     Q.   Did you see whether or not anything was
19 inside that bag?
20     A.   You could see it had gun boxes.
21     Q.   And I'm going to show you what's marked
22 201I, and ask you if you recognize that bag.
23     A.   Yes.
24     Q.   And how do you recognize that bag?
25     A.   That is the bag that was found within the

1912

1  blue container.
2      Q.   And is that in substantially or exactly the
3  same condition as when you found it on
4  November 29th?
5      A.   It appears so.
6      Q.   Was that photographed at the scene?
7      A.   Yes.
8          MR. MARKLE:  I'd offer 201I, your Honor.
9          MR. SMITH:  No objection.
10         THE COURT:  All right, full exhibit.
11         THE WITNESS:  Excuse me?
12         THE COURT:  201 is a full exhibit.
13         MR. SMITH:  Is that 201?
14         THE COURT:  201I.  That's how you
15 designated it?
16     Q.   That's the nylon bag?
17     A.   Yes.
18     Q.   And that was found in the porch area,
19 correct?
20     A.   Yes.
21     Q.   Now, underneath that, is that the container
22 you referred to?
23     A.   Yes.
24     Q.   So, in Government's 201I there is like a
25 blue plastic container?

1913

```
1    A.    Yes.
2    Q.    And where was that found?
3    A.    That was found on the second floor porch.
4    Q.    And where was the black bag depicted in
5   201I in relation to that blue container?
6    A.    It was in it.
7    Q.    And did you remove it from the container?
8    A.    Yes.
9    Q.    And inside that black bag did you observe
10  any other items of evidentiary value?
11   A.    Yes.
12   Q.    And do you recall what, if anything, was
13  found inside that bag?
14   A.    There were a few empty gun boxes with the
15  serial numbers and description of the firearms on
16  the bag -- on the box, I'm sorry.  There was an
17  ammunition clip with rounds of ammunition in it.  I
18  believe there is a few boxes of ammunition in there.
19   Q.    And did you take those items into custody,
20  your custody?
21   A.    Yes.
22   Q.    And they were preserved as evidence?
23   A.    Yes.
24   Q.    Showing you what's been marked Government's
25  Exhibit 201H for identification, ask you if you
```

1914

```
1   recognize that item.
2    A.    Yes.
3    Q.    And is that one of the items that was found
4   in the black nylon bag?
5    A.    Yes, it is.
6    Q.    And that's described as what?
7    A.    This is described as a Smith & Wesson gun
8   box, labelled .22 caliber with the model, serial
9   number.
10   Q.    And does it bear your name or evidence
11  indicating that that was the subject of a search on
12  November 29th and taken into custody by you?
13   A.    Yes, it does.
14   Q.    And what is that?
15   A.    Well, it indicates the date, the location
16  where it was found, our case number, and my
17  handwritten signature and badge number.
18   Q.    And did you prepare that?
19   A.    Yes, I did.
20   Q.    And did you package it in substantially the
21  way it is now, other than going to the lab for
22  further analysis?
23         MR. SMITH:  Objection to leading.
24         THE COURT:  Sustained.
25         MR. MARKLE:  Sorry.
```

1915

```
1    Q.    Is that the package, the labelling you have
2   on there, the way it was labelled when you sealed
3   it, the evidence?
4    A.    Yes.
5          MR. MARKLE:  Offer it as a full exhibit,
6   your Honor, 201H.
7          MR. SMITH:  No objection.
8          THE COURT:  Full exhibit.
9    Q.    And 201H has an exhibit number.  Did you
10  give it an exhibit number for your purposes?
11   A.    Yes, I did.
12   Q.    And what number is that?
13   A.    17.
14   Q.    And again, what is that -- what is
15  contained in that exhibit?
16   A.    It's a Smith & Wesson gun box labeled .22
17  caliber, model 422, with a serial number -- it's
18  kind of smudged here since after I wrote it down.
19  Six-inch barrel, with a black finish, the location
20  was the front porch.
21   Q.    And that was found in the nylon bag?
22   A.    Yes.
23   Q.    And was there any gun found in that box?
24   A.    No.
25   Q.    Showing us what's been marked Government
```

1916

```
1   Exhibit 201F, do you recognize the item contained in
2   that plastic wrapping?
3    A.    Yes, I do.
4    Q.    And do you recognize that as seized on
5   November 29th from the Boston Avenue apartment?
6    A.    Yes, I do.
7    Q.    And where was that item found?
8    A.    It was found on the front porch in the
9   nylon bag.
10   Q.    And does that bear an exhibit number
11  assigned by the state police?
12   A.    Yes.
13   Q.    And what number is that?
14   A.    20.
15   Q.    And is that in substantially the same
16  condition as when you seized it?
17   A.    Yes.
18   Q.    And do you recall whether or not there was
19  a firearm inside of that item?
20   A.    It was empty.
21         MR. MARKLE:  I would offer it as a full
22  exhibit, your Honor.
23         MR. SMITH:  No objection.
24         THE COURT:  201F is a full exhibit.
25   Q.    And inside 201F, Mr. Procaccini, would you
```

**GA479**

1917

```
1    tell us whether there is -- what is contained inside
2    the box?  Can you open the item?
3        A.  Can I open it?
4        Q.  On your label then, rather, is there any
5    indication what's inside the box?
6        A.  Yes.
7        Q.  What is that?
8        A.  A Smith & Wesson plastic gun box labeled
9    .22 long rifle, five and a half barrel, model
10   No. 22A, serial No. UAZ 2474 with black finish.
11       Q.  Thank you.  And the wrapping, I mean the
12   label you just read from is the label you placed on
13   it shortly after it was recovered from the scene,
14   correct?
15       A.  Yes.
16           MR. MARKLE:  Your Honor, if I could just
17   pass these as I go through some of the other
18   evidence for the jurors.
19           THE COURT:  All right.
20           MR. MARKLE:  It's difficult to see.
21           THE COURT:  I'll ask you to pass the
22   exhibits and listen at the same time, please.
23       Q.  Showing you what's been marked Government's
24   201G, do you recognize that item?
25       A.  Yes.
```

1918

```
1        Q.  And does that bear an exhibit number
2    assigned by the state police?
3        A.  Yes.
4        Q.  What number is that?
5        A.  18.
6        Q.  And what do you recognize that to be?
7        A.  This is a Carr Arms plastic gun box.
8        Q.  And do you recall -- where did you see and
9    find and seize that item?
10       A.  This also was located in the nylon bag.
11       Q.  And is that in substantially the same
12   condition as when you seized it on the 29th.
13   November 29th?
14       A.  Yes.
15       Q.  And was that maintained in your possession
16   until put in the property room?
17       A.  Yes.
18       Q.  And secured as evidence?
19       A.  Yes.
20           MR. MARKLE:  I would offer it, your
21   Honor.
22           MR. SMITH:  No objection.
23           THE COURT:  All right, absent objection
24   201G is a full exhibit.
25       Q.  And was that -- did that box contain a
```

1919

```
1    firearm or not?
2        A.  It was empty.
3        Q.  When you say "empty," did two of the boxes,
4    did you notice, have operating or owner manuals in
5    them?
6        A.  Yeah.
7        Q.  And so when you say "empty," you mean empty
8    of a firearm?
9        A.  That is correct.
10       Q.  But there was paperwork in the boxes.
11       A.  Yeah, the manufacturer's paperwork that
12   comes with the box -- the gun.
13       Q.  Showing you what's been marked Government's
14   Exhibit 201E, do you recognize the item in that
15   plastic wrapping?
16       A.  Yes.
17       Q.  And what do you recognize that to be?
18       A.  This was an ammunition magazine that was
19   found inside the nylon bag.
20       Q.  And an ammunition magazine, what is that?
21       A.  It holds the ammunition.
22       Q.  And do you know how many rounds of
23   ammunition were found?
24       A.  I would have to look.  I think 14,
25   according to my notes here.
```

1920

```
1        Q.  And do you know what kind of ammunition
2    that was?
3        A.  It was .9mm.
4        Q.  And was that -- where was that seized from?
5        A.  Inside the nylon bag.
6        Q.  And taken into possession by you?
7        A.  Yes.
8        Q.  And logged in to evidence by you?
9        A.  Yes.
10       Q.  And maintained by you?
11       A.  Yes.
12           MR. MARKLE:  We'd offer 201E, your
13   Honor.
14           MR. SMITH:  Is there a Bridgeport
15   exhibit number assigned to that?
16       Q.  What is your Connecticut state police
17   number?
18       A.  21.
19           MR. SMITH:  No objection, your Honor.
20           THE COURT:  201E is a full exhibit.
21       Q.  Showing you what's been marked 201C and D,
22   do you recognize what's contained in that evidence
23   packet?
24       A.  Yes.
25       Q.  And does that have a corresponding
```

**GA480**

1921

```
 1    Connecticut state police exhibit number?
 2        A.   Yes.
 3        Q.   What is that?
 4        A.   22.
 5        Q.   And what is inside Government's
 6    Exhibit 201C and 201D?
 7        A.   It's a box of federal ammunition with 12
 8    live rounds of .380 caliber ammunition and a plastic
 9    bag containing eight live rounds of .22 caliber long
10    ammunition.
11        Q.   And do you know where that was seized from?
12        A.   This also was in the nylon bag.
13             MR. MARKLE:  I would offer 201C and
14    201D, your Honor.
15             MR. SMITH:  No objection.
16             THE COURT:  All right, they are both
17    full exhibits.
18        Q.   I would show you what's been marked 201B,
19    ask you if you recognize the item contained in that
20    plastic bag?
21        A.   Yes.
22        Q.   And what is the item inside 201B?
23        A.   It's a September 2005 edition of
24    "Guns & Ammo" magazine, addressed to Azibo Smith at
25    201 Read Street, floor one, Bridgeport Connecticut.
```

1922

```
 1        Q.   And was that seized from -- where was that
 2    seized from?
 3        A.   This, too, was in the bottom of the nylon
 4    bag.
 5        Q.   Where the three empty gun boxes were?
 6        A.   Yes.
 7        Q.   And the ammunition?
 8        A.   Yes.
 9        Q.   And the extended clip that you already
10    testified to?
11        A.   Yes.
12        Q.   And is that in substantially the same
13    condition as when you found it on November 29th?
14        A.   Yes.
15             MR. MARKLE:  I would offer 201B, your
16    Honor.
17             MR. SMITH:  No objection.
18             THE COURT:  Full exhibit.
19        Q.   Now, Officer Procaccini, in regards to your
20    search, did you search other areas of the apartment
21    as well?
22        A.   Yes.
23        Q.   And did you search the rear bedroom area of
24    the house?
25        A.   Yes.
```

1923

```
 1        Q.   And whose room was that, did you understand
 2    that to be?
 3        A.   Shante.
 4        Q.   And in regards to that room, did you seize
 5    what you designated as item 14?  Let me show you
 6    what's designated State Police Exhibit No. 14.  Does
 7    that bear your sticker?
 8        A.   Yes.
 9        Q.   And is that an item that you seized from
10    1912 Boston Avenue?
11        A.   Yes.
12        Q.   And do you recall finding those reports?
13        A.   Yes.
14        Q.   Or those items?
15        A.   Yes.
16        Q.   And were those taken into custody by you?
17        A.   Yes.
18        Q.   And do you recall where they were found?
19        A.   Yes.
20        Q.   And where was that?
21        A.   In that rear bedroom in a dresser drawer.
22        Q.   And were they -- was there a letter that
23    was also contained or found nearby those -- the
24    items in that exhibit?
25        A.   Yes.
```

1924

```
 1        Q.   And I'm going to show you what's been
 2    marked Government Exhibit 504.  Do you recall seeing
 3    this letter?
 4        A.   Yes.
 5        Q.   And were those items seized from 1912
 6    Boston Avenue, the rear bedroom?
 7        A.   Yes.
 8        Q.   And are they in substantially the same
 9    condition as when they were seized on November 29th?
10        A.   Yes.
11             MR. MARKLE:  I would offer Government's
12    504, your Honor it's --
13             MR. SMITH:  No objection.
14             THE COURT:  504 is a full exhibit.
15             MR. MARKLE:  504 is the letter, your
16    Honor, for the record.
17             THE COURT:  You only called the other
18    14?
19             MR. MARKLE:  Yes, your Honor, I have to
20    give it an exhibit and I realized I don't have my
21    own exhibit number.
22             MR. SMITH:  Your Honor, may I approach
23    and take a look at 504?
24             THE COURT:  Yes.
25             MR. MARKLE:  Just so the record is
```

**GA481**

1925

1   straight, your Honor, 201J is the --
2       Q.   Well, why don't you read in what's
3   contained in 201J.
4       A.   This would be my Exhibit 14, which states
5   it's police reports, arrest warrant copy and letters
6   of Azibo Aquart and Shante Pettway.
7            MR. MARKLE:  Thank you.
8            THE COURT:  And you are offering them?
9            MR. MARKLE:  Yes, your Honor.  I think
10  there was no objection to either of these items but
11  I didn't have Exhibit 201J marked yet.
12           No objection?
13           MR. SMITH:  No objection.
14           THE COURT:  201J is a full exhibit.
15      Q.   In regards to the boxes, the gun boxes that
16  had no guns in them, did you do anything once you
17  obtained the serial number of those guns?
18      A.   Yes.
19      Q.   And what did you do with the serial number?
20  What did you do?
21      A.   The serial numbers were checked through the
22  NCIC database to see if those serial numbers were
23  attached to guns that reported stolen.
24      Q.   And that's a database used by law
25  enforcement?

1926

1       A.   Yes.
2       Q.   And do you know whether or not any of those
3   serial numbers came back as reported as a stolen
4   firearm?
5       A.   Yes, I believe --
6            MR. SMITH:  Objection, hearsay, your
7   Honor.
8            THE COURT:  Well, he -- the question is
9   did he get an answer back.  Yes.  What's your next
10  question?
11           MR. MARKLE:  It was going to be whether
12  they were reported stolen or not.
13           THE COURT:  Why is that not hearsay?
14           MR. MARKLE:  I think it is, that's why I
15  didn't have an answer for your Honor.
16      Q.   In regards to the evidence that you just
17  went through and seized, what exactly was done with
18  it?  You said you set up a table and logged it in?
19      A.   Yes.
20      Q.   Would you explain what process you went
21  through?
22      A.   Well, in this case I would take the serial
23  numbers that were depicted on the boxes and have
24  them run through the computer.  And the serial
25  numbers were run through the system, and if they're

1927

1   reported stolen they would come up on the screen
2   that they're reported stolen, or you get a printout
3   on the printer next to you that it was reported
4   stolen.
5       Q.   And so that was done regarding the boxes
6   with the serial numbers?
7       A.   Correct.
8       Q.   What was done with the actual boxes in
9   terms of preserving it as evidence?
10      A.   The boxes themselves were seized and bagged
11  and an evidence sticker was attached to them.
12      Q.   And would you do that at the scene or back
13  at headquarters?  Where would that take place?
14      A.   That would be -- they would be placed in
15  the bag at the scene, but our policy was to heat
16  seal the bags.  So once we got back to the state
17  facility, we would use the heat sealer and we would
18  initial the bags.
19      Q.   So, at the scene they're sealed, but not
20  heat sealed?
21      A.   Correct.
22      Q.   Like you said before, there might be things
23  you want to count or look at?
24      A.   Yes.
25      Q.   Now, where do you take the evidence once

1928

1   it's bagged, but not permanently sealed?
2       A.   In this case here, because we were in the
3   city of Bridgeport there is a state police barracks,
4   Troop G, so we went back to the troop.
5       Q.   And where is the evidence at that -- at
6   Troop G do you actually then seal the evidence once
7   you have gone through it?
8       A.   Yes.
9       Q.   And who actually seals it, you or someone
10  else at that time?
11      A.   No, that's my responsibility.
12      Q.   So, from the time you seize it at the scene
13  to the time it's sealed, it's your responsibility?
14      A.   Yes, it is.
15      Q.   And does that evidence -- was all of the
16  evidence that was shown to the jury today sealed in
17  that manner?
18      A.   Yes.
19      Q.   Heat sealed?
20      A.   Yes.
21      Q.   And where was it then maintained?
22      A.   At that point it's brought to the southwest
23  office of the Statewide Narcotics Task Force.
24  That's the office I'm assigned to, where it's locked
25  and in an alarmed room in a secure facility.

**GA482**

1929

```
1      Q.   And is there limited access or general
2   access to that room?
3      A.   No, very limited.  Only the sergeant has
4   the key.
5      Q.   Do you know whether or not some of that
6   evidence was subsequently sent to the state lab for
7   testing?
8      A.   Yes.
9      Q.   And it was or?
10     A.   Yes.
11     Q.   And some fingerprint analysis conducted of
12  some of the evidence.
13     A.   Yes.
14     Q.   You did not participate in that portion of
15  the investigation.
16     A.   I did not.
17          MR. MARKLE:  If I may just have a
18  moment, your Honor.
19          I have no further questions.  Thank you,
20  your Honor.
21          THE COURT:  All right, Mr. Smith, cross.
22  CROSS-EXAMINATION.
23  BY MR. SMITH:
24     Q.   I just wanted to clear up one thing.
25          Is it detective or are you mister now
```

1930

```
1   because you are away from Bridgeport PD?
2      A.   Whatever you like.
3      Q.   We'll stick with detective.
4      A.   And it was the state police.
5      Q.   I'm sorry, the state police.
6          You testified about the magazine being found
7   inside of the bag.
8      A.   Yes.
9      Q.   But is that perhaps not right?  Because the
10  location is listed here as front porch lying next to
11  Exhibit 16.
12     A.   Could I just review it?
13     Q.   Sure.
14     A.   Okay.  My recollection is it was in the
15  bottom of 16.  If I've indicated here it's lying
16  next to 16, I would go with what I wrote on the tag
17  because that was done at the time I seized it.
18     Q.   Okay.  And item 16 was in fact that black
19  bag.
20     A.   Correct.
21          MR. SMITH:  I don't believe I have any
22  other questions.  Thank you.
23          THE COURT:  All right, anything further?
24          MR. MARKLE:  No, your Honor.
25          THE COURT:  All right, thank you,
```

1931

```
1   Mr. Procaccini.  You may go.  You are excused.
2          THE WITNESS:  Thank you.
3          THE COURT:  All right.  Please call your
4   next witness.
5          MS. REYNOLDS:  Yes, your Honor, the
6   government calls Randi Washington.  We may need a
7   couple minutes to get him in here.
8          THE COURT:  All right, Mr. Washington,
9   would you please remain standing and raise your
10  right hand.
11          R A N D I   W A S H I N G T O N
12  Having first affirmed, was examined and testified as
13  follows:
14          THE WITNESS:  Randi Washington.
15          THE COURT:  Spell your last name, but
16  you need to move in to the microphone so you can be
17  heard.
18          THE WITNESS:  W-a-s-h-i-n-g-t-o-n.
19          THE COURT:  Your town of residence.
20          THE WITNESS:  Bridgeport, Connecticut.
21          THE COURT:  Thank you.
22  DIRECT EXAMINATION
23  BY MS. REYNOLDS:
24     Q.   Let me just ask you, if you can just move
25  your chair up and speak right into the microphone so
```

1932

```
1   everyone can hear you.
2          Mr. Washington, how old are you?
3      A.   Thirty-one.
4      Q.   Where were you born?
5      A.   In Florence, South Carolina.
6      Q.   Where did you grow up?
7      A.   In Bridgeport, Connecticut.
8      Q.   Approximately how old were you when you and
9   your family moved from Florence, South Carolina to
10  Bridgeport, Connecticut?
11     A.   About five years old.
12     Q.   Did you go to school in Bridgeport,
13  Connecticut?
14     A.   Yes.
15     Q.   How far did you get in school?
16     A.   Twelfth grade.
17     Q.   Did you graduate from high school in
18  Bridgeport, Connecticut?
19     A.   Yes.
20     Q.   Which high school did you graduate from?
21     A.   Central night school.
22     Q.   Central night school?
23     A.   Yes.
24     Q.   And did you have any other schooling after
25  you graduated from high school?
```

**GA483**

1933

```
1    A.   I went to Job Corps.
2    Q.   Can you tell us what Job Corps is?
3    A.   It's like a training school.
4    Q.   And where did you go to Job Corps?
5    A.   In Vergennes, Vermont.
6    Q.   And how long was the program you did
7  through Job Corps up in Vermont?
8    A.   About three months, but I stayed up there
9  about a year, a year and some change.
10        THE COURT:  Would you pull the
11 microphone closer to you, please.
12        Thank you.
13   Q.   And just talk right into the microphone so
14 everyone can hear you.
15        You said you were up in Vermont for about
16 three months and then you stayed a little longer?
17   A.   Yes, over a year.
18   Q.   About a year?
19   A.   Yes.
20   Q.   What did you study through Job Corps when
21 you were up in Vermont?
22   A.   The CNA program.
23   Q.   And what is a CNA program?
24   A.   Certified nurse's aide.
25   Q.   And did you in fact graduate from the Job
```

1934

```
1  Corps program with a certified nurse's aide
2  certificate?
3    A.   Yes.
4    Q.   Did you work up -- while you were in
5  Vermont in connection with your CNA certificate and
6  training?
7    A.   Yes.
8    Q.   And where did you work in Vermont?
9    A.   Oh, man.  I worked at two nursing homes.  I
10 can't remember their names right now.
11   Q.   And what types of things did you do?
12   A.   Oh, Green Mountain.  One was Green
13 Mountain, and I forget the other nursing home.  I
14 don't remember the name.
15   Q.   And again, this is up in Vermont?
16   A.   Yes.
17   Q.   And what types of things -- or what were
18 your duties as a nurse's aide when you worked up in
19 the nursing homes up in Vermont?  What did you have
20 to do?
21   A.   To care for elderly people.  Clean them,
22 wash them up, feed them.  That was my job.
23   Q.   About how old were you when you were doing
24 that, when you were up in Vermont and had just
25 gotten year CNA certificate?
```

1935

```
1    A.   About 20.
2    Q.   Twenty?
3    A.   Yes.
4    Q.   Did there come a time that you left Vermont
5  or that you had some problems at the nursing homes
6  that you were working at up in Vermont --
7    A.   Yes.
8    Q.   -- that you left?
9    A.   Yes.
10   Q.   What happened up in Vermont that you had to
11 leave that job?
12   A.   I made a comment to a nurse up there that I
13 was going to buy some guns, and then she reported it
14 to the head nurse, and then they told me not to come
15 back there again.
16   Q.   So, you were fired from that job?
17   A.   Yes.
18   Q.   What did you do after you were fired from
19 the job up in Vermont?
20   A.   I came back home to Bridgeport.
21   Q.   And when you returned back to Bridgeport,
22 did you get a job at that time?
23   A.   Yes.
24   Q.   And where were you working at that time?
25   A.   My first nursing home I worked at was
```

1936

```
1  Bridgeport Manor.
2    Q.   And where is that located?  Is that in
3  Bridgeport?
4    A.   Yes, that's in Bridgeport on Bond Street
5  next to GE.
6    Q.   How long did you work at Bridgeport Manor?
7    A.   About eight months.
8    Q.   And did you go work somewhere else after
9  you worked at the Bridgeport Manor?
10   A.   Yes.
11   Q.   Where did you work after that?
12   A.   I worked at a couple of places.  I worked
13 at Southport Manor, I worked at the Saint Joseph
14 Manor in Fairfield.  I worked in a couple nursing
15 homes.
16   Q.   And again, this is all through your degree,
17 your certified nurse's aide degree, correct?
18   A.   Yes.
19   Q.   Did there come a time that you lost those
20 other jobs that you just described at these nursing
21 homes in Connecticut?
22   A.   Yes.
23   Q.   And you were fired from those jobs?
24   A.   It was more or less quit because you get
25 hired at per diem, but you get to put in more than
```

**GA484**

1937

1 40 hours.  So, I was putting in more than 40 hours,
2 I never got a chance to get hired for a full-time
3 position, so I was like why do this job, I'd go look
4 for another job.
5    Q.   So, you would quit those and look for
6 opportunities in other places?
7    A.   Yes.
8    Q.   And eventually did you leave the field of
9 nursing and start to work in another line of work?
10    A.   Yes.
11    Q.   What did you start doing at that time?
12    A.   I started doing security for Allied
13 Security.
14    Q.   And what did you do for security?  What
15 were you --
16    A.   My first job I worked as the Wachovia Bank
17 in Shelton, Connecticut.  They had a call center up
18 there, I worked up there.  I walked around.  And my
19 second one was, it was -- that duty ended, so I went
20 over to Home Depot, I was working at the doors for
21 the same security company.
22    Q.   And again, were you basically a security
23 guard for these companies?
24    A.   Yes, yes.
25    Q.   And did you have to have any training to

1938

1 become a security guard?
2    A.   I mean, regular orientation, but it wasn't
3 an armed guard, it was just there, sit at the door.
4    Q.   So you didn't carry a gun in connection
5 with your jobs --
6    A.   No.
7    Q.   -- as security guard?
8    A.   No, no.
9    Q.   And did something happen that you left
10 those jobs?
11    A.   Yes.
12    Q.   What happened?
13    A.   I got fired.
14    Q.   And what did you start doing -- or did you
15 get another job after the security job ended?
16    A.   No.
17    Q.   Okay.  At some point, Mr. Washington, did
18 you recover getting -- sorry, do you recall
19 obtaining a gun license?
20    A.   Yes.
21    Q.   Do you recall approximately when it was
22 that you obtained a gun license?
23    A.   My daughter was born in November.  I
24 received a gun license the week that she was born.
25 2004.  November 2004.

1939

1    Q.   Okay.  And showing you what's been demarked
2 Government Exhibit 230 for purposes of
3 identification, do you see that up on your screen
4 there?
5    A.   Yes.
6    Q.   And do you recognize what that document is?
7    A.   Yes, that's the gun license.
8    Q.   And does that document have a photo of you
9 and your name and your information on it?
10    A.   Yes.
11         MS. REYNOLDS:  Your Honor, at this time
12 the government would offer as a full exhibit the
13 Government's 230.
14         MR. SMITH:  Your Honor, may I voir dire.
15         THE COURT:  You may.
16 VOIR DIRE EXAMINATION
17 BY MR. SMITH:
18    Q.   Is what we are looking at the actual thing
19 you carried with you as the license?
20    A.   Yes.
21    Q.   You are issued a card, right?
22    A.   It looks just like the Connecticut driver's
23 license.
24    Q.   So, what you are looking at here is not the
25 card you were issued?

1940

1    A.   No, but it's the actual picture and the
2 information.
3    Q.   So, the photo is you?
4    A.   Yes.
5    Q.   But it's not a picture of the actual card
6 you are issued, this whole screen we're looking at?
7    A.   Oh, no, the picture that they give you is,
8 it looks just like a Connecticut ID.
9         MR. SMITH:  I'd object, your Honor, to
10 this coming in on that basis.  The photo perhaps
11 that's attached, but the entire document, no.
12         THE COURT:  Ms. Reynolds?
13         MS. REYNOLDS:  I can ask a few more
14 questions, your Honor, perhaps to clarify.
15 CONTINUED DIRECT EXAMINATION
16 BY MS. REYNOLDS:
17    Q.   Mr. Washington, the document that is
18 contained in Government's Exhibit 230 for purposes
19 of identification that's up there on your screen,
20 does that contain your name?
21    A.   Yes.
22    Q.   And the address you were living at at the
23 time?
24    A.   Yes.
25    Q.   And did you have to fill out paperwork in

1941

```
1    order to obtain a gun license?
2        A.   Yes.
3        Q.   And is this the information that would also
4    show up on the actual little card?  Is this
5    information consistent with the gun license card
6    that you obtained?
7        A.   Yes.
8        Q.   And, again, this has the photo that you
9    submitted at the time that eventually would end up
10   on the little card?
11       A.   Yes.
12       Q.   And it has all of the other information,
13   including a printout from the computer about gun
14   registration, correct?
15       A.   Yes.
16       Q.   Does it appear to be the same information
17   that appears on the actual card that you were --
18   that you obtained when you applied for a gun license
19   in the State of Connecticut?
20       A.   Yes.
21            MS. REYNOLDS:  Your Honor, I would offer
22   this as a full exhibit at this time.
23            MR. SMITH:  May I voir dire, your Honor?
24            THE COURT:  You may.
25   VOIR DIRE EXAMINATION
```

1942

```
1    BY MR. SMITH:
2        Q.   Mr. Washington, when you actually applied
3    for and received the card, it does not contain the
4    number of weapons registered to you on the card,
5    does it?
6        A.   No.
7            MR. SMITH:  I would object to its
8    admission on that ground, your Honor.
9            MS. REYNOLDS:  Well, we can redact that
10   portion out.
11           THE COURT:  I was going to suggest, if
12   that portion is the only dissimilar portion, do you
13   still -- and it's removed, would any objection
14   remain?
15           MR. SMITH:  Also the top of this, your
16   Honor.
17           THE COURT:  Can you use the microphone,
18   Mr. Smith, it's really hard to hear you.
19           MR. SMITH:  I'm sorry, your Honor.  The
20   top of that as well, your Honor.
21           MS. REYNOLDS:  Your Honor, we can cut it
22   out like that.
23           THE COURT:  Let's admit it provisionally
24   for redaction.
25           MS. REYNOLDS:  Thank you, your Honor.
```

1943

```
1            THE COURT:  And let's move on.
2            MS. REYNOLDS:  Thank you.
3    CONTINUED DIRECT EXAMINATION
4    BY MS. REYNOLDS:
5        Q.   And Mr. Washington, again, do you remember
6    approximately when it was, what year it was you
7    applied for a gun license in the State of
8    Connecticut?
9        A.   Early 2004.
10       Q.   Okay.
11       A.   And then I received it in November, that's
12   when my daughter was born.  I received the actual
13   license.  I went down to state trooper barracks and
14   took a picture and everything.
15       Q.   And they gave you a little card that you
16   said looks like your Connecticut driver's license,
17   but it's a license to purchase firearms, correct?
18       A.   Yes, yes.
19       Q.   And why was it that you obtained a gun
20   license in Connecticut?  Why did you do that?
21       A.   At the time I was looking to further my
22   career in the security job as a security officer,
23   armored trucks or so.
24       Q.   And what would you need to further your
25   career as a security officer?
```

1944

```
1        A.   Probably pistol -- not a pistol permit, but
2    a license to carry outside and drivers license and
3    stuff like that.
4        Q.   So, that's one of the reasons you obtained
5    a gun license?
6        A.   Yes.
7        Q.   And after you obtained the license, the gun
8    license, were you able to then legally purchase
9    firearms?
10       A.   Yes.
11       Q.   And did you begin to purchase firearms
12   after you obtained your Connecticut gun license?
13       A.   Yes.
14       Q.   Do you recall the first weapon that you
15   purchased?
16       A.   It was a Charter Arm .38, .38 caliber
17   revolver.
18       Q.   That's a revolver?
19       A.   Yes.
20       Q.   Do you recall where it was that you
21   purchased that .38 caliber revolver?
22       A.   From the gun store in Stratford.
23       Q.   Gun store in Stratford?
24       A.   Yes.  D'Andrea's.
25       Q.   D'Andrea's?
```

1945

```
1    A.   Yes.
2    Q.   That was a gun store in Stratford?
3    A.   Yes.
4    Q.   And did you have to do anything with your
5  gun license when you would go purchase -- when you
6  went to purchase that first firearm that you
7  purchased?
8    A.   You had to fill out an application, show
9  them your ID, and he has to register it with the
10  State of Connecticut over the phone.  And then once
11  that's done, it would take less than an hour, and he
12  gives you a gun, and walk out the store.  This is
13  for handguns.
14    Q.   And on that occasion, the first firearm
15  that you purchased, was that firearm for yourself?
16    A.   Yes.
17    Q.   And at that time were you still employed as
18  a security guard?
19    A.   Yes.
20    Q.   Did you continue to buy additional firearms
21  for yourself after that first time?
22    A.   Yes.
23    Q.   About how many guns do you recall
24  purchasing for yourself?
25    A.   Three more.
```

1946

```
1    Q.   And do you recall what type of guns you
2  purchased for yourself?
3    A.   Yes.
4    Q.   What were they?
5    A.   Two Sig Arms, two .45-calibers, and a 45 --
6  another .45-caliber.  All handguns.
7    Q.   And what, if anything, did you do with
8  those firearms once you purchased them?
9    A.   I would go to the range.
10    Q.   And what would you do at the firing range?
11    A.   I would shoot the guns.
12    Q.   Do you recall what range you would go to?
13    A.   I would go to the Bridgeport range,
14  sometimes I would go out to the Norwalk range out in
15  New Canaan, out there.
16    Q.   Do you recall how much you paid for those
17  firearms, those first firearms you bought for
18  yourself?
19    A.   The .38 I paid like $100 for.  The two Sig
20  Arms I paid 1300; 13, $1,400.
21    Q.   Is that for both of them or each?
22    A.   That was for both of them.
23    Q.   And where were you getting the money to buy
24  these firearms?
25    A.   At the time it was from my jobs.
```

1947

```
1    Q.   And did there come a time that you lost
2  your job or that you left your job as a security
3  guard?
4    A.   Yes.
5    Q.   Did you find any other employment after
6  that?
7    A.   No.  I was off of unemployment, getting the
8  checks from unemployment.
9    Q.   And let me ask you, you mentioned your
10  daughter was born.  Are you married?
11    A.   No.
12    Q.   Do you have any children?
13    A.   Yes, I have one daughter.
14    Q.   And how old is she now?
15    A.   Seven, six.  Six.
16    Q.   And you were together with your girlfriend
17  at the time?
18    A.   Yes.
19    Q.   The mother of your child?
20    A.   Yes.
21         MR. SMITH:  Objection, leading.
22    Q.   Were you --
23         THE COURT:  I'm sorry, you have to stand
24  up if you are going to object.
25         MR. SMITH:  I'm sorry.  Objection,
```

1948

```
1  leading.
2         MS. REYNOLDS:  I'll rephrase, your
3  Honor.
4    Q.   At the time that we're talking about when
5  you are purchasing the firearms, were you seeing
6  anybody, with anybody at that time?
7    A.   Yes.
8    Q.   Who were you with at that time?  You don't
9  have to tell her name, but were you with --
10    A.   The mother of my child.
11    Q.   And you have one child with that person?
12    A.   Yes.
13    Q.   Now, Mr. Washington, after you lost your
14  other job as the security guard or you lost the
15  security guard position, what, if anything, did you
16  start doing to make money?
17    A.   I started selling guns.
18    Q.   And when you say you started selling guns,
19  I'm going to actually draw your attention to the
20  time period approximately late spring, May or so, of
21  2005, and ask you if in that time period did you
22  start buying and selling guns around that time
23  period?
24    A.   Yes.
25    Q.   And during that time period -- well, why
```

**GA487**

1949

1     don't you tell us, how did that come about?  How was
2     it you started buying and selling guns?  What
3     happened?
4         A.    I was going to the casino one night and I
5     made a reference to an old school friend saying,
6     "Well, I could sell somebody guns, do you want to
7     buy some guns, 250 a piece?"  And he was, like, "No,
8     I don't want any."  And he was, like, "I might know
9     somebody who do want some, though."
10        Q.    And this friend of yours who you were
11    having these discussions with about making some
12    money buying and selling the guns, what was his
13    name?
14        A.    Abraham.
15        Q.    And where did you know Abraham from?
16        A.    From Harding High school.
17        Q.    From?
18        A.    Harding High school.
19        Q.    Is that in Bridgeport?
20        A.    Yes, it is.
21        Q.    And after you had this discussion with
22    Abraham who said he might know somebody, did you see
23    Abraham again?  Did you meet anybody through
24    Abraham?
25        A.    Yes.

1950

1         Q.    Who did you meet through Abraham?
2         A.    Met Dreddy.
3         Q.    And you said you met Dreddy.  Do you see
4     the person you knew as Dreddy in the court here
5     today?
6         A.    Yes.
7         Q.    Can you just indicate where he's sitting
8     and what he's wearing?
9         A.    Right there with the red shirt, striped
10    tie.
11             MS. REYNOLDS:  Indicating the defendant,
12    your Honor.
13             THE COURT:  Yes.
14        Q.    Now, can you tell the members of the jury
15    where and -- where you met Dreddy, how that came
16    about?  Do you recall?
17        A.    Yes.  Abraham brought him to my house over
18    on Gregory Street.
19        Q.    Where were you living at the time?
20        A.    On Gregory Street in Bridgeport,
21    Connecticut.
22        Q.    Did you meet with Abraham and Dreddy inside
23    your house?
24        A.    No, I met him -- I went down.  He called
25    me, he said, "I'm outside."  I walked down to the

1951

1     car, got into the car, that's when I met Dreddy.
2     And I talked to Abraham and he was like, "Well, he
3     wanted to buy some guns," and we started again.
4              MR. SMITH:  I'm going to object to
5     getting into conversation that was in the car.
6              THE COURT:  Sustained.
7         Q.    Just tell us, did you go downstairs and get
8     in the car?
9         A.    Yes.
10        Q.    Do you recall what kind of car?
11        A.    Yes.
12        Q.    What kind of car?
13        A.    A two-door Lexus.
14        Q.    Do you know whose car that was?
15        A.    It was Abraham's car.
16        Q.    And was anybody else in the car when you
17    got into the car?  Who was in the car?
18        A.    Abraham and Dreddy.
19        Q.    And did you have a discussion with Abraham
20    and Dreddy inside the car?
21        A.    Yes.
22        Q.    And how long were you in the car?
23        A.    About over a half an hour.  We took a ride
24    to the gun store.
25        Q.    So, what gun store did you take a ride to?

1952

1         A.    We went to D'Andrea's and they were closed,
2     so we came back, and then Dreddy got his car and we
3     went over to K-5.  K-5 is another gun store in
4     Stratford, Connecticut at the time.
5         Q.    When you say Dreddy got his car, what car?
6     Do you recall?
7         A.    It was a blue Cadillac.
8         Q.    And who went with Dreddy to the second gun
9     shop?
10        A.    Just me and him.
11        Q.    Just you and Dreddy?
12        A.    Yes.
13        Q.    And did you have some discussions with
14    Dreddy with regard to purchasing firearms?
15        A.    Yes.
16        Q.    And what did you discuss?
17        A.    Talked about the price.  We went to the
18    first store and we looked at a silver .22.  And the
19    guy, the gun store owner was joking saying it was a
20    suppressor built inside of it.  And he was, like, "I
21    like that.  I like that, but I want to check the
22    other store for better prices."  So that's what we
23    waited for.
24        Q.    And can you describe how it was going to
25    work, what would you do and how much money you would

1953

```
1   make?  What was --
2        A.   He would purchase the firearm.
3        Q.   Who would purchase?
4        A.   Dreddy would purchase the firearm and he
5   would give me $250 besides the buying price.
6        Q.   And how was it -- did you go into the store
7   with your gun license in order to purchase the
8   firearm?
9        A.   Yes.
10       Q.   So, you purchased it under your name?
11       A.   Yes.
12       Q.   And you would pay cash or -- did you pay
13  cash for the firearm?
14       A.   Yes.
15       Q.   Did you, in fact, purchase some firearms
16  for the defendant?
17       A.   Yes, I did.
18       Q.   And was it during that first meeting that
19  you had where you went to the stores or was it at a
20  later date in time?
21       A.   It was at a later date because that was a
22  Monday.  D'Andrea's was closed that day.  K-5 was
23  open, but D'Andrea was closed, so we had to wait
24  until the following day to where D'Andrea's was
25  open.
```

1954

```
1        Q.   This following day was it -- did you and
2   Dreddy go back to the drug store?
3        A.   Yes.
4        Q.   How was it that you and the defendant went
5   back to the drugstore -- the gun store?  I
6   apologize.
7        A.   He picked me up.
8        Q.   Where did he pick you up?
9        A.   At my house on Gregory Street.
10       Q.   Was the defendant alone or with anyone else
11  when the defendant picked you up?
12       A.   He was alone.  It was just me and him.
13       Q.   Do you recall what kind of car he was
14  driving that day?
15       A.   A burgundy CTS.
16       Q.   A burgundy CTS?
17       A.   Yes.
18       Q.   What happened after the defendant picked
19  you up?  Where did you go?
20       A.   We went to D'Andrea's.
21       Q.   And again, where was D'Andrea's located?
22       A.   In Stratford, Connecticut.
23       Q.   Had you purchased firearms from D'Andrea's
24  for yourself prior to that occasion?
25       A.   Yes.
```

1955

```
1        Q.   So what happened when you and the defendant
2   got to the gun store, D'Andrea's?  What happened
3   next?
4        A.   We was in the parking lot.  He gave me the
5   money in the parking lot and told me, "All right,
6   I'll pick the guns out, which ones I went."  We went
7   inside into the store.
8        Q.   When you say "we," who went?
9        A.   It's me and Dreddy, went inside the gun
10  store.  Picked out two .22s and a .357, a laser and
11  a speed loader.
12       Q.   All right.  And who picked out the two
13  .22s, the .357, the laser and the speed loader?
14       A.   Dreddy did.
15       Q.   And after the defendant picked those items
16  out, what did you do?
17       A.   I went to go purchase the guns, pay for the
18  guns.  Well, he was short on the money, so he put
19  some more money in my pocket, like -- just like I'm
20  standing next to you and I put money in your pocket.
21  He put extra -- he put extra money in my pocket so I
22  could pay for the guns.
23       Q.   Do you recall how much money the defendant
24  gave you in order to pay for the guns?
25       A.   1500.
```

1956

```
1        Q.   Were you going to -- what was your
2   understanding of how much money you would get out of
3   this deal?
4        A.   I would get 750.
5        Q.   Were you -- did you in fact purchase the
6   guns and the other items from D'Andrea's that day?
7        A.   Not that day.  He called it into the State
8   to get the registration for the guns, they said no.
9   I mean, the registration place was closed, so he
10  was, like, I'm going to hold everything and tomorrow
11  you just come pick it up from D'Andrea's in
12  Stratford, Connecticut.
13            So, the next day I went back, picked up
14  the three guns, the laser and the speed loader, and
15  then brought them back to my house, and I called
16  Dreddy, Dreddy came and picked them up, and I drove
17  with Dreddy over to the stash house, put the guns in
18  the stash house.
19       Q.   Okay.  So the next day you drove the guns
20  with the defendant over to a house.  Do you recall
21  where that was located?
22       A.   Off of Arctic.  I forget the name of the
23  street.
24       Q.   And showing you what's in evidence as
25  Government Exhibit 204, do you recognize that
```

**GA489**

1957

1    location?
2        A.   Yes, I do.
3        Q.   And what is that?  Where is that?
4        A.   That was Dreddy's stash house where we put
5    the guns, brought the guns at.
6        Q.   Did you go inside that location with the
7    defendant in order to put the guns in there?
8        A.   Yes.
9        Q.   And when you went inside the location at
10   Hallet Street -- well, depicted in Government's 204,
11   was anybody else inside that location?
12       A.   No.
13       Q.   Can you describe what, if anything, you saw
14   when you went into the apartment depicted in 204?
15       A.   You come inside the house, it's two bi
16   rooms.  The first big room there was a table, TV in
17   there.  The table had baggies on it, like four
18   different corners.  The second room was a couch and
19   a locker.  And then inside the couch, that's where
20   the guns were.
21       Q.   Which guns?
22       A.   He had other guns.  He had a Mac-10, .38.
23   He had those stored inside the couch.
24       Q.   Did you see where -- well, do you know
25   where the guns that you had purchased for the

1958

1    defendant were placed?
2        A.   No, no, after we just put them down.  They
3    were in the box.
4        Q.   They were in a box?
5        A.   Yes.
6        Q.   Did you take them into the location?
7        A.   Yes, in the second room.  We left them in
8    it the second room.
9        Q.   So, you said you saw some other guns inside
10   that location, correct?
11       A.   Yes, yes.
12       Q.   And how many other guns do you recall that
13   you saw?
14       A.   At the time I just saw two.
15       Q.   Two other ones?
16       A.   Yeah.  Later on I seen more than two.
17       Q.   But on this occasion you saw two other
18   guns?
19       A.   Yes.
20       Q.   And again, what type of guns did you see?
21       A.   A Mac-10 and a .38.
22       Q.   And you indicated that you also saw some
23   baggies on a table.  Can you describe what it was
24   that you saw more specifically.
25       A.   They were little crack baggies.

1959

1        Q.   And how did you know they were little crack
2    baggies?
3        A.   I sold crack one time.
4        Q.   So --
5        A.   When I was younger.
6        Q.   How old were you when you sold crack?
7        A.   About 13, 14 years old.
8        Q.   And when you were selling crack, did you
9    also have occasion to package, cook and package up
10   crack cocaine?
11       A.   Not cook, but package it, yes.
12       Q.   You packaged it up before?
13       A.   Yes.
14       Q.   And did -- well, how did the little baggies
15   that you saw inside the location depicted in
16   Government's 204, how did those little baggies
17   compare to the little baggies that you would use to
18   package crack?
19       A.   I had caps, but the package, they like
20   little ZipLoc bags.  They call them slabs.
21       Q.   And that's what you saw inside the
22   location?
23       A.   Yes.
24       Q.   Inside the apartment?
25       A.   Yes.

1960

1        Q.   And approximately how many little baggies
2    do you recall seeing on that table?
3        A.   Like four little piles in different corners
4    of the table.
5        Q.   When you say "four little piles" can you
6    indicate for purposes of the record?
7        A.   A handful.  A handful of bags.
8        Q.   Handful of little baggies?
9        A.   Yes.
10       Q.   Four different spots, different locations?
11       A.   Yes.
12       Q.   Did you see anything else on that table at
13   that time?
14       A.   No.
15       Q.   What, if anything, did you do after you --
16   well, you dropped off the guns that you had
17   purchased for the defendant.  What happened next?
18       A.   What happened next?  He brought me back to
19   my house.  Later on in the week I called him and we
20   went to the range, shot the guns in the Bridgeport
21   range.
22       Q.   And you called the defendant to make those
23   arrangements to go to the shooting range?
24       A.   Yes.
25       Q.   And did you, in fact, go to a shooting

1961

```
1   range with the defendant to shoot the guns then?
2       A.   Yes.
3       Q.   Do you recall which shooting range you went
4   to with the defendant?
5       A.   More than once.  The first time we went to
6   Norwalk.  The first time we went to Norwalk,
7   New Canaan out there, I forget the name of the gun
8   store.  That's where we shot.  We shot the .357, the
9   .22s, I had my stainless steel Sig, my same Sig, and
10  we shot a gun made by H & K with a suppressor on it.
11      Q.   When you say "we shot," did you go, who
12  went to the range?
13      A.   Me, Dreddy and my little cousin named Baby
14  Randi.
15      Q.   Baby Randi?
16      A.   Randi, just like my name.
17      Q.   And you and your cousin and the defendant,
18  how did you get to the shooting range that you went
19  to that first time?
20      A.   Dreddy came and picked us up.
21      Q.   In order to -- once you got to the shooting
22  range, do you have to pay in order to shoot the
23  guns?
24      A.   I mean, it's -- on occasions when you buy a
25  gun they usually give you free range time, but we
```

1962

```
1   didn't buy no guns from that store, so they just let
2   us.  We had to pay to shoot, yes, that day.
3       Q.   Do you recall how much you had to pay to
4   shoot guns at a shooting range?
5       A.   Like 10, $20.  Like $10, 20, but that day
6   we spent 500.
7       Q.   When you say we spent 500, what did you
8   spend $500 on at the range on that day?
9       A.   Ammunition.  Dreddy bought me two extra
10  clips for my gun.  And just messing around.  A
11  rental gun also, H & K with the suppressor, we
12  rented that.
13      Q.   And who paid for all of that?
14      A.   Dreddy.
15      Q.   Do you recall how long you and Baby Randi,
16  your cousin, and the defendant spent at the range
17  that time?
18      A.   About an hour and some change.
19      Q.   And what happened after you finished up at
20  the range?  Where did you go?
21      A.   He dropped me off to my house.
22      Q.   And did he drop your cousin, Baby Randi,
23  off as well?
24      A.   Yes, both of us.
25      Q.   Do you recall what car he had that day when
```

1963

```
1   you all went to the range?
2       A.   The burgundy CTS.
3       Q.   Now, did you go -- do you recall going to
4   firing ranges with the defendant on any other
5   occasion?
6       A.   Yes.
7       Q.   And approximately how long after that first
8   time that you went to the firing range did you go
9   back?
10      A.   I want to say weeks.
11      Q.   Weeks?
12      A.   Yes.
13      Q.   And did you go to the same firing range or
14  did you go to a different one?
15      A.   We went to Bridgeport shooting range.
16      Q.   Bridgeport shooting range?
17      A.   Yes.
18      Q.   Then on that occasion -- how did that come
19  about?  How did you get there and who went?
20      A.   Me, Dreddy, and Dreddy introduced me to his
21  cousin, Nathaniel.  Just us three.
22      Q.   And this person, Nathaniel, had you ever
23  met him prior to that day?
24      A.   No.
25      Q.   Did you know him --
```

1964

```
1            MR. SMITH:  I'm sorry, did he say
2   Nathaniel or Daniel?
3       A.   Nathaniel.
4            MR. SMITH:  I'm sorry, thank you.
5       Q.   And did you come to know Nathaniel by any
6   other names or nicknames?
7       A.   They call him Stone, too.
8       Q.   All right.  And showing you what's in
9   evidence as Government's Exhibit 216, do you
10  recognize who that is?
11      A.   Yes.
12      Q.   Who is that?
13      A.   That's Nathaniel.
14      Q.   So, he was one of the people with you on
15  that second trip to the shooting range?
16      A.   Yes.
17      Q.   And on that day, do you recall what
18  firearms you used at the shooting range?
19      A.   Yes.
20      Q.   Which firearms?
21      A.   Dreddy brought a 9 Kahr, it's like a
22  three-inch barrel 9mm; a Ruger; the .22s, the two
23  .22s that I purchased at D'Andrea's; the .357 that I
24  purchased at D'Andrea's.  My Sig, I had the same Sig
25  still, and I think that's about it.
```

1965

1     Q.   And again, getting back to -- you've
2 mentioned you had purchased the two .22s and a .357?
3     A.   Yes.
4     Q.   Are those the firearms that you purchased
5 at D'Andrea's?
6     A.   Yes.
7     Q.   I'm going to hand up and show you what's
8 been -- what I'll demark Government's Exhibit 257.
9         MS. REYNOLDS:  And then I've marked,
10 your Honor, each page individually, and I do have
11 copies for the Court and I've previously provided
12 copies to defense counsel.  But I've marked pages
13 257A, 257B, 257C, 257D-1, D-2, and D-3, and 257E,
14 and I'm going -- if I can approach and hand those up
15 to the witness at this time?
16         THE COURT:  All right.
17         All right, it's 3:30.  Why don't we pick
18 up with that tomorrow morning.
19         MS. REYNOLDS:  We can, your Honor.
20 Thank you.
21         THE COURT:  Have a pleasant afternoon,
22 ladies and gentlemen.  See you tomorrow at 9:30.
23         (Jury exited the courtroom.)
24         THE COURT:  All right, Mr. Washington,
25 you are excused for the day.  We'll see you back

1966

1 here at 9:30 tomorrow.  Please don't discuss your
2 testimony with anyone.  All right?
3         THE WITNESS:  Yes.
4         THE COURT:  Counsel, will there be
5 anything before we recess for the day?
6         MS. REYNOLDS:  Your Honor, I don't think
7 so.  I did want to alert the Court, I think one of
8 our next witnesses, that we should hopefully get to
9 tomorrow is Shante Pettway, who we will be playing
10 some phone calls to, we have given full transcripts
11 to defense counsel, but I just wanted to alert the
12 Court to that and counsel to that, so that -- I
13 haven't seen any objections to the transcripts.
14 They've had the calls for a long time.  But we do
15 intend to offer those calls, or what we're going to
16 do is play portions of the call and we've prepared
17 separate CDs so we can just play portions of the
18 call, but I just want to make sure there is no
19 objection, so we don't have a delay tomorrow.
20         THE COURT:  Will there be any objection,
21 Mr. Smith?
22         MR. SHEEHAN:  I don't know, your Honor.
23 I have not reviewed the transcript that they gave us
24 today.
25         THE COURT:  If there is going to be an

1967

1 objection, may I hear you at 9:15?
2         MR. SHEEHAN:  Certainly, your Honor.
3         THE COURT:  Okay.  But you'll need to
4 alert me and opposing counsel.  All right.
5         MR. SHEEHAN:  Your Honor, the only
6 person -- we have Shante Pettway tomorrow.  May I
7 inquire as to who the government might also be
8 contemplating tomorrow?
9         MS. REYNOLDS:  Obviously finish Randi
10 Washington and Shante Pettway.
11         MS. DAYTON:  Juanita Hopkins.
12         MS. REYNOLDS:  Juanita Hopkins who was
13 on the list last week.
14         MS. DAYTON:  Possibly Kurt Wheeler.
15         MS. REYNOLDS:  And Kurt Wheeler who was
16 on our list last week, ATF agent, that would
17 probably be a full day.
18         THE COURT:  And then Wednesday?
19         MS. DAYTON:  We'll probably finish
20 Juanita Hopkins, and then John Taylor, and I'm
21 guessing that will take the day.
22         THE COURT:  Okay.  And will the
23 government give me their request for charge?
24         MS. DAYTON:  Yes, your Honor.  We are
25 trying to finalize it.

1968

1         THE COURT:  All right.
2         MR. SHEEHAN:  Your Honor, the two
3 excerpts that we played for -- to refresh --
4         THE COURT:  Randolph.
5         MR. SHEEHAN:  -- Ms. Randolph's
6 recollection, I have those.  I'm going to mark those
7 for identification as Defendant's Exhibit R.  I have
8 a copy of those excerpts for the government and I
9 would just indicate --
10         THE COURT:  What was the marking of 2B
11 and 4C that Mr. Smith used?
12         MR. SMITH:  I'm sorry?
13         THE COURT:  You used the marking, when
14 you played that to refresh her recollection of 2B
15 and 4C for ID.
16         MR. SMITH:  Yes.
17         THE COURT:  Are we remarking these two
18 things?
19         MR. SHEEHAN:  I think it makes sense to
20 remark them.
21         MR. SMITH:  Yes, your Honor, that was
22 our internal way to identify those calls.
23         MR. SHEEHAN:  I would ask that those be
24 marked as Government Exhibit R for identification,
25 and I can just reflect that they appear on the

1969

```
1   9/16/05 and the 9/17/05 clips that were given to us
2   by the government.
3              THE COURT:  So the second one is S.
4              MR. SHEEHAN:  Well, I have them both on
5   one CD, your Honor.
6              THE COURT:  I see.  All right.  And
7   they're both for ID.
8              MS. RODRIGUEZ-COSS:  Your Honor, I'm
9   sorry, with regards to those last two
10  identifications marked, is the defense representing
11  the entirety of the excerpts contained in these CDs
12  was played to the witness?
13             MR. SHEEHAN:  Yes.
14             MS. RODRIGUEZ-COSS:  We haven't heard
15  these excerpts before, we don't have copies.  There
16  is no way for us to know.
17             THE COURT:  Why don't you take a look at
18  what is marked R for ID.  You say these are the
19  excerpts that were played to the witness from 9/16
20  and 9/17/05?
21             MR. SHEEHAN:  Yes, your Honor, they're
22  marked respectively.  The first one is 9G0D10PS,
23  that's the call, and the second one is 9H0D10Q2.
24  And I can tell the -- I can represent to the
25  government, just give them the times, if they want
```

1970

```
1   to look at that, that might be helpful.
2              THE COURT:  All right.
3              MR. SMITH:  For the record, your Honor,
4   these are were part of calls disclosed to us by the
5   government, not things we obtained on our own.
6              THE COURT:  I think the question was is
7   that CD limited to what was played for the witness?
8              MR. SHEEHAN:  Yes.  Actually when they
9   open these they will see the time.
10             THE COURT:  I'm going to leave that for
11  you all to verify, if necessary.  And we will recess
12  for the day and proceed at 9:15, if necessary, or
13  9:30 if there is no objection.  Thank you.
14             (Proceedings concluded 3:35)
15
16
17
18
19
20
21
22
23
24
25
```

1971

```
1                  I N D E X
2
3   WITNESS                                  PAGE
4   JUDITH RIVERA
5   Continued Cross-Examination by Mr. Sheehan  1695
6   Redirect Examination by Ms. Reynolds     1719
7
8   FRANK EVANGELISTA
9   Direct Examination by Ms Rodriguez-Coss  1730
10  Cross-Examination by Mr. Smith           1761
11
12  SHERRELL RANDOLPH
13  Direct Examination by Mr. Markle         1764
14  Cross-Examination by Mr. Smith           1843
15  Redirect Examination by Mr. Markle       1882
16
17  VIRGIL PROCACCINI
18  Direct Examination by Mr. Markle         1895
19  Cross-Examination by Mr. Smith           1929
20
21  RANDI WASHINGTON
22  Direct Examination by Ms. Reynolds       1931
23
24
25
```

1972

```
1              I certify that the foregoing is a
2   correct transcript from the record of proceedings in
3   the above-entitled matter.
4                          5/3/11
5                           Date
6
7                   /S/  Sharon Montini
8                     Official Reporter
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1973

```
 1              UNITED STATES DISTRICT COURT
 2               DISTRICT OF CONNECTICUT
 3   * * * * * * * * * * *   *
                             *
 4   UNITED STATES OF AMERICA,  * Case No 6cr160(JBA)
 5             Plaintiff,      *
                              *
 6         vs.                *
                              *
 7   AZIBO AQUART             * May 3, 2011
                              *
 8             Defendant.     *
 9   * * * * * * * * * * *    *
10              TRIAL TRANSCRIPT
11                VOLUME IX
12   BEFORE:  THE HONORABLE JANET BOND ARTERTON U.S.D.J.,
13                                        and jury
     Appearances:
14   FOR THE GOVERNMENT:  ALINA REYNOLDS, ESQ
                          TRACY DAYTON, ESQ.
15                        PETER MARKLE, ESQ.
                          JACABED RODRIGUEZ-COSS
16                        United States Attorney's Office
                          915 Lafayette Blvd
17                        Bridgeport, CT 06604
18   FOR THE DEFENDANT    MICHAEL SHEEHAN, ESQ
19   AZIBO AQUART:        Sheehan & Reeve
                          139 Orange Street
20                        New Haven CT 06510
21                        JUSTIN SMITH, ESQ.
                          383 Orange Street
22                        New Haven, CT 06511
23
     Court Reporter:    Sharon Montini, RMR
24
     Proceedings recorded by mechanical stenography,
25   transcript produced by computer
```

1974

```
 1              THE COURT:  All right, good morning,
 2   ladies and gentlemen, Mr. Aquart.  Please be seated.
 3   I guess in terms of the jury charge, we'll just use
 4   the defendant's jury charge.
 5              MS. RODRIGUEZ-COSS:  Your Honor, may
 6   we --
 7              THE COURT:  It was due last Friday and
 8   the government hasn't submitted anything even as of
 9   now.
10              MS. RODRIGUEZ-COSS:  I don't know why it
11   hasn't been filed, we finalized it yesterday
12   afternoon.
13              THE COURT:  I don't have it.
14              MS. RODRIGUEZ-COSS:  We'll have it this
15   morning, your Honor.
16              THE COURT:  The deadlines that the Court
17   sets are actually not invitational.
18              MS. RODRIGUEZ-COSS:  We understand that,
19   your Honor, and we apologize for missing that
20   deadline.
21              THE COURT:  All right, verdict forms
22   would also be -- if it's anything other than just a
23   very simple verdict form, we would want to have
24   that.
25              MR. SHEEHAN:  I don't think this is,
```

1975

```
 1   your Honor, under the circumstances.
 2              THE COURT:  Our jurors are all here?
 3              THE CLERK:  Yes, they are.
 4              THE COURT:  Incidentally, the issue of
 5   protection of, any statutory protection for
 6   subpoenaed witnesses is not as straightforward as it
 7   is for protection of jurors from retaliation for
 8   their jury service.  There seems to be no statutory
 9   analog, and there -- the question of whether or not
10   firing a person because of her testimony -- however
11   you would characterize it, conceivably falls under
12   the 18 U.S.C. 1512 area that relates to whoever
13   intentionally harasses another person and thereby
14   hinders, prevents, dissuades a person from
15   testifying in an official proceeding in a criminal
16   matter.  There is a further matter under 1514(a)(1)
17   the United States district court on application from
18   an attorney for the government shall issue a
19   temporary restraining order prohibiting harassment
20   of a victim or witness.
21              So there is injunctive relief, but I
22   think very quick research on this says that there is
23   not something that is as clear and straightforward
24   as for a juror, which is interesting.  I didn't know
25   that.  But I think it makes the task of dealing with
```

1976

```
 1   Ms. Randolph's situation less straightforward.
 2              MS. REYNOLDS:  Well, thank you, your
 3   Honor.  We'll continue to follow up on that with
 4   Attorney O'Reilly.
 5              THE COURT:  All right then.  We have
 6   Mr. Washington back.
 7              THE WITNESS:  Good morning, your Honor.
 8              THE COURT:  You remain under oath and
 9   we'll bring in the jury.
10              (Jury entered the courtroom.)
11              THE COURT:  All right, good morning,
12   ladies and gentlemen.  Please be seated.  We will
13   have the -- you may be seated, Mr. Washington.  We
14   will have the continuation of Mr. Washington's
15   testimony in direct by Ms. Reynolds.
16              You may proceed.
17              MS. REYNOLDS:  Thank you your Honor.
18          R A N D I   W A S H I N G T O N
19   Having previously affirmed, was examined and
20   testified as follows:
21   CONTINUED DIRECT EXAMINATION
22   BY MS. REYNOLDS:
23      Q.   Good morning, Mr. Washington.
24      A.   Good morning.
25      Q.   Again, if you could pull your chair up and
```

1977

```
 1    just make sure you are speaking right into the
 2    microphone so everyone can hear.
 3         A.   Good morning.
 4         Q.   When we left off yesterday afternoon I had
 5    started to talk about some documents which I've
 6    demarked Government's Exhibit 257 for the entire
 7    exhibit, and then 257A, 257B, 257C, 257D-1, D-2,
 8    D-3, and 257E.
 9              MS. REYNOLDS:  And I provided a copy of
10    that to defense counsel.  I'm just going to hand up
11    a copy to the Court.  These are additions.
12         Q.   And let me just ask you, Mr. Washington,
13    when you went to purchase the firearms at D'Andrea's
14    gun store with the defendant, did you have to fill
15    out any paperwork before purchasing those firearms?
16         A.   Yes.
17         Q.   And showing you then what's contained in
18    Government's 257 with all of those pages marked
19    separately, can you take a look at that and see if
20    you recognize that paperwork.  Starting with 257A.
21    Do you recognize what that is?
22         A.   Yes.
23         Q.   And what is that?
24         A.   It's part of the application you had to
25    sign to get the gun.
```

1978

```
 1         Q.   And does that document have your signature
 2    and the date?
 3         A.   Yes.
 4         Q.   And then taking a look at the next sheet,
 5    257B, do you recognize what that document is?
 6         A.   Yes.
 7         Q.   And what is that?
 8         A.   It's a receipt.
 9         Q.   And does that also have your name, and it's
10    dated and the name of the store?
11         A.   Yes.
12         Q.   And do these -- as you look at these, do
13    these documents look familiar to you as the
14    documents in connection with the firearms that you
15    purchased with the defendant?
16         A.   Yes.
17         Q.   And then taking a look at 257C, do you
18    recognize what that document is?
19         A.   Yes.
20         Q.   And what is that?
21         A.   This is a receipt.
22         Q.   And that is a receipt for what?
23         A.   The guns I purchased with Dreddy on the
24    day.
25         Q.   And then taking a look at 257D-1 and D-2
```

1979

```
 1    and D-3, do those documents look familiar to you?
 2         A.   Yes.
 3         Q.   And how is it that you recognize those
 4    documents?
 5         A.   They also receipts.
 6         Q.   And does your name appear on those
 7    documents?
 8         A.   Yes, my signature and my name.
 9         Q.   And specifically with regard to 257D-1, D-2
10    and D-3, what is -- what document is this?
11         A.   Sales or transfers of all firearms.
12         Q.   And you remember getting or seeing these
13    documents at the time you purchased the firearm?
14         A.   Yes.
15         Q.   And then finally taking a look at 257E, do
16    you recognize what this document is?
17         A.   Yes.
18         Q.   Okay.  And what is this?
19         A.   This is part of the application.
20         Q.   Okay.  And when you say "part of the
21    application," part of the application that you have
22    to --
23         A.   Sign, fill out in order to start the
24    process to get the firearms, the handguns.
25         Q.   And so taking a look at the first page of
```

1980

```
 1    257E, did you actually fill out that part of the
 2    document?
 3         A.   Yes.
 4         Q.   And you answered all of these questions, A
 5    through L?
 6         A.   Yes.
 7         Q.   And does your signature appear on that
 8    document?
 9         A.   Yes.
10         Q.   And, again, with regard to all of the
11    documents contained in Government's 257, do they
12    appear to be the same documents that you filled out
13    or that were -- you received in connection with the
14    purchase of the firearms at the D'Andrea's store?
15         A.   Yes.
16              MS. REYNOLDS:  Your Honor, the
17    government would move the entire contents of 257 as
18    outlined, specifically every page marked 257A
19    through 257E.
20              MR. SMITH:  No objection.
21              THE COURT:  All right, they are full
22    exhibits.
23         Q.   And Mr. Washington, let me start by showing
24    you 257A.  Let me see if I can put that up here.
25    So, taking a look again at the top of that form,
```

**GA495**

1981

1   that's the application to purchase a firearm that
2   you just testified about.
3       A.   Yes.
4       Q.   And this has all of your information.  It
5   has your name and where you were living at the time.
6       A.   Yes.
7       Q.   And then did you have to answer a series of
8   questions here, A through F?
9       A.   Yes.
10      Q.   All right.  And that first -- the first
11  question that you had to answer is, have you ever
12  been convicted in any court of a felony.  And you
13  answered no.
14      A.   Yes.
15      Q.   And in order to have a gun license, can you
16  have a gun license if you have a prior felony
17  conviction --
18      A.   No.
19      Q.   -- to your knowledge?
20      A.   No.
21      Q.   So, again, you answered all of these
22  questions prior to purchasing the firearms, correct?
23      A.   Yes.
24      Q.   And then taking a look at the bottom of
25  Government's 257A, is that your signature here at

1982

1   the bottom?
2       A.   Yes.
3       Q.   And what is the date?
4       A.   5/26/05.
5       Q.   And is that the date that you went to the
6   store to purchase the firearms?
7       A.   It was either -- that was the day.  That
8   was the day I filled out the application because
9   there was a time where I had to fill out the
10  application and then the next day I went to go pick
11  up the guns because the State was closed.  The State
12  that had to approve the guns, they were closed, so I
13  filled out the applications, paid the money, then
14  the next day I returned to the store by myself and
15  picked the guns up.
16      Q.   All right.  So, turning your attention then
17  to 257B, just showing you that document there on the
18  screen, does that document, this report of multiple
19  sales, does that indicate the firearms that you
20  purchased from D'Andrea's store for the defendant?
21      A.   Yes.
22      Q.   And starting here at the top, it says --
23  what does this say?
24      A.   Revolver.
25      Q.   Okay.  And the serial number, do you know

1983

1   what that corresponds to?
2       A.   Yes.
3       Q.   What does the serial number correspond to?
4       A.   It registers the gun to me.
5       Q.   Okay.  And where does the serial number
6   appear -- or does the serial number appear on a
7   firearm?
8       A.   Yes.
9       Q.   And do you know whether this serial number
10  then would correspond to the revolver, the
11  Smith & Wesson revolver that you purchased that day?
12      A.   Yes.
13      Q.   And then further on in this line, this
14  first line, S & W, do you know what that stands for?
15      A.   Yes.
16      Q.   What does that stand for?
17      A.   Smith & Wesson.
18      Q.   And then what is the model?
19      A.   65LS.
20      Q.   And what is the caliber?
21      A.   .357.
22      Q.   And when it says "caliber," what does that
23  refer to, the caliber of the gun?  Do you know?
24      A.   Yeah.  Repeat that question again.
25      Q.   Yes, I'm sorry.  What does the caliber

1984

1   refer to?
2       A.   The caliber is the bullet that goes inside
3   the gun.  Like .45 caliber, .357.  They're all
4   different.
5       Q.   So, that refers to the ammunition that
6   would go with that particular gun?
7       A.   Yep.
8       Q.   Taking a look at the next line, what does
9   that say?
10      A.   It says pistol.
11      Q.   And again it has a serial number that
12  corresponds to that pistol?
13      A.   Yes.
14      Q.   And what does it say over here on the next
15  line, manufacturer or importer?
16      A.   Smith & Wesson.
17      Q.   And what model?
18      A.   22A.
19      Q.   And what caliber.
20      A.   .22.
21      Q.   And then finally the third line, again, is
22  that another Smith & Wesson pistol?
23      A.   Yes.
24      Q.   With the corresponding serial number?
25      A.   Yes.

1985

```
1      Q.   And again, what caliber is that third
2  Smith & Wesson?
3      A.   A .22.
4      Q.   And then taking a look at the bottom of
5  that form down here, where it says No. 9, type of
6  identification.  What does that say?
7      A.   State permit.
8      Q.   And in No. 10?
9      A.   Connecticut.
10     Q.   And then what date of birth is this?
11     A.   That's my birthday, 1/18/80.
12     Q.   And then it shows where you were born?
13     A.   Yes, Flores, South Carolina.
14     Q.   And taking a look at Government's 257C, is
15  this a receipt you were referring to when you
16  identified this document?
17     A.   Yes.
18     Q.   Now, you indicated yesterday in addition to
19  the three firearms you had purchased other items?
20     A.   Yes.
21     Q.   And taking a look at 257C, this item here
22  that's listed as SLG 206, crim. lasergrip K, L
23  round; what is that?
24     A.   It's a handle that you have to put on --
25  apply to the gun and then when you press the button
```

1986

```
1  of the handle, a laser comes out of it.
2      Q.   And what would a laser be used for with a
3  gun?
4      A.   To make sure that you hit the target.
5      Q.   And then taking a next entry, under the
6  purchase summary section of the document this
7  S001BA13ZO, DeSantis K 2-3/4 RH, what is that
8  referring to?
9      A.   It's a speed loader for a revolver.
10     Q.   What is a speed loader for a revolver?
11     A.   So instead of you doing one bullet at a
12  time to reload the gun, it's bullets already loaded
13  in the speed loader.  You lock it and you can just
14  pull it out and slip it in, just like that, and load
15  the whole round in the gun.  All the rounds in the
16  gun at one time.
17     Q.   And who had picked out these firearms and
18  the lasergrip and the speed loader when you were at
19  the D'Andrea's store?
20     A.   Dreddy did.
21     Q.   And then again this receipt also shows what
22  you paid for each gun and for the additional items,
23  correct?
24     A.   Yes.
25          MR. SMITH:  I'm going to object to the
```

1987

```
1  leading.  Ask what's on the document instead of
2  telling him.
3          THE COURT:  Sustained.
4          MS. REYNOLDS:  I'll withdraw and
5  rephrase.
6      Q.   Under the unit price, can you see what's
7  listed there for the unit price of the first item?
8      A.   The price of the gun.
9      Q.   And what was the price of the first gun?
10     A.   $468.75.
11     Q.   And then taking the next entry at the unit
12  price, what was the price of the Smith & Wesson?
13     A.   $265.
14     Q.   And the other Smith & Wesson is the next
15  entry.
16     A.   $250.
17     Q.   What was the price of the lasergrip?
18     A.   $289.95.
19     Q.   And finally, what was the price of the
20  DeSantis speed loader?
21     A.   $48.
22     Q.   And who gave you the money to purchase
23  those guns?
24     A.   Dreddy did.
25     Q.   Now, in addition to the money to actually
```

1988

```
1  pay for what the guns cost at D'Andrea's, did you
2  get any additional money?
3      A.   Yes.
4      Q.   And how much additional money did you get
5  in connection with these transactions?
6      A.   $250 per gun.  It was $750.
7      Q.   Okay.  So how much money did you net or how
8  much money did you make off of these transactions?
9      A.   $750.
10     Q.   Now, Mr. Washington, yesterday you had
11  talked about after you purchased the guns you had
12  gone over to a location that you called the stash
13  house where you dropped the guns off with the
14  defendant.  Do you remember testifying about that
15  yesterday?
16     A.   Yes.
17     Q.   And just drawing your attention again to
18  Government's Exhibit 204, was that the location you
19  went to to drop off the guns?
20     A.   Yes.
21     Q.   Now, do you recall whether or not after
22  that time when you dropped off the guns at the
23  location depicted in 204, whether you had an
24  opportunity to go back to that location?  Did you go
25  back to that location?
```

**GA497**

1989

1    A.    Yes, I did.
2    Q.    And do you recall approximately how long
3 after that first time that you had been at the
4 location that you went back to that stash house?
5    A.    A couple of weeks or so.
6    Q.    And what caused you to go back?  Describe
7 that for the members of the jury.
8    A.    One day my cousin, he gave me a call and he
9 was telling me that he was in jail and he needed
10 help to get out of jail.  And I told him, I told
11 Dreddy.  He was, like, well, you know, he's in jail
12 and everything.  And he was, like, well, you know,
13 he got a rumor around the neighborhood saying that
14 he bonded me out of jail, somebody bonded me out of
15 jail.  So he told me not to tell no one, though, and
16 I went back to -- he drove me to the stash house, he
17 gave me --
18    Q.    Who drove you to the stash house?
19    A.    I'm sorry.  Dreddy drove me to the stash
20 house and gave me the keys and told me to go
21 upstairs in the house and to get three stacks out of
22 the cracker box.
23    Q.    When he said to get three stacks out of the
24 cracker box, did you have an understanding of what
25 he was referring to?

1990

1    A.    Stacks of money.
2    Q.    All right.  And did you in fact go into the
3 stash house?
4    A.    Yes.
5    Q.    And was anybody in there when you went in?
6    A.    No.
7    Q.    What did you see when you went in?
8    A.    When I went in I came in the kitchen door,
9 came to the kitchen, I went to the kitchen sink,
10 below it was -- he told me to go below and get it
11 out the cracker box.  I went below the cabinet of --
12 I know there was a cracker box in there, but I
13 didn't see no money in the cracker box.  So I went
14 above, from the top cabinet, where the cabinet was
15 half full of the money, and I took three stocks,
16 closed the cabinet, went back in the car, gave
17 Dreddy the keys to the apartment, gave him the
18 money.  He gave me two stacks of money and he then
19 went, go ahead and get him out of jail.
20        So we then drove to Wanda Jeter, a bail
21 bondsman on Golden Hill Street in Bridgeport,
22 Connecticut.  We drove over there, gave her the
23 money, I gave her $350, I didn't give her full $500,
24 that was my first time bonding anybody out, I didn't
25 know you had to give the whole money.

1991

1    Q.    Let me stop you there.  When you were
2 inside the stash house depicted in Government's
3 Exhibit 204 --
4    A.    Yes.
5    Q.    And when you were in the kitchen, did you
6 open the kitchen cabinets?
7    A.    Yes.
8    Q.    And were those the top cabinets?
9    A.    Yes.
10    Q.    When you opened them, can you describe for
11 the members of the jury what you saw when you opened
12 those kitchen cabinets.
13    A.    Stacks of money in probably 250 -- I don't
14 know how much it was.  But it was stacks of money
15 wrapped already individually like half full in the
16 cabinet.
17    Q.    So, indicating for the record, first of
18 all, with regard to the stacks of money, about how
19 big was each individual stack, bundle of money?
20    A.    Well, so -- yes.
21    Q.    About an inch or two?
22    A.    Yes.
23    Q.    And how was each individual bundle of
24 money -- how was it held together?
25    A.    A rubber band or so.

1992

1    Q.    And then approximately how high in the
2 cabinet or -- you indicated you lifted your hand
3 like that.  How --
4    A.    Yes.
5    Q.    How high in the cabinet were there stacks
6 of money stacked up to?
7    A.    Halfway in the cabinet.
8    Q.    Halfway up through the kitchen cabinet?
9    A.    Yes, yes.
10    Q.    So, about how high?  Could you just
11 indicate for the members of the jury?
12    A.    About that high.
13    Q.    Okay.  About a foot would you say?
14    A.    Yes.
15    Q.    And about how many rows?  How wide were the
16 stacks?  Could you indicate, if you recall?
17    A.    Well, like eight to 10 across.
18    Q.    Eight to 10 across of rows?
19    A.    Yes.
20    Q.    Of stacks?
21    A.    Yes.
22    Q.    So, about how wide would that be?  Could
23 you just indicate?
24    A.    The length of the cabinet.
25    Q.    The length of the cabinet?

1993

1    A.    Yes.

2    Q.    All right.  And, again, that was just all

3  stacks of money?

4    A.    Yes.

5          MR. SMITH:  Objection.  Asked and

6  answered how many times?

7          THE COURT:  All right.

8          MS. REYNOLDS:  I'll move on, your Honor.

9          THE COURT:  Thank you.

10   Q.    And so how many -- again, how many stacks

11  or how many bundles did you grab?

12   A.    Three.  As I was told, he told me to grab

13  three.

14   Q.    And what did you do after -- well, let me

15  ask you this:  After you grabbed those three bundles

16  of money, did you have occasion to see anything else

17  while you were inside?

18          MR. SMITH:  Objection.  Asked and

19  answered.  He's asked what he did when he went in

20  the apartment, now we're going back over the same

21  ground.

22          THE COURT:  No, this is a different

23  question.  After you grabbed the three bundles of

24  money did you have occasion to see anything else

25  while you were inside the apartment.

1994

1          MS. REYNOLDS:  Correct, your Honor.

2    A.    I mean as is, it is the same as before.

3  Table and everything was the same that I could catch

4  with my eye as I entered the apartment.

5    Q.    When you say the table and everything was

6  the same, did you see anything on the table?

7    A.    The same baggies.  It was just baggies all

8  around on the table, the crack baggies, a handful,

9  full box.

10   Q.    Did you see anything else in the apartment

11  before you left?

12   A.    No.

13   Q.    Now, when you got back into the car -- and,

14  by the way, was it just you and Dreddy that day in

15  the car?

16   A.    Yes, it was.

17   Q.    How much money were you -- did he give you

18  to go bond your cousin out?

19   A.    He gave me two stacks and I gave him the

20  other one.  I gave him all three stacks, he turned

21  and gave me two stacks, he, like, "get him out of

22  jail."

23   Q.    Did you know or did you learn how much

24  money was in each stack?

25   A.    Like $250 per stack.

1995

1    Q.    And then after that where did you go?

2    A.    We went to Wanda Jeter's on Golden Hill.

3    Q.    And were you -- did you give her some

4  money?

5    A.    Yes, I did.

6    Q.    And again, how much money did you give her?

7    A.    I gave her $350.

8    Q.    And what did you do with the remainder of

9  the money from the two stacks that you were given?

10   A.    At the time I just put it in my pocket.  It

11  was mine.

12   Q.    And were you able to bond your cousin out

13  that day?

14   A.    Yes, I was.

15   Q.    Now, Mr. Washington, drawing your attention

16  to around July or August of 2005, were you working

17  during that time period, a legitimate job?

18   A.    No.

19   Q.    Did there come a time that you needed to

20  make money?

21   A.    Yes.

22   Q.    Do you recall if you contacted the

23  defendant to try to make some money?

24   A.    Yes.

25   Q.    And can you describe what happened when you

1996

1  contacted the defendant?

2          THE COURT:  What's the timeframe on

3  this?

4          MS. REYNOLDS:  July or August of --

5    Q.    And again, this is in the summer months,

6  July or August of 2005?

7    A.    Yes.

8    Q.    Did you have occasion to contact the

9  defendant and attempt to make more money through

10  him?

11   A.    Yes.

12   Q.    And can you describe what you did?  How did

13  you contact him?

14   A.    First I left a note on his car to get in

15  contact with me.  Then I seen him at -- they had

16  like a block party.  I seen him at the block party

17  and he was, like, "I'll come and talk to you," and

18  then he came to my house and we talked about what

19  could I do.  He didn't want me to do anything

20  illegal, he was, like, "you don't need to do

21  anything illegal."  So he was, like, "I'll pay you

22  to clean the guns and you can come over here to the

23  stash house and you can be the lookout."  And then

24  we agreed upon a price was $500 for the week, every

25  week $500.

1997

```
1      Q.   So, let me stop you there.  You had a
2   conversation with the defendant in your house where
3   you were living at the time?
4      A.   Yes.
5      Q.   Was anybody else present?
6      A.   No.
7      Q.   And first with regard to cleaning the guns,
8   what did he ask you with regard to that?
9      A.   He was saying that he had a .38 revolver
10  that jammed and he wanted me to take a look at it.
11  So, I took a look at it, cleaned the rest of the
12  guns, and that's it.
13     Q.   Okay.  And were you going to be paid for
14  the cleaning of the guns?
15     A.   It would go into the $500 that he was going
16  to pay me for the week.
17     Q.   And then you mentioned a lookout.
18     A.   Yes.
19     Q.   Where were you going to be a lookout?  Did
20  you know?
21     A.   Come to be it was on Charles Street.
22     Q.   Had you been to Charles Street before you
23  had that conversation with the defendant?
24     A.   No.
25     Q.   Did you have occasion to go over to Charles
```

1998

```
1   Street and start being a lookout?
2      A.   Yes.
3      Q.   And showing you Government's Exhibit 102,
4   do you recognize what's depicted in that photograph?
5      A.   It's the front of the building on Charles
6   Street.
7      Q.   Is that the building where you eventually
8   went over to be a lookout?
9      A.   Yes.
10     Q.   Now, when you went over there to that
11  building to be a lookout, did you remember whether
12  or not you had been to that building before?
13          MR. SMITH:  Objection.  Asked and
14  answered.
15          MS. REYNOLDS:  Well, I can rephrase the
16  question.  It was a little confusing anyway, your
17  Honor.
18     Q.   When was the first time that you went over
19  to the building at Charles Street depicted in
20  Government's 102, if you remember?
21     A.   Yes.  One day Dreddy gives me a call, he
22  was, like, "I need you to do me a favor.  I'm going
23  to get you."  So I'm, like, "No problem."  So we
24  went over to Charles Street, parked in the back of a
25  diner.
```

1999

```
1      Q.   When you say he drove over, who drove over?
2      A.   Dreddy did.
3      Q.   Do you recall what car you were in that
4   day?
5      A.   It was the CTS.
6      Q.   The Cadillac CTS?
7      A.   Yes.
8      Q.   Again, what color was that?
9      A.   It was a burgundy.
10     Q.   Was anybody else with you and Dreddy when
11  you drove over to Charles Street?
12     A.   No, it just us two.
13     Q.   And you said you parked in a diner?
14     A.   Yes, in the back of a diner.
15     Q.   And where was that diner located in
16  relation to the building on Charles Street?
17     A.   It was Main Street and Charles Street.  The
18  diner is right here, it's a little wall, and then
19  that's -- it's on the side of the building.
20     Q.   And did you -- what happened next when you
21  and Dreddy drove over to Charles Street?
22     A.   He parked in back of the diner and he said,
23  "All right, I want you to go -- there is a guy over
24  there selling drugs that's not supposed to be there.
25  I want you to go -- I want you to pistol whip him
```

2000

```
1   and don't let the gun go off," and I had a Kimber
2   Ultra Carry.
3      Q.   Do you know how to spell that?
4      A.   No.
5      Q.   Kimber -- can you just repeat it a little
6   slower.
7      A.   Ultra Carry.  It's a three-inch barrel gun,
8   a small gun that's made by Kimber.
9      Q.   And that was your gun?
10     A.   Yes.
11     Q.   All right.  And so what were you supposed
12  to do with your gun?
13     A.   He told me to take the bullet out the head
14  and just pistol whip him.  He don't want the gun to
15  go off inside the building.
16     Q.   Did you know who you were supposed to go
17  find inside the building?
18     A.   He said the Spanish male.  He said if I see
19  him I would know who he is.
20     Q.   And were you -- did you have any
21  understanding as far as if you were going to be paid
22  for doing this?
23     A.   No.  Not at the time, no.
24     Q.   So, did you agree to go in and look for
25  this person and pistol whip the person?
```

2001

```
1       A.    Yes.
2       Q.    And did you in fact go into Charles Street?
3       A.    Yes.
4       Q.    And where did you go when you went into
5   Charles Street looking for him?
6       A.    I went through the side of the building
7   from the back of the parking lot, jumped over the
8   back of the wall behind the garbage can, walked
9   through the bottom of the -- they had a parking lot
10  over there.  Walked through that, went through the
11  stairs, the back stairs up there, and then from each
12  floor I walked all the way to the third floor, all
13  the way to the third floor, and then came out the
14  front door of the building.
15      Q.    Okay.  And did you find this person?
16      A.    No.
17      Q.    So you didn't pistol whip anybody that
18  time?
19      A.    No.
20      Q.    What did you do?  Did you meet up with
21  Dreddy again?
22      A.    Yes.
23      Q.    Where did you meet up with him?
24      A.    Then I got back in his car.
25      Q.    And where was he parked at that time?
```

2002

```
1       A.    Behind the diner.
2       Q.    And did you say anything to Dreddy when you
3   got back into the car?
4       A.    Yeah, there was nobody in there.
5       Q.    Did you get any money from the defendant at
6   that time?
7       A.    Yes, he gave me $250.
8       Q.    Now, after that occasion, drawing your
9   attention back then to when you became a lookout, do
10  you know approximately when it was that you went
11  back to Charles Street to become a lookout?
12      A.    I would want to say around the 4th of July.
13      Q.    And can you describe what happened when
14  you -- well, how did you know where to go at Charles
15  Street when you were going to become a lookout?
16      A.    From the last situation he was, like,
17  "That's my building."  We went out to dinner the
18  night before we went to the range, actually.  The
19  night before we went to the range, went to dinner,
20  talked about it, and then he was, like, the next day
21  I was supposed to start working from 6:00 in the
22  morning until 3:00 in the afternoon.
23      Q.    When you say you went to the range, which
24  range did you go to?
25      A.    Went to the Bridgeport range.
```

2003

```
1       Q.    And did you go with anyone else to the
2   range at that time?
3       A.    Yes, Nathaniel.
4       Q.    Nathaniel?
5       A.    Yes.
6       Q.    And showing you what's in evidence as
7   Government's Exhibit 216, who is that?
8       A.    Nathaniel.
9       Q.    And you indicated that you all went out to
10  dinner after you were at the range?
11      A.    Yes.
12      Q.    Who went to dinner; do you recall?
13      A.    It was me, Dreddy, his baby mother and
14  another female and Nathaniel.
15      Q.    And at that dinner, is that when you had
16  some conversations with the defendant?
17      A.    Yes.
18      Q.    And what did he tell you as far as what
19  your duties and responsibilities would be as a
20  lookout at Charles Street?
21      A.    He told me to stay in the lookout
22  apartment, stay away from the drug area.  And he's,
23  like, "Make sure all the people don't be acting
24  stupid or anything," and stuff like that.
25      Q.    And when was it -- after that dinner when
```

2004

```
1   was -- did you start working as a lookout at Charles
2   Street?
3       A.    Yes.
4       Q.    And when in relation to the conversation
5   you had at the dinner?
6       A.    The next morning.
7       Q.    And around what time did you report to
8   Charles Street to start your job as a lookout?
9       A.    Well, that morning I thought he was going
10  to come get me, so I called him and he was, like,
11  "You not over there yet?"  I'm, like, "No, I ain't
12  over there yet."  "You coming to get me?"  He, like,
13  "No."  So, I took a cab over there.
14      Q.    And do you remember about what time that
15  was?
16      A.    About six o'clock.
17      Q.    Six o'clock in the morning?
18      A.    Yes.
19      Q.    And where did you go when you got to
20  Charles Street at 6:00 in the morning?
21      A.    I went to the second floor of the building
22  to the front of the building on the second floor.  I
23  forget the number.
24      Q.    And do you remember what -- where that
25  apartment was located?  Do you --
```

2005

```
1       A.   It's like on the second floor.  They got --
2  you come back towards the front, it's a little
3  balcony that looks over there.  It's right next to
4  the balcony on the second floor of the apartment,
5  the building.
6       Q.   Do you remember the apartment number?
7       A.   No.
8       Q.   Do you remember -- well, what happened when
9  you got to that apartment?
10      A.   When I got to the apartment the door was
11 broken already.  So I knocked on the door.  The lady
12 of the house came, she came and talked to me, I
13 talked to her, tell her that Dreddy sent me over
14 there and everything, and I started looking through
15 the window.
16      Q.   Okay.  And did you know the lady of the
17 house prior to that occasion when you first went
18 over there?
19      A.   No.
20      Q.   Had you met her before?
21      A.   No.
22      Q.   And showing you what's in evidence as
23 Government's Exhibit 217, do you recognize who is
24 depicted in that photograph?
25      A.   Yeah, that's the lady of the house.  That
```

2006

```
1  was her apartment.
2       Q.   And did you come to learn her name?
3       A.   I did.  I forget it now.
4       Q.   But that's the woman who answered the door
5  and who let you into the apartment that day?
6       A.   Yes.
7       Q.   And you said -- well, so what did you do
8  once you got inside the apartment?
9       A.   Started looking out the window and
10 everything.
11      Q.   Which window were you looking out from?
12      A.   Through the front of the building, it's a
13 little tree in front of the window, and I was
14 looking through the front in the building, down on
15 the ground, looking for the coming and going of cars
16 and people.
17      Q.   And did you know or did you have an
18 understanding of what you were supposed to do if you
19 did see some trouble or something happening?  What
20 was your job at that point?  What would you have to
21 do?
22      A.   Then Big Man came to the apartment and he
23 was telling me, like, "Here is a cell phone,
24 anything happen, call back to the apartment in the
25 back," and then back in the hall -- I mean a couple
```

2007

```
1  apartments down was an apartment building to call
2  and let them know that the police are coming or
3  whatever.  So --
4       Q.   And this person, Big Man, had you met him
5  before you became a lookout over at Charles Street?
6       A.   Yes.
7       Q.   And do you recall when the first time was
8  that you met Big Man?
9       A.   Yes.
10      Q.   And when was that?
11      A.   I would say about a week before I started
12 working over there I was looking for Dreddy and
13 Dreddy brought me over to his house one time.  I
14 didn't know it was his house, I didn't even know
15 him, and I was just looking for Dreddy, so I went
16 over there.  He was parked outside his house.  He
17 was, like, "What are you looking for?"  I'm, like,
18 "Well, I'm looking for Dreddy."  He's, like, "This
19 my house right here."  I was, like, "All right, let
20 Dreddy know I'm looking for him."
21      Q.   Let me break that down a bit.  When you say
22 you went over to his house.
23      A.   Yes.
24      Q.   Whose house are you referring to?
25      A.   Big Man's house.
```

2008

```
1       Q.   And do you remember where that was?
2       A.   Yes.
3       Q.   Okay, where was that?
4       A.   Right across the street from the North
5  Avenue jail.
6       Q.   And showing you what's in evidence as
7  Government's Exhibit 210, do you recognize who that
8  is?
9       A.   Yes.
10      Q.   Who is that?
11      A.   That's Big Man.
12      Q.   And that's the person you spoke to about a
13 week before you became a lookout?
14      A.   Yes.
15      Q.   And after -- did you have some discussions
16 with Big Man about being a lookout at Charles
17 Street?
18      A.   I'm sorry?
19      Q.   That was --
20      A.   Repeat that question.
21      Q.   I will rephrase the question.
22           Did there come a time that -- well,
23 withdrawn.
24           When you were back at Charles Street already
25 being a lookout, did Big Man come to the lookout
```

**GA502**

2009

```
1    apartment?
2        A.   Yes.
3        Q.   And did you talk about what your duties and
4    responsibilities were with Big Man?
5        A.   Yes.
6        Q.   And you mentioned cell phones.  Did Big Man
7    give you some cell phones?
8        A.   Yes.
9            MR. SMITH:  Asked and answered.  He's
10   already testified to all of this.  It's just going
11   back over.  He testified he came in and gave him a
12   cell phone, now we're asking about it again.
13           THE COURT:  Well, then there was the
14   interruption of how he met him, now we're going on,
15   that I'm going to, for continuity sake, let her
16   continue.
17           MS. REYNOLDS:  Thank you, your Honor.
18       Q.   How many cell phones did you get from
19   Big Man?
20       A.   He gave me one cell phone.
21       Q.   And what instructions did he give you with
22   regard to using the cell phone?
23       A.   That if any police were to come or anything
24   was to happen, to call and let the other guy in the
25   back of the couple houses down, let him know --
```

2010

```
1    couple houses -- apartments down.
2        Q.   Did you have occasion once you started
3    acting as a lookout in that second floor apartment
4    to go down the hall to the other apartment?
5        A.   Yes, me and Nathaniel went down there one
6    time.
7        Q.   Did you meet anybody inside of that
8    apartment?
9        A.   Yes.
10       Q.   Do you remember whose apartment that was?
11       A.   It was an old man they called Pop.
12       Q.   And did you meet Pops?
13       A.   Yes.
14       Q.   And showing you what's in evidence as
15   Government's Exhibit 229, do you recognize who that
16   is?
17       A.   That's Pop.
18       Q.   And when you went to Pops' apartment down
19   the hall from the lookout apartment, did you meet
20   anybody else?
21       A.   Yes.
22       Q.   And who else did you meet?
23       A.   It was a lady down there, an older black
24   lady, and there was also a guy there named Frank.
25       Q.   And showing you Government's Exhibit 212 in
```

2011

```
1    evidence, do you recognize who is depicted in 212?
2        A.   Yeah, that's Frank.
3        Q.   And you mentioned that there was also a
4    woman.  Showing you Government's Exhibit 213, do you
5    recognize who that is?
6        A.   Yes, that is was the lady that was down
7    there, too.
8        Q.   Do you recall her name?
9        A.   No.
10       Q.   And, again, where were they when you met
11   them?
12       A.   They were inside the apartment.
13       Q.   Do you know what they were doing inside the
14   apartment?
15       A.   Selling drugs.
16       Q.   Do you know what kind of drugs they were
17   selling?
18       A.   Selling crack.
19       Q.   Now, how long did your shift -- well, did
20   you have a shift or set hours that you were supposed
21   to work as a lookout inside the second floor
22   apartment?
23       A.   Yes.
24       Q.   What were your hours?
25       A.   Six in the morning til three in the
```

2012

```
1    afternoon.
2        Q.   At three in the afternoon do you know
3    whether or not anybody else came to be a lookout?
4        A.   Yes, Nathaniel was supposed to take it from
5    that time on.  He was supposed to relieve me and
6    start his time working there.
7        Q.   And again, when you say that Nathaniel was
8    supposed to relieve you and start his shift, was
9    that the person depicted in Government's 216?
10       A.   Yes.
11       Q.   And that first time when you started acting
12   as a lookout, did you work until three o'clock?
13       A.   Yes.
14       Q.   Were there any issues or problems that
15   first day that you had?
16       A.   The first day not.  Somebody came and they
17   fixed the door.  The only issue I had, I called
18   Dreddy to come pick me up.  I ended up taking a cab
19   over there.  I was, like, "You didn't come pick me
20   up."  He said, "What you doing, you supposed to be
21   there already."  I just called a cab.  I didn't have
22   a car at the time.
23       Q.   You didn't have a car at the time?
24       A.   No.
25       Q.   Did Nathaniel in fact show up around three
```

**2013**

```
1   o'clock when your shift was over?
2       A.   Yes.
3       Q.   What did you do at that point?
4       A.   I left.
5       Q.   You left?
6       A.   Uh-huh (indicating affirmatively).
7       Q.   Did you come back to Charles Street after
8   that first day to be a lookout?
9       A.   Yes.
10      Q.   And when did you go back?
11      A.   The next day.
12      Q.   So, what was your understanding of what
13  days you would be working as a lookout inside that
14  apartment?
15      A.   Seven days a week.
16      Q.   And always the morning shift?
17      A.   Yes.
18      Q.   Six to three?
19      A.   Yes.
20      Q.   And did you, in fact, go the rest of that
21  week to be a lookout over at Charles Street?
22      A.   Yes.
23      Q.   While you were inside being a lookout, did
24  you ever see the defendant in the apartment?
25      A.   Yes.
```

**2014**

```
1       Q.   And can you describe, how did that come
2   about?
3       A.   One day he came over, it was at night.  I
4   stayed a little bit later that night.  He came into
5   the apartment, his hand was bleeding.  He was
6   talking junk to us, like, "What am I paying y'all
7   for?  What am I paying y'all for?  This dude was out
8   here, I had to do something to him."
9       Q.   You have to slow down a little because the
10  court reporter has to get all of this.
11           So when the defendant came in, you said it
12  was nighttime?
13      A.   Yes.
14      Q.   And you had stayed over?
15      A.   Yes.
16      Q.   Stayed.  Was he with anybody when he came
17  in that time?
18      A.   Yes.
19      Q.   Do you remember who he was with?
20      A.   A kid named Woby.
21      Q.   And who else was in the apartment with you?
22  Was Nathaniel with you at that time?
23      A.   Yes.
24      Q.   Do you remember if there were any other men
25  in the apartment at that time?
```

**2015**

```
1       A.   The lady of the house had a boyfriend.  He
2   was there, too.
3       Q.   And showing you Government's Exhibit 218 in
4   evidence, do you recognize who that is?
5       A.   Yeah, that's him right there.
6       Q.   That's the boyfriend?
7       A.   The lady of the house boyfriend.
8       Q.   Did you know his name?
9       A.   I forget it.
10      Q.   And so what happened after the defendant
11  came into the apartment and had those discussions
12  with you?  What happened next?
13      A.   I went home.
14      Q.   You went home?
15      A.   Uh-huh (indicating affirmatively).
16      Q.   Do you remember if you saw the defendant
17  inside the apartment on any other occasions, the
18  lookout apartment?
19      A.   I seen him one other time he came over
20  there.  I walked him over there.  We, me and him,
21  ourselves went over there, walked down the street.
22  He parked in the back on the other side of the
23  street over near Central High School, and we walked
24  over to the building, went inside the building.  It
25  was at nighttime.
```

**2016**

```
1       Q.   And do you know who was paying the rent for
2   the lookout apartment?
3       A.   Dreddy was.
4       Q.   And how do you know that?
5       A.   He told me.  He's, like, "I'm going to take
6   care of the rent, the light bills, any bills you
7   need pay I'm going to take care of."
8       Q.   And what was your understanding about how
9   much you were going to be paid for being a lookout?
10      A.   My understanding, I thought it was $500 a
11  week.
12      Q.   And did you get paid?
13      A.   One time, yes.
14      Q.   And who paid you?
15      A.   Big Man.
16      Q.   And again, that's the person in
17  Government's Exhibit 210?
18      A.   Yes.
19      Q.   When he paid you, where were you when he
20  paid you?
21      A.   I was inside the apartment.
22      Q.   The lookout apartment?
23      A.   Yes.
24      Q.   And did you continue after that first week
25  to work as a lookout over at Charles Street?
```

GA504

2017

1    A.    Repeat the question.
2    Q.    After that first week that you worked, did
3  you go back a second week?
4    A.    No.
5    Q.    What happened that you didn't go back?
6    A.    I just didn't like the atmosphere,
7  everything around there.  I told Dreddy, I was,
8  like, "Huh, take your guns, take your keys," and we
9  both went our separate ways.
10    Q.    Let me ask you this:  Did you -- how would
11  you get into the lookout apartment after you started
12  working there?  How did you?
13    A.    House keys.
14    Q.    And who gave you the keys?
15    A.    Womble.  Womble gave me keys, copies of the
16  keys.  Because when I first went the first day the
17  door was kicked in and somebody came and fixed the
18  door, gave the keys.  He went to Home Depot, got
19  copies of the keys, came back and gave them to me.
20    Q.    When you say "Womble," is that the same
21  person in Government's 210 you previously referred
22  to as Big Man?
23    A.    Yes.
24    Q.    Do you know if Womble gave keys to Stone,
25  to Nathaniel Grant?

2018

1    A.    Yes, yes.
2    Q.    And while you were over there as a lookout,
3  did you also have a nickname?
4    A.    Yes.
5    Q.    Okay.  What was your nickname?
6    A.    They called me Bear.
7    Q.    Bear?
8    A.    Yes.
9    Q.    Did you know what Big Man or Womble's role
10  was other than paying you and giving you the keys?
11  Did you see him go anything else over there?
12    A.    Yes, he was bringing the drugs to the back
13  apartment, to Pop apartment.
14    Q.    While you were working as a lookout, did
15  you learn of any problems with some people on the
16  first floor, who lived on the first floor?
17    A.    Yes.
18    Q.    And describe that.  What did you learn what
19  happened?
20    A.    At first me and -- one day me and Nathaniel
21  was talking and he was, like -- he's like "Let's go
22  downstairs and talk to these people and try to get
23  them to work with us."  And then we went downstairs,
24  knocked on the door.
25    Q.    And where downstairs did you go?  Do you

2019

1  need some water?  There is water there.
2    A.    Yes, give me some water.
3    Q.    Better?
4    A.    Yes.
5    Q.    Okay.  So, where downstairs did you go?  Do
6  you remember what apartment?
7    A.    In the front of that building.  In the
8  front of the building, we walked downstairs and then
9  as soon as you come through the door, the front of
10  the building, the house on the right, right-hand
11  side.
12    Q.    And did you know who lived inside that
13  apartment?
14    A.    Other people at the time, no.
15    Q.    And did you, in fact, go down there with
16  Nathaniel and knock on the door?
17    A.    Yes.
18    Q.    And did you speak to anybody after you
19  knocked on the door?
20    A.    Yes, they told us to come in.  We came in.
21  It was a lady on the couch.  And it smelled funny in
22  there.  And we was talking, and all of a sudden the
23  guy from the backroom came out, like, "Get out of
24  here, get out of here."
25         MR. SMITH:  Your Honor, if we're going

2020

1  to get into too much hearsay conversation about what
2  the people in the apartment said, I would ask we be
3  very careful about that.
4         MS. REYNOLDS:  That's fine.
5    Q.    Without telling us what anyone said, did
6  you have some discussions with people in the
7  apartment on the first floor?
8    A.    Yes, briefly.
9    Q.    And what was your -- you went down there
10  with Nathaniel you said.  What was your purpose for
11  going down there?  What were you trying to do?
12    A.    I wasn't trying to do nothing.  I was just
13  following Nathaniel.  He said he wanted to talk to
14  them about putting them together as lookout
15  apartment so they could look out, too.
16    Q.    As a lookout for who?
17    A.    For Dreddy.
18    Q.    And did you have those discussions with the
19  people on the first floor apartment when you went
20  down there?
21    A.    Briefly.
22    Q.    And what did you do after that?
23    A.    Went back upstairs.
24    Q.    Did you talk to the defendant about those
25  discussions that you had with the people on the

2021

```
1    first floor?
2        A.   Yes.
3        Q.   And what did the defendant say?
4        A.   He said that was stupid, shouldn't have did
5    that, the whole reason why I was there was because
6    of them.  And he said that was a bad idea, it wasn't
7    a good idea doing that.
8        Q.   Now, you said that you -- did you work more
9    than -- when did you stop working as a lookout in
10   the apartment?
11       A.   A week.  A week or so.
12       Q.   And did you have any discussions with the
13   defendant after you stopped working as a lookout?
14       A.   No, he changed his phone number.
15       Q.   Did the defendant ever come over to see you
16   after you stopped working as a lookout?
17       A.   He came -- the last time when I told him,
18   after that, no.  After I told him that I didn't want
19   to deal with him, that building, no, I didn't see
20   him no more after that.
21       Q.   And with regard to the firearms that you
22   had purchased for the defendant, did you do anything
23   in connection with those firearms?
24       A.   Repeat the question.
25       Q.   Yes, I will.  Actually I'll rephrase the
```

2022

```
1    question.
2            Did you report any guns stolen --
3        A.   Oh, yes, I did.
4        Q.   -- to the police?  And approximately when
5    did you report the guns stolen?
6        A.   That night that I told him I wasn't going
7    to work with him no more, that's when I reported
8    them stolen.
9        Q.   And why did you report the guns stolen?
10       A.   Because Nathaniel told me, he was, like,
11   one night they drove past up Charles Street on the
12   other end of Charles Street --
13           MR. SMITH:  Objection.
14           THE COURT:  Just a moment -- pardon?
15           MS. REYNOLDS:  Yes, I was going to stop
16   the witness.
17           THE COURT:  Yes.
18       Q.   Without telling us what Nathaniel told you,
19   at that point did you have some discussions with
20   Nathaniel about the guns that you had purchased for
21   the defendant?
22       A.   Yes.
23       Q.   And without telling us what he told you,
24   what did you do next after you had those
25   discussions?
```

2023

```
1        A.   I reported the guns stolen.
2        Q.   And those guns were purchased in whose
3    name?
4        A.   My name.
5        Q.   And how was it that you reported the guns
6    stolen?  What did you have to do to report the guns
7    stolen?
8        A.   Just call Bridgeport PD and tell them my
9    house been broken into and they stole my guns.
10       Q.   And was that report that you made to the
11   Bridgeport PD about the guns being stolen true?
12       A.   No.
13       Q.   Did you tell the defendant that you had
14   reported the guns stolen?
15       A.   No.  I didn't see him after that.
16       Q.   And Mr. Washington, at some point did you
17   continue to buy guns, but for other individuals in
18   Bridgeport?
19       A.   Yes.
20       Q.   And you continued to make money illegally
21   by purchasing guns for other individuals?
22       A.   Yes.
23       Q.   Approximately how many guns did you
24   purchase illegally for other individuals in
25   Bridgeport?
```

2024

```
1        A.   About 21.
2        Q.   Twenty-one guns?
3        A.   Yes.
4        Q.   And do you recall where you purchased those
5    firearms?
6        A.   From D'Andrea's -- in Stratford and Milford
7    and also Hansen in Fairfield, Connecticut.  Am I
8    saying it right?  Hansen in Fairfield.  It's a gun
9    store in Fairfield.
10       Q.   Okay.  And you made a lot of money doing
11   this?
12       A.   No.
13       Q.   Not a lot of money?
14       A.   No.
15       Q.   How much money would you make?
16       A.   I scored 250 per gun.
17       Q.   And at some point were you arrested in
18   connection with an incident that happened at one of
19   the gun stores?
20       A.   Yes.
21       Q.   And approximately when was that that you
22   were arrested; do you recall?
23       A.   The end of February.
24       Q.   February of what year?
25       A.   2006.
```

2025

```
1      Q.   And can you describe what led to your
2  arrest that night?  What happened?
3      A.   I'm sorry.  Repeat that question.
4      Q.   Can you describe what led to your arrest?
5  What happened that night when you were arrested in
6  February of 2006?  Why were you arrested?
7      A.   Oh, for crashing the car at first.
8      Q.   Okay.  And were you trying to purchase guns
9  that night?
10     A.   Yes, yes.
11     Q.   For another individual, another person in
12 Bridgeport?
13     A.   Yes.
14     Q.   And you were trying to do so illegally?
15     A.   Yes.
16     Q.   And you ended up crashing your car that
17 night?
18     A.   Yes.
19     Q.   And after you crashed the car, what did you
20 do?
21     A.   Huh?
22     Q.   Well, how did you get arrested?  Where were
23 you arrested?
24     A.   Oh, in Bridgeport.
25     Q.   Okay.  And after the car crash, did you do
```

2026

```
1  anything?
2      A.   Yeah, then I jumped in the water.
3      Q.   Okay.  What water did you jump in?
4      A.   I forget the name of the street over there.
5      Q.   And did you swim through that water?
6      A.   Yes.
7      Q.   And you were eventually arrested.
8      A.   Yes.
9      Q.   And after you were arrested, were you taken
10 to the Bridgeport police station?
11     A.   Yes.
12     Q.   And on that night did you start giving
13 information to the Bridgeport Police Department?
14     A.   Yes.
15     Q.   And did you speak to several officers after
16 you were arrested and continue to speak to those
17 officers for some time?
18     A.   Yes.
19          MR. SMITH:  Objection to the leading
20 nature.
21          MS. REYNOLDS:  I'll rephrase the
22 question, your Honor.
23     Q.   Who did you speak to when you were arrested
24 and were taken to the police station?
25     A.   At first I thought it was Bridgeport PD,
```

2027

```
1  but come to find out it was the FBI.
2      Q.   And did you speak, do you know, to any
3  other agents from any other agencies?
4      A.   The ATF and also the narc -- TNT.
5      Q.   And what did you tell them about when you
6  were speaking to them?
7      A.   I told them about purchasing the guns, told
8  them -- told them about the purchase of the guns and
9  pretty much everything I could think about.  The
10 truth.
11          MS. REYNOLDS:  Could I just have a
12 moment, your Honor?
13          THE COURT:  Yes.
14     Q.   And, Mr. Washington, did you eventually
15 plead guilty in federal court?
16     A.   Yes.
17     Q.   And I'm going to show you what I've
18 demarked Government Exhibits 242 and 242A.  In
19 addition to pleading guilty, did you also enter into
20 what's known as a cooperation agreement?
21     A.   Yes.
22     Q.   And let me just show you these two
23 documents.  Starting with Government's Exhibit 242.
24 Is that a copy of your plea agreement?
25     A.   Yes.
```

2028

```
1      Q.   And that's got your attorney, Jonathan
2  Einhorn's, name on it, correct?
3      A.   Yes, yes.
4      Q.   And do you recall in April 3rd of 2006
5  pleading guilty to two offenses, one narcotics
6  trafficking conspiracy and also a firearms charge
7  involving unlawful dealing in firearms?  Did you
8  plead guilty to two federal felony offenses?
9      A.   Yes.  Yes, I did.
10     Q.   And on that same day, on April 3rd of 2006,
11 and showing you now what's marked for purposes of
12 identification 242A, is this the cooperation
13 agreement or copy of the cooperation agreement that
14 you entered into?
15     A.   Yes.
16     Q.   And that's signed by you and dated
17 April 5th of 2006.
18     A.   Yes.
19     Q.   Also signed by your attorney.
20     A.   Yes.
21     Q.   And also signed by the prosecutor at the
22 time, James Glasser.
23     A.   Yes.
24     Q.   All right.  And, Mr. Washington, what is
25 your understanding with regard to the cooperation
```

2029

```
 1   agreement?  What do you have to do?  What's your
 2   understanding of what you have to do?
 3        A.   Just tell the truth.
 4        Q.   And what are you hoping happens as a result
 5   of your cooperation in this case?
 6        A.   Nothing.
 7        Q.   You are hoping nothing happens?  What do
 8   you mean?
 9        A.   I served my time already so there is
10   nothing they could do.  I'm not hoping to get a
11   lesser sentence because I served my time already.
12        Q.   And why are you cooperating?
13        A.   Because I made a terrible mistake by
14   selling those guns and I'm trying to make what I did
15   wrong -- I'm going to try make at least some good
16   out of it, make a right out of it.
17        Q.   Okay.
18             MS. REYNOLDS:  Your Honor, I would offer
19   both of those.  Unless there is an objection, I'm
20   offering them at this time.
21             MR. SMITH:  No objection.
22             MS. REYNOLDS:  242 and 242A.
23             THE COURT:  There is no objection I see.
24   Therefore, they're full exhibits.
25        Q.   Mr. Washington, getting back to Charles
```

2030

```
 1   Street when you were a lookout there, you had
 2   mentioned a person by the name of Woby.
 3        A.   Yes.
 4        Q.   Is that correct?  And showing you
 5   Government's Exhibit 220 in evidence, do you
 6   recognize that person?
 7        A.   Yes, that's Woby.
 8        Q.   That's Woby?
 9        A.   Uh-huh (indicating affirmatively).
10        Q.   And that's the person that came with the
11   defendant that time that he came to the apartment,
12   one of the times?
13        A.   Yes.
14        Q.   Did you have any other dealings with Woby,
15   who is in Government's Exhibit 220?
16        A.   No.  I know him when I was younger, me and
17   him grew up on the same side of town.
18        Q.   And what side of town did you grow up on?
19        A.   The east end of Bridgeport.
20        Q.   And then, Mr. Washington, there were some
21   additional documents contained in Government's 257
22   that I just wanted to go over with you that are in
23   evidence.
24             I'm starting with Government's 257D-1.
25   Taking a look at that.  Again, what's the date for
```

2031

```
 1   that transaction?
 2        A.   5/26/05.
 3        Q.   And what is this document?  What's it
 4   called?
 5        A.   Sale and Transfer of All Firearms.
 6        Q.   What is listed on this document?
 7        A.   The sale authorization, manufacturer, the
 8   number of the gun, the serial number of the gun.
 9        Q.   And that's over here in this corner where
10   it says serial number?
11        A.   Yes.
12        Q.   And it has the purchaser?
13        A.   Yes.
14        Q.   You.  And your address.
15        A.   Yes.
16        Q.   And 257D-1, that's for this Smith & Wesson
17   with this serial number UAC 3966?
18        A.   Yes.
19        Q.   And then showing you 257D-2, that's also
20   from that same date that you had purchased the
21   firearms for the defendant, correct?
22        A.   Yes.
23        Q.   And this is for which gun?
24        A.   The Smith & Wesson.
25        Q.   Okay, and the exact model?
```

2032

```
 1        A.   22A.
 2        Q.   And what is the serial number listed in
 3   257D-2?
 4        A.   UAZ 2474.
 5        Q.   And, again, does that document contain your
 6   name as the purchaser?
 7        A.   Yes.
 8        Q.   And it also has your pistol permit ID?
 9        A.   Yes.
10        Q.   And then showing you 257D-3, what is this
11   document for?
12        A.   Smith & Wesson.
13        Q.   Another Smith & Wesson?
14        A.   Yes.
15        Q.   What serial number?
16        A.   CHV 0228.
17        Q.   And then, you know, you mentioned that you
18   had cleaned some guns for the defendant.
19        A.   Yes.
20        Q.   Do you remember that testimony?  And you
21   also mentioned that you had gone to the shooting
22   range with the defendant on several occasions,
23   correct?
24        A.   Yes.
25        Q.   When you would go to the shooting ranges,
```

2033

1  do you recall what firearms, if any, the defendant
2  brought with him to fire at the shooting range?
3     A.  The --
4        MR. SMITH:  Objection.  This was asked
5  and answered yesterday on direct, I believe.
6        THE COURT:  Is this some new outing to
7  the shooting range?
8        MS. REYNOLDS:  I don't think we went
9  through what -- if the defendant brought firearms.
10       THE COURT:  His own?
11       MS. REYNOLDS:  His own firearms to
12 shoot.
13       THE COURT:  You may proceed.
14       MS. REYNOLDS:  Thank you, your Honor.
15    Q.  Do you know whether the defendant brought
16 his own firearms when you would go to the shooting
17 range?
18    A.  The first time no, the second time, yes.
19    Q.  And with regard to the second time, do you
20 know what firearms the defendant brought when he
21 brought his own firearms to go to the shooting
22 range?
23    A.  Yes.
24    Q.  And which firearms did he bring?
25    A.  It was a 3-inch barrel Kahr 9.

2034

1     Q.  A Kahr 9?
2     A.  Yes, that's K-a-r [sic] as the make.
3     Q.  Okay.
4     A.  And then the .38 revolver.  A P90 Ruger;
5  the 22 -- the two .22s that I bought him, and the
6  .357 that I bought him.  And I also I had my
7  Sig-Sauer stainless steel also.
8     Q.  So, you brought your Sig?
9     A.  Yes.
10    Q.  And those other firearms, the defendant
11 brought those?
12    A.  Yes.
13       MS. REYNOLDS:  Could I just have a
14 moment, your Honor?
15       THE COURT:  Yes.
16    Q.  Mr. Washington, are you familiar with the
17 difference between a revolver and a pistol?
18    A.  Yes.
19    Q.  And can you describe what the difference is
20 between a revolver and a pistol?
21    A.  A semiautomatic hand pistol is, it can
22 carry more than six or seven rounds.  A revolver
23 usually has six to eight rounds inside of a circle
24 where you put the bullets inside.  Like Clint
25 Eastwood, he carries a revolver.

2035

1     Q.  And the pistol, where do the bullets go or
2  how are the bullets loaded in to the semiautomatic
3  pistol?
4     A.  It's loaded inside of a clip and then you
5  put one into the head and then you fire it.  Or some
6  you have where you can just fire them.  But you put
7  one in the head and fire.
8     Q.  Okay.
9     A.  Chamber, one into the head and then fire
10 it.
11       MS. REYNOLDS:  Nothing further.  Thank
12 you, your Honor.
13       THE COURT:  All right,
14 cross-examination.
15 CROSS-EXAMINATION
16 BY MR. SMITH:
17    Q.  Good morning, Mr. Washington.
18    A.  Good morning, sir.
19    Q.  My name is Justin Smith.  I'm one of the
20 attorneys who represents Azibo Aquart.  You talked a
21 little bit about knowing what crack looked like when
22 it's packaged.
23    A.  Yes.
24    Q.  You grew up in Bridgeport.
25    A.  Yes, I did.

2036

1     Q.  In the east end.
2     A.  Yes.
3     Q.  And that was pretty rough town, pretty
4  rough area, growing up.
5     A.  Yes.
6     Q.  And it was a dangerous area of town, right?
7     A.  Yes.
8     Q.  A lot of violence there?
9     A.  Yes.
10    Q.  In fact, at one point you got expelled from
11 school for having a hunting knife at school, right?
12    A.  Yes, I did.
13    Q.  And you had that for protection, right?
14       MS. REYNOLDS:  Objection, your Honor.
15       MR. SMITH:  I'm exploring his
16 background.
17       MS. REYNOLDS:  I would ask that we
18 approach.
19       THE COURT:  All right, I'll see you.
20       (Sidebar conference)
21       MS. DAYTON:  This was filed this morning
22 for this reason.
23       MR. SMITH:  I didn't see it.
24       THE COURT:  This was not filed by the
25 time I came on the bench.

2037

```
 1              MS. DAYTON:  No, it wasn't, but it was
 2   -- after all the problems we had with 609, that they
 3   would inquire into a juvenile issue, which is
 4   completely improper under the rules --
 5              MR. SMITH:  They asked about his
 6   background extensively, your Honor, I'm asking
 7   about --
 8              THE COURT:  That doesn't mean you don't
 9   have to follow the rules.
10              MR. SMITH:  I understand that, your
11   Honor, but it's at the Court's discretion whether
12   I'm allowed.  He talked about dealing crack at age
13   13 or 14 yesterday.
14              MS. REYNOLDS:  I didn't ask him about --
15              MR. SMITH:  He was asked and he said he
16   knew what crack liked like.
17              MS. REYNOLDS:  I want to know how a
18   juvenile expulsion for carrying a knife has anything
19   to do with crack dealing.
20              THE COURT:  I think it's outside the
21   rules.
22              MR. SMITH:  Well, I intend to ask about
23   the crack.
24              MS. REYNOLDS:  There is no objection,
25   you can ask him about whether he was dealing crack,
```

2038

```
 1   that was brought out on direct.
 2              THE COURT:  That's where you were going
 3   originally, he knows about crack from a long time
 4   back.
 5              MR. SMITH:  Yeah.
 6              THE COURT:  Okay.
 7              MS. REYNOLDS:  Can we instruct the jury,
 8   your Honor?
 9              THE COURT:  Pardon me?
10              MS. REYNOLDS:  Is there an instruction
11   that would be appropriate to the jury with regard to
12   this line of questioning?  I mean, it's happened now
13   three times.
14              THE COURT:  I'll strike the answer.
15              MS. REYNOLDS:  Well, strike the question
16   and the answer?
17              MS. DAYTON:  Can you also tell them to
18   disregard, because this is the fourth time,
19   actually.  It was twice with Ms. Rivera, and with
20   Mr. Hodges.  This is the fourth time, which is why I
21   filed the motion this morning.
22              THE COURT:  Okay.  It's useful for me to
23   get the motions before I come on the bench.
24              MS. DAYTON:  I understand, your Honor, I
25   had computer issues.  I tried.
```

2039

```
 1              (Sidebar concluded)
 2              THE COURT:  I'm going to strike the last
 3   question and answer.  Kindly disregard it.  It was
 4   not evidence.
 5              And you may rephrase your question.
 6              MR. SMITH:  Thank you, your Honor.
 7        Q.   Mr. Washington, you talked a little bit
 8   about, you were age, I think you said 13 or 14, you
 9   were selling crack?
10        A.   Yes.
11        Q.   And that you knew what crack dime bags
12   looked like because you had packaged and sold crack
13   in the past, right?
14        A.   Sorry?  Repeat that question.
15        Q.   You were asked about seeing dime bags at
16   the stash house, right?
17        A.   Yes, yes.
18        Q.   And you knew what dime bags were because
19   when you were 13 or 14 you had packaged and sold
20   crack.
21        A.   When I was 13 or 14 I sold the vials.
22        Q.   Okay.
23        A.   And then I come to find out, which they
24   package the slabs inside, they're like little ZipLoc
25   bags, like the size of the pinkie, and that's where
```

2040

```
 1   you package crack inside.  Yes, yes.
 2        Q.   So, you were familiar with that from when
 3   you were a kid you were dealing with that, right?
 4        A.   Yes.
 5        Q.   And someone had taught you how to deal
 6   crack cocaine, right?
 7        A.   Yes.
 8        Q.   And how to package it?
 9        A.   Uh-huh (indicating affirmatively).
10        Q.   How the drug trade worked, right?
11        A.   Yes, yes.
12        Q.   And that wasn't your family necessarily.
13        A.   No.
14        Q.   That was people on the streets.
15        A.   Yes.
16        Q.   Okay.  And they were older than you.
17        A.   Yes.
18        Q.   Do you think they took advantage of you?
19        A.   No.
20        Q.   But you were making money?
21        A.   No, not really.  I mean, as a kid, yeah, I
22   figured, yeah, when I was a kid, yes.
23        Q.   You were making some money doing that.
24        A.   Uh-huh (indicating affirmatively).
25        Q.   But eventually you ended up going to
```

**GA510**

2041

```
1    Job Corps, right?
2        A.   Yes.
3        Q.   Okay.  And you got trained as a certified
4    nurse's aide?
5        A.   Yes.
6        Q.   And you got a few jobs doing that?
7        A.   Yes.
8        Q.   Okay.  But you got fired from those jobs.
9        A.   Fired.  Some I quit, some I got fired, yes.
10       Q.   And at some point you did get your
11   concealed weapon permit, right?
12       A.   Yes.
13       Q.   And you were asked about buying these other
14   guns, right?
15       A.   Yes.
16       Q.   And you bought those guns for a person by
17   the name of L.T.?
18       A.   Yes.
19       Q.   He was a gang member in Bridgeport.
20       A.   Yes.
21       Q.   And your understanding of why he wanted the
22   guns was because he wanted to take over the P.T.
23   Barnum housing projects.
24       A.   Yes.
25       Q.   And he wanted to control the drug trade
```

2042

```
1    there.
2        A.   Yes.
3        Q.   That was your understanding.
4        A.   Yes.
5        Q.   And he would need guns to do that, right?
6        A.   Yes.
7        Q.   And you were the one who got him those
8    guns.
9        A.   Yes.
10       Q.   Over 20 guns.
11       A.   Twenty-one.
12       Q.   Twenty-one guns?
13       A.   Yes.
14       Q.   Okay.  When you are doing something like
15   this, dealing with firearms and guys who want the
16   guns, it's kind of dangerous, right?
17       A.   Of course.  Yes, yes, it is.
18       Q.   And you find that out, right?
19       A.   Yes.
20       Q.   Because the night of your arrest you had
21   actually agreed with L.T. to take the money from
22   some other guys, right, who had given you money to
23   purchase guns?
24       A.   Yes.
25       Q.   And just take off with the money.
```

2043

```
1        A.   Yes.
2        Q.   And when you did, you left with L.T.
3        A.   Yes.
4        Q.   And the next thing you know L.T. is
5    pointing a gun at you.
6        A.   Yes.
7        Q.   And you have to give him your gun.
8        A.   Yes.
9        Q.   And any money you have on you.
10       A.   Yes.
11       Q.   But he left you with your car.
12       A.   Yes, he did.
13       Q.   And you tried to run him down with that
14   car.
15       A.   I missed him.
16       Q.   You missed him?
17       A.   Yes.
18       Q.   You crashed into the river.
19       A.   Yes.
20       Q.   Then he fired a shot at you.
21       A.   Yes.
22       Q.   And you had to swim across the river to get
23   away.
24       A.   Yes, I did.
25       Q.   So now that takes us up to your arrest,
```

2044

```
1    right?
2        A.   That's the night of my arrest, that night.
3        Q.   Yes, that's the night of your arrest.  And
4    the police find you all wet.
5        A.   Yes.
6        Q.   They find your car smashed up.
7        A.   Yes.
8        Q.   And you start talking to them, right?
9        A.   Yes, I did.
10       Q.   And within a short amount of time the
11   Bureau of Alcohol, Tobacco and Firearms gets
12   involved?
13       A.   Yes.
14       Q.   And that's the agency that controls
15   firearms, right?
16       A.   Yes, it is.
17       Q.   You knew that.
18       A.   Yes.
19       Q.   So now you are looking at a federal
20   offense, right?
21       A.   Yes.
22       Q.   And you knew that.
23       A.   Yes.
24       Q.   And you know you are in serious trouble at
25   this point, right?
```

2045

1    A.    Yes.
2    Q.    And so you agree to start talking to them,
3 right?  The police.
4    A.    Yes, yes.
5    Q.    And eventually the ATF.
6    A.    Yes.
7    Q.    And then later the FBI.
8    A.    No, that was wrong order.  First the FBI.
9    Q.    Okay.
10    A.    The FBI was on the scene when I came all
11 wet.
12    Q.    They were already there.
13    A.    They were already there.
14    Q.    Right on top of it.
15    A.    Right on top of it.
16    Q.    Now, you talked a little bit yesterday
17 about the first time that you met Dreddy, right?
18    A.    Yes.
19    Q.    And you, I believe, said that Abraham
20 brought Dreddy to your house?
21    A.    Yes, he did.
22    Q.    And that was the very first time you met
23 him.
24    A.    That was the first time I met Dreddy, yes.
25    Q.    And that was on Gregory Street.

2046

1    A.    Yes.
2    Q.    Now, you've been interviewed about this on
3 multiple occasions, right?
4    A.    Yes.
5    Q.    And one of the times you were interviewed
6 was April 22, 2010, right?
7    A.    Yes.
8    Q.    And this was when the FBI was there at this
9 interview.
10    A.    Yes.
11    Q.    Your lawyer was there.
12    A.    Yes.
13    Q.    And in that interview you told the agents
14 that on Memorial Day --
15         MS. REYNOLDS:  Objection, your Honor.
16 He can ask him what he told the agents, but --
17         THE COURT:  Don't state what he told
18 agents because you are not the witness.
19    Q.    Did you tell the agents that on Memorial
20 Day 2005 Abraham introduced you to Dreddy?
21    A.    The dates I would go back and forth with
22 because it's been over five years and I got to keep
23 jogging my mind.  A lot of stuff happened during
24 this, my whole time right now, so I might have told
25 them wrong.  I might have, I don't know.

2047

1    Q.    I guess the question is, did you tell the
2 agents you were introduced to Dreddy for the first
3 time on Memorial Day of 2005?
4    A.    Yes.
5    Q.    Okay.  So you would agree that's correct?
6    A.    Yes.
7    Q.    And that's the date you actually were
8 introduced to Dreddy?
9    A.    Yes.
10    Q.    And it wasn't at your house the first time
11 you met him.
12    A.    No, no, it was in front of my house
13 actually.  Yes.
14    Q.    But it was on Memorial Day?
15    A.    Yes.
16    Q.    2005.
17    A.    Yes.
18    Q.    Okay.  So, by extension, you would have had
19 to purchase the guns after that meeting on Memorial
20 Day.
21    A.    No, wait.  That was a Monday because
22 D'Andrea's was closed.  So it might not have been
23 Memorial.  It was probably Memorial weekend, not
24 Memorial Day.
25    Q.    Okay.  So Memorial Day weekend?

2048

1    A.    Yeah.
2    Q.    Okay.  But you said that D'Andrea's was
3 closed?
4    A.    Yes.
5    Q.    Because of the Memorial Day holiday?
6    A.    No, no, because it was a Monday.
7    Q.    Okay.
8    A.    Okay.  D'Andrea's is closed on Monday.
9    Q.    But this is still Memorial Day weekend
10 we're talking about.
11    A.    Yes.
12    Q.    And you would have purchased the guns after
13 Memorial Day weekend.
14    A.    Repeat that question one more time for me,
15 please.
16    Q.    You met Dreddy on Memorial Day weekend?
17    A.    Uh-huh (indicating affirmatively).
18    Q.    And you purchased the guns after Memorial
19 Day weekend because D'Andrea's was closed on a
20 Monday.
21    A.    It had to been -- no, because it was still
22 in May when I purchased the guns.  It was like
23 May 27, 26 -- 27th.  It was 27th when I took the
24 guns out the store.  So, that was still Memorial
25 weekend.  So we went Monday, the store was closed,

2049

```
 1   then we went back again.
 2          The first store we went was to K-5.  When
 3   we went to K-5, we looked at a silver .22 where the
 4   guy said it was a suppressor built inside.  Dreddy
 5   said he liked that gun, but he wanted to look at the
 6   other store.  So we waited until D'Andrea's was open
 7   and we went to D'Andrea's that day.  Yes.  Does that
 8   answer your the question?
 9      Q.   The day you went to D'Andrea's was either
10   before or after Memorial Day?
11      A.   It was before.  It was the 27th.
12      Q.   All right.  And you are certain of that?
13      A.   Yes, it's on the receipt, yes.
14      Q.   Okay.  But you told the agents that you had
15   met Dreddy for the first time on Memorial Day.  You
16   agree with that?
17      A.   Well, I probably was -- I didn't understand
18   the question when he asked me.
19      Q.   Okay.  You didn't understand the question
20   when the agent asked you?
21      A.   Uh-huh (indicating affirmatively).
22      Q.   Okay.  You were interviewed a lot of times,
23   right?
24      A.   Yes, I was.
25      Q.   You were interviewed the night of your
```

2050

```
 1   arrest, right?
 2      A.   Yes.
 3      Q.   And then a couple nights later you were
 4   interviewed again by the police.
 5      A.   Yes.
 6      Q.   And then you were interviewed by the agents
 7   from the Bureau of Alcohol, Tobacco and Firearms.
 8      A.   Repeat that question, please.
 9      Q.   You were interviewed by agents from the
10   ATF, correct?
11      A.   When?
12      Q.   The same night as your second interview
13   with the Bridgeport Police Department.
14      A.   Yes.
15      Q.   And they asked you to sign an affidavit.
16      A.   Yes, yes, they did.
17      Q.   And you signed that affidavit, right?
18      A.   Yes, I did.
19      Q.   And then they interviewed you again the
20   next day, right?
21      A.   Yes.
22      Q.   The ATF agents?
23      A.   Yes.
24      Q.   And they asked you to sign another
25   affidavit, right?
```

2051

```
 1      A.   Yes.
 2      Q.   And you did that?
 3      A.   Yes, I did.
 4      Q.   Okay.  And then a couple days later on
 5   March 2nd, the Bridgeport police took a statement
 6   from you.
 7      A.   Yes.
 8      Q.   Very detailed statement.
 9      A.   Yes.
10      Q.   Asking about Dreddy.
11      A.   Yes.
12      Q.   All kinds of questions about Dreddy.
13      A.   Yes.
14      Q.   It was a long statement?
15      A.   Yes.
16      Q.   Took a while to do?
17      A.   Yes.
18      Q.   And they had to type it out?
19      A.   Yes.
20      Q.   And they had you read it over?
21      A.   Yes.
22      Q.   And you signed it?
23      A.   Yes.
24      Q.   Saying everything in there was true and
25   correct?
```

2052

```
 1      A.   Uh-huh (indicating affirmatively).
 2      Q.   And that it was everything you knew about
 3   Dreddy, right?
 4      A.   Yes.
 5      Q.   Okay.  And in fact at the very end of the
 6   statement you were asked if you wanted to add
 7   anything to that statement, right?
 8      A.   I don't remember.
 9      Q.   Okay.
10           MR. SMITH:  Can we bring up DG 2890.
11      Q.   Can you see that third line down.  Does
12   that refresh your memory about whether you were
13   asked if you wanted to add anything to the
14   statement?
15           THE COURT:  It's not what it says, it's
16   does it refresh your recollection of whether you
17   were asked that.
18      A.   Yes, yes.
19      Q.   Okay.  So you remember now that you were
20   asked in the statement if there was anything you
21   wanted to add, right?
22      A.   Yes.
23      Q.   Okay.
24           MR. SMITH:  You can take that down.
25      Q.   And then you signed the statement, right?
```

**GA513**

2053

```
1      A.   Yes.
2      Q.   And, in fact, then they asked you, like the
3  next day, to have you handwrite a statement, right?
4      A.   Yes.
5      Q.   And you did that, you wrote out a statement
6  in your own handwriting.
7      A.   Yes, I did.
8      Q.   And you signed that, right?
9      A.   Yes.
10     Q.   And you swore that was the truth, right?
11     A.   Yes.
12     Q.   And then you went through a bunch of
13 interviews with the FBI, right?
14     A.   Yes.
15     Q.   And there was one on July 11, 2006.
16     A.   Yes.
17     Q.   And one on November 6, 2007.
18     A.   Yes.
19     Q.   And one on August 26, 2009.
20     A.   Yes.
21     Q.   And one on April 22, 2010.
22     A.   Yes.
23     Q.   Okay.  And then you were interviewed more
24 recently, just in March --
25     A.   Yes.
```

2054

```
1      Q.   -- of this year.
2      A.   Yes.
3      Q.   About a month ago.
4      A.   Yes.
5      Q.   A little over a month ago.
6      A.   Yes.
7      Q.   So you are interviewed several times,
8  right?
9      A.   Yes.
10     Q.   And you got two signed affidavits, right?
11     A.   Yes, yes.
12     Q.   Two signed statements.
13     A.   Yes.
14     Q.   One was in your own handwriting, right?
15     A.   Yes.
16     Q.   And never once in all of those or in your
17 interviews with the FBI did you tell the agents
18 about being asked to go pistol whip a guy in Charles
19 Street.
20          MS. REYNOLDS:  Objection, your Honor.
21          THE COURT:  Basis?
22          MS. REYNOLDS:  As to all of those dates,
23 there was a final interview where he did.
24          THE COURT:  Well, you can redirect.
25 It's the question.  Did you at any time in all of
```

2055

```
1  those interviews tell them about being asked to
2  pistol whip someone?
3          THE WITNESS:  Yes.
4      Q.   You did?
5      A.   Yes, I did.
6      Q.   Which ones?
7      A.   Probably the last ones.
8      Q.   The very last one?
9      A.   Yes.  Not just the last, one of the last
10 ones.
11     Q.   So, you told them April 22nd?
12     A.   At the time when I first got arrested I
13 was, like, I went through the water, I got shot at,
14 I got robbed.  A lot was going through my mind at
15 the time.  It was in February, I jumped in a river,
16 or a lake -- a river.  I jumped in the river, went
17 across the other side, got arrested.  And a lot of
18 stuff was going.  I was trying to put everything
19 together still at the time at the first couple of
20 meetings, and then as the meetings were to go on,
21 yep, stuff came back to me.  Like showing the
22 picture, all right, it jogged my memory.  That's
23 what it all came in at, yes.
24     Q.   Okay.  So, the first few meetings were in
25 February and March of 2006 after your arrest.
```

2056

```
1      A.   Yes.
2      Q.   But eventually then you had interviews
3  2007, 2009, 2010.
4      A.   Yes.
5      Q.   And you never said in any of those
6  interviews after you are past the stress of your
7  arrest --
8      A.   Yes.
9      Q.   You never said anything about pistol
10 whipping Smiley (ph)?
11     A.   Yeah, it is in there.  I told him.  I told
12 him.
13     Q.   You believe it is in there.
14     A.   Yes, it should be.
15     Q.   Your job as a lookout, you say, that was --
16 you did that for a week.
17     A.   Yes, a week or so.
18     Q.   And you had a gun with you while you did
19 that.
20     A.   Yes.
21          MR. SMITH:  May we approach?
22          THE COURT:  Yes.
23          Why don't we take our recess, ladies and
24 gentlemen.  We'll take a 15-minute recess.
25          (Jury exited the courtroom.)
```

**GA514**

2057

```
1          THE COURT:  All right, Mr. Washington,
2    you will be back in 15 minutes.  Again, don't
3    discuss your testimony.  Thank you.
4          All right, Mr. Smith.
5          MR. SMITH:  I intend to ask
6    Mr. Washington, your Honor, about his pulling a gun
7    on Rafael, his admission to pointing a firearm at
8    Rafael while being a lookout at apartment 211.  I
9    just wanted to put the Court on notice because I
10   know that's going to create an objection and create
11   a sidebar when we have the jury here.  I think it
12   goes to his bias and his state of mind, your Honor,
13   in that he's admitting to other crimes to the
14   government.  Never charged for those crimes by the
15   State or any other authority.
16         THE COURT:  Ms. Reynolds, do you wish to
17   be heard?
18         MS. REYNOLDS:  Well, your Honor, there
19   was an incident between Rafael and the witness
20   regarding a gun license and, you know, it was a
21   dispute that they had.  I don't see how it goes to
22   his credibility in this case and I would ask that it
23   not be inquired into.  I don't think they've shown
24   how it goes to his credibility.  It's an incident,
25   it was a dispute he had with Rafael Melendez who
```

2058

```
1    also lived in the apartment about a gun license.
2    And I would ask for a further showing as to how that
3    specific incident, conduct goes to the witness's
4    credibility.
5          MR. SMITH:  He's never been prosecuted,
6    your Honor.
7          MS. REYNOLDS:  He can ask him about that
8    without getting into the specifics.  We would have
9    no objection without getting into the specifics of
10   disputes he's had with people, whether he's been
11   prosecuted for other -- well, I don't know.  I just
12   don't see the how it goes to his credibility.
13         THE COURT:  So tell me what it is
14   exactly that you say is relevant on this witness's
15   credibility.
16         MR. SMITH:  Your Honor, Mr. Washington
17   during one of his interviews with the FBI admits to
18   essentially what is assault under state law.  He
19   says I pulled a gun on Rafael over this dispute.  I
20   can ask him about the details of that.  At no point
21   is he ever prosecuted.  At no point is it ever clear
22   this is reported to the State authorities this
23   assault occurred.
24         THE COURT:  So tell me why this bears on
25   credibility.
```

2059

```
1          MR. SMITH:  Because it goes to his state
2    of mind as to his willingness to cooperate because
3    he knows he can tell them that I've committed crimes
4    and nothing is going to happen.
5          THE COURT:  All right.  So he can tell
6    them -- you say he told the FBI about a crime he had
7    committed and they didn't prosecute him.
8          MR. SMITH:  Or apparently report it to
9    the state police.
10         THE COURT:  Or they didn't report it to
11   the state police.  Why are we going anything beyond
12   that?
13         MR. SMITH:  Because I think he's already
14   talked about being with Rafael in the apartment.  I
15   think just some random -- we just leave it in some
16   vague random crime --
17         THE COURT:  No, some crime involving
18   Rafael.
19         MR. SMITH:  The specifics of which are
20   an actual felonious assault.
21         THE COURT:  Why -- if it goes to state
22   of mind, which you suggest is his state of mind of
23   impunity, why does it matter what the crime is so
24   long as you are talking about conduct that could
25   potentially be charged as a felony, but never was.
```

2060

```
1    Why is that not exactly what you need for your state
2    of mind relevance?
3          MR. SMITH:  Well, your Honor, at this
4    point it sounds as if -- if we leave it vague it's
5    not clear what it is to the jury.
6          THE COURT:  Why does it matter?
7          MR. SMITH:  Because the relevance.
8          THE COURT:  What matters is he confessed
9    to some conduct that may be a crime, but he never
10   was prosecuted either state or federally.  That's
11   all that's important.
12         MR. SMITH:  If government's willing to
13   stipulate to it, that will be fine.
14         THE COURT:  I doubt the government will
15   stipulate to it, but they might not object to you
16   asking questions in that form.
17         MS. REYNOLDS:  We certainly wouldn't
18   stipulate to it.  First of all, we can't charge him
19   federally for this conduct.  That would be
20   misleading.
21         THE COURT:  Why is that?
22         MS. REYNOLDS:  Because it would be
23   assault.  We don't have a federal --
24         THE COURT:  Because he possessed the
25   weapon legally.
```

**GA515**

2061

```
1         MS. REYNOLDS:  Correct.  He doesn't have
2   a prior conviction.
3         THE COURT:  It would have been a State
4   charge.
5         MS. REYNOLDS:  He would -- it would have
6   been a State charge if anything.  By the time his
7   state of mind becomes relevant, as part of the
8   cooperation, which is years later when he pleads
9   guilty and enters into his cooperation agreement,
10  he's admitted to two felony offenses and all sorts
11  of conduct which would be relevant to his sentencing
12  in the federal case.  So, I'm not sure I understand
13  the state of mind argument at all.
14        And I would, again, point to the Court,
15  if it's just crimes of violence, that type of thing
16  are routinely held by the Second Circuit as not
17  being relevant to credibility.  The Estrada case
18  which is a case prosecuted in this district that
19  went up on appeal, 430 F.2d, clearly said -- noting
20  that crimes of force, such as armed robbery or
21  assault, or crimes of stealth, such as burglary or
22  petit larceny, do not come in under 609(a)(2).
23        THE COURT:  Four-thirty --
24        MS. REYNOLDS:  430 F.2d at 614.
25        THE COURT:  All right.
```

2062

```
1         MS. REYNOLDS:  And it's just -- I've
2   never, I guess I've never had a case where
3   continually we have the defense trying to impeach
4   the credibility of witnesses using cases that were
5   nolled, cases that have nothing to do with
6   credibility, you know, continually not following
7   Rule 609.  And so we did file earlier today a
8   memorandum --
9         THE COURT:  I will look at that at the
10  break.
11        MS. REYNOLDS:  But we -- and again, we
12  don't think there has been any showing that this
13  would go to credibility.  It's not relevant and
14  doesn't go to credibility, so we would ask that --
15        THE COURT:  Let me take a look at
16  Estrada.
17        Any case you want me to look at,
18  Mr. Smith?
19        MR. SMITH:  I do not, your Honor, off
20  the top of my head, but I do want to note that this
21  statement is made in April of 2010 for the first
22  time.  He's already pled guilty at this point.  He
23  has already signed his cooperation agreement at this
24  point.  And I think it goes that he's speaking with
25  the agents, he's admitting additional crimes, and
```

2063

```
1   nothing is happening to him because of that, and
2   that shows --
3         THE COURT:  What does the cooperation
4   agreement say about that?
5         MS. REYNOLDS:  I would point the Court
6   also to the proffer agreement.  Witness --
7         THE COURT:  And I --
8         MS. REYNOLDS:  Witnesses are protected.
9         THE COURT:  I thought that was part of
10  what proffer agreements and cooperation agreements
11  were about.
12        MS. REYNOLDS:  That's correct, your
13  Honor.  And I'm not sure we could prosecute him
14  based on his own admissions or his own information
15  that he gives during a proffer session.  All of
16  those meetings with the FBI were covered by the
17  proffer agreement and the terms of the proffer
18  agreement.
19        THE COURT:  Anything further, Mr. Smith?
20        MR. SMITH:  Only that the government
21  already knew this information from Melendez himself.
22        THE COURT:  From what?
23        MR. SMITH:  Mr. Melendez had recounted
24  this information to the government as well, so they
25  knew it had happened.
```

2064

```
1         THE COURT:  Does that mean the rules
2   don't apply?  Okay, let's take a recess.
3         (Recess)
4         THE COURT:  All right, please be seated,
5   Counsel.  I'm a little perplexed by the arguments
6   here.  The issue at hand is.
7         MR. SMITH:  Your Honor, perhaps I can,
8   having had a chance to think this through a little
9   bit better, I'd like to give my explanation as to
10  why I think it's relevant more clearly.
11        THE COURT:  Do you want to use the
12  microphone to do that?
13        MR. SMITH:  Yes.  Sorry.
14        Under the cooperation agreement he agrees
15  to fully and truthfully disclose information to the
16  government.  And if he doesn't do that, the
17  government is allowed to breach or say that
18  agreement has been breached and to pull the
19  cooperation agreement and not make a recommendation
20  to the Court.  Information comes to the government
21  via Rafael Melendez regarding this incident of
22  Mr. Washington pulling a gun and pointing a gun at
23  Mr. Melendez.  They then confront Mr. Washington
24  with this information and then he says, oh, yeah,
25  okay, I did that.  So, in other words, at that point
```

**GA516**

he has admitted to breaching the cooperation

```
 1  he has admitted to breaching the cooperation
 2  agreement.  He did not fully disclose his own
 3  involvement in all crimes and then the government
 4  does not pull the agreement, and, therefore, it goes
 5  to his bias as to wanting to please the government
 6  here today.
 7        And that's simply how the argument boils
 8  down.  And that's why I believe it is relevant and I
 9  should be allowed to inquire as to it.
10        THE COURT:  All right, does the
11  government wish to be heard?
12        MS. REYNOLDS:  Just briefly, your Honor.
13  He wasn't specifically asked -- it's a lot like we
14  asked him were you involved in this and then he
15  denied it.  That might then go to credibility.  I
16  still don't see how the incident would go to the
17  witness's credibility.  And with regard to his --
18        THE COURT:  Well, he's not saying
19  credibility anymore.
20        MS. REYNOLDS:  Well, I guess I didn't
21  understand what he was saying.
22        THE COURT:  He's saying bias.
23        MS. REYNOLDS:  Bias.  Well, he can ask
24  him about the meetings he had, if he told the agents
25  everything he knew, what his exposure is, all the
```

```
2066

 1  typical bias questions, but getting into a specific
 2  incidents like this one doesn't go to bias in the
 3  government's view.
 4        THE COURT:  I must confess, I'm a little
 5  bit perplexed on how you get bias out of this,
 6  Mr. Smith.  I'm happy to hear you on this, but I
 7  don't understand it.
 8        MR. SMITH:  The cooperation agreement in
 9  which he enters, that he understands that all of his
10  cooperation testimony, statements, information and
11  other assistance as provided below must be fully
12  truthful, accurate, and complete, and the defendant
13  agrees to be debriefed and disclose fully and
14  truthfully all information concerning his knowledge
15  of and participation in criminal activities by
16  himself or others, whether or not related to the
17  charges to which he is pleading guilty.
18        So, he has agreed back on April of 2006
19  to do these things for the government, be fully and
20  accurate and truthful and disclose his own crimes,
21  crimes of others, all of that.  He goes through a
22  few interviews with the FBI in the interim, he does
23  not disclose this incident with Mr. Melendez, the
24  government discovers the incident with Mr. Melendez
25  in 2010 from Mr. Melendez, they then confront
```

```
2067

 1  Mr. Washington with that information, and then he
 2  says, oh, yeah, I did pull a gun and point it at
 3  Mr. Melendez.  So, by his admission at that point he
 4  has violated the cooperation agreement.
 5        THE COURT:  Why is that a violation?
 6  He's admitting it.
 7        MR. SMITH:  Exactly.  By admitting it,
 8  by admitting pointing the gun at Melendez when he
 9  had opportunities to tell them about his own crimes
10  before and did not, he's, in essence, admitting that
11  in his previous interviews he did not fully
12  disclose.
13        THE COURT:  All right, so then what
14  happens?  What's the analysis from there?
15        MR. SMITH:  From there, your Honor, he
16  has breached the cooperation agreement.
17        THE COURT:  All right.
18        MR. SMITH:  The government has not at
19  this point up 'til today told him he's in violation
20  of his cooperation agreement and that it will be,
21  therefore, not honored by the government.
22        THE COURT:  So that's the end of the
23  inquiry.
24        MR. SMITH:  And that's what goes to his
25  bias, your Honor.
```

```
2068

 1        THE COURT:  All right.
 2        MR. SMITH:  That's exactly --
 3        THE COURT:  What goes to his bias?
 4        MR. SMITH:  The fact that he has
 5  violated the cooperation, the government is aware
 6  he's violated the cooperation.
 7        THE COURT:  Right.
 8        MR. SMITH:  And they're not going to
 9  pull it.
10        THE COURT:  So, where does the bias come
11  in?
12        MR. SMITH:  Your Honor, because he
13  understands it's okay for him not to be honest with
14  the government.  They're not going to not honor the
15  cooperation agreement.
16        THE COURT:  All right.  I'm not going to
17  let you get into the specifics, but you can inquire
18  as to whether criminal activity on his part that he
19  hadn't reported was later brought to his attention.
20        MR. SMITH:  And if he tells me he
21  doesn't know what I'm talking about.
22        THE COURT:  You can -- involving
23  Mr. Melendez.
24        MR. SMITH:  Okay, and then?  I'm playing
25  out what could happen here, your Honor.  He might
```

**GA517**

2069

```
1   say I don't know what you are talking about.  I
2   mean, I guess I could -- at that point I would want
3   to confront him with the specifics of that act, if
4   he says I have no idea what you are talking about.
5          MS. REYNOLDS:  Your Honor, I think this
6   is precisely why the rule exists, because it's not
7   relevant.  It doesn't go to credibility or bias and
8   it's confusing.
9          THE COURT:  Well, it goes to bias in the
10  sense, by the defendant's reasoning, that the
11  obligation to tell the truth isn't really a serious
12  obligation -- or one he takes seriously because he
13  didn't tell all of his acts before that.  And you
14  can redirect on had you remembered the incident with
15  Melender and all of that stuff.  Either he will or
16  he will not remember an incident with Melendez.
17  There is not going to be any need to go any further
18  than that.
19         MS. REYNOLDS:  And if we call it an
20  incident with Melendez, I think that will be better.
21         THE COURT:  Let's bring Mr. Washington
22  in.
23         All right, please bring in the jury.
24         (Jury entered the courtroom.)
25         THE COURT:  All right, please be seated,
```

2070

```
1   ladies and gentlemen.  We'll continue
2   cross-examination of Mr. Washington by Mr. Smith.
3          MR. SMITH:  Thank you, your Honor.
4    Q.  Mr. Washington, we were talking before the
5   break about this story that you told about going
6   into Charles Street to pistol whip the person.
7    A.  Yes.
8    Q.  When did you tell the agents about that?
9    A.  I want to -- I probably told them at the
10  beginning.  Not probably, I told them at the
11  beginning, but I probably didn't go into full detail
12  about the whole situation.
13   Q.  Okay, let's work backwards.  You told them
14  about this on March 9, 2011, right?
15         THE COURT:  You need to say yes or no,
16  sir.
17   A.  Yes.  Sorry about that.
18   Q.  Did you tell them about it on April 22,
19  2010?
20   A.  Yes.
21   Q.  You did tell them?
22   A.  No, no.  Rephrase that again.
23   Q.  Okay.  We're working backwards in time.
24   A.  All right.
25   Q.  We just talked about March 9, 2011.
```

2071

```
1    A.  Okay.
2    Q.  Okay.  The previous interview to that was
3   April 22, 2010, correct?
4    A.  Yes.
5    Q.  Did you tell them then?
6    A.  I think we was going over something else.
7   I don't think we went over that.
8    Q.  So the answer is no, you didn't tell them
9   then.  Is that fair?
10   A.  No.
11   Q.  No, it's not fair or no, you didn't tell
12  them?  I'm sorry.
13   A.  No, I don't think it's -- when we got to
14  talking about that, we talked, because, like, when I
15  saw a picture, it jogged my memory.  Like I was
16  saying, a lot of stuff jogged my memory.  It's been
17  a long time, a lot of stuff has happened since then
18  that appeared in my thought.  So, like, when I seen
19  a picture, then when I was shown the picture, and I
20  was, like, okay, I remember that, when that
21  happened, and that's when all that came about, yes.
22  But then when I first came in at the beginning in
23  February, I did bring it up.  I wrote it in the
24  thing.  I probably didn't go into full detail about
25  the whole situation because afterwards we went to,
```

2072

```
1   come to find out, what was Big Man's house.  Dreddy
2   brought me over there, he was, like, there is two
3   chicks over there and he was, like, they wanted me
4   to get my dick sucked or something, that he would
5   get that to happen.
6    Q.  Okay.
7    A.  All right.
8    Q.  Now, I want to take you back --
9    A.  Yeah.
10   Q.  So, the answer is you told them or you did
11  not tell them on April 22, 2010?
12   A.  I told them we probably -- I told them,
13  but, but didn't go into full detail.
14   Q.  So, you claim you did tell them on
15  April 22, 2010.
16   A.  I'm sorry?
17   Q.  You are saying you did tell them about this
18  on April 22, 2010?  I want to be clear.
19   A.  Uh-huh (indicating affirmatively).
20   Q.  You did tell them?
21         THE COURT:  On that date.
22   Q.  On that day.
23   A.  On that date?  Say that date again.
24   Q.  April 22, 2010.
25   A.  April 22nd?  Because we in 11 right now,
```

2073

```
1    right?
2              THE COURT:  Correct.
3        Q.   Correct.
4        A.   That would be last year.
5        Q.   The proffer you went to last year.
6        A.   Where was I -- what jail was I in at that
7    time?
8        Q.   That I don't know, sir.
9        A.   You say April.
10       Q.   This was at the Bridgeport FBI office,
11   correct?
12       A.   Oh, that was in Bridgeport?  I don't know.
13   No, I don't tell them in Bridgeport, no.
14       Q.   Okay.
15       A.   No.
16       Q.   So, you didn't tell them about it on
17   April 22nd.
18       A.   Not in Bridgeport, no.  But, like I said,
19   when I first came in, I said something about it, but
20   I didn't go into full detail, no.
21       Q.   Well, on August 26, 2009, you were
22   interviewed.  This was two years ago now.
23       A.   Okay.
24       Q.   And again, at the FBI Bridgeport you didn't
25   tell them about it then, about the pistol whipping,
```

2074

```
1    right?
2        A.   Yes.
3        Q.   You did tell them in that interview?
4        A.   No.
5        Q.   Okay.  So you didn't tell them then.
6        A.   Rephrase that question again, please.
7        Q.   Sure.  Did you tell them on
8    August 26, 2009, about being asked to go pistol whip
9    the guy at Charles Street?
10       A.   Like I said before, it was something that I
11   told them, but did not go into full detail, no.
12       Q.   But you are certain you told them this?
13       A.   Yes, I'm certain.
14       Q.   That you were asked?
15       A.   It should be in the first meeting from in
16   February.  In my statement, it should be in my
17   statement.
18       Q.   Your handwritten statement?
19       A.   It should be.
20       Q.   Okay, let's go to your handwritten
21   statement.
22       A.   Go towards the end.  I think it should be
23   towards the end.
24       Q.   Is this your handwritten statement?
25       A.   Yes.
```

2075

```
1        Q.   Could you take a look at that, tell us
2    where that is in there.  Take your time, please.
3        A.   Thank you.
4        Q.   Have you had a chance to look at that?
5        A.   Yes.  There.  This right here.  It says one
6    time after the range me and Dreddy went to Big Man's
7    house and he said Big Man's girl would suck my dick.
8        Q.   I understand that.  But again, the question
9    was --
10       A.   No, no.  I'm telling you -- remember I told
11   you it was that was part of that time right there,
12   because right after we went from -- came from
13   Charles Street apartment, me and Dreddy we went over
14   to Big Man's house, that's how I knew where Big Man
15   lived at.
16       Q.   I understand you know where Big Man lived
17   at.
18       A.   Yes.
19       Q.   No.  Where in this statement does it say I
20   then went to Charles Street and Dreddy asked me to
21   go inside and pistol whip somebody?  Does it?  This
22   doesn't say that anywhere in this statement, does
23   it?
24       A.   But it also in that statement I told you --
25       Q.   Sir, I'm asking you to answer my question,
```

2076

```
1    simply yes or no.  It does not say that in this
2    statement.
3        A.   No, it doesn't say that.
4        Q.   Okay, thank you.
5        A.   All right.
6        Q.   And this statement was signed on March 3rd,
7    2006?
8        A.   Yes.
9        Q.   Written in your own handwriting?
10       A.   Yes.
11       Q.   And sworn to as the truth by you?
12       A.   Yes.
13       Q.   Yes?
14       A.   After I went through a lot.
15       Q.   Yes, after you had been through a lot.
16       A.   Yes.
17       Q.   You also didn't tell the agents about this
18   on July 18, 2006.  That was after this statement,
19   right?
20       A.   You asked me a question, now I'm telling
21   you the answer.  The answer to your question is when
22   I saw the pictures, when they showed me the
23   pictures, it jogged my memory.  It jogged my memory.
24       Q.   All right.
25       A.   That's the answer to your question.
```

**GA519**

2077

1    Q.   So, the answer is no, you didn't tell them
2   on July 18, 2006.
3    A.   My answer is that they jogged my memory
4   when they showed me the picture.  After when I seen
5   the picture, sir, that's when it jogged my memory.
6    Q.   And your memory got jogged on March 9,
7   2011.
8    A.   Yes.
9    Q.   Okay.  Now, in one of your interviews on
10  April 2010, you told the agents about an incident
11  that you had with Rafael.
12   A.   Oh, yes.
13   Q.   Okay.  I'm not going to ask you about the
14  details about that, but you knew what you had done
15  was a crime in that incident.
16   A.   Who is Rafael again?
17   Q.   Rafael, the person who is the boyfriend of
18  the woman of the lookout apartment.
19   A.   Oh, okay, okay.  Thank you.
20   Q.   You are welcome.  You identified a picture
21  of him earlier, right?
22   A.   Yes.
23   Q.   So, you know who we're talking about.
24   A.   Yes.
25   Q.   You had an incident with Rafael.  You knew

2078

1   it was illegal what happened with Rafael.
2    A.   What was that incident?  Can you tell me,
3   please.
4        MR. SMITH:  Your Honor?
5        THE COURT:  No, just ask your next
6   question.
7        MR. SMITH:  Your Honor, I'm just making
8   the record that I believe I should be allowed to
9   inquire.
10       THE COURT:  I understand that.
11       MR. SMITH:  The witness has asked me to
12  specify what that incident is.
13       THE COURT:  I understand that.  You
14  should ask your next question.
15   Q.   Do you recall an incident with Rafael where
16  you used a gun?
17   A.   Oh, yes.
18       MS. REYNOLDS:  Objection, your Honor.
19       THE COURT:  Sustained.  Now you should
20  go to the next question.  Please disregard the
21  answer.  Please disregard the question.  It has been
22  struck.
23   Q.   Would there be something that would refresh
24  your memory as to the incident I'm talking about?
25       THE COURT:  Do you want to show him

2079

1   something?
2        MR. SMITH:  Yes.
3    Q.   Would looking an a document maybe refresh
4   your recollection?
5    A.   Yes.
6    Q.   Can you look at the bottom of this, please.
7    A.   Thank you.  In right here.
8        MS. REYNOLDS:  May I know what he is
9   showing?
10       THE COURT:  Go over there and take a
11  look.
12            This document is being shown to you
13  just to see if it refreshes your recollection --
14       THE WITNESS:  Okay, thank you, your
15  Honor.
16       THE COURT:  -- about an incident with
17  the man you've identified as Rafael.  Okay?
18   Q.   And you had a chance?
19   A.   I didn't look.
20   Q.   I'm sorry.  Really what I'm asking you
21  about is right here, this couple sentences.
22   A.   Okay.  Yes, yes.
23   Q.   Do you recall what we are talking about?
24   A.   Yes.
25   Q.   And you knew that that was a crime, what

2080

1   you did?
2    A.   At the time I wasn't thinking about it as a
3   crime, no, but now, yes, it is a crime.
4    Q.   But you know it is, correct?
5    A.   Right, yes.
6    Q.   Now, you had not previously disclosed that
7   information to the agents.
8    A.   I'm sorry?
9    Q.   That crime that we're talking about.
10   A.   Yes.
11   Q.   You had not previously told the agents
12  about that.
13   A.   What do you mean?  Say that again, please.
14   Q.   The thing you were just looking at in
15  regards to Rafael, right, you know what we're
16  talking about.
17   A.   Yes, yes.
18   Q.   You told the agents about that incident on
19  April 22, 2010.
20   A.   Okay.
21   Q.   Correct?
22   A.   Yes.
23   Q.   You had not previously told them about
24  that.
25   A.   Once again, like I tell you before, it was

**GA520**

2081

```
1   jogging -- once I get my mind jogging, things come
2   back, yes.
3       Q.   Did they jog your memory by telling you
4   that Rafael had told them about it?
5       A.   No, no, I didn't even know that guy's name.
6       Q.   So, you just came up with this on your own?
7           MS. REYNOLDS:  Objection, your Honor.
8       A.   It didn't come up.
9           THE COURT:  Basis of your objection?
10          MS. REYNOLDS:  I'll withdraw it, your
11  Honor.
12      A.   I come up on it on my own once they start.
13          THE COURT:  There is no question
14  pending.  Ask your next question, please.
15      Q.   Okay, but again, you did not tell them
16  about this prior to August -- I'm sorry April 22,
17  2010, correct?
18      A.   Yes.
19      Q.   Okay.
20      A.   But excuse me, sir.
21      Q.   Yes.
22          THE COURT:  Sir, you need to wait and
23  answer just a question, okay?
24          THE WITNESS:  Sorry.
25          THE COURT:  Thank you.  Your next
```

2082

```
1   question, sir.
2       Q.   You signed a cooperation agreement,
3   correct?
4       A.   Yes.
5           MR. SMITH:  This is Government's
6   Exhibit 242A.
7           THE WITNESS:  Can you move it over some,
8   please.  Thank you.
9       Q.   You can see it.  We just don't have the
10  jury's ability to see it, but we'll talk about this.
11          THE COURT:  Is there anything you want
12  to read to the jury.  It's in evidence.
13          MR. SMITH:  It is, your Honor, but I
14  want the witness to be able to see this as well.
15          THE COURT:  All right.
16      Q.   Mr. Washington, when you signed this you
17  were asked -- or I'm sorry, when you signed this
18  plea agreement, this was in 2000 -- I'm sorry
19  cooperation agreement, you signed this, right?
20      A.   Yes.
21      Q.   This was in 2006.
22      A.   Yes.
23      Q.   And it says in there that you understand
24  that all of your cooperation, testimony, statements,
25  information and other assistance as provided below
```

2083

```
1   must be fully truthful, accurate and complete?
2       A.   Yes.
3       Q.   You agreed to that.
4       A.   Yes.
5       Q.   In 2006.
6       A.   Yes.
7       Q.   And you agreed to disclose fully and
8   truthfully all information concerning your knowledge
9   of and participation in criminal activities by
10  himself or others whether or not related to the
11  charges to which you were pleading guilty.
12      A.   Yes.
13      Q.   You agreed to disclose all of that
14  information.
15      A.   Yes.
16      Q.   And that was back in 2006.
17      A.   Yes.
18      Q.   And you met with the agents on a couple of
19  occasions since then.
20      A.   Yes.
21      Q.   On at least three occasions, prior to
22  April 22, 2010, correct?
23      A.   Yes.
24      Q.   When you then admitted this incident with
25  Rafael.
```

2084

```
1       A.   Once again, I was telling you, once I get
2   my mind jogged I start remembering certain stuff.
3       Q.   Okay.
4       A.   Like if we going on a fishing trip and you
5   caught five fish that day and they were purple,
6   maybe I see a picture of the boat, I go, oh, yeah, I
7   remember you got them purple fish.  Do you see what
8   I'm saying?
9       Q.   I do.
10      A.   All right.
11      Q.   Because criminal activity for you, you need
12  your memory to be jogged in order to know, to
13  remember it, right?
14      A.   No, I been through a lot, like I said.  A
15  lot.  So a lot of stuff that I'm trying to deal with
16  also.
17      Q.   Okay.  At any point has the government told
18  you that based on this incident with Rafael that the
19  deal is off?
20      A.   No.
21          MR. SMITH:  May I have just a moment,
22  your Honor?
23          I have nothing further, your Honor.
24  Thank you.
25          THE COURT:  Thank you, redirect.
```

2085

```
1   REDIRECT EXAMINATION
2   BY MS. REYNOLDS:
3       Q.   Mr. Washington, you were asked by
4   Attorney Smith about numerous statements that you
5   gave.  Do you remember all of those questions?  And
6   he went through a limit of statements.
7       A.   Yes.
8       Q.   Do you remember that?  And from the date of
9   your arrest back in February of 2006, you've met
10  with numerous agents, correct?
11      A.   Yes.
12      Q.   And you've met with agents from various
13  agencies; is that fair to say?
14      A.   Yes.
15      Q.   And did you meet on those occasions and
16  give some signed and sworn statements?
17      A.   Yes, I did.
18      Q.   You also wrote out some statements?
19      A.   Yes.
20      Q.   And then you continued to be interviewed
21  throughout the last several years.
22      A.   Yes.  Not seven.
23      Q.   I'm sorry?
24      A.   Not seven years.
25      Q.   The last several years.  I apologize.
```

2086

```
1       A.   I'm sorry.  I apologize if I misspoke.
2       Q.   And you cooperated in several cases; is
3   that correct?
4       A.   Yes.
5       Q.   Not just this case?
6       A.   No.
7       Q.   Now, I'm going to draw your attention to,
8   you were asked a lot of questions by Attorney Smith
9   about the incident, the pistol whipping incident and
10  when you first talked about that.  Do you remember
11  those questions you were just asked?
12      A.   Yes.
13      Q.   And you indicated in response to one of the
14  questions that you had early on, when you were first
15  arrested early on, given some information about that
16  incident but that you didn't give full details at
17  the time.
18      A.   Yes.
19      Q.   And then you testified that later on when
20  your memory was jogged you gave some more detail
21  about that incident.
22      A.   Yes.
23      Q.   Do you remember that?
24           I'm going to draw your attention to a signed
25  and sworn statement that you gave to the Bridgeport
```

2087

```
1   Police Department on February 23rd of 2006 and ask
2   you if you recognize this statement.  Is that signed
3   by you?
4       A.   Yes.
5       Q.   And showing you page 7 of 7.
6       A.   I can't see it.
7       Q.   Okay.  That's your signature.
8       A.   Yeah, that's my signature, yes.
9       Q.   And at that time were you asked the
10  following question and did you give the following
11  answer.  "Question:  Earlier you indicated that you
12  were an enforcer for a drug operation that operated
13  out of Charles Street, Bridgeport, and that you have
14  knowledge pertaining to a homicide that occurred
15  several months ago where three people were murdered.
16  Please tell me the what you know about this drug
17  operation and the people you encountered during this
18  time.
19       "Answer:  Well, as of right now everything
20  is down as far as that operation.  I used to work
21  for Dread.  He paid me to be a lookout and he wanted
22  me to rough people up."
23           MR. SMITH:  I'm going to object, your
24  Honor.
25       Q.   "I quit on him."
```

2088

```
1            THE COURT:  Is this statement in
2   evidence?
3            MR. SMITH:  No.
4            MS. REYNOLDS:  It's not, your Honor, but
5   it's impeachment.
6            MR. SMITH:  If I can't read from a
7   statement, your Honor, I don't see why she's
8   allowed.
9            MS. REYNOLDS:  Your Honor.  There was a
10  claim of recent fabrication and I think a prior
11  consistent statement comes in.
12           THE COURT:  I don't think it comes in in
13  that form.  If you want to show him his statement
14  and get testimony with respect to whether or not he
15  mentioned something there, that should take care of
16  it.
17           MS. REYNOLDS:  Thank you, your Honor.
18           THE COURT:  I'm not going to have you be
19  reading from a document that's not in evidence.
20           MS. REYNOLDS:  I will show it to him,
21  your Honor.
22       Q.   Just showing you the top question and the
23  top answer.
24           THE COURT:  And what's the question for
25  him?
```

**GA522**

2089

```
1      Q.    Does that refresh your recollection as to
2   whether or not back on February 23rd of 2006, you
3   gave some information with regard to that general
4   information with regard to that pistol whipping
5   incident?  Reading your answer there.
6      A.    Do you want me to read it out loud?
7      Q.    No, don't read it out loud.  Just read it
8   to yourself.
9      A.    Yes.
10     Q.    Did you give some general information about
11  that incident?
12     A.    Yes.
13     Q.    The pistol whipping incident?
14     A.    Yes.
15     Q.    And, Mr. Washington, do you know how much
16  you face as a result of pleading guilty and
17  entering -- pleading guilty to the two federal
18  felony offenses that you pled guilty to?
19     A.    Yes.
20     Q.    How much time do you face?
21     A.    Sixty to seventy months.
22     Q.    And was that part of your plea agreement?
23     A.    Yes.
24     Q.    And how long have you been in jail?
25     A.    Sixty-two months.
```

2090

```
1             MS. REYNOLDS:  Can I just have a moment,
2   your Honor?
3      Q.    And again, going back to the statement that
4   you gave back on February 23rd of 2006, the question
5   and answer statement that I showed you before that
6   you signed.
7      A.    Yes.
8      Q.    Did you have a chance to read those
9   questions on page 7 and the answer on page 7?
10     A.    That you just showed me?
11     Q.    Yes.
12     A.    Yes.
13     Q.    And did that -- well, what did you tell the
14  agents or the Bridgeport Police Department officers
15  back in February of 2006 about what Dreddy had asked
16  you to do?
17     A.    I told them that there was no amount of
18  money that he could pay me to do what he wanted me
19  to do on that block.  That's why I gave him his keys
20  and his guns back and told him I didn't want no part
21  of that.
22     Q.    Did you tell them -- do you recall whether
23  you told them anything about roughing people up?
24     A.    Yes.
25             MR. SMITH:  Objection.  Asked and
```

2091

```
1   answered.  She asked him what he told them and he
2   told us.
3             THE COURT:  Overruled.
4      Q.    Do you recall what it was that you told the
5   police officers about roughing people up?
6      A.    Yes, I told them that I wasn't going to
7   stand over there and rough people up that really
8   wasn't doing anything.  I'm not going out there for
9   -- I'm not a daycare watcher, and also that I wasn't
10  going -- he wasn't paying me enough to go out there
11  and rough people up and to do what he wanted me to
12  do.  That's exactly why I ended our relationship.  I
13  gave him his keys and his guns back.
14             MS. REYNOLDS:  Nothing further, your
15  Honor.
16             THE COURT:  All right, anything further,
17  Mr. Smith.
18  RECROSS-EXAMINATION
19  BY MR. SMITH:
20     Q.    Do you remember telling the police that you
21  were paid to be a lookout?
22     A.    Yes.
23     Q.    And then asked to rough people up?
24     A.    I'm sorry?  Rephrase that question again,
25  please.
```

2092

```
1      Q.    You were told -- you recall telling the
2   police that you were paid to be a lookout, right?
3   She was just asking you questions about what --
4      A.    Yes, yes.
5      Q.    -- what you remember telling the police
6   back then.
7      A.    Yes.
8      Q.    You were paid to be a lookout and then were
9   asked to rough people up, correct?
10     A.    That's the same question she was asking me,
11  right?  Then yes, yes.
12     Q.    Not two weeks before, as you previously
13  testified.
14     A.    I'm sorry?  Rephrase that question again.
15     Q.    Withdrawn.
16          I just want to make sure we're clear.  What
17  you told the police back then --
18     A.    Yes.
19     Q.    -- in this statement, you recall, is that
20  you were hired first, right, to be a lookout.
21     A.    No, the first thing we did was the guns.
22  That was before any lookout or anything.  We went to
23  D'Andrea's, bought the guns.
24     Q.    And then you had -- I'm sorry.  I want to
25  focus your attention on exactly the question she was
```

2093

```
1   just asking you, the U.S. attorney was just asking
2   you.  Okay?
3       A.  Yes.
4       Q.  Talking about what you told the police.
5           MS. REYNOLDS:  Your Honor, we would
6   offer the statement.
7           MS. SMITH:  I would object.  It's not
8   necessary.
9           THE COURT:  Let's focus the question and
10  ask the question.
11      Q.  You recall telling the police back then --
12          THE COURT:  This is in his written
13  statement of 2/23/06.
14          MR. SMITH:  That is correct.
15      Q.  The statement we were just talking about,
16  okay?
17      A.  Yes.
18      Q.  You recall telling the police that you were
19  paid to be a lookout, that was part of what you told
20  the police, and as far -- and he wanted me to rough
21  people up.
22      A.  Yes.
23      Q.  This is after you were hired as a lookout.
24      A.  Look -- no, look.
25      Q.  No, no.  Sir, I'm asking you if this is
```

2094

```
1   what you told the police.
2       A.  Excuse me, sir, you asked me -- you trying
3   to make a timeline.  Now I'm trying to tell you
4   everything that happened, that took place.
5       Q.  Sir, my question is not a timeline.
6           THE COURT:  Just ask the question again,
7   please.
8       Q.  Sir, this is what you told the police.
9           THE COURT:  That's not a question.
10      Q.  Is this what you told the police, sir, yes
11  or no?
12          THE COURT:  What?
13      Q.  Did you tell the police he paid me to be a
14  lookout and he wanted me to rough people up?
15      A.  Yes.
16      Q.  That's how you said it to them, correct?
17      A.  Well, what date is that on there?
18      Q.  Do you recall, this is February 23, 2006.
19          THE COURT:  Do you want to show him his
20  statement?
21      Q.  This is the same document the government
22  showed you just a few moments ago.
23      A.  Okay, yes.
24      Q.  So, you know what we're talking about?
25      A.  Yes.
```

2095

```
1       Q.  So, this is what you told the police,
2   right?
3       A.  Yes.  Yes, it is, sir.
4       Q.  But you testified earlier that the first
5   thing that happened was that he asked you to rough
6   up people.
7       A.  Yes.  Yes, it was.
8       Q.  And then you got paid, right?
9       A.  Well, he paid me for that incident, right,
10  at that time.
11      Q.  Right.  And then later asked you to be a
12  lookout.
13      A.  Yes.
14      Q.  And then you worked for a week.
15      A.  Yes.
16      Q.  And you quit.
17      A.  Yes.
18      Q.  And that's not what you told the police on
19  this date.
20      A.  But then I also -- I did tell them on that
21  date, I just didn't go into full detail.  I was just
22  jogging my mind at that time.
23      Q.  All right.  So the answer is, no, you did
24  not tell them that in this statement.
25      A.  My answer is that I told them, but I didn't
```

2096

```
1   fully go into -- elaborate into it.
2       Q.  You didn't tell them what you told the jury
3   here today, correct?
4       A.  I did tell them, but I didn't go to full
5   detail of the whole situation.
6       Q.  And the detail meant getting the order
7   wrong?
8       A.  I'm sorry.
9       Q.  The detail meaning you got the order wrong?
10      A.  What do you mean by that?  Say that again,
11  please.
12      Q.  You got the order of events wrong when you
13  told them about it.
14      A.  Well, that was February -- what date was
15  that again?
16      Q.  February 23, 2006.
17      A.  Yeah, I told you a lot of stuff happened to
18  me at that time.  I been through a lot.  A whole
19  crazy situation, so I'm jogging like -- you ever
20  been swimming before?
21      Q.  Sir, I'm asking you questions.
22          THE COURT:  Sir, you need to just answer
23  questions.
24          Any other questions, Mr. Smith?
25          MR. SMITH:  No, your Honor, I don't
```

**GA524**

2097

```
1   think so.
2             THE COURT:  All right, anything further,
3   Ms. Reynolds?
4             MS. REYNOLDS:  No, your Honor.
5             THE COURT:  All right, thank you,
6   Mr. Washington.  You are excused.  You may step
7   down.
8             THE WITNESS:  Thank you, your Honor.
9             THE COURT:  Will government please call
10  its next witness.
11            MS. REYNOLDS:  Yes, your Honor, the
12  government calls Shante Pettway.
13            THE COURT:  Ms. Pettway, will you please
14  come over to the stand.  Over there and remain
15  standing and raise your right hand.
16            S H A N T E   P E T T W A Y
17  Having first affirmed, was examined and testified as
18  follows:
19            THE WITNESS:  Shante Pettway,
20  P-e-t-t-w-a-y, in Fairfield County.
21            THE COURT:  You can move the microphone
22  around to suit you, but just speak into it.  Okay?
23  It's wireless.
24            MS. REYNOLDS:  Scoot your chair up.
25  Just try to speak into the microphone.
```

2098

```
1             THE COURT:  You may proceed.
2             MS. REYNOLDS:  Thank you, your Honor.
3   DIRECT EXAMINATION
4   BY MS. REYNOLDS:
5   Q.   Ms. Pettway, you are here today under a
6   subpoena, correct?
7   A.   Yes.
8   Q.   I'm going to ask you, how old are you?
9   A.   Twenty-three.
10  Q.   Where were you born?
11  A.   In Bridgeport, Connecticut.
12  Q.   Where did you grow up?
13  A.   Bridgeport, Connecticut and the valley.
14  Q.   Did you go to school when you were growing
15  up in Bridgeport?
16  A.   Yes.
17  Q.   How far did you get in school?
18  A.   I am in college now.
19  Q.   You are currently in college.  Where are
20  you enrolled?
21  A.   Housatonic.
22  Q.   And what are you studying at Housatonic?
23  A.   Registered nurse.
24  Q.   Registered nurse?
25  A.   Yes.
```

2099

```
1   Q.   Are you currently working?
2   A.   Yes.
3   Q.   And what type of work do you do?
4   A.   Nursing.
5   Q.   Do you have --
6             MR. SHEEHAN:  I'm sorry, I couldn't
7   hear.
8             THE COURT:  Nursing.
9             MR. SHEEHAN:  Thank you.
10  Q.   Did you have to obtain any special
11  certificates or do any special training in order to
12  do your current work as a nurse?
13  A.   Yes.
14  Q.   And are you a nurse's aide currently?
15  A.   Yes.
16  Q.   Do you have a certificate in nursing?
17  A.   Yes.
18  Q.   How long have you been a nurse's aide?
19  A.   Since 2005.
20            THE COURT:  Would you pull the
21  microphone over closer to you.  You speak very
22  softly.  Thank you.
23  Q.   How long have you been a nurse's aide?
24  A.   Since 2005.
25  Q.   And in addition to being a nurse's aide, do
```

2100

```
1   you have any other jobs?
2   A.   Yes.  I work part-time in Norwalk as a
3   customer service clerk.
4   Q.   So when do you do that job?
5   A.   At night.
6   Q.   Are you married or single?
7   A.   Single.
8   Q.   And do you have any children?
9   A.   Yes.
10  Q.   And how many children do you have?
11  A.   Two.
12  Q.   How old are they?
13  A.   Five and one.
14  Q.   And the oldest child, who's the father of
15  that child?
16  A.   Azibo.
17  Q.   And do you see him in court here today?
18  A.   Yes.
19  Q.   Can you just indicate what he's wearing.
20  A.   A blue shirt with a tie.
21            MS. REYNOLDS:  Indicating the defendant,
22  your Honor.
23            THE COURT:  Yes.
24            MS. REYNOLDS:  Thank you.
25  Q.   Ms. Pettway, I'm going to draw your
```

2101

1  attention to late 2004, early 2005 time period.  And
2  around that time, did you meet the defendant?
3      A.   Yes.
4      Q.   How was it that you met the defendant?
5      A.   Through a friend.
6      Q.   And after you met the defendant, did you
7  start dating?
8      A.   A little while later, yes.
9      Q.   During that time that you started dating
10 the defendant, did you ever go over -- well, did you
11 visit any locations with him or go to any apartments
12 with him?
13     A.   Yes.
14     Q.   And showing you Government's Exhibit 204,
15 and if you look -- there is a monitor next to your
16 witness stand.  Do you recognize that location?
17     A.   Yes.
18     Q.   And where is that?
19     A.   That's in Bridgeport on --
20          THE COURT:  You need it speak louder,
21 please.
22     A.   Bridgeport.  I think Hallet Street.
23     Q.   Who did you go there with?
24     A.   Azibo.
25     Q.   How did you get there?  Do you remember the

2102

1  first time you went there?
2      A.   He picked me up.
3      Q.   Do you recall what kind of cars the
4  defendant had when you were dating him?
5      A.   A truck and a Cadillac.
6      Q.   When you say "a truck," do you remember
7  what kind of truck that was?
8      A.   A black Tahoe.
9      Q.   Do you remember what kind of Cadillac or
10 what color it was?
11     A.   I just remember the color.  Burgundy.
12     Q.   Burgundy, okay.  And when you went over to
13 Hallet Street which is depicted in Government's
14 Exhibit 204, did you go there with anyone other than
15 the defendant, or was it just the two of you?
16     A.   Just us.
17     Q.   When you were inside there did you see
18 anything unusual?
19     A.   No.
20     Q.   Now, do you recall going to -- eventually
21 moving in with the defendant at another location?
22     A.   Yes.
23     Q.   And where did you move into?
24     A.   Read Street.
25     Q.   And showing you what's in evidence as

2103

1  Government's Exhibit 202, do you recognize that
2  photograph?
3      A.   Yes.
4      Q.   And what is that?
5      A.   Read Street.
6      Q.   And did you eventually move in there for a
7  little while with the defendant?
8      A.   Yes.
9      Q.   Do you know who paid the rent at that
10 location?
11     A.   Azibo.
12     Q.   And do you recall whether there were some
13 occasions that you gave the landlord some of the
14 money that Azibo gave you to pay the rent?
15     A.   Yes.
16     Q.   And I'm going to show you what I'll demark
17 Government's Exhibit 248.
18          MS. REYNOLDS:  And I think, your Honor,
19 on our exhibit list it misreferences this, but it is
20 rental receipts, and I'm going to show that to the
21 witness.
22          MR. SHEEHAN:  No objection.
23          THE COURT:  That's 248?
24          MS. REYNOLDS:  248.
25          THE COURT:  Full exhibit.

2104

1      Q.   Just taking a look at Government's
2  Exhibit 248 on your monitor, drawing your attention
3  to the date.  What date is listed up there?
4      A.   March 5, 2005.
5      Q.   And this is a receipt, correct?
6      A.   Yes.
7      Q.   And whose name is listed on there?
8      A.   Mines [sic].
9      Q.   And how much money is listed on there?
10     A.   Twenty-one hundred.
11     Q.   And do you recall if you in fact gave money
12 over to the landlord at that location on that
13 occasion where you got the receipt?
14     A.   Yes.
15     Q.   Who gave you the money?
16     A.   Azibo.
17     Q.   Was that money -- was it a check or cash?
18     A.   Half was cash and some was in a money
19 order.
20     Q.   And then on the other receipt, what date is
21 that for?
22     A.   April 1st.
23     Q.   And again, this is 2005.
24     A.   Correct.
25     Q.   And how much money is listed there?

2105

```
1       A.   1050.
2       Q.   And were there occasions -- other occasions
3   then that you would be present when the defendant
4   would pay the landlord at Read Street?
5       A.   No.
6       Q.   So that was the one occasion you remember?
7       A.   Yes.
8       Q.   Do you know whose name that location was
9   in?  What name the lease was in?  If you know.
10      A.   I really can't remember.
11      Q.   Now, as you were dating the defendant, do
12  you recall ever going over with him to Charles
13  Street?
14      A.   Yes.
15      Q.   And when you went over to Charles Street,
16  do you remember what floor you went to with the
17  defendant?
18      A.   On the second floor, I think.
19      Q.   Did you meet anybody up on the second
20  floor?
21      A.   Yes.
22      Q.   Did you go inside of an apartment on the
23  second floor?
24      A.   Yes.
25      Q.   Did you come to learn whose apartment that
```

2106

```
1   was?
2       A.   Yes.
3       Q.   And whose apartment was that?
4       A.   Pops.
5       Q.   And did you have occasion to meet Pops when
6   you went over there with the defendant?
7       A.   Yes.
8       Q.   And showing you what's in evidence as
9   Government's Exhibit 229, do you recognize who that
10  is?
11      A.   Pops.
12      Q.   Do you recall whether you met any other
13  people over there at Charles Street?
14      A.   No.  I met a Spanish lady before, but I
15  don't know her name.
16      Q.   And when you say you met a Spanish lady
17  before, did you meet her inside of Pops' apartment;
18  if you recall?
19           MR. SHEEHAN:  Object to leading.
20           THE COURT:  Where did you meet the
21  Spanish lady?
22           THE WITNESS:  In Charles Street.
23      Q.   Do you remember where in Charles Street?
24      A.   I met her in the hallway.
25      Q.   Of which floor?  If you remember.
```

2107

```
1       A.   Just in the bottom of the hallway by the
2   door.
3       Q.   Did you meet an individual or later meet an
4   individual named Womble?
5       A.   Yes.
6           MR. SHEEHAN:  Objection, leading.
7           THE COURT:  Sustained.
8           MS. REYNOLDS:  I'll rephrase.  I'll
9   withdraw and rephrase.
10      Q.   Do you recall whether you met any other
11  individuals through the defendant?
12      A.   Yes.
13      Q.   Who else do you recall meeting?
14      A.   Womble.
15      Q.   Do you recall how that came about, where
16  you met him or under what circumstances?
17      A.   They worked together.
18      Q.   And do you know where they worked together?
19      A.   The car wash.
20      Q.   And is that where you met Womble?
21      A.   Yes.
22      Q.   Initially.  After you met Womble -- well,
23  let me show you what's in evidence as Government's
24  Exhibit 210, and ask you if you recognize this
25  photograph.  Who is that?
```

2108

```
1       A.   Womble.
2       Q.   And that's the individual you met over at
3   the car wash?
4       A.   Yes.
5       Q.   After that time when you first met him, did
6   you see Womble again?
7       A.   Yes.
8       Q.   And where did you see him again?
9       A.   On Hallet Street.
10      Q.   And again, that's the location you
11  previously identified in Government's 204?
12      A.   Yes.
13      Q.   And can you describe how that came about.
14  Why did you meet Womble at Hallet Street?
15      A.   He wanted me to drop something off for him.
16      Q.   Who wanted you to drop something off?
17      A.   Womble.
18      Q.   And how did you know to go see Womble at
19  Hallet Street?
20      A.   He called.
21      Q.   Who called?
22      A.   Womble.
23      Q.   He called you?
24      A.   No.
25      Q.   Who did he call?
```

GA527

2109

```
1       A.    Azibo.
2       Q.    And then what happened after Womble called
3   Azibo?
4       A.    He wanted me to come by the house and drop
5   something off for him.
6       Q.    And when you say "he"?
7       A.    Womble.
8       Q.    Did you go to Hallet Street to meet Womble?
9       A.    Yes.
10      Q.    Did you -- did anyone tell you to go there?
11  Or what caused you to go there?
12      A.    I got on the phone with Womble.
13      Q.    Who handed you the phone?
14      A.    Azibo.
15      Q.    And after you had that conversation with
16  Womble, what, if anything, did you do?
17      A.    I went to meet Womble at Hallet Street.
18      Q.    And did you go inside the apartment on
19  Hallet Street?
20      A.    Yes.
21      Q.    Was anybody else there other than Womble?
22      A.    No.
23      Q.    And what happened next?
24      A.    He asked me to bring a paper bag to Charles
25  Street.
```

2110

```
1       Q.    Did you see what was in the paper bag?
2       A.    It was a plastic sandwich bag with
3   narcotics in it.
4       Q.    Did you know what kind of narcotics was in
5   it?
6       A.    No.
7       Q.    Did you take the bag from Womble?
8       A.    Yes.
9       Q.    And where did you go after you got the bag
10  from Womble?
11      A.    Charles Street.
12      Q.    And do you recall where on Charles Street
13  you went?
14      A.    I don't know the address, but the apartment
15  building on Charles Street.
16      Q.    And I'll rephrase the question.  Once you
17  got to Charles Street, did you go inside?
18            Let me show you Government's Exhibit 102.
19  Do you recognize that location?
20      A.    Charles Street.
21      Q.    Those are the Charles Street apartments?
22      A.    Yes.
23      Q.    Is that where you went after you got the
24  package from Womble?
25      A.    Yes.
```

2111

```
1       Q.    And did you go inside the apartment
2   building?
3       A.    The hallway.
4       Q.    The hallway.  Do you recall what floor?
5       A.    I went down on the underground where the
6   stairs were.  I don't remember, it was just the back
7   hallway.
8       Q.    And how did you know to go to that area of
9   the Charles Street apartments?
10      A.    Womble told me.
11      Q.    Did you drop the package off with anyone in
12  that stairwell?
13            MR. SHEEHAN:  Objection, leading.
14      Q.    Did you --
15            MS. REYNOLDS:  I'll rephrase, your
16  Honor.
17      Q.    What happened next after you got to the
18  Charles Street apartments and went to that stairwell
19  area?
20      A.    The Spanish lady was waiting for me.
21      Q.    And what did you do?
22      A.    I gave the bag to her.
23      Q.    Did you do anything else after that?
24      A.    No.
25      Q.    Where did you go after that?
```

2112

```
1       A.    Back home.
2       Q.    To where?
3       A.    Newfield Avenue.
4       Q.    At that time had you moved into Read Street
5   yet with the defendant?
6       A.    No.
7       Q.    Did you have any discussions with the
8   defendant about what you did for Womble after you
9   did it?
10      A.    No.
11      Q.    Other than that occasion when Womble had
12  you take that package over to Charles Street, do you
13  recall going there on any other occasions?
14      A.    Yes.
15      Q.    And can you tell the members of the
16  grand -- of the jury the other times you went there.
17      A.    To bring Ozzie food and to get money.
18      Q.    And when you say "Ozzie," do you know
19  Ozzie's real name?
20      A.    Azikiwe.
21      Q.    Okay.  And did you learn Azikiwe's
22  relationship to the defendant?
23      A.    Yes.  Brother.
24      Q.    And showing you what's in evidence as
25  Government's 207.  Do you recognize who that person
```

2113

```
1   is?
2        A.   Yes.
3        Q.   Who is that?
4        A.   Azikiwe.
5        Q.   Now, you said Azikiwe, you dropped food off
6   to Azikiwe.  Is that what you testified to before?
7        A.   Yes.
8        Q.   Do you remember approximately how many
9   times you dropped food off to him?
10       A.   Maybe about twice.
11       Q.   And when you would go over to drop food off
12  on those approximately two occasions, where within
13  the Charles street apartments did you meet Azikiwe?
14       A.   Hallway.
15       Q.   In the hallway.  When you say "the
16  hallway," do you remember what hallway?
17       A.   The downstairs hallway.
18       Q.   Is that --
19       A.   Underground.
20       Q.   And is that -- taking a look at -- again,
21  at Government's Exhibit 102, do you see on this side
22  where the arrow is, what is that?
23       A.   That's the underground.
24       Q.   And it was -- is that where you went to
25  meet --
```

2114

```
1        A.   Yes.
2        Q.   -- Azikiwe?
3             And you mentioned that you picked up money
4   from Azikiwe.  Is that what you testified to before?
5        A.   Yes.
6        Q.   And describe how that came about.  How did
7   you get that money -- or who gave it to you?
8        A.   Azikiwe.
9        Q.   And where, in that same area in the
10  stairwell?
11       A.   Yes.
12            MR. SHEEHAN:  Objection, leading.
13            THE COURT:  Sustained.
14            MS. REYNOLDS:  I'll rephrase, your
15  Honor.
16       Q.   Where did he give you the money?
17       A.   In the hallway.
18       Q.   And when he, Azikiwe, gave you the money,
19  do you recall how it was packaged?
20       A.   The money was in a bag.
21       Q.   And did you learn how much money was in the
22  bag?
23       A.   No.  It wasn't that much.
24       Q.   What did you do with the money after you
25  got it from Azikiwe?
```

2115

```
1        A.   Gave it to Azibo.
2        Q.   Ms. Pettway, I'm going to draw your
3   attention to the summer of 2005.  In that time
4   period, again, were you still dating the defendant?
5        A.   Yes.
6        Q.   At some point in 2005 did you become
7   pregnant with his child?
8        A.   Yes.
9        Q.   And drawing your attention to August of --
10  well, let me ask you this.  How old were you when
11  you were dating the defendant back in 2005?
12       A.   Seventeen going on 18.
13       Q.   And in August of 2005 -- well, when is your
14  birthday?
15       A.   August 13th.
16       Q.   And drawing your attention to August of
17  2005, around your birthday, did you take any trips
18  with the defendant?
19       A.   Yes.
20       Q.   And can you describe where you went in
21  August of 2005 around your birthday?
22       A.   Busch Gardens and Georgia.
23       Q.   And how was it that you got to Busch
24  Gardens and Georgia?
25       A.   Drove.
```

2116

```
1        Q.   Who drove?
2        A.   Azibo.
3        Q.   Do you recall what car you drove?
4        A.   The burgundy Cadillac.
5        Q.   Did anyone else go on that trip down south
6   with you and Azibo?
7        A.   Yes.
8        Q.   Who else went?
9        A.   Ozzie and Black.
10       Q.   And showing you what's in evidence as
11  Government's Exhibit 209 -- not in evidence yet.  So
12  let me just take it off the big screen here and ask
13  you just to look at your monitor.  And showing you
14  what's been marked as Government's Exhibit 209, do
15  you recognize who that's a photograph of?
16       A.   Black.
17            MS. REYNOLDS:  Your Honor, I would move
18  as a full exhibit Government's 209.
19            MR. SHEEHAN:  No objection.
20            THE COURT:  Full exhibit.
21       Q.   So then taking a look at the big screen,
22  the individual in 209 is the individual you knew as
23  Black?
24       A.   Yes.
25       Q.   Prior to your trip -- well, prior to your
```

**GA529**

2117

```
1    trip down south, had you met Black before that time?
2        A.   I don't think so.
3        Q.   And you said Black and Azikiwe went on the
4    trip as well?
5        A.   Yes.
6        Q.   Did they drive with you and the defendant?
7        A.   No.
8        Q.   How did they go down south?
9        A.   They drove their own car.
10       Q.   Do you remember what kind of car they drove
11   in?
12       A.   A truck.
13       Q.   A truck?
14       A.   Yes.
15       Q.   And describe for the jury how it was that
16   this trip -- how did you drive down?  Did the both
17   cars go together?  Or how was it you got down south?
18       A.   They followed us.
19       Q.   They followed you and the defendant?
20       A.   Yes.
21       Q.   And where did you first go on the trip?  Do
22   you recall where your first stop was?
23       A.   Busch Gardens.
24       Q.   And where is that?  What state?  If you
25   know.
```

2118

```
1        A.   I don't remember.
2        Q.   Down south?
3        A.   Yeah.
4        Q.   And do you recall how long you stayed at
5    Busch Gardens?
6        A.   I think one day.
7        Q.   Where did you go after you left Busch
8    Gardens?
9        A.   To a hotel.
10       Q.   And did you continue to drive further south
11   after --
12            MR. SHEEHAN:  Objection, leading.
13            THE COURT:  Sustained.
14       Q.   Where else did you go after Busch Gardens?
15       A.   Kept driving down south.
16       Q.   And where did you go?
17       A.   To a hotel.
18       Q.   Do you recall what state you were in?
19       A.   No.
20       Q.   What did you do when you got to this other
21   hotel down south?
22       A.   Nothing.
23       Q.   At the time that you kept going to another
24   hotel down south, were Azikiwe and Black, the person
25   depicted in 209, were they still with you and the
```

2119

```
1    defendant?
2        A.   When we first got there, no.
3        Q.   Did they join you --
4        A.   Yes.
5        Q.   -- later?
6            Do you know -- well, let me ask you this.
7    Were you and the defendant pulled over by any
8    officers on the trip?
9        A.   No.
10       Q.   Do you know whether or not Black and
11   Azikiwe were pulled over?
12       A.   Yes.
13       Q.   And how do you know that?
14       A.   I seen it.
15       Q.   You were driving -- well, can you describe
16   what you saw.
17       A.   I seen the police flash their lights and
18   pull the truck over.
19       Q.   And which truck did the police pull over?
20       A.   The truck that Azikiwe was in.
21       Q.   And what did you and the defendant do at
22   that point when Azikiwe and Black were pulled over?
23       A.   Kept driving.
24       Q.   At some point -- well, how long was this
25   trip down south?  Do you remember how many days?
```

2120

```
1        A.   Not really.
2        Q.   Was it -- well, at some point did you
3    return?
4        A.   Yes.
5        Q.   And how did you get back to Connecticut?
6        A.   Drove.
7        Q.   And at that time when you were returning,
8    where were you?  Were you still with the defendant
9    in his car?
10       A.   Yes.
11       Q.   And where were Black and Azikiwe, what car
12   were they in?
13       A.   Behind us.
14       Q.   In their car?
15       A.   Yes.
16       Q.   Do you recall how pregnant you were at that
17   time, how far along you were in your pregnancy?
18       A.   Somewhere around five months.
19       Q.   And did you start going to see doctors
20   around that time for treatment for your pregnancy?
21       A.   Yes.
22       Q.   And where were you getting medical
23   attention, if you remember?
24       A.   Mill Hill.
25            MR. SHEEHAN:  I'm sorry, could I just
```

2121

```
 1   ask that she --
 2            THE COURT:  Yes.  You need to speak into
 3   the microphone.  Mill Hill, is that what you said?
 4            THE WITNESS:  Yes.
 5       Q.   And where were -- when you got back to
 6   Connecticut after that trip down south, where were
 7   you living at that time?
 8       A.   On Newfield.
 9       Q.   And who were you living with over at
10   Newfield?
11       A.   My mom.
12       Q.   And is Newfield in Bridgeport?
13       A.   Yes.
14       Q.   Was anybody else other than you and your
15   mom living at Newfield?
16       A.   No.
17       Q.   Would the defendant visit you over at
18   Newfield?
19       A.   Yes.
20       Q.   Were there occasions, if you remember, when
21   Azikiwe visited or stopped by Newfield?
22       A.   Yes.
23       Q.   During that time period, after the trip
24   down south when you were living at Newfield, did you
25   go over to Charles Street at that time period,
```

2122

```
 1   during that time field?
 2       A.   No.
 3       Q.   Did there come a time that --
 4            MS. REYNOLDS:  Your Honor, at this point
 5   we were going to get into some of some transcripts
 6   and calls.  I don't know if it might make sense to
 7   take a little bit earlier lunch and then have that
 8   ready to go for right after lunch.  If not, I'm
 9   happy to start it.  We have to pass out transcript
10   binders, et cetera.
11            THE COURT:  All right, why don't we take
12   an earlier lunch then, ladies and gentlemen.  Leave
13   your notebooks here and don't discuss the case.  But
14   we'll still try to start in a half an hour.  Okay.
15            (Jury exited the courtroom.)
16            THE COURT:  All right.  May I excuse the
17   witness for lunch, Ms. Reynolds?
18            MS. REYNOLDS:  Yes, you may, your Honor.
19            THE COURT:  Ms. Pettway, we'll take a
20   half an hour for lunch.  Please don't discuss your
21   testimony with anyone.  All right?
22            Now, what is it you need to do?
23            MS. REYNOLDS:  Your Honor, we had -- we
24   have several prison calls that we intend to play.
25   We have a supplemental exhibit list which we can
```

2123

```
 1   pass up to the Court.
 2            THE COURT:  I think I have it.
 3            MS. REYNOLDS:  You have it.  Good.  And
 4   we have provided copies of the full transcripts.
 5   What we've prepared are excepts from those calls and
 6   transcripts that are just of the portions of the
 7   call we're playing, and we've prepared binders.
 8   We've shown those to defense counsel and I
 9   understand there is no objection to passing those
10   out to the jury.  So what we would do is perhaps
11   just leave them on their chairs at this point, so we
12   can get started.  And then we would just play a
13   series of prison calls.
14            We also have a stipulation with regard to
15   the prison calls that we would read in, mark and
16   read into the record.  So logistically, I thought it
17   would be a good time to get all of that ready right
18   now.
19            THE COURT:  All right, will there be
20   anything further from the defendant with respect to
21   these excerpted prison calls and transcripts?
22            MR. SHEEHAN:  I'm sorry, your Honor, in
23   what sense?
24            THE COURT:  I had received no objection.
25            MR. SHEEHAN:  Right, I just wanted to
```

2124

```
 1   talk to the government about one line in the last
 2   transcript.
 3            THE COURT:  All right, why don't we
 4   break for lunch and we will be back in half an hour.
 5   Thank you.
 6            (Recess)
 7            THE COURT:  All right, are we ready?
 8            MS. REYNOLDS:  Yes, your Honor.  And
 9   just for the record, we had provided the transcripts
10   to defense counsel prior to lunch.  They raised just
11   one objection to one line in one of the transcripts,
12   and we agreed to redact that out.  So we have
13   replaced that page in the transcript binders for
14   everyone.
15            THE COURT:  All right, and all the
16   jurors have their binders?
17            MS. REYNOLDS:  What we did is we put
18   them under the chairs so they're available when we
19   get to that portion.
20            MR. SHEEHAN:  Could I also just, your
21   Honor, indicate one thing that I think it would be
22   important for us to clarify here?  Your Honor had
23   directed Ms. Pettway not to talk to anybody about
24   her testimony.  I think under that circumstance the
25   government should not talk to Ms. Pettway's lawyer
```

2125

```
1   to ask him to talk to his client about anything that
2   was coming up.  It may be one thing if Ms. Pettway's
3   lawyer talks to her, that's I think --
4          THE COURT:  What's going on?
5          MR. SHEEHAN:  Well, we just had this
6   happen, your Honor, and I want to get it clear what
7   your Honor's position is with respect to when your
8   Honor --
9          THE COURT:  What you can't do directly
10  you can't do indirectly.  It seems to me if there
11  are going to be conversations with a witness's
12  lawyer, both sides ought to be present.
13         MR. SHEEHAN:  And if they are, it
14  shouldn't be to communicate something to the witness
15  unless both sides agree.
16         THE COURT:  Well, I don't know that both
17  sides are ever going to agree here.
18         MR. SHEEHAN:  I don't think so either,
19  your Honor.  But we did agree, your Honor.  We got
20  an agreement on this exhibit.  So, there you go.
21         MS. REYNOLDS:  Your Honor, just for the
22  record, I did not speak to the witness's lawyer.
23  She was sitting in the hallway.  I did ask her if
24  she wanted to go into the other room or if she
25  needed to go to the bathroom.
```

2126

```
1          MR. SHEEHAN:  I wasn't talking about Ms.
2   Reynolds, your Honor.
3          MS. REYNOLDS:  That was the extent of
4   the contact with the witness.
5          THE COURT:  Let's bring in the jury,
6   please.  I'll deal with specifics when they're
7   presented.
8          (Jury entered the courtroom.)
9          THE COURT:  All right, please be seated,
10  ladies and gentlemen.  You are going to find
11  notebooks under your seat and the government will
12  let you know when we get to the point where that is
13  relevant.  You don't need to look at that right now.
14  All right, Ms. Reynolds.
15         Ms. Pettway, you may be seated, and you
16  remain under oath.
17         And Ms. Reynolds may continue direct
18  examination.
19         MS. REYNOLDS:  Thank you, your Honor.
20  Q.  Ms. Pettway, prior to the lunch break you
21  had mentioned a couple of things and I just wanted
22  to go back to that.  You mentioned that one of the
23  times you went over to Charles Street you met a
24  Spanish lady.  Do you recall that testimony?
25  A.  Yes.
```

2127

```
1   Q.  And I'm just going to show you what's in
2   evidence as Government's Exhibit 217, ask you to
3   take a look at that photograph.  Do you recognize
4   who that is?
5   A.  No.
6   Q.  You don't recognize that person?
7   A.  No.
8   Q.  And you had talked about the trip you took
9   down south with the defendant and Black and Azikiwe
10  for your birthday.  Do you remember that testimony?
11  A.  Yes.
12  Q.  In addition to Busch Gardens and Georgia,
13  did you go anywhere else?
14  A.  No.
15  Q.  Did you -- other than the hotels that you
16  stayed at, what else did you do on that trip down
17  south?
18  A.  Went to visit some family.
19  Q.  Do you know whose family you were visiting?
20  A.  Azibo's.
21  Q.  And did you visit any other families or do
22  anything else while you were down south?
23  A.  I think we stopped by Black's family also.
24  Q.  Black's family?
25  A.  Yes.
```

2128

```
1   Q.  And what, if anything, did you do when you
2   stopped by Black's family?
3   A.  We just went to a cookout.
4   Q.  And do you recall what state you were in
5   when you visited Black's family?
6   A.  No.
7   Q.  And you had talked about when the police
8   pulled over Black and Azikiwe.  Do you recall you
9   testified to that earlier today?
10  A.  Yes.
11  Q.  After that happened, where did you and
12  Dreddy go, after you saw them getting pulled over?
13  A.  To a hotel.
14  Q.  And when you and the defendant went to the
15  hotel, did you have occasion to see Black and
16  Azikiwe later that day?
17         MR. SHEEHAN:  Objection, leading.
18  Q.  Well, what happened?  Did you see Black and
19  Azikiwe later that day?
20         MR. SHEEHAN:  Objection, leading.
21         THE COURT:  I don't think that's
22  leading.
23  A.  Yes.
24         THE COURT:  Yes or no.
25  Q.  You did see them?
```

2129

```
1       A.   Yes.
2       Q.   And where did you see them?
3       A.   The hotel.
4       Q.   And were there any discussions at that time
5   about what had happened after they got pulled over?
6       A.   Yes.
7       Q.   Were you present for those discussions?
8       A.   Yes.
9       Q.   And what did you hear?
10      A.   That someone had a weapon in the car.
11      Q.   Did you learn who had a weapon in the car?
12      A.   No.
13      Q.   Did you know what happened after they got
14  pulled over with the weapon in the car?
15      A.   They just let them go.
16      Q.   Who let who go?
17      A.   The police.
18      Q.   And who did they let go?
19      A.   Black and Azikiwe.
20      Q.   Now, how long -- well, did you come back
21  then?  You testified earlier today eventually you
22  returned to Connecticut?
23      A.   Yes.
24      Q.   And I'm going to ask you, at that time when
25  you returned to Connecticut, again where were you
```

2130

```
1   living?
2       A.   Newfield.
3       Q.   With your mom there?
4       A.   Yes.
5       Q.   Eventually did the defendant get arrested
6   for something?  In September -- drawing your
7   attention to when you were living at Newfield,
8   September, did the defendant go to jail?
9       A.   Yes.
10      Q.   Did you continue to remain in contact with
11  the defendant after he went to jail?
12      A.   Yes.
13      Q.   And how would you remain in contact with
14  him when he went to jail?
15      A.   Phone calls.
16      Q.   Phone calls?  Do you recall remaining in
17  touch with him in any other way?
18      A.   I got a letter.
19      Q.   And let me show you what's been marked as
20  Government's Exhibit 504.  Showing you what's in
21  evidence as Government Exhibit 504, do you recognize
22  this?
23      A.   Yes.
24      Q.   And is that one of the -- is that the
25  letter you got from the defendant?
```

2131

```
1       A.   Yes.
2       Q.   And taking a look at Government 504.
3            THE COURT:  Are you offering that?
4            MS. REYNOLDS:  It's in evidence.
5            THE COURT:  It's in evidence?
6            MS. REYNOLDS:  Yes.
7       Q.   Taking a look then at Government's 504, and
8   just starting with the top portion of the letter, do
9   you see that up on your monitor there?
10      A.   Yes.
11      Q.   Did you write anything on this letter or,
12  for example, the underlines or any of the --
13      A.   No.
14      Q.   So, this letter appears today as it was
15  when you received it?
16      A.   Yes.
17      Q.   Do you recall whether or not there were any
18  attachments to the letter, things that came with the
19  letter?
20      A.   Yes.
21      Q.   What came with the letter?
22      A.   His charges.
23      Q.   And just reading and taking a look at the
24  letter in the middle here where it starts:  "This is
25  one.  Take this legal package to make two copies of
```

2132

```
1   each piece of paper.  Make sure you staple to keep
2   them in the order I have them in.  When you are done
3   copying, you should have three sets, original and
4   two copies.  I need you to find some time in like a
5   week or so to make an appointment with this guy Gary
6   Mastranardi."  And it has a phone number and "the
7   fourth floor."  And an address after that.
8            Can you describe what you did when you
9   got this letter.
10      A.   I went to go see the lawyer.
11      Q.   And reading further in the letter it says
12  --  did this letter give you directions as to what
13  to do when you went to see the lawyer?
14      A.   Yes.
15      Q.   And reading further say:  "It is very
16  important you have a sit down with him.  You are
17  willing to wait if it's possible he can squeeze you
18  in at the end of his day.  This should get you a
19  four o'clock to five o'clock appointment.  Bring a
20  package and ask him if he could be so kind to
21  overlook the paperwork.  Don't say what anything is
22  about until you get in his office.  If he seems
23  patient, get him to glance through the papers first.
24  You tell him you have a case you want to know if he
25  is interested in helping with."  And then at the
```

2133

1   bottom here it says in bolded print "Try not to
2   smile too much."  On the top it says "bubble gum or
3   speak."
4          At the top, continuing on page 2 of the
5   letter, Government Exhibit 504, "While he is
6   speaking" again underlined, "or reading, unless he
7   asks you something.  If it looks like he thinks it's
8   a lot of reading or looks like he wants some talk
9   out of you you say," quote and underlined, 'this
10  gentleman came in your office about a week before
11  they took him into custody.  He was accompanied by
12  his sister.'"  In the top in little print it says in
13  between the lines "last week of August, appointment
14  4:80 and just saw you in court on the 25th."
15         Again it says:  "He was accompanied by
16  his sister," parentheses, "a real black girl."  And
17  then it's got a dot.  "That is Queda just in case
18  you want to know.  That is the day we saw you and
19  crew riding on Dover.  We spoke about sentence
20  reductions because of fears of a parole violation
21  for not cooperating in a police investigation.  If
22  he still don't remember, tell him he advised me it
23  would be better for me if whatever they were gonna
24  try be done while I was still serving parole time.
25  I was under the impression they might try to charge

2134

1   me with some old sales charges from '03, but instead
2   they" and underlined "made up some assaults to make
3   him," and then it says, slash, "me seem violent."
4          Then, "They took him out of the parole
5   office in the middle of a urine, claimed it was for
6   the murder," that's in small print above, "to claims
7   he had weed in his possession.  When they got to the
8   station.  You know for a fact her wasn't using"
9   no or N, "would not have went in there with any,"
10  period.  "He didn't even carry his phone in there."
11         Again, this is all underlined, correct,
12  in the letter there you see.
13      A.  Yes.
14      Q.  "He also was no longer dealing.  That's
15  probably why it wasn't a sales charge even though he
16  told me they have five years."  End of quote.
17         So, that was a long quote that was
18  underlined.  And what was your understanding of what
19  you were supposed to tell the lawyer when you met
20  with him?
21      A.  What they were charging him with.
22      Q.  And you were supposed to follow this,
23  what's in this letter, and give this information to
24  the lawyer?
25      A.  Yes.

2135

1       Q.  It goes on to say at the end here:  "Find
2   out if he is interested to let him know I am not
3   taking any of these charges."  And then there is a
4   section that's blacked out.  It goes on to say:
5   "One of the cases were supposed to be dropped to,
6   that's when they made up the second one."
7   Underlined with two lines, "We are not sure if the
8   lawyer working on it is even trying to get them
9   dismissed anymore.  Or even working for us."  And at
10  the bottom it's got another lawyer's name "Stephen
11  Basile" and address, it says "court appointed."
12         Going back to the first page, when you
13  were asked to make copies of the attachments that
14  came with this letter, did you do that?
15      A.  No.
16      Q.  And did you go meet with a lawyer after you
17  received this letter?
18      A.  Yes.
19      Q.  And did you tell the information on page 2
20  as it's quoted here for you to say to the lawyer?
21      A.  I just gave him the packet.
22      Q.  You gave him the packet?
23      A.  Yes.
24      Q.  Of the attachments?
25      A.  Yes.

2136

1       Q.  And you didn't keep a copy for yourself?
2       A.  No.
3          MR. SHEEHAN:  May I have one second,
4   your Honor, with counsel?
5       Q.  I don't know if you can see, but there is
6   some small print here like "Q JRS."  Does that look
7   familiar to you?  Do you remember if that was in --
8       A.  No.
9       Q.  That's somebody else's initials and
10  reference to something else, not in the letter as
11  you received it, correct?
12      A.  I really don't remember.
13         MR. SHEEHAN:  Your Honor, I think we can
14  stipulate that that was actually put on the letters
15  after at some point in time later on down the road.
16         MS. RODRIGUEZ-COSS:  That is correct,
17  your Honor.
18         MS. REYNOLDS:  That's fine.
19         MR. SHEEHAN:  I just didn't want any
20  misunderstanding in that regard.
21         MS. REYNOLDS:  That's fine.  The witness
22  also didn't recall her seeing that there.  That's
23  why I asked her that.  But we will stipulate to
24  that.
25      Q.  Now, Ms. Pettway, after the defendant went

2137

```
1    to jail, did something happen to the apartment over
2    at Read Street?
3        A.   I moved the stuff out.
4        Q.   You moved the stuff out?
5        A.   Yes.
6        Q.   And, again, showing you again Government's
7    Exhibit 248, with the receipts, those payments were
8    for the apartment at Read Street, correct?
9             MR. SHEEHAN:  Objection, asked and
10   answered.
11            THE COURT:  Sustained.
12       Q.   Whose name appears on the second receipt,
13   "received from"?
14            MR. SHEEHAN:  Objection, asked and
15   answered.  And the document also speaks for itself.
16            MS. REYNOLDS:  I didn't ask --
17            MR. SHEEHAN:  She testified about this,
18   your Honor, previously.
19            THE COURT:  Overruled.
20       Q.   On the second receipt, whose name appears?
21   What does it say?
22       A.   Azibo Smith.
23       Q.   Azibo Smith?
24       A.   Yes.
25       Q.   Now, you said you moved the stuff out.  How
```

2138

```
1    did that come about?  How did you go over to Read
2    Street to move the stuff out?
3        A.   You said how did I?
4        Q.   Yes.  Well, let me ask you this.  I'll
5    strike that.  Who did you go with?  Or did you go
6    with anyone?
7        A.   I went with Seleana and Tanika (ph).
8        Q.   And Seleana, did you know Seleana's last
9    name?
10       A.   Bember.
11       Q.   And did you know if there is any
12   relationship between Seleana Bember and the
13   defendant?
14       A.   I knew her as being his mother.
15       Q.   And your oldest child is with the
16   defendant?
17       A.   Yes.
18       Q.   Correct?  You testified to that before.
19   And what does she call Seleana Bember?
20       A.   Grandma.
21       Q.   Now, at that time when you went over with
22   Seleana -- and, I'm sorry, who else did you go over
23   with to Read Street?
24       A.   Tanika.
25       Q.   Tanika.  And who is Tanika?
```

2139

```
1        A.   She was Seleana's daughter-in-law.
2        Q.   Was she married to one of Seleana's son's
3    then?
4        A.   No, they weren't married, they were dating.
5        Q.   Who was she dating?
6             MR. SHEEHAN:  I'm sorry, I don't
7    understand the question.  Who?
8        Q.   Who was Tanika dating?
9             MR. SHEEHAN:  I'm sorry.  Thank you,
10   your Honor.
11       A.   Linwood.
12       Q.   Did he have a nickname?
13       A.   Woby.
14       Q.   And showing you what's in evidence as
15   Government's Exhibit 220.  Do you recognize who that
16   is?
17       A.   That's Woby.
18       Q.   And what was Woby' relationship to Seleana?
19       A.   Son.
20       Q.   Now, how was it that you and Seleana and
21   Tanika got over to the Read Street?
22       A.   I believe I met them, met them there.
23       Q.   You met them there.  Okay, and what did you
24   do when you got to the apartment over on Read
25   Street?
```

2140

```
1        A.   I put the stuff in the U-Haul -- I mean, we
2    moved it to the U-Haul storage.
3        Q.   And what stuff are you talking about?
4        A.   The stuff in the apartment.
5        Q.   Whose stuff was that?
6        A.   Azibo's.  Not all of it.
7        Q.   And where did you take that stuff?
8        A.   To the U-Haul.
9        Q.   Do you know if some stuff from Read Street
10   was also taken over to Seleana's home?
11            MR. SHEEHAN:  Objection, leading.
12            THE COURT:  Sustained.
13            MS. REYNOLDS:  Do you know?
14       Q.   Well, where were you staying at that time?
15            THE COURT:  Ms. Reynolds, we're going to
16   take a five-minute recess.
17            MS. REYNOLDS:  Okay, thank you, your
18   Honor.
19            (Jury exited the courtroom.)
20            THE COURT:  All right, please be seated.
21   A juror needs to go to the bathroom.
22            MR. SHEEHAN:  I'm sorry, your Honor?
23            THE COURT:  A juror needs to go to the
24   bathroom.
25            MR. SHEEHAN:  I wonder if I might go,
```

**GA535**

2141

```
1   your Honor.
2           THE COURT:  We'll recess for five
3   minutes.  Counsel, would you have any objection if
4   juror No. 9 and juror No. 10 switched places?
5           MS. REYNOLDS:  We would have no
6   objection, your Honor.
7           MR. SMITH:  These are the two jurors on
8   the very end?
9           THE COURT:  Over here, yes.  One wishes
10  to be closer to the end.
11          MR. SMITH:  I agree.  I don't see a
12  problem.
13          THE COURT:  Let them do that, and we'll
14  change our seating chart.
15          (Recess)
16          THE COURT:  All right, we'll ask the
17  jury to return.
18          (Jury entered the courtroom.)
19          THE COURT:  All right, please be seated.
20  9 and 10 are switching places to be more
21  comfortable.  Is that all right with you?
22          JUROR:  Fine, thank you.
23          THE COURT:  No. 10, is that all right
24  with you?
25          JUROR:  That's fine.
```

2142

```
1           THE COURT:  All right, then we'll
2   proceed with direct examination of Ms. Pettway.
3           MS. REYNOLDS:  Thank you, your Honor.
4   Q.   Ms. Pettway, I'm going to show you what's
5   in evidence as Government's Exhibit 221 and ask you
6   if you recognize that person.  Who is that?
7   A.   Squeaky.
8   Q.   And do you know Squeaky's real name?
9   A.   Tyler.
10  Q.   And do you know if Tyler and -- has any
11  relationship to Seleana Bember?
12  A.   Nephew.
13  Q.   Nephew?
14  A.   Yes.
15  Q.   Now, Ms. Bember -- I'm sorry, Ms. Pettway,
16  we talked about the letter, and you had indicated in
17  the letter that's in Government's Exhibit 504 there
18  were some attachments when you received it, and I'm
19  just going to show you what's in evidence as
20  Government Exhibit 201J and ask you to take a look
21  at that.
22          Taking a look at these documents, do you
23  recognize that.
24  A.   Yes.
25  Q.   And what are these documents that are
```

2143

```
1   contained in Government's Exhibit 201J?  Well, what
2   were they with -- how is it that you recognize them?
3   A.   They came with the letter.  I don't recall
4   these, I just recall the ones in the back.
5   Q.   So you recall these?
6   A.   Yes.
7   Q.   And these were with the letter?
8   A.   Yes.
9           MR. SHEEHAN:  May I -- were you going to
10  inquire on the basis of those?
11          MS. REYNOLDS:  No, I'm not going to
12  inquire any further about these.
13          MR. SHEEHAN:  Thank you.
14          MS. REYNOLDS:  They're in evidence.
15  Q.   Ms. Pettway --
16          MR. SHEEHAN:  Could I just, your Honor,
17  as to what -- so the record is clear as to what the
18  witness didn't -- she was shown something.
19          THE COURT:  That's fine.  Why don't you
20  clarify with her.
21          The exhibits in 201J, the documents,
22  which one do you not recognize.
23          MR. SHEEHAN:  Would it be okay if I just
24  looked over her shoulder, your Honor?
25          THE COURT:  Sure.
```

2144

```
1           MR. SHEEHAN:  That might shorten that.
2   Q.   Showing you this document, do you recognize
3   this document as one of the documents that came with
4   the letter?
5   A.   No.
6   Q.   Okay.  How about this one?
7   A.   I just really remember the ones in the
8   back.
9   Q.   Okay.  So which ones -- perhaps it's easier
10  if we identify which ones she really remembers
11  instead of going through all of them.  Do you
12  remember this one?
13  A.   Not really.  I just distinctly remember
14  this.
15  Q.   Distinctly remember this one?  And this is
16  a Bridgeport -- I'm going to mark this one
17  separately.  Do you remember any of the other ones
18  that are in here, these other two?
19  A.   Yes, I remember those.
20  Q.   So, you remember these three?
21  A.   Yes.
22  Q.   Okay.
23          MS. REYNOLDS:  Your Honor, I'll just at
24  another time mark these separately just so it's
25  clear.
```

2145

```
1              THE COURT:  So we will mark them as J-1.
2    How about that?  201J-1, and those are the ones that
3    -- the documents she remembers, okay, she recalls
4    being with that letter.
5              MS. REYNOLDS:  Thank you, your Honor.
6              MR. SHEEHAN:  Thank you, your Honor.
7       Q.    Now, Ms. Pettway, did there come a time
8    that you started living over -- or moved in with
9    Seleana Bember?
10      A.    Yes.
11      Q.    And where did you move to when you moved in
12   with her?  Where were you living?  Do you remember
13   the address?
14      A.    No, I just know it was Boston Avenue.
15      Q.    Boston Avenue?
16      A.    Uh-huh (indicating affirmatively).
17      Q.    And were you present at Boston Avenue when
18   some police officers showed up to do a search
19   warrant at that location?
20      A.    Yes.
21      Q.    And do you know whether or not they took
22   some property off the porch area of that location?
23      A.    Yes.
24      Q.    And whose stuff was that; if you know?
25      A.    I know that some of the stuff on the porch
```

2146

```
1    belonged to Read Street, but not all.
2       Q.    And when you say some of the stuff on the
3    porch, that's the porch of Seleana Bember's house
4    where you were living at that time?
5       A.    Yes.
6       Q.    And it came from Read Street, that stuff?
7              MR. SHEEHAN:  I'm going to object to
8    leading, your Honor.
9       Q.    Where did that stuff come from?
10      A.    Some stuff came from Read Street.
11      Q.    And do you know how it got from Read Street
12   to Boston Ave?
13      A.    When we moved some of the items out of Read
14   Street, some of it was brought there.
15      Q.    Now, in addition to letters, you had
16   mentioned before that you continued to communicate
17   with the defendant through phone calls?
18      A.    Yes.
19              MS. REYNOLDS:  Your Honor, at this time
20   I would mark Exhibit 608, it's a stipulation that
21   the parties have entered into, and we've made one
22   correction that we've initialed, and I would mark
23   that and move that as a full exhibit.
24              MR. SHEEHAN:  No objection, your Honor.
25              THE COURT:  All right.
```

2147

```
1              MS. REYNOLDS:  Just reading that
2    stipulation into the record.  This states that:  "It
3    is hereby and stipulated by and between the United
4    States of America, by Assistant United States
5    Attorney Alina Reynolds, and the defendant Azibo
6    Aquart, by his attorneys Michael Sheehan and Justin
7    Smith, as follows:  If called to testify, a
8    custodian of records from the Connecticut Department
9    of Corrections would testify that Government
10   Exhibits 600 through 607, and clips of the calls
11   contained n on 600A through 607A, are fair and
12   accurate copies of telephone conversation recordings
13   made and maintained in the ordinary course of
14   business by the Department of Corrections for the
15   calls made from Bridgeport Correctional Center
16   and/or Cheshire County Correctional Facility between
17   September 6, 2005, and November 1st, 2005.
18              "It is hereby stipulated and agreed that
19   this stipulation and the above-described Government
20   Exhibits are admissible in evidence."
21              And it's signed by myself and Attorney
22   Michael Sheehan and Attorney Justin Smith.  Again,
23   that's Government 608.
24              THE COURT:  All right, that is a full
25   exhibit.
```

2148

```
1              MR. SHEEHAN:  May I have one second,
2    your Honor, with counsel?
3              MS. REYNOLDS:  And I'm going to, if I
4    could approach the witness at this time, your Honor
5    -- well, actually these come in.  I'm going to
6    start with government's 600A, and at this time I
7    think it would be appropriate if the jurors reached
8    under their chair and turned to the first
9    transcript.  And again, just for clarity in the
10   record, these are portions of these calls that have
11   been agreed to be entered into evidence.
12              THE COURT:  And there is a 600A?
13              MS. REYNOLDS:  There is a -- there
14   should be a 600A.
15              MS. DAYTON:  B is the transcript, A is
16   the clip.
17              MS. REYNOLDS:  Yes, I'm going to play --
18   sorry.  Just so it's clear, we've marked each CD for
19   purposes of the record which contains the portion of
20   the call with the 600A.  600B is the transcript that
21   corresponds to that portion of the call.
22              THE COURT:  And that's what you are
23   going to go play now?
24              MS. REYNOLDS:  And at this time we would
25   start, yes, your Honor, with that first call.
```

2149

1   MR. SHEEHAN:  Your Honor, just to make
2   things clear, what we're going to do is, by
3   agreement, the full clips will just be marked for
4   identification -- I mean, the full tapes, but the
5   clips are really the only thing that's being offered
6   in evidence.
7   THE COURT:  Fine.  Thank you.
8   MR. SHEEHAN:  Thank you, your Honor.
9   MS. REYNOLDS:  I have my able assistant
10  here, your Honor, just to pull up the first call,
11  which is 600A.
12  And for purposes of the record, playing
13  600A at this time.
14  (Tape played)
15  Q.   Ms. Pettway, in that call that was just
16  played for the jury, which is Government's
17  Exhibit 600A, or that portion of the call, when --
18  well, who is speaking in that call?
19  A.   Azibo.
20  Q.   And who is he speaking to?
21  A.   Azikiwe.
22  Q.   And had Azibo called you first?
23  A.   Yes.
24  Q.   And how was it that you got Azikiwe on the
25  line?

2150

1   A.   I clicked over and called.
2   Q.   And when Azibo, the defendant, and Azikiwe
3   are speaking and they reference Baby Momma, who is
4   that?
5   A.   That's me.
6   Q.   And when Azibo and Azikiwe were speaking on
7   Government's 600A and they referenced Black, who
8   were they -- do you have an understanding of who
9   they were referring to?
10  A.   Yes.
11  Q.   Who were they referring to?
12  A.   I don't recall his real name.
13  Q.   Is that the person that you previously --
14  I'm showing you Government's Exhibit 209.  Who is
15  that?
16  A.   Black.
17  Q.   That's Black?
18  A.   Yes.
19  Q.   And in this phone call -- or this
20  conversation we just listened to, when there is a
21  reference -- when the defendant referenced Woby, who
22  is Woby?
23  A.   Linwood.
24  Q.   And is that the person -- again, just for
25  the record, showing up on the screen now

2151

1   Government's Exhibit 209, who is depicted in that
2   photograph?
3   A.   Black.
4   Q.   During the phone call the defendant and
5   Azikiwe also referred to an individual named Woby,
6   and who was that?
7   A.   Linwood.
8   Q.   Showing you Government Exhibit 220 that you
9   previously identified, just so the record is clear,
10  is that Woby?
11  A.   Yes.
12  Q.   And you had an opportunity to listen to
13  these phone calls prior to testifying here today?
14  A.   Yes.
15  Q.   Did you have an understanding of when Azibo
16  and Azikiwe were speaking about Black's bill, do you
17  have an understanding what they're talking about
18  during that part of the conversation on Page 4?
19  A.   No.
20  Q.   And during the conversation when Azibo says
21  to Azikiwe that "Baby mother," and I'm referring to
22  page 4 at the top of the page, where Azibo says,
23  "And baby mother should have about five for that.
24  No, you, you all, you all should cover that."  Do
25  you have an understanding of what the defendant was

2152

1   talking about there?
2   A.   As far as the five, I was supposed to sell
3   the truck.
4   Q.   You were supposed to sell which truck?
5   A.   The Tahoe.
6   Q.   And how much were you supposed to sell it
7   for?
8   A.   Five.
9   Q.   Five what?
10  A.   Thousand dollars.
11  Q.   Okay.  And who told you to do that?
12  A.   Azibo.
13  Q.   Were you able to sell the truck for $5,000?
14  A.   No.
15  Q.   Did you know -- well, what were you
16  supposed to do had you been able to sell the truck
17  for $5,000?  What were you supposed to do with those
18  $5,000?
19  A.   It was supposed to go towards a bond.
20  Q.   A bond for who?
21  A.   Black.
22  MS. REYNOLDS:  And, your Honor, at this
23  time we would move on to the next phone call, which
24  is marked 601A, the actual call, and the transcript
25  in the transcript binder is marked 601B.

2153

```
1              MR. SHEEHAN:  D or B?
2              MS. REYNOLDS:  B as in boy.
3              Playing 601A, your Honor.
4              (Tape played)
5      Q.   Ms. Pettway, during the portion of the call
6  that we just heard that's contained on 601B, who are
7  they -- or who is the defendant referring to when he
8  talks about Womble?  Who is that?
9              MR. SHEEHAN:  Objection to the form of
10 the question, your Honor.
11     A.   Womble?
12             THE COURT:  I'm sorry.
13             MR. SHEEHAN:  I object to the form of
14 the question.
15             MS. REYNOLDS:  Well, I'm just --
16     Q.   Showing you Government Exhibit 210, who is
17 that?
18     A.   Womble.
19     Q.   And is that the person they were talking
20 about in the phone call by name?
21     A.   Yes.
22     Q.   And do you have any understanding as you
23 listen to the call of what the defendant meant when
24 he told Azikiwe "Tell Womble he owe me $1,800 or
25 it's curtains"?  Do you know?
```

2154

```
1      A.   No.
2      Q.   And do you know who Quita is?
3      A.   Can you state that name again?
4      Q.   Quita, or Quita, that they talked about.
5  During the phone call "Quita said Womble has been
6  asking her all types of questions," in the beginning
7  of the call?
8      A.   Yes.
9      Q.   And who is Quita?
10     A.   A friend of Azibo's.
11     Q.   A friend of Azibo's?
12     A.   Yes.
13             MS. REYNOLDS:  Your Honor, moving on
14 then to Government's Exhibit 602A, and again the
15 transcript is 602A-1.  There is two clips from this
16 particular call so we've marked -- I'm sorry, the
17 transcript is 602A-1 for 602A.
18             Playing 602A at this time, your Honor.
19             (Tape played)
20     Q.   Ms. Pettway, in Government's Exhibit 602A,
21 the portion of the call we just played, do you know
22 -- or do you have an understanding of who the
23 defendant is referring to when he says Yes, Yes?
24     A.   Yes.
25     Q.   And who is he referring to?
```

2155

```
1      A.   Black.
2      Q.   And, Ms. Pettway, prior to today you said
3  you did have an opportunity to listen to these phone
4  calls.  Did you also have an opportunity to look at
5  the transcripts and compare them to the phone calls?
6      A.   Yes.
7      Q.   And the names as they appear on the
8  transcript and the transcript seemed consistent with
9  the phone calls to you?
10     A.   Yes.
11             MS. REYNOLDS:  And now playing
12 Government's Exhibit 602B, and the transcript is
13 marked 602B-1 in the transcript binders.
14             THE COURT:  602.  I thought you just did
15 602?
16             MS. REYNOLDS:  Yes, it's 602B.  There is
17 a two clips from this call, your Honor.
18             THE COURT:  Okay.
19             MS. REYNOLDS:  And then we marked the
20 transcript 602B-1.
21             THE COURT:  Okay.
22             MS. REYNOLDS:  So playing 602B.
23             (Tape played)
24     Q.   And, Ms. Pettway, in the portion of the
25 call that we just listened to on 602B, did you have
```

2156

```
1  an understanding of who Azibo was referring to when
2  he mentioned Woby?  Is that the same Woby you
3  previously identified?
4      A.   Yes.
5      Q.   And did you have an understanding on page 2
6  when Azikiwe says "Gotcha you.  We got to talk about
7  Black, though, so you already know."  Who they were
8  referring to?  The same person you previously
9  identified?
10     A.   Yes.
11     Q.   Did you have an understanding of what they
12 were talking about in this phone call, Azibo and
13 Azikiwe?
14     A.   No.
15             MS. REYNOLDS:  Now, I'm going to play at
16 this time, your Honor, Government's Exhibit 603A.
17 The corresponding transcript in the transcript
18 binder is 603B.
19             Playing at this time 603A.
20             (Tape played)
21     Q.   So, Ms. Pettway, during this conversation
22 did you learn Yes, Yes and Black's real name?
23     A.   Yes.
24     Q.   And what was his real name?
25     A.   John Taylor.
```

2157

1    Q.   And can you describe what you were told to
2  do during this time period with regard to John
3  Taylor?  What were your instructions?
4    A.   Just trying to find out was he incarcerated
5  and talk to a bails bondman about trying to get him
6  out.
7    Q.   And how were you supposed to try to find
8  that out?
9    A.   Try to find what out?  If he was in jail?
10   Q.   Yes.
11   A.   By giving the jail his name.
12   Q.   Okay.  And were you able to find out any
13 information about John Taylor and whether he was
14 incarcerated?
15   A.   Yes.
16   Q.   And what were you supposed to do with that
17 information once you found it out?
18   A.   Give it to a bails bondman.
19   Q.   Who was telling you to do these things as
20 far as finding out information about John Taylor?
21   A.   Azibo.
22   Q.   Who?
23   A.   Azibo.
24   Q.   And were you also having, during this time
25 period, discussions with Azikiwe?

2158

1    A.   Yes.
2    Q.   And what did you discuss with Azikiwe with
3  regard to John Taylor?
4    A.   That I was found out his name and that he
5  was incarcerated and that I would try to get him
6  out.
7    Q.   How were you going to try to get him out?
8    A.   With the bails bondman.
9    Q.   And how were you going to get the money to
10 bail him out?
11   A.   Was going to use the truck money.
12        MR. SHEEHAN:  I'm sorry?  I didn't hear.
13 The money?
14   A.   Truck money.
15        MR. SHEEHAN:  Thank you.  I'm sorry.
16 Thank you, your Honor.
17   Q.   Did you receive instructions to get money
18 from anyone else?
19   A.   Not that I can really remember.
20   Q.   Do you know whether or not Azikiwe was
21 trying to get money to help bond John Taylor out?
22   A.   Yes.
23   Q.   And did you discuss that with Azikiwe?
24   A.   No.
25   Q.   Do you know why the defendant wanted to

2159

1  bond John Taylor out?
2        MR. SHEEHAN:  Object to the form of that
3  question, your Honor.
4        THE COURT:  Does she know.
5        MR. SHEEHAN:  We need a foundation.
6        THE COURT:  The question is do you know
7  why the defendant wanted to bond John Taylor out.
8    A.   I just believed that he was trying to get a
9  friend out of jail.  That was my understanding.
10   Q.   And how did you know that?  Who told you
11 that?
12   A.   Who told me what?
13   Q.   How did you come to that understanding as
14 to why you were trying to bond him out?
15   A.   Because I never really asked any questions.
16 It was just something that I -- because I knew that
17 was his friend.
18   Q.   And this is the same John Taylor that went
19 down south with you all on the trip?
20   A.   Yes.
21   Q.   Did you know what John Taylor was doing for
22 a living at that time?
23   A.   No, I do not.
24   Q.   And what was the defendant doing for a
25 living at the time that you were dating him?

2160

1    A.   Car wash.  Working at the car wash.
2    Q.   Do you know if he made money doing anything
3  else?
4    A.   I know he sold weed from time to time.
5    Q.   Do you know if he sold any other drugs?
6    A.   No.
7    Q.   You don't know?
8    A.   No.
9    Q.   You remember testifying, though, that you
10 took a package that Womble gave you over to Charles
11 Street?
12   A.   Yes.
13   Q.   Did the little baggies that you previously
14 described when you testified, the little small
15 baggies, was that weed or was that some other drug,
16 as you said?
17   A.   It wasn't weed, it was -- I'm not sure what
18 it was, but it wasn't weed.
19   Q.   It was some other drug?
20   A.   Yes.
21   Q.   And when you took those packages over -- or
22 that package over to Charles Street and you dropped
23 it off, did you -- well, let me ask you this:  You
24 had also testified earlier today that you collected
25 some money a couple of times from Azikiwe at Charles

2161

```
1   Street.
2       A.   Yes.
3       Q.   And who did you give that money to?
4       A.   Azibo.
5       Q.   And again, how old were you when you were
6   dating the defendant?
7       A.   I was 17 going on 18.
8       Q.   At that time did you use any drugs?
9       A.   Yes.
10      Q.   What drugs did you --
11      A.   Before I got pregnant?
12      Q.   Before you got pregnant.
13      A.   Yes.
14      Q.   And what drugs did you use at that time?
15      A.   I smoked marijuana.
16      Q.   Did you ever use any other drugs?
17      A.   No.
18      Q.   Did you ever sell any drugs?
19      A.   No.
20          MS. REYNOLDS:  Your Honor, at this time
21  we would move on and play what's been marked as
22  Government Exhibit 604A, which is the portion of the
23  call, and the corresponding transcript in the binder
24  is 604B.
25          THE COURT:  All right.
```

2162

```
1           MS. REYNOLDS:  Playing 604A.
2           (Tape played.
3       Q.   And, Ms. Pettway, in this phone call in
4   604A that was just played, when you are reporting to
5   the defendant that in the beginning there, "Got
6   locked up," when you say "I'm about to tell you the
7   skinny, the skinny old guy," when you go on to say
8   "got locked up and they won't let him out, they said
9   something to do with some feds or something," who
10  were you referring to when you were talking about
11  the "skinny old guy"?
12      A.   Pops.
13      Q.   And when you go on to say, "I was told this
14  yesterday, last night.  And they been took the
15  Puerto Rican one, took the Puerto Rican girl.  Cause
16  she violated her probation."  Who were you referring
17  to?
18      A.   The Puerto Rican lady that I met in the
19  hallway.
20      Q.   And throughout this time period, do you
21  remember approximately how many times the defendant
22  would call you from jail?
23      A.   What do you mean, like a day?
24      Q.   Yeah, in a -- on average in a day?
25      A.   Sometimes two or three.
```

2163

```
1       Q.   Sometimes two or three times a day?
2       A.   Yeah.
3       Q.   And would you receive instructions from him
4   at that time of things to do?
5       A.   Yes, about some stuff, yes.
6       Q.   And then in subsequent conversations what
7   were you supposed to do with any information that
8   you had?
9       A.   Any information that I had?
10      Q.   If you got any information about anyone the
11  defendant asked about, did you report it to the
12  defendant?
13          MR. SHEEHAN:  Objection, leading.
14      A.   I'm lost.
15          MR. SHEEHAN:  Leading, your Honor.
16          THE COURT:  Sustained.  Rephrase.
17          MS. REYNOLDS:  I'll withdraw and I'll
18  rephrase, your Honor.
19      Q.   Did you obtain information throughout this
20  time period of September 2005 about different people
21  and what was happening to them?
22      A.   Yes, the three people we have talked about.
23      Q.   And what did you do with that information
24  once you got it?
25      A.   I told Azibo.
```

2164

```
1           MS. REYNOLDS:  And, your Honor, moving
2   on to 605A.  And that transcript actually is in the
3   front of the binders.  That's 605B.
4           So playing 605A.
5           (Tape played)
6           MR. SHEEHAN:  May I just -- could I
7   just -- can I ask the Court's indulgence for one
8   second?  You said in the beginning of the binder?
9           I'm sorry, maybe there was just -- thank
10  you, your Honor.  I appreciate that.
11          THE COURT:  Do you want to start over?
12          MS. REYNOLDS:  We will start that one
13  over so everyone can follow along again.  It's 605A,
14  corresponding transcript is 605B, which is in the
15  front of the binders.
16          (Tape played)
17      Q.   Again, Ms. Pettway, in the phone call we
18  just listened to, which is contained on Government's
19  Exhibit 605A, there is references to Ozzie.  Who is
20  Ozzie?
21      A.   Azikiwe.  Azikiwe.
22      Q.   That's another name for Azikiwe?
23      A.   Yes.
24      Q.   Did you know Azikiwe by any other nicknames
25  other than Ozzie?
```

2165

```
1      A.   And Zee.
2      Q.   I'm sorry?
3      A.   Zee.
4      Q.   And, again, what were you discussing here
5  with the defendant with regard to John Taylor and
6  his bond?
7      A.   That basically no one wanted to get him out
8  because that he had more charges than what we knew
9  about and nobody didn't trust to bail him out
10 because they didn't know if he was going to come to
11 court and the bond was too high.
12     Q.   And, again, were you able to obtain any
13 money to bond Taylor out?
14     A.   No.
15     Q.   Do you know whether or not Azikiwe was able
16 to get the money to bond John Taylor out?
17     A.   No.
18     Q.   You don't know or he didn't?
19     A.   I don't know, because I never tried again
20 after that.
21     Q.   What do you mean you never tried again?
22     A.   To bond him out after I found out he had
23 more charges.
24     Q.   And did you tell the defendant that you
25 were going to stop trying to bond him out?
```

2166

```
1      A.   Yes.
2      Q.   What was his reaction to that?
3      A.   He said okay.
4      Q.   Now, Ms. Pettway, prior to testifying
5  today, did you also have an opportunity to listen to
6  a voicemail recording?
7      A.   Yes.
8      Q.   And I'll show you what I'll demark
9  Government's Exhibit 609 and ask you to take a look
10 at this and see if you recognize if this contains
11 the voicemail message that you listened to.  Okay,
12 do you recognize that?
13     A.   Yes.
14     Q.   And how do you recognize it?
15     A.   That's a voicemail from --
16     Q.   Well, without telling us what's on it.
17 Does this have your initials and it's dated?
18     A.   Yes.
19     Q.   And does this contain the voicemail message
20 that you listened to prior to testifying here today?
21     A.   Yes.
22          MS. REYNOLDS:  Your Honor, at this time
23 I would offer Government's Exhibit 609 subject to
24 connection with another witness who would explain
25 how this was obtained.
```

2167

```
1          MR. SHEEHAN:  No objection subject to
2  connection.
3          THE COURT:  All right, you may proceed.
4  It's a full -- it's a full exhibit for now.
5          MS. REYNOLDS:  Playing -- just making
6  sure it's the right call, your Honor.  So playing at
7  this time Government's 609.
8          (Tape played)
9      Q.   And whose voice was that on the voicemail?
10     A.   Azibo.
11     Q.   Ms. Pettway, did you know if the defendant
12 helped bond anybody else out of jail?
13     A.   No.
14     Q.   And what did Azikiwe or Ozzie, or Zee, do
15 for a living?
16     A.   I don't know.
17          MS. REYNOLDS:  If I could just have a
18 moment, your Honor.
19     Q.   I'm just going to go back to -- you
20 previously testified when you were living at Seleana
21 Bember's house over on Boston Ave -- I just wanted
22 to ask you a few more questions about that time
23 period.
24     A.   Okay.
25     Q.   All right?  And you had indicated when you
```

2168

```
1  testified before that you and Seleana and one other
2  person, I forget who it was, went over to Read
3  Street to remove some items?
4      A.   Yes.
5      Q.   What was it that you removed from Read
6  Street?
7      A.   Everything that was in the house,
8  furniture, clothes.  That's what I removed to the
9  U-Haul.
10     Q.   Do you remember some plastic containers
11 with stuff inside of them?
12          MR. SHEEHAN:  Objection, leading.
13          THE COURT:  Sustained.
14     Q.   Do you remember more specifically what
15 types of items you removed from the house with
16 Seleana Bember?
17     A.   It was clothes, bags of all his mail in
18 there.  Furniture, boxing equipment.  There might
19 have been some bins.  But I was pregnant, I didn't
20 really touch anything.
21     Q.   Okay.  You said there might have been some
22 bins.  What types of bins?
23     A.   Plastic bins.
24     Q.   Like container bins?
25          MR. SHEEHAN:  Objection, leading.
```

**GA542**

2169

```
1              THE COURT:  Sus --
2       Q.   Can you describe the type of bins?
3       A.   Like you would buy from Wal-Mart and keep
4    clothes in it.
5       Q.   And you mentioned some bags.  What type of
6    bags?
7       A.   Plastic bags like from the grocery store.
8       Q.   And any other types of bags that you
9    removed?
10      A.   I really can't remember.  There might have
11   been some plastic baggies of like empty, clear that
12   you might use to put weed or other things in it.
13      Q.   Little baggies?
14      A.   Yeah.
15      Q.   And at whose -- well, why was it that you
16   went over to Read Street with Seleana to remove all
17   of the stuff in there?
18      A.   Because I couldn't afford to keep the rent
19   up.
20      Q.   Whose stuff were you removing from Read
21   Street, Ms. Pettway?
22      A.   Azibo's.
23      Q.   And where did you take all that stuff that
24   you removed from Read Street, all of the defendant's
25   stuff?
```

2170

```
1       A.   Some of it went to the U-Haul.
2       Q.   And where did the rest of it go?
3       A.   To Seleana's house.
4       Q.   And when you were living at Seleana's
5    house, did you see where Azibo's stuff was within
6    Seleana's house?
7       A.   In the porch.
8       Q.   On the porch?
9       A.   Yes.
10      Q.   Did you have an opportunity to look inside
11   whatever bags or bins were on the porch to see what
12   was contained in there?
13      A.   No.
14           MS. REYNOLDS:  One moment, your Honor.
15      Q.   And at this time when you were living with
16   Seleana Bember over on Boston Ave., which room were
17   you living in?
18      A.   All the way in the back of the apartment.
19      Q.   And that was a separate bedroom?
20      A.   Yes.
21      Q.   And why was it some of the defendant's
22   stuff was brought over to storage and some was
23   brought over to the house you were living in with
24   Seleana?
25           MR. SHEEHAN:  Objection to the form of
```

2171

```
1    the question, your Honor.  It assumes she has
2    personal knowledge.
3              THE COURT:  Is the question why did she
4    take it?
5              MR. SHEEHAN:  I think the question was
6    why was it.
7              THE COURT:  Do you want to rephrase,
8    something that would be within her knowledge.
9              MS. REYNOLDS:  I thought she just
10   testified that they took the stuff, but yes, I'll
11   rephrase, your Honor.
12      Q.   With regard to the defendant's stuff that
13   you and Seleana took out of Read Street, do you know
14   why some stuff was brought over to Seleana's house?
15      A.   No, I do not.  I know as far as like
16   blankets and stuff, they didn't want to put them in
17   the U-Haul, they were nice and they were going to
18   keep it, but never asked no questions.  And plus
19   another reason was I couldn't afford to get a bigger
20   storage.
21      Q.   And did you -- you testified about the
22   letter and some of those attachments to the letter.
23   Did you have any police reports or any things like
24   what was contained in that letter other than the
25   ones that you got from the defendant?  Did you,
```

2172

```
1    yourself, keep any police reports lying around the
2    house?
3       A.   No.
4       Q.   And, again, you testified that when the
5    police came over to Seleana's house to execute the
6    search warrant you were there, right?
7       A.   Yes.
8       Q.   And did you indicate at that time which
9    bedroom was your bedroom?
10      A.   Yes, I did.
11      Q.   And did you give them consent to search
12   your bedroom?
13      A.   No, I don't remember that.
14      Q.   Did you see where the officers -- well, did
15   you see if the officers removed any items from
16   Seleana's house?
17      A.   At the time no, because of where I was
18   sitting inside of the house.  I don't know
19   exactly -- I didn't see what they exactly took.
20           MS. REYNOLDS:  Okay.  And if I could
21   just have a moment, your Honor, I just have to grab
22   an exhibit.
23      Q.   I'm just going to show you what's in
24   evidence as Government Exhibit 201B.  And do you see
25   here who this magazine is addressed to?
```

2173

1    A.    Yes.
2    Q.    And what does it say there?
3    A.    Azibo Smith.
4    Q.    And does it have an address?
5    A.    201 Read Street.
6    Q.    Is that where you lived, Read Street, with
7 Azibo?
8    A.    Yes.
9    Q.    And who is Azibo Smith?
10    A.    Azibo Aquart.
11    Q.    He also went by Smith?
12    A.    Yes.
13    Q.    And showing you some other items.  Showing
14 you starting with Government's Exhibit 201E in
15 evidence, do you recognize this, what's contained in
16 this exhibit?
17    A.    No.
18    Q.    Did you see Azibo, the defendant, with any
19 guns or ammunition when you were dating him?
20    A.    No.
21    Q.    Showing you Government's Exhibit 201H, do
22 you recognize what's contained in that exhibit?
23    A.    No.
24    Q.    And showing you Government's Exhibit 201G,
25 do you recognize this?

2174

1    A.    No.
2    Q.    And then showing you Government's
3 Exhibit 201F, do you recognize what this is?
4    A.    No.
5    Q.    And are any of those items yours?
6    A.    No.
7         MS. REYNOLDS:  No further questions at
8 this time, your Honor.
9         THE COURT:  All right,
10 cross-examination.
11         MR. SHEEHAN:  Thank you, your Honor.
12         THE COURT:  You may proceed.
13 CROSS-EXAMINATION BY
14 BY MR. SHEEHAN:
15    Q.    Ms. Pettway, my name is Michael Sheehan.
16 I'm one of the lawyers for Azibo.  One of the
17 questions the government asked you was about Seleana
18 Bember.
19    A.    Yes.
20    Q.    And that was somebody that the defendant
21 referred to as his mother, was it not?
22    A.    Yes.
23    Q.    You knew that wasn't his biological mother?
24    A.    Yes.
25    Q.    You knew his mom was dead?

2175

1    A.    Yes.
2    Q.    All right.  And Azibo Smith, Smith is his
3 mom's name, right?  Did you know that?
4    A.    Yes.
5    Q.    Okay.  Fair to say you are not happy about
6 being here in this situation?
7    A.    No, I'm not.
8    Q.    Not at all?
9    A.    Not at all.
10    Q.    And the whole thing has you feeling very
11 uncomfortable, doesn't it?
12    A.    Yes.
13    Q.    And you met Azibo when you were 17, right?
14    A.    Yes.
15    Q.    You just graduated from the Job Corps?
16    A.    Yes, yes.
17    Q.    And Azibo would come to your house and talk
18 to you?
19    A.    Yes.
20    Q.    Initially.  And after a few months that
21 relationship got serious, right?
22    A.    Yes.
23    Q.    And then at some point in time you found
24 out that you were pregnant with his baby?
25    A.    Yes.

2176

1         MR. SHEEHAN:  I wonder, your Honor, I
2 have the -- I'm going to offer -- it's marked
3 Government Exhibit 243, and with the record
4 reflecting that, I'll just offer it at this time.  I
5 can put another marking on it.  Whatever the Court
6 thinks might make sense.
7         MS. DAYTON:  Your Honor, there is a
8 stipulation we've entered into.  They're medical
9 records and the government and the defense have
10 stipulated to their authenticity.  It's Government
11 Exhibit 243, and 243A is the stipulation.
12         MR. SHEEHAN:  And I --
13         THE COURT:  Maybe we should keep it
14 marked the same way if the stipulation uses that
15 number.
16         MR. SHEEHAN:  What I'll do, your Honor,
17 is -- it did not get eaten by my desk.  With the
18 court's permission -- show my ignorance again.
19         The Court's permission I would just read
20 to the jury about Government Exhibit 243A.  That "It
21 is hereby stipulated and agreed by and between the
22 United States of America, by Assistant United States
23 Attorney Tracy Lee Dayton, and the defendant Azibo
24 Aquart, by his lawyers Michael Sheehan and Justin
25 Smith, as follows:  If called to testify, Marie

**GA544**

2177

```
1   Cohen, a custodian of records for the Bridgeport
2   Hospital in Bridgeport, Connecticut, would state
3   that Government Exhibit 243 is a fair and accurate
4   copy of the medical records maintained in the
5   ordinary course of business by Bridgeport Hospital,
6   and Dr. Edward Luchansky, for medical treatment
7   provided to Shante Pettway between January 18, 2005,
8   and October 30, 2005.
9           "And it is hereby stipulated and agreed
10  that Government Exhibit 243 and the stipulation are
11  admissible in evidence."
12          And thereafter it is signed by the
13  lawyers in the case.
14          THE COURT:  All right, then 243 and 243A
15  are full exhibits.
16          MR. SHEEHAN:  And 243, that, your Honor,
17  is the actual records of the Bridgeport Hospital
18  noted on the bottom as 243.
19     Q.   And I take it, Ms. Pettway, you authorized
20  the government to get a copy of your medical
21  records, didn't you?
22     A.   Yes.
23     Q.   Okay.  And basically what these medical
24  records reflect -- did you ever see these?
25     A.   No.
```

2178

```
1      Q.   Okay.  And at the second -- at the third
2   page of those records -- fourth page of those
3   records, it reports that you were 17 years old at
4   the time, correct?
5      A.   Yes.
6      Q.   It was an unplanned pregnancy, but you were
7   happy and you were not on contraception at the time.
8   Correct?
9      A.   Yes.
10     Q.   And the father of the baby was involved and
11  happy.  That's what you told your doctors at that
12  time, right?
13     A.   Which time was this now?
14     Q.   Well, back when you first went in for your
15  visits?
16     A.   Okay.  Yes.
17     Q.   Yeah.  And at the time that you found out
18  that you were pregnant, you and your mom were having
19  some real difficulties, weren't you?
20     A.   Yes.
21     Q.   Okay.  And then at some point in time you
22  and Azibo moved into the Read Street apartment?
23     A.   Yes.
24     Q.   And then later you moved out, but you
25  continued to have a relationship with him?
```

2179

```
1      A.   Yes.
2      Q.   Right?  And Azibo helped you to get started
3   at the -- in your CNA school?
4      A.   Yes.
5      Q.   And he was trying to help you to get ahead
6   at that period of time, right?
7      A.   Yes.
8      Q.   He would pick you up from school?
9      A.   Yes.
10     Q.   Help you with your homework?
11     A.   Yes.
12     Q.   And to you, anyway, he appeared interested
13  in your life, right?  He seemed interested in your
14  life?
15     A.   Oh, yes.
16     Q.   And he would actually go to doctors'
17  appointments with you, would he not?
18     A.   Yes.
19     Q.   And when you were pregnant you would
20  sometimes have these funny food cravings, wouldn't
21  you?
22     A.   Yes.
23     Q.   And he would take you to Chinese
24  restaurants?
25     A.   Yes.
```

2180

```
1      Q.   Or to TGIF's?  That was a place you liked
2   to go to, right?  Do you want some water?  Would
3   that be helpful, or a Kleenex?  How about a little
4   water.
5           And you'd often watch movies together.
6      A.   Yes.
7      Q.   And in the morning you had to get up and go
8   to school pretty early during that time, did you
9   not?
10     A.   Yes.
11     Q.   And even when you were not living together
12  Azibo would come and take you for breakfast and then
13  bring you to school?
14          MS. REYNOLDS:  Your Honor, I object as
15  to the relevance to all of this.
16          MR. SHEEHAN:  Your Honor, I think it's
17  relevant.  I think the timing is relevant, your
18  Honor.
19          MS. REYNOLDS:  He hasn't asked about
20  timing.
21          THE COURT:  Do you want to specify the
22  timing.
23     Q.   In the summer of 2005?
24     A.   Yes.
25     Q.   Okay.  And when Azibo got arrested, you
```

2181

```
1    were about seven to eight months pregnant?
2        A.   Yes.
3        Q.   And after he got arrested, is it fair to
4    say that you were contacted on numerous occasions by
5    federal law enforcement people?
6        A.   Yes.
7        Q.   And it seemed like they were following you
8    everywhere, right?
9        A.   Yes.
10       Q.   In late September they came out with a
11   warrant to seize the truck that you've talked about,
12   the Tahoe, right?
13       A.   Yes.
14       Q.   And that search involved both federal and
15   state officials, did it not?
16       A.   I'm not really sure.
17       Q.   Okay.  Did they tell you who they were?
18       A.   Yes.
19       Q.   All right.  And let me ask you, on the
20   tapes that we heard -- well, actually maybe not on
21   the tapes we heard, but another name that Azibo used
22   was Jumbo, right?
23       A.   Yes.
24       Q.   Okay.  And that was a name that some of his
25   friends called him by?
```

2182

```
1        A.   Yes.
2        Q.   And the feds, federal law enforcement when
3    they came to seize that Tahoe, they were asking you
4    a lot of questions about Jumbo, were they not?
5        A.   Yes.
6        Q.   And in late September they were telling you
7    that you might go to jail for lying?
8        A.   They stated that I could possibly go to
9    jail.
10       Q.   Okay.  And then they -- what they wanted
11   you to do was to come in to the FBI and talk to
12   them, right?
13       A.   Yes.
14       Q.   And you did?
15       A.   Yes.
16       Q.   And the first time you went in there was in
17   early October of 2005, was it not?
18       A.   Yes.
19       Q.   Now, when was Angel born?
20       A.   October 2006.
21       Q.   Okay.
22       A.   I mean, I'm sorry.
23       Q.   2005, right?
24       A.   Yes.
25       Q.   And Angel is the child that you and Azibo
```

2183

```
1    have together, right?
2        A.   Yes.
3        Q.   And what's her birthday; if you remember?
4        A.   October 26, 2005.
5        Q.   All right.  So, in early October when you
6    went in to see the federal law enforcement, you were
7    quite pregnant, were you not?
8        A.   Yes.
9        Q.   And you had just turned 18, had you not?
10       A.   Yes, in August.
11       Q.   In August.  And you didn't have a lawyer
12   with you at that time, did you?
13       A.   No.
14       Q.   And you didn't go in with your mom, did
15   you?
16       A.   No.
17       Q.   You didn't go in with your dad?
18       A.   No.
19       Q.   You didn't have any other adult with you,
20   did you?
21       A.   No.
22       Q.   There were no adults with you that you
23   trusted when you went to see them, right?
24       A.   No.
25       Q.   And do you remember the people who were at
```

2184

```
1    that first meeting in October for the government?
2        A.   I only could remember Syrax.
3        Q.   Okay, and that's Michael Syrax who was the
4    FBI agent?
5        A.   Yeah.  And a captain, but I don't remember
6    her name.
7        Q.   Okay.  Do you think that looking at a
8    document might refresh your recollection as to who
9    was there?
10       A.   Yes, it's very possible.
11       Q.   All right.
12            MR. SHEEHAN:  I'm just going to ask if
13   we could just bring up 2208.
14       Q.   And just see if looking at that document --
15            MR. SHEEHAN:  The date on that is 11 --
16   no, do you know what I apologize, I got the wrong
17   one.
18            THE COURT:  We are at 3:30.  Should we
19   stop?
20            MR. SHEEHAN:  That will be great, your
21   Honor.
22            THE COURT:  Let's do that, ladies and
23   gentlemen.  See you tomorrow at 9:30.  And Thursday
24   we start at nine.
25            (Jury exited the courtroom)
```

2185

```
1              THE COURT:  All right, Ms. Pettway,
2   you'll need to come back tomorrow at 9:30.  Please
3   don't discuss your testimony with anyone.  All
4   right?
5              THE WITNESS:  Okay.
6              MS. REYNOLDS:  Your Honor, if we can
7   just put on the record, because this witness has
8   some similar issues with her employer, I know I
9   can't have any contact with her, but I am going to
10  get information as to who to fax a letter to so that
11  we can alert the employer, because she came here
12  today because it's her day off and we had made
13  arrangements, but we want to be able to make sure
14  she doesn't run into the same problems.  So I'd like
15  to just get the information of her employer, fax the
16  letter today.
17             MR. SHEEHAN:  Your Honor, I would have
18  no objection to counsel talking to Ms. Pettway's
19  lawyer giving him information.  I understand that he
20  is here today, and then perhaps he might be of
21  assistance in that regard.
22             THE COURT:  All right.  Very good.  Then
23  we'll see you all tomorrow.  Thank you.
24             We stand in recess.
25             (Proceedings concluded 3:30)
```

2186

```
1                    I N D E X
2
3   WITNESS                                    PAGE
4   RANDI WASHINGTON
5   Continued Direct Examination by        1976
    Ms. Reynolds
6
7   Cross-Examination by Mr. Smith         2035
8   Redirect Examination by Ms. Reynolds   2085
9   Recross-Examination by Mr. Smith       2091
10
11  SHANTE PETTWAY
12  Direct Examination by Ms. Reynolds     2097
13  Cross-Examination by Mr. Smith         2174
14
15
16
17            I certify that the foregoing is a
18  correct transcript from the record of proceedings in
19  the above-entitled matter.
20                  5/4/11
21                   Date
22
23               /S/  Sharon Montini
24                Official Reporter
25
```

2187

```
1              UNITED STATES DISTRICT COURT
2                 DISTRICT OF CONNECTICUT
3   * * * * * * * * * * *      *
                               *
4   UNITED STATES OF AMERICA,  * Case No 6cr160(JBA)
5            Plaintiff,        *
                               *
6        vs.                   *
                               *
7   AZIBO AQUART              * May 4, 2011
                               *
8            Defendant.        *
                               *
9   * * * * * * * * * * * *     *
10              TRIAL TRANSCRIPT
11                 VOLUME X
12  BEFORE:  THE HONORABLE JANET BOND ARTERTON U.S.D.J.,
                                        and jury
13  Appearances:
14  FOR THE GOVERNMENT:  ALINA REYNOLDS, ESQ
                         TRACY DAYTON, ESQ.
15                       PETER MARKLE, ESQ.
                         JACABED RODRIGUEZ-COSS
16                       United States Attorney's Office
                         915 Lafayette Blvd
17                       Bridgeport, CT 06604
18
19  FOR THE DEFENDANT   MICHAEL SHEEHAN, ESQ
    AZIBO AQUART:       Sheehan & Reeve
                        139 Orange Street
20                      New Haven CT 06510
21                      JUSTIN SMITH, ESQ.
                        383 Orange Street
22                      New Haven, CT 06511
23
    Court Reporter:     Sharon Montini, RMR
24
    Proceedings recorded by mechanical stenography,
25  transcript produced by computer
```

2188

```
1              THE COURT:  Good morning, Counsel.
2   Ladies and gentlemen.  Mr. Aquart.  Ms. Pettway.
3   Please be seated.
4              MR. SHEEHAN:  Good morning, your Honor.
5              THE COURT:  We are now ready to proceed,
6   are we?
7              MR. SHEEHAN:  We are, your Honor.
8              THE COURT:  All right.  And we will
9   bring in the jury.
10             (Jury entered the courtroom.)
11             THE COURT:  Good morning, ladies and
12  gentlemen.  We have almost everybody.  Please be
13  seated.  I apologize for the unexpected scheduling
14  difficulties that got us off to a late start this
15  morning.
16             We'll continue with cross-examination of
17  Shante Pettway by Mr. Sheehan.
18             You may proceed.
19             MR. SHEEHAN:  Thank you, your Honor.
20           S H A N T E   P E T T W A Y
21  Having previously affirmed, was examined and
22  testified as follows:
23  CONTINUED CROSS-EXAMINATION
24  BY MR. SHEEHAN:
25      Q.   Good morning, Ms. Pettway.
```

2189

1    A.   Good morning.
2    Q.   I wanted to go back to a couple of things
3  you testified to yesterday.
4    In the summer of 2005, you didn't have a
5  cell phone, did you?
6    A.   I don't remember.  I think I did.
7    Q.   You had a land line coming into your house
8  on Newfield Street.
9    A.   Yes.
10   Q.   All right.  Remember yesterday when the
11 government asked you about that voicemail?
12   A.   Yes.
13   Q.   Do you recall when it was that you met with
14 the government to listen to that voicemail?
15   A.   Maybe about a week ago.
16   Q.   And you wouldn't -- you really didn't call
17 Dreddy very often and get a voice message, did you?
18 Azibo, I'm sorry.
19   A.   No.
20   Q.   And how many times did you listen to that
21 voicemail before you thought it might be Dreddy's?
22   A.   About two or three times.
23   Q.   Okay.  And were you asked to compare that
24 with anybody else's voice?
25   A.   No.

2190

1    Q.   And are you sure that's Azibo's voice?
2    A.   It sounds like it.
3    Q.   I asked you a little bit, I think the
4  government asked you, and then I asked you a little
5  bit about your school program.  You got your CNA
6  degree in 2005.
7    A.   Yes.
8    Q.   And to do that you were going to classes.
9    A.   Yes.
10   Q.   And what time were those classes in the
11 summer of 2005?
12   A.   They were in the morning.
13   Q.   Early?
14   A.   Yeah.  Pretty early.
15   Q.   And directing your attention to -- do you
16 recall when you went on that trip down south?  That
17 was around your birthday, right?
18   A.   Yes.
19   Q.   And then you came back to Bridgeport from
20 the trip, right?
21   A.   Yes.
22   Q.   And did you continue your program after you
23 came back?  You were still going to school?
24   A.   Yes.
25   Q.   And was that every day of the week?

2191

1    A.   Yes.
2    Q.   And was Azibo giving you a ride, picking
3  you up in the morning and taking you to class every
4  day during that period of time?
5    A.   Yes, he stayed with me at night and brought
6  me to school in the morning.
7    Q.   Now, I think I left off yesterday asking
8  you about the fact that you -- after they came and
9  seized the truck, they told you -- they asked you to
10 come in and talk to them, right?
11   A.   Yes.
12   Q.   And you told us there was an FBI agent by
13 the name of Syrax there?
14   A.   Yes.
15   Q.   And there was a woman officer.
16   A.   Yeah, I think she was a captain she said.
17   Q.   It was Captain Kerwin.
18   A.   I really don't remember.
19   Q.   All right.
20   And when they saw you on that first time,
21 they told you that they weren't trying to scare you,
22 but your baby's father wasn't coming home anytime
23 soon, right?
24   A.   Yes.
25   Q.   Now, even though they said they weren't

2192

1  trying to scare you, you saw that as kind of scary,
2  right?
3    A.   Yes.
4    Q.   And they already told you you might go to
5  jail for lying.
6    A.   Yes.
7    Q.   So, after those -- they said those things,
8  you answered their questions, right?
9    A.   Yes.
10   Q.   And then do you remember the day on
11 November 29th when you were over there on Boston
12 Avenue and the police came in?
13   A.   Yes.
14   Q.   You had been living for some period of time
15 with Seleana.
16   A.   Yes.
17   Q.   And Seleana Bember was arrested at the
18 house that day, right?
19   A.   Yes.
20   Q.   And the police actually came in the house
21 with a ram, right?  They broke down the door?
22   A.   Yes.
23   Q.   You, in fact, thought it was Seleana who
24 was coming up those stairs?
25   A.   Yes.

2193

1    Q.   And then the next thing, kaboom, the door
2  got broken, right?
3    A.   Yeah, glass splattered everywhere.
4    Q.   And when they came in the apartment, they
5  had their guns out, right?
6    A.   Yes.
7    Q.   And they had the guns pointed at you.
8    A.   Yes.
9    Q.   And you were holding the baby, weren't you?
10   A.   Yes.
11   Q.   And they told you that a warrant for your
12 arrest was getting processed.
13   A.   Yes.
14   Q.   And then they sat you down on the couch.
15 Or was this in a bedroom?  Do you remember where
16 they sat you down?
17   A.   They brought me to the bathroom.
18   Q.   With the baby?
19   A.   No.
20   Q.   Where was the baby?
21   A.   They let Seleana hold her.
22   Q.   Okay.  And then they also had a dog there,
23 right?
24   A.   I really don't remember that part.  I don't
25 know if they could have brought it in when I was in

2194

1  the back.  Because I was in the back the whole time,
2  in the bathroom.
3    Q.   And they started asking you more questions,
4  right?
5    A.   Yes.
6    Q.   And one of the questions they asked you was
7  what were you going to do with the baby if they took
8  you away, right?
9    A.   Yes.
10   Q.   First they told you how nice the baby was.
11   A.   Yes.
12   Q.   She was adorable, right?  That's what they
13 told you.
14   A.   Yes.
15   Q.   And then they said, you don't want to leave
16 her, right?
17   A.   Yes.
18   Q.   And you didn't want to leave her, did you?
19   A.   No.
20   Q.   And you understood this to be a threat to
21 you, didn't you?
22   A.   Yes.
23   Q.   It was kind of like an implied threat,
24 right?
25   A.   What do you mean by that?

2195

1    Q.   Well, they weren't directly saying
2  something, they were kind of indirectly threatening
3  you.  That's the way you understood it, right?
4    A.   Yes.
5    Q.   And then they made a direct threat to you,
6  right?
7    A.   Yes.
8    Q.   They told you you don't want to be the
9  second girlfriend locked up, right?
10   A.   Yes.
11   Q.   And, in fact, they told you that Rodney's
12 girlfriend had been locked up already, right?
13   A.   Yes.
14   Q.   And you perceived this as a threat to you,
15 didn't you?
16   A.   Yes.
17   Q.   And you really didn't have any -- anybody
18 to give the baby to at that time, did you?
19   A.   No.
20   Q.   And you sure didn't want to give the baby
21 to anybody, right?
22   A.   Correct.
23   Q.   And so then they told you to come down
24 there the next day and talk to them, right?  Down to
25 the FBI.

2196

1    A.   I don't know if it was the next day.  They
2  sent DCF to the house the next day.
3    Q.   Okay.  And shortly thereafter, you did go
4  down and meet with them again, right?
5    A.   Yes.
6    Q.   And again, that captain was there, the lady
7  police officer.
8    A.   Yes.
9    Q.   And Special Agent Syrax was there from the
10 FBI.
11   A.   Yes.
12   Q.   And do you remember Detective Martinez
13 being there from the Bridgeport Police Department?
14   A.   Those are the only two I remember, is Syrax
15 and the captain.  I don't know anybody else by their
16 name.
17   Q.   And were there other people there when they
18 were asking you these questions?
19   A.   Yes.
20   Q.   And, again, you didn't have a lawyer with
21 you, did you?
22   A.   No.
23   Q.   And you didn't have another adult with you,
24 did you?
25   A.   No.

2197

```
1      Q.   And then you answered their questions.
2      A.   Yes.
3      Q.   And later on at some time down the road
4  they actually provided you with some financial help
5  to allow you to move, right?
6      A.   Yes.
7      Q.   Something towards your rent and moving
8  expenses and a security deposit.
9      A.   Yes.
10         MR. SHEEHAN:  I don't have any more
11 questions.  Thank you, your Honor.
12         THE COURT:  Thank you.  Let's have
13 redirect, please.
14 REDIRECT EXAMINATION
15 BY MS. REYNOLDS:
16     Q.   Ms. Pettway, on that time when the officers
17 came to arrest Seleana, they found drugs on Seleana,
18 right?
19     A.   I think they found it in her room under
20 something.
21     Q.   So, that was in the house you were living
22 in with your child.
23     A.   Correct, yes.
24     Q.   And Ms. Pettway, you were just asked some
25 questions about that day and when Seleana was
```

2198

```
1  arrested with the drugs and then you started to --
2  you went on some interviews -- or you were
3  interviewed after that, right?
4      A.   Yes.
5      Q.   And since that time, you've been
6  interviewed several times.
7      A.   Yes.
8      Q.   And did you lie or did you actually go and
9  deliver drugs to Charles Street that you got from
10 Womble?
11         MR. SHEEHAN:  Objection.  It's outside
12 the scope of cross.
13         THE COURT:  I'm going to sustain that.
14 The issue of the interviews was covered in cross.
15 The substance of what she did was not.  But it may
16 be that you can -- you wish to rephrase your
17 question.
18         MS. REYNOLDS:  Okay, your Honor.
19     Q.   Mr. Sheehan asked you a bunch of questions
20 about being threatened.  Do you remember those
21 questions?
22     A.   Yes.
23     Q.   And he asked you a bunch of questions about
24 the interviews you had with the agents and that you
25 didn't have lawyer there or parent or a guardian.
```

2199

```
1  Do you remember that?
2      A.   Yes.
3      Q.   And during those interviews, did you tell
4  the agents what you knew?
5          MR. SHEEHAN:  Objection, your Honor.  I
6  didn't ask that question.  That's outside the scope
7  of the cross.
8          THE COURT:  I'm going to overrule the
9  objection.
10     Q.   Did you talk to the agents during those
11 interviews?
12     A.   Yes.
13     Q.   And did you tell them what you knew?
14     A.   Yes.
15     Q.   Did you also -- or do you remember that you
16 also testified in the Grand Jury?
17         MR. SHEEHAN:  Objection.  Outside the
18 scope of cross.
19         THE COURT:  The subject of her contact
20 with law enforcement was the subject of
21 cross-examination.  I'm going to permit the
22 question.
23     Q.   Did you testify in the Grand Jury in
24 relation to this case?
25     A.   Yes.
```

2200

```
1      Q.   And did you testify two times before the
2  Grand Jury in relation to this case?
3          MR. SHEEHAN:  Same objection.
4          THE COURT:  Overruled.
5      Q.   Did you testify more than once in the
6  Grand Jury?
7      A.   Yes.  I think so.
8      Q.   And do you remember at the beginning of
9  your Grand Jury testimony being asked some questions
10 by the prosecutor at the time, Jim Glasser, about
11 your rights, the rights that you had?  Do you
12 remember those questions?
13         MR. SHEEHAN:  Objection, your Honor.
14 Outside the same objection.
15         THE COURT:  I think it is the theme of
16 being threatened.  I'm going to permit the question
17 so long as it's not getting into the substance.
18     Q.   So, Ms. Pettway, at the beginning of your
19 Grand Jury testimony, and even prior to going into
20 the Grand Jury, do you remember having some
21 discussions with the prosecutor, Jim Glasser, about
22 your rights to a lawyer, for example?
23     A.   At that time, yes.
24     Q.   And you were given those rights in the
25 Grand Jury prior to your testimony.  Do you remember
```

2201

```
1    that?
2             MR. SHEEHAN:  Objection, your Honor.
3    The same objection.
4             THE COURT:  Overruled.
5        A.   Yes.
6        Q.   And do you remember being told by the
7    prosecutor that you were not a target of the
8    investigation; that he did not intend to charge you
9    with any crimes?  Do you remember that at the
10   beginning?
11            MR. SHEEHAN:  Objection to the form of
12   the question, and also the same objection
13   previously.
14            THE COURT:  It's a leading question,
15   please rephrase.
16            MS. REYNOLDS:  I'll rephrase it.  Sorry.
17       Q.   Do you remember what the prosecutor, Jim
18   Glasser, told you at the beginning of your
19   Grand Jury testimony?
20       A.   Yes.
21       Q.   And what did he tell you?
22            MR. SHEEHAN:  Renew my objection, your
23   Honor.  Same grounds.
24            THE COURT:  Overruled.  The issue was
25   opened on cross-examination.
```

2202

```
1        A.   That I could have a lawyer and that I
2    wasn't going to be prosecuted.
3        Q.   And you weren't ever charged in this case,
4    were you?
5        A.   No.
6        Q.   And you were asked some questions about the
7    assistance that the government had given to you over
8    the years.  Mr. Sheehan just asked you about
9    receiving some money.  Do you remember those
10   questions?
11       A.   Yes.
12       Q.   And you had another child a couple of years
13   ago.
14       A.   Yes.
15       Q.   And at that time, is that when you received
16   the assistance in order to find a place to live?
17            MR. SHEEHAN:  Objection to the form of
18   the question.
19            MS. REYNOLDS:  I'll rephrase, your
20   Honor.
21       Q.   When was it that you received assistance
22   from the government in this case?
23       A.   After I had my son.
24       Q.   And when was that?
25       A.   Around December.
```

2203

```
1        Q.   December of what year?
2        A.   2009.
3        Q.   And when you got that assistance, what did
4    you do with it?  That money.  We're talking about
5    money, right?
6        A.   Yes.
7        Q.   And what did you use the money that the
8    government gave you for?
9        A.   My rent.
10       Q.   And Ms. Pettway, you were asked about --
11   you were asked some questions this morning about the
12   defendant staying with you over on Newfield.
13       A.   Yes.
14       Q.   And when the defendant would come stay with
15   you, how would it be -- about what time of night
16   would he show up?  Do you remember?
17            MR. SHEEHAN:  Objection, your Honor,
18   outside the scope of the cross.  That wasn't my
19   question.  That wasn't my question.
20            THE COURT:  The question of his coming
21   over and spending the night before he took her to
22   classes was in cross-examination.  I'm going to
23   permit the government to inquire.
24       Q.   Do you remember what time the defendant
25   would show up when he would come stay with you at
```

2204

```
1    night at Newfield?
2        A.   Sometimes it would be after work.  8:00,
3    nine o'clock at night.
4        Q.   Were there times that he would show up
5    later at night?
6             MR. SHEEHAN:  Objection.  Outside the
7    scope of the cross.
8             THE COURT:  Overruled, it is not.
9        A.   Yes.
10       Q.   On those occasions when the defendant
11   showed up later in the night, how would it be that
12   he would alert you to the fact that he was there?
13            MR. SHEEHAN:  Objection, same basis.
14       Q.   At Newfield?
15            THE COURT:  Overruled.
16       A.   Throwing rocks at my window.
17       Q.   Throwing rocks at the window?
18       A.   Uh-huh (indicating affirmatively).
19       Q.   And do you remember an occasion when the
20   defendant's brother, Azikiwe Aquart, came over in
21   the middle of the night and threw rocks at your
22   window?
23            MR. SHEEHAN:  Objection.  Outside the
24   scope of the cross.
25            THE COURT:  Sustained.
```

2205

```
1      Q.   And Ms. Pettway, you eventually did get a
2  lawyer in this case, is that correct, to represent
3  you?
4           MR. SHEEHAN:  Objection.  That's outside
5  the scope of the cross.
6           THE COURT:  Overruled.
7      A.   Yes.
8           THE COURT:  It all has to do with the
9  issue of threat that was raised in cross.
10     A.   Yes.
11     Q.   And was it during -- well, when was it that
12 you got a lawyer, approximately when?
13          MR. SHEEHAN:  Same objection.
14          THE COURT:  Overruled.
15     A.   About a month ago.
16     Q.   And how was it -- or how did it come about
17 that you got a lawyer to represent you in this case?
18     A.   It was court appointed.
19     Q.   He was court appointed.
20     A.   Yes.
21     Q.   And did you ask during one of your meetings
22 with the government in that time period that you did
23 want a lawyer?
24          MR. SHEEHAN:  Objection to the form of
25 the question, and same objection.
```

2206

```
1           THE COURT:  I'm going to sustain it as
2  to form.
3           MS. REYNOLDS:  I'll rephrase, your
4  Honor.
5      Q.   Whose idea was it -- are you okay?  Do you
6  want some water?  Whose idea was it to get a lawyer?
7      A.   Mines [sic].
8      Q.   And could you afford a lawyer at that time?
9      A.   No.
10     Q.   And you've got a court-appointed lawyer?
11     A.   Yes.
12     Q.   Now, Ms. Pettway, prior to dating the
13 defendant, had you ever delivered a package of drugs
14 to a known drug location like Charles Street?
15          MR. SHEEHAN:  Objection.  Outside the
16 scope of the cross.
17          MS. REYNOLDS:  Your Honor, he started
18 his cross yesterday with a series of questions about
19 how the defendant helped her during this time
20 period.
21          MR. SHEEHAN:  Your Honor, that's outside
22 the scope of cross.
23          THE COURT:  I'm going to sustain the
24 objection.  The inquiry was related to meeting the
25 defendant when she was 17 having just graduated from
```

2207

```
1  Job Corps.  I don't recall that the inquiry went
2  back further before that time.  I'm going to sustain
3  the objection.
4           MS. REYNOLDS:  Your Honor, I'll set a
5  different timeframe.
6      Q.   At the time that you were pregnant do, you
7  remember Mr. Sheehan asking you some questions about
8  your medical records yesterday when he started to
9  question you?
10     A.   Yes.
11     Q.   And you remember Mr. Sheehan asking you
12 some questions about how the defendant went with you
13 to some of your doctor's appointments at that time
14 period when you were pregnant?
15     A.   Yes.
16     Q.   And you remember Mr. Sheehan asking you if
17 the defendant helped you with your homework during
18 that time period?
19     A.   Yes.
20     Q.   And you remember Mr. Sheehan asking you if
21 the defendant took you to breakfast during that time
22 period?
23     A.   Yes.
24     Q.   And during that time period, did the
25 defendant also have you deliver drugs to Charles
```

2208

```
1  Street?
2           MR. SHEEHAN:  Objection.  Outside the
3  scope of the cross.
4           THE COURT:  Overruled.
5      Q.   The drugs that you picked up from Womble.
6  Do you remember you testified about that?
7      A.   Yes.
8      Q.   Did you deliver those to Charles Street?
9      A.   Yes.
10     Q.   Did you also pick up cash from the
11 defendant's brother at Charles Street?
12     A.   Yes.
13          MR. SHEEHAN:  Objection, your Honor.
14 Again, outside the scope of the cross.
15          THE COURT:  Overruled.
16     A.   Yes.
17     Q.   And did the defendant drive you to Charles
18 Street to go deliver the drugs?
19     A.   No.
20          MR. SHEEHAN:  Objection.  Outside the
21 scope of the cross.
22          THE COURT:  The defendant's activities
23 with the witness certainly were the subject of
24 cross.  Overruled.
25     A.   No.
```

2209

```
1       Q.   And did the defendant go with you when you
2  picked up the cash from Azikiwe?
3            MR. SHEEHAN:  Same objection.
4            THE COURT:  Overruled.
5       A.   No.
6       Q.   And you were asked yesterday and again
7  today a series of questions about who was present
8  when you met with federal agents and with the
9  government when you were interviewed.  Do you
10 remember those questions?
11      A.   Yes.
12      Q.   And you were asked yesterday whether
13 parents were brought along for those interviews or
14 an adult that you trusted.  Do you remember those
15 questions that Mr. Sheehan asked you?
16      A.   Yes.
17      Q.   And did the defendant tell you to take a
18 parent with you when you went to deliver drugs to
19 Charles Street or adult that you trusted?
20           MR. SHEEHAN:  A, the form of the
21 question improperly assumes facts.  B, it's outside
22 the scope.
23           THE COURT:  I'm going to sustain it on
24 form.
25           MS. REYNOLDS:  I'll rephrase then, your
```

2210

```
1  Honor.
2       Q.   Who did the defendant -- well, strike that.
3            Did you go with anyone when you delivered
4  the drugs -- when you picked up the drugs from
5  Womble and went to Charles Street?
6            MR. SHEEHAN:  Note my objection.  Same
7  basis.
8            THE COURT:  Overruled.
9       A.   No.
10      Q.   And did you go with anyone when you picked
11 up cash from the defendant's brother?
12      A.   No.
13           MR. SHEEHAN:  Same objection.
14           THE COURT:  Overruled.
15      Q.   And you were asked about the trip down
16 south for your birthday.  Do you remember those
17 questions?
18      A.   Yes.
19      Q.   And did you bring a parent or a guardian or
20 an adult that you trusted with you on that trip down
21 south?
22      A.   No.
23      Q.   And Mr. Sheehan asked you some questions
24 yesterday, again, at that time period when you were
25 pregnant with the defendant's child, and indicated
```

2211

```
1  the defendant was happy.  He was asking you
2  questions about how happy the defendant was.  Do you
3  remember those questions and the medical records
4  that he showed you?
5       A.   Yes.
6       Q.   And did the defendant sound happy to you
7  when he started calling you in September?
8  Specifically September 17, 2005, in Government's
9  Exhibit 603A, did he sound happy to you when he
10 said, "God damn, Shante, listen, this is when I say
11 you're a liar because you don't fucking listen."
12 Did he sound happy to you during that time period?
13           MR. SHEEHAN:  I'm objecting to the form
14 of the question.  I'm also objecting it's outside
15 the scope of the cross.
16           THE COURT:  It's not outside the scope.
17 Do you want -- the choice is replaying that -- do
18 you recall the recording that was played here
19 yesterday?
20           THE WITNESS:  Yes.
21           THE COURT:  Do you want to take a look
22 at the transcript of it to make sure you understand
23 which call Ms. Reynolds is referring to or do you
24 remember it?
25           THE WITNESS:  I would want to look at
```

2212

```
1  it.
2            THE COURT:  Would you give her the
3  transcript, please.
4            MS. REYNOLDS:  Yes.  Just showing the
5  witness Government's Exhibit 603B, which is the
6  transcript for a call marked as 603A, it's a call
7  from September 17, 2005, showing page 2 of the
8  transcript.
9            MR. SHEEHAN:  603A?
10           MS. REYNOLDS:  603A is the call; B is
11 the transcript.
12           THE COURT:  B is the transcript.
13           Do you remember that --
14           THE WITNESS:  Yes.
15           THE COURT:  -- being played or do you
16 need to have it played again?
17           THE WITNESS:  I remember.
18           THE COURT:  Okay.
19      Q.   So, when you participated in that
20 conversation and then when you heard it again, did
21 the defendant sound happy to you?
22      A.   No.
23      Q.   And showing you what's in evidence as
24 Government's Exhibit 504, this is the letter you got
25 from the defendant.
```

2213

1      A.   Yes.

2      Q.   And how far along were you in your

3  pregnancy when you started getting these phone calls

4  and the letter from jail?

5          MR. SHEEHAN:  Objection.  Outside the

6  scope of the cross.

7          THE COURT:  Overruled.  The nature of

8  the relationship between the two was raised in

9  cross.

10     Q.   How pregnant were you when this was going

11  on?

12     A.   I wasn't pregnant when I received that

13  letter.

14     Q.   You weren't pregnant when you received this

15  letter.  Were you pregnant when you received these

16  phone calls we listened to yesterday?  In September

17  of 2005 were you pregnant?

18     A.   Yes.

19     Q.   And how far along were you in September of

20  2005?

21     A.   Maybe around six, seven months.

22     Q.   And do you remember when your child was

23  born?  What's her birthday?

24     A.   October 26, 2005.

25     Q.   All right.  And then taking a look at

2214

1  Government's Exhibit 504, when the defendant wrote

2  "fact" in the margin, underlined, and in bold, "you

3  are still a punk and you still got dues to pay,"

4  exclamation point, "and this is one."

5          Did he sound happy to you when he wrote that

6  to you in that letter?

7      A.   It doesn't sound upset.

8      Q.   He doesn't sound upset to you?

9      A.   No, not to me.

10     Q.   Not to you.  Okay.  And you did what he

11  told you to do in that letter, right?

12          MR. SHEEHAN:  Objection.  That's outside

13  the scope of the cross.

14          THE COURT:  Sustained.

15     Q.   Did you follow his instructions throughout

16  your pregnancy?  When you were getting the phone

17  calls and getting information, did you do what he

18  told you to do and try to get information for him?

19          MR. SHEEHAN:  Objection.  Outside the

20  scope of the cross.

21          MS. REYNOLDS:  This is at the time she

22  was pregnant, your Honor.

23          THE COURT:  I'm going to permit the

24  question.

25     Q.   When you -- I'll rephrase it.  Maybe you

2215

1  don't remember.

2          When you were getting all those calls from

3  the defendant when you were pregnant, did you do

4  what he asked you to do?

5          MR. SHEEHAN:  Objection, your Honor.

6  May -- may we approach?

7          THE COURT:  The relationship between the

8  two was raised on cross-examination.

9          MR. SHEEHAN:  Same grounds then.

10          THE COURT:  Okay.

11     Q.   You can answer.

12     A.   Yes, yes.

13     Q.   Yes?  You did --

14     A.   Yes.

15     Q.   And you went and met with the people he

16  told you to meet with?

17     A.   Yes.

18     Q.   You went to the places he told you to go to

19  meet with those people?

20          MR. SHEEHAN:  Same objection, same

21  grounds.

22          THE COURT:  Same ruling.

23     A.   Yes.

24     Q.   And you asked no questions of him.

25     A.   No.

2216

1      Q.   And Mr. Sheehan asked you about, in the

2  beginning of his cross-examination, about this isn't

3  easy for you, right?  Do you remember those

4  questions he asked you?

5      A.   Yes.

6      Q.   And you don't want to be here.

7      A.   No.

8      Q.   And you were brought here under a subpoena,

9  a court order.

10     A.   Yes.

11     Q.   And in connection with your meetings with

12  the government, have there been problems for you?

13          MR. SHEEHAN:  Objection, your Honor.

14  Outside the scope of the cross.

15     Q.   Has it been easy for you?

16     A.   No.

17     Q.   And throughout that time period, if you

18  needed assistance did you obtain some assistance

19  from the government?

20     A.   Yes.

21          MS. REYNOLDS:  May I just have a moment,

22  your Honor?

23          THE COURT:  Yes.

24     Q.   And, Ms. Pettway, getting back to the

25  questions you were asked about when the defendant

2217

1    visited or stayed with you some nights when you were
2    living back with your mom at Newfield, getting back
3    to those questions, were there times that the
4    defendant would leave in the middle of the night?
5            MR. SHEEHAN:  Objection.  Outside the
6    scope of cross.
7            THE COURT:  Overruled.
8    A.    There might have been a time or two.
9    Q.    There might have been a time or two?
10    A.    Uh-huh (indicating affirmatively).
11    Q.    That he left in the middle of the night.
12    A.    Yes.
13    Q.    And you were living in Newfield.  What time
14    period had you moved back to Newfield?  When was
15    that?
16    A.    I couldn't tell you.
17    Q.    Were you living -- do you remember if you
18    were living there in the summer of 2005?  Late
19    summer, early fall?
20    A.    Yes.
21    Q.    And just one more thing.
22          You were asked some questions about whether
23    you had a cell phone back in that time period.  Do
24    you remember the questions Mr. Sheehan asked you
25    about the cell phone?

2218

1    A.    Yes.
2    Q.    Do you remember what your cell phone number
3    was?
4    A.    No.
5    Q.    No.  Do you think if I showed you something
6    that might help refresh your recollection as to what
7    your cell number was back then?
8    A.    It's possible.
9            MS. REYNOLDS:  Your Honor, could I
10    approach?
11    Q.    Just showing this, does that refresh your
12    recollection as to what your cell phone number was
13    back then?
14    A.    No, I never recall having a cell phone with
15    that number ending three, no.
16    Q.    Does that have the address you were living
17    in?
18            MR. SHEEHAN:  Objection.
19    Q.    Well, it doesn't refresh your recollection?
20    A.    No.
21    Q.    But you had a cell phone at the time.
22    A.    I believe so.
23    Q.    You believe so.
24            MS. REYNOLDS:  Nothing further, thank
25    you.

2219

1            THE COURT:  All right, any recross.
2    RECROSS-EXAMINATION
3    BY MR. SHEEHAN:
4    Q.    Ms. Pettway, when you went before the
5    Grand Jury you had been subpoenaed to go in, right?
6    A.    Yes.
7    Q.    And you know that if you don't obey a
8    subpoena you go to jail, right?
9    A.    Yes.
10    Q.    And when you came here to court it was
11    pursuant to that subpoena, another subpoena, right?
12    A.    Yes.
13    Q.    And, again, you knew that if you didn't
14    come to court and testify you'd go to jail, right?
15    A.    Yes.
16            MR. SHEEHAN:  I have no further
17    questions.
18            THE COURT:  All right, anything further?
19            MS. REYNOLDS:  No, your Honor.
20            THE COURT:  Thank you.  Thank you,
21    Ms. Pettway.  You may step down.  You are excused.
22          Will the government please call its next
23    witness.
24            MS. RODRIGUEZ-COSS:  Your Honor, the
25    government calls John Taylor.

2220

1            THE COURT:  All right, Mr. Taylor,
2    please remain standing.  Raise your right hand.
3            J O H N   T A Y L O R
4    Having first affirmed, was examined and testified as
5    follows:
6            THE WITNESS:  John Taylor, T-a-1 --
7    T-a-1 -- T-a-1-y-o-r, North Carolina.
8    DIRECT EXAMINATION
9    BY MS. DAYTON:
10    Q.    Good morning, Mr. Taylor.
11    A.    Good morning.
12    Q.    How are you doing?
13    A.    I'm fine.
14    Q.    Are you a little nervous?
15    A.    Yes.
16    Q.    Do you spell your last name T-a-y-l-o-r?
17    A.    Yes.
18    Q.    What's your full name?
19    A.    John Fitzgerald Taylor.
20    Q.    Do you ever go by anything other than John?
21    A.    Yes.
22    Q.    What do you go by?
23    A.    Yes Yes or Taylor -- Black.
24    Q.    If you want you can scoot that a little
25    closer to you so you don't have to lean forward

2221

```
1    every time.
2           You said Yes Yes or Black?
3       A.   Yes.
4       Q.   Why Yes Yes?
5       A.   The name that I was given.
6       Q.   Why were you given that name?
7       A.   I don't really know why, but it was just a
8    name that people give people sometime on the street
9    because I would always say Yes Yes.
10      Q.   You would always say yes, yes.  And why
11   Black?  Why were you given that name?
12      A.   It was given to me when I was on the street
13   as well.
14      Q.   Who gave you that name?
15      A.   The defendant.
16      Q.   You are pointing to someone over here.  Who
17   are you pointing to?
18      A.   To Dreddy.
19      Q.   And what is Dreddy wearing?
20      A.   The blue shirt and a white shirt and collar
21   and tie.
22           MS. DAYTON:  Indicating the defendant
23   for the record, your Honor.
24           THE COURT:  Yes.
25      Q.   How old are you, Mr. Taylor?
```

2222

```
1       A.   I'm 34.
2       Q.   And where were you born?
3       A.   North Carolina.
4       Q.   Where in North Carolina?
5       A.   Pinetops.
6       Q.   Pinetops?
7       A.   Yes.
8       Q.   And when you lived in Pinetops, who did you
9    live with?
10      A.   My grandmother.
11      Q.   And just your grandma?
12      A.   Yes.
13      Q.   Did you have any brothers or sisters that
14   had lived with you?
15      A.   My sister wasn't staying with us at the
16   time.
17      Q.   She was not?
18      A.   No.
19           THE COURT:  Could you pull the
20   microphone closer to you, please.
21      Q.   We just need everyone to hear you, okay?
22      A.   Okay.
23      Q.   And is your sister older or younger?
24      A.   She older.
25      Q.   Where was your mom?
```

2223

```
1       A.   She passed away when I was a month old.
2       Q.   A month old?
3       A.   A month, month or a month and a half.  I
4    don't really know, but -- they ain't never tell me
5    when she passed away, but after that my grandmother
6    adopted me, me and my sister.
7       Q.   And where was your father?
8       A.   He was a roller, he was here and there.
9       Q.   Is that what it means to be a roller?
10      A.   Yeah, just rolling stone, wherever he lay
11   his hat is home.
12      Q.   Did your father have other children?
13      A.   Yes.
14      Q.   How many, if you know?
15      A.   Four more, older.
16      Q.   Older than you?
17      A.   Yes.
18      Q.   Where is your father now?
19      A.   In convalescent home.
20      Q.   In what state?
21           MR. SHEEHAN:  Objection, irrelevant.
22           THE COURT:  It's background.  I'm going
23   to permit it.  Go ahead.
24      Q.   In what state?
25      A.   Chadbourn, North Carolina.
```

2224

```
1            THE COURT:  But I need you and the
2    microphone to be closer together.  Okay.  It will
3    move.  You can pull it.  It's wireless.  Okay.
4    Thank you.
5       Q.   Where did you go to high school?
6       A.   Southwest High School.
7       Q.   And how far did you go in school?
8       A.   Tenth grade.
9       Q.   How old were you in 10th grade?
10      A.   I don't remember.
11      Q.   Why did you leave school in 10th grade?
12      A.   Because I caught my first felony.
13      Q.   Caught your first felony?
14      A.   Yes.
15      Q.   And what was the felony for?
16      A.   Possession of narcotics, drugs.
17      Q.   How old were you when you started selling
18   drugs?
19      A.   Sixteen, 17.
20      Q.   And who first gave you drugs?
21      A.   Well, we would -- started dealing with
22   other friends and I started buying from him, he is
23   telling me how to buy the drugs, and I started
24   buying them on my own.
25      Q.   Did something happen when you first started
```

2225

```
1    getting drugs?
2        A.    Yes.
3        Q.    What happened?
4        A.    Some guys that I grew up with, and they end
5    up giving me drugs, and then they left off and went
6    somewhere, and when we came back -- when they came
7    back, the other guy, the friend of that guy, he say
8    that, give me the drugs and --
9        Q.    Who did he say "give me the drugs" to?
10       A.    Me.
11       Q.    And what did you do?
12       A.    I gave him the drugs.
13       Q.    What happened?
14       A.    And when I gave him the drugs, that's when
15   I found out that he didn't tell him to get the drugs
16   from me.  At the time of that the guy who gave me
17   the drugs, he wanted to kill me.
18       Q.    How do you know he wanted to kill you?
19       A.    Because he shot at me and he end up -- a
20   little boy got killed.
21       Q.    What did he shoot at you with?
22       A.    AK 47.
23       Q.    Did you get hit?
24       A.    I got grazed.  I don't know if I got grazed
25   or the bullet hit the ground then and then some
```

2226

```
1    fragment came across the bridge of my nose.
2        Q.    Across the bridge of your nose?
3        A.    Yeah.
4        Q.    You said a little boy got killed.  Who was
5    the little boy?
6             MR. SHEEHAN:  Objection, irrelevant.
7             THE COURT:  Sustained.
8        Q.    Okay.  After you got shot, did you talk to
9    the police?
10       A.    Yes.
11       Q.    Did you give them a statement?
12       A.    Yes.
13       Q.    Did you tell them who did it?
14       A.    Yes.
15            MR. SHEEHAN:  Objection, irrelevant.
16            THE COURT:  Overruled.
17       Q.    And how did this affect your -- were you
18   still going to school then?
19       A.    Yes.
20       Q.    And how did it affect you at school?
21       A.    For a week they wouldn't let me -- they
22   would call me to the principal office and I would go
23   down to the office, and when they rang the bell for
24   the school to turn out I was dragged -- I was let
25   out with officers taken to the school bus.
```

2227

```
1        Q.    Police officers would escort you to the
2    school bus?
3        A.    Yes.
4        Q.    Do you know why that was?
5             MR. SHEEHAN:  Objection, irrelevant.
6             THE COURT:  Overruled.
7        Q.    Do you know why they were escorting you to
8    the school bus?
9        A.    Because they didn't want no retaliation
10   from the guys that -- they didn't catch them yet.
11       Q.    Did they eventually get caught?
12       A.    Yes.
13            MR. SHEEHAN:  Objection, irrelevant.
14            THE COURT:  Sustained.
15       Q.    You said you didn't stay in school after
16   10th grade; is that right?
17            You have to say yes or no.
18       A.    No.
19       Q.    Are you taking classes now?
20       A.    Yes.
21       Q.    What are you studying for?
22       A.    GED.
23       Q.    You said that also you had started selling
24   drugs and you said you got your first felony for
25   possession of narcotics.  How old were you then?
```

2228

```
1        A.    Maybe about -- maybe like 16 or 15.  Maybe
2    16, somewhere around 17.
3        Q.    Young.
4        A.    Yes.
5        Q.    And when did you get your next felony for
6    possession of narcotics?
7        A.    Maybe a year or two after that.
8        Q.    Did you also have a conviction in 1997?
9        A.    Yes.
10       Q.    For aiding and abetting a common law
11   robbery?
12       A.    Yeah.
13       Q.    Did you go to prison for that?
14       A.    Yes.
15       Q.    How long did you do in prison?
16       A.    If I'm not mistaken, maybe 18 to 20 months.
17       Q.    And then after you were released from
18   prison, were you convicted again of selling drugs?
19       A.    Yes.
20       Q.    And when was that?
21       A.    I don't remember.
22       Q.    Did you -- do you recall having a 2001
23   conviction?
24       A.    Yes.
25       Q.    One or two convictions?
```

2229

```
1      A.   I think it was one.  In 2001?
2      Q.   Yes.
3      A.   I don't know if it was -- I think it was
4   just one conviction.
5      Q.   Did you go to prison or jail for that?
6      A.   Yes.
7      Q.   And how long did you spend in then?
8      A.   I think 18 to 20 -- 18 -- 12 -- 11 to 20,
9   or something like that.
10     Q.   So, around a year?
11     A.   Yeah.
12     Q.   Did you eventually relocate to Connecticut?
13     A.   Yes.
14     Q.   Approximately when did you do that?
15     A.   In 2004.
16     Q.   Why?
17     A.   To get away from the things I used to know,
18   I used to do all the time, I just wanted to start
19   over.
20     Q.   What sort of things?
21     A.   Selling drugs, being around the same people
22   I used to be around.  I hang around -- every time I
23   got out of prison I went right back dealing with the
24   same people, you know.
25     Q.   When you moved to Connecticut, what area
```

2230

```
1   did you move to?
2      A.   Townhouse Garden.
3      Q.   Where is that?
4      A.   Right close -- right by -- right behind the
5   police station.  Right by the train station.
6      Q.   In what city?
7      A.   Norwalk.
8      Q.   Why did you move to Norwalk?
9      A.   Me and my aunt, we talked, she told me it
10  was a good thing for me to do if I wanted to make
11  the decision to come.
12     Q.   Your aunt?
13     A.   Yes.
14     Q.   She was living in Norwalk?
15     A.   Yes.
16     Q.   And after you moved to Norwalk, or when you
17  first got here, who did you live with?
18     A.   My aunt.
19     Q.   And did you get a legitimate job?
20     A.   Yes.
21     Q.   What were you doing?
22     A.   I was -- at first I started out working at
23  Shop-Rite in -- somewhere in -- I forgot where it
24  was at in Connecticut.  Then that wasn't -- they
25  told me I wasn't be able to get more than, like,
```

2231

```
1   maybe a couple hours a week.  Then I started doing
2   nightclubs in Stamford.
3      Q.   What would you do at the nightclubs?
4      A.   A bouncer.
5      Q.   How long did you stay living with your
6   aunt?
7      A.   Maybe 'til about winter.  I got up in
8   November and maybe the winter of -- midwinter '05,
9   beginning of the summer, and me and my aunt got into
10  differences and I just left out, I moved out.
11     Q.   Who did you move in with?
12     A.   My cousin Amy.
13     Q.   Was this -- what city was this in?
14     A.   Connecticut.  Norwalk.
15     Q.   Where in Norwalk did Amy live?
16     A.   Washington Village.
17     Q.   And what kind of area is Washington
18  Village?  Apartment complex or housing project, what
19  is it?
20     A.   I think it was a housing complex.
21     Q.   And when you moved in with Amy, were you
22  still working as a bouncer?
23     A.   Yes.
24     Q.   Were you doing any other jobs?
25     A.   I started once I got -- when I moved out of
```

2232

```
1   there I got with this person who was doing
2   demolition work, and I started doing demolition work
3   with this guy over in Bridgeport.
4      Q.   At some point did you start selling drugs
5   again?
6      A.   Yes.
7      Q.   And how did that come to be?  What
8   happened?
9      A.   Well, at the time I was at a job in
10  Bridgeport, I was working, and my cousin Amy had
11  called me and she said -- no, my cousin Tricia
12  called me, she called and told me, she said
13  Fitzgerald --
14     Q.   What did she call you?
15     A.   Fitzgerald.
16     Q.   Did you go by Fitzgerald also?
17     A.   Yes.
18     Q.   That's your middle name?
19     A.   Yes.
20     Q.   Is that what your family called you?
21     A.   Yes.
22     Q.   So, she said Fitzgerald, what happened?
23     A.   She said, "The housing people here, Amy in
24  the apartment taking all her stuff out."  So I said,
25  "What you mean?"  She said, "Well they're taking all
```

2233

```
1    her stuff and putting it on the side of the street."
2    I go -- said, "Please, go get my stuff, it's the
3    only stuff I got.  Go get my stuff."
4             So I was still working and she said she
5    would try to go get it, but she said "They loaded it
6    all up in the truck."  I said, "What do you mean?"
7    She said, "They put it in the truck."  I said, "They
8    took it all?"  She said, "Yeah, they took
9    everything."  I said, "Wow."  So I said, "I'm on my
10   way."
11            I told my boss I had to go because it was
12   urgent.  So, I jumped on the train, went back to
13   Norwalk, and that's when they had told me what was
14   going on.  So I got in touch with housing and
15   housing gave me some numbers to call, whoever, they
16   took my stuff, I would be able to receive my
17   property.
18   Q.    Did you get it back?
19   A.    No.
20   Q.    Was Amy evicted?
21   A.    Yeah, she was.
22   Q.    So, how did this affect you?  Your stuff is
23   gone.  What did you have left?
24   A.    Nothing but what I had on.
25   Q.    So, how did that have to do with dealing
```

2234

```
1    drugs?
2    A.    That's the only thing I knew how to get my
3    next dollar from because I was working, I was going
4    to get paid that week, but that week was going to be
5    going downhill.  It was going to be the last week of
6    that job.  I was going to be finished with it, so I
7    couldn't drag it along.  So I had to figure out how
8    I'm to get some money to be able to get some clothes
9    or jump on the train, go back and forth for job
10   interviews and stuff like that, and now I got to
11   find somewhere to stay.
12   Q.    Did you talk to someone about the
13   predicament you were in?
14   A.    Yes.
15   Q.    Who did you talk to?
16   A.    Kosher.
17   Q.    Who is Kosher?
18   A.    He was a friend of mine.  Well, he was a
19   friend of -- in around in the projects at the time.
20   Q.    Do you know his real name?
21   A.    No.
22   Q.    What does he look like?
23   A.    Tall guy, light-skinned with dreads.
24   Q.    And when you talked to Kosher about the
25   issue, did Kosher have a suggestion for you?
```

2235

```
1    A.    Yes.
2    Q.    And what was that?
3    A.    He said he knew a couple good guys that
4    will probably help me out.
5    Q.    What happened after that?
6    A.    One day he left and came back and that's
7    when he came back with Dreddy.
8    Q.    Is that -- is Dreddy the name that you used
9    for the defendant?
10   A.    That's his name that I was told from
11   Kosher.
12   Q.    Do you know what his real name is?
13   A.    No.
14   Q.    And so Kosher came back with Dreddy, and
15   what happened?
16   A.    We -- he came back, they parked up in the
17   front of the Washington Village, I think it's -- I
18   don't know the name of the street, but in the front
19   of the project where the ballpark at.  Then he --
20   then him and another guy that I never knew and
21   Kosher, they came back and started talking to me and
22   they is telling me, he's telling me "What can you do
23   out here?"  I was, like, "I don't really know too
24   much out here, but I know I can be able to push some
25   weed."
```

2236

```
1    Q.    Who is saying, "What can you do out here?"
2    A.    Dreddy.
3    Q.    And you said you could push some weed?
4    A.    Yeah.
5    Q.    What's that mean?
6    A.    Sell weed.
7    Q.    And what is weed?
8    A.    Marijuana.
9    Q.    All right.  So what did the defendant tell
10   you?
11   A.    He didn't really tell me nothing then.  He
12   said was going to get back with me and --
13   Q.    What happened?  Go ahead.  What happened
14   next?
15   A.    Then he left.  Then him, Kosher, and the
16   other guy left.
17   Q.    When is the next time you saw Kosher?
18   A.    The next couple of days, I guess, when he
19   came back with a sack of bubble gum balls, weed
20   inside of the balls.
21   Q.    When you say "bubble gum balls," do you
22   mean the actual bubble gum itself?
23   A.    No.
24   Q.    What did you mean?
25   A.    The casing where the bubble gums is in.
```

2237

```
1      Q.   Okay.  So what does it look like?
2      A.   A cap with a see-through clear cover with a
3  cap on top of it with the marijuana on the inside.
4      Q.   Do you remember what color the cap was?
5      A.   Different colors, some green, some blue.
6           MS. DAYTON:  May I approach, your Honor?
7           THE COURT:  You may.
8      Q.   I'm going to show you an item that's been
9  previously marked 200B.  Do these look familiar to
10 you?
11     A.   Yes.
12     Q.   And what is it about them that's familiar?
13     A.   That's the same bottles that I was given.
14     Q.   Are those the exact ones?
15     A.   Well --
16     Q.   Do you know?
17     A.   The colors, yeah, everything.
18     Q.   So, they looked like that?
19     A.   Yeah.
20     Q.   What was inside the bottle, plastic
21 container?
22     A.   Marijuana.
23     Q.   Do you know how much marijuana was in each
24 one?
25     A.   No.
```

2238

```
1      Q.   How about monetarily, what did you sell
2  them for?
3      A.   $20.
4      Q.   And so Kosher came back with how many of
5  those -- or how many money-wise?
6      A.   Well, I don't know how much exactly, but I
7  know how much he gave me.
8      Q.   What did he give you?
9      A.   He gave me like 250 of them.
10     Q.   Two hundred fifty little balls?
11     A.   That equal up to $250.
12     Q.   So, $250.  What happened?  What did you do
13 with them?
14     A.   I sold mine.  I sold mines.  No, no, I sold
15 my bottles and I gave him the money that he told me
16 to give off the PC of the money.
17     Q.   What's the PC?
18     A.   The profit.
19     Q.   Okay.  You gave the profit to whom?
20     A.   Kosher.
21     Q.   And what happened next?
22     A.   The only thing I know that he -- he -- to
23 get the money, he supposed to take the money back to
24 him.
25          Who is him?
```

2239

```
1      A.   Dreddy.
2      Q.   And what happened?
3      A.   All of a sudden me and him starting getting
4  into a conflict about money-wise, and I'm telling
5  him, "I'm giving you my money, whatever you doing, I
6  don't know what -- I don't know what your half is."
7  So I guess he didn't get -- I guess, I guess he
8  wasn't paying --
9           MR. SHEEHAN:  I'm going to object to
10 that.  Basis, your Honor.
11          THE COURT:  Let's just ask questions.
12     Q.   So you had a problem with Kosher and then
13 after that did you continue to sell with Kosher?
14     A.   Yes.
15     Q.   And for how long?
16     A.   Maybe about a half of the summer, beginning
17 of '05, that beginning of the summer.
18     Q.   And at some point did you stop selling with
19 Kosher?
20     A.   Yes.
21     Q.   Why?
22     A.   It was a conflict I guess with him and
23 Dreddy, and he got in -- and Dreddy got --
24          MR. SHEEHAN:  I'm going to object, your
25 Honor.
```

2240

```
1      Q.   Who did you speak to about this?
2      A.   Dreddy.
3      Q.   And what did Dreddy tell you?
4      A.   That he believed that Kosher was doing
5  dust, smoking dust.
6      Q.   What's dust?
7      A.   I don't really know, the only thing I know
8  it's black bags, whatever that is.
9      Q.   Okay.  So Dreddy thought that Kosher was
10 smoking dust.
11     A.   And he asked me keep an eye on him, get in
12 contact with him, and stuff like -- if he is, let me
13 know.  And all of a sudden, then I kept telling him
14 I needed money.
15     Q.   Telling who?
16     A.   Dreddy.  Yes.
17     Q.   And what did Dreddy tell you?
18     A.   Come up to -- "Can you come up to
19 Bridgeport?"  And I came to Bridgeport.
20     Q.   And when you came to Bridgeport, who did
21 you meet with?
22     A.   Dreddy.
23     Q.   How did you get to Bridgeport?
24     A.   My girl drove me.
25     Q.   Do you know the girl's name?
```

**GA560**

2241

```
1       A.   All I knew was Pint.
2       Q.   Pint, like a nickname?
3       A.   Yes.
4       Q.   Where did you meet with the defendant?
5       A.   I'm not exactly aware because I never
6    really been to Bridgeport like that before.
7       Q.   Okay.  You had been doing demolition in
8    Bridgeport?
9       A.   Yeah, but that's the only place where I
10   knew where to go because the boss man used to pick
11   me up at the train station.
12      Q.   The Bridgeport train station?
13      A.   Right.
14      Q.   So Pint drove you to a location in
15   Bridgeport.  What happened when you got there?
16      A.   I called him.  He was already there.  So
17   she drove up, I got out, I walked to the car.
18   That's when he gave me more bags of little bottles.
19      Q.   And when you say "he," who do you mean?
20      A.   Dreddy.
21      Q.   What kind of car did Dreddy have?
22      A.   At that time it was -- I do remember the
23   color, but I don't want to say it wrong, but I know
24   it was a long Cadillac, and I want to say it was
25   purple or green.
```

2242

```
1       Q.   Okay.  So, a Cadillac that was -- you don't
2    remember the color, either purple or green?
3       A.   Yeah.
4       Q.   Like bright purple?
5       A.   Yeah.
6       Q.   After he gave you the weed, what did you
7    do?
8       A.   I -- me and her left, got in the car, and
9    we went back to Norwalk.
10      Q.   To Norwalk?
11      A.   Yes.
12      Q.   Did you sell those drugs?
13      A.   Yes.
14      Q.   Where were you selling at the time?
15      A.   In the village, Washington Village.
16      Q.   Just out on the street?
17      A.   Yes.
18      Q.   Did you have a cell phone?
19      A.   Yes.
20      Q.   And what's it mean to sell drugs from your
21   phone?
22      A.   That you definitely have -- you definitely
23   got clients going to come see you, just like a
24   store.  If you know the store has it, you going to
25   go to that store and get that drug.  You know that
```

2243

```
1    store has it.  It's the same way like supermarket.
2       Q.   So, they call first?
3       A.   Yes.  Call first, see if you have it, then
4    if you have it, they coming.
5       Q.   Do you remember your phone number from that
6    summer?
7       A.   I remember maybe like the first three
8    digits, 5-0-9.
9       Q.   Do you think there is something that might
10   refresh your memory?
11      A.   Yes.
12      Q.   If you saw the number would you remember
13   it?
14      A.   Yes.
15           MS. DAYTON:  Your Honor, if I may
16   approach?
17           THE COURT:  You may.
18      Q.   Was it a Connecticut area code like a 203
19   area code?
20      A.   Maybe.  I'm not for sure.
21      Q.   I'm going to approach with --
22           MS. DAYTON:  This has been marked 258
23   for identification, your Honor.
24           THE COURT:  All right.
25      Q.   Directing your attention to the subject
```

2244

```
1    number.
2       A.   Yes.
3       Q.   Does that refresh your memory?
4       A.   Yes.
5       Q.   So what was your phone number?
6       A.   4950 -- 4099.  I meant 203-509-4099 if I'm
7    not mistaken.
8       Q.   Do you want to look at it, is this right?
9    Is this your phone number?  Do you recognize it?
10      A.   Yes, yes, yes, 4059, that's what it is.
11      Q.   So, you recognize this number?
12      A.   Yes.
13      Q.   Did you have any other cell phone that
14   summer?
15      A.   Yes.
16      Q.   You had more than one?  Where did you get
17   your cell phones from?
18      A.   That phone, particular phone, I bought from
19   a corner store.
20      Q.   Corner store where?
21      A.   In Norwalk.
22      Q.   Did Dreddy ever come down to Norwalk to see
23   you?
24      A.   Uh-huh (indicating affirmatively).
25      Q.   Is that a yes?
```

2245

```
1       A.   Yes.
2       Q.   How often?  Around this time period we're
3  talking about, when you are selling the weed for
4  him.
5       A.   He came down a couple of times to bring
6  more weed, or when I called him to tell him I am
7  getting low on marijuana or I got money, he will
8  bring me more and I'd give the money from the last
9  PC and then he give me some more.
10      Q.   So, you would pay him back for the
11 marijuana?
12      A.   Yes.
13      Q.   And how much did you get to keep as your
14 profit?
15      A.   It was like, if he give me a thousand, I
16 probably keep like maybe 500 out for my own.  I
17 would give him -- whatever he give me, I give him
18 half.
19      Q.   And how long did this go on for?
20      A.   I'm not for sure because it was going so
21 fast.
22      Q.   You were able to sell drugs quickly?
23      A.   Yes.
24      Q.   Did -- and when Dreddy would come down to
25 visit you in Washington Village, what did he drive;
```

2246

```
1  if you recall?
2       A.   I seen him on a burgundy Cadillac,
3  four-door.
4       Q.   This is a different Cadillac?
5       A.   Yes.
6       Q.   Burgundy, four-door Cadillac?
7       A.   Yes.
8       Q.   A new model, an old model?
9       A.   I think it was a new model.
10      Q.   Did you see him in any other cars around
11 that time?
12      A.   A Black Ford Tahoe, maybe, with rims.
13      Q.   Like a --
14      A.   With tinted windows.
15      Q.   Like an SUV, a truck?
16      A.   Yes.
17      Q.   Did there come a time -- well, did the
18 defendant ever give you at that time any other type
19 of drug?
20      A.   Yes, about maybe a couple times he came to
21 see me, I guess he didn't have too much of that
22 weed, he gave me, like, a like, maybe like a sack of
23 crack cocaine.
24      Q.   And you're opening your fist.  Is it a big
25 sack of crack cocaine?
```

2247

```
1       A.   Yes.
2       Q.   And was it bagged up into smaller bags or
3  bottles, or was it just like a big globular of it, a
4  rock?
5       A.   No, it was already broken up and packaged.
6       Q.   How was it packaged?
7       A.   In little bitty diamond bags.
8            MS. DAYTON:  Indicating about an inch
9  high.
10      Q.   Is that right?
11      A.   Uh-huh (indicating affirmatively).
12           MS. DAYTON:  With his fingers, your
13 Honor.
14      Q.   And what did the bags look like?
15      A.   That you hold diamonds in.  Little bitty.
16      Q.   Diamonds?
17      A.   Yes.
18      Q.   Are they see-through, not see-through?
19      A.   See-through.  Yes.
20      Q.   Do you know what the quantity was?
21      A.   I'm not for sure, but maybe by me looking
22 at it, a sandwich bag, you hold a sandwich bag, you
23 put it in a corner of a sandwich bag, maybe could
24 have been an ounce in it.
25      Q.   An ounce?
```

2248

```
1       A.   Yes.
2       Q.   What did you do with that crack when the
3  defendant gave it to you?
4       A.   At the time I didn't -- that's one reason I
5  left, because that's all my conviction was about,
6  selling drugs, selling crack, I didn't really want
7  to get into that no more.
8       Q.   What's the difference between selling crack
9  and selling marijuana?
10      A.   One more time and one less.
11      Q.   You get more time for crack?
12      A.   Yes.
13      Q.   Okay.  So you didn't mind selling the weed
14 as much, you didn't want to sell the crack?
15      A.   Right.
16           MR. SHEEHAN:  Objection, leading.
17           THE COURT:  Sustained.
18      Q.   So what did you do with the crack?  Did you
19 sell it anyways?
20      A.   No, I didn't.  I didn't tell him, but I
21 just grabbed it and just put it up.
22      Q.   Put it up where?
23      A.   In a friend of mines where I was staying
24 at.
25      Q.   What was your friend's name?
```

**GA562**

2249

```
1       A.   Denita.
2       Q.   Denita?
3       A.   Yeah.
4            MS. DAYTON:  D-e-n-i-t-a, for the
5  record.
6       Q.   And where did Denita live?
7       A.   The only thing I knew the name of it, they
8  called it The Hill.  That's the only thing I knew.
9       Q.   The Hill?
10      A.   Yes.
11      Q.   And what city is that in?
12      A.   Norwalk.
13      Q.   Did you ever go anywhere with the defendant
14 other than Norwalk and Bridgeport?
15      A.   Yes.
16      Q.   How did that come to be?
17      A.   Well, like -- maybe like a day or maybe a
18 day and a half after he gave me the last batch, I
19 met him, and that's -- with the crack, he called me
20 up, he was, like, "What are you doing?"  I said,
21 "Nothing."  He said, "Do you want to take a trip?"
22 I said, "Sure."  "You from down south, right?"  I
23 said, "Yeah, I'm from down south.  He like, "I'm
24 going to call you back, let you know what's going to
25 happen."
```

2250

```
1       Q.   What happened after that?
2       A.   Later on that night he called me back, he
3  said, "Go ahead and pack up because I'm waiting for
4  my brother to come with the car."  Then he said,
5  "Then we'll be down there to pick you up."  I said,
6  "okay."
7       Q.   So, what did you do?
8       A.   Later on that afternoon, maybe like around
9  about seven, maybe a little -- 7:00, 8:00, it was
10 getting like dusk, start, it wasn't completely, dark
11 then, he called me up, he said, "Come on outside."
12 And I came outside and I had my little bag with me.
13 So --
14      Q.   Who was there when you got outside?
15      A.   Dreddy, his girlfriend, and his brother.
16      Q.   Okay.  Did you know his girlfriend or his
17 brother before that day?
18      A.   No.
19      Q.   And how did you know it was his girlfriend
20 and how did you know it was his brother?
21      A.   She -- well, he -- well, I figured that it
22 was his girlfriend because she was pregnant.  And
23 his brother, he -- when I was on my way to the car
24 he got out the car and introduced us, that was his
25 brother, and he said, "You will be riding with him."
```

2251

```
1  I said, "Okay."
2       Q.   So how many cars were there when you came
3  out?
4       A.   Two.
5       Q.   I'm going to show you a picture.
6            MS. DAYTON:  Do you know -- I don't know
7  if this is in evidence, your Honor.
8       Q.   If you can look at your screen, do you
9  recognize who that is?
10      A.   Yes.
11      Q.   Who is that?
12      A.   His baby mother.
13      Q.   Whose baby mother?
14      A.   Dreddy.
15      Q.   Do you remember her name?
16      A.   Charmaine Pettaway.
17      Q.   Charmaine Pettaway, is what you remember?
18      A.   Yeah.
19           MS. DAYTON:  If I may move this into
20 evidence, your Honor, Government Exhibit 222.
21           MR. SHEEHAN:  No objection.
22           THE COURT:  All right.  Full exhibit.
23           MS. DAYTON:  Thank you, your Honor.
24      Q.   So, she was there and you said she was
25 pregnant?
```

2252

```
1       A.   Yes.
2       Q.   And what car was the defendant driving?
3       A.   The burgundy Cadillac, four-door.
4       Q.   The same one you described earlier?
5       A.   Yes.
6       Q.   And you said his brother was there.  Did
7  the defendant introduce you to his brother by a
8  particular name?
9       A.   Ziggy.
10      Q.   And I'm going to show you a picture and ask
11 you if you recognize this person.  This is in
12 evidence as Government's Exhibit 207.  Do you
13 recognize who that is?
14      A.   Yes.
15      Q.   Who is that?
16      A.   His brother.
17      Q.   The person you just called Ziggy?
18      A.   Yes.
19      Q.   Is that what you would refer to him by?
20      A.   Yes.
21      Q.   Do you know what his real name is?
22      A.   No.
23      Q.   What was Ziggy driving?
24      A.   A Jeep Cherokee.
25      Q.   What color, if you remember?
```

2253

```
1        A.   I don't know.
2        Q.   Who did you get in the car with?
3        A.   With his brother.
4        Q.   And when you got in the car, where did you
5   guys go?
6        A.   We started talking and he was, like, "Well,
7   we going to go to Virginia."
8        Q.   What's in Virginia?
9        A.   Busch Gardens.
10       Q.   Okay.  And who said you were going to go to
11  Busch Gardens?
12       A.   Dreddy.
13       Q.   So was that before or after you got in the
14  car?  Do you know?
15       A.   This is before we got in.
16       Q.   So when you got in the car, you guys
17  start -- do you start driving south?
18       A.   Yes.
19       Q.   Do you drive straight through to Virginia
20  or do you stop at all on the way?
21       A.   Well, we stopped and got gas and we stopped
22  at the Maryland House.
23       Q.   At the Maryland House?
24       A.   Yes.
25       Q.   When you stopped for gas, did you pay for
```

2254

```
1   gas?
2        A.   No.
3        Q.   Who paid?
4        A.   Dreddy.
5        Q.   For both cars?
6        A.   Yes.
7        Q.   Then you said you stopped at the Maryland
8   House.  What is that?
9        A.   It's like a rest stop where you go get --
10  stop and you can rest.
11       Q.   Did you -- is there -- did you rest there?
12       A.   Yes, we got something to eat and stuff like
13  that.
14       Q.   And when you say "we," who was there?
15       A.   All four of us.
16       Q.   And when you left, did anyone leave
17  anything behind?
18       A.   Me and Ziggy was sitting at a table, we was
19  eating, and I guess he had his phone on the table.
20       Q.   Ziggy did?
21       A.   Yes.  And we got back in the car, he was,
22  like -- we was already on the highway on 95 in
23  motion, and he said, "Oh, man, I left my phone."
24       Q.   So, he lost his phone in Maryland?
25       A.   Yes.
```

2255

```
1        Q.   Did you go back?
2        A.   No.
3        Q.   So, what did he do for a phone for the rest
4   of the trip?
5        A.   He used my number.
6        Q.   So, you both shared the number?
7        A.   Yes.
8        Q.   Your phone.  Did you go from Maryland down
9   to Virginia?
10       A.   Yes.
11       Q.   And when you got there, what did you do?
12  To Virginia.
13       A.   When we got there, we got there late that
14  night, then we got a hotel.
15       Q.   Who paid for the hotel?
16       A.   Dreddy.
17       Q.   Did you get one room for the four of you,
18  two rooms, three rooms?
19       A.   Two rooms.
20       Q.   Who did you stay with?
21       A.   Me and Ziggy.
22       Q.   And Dreddy and Shante, or Charmaine, stayed
23  where?
24       A.   In the other room.
25       Q.   The next day what did you do?
```

2256

```
1        A.   We got up the next morning and we off to
2   Busch Gardens.
3        Q.   Did you spend the day at Busch Gardens?
4        A.   Yes, the whole day.
5        Q.   Did you take pictures?
6        A.   They did.
7        Q.   Okay.  What did you guys do at Busch
8   Gardens?
9        A.   Well, they rode on rides and stuff like
10  that, but, you know, I didn't ride on rides.  I'm a
11  chicken, I don't do rides.
12       Q.   So, but you spent the whole day there?
13       A.   Yes.
14       Q.   And at the end of the day, what did you do?
15       A.   End of the day it was getting, like, maybe
16  late in the afternoon, and that's when Dreddy came
17  to me, he was like, "You from North Carolina?"  I
18  said, "Yes."  He was like, "Well, we right here, do
19  you want to go to North Carolina, see about your
20  neighborhood?"  I said, "Sure, no problem."  That's
21  what I said.
22       Q.   What happened next?
23       A.   We took off and started going down North
24  Carolina.  So I said, "Well, I'm going to call my
25  people, some family I know down there for by the
```

2257

```
1    time I get there, we will have a cookout, you know."
2        Q.    Okay.  Did you call your family?
3        A.    Yes.
4        Q.    Do you remember who you spoke to?
5        A.    Yes, Annie.
6        Q.    Who is Annie?
7        A.    A good friend of the family.
8        Q.    And what did you tell Annie?
9        A.    I told her I got a couple of people coming
10   from Connecticut, coming down south with me, can you
11   be able to have the grill fired up for us.  She,
12   like, sure.
13       Q.    So, what did you guys do?
14       A.    We got there, but we got there kind of
15   late.  So when we got there we just went there and
16   chilled in her house, just chilled out and talked.
17   Everybody played cards, smoked weed.
18       Q.    Who were you smoking weed with?
19       A.    Me, Dreddy, his brother and some people
20   that was there.
21       Q.    Did you smoke a lot of weed on that trip?
22       A.    Oh, yes.
23       Q.    You and who?  With Ziggy or?
24       A.    Me and Ziggy.
25       Q.    Okay.  In the car?
```

2258

```
1        A.    Yes.
2        Q.    And just smoked a lot?
3        A.    Smoked.
4        Q.    So, you said you hung out.  Were you at
5    Annie's house hanging out?
6        A.    Yes.
7        Q.    And did you spend the night at that house?
8        A.    No, we didn't stay the night at that house.
9        Q.    Where did you sleep?
10       A.    We left that night, went to a hotel in
11   Greenville.
12       Q.    And how many rooms did you get in
13   Greenville?
14       A.    Two.
15       Q.    Who paid for those rooms?
16       A.    Dreddy.
17       Q.    Did you have money to pay for any of this?
18       A.    No.
19       Q.    So, you spent the night in the two rooms.
20   Who did you stay with?
21       A.    Ziggy.
22       Q.    What happened when you got up the next day,
23   what did you do?
24       A.    We got up the next day, I got in touch with
25   Annie, the house the night before -- the next day --
```

2259

```
1    that same night we got there.  We went -- all of us
2    got up, probably around -- I forgot what time we got
3    up then.  That's -- when he got up, because we had
4    to check out at 11 o'clock, but I think he went and
5    paid for another night.  So he paid for another
6    night.  We went to Pinetops to where the cookout was
7    going to happen at.
8        Q.    Is that your hometown?
9        A.    Yes.
10       Q.    Did you bring anything to the cookout?
11       A.    We went to the grocery store,
12   Piggly Wiggly.
13       Q.    Piggly Wiggly?
14       A.    Yes.
15       Q.    How do you remember its Piggly Wiggly?
16       A.    It's the only grocery store in town.
17       Q.    Is Pinetops a small town?
18       A.    Yes.
19       Q.    Who went in the Piggly Wiggly?
20       A.    Me, Charmaine, went to the grocery store.
21       Q.    And who paid for the groceries?
22       A.    The only thing I know was Charmaine.
23       Q.    And after you left the grocery store where
24   did you go?
25       A.    Back to the cookout.
```

2260

```
1        Q.    Did you stay at the cookout all night?
2        A.    No.  Me, Ziggy left to go get -- we ran out
3    of weed, so I told him I knew a couple of places we
4    can go.
5        Q.    So you left to go get weed?
6        A.    Yes.
7        Q.    And where did you go get weed.  Do you
8    remember?
9        A.    No.
10       Q.    Did you stop and visit anyone while you
11   were out with Ziggy?
12       A.    Yes.  I stopped by my aunt house and --
13   because I just seen her daughter just had a newborn,
14   so I hadn't seen him, so I went by there and
15   introduce him, my family to Ziggy, and we stayed for
16   like five, five minutes and, we left and went back
17   to the house.
18       Q.    Which aunt is that?
19       A.    Laura Willoughby.
20       Q.    Willoughby?
21       MS. DAYTON:  W-i-l-l-o-u-g-h-b-y, for
22   the record.
23       Q.    Where did you stay that night?
24       A.    That night we stayed to Annie house for
25   probably late, then we went back to the hotel.
```

**GA565**

2261

```
 1      Q.   The same hotel you had been at the night
 2   before?
 3      A.   Yes.
 4      Q.   When you got up in the morning.  What did
 5   you do?
 6      A.   We got up the next morning, we checked out
 7   at -- checkout time was 11:00.  We went to KFC, went
 8   inside a KFC, everybody went inside the KFC, went in
 9   KFC, that's when I know we was -- I found out I was
10   on our way to Georgia.
11      Q.   What do you mean you found out you were on
12   your way to Georgia?
13      A.   When we was in KFC that's when Dreddy said
14   he was going to see his uncle.
15      Q.   So, what happened next?
16      A.   We off to Georgia.  Why -- I left from KFC,
17   everybody gassed up and went to Wilson, and then got
18   on 95, and started down to Georgia.
19      Q.   As you were driving -- were you driving or
20   was Ziggy driving?
21      A.   Ziggy was driving.
22      Q.   And where was the defendant and his
23   girlfriend?
24      A.   In front of us.
25      Q.   In the other car?
```

2262

```
 1      A.   Yes.
 2      Q.   And as you are driving, did something
 3   happen?
 4      A.   Well, as we was driving, Dreddy was like in
 5   front of us and Ziggy was -- we was behind him and
 6   we was driving, and the car -- and do you know how
 7   state troopers sitting in the middle of the median?
 8   And then nobody could see him, and the other cars
 9   didn't see him either.  We was driving, we was
10   going, and the other car put on brakes real fast,
11   and we seen the brakes, so he put on brakes, so when
12   he put on brakes, that means we was coming right
13   close behind him, so the only thing the cops seen
14   was us right behind him.
15      Q.   Was it Dreddy's car or a third person's
16   car?
17      A.   Somebody.  It was a passenger -- not
18   passenger, somebody else was on the highway.
19      Q.   So, you guys saw the cops and slammed on
20   the brakes?
21           MR. SHEEHAN:  I would object to the
22   leading.
23           THE COURT:  Sustained.  We're at 11:15.
24   I think we should take a break.
25           MS. DAYTON:  Sure.
```

2263

```
 1           THE COURT:  All right, we'll take a
 2   15-minute break.
 3               (Jury exited the courtroom.)
 4           THE COURT:  All right.  Mr. Taylor, you
 5   will be excused for 15 minutes.  Please don't
 6   discuss your testimony with anyone.
 7               Will there be anything, Counsel, before
 8   we recess?
 9           MS. DAYTON:  No.
10           MR. SHEEHAN:  No, your Honor.
11           THE COURT:  Very well.  We stand in
12   recess.
13               (Recess)
14           THE COURT:  All right, we'll bring in
15   the jury.
16               (Jury entered the courtroom.)
17           THE COURT:  Please be seated, ladies and
18   gentlemen.  Continued direct examination of John
19   Taylor by Ms. Dayton.
20           MS. DAYTON:  You forgot my name, your
21   Honor?
22           THE COURT:  You are new on the scene,
23   right?
24      Q.   Mr. Taylor, you were saying that there was
25   a state police officer sitting in the median.
```

2264

```
 1   Explain what happened.
 2           MR. SHEEHAN:  Your Honor, if we're not
 3   using that exhibit-- is counsel using that exhibit
 4   now?  Thank you.
 5      A.   After that we got pulled over.  When we got
 6   pulled over, that's when the officer got out of the
 7   car and told us to get out of the car.  So then we
 8   got out of the car, he said, do you have any drugs
 9   or any guns or anything on you?  Both of us said no.
10   So they put me in front of the car, put him behind
11   the car.
12      Q.   Did you have any drugs on you?
13      A.   No.
14      Q.   Where was all of the weed?
15      A.   Smoked it up.
16      Q.   So, it was gone?
17      A.   Yes.
18      Q.   And did you have any weapons on you?
19      A.   No.
20      Q.   Did you know if Ziggy had any weapons on
21   him?
22      A.   No.
23      Q.   What happened next?
24      A.   The police came and start searching the
25   car.  When they start search the car, that's when he
```

2265

```
1   said, the police officer came over to me, he was,
2   like, "Who gun is this?"  "There is no gun, I don't
3   know nothing about no gun."  He said, "There is a
4   gun," and the officer held it up in front of the car
5   and I was, like --
6       Q.   Do you remember what type of gun it was?
7       A.   It looked like a revolver.
8       Q.   And what is it about the gun that makes you
9   say it looked like a revolver?
10      A.   The round -- where the bullets go, I think.
11      Q.   The round thing --
12      A.   Yes.
13      Q.   -- you said.  Okay.  And what happened
14  next?
15      A.   He went back and start searching the car
16  more and that's when he started talking to -- well,
17  they started talking to Ziggy and then they let us
18  go.
19      Q.   They just let you guys go?
20      A.   Uh-huh (indicating affirmatively).
21      Q.   How many police officers were on the scene?
22  If you remember.
23      A.   I don't remember.  I remember there was two
24  cars.
25      Q.   Two cars?
```

2266

```
1       A.   Yes.
2       Q.   Did they both pull you over?
3       A.   No, just one car.
4       Q.   And how did the other one get there?
5       A.   I know the other car was a K-9 car.
6       Q.   A K-9 car?
7       A.   Yeah.
8       Q.   What does that mean?
9       A.   A car with a dog in it.
10      Q.   Did you and Ziggy get back into the Jeep?
11      A.   Uh-huh (indicating affirmatively).
12      Q.   Is that a yes?
13      A.   Yes.
14      Q.   And what -- did you start driving again?
15      A.   Yes.
16      Q.   Heading north or south?
17      A.   South.
18      Q.   Did you have any conversation about getting
19  pulled over?
20      A.   Yes.  When I got back in the car I said,
21  "The officer said that you said the gun was mine."
22  He was, like, "No."  He said, "I didn't say that.
23  He's lying."  And that was that.
24      Q.   Did Ziggy say anything else about the gun?
25      A.   He said "That was my favorite."
```

2267

```
1       Q.   It was his favorite?
2       A.   Yeah.
3       Q.   Where did you go -- well, when you got
4   pulled over, you mentioned that the defendant and
5   his girlfriend were in front of you in a car.  Did
6   they stop?
7       A.   They took the next exit.
8       Q.   How do you know that?
9       A.   I guess it was -- I guess Dreddy must have
10  already told them before the trip and he just
11  automatically just took the first exit.
12      Q.   Who is he?
13      A.   Ziggy.
14      Q.   So, the first exit after you got pulled
15  over?
16      A.   Yes.
17      Q.   And when you pulled off the exit, what did
18  you do?
19      A.   We went to a -- like a little auto part --
20  not an auto part store, maybe a place where they fix
21  cars at.  And there was a guy standing out there and
22  he was fixing cars, and we asked him, he said --
23  asked him, said, "Do you know a guy with a burgundy
24  car with Connecticut plates?"  He said, "Oh, yeah,
25  he said take the next exit."
```

2268

```
1       Q.   So, what did you guys do?
2       A.   We got on the highway and took the next
3   exit.
4       Q.   Where did you go?
5       A.   To a hotel.  That's all I remember.
6       Q.   A hotel?
7       A.   Yes.
8       Q.   Close to the highway?
9       A.   Yes.
10      Q.   When you got to the hotel, what did you do?
11      A.   We got in the hotel, Ziggy started telling
12  them what happened and everything.
13      Q.   Telling who?
14      A.   Dreddy.
15      Q.   Telling him about -- you said what
16  happened?
17      A.   About the gun, and how we got pulled over
18  and stuff.
19      Q.   Was the girlfriend -- was Dreddy's
20  girlfriend present for that conversation?
21      A.   I think so.  I'm not for sure.
22      Q.   Okay.
23      A.   But I think all of us was together.
24      Q.   In one room?
25      A.   Yes.
```

2269

```
1      Q.   And what happened after this conversation?
2      A.   Then that's when he -- I overhearing, I
3  overheard the girlfriend and Dreddy was saying,
4  "Well, no need for us to stay here.  We might as
5  well just go ahead and get back on the highway."  So
6  that's when -- I went in the car.  That's when they
7  went to the front office, I guess to turn the key
8  back in, get they money back, or however they did
9  it.
10     Q.   What happened next?
11     A.   We got back on the highway heading towards
12 Georgia.
13     Q.   What car were you in now?
14     A.   The same car, the Jeep Cherokee.
15     Q.   With Ziggy?
16     A.   Yes.
17     Q.   And where were the defendant and his
18 girlfriend?
19     A.   In the burgundy Cadillac.
20     Q.   And the four of you started heading south
21 again?
22     A.   Yes.
23     Q.   Where did you go?
24     A.   Well, we got to Georgia around about kind
25 of late, late, maybe like 12:00 maybe something in
```

2270

```
1  the morning.  It was real late.  I guess Dreddy was
2  trying to get in touch with his uncle.  He was
3  trying to get in touch with his uncle.  He didn't
4  get in touch with him right as soon as we got to
5  Georgia, he got in touch with him maybe like a
6  couple -- maybe later on that night or after we got
7  the hotel, I guess.
8      Q.   So, you've got a hotel in Georgia?
9      A.   Yes.
10     Q.   And where was this hotel?  Do you know what
11 city you were in?
12     A.   The only thing I know it was the state of
13 Georgia.
14     Q.   And when you got the hotel, was it one
15 room, two rooms?
16     A.   It was one room.
17     Q.   For all four of you this time?
18     A.   Yes.
19     Q.   And who paid?
20     A.   Dreddy.
21     Q.   You guys went to sleep there that night?
22     A.   Yes.
23     Q.   What did you do the next day?
24     A.   I guess in the time we was sleeping --
25 before we went to sleep that's when he got the phone
```

2271

```
1  call from his uncle.  When he got the phone call
2  from his uncle, he said that -- to meet him
3  somewhere.  So, he knew -- I guess he put it in his
4  GPS of his car, and then we just followed him.
5      Q.   So was that that night or the next morning?
6      A.   The next morning.
7      Q.   So, you were in the car with who?
8      A.   Ziggy.
9      Q.   And you were following who?
10     A.   Dreddy.
11     Q.   And his girlfriend?
12     A.   Yes.
13     Q.   Where did you follow them to?
14     A.   To some building that was in Georgia where
15 his uncle directed Dreddy to come to.
16     Q.   Did you see his uncle there?
17     A.   Yes.
18     Q.   And was that inside the building or outside
19 the building?
20     A.   Outside.
21     Q.   What did you do when you met up with the
22 uncle?
23     A.   We met up with him, they got out and
24 hugged, we spoke, "Hey, how you doing."  We got back
25 in the car, we followed the uncle.
```

2272

```
1      Q.   Where did you go with the uncle?
2      A.   To his place.
3      Q.   And where did he live, if you know?
4      A.   I'm not exactly sure.
5      Q.   In Georgia?
6      A.   Yeah.
7      Q.   Was it a house, an apartment?
8      A.   A house.
9      Q.   When you got to the uncle's house, did you
10 go inside?
11     A.   Yes.
12     Q.   What did you do?
13     A.   We got inside, we -- I met -- his wife
14 wasn't there at the time.  She got out of work with
15 his uncle daughter.  So, all of them got off work
16 and everybody met and introduced everybody.  He
17 introduced his brother, he introduced his baby mom,
18 he introduce me.
19     Q.   So, the defendant is introducing you to
20 everybody, you said the uncle, the uncle's wife, and
21 his daughter?
22     A.   Yes.
23          MR. SHEEHAN:  Objection, leading.
24          MS. DAYTON:  I'm just trying to clarify
25 because it's hard to hear, your Honor.
```

2273

```
 1            THE COURT:  You need to keep moving
 2   towards there.
 3            MS. DAYTON:  Okay.
 4       Q.   And after introductions were made, what did
 5   you guys do?
 6       A.   We stayed for -- until later on that night
 7   and then he started asking his uncle about his
 8   cousin, a female cousin that he had in Georgia.
 9       Q.   When you say "he," you mean the defendant?
10       A.   Yes.
11       Q.   And what happened?
12       A.   We all -- me, him and Dreddy and -- me --
13   no, Dreddy, his girlfriend and Ziggy and I, all of
14   us, went to -- left and we started riding around.  I
15   guess we tried to find the place, but no one really
16   don't know where to go, didn't know how to go about
17   to find it, so we went and got something to eat.
18       Q.   Where did you go to get something to eat?
19       A.   Jamaican, Jamaican spot.
20       Q.   What did you do next?
21       A.   Went back to the house.
22       Q.   Uncle's house?
23       A.   Yes.
24       Q.   When you got back to the uncle's house,
25   what did you do?
```

2274

```
 1       A.   We got back to the uncle's house, we -- I
 2   think the uncle came home, came back, and we -- I
 3   guess he started talking to his uncle.  They was
 4   more like in the garage mostly talking with him.
 5       Q.   You are pointing to the defendant?
 6       A.   Yes.
 7       Q.   Okay.
 8       A.   He was talking to his uncle, him and his
 9   brother all -- most of the time they was under the
10   garage where the car goes, and they was out there
11   talking most of the time.
12       Q.   What were you doing?
13       A.   In the house.
14       Q.   At any point did you come out of the house?
15       A.   Yes.
16       Q.   And where did you go?
17       A.   Out there where they were.
18       Q.   And did you engage in the conversation with
19   them?
20       A.   Well, then I came out it wasn't -- like,
21   the conversation was over.  Maybe they was talking
22   about something else.
23       Q.   Did you stay out there for a while or did
24   you go back in?
25       A.   I stayed out for a while.
```

2275

```
 1       Q.   And what were you guys doing?
 2       A.   Everybody just talking.
 3       Q.   And did you have any conversations with the
 4   defendant?
 5       A.   We talked.  We talked, but it was like
 6   regular conversation talk.  Mostly he was trying to
 7   find his cousin.
 8       Q.   At some point did the defendant ask you
 9   something?
10       A.   Yes.
11       Q.   And what did he ask you?
12       A.   Could I help him.
13       Q.   With what?
14       A.   With something when we get back to
15   Connecticut.
16       Q.   Okay.  What did he tell you he needed help
17   with?
18       A.   He didn't say specifically.
19       Q.   And when he asked you if you could help him
20   with something, what did you tell him?
21       A.   Yes, yes.
22       Q.   Yes, yes, like your name?
23       A.   Yes.
24       Q.   Did you overhear the defendant having any
25   other conversations?
```

2276

```
 1       A.   He was talking to his brother.
 2       Q.   When you say "his brother," you mean Ziggy?
 3       A.   Yes.  But then he was at -- we've got up
 4   with his cousin at the time later on that night, and
 5   when we got up with his cousin, that's when he told
 6   me about all of this.  We was smoking weed and
 7   playing spades and stuff like that, and that's when
 8   they was on the patio, they was talking among
 9   themselves, so -- we couldn't smoke inside the
10   house, so we had to go on the patio and smoke.
11       Q.   Why couldn't you smoke in the house?
12       A.   Because his cousin had kids there.
13       Q.   Okay.
14       A.   So then we just went outside on the patio
15   and smoked.
16       Q.   And who was on the patio?
17       A.   Me, Dreddy, Ziggy and me and his cousin and
18   his baby mama.
19       Q.   A female cousin?
20       A.   Yes.
21       Q.   And the girlfriend that came down with you
22   guys?
23       A.   Yes.
24       Q.   And what was the discussion on the patio?
25       A.   The only thing what I overheard was --
```

2277

```
1   because he wasn't talking to me directly, he was
2   talking to his brother, like they was standing like
3   face-to-face.
4        Q.   You mean Dreddy and Ziggy?
5        A.   Yes.  He was standing face-to-face.  He
6   said I had a problem with some people in this
7   building, and I didn't really --
8        Q.   Did you know what they were talking about?
9        A.   No.
10       Q.   Did you hear anything else?
11       A.   No, that's the only thing I really heard,
12  you know.
13       Q.   And after that conversation, did you guys
14  spend the night there?  Did you leave?  What did you
15  do?
16       A.   We left that night.
17       Q.   Okay, where did you go?
18       A.   Back to his uncle house.
19       Q.   And where did you stay that night?
20       A.   We stayed at his uncle house.
21       Q.   So you had -- this conversation on the
22  patio took place at the cousin's house?
23       A.   Yeah, the female.
24       Q.   You spent the night at the uncle's house?
25       A.   Yes.
```

2278

```
1        Q.   And what did you do the next day?
2        A.   We went back -- went back, coming back to
3   Connecticut.
4        Q.   Why such a short trip?
5        A.   I don't really know.  The only thing I was
6   just a ride-along.  That's all I know.
7        Q.   Was there some pressing matter that someone
8   had to get back for?
9             MR. SHEEHAN:  Objection, leading.
10            THE COURT:  Overruled.
11       A.   Not if I know of.
12       Q.   Okay.  When you drove back, did you stop
13  anywhere?
14       A.   Get gas.
15       Q.   Okay.
16       A.   And we stopped -- no, we stopped and rested
17  at a rest stop in Jersey.
18       Q.   And did you stop for gas as well?
19       A.   Yes.
20       Q.   Who paid for the gas?
21       A.   I guess he gave Ziggy some money then.
22       Q.   You say you guess.  Why do you guess?
23       A.   Because he filled up and we was still
24  there.  He already had left going back, going to
25  Connecticut, and we still there and he went inside
```

2279

```
1   and paid for the gas.
2        Q.   Do you know what day you got back to
3   Connecticut specifically?
4        A.   Not for sure.
5        Q.   Was it a weekend, a weekday.  Do you know?
6        A.   I don't know.  It was -- I know it was the
7   weekend of -- weekend -- it had to be on a weekend,
8   or a Saturday or Sunday that we got back.
9        Q.   But you are not specific?
10       A.   No, not for sure.
11       Q.   And when you got back to Connecticut, how
12  did you get home to Norwalk?
13       A.   Ziggy dropped me off.
14       Q.   And when you got home, what did you do?
15       A.   Relax.
16       Q.   When is the next time that you heard from
17  the defendant?
18       A.   I'm not for sure if it was a couple days
19  later or if it was the next day, but I know he had
20  called me.  When he had called me he said, "Can you
21  come to Bridgeport?"
22       Q.   And when he would call you, would he call
23  you on a hard line or on a cell phone?
24       A.   Cell phone.
25       Q.   And is that the cell phone you said was
```

2280

```
1   your number?
2        A.   Yes.
3        Q.   And he asked you to come to Bridgeport.
4   Did he tell you why?
5        A.   No.
6        Q.   Did you go?
7        A.   Yes.
8        Q.   How did you get there?
9        A.   The first time I went down on the train.
10       Q.   And where did you take the train from?
11       A.   From Norwalk to Bridgeport.
12       Q.   And when you got to the train station, what
13  did you do in Bridgeport?
14       A.   We --
15       Q.   Who is we?
16       A.   Me and -- Ziggy had picked me up.
17       Q.   Ziggy picked you up?
18       A.   Yes.
19       Q.   What was Ziggy driving?
20       A.   A black four-door Toyota.
21       Q.   So, Ziggy picked you up.  Did you get in
22  the car with him?
23       A.   Yes.
24       Q.   Was it the two of you or were there more
25  people in there?
```

2281

```
1      A.   Just the two.
2      Q.   And what did you do?
3      A.   We rode around Bridgeport.
4      Q.   Doing what?
5      A.   Just free-lancing, looking around.  Just
6   looking at places, houses and stuff.
7      Q.   Did you know those areas?
8      A.   No.
9      Q.   Did Ziggy know those areas, if you know?
10     A.   Yes.
11     Q.   How do you know?
12     A.   Because he gave me one project name, was
13  Father Panik or something.
14     Q.   Was there a project there?
15     A.   No, there wasn't.  It was just flat land.
16     Q.   And he showed that to you?
17     A.   Uh-huh (indicating affirmatively) yes.
18     Q.   Did he tell you anything about it?
19     A.   He just told me it was a project that was
20  there.
21     Q.   Had you ever heard of Father Panik?
22     A.   No.
23     Q.   Where did you go?  Did you just drive
24  around all night or did you go somewhere?
25     A.   We drove around and I guess he got the
```

2282

```
1   phone call, then we met Dreddy at some parking lot
2   in some building.  I don't really -- I don't know
3   the name of it.  I don't really know where it's at.
4      Q.   Did you pick that parking lot?
5      A.   No.
6      Q.   And you said you met Dreddy there.  Was he
7   standing there or did he have a car?
8      A.   Well, we got there before he did and then
9   he drove there afterwards.
10     Q.   What was the defendant driving?
11     A.   Burgundy four-door Cadillac.
12     Q.   The same one you mentioned earlier?
13     A.   Yes.
14     Q.   When he -- when the defendant came into the
15  parking lot, did you meet with him?
16     A.   Yes.
17     Q.   Did you talk?
18     A.   Well, him and his brother talked more
19  mostly, but...
20     Q.   What happened next?
21     A.   Everybody got into the four-door Toyota
22  Corolla and -- we got in the Toyota Corolla, we
23  started riding around, and they started talking.
24  And he said something about duct tape and he
25  wanted --
```

2283

```
1      Q.   Who is he?
2      A.   Dreddy.
3      Q.   He said something about duct tape and what
4   happened?
5      A.   After that we rode around to some stores.
6   I wouldn't -- I couldn't go back right to the day.
7   And some more other places, and -- but...
8      Q.   Did you eventually stop at a store?
9      A.   Yes.
10     Q.   Did you stop at more than one store?
11     A.   Yes.
12     Q.   Did anyone get out of the car at any of the
13  stores?
14     A.   Dreddy.
15     Q.   And did you at any point see him come back
16  to the car with anything?
17     A.   When we got to the Walgreen's.
18     Q.   Do you know which Walgreen's?
19     A.   I'm not exactly sure, but at the time I
20  didn't know -- I didn't know where I was at.
21     Q.   But you went to a Walgreen's?
22     A.   Yes.
23     Q.   Let me ask you a question.  Did you
24  later, much longer after this, go out with some law
25  enforcement officers on a drive around Bridgeport
```

2284

```
1   like just maybe six months ago?
2      A.   Yes.
3      Q.   Did you point out that Walgreen's?
4      A.   Yes.
5      Q.   So, when you stopped at Walgreen's, it was
6   just the three of you, you, Dreddy and Ziggy?
7      A.   Yes.
8      Q.   And who, if anyone, went inside?
9      A.   Of the Walgreen's?
10     Q.   Yes.
11     A.   Dreddy.
12     Q.   Did he come out with anything?
13     A.   Yes.
14     Q.   What?
15     A.   Duct tape and a Walgreen bag.
16     Q.   How do you know there was duct tape in the
17  Walgreen's bag?
18     A.   That's the only thing he was looking for.
19     Q.   What color was the bag, if you remember?
20     A.   Clear.
21     Q.   Clear, like, see-through?
22     A.   No.  A white clear Walgreen bag.  White.
23     Q.   But you could see into the bag?  Like thin
24  or something?
25     A.   Yeah.
```

2285

```
1     Q.   Did the defendant get back in the car?
2     A.   Yes.
3     Q.   Where did you go?
4     A.   It wasn't that far.  We drove and then went
5  to this diner.
6     Q.   Where was the diner?
7     A.   Right besides the place where he told me he
8  was going to set me up at.
9     Q.   Okay.  What do you mean by that?
10    A.   That -- well, it was on the trip he said he
11 was going to -- he was going to set me up a place.
12 You know, set me up, I guess.
13    Q.   What do you mean by that, set you up?  What
14 was your understanding?
15    A.   For a place to make money.
16    Q.   Make money doing what?
17    A.   Selling drugs.
18    Q.   So when you get to this diner, you
19 mentioned it's next to the building where he's going
20 to set you up.  How do you know that?
21    A.   Because that's what he told me.
22    Q.   Was the diner in the middle of a block?
23 Where was it on the street that you went to?  Do you
24 remember?
25    A.   The diner?
```

2286

```
1     Q.   Yeah.
2     A.   It was on a corner.  I don't know what
3  corner.  I don't know, it was a diner and then it
4  was the building.
5     Q.   Okay.  So, if you are looking from your
6  view at the diner, is the building on the left or
7  the right of the diner?
8     A.   The right.
9     Q.   Okay.  And did you guys -- you said you
10 were going to the diner.  Did you actually go to the
11 diner?
12    A.   Yes, we went inside.  We went inside the
13 diner.  We sat down, we got a sandwich.  Then next
14 time I know, we came out of the diner, then that's
15 when we went in the back of the diner where we
16 parked at and that's when we met another guy.
17    Q.   And who was that other guy?
18    A.   I don't know his name.
19    Q.   What did he look like?
20    A.   Big, light-skinned guy with corn rows.
21    Q.   A light-skinned guy with corn rows, you
22 said?
23    A.   Yes.
24    Q.   I'm going to show you a photograph that's
25 been marked.
```

2287

```
1          MS. DAYTON:  Government's Exhibit 208
2  for identification, your Honor.
3     Q.   Do you see that person there?
4     A.   Yes.
5     Q.   And do you recognize who that is?
6     A.   Yes, that's the other guy we met.
7     Q.   Did you hear any name that he was called?
8  Or what did you refer to him as?
9     A.   Big Boy.  Nobody ain't never said no names.
10         MS. DAYTON:  Your Honor, if I may move
11 Government's Exhibit 208 into evidence.
12         MR. SHEEHAN:  No objection.
13         THE COURT:  All right, full exhibit.
14         MS. DAYTON:  Thank you.
15    Q.   So you met him, you said, at the back of
16 the diner?
17    A.   Yes.
18    Q.   And what you said, you parked at the back
19 of the diner?
20    A.   Yes, by close by the dumpster.
21    Q.   Okay.  I'm going to show you -- no, not
22 that.  Sorry.
23         Do you recognize what's in the picture,
24 Government's Exhibit 110?
25    A.   Yes.
```

2288

```
1     Q.   What is that a picture of?
2     A.   The apartment building that's on your left.
3     Q.   Why don't you look at it up on the screen,
4  that might help.  Okay.
5     A.   Yes.  That's where we parked over there.  I
6  see some people, but...
7     Q.   Where the people are in the picture?
8     A.   Yes, but I think it was a little further
9  back because right here, where that little ledge at,
10 right down here.
11    Q.   Yes.
12    A.   That's where we came over at.
13    Q.   So, you said you were on the left side of
14 the picture.
15    A.   Uh-huh (indicating affirmatively).
16    Q.   And what's over there on the left side?
17    A.   Where we was at?
18    Q.   Yes.
19    A.   That's where we parked at and that's where
20 we met the other -- the fourth person.
21    Q.   Behind the diner?
22    A.   Yes.
23    Q.   And what is this pictured on the right, if
24 you know?
25    A.   That's the building.
```

2289

1  Q.  Okay.  And when you met this individual,
2  did you speak with him?
3  A.  No.
4  Q.  Did Dreddy speak to him?
5  A.  Yes.
6  Q.  And where were you all standing while the
7  defendant was speaking to this guy?
8  A.  Like, we wasn't, like, in no huddle, it was
9  just like everybody was right standing there.
10  Q.  Were you standing near anything?
11  A.  I'm not for sure.
12  Q.  Okay.
13  A.  I know I was standing besides that wall
14  right there.
15  Q.  Besides the wall on the left?
16  A.  Yes.
17  Q.  I'm going to show you a picture that I'm
18  practically incapable of showing you.  And was it
19  daylight or was it nighttime when you were there?
20  A.  Daylight.
21  Q.  Okay.
22  A.  No, no, nighttime.
23  Q.  Nighttime.  Is there lights up there?
24  A.  Yeah, streetlights.
25  Q.  Was there anyone else standing there other

2290

1  than the four of you?
2  A.  It was a some streetwalker, she was walking
3  down the street like in front, like in the front of
4  the building.
5  Q.  I'm going to show you what's in evidence as
6  Government's Exhibit 101, I believe.  Do you
7  recognize what that is an aerial photograph of?
8  A.  That's the diner at the bottom where the
9  cars lined up all the way.
10  Q.  Why don't you point to it on the big screen
11  if you can.  We had a pointer, it's disappeared.
12  A.  That's the diner.
13  Q.  On the left, lower left-hand corner?
14  A.  Yeah.
15  Q.  Okay.
16  A.  And that's the spot where we parked at
17  right here.
18  Q.  I'm going to give you a pointer.  If you
19  can use this.  You can stand up if you need to.
20  A.  This the diner.  This where we parked at
21  round here.
22       MS. DAYTON:  Indicating the lower
23  left-hand corner of the picture.
24  Q.  But on the right side of the parking lot of
25  the building that you said was the diner?

2291

1  A.  Yes.
2  Q.  Which is the lower left-hand of the
3  picture.  What are the cars pulled up to?
4  A.  The wall.
5  Q.  Okay.  And what's on the other side of the
6  wall?
7  A.  The little ledge of another little wall in
8  the back where the dumpster at.
9  Q.  And what's the building in the middle?
10  A.  The building where we went to.
11  Q.  Okay.  So, as you are standing back there,
12  what is the -- what's the nature of the discussion
13  that you had?  What do you talk about?
14  A.  That he wanted to move some people out.
15  Q.  And when he said he wanted to move some
16  people out, what did that mean to you?
17  A.  To take them out or move them out, out of
18  the building.
19  Q.  Why?
20  A.  The only thing I overheard was he was
21  saying they was -- they was into his money business.
22  Q.  Into whose money business?
23  A.  Dreddy's.
24  Q.  And who was Dreddy telling that he wanted
25  to move these people out?

2292

1  A.  I guess he was telling everybody that was
2  there.
3  Q.  Okay.  So yourself included?
4  A.  Yes.
5  Q.  And what happened next?
6       Do you recognize what this is, Government's
7  Exhibit 112?
8  A.  Yes, that's the little ledge right there
9  where we was on.
10  Q.  Okay.  And what happened?
11  A.  The girl that walked by, we had to wait
12  'til the girl go by.
13  Q.  Do you know what the girl looked like?
14  A.  All I remember is she was a dark skin that
15  was real skinny.
16  Q.  When you say "a girl," do you mean a young
17  girl or a woman?
18  A.  She was an older woman, yes.
19  Q.  So, a woman comes walking by.  What drew
20  your attention about her?
21  A.  Because she was watching us.
22  Q.  Were you watching her?
23  A.  Yes.
24  Q.  And what happened next?
25  A.  After she walked by, went by, that's when

2293

```
1   everybody went over.
2      Q.   Over what?
3      A.   The wall.
4      Q.   When you went over the wall, did you have
5   anything with you?
6      A.   Bats.
7      Q.   Bats?
8      A.   Yes.
9      Q.   Who had the bats?
10     A.   Ziggy and the big guy.
11     Q.   And were you just dressed in plain clothes?
12  How were you dressed?
13     A.   Black.
14     Q.   In black?
15     A.   Yes.
16     Q.   You?
17     A.   Well, I was.
18     Q.   What about the defendant?
19     A.   I can't remember what he had on.
20     Q.   And what about Ziggy, if you remember?
21     A.   No.
22     Q.   And what about the big guy?
23     A.   No.
24     Q.   And did you have anything else on you?
25     A.   At the time I didn't know it, if anything
```

2294

```
1   was on until we got inside of the building.
2      Q.   How did you get into the building?
3      A.   One of these doors at the bottom down here.
4          MS. DAYTON:   Indicating the left side of
5   the picture.
6      Q.   Let me show you a different picture.  Do
7   you recognize what this is, Exhibit 111?
8      A.   Yes.
9      Q.   What is it?
10     A.   That's, it look like one of the doors that
11  we went through.
12     Q.   And what happened?
13     A.   We went in, we went in one of them doors in
14  the back of the building, went into it, went up to
15  the building, to the end of the building, we went up
16  to the -- I don't know if it was the second or the
17  third floor.  It was one of them.  Went up to the
18  top of the building, then we walked all the way down
19  the hallway, all four of us.  And we walked all the
20  way down the hallway.  That's when he was -- he left
21  -- like, he didn't leave, like, right after we got
22  over the wall, but he was already in the building.
23     Q.   The defendant was already in the building?
24     A.   Like, not right way.  Before we crossed the
25  wall, everybody would cross the wall, but then he
```

2295

```
1   already went in.
2      Q.   Okay.
3      A.   So when he went in, that's when he went
4   inside the building, and we got on to the top floor,
5   that's when we seen him again.
6      Q.   You saw the defendant again?
7      A.   Yes.
8      Q.   Okay.
9      A.   And then we -- everybody lined up on the
10  wall inside of the building.  We lined inside of the
11  building, that's when we was, like, standing right
12  here, then there with a girl knocking on the door.
13     Q.   Knocking on which door?
14     A.   Inside of the building.
15     Q.   Okay.  Let me go back for a minute.
16         You come into the building.  How do you get
17  upstairs?  You said you don't know exactly -- how
18  many flights of stairs do you go?  Do you remember?
19     A.   I think it was the second floor.
20     Q.   So, second floor from this ground, right
21  here?
22     A.   Yes, because when we get inside, you got to
23  go up the stairs and then you've got to up some more
24  steps and then you got to go up another one.  It was
25  so many, you don't really know how many steps you
```

2296

```
1   going up.
2      Q.   Had you ever been in this building before
3   that day?
4      A.   No.
5      Q.   And you mentioned that the big guy and
6   Ziggy had bats.  Did you?
7      A.   Yes.
8      Q.   Did you see where those bats came from?
9      A.   The big guy brung [sic] them.
10     Q.   And so he was -- how do you know that?
11     A.   We didn't have no bats with us when we got
12  to the diner.  The only time I seen bats, when he
13  arrived.
14     Q.   Did you see him take them out of his car or
15  anything like that?
16     A.   No.
17     Q.   You just saw bats all of sudden?
18     A.   Yes.
19     Q.   So, do you have any sort of disguise on
20  while you guys are going into the building?
21     A.   Ziggy gave us masks.
22     Q.   What kind of masks?
23     A.   A mask with hole in the nose.
24     Q.   So, holes for the eyes and the nose, you
25  are indicating?
```

2297

```
1       A.    Yeah.
2       Q.    Did you have anything on your hands?
3       A.    Latex gloves.
4       Q.    Where did you get the latex gloves from?
5       A.    Ziggy.
6       Q.    So you go into the building, you go up and
7  you said you were lining up against a wall.  And who
8  do you see knocking on the door?
9       A.    A light-skinned female.
10      Q.    And what happened next?
11      A.    She kept knocking, she knock, she knock, we
12 waited, she knock, nobody came to the door.
13      Q.    So what did you do?
14      A.    We left, went to another floor, top of that
15 floor.
16      Q.    So, you went up?
17      A.    Yes.
18      Q.    And did go up one flight, two flights, do
19 you know?  Do you remember?
20      A.    I remember, but I don't know.  I think it
21 was the third floor, I think.
22      Q.    You went to what you believe to be the
23 third floor?
24      A.    Yes.
25      Q.    When you got to that floor, what did you
```

2298

```
1  do?
2       A.    We went inside the building of one of his
3  drug spots he say he had.
4       Q.    The defendant told you it was one of his
5  drug spots?
6       A.    Yes.
7       Q.    Who did you see inside there, if anyone?
8       A.    The female that knocked on the door and
9  another male.
10      Q.    What did the female look like?
11      A.    Light-skinned, maybe Hispanic.
12      Q.    Okay.  And what happened next?  Who was in
13 there besides the female, the male?  Do you remember
14 what he looked like?
15      A.    No, not -- no, not for sure.
16      Q.    And who else was there?  Was it all four of
17 you?
18      A.    Yes.  No, I think the big guy had left.
19      Q.    Okay.
20      A.    And --
21      Q.    Go ahead.
22      A.    When we got inside the building, we got
23 inside the apartment, I think the big guy left with
24 the bats.  I didn't see the bats no more.
25      Q.    When you got into that third floor
```

2299

```
1  apartment?
2       A.    Yeah, in the third floor apartment.
3       Q.    So, you didn't see the bats when you went
4  in there?
5       A.    No.
6       Q.    You said the defendant told you this was
7  one of his spots.  Do you remember what else, if
8  anything, he said?
9       A.    This is one of his spots and that's where
10 he was going to set me up at.  And he put me to --
11 he told me to go stand -- it was a chair sitting
12 besides a window of that apartment and you could see
13 when you look out that -- when you look outside you
14 could see the walkway of that apartment with a big
15 tree, and there was a girl walking.
16      Q.    Okay.  Showing you what's been marked as --
17 or it's in evidence as Government's Exhibit 102, do
18 you recognize what this is?
19      A.    Yes, at the top that's where I was at,
20 right up here.
21      Q.    The upper left-hand side behind the big
22 tree?
23      A.    Yes.
24      Q.    Inside an apartment?
25      A.    Yes.
```

2300

```
1       Q.    So, go ahead.  He told you that he was
2  going to set you up there.  What were you going to
3  do?
4       A.    He just told me that I'm going to be
5  sitting here watching them, make sure they do
6  everything right, correctly and stuff, you know.
7  And that's when a girl had came up, somebody
8  walking, and she was looking up at the building --
9  up in the window.  And he called the girl name out,
10 so I didn't know who she was, and the next thing I
11 know, like two, three minutes after that, that's
12 when he knocked -- or she knocked on the door.  And
13 when she knocked on the door, he opened the door up
14 and she came in and he shut the door back and he
15 served her.
16      Q.    When you say "he served her," what did he
17 serve her?
18      A.    Crack.
19      Q.    You saw the defendant give this woman
20 crack?
21      A.    Yes.
22      Q.    Do you remember what that woman looked
23 like?
24      A.    If I see her again, yes.
25      Q.    Have you seen some pictures before and
```

2301

```
1    recognized that woman?
2        A.   Yes.
3        Q.   I'm going to show you what's been marked
4    Government's Exhibit 213.  Do you recognize who that
5    is?
6        A.   Yes.
7        Q.   Who is that?
8        A.   That's the girl that came in, bought the
9    crack from Dreddy.
10       Q.   Do you know her name?
11       A.   No.
12       Q.   How long did you spend in this third floor
13   apartment?
14       A.   I can't really give you a time because I
15   don't really know, but I know it was no short time
16   and it was no long time.
17       Q.   At some point you left?
18       A.   Yes.
19       Q.   Where did you go?
20       A.   Jump back on the train, went back -- he
21   took me to the train station, dropped me off at the
22   train station, I went back to Norwalk.
23       Q.   Was it light out or dark?
24       A.   It was still dark.  Enough time to catch a
25   train.
```

2302

```
1        Q.   After that night, when is the next time you
2    remember hearing from the defendant?
3        A.   I don't remember.  I can't really say.  I
4    don't really know to give you specific, like, if it
5    was the next day or it was a couple days later.  But
6    I know that he called me up and told me to come back
7    and told me, he said, "Well, the big guy got a
8    couple girls at the diner, do you want to come up?"
9        Q.   So, what did you say?
10       A.   Yeah.
11       Q.   Did you go up?
12       A.   Yeah.
13       Q.   How did you get there?
14       A.   Well, since he said it was a couple girls,
15   the girl I was staying with, I just grabbed her car
16   and just went to Bridgeport.
17       Q.   Why -- how did you connect two things that
18   there is girls and you took a car?  What was the
19   connection between those?
20       A.   If I had to stay later I wouldn't never had
21   a ride to get back unless he was going to take me
22   back to Norwalk.
23       Q.   So, you were hoping to stay later?
24       A.   Right.
25       Q.   And when you drove up, where did you go?
```

2303

```
1        A.   I didn't really know where to go, but I got
2    on the phone and I called Ziggy and he gave me
3    direction what exit to take off and where to go from
4    there.
5        Q.   Where did you go?
6        A.   I don't remember the exit, but I just know
7    he just told me to take the exit and I took off and
8    I came off.  When I came off, I came off and I came
9    by the train station, the bus station right there,
10   that road, and I came down and I went, made that
11   right.
12       Q.   And did you meet somebody?
13       A.   Yes.  When I got to that parking lot.
14       Q.   The same parking lot you had been in the
15   few nights before?
16       A.   Yes.
17       Q.   And who was there?
18       A.   Ziggy.  Ziggy was there.
19       Q.   Alone?
20       A.   Yes.
21       Q.   Did he walk there or did he drive?  Do you
22   know?
23       A.   The same Black Corolla, four-door Corolla.
24       Q.   And what did you do once you got there?
25       A.   We waited for Dreddy.
```

2304

```
1        Q.   Did he show up?
2        A.   Yes.
3        Q.   And what about Dreddy, was he walking or
4    driving?
5        A.   He drove the same four-door burgundy
6    Cadillac.
7        Q.   What happened after Dreddy arrived?
8        A.   We got in the car, we drove off.
9        Q.   You got in which car?
10       A.   The four-door Toyota Corolla.
11       Q.   Where did you sit in the car?
12       A.   In the backseat.
13       Q.   And who was driving?
14       A.   Ziggy.
15       Q.   As Ziggy was driving, was the defendant
16   doing anything?
17       A.   Not that I recall.
18       Q.   Okay.
19       A.   But...
20       Q.   Any talking going on in the car?
21       A.   No.
22       Q.   Where did you go?
23       A.   Back to the building where he was selling
24   drugs, where he was selling drugs at.
25       Q.   The same building you had been to?
```

**GA576**

2305

```
1        A.    Yes.
2        Q.    Where did you park?
3        A.    We got to -- when I realized -- when we
4   left from -- from where we was at, we went on the
5   highway, and I was already lost, but then when I got
6   over there where he was selling drugs and I seen the
7   diner and the building, then I knew where I was at.
8   I was, like, we over here, back on over here at the
9   diner.  So now I'm thinking we going to meet the
10  girls.
11       Q.    At the diner?
12       A.    At the diner.
13       Q.    Okay.
14       A.    But we didn't go to the diner, we went to
15  -- we went in the front of the building.
16       Q.    I'll show you the -- 102 again.  Go ahead.
17       A.    The parking, we drove down there and all
18  the way to the back.
19       Q.    Into the underground garage?
20       A.    Yes.
21       Q.    I'm going to show you what's in evidence as
22  113A.
23            MS. DAYTON:  Your Honor, do you mind
24  turning the lights down a little bit?  Thank you.
25       Q.    You can look on your screen, that might
```

2306

```
1   help.  Do you recognize what this is a picture of?
2        A.    Yes.  We parked at the back where -- at the
3   back right back here.
4            MS. DAYTON:  Indicating the far right of
5   113A, your Honor.
6        Q.    And when you parked, did you stay in the
7   car, did you get out?
8        A.    We got out the car.  When we got out the
9   car, that's when the big guy came.
10       Q.    Where did the big guy come from?
11       A.    From the front of that, where we drove in
12  at.
13       Q.    From the front of the garage?
14       A.    Yes.
15       Q.    Showing you Government's Exhibit 113B, do
16  you recognize this photo?
17       A.    Yes.
18       Q.    And if you can indicate from where you saw
19  the big guy walking in.
20       A.    From that way.
21       Q.    Which way?
22       A.    The front end.
23       A.    Where the light is?
24       A.    Where the light is.
25            MS. DAYTON:  Indicating the center of
```

2307

```
1   the photo, your Honor.
2        Q.    And what did you see?  Did the big guy have
3   anything with him when he walked in?
4        A.    The only thing I know, I know that it
5   wasn't no bats with us when we got there.  When he
6   got there, that's when I seen the bats again.
7        Q.    What happened after the big guy joined you?
8        A.    That's when we got the gloves, that's when
9   we got the mask.
10       Q.    Where did you get the gloves and the mask
11  from?
12       A.    Ziggy.
13       Q.    What happened next?
14       A.    That's when he was like -- well, that's
15  what Dreddy was saying, "Well, I know she's there
16  now."
17       Q.    Did you know what he meant when he said "I
18  know she's there now"?
19       A.    No.
20       Q.    Did he say anything else at that time?
21       A.    He said that, "Well, you going to help
22  because she got a son and he's a big guy and you
23  going to handle him."
24       Q.    Did you agree?
25       A.    Yes.
```

2308

```
1        Q.    Okay.  What happened next?
2        A.    We started from the back where we parked
3   at, we started walking up toward the front where the
4   front door at.
5        Q.    I'm going to show you what's in evidence as
6   Government's Exhibit 114.  Do you recognize what's
7   in this photo?
8        A.    Yes.  That's the -- that look like the
9   front door.  It look like a little -- it's like from
10  the inside, this -- it's like a little room on the
11  inside.
12            MS. DAYTON:  Indicating the door in this
13  particular picture.
14       Q.    There is garbage can.  Was that garbage can
15  there when you were there?
16       A.    No.
17       Q.    So, inside that door you are saying there
18  is a room?
19       A.    Yes.
20       Q.    I'm going to show you what's in evidence as
21  Government's Exhibit 114A.  Do you recognize what
22  this is?
23       A.    Yes.
24       Q.    What is that?
25       A.    That's the room.  Me and Ziggy hid in this
```

**GA577**

2309

```
1   room while Dreddy and the other guy went somewhere
2   else when somebody came downstairs.
3       Q.   You said you and Ziggy hid in a room and
4   you are pointing to a room on the left side of the
5   photo?
6       A.   Yes.
7       Q.   Who came downstairs?
8       A.   I'm not sure who it was, but we was in the
9   stairway and -- was in the stairway, then that's
10  when he heard somebody coming.  When he heard
11  somebody coming, he just said we got to go back
12  down.  So everybody just started going back down
13  there.  When we came out there, that's when the
14  Spanish guy just went by.
15      Q.   Who heard someone coming?
16      A.   Dreddy.
17      Q.   And he told you that?
18      A.   Yes.  He told everybody that, so.
19      Q.   And you guys ran back downstairs?
20      A.   Yes.
21      Q.   After you hid in that room, what happened?
22      A.   After we hid in that room we went up to --
23  all the way, I think, to the third floor, the third
24  floor, and we -- when you come out the stairway,
25  it's like the door, the door is right here.
```

2310

```
1       Q.   You are saying -- before you said you
2   thought you went up three flights of stairs.  Is
3   that the same three flights or was there more
4   stairs?
5            MR. SHEEHAN:  I object to the leading
6   nature of the question.
7            THE COURT:  I think she's clarifying the
8   prior testimony, not leading.
9       Q.   Did you go up the same three flights or did
10  you go up more flights?
11           MR. SHEEHAN:  Just note my objection.  I
12  think she's testifying now.
13           THE COURT:  I'm going to ask you just to
14  rephrase and let's start over there.
15           MS. DAYTON:  Sure.  No problem.
16      Q.   Do you recall exactly how many flights of
17  stairs that you went up at this point?
18      A.   I am not for sure how many flights, but I
19  know it was the three -- the third floor that we
20  went to the first night.
21      Q.   Okay.  When you say the third floor you
22  went to the first night, do you mean --
23      A.   I meant the -- not the third floor, the
24  second floor.
25      Q.   Okay.  And when you got up there, what did
```

2311

```
1   you do?
2       A.   We went to -- when we got to the second
3   floor, we went to the door, went through the door.
4   When we went through the door, that's when we -- it
5   was -- you could see the apartment door right here.
6   So, when we come through the door we could see the
7   apartment door, and all the four of us went in and
8   waited right at the door.
9       Q.   So, you said when you came out of the door,
10  the door of -- what were you coming out?
11      A.   The stairway door.
12      Q.   So, as soon as you come out of the
13  stairwell door, you said you could see the door.
14  What door are you talking about?
15      A.   The door we was going to go through.
16      Q.   What happened next?
17      A.   Everybody standing around the door, then
18  that's when Dreddy pulled out a gun.
19      Q.   What did the gun look like?
20      A.   Silver, maybe a revolver.
21      Q.   Do you know what kind of gun?
22      A.   No.
23      Q.   So, he had a silver gun?
24      A.   Uh-huh (indicating affirmatively).
25      Q.   Is that yes?
```

2312

```
1       A.   Yes, yes.
2       Q.   And who had the bats?
3       A.   Ziggy and Dreddy -- I meant Ziggy and the
4   big guy.
5       Q.   What did you have?
6       A.   Nothing.
7       Q.   As you went into the door -- or as you went
8   to the door, what happened next?
9       A.   That's when Dreddy had went up to the door
10  and said -- kicked the door in, boom, kicked the
11  door again, boom.  That's when everybody went in
12  behind, it's like boom boom, started going in.  When
13  I heard somebody say, "who is it," then that's when
14  the door came open, and when the door came open,
15  that's when all of us went inside.
16      Q.   Who was in first?
17      A.   Dreddy.
18      Q.   And who is the person who kicked the door
19  open?
20      A.   Dreddy.
21      Q.   So Dreddy goes in, who goes in after
22  Dreddy?
23      A.   Ziggy.
24      Q.   Then who?
25      A.   The big guy.
```

**GA578**

2313

```
1    Q.   And then who?
2    A.   Me.
3    Q.   You all four go in the apartment?
4    A.   Yes.
5    Q.   What happens next?
6    A.   When we went inside the apartment, that's
7    when we got inside the apartment, then that's when
8    the guy -- that's when the -- it was a guy coming to
9    the door.  When he came to the door, that's when he
10   was, like, "What's going on," he said.
11   Q.   What did that guy look like?
12   A.   The skinny guy.
13   Q.   A skinny guy?
14   A.   Yes.
15   Q.   White, black, Latino?
16   A.   Black guy.
17   Q.   Okay.
18   A.   It was a skinny guy, he said, "What's going
19   on?"  "Get on the ground, get on the ground, get on
20   the ground."  Everybody got on the ground.  That's
21   when the girl in the room and the guy who was in the
22   room with her, and the guy was in this room, and
23   everybody was on the ground and then --
24   Q.   Who is yelling "Get on the ground, get on
25   the ground"?
```

2314

```
1    A.   Dreddy.
2    Q.   Okay.  And you said that -- you are
3    pointing over to your left.  You saw a girl and a
4    man in that room on the left?
5    A.   Yes.
6         MR. SHEEHAN:  Objection to the leading,
7    your Honor.
8         THE COURT:  Pardon me?
9         MR. SHEEHAN:  Object to the leading
10   nature of the question.
11        THE COURT:  Would you rephrase.
12        MS. DAYTON:  Sure.
13   Q.   Who did you see in the room on the left?
14   A.   The girl, a female woman and a male.
15   Q.   What sort of room was that that you saw
16   them in?
17   A.   Bedroom.
18   Q.   And the gentleman you said that you saw
19   come out, what did you see happen to him?  Like what
20   happened next after?
21   A.   Pushed into the room on the right.
22   Q.   Who pushed him?
23   A.   It wasn't -- like nobody literally touched
24   him, it was like when you see somebody with a gun,
25   instinct going to tell you to go back, so he went
```

2315

```
1    back into where his room was.
2    Q.   Who is pointing the gun then?
3    A.   Dreddy.
4    Q.   And what's he saying while he's pointing
5    the gun, if anything?
6    A.   "Get down."
7    Q.   And are they getting down?
8    A.   Yes.
9    Q.   What are you doing?
10   A.   I at the time -- everybody had -- when
11   he -- when we got there, he went here and the big
12   guy -- Dreddy and his brother went to this room.
13   Q.   And who was in this room?
14   A.   The female and the male.
15   Q.   Okay.
16   A.   And me and the big guy, we went to -- I
17   didn't go in the room, but he went in the room where
18   the older guy was.  Everybody was standing right
19   here.
20   Q.   Did you go towards that room, too?
21   A.   Yes.
22   Q.   Okay.  And then what did you do?
23   A.   That's where everybody was on the ground,
24   and when everybody was laying down, that's when
25   Ziggy came out, came over to me, because I was
```

2316

```
1    standing on the outside, I could, like, see both.  I
2    could see them two in this room, I could see him in
3    this room, because I'm standing right here in the
4    room.
5    Q.   Are the bedrooms close to each other?
6    A.   Yes, right besides each other.
7    Q.   Okay.  What happens?  What do you do next?
8    A.   After that Dreddy came -- Ziggy -- Ziggy
9    came out, he came out, he was like, "Come on, you
10   got to come over here and look out the window."  So
11   I go over.  He took me over to where the window was,
12   and there was no window right here.  No, at first we
13   got in, people was on the ground, he came in, me and
14   Dreddy came out.
15   Q.   And what did you do?
16   A.   We pushed the couch back to the door.
17   Q.   Okay.  Where did you get the couch from?
18   A.   It was in the living room.  I guess the
19   living room.
20   Q.   Was it sitting in the middle of the living
21   room or against the wall?
22   A.   Against the wall.
23   Q.   Was it a short couch or a long couch?
24   A.   Long couch.
25   Q.   And you said you and Dreddy pushed it up
```

2317

```
1   against the door?
2        A.   Yes.
3        Q.   Why?
4        A.   Because I guess when we kicked the door in
5   the door -- it hinges came off or broke or cracked
6   the door frames or something, but the door wouldn't
7   shut like it's supposed to hold it back, so we came
8   up, me and him, he said "Grab the couch."  I grabbed
9   the couch and we pushed the couch back up against
10  the door.
11       Q.   I'm going to show you Government's
12  Exhibit 116K.  Do you recognize what this is a
13  photograph of?
14       A.   Yes.
15       Q.   What is it?
16       A.   That's the house, the apartment.
17       Q.   And when you went into this room, is this
18  the room that you got the couch from?
19       A.   Yes.
20       Q.   And do you see the couch in the picture?
21       A.   Yes.
22            MS. DAYTON:  Indicating on the left side
23  of the photo, your Honor.
24       Q.   So, that sort of off-white couch.  And is
25  that where it was when you first saw it?
```

2318

```
1        A.   Yes.
2        Q.   And where did you push it up to?
3        A.   Pulled the couch out from the front of the
4   handle and pulled it all the way to the door.
5        Q.   Okay.  I'm going to show you --
6            MS. DAYTON:  What's in evidence as 117H,
7   your Honor.
8        Q.   Is that, can you see what this is?
9        A.   Yes.
10       Q.   Is that the area that you pushed the couch
11  to?
12       A.   Yes.
13       Q.   Right where it is or closer or further away
14  to the door?
15       A.   To the door.  Right.  Up to the door for to
16  hold the door shut.
17       Q.   And what did you do after that?  Is that
18  when you went down the hall?
19       A.   Yes.
20       Q.   When you got down the hall, what did you
21  see?
22       A.   That's when they was still on the ground
23  and Ziggy was in the room with the male and the
24  female, and the big guy was standing at the door of
25  the male, and we -- he said, that's when -- that's
```

2319

```
1   when me and Dreddy was out.  And that's when Dreddy
2   had told me to go, not Ziggy, Dreddy had told me to
3   go to the window and watch out.
4        Q.   Was the son that you were supposed to take
5   care of, was he in the apartment?
6        A.   No.
7        Q.   Did you go out to the window?
8        A.   Yes.
9        Q.   And I'm going to show you --
10            MS. DAYTON:  What's in evidence as 117E,
11  your Honor.
12            That didn't work.
13       Q.   Do you see in this picture the area in
14  which you were standing?
15       A.   Yes.
16       Q.   And where were you standing?
17       A.   Right here.
18            MS. DAYTON:  Indicating sort of on the
19  left side next to the fan, your Honor.
20       Q.   And when you were standing over there,
21  could you see out the window?
22       A.   Yes.
23       Q.   And what do you see when you look out that
24  window?
25       A.   The street and the walkway and up under the
```

2320

```
1   -- where your cars go.
2        Q.   You could see right down into the street?
3        A.   Yes.
4        Q.   And as you're standing there, what happens?
5   What are you doing?  Do you just stand there?  Do
6   you move around?
7        A.   At the time I was just standing there, you
8   know, the only thing I know -- he, Dreddy had went
9   back, and the only thing I'm hearing is duct tape,
10  shh, shh, shh.
11       Q.   That's what it sounded like?
12       A.   Yes.
13       Q.   What did you do, did you go back to look?
14       A.   I went back to look a couple of times.
15       Q.   What did you see?
16       A.   Dreddy and Ziggy duct taping.
17       Q.   Who are they duct taping?
18       A.   The male and the female.
19       Q.   In the left bedroom?
20       A.   Yes.
21       Q.   Could you see where the big guy, the other
22  guy was?
23       A.   Still standing there and he was still
24  laying on the ground.
25       Q.   Who was still laying on the ground?
```

2321

1   A.   The skinny male.
2   Q.   Did you actually see the big guy duct
3 taping anyone?
4   A.   No.
5   Q.   So, you see the defendant and his brother
6 duct taping people.  What happens next?  What do you
7 do?
8   A.   So, now I'm back and forth, that's all.
9 I'm hearing this duct taping, duct tape, so I went
10 back and forth, running back and forth, going back
11 and forth looking, and all of a sudden everybody is
12 finished up, don't hear no more duct tape.
13        So now I was in -- I was standing, it was
14 somebody coming and I told, I said, "Yo, somebody
15 coming."  He said, "Hold on, hold on."  He stopped,
16 and Ziggy had came out over there by the window
17 where I was at, and looked.  "It's nobody, it's
18 nobody," then he went back.  Then they -- I guess
19 they started back duct taping.
20   Q.   What happened next?
21   A.   All of a sudden you start hearing nothing,
22 nothing.  And then right after that I go back, I
23 heard somebody like "Yeow."
24   Q.   Like a loud-type pitch sound?
25   A.   And I said, I go back, I go back, and I

2322

1 look, I said, "Yo, what are you doing?"
2   Q.   You go where to look?
3   A.   I go back because I heard somebody yelling,
4 I'm like -- making a whole muffled sound.  I'm like,
5 like, like, wow.  So when I go back, when I go back
6 and look, I look, I seen them.  He was standing over
7 like this over and start hitting her.
8   Q.   Who is standing like that?
9   A.   Dreddy.
10   Q.   Okay.  You indicated, you put the pointer
11 over your head and knocking down in front of you.
12 And who is he hitting?
13   A.   The female, staying right here.
14   Q.   Is she on the floor?
15   A.   Yes.
16   Q.   And when the defendant is hitting her,
17 what's he hitting her with?
18   A.   The bat.
19   Q.   What is she doing?
20   A.   What could you do but yell.  The only thing
21 you can do.  And she was just yelling and when I --
22 just laying there and he's standing over her, and
23 Ziggy is standing on the other side doing the same
24 thing to the other guy.  I'm, like, "Yo, what are
25 you doing?"  And then he said, "Yo, come and get you

2323

1 some."
2   Q.   Who said come and get you some?
3   A.   Dreddy.
4   Q.   When you say that Ziggy was doing the same
5 thing to the other guy, can you explain what you
6 mean?
7   A.   When I came round, the only person I seen
8 at the time was Dreddy.  When I go at the time in
9 the hallway, it ain't like short, but when you go a
10 little closer you look, so now when I get to the
11 corner of the hallway, now I see him go in the
12 front.  I'm looking at him, I'm seeing him doing the
13 same thing what he's doing.  So I, like, what's
14 going on.
15   Q.   So what do you do at this point?
16   A.   I leave.  I said, "I'm out of here."  So
17 now I going, like the couch in front of the door, so
18 I go and push the couch out with my body, push the
19 couch out with my body, and when I looked back
20 that's when I see Dreddy handing Ziggy the gun.
21   Q.   And what are you thinking at that point?
22   A.   I don't think what I going to do.  They
23 going to come and get me or what?  I don't know.  I
24 don't know what.  My mind was just going so fast
25 it -- I was, yeah, I was thinking he was going to

2324

1 come and get me.
2   Q.   So, you see the defendant hand Ziggy the
3 gun.  Do you see Ziggy -- let me go back for a
4 minute.
5        You say you moved the couch away from the
6 door, you indicated, with your body.  Are you facing
7 the door or are you facing into the room?  Do you
8 know what I mean?
9   A.   Not exactly.
10   Q.   So, if the door is here and the couch is
11 pushed up to it, do you face the door and move your
12 body this way, or do you face your back to the door
13 and you are moving the furniture away from you
14 that's in front of you?
15   A.   Could we go back, I'll show you.
16   Q.   Sure.  Okay.  Does that help?
17   A.   No, to the door, the door with the couch.
18   MS. DAYTON:  Can you close the light
19 please, your Honor, I think it's easier to see.
20   Q.   Does that help?
21   A.   Yes.  I was right behind the couch and the
22 door was wedged right to the -- the couch was wedged
23 to the door.  That's when I pushed it with my
24 stomach and I could still see --
25   Q.   So, you were facing into the apartment.

2325

```
1        A.    Yeah, you could see.
2        Q.    As you are pushing the couch away, what do
3   you see happen?
4        A.    He, Dreddy, handed Ziggy the gun.
5        Q.    And what happens next?
6        A.    I went outside, he came behind me.
7        Q.    Other -- did Ziggy bring the gun with him?
8        A.    No.  I don't know if he did or not.  I
9   don't know then.
10       Q.    Did you see him bring anything else with
11  him?
12       A.    Besides the bat?
13       Q.    Okay, did he bring a bat?
14       A.    Yeah.
15             MR. SHEEHAN:  Can I ask for
16  clarification.  Who is the "he" counsel is referring
17  to.
18       Q.    Ziggy?
19       A.    Ziggy.
20       Q.    Did Ziggy take anything out of that
21  apartment towards you?
22       A.    Well, when we got inside, that's when the
23  lady -- way before all that, before the lady started
24  getting beat with the bat, he grabbed a cell phone
25  and some money and put it on top of that counter.
```

2326

```
1        Q.    Which counter?
2        A.    Right here, where you can't even see it.
3   It's right over here.
4        Q.    Indicating to the right?
5        A.    Yes.
6        Q.    What's over there?
7        A.    The kitchen I think.
8        Q.    So you are pointing at the defendant.  The
9   defendant took a cell phone and some money?
10       A.    Yeah, it's way before they started duct
11  taping.  It was on top of the counter.
12       Q.    The defendant put it on top of the counter?
13       A.    Yes.
14       Q.    Did you see where he got the cell phone and
15  the money from?
16       A.    Out of the room where the male and the
17  female was.
18       Q.    So, what does this have to do with Ziggy
19  leaving?  When he left did the cell phone and the
20  money stay there?
21       A.    No, the cell phone and money left with
22  Ziggy.
23       Q.    Did you see him take them?
24       A.    Yes.
25       Q.    And when you walked out, what happened?
```

2327

```
1        A.    Both of us went downstairs.  He was
2   leaving.  We went downstairs.  I followed him.  We
3   got in the car, we drove out of the parking lot and
4   that's --
5        Q.    What was your state of mind right then?
6   How did you feel?
7        A.    I don't feel too good right now.
8        Q.    You get in the Corolla?
9        A.    Yes.
10       Q.    And where do you go?
11       A.    Got in the car, went out the parking lot
12  and went to the left.
13       Q.    Is Ziggy talking to you in the car?
14       A.    Yes.
15       Q.    What's he saying?
16       A.    "Did you hear the people say our names?"
17       Q.    Ziggy is asking you that?
18       A.    Yes.  And I said "No."
19       Q.    What else did he say, if anything?
20       A.    He said, "Do you, do you -- do you want
21  this phone?"  "No."
22       Q.    The phone he took from the apartment?
23       A.    Yes.
24             MR. SHEEHAN:  Objection to leading, your
25  Honor.
```

2328

```
1              THE COURT:  I think that's
2   clarification.  Overruled.
3        Q.    And as you started -- was Ziggy driving
4   during these conversations?
5        A.    Yes.
6        Q.    Did he -- what else did he say, if
7   anything?
8        A.    He just said, "I think I got something on
9   my pants."  And then I didn't pay it no mind, I was
10  just trying to just don't say too much, not say too
11  much, not say too much for I don't know what's going
12  to happen next.  He just took out -- I just seen him
13  beat somebody.  I don't know what he's going to do
14  next.  Now he got a gun, he don't have to beat, he
15  just got to point and shoot.  So I'm, like, all
16  right.  I don't know what to do, I'm just sitting
17  like trying to play calm as I can, like.  So, we
18  left from there, we went somewhere else, and I don't
19  know where we was going, but we left.  We parked on
20  the side of a street and we walked up around to an
21  apartment.
22       Q.    And what did the apartment look like?
23       A.    I can't really tell you in detail, but it
24  was a door here and a door here.  But it was -- like
25  I think it was one house.
```

2329

```
1    Q.   So, a door on each side?
2    A.   Yes.
3    Q.   Basically.  And it looked like a house?
4    A.   Yes.
5    Q.   And did you go inside that location?
6    A.   Yes.
7    Q.   What did you do when you went inside?
8    A.   We got on the inside, that's when he told
9    me to sit down.  I sat down over here in this couch
10   and he went back in the room and changed clothes.
11   Q.   What did you do while you are sitting
12   there?
13   A.   Nothing.
14   Q.   And at some point did you leave and walk
15   out of there?
16   A.   Yes, after he changed clothes.
17   Q.   And where did you go?
18   A.   To some other building.
19   Q.   Where was the other building?
20   A.   I'm not for sure.
21   Q.   How did you get there?
22   A.   We got back in the Corolla.
23   Q.   And who was in the Corolla?
24   A.   Me and Ziggy.
25   Q.   And who was driving?
```

2330

```
1    A.   Ziggy.
2    Q.   Are you guys talking at this point?
3    A.   Nope.
4    Q.   Where do you go?
5    A.   Went to some apartment building.  We parked
6    on the side and we walked in front, in the front.  I
7    think it was a one-way.  We walked in the front.
8    Q.   A one-way street?
9    A.   Yeah.
10   Q.   And when you walked in the front, what did
11   you see?
12   A.   Some people standing in front of the
13   building.
14   Q.   Okay.  And did you stop and talk to them?
15   A.   Yes.
16   Q.   And then what did you do?
17   A.   Went up to the -- I think the third floor.
18   Q.   And when you got to the third floor, were
19   you alone or were with you someone else?
20   A.   Just me and him.
21   Q.   And Ziggy?
22   A.   Uh-huh (indicating affirmatively).
23   Q.   Is that yes?
24   A.   Yes.
25   Q.   Did you go into an apartment?
```

2331

```
1    A.   Yes.
2    Q.   What did you do when you got in there?
3    A.   We got inside, it wasn't nobody in there,
4    and then it was a girl kept coming back.  She came
5    from -- where I seen down when we came into the
6    front door, and she went inside.  She went up, kept
7    going up to the third floor and back downstairs.
8    Q.   Do you know what she was doing?
9    A.   Nine out of ten, yeah, but...
10   Q.   Nine out of ten meaning what?
11   A.   Yeah, I did.
12   Q.   What did you think she was doing?
13   A.   Selling drugs.
14   Q.   Do you know who this woman is?
15   A.   No.
16   Q.   Were you and Ziggy talking at all while you
17   were in there?
18   A.   No.
19   Q.   Not a word?
20   A.   Nothing about what I just seen.  I didn't
21   want to talk about that.
22   Q.   And did you do anything while you sat
23   there?
24   A.   Smoked weed.
25   Q.   How long did you stay?
```

2332

```
1    A.   I can't really say, but it wasn't no short,
2    long time.
3    Q.   And what happened after you were there for
4    a little while?  What did you do?
5    A.   We chilled out, waited for a little while,
6    and that's when Ziggy got on the phone, took my
7    phone and started talking.  I think it was to
8    Dreddy.
9    Q.   What makes you think it was to Dreddy?
10   A.   I'm not for sure that it was to.  I was
11   thinking that's the only time he would use my phone,
12   is to call him, but I don't.
13   Q.   So Ziggy used your phone?
14   A.   Yes.
15   Q.   To make one call, two calls, do you know?
16   A.   I think it was one.
17   Q.   Okay.  And at some point, I mean, did you
18   stay there a long time or did you leave?
19   A.   I left.
20   Q.   How did you leave?
21   A.   I kept telling him that I had somewhere to
22   go.
23   Q.   Did you have somewhere to go?
24   A.   No.
25   Q.   And what happened next?
```

2333

```
1        A.   He was -- like, then that's when he grabbed
2    my phone.
3        Q.   Okay.  He made some calls and then what
4    happened?
5        A.   He said, come on, went downstairs, took me
6    to the car.
7        Q.   Back to Denita's car?
8        A.   Yeah.
9        Q.   Did you are see the defendant or the big
10   guy at that third floor apartment that morning?
11       A.   No.
12       Q.   Did you get back in Denita's car?
13       A.   Yes.
14       Q.   And did you drive somewhere?
15       A.   Yes.
16       Q.   Where did you drive?  Where did you go?
17       A.   To white Ford, back to Norwalk.
18       Q.   When you got back to Norwalk what did you
19   do?
20       A.   Went back to her apartment and I chilled
21   out and went to sleep, and when I went back to the
22   apartment, I woke up the next morning --
23       Q.   Do you mean like -- when you went back, was
24   it light or dark out when you drove back?
25       A.   Dark.
```

2334

```
1        Q.   It was dark.
2        A.   Well, it could be wee in the morning.  It
3    could be getting daylight and dark at the same.
4        Q.   Like dawn?
5        A.   Yes.
6        Q.   So, you said you went to sleep?
7        A.   Uh-huh (indicating affirmatively).
8        Q.   Did you sleep for 24 hours until the next
9    morning?
10       A.   No.
11       Q.   Or did you sleep for a little while?
12       A.   Just a little while.
13       Q.   Okay.  When you woke up, what did you do?
14       A.   When I woke up, then I'm sitting down there
15   I turn the TV on, but I don't know what time I
16   really got up, but I know when I turned the TV on
17   that was the breaking news.
18       Q.   What was the breaking news?
19       A.   The same building, they was showing -- the
20   lady was on the -- telling them, somebody, about
21   three people had got murdered today.  So, I'm like,
22   wow.
23       Q.   So, what did you do?
24       A.   So, I tried to get in touch with him.
25       Q.   "With him" is who?
```

2335

```
1        A.   Dreddy.
2        Q.   Were you able to get in touch with him?
3        A.   No.
4        Q.   So, what did you do?
5        A.   I just -- I thought maybe he wasn't picking
6    up his phone, so I called from that cell phone
7    number, I called him from Denita's house phone
8    number to try to see whether he going to pick up the
9    phone or not, but he didn't never pick up the phone.
10       Q.   At some point did you get in touch with him
11   again, the defendant?
12       A.   Yes.
13       Q.   Do you know how long after the murders that
14   was?
15       A.   No.
16       Q.   Like a day, like a week?
17       A.   I can't really say.
18       Q.   Did you ever speak with the defendant
19   again?
20       A.   Yes.
21       Q.   In person?
22       A.   Yes.
23       Q.   Okay.  Where was that?
24       A.   He was on the black Toyota Corolla.
25       Q.   Where did you see him?
```

2336

```
1        A.   On Day Street in Norwalk.
2        Q.   Day Street?
3        A.   Yes.
4        Q.   How did he, the defendant, come to be at
5    Day Street Norwalk, if you know?
6        A.   He came over, he tried to give me more
7    drugs.
8        Q.   What kind of drugs?
9        A.   The bottle, the weed.
10       Q.   Anything else?
11       A.   No.
12       Q.   Did you take the drugs?
13       A.   I took the -- yes.
14       Q.   The weed?
15       A.   Yes.
16       Q.   And what did you do with it?
17       A.   I started to move it.
18       Q.   Sell it?
19       A.   Yes.
20       Q.   And where is -- you mentioned earlier this
21   bag of crack that the defendant had given you.
22   Where was that at this point?
23       A.   Still in Denita's apartment.
24       Q.   And did you talk to the defendant about
25   that crack at all?
```

**GA584**

2337

1    A.   Not him.
2    Q.   Not him?  Not the defendant?
3    A.   No.
4    Q.   So, the defendant gives you some more weed.
5  Do you sell it?
6    A.   Yes.
7    Q.   What do you do with the money?
8    A.   At the time I sold it I couldn't get in
9  touch with him, with Dreddy.
10   Q.   So, what happened?
11   A.   All of a sudden Ziggy picked up the phone
12 and he came up, and I decided, I told him, "I don't
13 want to do this no more."  So, I just gave him the
14 weed and the little money that I made off of it, and
15 the drugs back to him.
16   Q.   Which drugs?
17   A.   The crack and the marijuana.
18   Q.   So, just if I can clarify.  You said you
19 couldn't get in touch with the defendant?
20   A.   Uh-huh (indicating affirmatively).
21   Q.   And you called and Ziggy picked up the
22 phone?
23   A.   Uh-huh (indicating affirmatively).
24   Q.   Is that yes?
25   A.   Yes, ma'am.

2338

1    Q.   The defendant's phone or did Ziggy pick up
2  Ziggy's phone?
3    A.   Ziggy didn't have a phone.  So it had to
4  been the phone that the -- the only two numbers I
5  knew from him.
6    Q.   For the defendant?
7    A.   Yes.
8    Q.   And when you spoke with Ziggy, you spoke to
9  Ziggy on the phone?
10   A.   Uh-huh (indicating affirmatively).
11   Q.   And then he said what?
12   A.   I told him to come up, and he came over.
13 He came up, and when he came up, that's when I gave
14 him the drugs.  I told him, I said, the people
15 didn't want it, the people didn't like it.  I just
16 lied to him just to give him the drugs back to him.
17   Q.   So, you told him the crack was not good?
18   A.   Yeah.
19   Q.   What's it mean to blend drugs?  Do you
20 know?
21   A.   To cook it up.
22   Q.   Okay.
23   A.   Recook it.
24   Q.   Recook it.  Why would you recook it?
25   A.   Make it stronger.

2339

1    Q.   So, if you had a bad batch or something?
2    A.   Yes.
3    Q.   So you gave the crack back to Ziggy, did
4  you have any conversation with him?
5    A.   No.  I just told him.  Then he said he was
6  going to come back and bring something else better.
7    Q.   Did you have any conversations with Ziggy
8  about the murders?
9    A.   No.
10   Q.   Did you see Ziggy again after that?
11   A.   No.
12   Q.   Did you see the defendant again after that?
13   A.   The only time when he came to give me the
14 other batch of weed.
15   Q.   So, earlier than you had seen Ziggy?
16   A.   Yes.
17   Q.   Did you stop selling drugs immediately?
18   A.   Yes.
19   Q.   You didn't sell drugs anymore after that?
20   A.   Well, not -- the weed, yeah.
21   Q.   So did you sell any other drugs?
22   A.   No crack cocaine.
23   Q.   And what did you sell?
24   A.   Weed.
25   Q.   Did you get arrested selling drugs shortly

2340

1  thereafter?
2    A.   Yes.  When I gave the stuff back to him.
3    Q.   Back the Dreddy?
4    A.   Yes.
5    Q.   You got some more drugs?
6    A.   Yes.
7    Q.   From who?
8    A.   I bought it from this other guy that's from
9  Norwalk.
10   Q.   What's his name?
11   A.   Shitty.
12   Q.   Shitty, is that the only name you know him
13 by?
14   A.   That's the only name I knew him by.
15   Q.   What did you buy from him?
16   A.   I didn't buy from him, he turned me on to
17 somebody else to buy from somebody else.
18   Q.   And what did you buy?
19   A.   Just a half or --
20   Q.   What's a half?
21   A.   Like seven grams or a half -- like seven.
22   Q.   Seven grams of what?
23   A.   Crack -- powder.
24   Q.   Powder, okay.  And how did you do selling
25 that?

2341

```
1      A.   How do I do?
2      Q.   Yeah, were you successful selling it?
3      A.   No, I got busted.
4      Q.   When approximately -- when you say
5  "busted," caught by the police?
6      A.   About two, three days later.
7      Q.   So, is this in -- what month, do you know?
8      A.   The only thing I remember was Oyster Fest.
9      Q.   So, it was around the time of Oyster Fest?
10     A.   Yes.
11     Q.   And after you got arrested, did you get
12 taken to jail?
13     A.   Yes.
14     Q.   What jail?
15     A.   Bridgeport.
16     Q.   And did you see anyone in jail who you
17 recognized?
18     A.   Yes.
19     Q.   Who?
20     A.   Dreddy.
21     Q.   When you saw Dreddy, did you speak with
22 him?
23     A.   Yes.
24     Q.   What did you guys talk about?
25     A.   What you in for?  What happened?  That's
```

2342

```
1  about it.
2      Q.   And did you tell him what you were in for?
3      A.   Yes.
4      Q.   And did you tell him what happened?
5      A.   Yes.
6      Q.   Did you guys talk about the murders at all,
7  you and Dreddy?
8      A.   The only thing he just said his baby momma
9  got rid of the weapons.
10     Q.   Dreddy told you his baby momma got rid of
11 the weapons?
12     A.   Yes.
13     Q.   Did you talk business with the defendant at
14 all?
15     A.   Yes.
16     Q.   What did you talk about?
17     A.   About packing up and going down south and
18 taking it down south.
19     Q.   Taking what down south?
20     A.   The business.
21     Q.   Why?
22     A.   Because he feel like it wasn't -- it
23 wasn't -- it was too hot.
24     Q.   What does that mean, too hot?
25     A.   The police going to be crawling everywhere,
```

2343

```
1  you can't really make no money.
2      Q.   So both of you are in custody at this
3  point.  How are you going to take the business down
4  south?
5      A.   He was going to bond me out.
6      Q.   Bond you out?
7      A.   Yes.
8      Q.   The defendant was going to?
9      A.   Well, he was going to tell his baby momma
10 to bond me out.
11     Q.   Do you know if he did that?
12     A.   Did I know?
13     Q.   Do you know if he told her to bond you out?
14     A.   As far as I know -- I don't know.  I don't
15 know if he did because -- the only
16 thing I know, he got on the phone.
17     Q.   Okay.
18     A.   And then he left, he went somewhere else
19 and I went somewhere else.
20     Q.   Did you ever speak to his baby momma?
21     A.   Yes, he gave me the number.
22     Q.   When you say he gave you the number, did he
23 give it to you verbally or did he write it down?
24     A.   He wrote it down.
25     Q.   Okay.  I'm going to show you an item that's
```

2344

```
1  been shown to counsel marked 231.
2           MS. DAYTON:  May I approach?
3           THE COURT:  You may.
4           MS. DAYTON:  Thank you.
5      Q.   Do you recognize what's contained in 231?
6      A.   Yes.
7      Q.   What is this?
8      A.   The address Dreddy wrote down with two
9  phone numbers and the address.
10     Q.   This little piece of paper, what's this
11 book right here?
12     A.   The phone book they sell in the jails.
13     Q.   Did you get this book in the jail?
14     A.   Yes.
15     Q.   And this piece of paper which has been
16 separately marked 231A, what is that?
17     A.   That's the address he gave me --
18     Q.   So --
19     A.   -- of her name.
20     Q.   Did you write this on there?
21     A.   No.
22     Q.   And it's -- okay.
23           MS. DAYTON:  Your Honor, at this point
24 we would ask to move 231 and 231A into evidence.
25           MR. SHEEHAN:  No objection.
```

**GA586**

2345

```
1              THE COURT:  Full exhibits.
2              MS. DAYTON:  Thank you, your Honor.
3      Q.    When did the defendant give this to you?
4      A.    Before both of us got moved somewhere else.
5              MS. DAYTON:  And this, for the record,
6  is 231A.
7      Q.    And whose name is at the top there?
8      A.    Shante.
9      Q.    Pettway?
10      A.    Yes.
11      Q.    Do you know who that is?
12      A.    His baby mother.
13      Q.    Is that the woman you were referring to as
14  Charmaine before?
15      A.    Yes.
16              MR. SHEEHAN:  Could I ask -- I'm sorry,
17  your Honor, is this the same one we were just
18  looking at?
19              MS. DAYTON:  Yeah.
20              MR. SHEEHAN:  I'm just a little
21  confused.
22              MS. DAYTON:  It came out.
23              MR. SHEEHAN:  The first one was a copy.
24  May I take a look?
25              THE COURT:  Sure.
```

2346

```
1              MR. SHEEHAN:  My mistake, your Honor.
2  Thank you.
3      Q.    There are two phones numbers on here
4  382-0284 and 338-0305.  Do you know what those two
5  numbers are?
6      A.    To Charmaine -- Shante.
7      Q.    Why two numbers, did you know?
8      A.    No.
9      Q.    Did you call them both at different times?
10      A.    I had to put them on my phone list first to
11  be able to call her.
12      Q.    Did you then call her?
13      A.    Yes.
14      Q.    Did you speak with her?
15      A.    Yes.
16      Q.    And down here it says 456 Newfield Street,
17  Bridgeport, Connecticut 06607.  Do you know what
18  that information is?
19      A.    I think that's the address he gave me.
20      Q.    And gave you as what?  What did he tell you
21  it was?
22      A.    The address to the house where she was
23  staying at.
24      Q.    Okay.  And what were you supposed to do
25  with this phone number?
```

2347

```
1      A.    To call her.
2      Q.    And what did the defendant tell you she was
3  going to do for you?
4      A.    Post my bond.
5              MS. DAYTON:  Your Honor, at this time we
6  have two calls we'd like to play.  Do you want to
7  take a lunch break first?
8              THE COURT:  We can do that.  Ladies and
9  gentlemen, leave your notebooks here, don't discuss
10  the case.  We'll take a half an hour for lunch.
11              (Jury exited the courtroom.)
12              THE COURT:  All right.  We'll have you
13  come back after lunch, Mr. Taylor.  Please don't
14  discuss your testimony with anyone.
15              Will there be anything else, Counsel,
16  before we return?
17              MS. DAYTON:  No, thank you, your Honor.
18              MR. SHEEHAN:  No, your Honor.  Thank
19  you.
20              MS. DAYTON:  Actually, your Honor, can I
21  ask a question?  We have transcripts, two more
22  transcripts we're going to play.  May we put them at
23  the back of the binders for the jurors?
24              THE COURT:  Sure.
25              MR. SHEEHAN:  I think that would be
```

2348

```
1  fine, your Honor.
2              THE COURT:  The jurors still have their
3  binders.
4              MS. DAYTON:  We'll just leave them in
5  case they wrote in them or anything, but we won't
6  touch anything except to put the two at the back.
7              THE COURT:  Thank you.  We stand in
8  recess.
9              MR. SHEEHAN:  Do you know, it might
10  makes sense to ask Betty do that in case people
11  wrote in them.
12              MS. DAYTON:  That's fine.
13              (Recess)
14              THE COURT:  Please be seated, counsel.
15              All right, if you'll bring Mr. Taylor
16  in, please.
17              You are all set up electronically?
18              MS. DAYTON:  Yes, your Honor.
19              THE COURT:  Please bring in the jury.
20              (Jury entered the courtroom.)
21              THE COURT:  Please be seated, ladies and
22  gentlemen.
23              Ms. Dayton, you may continue examination
24  of Ms. Taylor.
25              MS. DAYTON:  Thank you very much.
```

2349

```
1              At this time, your Honor, the
2  government's going to play two calls.  The first one
3  has been marked Government's Exhibit 606.  That's
4  the actual call.  There has been two transcripts
5  added to everyone's binder, the last two.  They
6  don't have tabs.
7              So, we're going to deal with the second
8  to last one first, and that is 606A.
9              THE COURT:  And the date is
10 September 26, '05.
11             MS. DAYTON:  That is correct, your
12 Honor.
13             (Tape played)
14    Q.  Who is that that said "Black" on the phone?
15    A.  That's me.
16             MS. DAYTON:  And, by the way, your
17 Honor, the government has no objection -- excuse me,
18 the government.  The defense has no objection, so we
19 would ask to move both 606 and 607 into evidence at
20 this time.
21             MR. SHEEHAN:  That is correct, your
22 Honor.
23             THE COURT:  They may be full exhibits.
24             MS. DAYTON:  Thank you.
25             (Tape played)
```

2350

```
1     Q.  Mr. Taylor, I'm going to stop this for a
2  second.  What are you talking about right there?
3     A.  She got -- when I called her she --
4     Q.  Who is "she"?
5     A.  His baby mother.
6     Q.  Okay.  And -- go ahead.  What are you guys
7  talking about?
8     A.  She -- when I called her, she got in
9  contact with me and saying that, that my cousin,
10 when -- who I asked her, for her to call him, see if
11 he could help me, get me out on bond, so he figured
12 I wasn't up here but like six months, he
13 probably thought maybe I was just going to get out
14 on bond and take off and run back down south.
15    Q.  Back to North Carolina?
16    A.  Yes.
17    Q.  So that's the discussion you are having?
18    A.  Yes.
19    Q.  And when you said "I never ran from a drug
20 case," what does that mean?
21    A.  I never -- if I caught a charge, I faced
22 it.  I didn't never had run from it.
23    Q.  Okay.
24             (Tape played)
25    Q.  I'm going to stop this to ask you who's
```

2351

```
1  Ozzy?
2     A.  Dreddy's brother.
3     Q.  A different brother or Ziggy?
4     A.  Ziggy.
5     Q.  So, he's also called Ozzy?
6     A.  Yes.  Uh-huh (indicating affirmatively).
7     Q.  Is that yes?
8     A.  Yes.
9     Q.  I'm sorry, she has to take it down.
10             When you say "I told him the last money
11 I had I gave it to him," what are you talking about
12 right there?
13    A.  The money that -- the drugs that he gave me
14 before he disappeared, then I gave back to Ozzy.
15    Q.  You are pointing to the defendant?  That
16 the defendant gave you before he disappeared?
17    A.  Yes.
18    Q.  And you gave those back to Ziggy?
19    A.  Yes.
20    Q.  Okay.
21             (Tape played)
22    Q.  What are you talking about there?  Whose
23 brother-in-law?
24    A.  Ziggy.
25    Q.  You are talking about her brother-in-law?
```

2352

```
1     A.  No, his brother.
2     Q.  So Dreddy's brother?
3     A.  Yeah.
4     Q.  Okay.  And you called him brother-in-law?
5     A.  Well, that's -- on the phone conversation,
6  that's what me and her was talking.
7     Q.  And when you say that you and Ziggy have a
8  job to do, what is that job?
9     A.  The thing that he wanted us to go down
10 south to do.
11    Q.  Who is "he"?
12    A.  Dreddy.
13    Q.  Go down south and do what?
14    A.  Drugs.
15             (Tape played)
16    Q.  Where were you calling from?
17    A.  Bridgeport Correction.
18    Q.  And you said you were speaking to the
19 defendant's baby mom.  How did you get that number?
20    A.  The number he gave, he wrote down for me.
21             MS. DAYTON:  Your Honor, at this time
22 the government would like to play 607.  It's 607A in
23 the binders.
24             THE COURT:  All right.
25             MS. DAYTON:  Thank you.
```

2353

```
1        (Tape played)
2     Q.   Whose phone number was that 615-8307?
3     A.   Ziggy.
4     Q.   How did you get that number, do you know?
5     A.   Dreddy.
6     Q.   Was this a new phone?
7     A.   Yes.
8     Q.   Who are you talking to?
9     A.   Ziggy.
10        (Tape played)
11    Q.   What are you and Ziggy talking about in
12   that call?
13    A.   Calling Denita for he can get -- well, I
14   had to call Denita for -- to get in touch with
15   Denita so Denita could get in touch with Ziggy.
16    Q.   For what purpose?
17    A.   Post bond.
18    Q.   Did Ziggy ever post bond for you in the
19   end?
20    A.   No.
21    Q.   What happened with that case?
22    A.   I didn't hear.  With the drug case?
23    Q.   Yeah.
24    A.   I pled out to two and a half years.
25    Q.   So you did prison time on that?
```

2354

```
1     A.   Yes.
2     Q.   I want to go back for a minute just into
3    the apartment for a second.  I want to show you a
4    picture that's previously in evidence as 121-1.
5         MS. DAYTON:  Your Honor, would you mind
6    darkening the room.  Thank you.
7     Q.   Can you see that on yours?
8     A.   Yes.
9     Q.   Do you recognize where this area is?
10    A.   That's the male and the female room.
11    Q.   And did you -- was there ever a point when
12   you were standing about where this picture was
13   taken?
14    A.   No.
15    Q.   You mentioned also that you had gloves and
16   a mask.  What happened to your gloves?
17    A.   When me and Ziggy was leaving out I still
18   had my gloves on and I threw them out the window
19   when we got down the street.
20    Q.   What about your mask?
21    A.   I gave it back to him, Ziggy.
22    Q.   To Ziggy.  Okay.  And what about Ziggy's
23   gloves, do you know what he did with those?
24    A.   The only thing I know that when we was in
25   the house Dreddy's gloves had tore and he put them
```

2355

```
1    inside of a bag.
2     Q.   Dreddy put his torn gloves inside of a bag?
3     A.   Yes.
4     Q.   Where did that occur?
5     A.   Inside of the apartment.
6     Q.   In the backroom or in the front room?
7     A.   Right there in the front room right where
8    the kitchen was.
9     Q.   And how do you know he put them -- that
10   Dreddy put his torn gloves in a bag?
11    A.   Because I held the bag.
12    Q.   While he put them in there?
13    A.   Yes.
14    Q.   And do you know if he put new gloves on or
15   not?
16    A.   Yes.
17    Q.   And do you know what happened with Ziggy's
18   gloves?
19    A.   I think his gloves was torn, too, and he
20   put his gloves in the bag.
21    Q.   There was more than one set of torn gloves?
22    A.   Yes.
23    Q.   I want to show you a couple photographs,
24   just ask you if you know these people.  Do you know
25   who this person is in picture 212?
```

2356

```
1     A.   No.
2     Q.   You've never seen that person before?
3     A.   No.
4     Q.   Do you know who this is in Government's
5    Exhibit 210?
6     A.   No.
7     Q.   How about in Government's Exhibit 229?
8     A.   I don't remember.  He look familiar, but --
9    I want to say that he was that older guy that was
10   inside the apartment, the third floor apartment.
11    Q.   Okay.  But you don't know who he is?
12    A.   No.
13    Q.   In particular.  You don't know his name or
14   anything like that?
15    A.   No.
16    Q.   I want to show you one picture that I don't
17   believe is in evidence yet.
18        MS. DAYTON:  I'm marking this for
19   identification 227.
20    Q.   Do you know who that is?
21    A.   No.
22    Q.   You never met that person?
23    A.   No.
24    Q.   Thank you.  Do you remember when you got
25   arrested for the murder case?
```

2357

```
1    A.   December 1st or 2nd.
2    Q.   Of what year?
3    A.   '09.
4    Q.   Between August 24th of 2005 when the
5  victims were murdered and December 2nd, 2009, had
6  anyone ever questioned you about the murders?
7    A.   No.
8    Q.   You mentioned that you went to jail in
9  September of '05, and you pled to your case, you
10 went to prison.  When you got out of prison, where
11 did you go?
12   A.   Waterbury.
13   Q.   Why Waterbury?
14   A.   That's the -- I went to a halfway house
15 there.
16   Q.   How long were you at the halfway house?
17   A.   Maybe seven, maybe six months.
18   Q.   For a while?
19   A.   Yes.
20   Q.   At some point when you got out of the
21 halfway house, did you -- well, did you stay in
22 Waterbury or did you move somewhere else?
23   A.   I stayed there.
24   Q.   For how long?
25   A.   Til '09.
```

2358

```
1    Q.   What were you doing in Waterbury?
2    A.   Working.
3    Q.   Were you selling drugs?
4    A.   No.
5    Q.   At some point did you leave Waterbury?
6    A.   Yes.
7    Q.   Why?
8    A.   Because I lost the job.
9    Q.   What was your job there?
10   A.   I was working in Torrington MBI.
11   Q.   Torrington MBI?
12   A.   Yes.
13   Q.   What is MBI?
14   A.   I think an import/export company.
15   Q.   Were you working every day?
16   A.   Yes.
17   Q.   And how did you lose your job?
18   A.   It was -- I think it was a year when all
19 the job -- everybody was just losing jobs, there
20 wasn't nobody -- all the -- it was '08 I think when
21 jobs started going down real bad, and they started
22 laying people off and I was one of the few that got
23 laid off.
24   Q.   And after you got laid off, did you stay in
25 Waterbury for a while?
```

2359

```
1    A.   Yes.
2    Q.   And what was it that -- you said you left
3  Waterbury eventually?
4    A.   Yes.
5    Q.   Why?
6    A.   Because when I lost that job I started
7  looking for more jobs.  I started doing nightclubs.
8  That didn't work out.  They wasn't giving but like
9  fifty, sixty dollars a night.  My rent was like six,
10 seven hundred.  And the landlord was giving me break
11 because I was like trying to be a tenant there, keep
12 the grass cut and stuff like that.  So, that
13 couldn't pay off, so he started more leaning, like
14 complaining because he gave me a cut on the rent and
15 I still couldn't be able to come up with the money
16 in rent and then also feed myself, too.
17        So, I just decided it's over and I
18 called my cousin in North Carolina and I told her I
19 don't really got nowhere to go, until I get back on
20 my feet, can I come back down.  She said "Yeah, you
21 can come."
22   Q.   Did you go?
23   A.   Yes.
24   Q.   Where in North Carolina did you go?
25   A.   Raleigh.
```

2360

```
1    Q.   How long did you stay with your cousin in
2  Raleigh?
3    A.   Maybe like two, three months maybe.
4    Q.   Did you still have family living in
5  Pinetops?
6    A.   Yes.
7    Q.   And did you ever visit them?
8    A.   Yes.
9    Q.   And drawing your attention to early
10 December of 2009, where were you?  What city?
11   A.   Pinetops.
12   Q.   And at that time did you get a visit from
13 law enforcement officers?
14   A.   Yes.
15   Q.   Where were those law enforcement officers
16 from?
17   A.   The only thing -- they didn't tell me at
18 first, but I figured that they was from -- when they
19 started talking to me, they started questioning me,
20 he started questioning me, he asked me about
21 something that -- the south and the city people talk
22 different.  So he asked me something and I told them
23 "You must be from Connecticut," and he -- yeah.
24   Q.   What was it that he said that you knew he
25 was from Connecticut?  Do you remember?
```

2361

```
1      A.    Base.
2      Q.    Base.  What's base?
3      A.    The crack.
4      Q.    That's another name for crack?
5      A.    Yes.
6      Q.    Base.  And they don't use that in south --
7  or North Carolina?
8      A.    No.
9      Q.    Okay.  And was anyone else, any of your
10 family members present at the house while the police
11 were there?
12     A.    Yes.
13     Q.    Who was there?
14     A.    My cousin Jeffrey.
15     Q.    Did you and/or Jeffrey allow the law
16 enforcement officers to come in to your house?
17     A.    Yes.
18     Q.    And did you speak with them?
19     A.    Yes.
20     Q.    What room were you in?
21     A.    I was in the room alone.
22     Q.    And what happened?
23     A.    He knocked on the door.  He told me, "You
24 got company."
25     Q.    Who told you?
```

2362

```
1      A.    Jeffrey.
2      Q.    Did you come out of the room?
3      A.    Yes.
4      Q.    And what room did you go into?
5      A.    We left out of the room I was sleeping in,
6  we went into the dinner room.
7      Q.    The dining room?
8      A.    Yes.
9      Q.    And sitting, standing?  What were you
10 doing?
11     A.    They asked me to sit down.
12     Q.    And did you -- did the officers tell you
13 they wanted to speak with you?
14     A.    Yes.
15     Q.    And did you agree to speak with them?
16     A.    Yes.
17     Q.    When you started speaking with the
18 officers, did they ask you about your knowledge
19 about Bridgeport?
20     A.    Yes.
21     Q.    And what did you tell them?
22     A.    "I don't know what you are talking about."
23     Q.    You told them "I don't know what you are
24 talking about"?
25     A.    Yes.
```

2363

```
1      Q.    Did they ask you about the murders?
2      A.    "I don't know what you talking about."
3      Q.    That's basically what you kept saying to
4  them?
5      A.    Yes.
6      Q.    Did you know what they were talking about?
7      A.    Yes.
8      Q.    Did they show you some photographs?
9      A.    Yes.
10     Q.    When the photographs were shown to you, did
11 you recognize the people in the photographs?
12     A.    The first time I didn't want to recognize
13 them.  I said I didn't know them.
14     Q.    You said you didn't know them, but did you
15 actually know who they were?
16     A.    Yes.
17     Q.    Do you remember now whose photographs you
18 were shown?
19          MR. SHEEHAN:  Objection,
20 mischaracterization.  I don't think he said he
21 didn't remember before.
22          THE COURT:  Sustained.
23     Q.    Okay, do you know whose photographs you
24 were shown?
25     A.    Yes.
```

2364

```
1      Q.    Can you tell me who they were?
2      A.    Dreddy, Ziggy, baby mother and the big guy.
3      Q.    When you said -- just to clarify, you said
4  at first you didn't know who those people were.
5      A.    I told the detectives I didn't know who
6  they were.
7      Q.    And that was not the truth?
8      A.    Yep.
9      Q.    Did -- when you told them I don't know who
10 that is, did they get up and walk out and say thank
11 you, sorry for your trouble?
12     A.    No.
13     Q.    What did they do?
14     A.    Carried on to a story that -- what they
15 knew about the trip and...
16     Q.    Which trip?
17     A.    To Georgia and Busch Gardens and the gun.
18     Q.    The gun from what?
19     A.    From when we got -- me and Ziggy got pulled
20 over.
21     Q.    And when they told you they knew about this
22 trip, what did you do?
23     A.    At first I denied it, but then I came
24 around.  I just gave them a little bit; not a lot,
25 but I just gave them a little bit.
```

2365

1    Q.   When you say you gave them a little bit,
2    what do you mean?
3    A.   I told them yeah, that happened the second
4    time around.
5    Q.   Like yes, that happened, the trip?
6    A.   Yes.
7    Q.   Okay.  Did they leave after that?
8    A.   No.
9    Q.   Do you know how many hours you spent with
10   the law enforcement officers in the dining room?
11   A.   No.
12   Q.   Was it one?
13   A.   No.
14   Q.   Two?
15   A.   Nope.
16   Q.   More?
17   A.   Maybe several maybe.  I don't really know.
18   I know it was a while.
19   Q.   And at some point did you indicate that
20   you, in fact, recognized the people in the pictures?
21   A.   Yes.
22   Q.   And at some point did you -- well, did you
23   ever admit that you were involved in the murders?
24   A.   No.
25   Q.   Did you ever admit that you were in the

2366

1    apartment while the murders occurred?
2    A.   No.
3    Q.   Are you sure?
4    A.   With the --
5    Q.   During the first interview?
6    A.   Did I ever admit I was in the apartment
7    where the murders occurred?
8    Q.   No.
9    A.   No.
10   Q.   Is that right?  Are you sure?
11   A.   At first I didn't.  I admitted it
12   afterwards.
13   Q.   So, during the course of the -- let me ask
14   you a different question.  Did you tell everything
15   you knew immediately?
16   A.   No.
17   Q.   After they had spoke with you for several
18   hours, did you provide more information?
19   A.   Yes.
20   Q.   And did you give the officers anything that
21   day?
22   A.   The phone book and the little piece of
23   paper.
24   Q.   Okay, the one I showed you earlier?
25   A.   Yes.

2367

1    Q.   With whose name on it?
2    A.   Shante.
3    Q.   And what did you say where you got those
4    from?
5         MR. SHEEHAN:  Objection.  Hearsay.  It's
6    not -- it's hearsay, your Honor.
7         THE COURT:  It is.
8    Q.   Were you ever asked to give a DNA sample?
9    A.   Yes.
10   Q.   And did you?
11   A.   Yes.
12   Q.   And you consented to that?
13   A.   Yes.
14   Q.   And after that occurred, did the police
15   leave?
16   A.   Yes.
17   Q.   And what did you do?
18   A.   I left with them.
19   Q.   Willingly?
20   A.   I had no choice, they had handcuffs on me.
21   Q.   So, you got arrested?
22   A.   Yeah.
23   Q.   What did you get arrested for?  What were
24   the charges?
25   A.   I didn't know.  The only thing I know it

2368

1    was murder.
2    Q.   And when you got in the car with the law
3    enforcement officers, did you say I never want to
4    speak to you again or did you indicate you wanted to
5    continue to talk?
6    A.   Yes.
7         MR. SHEEHAN:  Objection, hearsay.
8         THE COURT:  Well, that's just a yes or
9    no.  Oh, I see.
10        MR. SHEEHAN:  I think it's --
11        MS. DAYTON:  I'll ask another question.
12   It's okay.  Thank you, your Honor.
13   Q.   Did you go -- did you go to court?
14   A.   Yes.
15   Q.   In what state?
16   A.   North Carolina and Connecticut.
17   Q.   How did you get to Connecticut?
18   A.   Marshals.
19   Q.   Transported you?
20   A.   Yes.
21   Q.   And do you have a lawyer?
22   A.   Yes.
23   Q.   Do you see that person in court today?
24   A.   Yes.
25   Q.   And how did that person come to be your

2369

```
1   lawyer?
2              MR. SHEEHAN:  Objection, irrelevant.
3              THE COURT:  Your claim?
4              MS. DAYTON:  That he has been
5   represented, your Honor.
6              THE COURT:  How he came to be, I don't
7   think it's relevant.
8      Q.   Since when have you had a lawyer?
9      A.   Since the day -- about maybe like a couple
10  weeks after I came to Connecticut.
11     Q.   And --
12     A.   When I had a lawyer when I was over there,
13  too.
14     Q.   So, you had a lawyer from the minute you
15  got arrested?
16     A.   Yes.
17     Q.   Since you arrived in Connecticut, have you
18  met with the government in the presence of your
19  lawyer?
20     A.   Yes.
21     Q.   On one, two or several occasions?
22     A.   Several.
23     Q.   And during the course of those meetings,
24  did you speak about the same types of things you
25  spoke about in court today?
```

2370

```
1      A.   Yes.
2      Q.   Were you always completely honest?
3      A.   No.
4      Q.   Why not?
5      A.   I was scared and embarrassed.
6      Q.   Scared of what?
7      A.   The truth, to tell the truth.  And I didn't
8   want to be involved, that I didn't -- I ain't want
9   to be involved.
10     Q.   And embarrassed about what?
11     A.   About what I did and what we went through.
12     Q.   Did you eventually plead guilty?
13     A.   Yes.
14              MS. DAYTON:  Your Honor, at this time I
15  would ask to approach.
16              THE COURT:  You may.
17              MS. DAYTON:  Thank you.
18              MR. SHEEHAN:  No objection, your Honor.
19     Q.   I'm going to show you two items that have
20  been marked for purposes of identification 247 and
21  247A.  Do you recognize what these two things are?
22     A.   Yes.
23     Q.   What are they?  247 first.
24     A.   It's my plea agreement.
25     Q.   And what's 247A?
```

2371

```
1      A.   My attorney --
2      Q.   Did you sign two agreements?
3      A.   Yes.
4      Q.   A plea agreement and a cooperation
5   agreement?
6      A.   Cooperation, yes.
7      Q.   I'm just going to turn to the last page of
8   247, page 9.  Did you sign that?
9      A.   Yes.
10     Q.   And did you also sign page 8?
11     A.   Yes.
12              MS. DAYTON:  Your Honor, at this time
13  the government would move 247 into evidence.
14              THE COURT:  All right, there is no
15  objection.
16              MR. SHEEHAN:  There is not, your Honor.
17              THE COURT:  So, it's a full exhibit.
18     Q.   And drawing your attention to page 5 of the
19  cooperation agreement, which is 247A, is your
20  signature on that page?
21     A.   Yes.
22     Q.   And your lawyer, too?
23     A.   Yes.
24              MS. DAYTON:  Your Honor, the government
25  would offer 247A as well.
```

2372

```
1              THE COURT:  It's a full exhibit.
2              MS. DAYTON:  Thank you, your Honor.
3      Q.   And, Mr. Taylor, what charges did you plead
4   guilty to?
5      A.   Three counts of felony murder.
6      Q.   And do you know what sort of sentence you
7   are facing?
8      A.   Life sentence.
9      Q.   For each count?
10     A.   Yes.
11     Q.   Is the government seeking the death penalty
12  against you?
13     A.   No.
14     Q.   When you were first arrested back in
15  Pinetops, did you even know that this could
16  potentially be a death penalty case?
17     A.   No.
18     Q.   Why are you testifying?
19     A.   To tell the truth.
20     Q.   Why?
21     A.   People got killed for no reason.  They
22  shouldn't got killed.  When I said they shouldn't
23  got killed, it never should have gone to the point
24  it went to.
25     Q.   When you walked into that apartment that
```

**GA593**

2373

1　day, what did you think was going to happen?
2　　　A.　My question is, I thought maybe we was
3　going to go inside and just beat the place up, like
4　tear the place up.　Like, you know, how people do,
5　like when you try to get somebody out of there, tear
6　them up.　I didn't knew they was just going to go in
7　there and kill them.
8　　　Q.　I'm going to go show you a picture marked
9　121-10.
10　　　　　MR. SHEEHAN:　Is that in evidence
11　already, counsel?
12　　　　　MS. DAYTON:　Yes.
13　　　　　MR. SHEEHAN:　I'm sorry.
14　　　　　MS. DAYTON:　Yes.
15　　　Q.　Mr. Taylor, do you see that photo, 121-10?
16　　　A.　Yes.
17　　　Q.　Did you see this on the day you were in the
18　apartment?
19　　　A.　Yeah.
20　　　Q.　Why didn't you call 911?
21　　　A.　Scared.
22　　　Q.　Scared of what?
23　　　A.　I figured if I told the truth they would
24　lock me up the way I am now.
25　　　Q.　And why didn't you call the police later?

2374

1　　　A.　I didn't know what to do.　I didn't.
2　　　Q.　What are you hoping happens to you?
3　　　A.　Lesser sentence.
4　　　Q.　Do you think you are going to go home
5　tomorrow?
6　　　A.　No.
7　　　Q.　When do you think you are going to go home?
8　　　A.　I don't think I'm never going home.
9　　　　　MS. DAYTON:　Thank you, your Honor, I
10　have nothing further at this time.
11　　　　　Thank you, Mr. Taylor.
12　　　　　THE COURT:　Thank you.
13　Cross-examination.
14　　　　　MR. SHEEHAN:　Thank you, your Honor.
15　　　　　THE COURT:　There are tissues on the
16　witness stand.
17　CROSS-EXAMINATION
18　BY MR. SHEEHAN:
19　　　Q.　Afternoon, Mr. Taylor.　My name is Michael
20　Sheehan and I represent Mr. Aquart.
21　The prosecutor went through your criminal history.
22　　　　　THE COURT:　All right, why don't we take
23　a five-minute recess, ladies and gentlemen.
24　　　　　MR. SHEEHAN:　That will be fine, your
25　Honor.

2375

1　　　　　THE COURT:　Before we recess, may I see
2　Ms. Rodriguez and defense counsel at sidebar,
3　please.
4　　　　　(Sidebar conference)
5　　　　　THE COURT:　You need to not say things
6　audibly.　I could hear you saying "it's not
7　hearsay."
8　　　　　MS. RODRIGUEZ-COSS:　I apologize, your
9　Honor.
10　　　　　THE COURT:　You have to be very careful
11　about that.　You are way too close to the jury.　If
12　I can hear you, they can hear you.
13　　　　　MS. RODRIGUEZ-COSS:　Very well.
14　　　　　(Sidebar concluded)
15　　　　　THE COURT:　All right, we stand in
16　recess.
17　　　　　(Recess)
18　　　　　THE COURT:　All right, we're ready for
19　the jury?
20　　　　　MR. SHEEHAN:　Yes, your Honor.
21　　　　　THE COURT:　Are you all set, Mr. Taylor?
22　　　　　THE WITNESS:　Yes, ma'am.
23　　　　　(Jury entered the courtroom).
24　　　　　THE COURT:　Please be seated, ladies and
25　gentlemen.

2376

1　　　　　Mr. Sheehan.
2　　　　　MR. SHEEHAN:　Thank you, your Honor.
3　　　Q.　Mr. Taylor, when you were first questioned
4　by the government, you started talking about dealing
5　drugs from the age of 16 and 17?
6　　　A.　Yes.
7　　　Q.　And the first felony drug conviction that
8　you got, that was in 1994, was it not?
9　January 20th?
10　　　A.　I don't remember the dates.
11　　　Q.　Do you think looking at something would
12　refresh your recollection?
13　　　A.　Maybe.
14　　　Q.　Maybe?
15　　　　　MS. DAYTON:　Can I just know what you
16　are showing him.
17　　　　　MR. SHEEHAN:　I'm sorry.
18　　　Q.　So, Mr. Taylor, just look at
19　the document, see if it refreshes your recollection
20　of when you were convicted of a felony for the first
21　time.　If it doesn't refresh your recollection, you
22　can tell us that and we'll move on.
23　　　　　THE WITNESS:　Do it supposed to say what
24　I was charged with or --
25　　　　　THE COURT:　The document is not in

2377

```
1    evidence.  So, you are just supposed to take a look
2    at it and see if there is anything on there that
3    refreshes your recollection.  If your recollection
4    is not refreshed --
5              THE WITNESS:  I remember my first case,
6    but it was so long ago and I had so many of them, so
7    maybe it could have been.  Maybe.
8              THE COURT:  All right, it does not
9    refresh your recollection.
10             THE WITNESS:  No, ma'am.
11             THE COURT:  Next question, please.
12   Q.    Okay.  You told the prosecutor you had a
13   felony drug conviction in 1994, correct?
14   A.    I told her?
15   Q.    She asked you about that and you said yes.
16   A.    Yes, I had a drug conviction, but I don't
17   remember what year it was.  I just remember the
18   time.
19   Q.    Right.  In fact, in 1994 you had another --
20   I'm sorry, in 1995 you had a felony drug possession
21   of cocaine, right?
22   A.    Yes.
23   Q.    And that was in Edgecombe County, North
24   Carolina?
25   A.    Yes.
```

2378

```
1    Q.    The same as your earlier one was in
2    Edgecombe County, North Carolina, right?
3    A.    Yes.
4    Q.    And then you had a felony conviction for
5    aiding and abetting a common law robbery.  That was
6    in 1997, was it not?
7    A.    Yes.
8    Q.    And then in the year 2001 -- I'm sorry,
9    2002 you had a possession -- a felony conviction for
10   possession with intent to sell, to distribute
11   cocaine?
12   A.    Yes.
13   Q.    And that, again, was in Edgecombe County,
14   North Carolina, right?
15   A.    Yes.
16   Q.    Just as was the robbery -- I'm sorry, the
17   aiding and abetting a common law robbery, that was
18   also in Edgecombe County, right?
19   A.    Yes.
20   Q.    And you also have the felony drug
21   conviction in the State of Connecticut, which was in
22   the year 2006, right?
23   A.    Yes.
24   Q.    Now, in that felony drug conviction you
25   were arrested in Norwalk on September 9, 2005,
```

2379

```
1    right?
2    A.    Yes.
3    Q.    And you were charged with possession with
4    intent to distribute cocaine, right?
5    A.    Yes.
6    Q.    You had a number of packets on your
7    possession when you were arrested?
8    A.    Yes.
9    Q.    And you pled guilty and you got a 30-month
10   sentence?
11   A.    Yes.
12   Q.    You looked for help in getting out on bail
13   while that case was pending?
14   A.    Yes.
15   Q.    And nobody came up with a bond for you,
16   right?
17   A.    No.
18   Q.    And as a result of that, you basically went
19   to jail in Connecticut on September 9, 2005.  That's
20   when you started your sentence, right?
21   A.    Yes.
22   Q.    And you remained in Bridgeport for some
23   period of time.  In fact, until August 31, 2006,
24   right?  That's where you were initially held?
25   A.    Yes.
```

2380

```
1    Q.    And then after being in the Bridgeport
2    jail, you went up to Walker, like most people do
3    when they get sentenced, right?
4    A.    Yes.
5    Q.    And then they shipped you to another
6    facility, Bergin, right?
7    A.    Yes.
8    Q.    And then they shipped you to Gates
9    facility.  That's out in Niantic, right?
10   A.    Yes.
11   Q.    And subsequently you got to the halfway
12   house?
13   A.    Yes.
14   Q.    Right?  And you finally finished your
15   parole in March of 2008, right?
16   A.    Yes.
17   Q.    Now, you were aware, were you not, that the
18   federal authorities had brought a prosecution
19   against Azibo and Azikiwe Aquart related to the
20   incidents at Charles Street?
21   A.    No.
22   Q.    You never knew that?
23   A.    No.
24   Q.    Okay.  During the period of time that you
25   were at Bridgeport jail, you never talked to anybody
```

2381

```
1   about the federal drug case out of Charles Street?
2       A.   No.
3       Q.   Did you ever talk to Rodney Womble?
4       A.   I don't know him.
5       Q.   Do you know who Rodney Womble is?
6       A.   No.
7       Q.   Did you tell the federal authorities that
8   you knew -- you had heard of Rodney Womble and the
9   fact that he was incarcerated at Bridgeport with
10  you?
11      A.   No.
12      Q.   Are you certain of that?
13      A.   Positive.
14      Q.   Okay.  So positive that you don't think
15  your recollection could be refreshed?
16      A.   I don't remember that, that person.
17      Q.   All right.  Well, let me ask you this:  You
18  remember the numerous meetings you had with law
19  enforcement, right?
20      A.   Yes.
21      Q.   And periodically you would meet with them,
22  would you not, with the law enforcement people?
23      A.   Yes.
24      Q.   Since the time of your arrest.  Okay.  I'm
25  going to show you a document and ask if this
```

2382

```
1   refreshes your recollection.  And I draw your
2   attention -- oh, let me ask you this.  I don't mean
3   to embarrass you in any way, but you can read,
4   right?
5       A.   Not too fluently.
6       Q.   Okay.  When you look at any documents, do
7   you have any -- do you have trouble understanding
8   them?
9       A.   Certain things.
10      Q.   All right.  Well, what I'm asking you is
11  just to look at here, this paragraph, and tell me if
12  you can read that.  First just to just that read to
13  yourself.
14      A.   Never --
15           THE COURT:  Don't read it out loud,
16  please.
17      Q.   The question -- I'm not asking you to read
18  it aloud, I'm asking you to read it to yourself, and
19  then in particular I'm interested in that sentence.
20           THE COURT:  Okay, what is the question
21  on which you are seeking to see whether his
22  recollection is refreshed?
23           MR. SHEEHAN:  Has he ever heard of
24  Rodney Womble.
25           THE COURT:  All right, that's the
```

2383

```
1   question.  You said you don't remember that person.
2   He's showing you a document.  Read that and see if
3   that refreshes your recollection in any way.  If so,
4   you can testify from what you remember; if not,
5   we'll just move on.
6       A.   No.
7       Q.   Okay.  And let me ask you this:  Did you
8   tell federal authorities on January 15, 2010, that
9   you had heard of Rodney Womble when you were both
10  incarcerated in BCC, Bridgeport Correctional Center
11  at the same time?
12      A.   That I have heard of him.
13      Q.   That you had heard of him?
14      A.   No.
15      Q.   Okay.  Have you found in your experience,
16  sir, there is a grapevine in prison?
17      A.   Yes.
18      Q.   Okay.  And people talk about things with
19  each other?
20      A.   Uh-huh (indicating affirmatively).
21      Q.   But it's your testimony, sir, that you
22  never heard of any federal prosecutions related to
23  the Charles Street drug cases?
24      A.   I don't understand what you mean, saying.
25  Can you repeat the question a different way?  I
```

2384

```
1   don't understand what you are saying.
2       Q.   Okay.  On December 2nd, 2009, federal
3   officials and state officials knocked on the door of
4   your aunt's house in Pinetops, North Carolina,
5   right?
6       A.   Yes.
7       Q.   And among the things that they were asking
8   you about was the murders at Charles Street, right?
9       A.   Yes.
10      Q.   And did you know at the time that the
11  agents knocked on your door that there was a federal
12  case involving the murders at Charles Street.
13      A.   No.
14      Q.   Did you know that there was a federal case
15  involving the drug operation at Charles Street?
16      A.   No.
17      Q.   Now, when those agents knocked on your door
18  on that date in December, there were more than a few
19  of them, were there not?
20      A.   Yes.
21      Q.   And do you remember who those people were?
22      A.   Not all of them.
23      Q.   Who do you remember?
24      A.   The three mens (sic).  That's all I
25  remember.  There were five mens.
```

2385

```
1     Q.   There were five men?
2     A.   I think five.
3     Q.   And do you remember their names?
4     A.   No.
5     Q.   All right.  Do you see any of them sitting
6  here in the courthouse right now?
7     A.   Just only one.
8     Q.   Mr. Munger?
9     A.   I don't know his name.
10    Q.   Okay.  Do you see anybody else who was at
11 your house on December 2nd, 2009?
12         MS. DAYTON:  Your Honor, may we approach
13 for one moment please?
14         THE COURT:  Yes.
15         (Sidebar conference)
16         MS. DAYTON:  So defense counsel made a
17 motion in limine to preclude the witnesses from
18 talking about the prosecutors, trial prosecutors,
19 being at any proffers or any interviews.  We
20 consented to that.  It was their motion.  Now the
21 defense is pushing him, and if they keep pushing
22 he's going to say that I was there.  And we think
23 that -- and then they're going to claim some sort of
24 problem.
25         Because they made this motion to keep
```

2386

```
1  this out, I would ask that he move on from this area
2  of questioning because it was their motion, and if
3  they're trying to make me a witness it's not going
4  to happen because there were other officers there,
5  and I think this is an improper line of questioning
6  considering their motion in limine.
7         MR. SHEEHAN:  I'll review the filings.
8  If that's -- if that is the case, then that was a
9  mistake on my part.
10        THE COURT:  It may have been Azikiwe's
11 motion.
12        MS. DAYTON:  They joined it.
13        MR. SHEEHAN:  If I joined it, I'll move
14 on.
15        THE COURT:  Okay.
16        MR. SHEEHAN:  I apologize.
17        (Sidebar concluded)
18    Q.   Do you remember a Sergeant John Gonzalez
19 from the Bridgeport Police Department?
20    A.   If I have a picture maybe I could.
21    Q.   Do you remember a Detective Richard
22 Donaldson from the Bridgeport Police Department?
23    A.   A picture.
24    Q.   Do you remember an officer from the North
25 Carolina state highway patrol by the name of Gregory
```

2387

```
1  Rioux (Ph)?
2     A.   From a picture I probably could.
3     Q.   You testified that there were about five
4  people there?
5     A.   That's a rough draft.
6     Q.   All right.  You didn't expect to see them,
7  did you?
8     A.   No.
9     Q.   You were sleeping at the time, right?
10    A.   Yes.
11    Q.   And did they tell you, sir, that they had a
12 subpoena?
13    A.   If they did I don't remember.
14    Q.   Do you know what a subpoena is?
15    A.   I'm not quite sure.  Can you explain.
16    Q.   Did they tell you that they had a legal
17 document that compelled you to provide a DNA sample?
18    A.   Yes.
19    Q.   Okay.  And you told us about the end of
20 that meeting when you were arrested, right?
21    A.   Ask it again.
22    Q.   You told us, sir, about the end of that
23 meeting on December 2nd when you walked out of there
24 in handcuffs, right?
25    A.   Told them what?
```

2388

```
1     Q.   You told us that you were arrested?  Do you
2  remember that?
3     A.   Yes.
4     Q.   Do you recall whether you gave them the
5  notebook before you were arrested, the little memo
6  book, or did you give that to them after you were
7  arrested?
8     A.   I gave it to them before.
9     Q.   All right.  Now, when these people knocked
10 on your door and you came out of the bedroom, you
11 went into the dining room, was it?
12    A.   Yes.
13    Q.   And you sat in this recliner, right?
14    A.   Yes.
15    Q.   And what did they say to you at the
16 beginning?  What was their first question to you at
17 the beginning when they greeted you?
18        MS. DAYTON:  Objection.  It calls for
19 hearsay.
20        MR. SHEEHAN:  It's a question I'm
21 asking, your Honor.  I'm not asking for -- I'm
22 asking what was their questioning.  What was their
23 first question to him.
24        THE COURT:  Right, and why is that not
25 hearsay?
```

2389

1    MR. SHEEHAN:  Because it elicits a
2  response perhaps from -- it may have elicited a
3  response from him, but it's not a statement.  It's
4  not a statement of fact.  A question is a question.
5    THE COURT:  A statement includes a
6  question.  But you can ask --
7    MR. SHEEHAN:  Okay.
8    THE COURT:  -- if he remembers the first
9  question and then go on from there.  I'm not sure
10 how this is going to work out.
11   Q.   Do you remember what the first question was
12 that they asked you?
13   A.   No.
14   Q.   Did they ask you about your car, why you
15 had a Connecticut license plate?
16   A.   I don't remember.
17   Q.   Okay.  When was it in the course of this
18 interview that you began to get the impression, if
19 you ever did, that they were here to talk to you
20 about what had happened in Connecticut?
21   A.   Well, I know I hadn't did nothing in North
22 Carolina.  So, I guess when I -- the detectives
23 started talking about base, that's when I figured it
24 had to been something from in Connecticut.
25   Q.   And what did they ask you about base?

2390

1    A.   I can't remember, but I remember the police
2  said base.  What the question was, I don't remember
3  what the question was, but I remember when he said
4  base, that's when I stopped him, "Where you are
5  from?"
6    Q.   All right.  And did he tell you where he
7  was from?
8    A.   Yes.
9    Q.   All right.  And I take it once he told you
10 where he was from, from then on you had an idea of
11 what this was all about, right?
12   A.   Pretty -- pretty much, yes.
13   Q.   Okay.  You can't think of any other reason
14 why, in your knowledge anyway, somebody would want
15 to come all the way from Connecticut to talk to you
16 about drugs other than the Charles Street incident,
17 can you?
18   A.   No.
19   Q.   Okay.  Did they have a tape recorder with
20 them?
21   A.   I don't know.
22   Q.   Do you know whether they had a video?
23   A.   I don't know.
24   Q.   And when was -- do you recall when it was
25 that they first told you that they wanted to ask you

2391

1  about the murders in Bridgeport at Charles Street?
2    A.   Can you repeat that again.
3    Q.   Do you recall when it was that they first
4  told you that they wanted to talk to you about the
5  murders at Charles Street?
6    A.   I don't understand.  I do, but then I don't
7  really kind of understand.
8    Q.   May I ask what you don't understand?
9    A.   The question.
10   Q.   Okay.  And what part do you understand?
11   A.   None of it.
12   Q.   So --
13   THE COURT:  Is your question at what
14 point during that first session?
15   MR. SHEEHAN:  Yes.
16   Q.   At what point in that first session did
17 they tell you that they wanted to talk to you about
18 the murders at Charles Street?
19   THE WITNESS:  I -- I -- I do understand,
20 but I don't really understand like what he's saying.
21   THE COURT:  Like at the beginning, in
22 the middle, towards the end?
23   THE WITNESS:  When they first came in
24 and first started talking to me, what was my
25 response to them or what did they ask me?

2392

1    THE COURT:  When in the course of
2  talking to you.
3    THE WITNESS:  Right.
4    THE COURT:  The middle -- the beginning,
5  the middle, the end, somewhere in between did they
6  talk to you about the murders at Charles Street?
7    THE WITNESS:  No.
8    Q.   Okay.  They asked you about your old case,
9  didn't you?
10   A.   They asked me about my old case?
11   Q.   Yeah, the Connecticut case, the Norwalk
12 case.
13   A.   I don't recall.  Maybe.
14   Q.   They asked you where you got those drugs,
15 right?
16   A.   They asked me where did I got the drugs?
17   Q.   Yeah, that you were arrested with on
18 November 9, 2005?
19   A.   I don't think so.
20   Q.   Okay.  You told them that you got those
21 drugs from a guy named Fan?
22   A.   That was a lie.  That was a lie.
23   Q.   All right.  So they asked you where you got
24 your drugs and you told them a guy named Fan, right?
25   A.   Yes.

2393

```
1    Q.   And that was a lie?
2    A.   Yes.
3    Q.   Okay.  And they asked you where you met
4  Fan, and you told them you met Fan --
5            MS. DAYTON:  Objection, it's not a
6  question.
7            MR. SHEEHAN:  I haven't finished it.
8            MS. DAYTON:  Telling him what he said.
9            MR. SHEEHAN:  I haven't finished my
10  question.
11            THE COURT:  There will be a question at
12  the end of that?
13            MR. SHEEHAN:  There will.
14            THE COURT:  Okay.
15    Q.   And you told them that you met Fan when you
16  were both pursuing Ebony; isn't that correct?
17    A.   Both pursuing Ebony?
18    Q.   A girl named Ebony?
19    A.   That was a lie.
20    Q.   Okay.  But it was a lie that you told them,
21  right?
22    A.   What, pursuing Ebony?
23    Q.   Yeah.
24    A.   Yes.
25    Q.   And then they asked you about who Ebony
```

2394

```
1  was, right?
2    A.   Yes.
3    Q.   And you told them that Ebony worked at a
4  club across the street from the Norwalk police
5  station, correct?
6    A.   Could have said it because I was lying.  I
7  could have said it.  If it was anything about Ebony,
8  it was a lie.
9    Q.   Okay.  You did tell them that, though?
10    A.   Yes, I did.
11    Q.   Okay.  And then they pursued that a little
12  bit more and asked you -- and you told them that you
13  had gone to the club with a friend of yours by the
14  name of David whose last name you didn't know,
15  right?
16    A.   That was a lie.
17    Q.   And then you told them you got the cocaine
18  from Fan twice and the second time was the time that
19  you were arrested, right?  That's what you told
20  them?
21    A.   To -- you are saying when I told them that,
22  that I got the drugs from Fan, then I got arrested?
23    Q.   You said you only got cocaine from Fan
24  twice and the second time was when you got arrested?
25    A.   Fan, one reason why I was saying Fan was
```

2395

```
1  because I wasn't saying his name.
2    Q.   And you told them that the second time when
3  you got the drugs from Fan was when you got
4  arrested, right?
5    A.   Yes.
6    Q.   Okay.  And that was a lie, right?
7    A.   Yes.
8    Q.   And then you told them that you thought
9  that Fan might have set you up with the police,
10  correct?
11    A.   That was a lie.
12    Q.   When the federal agents came in and started
13  questioning you, did they tell you at the beginning
14  of the questioning that lying to federal officials
15  was a crime?
16    A.   Yes.
17    Q.   Okay.  They did that even before they
18  really started asking you questions?  They cautioned
19  you, right, gave you a warning?
20    A.   Yes.
21    Q.   And after that warning you proceeded to
22  give them about six lies in a row, right?
23    A.   Yes.
24    Q.   And then they said to you they weren't
25  buying it, right?
```

2396

```
1    A.   Yes.
2    Q.   And they reminded you again about the fact
3  that it was a federal crime to lie to the police,
4  right?
5    A.   Yes.
6    Q.   You didn't really need a reminder at that
7  point, did you?
8    A.   They told me a couple of times.  I still
9  didn't want to tell the truth.
10    Q.   And you insisted that you were telling them
11  the truth at that moment, right?
12    A.   Yes.
13    Q.   Did you think at that point in the
14  conversation when they told you that it was a crime
15  to lie to federal officials that you could just get
16  up and walk out of your living room?  Your dining
17  room, I'm sorry.
18    A.   Can you ask the question again, please.
19    Q.   Yes.  Did you think at that point that you
20  could just get up and walk out of your dining room?
21    A.   Well, by lying to them?
22    Q.   Yeah.
23    A.   I thought maybe if I lied to them they'd go
24  away.
25    Q.   Okay.  Could you just say to them I'm not
```

2397

```
1    going to talk to you, go away?
2        A.   I guess at the time I was scared.  I didn't
3    know, they rushed in on me, and when they came in I
4    was halfway sleep and I had a long night and I --
5    they talking to me.
6        Q.   And you thought you had to answer their
7    questions, right?
8        A.   Pretty much.
9        Q.   I mean you might be lying, but you had to
10   answer their questions, right?
11       A.   I had?
12       Q.   You had to answer their questions?
13       A.   Yeah.
14       Q.   Right?
15       A.   Because if I didn't answer they wasn't
16   going to go nowhere.
17       Q.   And you insisted, nonetheless, that you
18   bought the cocaine from Fan, and you used the term
19   "pickles" to describe the cocaine that you had in
20   your pocket, right?
21       A.   That was a lie.
22       Q.   And then they showed you some photos,
23   right?
24       A.   Yes.
25       Q.   And one of the photos was of Mr. Aquart
```

2398

```
1    sitting here?
2        A.   Yes.
3        Q.   And you said you didn't know him?
4        A.   Yes.
5        Q.   And that was a lie?
6        A.   Yes.
7        Q.   Right?  And they showed you a photo of
8    Shante Pettway and you said, oh, she's from Norwalk.
9    I know a girl named Shante, but that's not her.  But
10   the Shante I know, she's from The Hill, right?
11       A.   I don't recall.  I --
12       Q.   You don't recall that one?
13       A.   If I did say it, it was a lie that I did.
14   I said I didn't know Charmaine, right?
15       Q.   They asked you if you knew a girl named
16   Shante?
17       A.   Shante.
18       Q.   Yeah, and you said I know a girl named
19   Shante, she's from The Hill in Norwalk?
20       A.   Oh, yeah, I remember saying that.
21       Q.   That was a lie, right?
22       A.   Yes.
23       Q.   And then they sort of gave you a little
24   encouragement and they asked you, well, who is --
25              MS. DAYTON:  Objection to the
```

2399

```
1    characterizations.
2              THE COURT:  All right, let's just ask
3    the question.
4        Q.   Well, then they asked you a little bit more
5    about this Shante and you told them, well, her
6    boyfriend Bluey, he's in jail for drugs.
7        A.   It was a lie.
8        Q.   And then you told them you had heard that
9    Bluey had shot some people in Norwalk.
10       A.   That was the real person that I knew.
11       Q.   Bluey?
12       A.   Yeah.
13       Q.   So that wasn't a lie?
14       A.   A part of the -- of the lies of the
15   questions they was asking me?
16       Q.   Yeah.
17       A.   I just put that in just for keep lying.
18       Q.   All right.  Then they asked you who is this
19   guy Bluey, and you said, oh, I never met him.  Is
20   that a lie, too?
21       A.   Yeah.
22       Q.   And then they said, you are not telling us
23   the truth, right?
24       A.   Yes.
25       Q.   And you weren't, were you?  By now we're up
```

2400

```
1    to about 12 lies, aren't we?
2              MS. DAYTON:  Objection.
3              THE COURT:  I'm going to sustain the
4    objection.
5        Q.   By -- at this point they reminded you again
6    about your obligation to tell the truth, correct?
7        A.   Yes.
8        Q.   And that it was a federal crime.  They
9    reminded you again of that fact, right?
10       A.   Yes.
11       Q.   And you'd already given them at least 12
12   lies, had you?
13              MS. DAYTON:  Objection.  Same objection.
14              THE COURT:  What's the objection?
15              MS. DAYTON:  He's just sort of pulling a
16   number out of the air.  Unless he's actually counted
17   the number of lies, it's the characterizations.
18              MR. SHEEHAN:  I can go right through
19   them again, your Honor.
20              THE COURT:  No, don't do that.
21              MR. SHEEHAN:  Okay.
22              MS. DAYTON:  Your Honor, this is an
23   18-page report.  If we're going to go through it
24   every page, the government has no objection to the
25   entire 18-page report going to the jury for them to
```