# 12-5086

*To Be Argued By:*
Tracy Lee Dayton

## United States Court of Appeals

### FOR THE SECOND CIRCUIT

### Docket No. 12-5086

————

UNITED STATES OF AMERICA,

*Appellee,*

-vs-

AZIBO AQUART, aka D, aka Dreddy, aka Jumbo,
aka Azibo Smith, aka Azibo Siwatu Jahi Smith,

*Defendant-Appellant,*

(For continuation of caption, see inside cover)

————

ON APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF CONNECTICUT

**GOVERNMENT APPENDIX-VOLUME III (GA601 – GA900)**

DEIRDRE M. DALY
*United States Attorney*
*District of Connecticut*

TRACY LEE DAYTON
JACABED RODRIGUEZ-COSS
SANDRA S. GLOVER
*Assistant United States Attorneys*

LESLIE R. CALWELL
*Assistant Attorney General*

SUNG-HEE SUH
*Deputy Assistant*
*Attorney General*

DAVID M. LIEBERMAN
*Attorney*
*Criminal Division*
*Appellate Section*

AZIKIWE AQUART, aka Zee, Nathaniel Grant, aka
Correctional Officer Stone, EFRAIN JOHNSON,

*Defendants.*

# TABLE OF CONTENTS

Trial Transcript – Volume I dated April 20, 2011 ...................................... GA1

Trial Transcript – Volume II dated April 21, 2011 ................................... GA65

Trial Transcript – Volume III dated April 25, 2011 ............................... GA115

Trial Transcript – Volume IV dated April 26, 2011 ................................ GA171

Trial Transcript – Volume V dated April 27, 2011 ................................. GA238

Trial Transcript – Volume VI dated April 28, 2011 ................................ GA298

Trial Transcript – Volume VII dated April 29, 2011 .............................. GA355

Trial Transcript – Volume VIII dated May 2, 2011 ................................ GA423

Trial Transcript – Volume IX dated May 3, 2011 ................................... GA494

Trial Transcript – Volume X dated May 4, 2011 .................................... GA547

Trial Transcript – Volume XI dated May 5, 2011 ................................... GA605

Trial Transcript – Volume XII dated May 9, 2011 .................................. GA655

Trial Transcript – Volume XIII dated May 10, 2011 ............................... GA707

Trial Transcript – Volume XIV dated May 11, 2011 ............................... GA767

Trial Transcript – Volume XV dated May 12, 2011 ................................ GA819

Trial Transcript – Volume XVI dated May 13, 2011 ............................... GA850

Trial Transcript – Volume XVII dated May 16, 2011 ............................. GA893

Trial Transcript – Volume XVIII dated May 17, 2011 ........................... GA952

Trial Transcript – Volume XIX dated May 18, 2011 .............................. GA1008

<u>TABLE OF CONTENTS</u> (cont'd)

Trial Transcript – Volume XX dated May 20, 2011 ............................... GA1036

Trial Transcript – Volume XXI dated May 23, 2011 ............................. GA1089

Transcript of Guilt Phase Charge Conference – Volume I
    dated May 13, 2011 ............................................................... GA1097

Transcript of Guilt Phase Charge Conference – Volume II
    dated May 18, 2011 ............................................................... GA1124

Guilt Phase Verdict Form dated May 23, 2011 ...................................... GA1137

Trial Transcript – Volume XXII dated May 31, 2011 ........................... GA1140

Trial Transcript – Volume XXIV dated June 1, 2011 ........................... GA1201

Trial Transcript – Volume XXV dated June 2, 2011 ............................. GA1237

Trial Transcript – Volume XXVI dated June 3, 2011 ........................... GA1285

Trial Transcript – Volume XXVII dated June 6, 2011 .......................... GA1342

Trial Transcript – Volume XXVIII dated June 7, 2011 ......................... GA1404

Trial Transcript – Volume XXIX dated June 13, 2011 .......................... GA1435

Trial Transcript – Volume XXX dated June 14, 2011 ........................... GA1472

Trial Transcript – Volume XXXI dated June 15, 2011 .......................... GA1479

Transcript of Penalty Phase Charge Conference – Volume I
    dated June 6, 2011 ................................................................. GA1483

Transcript of Penalty Phase Charge Conference – Volume II
    dated June 7, 2011 ................................................................. GA1502

Special Verdict Form (Penalty Phase) dated June 15, 2011 .................. GA1523

Motion for Mistrial dated May 23, 2011 ................................................ GA1537

<u>TABLE OF CONTENTS</u> (cont'd)

Ruling on Defendant's Motion for a Mistrial dated February 21, 2012  GA1542

Transcript of John Taylor's Guilty Plea dated October 18, 2010 ........... GA1555

Transcript of John Taylor' Sealed Cooperation Agreement Plea
    Dated October 18, 2010 ..................................................................... GA1565

Transcript of John Taylor's Sentencing Hearing dated April 16, 2012 . GA1569

Trial Transcript of Efrain Johnson – Volume VII dated February 16, 2012
    [Testimony of John Taylor] ............................................................... GA1580

Trial Transcript of Efrain Johnson – Volume VIII dated February 17, 2012
    [Testimony of John Taylor] ............................................................... GA1643

Trial Transcript of Efrain Johnson – Volume IX dated February 21, 2012
    [Testimony of Lashika Johnson] ....................................................... GA1712

Failed Change-of-Plea Hearing Transcript of Efrain Johnson
    dated March 8, 2011 ......................................................................... GA1731

Transcript of Azikiwe Aquart Change of Plea dated August 26, 2011 .. GA1742

Government Exhibit 100A ...................................................................... GA1751

Government Exhibit 102A ...................................................................... GA1754

Government Exhibit 109 ........................................................................ GA1755

Government Exhibit 110 ........................................................................ GA1756

Government Exhibit 111 ........................................................................ GA1757

Government Exhibit 112 ........................................................................ GA1758

Government Exhibit 114 ........................................................................ GA1759

Government Exhibit 116G ..................................................................... GA1760

## TABLE OF CONTENTS (cont'd)

Government Exhibit 116H ........................................................................GA1761

Government Exhibit 116I...........................................................................GA1762

Government Exhibit 116J ..........................................................................GA1763

Government Exhibit 117H ........................................................................GA1764

Government Exhibit 117J ..........................................................................GA1765

Government Exhibit 120-1 ........................................................................GA1766

Government Exhibit 120-2 ........................................................................GA1767

Government Exhibit 120-3 ........................................................................GA1768

Government Exhibit 120-5 ........................................................................GA1769

Government Exhibit 120-6 ........................................................................GA1770

Government Exhibit 121-4 ........................................................................GA1771

Government Exhibit 121-6 ........................................................................GA1772

Government Exhibit 121-8 ........................................................................GA1773

Government Exhibit 121-10 ......................................................................GA1774

Government Exhibit 122-3 ........................................................................GA1775

Government Exhibit 122-5 ........................................................................GA1776

Government Exhibit 122-7 ........................................................................GA1777

Government Exhibit 123-1 ........................................................................GA1778

Government Exhibit 124 ...........................................................................GA1779

Government Exhibit 127 ...........................................................................GA1780

## TABLE OF CONTENTS (cont'd)

Government Exhibit 128A........................................................................GA1781

Government Exhibit 129A........................................................................GA1782

Government Exhibit 129B........................................................................GA1783

Government Exhibit 130 ..........................................................................GA1784

Government Exhibit 136 ..........................................................................GA1785

Government Exhibit 137 ..........................................................................GA1786

Government Exhibit 139 ..........................................................................GA1787

Government Exhibit 140 ..........................................................................GA1788

Government Exhibit 164 ..........................................................................GA1789

Government Exhibit 165 ..........................................................................GA1790

Government Exhibit 231A........................................................................GA1791

Government Exhibit 245 ..........................................................................GA1792

Government Exhibit 246 ..........................................................................GA1801

Government Exhibit 247 ..........................................................................GA1807

Government Exhibit 247A........................................................................GA1817

Government Exhibit 249 ..........................................................................GA1822

Government Exhibit 263 ..........................................................................GA1828

Government Exhibit 264 ..........................................................................GA1837

Government Exhibit 273 ..........................................................................GA1847

Government Exhibit 274 ..........................................................................GA1850

TABLE OF CONTENTS (cont'd)

Government Exhibit 275 ........................................................................GA1852

Government Exhibit 276 ........................................................................GA1860

Government Exhibit 277 ........................................................................GA1864

Government Exhibit 278 ........................................................................GA1866

Government Exhibit 279 ........................................................................GA1868

Government Exhibit 300 ........................................................................GA1870

Government Exhibit 300A......................................................................GA1871

Government Exhibit 301 ........................................................................GA1872

Government Exhibit 302 ........................................................................GA1873

Government Exhibit 305 ........................................................................GA1874

Government Exhibit 306 ........................................................................GA1888

Government Exhibit 307 ........................................................................GA1889

Government Exhibit 308 ........................................................................GA1890

Government Exhibit 314 ........................................................................GA1891

Government Exhibit 315 ........................................................................GA1906

Government Exhibit 316 ........................................................................GA1907

Government Exhibit 319 ........................................................................GA1908

Government Exhibit 322 ........................................................................GA1909

Government Exhibit 400 ........................................................................GA1924

## TABLE OF CONTENTS (cont'd)

Government Exhibit 403 ........................................................................GA1925

Government Exhibit 404 ........................................................................GA1926

Government Exhibit 414 ........................................................................GA1927

Government Exhibit 424 ........................................................................GA1928

Government Exhibit 433 ........................................................................GA1929

Government Exhibit 435 ........................................................................GA1930

Government Exhibit 447 ........................................................................GA1931

Government Exhibit 451 ........................................................................GA1932

Government Exhibit 464 ........................................................................GA1933

Government Exhibit 465 ........................................................................GA1934

Government Exhibit 467 ........................................................................GA1935

Government Exhibit 506 ........................................................................GA1936

Government Exhibit 514 ........................................................................GA1939

Government Exhibit 3 ...........................................................................GA1943

Government Exhibit 4 ...........................................................................GA1944

Government Exhibit 9 ...........................................................................GA1945

Government Exhibit 12A........................................................................GA1952

2401

```
1   read.  We foresaw this.  We've made 25 copies of it.
2   We're happy for it to go to the jury if the counsel
3   would like.
4           THE COURT:  Do you want to continue
5   questioning?
6           MR. SHEEHAN:  Yes, your Honor.  Thank
7   you.
8       Q.   The last place you wanted to go was back to
9   jail, right?
10      A.   Exactly.
11      Q.   You hated jail, didn't you?
12      A.   Yes.
13      Q.   In jail you are away from your family,
14  right?
15      A.   Yes.
16      Q.   It's a hard place to be?
17      A.   Yes.
18      Q.   Isn't it?  Now, they asked you about names,
19  and then the next thing they did is they went to
20  pictures, right?  Do you remember he had a little
21  phone that had kind of a feature where you could
22  have photos on it?
23      A.   Yes.
24      Q.   And they were showing you pictures of
25  people that they were obviously interested in,
```

2402

```
1   right?
2       A.   Yes.
3       Q.   And they showed you five pictures?
4       A.   Yes.
5       Q.   And you said one of them might be a little
6   bit familiar, but I don't know the other four,
7   right?
8       A.   Yes, at the beginning of the talk.
9       Q.   Okay.  The talk?
10      A.   Yes.
11      Q.   Were they talking or were you talking?
12      A.   All of us was talking.
13      Q.   Talking together?
14      A.   They asked me a question, I answered it.
15      Q.   All right.
16      A.   Or I lied.
17      Q.   And among the photos they showed you was
18  Azibo?  Was the defendant, right?
19      A.   Yes.
20      Q.   His brother, right?
21      A.   Yes.
22      Q.   Shante?
23      A.   Yes.
24      Q.   And the fellow you now call Big Boy, right?
25      A.   Yes.
```

2403

```
1       Q.   And you told them at that point that you
2   didn't know any of them, right?
3       A.   Well, at that point I told them, once I
4   seen the pictures, I knew them.  Well --
5       Q.   Not in the beginning, though?
6       A.   No, not in the beginning I didn't.
7       Q.   And then they asked you about Charles
8   Street, did you know anything about Charles Street,
9   right?
10      A.   They asked me about it, I told them no.
11      Q.   And you told them you never went down south
12  with anyone from Connecticut, right?
13      A.   Yes.
14      Q.   A lie, right?
15      A.   Yes.
16      Q.   Then you told them you never got pulled
17  over in North Carolina by the police, right?
18      A.   Yes.
19      Q.   And you told them no guns were seized,
20  right?
21      A.   Yes.
22      Q.   Then you said, oh, once a friend of mine by
23  the name of Tyrone Dennis, that was in North
24  Carolina, maybe that's when I got pulled over with a
25  gun.
```

2404

```
1       A.   I?
2       Q.   Yeah, that's what you told them about your
3   friend Tyrone Dennis -- Davis, I'm sorry.
4       A.   That was a lie.
5       Q.   Okay.  Were you ever pulled over with a guy
6   named Tyrone Davis in North Carolina?
7       A.   No.
8       Q.   You just cooked that one up, right?
9       A.   It was a lie.
10      Q.   Okay.  And then they asked you about
11  whether you knew somebody named Denita.  First you
12  lied to them and then you said, well, maybe I left
13  my clothes there, right?
14      A.   Yes, maybe.
15      Q.   That's kind of a lie, too, right?
16      A.   It wasn't a lie.  I knew her and I did have
17  my clothes there.
18      Q.   The lie part was when you first said no,
19  then you fixed it, right?
20          THE COURT:  You need to say yes or no.
21  The court reporter can't pick up your head nod.
22      A.   Yes.
23      Q.   And then you said, oh, Denita she's a
24  friend of Shante from Norwalk, right?
25      A.   I don't remember saying that.
```

2405

```
 1     Q.   This series of lies did not seem to be
 2  working, though, did it?
 3     A.   Not for me.
 4     Q.   Because they were sitting there still in
 5  your dining room, right?
 6     A.   Yep, knowing the truth.
 7     Q.   They're sitting there, the agents, right?
 8     A.   Yes.
 9     Q.   And you are sitting there in the recliner,
10  right?
11     A.   Yes.
12     Q.   And they haven't gone anywhere, right?
13     A.   Yes.
14     Q.   They don't show any signs of leaving, do
15  they?
16     A.   No, sir.
17     Q.   Pretty patient, weren't they?
18     A.   Yes sir.
19     Q.   Now, at that point in time you didn't know
20  what kind of information they had.  Did they --
21     A.   No, sir.
22     Q.   And your goal was to get them out of there
23  without harming yourself, right?
24     A.   Yes.
25     Q.   And your old strategy wasn't working, was
```

2406

```
 1  it?
 2     A.   No, sir.
 3     Q.   So you changed strategies a bit, right?
 4     A.   Yes.
 5     Q.   Did they tell you they had the police --
 6  well, actually you admitted that you were stopped in
 7  North Carolina, right?
 8     A.   Yes.
 9     Q.   But when they asked you who, you said it
10  was with a guy who picked you up in Stamford.
11     A.   I'm still trying to take myself out of
12  the --
13     Q.   The lie?
14     A.   Yes.
15     Q.   Okay.  And you said you didn't know the
16  guy's name, right?  Another lie?
17     A.   Yes.
18     Q.   But he didn't have a gun.  That's what you
19  told them, right, another lie?
20     A.   Told who?
21     Q.   The police officers who were sitting right
22  there.
23     A.   That he didn't have a gun?
24     Q.   Yeah, the guy who picked you up from
25  Stamford.  You said, oh, I went south with a guy
```

2407

```
 1  from Stamford, yeah, I guess I got stopped in North
 2  Carolina, but there was no gun.
 3     A.   No, it wasn't -- to my knowledge there
 4  wasn't no gun.
 5     Q.   You didn't see the gun that the officer put
 6  in front of you in North Carolina?
 7     A.   Yeah, that was after we got stopped.
 8     Q.   Did you think that gun just kind of came
 9  out of the breeze?
10     A.   I don't know how it got there, but I know
11  when I got in the car I didn't see no gun.
12     Q.   Okay.  And in any case you were telling
13  them that -- the first time you were telling them
14  when you got stopped in North Carolina there wasn't
15  a gun, right?
16     A.   The detectives?
17     Q.   Yeah.
18     A.   I don't -- I told them that it wasn't no
19  gun.  That was a lie probably.
20     Q.   Okay.  And then they told you that they had
21  the Cumberland County report, right?
22     A.   Yes.
23     Q.   And told you there was a gun, right?
24     A.   Yes.
25     Q.   And they probably told you -- did they tell
```

2408

```
 1  you they got the gun?
 2     A.   They didn't say.  They didn't tell me.
 3     Q.   Okay.  And so then you said I've been
 4  pulled over numerous times with people who had guns
 5  in theirs cars.
 6     A.   I may have said that.
 7     Q.   Was that true?
 8     A.   May not be, but...
 9     Q.   May not be?
10     A.   It may not be true, but I was just saying
11  anything just to get them out of there.
12     Q.   Well, only you would know if you were
13  pulled over numerous times with people with guns in
14  the car.  So I'm asking you, was that true?
15     A.   Like I said again, it might not -- no, it
16  wasn't true.
17     Q.   Okay.  So, then they told you -- they said,
18  John -- did they tell you this is going to be a long
19  day if you keep doing this?
20     A.   I don't remember.
21     Q.   Okay.  It was clear to you at that point
22  that they weren't buying your strategy, right?
23     A.   Exactly.
24     Q.   All right.  What you wanted to do was get
25  them out of the kitchen -- out of the living room
```

2409

1   and on their way back to Connecticut, right?
2       A.   Yes.
3       Q.   So, you can go back to being there in North
4   Carolina without this problem.
5       A.   Yes.
6       Q.   But it wasn't working, so you gave them the
7   name of Dreddy, right?
8       A.   Yes.
9       Q.   And you told them that you had met Dreddy
10  at a club in Norwalk.
11      A.   I don't remember.
12      Q.   Through a guy named Kosher.
13      A.   I never met him in a club before.
14      Q.   Okay.  So, do you think looking at a
15  document might refresh your recollection?
16      A.   Yes.
17      Q.   Okay.  I'm going to just ask you to see if
18  reading this last -- well, this statement here, if
19  that refreshes your recollection as to what you told
20  the agents.
21      A.   You are saying did I say that?
22      Q.   Yeah.
23           THE COURT:  The question is does that
24  refresh your recollection of whether you told them
25  that you met Dreddy at a club in Norwalk.

2410

1       A.   No.
2            THE COURT:  Okay.
3       Q.   And at that point you told them that you
4   had purchased marijuana and crack from Dreddy to
5   sell in Norwalk?
6       A.   I -- can you repeat that again, please.
7       Q.   Well, you told them you knew a guy named
8   Dreddy, right?
9       A.   Right.
10      Q.   And at that point you told him that you had
11  purchased the marijuana and the crack from him to
12  sell in Norwalk?
13      A.   Yes.  Excuse me, that question you asked me
14  again, you saying that I had purchased the crack
15  from Dreddy?
16      Q.   My question is really that you told them
17  that you had.
18      A.   Oh, okay.
19      Q.   Right?
20      A.   Yeah.
21      Q.   You did?
22      A.   Purchased it from Dreddy?
23      Q.   Yeah, to sell in Norwalk.
24      A.   Well, I didn't purchase it from him, but I
25  guess he gave it to someone else and then he gave it

2411

1   to me.
2       Q.   And the point is you were going to sell
3   that marijuana and crack in Norwalk, right?
4       A.   Yes.
5       Q.   Now, at that point in time you knew that
6   they wanted -- or you understood that they wanted
7   more from you about the fact that you went on this
8   trip, right?
9       A.   I don't understand it.
10      Q.   Well, you understood that they -- when they
11  got there they already knew you had been on the
12  trip?
13      A.   Who, the officers?
14      Q.   Yeah.
15      A.   Yes.
16      Q.   Okay.  And, in fact, you understood that
17  they were looking for more from you than simply
18  admitting that you went on a trip, right?
19      A.   They was looking more from me to admit that
20  I went on a trip?
21      Q.   Yeah.
22      A.   We did go on a trip.
23      Q.   Yeah, but that wasn't -- you couldn't just
24  tell them I went on a trip and they were going to go
25  away, could you?

2412

1       A.   Yeah, they wasn't going to go away if I
2   just told them that.
3       Q.   They wasn't?
4       A.   No.
5       Q.   And by that point in time when you had
6   finally talked to them about Dreddy, had you begun
7   to think that this had something to do with the
8   murders?
9       A.   That was the only time that I ever, ever
10  knew Dreddy, and most likely, yeah.  I never knew
11  him no other time, but Connecticut.
12      Q.   So, you told them that when you came back
13  from Georgia Azibo came and picked you up at a club
14  in Stamford.  That's what you initially told them,
15  right?
16      A.   That he picked me -- we never met at no
17  club before.
18      Q.   Okay.
19      A.   If I said that, that was not intended.  It
20  was a lie.
21      Q.   And then you said he picked you up at the
22  train station, right?
23      A.   Who?
24      Q.   Mr. Aquart, Azibo.
25      A.   He never picked me up at a train station,

**GA603**

2413

1  his brother did.
2      Q.   So, if you told them that Azibo picked you
3  up at the train station, that was a lie?
4      A.   That Azibo?
5      Q.   Yeah.
6      A.   Who is Azibo?
7      Q.   Dreddy?
8      A.   Dreddy never picked me up from a train
9  station.
10     Q.   Okay.  And then you told them about going
11 to Charles Street with Dreddy and Ba, right?
12     A.   Who is -- Ba was a --
13     Q.   Ziggy?
14     A.   -- a lie.
15     Q.   Ba was a lie?
16     A.   Yes.
17     Q.   Oh?
18     A.   It was a name I just came up with.  I just
19 came up with it because I didn't want to tell the
20 truth who the person really was.
21     Q.   Okay, but -- all right.
22     A.   But us, all three of us, did go to Charles
23 Street apartments together.
24     Q.   Okay.  And what did you know -- what did
25 you believe was the name of Dreddy's brother?

2414

1      A.   I knew what Dreddy's brother name was.
2      Q.   What did you think it was?
3      A.   He told me it was Zee.
4      Q.   Zee, okay?
5      A.   Ziggy.
6      Q.   Ziggy.  So can I ask you why were you
7  saying the person's name was Ba?
8      A.   Because I was lying.
9      Q.   To protect Ba?
10     A.   No, not protect Ba, to protect the truth.
11     Q.   Protect yourself?
12     A.   Well, pretty -- yes.
13     Q.   And then you told them that Dreddy was
14 selling drugs out of the top floor of Charles
15 Street, right?
16     A.   I didn't know he was selling drugs there
17 until after everything.
18     Q.   Until after what?
19     A.   We came back from Georgia.  Then he told
20 me.
21     Q.   Okay, but these guys are talking to you
22 back after you've been arrested.  So that point in
23 time you told them that Dreddy and Ba -- I'm sorry,
24 that Dreddy was selling drugs out of the top floor
25 of Charles Street?

2415

1      A.   Repeat that again.
2      Q.   You told them on December 2nd, 2009, that
3  Dreddy was selling drugs out of the top floor of
4  Charles Street?
5      A.   On December 9th?
6      Q.   I'm sorry, I didn't mean to mislead you,
7  sir.  December 2nd.
8      A.   December 2nd?
9      Q.   Sitting in the recliner in the dining room.
10     A.   Maybe I did.  Probably.  I don't remember.
11     Q.   Okay.  And you told them that you were
12 waiting in the car outside Charles Street, right?
13     A.   That was a lie.
14     Q.   And that they went in the building and then
15 they came back to the car.
16     A.   That was a lie.
17     Q.   And you told them that you did this another
18 time also, just the three of you, you, Dreddy and
19 Ba, right?  You went to the building?
20     A.   Ba is Ziggy, right?
21     Q.   I'm just asking if you told them it was a
22 guy named Ba?
23     A.   Yes.
24     Q.   Okay.  And you said that there was a
25 Spanish lady there?

2416

1      A.   Yes.
2      Q.   Now --
3           MR. SHEEHAN:  If I might have a minute,
4  your Honor.
5           THE COURT:  If this a stopping time, we
6  can stop.
7           MR. SHEEHAN:  It might be, your Honor.
8           THE COURT:  We have a commitment to
9  juror No. 17 to get him out of here by 3:30.
10          MR. SHEEHAN:  Thank you, your Honor.
11          THE COURT:  He looks very spiffy today.
12          Ladies and gentlemen, we're going to
13 start at nine o'clock tomorrow.  We're going to go
14 til 2:30, and we are not sitting on Friday and we're
15 going to begin again on Monday at 9:30.
16          Okay, have a nice evening.
17          (Jury exited the courtroom)
18          THE COURT:  All right.
19          MR. SHEEHAN:  Thank you, your Honor.
20          THE COURT:  Anything before we recess?
21          MS. DAYTON:  No, your Honor.
22          MR. SHEEHAN:  No, your Honor.
23          THE COURT:  All right, Mr. Taylor, we'll
24 see you back at nine o'clock tomorrow morning.
25          THE WITNESS:  Yes, ma'am.

**GA604**

2417

```
 1              THE COURT:  Don't discuss your testimony
 2  with anybody.
 3              MS. DAYTON:  Your Honor, just for the
 4  records, the agents are going to transport Mr.
 5  Taylor back to the jail and back here tomorrow
 6  morning.  I've already talked to defense counsel.
 7  They will not talk to him about his testimony.
 8              THE COURT:  Okay.
 9              MR. SHEEHAN:  That's fine, your Honor.
10              THE COURT:  All right, we stand in
11  recess.
12              (Proceedings concluded 3:30)
13
14
15
16
17
18
19
20
21
22
23
24
25
```

2418

```
 1                   I N D E X
 2
 3  WITNESS                                    PAGE
 4  SHANTE PETTWAY
 5  Continued Cross-Examination by Mr. Sheehan  2188
 6  Redirect Examination by Ms. Reynolds        2197
 7  Recross-Examination by Mr. Sheehan          2219
 8
 9  JOHN TAYLOR
10  Direct Examination by Ms. Dayton            2220
11  Cross-Examination by Mr. Sheehan            2374
12
13
14
15      I certify that the foregoing is a
16  correct transcript from the record of proceedings in
17  the above-entitled matter.
18                          5/5/11
19                          Date
20
21                      /S/  Sharon Montini
22                      Official Reporter
23
24
25
```

2419

```
 1          UNITED STATES DISTRICT COURT
 2            DISTRICT OF CONNECTICUT
 3  * * * * * * * * * * * *   *
                              *
 4  UNITED STATES OF AMERICA,  * Case No 6cr160(JBA)
                              *
 5          Plaintiff,         *
                              *
 6          vs.                *
                              *
 7  AZIBO AQUART               * May 5, 2011
                              *
 8          Defendant.         *
                              *
 9  * * * * * * * * * * * *   *
10          TRIAL TRANSCRIPT
11            VOLUME XI
12  BEFORE:  THE HONORABLE JANET BOND ARTERTON U.S.D.J.,
                                       and jury
13  Appearances:
14  FOR THE GOVERNMENT: ALINA REYNOLDS, ESQ
                        TRACY DAYTON, ESQ.
15                      PETER MARKLE, ESQ.
                        JACABED RODRIGUEZ-COSS
16                      United States Attorney's Office
                        915 Lafayette Blvd
17                      Bridgeport, CT 06604
18
    FOR THE DEFENDANT   MICHAEL SHEEHAN, ESQ
19  AZIBO AQUART:       Sheehan & Reeve
                        139 Orange Street
20                      New Haven CT 06510
21                      JUSTIN SMITH, ESQ.
                        383 Orange Street
22                      New Haven, CT 06511
23
    Court Reporter:     Sharon Montini, RMR
24
    Proceedings recorded by mechanical stenography,
25  transcript produced by computer
```

2420

```
 1              THE COURT:  Good morning, ladies and
 2  gentlemen, counsel, Mr. Aquart.
 3              Let me ask the government, how are we
 4  doing in terms of time?
 5              MS. DAYTON:  We're doing well, your
 6  Honor.  We hope to be concluding either by next
 7  Friday, possibly -- it's hard to say because we
 8  can't account for exactly how long cross-examine may
 9  be, but it may spill into Monday.  We are pretty
10  much on schedule.  We had hoped to be done next
11  Friday, but we are sort of at the end of Friday or
12  Monday for the end of our testimony.
13              THE COURT:  Mr. Sheehan, can you advise
14  me on how much additional time beyond what is
15  calculated in that estimate for your
16  cross-examinations of witnesses?
17              MR. SHEEHAN:  On the outside, absolute
18  outside would be two days, I would think, your
19  Honor, and probably less.  And could we just get a
20  schedule for --
21              MS. DAYTON:  I just told Mr. Smith that
22  I would give you a schedule for next week.
23              MR. SHEEHAN:  Thank you, your Honor.  I
24  was doing something else, so I apologize.
25              MS. DAYTON:  He was ignoring me as
```

2421

```
1  usual.
2           THE COURT:  Juror No. 16 has,
3  notwithstanding my description of the process which
4  would not include questions, given us a question.
5  You have a copy of it.  You may do with-- the
6  question is "what is felony murder and the range of
7  actions within a plea."
8           MS. DAYTON:  The range of actions within
9  a plea?
10          THE COURT:  All right, let's see, Mr.
11 Taylor.  Yes, thank you.
12          MR. SHEEHAN:  Your Honor, could I just
13 think about -- discuss this for a moment before the
14 jurors come out.  On the one hand it is a matter of
15 -- now that it has been raised in court, it is a
16 matter of some interest, but I don't want to
17 elaborate on it.
18          THE COURT:  What is a matter of
19 interest?
20          MR. SHEEHAN:  This question that was
21 raised by the juror.  We'll just -- is this just for
22 our interest?
23          THE COURT:  It is for your interest
24 only.
25          MR. SHEEHAN:  Okay.
```

2422

```
1           THE COURT:  Nothing will be done with
2  it.  The juror put the question to Ms. Torday, she
3  said --
4           MR. SHEEHAN:  I appreciate it.
5           THE COURT:  -- I can't talk to you about
6  that, if you have something to say, put it in
7  writing.  I will tell the jurors that we are unable
8  to take questions and answer questions.
9           MR. SHEEHAN:  Great.  Thank you, your
10 Honor.
11          THE COURT:  But if you want to include
12 further information in your examination that gets to
13 these, that's why I share that with you.
14          MR. SHEEHAN:  Okay.
15          THE COURT:  All right, we need more
16 people.
17          All right, good morning, Mr. Taylor.
18 You remain under oath.
19          (Jury entered the courtroom.)
20          THE COURT:  Good morning, ladies and
21 gentlemen.  Please be seated.
22          As I indicated to you all several days
23 ago, in this criminal matter we will not be inviting
24 the jurors questions, but we will ask you to keep
25 that open mind I talked about because some of the
```

2423

```
1  answers to your questions may come up in the course
2  of the completion of evidence.  Obviously you have
3  not heard all of it.  So, I know there was a juror
4  who did have a question, but we are not going to
5  take questions.
6           I hope that, to the extent that is of
7  interest, the evidence will answer it.  To the
8  extent the evidence does not answer it, it is,
9  therefore, not for your speculation or within your
10 duties as jurors to answer it yourself other than as
11 provided by the evidence that's presented to you
12 because that's the basis for your decision.
13          All right then, we will continue with
14 cross-examination of Mr. Taylor by Mr. Sheehan.
15          Good morning.
16          MR. SHEEHAN:  Good morning, your Honor.
17          J O H N   T A Y L O R,
18 Having previously affirmed, was examined and
19 testified as follows:
20 CONTINUED CROSS-EXAMINATION
21 BY MR. SHEEHAN:
22      Q.   Good morning, Mr. Taylor.
23      A.   Good morning.
24      Q.   I asked you at the beginning of the
25 cross-examination about the times that you met with
```

2424

```
1  federal law enforcement people.  Do you recall that
2  question?
3       A.   No.
4       Q.   All right.  Do you remember how many times
5  you met with law enforcement people?
6       A.   To the period of time I did, from now
7  'til -- several times.
8       Q.   Between the time that you were arrested on
9  December 2nd and --
10      A.   Until now.
11      Q.   -- and yesterday.
12      A.   Several.
13      Q.   Several, okay.  Now, had you talked to law
14 enforcement people yesterday before you testified?
15      A.   No.
16      Q.   When was the -- when was the most recent
17 time that you talked with law enforcement people?
18      A.   I'm not for sure.  It could have been a
19 couple months ago or -- I'm not for sure.
20      Q.   Do you remember where it was that you
21 talked with them?
22      A.   At Bridgeport, I think.
23      Q.   Okay.  And could it have been as close in
24 time as a week ago?
25      A.   Maybe.
```

2425

```
1    Q.   Could it have been as close in time as a
2  couple of days ago?
3    A.   No.
4    Q.   Was your lawyer with you at that time?
5    A.   Yes.
6    Q.   And I asked you about the law enforcement
7  people.  And was this gentleman here one of those
8  law enforcement people?
9    A.   Yes.
10   Q.   In the blue -- dark blue blazer?
11       MS. DAYTON:  Can you say who that is for
12 the record.
13   Q.   Do you know his name?
14   A.   Not exactly, but -- I can't remember it,
15 but --
16   Q.   Do you know his first name?
17   A.   No.
18   Q.   Do you know his last name?
19   A.   No.
20   Q.   Was it Mr. Munger?
21   A.   It sounds familiar.
22   Q.   Okay.  Do you think his first name was
23 Christopher, or Chris?
24   A.   I'm not for sure.  I'm bad memory with
25 names, so...
```

2426

```
1        MR. SHEEHAN:  Your Honor, just so the
2  record reflects, I was referring to Agent Munger.
3        THE COURT:  Very well.
4    Q.   And do you know the name of your lawyer?
5    A.   Yes.
6    Q.   Okay.  And one of your lawyers is sitting
7  right over here in court, is he not?
8    A.   Yes.
9    Q.   And what's his name?
10   A.   Mr. Chuck Tiertan (sic).  I can't really --
11 Tiertan, if I'm saying it right.
12   Q.   And you have two lawyers, do you not?
13   A.   Yes.
14   Q.   And do you know the name of the other
15 lawyer?
16   A.   I can't pronounce his last name that good.
17   Q.   Do you remember his first name?
18   A.   No.
19   Q.   All right.  Do you have any idea about how
20 his last name is pronounced?
21   A.   No.
22   Q.   Do you have any idea what his last name is,
23 that other lawyer?
24   A.   Maybe if I see his face I could be able to
25 get his name.  Sometimes when -- it works if I see
```

2427

```
1  his face I be able to get his name again, but I
2  don't --
3    Q.   If I were to ask you if his name was
4  Attorney Casale?
5    A.   Yes.
6    Q.   Do you agree with me?
7    A.   Yes.
8    Q.   Do you remember sitting here what the cell
9  phone number was that you had back in 2005?
10   A.   Do I remember the number?
11   Q.   Yeah?
12   A.   Yes.
13   Q.   And what was it?
14   A.   509-0499.
15   Q.   Okay.  Now, when we left off on the -- I
16 believe that the government yesterday when you were
17 asked to identify certain documents, you were asked
18 to identify your plea document.  Do you remember
19 that?
20   A.   Yes.
21   Q.   And you were asked to identify a
22 cooperation agreement.  Do you recall that?
23   A.   Yes.
24   Q.   Okay.  And you entered into another
25 agreement as well in this case, did you not?  A
```

2428

```
1  written agreement with the government?
2    A.   A written agreement?
3    Q.   Yes.
4    A.   I don't understand what you are saying by a
5  written agreement.  All I remember is two
6  agreements.  A written agreement, you mean like
7  somebody written a letter for me?
8    Q.   Something that you signed.
9    A.   Yeah, the two agreements that --
10   Q.   Okay.
11       MR. SHEEHAN:  May I have one second,
12 your Honor.  May I inquire, your Honor?
13       THE COURT:  Yes.
14       MR. SHEEHAN:  I have it, your Honor.
15 Thank you.
16   Q.   Mr. Taylor, showing you what's marked
17 Exhibit 247A, that is the cooperation -- that is the
18 cooperation agreement, is it not?
19   A.   Yes.
20   Q.   Okay.  And showing you Exhibit 247, that's
21 the plea agreement?
22   A.   Yes.
23   Q.   Correct?  Okay.  Are those the only two
24 documents that you can recall signing?
25   A.   Yes.
```

**GA607**

2429

```
1       Q.   All right.
2            MR. SHEEHAN:  May I inquire of the clerk
3  what number we're up to, your Honor?  Ms. Torday, if
4  I may?
5            THE COURT:  R, I think.
6            THE CLERK:  S.
7       Q.   I'm going to show you what's marked for
8  identification as Defendant's Exhibit R, and ask you
9  to take a look at that document and see if you
10 recognize that.
11           THE COURT:  I'm sorry, you inquired what
12 the next exhibit number was, and it's S.
13           MR. SHEEHAN:  I apologize, your Honor.
14 That's Exhibit S.
15      A.   I don't -- I signed it, but I don't -- I
16 probably forgot what it was.
17           MR. SHEEHAN:  Okay.  I would offer it at
18 this time, your Honor.
19           MS. DAYTON:  What is it?
20           MR. SHEEHAN:  Defendant's Exhibit S.
21           MS. DAYTON:  The government has no
22 objection, your Honor.  It's a proffer agreement for
23 the record.
24           THE COURT:  All right, S is a full
25 exhibit.
```

2430

```
1       Q.   Okay.  And let me put this on the screen,
2  and it will come up next to you over there, and ask
3  you, do you see where my finger is pointed to the
4  top where it says "Proffer Agreement"?
5       A.   Yes.
6       Q.   Is that -- do you know what a proffer
7  agreement is?
8       A.   Yes and no.
9       Q.   What is it?  What do you understand it to
10 be?
11      A.   An agreement.
12      Q.   To do what?
13      A.   To cooperate and tell the truth.
14      Q.   And in this agreement, what happens if you
15 don't tell the truth?  What's your understanding of
16 what happens if you don't tell the truth?
17      A.   I would be -- I would be a life sentence
18 or...
19      Q.   Or?
20      A.   A life sentence.
21      Q.   Okay.  And turning to the second page of
22 that agreement where it says the date on it, and the
23 date appears to be January 15, 2010, does this
24 refresh your recollection as to when you entered
25 into this agreement?
```

2431

```
1       A.   No.
2       Q.   Okay.  And on the next page there are a
3  series of signatures, and one of them appears above
4  your -- where your name is typed.  Is that your
5  signature?
6       A.   Yes.
7       Q.   And do you remember if your lawyers were
8  there when you signed that agreement?
9       A.   Yes.
10      Q.   All right.  And do you remember if Special
11 Agent Munger was there?
12      A.   Yes.
13      Q.   And how about Sergeant Gonzalez, he was
14 there, right?
15      A.   Yes.
16      Q.   Okay.  He is a Bridgeport police officer,
17 is he not?
18      A.   I don't know what he -- I just know he was.
19      Q.   He was there?
20      A.   Yes.
21      Q.   All right.  And there is also a reference
22 to a Detective Richard Donaldson.  And he was there,
23 was he not?
24      A.   Yes.
25      Q.   And do you have any reason to believe that
```

2432

```
1  this was not signed on January 15, 2010?
2       A.   I don't remember the date.
3       Q.   Okay, but -- I understand you don't
4  remember the date, but do you have any reason to
5  think that it was something different from January
6  15, 2010?
7            MS. DAYTON:  Objection.
8            THE COURT:  Basis?
9            MS. DAYTON:  It's just calling for
10 speculation.  He doesn't remember.  He said that
11 several times.
12           THE COURT:  I'm going to overrule the
13 objection.
14      A.   Repeat the question.
15           THE COURT:  Do you have any doubt what
16 the date was.
17      A.   I don't remember the date, but I remember
18 this agreement now.
19      Q.   This agreement was -- in any case, this
20 agreement, referring here to Defendant's Exhibit S,
21 that was after you had come up to Connecticut, was
22 it not?
23      A.   Yes.
24      Q.   You didn't have this kind of an agreement
25 when you were sitting in your -- in the dining room
```

2433

```
1   down in Pinetops?
2       A.   No.
3       Q.   Did you?  And you didn't have lawyers with
4   you at that time?
5       A.   No.
6       Q.   Right?  And I think that when we concluded
7   on yesterday I was asking you about the Pinetops
8   meeting and the various stories that you told the
9   agents.  Do you remember what we were talking about
10  yesterday?
11      A.   Not everything.
12      Q.   Okay, but do you remember we were talking
13  about Pinetops.
14      A.   Yes.
15      Q.   All right.  And I believe that you -- do
16  you recall we had just gotten to the point where you
17  had admitted that you had come up to Connecticut
18  with Dreddy and Ziggy -- I'm sorry, that you had
19  basically gone to Charles Street with Dreddy and
20  Ziggy, right?
21      A.   So where we at, in Pinetops or we in
22  Connecticut?
23      Q.   Right now we're still in Pinetops.  I'm
24  sorry.  We're still -- I'm asking you about what you
25  told the agents down there in Pinetops.
```

2434

```
1       A.   Okay.
2       Q.   You told them a lot of lies, right?
3       A.   And also the truth.
4       Q.   Okay.  But I'm just dealing with the lies
5   part right now so you can recall.  All right?
6       A.   Okay.
7       Q.   Okay.  Now, at some point in time you told
8   the agents that Dreddy and his brother went into the
9   building at Charles Street and then they came out
10  while you waited in the car.  And that was a lie,
11  right?
12      A.   Yes.
13      Q.   All right.  And you referenced that there
14  was a Spanish lady there.  You told the agents that,
15  right?
16      A.   Yes.
17      Q.   Now, in fact, you talked about -- you
18  testified yesterday about some Spanish lady, right,
19  in the apartment you went up to on the second or the
20  third floor?
21      A.   The second floor she knocked on the door.
22      Q.   You also said when you went up to the
23  apartment on the third -- the top floor, right,
24  there was a Spanish lady there?
25      A.   When we went to the third floor, yes, there
```

2435

```
1   was a Spanish lady there.
2       Q.   And showing you what's been previously
3   marked as -- and that's -- I hope it's -- previously
4   marked as Defendant's Exhibit 72.  I'm sorry,
5   Government Exhibit 217.  Do you see that on your
6   screen there?
7       A.   Yes.
8       Q.   This lady, you don't recognize this photo,
9   right?
10      A.   Yes, I do recognize this photo.
11      Q.   Oh, you do.  Can you tell us who is in this
12  photo?
13      A.   That's the lady that knocked on the door.
14      Q.   All right.  And when was the last time that
15  you saw this photo?
16      A.   Maybe '09 when I -- maybe '010, I think.
17  '010.
18      Q.   In 2010?
19      A.   Yes.
20      Q.   And when you saw this -- did you review
21  this photo again with the government, with the law
22  enforcement when you were preparing for your
23  testimony recently?
24      A.   I don't remember if they have -- I don't
25  remember.
```

2436

```
1       Q.   Okay.  Didn't you previously tell the
2   government that you didn't know who was -- you'd
3   never seen this person in Exhibit 217?
4       A.   That's the same person?
5       A.   Yeah.
6       A.   I never said I never seen her.
7       Q.   You didn't?
8       A.   I told her I seen her, this lady right
9   here, that knocked on the door.
10      Q.   And you identified her as the woman who
11  knocked on the door?
12      A.   Yes.
13      Q.   All right.
14           MR. SHEEHAN:  May I have one second.
15           THE COURT:  Yes.
16      Q.   Now, you knew -- well, you testified that
17  you had seen the television coverage about the
18  incident at Charles Street, right?
19      A.   Yes.
20      Q.   Okay.  And do you recall whether or not in
21  your recollection it was reported that the people
22  had been beaten to death?
23      A.   No.  It was reported, but I was there and
24  he was -- Dreddy was there as well.
25      Q.   Okay.  So when you saw the news, the
```

2437

```
1   television coverage, you knew what it was about,
2   right?
3       A.   Before the television coverage I knew what
4   it was about.
5       Q.   And after you -- you knew what the
6   television coverage was about when you saw the
7   television, right?
8       A.   Before I seen the television coverage I
9   knew what was it about.
10      Q.   Well, you knew what you said happened at
11  Charles Street, but you didn't know what the story
12  was until you saw the story, right?
13      A.   The news was -- I just seen it on the news,
14  but I knew the story before it came to the news.
15      Q.   Okay.  Do you remember on April 29, 2010,
16  being shown a group of pictures?
17      A.   2010, yes.
18      Q.   Okay.  And do you remember on that date
19  being specifically shown a photo of -- being
20  specifically shown this photo, 217, Government
21  Exhibit?
22      A.   Yes.
23      Q.   Okay.  And is it your testimony here today
24  that on April 29, 2010, you told the law enforcement
25  agents that you recognized this person in the photo?
```

2438

```
1       A.   Yes.
2       Q.   And that this person was the female that
3   you had previously referred to as the Hispanic
4   person?
5       A.   As a Hispanic person, yes.
6       Q.   Okay.  And are you sure about that?
7       A.   I don't know, some people look like
8   Hispanic, some people don't.  But me, I never really
9   grow up around Hispanic people.  When I came up here
10  I knew -- I don't know them, but they look Hispanic
11  to me.
12      Q.   Okay.  And, I'm sorry, I don't think my
13  question was clear enough here.  Are you certain
14  that that's what you told the law enforcement?
15      A.   Yes, I am certain I told them that she was
16  Hispanic.
17      Q.   And are you certain that you said that it
18  was the lady in that photo?
19      A.   Yes.
20      Q.   Okay.  Would looking at a document -- do
21  you have any uncertainty about that?
22      A.   No.
23      Q.   Okay.  Now -- so, you first told the agents
24  on -- I'm going to go back now to December 2nd, back
25  to Pinetops.  All right?
```

2439

```
1       A.   Yes.
2       Q.   And you've told the agents that Dreddy and
3   his brother went in the building, but you were going
4   to stay in the car -- but you stayed in the car,
5   right?
6       A.   That was a lie.
7       Q.   Okay.  And then you said that -- you
8   repeated this thing on a second night, and once
9   again Dreddy and his brother went outside while you
10  stayed in the car smoking cigarettes.
11      A.   That was a lie.  I don't smoke cigarettes.
12      Q.   All right.  And then you said that you saw
13  Azibo and Azikiwe come out of -- I'm sorry, Dreddy
14  and his brother come out of the building and put the
15  bats and clothing in the trunk of the car.  That's
16  what you told them on December 2nd, 2009, right?
17      A.   That was a lie.
18      Q.   Okay.  And then they asked you how you knew
19  they were bats.  Do you remember them asking you
20  that?
21      A.   Yes.
22      Q.   And your answer was that they made a --
23  they -- you could hear them banging against each
24  other.  That's what you told them, right?
25      A.   Yes.
```

2440

```
1       Q.   Okay.  Now, that little story about hearing
2   them banging against each other, that was something
3   you made up, right?
4       A.   Yes.
5       Q.   And just like you made up the name of Fan
6   back in the beginning of the interview, right?
7       A.   Yes.
8       Q.   Do you remember how it was that you made up
9   that name of Fan, what you did?
10      A.   Yes.
11      Q.   Tell the jury what it was that caused you
12  to make up -- how did you make up that name?
13      A.   Well, while they was sitting there talking
14  to me in my grandmother living room, I was nervous,
15  I was scared, and I just looked up in the other room
16  and I seen the ceiling fan.  I didn't want to say
17  his name, so I just said his name Fan.  So, I just
18  -- then they started asking me other names, and I
19  didn't want to say his brother name, so I just said
20  --
21      Q.   So, on Fan you are telling us --
22           MS. DAYTON:  Objection.
23           THE COURT:  Let him finish his answer.
24           MR. SHEEHAN:  I think the rest is
25  non-responsive.
```

2441

```
1          THE COURT:  Let him finish and we'll
2    see.
3       Q.  Okay.
4       A.  And other name came up and I said -- "Do
5    you know this person?"  I was like -- I did know
6    him, but I said "Ba" instead of me saying his name.
7    So then I wanted to just throw them off from the
8    real name, from me knowing the real name.  That's
9    why I started trying to give them a different name.
10      Q.  Okay.  And so that fan was something that
11   you saw, the fan circulating, and right there you
12   just cooked up that little story about Fan, right?
13      A.  Yes.
14      Q.  All right.  And just like you cooked up the
15   little story about hearing the bats rattling, right?
16      A.  Yes.
17      Q.  And when you cooked up the story about Fan,
18   you thought that was going to get you out of the
19   problem, right?
20      A.  Yes.
21      Q.  And when you cooked up the little story
22   about the bats, you thought that was going to get
23   you out of the problem, didn't you?
24      A.  Yes.
25      Q.  Okay.  And even when you made up the story
```

2442

```
1    about smoking, you thought that was going to get you
2    out of the problem, right?
3       A.  Yes.
4       Q.  Okay.  Now, at this point in time you are
5    talking about -- do you know at this point in time
6    whether you were still -- were you still telling
7    them that this guy's name, Dreddy's name, was Fan?
8       A.  Yes.
9       Q.  Okay.  So, you were telling them that Fan
10   and Ba went into the building, right?
11      A.  Yes.
12      Q.  All right.  And they weren't buying it,
13   were they, that you sat out there in the car smoking
14   your cigarettes, et cetera?
15      A.  Rephrase that.  When you asked me that
16   question about smoking cigarettes, I said --
17      Q.  Yes.
18      A.  I mean that -- I say "I don't smoke
19   cigarettes," I answered the question too fast.  But
20   I don't smoke cigarettes.
21      Q.  Oh, all right.  And when you told the
22   agents that you did, that was just something -- an
23   explanation that you invented in order to throw
24   them -- kind of get you out of the jam, right?
25      A.  I didn't never tell them I smoked
```

2443

```
1    cigarettes.
2       Q.  Oh, all right.  So when you said you were
3    in the car smoking, you meant smoking reefer or
4    something like that?
5       A.  I never told them smoking reefer.  I
6    remember telling them sitting in the car, but I
7    never told them I was smoking a cigarette.
8       Q.  Okay.  Now, so far you'd been talking about
9    Fan and Ba, right?
10      A.  Yes.
11      Q.  Okay.  And they weren't going away, right?
12      A.  No.
13      Q.  Okay.  And then you added in a fourth
14   person, right?
15      A.  It was a fourth person.
16      Q.  Right.  And at some point you started
17   talking about that fourth person?
18      A.  A light-skin -- light-skinned chubby guy.
19      Q.  Yeah, you started talking about that back
20   in December of '09, right?
21      A.  Yes.
22      Q.  When they told you they weren't believing
23   what you were saying, right?
24      A.  Yes.
25      Q.  And then you told them about the fact that
```

2444

```
1    a month after you got arrested on the -- on your
2    drug charges you ran into -- were you still calling
3    him Fan at that point?  You ran into Fan in
4    Bridgeport Correctional Center?
5       A.  I knew him as Dreddy.
6       Q.  Okay.  And then they said to you, well, we
7    still don't quite -- you are still not being
8    completely truthful with us, right?
9       A.  Yeah, they found out -- they found out, as
10   well as I did, that I wasn't a good liar.
11      Q.  And they told you that, right, you are not
12   a good liar?
13      A.  Yes.
14      Q.  Okay.  But we're not through with all of
15   the lies on December 9th -- December 2nd, are we?
16   You still kept lying some more, right?
17      A.  Yes.
18      Q.  All right.  And so then you told them that
19   the first night the three you went to Charles Street
20   and you went to the diner.
21      Q.  What night it was?
22      Q.  The first night you told the agents that
23   you and Fan and Ba went to the diner together to get
24   something to eat?
25      A.  Me, Dreddy and Ba.
```

2445

```
 1      Q.   Yeah.
 2      A.   Ziggy is Ba.  Went to the diner.
 3      Q.   Yeah.  And then you waited in the car while
 4  Dreddy and Ziggy went into the building.  That's
 5  what you told them, right?
 6      A.   This was at --
 7      Q.   December 2nd.
 8      A.   This was at the diner?  So you are carrying
 9  on with from the diner or just --
10      Q.   I'm going to try to see if you remember
11  sitting in that chair in Pinetops.  That's where we
12  are right now.
13      A.   Okay.
14      Q.   Okay?  So, you are back there in Pinetops
15  and now you are telling them that you went to the
16  diner.  Right?
17      A.   Yes.
18      Q.   And when you got back to the car, Dreddy
19  took the keys and opened the trunk and put the bats
20  in a black bag in the trunk of the car?
21      A.   That was a lie.
22      Q.   Okay.  And then you went to a first floor
23  apartment and stayed for a little while smoking pot
24  and drinking?
25      A.   That was the third house we went to, and
```

2446

```
 1  that was the truth.
 2      Q.   And then you said a fourth person came
 3  inside the apartment, and you didn't know who that
 4  person was, and then they drove you back to the
 5  train station.  That was another lie you told them,
 6  right?
 7      A.   I don't understand that question.
 8      Q.   Well, did you tell them that when you were
 9  at the house?
10      A.   This is the second floor of Charles Street?
11      Q.   Well, here, let me go through this.
12  Remember now, we're still in Pinetops, right?
13      A.   Okay.
14      Q.   All right.  You told them at that point
15  that you were still hearing the bats hitting against
16  each other in the back.  That was a lie, right?
17      A.   Yes.
18      Q.   Okay.  Then they asked you -- they told
19  you, we don't believe you, right?
20      A.   Yes.
21      Q.   And you started up again, didn't you?  You
22  answered some more questions?
23      A.   Yes.
24      Q.   Okay.  And this time you told them that
25  when you got to the train station Dreddy told you to
```

2447

```
 1  drive the car.
 2      A.   It was a lie.
 3      Q.   And then you said that you parked on the
 4  side of the building while Dreddy and Ziggy went
 5  into the building.  That's also a lie?
 6      A.   I said that?
 7      Q.   Yeah.
 8      A.   I don't remember that.
 9      Q.   Okay.  And do you remember telling them
10  that you saw Dreddy's head pop out of a window on
11  the diner's side of the building?
12      A.   I said that?
13      Q.   Do you remember saying that?
14      A.   I don't remember saying that.
15      Q.   Would looking at something perhaps refresh
16  your recollection?
17      A.   Yes.
18      Q.   All right.  I'm going to ask you, sir, to
19  look at the bottom paragraph, starting here where it
20  has -- where it says something.  And could you read
21  that to yourself.
22      A.   I may have said it, but --
23           THE COURT:  The question is after you've
24  read that, does it refresh your recollection that in
25  Pinetops do you remember telling the law enforcement
```

2448

```
 1  people that you saw Dreddy's head pop out of a
 2  window on the diner's side of the building.
 3           THE WITNESS:  No, ma'am.
 4           THE COURT:  Okay, next question, please.
 5      Q.   And do you remember telling them that
 6  Dreddy asked you to pull around?
 7      A.   No, I don't remember.
 8      Q.   Okay.  And do you remember telling them
 9  about a Spanish woman with long, black hair who came
10  down and talked to you?
11      A.   I don't remember.
12      Q.   And do you remember telling them that about
13  an hour later you saw Dreddy and Ziggy and the same
14  Spanish woman come back downstairs?
15      A.   I don't remember.
16      Q.   And do you remember telling them that you
17  heard Dreddy say something in Spanish to the Spanish
18  woman?
19      A.   I don't remember.
20      Q.   And do you remember telling them that the
21  woman went back inside?
22      A.   I don't remember.
23      Q.   Do you remember telling them that you
24  stayed at the house until 5:00 or 6:00 a.m. because
25  you had to wait for the next train to Norwalk?
```

2449

```
1       A.   Don't remember.
2       Q.   Do you remember telling them that Azibo --
3   Dreddy drove Taylor -- drove you to the train
4   station and told him he would straighten him out?
5       A.   Repeat that again.
6       Q.   Do you remember telling the agents that
7   Dreddy drove you to the train station and told you
8   that he would straighten him out?
9       A.   That I don't remember.
10      Q.   Did you remember telling them that you
11  understood this to mean that Dreddy was going to
12  give you more drugs to sell?
13      A.   I don't remember.
14      Q.   Do you remember telling them that you
15  learned of the murders at the Charles Street
16  apartment later that day from the news on the
17  television?
18      A.   I may have said that.  I may have said
19  that.
20      Q.   And do you remember telling them a few days
21  later Dreddy came to Norwalk and gave you money and
22  more drugs?
23      A.   Dreddy came to Norwalk and gave me more
24  drugs?
25      Q.   To sell.
```

2450

```
1       A.   Yes.
2       Q.   Right?
3       A.   Yes, yes.
4       Q.   And do you remember telling them that when
5   you ran out of drugs and needed to be re-upped,
6   meaning getting more drugs, that Azikiwe came by
7   with a resupply of crack?
8       A.   I don't remember, but I may have said it.
9       Q.   Is it true that Azikiwe came by with a
10  resupply of crack?
11      A.   He came up -- who Ziggy or Dreddy?
12      Q.   I stand corrected.  Did Ziggy come by with
13  a resupply of crack?
14      A.   No.
15      Q.   Okay.  So, if you told them that, that was
16  a lie?
17      A.   Yes.
18      Q.   Do you remember being asked what Dreddy was
19  wearing on the night of the murders?
20      A.   No.
21      Q.   Do you remember telling them that there
22  were a box of blue hospital rubber gloves in the
23  car?
24      A.   Yes.
25      Q.   Okay.  Was that true?
```

2451

```
1       A.   Yes.
2       Q.   The gloves that you are talking about, that
3   you testified to in this case, were blue?
4       A.   The gloves that I had was blue.
5       Q.   All right.  And do you remember telling
6   them, the agents, on December 9th -- I'm sorry,
7   December 2nd, 2009, that you did not go into the
8   apartment?  You told them that on several occasions,
9   right?
10      A.   That I didn't go into the apartment?
11      Q.   Right.
12      A.   Yes.
13      Q.   And do you remember going -- telling them
14  that you went to a first floor apartment where Azibo
15  and Azikiwe changed their clothes after the murders?
16      A.   Don't remember.
17      Q.   Do you remember telling them that you saw
18  Azikiwe put on a -- I'm sorry, Dreddy put on a
19  shirt, blue jeans and sneakers?
20      A.   No.
21      Q.   If you told them that, that was a lie,
22  right?
23      A.   I don't remember telling them that.
24      Q.   Okay.  Would looking at a document perhaps
25  refresh your recollection as to whether or not you
```

2452

```
1   told them that?
2       A.   I don't remember.
3       Q.   All right.  And do you remember telling
4   them that after they changed their clothes Dreddy
5   and Ziggy came out with a black trash bag and that
6   Dreddy threw you a bag of weed, meaning marijuana,
7   and told you to roll it up?
8       A.   I don't remember that, but I remember me
9   and Ziggy left out of the building together and
10  Dreddy was still inside the building, the second
11  floor apartment.
12      Q.   Okay.  You don't remember telling them
13  anything about after changing their clothes they
14  came out with a black trash bag and threw you a bag
15  of marijuana and said to roll it up?
16      A.   No.
17      Q.   Okay.  And would looking at a document
18  refresh your recollection on that?
19      A.   Don't remember.
20      Q.   Meaning it's probably not -- you don't
21  think looking at a document would help you to
22  remember it?
23      A.   If I lied, I lied, but some of the lies I
24  told in that -- the first time they met me, it was a
25  lie, but also some of it was the truth.
```

2453

```
1      Q.   Okay.  And then do you remember telling
2  them after they had changed their clothes, meaning
3  Dreddy and Ziggy, a fourth guy showed up at the
4  apartment?
5      A.   That I said?
6      Q.   Yeah.
7      A.   Don't remember.
8      Q.   Okay.  And do you think that looking at a
9  document would help you?
10     A.   No, I don't remember -- if I lied I
11 wouldn't remember it.
12     Q.   And then do you remember telling them that
13 you went to another apartment and there you met a
14 dark-skinned female?
15     A.   Yes, when me and Ziggy left from the
16 Charles Street apartment we went to the -- his
17 apartment where he changed clothes at, Ziggy, then
18 me and him, Ziggy, left, went to a third floor
19 apartment where we met a dark-skinned female.
20     Q.   Okay.  Now, is that the female that you
21 told us was going up and down the stairs?
22     A.   Yes.
23     Q.   She wasn't in the apartment when you got
24 there, though, right?
25     A.   No.
```

2454

```
1      Q.   Do you remember telling them that you saw
2  Azibo take -- meaning Dreddy -- take the car keys
3  and open the trunk and put the bags and bats inside
4  the trunk?
5      A.   That was a lie.
6      Q.   Okay.  Now, after all of these lies, did
7  they let you use the bathroom, give you a break?
8      A.   Yeah, they asked me.
9      Q.   And did they let you get a drink of soda?
10     A.   Yes.
11     Q.   Do you remember what kind of soda it was?
12     A.   No, sir.
13     Q.   Okay.  And after you had your bathroom
14 break and your soda, did they tell you again that
15 they didn't think you were being truthful?
16     A.   Yes.
17     Q.   And at that point did you start to get kind
18 of -- did you kind of start getting teary-eyed and
19 crying a little bit?
20     A.   Yes.
21     Q.   And after you cried, did you keep on lying?
22     A.   Yes, but also I told the truth.
23     Q.   After you cried on December 2nd, 2009, did
24 you tell them the truth on that day?
25     A.   Some of the truth.
```

2455

```
1      Q.   Now, after you cried, you told them that
2  you went to a third floor apartment that was used as
3  a lookout for the building, right?
4      A.   Yes.
5      Q.   And that apartment was owned by the Spanish
6  woman, right?
7      A.   I don't know who apartment it was, but that
8  was the only person was in the apartment when we got
9  there.
10     Q.   Okay.  And that's that same woman
11 identified in Defendant's Exhibit 217 -- Government
12 Exhibit 217?  This lady?
13     A.   Yes.
14     Q.   Okay.  And then you said that Dreddy and
15 Ziggy took rope and duct tape and a bag from the
16 apartment and went downstairs.  That was a lie,
17 wasn't it?
18     A.   Yes, I remember telling them that.  That
19 was a lie.
20     Q.   And then you told them that they gave you a
21 pack of drugs to sell from the apartment while they
22 were out?
23     A.   I don't remember.
24     Q.   Telling them that?  Do you remember telling
25 them that?
```

2456

```
1      A.   I don't remember.
2      Q.   Would looking at a document help you to
3  remember whether you told them that, or not?
4      A.   No.
5      Q.   And then you told them, did you not, that
6  after they returned, they changed their clothes
7  inside the lookout apartment and that you did not
8  know what they had done?
9      A.   I was lying, and I was also trying to
10 distance myself from them, from telling the truth.
11     Q.   And then you said the following day you
12 were watching the TV in Denita's apartment and heard
13 about the news, right?
14     A.   Yes.
15     Q.   And then you said that you and Denita
16 actually borrowed a car to come down to Charles
17 Street just to see if it was the same apartment
18 building you were in the night before?
19     A.   Yes, I remember saying that, and that was a
20 lie.
21     Q.   And then you said that you saw two bats
22 outside the car and they had blood on them.  Was
23 that a lie?
24     A.   Yes.
25     Q.   And then you said that you and Dreddy and
```

**GA614**

2457

```
1   Ziggy drove out of the garage together in one car?
2       A.  Me and Ziggy drove out of the garage
3   together in one car.
4       Q.  Okay, but in this story that you just told
5   them on December 2nd, you told them that the three
6   of you drove out of the garage together in one car,
7   right?
8       A.  I don't remember.  I could have said it,
9   but I don't remember.
10      Q.  And would looking at a document refresh
11  your recollection?
12      A.  No.
13      Q.  Okay.  And then they pressed you a little
14  bit more, right?
15      A.  Yes.
16      Q.  And then you said that you went up to the
17  third floor lookout apartment with Dreddy and Ziggy
18  and you met with a Spanish female with long hair.
19      A.  Yes.
20      Q.  And that you stayed in the apartment while
21  Dreddy and Ziggy left.
22          MS. DAYTON:  Objection.  May we
23  approach?
24          THE COURT:  Yes.
25          (Sidebar conference)
```

2458

```
1           MS. DAYTON:  Your Honor, I'm objecting
2   under Rule 611, Subsection 2.  The Court is
3   permitted to limit cross-examination when it is
4   needless consumption of time.  Counsel has amply
5   demonstrated that Mr. Taylor lied.  This is the
6   first interview he's on.  If he's going to do this,
7   we will not be finishing trial next week, we will be
8   finishing trial next year.  I mean, I'm not sure
9   what the point is.  He's admitted that he lied
10  umpteen times and I don't know what more he expects
11  him to say other than he lied.  He's literally still
12  on the first interview on page, like, 13.
13          THE COURT:  Do you wish to respond?
14          MR. SHEEHAN:  Yes, your Honor.  I don't
15  think that my right to cross-examination on this
16  point should be curtailed.  I think that would be a
17  Sixth Amendment violation if that were the case.
18  And, furthermore, your Honor, I think that it is
19  important for the jury to understand that, A, not
20  only did he lie, as he's admitted, but that he was
21  consistently making up details, that he is
22  fabricating stories, and ultimately our argument
23  will be that the story that they're hearing is
24  similarly fabricated, that this witness is not
25  just -- that this witness is a person who makes up
```

2459

```
1   stories as he's going along.
2           THE COURT:  Do you think the jury has
3   not gotten that --
4           MR. SHEEHAN:  I don't know.
5           THE COURT:  -- message.
6           MR. SHEEHAN:  Your Honor.
7           THE COURT:  Do you intend to go through
8   every interview and every line of every interview?
9           MR. SHEEHAN:  No, I intend to through
10  this first interview, your Honor, and then I intend
11  to go through some of the other interviews when he
12  was represented by counsel on limited points when he
13  continued to lie.
14          THE COURT:  I'm not going to interfere
15  with your cross-examination at this point.  The
16  objection is overruled.
17          MS. DAYTON:  Thank you, your Honor.
18          THE COURT:  You may proceed.
19          (Sidebar concluded)
20          MR. SHEEHAN:  Can I have my last
21  question re-read?
22          THE COURT:  Yes, Ms. Montini.
23          (Testimony read)
24      Q.  So that you and Ziggy -- I'm sorry, you,
25  Dreddy and Ziggy went to the third floor apartment
```

2460

```
1   where you met with a Spanish female.
2       A.  Yes.
3       Q.  And then you told them that Dreddy and
4   Ziggy left and then came back with a fourth guy.
5       A.  This was still in -- sitting on the couch
6   in North Carolina?
7       Q.  Yeah.
8       A.  That was the truth, but it was also -- the
9   end part that was a lie.  The fourth guy didn't come
10  up with us to the third floor apartment.  They
11  didn't go out and get the fourth guy, he left.
12      Q.  Okay.  Did you have any reason in North
13  Carolina to be protecting the fourth guy?
14      A.  No.
15      Q.  The only person you were trying to protect
16  in North Carolina was you, right?
17      A.  Yes.
18      Q.  Then do you remember telling them that
19  Dreddy knocked on the door -- when you went
20  downstairs to the apartment, Dreddy knocked on the
21  door and the woman opened the door?
22      A.  Can you repeat that again, please.
23      Q.  Did you tell -- back in Pinetops, did you
24  tell the law enforcement that Dreddy knocked on the
25  door and the woman opened the door?
```

2461

1    A.   What floor?  Second or third floor?
2    Q.   Second floor?
3    A.   No, a female knocked on the door.
4    Q.   Okay.  I understand that's what your
5  testimony is, but I'm asking you if you remember
6  back in Pinetops whether you told them that Dreddy
7  knocked on the door, meaning the door of the
8  apartment where the murders took place, and the
9  woman opened the door?
10   A.   Don't remember.
11   Q.   And that you then told them that Dreddy put
12 a gun in the woman's face and said he was the cops
13 and rushed into the apartment.
14   A.   That was also the truth, but it was also a
15 lie.
16   Q.   And the lie part was?
17   A.   The cop and -- that's about it.
18   Q.   And then you said that Dreddy gave -- I'm
19 sorry, Ziggy gave the duct tape to Dreddy and you
20 saw Dreddy duct tape the three people inside the
21 apartment.
22   A.   Excuse me?
23   Q.   You told the police officers December 2nd
24 that Ziggy handed the duct tape to Dreddy and that
25 you then saw Dreddy duct tape the three people

2462

1  inside the apartment.
2    A.   Yes.
3    Q.   You remember telling them that?
4    A.   Yes.
5    Q.   Okay.  And that Dreddy told you not to
6  stand in front of the window.
7    A.   He told me not to stand exactly in front of
8  the window.  He had said, like, don't stand like in
9  front of the window, stand like on the side of the
10 window.  That's what he told me.
11   Q.   And then you told them that he told you to
12 wait in the car.
13   A.   Yes, I remember saying that, but that was a
14 lie.
15   Q.   Okay.  And, again, they showed you some
16 more photos -- the same photos, right?
17   A.   Yes.
18   Q.   Do you remember telling them that Dreddy,
19 Ziggy and the light-skinned chubby guy, Big Boy I
20 guess, Big Guy -- what name did you think -- what
21 did you think his name was, that guy?
22   A.   I didn't know his name.
23   Q.   All right.  You know what we're talking
24 about, right?
25   A.   Yes, the chubby guy.

2463

1    Q.   Let's call him the chubby guy.  Do you
2  remember telling them that Dreddy and Ziggy and the
3  chubby guy were all wearing blue rubber gloves?
4    A.   I don't remember, but I remember what
5  gloves I was wearing.
6    Q.   And do you remember telling them that
7  Dreddy saw you didn't have rubber gloves on your
8  hands?
9    A.   Yes, I remember saying that, and that was a
10 lie.
11   Q.   And that Dreddy then told you, yelled at
12 you not to touch anything.
13   A.   Yes, I remember saying that, and that was a
14 lie.
15   Q.   And that you then left, right?
16   A.   Yes.
17   Q.   And then you said that after you left the
18 apartment you all met up together at a third floor
19 apartment on a one-way street near the pool hall,
20 right?
21   A.   Yes, I do remember saying that.
22   Q.   And that there you started to drink
23 Hennessy?
24   A.   Well, yes, I remember saying that, and that
25 was a lie.

2464

1    Q.   And that in the apartment was a short,
2  dark-skinned, good-looking girl.
3    A.   Yes, I remember saying that.
4    Q.   And that she had children in there who were
5  sleeping.
6    A.   That was a lie.
7    Q.   And the first lie, that lie -- the first
8  one was "in the apartment was a short, dark-skinned,
9  good-looking girl"?  That was a lie?
10   A.   About me saying that to them?
11   Q.   Yeah.
12   A.   Oh, I said that to them.
13   Q.   But it was a lie.
14   A.   It was a dark-skinned girl at the
15 apartment, but the kids part was a lie.
16   Q.   You just made that up?
17   A.   The kids part, yeah.
18   Q.   So, by the end of the day on December 2nd,
19 you had admitted that you went to the apartment to
20 rob the people, right?
21   A.   Yes.
22   Q.   And that you had -- that there were gloves
23 and bats involved, right?
24   A.   Yes.
25   Q.   And that the apartment had been broken

2465

```
1   into.  You pushed open the door -- Dreddy did?
2       A.   Dreddy kicked in the door, yes.
3       Q.   Okay.  And you went in there, right?
4       A.   And.
5       Q.   You went in the apartment?
6       A.   Four of us went in the apartment.
7       Q.   Right?
8       A.   Yes.
9       Q.   Including yourself?
10      A.   Right.
11      Q.   And you were there to help them, right?
12      A.   Yes.
13      Q.   And then those people were murdered, right?
14      A.   Yes.
15      Q.   And after you told them all of those
16   things, they arrested you, right?
17      A.   Yes.
18      Q.   And you were very surprised at that point,
19   weren't you?
20      A.   Yes.
21      Q.   You just couldn't believe that they had
22   arrested you.
23      A.   Yes.
24      Q.   You thought you'd talked them out of being
25   arrested.
```

2466

```
1       A.   Well, I thought if I lied to them they'd
2   not arrest me.  I thought maybe I told enough good
3   little lies to squiggle my way out of it, but I end
4   up putting myself in -- the more I lied -- the more
5   I lied, the more I put myself into it.  I couldn't
6   come out of it now.
7       Q.   And in the course of these lies you made up
8   all kinds of stories, had you not?
9       A.   Also some stories and most of the truth.
10      Q.   And the stories you made up were there on
11   the spot.  You didn't have a chance to think about
12   that before they came there on December 2nd, did
13   you?
14      A.   Excuse me?
15      Q.   Before December 2nd, 2009, you really
16   hadn't thought about what you were going to say if
17   anybody knocked on your door, did you?
18      A.   I had no clue they were looking for me.
19      Q.   And at that point in time you were just
20   going on about your business, right?
21      A.   Yes.
22      Q.   And you'd been going on about sort of
23   taking care of John Taylor since -- well, since the
24   day of the murders, right?
25      A.   Yes.
```

2467

```
1       Q.   And did you go back with Denita to look at
2   the apartment?
3       A.   No, that was a lie.
4       Q.   And when you got out of jail you just
5   continued going on about your business, right?
6       A.   Yes.
7       Q.   And when you were working at MBI you just
8   continued going on about your business?
9       A.   Yes.
10      Q.   Were you working with a temp agency at MBI,
11   or was that actually working with MBI itself?
12      A.   Temp.
13      Q.   Okay.  Which one was that?
14      A.   I don't remember the name.
15      Q.   Okay.
16           THE COURT:  Mr. Sheehan, is this a good
17   stopping point?
18           MR. SHEEHAN:  It is, your Honor.
19           THE COURT:  Let's take a 15-minute
20   recess, ladies and gentlemen.
21           (Jury exited the courtroom.)
22           THE COURT:  All right, counsel, will
23   there be anything before we recess?
24           MR. SHEEHAN:  No, your Honor.
25           MS. DAYTON:  No your Honor.
```

2468

```
1           THE COURT:  All right, thank you.
2           Mr. Taylor, we'll recess for 15 minutes.
3   Please don't discuss your testimony.
4           (Recess)
5           THE COURT:  All right, if we could get
6   Mr. Taylor.  We'll bring in the jurors.
7           MS. DAYTON:  Your Honor, we have a
8   witness here from out of town who has a flight back
9   tonight.  He's a very short witness to put on after
10  Mr. Taylor.  If we could possibly do him before
11  lunch so we don't run into a problem with his
12  flight.  He's very short, like 15 minutes.
13          THE COURT:  Is he chubby?
14          MR. SHEEHAN:  Some things got to --
15          THE COURT:  All right, we'll bring in
16  the jurors, please.
17          (Jury entered the courtroom.)
18          THE COURT:  Please be seated, ladies and
19  gentlemen.  Continued cross-examination by Mr.
20  Sheehan of Mr. Taylor.
21      Q.   Mr. Taylor, I want to just go back for a
22  moment on something that you testified about
23  yesterday.  And I believe you can correct me if I'm
24  wrong on this.  Do you see this document,
25  Exhibit 117H?  Does that appear -- do you recognize
```

2469

```
1    what that's a photo of?
2        A.   Yes.
3        Q.   And is that the couch you were talking
4    about yesterday?
5        A.   Yes.
6        Q.   Okay.  And showing you Exhibit 117E, that
7    has the windows in the background, does it not,
8    where my finger is pointing up there?
9        A.   Yes.
10       Q.   And is this the couch that my finger is
11   pointing to here?
12       A.   Yes.
13       Q.   That's the couch that you pushed up against
14   the door, correct?
15       A.   Yes.  Me and Dreddy.
16       Q.   You and Dreddy.  Okay.  And showing you
17   Government Exhibit 117J, do you recognize that
18   couch?
19       A.   No.
20       Q.   Okay.  You've never seen that couch before?
21       A.   No.
22       Q.   That was not the couch that you pushed up
23   against -- you and Dreddy -- that you are testifying
24   that you and Dreddy pushed up against the door of
25   the apartment?
```

2470

```
1        A.   No, that's not the couch.
2        Q.   And, in fact, was that couch in the
3    apartment, as far as you can recall?
4        A.   I don't recall.  I don't remember that
5    couch.
6        Q.   Okay.  And do you remember at one point in
7    time being shown certain crime scene photos --
8    certain photos of the apartment?
9        A.   Yes.
10       Q.   And this was in June of 2010, correct?
11       A.   What was?
12       Q.   That you were asked to look at pictures of
13   a couch?
14       A.   I was asked, but I don't remember the date.
15       Q.   And isn't it a fact, sir, that on that date
16   you were shown pictures of what is marked -- what is
17   Defendant's Exhibit A of this couch in the hallway?
18       A.   Just right then or previously?
19       Q.   Back on June 18th of 2010.
20       A.   Yes, I was shown that couch.
21       Q.   Okay.  And what's your recollection as to
22   what you said about that couch?
23       A.   I don't remember that couch.
24       Q.   Okay.  You did not tell them on that
25   date -- you did not positively identify that couch
```

2471

```
1    as the couch you used to prop up the door, did you?
2        A.   I understand but I don't understand what
3    you are saying.
4        Q.   All right, I'm going to go back.  You have
5    a recollection of meeting with them and seeing
6    pictures of this couch, right?  Referencing
7    Defendant's Exhibit A.
8        A.   Yes, I remember that.
9        Q.   And you said on that date that you did not
10   recognize that couch.
11       A.   Exactly.
12       Q.   Now, do you remember what color gloves
13   everybody had on that date?
14       A.   No, I don't remember.  The only thing I
15   remember what gloves I had on.
16       Q.   Okay.  And do you remember when you entered
17   a plea of guilty in this case, one of the things
18   that you had to do was write out a statement in your
19   own hand, in your own writing about what happened on
20   that date?  Right?
21       A.   Yes.
22       Q.   And do you remember what it was that you
23   wrote in that statement about the color of the
24   gloves?
25       A.   Blue.
```

2472

```
1        Q.   Okay.  And do you remember writing in that
2    statement that everyone had masks and blue rubber
3    gloves?
4        A.   I may have said that, but then more time
5    thinking about it, I couldn't remember.  I know
6    everybody had rubber gloves.
7        Q.   Okay.  And do you remember when it was that
8    you entered that -- when you pled guilty?
9        A.   Do I remember what day I pled guilty on?
10       Q.   Yeah, what year.
11       A.   I think it was last year.  If I'm not -- I
12   might be right.
13       Q.   Okay.  And you did write in that document
14   that you submitted to the Court that -- in your own
15   hand, that everyone had masks and blue rubber
16   gloves, correct?
17       A.   I may have wrote that.  Like I said, I -- I
18   have to see it again.
19       Q.   Okay.  And let me show you this, and
20   perhaps if I could just draw your attention right
21   here.
22       A.   Yes.
23       Q.   Okay.  And by "yes" you mean that you did
24   tell the Court at that time in your own hand that
25   everybody had masks and blue rubber gloves?
```

2473

1    A.   Yes.

2    Q.   And that was on October 18, 2010, was it

3 not?

4    A.   I don't remember the date, but if -- yes.

5    Q.   Okay.

6          MR. SHEEHAN:  Your Honor, I wonder if we

7 could stipulate as to the date the plea was entered.

8          MS. DAYTON:  Absolutely.

9          MR. SHEEHAN:  So, for the record, your

10 Honor, the plea in this case was -- in Mr. Taylor's

11 case was entered on October 18th, 2010.

12          THE COURT:  All right.

13    Q.   And I want to go back just very, very

14 briefly to Pinetops.  You had indicated that you --

15 and this is back in December, that you really --

16 December of 2009, that you had -- in trying to talk

17 yourself out of a problem you got yourself in a big

18 one, right?

19    A.   Yes.

20    Q.   And at that time when they told you that

21 you were arrested for murder, that was a big concern

22 for you, was it not?

23    A.   Yes.

24    Q.   Now you were initially presented in federal

25 court in North Carolina?

2474

1    A.   Yes.

2    Q.   You got brought into court?

3    A.   Yes.

4    Q.   And at that time you had a lawyer appointed

5 to represent you?

6    A.   Yes.

7    Q.   In those proceedings?

8    A.   Yes.

9    Q.   And those were short.  I mean, you

10 basically agreed that you were going to come back up

11 to Connecticut and deal with the charges, right?

12    A.   Yes.

13    Q.   And when you got to Connecticut you went

14 into court again.

15    A.   Yes.

16    Q.   And at that point in time, you had lawyers

17 appointed for you, right?

18    A.   Yes.

19    Q.   Not one lawyer, but two lawyers, right?

20    A.   Yes.

21    Q.   And the reason you got -- you understood

22 that the reason you got those two lawyers was that

23 potentially you were looking at the death penalty in

24 this case, right?

25    A.   The reason why that I got these lawyers was

2475

1 because I was looking at death penalty?

2    Q.   Yeah.

3    A.   The only thing I know about being

4 experienced by going to court is you always have an

5 attorney beside you.  I knew I had to have an

6 attorney, that's only --

7    Q.   Okay.  And you got two lawyers, right?

8    A.   Yes.

9    Q.   And what I'm asking you, sir, isn't it a

10 fact, and you understood at the time --

11          THE COURT:  That light wobbles.

12          MR. SHEEHAN:  Yes.  I apologize, your

13 Honor.  I had been advised of that.

14    Q.   You had been told that you were potentially

15 looking at the death penalty?

16    A.   Yes.

17    Q.   And when were you first told that you were

18 potentially looking at the death penalty in this

19 case?

20    A.   I think it was my attorney told me.

21    Q.   All right.  Well, I don't want to ask you

22 about what your lawyer told you, but in any case you

23 learned about it as soon as you got to court, right?

24 In Connecticut or in North Carolina?

25    A.   Oh, in North Carolina.

2476

1    Q.   Oh, all right.  And when you were being

2 questioned in Pinetops, did any of the law

3 enforcement people, did anybody who was questioning

4 you there tell you that you were potentially looking

5 at the death penalty?

6    A.   If they did, I don't remember it.

7    Q.   Okay.  So, do you remember when you first

8 heard about the fact that you were potentially

9 looking at the death penalty, was that news to you?

10    A.   I don't --

11    Q.   I mean, were you surprised?

12    A.   Repeat the question again, please.

13    Q.   Maybe it's a lousy question.  Let me do it

14 this way.  When you got to court in North Carolina

15 and you learned in December of 2009 that you were

16 looking at the death penalty -- potentially looking

17 at the death penalty --

18    A.   December 2000 and -- the 3rd or the 5th,

19 that's when I went to court.  I don't remember the

20 9th.

21    Q.   All right, and it probably is December --

22 it probably is December 3rd, I would think.

23    A.   That's when I went up to court and I met

24 with my attorney.

25    Q.   Okay.

2477

```
1       A.   And we went -- she talked to me, and some
2   more other people talked to me, and I went up in
3   front of the judge, that's when the judge told me
4   that my charges -- all my charges and what I was
5   facing and what was the maximum and minimums, if I'm
6   saying it right.
7       Q.   And the maximum at that point was death,
8   right?
9       A.   Yes, yes.
10      Q.   And you had a little while to think about
11  that before you got back to Connecticut, right?
12      A.   Yes.
13      Q.   Do you recall how long it was for you to
14  get from North Carolina back to Connecticut?
15      A.   Maybe two or three days.
16      Q.   Okay.  And --
17      A.   Oh, you mean from North Carolina to -- I
18  mean from North Carolina to Connecticut?  Maybe
19  about two weeks, maybe.  Because I went somewhere
20  else and waited, then I came over.
21      Q.   All right.  Because you were kind of in the
22  transport system, right?
23      A.   Yes, yes.
24      Q.   Did they sent you to Oklahoma or someplace?
25      A.   Yes, yes.
```

2478

```
1       Q.   And then eventually they brought you here,
2   brought you to Connecticut, right?
3       A.   Yes.
4       Q.   And that's when you met Attorney Tiernan
5   and Attorney Casale for the first time?
6       A.   Yes.
7       Q.   Okay.  And then you entered into this
8   proffer agreement, right?  The one we talked about
9   earlier.
10      A.   After or before?  After or --
11      Q.   Well, after you met Attorney Casale -- I'm
12  sorry, Attorney Tiernan and Attorney Casale, you
13  signed up on that proffer agreement, right?
14      A.   I'm not for sure.  I think so.  I don't
15  know if it was exactly right after, after he seen me
16  like a couple of times.
17      Q.   Okay.
18      A.   I think.
19      Q.   All right.  The first time after your
20  arrest --  do you remember when it was the first
21  time after your arrest that you met with the agents
22  again?
23      A.   I don't know if it was that same month I
24  came in or it was the next month.  It was one of
25  those two months.
```

2479

```
1       Q.   Okay.  And you had already met with your
2   lawyers before that time, right?
3       A.   Yes.
4       Q.   And showing you this Defendant's Exhibit S,
5   do you recall whether your first meeting was at the
6   same time this proffer agreement was executed -- I
7   mean was signed?
8       A.   Repeat that again, sir.
9       Q.   Sure.  Was your first meeting with law
10  enforcement back here in Connecticut on this day?
11      A.   I don't remember the date, but I remember
12  it was like the first week of the month and -- I
13  don't know, positive sure, but I know it was the
14  next month.  I don't know what date it was or --
15      Q.   Okay.  And part of this agreement,
16  Defendant's Exhibit S, in fact it says at the top of
17  Defendant's Exhibit S that the "meeting has been
18  requested by the defendant for the purpose of
19  discussing the evidence of criminal wrongdoing."  Do
20  you remember asking for that meeting?
21      A.   Yes.
22      Q.   Okay.
23      A.   I asked before I left North Carolina.
24      Q.   And this sentence here, "It is understood
25  that everything that the defendant says must be
```

2480

```
1   truthful and accurate to the best of his ability to
2   recall."  You understood that that was part of your
3   agreement with the government, right?
4       A.   Yes.
5       Q.   And the government also promised you that
6   any statements made by you would not be offered
7   against you in the government's direct case.  Do you
8   understand what that provision, No. 2, what that
9   means?
10      A.   Yes.
11      Q.   What did you understand that to mean?
12      A.   Whatever I say won't be brought up against
13  me.
14      Q.   What about this part here where it says
15  "unless the defendant breaches this agreement as
16  provided in 8 below"?  Did you understand what that
17  meant?
18      A.   Mean like whatever -- whatever I say, it
19  means that I am telling the truth.
20      Q.   Okay.  And what does this mean about
21  breaching -- what do you understand it to be about
22  breaching the agreement?
23      A.   Breaching?
24      Q.   Yeah.
25      A.   Don't break it or --
```

2481

1    Q.   Okay, turning to paragraph 8 on the back
2    where it says that "It is further understood that if
3    the government determines that you have
4    intentionally provided either false or misleading or
5    inaccurate statements or information at this
6    meeting, then this agreement will become null and
7    void."  Do you know what that means?
8    A.   That if I lie and they believe that it is a
9    lie, that this agreement was no good.
10   Q.   And you under --
11   A.   They find out I was lying, this agreement
12   would no good.
13   Q.   They what?
14   A.   They found out that I was lying, then this
15   agreement would be no good.
16   Q.   And after you entered that agreement you
17   did continue to tell them some lies, right?
18   A.   Yes.
19   Q.   All right.  And did they ever tell you,
20   sir, that your agreement was ripped up?
21   A.   Not that I recall.  I didn't -- I didn't --
22   no.
23   Q.   All right.
24        MR. SHEEHAN:  Might I have a second?
25   Thank you.

2482

1    Q.   Did you have an understanding as to why
2    this case was a federal case?
3    A.   I never asked.
4    Q.   And do you have an understanding in your
5    mind about why this case is a federal case?
6    A.   I still --
7        MS. DAYTON:  Objection, relevance.
8        THE COURT:  Your claim of relevance?
9        MR. SHEEHAN:  I would claim that it is
10   relevant.  I can approach, your Honor, on that.
11       THE COURT:  All right.
12       (Sidebar conference)
13       MR. SHEEHAN:  Your Honor, in order to
14   get this case in federal court there needs to be
15   jurisdiction, and in this case the jurisdiction is
16   that it was in the context of the drug cases, and
17   what happened afterwards is that, although Mr.
18   Taylor had admitted that he had received crack from
19   Mr. Aquart, once he got here in Connecticut, for the
20   longest period of time he continued to deny that
21   fact.  And I think that's relevant because --
22       THE COURT:  But your question was does
23   he understand why this is in federal court.
24       MR. SHEEHAN:  What is his understanding
25   of why it is in federal court.  I asked him.

2483

1        THE COURT:  Are you saying that you
2    think that he was denying the drug trafficking in
3    order to deprive the federal court of jurisdiction?
4        MR. SHEEHAN:  Yeah.
5        THE COURT:  Well, you can ask him if he
6    has any understanding why this is a federal case.
7        (Sidebar concluded)
8    Q.   Mr. Taylor, I'm going to try rephrasing
9    this to make it a little clearer.  Do you have any
10   understanding why this case is in federal court?
11   A.   No.
12   Q.   Now, when you were down there in Pinetops
13   after they had arrested you, the first thing you
14   wanted to do was to make a deal for yourself.
15   A.   No, I just told them that -- I just got
16   tired of lying.  I just wanted to tell the truth.  I
17   ain't want -- it don't do me no good.  I'm going to
18   jail now.  I didn't want to lie no more.
19   Q.   Okay.  And then you came up here and you
20   lied.
21   A.   I also told the truth.  But I also tried to
22   minimize myself from what I seen about the drugs and
23   what I -- what I seen, the murders, I didn't lie
24   about that, I told the truth, but the drugs and the
25   other stuff and the bats and --

2484

1    Q.   One of the things that, when you got up
2    here, they asked you about was the drugs, right?
3    A.   Yes.
4    Q.   Okay.  Before we get to the drugs, let me
5    ask you this:  You testified that on that second
6    trip, you testified on -- when the prosecutor was
7    asking you questions, you told this jury that on
8    that second trip you borrowed Denita's car to come
9    up to Connecticut.
10   A.   Yes.
11   Q.   Right?  Didn't you tell them a number of
12   different stories about how you got to Connecticut
13   on that date?
14   A.   Yes.
15   Q.   So, on January 15th you told them that you
16   got picked up by Dreddy in Norwalk, right?
17   A.   I got picked up by Dreddy in Norwalk?
18   Q.   That was the first story you told them
19   after you got up here to Connecticut.
20   A.   I don't remember.
21   Q.   Would looking at a document refresh your
22   recollection?
23   A.   No.
24   Q.   Okay.  And on February 9th you told them
25   that you took the train from Norwalk to Bridgeport

2485

```
1   on that second day, right?
2       A.   Yes, because I didn't -- the only reason I
3   told them that, because I didn't want to involve the
4   girl that owned the car, and the reason -- that's
5   the reason why I told them that.  I didn't want them
6   to go get her for something or go get her car, so
7   that's one reason why I said that.
8       Q.   And was that in your mind when you told
9   them that on January 15th of 2010, the same kind of
10  little scheme?
11      A.   I didn't consider it just a scheme.  I just
12  didn't want to tell that -- about a car, about me
13  driving over there.
14      Q.   So you made up a little lie that you
15  thought would work to your advantage in some way or
16  another, right?
17      A.   Maybe.  Sure, yes.
18      Q.   Okay.  And then, in fact, you kept telling
19  them that little lie every time you met, right?
20      A.   Because it wasn't never asked again.  It
21  was, but not as much.
22      Q.   When you get asked as much.
23      A.   Excuse me?
24      Q.   Well, when did they press that point with
25  you?
```

2486

```
1       A.   They pressed it all the time, but to me I
2   feel like it wasn't that much.
3       Q.   Okay.  So when you say they pressed it all
4   the time, tell us how they pressed it.
5       A.   Ask me.  They asked me.
6       Q.   Yep.  And you would lie, right?
7       A.   And they ask me.
8       Q.   And then you'd lie.
9       A.   Yes.
10      Q.   Okay.
11      A.   And plus I couldn't remember most of the
12  stuff that we did that night.
13      Q.   So on that -- that was a little lie about
14  the car, right, that you told -- after you entered
15  into this proffer agreement?
16      A.   Yes.
17      Q.   They didn't rip it up, right, rip up the
18  agreement?
19      A.   No.
20      Q.   Okay.  And then one of the things they
21  asked you about once you got up here is whether you
22  had gotten any drugs, right, from Dreddy.
23      A.   I don't understand what you are saying.
24      Q.   On this January 15th meeting they asked you
25  whether you had gotten any drugs from Dreddy?
```

2487

```
1       A.   I told them no.
2       Q.   And that was a lie, right?
3       A.   Yes.
4       Q.   And the reason you're scheming at that --
5   lying at that point is trying to get yourself to --
6   to help yourself, right?
7       A.   I'm not understanding what you are saying.
8       Q.   You lied to them on that date about the
9   drugs, right?
10      A.   Yes.
11      Q.   And the reason you lied to them is you
12  wanted to minimize your involvement.
13      A.   Yes.
14      Q.   You wanted to help yourself, right?
15      A.   But I wasn't.  I was putting myself in
16  more worse predicament by lying.
17      Q.   And did they -- at that January 15th
18  meeting when you told them that lie, did they -- did
19  law enforcement people say to you, Mr. Taylor,
20  you're just lying to us?
21      A.   Yes, they said -- yes, they said that.
22      Q.   Okay.  And did you look them right in the
23  eye and say no, sir, I'm not?
24      A.   No.  Most of the time I didn't look at
25  them.  Mostly I just didn't say nothing.
```

2488

```
1       Q.   All right.  And then that's on
2   January 15th.  And then when you didn't say, okay, I
3   guess I lied, on that date anyway, they didn't just
4   go away, did they?
5       A.   No.
6       Q.   They called you back, right?
7       A.   Yes.
8       Q.   Did they call you back or did you ask to go
9   back?
10      A.   I don't remember.  I don't remember asking.
11  I don't know they called me back or not.  The only
12  thing I know I wanted to go to court.
13      Q.   And going to court is a bit of a production
14  when you are in jail, isn't it?
15      A.   Bit of a pro -- what do you mean?
16      Q.   Well, they've got to come get you.
17      A.   Yes.
18      Q.   And do you remember when the next time it
19  was that they got you, came to get you?
20      A.   No.
21      Q.   Okay.  On February 3rd, 2010, you had
22  another meeting with them, correct?
23      A.   I had another -- I don't remember the date.
24      Q.   Would looking at a document refresh your
25  recollection?
```

2489

1    A.   No, but -- I remember the second meeting,
2  but I don't remember the date.
3    Q.   And at that second meeting you again lied
4  to them, did you not?
5    A.   Maybe, but --
6    Q.   Well, in fact, you told them that I'm not
7  involved with selling drugs with or for either one
8  of them, meaning Dreddy or Ziggy, right?
9    A.   Yes.  I remember saying that, yes.
10   Q.   And you said, well, they offered me a job,
11 but I didn't want to take it, right?
12   A.   No.  I remember telling them that he
13 offered me to set me up inside of that apartment
14 building.
15   Q.   And you said you didn't take advantage of
16 it, right?
17   A.   It wasn't -- the whole -- the whole plot
18 was -- I don't think it was no setting me up in the
19 apartment.  I think the plot was to go over there to
20 murder those people.
21   Q.   Aha.
22   A.   Because he never come down to talk about
23 that no more.
24   Q.   Okay.  And then they said, hey, Taylor,
25 wake up, why is your phone number on Dreddy's,

2490

1  right?  That's what they said to you?
2    A.   They didn't say that.
3    Q.   Not that way, but in substance they asked
4  you nicely why is it that your phone number was in
5  contact with Dreddy's, right?
6    A.   Yes.
7    Q.   Okay.  And then you said, well, maybe
8  Kosher used my phone.
9    A.   Yes.
10   Q.   To get marijuana.
11   A.   Yes, I said that.
12   Q.   Okay.  And that was a lie, right?
13   A.   Kosher did use my phone.
14   Q.   Yeah, but it doesn't explain what they're
15 asking you about, right?
16   A.   You asked me that my number was in Kosher
17 phone, right?  I mean in Dreddy's phone, right?
18   Q.   Yeah.
19   A.   So that means if Dreddy use my phone, that
20 means that my phone number would be in Dreddy's
21 phone.
22   Q.   I see.  So that's how you figured you would
23 persuade them that you were not dealing, involved in
24 drugs, right?
25   A.   No.

2491

1    Q.   Well, you just lied to them.  You said you
2  weren't.
3    A.   Because I didn't want to be involved with
4  the -- I didn't want to tell the truth about that I
5  was involved with him buying, with drugs.
6    Q.   Okay.  And your lawyer was with you at that
7  meeting, right?
8    A.   Yes.
9    Q.   And did they rip up the agreement after
10 that meeting?
11   A.   My --
12   Q.   "They" meaning the government?
13   A.   If he -- I don't know if he keeps -- you
14 saying about ripping up agreement.  They never -- I
15 knew I signed an agreement, but the agreement never
16 came up, like, we ripped it up, somebody saying you
17 don't tell the truth, we'll rip the agreement up.
18 If they said it, I don't remember it, but...
19   Q.   So, did you get the impression, sir, that
20 you could continue lying?
21   A.   No.
22   Q.   But you did, right?  You did continue
23 lying.
24   A.   Yes, I did.
25   Q.   And then on March 24th, 2010, you met with

2492

1  them again, right?
2    A.   Yes.
3    Q.   And you were still denying that you were
4  involved in the drug dealing, right?
5    A.   Yes.
6    Q.   And then you also said, well, I met two
7  other guys at the apartment on that third floor.  Do
8  you remember telling them about that?
9    A.   Don't remember.
10   Q.   Okay.  Did they get -- ever get angry with
11 you about your lies?
12   A.   Yes.
13   Q.   Did they walk out of any of these meetings
14 and say, forget it, Mr. Taylor?
15   A.   Yes.  Then also I told my attorney to tell
16 them to come back in.
17   Q.   Come back in, I'm ready to tell the truth?
18   A.   Yes.
19   Q.   And then you would come back in and you'd
20 lie, right?
21   A.   Yes, about the drugs.
22   Q.   And for whatever reason you were lying, it
23 was because you thought it would help yourself?
24   A.   Yes, help myself minimizing -- to min -- to
25 not put myself in his drug business.

**GA623**

2493

1  Q.  Mr. Taylor, when it helps you, you lie,
2  right?
3  A.  I'm not a very good liar, though, but...
4  Q.  But your reason for lying is to help
5  yourself, right?
6  A.  Yes.
7  MR. SHEEHAN:  I don't have anything
8  further with Mr. Taylor.
9  THE COURT:  All right, redirect.
10  MS. DAYTON:  Thank you, your Honor.
11  MR. SHEEHAN:  If I might, your Honor,
12  I'll just hand these things back up before I walk
13  off with them.
14  THE COURT:  All right, Ms. Dayton, you
15  may redirect.
16  MS. DAYTON:  Are you done?
17  MR. SHEEHAN:  Yes, I am.  Thank you.
18  MS. DAYTON:  I thought he had a note, he
19  was coming back.
20  MR. SHEEHAN:  Thank you.
21  REDIRECT EXAMINATION
22  BY MS. DAYTON:
23  Q.  Good morning, Mr. Taylor.  How are you
24  doing?
25  A.  Good morning.  I'm fine.

2494

1  Q.  Mr. Taylor, do you think it's going to help
2  you to lie here today?
3  A.  No.
4  Q.  Why not?
5  A.  Because if I get -- if I perjury and
6  they -- perjury, I don't want perjury.  That's
7  another charge.  I don't want that.  I'm looking for
8  help.
9  Q.  And if you lie in court, what do you think
10  your sentence on the murders, the three murder
11  charges, is going to be?
12  A.  Still the same.
13  MR. SHEEHAN:  Objection.  I don't think
14  he has any -- what he thinks the Court's sentence
15  will be, I would object to that, your Honor.
16  THE COURT:  On what grounds?
17  MR. SHEEHAN:  First of all, it invites
18  speculation on his part.
19  THE COURT:  It's his state of mind.
20  MR. SHEEHAN:  Are we going into what his
21  lawyers have told him, your Honor?
22  THE COURT:  No.  Do you want to rephrase
23  your question.
24  MS. DAYTON:  I can re-ask it.
25  THE COURT:  No, rephrase it to exclude

2495

1  anything his lawyers have told him.
2  Q.  Your personal thoughts, not what your
3  lawyers told you, if you lie in court, what do you
4  think you are going to be sentenced to on the three
5  murders?
6  A.  Life sentence.
7  Q.  You were asked a lot of questions about an
8  interview while you were in Pinetops in December 2nd
9  of 2009.  Do you remember all those questions?
10  A.  Not all of them.
11  Q.  You remember being asked about that
12  repeatedly?
13  A.  Yes.
14  Q.  Was that a short interview?
15  A.  No.
16  Q.  Have you ever seen the report of that
17  interview?
18  A.  No.
19  Q.  Have you seen any reports in this case?
20  A.  No.
21  Q.  Was that interview multiple hours long?
22  A.  Yes.
23  Q.  Who killed the victims?
24  MR. SHEEHAN:  Objection.  Outside the
25  scope of the cross.

2496

1  MS. DAYTON:  Your Honor, the entire
2  cross was based upon attacking his credibility.
3  THE COURT:  Let's stop.  I know what the
4  argument is.
5  MR. SHEEHAN:  Could I just reference,
6  your Honor, a case or --
7  THE COURT:  Do you have a copy of it for
8  me?
9  MR. SHEEHAN:  I do, your Honor.  I don't
10  have an extra copy for the government.  I have an
11  extra copy for myself.
12  MS. DAYTON:  Can I see it?
13  MR. SHEEHAN:  Yes.
14  THE COURT:  I'll see you at sidebar.
15  (Sidebar conference)
16  MR. SHEEHAN:  The Second Circuit case
17  I'm relying on is United States v. Al-Moayad, 543
18  F.3d 139 at 167 to 168, and including Note 24, and
19  what it stands for, your Honor, is that the fact
20  that he is available for cross-examination doesn't
21  allow them just to bolster him continually.  They
22  can ask a questions about prior consistent
23  statements to the extent that my claim is one of
24  recent fabrication.  They cannot go back and redo
25  all of the direct examination simply because I have

2497

1 attacked his credibility with respect to
2 inconsistent statements.
3          THE COURT:  So you don't object if the
4 government asks --
5          MS. DAYTON:  What did you tell them.
6          THE COURT:  Who did you tell.  What did
7 you tell the agents about who killed the victims.
8          MR. SHEEHAN:  I do, your Honor, because
9 he already testified to that and I didn't go into
10 that, your Honor.
11          THE COURT:  But you don't think that
12 it's within the scope of cross when you went into
13 everything that he told the agents that turned out
14 not to be true for --
15          MR. SHEEHAN:  Correct.
16          THE COURT:  -- the government to go into
17 what he told the agents that turned out to be true?
18          MR. SHEEHAN:  Yes.
19          THE COURT:  Why is that?
20          MR. SHEEHAN:  Because, your Honor,
21 otherwise they basically get to redo their whole
22 argument all over again.  The purpose of the attack
23 on inconsistent statements is really so that if they
24 have prior consistent statements, that reintroduces
25 it.  But the purpose of the prior inconsistent

2498

1 statements is to reflect on his general credibility.
2 It doesn't allow them to reopen the same thing and
3 redo it all over again.
4          THE COURT:  So tell me --
5          MR. SHEEHAN:  Otherwise we end up
6 looping and looping around.
7          THE COURT:  Tell me the distinction
8 between prior consistent statements that is
9 consistent with his testimony here today and
10 cross-examination on prior inconsistent statements.
11 Why is the government precluded from prior
12 consistent statements where your theory is one of
13 recent fabrication?
14          MR. SHEEHAN:  My theory, your Honor,
15 they can show a prior consistent statement.
16          THE COURT:  They can.
17          MR. SHEEHAN:  They can with respect to
18 the statements that I am claiming are inconsistent.
19 For example, if the issue is, did you see John, and
20 the guy says, testifies, that he did see John, and
21 then I bring out a prior inconsistent statement that
22 he didn't see John, and then they have an earlier
23 statement saying that he did --
24          THE COURT:  Right.
25          MR. SHEEHAN:  -- they could bring that

2499

1 out.
2          THE COURT:  Your claim is that you
3 purposefully --
4          MS. DAYTON:  Can I say something before
5 you come to some sort of conclusion?
6          THE COURT:  I am not coming to a
7 conclusion, I'm trying to understand the defendant's
8 position.  So, for instance, where he says he sat
9 out in the car while the defendants went in, and he
10 somewhere else said he went in with them, is that or
11 is that not a prior consistent statement?
12          MR. SHEEHAN:  Because it's not prior.
13 In other words, the sequence as it unfolded here is
14 that he continually gave a series of statements that
15 he's now claiming are lies.  Subsequently he changes
16 his testimony.  That's what he testifies to in the
17 end is the final version.  Now, the fact that he may
18 have said some things that --
19          THE COURT:  So you say inconsistent
20 statements and consistent statements versus prior --
21          MR. SHEEHAN:  Yes.
22          THE COURT:  -- is the difference.
23          MR. SHEEHAN:  Yes.
24          THE COURT:  But if prior is measured
25 from testimony in court, why does your argument hold

2500

1 up?
2          MR. SHEEHAN:  It does, your Honor,
3 because he's testifying here in court -- previously
4 in this sequence -- I think it has to be in terms of
5 prior consistent statements.  It has to be before
6 the date of the impeaching statements.
7          MS. DAYTON:  Can I say something?  When
8 we came to sidebar last time counsel said that his
9 entire argument is based upon he's making it up now.
10 That's what he says, and the argument to the jury is
11 he is going to argue everything he has said here is
12 a lie.  And as your Honor pointed out, by going
13 through ad nauseam every single prior version of the
14 events, he has attacked the credibility of what he
15 said on everything, like including you didn't even
16 see the murders.  But the realty is, he did see the
17 murders and he said he saw the murders.  So, I can
18 rephrase to say what did you tell the agents, what
19 did you say.
20          THE COURT:  That seems to me to be -- I
21 have not read this case, and it's a pretty long one.
22          MR. SHEEHAN:  Uh-huh (indicating
23 affirmatively).
24          THE COURT:  If there is a specific
25 holding that you think is one that determines the

2501

1  outcome of this objection, I will be happy to read
2  it.
3      MR. SHEEHAN:  My point, your Honor, is
4  that when you attack a witness's credibility by
5  referencing prior inconsistent statements, it does
6  not allow the government to do as the government is
7  purporting to do, because if they do that, then we
8  end up continually going around and around.
9      THE COURT:  I understand your position.
10 It seems to me that where you have put in extensive
11 evidence of his prior inconsistent statements,
12 inconsistent with his testimony here, that the
13 government is entitled to elicit evidence of prior
14 consistent statements, consistent with his testimony
15 here.  It seems to me that's the way it goes.  Now,
16 whether he is going to remember any of what he said
17 is a wholly different matter.
18     MS. DAYTON:  And your Honor, this is
19 like two questions.  I'm not going to spend two
20 hours on this.
21     THE COURT:  But this is not what his
22 testimony is now.
23     MS. DAYTON:  I understand.
24     THE COURT:  Okay, I'm going to --
25     MS. DAYTON:  It's going to be minimal.

2502

1      THE COURT:  I'm going to, in light of
2  that direction to the government, overrule your
3  objection.
4      (Sidebar concluded)
5  Q.  Sorry about that.  Mr. Taylor, do you
6  remember what you told the agents with respect to
7  who killed the victims?
8  A.  Yes.
9  Q.  And do you remember what you told them with
10 respect to who was bashing the victims over the head
11 with the baseball bats?
12 A.  Yes.
13     MR. SHEEHAN:  Same objection, your
14 Honor.
15     THE COURT:  Overruled.
16 Q.  And what did you tell them?
17     MR. SHEEHAN:  Same objection, your
18 Honor.
19     THE COURT:  Overruled.
20 Q.  You can answer.
21     THE COURT:  This is what you told the
22 agents.
23 A.  Okay, that when I walked back from the
24 window, went back and looked, Dreddy was standing
25 over the victim's body bashing her like he was at a

2503

1  meat cleaver -- that he was at a meat market,
2  beating them.  His brother was over there doing the
3  same thing.
4  Q.  Do you remember what type of bats they
5  were?
6      MR. SHEEHAN:  Objection.  Outside the
7  scope of the cross.
8      THE COURT:  Sustained.
9  Q.  Do you have any doubt about the
10 truthfulness of what you testified to --
11     MR. SHEEHAN:  Objection.
12 Q.  -- here?
13     MS. DAYTON:  I didn't even get the
14 question out.
15     MR. SHEEHAN:  I don't think a witness
16 can be allowed to characterize his own truthfulness,
17 your Honor.
18     THE COURT:  Let me hear the full
19 question.
20 Q.  The truthfulness to what you testified to
21 here today and yesterday?
22     MR. SHEEHAN:  Objection, your Honor.
23     THE COURT:  Sustained.
24     MS. DAYTON:  I have nothing further.
25 Thank you.

2504

1      THE COURT:  All right, anything further,
2  Mr. Sheehan?
3      MR. SHEEHAN:  No, your Honor.  Thank
4  you.
5      THE COURT:  Thank you, Mr. Taylor.  You
6  may step down.  You are excused.
7      Will the government please call its next
8  witness.
9      MS. RODRIGUEZ-COSS:  We will call
10 Timothy Bailer.
11     THE COURT:  All right, sir, will you
12 please take the witness stand over here.  Remain
13 standing and the oath will be administered to you.
14 T I M O T H Y  J O S E P H  B A I L E R
15 Having first affirmed, was examined and testified as
16 follows:
17     THE COURT:  Please pull the microphone
18 over to you.  It moves.
19     THE WITNESS:  My name is Timothy Joseph
20 Bailer.  Last name is spelled b-a-i-l-e-r.
21     THE COURT:  Your town of residence?
22     THE WITNESS:  Cumberland County, North
23 Carolina, city and state.
24     THE COURT:  You may proceed.
25 DIRECT EXAMINATION

**GA626**

2505

```
1   BY MS. RODRIGUEZ-COSS:
2       Q.   Mr. Bailer, I'm going to ask you to bring
3   that microphone a little bit closer to you.  There
4   you go.
5            Can you tell the ladies and gentlemen of
6   jury how you are currently employed.
7       A.   I'm employed as a deputy sheriff with the
8   Cumberland County Sheriff's Office, Fayetteville,
9   North Carolina.
10      Q.   How long have you been employed by the
11  Cumberland County Sheriff's Office?
12      A.   I've been with the sheriff's office since
13  1993.
14      Q.   And can you tell us, are you currently
15  assigned to any particular unit or division within
16  that sheriff's office?
17      A.   Yes, I'm assigned to the interstate
18  criminal enforcement unit.
19      Q.   And what is it that you do with that unit?
20      A.   We patrol Interstate 95 enforcing the
21  traffic laws of the state of North Carolina.
22      Q.   All right.  And during the course of those
23  investigations or enforcing the traffic laws of the
24  state of North Carolina, does that involve also
25  other types of investigations?
```

2506

```
1       A.   Yes, it does.  While doing an enforcement
2   action for a traffic violation --
3            THE COURT:  Sir, can you pull that
4   closer or put you closer to it.
5            THE WITNESS:  I'll move closer.
6       A.   While doing traffic enforcement, if we
7   observe indicators of other criminal activity afoot,
8   we'll go beyond the scope of the traffic violation
9   and do a potential encounter with the occupants of
10  the vehicle.
11      Q.   All right.  On those occasions where
12  traffic violations may lead to investigations of
13  other violations, do you also pursue those
14  investigations?
15      A.   Yes.
16      Q.   All right.  So, I want to bring your
17  attention to August 17, 2005.  Were you working in
18  that same capacity at that time?
19      A.   Yes, I was.
20      Q.   And can you tell the members of the jury
21  what, if anything, of significance transpired on
22  that day?
23      A.   That particular day, shortly after three
24  o'clock that afternoon, my supervisor, Sergeant Mark
25  Hart, had a vehicle stopped southbound on Interstate
```

2507

```
1   95 near the 39-mile marker.  I wait --  I have a
2   computer system on my mobile data terminal inside my
3   patrol car, and I observed that it had taken him
4   longer on that traffic violation than normal for
5   just an enforcement action.
6       Q.   So, you can tell -- let me clarify
7   something.  Is Sergeant Hart in your same vehicle
8   with you?
9       A.   No, he's not.
10      Q.   And so how do you coordinate your actions
11  with him, if in any way?
12      A.   We have computer systems in our car.
13  Basically it's a dispatch screen where you can see
14  what every officer in Cumberland County is doing,
15  what kind of call they're on, if they're on a
16  traffic stop.
17      Q.   And you were saying that you noticed that
18  he had been stopped for over five minutes.  Is that
19  what you said?
20      A.   Approximately more than five minutes.
21      Q.   What, if anything, does that indicate to
22  you?
23      A.   To me normally if we're over five minutes,
24  then he's probably going further than a traffic
25  violation.
```

2508

```
1       Q.   So, what did you do as a result of that
2   conclusion?
3       A.   I pulled out and just headed towards his
4   traffic stop to assist him.
5       Q.   And did you actually arrive where Sergeant
6   Hart was stopped?
7       A.   Yes, I did.
8       Q.   And when you arrived at that location,
9   Officer Bailer, what did you observe?
10      A.   When I pulled up to the scene, I observed
11  Sergeant Hart and two gentlemen standing in the
12  grassy median to the right side of their vehicle,
13  which was a silver-colored Jeep.
14      Q.   And what other vehicle, if any, was at the
15  scene?
16      A.   Sergeant Hart's patrol car and another
17  Cumberland County K-9 unit.
18      Q.   And what's a K-9 unit?
19      A.   It's our narcotics canine or bomb canine.
20  We have several different canines.
21      Q.   A dog?
22      A.   Yes, it's a handler and his dog, yes.
23      Q.   And so what did you proceed to do?
24      A.   At that time I exited my patrol vehicle and
25  walked up to Sergeant Hart, and at that time he
```

2509

1  asked me to assist him on the traffic stop.
2      Q.   And how did you assist him?
3      A.   I performed -- assisted him by performing a
4  systematic search of the vehicle.
5      Q.   Of the Jeep?
6      A.   Yes.
7      Q.   What, if anything, of significance did you
8  locate inside that vehicle?
9      A.   I started my searching of the vehicle at
10  the driver's side, and after I opened the door,
11  immediately knelt down, I observed a
12  blackened-colored revolver underneath the driver
13  seat.
14      Q.   Let me bring your attention to what has
15  been marked Government Exhibit 232.
16          MS. RODRIGUEZ-COSS:  I'm bringing his
17  attention to 232 and 233, your Honor.
18      Q.   Bringing your attention first to 232, can
19  you tell me if you recognize that item.
20      A.   Yes, I do.
21      Q.   And how do you recognize that item?
22      A.   That is the gun that I found underneath the
23  driver's seat on that day.  I see it's an H&R Arms,
24  and it's model 22, and the serial number is the same
25  as all the report -- the serial number on the

2510

1  report.
2      Q.   When you locate physical evidence such as
3  what is contained on Government Exhibit 232, do you
4  label or tag it in any manner?
5      A.   Yes, they're tagged.
6      Q.   And is Government Exhibit 232 accompanied
7  by a tag?
8      A.   Yes, it is.
9      Q.   And do you recognize that tag?
10      A.   Yes, I do.
11          MS. RODRIGUEZ-COSS:  We are submitting
12  Exhibit 232, your Honor.
13          MR. SMITH:  No objection.
14          THE COURT:  Full exhibit.
15      Q.   And bringing your attention to what has
16  been marked Government Exhibit 233.  Let me just
17  tell you how we marked this.  This is 233.  Can you
18  tell me if you recognize what is contained in that
19  item?
20      A.   Yes, I do.
21      Q.   And what is that?
22      A.   Ammunition found with the gun that was
23  located.
24      Q.   Okay.
25          MS. RODRIGUEZ-COSS:  Government

2511

1  Exhibit 233, your Honor.
2          MR. SMITH:  No objection.
3          THE COURT:  Full exhibit.
4          MS. RODRIGUEZ-COSS:  Your Honor, we'd
5  like to publish these two items to the jury.
6          THE COURT:  On the ELMO or circulating?
7          MS. RODRIGUEZ-COSS:  Circulating.  It's
8  kind of difficult to publish these particular items
9  on the ELMO.
10          THE COURT:  Go ahead.
11          MS. RODRIGUEZ-COSS:  Thank you, your
12  Honor.
13      Q.   Officer, bringing your attention back to
14  what you just identified as Government's
15  Exhibit 232, can you tell us what that is?
16      A.   It's a .22 caliber revolver.
17      Q.   And how does a revolver -- well, how is
18  that loaded?
19      A.   It would be loaded two different ways; one,
20  manually by sticking an individual round into the
21  cylinder, or by a speed loader, which is a
22  pre-loaded mechanism that once you open up the
23  cylinder all you do is drop and release the rounds
24  in there.
25      Q.   So, the speed loader would allow you to

2512

1  load all the rounds at once?
2      A.   Yes.
3      Q.   And where was -- let me ask you this:  You
4  said you located the firearm underneath the driver's
5  seat.  Who was the driver of that vehicle?
6      A.   From the report is Aquart.
7          MR. SMITH:  Objection, your Honor.  He's
8  referencing hearsay at this point.  I think it
9  should be asked if he observed.
10          THE COURT:  Let's have some foundation
11  on that.
12      Q.   Do you -- is the report prepared as a
13  result of your intervention with that vehicle?
14      A.   Yes.
15      Q.   And what sort of information does the
16  sheriff's office routinely place on this report?
17      A.   Driver's information and occupant
18  information.
19      Q.   And does it contain a description of that
20  occupant?
21      A.   Yes, it does.
22      Q.   Does it contain a description of the
23  vehicle?
24      A.   Yes, it does.
25      Q.   If I were to show you the report that was

2513

```
1   prepared as a result of that intervention, would
2   that refresh your recollection as to the name of the
3   driver of the vehicle?
4        MR. SMITH:  Objection, foundation.
5   She's asking if --
6        THE COURT:  Is this his report?
7        MS. RODRIGUEZ-COSS:  It's the report of
8   the incident, your Honor.
9        THE COURT:  It's not his report.
10       MR. STERN:  It's Sergeant Hart's report.
11       THE COURT:  Let's go through that a few
12  more steps at a time to understand how it is that he
13  can testify as to the contents of that report.
14       Q.  How are you -- how are you listed, if in
15  any manner, on that report?
16       A.  As a witness.
17       Q.  And were you actually present at the scene
18  where the intervention transpired?
19       A.  Yes.
20       Q.  And so have you had an opportunity to
21  review that report?
22       A.  Yes, I have.
23       THE COURT:  Do you want to voir dire.
24  VOIR DIRE EXAMINATION
25  BY MR. SMITH:
```

2514

```
1        Q.  When you arrived on the scene --
2        THE COURT:  Can you put the microphone
3   over, please.
4        MR. SMITH:  Yes.
5        Q.  Officer, when you arrived on the scene,
6   were the people who presumably were the occupants of
7   the vehicle standing outside of the vehicle?
8        A.  Yes.
9        Q.  So you did not see the vehicle when it was
10  first pulled over?
11       A.  No.
12       MR. SMITH:  Your Honor, I'd object to
13  any more testimony about his knowledge on that on
14  the basis of lack of foundation.
15       THE COURT:  Anything further, Ms.
16  Rodriguez?
17  CONTINUED DIRECT EXAMINATION
18  BY MS. RODRIGUEZ-COSS:
19       Q.  All right, so let me ask you this:  Who
20  were the occupants of the vehicle?
21       MR. SMITH:  Objection.
22       MS. RODRIGUEZ-COSS:  As to who were the
23  occupants?
24       THE COURT:  Do you know who the
25  occupants were?
```

2515

```
1        THE WITNESS:  From the report, yes, I
2   do.
3        THE COURT:  Do you know in any other way
4   other than the report who the occupants were?
5        THE WITNESS:  No.
6        THE COURT:  May I see you at sidebar.
7        (Sidebar conference)
8        THE COURT:  All right, your claim, Mr.
9   Smith, is that his report is hearsay.
10       MR. SMITH:  Yes, your Honor.
11  Information contained within the police report is
12  hearsay.  If his basis of knowledge is looking at a
13  report, which he did not write, it is hearsay.
14       THE COURT:  Why is Mr. Smith wrong?
15       MS. RODRIGUEZ-COSS:  Your Honor, this is
16  a police report prepared in the regular course of
17  business with the police department.  They would
18  generate a report any time an invention is made with
19  two individuals, and so the report will list who
20  were the individuals that the police intervened with
21  on that particular occasion.  So, I withdrew the
22  question as to who was actually driving the vehicle,
23  but who were the two individuals that the police
24  intervened with as reflected on a report that is
25  prepared during the regular course of business on
```

2516

```
1   the police department, I don't think that's hearsay.
2   I think he should be allowed to testify who were the
3   subjects intervened with.
4        MR. SMITH:  Your Honor, again, it's
5   hearsay.  He didn't prepare the report.  He didn't
6   observe who the occupants of the vehicle were when
7   the vehicle was first stopped.
8        MS. RODRIGUEZ-COSS:  We could call the
9   other police officer, but I really think that this
10  witness can testify as to who were the two
11  individuals intervened with.
12       THE COURT:  Here is the problem:  If
13  you're right couldn't the government always just put
14  up anyone to testify to the contents of the report
15  and the substance of what they're testifying about
16  can't be cross-examined on?  I mean, isn't that what
17  the problem is.
18       MR. MARKLE:  I think that's right.  I
19  honestly didn't think it was an issue, and we'll
20  have to call the other officer from North Carolina
21  to establish who the driver was.  He can say who the
22  two occupants were because he was standing by the
23  car and there was nobody else.
24       MR. SMITH:  He can say, your Honor,
25  unless -- here is what I would say.  He could say
```

**GA629**

2517

```
 1   who he observed if he gives a physical description
 2   from his memory who was there, but if he did not
 3   actually inquire of those persons as to their
 4   identities, I don't think he can testify to that.
 5   That also comes from the report.
 6             THE COURT:  Why don't we get all of what
 7   he can testify about and let's proceed, and absent
 8   any agreements, I think Mr. Smith is right, and I'll
 9   I will sustain his objection.  But you should get
10   all of the description of cars and so forth that
11   this witness can provide.  Thank you.
12             (Sidebar concluded)
13     Q.   Officer Bailer, you testified that you
14   observed two individuals in addition to Sergeant
15   Hart by the side of the road; is that correct?
16     A.   Yes.
17     Q.   All right.  Do you recall what those
18   individuals looked like?
19     A.   I just remember one having long dreadlocks.
20     Q.   You just one remember having long
21   dreadlocks?
22     A.   Yes.
23     Q.   Were those individuals subsequently
24   identified for purposes of recording that
25   information on the incident report?
```

2518

```
 1     A.   Yes.
 2     Q.   Were you present when those identifying --
 3   or when that identifying information was obtained
 4   from those individuals?
 5     A.   I was with Sergeant Hart when he obtained
 6   it.
 7             MR. SMITH:  May I voir dire, your Honor.
 8             THE COURT:  You may.
 9   VOIR DIRE EXAMINATION
10   BY MR. SMITH:
11     Q.   You were actually present as Mr. -- I'm
12   sorry, as Sergeant Hart questioned these individuals
13   as to their identities?
14     A.   When I arrived on the scene and the weapon
15   was found, at that time he would have gotten the
16   passenger information and more of the driver
17   information.
18     Q.   But you did not actually witness him doing
19   that?
20     A.   He was at his patrol car with his computer.
21     Q.   Okay, but you were not present to hear?
22     A.   No, sir.
23     Q.   That information?
24     A.   No, sir.
25             MR. SMITH:  Thank you.
```

2519

```
 1   CONTINUED DIRECT EXAMINATION
 2   BY MS. RODRIGUEZ-COSS:
 3     Q.   You did not observe them actually tell
 4   Sergeant Hart their names, their address and so
 5   forth?
 6     A.   No.
 7     Q.   All right.  Do you recall where the
 8   vehicle, the Jeep vehicle was registered?
 9     A.   It was a New Jersey vehicle registration.
10     Q.   Do you recall whether it was registered to
11   either of the individuals there at the scene?
12             MR. SMITH:  Objection, foundation of his
13   knowledge for that.
14             THE COURT:  He can answer that.  It's
15   just a yes or no answer.
16             Did you make a determination of whether
17   or not the registration was to either of the
18   individuals at the scene or not.
19     A.   I knew the vehicle was not registered to
20   either one.
21     Q.   It wasn't registered to either one?
22     A.   No.
23     Q.   Do you recall who it was registered to?
24             MR. SMITH:  Objection, foundation for
25   that.
```

2520

```
 1             THE COURT:  Well, the question is do you
 2   know who it was registered to, and then the basis
 3   for knowledge.  We'll just do it that way.
 4             Do you know who it was registered to?
 5             THE WITNESS:  Yes, I do.
 6             THE COURT:  And how do you know that?
 7             THE WITNESS:  From my computer.
 8             THE COURT:  All right, you may proceed.
 9     Q.   And where was that vehicle registered --or
10   who was it registered to?
11     A.   To a rental company.
12             MS. RODRIGUEZ-COSS:  The Court's
13   indulgence, your Honor.
14     Q.   And subsequently to finding the firearm
15   inside the vehicle, what efforts, if any, did you or
16   Sergeant Hart undertake to try and determine who
17   that weapon belonged to?
18             MR. SMITH:  Objection, form.
19             THE COURT:  Overruled.
20     A.   Sergeant Hart contacted our records
21   communication after finding -- after he ran the
22   serial number.
23             MR. SMITH:  Objection, your Honor.  He's
24   testifying to what another witness did.
25             THE COURT:  Yes, he was there.  He --
```

2521

1    you saw him do this, right?
2              THE WITNESS:  Yes, ma'am.
3              THE COURT:  Okay.
4       A.    After finding the weapon, Sergeant Hart ran
5    the serial number on his mobile data terminal, is
6    where a stolen gun query was processed, and after
7    that he contacted our records division.
8       Q.    All right.  And did you receive a response
9    while you were at the scene?
10      A.    Yes, at the scene the weapon came back as a
11   stolen firearm.
12      Q.    And then were either of the suspects -- or
13   the two individuals there, were either one of them
14   asked about the ownership of this weapon?  Let me
15   rephrase.
16             MR. SMITH:  May I voir dire?
17      Q.    Did you ask either one of the individuals
18   with regards to the ownership of the weapon?
19      A.    No, I didn't.
20      Q.    Were you present when Sergeant Hart asked
21   them, if he did?
22      A.    Yes, I was.
23      Q.    All right.  And did you hear the response?
24      A.    No, I didn't.
25      Q.    All right.

2522

1              MS. RODRIGUEZ-COSS:  The Court's
2    indulgence, your Honor.
3              We have nothing further, your Honor.
4              THE COURT:  All right,
5    cross-examination.
6              MR. SMITH:  No, thank you, your Honor.
7              THE COURT:  All right, thank you,
8    officer Bailer.  Sheriff Bailer.  You are excused.
9    You may step down.
10             All right, ladies and gentlemen, why
11   don't we take lunch for a half an hour.
12             (Jury exited the courtroom.)
13             THE COURT:  All right, counsel, will
14   there be anything else before we resume in a half an
15   hour?
16             MS. DAYTON:  No, thank you.
17             THE COURT:  Who will be the next
18   witness?
19             MS. DAYTON:  Juanita Hopkins.
20             THE COURT:  Thank you.  We stand in
21   recess.
22             (Recess).
23             THE COURT:  All right, are we ready for
24   the jury.
25             MS. DAYTON:  Should we bring in the

2523

1    witness first?
2              THE COURT:  Yes, please.
3              All right, if you'll bring in the jury,
4    please.
5              (Jury entered the courtroom.)
6              THE COURT:  Please be seated, ladies and
7    gentlemen.  I'll ask the witness to stand, please,
8    and raise your right hand, the oath will be
9    administered to you.
10        J U A N I T A   H O P K I N S,
11   Having first affirmed, was examined and testified as
12   follows:
13             THE WITNESS:  Juanita Hopkins,
14   h-o-p-k-i-n-s, I reside at York Correctional
15   Institute, Niantic, Connecticut.
16             THE COURT:  All right, would you pull
17   your chair up, and also the microphone can be
18   adjusted to come towards you.  It's wireless.
19             THE WITNESS:  Okay.
20             THE COURT:  All right, you may proceed,
21   Ms. Dayton.
22             MS. DAYTON:  Thank you, your Honor.
23   DIRECT EXAMINATION
24   BY MS. DAYTON:
25      Q.    Good afternoon, Ms. Hopkins.

2524

1       A.    Good afternoon.
2       Q.    How are you?
3       A.    I'm fine.
4       Q.    Ms. Hopkins, how old are you?
5       A.    I'm 43.
6       Q.    And you said you are currently living at
7    York in Niantic.
8       A.    Yes.
9       Q.    What kind of place is that?
10      A.    It's an institution for women.
11      Q.    Like a prison for women?
12      A.    Prison for women, yes.
13      Q.    How long have you been there?
14      A.    I first got arrested September the 28th,
15   2005, and then I was rearrested on October 26, 2007,
16   and I been residing there ever since.
17      Q.    So, since October 2007?
18      A.    Yes.
19      Q.    So, you said you were first arrested
20   September 28, 2005?
21      A.    Yes.
22      Q.    And what were you arrested for?
23      A.    Conspiracy to distribute over 50 grams of
24   crack cocaine.
25      Q.    And was that a federal arrest?

2525

```
1      A.    Yes.
2      Q.    And were you released from custody after
3  you were first arrested?  Did you get out of jail?
4      A.    Yes.
5      Q.    And where did you go from jail?
6      A.    Salvage Army.
7      Q.    What do you mean by the Salvage Army?
8      A.    It's a rehabilitation center for women and
9  men.
10     Q.    Why did you need to go to a rehabilitation
11 center?
12     A.    Because I was heavily addicted to drugs.
13     Q.    Which drugs?
14     A.    Marijuana, cocaine, crack cocaine and
15 alcohol.
16     Q.    How long were you addicted to drugs for?
17     A.    Twenty-two years.
18     Q.    I'm going to show you a picture.  Can you
19 tell me if you know who this person is.
20         MS. DAYTON:  I'm just going to turn hers
21 on.  There is a picture coming up.  Or not.  I'll
22 move on.
23     A.    Okay.
24     Q.    What are you doing in custody now?  Are you
25 taking any classes or anything like that?
```

2526

```
1      A.    Yes, I have completed a culinary arts
2  class.  I received my license.  I have done a drug
3  and alcohol counseling course.  I've done a
4  re-entry, which is a transition back to the living
5  society.  I've also done Parenting From a Distance,
6  a mother support group.  I'm involved in NA, AA.
7  I'm a part of Sisters Standing Strong, which is a
8  peer mentoring group.  I'm a part of the prison
9  choir.  And that's about it.
10     Q.    You are keeping busy.
11     A.    Yes.
12     Q.    What's that mean "parenting from a
13 distance"?
14     A.    It teach you how to become a better parent.
15 If you been gone for a certain time out of your
16 child's life or you never had custody of your child,
17 and it pretty much teaches the women from prison how
18 to build a better relationship.
19     Q.    Do you have children?
20     A.    Yes, I do.
21     Q.    How many do you have?
22     A.    Two.
23     Q.    And what are their ages?
24     A.    Twenty-eight and sixteen.
25     Q.    Where were you born?
```

2527

```
1      A.    Bridgeport.
2      Q.    Why don't you look and tell me who that is
3  in Government's Exhibit 213.
4      A.    Wow.  That's me.
5      Q.    Okay.
6      A.    Wow.  Wow.
7      Q.    Different?
8      A.    Very different.
9      Q.    Okay.  So, you said you were born in
10 Bridgeport.
11     A.    Yes.
12     Q.    And where were you raised?
13     A.    In P.T. Barnum.
14     Q.    What is P.T. Barnum?
15     A.    It's a housing project.
16     Q.    Who did you live with?
17     A.    My parents.
18     Q.    And do you have any brothers or sisters?
19     A.    Yes, I have five brothers, no sisters.
20     Q.    Were your mom and dad both equally involved
21 in your life?
22     A.    No.
23     Q.    Okay, who wasn't?
24     A.    My father.
25     Q.    What do you mean?
```

2528

```
1      A.    He was there when it was, I guess,
2  comfortable for him to be there.  In other words,
3  when money came around, he came around.  But he
4  wasn't there, really.  You can't say he was, really.
5      Q.    Did you live with your mom your whole
6  childhood, or did you ever go to live with anyone
7  else?
8      A.    I went to live with other few relatives.
9      Q.    Like who?
10     A.    My aunt and my grandmother.
11     Q.    And why was that?
12     A.    I was being physically and sexually
13 molested by brothers and cousins.
14     Q.    Did your mom work?
15     A.    Yes.
16     Q.    What did she do?
17     A.    She was a CNA.
18     Q.    What does that mean?
19     A.    Certified nursing assistance; works close
20 with the hospitals, nursing homes.
21     Q.    Did you go to high school?
22     A.    Yes.
23     Q.    Where did you go?
24     A.    Bassick High School.
25     Q.    And how far did you go in high school?
```

2529

```
 1      A.   I graduated.
 2      Q.   And how old were you when you had your
 3 children?
 4      A.   I was 15 when I had my first daughter, and
 5 I was 27 when I had my second daughter.
 6      Q.   After you graduated from high school, did
 7 you have any additional schooling or training?
 8      A.   Yes.  I went to Educational Training Inc
 9 and received my CNA license.
10      Q.   Like your mom?
11      A.   Yes.
12      Q.   And did you start working as a CNA?
13      A.   Yes.
14      Q.   How long did you do that for?
15      A.   Maybe two months.
16      Q.   What happened?
17      A.   I started using drugs and wasn't able to go
18 to work.
19      Q.   And did you lose your job?
20      A.   Yes.
21      Q.   What happened after that?
22      A.   I --
23      Q.   Did you get another job?
24      A.   No.
25      Q.   Have you ever been in the military?
```

2530

```
 1      A.   Yes.
 2      Q.   When did you join the military?
 3      A.   In 1992.
 4      Q.   What branch of the military?
 5      A.   United States Navy.
 6      Q.   How long were you in the military?
 7      A.   I did the eight weeks of basic training,
 8 and I went home for two weeks, and then I went to my
 9 duty station.  I maybe lasted three weeks.
10      Q.   What happened?
11      A.   I received a dishonorable discharge.
12      Q.   Why?
13      A.   When I got to my first duty station I
14 tested positive for crack cocaine.
15      Q.   How old were you when you started using
16 drugs?
17      A.   Sixteen.
18      Q.   What did you start with?
19      A.   Marijuana and beer.
20      Q.   Marijuana and beer?
21      A.   Yes.
22      Q.   And how were you getting the marijuana?
23 Who were you getting it from, is the better
24 question.
25      A.   Well, in the project that I grew up with,
```

2531

```
 1 you know, it was like a favor for a favor.  From a
 2 drug dealer, you know, if I -- sexual favor for you,
 3 you would give me drugs.
 4      Q.   And so drug dealers were giving you drugs?
 5      A.   Yes.
 6      Q.   And you said that you've also suffered with
 7 an addiction to cocaine.  Did you start with powder
 8 cocaine or crack cocaine?
 9      A.   Powder cocaine.
10      Q.   What's the difference between the two?
11      A.   Powder cocaine is a substance that you will
12 sniff, and crack cocaine is part of cocaine that's
13 cooked up, it come back a rock.
14      Q.   Do they make you feel differently, one from
15 another?
16      A.   Yes.
17      Q.   What are the differences?
18      A.   Cocaine, for me, was like a speed, for me,
19 and the crack cocaine kind of slowed me down, left
20 me in a position where I couldn't talk or -- you
21 know.
22      Q.   Okay.  And how old were you when you
23 started using crack?
24      A.   I want to say about 17 or 18.
25      Q.   Okay.
```

2532

```
 1      A.   Somewhere in there.
 2      Q.   So young?
 3      A.   Young, yes.
 4      Q.   You were using powder, crack and marijuana?
 5      A.   Yes.
 6      Q.   And drinking?
 7      A.   Yes.
 8      Q.   Did you ever try to go to a program prior
 9 to your arrest?
10      A.   Yes.
11      Q.   Like on your own?
12      A.   Yes.
13      Q.   Did you successfully complete it?
14      A.   No.
15      Q.   I want to draw your attention to the
16 beginning of 2005.  Are you familiar with the
17 Charles Street building in Bridgeport?
18      A.   Yes.
19      Q.   How are you familiar with that?
20      A.   I helped my daughter move in the beginning
21 of the year.  She rented an apartment out of that
22 building.
23      Q.   On what floor?
24      A.   The second floor.
25      Q.   Do you remember the apartment number?
```

2533

1   A.   I always get the two apartments mixed up.
2   It's either 206 or 211.
3   Q.   And you said the two apartments.  What's
4   the other one?
5   A.   The other apartment was Pops' apartment
6   where we used crack and sold crack out of that
7   apartment.
8   Q.   Where was your daughter's apartment on the
9   second floor located?  Do you remember?  Like was it
10  at the front of the building, the back of the
11  building?
12  A.   The back.  Near the back.
13  Q.   And where was Pops' apartment that you --
14  A.   The front part.
15  Q.   Was it the very front, the middle?  Do you
16  remember?
17  A.   I would say the middle.
18  Q.   I'm going to show you a picture.  It's
19  Government's Exhibit 102.  Do you recognize what
20  this is a photograph of?
21  A.   Yes.
22  Q.   What is it?
23  A.   That's the Charles Street apartments.
24       MS. DAYTON:  This is Government's
25  Exhibit 102 for the record, your Honor.

2534

1   Q.   After you helped your daughter move into
2   Charles Street, did you ever go back over there?
3   A.   Well, I never really left.
4   Q.   What do you mean by that?
5   A.   I moved her in and ran into somebody that I
6   knew from over there.
7   Q.   Who was that?
8   A.   Venro Fleming.
9   Q.   And how do you know Venro Fleming?
10  A.   My mother's baby sister had a baby by his
11  nephew.
12  Q.   Your mother's baby sister had a baby by his
13  nephew?
14  A.   Right.
15  Q.   So have you known him for a long period of
16  time?
17  A.   Yes.
18  Q.   I'm going to show us what's in evidence as
19  Government's Exhibit 223.  Do you recognize that
20  person?
21  A.   Yes.
22  Q.   Who is that?
23  A.   Venro Fleming.
24  Q.   And where did you run into Venro?
25  A.   At Pops' apartment.

2535

1   Q.   Were Pops' apartment and your daughter's
2   apartment close to one another?
3   A.   I want to say Pops was maybe up toward the
4   middle this way and my daughter's was down -- maybe
5   three or four doors down.
6   Q.   Okay.
7   A.   On the hall.
8   Q.   On the same hallway?
9   A.   On the same hallway, yes.
10  Q.   So, when you ran into Venro Fleming, did
11  you talk to him?
12  A.   Yes.
13  Q.   What did you guys talk about?
14  A.   He asked me what was I doing over there,
15  and I told him my daughter had just moved in.  And
16  then I asked him the same question.
17  Q.   What did he tell you?
18  A.   He told me he was living down in 206
19  selling drugs.
20  Q.   Okay.  And did he say what kind of drugs he
21  was selling?
22  A.   Yes.
23  Q.   What did he tell you?
24  A.   Crack cocaine.
25  Q.   Did you ever go to the place where he was

2536

1   selling drugs?
2   A.   Yes.
3   Q.   And when did you go there?
4   A.   The very same day.
5   Q.   And when you went in, what did you see?
6   A.   Venro and quite a few other people that
7   were in there.
8   Q.   What were they doing?
9   A.   Some were smoking.  Some people were
10  smoking and some people were just sitting there.
11  Q.   Smoking what?
12  A.   Crack cocaine.
13  Q.   I'm showing you what's in evidence as
14  Government's Exhibit 229.  Do you know who that is?
15  A.   Yes.
16  Q.   Who is that?
17  A.   Pop.
18  Q.   Do you know -- you said it was Pops'
19  apartment.  What did you mean by that?
20  A.   Pop was the one that rented that apartment.
21  Q.   And Venro was selling from inside there?
22  A.   Yes.
23  Q.   Do you know, did you ever have a discussion
24  with Pops about why he let Venro sell inside there?
25  A.   No.

**GA634**

2537

```
1       Q.   Did you get crack cocaine yourself on that
2   particular day?
3       A.   Yes.
4       Q.   And what did you do with it?
5       A.   I smoked it.
6       Q.   And after that, did you continue to spend
7   time in that apartment?
8       A.   Yes.
9       Q.   And how often would you go there in the
10  beginning?
11      A.   Every day.
12      Q.   And would you spend -- just walk in and say
13  hi, or would you spend time there?
14      A.   I would spend time.
15      Q.   And what would you do?
16      A.   Purchase crack cocaine and smoke crack
17  cocaine.
18      Q.   Were there particular hours that you could
19  go in there to purchase crack cocaine.
20      A.   No, it just was all day, any time of the
21  day or any time of the night.  It was all day, no
22  set time.
23      Q.   And when you were buying the crack cocaine
24  from -- were you buying it from Venro?
25      A.   Yes.
```

2538

```
1       Q.   Do you remember how it was packaged?
2       A.   Yes, it was packaged in a small sealed
3   baggy.
4       Q.   Indicating about an inch or a half an inch?
5       A.   About an inch.
6            MS. DAYTON:  For the record, indicating
7   about the size of an inch with her fingers, your
8   Honor.
9       Q.   And how much did that cost?
10      A.   $10.
11      Q.   Do you know, in terms of quantity, how much
12  crack cocaine was in there?
13      A.   No, I don't.
14      Q.   Were there people that you regularly saw in
15  the apartment when you first started hanging out
16  there?
17      A.   Yes.
18      Q.   Like who?
19      A.   Venro, Constance, Woby, Womble, Hodges,
20  Pop, Jackie, and Darlene, Mary.
21      Q.   Lots of people would hang out there?
22      A.   Yes.
23      Q.   I'm going to show you some photos, maybe
24  you can just tell me if you recognize any of these
25  people.  I'm going to show you what's in evidence as
```

2539

```
1   Government's Exhibit 214.  Do you know who that is?
2       A.   Yes.
3       Q.   Who is that?
4       A.   Jackie.
5       Q.   And what was Jackie doing in the apartment
6   when you were there?
7       A.   Purchasing and smoking crack cocaine.
8       Q.   Did she spend a lot of time there?
9       A.   Yes.
10      Q.   I'm going to show you Government's
11  Exhibit 210.  Who is that person?
12      A.   Wom -- wom -- Womble.  Big Man.  That's Big
13  Man there.
14      Q.   Do you know his first name?
15      A.   Rodney.
16      Q.   Rodney.  And you also called him Womble and
17  Big Man?
18      A.   Yes.
19      Q.   And do you know who this person is?
20      A.   Yes.
21      Q.   Who is that?
22      A.   Hodges.
23      Q.   And what was Hodges --
24           THE COURT:  That number is?
25           MS. DAYTON:  I'm sorry, your Honor,
```

2540

```
1   Government's Exhibit 212.
2       Q.   And what was Hodges doing in there when you
3   first started hanging out there?
4       A.   He was pretty much answering the door when
5   anybody knocked.
6       Q.   And why would he answer the door when
7   someone knocked?
8       A.   He was doing that for Venro.
9       Q.   And what type of -- or who was he letting
10  in?
11      A.   All types of people.
12      Q.   For what purpose?
13      A.   To purchase crack cocaine.
14      Q.   Showing you what's in evidence as
15  Government's Exhibit 220.  Do you know who that is?
16      A.   Yes.
17      Q.   Who is that?
18      A.   That's Woby.
19      Q.   Woby?
20      A.   Woby.
21      Q.   And what was Woby doing in the apartment;
22  if you know?
23      A.   Woby was one of the ones I first met, too,
24  when I -- introduced to, but I had to purchase crack
25  cocaine from him.  When I first moved my daughter
```

2541

```
 1   into that apartment, he was one of the ones that was
 2   also working out of there at that time.
 3       Q.   I'm going to show you one more photo.  It's
 4   Government's Exhibit 221.  Do you know who this
 5   individual is?
 6       A.   Yes.
 7       Q.   Who is that?
 8       A.   Squeaker or Squealy.  Squeaker.
 9       Q.   Okay.  That's how you know him?
10       A.   Yes.
11       Q.   And what would -- would he be in that
12   apartment or did you know him from the street?  How
13   did you know him?
14       A.   The apartment.  From the apartment.
15       Q.   And what was he doing in there?
16       A.   He also sold drugs out of the apartment.
17       Q.   When you first started spending time there?
18       A.   Not at the very beginning I didn't see him.
19       Q.   Do you recognize anyone in this courtroom
20   that you have seen in Pops' apartment in Charles
21   Street?
22       A.   Yes.
23       Q.   Okay, who do you recognize?
24       A.   Dreddy.
25       Q.   Can you please tell me what Dreddy is
```

2542

```
 1   wearing today.
 2       A.   A white shirt, a polka dot tie, black pants
 3   and black shoes.
 4            MS. DAYTON:  Identifying the defendant
 5   for the record, your Honor.
 6            THE COURT:  Yes.
 7       Q.   Do you know -- is Dreddy what you would
 8   call him?
 9       A.   Yes.
10       Q.   Do you know what his real name is?
11       A.   I didn't at first until I -- I believe I
12   heard it when I got my PSI, or something like that.
13   But I never knew.
14       Q.   What's your PSI?
15       A.   My presentencing.
16       Q.   So you learned it from a court document?
17       A.   Right.
18       Q.   You didn't know it?
19       A.   No.
20       Q.   Previous to that?
21       A.   No, no.
22       Q.   And do you recall when it was,
23   approximately, that you first met the defendant?
24       A.   Yes.
25       Q.   Approximately when was that?
```

2543

```
 1       A.   I want to say early morning back in
 2   February.
 3       Q.   Of 2005?
 4       A.   Yes.
 5       Q.   And where was it that you met the
 6   defendant?
 7       A.   In Pops' apartment.
 8       Q.   Do you remember if it was day or night?
 9       A.   It was the early morning.
10       Q.   And when you say "early morning," do you
11   mean like four in the morning or like seven in the
12   morning?
13       A.   I want to say about 6:00 or 6:30.
14       Q.   Was the defendant coming into the apartment
15   to buy drugs; if you know?
16       A.   Not at that time.
17            MR. SMITH:  Objection, leading.
18       A.   Not that morning.
19            THE COURT:  I think it's been asked and
20   answered.
21            MS. DAYTON:  Shall I just move on?
22       Q.   When the defendant first came into the
23   apartment, were you there alone or was someone else?
24       A.   I was there and Pop was in the bedroom.
25       Q.   Was anyone else present; if you know?
```

2544

```
 1       A.   No.
 2       Q.   Did you speak to the defendant?
 3       A.   Yes.
 4       Q.   And what did -- did the defendant say
 5   anything to you?
 6       A.   Yes.
 7       Q.   What did he say to you?
 8       A.   He asked me what was I doing.  I was like
 9   "smoking."  And then he asked me did I want to trade
10   a sexual favor for some crack.
11       Q.   And did you agree to do that?
12       A.   Yes.
13       Q.   And what did the defendant give you?
14       A.   Some crack cocaine.
15       Q.   And did you engage in sex with the
16   defendant?
17       A.   Yes.
18       Q.   In the apartment?
19       A.   No.
20       Q.   Where?
21       A.   At the end of the hallway on the second
22   floor, the steps.  Go out the back way, down the
23   steps.
24       Q.   After that incident, did you continue to
25   spend time in Pops' apartment?
```

2545

```
1       A.   Yes.
2       Q.   At any point did you get involved in
3   selling drugs from there?
4       A.   Yes.
5       Q.   And how did that come to be?
6       A.   After Venro no longer sold the drugs,
7   Hodges begin selling the drugs, and for a while he
8   was the only one that was doing the selling, so I
9   was pretty much helping him out answering the door,
10  and then one night he went to sleep and he left me
11  with a pack to sell and I sold it and he told Big
12  Man about it, and later Big Man offered me a
13  position.
14      Q.   Okay.  I'm just going to go back for a
15  minute.  You said there came a time when Venro
16  stopped selling from the apartment.
17      A.   Yes.
18      Q.   Do you know why he stopped selling from the
19  apartment?
20      A.   To my understanding he messed up some
21  money.
22      Q.   What's that mean, to mess up some money?
23      A.   The money is short.
24      Q.   Okay.  And what happened; if you know?
25      A.   From what I heard --
```

2546

```
1       Q.   Who did you hear it from, first of all?
2       A.   Hodges.
3       Q.   What did Hodges tell you?
4       A.   That he had been beaten up.
5       Q.   And did Hodges tell you who beat Venro up?
6       A.   No.
7       Q.   And so did you see Venro after that
8   anymore?
9       A.   No.
10      Q.   And you said that Hodges started selling
11  crack?
12      A.   Yes, yes.
13      Q.   You said one night he fell asleep, he gave
14  you a pack.
15      A.   Right.
16      Q.   What's a pack?
17      A.   A pack is like an -- I want to say a baggy
18  about this size, filled with maybe --
19      Q.   You are indicating about five or six
20  inches.
21           MS. DAYTON:  With her fingers, your
22  Honor, for the record.
23      Q.   Okay?
24      A.   Yes, filled with maybe about 36 or 46
25  individualized packs, bags of crack cocaine.
```

2547

```
1       Q.   Did it vary between 36 and 46?
2       A.   Yes.
3       Q.   And each of the little -- you know, the 36
4   or 46 bags inside, what did those look like?
5       A.   I don't quite understand.
6       Q.   I'm sorry, you said each larger bag had
7   smaller bags in it?
8       A.   Yes.
9       Q.   And what did those smaller bags look like?
10      A.   About an inch.
11      Q.   The same plastic bags you talked about
12  before?
13      A.   In the beginning, yes.
14      Q.   And how much were each of those worth when
15  you started selling?
16      A.   $10 apiece.
17      Q.   Okay.  Now, you said that Big Man found out
18  that you sold the pack.
19      A.   Right.
20      Q.   And what happened?  And Big Man is the
21  person you identified in Government's Exhibit 210?
22      A.   Yes.
23      Q.   Okay.  And after he found out, you had a
24  conversation with him about what?
25      A.   Selling for him.
```

2548

```
1       Q.   What did he say to you?
2       A.   He asked me did I want to become part of
3   the team, and I was like "yes."
4       Q.   And can you describe how the team worked?
5   How did you get the drugs every day?
6       A.   Either Big Man would bring them over if he
7   wasn't at work or we would call and go to his house
8   and his girlfriend Sherrell would hand them to us.
9       Q.   And do you remember where Sherrell lived?
10      A.   She lived with Big Man.  I'm not -- I don't
11  remember the street.
12      Q.   Was it far from Charles Street or close to
13  Charles Street?
14      A.   Close to Charles Street.
15      Q.   Did you have to drive or could you walk
16  there?
17      A.   Walk.
18      Q.   Do you remember if there was any landmarks
19  near Womble's house?
20      A.   I want to say a school or a playground.  I
21  remember walking past -- I believe it was
22  Walgreen's.  I want to say it was Walgreen's.
23      Q.   There was a Walgreen's near there?  I'm
24  going to show you what's in evidence as Government's
25  Exhibit 211.  Do you know who that is?
```

2549

```
1      A.   Yes.
2      Q.   Who is that?
3      A.   Sherrell.
4      Q.   When you would obtain a pack, did you get
5  one, did you get multiple packs at a time?  How did
6  it work?
7      A.   Sometimes we would get one or we would get
8  multiple packs.
9      Q.   When you say "we," who do you mean?
10     A.   Me and Hodges.
11     Q.   Were you selling at the same exact time?
12     A.   No.
13     Q.   How did it work?
14     A.   Frankie would work a certain time of the
15 day and then I would work once he was finished.
16     Q.   Why?
17     A.   We just couldn't sell at the same time.
18     Q.   Who said?
19     A.   Big Man.
20     Q.   And why is that?
21     A.   I really don't know why.
22     Q.   Okay.  On an average day, while you were
23 selling drugs there, how many packs do you think you
24 would sell?
25     A.   I want to say about six or maybe seven.
```

2550

```
1      Q.   And on a slow day?
2      A.   Three.
3      Q.   So, three packs of 36 to 46 packs?
4      A.   Yes.
5      Q.   Do you know the total quantity in a pack,
6  like how much the weight was?
7      A.   No.
8      Q.   Once you sold the pack, did you earn a
9  profit from that?
10     A.   Yes.
11     Q.   And how much profit did you earn per pack?
12     A.   I believe it was either fifty or sixty
13 dollars off of each pack.
14     Q.   And how did you get your money?
15     A.   Either I took five individually wrapped
16 packets, or six, or I sold them and I kept the
17 money.
18     Q.   So, when you say you took five or six
19 wrapped packs, you mean of the crack?
20     A.   Yes.
21     Q.   The little bags?
22     A.   Yes.
23     Q.   So you were paid in drugs?
24     A.   Right.
25     Q.   And once you sold all of the drugs --
```

2551

```
1      A.   Right.
2      Q.   -- what did you do with the money?
3      A.   We would have to call Big Man.  He would
4  come and pick it up or, like I said, if he was at
5  work, we would drop it off to Sherrell.
6      Q.   Did you ever give money to anyone other
7  than Big Man?
8      A.   Yes.
9      Q.   Who?
10     A.   Woby.
11     Q.   Okay.  And that's the individual that you
12 identified before on Government's 220?
13     A.   Yes.
14     Q.   And anyone else besides Woby; if you
15 remember?
16     A.   No, I can't recall.
17     Q.   And did you ever make a larger profit than
18 fifty or sixty dollars?
19     A.   No.
20     Q.   Did you ever get bonuses for working?
21     A.   Yes.
22     Q.   And what sort of bonuses were those?
23     A.   You got a pack with maybe $200 worth, you
24 could either sell it or smoke it.
25     Q.   And who would give you those?
```

2552

```
1      A.   Dreddy.
2      Q.   And how often would Dreddy give you a
3  bonus?
4      A.   Not too often.
5      Q.   But did he hand it to you directly or
6  through Big Man?
7      A.   From him directly.
8      Q.   Was there ever a time where you would call
9  Womble and he would tell you that there was drugs
10 somewhere other than at his house?
11     A.   No.
12     Q.   Did they ever leave stashes in the
13 apartment?
14     A.   Yes.
15     Q.   Where?
16     A.   Some -- we had a ceramic pig, and they had
17 an army jacket that zipped around the collar, they
18 would stash them in there.
19     Q.   You said a ceramic pig?
20     A.   Rabbit.
21     Q.   Ceramic rabbit.  What did the rabbit look
22 like?  A rabbit?
23     A.   A ceramic rabbit.
24     Q.   How did you get drugs into the rabbit, I
25 guess is the better question.
```

2553

```
 1      A.   There was a hole under the bottom and you
 2   would just stick them up under there.
 3      Q.   I'm going to show you Government's
 4   Exhibit -- no, that's not it.  Sorry.  Just go back
 5   where I was.
 6           Okay, now, in terms of -- you mentioned
 7   earlier that you saw Dreddy at the Charles Street
 8   apartments.  Did you just see him that first time or
 9   did you see him on other occasions.
10      A.   I seen him on other occasions.
11      Q.   And how often?
12      A.   He would come through sometime like the wee
13   hours of the morning to just check and make sure,
14   you know, nothing was going on that shouldn't be
15   going on in the apartment.
16      Q.   What shouldn't be going on in the
17   apartment?
18      A.   You shouldn't be selling nobody else's
19   drugs or nobody else should be in there selling
20   their drugs if it wasn't his drugs.
21      Q.   If it wasn't whose drugs?
22      A.   Dreddy's.
23      Q.   And who told you those were the rules?
24      A.   Big Man.
25      Q.   Did the police ever show up at apartment
```

2554

```
 1   211?
 2      A.   Yes.
 3      Q.   How often?
 4      A.   Well, I was there on one occasion.
 5      Q.   When was that; if you remember?
 6      A.   I want to say maybe August of 2005.
 7      Q.   Okay.
 8      A.   July or August of 2005.
 9      Q.   Do you recall specifically when it was?
10      A.   Either July or August.  I'm not real sure.
11      Q.   Who were you arrested with?
12      A.   Hodges, Pop, Squeaker.  And I believe
13   that's all.  That was it.
14      Q.   And when you got arrested, what were you
15   doing in the apartment at the time?
16      A.   Nothing.
17      Q.   You were just sitting?
18      A.   Yes.
19      Q.   Was anyone else doing anything in the
20   apartment that was illegal?
21      A.   Yes.
22      Q.   Who?
23      A.   Squeaker.
24      Q.   What was he doing?
25      A.   He was selling drugs.
```

2555

```
 1      Q.   And did the police find any drugs; if you
 2   know?
 3      A.   I really don't know.  I don't know.  I'm
 4   not for sure.  I believe that's the day they found
 5   it in the ceramic rabbit.
 6      Q.   Okay.  You went to jail that day?
 7      A.   Yes.
 8      Q.   How did you get out of jail?
 9      A.   I got out on a PTA.
10      Q.   What's a PTA?
11      A.   A promise to appear.
12      Q.   How did you get home from the jail?
13      A.   Big Man.
14      Q.   He picked you up?
15      A.   Yes.
16      Q.   What kind of car did he drive; if you
17   remember?
18      A.   I want to say a burgundy Seville Cadillac,
19   or something to that extent.
20      Q.   An old one or a new one?
21      A.   An old one.
22      Q.   Okay.  So when Big Man picked you up, where
23   did he take you?
24      A.   To the barbershop.
25      Q.   Why the barbershop?
```

2556

```
 1      A.   Dreddy wanted to talk to me.
 2      Q.   About what?
 3      A.   What went on that night in the apartment,
 4   the night the police came and who said what.
 5      Q.   And did you talk to Dreddy?
 6      A.   Yes.
 7      Q.   What did you tell him?
 8      A.   I tell him -- I told him the things that
 9   Squeaker was saying.  Because he was the only one
10   talking.
11      Q.   And was Squeaker telling on Dreddy?
12      A.   No, he was just asking questions like why
13   do they keep harassing him.
14      Q.   Harassing him?
15      A.   Uh-huh (indicating affirmatively).  And
16   Pops.  And like that, yes.
17      Q.   And what happened after you told the
18   defendant what Squeaker was saying?  Did the
19   defendant say anything else to you?
20      A.   No.
21      Q.   Did he tell you not to go back to work?
22           MR. SMITH:  Objection, leading.
23           THE COURT:  Sustained.
24      Q.   Did you go back to work?
25      A.   Yes.
```

2557

1    Q.   And where did you go back to work?
2    A.   At Charles Street.
3    Q.   And what did you do when you got there?
4    A.   First of all, we had to clean up the mess
5  that the police left.
6    Q.   Who is "we"?
7    A.   Me, Doris, and Jackie.
8    Q.   You cleaned it up?
9    A.   Yes.
10   Q.   And then what did you do?
11   A.   Begin to start back selling.
12   Q.   Was anyone else selling at that time?
13   A.   No, just me, because everybody else was
14  still locked up.
15   Q.   Do you know if they got out of custody?
16   A.   Yes.
17   Q.   Do you know how?
18   A.   Well, from what Big Man told me, I had to
19  work hard so there would be enough money to get Pop
20  and Frankie out.
21   Q.   And did you do that?
22   A.   Yes.
23   Q.   When you say "work hard," what did that
24  entail?
25   A.   I had to really sell packages all day, all

2558

1  night.
2    Q.   Do you remember the apartment getting
3  raided any other time?
4    A.   Yes.
5    Q.   And when was that?
6    A.   June 2nd, of my birthday.
7    Q.   Of 2005?
8    A.   Yes.
9    Q.   Were you there when it got raided?
10   A.   No.
11   Q.   Let me ask you a question.  The raid where
12  you got arrested, was that before your birthday?
13   A.   Yes.  Before my birthday, yes.
14   Q.   So, it was before June 2005 with the
15  ceramic rabbit?
16   A.   Right.
17   Q.   And when you got -- sorry, the raid on June
18  2, 2005, you remember it because it was your
19  birthday?
20   A.   Yes.
21   Q.   And how do you know the apartment got
22  raided if you weren't there?
23   A.   I was at my daughter's house taking a
24  shower, getting ready to go back down to Pops'
25  house, but as I put my hand on the doorknob to open

2559

1  my daughter's door I heard when the ram hit the door
2  and I heard them screaming "everybody get on the
3  ground."  So I froze.
4    Q.   Okay.
5    A.   I didn't go out.
6    Q.   Did you recognize it as the police?
7    A.   Yes.
8    Q.   So you stayed in your daughter's apartment?
9    A.   Yes.
10   Q.   Do you know if anyone got arrested on that
11  day?
12   A.   Yes.
13   Q.   Who?
14   A.   Frankie, Shirley -- it's a lot of people.
15  I only remember two, Frankie, Shirley.  But I
16  remember seeing about 10 or 11 people coming out
17  that day.
18   Q.   Due to the ongoing raids, did the team, as
19  you refer to it, do anything to watch out for law
20  enforcement?
21   A.   Yes.
22   Q.   And what was that?
23   A.   They paid Judith to use her apartment.
24   Q.   Who is "they"?
25   A.   Judith Rivera was someone who lived also in

2560

1  the Charles Street apartments.
2    Q.   Do you know where she lived?
3    A.   She lived in the front, the very front.
4    Q.   The front of what floor?
5    A.   Second floor.
6    Q.   The same floor as Pops' apartment?
7    A.   Yes.
8    Q.   And who was it that paid her; if you know?
9    A.   Dreddy.
10   Q.   And why did they choose her apartment; if
11  you know?
12   A.   Because you could see the road, you could
13  see the street, so you can see the police when they
14  were coming.
15   Q.   Do you know if Judith lived there alone or
16  with someone else?
17   A.   She lived there with someone else.
18   Q.   And who was that?
19   A.   Rafael.
20   Q.   I'm going to show you what's in evidence --
21  what was Rafael's relationship to Judy; if you know?
22   A.   Her boyfriend.
23   Q.   Do you recognize what's in Government's
24  Exhibit 217?
25   A.   Yes.

2561

```
1     Q.   And what is that?
2     A.   That's Judy.
3     Q.   Who is that?  Excuse me?
4     A.   That's Judith.
5     Q.   And I'm going to show you Government's
6  Exhibit 218.  Do you recognize who that is?
7     A.   Yes.
8     Q.   Who is that?
9     A.   Rafael.
10    Q.   Have you ever been into that apartment?
11    A.   Yes.
12    Q.   On one occasion or several occasions?
13    A.   Several occasion.
14    Q.   I'm going to show you what's in evidence as
15 Government's Exhibit -- actually, I'm going to move
16 on.  So you said that you could see out of the
17 window from Judith's apartment?
18    A.   Right.
19    Q.   So, how did that benefit anyone in Pops'
20 apartment?
21    A.   Well, they would -- they had -- what they
22 had, chirp telephones, where you would chirp if
23 something was going on.  You would be able to phone
24 ahead, I want to say, before it happened.
25    Q.   Phone ahead to where?
```

2562

```
1     A.   Pops' apartment.
2     Q.   When you say "chirp," what do you mean?
3  Like, do you have to dial to chirp?
4     A.   No, just -- I never knew how to work it,
5  but I know you press, I believe, to speak and then
6  let go to hear.
7     Q.   So, similar to a walkie-talkie?
8     A.   Yeah, something like that.  Yeah.
9     Q.   And were there -- did the people from Pops'
10 apartment sit in that lookout apartment or were
11 there other people?
12    A.   There were other people.
13    Q.   Do you know any of those individuals'
14 names?
15    A.   I don't remember none of their names.
16    Q.   Do you know if any of those people had a
17 relationship to the defendant?
18    A.   I don't know of that either.
19    Q.   I'm going to show you what's in evidence as
20 Government's Exhibit 215.  Have you ever seen this
21 person before?
22    A.   Yes.
23    Q.   Do you know what his name is?
24    A.   No.
25    Q.   And where have you seen him?
```

2563

```
1     A.   He was one of the lookouts in Judith's
2  apartment.
3     Q.   And do you know the time period when he was
4  a lookout?
5     A.   No.
6     Q.   I'm going to show you Government's
7  Exhibit 216.  Do you recognize that person?
8     A.   Yes.
9     Q.   How do you recognize him?
10    A.   He also was one of the lookouts in Judith's
11 apartment.
12    Q.   Do you know his name?
13    A.   No.
14    Q.   Do you know nicknames or anything?
15    A.   No, I can't remember.
16    Q.   Did you know them at one time?
17    A.   No.
18    Q.   Okay.  Now, you mentioned that you were
19 selling crack cocaine, but that you were addicted to
20 crack cocaine.
21    A.   Yes.
22    Q.   Was there ever a time where you smoked some
23 of the product you were supposed to sell?
24    A.   Yes.
25    Q.   What how did that happen?  What happened?
```

2564

```
1     A.   What do you mean what happened?
2     Q.   Like what would make you smoke something
3  you are supposed to sell?
4     A.   I was just addicted.  The more I smoked,
5  the more I wanted.
6     Q.   So, if you were supposed to be selling a
7  certain number of baggies, what would you do if you
8  had smoked some of it?
9     A.   Well, I would try to go, you know, maybe
10 prostitute, or do whatever I needed to do to try to
11 get the money back.
12    Q.   And was that allowed?
13    A.   No.
14    Q.   Was there ever a time that this caused a
15 problem for you?
16    A.   Yes.
17    Q.   What happened?
18    A.   I got in trouble.
19    Q.   With who?
20    A.   Dreddy.
21    Q.   Okay, what happened?  Are you okay?  Do you
22 need a minute?
23         MS. DAYTON:  Your Honor, may we take a
24 brief recess?
25         THE COURT:  We can.  There is also water
```

2565

```
1   on your table.  We'll take a five-minute recess.
2            MS. DAYTON:  Thank you, your Honor.
3            (Jury exited the courtroom.)
4            THE COURT:  All right, we'll stand in
5   recess.
6            Please don't discuss your testimony.
7            MS. DAYTON:  Is it okay if her lawyer
8   speaks with her?  I won't speak with her lawyer.
9            (Recess).
10           THE COURT:  All right, Ms. Hopkins, are
11  you okay?
12           THE WITNESS:  Yes.  Thank you.
13           THE COURT:  Please bring in the jury.
14           (Jury entered the courtroom.)
15           THE COURT:  Please be seated, ladies and
16  gentlemen.  You may continue.
17           MS. DAYTON:  Thank you, your Honor.
18     Q.   Ms. Hopkins, when we just broke we were
19  talking about how you got in trouble with the
20  defendant.  Why don't you tell us first what you got
21  in trouble for.
22     A.   Well, this particular time I got in trouble
23  for allowing my brother to come in to Charles
24  Street, Pops' house.
25     Q.   What's your brother's name?
```

2566

```
1      A.   John Sullivan.
2      Q.   Did he have a nickname?
3      A.   John-John.
4      Q.   I'm showing you what's in evidence as
5   Government's Exhibit 224.  Do you recognize that
6   person?
7      A.   Yes.
8      Q.   Who is that?
9      A.   John-John.
10     Q.   Okay.  You said you let him into the
11  apartment.  What was the problem with that?
12     A.   He shouldn't have been there because we
13  were helping him sell his drugs out of that
14  apartment.
15     Q.   Who is "we"?
16     A.   Frankie and I.
17     Q.   And you were helping who sell their drugs?
18     A.   John-John.
19     Q.   And what happened?
20     A.   Big Man came in that night and he noticed
21  John-John there, and Big Man stayed about five
22  minutes, and Big Man got up to leave out and I went
23  behind Big Man to ask him a question about would I
24  be working tonight once Frankie was finished, but he
25  never answered, he kept walking.  So, I went back
```

2567

```
1   into the apartment and a few minutes later Dreddy
2   came to the apartment.
3      Q.   And what happened when Dreddy came to the
4   apartment?
5      A.   He told everybody to leave except for me
6   and John-John.
7      Q.   And what happened next?
8      A.   He went in a gym bag and pulled out a
9   pistol.
10     Q.   Who did?
11     A.   Dreddy.
12     Q.   And what happened?
13     A.   He hit me with it and then he would hit my
14  brother, then he would hit me again and then he
15  would hit my brother.
16     Q.   With the gun?
17     A.   Yes.
18     Q.   And where was he hitting you?
19     A.   He hit me in my nose and he hit me in my
20  eye.
21     Q.   And were you injured by it?
22     A.   Yes.
23     Q.   And did you see where he hit your brother?
24     A.   Yes.
25     Q.   Where did he hit your brother?
```

2568

```
1      A.   In the head.
2      Q.   Once, more than once?
3      A.   More than once.
4      Q.   And did you see if your brother was
5   injured?
6      A.   Yes.
7      Q.   And how did you know he was injured?
8      A.   Because he was bleeding.
9      Q.   Where was he bleeding from?
10     A.   The head.
11     Q.   And what happened -- well, was the
12  defendant saying anything while he was beating up on
13  you and your brother?
14           MR. SMITH:  Objection to the form.
15           THE COURT:  Overruled.
16     A.   Yes.
17     Q.   What was the defendant saying?
18     A.   "Didn't I tell you about bringing people in
19  my house to sell drugs."
20     Q.   How long did this go on for, the defendant
21  hitting you and your brother?
22     A.   For about five minutes.
23     Q.   And what happened when he was done?
24     A.   He left.
25     Q.   And what did you do at that point?
```

**GA642**

2569

```
1     A.   I went to make sure my brother was okay.
2     Q.   Was he okay?
3     A.   No.
4     Q.   And what happened?
5     A.   John-John went to St. Vincent's.
6     Q.   Hospital?
7     A.   Yes.  And he told me to just stay there,
8  because he was afraid if we both left maybe
9  something would happen to both of us once leaving
10 the apartment.
11    Q.   So did you ever go to the hospital?
12    A.   No.
13    Q.   And why not?
14    A.   My brother told me not to go.
15    Q.   Did you ever see the defendant beat anyone
16 else up?
17    A.   Yes.
18    Q.   Who?
19    A.   Hodges.
20    Q.   Do you know why?
21    A.   Yes.
22    Q.   What happened?
23    A.   He messed up a whole entire pack.
24    Q.   Who is he?
25    A.   Hodges.
```

2570

```
1     Q.   How did he mess up a whole entire pack?
2     A.   He smoked more than he was supposed to
3  smoke.
4     Q.   Okay, and what happened?  Were you there
5  when this occurred?
6     A.   Yes.
7     Q.   Okay, and what happened?
8     A.   Hodges made a phone call to somebody who we
9  would normally call if we needed to make up money we
10 messed up of Dreddy's.
11    Q.   Can you explain what you mean by that?  Who
12 would you call?
13    A.   Another drug dealer.
14    Q.   And how would that help you?
15    A.   It would help us to cook it up, bag it up
16 into the same type of baggies that Dreddy used and
17 sell it as if it was the same drugs that we got from
18 Big Man.
19    Q.   So you would try to replace it?
20    A.   When Frankie messed up, yes.
21    Q.   And so you said that Frankie called this
22 person on that day.
23    A.   Yes.
24    Q.   Do you remember that guy's name?
25    A.   T.
```

2571

```
1     Q.   T was his nickname or street name?
2     A.   Street name, yes.
3     Q.   Did Frankie get drugs from T?
4     A.   Yes.
5     Q.   Powder or crack?
6     A.   Powder.
7     Q.   And what happened with the powder?
8     A.   He cooked it up.
9     Q.   Who is he?
10    A.   Frankie.
11    Q.   And what happened next?
12    A.   Big Man came, and it was a lot of people in
13 the house, but nobody was smoking, and he was
14 wondering why all the people were there.  So, he was
15 asking the people why, and they were like they were
16 waiting on Frankie to give them their drugs, and Big
17 Man asked Frankie why these people waiting, you
18 should have drugs, and he didn't have an answer.
19    Q.   And what happened next?
20    A.   Big Man called Dreddy.
21    Q.   And then what happened?
22    A.   Dreddy came to the apartment and put
23 everybody out the apartment except for me, Frankie,
24 T, Pop and Constance.
25    Q.   Who is T?
```

2572

```
1     A.   T was another guy that lived on the third
2  floor who would come down sometimes and sit down
3  Pops' house to get high.
4     Q.   Is this a different T than the drug dealer?
5     A.   Yes, this is a different T.
6     Q.   Okay.  And once the defendant put everyone
7  out of the Pops' apartment, what happened?  What did
8  you see the defendant do?
9     A.   He began to beat on Frankie and stomp him.
10    Q.   And did Frankie fight back?
11    A.   No.
12    Q.   Did you see if Frankie got injured?
13    A.   Yes.
14    Q.   What were his injuries?
15    A.   Both of his eyes were closed almost, his
16 ribs were messed -- bruised.  His eye was like -- a
17 broken vessel in his eye.
18    Q.   Okay.
19    A.   And his nose was bleeding, his mouth was
20 bleeding.
21    Q.   Do you know if Frankie went to the
22 hospital?
23    A.   He didn't.
24    Q.   He didn't go that day?
25    A.   No.
```

2573

1    Q.   Do you know if he ever went?

2    A.   He went the day he was scheduled to go to

3    court.  You know, he went to the hospital instead of

4    going to court.

5    Q.   Do you know how long after the beating that

6    was?

7    A.   About a week.

8    Q.   Okay.  I'm going to show you a photo, it's

9    Government's Exhibit 252, and just ask you if you

10   know this person.

11   A.   Yes.

12   Q.   Who is that?

13   A.   Tina.

14        MR. SMITH:  Your Honor, I may have been

15   somewhat lax on this.  The limited instruction we

16   had discussed previously in regards to other acts,

17   if the Court could instruct the jury in regards to

18   testimony that just came in.

19        THE COURT:  Yes.

20        You will recall, ladies and gentlemen,

21   the instruction that I gave you earlier with respect

22   to the acts by the defendant about which you have

23   heard testimony and the limited purpose for which

24   that testimony has been admitted, and that is, it is

25   for the purpose of -- if you credit that testimony,

2574

1    it is for the purpose of considering it as evidence

2    that a racketeering enterprise existed as the

3    government alleges and of its alleged nature, scope

4    and methods and/or the existence -- evidence of the

5    existence of a drug conspiracy.

6         Specifically what it is not evidence of

7    and you may not consider it as evidence of is the

8    defendant's bad character or general propensity to

9    engage in any acts of violence.  You may recall that

10   instruction I gave you earlier.  It applies to this

11   testimony as well.  And in the final instructions

12   that I will give you I will reiterate it and with

13   slight expansion.

14        Thank you very much.

15        MS. DAYTON:  Thank you.

16   Q.   You said this is Tina?

17   A.   Yes.

18   Q.   How did you know Tina?

19   A.   Tina used to also stop by Pops' apartment.

20   Q.   And what would she do there?

21   A.   She would smoke crack cocaine with us.

22   Q.   Do you know where Tina lived?

23   A.   I want to say in the valley.

24   Q.   Okay.

25   A.   Ansonia, if I'm not mistaken.

2575

1    Q.   And what was she doing at the building, if

2    you know, at Charles Street?

3    A.   Coming over to smoke, purchase crack and

4    smoke it.

5    Q.   Do you know if Tina had a job?

6    A.   Yes.

7    Q.   What did she do?

8    A.   She also was a CNA.

9    Q.   And how did you know that?

10   A.   She would often come in a uniform and we

11   would talk about it.

12   Q.   How often would you see her at the

13   building?

14   A.   A lot.

15   Q.   And did she -- did you ever see her

16   anywhere but in Pops' apartment.

17   A.   Yes, on the first floor in Basil's

18   apartment?

19   Q.   And who would you see her there with?

20   A.   Tippy.

21   Q.   Who is Tippy?

22   A.   Her boyfriend.

23   Q.   Do you know Tippy's real name?

24   A.   I want to say James.  I believe it's James.

25   Q.   Do you recognize the person in 253?

2576

1    A.   Yes.

2    Q.   Who is that?

3    A.   Tippy.

4    Q.   And how did you know Tippy?

5    A.   When the raid occurred, the first raid

6    occurred and I needed to sell enough packs to get

7    Frankie and Pop out, Tippy was there as maybe

8    watching over me.

9    Q.   What do you mean by that, watching over

10   you?

11   A.   He would make sure if I fell asleep, you

12   know, nobody would do anything they weren't supposed

13   to do, or he would answer the door.  Or he would go

14   to the store if I needed something from the store.

15   He was just there with me.

16   Q.   Okay.  And you mentioned that they would go

17   to visit Basil.  Who is Basil?

18   A.   Basil was the older Jamaican guy who lived

19   on the first floor.

20   Q.   Do you know what Basil did?

21   A.   Basil drank and smoked week sometime.

22   Q.   Do you know if Basil smoked crack?

23   A.   No.

24   Q.   Do you know if Basil worked?

25   A.   Yes.

**GA644**

2577

```
1    Q.   Do you know where he worked?
2    A.   I don't know what he did.
3    Q.   I'll show you -- it's a little hard to see.
4  Do you recognize who that is?
5    A.   Yes.
6    Q.   Who is that?
7    A.   That's Basil.
8         MS. DAYTON:  That's Government
9  Exhibit 254, your Honor.
10   Q.   Have you ever been into Basil's apartment?
11   A.   Yes.
12   Q.   And what would you go there for?
13   A.   To sit down and smoke with Tina and Tippy
14 sometime.
15   Q.   Smoke crack?
16   A.   Yes.
17   Q.   Did there come a time where Tina started to
18 sell crack?
19   A.   Yes.
20   Q.   Do you remember when that was?
21   A.   Maybe July.
22   Q.   Of 2005?
23   A.   2005.
24   Q.   How did you find out that Tina was selling
25 crack?
```

2578

```
1    A.   Big Man.  I believe Big Man was the one
2  that mentioned it.
3    Q.   Do you remember what he said to you?
4    A.   I don't recall exactly what was said, no.
5    Q.   Did you do anything when you found out that
6  she was selling crack?
7    A.   No.
8    Q.   Did you ever talk to her about it?
9    A.   No.
10   Q.   Do you know if anyone else was selling with
11 her?
12   A.   I don't know.
13   Q.   Did you ever get any crack from Tina?
14   A.   No.
15   Q.   Do you know someone named Velma?
16   A.   Yes.
17   Q.   What did Velma do?
18   A.   When I first met Velma, Velma was one of
19 Tina's friends who used to come by and bring Tina
20 drugs every now and then.
21   Q.   Was there ever a time that Velma was
22 working with Tina; if you remember?
23   A.   I don't know.  I'm not sure of that.
24   Q.   Okay.  Did you -- did anyone ever give you
25 any of Tina's drugs; if you recall?
```

2579

```
1    A.   No.
2    Q.   When Tina started selling crack, where was
3  she selling from?
4    A.   Basil's apartment.
5    Q.   On the first floor?
6    A.   Yes.
7    Q.   And you -- were you still selling from the
8  second floor?
9    A.   Yes.
10   Q.   Did Tina's selling crack on the first floor
11 affect your sales in any way?
12   A.   Yes.
13   Q.   How did it affect it?
14   A.   They slowed down.  The people pretty much
15 stopped coming.
16   Q.   To the second floor?
17   A.   Yes.
18   Q.   Do you know why?
19   A.   Because Tina was selling them on the first
20 floor.
21   Q.   And did that change the business at all?
22   A.   I don't understand what you asking me.
23   Q.   When it slowed down, did you start -- or
24 did Dreddy spend more time at the building, did Big
25 Man?
```

2580

```
1    A.   Big Man did.
2    Q.   Do you know what he was doing there?
3    A.   Watching who was going in and coming out of
4  the first floor apartment.
5    Q.   And what was his purpose in doing that?
6  Why was he doing that?
7    A.   To report back to Dreddy what was going on.
8    Q.   Did you ever see Womble have a
9  confrontation with anyone?
10   A.   Besides Frankie, no.
11   Q.   Okay.  Did Womble's role in the operation
12 change at some point?
13   A.   Yes.
14   Q.   When about was that?
15   A.   I want to say in June sometime.  If I'm not
16 mistaken, sometime in June.
17   Q.   How did it change?  Do you remember
18 specifically?  You look like you are a little
19 unsure.
20   A.   I'm not really sure when, but I know it
21 changed.
22   Q.   And what was it that changed?
23   A.   We weren't able to like contact him when we
24 needed to.
25   Q.   When you say "we," who do you mean?
```

**GA645**

2581

1      A.    Frankie and I.  The regular packages that
2   we were getting we were no longer getting.  We would
3   get maybe $100 pack or $150 pack.
4      Q.    From Womble?
5      A.    Yes.
6      Q.    Do you know what was happening to the drugs
7   that -- the rest of the drugs that were supposed to
8   be in the pack?
9      A.    No.
10     Q.    So when you started getting smaller packs,
11  what happened?
12     A.    Eventually Big Man told us instead of
13  bringing the money back to him, just keep flipping
14  the money.
15     Q.    What do you mean by that, keep flipping the
16  money?
17     A.    Buy other drugs, you know, and keep
18  flipping it, because I assume he had no drugs to
19  give us.  So I believe that purpose was for, you
20  know, just to keep the business going.
21     Q.    So, what did you do?
22     A.    We did just that.
23     Q.    At some point did you run out of drugs?
24     A.    Completely.  And money, yes.
25     Q.    And did you get drugs from someone else?

2582

1      A.    Yes.
2      Q.    Who?
3      A.    When that happened, Dreddy came one morning
4   and asked what was going on, and we was like
5   nothing, we hadn't seen nor heard from Big Man in a
6   while, a couple of days, and he asked why.  We
7   didn't know why.  So that morning Dreddy gave us
8   some drugs to sell.
9      Q.    And was it the same or different than the
10  packs that you would usually get?
11     A.    It was the same.
12     Q.    Did you sell that?
13     A.    Yes.
14     Q.    And after you sold it, did you get more
15  drugs?
16     A.    Yes.
17     Q.    How?
18     A.    I called Dreddy and let him know that I was
19  finished.  He told me that someone would be bringing
20  me some more.
21     Q.    And how did you get Dreddy's number?
22     A.    He left it with us that morning.
23     Q.    Okay.  And did you use the number to get
24  more drugs?
25     A.    Yes.

2583

1      Q.    Did someone bring them to you?
2      A.    Yes.
3      Q.    Do you remember who?
4      A.    A female.
5      Q.    Do you remember what the female looked
6   like?
7      A.    She was light-skinned and pregnant.
8      Q.    Light-skinned and pregnant?
9      A.    Uh-huh (indicating affirmatively).
10     Q.    Do you know if she had any relationship to
11  the defendant?
12     A.    She was Dreddy's girlfriend.
13     Q.    I'm going to show you a picture that's in
14  evidence as Government's Exhibit 222.  Do you
15  recognize who this person is?
16     A.    Yes.
17     Q.    Who is that?
18     A.    That's the young lady that brought the
19  drugs over that day.
20     Q.    And when she came in, do you remember
21  where -- well, did she come to the apartment?
22     A.    Yes.
23     Q.    Into the apartment building or to the
24  actual apartment?
25     A.    She came into the apartment.

2584

1      Q.    And what did she give you?
2      A.    She went into the bathroom, first of all,
3   and then she came out with a package of crack
4   cocaine for me to sell.
5      Q.    Do you remember how much was in the pack?
6      A.    I can't recall how much was in the pack.
7      Q.    I'm going to draw your attention to late
8   August of 2005.  Did there come an evening where the
9   woman you identified as Jackie came to the
10  apartment?
11     A.    Yes.
12     Q.    What happened that night?
13     A.    She came in stating that there were a bunch
14  of guys dressed in black down on the first floor to
15  Frankie and I.
16     Q.    And what did you do?
17     A.    I panicked automatically.
18     Q.    Why did you panic?
19     A.    I figured somebody was maybe coming to rob
20  us or hurt us or something.
21     Q.    Had you ever been robbed there before?
22     A.    No.
23     Q.    So, what did you do after she gave you this
24  information, if anything?
25     A.    I didn't do anything.

**GA646**

2585

```
1      Q.    Did Frankie do anything?
2      A.    There was a knock on the door and Frankie
3   went to the door, and I didn't see who was at the
4   door.  Frankie went out the door and returned maybe
5   about five or six minutes later.
6      Q.    And when he returned, did you talk to him?
7      A.    Yes.
8      Q.    And what did Frankie tell you?
9      A.    I asked him who was at the door and where
10  did he go, and he said it was Dreddy at the door.
11     Q.    And did he say where he went?
12     A.    Yes.
13     Q.    Where?
14     A.    Downstairs to the first floor.
15     Q.    And did Frankie tell you what he did
16  downstairs on the first floor?
17     A.    Yes.
18     Q.    On the first floor?
19     A.    Yes, he knocked on Basil's door.
20     Q.    Okay.  And did he say what happened when he
21  knocked on Basil's door?
22     A.    Nobody never answered the door.
23     Q.    During -- do you know about how long before
24  the murder of Tina, James and Basil this occurred,
25  the knocking on the door?  Like was it two months or
```

2586

```
1   two days; if you know?
2      A.    Days.  It was days.
3      Q.    Okay.  And during this period is Big Man
4   bringing you drugs?
5      A.    No.
6      Q.    Was it during this period that this woman
7   in the picture brought you the drugs, 222?
8      A.    Yes.
9      Q.    Were you still communicating with the
10  defendant during this time period?
11     A.    Yes.
12     Q.    In person or by phone?
13     A.    By phone.
14     Q.    And did the defendant ever call you and ask
15  about what's going on in the building?
16     A.    Well, I called -- after receiving the drugs
17  from that young lady, once I finished selling those,
18  I tried to call Dreddy for a couple of hours and I
19  couldn't get to him, and that's when Woby answered
20  the phone, and I told him what I wanted, and that's
21  when Dreddy called me back with instructions.
22     Q.    And what were the instructions?
23     A.    To go to Big Man's apartment, and not to go
24  inside the apartment, but on the outside porch there
25  was a pot, a flower pot.  I was to lift up the
```

2587

```
1   flower pot and pick up some drugs that were under
2   there.  Once I picked those up, I was to go meet
3   Woby.  I don't remember the street, but it was a
4   couple streets from Pops' apartment, the side street
5   from Dunkin Donuts.
6      Q.    And did you do as the defendant instructed
7   you?
8      A.    Yes.
9      Q.    So what specifically did you do?
10     A.    I met Woby there to give him the money from
11  the drugs that I had sold earlier that I received
12  from the young lady.
13     Q.    Then what did you do?
14     A.    I went back to the house, Frankie and I,
15  and I counted the drugs.  I don't remember how much
16  it was.  And I told Dreddy how much was in it, and
17  that was that.
18     Q.    Were you at Pops' apartment the night
19  before the murder?
20     A.    Yes.
21     Q.    What were you doing?
22     A.    I was asleep.  I had been up for a couple
23  of days, so -- I had smoked a couple of bags of the
24  crack and drank some Bukoff and I dosed off to
25  sleep.
```

2588

```
1      Q.    What did you drink?
2      A.    Some Bukoff.
3      Q.    And you said you went to sleep.  About what
4   time?
5      A.    I'm not even sure about what time that is.
6      Q.    Do you remember who was in the apartment
7   when you went to sleep?
8      A.    Me, Hodges, Pop, Pat, Judith.
9      Q.    A number of people?
10     A.    A number of people.
11     Q.    Did you hear anything during the night?
12     A.    No.
13     Q.    Did you hear anything in the morning?
14     A.    Yes.
15     Q.    What did you hear?
16     A.    A scream.
17     Q.    A woman scream, a man scream?
18     A.    A man scream.
19     Q.    Do you know what time that was?
20     A.    No, I don't recall what time that was.
21     Q.    After you heard the scream, what did you
22  do?
23     A.    I sent Pat out to the store to purchase a
24  glass pipe that you use to smoke crack with, and she
25  came back and said that there were a lot of police
```

2589

```
1   downstairs.
2       Q.   Did you get up and go investigate?
3       A.   No.
4       Q.   What did you do?
5       A.   I sat there, and a few minute later the
6   telephone rang.
7       Q.   Who was it?
8       A.   Dreddy.
9       Q.   And what did he say to you?
10      A.   He was giving us instructions to put
11  everything up.
12      Q.   What does that mean "put everything up"?
13      A.   The crack.
14      Q.   Put it where?
15      A.   Somewhere up in the house.  Just put it up,
16  hide it in the house somewhere.
17      Q.   Hide it?
18      A.   Yes.
19      Q.   Why?
20      A.   And to walk outside, that there was
21  somebody watching for us, watching us, watching for
22  us.
23      Q.   Did you do as he instructed?
24      A.   Yes.
25      Q.   And what happened next?
```

2590

```
1       A.   Frankie and I made a phone call, because I
2   woke up that morning short of drugs and short of
3   money, so I knew I needed to make a call in order to
4   replace what was gone.
5       Q.   Did you make that phone call?
6       A.   Yes.
7       Q.   Who did you call?
8       A.   T.
9       Q.   The same guy you talked about before?
10      A.   Yes.
11      Q.   Did you go get something from T?
12      A.   Yes.
13      Q.   You left the building?
14      A.   Yes.
15      Q.   Did you see police?
16      A.   Yes.
17      Q.   Did you talk to anyone?
18      A.   Yes.  As we were coming out the apartment,
19  I want to say he was a detective, he was coming
20  towards the apartment, and he asked us was we just
21  coming out that apartment, and we said yes, and he
22  asked us our name.
23      Q.   Did you give him your name?
24      A.   Yes.
25      Q.   Did you still leave?
```

2591

```
1       A.   Yes.
2       Q.   Where did you go?
3       A.   We walked down to the store to meet the
4   connect that we had called.
5       Q.   What did you get?
6       A.   We purchased some powder.
7       Q.   Do you remember how much?
8       A.   Three and a half grams.
9       Q.   Is there a street name for three and a half
10  grams of drugs?
11      A.   It's been so long I don't recall.
12      Q.   It's probably a good thing.  And what did
13  you do with the three and a half grams?
14      A.   We went back to Pops' and Frankie begin to
15  cook it.
16      Q.   You just mentioned there is police in the
17  building while this is occurring?
18      A.   Yes.
19      Q.   Were you guys scared of getting caught?
20      A.   I would rather had my chance getting caught
21  than not have Dreddy's money or product, something,
22  you know.
23      Q.   So, did you cook the coke -- did he cook
24  the coke into crack?
25      A.   Yes.
```

2592

```
1       Q.   And what happened next?
2       A.   Judith knocked on the door to purchase
3   some, but Frankie was still in the midst of cooking
4   it, so Judy had to wait for a while, and we
5   finished, we gave it to Judy, we didn't even bag it
6   up because we just assumed it was for her, and a few
7   minutes later Dreddy called me again.
8       Q.   And what did he say?
9       A.   He said "I know you are not cooking no
10  crack -- not cooking up no coke in that house," and
11  I lied and I said "No, it's Pat cooking up some
12  coke.  She wanted us to cook up coke for her.
13      Q.   And what did Dreddy say?
14      A.   He told me to turn over the money to the
15  person that he had sent to the door to make sure
16  nothing was going on that shouldn't have been going
17  on.
18      Q.   Did someone show up at the door?
19      A.   Yes.
20      Q.   Who was that?
21      A.   That was the guy that was looking out that
22  day.
23      Q.   What did he look like?
24      A.   Real, real dark skin with dreads.
25      Q.   Short dreads, long dreads?
```

**GA648**

2593

1   A.   Long dreads.
2   Q.   I'm going to show you a photograph that's
3   in evidence as 207.  Do you recognize this person?
4   A.   Yes.
5   Q.   How do you recognize him?
6   A.   That's the person that came to the door
7   that morning.
8   Q.   After Dreddy called you and said someone
9   was coming?
10  A.   Yes.
11  Q.   And when the person in 207 came to the
12  door, did he give you a name?
13  A.   No.
14  Q.   Did he ask you for anything?
15  A.   Yes.
16  Q.   What?
17  A.   The money and the drugs.  I didn't have any
18  drugs, I had money.  So, I gave him money.  And I
19  was still talking to Dreddy at the time on the phone
20  telling Dreddy that I gave the drugs to Pop and Pop
21  put them up in the room and I don't know where he
22  put them at and Pop wasn't there.
23  Q.   Was that true?
24  A.   No.
25  Q.   Why were you telling Dreddy that?

2594

1   A.   Because I was afraid.
2   Q.   After you gave the money to this guy in
3   207, did you see him again that day?
4   A.   Yes.
5   Q.   When?
6   A.   Maybe a couple hours later after leaving
7   out of Pops' house, I went down to Judith's house
8   because the detectives just kept coming to the
9   house.  They picked up Pop, I guess to take down for
10  questioning, and I didn't want to be one of the ones
11  that went down for questioning, so I went to
12  Judith's apartment, and he was still there in Judy's
13  apartment.
14  Q.   This guy in 207?
15  A.   Yes.
16  Q.   How long did you spend in Judy's apartment?
17  A.   I want to say a couple of hours.
18  Q.   And where did you go after that?
19  A.   I went down -- Judy and I walked down to
20  the Colony Diner, and I noticed the cab, so I got in
21  the cab and I left the building never to return.
22  Q.   You mentioned earlier that you got arrested
23  on September 28, 2005.
24  A.   Uh-huh (indicating affirmatively).
25  Q.   Is that yes?

2595

1   A.   Yes.
2   Q.   And after you got arrested, were you read
3   your Miranda rights?
4   A.   Yes.
5   Q.   And did you agree to speak with the police
6   officers?
7   A.   Yes.
8   Q.   And how was your health at that time?
9   A.   Bad shape.
10  Q.   But did you speak to them anyways about
11  what was going on in the building?
12  A.   Yes.
13  Q.   And you mentioned again earlier that you
14  were released to a rehabilitation program, right?
15  A.   Right.
16  Q.   Was that inpatient or outpatient?
17  A.   That was inpatient.
18  Q.   How long did you spend in the program?
19  A.   Maybe a month.
20  Q.   What happened?
21  A.   I had some items, you know, that I were not
22  supposed to have.  You are only allowed a certain
23  amount of items, and what I had in my closet didn't
24  match my inventory list, so it was pretty much
25  called theft out of the warehouse clothes that were

2596

1   taken out of Salvation Army warehouse where we
2   worked at.
3   Q.   So, you had extra clothes in your closet?
4   A.   Yes.
5   Q.   And you got kicked out of the program?
6   A.   Yes.
7   Q.   Where did you go?
8   A.   I went back to Bridgeport.
9   Q.   To jail?
10  A.   No.
11  Q.   Okay, what happened in Bridgeport?
12  A.   Nothing.
13  Q.   You left the program, in other words?
14  A.   Right.
15  Q.   When you went back to Bridgeport, what
16  happened?
17  A.   I started getting high again.
18  Q.   So, you started using drugs?
19  A.   Uh-huh (indicating affirmatively).
20  Q.   And what happened after that?
21  A.   Maybe two months later my probation officer
22  called my mother.  Nicole Owens went to the
23  Salvation Army to check up on me and they told her I
24  had been gone for over like two months.  So, she
25  didn't know I had left the program.

**GA649**

2597

```
1     Q.   What happened?
2     A.   I was rearrested.
3     Q.   Is it fair to say that you were not very
4  successful in your rehabilitation programs at that
5  time?
6     A.   Yes.
7     Q.   And you eventually got sent back to jail?
8     A.   Yes.
9     Q.   When did you plead guilty to your charges?
10    A.   June 5, 2006.
11    Q.   Do you remember exactly what charge you
12 pled guilty to?
13    A.   Conspiracy to distribute 50 grams of crack
14 cocaine.
15    Q.   And did you, in fact, sell over 50 grams of
16 crack cocaine?
17    A.   Yes.
18    Q.   A lot more?
19    A.   Yes.
20    Q.   I'm going to show you what's been marked
21 Government's Exhibit 236 and 236A for
22 identification.
23         MS. DAYTON:  May I approach?
24         THE COURT:  You may.
25    Q.   Do you recognize what 236 is?  Let me show
```

2598

```
1  you the last page.  The second to last page and then
2  the last page.  Are those your signatures?
3     A.   Yes.
4     Q.   Do you know what this document is?  Do you
5  want to take look, see if you recognize it?
6     A.   Yes, this is all about what I was charged
7  with, isn't it?  This is what I was charged.
8     Q.   Is this your plea agreement?
9     A.   Yes.
10    Q.   And 236A, showing you the last page, is
11 that your signature?
12    A.   Yes.
13    Q.   And both documents bear your attorneys
14 signature as well?
15    A.   Yes.
16    Q.   Is this your cooperation agreement?
17    A.   Yes.
18    Q.   It's been a while since you looked at
19 these?
20    A.   Yes.
21         MS. DAYTON:  Your Honor, at this time we
22 would ask to move 236 and 236A into evidence.
23         MR. SMITH:  No objection.
24         THE COURT:  All right, full exhibits.
25         MS. DAYTON:  Thank you, your Honor.
```

2599

```
1     Q.   And for the charge that you pled guilty to,
2  do you know what term of imprisonment you are
3  facing?
4     A.   Yes, I believe minimum was ten and the
5  maximum was life.
6     Q.   Ten what?
7     A.   Years.
8     Q.   Up to life imprisonment?
9     A.   Yes.
10    Q.   Why are you testifying?
11    A.   I agreed to cooperate.
12    Q.   What does that mean?
13    A.   I agreed to get up here and tell the truth
14 to the best of my ability.
15    Q.   How do you think testifying is going to
16 help you?
17    A.   Well, my attorney explained something about
18 a 5K1, that if I would get up and testify for the
19 government and tell the truth, that a letter would
20 be written in my regards with my cooperation to the
21 Judge on my behalf.
22    Q.   And how did hope that letter would help
23 you?
24    A.   I want to go home.
25    Q.   Okay.  Has anyone made any promises to you
```

2600

```
1  as to what your sentence is going to be?
2     A.   No.
3     Q.   I just have two more questions.  I just
4  want to go back for a minute.  Was there more than
5  one occasion where you and Frank bought drugs,
6  cooked them up to replace drugs that were lost?
7     A.   Yes.
8     Q.   And did you regularly buy the same amount,
9  three and a half grams?
10    A.   Yes.
11    Q.   And how many baggies would you get out of
12 three and a half grams?
13    A.   It all depends on how much you put in a
14 bag, but we would get more than what we had to
15 replace.  We would have to get more than what we had
16 to replace.
17    Q.   So, approximately how much would you
18 usually get?
19    A.   Maybe $500 worth.
20    Q.   So -- and each bag was $10?
21    A.   Yes.
22    Q.   So, up to 50 bags?
23    A.   Uh-huh (indicating affirmatively).  Yes.
24    Q.   And you mentioned having a cell phone back
25 then that the defendant called you on.  Do you
```

**GA650**

2601

1   remember mentioning that?
2      A.   Yes.
3      Q.   Do you know if that was local or a long
4   distance phone?
5      A.   I'm not sure because I believe that phone
6   came from a customer that Frankie and I had gave
7   credit to.  You know, so we had held on to the phone
8   for collateral and the person never came back for
9   the telephone.
10      Q.   Do you remember at all the phone number?
11      A.   I want to say it was a nine something
12   number.  I really can't recall.
13      Q.   The area code started with a nine?
14      A.   Yes.
15      Q.   Okay.  Thank you.
16          MS. DAYTON:  I have nothing further.
17   Thank you, your Honor.  Thank you.
18          THE COURT:  Cross-examination.
19   CROSS-EXAMINATION
20   BY MR. SMITH:
21      Q.   Hello, Ms. Hopkins.
22      A.   Hello.  My name is Justin Smith.  I'm one
23   of the attorneys who represents Mr. Aquart.  Fair to
24   say you are in a little better shape today than you
25   were six years ago.

2602

1      A.   Yes.
2      Q.   In fact, things were pretty ugly for you
3   back then.
4      A.   Yes.
5      Q.   You grew up in Bridgeport, right?
6      A.   Yes.
7      Q.   P.T. Barnum?
8      A.   Yes.
9      Q.   Those are projects in Bridgeport?
10      A.   Yes.
11      Q.   There was a lot of violence going on there?
12      A.   Yes.
13      Q.   Drug dealing?
14      A.   Yes.
15      Q.   Prostitution?
16      A.   Yes.
17      Q.   And at some point you said you started
18   using crack, right?
19      A.   Yes.
20      Q.   And you joined the Navy?
21      A.   Yes.
22      Q.   A way to try to get out?
23      A.   Yes.
24      Q.   It didn't work.
25      A.   No.

2603

1      Q.   So, it's my understanding in early 2005 you
2   moved in with your daughter in Charles Street?
3      A.   I didn't actually move in.  I moved her
4   over there.
5      Q.   Okay.  And her granddaughter was there as
6   well?
7      A.   Her daughter.
8      Q.   Your daughter's daughter?
9      A.   Right.
10      Q.   Your granddaughter?
11      A.   Yes.
12      Q.   And you were helping take care of the
13   granddaughter sometimes?
14      A.   Yes.
15      Q.   And this is while you were using crack
16   cocaine?
17      A.   Yes.
18      Q.   And engaging in prostitution?
19      A.   Yes.
20      Q.   Charles Street, that's in a rough part of
21   town as well, right?
22      A.   Yes.
23      Q.   Kind of like P.T. Barnum area?
24      A.   No, no.
25      Q.   Not quite the same, but --

2604

1      A.   No.
2      Q.   Still a rough area?
3      A.   Yes.
4      Q.   So eventually you start hanging out at
5   apartment 211 every day?
6      A.   Yes.
7      Q.   And you started to at some point sell
8   crack, right?
9      A.   Yes.
10      Q.   And you were making money doing that,
11   right?
12      A.   Sometimes.
13      Q.   When you were there, apartment 211 was
14   raided you said.
15      A.   Yes.
16      Q.   The police came in?
17      A.   Yes.
18      Q.   And knocked down the door?
19      A.   Yes.
20      Q.   And you were arrested, right?
21      A.   Yes.
22      Q.   But after you got bonded out you continued
23   to sell there, right?
24      A.   Yes.
25      Q.   In fact, almost immediately.

2605

```
 1      A.   Yes.
 2      Q.   So being arrested, that didn't stop you.
 3      A.   No.
 4      Q.   And you knew that it was possible you could
 5   be arrested again, right?
 6      A.   Yes.
 7      Q.   And, in fact, the apartment was raided
 8   again.
 9      A.   Yes.
10      Q.   And you said that was on June 2nd, 2005.
11      A.   Yes.
12      Q.   And you specifically remember that because
13   that was your birthday.
14      A.   Yes.
15      Q.   But you got lucky, right?
16      A.   Yes.
17      Q.   Because that was -- you weren't in the
18   apartment at the time.
19      A.   Right.
20      Q.   You just happened to be down the hall in
21   your daughter's apartment.
22      A.   Right.
23      Q.   Taking a shower.
24      A.   Yes.
25      Q.   You also knew when you were dealing drugs
```

2606

```
 1   that -- well, you had talked about it.  You were
 2   afraid you might get robbed?
 3      A.   On the incident where Jackie came up the --
 4   yes.
 5      Q.   And you know that if you were to get robbed
 6   you probably wouldn't call the police, right?
 7      A.   Right.
 8      Q.   And nobody called the police that night?
 9      A.   No.
10      Q.   Okay.  And of course if you were to rob
11   someone you know that person is not going to call
12   the police, right?
13           MS. DAYTON:  Objection.  Vague.
14           THE COURT:  Can you answer the question
15   in that form?
16           THE WITNESS:  I don't really understand.
17           THE COURT:  Okay, rephrase.
18      Q.   Okay.  You know that if you were going --
19   if you got robbed, right --
20      A.   Right.
21      Q.   -- you wouldn't call the police?
22      A.   If I got robbed in that building?
23      Q.   Right.
24      A.   Right.  No, I wouldn't call the police.
25      Q.   Because you've got drugs there?
```

2607

```
 1      A.   Right.
 2      Q.   Illegal drugs?
 3      A.   Yes.
 4      Q.   Okay.  And if you were to rob someone you
 5   figured they wouldn't call the police either, if you
 6   were robbing them of their drugs, right?
 7      A.   Right, they wouldn't call.
 8      Q.   And, in fact, you did rob someone in that
 9   building, right?
10      A.   Yes.
11      Q.   And that was Velma?
12      A.   Yes.
13      Q.   And you and Hodges did that together?
14      A.   No, I did that alone.
15      Q.   Okay, do you remember telling the agents in
16   one of your interviews that you and Hodges
17   approached Velma?
18      A.   Yes.
19      Q.   So, Hodges was with you?
20      A.   Yes.
21      Q.   Okay.
22      A.   But I did the robbing alone.  He just stood
23   there.
24      Q.   Okay.  But he knew why he was there?
25      A.   Yes.
```

2608

```
 1      Q.   Okay.  And you did this at Womble's
 2   direction, right?
 3      A.   Yes.
 4      Q.   And this was to confirm that Velma was in
 5   fact selling crack for Tina?
 6      A.   No.
 7      Q.   You didn't tell the agents that Womble told
 8   you to do this to confirm that Velma was selling
 9   crack for Tina?
10      A.   Not for Tina.  Just that she was selling
11   drugs.  She had drugs in that building.  Not
12   pertaining to Tina.  She was bringing them to Tina.
13      Q.   Well, didn't Tina come up later that night
14   and start yelling at you?
15      A.   Yes.
16      Q.   For robbing Velma?
17      A.   Yes.
18      Q.   And didn't you tell the agents that it was
19   clear to you at this point that Velma had been
20   selling for Tina?
21      A.   No, I don't remember -- I don't recall
22   saying that.
23      Q.   You don't recall saying that?
24      A.   No.
25      Q.   Would looking at something maybe refresh
```

**GA652**

2609

```
1   your memory as to that?
2       A.  I know that-- I know for sure that's not
3   the reason.  I know Velma was selling these drugs to
4   Tina, not for Tina, because Tina would often call
5   Velma when she didn't have no money and we weren't
6   able to give her credit.
7       Q.  I understand.  But did you or did you not
8   tell the agents it was clear to you that Velma had
9   been selling for Tina?
10          MS. DAYTON:  Objection, asked and
11  answered.
12          THE COURT:  Overruled.
13      A.  I don't recall.
14      Q.  Would looking at something maybe refresh
15  your memory?
16      A.  I don't know.
17      Q.  Would you like to look at something?
18      A.  Yes.
19      Q.  And see if that refreshes your
20  recollection.  Ms. Hopkins, if you would just look
21  starting here and just read that to yourself.
22          THE COURT:  Read it to yourself.  If it
23  refreshes your recollection about whether or not you
24  told agents it was clear to you that Velma had been
25  selling for Tina, then you can testify from your
```

2610

```
1   refreshed recollection, but not just from reading
2   that.  All right.
3       A.  Where do you want me to start reading at?
4       Q.  I'm sorry, right there.
5           Was that -- did that refresh your
6   recollection as to what you told the agents.
7       A.  Not at all.
8       Q.  You don't recall telling the agents that?
9       A.  No, I don't.
10      Q.  Okay.  But you do, in fact, recall going
11  down and robbing Velma for those drugs?
12      A.  Yes.
13      Q.  And it was Womble who told you to do that?
14      A.  Yes.
15      Q.  Okay.  And -- let me go back, talk to you a
16  little bit about after you were arrested.  Before
17  your arrest you were interviewed, right, by the
18  police?
19      A.  Yes.
20      Q.  You had gone in and given them a statement.
21      A.  Yes.
22      Q.  You weren't arrested then.
23      A.  No.
24      Q.  They let you go?
25      A.  Yes.
```

2611

```
1       Q.  And you didn't just walk in the police
2   station, right?
3       A.  No.
4       Q.  They had come and found you?
5       A.  I was told that they were looking for me,
6   and I finally called, not knowing that calling they
7   were able to know -- exactly pinpoint where I was.
8   So yes, they came and got me.
9       Q.  And then later you were actually arrested
10  by the federal agents, right?
11      A.  Yes.
12      Q.  And you didn't have a lawyer at that very
13  first meeting, correct?
14      A.  No, I didn't.
15      Q.  But a few days later you had another
16  meeting with the agents, right?
17      A.  I can't remember.
18      Q.  Well, you were arrested, I think you said,
19  September 28, 2005?
20      A.  Yes.
21      Q.  Okay.  And do you recall that you had
22  another interview with the agents just a few days
23  later, October 3rd, 2005?
24      A.  Oh, yes, yes, yes, yes.
25      Q.  And you had your lawyer at that second
```

2612

```
1   meeting, right?
2       A.  Yes.
3       Q.  And then you met with the agents more
4   recently in May of 2010, right?
5       A.  Yes.
6       Q.  Okay.  But since October 3, 2005, you had
7   what's called a proffer agreement?
8       A.  A proffer?
9       Q.  A proffer agreement.
10      A.  And that is?
11      Q.  Well, did you sign something with your
12  lawyer at that first meeting saying what you would
13  tell the agents was protected?
14      A.  Yes.
15      Q.  Okay.  So you remember that?
16      A.  Yes.
17      Q.  Okay.  And what was your understanding of
18  that agreement?
19      A.  I don't remember.
20      Q.  Now, when you were arrested on
21  September 28, 2005, obviously you never really spent
22  any time in jail, right?
23      A.  Right.
24      Q.  And that was scary to you?
25      A.  Yes.
```

2613

1    Q.   And you knew the agents were telling you
2  you could be facing quite a bit of time?
3    A.   Yes.
4    Q.   Maybe life.
5    A.   Yes.
6    Q.   And so you knew that right from the
7  beginning, right?
8    A.   Not from the very beginning, but I knew.
9    Q.   Well, at your arrest?  Did you know at your
10 arrest?
11   A.   I don't recall.
12   Q.   Okay.  But at some point you came to find
13 out you could be facing life in prison.
14   A.   Right.
15   Q.   But about a month after you got arrested
16 you did get out on bond, right?
17   A.   That's when I was taken to the Salvation
18 Army.
19   Q.   Right.
20   A.   Yes.
21   Q.   But by the time you were released on bond,
22 you knew you could have been facing life in prison,
23 right?
24   A.   I don't recall.
25   Q.   Okay.

2614

1    A.   I don't recall.
2    Q.   In any event, you are released on bond,
3  right?
4    A.   Yes, yes.
5    Q.   And that bond had conditions, right?
6    A.   Yes.
7    Q.   In other words, you promised the court
8  you'd do certain things.
9    A.   Right.
10   Q.   And one of those things was to go to the
11 Salvation Army program.
12   A.   Yes.
13   Q.   And enter the treatment, right?
14   A.   Yes.
15   Q.   And you knew the Salvation Army was
16 supposed to notify the court if you had any problems
17 with your treatment, right?
18   A.   Yes.
19   Q.   And, in fact, like you said, the probation
20 officer actually took you directly to the program,
21 right?
22   A.   Yes.
23   Q.   Dropped you off?
24   A.   Yes.
25   Q.   Later you did violate the program rules?

2615

1    A.   Yes.
2    Q.   You took things that weren't yours?
3    A.   Yes.
4    Q.   So, you stole?
5    A.   Right.
6    Q.   Okay.  And then your counselor at the
7  Salvation Army asked you if you were under court
8  supervision.
9    A.   Yes.
10   Q.   And you said no.
11   A.   I don't recall.  I probably did.  I don't
12 know.
13   Q.   Well, what you told them exactly was that
14 you'd been arrested for a drug charge.
15        MS. DAYTON:  Objection.  It's hearsay.
16        THE COURT:  It is.
17        MR. SMITH:  It's not offered for the
18 truth of the matter asserted, your Honor.  It's
19 offered for her state of mind.
20        THE COURT:  Sure it is.
21        MR. SMITH:  I'm sorry?
22        THE COURT:  You can get her state of
23 mind other than by quoting from a document not in
24 evidence.
25        But we are at 2:30.  Could you do that

2616

1  Monday morning?
2        MR. SMITH:  We can do that Monday
3  morning, your Honor.
4        THE COURT:  Thank you very much.
5        Ladies and gentlemen, have a nice Friday
6  and weekend and we'll see you Monday morning at
7  9:30.
8        (Jury exited the courtroom.)
9        THE COURT:  All right, Ms. Hopkins, you
10 will come back Monday at 9:30 to continue your
11 testimony.  Please don't discuss your testimony with
12 anyone other than your attorney until you come back.
13 All right?
14        THE WITNESS:  Yes.
15        MS. DAYTON:  Just for the record, again
16 the agents will be transporting Ms. Hopkins.  They
17 will not speak to her about her testimony.
18        THE COURT:  All right.
19        MS. DAYTON:  Thank you.
20        THE COURT:  We stand in recess.
21        (Proceedings concluded 2:30)
22
23
24
25

**GA654**

2617

```
 1                    I N D E X

 2
 3   WITNESS                                    PAGE

 4   JOHN TAYLOR

 5   Continued Cross-Examination by Mr. Sheehan   2423

 6   Redirect Examination by Ms. Dayton           2493

 7
 8   TIMOTHY BAILER

 9   Direct Examination by Ms. Rodriguez-Coss     2504

10
11   JUANITA HOPKINS

12   Direct Examination by Ms. Dayton             2523

13   Cross-Examination by Mr. Smith               2601

14
15
16           I certify that the foregoing is a

17   correct transcript from the record of proceedings in

18   the above-entitled matter.

19                    5/6/11

20                     Date

21
22              /S/   Sharon Montini

23              Official Reporter

24
25
```

2618

```
 1              UNITED STATES DISTRICT COURT.

 2               DISTRICT OF CONNECTICUT

 3   * * * * * * * * * * *      *

 4   UNITED STATES OF AMERICA,  * Case No 6cr160(JBA)

 5            Plaintiff,        *
                                *
 6       vs.                    *

 7   AZIBO AQUART              * May 9, 2011
                                *
 8            Defendant.        *
                                *
 9   * * * * * * * * * * * *     *

10              TRIAL TRANSCRIPT

11                VOLUME XII

12   BEFORE:  THE HONORABLE JANET BOND ARTERTON U.S.D.J.,
                                          and jury
13   Appearances:
     FOR THE GOVERNMENT:   ALINA REYNOLDS, ESQ
14                          TRACY DAYTON, ESQ.
                            PETER MARKLE, ESQ.
15                          JACABED RODRIGUEZ-COSS
                            United States Attorney's Office
16                          915 Lafayette Blvd
                            Bridgeport, CT 06604
17
18
     FOR THE DEFENDANT     MICHAEL SHEEHAN, ESQ
19   AZIBO AQUART:         Sheehan & Reeve
                           139 Orange Street
20                         New Haven CT 06510

21                         JUSTIN SMITH, ESQ.
                           383 Orange Street
22                         New Haven, CT 06511

23
     Court Reporter:    Sharon Montini, RMR
24
25   Proceedings recorded by mechanical stenography,
     transcript produced by computer
```

2619

```
 1           THE COURT:  Good morning, ladies and

 2   gentlemen, counsel.  Mr. Aquart.  Juror No. 12 is

 3   not here.  We are calling him.  He reports to us

 4   that he was in a convenience store this morning that

 5   was robbed and there was a murder, and so he's being

 6   held at the police station as a witness for all that

 7   questioning.  So, we are making a call to see

 8   whether magically he could be here in five minutes

 9   or whether he should be excused from further service

10   on this case.  Do you have a view on this?

11           MR. SHEEHAN:  I think we can wait more

12   than five minutes, your Honor.

13           THE COURT:  Pardon?

14           MR. SHEEHAN:  I think we can wait more

15   than five minutes, your Honor.

16           MS. DAYTON:  We can wait as long as the

17   Court deems appropriate.

18           MR. MARKLE:  Do we know where?

19           THE COURT:  West Haven.

20           MR. MARKLE:  We could try to contact the

21   police department number and find out.

22           THE COURT:  All right, is there any

23   other business that we can take up that has come up

24   since we last sat?

25           MR. SHEEHAN:  Well, your Honor, there
```

2620

```
 1   are some scheduling issues.

 2           THE COURT:  All right.

 3           MR. SHEEHAN:  And tomorrow -- well, one

 4   thing, tomorrow we had anticipated that the

 5   government was going to put on Christine Roy as the

 6   DNA expert.  We had not seen until this morning what

 7   charts the government intended to rely upon.  We

 8   have those charts.  We don't have a problem with

 9   those charts.  I had contacted Ms. Roy this morning

10   to ask in anticipation of cross-examination if she

11   could bring in the -- if she could either prepare a

12   list of the peak heights that were relied upon in

13   the various items that she is expected to testify

14   to, and I can represent to the Court -- and she had

15   agreed with us to do that.

16           THE COURT:  Excuse me, just one moment.

17   The answer seems to be a minimum of two hours.  I

18   don't know whether someone wants to call and see

19   what the status is.  I'm loathe to wait two hours.

20           MR. MARKLE:  We need the name of the

21   juror and we can call and see if maybe they could

22   interview him or her first.

23           THE COURT:  We're trying not to have

24   names on the record.

25           MS. DAYTON:  I can give it to the agent.
```

2621

```
 1              THE COURT:  Okay.
 2              MS. DAYTON:  Got it.
 3              MR. MARKLE:  Thank you, your Honor.
 4              THE COURT:  Okay, peak heights.
 5              MR. SHEEHAN:  Yes, the reason why peak
 6   heights are relevant, your Honor, is that the
 7   practice of the lab is to identify specific alleles.
 8              THE COURT:  I'm sorry.  Sorry.
 9              MR. SHEEHAN:  I'm sorry, your Honor.
10   The practice of the lab is to identify specific
11   alleles by reference to the peak heights that appear
12   on the electropherograms.  The lab had previously
13   provided us through the government with all of the
14   electropherograms in the case, although those
15   electropherograms do not reference the specific peak
16   heights of the alleles.  I had been advised and was
17   aware from both other sources, as well as from the
18   lab, that the programming of the computer in the lab
19   could identify, specifically identify the peak
20   heights.  So, in other words, when the electronic
21   data is run, those peak heights could then be
22   captured in an image that could then be used for
23   purposes of cross-examination.
24              So, I asked that those be prepared, that
25   those be provided by Ms. Roy for purposes of
```

2622

```
 1   cross-examination.  Ms. Roy had indicated to our
 2   office that she could do that.  She was annoyed at
 3   the timing of the request, but she said she could do
 4   that.  Now I've been advised by the government that
 5   after the head of the lab spoke to them, the lab is
 6   not willing to do that for tomorrow.  We have a
 7   subpoena being served on them today to produce that
 8   information.  So that's an issue that may come up
 9   tomorrow depending on the timing and I wanted to
10   alert the Court.
11              THE COURT:  Does the government want to
12   respond in any way?
13              MS. DAYTON:  Yes, your Honor.  As
14   counsel just said, he was provided, and I understand
15   we're like speaking Greek here, but he was provided
16   with all of the electropherograms several times
17   actually in this case.  Counsel has been to the lab
18   on several occasions, and in the presence of the --
19   the government on certain occasions.  He's spoken
20   with Carll Ladd, who is the head of the DNA section
21   several times.  This was never requested.
22              These documents, they don't currently
23   exist in paper form, they're in electronic form.  I
24   received a call from Carll Ladd, who is the head --
25   and for the record that's c-a-r-l-l, l-a-d-d -- this
```

2623

```
 1   morning saying that the defense counsel called this
 2   morning and spoke to Christine Roy, even though
 3   they've known for quite some time that she'd be
 4   testifying this week, and requested that she create
 5   all of these documents.
 6              My understanding from Dr. Ladd was that
 7   Christine Roy said I can try, but I need to speak
 8   with my supervisor.  He told her no, we can't do
 9   this between today and tomorrow, this is, A, not our
10   only case, B, she's preparing for her testimony,
11   which is quite voluminous.  They tested 70 items, or
12   something.  So, to prepare the alleles is basically
13   to create what appear to be like these EKGs for
14   every single piece of evidence.  And they're not
15   sure, your Honor.  There is 15 loci for each piece
16   of evidence.  They're compared against reference
17   samples, known samples.
18              I mean, this is not a small task that's
19   being requested.  There is no ground for a four-foot
20   subpoena here.  This case is five and a half years
21   old.  The documents that counsel is requesting could
22   have been created long before today.
23              And all of that aside, it appears that
24   counsel is requesting these documents in order to
25   make basically a Daubert motion, your Honor, that he
```

2624

```
 1   is questioning the science of DNA and how the lab
 2   interprets its results, and the time for that was
 3   pretrial, not in the middle of trial, because my
 4   understanding, the only real reason to look at peak
 5   heights was -- there is a way to interpret heights
 6   above -- peak heights above a certain height versus
 7   below a certain height, and perhaps counsel is going
 8   to attack how the lab interprets those results, even
 9   though they interpreted the results in accordance
10   with the standards that they're required to follow.
11   And if the defense wanted to attack the science,
12   this should have been done pretrial.  That's what
13   Daubert hearings are for.
14              THE COURT:  Let me ask if the charts and
15   the data that Roy used has been produced, why is it
16   that the defendant's expert can't do the same thing
17   as a rebuttal case and/or to assist counsel in the
18   cross-examination?
19              MR. SHEEHAN:  Your Honor, the electronic
20   data has been produced, and my understanding both
21   from Dr. Ladd and from individuals that we have
22   consulted on that -- is that that electronic data
23   can be programmed to reflect the actual peak
24   heights.  And what I anticipate in cross-examination
25   is that Ms. Roy will testify that she looked at the
```

2625

```
1   electronic data and the peak heights as reflected on
2   the electronic data and that became the basis for
3   her report.  They did not print out a copy of those
4   peak heights, however.  What they printed out was
5   the electronic data with simply -- with only
6   reference to the actual alleles that are called on
7   them, and what I am requesting, your Honor, in terms
8   of cross-examination is that I be allowed to ask her
9   those questions about what she relied upon.
10  Otherwise, what I anticipate she will be saying here
11  is that, yes, I did look at those peak heights in
12  order to call the alleles, but I don't have any
13  record other than in the electronic form of what
14  those peak heights were or of what I relied upon.
15          I think for purposes of
16  cross-examination it would be much more useful if we
17  had those actual peak heights that she relied upon.
18  And I don't think that it is much of an effort for
19  them to actually print that page with the peak
20  heights with reference to the four, not many, with
21  reference to the four samples that I requested from
22  her.  And those really are the four kind of key --
23  1, 2, 3 -- I'm sorry, one -- five samples.  There
24  are five samples that the government, my
25  understanding, that the government intends to rely
```

2626

```
1   upon where they have the defendant in the category
2   of could not be excluded.  And that's what I want to
3   challenge, your Honor, with respect to that.
4          THE COURT:  Is Ms. Dayton correct you
5   want to challenge it as a Daubert matter?
6          MR. SHEEHAN:  No.
7          THE COURT:  Or as credibility of the
8   expert opinion?
9          MR. SHEEHAN:  No.  The latter, your
10  Honor.  I think if it was a Daubert challenge, then
11  obviously our time for making that challenge has
12  long since passed.
13          THE COURT:  All right, so --
14          MS. DAYTON:  Your Honor, but I don't
15  think that's clear what Mr. Sheehan just said.  I
16  think if the question is --
17          THE COURT:  The question is whether or
18  not it's going to be put as a subject of
19  cross-examination versus a motion to preclude put to
20  the Court, and he's saying the latter is not his
21  intention.
22          MR. SHEEHAN:  Your Honor, on this point
23  I can just indicate that really the science in this
24  area is in dispute.
25          THE COURT:  But that's a subject of
```

2627

```
1   cross-examination.
2          MR. SHEEHAN:  Right.  Yeah, in that
3   sense.  I don't think that -- I'm not making a claim
4   that it should be precluded.  I'm not making that
5   argument.
6          THE COURT:  So, if you have the
7   electronic data, if Ms. Roy used that electronic
8   data for her conclusions with respect to the
9   alleles, and particularly in the five samples that
10  you are focussing on, what I don't understand is why
11  your expert's can't do the same thing -- perhaps
12  can't do the same thing to supply you with that
13  which may be substantively the cross-examination
14  and/or the expert testimony in rebuttal.
15          MR. SHEEHAN:  Well, your Honor, I did
16  request as an alternative that -- one of the
17  problems with the electronic data is that it needs a
18  sophisticated software to read it.  It's not -- it
19  does not in and of itself -- it's not a disk that
20  you can slide -- although the electronic data is a
21  disk, in order to read it it needs this fancy and
22  very expensive software.  As an alternative I had
23  requested in our discussions with Ms. Roy that she
24  be directed to bring a laptop computer that could
25  display the same thing.  In that context she would
```

2628

```
1   not have to be producing anything.  She told us she
2   didn't want to do -- she would prefer to do the
3   other.  I said, fine.  That seemed to solve that
4   problem until I learned this morning, I guess after
5   consultation with the government, that they were not
6   going to do anything.
7          MS. DAYTON:  That wasn't after
8   consultation with the government.  Dr. Ladd --
9          MR. SHEEHAN:  I learned it.
10          MS. DAYTON:  -- contacted the government
11  and said they can't bring those computers in here.
12  They're lab equipment, they can not just be brought
13  into court like that.  They have special purposes.
14  It's not like us bringing our laptops in here.
15  Number one.  And number two, Dr. Ladd.
16          Said that this request is not as simple
17  as counsel thinks.  And when it was put to Christine
18  Roy, well, you can do this or this, of course she
19  said, well, I'd prefer to do the latter, but her
20  supervisor said, look, we don't have time to do this
21  between now and tomorrow.
22          THE COURT:  So, as I understood what Mr.
23  Sheehan was saying, that in her report she
24  references alleles that are in some way necessarily
25  related to peak heights.  So, is there some stage of
```

2629

1   her analysis that produces or shows in some form the
2   peak heights as associated with the alleles that are
3   the subject of the -- her opinion on those five
4   samples?
5           MS. DAYTON:  Counsel has the printouts,
6   your Honor, that show the little mountains, the
7   peaks themselves.  And he's asking for her to
8   produce a different document that will have a number
9   at the top of each peak, and that's not how the lab
10  creates it or produces it.  They run it through the
11  program, is my understanding, that Mr. Sheehan was
12  just talking about that gives them the peak heights
13  based upon the little mountain that appears.
14          Mr. Sheehan has had those documents, and
15  while he hasn't notified that he's calling an
16  expert, he clearly had an expert because there was
17  one sitting there watching the DNA testing,
18  Charlotte Word, formerly of CellMark, and she
19  watched for weeks.
20          So, for this to happen the day before
21  Ms. Roy's testimony, your Honor, is just -- it's,
22  you know, not reasonable to ask someone who is
23  trying to prepare to come to court tomorrow, and as
24  everybody in the State of Connecticut knows, the lab
25  runs very short because of funding, to start

2630

1   creating these documents.  This could have happened
2   a long time ago.
3           And counsel has the electronic data.  He
4   has probably thousands of pages of peak heights
5   showing the peaks.  If he wants something with a
6   little number, he could have got the software, he
7   could have asked his expert to print it out.  There
8   are lots of things that could have been done before
9   Monday morning the day before Ms. Roy testifies.  He
10  could also ask -- he could serve a subpoena and give
11  them time to do this.  He could recall her in his
12  case.  He could call Dr. Ladd in his case, as he had
13  previously indicated, "he" being Mr. Sheehan, that
14  he was potentially going to do.  Those are other
15  options, rather than to cause a witness to start
16  creating documents the day before her testimony that
17  are not in creation at this time.  They do not
18  exist.  It's not a matter of putting them through a
19  photocopy machine, your Honor.
20          MR. SHEEHAN:  Your Honor, the difficulty
21  with the documents that have been produced, the
22  documents that were produced are basically -- they
23  do have -- they do look somewhat as counsel said,
24  like an EKG, they have peaks and there is a scale at
25  the side.  The scale, however, does not -- because

2631

1   most of these samples, and I think Ms. Roy will
2   agree on this point, most of the samples are
3   mixtures.  Most of the samples are low quantity
4   amounts of DNA where the actual alleles are at --
5   many of the alleles are either at the peak that is
6   called for under the lab's protocol.  Some of them
7   are actually what they call minor peaks, which are
8   below, and the presence of these minor peaks and the
9   presence of this low quantity DNA is what is at
10  issue ultimately in how -- in my opinion in how the
11  jury ultimately assesses the DNA evidence in the
12  case.
13          I know that in my discussions with Dr.
14  Ladd that they do -- when they look at the
15  electronic data it does generate a numerical number
16  that is with reference to the various peak heights,
17  and in fact that's relied upon by them for two
18  things.  One, the machine only calls, that is -- by
19  "calling" I mean identifying, only identifies
20  alleles that are over a certain threshold.  But they
21  also look at the alleles to identify minor peaks.
22  So, for example, the main threshold -- there were
23  two thresholds in use under this period of time, but
24  the main threshold for most of the samples was 75, a
25  peak height of 75, but the lab's protocol also calls

2632

1   for identifying minor peaks between 50 and 75, and
2   what I -- what is ultimately at issue here is how
3   much of a mix of DNA is there in there and how
4   much -- and of what significance does that have as
5   far as the defendant in this case.
6           I know that there is one sample at issue
7   where according to the lab, and what I anticipate
8   Ms. Roy to testify, that the statistical
9   significance is very high that Mr. Aquart was a
10  contributor to that sample.  There are also a number
11  of other ones that we've seen here where I believe
12  Ms. Roy will testify, well, those are mixtures and a
13  lot of people could have been involved in those,
14  including Mr. Aquart, and that's what I'm
15  challenging on cross-examination.
16          THE COURT:  But that sounds exactly like
17  cross-examination.
18          MR. SHEEHAN:  I hope so.
19          THE COURT:  And to the extent you
20  believe that there are deficits or lack of
21  substantiation, that's what cross-examination is
22  about.
23          MR. SHEEHAN:  Yeah, but they relied on
24  something, your Honor, that --
25          THE COURT:  But if they've produced to

2633

```
1   you every sheet that they used, which is what I
2   understood the government to be saying.
3           MR. SHEEHAN:  I don't think -- it is
4   true that they produced to me every sheet that they
5   produced.  What --
6           THE COURT:  That's a bit of tautology.
7           MR. SHEEHAN:  What they did not produce
8   in a paper form, which would be demonstrable to the
9   jury, but I do believe that they relied upon, is the
10  peak heights.  So, in scrolling through -- the
11  transition, as I understand it in my discussions
12  both with Dr. Ladd and with others, is that when the
13  electronic data gets put into place, you can look at
14  it on the screen, it will tell you what the various
15  peak heights are for various things, and then at
16  that point in time a decision is made as to whether
17  or not ultimately those are alleles.  The machine
18  does not call alleles.  The ultimate -- the analyst
19  ultimately calls the alleles that are present in the
20  machine.  But then they choose at a particular point
21  in time to make a PDF file of a particular screen
22  that's in front of them, and that's what they
23  produced to us.
24          THE COURT:  All right.  And that is what
25  Ms. Roy will testify formed the basis for her
```

2634

```
1   opinion or not and the area of cross-examination is
2   the not, right?
3           MR. SHEEHAN:  I mean, that is not -- I
4   don't anticipate she will say, because that isn't --
5   I don't think that's -- I don't think she's going to
6   say I relied on this.  What she's going to say is I
7   relied upon this procedure which gives me the
8   respective peak heights, and from those I concluded
9   that this final product is, in this case, really is
10  her reports, reflects the underlying reality of what
11  was going on here.
12          THE COURT:  Yes.  And the classic of
13  cross-examination is picking apart what she didn't
14  do and hasn't given you a report that substantiates
15  what she's saying and so forth and so on.  So what
16  I'm trying to understand is why -- if the issue is
17  has the government met its burden of proof, your
18  cross-examination is the deficits.  If you believe
19  there are deficits in what was turned over to you,
20  then that's your cross-examination.  But that
21  doesn't answer the other issue that the government
22  raises, which is why so late.
23          MS. DAYTON:  Your Honor, he was given
24  the electronic data.  So, he has that, too.  He just
25  wasn't given it in printed out form.  Counsel has
```

2635

```
1   several times requested data in electronic form in
2   this case.  He was given the data that he's talking
3   about in electronic form.  So the government hasn't
4   failed to turn over anything.  It was never printed
5   out, and he requested it in electronic form, and
6   that's what he has.  And he is now complaining it
7   wasn't printed out as well.
8           MR. SHEEHAN:  No, I asked for it both
9   ways, your Honor.  Not surprisingly, maybe I might
10  have appeared a little greedy in that regard, but I
11  asked for the peak heights.  I was advised that the
12  peak heights are there on the electronic data.  I
13  now see that they're basically anticipating no --
14  nothing by way of demonstrative exhibits from Ms.
15  Roy.  That's fine, that's their choice.  But I think
16  that on cross-examination that's why I requested --
17  that's why I am seeking the peak heights.  I
18  could -- in terms of the cross-examination I think
19  it's something she looked at.  And in that regard,
20  that's what I'm asking them to do.  I am just a
21  little puzzled that at first it was fine,
22  begrudgingly fine, okay.  Now, no deal.  But that's
23  what they've said.
24          THE COURT:  All right.  Right now there
25  is nothing before me.  You are giving me a heads up
```

2636

```
1   that this is an issue.
2           MR. SHEEHAN:  Right.
3           THE COURT:  It seems to me that the
4   issue frames itself not only in the timing context,
5   but also in the context of what her testimony will
6   be, which of course I don't know.  So, it strikes me
7   that we probably can't answer this question right
8   now and I'm still not -- maybe I missed what you
9   said about why the timing of this request.
10          MR. SHEEHAN:  Well, you didn't hear.  I
11  have to admit, your Honor, I wish I had done it
12  sooner.  I had asked them on a number of occasions
13  for this material.  They had not -- they basically
14  said no, and then I got a subpoena to them, or on
15  the way to them, which I believe should now be
16  served on them in light of their subsequent refusal
17  to provide it.  So, that's kind of where we are.  I
18  did not -- because I have actually watched this
19  done, I did not think that that was a big deal.
20          MS. DAYTON:  Your Honor, I think that
21  the defense should not be permitted to ask a witness
22  about discovery production.  Counsel is not entitled
23  to have, first of all, documents in any particular
24  form.  In fact, under Rule 16 we're not even
25  required to give him documents, we're required to
```

2637

1  make it available for him to see.  Number one.
2  Number two, counsel, as I have stated, has this in
3  electronic form, which is the form in which Ms. Roy
4  relied upon it.  She did not rely upon it in printed
5  out form.  So he has exactly what she relied upon.
6          Counsel has made FOIA requests to the
7  lab.  He's made repeated requests for their
8  protocols.  He's called the lab and asked them
9  questions.  He's visited the lab.  So, for -- you
10 know, all of the discovery production occurs between
11 counsel on both sides or between counsel for the lab
12 and the defense counsel.  For instance, the FOIA
13 requests, which the government doesn't even have,
14 were apparently incredibly voluminous.
15         So, the government does not feel that
16 Mr. Sheehan can properly ask Ms. Roy did you turn
17 this over in paper form.  The government far
18 exceeded its burden in this case, turned it over in
19 the electronic form that was requested, despite the
20 fact that there was, you know, a defense expert
21 present for much of this.  And they received
22 worksheets, they received reports, they received the
23 underlying documentation, and I think it's
24 inappropriate for them to begin to ask, like for
25 instance, about a conversation that occurred this

2638

1  morning, well, you refused to do this.  I mean, it's
2  inappropriate impeachment of a witness when she was
3  told that this is too late to start asking this
4  question by her supervisor who runs that section of
5  the lab.
6          THE COURT:  Was that in your intention
7  in any regard, Mr. Sheehan?
8          MR. SHEEHAN:  I haven't really thought
9  about that, your Honor.  I think I can talk to any
10 witness at any time for any purpose unless that
11 individual happens to be represented by counsel in
12 that case.
13         THE COURT:  But that wasn't -- the
14 question was what can you use by way of subject
15 matter for your cross-examination here at trial.
16 And the problem is the issue of pretrial discovery
17 is one between counsel to which the witness may
18 be -- may not be privy, in which case couldn't give
19 a good answer.  But why don't we wait and see what
20 the issues are when they present themselves as
21 opposed to speculating.
22         MR. SHEEHAN:  Okay, I was alerting the
23 Court to the issue.
24         THE COURT:  Thank you.  Was there
25 anything else?

2639

1          MS. REYNOLDS:  Your Honor, just an
2  update on juror No. 12.  Apparently he's been
3  released from the PD and is on his way to court.
4          THE COURT:  All right.  Why don't we
5  tell the jury that we expect then to be able to get
6  going in 20 minutes.  Is that your --
7          MS. DAYTON:  We had just a discussion
8  with counsel.  Maybe we should just inquire of juror
9  12 if he feels capable.  If he saw a murder he may
10 not feel good.  I'm just saying, once he gets here
11 maybe we should ask him on the record.
12         THE COURT:  When he gets here would you
13 bring him in.
14         And if there is nothing else, then we'll
15 stand in recess.  Thank you.
16         MS. DAYTON:  One more thing.  Perhaps we
17 can grab the juror before he goes in there so he
18 doesn't let them know what happened.
19         MR. SHEEHAN:  I didn't hear counsel.
20         THE COURT:  Intercept the juror so he
21 can come in here, tell us how he is, if he's capable
22 of continuing.  Also requesting that he not discuss
23 his appearance.
24         MR. SHEEHAN:  I think that's a good
25 idea.  I would second the motion.

2640

1          THE COURT:  Why don't I ask then our
2  court security officers to intercept the juror as he
3  gets here and just bring him right into the
4  courtroom.  Thank you very much.
5          (Recess)
6          Good morning.  Please take your usual
7  and customary seat.  Please be seated.  All right,
8  juror No. 12 apparently had an unusual
9  experience in picking up eggs and milk.
10         Sir, are you -- I know you've been very
11 attentive throughout this trial and you've served as
12 a juror for a long time now on this trial.  But,
13 given your experience of this morning, do you feel
14 that you are okay to continue?
15         JUROR:  Oh, yes, your Honor.
16         THE COURT:  Are you sure?
17         JUROR:  Yep.
18         THE COURT:  All right.  And that will be
19 fine.  I would ask you, however, not to share your
20 experience with your fellow jurors.  All right?
21         JUROR:  Yes.
22         THE COURT:  All right, why don't we then
23 ask you to go back, go back around and come in the
24 usual way to the jury room, and then we'll bring
25 everyone out.  And you are sure you are all right?

**GA660**

2641

```
1              JUROR:  I'm fine.
2              THE COURT:  Very good then.
3              MS. DAYTON:  Your Honor, I'm just
4    wondering what -- human nature, when juror No. 12
5    walks in they're going to say "where were you."  So
6    maybe -- or "where have you been."  What he should
7    say --
8              THE COURT:  You got delayed.
9              JUROR:  A delay.
10             THE COURT:  Thank you.  Unavoidably.
11             JUROR:  Exactly.
12             THE COURT:  All right then, let's bring
13   Ms. Hopkins back and she can be brought back to the
14   stand.
15             All right, we can hear he has been duly
16   greeted.
17             MR. SHEEHAN:  We do have more sound
18   separation here, your Honor, than in state court, I
19   want to say.
20             THE COURT:  Is that right?
21             MR. SHEEHAN:  That extra door adds a
22   slight measure of a pretty good barrier.  Sometimes
23   you feel like you are in there.
24             (Jury entered the courtroom.)
25             THE COURT:  All right, good morning
```

2642

```
1    ladies and gentlemen.  Please be seated.
2              We will pick up and continue with the
3    examination of Juanita Hopkins.
4              Good morning, Ms. Hopkins.  You remain
5    under oath.
6              THE WITNESS:  Yes.
7              THE COURT:  And this is
8    cross-examination by Mr. Smith.
9              All right, you may proceed.
10             MR. SHEEHAN:  Thank you, your Honor.
11   J U A N I T A   H O P K I S,
12   Having previously affirmed, was examined and
13   testified as follows:
14   CONTINUED CROSS-EXAMINATION
15   BY MR. SHEEHAN:
16   Q.  Good morning, Ms. Hopkins.
17   A.  Good morning.
18   Q.  When we were talking last week, do you
19   recall we were talking about your going for
20   treatment at the Salvation Army?
21   A.  Yes.
22   Q.  And you were discharged from that program,
23   right?
24   A.  Yes.
25   Q.  And this was at the end of November?
```

2643

```
1    A.  I don't remember exactly when it was.
2    Q.  But you weren't there that long.
3    A.  Right.
4    Q.  And then you were discharged, right?
5    A.  Yes.
6    Q.  And you went back to Bridgeport.
7    A.  Yes.
8    Q.  You didn't tell your probation officer
9    about that.
10   A.  No.
11   Q.  You didn't tell the court.
12   A.  No.
13   Q.  You didn't tell your lawyer you had been
14   discharged.
15   A.  No.
16   Q.  In fact, you did go back to court on
17   December 21st, 2005, right?
18   A.  Yes.
19   Q.  And that was for your arraignment?
20   A.  Yes.
21   Q.  Where you had to enter a not guilty plea
22   and start the process formally.  Well, you recall
23   going to Court on the December 21st, 2005?
24   A.  Yes.
25   Q.  And after that hearing you were allowed to
```

2644

```
1    remain on bond.
2    A.  Yes.
3    Q.  But at that point you didn't tell the court
4    you'd been discharged from treatment, right?
5    A.  No.
6    Q.  And you didn't tell your probation officer.
7    A.  No.
8    Q.  And you didn't even tell your lawyer.
9    A.  No.
10   Q.  So, eventually in January your probation
11   officer gets ahold of you.
12   A.  Yes.
13   Q.  And she tells you to come in to her office.
14   A.  Yes.
15   Q.  Which you did, right?
16   A.  Yes.
17   Q.  And it was only then that you admitted that
18   you'd been discharged from the program, right?
19   A.  I guess.  I don't remember.
20   Q.  Okay.  But you remember at some point
21   admitting --
22   A.  Yes, yes.
23   Q.  -- to her you'd been discharged, right?
24   A.  Yes.
25   Q.  And you rendered a positive urine for
```

2645

```
1   cocaine.
2        A.   Yes.
3        Q.   And you went back into jail.
4        A.   Yes.
5        Q.   But just for a few days, right?
6        A.   Yes.
7        Q.   So, then you went to another treatment
8   program.
9        A.   Yes.
10       Q.   And that was the Regional Network program.
11       A.   Horizons?
12       Q.   Do you recall going to a Regional Network
13  treatment program?
14       A.   No, I don't.
15       Q.   Okay.  So you don't recall being -- stop
16  attending the Regional Network program?
17       A.   Oh, outpatient.
18       Q.   Yes.
19       A.   Outpatient, yes.
20       Q.   So, you did go to an outpatient program?
21       A.   Yes.
22       Q.   But eventually you stopped attending that.
23       A.   Yes.
24       Q.   In fact, you refused to provide them with a
25  urine sample; is that right?
```

2646

```
1        A.   Yes.
2        Q.   So, the probation officer ordered you to
3   come back to her office.
4        A.   Yes.
5        Q.   But then you went and admitted yourself to
6   Horizons.
7        A.   Yes.
8        Q.   Okay.  And that's on -- this is in February
9   of -- or March of 2006, right?
10       A.   Yes.
11       Q.   Okay.  So you completed the Horizons at
12  some point, right?
13       A.   Yes.
14       Q.   And then you put yourself into another
15  program, the Another Chance program?
16       A.   Yes.
17       Q.   But on May 30th you were discharged from
18  Another Chance program?
19       A.   Yes.
20       Q.   Okay.  So then June 5, 2006, this is just a
21  few days after your discharge from Another Chance,
22  right?
23       A.   Yes.
24       Q.   You pled guilty.
25       A.   Yes.
```

2647

```
1        Q.   And on that same day you signed your
2   cooperation agreement.
3        A.   Yes.
4        Q.   And you knew what the cooperation agreement
5   said, right?
6        A.   Yes.
7        Q.   And part of the agreement was that if you
8   committed a new crime the government can say the
9   deal is off, right?
10       A.   Yes.
11       Q.   And at that plea hearing they modified your
12  bond one more time, right?
13       A.   Yes.
14       Q.   And you are told to go to Horizons again.
15       A.   Yes.
16       Q.   The next day, June 6, 2006.
17       A.   Yes.
18       Q.   Okay.  So, you did go there.
19       A.   Yes.
20       Q.   And you rendered a positive test for
21  cocaine.
22       A.   Yes.
23       Q.   Now, this is just 24 hours after you signed
24  the cooperation agreement.
25       A.   Yes.
```

2648

```
1        Q.   And you knew you could lose the cooperation
2   agreement if you committed a new crime.
3        A.   Yes.
4        Q.   But you didn't lose the cooperation
5   agreement, right?
6        A.   No, I didn't.
7        Q.   Okay.  So, on June 27, 2006, you get
8   discharged from the Horizons program.
9        A.   Yes.
10       Q.   And, again, that was for theft.
11       A.   Yes.
12       Q.   Okay.  And, again, that's a new crime,
13  right?
14       A.   Yes.
15       Q.   The government didn't take away your
16  cooperation deal then, right?
17       A.   No.
18       Q.   So, then you had another bond hearing,
19  right?
20       A.   Yes.
21       Q.   And you are ordered to go back now to the
22  Salvation Army.
23       A.   Yes.
24       Q.   And you did go to that program, right?
25       A.   Yes.
```

2649

1      Q.   And in December of 2006 you got discharged
2  from that program?
3      A.   Yes.
4      Q.   And the reason you got discharged was
5  because, again, you violated the program rules?
6      A.   Yes.
7      Q.   You had a relationship with another patient
8  there, a male patient.
9      A.   Yes.
10     Q.   And you denied it initially.
11     A.   Yes.
12     Q.   Until they found some letters.
13     A.   Yes.
14     Q.   Showing that you did have the relationship.
15     A.   Yes.
16     Q.   So, finally, this is January 2007, you are
17 put back into jail; is that right?
18     A.   Yes.
19     Q.   And the government didn't take away the
20 cooperation agreement.
21     A.   No.
22     Q.   Okay.  You talked a little bit last week
23 about a 5K, correct?
24     A.   Yes.
25     Q.   5K is a motion that the government files

2650

1  with the Court, correct?
2      A.   Yes.
3      Q.   And that's the motion where they ask the
4  judge to give you less time?
5      A.   Yes.
6      Q.   Okay.  And government is the one who
7  decides whether or not to file that motion, correct?
8      A.   Yes.
9      Q.   And it's in the government's sole
10 discretion to determine whether or not you were
11 truthful, correct?
12     A.   Yes.
13     Q.   Okay.  You talked a little bit last week
14 about when you'd met Mr. Aquart.  Do you recall
15 that?
16     A.   Yes.
17     Q.   Okay.  And you talked about you met him and
18 then there was sexual favor in exchange for drugs.
19 Is that my understanding?
20     A.   Yes.
21     Q.   Now, you were interviewed multiple times in
22 regards to this.
23     A.   Yes.
24     Q.   You were interviewed on September 15, 2005.
25     A.   Yes.

2651

1      Q.   And that was at the Bridgeport Police
2  Department, right?
3      A.   Yes.
4      Q.   And you gave a sworn statement, right?
5      A.   Yes.
6      Q.   And they asked you about Mr. Aquart?
7      A.   Yes.
8      Q.   How you guys met, how you became to dealer
9  for him, right?
10     A.   Yes, yes.
11     Q.   And then you were interviewed at your
12 arrest September 28, 2005, right?
13     A.   Yes.
14     Q.   And again you were asked questions about
15 Mr. Aquart.
16     A.   Yes.
17     Q.   How you met him.
18     A.   Yes.
19     Q.   How you came to work for him.
20     A.   Yes.
21     Q.   And you were interviewed again on
22 October 3rd, 2005, correct?
23     A.   Yes.
24     Q.   This time your lawyer is there.
25     A.   Yes.

2652

1      Q.   And you are asked questions about Mr.
2  Aquart.
3      A.   Yes.
4      Q.   How you met him, correct?
5      A.   Yes.
6      Q.   How you came to work for him, right?
7      A.   Yes.
8      Q.   And in none of those interviews did you
9  ever say anything about a sexual favor for Mr.
10 Aquart, did you?
11     A.   No.
12     Q.   So it's a new story about the sexual favor,
13 right?
14          MS. DAYTON:  Objection.  New when?
15          THE COURT:  Do you want to clarify your
16 question.
17     Q.   Prior to May of 2010, had you ever told the
18 agents that, about the sexual favor with Mr. Aquart?
19     A.   I can't recall.
20     Q.   Okay.  But you just agreed with me in all
21 of those previous interviews we just talked about
22 you never said that.
23     A.   No.
24     Q.   You didn't say it, correct, in those
25 previous interviews?

**GA663**

2653

1    A.   Correct.
2    Q.   You talked about your brother John at
3  apartment 211, correct?
4    A.   Yes.
5    Q.   You said he was selling out of that
6  apartment sometimes, correct, out of 211?
7    A.   No, he wasn't selling per se hisself (sic).
8    Q.   You didn't tell the agents that you and
9  Hodges would allow Sullivan to sell out of 211 on
10  occasion?
11   A.   I don't recall making that statement.
12        MR. SMITH:  Okay, can we bring up DG
13  1171.  This is third paragraph down.
14   Q.   Do you see that, Ms. Hopkins?
15   A.   Yes.
16   Q.   Does that refresh your memory as to what
17  you told the agents?
18   A.   No.
19   Q.   So, you don't recall telling the agents
20  that you would allow Mr. Sullivan to sell from 211?
21   A.   No.
22   Q.   Okay.  And you don't recall telling the
23  agents that you would do that for a cut of John's
24  profits?
25   A.   No.

2654

1    Q.   Okay.  And that this occurred -- it
2  happened about three times a month.  You don't
3  recall?
4    A.   Yes, I recall that happening, I just don't
5  recall saying that John-John was the one selling the
6  narcotics.
7    Q.   Okay.
8        MR. SMITH:  You can take that down.
9  Thank you.
10   Q.   You'd also talked about Frankie Hodges
11  being assaulted.
12   A.   Yes.
13   Q.   It's true, isn't it, that Mr. Womble was
14  part of those assaults?
15   A.   Yes.
16   Q.   On Mr. Hodges?
17   A.   Yes.
18   Q.   He was also kicking and beating him, right?
19   A.   Yes.
20   Q.   Is it fair to say, Ms. Hopkins, that at
21  this time, the summer of 2005, you were pretty much
22  high all of the time?
23   A.   Yes.
24   Q.   And you'd stay up for days sometimes?
25   A.   Yes.

2655

1    Q.   And then you'd crash from the high?
2    A.   Yes.
3    Q.   And then as soon as you woke up you'd feel
4  sick, maybe, or not feel well?
5    A.   No.
6    Q.   When you woke up you'd start smoking crack
7  again?
8    A.   Yes.
9    Q.   And I think you talked about drinking
10  Bukoff.
11   A.   Yes.
12   Q.   Cough syrup?
13   A.   No, that's a liquor, a cheap liquor.
14   Q.   And that would help you sleep?
15   A.   Yes.
16   Q.   Okay.  And because you had to counteract
17  the effects of the crack.
18   A.   I don't understand what you are saying.
19   Q.   Well, why would you drink the Bukoff?
20   A.   I had been up for a couple of days and my
21  body was tired, and I was smoking the crack to fight
22  the tiredness, but after a while I just drank Bukoff
23  so I could go to sleep.
24   Q.   And you spent most of your time in
25  apartment 211, right?

2656

1    A.   Yes.
2    Q.   And the days kind of started to run
3  together?
4    A.   No.
5    Q.   No?
6    A.   No.
7    Q.   It didn't seem like one day was just like
8  the next day sometimes?
9    A.   No.
10   Q.   But you were, again, high most of the time.
11   A.   Yes.
12   Q.   Okay.  Now, you talked about the night that
13  Jackie came up to knock on the door, correct?
14   A.   Correct.
15   Q.   And I think you said Frank Hodges stepped
16  out of the apartment.  Is that correct, my
17  recollection?
18   A.   At some point in time, yes.
19   Q.   Did anyone else step out of the apartment
20  with him?
21   A.   No.
22   Q.   Do you recall telling the police that Stone
23  stepped out of the apartment with Mr. Hodges?
24   A.   I don't even know who that is.  Oh, I know
25  who that is, I just didn't know his name.

2657

```
 1       Q.    Does Stone sound familiar to you?
 2       A.    I don't remember his name at all.
 3       Q.    Okay.  But this is the person who was the
 4   lookout, you said?
 5       A.    Yes, that morning of the murder.
 6       Q.    And do you recall telling the police on
 7   September 15, 2005, the interview you had at the
 8   Bridgeport Police Department, that Stone, who you
 9   also referred to as a lookout, also stepped out of
10   the apartment with Mr. Hodges?
11       A.    No.
12       Q.    Okay.
13             MR. SMITH:  For the record, this is
14   Government's Exhibit 216.
15             THE COURT:  All right.
16       Q.    Do you think looking at your statement
17   might refresh your memory about telling the police
18   about Stone being in the apartment?
19       A.    I don't recall that at all.
20       Q.    Okay.  Do you think looking at your
21   statement might help you remember?
22       A.    I don't know.
23       Q.    Would you like to look at your statement?
24       A.    Yeah.
25       Q.    Okay.
```

2658

```
 1             MR. SMITH:  Can we bring up DG 1029,
 2   please.
 3       Q.    If you would take a moment to look at that.
 4       A.    I don't remember that.
 5       Q.    Okay.  You don't remember telling the
 6   police that, okay.
 7             MR. SMITH:  You can take that down.
 8   Thank you.
 9       Q.    You also, if I recall, had talked a little
10   about who was in the apartment the night before the
11   morning that the homicide, the murders were
12   discovered; is that right?
13       A.    Right.
14       Q.    I think you mentioned Frankie was there.
15       A.    Yes.
16       Q.    Okay.  Now, do you recall in your very
17   first interview with the police -- well, strike
18   that.  Do you remember an interview with the agents
19   telling them that Hodges had left the apartment to
20   go down to Bouzzine's apartment that night?
21       A.    Yes.
22       Q.    So, you recall telling the agents that?
23       A.    Yes.
24       Q.    And did he, in fact, go down to see
25   Bouzzine that night?
```

2659

```
 1       A.    Yes.
 2       Q.    Do you also recall telling the agents that
 3   you woke up between 2:00 and 3:00 a.m. that night
 4   and Hodges was not in the apartment?
 5       A.    Yes.
 6       Q.    So that, in fact, you did wake up at two or
 7   three and Hodges was not in the apartment?
 8       A.    Yes.
 9       Q.    Okay.  Now, the morning of the homicides
10   you say you wake up; is that correct?
11       A.    Yes.
12       Q.    And you hear some screaming.
13       A.    Yes.
14       Q.    And then you and Hodges leave to go buy
15   some drugs.
16       A.    Yes.
17       Q.    Walk out the building, right?
18       A.    Yes.
19       Q.    Past the police.
20       A.    Yes.
21       Q.    They stopped you and asked you who you
22   were.
23       A.    Yes.
24       Q.    You gave your names.
25       A.    Yes.
```

2660

```
 1       Q.    Didn't tell them anything about what was
 2   going on in the building.
 3       A.    No.
 4       Q.    And you went out and you bought the drugs.
 5       A.    Yes.
 6       Q.    And then you came back.
 7       A.    Yes.
 8       Q.    And you passed the police again.
 9       A.    Yes.
10       Q.    And then went up to the apartment to cook
11   the drugs.
12       A.    Yes.
13       Q.    Is that right?
14       A.    Yes.
15       Q.    Now, do you recall that in your very first
16   interview on September -- well, your first interview
17   with the agents on your arrest on September 28,
18   2005, that you told the agents that you were
19   awakened by a phone call from Mr. Aquart?
20       A.    Yes.
21       Q.    So you remember telling the agents that,
22   correct?
23       A.    Yes.
24       Q.    You'd also talked about seeing this other
25   person with the dreads, right?
```

2661

```
1      A.   Yes.
2      Q.   And how did you refer to him?  I'm sorry, I
3  forgot.
4      A.   As a person with dreads.  I didn't refer to
5  him as anything.
6      Q.   You didn't refer to him by name?
7      A.   No.
8      Q.   Okay.  Now, do you recall in your very
9  first interview telling the agents that after your
10 return from purchasing cocaine you got a call from
11 Mr. Aquart?
12     A.   Yes.
13     Q.   And he told you to open the apartment door.
14     A.   Yes.
15     Q.   And this is apartment 211 we're talking
16 about.
17     A.   Yes.
18     Q.   And then this person with the dreadlocks is
19 standing there.
20     A.   Right.
21     Q.   Later, though, do you recall telling the
22 agents that when you got the phone call from Mr.
23 Aquart that he told you to take the money from
24 selling of the crack and you'd brought it down to
25 Judy's apartment?
```

2662

```
1      A.   No.
2      Q.   You don't recall telling the agents that?
3      A.   No.
4           MR. SMITH:  Could we bring up DG 1174.
5      Q.   I'm sorry, would looking at a document
6  maybe refresh your memory?
7           THE COURT:  If you want to refresh her
8  recollection, just show it to her.
9           MR. SMITH:  Okay.
10          THE COURT:  She won't know whether it
11 will or not.
12     Q.   In that first full paragraph.  Do you
13 see --
14          MR. SMITH:  May I approach, your Honor,
15 so -- it's kind of a long paragraph.
16          THE COURT:  Yes.
17     A.   I don't recall that.
18     Q.   You don't recall telling the agents that?
19     A.   No.
20          MR. SMITH:  We can take that down.
21 Thank you.
22     Q.   Now, it's my understanding that Womble was
23 the person who'd begun to watch apartment 101; is
24 that right?  Maybe I'm not being very clear.  You
25 stated at some point that Tina had begun to sell
```

2663

```
1  narcotics?
2      A.   Yes.
3      Q.   And Womble was the person who began to
4  watch the apartment, watch 101?
5      A.   Yes.
6      Q.   And it was Womble who was the one who was
7  robbing some of the customers who were leaving 101.
8      A.   Yes.
9      Q.   And I think last week you testified that
10 you had never seen Womble have a dispute with Tina
11 directly.
12     A.   Yes.
13     Q.   Okay.  But you are aware of a time -- well,
14 let me back up.  So you never threw a table leg down
15 to Womble as he was arguing with Tina?
16     A.   No.
17     Q.   And you are certain about that?
18     A.   Yes.
19     Q.   But you do recall a time when Womble once
20 came into apartment 211 --
21     A.   Yes.
22     Q.   -- and picked up the table leg.
23     A.   Yes.
24     Q.   And said he was going to beat Tippy with
25 the table leg.
```

2664

```
1      A.   I don't recall him saying that.
2      Q.   Okay.  Would looking at something help
3  refresh your memory to that?
4      A.   I don't recall him saying that.
5      Q.   Okay.  Would you like to look at it?
6           THE COURT:  If you have something you
7  want to show to refresh her recollection, let's just
8  do it.
9           MR. SMITH:  Can we bring up DG 1167.
10     Q.   Do you see that top paragraph?
11     A.   Yes.
12     Q.   Okay.
13     A.   I don't recall that.
14     Q.   You don't recall telling the agents that
15 Womble said he was going to beat Tippy with the
16 table leg?
17     A.   No.
18     Q.   Okay.
19          MR. SMITH:  You can take that down.
20     Q.   And this table leg was kind of long.
21     A.   Yes.
22     Q.   And had a squared off top.
23     A.   Yes.
24     Q.   It had taped wrapped around the top.
25     A.   Yes.
```

**GA666**

2665

```
1      Q.   And this incident where Womble came in to
2   pick up the table leg, that was shortly before the
3   murders, right?
4      A.   I don't recall exactly when it was.
5      Q.   Okay.  Do you recall telling the agents it
6   was about a week before the murders?
7      A.   Yes.
8      Q.   Okay.  When you were preparing for your
9   testimony here today, you'd met with law enforcement
10  more recently?
11     A.   Yes.
12     Q.   Okay.  Did they ask you about this incident
13  with Womble coming in with a table leg -- or coming
14  in to get the table leg?
15     A.   I don't recall.
16     Q.   But you don't --
17     A.   If they asked me or not, I don't recall.
18     Q.   You don't remember if they were asking you
19  about that?
20     A.   I don't remember.
21          MR. SMITH:  Could I have just a moment,
22  your Honor?
23          THE COURT:  Yes.
24     Q.   Maybe it wasn't clear to me, Ms. Hopkins,
25  and I apologize.  You don't recall telling the
```

2666

```
1   agents that Womble had said to you he was going to
2   beat Tippy with the table leg?
3      A.   I don't recall.
4      Q.   Okay.  Do you recall telling the agents
5   that?
6      A.   I don't recall.
7      Q.   You don't remember either him saying it or
8   him --
9      A.   I don't remember.
10     Q.   Or you telling the agents?
11     A.   Recently telling the agents, no, I don't,
12  but I remember in the beginning telling the agents,
13  yes, I do.
14     Q.   So, you do remember telling the agents that
15  Womble said to you he would beat Tippy with the
16  table leg?
17     A.   No, I just told them I recall Womble coming
18  to get the table leg.
19     Q.   Okay?
20     A.   I don't recall Womble saying that at all.
21     Q.   Okay.
22          MR. SMITH:  I have nothing further, your
23  Honor.  Thank you.
24          THE COURT:  All right, redirect.
25          MS. DAYTON:  Thank you, your Honor.
```

2667

```
1   REDIRECT EXAMINATION
2   BY MS. DAYTON:
3      Q.   Good morning, Ms. Hopkins.
4      A.   Good morning.
5      Q.   How are you?
6      A.   Fine.
7      Q.   Good.  Ms. Hopkins, I forgot to ask you
8   earlier, did you ever GO by any other name other
9   than Juanita?
10     A.   Yes.
11     Q.   What name?
12     A.   Vanessa.
13     Q.   Who gave you that name?
14     A.   Womble.
15     Q.   Why?
16     A.   He didn't want us to be called by our
17  government names.
18     Q.   What do you mean by "government names"?
19     A.   The real name.
20     Q.   Why not?
21     A.   I'm really not sure of why.  I'm really not
22  sure why.
23     Q.   Ms. Hopkins, counsel asked you a lot of
24  questions about attending drug programs?
25     A.   Yes.
```

2668

```
1      Q.   Do you recall that?  You testified on
2   direct that you were addicted to coke, crack,
3   marijuana and alcohol for 22 years; is that correct?
4      A.   Yes.
5      Q.   Was that an easy habit to kick?
6      A.   No.
7      Q.   Why not?
8      A.   It's just not easy habit.  I been addicted
9   for so long.  It's a disease.  It's just like
10  fighting off a disease.  I didn't even believe -- I
11  didn't have a desire at that time to kick it.  But a
12  lot of time that addiction helped me to numb a lot
13  of my past, things that I had gone through at that
14  time.
15     Q.   Without getting too personal, what types of
16  things from your past were you trying to numb?
17          MR. SMITH:  Objection.  This is outside
18  the scope of my cross.
19          THE COURT:  I think it isn't because you
20  examined how many times she failed in her
21  rehabilitation programs.
22     A.   I was molested as a child by my brothers
23  and cousins.  I became pregnant at 13, didn't know
24  who I was pregnant by, which relative.  I also was
25  physically abused by my mother.  After telling my
```

2669

```
1   mother that my private part would hurt, and I would
2   tell her why, and she would think it would hurt
3   because I wasn't wiping properly.  So, I was numbing
4   basically all my life so I didn't have to deal with
5   those things being neglected and physically and
6   sexually abused.
7        Q.   Have you had the opportunity now while
8   you've been in custody to get treatment both for
9   your drug addiction and for what you've talked
10  about?
11            MR. SMITH:  Objection, outside the
12  scope.
13            THE COURT:  Sustained.
14       Q.   Do you continue in drug treatment now?
15            MR. SMITH:  Objection, outside the
16  scope.
17            THE COURT:  Sustained.
18       Q.   How long have you been clean?
19            MR. SMITH:  Objection, same.
20            THE COURT:  Overruled.
21       A.   I've been clean now for 43 months.
22       Q.   Counsel also asked you a question about the
23  defendant asking you for a sexual favor.  Was that
24  easy for you to talk about?
25       A.   No.
```

2670

```
1        Q.   Okay.  I want to ask you a few more
2   questions.  Counsel also asked you about being
3   interviewed by the police prior to your arrest?
4        A.   Yes.
5        Q.   In September of 2005.  Do you recall that?
6        A.   Yes.
7        Q.   And at that time did you talk to them about
8   a person named Zee?
9             MR. SMITH:  Objection, outside the
10  scope.
11            THE COURT:  Overruled.  The subject of
12  her interviews with law enforcement was the subject
13  of cross-examination.
14       Q.   Do you recall?
15       A.   I don't recall.
16       Q.   Okay.
17            MS. DAYTON:  Your Honor, if I may
18  approach.
19            THE COURT:  You may.
20            MS. DAYTON:  Thank you, your Honor.
21       Q.   Just showing you, this is a report of an
22  interview --
23            THE COURT:  You don't have to describe
24  what it is.
25            MS. DAYTON:  I was just referring --
```

2671

```
1             THE COURT:  Unless she signed it.
2             MS. DAYTON:  She did.
3             THE COURT:  All right.
4             MS. DAYTON:  This is a report of an
5   interview from September 15th of 2005, your Honor.
6   And her signature is on the bottom.
7             MR. SMITH:  Well, is the question is
8   this refreshing her memory?
9             MS. DAYTON:  I'm asking her to take a
10  look.
11            THE COURT:  And to refresh her memory on
12  whether or not she ever described to the police
13  someone named Zee?  Is that the question?
14            MS. DAYTON:  Yes.
15       Q.   Does that refresh your memory?
16       A.   No.
17       Q.   Okay.  Do you remember describing to the
18  detective who interviewed you the person who came to
19  the door to collect money?
20            MR. SMITH:  Objection.  Asked and
21  answered.  She just said she didn't remember.
22            THE COURT:  Different question.
23  Overruled.
24       A.   Yes.
25       Q.   What did that person look like?
```

2672

```
1        A.   A black, black, black guy with dreads.
2        Q.   And do you remember anything else about
3   him?
4        A.   No.
5        Q.   And did you earlier identify that person
6   while we've been in court?
7        A.   Yes.
8        Q.   And is that the person you identified in
9   Government's Exhibit 207.  Just slowly coming up.
10       A.   Yes.
11       Q.   Counsel also -- oh, actually let me ask you
12  a question.  Who controlled the activities at Pops'
13  apartment?
14            MR. SMITH:  Objection.  Outside the
15  scope.
16            THE COURT:  Overruled.
17       A.   Dreddy.
18       Q.   And is that where that table leg was
19  located?
20       A.   Yes.
21       Q.   Counsel also asked you several questions
22  about whether you told the police about an
23  individual named Stone leaving the apartment with
24  the defendant a few nights before the murders.  Do
25  you remember that?  Do you remember him asking you
```

2673

```
1    those questions?
2        A.   Yes.
3        Q.   Did you -- do you remember whether or not
4    you told the agents, or the detective in this case,
5    that Frankie left with the defendant?
6        A.   Yes.
7        Q.   And did you, in fact, identify the
8    defendant from a photographic lineup?
9        A.   Yes.
10           MS. DAYTON:  Your Honor, at this time
11   the government would mark the photographic lineup as
12   Government's Exhibit 261.
13           MR. SMITH:  I'm going to object, your
14   Honor, as again being outside the scope.  I didn't
15   ask her about her identification of Mr. Aquart.
16           THE COURT:  You asked her about whether
17   Mr. Aquart himself was selling out of the apartment.
18           MS. DAYTON:  May I approach, your Honor?
19           THE COURT:  Yes.
20           MR. SMITH:  Respectfully, your Honor, I
21   don't believe I asked that specific question,
22   whether Mr. Aquart was selling.
23           THE COURT:  The issue of what she told
24   to the agents, however, was a subject of
25   cross-examination.  At least for the purposes of
```

2674

```
1    this question I'm going to consider this to be
2    within the area of cross.
3            MS. DAYTON:  Thank you.
4        Q.   Do you recognize what I'm showing you as
5    261?
6        A.   Yes.
7        Q.   What is that?
8        A.   That's a police, I guess, mug shot lineup
9    identifying -- I guess.
10       Q.   Do you recognize those initials?
11       A.   Yes.
12       Q.   Whose are those?
13       A.   Mines (sic).
14       Q.   And there a date.  What's the date?
15       A.   September 15, 2005.
16       Q.   And that was before your arrest?
17       A.   Yes.
18           MS. DAYTON:  Your Honor, at this time
19   the government would move Government's Exhibit 261
20   into evidence.
21           MR. SMITH:  Objection.
22           THE COURT:  Basis?
23           MR. SMITH:  It's hearsay, your Honor.
24           THE COURT:  This is being offered for
25   what purpose?
```

2675

```
1            MS. DAYTON:  Your Honor, actually it's
2    not hearsay.  Under Federal Rules of Evidence
3    801(d)(1)(C), prior identification.  And it's also a
4    consistent statement, consistent prior statement.
5            MR. SMITH:  Your Honor, may we approach
6    on prior consistent statement?
7            THE COURT:  Yes.
8            (Sidebar conference)
9            MR. SMITH:  Your Honor, I think Mr.
10   Sheehan raised this issue last week with the case of
11   Moayad.
12           MS. DAYTON:  Moayad.
13           MR. SMITH:  Moayad, I apologize.  The
14   problem here is that if I ask a witness a specific
15   inconsistent statement, did you tell the agents X on
16   X date, then what happens is the government comes
17   back and says, well, did you identify Dreddy.  I
18   never asked did you at any point in the past not
19   identify the defendant.
20           THE COURT:  Can I jump ahead to the
21   other ground?
22           MR. SMITH:  Sure.  It's also not --
23   again, it's outside the scope.
24           THE COURT:  This is one of
25   identification of a person made after perceiving the
```

2676

```
1    person, which is the reason that they're offering
2    it.  So, if I were to accept your prior --
3            MR. SMITH:  Let's assume then it comes
4    in under that, your Honor.
5            THE COURT:  Right.
6            MR. SMITH:  The problem is it is outside
7    the scope because I didn't ask did you not identify
8    Mr. Aquart in the past or did you -- were you shown
9    a photo and said you don't see him, then yes, they
10   could say this is a prior consistent to that
11   specific issue.
12           THE COURT:  But this is whether or not
13   it's hearsay as opposed to whether not it's prior
14   consistent.  No?
15           MR. SMITH:  Well --
16           THE COURT:  This is a prior statement
17   made by a witness.
18           MS. DAYTON:  It's C, your Honor.
19           THE COURT:  Which is identification of a
20   person made after perceiving the person.
21           MR. SMITH:  Okay.  Arguably, if it is
22   not hearsay, your Honor, the problem is it still is
23   not a prior consistent statement as to something
24   which I specifically questioned the witness on.  So,
25   therefore, it's outside the scope of my cross.
```

2677

1    MS. DAYTON:  They asked her about did
2  you admit to the agents that you had sex with Dreddy
3  for the purpose of, you know, drugs.  They asked her
4  about who was selling drugs out of that apartment.
5  They asked her about Stone leaving with the
6  defendant.  They've asked her about defendant.
7        They've attacked her credibility over
8  and over again, and they've specifically questioned
9  her about this particular interview and what she
10  didn't tell them.  So, the government is not limited
11  by the exact wording of their questions.  She
12  identified the defendant in that first interview as
13  the person she was selling drugs for and the person
14  that she saw Frank leave with.  This goes exactly to
15  what their cross-examination was.
16        THE COURT:  The defendant's claim that
17  merely asking a witness what she said or didn't say
18  doesn't open the door to the entirety of what she
19  did say.
20        MR. SMITH:  That is correct, your Honor.
21        THE COURT:  Is -- I'm going to put that
22  aside because the issue of scope I think really is
23  raised by the questions related to her dealings with
24  Dreddy, the challenge to her credibility, and
25  therefore, it seems to me she's entitled to -- the

2678

1  government is entitled to question who she's
2  identifying as doing these things and that she did
3  so in her interview.  It doesn't open the door
4  completely, but I'm going to permit the
5  identification.
6        MR. SMITH:  Well, again, your Honor,
7  what I asked was had she ever before -- for
8  instance, for the sexual favors, had she ever before
9  said this.  Her answer was no, I didn't.  Now if the
10  government had a prior consistent statement to say
11  actually she had told the agents about this on some
12  prior occasion, that would be proper.  But if I
13  simply question, I'm trying to impeach a witness
14  through use of prior inconsistent statement, but
15  what that does not do, and I want the record to be
16  clear what my objection is, it does not open it up
17  for them to say all of the times on all of the
18  subjects she was previously consistent on.  That's
19  what it does not do.  If I say did you tell the
20  agents on such and such a date X and such a date no,
21  but then the government says on date Y did you tell
22  them that, then yes, that could come in.
23        THE COURT:  I understand your position.
24        MR. SMITH:  Okay.
25        THE COURT:  The government's claim has

2679

1  many aspects, one of which is not --
2        MS. DAYTON:  Correct.
3        THE COURT:  Something more you want to
4  add?
5        MS. DAYTON:  No, I think this is
6  actually my last question.
7        THE COURT:  Okay.  It is limited to the
8  person that she's identifying as Dreddy and that she
9  in fact identified that person by a photo as well,
10  and that is not opening the door to the full
11  panoply.
12        MR. SMITH:  If that's the government's
13  representation, that's where this ends, that's fine.
14        MS. DAYTON:  This is where this ends.
15        (Sidebar concluded)
16        MS. DAYTON:  May I publish, your Honor.
17        THE COURT:  You may.
18   Q.   Is that the document that you previously
19  identified, Ms. Hopkins?
20   A.   Yes.
21   Q.   Who is the person that you circled?
22   A.   Dreddy.
23   Q.   Thank you.
24        MS. DAYTON:  The government has no
25  further questions, your Honor.

2680

1        THE COURT:  All right, recross.
2        MS. DAYTON:  It's 261 for the record.
3        THE COURT:  Yes, I have that.  It's a
4  full exhibit.
5  RECROSS-EXAMINATION
6  BY MR. SMITH:
7   Q.   Ms. Hopkins, you talked about it not being
8  easy to talk about the incident with Mr. Aquart with
9  the sexual favor; is that right?
10   A.   Yes.
11   Q.   You told the agents from day one you were a
12  prostitute, right?
13   A.   Yes.
14   Q.   Okay.
15        MR. SMITH:  I have nothing further.
16        THE COURT:  Anything further?
17        MS. DAYTON:  No.  Thank you very much,
18  your Honor.
19        THE COURT:  Thank you, Ms. Hopkins.  You
20  may step down.  You are excused.
21        Will the government please call its next
22  witness.
23        MS. RODRIGUEZ-COSS:  Your Honor, we call
24  Ms. Roberta Benoit.
25        THE COURT:  I'm sorry?

2681

```
1          MS. RODRIGUEZ-COSS:  Roberta Benoit,
2  b-e-n-o-i-t.
3          MS. DAYTON:  May we approach briefly.
4  We don't need it on the record.
5          (Off the record)
6          THE COURT:  All right, Ms. Benoit, if
7  you would take the stand, remain standing, raise
8  your right hand, the oath will be administered to
9  you.
10         R O B E R T A    B E N O I T,
11 Having first affirmed, was examined and testified as
12 follows:
13         THE WITNESS:  My name is Roberta Benoit,
14 b-e-n-o-i-t, and I live in Meriden, Connecticut.
15         THE COURT:  All right, you may proceed,
16 Ms. Rodriguez.
17 DIRECT EXAMINATION
18 BY MS. RODRIGUEZ-COSS:
19    Q.   Hi.  So, I think I may be mispronouncing
20 your last name.  Is it Benoit?
21    A.   It's either Benoit, Benoit.
22    Q.   How do you pronounce it?  Benoit?
23    A.   I pronounce it Benoit.
24    Q.   Ms. Benoit, can you tell the members of the
25 jury where you are currently employed?
```

2682

```
1     A.   I'm employed by Wells Fargo Bank.
2     Q.   In what capacity?
3     A.   I'm an operations manager.  My official
4  title is marketing support consultant.
5     Q.   What is the relationship between Wells
6  Fargo and Wachovia bank?
7     A.   Wells Fargo bought out Wachovia
8  approximately a year and a half ago.
9     Q.   As part of that acquisition, does Wells
10 Fargo then come to have all the records and
11 documents of Wachovia Bank in its possession?
12    A.   Yes, that is correct.
13    Q.   And how long have you been employed with
14 them?
15    A.   Through mergers 26 years.
16    Q.   And what are some of your duties with the
17 bank?
18    A.   I manage policy and procedure within the
19 financial centers ensuring that they remain
20 compliant enough to pass their audits.
21    Q.   And have you also as part of your duties
22 been called at different times in court proceedings
23 to identify records, bank records?
24    A.   Yes, that is correct.  That is part of our
25 responsibility.
```

2683

```
1     Q.   So, I want to bring your attention to what
2  has been marked Government's Exhibit 259A and B.  So
3  can you tell us, Ms. Benoit, whether you recognize
4  these documents?
5     A.   Yes, I do.
6     Q.   How do you recognize them?
7     A.   I recognize this first set of documents as
8  statements on a crown checking account.
9     Q.   And when you say this first set of
10 documents, we're referring to Government
11 Exhibit 259A; is that correct?
12    A.   Yes, that is correct.
13    Q.   And are those documents kept in the regular
14 course of business of Wachovia Bank?
15    A.   Yes, they are.
16    Q.   And bringing your attention to 259B, do you
17 recognize those documents?
18    A.   Yes.  These documents are savings account
19 statements.
20    Q.   And also records kept in the regular course
21 of business of Wachovia Bank?
22    A.   Yes, that is correct.
23         MS. RODRIGUEZ-COSS:  Your Honor, we
24 would like to submit into evidence at this time
25 Government's Exhibit 259A and 259B.
```

2684

```
1          MR. SHEEHAN:  No objection.
2          THE COURT:  Full exhibits.
3     Q.   So, bringing your attention first to
4  Government Exhibit 259A, can you see that there on
5  the monitor in front of you?  And I'm going to zoom
6  in.  And what do these particular records correspond
7  to?  What type of account?
8     A.   This is a checking account.
9     Q.   And that's what you I guess call crown
10 access banking?
11    A.   Yes, that is correct.
12    Q.   And what is the account number?
13    A.   The account number is 1010069168927.
14    Q.   And who does that account correspond to?
15    A.   Azibo Smith.
16    Q.   And what the customer's address?
17    A.   The address is 201 Read Street in
18 Bridgeport, Connecticut, 06607.
19    Q.   And I'm going to bring your attention to
20 the last document.
21         MS. RODRIGUEZ-COSS:  I'm going to
22 separate it, your Honor.
23    Q.   The last document on Government
24 Exhibit 259A, can you tell us what we're looking at
25 here?
```

2685

```
1     A.    This is a counter deposit ticket.
2     Q.    What does that mean for people out of the
3  banking world?
4     A.    It means that it is a blank deposit ticket.
5  So, if a customer does not come in with a preprinted
6  ticket, we have a blank supply that they can
7  complete for us.
8     Q.    And when you say if the customer doesn't
9  come in with, when you refer to a counter deposit,
10 you are referring to a deposit conducted where?
11    A.    Within the branch.
12    Q.    Within?
13    A.    Or the drive-up window.
14    Q.    And when was this particular deposit made?
15    A.    This deposit was made on August 23rd, 2005.
16    Q.    And in what amount?
17    A.    $400.
18    Q.    And there is a circle around that $400.
19 Can you tell us what significance, if any, that
20 circle has?
21    A.    That usually means when our tellers accept
22 cash, they count the cash and circle it to show that
23 they verified it to the total on the ticket.
24    Q.    And can you tell me where this particular
25 deposit was made, in what branch?
```

2686

```
1     A.    This was made in our Trumbull office on
2  Hawley Lane.
3     Q.    And this is the supporting documentation
4  for the $400 deposit, correct?  Would it also be
5  reflected in the bank statement corresponding to
6  August 2005?
7     A.    Yes, it will show in the statement.
8     Q.    Bringing your attention to page 6 of
9  Government Exhibit 259A, can you tell us what we're
10 looking at here?
11    A.    This is a listing.  As part of the
12 statement it says "deposits and other credits."  So
13 this is a deposit of deposits that were made during
14 that time period and then the total.
15    Q.    Okay.  And reflected here on 8/23, this is
16 that the same date we just reviewed the slip for?
17    A.    Yes.
18    Q.    And when it says here "counter deposit," is
19 that a reference to what you were saying, a deposit
20 actually made physically at the branch?
21    A.    It's a deposit made at the branch using
22 that type of ticket.
23    Q.    And bringing your attention again to page 6
24 of that document, further down, you see a series of
25 other transactions; is that correct?
```

2687

```
1     A.    Yes, that is correct.
2     Q.    I want to bring your attention first to the
3  first transaction shown there on the bottom.  Where
4  it says purchase "Amoco Oil," can you tell us what
5  type of transaction that is?
6     A.    That is a point of sale purchase using a
7  debit card.
8     Q.    And in the amount of 22.64?
9     A.    Yes, that is correct.
10    Q.    And we see two different dates.  One first
11 listed in the left-hand column of August 15th and
12 one listed to the right of the transaction of
13 August 14th.  Can you tell us -- or explain to us
14 the difference in those dates?
15    A.    The date to the left of August 15th is the
16 actual date it posted to the account.  August 14th
17 would be the day it was transacted.
18    Q.    And when you say this was the actual
19 purchase, someone using a debit card corresponding
20 to this account purchased gas, I would imagine, at
21 Amoco Oil in Bronx, New York on August 14th?
22    A.    Yes, there was a purchase made at that
23 location.
24    Q.    And the second transaction there, is that a
25 similar transaction?
```

2688

```
1     A.    Yes.
2     Q.    Again gas purchased?
3           MR. SHEEHAN:  I'm going to object, your
4  Honor.  I think the document speaks for itself and
5  counsel should not be characterizing what it is.
6           THE COURT:  Sustained.
7     Q.    And bringing your attention further down to
8  the transaction listed here with a left-hand column
9  date of August 17th.  What type of transaction is
10 that?
11    A.    That is also a point of sale purchase
12 transaction.
13    Q.    And where was that according?  For your
14 record, where was that transaction made?
15    A.    It says it was made at Piggly Wiggly, No.
16 85, in Pinetops, North Carolina.
17    Q.    And, again, when was the actual purchase
18 made?
19    A.    August 16th.
20    Q.    And bringing your attention to page 7 of
21 Government Exhibit 259A, at the top of that page,
22 and specifically the first transaction there on the
23 left-hand column, date of August 19th, what type of
24 transaction is that?
25    A.    That's a point of sale purchase.
```

2689

1    Q.   And where was that transaction made?
2    A.   At Tanner's Citgo, Greensboro, Georgia.
3    Q.   What date?
4    A.   The actual transaction was on 8/17 and it
5  posted on 8/19.
6    Q.   And the immediate transaction following
7  that, where was that transaction made?
8    A.   It was made at Tanner's Citgo in
9  Greensboro, Georgia.
10   Q.   Again on what date?
11   A.   August 17th.
12   Q.   And further on the down, we see three other
13 transactions posted on August 22nd.  Do you see
14 those there?
15   A.   Yes.
16   Q.   Can you tell us -- let's start with the
17 first one.  Where was that transaction made?
18   A.   Amoco Oil in Trenton, New Jersey.
19   Q.   And when?
20   A.   August 20th.
21   Q.   And the second transaction, where was that
22 made?
23   A.   Shell Oil in Madison, Georgia.
24   Q.   And when was that made?
25   A.   August 19th.

2690

1    Q.   And can you tell us why it is that the
2  transaction at Amoco Oil for 14.15 is listed before
3  the sale of Shell Oil on Madison, Georgia?
4    A.   My understanding is that when there are
5  multiple purchases on the same date or multiple
6  debits on the same date, they will post them in
7  dollar amounts with those smallest going first to
8  the largest.
9    Q.   So all three of those transactions were
10 posted by the bank on the same date?
11   A.   Yes.
12   Q.   But, again, the date on the right-hand side
13 is when the purchase was actually made; is that
14 right?
15   A.   Yes.
16   Q.   And the transaction there, when was that
17 one made?
18   A.   That was made at Shell Oil in Madison,
19 Georgia.
20   Q.   And again on what date?
21   A.   On August 19th.
22   Q.   Let me bring your attention now to what we
23 have marked Government Exhibit 259B.  Can you tell
24 us what we're looking at here?
25   A.   This is a premium savings account

2691

1  statement.
2    Q.   And how does that account differ from the
3  account reflected on Government's Exhibit 259A?
4    A.   This is a savings account, the other was a
5  checking account.
6    Q.   And who does this account belong to?
7    A.   Azibo Smith.
8    Q.   And what's the account number on this
9  account?
10   A.   3000061137922.
11   Q.   I'll bring your attention to five pages
12 from the end of the document.  Can you tell us what
13 we're looking at here?
14   A.   This is a counter deposit ticket.
15   Q.   And, again, can you tell us what that
16 means?
17   A.   It is a deposit to the savings account that
18 is not a preprinted transaction, it's something that
19 the customer completes when they come in to our
20 branch to make a deposit.
21   Q.   And according to this -- and when was this
22 deposit made?
23   A.   This was made on August 23, 2005.
24   Q.   And according to the deposit slip that
25 we're looking at, it was made by whom?

2692

1    A.   Azibo Smith.
2    Q.   And in what amount?
3    A.   $500.
4    Q.   And that $500 is not circled.  What, if
5  anything, does that indicate to you?
6    A.   Well, it could indicate that it's not cash
7  or that the teller didn't circle the cash as she was
8  supposed to.
9    Q.   And why would the teller not circling the
10 cash as she was supposed to be an option in this
11 particular case?
12        MR. SHEEHAN:  Objection.  It calls for
13 speculation.
14        MS. RODRIGUEZ-COSS:  If she knows?
15        THE COURT:  Sustained.
16   Q.   What would you expect to see if the deposit
17 was, for example, a series of checks that amounted
18 to $500?
19        MR. SHEEHAN:  Objection.  It calls for
20 speculation.
21        THE COURT:  I'm going to permit the
22 question.
23   A.   Can you repeat question for me.
24   Q.   What would you expect to see on the deposit
25 slip if the amount being deposited was comprised of

2693

```
1   a series of checks?
2           MR. SHEEHAN:  Objection, it calls for
3   speculation.
4       A.  Usually there is --
5           THE COURT:  Overruled.  Do you have
6   knowledge of what would appear on a deposit slip if
7   the deposit was comprised of a series -- of several
8   checks?  You have knowledge of that?
9       A.  A customer --
10          THE WITNESS:  Yes.
11          THE COURT:  Go ahead, you may answer the
12  question.
13      A.  A customer would list their individual
14  checks in the check section of the deposit ticket.
15      Q.  And would you be referring to this section
16  here to the right-hand side of the document?
17      A.  Yes, where it says "checks."
18      Q.  Bringing your attention to document
19  contained at nine pages from the end of the
20  document.  Can you tell us what we're looking at
21  here?
22      A.  This is a deposit to the savings account,
23  the counter deposit ticket.
24      Q.  And when was this one made?
25      A.  This one was made on October 7, 2004.
```

2694

```
1       Q.  And by whom?
2       A.  Azibo Smith.
3       Q.  And, again, the circle around the 5,000
4   indicates what to you, if anything?
5       A.  It indicates to me that it could have been
6   cash.
7       Q.  And those transactions would be posted in
8   the statements of the account; is that correct?
9       A.  Yes, that is correct.
10      Q.  So if we go to the August statement, do we
11  see a counter deposit listed on 8/23?  Is that
12  correct?
13      A.  Yes, that is correct.
14      Q.  And if we go to the October 2004 statement,
15  we see the $5,000 counter deposit listed; is that
16  correct?
17      A.  Yes, that is correct.
18      Q.  On October 12th.  And what is the address
19  listed for Azibo Smith in the premium savings
20  account?
21      A.  The address listed is 201 Read Street in
22  Bridgeport, Connecticut, 06607.
23      Q.  And now, bringing your attention for
24  example to the statement of March 2005, what is the
25  address listed for Mr. Smith on that statement?
```

2695

```
1       A.  776 Shelton Street in Bridgeport,
2   Connecticut, 06608.
3       Q.  So at some point in time had Mr. Smith
4   informed an address change to the bank?
5           MR. SHEEHAN:  Objection.  It calls for
6   speculation.
7           THE COURT:  Is there a document you are
8   showing her?
9           MS. RODRIGUEZ-COSS:  Well, I just showed
10  her the statement reflecting a different address.
11          THE COURT:  I'm going to sustain the
12  objection.
13          MS. RODRIGUEZ-COSS:  The Court's
14  indulgence.
15          We don't have anything further.  Thank
16  you.
17          THE COURT:  Cross-examination.
18          MR. SHEEHAN:  I have no questions.
19  Thank you, your Honor.
20          THE COURT:  All right, thank you, Ms.
21  Benoit.  You are excused.  You may step down.
22          Please call your next witness.
23          MS. RODRIGUEZ-COSS:  Yes, your Honor.
24  We will call Special Agent Kurt Wheeler.
25          THE COURT:  All right, Agent Wheeler, if
```

2696

```
1   you'll come to the stand, please.  Remain standing.
2   Raise your right hand.
3            K U R T   W H E E L E R,
4   Having first affirmed, was examined and testified as
5   follows:
6           THE WITNESS:  My name is Kurt, k-u-r-t,
7   last name Wheeler, w-h-e-e-l-e-r, 150 Court Street,
8   New Haven.
9   DIRECT EXAMINATION
10  BY MS. RODRIGUEZ:
11      Q.  I'm going to ask you to bring that
12  microphone a little bit closer to you so that it
13  captures all that you are saying.
14          Can you tell us how you are employed.
15      A.  I'm an agent with the Bureau of Alcohol,
16  Tobacco, Firearms and Explosives.
17      Q.  And how long have you been employed by the
18  Bureau of Alcohol, Tobacco and Firearms?
19      A.  Since August of 1988.
20      Q.  And is the Bureau of Alcohol, Tobacco and
21  Firearms also what is commonly known as ATF?
22      A.  Yes, it is.
23      Q.  Can you tell us what your duties are as a
24  special agent for ATF?
25      A.  Predominately I investigate violations of
```

**GA674**

2697

```
 1    federal firearms laws.
 2        Q.   Can you tell us what specialized training,
 3    if any, you've received while in that position?
 4        A.   I received advanced training in determining
 5    how firearms and ammunition affect interstate
 6    commerce.
 7        Q.   And what does that training entail?  What
 8    exactly is it you are able to do after receiving
 9    that training?
10        A.   The training was a three-part process.  The
11    first part was an introductory part where you are
12    trained in how to recognize what a firearm is, learn
13    how to evaluate the markings on the firearm.  The
14    second part was actually touring local firearm
15    manufacturers here in New England.  And the third
16    part was touring ammunition manufacturers in the
17    Midwest.
18        Q.   And the purpose of training is for you to
19    be able to do what?
20        A.   Determine where a firearm or ammunition is
21    made and determine whether it affected interstate
22    commerce or whether it crossed state lines.
23        Q.   And on how many occasions have you had the
24    opportunity to examine firearms for that purpose?
25        A.   It's into the thousands now.
```

2698

```
 1        Q.   And have you ever testified previously as
 2    an interstate nexus expert before?
 3             MR. SMITH:  Objection, your Honor.  Can
 4    we approach?
 5             THE COURT:  Yes.
 6             (Sidebar conference)
 7             MR. SMITH:  Maybe counsel can clear this
 8    up, but are we trying to establish interstate nexus?
 9    If we are, for what purpose?  It's not an element of
10    any charge in this case.
11             MS. RODRIGUEZ-COSS:  Well, your Honor,
12    we have to prove an enterprise exists.
13             THE COURT:  Say that again.
14             MS. RODRIGUEZ-COSS:  We have to prove
15    that an enterprise existed, and one of the elements
16    of establishing an enterprise is that it affected
17    interstate commerce.
18             THE COURT:  That's true no matter how
19    many --
20             MR. SMITH:  Unfortunately, yes.  Is that
21    all?  I assume he's going to testify to establishing
22    interstate nexus.
23             MS. RODRIGUEZ-COSS:  With the two
24    firearms, yeah, that were provided to Mr. Aquart.
25             MR. SMITH:  The trip down south doesn't
```

2699

```
 1    establish that?  I don't know, maybe it doesn't.
 2             THE COURT:  I don't think you can
 3    confine the government's way it's going to prove
 4    this.  Okay.
 5             (Sidebar concluded)
 6        Q.   I can just repeat my last question.  Have
 7    you testified previously as an interstate nexus
 8    expert in federal court?
 9        A.   Yes, I have.
10        Q.   On how many occasions, approximately?
11        A.   About 15 now.
12             MS. RODRIGUEZ-COSS:  Your Honor, we would
13    submit Agent Wheeler as an expert in interstate
14    nexus.
15             MR. SMITH:  No objection.
16             THE COURT:  All right, and you'll recall
17    my previous instruction about what that means.  He
18    gets to give an opinion based on his specialized
19    knowledge or experience, but you weigh and assess
20    that opinion and the credibility of the witness as
21    you would with any other witness.
22             All right, you may proceed.
23             MS. RODRIGUEZ-COSS:  Thank you, your
24    Honor.
25        Q.   Let me bring your attention to what has
```

2700

```
 1    been marked Government Exhibit 260A and 260B, and
 2    ask you, Agent Wheeler, whether you recognize those
 3    documents?
 4        A.   Yes, these are two reports that I drafted.
 5        Q.   And let's first bring your attention to
 6    what has been marked 260A.  And what does 260A
 7    consist of?
 8        A.   260A is a report I drafted regarding my
 9    examination of two gun boxes that were -- that were
10    labeled from Smith and Wesson.  After looking at the
11    gun boxes and doing some research, I determined that
12    the firearms that were in the box that the label
13    corresponds to did travel in interstate commerce.
14        Q.   Let me bring your attention to what have
15    already been marked Government's Exhibit 201F and
16    201H, and ask you if you recognize those two items.
17    Let's first bring your attention to 201F.  Can you
18    tell us what that is.
19        A.   It's a Smith and Wesson gun box, which
20    means basically that when a gun is newly
21    manufactured it's packaged in the box for sale.  This
22    one correspond to a Smith and Wesson model 22A .22
23    caliber semiautomatic pistol, serial number UAZ
24    2474.
25        Q.   Is that information that is normally found
```

2701

1    on the box containing the firearm itself?
2         A.    Yes.
3         Q.    And where else would you expect to find
4    that information?
5         A.    It would be on the firearm itself.
6         Q.    And bringing your attention now to
7    Exhibit 201H, can you tell us if you recognize that
8    item.
9         A.    Yes.
10        Q.    And can you tell us what that is?
11        A.    It's a Smith and Wesson gun box for a Smith
12   and Wesson model 422, .22 caliber semiautomatic
13   pistol, serial number UAC -- I'm sorry, my eyes are
14   failing me here.  It looks to say UAC.
15        Q.    If it would make it easier for you to
16   remove the item from the bag, you may do that.
17        A.    Yes, that would be easier for me.
18        Q.    Is that sealed?
19        A.    Yes, it is.  The serial number on the box
20   is UAC 3966.
21        Q.    All right.  And while we're on Government
22   Exhibit 201H, where was that firearm that was
23   contained in that box manufactured?
24        A.    These two firearms were manufactured in the
25   state of Massachusetts.

2702

1         Q.    So, both 201H and 201F were manufactured in
2    the state of Massachusetts?
3         A.    Yes.
4         Q.    For the firearms that were contained in
5    these boxes?
6         A.    Correct.
7         Q.    Does that mean that they travelled in
8    interstate commerce before being sold in the state
9    of Connecticut?
10        A.    Yes.
11        Q.    And is that what the opinion is that is
12   reflected on the report you prepared which has been
13   marked Government Exhibit 260A?
14        A.    Yes.
15              MS. RODRIGUEZ-COSS:  We'd submit 260A,
16   your Honor.
17              MR. SMITH:  I'd object, your Honor.
18   It's hearsay.  He's already testified as to what the
19   report says.
20              THE COURT:  Your position?
21              MS. RODRIGUEZ-COSS:  Your Honor, the
22   report -- that's fine.  We'll move on.
23              THE COURT:  Okay.
24        Q.    Bringing your attention now to what has
25   been marked Government Exhibit 201C and 201D.  Can

2703

1    you tell us if you recognize those items.
2         A.    Yes, I do.
3         Q.    Can you tell us what is contained in
4    Exhibit 201C and D?
5         A.    Contained in this plastic bag is eight
6    rounds of CCI .22 caliber ammunition.  And in this
7    box there is 12 rounds of .380 caliber ammunition
8    with 11 of them being Federal ammunition and one
9    being Remington ammunition.
10        Q.    And when you say Federal ammunition and
11   Remington ammunition, what does that mean?
12        A.    The manufacturer marks -- puts their stamp,
13   it's called a head stamp.  Basically it's on the
14   back end of the cartridge.  They put their mark on
15   it so you can determine who the manufacturer is.
16        Q.    So, for example, I'm holding up one of the
17   rounds contained in the box.  When you are saying
18   the back of the cartridge, are you talking about
19   this area right here?
20        A.    That is correct.
21        Q.    So the manufacturer would place their stamp
22   on that area of the ammunition?
23        A.    Yes, it would be the manufacturer's mark
24   and the caliber of the ammunition.
25        Q.    And these rounds we're looking at right

2704

1    here are what caliber rounds?
2         A.    .380.
3         Q.    And the rounds, I'm just going to pull out
4    a couple of the ones contained in the plastic bags,
5    what caliber are those?
6         A.    Those are .22 caliber.
7         Q.    Significantly smaller than the .380?
8         A.    Yes.
9         Q.    And, again, are those also -- do those also
10   contain the marks of the manufacturer on the back of
11   the round?
12        A.    Yes, it has a script C which stands for
13   CCI.
14        Q.    And these rounds here seem to be different,
15   for example, than this round.  These -- can you
16   see that there?  Are these rounds spent or have not
17   been used?
18        A.    They have not been used.  Those are
19   commonly referred to as hollow-point projectiles.
20        Q.    What does that mean?
21              MR. SMITH:  I'm going to object to the
22   relevance of this.
23              MS. RODRIGUEZ-COSS:  To whether they've
24   been used or not?
25              THE COURT:  Right, he's an interstate

**GA676**

2705

1  nexus expert.  What is the relevance whether they've
2  been used or not?
3          MS. RODRIGUEZ-COSS:  I think I'm
4  clarifying they're not casings, they're rounds.
5  This evidence is already in evidence.
6          THE COURT:  Yes.
7          MS. RODRIGUEZ-COSS:  Just trying to
8  establish these are not used rounds.
9          MR. SMITH:  He's answered that, and
10 everything else is irrelevant in regards to --
11         THE COURT:  He's been certified as an
12 interstate nexus expert.
13         MS. RODRIGUEZ-COSS:  He's also --
14         THE COURT:  That's his testimony.  He's
15 being -- there is additional testimony in addition
16 to his being an interstate expert -- interstate
17 nexus expert?
18         MS. RODRIGUEZ-COSS:  I don't think we're
19 precluded from asking factual questions.
20         THE COURT:  I'm asking you is this
21 considered to be within his expertise as an
22 interstate nexus expert or otherwise as a agent?
23         MS. RODRIGUEZ-COSS:  As an agent.
24         MR. SMITH:  Your Honor, may we approach?
25         THE COURT:  Yes.

2706

1          (Sidebar conference).
2          MS. RODRIGUEZ-COSS:  May I establish --
3          THE COURT:  Let me hear your objection.
4          MR. SMITH:  My objection is, your Honor,
5  all of this is irrelevant to interstate nexus, and
6  we have not received notice of his being -- of
7  testifying as to the types of bullets and what they
8  are and the hollow-point and all of that.  It's
9  totally irrelevant and it's prejudicial.
10         THE COURT:  These are exhibits that are
11 in evidence.
12         MR. SMITH:  Yes.
13         THE COURT:  This 201C and D.  Why is it
14 irrelevant if he is describing the exhibits?
15         MR. SMITH:  He was asked, my
16 understanding was, to do a determination --
17         THE COURT:  Right.
18         MR. SMITH:  -- as to what whether or not
19 these items moved in interstate commerce.
20         THE COURT:  Right.
21         MR. SMITH:  He's done that.  What other
22 relevance is there to this testimony?
23         THE COURT:  Because these are exhibits
24 and he has the qualification to describe the
25 exhibits.

2707

1          MR. SMITH:  The jury can view the
2  exhibits.  I don't understand.  Again, what is the
3  relevance to interstate commerce of what type of
4  bullets these are?
5          THE COURT:  Are you claiming this is
6  relevant to interstate commerce?
7          MS. RODRIGUEZ-COSS:  Your Honor, I'm
8  claiming that it's relevant for the jury to
9  understand --
10         THE COURT:  No, no, is it relevant to
11 interstate commerce.
12         MS. RODRIGUEZ-COSS:  Yes, it is.
13         THE COURT:  How so?
14         MS. RODRIGUEZ-COSS:  Because he has to
15 identify, first, what type of bullet or ammunition
16 it is before he can testify where it was
17 manufactured.
18         THE COURT:  He looks at the head stamp.
19         MS. RODRIGUEZ-COSS:  Right, but he's --
20 so, your Honor, in addition to that, when we submit
21 an item of evidence, an item of physical evidence
22 into evidence, we are allowed to ask a witness to
23 describe the item.
24         THE COURT:  Okay, I agree with you, but
25 my question was were you claiming that that was

2708

1  related to interstate nexus.
2          MS. RODRIGUEZ-COSS:  Well, yes and no.
3          THE COURT:  How does whether or not a
4  hollow-nose bullet has been fired --
5          MS. RODRIGUEZ-COSS:  I'm sorry.
6          THE COURT:  -- have anything to do with
7  interstate nexus?
8          MS. RODRIGUEZ-COSS:  I'm sorry, I
9  thought he was referring to the identification of
10 the caliber.  Whether or not it's been fired is not
11 related to interstate nexus.
12         THE COURT:  I'm going to permit her as
13 long as -- go ahead.
14         MR. SMITH:  I'm just the curious how is
15 it being a hollow-nosed bullet relevant to that?
16         THE COURT:  It isn't relevant to
17 interstate commerce.  It is relevant to describing
18 the exhibit that's already in evidence.  He is a
19 two-fer.
20         MR. SMITH:  So notice of that would have
21 been --
22         THE COURT:  Notice of not expert is not
23 required to be given, I think.
24         MR. SMITH:  All right.
25         THE COURT:  I'm going to instruct the

2709

```
1    jury the testimony he's going to be giving now
2    describing exhibits already in evidence is now his
3    testimony as an agent, it is not part of his
4    expertise as interstate nexus expert.  All right,
5    that's satisfactory?
6              MR. SMITH:  And, your Honor, if I may, I
7    presume one of the questions is what are
8    hollow-nosed bullets used for.  I'm going to object
9    to that.  What's the relevance of that?  If that's a
10   question that comes up.
11             THE COURT:  Well, it seems to me to
12   probably be a very broad set of uses that isn't part
13   of this.  Are you intending to ask that?
14             MS. RODRIGUEZ-COSS:  No.
15             THE COURT:  Okay.
16             (Sidebar concluded)
17             THE COURT:  All right, so Agent Wheeler
18   has testified as an interstate nexus expert, and
19   that testimony is now completed and he is now
20   testifying as an agent.
21             MS. RODRIGUEZ-COSS:  The interstate
22   nexus testimony is not quite completed.
23             THE COURT:  Okay.  I'm going to sort it
24   out into the two categories then.
25             MS. RODRIGUEZ-COSS:  Okay.
```

2710

```
1        Q.   Bringing your attention -- well, before we
2    move on to Exhibit 201E, let me bring 201C and D
3    back to you and ask you whether you were able to
4    determine where these different rounds were
5    manufactured.
6        A.   Yes, the Federal ammunition, which is the
7    silver ammunition with the hollow-point tip on the
8    bullet, this ammunition was manufactured in the
9    state of Minnesota.
10       Q.   I'm sorry, a little closer to the mic.
11       A.   The Federal ammunition was manufactured in
12   the state of Minnesota.
13       Q.   All right?
14       A.   The one .380 caliber round of ammunition
15   that has a solid tip in a gold case, this is a
16   Remington, a round of Remington ammunition.  It was
17   manufactured in the state of Arkansas.
18       Q.   And -- okay.
19       A.   The eight rounds of CCI .22 caliber
20   ammunition, these rounds of ammunition were
21   manufactured in the state of Idaho.
22       Q.   And so, again, Agent Wheeler, is it your
23   opinion that they necessarily travelled in
24   interstate commerce before being found in the State
25   of Connecticut?
```

2711

```
1        A.   Yes.
2        Q.   So, let me bring your attention now to what
3    has been marked Government Exhibit 201E.  Can you
4    tell me whether you recognize any of the items in
5    that exhibit?
6        A.   I do, yes.
7        Q.   And how is it that you recognize those?
8        A.   This is the ammunition I examined
9    previously before.
10       Q.   And for what purpose?
11       A.   To determine whether this ammunition
12   travelled in interstate commerce.
13       Q.   And the ammunition contained in Government
14   Exhibit 201E, what is the nature of that ammunition?
15       A.   There is 14 rounds of Federal 9mm
16   ammunition.  This is the gold-colored casing with
17   the solid tip.  And there was one round of
18   Winchester ammunition, you can see with the
19   silver-tip projectile and in the tarnished case.
20       Q.   And that last round that you described is
21   what caliber?
22       A.   This is 9mm also.
23       Q.   All right.  Were you able to determine
24   where these 9mm round ammunitions were made?
25       A.   Yes, the Federal ammunition was made in the
```

2712

```
1    state of Minnesota and the Winchester ammunition was
2    manufactured in the state of Illinois.
3        Q.   All right.  All right, and so these are 9mm
4    rounds; is that correct?
5        A.   Yes.
6        Q.   And these here with the gold casing are the
7    Federal ammunition?
8        A.   That is correct.
9        Q.   And "Federal" we don't -- by "Federal" we
10   don't mean federal government, we mean the
11   manufacturer?
12       A.   Federal cartridge company.  It's a private
13   manufacturer, not associated with the federal
14   government.
15       Q.   And this one here with the hollow point is
16   also a 9mm round; is that correct?
17       A.   Yes, it is.
18       Q.   And manufactured by what company?
19       A.   Winchester.
20       Q.   Bringing your attention back to
21   Exhibit 201F, and also to what has already been
22   marked 257E, can you see that document there?
23       A.   Yes, I do.
24       Q.   Do you know what this is?
25       A.   It's an ATF Form 4473.  It's a record of an
```

**GA678**

2713

```
1    over-the-counter firearms transaction between a
2    retailer and a person who is a non-licensee,
3    non-firearms licensee.
4         Q.   And, Agent Wheeler, what is the purpose of
5    this form?
6         A.   This form is -- basically the purpose is to
7    determine whether the person who is attempting to
8    buy the firearm is allowed to -- is lawfully allowed
9    to buy the firearm, and it keeps a record of who
10   owns the firearm in case it needs to be traced.
11        Q.   And this particular form, showing you the
12   backside of that, Government Exhibit 257E, is it
13   required then for the firearms being purchased to be
14   listed on the form?
15        A.   Yes, it is.
16        Q.   So, here we have the first item listed as
17   Smith and Wesson .22 caliber; is that correct?
18        A.   That's actually the model number, 22A.
19        Q.   All right.  And serial number UAZ 2474.  Is
20   that one of the same weapons you previously
21   testified travelled in interstate commerce?
22        A.   Yes.
23        Q.   And that serial number corresponds to which
24   one of exhibits, 201F and 201H?
25        A.   201F.
```

2714

```
1         Q.   So, in other words, the firearm listed here
2    in Government's Exhibit 257E was also contained in
3    Government Exhibit 201F; is that correct?
4              MR. SMITH:  Objection.  It calls for
5    speculation whether it was ever contained in it.
6         Q.   Can you answer that question, Agent
7    Wheeler, or would that be speculation on your part?
8         A.   It would be speculation.
9         Q.   Now, what is this number UAZ 2474?  What
10   does that represent?
11        A.   That's the serial number of the firearm
12   that's being sold.
13        Q.   And so is that like sort of like the
14   fingerprint of the firearm?
15        A.   It's a unique identifier yes.
16        Q.   So, would it be contained in the firearm
17   itself?
18        A.   Yes.
19        Q.   Where else would you find that number?
20        A.   You may be able to find it on a shipping
21   container or the box that it came from from the
22   factory.
23        Q.   Would it also be on the actual box where
24   the firearm was packaged?
25        A.   Yes, it could be.  Yes.  Not in all cases,
```

2715

```
1    but most cases yes.
2         Q.   In the case of Government Exhibit 201F,
3    does that contain the serial number for the firearm?
4         A.   Yes, it does.
5         Q.   And then bringing your attention to the
6    second item listed here, serial number UAC 3966, is
7    that the serial number for the firearm you
8    previously indicated travelled in interstate
9    commerce?
10        A.   Yes, it is.
11        Q.   And does that correspond to the serial
12   number on the firearm box on Government
13   Exhibit 201H?
14        A.   It does.
15        Q.   And bringing your attention now to what has
16   been marked Government Exhibit 257B, can you tell us
17   if you recognize this document?
18        A.   Yes, this is a report of a multiple sale of
19   either a pistol -- pistols or revolvers.  This is a
20   form that the ATF requires a federal firearms
21   licensee, a gun dealer, to file with ATF if an
22   individual purchases two or more handguns, a pistol
23   or revolver, within a five-day period.
24        Q.   And, again, Agent Wheeler, here listed we
25   see UAZ 2474 and UAC 3966.  Again, the serial
```

2716

```
1    numbers of the firearms or corresponding to the
2    firearm boxes in 201F and 201H; is that correct?
3         A.   Yes.
4         Q.   Now, you've had the opportunity to visit
5    firearm manufacturers; is that correct?
6         A.   Yes, I have.
7         Q.   Was that part of your training as an
8    interstate nexus expert.
9         A.   Yes.
10        Q.   And as a result of having visited those
11   manufacturing plants, how do they usually package
12   their firearms for sale?
13             MR. SMITH:  Objection, relevance.
14             THE COURT:  I'm going to permit the
15   question.
16        A.   I'm sorry, could you repeat the question,
17   please.
18        Q.   Yeah, as part of your visits to these
19   manufacturing plants of firearms, were you able to
20   see how these manufacturers usually package their
21   firearms for retail sale?
22        A.   Yes.
23        Q.   And how is that?
24        A.   Most firearm manufacturers package their
25   firearms in either boxes, cardboard boxes.  In the
```

2717

1  case of long guns, which would be a rifle or
2  shotgun, sometimes plastic cases or cardboard cases.
3  Handguns and revolvers also.
4      Q.   So, boxes or -- and how do those boxes or
5  cases compare to those that we see here in
6  Exhibit 201F and 201H?
7      A.   They're consistent with what I've seen.
8          MS. RODRIGUEZ-COSS:  We have nothing
9  further for Agent Wheeler, your Honor.
10         THE COURT:  All right,
11  cross-examination.
12         MR. SMITH:  We have no questions.  Thank
13  you, your Honor.  Thank you, Agent Wheeler.
14         THE COURT:  Agent Wheeler, you may step
15  down.  You are excused.
16         Will the government please call its next
17  witness.
18         MS. REYNOLDS:  Yes, your Honor.  The
19  government calls John Pleckaitis
20      J O H N   P L E C K A I T I S
21  Having first affirmed, was examined and testified as
22  follows:
23         THE WITNESS:  John Pleckaitis, last name
24  is spelled P-l-e-c-k-a-i-t-i-s, business address is
25  278 Colony Street, Meriden, Connecticut.

2718

1          THE COURT:  You may proceed,
2  Ms. Reynolds.
3          Ms. Reynolds:  Thank you, your Honor.
4  DIRECT EXAMINATION
5  BY MS. REYNOLDS:
6      Q.   Mr. Pleckaitis, where do you work?
7      A.   I work for the State of Connecticut
8  Department of Public Safety, division of scientific
9  services, forensic sciences laboratory.
10     Q.   And what section of the forensic sciences
11 laboratory do you work in?
12     A.   I'm assigned to the latent print unit.
13     Q.   Is the Connecticut state forensic lab
14 accredited by the American Society of Crime Lab
15 Directors?
16     A.   Yes, it is.
17     Q.   And what does that mean to be part of the
18 lab that's accredited by that association?
19     A.   There are certain quality assurance
20 measures in place.  We have standard operating
21 procedures.  The manner evidence is examined,
22 certain protocols we have to follow: for instance,
23 like in the latent print section we'll want to
24 examine evidence in a sequential process so we can
25 do multiple methods of examining evidence.

2719

1          There is protocols in place for our
2  findings.  Reports of findings have to be reviewed
3  by a second examiner when it's a finding of an
4  identification which a second examiner will have to
5  verify.  A finding of a latent print of no value
6  will have to be examined by a second examiner and
7  come to the same conclusion.  An exclusion,
8  likewise, all our findings a second examiner goes
9  through the same process and agrees with whatever
10 findings.
11     Q.   So, these are all different protocols --
12     A.   Yes.
13     Q.   -- that are required for the lab to be
14 accredited.  Correct?
15     A.   That is correct.
16     Q.   And you said you are assigned to the
17 fingerprint or the latent print examination unit.
18 What do you do there?  What are your duties and
19 responsibilities as a latent print examiner?
20     A.   Our duties are broadly broken down into
21 four major categories.  Number one, we examine
22 physical items of evidence submitted to the
23 laboratory for detection or presence of latent
24 prints.
25          Another aspect, the police agency will

2720

1  develop the latent prints themselves and submit the
2  latent prints and known prints and request that we
3  examine the latent prints with known prints and see
4  if we can effect an identification.
5          Another aspect of our duties would be if
6  there is no known suspect in the investigation, we
7  will take the latent impression and search it to a
8  database which is called the Automated Fingerprint
9  Identification System, see if we can develop a
10 suspect.
11          Another major component of our work is
12 writing the reports with the technical reviews which
13 I kind of referred to in the quality assurance
14 programs.  All our casework has to be reviewed by a
15 second examiner, and he goes through the same
16 process of reviewing all our notes, our worksheets,
17 make sure we followed the proper laboratory
18 protocol, and then sign the report.
19     Q.   How long have you been a latent print
20 examiner with the Connecticut Department of Public
21 Safety?
22     A.   Over 12 years now.
23     Q.   And prior to joining the forensic science
24 lab there at the Connecticut Department of Public
25 Safety what were you doing?

2721

1    A.  I was a sergeant with the New Haven Police
2  Department.
3    Q.  How long were you a member of the New Haven
4  Police Department?
5    A.  Over 26 years.
6    Q.  And can you briefly, briefly describe some
7  of your assignments within the New Haven Police
8  Department.
9    A.  I started working in the New Haven Police
10  Department in 1973 as a civilian and in the capacity
11  of an investigative aide. It was in this capacity,
12  I received my first formal training in fingerprints
13  attending the basic fingerprint classification
14  school and advanced latent fingerprint school. In
15  1975, I received my Bachelor of Science Degree in
16  criminal justice in the University of New Haven.
17        In 1976, I became a sworn member of the
18  department. For four and a half years I was
19  assigned to uniform patrol, after which I was
20  assigned to the identification unit, which is the
21  crime scene unit of the New Haven Police Department.
22  As my training and experience in fingerprints, my
23  exclusive duty was just classifying and examining
24  fingerprints. I was then formally transferred as a
25  crime scene investigator. I received specialized

2722

1  training as it pertains to crime scene processing
2  and examination of fingerprints, particularly
3  attending such schools as the palm print school,
4  advanced ridgeology, advanced latent print
5  photography, advanced latent print comparison
6  school. Even after my training with the New Haven
7  Police Department, my training as it pertains to
8  fingerprints is ongoing and continuous, at least
9  yearly to attend one seminar as it pertains to
10  fingerprints to stay abreast of changes in the
11  field.
12    Q.  Prior to your 12 years as a latent print
13  examiner with the forensic science lab, how long
14  were you a latent print examiner with the crime
15  scene unit of the New Haven Police Department?
16    A.  For 18 years.
17    Q.  And you mentioned your training and your
18  education is ongoing even through today?
19    A.  Even today. Most recently I came back from
20  Iowa in February for essentials of ridgeology.
21    Q.  And are you a member of any professional
22  organizations related to the area of latent print
23  examination?
24    A.  Yes. I'm a member of the Connecticut
25  chapter of the International Association for

2723

1  Identification. International Association for
2  Identification is the largest professional
3  organization of fingerprint examiners. And I'm also
4  a member of the international chapter. And just
5  about every year I attend the international
6  educational conference which is scattered throughout
7  the country.
8    Q.  Do you have any special certifications that
9  you've obtained from the organization you just
10  mentioned?
11    A.  Yes, I am a certified latent print examiner
12  by the International Association for Identification.
13    Q.  And is that certification something that's
14  required to be a latent print examiner?
15    A.  No, it is not required as of now, but it is
16  a difficult feat to attain. Over 50 percent of the
17  examiners who take it do not pass.
18    Q.  But you do have that certification?
19    A.  Yes, I do.
20    Q.  Are you -- I think you may have mentioned
21  this, but are you required to pass any yearly test
22  in order to sustain the level of proficiency you
23  currently have in the area of latent print
24  examination?
25    A.  That is correct. Every year I have to take

2724

1  a proficiency test, which is a comparison of latent
2  prints to known prints. There are some prints that
3  are not attributable to a source. We have to do
4  that examination every year, and plus every year
5  I'll do a verification of another examiner who takes
6  an exam. So, in essence, I take two proficiency
7  tests a year.
8    Q.  Have you previously testified as an expert
9  in the area of latent print examination in a court
10  of law?
11    A.  Yes, I have. I've testified over 100
12  times.
13    Q.  And what I courts have you testified in?
14    A.  Federal courts, New Haven, Bridgeport, and
15  Hartford, and the state courts scattered throughout
16  the state. Again, the state courts of the major
17  cities of the state.
18    Q.  Were you always qualified as an expert in
19  this area?
20    A.  Yes, I was.
21    MS. REYNOLDS: Your Honor, at this time
22  the government would offer John Pleckaitis as an
23  expert in the area of latent print examination of
24  friction ridge identification.
25    MR. SMITH: No objection.

2725

1  THE COURT:  All right.  And the same
2  instruction goes for this expert witness or opinion
3  witness, as we call it.  You may proceed.
4  MS. REYNOLDS:  Thank you, your Honor.
5  Q.  Mr. Pleckaitis, can you describe for the
6  jury what the term "a known print," what is a known
7  print?
8  A.  A known print is a deliberately recorded
9  impression.  When I first started we used to refer
10  to those as ink prints.  With the advances of
11  technology now we have Livescan, which is digital
12  recording of an impression.  For the most part when
13  we talk about fingerprints we're talking only about
14  the end joint of the finger.  From the first crease
15  up to the top of the finger are commonly referred to
16  as fingerprints, and that's what were referred to as
17  known prints, which are deliberately recorded.  And
18  when you are looking at a known print, raised
19  portions of the skin which appear as black lines and
20  the furrows are kind of the white spaces in between
21  the ridges.
22  Q.  And would that be, for example, if one were
23  to go get fingerprinted for a job, those would be
24  known prints?
25  A.  That is correct.

2726

1  Q.  What is a latent print?
2  A.  A latent print is a chance impression.
3  It's not deliberately left.  It depends on -- it's
4  unknowingly leaving it, and the conditions have to
5  be right to leave the impression.  There is a number
6  of variables that are involved in leaving a chance
7  impression.  The word "latent" comes from the Latin
8  meaning hidden.  So that gives you a clue what we're
9  looking for is something that is invisible or barely
10  visible to a latent impression.
11  Now, the skin that's on the palmar
12  surface of our hands or the plantar or soles of our
13  feet is different from skin from other parts of our
14  body; it's rough, it's corrugated.  These raised
15  portions of skin have very minute sweat pores, and
16  these sweat pores are constantly exuding
17  perspiration.  Now, it's this perspiration and other
18  contaminants, such as if we brush our hair or face,
19  we're picking up a different type of contaminant.
20  This is from the sebaceous glands.  This will have
21  more oils and lipid fats, and when we touch an
22  object the outline of that fingerprint pattern may
23  be transferred to the surface of that object.  Now,
24  in order for us to visualize this latent impression
25  we have --

2727

1  MR. SMITH:  Objection, your Honor.
2  We're sort of getting into a narrative here.
3  Perhaps we can --
4  THE COURT:  Was your question answered,
5  Ms. Reynolds?
6  MS. REYNOLDS:  I think he was about to
7  conclude his answer as to how a latent print is left
8  on an object.  But I can ask another question, your
9  Honor.
10  THE COURT:  All right, go ahead.
11  Q.  Did you complete your answer with regard to
12  the latent prints?
13  A.  No, just going a little further, because it
14  is invisible we would have to use chemicals, powders
15  or high-powered sources so we can visualize a latent
16  print, because, remember I was saying, it's
17  perspiration, and the perspiration is coming from
18  the palmar surface of our hands is 98.9 percent
19  water, and water being colorless, we cannot see
20  that.  So, we have to use the powders and chemicals
21  to visualize them so they can be lifted or otherwise
22  recorded for comparison purposes.
23  But, in short, a latent impression is a
24  chance impression found at or near a crime scene.
25  Q.  And a latent impression is not always

2728

1  visible to the human eye?
2  A.  That is correct.
3  Q.  Now, are friction ridge impressions always
4  left on an object when someone touches an object?
5  A.  No.
6  Q.  Okay.  And why not?
7  A.  Well, number one, the first thing you have
8  to consider is the donor.  You have to have enough
9  matrix or residue or perspiration on the summits of
10  the friction ridge skins.  We all perspire at
11  different rates.  Some of it can depend on our
12  metabolism, our age.  Our occupation can interfere.
13  If we're involved in certain occupations, such as
14  construction, concrete, some of us have skin
15  conditions that will interfere with us deliberately
16  trying to take a known print, much less trying to
17  create a latent impression.  So, that's the first
18  thing you are going to have to consider is the
19  conditions.  You have to have material on the
20  summits of the ridges to be transferred.
21  Now, the transfer process, the process of
22  transferring the print onto the surface, the
23  mechanics involved, very seldom when we touch
24  something do we come down vertically and vertically
25  lift up; it's usually an angled impact.  The drag

**GA682**

2729

1 movement can obliterate the pattern on the friction
2 ridge. The amount of contact might minimize the
3 chance of recovery of a latent impression, the
4 surface that it's going to be deposited on. Not all
5 surfaces are conducive to receiving latent prints.
6 If it's rough or texturized, such as this case here,
7 this will break up the fingerprint pattern.
8 Environmental factors, what happens to the latent
9 print after it is deposited. Its subjection to UV
10 rays, dust, it is fragile. Another person coming in
11 or another object coming in contact with that latent
12 print can obliterate that latent print. So, these
13 are all factors to indicate whether or not we can
14 develop a latent print on a surface.
15     Q.   All right.  What are the two basic
16 principles in the use of fingerprints as a means of
17 identification?
18     A.   Number one, fingerprints are unique.  Each
19 fingerprint of each person is unique to that
20 individual as it has a unique pattern.  The reason
21 for the uniqueness is differential growth rate while
22 still in the womb before we're born.  It's the
23 fusion of the individual cells as they're forming
24 together, the intrauterine pressures, it's going to
25 change as you are moving about within the uterus.

2730

1 And as certain parts of the bones and other segment
2 of the fetus, as they are growing and stretching, it
3 creates variability where these friction ridge
4 arrangements are going to happen.
5         The other premise of fingerprint
6 identification is permanence.  Between the fourth
7 and fifth month of gestation before we're born
8 they're starting to form.  By the fifth month that
9 is locked.  That is set for the rest of your life,
10 that ridge formation, that unique ridge formation,
11 until after death, even until after the skin has
12 decomposed.  We fingerprint a lot of dead people and
13 are able to identify them from the friction ridge
14 skin.  So it's permanence and uniqueness.
15         THE COURT:  Ms. Reynolds, is this a good
16 stopping time for lunch?
17         MS. REYNOLDS:  Yes, your Honor.  That
18 would be fine.
19         THE COURT:  Okay, we'll do that then.
20 We'll take a half an hour for lunch.
21         (Jury exits the courtroom.)
22         THE COURT:  All right, sir, we will come
23 back at 1:00.  Kindly don't discuss your testimony.
24 Thank you very much.  Anything else before we
25 recess?

2731

1         MR. SHEEHAN:  No, your Honor.
2         MS. REYNOLDS:  No, your Honor.
3         THE COURT:  We stand in recess.
4         (Recess)
5         THE COURT:  All right, ladies and
6 gentlemen, we'll bring back the jury.  And
7 Mr. Pleckaitis.
8         MS. REYNOLDS:  He's here.
9         (Jury entered the courtroom.)
10         THE COURT:  Please be seated, ladies and
11 gentlemen.  All right, Ms. Reynolds, you may proceed
12 with the direct of Mr. Pleckaitis.
13         MS. REYNOLDS:  Thank you, your Honor.
14     Q.   Mr. Pleckaitis, before the lunch break I
15 was just about to ask you to please describe for the
16 members of the jury the methods that you use for
17 performing a fingerprint examination.  Just
18 generally describe what the methods are that you
19 use.
20     A.   Sure.  Methodology used to make fingerprint
21 comparisons is called, the acronym is called ACE-V,
22 and what that stands for is analysis, comparison,
23 evaluation and verification.
24         Now, during the analysis phase, which is
25 -- and it's not a stagnant thing, we're going back

2732

1 and forth.  We want to first look at the latent
2 impression, and it's an information gathering stage.
3 So there are a number of factors we're looking at.
4 We're looking at the substrate, we're looking at the
5 development medium, the matrix, the residue that
6 made the latent impression, if we know it,
7 deposition pressure, lateral deposition pressure,
8 that's movement either going up or down, or torque,
9 twisting of the digit.
10     Q.   And what you are describing right now is
11 just your process of examining the latent print?
12     A.   That is correct.
13     Q.   Go ahead.
14     A.   At this point in time we are also trying to
15 determine the anatomical source of the impression,
16 the joint of -- the lower joint finger or palm of
17 the hand, or it could be the foot.  Also at this
18 time we're going to make a determination of the
19 suitability of comparison.
20         And while we're looking at the
21 impression, there is three levels of detail that
22 we're looking for.  Level one detail is the overall
23 pattern flow of the ridge characteristics.  Level
24 two type characteristic would be the ridges on the
25 fingers or the friction ridge.  Skin is not just

2733

1  continuous lines. There is definite characteristics
2  that happen. Sometimes the ridge ends abruptly. We
3  call that a ridge ending. It may be a single ridge
4  that splits and becomes two; that's something we
5  refer to as a bifurcation. Another type of
6  characteristics is a dot. A dot is pretty much what
7  you see at the end of a sentence. Although there is
8  17 different types of catalog-type characteristics,
9  those are the three basic. So, we try to keep it
10 simple to the three basic types of characteristics.
11       In addition to the level two type, the
12 detail, the next thing we want to look for, if there
13 is any level three detail. And level three detail
14 can include poroscopy, that's pores that exude the
15 perspiration, the arrangement on the friction ridge
16 skin, if it's visible, and recording both
17 impressions, we can use that.
18     Q.   So, basically the pores within those
19 ridges?
20     A.   The pores, right on the summits of the
21 ridges, the arrangements would be unique.
22 Edgeoscopy, that is the clarity of that. It's
23 almost like looking at the coastline of the ridges,
24 just follow the coastline of the ridges. We can use
25 that.

2734

1      Q.   So, that's another way of saying the edge?
2      A.   Another method of comparison, another thing
3  we're looking at are the shapes of the
4  characteristics. When I refer to something as a
5  bifurcation, and I told you that was a single ridge
6  that split, becomes two, not all bifurcations appear
7  the same. The shapes can vary. Some look like a Y
8  with a pronounced angle and the other ones will look
9  like a U with a tail line, so to speak. So, it's a
10 curve. Both bifurcations, but the shapes of them
11 are different.
12       Other things that can be considered as
13 level three detail is open fields where nothing
14 happens. You have segments of ridges all in
15 sequence, but there is no event tat happened there.
16 There is a value to that because nature could have
17 had an opportunity anywhere there to have a feature
18 to appear. So those are some of the things we would
19 consider for level three detail.
20       As we examine the latent print for that
21 quality and quantity of information, then it will
22 become a determination of suitability for comparison
23 to go on to the next phase. If at that point in
24 time the determination is made that there is
25 insufficient amount of information in the friction

2735

1  ridge impression, the examination will be terminated
2  at that point. There is no need to go on further.
3      Q.   So, just to clarify or summarize, if you
4  are examining a piece of evidence that has a latent
5  print on it and you are examining that print, what
6  you just said would be just sometimes there aren't
7  enough -- there isn't enough quality or quantity of
8  characteristics in that latent print for a
9  comparison to actually be made; is that fair to say?
10     A.   That is correct.
11     Q.   But if you do find all of those or many of
12 those characteristics that you described in your
13 testimony, what then is the next step? Once you
14 find a latent print that has enough quality and
15 characteristics, what do you do next with that?
16     A.   Well, the next segment is to conduct a
17 comparison. Now, if the latent impression has
18 certain features, focal points, if we can see the
19 core or another detail formation, we may know where
20 on what part of the hand to look at. That's the
21 focal point will also guide us to see which
22 characteristics are in that impression. And in a
23 known impression if we see those features in the
24 known impression, then each contiguous ridge is
25 examined one after another until you come to the

2736

1  evaluation phase.
2      If there was some dissimilarity it would
3  be -- at that point the three conclusions that we
4  could come to, that the print was made by that
5  individual, the print and the known impression were
6  not from the same source, or there is insufficient
7  information in either one and your conclusion will
8  be an inconclusive.
9      Q.   When you say there is insufficient
10 information in either one, do you mean insufficient
11 information in the latent print and/or in the known
12 print to make a comparison?
13     A.   That is correct. Sometimes our exemplars
14 or known prints don't record the entire impression,
15 we need better exemplars because it's either smudged
16 ink, under-inked or not even recorded, so we have to
17 get additional information. Or it just may be
18 deficient in the sense that we see ridge formations
19 in agreement, but there is just not enough
20 information to go there for a full identification.
21 So that would be an inconclusive.
22     Q.   So, what would you do, for example, if you
23 had a latent print that you were examining and you
24 were comparing to a known print, but the latent
25 print was not of the fingerprint and the only known

2737

1  print you had was just of the fingerprint, what do
2  you do at that point?
3      A.  Well, the terminology -- if we know that
4  the segment -- sometimes we get latent impressions,
5  we don't know where on the hand or a finger or which
6  portion of the fingers.  So, we compare it insofar
7  as we can to the exemplar.  Sometimes we only have
8  the fingers, sometimes we have the palms, and if we
9  don't know exactly where to look on the hand, then
10  we can't be -- because when we make a finding of an
11  exclusion, you have to have the same amount of
12  confidence as that when you make an identification.
13      Q.  Okay.  And what does the term "major case
14  prints" refer to?
15      A.  Just before you go to that, we did forget
16  the last stage of the ACE-V methodology.  The last
17  phase of the ACE-V methodology was verification.
18  And basically, quickly, that is another competent
19  examiner will go through the same process and has to
20  come to the same conclusions and findings as the
21  initial examiner.
22      Q.  And that's the methodology you use when
23  examining the latent prints that you've been doing
24  for 12 years at the lab?
25      A.  That is correct.

2738

1      Q.  Now, I had asked you when you were talking
2  about sometimes not having enough characteristics in
3  either the latent print or in the known print that
4  you are comparing it to.  Is there something that
5  you can obtain known as major case prints to assist
6  in your examination and in your comparison?
7          MR. SMITH:  Objection, leading.
8          MS. REYNOLDS:  Is there something that
9  you could?
10          THE COURT:  Sustained.
11      Q.  What is a major case print?
12      A.  Major case prints are additional
13  recordings.  Like earlier I testified we're only
14  recording the end joints of the fingers, but we can
15  use any part of the palmar surface of the hand from
16  the wrist to the fingertips to the tops of the
17  fingers.  Sometimes the impressions are really high
18  up on the tops of the fingers and when you are
19  taking a rolled impression and the finger being
20  rounded and tapered on the end, the tops of the
21  fingers are not recorded nor are the second or third
22  joint of the fingers or the palm surface of the
23  hands.  So, we ask for major case prints.  We are
24  asking not only for palm prints, but additional
25  recordings.  There is an area we call the writer's

2739

1  edge, and it's pretty much like doing a karate chop
2  and just rolling it in.  The other segment was not
3  only rolling the fingers from nail to nail, but
4  rolling the fingers up to the top of the nails to
5  capture the friction ridge detail at the tops of the
6  fingers.
7      Q.  And let me ask you this:  I think before
8  you mentioned something known as AFIS, the AFIS
9  system.  If you have a latent print and you don't
10  have a set of known prints to compare that latent
11  print to, is there some other step that you can take
12  to go on to that part of the comparison to do the
13  comparison?
14      A.  Yes, if the latent impression is suitable
15  quality, then we can search it through the database,
16  and we can search it here in Connecticut, which is
17  the database comprising the criminal records and
18  civilian records of the -- Connecticut and Rhode
19  Island are joined together as one database.  We can
20  also search it in the national database which is
21  called the IAFIS system.
22      Q.  Now, I'm going to draw your attention now
23  to 2005, specifically the end of August of 2005, and
24  ask you if at that time you were assigned to be the
25  latent print examiner in a case out of the

2740

1  Bridgeport -- that came to you from the Bridgeport
2  Police Department in a crime that had happened on
3  August 24, 2005, in Bridgeport?  Were you assigned
4  at that time?
5      A.  Yes, I was.
6      Q.  And can you explain generally how it is
7  that a case would get assigned to you and what
8  happens when the case arrives at the lab?
9      A.  Well, we try to distribute the workload
10  equally in major cases, so I guess this was my turn
11  to get the next major case.  The case is assigned to
12  me, I'm notified.  All my assignments are notified
13  to me through computer, and it's up to the
14  individual examiner to monitor his assignments.  We
15  get a major case, process that evidence in a
16  triaging, prioritize that evidence.  So that is
17  something, like in this case here, I would take the
18  evidence, I examine evidence I have that doesn't go
19  to other sections of the laboratory, and examine
20  that evidence first.
21      Q.  What are some other sections of the
22  laboratory evidence would be sent to?
23      A.  It could go to forensic biology, which
24  includes the serology.  It can go to DNA.  It can go
25  to the trace section.  It depends on the type of

2741

```
1   evidence and the request for examination.
2       Q.   Do you know whether a number or an ID
3   number is assigned -- was assigned to this case that
4   you became involved in in August of 2005?
5       A.   All evidence submitted to the laboratory
6   comes in and it's monitored through the LIM system,
7   which is Laboratory Inventory Management System.
8   It's a software system and prints out a bar code for
9   each item.  So as long as -- as soon as the item
10  comes into the laboratory that bar code label is
11  printed out, has a description of the object, has
12  the laboratory case number, submitting case agency,
13  and their case number, and that bar code is affixed
14  to the packaging in the item.  So, as that item is
15  moved throughout the laboratory, its chain of
16  custody can be monitored; its coming and leaving of
17  the laboratory.
18      Q.   And that was done in this case?
19      A.   Yes.
20      Q.   That bar code and ID number?
21      A.   Yes, it was.
22      Q.   And when the evidence request for
23  examination has been made, when the evidence arrives
24  at the lab, do you know whether or not it's
25  photographed as well?
```

2742

```
1       A.   It can be.  Depending on the sections and
2   the nature of the evidence, particularly in 2005.
3   Now everything is photographed.
4       Q.   Okay.  And in this case have you had an
5   opportunity to review some of the photographs of the
6   items as they arrived first to the lab prior to you
7   testing those items?
8       A.   Yes, I did.
9       Q.   And I'm going to hand up and show you
10  Government's Exhibits 400 through 408, and just have
11  you take a look at these photographs.
12           Do you know who took the photographs of the
13  items that you tested in this case?  At the lab?
14      A.   Which items are you referring?
15      Q.   Well, I'll show you these first.  Referring
16  first to these.  Do you recognize those photographs
17  and those items?
18      A.   Yes, I do.
19      Q.   What are those photographs of?
20      A.   Are photographs of two plastic bags
21  and duct tape.  And the photographs were taken by
22  Maria Warner in the trace section of the laboratory.
23      Q.   Did you eventually conduct tests on --
24           MS. REYNOLDS:  Well, your Honor, at this
25  time I would move as full exhibits Government's
```

2743

```
1   Exhibits 400 to 408.
2           MR. SMITH:  No objection.
3           THE COURT:  All right, they may be
4   admitted as full exhibits.
5           MS. REYNOLDS:  Thank you, your Honor.
6       Q.   Starting with Government's 400 in evidence,
7   if you can take a look there at your monitor, can
8   you tell us what the No. 21 refers to in that
9   photograph?
10      A.   The 21 refers to the laboratory submission,
11  No. 21.
12      Q.   And so in this case what was the number
13  given to the items contained in the photograph
14  there?
15      A.   That, the three items were all submitted in
16  a packaging that has the bar code with the
17  laboratory case number, and the submission number
18  would be 021.  So those three items, the duct tape,
19  the Walgreen's bag and blue-green bag were all in
20  one packaging.
21      Q.   And then showing you --
22           MS. REYNOLDS:  Your Honor, if you could
23  just dim the lights a little bit because it's not as
24  clear on the screen.
25      Q.   So, again, that's Government's Exhibit 400.
```

2744

```
1   And that just shows the laboratory number that was
2   given to the exhibits in that exhibit as you
3   received it, correct?
4       A.   That is correct.
5       Q.   And then showing you Government's
6   Exhibit 401, what's depicted in this photograph?
7       A.   That is basically the way I received the
8   two.  It would be the outer bluish-green bag, and
9   just barely visible is a part of the white, is the
10  Walgreen's bag.
11      Q.   And then showing you Government's
12  Exhibit 402, what's depicted in that photograph?
13      A.   Once again, it's a side view.  There was a
14  slight cutting of the blue-green bag, and inside you
15  can see the visible white with -- red, white and
16  blue part of the logo of the Walgreen's bag.
17      Q.   And showing you Government's Exhibit 403 in
18  evidence, what's depicted in that photograph?
19      A.   Largely you can see in the left-hand corner
20  the bag is stained with a reddish brown material.
21  In the upper right-hand corner you can see one piece
22  of duct tape attached to the Walgreen's bag.
23      Q.   That's in that area there, the duct tape
24  where the arrow is?
25      A.   That is correct.
```

**GA686**

2745

```
 1      Q.   Showing you Government's Exhibit 404,
 2  what's shown in that photograph?
 3      A.   Okay.  Now, you can clearly see there is
 4  two pieces of grey duct tape, one on the left and a
 5  small piece over on the right.  And the white
 6  crumpled-up Walgreen's bag.
 7      Q.   Showing you Government Exhibit 405, is this
 8  just another angle of the duct tape attached to the
 9  white bag?
10      A.   That is correct.
11      Q.   And then, again, in each one of these
12  photos there is this No. 21 in the photograph,
13  correct?
14      A.   That is correct.
15      Q.   Showing you Government's Exhibit 406 in
16  evidence up here at the top, this is just another
17  angle of this, the bags?
18      A.   That is correct.
19      Q.   And Government's 407, again, another angle?
20      A.   That is correct, viewing it with the blue
21  bag a little bit more exposed showing the Walgreen's
22  bag contained within the bag.
23      Q.   And then finally Government's 402, the two
24  bags, correct?
25      A.   That is correct.
```

2746

```
 1      Q.   Once these items are received at the lab,
 2  and specifically the items we're talking about in
 3  Government's 400 through 408, and they're
 4  photographed and the bar code is issued and the
 5  evidence number is issued, what happened with these
 6  items?  Did they eventually get to you?
 7      A.   Yes.  They first were examined by the trace
 8  section of the laboratory.  Maria Warner then
 9  transferred them to me for me to conduct my latent
10  print examination.
11      Q.   And what is the trace section of the
12  laboratory?
13      A.   They look for minute traces of evidence
14  that may be attached to items, it could be hairs,
15  fibers.
16      Q.   So, after they went through these items,
17  the bags and the duct tape, looking for trace, they
18  eventually came to the fingerprint unit?
19      A.   That is correct.
20      Q.   Let me hand you what's in evidence
21  Government Exhibit 123A, and just hand you those
22  items, 123A and 123A-2 and 123A-1.  Just take a look
23  at those items and see if you recognize the contents
24  of 123A.
25      A.   This what I'm looking at is a paper bag,
```

2747

```
 1  it's original packaging that was submitted to the
 2  laboratory which contained the items in front of me.
 3  Partly covered up by this secondary seal is the
 4  laboratory bar code, which I talked about earlier.
 5  It has the laboratory case number, the submission
 6  No. 21, my initials on it.  Also written on the
 7  exterior of the bag is the laboratory case number
 8  with the No. 21 and the initials of M-G-W which I
 9  recognize to be Maria Warner's initials.
10      Q.   And do you recognize 123A-1 and 123A-2?
11      A.   Yes, I do.
12      Q.   And how is it that you are able to
13  recognize what's contained -- well, first of all,
14  what is in 123A-1?  What is that?
15      A.   Okay, this is the labelling that I've
16  written on the exterior of a clear plastic bag the
17  laboratory case number, the submission number,
18  021-04, it has my initials and it's labelled tape
19  from Walgreen bag.
20      Q.   And what's contained in 123A-2?
21      A.   This contains a piece of duct tape, and
22  there is also a clear lifter which I attached to the
23  tape to attempt to flatten the tape out so an
24  impression could be photographed on it.
25      Q.   And did you place those pieces of duct tape
```

2748

```
 1  into those bags, 123A-1 and 123A-2?
 2      A.   Yes, I did.
 3      Q.   And you wrote the markings on there?
 4      A.   Yes, on 123A I also wrote the laboratory
 5  case number, the submission No. 021, my initials and
 6  written on it is tape from Walgreen bag.
 7      Q.   And that's 123A-2, correct?
 8      A.   That is correct.
 9           MS. REYNOLDS:  Your Honor, we had moved
10  these subject to connection with the testimony of
11  Mr. Pleckaitis.  At this time I would move 123 and
12  123A-1 and 123A-2 as full exhibits.
13           THE COURT:  All right, anything further?
14           MR. SMITH:  No objection, your Honor.
15           THE COURT:  All right, those are full
16  exhibits now.
17      Q.   Now, Mr. Pleckaitis, can you describe for
18  the members of the jury what you did once you
19  received the items contained in Government's
20  Exhibit 123A?  What did you then do with those
21  items?
22      A.   123A would be all the items together.
23      Q.   Why don't we start with the bag, the
24  blue-green bag.
25      A.   Actually, on all three items, the two bags
```

2749

```
1   and the tape, the duct tape, because the duct tape
2   was actually folded on itself, adhesive to adhesive,
3   one of the first things we want to do is subject any
4   nonporous item of evidence to be examined for
5   fingerprints, we want to attempt to rehydrate the
6   print.  So it's put in a chamber in warm water and
7   the humidity level is raised within the chamber.
8   The specimen would then be subjected to
9   cyanoacrylate ester fumes.
10      Q.  Easy for you to say.  What is that?
11      A.  Cyanoacrylate ester is the name of
12  Super Glue.  Super Glue is a trade name.  It could
13  be Super Glue, Crazy Glue, but it's cyanoacrylate
14  ester is the component we're going to use.  The glue
15  is heated, the vapors of the fume vaporize,
16  Super Glue or cyanoacrylate ester fumes have an
17  affinity for moisture and lipid fats, so they're
18  attracted to the latent print residue.  They'll
19  adhere to the latent print residue and they'll
20  polymerize right on the surface of the latent print
21  residue.  So it will turn white.
22          Once the residue is on a surface we have
23  an option at that point either to powder the
24  specimen or we can try to dye stain it.  We're
25  actually going to go dye stain the Super Glue
```

2750

```
1   residue and there is a number of different types of
2   chemicals that we can use to dye stain the latent
3   impression which would then be examined with a
4   forensic or alternate light source that we then will
5   use specialized different colored goggles and we can
6   visualize the latent impressions and different
7   wavelengths and the latent impressions can be
8   photographed and the photograph used for comparison
9   purposes.
10      Q.  And you performed those tests, you said, on
11  all of the items contained in Government's 123A, the
12  blue bag, the Walgreen's bag, and the duct tape
13  contained therein, correct?
14      A.  That is correct.
15      Q.  And were you able to see, once you used
16  those alternate sources of light, were you able to
17  see then some latent prints?
18      A.  Yes, I did.
19      Q.  And let's start then first, if you could,
20  with the blue-green bag.  Were you able to identify
21  -- well, were you able to, through your examination
22  and your test, find some latent prints of enough
23  quality and characteristics that you could then do a
24  comparison?
25      A.  Yes.  When we examine the physical item in
```

2751

```
1   evidence, any impression that could be possibly used
2   for comparison purposes, because we're in a darkened
3   room using a handheld magnifier, we'll examine the
4   print.  If we see there is enough ridge detail there
5   to warrant further examination we'll designate that
6   with a latent number and it will be photographed.
7   Then later on in our office we'll be able to
8   evaluate the photographs of latent impressions,
9   determine their value for comparison.
10      Q.  And so, how do you designate -- starting
11  then with, for example, the blue-green bag, you said
12  you designated a latent number?
13      A.  Right.  Because they all came from
14  submission No. 21, so they'll all start with 021,
15  and then each bag will be 1, 2, 3, 4.  Actually
16  three, there is four items in here because you have
17  two pieces of tape.
18      Q.  And is that, those numbers that you give to
19  the latent prints you find on each item of evidence
20  recorded by you in your notes and then later
21  referenced in your final report?
22      A.  That is correct.
23      Q.  And in this case, then, focussing on the
24  blue-green bag, were you able to, once you examined
25  the blue-green bag, find some latent prints that you
```

2752

```
1   were able to compare using the ACE-V methodology and
2   then identify?
3       A.  Yes, I did.
4       Q.  Can you describe for the members of the
5   jury what you did and what conclusions you reached
6   with regard to any latent prints on the blue-green
7   bag contained in Government's Exhibit 123A?  And if
8   you need to refer to your report, you can do so.
9       A.  Yes, if I can briefly.
10      Q.  Just showing you your report from
11  February 6th of 2006.  See if that will help refresh
12  your recollection as to the blue-green bag.
13  Does that refresh your recollection as to the
14  blue-green bag?
15      A.  Make sure I'm on the right bag.
16          Yes.
17      Q.  Can you describe for the members of the
18  jury then what you found on the blue-green bag and
19  what comparison you made?
20      A.  I developed five areas of friction ridge
21  detail which I designated as latents 021-01 through
22  L1 through L5.  Can I refer to my report?
23      Q.  Yes, you may.
24      A.  Can you repeat the question.
25      Q.  Yes.  Did you find any latent prints of
```

2753

```
1   value that you were then able to compare from the
2   blue-green bag?
3       A.   Yes, I did.
4       Q.   And can you describe what you found and
5   what comparison you made and what your findings were
6   with regard to those latent prints?
7       A.   On this particular bag one of the
8   impressions was insufficient for identification.
9   Four impressions were suitable for identification.
10  I compared the latent impressions developed on this
11  bag to six individuals, the three victims in this
12  offense, Tina Johnson, Basil Williams and James
13  Reid --
14      Q.   So, you had obtained -- let me just stop
15  you.  You had obtained known prints from the three
16  victims in this case?
17      A.   Yes, they were submitted from the
18  Bridgeport Police Department.
19      Q.   And then you said you compared the latent
20  prints you found on the blue-green bag to three
21  other sets of known prints?
22      A.   That is correct.
23      Q.   Who else did you compare it to?
24      A.   In addition, they submitted the
25  fingerprints of Azibo Aquart, Rodney Womble, and
```

2754

```
1   James Rucker.
2       Q.   And did you find anything?  When you did
3   that comparison of the latent prints, compared them
4   to those six known prints, were you able to make any
5   identification or any conclusions?
6       A.   No, I did not identify any of the latent
7   prints belonging to any of those individuals.
8       Q.   Did you take any other steps with regard
9   to the latent prints obtained or found on the
10  blue-green bag?
11      A.   Not at this time.
12      Q.   Did there come a time later on during the
13  investigation that you took other steps with regard
14  to those latent prints from the blue-green bag?
15      A.   Yes, I did.
16      Q.   Can you describe what it was that you did
17  at that time?
18      A.   Well, from the latent impression that was
19  developed on the Walgreen's bag, it was a good
20  quality print and I ran it through the Automated
21  Fingerprint Identification System and I developed a
22  candidate from the -- the computer found the
23  candidate in the database and I requested a copy of
24  the fingerprints of Azikiwe Aquart.  I then compared
25  the latent impressions developed on the evidence to
```

2755

```
1   the fingers of Azikiwe Aquart.
2       Q.   And you mentioned that you were able to
3   obtain a latent print quality from the Walgreen's
4   bag; is that what you just testified to?
5       A.   Yes.
6       Q.   And were you able to compare that, as you
7   just said, to Azikiwe Aquart's fingerprints?
8       A.   Yes, I did.
9       Q.   And what conclusions or findings did you
10  reach?
11      A.   At that time I was able to identify one
12  latent impression on the blue-green bag as having
13  been made by Azikiwe Aquart and four latent prints
14  developed on the Walgreen's bag as having been made
15  by Azikiwe Aquart.
16      Q.   And can you show -- when you are looking
17  for the latent prints on the blue-green bag or the
18  Walgreen's bag, do you make any notations on the
19  bags themselves?
20      A.   Yes, I do.  I circle the location where the
21  latent impression is from, I write the laboratory
22  case number, the submission number, the latent
23  designation number and my initials.  The evidence
24  then would be submitted to the photographer who is
25  assigned to the latent print unit and he will
```

2756

```
1   photograph the latent impressions.
2       Q.   What do you do with the photographs once
3   you get them back from the photographer at the lab?
4       A.   It was at that time that we are able to
5   compare the latent impressions to known impressions
6   in the case.
7       Q.   And again, with regard first to the
8   Walgreen's bag, what conclusions or findings did you
9   make with regard to the latent prints that you were
10  able to find and compare to Azikiwe Aquart's
11  fingerprints?
12      A.   Well, on the Walgreen's bag there was eight
13  areas of friction ridge detail which I designated as
14  latents 021-02 L1 through L8.  Of those eight latent
15  impressions I found four of them to be insufficient
16  for identification purposes.  The remaining four
17  latent impressions were developed -- were identified
18  as having been made by Azikiwe Aquart.
19      Q.   And in addition to those four latent prints
20  on the Walgreen's bag that were identified as
21  Azikiwe Aquart's fingerprints, were you also able to
22  make an identification with regard to the latent
23  print on the blue-green plastic bag?
24      A.   Yes, I did.
25      Q.   And what was your finding?
```

2757

1    A.    There was one impression that was
2 identified as having been made by Azikiwe Aquart.
3    Q.    Now, you said that you also compared all of
4 those latent prints to the other six cards that you
5 had, the three from the victims and the other
6 individuals you mentioned, correct?
7    A.    That's correct.
8    Q.    But you were not able to make any
9 identification of any of the latents on the plastic
10 bags, the Walgreen's bag and the blue-green bag, to
11 these other individuals?
12    A.    No.    There was two latent impressions on
13 the blue-green plastic bag that I wasn't able to
14 find -- attribute them to a source.
15    Q.    Now, drawing your attention then to the
16 duct tape that's contained in Government 123A-1 and
17 123A-2, were you able to conduct some tests of the
18 duct tape?    Can you describe what tests you
19 performed and what, if any, conclusions you reached
20 with regard to any latent prints found on the duct
21 tape?
22    A.    Yes.    Similar as I processed the plastic
23 bags, the nonadhesive side of the duct tape is
24 similar to plastic material, nonporous, that was
25 subjected to the humidity, the cyanoacrylate ester

2758

1 fumes and the dye stain and I did develop one --
2 actually I designated three areas of friction ridge
3 detail.    One of those impressions was suitable for
4 identification.
5         Now I compared that latent impression to
6 the seven people now involved in the investigation,
7 the three victims and the two Aquart subjects and
8 Mr. Rucker and Mr. Womble, and I was able to
9 identify that latent impression developed on the
10 nonadhesive side of the tape as having been made by
11 the left middle finger of Azibo Aquart.
12    Q.    And let me hand you what's been -- what
13 I've demarcated Government's Exhibit 409.    And before
14 I do that, let me ask you, in preparation for your
15 testimony here today, did you work with members of
16 your office in the lab to develop a PowerPoint
17 presentation that shows the photographs that you
18 took of the latent prints on the duct tape and
19 charts that you prepared so that you could explain
20 the comparison that you made?
21    A.    Yes, I did.
22    Q.    And have you reviewed the CD containing
23 those PowerPoint presentations prior to testifying
24 here today?
25    A.    Yes, I did.

2759

1         MS. REYNOLDS:    Your Honor, at this time
2 I would move as a full exhibit Government's 409.
3         MR. SMITH:    No objection.
4         THE COURT:    All right, that is now a
5 full exhibit.
6    Q.    And then showing you Government's 409, the
7 first PowerPoint contained on that CD, starting with
8 the first slide, if you can just describe -- and
9 there is a pointer next you to.    It's up on your
10 monitor, but it's also up on the big screen.    If you
11 could describe what is shown in the first slide of
12 Government's 409 --
13    A.    You want me to point at the screen?
14    Q.    Yes, if you could use that to describe
15 what's shown in the first slide.
16    A.    This is submission 21-03.    So it's a piece
17 of duct tape that was on the Walgreen's bag.    At
18 this point in time the duct tape was processed with
19 a dye stain and we're looking at it visualized with
20 an alternate light source and it is photographed as
21 such.    So that's what you see, the fluorescence.
22 The white there is an impression up in here which
23 was designated as L3.    This impression here in the
24 dark was L1.    And L2 there is an arrow pointing to
25 L2, this impression down at the bottom of the

2760

1 screen.
2    Q.    Is that your writing on the actual piece of
3 duct tape?
4    A.    Yes.    This is the laboratory case number,
5 this is an arrow.    A little bumpy, but that's an
6 area pointing to this impression over here.
7    Q.    Again, this was a photograph of the duct
8 tape showing the latent prints with the alternate
9 light source, correct?
10    A.    That is correct.
11    Q.    Showing you then the second slide, can you
12 describe what's contained or what that's a
13 photograph of?
14    A.    Okay, now a reversal has been made, tunnel
15 reversal of the photograph.    So, what was white is
16 now is black, because we're going to a comparison
17 and when we compared this to known impressions,
18 remember I said the known impressions, those ridges
19 are black.    So now we're comparing black ridges to
20 black ridges.    So, the ridges now have turned dark,
21 and you can't see it very well over here, but there
22 is an arrow pointing to this impression here which I
23 was able to identify.
24    Q.    Showing you the next slide in Government's
25 409, what does that show?

2761

1    A.    Okay, that's pointing to impression of
2    latent 21-L3.  This would be the third item of that
3    submission number.  What you are seeing here, you
4    see these little, like, vertical lines.  That's
5    webbing in the duct tape.  That's what gives duct
6    tape its strength and whatnot, allows it to be torn
7    whichever way.  And these little -- these are not
8    holes, but they're like indentures in the duct tape;
9    it's part of the winding in the processing of the
10   tape.  Up here you can see a fingerprint pattern.  I
11   can see it's a looping pattern, the ridges come
12   inside, recurve, turn around, come in from the same
13   side that you -- that they enter from.
14            THE COURT:  Mr. Pleckaitis, do you think
15   it would be possible for you to pick up that
16   microphone and hold it in one hand and point with
17   the other, just so that -- it's a little hard to
18   hear you.
19            THE WITNESS:  Okay.
20    A.    Now, the first thing I would do at this
21   point is I do an analysis of the latent impression,
22   taking into consideration of the artifacts, the
23   background, the ridge detail.  Right away I
24   obviously can see -- up at the top of the impression
25   I see a single ridge that splits and becomes two.

2762

1    I'm looking up further, I see another ridge that's
2    coming over from the left and into the right.  I see
3    additional features down in the core pattern of the
4    area and moving over towards the delta area, I see
5    some additional ridge characteristics.
6            So, my evaluation of the print, I feel
7    it's a value of comparison, so now I'm go to the
8    next phase and compare that impression to the known
9    prints of people involved in the investigation.
10    Q.    And showing you then the next slide in
11   Government's 409, is this a chart that you prepared?
12   Well, tell us what this is a chart of.
13    A.    The image on the left is the latent
14   impression 21-03 L1.  It's the impression that was
15   developed on the nonadhesive side of the duct tape.
16   And the impression on the right side of the screen
17   is the known fingerprint of the left middle finger
18   of Azibo Aquart.
19    Q.    And then if I go on to the next slide, can
20   you describe what that slide shows?  This is showing
21   a red mark on it.
22    A.    What the red arrow is pointing to is a
23   single ridge.  And if you are looking at a
24   fingerprint, this area of the fingerprint is a core.
25   That's like a fixed point for us in the field.  And

2763

1    I would just simply count how many ridges from the
2    center of the pattern out there are.  So I would
3    count, one, two -- third ridge out, ridge coming up,
4    bifurcates, it opens to the right.
5            Similarly, going over to the known
6    fingerprint of Azibo Aquart, coming from the core of
7    the impression counting up one, two -- third ridge
8    comes up opposite to the right.  This is the same
9    type of characteristics and it's in the same
10   relative position.  So it's like in between the
11   eleven and twelve o'clock position.  Now, examining
12   additional ridges to see if I can see any other
13   corresponding characteristics.
14    Q.    Showing you the next slide.
15    A.    Likewise, from this characteristic now,
16   which I have marked as No. 1, if I count one, two --
17   there is three intervening ridges now coming in a
18   downward direction.  There is an ending ridge right
19   there.
20            Now, it should be in the same relative
21   position in the known impression of Azibo Aquart.
22   Likewise counting from ridge characteristic No. 1,
23   it's one, two, three intervening ridges, the fourth
24   ridge ends in a down direction.  And look how close
25   that is to the adjoining ridge, almost abuts it,

2764

1    almost becomes a bifurcation.  Similarly, in the
2    latent impression, same type of characteristic.
3    Q.    Showing you the next slide in Government's
4    409, what does that third arrow show?
5    A.    Now we're going to move -- I could go
6    counterclockwise or -- counterclockwise and do this
7    using -- the way we collect the pattern order is
8    just so we don't get our lines crossed from one
9    another.  This, it doesn't matter, it's made by the
10   same type of pattern.  It's going to come out the
11   same.  So we can count from ridge characteristic 2
12   all the ways back to the core and it's still going
13   to be the same.  So from ridge characteristic No. 2
14   you count one, two, three, four, five, six, seven,
15   we're back in the core.  You follow the ridge down a
16   short distance and it bifurcates.  One ridge splits
17   and becomes two in a downward direction.
18           Now, we go over to Mr. Azibo Aquart's
19   fingerprint we count from ridge characteristic
20   No. 2, one, two, three, four, five, six, seventh
21   ridge, follow it downward and you see where one
22   ridge becomes two ridges going in a downward
23   direction.
24           Next slide.
25    Q.    The next slide with an arrow, 4?

2765

1    A.   Now going over to over to ridge
2  characteristic No. 4, if we count over to the right,
3  we count over one, two, the third ridge over, follow
4  that in a downward direction, we have another
5  bifurcation in a downward direction.  Likewise in
6  the known fingerprint if we count over from the
7  right one, two, third ridge, follow it downward, we
8  have a bifurcation, a single ridge that becomes two
9  ridges in a downward direction.
10   Q.   Showing you the next slide.
11   A.   Now, from ridge characteristic No. 4, you
12 count over one intervening ridge, the second ridge
13 over, we can see it ends in a downward direction.
14 Going to the known impression, from ridge
15 characteristic No. 4, one intervening ridge, the
16 next ridge coming down in a downward direction.
17 There is an ending ridge.
18   Q.   Showing you --
19   A.   A known characteristic No. 6, next slide.
20   Q.   Next slide.
21   A.   Now, we have counting over from this ridge
22 characteristic, one, two, three, the fourth ridge,
23 if you follow it up you can see it ends in an upper
24 direction right there, where I have marked as ridge
25 characteristic No. 6.  Looking at the known

2766

1  impression, counting over to the right from
2  characteristic No. 5, one, two, three, the fourth
3  ridge, follow it up, ends in an upward direction.
4    Q.   The next slide.
5    A.   Actually, if you advance to the end because
6  I have -- I'm going to be jumping over one.  It will
7  just be easier to -- okay, there we are.  Here we
8  are.  Ridge characteristic No. 3 -- no, 6.  Here
9  we're going to go over to ridge characteristic
10 No. 9.  Remember the sequence doesn't matter, it's
11 just a matter of not crossing lines and it's just
12 easier to come down at this angle.  So we're going
13 to count over from ridge characteristic No. 6, one,
14 two, three, and you can see the ridge characteristic
15 coming up and ending where I have indicated, No. 9.
16          Similarly, the known impression of the
17 left middle finger of Azibo Aquart, we count over
18 one, two, three, the ridge coming and ending in an
19 upward direction.
20          And to go to ridge characteristic No. 7,
21 we can count over from 9 to 7 by counting one, two,
22 three, and here comes the ridge characteristic
23 ending in an upward direction.  And likewise, over
24 in the known fingerprint of Mr. Azibo Aquart, we're
25 going to count over one, two, three and here comes

2767

1  ridge right abutting where I have No. 7 marked.
2          And for characteristic No. 8 you can see
3  there is one, two intervening ridges, and here comes
4  a ridge ending right there I have marked No. 8, an
5  ending ridge in a downward direction.  From ridge
6  characteristic No. 7 counting over one, two
7  intervening ridges, No. 8 ending in a downward
8  direction.
9          When we examine a latent impression we
10 examine the whole impression.  We don't look at any
11 little minute discrepancy because you are always
12 going to have a little distortion.  The
13 flexibility --
14   Q.   You can have a seat if it's easier.  You
15 have a lot in your hands there.
16          So, you were saying when you examine a
17 latent print you examine the whole print, right?
18   A.   Yes.  When we come to a conclusion we take
19 the total impression.  It's not the appearance of
20 one appearance of one feature of the impression.
21 All the features, or the conglomerate, they all have
22 to be in the same spatial relationship, the same
23 type of feature, the same relative position for us
24 to come to a conclusion.
25   Q.   And once you examined the latent print

2768

1  contained in 120 -- Government's 123 on the duct
2  tape and did this comparison, what conclusions did
3  you reach?
4    A.   I came to the conclusion that the latent
5  impression and the known impression of the left
6  middle finger of Azibo Aquart were made by the same
7  source.
8    Q.   Now, Mr. Pleckaitis, in addition to
9  examining and comparing the latent prints found on
10 the blue-green plastic bag, the Walgreen's bag and
11 the duct tape, did you also have occasion to examine
12 some additional items, and specifically, let me hand
13 up to you what's already in evidence as Government's
14 Exhibit 201F, and have you open that and take out
15 201F-1 and 201F-2.
16          First of all, taking a look at 201F, do you
17 recognize what this is?
18   A.   Yes, I do recognize it.
19   Q.   How -- well, what do you recognize it to
20 be?
21   A.   I recognize it to be a gun box case.  It's
22 a S&W gun box case.  It has a different laboratory
23 case number, it has laboratory case number ID
24 063506, submission No. 3 and it has my initials on
25 it.

2769

1    Q.   So this, the item, the blue gun box
2  contained in Government's Exhibit 201F, has a
3  different Connecticut state forensic laboratory ID
4  number than the ID number contained on the items
5  contained in Government's 123, the blue plastic bag
6  and the Walgreen's bag and the duct tape; is that
7  correct?
8    A.   That is correct.
9    Q.   And these, do you know -- well, let me ask
10 you this.  Once you are assigned to a case do you
11 stay with that case for the duration?
12   A.   Usually.
13   Q.   All right.  And so, do you recall when it
14 was that you obtained or that the item contained in
15 Government's 201F, the gun box, came to you, came to
16 the lab?  Do you recall when that would be?
17   A.   That would have been in November of 2006.
18   Q.   So, more than a year after you had obtained
19 the items, the plastic bags and the duct tape,
20 correct?
21   A.   That is correct.
22   Q.   So then again, focussing on Government's
23 Exhibit 201F, and if you could just open 201F there,
24 the gun box.  And showing you what's contained
25 inside that's been marked 201F-1 and 201F-2, do you

2770

1  recognize what these packages contain, what these
2  plastic bag contains?
3    A.   Yes, I do.
4    Q.   What do you recognize them to be?
5    A.   The first bag contains a Smith & Wesson
6  owner's manual for a .22 sport series target pistol.
7  On the front cover is the laboratory case number and
8  my designation of a latent impression on it.
9    Q.   And what's contained in 201F-2?
10   A.   This would be some additional items that
11 were contained within the gun box.  It's a product
12 registration card, a cartridge case, spent cartridge
13 case and an additional gun manual.
14   Q.   And again, you, yourself put those items
15 into those plastic bags and labeled them with your
16 initials and your numbers.
17   A.   That is correct.
18        MS. REYNOLDS:  Your Honor, at this time
19 201F is already a full exhibit.  We would move
20 201F-1 and 201F-2 as full exhibits as well.
21        MR. SMITH:  No objection.
22        THE COURT:  Full exhibits.
23   Q.   So, again, just taking a look then at the
24 owner's manual in 201F-1, do you recognize that?
25   A.   Yes, I do.

2771

1    Q.   And can you describe for the members of the
2  jury whether you performed any tests on -- well,
3  let's step back.
4        Did you perform any tests on the blue gun
5  box and the contents of the blue gun box?
6    A.   Yes, I did.
7    Q.   Can you describe what tests you performed
8  and what, if anything, you found?
9    A.   Well, the blue gun box I performed the same
10 test that I described earlier in processing
11 nonporous items of evidence.  I subjected the
12 evidence to humidity, cyanoacrylate ester fumes and
13 dye staining of the latent impressions, examination
14 with the alternate light source, the visualization
15 of latent impressions.  I designated certain areas
16 of developed friction ridge skins, different latent
17 numbers on the box itself, which were photographed.
18        And additionally, the paper items
19 contained within the box, the owner's manual, I used
20 a different method to develop the latent impressions
21 because these are really porous type surfaces, so we
22 use a different regimen of types of chemicals that
23 we use to develop latent impressions.
24        On this particular specimens I used a
25 product that short term is called ninhydrin, and

2772

1  that will react with the amino acids component of
2  the sweat residue.
3    Q.   And based on your knowledge and expertise
4  in this area, is paper a good source -- or is paper
5  a -- the question is, is paper a good source to
6  obtain a fingerprint from?
7    A.   It depends on the paper, the quality of the
8  paper, how much -- paper bags are not really good
9  because they're more fibrous, more pulp in it.  The
10 finer paper is pretty good.  This type of paper,
11 it's a hit or miss because some of it is glossy, so
12 it almost has the qualities both of nonporous and
13 porous at the same time.  But once a latent
14 impression is developed on the -- deposited on the
15 surface of the paper it will then migrate into the
16 substrate of the paper and we're able to develop the
17 impression using the chemicals of ninhydrin.
18   Q.   So, again, this goes back to what you
19 described earlier as far as the chances of obtaining
20 a chance impression just vary depending on many
21 different factors, correct?
22   A.   That is correct.
23   Q.   So, in this case when you examined
24 Government's Exhibit 201F and 201F-1 and 201F-2 and
25 performed the tests you just described, did you find

2773

1  any latent prints of value to you in order to then
2  go to the next step of doing a comparison?
3      A.  Yes, I did.
4      Q.  Can you describe what it was you found and
5  what you did once you found the latent print of
6  quality?
7      A.  On States -- Government's Exhibit 201F-1 --
8      Q.  And, again, what is that that's contained
9  in 201F-1?
10     A.  That is a Smith & Wesson owner's manual for
11 a .22 Sports series target pistol.
12     Q.  So, Government's Exhibit 201F-1, the
13 owner's manual for the Smith & Wesson in the blue
14 box, what, if anything, did you find?
15     A.  I developed three latent impressions of
16 value in the owner's manual.
17     Q.  And did you also prepare a PowerPoint in
18 connection with the latent print you examined and
19 found on the owner's manual?
20     A.  Yes, I did prepare a PowerPoint impression
21 relative to the latent I developed on page 14.  I
22 also developed a latent impressions on the front and
23 back covers.
24     Q.  All right.  And before we get to it, the
25 latent you developed on page 14, you said you

2774

1  developed other latent impressions.  Were you able
2  to compare those impressions to the known
3  fingerprints of anyone?
4      A.  Yes, I compared them to all the people
5  involved in this investigation and I was not able to
6  effect an identification.
7      Q.  And do you know off the top of your head
8  whose known prints you compared them to?
9      A.  I compared them to Azibo Aquart, Azikiwe
10 Aquart, Linwood Bember, B-e-m-b-e-r, and I'm missing
11 somebody.
12     Q.  Do you remember everybody you compared the
13 latent print to?
14     A.  Pardon me?
15     Q.  Do you remember everybody or would looking
16 at your report refresh your memory?
17     A.  I would have to look at my report to
18 refresh my memory.
19     Q.  I'm showing you a copy of your report that
20 was issued on January 31st of 2007.  If you want to
21 take a look at that, see if that refreshes your
22 memory as to whose known prints you compared the
23 latents from the owner's manual to.
24     A.  I compared them to the -- the fingerprints
25 additionally to Efrain Johnson.

2775

1      Q.  So you compared it to Efrain Johnson,
2  Linwood Bember, Azibo and Azikiwe Aquart?
3      A.  That is correct.
4      Q.  Now -- and again, with regard to those
5  other two prints on the front and back cover, you
6  weren't able to make an identification?
7      A.  Yes, I was.
8      Q.  Okay.  And were you -- what did you find
9  with regard to those latent prints?
10     A.  Since I could not match it to any of the
11 names that were involved in the investigation, I
12 took one of the latent impressions and I searched it
13 through the database using the Automated
14 Fingerprints Identification System and I came up
15 with an additional suspect.
16     Q.  And what did you find?  What were your
17 findings?
18     A.  I found that -- I requested the copy of the
19 fingerprints of a subject by the name of Randi
20 Washington, and I was able to identify a fingerprint
21 on the front cover and back cover as having been
22 made by Mr. Randi Washington.
23     Q.  And again, that's on the front cover and
24 the back cover of the owner's manuals of the blue
25 Smith & Wesson gun box contained in Government's

2776

1  201F and specifically marked 201F-1; is that
2  correct?
3      A.  That is correct.
4      Q.  Now, in addition to identifying Randi
5  Washington's fingerprints on the back and front
6  cover of the owner's manual for the Smith & Wesson,
7  you mentioned that you were also able to find a
8  latent of value on page 14 of that owner's manual,
9  correct?
10     A.  That is correct.
11     Q.  And is that the PowerPoint, the additional
12 PowerPoint contained in the CD that's been marked as
13 Government's 409?
14     A.  Yes, it is.
15     Q.  Would that assist you in explaining to the
16 jury the tests you performed and the comparison you
17 made of the latent print from the owner's manual on
18 page 14?
19     A.  Yes, it did.
20         MS. REYNOLDS:  Your Honor, at this point
21 I would ask that we again dim the lights.
22     Q.  And showing you the second PowerPoint
23 contained in Government's 409, and I'm going to ask
24 you to do your balancing act again and use the
25 microphone and the pointer, and just explain, taking

2777

```
1   a look at the first slide, Government's Exhibit 409
2   on the owner's manual, can you describe what that's
3   a photograph of?
4        A.   Okay, as you can see the page is turned
5   sideways.  The page number is in the lower
6   right-hand corner of the slide, page 14.  Written on
7   the page is the assigned laboratory case number ID
8   063506.  03 refers to the submission number.  01 is
9   item one.  L2.  So it's latent No. 2.  These are my
10  initials.  I'm pointing to the darker circular type
11  impression of one of three impressions on the page.
12       Q.   Showing you the next slide, can you
13  describe what that is?
14       A.   Okay.  This is a close-up or blowup of
15  where the arrow is pointing to, that circular dark
16  impression on the left side of the slide.  On the
17  right side of the slide is the known left thumb
18  fingerprint of Azibo Aquart.
19       Q.   And again, this latent was contained on
20  page 14 of the owner's manual of the Smith & Wesson?
21       A.   That is correct.
22       Q.   So, showing you the next slide.
23       A.   The next slide is pointing to -- this is a
24  whorl type pattern, a circular type pattern, and
25  what I'm pointing to is the top half in the
```

2778

```
1   enclosure.  Remember I said we'll keep it simple and
2   keep it to three basic characteristics.
3        So essentially this is one bifurcation,
4   one ridge splits and becomes two.  Or if you are
5   looking at it coming from a downward direction, it's
6   one ridge, it splits, it becomes two.  This actually
7   becomes like an enclosure, and that is one of those
8   17 names that additionally they like to catalog, but
9   we'll just stick with the bifurcation point.  So, we
10  can use that as a reference point.
11       Likewise, in the known fingerprint of
12  the left thumb of Azibo Aquart, we have similar
13  enclosure type pattern, characteristic, you see
14  where I have marked as characteristic No. 1.
15       Q.   And showing you the next slide then.
16       A.   Similarly, from characteristic No. 1, now
17  just go contiguous ridges.  If we count one ridge
18  over, we can see that's going to bifurcate in a
19  downward direction.  And looking at the known
20  fingerprint of Azibo Aquart, going right over from
21  that small enclosures, the next ridge we can see,
22  one ridge splits and becomes two, bifurcating in a
23  downward direction opening to the right.
24       Q.   Showing you the next slide.
25       A.   Okay, from characteristic No. 2, if you
```

2779

```
1   count over to the left with me from that bifurcation
2   we can see one, two, two intervening ridges, and we
3   have a ridge coming and ending in an upward
4   direction.
5        Similarly, in the known fingerprint of
6   Mr. Azibo Aquart counting over two ridges from the
7   bifurcation we have one, two intervening ridge, the
8   third ridge ending in an upward direction.
9        Q.   Showing you the next slide.
10       A.   From characteristic No. 3, counting over to
11  the left we see that there is one, two intervening
12  ridges, the third ridge ends in an upward direction.
13       In the latent impression going over to
14  the known impression, we count over one, two
15  intervening ridge, the third ridge ends in an upward
16  direction.
17       Q.   Showing you the next slide.
18       A.   Characteristic No. 5, this one is pretty
19  easy because we stay right on the same
20  characteristic.  We just follow it down and the next
21  ridge over you have ending ridge where we have
22  marked characteristic No. 5.  Similar in the known
23  fingerprint, we stay on that characteristic, follow
24  it down and we could see where we have an ending
25  ridge right above it.
```

2780

```
1        Q.   Let me show you the next slide.
2        A.   And you could see No. 6, if we stayed on 4,
3   it would take us right to it.  Or going from 5 to 6
4   we just drop down and we could see it end.
5        Likewise, in the known impression, if we
6   stay on 5, we can follow that over and we could see
7   it ends in the -- to the right.  And likewise, if we
8   were to follow it from characteristic No. 4, it's
9   the same ridge.  We follow it over and it ends where
10  characteristic No. 6 is.
11       Q.   Showing you the next slide, No. 7 arrow.
12       A.   No. 7 we just go up one ridge, follow it
13  up, it ends in an upward direction.  And likewise,
14  in the known impression, next ridge up, follow it
15  up, it ends in an upward direction.
16       Q.   Showing you the next slide.
17       A.   The next slide, just counting over from the
18  characteristic No. 7, there is one intervening
19  ridge.  If you go to the next ridge you see it
20  bifurcates, one ridge becomes two ridges opening to
21  the left.  Similarly in the known print we have one
22  intervening ridge, the next ridge bifurcates or
23  opens to the left.
24       Q.   That is a chart that you used to assist in
25  explaining your comparison of the latent print from
```

**GA695**

2781

```
1   page 14, the owner's manual of the Smith & Wesson
2   and the known print of Azibo Aquart, correct?
3       A.   That is correct.
4       Q.   And after you did the test and made your
5   comparison, in your opinion whose fingerprint is
6   contained on that owner's manual?
7       A.   That latent impression and the known left
8   thumb impression of Azibo Aquart were all made by
9   the same source.
10      Q.   Now, did you also have an opportunity to
11  conduct additional testing on the other gun related
12  evidence under the same lab number, and specifically
13  I'm going to hand up to you Government's
14  Exhibit 201G and ask you, do you recognize this?  Do
15  you recognize Government's 201G?
16      A.   Yes, I do.
17      Q.   And what do you recognize is contained in
18  Government's 201G that's already in evidence?
19      A.   Once again, it has the bar code labelling
20  from the forensic lab, the laboratory case number
21  under which it was submitted, ID 063506, submission
22  No. 4, a description of the item of evidence.
23      Q.   If you could just open Government's 201G
24  I'll ask you to take a look at what I've previously
25  demarced Government's Exhibit 201G-1.  I'll ask if
```

2782

```
1   you recognize what's in that exhibit.
2       A.   I'm looking at item No. 201G-1, and it's
3   operating instructions for a Kahr, K-a-h-r, pistol.
4       MS. REYNOLDS:  Your Honor, at this point
5   I would move as a full exhibit Exhibit 201G-1.
6       MR. SMITH:  No objection.
7       THE COURT:  Full exhibit.
8       Q.   And, Mr. Pleckaitis, were you able to
9   conduct some tests on the gun box that you've just
10  described in 201G and the operating manual in
11  201G-1?
12      A.   Yes, I did.
13      Q.   And were those the same tests that you
14  previously described that you conducted on the other
15  gun box and the other manual?
16      A.   That is correct.
17      Q.   And were you able to find any latent prints
18  of value on any of those items contained in
19  Government's 201G or 201G-1?
20      A.   Yes, I did.  I developed latent impressions
21  on the box itself and also on the operating
22  instruction manual.
23      Q.   And were you able to compare those latent
24  impressions to any known fingerprints?
25      A.   Yes, I did.
```

2783

```
1       Q.   And do you recall if you made any findings
2   with regard to the latent prints either from the gun
3   box or the operating instructions contained inside
4   the gun box?
5       A.   Yes.  I was able to identify a latent
6   impression which I developed on the back cover of
7   the operating manual as having been made by the
8   right thumb of Azibo Aquart.
9       Q.   And did you use the same methodology and do
10  the same type of comparison that you've just
11  described for the members of the jury with regard to
12  the other owner's manual from the gun box and with
13  regard to the duct tape?
14      A.   That is correct.
15      Q.   And did you develop any other prints that
16  you were able to -- were you able to identify any
17  of the other latents from those items contained in
18  201G or 201G-1?
19      A.   Yes, I did.
20      Q.   And can you tell us who the other latents
21  were identified to?
22      A.   One additional latent print was identified,
23  which was developed on submission No. 1.  I forgot
24  the exhibit number.
25      Q.   Is that from the Kahr black box you are
```

2784

```
1   looking at there?
2       A.   No, the other box.
3       Q.   Yes, I'll hand you Government's 201H and
4   see if you recognize that.
5       A.   Yes, a latent impression that was developed
6   on Government's Exhibit 201H, latent impression on
7   this box was also developed, identified as having
8   been made by Randi Washington.
9       Q.   Now, Mr. Pleckaitis, in addition to all the
10  items that you've discussed during your testimony
11  here today, the plastic bags, the duct tape and then
12  these gun boxes and owner's manuals, did you receive
13  other items during the course of your participation
14  in this case that you also tested for latent prints?
15      A.   Yes, I did.
16      Q.   Do you recall what other types of items you
17  received and whether or not you were able to make a
18  comparison and identify any of those prints?
19      A.   Relative to our laboratory case number
20  3506?
21      Q.   Well, let me do this.  Let me start with,
22  do you recall how many reports you prepared during
23  the whole time you participated and done
24  examinations of items related to these -- to this
25  case?
```

2785

```
1     A.   I wrote, I believe, five reports relative
2   to laboratory case No. 0519367 and one report
3   relative to the gun boxes.
4     Q.   And drawing your attention to the first
5   report that you generated dated December 16th of
6   2005, if you took a look at that report, would that
7   help you remember the types of items you received in
8   connection with laboratory ID number 05019367?
9     A.   Yes.
10    Q.   So again, just showing you your report from
11  December 16th of 2005.  Did you -- does that refresh
12  your recollection as to other items that were
13  submitted to you and the fingerprint examination
14  unit in connection with this case?
15    A.   Yes, it does.
16    Q.   And what were some of the other items that
17  you received and then tested, just as using the same
18  test and methodology you described here today with
19  regard to the items we've just discussed?
20    A.   I examined four submissions that were paint
21  cans that contained duct tape.  I examined them for
22  latents and I did not find any latent impressions on
23  them.  Additionally, there was two packagings of
24  gloves and a piece of glove.  And in addition to
25  that, a latent lift which I did not develop, but the
```

2786

```
1   Bridgeport Police Department developed and
2   submitted.  That was the only latent impression in
3   value of comparison relative to this report.  That
4   latent impression from submission No. 22, that was
5   compared to all the individuals that I know of were
6   involved in this investigation, did not effect any
7   identification to any of the subjects.
8             That latent impression was searched in
9   the AFIS, Connecticut AFIS database, and also the
10  national AFIS database, and I was not able to
11  develop a candidate from that.  That impression
12  encompasses an area of the tip region.  So that may
13  be an area that is not recorded during standard
14  fingerprinting procedures.
15    Q.   And again, that impression that you are
16  talking about, that was a latent impression that was
17  found at the scene by the crime scene unit in
18  Bridgeport and submitted to you; that's not a latent
19  impression that you developed from the items,
20  correct?
21    A.   That is correct.
22    Q.   And, again, with regard to the duct tape in
23  the paint cans, you conducted similar tests and were
24  not able to find any latent impressions of value
25  enough to do a comparison, correct?
```

2787

```
1     A.   That is correct.
2     Q.   And you said that you compared those items,
3   and again, this is referring you to your first
4   report that you generated in this case, to the known
5   suspects.  How would it be that you would obtain
6   known prints in this case?
7     A.   In this case they were submitted.  The
8   known prints at the time of this report would have
9   been Azibo Aquart, James Rucker, and Mr. Womble.
10    Q.   Okay.  And then --
11    A.   And the three victims, too.
12    Q.   And the three victims, okay.
13         And then drawing your attention to a report
14  that you generated on April 20th of 2006, let me ask
15  you to take a look at this and see if that helps you
16  remember other items that you obtained in connection
17  with this case and conducted tests on and tried to
18  do comparisons.
19    A.   Yes.  My second report refers to four
20  submissions that were submitted to the laboratory.
21  Once again, there were paint cans which contained
22  duct tape.  I examined all of the duct tape that was
23  submitted.  I was able to develop some minor
24  fragments on the duct tape from submission 9.  Some
25  of the latent impressions were on the first layer of
```

2788

```
1   duct tape.  Second impression, which was cut in
2   half, that was at the bottom of the duct tape that
3   may have been deposited by whom the duct tape was
4   on.  The only thing is, we did not have any known
5   palm prints from any of the victims to be compared
6   to that impression.
7     Q.   And later during the course of your
8   participation in this case, did you obtain
9   additional known prints that you started to use to
10  compare any latent prints that you were able to
11  develop from any of the evidence you received?
12    A.   Yes, I did.
13    Q.   And whose known prints did you receive in
14  addition to the ones you've already testified to
15  here today?
16    A.   I made reference, I needed major case
17  prints.  I received a submission of the major case
18  prints of Azikiwe Aquart and another subject by the
19  name of Nathaniel Grant.
20    Q.   And showing you a report that you generated
21  September 22nd of 2006, does that also show another
22  individual who you obtained prints from to use
23  during your comparisons?
24    A.   Yes.  They were not major case prints, they
25  were just regular hand and joint fingerprints of a
```

2789

1  subject by the name of Efrain Johnson.
2      Q.   And, Mr. Pleckaitis, let me ask you, do you
3  recall in addition to that latent print that was
4  developed by the crime scene unit at the crime
5  scene, in addition to that, do you recall receiving
6  like a piece of wall, a piece of plaster with what
7  appeared to be a latent impression?
8      A.   Yes, I did.
9      Q.   Did you run some tests from that piece of
10  wall that you received from the crime scene unit?
11     A.   Yes, I did.
12     Q.   And can you describe briefly what tests you
13  performed and if you found anything of value or were
14  able to make a comparison?
15     A.   That material is submission 24, 25 and I
16  believe 26 to the laboratory consisted of a
17  Sheetrock material that had an impression that
18  fluoresced without any enhancement on it using an
19  alternate light source.  All three pieces seemed to
20  come together like a piece of puzzle fit together.
21  Photographed one of the latent impressions,
22  impression was searched through the Connecticut
23  Automated Fingerprint Identification System and
24  requested a copy of the fingerprints of a subject by
25  the name of James Rucker.  The finger impression on

2790

1  this, although it's one hand impression, it looks
2  like all made at one time.  We did not have palm
3  prints of Mr. Rucker, but the finger was identified
4  as being made by James Rucker.
5      Q.   Now, did you generate a report?  Are you
6  sure it was James Rucker or could it have been a
7  different James?
8      A.   I'm sorry, James Platt.
9      Q.   Did you say Platt?
10     A.   P-l-a-t-t.
11     Q.   And you compared that piece of wall and the
12  latent to all of the other known prints you had
13  received in this case and were not able to identify
14  it to any of the known prints of the subjects in
15  this case, correct?
16     A.   That is correct.  That's the first thing I
17  do is compare it to knowns that I knew were involved
18  in the investigation.  And when it did not match any
19  of the knowns, then the search through the AFIS
20  Automated Fingerprint Identification System, is
21  performed.
22     Q.   And then I just wanted to ask you, you
23  generated a report dated March 2nd of 2011.  Does
24  this report indicate whether or not you obtained
25  known prints from any other individual to then

2791

1  compare or use with regard to comparisons of the
2  latents you developed from all of the pieces of
3  evidence you tested in this case?
4           MR. SMITH:  Your Honor, may I take a
5  look at this?
6           THE COURT:  Certainly.  March 2, 2011.
7      Q.   Do you recall, Mr. Pleckaitis, whether you
8  obtained known prints from any other individuals
9  which you then used to compare to the latent prints
10  you had developed from the different pieces of
11  evidence submitted to you in this case?
12     A.   Yes, I did.
13     Q.   Who else's known prints did you obtain in
14  this investigation?
15     A.   A subject by the name of John Taylor,
16  compared any latent prints that were still not
17  identified in the case to the known finger and palm
18  prints of Mr. John Taylor, and no identification was
19  effected.
20     Q.   Mr. Pleckaitis, with regard to all of these
21  reports, you had indicated before that one of the
22  protocols is, for your reports and findings, to be
23  reviewed by another fingerprint examiner.  Did you
24  testify to that earlier today?
25     A.   Yes, I did.

2792

1      Q.   And were your reports and your findings in
2  this case reviewed by someone else according to lab
3  protocol?
4      A.   Yes.
5           MS. REYNOLDS:  One moment, your Honor.
6      Q.   Mr. Pleckaitis, you just testified that
7  with regard to John Taylor you weren't able to make
8  any positive identifications of the latent prints
9  that you examined, correct?
10     A.   That is correct.
11     Q.   Now, with regard to, you had mentioned
12  before that you also had known prints during the
13  course of your investigation of Rodney Womble.  Were
14  you able to make any identifications of any of the
15  latent prints that come back to Rodney Womble?
16     A.   No.
17     Q.   And you had testified about the latent
18  prints that were identified as Azibo Aquart's, and
19  you testified about the latent print on the duct
20  tape.  Which finger of Azibo Aquart's did that come
21  back to?
22     A.   On the duct tape?
23     Q.   On the duct tape.
24     A.   His left middle finger.
25     Q.   And with regard to the owner's manual, was

2793

1    that a different finger than the left middle finger
2    found on the duct tape?
3        A.   On which?
4        Q.   The --
5        A.   Well, it wasn't a middle finger.
6        Q.   With regard to the page 14 on the Smith &
7    Wesson owner's manual, do you recall which finger
8    was identified as being the latent print?
9        A.   That was made by his left thumb.
10       Q.   By his left thumb.  Okay.  And is there a
11   difference in the patterns depending on the finger
12   that the latent is compared to?  And can you
13   describe that.
14       A.   Well, the patterns, the two patterns you
15   are talking about there are different, one being the
16   whorl and the other being a loop.
17       Q.   And is that affected by the finger or that
18   just depends?
19       A.   No, the pattern types, there is a certain
20   amount of heredity involved in the overall flow of
21   patterns you can inherit, but the individual ridge
22   characteristics, that's unique to yourself, and the
23   differential growth rate is going to affect that.
24   But the pattern types is just overall general
25   pattern type.

2794

1        Q.   And with regard to the plastic bags, the
2    Walgreen's plastic bag and the blue-green plastic
3    bag that you testified to earlier today, you were
4    able to identify Azikiwe Aquart's fingerprints as
5    the fingerprints on those items.  Do you recall what
6    finger of Azikiwe Aquart's were on those bags?
7        A.   From -- it varies from bags and which
8    latent and which finger.
9        Q.   Would taking a look at your report assist
10   you in testifying to the jury as to which fingers
11   were identified, which of Azikiwe Aquart's fingers
12   were identified on those two bags?
13       A.   Okay.
14       Q.   There is a couple of reports up there.
15       A.   Referring to one report where the major
16   case prints were submitted of Azikiwe Aquart, a
17   latent impression that was not previously identified
18   because it was the ridge detail up near the tip of
19   the finger, that finger -- that latent was
20   identified as being made by the right middle finger
21   of Aquart, and that latent print was developed on
22   the blue-green plastic bag.  So it's two latent
23   impressions developed on the blue-green plastic bag
24   that were made by Azikiwe Aquart.
25       Q.   And with regard to the Walgreen's plastic

2795

1    bag, do you recall which fingers of Azikiwe Aquart's
2    you were able to identify as coming back to the
3    latents on that bag?  Would looking at your report
4    assist you?
5        A.   For accuracy I would want to refresh my
6    memory, look at the report.
7        Q.   Did that refresh your recollection as to
8    the fingers of Azikiwe Aquart that were identified
9    on the latent prints on the Walgreen's plastic bag?
10       A.   Yes, it does.
11       Q.   And what were the different fingers?
12       A.   The first latent impression was identified
13   as being made by the left middle finger, and as I --
14   the tip impression -- I'm sorry, I'm on -- I was
15   quoting the wrong bag.
16            MR. SHEEHAN:  I'm having a hard time
17   hearing.
18            THE COURT:  Yes, keep the microphone
19   pulled towards you, please.
20       Q.   Yes, with regard to the Walgreen's bag, you
21   testified earlier that you were able to identify
22   latent prints on the Walgreen's bag as being Azikiwe
23   Aquart's?
24       A.   That is correct.
25       Q.   Do you recall after looking at your report

2796

1    which fingers of Azikiwe Aquart's you were able to
2    identify on that Walgreen's plastic bag?
3        A.   Two of the impressions, one was made by the
4    left thumb, one was made by the right thumb.  And
5    then there was one impression made by the left
6    middle and one was made by the left ring finger of
7    Azikiwe Aquart.
8            MS. REYNOLDS:  I have no further
9    questions, your Honor.  Thank you.
10           THE COURT:  All right,
11   cross-examination.
12           MR. SMITH:  Would the jury perhaps want
13   a five-minute break.
14           THE COURT:  Would you like a five-minute
15   break.  That will be fine.  Thank you.
16           (Jury exited the courtroom.)
17           THE COURT:  All right.  If there is
18   nothing further we'll take our five-minute recess.
19           (Recess)
20           THE COURT:  All right, please bring in
21   the jury.
22           MR. SMITH:  Your Honor, I have most
23   generously agreed to allow Ms. Reynolds to continue
24   her direct in order to enter a couple of exhibits.
25   She failed to do so.

2797

```
1            THE COURT:  You get points.
2            MR. SMITH:  Thank you.
3            MS. DAYTON:  We're going to send him a
4    Christmas card.
5            MS. REYNOLDS:  It's just two additional
6    charts.
7            (Jury entered the courtroom.)
8            THE COURT:  Please be seated, ladies and
9    gentlemen.  Finish up the direct examination by
10   Ms. Reynolds.
11           MS. REYNOLDS:  Yes, thank you, your
12   Honor.  At this time I just wanted to mark and move
13   in as full exhibits Government's Exhibit 409A, which
14   is a printout of the latent print and known print
15   chart contained in the -- on the PowerPoint
16   presentation of the latent print from the duct tape,
17   and Government's Exhibit 409B, which is a printout
18   of the chart prepared in connection with the latent
19   print recovered from the Smith & Wesson owner's
20   manual on page 14.
21           So, at this point I would move both of
22   those exhibits as full exhibits.
23           THE COURT:  All right then.
24           MR. SMITH:  No objection.
25           THE COURT:  There is no objection, so
```

2798

```
1    they will be full exhibits.  All right, if that
2    concludes direct examination we'll begin
3    cross-examination.
4    CROSS-EXAMINATION
5    BY MR. SMITH:
6        Q.  Good afternoon, Mr. Pleckaitis.
7        A.  Good afternoon.
8        Q.  I'm Justin Smith.  I'm one of the attorneys
9    who represents Azibo Aquart.  I wanted to start by
10   asking you about one of the photos that you looked
11   at.  This is Government's Exhibit 401.  Is that how
12   that item came to you?
13       A.  Pretty much.
14       Q.  So, one bag inside of the other?
15       A.  Uh-huh (indicating affirmatively).
16       Q.  Okay.  And then the tape was separated from
17   those two or attached?
18       A.  No, it was affixed to the Walgreen's bag.
19       Q.  But separated from the blue bag?
20       A.  Yes.
21       Q.  Okay.  Now, we've been talking a lot about
22   latent prints, and it's my understanding a latent
23   print is like the oils in your hand that can create
24   an impression on a surface.
25       A.  Well, it could be oils if you are touching
```

2799

```
1    different parts.  The -- an eccrine glands, that's
2    the sweat glands on the palmar surface of the hands,
3    they don't have oil.  Oil we pick up from touching
4    other parts of our body.  Oil is associated with
5    hair follicles.  That's where you would get the oil.
6        Q.  So, but it's, in other words, it's not what
7    they call plastic prints?
8        A.  No.
9        Q.  I mean, there are such things as plastic
10   prints?
11       A.  Yes.
12       Q.  And those are prints made into the
13   impression of a soft surface like a putty or
14   something?
15       A.  That's correct.
16       Q.  And there is also transfer prints.  If you
17   touch, say, wet paint and then touch another item
18   that would be a transfer --
19       A.  We'll refer to that as a patent, where you
20   don't need any medium to develop.  So if you had
21   dirty hands and you touch a white wall, you would
22   leave a patent print, or you had blood or ink.
23       Q.  So, really the only thing we're dealing
24   with in this case are the latent prints?
25       A.  That is correct.
```

2800

```
1        Q.  So, all the prints that you -- were not
2    either plastic or putty-type prints, and they were
3    not the patent prints?
4        A.  That is correct.
5        Q.  Now, on the piece of duct tape, that was
6    attached to the Walgreen's bag you said?
7        A.  Yes.
8        Q.  And that --
9        A.  We are talking about --
10       Q.  I'm sorry?
11       A.  We're talking about the one submission, 21.
12       Q.  Correct, submission 21.  I apologize for
13   not being more precise.  And Azibo Aquart's left
14   middle finger was found on the duct tape itself; is
15   that correct?
16       A.  On the nonadhesive side of the duct tape.
17       Q.  On the nonadhesive side, meaning the gray
18   or silver side of the tape?
19       A.  That is correct.
20       Q.  Now, what a latent print tells you is that
21   someone at some point in time touched an item, is
22   that right, or deposited a print on that item?
23       A.  That is correct.
24       Q.  But you can't say when that was deposited.
25       A.  No, I cannot.
```

2801

```
 1    Q.   There is no way to date when that occurred.
 2    A.   No.  There is no scientific way to date
 3  when an impression was deposited.
 4    Q.   Presumably before the item of evidence was
 5  collected we might be able to surmise that, right?
 6    A.   Yeah.  Sometimes you can get it by events
 7  around the newspaper being printed at a certain
 8  date.
 9    Q.   So, the print could have been deposited on
10  that tape shortly before it was collected by the
11  police, right?
12    A.   I have no way of knowing.
13    Q.   You just have no way.  It could be weeks or
14  months before.  That's possible?
15    A.   That is possible.
16    Q.   Okay.  And you don't know where that tape
17  was originally when the fingerprint was deposited.
18    A.   No.
19    Q.   Okay.  There is no way to tell where it was
20  deposited at.
21    A.   No.
22    Q.   Okay.  And you can't tell whether that
23  print was deposited on the tape before or after the
24  tape came to be attached to the bag.
25    A.   No, I can't tell that.
```

2802

```
 1    Q.   Okay.  Now, is it my understanding that
 2  that print was found actually inside of a fold of
 3  the duct tape?
 4    A.   Yes, it was.
 5    Q.   So initially when you received the tape you
 6  didn't see the print?
 7    A.   No, I did not.
 8    Q.   You had to unfold the tape in order to
 9  reveal the fingerprint.
10    A.   That is correct.
11    Q.   And is it fair to say that the one thing we
12  could surmise from that is that the print was placed
13  on the duct tape before it was folded over?
14    A.   I don't know when it was folded over or by
15  whom.
16    Q.   Okay.
17    A.   It could have been just putting it in the
18  bag.
19    Q.   But when you received it, it was folded
20  over and you had to open it up in order to reveal
21  the print?
22    A.   That is correct.
23    Q.   Okay.  But it wasn't found, in other words,
24  across a fold?  In other words, if there was a fold,
25  the print wouldn't have been across it, correct?
```

2803

```
 1    A.   You mean on the end of the fold?
 2    Q.   Right.
 3    A.   No, it wasn't.
 4    Q.   Okay.  We talked a little bit about
 5  submission 22.  This was a hinge lifter print that
 6  was submitted to the lab.
 7    A.   That is correct.
 8    Q.   And that corresponded to Bridgeport Police
 9  Department Exhibit.  No 29?
10    A.   I don't recall their exhibit number.
11    Q.   Okay.  Would looking at your report assist
12  you with that?
13    A.   Yeah, I would have listed on the report the
14  Bridgeport number.
15         Actually, it does not help me.  It's not
16  listed on the report.  Oh, yes, it is.  I'm sorry.
17  Yes, it is.  Submission Bridgeport number, it's the
18  laboratory number then the submitting agency's
19  number is next to that.
20    Q.   And the submitting agency's number is No.
21  29?
22    A.   That is correct.
23    Q.   And when that comes to you, you don't know
24  where that was collected, or do you?
25    A.   The envelope that it was submitted in
```

2804

```
 1  indicated it came from the interior side of a
 2  window, and I would have to refer to my --
 3    Q.   But you did have some information that it
 4  was collected from a window?
 5    A.   Yes.
 6    Q.   And you did in fact identify that print as
 7  suitable for identification, right?
 8    A.   There was two impressions there.  They're
 9  both suitable for identification.
10    Q.   And neither of those, after your analysis
11  and comparison, matched either Azikiwe or Azibo
12  Aquart; is that right?
13    A.   Yes.
14    Q.   And, in fact, it didn't match anyone else
15  with whom you compared the print?
16    A.   Insofar as I can't through the quality of
17  the exemplars that I have.  This impression, I
18  believe, is from the top -- tip region of an
19  impression.  Some of the impressions I have are just
20  rolled impressions where the tip does not come in
21  contact with the recording paper or surface.
22    Q.   Okay.  But you had major case prints for
23  both Azibo and Azikiwe Aquart.
24    A.   No.
25    Q.   Okay.  At some point you got case prints,
```

2805

1  major case prints for Azibo or Azikiwe Aquart.
2      A.   Just for Azikiwe.
3      Q.   Okay.  But as far as you know, again, that
4  print you cannot match to anybody, either Azibo or
5  Azikiwe Aquart, correct?
6      A.   I did not match it to either one.
7      Q.   Okay.  And there was also a submission of
8  Sheetrock, correct, you said?
9      A.   Yes.
10     Q.   Submissions 24, 25 and 26, these three
11 sections.
12     A.   Yes.
13     Q.   And you did find some prints suitable for
14 identification there.  Is that my understanding?
15     A.   That is correct.
16     Q.   And you determined that those did not
17 belong to either Azibo or Azikiwe.
18     A.   That is correct.
19     Q.   But there was also -- you said there was
20 one fingerprint that was -- you were able to
21 determine was for James Platt?
22     A.   That is correct.
23     Q.   And that fingerprint -- there were
24 additional -- I'm sorry, let me strike that.
25          There were additional prints on that

2806

1  Sheetrock, correct?
2      A.   There was adjacent fingers, lower finger
3  joints and the interdigital palm area appears to be
4  a simultaneous touch of the hand.
5      Q.   But you couldn't say that for sure that it
6  was all the same handprint, correct?
7      A.   Without having the corresponding areas of
8  the palm to confirm or lower finger joints,
9  conclusively, no.
10     Q.   Were you given those corresponding palm and
11 lower finger joints to compare --
12     A.   No.
13     Q.   -- for Mr. Platt?  You were not?
14     A.   No, I was not.
15     Q.   You also said there were some submissions
16 on or some -- I'm sorry, some latent prints on lab
17 submission No. 9.
18     A.   Yes.
19     Q.   Duct tape?
20     A.   Yes.
21     Q.   It was your understanding this was duct
22 tape taken from one of the victims.
23     A.   That is correct.
24     Q.   And, again, you were able to find some
25 prints suitable for identification; is that right?

2807

1      A.   Two impressions on the tape, in the upper
2  surface of the tape, I list them as value for
3  comparison.  Without having the right area of the
4  known print to say they're suitable, because they're
5  limited as far as the amount of information there.
6      Q.   Okay.  But comparing those to the exemplars
7  that you had, again, you did not identify those as
8  belonging to Azibo or Azikiwe?
9      A.   That is correct.
10          MR. SMITH:  Could I have just a moment,
11 your Honor?
12          THE COURT:  Yes.
13          MR. SMITH:  I have no further questions,
14 your Honor.  Thank you.
15          THE COURT:  Redirect.
16          MS. REYNOLDS:  Nothing, your Honor.
17          THE COURT:  All right, thank you,
18 Mr. Pleckaitis, you may go.  You are excused.
19          And I'll ask the government to get going
20 on its next witness.  Thank you, sir.
21          MR. MARKLE:  The government will call
22 Lashika Johnson.
23          L A S H I K A   J O H N S O N
24 Having first affirmed, was examined and testified as
25 follows:

2808

1          THE WITNESS:  Lashika Johnson,
2  J-o-h-n-s-o-n, Bridgeport, Connecticut.
3          THE COURT:  All right.  You may proceed.
4          MR. MARKLE:  Thank you, your Honor
5  DIRECT EXAMINATION.
6  BY MR. MARKLE:
7      Q.   Ms. Johnson, could you either lean forward,
8  move up or move the microphone back.  It's wireless,
9  so you can move it.
10          Can you tell us how old you are?
11     A.   Twenty-seven.
12     Q.   And where were you born?
13     A.   Bridgeport.
14     Q.   And were you raised in Bridgeport?
15     A.   Yes.
16     Q.   And did you live in Bridgeport all your
17 life?
18     A.   Yes.
19     Q.   And do you have any children, Ms. Johnson?
20     A.   Yes, I do.
21     Q.   How many?
22     A.   Three.
23     Q.   And what are their ages?
24     A.   Eleven, eight and seven.
25     Q.   And how far did you go in school?

**GA702**

2809

```
1     A.   Tenth grade.
2     Q.   Eleven?
3     A.   Tenth.
4     Q.   Tenth.  And did you ever get your GED or go
5  back to school?
6     A.   No.
7     Q.   Are you presently working?
8     A.   Yes.
9     Q.   And for whom do you work?
10    A.   I work for Bogopa Corporation.
11    Q.   Can you spell it for us?
12    A.   B-o-g-o-p-a.
13    Q.   And what kind of work is it?
14    A.   It's a local grocery store.
15    Q.   And for how long have you been working
16 there?
17    A.   Almost one year.
18    Q.   And how often do you work?  How many days a
19 week?
20    A.   About four.
21    Q.   And what kind of hours do you work?
22    A.   About 20 to 25 hours a week.
23    Q.   And are you living in Bridgeport now?
24    A.   Yes.
25    Q.   And who do you live with?
```

2810

```
1     A.   By myself.  Me and my daughter.
2     Q.   Just you and your daughter?
3     A.   Right.
4     Q.   And how old is your daughter?
5     A.   Seven.
6     Q.   And where are your other children?
7     A.   They're -- my oldest son is in South
8  Carolina with his grandmother and my youngest son is
9  in Bridgeport with his grandmother.
10    Q.   And are you -- what's your -- are you
11 related to Efrain Johnson?
12    A.   Yes.
13    Q.   And what's your relationship?
14    A.   That's my older brother.
15    Q.   Your older brother?
16    A.   Yes.
17    Q.   And was he known by any other names?
18    A.   He went by Pootney or we called him Diddy.
19    Q.   Pootney or?
20    A.   Diddy.
21    Q.   And was Pootney a name that he recently was
22 given or --
23    A.   No, he's had Pootney all his life.
24    Q.   That goes back to when he was a child?
25    A.   Yes.
```

2811

```
1     Q.   And how old is your brother?
2     A.   He's 28.
3     Q.   And is he charged in regards to the
4  homicides?
5     A.   Yes.
6     Q.   And you are aware of that, correct?
7     A.   Yes.
8     Q.   And you've talked to him about that?
9     A.   Briefly, yes.
10    Q.   And does he have any children?
11    A.   Yes.
12         MR. SHEEHAN:  Objection to relevance.
13         THE COURT:  Is there a claim of
14 relevance?
15         MR. MARKLE:  Yes, your Honor.  I'm going
16 to ask who's the mother of his children because
17 there is a phone subscribed in her --
18         THE COURT:  All right.  Go ahead.
19    Q.   Does he have any children?
20    A.   Yes.
21    Q.   How many?
22    A.   He has seven.
23    Q.   Is one or more of his children -- do you
24 know the name Kytha Shaw?
25    A.   Yes.
```

2812

```
1     Q.   And what does that name mean to you?
2     A.   That is the mother of his three -- three of
3  his children.
4     Q.   And are you aware of any -- are you aware
5  of the victim in this case and the homicides that
6  we're going to talk about?
7     A.   Just from what I heard, yes.
8     Q.   Did you know Tina Johnson?
9     A.   No.
10    Q.   Are you related to Tina Johnson?
11    A.   No.
12    Q.   You just have the same last name, with no
13 relationship?
14    A.   Right.
15    Q.   When was the last time you spoke to your
16 brother?
17    A.   The last time I saw or spoke to him was
18 when he came to court a couple of weeks back here.
19    Q.   And do you have other brothers and sisters?
20    A.   I have two sisters.
21    Q.   Let me ask you, at that time did you talk
22 about the details of this case with your brother?
23    A.   No.
24    Q.   And do you know Azibo Aquart?
25    A.   Yes.
```

**GA703**

2813

```
1      Q.   And do you see him in court today?
2      A.   Yes.
3      Q.   And what's he wearing, if you could
4   describe it?
5      A.   A vest and shirt, pants, shoes.
6           MR. MARKLE:  May the record indicate
7   she's identified the defendant, your Honor.
8           THE COURT:  Yes.
9      Q.   And what names do you know him by?
10     A.   Dreddy.
11     Q.   Is that the only name you knew him by or
12  would refer to him with?
13     A.   Yes.
14     Q.   When did you meet the defendant?
15     A.   Fall of 2004.
16     Q.   And where were you living at the time?
17     A.   At Stratford Ave.
18     Q.   And do you remember your exact address?
19     A.   1324 Stratford Ave.
20     Q.   And was that in Bridgeport or another --
21     A.   Yes, that was Bridgeport, Connecticut.
22     Q.   And is that an apartment or a home?
23     A.   That's an apartment.
24     Q.   And who were you living with at the time?
25     A.   Me, myself and my two children.
```

2814

```
1      Q.   And could you describe that area where you
2   lived?  Describe your street.
3      A.   One-way street.
4      Q.   One way?
5      A.   Yes.  Lots of churches, liquor stores,
6   Chinese restaurant, buildings, houses.
7      Q.   Was there any recreational area or pool
8   halls in the area?
9      A.   There was a pool hall a block away from my
10  house, yes.
11     Q.   So, it's a one-way street with a pool hall
12  about a block away?
13     A.   Yes.
14     Q.   How did you first meet the defendant?
15     A.   Just one night we were out, not too far
16  away from my house and I ran into him and we met
17  each other and we exchanged names.
18     Q.   And were you employed at the time?
19     A.   I don't remember.  I could have been, but
20  I'm not sure.
21     Q.   What couple of jobs did you have back then?
22     A.   I worked for Stop & Shop at that time.  I
23  worked for a hotel doing food services at that time.
24  It was just more than one different kind of place.
25     Q.   And you just can't remember precisely at
```

2815

```
1   the time you met him whether you were employed at
2   one or another of those?
3      A.   Yes.
4      Q.   And so is that -- was that your sole means
5   of making money at the time?
6      A.   Yes.
7      Q.   And did there come a time when you were
8   involved in making money from marijuana?
9      A.   Yes.
10     Q.   And what were you doing with -- what were
11  you doing to make money with marijuana?
12     A.   I was selling it.
13     Q.   And who was providing you with the
14  marijuana?
15     A.   At first my brother was.
16     Q.   Efrain?
17     A.   Yes.  And then I got to know Dreddy and
18  then he was.
19     Q.   And in between your brother and Dreddy, was
20  there anyone else who would supply you with the
21  marijuana?
22     A.   Dreddy's associate, Squeaky, who was
23  bringing it to me first.
24     Q.   Squeaky?
25     A.   Yes.
```

2816

```
1      Q.   Do you know -- is that his real name?
2      A.   No, his real name is Tyler.
3      Q.   Do you know his last name?
4      A.   I think it's Bember.
5      Q.   And did you meet him before you met the
6   defendant?
7      A.   Yes, I've known him for a long time.
8      Q.   And what kind of quantities of marijuana
9   was Squeaky, or Tyler, providing to you?
10     A.   Small quantities.  It was maybe nine, eight
11  or nine bags.
12     Q.   And what's a bag, how much is a bag worth?
13     A.   $20.
14     Q.   And for how long did Squeaky supply you
15  with that quantity of marijuana?
16     A.   Only for a few weeks.
17     Q.   A few weeks?
18     A.   Yeah.  Not -- only for, like, maybe two and
19  a half, maybe three weeks.
20     Q.   And is this after or before you met the
21  defendant?
22     A.   After.
23     Q.   And do you recall about what time of year
24  this was when you were being supplied by Squeaky?
25     A.   Maybe like November.  Around that time.
```

2817

```
 1      Q.   Around November of 2004?
 2      A.   Right.
 3      Q.   Well, are there any -- when is your
 4  birthday?
 5      A.   December.
 6      Q.   December?
 7      A.   Uh-huh (indicating affirmatively).
 8      Q.   Do you remember whether or not Squeaky was
 9  providing you marijuana when you were -- during your
10  birthday in December?
11      A.   No, he wasn't.
12      Q.   Who was supplying you with marijuana by
13  that time?
14      A.   Dreddy.
15      Q.   And was the defendant, or Dreddy, were you
16  in a romantic relationship with him at that time?
17      A.   I believe so, yes.
18      Q.   Were you dating, seeing each other?
19      A.   Yes.
20      Q.   And you also had a business relationship?
21      A.   Yes.
22      Q.   And when -- so, in December of 2004, what
23  kind of -- how did he first start supplying you with
24  marijuana?  How did that come about?
25      A.   I had talked to Squeaky about possibly
```

2818

```
 1  making some money, and he basically told me that I
 2  could and that he would help me to start, and he
 3  started to bring it to me.
 4      Q.   Who said he would help you?
 5      A.   Squeaky.
 6      Q.   I'm sorry?
 7      A.   Squeaky.
 8      Q.   And how did Dreddy come into the picture?
 9      A.   One day I guess Squeaky couldn't bring it
10  or Squeaky didn't have it or he couldn't supply me
11  that day, and it just so happened that Dreddy had to
12  bring it to me.
13      Q.   And at that point did Dreddy bring you
14  marijuana?
15      A.   Yes.
16      Q.   And did he continue to supply you with
17  marijuana after that?
18      A.   Yes.
19      Q.   And this is while you were dating or seeing
20  each other as well?
21      A.   Yes.
22      Q.   And did this continue into 2005?
23      A.   Yes.
24           MR. SHEEHAN:  Object to leading, your
25  Honor.
```

2819

```
 1      Q.   For how long did this continue?
 2      A.   Up until he went to jail.
 3      Q.   So, from December of 2004 until September
 4  of 2005?
 5           MR. SHEEHAN:  Objection, leading.
 6      Q.   Do you know --
 7           THE COURT:  Sustained.
 8      Q.   -- when he went to jail?
 9      A.   I don't remember.
10      Q.   Was it months and months later?
11      A.   It was months later.
12      Q.   And for each one of those months who
13  provided you with marijuana during that time?
14      A.   Dreddy.
15      Q.   And after he got arrested who provided you
16  with marijuana?
17      A.   Well, once he went to jail I still was
18  acquainted with his brother.  His brother was who I
19  dealt with then after that.
20           THE COURT:  It is now 3:30.  Are you at
21  a stopping place?
22           MR. MARKLE:  I'll stop right now, your
23  Honor, if you wish.
24           THE COURT:  All right, ladies and
25  gentlemen, we will be back at 9:30 tomorrow morning.
```

2820

```
 1  Please leave your notebooks here.  Don't discuss the
 2  case.
 3           And Ms. Johnson, you'll need to be back
 4  at 9:30 tomorrow morning.  Don't discuss your
 5  testimony with anyone.  All right?
 6           (Jury exited the courtroom.)
 7           THE COURT:  All right, Counsel, anything
 8  further before we recess?
 9           MR. SHEEHAN:  I wonder if we could
10  briefly discuss scheduling issue, your Honor.  I
11  would guess at the rate we're going that the
12  government's case is likely to be done by Monday.
13           MS. DAYTON:  We were hoping for Friday.
14           MR. SHEEHAN:  Our case is likely to be
15  no more than two days, more likely to be -- I would
16  say two days on the outside, completely on the
17  outside.  If in terms of -- if the case then were to
18  go to the jury on, say, Wednesday, I'm concerned we
19  have -- we have witnesses that the marshal's office
20  is helping us to bring.  I don't -- we obviously
21  don't want -- we don't know what -- how much time
22  deliberation will be.  I'm wondering if it makes
23  more sense at this juncture in terms of working with
24  the marshal's office if we could plan on starting
25  the penalty phase on the Tuesday after Memorial Day.
```

2821

```
 1              MR. SMITH:  And your Honor, I can also
 2   submit that speaking to the administrative officer
 3   here, Roland Albert, about this issue of
 4   transporting witnesses, some coming from out of the
 5   country, he's away the week before the 23rd which
 6   creates a real issue if we're trying to get people
 7   in on the 23rd.
 8              THE COURT:  So, if the government were
 9   to finish by Friday, and even somewhat before the
10   end of the day on Friday, you would start.  At the
11   outside you would be finished on Tuesday.  We charge
12   and your closing arguments are Wednesday and the
13   case is submitted.  If the jury were able to return
14   a verdict by the end of the next day, I guess my
15   concern is that long gap, if that's the case,
16   because that would then mean 13 days.
17              MR. SHEEHAN:  I don't think that's a
18   particularly -- I realize it's somewhat of a longer
19   gap than we had originally contemplated.
20              THE COURT:  Right.
21              MR. SHEEHAN:  But I think that it is,
22   under all of the circumstances of the case, it's not
23   that long a gap.  I don't anticipate the penalty
24   phase -- the government can obviously speak to how
25   long they would contemplate if we get to the penalty
```

2822

```
 1   phase, how long that would be.  I would guess that
 2   our portion of the penalty phase would be at the
 3   most three days.
 4              MS. DAYTON:  Your Honor, we have
 5   discussed timing.
 6              THE COURT:  We have.
 7              MS. DAYTON:  Ad nauseam.  And we've
 8   advised the jurors as to timing and we would object
 9   to extending it.
10              THE COURT:  Well, I'm concerned about
11   that as well.  We tell them we have their -- the
12   dates of their availability.  Can we just wait and
13   see how well we're doing.
14              MR. SHEEHAN:  We can.
15              THE COURT:  I'm not giving you much
16   encouragement that we would not start until Tuesday,
17   May 31st.  So it may well be that we are starting
18   the government's penalty phase earlier than that,
19   but we may not get to yours until May 31st, and that
20   probably addresses your concern anyhow.
21              MR. SHEEHAN:  That would be fine if
22   that's what the government contemplates.  I just
23   don't know how long they had anticipated on.
24              MS. DAYTON:  Ours will take several
25   days.  I mean, it's not going to take weeks, but it
```

2823

```
 1   will take several days.
 2              THE COURT:  So it's reasonable to
 3   contemplate the defendant's penalty phase case isn't
 4   probably going to start until the Tuesday after
 5   Memorial Day.
 6              MS. DAYTON:  Yes.
 7              THE COURT:  But the government's case
 8   will be finished.
 9              MS. DAYTON:  Correct.
10              MR. SHEEHAN:  That would really be very
11   helpful for scheduling for our purposes.
12              MS. DAYTON:  We aim to please.
13              MR. SMITH:  I just don't want to --
14              THE COURT:  We aim to be pleased.
15              MR. SMITH:  -- having people lodged here
16   for weeks, so if we're setting 31st for the date for
17   those particular witnesses to be here, we will.
18              THE COURT:  All right.
19              MR. MARKLE:  Just for tomorrow's
20   purposes, Lashika Johnson obviously has quite a
21   while to go, and then we may have to call Detective
22   Rick Donaldson, Special Agent Munger, and Detective
23   John Andrews, they will all, I hope, be relatively
24   brief in regards to some of the phone record.
25              THE COURT:  Andrews is the custodian for
```

2824

```
 1   T-Mobile?
 2              MS. DAYTON:  No, John Andrews is a
 3   police officer.
 4              MR. MARKLE:  Detective from Bridgeport
 5   Police Department.  Special Agent Munger, and
 6   Detective Rick Donaldson is also Bridgeport.
 7              THE COURT:  I just don't see them on the
 8   list.
 9              MR. SHEEHAN:  They're not.
10              MS. DAYTON:  We've had some timing
11   issues because of the delay this morning.
12              THE COURT:  Okay.  All right.  We will
13   pick up with Ms. Johnson, however, tomorrow morning.
14   Thank you.  We stand in recess.
15              (Proceedings concluded 3:40)
16
17
18
19
20
21
22
23
24
25
```

2825

```
 1              I N D E X

 2

 3   WITNESS                            PAGE

 4   JUANITA HOPKINS

 5   Continued Cross-Examination by Mr. Smith    2642

 6   Redirect Examination by Ms. Dayton          2667

 7   Recross-Examination by Mr. Smith            2680

 8

 9   ROBERTA BENOIT

10   Direct Examination by Ms. Rodriguez-Coss    2681

11

12   KURT WHEELER

13   Direct Examination by Ms. Rodriguez-Coss    2696

14

15   JOHN PLECKAITIS

16   Direct Examination by Ms. Reynolds          2717

17   Cross-Examination by Mr. Smith              2798

18

19   LASHIKA JOHNSON

20   Direct Examination by Mr. Markle            2808

21

22

23

24

25
```

2826

```
 1        I certify that the foregoing is a

 2   correct transcript from the record of proceedings in

 3   the above-entitled matter.

 4                    5/10/11

 5                    Date

 6

 7              /S/  Sharon Montini

 8              Official Reporter

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

2827

```
 1        UNITED STATES DISTRICT COURT.

 2           DISTRICT OF CONNECTICUT

 3   * * * * * * * * * * * *    *
                                *
 4   UNITED STATES OF AMERICA,  * Case No 6cr160(JBA)
                                *
 5        Plaintiff,            *
                                *
 6      vs.                     *
                                *
 7   AZIBO AQUART               * May 10, 2011
                                *
 8        Defendant.            *
                                *
 9   * * * * * * * * * * * *    *

10            TRIAL TRANSCRIPT

11            VOLUME XIII

12   BEFORE:  THE HONORABLE JANET BOND ARTERTON U.S.D.J.,
                                             and jury
13   Appearances:
14   FOR THE GOVERNMENT:  ALINA REYNOLDS, ESQ
                          TRACY DAYTON, ESQ.
15                        PETER MARKLE, ESQ.
                          JACABED RODRIGUEZ-COSS
16                        United States Attorney's Office
                          915 Lafayette Blvd
17                        Bridgeport, CT 06604

18
     FOR THE DEFENDANT    MICHAEL SHEEHAN, ESQ
19   AZIBO AQUART:        Sheehan & Reeve
                          139 Orange Street
20                        New Haven CT 06510

21                        JUSTIN SMITH, ESQ.
                          383 Orange Street
22                        New Haven, CT 06511

23
     Court Reporter:      Sharon Montini, RMR
24
     Proceedings recorded by mechanical stenography,
25   transcript produced by computer
```

2828

```
 1        THE COURT:  Good morning, ladies and

 2   gentlemen, Mr. Aquart.  Please be seated.

 3        We have Ms. Johnson who will return for

 4   her continued examination.  The issue that was

 5   raised before we began evidence in the motion in

 6   limine as to what Efrain Johnson told his sister,

 7   Lashika Johnson, whether that was admissible,

 8   required under Williamson the context for the

 9   determination of whether or not what was said was

10   against the declarant's interest and, thus,

11   admissible as a penal admission.

12        We are now far enough into the evidence

13   that we have that context, and the question is

14   whether or not or in what manner the defendant is

15   pressing its motion -- his motion in limine.

16        MR. SHEEHAN:  We would still rely on our

17   motion in limine, your Honor.

18        THE COURT:  Now, the statements were

19   with respect to Mr. Johnson's being in the apartment

20   with the baseball bat.  There were four statements:

21   He went to the apartment with Azibo and Azikiwe

22   Aquart -- excuse me -- yes, and another unknown

23   male; he tied up one of the victims; saw someone

24   hitting one of the victims with a bat.

25        Those are the statements that are
```

**GA707**

2829

1  expected to be from this witness as to what Efrain
2  Johnson told her?
3          MR. MARKLE: Yes, your Honor.
4          THE COURT: They wore gloves and masks,
5  had baseball bats. Azibo disposed of the bats after
6  the deaths, and then what he saw.
7          So, when we last argued this motion I did
8  not have the 302 from her. All right.
9          MR. SHEEHAN: Your Honor, just so the
10  record is complete on this, I don't know whether --
11  and I apologize for not recalling. I have another
12  basis for precluding those statements. I would rely
13  on our -- the defendant's Sixth Amendment
14  confrontation rights. I don't believe that that
15  exception of a statement against penal interest was
16  an exception recognized at the time the Constitution
17  was drafted, and under the Crawford analysis, that
18  is the critical framework as to whether the Sixth
19  Amendment incorporated that common law -- as a
20  common law exception to hearsay.
21          I recognize that, unlike the Crawford
22  situation, what Mr. Johnson is alleged to have said
23  is not in the context of a law enforcement
24  investigation, which was a primary focus in
25  Crawford. On the other hand, we are unable to

2830

1  cross-examine Mr. Johnson as to what is being said.
2  Our ability to impeach Mr. Johnson is limited.
3  There is some ability to impeach him, but it is
4  limited by the rules of evidence in a way that it
5  would not be were Mr. Johnson on the stand and we
6  could ask him about those questions.
7          So, just so the record is complete on
8  that regard, I would also argue that those
9  statements by Ms. Johnson as to what her brother may
10  have said are -- if they're admitted through her is
11  an unconstitutional -- is unconstitutional under the
12  Sixth Amendment.
13          THE COURT: All right.
14          MR. SHEEHAN: And I would say that has
15  not gotten that far. The case law has not -- I have
16  no Supreme Court authority on that because it hasn't
17  gotten there yet.
18          THE COURT: Is this the first this
19  Crawford issue is being raised, Mr. Sheehan? I
20  don't remember it.
21          MR. SHEEHAN: Do you know what, I don't
22  recall either, and that's why I'm raising it at this
23  moment because I don't know if the record clearly
24  reflected it at the time that we filed the motion in
25  limine.

2831

1          THE COURT: When you say that you have
2  some ability to question, but not as much as you
3  think is required by the Sixth Amendment, are you
4  speaking of cross-examination of his sister?
5          MR. SHEEHAN: No, I don't think so. I
6  think I can get to what Mr. -- obviously --
7          THE COURT: What were you referring to?
8          MR. SHEEHAN: Under 608 I can impeach
9  him -- I'm sorry, 806. I'm sorry, 808, 60 -- under
10  Rule 806 I can impeach whatever Mr. Johnson --
11  whatever testimony is elicited as to what Mr.
12  Johnson said, but I really can't -- there is nobody
13  to cross-examine in this context. Mr. Johnson is
14  alleged to have said other things to law
15  enforcement, so I can clearly impeach him through
16  those law enforcement officers as to what he said at
17  those subsequent dates, but I can't cross-examine in
18  the same way that I can cross-examine a live witness
19  in the context of the Sixth Amendment. So that's
20  why --
21          THE COURT: So I take it you can
22  cross-examine this witness in terms of her knowledge
23  of her brother's criminal record and other things.
24          MR. SHEEHAN: If she knows, your Honor.
25  I think if this witness knows about that I can

2832

1  cross-examine her. I can -- and it is -- he does
2  have a criminal record, but I don't know if she's
3  going to know that fact. It is a record for a
4  felony. He previously had been convicted of a drug
5  possession offense.
6          THE COURT: Crawford was a 911 call?
7          MR. SHEEHAN: No, Crawford actually --
8  Crawford was a statement. I don't think it was the
9  911 call. I think Crawford was the witness's
10  statement when they went to the house and the law
11  enforcement knocked on the door, as I recall, and
12  they asked her what was going on. She said her
13  husband was beating her up, or something to that
14  effect, and they basically questioned her, and then
15  subsequently at trial I think she was unavailable or
16  else -- I think she was unavailable, and they used
17  her statement to law enforcement, and then in its
18  analysis what the Supreme Court did is they
19  basically anchored the Sixth Amendment right to
20  confrontation which has really two aspects which I
21  think is also present here. One is the right to
22  cross-examine, which is being truncated, but the
23  other one is the right to physically confront the
24  witnesses.
25          Now, in this case the witness -- they're

2833

```
1  two witnesses going on.  One witness is obviously
2  Ms. Johnson, and her I can cross-examine, and she's
3  physically there and we can confront her, but the
4  other person that we cannot confront physically is
5  Mr. Johnson.  Now, the Supreme Court didn't really
6  deal with, explicitly deal with the physical
7  confrontation in Crawford, and that issue I think
8  remains a live issue as to whether those are
9  separate and independent rights, whether the right
10 to physically confront applies in this case, and I
11 would argue that it does, the underlying theory in
12 Crawford.
13      THE COURT:  So you say that there is a
14 right to cross-examine and then there is a right to
15 physically confront, and those are the two rights
16 that are implicated by the Sixth Amendment not fully
17 answered in Crawford, and you are saying that
18 through the agents testifying as to what Efrain
19 Johnson told them, and cross-examination on -- of
20 this witness's knowledge of her brother's lack of
21 credibility, even if adequate for cross-examination
22 purposes, still means that a right of physical
23 confrontation has been violated.
24      MR. SHEEHAN:  Yes.  I'm saying that
25 there are two components to confrontation.  One is
```

2834

```
1  the actual posing of the question, and the second
2  one is the physical presence of the person there.  I
3  think it comes up most clearly in different
4  situations where you have videotaped depositions, in
5  videotaped depositions, et cetera.  That -- post
6  Crawford that issue has not been resolved by the
7  Supreme Court.
8       MR. MARKLE:  Your Honor, we're dealing
9  with the hearsay exception.  So, I think what Mr.
10 Sheehan is saying, it kind of ignores the exception
11 that we're dealing with.  And the case law that we
12 cited in our brief, your Honor, it does address the
13 Crawford confrontation issue, and although Mr.
14 Johnson is unavailable, your Honor, that's a given,
15 that this exception applies.  It's clearly against
16 his interest, it's clearly reliable, it's --
17      THE COURT:  Let's assume you are correct
18 that it's against penal interest, it would be
19 admissible under the hearsay exception.  That does
20 not answer the full question, does it, as to whether
21 or not the use of that hearsay exception violates
22 the Sixth Amendment.
23      MR. MARKLE:  I think the way to address
24 Mr. Sheehan's concerns is as your Honor indicated,
25 he can cross-examine the witness who will testify to
```

2835

```
1  the statements, he can put on evidence if it's
2  admissible regarding Mr. Johnson and his reliability
3  if that would impact it, but to preclude the
4  government from presenting the evidence, that would
5  not be the appropriate remedy.  I don't think that
6  that violates -- he's not being deprived of his
7  right to confrontation, he'll just have to do it by
8  other means.
9       Again, your Honor, I just would I think
10 reiterate, if this truly was a confrontation issue
11 that Mr. Sheehan raises, then the hearsay exception,
12 there would be no need for the rule.
13      THE COURT:  That may be, and there were
14 a number of cases that you remember predated
15 Crawford and whether the excited utterance exception
16 was one that was such that the confrontation clause
17 was not implicated, and then there was Crawford.
18      MR. MARKLE:  And I believe that we
19 referred to cases after Crawford, your Honor, that
20 say that in this situation non-testimonial, the
21 right to confrontation is not infringed and it is a
22 hearsay exception.  I believe Crawford was 2004, and
23 we cited cases decided in 2010, 2007, 2006, 2008,
24 2005.
25      THE COURT:  All right, I will know what
```

2836

```
1  the substance of your objection is --
2       MR. SHEEHAN:  Thank you, your Honor.
3       THE COURT:  -- when it is raised.
4       MR. SHEEHAN:  And, your Honor, if it
5  would be -- at that time is it appropriate I just
6  say I object for the reasons previously stated?
7  That would suffice, your Honor?
8       THE COURT:  Yes.
9       MR. SHEEHAN:  Thank you.
10      THE COURT:  All right, let's bring in
11 the witness and bring in the jury.
12      (Jury entered the courtroom.)
13      THE COURT:  Good morning, ladies and
14 gentlemen.  Please be seated.  We will now continue
15 with the direct examination of Lashika Johnson,
16 which we started late yesterday afternoon.
17      Mr. Markle, you may proceed.
18      MR. MARKLE:  Thank you, your Honor.
19      THE COURT:  Good morning, Ms. Johnson.
20      THE WITNESS:  Good morning.
21      THE COURT:  You remain under oath.
22      THE WITNESS:  Yes.
23      L A S H I K A   J O H N S O N,
24 Having previously affirmed, was examined and
25 testified as follows:
```

2837

```
1    CONTINUED DIRECT EXAMINATION
2    BY MR. MARKLE:
3         Q.   Good morning, Ms. Johnson.
4         A.   Good morning.
5         Q.   Ms. Johnson, yesterday you mentioned your
6    brother was Efrain Johnson.
7         A.   Yes.
8         Q.   I'm going to ask you to look at the monitor
9    and look at what's marked Government's Exhibit 208
10   and ask if you recognize that photograph.
11        A.   Yes, that is my brother.
12        Q.   That's your brother?
13        A.   Yes.
14             MR. MARKLE:  Your Honor, I would offer
15   that as a full exhibit.
16             MR. SHEEHAN:  No objection.
17             THE COURT:  It's a full exhibit.
18        Q.   And now it's on the big screen.  That is
19   your brother?
20        A.   Yes.
21        Q.   And he's your younger brother?
22        A.   My older brother.
23        Q.   Older brother, I'm sorry.  And how old is
24   he?
25        A.   He's 28.
```

2838

```
1         Q.   And you also mentioned a person by the name
2    of Squeaky.  I'm going to show you a photograph and
3    ask you if you recognize the person in that
4    photograph.
5         A.   Yes.
6         Q.   Who do you recognize that to be?
7         A.   Squeaky.
8              THE COURT:  And the number of that is?
9              MR. MARKLE:  I'm sorry, your Honor.
10   221, your Honor.
11             THE COURT:  Thank you.
12        Q.   Now, you indicated that Squeaky at one time
13   supplied you with marijuana; is that correct?
14        A.   Right.
15             MR. SHEEHAN:  I'm going to object to
16   leading, your Honor.
17             THE COURT:  Sustained.
18        Q.   Do you remember what you told us about
19   Squeaky?
20        A.   Yes.
21        Q.   What was your relationship with Squeaky?
22        A.   I have known Squeaky for a long time, from
23   when we were little.
24        Q.   And did that relationship involve
25   narcotics, drugs?
```

2839

```
1         A.   Not when we were younger, but when --
2    around the time that I met the defendant, yes.
3         Q.   And what kind of drugs?
4         A.   Marijuana.
5         Q.   And what was Squeaky's role in that?
6         A.   At first when I wanted to get involved with
7    selling marijuana I introduced it to Squeaky.
8         Q.   I'm sorry?
9         A.   At first when I wanted to get involved with
10   selling marijuana, I introduced it to Squeaky.
11        Q.   And you say you introduced to Squeaky?
12        A.   Right.
13        Q.   And who introduced you -- how did you
14   get involved in the marijuana with Squeaky?
15             MR. SHEEHAN:  Objection, asked and
16   answered.
17             THE COURT:  Overruled.
18        A.   Well, basically I was selling weed with my
19   brother, and he wasn't consistent, so I asked
20   Squeaky one day when we were talking if he could
21   supply me with it, and he said yes.
22        Q.   And when you stopped dealing with Squeaky,
23   who did you begin to deal with in marijuana?
24        A.   I started dealing with Dreddy.
25        Q.   And how much marijuana would you receive
```

2840

```
1    from the defendant?
2         A.   At first it was a few bags, like nine bags,
3    and then eventually it grew into more.
4         Q.   And a bag was worth how much?
5         A.   $180.
6         Q.   Each bag, or nine bags?
7         A.   Nine bags.
8         Q.   And how was the marijuana packaged when you
9    got it originally from Squeaky?
10        A.   It was individually packaged in small clear
11   baggies.
12        Q.   And how about when you began to get it from
13   the defendant?
14        A.   At first it was the same way.
15        Q.   And did it ever change?
16        A.   Yes.
17        Q.   And then what was the change in the
18   packaging?
19        A.   They were small like bubble gum plastic
20   containers.
21        Q.   I'm going to show you what's been marked
22   Government's Exhibit 200B and ask you, are those
23   familiar to you?
24        A.   Yes.
25        Q.   Those containers?
```

2841

1    A.    Yes.
2    Q.    And how were those familiar to you?
3    A.    Those are what we used.
4    Q.    And who supplied these to you?
5    A.    Dreddy.
6    Q.    And they would contain what?
7    A.    Marijuana.
8    Q.    And how much was each one worth?
9    A.    $20.
10   Q.    And how many of those would he supply to
11   you?
12   A.    At first it was the same, nine bags --
13   well, nine jars, and they were -- the pack was at
14   least $180 a piece.
15   Q.    And how many would you sell a week?
16   A.    I don't remember.  It was quite a few, but
17   I don't remember exactly how many.
18   Q.    And how much money did you make off of each
19   pack?
20   A.    About $100.
21   Q.    And what --
22   A.    No, I'm sorry, make about $80, or something
23   like that.
24   Q.    And what would you do with the remainder of
25   that money?

2842

1    A.    I would give it to Dreddy.
2    Q.    And how long did that marijuana connection
3    last?
4    A.    Up until he went to jail.
5    Q.    Do you remember, did you ever sell crack
6    cocaine for the defendant?
7    A.    A small amount for a little while, but yes.
8    Q.    And when you say a "small amount," what do
9    you mean?
10   A.    It was like maybe $100 or something or so a
11   week, or something like that.  But not for a long
12   time.
13   Q.    For about how long?
14   A.    Maybe two months or less.
15   Q.    And did you have your own customers?
16   A.    Which he provided, yes.
17   Q.    And who provided the crack cocaine?
18   A.    Dreddy.
19   Q.    Did anyone else ever provide you with crack
20   cocaine?
21   A.    No.
22   Q.    And how much money did you make from
23   selling the crack cocaine?
24   A.    I don't remember.  Not much.
25   Q.    Would portions of the profit go back to the

2843

1    defendant?
2    A.    Yes.
3    Q.    In early 2005, do you know where the
4    defendant was living?
5    A.    Early 2005 I believe he was living on
6    Hallet Street.
7    Q.    Hallet Street?
8    A.    Yes.
9    Q.    And I'm going to show you a photograph and
10   ask you if you recognize this -- do you recognize
11   that location?
12   A.    Yes.
13   Q.    What is that?
14   A.    That's Hallet Street.
15   Q.    And how did you know the defendant lived
16   there?
17         THE COURT:  I'm sorry, the photograph is
18   number what?
19         MR. MARKLE:  I'm sorry, your Honor, 204.
20         THE COURT:  Thank you.
21   Q.    How did --
22   A.    Because he took me there.
23   Q.    And was this while you still had a
24   marijuana connection with him?
25   A.    He took me there before we got involved

2844

1    with marijuana together, but yes, eventually while I
2    was selling marijuana it was still the location he
3    would take me to.
4    Q.    Did you also have a social, romantic
5    relationship with him at that time?
6    A.    Yes.
7    Q.    And did anyone else live there; to your
8    knowledge?
9    A.    Not to my knowledge.
10   Q.    And do you know whether or not the
11   defendant was married?
12   A.    No.
13   Q.    Do you know whether or not he had a
14   girlfriend at the time?
15   A.    Not at first, no.
16   Q.    Was the apartment furnished?  Describe the
17   apartment.
18   A.    There was like a refrigerator in the
19   kitchen, and in the living room there was a couch
20   and a table and a TV, but in the other room there
21   wasn't any furniture.
22   Q.    Did you ever sleep there, stay overnight
23   there?
24   A.    Yes.
25   Q.    Did the defendant have any term by which he

2845

```
1   referred to Hallet Street?
2       A.   He called it the office.
3       Q.   The office?
4       A.   Yes.
5       Q.   And do you know why he called it the
6   office?
7       A.   He called it the office because that's
8   where he did his work from.
9       Q.   What was his work?
10      A.   From what I saw it was packaging his drugs.
11      Q.   And what kind of drugs?
12      A.   Crack and weed.
13      Q.   And were you ever in the apartment when you
14  saw that going on?
15      A.   Yes.
16      Q.   And what did you observe?
17      A.   I observed him packaging the crack.
18      Q.   And what exactly did you observe?  How was
19  he packaging the crack?
20      A.   He was sitting at a table putting it
21  together, as he would call it.  Cutting it, putting
22  it into little baggies.
23      Q.   What was he cutting it with?
24      A.   A blade.
25      Q.   Was it a small quantity of crack cocaine?
```

2846

```
1       A.   No.
2       Q.   Like how much crack cocaine?
3       A.   I wouldn't know how much, but the table was
4   full and it looked like a lot.
5       Q.   Were there -- you said there were baggies.
6   Were there a few baggies or a lot of baggies?
7       A.   No, there were a lot of ones.  Some empty
8   and some were -- some contained the product.
9       Q.   And when you say he was doing something
10  with it, how was he -- how was he putting it into
11  the bags?
12      A.   He used a straw and used the tip of it to
13  put the crack into the bag.
14      Q.   And how did he separate the -- was it all
15  separated already, or how did he shave it off or cut
16  it off?
17      A.   I don't understand.
18      Q.   How was -- how did he make small portions
19  of the crack to put into the bag?
20      A.   He used a blade.
21      Q.   When you say a "blade," what did he use?
22      A.   Like a little box cutter, like.
23      Q.   And was anyone else present when you
24  observed that?
25      A.   No.
```

2847

```
1       Q.   Did you participate in the packaging?
2       A.   No.
3       Q.   Do you know how many small bags were
4   prepared?
5       A.   No.
6       Q.   Was it more than ten?
7       A.   Yes.
8       Q.   More than 20?
9       A.   Yes.
10      Q.   More than 50?
11      A.   Yes.
12      Q.   More than 100?
13      A.   I would give and take around that area
14  because it wasn't all -- it wasn't all packaged.
15      Q.   And do you recall whether he finished doing
16  all of the crack cocaine, putting it all into
17  packages?
18      A.   No, he didn't finish.
19      Q.   And do you recall where the -- were the
20  packages left in the apartment when you left?  Did
21  you leave the apartment that -- when you left --
22      A.   I didn't leave.
23      Q.   Did the packages leave?
24      A.   No.
25      Q.   Did the rest of the crack cocaine remain?
```

2848

```
1       A.   Yes.
2       Q.   And who had a key to Hallet Street?
3       A.   He had a key, and I'm assuming Squeaky had
4   a key because --
5            MR. SHEEHAN:  Objection.
6       Q.   Do you know who else had a key?  Do you
7   know?
8       A.   I think Squeaky had a key.
9            MR. SHEEHAN:  I'm going to object.  Move
10  to strike it as non-responsive.
11           MR. MARKLE:  Maybe I can --
12           THE COURT:  The question was:  Do you
13  know who else had a key.  She says:  I think Squeaky
14  had a key.  That's responsive.  Overruled.
15           MR. SHEEHAN:  Object to the foundation.
16           THE COURT:  I'm going to let the
17  government establish that.
18      Q.   Did you ever -- were you ever in the
19  apartment when Squeaky was there?
20      A.   Yeah, the morning after I saw the crack.
21      Q.   Squeaky was in the apartment?
22      A.   He came into the apartment.
23      Q.   Were you already in the apartment?
24      A.   Yes.
25      Q.   Was the door locked?
```



2849

```
1        A.   To my knowledge.
2        Q.   And did Squeaky knock?  Did you let him in?
3        A.   No, I didn't let him in.
4        Q.   Squeaky found his way in?
5        A.   Yes.
6        Q.   Is that why you think he had a key?
7        A.   Yes.
8        Q.   Do you know why he came that morning?
9        A.   To pick me up.
10       Q.   Was the defendant working during this time
11  you saw him with crack cocaine and marijuana?
12       A.   Yes.
13       Q.   And where was he working?
14       A.   He was working at the car wash.
15       Q.   And would you ever visit him at the car
16  wash?
17       A.   Yes.
18       Q.   And did you know Rodney Womble?
19       A.   I didn't know him, but I met him.
20       Q.   Showing you Government's Exhibit 210, do
21  you recognize that person?
22       A.   Yes.
23       Q.   Who is that?
24       A.   Womble.
25       Q.   Where had you met him?
```

2850

```
1        A.   Dreddy introduced him to me.
2        Q.   And did you know if he had any -- what his
3   relationship was with the defendant?
4        A.   I believe he worked with him at the car
5   wash, but no.
6        Q.   Do you have any knowledge of Mr. Womble
7   engaged in the drug operation?
8             MR. SHEEHAN:  Objection, leading.
9             THE COURT:  Overruled.
10       Q.   Can you answer that?
11       A.   Could you repeat it.
12       Q.   Do you have any knowledge of Mr. Womble
13  engaged in the drug operation?
14       A.   Well, once Womble came to my house to
15  either --
16            MR. SHEEHAN:  I'm going to object as
17  non-responsive, your Honor.
18            MR. MARKLE:  It's hard to know that.
19            THE COURT:  The answer is yes or no.
20            MR. MARKLE:  Yes.
21            THE COURT:  Do you know anything about
22  Mr. Womble's involvement with Mr. Aquart's drug
23  operation?  Do you know that?  Do you know anything
24  about that?
25            THE WITNESS:  No.
```

2851

```
1             THE COURT:  Okay.
2        Q.   Were you ever present when money was
3   exchanged between Mr. Womble and anyone?
4        A.   Yes.
5        Q.   And who was the money -- who did he
6   exchange money with?
7        A.   Me.
8        Q.   You?
9        A.   Yes.
10       Q.   And what was your understanding of what
11  that money was for?
12       A.   It was time for me to turn in some money to
13  Dreddy and I guess he couldn't make it, so he sent
14  Womble and I gave it to Womble.
15       Q.   Did you ever hear the defendant talking
16  about Charles Street?
17       A.   Yeah.
18       Q.   Had you ever been to Charles Street before
19  you met the defendant?
20       A.   No.
21       Q.   Had you known anyone who resided at Charles
22  Street before you met the defendant?
23       A.   No.
24       Q.   Have you been to Charles Street after you
25  met the defendant?
```

2852

```
1        A.   Yes.
2        Q.   Showing you Government's Exhibiting 102, do
3   you recognize that photograph?
4        A.   Yes.
5        Q.   And what do you recognize that to be?
6        A.   The building.
7        Q.   What building?
8        A.   Charles Street.
9        Q.   Did you ever go there -- how many times
10  have you been to Charles Street?
11       A.   Roughly three times.
12       Q.   And how did the defendant refer to Charles
13  Street?  Did he refer to it as Charles Street?
14       A.   No, he said "the building."
15       Q.   The building?
16       A.   Yes.
17       Q.   And who was -- what was the first time you
18  went to Charles Street?
19       A.   The first time was when I had to take Pop
20  to the grocery store.
21       Q.   And did you know Pops before you met the
22  defendant?
23       A.   No.
24       Q.   And how did you know to take Pops to the
25  grocery store?
```

**GA713**

2853

```
1      A.   Because Dreddy told me to do.
2      Q.   And did you take him to the grocery store?
3      A.   Yes.
4      Q.   And was the defendant with you?
5      A.   Yes.
6      Q.   And what other time -- do you recall any
7  other time going to Charles Street?
8      A.   I went there another time to go sell some
9  weed to somebody.
10     Q.   And was this -- when you took Pops for
11 groceries, was that before or after the murders?
12     A.   Before.
13     Q.   And when you went to deliver some
14 marijuana, was that before or after the murders?
15     A.   Before.
16     Q.   And was that a customer of yours?
17     A.   No, it was under instruction of Dreddy to
18 go there and see somebody.
19     Q.   The defendant told you to go there?
20     A.   Yes.
21          MR. SHEEHAN:  Objection, leading, your
22 Honor.
23          MR. MARKLE:  I was just clarifying the
24 answer, your Honor.
25          MR. SHEEHAN:  There is no need.  It's a
```

2854

```
1  repetition of the same thing, your Honor.  I think
2  that's improper.
3      Q.   Did you ever go to Charles Street again?
4      A.   Yes.
5      Q.   Was that before or after the murders?
6      A.   After.
7      Q.   And what was the purpose of that?
8      A.   Dreddy instructed me to go to Charles
9  Street to pick up his brother.
10     Q.   Did you do that?
11     A.   Yes.
12     Q.   Did you ever observe the defendant with
13 large amounts of cash?
14     A.   Yes.
15     Q.   When was that?
16     A.   Once we were going to Norwalk for I guess a
17 ride, I don't know why, but we went to Norwalk, and
18 he asked me to hold it.
19     Q.   Asked you to hold what?
20     A.   A box of money.
21     Q.   Do you know how much money was in it?
22     A.   No.
23     Q.   Was it a big box or a small box?
24     A.   It was a shoe box.
25     Q.   And was it a little bit full, halfway full
```

2855

```
1  or all the way full?
2      A.   It was mostly full.
3      Q.   Do you know if it was singles, five, tens?
4      A.   No.
5      Q.   Twenties?
6      A.   No.
7      Q.   You don't know the exact amount?
8      A.   No.
9      Q.   Did you ever observe the defendant driving
10 any vehicles?
11     A.   Yes.
12     Q.   What kind of cars did you associate with
13 the defendant?
14     A.   He had a truck, he had a blue Cadillac, he
15 had a red Cadillac.
16     Q.   And was the truck a Tahoe, or do you know?
17     A.   I think so, yes.
18     Q.   Was it knew or old?
19     A.   It was old.
20     Q.   How about the Cadillac?
21     A.   The blue Cadillac was pretty old.
22     Q.   How about the red Cadillac?
23     A.   The red Cadillac was new.
24     Q.   And how do you know those were the
25 defendant's cars?
```

2856

```
1      A.   Because he said so.
2      Q.   And did you have anything to do with the
3  purchase of those vehicles?
4      A.   No, sir.
5      Q.   Were they registered to the defendant or to
6  someone else?
7      A.   I don't know.  I believe they were
8  registered to someone else.
9      Q.   Did you ever -- strike that.  Did you ever
10 see the defendant with guns?
11     A.   Yes.
12     Q.   And how many?
13     A.   Two.
14     Q.   What kind?
15     A.   One -- I don't really know exactly what
16 kind of guns they were, but one gun was like a
17 revolver kind of gun and another gun was like a
18 smaller gun, like a little gun that might fit into
19 my purse.
20     Q.   And the little gun, when did you first see
21 that?
22     A.   I don't remember.
23     Q.   Do you remember where you saw it?
24     A.   I remember seeing them, but I believe the
25 first time I actually saw them saw them were when he
```

**GA714**

2857

1 brought them to my house.
2     Q.    Was there anything unique about the little
3 gun?
4     A.    No.
5     Q.    How about the revolver, do you remember
6 when you first saw that?
7     A.    I don't remember when I first saw that.
8     Q.    Was there anything unique about the
9 revolver?
10     A.    The revolver gun had like a beam, like a
11 red beam on it, a laser beam of some sort.
12     Q.    And how do you know it had that?
13     A.    Because he showed me it or was playing with
14 it or something.  Somehow I saw the beam, I saw the
15 red laser.
16     Q.    Did you ever possess the guns, hold the
17 guns?
18     A.    Yes.
19     Q.    And who was present when you did that?
20     A.    Dreddy was.
21     Q.    And did you ever see anyone else possessing
22 those guns?
23     A.    I gave them to his brother later on.
24     Q.    At the time when you first saw them --
25 where were they kept?

2858

1     A.    In my house.
2     Q.    And who put them there?
3     A.    Dreddy.
4     Q.    And do you know why?
5     A.    No.
6     Q.    Did you ever see anyone while they were in
7 your house possessing those guns?
8     A.    No.
9     Q.    Now, you said -- what happened to the two
10 guns?
11     A.    Well, later on after he was taken to jail
12 his brother came and got them.
13     Q.    After who was taken to jail?
14     A.    Dreddy.
15     Q.    And when you say "his brother," I'm going
16 to show you a photograph, ask you if you recognize
17 the person depicted in this photograph.
18     A.    Yes.
19     Q.    And who is that?
20     A.    Ozzie.
21     Q.    And how do you know him?
22     A.    I was introduced to him as him being
23 Dreddy's brother.
24     Q.    And is that who you are referring to when
25 you say his brother?

2859

1     A.    Yes.
2     Q.    And so after the defendant was arrested,
3 what happened with him, with Ozzie?
4     A.    He came and got the guns.
5     Q.    And did you know where they were hidden?
6     A.    In my house.  Yes.
7     Q.    Did you give them to Ozzie?
8     A.    Yes.
9     Q.    Did he leave with the weapons?
10     A.    Yes.
11     Q.    Did you ever see them again?
12     A.    No.
13     Q.    Did you know he was coming over to your
14 house for the weapons?
15     A.    I don't remember.
16     Q.    Did you know a person by the name of Jackie
17 Bryant?
18     A.    No.
19     Q.    Did you know Judith Rivera?
20     A.    No.
21     Q.    Did you know Juanita Hopkins?
22     A.    No.
23     Q.    Frank Hodges?
24     A.    No.
25     Q.    To your knowledge you never met those

2860

1 people?
2     A.    To my knowledge, yes.
3     Q.    Let me -- just to make sure, let me show
4 you photographs and ask you if you recognize any of
5 these individuals.  Do you recognize the woman
6 depicted in 214?
7     A.    No.
8     Q.    Do you recognize the woman depicted in 217?
9     A.    No.
10     Q.    Do you recognize the woman depicted in 213?
11     A.    No.
12     Q.    Do you recognize the man depicted in 212?
13     A.    No.
14     Q.    Do you recognize 229?
15     A.    That's Pop.
16     Q.    That's the man you bought groceries for?
17     A.    Right.
18     Q.    And where did he live?
19     A.    He lived at Charles Street.
20     Q.    And did you know what relationship he had
21 with the defendant?
22     A.    Not at first, no.
23     Q.    What did you understand the relationship to
24 be at first?
25     A.    At first I just thought he was an older guy

**GA715**

2861

1   that Dreddy took interest in that he wanted to help.
2       Q.   Did you -- did there come a time when you
3   learned the relationship was different?
4       A.   Yes.
5       Q.   And how did you learn that?
6       A.   After Pops got arrested when his house got
7   raided.
8       Q.   And what happened after the house got
9   raided?
10      A.   Dreddy asked me to bond him out.
11      Q.   And did you know that the house got raided?
12      A.   Not until he told me.
13      Q.   Who is he?
14      A.   Dreddy.
15      Q.   And when you were asked to help bond him
16  out, what did you do?
17      A.   Took the money, saw the bondsman, signed
18  the papers.
19      Q.   Where did you get the money?
20      A.   Dreddy gave it to me.
21      Q.   Do you remember how much money?
22      A.   No.
23      Q.   And how did you know what bondsman to go
24  to?
25      A.   I didn't, the bondsman was already there.

2862

1       Q.   Who told you where to go?
2       A.   Dreddy.
3       Q.   And did you meet the bondsman?
4       A.   Yes.
5       Q.   And did you help Pops get bonded out?
6       A.   Yes.
7       Q.   And was there a second time when that --
8   when a similar request was made?
9       A.   Yes, not too long after that he got
10  arrested again.
11      Q.   And "he" being who?
12      A.   Pops.
13      Q.   Did you even know his real name?
14      A.   No.
15      Q.   And how did you learn he got arrested a
16  second time?
17      A.   Dreddy.
18      Q.   And who provided you with the money?
19      A.   I don't remember if there was a second
20  bond.  I don't know if he came up from court.  I
21  don't remember if there was a second bond.
22      Q.   Did you go and help him get bonded out?
23           MR. SHEEHAN:  Objection.  Assumes a
24  fact.  She just said something to the contrary.
25           MR. MARKLE:  I'll withdraw it.

2863

1       Q.   Did you go to the courthouse?
2       A.   No, I don't remember going to the
3   courthouse.
4       Q.   Did you work at the time?
5       A.   At this time, no.
6       Q.   Did you ever voice any concern to the
7   defendant about being involved with the bonds?
8       A.   I didn't -- not until after we purchased a
9   car for Squeaky.
10      Q.   You purchased a vehicle for Squeaky?
11      A.   Yes.
12      Q.   And who is "we"?
13      A.   Me -- well, me and Squeaky went to buy the
14  car, but Dreddy was with us.
15      Q.   And what kind of car was that?
16      A.   It was a Lexus.
17      Q.   And do you remember the cost of the car?
18      A.   No.
19      Q.   And why was the defendant with you?
20      A.   I'm not sure, just I guess we were all just
21  going to go.
22      Q.   And why did that concern you with -- when I
23  asked you about being concerned about money,
24  explaining the money, you said not until the car?
25      A.   Because there was another person that he

2864

1   asked me to bond out of jail the second -- I don't
2   remember if it was the second time, but it was the
3   second person he asked -- he had to bond out of
4   jail, and my concern was that it was a lot of money
5   for someone that wasn't working to have spent in a
6   small amount of time.
7       Q.   Meaning you?
8       A.   Right.
9       Q.   And who did you voice that concern to?
10      A.   Dreddy.
11      Q.   And why did you talk to him about it?
12      A.   Because it was him who was giving me the
13  money.
14      Q.   And what did he say?
15      A.   He basically told me not to worry about it.
16      Q.   Did you know Tina Johnson?
17      A.   No.
18      Q.   I'll show you a picture, 252, and ask you
19  if you recognize that person?
20      A.   No.
21      Q.   Did you know Basil Williams?
22      A.   No.
23      Q.   Do you recognize the person in 254?
24      A.   No.
25      Q.   Do you recognize the person in government's

2865

```
1   253?
2       A.   No.
3       Q.   During this period of time, did your
4   brother, to your knowledge, have legitimate
5   employment?
6       A.   No, he didn't.
7       Q.   Did Azikiwe Aquart have legitimate
8   employment to your knowledge?
9       A.   No, not to my knowledge.
10      Q.   Do you recall what your cell phone was in
11  2005?
12      A.   No.
13      Q.   Do you recall your brother's cell phone
14  number?
15      A.   No.
16      Q.   Do you recall the defendant's?
17      A.   No.
18      Q.   Did the defendant ever give you a cell
19  phone to use?
20      A.   Yes.
21      Q.   Did he tell you where that cell phone came
22  from?
23      A.   No. He implied that Womble's girlfriend got
24  the cell phone for him.
25      Q.   That was your understanding?
```

2866

```
1       A.   Yes.
2       Q.   And did you subsequently or during that
3   same time have your own cell phone?
4       A.   Yes.
5       Q.   And do you remember whether or not you used
6   your actual name when you got that?
7       A.   For my cell phone, yes.
8       Q.   And did you give your address?
9       A.   Yes.
10      Q.   It was billed to you?
11      A.   Yes.
12      Q.   When was the last time you had any contact
13  with the defendant?
14      A.   He sent me a letter a couple of months
15  after he went to jail -- or not too long after he
16  went to jail.
17      Q.   Did you have any phone contact with him?
18      A.   No.
19      Q.   Did you visit him?
20      A.   No.
21      Q.   And do you have that letter?
22      A.   No.
23      Q.   What happened to that letter?
24      A.   Well, when I got the letter I read it and
25  at the end of the letter he basically told me to get
```

2867

```
1   rid of it, throw it away.
2       Q.   Did you have knowledge of what happened on
3   August 24, 2005?
4       A.   Yes.
5       Q.   Had you shared it with anyone when you got
6   that letter -- before you got that letter?
7       A.   The knowledge on what I knew.
8       Q.   Excuse me?
9       A.   The knowledge on what I knew about, yes.
10      Q.   Who did you share it with?
11      A.   My sister.
12      Q.   Is that the only person?
13      A.   No.
14      Q.   Who else?
15      A.   One my best friends.
16      Q.   And did the defendant find out that your
17  best friend knew about what you knew?
18      A.   I believe he did, but I'm not sure if he
19  did.
20      Q.   Had you shared your information with the
21  police?
22      A.   No.
23      Q.   Had you -- had the police come to you?
24      A.   No.
25      Q.   Had you -- when you received the letter
```

2868

```
1   from the defendant, had you talked to the police
2   about what you knew happened on August 24, 2005?
3       A.   No.
4       Q.   Did you get rid of the letter that he sent
5   to you?
6       A.   Yes.
7       Q.   On August 23, 2005, do you remember that,
8   the day before -- the night before the murders?
9       A.   Yes.
10      Q.   Do you recall what you did that night?
11      A.   Yes.
12      Q.   What did you do?
13      A.   Well, we had a night -- we promoted a night
14  at the club near my house, and we were there up
15  until 1:00 a.m. or so. When we left there, we went
16  to Denny's to have breakfast.
17      Q.   What's the name of the club?
18      A.   Yellow Bird.
19      Q.   And you said you went. Who went to the
20  club?
21      A.   Me, my brother, a bunch of other people.
22  My friend Tasha.
23      Q.   Was there any special occasion at the club
24  that night?
25      A.   No, just a night that we were promoting.
```

**GA717**

2869



```
1    Q.   Promoting?
2    A.   Right.
3    Q.   What do you mean?
4    A.   Basically we rented the club and bought the
5    liquor to serve and sell.
6    Q.   And who is "we"?
7    A.   My brother was the person in charge of
8    everything, but we helped him out.
9    Q.   And was the defendant with you?
10   A.   No.
11   Q.   And how long did you stay at the club that
12   night?
13   A.   We went there roughly about eleven o'clock
14   and we stayed til one.
15   Q.   And what, if anything, did you do when you
16   left?  Where did you go?
17   A.   We went to my house first to drop off the
18   car.
19   Q.   Who was in your car?
20   A.   I was in my car alone at first.
21   Q.   Okay.
22   A.   And then I got into a car with Tasha and
23   her friend.
24   Q.   And do you know her friend's name?
25   A.   His name is Duck.
```

2870

```
1    Q.   Doug?
2    A.   Duck.
3    Q.   Do you know his last name?
4    A.   No.
5    Q.   And do you know if your brother left the
6    club at the same time?
7    A.   Yes, because the club closed, so we all
8    left.
9    Q.   And was your brother with anyone else?
10   A.   He was with Tanya, his girlfriend.
11   Q.   And what kind of car was he driving?
12   A.   My brother?
13   Q.   Yes.
14   A.   He was driving a burgundy Camry.
15   Q.   And did he own that vehicle?
16   A.   No, it was a rental.
17   Q.   And where did you go?
18   A.   From the club?
19   Q.   With your car.
20   A.   I went to my house to park my car.
21   Q.   And did you stay at your house or leave?
22   A.   No, I left.
23   Q.   Where did your brother go?
24   A.   My brother went up to Denny's.
25   Q.   And did you eventually go to Denny's?
```

2871

```
1    A.   Yes.
2    Q.   And Denny's is what?
3    A.   A restaurant.
4    Q.   And so who -- did you all meet at Denny's?
5    A.   Right, yes.
6    Q.   Was that a plan or just a coincidence?
7    A.   No, it was a plan.
8    Q.   And who went to Denny's?  Who met at
9    Denny's?
10   A.   Me, Tasha, Tanya, my brother, Tasha's
11   friend Duck, and then there was like a group of guys
12   that was hanging out at the club with us, too.
13   Q.   And had you been drinking at the club?
14   A.   Yes.
15   Q.   And did you go to Denny's -- did you
16   continue drinking after you left the club?
17   A.   No.
18   Q.   Were you using drugs after you left the
19   club?
20   A.   No.
21   Q.   And what did you do at Denny's after you
22   all met?
23   A.   We had breakfast.
24   Q.   And about what time was this?
25   A.   We got there about the 1:30.
```

2872

```
1    Q.   How long did it take you to get to the
2    Denny's?
3    A.   Maybe 20, 25 minutes.
4    Q.   And while you were there, was your brother
5    seated with you?
6    A.   Yes.
7    Q.   Did you -- was the defendant with you?
8    A.   No.
9    Q.   Did you have occasion while at the Denny's
10   to speak with the defendant?
11   A.   Yes.
12   Q.   And how did that happen?
13   A.   Over a phone.
14   Q.   And were you still eating when that
15   happened?  Was it before you ate, during or after?
16   Do you remember?
17   A.   During, I believe.
18   Q.   And did you talk to him?
19   A.   Yes, briefly.
20   Q.   Do you know where he was?
21   A.   He told me that he was asleep all day and
22   that he was home.
23   Q.   And did you have any further conversation
24   with him?
25   A.   No, he just asked me to speak to my
```

**GA718**

2873

```
1   brother.
2       Q.   And what did you tell him?
3       A.   Hold on.
4       Q.   And did you give the phone to someone?
5       A.   I gave it to my brother.
6       Q.   And do you know whether or not the
7   defendant and your brother had a conversation?
8       A.   They spoke, but I don't know how long the
9   conversation lasted.
10      Q.   Did you know what kind of association,
11  relationship the defendant and your brother had at
12  the time?
13      A.   As far as I knew they were just associates.
14  They were just like hi and bye.
15      Q.   Now, a few nights before August 23rd into
16  August 24, 2005, had you seen your brother with the
17  defendant?
18      A.   They were standing outside my house
19  talking, yes.
20      Q.   And did you hear the conversation?
21      A.   Barely.  But the conversation consisted of
22  "I need you to help me handle something."
23      Q.   And who said that?
24      A.   Dreddy.
25      Q.   And who did he say it to?
```

2874

```
1       A.   My brother.
2       Q.   And did you the hear your brother reply?
3       A.   No.
4       Q.   And was anyone else there?
5       A.   Not that -- it was early in the day, so it
6   could have been, but I'm not sure.
7       Q.   And do you know what -- what, if anything,
8   did they do after he said "I need your help"?
9       A.   Nothing right away.
10      Q.   Did anything happen later?
11      A.   Later, yes.
12      Q.   How much later?
13      A.   Later on in the nighttime.
14      Q.   And what happened then?
15      A.   They left.
16      Q.   And who is "they"?
17      A.   No, I'm sorry, my brother left and he said
18  he had to go deal with something.
19      Q.   And was the defendant there?
20      A.   I don't think so.
21      Q.   And did you see the defendant's brother?
22      A.   No.
23      Q.   And what happened after your brother left?
24      A.   Nothing.
25      Q.   Did he come back?
```

2875

```
1       A.   Yes.
2       Q.   Did anyone else come back with him?
3       A.   Dreddy came back with him, and I don't
4   remember if his brother came back this time, but --
5   yeah, I don't remember.
6       Q.   Did you hear any conversation when they
7   came back?
8       A.   I don't remember.
9       Q.   Now, going back to the -- after your
10  brother spoke to the defendant on the phone at the
11  Denny's, did you leave right away or remain?
12      A.   No, we finished up what we were doing and
13  then we left when we were -- we didn't rush, we just
14  finished up the food or laughing and whatever it
15  was, and then we left.
16      Q.   And where did you -- whose car did you get
17  in?
18      A.   I got back in the car with Tasha and her
19  friend.
20      Q.   So, there were three of you?
21      A.   Right.
22      Q.   What kind of car were you in?
23      A.   I don't remember.
24      Q.   And who did your brother leave with?
25      A.   Tanya.
```

2876

```
1       Q.   And was he still in the rental vehicle?
2       A.   Yes.
3       Q.   And where did you go?
4       A.   Back to my house.
5       Q.   And where were you living at the time?
6       A.   1324 Stratford Ave.
7       Q.   And where did your brother go?
8       A.   I'm assuming he went to drop Tanya off.
9       Q.   Okay.  You didn't see him come to your
10  house at that time?
11      A.   No.
12      Q.   Did you immediately go inside?  Or what did
13  you do when you got to your apartment?
14      A.   Well, I kind of like lingered behind,
15  eventually went upstairs.
16      Q.   And while you lingered behind, did you see
17  anyone arrive at your apartment?
18      A.   I saw Dreddy.
19      Q.   Had you called -- had you planned on seeing
20  Dreddy?
21      A.   No.
22      Q.   When you spoke to him on the phone, did he
23  say he was coming over?
24      A.   No.
25      Q.   What kind of car was he driving?
```

2877

```
1    A.  He had the red Cadillac.
2    Q.  And was he alone or with someone else?
3    A.  He was alone.
4    Q.  And did you see your brother at this time?
5    A.  No.
6    Q.  And when he arrived, where did he go?  The
7  defendant.
8    A.  He parked his car across the street from my
9  house and walked towards Union Ave.
10   Q.  Would that be away from your house?
11   A.  Yes.
12   Q.  Did you call him or yell out to him?
13   A.  No.
14   Q.  Did you see him meet with anyone?
15   A.  No.
16   Q.  And so the last you saw was him walking
17 alone?
18   A.  Yes.
19   Q.  What did you do?
20   A.  I went upstairs.
21   Q.  And what did you do?
22   A.  Went to bed.
23   Q.  And who else was in your apartment at that
24 time?
25   A.  Me and Tasha.
```

2878

```
1    Q.  And once you got inside you went to sleep?
2    A.  Right.
3    Q.  And do you recall anything after you went
4  to sleep?  Do you recall -- what, if anything,
5  happened next?
6    A.  After I went to sleep, I'm not sure how
7  long after, but after I went to sleep I woke up to
8  guys talking in my living room.
9    Q.  I'm sorry, guys were talking?
10   A.  Right.
11   Q.  Did you recognize the voices?
12   A.  I recognized my brother and Dreddy's voice.
13   Q.  Did you recognize any other voices?
14   A.  I assumed to be -- I assumed for what to be
15 Dreddy's brother because they sound alike.  So, I
16 believed that that's who was there.
17   Q.  Was there a fourth or fifth or sixth voice
18 that you heard?
19   A.  I could have sworn I heard an unfamiliar
20 voice.
21   Q.  Could you describe that voice?
22   A.  Deeper than the other three.
23   Q.  And was Tasha awake or asleep?
24   A.  No, she was still asleep.
25   Q.  Who has a key to your apartment?
```

2879

```
1    A.  At this time me, my brother and Dreddy.
2    Q.  When you heard the voices, what kind of
3  noise was being made?  Was it loud?  Or what did you
4  hear?
5    A.  I just heard talking.
6    Q.  And after you woke up, what, if anything,
7  did you do?
8    A.  Well, I was a little bit groggy, so I
9  walked into the living room to figure out why they
10 were making so much noise.
11   Q.  And what time of day or morning was it?
12   A.  I don't remember, but it was like almost
13 light.  It was like dusk.
14   Q.  And did you notice -- when you went out
15 there, how many people did you observe in your -- in
16 the living room, is it?
17   A.  Yes.
18   Q.  How many people?
19   A.  Three.
20   Q.  And who were they?
21   A.  Dreddy, his brother Ozzie and my brother.
22   Q.  And where were they?
23   A.  Sitting in the living room.
24   Q.  And were your children home at the time?
25   A.  No.
```

2880

```
1    Q.  And were they -- was there anything unusual
2  that you observed?
3    A.  Well, when I came out to the living room
4  they didn't have on clothes.  They just had on like
5  boxers and T-shirts.
6    Q.  Who is they?
7    A.  Dreddy and his brother.
8    Q.  And how about your brother?
9    A.  My brother had on like a T-shirt, but he
10 had on jeans.
11   Q.  And were those the clothes he wore to
12 Denny's?
13   A.  I don't remember.
14   Q.  And what were they doing in their boxers
15 and T-shirts in your living room?
16   A.  Just sitting were.
17   Q.  Were they eating, drinking, smoking?  What
18 were they doing?
19   A.  I don't remember.  I know they wasn't
20 eating, but they could have possibly been smoking
21 and just talking.
22   Q.  Was there a TV in that room?
23   A.  Yes.
24   Q.  Was it on, off?
25   A.  It was off.
```

**GA720**

2881

```
1      Q.   Did you see any clothes of theirs on the
2   couch?
3      A.   No.
4      Q.   Did you see it on any chairs?
5      A.   No.
6      Q.   Did you see shoes?
7      A.   No.
8      Q.   Sneakers?
9      A.   Only on my brother.
10     Q.   Not on Azikiwe and not on Azibo?
11     A.   No.
12     Q.   No?
13     A.   No.
14     Q.   Did you see clothes or sneakers of theirs
15  anywhere in the apartment?
16     A.   No.
17     Q.   Did you talk to them?
18     A.   Other than why, like why was it so noisy,
19  no.
20     Q.   And what did they -- did anyone respond?
21     A.   No.
22     Q.   And what did you do?
23     A.   I sat on the couch with Dreddy.
24     Q.   And did you remain on the couch for the
25  rest of that morning?
```

2882

```
1      A.   No.
2      Q.   Why not?
3      A.   Because Dreddy had asked me to do
4   something.
5      Q.   What did he ask you to do?
6      A.   He asked me to take the bags that was at my
7   front door to the garbage.
8      Q.   And what bags were by your front door?
9      A.   Some garbage -- some kitchen garbage bags.
10     Q.   And were they full, half full, empty?
11     A.   They weren't completely full, no.
12     Q.   How many bags were there?
13     A.   Two or three.
14     Q.   And who told you -- who referred you to the
15  bags?
16     A.   Dreddy.
17     Q.   And what did he ask you to do with them?
18     A.   He asked me to take the bags and bring them
19  to the dumpsters a couple of blocks away from my
20  house.
21     Q.   Is there a dumpster in your apartment
22  complex?
23     A.   Yeah.
24     Q.   Did you take them there?
25     A.   No.
```

2883

```
1      Q.   Did he say to take them there?
2      A.   No.
3      Q.   Did he direct you where to take them?
4      A.   Yes.
5      Q.   And did you take those bags?
6      A.   Yes.
7      Q.   Do you know what was in those bags?
8      A.   I do know what was in the bags, yes.
9      Q.   And how do you know what was in the bags?
10     A.   Because so many years of not having a
11  washer and dryer in my own home, I had to do laundry
12  at a laundromat, so I knew it was clothes.
13     Q.   Did you look in the bags?
14     A.   No.
15     Q.   Were they already tied or --
16     A.   Yes.
17     Q.   -- shut?
18     A.   Yes.
19     Q.   Was it heavy?
20     A.   No.
21     Q.   Do you know whether there were sneakers or
22  shoes in the bags?
23     A.   I don't remember.
24          MR. SHEEHAN:  Objection, leading.
25  Leading, your Honor.
```

2884

```
1          THE COURT:  Sustained.
2      Q.   Do you know what was in the bags?
3      A.   No.
4      Q.   And were they bags that you had put by the
5   front door?
6      A.   No.
7      Q.   Were they bags of your garbage?
8      A.   No.
9      Q.   Were they bags of your clothes?
10     A.   No.
11     Q.   What did you do -- so what did you do when
12  he said to take those bags and go to a dumpster?
13     A.   I put some clothes on and did what I was
14  told.
15     Q.   And after getting dressed, did he give you
16  anything else before you took the bags?
17     A.   Yeah, he gave me a black drill.
18     Q.   Drill?
19     A.   A black drill.
20     Q.   A black drill.  And had you ever seen that
21  drill before?
22     A.   I saw it once before.
23     Q.   Where did you see it before?
24     A.   He had it when he was drilling a peek hole
25  into my front door.
```

2885

1    Q.    When you say "he," who are you referring
2    to?
3    A.    Dreddy.
4    Q.    And had he left it at your apartment?
5    A.    No.
6    Q.    Was it yours?
7    A.    No.
8    Q.    Had you ever used it?
9    A.    No.
10   Q.    And what did you do with that drill and the
11   two bags?
12   A.    I brought them to the dumpster.
13   Q.    How did you take them?  Did you walk?
14   A.    I put them in my car and took them.
15   Q.    And how far away was that?
16   A.    Maybe three blocks.
17   Q.    And, again, did you pick the dumpster?
18   A.    No.
19   Q.    Who did?
20   A.    Dreddy.
21   Q.    And what did you do with them?
22   A.    I brought them to the dumpster and dropped
23   them in.
24   Q.    And then what did you do?
25   A.    I went back home.

2886

1    Q.    And when you got back home, who was there?
2    A.    At this point I think it's still Dreddy and
3    his brother.
4    Q.    Was your brother there?
5    A.    I believe he left already.
6    Q.    Do you remember if Tasha woke up during any
7    of this?
8    A.    Not yet.
9    Q.    Did she see you with the bags?
10   A.    No.
11   Q.    With the drill?
12   A.    No.
13   Q.    Had she come out into the living room when
14   all three men were there?
15   A.    No.
16   Q.    Did you ask why am I doing this?
17   A.    No.
18   Q.    Why didn't you question what he was having
19   you do?
20   A.    Usually like you just don't ask questions,
21   you just do what you are told, and I did.
22   Q.    Is that how your relationship was?
23   A.    Yeah.
24   Q.    When you got back, what, if anything, did
25   you do?

2887

1    A.    I sat around for a few more minutes, and
2    then he, Dreddy, asked me to bring his car home and
3    to get him some clothes.
4    Q.    And did you do that?
5    A.    Yes.
6    Q.    Did you question why?
7    A.    No.
8    Q.    Did you -- how did you do that?
9    A.    Well, at this point I woke Tasha up and
10   asked her to help me, if she could drive my car
11   home -- well, drive my car and follow me to bring
12   his car home.
13   Q.    And did she help you?
14   A.    Yes.
15   Q.    And who drove the defendant's red Cadillac?
16   A.    I did.
17   Q.    And what car did she drive, Tasha drive?
18   A.    She drove my Thunderbird.
19   Q.    And how far away was the defendant's
20   apartment?
21   A.    Like three blocks.
22   Q.    And which apartment was this?
23   A.    Read Street.
24   Q.    How many blocks?  I'm sorry?
25   A.    Maybe three.

2888

1    Q.    Is there a dumpster at his apartment?
2    A.    No.
3    Q.    I'm going to show you what's been marked
4    Government 202, ask you if you recognize what's
5    depicted in Government's 202.
6    A.    That's Read Street where he lived.
7    Q.    And is that where you took the car to?
8    A.    Yes.
9    Q.    And what did you do when you got there with
10   the car?
11   A.    I parked the car and I went inside the
12   house.
13   Q.    And why did you go in the house?
14   A.    Because he asked me to get him some
15   clothes.
16   Q.    And how do you remember -- well, did you
17   get him some clothes?
18   A.    Yes.
19   Q.    Did you get him anything else?
20   A.    I got him clothes and shoes.
21   Q.    And what did you do?
22   A.    Got the clothes and shoes and went back
23   home.
24   Q.    Did you ever ask him why you have to move
25   his car?

**GA722**

2889

```
1      A.   No.  He said something about -- I didn't
2  ask, but he said something about making it look like
3  he was home all day or all night.
4      Q.   He, the defendant, said that?
5      A.   Yes.
6      Q.   Did you ask him why he doesn't have any
7  clothes?
8      A.   No.
9      Q.   Did you -- what did you do with the
10 clothes?
11     A.   I brought them to him at my house.
12     Q.   Did you give them to him?
13     A.   Yes.
14     Q.   Do you recall doing that?
15     A.   Yes.
16     Q.   How do you remember that?  Anything
17 particular?
18     A.   Him asking me why did I get what I got.  I
19 guess he didn't like what I picked, but...
20     Q.   Didn't like the clothes you brought back?
21     A.   Right.
22     Q.   When you returned, was his brother still
23 there?
24     A.   I don't think so.
25     Q.   Did there come a time when his brother was
```

2890

```
1  still there or not, when his brother had left?
2      A.   I don't remember when his brother left.
3           MR. SHEEHAN:  I object to that question,
4  your Honor.
5           THE COURT:  I can't hear you.
6           MR. SHEEHAN:  I object to the form of
7  the question.
8           THE COURT:  Can you stand when you make
9  an objection.
10          MR. SHEEHAN:  Yes.  I'm objecting to the
11 form of the question, your Honor.
12          THE COURT:  I'll sustain the objection.
13          MR. SHEEHAN:  Thank you, your Honor.
14     Q.   Do you recall whether or not his brother
15 was in the apartment when you returned?
16     A.   I don't remember.
17     Q.   Do you remember there coming a time when
18 you were alone with the defendant in the apartment?
19     A.   Yes.
20     Q.   Was Tasha still there?
21     A.   Yes, but she was in my room.
22     Q.   And do you remember where you were with the
23 defendant?
24     A.   In the living room.
25     Q.   And was Efrain there?
```

2891

```
1      A.   No.
2      Q.   Was his brother there?
3      A.   No.
4      Q.   And do you recall anything happening while
5  you were with him that morning?
6      A.   By now I started to fall asleep and then
7  morning came, he was still there.
8      Q.   I'm sorry?
9      A.   Then the morning came where it was into the
10 next day, he was still there.
11     Q.   And do you recall the defendant receiving a
12 phone call?
13          MR. SHEEHAN:  Objection to leading.
14          THE COURT:  Sustained.
15     Q.   Do you recall the defendant speaking to
16 anyone?
17     A.   I remember him getting a phone call that
18 morning, yes.
19     Q.   Was he speaking on the phone or in person
20 to someone?
21     A.   On the phone.
22     Q.   And do you know who he was speaking to?
23     A.   No.
24     Q.   Do you know what -- do you recall what you
25 heard him saying?
```

2892

```
1      A.   He said something about why would you take
2  a cell phone from -- or why would you be calling me
3  from this cell phone, or something like that.
4      Q.   Why would you be calling me from her cell
5  phone?
6      A.   From this cell phone.
7      Q.   From this cell phone.  And was he in a good
8  mood or upset or angry?
9      A.   He didn't really get angry, but he sounded
10 a little bit aggravated.
11     Q.   And you don't know exactly who he was
12 talking to?
13     A.   No.
14     Q.   Did you-- after that phone call, did you
15 know what he was talking about when he said, why are
16 you calling me from this phone?
17     A.   Something made me think --
18          MR. SHEEHAN:  I'm going to object, your
19 Honor.  Objection, your Honor.  It calls for a yes
20 or no, and I think she's going into some --
21          THE COURT:  So the question was:  After
22 that phone call, did you know what he was talking
23 about when he said, why are you calling me from this
24 phone.  So that's a yes or no question.
25          THE WITNESS:  No.
```

2893

```
 1              THE COURT:  Okay.
 2      Q.   Did you have a -- you said there was a
 3  third time you went to Charles Street.  When was
 4  that?
 5      A.   The third time I went to Charles Street was
 6  to pick up his brother after the murder.
 7      Q.   Was that after you had gone to the
 8  dumpster?
 9      A.   That was -- yeah.
10      Q.   After you had moved his car?
11      A.   Yes.
12      Q.   After he received this phone call?
13      A.   Yes.
14      Q.   You went to pick up his brother where?
15      A.   On Charles Street.
16      Q.   And how did you know to go pick up his
17  brother?
18      A.   He told me to.
19      Q.   Who is "he"?
20      A.   Dreddy.
21      Q.   And were you concerned about going there?
22      A.   Yes.
23      Q.   Had you learned by this time -- did you
24  know if anything had happened by this time at
25  Charles Street?
```

2894

```
 1      A.   Yes.
 2      Q.   And how did you learn about what happened
 3  at Charles Street?
 4      A.   When we woke up the next morning we went to
 5  Tasha's house and I saw it on the news.
 6      Q.   And did you go and pick up his brother
 7  after having that knowledge?
 8      A.   Yes.
 9      Q.   And did you in fact pick him up?
10      A.   Yes.
11      Q.   And where did you bring him?
12      A.   I don't remember.
13      Q.   Did you talk to the defendant about what
14  happened at Charles Street?
15      A.   No.
16      Q.   Did you ever ask him about it?
17      A.   No.
18      Q.   Did you talk to your brother back close in
19  time to the murders about it?
20      A.   No.
21      Q.   How about Azikiwe, did you talk to him?
22      A.   No.
23      Q.   When he told you to pick up his brother,
24  did you say anything else?
25      A.   He just gave me instructions on where to
```

2895

```
 1  pick him up from.
 2      Q.   And did he say why you had to pick him up?
 3      A.   No.
 4      Q.   Now, shortly after the murders, after the
 5  defendant is arrested, did you continue to associate
 6  with his brother?
 7      A.   Yes.
 8      Q.   And what was that relationship?
 9      A.   At first it was still to keep going with
10  the marijuana, but that didn't last.
11      Q.   Why didn't that last?
12      A.   Something happened where the last bit of
13  weed that I had was no good and nobody was buying
14  it, so I let him take it.
15      Q.   And before your relationship broke up with
16  marijuana, did he come to get those two guns you
17  talked about?
18      A.   Yes.
19              MR. SHEEHAN:  Objection to leading.
20      Q.   When did he come to get those guns?
21      A.   Directly after Dreddy went to jail.
22      Q.   After Dreddy went to jail did you continue
23  to buy marijuana from his brother?
24      A.   No.
25      Q.   For a short period of time -- withdrawn.
```

2896

```
 1  Did you tell anyone about getting rid of the
 2  clothes?
 3      A.   Yes.
 4      Q.   Who did you tell?
 5      A.   My sister.
 6      Q.   And what's her name?
 7      A.   Nabria (ph).
 8      Q.   And do you know if anyone else ever found
 9  out that you talked about it?
10      A.   I believe my sister's girlfriend did.
11      Q.   Did the defendant ever talk to you about
12  talking to people about it?
13      A.   Yeah.
14      Q.   And when was that, before or after he was
15  arrested?
16      A.   Before.
17      Q.   And how did that conversation come up?
18      A.   He basically called me over the car wash
19  and told me that I am not to discuss it with
20  anybody.
21      Q.   Did you ever go to the police the day after
22  -- or before the defendant was arrested?
23      A.   No.
24      Q.   Why not?
25      A.   Because, again, don't tell.
```

**GA724**

2897

1    Q.    I'm sorry?

2    A.    Again, you don't tell.

3    Q.    Did your brother stay in Bridgeport during

4    this time, after the murders?

5    A.    He was in Bridgeport for a while after the

6    murders, but then he went to Philly to visit with my

7    mom.

8    Q.    And who took him to Philadelphia?

9    A.    I took him to Philadelphia, me and Ozzie.

10   Q.    The defendant's brother went with you?

11   A.    Yes.

12   Q.    Did you ever go back to Charles Street

13   after you picked up the defendant's brother?

14   A.    No.

15   Q.    Now, Ms. Johnson you met with law

16   enforcement on a number of occasions, correct?

17   A.    Correct.

18   Q.    And on one occasion did you indicate that

19   you had a letter in your possession?

20   A.    Yes.

21   Q.    And do you recall where you got that letter

22   from?

23   A.    My brother sent it to me.

24   Q.    And do you recall -- he sent it to you?

25   A.    Yes.

2898

1    Q.    Was it -- where did he send it from?

2    A.    From North Ave, Bridgeport Correctional

3    Center.

4    Q.    He was incarcerated at the time?

5    A.    Yes.

6    Q.    And you kept that letter?

7    A.    Yes.

8    Q.    And I'm going to show you what's been

9    marked Government's 500 and ask you if you

10   recognize, first of all, the writing on the front

11   side of the exhibit.

12   A.    That's my brother's writing.

13   Q.    And do you recognize the writing on the

14   backside?

15   A.    No.

16   Q.    But taking a look at this, is this the

17   letter that your brother provided to you?

18   A.    Yes.

19   Q.    Did you change any of the wording of the

20   letter?

21   A.    No, sir.

22   Q.    Either your brother's writing or the other

23   person's?

24   A.    No, sir.

25   Q.    Did you delete anything, edit it?

2899

1    A.    No.

2         MR. MARKLE:  Offer Government's 500,

3    your Honor.

4         MR. SHEEHAN:  Object.  May we approach,

5    your Honor?

6         THE COURT:  Why don't we take a recess.

7         (Jury exited the courtroom.)

8         THE COURT:  All right, Ms. Johnson,

9    we'll take a 15-minute recess.  Don't discuss your

10   testimony with anyone.  Thank you.

11        All right.

12        MR. SHEEHAN:  Your Honor I don't think

13   has the whole of Exhibit 500.  The first part of 500

14   is a note that I believe that Ms. Johnson is

15   referring to that she got from her brother in the

16   context of this letter.  I think that note, the note

17   from the brother, I don't think there can be any

18   claim that that is in furtherance of the conspiracy.

19        THE COURT:  Can I have a copy of that?

20        MR. SHEEHAN:  I don't know if you do,

21   your Honor.

22        THE COURT:  No.  Can I, please?  I

23   don't.

24        THE COURT:  All right.

25        MR. SHEEHAN:  With respect to the note,

2900

1    your Honor, which is -- I think it's the first page

2    of Exhibit 500 as the Government is now offering it,

3    that's clearly hearsay.  It is not in furtherance of

4    the conspiracy.  I don't think there is any claim

5    that it is a statement against penal interest.  I

6    don't think it's admissible under any circumstances.

7         With respect to the second document, I

8    understand that the government may ultimately

9    contend that this was written by the defendant.  We

10   know that from prior hearings on this matter.  I

11   don't think that it should come in through this

12   witness at this time under any set of circumstances.

13        THE COURT:  Mr. Markle?

14        MR. MARKLE:  Your Honor, if there is no

15   question about this being the letter that was

16   provided to her by her brother, then I agree, that's

17   not necessary.  But otherwise that establishes how

18   the witness -- first of all, that her brother

19   associated with the defendant, and also that's the

20   handwriting she recognizes that came with the

21   letter.  But if Mr. Sheehan is not challenging that,

22   then I would agree that there is no necessity for

23   the portion that's written by her brother.

24        THE COURT:  So, let me understand this,

25   Mr. Sheehan.  Your objection is to Efrain Johnson's,

2901

```
1  essentially, cover letter.
2              MR. SHEEHAN:  That's a good
3  characterization, your Honor, yes.
4              THE COURT:  But you do not object to --
5              MR. SHEEHAN:  I do at this time.
6              THE COURT:  Okay.  What's --
7              MR. SHEEHAN:  There is no basis, your
8  Honor.  It's not relevant at this time.  It has not
9  been connected.  I don't think it should come in
10 through this witness.  I don't think it should be
11 published at this time.
12             MR. MARKLE:  There will be a handwriting
13 expert who will testify.  My understanding is that
14 he'll testify that this was the handwriting of the
15 defendant.  So if it's just a matter of proving that
16 up, your Honor, the government will wait to offer it
17 as a full exhibit.  That's what I asked Mr. Sheehan,
18 if that was the objection.
19             THE COURT:  So that's what -- so 500
20 should just be for identification now, that this is
21 what she got mailed to her from her brother, and
22 leave it there.
23             MR. SHEEHAN:  I think that's all we can
24 do at this moment, your Honor.  And in any case, I
25 don't think part of 500 should come in.
```

2902

```
1              THE COURT:  And the government is not
2  offering that.
3              MR. SHEEHAN:  Well, no.  No -- yeah.
4              THE COURT:  If there is no objection to
5  her testifying that she received 500 for
6  identification from her brother.
7              MR. SHEEHAN:  Yeah, she can say I
8  believe I got something from my brother, but
9  frankly, the other issue I have, your Honor, with
10 that is that implicit in that is a representation of
11 sorts by her brother that she got -- he got this
12 from somebody.  That's the real problem.  I think
13 also a problem --
14             THE COURT:  May I see if there is a real
15 dispute about this.  Mr. Markle, do I understand
16 that you are not offering this other than if
17 necessary to -- because she has testified that she
18 got this note from her brother with a letter.
19             MR. MARKLE:  Correct, your Honor.
20             THE COURT:  And the letter was not by
21 her brother.
22             MR. MARKLE:  Correct.
23             THE COURT:  And we would just leave it
24 there.
25             MR. MARKLE:  Correct.
```

2903

```
1              MR. SHEEHAN:  So I don't think we need
2  to get into it, whether it comes in at this moment
3  anyway, it's marked for identification.
4              THE COURT:  That's how we'll do that.
5              MR. MARKLE:  Yes, your Honor.
6              THE COURT:  All right, that's helpful.
7  And then with respect to the issue of what her -- so
8  when did her brother speak to her and make the
9  statements that the defendant has moved to exclude?
10             MR. MARKLE:  I'm going to go back to
11 that right after the letter.
12             THE COURT:  And when was that that he
13 spoke to her?
14             MR. MARKLE:  I don't remember exactly
15 when, your Honor.  You mean in terms of a date?
16             THE COURT:  Some kind of a timeframe.
17 This is before his arrest?
18             MR. MARKLE:  Yes.  There are statements
19 both before and after his arrest.  But I think the
20 bulk of them are before his arrest.
21             THE COURT:  So clearly Mr. Efrain
22 Johnson is unavailable because he still is awaiting
23 trial and would not testify in this case, would
24 invoke his Fifth Amendment rights, so he's not an
25 available witness.
```

2904

```
1              The testimony that you have claimed she
2  will testify -- excuse me, the statements you have
3  claimed she will testify he said to her, in the
4  context of what we now know of the details of how
5  the murders were allegedly carried out, seems to me
6  to be certainly an admission of criminal activity
7  that would subject him to liability such that no
8  reasonable person would have made the statement
9  without believing they're true, and these
10 statements, at least what you've told me of them
11 with respect to being in the apartment, the drill,
12 the bats, the beating, so forth, have been
13 corroborated by non-hearsay testimony of Taylor,
14 some of the crime scene evidence and other
15 testimony, and then I think we get to the critical
16 part for the purposes of addressing the defendant's
17 motion to preclude, and that is, is it precluded.
18             So it's a statement against penal
19 interest, it is non-hearsay, and the question is, is
20 it testimonial, and if it's testimonial we're under
21 Crawford; if it's not, we aren't.  It certainly
22 isn't, from what you've proffered, a statement to
23 the police.  It's received by Efrain Johnson to his
24 sister; I presume privately because he trusted his
25 sister, that he didn't have any expectation it would
```

2905

```
1   be used against the defendant.  He didn't make the
2   statement to the police or in any judicial type
3   proceeding.  It doesn't have the solemn declaration
4   characteristics as if he was trying -- stating it
5   for the purpose of proving thing.
6           So it seems to me that it is not the
7   functional equivalent of testimony, that it -- and I
8   look at U.S. v. Pike from the Second Circuit, at 292
9   F. App'x 108, Second Circuit 2008, in which a
10  defendant -- a person -- the statement to a fellow
11  inmate was non-testimonial and not -- about having
12  committed murders was against penal interest and
13  non-testimonial, and in reliance on that I'm going
14  to deny the defendant's objection to that testimony,
15  assuming nothing changes about the context in which
16  it is offered.
17          So, that will be my ruling which I think
18  we are now prepared to make.  If there is anything
19  that needs to be -- that Ms. Johnson's testimony
20  changes, then I certainly will reconsider that.  So
21  that's where we are.
22          MR. MARKLE:  Your Honor, that is my
23  understanding of the context.  And just for the
24  record, I think it's obvious Mr. Johnson's
25  unavailable, but his attorney is, or was, present in
```

2906

```
1   the courtroom and would advise us that he would
2   invoke the Fifth amendment.
3           THE COURT:  Who is his counsel?  I've
4   forgotten.
5           MR. MARKLE:  Mr. Bussert.
6           THE COURT:  Mr. Bussert dressed for
7   court, I see.
8           MR. BUSSERT:  I didn't realize I'd be
9   called upon.
10          THE COURT:  All right, and that is true,
11  Mr. Bussert, that Efrain Johnson, your client,
12  would, on your advice, respond to any questions
13  about the activities ON August 24th with his
14  invocation of his Fifth Amendment rights?
15          MR. BUSSERT:  Your Honor, I think that
16  would be my advice and Attorney Hoose as well.
17          THE COURT:  I think that brings us
18  up-to-date, so why don't we take a five-minute
19  recess.
20          (Recess)
21          THE COURT:  All right, would you bring
22  back the witness.  Bring back the government.
23          All right, please bring back the jury.
24          (Jury entered the courtroom.)
25          THE COURT:  Please be seated, ladies and
```

2907

```
1   gentlemen.  Continued direct examination of
2   Ms. Johnson by Mr. Markle.
3           MR. MARKLE:  Thank you, your Honor.
4           THE COURT:  These momentary lapses.
5       Q.  Ms. Johnson, I had shown you Government's
6   Exhibit 500 and you recognize that as the letter
7   your brother sent you from prison, correct?
8       A.  Yes.
9           MR. MARKLE:  We'll offer it just for
10  identification at this point, your Honor.
11          THE COURT:  Very well.
12      Q.  Now, before your brother went into prison,
13  Ms. Johnson, did there come a time -- did you have
14  conversations with him about the murders?
15      A.  Yes.
16      Q.  And what caused you to have a conversation
17  with him about the murders?  If you could just sit
18  up a little bit.
19      A.  The fact that he wanted to go visit my
20  mother, which was odd, and then something changed
21  about his characteristics, like he wasn't the same
22  person.
23      Q.  Were you concerned about your brother?
24      A.  Yes.
25      Q.  And where did you have a conversation with
```

2908

```
1   him about it?
2       A.  I believe my house.
3       Q.  And was anyone else present?
4       A.  No.
5       Q.  And what did he tell you at that time?
6           MR. SHEEHAN:  Objection for the reasons
7   previously stated, your Honor.
8           THE COURT:  Based on my previous ruling,
9   it is overruled.
10          MR. SHEEHAN:  May I have a continuing
11  objection with respect to this line of questioning?
12          THE COURT:  You may.
13          MR. SHEEHAN:  Thank you, your Honor.
14      Q.  What did your brother tell you?
15      A.  I asked him what was wrong, if he was ever
16  going to tell me what happened, and he basically
17  told me -- he didn't give me a full response, but he
18  just said that he helped tie the people up and rough
19  them up a little bit, but he said when he left those
20  people were still alive.
21      Q.  And did he say who he helped?
22      A.  Not at that moment, no.
23      Q.  At a later time did he do that?
24          MR. SHEEHAN:  Objection to leading.
25          THE COURT:  Sustained.
```

2909

1     Q.   Did he ever tell you who he helped?

2     A.   He said something like he left Dreddy by

3 hisself (sic).

4     Q.   Left him where?

5     A.   In the apartment.

6     Q.   And was anyone else present when he said

7 that?

8     A.   No.

9     Q.   He told that to you?

10     A.   Yes.

11     Q.   Did he say anything about any -- how the

12 acts were performed?

13     A.   Well, I asked him about anything else, like

14 as far as evidence went.  He said that everything

15 that they had or used was disposed of before they

16 came to me.

17     Q.   And what did he say -- what were those

18 things that were disposed of?

19     A.   Bats and gloves and maybe masks.

20     Q.   And that was according to who?

21     A.   My brother.

22     Q.   Did he say how many people were involved?

23          MR. SHEEHAN:  Objection, leading.

24          THE COURT:  Sustained.

25     Q.   Did he say that he was in the apartment

2910

1 alone?

2     A.   No.

3     Q.   Who did he say he was with?

4     A.   He said he was with Dreddy and his brother.

5     Q.   And why were you asking him about this?

6     A.   Because I was wondering why he was so

7 different all of a sudden.  And then, too, it's just

8 my curiosity.

9     Q.   And was this before or after he was

10 arrested?

11     A.   Before.

12     Q.   And did you ever talk to him more about it

13 after he was arrested?

14     A.   Not details about what happened, no.

15     Q.   Now, were you -- by the way, where did you

16 live?  What floor did you live on in your apartment

17 house?

18     A.   I'm sorry?

19     Q.   What floor did you live on?

20     A.   It was considered third floor.

21     Q.   Third floor?

22     A.   Third floor.

23     Q.   And you said that when you came into --

24 going back to August 24th, 2005, the early morning

25 hours, when you went into your living room, what

2911

1 caused you to be awakened?

2     A.   Because I heard loud voices.

3     Q.   And when you took the items, after you got

4 rid of them, were you concerned that you might be

5 associated with those items?

6     A.   No.

7     Q.   Were you worried that your fingerprints

8 might be on the plastic bags if they were ever

9 found?

10     A.   Yes.

11     Q.   Were you worried that they might be on the

12 drill?

13     A.   Yes.

14     Q.   Did you do anything to make sure that you

15 didn't leave fingerprints?

16     A.   Well, I had gloves.

17     Q.   In August you had gloves?

18     A.   Uh-huh (indicating affirmatively).

19     Q.   What kind of gloves?

20     A.   Just regular plastic household gloves.

21     Q.   And where did those come from?

22     A.   They were at my house.

23     Q.   And did you decide to wear those?  Or

24 how --

25     A.   No.  Dreddy told me to use them.

2912

1     Q.   Dreddy told you?

2     A.   Yes.

3     Q.   And did you wear them?

4     A.   Yes.

5     Q.   And what did you do with those gloves?

6     A.   I disposed of them as well.

7     Q.   Where?

8     A.   The same -- in the garbage dump, the same

9 place I put the bags.

10     Q.   When you picked up the defendant's brother

11 at Charles Street, do you recall -- let me see if I

12 can find a photo of it.  Do you recall where you

13 picked him up?

14     A.   There was like an underground parking kind

15 of thing at the building.  So I went underneath the

16 building to pick him up.

17     Q.   And how did you know where to go?

18     A.   Dreddy told me to.

19     Q.   And did you call his brother and tell him

20 you were there?

21     A.   No.

22     Q.   How did he know you were there?

23     A.   He just came out.

24     Q.   Did you have to wait for him?

25     A.   No.

2913

1    Q.   So, when you arrived he came out?
2    A.   Yes.
3    Q.   Do you recall the first time you were
4  questioned by law enforcement?
5    A.   Yes.
6    Q.   Do you remember the date?
7    A.   No.
8    Q.   Do you remember talking to them?
9    A.   Yes.
10   Q.   Did you tell them the truth?
11   A.   No.
12   Q.   Did you tell them that you knew about
13 getting rid of the garbage bags?
14   A.   No.
15   Q.   Did you tell them about getting rid of the
16 drill?
17   A.   No.
18   Q.   Did you tell him about the three people,
19 four people in your apartment?
20   A.   No.
21   Q.   Why didn't you tell them the truth?
22   A.   I was afraid.
23   Q.   Afraid for yourself?
24   A.   Afraid for all of us.
25   Q.   Did you have an attorney at that time?

2914

1    A.   No.
2    Q.   Did you have any agreement with the police?
3    A.   No.
4    Q.   After that did you get an attorney?
5    A.   Yes.
6    Q.   And have you had an attorney since then?
7    A.   Yes.
8    Q.   At some point did you enter into what we've
9  referred to it as a proffer agreement?
10   A.   Yes.
11   Q.   I'm going to show you what's been marked
12 Government Exhibit 268 for identification, ask you
13 if you recognize that agreement.
14   A.   Yes.
15   Q.   Do you recognize the signatures on the last
16 page?
17   A.   Yes.
18   Q.   Do you recognize your signature?
19   A.   Yes.
20   Q.   Is that the agreement you entered into?
21   A.   Yes.
22            MR. MARKLE:  Offer the Government's 268.
23            MR. SHEEHAN:  No objection.
24            THE COURT:  Full exhibit.
25   Q.   Do you have any other agreements with the

2915

1  government?
2    A.   No.
3    Q.   No plea agreement?  Do you have a plea
4  agreement?  Do you know what plea agreement is?
5    A.   No.
6    Q.   Cooperation agreement?
7    A.   The only thing that I know is that that
8  paper states that if I tell the truth and be
9  completely honest that this will not -- I won't be,
10 how do you say it, punished for what I did.
11   Q.   Do you have -- have you been charged in
12 this case?
13   A.   No.
14   Q.   Another photograph I need to show you.  Do
15 you recognize the person depicted in Government's
16 209?
17   A.   No.
18   Q.   Do you know John Taylor?
19   A.   No.
20   Q.   Now, would you say, Ms. Johnson, that you
21 gave all the information the first time you sat down
22 pursuant to that proffer agreement?
23            MR. SHEEHAN:  Objection, form of the
24 question.  Leading.
25            THE COURT:  Sustained.

2916

1    Q.   Did you tell the law enforcement officers
2  after you entered into that proffer agreement
3  everything you testified to here today?
4    A.   No.
5    Q.   And why not?
6    A.   Because I was afraid that, once again, it
7  would hurt us, and my brother mostly.
8    Q.   Has this been an easy or difficult process
9  for you?
10   A.   Difficult.
11   Q.   And what happens if you lie today?
12   A.   I will be charged with the crime that
13 I'm -- that I committed.
14   Q.   And are you aware you could be charged with
15 perjury?
16   A.   Yes.
17   Q.   Making false statements?
18   A.   Yes.
19   Q.   And as of today you've not been charged
20 with any of those crimes, correct?
21   A.   Correct.
22   Q.   Are you willing to lie for the government?
23            MR. SHEEHAN:  Objection, form of the
24 question.
25            THE COURT:  Sustained.

**GA729**

2917

```
1       Q.   Are you lying to hurt the defendant?
2            MR. SHEEHAN:  Objection, form of the
3   question.
4            THE COURT:  Sustained.
5       Q.   Do you have any reason that you want to
6   hurt the defendant?
7       A.   No.
8       Q.   Did your relationship end because he was
9   arrested or because of some other reason?
10      A.   It was because he was arrested.
11      Q.   Are you willing to lie for your brother?
12           MR. SHEEHAN:  Objection, form of the
13  question.
14           THE COURT:  Sustained.
15      Q.   Do you want to hurt your brother,
16  Ms. Johnson?
17      A.   No.
18      Q.   Why are you testifying telling us what you
19  did, your brother did and the defendant did?
20      A.   It's the right thing to do.
21           MR. MARKLE:  I have no further
22  questions.  Thank you.
23           THE COURT:  All right,
24  cross-examination.
25  CROSS-EXAMINATION BY
```

2918

```
1   BY MR. SHEEHAN:
2       Q.   Good morning.
3       A.   Good morning.
4       Q.   My name is Michael Sheehan.  I'm one of the
5   attorneys for Mr. Aquart.  In late -- in 2004 you
6   were kind of a businesswoman, weren't you?
7       A.   Yeah.
8       Q.   And part of your business was selling
9   marijuana, right?
10      A.   Yes.
11      Q.   And you engaged in other illegal activities
12  during that period, did you not?
13      A.   Yes.
14      Q.   Okay.  Including prostitution?
15      A.   Absolutely not, sir.
16      Q.   Okay.  So you never did that?
17      A.   No.
18      Q.   All right.  And you had started in the
19  marijuana business?
20           MR. MARKLE:  Your Honor, I'm going to
21  ask if we could approach.
22           THE COURT:  You may.
23           (Sidebar conference)
24           THE COURT:  What's the good faith basis
25  for saying that?
```

2919

```
1            MR. SHEEHAN:  I had been advised of that
2   by other people, your Honor.
3            MR. MARKLE:  By who, the defendant?  I
4   don't think that's a good faith basis, your Honor,
5   and I think it should be clear to the jury that
6   there is no good faith basis for that.
7            MS. DAYTON:  It doesn't go to
8   credibility either, even if it was true, which it's
9   not.
10           THE COURT:  Your good faith basis is
11  what?
12           MR. SHEEHAN:  I had been advised by
13  other people of that fact.
14           THE COURT:  Other people who were in a
15  position to know that fact?
16           MR. SHEEHAN:  Yes, your Honor.
17           THE COURT:  People with whom you have an
18  attorney-client relationship or -- why won't you
19  tell me who they are?
20           MR. SHEEHAN:  Well, if I were to tell
21  you that it was somebody I had an attorney-client
22  relationship with then I would be divulging
23  attorney-client matters.
24           THE COURT:  My question is, is there
25  someone other than --
```

2920

```
1            MR. SHEEHAN:  No.  I don't know if I
2   said something -- well, let me put it this way.  I
3   had a good faith basis for it.
4            THE COURT:  What is the government
5   proposing?  I think her response fully answers the
6   question, that of shock and horror.
7            MR. MARKLE:  Yes.  To tell the truth, I
8   don't know, but I think my gut reaction is the jury
9   should be instructed that there is no reason for
10  that question, for any implication be drawn from
11  that other than her answer absolutely no.
12           THE COURT:  That then gets back to the
13  credibility of counsel, and you know that I'm not
14  going to do that.
15           MR. MARKLE:  Perhaps your Honor can
16  instruct them that the question, as you've told them
17  before, the question is not evidence and the answer
18  is.
19           MS. DAYTON:  Your Honor, though -- I'm
20  sorry, I know you don't want to hear from two
21  people.
22           MR. SHEEHAN:  I don't think -- we don't
23  want to hear from two people.
24           THE COURT:  You criticized them when
25  they --
```

2921

```
 1            MS. DAYTON:  Your Honor, we're at
 2  sidebar.
 3            MR. SHEEHAN:  We don't want to hear from
 4  two people.
 5            MS. DAYTON:  This is the fifth time 609
 6  has been violated and that is beyond like --
 7            THE COURT:  I'm going to tell them
 8  questions are not evidence.
 9            (Sidebar concluded)
10            THE COURT:  You'll recall, ladies and
11  gentlemen, when I first gave you preliminary
12  instructions I told you what is not evidence and I
13  told you that lawyers' questions are not evidence.
14  I want you to recall that, that only the answer is
15  evidence.  I want you to recall that instruction at
16  this time and disregard questions as not being
17  evidence because they are not evidence.
18            All right, you may proceed.
19     Q.   You had, in November of 2003, a prior
20  conviction for Larceny 6?
21     A.   Yes.
22            THE COURT:  Mr. Sheehan, can you pull
23  the microphone around so you can be heard.  Thank
24  you.
25            If at any time the jury can't hear,
```

2922

```
 1  raise your hand.  Okay?  This is all for you, so if
 2  you are missing it, it's all wasted.
 3     Q.   And that charge was actually conspiracy to
 4  commit Larceny 6?
 5     A.   Yes.
 6     Q.   And you had started -- I believe you
 7  testified that you had at one point been dealing
 8  marijuana with your brother?
 9     A.   Yes.
10     Q.   And how long a period of time did you do
11  that for?
12     A.   Only for a few weeks.  Maybe four.
13     Q.   Now, on March 7, 2007, the police came to
14  you and knocked on your door, did they not?
15     A.   Yes.
16     Q.   And at that time they told you that they
17  wanted to ask you some questions, right?
18     A.   Yes.
19     Q.   Did you know that your brother had been
20  arrested the day before?
21     A.   No.
22     Q.   Okay.  You didn't know anything about the
23  circumstances of your brother's arrest at that time?
24     A.   No.
25     Q.   All right.  And at that first interview,
```

2923

```
 1  those law enforcement people reminded you that it
 2  was a crime to lie to law enforcement officials, did
 3  they not?
 4     A.   Yes.
 5     Q.   And then they asked you questions
 6  immediately.  They started asking you questions
 7  about what you knew about the murders, right?
 8     A.   Yes.
 9     Q.   And your response was that you did not know
10  anything about the murders, correct?
11     A.   Correct.
12     Q.   And they also asked you a specific question
13  at that time, if you knew anything about bloody
14  clothes.  Right?
15     A.   Right.
16     Q.   And you told them that you did not know
17  anything about it, right?
18     A.   Correct.
19     Q.   And they also asked you at that time a
20  specific question, if Mr. Aquart and his brother and
21  your brother had been to your house on the day
22  before the murders.  Do you remember them asking you
23  that question?
24     A.   Possibly.  Yes.
25     Q.   And you told them no, right?
```

2924

```
 1     A.   Right.
 2     Q.   And what you told them was that you had
 3  only become aware of the murders when you saw it in
 4  the paper.
 5     A.   Yes.
 6     Q.   And that you also told them that you knew
 7  the daughter of one of the victims, right?
 8     A.   Yes.
 9     Q.   And was that true, that you knew the
10  daughter of one of the victims?
11     A.   Yes.
12     Q.   Okay.  And at that time you said you did
13  not have a clue as to who committed the murders.
14     A.   Yes.
15     Q.   And this was before you were aware that
16  your brother had been arrested on any kind of
17  criminal charges, right?
18     A.   Yes.
19     Q.   Now, you are aware that your brother was
20  originally arrested in a drug case.
21     A.   Yes.
22     Q.   That had nothing to do with this present
23  case.
24     A.   Yes.
25     Q.   Okay.  And the next time that you actually
```

2925

```
1   gave a statement to law enforcement was on
2   September 18, 2008, right?
3        A.   I believe.
4        Q.   And at that point in time you had a lawyer
5   appointed to represent you.
6        A.   I don't know if it was that soon, but I had
7   a lawyer appointed, yeah.
8        Q.   And that's Attorney Cramer, right?
9        A.   Yes.
10       Q.   And Attorney Cramer was with you at that
11  meeting on September 18, 2008, was he not?
12       A.   Yes.
13       Q.   And what I want to know is, how is it that
14  you had a lawyer with you at that meeting?  Had you
15  gotten that lawyer before then?
16       A.   Well, the first time that the officials
17  picked me up they basically told me that they would
18  be coming to see me again, and from that I figured
19  that I needed one.
20       Q.   And when was the first time that they came
21  and picked you up?
22       A.   I don't remember the date.
23       Q.   How long a period of time was there between
24  that first time when they picked you up and the
25  time -- the first meeting that you had where you had
```

2926

```
1   a lawyer with you when you met with them?
2        A.   I would say maybe a month or so, or maybe a
3   little bit longer.
4        Q.   And I take it they suggested that if you
5   wanted to apply for a lawyer, you could fill out a
6   form with the clerk's office and that a lawyer might
7   be appointed to represent you.
8        A.   I believe that's how it went.
9        Q.   Or did they actually -- had you met with
10  your lawyer before you met with the law enforcement
11  on the day that you gave them an initial statement?
12       A.   I don't remember.
13       Q.   Do you remember if when they first met you
14  they said anything to you about why they wanted to
15  talk to you?
16       A.   At first they didn't, but once we got to
17  the police station they asked me certain questions
18  leading up to certain things that happened.
19       Q.   Okay.  And this was before you had the
20  lawyer, right?
21       A.   Right.
22       Q.   And was -- you know Special Agent Munger
23  sitting here in the first row, do you not?
24       A.   Yes.
25       Q.   Was he there when you got picked up on that
```

2927

```
1   first occasion?
2        A.   I believe so.
3        Q.   And so when you say you got picked up, did
4   they tell you you were under arrest?
5        A.   Yes.
6        Q.   And what did they tell you you were charged
7   with?
8        A.   They didn't tell me what I was charged with
9   until I got to the station.  And it was a warrant
10  for my arrest for violation of probation.
11       Q.   Oh, okay.  And what were you on probation
12  for?
13       A.   The Larceny 6 -- or 3.
14       Q.   Are you sure about that?
15       A.   Yeah.
16       Q.   It was two years later and your
17  recollection -- in fact, that case was disposed of
18  when you just paid a $300 fine?
19       A.   Then it had to be the case before that.  It
20  was the larceny case that I had a warrant for.
21       Q.   All right.  Do you know what that larceny
22  case was about?
23       A.   It was Larceny 3.
24       Q.   And what did you do in that case that
25  caused you to be arrested for the larceny 3?
```

2928

```
1             MR. MARKLE:  Objection, your Honor.
2             THE COURT:  Sustained.
3        Q.   Had you stolen something?
4             MR. MARKLE:  Objection, your Honor.
5             THE COURT:  Sustained.
6             MR. MARKLE:  Your Honor.
7             THE COURT:  You are entitled to inquire
8   about the name of the conviction, the date of the
9   conviction, and that's all.
10            MR. MARKLE:  I would ask that counsel's
11  question and whatever -- I don't know if an answer
12  was even made.  May it be stricken, your Honor?
13            THE COURT:  I have ruled.
14            MR. MARKLE:  Thank you.
15            THE COURT:  We'll have no more
16  exploration.
17            MR. SHEEHAN:  May we approach, your
18  Honor?
19            THE COURT:  Yes.
20            (Sidebar conference)
21            MR. SHEEHAN:  Your Honor, this is
22  totally news to me.  The rap sheet that I was given
23  reflects only the 2003 conviction for Larceny 6.
24            MS. DAYTON:  She was a juvenile.
25            MR. SHEEHAN:  As far as her being
```

**GA732**

2929

```
1   brought in and questioned at an earlier date, I have
2   no records that reflect anything about that.  I
3   don't know the circumstances of that at all.  That's
4   what is all coming out at this moment and that's why
5   I --
6           THE COURT:  That does not entitle you to
7   explore what the offense was about.
8           MR. MARKLE:  Even if you had all that
9   you can't ask what you are asking and you know that.
10          MR. SHEEHAN:  I can ask about specific
11  acts that reflect on honesty, and specifically in
12  terms of honesty, that encompasses larceny.
13          THE COURT:  Okay.  You have established
14  by her testimony that she was convicted of
15  larceny 3, that is what you get to do.  Whether or
16  not she stole Doritos or whether she stole credit
17  cards doesn't increase or decrease her veracity.
18          MR. SHEEHAN:  I didn't even know about
19  the Larceny 3.
20          MS. DAYTON:  She was a juvenile.
21          MR. MARKLE:  She was a juvenile or YO,
22  that's why you don't know.
23          MR. SHEEHAN:  I'm hearing it today.
24          THE COURT:  Fine.
25          (Sidebar concluded)
```

2930

```
1       Q.  So let me -- the police came to you at some
2   point and they told you they had a warrant for your
3   arrest on that larceny 3 charge, right?
4       A.  Once I got downtown, yes.
5       Q.  Okay.  Did you ever go to court on that
6   larceny 3 charge?
7       A.  Yes.
8       Q.  Afterwards?
9       A.  Yes.
10      Q.  And what happened to that case?
11      A.  Well, I had a restitution that I had to pay
12  and I paid it.
13      Q.  All right.
14      A.  And it was done.
15      Q.  Okay.  So they told you that they had a
16  warrant for you on that case.  And what else did
17  they ask you about at that time?
18      A.  They asked me about did I know certain
19  people.  They asked me if I seen anybody's clothes.
20  They asked me if I handled any bloody clothes, stuff
21  like that.
22      Q.  And this is before you had the lawyer,
23  right?
24      A.  Right.
25      Q.  And did you answer those questions?
```

2931

```
1       A.  No.
2       Q.  And then you've got an -- at some point in
3   time between that date and the following date when
4   you went to meet with them you had a lawyer
5   appointed for you, right?
6       A.  Right.
7       Q.  And that's the date that you execute -- you
8   signed that proffer agreement, right?
9       A.  Right.
10      Q.  And --
11          MR. SHEEHAN:  Thank you.  Thank you all.
12  Thank you, your Honor.
13      Q.  This proffer agreement is Exhibit 268, is
14  it not?  Do you see the number down at the bottom
15  there?
16      A.  Yes.
17      Q.  That's Government's Exhibit 268.  And in
18  paragraph one of that -- and I apologize for the
19  blinking light -- they say the meeting has been
20  arranged for the purpose of discussing evidence of
21  criminal wrongdoing about which, in this case, you,
22  she, is aware.  Right?
23      A.  Right.
24      Q.  And you understood that was the purpose for
25  meeting with them, right?
```

2932

```
1       A.  Yes.
2       Q.  And at that time the other purpose was that
3   the government was going to consider the evidence
4   discussed at the meeting to assess your potential
5   ability to cooperate with the government.  Correct?
6       A.  Correct.
7       Q.  And then they go on to say that everything
8   you say must be truthful and accurate to the best of
9   your ability to recall, right?
10      A.  Right.
11      Q.  And then they said, the bottom of paragraph
12  8 there, among other things, if the government
13  determines that Johnson, that's you, has
14  intentionally provided false, misleading and
15  inaccurate statements or information at this
16  meeting, then this agreement will become null and
17  void.  Right?
18      A.  Right.
19      Q.  And you know what null and void means,
20  don't you?
21      A.  Yes.
22      Q.  What do you understand that to mean?
23      A.  That it's not an agreement, it won't be an
24  agreement.
25      Q.  And if it's not an agreement what happens
```

2933

1   to what you've said to them?  What can they do with
2   that?
3       A.   Basically use it against me.
4       Q.   Okay.
5            And let me ask you about paragraph 2.  That
6   agreement says that any statements made by you at
7   this meeting will not be offered against you in the
8   Government's direct case in any federal criminal
9   case brought against you in this district unless you
10  breach this agreement as provided in paragraph 8
11  below.  What do you understand that to mean?
12      A.   That anything I say at that meeting will
13  not be offered against me unless I didn't agree or
14  do what the contract says.
15      Q.   And what about the part where it says "in
16  any federal criminal case brought against you in
17  this district"?  Were you charged in any federal
18  criminal case?
19      A.   No.
20      Q.   Ever?
21      A.   No.
22      Q.   Not to this day?
23      A.   No.
24      Q.   But after you signed this agreement you
25  lied to them.

2934

1       A.   Yes.
2       Q.   Now, this agreement was dated September 18,
3   2008, right?
4       A.   Yes.
5       Q.   And by this date you were aware that your
6   brother had also been charged with the Charles
7   Street murders, right?
8       A.   I wasn't aware that he was charged, but I
9   was aware that that was the reason why he was in
10  jail.
11      Q.   For the murders, right?
12      A.   Right.
13      Q.   And he had been charged as of September --
14  I'm sorry June 28, 2007.
15      A.   Oh, okay.  Yeah.
16      Q.   All right.  So he was facing charges
17  related to those murders.
18      A.   Yes.
19      Q.   And you were aware of that when the police
20  brought you in.
21      A.   Yes.
22      Q.   Right?
23      A.   Yes.
24      Q.   But on -- is it fair to say that the reason
25  why you went -- the police came to you first?

2935

1       A.   Right.
2       Q.   Right?
3       A.   Right.
4       Q.   And your brother had been charged for
5   almost -- well, actually more than a year at this
6   time, right?
7       A.   Yes.
8       Q.   And you were aware that at that time your
9   brother was facing potentially the death penalty.
10      A.   Potentially, yes.
11      Q.   Now, before this second meeting, and I say
12  second, this is the first time you met with your
13  lawyer, but you had had the one other meeting
14  with -- well, actually it sounds like you had two
15  other meetings with law enforcement, right?
16      A.   I don't remember how many meetings there
17  were.
18      Q.   First time they came to you was the day
19  after your brother was arrested.
20      A.   Yes.
21      Q.   Then they picked you up on the violation of
22  the probation.
23      A.   No.  They picked me up on violation of
24  probation the first time.
25      Q.   Oh.  Back when you told them -- that was

2936

1   before you've got a lawyer, though, right?
2       A.   Yeah.
3       Q.   And then how about -- I guess I don't quite
4   understand.  I thought you were telling us that you
5   got the lawyer about a month -- you applied for a
6   lawyer about a month before you met with them on the
7   second occasion.
8       A.   No.  I got -- the night they picked me up
9   to question me about the murder or anything that I
10  knew was the night that they told me that I had a
11  warrant.
12      Q.   Okay.  And was that the March 7, 2007,
13  meeting?
14      A.   I don't remember dates, but it was the
15  first time I had ever seen any agents or detectives
16  or anything.
17      Q.   And in that meeting where you had been
18  picked up on the probation violation, did you answer
19  any of their questions?
20      A.   No.
21      Q.   Okay.  So there was a first meeting where
22  you answered questions and told them lies, right?
23      A.   Right.
24      Q.   Then there was a second meeting where they
25  picked you up and they asked you questions, but you

2937

```
1    didn't tell them anything.
2        A.   No.
3        Q.   No?
4        A.   The first meeting was the warrant.  The
5    first meeting was also the time where they asked me
6    questions where I didn't -- I wasn't honest with
7    them and I told them I didn't know anything about
8    the murders or anything else.
9        Q.   Okay.  And then the next time you are
10   seeing them is September 18, 2008, right?
11       A.   Okay.  I don't remember dates again, but...
12       Q.   But at some point in time in that 15 months
13   you got a lawyer.
14       A.   Yes.
15       Q.   How is it that you came about to get a
16   lawyer?  That's what I'm just trying to understand.
17       A.   I don't remember exactly how it came about,
18   but I knew that I had to get one and that basically
19   it would help me.
20       Q.   Who told you that you had to get one?
21       A.   I don't remember whether it was my
22   brother's lawyer or the prosecutors.  I don't
23   remember exactly how that came about.
24       Q.   Okay.  Now, before you had this meeting
25   with your lawyer and law enforcement, you had been
```

2938

```
1    visiting your brother in prison, had you not?
2        A.   Yes.
3        Q.   You weren't initially on his visiting list.
4        A.   No.
5        Q.   But you were able to -- you worked out a
6    plan as to how to see him in prison anyway, right?
7        A.   Yeah.
8        Q.   Okay.  Because you were already on the
9    visiting list for somebody else Brian Duvo (ph)?
10       A.   Yes, yes.
11       Q.   And as a result you could talk to either
12   Brian or to Efrain at that time?
13       A.   Yes.
14       Q.   Then later you got put on your brother's
15   list, right?
16       A.   Right.
17       Q.   And you were talking to him on the phone,
18   were you not?
19       A.   Yeah.
20       Q.   And you were sending him some written
21   messages.
22       A.   Yes.
23       Q.   Right?  And one of the things that your
24   brother had told you is that he had been told that
25   there was DNA evidence against him.
```

2939

```
1        A.   Yes.
2        Q.   And he also told you that he had given
3    statements to the police about the murders.
4        A.   I don't know about this time yet.  I don't
5    know if he told me that around the beginning of our
6    visits, no.  I don't remember that.
7        Q.   You don't remember whether or not your
8    brother had told you by March -- I'm sorry, by
9    September of 2008 that he had given statements to
10   the police about the murders?
11       A.   No, I don't remember.
12       Q.   In any case, your brother had told you, did
13   he not, that the feds were going to want to talk to
14   you?
15       A.   I'm sorry, repeat the question.
16       Q.   Your brother had told you, had he not, that
17   the federal law enforcement people were probably
18   going to want to talk to you?
19       A.   Well, they had already spoken to me before
20   I even knew that my brother was in jail.  Well, not
21   before I knew, but I found out my brother was in
22   jail the same day that they picked me up.
23       Q.   So did your brother confirm that with you?
24       A.   No.
25       Q.   Had you ever talked to your brother before
```

2940

```
1    September 28th about the fact that the feds had been
2    out to see you already?
3        A.   I don't remember.
4        Q.   In that interview, one of the questions
5    that they asked you was whether Azibo had been
6    giving any drugs to Efrain, right?
7        A.   Right.
8        Q.   And you said only marijuana for Efrain's
9    personal use.
10       A.   Right.
11       Q.   Is that a story that you had rehearsed with
12   your brother?
13       A.   No, I knew it to be true.
14       Q.   In other words, what you were saying to the
15   feds at that time was that the only drugs that Azibo
16   had ever given to Efrain had been marijuana, right?
17       A.   Right.
18       Q.   And you knew that to be true?
19       A.   Right.
20       Q.   In that interview you actually admitted
21   that you, yourself, had committed various crimes,
22   had you not?
23       A.   Yeah.
24       Q.   For example, you admitted being a marijuana
25   dealer.
```

2941

```
1      A.   Yes.
2      Q.   For a considerable period of time, right?
3      A.   Yes, yes.
4      Q.   You admitted that you were selling one to
5   two pounds of marijuana a week.
6      A.   Possibly, yes.
7      Q.   And you had admitted helping in narcotic
8   sales at Charles Street, right?
9      A.   Marijuana sales, yes.
10     Q.   And were you asked any questions at that
11  time about Claude Lee?
12     A.   Yes.
13     Q.   And did you admit being involved in drug
14  activity with him?
15     A.   Yes.
16     Q.   Now, he had recently been arrested, had he
17  not?
18     A.   Yes.
19     Q.   And that was somebody that you had
20  travelled to Houston with.
21     A.   Yes.
22     Q.   Right?
23     A.   Yes.
24     Q.   And did you cooperate against Mr. Lee?
25     A.   No.
```

2942

```
1      Q.   As far as admitting these various crimes
2   that you had -- were you involved in marijuana with
3   Mr. Lee as well?
4      A.   Yes.
5      Q.   Okay.  And you admitted that to the
6   government, right?
7      A.   Yes.
8      Q.   And all of these admissions that you made
9   to the government were after you had this particular
10  proffer agreement, right?
11     A.   Right.
12     Q.   And you believed that with this agreement
13  they weren't going to prosecute you for those crimes
14  that you had admitted committing, right?
15     A.   Right.
16     Q.   Six days later they called you back for
17  another interview, right?
18     A.   Okay.
19     Q.   And at that point in time you had already
20  told Efrain that he should do whatever he needed to
21  do and that you had his back.
22     A.   Yes.
23     Q.   And by having his back, when you said that
24  to your brother, what you meant was that you were
25  going to protect him as best you could, correct?
```

2943

```
1      A.   No.
2      Q.   What does it mean when you have somebody's
3   back?  What does it mean to you when you say that
4   you've got somebody's back?
5      A.   When I told him that I meant that whatever
6   he needed to do to save his life and to free him of
7   this, then he should.  If it meant he wanted to
8   tell, then he should tell, and that I would do the
9   same because it's what was right.
10     Q.   In other words, you were going to help him,
11  right?
12     A.   Not help him.  Not help him.
13     Q.   Well, what you had told him was "I got your
14  back," right?
15     A.   Right.
16     Q.   Now, on that -- then -- so that was your
17  third interview on September 24th.  And then you
18  came back on October 14, 2007, for another
19  interview, right?
20     A.   Right.
21     Q.   And in that interview they asked you about
22  a power drill and you said you have no idea about a
23  power drill, right?
24     A.   Right.
25     Q.   You said I never saw it, I never saw a
```

2944

```
1   power drill, right?  You told them that?
2      A.   Possibly.
3      Q.   You told them I didn't put it in the bags,
4   I don't know anything about that, right?
5      A.   Possibly.
6      Q.   And at that meeting you added in a new
7   detail about Azikiwe going to Philadelphia with you
8   and Efrain.
9      A.   No, his brother went to Philadelphia with
10  me and my brother.
11     Q.   That's Azikiwe, right?  I'm sorry?
12     A.   Yeah, yeah.  I'm sorry.
13     Q.   Fair enough.  Let me rephrase that.  You
14  knew him as Ozzie?
15     A.   Right.
16     Q.   At the October 14th interview you added in
17  that new detail about Ozzie going to Philadelphia
18  with you and Efrain.
19     A.   Right.
20     Q.   You hadn't told them previously about Ozzie
21  going with you, had you?
22     A.   I guess not.
23     Q.   And then in that meeting they confronted
24  you, did they not?
25     A.   About?
```

2945

1    Q.   They said that we don't think that you are
2    telling us the truth.
3    A.   Yeah.
4    Q.   Now, you understood that at that point that
5    if the law enforcement people didn't believe you,
6    you were in big trouble.
7    A.   Yeah.
8    Q.   And they were telling you they didn't
9    believe you, right?
10   A.   Yes.
11   Q.   And then you started crying?
12   A.   Uh-huh (indicating affirmatively).
13   Q.   And you understood, however, that if they
14   didn't believe you, your proffer was gone, right?
15   A.   Right.
16   Q.   You could be prosecuted, right?
17   A.   Right.
18   Q.   And so you told them some more stuff about
19   your brother, didn't you?
20   A.   Possibly.
21   Q.   Well, you now told them that your brother
22   had admitted tying up people.
23   A.   Yes.
24   Q.   You hadn't told them that before, had you?
25   A.   No.

2946

1    Q.   Is telling them that what you mean by I've
2    got your back?
3    A.   I'm sorry?
4    Q.   Well, you now said that your brother had
5    admitted tying people up, right?
6    A.   Right.
7    Q.   Because you were being threatened, right?
8    A.   Not because I was being threatened.
9    Q.   You were being threatened, were you not?
10   A.   I don't think it was a threat.  It was just
11   more so like they were telling me what was right and
12   what I had to do.
13   Q.   And you understood that if you didn't do
14   what they said, you were in big trouble.
15   A.   I understood that if I didn't do what was
16   right then I would be in trouble.
17   Q.   And at that point in time after you told
18   them that additional detail about your brother, they
19   didn't rip up the proffer agreement, did they?
20   A.   No.
21   Q.   Then on October 22nd they called you back
22   for a fifth interview, did they not?
23   A.   Yeah.
24   Q.   Any idea why they called you back so soon
25   after the prior meeting?

2947

1    A.   No.
2    Q.   Was there anything that you needed to
3    practice at these meetings?
4    A.   No.  More so it was time.
5    Q.   And now at this meeting you added in the
6    story about the power drill, right?
7    A.   Right.
8    Q.   You'd been previously questioned about it
9    and you said you had no knowledge, right?
10   A.   Right.
11   Q.   But now you remembered taking it out of
12   your apartment to the dumpster.
13   A.   Right.
14   Q.   And you not only remembered it, you knew
15   the color of it, right?
16   A.   Right.
17   Q.   And then you added in a new story, did you
18   not, about remembering a phone call that you say
19   Azibo had?
20   A.   Possibly, but I remember the phone call.
21   Q.   You hadn't told them anything about this
22   phone call before, had you?
23   A.   Possibly not.
24   Q.   And you now told them that you remembered
25   this phone call where Azibo was saying something

2948

1    about my brother is in the building.
2    A.   Yes.
3    Q.   Cops are everywhere, right?
4    A.   I don't remember that.
5    Q.   We need to get him out of that.  You don't
6    remember telling them that?
7    A.   I remember him telling me to go pick him
8    up.
9    Q.   Okay.  So that's a conversation you
10   remember between him and you.
11   A.   Him telling me to go pick him up, yes.
12   Q.   Do you remember telling the police, the law
13   enforcement people, that there was a phone
14   conversation where Azibo was saying, "My brother is
15   in the building, the cops are everywhere, we need to
16   get him out"?
17   A.   Possibly.
18   Q.   That's a dramatic detail, isn't it?
19   A.   All of them are.
20   Q.   All of them are?
21   A.   All of them are.
22   Q.   It is something that you hadn't mentioned
23   previously, right?
24   A.   Right.
25   Q.   And now we're three years, more than three

2949

```
1    years after the murders, right?
2        A.   Okay.
3        Q.   I don't know if you were asked this
4    question, but you previously told law enforcement
5    that Azibo stayed at your house 'til about noon that
6    day.
7        A.   A little before maybe.  But yeah.
8        Q.   Is that your recollection now?
9        A.   Yes.
10       Q.   And you said something about the fourth
11   guy, that it sounded like he was from New Haven or
12   New York.
13       A.   That was something that I asked my brother,
14   but I thought I heard when I woke up that night
15   another voice in my house.  So, I was assuming that
16   there was another person.  But I asked my brother
17   later on was there another person.
18       Q.   So you were talking to your brother about
19   what his recollection was, right?
20       A.   Not really, just more so the unanswered
21   question that I had.  I asked him.
22       Q.   And then more recently in January 20th of
23   2010, that would be your -- about your sixth
24   interview.
25       A.   Okay.
```

2950

```
1        Q.   You had another meeting with the law
2    enforcement, right?
3        A.   Okay.
4        Q.   Is that another practice session for you?
5        A.   I wouldn't call it a practice session.
6        Q.   And now four and a half years later you now
7    recall seeing Azibo arrive outside your apartment.
8        A.   Right.
9        Q.   In his red Cadillac, right?
10       A.   Right.
11       Q.   Whereas previously you'd said nothing about
12   that.
13       A.   I mean, everything was coming to me not all
14   at once.  But I couldn't remember everything all at
15   first.
16       Q.   And we're now four and a half years later
17   and these things, you say, they're now coming to
18   you, right?
19       A.   They're not now coming to me, they're
20   slowly piecing themselves together.
21       Q.   And on that date you told the agents that
22   Efrain had told you that he had previously gotten
23   crack from Azibo.
24       A.   Yes.
25       Q.   But the first time you told them that
```

2951

```
1    Efrain only got marijuana, right?
2        A.   Right.
3        Q.   As far as now telling them about crack, did
4    you still feel like you had Efrain's back?
5        A.   No, it was just another one of the things
6    that just popped into my mind.  I just knew what
7    happened because it just came up.
8        Q.   And then another thing that popped into
9    your mind was Efrain telling you that he had to
10   handle something with Azibo, right?
11       A.   Right.
12       Q.   That's a brand new story that just popped
13   into your mind at that time, isn't it?
14       A.   At what time?
15       Q.   At that interview on January 20, 2010.
16       A.   I don't remember he said he had to handle
17   something with Azibo.  I remember him saying he had
18   to handle something, though.
19       Q.   And then you added in you remembered -- or
20   it popped into your mind a new detail about a trip
21   to Norwalk, right?
22       A.   Yeah.
23       Q.   And we're now almost five years later when
24   these details keep popping into your mind, right?
25       A.   This particular thing didn't pop.  They
```

2952

```
1    asked me had I ever -- like, where did I go with
2    him, like where we ever been together.
3        Q.   And let me ask you this:  Before today, had
4    you told anybody the new story, the story about
5    picking up Azikiwe at Charles Street?
6        A.   I told them.
7        Q.   When did you tell them?
8        A.   I don't remember.
9        Q.   It was after January of 2010, wasn't it?
10       A.   Again, the date, I don't remember, but I
11   told them.
12       Q.   You didn't tell them about it on January --
13   in January of 2010, did you?
14       A.   I don't remember.
15       Q.   Would looking at a report refresh your
16   recollection about that?
17       A.   No.
18       Q.   Okay.  You didn't tell them about it on
19   September 18, 2008, did you?
20       A.   I don't remember.
21       Q.   Would looking at a report refresh your
22   recollection?
23       A.   No.
24       Q.   Okay.  And you didn't tell them about it on
25   September 24, 2008, did you?
```

2953

1    A.    Again, I don't know how long ago I told
2  them I had to pick him up.
3    Q.    And I take it looking at a report wouldn't
4  refresh your recollection about that, would it?
5    A.    No, no.
6    Q.    And on October 14, 2008, you don't recall
7  whether you told them that or not.
8    A.    I don't recall.
9    Q.    And looking at a report wouldn't refresh
10 your recollection about that, would it?
11   A.    No, sir.
12   Q.    And on October 22, 2008, again, you don't
13 know if you told them about that new detail.
14   A.    I don't remember when I told them.
15   Q.    How long ago was it when you told them?
16   A.    I don't know.
17   Q.    Days?
18   A.    I'm sure not days, but I don't remember
19 exactly when.  It's been a long time.
20   Q.    When was the last time you met with law
21 enforcement?
22   A.    Last week, Friday.
23   Q.    Okay.  And did you tell it to them at that
24 time?
25   A.    No.  They had already known.

2954

1    Q.    All right.  And when was the time before
2  that that you met with them?
3    A.    Oh, God.  I don't remember.  It's been so
4  long and so many times, I don't remember dates.  I
5  don't remember how often.  I don't remember how far
6  apart.  I don't remember.
7    Q.    Isn't it a fact that prior to December 13,
8  2010, in fact prior to December 16, 2010, you had
9  never told them about this new detail?
10   A.    I don't remember.
11   Q.    Indeed, prior to January 27, 2011, you
12 hadn't told them about this new detail.
13   A.    I don't remember exactly when I told them.
14   Q.    When you told them about it, what did they
15 say to you?
16        MR. MARKLE:  Objection, your Honor, it's
17 hearsay.
18        MR. SHEEHAN:  I'm not asking it for the
19 truth of the matter, your Honor.
20        MR. MARKLE:  It's irrelevant.
21        MR. SHEEHAN:  It's not irrelevant, your
22 Honor.
23        THE COURT:  The question is:  "Before
24 January 27, 2011, you hadn't told them about this
25 new detail."  "I don't remember exactly when I told

2955

1  them."  "When you told them it, what did they say to
2  you?"  That is either hearsay -- of what relevance
3  is it?
4        MR. SHEEHAN:  It goes to her state of
5  mind and it also goes to trying to place the period
6  of time when she made this statement.
7        THE COURT:  I think there is another way
8  to achieve those goals.  Rephrase your question,
9  please.
10   Q.    Do you recall any conversations with them
11 when you first told them about this detail?
12   A.    No, I don't recall.
13   Q.    Did they say to you, for example, hey, you
14 never told us that before?
15   A.    I don't remember that.
16   Q.    Did they ask you how was it that you
17 happened to remember this fact?
18   A.    No, not that I can remember.
19   Q.    Did they ask you why was it that you never
20 told us about this previously?
21   A.    I don't know.
22   Q.    You don't recall?
23   A.    I don't recall.  I don't think so.  I don't
24 know.
25   Q.    Let me ask you this:  According to your

2956

1  testimony you knew about the murders, right?
2    A.    I found out about the murders, yes.
3    Q.    On the television?
4    A.    Right.
5    Q.    At Tasha's house?
6    A.    Right.
7    Q.    And then you came back -- what you've
8  testified to is then you came back to your house,
9  right?
10   A.    Right.
11   Q.    And at that point in time you knew that the
12 murders had taken place at Charles Street.
13   A.    Yes.
14   Q.    And you were then directed to go back to
15 that very same spot, right?
16   A.    Right.
17   Q.    And, in fact, to pick up Ozzie, right?
18   A.    Not that day.
19   Q.    Oh, not the day of the murders?
20   A.    No.
21   Q.    So, what you are saying then is that
22 conversation took place at another time?  I mean,
23 that trip to pick up Ozzie took place at another
24 time?
25   A.    It wasn't far after the murders, but it

**GA739**

2957

```
1    wasn't that very day.  It was either the next day or
2    maybe later on.  It wasn't that same day.
3        Q.   Didn't you just tell us that it was that
4    day?
5        A.   The conversation that he had over the phone
6    about a cell phone or "why you calling me from this
7    phone" was that day, but the next day it wasn't --
8    there was no way I could have gone to that place
9    that day.
10       Q.   So, is it your recollection that you did
11   not testify in response to the prosecutor's question
12   that it was that day that you went back?
13       A.   He didn't ask me if it was that day that I
14   went to pick up Ozzie from the building.  He asked
15   me if I remember going and picking him up and where
16   I picked him up from.
17       Q.   In any case, you haven't been prosecuted,
18   have you?
19       A.   No.
20       Q.   You've covered your own back, haven't you?
21       A.   I wouldn't say covered my own back.
22       Q.   Committed a lot of crimes, right?
23       A.   Right.
24       Q.   No prosecution, right?
25       A.   Right.
```

2958

```
1        Q.   Crimes you've testified to today, right?
2        A.   Right.
3        Q.   Other crimes with other people.
4            MR. MARKLE:  It's been asked and
5    answered, your Honor.
6            THE COURT:  Overruled.  It's
7    cross-examination.
8        A.   Right.
9            MR. SHEEHAN:  Thank you.
10           THE COURT:  All right, redirect.
11           MR. MARKLE:  Thank you, your Honor.
12   REDIRECT EXAMINATION
13   BY MR. MARKLE:
14       Q.   Ms. Johnson, do you think you should have
15   been charged with a crime?
16       A.   No, sir.
17       Q.   Do you think you got away with a crime?
18       A.   No.
19       Q.   Why did you get rid of the clothes?
20       A.   Because he told me to.
21       Q.   Why did you get rid of the drill?
22       A.   Because he told me to.
23       Q.   Why didn't you tell us about that earlier?
24       A.   Because you just don't tell from where I'm
25   from.
```

2959

```
1        Q.   Who told you to keep your mouth shut when
2    you told your friend about what happened?
3        A.   Dreddy.
4        Q.   Who told you to rip up the letter you got
5    from him so no one could see it?
6        A.   Dreddy.
7        Q.   What did you take that to mean, rip up the
8    letter, why?
9        A.   I took it to mean that he didn't want
10   anybody to know that we were corresponding.
11       Q.   You spoke to law enforcement on one, two,
12   three, four, five, six, seven -- eight times?
13       A.   Possibly.
14       Q.   Maybe more?
15       A.   Maybe more.
16       Q.   Did you ever give a written statement?
17       A.   No.  No, sir.
18       Q.   Did you ever see the reports of the
19   interviews that were done for you?
20       A.   No, sir.
21       Q.   Did you ever have a chance to edit them?
22       A.   No, sir.
23       Q.   Change them, correct them?
24       A.   No, sir.
25       Q.   Approve of them?
```

2960

```
1        A.   No.
2        Q.   Say they're absolutely complete and
3    correct?
4        A.   No.
5        Q.   Did you ever see them?
6        A.   No.
7        Q.   Do you know what happened to the drill
8    because law enforcement told you what happened to
9    it?
10       A.   No.
11       Q.   Do you know what happened to the clothes
12   because law enforcement told you?
13       A.   No.
14           MR. SHEEHAN:  Objection.  Outside the
15   scope of the cross.
16           MR. MARKLE:  Your Honor, there were
17   questions -- I'm sorry.
18           THE COURT:  Overruled.  The subject
19   matter of what happened to -- when she told law
20   enforcement what was the subject of cross.
21       Q.   Were you told what to say by anyone?
22       A.   No.
23       Q.   Were you rehearsed as to what to say?
24       A.   No.
25       Q.   Did you need prep sessions to know what
```

**GA740**

2961

```
1   happened?
2       A.   No.
3            MR. SHEEHAN:  Objection, leading.
4            THE COURT:  Sustained.
5       Q.   Did you engage in any prep sessions?
6       A.   No.
7       Q.   When you met with law enforcement, who gave
8   the information, you or them?
9            MR. SHEEHAN:  Objection, leading.
10           THE COURT:  Overruled.
11      A.   I did.
12      Q.   Is your testimony today here aimed at
13  helping your brother?
14      A.   No, sir.
15      Q.   Are you telling what your brother told you?
16      A.   Whatever he told me, yes, I told.
17      Q.   When you said you had his back, what did
18  you mean?
19      A.   That I wanted him to do what was right and
20  that I would be behind him 100 percent.
21      Q.   And what was right?  What did you mean by
22  that?
23      A.   What was right was to tell the truth.
24      Q.   Are you doing this because your Larceny 3rd
25  case was disposed of in state court some years ago?
```

2962

```
1       A.   No, sir.
2       Q.   Are you doing this because your Larceny 6
3   case you only paid a $300 fine?
4       A.   No, sir.
5       Q.   Was that part of the deal about testifying?
6       A.   No.
7       Q.   Was there any secret deal about testifying?
8       A.   No.
9       Q.   Is the whole deal in the proffer agreement?
10      A.   Yes.
11      Q.   Is there any backroom hidden agreement?
12      A.   No.
13      Q.   When your brother told you about the DNA,
14  was he worried about it?
15           MR. SHEEHAN:  Objection.
16           THE COURT:  Sustained.
17      Q.   Do you remember your brother telling you
18  about the DNA?
19      A.   I remember there being hearsay about it,
20  but I asked him about it.
21      Q.   You asked him about it?
22      A.   Right.
23      Q.   And did he voice concern about it?
24           MR. SHEEHAN:  Objection.
25           THE COURT:  I'm going to sustain the
```

2963

```
1   objection.  You may rephrase.
2       Q.   Did you rehearse any of this testimony or
3   any of the information you provided with your
4   brother?
5            MR. SHEEHAN:  Objection.  Asked and
6   answered.
7            THE COURT:  Sustained.
8            I'm sorry, wait a minute.  With your
9   brother.  Overruled.
10           MR. MARKLE:  Thank you, your Honor.
11           THE COURT:  Ask your question again.
12      Q.   Did you rehearse any of the testimony you
13  gave or any of the statements you gave to law
14  enforcement with your brother?
15      A.   No.
16      Q.   Did you prepare with your brother for what
17  to say?
18      A.   No.
19      Q.   When you asked your brother about a fourth
20  person, did he say there was a fourth person?
21           MR. SHEEHAN:  Objection.  Outside the
22  scope of the cross.
23           THE COURT:  May I see you at sidebar.
24           (Sidebar conference)
25           THE COURT:  My notes are not always
```

2964

```
1   complete because I'm just putting down notations of
2   subjects.  It's not clear from my notes that she in
3   cross-examination was asked about --
4            MR. MARKLE:  I thought right at the end,
5   your Honor, about North Carolina.
6            MS. DAYTON:  New Haven or New York.
7            MR. MARKLE:  In New Haven or having a
8   New York voice or being from New York.
9            MR. SHEEHAN:  I didn't ask anything
10  about what her brother said about the fourth person.
11           THE COURT:  You asked on direct about
12  the voice and it was a deeper voice.
13           MR. MARKLE:  Right.  And then
14  Mr. Sheehan asked about whether the person, whether
15  she said the person was from New Haven or New York.
16           MR. SHEEHAN:  I did, your Honor, which
17  is what she said to the agents.  I didn't ask
18  anything about what her brother said to her about
19  the fourth person.
20           MR. MARKLE:  She said that came from my
21  brother.
22           MR. SHEEHAN:  I didn't ask her anything
23  about that, your Honor.  I asked her what she said
24  to the agents.  As far as what my question elicited,
25  I didn't ask that question.
```

2965

```
1              THE COURT:  I can go back and look at
2   transcript and we can go to lunch.  Okay.
3              (Sidebar concluded)
4              THE COURT:  We're going to take lunch,
5   ladies and gentlemen, for a half an hour.
6              (Jury exited the courtroom.)
7              THE COURT:  All right, Ms. Johnson,
8   we'll be back in a half an hour.  Again, please
9   don't discuss your testimony.
10             (Recess)
11             THE COURT:  All right, please bring in
12  the witness and the jury.  I have reviewed the
13  transcript of the cross-examination and I'm going to
14  overrule the objection.
15             (Jury entered the courtroom.)
16             THE COURT:  Please be seated, ladies and
17  gentlemen.  I thought we had everyone collected.
18  Sorry.
19             MR. SHEEHAN:  Just need the witness,
20  your Honor.
21             MR. MARKLE:  She's in the ladies room.
22             MR. SHEEHAN:  I didn't hear that.  I'm
23  sorry.
24             THE COURT:  Have you been watching the
25  stage come down at the end of the Green?
```

2966

```
1              JUROR:  A lot of memories go with it.
2              THE COURT:  Thirty-five years of them.
3   Or 34.
4              All right, Ms. Johnson, if you'll resume
5   the stand, please.  Let me remind you where you
6   were.  The question was asked, "Did you prepare with
7   your brother for what to say?"
8              Answer:  "No."
9              Question:  "When you asked your brother
10  about a fourth person, did he say there was a fourth
11  person?"
12     A.   Yes.
13             THE COURT:  You may proceed.
14             MR. MARKLE:  Thank you, your Honor.
15     Q.   Ms. Johnson, on the day that the defendant
16  asked you to pick up his brother at Charles
17  Street --
18     A.   Yes.
19     Q.   -- did the defendant have a car at that
20  time?
21     A.   Yes.
22     Q.   Did the defendant drive his car there?
23     A.   I don't know.
24     Q.   Did he go with you?
25     A.   Yes.
```

2967

```
1    Q.   When you picked up his brother, did the
2   defendant --
3      A.   No, no.  I'm sorry.
4      Q.   He's been there with you before, to Charles
5   Street.
6      A.   No.
7      Q.   Oh, no?  Okay.  So -- let me just ask you:
8   The day you picked up his brother after the murders
9   from Charles Street --
10     A.   Right.
11     Q.   -- who did you go with?
12     A.   I think I went by myself.
13     Q.   And the defendant had a car at that time,
14  correct?
15     A.   Yes.
16     Q.   But he did not go pick up his brother, to
17  your knowledge, correct?
18     A.   No, he didn't go.
19     Q.   And you were asked about talking to your
20  brother.  Has your brother ever written you any
21  letters that he said you should tear up or get rid
22  of after you read them?
23     A.   No.
24             MR. SHEEHAN:  Objection.  Outside the
25  scope of the cross.
```

2968

```
1              THE COURT:  Overruled.
2      Q.   Did your brother ever tell you to keep your
3   mouth shut?
4      A.   No.
5      Q.   And how do you know, Ms. Johnson, what
6   happened inside the victims' apartment on August 24,
7   2005?
8      A.   Other than my brother telling me that he
9   helped rough the people up a little bit and what I
10  saw on the news.
11     Q.   And how do you know how the people were
12  killed?
13             MR. SHEEHAN:  Objection.  Form of the
14  question.
15             THE COURT:  Sustained.
16     Q.   Do you know how -- were you told how the
17  people were killed?
18     A.   By the news.
19     Q.   Were you ever told by your brother what
20  kind of weapons were used?
21             MR. SHEEHAN:  Objection, leading.
22             THE COURT:  Sustained.
23     Q.   Did you ever discuss with your brother what
24  happened inside the apartment?
25             MR. SHEEHAN:  Objection.  Outside the
```

2969

```
1    scope of the cross.
2              THE COURT:  Overruled.
3        A.  He told me that, again, he roughed the
4    people up a little bit and that the bats and gloves
5    and whatever else were disposed of.  So, he never
6    exactly told me what was done with what, but from
7    that, and then what the news told me.
8        Q.  Did he tell you how he left the apartment?
9              MR. SHEEHAN:  Objection.  Asked and
10   answered.
11             THE COURT:  How he left the apartment?
12             MR. MARKLE:  Yes, your Honor.
13             THE COURT:  Could you rephrase your
14   question.
15       Q.  Did your brother tell you how he, your
16   brother, left the apartment?
17       A.  No, he --
18             MR. SHEEHAN:  Your Honor, I'm objecting
19   as outside the scope of the cross.
20             MR. MARKLE:  She was questioned about
21   conversations with her brother, meetings with her
22   brother, claims of rehearsing with her brother.
23             MR. SHEEHAN:  Your Honor, I object to
24   counsel giving a speech.  If he wants to ask to go
25   to the bench, he should do so.
```

2970

```
1              THE COURT:  I'm going to sustain the
2    objection to the question in that form.
3        Q.  In regards to what your brother told you,
4    did he say whether or not he knew the fourth person?
5        A.  No, he told me something about him not
6    living in Bridgeport.
7        Q.  Did he ever say anything about how he, your
8    brother, exited the victims' apartment?
9              MR. SHEEHAN:  Objection, outside the
10   scope of the cross.
11             THE COURT:  Sustained.
12       Q.  Did he ever say anything about how the
13   drill was used?
14       A.  No.
15             MR. SHEEHAN:  Objection, outside the
16   scope of the cross.  Her answer was no, so --
17             THE COURT:  Well, your objection is also
18   overruled.  The subject of the drill was a subject
19   of cross, I believe.
20       Q.  At the time you disposed of the bags and
21   the drill, what was your relationship with the
22   defendant?
23       A.  He was my boyfriend.  He was my partner.
24       Q.  And as your boyfriend and partner, how did
25   you feel towards him then?
```

2971

```
1        A.  I loved him.
2        Q.  And on March 7, 2007, when you were first
3    questioned by law enforcement, how did you feel
4    about the defendant?
5        A.  The same as before, I still loved him.
6        Q.  And on March 7, 2007, when you were
7    questioned by law enforcement, how did you feel
8    about your brother Efrain Johnson?
9        A.  I loved him.
10       Q.  How do you know what happened inside your
11   apartment on August 24, 2005?
12             MR. SHEEHAN:  Objection.  Your Honor, I
13   object.  It's just a vouching question.  She's
14   testified as to what she has testified to.  Asking
15   her how she knows what she testified to?
16             THE COURT:  There was a lot of
17   questioning about what she told law enforcement and
18   what the motivation would be.  I think that's a
19   proper question, if I understand what it means.  Go
20   ahead.
21             MR. MARKLE:  Thank you.
22       A.  Can you ask me again.
23       Q.  How do you know what happened inside your
24   apartment on August 24, 2005?
25       A.  All I know is from what I saw when I woke
```

2972

```
1    up.
2              MR. MARKLE:  Thank you.  I have no
3    further questions.
4              Thank you, your Honor.
5              THE COURT:  Recross.
6    RECROSS-EXAMINATION BY
7    BY MR. SHEEHAN:
8        Q.  Ms. Johnson, you were asked if you -- on
9    the redirect examination about these multiple
10   meetings that you had with law enforcement.  Do you
11   remember Mr. Markle just asking you those questions?
12       A.  Yes.
13       Q.  And he asked you whether you saw -- whether
14   you signed any statements at those meetings.
15       A.  Right.
16       Q.  Were you asked to sign any statements?
17       A.  No.
18       Q.  Were you asked to write down what you were
19   saying at any time?
20       A.  No.
21       Q.  Then he asked you whether you saw any
22   reports of those meetings.  To your knowledge, were
23   any of those meetings recorded?
24       A.  Not to my knowledge.
25       Q.  To your knowledge, were any of those
```

2973

1    meetings videotaped?
2        A.   Not to my knowledge.
3        Q.   And is it fair to say that you may not
4    remember what you said at those various meetings,
5    right?
6        A.   It's fair to say I wouldn't remember all of
7    the stuff.
8        Q.   And the reason for that is you have nothing
9    to look at to remind you about what you said, right?
10   You don't have any written statements, do you?
11       A.   No.
12       Q.   And there is no videotapes that you've ever
13   had.
14       A.   No.
15       Q.   Because, as far as you know, none were
16   prepared, right?  Nobody ever made a written
17   statement for you, right?
18       A.   No.
19            MR. SHEEHAN:  I have no questions.
20            THE COURT:  Any redirect?
21            MR. MARKLE:  No, your Honor.
22            THE COURT:  Thank you.  All right.
23   Thank you, Ms. Johnson.  You may step down.  You are
24   excused.
25            Will the government please call its next

2974

1    witness.
2            MS. DAYTON:  Your Honor, with the
3    defense consent, we're just going to leave a binder
4    with the same photos that the defense has and you
5    have on the witness stand.
6            THE COURT:  All right.
7            All right, ma'am, if you will please
8    stand, raise your right hand, the oath will be
9    administered to you.
10            M A R I A    W A R N E R
11   Having first affirmed, was examined and testified as
12   follows:
13            THE WITNESS:  Maria Warner, W-a-r-n-e-r.
14   Town of residence, West Haven.
15            THE COURT:  All right, you may proceed.
16            MS. DAYTON:  Thank you.
17   DIRECT EXAMINATION BY
18   BY MS. DAYTON:
19       Q.   Good afternoon.
20       A.   Good afternoon.
21       Q.   What do you do for a living?
22       A.   I'm a forensic science examiner at the
23   Connecticut State Forensic Science Laboratory in
24   Meriden, Connecticut.
25       Q.   Are you in a particular section?

2975

1        A.   I'm assigned to the trace evidence section.
2        Q.   How long have you been employed as a
3    forensic science examiner?
4        A.   It will be 13 years in July.
5        Q.   And what are your responsibilities at the
6    lab?
7        A.   As a trace evidence examiner I look at
8    evidence that's submitted to the laboratory from
9    state, local and federal agencies.  As a trace
10   examiner, I look at small particulates, more
11   specifically, fibers, hair, paint, plastic.  I'm
12   also cross-trained to fully document evidence and
13   screen for blood and body fluids.
14       Q.   What does that mean, screen for blood and
15   body fluids?
16       A.   Well, depending on the type of case, there
17   may be reddish-brown stains, and there are different
18   chemical processes that can include or exclude a
19   stain from possibly being blood.  And I could go on
20   and confirm it indicates human blood.  Also I will
21   report my findings and I can testify in court, if
22   asked.
23       Q.   And what does the word "particulate" mean?
24       A.   Meaning small materials, small grains of
25   paint, pieces of fibrous material, something small.

2976

1        Q.   Before working at the lab, did you have
2    prior employment in the field of forensic science?
3        A.   Yes.
4        Q.   And what was that?
5        A.   I started my forensic science work, if you
6    will, as the coordinator of the lab at the
7    University of New Haven where I coordinated the lab
8    classes for both undergraduate and graduate degree
9    students.  From there I worked at the Washington
10   office of the FBI in the laboratory when it was
11   located in Washington, D.C.
12       Q.   And when were you there?
13       A.   From 1995 to 1997.
14       Q.   And have you ever taught?
15       A.   Yes.  I taught at the University of New
16   Haven on two occasions as an adjunct professor where
17   I had the entire class as the professor of record.
18   I've also taught at several universities in
19   Connecticut as a guest lecturer for the evening.
20   Sometimes the students come to the laboratory and
21   we'll lecture there as well.
22       Q.   What kinds of things do you teach?
23       A.   Particularly trace evidence, hair, hair
24   comparisons, paints, fibers, crime scene processing.
25   You know, whatever the case is that they need their

2977

1   lecture on at that time.
2       Q.   Is your job like it is on TV?
3       A.   I would say no, it is not.
4       Q.   What is your educational background?
5       A.   I received a Bachelor of Science degree
6   from the University of Rhode Island in 1993.  In
7   1995 I received a Master of Science degree in
8   forensic science with a concentration in
9   criminalistics from the University of New Haven.  In
10  addition to that, I also have other types of
11  training, specifically to fibers.  I've taken
12  classes with the McCrone Institute, which is a
13  school out of Chicago which does road classes and
14  comes to universities as well as laboratories for
15  additional training.  I've taken classes with regard
16  to paint, tape, crime scene photography.  I believe
17  I stated fibers.  Hair and fiber classes offered by
18  the FBI as well.
19      Q.   So, there will be a whole class dedicated
20  to tape.  When you say "tape" what do you mean?
21      A.   There was a recent class that was offered
22  at the Connecticut State Forensic Science Laboratory
23  for trace examiners with regard to tape, pressure
24  sensitive tape, which included any type of tape with
25  adhesive all the way to duct tape as well.

2978

1       Q.   How often do you participate in continued
2   training like you are discussing?
3       A.   When the occasion arises we will attempt to
4   get funding and usually try to get at least one
5   class a year.  Or any other occasion, there is
6   different meetings throughout the year that you can
7   go to different laboratories, host different types
8   of classes.  So there is different types of
9   opportunities available.
10      Q.   What is a proficiency test?
11      A.   Proficiency test is testing that's given to
12  the examiners at the laboratory depending on your
13  discipline, either annually or biannually.  I take a
14  proficiency test in paint examination as well as
15  fiber examinations.  Other types of sections in the
16  laboratory would take different types depending on
17  their discipline of training.
18      Q.   You say you do that twice yearly?
19      A.   I take one paint and one fiber examination
20  for the proficiency testing once a year.
21      Q.   Have you passed all of your proficiency
22  exams?
23      A.   Yes.
24      Q.   Have you ever testified and offered an
25  expert opinion regarding trace evidence?

2979

1       A.   Yes.
2       Q.   How many times have you testified?
3       A.   In excess of 40 times.
4       Q.   What sort of courts have you testified in?
5       A.   The state Superior Courts of Connecticut as
6   well as federal court which was in Bridgeport.
7       Q.   And --
8       A.   Bridgeport.  Sorry.
9       Q.   Fair enough.  And do you always testify for
10  the prosecution?
11      A.   No.
12           MS. DAYTON:  Your Honor, at this time I
13  would offer Ms. Warner as an expert under Federal
14  Rule of Evidence 702.
15           THE COURT:  And specifically the
16  expertise?
17           MS. DAYTON:  Trace evidence, your Honor.
18           THE COURT:  All right.
19           MR. SHEEHAN:  I have no objection.
20           THE COURT:  And you'll recall the
21  instruction I give you about expert witnesses,
22  otherwise known as opinion witnesses.  And so
23  Ms. Warner will be permitted to give her opinion
24  based on her experience training and other bases.
25  All right.  She is so certified.

2980

1           MS. DAYTON:  Thank you, your Honor.
2       Q.   Were you one of the forensic examiners
3   assigned to the case of United States v. Azibo
4   Aquart?
5       A.   Yes.
6       Q.   Are you the only trace examiner on that
7   case?
8       A.   There was another trace examiner who
9   cosigned all of the reports, but I am the primary
10  examiner.  So your answer to that would be yes.
11      Q.   When were you first assigned to this case,
12  if you remember?
13      A.   I was assigned to the case August 29th of
14  2005.
15      Q.   Can you explain for the jury the process of
16  getting a case assigned to you in the lab.
17      A.   Yes.  The case comes into the laboratory
18  from either a local, state or federal agency.  With
19  regard to a criminal matter, the evidence and
20  additional paperwork will go to an area called the
21  evidence receiving area where all of the paperwork
22  is locked in and a case number is generated.
23      Q.   I'm going to stop you for a second.  This
24  woman has to take down everything thing you say.
25  Can you speak a little more slowly so she doesn't

2981

1   throw things at you.
2       A.   A case number is generated.  The case
3   number will begin with the letters ID, which stand
4   for identification.  The next two letters represent
5   the year, for example, 2005 the number will be 05.
6   And then a sequential number is generated depending
7   on how many cases come in that year.
8            So once the lab number, what we often
9   reference it as, is generated, bar codes are created
10  and placed on all of the evidence.  So, the bar code
11  is a method of tracking the evidence throughout the
12  laboratory.  So we use a bar code system with a PIN
13  identification for each examiner.  The evidence when
14  it comes in will also receive a lab identification
15  number.  So the first piece of evidence that comes
16  to the door would be lab No. 1.
17           Once all of that is logged in, paperwork
18  is generated, it's given to a supervisor and then
19  they will go into a computer system and assign the
20  case to a particular examiner or examiners depending
21  on what type of case it is.  Depending on the type
22  of case, you may also be told verbally if something
23  is coming in so you are aware, so you need to begin
24  processing it as well.
25      Q.   Do you know what the lab ID number was on

2982

1   this case?
2       A.   Yes, it was ID 0519367.
3       Q.   And you said that the bar code follows the
4   evidence throughout the lab.  Is that ID on the bar
5   code?
6       A.   Yes, it is.
7       Q.   And so if it goes -- for instance, if a
8   piece of evidence goes from trace evidence to DNA,
9   will it still have that same bar code?
10      A.   If the actual piece of evidence gets
11  transferred, yes, it will.
12      Q.   And you also said that when items arrive
13  they are assigned like a submission number?
14      A.   That is correct.
15      Q.   One, two?  In your experience when items
16  arrive, do they already have a number assigned to
17  them from the agency that brought them to the lab?
18      A.   Yes.  An agency will have their own
19  inventory, whether it's a local police department or
20  a federal agency.  So they have their own system of
21  numbering.  They may only bring us their numbers 1,
22  5 and 7.  And then when it comes to us it will be 1,
23  2 and 3.  So, we start the numbering process all
24  over with our own bar code system.
25      Q.   So your numbers don't necessarily match?

2983

1       A.   That is correct.
2       Q.   Okay.  With respect to this case, do you
3   know where the items in this case were received
4   from?
5       A.   Yes.
6       Q.   What agencies?
7       A.   Yes, there were three agencies that
8   submitted evidence; the Bridgeport Police
9   Department, the Office of the Chief Medical
10  Examiner, and the FBI.
11      Q.   Do you know approximately how many items
12  were submitted in this case jointly by those three
13  agencies?
14      A.   There were 75 pieces of evidence submitted
15  to the laboratory under this case number.
16      Q.   So, how did you decide what you were going
17  to work on first?
18      A.   Well, they didn't all come in on the same
19  day.  Let me preface that.  So it came in in
20  batches.  When the first batch of evidence came in,
21  we consulted with the supervisor of the
22  criminalistics section, which is where the trace
23  section falls under.  We came up with a game plan to
24  see what type of case it was, what type of evidence
25  it was, to see how quickly and what type of evidence

2984

1   can be processed to give the best information
2   depending on the case.
3       Q.   And what was your sort of theory of attack
4   in this case?
5       A.   Considering at the time when it came in it
6   was considered a no suspect case, we wanted to see
7   if we can generate any leads to help the submitting
8   agency, the Bridgeport Police Department, to
9   determine how this happened or who was involved; the
10  actor, if you will.
11           One of the ways you can do this would be
12  to generate leads with regard to possibly finding
13  DNA on a sample.  So we looked at all of the items
14  and tried to determine a game plan, if you will, and
15  triage the evidence to see which pieces we would do
16  first and what would be swabbed for something called
17  touch DNA.  And the premise of this is when you
18  touch something you are going to leave a little bit
19  -- you may leave a little bit of your DNA behind.
20  So, we wanted to look at it the items of evidence,
21  see what they were, and to see what could be done in
22  which order for the best information to give back to
23  the submitting agency.
24      Q.   Did you -- so, is it fair to say you did
25  the items in groups?

2985

```
1      A.  Yes, they were batched, if you will
2  depending on what type of evidence it was.  Usually
3  you try to do evidence that you would need specific
4  resources for at the same time.  Depending on the
5  type of evidence, forgive the comment here,
6  depending on the state of the evidence, if it's wet
7  or dry or if it has an odor to it, you need certain
8  types of equipment to do it properly.
9      Q.  And here were there -- how did you choose
10 the batches, I guess?
11     A.  Well, we looked at what came in in the
12 first batch and just started with some of the --
13 there were duct tape items that came in.  In all,
14 there were seven reports generated, and we started
15 with the duct tape.  There were several items of
16 duct tape that came in in paint cans.  So,
17 originally the victims in the case were
18 unidentified, so they came in as victims 1, 2 and 3.
19 So we looked at the different pieces of evidence,
20 where they came off of the victims.  It was
21 explained to me through the paperwork as well as
22 through the supervisor who went to the crime scene
23 that there was --
24          MR. SHEEHAN:  I'm going to object to
25 what was told to her, your Honor.
```

2986

```
1          THE COURT:  Well, the question is how
2  did you choose the batches.
3          Have you answered that question to your
4  satisfaction?
5          THE WITNESS:  Somewhat.
6          THE COURT:  I guess the answer is no,
7  right?
8          THE WITNESS:  Yes, ma'am.
9          THE COURT:  Okay.  Without telling us
10 what others told you substantively.
11         THE WITNESS:  I can rephrase the answer.
12         THE COURT:  Thank you.
13     A.  Based on the paperwork that came in, I knew
14 that there was blunt force trauma and there was
15 bloodshed, so we looked at the different pieces of
16 evidence that may have been off of the victims where
17 there would not have been as much blood.
18     Q.  Why?
19     A.  If there is a lot of blood on a particular
20 item of evidence and you go to swab it you are going
21 to be getting the blood from the victim.  And what
22 we were trying to swab for was anything from someone
23 who had touched any of the evidence other than the
24 victim.
25     Q.  So how does the -- if there is the blood of
```

2987

```
1  the victim on a piece of evidence, how would that
2  affect touch DNA?
3      A.  You would have -- you would get the profile
4  of the victim.
5      Q.  So, it masks it?
6          MR. SHEEHAN:  Objection, leading.
7          THE COURT:  Sustained.
8      Q.  Okay.  Is it -- are you successful getting
9  touch DNA on blood-soaked items?
10     A.  From my training and experience, if it's a
11 blood-soaked item you will not get multiple
12 profiles.  Based on the cases that I've worked, you
13 would try to stay away from large areas that have
14 large brown stains.
15     Q.  And when you process the evidence, do you
16 wear any sort of -- going back to 2005, did you
17 wear any sort of protective clothing in this case?
18     A.  Yes, you wear lab coats and gloves.
19     Q.  And do you keep the same set of gloves on
20 for the entire case?
21     A.  No, you change gloves frequently.
22 Definitely between items as many times as necessary.
23     Q.  Why?
24     A.  Well, gloves are used for two reasons.
25 It's my personal protection.  The items that come in
```

2988

```
1  can have blood and body fluids on them, they can
2  have sharps enclosed in them.  There can be
3  different types of powders that I don't want to
4  touch.  So, first off, for my protection.  Secondly,
5  you don't want any of my DNA touching back on the
6  evidence, nor my fingerprints for that matter.  So
7  it's a mutual reasoning between my protection and
8  the protection of the evidence.
9      Q.  And did you work on any sort of specialized
10 surface?
11     A.  We work in the laboratory space, the trace
12 evidence section has large bench areas.  All of the
13 benches are cleaned off with a bleach solution or
14 similar disinfectant solution.  We work on large
15 sheets of white or brown paper, depending on the
16 piece of evidence, so we have a good contrast.
17     Q.  And you are talking about blood.  Are those
18 items with blood considered biohazards?
19     A.  Any type of blood or body fluids is
20 definitely considered a biohazard and we would take
21 precautions as such.
22     Q.  Is there any special equipment that you had
23 to use for any of the items?
24     A.  Some of the items were opened in a laminar
25 flow hood, which is a hood where the airflow goes
```

**GA747**

2989

```
1   out of the building, and there a large shield in
2   front of it, kind of like a large box with a large
3   glass shield.  So the items that had labels that
4   came from the Office of the Chief Medical Examiner
5   having come off the victims' faces and bodies,
6   with my experience, I knew that those would be
7   something you would want to open in a hood based on
8   the fact if you have a lot of duct tape on someone's
9   face and they've been bludgeoned, there is going to
10  be a lot of blood and you really don't want that dry
11  blood flying around, nor would you want to smell
12  what that evidence is going to smell like.
13      Q.   And at that time did you wear masks in the
14  trace evidence section?
15      A.   It was not required at the time.
16      Q.   Is it now?
17      A.   Yes.
18      Q.   And why the change?
19      A.   A memo was drafted based on the fact that
20  DNA can be aspirated when you are breathing, that
21  the sensitivity of the DNA as a science has gotten
22  such that we need to wear masks so that no DNA is
23  introduced to the evidence.
24      Q.   So while you were processing the evidence
25  you said that you were looking for trace evidence.
```

2990

```
1   Did you process it for any other purpose?
2       A.   Yes.  The evidence was basically fully
3   documented.  All examiners will do that.  And I'm
4   looking for something that may have been specific to
5   the person or persons who were acting in this case,
6   a suspect, if you will.  So, I look at different
7   pieces of evidence and try to determine what needs
8   to be removed.  So that could be blood and body
9   fluids, it could be hairs or fibers or small pieces
10  of something.  It's very case dependent.  No two
11  cases are the same.  So, you go on the information
12  you get from the submitting agency, through your
13  paperwork and your experience, and relaying --
14  getting information from the supervisor as well as
15  their experience to determine what needs to be
16  removed.
17      Q.   And in processing the -- how do you
18  actually process the evidence to send it to another
19  section?
20      A.   Well, the evidence packaging is first fully
21  documented so we know all of the information that's
22  on the labels.  After that, it's removed one piece
23  at a time, of course, onto large sheets of paper on
24  the bench top.  It's fully documented with regard to
25  either sketching or photographing, and then you
```

2991

```
1   determine what you -- and you don't really know
2   what's in the bag or box or can until you open it.
3   Once you open it, you determine where are we going
4   from here.  What is this?  Are there blood and body
5   fluids?  Is there something unusual?  Are there
6   tears or holes?  Is there, you know, a gunshot hole
7   or something of that nature?  So each time it's very
8   specific to the case and to the item of evidence.
9       Q.   And did you photograph all of the items in
10  this case?
11      A.   Yes.
12      Q.   And you said that you documented, you
13  document the items.  Where do you document these
14  items?
15      A.   The items are documented in a series of
16  worksheets that are handwritten, and the photographs
17  are included onto the worksheets.  So, it -- we
18  document -- or, excuse me, I document what it looks
19  like, what did it include, what condition is it in.
20  For clothing, are there any labels, what did I find
21  on top of it, or stains, that type of thing.
22      Q.   And what other sections were you sending
23  for processing evidence, was assisting to process
24  evidence?
25      A.   In this case I sent evidence samples to
```

2992

```
1   both the DNA section and the latent print section.
2       Q.   And what did you do to evidence prior to it
3   going to the DNA section?
4       A.   Well, specifically for the DNA section, I
5   did something called swabbing of evidence.  You take
6   what looks like a sterile Q-tip, if you will, and
7   you place sterile water on the end of that Q-tip and
8   you swab areas that you determine from your training
9   and experience in having done case work where you
10  may get touch DNA.  You are going to avoid large
11  areas of blood stains.  So you are going to swab a
12  particular area, you take the end of that Q-tip, if
13  you will, and put it in a tube, and the tube is then
14  sent to either the freezer storage area or to the
15  DNA section itself.
16      Q.   When you say the end of the Q-tip, which
17  portion?
18      A.   The little cotton end.
19      Q.   Why don't you put the whole tube in -- I
20  mean, the whole Q-tip in the tube?
21      A.   The tube is only about two centimeters in
22  length.  So you snip off the end.  The reason why
23  it's not a long stick is for ease of collection.
24      Q.   Do you actually hand it to the DNA examiner
25  or do you store it somewhere?
```

2993

1  A.  It actually goes into a freezer storage
2  area where the DNA examiner will then retrieve it
3  when they are ready to do their examination.
4  Q.  What about the items that are going to
5  latent prints, what do you do to process for that
6  unit?
7  A.  I didn't do anything in preparation for the
8  latent print examiner.  However, I did actually try
9  not to swab any area where latent prints may
10  potentially be.  So, for example, if you had handles
11  of a plastic bag, with your training and experience
12  you wouldn't swab that area.  So you use your
13  training and your experience to try and determine
14  where to swab so when it goes to latent print
15  section they may have success with their
16  examinations.
17        And with that case -- in this case,
18  excuse me, the actual items of evidence themselves
19  were brought to the latent print section and
20  transferred to the examiner.
21  Q.  Thank you.  You said there are 75 items of
22  evidence.  We're not going to go through every one.
23  But you said that you chose, like, similar items
24  together; is that right?
25  A.  Tried to, yes.  We also tried to have as

2994

1  much speed as possible under the constraints of what
2  the laboratory can process at a time.
3  Q.  So, drawing your attention to sort of the
4  beginning of the case in September of 2005, I'm
5  going to show you two items of evidence,
6  Government's Exhibit 136A and 148A, both already in
7  evidence.  Starting with 136A, do you recognize what
8  that is?  The other one.
9  A.  Sorry.
10  Q.  Sorry, it's our 136 it's not yours.  It's
11  lab 13.
12  A.  Yes, I recognize this, this item, by the
13  bar code which is here, which was received in the
14  evidence receiving area.  And that's how it was
15  tracked throughout the laboratory, as well as my
16  initials M-G-W in black in the lower right-hand
17  corner.
18  Q.  And why do you do that?  Why do you mark it
19  like that?
20  A.  That way I can identify it when I get to
21  court.  I know I have opened it and closed it and
22  that those are my initials, and it's also lab
23  protocol.
24  Q.  And is this an accurate representation of
25  what this item looked like when you saw it?

2995

1  A.  It looks a little more worn than I
2  remember, but it is in essence the same item.  Yes.
3  Q.  And did you take photos of this item?
4  A.  I did.
5  Q.  Drawing your attention to what's on your
6  screen as Government's Exhibit 447, what is that?
7  A.  That is laboratory submission No. 13.  It
8  was identified on the packaging as partial latex
9  glove.  It was a piece of what looked like rolled
10  latex material which may have come from the cuff
11  area of a glove.
12  Q.  How would you know that?
13  A.  Based on having worn thousands of gloves in
14  my time at the laboratory, that's what it looks
15  like.
16        MS. DAYTON:  Your Honor, at this time I
17  would ask to 447 to be admitted.
18        MR. SHEEHAN:  No objection.
19        THE COURT:  Full exhibit.
20        MS. DAYTON:  Thank you, your Honor.
21  Q.  Let me go with the ELMO back up.
22        MS. DAYTON:  Your Honor, we're going to
23  be going through a lot of pictures, we might just
24  want to leave the lights down.
25        THE COURT:  You are not going to have

2996

1  testimony and then pictures?
2        MS. DAYTON:  We're going --
3        THE COURT:  All of the testimony relates
4  to pictures?
5        MS. DAYTON:  To photos and evidence I'm
6  going to show.
7        THE COURT:  All right, we'll go in our
8  dark phase.
9        MS. DAYTON:  Stealth mode.
10  Q.  What is this?
11  A.  This is a picture that I took at the
12  laboratory, laboratory submission No. 13.
13  Q.  Okay.  And this is the item you just
14  described.  Can you describe it again?
15  A.  Yes, it was listed as a piece of latex
16  glove.  It appears to be the cuff area of a latex
17  type glove.
18  Q.  Did you just take one photo of each item of
19  evidence or did you take multiple photos?
20  A.  Depending on the evidence, I took as many
21  photos as needed to attempt to accurately represent
22  it in the case jacket so I would be able to refer
23  back to it.  The evidence does not stay at the
24  laboratory, it gets returned to the submitting
25  agency.

2997

1    Q.   I'm also showing you on your screen what's
2  been marked Government Exhibit 448.  What is that?
3    A.   Again, it's laboratory submission No. 13.
4  That was described as a blood-like stains.  There
5  was no other testing done on that at this time.
6    Q.   By you?
7    A.   Correct.
8    Q.   And -- I'd -- is this -- you took all of
9  these photographs, correct?
10   A.   Yes, I furnished you with a disk of the
11 photographs I took.
12        MS. DAYTON:  Your Honor, we would ask to
13 move 448 into evidence.
14        MR. SHEEHAN:  No objection.
15        THE COURT:  Full exhibit.
16   Q.   Did you send this item of evidence on to --
17 did you send this item of evidence on to any other
18 unit?
19   A.   Yes.  This item in its entirety was sent to
20 the latent print section.
21   Q.   Did you also send it on to the DNA -- or
22 did you do anything to this item to send it on to
23 DNA?
24   A.   Yes.  The item was swabbed, as I referenced
25 before, using a sterile Q-tip and sterile water, and

2998

1  that swab was ultimately sent to the DNA section.
2    Q.   Government's Exhibit 148A, which is in the
3  smaller little bag that I gave to you, was that
4  processed at the same time?
5    A.   Yes, it was.
6    Q.   Why did you choose to process that at the
7  same time that you did lab 13?
8    A.   Having had experience finding remnants or
9  pieces of what could be latex gloves at crime
10 scenes, we knew there could be possible latent
11 prints and potential touch DNA on them.  So we
12 wanted to try to do those types of items first.
13   Q.   And looking at the item, are your
14 fingerprint -- your fingerprints --
15   A.   My initials are on them as well as the bar
16 code from the laboratory.  So I can fully identify
17 it as what came to the laboratory that I examined.
18   Q.   I'm going to move on to the next batch of
19 items.  What was --
20        MR. SHEEHAN:  Can I just ask for a
21 little clarification.  I'm sorry, your Honor, that
22 other document was 148A.
23        THE COURT:  That's the exhibit.
24        MS. DAYTON:  It's lab 18 --
25        MR. SHEEHAN:  I see exactly where we

2999

1  are.  Thank you.
2    Q.   What was the next batch of items that you
3  worked on?
4    A.   Are you referencing a particular report?
5    Q.   Yes, sorry, October 24, 2005, supplemental
6  trace report.
7    A.   Yes.  I started processing sections of duct
8  tape that was labeled having come from the crime
9  scene.  And each of those were opened individually,
10 fully photographed, and assessed to see where would
11 swabbing for touch DNA be taken, and was there
12 anything else in the cans or the packaging
13 additional to duct tape.
14   Q.   How do you choose where to do the
15 swabbings?
16   A.   Well, in this case, having worked with duct
17 tape before, usually when you go to rip it, when you
18 are done with an area that you tear, okay, you don't
19 usually -- you would hold on to it as I'm showing
20 you with two hands and rip.  So I chose areas that
21 looked like they had been torn as opposed to having
22 been cut.  In my experience, usually the cut areas
23 are from emergency medical personnel or some type of
24 medical personnel cutting it off of a victim.  So I
25 looked at areas on all of the duct tape that may

3000

1  have had a torn edge.
2    Q.   So, for instance, if someone used a
3  scissors or some other tool to cut the duct tape,
4  would you expect to get any results where you
5  swabbed?
6    A.   Not necessarily because it's that sharp
7  implement that is making the cut in the duct tape.
8  So based on having seen many, many cases that have
9  duct tape in them that are used to bind victims, I
10 based it on that, and that's why I swabbed torn
11 areas.
12   Q.   You said that you started with some duct
13 tape.  Did you choose duct tape?  Did you start from
14 the head down?  Or how did you start?
15   A.   There were three victims, and each of the
16 victims had duct tape on the ankle areas, the wrist
17 areas, and then the face area.  We started with
18 those areas that were on the wrists and ankles.
19 Based on the information that was provided in the
20 paperwork from the submitting agency, because there
21 would have been so much blood on the duct tape that
22 was around the face.
23   Q.   I'm going to go show you what's been marked
24 Government's Exhibit 120C and 120C-1.
25        MS. DAYTON:  For counsel, it's lab 5,

3001

```
1   Bridgeport PD, 3.
2            MR. SHEEHAN:  I got it.  Thank you.
3       Q.   This is 120C, and 120C-1.  Do you recognize
4   what these items are?
5       A.   I recognize 120 by my initials on the top
6   as well as on the side of this paint can.  And there
7   is also the laboratory bar code on it as well.
8   120C-1 was the contents that was removed by someone
9   other than myself, so I'm --
10      Q.   Okay.
11      A.   That's the contents of this.
12      Q.   So, you didn't specifically remove those
13  items?
14      A.   No, I did not.
15      Q.   In other words --
16      A.   That is correct.
17      Q.   So, showing you what's been marked
18  Government Exhibit 415, do you recognize what's in
19  that photo?
20      A.   That is a photo that I took of laboratory
21  submission No. 5.
22      Q.   And is that -- was that inside the paint
23  can that you are holding?
24      A.   Yes, it was.
25           MS. DAYTON:  Your Honor, at this time I
```

3002

```
1   would ask to admit 415.
2            MR. SHEEHAN:  May I just inquire
3   briefly.
4            THE COURT:  Yes.
5   VOIR DIRE EXAMINATION
6   BY MR. SHEEHAN:
7       Q.   Ms. Warner, are you saying that duct tape
8   was subsequently wrapped up and put in the bag?
9       A.   I have no knowledge of that.  That was a
10  question I wanted to clarify.  When I return
11  evidence it goes back in the original packaging.
12      Q.   Okay.  But you are clear that that's the
13  duct tape that came out of that can?
14      A.   I'd have to look at it further and open it
15  which I wouldn't recommend in this venue.
16      Q.   Maybe I could just -- I think it is -- let
17  me just --
18           MR. SHEEHAN:  That's fine, your Honor, I
19  understand now.  Thank you.
20  CONTINUED DIRECT EXAMINATION
21  BY MS. DAYTON:
22      Q.   So, is the photo an accurate representation
23  of what was inside, it's Government's Exhibit 120C,
24  but it was lab 5?
25      A.   That is correct.
```

3003

```
1            MS. DAYTON:  Your Honor, at this time we
2   would ask to move in 415.
3            MR. SHEEHAN:  No objection.
4            THE COURT:  It is a full exhibit.
5            MS. DAYTON:  Thank you.
6       Q.   Can you please describe for the jury what
7   you are looking at up there?
8       A.   That is a picture of laboratory submission
9   No. 5 as it was received at the laboratory and
10  removed from the paint can that it was submitted in.
11      Q.   And do you know where this came from?  Did
12  you receive evidence or information regarding that?
13      A.   Yes.  There was evidence or -- excuse me,
14  information on the paint can itself which listed the
15  victims, as I said, 1, 2, then a 3.  At a later date
16  it was identified as who was identified as victims
17  1, 2 and 3.  So having done the cross-referencing,
18  laboratory submission 5 is from the arms and hands
19  of Basil Williams.
20      Q.   And did you process this item?
21      A.   Yes, I swabbed an area that appeared torn
22  for touch DNA and that was stored at the laboratory
23  for DNA analysis.
24      Q.   And do you know what happened to this
25  particular item afterwards?
```

3004

```
1       A.   Yes, this item itself in its entirety was
2   sent to the latent print section for latent print
3   processing.
4       Q.   Moving on to Government's Exhibit 120D,
5   120D-1 which is lab 6, do you recognize 120D?
6       A.   Yes.  I can recognize 120D by my initials
7   in black.  It is laboratory submission No. 6 and the
8   bar code is on it as well.
9       Q.   120D-1, again, I'd ask you -- I'll do this.
10  Do you know what was inside that?
11      A.   Yes.
12      Q.   What was inside there?
13      A.   Duct tape.  Quite a bit of duct tape,
14  wrapped on itself in layers as you see in the
15  pictures, was -- I'm sorry, you don't have the
16  picture yet -- was inside of this paint can.
17      Q.   You took a photograph of it?
18      A.   Yes, I did.
19      Q.   And the picture in Government's
20  Exhibit 420, is that the photo that you took?
21      A.   Yes, it is.
22      Q.   And is that an accurate representation what
23  it looked like --
24      A.   Yes, it is.
25      Q.   -- when you first removed it from the paint
```

3005

1  can?
2      A.  Yes, that is correct.
3          MS. DAYTON:  Your Honor, I would ask to
4  put in Government's Exhibit 420.
5          MR. SHEEHAN:  No objection, your Honor.
6          THE COURT:  Full exhibit.
7          MS. DAYTON:  Thank you.
8      Q.  And you indicated that this was a lot of
9  duct tape wrapped on itself.  Can you please explain
10 what you mean?
11     A.  Well, it was wrapped in a circular fashion,
12 wrapped on itself in layers.  There was also some
13 brown paper, possibly the core or roll of the duct
14 tape that was also located in the paint can.
15     Q.  When you say "core or roll" what do you
16 mean?
17     A.  Duct tape is usually purchased on a core or
18 a roll, and that's the inside of the -- of duct
19 tape, what holds it on it -- it holds on to.  Excuse
20 me.
21     Q.  Did you find anything else that drew your
22 attention in lab 6?
23     A.  Yes.  There was a small piece of what
24 appeared to be latex-like material that was wrapped
25 in it as well.

3006

1      Q.  I'm going to draw your attention to what's
2  been marked for identification as Government
3  Exhibit 419.  Do you recognize this photograph?
4      A.  Yes.
5      Q.  What is it?
6      A.  This is a picture of laboratory submission
7  No. 6.  And in the picture is a piece of
8  latex-like material which is sticking to the
9  adhesive backing of the duct tape.
10     Q.  And you took this photograph?
11     A.  Yes, I did.
12         MS. DAYTON:  Your Honor, may we admit
13 Government's Exhibit 419?
14         THE COURT:  Yes.
15         MR. SHEEHAN:  Your Honor, may I just
16 briefly inquire?
17 VOIR DIRE EXAMINATION
18 BY MR. SHEEHAN:
19     Q.  Do you have a 35-millimeter print of this
20 that you are looking at there?
21     A.  I have a copy of my case jacket where I
22 printed off the pictures and put them in there.
23     Q.  And are those -- are they like small
24 pictures that --
25     A.  They're four by six.

3007

1          MS. DAYTON:  The same.
2      A.  The same I had sent for discovery.
3          MR. SHEEHAN:  Thank you.  I have no
4  objection.
5          THE COURT:  419 is a full exhibit.
6          MS. DAYTON:  Thank you.
7  CONTINUED DIRECT EXAMINATION
8  BY MS. DAYTON:
9      Q.  Can you please explain to the jury what
10 they're looking at in 419.
11     A.  You are looking at laboratory submission
12 No. 6.  This is the backing or the adhesive end,
13 excuse me, of duct tape.  And you see this
14 beige-ish, cream-color material which is latex-like
15 material.  There is also some different trace
16 material which is on there as well.
17     Q.  What do you mean by "trace material"?
18     A.  Some fibrous material, possibly some
19 hairlike fibers.
20     Q.  Have you in your experience ever seen latex
21 stuck in duct tape?
22     A.  Yes.
23     Q.  Like once?
24     A.  Several times.
25     Q.  Do you know why?

3008

1      A.  Yes.
2          MR. SHEEHAN:  I'm going to object, your
3  Honor.
4          THE COURT:  Beyond this case.  Did she
5  use that as part of her analysis?
6          MS. DAYTON:  Yes.
7          THE COURT:  Let's ask the question in
8  that form.
9      Q.  Why was this of relevance to you?
10     A.  In my experience duct tape is used quite
11 often to bind victims in criminal cases.  And
12 criminals tend to know that they'll leave
13 fingerprints behind and try to wear gloves.  And
14 when you mix duct tape with gloves and you are not
15 careful you may leave behind portions of the latex
16 glove in the tape.  So, having known that those are
17 areas of interest, because you don't normally find
18 latex glove parts in your roll of duct tape, so you
19 would go ahead and swab that to potentially find out
20 who was wearing what could be part of a glove while
21 they were handling duct tape.
22     Q.  And did you swab the latex in this exhibit?
23     A.  Yes.
24     Q.  Now, with respect to these hairs, based
25 upon your examination, do you know where on the body

**GA752**

3009

```
1   that these hairs would have come from?
2       A.   The laboratory submission No. 6, by
3   cross-referencing the information from the office of
4   medical examiner, came from the ankles of Basil
5   Williams.  So potentially they could be body hairs.
6   In this case trace material, meaning fibrous
7   material, hair, fibers were collected, but no
8   further examinations were conducted.
9       Q.   Why wouldn't you test body hairs?
10      A.   Well, with regard to hairs, first of all,
11  the policy of the laboratory is we only compare head
12  hairs and pubic hairs.  And also, body hairs don't
13  lend enough characteristics for comparison.  You can
14  do identification on them as to that they're from
15  the body area, for example, the arms -- the limb
16  areas, but they're not used for comparison.
17      Q.   With respect to lab 6, which is the same
18  item, did you notice any -- did you examine the duct
19  tape itself?
20      A.   Yes, I did.  With regard to the duct tape,
21  there is -- actually, it appears to be two different
22  types of duct tape.
23      Q.   I'm going to show you some photos before
24  you go on.  Showing you what's been marked for
25  identification as Government's Exhibit 421, do you
```

3010

```
1   recognize this photo and did you take it?
2       A.   Yes, I did.  It's a picture of some of the
3   duct tape from laboratory submission No. 6.
4           MS. DAYTON:  Your Honor, I would ask to
5   admit Government's Exhibit 421.
6           MR. SHEEHAN:  No objection.
7           THE COURT:  Full exhibit.
8           MS. DAYTON:  Thank you.
9       Q.   You said there are two types of duct tape.
10  If you can describe first what this type is.
11      A.   Well, I don't have --
12          MR. SHEEHAN:  We're looking at 421?
13          MS. DAYTON:  Yes.
14      A.   I don't have a specific brand; however, in
15  comparison to other types of duct tape that was in
16  laboratory submission No. 6, they appear different.
17  Oftentimes you'll find what looks like -- are called
18  calendaring or small bumps where the tape was rolled
19  onto the core.  So if you look at this, it looks
20  rather smooth, but there was other that I -- in this
21  can that did not look like this and it had a
22  different appearance on the backing inside.
23      Q.   I'm going to show you another photo which
24  has been marked Government's 422 for identification.
25  Do you recognize this photo?
```

3011

```
1       A.   Yes, this is a picture of some of the duct
2   tape from laboratory submission No. 6.
3       Q.   You took this photo?
4       A.   Yes, I did.
5           MS. DAYTON:  Your Honor, I would ask
6   that Government's Exhibit 422 enter into evidence.
7           MR. SHEEHAN:  No objection.
8           THE COURT:  Full exhibit.
9       Q.   What is this photo of?
10      A.   This is some of the duct tape in laboratory
11  submission No. 6.  You'll notice it has what looks
12  like -- could be small dents or marks in it.  And
13  that's a manufacturing mark.  When duct tape is
14  spooled sometimes you may have this type of marking
15  on the tape itself.
16      Q.   In the middle of the photo there appears a
17  horizontal line.  Can you explain if that would draw
18  your attention or have any relevance to you at all?
19  The tear area or ripped area.
20      A.   That potentially could be an area that was
21  handled or torn, so that would be of importance, and
22  it's this torn edge in this case for laboratory
23  submission No. 6 that was swabbed for potential
24  touch DNA.
25      Q.   Moving on to Government's Exhibit 121C and
```

3012

```
1   C-1, which is lab 8, do you recognize this?
2       A.   Yes, I recognize the paint can.  It has
3   laboratory submission No. 8 on it, as well as the
4   bar code.  My initials are both on the top and on
5   the sides.  And 121C-1 is in fact duct tape that --
6   I apologize, I'm sorry, you are saying it was
7   removed from this container?
8       Q.   Yes.  We have had testimony earlier
9   regarding that, so mostly you can look at the can
10  and your photos.
11      A.   Thank you.
12      Q.   And showing you what's been marked for
13  identification Government's Exhibit 426, do you
14  recognize what that is?
15      A.   Yes, this is duct tape which was laboratory
16  submission No. 8.  It was identified as coming from
17  the ankles of Tina Johnson.
18      Q.   Okay.  And did you take this photograph?
19      A.   Yes, I did.
20          MS. DAYTON:  Your Honor, if I may move
21  Government Exhibit 426 into evidence.
22          MR. SHEEHAN:  No objection.
23          THE COURT:  Full exhibit.
24          MS. DAYTON:  Thank you.
25      Q.   If you could explain what it is we're
```

3013

```
1    looking at in this photograph.  Would a pointer help
2    you to point to things, do you need it?
3        A.  I can probably just describe it.
4        Q.  Okay.
5            MR. SHEEHAN:  There was a pointer there,
6    I think.
7            THE WITNESS:  Yes, here it is.
8        Q.  If you need it.
9        A.  Okay.  Thank you.
10       Q.  Go ahead.
11       A.  This is a photograph of laboratory
12   submission No. 8.  Again, duct tape wrapped in a
13   circular fashion upon itself.  It was received in a
14   paint can.  There were some torn areas that were
15   identified, and those areas were swabbed as well as
16   what looked to be a fingertip-like piece of latex
17   material as well.
18       Q.  Where do you see the fingertip-like piece?
19       A.  If you look at the twelve o'clock position
20   in the photograph you'll see a beigish-yellowish
21   color piece of latex-type material.
22       Q.  What's the white stuff sort of in the
23   middle?
24       A.  That's actually the adhesive backing of the
25   duct tape.  That's the reverse side of the duct
```

3014

```
1    tape.
2        Q.  And did you swab this item of evidence?
3        A.  Yes, I did.
4        Q.  And what did you do with it?
5        A.  I swabbed two locations.  And those were
6    sent to the DNA section.  I swabbed two torn areas
7    and then I swabbed the latex-like material as well.
8        Q.  You said earlier swabbing for touch DNA?
9        A.  Yes.
10       Q.  What's the difference between touch DNA and
11   regular DNA?
12       A.  There really is no difference.  It's just a
13   term that's used based on the fact that when you
14   touch something you could potentially be leaving
15   touch behind, and it's something that's been very up
16   and coming to forensic science because the DNA now
17   is so sensitive, so if you had a case where someone
18   touched something or grabbed onto someone and you
19   swabbed that area, you may potentially find out who
20   that person is by their DNA profile that may have
21   been left behind.
22       Q.  Thank you.  Just put these away and grab
23   the next group.  I'm going to move on to Government
24   Exhibit 122C and C-1, which is lab Exhibit 11.  Did
25   you analyze that piece of evidence?
```

3015

```
1            It's not up on your screen yet.  Sorry, it
2    would help if I handed it to you.  There you go.
3    122C and C-1.
4        A.  I recognize this as laboratory submission
5    No. 11.  My initials are on both the top and the
6    side and as well as the bar code here on the bottom.
7    And then this is duct tape.
8        Q.  What was inside the paint can when you got
9    it?
10       A.  Submission No. 11 consisted of duct tape
11   layered on itself in a circular fashion.  Similar to
12   the other types of duct tape that was submitted in
13   this case.
14       Q.  Showing you what's been marked for
15   identification Government's Exhibit 440.  Do you
16   recognize that?
17       A.  Yes, this is a picture that I took of
18   laboratory submission No. 11 of the duct tape as it
19   was received at the laboratory.
20       Q.  And do you know where this particular duct
21   tape was removed from?
22       A.  Yes, based on cross-referencing the
23   information, it was removed from the wrist, arms and
24   hands of James Reid.
25       Q.  And did you take that photograph?
```

3016

```
1        A.  Yes, I did.
2            MS. DAYTON:  Your Honor, at this time I
3    would ask for 440 to be moved into evidence.
4            MR. SHEEHAN:  No objection.
5            THE COURT:  Full exhibit.
6            MS. DAYTON:  Thank you.
7        Q.  Now, in each photo there appears to be --
8    in almost all of the photos a little ruler at the
9    bottom with a number on it, who does that?
10       A.  I do that.
11       Q.  Why?
12       A.  Well, you want to put a scale in the
13   picture to the best of your ability to get an idea
14   how large something is when you take the picture.
15   So, for your reference.  Again, all of the evidence
16   goes back to the submitting agency, so I only have
17   the photographs for reference.  Also you would want
18   to put the submission number on it so you would know
19   what you are taking a picture of, especially when
20   you have nine cans of duct tape and you need to keep
21   your photos in order.
22       Q.  If you can just explain for the jury what
23   this is a picture of.
24       A.  This is laboratory submission No. 11 as it
25   was received at the laboratory.  There was a cut --
```

3017

```
1   excuse me, a torn edge that was swabbed.  There was
2   trace material removed and it was retained at the
3   laboratory.
4        Q.   I'm going to show you what's been marked
5   Government Exhibit 443 for identification.  You say
6   trace material removed.  Can you explain what type
7   of trace material was removed?
8        A.   Trace material can be fibrous, hairlike,
9   you know, it can be plant material.  That's a
10  general term that we use when we remove something
11  and we hold it in storage.  And anytime we can go
12  back and examine it further.  Do you want me to
13  identify --
14       Q.   Sure.  Do you recognize what's in 443?
15       A.   Yes.  That's a photograph I took, a
16  close-up photograph of laboratory submission No. 11
17  where there is trace-like material.  It looks like
18  fibrous, fiber material.
19       Q.   And is that the trace material that you in
20  fact removed from that item?
21       A.   Yes, it is.
22            MS. DAYTON:  Your Honor, at this time I
23  would ask to move 443 into evidence.
24            THE COURT:  All right.
25            MR. SHEEHAN:  No objection.
```

3018

```
1        Q.   And you also took this photograph?
2        A.   Yes, I did.
3        Q.   If you could just describe for the jury
4   what they're looking at.
5        A.   You are looking at a close-up picture of
6   laboratory submission No. 11.  There is the adhesive
7   side just dead center there, and you see a small
8   clump of fibrous material that was retained at the
9   laboratory.
10       Q.   The spots, the red spots?
11       A.   You are also seeing some reddish-brown
12  staining that was evident as well.  Those samples --
13  I'm sorry, I just want to reference my notes -- were
14  just referenced as reddish-brown flakes.  No further
15  testing was done on those at this time.
16       Q.   So, just by looking at a reddish-brown item
17  would you write in your report that it's blood.
18       A.   No.
19       Q.   Why not?
20       A.   Because the -- just because it's
21  reddish-brown doesn't make it blood.  You need to do
22  further testing.  So I write RB, reddish-brown.
23       Q.   So, you don't come to a conclusion without
24  doing testing?
25       A.   Not for blood identification, no.
```

3019

```
1        Q.   And in this picture, again, you can see a
2   close-up of the white, and there seems to be lines
3   both horizontally and vertically.  Based upon your
4   experience with duct tape, can you explain what
5   those lines are?
6        A.   Well, duct tape is actually a three layered
7   system.  Duct tape is meant to be used for strength.
8   So you have a backing layer which is a polymer.  And
9   then there is a fabric, actually that is the next
10  layer, it's called a scrim, and that helps give duct
11  tape its strength.  And what hold the whole thing
12  together is adhesive layer.  So what you are seeing
13  just above, you know, in the center there, is the
14  actual scrim or fabric that's holding, that gives
15  duct tape its strength.
16       Q.   Thank you.  I'm going to move on to what's
17  been previously marked Government's Exhibit 122D and
18  122D-1, which is lab Exhibit 12.  I'm going to show
19  you Government Exhibit 122D and D-1.  Do you
20  recognize this item?
21       A.   Yes, I recognize this item by my initials,
22  MGW.  It is laboratory submission No. 12, as well as
23  the bar code on one side.  122D-1 is duct tape.
24       Q.   Was there duct tape in 122D when you
25  received it?
```

3020

```
1        A.   Yes.
2        Q.   I'm going to draw your attention to what's
3   been marked for identification Government's
4   Exhibit 444 on the small screen.  Do you recognize
5   what this is?
6        A.   This is a photograph of laboratory
7   submission No. 12, which I took.
8        Q.   Thank you.
9            MS. DAYTON:  At this time I would ask
10  that 444 be moved into evidence, your Honor.
11            MR. SHEEHAN:  No objection, your Honor.
12            THE COURT:  Full exhibit.
13       Q.   And is this an accurate representation of
14  what the duct tape looked like when you removed it
15  from 122D which is lab 12?
16       A.   Yes, it is.
17       Q.   Thank you.
18            If you could please describe for the jury
19  what they're looking at.
20       A.   This is a photograph that I took of
21  laboratory submission No. 12 with cross-referencing,
22  it is from the ankles of James Reid.  So you are
23  looking at the duct tape, both the adhesive side and
24  the backing side.  There was also what appeared to
25  possibly be a shoelace type item just around the
```

3021

```
1   eleven o'clock area there, that black mass on the
2   left-hand side.
3       Q.   And there seems to be a hole, like a round,
4   like a void on the left side, and then there is
5   something in the middle, then there is another void.
6   Can you explain that?
7       A.   It was wrapped on itself in a circular
8   fashion.  So you had two areas of circular duct tape
9   taped on itself.
10      Q.   And this was around Mr. Reid's ankles?
11      A.   That is correct.
12      Q.   I'm also going to show you what's been
13  marked as Government's Exhibit 445 for
14  identification.  Do you recognize what this is?
15      A.   Yes, this is a picture of laboratory
16  submission No. 12, photograph that I took.
17           MS. DAYTON:  May we move 445 into
18  evidence, your Honor?
19           MR. SHEEHAN:  No objection.
20           THE COURT:  Full exhibit.
21      Q.   Is this the same item that we were just
22  discussing?
23      A.   Yes, it's just a different view of the same
24  item.
25      Q.   And did you find any trace evidence in
```

3022

```
1   this, if you know?
2       A.   There was no trace material collected.  It
3   was fully documented, but none was removed.
4       Q.   And what sort of items, trace items were
5   found in there?
6       A.   As I previously stated, it looked like a
7   shoelace type item.  It's larger than typical trace.
8   There were some hairlike fibers sticking on the
9   adhesive side.
10      Q.   I'm going to show you what's been entered
11  into evidence as 137A, it's lab 14.  Do you
12  recognize what that is?
13      A.   First off, I recognize the packaging as
14  being laboratory submission No. 14 by my initials as
15  well as the bar code.  And this is the item that I
16  opened.  There are two gloves that are here right
17  now.  This is not the coloring of the gloves when I
18  received them, but I do recognize the markings that
19  I placed on the cuff area of the glove for
20  identification.
21      Q.   I'm going to ask you to draw your attention
22  to the screen to Government's Exhibit 449 for
23  identification.  Do you recognize what is pictured
24  in that photograph?
25      A.   Yes.  This is a picture of laboratory
```

3023

```
1   submission No. 14, and I took this picture.
2       Q.   Is this how the item looked when you
3   received it?
4       A.   This picture that you are showing me on my
5   right is how it was received when it was taken out
6   of the package.  What it was was two gloves layered,
7   and it was not a latex-type glove, it was more like
8   a vinyl type or, to do an analogy, a food service
9   type glove, which is more of a clear nature.  They
10  were received layered.  And in my opinion it
11  appeared as if they were taken off simultaneously.
12  So, they were removed at the same time based on the
13  fact that the fingertips were pushed in.
14           MS. DAYTON:  Your Honor, at this time we
15  would ask to move 449 into evidence.
16           MR. SHEEHAN:  No objection.
17           THE COURT:  Full exhibit.
18      Q.   If you can just describe on the photograph
19  for the jury what you mean by the fingertips.  You
20  may need the pointer this time.
21      A.   Yes.
22           THE COURT:  I'm going to ask you to pick
23  up the mic and just take it around with you.  It's
24  wireless.  You can pick it up at the base.
25           MR. SHEEHAN:  It's an agility test.
```

3024

```
1           THE WITNESS:  Yes.
2       A.   This is laboratory submission No. 14.  It
3   is two gloves layered.  And in my opinion, based on
4   the fashion that it was received, at the fingertips,
5   here, I'm pointing to the end of the fingertips on
6   the rightmost side of the photograph, these
7   fingertips were pushed in.
8           As previously stated, having worn
9   thousands of gloves and have frequently
10  double-gloved, based on the type of evidence, this
11  is what it would look like if you had two gloves on
12  and then took them off.  So, the outermost area that
13  you see here in the picture is what would
14  essentially be touching the hand because that's the
15  inside.
16      Q.   And what type of evidence would you double
17  glove for?
18      A.   I've double-gloved for any type of evidence
19  that had a lot of blood, a lot of blood-like crusts
20  and flakes, something of that nature.
21      Q.   And you mentioned that --
22           THE COURT:  Excuse me, we're going to
23  take a five-minute recess.
24           MS. DAYTON:  Okay.
25           (Jury exited the courtroom)
```

3025

1    THE COURT:  I got the high sign.  Five
2  minutes, please.  We'll just take a five-minute
3  break.  One of the jurors wished to do that.
4    (Recess)
5    THE COURT:  All right, we'll bring in
6  the jury.
7    MR. SHEEHAN:  Could we just approach.
8  We don't need the record on this, just explain what
9  we're thinking about here.
10    (Discussion held off the record)
11    (Jury entered the courtroom.)
12    THE COURT:  Please be seated, ladies and
13  gentlemen.  All right, continued direct
14  examination --
15    MS. DAYTON:  Thank you, your Honor.
16    THE COURT:  -- by Ms. Dayton.
17    Q.  We were talking about the gloves.  You said
18  that these were vinyl type gloves?
19    A.  Yes, vinyl type.  I didn't test them for
20  their chemical makeup, but that's what vinyl type
21  gloves look like.
22    Q.  And they're different than the -- you
23  testified earlier about other bits of gloves.
24    A.  Right.  The pieces of latex type material
25  that was located in the various items of duct tape

3026

1  is opaque and it's more of a cream color.  It's your
2  traditional latex type glove in appearance, where
3  this is more clear and shiny.  These just have a
4  different appearance.
5    Q.  And you indicated this in the actual
6  Government's Exhibit 137A, that it looks different,
7  there is some coloring.
8    A.  Yes.  I wasn't there when they were
9  processed in the latent print section; however, I am
10  aware they use different types of methods which
11  impart color to the gloves.  So I'm sure you will
12  hear more about that at a later date.  However, when
13  I received them they did not look like this.
14    Q.  Okay.  And then I'm going to draw your
15  attention to the screen again to Government's
16  Exhibit 451 for identification.  Do you recognize
17  what this is a photograph of?
18    A.  This is a photograph of laboratory
19  submission No. 14.  It shows the two gloves in a
20  layered fashion, and they are identified as 14-1 and
21  14-2.
22    Q.  Did you make those markings?
23    A.  I did.
24    Q.  And you took this photo?
25    A.  I did.

3027

1    MS. DAYTON:  Your Honor, at this point
2  we would ask that 451 be moved into evidence.
3    MR. SHEEHAN:  No objection.
4    THE COURT:  Full exhibit.
5    MS. DAYTON:  Can I bother you to turn
6  the lights down a little.  Thank you.
7    Q.  On 451, if you could see the 14-1 and 14-2
8  on the right side of the photograph, why did you
9  mark them like that?
10    A.  I needed to identify which glove was which.
11  Whenever we receive multiple items in a bag or a
12  can, it's our job to identify them and index them,
13  if you will.  So I wanted to be able to determine
14  which one was received in which order.  So 14-1 is
15  the outermost glove.  Based on my opinion that they
16  were taken off simultaneously, 14-1 would have been
17  the glove that was closest to the hand when it was
18  being worn.
19    Q.  So, you indicated before pulling them off
20  and they turned inside out type thing?
21    A.  Correct, that was my opinion based on the
22  way they were received at the laboratory.
23    Q.  And what, if anything, did you do to
24  process these two items?
25    A.  Each of the gloves was swabbed separately.

3028

1  So 14-1 was swabbed and those swabs were given a
2  designation and 14-2 was swabbed separately.  Those
3  swabs were then put into storage through the DNA
4  section for examination.  The gloves themselves were
5  forwarded to the latent print section for further
6  analysis.
7    Q.  When you say the swabs were given a
8  designation, what do you mean by that?
9    A.  Well, anything that is done in my section
10  receives the letter Z after it.  So this started as
11  laboratory submission 14, that is the bag.  Its
12  contents contained two items, so that was laboratory
13  submission 14-1 and 14-2.  I did swabbings, so those
14  became 14-1 Z1, 14-2 Z1 and those -- that's the name
15  that the swabs were given as they tracked through
16  the laboratory for further analysis.
17    Q.  So, previously you mentioned swabs.  Would
18  those swabs have also received a Z designation?
19    A.  That is correct.
20    Q.  And if you swab -- like, for instance, some
21  of the items you said you swabbed in more than one
22  area.  Do you use the same swab for that?
23    A.  No.  You would use separate swabs.  So if
24  you had an area, let's say there was duct tape and
25  there was two torn areas, there may be a Z1 and Z2.

3029

```
1      Q.   Okay.
2      A.   And that's standard operating procedure for
3  swabbing for my section.  We're designated with the
4  letter Z.
5      Q.   I'm going to show you now what's been
6  marked Government Exhibit 142A, and it is lab
7  submission 15.  Do you recognize this?
8      A.   Yes, this is the packaging for laboratory
9  submission 15.  My initials are on it as well as the
10 bar code.  Also in this plastic pack is what was the
11 contents of this bag.  And I can identify that by
12 the hang tag which has my initials and laboratory
13 No. 15 on it as well.  It appeared to be the end of
14 a nylon stocking, nylon type stocking, I should say.
15 The foot area.  The end, which was not sewn, so the
16 toe area is sewn shut, but the area that would have
17 been toward the leg appeared to have been cut and
18 there was some reddish-brown stains on it as well.
19     Q.   I'm going to draw your attention to your
20 small screen, Government Exhibit 452 for
21 identification.  Do you recognize what that is a
22 photo of?
23     A.   That is laboratory submission No. 15 and
24 that is a photograph which I took.
25              MS. DAYTON:  Your Honor, I would ask
```

3030

```
1  that 452 be moved into evidence.
2              THE COURT:  All right, absent objection
3  it's a full exhibit.
4              MR. SHEEHAN:  There is no objection,
5  your Honor.
6              THE COURT:  Thank you.
7              MS. DAYTON:  Thank you.
8      Q.   And if you could just describe for the jury
9  what you were just explaining about this item.
10     A.   This is laboratory submission No. 15.  It
11 appears to be the end of a nylon stocking.  On the
12 foot area, there is -- if you have -- if it was
13 lighter you would notice that there is the sewn end
14 which is the toe area.
15     Q.   And you said the other end appeared to be
16 cut?
17     A.   It appeared to be cut, yes.
18     Q.   Was there any other sort of damage or
19 anything that you noticed about this item?
20     A.   It was rolled up and there was some what
21 you would consider runs.  If you have ever worn
22 hosiery you would know you get tears and they're
23 called runs.  It was swabbed for potential DNA,
24 trace material was removed, that was held at the
25 laboratory.
```

3031

```
1      Q.   I'm going to show you what's been marked
2  for identification as Government's Exhibit 453.  And
3  do you recognize what this is a photograph of?
4      A.   It's a close-up photograph of laboratory
5  submission No. 15, the photograph which I took.
6              MS. DAYTON:  We'd ask that 453 be moved
7  into evidence, your Honor.
8              THE COURT:  Absent objection it's a full
9  exhibit.
10             MR. SHEEHAN:  And there is none, your
11 Honor.
12             MS. DAYTON:  Thank you.
13     Q.   You mentioned about some trace evidence.
14 Is this what you were talking about?
15     A.   Well, what you are seeing here is some
16 round area, dead center there.
17     Q.   Can you use the pointer.
18     A.   Of course.
19     Q.   You can point and just sit, so you don't
20 have to carry the care microphone.
21     A.   This area here.
22             MS. DAYTON:  Indicating sort of the
23 center of the screen there is a dark roundish area.
24     Q.   What did that appear to be to you?
25     A.   That was reddish-brown stains it appeared
```

3032

```
1  to be blood-like.
2      Q.   What, if anything, did you do with that?
3      A.   That area was tested with a chemical
4  screening test for the presence of blood and that
5  was positive for a screening test.  The actual item
6  itself was swabbed and trace material was retained.
7  At a later date the trace material was -- a report
8  was written on it.
9      Q.   What sort of trace material?
10     A.   Trace material was a hairlike fiber.  It
11 was retained at the laboratory until it was asked to
12 be reported out and it was a human Negroid head
13 hair.  It had a telogen root, which means it was
14 naturally shed.  There was a little bit of tissue
15 adhering to the end.
16     Q.   Could you make any sort of comparison with
17 this hair?
18     A.   No, it was not suitable based on its
19 length, so no comparisons could be made.
20     Q.   You said you swabbed this.  Can you swab
21 any sort of surface?
22     A.   Well, dependent on what it looks like.  I
23 mean, most nonporous surfaces are swabable, if you
24 will.  Most clothing can be swabbed, most items can
25 be swabbed.
```

3033

1    Q.   But a nylon stocking, would that be
2    considered porous?
3    A.   It is porous yes, but it would definitely
4    adhere to -- cellular material would definitely
5    adhere to it.
6    Q.   Those swabs, where did they go to?
7    A.   To DNA section for further analysis.
8    Q.   I'm going to show you what's been marked
9    Government Exhibit 138A.  It's been moved into
10   evidence.  Excuse me, it's lab 16.  Do you recognize
11   this item?
12   A.   Yes, I recognize the packaging by my
13   initials and the bar code.  It is laboratory
14   submission 16.  Also within the pack, I can
15   recognize it by the hang tag which has my initials
16   and laboratory 16.  It is the glove which was inside
17   of this paper bag.
18   Q.   I'm going to ask you to draw your attention
19   to the small screen, Government Exhibit 454 for
20   identification, do you recognize what that is a
21   photo of?
22   A.   That's a photo of laboratory submission No.
23   16.  It is a vinyl type or food service type glove
24   similar to the glove we referenced earlier in
25   testimony.

3034

1    Q.   Did you process this evidence also?
2    A.   I did.  There was no blood-like stain
3    located, there was no trace material located on it.
4    It was swabbed, as I referenced already and those
5    swabs were sent to DNA section for further analysis.
6    Q.   Moving on to the next sort of batch of
7    items in supplemental trace report 2, January 19th
8    of 2006, did you group some items for that report as
9    well?
10   A.   Yes, I did.
11   Q.   And what sort of items did you group there?
12   A.   There were several --
13       THE COURT:  I'm sorry, did you offer
14   454?
15       MS. DAYTON:  You mean the one I never
16   asked to enter into evidence?
17       THE COURT:  That one.
18       MS. DAYTON:  Yes, may I admit 454 into
19   evidence?
20       MR. SHEEHAN:  No objection.
21       THE COURT:  Would you like to show the
22   jury.
23       MS. DAYTON:  I would love to show the
24   jury.  Thank you, your Honor.
25   Q.   What is that?

3035

1    A.   This is laboratory submission 16, a glove
2    that was in the packaging.  Again, similar to a
3    vinyl type food service type glove, not a typical
4    latex type glove.
5    Q.   How would you swab -- do you just swab a
6    finger?  How does that work?
7    A.   You have to be very careful of swabbing
8    gloves of this nature because you have to remember
9    there are different types of exams done in the
10   laboratory, so if I were to swab the entire glove,
11   it's kind of like washing a window, you are going to
12   wash off all of the potential fingerprints.  So you
13   have to swab areas that would not lend itself to
14   where fingerprints would lie.  So you would swab,
15   you know, the cuff area, and I'm motioning to around
16   the wrist, the palm area.  You would not want to
17   swab the absolute fingertip area because when you
18   wear gloves you could potentially leave your
19   fingerprints behind inside of the glove.
20   Q.   So, the swabs on this particular item,
21   those were forwarded to DNA?
22   A.   Yes, they were.
23   Q.   And was the glove itself forwarded
24   anywhere?
25   A.   It was forwarded to latent print section

3036

1    for further analysis.
2    Q.   Thank you.  I'm going to go now move on to
3    the January 19, 2006, report.
4        Did you choose some items to batch together
5    for that report as well?
6    A.   Yes, there were, if I may list them.  There
7    was a folding tool, plastic bags -- excuse me, a
8    plastic bag with packages of gloves, a light bulb,
9    plastic bag with duct tape, and pieces of Sheetrock.
10   Q.   Okay.  We're not going to go through all of
11   the items, but I am going to draw your attention to
12   what was previously marked -- admitted as
13   Government's Exhibit 139A, it's lab 19.  Do you
14   recognize what that item is?
15   A.   I recognize the packaging which is in this
16   clear container as laboratory submission 19.  I
17   recognize it by my initials as well as the bar code.
18   Also in this clear packaging is the contents.  There
19   were several items inside of this paper bag when I
20   received it.  There was a Walgreen's brand bag
21   containing a empty bag of Mr. Clean gloves.  There
22   were two loose latex type gloves and there was a bag
23   of Mr. Clean gloves with five gloves in it.
24   Q.   I'm going to start by showing you what's on
25   your small screen as Government's Exhibit 455.  Do

3037

1  you recognize what that is a photograph of?
2      A.   Yes, this is a portion of the contents of
3  laboratory submission No. 19 and it is a Walgreen's
4  brand plastic type bag, and I took this picture.
5          MS. DAYTON:  Your Honor, may I move 455
6  into evidence?
7          MR. SHEEHAN:  No objection.
8          THE COURT:  It is a full exhibit.
9          MS. DAYTON:  Thank you.
10     Q.   And once again, there is a little ruler at
11  the bottom with the 19?
12     A.   Yes.
13     Q.   That's your scale?
14     A.   That is correct.
15     Q.   And this is a photograph of a Walgreen's
16  bag?
17     A.   Yes, it is.
18     Q.   And where were the items, the other items
19  that you described, the Mr. Clean, the package of
20  gloves, where were they located?
21     A.   They were inside of it.
22     Q.   I'm going to show you what's been marked
23  456 for identification and ask you if you recognize
24  what's in this photograph.
25     A.   Yes, this is a pictorial of the contents of

3038

1  said bag we just talked about, the Walgreen's bag.
2  It's submission No. 19 from the laboratory.  It is
3  the two packages of Mr. Clean, as well as two loose
4  latex type gloves.
5      Q.   And you took this photo.
6      A.   Yes, I did.
7          MS. DAYTON:  Your Honor, may I move 456
8  into evidence?
9          MR. SHEEHAN:  No objection, your Honor.
10          THE COURT:  All right.
11          MR. SHEEHAN:  456, right?
12          THE COURT:  Yes.
13          MR. SHEEHAN:  Yes, no objection.
14     Q.   Did you remove these items from the bag?
15     A.   Yes, I did.
16     Q.   And if you can just describe from the left
17  to the right what we're looking at.
18     A.   Starting at the left, you'll notice there
19  is a bag of Mr. Clean latex gloves.  In the center
20  of the photograph are two loose latex gloves and to
21  the right is another bag of -- bag, just the bag
22  portion of Mr. Clean latex gloves.  Moving back to
23  the left there were five gloves inside of that
24  Mr. Clean bag.
25     Q.   And do you know how many come in the bag

3039

1  based on the markings on the bag?
2      A.   I don't recall.  I'm sorry.
3      Q.   Okay.  And in the middle you said there is
4  two loose gloves.  Were those loose inside the
5  Walgreen's bag?
6      A.   They were loose inside the Walgreen's bag,
7  yes.
8      Q.   Are these latex gloves, the ones in the
9  middle, consistent with any other items that you
10  analyzed while working on this case?
11     A.   They appear to be latex type gloves and
12  there were pieces of latex also found within the
13  duct tape.
14     Q.   And I'm going to show you what's been
15  marked 457 for identification, do you recognize what
16  this is a photograph of?
17     A.   This is a picture of the backside of one of
18  the Mr. Clean bags which contained gloves from
19  laboratory submission 19, and I took this picture.
20          MS. DAYTON:  Your Honor, we'd ask to
21  move it into evidence, 457?
22          MR. SHEEHAN:  No objection.
23          THE COURT:  457 is a full exhibit.
24          MS. DAYTON:  Thank you.
25     Q.   Did you -- well, if you could describe what

3040

1  this is and what, if anything, appeared to be of
2  relevance to you.
3      A.   This is the backside of one of the
4  Mr. Clean bags which contained latex type gloves.
5  If you'll notice the center of the bag is torn.  And
6  if you've ever taken any type of plastic and pulled
7  it, or if you have ever seen a puncture through a
8  trash bag, you know what pulled plastic looks like.
9  So whomever did that didn't go through the tear-out
10  portion, which is in the center where you are
11  supposed to remove the gloves.  Instead they tore
12  the top of the bag.  So that was of interest.  So,
13  that means that someone had to pull and pinch it
14  open and that was swabbed for potential touch DNA.
15     Q.   Now, if someone was, for instance, wearing
16  latex gloves from the other package when they ripped
17  this one, would you expect to find touch DNA?
18     A.   Not necessarily.
19     Q.   So you swabbed this area.  Did you swab
20  anything else in Government's Exhibit -- or excuse
21  me, it's lab Exhibit 19 and it is Government's
22  Exhibit 136 -- 139A.  Did you swab anything else?
23     A.   I swabbed, there were three swabbings taken
24  off of laboratory submission 19.  I swabbed the area
25  around the damaged opening of the bag we just

3041

1    discussed, which is identified as 19-1.  And then
2    the other bag that we saw in the first exhibit, that
3    was 19-3.  So that was swabbed as well in two areas.
4         Q.   And those were transferred where?
5         A.   To the DNA section for further examination.
6         Q.   And what did you do with the rest of the
7    items?
8         A.   They were packaged back in the original
9    packaging and sent to latent print section.
10        Q.   I'm going to show you what's been admitted
11   into evidence as Government Exhibit 123A, 123A-1 and
12   123A-2, which is lab 21.  If you could take a look
13   at this, let me know if you recognize it.
14        A.   I recognize the packaging by my initials
15   which are under this plastic piece here.  I
16   recognize the MGW as well as the bar code here,
17   which is in the center of the bag.  So, I recognize
18   the packaging.  I would prefer not to put my hand in
19   the bag, it's not -- I don't have gloves on, I can
20   put gloves on.
21        Q.   That's fine.  If I can just direct your
22   attention instead to the picture in Government's
23   Exhibit 402.  Do you recognize what that is?  It's
24   marked for identification 402.
25        A.   Yes, this is a picture of laboratory

3042

1    submission No. 21.
2         Q.   Who took this photo?
3         A.   I took this photo.
4         Q.   And does this accurately represent what you
5    received at the lab in terms of lab exhibit 21?
6         A.   Yes, it is.  It is a photo of a series of
7    bags, blue as well as white Walgreen's bag nested
8    together, if you will.  The blue bag on the exterior
9    is a heavier type of plastic and there was also duct
10   tape located on the interior second bag.
11        Q.   I'm just going to show you a couple photos.
12             MS. DAYTON:  First we'd ask to admit
13   402.
14             MR. SHEEHAN:  May I briefly inquire,
15   your Honor?
16             THE COURT:  You may.
17   VOIR DIRE EXAMINATION
18   BY MR. SHEEHAN:
19        Q.   Ms. Warner, the picture you have there in
20   front of you, is that the way that it came -- is
21   that the way it was when you opened the bag?
22        A.   Yes.
23        Q.   In other words, that white bag was nested
24   inside of the other bag?
25        A.   Yes, it is.

3043

1         Q.   And you didn't put it in that other bag,
2    that's where it was when you got the bag from the
3    Bridgeport Police Department?
4         A.   That is correct.
5              MR. SHEEHAN:  I don't have any further
6    questions, your Honor.
7              MS. DAYTON:  402 is already in evidence
8    from yesterday.
9              MR. SHEEHAN:  Well, then.
10             MS. DAYTON:  So then he really has no
11   objection.
12             MR. SHEEHAN:  Well, then I really have
13   no objection.  I double that, your Honor, no no
14   objection.
15   CONTINUED DIRECT EXAMINATION
16   BY MS. DAYTON:
17        Q.   And this is what you described, the
18   Walgreen's bag inside of the blue bag?
19        A.   Yes.
20        Q.   Did you take those items apart?
21        A.   Yes, I did.
22        Q.   And what, if anything, did you find as you
23   took them apart?
24        A.   There is the blue plastic bag which you see
25   in the photograph.  There was some damage to it and

3044

1    there were some dent marks on it, which in my
2    opinion looked like teeth marks.  Those areas were
3    swabbed and sent to the DNA section for further
4    examination.  There was also a white plastic
5    Walgreen's brand bag and there was duct tape
6    sticking to that in two areas.  There were some
7    reddish-brown stains and crusts on this as well.
8         Q.   I'm showing you what's already in evidence
9    as Government's Exhibit 403.  Did you take this
10   photo?
11        A.   Yes, I did.
12        Q.   And what is this a photograph of?
13        A.   This is a close-up of laboratory submission
14   No. 21, the Walgreen's bag depicting the
15   reddish-brown stains which were on the Walgreen's
16   bag.
17        Q.   And which bag was the one with the -- you
18   said it looks like teeth marks?
19        A.   There were a series of dents in a row which
20   looked to me like teeth marks.  Those, that was the
21   blue bag which you are referencing.
22        Q.   And was there any damage on the Walgreen's
23   bag that we're looking at right now?
24        A.   Yes, it was ripped.  It was not in pristine
25   condition, it was damaged.

3045

1    Q.   I'm going to show you what's in evidence as
2   Government Exhibit 404.  Do you recognize this
3   photo?
4    A.   Yes.  This is a close-up of laboratory
5   submission 21.  It is a view of the white Walgreen's
6   bag and there is two areas of duct tape which were
7   on the bag.
8    Q.   And did you do anything to process this
9   evidence combined, the two bags, the duct tape?
10    A.   I swabbed the blue bag for potential touch
11   DNA where I thought it looked like teeth marks.  And
12   there were reddish-brown crusts which were both on
13   the blue bag as well as the white bag.  When
14   blood-like material -- when blood is on plastic it
15   dries and then it can flake.  So I took some of the
16   crusts that were off of the blue bag as well as the
17   white bag and tested them separately and they were,
18   it indicated, human blood.
19    Q.   Did you -- when you say you swabbed the
20   blue bag, did you swab the whole bag, front and
21   back?
22    A.   No, just the area that looked like there
23   were these little dent marks on it.  It looked
24   indicative of teeth marks.
25    Q.   And what did you do with the swabs?

3046

1    A.   They were packaged and sent to the DNA
2   section for further examination.  And number 21 in
3   its entirety was sent to the latent print section
4   for further analysis.
5    Q.   I'm going to move on now to January 20,
6   2006, supplemental trace report 3, and did you have
7   another group of items together?
8    A.   Yes.  This was the last of the duct tape
9   that I received.  I received nine pieces of duct
10   tape, each individually numbered, coming from the
11   various areas of the victims.  And these were the
12   last four pieces that needed to be examined.
13    Q.   And was there any particular reason you
14   saved these items until last?
15    A.   Well, based on the information that was
16   provided in the documents from the police
17   department, I knew that duct tape that was removed
18   off of the head of someone.
19          MR. SHEEHAN:  I'm going to object.  If
20   she is testifying to what she heard from the police
21   department.
22          MS. DAYTON:  Your Honor --
23          THE COURT:  There is some record that
24   you are reviewing when you obtain that information?
25          THE WITNESS:  Yes, your Honor.

3047

1          THE COURT:  Why don't you describe what
2   that is.
3    A.   Based on the request for examination
4   documents which are sent to the laboratory, there is
5   a synopsis from the police department which
6   describes the crime scene.  Based on that, I knew
7   that there may be blood, a significant amount of
8   blood on these pieces of duct tape.  Also the duct
9   tape was identified as having been removed from the
10   faces.  Three of these submissions were removed from
11   the faces of the victim.
12    Q.   I'm going to show you what's in evidence as
13   Government's Exhibit 120A and 120A-1.  Particularly
14   with 120A, do you recognize what that item is?
15    A.   This is the paint can, which is laboratory
16   submission No. 4.  This was brought to the
17   laboratory.  With cross-referencing the information
18   on the paint can, it was -- duct tape was the
19   contents and it was removed from the face and head
20   of Basil Williams.
21    Q.   If I could direct your attention to what's
22   on your screen as Government Exhibit 411 for
23   identification.  Do you recognize what that is?
24    A.   It's a photograph of the duct tape as it
25   was received out of the paint can for laboratory

3048

1   submission No. 4 and I took that picture.
2          MS. DAYTON:  Your Honor, I would ask to
3   move 411 into evidence.
4          MR. SHEEHAN:  No objection.
5          THE COURT:  All right, 411 is a full
6   exhibit.
7          MS. DAYTON:  Thank you.
8    Q.   This has a 4 on the bottom, what does that
9   indicate?
10    A.   Laboratory submission No. 4.
11    Q.   And what is this we're looking at?
12    A.   Laboratory submission No. 4 is duct tape
13   that was removed from the head, face and head of
14   Basil Williams.
15    Q.   On the right side of the photograph you can
16   see -- can you describe what we're looking at.
17    A.   Yes.
18    Q.   Indicating the right side of the duct tape,
19   what is that?
20    A.   Those are hairline fibers that were
21   adhering to the adhesive portion of the duct tape.
22    Q.   There is a hand in the lower left-hand
23   side, gloved, who is that?
24    A.   That is my hand.
25    Q.   I'm going to show you a second photograph.

3049

1  This is 414 for identification. Do you recognize
2  what this is?
3      A. Yes, this is another shot of laboratory
4  submission No. 4 which is the duct tape that was
5  removed from the face and head of Basil Williams.
6          MS. DAYTON: Your Honor, I would ask --
7      Q. Did you take this photograph?
8      A. Yes, I did.
9      Q. Does this accurately represent what the
10 tape looked like when you removed it from lab 4, the
11 can?
12     A. Yes, it is.
13         MS. DAYTON: May I move 414 into
14 evidence, your Honor?
15         THE COURT: Absent objection.
16         MR. SHEEHAN: Your Honor, may I approach
17 on this?
18         THE COURT: Approach or inquire?
19         MR. SHEEHAN: Approach, your Honor.
20         THE COURT: All right.
21         (Sidebar conference)
22         MR. SHEEHAN: Your Honor, I'm objecting
23 that this is cumulative. I don't think that there
24 is anything in this other than being obviously sort
25 of a death mask. We've already gotten Mr. Williams

3050

1  being duct-taped to death. We've seen pictures of
2  it and, I don't think having a death mask here helps
3  at all. Other than -- I mean, does it advance the
4  Government's case in any meaningful way? And it
5  does work an unfair prejudice.
6          MS. DAYTON: So, number one, I object to
7  the timing of the objection because these were
8  provided to counsel in advance. Number two, counsel
9  has already indicated he is going to spend at least
10 an hour with Ms. Warner and possibly a whole day
11 with our DNA people talking about contamination and
12 protocol at the lab. She processed all of these
13 items.
14         This is -- first of all, it's not
15 gruesome. There is like a couple -- it's specks of
16 blood in it. It's duct tape and it's not
17 cumulative. There is no other photos of
18 Mr. Williams' duct tape once it's been removed from
19 his face. This is the first one that we're putting
20 in from this sort of angle, your Honor. So, with
21 respect to the crime scene photos, there is no full
22 face frontal shot at all.
23         THE COURT: All right, I'm going to
24 overrule the objection, if for no other reason than
25 the meticulousness of her swabbing and analysis is

3051

1  going to be the subject of cross-examination, and I
2  think that's right, I think other than the live -- I
3  mean, the crime scene photos of the victims' bodies,
4  there is nothing that is Basil Williams' head
5  mask -- duct tape in full. So, I'm going to
6  overrule the objection. It's not cumulative.
7          (Sidebar concluded)
8          MS. DAYTON: Your Honor, may I publish
9  to the jury?
10         THE COURT: You may.
11         MS. DAYTON: I'm going to ask you to
12 turn the lights down again.
13         THE COURT: You are so demanding.
14     Q. If you could just explain for the jury what
15 we're looking at.
16     A. This is another view of laboratory
17 submission No. 4 which is the duct tape that was
18 removed from the face and head of Basil Williams.
19     Q. Is this an accurate representation of what
20 this looked like when you received it?
21     A. Yes.
22     Q. There are spots on the tape?
23     A. Yes.
24     Q. Do you know what those spots are?
25     A. They were reddish-brown stains, and I

3052

1  tested a sample, I just want to find the location.
2  A sample of the reddish-brown crusts were tested and
3  they were -- they indicated the presence of human
4  blood.
5      Q. Did you find -- there is a hole in the
6  middle. Do you know what that is?
7      A. It seems to be a damaged area in the
8  wrappings.
9      Q. So, this is how it came to you?
10     A. That is correct.
11     Q. Did you find anything, any trace evidence
12 in this item of duct tape?
13     A. Yes, there was significant amount of
14 hairlike fibers adhering to one side of the interior
15 adhesive area of the duct tape.
16     Q. I'm going to show you what's been marked
17 Government's Exhibit 413 for identification. Do you
18 recognize this photo?
19     A. Yes, this is a picture of laboratory
20 submission No. 4, just a different view, and I took
21 this picture.
22     Q. Is this an accurate representation of what
23 you received?
24     A. Yes, it is.
25         MS. DAYTON: Your Honor, I would ask to

3053

```
1    move 413 into evidence.
2              MR. SHEEHAN:  Your Honor, I renew my
3    objection as previously stated.
4              THE COURT:  Overruled.
5              MS. DAYTON:  May I publish, your Honor?
6              THE COURT:  You may.
7              MS. DAYTON:  Thank you.
8         Q.   If you can just describe for the jury what
9    we're looking at.
10        A.   You are looking at another view of
11   submission No. 4 which is the duct tape that was
12   removed from the face and head of Basil Williams.
13   If you'll notice -- I'll point it out first.
14             MS. DAYTON:  Indicating the middle lower
15   portion of picture 413, your Honor, Government's
16   Exhibit.
17        A.   Yes, you'll notice several hairlike fibers
18   which were present sticking to the adhesive portion
19   of the duct tape.
20        Q.   Thank you.
21        I'm going to move on to Government's
22   Exhibit 121A and 121A-1 which is lab 7.  Do you
23   recognize 121A?
24        A.   Yes, this is the paint can which was
25   laboratory submission No. 7.  I can identify it by
```

3054

```
1    my initials as well as the bar code which is on the
2    bottom area.
3         Q.   What was contained in there when you
4    received it?
5         A.   This contained duct tape, again, wrapped in
6    a circular fashion upon itself.  It was cut up one
7    side.  There were reddish-brown stains and crusts
8    which indicated the presence of human blood.  There
9    was also some latex type material which was located
10   in the adhesive area and there were numerous
11   hairlike fibers which were adhering to one side of
12   the interior of the adhesive.
13        Q.   And drawing your attention to the small
14   screen to Government's Exhibit 424.  Do you
15   recognize what that's a photo of?
16        A.   Yes, that's a picture of laboratory
17   submission No. 7.  With cross-referencing it is
18   taken from the face and head of Tina Johnson.
19        Q.   And you took this photo?
20        A.   Yes, I did.
21             MS. DAYTON:  Your Honor, I would ask to
22   publish this?
23             MR. SHEEHAN:  No objection.
24             MS. DAYTON:  To admit it and to publish
25   it.
```

3055

```
1              THE COURT:  Full exhibit.
2         Q.   And again, if you can just describe for the
3    jury what we're looking at.
4         A.   This is a view of laboratory submission
5    No. 7.  I took this photograph.  It is duct tape
6    that was removed from the face and head of Tina
7    Johnson.
8         Q.   And what are the -- can see some markings
9    along the outside?
10        A.   Those are reddish-brown crusts.  Those
11   reddish-brown crusts were tested and they indicated
12   the presence of human blood.
13        Q.   And along the inside on the upper portion,
14   what is that?
15        A.   The upper portion at approximately the
16   twelve o'clock portion in the circle, numerous
17   hairlike fibers that were adhering to the adhesive
18   on the duct tape.
19        Q.   Did you swab this item?
20        A.   I swabbed a piece of latex type material
21   that was in the wrappings.
22        Q.   I'm going to show you what's been marked
23   425 for identification.  Why didn't you swab the
24   entire piece of duct tape?
25        A.   Based on my training and experience the
```

3056

```
1    amount of reddish-brown crusts that did indicate the
2    presence of human blood, that is not something that
3    would have made sense based on the fact that we're
4    looking for touch DNA, not the victim's DNA on an
5    item that was taken off of the victim.
6         Q.   So, you would expect this blood to be
7    whose?
8              MR. SHEEHAN:  Objection, leading.
9              THE COURT:  Overruled.
10        A.   Based on my training and experience I would
11   expect the blood to be of the victim.
12        Q.   And Government's Exhibit 425 on your small
13   screen, do you recognize that photograph?
14        A.   Yes, this is another view of laboratory
15   submission No. 7.
16        Q.   And you took this?
17        A.   Yes, I did.
18             MS. DAYTON:  Your Honor, I would ask to
19   move this into evidence?
20             MR. SHEEHAN:  No objection.
21             THE COURT:  All right.  425 is a full
22   exhibit.
23        Q.   And what, if anything, is shown in 425 that
24   drew your attention?
25        A.   You'll notice that cream colored area right
```

**GA764**

3057

1  in the center there, it appears to be a piece of
2  latex type material.
3      Q.  And what did you do, if anything, with
4  that?
5      A.  An area that did not have blood,
6  reddish-brown stains on it, was swabbed, and that
7  swabbing was then sent to the DNA section for
8  further analysis.  The entire piece of evidence,
9  laboratory No. 7 was then forwarded to the latent
10 print section for further analysis.
11     Q.  Thank you.
12         I'm going to show you Government
13 Exhibit 122A and 122A-1 which is lab 10.  Do you
14 recognize 122A?
15     A.  Yes.  This is the paint can that was
16 laboratory submission No. 10.  I can recognize it by
17 both my initials and the bar code on the bottom.
18 This contained duct tape.  With the
19 cross-referencing, it is the duct tape removed from
20 the face and head of James Reid.  It was duct tape
21 wrapped on itself in layers and it was cut up on one
22 side.  There were reddish-brown crusts on it that
23 indicated the presence of human blood.
24     Q.  I'm going to draw your attention to the
25 small screen, Government's Exhibit 435.  Did you

3058

1  take that photograph?
2      A.  I did.  This is a photograph of laboratory
3  submission No. 10 as it was received at the
4  laboratory.
5      Q.  By you?
6      A.  That is correct.
7          MS. DAYTON:  Your Honor, I would ask to
8  move this into evidence.
9          MR. SHEEHAN:  No objection.
10         THE COURT:  435 is a full exhibit.
11         MS. DAYTON:  Thank you.
12     Q.  And if you could just describe for the jury
13 what it is we're looking at.
14     A.  You are looking at laboratory submission
15 No. 10.  It is duct tape wrapped upon itself.
16 You'll notice the reddish-brown stains and crusts
17 that are on the front.  A sample of those was tested
18 and it indicated the presence of human blood.  There
19 was some latex type material that was swabbed that
20 was not near any of the reddish-brown stains that
21 was caught up in the adhesive.  That was collected
22 and sent to the DNA section for further analysis.
23 Submission No. 10 in its entirety was then forwarded
24 to latent print section for further analysis.
25     Q.  You said you swabbed some latex?

3059

1      A.  Yes.
2      Q.  I'm going to show you what's been marked
3  for identification Government's Exhibit 436.  Do you
4  recall where in the duct tape the latex was found?
5      A.  It was in the wrappings of the duct tape in
6  the layering of the duct tape.
7      Q.  Showing you government 436, do you
8  recognize what this is?
9      A.  I do.  This is another view of laboratory
10 submission No. 10 showing the latex type material in
11 the center of the photograph.  I took this
12 photograph and this is how it was received at the
13 laboratory when I examined it.
14         MS. DAYTON:  Your Honor, I would ask to
15 move 430 into evidence.
16         MR. SHEEHAN:  No objection.
17         THE COURT:  Full exhibit.
18         MS. DAYTON:  Thank you.
19     Q.  And if you can just -- first of all, this
20 is open.  How did it get -- it's different than 435,
21 how did it get open?
22     A.  Well, I manipulated it to be able to see
23 what is inside of the adhesive wrappings when I
24 noticed there was a piece of latex there.
25     Q.  And what did you do with the latex?

3060

1      A.  Excuse me, latex type material.
2      Q.  Latex type material.
3      A.  Thank you.  It was swabbed.  An area was
4  swabbed where I didn't hit any of the reddish-brown
5  crusts, and that sample was then put -- sent to the
6  DNA section for further analysis.  Submission No. 10
7  was then forwarded to t the latent print section.
8  This was identified as coming from the face and head
9  of James Reid.
10     Q.  You said that it was wrapped, the latex was
11 in between layers.  Was it between layers or more
12 than two, if you recall?
13     A.  Based on the photographs I feel it was more
14 than two layers.
15     Q.  And along the outside on the right side of
16 the photograph you see some staining.  Do you know
17 what that is?
18     A.  Those are the reddish-brown stains that
19 were on the submission as it was received in the
20 laboratory.
21     Q.  And did you test those stains?
22     A.  Yes.  I tested some crusts that came off of
23 the submission and that indicated the presence of
24 the blood.
25     Q.  And inside along the white you can see some

3061

```
1    items.  Do you know what those are?
2        A.   Again, those are more reddish-brown stains
3    and crusts.
4        Q.   And was there hair in this item?
5        A.   Yes, there was hairlike fibers that were
6    adhering to it as well.
7        Q.   Okay.  I'm going to show you one last item.
8    It's Government's Exhibit 121D and D-1.  It's lab
9    exhibit 9 for ID -- lab exhibit 9 for you.  121D, do
10   you recognize what that is?
11       A.   I do.  This is the paint can identified as
12   laboratory submission No. 9.  I can identify it by
13   my initials and the bar code.  This, again,
14   contained duct tape that was wrapped on itself.
15   This was identified with a cross-reference as coming
16   from the wrist, hands, and arms of Tina Johnson.  It
17   contained, again, wrapped duct tape and three
18   different areas of latex type material that were in
19   the wrappings, in the layering as well.  There were
20   crusts, reddish-brown crusts that were located on
21   this submission and they were tested and they
22   indicated the present of human blood.
23       Q.   And I'm going to ask you to look at the
24   small screen at what's been marked 430 for
25   identification.  If you recognize that.
```

3062

```
1        A.   This is a picture of laboratory submission
2    No. 9.  I took this picture and this is how it was
3    received in the laboratory when I examined it.
4            MS. DAYTON:  Your Honor, I would ask to
5    move 430 into evidence.
6            MR. SHEEHAN:  No objection.
7            THE COURT:  Full exhibit.
8        Q.   Starting with the right-hand side, you can
9    see some little dots.  Do you see what I'm talking
10   about in the actual latex -- I mean, in the duct
11   tape material on the right-hand side?  I don't know
12   if you can see it up close.  The calendaring you
13   spoke of?
14       A.   I'm sorry.  I thought you meant reddish.
15       Q.   I didn't mean "dots."  I'm using the wrong
16   word.
17       A.   You can see some parallel lines which
18   looked like dots, and that's that calendaring I told
19   you about.  When duct tape is manufactured it is
20   spooled, and different types of manufacturers will
21   leave those manufacturing marks on the duct tape.
22       Q.   On the upper sort of left-hand side you see
23   some cream colored items, what are those?
24       A.   That's latex type material that was again
25   in the layering of the duct tape.
```

3063

```
1        Q.   And I'm going to ask you to take a look at
2    Government's Exhibit 433 for identification.  Do you
3    recognize what this is a photo of?
4        A.   This is, again, another photo of laboratory
5    submission No. 9.  I took this photo.  It is how it
6    appeared when I received it at the lab.  It is duct
7    tape from the wrist, hands, and arms of Tina
8    Johnson, and there is latex type material visible in
9    the layering of it.
10           MS. DAYTON:  Your Honor, I would ask to
11   move 433 into evidence.
12           MR. SHEEHAN:  No objection.
13           THE COURT:  Full exhibit.
14           MS. DAYTON:  Thank you, your Honor.
15       Q.   If you can describe for the jury where and
16   how many locations you see the latex?
17           MS. DAYTON:  Indicating in the middle
18   upper portion, to the right, and to the left.
19       A.   There are three areas of latex type
20   material that are visible.  This was -- it did
21   appear to be cut up one side, so it may have
22   actually been one piece of latex that got cut when
23   it was removed from the victim.  I took three
24   different swabbings of the latex type material.
25   They were identified as 9-Z-1, 9-Z-2 and 9-Z-3.
```

3064

```
1    Those swabbings were then sent to the DNA section
2    for further analysis.  No. 9 in its entirety was
3    then sent to the latent print section for further
4    examination.
5        Q.   And very faintly on the picture at the top
6    you can see some reddish-brown dots.  Did you see
7    the presence of any staining on this item?
8        A.   There were reddish-brown stains.  The
9    orientation of it in my photographs is a little bit
10   different, but they did indicate the presence of
11   human blood.
12       Q.   So, they were tested for blood?
13       A.   Yes.
14       Q.   Do you know how many layers of duct tape is
15   in 433?
16       A.   I did not count them, however, it appears
17   to be more than two.  There is significant amount of
18   layering there.
19       Q.   And as you said at the beginning, there
20   were 75 items in total you received?
21       A.   The laboratory received 75 items.  That is
22   correct.
23       Q.   So we haven't gone over every single item
24   you analyzed.
25       A.   No, we did not.
```

3065

```
 1          MS. DAYTON:  Thank you.  Your Honor, I
 2   have -- oh, I might have one further thing.  One
 3   moment, please.
 4          Nothing further at this time, your
 5   Honor.
 6          THE COURT:  All right, then, we are at
 7   3:30.  You indicated you had a short witness, but
 8   can that witness come back tomorrow because I have
 9   another matter.
10          MS. RODRIGUEZ-COSS:  Tomorrow or another
11   day.  She will be about 15 minutes, but if the Court
12   can't, we'll reschedule.
13          THE COURT:  All right then, we will stop
14   for the day and we will pick up with
15   cross-examination tomorrow.
16          Leave your notebooks here, don't discuss
17   the case, enjoy the rest of the day.  See you
18   tomorrow.
19          (Jury exited the courtroom)
20          THE COURT:  All right, Ms. Warner, you
21   are excused for the day.  Please come back tomorrow
22   and be prepared to proceed at 9:30.  Don't discuss
23   your testimony with anyone.
24          THE WITNESS:  Thank you, your Honor.
25          THE COURT:  Is there anything else
```

3066

```
 1   before we conclude today?  If not, we'll stand in
 2   recess.
 3          (Recess)
```

3067

```
 1              I N D E X

 2
 3   WITNESS                                    PAGE
 4   LASHIKA JOHNSON
 5   Continued Direct Examination by Mr. Markle  2837
 6   Cross-Examination by Mr. Sheehan            2917
 7   Redirect Examination by Mr. Markle          2958
 8   Recross-Examination by Mr. Sheehan          2972
 9
10   MARIA WARNER
11   Direct Examination by Ms. Dayton            2974
12
13
14          I certify that the foregoing is a
15   correct transcript from the record of proceedings in
16   the above-entitled matter.
17              5/11/11
18              Date
19
20              /S/  Sharon Montini
21              Official Reporter
22
23
24
25
```

3068

```
 1          UNITED STATES DISTRICT COURT.
 2          DISTRICT OF CONNECTICUT
 3   * * * * * * * * * * * *    *
                                *
 4   UNITED STATES OF AMERICA,   * Case No 6cr160(JBA)
                                *
 5          Plaintiff,          *
                                *
 6      vs.                     *
                                *
 7   AZIBO AQUART              * May 11, 2011
                                *
 8          Defendant.          *
                                *
 9   * * * * * * * * * * * * *   *
10              TRIAL TRANSCRIPT
11              VOLUME XIV
12   BEFORE:  THE HONORABLE JANET BOND ARTERTON U.S.D.J.,
                                        and jury
13   Appearances:
14   FOR THE GOVERNMENT:  ALINA REYNOLDS, ESQ
                          TRACY DAYTON, ESQ.
15                        PETER MARKLE, ESQ.
                          JACABED RODRIGUEZ-COSS
16                        United States Attorney's Office
                          915 Lafayette Blvd
17                        Bridgeport, CT 06604
18
19   FOR THE DEFENDANT    MICHEAL SHEEHAN, ESQ
     AZIBO AQUART:        Sheehan & Reeve
20                        139 Orange Street
                          New Haven CT 06510
21                        JUSTIN SMITH, ESQ.
                          383 Orange Street
22                        New Haven, CT 06511
23
24   Court Reporter:    Sharon Montini, RMR
25   Proceedings recorded by mechanical stenography,
     transcript produced by computer
```

3069

```
1              THE COURT:  Good morning, counsel,
2   ladies and gentlemen.  Mr. Aquart.  I have the
3   defendant's motion to preclude Thomas Martin from
4   testifying, which I have just picked up and looked
5   through briefly.  When is Mr. Martin's testimony
6   anticipated?
7              MS. DAYTON:  Tomorrow.
8              THE COURT:  Why is this motion being
9   filed at this time?
10             MR. SMITH:  Your Honor, after reviewing
11  Mr. Martin's report, forwarding that to a consulting
12  expert of our own, and also reviewing the previous
13  testimony of the medical examiners who have already
14  testified, and I presume the expected testimony of
15  the third medical examiner, I came to the conclusion
16  that it was in fact cumulative testimony.  It didn't
17  have any bearing to assist the jury with any fact at
18  issue and that the point was simply unnecessary.
19             THE COURT:  It seems to me the Court
20  would we better informed if I had a copy of his
21  report, no?
22             MR. SMITH:  Yes, your Honor.  I can
23  provide that to the Court.
24             THE COURT:  Okay.
25             MR. SMITH:  I thought -- I had intended
```

3070

```
1   to attach a copy, but I did not.
2              THE COURT:  Now, we need to discuss a
3   charge conference in this case as we are nearing the
4   conclusion of evidence.  Has the government -- we
5   set a time for the government to submit the
6   statutory aggravating factors.  We must be getting
7   close to that deadline.
8              MR. SHEEHAN:  I don't think --
9              THE COURT:  Pardon me?
10             MR. SHEEHAN:  I don't think we did.  We
11  didn't get into penalty phase charges at all.
12             THE COURT:  I don't mean charges.  I
13  mean, you have a motion for more definite statement.
14  Excuse me?
15             MS. DAYTON:  Bill of particulars.
16             MR. SHEEHAN:  Which they responded to,
17  your Honor.
18             THE COURT:  So that's all set.
19             MR. SHEEHAN:  I think that's all set.
20             THE COURT:  So you have all the
21  nonstatutory aggravating factors known to you.
22             MR. SHEEHAN:  Yes.
23             THE COURT:  Okay, good.  It seems to me
24  that we perhaps should be doing our charge
25  conference Friday afternoon after trial.  The
```

3071

```
1   government's aspirations were to be finished with
2   its evidence by then.  I don't know whether that
3   still holds.  The maximum the defendant had was two
4   more days.  I don't think that the charge is
5   substantively much in dispute, but structurally it's
6   not an easy charge to make useful to the jury, and
7   I'm working on various forms.
8              MR. SHEEHAN:  Friday afternoon would be
9   fine, your Honor.
10             THE COURT:  Let's do that.  Let's mark
11  that off, and I will clear the calendar here to do
12  that.  And I will have a draft to you -- well, maybe
13  tonight sometime.  Okay.
14             All right, anything else before we
15  begin?
16             MS. DAYTON:  Yes.  There is one thing
17  related to the DNA examiner who is the next witness
18  to testify.  So, I don't know if you want to deal
19  with that right now or after Ms. Warner completes
20  her testimony.
21             THE COURT:  And this is the issue of --
22             MR. SHEEHAN:  The second.
23             THE COURT:  -- the second examiner.
24             MS. DAYTON:  Yes.
25             THE COURT:  And why don't we take that
```

3072

```
1   matter up.
2              MS. DAYTON:  Maria Warner is still on
3   the stand.  She's going to be crossed.
4              MR. SHEEHAN:  I don't think --
5              MS. DAYTON:  And then Christine Roy.  We
6   can do it between then if you would like, your
7   Honor.
8              MR. SMITH:  Your Honor, if I may.  Also
9   I do have a copy of Mr. Martin's report that I could
10  file with the clerk now.
11             THE COURT:  All right, if you would just
12  hand it up to Mr. Kretman.
13             All right, let's get our jury in here.
14  And then there was somebody else who was a brief
15  witness.
16             MS. DAYTON:  She's gone.  She will be
17  back Thursday.  Thank you.  We'll get Ms. Warner.
18             THE COURT:  All right.
19             (Jury entered the courtroom.)
20             THE COURT:  All right, good morning.
21  Got off to a little bit of a late start, although
22  we've been working.
23             All right, please be seated, and we will
24  resume the testimony of Ms. Warner.
25             THE WITNESS:  Good morning.
```

3073

1      THE COURT:  Ms. Warner, you remain under
2  oath and we he will begin cross-examination by Mr.
3  Sheehan.
4      All right, cross.
5      M A R I A   W A R N E R,
6  Having previously affirmed, was examined and
7  testified as follows:
8  CROSS-EXAMINATION
9  BY MR. SHEEHAN:
10     Q.   Good morning again, Ms. Warner.
11     A.   Good morning.
12     Q.   I want to just review a number of items
13  that you testified to.  You were basically the trace
14  processor for all of the material received in this
15  case, were you not?
16     A.   Yes.
17     Q.   And some of that material came from the
18  Bridgeport Police Department?
19     A.   Yes.
20     Q.   And other material, some of it came from
21  the chief medical examiner's office?
22     A.   That is correct.
23     Q.   Now, I believe you testified to processing
24  various items of DNA, swabbing, to see if there was
25  DNA evidence in this case.

3074

1      A.   I swabbed for the collection, and the DNA
2  processing is done by another person.
3      Q.   All right.  But you are like the collector,
4  right?
5      A.   You could say that, sure.
6      Q.   And if it is on that swab when you are done
7  with it, they have nothing to analyze, right?
8      A.   You could say that I guess.
9      Q.   All right.  And the items that you looked
10  at included lab No. 7?
11     A.   Yes.
12     Q.   And 8?
13     A.   Yes, I did.
14     Q.   And 9?
15     A.   Yes.
16     Q.   And 10?
17     A.   Yes.
18     Q.   And 12?
19     A.   Yes.
20     Q.   13?
21     A.   Yes.
22     Q.   And 14 as well?
23     A.   Yes.
24     Q.   15?
25     A.   Yes.

3075

1      Q.   And item 16?
2      A.   Yes.
3      Q.   All right, and in that context, you took
4  the material that you'd received from the -- for
5  those items, you took the material you'd received
6  from the Bridgeport Police Department, you swabbed
7  them and you forwarded the -- well, you basically
8  put the little swabs in the container and then they
9  go in the freezer until somebody else looks at them.
10     A.   That is correct.  Some of those items did
11  not just come from the Bridgeport Police Department
12  that you referenced.  Some of those did come from
13  the medical examiner as well.
14     Q.   And another item that you processed for DNA
15  swab was item lab 32?
16     A.   That is correct.
17     Q.   And that was fingernail clippings from the
18  chief medical examiner related to Tina Johnson?
19     A.   Yes.
20     Q.   And that would then be forwarded, your
21  swabs also similarly were forwarded to the DNA
22  section, right?
23     A.   Those samples were retained at the
24  laboratory.  I would have to refer to -- you would
25  have to refer to the DNA examiner if further testing

3076

1  was done on those.
2      Q.   Right, because you don't do that testing?
3      A.   That is correct.
4      Q.   And with respect to item 15, that was one
5  of the items that you processed?  That was that
6  stocking cap that we have -- stocking, piece of
7  stocking?
8      A.   I'm sorry, can you repeat that?
9      Q.   Yes.  I'm sorry, the state lab 15, was that
10  nylon stocking?
11     A.   Yes, it was a stocking, not a cap.
12     Q.   All right.  And partly you swabbed that,
13  right?
14     A.   It was swabbed, yes.
15     Q.   And there was also what appeared to be a
16  human hair recovered on that item?
17     A.   That is correct.
18     Q.   And that hair was then forwarded to the DNA
19  lab, right?
20     A.   No, that's incorrect.
21     Q.   What happened to that hair?
22     A.   A portion of the hair, the root end that
23  had tissue was sent, not the hair in its entirety.
24     Q.   And would you take responsibility for
25  clipping that?

**GA769**

3077

1    A.    Yes.

2    Q.    And putting the root in the little vial?

3    A.    Tube.

4    Q.    Tube?

5    A.    Yes, that is correct.

6    Q.    Now, I believe -- if I may, yesterday you

7    talked about Government Exhibit 447.  Do you recall

8    the latex -- the fragment of latex type material,

9    item 13?

10   A.    I don't have a reference to what 447 is,

11   but the picture you are holding is laboratory 13.  I

12   can discuss that, unless I have a reference list as

13   to what the pictures are called.

14   Q.    Okay.  Looking at the top to Exhibit 447,

15   this was that piece of -- and it's state lab 13, the

16   number you assigned to it, right?

17   A.    It was assigned in the evidence receiving

18   area, but that's how I reference it, that is

19   correct.

20   Q.    And that was the latex type material that

21   you -- one piece of latex type material that you

22   looked at, right?

23   A.    That is correct.

24   Q.    And I believe in your testimony yesterday

25   you indicated there was a reddish stain on that?

3078

1    A.    There were some stains on it, yes.

2    Q.    This item was not tested for the presence

3    of human blood, was it?

4    A.    There was a swabbing taken of the area that

5    was put into storage.  You would have to reference

6    the DNA reports to see if further testing was done.

7    Q.    But as far as your testing, you were not

8    testing that for the presence of blood, correct?

9    A.    I tested it with a screening test for the

10   presence of blood and that came up positive.

11   Q.    And you have further tests that you can do

12   to determine whether or not it is human blood,

13   right?

14   A.    That is correct.

15   Q.    And in this case you did not do those

16   tests?

17   A.    No, I did not.

18   Q.    Okay.  And that presumptive test is simply

19   an indication that you may want to test further,

20   right?

21   A.    Well, if I can clarify.  We don't use the

22   term "presumptive test."  It's called a chemical

23   screening test, and if the test comes up positive,

24   you may go on and do further testing.

25   Q.    Okay, if it comes out negative you don't

3079

1    bother?

2    A.    If it comes out negative then it indicates

3    it is a negative result and it is not -- you would

4    not continue on and do further testing.

5    Q.    And at least as far as you are concerned,

6    or to your knowledge, you did not do anything

7    further with that material?

8    A.    With the swabbing?

9    Q.    Yes.

10   A.    It was placed into storage and, again, you

11   would have to consult the DNA reports.

12   Q.    Okay.  And you did not test that for the

13   presence of human blood, did you?

14   A.    No, I did not.

15   Q.    And that testing that you did was what was

16   called Kastle-Meyer testing?

17   A.    Yes.

18   Q.    And that doesn't confirm the presence of

19   blood, does it?

20   A.    No, it's a screening test.

21   Q.    Because, in fact, other natural items

22   sometimes produce a similar effect to blood when

23   tested with the Kastle-Meyer test, right?

24   A.    That is correct.

25   Q.    For example, coffee might?

3080

1    A.    I don't have the list with me, but there is

2    reference material available and that can be

3    consulted.

4    Q.    Okay.  But, in fact, you know that there

5    are other materials that produce a similar reaction

6    with the Kastle-Meyer test?

7    A.    Yes.

8    Q.    Now, you talked -- you testified yesterday

9    about the various fragments of latex type material

10   that were recovered from the duct tape?

11   A.    Yes.  Speaking in general there were

12   several different types of latex type material with

13   in the adhesive areas of the duct tape.

14   Q.    All right, and you testified about loose

15   gloves and bags of latex type gloves that were found

16   in state lab No. 19, right?  I think it was the Mr.

17   Ajax.

18   A.    Let me just confirm the state laboratory

19   number.  Yes, it is laboratory 19, and the brand you

20   are speaking of is Mr. Clean.

21   Q.    I'm sorry, Mr. Clean.  And then you told us

22   about state lab item 14, which was the two gloves

23   that were found together.

24   A.    Yes.

25   Q.    And those were the clear vinyl gloves?

3081

1    A.    They weren't tested for their chemical
2    composition.  In my opinion they were vinyl type.
3    That's what they appeared to be.
4        Q.    And, in fact, none of the material that was
5    recovered, either the 14 or 16 or the fragments of
6    latex type material, none of those were tested for
7    their chemical composition at the lab, were they?
8        A.    No.
9        Q.    And as far as, for example, whether item
10   13, which we've seen I believe again as Exhibit 447,
11   right, whether this material was of the same
12   composition as the fragments that were recovered
13   from the duct tape, that was not tested, was it?
14       A.    That was not tested based on the fact it
15   was all in the same location and it didn't lend
16   anything --
17       Q.    Well, my question really was, was it
18   tested?
19       A.    No, it was not.
20       Q.    With respect to state lab No. 14, and that
21   is?
22       A.    Two vinyl type gloves.
23       Q.    Two vinyl type gloves.  If I might have one
24   second here.
25              THE COURT:  I'm sorry is 14, 447 in?

3082

1    No, it's not.
2               MR. SHEEHAN:  14 I believe is 449, your
3    Honor.
4               THE COURT:  Okay.  It's a picture of 449
5    anyway.
6               MR. SHEEHAN I apologize, I don't
7    remember what the actual --
8               THE COURT:  That's all right.  I just
9    want to make sure we know what exhibit you are
10   talking about.
11       Q.    Looking here at Government Exhibit 449,
12   those were the vinyl -- I'm sorry -- yeah, what
13   appeared to you to be the vinyl type gloves?
14       A.    Yes.
15       Q.    One of the things that you did when you
16   examined those gloves was to determine if there were
17   any even blood-like stains on them, right?
18       A.    Yes.
19       Q.    And you also looked at them to determine
20   whether there was any kind of trace material on
21   them?
22       A.    Yes.
23       Q.    And you did not find either anything -- any
24   blood-like stains or any trace materials on those
25   items, did you?

3083

1        A.    That is correct.
2        Q.    Okay.  Now, I believe that your notes --
3    you examined -- you first examined that item on
4    September 14, 2005?
5        A.    Yes.
6        Q.    And at a later date you swabbed them for
7    DNA purposes?
8               MR. SHEEHAN:  If we could bring up 4864
9    for the witness.  Maybe that would help to refresh
10   her recollection.
11       Q.    Does that refresh your recollection as to
12   the date?
13       A.    Yes, I have the notes in front of me.  I
14   was just getting to the page.
15       Q.    I'm sorry, you had it there.  With respect
16   to the swabbing of the gloves, you had to first
17   separate them, did you not?
18       A.    Yes.
19       Q.    Did you do that on the 14th or on the 21st?
20       A.    I believe I took all of the pictures on the
21   14th, but swabbed on the 21st.  The swabbings were
22   taken on the 21st.
23       Q.    So, if you took all of the pictures, you
24   probably separated them on the 14th; would that be
25   your best recollection?

3084

1        A.    I believe so.  I don't actually recall.
2        Q.    Your notes don't reflect that, in any case?
3        A.    No, they don't.
4        Q.    And as far as the swabbing process that you
5    used, you swabbed both the inside and the outside
6    areas of the glove, did you not, part of the glove?
7        A.    The gloves were swabbed on both sides, that
8    is correct, separately.
9        Q.    And do you do a -- for example, let's say
10   you gave separate numbers to each glove.  I think we
11   saw that in the picture yesterday.
12       A.    Yes.
13       Q.    Right?  Do you use a separate swab on each
14   glove?
15       A.    Oh, yes, definitely.
16       Q.    And with that swab -- you gave it a number,
17   14-1-Z1?
18       A.    One is 14-1.
19       Q.    14-1?
20       A.    Z1.
21       Q.    And --
22       A.    And 14-2-Z1.
23       Q.    So, do you use the same swabs to do the
24   inside and the outside area of the glove?
25       A.    Yes, the swab was -- excuse me, the glove

3085

1  was swabbed in its entirety with the one swabbing.
2      Q.  All right.  And similarly with respect to
3  14?
4      A.  -2.
5      Q.  -2-Z1, you did the same process, right?
6      A.  Yes.
7      Q.  And I think you testified that, in your
8  opinion anyway, the change of color that we see when
9  you looked at the actual items, that was probably --
10 that sometimes happens when things go to the latent
11 section for fingerprint treatment, right?
12     A.  You would have to check with them, but
13 that's what I've seen in my experience.
14     Q.  In your experience?
15     A.  The question I believe yesterday was is it
16 in the same condition as when I received it, and it
17 is not.
18     Q.  Okay.  Now, you also swabbed, did you not,
19 state No. 16, another glove that was recovered
20 there?
21     A.  Yes.
22         MR. SHEEHAN:  I don't think we need the
23 lights changed for this one.
24     Q.  But this is Government Exhibit 454.
25     A.  Can you just move the picture up so I can

3086

1  see the tag on it.  Thank you very much.  That's
2  laboratory submission No. 16.
3      Q.  And did this item, state 16, appears to you
4  to be of a similar kind of material as 14?
5      A.  It was a vinyl type, food service type
6  glove, yes.
7      Q.  But, again, the chemical composition was
8  not tested for that item?
9      A.  That is correct.
10     Q.  You've told us about the procedures that
11 you use in the lab for swabbing -- for gathering
12 trace evidence, right?  You put them out on a table?
13     A.  Yes.
14     Q.  And sometimes you have this -- some items
15 are actually processed under a hood?
16     A.  Yes.
17     Q.  Physically are you the only person in the
18 room at the time that the item is being processed?
19     A.  We have a large bench space.  There may be
20 other people in the room, that is possible.  It's
21 depending on what casework is going on.  We only
22 open one case at a time.  If we have two people
23 working, one will be doing paperwork, one would be
24 working on the case.
25     Q.  And how many benches are there that people

3087

1  are actually working on?
2      A.  The trace section itself has one large room
3  with a very large bench in the center, and then
4  there is four rooms off of it, each of which has
5  space for work.  It's dependent on what type of
6  evidence you are working on, which instrument you
7  are working on, whether you are using a microscope,
8  whether you are doing instrumental examination or
9  physical examination.
10     Q.  And in the process, for example, of
11 disassembling -- you disassembled the duct tape to
12 retrieve the fragments of latex, did you not?
13     A.  I actually didn't remove any of the latex.
14 I swabbed while it was still adhering to the duct
15 tape.
16     Q.  Okay.  Do you recall whether or not you
17 were consulting with anybody while you were
18 processing the information related to this case?
19     A.  Yes.
20     Q.  And were you looking at those items of
21 evidence together?
22     A.  There were moments when the supervisor was
23 called in to consult with the evidence.  Considering
24 the unusual nature of the case I wanted a
25 supervisor's opinion as well as their experience,

3088

1  and that's their job, is to consult on cases for
2  their forensic examiners.
3      Q.  And are the supervisors in the same lab
4  productive gear as yourself?
5      A.  Yes.
6      Q.  And that consisted of a coat, a lab coat at
7  that time, a lab coat and gloves?
8      A.  Yes.  If evidence is being handled you
9  would wear a lab coat and gloves at that time.
10     Q.  All right.  And that procedure has since
11 changed, correct?
12     A.  It has been modified, yes.  Now a mask is
13 required.
14     Q.  Okay.  But that was after all of the
15 evidence in this case had already been processed,
16 right?
17     A.  I would have to consult with other people
18 who worked on this case.  I know the date of when
19 that edict came down, but other evidence has since
20 been processed more recently.
21     Q.  But not by you?
22     A.  I think I wrote some reports, actually, in
23 2010 after the memo came down that we had to wear
24 masks.
25     Q.  But in so far as, for example, the

3089

```
1   processing of the swabbing of the DNA evidence in
2   this case, and by that I'm referring to the samples
3   themselves, the evidentiary samples, all of that was
4   done before you started using masks?
5       A.   That is correct.
6       Q.   Okay.  And can you tell me in terms of
7   your -- I notice in some of the pictures that we
8   have here -- if I might.  Well, let's just take as
9   an example, Government's Exhibit 440, and that was
10  lab 11.  You took this picture, did you not?
11      A.   Yes, I did.
12      Q.   And when you were taking this picture, were
13  you wearing gloves?
14      A.   Yes.
15      Q.   Okay.  And when you were manipulating the
16  item for purposes of setting it up for taking the
17  picture, you were also wearing gloves, right?
18      A.   Yes.
19      Q.   And is there any procedure to -- you got
20  the item that you are taking, you are taking the
21  picture, do you change cameras?
22      A.   No, there is one camera that's used and
23  it's alcohol swabbed off in between.  There is
24  alcohol pads that are used on the camera to wipe it
25  down.
```

3090

```
1       Q.   And how does that actually work?
2       A.   An alcohol pad is used and you wipe down
3   the camera.
4       Q.   After each photo is taken?
5       A.   After you take the pictures, yes.
6       Q.   Now, at some point in time, in the context
7   of -- in this -- while you were involved with this
8   case, were you advised that there had been some
9   contamination or suspected contamination of one of
10  the items of evidence that had been examined?
11      A.   The actual information in regard to further
12  testing is done by other examiners and I don't have
13  firsthand knowledge of their results, and I would
14  imagine you should be speaking to the DNA examiner
15  if you wanted information about further testing.
16      Q.   Okay.  I'm not interested in further -- I
17  guess my question is a little bit unclear.  I'm
18  really asking you if at some point in time you were
19  advised that there had been contamination with
20  respect to one of the items of evidence in this
21  case.
22      A.   I had heard from what other people said.
23      Q.   Okay.
24      A.   And I don't feel that I should be speaking
25  from someone else's information, you know.
```

3091

```
1       Q.   I'm not asking you to say what they said
2   except to confirm that in fact you were advised of
3   that fact.
4       A.   I was advised that there might be an issue.
5   Further information, I have no knowledge of.
6       Q.   All right.  And when you were advised of
7   that issue, were you asked to review the steps that
8   you had taken to process the evidence in this case?
9       A.   No, not to my knowledge, no.
10      Q.   And do you have any recollection of anybody
11  asking you if you did anything different with
12  respect to the processing of some of the evidence in
13  this case?
14      A.   No.
15      Q.   Did you, in fact, as far as you can recall,
16  follow the same procedures with respect to all of
17  the evidence in this case?
18      A.   Yes.
19      Q.   Had you ever been -- had you ever in your
20  experience contaminated an item of evidence, as far
21  as you know?
22      A.   No.
23      Q.   And when the topic of the contamination
24  came up, were you approached by your supervisors?
25      A.   No, not by supervisors.
```

3092

```
1       Q.   Okay.  Were you approached by other members
2   in the lab?
3       A.   As I said, I was informed that there may be
4   an issue.  Further than that, I have no knowledge of
5   any other information.
6       Q.   All right.  But is it fair to say that
7   insofar as you can recall, you treated these items
8   of -- all of the items of evidence in this case in
9   the same way?
10      A.   I used the utmost care and science when
11  processing all of the evidence.
12      Q.   And one of the things that you have told us
13  -- talked about is collecting trace amounts of DNA,
14  right?
15      A.   Yes.
16      Q.   And I believe you testified to sort of the
17  fact that now you can process even smaller and
18  smaller amounts of DNA.
19      A.   Yes.
20      Q.   And in that set of circumstances it makes
21  it all the more imperative, does it not, that proper
22  techniques be followed at all time?
23      A.   Yes.
24      Q.   Because one could contaminate an item
25  without even knowing about it, right?
```

**GA773**

3093

1    A.   Are you speaking hypothetically?
2    Q.   Yeah.
3    A.   I would imagine it's possible.
4    Q.   Okay.  And were you told that was the
5  reason for adding the masks?
6    A.   A memo was drafted and issued to the entire
7  laboratory, and it was not person specific, it was
8  laboratory wide.
9    Q.   And was the policy reason because of the
10  possibility of contamination?
11    A.   Yes.
12    Q.   Without masks?
13    A.   Correct.
14        MR. SHEEHAN:  I have no further
15  questions of Ms. Warner.
16        THE COURT:  Thank you.  Redirect.
17        MS. DAYTON:  Yes thank you, your Honor.
18  REDIRECT EXAMINATION
19  BY MS. DAYTON:
20    Q.   Good morning, Ms. Warner.
21    A.   Good morning.
22    Q.   Counsel asked you some questions about what
23  items you processed, and he asked you about nine
24  items -- ten in particular 7, 8, 9, 12, 13, 14, 15,
25  16 and 32.  Do you remember that question?

3094

1    A.   Yes.
2    Q.   Did you also process 4?
3    A.   I can actually list them off, but.
4    Q.   Well, did you process dozens of items?
5    A.   Yes, multiple items.
6    Q.   A lot more than the defense asked you
7  about?
8    A.   Yes.
9    Q.   In to the 30s and 40s your numbers were?
10        MR. SHEEHAN:  Objection to leading.
11        THE COURT:  Sustained.
12    Q.   Did your numbers end in the 10s?
13    A.   It was in excess of, I believe, 30 items.
14  If you give me a moment I can count.
15    Q.   That's okay.  That's sufficient.  And
16  you --
17        MR. SHEEHAN:  I would ask that counsel's
18  remark be stricken.
19        THE COURT:  It may be.
20    Q.   You were asked about the Kastle-Meyer test?
21    A.   Yes.
22    Q.   Can you the explain what that is for the
23  jury.
24    A.   Kastle-Meyer is a chemical screening test
25  for the presence of blood.  It's a color change

3095

1  test.  We use a sterile -- a swab, a cotton swab,
2  and it's moistened with sterile water, and then an
3  area of interest which has reddish-brown staining is
4  then swabbed.  A series of chemicals is placed on to
5  that swab, not on to the item of  evidence.  The
6  swab itself, if the swab changes color to pink, it's
7  an indication of a positive result which indicates
8  that it is positive for a screening test.  It does
9  not mean it is blood, it means you can go on further
10  and confirm blood, and in fact even confirm human
11  blood if that is the type of testing you are doing.
12    Q.   So there are several steps.
13    A.   Yes.
14    Q.   And what are some of the reasons you
15  wouldn't go on to additional tests?
16    A.   One of the reasons you wouldn't go on is
17  depending on how much of the stain is there.  If
18  there is a very small amount of stain you would want
19  to save it and send it on to DNA.  The testing just
20  to have a chemical screening test and come up
21  positive and you use up all of your sample isn't
22  really beneficial.  So you need to think about the
23  future examinations that will be done and what will
24  come after your testing.
25    Q.   Counsel also asked you about swabbing

3096

1  submission 14, photographing it and swabbing it.  Do
2  you remember those questions?
3    A.   Yes.
4    Q.   When you photographed it on September 14th,
5  was there -- were there multiple items of evidence
6  on the bench?  Or how did it work?
7    A.   One submission.  A submission is whatever
8  is in that one particular bag.  Yesterday we showed
9  brown bags and paint cans.  That's considered one
10  submission.  So, whatever is in that container is
11  only opened.  One container or bag is only opened at
12  one time.
13    Q.   And between September 14th and
14  September 21st, did you leave that item sitting on
15  the bench?
16    A.   No.  Any item would be resealed and stored
17  away in a locked facility that's in the trace
18  section.
19    Q.   And based upon your knowledge and
20  experience, can DNA remain on an item for over a
21  week?
22    A.   Definitely.
23    Q.   You were also asked several questions about
24  contamination.  And by contamination I -- what does
25  that mean to you, contamination?

3097

```
1      A.    Contamination doesn't necessarily mean
2   something terrible, it just means something has been
3   introduced on to evidence.
4      Q.    So, someone, an individual, can introduce
5   their DNA on to evidence without knowing?
6             MR. SHEEHAN:  Objection, leading.
7      Q.    That's what counsel asked you about.  That
8   is what I was trying to say.
9             THE COURT:  Why don't you rephrase.
10     Q.    Do you recall counsel asking you whether or
11  not someone could introduce their DNA on to evidence
12  without knowing?
13     A.    Yes.
14     Q.    So could that include someone at the lab?
15     A.    Possibly.
16     Q.    Could that include a suspect at a crime
17  scene?
18     A.    Yes.
19     Q.    Thank you.
20            MS. DAYTON:  I have nothing further.
21            THE COURT:  Anything further?
22            MR. SHEEHAN:  Just briefly, your Honor.
23  RECROSS-EXAMINATION
24  BY MR. SHEEHAN:
25     Q.    Fair to say that contamination can come
```

3098

```
1   from any number of sources, right?
2      A.    Contamination is a very broad word.  You
3   know, it could mean a number of things.
4      Q.    Okay.  You mentioned it could come from
5   somebody at the lab.
6      A.    Anything that is introduced on to evidence
7   can be considered contamination.
8      Q.    You asked whether a suspect could
9   contaminate an item?
10     A.    Yes, I was asked that.
11     Q.    A police officer gathering it could
12  contaminate an item?
13     A.    We could continue on like this, but
14  anything introduced into evidence.
15     Q.    And when you told the members of the jury
16  that contamination really isn't a terrible thing --
17     A.    No, I said it doesn't necessarily mean it's
18  a terrible thing.  It's just the introduction of
19  something else.
20     Q.    All right.  And from the lab's perspective,
21  contamination is about as terrible as it gets, isn't
22  it?
23     A.    No, I can think of some worse things,
24  actually.
25     Q.    You could lose it.
```

3099

```
1      A.    Yes.
2      Q.    You could lose the item, right?
3      A.    There is a laundry list of things that we
4   are very, very concerned about at the laboratory.
5      Q.    The problem with when -- if an item gets
6   actually contaminated at the lab, then that -- the
7   reason why you are concerned about that is because
8   now what you are really looking at is something that
9   had nothing to do with the crime scene, right?
10     A.    Possibly.  You are speaking very
11  hypothetically, gray area.  You know, it's just the
12  introduction of something else on to evidence.  You
13  know, sun light on something may yellow the gloves.
14  Is that contamination that's going to change your
15  results?  Not necessarily.  If you can understand
16  what was introduced and does it affect your results.
17  As a scientist we should be able to understand what
18  is going on, and we're smart enough to know is this
19  contamination something we need to identify and do
20  something with.
21     Q.    You don't want to contaminate things if you
22  can help it, right?
23     A.    Of course not.
24            MR. SHEEHAN:  Thank you.
25            THE COURT:  All right, anything further?
```

3100

```
1             MS. DAYTON:  No, thank you, your Honor.
2             THE COURT:  All right, thank you, Ms.
3   Warner.  You are excused.  You may step down.
4             I'll ask the government to call the next
5   witness.
6             MS. DAYTON:  Your Honor, may we
7   approach?
8             (Sidebar conference)
9             MS. DAYTON:  We need to deal with the
10  issue about her testimony.
11            THE COURT:  All right, she's going to
12  start, you are going to go through all of the sorts
13  of introductory stuff.
14            MS. DAYTON:  So we're going -- it's in
15  the introductory stuff.
16            THE COURT:  All right.
17            MS. DAYTON:  Can we take five minutes to
18  do it so we don't have to have a lengthy sidebar
19  while she's on the stand?  I gave you some cases.
20            THE COURT:  Yes, I've now read them.
21            MS. DAYTON:  So if we could do it
22  before, because I need to instruct her also as to
23  what -- if she's not to say something.
24            THE COURT:  We'll just take our morning
25  recess now.
```

3101

```
1         MS. DAYTON:  That's fine.
2         (Sidebar concluded)
3         THE COURT:  I realize you only recently
4    got here, but we're going to take a 15-minute recess
5    in an effort to make your time as efficient as we
6    can when you come back.  All right.
7         (Jury excused)
8         THE COURT:  All right, why don't we --
9    this is the defendant's motion to preclude the
10   government's evidence to be adduced through the next
11   witness, Ms. Roy, that her results and report were
12   reviewed by a second examiner and/or that the second
13   examiner concurred in her conclusions.  So let's
14   start with the question of whether or not -- or what
15   is the nature of Ms. Roy's anticipated testimony?
16        MS. DAYTON:  Your Honor, one of the
17   things that she'll testify to is their protocols,
18   and their protocols include giving their results to
19   a second examiner.  And let me actually make sure I
20   state it exactly correctly.  But it definitely
21   includes giving their results to a second examiner
22   to be verified, so to speak, and it's actually
23   looked at by two different people, one will look at
24   the data and then one will look at the reports, and
25   so three people look at it.
```

3102

```
1         The government doesn't intend to ask Ms.
2    Roy were your results in fact verified by someone
3    else.  I would note for the record that under
4    Daubert a witness's -- an expert witness, which we
5    expect fully Ms. Roy to be qualified, is fully
6    entitled to testify from hearsay, and if part of her
7    results relies upon the another individual saying,
8    yes, this in fact is what I found, too, it's the
9    government's position that that would be fully
10   admissible.
11        THE COURT:  But the Daubert issue is
12   different from the admissibility issue, and to the
13   extent in U.S. v. Monteiro, the District of
14   Massachusetts case, that was a Daubert analysis in
15   which the question -- the insufficiency of the
16   testifying sergeant's conclusion because he
17   couldn't --
18        MS. DAYTON:  He couldn't say that a
19   second --
20        THE COURT:  He couldn't give a
21   reproducible and verifiable analysis was potentially
22   corrected by a second independent examiner which
23   would give corroboration to the reliability.  But
24   that's a very different issue.
25        MS. DAYTON:  I understand that.  But I
```

3103

```
1    was making the point by giving these to the Court
2    that this is standard operating procedure all over
3    the country.  This is what is done.  This is not --
4    she didn't do this so she could come to court and
5    say, oh, my results have been verified.  This is
6    what is done all over the country regularly.  And so
7    the government's intention is to ask Ms. Roy, did
8    you follow protocol?  What does that include?  It
9    includes generating a profile.  It includes
10   amplifying and all sorts of things.  But did you
11   give the items to someone else?  Yes.  Okay, and,
12   you know, did you follow your rules?  Not what they
13   said to you.  And considering that the defense is
14   going to attack the lab's protocol, the government
15   feels that this is a proper area to go into, that
16   she followed exactly what she is required to do
17   under the lab protocol.
18        THE COURT:  All right, so let me ask you
19   this.
20        MS. DAYTON:  Yes.
21        THE COURT:  Why is it not sufficient for
22   your direct examination to ask her whether she
23   followed all the protocols that are required of
24   medical -- whatever her title is, and that are these
25   national protocols and are they in place in the lab
```

3104

```
1    and so forth, without the need of going through what
2    those protocols are?  Now, if on cross-examination
3    the door is opened to some form of deviation from
4    the protocols, then it seems to me defense has
5    little to complain about.
6         MS. DAYTON:  That's fine.  I just need
7    to spend a few minutes instructing the witness.
8         THE COURT:  And that's the purposeful
9    your motion, correct?
10        MR. SHEEHAN:  Well, yeah.  The purpose
11   of my motion is to preclude the jury from hearing,
12   in essence, the testimony of absent witnesses.
13        THE COURT:  But my solution --
14        MR. SHEEHAN:  I think if I were to
15   challenge what they did with respect to not having a
16   second person look at it or a third person look at
17   it, I do believe that I have opened the door in that
18   context.  If I were to challenge what they did in
19   terms of, you know, dropping pipettes on the floor,
20   or whatever things I could imagine, which I probably
21   don't have very many of, but just to give you that
22   as a for instance, it would not, therefore, be -- I
23   don't think that would open the door to having
24   hearsay, well, Dr. Ladd looked at all of my work and
25   thought it was fine.
```

3105

```
1              THE COURT:  That may be.  But I don't
2    know what your cross-examination is going to be.
3              MR. SHEEHAN:  No, I understand that.
4              THE COURT:  We have a resolution.  The
5    motion is granted as to the direct examination of
6    this witness by agreement that she will not
7    specifically testify that she had, in complying with
8    all of the protocols, obtained a second examiner's
9    opinion that concurred with her conclusion, and
10   we'll just see what the cross-examination brings.
11   All right.
12             MR. SMITH:  Your Honor?
13             THE COURT:  Yes.
14             MR. SMITH:  I do not mean to tell the
15   Court how to arrange it's bench, but if that lamp
16   him could be at this pointed just slightly back.
17   It's hitting me right in the eye.
18             THE COURT:  I'm sorry.  Yes.  Is that
19   better like that?
20             MR. SHEEHAN:  It's just that -- now it's
21   back.
22             THE COURT:  So that's where it gets
23   back.  Okay.
24             MS. DAYTON:  And the one other thing,
25   just for ease of the testimony, is I've made some
```

3106

```
1    charts.  They've been given to your Honor and been
2    given to the defense.
3              THE COURT:  Let me find them.
4              MS. DAYTON:  They're in the front of the
5    binder you were given yesterday.  That is a lab
6    binder.
7              THE COURT:  All right.
8              MS. DAYTON:  The defense has the same
9    ones.
10             MR. SHEEHAN:  We do, your Honor.
11             THE COURT:  And I made copies for the
12   jury, just because the numbers are very small, to
13   use as an aid, and we'll take them back.
14             All right, then why don't we take a quick
15   break because I'm not intending to take another one.
16   And then we'll bring -- and that will give you
17   chance to tell Ms. Roy the limits of what she's
18   going to talk about on protocol until further
19   notice.  Okay.
20             MS. DAYTON:  Thank you.
21             THE COURT:  Thank you.
22             (Recess)
23             THE COURT:  All right, we'll bring in
24   the jury.  And do you want to bring in the witness.
25             (Jury entered the courtroom.)
```

3107

```
1              THE COURT:  All right, please be seated.
2    Will the government call its next witness.
3              MS. DAYTON:  Thank you.  The government
4    calls Christine Roy.
5              THE COURT:  All right, Ms. Roy, if you
6    will take the stand, remain standing, the oath will
7    be administered to you.
8                  C H R I S T I N E   R O Y
9    Having first affirmed, was examined and testified as
10   follows:
11             THE WITNESS:  My name is Christine Roy,
12   and my last name is spelled r-o-y, and my town of
13   employment is Meriden, Connecticut.
14             THE COURT:  All right, you may proceed.
15             MS. DAYTON:  Thank you.
16   DIRECT EXAMINATION
17   BY MS. DAYTON:
18    Q.   Good morning, Ms. Roy.
19    A.   Good morning.
20    Q.   Can you please tell the jury what you do
21   for a living.
22    A.   I'm a Forensic Science Examiner I at the
23   Connecticut State Forensic Science Laboratory.
24    Q.   And how long have you been a forensic
25   science examiner with the state lab?
```

3108

```
1    A.   I've been an examiner there for
2    approximately ten years.
3    Q.   What does that mean, Forensic Examiner I?
4    A.   The I refers to the position number, and
5    that's the title that examiners are given.
6    Q.   Okay.  And can you describe what your
7    responsibilities are with the state lab?
8    A.   I examine physical evidence for the
9    presence of physiological fluids such as blood,
10   semen and saliva.  I do testing on that evidence to
11   identify the physiological fluid.  I do DNA testing
12   on samples from that evidence, as well as known or
13   reference samples.  And then I do comparisons of the
14   DNA profiles that I develop from the evidence
15   samples, as well as the reference known samples.
16   And then I write reports.  And when asked to, come
17   to testify.
18    Q.   What is a known or reference sample?
19    A.   That's a sample that's taken from like the
20   inside of the person's mouth where you are
21   collecting cheek cells or a blood sample.  It's a
22   sample that you know came from that person as
23   opposed to evidentiary samples which can also be
24   taken from a person, but those samples are looking
25   for foreign material.
```

3109

1    Q.    Before your employment with the Connecticut
2    state lab, where did you work?
3    A.    At the New York City Office of the Chief
4    Medical Examiner in the forensic biology department.
5    Q.    And how long were you there?
6    A.    For approximately two and a half years.
7    Q.    What did you do there?
8    A.    I did -- I had similar responsibilities
9    where I examined physical evidence for the presence
10   of physiological fluid.  Then I did testing to
11   identify those physiological fluids, and I did DNA
12   testing.
13   Q.    And are you affiliated with any
14   professional associations?
15   A.    Yes.
16   Q.    Which ones?
17   A.    The Northeastern Association of Forensic
18   Scientists and the American Academy of Forensic
19   Sciences.
20   Q.    Where did you go to school?
21   A.    I went to Gettysburg College where I got my
22   Bachelor's of Arts degree in biology, and I went to
23   John Jay College where I got my Master of Science
24   degree in forensic science.
25   Q.    And do you have any additional graduate

3110

1    education that you completed?
2    A.    I've taken graduate level courses at the
3    University of Minnesota, and during my employment at
4    Albert Einstein College of Medicine I took a couple
5    courses there, and have taken a couple classes
6    during -- post-bachelor degree.
7    Q.    And when you say "classes," do you mean in
8    your field of specialty?  You don't mean like
9    literature, right?
10   A.    No, I mean in biology.
11   Q.    Okay.  And do you do additional or
12   continued training while you work?
13   A.    Yes.  There are new techniques that are
14   introduced, new types of equipment.  We have to get
15   training on those new techniques.  And we also are
16   -- when we can, go to meetings where we can attend
17   seminars.
18   Q.    How often -- are you required to
19   participate in additional training?
20   A.    Yes.  We're required to do additional
21   training at least once a year.
22   Q.    And is the Connecticut forensic lab where
23   you work, is that accredited?
24   A.    Yes, it is.
25   Q.    What is the accrediting agency?

3111

1    A.    The American Society of Crime Laboratory
2    Directors, laboratory accreditation board.  We also
3    refer to it as ASCLD.
4    Q.    Were you thinking out the acronym there?
5    A.    Yes, yes.
6    Q.    So, what's it actually mean to be
7    accredited?
8    A.    Every five years you have to go through a
9    very thorough examination by this agency.  They look
10   at basically everything; protocols, education.  It's
11   basically from when the evidence comes into the lab
12   to the final reports, as well as the physical
13   building that we do our testing in.
14   Q.    So, what sort of things -- what does the
15   review include?  I know you said from the reports,
16   can you be a little more specific?
17   A.    They review our protocols, our validations,
18   our equipment maintenance.  Every two years as a DNA
19   analyst -- I mean, twice a year as a DNA analyst I'm
20   required to take a proficiency test, which is a test
21   from an outside testing agency.  So they review our
22   proficiency tests.  They also question us usually
23   individually.  They go over some of our case folders
24   and our data and our reports, and they might have a
25   few questions to ask us.  So, it's very thorough.

3112

1    Q.    How many people are in the DNA section of
2    the lab?
3    A.    Currently there is about 21 people.
4    Q.    And you handle everything for the state of
5    Connecticut?  I mean your lab, your DNA section.
6    A.    Correct, unless there is -- I don't know
7    why we would ever send anything beyond us unless it
8    was a case that involved an individual in DNA, then
9    we'd have to send it out to some other lab.
10   Q.    Why is it important to be accredited?
11   A.    Because you want to be able to, A, submit
12   your data to the CODIS, which is run by the FBI, and
13   CODIS is a big database that contains DNA profiles
14   from convicted offenders as well as DNA profiles
15   from evidentiary samples.
16         Now, there are some rules that we have to
17   follow before we can submit a DNA profile to this
18   CODIS database.  And also you want to be able to
19   receive federal funding, is another reason.  So,
20   those are all.
21   Q.    Okay.  Go ahead.
22   A.    To maintain your quality, and also in
23   particular to be able to submit profiles into the
24   CODIS database.
25   Q.    You said that CODIS has DNA profiles from

3113

```
1   convicted offenders.  What are the standards?  You
2   said there are some standards you have to follow or
3   process; what does that mean?
4        A.   Well, the profiles from forensic samples,
5   you have to -- there are certain rules as to which
6   type of profiles can go in and the information that
7   you can put in the profile.  You can't put in so
8   little information that you would have hits on, you
9   know, hundreds of individuals that are in the
10  database.  You are required to put in a certain
11  amount of information.
12       Q.   Okay.  In addition to the accreditation
13  process, is the lab also audited?
14       A.   Yes.  As part of our accreditation process
15  the laboratory has to be audited once a year.  This
16  audit can be from an outside agency or we can do an
17  internal audit.  But for DNA it has to be outside
18  agency audit at least every other year.
19       Q.   And are you aware of whether the DNA
20  section has passed all of its audits?
21       A.   Yes.
22       Q.   Yes, it has?
23       A.   Yes, it has.
24       Q.   Okay.  And you mentioned proficiency tests
25  that you do twice a year.  What types of things do
```

3114

```
1   they test?
2        A.   Well, it's presented to you as a small
3   case.  Usually there is two items of evidence and
4   two knowns and you have to go through your normal
5   testing procedure and fill out -- once you get your
6   results fill out a test form.
7        Q.   And have you passed all of your tests?
8        A.   Yes, I have.
9        Q.   In total, how many years have you been a
10  forensic scientist?
11       A.   I've been at the Connecticut lab for about
12  ten years and I worked at the Office of the Chief
13  Medical Examiner for about two and a half years.
14       Q.   And that whole time you have been doing DNA
15  analysis?
16       A.   Yes.  DNA and forensic biology.  About five
17  or six years ago I was originally hired as part
18  forensic biology, part DNA, and then about 2005 or
19  so I went over completely into the DNA section.
20       Q.   Have you ever testified and offered an
21  expert opinion in court?
22       A.   Yes, I have.
23       Q.   On DNA analysis?
24       A.   Yes.
25       Q.   Approximately how many times have you
```

3115

```
1   testified?
2        A.   I've testified about 50 times.
3        Q.   And in what types of courts?
4        A.   I testified in New York City a couple of
5   times.  I've testified here in Connecticut in state
6   courts.  I've testified in the federal court in
7   Hartford.  And I've testified for Department of
8   Children and Families.
9        Q.   And have you ever been denied expert
10  status?
11       A.   No.
12       Q.   And do you only testify for the
13  prosecution?
14       A.   No.
15            MS. DAYTON:  Your Honor, at this time I
16  would offer Ms. Roy as an expert under Federal Rule
17  of Evidence 702.
18            MR. SHEEHAN:  No objection, your Honor.
19            THE COURT:  And precisely the expertise
20  on which she's being certified?
21            MS. DAYTON:  DNA.
22            THE COURT:  DNA analysis?
23            MS. DAYTON:  Yes, your Honor.  Thank
24  you.
25            THE COURT:  And the same instruction
```

3116

```
1   with respect to experts.  All right.
2            MS. DAYTON:  Thank you.
3        Q.   What does DNA stand for?
4        A.   DNA stands for deoxyribonucleic acid.  It
5   is the genetic material that determines us as
6   individuals and as human beings.  Each person's DNA
7   is unique with the exception of identical twins.
8        Q.   So, you said each person is unique.  Is
9   100 percent of our DNA unique from one another?
10       A.   No, because we're all human beings, so we
11  share -- greater than 99 percent of our DNA we have
12  in common because we're functioning human beings.
13       Q.   So, in other words, there is DNA for having
14  arms and legs and a head?
15       A.   Right.  The physical properties that you
16  have is from your genetic material.  That's the
17  coding.
18       Q.   So, how much of the DNA actually differs
19  between people other than identical twins?
20       A.   Less than 1 percent.
21       Q.   Where do you find DNA in the body?
22       A.   It's in the nucleus of cells.  And nucleus
23  is just a compartment within cells.  And red blood
24  cells don't have a nucleus.
25       Q.   Is there any sort of -- so, what types of
```

3117

1    cells do have a nucleus?
2        A.    Well, for blood we're getting the DNA from
3    blood samples from white blood cells.  In sexual
4    assaults cases, when semen has been identified,
5    we're getting the DNA from sperm cells.  And when
6    we're doing evidence that's been swabbed for the
7    wearer or possibly if someone has handled something,
8    it's from biological material that may have been
9    left by skin cells that have been shed.
10       Q.    So, is there a name, like a colloquial name
11   for the skin cells that are shed for that type of
12   DNA?
13       A.    Well, those type of cells are epithelial
14   cells, but the person swabbing for, we call it touch
15   or handler DNA.  Or in the case of clothing that's
16   submitted that may have been left behind, we call it
17   wearer DNA, where like for a jacket you might swab
18   the neck area to see who possibly could have left --
19   you know, to detect DNA that was left behind by a
20   wearer.
21       Q.    So, I'm holding this pen, and if you
22   examine it for my DNA profile, will you necessarily
23   find it?
24       A.    Well, not necessarily, no.
25       Q.    Why not?

3118

1        A.    Because people vary in the nature of their
2    skin.  Some people shed a lot of cells, some people
3    -- we call those people shedders, for lack of a
4    better word.  And some people shed less cells.  And
5    also the surface can affect how many cells are left
6    behind.  You have a smooth surface or a very rough
7    surface.  And how long the person handled something
8    and how vigorously something was handled and then
9    what happens to the item after they may have
10   deposited their cells.  So, all of those things can
11   affect whether we would even detect any DNA on
12   something that's swabbed.
13       Q.    Is it possible that there will be DNA on
14   something, but you just can't detect it?
15       A.    There is a limit to our detection.  Like
16   most instrumental analysis, there is a limit, and,
17   yes.  So, there could be so little DNA left behind
18   that it's not enough to generate a DNA profile.  And
19   when I say "DNA profile," that's kind of the end
20   result of our DNA testing that we go through.
21             And a DNA profile is a series of numbers.
22   So, we're comparing a series of numbers that we
23   obtain from a known or reference sample to a series
24   of numbers that we obtain from evidentiary sample.
25       Q.    Is the person's DNA the same regardless if

3119

1    you get it from their hair or their blood or the
2    inside their cheek?
3        A.    Yes, the DNA that you would obtain from
4    cheek cells would be the same DNA profile that you
5    would obtain from a blood sample.
6        Q.    And if DNA material is deposited on an
7    object, what sort of factors affect how long it can
8    remain on the object?
9        A.    Well, again, it's not so much that DNA is
10   deposited, but the cellular material is deposited,
11   and what could affect that is if someone else comes
12   along and handles it.  If it's cleaned off or wiped
13   off or if it's washed, and then other factors such
14   as exposure to environment, factors such as
15   sunlight, if there is moisture, bacteria, especially
16   when things are left outside.
17       Q.    And in your line of work, what sort of
18   purposes do you use DNA testing for?
19       A.    It's a forensic tool that we can use to
20   include or exclude an individual as a possible
21   source or contributor to the DNA profile that's
22   obtained from an evidentiary sample.
23       Q.    Okay.  So, can you explain the process for
24   DNA testing in as simple form possible.
25             So, how do you obtain a DNA profile, in

3120

1    other words?
2        A.    The first step, first of all, when we have
3    an evidentiary sample that is submitted for testing,
4    it's usually in the form of a cutting or a swabbing.
5    So, we want to remove the cellular material from
6    that swab or cutting, so to speak, the substrate
7    that the cellular material is on.  So we do an
8    extraction procedure.  And we also want to remove,
9    purify and concentrate the DNA material from the
10   other cellular components.  So we do a purification
11   step as well as a concentration.  So that's the
12   beginning of the process.
13             The next step is we want to know how
14   much, approximately, human DNA we've extracted from
15   that sample.  So we do an assay for that.  And then
16   the next step is what we call the amplification
17   procedure, and it's kind of like a molecular
18   Xeroxing where specific sites on the DNA molecule,
19   the DNA that's been extracted from your sample, many
20   copies are made of those specific sites.  So, again,
21   it's like a Xeroxing process for very specific sites
22   on the DNA.  And what we look at is 15 sites on the
23   DNA, and an additional site for gender
24   identification, male or female.
25             And then the next step -- we now have

**GA780**

3121

```
1   what is called amplified DNA -- is to analyze that
2   amplified DNA and obtain a DNA profile.  And again,
3   that's just a series of numbers.
4       Q.   And how long is the series of numbers if
5   you have an entire profile?
6       A.   Well, you would get a result at 15 sites
7   that we tested and the site for gender
8   identification.
9       Q.   And you mentioned earlier that you then do
10  a comparative test?
11      A.   We do a comparison between the DNA profile
12  that we obtained from reference samples to the DNA
13  profile that we obtain from evidentiary samples.
14      Q.   Is this similar to like a pattern analysis?
15      A.   Yes.
16      Q.   Is there any analogy you can make in other
17  forensic sciences?
18      A.   Well, other areas of forensic sciences also
19  use pattern analysis, as in latent prints or when
20  they're doing bullet comparisons, you are looking at
21  a pattern from one piece of evidence to a pattern on
22  another piece of evidence.
23      Q.   I'm going to show you -- did you review
24  some charts when you came in this morning that have
25  been marked as government's evidence?
```

3122

```
1       A.   Yes.
2       Q.   And did you initial those?
3       A.   Yes.
4       Q.   I'm going to show you what's been marked
5   for reference as Government's Exhibit 462, chart 1.
6            MS. DAYTON:  These have been provided to
7   the defense, your Honor.
8       Q.   Actually, I'm going to go show you all of
9   the charts first.
10           MS. DAYTON:  Your Honor, what I've done
11  is, I've made charts and copies for the jury because
12  they have lots of little numbers on them.  So I'm
13  going to ask Ms. Roy to identify all of the charts,
14  ask to admit them into evidence and provide copies
15  to the jury.
16      Q.   Can you please take a look at Government's
17  Exhibits 462, 463, 464, 465 and 466.  Let me know if
18  you recognize these items first.
19      A.   Yes, I do.
20      Q.   And did you review those for accuracy with
21  respect to the actual alleles that are written on
22  the charts?
23      A.   Yes, I did.
24      Q.   And are they accurate?
25      A.   Yes.
```

3123

```
1       Q.   And aside from a couple of them that have
2   some color on them, are these accurate
3   representations of results that you obtained during
4   the course of your testing?
5       A.   Yes.
6            MS. DAYTON:  Your Honor, I would ask to
7   move 462, 463, 464, 465 and 466 into evidence.
8            MR. SHEEHAN:  Just briefly, your Honor.
9            THE COURT:  All right.
10  VOIR DIRE EXAMINATION
11  BY MR. SHEEHAN:
12      Q.   Ms. Roy, these are -- these are not all of
13  the samples you tested, right?
14      A.   That is correct.
15      Q.   So, these charts reflect some of the
16  samples you've looked at.
17      A.   That is correct.
18           MR. SHEEHAN:  All right.  I have no
19  objection, your Honor.
20           THE COURT:  All right then, 462 through
21  466 are exhibits, and you have copies for the
22  jurors.
23           MS. DAYTON:  We do.
24           THE COURT:  All right.  And then these
25  will be collected after the witness's testimony is
```

3124

```
1   completed.  Hopefully this will assist you in
2   following along in a way that just putting the
3   figures up on the screen would be inadequate.
4   CONTINUED DIRECT EXAMINATION
5   BY MS. DAYTON:
6       Q.   So I'll just start with this first chart,
7   try to figure out which way is the easiest to look
8   at it.  It's hard to make it large, period.  But you
9   have them in front of you still?
10      A.   Yes, I do.
11      Q.   You can look right there or on your chart.
12      A.   Okay.
13      Q.   So, you mentioned earlier that a DNA
14  profile is represented by a series of numbers.  So
15  can you sort of explain for the jury what they're
16  looking at here in chart 1.
17      A.   Sure.  At the top of the chart we have No.
18  1S2, 2S2, 3S2.  And that was the item number
19  assigned to those samples.
20      Q.   What are those samples of?
21      A.   A blood sample from Tina's Johnson, a blood
22  sample from James Reid and a blood sample from Basil
23  Williams.  Aliquot just means a small sample from
24  the blood that was submitted to the laboratory.
25      Q.   And then the words "Identifiler alleles
```

3125

1  defected" what does that mean?
2      A.   Identifiler is the name of the manufactured
3  kit we use in the amplification process.  And just
4  as a reminder, the amplification process is where
5  many copies of specific sites on the DNA molecule
6  are made, and this is a manufactured kit that we use
7  in this process.  And alleles are just a scientific
8  word for those numbers in the chart.
9      Q.   So those would be these numbers like right
10 here in each section?
11     A.   Right.  We also --
12     Q.   You can see my finger also on the one to
13 your right so you won't have to crane your head.
14     A.   We also call them -- I usually don't use
15 the word "allele," I use the word "genetic marker"
16 sometimes.  That's just easier to understand.
17     Q.   The numbers here at the top, D8S1179; what
18 do those represent?
19     A.   Those are the locations on the DNA that we
20 test.  It's like an address for the sites that are
21 tested.
22     Q.   And on the bottom here it says AMEL and
23 Tina Johnson has an X, but James Reid and Basil
24 Williams both have X and Y; what does that mean?
25     A.   That's the site I mentioned earlier for

3126

1  gender identification.  Females are XX, and it's
2  represented in the chart as an X.  And males are XY
3  and that's why for males you see an XY.
4      Q.   At some of the locations, just sticking
5  with D8 for the beginning, Tina Johnson was a 15 and
6  16, James Reid is a 13 and 14.  Basil Williams seems
7  to only have a 14.  Can you explain that?
8      A.   Sure.  Each of us receives one chromosome
9  from our parents, from each pair and one from our --
10 from each of our parents, one from our mother and
11 one from our father.  So, that's represented in the
12 chart as, say, the 15 and 16 when they're different.
13 But when they're same, it's represented in the chart
14 as a 14 because we're only seeing one 14.
15     Q.   So, in other words, this is a 14 from
16 Basil's mother and a 14 from Basil's father.
17     A.   That's how you would interpret it, yes.
18     Q.   So, but you don't write 14, 14 you just put
19 the single 14?
20     A.   Right.
21     Q.   Okay.  And can you describe the types of
22 DNA profiles?  These are considered known or
23 reference samples; is that correct?
24     A.   That is correct.
25     Q.   And why are they known or reference

3127

1  samples?
2      A.   Because they're samples that are taken
3  from, like, the inside of the cheek.  We call those
4  buccal samples or a known blood sample.
5          MS. DAYTON:  Your Honor, before we go
6  on, we do have a stipulation that I'd like to read
7  into evidence.
8          THE COURT:  All right.
9          MS. DAYTON:  It's been marked Government
10 Exhibit 262, it's been signed by both defense
11 counsel in the presence of the defendant, and I'm
12 signing it right now.  If I can just put this up for
13 a moment.
14         And it's "United States v. Azibo Aquart
15 CR 3:06 160.  It is hereby stipulated and agreed by
16 and between the United States of America by
17 Assistant United States Attorney, Tracy Lee Dayton,
18 and the defendant Azibo Aquart by his attorneys,
19 Michael Sheehan and Justin Smith, as follows:  If
20 called to the testify, Mark Morin, a registered
21 nurse, would testify that on December 13, 2005, he
22 drew defendant Azibo Aquart's blood.  The
23 defendant's blood was thereafter transported by law
24 enforcement officer to the Connecticut State
25 Forensic Laboratory where it was received and

3128

1  analyzed by forensic science examiner Christine Roy.
2          "If called to testify, Ben Candelaria, a
3  registered nurse, would testify that on
4  September 27, 2006, he drew Azikiwe Aquart's blood.
5  Azikiwe Aquart's blood was thereafter transported by
6  a law enforcement officer to the Connecticut State
7  Forensic Laboratory where it was received and
8  analyzed by forensic science examiner Christine Roy.
9          "If called to testify, Sarose Hamid,"
10 S-a-r-o-s-e, the first, and H-a-m-i-d, for the
11 record, "a registered nurse, would testify that on
12 February 8, 2008, he drew Efrain Johnson's blood.
13 Efrain Johnson blood was thereafter transported by a
14 law enforcement officer to the Connecticut State
15 Forensic Laboratory where it was received and
16 analyzed by forensic science examiner Christine Roy.
17         "And if called to testify, Federal Bureau
18 of Investigation Special Agent Christopher Munger
19 would testify that on December 2nd, 2009, he took
20 two buccal swabs from John Taylor.  The swabs were
21 thereafter transported by a law enforcement officer
22 to the Connecticut State Forensic Laboratory where
23 they were received and analyzed by forensic science
24 examiner Christine Roy.
25         "It's hereby stipulated and agreed this

3129

1    stipulation is admissible in evidence."  Signed by
2    me, Tracy Dayton, Michael Sheehan and Justin Smith.
3              We'd ask to move this into evidence,
4    your Honor.
5              THE COURT:  All right, that is a full
6    exhibit.  It will be with the jurors in the jury
7    room.
8              MS. DAYTON:  Thank you.
9        Q.  Can you just explain again what a buccal
10   swab is?
11       A.  A swab is used to collect cells from the
12   inside of a person's mouth.
13       Q.  And is that -- does that give a DNA profile
14   the same way that drawing blood does?
15       A.  Yes.  Those two samples, when tested you
16   can obtain a DNA profile for the individual.
17       Q.  Okay.  So, did you also receive known
18   samples of four suspects or four other individuals
19   in this case?
20       A.  Yes.  There were four additional known
21   samples that were examined and tested for this case.
22       Q.  Drawing your attention to what's been
23   marked or admitted as Government's 463.  Can you
24   explain sort of what we're looking at here.
25       A.  From the first chart to this chart, now

3130

1    you've included the four known samples from
2    individuals involved in this case.  Submission 46,
3    which was a known blood from Azibo Aquart.
4    Submission 60, which was a known blood from Azikiwe
5    Aquart.  Item 61-1S1, that was tested, which was a
6    known blood stain, Efrain Johnson.  And also
7    submission 6 was a known buccal swab from John
8    Taylor.
9        Q.  Can I ask you why 61-1S1, why did that have
10   a different type number than 60 or 46?
11       A.  Because the known blood came in, was
12   examined and a blood stain card was prepared.  At
13   this time we were using FTA cards, which is just a
14   way of archiving or preserving known blood samples.
15   And so this preparation was used to obtain a DNA
16   profile.
17       Q.  So it was just because it came in in a
18   different time, basically?
19       A.  It came in as a blood sample and then what
20   was tested was this preparation with the FTA card.
21       Q.  And with respect to the last one, John
22   Taylor, I've just indicated a 6 there.  Did that
23   also have some other numbers attached to it?
24       A.  Yes, it did.
25       Q.  And what were the purpose of the other

3131

1    numbers?
2        A.  It came in under a different laboratory
3    case number.
4        Q.  Why is that?  Do you know?
5        A.  Why?  No, I don't know the circumstances
6    around it being submitted under a different case
7    number.
8        Q.  And did the last one, No. 6, come in a long
9    time after, for instance, No. 46?
10       A.  Yes.
11       Q.  Okay.
12       A.  Well, I guess it depends on your definition
13   of a long time.
14       Q.  Years later?
15       A.  Yes.
16       Q.  Can you describe, these were all known or
17   reference samples, correct?
18       A.  Yes.
19       Q.  Can you describe what types of DNA profiles
20   that you can get from evidentiary samples?
21       A.  You can also obtain single source profile,
22   which looks similar to a known profile.  And by
23   single source, I mean it's consistent with coming,
24   the DNA coming from one individual.  You can also
25   obtain a DNA profile that more than one person

3132

1    contributed their DNA profile, and we refer to these
2    as mixtures.  You can also obtain a partial profile
3    where you don't obtain a result at every site that's
4    tested, and you also sometimes obtain no DNA
5    profile.
6        Q.  When you say every site that's tested, you
7    mean all 15 sites as listed on the charts?
8        A.  Right, correct.
9        Q.  So, what would cause you not to get a
10   result, not to get, like, any result in a particular
11   site?
12       A.  There could be various reasons.  One of
13   them, there is just not enough DNA there to detect
14   to obtain a DNA profile.  It could have been so
15   badly degraded that the DNA is affected and we can't
16   obtain a DNA profile.
17       Q.  And you mentioned that you can in some
18   instances get a mixture.  How do you know if you
19   have a mixture?
20       A.  Well, again, each one of those numbers
21   under each site, one comes from your mother and one
22   comes from your father, but when we see more than
23   two, again, I'll refer to them as genetic markers,
24   they're at the different sites tested, we -- that's
25   evidence that the DNA profile is a mixture.

3133

```
1      Q.   So if you see three numbers, what sort of
2   conclusion would you draw from three numbers?
3      A.   It's consistent with coming from at least
4   two people.
5      Q.   What if you see, like, five numbers?
6      A.   Then it would be evidence that the DNA
7   profile had three or more contributors.
8      Q.   So, going back to the single profile.  What
9   are the types of conclusions that you can draw from
10  comparing a known sample to an evidentiary sample?
11     A.   Well, if we have a single source profile
12  from evidence that's consistent with being a single
13  source, and we compare it to a known profile and we
14  see that all of the genetic markers in the known
15  profile were also detected in the evidentiary
16  profile, then we would make a statement as the
17  results are consistent with that person being the
18  source of the DNA profile from item X.
19     Q.   So, in other words, if all of the numbers
20  in the known profile matched all of the numbers in
21  the evidentiary profile, that would be considered
22  like a single source match; is that right?
23          MR. SHEEHAN:  Objection, leading.
24          MS. DAYTON:  I'm just trying to clarify
25  a very difficult science.
```

3134

```
1          THE COURT:  I'm going to permit the
2   question.
3      A.   Okay, again, if it's consistent with being
4   a single source and we compare it to a known
5   profile, and we see all of the genetic markers that
6   the known profile has, we also see those same
7   genetic markers in the evidentiary DNA profile, then
8   we would conclude that the results are consistent
9   with that person being the source of the DNA profile
10  obtained from item X.
11     Q.   And when you say "single source" that's
12  what you mean, like one person was the source of it,
13  it's consistent with that?
14     A.   It's consistent with one person, that we
15  detected the DNA from one person.
16     Q.   With respect to a mixture profile, when you
17  have multiple numbers at the different loci, what
18  sort of conclusions can you draw from comparing a
19  known sample to a mixture sample?
20     A.   If I could go back to a single source.
21     Q.   Sure.
22     A.   We also can eliminate somebody as being a
23  source of that DNA profile.
24     Q.   Okay.
25     A.   So that's also an important conclusion that
```

3135

```
1   we can make.
2      Q.   If the numbers don't match.
3      A.   Right.  If the person's DNA is not present
4   or it's not detectable, not detected there.
5      Q.   Okay.  And when you say "not detected" can
6   you explain again what you mean by that?
7      A.   Sorry, not at a detectable level.  So, it's
8   not just that we have a DNA profile and we say,
9   okay, especially with partial profiles, if you only
10  have a few genetic markers, that may not be enough
11  evidence to say that that person could be the
12  source.
13     Q.   I just want to give you a hypothetical just
14  on this "not detected" thing.
15          So if you took a tube of my blood and you
16  drop it in like a pool of water, like a swimming
17  pool of water, my blood is definitely in the
18  swimming pool, would you necessarily be able to
19  detect it?
20     A.   Your DNA profile?
21     Q.   Yes.
22     A.   Not necessarily.  It depends.  If there is
23  not enough DNA there, then it's not so much
24  detecting your profile, it's whether I would be able
25  to the detect any profile from that evidentiary
```

3136

```
1   sample.
2      Q.   So it could be overwhelmed by other things.
3      A.   Well, it can be so little DNA present that
4   I can't obtain a DNA profile.
5      Q.   It doesn't mean I wasn't there.
6      A.   That's what I mean by the person's DNA
7   wasn't there or it wasn't there in a detectable
8   level.
9      Q.   Thank you.  So with a mixture profile, if
10  you take a mixture of the different profiles and you
11  compare a known source to it, what sort of
12  conclusions can you draw from that?
13     A.   You could say that the person is included
14  as a contributor to the DNA profile from item X.
15     Q.   What does that mean?
16     A.   That the genetic markers that are observed
17  or obtained in the individual DNA profile were also
18  detected in the DNA profile from an evidentiary
19  sample.
20     Q.   If someone is not included as a
21  contributor, what other sort of conclusions can you
22  draw?
23     A.   Of course you could always eliminate them.
24  That means that there is not enough evidence there
25  that their DNA is detected or found there.  And
```

**GA784**

3137

```
1   there is another conclusion that we make, is that,
2   can that be eliminated.  That means that the genetic
3   markers that that individual has in their DNA
4   profile when you compare them to the DNA profile of
5   the genetic markers that are in the evidentiary
6   profile, that there is significant genetic evidence
7   that you cannot eliminate that person as a
8   contributor to that DNA profile.
9       Q.  So they're not excluded but you wouldn't
10  call them included either?
11      A.  No.  In order to call someone included,
12  again, all the genetic markers that individual has
13  must be also observed in the DNA profile from an
14  evidentiary sample.
15      Q.  When you are making these comparisons, are
16  you trying to determine when the DNA was deposited
17  somewhere, when the profile was deposited?
18      A.  No, we're not able to tell you when that
19  genetic material or biological material was
20  deposited on an item.
21      Q.  So what are you doing?
22      A.  We're letting -- we're determining if
23  somebody could be a contributor or they're
24  eliminated as a contributor to a DNA profile.  Or
25  with a source, whether they're consistent with being
```

3138

```
1   the source or whether they're eliminated from the --
2   as the source of the DNA profile from the
3   evidentiary sample.
4       So, we're looking at associations.  Is
5   there an association between an individual and the
6   DNA profile that was obtained?
7       Q.  Okay.  Once you have come to a conclusion
8   of included or cannot be eliminated, do you do any
9   sort of statistical evaluation of your findings?
10      A.  Yes, we do.
11      Q.  And how do you do that?
12      A.  It's based on our database that we have at
13  the laboratory which is the sample from three
14  population groups, African-American, Caucasian and
15  Hispanic.  And by looking at the frequency that the
16  genetic markers are found in those three population
17  groups, we ask the question for when -- we say the
18  results are consistent with a person being the
19  source of the DNA profile from item X, we ask how
20  many people in those three population groups could
21  also be the source of that DNA profile.
22      And when we do a comparison with the
23  mixture, we are asking the question, what is the
24  rarity of finding an individual in those three
25  population groups that could be included or cannot
```

3139

```
1   be eliminated as a contributor to that DNA profile.
2       Q.  And does this statistical analysis, is it
3   -- how is it represented?  Is it a ratio?  How is it
4   represented?
5       A.  It's represented as approximately one and a
6   number.  So, if that number was, say, one in, say,
7   10,000, that in the African-American, Caucasian or
8   Hispanic population, what that means is that if you
9   took, say, 10,000 Caucasians and you obtained their
10  DNA profile, you would expect approximately one of
11  those individuals who, say, could be the contributor
12  to the DNA profile, or whatever your conclusion is
13  you are making.
14      Q.  And the other 9,999 you would not expect
15  them to be a contributor to?
16      A.  Right, you would not expect that number to
17  be, they would be eliminated.
18      Q.  And why do you choose these particular
19  population groups?
20      A.  Because they're the three major population
21  groups of Connecticut.
22      Q.  And if you have a single source profile and
23  it's matched to a known source, what would the
24  random probability match be for an exact match?
25      I don't think I said that very clearly at
```

3140

```
1   all.  Let me try again.
2       So, if you were to, for instance, compare,
3   you know, an evidentiary sample to a known sample,
4   and you determine this person is included and you
5   believe that they were in fact the source, how would
6   that be represented statistically?
7       A.  Well, when we have a single source profile
8   where we obtain a result at all 15 loci and the
9   conclusion is the results are consistent with that
10  person being the source of that DNA profile, we give
11  what's called our ceiling statistic, which is the
12  expected frequency of individuals who could be the
13  source of the DNA profile is less than one in seven
14  billion.  And what that means is that -- say it was
15  less than one in seven billion in the Caucasian
16  population.  That means if you took seven billion
17  Caucasians and obtained their DNA profile, you would
18  not expect to find more than one individual who
19  could be the source of that DNA profile.
20      Q.  Were you the DNA forensic examiner for the
21  Aquart case?  Were you the only DNA examiner?
22      A.  I'm not sure what you mean by that.
23      Q.  You were assigned to this case to review
24  evidence in this case.
25      A.  Yes, I was assigned to do the DNA testing
```

3141

1  in this case.
2      Q.   And can you explain the process by which
3  the case is assigned to you?
4      A.   Our supervisor, the head supervisor of the
5  DNA section, assigns you the case.
6      Q.   Who is the head supervisor?
7      A.   Dr. Carll Ladd.
8      Q.   Once the case is assigned to you, are you
9  told it's a paternity case, a crime, a murder?  Are
10 you given any information about the case?
11     A.   Yes, we are.  Usually it comes in the form
12 of a manilla folder with the initial paperwork on it
13 that tells you what type of case it is and some
14 preliminary information about the case.
15     Q.   And once the case is assigned to you,
16 what's the first thing you do?
17     A.   Well, if it's evidence that someone else is
18 examining, then I wait until they do their
19 examination.  Well, first thing I do is review the
20 paperwork and make any phone calls I have to make to
21 find out more about the case or speak to someone
22 else in the laboratory.  And then if it's evidence
23 that is being tested by someone else, examined and
24 I'm going to test samples from that evidence, then
25 of course I have to wait until they do their

3142

1  examination.  But also, if there is known samples
2  submitted into the laboratory, those samples can be
3  tested.
4      Q.   When you first received this case, were the
5  -- other than the three victims, did you receive any
6  other known samples?
7      A.   No.
8      Q.   So, when you -- how did you come to be in
9  possession of the evidentiary samples in this case?
10     A.   Some of them were prepared by Maria Warner
11 and some of the samples I examined by myself.
12     Q.   Did you -- you didn't in this case go out
13 and collect the samples?
14     A.   No.
15     Q.   And you say some of the samples you
16 examined yourself, what do you mean by that?
17     A.   Some samples were samples of blood -- well,
18 possible blood, and there was other evidence
19 submitted.  So those samples -- those submissions
20 came directly to me for testing.
21     Q.   Were those already in the form of a swab?
22     A.   Yes.  The samples with the blood on them
23 are already in the form of swabs.
24     Q.   And the ones that you received from Maria
25 Warner, what did those look like when you got them?

3143

1      A.   They were in the form of swabs for most of
2  them.
3      Q.   And where do you store all of the DNA
4  sample -- or all the samples?  Not the DNA, the
5  evidentiary samples?
6      A.   We have a minus 20-degree freezer.  So when
7  someone prepares -- it's a walk-in freezer in a
8  secure laboratory.  And so when someone prepares
9  samples that, if needed, will go on to DNA testing,
10 those samples are put into storage in the walk-in
11 freezer.
12     Q.   And in this particular case, what was --
13 initially what was the goal of doing the DNA
14 testing?
15     A.   There were a few samples that I did
16 initially just to look for DNA that could not have
17 come from the three victims.
18     Q.   So, when you first received it, did anyone
19 say to you who the suspect was in the case or who
20 the suspects were in the case?
21     A.   I'm not sure if on the first request there
22 were any suspects listed.  I would have to look at
23 it, that first request.
24     Q.   Okay.  Do you have it with you?
25     A.   Yes, I do.

3144

1      Q.   Go ahead.
2           THE WITNESS:  Your Honor, if it's okay,
3  I'm going to pull out all of my laboratory notes so
4  they're here, too, because I have to refer to them.
5           THE COURT:  That's fine.
6      A.   Evidence that was submitted on 08/29/05 has
7  two names listed under the suspect area of the
8  request for examination of physical evidence.  That
9  form is filled out by the submitting agency.
10     Q.   And who was listed?
11     A.   Azibo Aquart and -- can I say the other
12 name?
13     Q.   Yeah.
14     A.   Rodney Wombie (ph).
15     Q.   So in the beginning it wasn't just Azibo
16 Aquart that were listed as suspect?
17     A.   No.
18     Q.   And over the course of the four-plus years
19 you've been working on this case, have you received
20 known samples of additional suspects?
21     A.   Yes, I have.
22     Q.   And are those the individuals you
23 identified before?
24     A.   Right.
25     Q.   Efrain Johnson, John Taylor and Azikiwe

**GA786**

3145

```
1   Aquart?
2       A.   Yes.
3       Q.   Drawing your attention to your first or the
4   November 29, 2005, report.  Had you received the
5   known samples of the victims' blood at that time,
6   the three victims?
7       A.   Yes.  The known samples of the three
8   victims' blood was submitted to the forensic lab.
9       Q.   And just generally speaking, what did you
10  do with the known samples?
11      A.   I tested a sample from the known blood and
12  obtained a DNA profile.
13      Q.   And did you then begin to compare it
14  against evidentiary items?
15      A.   Yes, I did testing on evidentiary items.
16      Q.   And for the ease of presentation, did you
17  eventually compare all of the evidentiary items
18  against all of the known samples that you had?
19      A.   I didn't test all of the evidentiary items,
20  but those that I did test I compared to all the
21  known profiles that were submitted.
22      Q.   And that occurred over the course of five
23  years, four to five years?
24      A.   I started in '05 and the last report was
25  2011.
```

3146

```
1       Q.   Six years.  So, do you know how many
2   evidentiary samples there were in total?
3       A.   There were over 70 -- there were over 70
4   submissions in this case, some of which were not for
5   DNA testing.
6       Q.   And why don't you test every sample?
7       A.   For those that are slated for DNA we might
8   find out as we're going along that certain samples
9   are not giving us DNA profiles, or there might be
10  multiple samples, say, from fingernail scrapings.
11  And what we do is we choose the ones that perhaps
12  have a better -- by looking at the amount of
13  material, might yield more of a DNA profile than
14  other samples.
15      Q.   And what do you base this evaluation on?
16      A.   Experience and what I'm obtaining in the
17  case from other samples.
18      Q.   What do you mean by what you are obtaining
19  in the case from other samples?
20      A.   Well, as I'm going along I did get some
21  samples that gave me no result, and so when I'm
22  evaluating what to do next, I'm looking at that
23  also.
24      Q.   Okay.  And if you didn't test a particular
25  item and someone wanted it tested, who could make
```

3147

```
1   that request of you?
2       A.   Basically it's the submitting agencies, the
3   prosecutor's office, or the defense can also make
4   requests.  Now, it doesn't mean that everything is
5   granted.  There is a process, discussion process
6   that has to go on as to why we need to do more
7   testing in a case.
8       Q.   Were requests made of you during the course
9   of this investigation to do additional analyzation?
10      A.   Yes, there was more evidence submitted over
11  the years to do additional testing.
12      Q.   And were you also -- were you ever asked to
13  test things --
14          MR. SHEEHAN:  I object.
15          May we approach?
16          THE COURT:  All right.
17          (Sidebar conference)
18          MR. SHEEHAN:  I want to guess that the
19  next question is going to be were you asked by the
20  defense to test any items.  If so, I think that's an
21  improper question.
22          MS. DAYTON:  What?  I'm going to ask did
23  the government, did the defense.  Why is that
24  improper?
25          MR. SHEEHAN:  Whether I ask them to
```

3148

```
1   test, in my own opinion, I don't think that's
2   relevant.
3           MS. DAYTON:  So, once again, there is
4   going to be much made of --
5           THE COURT:  All right, so why don't we
6   for now leave it that the defendant, the government,
7   the submitting agency can request more testing.
8           MS. DAYTON:  Well, I'm going to ask --
9   the government did.  We did a lot of times.  It goes
10  to the defense argument that all we cared about was
11  Azibo Aquart.  That is not true and never was true.
12          THE COURT:  So why does that not come up
13  in redirect?  In other words, why does it matter for
14  her opinion where she got the evidence from or who
15  asked her to test it?  Isn't what we want at this
16  stage what her opinion is, and then the further
17  process of understanding through cross-examination
18  what are alleged deficiencies in that and/or claims
19  of targeting or channeling?
20          MS. DAYTON:  Because I'm assuming that
21  when I stand up to ask that on redirect it's going
22  to draw an objection, because, with all due respect
23  to Mr. Sheehan, he'll come up and say I didn't
24  specifically ask whether or not the defense asked
25  evidence to be, you know, tested at a later date, so
```

3149

```
1   she can't redirect on that.  And I have a right to
2   show that they were careful and they're not biased.
3   They don't work for me, they don't work for the
4   federal government.  They don't work for like any
5   particular agencies and they're completely -- they
6   work on the innocence project.
7        THE COURT:  So can you ask that then in
8   the general terms of -- why is it not a proper
9   question?
10       MR. SHEEHAN:  Because the practicality
11  -- the defendant has no obligation to prove anything
12  under the law, and the fact that I don't ask to have
13  something tested is not probative at all.  Whether I
14  ask or not, if I want to ask --
15       THE COURT:  I'm going to ask you to keep
16  this to the general questions related to showing
17  that you are -- that she's available for anyone's
18  projects, anyone's evidence, and we'll see what
19  happens on cross-examination.  I understand that
20  scope of the cross might be a subject of objection,
21  as it has been.
22       MR. SHEEHAN:  It's possible.
23       MS. DAYTON:  Shocking, but true.
24       THE COURT:  And we'll take it up then.
25       MS. DAYTON:  So if I just say,
```

3150

```
1   regardless of who asked you to do additional
2   testing, if you find it's scientifically
3   appropriate, you'll do it.
4        MR. SHEEHAN:  It sounds leading, but you
5   can ask it anyway.
6        (Sidebar concluded)
7    Q.   So, regardless of who asks you to do
8   additional testing, if it's determined by the lab
9   it's scientifically appropriate, the lab will do
10  that testing; is that correct?
11   A.   Yes.  If the request is made and it's
12  deemed possible in the timeframe to do the testing
13  and we're not just repeating results, say, such as
14  we already have, say, the victim's blood on the
15  suspect's clothing, doing more blood stains on more
16  pieces of clothing that the suspect wore would not
17  warrant additional testing.  But yes, we do agree to
18  do additional testing on some cases.
19   Q.   And just to be clear, that's hypothetical.
20  Here you don't have any suspect clothing, right?
21   A.   Yes.  That's just an example which comes to
22  mind which has been requested in the past.
23   Q.   Okay.  And with respect to the samples that
24  were submitted in this case, did you ever find --
25  you briefly touched upon this, you couldn't get
```

3151

```
1   enough genetic material to do any further
2   analyzation.
3    A.   Some samples I did not obtain a DNA profile
4   from.
5    Q.   And if you know, was that true even with
6   things that might have been right against the
7   victims' skin such as duct tape?
8    A.   I don't know if it was against the person's
9   skin, but -- that I wouldn't know.
10   Q.   Let me ask you a different way.  Did you
11  have any situations where you couldn't get enough to
12  generate a profile from duct tape?  I should say
13  swabbings taken from duct tape because you don't
14  actually get the duct tape, correct?
15   A.   That is correct, yes.  Yes, there were
16  results from swabbings from a torn area of duct tape
17  that I did not obtain a result from.
18   Q.   What number was that, if you recall?
19  Sorry, I should have grabbed you before you put the
20  paper down.
21   A.   Item 5-Z1, swabbing of torn area of duct
22  tape, I did not obtain a result.
23   Q.   And just generally speaking, if you know,
24  did you have more than one situation where you
25  couldn't get a result?
```

3152

```
1    A.   Yes.
2    Q.   And again, generally, with respect to the
3   evidentiary swabs, were they, if you know, mostly
4   single profile or mixtures, generally?
5    A.   A combination of both, partial profiles,
6   some single source, some mixtures where there were
7   more than three contributors, that DNA profile where
8   there were more than three contributors, four
9   contributors, sometimes at least four contributors.
10   Q.   And with respect to your reports, do you
11  know how many reports you did in this case in total?
12   A.   I did the last report was supplemental 11,
13  so that means I did 12 reports.
14   Q.   And some of them were supplemental or
15  amended; is that right?
16   A.   Yes.  I had two amended reports.
17   Q.   Okay.  And the majority of the items appear
18  to have been tested, to have been analyzed in early
19  2008 appearing in reports 4, 5 and 6.  Why is that,
20  if you know?
21   A.   Reports 5 and 6 were evidence that I tested
22  while I was under the observation of a defense
23  observer for some of the DNA testing that I did.
24   Q.   Do you know the defense observer's name?
25   A.   Charlotte Word.
```

**GA788**

3153

```
1    Q.    And how did Ms. Word actually observe?
2    A.    There was a camera on me while I was doing
3  the work and she watched a live video in a room in
4  administration.
5    Q.    And what processing did she watch?
6    A.    She watched me examine the evidence, put
7  the samples in the tube, set up the start of the
8  extraction process.  Then she observed the
9  extraction process and the quantification process.
10   Q.    Did you say she saw the labelling of the
11 tubes, too?
12   A.    Yes.  During various times, because you are
13 transferring the DNA during the extraction procedure
14 from one tube to the next tube, I would put the rack
15 of tubes, labeled, inside a new ZipLoc type plastic
16 bag and bring it to her so she could see I had all
17 of the tubes labelled properly and how the tubes
18 were set up.  Because in the video you couldn't
19 really see the labelling of the tubes.  It was too
20 small.
21   Q.    Do you know how many weeks Ms. Word was
22 there for?
23   A.    She was for two days for each of three
24 extraction procedures.
25   Q.    I'm going to draw your attention to
```

3154

```
1  Government's Exhibit 465.  Now, you have in front of
2  you, it's also on your chart, I mean on your screen
3  to the right.  Now, counsel asked you earlier, there
4  is just six items listed here.  You tested far more
5  than six items, correct?
6    A.    Yes, I did.
7    Q.    And in fact 9-Z2 and 9-Z3 are listed.  Did
8  you also test a 9-Z1?
9    A.    Yes, I did.
10   Q.    I'm actually going to start with 9-Z1.
11 It's not on the chart, but I want to start with that
12 because was that a mixture.
13   A.    I have to refer to my notes.
14        THE COURT:  You may.
15   A.    My reports.  Yes.  9-Z1 was a mixture.
16   Q.    How would you characterize that mixture?
17   A.    There is evidence of at least four
18 contributors.
19   Q.    Why is there evidence of at least four
20 contributors?  What did you see to make you conclude
21 that?
22   A.    That means that there must have been at
23 least seven genetic markers either detected or --
24 evidence of seven, of at least seven.  And what I
25 mean by that is that the amount of amplified DNA,
```

3155

```
1  when it goes through the detection procedure and
2  analysis, it's represented by a peak, and that peak
3  height is reflective of how much amplified DNA was
4  detected in that sample.  So, we have what we call a
5  minimum threshold level.  So, those are the genetic
6  markers that are reported and represented by
7  numbers.  But we also look at a range of peaks that
8  are present that don't reach minimum threshold
9  level, but we do observe them and we indicate on the
10 report or in the profiles with an asterisk.
11   Q.    We'll get back into that.
12   A.    So there was evidence of at least --
13   Q.    First of all, what was 9-Z1?
14   A.    9-Z1 was swabbing of latex type material
15 from submission 9.
16   Q.    And you said that there were at least four
17 individuals that contributed.  Now, with respect to
18 the known profiles that you received, you had the
19 three victims and the four suspects in this case.
20 Can you say -- can you tell us who was included, if
21 anyone, as contributors?
22        THE COURT:  In 9-Z1?
23        MS. DAYTON:  Yes.
24   Q.    If you could stay on the page when you get
25 there because I'm going to ask you a few questions
```

3156

```
1  about it.
2    A.    Okay.  The individuals who were included as
3  contributors were Tina Johnson and James Reid.
4    Q.    And again, just "included" means what?
5    A.    That the genetic markers that were in the
6  known DNA profile were also detected in the DNA
7  profile from 9-Z1.
8    Q.    So, every -- all of their -- Tina Johnson
9  and James Reid, all of their genetic markers or
10 alleles were also present in the mixture; is that
11 correct?
12   A.    That is correct.  That is correct, yeah.
13   Q.    Who could not be eliminated as a
14 contributor?
15   A.    Basil Williams, Azibo Aquart, Azikiwe
16 Aquart, Efrain Johnson and John Taylor.
17   Q.    So, basically, what does that mean in terms
18 of, again, they can't be eliminated?
19   A.    That means that not all of their genetic
20 markers were detected in the DNA profile from 9-Z1,
21 but there was sufficient genetic evidence that there not
22 to eliminate them as contributors to that DNA
23 profile.
24   Q.    Going into the statistical analysis, if we
25 could start with Tina Johnson and James Reid.  What
```

3157

1   was the statistical rarity that you found for them?
2       A.   It's not for them.
3       Q.   Okay.
4       A.   So let me just clarify.
5       Q.   Please do.
6       A.   When we make a conclusion such as Tina
7   Johnson and James Reid are included as contributors
8   to the DNA profile, we're asking the question what
9   is the rarity of finding individuals in the three
10  major populations who could be -- who also could be
11  included in that detected DNA profile of the
12  evidentiary sample.
13          So, my statistical evaluation is the
14  expected frequency of individuals who could be a
15  contributor to the DNA profile from item 9-Z1, which
16  was the swabbing of the latex type material from
17  submission 9, is approximately one in 24,000 in the
18  African-American population, approximately one in
19  21,000 in the Caucasian population and approximately
20  one in 20,000 in the Hispanic population.
21      Q.   So, when it says, say, going from the
22  bottom up, one in 20,000, the other 19,999 you would
23  expect to eliminate then?
24      A.   Right.   If you tested 20,000 Hispanic
25  individuals' DNA profile you would expect

3158

1   approximately one of those individuals could be a
2   contributor to the DNA profile from the evidentiary
3   sample 9-Z1.
4       Q.   Moving on to Basil Williams who you said
5   could not be eliminated, can you say what his -- the
6   rarity evaluation is with him?
7       A.   The expected frequency of individuals who
8   cannot be eliminated as a contributor to the DNA
9   profile, and that's all those I tested except for
10  D2, and D2 is just the name of a location of the
11  site that was tested, from item 9-Z1 is
12  approximately one in 24,000 -- sorry, 2,400 in the
13  African-American population, approximately one in
14  7,600 in the Caucasian population and approximately
15  one in 6,000 in the Hispanic population.
16      Q.   When you say except in D2, I'm pointing to
17  D2, so what does that mean there was no 20 or 25
18  there?
19      A.   For this particular result one of the
20  genetic markers was called or reported and the other
21  genetic marker was not reported.   It was -- there
22  was a peak on the electropherograms that was in the
23  position of one of the genetic markers but did not
24  rise to the level of being reported.
25      Q.   What's an electropherogram?

3159

1       A.   I'm sorry.   An electropherogram is just the
2   peaks represented in the chart, the result.   That's
3   how the amplified DNA is represented as an
4   electropherogram.   It's kind of a chart, a graph,
5   would be better, not a chart, of peaks, and that's
6   what the amplified DNA, how it's represented.
7       Q.   When you say peaks, like little mountains?
8       A.   Yes, little mountains.
9       Q.   In various sizes?
10      A.   Various heights.
11      Q.   So, when you say there was one marker that
12  was represented.   So, either the 20 or the 25 was
13  there, but the other one wasn't?
14      A.   Correct.
15      Q.   Okay.
16      A.   So, therefore, that site is not included in
17  our statistical evaluation.
18      Q.   And is that why the numbers drop from one
19  in 24,000 to 1 in 2,400, for example?
20      A.   Correct, because I'm not using all 15
21  results to do my statistical evaluation.
22      Q.   Moving on to Azibo and Azikiwe Aquart.
23  What were the statistical analysis for them and how
24  did you arrive at it?
25      A.   The expected frequency of individuals who

3160

1   cannot be eliminated as a contributors to the DNA
2   profile at all loci tested except for D21, D2 and
3   FGA from item 9-Z1, is approximately one in 140 in
4   the African-American population, approximately 240
5   in the Caucasian population, and approximately one
6   in 220 in the Hispanic population.
7       Q.   So, again, now three locations D21, D2, and
8   FGA.   And so, for Azibo and Azikiwe Aquart, what is
9   that exact -- so what does that exactly mean that
10  those loci are not included?
11      A.   That their genetic markers were fully not
12  detected in those three sites.   Therefore, we can't
13  use those three -- the information at those three
14  sites when we do our statistical evaluation.
15      Q.   Okay.   So, when you do the statistical
16  evaluation, does each site get its own percentage,
17  or how does that work?
18      A.   Well, we're looking at the frequency of the
19  genetic markers that are detected at each site.   And
20  we -- so you are combining the result of each site.
21      Q.   Okay.
22      A.   I'm not sure that's an answer to that
23  question.
24      Q.   Okay.   Let me try again.   This is a lawyer
25  speaking to a forensic examiner.   So, you said

3161

```
1   earlier that if someone is included they would have
2   all 15 sites.  And would there be a statistical sort
3   of probability for each site individually?
4       A.   Correct.  And that's based, again, on the
5   frequency of the genetic markers that are seen in
6   each of the three populations.
7       Q.   So, if, for instance, FGA is not included,
8   so you would only be using 14 sites to do the
9   evaluation.
10      A.   Right.  And FGA would be represented by a
11  one because obviously if you multiply something by
12  zero you end up with zero.
13      Q.   So the numbers get smaller if loci are
14  dropped out.  The bottom number I should say, the
15  denominator.
16      A.   So if you start with a full inclusion for a
17  sample, you have one number, and as you
18  progressively remove more and more of those loci
19  from the statistical evaluation, that one in number
20  will get smaller.
21      Q.   Okay.
22      A.   From the original number of full inclusion.
23      Q.   Which is one in seven billion?
24      A.   It depends on what the sample is.
25      Q.   Okay.  Here it was one in 24,000 for Tina
```

3162

```
1   Johnson and James Reid, that was full inclusion,
2   correct?
3       A.   For full inclusion the expected frequency
4   of individuals that could be a contributor to the
5   DNA profile from 9-Z1 is approximately one in 24,000
6   in the African-American population, approximately
7   one in 21,000 in the Caucasian population, and
8   approximately one in 20,000 in the Hispanic
9   population.
10      Q.   Is it fair to say that whether or not what
11  the race of the individual is, you don't make a call
12  based on a particular race of a known sample?  Is
13  that fair?
14      A.   We give statistics based on the DNA profile
15  obtained from the evidentiary sample.  None of our
16  testing that we do tells us what population group
17  the contributor or source of that DNA profile would
18  fall into.  So, what we do is we calculate the
19  frequency for three population groups, the major
20  three population groups in Connecticut.
21      Q.   Okay.  Moving to Efrain Johnson.  On this
22  we have two more people, Efrain Johnson cannot be
23  eliminated.  Can you explain the statistical
24  evaluation here?
25      A.   The expected frequency of individuals who
```

3163

```
1   cannot be eliminated as a contributor to the DNA
2   profile at all loci except for D21, D13, D2 and D18
3   from item 9-Z1 is approximately one in 70 in the
4   African-American population, approximately one in 60
5   in the Caucasian population, and approximately one
6   in 50 in the Hispanic population.
7       Q.   So, significantly lower numbers?
8       A.   Yes.  It's also based on if your -- how
9   many genetic markers are present in those loci that
10  you are also using, that you are using in your
11  statistical evaluation, because the more genetic
12  markers that are at a site, of course, the more
13  individuals that could have contributed to that DNA
14  profile.
15      Q.   Okay.  And John Taylor, what are his --
16  what's his statistical evaluation?
17      A.   The expected frequency of individuals who
18  cannot be eliminated as a contributor to the DNA
19  profile at all loci tested except for D7, D2, D18
20  and FGA from item 9-Z1 is approximately one in 10 in
21  the African-American population, approximately one
22  in 180 in the Caucasian population and approximately
23  one in 200 in the Hispanic population.
24      Q.   So, is it fair to say this is a very
25  complex mixture?
```

3164

```
1       A.   There was evidence of at least four
2   contributors.
3       Q.   Okay.  I'm going to move on to some of the
4   other samples, not in quite as much detail.
5   Sticking with evidentiary submission No. 9, which
6   for the record is Government's Exhibit 121D and
7   121D-1 it was represented by photo 433 yesterday,
8   government exhibit, three swabs were submitted to
9   you on that one, on the submission 9.
10      A.   Yes.
11      Q.   I'm going to draw your attention to -- I
12  should say back to Government's Exhibit 465.  It's
13  on your thing, you also have it in front of you.
14  Did you perform DNA testing on submission 9-Z2?
15      A.   Yes, I did.
16      Q.   And from your analysis, what sort of result
17  did you obtain?
18      A.   The results were consistent with item 9-Z2
19  being a mixture.  And why I'm saying "consistent
20  with" is because there is evidence at only one site
21  that was tested that had evidence of a mixture.
22      Q.   What site was that, if you know?
23      A.   D19.
24      Q.   So, there was like one extra number at D19?
25      A.   No, there was a peak height difference that
```

3165

1    was significant, that indicated that it was -- item
2    9-Z2 was consistent with a mixture.
3        Q.   Can you say again, what that means, a peak
4    height difference?
5        A.   That just means how the amplified DNA is
6    represented as peak.  The peak height represents how
7    much of amplified DNA at that position or that
8    genetic marker is detected.  So you have peaks of
9    various heights, and so there was one peak that was
10   significantly larger than the other peak which was
11   an indication that at that site there was a mixture.
12   And since there was only one site, there was
13   evidence of a mixture, we refer to that result as
14   consistent with being a mixture.
15       Q.   Were the results from 9-Z2 put into CODIS?
16       A.   Yes, they were.
17       Q.   You described CODIS.  Can you remind the
18   jurors what that is?
19       A.   CODIS is a DNA profile database that is run
20   by the FBI and you can -- state accredited
21   laboratories can submit known evidentiary samples to
22   that database, and then it's compared to known
23   profiles and other evidentiary samples that are in
24   that database.
25       Q.   Did you receive a CODIS hit?

3166

1            MR. SHEEHAN:  Objection, may we
2    approach?
3            THE COURT:  Yes.
4            (Sidebar conference)
5            MR. SHEEHAN:  If they want to bring in
6    what the CODIS result was, they can put on the CODIS
7    people.  She's testifying based on her results, not
8    what CODIS has to say about it, and what CODIS has
9    to say about it is hearsay.
10           MS. DAYTON:  Number one, she's an
11   expert.  She can testify from hearsay and she could
12   base results on hearsay.  Number two, it's not being
13   offered for the truth of the matter asserted, it's
14   going to explain what she did next, which is that
15   there was an advisement that went out to the
16   submitting agency that the hit had been for Efrain
17   Johnson, and based upon that, she later received a
18   blood sample which has already been stipulated to.
19   So it's not hearsay because it's not being offered
20   for the truth of the matter asserted.  It was in
21   fact Efrain Johnson, and she would go on to testify
22   that she tested the blood.
23           THE COURT:  So she would testify that
24   she got a hit and as a result of that she went on
25   and did certain things?

3167

1            MS. DAYTON:  Yeah, but she can't say
2    just I sent a request for names in general, I mean
3    she got a hit.
4            THE COURT:  No, no, but she can say she
5    gets a hit without describing what the hit is, and
6    she did, therefore, the following things:  And, I
7    therefore, asked for a blood sample from Efrain
8    Johnson.
9            MS. DAYTON:  Right.
10           THE COURT:  That seems fair.
11           MS. DAYTON:  Well, she didn't say I
12   asked for a blood sample.  She notifies the agency I
13   got a hit on Efrain Johnson.
14           MR. SHEEHAN:  That isn't the way it
15   worked at all.  The way that it worked is they had a
16   hit from CODIS after the -- they had Mr. -- they had
17   him in the database.
18           MS. DAYTON:  Right.
19           MR. SHEEHAN:  They basically ended up
20   getting a -- and then she ends up getting a blood
21   sample from Johnson, and this is what she ended up
22   basing her reports on, not the CODIS.  They don't
23   base any of their conclusions on CODIS.
24           THE COURT:  But in all of this, does it
25   explain why she's asking for Efrain Johnson?

3168

1            MS. DAYTON:  She doesn't specifically
2    ask, she sends a letter to the submitting agency
3    saying she got a hit.  It's up to the submitting
4    agency then to get the blood sample and submit it,
5    if, in fact, they want it tested, which is exactly
6    what was done in this case.
7            MR. SHEEHAN:  The submitting agency is
8    Bridgeport.  And what CODIS has to say isn't
9    relevant here.  She basically -- the ultimate
10   conclusion.
11           THE COURT:  Otherwise how is the jury
12   going to understand?  That she just dreamt up she
13   should ask Bridgeport for more blood from this
14   particular --
15           MR. SHEEHAN:  No.  She could say I sent
16   this to CODIS.  As a result of that I asked for
17   information.  She doesn't have to say what CODIS
18   said.
19           THE COURT:  Well, but it doesn't make
20   any sense.  I'm going to permit her -- if you want
21   me to give a limiting instruction, but I don't think
22   that she is talking about -- what she says, she gets
23   a hit and thereafter she requests from -- she
24   advises Bridgeport of the hit and they thereafter
25   submitted Efrain Johnson's blood sample; is that the

3169

```
1   way it goes?
2            MS. DAYTON:  Yeah.
3            THE COURT:  That seems fine.
4            (Sidebar concluded).
5       Q.  Did you get a CODIS hit?
6       A.  Yes, I did.
7       Q.  And who was that for?
8       A.  Efrain Johnson.
9       Q.  Did you thereafter obtain a blood sample
10  from the submitting agency for Efrain Johnson?
11      A.  Yes.
12      Q.  And did you compare the evidentiary sample
13  in 9-Z2 to the known sample for Efrain Johnson?
14      A.  Yes.
15      Q.  And what conclusion did you reach?
16      A.  Efrain Johnson is included as a contributor
17  to the DNA profile from item 9-Z2.
18      Q.  And before we go on to the statistical
19  evaluation, did you compare 9-Z2 to all of the
20  individuals in this case?
21      A.  Yes, all the known samples that I received.
22      Q.  So Efrain Johnson, who is 61-1S1 EJ, he was
23  included, correct?
24      A.  Yes.
25      Q.  Everybody else, what were they?
```

3170

```
1       A.  Eliminated.
2       Q.  And why were they eliminated?
3       A.  Because there was not enough genetic
4   information in the DNA profile obtained from the DNA
5   profile from 9-Z2 to include or cannot be
6   eliminated.  If they were eliminated, there wasn't
7   evidence they were contributors to that DNA profile.
8       Q.  Is it possible for some of someone's
9   genetic markers or alleles to show up, but you still
10  exclude them?
11      A.  Correct.
12      Q.  Or eliminate them?
13           MR. SHEEHAN:  I'm going to object, your
14  Honor.  She has no way of knowing whose markers
15  these are.
16           THE COURT:  This is just a general
17  question, isn't it?
18           MS. DAYTON:  Yes.  Extraordinarily
19  general.
20           THE COURT:  As a matter of this science,
21  can you tell us the answer to that question.
22      A.  Yes, I was going to say that we all share
23  genetic markers, as may have observed when they
24  had the known profiles submitted.  I'm not -- when I
25  get a DNA profile from an evidence sample, it
```

3171

```
1   doesn't tell me who that genetic marker came from.
2   I'm just doing a comparison from a known DNA profile
3   to DNA profile from an evidentiary sample.  Since we
4   share genetic markers there very well could be some
5   genetic markers that an individual has in their DNA
6   profile that could be there, but that doesn't mean
7   that they're a contributor to that DNA profile.
8       Q.  When you say that people share genetic
9   markers, that means in some places there will be
10  similar -- like, for instance, at D8 James Reid is
11  13, 14, Azibo Aquart is a 13, 14, Azikiwe Aquart is
12  a 13, 15.  So John Taylor is a 13, 16, so they share
13  a 13, but they have other markers that are
14  different.  Is that accurate?
15      A.  Correct.  You can see that they -- those
16  James Reid, Azibo Aquart, Azikiwe Aquart and John
17  Taylor all have a 13 genetic marker at D8.  So
18  they --
19      Q.  Okay.
20      A.  So you could have genetic markers in the
21  DNA profile from the evidence that are also -- the
22  person may have those in their DNA profile, but
23  again, that doesn't mean that they contributed to
24  that DNA profile.
25      Q.  So, you mentioned that Efrain Johnson was
```

3172

```
1   included as a contributor.  What was your
2   statistical evaluation of your findings?
3       A.  The expected frequency of individuals who
4   could be a contributor to the DNA profile from 9-Z2
5   is less than one in seven billion in the African
6   American, Caucasian and Hispanic population.
7       Q.  Fewer than one in seven billion?
8       A.  Is less than one in seven billion.
9       Q.  And that's what you said earlier -- how did
10  you describe that statistical analysis earlier?
11      A.  As our ceiling.
12      Q.  The top, the highest.  That's basically the
13  largest number you would call, you wouldn't go one
14  in 12 billion?
15      A.  That's correct.
16      Q.  So, again, out of every seven billion
17  people tested, you would expect to exclude the other
18  6,999,999,999 people.
19      A.  Yes.  You would not expect to find more
20  than one individual in those seven billion who could
21  be a contributor to the DNA profile from 9-Z2.
22      Q.  Moving on to 9-Z3, which is also a swabbing
23  of a latex glove from submission 9.  Did you perform
24  DNA testing on that item?
25      A.  Yes.
```

3173

```
1    Q.   And from your testing what did your results
2    tell you?  What kind of submission was it?
3    A.   It was a swabbing of a latex type material
4    from submission 9.
5    Q.   And what did you find on the swabbing?
6    A.   I obtained a DNA profile that was
7    consistent with being a mixture.
8    Q.   And was it a full profile?
9    A.   Yes, I obtained a DNA profile at each
10   result.  Each of the sites tested I obtained a DNA
11   profile.
12   Q.   For 9-Z3?
13   A.   Yes, for 9-Z3.
14   Q.   And what conclusion did you reach?  Who
15   contributed, if anyone?
16   A.   Efrain Johnson cannot be eliminated as a
17   contributor to the DNA profile from 9-Z3.
18   Q.   Okay.  And were other people eliminated?
19   A.   Yes, I eliminated Tina Johnson, James Reid,
20   Basil Williams, Azibo Aquart, Azikiwe Aquart are
21   eliminated as contributors to the DNA profile from
22   9-Z3.
23   Q.   What about John Taylor then?
24   A.   He's also eliminated as a contributor from
25   the DNA profile in 9-Z3.
```

3174

```
1    Q.   What is the statistical evaluation of your
2    findings with respect to Efrain Johnson?
3    A.   The expected frequency of individuals who
4    cannot be eliminated as a contributor to the DNA
5    profile at loci D8, THO1, D19 and D5 from item 9-Z3
6    is approximately one in 400,000 in the
7    African-American population, approximately one in
8    71,000 in the Caucasian population, and
9    approximately one in 120,000 in the Hispanic
10   population.
11   Q.   Why is the frequency for 9-Z3 so much lower
12   than for 9-Z2?
13   A.   Because there for 9-Z2 I was looking at a
14   full inclusion, and 9-Z3, Efrain Johnson cannot be
15   eliminated as a contributor to the DNA profile, plus
16   the two profiles are not the same.
17   Q.   Okay.  I'm going to move on to 13-Z1, what
18   was that item?
19   A.   Swabbing of a partial latex glove.
20   Q.   And was that of submission 13?
21   A.   Yes, 13-Z1 was prepared from submission 13.
22        MS. DAYTON:  That's Government's
23   Exhibit 136A for the record.
24   Q.   And you performed DNA testing on that item?
25   A.   Yes, I did.
```

3175

```
1    Q.   Is this one of the items where the defense
2    observer was present?
3    A.   Yes, it was.
4    Q.   And what did you find from your DNA
5    testing?
6    A.   That the results demonstrate that item
7    13-Z1, the swabbing of the partial latex glove,
8    partial latex glove is in quotes, is a mixture.
9    Q.   Why is partial latex glove in quotes?
10   A.   Because that's how it was referred to by
11   the submitting agency.  So, sometimes when we get a
12   piece of something we don't know what it's actually
13   from, or you can't -- you know, you may not want to
14   make that conclusion that that's what it's from.
15   So, therefore, you put quotes around it.
16   Q.   I'm going to show you what's been marked
17   Government's Exhibit 464 admitted into evidence.
18   It's chart 3.
19        So, for this particular item did you find
20   that anyone was included?
21   A.   For item 13-Z1?
22   Q.   Yes.
23   A.   James Reid is included as a contributor to
24   the DNA profile from item 13-Z1.
25   Q.   And what was the expected frequency of
```

3176

```
1    individuals who could have been included as a
2    contributor?
3    A.   The expected frequency of individuals who
4    could be a contributor to the DNA profile from item
5    13-Z1 was approximately one in four billion in the
6    African-American population, and is less than one in
7    seven billion in the Caucasian and Hispanic
8    populations.
9    Q.   And did you find that anyone could not be
10   excluded or cannot be eliminated as a contributor?
11   A.   Azibo Aquart cannot be eliminated as a
12   contributor to the DNA profile from item 13-Z1.
13   Q.   Drawing your attention to the chart, these
14   are in different colors by the government, James
15   Reid is in blue.
16   A.   I'm sorry, I didn't hear the beginning of
17   that.
18   Q.   Just drawing your attention to the chart.
19   James Reid is in blue and Azibo Aquart is in red,
20   and the partial latex glove, the -- well, 13-Z1.  So
21   here there is a 12, a 13 and a 14.  What does this
22   mean that there is three genetic markers or alleles
23   there?
24   A.   That's the genetic markers that I detected.
25   Q.   And because there is more than two, what
```

3177

1  does that mean?
2      A.    That's consistent with more than one person
3  contributing to that result at D8.
4      Q.    And here at D21 there is one, two, three,
5  four, five.  What is that consistent with, five
6  markers?
7      A.    That there is at least three contributors
8  detected at D21.
9      Q.    The asterisk you mentioned earlier, can you
10 explain what that means?
11     A.    That means that there was an indication of
12 genetic material that was detected that did not
13 reach the minimum threshold level that we have for
14 calling a genetic marker as being there.  So, we
15 indicate those, what we call minor peaks, with an
16 asterisk.
17     Q.    So, when you say a minimum threshold level,
18 how high must the peak be for it to be above your
19 threshold?
20     A.    It's called 75 RFUs.  That's just a
21 reflection of the height, relative florescent units.
22 So it's a measurement of what's detected at that
23 site.
24     Q.    So, if something is below 75, below the
25 threshold, do you pay any attention to it?

3178

1      A.    Yes.  We look at peak heights below the 75
2  threshold.
3      Q.    Down to how low?
4      A.    We look at peaks greater than 50 RFUs, but
5  actually we do look at the entire profile.  It's not
6  like I don't ever look below the 50 RFU site.  I
7  mean, I'm looking at the data as I'm analyzing it.
8      Q.    Do you rely on peaks that are below 50 RFU?
9      A.    We don't rely on them for our
10 interpretation.
11     Q.    Why not?
12     A.    Because that's our protocol which is based
13 on our validation studies.
14     Q.    What's a validation study?
15     A.    Before you can use, say, the kits or the
16 instruments, they have to go through what's called a
17 validation study where you are seeing how they work,
18 their reliability, reproducibility of using them.
19 And then from those validation studies you have
20 protocols that are developed, and those are the
21 instructions, if you will, that you have to follow.
22     Q.    So, between 50 and 75, is that considered a
23 minor peak?
24     A.    Greater than 50 and less than 75, yes.  And
25 that was for analysis done on the -- what we call

3179

1  the capillary electrophoresis instrument.
2      Q.    And do you -- if there is a minor peak like
3  that, does that still get included in your
4  statistical evaluation?
5      A.    No.
6      Q.    So, if you were going to do a statistical
7  evaluation, let's say, of -- well, what was your
8  statistical evaluation?  What were your conclusions
9  with regard to Azibo Aquart who you said cannot be
10 eliminated as a contributor to the profile from
11 13-Z1?  What was your conclusion?
12     A.    My statistical evaluation was the expected
13 frequency of individuals who cannot be eliminated as
14 a contributor to the DNA profile at all loci tested
15 except for CSF and D2 from item 13-Z1 is
16 approximately one in 79 million in the
17 African-American population, approximately one in
18 two billion in the Caucasian population and
19 approximately, and one in 630 million in the
20 Hispanic population.
21     Q.    So, one in 79 million in the
22 African-American population, one in two billion in
23 Caucasian -- you said in the Caucasian, and one in
24 630 million for the Hispanic?
25     A.    Approximately for each of those.

3180

1      Q.    Now, were the defendant's -- were both of
2  the defendant's genetic markers present at every
3  site?
4            MR. SHEEHAN:  I'm sorry, I don't
5  understand the form of the question.
6            MS. DAYTON:  I can ask it again.
7            THE COURT:  Were the defendant's?
8            MR. SHEEHAN:  I think she said both of
9  the defendants.
10           MS. DAYTON:  I can rephrase.
11           MR. SHEEHAN:  I wasn't sure what that
12 was about.
13     Q.    Did you find genetic markers at every, all
14 15 loci consistent with the defendant's known
15 profile?
16     A.    I'm not sure I understand that question.
17     Q.    Me either.  Let me try again.
18 So, here there is a 13, 14 at D8.  The defendant has
19 a 13, 14, James Reid had a 13, 14 at D8, can you
20 necessarily say which one of them contributed the
21 13, 14 or the both?
22     A.    I can't say what individual contributed
23 that 13 or 14.  There is nothing that identifies a
24 genetic marker coming from an individual.
25     Q.    Okay.  But so what can you say?

3181

1    A.   I can say that at 13-Z1 I detected a 12,
2  13, 14 and James Reid has a 13, 14, and Azibo Aquart
3  has a 13, 14, and both of those genetic markers that
4  they have in their DNA profile were also detected in
5  13-Z1.
6    Q.   Okay.  And D21, the defendant has a 31.2
7  and a 35?
8    A.   Yes.
9    Q.   And did you find those on 13-Z1, those
10 markers?
11   A.   Right.
12   Q.   I'm not saying from the defendant, just
13 consistent with the ones that the defendant has at
14 the same spot?
15   A.   Right, at that D21 I also detected 27, 31,
16 31.2, 33.2 and a 35.  So, included in there is the
17 31.2 and the 35.
18   Q.   I'm going to just skip ahead to CSF because
19 you mentioned something about every loci except CSF
20 was one of them.  Why did you say except CSF?
21   A.   Because Azibo Aquart has a 10, 12 and I
22 only detected -- I'm sorry, he has an 11, 12 and I
23 only detected a 10 and 11.
24   Q.   Okay.
25        MR. SHEEHAN:  Can I caution counsel

3182

1  about that pen, just it ends up marking the exhibit.
2    Q.   Okay.  What could contribute or what could
3  cause a specific marker not to appear in a site,
4  what types of things?
5    A.   Well, if you have a low amount of DNA that
6  you've extracted from the sample you may not get a
7  result at every site tested.  And also if the DNA is
8  degraded.  Certain sites are more susceptible to
9  degradation and you might not get a result at those
10 sites.
11   Q.   Which sites -- you said certain sites are
12 more susceptible to degradation.  Do you know which
13 ones those are?
14   A.   In general the longer the fragment of DNA
15 that we're looking at at a site, the more
16 susceptible it is to degradation.  And degradation
17 just means that something has happened to the
18 structure of the DNA that it's not amplified.
19   Q.   When you say "longer," longer like in
20 length?
21   A.   Correct.
22   Q.   So certain sites are shorter than other
23 sites; is that correct?
24   A.   That is correct.
25   Q.   So which sites are the shortest?

3183

1    A.   The shortest sites that we test are D8, D3,
2  D19 and D5.
3    Q.   And which are the longer, the longest sites
4  that are most susceptible to degradation?
5    A.   CSF, D2, D18, and FGA also is one of the
6  longer sites.  But there is some overlap in the
7  length of sites that we're testing.
8    Q.   Okay.  So they literally overlap each other
9  in certain places?
10   A.   No, as far as their size goes.
11   Q.   Their size goes, okay.
12        And so, you said that in this particular
13 instance the defendant's, you said -- excuse me, you
14 said at all loci tested except for CSF and D2.  So
15 here is CSF and D2, and these are both two of the
16 longer sites that are more susceptible to
17 degradation.
18   A.   That's correct, but I wouldn't want to say
19 that's why I did not detect the 12 at CSF or
20 the 23 at D2.  It could also be that the input of
21 DNA was low.
22   Q.   What do you mean input of DNA was low?
23   A.   We have an optimal amount of DNA that we
24 amplify.  So when you have a mixture such as 13-Z1,
25 and you have multiple contributors, they may not be

3184

1  contributing equally to the overall quantity of DNA
2  that is extracted.  You could have some that are,
3  say, 75 percent of what's extracted and others that
4  are like 5 percent.  So, we know that as the input
5  or the ratio of the contributors gets smaller and
6  smaller, that we will not always get a result from
7  all of the sites tested.  And the shorter fragments
8  of DNA tend to amplify more efficiently than some of
9  the other sites that we test at.
10   Q.   So, the shorter sites Xerox better?
11   A.   Right.
12   Q.   Okay.
13   A.   It's just based on the fact that they're
14 shorter.
15   Q.   And just drawing your attention to THO1,
16 there is a 7 and an 8 detected.  The 7 is seen in
17 both James Reid and Azibo Aquart's known profile; is
18 that correct?
19   A.   Yes, they both have a 7 genetic marker.
20   Q.   And the 8 only in James Reid?
21   A.   Well, James Reid has an 8 and Azibo Aquart
22 does not have an 8.
23   Q.   So, there is some overlap between the two
24 of them and there are some differences between the
25 two of them as well; is that fair?

3185

```
1       A.   Yes.
2            MR. SHEEHAN:  Your Honor, I'm going to
3    object to the form of the question, "between the two
4    of them."  She's not saying that this DNA comes from
5    any particular person and I think that's implicit in
6    the question.
7            MS. DAYTON:  Well, if I can respond.
8            THE COURT:  Okay, I don't want you to
9    respond.  I want you to ask another question that
10   will clarify what this overlap means with respect to
11   the two specific people, Reid and Azibo Aquart, that
12   you are talking about.
13       Q.   Okay.  The sample I just referred to 2S2
14   for James Reid, is that a known sample form James
15   Reid?
16       A.   Yes, it is.
17       Q.   So, you know the two have come from James
18   Reid?
19       A.   I know that that's how it was represented
20   to me.
21       Q.   And we have stipulated for the record with
22   respect to 46, that's known to have come from Azibo
23   Aquart?
24       A.   Correct.
25       Q.   Okay.  Moving on to evidence submission
```

3186

```
1    14-1-Z1.
2            MS. DAYTON:  It's Government's
3    Exhibit 137A for the record.
4       Q.   I'll put 465 back up on the ELMO.  Did you
5    perform DNA testing on this submission?
6       A.   14-1 Z1, yes.
7       Q.   And what was this, what was the 14-1 Z1?
8       A.   Could I just get back to this chart for a
9    second?
10       Q.   Sure.
11       A.   14-1 Z1 was swabbing of glove.
12       Q.   And what did you find with respect to your
13   analysis?
14       A.   I obtained DNA profile from 14-1-Z1 and the
15   results demonstrated that the profile from 14-1-Z1
16   was a mixture.
17       Q.   Did you find any individuals who are
18   included as contributors?
19       A.   Yes.  I compared the DNA profiles that were
20   submitted -- the known samples that were submitted
21   in this case, and James Reid, Basil Williams, Azibo
22   Aquart and Azikiwe Aquart are included as
23   contributors to the DNA profile from 14-1-Z1.
24       Q.   And was the statistical analysis for all
25   four of them the same?
```

3187

```
1       A.   Yes.
2       Q.   And what was it?
3       A.   The expected frequency of individuals who
4    could be a contributor to the DNA profile from item
5    14-1-Z1 is approximately one in 400 in the
6    African-American population, approximately one in
7    1,300 in the Caucasian population, and approximately
8    one in 1,200 in the Hispanic population.
9       Q.   And you mentioned that Azibo Aquart, the
10   defendant, is included.  Were all of the defendant's
11   genetic markers also present in this sample at every
12   loci?
13       A.   The genetic markers that were in the DNA
14   profile from Azibo Aquart, those genetic markers
15   were detected in the DNA profile from 14-1-Z1, but
16   again it's not that -- that marker that was
17   detected, I know it comes from --
18       Q.   Right.  You don't know the defendant,
19   right?
20       A.   No.
21       Q.   You've never met him?
22       A.   No.
23       Q.   Correct?  And you didn't personally draw
24   his blood?
25       A.   Correct.
```

3188

```
1       Q.   And you didn't collect the evidentiary
2    samples yourself?
3            MR. SHEEHAN:  Your Honor, I'm going to
4    object.  May we approach?
5       A.   I think --
6            THE COURT:  Just a moment.
7       A.   My answer was --
8            THE COURT:  There is an objection
9    pending.
10            MR. SHEEHAN:  May we approach.
11            THE COURT:  Yes.
12            (Sidebar conference)
13            MR. SHEEHAN:  Your Honor, implicit in
14   her question, this witness is not saying that that
15   is Mr. Aquart's DNA in there.  And implicit in the
16   way those questions were framed is trying to frame
17   something that this witness is not saying.  She
18   doesn't -- what this witness can testify to is
19   basically the odds of any particular match.  She's
20   not saying, and she cannot say, and she will not
21   say, that it comes from any individual.
22            MS. DAYTON:  Which is --
23            MR. SHEEHAN:  And implicit in that,
24   well, you don't know where the blood came from, is
25   oh, okay, this is from him.  That's not what she's
```

3189

```
1   saying and it's misleading.
2            THE COURT:  Okay, why this line of
3   questioning anyhow?
4            MS. DAYTON:  I was just trying to
5   clarify.  What I was going to say next, so you could
6   never say for sure any genetic marker came from any
7   person.  Because she's saying it every single time.
8   I was just trying to clarify that so we don't have
9   to have repetitive testimony every time.  That's
10  where I was getting to when I was objected to.
11           MR. SHEEHAN:  But when --
12           THE COURT:  I'm going to sustain the
13  objection.
14           MS. DAYTON:  That's fine.
15           (Sidebar concluded)
16   Q.  I'm just going to ask you another question.
17       With respect to -- was there anyone who
18  could not be -- with respect to the known profiles,
19  was there anyone who could not be eliminated?
20   A.  Tina Johnson cannot be eliminated as a
21  contributor to the DNA profile from item 14-1-Z1.
22   Q.  And what was your statistical analysis with
23  respect to Tina Johnson?
24   A.  The expected frequency of individuals who
25  could be a contributor to the DNA profile from item
```

3190

```
1   14-1-Z1 at all loci tested except for D5 and D13 is
2   approximately one in 60 in the African-American
3   population, approximately one in 90 in the Caucasian
4   population, and approximately one in 70 in the
5   Hispanic population.  And I do want to add that for
6   this test of this sample I used only -- there are
7   only 13 sites tested.
8    Q.  Why?
9    A.  Because our original testing before we used
10  the Identifiler kit we used two kits called Profiler
11  Plus and COfiler and they covered 13 sites as well
12  as the Amelogenin site.
13   Q.  When did the testing change from 13 sites
14  to 15 sites?  Approximately, if you know.
15   A.  Between the time that the first report was
16  generated and when the second report was generated.
17  So that would be between the end of -- sometime
18  towards the end of 2005 and the beginning of 2006.
19   Q.  And the lab started to use the new, the 15
20  site test instead of the 13 --
21   A.  Correct.
22   Q.  -- to test.  And did you also compare John
23  Taylor's profile against the evidentiary sample in
24  14-1-Z1?
25   A.  Yes, I did.
```

3191

```
1    Q.  And what did you find?
2    A.  He cannot be eliminated as a contributor to
3   the DNA profile from item 14-1-Z1.
4    Q.  What was your statistical analysis there?
5    A.  The expected frequency of individuals who
6   cannot be eliminated as a contributor to the DNA
7   profile at all loci tested except D7, D18 and FGA
8   from item 14-1-Z1 is approximately one in 30 in
9   African-American population, approximately one in 50
10  in the Caucasian population, and approximately one
11  in 60 in the Hispanic population.
12   Q.  When the you say at all sites except D7,
13  D18 and FGA, why are those excluded?
14   A.  Because his genetic markers were not --
15  those genetic markers that he has were not detected
16  in the DNA profile of 14-1-Z1, not fully detected.
17  I'm not -- I would have to check -- do the
18  comparison.
19   Q.  Okay.  Is it that some genetic markers were
20  not present?
21   A.  Correct.
22   Q.  And Efrain Johnson, was he included or
23  cannot be excluded?
24   A.  He was eliminated as a contributor to the
25  DNA profile from 14-1-Z1.
```

3192

```
1    Q.  And just again, there are some pretty low
2   numbers here, comparatively speaking, like we heard
3   a one in 7 billion and one 79 million before.  These
4   are much lower numbers.  And what accounts for that?
5    A.  Because there are multiple genetic markers
6   detected at more multiple sites that were tested and
7   so, therefore, there is more people who could be
8   potential contributors to the DNA profile.
9    Q.  Okay.
10           MS. DAYTON:  This is probably a great
11  place to take break.
12           THE COURT:  All right, that's fine.
13  We'll do that and we will take a half an hour for
14  lunch.  My usual flexible view of a half hour
15  depending on how much work we have to do instead of
16  eating lunch.  So enjoy yours.
17           (Jury exited the courtroom.)
18           MR. SHEEHAN:  Your Honor.
19           THE COURT:  Yes.
20           MR. SHEEHAN:  Before Ms. Roy leaves, I
21  would just like to address the issue of our
22  subpoena.  We have a subpoena that the state -- to
23  the state lab.
24           THE COURT:  I don't have a copy of the
25  subpoena.  I don't have a written motion.  I don't
```

3193

```
1    have anything before me.
2                MR. SHEEHAN:  Okay.
3                THE COURT:  If there an issue that
4    relates to her testimony.
5                MR. SHEEHAN:  No, it really relates to
6    cross-examination, but I'll provide the Court a copy
7    with the subpoena.
8                THE COURT:  All right.  We'll take a
9    recess.  Please don't discuss your testimony.  Thank
10   you.
11               (Recess)
12               THE COURT:  All right.  Please bring
13   back the witness and the jury.
14               (Jury entered the courtroom.)
15               THE COURT:  All right, please be seated.
16               All right, you may proceed.
17               MS. DAYTON:  Thank you.
18       Q.   Good afternoon.
19       A.   Good afternoon.
20       Q.   I'm going to draw your attention to
21   evidence submission 15-Z2.  I neglected to ask you,
22   do you know what the case number is for the U.S. v
23   Aquart case, your last ID number?
24       A.   Yes, it's ID 05-019367.
25       Q.   And when you receive the evidentiary swabs,
```

3194

```
1    are they labeled in any particular manner?
2        A.   The submissions, are you talking about the
3    samples from the Maria Warner?
4        Q.   Let me start with the samples from Maria
5    Warner.
6        A.   Yes, there is the case number on them and
7    the sample item number and her initials.
8        Q.   You recognize her initials?
9        A.   Yes.
10       Q.   And if something, like, for instance,
11   evidence submission 15-Z2, what lab submission
12   number would that come from?
13       A.   ID 05-019367.
14       Q.   And would it be submission No. 15?
15       A.   Yes, it would have been a sample obtained
16   from submission 15.
17       Q.   I'm just going to show you some of the
18   items we've already talked about and one more item.
19   This is Government's Exhibit 122A.  Do you recognize
20   that submission or do you recognize this item?
21       A.   I recognize the laboratory label that's on
22   the can.
23       Q.   And what submission number is that?
24       A.   Submission 10.
25       Q.   Okay.  I handed you the wrong one.  I
```

3195

```
1    wanted to hand you 9.  Let me start with these.  The
2    top one, first, do you recognize what that is?
3        A.   This is submission 13, that's how it's
4    labeled on the laboratory label.
5        Q.   And the laboratory label, does that contain
6    the ID number 05-019367?
7        A.   Yes.
8        Q.   And so, if that's submission 13, would that
9    be where 13-Z1 was derived from?
10       A.   Yes.
11       Q.   Okay.  And do you see Maria Warner's -- do
12   you recognize her initials on there?
13       A.   Yes, I do.
14       Q.   Okay.  And for the next --
15            MS. DAYTON:  This is for the record 13
16   is Government's Exhibit 136A.
17       Q.   Drawing your attention to Government's
18   Exhibit 137A, do you recognize what that is from?
19       A.   Yes, I see the laboratory label on the
20   packaging.
21       Q.   Bearing your lab ID number?
22       A.   Yes.
23       Q.   For this case?
24       A.   Correct.
25       Q.   And what submission is that?
```

3196

```
1        A.   Submission 14.
2        Q.   And would that be where 14-1-Z1 was derived
3    from?
4        A.   Yes.
5        Q.   So, the first number, like 14, that goes to
6    the submission?
7        A.   Correct.
8        Q.   And do you know what the one and the Z1
9    stand for?
10       A.   When you receive a submission that has more
11   than one item in it, you call those -- say for this
12   submission it appears it has two gloves in it.  So
13   one glove would be designated 14-1 and the other
14   glove would be designated 14-2.  So when you remove
15   or obtain samples from 14-1, then you would sub-item
16   that as 14-1 and in the case of Maria Warner, her
17   samples are designated with a Z because she works in
18   the trace section of the laboratory.
19       Q.   So, anything that comes from the trace
20   section is designated with a Z?
21       A.   Correct.
22       Q.   And drawing your attention to the next
23   item, which is Government's Exhibit 142A, do you
24   recognize what that is?
25       A.   Yes, I recognize the laboratory label on
```

3197

1  the packaging.
2      Q.   And does it bear the ID number for this
3  case?
4      A.   Yes, it does.
5      Q.   And what submission number is that?
6      A.   15.
7      Q.   So, we're going to talk about that one
8  right now.  Do you recognize anyone's initials on
9  that?
10     A.   Yes, I recognize Maria Warner's initials.
11     Q.   And did you receive an evidentiary swab
12 derived from submission 15?
13     A.   Yes, I did.
14     Q.   And did you test -- did you test 15-Z2?
15     A.   Yes, I did.
16     Q.   And what was 15-Z2?
17     A.   15-Z2 was a swabbing of a piece of
18 stocking.
19     Q.   And what did your results demonstrate?
20     A.   The results demonstrate that item 15-Z2 is
21 a mixture.
22     Q.   And were you able to determine how many
23 people might have contributed to that mixture?
24     A.   At least five people contributed to that
25 DNA mixture.

3198

1      Q.   And did you analyze this against all the
2  known samples that you had?
3      A.   Yes, I compared it to the known samples
4  submitted in this case.
5      Q.   And did you find that any of the known
6  individuals were included as contributors?
7      A.   Yes.
8      Q.   Who?
9      A.   James Reid, Basil Williams and Azikiwe
10 Aquart are included as contributors to the DNA
11 profile from item 15-Z2.
12     Q.   And what was your statistical analysis with
13 respect to those three individuals?
14     A.   The expected frequency of individuals who
15 could be a contributor to the DNA profile from item
16 15-Z2 is approximately one in 1,000 in the
17 African-American population, approximately one in
18 1,500 in the Caucasian and Hispanic populations.
19     Q.   So, again, for the Caucasian and Hispanic
20 population, 1,499 people would be excluded out of
21 every 1500?
22     A.   Yes.  You would expect approximately 1,499
23 individuals out of that 1,500 would be eliminated as
24 a contributor to that DNA profile.
25     Q.   And for the African-American population,

3199

1  999 out of every thousand you would expect them to
2  be excluded?
3      A.   Approximately 999 out of a thousand you
4  would expect to be eliminated as a contributor to
5  that DNA profile.
6      Q.   With respect to -- did you find anyone that
7  could not be eliminated as a contributor from the
8  known samples?
9      A.   Tina Johnson cannot be eliminated as a
10 contributor to the DNA profile from item 15-Z2.
11     Q.   What was your statistical analysis with
12 regard to Tina Johnson?
13     A.   The expected frequency of individuals who
14 could be -- actually, I have a typo here.
15     Q.   In your report?
16     A.   Yes.
17     Q.   Okay.  Is that your report or your notes?
18     A.   My report.
19     Q.   Okay.  Do you have your results with you?
20     A.   It's just that I should have had in -- the
21 report it says the expected frequency of individuals
22 who could be a contributor, and it should be the
23 expected frequency of individuals who cannot be
24 eliminated as a contributor.
25     Q.   Okay.  And do you have the statistical

3200

1  analysis there?
2      A.   Yes.
3      Q.   Okay.
4      A.   So the DNA profile from item 15-Z2 at all
5  loci tested except for D2 is approximately one in
6  450 of the African-American population,
7  approximately one in a thousand in the Caucasian
8  population, and approximately one in 990 in the
9  Hispanic population.
10     Q.   And was there anyone else from the knowns
11 who could not be excluded as a contributor -- cannot
12 be eliminated?
13     A.   Azibo Aquart cannot be eliminated as a
14 contributor to the DNA profile from item 15-Z2.
15     Q.   And what was the statistical analysis with
16 regard to Azibo Aquart?
17     A.   Again, it should read the expected
18 frequency of individuals who cannot be eliminated as
19 a contributor to the DNA profile from item 15-Z2 at
20 all loci tested except D21, D2 and vWA is
21 approximately one in 220 in the African-American
22 population, approximately one in 510 in the
23 Caucasian population, and approximately one in 360
24 in the Hispanic population.
25     Q.   And why at all loci tested except D21, D2

3201

```
1   and vWA?
2        A.   Because there was not -- all of his genetic
3   markers were not detected at those three sites.
4   It's not -- again, it's just that the genetic
5   markers and the DNA profile from the evidence did
6   not have those genetic markers which were also found
7   in his DNA profile.
8        Q.   I'm going to move on to 16-Z1.
9             MS. DAYTON:  This is Government's
10  Exhibit 138A for the record.
11       Q.   Do you recognize this?
12       A.   Yes, I recognize the laboratory label on
13  the packaging.
14       Q.   And is the ID number for this case on that?
15       A.   Yes.
16       Q.   And do you recognize Marie Warner's
17  initials?
18       A.   Yes, I do.
19       Q.   And do you know what this item is?
20       A.   It's submission No. 16.
21       Q.   And did you analyze any evidentiary swab
22  from that sample?
23       A.   Yes, I did.
24       Q.   Submission -- excuse me.
25            And what did you find?
```

3202

```
1        A.   I analyzed 16-Z1, which was the swabbing of
2   both sides of glove.
3        Q.   What did you find?
4        A.   And the DNA profile that I detected from
5   16-Z1 demonstrated it was a mixture.
6        Q.   And were you able to determine how many
7   people contributed to that mixture?
8        A.   At least four people contributed to that
9   DNA mixture.
10       Q.   Now, looking at the chart on Government's
11  Exhibit 465, it has certain -- Tina Johnson, Efrain
12  Johnson and John Taylor eliminated, but then there
13  are four inconclusives.  What does inconclusive
14  mean?
15       A.   That means that no conclusion could be made
16  from the result when I compared it to those known
17  DNA profiles.
18       Q.   Why not?
19       A.   Because at some point the DNA profile of an
20  examiner was detected as a contributor to that
21  sample.
22       Q.   When you say the DNA profile for an
23  examiner was detected, what do you mean by that?
24       A.   That when you compared that DNA profile to
25  the DNA profile of 16-Z1, the conclusion was that
```

3203

```
1   they are included as a contributor.
2        Q.   So, how was this determined?
3        A.   I put that DNA profile from 16-Z1 into
4   CODIS.
5        Q.   Why did you put it into CODIS?
6        A.   Because it was an evidentiary sample and
7   there was enough information in it to put it into
8   CODIS.
9        Q.   What happened after you put it into CODIS?
10       A.   Sometime later it hit on the DNA profile of
11  a member of laboratory staff.
12       Q.   So, is there a -- when you work at the
13  laboratory do you have to give a DNA sample?
14       A.   Yes, I did.
15       Q.   Does everybody that works there?
16       A.   Now everybody does.
17       Q.   Did that used to be the case?
18       A.   No.
19       Q.   What was -- how did it work before?
20       A.   There was -- well, we had to give our DNA
21  profile as a member of the DNA section, and then
22  later that was expanded to include everybody in the
23  forensic lab, including people who have nothing to
24  do with evidence.
25       Q.   So, is this just a -- why?  Why do you give
```

3204

```
1   DNA samples?
2        A.   Because we wanted to make sure that if
3   there was DNA from an individual that was detected
4   on a sample that we know that.
5        Q.   Is this required -- well, what's it's
6   called?  Is there a name for the DNA profiles of all
7   of the staff combined?
8        A.   I'm not sure what that --
9        Q.   Yeah, it's not a good question.  Is there
10  like an index of all staff members?
11       A.   Yes.  We have a staff index that we use to
12  compare the DNA profiles to.
13       Q.   When you initially analyzed 16-Z1, did it
14  hit on the staff profile?
15       A.   No.
16       Q.   At that time when you initially analyzed
17  it, were all the staff members in the staff index?
18       A.   No.
19       Q.   So how did it come to be that there was
20  later a hit?
21       A.   Because they entered more DNA profiles from
22  staff members into that staff index and because it
23  was in CODIS, it hit on that staff index.
24       Q.   So, basically the results were rerun later
25  when all staff members were in there?
```

3205

```
1      A.    Correct.
2      Q.    Is that a matter of course?  Did it have
3  anything to do with this case or does that happen
4  for all things that go into CODIS?
5      A.    That's correct.
6      Q.    Which one?
7      A.    That all of the samples that go into CODIS
8  will be run against the staff members.
9      Q.    And as your accrediting agency, do they
10 require this?
11     A.    Our own protocols require us to do this.
12     Q.    So, the lab has gone beyond what is
13 mandated.
14            MR. SHEEHAN:  Objection, leading.
15            THE COURT:  Rephrase, please.
16     Q.    If this is not mandated why does the lab do
17 it?
18     A.    Because we want to make sure, as in this
19 case, where this sample we -- there was the DNA
20 profile from that individual was included into the
21 DNA -- was included as a contributor to the DNA
22 profile from 16-Z1.  Therefore, that additional DNA
23 made comparisons from knowns to the evidentiary
24 sample, initially I had one conclusion and then I
25 had to change it to inconclusive.
```

3206

```
1      Q.    What was your initial conclusion on 16-Z1,
2  do you remember?
3      A.    That's in my original unamended report.
4      Q.    Okay.  Do you recall which report that is?
5      A.    Yes, I have it.
6      Q.    Okay.
7            MR. SHEEHAN:  Your Honor, I'm going to
8  object to her testifying as to something before she
9  corrected it.  It's not what she's relying upon.
10            THE COURT:  Overruled.
11     Q.    Go ahead.
12     A.    My initial conclusion was the results
13 demonstrate that item 16-Z1 is a mixture and James
14 Reid cannot be eliminated as a minor contributor to
15 the DNA profile from item 16-Z1.  Basil Williams
16 cannot be eliminated as a minor contributor to the
17 DNA profile from item 16-Z1.  Azibo Aquart cannot be
18 eliminated as a minor contributor from 16-Z1.  And
19 Azikiwe Aquart cannot be eliminated as a minor
20 contributor to the DNA profile from 16-Z1.
21            The results eliminate Tina Johnson,
22 Efrain Johnson as a contributor to the DNA profile
23 from item 16-Z1.
24     Q.    And what was the date of that report?
25     A.    The initial report date is 05/02, 2008.
```

3207

```
1      Q.    And do you know approximately when it was
2  that the you determined that a staff member's DNA
3  profile appeared in 16-Z1?
4      A.    I think I was notified the beginning of
5  2009.
6      Q.    And are you notified in the same way of any
7  CODIS hit?
8      A.    Yes, I was told by the CODIS administrator.
9  Sometimes -- in this case I was notified by the
10 CODIS administrator.
11     Q.    And what did you do?
12     A.    Then I rechecked the profiles against her
13 DNA profile and then I reissued a new report.
14     Q.    The "her" is a staff member?
15     A.    Yes.
16     Q.    Do you know what unit she works in?
17     A.    Yes.
18     Q.    Which unit?
19     A.    The trace section.
20     Q.    And was she the trace examiner on this
21 case?
22     A.    Yes, she was.
23     Q.    And after you rechecked your conclusions
24 changed?
25     A.    Yes.
```

3208

```
1      Q.    And why is that?
2      A.    Because I couldn't use that data that I
3  made a positive association with those individuals.
4  So before it was cannot be eliminated as a minor
5  contributor and now I changed it to inconclusive.
6      Q.    Did you go back and check all of the
7  evidentiary samples in this case against the profile
8  for the trace examiner?
9      A.    Yes, I did.
10     Q.    And did you find -- did you conclude that
11 she was included, that her profile was included in
12 any other evidentiary sample?
13     A.    No, she wasn't included in any other
14 evidentiary sample.
15     Q.    Did you determine that she couldn't be
16 excluded from any other evidentiary sample?
17 Couldn't be eliminated.
18     A.    No, she's eliminated.
19     Q.    She's eliminated from everything else.
20     A.    Correct.
21     Q.    I am going to move on.  I'm going to bring
22 you -- actually, I want to show you one more piece
23 of evidence.  I think I got the right one this time.
24            Government's Exhibit 121D, do you recognize
25 what this is?
```

**GA802**

3209

1    A.   That has our laboratory label on it for ID
2  05-19367 and it's submission 9.
3    Q.   And so this is what 9-Z1, 9-Z2 and 9-Z3
4  would have come from?
5    A.   Yes.
6    Q.   Do you actually open the items and look
7  inside?  Like when you get your submissions, do you
8  go and look at the actual submission itself when you
9  get your swabs?
10   A.   No.
11   Q.   Okay.  Why not?
12   A.   Because it's been examined by another
13 examiner.
14   Q.   So, it's not part of your particular
15 protocol?
16   A.   No.  It's not to say that I don't go look
17 at their photographs, but the actual submission, no,
18 I don't go reexamine their examination, no.
19   Q.   Did you --
20   A.   I would like to --
21   Q.   Go ahead.
22   A.   -- add something to that.
23        Sometimes submissions go from one section
24 to another.  So, I might look at something, see
25 like, say, a latent print on something, what could

3210

1  be a latent print, and I'll stop my examination and
2  transfer to someone in the latent print section, but
3  then I will receive it back to finish my
4  examination.  So, but we don't repeat similar type
5  of examinations.
6    Q.   You mentioned earlier that some of the
7  evidentiary swabs in this case you got from Marie
8  Warner and some you received directly, swabs,
9  evidence swabs from the scene?
10   A.   Some samples I examined myself, yes.
11   Q.   So I'm going to show you -- and when you
12 examine something yourself, do you put anything on
13 the item to indicate that you, in fact, examined it
14 yourself?
15   A.   I put my initials on the packaging.
16   Q.   I'm going to show you what is in evidence
17 as Government's Exhibits 166 and 167.  First 166.
18 If you could take a look at that and just tell me if
19 you recognize it.
20   A.   Yes, I do.
21   Q.   What is it?
22   A.   It's sample submission that was submitted
23 on this case and it's submission No. 47.
24   Q.   And do you know what was in that
25 submission?  Well, how do you recognize it?  I'm

3211

1  sorry.
2    A.   Well, it has the laboratory label on the
3  box and I recognize my initials.
4    Q.   And what was in there?
5    A.   Two cotton swabs on wooden sticks.
6    Q.   And what are the two cotton swabs on wooden
7  sticks.  What's on them?
8    A.   Stain.
9    Q.   What does the stain look like?
10   A.   I would have to refer to my actual
11 examination work sheets.
12   Q.   Would that help refresh your memory?
13   A.   Yes, it would.
14   Q.   Okay.
15   A.   Both swabs were stained reddish-brown.
16   Q.   Do you know where the actual swab was taken
17 from?
18   A.   Just from the information that was on the
19 packaging.
20   Q.   And what is that?
21   A.   Taken from wall F within apartment No. 101,
22 215 Charles Street, Bridgeport, Connecticut.
23   Q.   I'm going to draw your attention to
24 Government's Exhibit 466.  So at the top 47, item
25 47, is that your submission number?

3212

1    A.   Yes, it is.
2    Q.   And swabs from wall F within apartment 101
3  at 215 Charles Street, you just said?
4    A.   Correct.
5    Q.   The result here says "human blood, single
6  source."  How did you come up with that result?
7    A.   Because I observed that there is
8  reddish-brown stains on the swabs I did -- the first
9  thing I did was a chemical screening test for blood.
10 That was positive.  And then I tested a portion of
11 one of the swabs for the presence of human blood and
12 that resulted that test was positive.
13   Q.   So, those were two different tests?
14   A.   Correct.
15   Q.   Why do you do two different tests?
16   A.   Because we do a screening test for blood,
17 so if it's negative for the screening test then we
18 don't go on and do the test for human blood.
19   Q.   But if it's positive, why do you need to do
20 a further test?
21   A.   We don't necessarily have to do a further
22 test, but if there is enough sample on the swab, we
23 don't want to consume a sample for more testing such
24 as DNA, but if there is enough sample on the swab
25 then we can take a small cutting of the

3213

```
1   reddish-brown stain and do a test, which if it's
2   positive indicates the presence of human blood.
3       Q.  So, if the screening test is positive for
4   blood, why do you have to test for human blood?
5   What other kind of blood could it be?
6       A.  Oh, it could be blood from any kind of
7   animal, and plus the screening test, it's only --
8   lets you know that there is a blood-like substance
9   or a stain there.
10      Q.  So you go on to test that it's human versus
11  a different mammal or animal?
12      A.  Correct.  If I, by looking at it, if I
13  think that there is enough sample there to use for
14  that test and still have enough to go on and do DNA
15  testing.
16      Q.  And did you DNA test this swab?
17      A.  Yes.  I tested one of the swabs contained
18  in submission 47.
19      Q.  And what were your results?
20      A.  I obtained a DNA profile that was
21  consistent with a single source.
22      Q.  And what does that mean?  Here it says
23  "consistent with being a source" under James Reid,
24  what does that mean?
25      A.  When I compared it to Mr. Reid's profile,
```

3214

```
1   the results were consistent with Mr. Reid being the
2   source of the DNA profile from submission 47.
3       Q.  And this is wall F in the apartment.  And
4   what was the expected frequency?
5       A.  The expected frequency of individuals who
6   could be the source of the DNA profile from
7   submission 47 is less than one in seven billion in
8   the African-American, Caucasian, and Hispanic
9   populations.
10      Q.  So, that's your ceiling you talked about
11  before?
12      A.  Yes, it is.
13      Q.  So, you consider that a match essentially?
14      A.  Those aren't the words.
15          MR. SHEEHAN:  I object, your Honor.
16      Q.  What words would you use?
17      A.  The results are consistent with James Reid
18  being a source of the DNA profile from submission
19  47.
20      Q.  And you eliminated everyone else.  So what
21  does that mean from that particular -- from 47, what
22  does that mean?
23      A.  The results eliminate the other known --
24  the other individuals who I received knowns from as
25  the source of the DNA profile from submission 47.
```

3215

```
1       Q.  Drawing your attention to Government's
2   Exhibit 167, which is also on the desk in front of
3   you there.  Do you recognize that?
4       A.  Yes, I do.
5       Q.  How?
6       A.  There is the laboratory label on the
7   packaging and I also recognize my initials.
8       Q.  And do you know where this came from?
9       A.  According to the label, that was placed on
10  the packaging, not by myself or the laboratory, it
11  was taken from wall F, below Exhibit 31, (A, B C)
12  within apartment number 101, 215 Charles Street,
13  Bridgeport, Connecticut.
14      Q.  And this is submission 48 you said?
15      A.  Yes.
16      Q.  And here for your results it says
17  "blood-like stain single source."  What does that
18  mean?
19      A.  That means when I looked at the sample the
20  swabs were stained brownish-black, and after I did
21  the screening test on one of the swabs it came up
22  positive, but in my opinion there was not enough for
23  further serological testing.  That means to go on
24  and do the test for human blood.  Therefore, I
25  wanted to not use any more of the sample up and keep
```

3216

```
1   what was there on the swab for DNA testing.
2       Q.  And what were your results for this
3   particular item?
4       A.  The results are consistent with Basil
5   Williams being a source of the DNA profile from item
6   48-1, and I sub-itemed submission 48 to 48-1 because
7   the second swab that was included with the one that
8   I tested for DNA came up negative for the screening
9   test for blood.  So, I did not test that swab, I
10  didn't retain it, I returned it with the packaging.
11      Q.  And what was your statistical analysis with
12  respect to submission 48, Government's Exhibit 167?
13      A.  The expected frequency of individuals who
14  could be the source of the DNA profile from item
15  48-1 is less than one in seven billion in the
16  African-American, Caucasian, and Hispanic
17  populations.
18      Q.  And was anyone else included or couldn't be
19  eliminated from 48-1?
20      A.  No, all the other known samples that were
21  received, the results eliminated them as the source
22  of the DNA profile from item number 48-1.
23      Q.  I'm going to show you Government's
24  Exhibit 131 and 131A, just ask you do you recognize
25  these?
```

**GA804**

3217

1    A.   Yes, I do.  Both of --
2    Q.   Actually, let me hand you several items.
3 I'm going to give you -- well, no, we'll start with
4 those.  Go ahead.  What are they?
5    A.   They are submission 65 and 66.
6    Q.   How do you recognize them?
7    A.   Because they have my initials on them and
8 they also have the laboratory label on them for this
9 case.
10   Q.   And do you know where both of these
11 submissions, where the swabs came from?
12   A.   Yes, there is information on the packaging
13 as to where they were collected from.
14   Q.   And where were they collected from?
15   A.   Submission 65 was taken from wall A,
16 located in the southwest bedroom within apartment
17 101, 215 Charles Street, Bridgeport, Connecticut.
18   Q.   And what about submission 66?
19   A.   Taken from wall A, located in the southwest
20 bedroom within apartment 101, 215 Charles Street,
21 Bridgeport, Connecticut.
22   Q.   And did you do testing on 65 and 66?
23   A.   Yes, I did.
24   Q.   And what were your results for 65?
25   A.   I did the screening test on 65 for blood

3218

1 and it was positive, and then I did a test which
2 also came up positive which indicates the presence
3 of human blood for 65.
4    Q.   And did you do a DNA analysis?
5    A.   Yes, I did.
6    Q.   And what did you find?
7    A.   The results are consistent with James Reid
8 being the source of the DNA profile from submission
9 65.
10   Q.   And what was the statistical analysis for
11 that?
12   A.   The expected frequency of individuals who
13 could be the source of the DNA profile from
14 submission 65 is less than one in seven billion in
15 the African-American, Caucasian, and Hispanic
16 populations.
17   Q.   Was anyone else included or couldn't be
18 eliminated from your known profiles?
19   A.   No.
20   Q.   66, did you analyze that?
21   A.   Yes, I did.
22   Q.   And what did you find?
23   A.   I did the screening test for blood, which
24 was positive and then I didn't go on to do the test
25 for human blood.

3219

1    Q.   Why not?
2    A.   Because the amount of sample that was on
3 the swab was limited and I wanted to save it for DNA
4 testing.
5    Q.   And it indicates on the chart that this is
6 a "blood-like stain, single source," but it says
7 "partial profile."  What does that mean?
8    A.   That means that I did not receive -- I did
9 not obtain a result at all the sites that I test.
10   Q.   Were you able to come to any conclusions
11 nonetheless?
12   A.   Yes, I was.
13   Q.   And what was that?
14   A.   James Reid cannot be eliminated as the
15 source of the DNA profile from submission 66.
16   Q.   What was the statistical analysis?
17   A.   The expected frequency of individuals who
18 cannot be eliminated as the source of the DNA
19 profile at all loci tested except D7, CSF, D16 and
20 D2 from submission 66 is less than one in seven
21 billion in the African-American, Caucasian, and
22 Hispanic population.
23   Q.   And what about the -- did you analyze
24 against other known sources -- samples?
25   A.   Yes, I did.

3220

1    Q.   And what was your conclusion there?
2    A.   They were eliminated as the source of the
3 DNA profile from submission 66.
4    Q.   I'm going to show you what's in evidence as
5 Government's Exhibit 132 and 132A and ask you if you
6 recognize those two items.
7    A.   Yes, I do.
8    Q.   How?
9    A.   There is a laboratory label on them for
10 this case and the submission numbers and my
11 initials.
12   Q.   And what are inside 67 and 68, submissions
13 67, 68?
14   A.   Swabs.  There is two swabs that were in
15 each submission.
16   Q.   And where were those swabs taken from, if
17 you know?
18   A.   According to the label for submission 67
19 taken from wall B, located in southwest bedroom
20 within apartment No. 101, 215 Charles Street,
21 Bridgeport, Connecticut.
22   Q.   And what about 68?
23   A.   Taken from wall B, located in southwest
24 bedroom within apartment 101, 215 Charles Street,
25 Bridgeport, Connecticut.

3221

```
1       Q.   For 67, again, your results says
2   "blood-like stain, single source, partial profile."
3   Why is that?
4       A.   I did the screening test for blood which
5   came up positive and then I didn't do any additional
6   test for the human blood.
7       Q.   Why was that?
8       A.   Because I wanted -- there is limited amount
9   of sample on the swab and I wanted to retain that
10  for DNA testing.
11      Q.   The same material that you are using to
12  test for the screening test for blood and then the
13  test for human blood and then DNA, that all comes
14  from the same material on the same swab?
15      A.   Right.  For the screening test you just cut
16  off a few fibers of the stained material, and then
17  for the test for human blood you just cut off a
18  little portion of the swab.  And then since two
19  swabs were given, I would use the remainder of that
20  swab for DNA testing, except when I tested 48-1,
21  since there was only one swab that I had a positive
22  result for KM, I only used half of the remaining
23  swab.  So there was some of that swab retained in
24  the laboratory.
25      Q.   And what was your result for 67 for DNA
```

3222

```
1   analysis?
2       A.   The results are consistent with James Reid
3   being the source of the DNA profile from submission
4   67.
5       Q.   Was anyone else included or couldn't be
6   excluded from that from the known profiles?
7       A.   All the other known samples were eliminated
8   as the source of the DNA profile from submission 67.
9       Q.   So, James Reid was consistent with having
10  been the source?
11      A.   Yes.
12      Q.   And for 68, the other swabs from wall B?
13      A.   James Reid cannot be eliminated as the
14  source of the DNA profile from submission No. 68.
15      Q.   And what was your frequency -- what was
16  your expected frequency for that?
17      A.   For 68 it was the expected frequency of
18  individuals who cannot be eliminated as a source of
19  the DNA profile at all loci except D7, D2, TPOX and
20  D18 from submission 68 was less than one in seven
21  billion in African-American, Caucasian and Hispanic
22  population.
23      Q.   And how is it that it could come up with
24  one in seven billion even if it's all loci except
25  those four?
```

3223

```
1       A.   Well, it was a partial profile which means
2   I did not get a result at all the sites on the DNA
3   that I tested.  But you don't need to have a result
4   at all 15 loci when you have a profile that's
5   consistent with a single source to get -- reach that
6   ceiling statistic.
7       Q.   Is that because it's not as diluted as a
8   mixture?
9       A.   No.
10      Q.   Why is it?
11      A.   Because there is not a lot -- because it's
12  consistent with a single source, there is not a lot
13  of -- there is only, at most, two genetic markers
14  that are detected at each of those sites tested.
15  So, therefore, there are not the -- what we call
16  that calculation is the random match probability or
17  the random man probability, which means the
18  frequency of finding a random man having -- could be
19  the source of that DNA profile is very low.
20      Q.   When you say "random man" you include
21  random women in that too, right?
22      A.   Right.  It's random man as human man.
23           THE COURT:  Soon to be known as random
24  person.
25           MS. DAYTON:  Legislation pending.
```

3224

```
1       Q.   Showing you what's been marked as
2   Government's Exhibit 130 and 130A, do you recognize
3   these two items?
4       A.   Yes, they both have the laboratory label on
5   them for this case and I see my initials on both
6   packaging.
7       Q.   And did you analyze both of these
8   submissions as well?
9       A.   Yes, I did.
10      Q.   And what are submission 69 and 70?
11      A.   Submission number 69 as on the label of the
12  packaging taken from wall C located in southwest
13  bedroom within apartment 101, 215 Charles Street,
14  Bridgeport, Connecticut.  And the packaging on
15  submission 70 taken from wall C, located in
16  southwest bedroom within apartment 101, 215 Charles
17  Street, Bridgeport, Connecticut.
18      Q.   And did you test 69 -- did you screen it
19  for the presence of blood?
20      A.   Yes, I did the screening test for blood and
21  it came up positive, but after that I wanted to
22  conserve what was on the swabs for DNA testing, so I
23  did not go on and do the test for human blood.
24      Q.   And what did your DNA test results, what
25  were they?
```

3225

```
1      A.   For submission 69 the results are
2   consistent with James Reid being the source of the
3   DNA profile from submission 69.
4      Q.   And what was the expected frequency?
5      A.   The expected frequency of individuals who
6   could be the source of the DNA profile from
7   submission 69 is less than one in seven billion in
8   the African-American, Caucasian, and Hispanic
9   populations.
10     Q.   And with respect to the other known
11  profiles that you had?
12     A.   The results eliminate all of the other
13  known profiles from those individuals as a source of
14  the DNA profiles from submission No. 69.
15     Q.   So, James Reid was consistent with being
16  the source?
17     A.   Yes.
18     Q.   And for submission 70, also from wall C,
19  what did you find with respect to your -- did you
20  test that for human blood?
21     A.   Yes.  First I did the screening test for
22  blood, which was positive, and then I went on to do
23  a test for human blood and the results were positive
24  for that test.
25     Q.   And with respect to your DNA -- did you do
```

3226

```
1   a DNA analysis on 70?
2      A.   Yes, I did.
3      Q.   And what was your result on this?
4      A.   I obtained a DNA profile from submission 70
5   and the results demonstrate that submission 70 was a
6   mixture.
7      Q.   And based upon your analysis, were you able
8   to determine who may have been a contributor?
9      A.   I compared it to the known samples that I
10  received in this case, and Mr. Reid is included as a
11  contributor to the DNA profile from submission 70.
12     Q.   And what is the statistical analysis with
13  respect to Mr. Reid?
14     A.   The expected frequency of individuals who
15  could be a contributor to the DNA profile from
16  submission 70 is approximately one in two billion in
17  the African-American population and is less that
18  than one in seven billion in the Caucasian and
19  Hispanic population.
20     Q.   Was anyone else either included or couldn't
21  be eliminated?
22     A.   Tina Johnson cannot be eliminated as a
23  minor contributor to the DNA profile from submission
24  70.
25     Q.   And why would you call her as a potential
```

3227

```
1   minor contributor?
2      A.   Because that mixture was consistent with at
3   least two people contributing to the DNA profile and
4   the genetic markers that were detected in the DNA
5   profile for submission 70, which were small --
6   again, the relative peak heights which had small
7   peak heights which could have come from Tina
8   Johnson.  Therefore, I added the minor contributor.
9      Q.   And --
10     A.   Cannot be eliminated as a minor
11  contributor.
12     Q.   And what was the expected frequency for
13  Tina Johnson?
14     A.   The expected frequency of individuals who
15  cannot be eliminated as a contributor to the DNA
16  profile at all loci tested except CSF, D16, D2 and
17  D5 from submission No. 70 is approximately one in
18  420,000 in the African-American population,
19  approximately one in 17 million in the Caucasian
20  population and approximately one in 6.7 million in
21  the Hispanic population.
22     Q.   And did you compare against other known
23  samples in this case?
24     A.   Yes.
25     Q.   What did you find?
```

3228

```
1      A.   That the individuals who I received the
2   other known samples from are eliminated as
3   contributors to the DNA profile from submission 70.
4      Q.   I'm going to show you two more Government's
5   Exhibits 134 and 134A.  Do you recognize what those
6   are?
7      A.   Yes, I do.
8      Q.   What are they?
9      A.   They're submissions No. 71 and 72 from this
10  case ID 05-19367.
11     Q.   And did you analyze this?
12     A.   Yes, I did.
13     Q.   And are your initials on them as well?
14     A.   Yes, my initials are on the packaging.
15     Q.   And what are submissions 71 and 72?
16     A.   According to the label that was on the
17  packaging, submission No. 71 is taken from wall -- I
18  think I'm not answering that question properly.
19  What was in each of these packages were two swabs.
20  Sorry.
21     Q.   That's okay.  Do you know where they came
22  from, those swabs?
23     A.   Taken from wall D, located on southwest
24  bedroom within apartment 101, 215 Charles Street,
25  Bridgeport, Connecticut.  That was the information
```

3229

```
1   on submission 71.  And the information on submission
2   72 was taken from wall D, located in southwest
3   bedroom within apartment 101, 215 Charles Street
4   Bridgeport, Connecticut.
5       Q.   So all these samples on this particular
6   chart were taken from the same bedroom -- excuse me,
7   65 through 72 were taken from the same bedroom; is
8   that fair according to the markings?
9       A.   They all indicate that they were taken from
10  the southwest bedroom.
11      Q.   And did you analyze submission 71?
12      A.   Yes, I did.
13      Q.   And did you test it for the presence of
14  blood?
15      A.   Yes.  I did the screening test for blood,
16  which was positive, and then I went on to do another
17  test which came up positive for human blood.
18      Q.   And what did you find?
19      A.   Sorry?
20      Q.   What did you find with your DNA analysis?
21      A.   Okay.  The results are consistent with
22  James Reid being the source of the DNA profile from
23  submission 71.
24      Q.   And what's the expected frequency?
25      A.   The expected frequency of individuals who
```

3230

```
1   could be the source of the DNA profile from
2   submission 71 is less than one in seven billion in
3   the African-American, Caucasian, and Hispanic
4   populations.
5       Q.   And did you check against the other known
6   profiles?
7       A.   Yes, the results eliminated the other
8   individuals who I received known samples from as the
9   source of the DNA profile from submission No. 71.
10      Q.   And with respect to No. 72 submission, what
11  did you find there?  Did you test that for blood?
12      A.   Yes, I did.  The screening test for blood,
13  which was positive, and then I went on to do a test
14  for human blood which was positive and then I went
15  on to do DNA testing.
16      Q.   And what did you find with respect to the
17  DNA testing?
18      A.   James Reid cannot be eliminated as the
19  source of the DNA profile from submission No. 72.
20      Q.   And what was the expected frequency?
21      A.   The expected frequency of individuals who
22  cannot be eliminated as the source of the DNA
23  profile at all loci tested except for D2 from
24  submission 72 is less than one in seven billion in
25  the African-American, Caucasian, and Hispanic
```

3231

```
1   populations.
2       Q.   One in seven billion?
3       A.   I'm sorry, what did I say?
4       Q.   No, I didn't hear you.
5       A.   Is less than one in seven billion in the
6   African-American, Caucasian, and Hispanic
7   populations.
8       Q.   You probably said that.  I just didn't hear
9   you.  And did you test it against the other known
10  profiles?
11      A.   Yes, I did.
12      Q.   And what did you find?
13      A.   The results eliminate the individuals who I
14  received known samples from as the source of that
15  DNA profile from submission 72.
16      Q.   And I want to just show you one more item
17  of evidence, Government's Exhibit 135.  Do you know
18  what this -- do you recognize this?
19      A.   Yes, I do.
20      Q.   And how do you recognize it?
21      A.   It has the laboratory label on it for this
22  case and it's submission No. 73 and also has my
23  initials on it.
24      Q.   And what is that?
25      A.   As indicated on the label, it says two
```

3232

```
1   control swabs and inside were two swabs.
2       Q.   What is a controlled swab?
3       A.   Those are swabs which typically don't have
4   any sample on them.
5       Q.   Why not?  What do you use a control swab
6   for?
7       A.   Sometimes they're submitted with swabs from
8   blood-like stains to show that the actual cotton
9   swab that was used to collect those samples did not
10  have blood on them.
11      Q.   And do you also use controls at the lab,
12  control swabs or control samples?
13      A.   In the DNA testing we use controls, yes.
14      Q.   And just generally, what is the purpose of
15  using a control?
16      A.   You want to make sure that your procedure
17  is working, that you've done the procedure
18  correctly, and that all your chemicals that you are
19  using and the instruments that you are using are all
20  working as they should.
21      Q.   Do you run controls at the same time that
22  you run evidentiary samples?  Or during the same
23  process, I should say?
24      A.   Yes, during the extraction process I set up
25  a reagent blank and a laboratory standard.
```

3233

1      Q.   What's a reagent blank?
2      A.   A reagent blank is a tube, it starts out as
3  an empty tube and then everything that you do to
4  your sample you also do to that tube.  You add the
5  components of the extraction buffer to that tube,
6  then you put it through the extraction process, and
7  then you -- so you are using all the solutions that
8  you are using to extract your DNA will also go
9  through that tube.  And what you end up with is what
10  we call the reagent blank.
11      So, the final step, you have about 50 --
12  I don't want to get too technical -- but you have
13  specific volume of solution that's similar to the
14  volume that you have of your extracted DNA and then
15  you perform all the further testing on that same
16  reagent blank.  And you also set up a laboratory
17  standard which is an aliquot of liquid blood that
18  you know what the DNA profile is.
19      Q.   And where do you get that from?
20      A.   It's from a staff member.
21      Q.   So, someone is the known laboratory
22  standard?
23      A.   Right.  And it's an individual who's not in
24  DNA.
25      Q.   And why do you do that?

3234

1      A.   Because, again, you want to have that --
2  you want to obtain, when the whole process is done,
3  that DNA profile that you know that sample should
4  have.  That's why it's called a laboratory standard
5  or the positive extraction control.
6      We also set up a negative and positive
7  control during the amplification procedure and those
8  are for similar reasons; that we want to make sure
9  that the amplification process works properly and
10  that we get a negative result for the negative
11  control and for the positive result we will get a
12  profile that we know we should get.
13      Q.   Did you follow all of those steps in this
14  case?
15      A.   Yes, I did.
16      Q.   And did you follow all the required
17  laboratory protocols in analyzing this entire case?
18      A.   Yes, I did.
19      MS. DAYTON:  Thank you.  I have nothing
20  further at this time.
21      THE COURT:  All right,
22  cross-examination.
23      THE WITNESS:  Could I have a moment to
24  put my paperwork in order.
25      MR. SHEEHAN:  I don't think -- your

3235

1  Honor, are you going to take an afternoon break.
2      THE COURT:  No.
3      MR. SHEEHAN:  Could we?
4      THE COURT:  We'll take a five-minute
5  recess.
6      (Recess)
7      THE COURT:  All right, bring in the
8  jury.
9      (Jury entered the courtroom.)
10      THE COURT:  Please be seated, ladies and
11  gentlemen.  Cross-examination of Ms. Roy by
12  Mr. Sheehan.
13      MR. SHEEHAN:  Thank you, your Honor.
14  CROSS-EXAMINATION BY
15  BY MR. SHEEHAN:
16      Q.   Ms. Roy, I'm Michael Sheehan.  I'm one of
17  the lawyers for Mr. Aquart.  I want to take you
18  briefly through just the process, the DNA collection
19  process.  And if I understand your testimony,
20  evidence gets sent to the lab.  That's the first
21  step, right?
22      A.   That is correct.
23      Q.   And then it goes to the criminalist
24  section?  By and large.  Is that the first step
25  usually?

3236

1      A.   Well, there is different sections in the
2  laboratory.  So, the individual who is going to
3  examine that evidence would go to evidence receiving
4  or where it's stored and transfer it to their
5  custodian, then -- I'm not sure what you are asking
6  exactly.
7      Q.   Well, is it pretty common it goes to the
8  trace section first?  Is that the normal process?
9      A.   Not necessarily, no.
10      Q.   In this case most of the evidence that you
11  ultimately did the DNA testing on, that went to
12  trace first, did it not?
13      A.   Correct.
14      Q.   And it's the job of trace, by and large, to
15  swab the items if we're looking for DNA, is it not?
16      A.   I don't want to say that that's their
17  activity of trace alone.
18      Q.   No, they have a lot of different jobs, but
19  one of their jobs, as it applies to DNA, is to
20  actually do the swabbing of the items, right?
21      A.   Correct.  There is also other people
22  outside of trace who do swabbings of items for DNA
23  testing.
24      Q.   For example, in this case we've heard some
25  testimony that swabs were taken at the crime scene

3237

1   and then sent directly to the lab.
2       A.   Correct.  And you could have, but not in
3   this case, other submissions could come in to the
4   laboratory.  What I'm trying to say, it's not solely
5   the responsibility of a trace person to swab items
6   of evidence for DNA testing.
7       Q.   Okay.  But your section, the DNA section,
8   you are working with -- you are working with,
9   oftentimes working with those swabs that are
10  collected by others, right?
11      A.   Or we do our own examination and collect
12  swabs.
13      Q.   And once you get the material there, the
14  first thing that you do with that is that you try to
15  remove any DNA that may be present on the item; is
16  that correct?
17      A.   On the swab, the first part of the
18  extraction process is to extract out or remove the
19  DNA that's present on that sample and purify and
20  concentrate it.
21      Q.   And then you record that information on
22  your note sheets, your worksheets, do you not?
23      A.   Yes.
24      Q.   Let me show you what's been marked for
25  identification as Defendant's Exhibit T.  Let's see

3238

1   if that's going to come up there on your screen.
2           Showing you what is marked for
3   identification as Defendant's Exhibit T, is that a
4   document that you recognize?
5       A.   Yes.
6       Q.   That form?
7       A.   Yes, I do.
8       Q.   Okay.  And is that the worksheet that is
9   associated with swabbing of DNA evidence?
10      A.   Yes.  14-1 Z1.  Swabbing of 14-1 glove.
11      Q.   And, in fact, are those your initials on
12  the top reflecting that you are the examiner?
13      A.   Yes.
14          MR. SHEEHAN:  I'd offer this document at
15  this time, your Honor.
16          THE COURT:  Absent objection, it's a
17  full exhibit.
18          MS. DAYTON:  Well, actually we do
19  object.  I'm not sure as to why --
20          THE COURT:  You are not sure as to why
21  you object?
22          MS. DAYTON:  No, as to why it's being
23  admitted.
24          THE COURT:  You are going to examine her
25  from that?

3239

1           MR. SHEEHAN:  Yes, I am.
2           THE COURT:  This is part of the process.
3           MR. SHEEHAN:  Yes.
4           THE COURT:  I'm going to permit it.
5           MR. SHEEHAN:  Thank you.
6       Q.   All right, and looking at Defendant's
7   Exhibit T up there, that is your physical evidence
8   worksheet, correct?
9       A.   Yes.
10      Q.   And your initials where it says "examiner,"
11  that's Christine Roy right on the right?
12      A.   CMR are my initials.
13      Q.   All right.  And then I believe down in the
14  middle of that it explains what you are doing.  If
15  we could go to that section there.  Okay.  So, is it
16  fair to say that what you are doing is you are
17  taking those swabs, you are noting what's on them,
18  correct?
19      A.   Correct.
20      Q.   And then at the bottom the swabs get cut
21  off the sticks and extracted for DNA; is that right?
22      A.   Correct.
23      Q.   And that's the normal process?
24      A.   Correct.
25      Q.   And then the swab itself at that point in

3240

1   time is consumed, is it not?
2       A.   For this sample I consumed the swabs.
3       Q.   So, to the extent that there is DNA on it,
4   it gets captured in this initial extraction process,
5   right?
6       A.   Captured or collected, extracted.  I would
7   use the word extracted.
8       Q.   Okay.  And then the next thing that
9   happens, just so we can -- the next thing that
10  happens is that you want to try to quantify what
11  you've got there, right?
12      A.   After the DNA is extracted and purified the
13  next step is to quantify it.
14      Q.   Let me show you on your screen what has
15  been marked as Defendant's Exhibit U for
16  identification.
17          And again, does Defendant's Exhibit U
18  reflect that process of quantification that you take
19  the material through?
20      A.   This is the first step.  It doesn't really
21  give us too much information because it's just a
22  visual as opposed to instrumental analysis, but this
23  is the first step in the quantification step.
24      Q.   And is this -- are those your initials on
25  the top?

3241

```
 1        A.   Yes.
 2        Q.   And does this also reflect -- I think if
 3   you take a look at line ten, does it reflect one of
 4   the samples that you've testified about, 14-1-21?
 5        A.   That is correct.
 6             MR. SHEEHAN:  I would offer this at this
 7   time, your Honor.
 8             MS. DAYTON:  Objection.  Can we
 9   approach?
10             THE COURT:  Yes.
11             (Sidebar conference)
12             MS. DAYTON:  These are her worksheets
13   and her notes.  He's submitting her notes, one piece
14   out of large amounts of documentation.  There is
15   no -- they're hearsay and there is no basis for them
16   to be admitted.  It's like putting in an officer's
17   notes.  He's not asked her any questions, she's not
18   denied anything that's in it.
19             THE COURT:  I asked you if you were
20   going it talk to her about it.
21             MR. SHEEHAN:  I am.  I'm taking her
22   through the process of collection and documentation.
23             THE COURT:  And then you are going to go
24   back an and ask her questions about things.
25             MS. DAYTON:  That's like saying all the
```

3242

```
 1   302s get admitted because they're asked about them.
 2   If you put an officer on the stand and you ask him
 3   about the 302s, you don't get to admit the 302s.
 4             THE COURT:  Somehow I see a difference
 5   between what an officer chooses to put down as
 6   interview notes versus her lab findings.
 7             MS. DAYTON:  So these aren't findings,
 8   these are her notes.  These are not her reports,
 9   these are her notes in preparation.  So, your Honor,
10   for instance if you took a bunch of notes reading
11   cases in preparation to write an opinion and you
12   wouldn't want your notes in, you might want your
13   opinion published or read in, but you wouldn't want
14   all your notes preparing it.  This is not a wanting
15   issue, it's just -- they're notes.
16             THE COURT:  What is your purpose?  Where
17   are you going with this?
18             MR. SHEEHAN:  What I'm trying to explain
19   to the jury is the importance of documentation, how
20   she documents it, what it looks like.  In this case,
21   for example, this document reflects that there was
22   no DNA detected on that sample.  So what I'm trying
23   to -- what I think all of these documents really
24   reflect is that we're dealing with extraordinarily
25   low quantities of DNA and that they're below their
```

3243

```
 1   thresholds.
 2             THE COURT:  That doesn't answer why you
 3   get notes as opposed to --
 4             MR. SHEEHAN:  Because she doesn't say
 5   that in her report.  This is a scientist.  This is
 6   not just a random musing, she has to record what
 7   she's doing.
 8             THE COURT:  Give me an example of what
 9   question you are going to ask from these documents.
10             MR. SHEEHAN:  I'm going to say, here,
11   for example, you found no DNA detected.
12             THE COURT:  Does that require submission
13   of her notes or just her using the notes to refresh
14   her recollection that she found no DNA?
15             MR. SHEEHAN:  I think I can do it either
16   way, your Honor.
17             MS. DAYTON:  So, your Honor, it's one
18   thing to admit something that's created by a machine
19   that might actually be like the electropherograms
20   that we hear so much about; that I'm sure they're
21   going to put in, which, as long as they're hers,
22   it's fine.  This is created by a machine, this is
23   not a note.
24             THE COURT:  Are you offering this as an
25   exemplar of what her file looks like?
```

3244

```
 1             MR. SHEEHAN:  Well, I am offering it to
 2   show in particular what her file, what the process
 3   is, that's part of it.  And this is a key part.  And
 4   to explain how it gets documented.
 5             THE COURT:  Okay.  You can do all of
 6   that.
 7             MR. SHEEHAN:  But they don't --
 8             THE COURT:  Without the notes
 9   themselves.
10             MR. SHEEHAN:  Your Honor, I want to show
11   the notes to the jury so that they understand what's
12   going on.
13             THE COURT:  I don't know that they
14   understand any more about what's going on from the
15   notes, that's what I'm trying to understand.
16             MR. SHEEHAN:  I happen to think they do
17   or are more likely to, your Honor.
18             THE COURT:  In what way?
19             MR. SHEEHAN:  Because, for one thing,
20   what everybody tells us, which I assume may have
21   some value, I don't know, is people learn by looking
22   at things.  And if I go through, I mean --
23             THE COURT:  Okay.  That does not mean
24   that this will enhance their understanding of her
25   testimony.  What I'm going to do is mark this for ID
```

3245

1  right now and then if and when you get back to
2  specific questions about it, then we can see whether
3  that means that the document should come in in full.
4  Okay.
5          (Sidebar concluded)
6      Q.   Ms. Roy, let me go back and ask you, on
7  that document that's marked for identification, that
8  reflects the preliminary quantification steps that
9  you take with respect to DNA samples, right?
10     A.   The image that's on the screen right now?
11     Q.   Yeah.
12     A.   That's the yield, yes, worksheet, which is
13  the first step in the quantification process.
14     Q.   And with respect, for example, to this
15  sample 14-1-Z1 that we've heard some testimony
16  about, and also I think you may have testified about
17  it, I'm not sure, 8-C-2, what you found on the yield
18  gel process was that there was no DNA, right?
19  Detected.  None detected.
20     A.   Correct.
21     Q.   And that's why you noted ND?
22     A.   Correct.  Could I clarify?
23     Q.   Sure.
24     A.   The lowest standard in the yield gel, it's
25  not quite visible on here.  On line 6.

3246

1      Q.   Would it be helpful if you could explain
2  what that was?
3      A.   A yield gel?
4      Q.   Well, what this document reflects.  Would
5  looking at this document help to explain your
6  testimony to the jury?  Do you think seeing the
7  document --
8      A.   Oh, they don't see the document?
9      Q.   Well, not yet.
10         MR. SHEEHAN:  But I'm going to renew my
11  offer, your Honor, at this time.
12         MS. DAYTON:  And I'm going to --
13         THE COURT:  All right, so the question
14  is, this the first step, which is visual, not
15  instrumental analysis, is the yield gel worksheet?
16         THE WITNESS:  Correct.
17         THE COURT:  And what is that showing?
18         THE WITNESS:  That has an image of the
19  yield gel and it has standard amounts of DNA in
20  certain slots and then the samples that were
21  extracted in other slots.  And then what you do is
22  you visually compare what you observe on the gel
23  after it's run to what the standard amounts of DNA
24  show.  It's the -- it's the darkest -- darkness of
25  the band.  So you are comparing one band to another

3247

1  band.  But the reason why it's not a very good
2  quantitative test is because the lowest standard is
3  12.5 nanogram per 5 microliters and-
4          THE COURT:  I'm going to admit U as a
5  full exhibit so that you can describe from that what
6  you are talking about.  All right?
7      Q.   And I wonder there is a --
8          THE COURT:  She hasn't finished, really.
9      Q.   I'm sorry.
10     A.   I don't know what that means.
11         THE COURT:  It means that you can either
12  look at your screen or that screen and point to what
13  the darkest of the band, et cetera, comparing one
14  band to another means.
15     Q.   And I think we have a pointer, if I might,
16  maybe that would be --
17         THE COURT:  Now, I'm going to actually
18  ask you to either perch the mic up on the wall there
19  or hold it, because otherwise we won't be able to
20  hear you.  It's a little acrobatic act we ask people
21  to do.
22     Q.   What you are pointing to there, could you
23  tell us what that is.
24     A.   Those are the samples right here, the
25  standard quantities of DNA that we're going to

3248

1  visually compare our samples to.  And the samples in
2  this case were loaded in slots 7 through 13.
3      Q.   Okay.
4      A.   That would be down here.
5      Q.   In that darker area?
6      A.   Correct.  And TMP, which is our positive
7  extraction control, is this right here, that's easy
8  to see.  And the first one is our reagent blank.
9  But what I was trying to say is this doesn't give us
10  a lot of information because the lowest standard,
11  which is right here, is 12.5 nanograms per 5
12  microliters.  So you can see even in this picture
13  here, you can, in the actual picture that's on the
14  worksheet, you can see there is a very faint band
15  there.  So the fact that it says "non-detected,"
16  means that I don't detect a band in these samples
17  which is as dark as the lowest standard.
18     Q.   Thank you.  So, now, but this process -- I
19  think you can sit down.
20     A.   Okay.
21     Q.   So on -- so this kind of yield gel is like
22  the first pass; is that correct?
23     A.   Correct.  If I saw a big smeary band there
24  then that would tell me -- sometimes that tells me
25  that there could be some degradation in my sample.

3249

```
 1   So that could give me a little information.  But it
 2   also -- had I detected a larger quantity of DNA than
 3   I had in my samples, then for the next test I might
 4   have wanted to dilute my sample before doing the
 5   next assay because I want to try to be in the range
 6   of the standards.
 7       Q.   Okay.
 8       A.   So you can get a more accurate result.
 9       Q.   Because if you have too much, that's a
10   problem?
11       A.   For comparing to the standards.  If you are
12   way above your known quantity, the highest known
13   quantity, then your estimation of the amount of DNA
14   in your sample will not be as accurate.
15       Q.   And then, in this case anyway, what we saw
16   from the Defendant's Exhibit U is that you
17   weren't -- you didn't have a large amount, a big
18   amount of DNA as revealed in the yield gel, right?
19       A.   Correct.  I didn't see any bands there for
20   those NDs that were equal to or darker than the
21   lowest standard.
22       Q.   And then the next thing that you do is you
23   have another somewhat -- you have -- at this time
24   anyway, you had a more sophisticated follow-up
25   method for quantifying it called the AluQuant,
```

3250

```
 1   right?
 2       A.   The AluQuant quantitation assay.
 3            MR. SHEEHAN:  I'm going to ask to bring
 4   up Defendant's Exhibit V for identification.  And
 5   that's going to pop up if we're lucky on your screen
 6   right there.
 7       Q.   And let me ask you, in looking at
 8   Defendant's V, is that the documentation with
 9   respect to the Aluquant machine as it reflects, in
10   this case in particular, looking down, it looks like
11   the third band down would be 14-1-Z1?
12       A.   Correct, this is the printout from the
13   instrument that we use to do our final step, if you
14   will, of this quantification assay.
15       Q.   And again, these are your initials on the
16   top, right?
17       A.   Correct.
18       Q.   And the same case number that we've been
19   talking about?
20       A.   Correct.
21            MR. SHEEHAN:  I would offer this at this
22   time as Defendant's Exhibit V.
23            THE COURT:  All right, it will be a full
24   exhibit.
25       Q.   I'm going to shift that over to the screen
```

3251

```
 1   now, to the bigger screen, and I'm going to ask you,
 2   if you wouldn't mind, can you see the arrow on your
 3   screen at 14-1-Z1?
 4       A.   Yes, I see that.
 5       Q.   And is that -- that's the sample, one of
 6   the samples that you were quantifying at that time,
 7   right?
 8       A.   Correct.
 9       Q.   And that's actually done by a machine, is
10   it not, a very sensitive machine?
11       A.   Well, I'm responsible for setting up the
12   assay and then at the end of the process there is a
13   chemical reaction that takes place and light is
14   emitted, which is -- the amount of light emitted is
15   relative to the amount of human DNA that's in your
16   sample.
17       Q.   Okay.
18       A.   So it's the actual instrument that measures
19   the amount of light that's created by the chemical
20   reaction.
21       Q.   And maybe it's just too obvious, but let me
22   ask you this question.  If I were to look at what
23   you were -- the liquid -- is it in a liquid form,
24   we're talking about at this moment in time?
25       A.   The actual solution that's put into the
```

3252

```
 1   instrument?
 2       Q.   Yeah.
 3       A.   Yes, it's a liquid form.
 4       Q.   And I see a reference on the top up there
 5   to where it says elution volume up on the top right?
 6       A.   Correct.
 7       Q.   Does that reflect that you got 50
 8   microliters of liquid there?
 9       A.   No.
10       Q.   Okay.  What is that telling us?
11       A.   At the end of the extraction procedure,
12   basically you are using a little filter device to
13   concentrate and purify your DNA.  So your DNA is
14   sitting on top of this filter device.  So you add
15   volume of water and then you flip the filtering
16   device over and then you use another instrument to
17   pull down that DNA, extracted DNA, into a tube, and
18   the final volume that you have your DNA in is
19   approximately 50 microliters.  That's the standard
20   volume that we have as our final sample from our
21   extracted DNA.
22       Q.   And the water, that's not tap water, is it?
23       A.   No.
24       Q.   That's purified water?
25       A.   Right.
```

3253

```
1        Q.   And the -- if I were to look at that --
2   it's about a test tube size?  Is that what we're
3   talking about?
4        A.   50 microliters?
5        Q.   Yes.
6        A.   No, it's kind of like a drop.
7        Q.   A drop.  Obviously if I were to look at
8   that drop I wouldn't see any DNA in there with my
9   eye, would I?
10       A.   It's not visible.
11       Q.   Okay.  Now, what this machine -- this
12  Aluquant machine is telling us, in this case, is it
13  not, is the concentration of the DNA in that
14  solution?
15       A.   Correct.  You are taking a small portion of
16  the extracted DNA and you are running this assay and
17  then the instrument, it's called luminometer,
18  detects the amount of light that's given off by the
19  reaction which is relative to the amount of human
20  DNA present.
21       Q.   And I see a figure, it's a little bit hard
22  on -- it's not great on my copy, but there is a DNA
23  concentration figure on -- running across from
24  14-1-Z1.  And then can you tell us what that is --
25  what that DNA concentration is telling us?
```

3254

```
1        A.   That's telling us 0.25, but I will add that
2   there is a worksheet that comes before this one
3   which tells the volume that I used in the test.  So,
4   this concentration has to actually be multiplied by
5   two.
6        Q.   Okay.  And I want to --
7        A.   So that would be approximately 0.5
8   nanograms per microliter.
9        Q.   And there is a worksheet that reflects
10  that?
11       A.   Yes.
12       Q.   And could I ask you to look at Defendant's
13  Exhibit W for identification.  Defendant's Exhibit
14  W, that's not your quantification worksheet, is it?
15       A.   No, that's my amplification worksheet.
16       Q.   That's something different.  Now, let me
17  ask you, once you've established the concentration
18  of the DNA --
19       A.   Again --
20       Q.   A portion of that, I take it, gets injected
21  into another machine, does it not?
22       A.   Not injected, no.
23       Q.   It gets -- what actually happens to that in
24  terms of the next step?  Is there a document in one
25  of your worksheets would that help to explain?
```

3255

```
1        A.   No, this worksheet explains what happens
2   next.
3        Q.   Defendant's Exhibit W for identification,
4   this one we got right here in front of you?
5        A.   Yes.  But it's not an injection.
6        Q.   All right.  Does this worksheet, again,
7   this has your initials on the top, does it not?
8        A.   Yes.
9        Q.   And it has the date that you performed that
10  function.
11       A.   Correct.
12       Q.   And it also references, among other items,
13  item 14-1-Z1.
14       A.   Correct.
15       Q.   Would this be helpful?
16            MR. SHEEHAN:  So, I'm going to offer
17  this at this time as an explanation of what you did.
18            MS. DAYTON:  Your Honor, my objection is
19  that he's giving her some of the documentation for
20  some of the items and she's just saying there is
21  pieces missing.
22            THE COURT:  You may redirect on whatever
23  is missing if it's relevant.  But this N --
24            MR. SHEEHAN:  W.  I'm sorry.
25            THE COURT:  W?  I can't read my own
```

3256

```
1   notes here.  Where in the process does the
2   amplification come up for which this is the
3   worksheet?
4            THE WITNESS:  That is the amplification
5   worksheet.
6            THE COURT:  In relation to the V which
7   was your assay assessment?  What's the relationship
8   between the two?  Does one happen right after
9   another?
10           THE WITNESS:  It's the next worksheet
11  that I would be filling out, yes.
12           THE COURT:  So does that mean it's the
13  next step in the process that you use?
14           THE WITNESS:  Yes.
15           THE COURT:  All right.  Then W may come
16  in as a full exhibit as an exemplar of the process.
17       Q.   Okay.  Now I've brought -- W is on the big
18  screen as well, and perhaps you could tell us at
19  this point with reference to Defendant's Exhibit W,
20  what the next step is as far as the amplification.
21       A.   Should I stand up and point?
22       Q.   Sure, if you are more comfortable, that
23  would be great.
24       A.   Up here you'll see PP kit, Profiler Plus
25  kit.
```

**GA814**

3257

1    Q.    And could I just before you go on, let me
2  just perhaps reference back your testimony.  This
3  was the first kit that you were using before you
4  went into the Identifier, right?
5    A.    Right.  I used Profiler Plus and COfiler.
6    Q.    And that's just like another -- it's --
7  that's the one that gives us 13 loci, right?
8    A.    Correct, plus the gender.
9    Q.    The gender, okay.  Thank you.  I didn't
10 mean to interrupt you.
11   A.    Okay, so what we have to do is first make
12 up what we call our master mix, which is the MM over
13 there, and the components of the master mix.  We
14 have, which are obtained in the kit, which is the
15 reaction mix, which is what has the components to
16 make the amplification procedure proceed in the
17 tube.  So we have the reaction mix, the primer mix
18 and the TAQ gold which is an enzyme.
19        So you make up your master mix.  And our
20 laboratory protocol is you have 15 microliters,
21 which is a volume, very small volume master mix, and
22 at the most 10 microliters of your sample.  So here
23 this is the amount of extracted DNA, that's the
24 volume, not the nanograms.  And then, so we're here,
25 as in 14-1-Z1 I used 4 microliters of the extracted

3258

1  DNA plus 6 microliters of sterile distilled water to
2  make a total volume of ten microliters, which was
3  added to a tube that had 15 microliters of my master
4  mix.  I used 10 microliters of the reagent blank.
5  Because I was doing a sample that I had to use 10
6  microliters maximum volume for my samples.  And then
7  here is my extraction positive control which was
8  also amplified at the same time.  And then it goes
9  into what is a thermocycler, it's not injected, it's
10 in a small tube.
11        The small tube is placed in the
12 thermocycler which just runs the reaction at various
13 temperatures over and over again for 28 cycles.  And
14 so I wrote down which thermocycler I was using.  And
15 so this is the worksheet for my amplification setup.
16   Q.    Okay.  Now, once you have amplified, that's
17 what we called about that copy machine, like the
18 Xeroxing of the copies?
19   A.    Right, during that amplification process
20 many copies of specific sites on the DNA molecule
21 are made.
22   Q.    And for forensic purposes, what you are
23 looking at is either 13 originally, but now 15 areas
24 of interest on that band, right, on the DNA?
25   A.    Correct, plus the site for gender

3259

1  identification.
2    Q.    Okay.  Now, the amount of time -- in order
3  to get that, the picture of what you have in there,
4  you are going to then put that into another machine,
5  are you not?
6    A.    You are going to take the amplified DNA,
7  that's what it's referred to once it goes through
8  the amplification process, and you are going to
9  analyze that.  Two different types of instruments
10 were used in this case.
11   Q.    If you take a look at Defendant's Exhibit X
12 for identification, which is, I believe on your
13 screen, does this example that we're talking about
14 here -- actually maybe that's a little -- let's not
15 look at that one.  Oh, all right, I'm sorry.  Yeah,
16 I see this has your initials up in the top, right?
17   A.    Correct.
18   Q.    And is this one of the samples that was
19 looked at in this machine in this case?
20   A.    This is one of the known samples.
21   Q.    Okay.  And does this Defendant's Exhibit X
22 for identification reflect another worksheet that
23 you perform at the time that you inject the
24 substance into the machine?
25   A.    Yes, this was filled out by the analyst

3260

1  performing this step in the process.
2    Q.    And that's under your supervision?
3    A.    Not my direct observation, but he is
4  trained to do this work and then I review the
5  worksheets and the results.
6    Q.    And is this consistent with the type of
7  documentation that you put in -- that is employed in
8  the context of the DNA evaluation in this case?
9    A.    Yes, this was for the capillary
10 electrophoresis testing.
11        MR. SHEEHAN:  I would offer Defendant's
12 Exhibit X as an example of how this was done.
13        THE COURT:  How it was documented?
14        MR. SHEEHAN:  Documented, correct.
15        MS. DAYTON:  I'm going to make the same
16 objection.  I don't believe this particular sheet
17 has relation to the last one, so it's sort of
18 misleading.
19        THE COURT:  So we had the amplification
20 worksheet before.  We had the -- I think it's the
21 word quantification assay sheet before that.  Is
22 this the next one in the series?
23        MR. SHEEHAN:  Well, your Honor, what
24 happened --
25        THE COURT:  Let me ask the witness.

3261

```
1              MR. SHEEHAN:  Yeah, I'm sorry.
2              THE COURT:  Is that the next thing, the
3    next worksheet that you fill out in your process of
4    analyzing DNA sample?
5              THE WITNESS:  This is the worksheet for
6    the instrument that is analyzing the amplified DNA,
7    correct.
8              THE COURT:  So it is the same step as
9    the worksheet that was --
10             THE WITNESS:  No, it's the following
11   step after the amplification procedure, then we
12   analyze the amplified DNA, and it's this setup of
13   the instrument and the analysis of the data is
14   recorded on this worksheet.
15             THE COURT:  And there is nothing in
16   between there?
17             THE WITNESS:  No, there are some other
18   worksheets that are generated with this worksheet
19   from the analysis, but as far as the next thing you
20   would fill out, this is it.
21             THE COURT:  All right.  So as an
22   exemplar of what it would look like as you record
23   that injection step, that's what it looks like.
24             THE WITNESS:  Correct.
25             THE COURT:  All right, I'm going to
```

3262

```
1    permit it.  Defendant's X.
2        Q.  I wonder if we could shrink that down a
3    little bit, initially anyhow.  And let me make
4    clear, the letters on the bottom of this exhibit
5    over here and over here, the DG and U.S.A., those
6    are not part of your worksheets?
7        A.  No.
8              MR. SHEEHAN:  And we're not claiming
9    those letters, your Honor.  Those were just letters
10   added subsequently, the little notations down in the
11   bottom, just so the record is clear.
12       Q.  I notice that among other things what this
13   Defendant's Exhibit X reflects is the injection time
14   that you are actually putting the -- putting it into
15   the machine, does it not?  Right there where the
16   yellow line magically appeared.
17       A.  Right, that reflects the amount of time
18   that an electrical field is created that the DNA
19   that's in the tube will enter the capillary.
20       Q.  And going a little bit farther down on the
21   page where it has the analysis parameters there in
22   the middle where it says RYGB equals 75 RFU.  Is
23   that what you were testifying to earlier about the
24   general parameters for identifying the genetic
25   markers?
```

3263

```
1        A.  Correct.  As I said, 75 RFUs is our minimum
2    peak height threshold.  So, the way you want to make
3    sure that the software is going to look at the data
4    is, you set that at 75 and then the orange, which is
5    the internal size standard, is set at 150.  That
6    doesn't have to be analyzed down --
7              THE COURT:  You need to bring the
8    microphone back down in front of you.  Bring the
9    microphone down.
10       A.  That orange is for the internal laying --
11   internal size standard.  Sorry, not laying.  And
12   that can be set at higher than 75 RFUs.
13       Q.  Okay.  But where it says RYGB, that has
14   some significance, does it not, those letters?
15       A.  Red, yellow, green, blue.
16       Q.  And can you tell us what the general
17   significance of those letters is in the context of
18   the DNA analysis?
19       A.  Sure.  During the amplification procedure
20   the DNA fragments that are created during the
21   copying procedure are tagged with a fluorescent
22   label, and it's either red, yellow, green, blue,
23   depending on which site it is that's being
24   amplified.
25       Q.  So, you are going to amplify at 16
```

3264

```
1    different sites, the 15 loci and the one genetic --
2    genetic marker -- what do we call that one, the XY?
3        A.  Gender identification.
4        Q.  Gender, I'm sorry.  Thank you.  The gender
5    identification.  And they have a color configuration
6    of red, yellow, green, and blue depending on which
7    loci -- which locus you are looking at right, right?
8        A.  Correct.
9        Q.  And if we could take a look at for
10   identification --
11             THE COURT:  I'm sorry.  If you are going
12   to go into a new exhibit, it's 3:30 and we're going
13   to stop for the day.
14             MR. SHEEHAN:  Thank you.
15             THE COURT:  All right then, ladies and
16   gentlemen.  Now, tomorrow is Thursday, so we'll
17   start at 9:00 and we will go 'til 3:00 as currently
18   planned.  All right?  Have a nice afternoon.  Leave
19   your notebooks here and don't discuss the case.
20             (Jury exited the courtroom)
21             MR. SHEEHAN:  Your Honor, I wonder
22   before Ms. Roy leaves if we could address the
23   subpoena issue.
24             THE COURT:  I don't know what it is to
25   address.  I don't have a motion for contempt.  I
```

**GA816**

3265

```
1   don't have anything.  I have the subpoena, that's
2   all I have.
3              MR. SHEEHAN:  Your Honor, what I am
4   orally requesting from the Court is a directive of
5   compliance with the subpoena.
6              THE COURT:  I don't think that's
7   appropriate.
8              MR. SHEEHAN:  Okay.
9              THE COURT:  All I have is this subpoena.
10             MR. SHEEHAN:  Correct.
11             THE COURT:  That says that it was served
12  on her less than two days before she started her
13  testimony.
14             MR. SHEEHAN:  Yes, your Honor.
15             THE COURT:  I don't even know whether
16  she complied with it.  All I have is the subpoena.
17  Don't I need something more to know what's before
18  me?
19             MR. SHEEHAN:  I can represent to the
20  Court, and Ms. Roy is here, that they haven't
21  complied with it.
22             THE COURT:  Yet.
23             MR. SHEEHAN:  Yet.
24             THE COURT:  All right.
25             MR. SHEEHAN:  And I don't think they
```

3266

```
1   have any intention of complying with it.
2              THE COURT:  All right, don't I need some
3   kind of a record on this?
4              MR. SHEEHAN:  Well, that's what I'm
5   trying to make, your Honor.  I can make it right
6   now.  I don't think your Honor needs, but if your
7   Honor --
8              THE COURT:  Are you moving for contempt?
9   What are you doing?
10             MR. SHEEHAN:  I am asking the Court to
11  direct her to produce the materials.
12             THE COURT:  The subpoena does that,
13  right?  It doesn't require the Court to compel it,
14  it requires, if it's not complied with, there may be
15  contempt unless, as Rule 17(c) says, unless there is
16  adequate excuse.  So, that's what you are asking is
17  that she should be held in contempt because without
18  adequate excuse she has disobeyed the subpoena
19  issued by a federal court in that district?  Is that
20  what you are asking?
21             MR. SHEEHAN:  I guess so.  I really just
22  want the material.  I obviously don't want Ms. Roy
23  held in contempt.  I want the material, though.
24             MS. DAYTON:  I'd like to note for the
25  record that defense has been provided with the
```

3267

```
1   electronic data.
2              THE COURT:  I understand that.  You
3   indicated that earlier.  Now, I also don't have any
4   motion to quash the subpoena, which is also the
5   other way in which these matters get determined.
6   And so if there were a motion to quash the subpoena
7   because it is too extensive and too short a period
8   of time and any other of the reasons, then I would
9   have before me what the parties' grounds are for
10  doing whatever they're asking the Court to do.
11         So we have this subpoena out there, we
12  are not seeking contempt and we don't have a motion
13  to quash.
14             MS. DAYTON:  A motion to quash wouldn't
15  come from the government.
16             THE COURT:  All I'm saying is I don't
17  have a motion to quash.
18             MR. SHEEHAN:  I would reluctantly,
19  orally move for contempt.  I don't want to find
20  Ms. Roy in contempt.  I think I'm just trying to get
21  a directive from the Court which I am confident will
22  be persuasive with the people who have told her not
23  to bring it.
24             THE COURT:  Now, the "it," you are
25  asking her to bring the laptop computer with
```

3268

```
1   suitable software which earlier was represented to
2   be a piece of lab equipment that doesn't leave the
3   lab.
4              MR. SHEEHAN:  Your Honor, I find it
5   difficult to believe that a laptop does not leave
6   the lab.  A laptop leaves the lab when somebody
7   takes it with them.  We're not talking about a
8   mainframe computer here that fills a -- you know.
9              THE COURT:  What is it you anticipate, I
10  will proceed on your oral motion to compel
11  compliance with the subpoena that is not a motion
12  for contempt?
13             MR. SHEEHAN:  Well, I've made it a
14  motion for contempt most --
15             THE COURT:  Now, let me turn to Ms. Roy.
16             MR. SHEEHAN:  Okay.
17             THE COURT:  You have -- do you have a
18  copy of the subpoena in front of you?  Would you
19  give her a copy of the subpoena, please.
20             MS. DAYTON:  Your Honor, this really
21  actually needs to go to the legal department at the
22  state lab.  It's not -- the issue is not --
23             THE COURT:  It should have.  When the
24  subpoena came it should have, and they should have
25  filed a motion to quash.
```

3269

1     MS. DAYTON:  Your Honor, they received
2 it on the 9th.  Ms. Roy was testifying --
3     THE COURT:  I understand that.  This is
4 the 11th.
5     MS. DAYTON:  Right, but it was the same
6 day she was testifying.  She was here yesterday, we
7 did not finish with Maria Warner.
8     THE COURT:  Do you understand the
9 problem?  I have nothing before me.  I have no
10 basis.
11     MS. DAYTON:  Then we should write it up.
12     THE COURT:  Pardon me?
13     MS. DAYTON:  I agree we should write it
14 up instead of sitting here and arguing in front of
15 Ms. Roy who can't control what the lab does.
16     THE COURT:  That's fine.  If she had
17 particular information relating to what these things
18 are and whether or not it can be produced as a
19 ministerial matter as opposed to additional
20 research, that's something entirely different.  I
21 think it should come in as a motion to quash with a
22 full affidavit as to what is unreasonable about the
23 subpoena.
24     MS. DAYTON:  Right.  And one of the
25 things I'm saying, your Honor, is this was served --

3270

1 the government was in court yesterday when this was
2 served.
3     THE COURT:  No, the government is
4 everywhere.  You all were in court.  All I'm saying
5 is that the issue of her compliance with the
6 subpoena is just sitting here with neither side
7 having done anything that informs the Court in a way
8 that allows me to act on what is now a pending oral
9 motion for contempt.
10     I will not take the matter up further at
11 this time, I will let -- if the lab, the state
12 medical lab legal department wants to file a motion
13 to quash, that would be vastly helpful because it
14 would contain the basis for that.  And if the
15 defendant wants to move for contempt, then they can
16 do so, representing what they don't have and why
17 they couldn't do this earlier.  Why don't we handle
18 it that way.
19     MS. DAYTON:  There is another issue, not
20 issue, I'd like to address, not in front of the
21 witness, your Honor.
22     THE COURT:  All right.  Ms. Roy, do you
23 want to leave your files here?
24     THE WITNESS:  No, I think I am required,
25 really, to keep them with me.

3271

1     THE COURT:  All right.  Then we will see
2 you tomorrow at nine o'clock.
3     THE WITNESS:  Yes, I will be here.
4     THE COURT:  Thank you very much.  Please
5 don't discuss your testimony.
6     THE WITNESS:  I won't.
7     MR. SHEEHAN:  Thank you, your Honor, I
8 have no objection -- before Ms. Roy leaves, I have
9 no objection whatsoever to her communicating with
10 legal counsel about these issues.
11     THE COURT:  About the subpoena, yes,
12 that has nothing to do with her testimony thus far.
13     MR. SHEEHAN:  At the lab I just want to
14 make that clear.  I don't know whether she can do
15 that or not.
16     THE WITNESS:  Well, I'll see what I can
17 say.
18     THE COURT:  You had another matter.
19     MS. DAYTON:  Yeah, do you know what,
20 we'll forget it.
21     THE COURT:  Good.  Can we stand in
22 recess.  Thank you very much.
23     (Proceedings concluded 3:40
24
25

3272

1            I N D E X
2 WITNESS                              PAGE
3 MARIA WARNER
4 Continued Cross-Examination by Mr. Sheehan   3070
5 Redirect Examination by Ms. Dayton           3093
6 Recross-Examination by Mr. Sheehan           3097
7
8 CHRISTINE ROY
9 Direct Examination by Ms. Dayton             3107
10 Cross-Examination by Mr. Sheehan             3235
11
12
13
14     I certify that the foregoing is a
15 correct transcript from the record of proceedings in
16 the above-entitled matter.
17            5/12/11
18            Date
19
20     /S/  Sharon Montini
21        Official Reporter
22 )
23
24
25

**GA818**

3273

```
 1          UNITED STATES DISTRICT COURT.
 2            DISTRICT OF CONNECTICUT
 3   * * * * * * * * * * *    *
                              *
 4   UNITED STATES OF AMERICA,  * Case No 6cr160(JBA)
 5            Plaintiff,       *
                              *
 6          vs.               *
                              *
 7   AZIBO AQUART              * May 12, 2011
                              *
 8            Defendant.       *
 9   * * * * * * * * * * *    *
10            TRIAL TRANSCRIPT
11              VOLUME XV
12   BEFORE:  THE HONORABLE JANET BOND ARTERTON U.S.D.J.,
13                                        and jury
     Appearances:
14   FOR THE GOVERNMENT:  ALINA REYNOLDS, ESQ
                          TRACY DAYTON, ESQ.
15                        PETER MARKLE, ESQ.
                          JACABED RODRIGUEZ-COSS
16                        United States Attorney's Office
                          915 Lafayette Blvd
17                        Bridgeport, CT 06604
18   FOR THE DEFENDANT    MICHAEL SHEEHAN, ESQ
19   AZIBO AQUART:        Sheehan & Reeve
                          139 Orange Street
20                        New Haven CT 06510
21                        JUSTIN SMITH, ESQ.
                          383 Orange Street
22                        New Haven, CT 06511
23   Court Reporter:      Sharon Montini, RMR
24
     Proceedings recorded by mechanical stenography,
25   transcript produced by computer
```

3274

```
 1          THE COURT:  Good morning, Counsel.
 2   Ladies and gentlemen.  Mr. Aquart.
 3          MS. RODRIGUEZ-COSS:  Good morning, your
 4   Honor.
 5          MR. SHEEHAN:  Good morning, your Honor.
 6          THE COURT:  Are we ready to begin?
 7          MS. RODRIGUEZ-COSS:  We are, your Honor.
 8   We have a witness who had been here previously on a
 9   couple of occasions and would not be available
10   tomorrow, and Mr. Sheehan has agreed to interrupt
11   his cross briefly.
12          THE COURT:  Who is that?
13          MS. RODRIGUEZ-COSS:  That would be Susan
14   Johnson.  She is the custodian of records for
15   T-Mobile.
16          MR. SHEEHAN:  That is correct, your
17   Honor.
18          THE COURT:  So we will take her first
19   then.
20          MS. RODRIGUEZ-COSS:  Thank you.
21          (Jury entered the courtroom.)
22          THE COURT:  All right, good morning,
23   ladies and gentlemen.  Please be seated.  We are
24   going to start this morning taking a witness with
25   scheduling difficulties out of order, and the
```

3275

```
 1   government is, therefore, calling Ms. Susan Johnson.
 2   We will then resume the cross-examination of
 3   Ms. Roy.
 4          All right, ma'am, if you will just raise
 5   your right hand, the oath will be administered to
 6   you.
 7          S U S A N   J O H N S O N
 8   Having first affirmed, was examined and testified as
 9   follows:
10          THE WITNESS:  Susan Johnson,
11   J-o-h-n-s-o-n, Bloomingburg.
12   DIRECT EXAMINATION
13   BY MS. RODRIGUEZ-COSS:
14      Q.   And, Ms. Johnson, can you tell us, please,
15   where do you work?
16      A.   I work for T-Mobile.
17      Q.   And what is your position there?
18      A.   I am the custodian of records.
19      Q.   All right.  And that entails basically
20   what?
21      A.   Responding to subpoenas from various law
22   enforcement agencies.
23      Q.   All right.  And I'm going to bring your
24   attention to what have already been marked
25   Government's Exhibits 263, 264 and 265.
```

3276

```
 1   And Ms. Johnson, can you tell us, please, if you
 2   recognize these documents.
 3      A.   Yes, I do.
 4      Q.   I bring your attention first to Government
 5   Exhibit 263.  How do you recognize those documents?
 6      A.   Subscriber information as well as call
 7   detail records, that states T-Mobile at the top.
 8      Q.   Were those records kept during the regular
 9   course of business of T-Mobile?
10      A.   Yes.
11          MS. RODRIGUEZ-COSS:  Your Honor, the
12   government would be submitting 263.
13          MR. SMITH:  Your Honor, I'm going to
14   object on relevance grounds.
15          THE COURT:  Let me hear more what the
16   relevance is.  You may proceed.
17          MS. RODRIGUEZ-COSS:  May we approach on
18   that, your Honor?
19          THE COURT:  Yes.
20          (Sidebar conference)
21          THE COURT:  There is no record of whose
22   records these are.
23          MS. RODRIGUEZ-COSS:  That is why we
24   wanted to approach.  The subscriber name for 263,
25   there is no subscriber name.  They are phone records
```

3277

```
1    of a prepaid telephone.  And we will ask Ms. Johnson
2    that.  Therefore, they don't do any verification of
3    subscriber name.  However, this is a telephone that
4    we will argue belonged to Tina Johnson.
5              Now, there is already evidence on the
6    record that Leroy Whittingham, who is her son,
7    called her on the morning of August 24, 2005 when he
8    discovered -- before discovering the bodies.  So his
9    number is reflected on these records.  In addition
10   to that, there was testimony that -- of a cell phone
11   taken from the apartment by Azikiwe Aquart
12   immediately following the murders.  There is a phone
13   call from this phone to Azibo Aquart's telephone
14   after the murders took place.  So we will argue that
15   we have presented sufficient evidence to connect
16   this phone to the case.
17             THE COURT:  What is your claim?
18             MR. SMITH:  Your Honor, there is
19   insufficient evidence to connect it because in Leroy
20   Whittingham's direct testimony he was asked does he
21   recognize his own cell number on those records and
22   his answer was no, he did not recall his telephone
23   number that is reflected in these records.
24             THE COURT:  So is the government going
25   to tie this up with the evidence of Whittingham's
```

3278

```
1    telephone number?
2              MS. RODRIGUEZ-COSS:  In part with Leroy
3    Whittingham's telephone number, yes, ma'am.
4              MR. SMITH:  Which he can't recall.
5              MS. RODRIGUEZ-COSS:  It's --
6              THE COURT:  It's registered?
7              MS. RODRIGUEZ-COSS:  His phone number is
8    registered in the 911 call which is in evidence.
9    So regardless of whether he can recall his own
10   number from five years ago --
11             THE COURT:  When you say the 911 call
12   reflects that number, that was the testimony, the
13   witness had that number?
14             MS. RODRIGUEZ-COSS:  That he called from
15   his phone to 911.
16             THE COURT:  But it had that number?  In
17   other words --
18             MS. RODRIGUEZ-COSS:  It had his number.
19             THE COURT:  And the witness from 911
20   testified as to what that number was?
21             MR. MARKLE:  The CAD report is in
22   evidence.
23             THE COURT:  And that has the number?
24             MS. RODRIGUEZ-COSS:  Right, and that
25   number calls --
```

3279

```
1              THE COURT:  I think there is sufficient
2    basis for this.
3              MR. SMITH:  In my opinion, your Honor,
4    just the fact that Mr. Leroy Whittingham's supposed
5    number, if it appears on the call and appears on
6    these records, does not prove this is Tina Johnson's
7    phone.
8              THE COURT:  So we have -- the CAD has
9    the number from which the 911 call was made.
10             MS. RODRIGUEZ-COSS:  Correct.
11             THE COURT:  Where do we link up that
12   number with Whittingham?
13             MS. RODRIGUEZ-COSS:  He called 911.
14             THE COURT:  But I'm sure there was more
15   than one 911 call that day.  How do you link that
16   with Whittingham's number?  Is there something --
17             MS. RODRIGUEZ-COSS:  No, it's in CAD,
18   his particular call.
19             THE COURT:  But how do you know it's his
20   call?
21             MS. RODRIGUEZ-COSS:  It's identified as
22   his call.
23             MR. MARKLE:  Well, he says I called at
24   whatever time.  There is a CAD call.  That is a 911
25   CAD printout that received a call at that time.
```

3280

```
1              MS. RODRIGUEZ-COSS:  And it identifies
2    the caller.
3              MR. MARKLE:  Remember, she says "who is
4    this" and he says "they call me Leroy Whittingham."
5              THE COURT:  And that is on the CAD
6    record.
7              MR. MARKLE:  The time and the number is,
8    and his testimony -- well, we played the 911 where
9    he says "they call me Leroy Whittingham."
10             MR. SMITH:  Your Honor, again, it
11   doesn't prove that Mr. Whittingham used his own
12   phone to call 911.  I mean, there is a call to 911.
13             MS. RODRIGUEZ-COSS:  He said he did.
14             MR. SMITH:  I mean, I don't recall the
15   testimony I used my phone to call 911.
16             THE COURT:  Well, I mean, what it is,
17   there is a number that appears in the CAD which the
18   government alleges is Mr. Whittingham, although he
19   does not recognize it or does not recall his number.
20   That is associated --
21             MR. SMITH:  Then there are two calls
22   that do appear in these records to which I'm
23   objecting.
24             MS. RODRIGUEZ-COSS:  From the number?
25             MR. SMITH:  From that number.
```

3281

```
1              MR. MARKLE:  Three.
2              MR. SMITH:  Three, whatever, but it
3    doesn't --
4              MS. RODRIGUEZ-COSS:  And then that --
5              MR. SMITH:  That in itself does not
6    prove that that is Ms. Johnson's phone.  Mr.
7    Whittingham could have called numerous numbers, we
8    don't know.
9              THE COURT:  So, is that not
10   cross-examination and argument?
11             MR. SMITH:  I suppose.
12             THE COURT:  It doesn't seem to me this
13   is irrelevant, which is your objection.
14             MR. SMITH:  Well, it's lack of
15   foundation as well, that is -- in fact, these
16   records are in fact Tina Johnson's records.
17             THE COURT:  Well --
18             MR. MARKLE:  It goes to the weight.
19             THE COURT:  This record that she's
20   offering, it's just the prepaid.
21             MS. RODRIGUEZ-COSS:  It's a prepaid
22   phone.
23             THE COURT:  There is no linking to Tina
24   Johnson.
25             MS. RODRIGUEZ-COSS:  Not on its face,
```

3282

```
1    your Honor.  We would have to connect the numbers.
2    But as to what Mr. Smith just said, in addition to
3    this, then this number calls Azibo Aquart's number
4    immediately following the murders.  So, I think that
5    is sufficient foundation for us to argue that's her
6    number.
7              THE COURT:  I think that's sufficient
8    foundation.
9              You can certainly argue that doesn't
10   show anything, but it doesn't seem to me that it's
11   either irrelevant, or given the timing of it and who
12   the call is going to and the testimony, and Lashika
13   Johnson saying, why are you calling me on this
14   phone, I mean, all that seems to me makes it a
15   circumstantial foundation.
16             (Sidebar concluded.)
17             THE COURT:  You may proceed.
18             MS. RODRIGUEZ-COSS:  So we would submit
19   263, your Honor.
20             MR. SMITH:  Objection for the previously
21   stated reasons, your Honor.
22             THE COURT:  All right, and it's
23   overruled and it is a full exhibit.
24             MS. RODRIGUEZ-COSS:  Thank you, your
25   Honor.
```

3283

```
1    Q.   And bringing your attention to what has
2    been marked Government Exhibit 264, can you tell us
3    if you recognize those documents?
4    A.   Yes, I do.
5    Q.   And how do you recognize those documents?
6    A.   The same thing, it states T-Mobile and it's
7    our normal subscriber and call detail records.
8    Q.   So, those were records kept in the regular
9    course of business of T-Mobile?
10   A.   Yes.
11             MS. RODRIGUEZ-COSS:  Submitting 264,
12   your Honor.
13             MR. SMITH:  No objection.
14             THE COURT:  Full exhibit.
15   Q.   And bringing your attention now to what has
16   been marked Government Exhibit 265, can you tell us
17   if you recognize those records?
18   A.   Yes, I do.
19   Q.   And how so?
20   A.   They state T-Mobile and it's our subscriber
21   and call detail records as well.
22   Q.   And again, these are records kept in the
23   regular course of business of your company?
24   A.   Yes.
25             MS. RODRIGUEZ-COSS:  We submit
```

3284

```
1    Government Exhibit 265, your Honor.
2              MR. SMITH:  No objection.
3              THE COURT:  Full exhibit.
4    Q.   Bringing your attention to what has been
5    marked Government Exhibit 263, can you tell us,
6    Ms. Johnson, what type of telephone this was?
7    A.   It was a prepaid.
8    Q.   All right.  And so we see here -- and to
9    what phone number do these records correspond?
10   A.   203-543-4209.
11   Q.   And we see here where it says subscriber
12   account, "name not given."  Why is that?
13   A.   It's a prepaid account.  They are not
14   required to furnish us with any identification.
15   Q.   And bringing your attention to the last
16   page of Government Exhibit 263, can you see here,
17   can you see that line there for August 24, 2005 at
18   7:25:57?
19   First of all, let me ask you, how, in what
20   standard of time are these records kept?
21   A.   Pacific time.
22   Q.   So, when it says here August 24, 2005 on
23   this line 7:25:57, what time is that Eastern
24   Standard Time?
25   A.   10:25:57.
```

3285

1    Q.   Where it says here, parentheses, "B 67,"
2    what does that mean, if you know?
3    A.   B represents a star.  So it means that the
4    caller was blocking their number when they made the
5    outbound call.
6    Q.   And are all your prepaid phone records, are
7    all your records, excuse me, are all your records
8    for prepaid phones maintained in Pacific Standard
9    Time?
10   A.   Yes, they are.
11   Q.   And does that include records of text
12   messages sent from prepaid phones?
13   A.   Yes.
14   Q.   Bringing your attention to Government
15   Exhibit 265, these particular records, again, is
16   this also a prepaid phone?
17   A.   Yes, it is.
18   Q.   And so here we actually see a subscriber
19   account name.  What steps, if any, do you take to
20   verify the identity or the name provided by a
21   subscriber of a prepaid phone?
22   A.   We don't.
23   Q.   So you take no steps whatsoever?
24   A.   Not for prepaids no.
25   Q.   So, they could say John Doe and you would

3286

1    not verify that.
2    A.   Correct.
3    Q.   And bringing your attention to what has
4    been marked Government Exhibit 264.
5         MS. RODRIGUEZ-COSS:  I don't know what I
6    did, your Honor.
7    Q.   Okay, here we go.  Again, what type of
8    telephone is this?
9    A.   That's a prepaid.
10   Q.   Okay.  And again, the subscriber name here
11   "Mark None Canney"?
12   A.   Correct.
13   Q.   For these records your answer would be the
14   same, no steps in terms of verifying that subscriber
15   name.
16   A.   Correct.
17        MS. RODRIGUEZ-COSS:  The Court's
18   indulgence.
19   Q.   So, we see here also a date of birth.  Is
20   that also information that you do not verify?
21   A.   Correct, we don't verify.
22   Q.   What about the date of activation for the
23   phone, would that be accurate?
24   A.   Yes.
25   Q.   That would be accurate?

3287

1    A.   Yes.
2    Q.   And then just one last question.  To go
3    back to Government Exhibit 263, that last page that
4    I showed you, where we see the B 67 there, so does
5    that mean that the person that used telephone No.
6    543-4209 blocked the number when they called
7    243-7132?
8    A.   Correct.
9    Q.   But the phone call would be reflected as an
10   incoming call.  The number would not be reflected.
11   In other words, if we look at the record of
12   243-7132, an incoming call would be reflected.
13   A.   Correct.
14   Q.   Not the number.
15   A.   Correct.
16        MS. RODRIGUEZ-COSS:  Nothing further,
17   your Honor.
18        THE COURT:  All right,
19   cross-examination.
20        MR. SMITH:  Thank you, your Honor.
21   CROSS-EXAMINATION
22   BY MR. SMITH:
23   Q.   Hi, Ms. Johnson.
24   A.   Hi.
25   Q.   My name is Justin Smith.  I'm one of the

3288

1    attorneys representing the defendant in this matter.
2    On these records, on the bill duration
3    above, can you explain what that means?
4    A.   That we billed the call in seconds.
5    Q.   So, that first call on that first line was
6    15 seconds?
7    A.   Correct.
8    Q.   When it reflects a number of seconds,
9    whatever that number is, that means that the call is
10   connected.
11   A.   Correct.
12   Q.   So one call has connected -- one phone has
13   connected with another phone.
14   A.   Correct.
15   Q.   Can you tell from these records whether a
16   connection is either by person to person or person
17   to voicemail?
18   A.   No.
19   Q.   So, that 15 seconds, that 49 seconds, any
20   of those could have gone into a voicemail.
21   A.   Correct.
22        MR. SMITH:  Okay, I have no further
23   questions.
24        THE COURT:  Anything further?
25        MS. RODRIGUEZ-COSS:  No, your Honor.

**GA822**

3289

```
 1              THE COURT:  All right, thank you,
 2   Ms. Johnson.  You are excused.  You may step down.
 3              All right, if we can now resume
 4   cross-examination with Ms. Roy.
 5              While we're waiting for Ms. Roy, ladies
 6   and gentlemen, we are going to take one break this
 7   morning, stop at 12:30 and stop for the day.
 8              All right.  Welcome back, Ms. Roy.
 9              THE WITNESS:  Good morning.
10              THE COURT:  Good morning.  You remain
11   under oath and Mr. Sheehan will continue his
12   cross-examination.
13           C H R I S T I N E   R O Y
14   Having previously affirmed, was examined and
15   testified as follows:
16              THE WITNESS:  Can I have a second?
17              MR. SHEEHAN:  Yes, please, take your
18   time.
19              THE WITNESS:  Okay.
20   CONTINUED CROSS-EXAMINATION
21   BY MR. SHEEHAN:
22       Q.   Good morning.
23       A.   Good morning.
24       Q.   I want to just go back to one point.  Early
25   in your testimony yesterday in response to the
```

3290

```
 1   government's questions you indicated that at the
 2   start of this investigation you were advised that
 3   there were two people of interest, correct?
 4       A.   On the request for examination form there
 5   were two names listed.
 6       Q.   And we've talked about Mr. Aquart, Azibo
 7   Aquart, in your testimony, right?
 8       A.   Correct.
 9       Q.   Were you ever asked to look at a profile
10   for the other individual?
11       A.   No.
12       Q.   Okay.  And that other person was Rodney
13   Womble, correct?
14       A.   I don't recall exactly.
15       Q.   Is it on your notes?
16       A.   I can look.
17       Q.   Sure.
18       A.   Rodney Wombie [sic] was on the request that
19   came in with the evidence dated 8/29/2005.
20       Q.   Okay.  May I look at what you refreshed
21   your recollection with?
22       A.   Sure.  Right here.
23       Q.   All right.  And the name there is Rodney
24   Womble.
25       A.   Oh, yes, Womble.  Sorry.
```

3291

```
 1       Q.   Now, I also wanted to go back to one point
 2   that -- I had asked you about the quantification
 3   process, and I want, if you could, to take a look at
 4   what is Defendant's Exhibit W-2 for identification.
 5            You had indicated that there was a separate
 6   worksheet that you go through in the process of
 7   quantification, and I don't think I had showed you
 8   that second worksheet.  Is Defendant's Exhibit W-2
 9   for identification that worksheet that I was missing
10   yesterday?
11       A.   Yes, this is the worksheet that I prepare
12   when I'm going to set up the assay for the AluQuant
13   human DNA quantitation assay.
14            MR. SHEEHAN:  I would offer that at this
15   time, your Honor.
16            THE COURT:  All right, it is a full
17   exhibit absent objection.
18       Q.   In this context the two highlighted
19   documents that appear on your screen, in terms of
20   the quantification, what you are doing at this point
21   is, for example, with respect to item 20 there,
22   that's 14-1-21, the sample we had previously
23   discussed?
24       A.   Yes.
25       Q.   When you are setting up your -- prior to
```

3292

```
 1   putting it into the AluQuant machine, that you are
 2   using 5 microliters of the material that you've
 3   recovered.
 4       A.   Yes, of the extracted DNA.
 5       Q.   Okay.  At this point you don't know whether
 6   it's DNA or not, do you?
 7       A.   No.  I mean, I've gone through the
 8   procedure to extract DNA, but sometimes you don't
 9   obtain any DNA that gives you a profile.  So, you
10   just go through the procedure.
11       Q.   Right.  And then what you do is you mix
12   that with 5 microliters of distilled water.
13       A.   Sterile distilled water.
14       Q.   Sterile distilled water.
15            And then is that -- so that's what that line
16   down indicates, that you are mixing it with those 5
17   microliters.
18       A.   Correct.
19       Q.   And then that 10 microliters is what you
20   use in the AluQuant machine.
21       A.   The 10 microliters is what is used as the
22   sample prep to then add it to the reaction mix, and
23   then the reaction occurs and then you measure the
24   amount of light produced.  And so that is what's
25   added for evaluation in the machine.
```

3293

1    Q.   Thank you.
2        Now, I believe you testified on direct
3    examination about the next step in the process,
4    which is to detect the genetic markers at the
5    various locations; is that correct?
6    A.   The analysis step of the amplified DNA,
7    yes.
8    Q.   And when we're talking about locations in
9    the DNA world, you use either locus or loci?
10   A.   Locus.
11   Q.   One place is a locus and more is loci?
12   A.   Yes.
13   Q.   Now, for most of the samples in this case,
14   your lab's protocol was that a sample could be ID'd
15   -- that a genetic marker could be identified if it
16   produced a peak of 75 or more RFUs; is that correct?
17   A.   That is correct.
18   Q.   With one exception in terms of these
19   samples, and that was the sample 14-ZI that we had
20   been talking a little bit about, because that was
21   done on a different system, an earlier system,
22   right?
23   A.   That was done along with some other samples
24   on an earlier system.
25   Q.   Okay.  And that system is called the

3294

1    Profiler COfiler system.
2    A.   Correct, but it was because of the
3    instrument that the amplified product was analyzed,
4    that minimum peak heights threshold for the slab gel
5    electrophoresis instrument was set at 50 RFUs.
6    Q.   Okay.  Now, once you take this material and
7    you've amplified it, and then you are going to ID
8    it, that generates a picture, does it not?
9    A.   Picture that we refer to as an
10   electropherogram.
11   Q.   All right, I'm going to ask if we can bring
12   up on your screen Exhibits -- Y-1 as a start.  And
13   is Exhibit Y-1 a copy of the electropherogram that
14   you have been talking about, that I've been asking
15   you questions about?
16   A.   Yes.
17   Q.   And was that produced in the course of your
18   analysis of the evidence in this case?
19   A.   Yes.
20   Q.   All right.
21       MR. SHEEHAN:  I would offer this Exhibit
22   Y-1 at this time.
23       THE COURT:  And this is also as an
24   exemplar of the work --
25       MR. SHEEHAN:  Yes.

3295

1        THE COURT:  -- that is done and the
2    process that's used?
3        MR. SHEEHAN:  And indeed in the process
4    in this case.
5        MS. DAYTON:  May I voir dire?
6        THE COURT:  You may.
7    VOIR DIRE EXAMINATION
8    BY MS. DAYTON:
9    Q.   Is this the entire electropherogram for
10   this evidentiary item?
11   A.   This actually is electropherograms for the
12   extraction control.  And as I recall, it looks like
13   the three known samples from the victim, and this is
14   for four loci.  So it's the same four loci results
15   for four samples.
16   Q.   But it's not the entire analysis for the
17   victims' profiles; is that correct?
18   A.   No.
19       MS. DAYTON:  We'd object.
20       THE COURT:  Overruled.  Go ahead.  Full
21   exhibit.
22   CONTINUED CROSS-EXAMINATION
23   BY MR. SHEEHAN:
24   Q.   It's going to come up on the screen behind
25   us.  Let me ask if you could take us through this

3296

1    for a moment.
2        I see that on the -- what we have are a
3    series of pictures going across, right, of peaks,
4    diagrams?  What would you call those, peaks?
5    A.   The things that are going up and down like
6    this, those we refer to as peaks.
7    Q.   Okay.  And on the left-hand side there is
8    a -- let's take a look at the top band there.  I
9    notice there are numbers, D8S, D21S, D7S, CSF.  Can
10   you tell us what those numbers are?
11   A.   That's the designation for the location of
12   the sites that we test.
13   Q.   All right.  And similarly, on the left-hand
14   side it says, zero through 300, that area of the
15   electropherogram.  Can you tell the members of the
16   jury what that refers to?
17   A.   That's the Y scale.
18   Q.   Okay.  And the Y scale refers to what?
19   A.   The peak heights.
20   Q.   All right.  And then, for example, under D8
21   we see a 13 -- we see the two peaks and a 13 and a
22   14.  Can you tell us what that represents?
23   A.   Those are the two genetic markers that were
24   detected at D8 for that sample.
25   Q.   All right.  Now, on that sample name it

3297

1  says TMP 103, 105, what is that referring to?
2      A.   TMP, that's the initials of the individual
3  who we get a blood sample from that we use as the
4  positive extraction control.
5      Q.   That's your safeguard, basically, right?
6  Kind of like your safeguard in this context.
7      A.   I wouldn't call it a safeguard.
8      Q.   Well, TMP is not one of the subjects you
9  are testing is it?
10     A.   That's why I refer to it as the extraction
11 positive control.
12     Q.   Okay.  Now, on the next line, if we could
13 go right down on the next section there.  What we
14 see is 05-19367, that's this case number, right?
15     A.   That is correct.
16     Q.   And then the 1S2, that refers to the first
17 sample that you were testing?
18     A.   That refers to the item No. 1-S2.
19     Q.   Which in this case was Tina Johnson's DNA,
20 right?
21     A.   There was a known blood sample from Tina
22 Johnson.
23     Q.   What we see down below that, again, is
24 going to be the same four loci, is it not, those --
25 the D8 21?

3298

1      A.   Correct.
2      Q.   And below that we see the peaks that were
3  reflected on that sample that was taken from Tina
4  Johnson, right?
5      A.   Correct.
6      Q.   And if we could, just to shift to Exhibit
7  Y-2 for identification.  Is this another page of the
8  electrophergram that reflects the process of
9  identifying the alleles in this -- the genetic
10 markers or alleles for Tina Johnson?
11     A.   Could you move it down so I can see my
12 initials at the top, please.  Okay.
13     Q.   Can you identify your initials there?
14     A.   Yes, I did.
15     Q.   It's not a great copy.  I apologize for
16 that.  Looking at the second line again, is that
17 with reference to Tina Johnson or 1S2?
18     A.   Correct.
19          MR. SHEEHAN:  I would offer that at this
20 time, your Honor.
21          THE COURT:  All right, it is a full
22 exhibit.
23     Q.   I wonder if we could look at the page
24 first.  What we see in the upper right is your
25 initials, the case number and your initials,

3299

1  correct?
2      A.   Well, there they are.  Okay, yes.
3      Q.   And then on the second line of that, again,
4  what we have there is the reflection of the genetic
5  markers for Ms. Johnson's sample, right?
6      A.   For five loci, yes.
7      Q.   Now, those are five different locations
8  that you are looking at at this point, correct?
9      A.   Correct.
10     Q.   And that's -- I think you had talked about
11 D3 and D3S, THO, D13, D16 and D2S.  That's the
12 common parlance, right?
13     A.   Yes.  The D and then the number after.
14     Q.   And what we're seeing on those, on this
15 exhibit, is the fact that in some locations there
16 are two genetic markers.  For example, at D3 we see
17 the 14 and 15, right?
18     A.   Yes, I see that.
19     Q.   And if you shift out, I guess actually all
20 of these have two genetic markers, do they not, each
21 loci?
22     A.   For this sample 1S2 at these five loci,
23 yes.
24     Q.   And I would just like to take you through
25 the balance.

3300

1          If you can look at similarly Exhibit Y-3.
2  Is that up on your screen there?
3      A.   Yes.
4      Q.   And that reflects four more of the alleles
5  identified for Ms. Johnson, does it not?
6      A.   Yes.
7      Q.   And it has your work --
8      A.   I'm sorry, not four more alleles, four more
9  loci.
10     Q.   Four more -- correct.  I apologize.  Four
11 more loci.  And it has your initials up on the top
12 there, right?
13     A.   Correct.
14          MR. SHEEHAN:  I'd offer that, your
15 Honor.
16          THE COURT:  So that is Y-3, that's still
17 all part of this?
18          MR. SHEEHAN:  Yes.
19          THE COURT:  Same analysis?
20          MR. SHEEHAN:  Correct, your Honor.
21          THE COURT:  Full exhibit.
22     Q.   Drawing your attention to the second column
23 there, and bringing that up, again we have four
24 different loci, correct, for Ms. Johnson?
25     A.   That is correct.

3301

```
1      Q.   And what we see, for example, this time on
2  Exhibit Y-3 is that at D19 she only shows one
3  allele, right?
4      A.   Correct.
5      Q.   Whereas at vWA, TPOX and D18 we're seeing
6  two -- and I apologize, the term you prefer is
7  genetic markers rather than alleles, right?
8      A.   Either one is fine.  I just --
9           THE COURT:  Let's stick with one or the
10 other.  Can we stick with genetic markers?
11          MR. SHEEHAN:  I'll work on that, your
12 Honor, I will try.
13     Q.   So, you see two genetic markers at the
14 other three loci, right?
15     A.   Yes, for this sample.
16     Q.   And then the final -- if we were to turn to
17 Exhibit Y-4, and drawing your attention to that
18 exhibit for identification, again, this references
19 your work in this case on Ms. Johnson?
20     A.   Correct.
21     Q.   On those alleles -- I'm sorry, those
22 genetic markers.  And what we see on line 2 are the
23 specific genetic markers and gender identification
24 for this sample, correct?
25     A.   Yes, there is the amelogenin site as well
```

3302

```
1  as two additional loci.
2           MR. SHEEHAN:  I would offer that, your
3  Honor.
4           THE COURT:  This is still all part of
5  the extraction control electropherogram that you
6  did?
7           THE WITNESS:  No.
8      Q.   I'm sorry.  Perhaps I could clear that up.
9      This is the actual sample, the
10 electropherogram that you did, that was generated by
11 the analysis of Ms. Johnson's sample, right?
12     A.   Correct.
13          THE COURT:  It's a full exhibit.
14     Q.   And looking again at line 2 as we've -- we
15 previously discussed, the first section on the left,
16 that has an X in it.  Is that what you explained to
17 the members of the jury, that's our gender
18 identification locus?
19     A.   Correct.  Females have XX and males have
20 XY.
21     Q.   And then similarly we look and there are
22 two additional loci on there, D5 and FGA.
23     A.   Correct.
24     Q.   And each of those we see two alleles, do we
25 not?
```

3303

```
1      A.   Two genetic markers each.
2      Q.   Oh, yes, two genetic markers.  And I would
3  ask you this question, when you are -- can you tell
4  us what the peak height is for the 10 allele?
5           THE COURT:  Genetic markers.
6      Q.   The 10 genetic marker at D5S?
7      A.   It is, it looks to be about approximately
8  250 RFUs.
9      Q.   Can you tell me what the peak height is for
10 the 12?
11     A.   It looks approximately 150 RFUs.
12     Q.   And when you are doing your analysis, are
13 you looking at actual peak heights?
14     A.   When I do my analysis if I want to see what
15 the peak height is, I can hold the cursor of the
16 mouse over the tip of the top of the peak and on the
17 display it will tell me the peak height.
18     Q.   So, the actual, when you are working on
19 your software program, will it generate a number
20 that is associated with that as well?
21     A.   I'm not sure what you are exactly asking
22 me.
23     Q.   Well, do you see the way we did it, where
24 it was done here with drawing a line across?  Is
25 that the -- are you making a guess from that or is
```

3304

```
1  the machine actually giving you an answer?
2      A.   The software, when I hold a cursor over the
3  top, I can see from the X, Y it gives you the X, Y
4  position of the cursor and that tells me the Y
5  position is the peak height position.
6      Q.   Does it give you a numerical value?
7      A.   Yes, it gives me a number for the Y scale.
8      Q.   And it wouldn't be as imprecise as what
9  we're looking at right here, would it?
10     A.   No.  No, because we're lining it up to the
11 hashmarks which are about 50 RFUs apart.
12     Q.   And similarly, if you are trying to get the
13 peak heights, for example, on the 23 and 25, you
14 would line up your cursor and that would give you
15 the actual height on the Y axis?
16     A.   Correct.
17     Q.   And sometimes that's a matter of interest
18 to you, is it not?
19     A.   Yes.
20     Q.   Because under your system in terms of
21 calling -- in terms of identifying genetic markers
22 if that number is not at 75 or greater, the machine
23 does not identify it as a genetic marker, does it?
24     Is that a bad question?
25     A.   Yes.
```

3305

1    Q.   All right.  Let me try and make the
2    question a little bit better.
3         If there is a peak -- what appears to be a
4    peak shape -- let's say if that 23 was 73 RFU units
5    high, would the peak itself appear on the
6    electropherogram?
7    A.   The peak would, yes.
8    Q.   Okay.  But would the number -- would there
9    be a number assigned to it --
10   A.   No.
11   Q.   -- by the computer?
12   A.   No.
13   Q.   All right.  And if you, for example, if
14   you -- you've mentioned that you look at something
15   called minor peaks.  Is that correct?
16   A.   Yes, I do.
17   Q.   And those minor peaks are between 50 and 75
18   RFUs, at least on -- well, yeah, this is
19   Identifiler, so that would be 50 and 75 RFUs?
20   A.   Correct.  Well, if they're at 75, they
21   would have been called.  So we're looking just below
22   75.  Less than 75 and greater than 50, in that
23   range.
24   Q.   All right.  And is there a particular magic
25   about the number of 75?

3306

1    A.   It's not magical, no.
2    Q.   Is the -- 75 is the number that you in the
3    lab, through your validation studies, have become
4    comfortable with as being a height to identify a
5    genetic marker; is that correct?
6    A.   Through our validation of the instrument
7    and the Identifiler kit, it was determined that 75
8    was minimums peak height level, peak height that we
9    would use as a reported peak.
10   Q.   And the way you got there was that you had
11   known samples that you would put into the machine
12   and if the profiles came out the same as what you
13   knew they were going to be, and the alleles were at
14   75 or greater, then you felt like the machine was
15   accurate; is that correct?
16   A.   That's not how the peak height of 75 was
17   chosen.
18   Q.   You didn't put in samples and see if the
19   machine was picking them up?
20   A.   Well, I think you are asking a different
21   question.  I guess then I don't understand your
22   question.
23   Q.   Well, I'm trying to ask you -- or maybe I'm
24   inartfully asking, if you could explain to the jury
25   how the 75 number came to be set.

3307

1    A.   They looked at the level of noise, because
2    there is a little bit of noise, baseline noise, and
3    so that was around 10 RFUs or less, and then --
4    with some occasionally higher.  And so about three
5    times that is the 50 mark.  And then from our
6    previous way that we used to do our analysis on the
7    gel electrophoresis, they also looked at when you
8    are running samples that's not supposed to have any
9    DNA, how much, say, noise you'd get.  And based on
10   multiple things, 75 RFUs was what we considered a
11   valid minimum peak height threshold where we were
12   confident that that peak represented amplified DNA.
13   Q.   All right.  Now, you mentioned the term
14   "noise."  I wonder if we could just sort of -- that
15   area 23, 25.  If we could blow that up a bit for a
16   second.  I noticed to the left of the 23, and indeed
17   to the right of the 23, there are little what appear
18   to be bumps.  Is that the kind of thing you mean by
19   noise?
20   A.   No.
21   Q.   What are those things?
22   A.   Those are what are refer to as stutter
23   peaks.
24   Q.   Okay.  And a stutter peak, just so the
25   members of the jury understand, that's not real DNA,

3308

1    is it?
2    A.   Yes, it's a product of DNA that is the
3    result of the amplification process.  It's true DNA,
4    but we know from our validations and published
5    papers that that product is produced during the
6    amplification procedure, and we know that for each
7    locus that we look at, and actually each size of the
8    genetic marker, what is the maximum stutter
9    percentage of the larger peak that is allowable and
10   still be considered stutter.
11   Q.   Okay.  So, in this case you are confident
12   that, for example, the material to the -- the
13   little bump that we've got there to the left of 23,
14   that's stutter product coming from 23 itself?
15   A.   Correct.  That would be considered the
16   stutter product when the 23 -- during the
17   amplification process.
18   Q.   And I notice that on this -- where we've
19   blown it up, we're seeing lines going up like over
20   the 23, it's kind of like a banded area going up to
21   the top.  If I might borrow your pointer and just
22   ask you about, for example -- oh, I don't need this.
23   That's really just the line on the chart that
24   represents the 23, right?
25   A.   That's part of the sizing process that the

3309

1   software does.  It's referred to as a bin, and the
2   peak falls in that bin and it's given the
3   designation of 23.
4       Q.   And to the left where we have that
5   highlighted, that would be the area that would be a
6   22 if there was a peak there, that bin?
7       A.   No.
8       Q.   What would that one be?
9       A.   That would be a 22.2.
10      Q.   Okay.  But in any case, what these bins
11  represent are the sizing on the electropherogram,
12  right?
13      A.   I'm sorry, could you --
14      Q.   What these various bins represent are the
15  various locations where you might find genetic
16  material.
17      A.   Correct.
18      Q.   Now, taking a look once more at Y-1, if we
19  could, just the main page on that.  S2, that was
20  1S2, that was Tina Johnson, right?
21      A.   Correct, that was a known sample from Tina
22  Johnson.
23      Q.   And then similarly, below her we have the
24  known sample from James Reid, 2S2.
25      A.   2S2 is a known sample from James Reid.

3310

1       Q.   And then 3S2 is the known sample from
2   Mr. Williams, right?
3       A.   Correct.
4       Q.   And what we see in each one of these, the
5   1S2, the 2S2, 3S2, are one or two genetic markers at
6   each location, right?
7       A.   That is correct.
8       Q.   And that's what gives you confidence, among
9   other things, that what you are looking at here is a
10  single source sample, right?  Well, I mean --
11      A.   I know it's a single sample because
12  it's a known sample from a blood, unless -- in order
13  to -- the only time I've ever seen a sample from a
14  known individual come up with multiple genetic
15  markers is when they tried to save somebody by
16  giving them multiple blood transfusions.  So when
17  you are testing a known sample, you know it's a
18  single source unless you are given some possible
19  other explanation.
20      Q.   Okay.  And similarly, do you feel confident
21  when you are looking at one or two alleles at each
22  locus, that what you are looking at is most likely a
23  single source sample if they are all at about the
24  same peak height ratios?
25      A.   This is not an evidentiary sample, so I

3311

1   know these are single source samples.
2       Q.   All right.  As an illustration, if you
3   didn't know that 3S2 was a single source sample, if
4   you had not been advised that that was from, in this
5   case that would be Mr. Williams' blood, looking at
6   that picture that we see there, would you feel
7   comfortable that that was a single source sample?
8       A.   Well, I would have to look at the entire
9   results.  That's what we do when we decide whether
10  it's a single source or a consistent with or
11  demonstrates that it's a mixture.  We look at all of
12  the results, not just four results that you have
13  shown here.
14      Q.   So, let's take a look at Y-2.  Remember we
15  got Y-1 in mind, let's look at Mr. Williams on Y-2.
16  And that would be, again, on 3S2, the bottom one.
17  Do you need it blown up for you there?
18           So that's part of his profile, right?
19      A.   That is correct.
20      Q.   And then the next one would be on Y-3.  And
21  finally on Y-4.
22           So, looking at those four samples -- those
23  four exhibits, could you, would you feel comfortable
24  if you didn't know that this was a single source,
25  would you feel comfortable identifying that as a

3312

1   single source?
2       A.   Yes, I would say that is consistent with a
3   single source sample.
4       Q.   The picture gets more complicated when we
5   get to mixtures, does it not, in terms of number of
6   alleles that we're likely to see?
7       A.   It depends how many contributors you've
8   detected in that mixture.
9       Q.   All right.  But in general, your process
10  for extracting, quantifying, amplifying and then
11  identifying the alleles, that's -- identifying the
12  genetic markers, that's the same whether it's a
13  single source or whether it's a mixture.
14      A.   That is correct.
15      Q.   Now, once you have identified the genetic
16  markers in a sample and you are asked to explain
17  the -- you are asked what the significance of that
18  is, in other words, you are trying to determine the
19  likelihood that an unknown individual or a random
20  individual might have made a contribution to that
21  sample, you need to compare those genetic markers
22  with what's been found in your sampling pool, right?
23      A.   I'm sorry.  When you got to the end of that
24  question I wasn't sure what you were referring to.
25      Q.   I'm talking about your method of computing

**GA828**

3313

```
1   frequencies or likelihoods that you testified about
2   yesterday.
3       A.  We calculate frequencies, but we don't
4   calculate likelihood ratios, if that's what you are
5   asking.
6       Q.  Okay.  But by frequencies, what a frequency
7   is, in essence, it's an extrapolation, a comparison
8   of what the specific genetic markers are with what
9   you would expect to find in the population that you
10  study.
11      A.  I'm not sure I understand that question.
12      Q.  All right.  What's the difference between a
13  frequency and a likelihood?
14      A.  A likelihood ratio?
15      Q.  Yeah.
16      A.  A likelihood ratio is -- well, we don't
17  calculate likelihood ratios in our protocol.
18      Q.  All right.  Well, let me ask you this:  The
19  frequencies that you were testifying to yesterday
20  you were saying, for example, one out of -- you
21  would expect to find this in one out of 7 billion in
22  the African-American population.  Is that a
23  frequency?
24      A.  That's a frequency, approximate expected
25  frequency.
```

3314

```
1       Q.  Okay.  Let me ask you, if we could bring up
2   Exhibit Z-2 and just go back on the mixture question
3   for a minute, Z-2 for identification.
4           Z-2 for identification, that references one
5   of the particular samples that you looked at in this
6   case, right?
7       A.  That is correct.
8       Q.  And in that -- and it's one that you
9   testified about earlier, 14-1-Z1.
10      A.  Correct.
11      Q.  And this reflects the electropherogram that
12  gave you the results at three of the loci as well as
13  the gender identification in that sample, did it
14  not?
15      A.  Correct.
16          MR. SHEEHAN:  I would offer that at this
17  time, your Honor.
18          THE COURT:  All right, that is a full
19  exhibit.
20      Q.  The area that we've highlighted here for
21  you, that is, again -- now we're seeing the case No.
22  05-19367, right?
23      A.  Correct.
24      Q.  And then the 14-1-Z1, that references the
25  sample that you examined?
```

3315

```
1       A.  Correct.
2       Q.  What we see on the left is the gender
3   identification XY.  And in this case what that is
4   telling us, is it not, is that this sample could be
5   from -- well, let's go on for one minute.
6           Then let's take a look at D8S.  There we see
7   four peaks that were identified, right?
8       A.  That is correct.
9       Q.  And similarly at D21 we see seven peaks
10  that were identified, right?
11      A.  No.
12      Q.  One, two, three, four, five, six -- eight.
13  I'm sorry, eight peaks that were identified?
14      A.  That is correct.
15      Q.  And at D18 we're seeing three peaks that
16  are identified.
17      A.  Correct.
18      Q.  And those two, the 13 and the 18, those
19  reflect minor peaks that you identified in the
20  sample, right?
21      A.  Correct.
22      Q.  Now, a minor peak, you are not calling it a
23  genetic marker, are you?
24      A.  No, it's not reported -- it's reported as
25  an asterisk.  We use it for interpretational
```

3316

```
1   purposes.
2       Q.  And can you tell us what the -- in terms of
3   getting the peak height of that 13, again, is this
4   something where you would put the cursor on it and
5   it would give you the height in the Y axis on the
6   left?
7       A.  Yes.  Also with this software I'm capable
8   of zooming in on that particular peak.  So I can get
9   an accurate reading by placing the cursor over the
10  top of the peak.
11      Q.  Okay.  And the same is true for the 18,
12  right?
13      A.  That is correct.
14      Q.  And can you tell us -- from these working
15  documents that you have, we don't know the height in
16  RFUs of the 13, do we?
17      A.  Well, it would have to be greater than 50
18  and less than 75.
19      Q.  Okay.
20      A.  Unless I specifically wrote it down on the
21  worksheet that accompanied this electropherogram,
22  but it's usually not my way I record those.  I just
23  write that there is an asterisk peak at that
24  location.
25      Q.  All right.  But you have looked at your
```

**GA829**

3317

1   computer -- I take it you have looked at this
2   electronic image and actually made a determination
3   that 13 is above 50 RFUs, 50 or above, right?
4       A.   Yes, and it would have been not called, so
5   I know it's less than 75.
6       Q.   Because the machine is the one that
7   automatically calls it, right?
8       A.   I'm not sure.
9       Q.   I mean calls it in the sense of picking it
10  up over 75.
11      A.   It doesn't pick up every peak over 75, if
12  that's what you are asking me.
13      Q.   Because it might be a stutter peak, for
14  example.
15      A.   Correct.
16      Q.   And if that -- if, for example, if you had
17  a very tall peak and something to the left of it
18  would go over 75, but it could have been stutter,
19  then it wouldn't be picked up as a peak, right?
20      A.   That is correct, but I also go along and
21  check those.
22      Q.   Check?  I'm sorry, you check them in what
23  way?
24      A.   Check to see what the percentage is of the
25  major peak height because the software does not

3318

1   allow variation and stutter percentage within one
2   locus.  So you have to go through and check.
3       Q.   Okay.  Because sometimes your stutter
4   percentage might be 10 percent, another time it
5   might be 12 percent, or whatever number you have
6   determined on the basis of your studies.
7       A.   That is correct.
8       Q.   Now, am I correct that, for example,
9   looking at this Z-2, just for instance, in order to
10  determine the frequency of contributors at -- for
11  example, looking at D8 there, what you need is
12  information about the percentage of people in the
13  general population who have those particular
14  alleles, right?  Those particular genetic markers.
15      A.   You are saying if I made the conclusion
16  that, say, somebody was included?
17      Q.   Correct.
18      A.   Right.  Then I look at the frequencies.
19  Using the frequencies of those genetic markers for
20  that site, I would determine how many people in
21  those three population groups could be a contributor
22  at that site.
23      Q.   So, for example, let's say 20 percent of
24  the Caucasians in your study had a 13 -- had a 13 --
25  a genetic marker at 13 in D8, that would be the

3319

1   number that you would be using in part of your -- in
2   the ultimate computation of the frequencies.
3       A.   Yes, whatever the actual number is.
4       Q.   Okay.  And the actual number that you get,
5   that is based upon a sampling that was done at one
6   point in time, is it not?
7       A.   That is correct.
8       Q.   You obviously haven't tested all of the
9   people in any one of the three populations that you
10  talked about, have you?
11      A.   No.
12      Q.   And that's what -- in the end when you've
13  given your testimony here, you've provided differing
14  frequencies for three categories of people, right?
15      A.   Population groups, yes.
16      Q.   Population groups, right.  Now, you can't
17  tell -- I think you testified to this yesterday, but
18  you can't tell an individual's race from their
19  genetic profile, can you?
20      A.   No.  Not with the testing that's done for
21  this kind of testing, no.
22      Q.   Okay.  There may be certain tests that
23  would be indicative -- you might look at other areas
24  of the genetic spectrum, I take it.
25      A.   There might be some research out there that

3320

1   we don't use, but for the forensic DNA analysis, it
2   does not tell us anything physical about the
3   individual besides the gender identification test,
4   which of course tells us male or female.
5       Q.   And we may have -- there may have been
6   identification of specific genes as indicative of,
7   say, cancer or something like that, that's not --
8   those aren't the kinds of genes you are looking at
9   in forensic testing, are you?
10      A.   Yeah, we're not looking at genes, period.
11      Q.   All right.  And you're not even identifying
12  specific areas of DNA that are relevant,
13  necessarily -- as far as we know, to people's height
14  or their eye color or things like that.
15      A.   The areas that are chosen are not --
16  they're not part of the coding regions of genes.
17  They're strictly chosen because they show
18  differences between individuals.
19      Q.   Okay.  Do you agree that racial categories
20  are really social and not biological categories?
21      A.   I don't have any opinion on that question.
22      Q.   Would you agree that race, to the extent it
23  explains anything, it explains only a small portion
24  of genetic variation?
25      A.   That's out of my area of expertise.

**GA830**

3321

```
1       Q.   Do you agree that there is no biological
2   basis for the concept of race?
3       A.   Again, I don't -- that's really out of my
4   area of expertise.
5       Q.   The statistics that you relied upon are
6   based on a sampling study that the lab did at one
7   point in time, right?
8       A.   That is correct.
9       Q.   And in that category they broke it down
10  into three groups, Caucasians in Connecticut, that
11  was one, right?
12      A.   Correct.
13      Q.   African-Americans in Connecticut, right?
14      A.   Correct.
15      Q.   And Hispanics in Connecticut?
16      A.   Correct.
17      Q.   Now, do you know as far as the Caucasian
18  category, that includes many different
19  nationalities, does it not?
20      A.   I know that the people that were
21  self-identifying, those individuals identified
22  themselves as Caucasians.  Whatever nationality they
23  are, I have no information on that.
24      Q.   Okay.  You don't know whether -- you have
25  no idea what the national origin is of those people.
```

3322

```
1       A.   That is correct.
2       Q.   Based upon your -- if you know this, in
3   your area of expertise, would you expect to find,
4   for example, that people from Italy have the same
5   frequencies in their DNA profiles as people who are
6   say born in -- of Irish nationality?
7       A.   I know that they have done studies that
8   have looked at comparing databases and they find
9   that the frequencies of the genetic markers are very
10  similar, but I don't know for those two populations
11  how similar they are.  So, no, I don't have any
12  knowledge of that.  But I know in general they have
13  compared databases and found that there is not a lot
14  of differences between the frequency of those
15  genetic markers within one group in multiple
16  databases.
17      Q.   And the sample -- I mean the lab study also
18  uses a category of African-Americans, right?
19      A.   That is correct.
20      Q.   And that's not a homogenous group, is it?
21      A.   I'm really not sure what you are asking me
22  about, like -- I know that African-American is a
23  general term applied to people from various
24  backgrounds, but beyond that I don't -- I just know
25  that as a layperson.  I also know, again, those
```

3323

```
1   individuals who are used in that database identified
2   themselves as African-Americans.
3       Q.   And that category would include -- do you
4   know whether there is any -- in terms of that study,
5   would that include, for example, somebody who was --
6   it would include anybody who identified themselves
7   as African-Americans, right?
8       A.   Yes, I think that's what I said.
9       Q.   And the study did not, as far as you know,
10  ask where people were born, did it?
11      A.   No.  As far as I recall -- I don't know if
12  even that was considered.  It was basically samples
13  that people identified themselves as
14  African-American.
15      Q.   And is there any category for interracial
16  populations that is used by the lab?
17      A.   No.
18      Q.   So, as far as you know, when somebody
19  identified themselves as African-American, they
20  could have had a white father and a black mother.
21  That's a possibility.
22      A.   I don't know that.  All I know is those
23  people in that database identified themselves as
24  either, the samples that were used,
25  African-American, Caucasian or Hispanic.  Whether
```

3324

```
1   they thought or considered themselves to be
2   something else, we could only go by what they
3   identified themselves as.
4       Q.   And with respect to Hispanic, they weren't
5   asked what language they spoke, were they?
6       A.   Not as far as I know.
7       Q.   So, as far as you know, the racial
8   identification is what they said it was.
9       A.   What was written down on a form.
10      Q.   And do you recall when the bulk of that
11  sampling was completed?
12           MR. SHEEHAN:  Could I bring up
13  Defendant's Exhibit AA.
14      A.   Yes, that's what I was trying to recall the
15  date of that.
16      Q.   Okay.  Would looking at this document
17  refresh your recollection as to when it was that the
18  sampling was done?  You have that in your --
19      A.   I have a copy of that with me.
20      Q.   Right.  Having looked at it, does that tell
21  you when it was done?
22      A.   Can I look at my copy?
23      Q.   Sure, that might be easier than looking at
24  this.
25      A.   The data was presented at the 51st annual
```

3325

1  meeting of American Academy of Forensic Sciences,
2  Orlando, Florida, February 1999.  So it was prepared
3  prior to that, around that time.
4      Q.   Okay.  And is your -- and that report, that
5  document that we've just talked about, Defendant's
6  Exhibit AA for identification, that is the study
7  that you base your ultimate determination of the
8  frequencies in this case on, is it not?
9      A.   This study and additional work that we had
10  to do for D2 and D19.
11      Q.   And that's added in.  You have -- there are
12  two more pages related to that after the three-page
13  study, are there not?
14      A.   Yes.
15          MR. SHEEHAN:  Your Honor, at this time I
16  would offer Defendant's Exhibit AA, which is 1
17  through 5, and showing that to counsel.
18      Q.   Showing you what's been marked as
19  Defendant's Exhibit AA, 1 through 5, is this a copy
20  of that document?
21          THE COURT:  This is just a document she
22  used to refresh her recollection on the date the
23  study was done, no?
24          MR. SHEEHAN:  No, she's also testified,
25  I believe, and I'll clear it up on the record, your

3326

1  Honor.
2      Q.   This document, Defendant's Exhibit AA, 1
3  through 5, this is the study you rely upon in
4  determining the ultimate frequencies that you
5  assigned in this case, is it not?
6      A.   Correct.
7          MR. SHEEHAN:  I would offer it at this
8  time, your Honor.
9          THE COURT:  So this is like the one in
10  7 billion, 1 in, so forth, that's what you mean?
11          MR. SHEEHAN:  I think this is the
12  underlying document, your Honor.  If I could just go
13  through that with her.
14          THE COURT:  All right.  So she relied on
15  this in assigning the frequency percentages.  All
16  right.  It's a full exhibit.
17      Q.   Let me show you Defendant's Exhibit AA-1.
18  Those are the allele -- also known as the genetic
19  marker frequencies that were used in this case, were
20  they not?
21      A.   That's the name of the paper, "Allele
22  Frequency for the CODIS Core STR Loci, Connecticut
23  population."
24      Q.   And going down a little bit further on the
25  page.  Let's do that whole section.

3327

1          For example, in this context, the observed
2  allele frequencies in the African-American
3  population on D3 at the 12 allele, can you tell us
4  what that is?
5      A.   0.549.
6      Q.   And what that means is that .5, like --
7  .5 percent of the African-American population in
8  your study had that particular genetic marker,
9  right?
10      A.   That's the frequency of that genetic marker
11  observed in the African-American population.
12      Q.   And then looking down a little bit below
13  that to the 15, there we see more than 28 percent of
14  the African-American population had that marker,
15  right?
16      A.   Yes, that's the frequency that the 15
17  allele is observed in the African-American
18  population.
19      Q.   And I wonder if we could just look at that.
20          MR. SHEEHAN:  If I could ask you, just
21  do that whole page, go back and just highlight.  Go
22  right down and over to the right a little bit.
23      Q.   So what we're seeing here is the
24  percentages as to where those genetic markers were
25  found, looking again just at D3, right?

3328

1      A.   The percentage where they were found?
2      Q.   What I mean is the 12, we had .5 percent,
3  it looks like less than 12, .275 percent.
4      A.   This is a chart that shows the genetic
5  frequencies associated with the genetic markers at
6  the loci that were tested.
7      Q.   Okay.  And would you generally expect that
8  those would total 100 percent?
9      A.   No.
10      Q.   Close to it?
11      A.   There are going to be rare genetic markers
12  that in your sampling population you are not going
13  to observe.
14      Q.   And can you tell us how many people were
15  sampled?
16      A.   There is 182 individuals that were sampled.
17      Q.   And those are people who self-identified as
18  African-American.
19      A.   Correct.
20      Q.   And turning to the next page, can you tell
21  us how many people were in the sample as to
22  self-identified Caucasians?
23      A.   179.
24      Q.   And then finally as to Hispanic, how many
25  people?

**GA832**

3329

1    A.   187.

2    Q.   And then you indicated on the next page a

3 4, that was subsequently updated to include the

4 information on D2?

5    A.   That is correct.

6    Q.   And then on page 85, D19.

7    A.   Correct.

8    Q.   Is it fair -- assume that -- I don't think

9 your study, this document tells us, but do you know

10 how many people were sampled on D2?

11   A.   200.

12   Q.   And how many people were sampled on D19?

13   A.   Oh, excuse me, I think I misspoke.  These

14 are for each of the three population groups.  So,

15 there is 200 for each population group for both

16 markers, for both loci.

17   Q.   And that -- so, when we're looking at,

18 like, that little C on the top, that indicates

19 Caucasian, does it not?

20   A.   Yes.

21   Q.   And then the AA on the top, that's

22 African-American?

23   A.   Correct.

24   Q.   And then similarly Hispanic, right?

25   A.   That is correct.

3330

1    Q.   So what you are telling us is that your

2 extrapolation of frequencies comes from a sampling

3 of self-identified individuals which is 200 or less

4 in the population, correct?

5    A.   It was 200 for those two loci.  It was 87

6 for the Hispanic.

7    Q.   I think 187, isn't it?

8    A.   I'm sorry, 187 for Hispanic.  179 for

9 Caucasian, and 182 for the African-American.

10   Q.   And that -- that study has not been updated

11 since the time that it was done, has it?

12   A.   No, we did this study and then when we

13 started using the D2, D19 and the Identifiler kit

14 that was --

15   Q.   That was what?

16   A.   The testing of the 200 individuals from

17 each of those three populations for D2 and D19 was

18 done before we started using the Identifiler kit.

19   Q.   Okay, but when you tested them on D2 and

20 D19 you didn't see whether they fit within the same

21 frequencies you previously assigned to the other

22 loci, did you?

23   A.   No.

24   Q.   And if more people in Connecticut who

25 define themselves as Hispanics or from other

3331

1 regions, for example, more from central America,

2 would that change your frequencies?

3    A.   It's a population of people who identified

4 themselves as Hispanic.  I don't know what

5 nationality they have.

6    Q.   Your study in Connecticut says nothing

7 about Asians, does it?

8    A.   That is correct.  We chose the three major

9 population groups here in Connecticut.

10   Q.   There nothing about Native Americans, does

11 it?

12   A.   That is correct.

13   Q.   And to get the frequencies that you've

14 testified about, what you are going to do is combine

15 the percentages that are found at each locus,

16 correct?

17   A.   We do what's called the product rule

18 because each of those sites that we test have been

19 shown to be independent of each other.  So,

20 therefore, you can combine, multiply, if you will,

21 those, the result at one locus times the next locus

22 times the next locus.

23   Q.   And your ultimate assessment as to the

24 frequency, that depends, does it not, on how

25 accurate your sampling is?

3332

1    A.   Because the way we do our statistical

2 analysis, it's very conservative.  It does rely on

3 the frequency here, but it's the frequency that we

4 have from that group.  So, any sampling error, if

5 that's what you are referring to, would not affect,

6 would be minimized by the technique that we use in

7 order to do our calculations.  Because we do a

8 combined probability of inclusion for mixtures and

9 we do the random match probability for single source

10 samples.

11   Q.   But ultimately, the accuracy depends on

12 going back to the frequencies that you are assigning

13 them based on your earlier study, right?

14        MS. DAYTON:  Objection.  Asked and

15 answered.

16        THE COURT:  Sustained.

17   Q.   In fact, all estimates about the frequency

18 of any particular population are subject to

19 statistical uncertainty, are they not?

20   A.   I'm not sure what you mean by "statistical

21 uncertainty."

22   Q.   Well, are you familiar with the National

23 Research Council report on the evaluation of

24 forensic DNA evidence?

25   A.   Yes.

**GA833**

3333

1    Q.   And that group is a group with members
2  which are drawn from the National Academy of
3  Science, the National Academy of Engineering and the
4  Institute of Medicine, are they not?
5    A.   I don't specifically remember the author
6  group of that report.
7    Q.   But it is one of the standards referenced
8  in your protocols.
9    A.   Yes, it is.
10   Q.   Is it not?
11   A.   Yes.
12   Q.   And in that sense it is recognized as a
13 kind of authority in your field, is it not?
14   A.   It's used -- the recommendations of it are
15 used, which is why we have the sample size that we
16 do.
17   Q.   Okay.  And let me ask you this.  If we
18 could turn to Exhibit BB for identification.
19 Actually, let me show you this document.
20     What I'm showing you here is -- before we
21 look at BB for identification, this is the book that
22 you are talking about, is it not?
23   A.   Yes.
24   Q.   Okay.  And in particular, I'm asking you to
25 see if you agree -- and I think we can put it back

3334

1  on the screen -- with the conclusions, with the
2  statements in the last paragraph of that, last full
3  paragraph of that reference standard.
4    A.   Yes.
5    Q.   Okay.
6    A.   And that's why in our reports, and as I
7  said, it's approximate.
8    Q.   And, in fact, in terms of what you are
9  concurring with, you agree that estimates of the
10 frequency of a particular profile in a population is
11 subject to uncertainty.
12   A.   Correct.  That's why we don't say it's one
13 in 1,232, we'll say something like approximately one
14 in a thousand.
15   Q.   And you agree that even moderate size DNA
16 databases drawn from samples of several hundred
17 persons are subject to statistical uncertainty.
18   A.   That is correct.  But, again, it also says
19 in that same book that the database size that we
20 used is adequate.
21   Q.   And you also agree that in samples, in
22 smaller ones, the uncertainty is greater.
23         MS. DAYTON:  Objection, irrelevant.
24         THE COURT:  Sustained.
25         MR. SHEEHAN:  I think they have said

3335

1  they rely on it.
2         THE COURT:  No, they're not relying on
3  smaller samples.
4         MR. SHEEHAN:  I think they've relied
5  upon --
6         THE COURT:  You've got to develop that.
7    Q.   Well, in this context, for example, how
8  many people were in that study as far as -- how many
9  Caucasians on AA-2?
10        THE COURT:  Before we go through this,
11 let's take a recess.  We'll take a 15-minute recess.
12        (Jury exited the courtroom.)
13        THE COURT:  We stand in recess.
14        MS. DAYTON:  Your Honor, before you get
15 off the bench -- actually, can we excuse the witness
16 first, only to deal with the subpoena issue.
17        THE COURT:  Okay.  I've got to read your
18 brief.  You filed it at 11:30 last night.  I have
19 not had a chance to read it.  Thank you.
20        (Recess)
21        THE COURT:  All right, Mr. Sheehan, have
22 you seen the government's motion to quash?
23        MR. SHEEHAN:  I have, your Honor.
24        THE COURT:  Are you prepared to respond
25 to it?

3336

1         MR. SHEEHAN:  Yes, your Honor.
2         MS. DAYTON:  Do we want the witness in
3  here for this?
4         MR. SHEEHAN:  I don't think we need the
5  witness, but she's welcome to stay.  Whichever, your
6  Honor, it's up to the court.
7         THE WITNESS:  I would rather leave.
8         MR. SHEEHAN:  Thank you.
9         THE COURT:  All right, go ahead.
10        Go ahead, Mr. Sheehan.
11        MR. SHEEHAN:  Thank you, your Honor.
12    Your Honor, as far as whether or not this is
13 subject to a subpoena, I think the government's
14 argument on that utterly fails insofar as the
15 government disavows, A, it has the material in its
16 possession or, B, that it has any control over the
17 producer of those materials, which is what we see
18 here.  I think that should just be rejected out of
19 hand.  I think the purpose of a subpoena is to get
20 evidence.  The purpose of discovery is to get
21 evidence from the government, and the government is
22 saying, A, they don't have it, and B, it's not their
23 witness, and, C, take a hike.  So, on the A and B
24 analysis, anyway, that part of it fails.
25        As far as the laptop, to the extent that

3337

1   the gubernatorial prerogative precludes them from
2   bringing a laptop to court, I think that
3   gubernatorial prerogative is subject to the Sixth
4   Amendment, as is any other claimed prerogative at
5   issue there.  I think that, why it is relevant in
6   the context of this cross-examination, is what we're
7   going to see here, is that there are -- that the
8   identification of RFUs is important for their
9   protocol, yet the jury is not going to be in the
10  position from any of the produced material to make
11  that assessment.  And I think that goes to
12  cross-examination of this witness.
13          I think the area where I am probably at
14  the most vulnerable is, as far as the time that I
15  made that request.  I think as a practical matter,
16  however, it would have not been a difficult
17  procedure for them to accomplish, either in terms of
18  producing the laptop or alternatively in producing
19  those particular peak heights.
20          I cannot get a witness -- in a criminal
21  case I don't have a request for admissions, I don't
22  have a right to depose, and yet here we are where a
23  person's liberty and life are at stake, and that's
24  why I think that through cross-examination of this
25  witness as to what she was relying upon, I need

3338

1   those materials.
2          THE COURT:  Now, the government attaches
3   a number of documents to its motion that it says
4   indicates that you have the software to get this
5   peak height data yourself.
6          MR. SHEEHAN:  I have access to software
7   that would get the peak height data.  What I don't
8   have is a way of confronting this witness with that
9   peak height data, short of -- and I think that
10  that's really the issue, is if she does not agree to
11  the material, then in terms of cross-examination it
12  has no value.
13          THE COURT:  Now, as I look at the peak
14  heights on the various electropherograms that you
15  have offered into evidence, there is a scale up on
16  the left and the peak heights are measured against
17  that scale.  So, what -- what exactly more than that
18  do you need?
19          MR. SHEEHAN:  Your Honor, the problem
20  with the scale, and I think it really -- the problem
21  with the scale is that it is extraordinarily
22  imprecise depending on -- for example, I think if we
23  could call up -- is Y-3 in evidence?
24          THE COURT:  Yes.
25          MR. SHEEHAN:  Your Honor, what we see on

3339

1   the scale is on the left-hand side, the Y axis, that
2   the witness has testified to --
3          Marie, if you could highlight that.
4          For example, on the second sample, it
5   ranges from zero up to slightly above 390.  But if
6   you drop down one level.  Yeah, on this one here,
7   you see what we're really talking about is somewhere
8   between zero and 750.  And the ability to
9   extrapolate those -- the RFUs from the Y axis vary
10  significantly depending on which particular allele
11  is in question.
12          If we go down one more to the lower one
13  there, we see that there is yet a different scale at
14  play, zero, in this case, up to -- I think that's
15  going to be 300 -- probably up to 600.  And where
16  it's going -- where it will be significant, your
17  Honor, is in terms of the mix -- of the mixtures.
18          Now, I think we put in --
19          THE COURT:  Let me just ask you, are the
20  numbers that you want what she testified she uses
21  for interpretation and that she gets by putting her
22  cursor on the top of the peak?
23          MR. SHEEHAN:  Yes, your Honor.
24          THE COURT:  How many such peaks are we
25  talking about?

3340

1          MR. SHEEHAN:  Well, there is -- with
2   respect to the four samples, and I actually can
3   narrow it a little bit more because she didn't talk
4   about all of the samples, but the ones I have
5   requested are, and I'm interested in, are 9-Z1,
6   13-Z1, 14-1-Z1 and 15-Z2, I think it is.  So, in
7   total, as far as the number of alleles, some of
8   those actually have 5 or 6 alleles at a particular
9   locus, and I'm interested in the peak heights of
10  those.
11          THE COURT:  Now, if the peak heights are
12  above 7500.
13          MR. SHEEHAN:  75.
14          THE COURT:  75 RFUs, what is your
15  interest?
16          MR. SHEEHAN:  Well, your Honor --
17          THE COURT:  Or if they are in the 50 to
18  75 range or if they're below 50, why do you need
19  refinement beyond that?
20          MR. SHEEHAN:  Because, your Honor, what
21  that really is indicating is the -- I think a jury
22  might conclude from that the kind of element of
23  arbitrariness that comes into play in terms of
24  ultimately assessing the number of contributors.
25          THE COURT:  That may be, but if you

**GA835**

3341

1  are -- if you can divine that, which I think you can
2  from these, that they are below 50, 50 to 75, 75 or
3  above, without being able to be more precise within
4  that, why doesn't your argument that all of this is
5  imprecise and is subject to the uncertainty that
6  those --
7              MR. SHEEHAN:  It may be ultimately with
8  this witness we will get that kind of admissions.
9  So, in that sense I have to say I'm not -- I don't
10  know how that's going to proceed, and I would prefer
11  to have this tool available to me for purposes of
12  cross-examination.  It may turn out in the end that
13  I don't -- I think so far we're not at a point where
14  we need it.  As we go along, I think we may become
15  in a different posture.  So right now I can make
16  that representation to the Court and we could -- I
17  had asked the Court then just to see, return to it
18  if necessary.
19              THE COURT:  All right.  I think we
20  should continue now.  I'm curious about the
21  government's standing.  But why don't we just see
22  whether this turns out to be an issue or not.  All
23  right.
24              MR. SHEEHAN:  Thanks, your Honor.
25              THE COURT:  Bring in the jury and please

3342

1  bring Ms. Roy back.
2              (Jury entered the courtroom.)
3              THE COURT:  Please be seated, ladies and
4  gentlemen.  Continued cross-examination of Ms. Roy.
5              MR. SHEEHAN:  Thank you, your Honor.
6      Q.  Ms. Roy, in the case of the number of
7  African-Americans, that was less than 200 that were
8  looked at for the 13 loci, correct?
9      A.  It was 182.
10      Q.  And similarly, as far as the Caucasians,
11  that was less than 200, was it not?
12      A.  It was 179.
13      Q.  And similarly, with respect to the Hispanic
14  population, that was less than 200, right?
15      A.  It was 187.
16      Q.  Okay.  And so it is not greater than
17  several hundred persons, is it, for each of those
18  groups?
19      A.  No, less than -- it's just the numbers that
20  I just stated, which is less than several hundred,
21  which I guess I would define as more than 300.  So,
22  yes, 187 is less than 300.
23              MR. SHEEHAN:  Your Honor, I would at
24  this time, in light of the witness's recognition of
25  the NRC report, and relying on Rule 803(18), just

3343

1  like to read into the evidence the paragraph that I
2  referenced to her that she indicated was something
3  that she concurred with.
4              THE COURT:  BB is a full exhibit, right?
5              MR. SHEEHAN:  I don't think that I -- I
6  could offer it as a full exhibit, your Honor.  I
7  think, however, under 803, I'm -- I'll be happy to
8  offer it as an exhibit, but I think under 803, I'm
9  stuck with reading it.
10              MS. DAYTON:  The government has no
11  objection to it going in as a full exhibit.
12              MR. SHEEHAN:  Thank you, your Honor.
13              THE COURT:  So it will be a full
14  exhibit.  You may read the sections.
15              MR. SHEEHAN:  Could we bring up then
16  double B.
17      Q.  And drawing your attention then --
18              MR. SHEEHAN:  Could I just highlight
19  that last full paragraph on there.
20      Q.  "Such estimates of the frequency of a
21  particular profile in a population are, of course,
22  subject to uncertainty.  Even moderate size DNA
23  databases drawn from samples of several hundred
24  persons are subject to statistical uncertainty, and
25  in smaller ones, the uncertainty is greater.

3344

1              "In addition, the database might not
2  properly represent the population that is relevant
3  to a particular case.
4              "Finally, the assumptions of HW and LE" --
5              MR. SHEEHAN:  And if I might, your
6  Honor, I'm going to ask the witness what they means.
7      Q.  "Although reasonable approximations for
8  most populations, are not exact.  We shall elaborate
9  on this point later, but to anticipate, we believe
10  that it is safe to assume that the uncertainty of a
11  profile frequency calculated by our procedures from
12  adequate databases, at least several hundred
13  persons, is less than a factor of about ten in
14  either direction.
15              "To illustrate, if a profile frequency is
16  calculated to be one in one hundred million, it is
17  safe to say that the true value is almost always
18  between one in 10 million and one in a billion."
19              Do you know what that HW and LE refers to?
20      A.  Yes.
21      Q.  And those are basic population theories,
22  are they not?
23      A.  Yes.
24      Q.  HW is the Hardy-Weinberg principle?
25      A.  Correct.

3345

1     Q.  All right.  And --
2     A.  It's also referred to as the Hardy -- I say
3 Weinberg.
4     Q.  Right.
5     A.  Equilibrium.
6     Q.  And the other one is the Linkage
7 Equilibrium?
8     A.  Correct.
9     Q.  Now, let me ask you, do you agree with
10 that, there is an uncertainty factor of about ten in
11 either direction?
12     A.  Yes, I would agree with that.
13     Q.  And I take it when it's a big number, that
14 may not make much difference, right?
15     A.  Are you referring to the less than seven
16 billion?
17     Q.  Yeah.
18     A.  That's our ceiling.
19     Q.  Right.  Let me ask you this.  I think
20 you've already been asked a little bit on direct,
21 but what we're talking about in this case for almost
22 all of the samples that you have testified about,
23 other than the single source samples, is what is
24 probably -- is what is touch DNA, is it not?
25     A.  Could you just say that again.  I'm sorry,

3346

1 I kind of -- all the samples that I tested?
2     Q.  Well, you've looked at some single source
3 samples that came from blood or buccal swabs, right?
4     A.  That is correct.
5     Q.  Putting aside the known samples that you
6 looked at --
7     A.  Correct.
8     Q.  -- the other samples that you have
9 testified about are what would probably fall into,
10 that are what would fall into that category of touch
11 DNA, are they not?
12     A.  Except for the samples that I detected
13 either blood-like stain or human blood on.
14     Q.  Okay.  Now, when you end up with a mixture,
15 that means that that DNA on that object is from more
16 than one person, right?
17     A.  The DNA profile that I detected from that
18 sample is contributed by more than one person.
19     Q.  Okay.  And you've talked about all of the
20 parts of our body where you can recover DNA from.
21     A.  I don't think I talked about all of the
22 parts.
23     Q.  Well, with the exception of red blood
24 cells, pretty much all of our cells have -- are made
25 up of DNA, are they not?

3347

1     A.  They have DNA that was used in the type of
2 testing done here.
3     Q.  Okay.  Saliva for example, that would have
4 DNA.
5     A.  The cells that are sloughed off from the
6 inside of your mouth would be in the saliva and they
7 would contain DNA.
8     Q.  Similarly hair?
9     A.  The hair root contains DNA.
10     Q.  And our skin cells, those have DNA.
11     A.  Sloughed off skin cells contain DNA for our
12 testing purposes.
13     Q.  And you talked about the fact that some
14 people shed more than others.
15     A.  Yes.  The nature of a person's skin varies;
16 it can also vary during the time of year.
17     Q.  So, not only one person might differ from
18 another, but one person themselves might shed more
19 at one time than at another?
20     A.  That is correct.
21     Q.  Your ultimate tests for DNA, they can
22 detect the presence or the absence of DNA on an
23 item, but they don't tell us how it got there, do
24 they?
25     A.  No, that is correct.

3348

1     Q.  And it can be deposited on an item in many
2 ways, can it not?
3     A.  Many ways?
4     Q.  Well, for example, an individual can touch
5 an item, that might leave DNA?
6     A.  That is correct.
7     Q.  If somebody, for example, drank from a
8 glass, they might leave DNA on the glass.
9     A.  That is correct.
10     Q.  And if somebody else then drank from the
11 same glass before it had been washed, if you were to
12 swab the whole glass you might find that there was
13 DNA from two people or from multiple contributors on
14 it, right?
15     A.  That is correct.
16     Q.  But your DNA analysis would not tell you
17 who drank first from the glass or who drank second;
18 it wouldn't differentiate, would it?
19     A.  No.
20     Q.  And then we talked about hats or garments.
21 If somebody wore a hat and then somebody else wore
22 the same hat you might find both of their DNA on
23 that hat.
24     A.  Yes, that's a possibility.
25     Q.  Now, DNA can also get transferred to an

**GA837**

3349

1  object by another person, can it not?
2      A.   Well, there is a limit to that, what we
3  refer to as secondary transfer.
4      Q.   And it can happen that one person can
5  transfer DNA to an object that was received from
6  another person, correct?
7      A.   It has to be a -- it's not through what we
8  call casual secondary touch.
9      Q.   Well, if I were to shake hands with a
10 person and then grasp an object.
11     A.   It would depend a lot on the nature of that
12 person's skin, how long you touched it, how
13 vigorously you shook it.
14     Q.   Those are kind of imponderables, right?  I
15 mean it's hard to say.
16     A.   Well --
17     Q.   But all we know is that it happens, does it
18 not?
19     A.   In general, that secondary transfer when
20 it's what we consider a casual secondary transfer,
21 there is -- you don't get like a full profile from
22 that original person.  So there is very -- there are
23 limitations on that detection of the secondary
24 transfer, as there are on the primary transfer.  But
25 you are doing one step removed from that primary

3350

1  transfer.  So, what we're talking about here is
2  somebody who probably handled this pitcher earlier
3  today and then me touching it and then having their
4  DNA, which then could be later swabbed off my hand
5  and still being able to detect that person who
6  handled that pitcher.
7      Q.   And that could happen, right?
8      A.   Correct, but there is additional factors
9  there.  It's almost like you are times-ing the
10 factors by two as opposed to the direct touching of
11 something.
12     Q.   Let's say I wipe my face with a towel and
13 then somebody else used that towel to wipe their
14 face.  It's possible that my DNA might be on that
15 person.
16     A.   That's correct.  Again, it depends on how
17 vigorously you deposited your cells and then how
18 vigorously they then handled that towel and
19 vigorously touched that towel and picked it up.
20     Q.   And it would depend on how much of a
21 shedder, for example, I was, the first time?
22     A.   Correct.
23     Q.   But in that circumstance if my DNA ended up
24 on the person, I might never have touched that
25 person, correct?

3351

1      A.   There, again, is a limitation as to what we
2  would detect on that secondary person.  It's not
3  just like a casual contact between the two
4  transfers.
5      Q.   In fact, one of the challenges of DNA is
6  that it has gotten much more sensitive over the
7  years, has it not?  Our ability to detect DNA has
8  gotten much more refined.
9      A.   Well, I think sensitive, there is some
10 increase in sensitivity, but basically I think the
11 number of items that have been realized that you
12 have potential information on them, those have
13 increased.
14     Q.   We can analyze, find and analyze small and
15 smaller amounts of DNA.
16     A.   Well, there is still a limitation as to
17 getting a result, and there was some increase in
18 sensitivity, but I think overall it's been more of a
19 recognition as to what we can test and get
20 information from.
21     Q.   And we can, in fact, test smaller amounts
22 than we used to be able to do.
23     A.   Well, a long time ago before STRs and
24 amplification was in place, they had to use large
25 amounts of intact DNA, but since the use of the PCR

3352

1  or the amplification, that was like a major change,
2  shift in the amount of DNA that was able -- you were
3  able to detect and get a DNA profile from.
4      Q.   And because of the increased sensitivity of
5  our DNA training, the lab has very stringent
6  procedures to prevent contamination in the lab, does
7  it not?
8      A.   Yes.
9      Q.   From the lab's perspective, contamination
10 is a bad thing, is it not?
11     A.   Yes.  We don't want to add any DNA to the
12 sample that wasn't present on the evidence
13 originally.
14     Q.   And so in your section, the DNA section,
15 for example, to prevent contamination you have to do
16 the mixes in a very special room when you are making
17 your mixes to do your DNA testing.  You don't do
18 that out in the work area, do you?
19     A.   No.  Are you talking about the
20 amplification step?
21     Q.   Yeah.
22     A.   Yes, that's done in a separate room from
23 all of the other procedures, and we use abiological
24 hood which prevents cells or -- it just is more
25 protection for our samples.

3353

1    Q.   And I believe there was testimony about the
2 fact that when you were doing some of the testing,
3 when you were doing the testing on some of the items
4 in this case, you were being observed by another DNA
5 scientist.  Do you remember that testimony?
6    A.   Yes.
7    Q.   And your protocol is such that that other
8 person could not even be in the same room with you
9 when you were doing the testing, right?
10    A.   That's the policy that was in place at that
11 time.
12    Q.   And the reason for that is the worry that
13 that person's DNA might somehow -- might contaminate
14 the sample?
15    A.   Well, it started that way because we
16 introduced mitochondrial DNA testing into the
17 laboratory, and so at that point we did not want any
18 outside individuals in our laboratory area.
19    Q.   And the testing in this case, with the
20 exception of one item of evidence, was not
21 mitochondrial testing, was it?
22    A.   That is correct.
23    Q.   But even with respect to the other testing
24 that was done, the other DNA testing that was done
25 in this case, your protocols are so careful that

3354

1 nobody else was allowed in the room when you were
2 doing that testing, right?
3    A.   That's not true.  There were other analysts
4 there in the laboratory.  It's just outside people
5 from the laboratory coming in and being in the
6 laboratory area.
7    Q.   Okay.
8    A.   We work in the same room, but we're using,
9 you know, different hoods and we're -- it's not like
10 no one is allowed to enter a room when someone else
11 is working.
12    Q.   When you are doing that, for example, when
13 you are working on the DNA material, you have to
14 wear gloves, right?
15    A.   Correct.
16    Q.   The benches, they have to be bleached
17 between whenever you change a sample, right?
18    A.   Correct.
19    Q.   And you also wear masks?
20    A.   That is correct.
21    Q.   And despite all of these very special
22 precautions that were taken in this case, one of the
23 items of evidence was contaminated in the lab, was
24 it not?
25    A.   At the time that that contamination

3355

1 occurred, that section did not also have to follow
2 the rule of wearing a mask, as I recall.
3    Q.   Okay.  And that section was the trace
4 section.
5    A.   Correct.
6    Q.   And the way that you ultimately discovered
7 this contamination was that you compared the
8 profiles of the staff members with the profiles from
9 the samples.
10    A.   The way it was ultimately discovered was
11 that the CODIS manager put all of the staff members,
12 that's my understanding, into the staff database.
13 Before when I checked -- did someone say something?
14    Q.   No, no, the machine just -- I bumped it,
15 I'm sorry.
16    A.   Before that it only had, as I recall, DNA
17 personnel.  So later when it was increased to cover
18 the staff, then that profile hit on the staff
19 member.
20    Q.   And this, in fact, was only discovered
21 years after that item in question had been tested,
22 right?
23         MR. SHEEHAN:  If we could bring up
24 Exhibit FF.
25    Q.   If I might draw your attention to

3356

1 Defendant's Exhibit FF for identification on your
2 screen over there.
3    A.   Oh, I'm sorry.
4    Q.   That's okay.  You tested the item in
5 question in February of -- February 7th of 2007, did
6 you not?
7    A.   Well, according to this, it got transferred
8 into my custody in January of 2007, but I would have
9 to look at my worksheet to when I started doing the
10 testing.
11    Q.   Okay.
12    A.   Do you want me to look at my worksheet?
13    Q.   Sure.  Thank you.
14    A.   I started my examination on 16-Z1 on
15 February 7, 2007.
16    Q.   And ultimately what happened in that
17 sample, it got consumed in the testing, right?
18    A.   Yes, under the defense observer
19 observation.
20    Q.   And as far as you know, you didn't do
21 anything to contaminate that item, did you?
22    A.   No.
23    Q.   It came to you contaminated, correct?
24    A.   Correct.
25    Q.   And it wasn't until May of 2008 that you

3357

```
1    issued a report on that, right?  Actually, I'm
2    sorry, it wasn't until January of 2009 that the
3    contamination was discovered.
4            MR. SHEEHAN:  If you could bring up HH.
5       Q.  If I could draw your attention to
6    Defendant's Exhibit HH for identification on your
7    screen.  Do you recall when it was that it was
8    matched to the staff index?
9       A.  I would have to look.  It says here
10   January 9, 2009.
11      Q.  So, that's almost two years after you
12   initially started testing the item?
13      A.  Yes.
14      Q.  And the results -- that 16-Z1 that we -- I
15   think you've testified to yesterday, that was a
16   swabbing of a latex type of glove that was recovered
17   at the crime scene.  Or is that a vinyl type glove?
18   I think it was a vinyl type glove.
19      A.  I don't know that.
20      Q.  All right, it was a swabbing from a glove
21   that was recovered at the crime scene, right?
22      A.  Yes, swabbing of both sides of glove.
23      Q.  And what you ultimately concluded was that
24   profile had, of the ultimate sample, that contained
25   the profile from one of your staff members?
```

3358

```
1       A.  She was included as a contributor to the
2    DNA profile from 16-Z1.
3       Q.  And as a result, your ultimate scientific
4    conclusion was that this sample was now -- your
5    conclusion as to the possibility of certain of the
6    contributors being -- I'm sorry.  Your ultimate
7    conclusion was that parts of the sample were the --
8    parts were now inconclusive, right?
9       A.  I changed in the amended report some of my
10   conclusions to inconclusive.
11      Q.  And after you learned -- did it first come
12   to your attention that that -- were you the first
13   person in the lab after the CODIS administrator to
14   learn that the sample had been contaminated?
15      A.  I don't believe I was.
16      Q.  Were you aware of any steps that were taken
17   in the lab to determine how the contamination took
18   place?
19      A.  How it took place?
20      Q.  Yes.  How did it get contaminated?
21      A.  Well, I don't want to assume anything, but
22   since it was the DNA profile of the person who
23   examined the evidence, and since she wasn't around
24   when I was testing the evidence because she's not
25   part of DNA, it's most likely happened while she was
```

3359

```
1    examining the evidence.
2       Q.  And that can happen by something as small
3    as a sneeze, can it not?
4       A.  Yes, if you sneezed on an item it is
5    possible that you could deposit enough DNA that
6    might be later detected.
7       Q.  Or if you coughed in the vicinity of an
8    item.
9       A.  Yes, again, it depends on what also is on
10   that item.  If there is a big bloody stain and you
11   cough on it, your addition of your small amount of
12   DNA most likely would never be detected in a cutting
13   from that heavily stained sample.  But if you
14   coughed or sneezed on something that you are later
15   swabbing to get touch or handler DNA, it could be
16   detected.
17      Q.  And are you aware of, by the way, of
18   scientific studies showing that contamination can
19   take place simply by speaking around an object?
20      A.  Well, that's why we now wear masks because
21   if you have to say something you don't want to
22   deposit your DNA on something.
23      Q.  Okay.  So our sensitivity is such that even
24   people speaking in close proximity of an object
25   might deposit their own DNA on it?
```

3360

```
1       A.  It's possible depending on how close they
2    were or how much.  I would guess it would be some
3    kind of particulate coming out.
4       Q.  Now, the way you -- the way this was
5    actually detected, this contamination, was that the
6    staff profiles, you had those available for
7    comparison purposes, right?
8       A.  Yes.
9       Q.  As far as you know, you do not have or were
10   not given any DNA profile for any of the people who
11   may have collected the items of evidence, were you?
12      A.  No.
13      Q.  You weren't given any DNA profiles for, for
14   example, the people of the ambulance group that may
15   have first seen the bodies.
16      A.  No.
17      Q.  So, you cannot tell this jury whether or
18   not those individual profiles might also be in these
19   samples.
20      A.  Unless I'm given a known sample to compare
21   to a DNA profile, I can't tell you whether some
22   individual could be included as a contributor.
23      Q.  With respect to almost all of the samples
24   in this case, the way that the machine was
25   programmed to identify the genetic markers was by
```

**GA840**

3361

```
1   the length of those genetic markers, right?
2       A.   I think you mean the software.
3       Q.   Yeah.
4       A.   Yes.
5       Q.   Okay.  And the software -- what the
6   software is measuring, when we were looking at the
7   15 and the 17 or the 21, 27, what those numbers are
8   referencing is a number in relation to the length of
9   the segment of material that we're looking at,
10  right?
11      A.   It's in relationship to the number of
12  4-base pair repeats that are present in that
13  fragment.
14      Q.   And that length is measured by counting the
15  number of base pairs?  What does 17 correspond to?
16      A.   The number of 4-base pair repeats, 17.  So
17  that fragment would have 17 4-base pair repeats.
18      Q.   Okay.  When you say 4-base pair repeats,
19  the different components of DNA, they're assigned
20  particular kinds of letters, are they not?
21      A.   Okay, the, what's called the genetic code
22  are bases, that's kind of what makes up the --
23  should I give a description of DNA?  Would that
24  help?
25      Q.   Well, I guess -- let me ask you this.  When
```

3362

```
1   you say the different things.  We're talking about
2   -- well, there is an A.  For example, there's an A,
3   a T and a C and a G.  Those are letters that stand
4   for something in particular in relation to DNA,
5   right?
6       A.   Correct.  Those are the building blocks of
7   DNA and they represent the -- well, nucleotides.
8   Instead of -- you're being so non-scientific that
9   you are not making any sense anymore.
10      Q.   I'm not?  It's quite possible I'm not, so I
11  appreciate your --
12      A.   I didn't mean you, but it's so hard to find
13  a word that's non-science and then still answer the
14  question correctly.
15      Q.   Okay.
16      A.   So those letters represent the genetic code
17  of DNA.  And so what I mean by 4-base pairs are four
18  of those A, T, G, C they can be all different
19  combinations, but it's the repeat of those 4-base
20  pair units and that is reflected in the number of
21  the genetic marker.
22      Q.   Okay.  And that's what is measured by
23  the -- the length of those repeats, as it were,
24  that's what's ultimately measured by the Identifiler
25  machine.
```

3363

```
1       A.   The number of repeats and the amplified DNA
2   fragment is measured by the software and it's given
3   a designation, that number.
4       Q.   Okay.  Now, for example, in D3, which is
5   something that we've looked at with respect to a
6   couple of these samples, D3S, that's a particular
7   location on the gene, is it not?
8       A.   Yes, D3 is what I would refer to as the
9   address or location on the DNA.
10      Q.   And in there there is a genetic marker
11  which is 17 repeat units long.
12      A.   Correct.
13      Q.   And, in fact, in this case the tests done
14  on some of the items of evidence showed a 17 at D3S,
15  did they not?
16      A.   Correct.
17      Q.   That was true with respect to 9-Z1?
18      A.   I will have to check each of those.
19      Q.   Well, let's just start with, you recall
20  that it was there on a number of items, right, that
21  17?
22      A.   On D3?
23      Q.   Yeah.
24      A.   Yes, I can see where I have a 17 included
25  on some of the results that I obtained.
```

3364

```
1       Q.   Okay.  And in this case, Mr. Aquart and --
2   both Azibo and Azikiwe Aquart had a 17 at D3, did
3   they not?
4       A.   Yes, they do.
5       Q.   Okay.  And one of the reasons -- if that 17
6   in D3S, if they had not had that 17, it would cast
7   doubt on whether they were contributors or could
8   have been contributors to this sample.
9       A.   Well, we look at the entirety in a profile.
10  I mean, that would be one thing to consider when
11  we're doing the comparison.
12      Q.   Okay.  There is -- there are, in fact, two
13  different genetic markers which are 17 repeat units
14  long, are there not?
15      A.   I know that it doesn't necessarily mean
16  that the repeats are exactly the same and still it
17  can be called as a 17.
18      Q.   And that's what we talked about, that's
19  what is talked about when they're talking about
20  prime alleles, is it not?
21      A.   I'm not familiar with that term.
22      Q.   But you are familiar with the fact that
23  there are some genetic markers which are labeled as
24  17 that are different from others?
25      A.   I know that in general that you can have a
```

3365

```
1    genetic marker be given, say, whatever number, and
2    someone else could have that same number, but that
3    doesn't necessarily mean that the sequence is the
4    same between the two.  I'm not sure of 17.  I don't
5    have the list at hand.
6         Q.   And you are familiar with John Butler, are
7    you not?
8         A.   Yes, I am.
9         Q.   And on his book on forensics on DNA typing
10   is one of the standard books in your field, is it
11   not?
12        A.   It's a book that is referred to, yes.
13        Q.   Okay.  And if I were to show you Professor
14   Butler's, a section of Professor Butler's book --
15             MR. SHEEHAN:  In fact, why don't we
16   bring that up as KK-1.
17        And let me hand you the book here so we
18   know what we're looking at.  In particular, I'm
19   asking you about the D3S, and the different alleles
20   which are both 17 base pairs long.
21        A.   Are you talking about 17 and 17 prime?
22        Q.   Yes.
23        A.   Okay, I see that.
24        Q.   All right.
25        A.   I'm sorry.
```

3366

```
1         Q.   That's okay.
2         A.   It's hard to see.
3         Q.   It is hard to see.  And there is both a 17
4    and a 17 prime at D3S, is there not?
5         A.   Correct.
6         Q.   Okay.  And let me show you Exhibit LL for
7    identification.  Does Exhibit LL accurately reflect
8    the difference between those two alleles, two
9    genetic markers?
10        A.   Yes.
11             MR. SHEEHAN:  I would offer Exhibit LL
12   at this time, LL-1 at this time, your Honor.
13             THE COURT:  All right, that is a full
14   exhibit.
15        Q.   LL has both a 17 and then a 17, that little
16   apostrophe, that's called a 17 prime, is it not?
17        A.   It says up here 17 and 17 prime, so.
18        Q.   Well, it has basically two different
19   genetic markers, does it not?
20        A.   I'm not sure what you mean by that
21   question.  It's been distinguished in this book as
22   17 and 17 prime because someone has sequenced those
23   fragments and learned that the sequences do not
24   match.
25        Q.   Okay.  So what that means is that, in fact,
```

3367

```
1    what we know scientifically is that there are two
2    different genetic markers, but both of which appear
3    as 17 units long.
4         A.   17 repeats, yes.
5         Q.   I'm sorry, 17 repeats, right?
6         A.   Correct.
7         Q.   And --
8             MS. DAYTON:  Your Honor, may we approach
9    for a moment?
10            THE COURT:  Yes.
11            (Sidebar conference)
12            MS. DAYTON:  Defense has something up on
13   the screen as a full exhibit which, you know, much
14   of this I'm just looking at for the first time.  It
15   was given to me yesterday and I, as you saw, it's
16   inches of documents and it says on the bottom its
17   source, Butler Forensic DNA.  Well, it's not an
18   accurate representation of what's on here.
19            MR. SHEEHAN:  It isn't?
20            MS. DAYTON:  No, because it says 17 and
21   17 prime it says 135-135-133-133 it has different
22   things up here.  I don't think it should be an
23   exhibit because it has a source on there and it's
24   not --
25            MR. SHEEHAN:  Well, the only thing
```

3368

```
1    that's different is that I don't have this reference
2    to this part.  The rest is the same, and I don't
3    have the references, the technical reference.
4             MS. DAYTON:  You don't have any of this
5    stuff at the top.
6             MR. SHEEHAN:  What I have is the ABI
7    profiler, which is what they were using, in fact.  I
8    can clarify that with them.
9             THE COURT:  If what you really want to
10   do to be accurate is just pull out this, all the way
11   across then we have -- she testified and I thought
12   she was using this and comparing it to that, and
13   said that was right.
14            MR. SHEEHAN:  Yeah.
15            THE COURT:  So I don't know what is
16   inaccurate about it.
17            MR. SHEEHAN:  Those are two -- and I can
18   go through this with the witness, but the program is
19   just a way of -- it's a machine that they use as it
20   goes to the Profiler.  They in fact use the
21   Profiler.
22            MS. DAYTON:  They don't anymore, they
23   use the Identifiler.
24            MR. SHEEHAN:  No, at this time they were
25   using --
```

3369

```
1           MS. DAYTON:  At what time, you haven't
2    made that remotely clear.
3           THE COURT:  All right.  The bottom line
4    was that she said when she sequenced the fragments
5    of 17 and 17 prime they found a different sequence.
6           MR. SHEEHAN:  Yes.
7           THE COURT:  That's the bottom line of
8    it.
9           MR. SHEEHAN:  Right.  That's all I
10   really -- that's my interest.  I can take out the
11   reference to the ABI Profiler if you want, but.
12          THE COURT:  We can tidy up the exhibit.
13   Let's go.  Move on.
14          (Sidebar concluded)
15   Q.   Does the repeat structure, I know on our
16   chart on that exhibit that we have there, which is
17   LL-1, there is a reference to the ABI Profiler and
18   there an indication as to base pairs under that.
19   Can you tell us what that means in the context of
20   this exhibit?
21   A.   That means that when you do the Profiler
22   testing on those two genetic markers they will run
23   at 133 base pairs.
24   Q.   And does the Identifiler, do you know
25   whether that would identify -- is that different
```

3370

```
1    from the Profiler?
2    A.   They did do some modifications of some of
3    the loci as to how they will size out to try to --
4    because it's an amplification of 15 loci at the same
5    time, so I am not sure.  But I think D3 is not one
6    of the ones that had to be adjusted, but I can't say
7    for sure.
8    Q.   But in any case, you have no reason to
9    believe that the repeat structure would be any
10   different.
11   A.   No, that would still migrate.  Whether it
12   was adjusted to migrate a different way, they would
13   still have the same number of base pairs.
14          MR. SHEEHAN:  Your Honor, just for the
15   record, what I would propose doing, we'll modify
16   this to delete the reference to base pairs which
17   might be a little bit confusing in that regard.
18          THE COURT:  All right.
19   Q.   And in this case, insofar as you -- if you
20   would leave that there, I'm going to go through a
21   couple more things.
22   A.   Okay.
23   Q.   In this case, with the exception of one of
24   the samples where you did the mitochondrial
25   analysis, all of the other samples were analyzed
```

3371

```
1    with reference to the length of the genetic marker,
2    right?
3    A.   That is correct.  The number of 4-base pair
4    repeats is how the designation is given to the
5    genetic marker.
6    Q.   They were not analyzed with reference to
7    the sequence of those genetic markers, were they?
8    A.   That is correct.
9    Q.   Now, in this case no attempt was made to
10   determine whether or not the 17 that was found in
11   the samples was either a 17 or a 17 prime?
12   A.   That is correct.
13   Q.   There is technology that would allow you to
14   measure the sequence of the genetic markers, is
15   there not?
16   A.   We don't do that in our laboratory.
17   Q.   I understand you don't do it.  But the
18   technology is available in the field to determine
19   the difference between a 17 and a 17 prime, is it
20   not?
21   A.   Well, that's how they discovered this, yes.
22   Q.   Okay.
23   A.   Because that technology exists.  That's why
24   they have that information there, but that's not
25   something we would do in the laboratory, a forensic
```

3372

```
1    DNA laboratory.
2    Q.   On this sample?
3    A.   On any sample we would not be sequencing
4    each of those fragments.
5    Q.   But you have, in fact, sequenced some of
6    the items, at least one of the items evidence in
7    this case.
8    A.   I didn't do it.  No, I'm not trained in
9    sequencing.
10   Q.   It was done as far as you know.
11   A.   Yes.
12   Q.   Correct?  That was the mitochondrial
13   analysis ultimately done on a hair that was
14   recovered on a piece of nylon stocking, right?
15   A.   There was a hair.  I don't recall exactly
16   which submission it was recovered from.
17   Q.   And in these samples you also found a 15
18   allele -- I'm sorry, a 15 genetic marker at D3S, did
19   you not?  And by these samples, I mean 9-Z1 is one
20   where you found a 15.
21   A.   Yes, I found a 15 on D3 from 9-Z1.
22   Q.   Also on 13-Z1?
23   A.   Yes.
24   Q.   14-Z1?
25   A.   D3 yes.
```

3373

```
1       Q.   And 15-Z2?
2       A.   Yes, I detected a 13, 14, 15 and 16, yes.
3       Q.   And asking you to look at page 567 of
4  Dr. Butler's book, and showing you -- I'm asking you
5  to look at -- I think it might be easier for you on
6  the book, but bringing up Exhibit KK-2 for
7  identification, there is, in fact, both a 15 and a
8  15 -- I'm sorry a 15 and a 15 prime for D3S, right?
9       A.   Yes.
10      Q.   And I'm going to ask on your screen if we
11 could bring up Exhibit LL-2?
12      A.   On my screen?
13      Q.   Well, you've got the book there, but I'm
14 going to ask you to compare that with the sequence
15 noted by Dr. Butler as far as the 15 and the 15
16 prime, and if you could tell us whether that exhibit
17 is accurate insofar as it has the correct repeat
18 structure for those two different genetic markers?
19      A.   Well, the base pair number is wrong.
20      Q.   The what?
21      A.   The base pair numbers are wrong.
22      Q.   Let's disregard the base pair because we're
23 going to take those out anyway.
24      A.   The sequences are correct.
25      Q.   All right.
```

3374

```
1            MR. SHEEHAN:  Your Honor, subject to
2  deletion of the base pair, the reference to base
3  pairs, I would offer this.
4            MS. DAYTON:  The government objects.
5  It's not accurate.
6            MR. SHEEHAN:  Do you know what I'll do,
7  your Honor?
8            THE COURT:  What was the ID number on
9  that exhibit?
10           MR. SHEEHAN:  That ID number is KK-2.
11 Oh, it's gone.  Your Honor, we have
12 redacted that reference to those base pairs and it's
13 now in front of the witness as Exhibit KK -- I'm
14 sorry, LL.  We'll call this LL-2, just substitute
15 that.
16      Q.   So the repeats is accurate and the repeat
17 structure is accurate on that as presented?
18      A.   Yes, it looks accurate.
19           MR. SHEEHAN:  I would offer that, your
20 Honor.
21           THE COURT:  Any further voir dire?
22           MS. DAYTON:  No, your Honor, thank you.
23           THE COURT:  All right.  LL-2 then is a
24 full exhibit.
25      Q.   So, on the jury screen right now, again,
```

3375

```
1  what we see is that each of those -- that those
2  genetic markers are different, are they not?
3       A.   One is represented as a 15 and the other
4  one is 15 prime and they have their sequence, their
5  repeat structure is different.
6       Q.   Okay.  And again, in this case you don't
7  make -- you did not make -- now, both Azibo and
8  Azikiwe Aquart, they have a 15 at D3, do they not?
9       A.   Yes, they both have a 15.
10      Q.   And you did not determine whether that 15
11 that they both present was either a 15 or a 15
12 prime?  You don't distinguish between those, do you?
13      A.   No.
14      Q.   And similarly, you don't determine whether
15 or not the 15 in the sample was a 15 or a 15 prime.
16      A.   No.
17      Q.   Your assumption is that they're the same,
18 right?
19      A.   Well, all I have is that it's a 15 number
20 of base pair repeats.  So I'm looking at a 15 and
21 comparing it to a 15.  I haven't done any additional
22 testing to distinguish it from a 15, from a 15
23 prime.
24      Q.   And if the sample, for example -- let me
25 ask you, assume for a moment that the sample was a
```

3376

```
1  15 prime and an individual had a 15.  Those would be
2  two different markers, would they not?
3       A.   That is correct.
4       Q.   Which your testing would not distinguish.
5       A.   No, it doesn't distinguish between a 15 and
6  a 15 prime.
7       Q.   Now, similarly, with respect to four of the
8  samples you found a 35 at D21, did you not?
9       A.   Could you tell me which of those samples
10 are --
11      Q.   I'm sorry, really I said four, but I meant
12 three.  13-Z1, there is a 35 there?
13      A.   Okay, can I look it up?
14      Q.   Sure.
15      A.   Under which locus?
16      Q.   D21.
17      A.   13-Z1 under D21 there is a 35, that is
18 correct.
19      Q.   Similarly on 14-Z1?
20      A.   Yes, there is also a 35 there.
21      Q.   And on 15-Z2, there was a 35 in the sample.
22      A.   Yes, I also detected a 35 for 15-Z2 under
23 the locus D21.
24      Q.   And you found a 35 for both Azibo and
25 Azikiwe, did you not?
```

3377

```
 1        A.   Yes, they both have a 35 genetic marker
 2   under D21.
 3        Q.   And turning again to Dr. Butler's text on
 4   this subject at pages 571 and 572, there is -- there
 5   are alleles at D21 that are 35 units in length, but
 6   have a different sequence, do they not?  That's
 7   exhibit KK-3 and KK-4.  I think that one is KK --
 8   I'm sorry, let me do it this way.
 9        Let me ask you to first look at, my exhibit,
10   the one I'm showing you.  Let's look at KK-3.
11             MR. SHEEHAN:  Can we bring that up
12   separately.
13        Q.   That starts at D21 at the top, right?
14   That's what we're looking at there.  And then it
15   kind of goes over to the next page.
16        A.   Right.  That's page 571.
17        Q.   I'm on page 572.  And I apologize for the
18   confusion.  There is also a 35 and a 35 prime?
19        A.   That is correct.
20        Q.   Showing you Exhibit LL-3.  Does Exhibit
21   LL-3 reflect the difference sequence of those two
22   items, those two genetic markers?
23        A.   Yes, that's the same that's listed in his
24   book.
25             MR. SHEEHAN:  I would offer LL-3 at this
```

3378

```
 1   time, your Honor.
 2             THE COURT:  All right, this is about 35
 3   and 35 prime?
 4             MR. SHEEHAN:  Yes, your Honor.
 5             THE COURT:  That's accurate, the
 6   sequencing is accurate in that LL-3 that's up on
 7   your screen?
 8             THE WITNESS:  It's the same that's
 9   presented in the book.
10             THE COURT:  In the book, all right.
11   It's a full exhibit.
12        Q.   And at this time just showing to the jury,
13   again, we see the different repeat structure for the
14   two differing genetic markers, right?
15        A.   Right.
16        Q.   And, again, in this case there was no
17   testing whether the -- whether the genetic markers
18   were a 35 or 35 prime?
19        A.   No.
20        Q.   Correct?
21        A.   No sequencing was done.
22        Q.   No sequencing.  All right.
23        And finally with respect to just -- for
24   three of the samples -- for two of the samples that
25   I'm asking about, 14-Z1 and 15-ZZ, you found a 29 in
```

3379

```
 1   that sample at D21, did you not?
 2        A.   Okay.  You are going to have to give me --
 3        Q.   I'll give you a second, I'm sorry.  14-Z1.
 4        A.   Okay, I see that.  You are asking about the
 5   29 in which locus?
 6        Q.   Yep.
 7        A.   D21?
 8        Q.   Yes.
 9        A.   Yes, for 14-1-Z1 there is 29 genetic marker
10   at D21.
11        Q.   Just take a look at that page, you'll also
12   see that was one you identified was in common with
13   Azikiwe Aquart, right?
14             MS. DAYTON:  I'm going to object as
15   vague.
16             MR. SHEEHAN:  Vague?
17             THE COURT:  Do you want to rephrase that
18   question.
19             MR. SHEEHAN:  Sure.  Let me take a look
20   here.
21        Q.   Does Azikiwe Aquart have a 29 at D21?
22        A.   Yes, he does.
23        Q.   I'm sorry.  The question was muddled, I
24   guess.  And turning then -- oh, so you found it at
25   14-Z1 and did you also find it at 15-Z2?
```

3380

```
 1        A.   D21, I did detect 29 genetic marker for
 2   15-Z2.
 3        Q.   Okay.  And asking you to turn to
 4   Dr. Butler's book at 572, which is exhibit KK-4 for
 5   identification, do you see there that there is also
 6   a -- there are two different genetic markers at D21
 7   which are 29 units in length?
 8        A.   Yes.  29 repeats.
 9        Q.   And those two different genetic markers,
10   they have different sequences, right?
11        A.   Yes.  I can see they have been sequenced
12   and there is differences.
13        Q.   All right.  Bringing up -- if you could
14   just leave Dr. Butler's book there, I'm bringing up
15   LL-4 for your consideration here for identification.
16   Does Exhibit LL-4 accurately reflect the differing
17   repeat structures?
18        A.   Yes, that accurately reflects what's in his
19   book.
20             MR. SHEEHAN:  And I would offer it at
21   this time, your Honor.
22             MS. DAYTON:  I'm going to object because
23   the witness has no personal knowledge about any of
24   these exhibits.  She's just saying this is what's in
25   his book.
```

**GA845**

3381

```
1            THE COURT:  She said that that's a text
2   that they rely on.  She said that's what's in the
3   book.  You can redirect her on it.
4            MS. DAYTON:  But she also said she
5   doesn't do sequencing and she doesn't do it at all,
6   she has no experience.
7            THE COURT:  She uses the sequencing
8   results in her analysis and her identification.
9            MS. DAYTON:  No, she doesn't.  She says
10  she doesn't use the sequencing.
11           THE COURT:  Do you want to ask her some
12  questions on the voir dire about these things or
13  reserve it for redirect?  Because what he's offering
14  this for is that, under the learned treatise,
15  Butler, this is what it says.  And then the analysis
16  that goes on from there goes on from there.  So I
17  think the objection should be overruled recognizing
18  that this is simply a less dense visualization of
19  what is in the learned treatise with respect to
20  markers found at certain loci.  Right?
21           MR. SHEEHAN:  Yes, your Honor.
22           THE COURT:  In this case.  So I'm going
23  to, recognizing that that's a limited offer, permit
24  LL-4 to come in and you may proceed with your
25  examination.
```

3382

```
1            MR. SHEEHAN:  Actually is that KK?
2            THE COURT:  I thought it was LL-4.
3            MR. SHEEHAN:  It is LL-4.  I apologize.
4   Q.   All right, that's LL-4.  And again, looking
5   for the jury's benefit, what we see there is that
6   there are two different genetic markers at 29 which
7   both are 29 repeats, correct?
8   A.   They both have -- they're both designated a
9   29 and their repeat structure is different.  Well,
10  according to this book one is designated 29 and 29
11  prime.
12  Q.   Right.  Okay.  And Dr. Butler's book, if I
13  might, in fact what that indicates is that other
14  scientists have found this and sourced the
15  differing -- the different sequences, right?
16  A.   Well, there is references listed for the
17  sequences, yes, for some of them.  Some of them are,
18  it looks like they're not published.
19  Q.   All right.  And Dr. Butler was one of the
20  architects of the STR system, was he not?
21  A.   The architect?  I'm not sure about who they
22  give credit to for the STR system.
23           MR. SHEEHAN:  May I have one second,
24  your Honor?
25  Q.   He is one of the recognized preeminent
```

3383

```
1   authorities in that field, in the field of DNA.
2   A.   Yes, he's well-known in the field of DNA.
3   Yes, I would agree to that.
4   Q.   Okay.
5   A.   Forensic DNA testing, I should say.
6   Q.   Are you aware he's one of the designers of
7   the STR base, the database for STR sequencing in the
8   DNA field?
9   A.   I'm not sure what you mean by the STR
10  database.
11  Q.   And he was a very active with the FBI for
12  many years.
13  A.   I'm not really familiar with that
14  individual's background.  I am familiar with that
15  book and his earlier edition of that book, and I
16  know he's well-known in the forensic DNA community.
17  But his resume, so to speak, I'm not -- I haven't
18  studied up on that.
19  Q.   All right.  Now, I would like to move on to
20  the specific samples, some of the specific samples
21  here.  And in particular, starting with 9-Z2.  That
22  was a swabbing from a latex fragment.
23  A.   Could I have a moment to put my reports in
24  order?
25  Q.   Sure.
```

3384

```
1   A.   Thank you.
2            Okay, thank you.
3   Q.   Thank you.  That 9-Z2, that is a swabbing
4   from a latex fragment, is it not?
5   A.   Swabbing from latex type material from
6   submission 9.
7   Q.   Okay.  And you testified that the -- well,
8   I'm not sure, I want to see if I get this right.
9   That the odds of a random person being a contributor
10  to that profile is one in seven billion with respect
11  to the African-American population.
12  A.   The expected frequency of individuals who
13  could be a contributor to the DNA profile from item
14  9-Z2 is less than one in 7 billion in the African
15  American, Caucasian, and Hispanic populations.
16  Q.   And obviously there is not 7 billion people
17  in Connecticut, is there?
18  A.   No.
19  Q.   And you've also testified that
20  Mr. Johnson's profile is included as a contributor
21  to that sample.
22  A.   Mr. Johnson is included as a contributor to
23  the DNA profile from 9-Z2.
24  Q.   And what that means is that potentially he
25  could be a contributor to that sample?
```

3385

1    A.   That's correct.

2    Q.   And his profile is not the same as the

3 sample, is it?

4    A.   No.

5    Q.   And if I could bring up exhibit MM for

6 identification.

7         MR. SHEEHAN:   Actually let's look at NN.

8         THE COURT:   Actually, we are at 12:30,

9 Mr. Sheehan.

10        MR. SHEEHAN:   Thank you, your Honor.

11 I'm sorry.

12        THE COURT:   So we are going to close up

13 for the day, we'll back at 9:30 tomorrow morning.

14 Enjoy the pretty day.   Leave your notebooks here.

15 Thank you very much.

16        (Jury exited the courtroom)

17        THE COURT:   All right, a couple things.

18 The first is could I ask defense counsel to give me

19 a tabbed exhibit book, please.   It's really very

20 difficult to go through and find the exhibits you

21 are referring to with the speed with which you refer

22 to them.   So if I may ask you for that.

23        MR. SHEEHAN:   We will do that, your

24 Honor.

25        THE COURT:   Secondly, as I understand

3386

1 your subpoena, you are looking for the measure of

2 the peak heights for 9-Z1, 13-Z1, 14 --

3         MR. SHEEHAN:   1-Z1.

4         THE COURT:   1-Z1 and 15-Z2.

5         MR. SHEEHAN:   Yes.

6         THE COURT:   And that information is

7 contained in the database that the lab has in its

8 laptop computer, which you, with Gene Mapper can't

9 pull up.

10        MR. SHEEHAN:   That's correct.   I don't

11 have -- I can't confront this witness with that.

12        THE COURT:   You have Gene Mapper?

13        MR. SHEEHAN:   No, well, it's -- I have

14 access to Gene Mapper.   It's a $10,000 program or

15 more.   I don't have it -- it's not like you can just

16 put it on your machine.   And it's a proprietary

17 thing.   I have access to it through another person.

18        THE COURT:   And --

19        MR. SHEEHAN:   But I don't have --

20        THE COURT:   And Ms. Roy described that

21 she pulls up the electropherogram result that shows

22 the peaks and she runs her cursor over it, and

23 placing her cursor at the point of the peak will be

24 able to read the number -- the Y number.

25        MR. SHEEHAN:   Yes, your Honor.

3387

1         THE COURT:   You can't do that?

2         MR. SHEEHAN:   Correct.   I couldn't do

3 that -- well, I could not do that with Ms. Roy here

4 because I don't have an ability to manipulate that

5 data without the underlying programs.   What we got

6 from the lab was all of their electronic data.   It's

7 not readable unless you have the special programming

8 material -- programming available.   It's readable in

9 the lab.   I have access to somebody who can read it.

10        THE COURT:   And so why is it that you

11 can't do the same thing she would do with your

12 cursor and put it on the heights and come up with

13 the same data?

14        MR. SHEEHAN:   Your Honor, I could,

15 except that then I've got -- I don't think it's

16 really --

17        THE COURT:   Oh, then you say you can't

18 confront her because she has neither that figure

19 before her or the laptop that she could be

20 questioned.

21        MR. SHEEHAN:   Right.   That's the

22 practical problem.

23        THE COURT:   So if the way you described,

24 Ms. Roy, how you get the exact peak height by moving

25 your cursor and it will give you that data when you

3388

1 stop in the right place.

2         THE WITNESS:   Well, I was answering that

3 question as to when I'm looking at it and analyzing

4 it.   You can set the software, which you are aware

5 of, because I know because I saw some of your data.

6         MR. SHEEHAN:   No, there is no question.

7         THE WITNESS:   You are aware of it, you

8 can set the software to label the peaks with the

9 peak height.

10        THE COURT:   The problem is he could do

11 that, but then it wouldn't be -- unless you were

12 willing to just accept those numbers, he can't use

13 that in his cross-examination with you because you

14 haven't -- you don't have those numbers that you

15 would have from your own data.   So that's where the

16 wrinkle is.

17        THE WITNESS:   But we don't -- our normal

18 case jacket, which I provided the State's

19 attorney -- the federal state's attorney's office

20 with, was all the worksheets and that's how we

21 display our data without the peak heights.   That's

22 our normal working way we display the data.

23        THE COURT:   I understand that.   The

24 question that -- the defense wants to go beyond just

25 how you normally display the data to see what more

3389

```
1    that data shows, could show, that is, the peak
2    heights.
3              THE WITNESS:  But that you could see on
4    the electropherograms.
5              THE COURT:  You can see, but not with
6    precision and there are different scales used with
7    different ones.  So that some may go up to 450, some
8    may go to 750.
9              So, here is my thinking on this.  I don't
10   think that the defendant's subpoena is a discovery
11   subpoena.  It seems to me it's the cyberworld
12   version of bringing all your documents and data in
13   your file, which, as I understand it, can only be
14   done if the laptop itself is being brought.  So, for
15   instance, if you subpoenaed a doctor to bring all of
16   her files and records and testing and so forth, that
17   could be brought physically into court, and that's
18   commonly done.  Here we have -- we don't have that
19   all in hard copy, and so the subpoena is not a
20   fishing expedition, it is directed to the witness's
21   file and data on which she formed her opinions.
22             So, it seems to me that we have two
23   choices.  It is, first of all, a precise request, it
24   is not broad-based discovery, such as bring all your
25   documents on something or other.  The defendant
```

3390

```
1    can't get this particular number in a way that
2    enables him to cross-examine this witness because
3    he's using another source of that data than she
4    would have in front of her.  The purpose has been
5    identified, given that peak heights is associated
6    with identification of markers.
7              The degree of precision that's necessary
8    to do that, I don't know.  But it seems to me that
9    either Ms. Roy should bring the laptop and that
10   subpoena is a -- it compels that.  And the lab nor
11   the governor nor anybody has moved to quash.  Or, as
12   an alternative, in order to respect the
13   gubernatorial directive, which I presume was
14   directed at computers being left in cars and getting
15   stolen and personal data gets disseminated, if
16   they're not confident that they can just have
17   Ms. Roy bring it here and then take it back, then
18   she should run those numbers for just those four
19   samples and just the peak heights in those four
20   samples.
21             There has not been any showing or claim
22   that this is so onerous.  The issue has been
23   percolating for several days.  So, I think that the
24   subpoena appears, except for the timing, and the
25   timing, while at best unfortunate, doesn't seem
```

3391

```
1    impossible to accomplish because it could be
2    accomplished by simply bringing the laptop here.
3              So, I'm going to deny the motion to
4    quash.  I'm not going to address the issue of
5    standing, although I think there are serious issues,
6    and ask you, Ms. Roy, to please -- you make that
7    choice which you want to do, just bring the laptop
8    here or bring the data for those four specific
9    samples.  Okay?
10             MS. DAYTON:  Your Honor, can I respond
11   at all?
12             THE COURT:  You have a long brief on the
13   thing and I've looked at it.
14             MS. DAYTON:  I realize, your Honor, but
15   you haven't addressed, with all due respect, all the
16   issues that Ms. Roy faces.  Number one, she has been
17   directed not to do this.
18             THE COURT:  That may be.  The compulsion
19   of a subpoena supersedes that, doesn't it?
20             MS. DAYTON:  I understand they have a
21   legal department.
22             THE COURT:  They do, and we have not
23   heard from them.
24             MS. DAYTON:  Well, they're addressing
25   it.  It has to be determined by the Attorney General
```

3392

```
1    not just by the legal department in particular.
2              THE COURT:  Okay.
3              MS. DAYTON:  So --
4              THE COURT:  I will address it when they
5    address it, but they've had three days to address
6    it.  Normally, I get, from the state, responses
7    within hours.
8              MS. DAYTON:  Your Honor, initially when
9    this was brought up the Court's response was that it
10   was -- that their request was untimely and
11   voluminous and that's -- so it wasn't dealt with
12   immediately on Monday.  When it --
13             THE COURT:  I said there was nothing
14   before me.
15             MS. DAYTON:  Right.
16             THE COURT:  There is now a motion for
17   contempt.  It is that odd nature of Rule 17(c) that
18   doesn't expressly contemplate a motion for
19   enforcement of a subpoena.
20             MS. DAYTON:  Right.  And you had --
21             THE COURT:  I am simply acting on what
22   is before me.  And if the legal department for the
23   lab or for the State of Connecticut wants to do
24   something that responds to a lawfully issued
25   subpoena, they can do so.  What I see this as, is
```

3393

```
1   not so voluminous and capable of being complied with
2   merely by bringing the laptop, which is neither
3   unreasonable nor onerous.
4          MS. DAYTON:  Okay.  A couple things.
5   One, my understanding when you spoke to us, meaning
6   both counsel, yesterday, was that it was not before
7   you in writing and you wanted it in writing.
8          THE COURT:  Right.
9          MS. DAYTON:  Which is why I stayed up
10  until 11:30.
11         THE COURT:  I understand.  We were all
12  pushing --
13         MS. DAYTON:  And the defense did
14  nothing.  They did not respond in writing, they've
15  produced no need for this except that they want to
16  look at this.  That's number one.  Number two, they
17  have it as evidenced by the fact that they printed
18  it out.
19         THE COURT:  That's not -- Mr. Sheehan
20  says that's not evidence that they have it or that
21  they can produce it in a fashion that allows her to
22  be examined.  In other words, if she brought her
23  laptop and he did all of the data work, and he says
24  now, isn't it correct that the peak height in sample
25  number something or other at location -- at locus
```

3394

```
1   number such and such, she would then be able to say
2   yes; otherwise, she can't.
3          MS. DAYTON:  Right, but some of what
4   he's asking for goes beyond what Ms. Roy relied
5   upon.  So he's asking her to print out peak heights
6   for peaks that fall below the protocol and the
7   threshold for the laboratory.
8          MR. SHEEHAN:  That's actually incorrect,
9   your Honor.  And the reason why -- what happened is
10  in an effort to resolve this, which I tried to do, I
11  gave the government --
12         THE COURT:  That's why we're going to
13  leave the issue where it is now, and if there is
14  further developments we can --
15         MS. DAYTON:  So if I can just clarify
16  for Ms. Roy, the understanding is she'll only print
17  out the peak heights she relied upon, period.
18         MR. SHEEHAN:  That's all I asked for in
19  the subpoena.
20         THE COURT:  That's fine.
21         MS. DAYTON:  Okay.
22         THE COURT:  I think that's all that was
23  ever requested.
24         MR. SHEEHAN:  Let me just check what I
25  asked for.
```

3395

```
1          THE COURT:  We need to be in recess.
2          (Proceedings concluded 2:45 )
```

3396

```
1                    I N D E X
2   WITNESS                                      PAGE
3   SUSAN JOHNSON
4   Direct Examination by Ms. Rodriguez-Coss    3275
5   Cross-Examination by Mr. Smith              3287
6
7   CHRISTINE ROY
8   Continued cross-Examination by Mr. Sheehan  3289
9
10
11
12         I certify that the foregoing is a
13  correct transcript from the record of proceedings in
14  the above-entitled matter.
15                  5/13/11
16                   Date
17
18             /S/  Sharon Montini
19             Official Reporter
```

3397

```
1              UNITED STATES DISTRICT COURT.

2                 DISTRICT OF CONNECTICUT

3    * * * * * * * * * * *      *
                                *
4    UNITED STATES OF AMERICA,  *  Case No 6cr160(JBA)
                                *
5             Plaintiff,        *
                                *
6          vs.                  *
                                *
7    AZIBO AQUART               *  May 13, 2011
                                *
8             Defendant.        *
                                *
9    * * * * * * * * * * * *     *

10                  TRIAL TRANSCRIPT

11                    VOLUME XVI

12   BEFORE:  THE HONORABLE JANET BOND ARTERTON U.S.D.J.,
                                        and jury
13
     Appearances:
14   FOR THE GOVERNMENT:  ALINA REYNOLDS, ESQ
                          TRACY DAYTON, ESQ.
15                        PETER MARKLE, ESQ.
                          JACABED RODRIGUEZ-COSS
16                        United States Attorney's Office
                          915 Lafayette Blvd
17                        Bridgeport, CT 06604

18
     FOR THE DEFENDANT    MICHAEL SHEEHAN, ESQ
19   AZIBO AQUART:        Sheehan & Reeve
                          139 Orange Street
20                        New Haven CT 06510

21                        JUSTIN SMITH, ESQ.
                          383 Orange Street
22                        New Haven, CT 06511

23   Court Reporter:    Sharon Montini, RMR

24   Proceedings recorded by mechanical stenography,
     transcript produced by computer
25
```

3398

```
1              THE COURT:  Good morning, counsel,

2    ladies and gentlemen, Mr. Aquart.  Please be seated.

3         Now, I've received a motion to preclude

4    the admission of a summary chart.  Mr. Smith, what

5    is this about?

6              MR. SMITH:  Your Honor, I was provided

7    with a few summary charts by the government.  I've

8    attached all of those as exhibits to the motion.

9              THE COURT:  Okay, what is the context in

10   which they are going to be used?

11             MR. SMITH:  My understanding is that the

12   government is going to call FBI analyst by the name

13   of Dellavolpe.

14             MR. MARKLE:  Dellavolpe.

15             MR. SMITH:  And she would testify as to

16   her analysis of some of the phone records.  Mr.

17   Markle provided me Exhibit A, which I think is the

18   graph charts, which I have no objection to.  I've

19   checked their accuracy against the records I have

20   been provided and I'm fine with those.  It's Exhibit

21   B with the names to which I'm objecting.

22             MR. MARKLE:  Your Honor, not to -- well,

23   maybe to shortcut this, the chart that Mr. Smith has

24   an issue with, we're reworking that.  So, I think it

25   might address some of his concerns.
```

3399

```
1              THE COURT:  Okay.

2              MR. MARKLE:  Maybe not all of them, but

3    hopefully it will be provided to him as soon as I

4    can get it.  We started redoing it.

5              MR. SMITH:  As soon as I receive it,

6    I'll take a look at that.

7              THE COURT:  Work in progress.  I will

8    hold off on your motion then.

9         All right, anything else before we bring

10   the jury in?

11             MR. SHEEHAN:  No.  I understand that Ms.

12   Roy has -- it was represented to me that the peak

13   heights were going to be turned over.  I have

14   obviously not talked to Ms. Roy this morning.

15             THE COURT:  All right, shall we bring

16   her in and then we'll bring the jury in.

17             MR. SHEEHAN:  That would be great, your

18   Honor.

19             THE COURT:  Okay.

20        Good morning, Ms. Roy.  How are you

21   today?

22             THE WITNESS:  Okay.  How are you?

23             THE COURT:  Welcome back, I should say.

24   I understand that you were able to bring some peak

25   heights with you.  Is that right?
```

3400

```
1              THE WITNESS:  Yes, I did.

2              THE COURT:  Great.  Thank you very much.

3    I know that you must feel a little like the knot in

4    the middle of the tug-of-war game, but I regret

5    that.  There are, however, incredibly important

6    matters at issue here.  All right then.

7              MR. SHEEHAN:  Your Honor, before the

8    jury is brought --

9              THE COURT:  We are ready to proceed.

10             MR. SHEEHAN:  I wonder if I might have a

11   copy of those peak heights.

12             THE WITNESS:  I prepared four copies.

13             THE COURT:  Thank you very much.

14             THE WITNESS:  I'll just keep my

15   original.

16             MR. SHEEHAN:  Yep.

17             THE WITNESS:  These are yours.  These

18   are all the copies.

19             THE COURT:  All right, and Mr. Sheehan

20   how much longer do you anticipate with Ms. Roy?

21             MR. SHEEHAN:  We might go til after

22   lunch, your Honor.

23             THE WITNESS:  Okay, here they are.

24             THE COURT:  All right.

25             THE WITNESS:  These I had to print on
```

3401

```
1   separate pages, it's a gene typing.
2             MR. SHEEHAN:  Now, when you say there is
3   four, should I --
4             MS. DAYTON:  Is there a copy for me?
5             THE WITNESS:  Yeah, I put the four
6   copies in there.
7             THE WITNESS:  I'm sorry, would you bring
8   the 14-1-Z1 back.  Oh, I just have an extra copy
9   here.
10            THE COURT:  I'd be glad to have one.
11            MR. SHEEHAN:  Yes, I'm going to hand
12  that up, your Honor.  There is two pages 9-Z1.
13            Does your Honor have a set of all of
14  them?  I'm just trying to figure out.
15            THE COURT:  Of the new material, no, I
16  don't have any of it.
17            And who is the government's next witness
18  after Ms. Roy concludes?
19            MS. DAYTON:  Probably John Andrews.  It
20  depends on what time she concludes.  We had to
21  make --
22            THE COURT:  John Andrews is who?
23            MS. DAYTON:  He is a police officer who
24  will testify regarding some phone information, your
25  Honor.  We had to make a lot of changes.  We didn't
```

3402

```
1   expect the length of the cross-examination.
2             THE COURT:  Okay.
3             MR. SHEEHAN:  I think this is a complete
4   set, your Honor.
5             THE COURT:  All right, so are we ready
6   to bring the jury in?
7             MR. SHEEHAN:  We are.
8             THE COURT:  All right.
9             (Jury entered the courtroom.)
10            THE COURT:  Good morning, ladies and
11  gentlemen.  I think it's easier if you keep standing
12  so he can get past you.
13            JUROR:  We're going to have to put a
14  rope on him.  Good morning.  Please be seated.
15            All right, we'll continue with
16  cross-examination of Ms. Roy by Mr. Sheehan.
17            MR. SHEEHAN:  Thank you, your Honor.
18            C H R I S T I N E   R O Y,
19  Having previously affirmed, was examined and
20  testified as follows:
21  CONTINUED CROSS-EXAMINATION
22  BY MR. SHEEHAN:
23  Q.   Good morning, Ms. Roy.
24  A.   Good morning.
25  Q.   When we broke off yesterday I had just
```

3403

```
1   started to ask you questions about your testing of
2   9-Z2.  And that was a testing of fragment from latex
3   type material, is it not?
4   A.   Swabbing of latex type material from
5   submission 9
6   Q.   And your testimony was Mr. Johnson's
7   profile was included in that sample.  The profile
8   attributed to Mr. Johnson was also found in that
9   sample, right?
10  A.   He's included as a contributor to the DNA
11  profile from 9-Z2.
12  Q.   All right.  And in point of fact, however,
13  his profile is not the same as the sample, is it?
14  A.   That is correct.  That's why I said that it
15  was consistent with a mixture.
16  Q.   Okay.
17            MR. SHEEHAN:  I'd ask at this time if we
18  could bring up Exhibit M -- actually, if I could
19  bring up Exhibit NN.
20  Q.   And I'd ask you to compare that with the
21  profile of the sample which I believe is on your --
22  in your report.  And if you have a chance while you
23  are looking at that to compare it with Mr. Johnson's
24  profile.
25  A.   This is accurate.
```

3404

```
1   Q.   All right.
2             MR. SHEEHAN:  I would offer it at this
3   time, Defendant's Exhibit NN.
4             THE COURT:  Hearing no objection, it's a
5   full exhibit.
6   A.   I just want to note that the way 9-Z2, it's
7   9-Z2 and here you have 9-Z-2, but it's the same
8   item.
9   Q.   Okay, thank you.  I appreciate that.
10            So, looking at this sample, this chart
11  which is Exhibit NN, that is the comparison of the
12  profile for Mr. Johnson and the profile in 9-Z2, is
13  it not?
14  A.   It's the results for the two samples, yes.
15  Q.   And I would ask if we could just look at
16  D19.  The difference between Mr. Johnson's sample
17  and 9-Z2 is precisely in that locus, is it not?
18  A.   That is correct.
19  Q.   Because Mr. Johnson's sample does not have
20  a 12 genetic marker, right?
21  A.   That is correct.
22  Q.   Okay.  And what this means is that there is
23  an allele -- a genetic marker in that sample that is
24  not accounted for by Mr. Johnson, by Mr. Johnson's
25  the profile, right?
```

3405

1    A.   Yes.  The genetic marker 12 that's found in
2  9-Z2 under D19 could not have come from Efrain
3  Johnson.
4             MR. SHEEHAN:  Could we take down the
5  builds, please, and just go back to Exhibit NN.
6    Q.   But in every other respect the genetic
7  markers in the two samples are identical, are they
8  not?
9    A.   They have the same number listed, yes.
10   Q.   And this tells us, does it not, one of
11 three things.  It tells us that that sample might be
12 a mixture, sample 9-Z2.  That's where you said it's
13 consistent with being a mixture, right?
14   A.   Yes, that's what I called it, consistent
15 with being a mixture.
16   Q.   Okay.  And it also might mean that this is
17 a single source sample from somebody other than Mr.
18 Johnson.
19   A.   Well, it's consistent -- when you look at
20 the DNA profile it's consistent with being a
21 mixture.
22   Q.   All right.  And when you say it is
23 consistent with being a mixture, the only
24 difference, I take it, is at that one locus, namely
25 D19?

3406

1    A.   Yes.
2    Q.   All right.  And a third possibility is that
3  12 is not really an allele, a genetic marker, is it
4  not?
5    A.   No, that's not a possibility.  Under our
6  protocols it's a genetic marker.
7    Q.   Okay.  The reason why you indicated that
8  9-Z2 is consistent with being a -- actually you have
9  different terminology that you use in your reports
10 for dealing with mixtures, do you not?
11   A.   That is correct.
12   Q.   And one set of terminology that you use is
13 that you say that the sample is a mixture.
14   A.   We say the sample -- the results
15 demonstrate that that DNA profile from that item is
16 a mixture.
17   Q.   But that's not what you are saying with
18 respect to 9-Z2, correct?
19   A.   That's right.  I've said it's consistent
20 with being a mixture.
21   Q.   Which means that you don't know whether it
22 is a mixture or not?
23   A.   There is evidence that it is a mixture, and
24 it's only at one site that there is evidence of a
25 mixture, not two sites.  We have to have two sites

3407

1  with evidence of a mixture in order to call it -- in
2  order to say that it demonstrates it's a mixture.
3  So, at this profile there is evidence that it was a
4  mixture at D19.
5    Q.   And under your criteria you cannot say
6  whether or not it is a mixture, correct?
7    A.   Right.  If I --
8    Q.   Thank you.  I'm sorry?
9    A.   If we have, as I said, two sites that we
10 test evidence of a mixture, then we use the term
11 demonstrates it's a mixture.  But because I had one
12 site here with evidence of a mixture, we call it
13 consistent with a mixture.
14   Q.   All right.  So if 9-Z2 is, in fact, a
15 mixture, and if one were to conclude that Mr.
16 Johnson was a contributor to that sample, that would
17 mean that at least one other person's DNA is on that
18 sample, right?
19   A.   That's correct, that profile is consistent
20 with two contributors to it.
21   Q.   And you compared the profiles of the other
22 people in this case to 9-Z2, did you not?
23   A.   Yes.
24   Q.   And you excluded them as contributors to
25 this sample, correct?

3408

1    A.   Correct.
2    Q.   So, if there was another contributor to
3  that sample, that was from somebody that you have
4  not tested, right?
5    A.   That's correct.
6    Q.   And --
7    A.   Or there is not enough.  A person is
8  eliminated if their DNA profile is not there or it's
9  not to a detectable level.  So just having -- when
10 you look at only one site like this D19 where you
11 have a 12, 13 -- I'm sorry a 12, 13, you have to
12 look at the overall profile, what's there, what
13 evidence you have, in order to make an inclusion or
14 cannot be eliminated statement.
15   Q.   Okay.  And if there was another contributor
16 to that sample, their profile would have had to
17 match Mr. Johnson's at all of the remaining 14 loci,
18 wouldn't it?
19   A.   No.
20   Q.   Or else you didn't pick up any genetic
21 information from those -- from that sample with the
22 exception of that one locus.
23   A.   Yes, that's a possibility.  And as we know,
24 D19 is a short -- one of the shorter fragments of
25 DNA that we look at.  So, D19 is one of the sites

**GA852**

3409

1  that when we have a mixture, as in this type of
2  mixture where there is very little evidence of the
3  second contributor, it often shows up in D19.
4      Q.   And there is a match.  What you are telling
5  us is that all of the other genetic material
6  vanished at every site with the exception of D19.
7      A.   That's a possibility if you have a very --
8  if the second contributor is contributing only a
9  very small quantity of DNA to that DNA mixture, you
10 can only detect that individual at maybe one site or
11 just a few sites.  It's possible.  This is not
12 uncommon to have seen that the only evidence of the
13 mixture is at D19.
14     Q.   Did you pick up any minor peaks in your
15 analysis of the data related to 9-Z2?
16     A.   If I had they would have been indicated on
17 that result with an asterisk.
18     Q.   And I would ask you to -- do you happen to
19 have the electropherograms in 9-Z2 in your work
20 file?
21     A.   Yes.
22     Q.   Could I ask you to take those out for a
23 second, please.
24          MR. SHEEHAN:  I think this is PP -- if
25 we could bring up PP No. 1 and PP No. 3.  And

3410

1  probably --
2      Q.   Do you have those?  I'm sorry.
3      A.   I have them, yes.
4      Q.   And taking a look at Defendant's Exhibit
5  PP-I for identification, is that the ultimate -- the
6  electropherogram that you relied upon in making your
7  analysis in this case on 9-Z2?
8      A.   Yes, that's part of the result.
9      Q.   Is that -- I'm sorry, we have the wrong one
10 in front of you.
11          MR. SHEEHAN:  Could I ask that we bring
12 up what is number PP-I.  Yes.
13     Q.   Okay, is this the first of the -- looking
14 again at PP-I, is that the first of the loci?
15     A.   Yes, that's for the results.
16     Q.   Okay.  And --
17          MR. SHEEHAN:  I would offer that at this
18 time, your Honor.
19          THE COURT:  You called this PP-1?
20          MR. SHEEHAN:  Yes PP-1.
21          THE COURT:  All right, full exhibit.
22          MR. SHEEHAN:  And could I have the
23 lights go down a little bit, your Honor.
24          THE COURT:  Yes.
25     Q.   So that is the electropherogram that

3411

1  we're -- part of the electropherogram with respect
2  to the testing of that sample, correct?
3      A.   That is correct.
4      Q.   And at D8 we see one allele for the 12,
5  right?
6      A.   Yes.
7      Q.   One allele for the 30?
8      A.   Yes.
9      Q.   And two alleles at D7, right?
10     A.   That is correct, 11, 12.
11     Q.   And the little bump to the left of the 11,
12 what is that?
13     A.   That looks like a stutter peak.
14     Q.   Okay.  And then we see two alleles for CSF,
15 right?
16     A.   That is correct.
17     Q.   And those -- the D7 and the CSF, they
18 appear to be in balance with each other?
19     A.   Yes.
20     Q.   And by "in balance" what we mean is that if
21 you get a source -- if you are looking at peaks, the
22 genetic markers for an individual and it has --
23 displays two genetic markers at one locus, you would
24 expect them to be about within 70 percent of each
25 other, 65 to 70 percent of each other?

3412

1      A.   That is correct.
2      Q.   I wonder if --
3          MR. SHEEHAN:  Do we have the next page
4  available?
5      Q.   I'll put that up here and just ask you to
6  take a look at what I believe will be PP No. 2.  Is
7  that the second page of the printout there?
8      A.   Yes, it is.
9          MR. SHEEHAN:  I would offer that at this
10 time, your Honor.
11          THE COURT:  And you have called that?
12          MR. SHEEHAN:  PP-2.
13          THE COURT:  2.  Full exhibit.
14     Q.   Okay, and looking at that second row, that
15 again is for 9-Z2, is it not?
16     A.   That is correct.
17     Q.   And the 15 and 17 were the markers that
18 were called for D3S?
19     A.   D3, yes.
20     Q.   And what are those two peaks next to them?
21     A.   Those are stutter peaks.
22     Q.   And at THO we have one peak, right?
23     A.   Yes, 9.3.
24     Q.   Can you tell us what the little peak is,
25 the little indication next to that, just to the left

3413

```
1   of it?
2       A.   Just to the left of it is the stutter peak.
3       Q.   Okay.  You are going to consistently find
4   stutter peaks, are you not?
5       A.   That is correct.
6       Q.   And then if we could shift now -- and I
7   take it on the remaining two -- three loci there we
8   have the two peaks that are called, right?
9       A.   Yes, at D13, D16 and D2 there are two peaks
10  called at each of those sites.
11      Q.   And there is no -- there is no indication
12  of minor peaks on those, is there?
13      A.   No.
14      Q.   Okay.  And then that brings us to the next,
15  PP No. 3.  It should come up there on your screen.
16  And that is the third chart associated with this,
17  the actual sample itself?
18      A.   Yes.
19      Q.   And that's accurate?
20      A.   Yes.
21           MR. SHEEHAN:  I would offer that, your
22  Honor.
23           THE COURT:  All right, full exhibit.
24      Q.   Now, D19 is where we see the one extra
25  genetic marker, right?  Extra in the sense of
```

3414

```
1   meaning inconsistent with Mr. Johnson.
2       A.   That is correct, the 12 could not have come
3   from Mr. Johnson.
4       Q.   Okay.  And that is above the calling --
5   that is above the level associated with the
6   identification of alleles, right?
7       A.   That is correct.
8       Q.   And it is below the stutter threshold at
9   D19?
10      A.   That's incorrect.
11      Q.   Oh, I'm sorry, it's correct?
12      A.   Incorrect.
13           THE COURT:  Incorrect.
14      Q.   I apologize.  It is above the stutter
15  threshold at D19?
16      A.   That's correct.
17      Q.   Okay.  Which means that you're confident
18  that that is actually somebody's genetic material?
19      A.   That's correct.
20      Q.   But it's your testimony that that could
21  be -- that that -- you could just have one marker
22  appearing at that point from another individual?
23      A.   That's correct.
24      Q.   Let me ask you to turn your attention to
25  13-Z1, your analysis of that.  That was a swabbing
```

3415

```
1   from a fragment of latex.  In your testimony you
2   concluded that -- or in your opinion you concluded
3   that that sample is a mixture, correct?
4       A.   Correct.
5       Q.   Unlike -- it's not consistent with a
6   mixture, this one is a mixture, in your opinion.
7       A.   The results demonstrate that 13-Z1 is a
8   mixture.
9       Q.   Okay.
10           MR. SHEEHAN:  At this time I would like
11  to bring up Exhibit KK -- the four Ks.
12      Q.   It's on your screen.  And this was a
13  chart -- do you recognize this particular chart?
14  Was this --
15      A.   Could you scroll down to the bottom of it
16  so I could look at it.
17      Q.   Well, let me just, this was a chart you
18  had?
19      A.   Yes, I would like to look at my initials.
20      Q.   Okay, I'm sorry, I think I put -- I don't
21  think this is your chart, but it might be.
22      A.   That will refresh my memory that I actually
23  reviewed it.
24      Q.   I see.  I can represent to you that this is
25  the same copy that was shown to you previously by
```

3416

```
1   the government, but I --
2            MS. DAYTON:  It wasn't.
3            MR. SHEEHAN:  Oh, it wasn't?  Then I
4   apologize.
5       Q.   You probably haven't seen this.  Let me ask
6   you if 13 -- if this chart with four Ks, if that
7   accurately reflects the genetic markers that you
8   found in your analysis of that subject?
9            THE COURT:  That subject meaning 13-Z-1?
10           MR. SHEEHAN:  I'm sorry, that sample
11  13-Z1.
12      A.   Yes, 13-Z1 is for the genetic markers that
13  are listed there, that's accurate.
14           MR. SHEEHAN:  I would offer at this time
15  Exhibit KKKK.
16           THE COURT:  Just as to that particular
17  sample?
18           MR. SHEEHAN:  Yes, your Honor.
19           THE COURT:  Well, there is all sorts of
20  other stuff on there.
21      A.   I only looked at 13-Z1.  It will take me a
22  little time to look at all of it.
23           THE COURT:  Why don't we keep that for
24  identification.
25           MR. SHEEHAN:  May I have one second,
```

**GA854**

3417

```
1    your Honor.
2       Q.   I'm wondering if you could take a look at
3    the other markers.
4       A.   Could I have the paper in front of me?
5       Q.   Yes, I apologize for that.  I think that
6    would be easier.
7       A.   Can I write on it?
8       Q.   Yeah.  Here, let me give you a copy to
9    write on.
10      A.   It's all right if I put checkmarks?
11      Q.   That's fine.
12      A.   I'm done.
13      Q.   Why don't you keep that.
14      A.   Okay.
15      Q.   And that's accurate?
16      A.   Yes.
17      Q.   Thank you for going through that.
18           MR. SHEEHAN:  I would offer it at this
19    time, your Honor --
20           THE COURT:  All right, if you are
21    satisfied that is accurate, KKKK is a full exhibit.
22      Q.   So, for the members of the jury, what we're
23    looking at here, KKKK, that reflects the genetic
24    markers identified at 13-Z1 in the bottom right of
25    each of the two columns, right?
```

3418

```
1       A.   I'm sorry, I didn't realize you were
2    talking to me.  I thought you were explaining to the
3    jury.
4       Q.   I can't really do that right yet.  I'm
5    trying to do it through you.
6       A.   I'm sorry, I thought when you said --
7       Q.   No, I apologize, I didn't mean to.  13-Z1,
8    that's the bottom row, and that reflects the genetic
9    markers on the sample, right?
10      A.   Yeah, you have it 13-Z, but I think you
11    meant to put 13-Z1.
12      Q.   I did, and I apologize for that.
13      A.   And the swabbing of the partial latex
14    glove, the partial latex glove should actually be in
15    quotes.
16      Q.   Okay.  But with the exception of those
17    typographical issues, are the genetic markers that
18    you just checked out, those are accurate?
19      A.   Those are correct.
20      Q.   And similarly where we have the listing,
21    those are the one -- the seven samples that you
22    examined in the context of this case?
23      A.   The seven known samples, yes.
24      Q.   Now, what we can see there, for example
25    D21, and looking at the sample itself, there are
```

3419

```
1    five genetic markers identified at that locus, are
2    there not?
3       A.   Correct.
4       Q.   And, in addition, you have the asterisks
5    for the minor peaks.
6       A.   Yes, two minor peaks were detected.
7       Q.   And if those minor peaks in fact were
8    genetic material from somebody, that would mean
9    there had to have been at least 1, 2, 3, 4, 5 --
10    well, that would mean that -- all right.  So you
11    have at least five, and maybe more, genetic markers
12    there at that locus, right?
13      A.   I have five genetic markers that are
14    reported and two asterisk peaks, and that just means
15    that they're below the minimum threshold level to be
16    reported, but they're above 50 RFUs, which again
17    means relative florescent units.
18      Q.   And, similarly, you have four genetic
19    markers at D7, at D3?
20      A.   Yes, yes.
21      Q.   At vWA?
22      A.   Yes.
23      Q.   And at FGA?
24      A.   Yes.
25      Q.   Now, with respect to this sample, you
```

3420

```
1    testified that James Reid was included as a possible
2    contributor to this sample.
3       A.   I'm checking my report.  I don't have these
4    results memorized.  I just mean I have to check my
5    reports.
6       Q.   No, I appreciate your thoroughness in that
7    regard, and I wouldn't expect that you --
8       A.   James Reid is included as a contributor
9    from the DNA profile in item 13-Z1.
10      Q.   And you concluded Mr. Aquart could not be
11    excluded as a contributor, right?
12      A.   Mr. Azibo Aquart cannot be eliminated as a
13    contributor to the DNA profile from 13-Z1.
14      Q.   But you did eliminate all of the other
15    tested individuals as being contributors?
16      A.   Yes, I did.
17      Q.   And in this sample you found a 12 at D8,
18    did you not?
19      A.   Yes.
20      Q.   And that could not have come from either
21    Mr. Reid or Mr. Aquart, could it?
22      A.   It could not have come from James Reid or
23    Mr. Azibo Aquart.
24      Q.   All right.  And, similarly, you found a 27
25    at D21?
```

**GA855**

3421

1   A.   Yes, I found a 27 at D21 for 13-Z1.
2   Q.   And that could not have come from either
3   Mr. Reid or Mr. Aquart, Azibo Aquart?
4   A.   That is correct.
5   Q.   And you also found a 14 at D3?
6   A.   Yes.
7   Q.   And Mr. -- neither Mr. Reid nor Azibo
8   Aquart have that genetic marker, do they?
9   A.   That is correct.
10  Q.   And you found minor peaks at D21, both at
11  28 and 30, right?
12  A.   Correct.  We wouldn't report it as a 28 or
13  30 because they don't reach the minimum threshold
14  level, but there is indication that there is
15  amplified DNA detected at the location of 28 and 30.
16  Q.   Okay.  And if in fact these are -- were
17  genetic -- neither one of these areas, neither one
18  of these genetic -- neither the 28 nor the 30
19  correspond to Mr. Reid or to Mr. Aquart, Azibo
20  Aquart, right?
21  A.   Neither of those minor peaks could have
22  come from Mr. Reid or Mr. Azibo Aquart.
23  Q.   If we could move on for a moment to
24  14-1-Z1.
25  A.   Sorry.

3422

1   Q.   No.  Let me ask you on that -- do you have
2   the material related to that testing?
3   A.   Yes, I have it in front of me.
4   Q.   Okay.  And what I'm going to show you is
5   marked for identification as 4C-2, and this one is
6   the one -- I'd ask you just to take a look at that
7   and see if that accurately reflects the genetic
8   markers that you identified for 14-1-Z1.
9   A.   I'll have to go through the -- just for
10  14-1-Z1?
11  Q.   Well, actually for all of them.
12  A.   Okay, I'll have to go through it again
13  because, as you know, this is Profiler Plus and
14  COfiler and the loci are in different order.
15  Q.   Right.  And I think your report has the
16  actual --
17  A.   Right, but I'll have to go through it
18  again.
19  Q.   Okay.
20       THE COURT:  Can you move to some other
21  questioning and she could do that at a recess.
22       MR. SHEEHAN:  Yes, I could do that, your
23  Honor.
24  Q.   Let me ask you this:  The individuals that
25  you considered as -- whose profiles you found -- let

3423

1   me ask you, this term that you use when you say
2   that, for example, that somebody is included as a
3   contributor, just generically by that you are not
4   saying that it is that individual's DNA, correct?
5   A.   That is correct.
6   Q.   What you are saying is that that person's
7   profile is in the sample?
8   A.   Could I say it in my own words?
9   Q.   Yeah, I think you could say it better than
10  I could.
11  A.   The genetic markers that you detect in the
12  individuals, the reference sample, are also observed
13  in the DNA profile from the sample.  All those
14  genetic markers are observed.
15  Q.   Okay.
16  A.   But I'm not saying that those genetic
17  markers came from that person.  There is nothing
18  that tells me in the results of the evidentiary
19  sample that that genetic marker came from that
20  individual.
21  Q.   Because we all share many genetic markers
22  in common, correct?
23  A.   Yes, we share genetic markers in common,
24  but that's why we look at 15 sites.  We wouldn't
25  just look at -- test one site because, as it's been

3424

1   pointed out earlier, we do share genetic markers.
2   Q.   Okay.  Now, let me ask you this:  With
3   respect to that sample, you concluded that certain
4   individuals' profiles are included in that sample,
5   right, with respect to 14-1-Z1?
6   A.   I found that four individuals are included
7   as contributors to that DNA profile 14-1-Z1.
8   Q.   And those four individuals are whom?
9   A.   James Reid, Basil Williams, Azibo Aquart
10  and Azikiwe Aquart.
11  Q.   All right.  And you also concluded that
12  Tina Johnson and John Taylor could not be excluded,
13  right?
14  A.   Tina Johnson cannot be eliminated as a
15  contributor to the DNA profile from 14-1-Z1.  And I
16  will look at --
17  Q.   John Taylor.  Thank you.
18  A.   John Taylor cannot be eliminated as a
19  contributor to the DNA profile from item 14-1-Z1.
20  Q.   But you did exclude Efrain Johnson as a
21  contributor.
22  A.   Yes, I did.
23  Q.   Okay.  And if you had your -- all right, so
24  let me ask you this:  Neither Tina Johnson nor James
25  Reid nor -- well, I think probably it might be

3425

```
1   actually faster if I do shorter questions.  Tina
2   Johnson didn't have a 30 at D21, did she?
3       A.   I'll have to look.  No, Tina Johnson does
4   not have a 30 at D21.
5       Q.   Nor does James Reid?
6       A.   No, he does not have a 30 at D21.
7       Q.   Nor does Basil Williams?
8       A.   No.
9       Q.   Nor do either of the Aquarts?
10      A.   That is correct.
11      Q.   And I think you have got to look at your
12  other chart for Mr. Taylor, but I'm asking you, he
13  doesn't have a 30 at that one, does he?
14      A.   No, he doesn't.
15      Q.   Similarly you found an 18 at D3?
16      A.   Yes, I did.
17      Q.   And none of the people that you either
18  included or did not exclude had that allele,
19  correct?
20      A.   I'm sorry, my reports have gotten a little
21  out of order.  14-1-Z1 has an 18.  I'm sorry, which?
22      Q.   What I'm asking you is none of the people
23  that you either included --
24      A.   I'm sorry, could you go back to your
25  question about 14-1-Z1 and which locus we're talking
```

3426

```
1   about.
2       Q.   Yes, at D3.
3       A.   Okay.
4       Q.   You found an 18 there, right?
5       A.   Yes.
6       Q.   And, again, Ms. Johnson did not have an 18
7   at that locus, did she?
8       A.   No.
9       Q.   Nor James Reid?
10      A.   No.
11      Q.   Nor Basil Williams?
12      A.   No.
13      Q.   Nor either of the Aquarts?
14      A.   Correct.
15      Q.   Nor Mr. Taylor?
16      A.   No.
17      Q.   You also found a minor peak at 13 on D18,
18  did you not?
19      A.   Yes, I did, consistent with --in the
20  location of a 13 genetic marker, but not being
21  called a 13.
22      Q.   Correct.  And none of the people that we
23  just asked you about, that is Tina Johnson, James
24  Reid, Basil Williams, either of the Aquarts or John
25  Taylor had a 13 at D18, did they?
```

3427

```
1       A.   I'm sorry, John Taylor at D18?
2       Q.   Yes.
3       A.   He's a 17, 18.
4       Q.   Right, and I was asking you about a 13.
5       A.   Okay.
6       Q.   So, he does not have a 13 at D18?
7       A.   That is correct.
8       Q.   Nor do the other individuals that we just
9   asked you about?
10      A.   Yes, that is correct.
11      Q.   And you also found a 13 at D5 on the sample
12  itself?
13      A.   Yes, I detected a 13 genetic marker at D5
14  for 14-1-Z1.
15      Q.   And none of the people that I've asked
16  you -- neither Tina Johnson, James Reid, Basil
17  Williams or either of the Aquarts had a 13 at D5,
18  did they?
19      A.   That is correct.
20      Q.   And, similarly, and I know you have to look
21  at your other report, Mr. Taylor did not have a 13
22  at D5.
23      A.   That is correct.
24      Q.   And you found a 22 at FGA, right?
25      A.   That is correct, in the sample 14-1-Z1.
```

3428

```
1       Q.   Correct, in the sample itself.  And none of
2   the people had genetic markers at that locus, did
3   they?
4       A.   No.
5       Q.   I think when we were looking at the -- as
6   far as 14-1-Z1, for example at D3, you had detected
7   in the sample five alleles, had you not?
8       A.   Yes, there are five genetic markers that
9   were detected in D3 for both Profiler Plus and the
10  COfiler results.
11      Q.   Okay.  And those five genetic markers could
12  have been from as many as 15 different patterns of
13  genetic contributors?  Does the question make sense
14  to you?
15      A.   Yes, I know the formula you are using and I
16  just did the math.  So there are 15 combinations,
17  pair-wise combinations when you have five genetic
18  markers detected.  And if I could explain that a
19  little more.
20      Q.   Yeah, I wonder if I could just ask you a
21  few questions about it.
22           MR. SHEEHAN:  We have a demonstrative
23  aid I would like to put up at this time.  I'll show
24  it first to the government and then I'm going to put
25  it on the screen.  I'm not offering this in
```

3429

```
1    evidence, this is a demonstrative aid, your Honor.
2        A.   I might be able to explain it verbally.
3        Q.   All right.  Well, let me ask you this.
4    Let's say you had a 14, 15, 16, 17 and 18 genetic
5    markers at D3, which is what you do have, right?
6        A.   Correct.
7        Q.   Okay.
8        A.   But to have them represented by human being
9    figures -- it's your -- sorry.
10       Q.   Well, let's say you had 14 -- you had five
11   homozygous contributors.
12           MS. DAYTON:  Your Honor, I'm going to
13   object.  I think that what the witness is trying to
14   say this is somehow misleading.
15           THE COURT:  Let her just explain it
16   verbally.
17           MS. DAYTON:  If we could take this down.
18           THE COURT:  The question you initially
19   put to her that she did the math for.
20       Q.   Perhaps you could explain that verbally.
21           THE COURT:  Do you want to ask the
22   question again so we have it in question form for
23   us.
24       Q.   Could you explain to us what you meant by
25   the 15 different combinations?
```

3430

```
1        A.   Sure.  So, if you have five genetic markers
2    you have 15 pair-wise combinations, and I'll just
3    start and give you an explanation, I won't go
4    through all 15.  So, you have 14, 15, 16, 17, 18,
5    that was what was detected, so you could have a 14,
6    14; a 14, 15; a 14, 16; a 14, 17; a 14, 18.  You
7    could also have a 15, 15; a 15, 16; 15, 17; a 15,
8    18.  You could also have a 16, 16; a 16, 17; a 16,
9    18.  And then you would go on like that for each
10   genetic marker.
11           And so there is a little formula that
12   you can use to kind of shorthand it and figure out
13   the number of pair-wise combinations, and 15 would
14   be the correct number of pair-wise combinations when
15   you have five genetic markers detected.
16       Q.   And in this case on this sample, meaning
17   14-1-Z1, you also found six genetic markers at vWA,
18   right?
19       A.   At vWA, yes, I did.
20       Q.   Okay.  And in that context there could be
21   21 possible pair-wise combinations?
22       A.   Yes, that is correct.
23       Q.   And, again, in this sample at D2S, you
24   found seven genetic markers.
25       A.   I'm sorry, could you say that site again?
```

3431

```
1        Q.   D2S.
2        A.   D2S?
3        Q.   Uh-huh.
4        A.   I'm sorry, I'm not hearing you correctly.
5        Q.   Oh, all right.
6        A.   You are talking D21?
7        Q.   Because I'm speaking improperly and I
8    appreciate that.  At D21.
9        A.   There are eight genetic markers.
10       Q.   Then I did mean D2.
11       A.   D2 is --
12       Q.   Not there.
13       A.   Is right because D2 is only included --
14       Q.   Exactly, my mistake.  So at D21 you found
15   eight allele -- genetic markers?
16       A.   That is correct.
17       Q.   And in that context that would be 36
18   possible base pair combinations, right?
19       A.   Well, I would just say that there is 36
20   pair-wise combinations.
21       Q.   I'm sorry, 36 pair-wise.
22       A.   Combinations.
23       Q.   Combinations.
24       A.   Correct.
25       Q.   Now, I wonder if we could move forward to
```

3432

```
1    15-Z2.
2        A.   Could I have a moment, please?
3        Q.   Yeah.
4        A.   You wanted to talk about 15-Z2 next?
5        Q.   Yes.
6        A.   Okay, I have that in front of me.
7        Q.   All right, with respect to that sample, you
8    had excluded Mr. Johnson and Mr. Taylor as possible
9    contributors; had you not?
10       A.   Yes, both of those individuals were
11   eliminated as contributors.
12       Q.   All right.  And the remaining individuals,
13   which would be -- well, in fact you included as
14   contributors -- could you tell us who you included
15   as contributors?  Maybe that's easier.
16       A.   James Reid, Basil Williams and Azikiwe
17   Aquart are included as contributors to the DNA
18   profile in item 15 -- 15-Z2.
19       Q.   And with respect to Mr. Azibo Aquart?
20       A.   Mr. Azibo Aquart cannot be eliminated as a
21   contributor to the DNA profile from item 15-Z2.
22       Q.   None of the people that you either included
23   or could not exclude had a 13 at D13.
24       A.   Well, would you like say -- first to say
25   15-Z2 at D13 has a 13?
```

3433

```
1      Q.   Yes, exactly.  I appreciate that.  You did
2  identify that in the sample.  And then with respect
3  to Tina Johnson, James Reid, Basil Williams, Azibo
4  Aquart or Azikiwe Aquart, they do not have a 13 at
5  D13, do they?
6      A.   That is correct.
7      Q.   And, similarly, with respect to D16, the
8  sample shows a 14, does it not?
9      A.   Yes, the -- there is a 14 genetic marker at
10 D16 in 15-Z2.
11     Q.   And, similarly, neither Tina Johnson --
12     A.   Okay, just I have to go from this to this.
13 Okay.
14     Q.   Yep.
15     A.   Okay, I'm looking at the --
16     Q.   Neither Tina Johnson, James Reid, Basil
17 Williams, Azibo or Azikiwe Aquart have a 14 at D16?
18     A.   That is correct.
19     Q.   And then with respect to D2, the sample
20 itself shows both a 19 and a 24, right?
21     A.   That is correct.
22     Q.   And neither Tina Johnson, James Reid, Basil
23 Williams, Azibo Aquart or Azikiwe Aquart have
24 that -- either one of those genetic markers, right?
25     A.   That is correct.
```

3434

```
1      Q.   And at D19 the sample shows a 16.2, does it
2  not?
3      A.   That is correct.
4      Q.   And none of those people that I've just
5  previously asked you about has the 16.2, do they?
6      A.   No, they don't.
7      Q.   And similarly on D18, the sample shows an
8  18.
9      A.   That is correct.
10     Q.   And none of those people that I just asked
11 you about has an 18.
12     A.   No, they don't.
13     Q.   And at D5 you found an 11 and a 13 in the
14 sample, did you not?
15     A.   Yes, I did.
16     Q.   And you also identified a minor peak at 8?
17     A.   Yes, I did.
18     Q.   At D5.  But none of those people that I
19 just asked you about have -- have these three
20 genetic markers, do they?
21     A.   No, they don't.
22     Q.   And at D21 you found a 30, right?
23     A.   That is correct.
24     Q.   And none of those people that I just asked
25 you about have this genetic marker?
```

3435

```
1      A.   That is correct.
2      Q.   And at D21 you identified a minor peak at
3  32.2?
4      A.   That is correct.
5      Q.   And that does not correspond with any of
6  the people that I asked you -- just asked you about,
7  namely Tina Johnson, James Reid, Basil Williams,
8  Azibo or Azikiwe Aquart?
9      A.   That is correct.
10     Q.   Now, you also tested other samples in this
11 case, and one of those was 8-Z3, was it not?
12     A.   Yes, I tested 8-Z3 swabbing of torn area of
13 duct tape.
14     Q.   Okay.  And in that context you concluded
15 that neither Mr. Reid nor Basil Williams, neither
16 one of those could be eliminated as minor
17 contributors, right?
18     A.   That's correct.
19     Q.   But you did conclude that Tina Johnson
20 Efrain Johnson, Azibo and Azikiwe Aquart and James
21 Taylor are eliminated as contributors.
22     A.   That is correct.
23     Q.   I'm sorry, John Taylor.
24     A.   That is correct.
25     Q.   Now, you found a 15 in this -- both a 15
```

3436

```
1  and a 16 at D8, did you not?
2      A.   Yes, I detected a 15 and 16 genetic marker
3  at D8 for -- I'm sorry, 8-C3.
4      Q.   Okay.  But the 15 and the 16 is not found
5  in the profiles for James Reid or Basil Williams, is
6  it?
7      A.   No, they do not have a 15 or a 16, Mr. Reid
8  or Mr. Williams.
9      Q.   You also found a 13 in the sample at D16.
10     A.   Yes, I did.
11     Q.   And --
12     A.   For 8-Z3.
13     Q.   For 8-Z3.  And neither Mr. Reid nor Mr.
14 Williams had that genetic marker at D16, did they?
15     A.   That is correct.
16     Q.   You also found a 17 at D2S in this sample
17 8-Z3?
18     A.   Yes, I did.
19     Q.   And neither Mr. Reid nor Mr. Williams show
20 that genetic marker at that locus, do they?
21     A.   That is correct.
22     Q.   And you also found a 10 at D5 in the
23 sample, again, 8-Z3?
24     A.   Yes.
25     Q.   And, again, neither Mr. Reid nor Mr.
```

3437

1   Williams show those genetic markers, do they?
2        A.   That is correct.
3        Q.   You also looked at another sample, which is
4   10-Z1, and that was a swabbing of a latex type
5   material.
6        A.   Swabbing of latex type material from
7   submission 10.
8        Q.   Okay.  And in that context you found that
9   James Reid could not be eliminated -- I'm sorry,
10  that James Reid could not be eliminated as a
11  contributor.
12       A.   That is correct.
13       Q.   But you did eliminate Tina Johnson, Basil
14  Williams, Efrain Johnson, both Aquarts, as well as
15  Mr. Taylor as being contributors to that sample?
16       A.   That is correct.
17       Q.   And James Reid does not have an 8 at D7,
18  does he?
19       A.   Do you want to first say that the 8 is
20  present?
21       Q.   Yeah, I think you are right.  Let's do it
22  that way.  At D7 there is an 8 in that sample,
23  10-Z1, right?
24       A.   Yes, 10-Z1 at D7 has an 8 genetic marker.
25       Q.   Which is not found on Mr. -- in Mr. Reid's

3438

1   profile?
2        A.   That is correct.
3        Q.   And similarly, 10-Z1 has a 17 at D3?
4        A.   That is correct.
5        Q.   Which is not found on Mr. Reid's profile,
6   is it?
7        A.   That is correct.
8        Q.   And it also has a 9 at TPOX, "it" being
9   10-Z1.
10       A.   Yes, that is correct.
11       Q.   Which is not found on Mr. Reid's profile.
12       A.   That's correct.
13       Q.   Now, moving on to 12-Z1.  I think it's the
14  same report.
15       A.   Yes, I'm looking at it.
16       Q.   Okay.  Again, this was a mixture, was it
17  not?
18       A.   Yes, this result demonstrates that the
19  profile from 12-Z1 was a mixture.
20       Q.   And 12-Z1 itself was a swabbing from the
21  duct tape, right?
22       A.   Swabbing of a torn end of duct tape, and
23  that was from submission 12.
24       Q.   Okay.  And the reason we know that it is a
25  mixture is because there are four alleles at many

3439

1   loci.
2        A.   At multiple loci have four genetic markers,
3   yes.
4        Q.   And Mr. Reid is included as a contributor,
5   meaning his profile is found at all sites, correct?
6        A.   Mr. Reid is included as a contributor to
7   the DNA profile from item 12-Z1.
8        Q.   And in this case Tina Johnson, Basil
9   Williams, Efrain Johnson, John tay -- and Mr. Taylor
10  are excluded as contributors?
11       A.   I'm not sure of all of the names that you
12  just said.
13       Q.   Yeah, because I made a mistake.  Tina
14  Johnson, Basil Williams, Efrain Johnson and both
15  Aquarts, they are eliminated as contributors, are
16  they not?
17       A.   That is correct.
18       Q.   And similarly, John Taylor is eliminated as
19  a contributor.
20       A.   That is correct.
21       Q.   And as far as D8 is concerned on 12-Z1, Mr.
22  Reid did not evidence either a 15 or a 16 at that
23  site, did he?
24            Well, let's do it the way we were doing
25  it before, probably better.  You do see a 15 and a

3440

1   16 at D8, do you not, with respect to 12-Z1?
2        A.   Yes, I do.
3        Q.   And Mr. Reid does not evidence those
4   genetic markers at that locus, does he?
5        A.   No.
6        Q.   And similarly, you do see a 27 and a 28 at
7   D21 on 15-Z1 -- 15-Z2.  No, I'm sorry 12-Z1, the
8   sample we're talking about.
9        A.   At D21?
10       Q.   Yep.
11       A.   I see a 27 and a 28, yes, there was --
12  those two genetic markers were detected.
13       Q.   All right.  And Mr. Reid does not have
14  those, does he?
15       A.   No, he does not.
16       Q.   And at D3, you see a 14, a 15 and a 17,
17  right?
18       A.   Yes, at D3.
19       Q.   Yes.  And Mr. Reid has none of those, does
20  he?
21       A.   No, he doesn't.
22       Q.   And at THO, there was a 9 found on 12-Z1,
23  right?
24       A.   Yes, for THO1.
25       Q.   THO1?

**GA860**

3441

```
1      A.   At 12-Z1 there was a 9 detected.
2      Q.   Which is not found in Mr. Reid's profile.
3      A.   That is correct.
4      There were also minor peaks at THO1 on
5  12-Z1.
6      A.   I'll have to look at the worksheet to see
7  just how many minor peaks.
8      Q.   Okay.  Actually, let me rephrase it, it
9  might spare us that one.  Oh, you have it right
10 there.
11     A.   Yes, there was one minor peak detected for
12 12-Z1 at THO1.
13     Q.   And that was inconsistent with Mr. Reid's
14 profile, that minor peak, right?
15     A.   Correct.
16     Q.   And at D13 you found in the sample, 12-Z1,
17 an 11 at that site?
18     A.   D13?
19     Q.   Yes.
20     A.   Yes, there is an 11 that was detected for
21 12-Z1 at D13.
22     Q.   And Mr. Reid did not evidence an 11 at that
23 the locus, did he?
24     A.   No, he did not.
25     Q.   And at D16 there was a 13 in the sample,
```

3442

```
1  12-Z1?
2      A.   You are talking about -- I'm sorry, I just
3  lost --
4      Q.   12-Z1.
5      A.   Yes, at which locus?
6      Q.   At D13 -- I'm sorry, now I lost track.  All
7  right, let's try D16.
8      A.   Okay, I have 12-Z1 at D16.
9      Q.   There is a 13 there, right?
10     A.   Yes, there is a 13 genetic marker.
11     Q.   Which is inconsistent with Mr. Reid's
12 profile.
13     A.   Mr. Reid could not have contributed that 13
14 genetic marker at D16.
15     Q.   You also found at least one minor peak at
16 that locus, did you not?
17     A.   We're looking at D16?
18     Q.   Yes.
19     A.   Yes, I found one minor peak at D16 for 13
20 -- for 12-Z1.
21     Q.   And that minor peak was again inconsistent
22 with Mr. Reid's profile, right?
23     A.   That's correct.
24     Q.   And at D19 you found in the sample itself a
25 12?
```

3443

```
1      A.   Yes, I did.
2      Q.   And you also found minor -- at least one
3  minor peak.
4      A.   I'm sorry, actually I was looking at the
5  earlier data for that sample.
6      Q.   Oh, okay.
7      A.   So, at D16.
8      Q.   D19.
9      A.   Well, I'm going back to D16.
10     Q.   D16, okay.
11     A.   I'll talk about the minor peaks for 12-Z1.
12 At D21 I detected one minor peak, at THO1 I detected
13 one minor peak, at D16 I detected two minor peaks.
14     Q.   Okay.  Both of those minor peaks at D16
15 were inconsistent with Mr. Reid's profile, right?
16     A.   That is correct.
17     Q.   And at D19, taking a look at that.
18     A.   Yes, I have one minor peak there.
19     Q.   Okay.  And that minor peak is inconsistent
20 with Mr. Reid's profile.
21     A.   That is correct.
22     Q.   As is the 12 genetic marker which you
23 identified at that locus.
24     A.   That is correct.
25     Q.   And by -- and I think my question might
```

3444

```
1  have been a little bit unclear.  You didn't find
2  that in Mr. Reid, did you, the 12?
3      A.   That is correct.
4      Q.   And at vWA you found both a 14 and a 16 on
5  12-Z1.
6      A.   Yes, I did.
7      Q.   And Mr. Reid did not evidence either one of
8  those, did he?
9      A.   No, he does not have a 14 or a 16.
10     Q.   And at TPOX, there was an 8 in the sample.
11     A.   That is correct.
12     Q.   Which Mr. Reid did not evidence.
13     A.   No.
14     Q.   And there were minor -- there was a
15 minor --
16     A.   I meant to say I agree with that instead of
17 "no."
18     Q.   Yes.  Okay.  So, Mr. Reid didn't have the
19 8, right?
20     A.   That is correct.
21     Q.   And there were also minor -- or minor peaks
22 at TPOX?
23     A.   Yes, there was one minor peak.
24     Q.   Which Mr. Reid did not have, right?
25     A.   That's correct.
```

3445

```
1        Q.   And at D18 the sample had a 17.
2        A.   That's correct.
3        Q.   Which Mr. Reid did not have.
4        A.   That's correct.
5        Q.   And in FGA the sample evidenced minor
6  peaks.
7        A.   Yes, there with one minor peak.
8        Q.   Which Mr. Reid did not have.
9        A.   That is correct.
10            THE COURT:  It's eleven o'clock, shall
11  we take a recess at this time?
12            MR. SHEEHAN:  That would be great, your
13  Honor.
14            THE COURT:  Take a 15-minute recess.
15            (Jury exited the courtroom.)
16            THE COURT:  All right, how much longer
17  will you be, Mr. Sheehan?
18            MR. SHEEHAN:  I have a while to go, your
19  Honor.  It's gotten a little slower than even I
20  thought.
21            THE COURT:  Is there some way in which
22  the Court can assist you in speeding it up?
23            MR. SHEEHAN:  No, your Honor, but I
24  appreciate the offer.
25            THE COURT:  We'll take a recess.
```

3446

```
1            MR. SHEEHAN:  Thank you.
2            THE COURT:  Fifteen minutes.
3            (Recess)
4            THE COURT:  All right, are we ready for
5  the jury?
6            MR. SHEEHAN:  We are, your Honor.
7            THE COURT:  All right, please be seated,
8  ladies and gentlemen.
9            Mr. Sheehan, you may continue.
10            MR. SHEEHAN:  Thank you, your Honor.
11        Q.   Ms. Roy, I'd ask if you could turn your
12  attention to 32-1-Z1.  And that was a swabbing from
13  the fingernail clippings from Ms. Johnson; was it
14  not?
15        A.   Yes, 32-1-Z1 was a swabbing of fingernail
16  clippings from -- you said 32-1, right?
17        Q.   Yes.
18        A.   From the right hand of Tina Johnson.
19        Q.   Right.  And one of the -- that's actually a
20  commonplace to check in forensic examinations, is it
21  not?
22        A.   Yes, it's one of the places on a person's
23  body.
24        Q.   And one -- when you looked at -- you were
25  able to retrieve a DNA profile from that sampling,
```

3447

```
1  were you not?
2        A.   Yes, I was.
3        Q.   And Ms. Johnson was included as a
4  contributor to that sample, was she not?
5        A.   The results demonstrated that item 32-1-Z1
6  is a mixture.  Tina Johnson is included as a
7  contributor to the DNA profile in item 32-1-Z1.
8        Q.   And so I think you just said it was a
9  mixture.  I'm sorry, you did, right?
10        A.   Yes, demonstrated that it was a mixture.
11        Q.   And another contributor to that sample had
12  to have been a man, correct?
13        A.   Yes, I detected at the gender
14  identification site, also known as an amelogenin, an
15  X and a Y.  So there had to have been a male
16  contributor to that DNA profile.
17        Q.   Now, in this case you looked at the samples
18  of the other -- you looked at the other samples,
19  known samples in this case, for Mr. Reid, Mr.
20  Williams, Mr. Johnson and both Aquarts, right?
21        A.   That is correct.
22        Q.   And did I say Mr. Taylor as well?
23        A.   No, you didn't.
24        Q.   All right, and Mr. Taylor.
25        A.   That is correct.
```

3448

```
1        Q.   And they were eliminated as contributors to
2  13-Z1, were they not?
3        A.   Yes, they were eliminated as a contributor
4  to the DNA profile from item 13 -- I'm sorry
5  32-1-Z1.
6        Q.   And I realize because Mr. Taylor appears on
7  another report you are going to have to look at two
8  documents, but if we could --
9        A.   He is also eliminated as contributor to the
10  DNA profile from 32-1-Z1.
11        Q.   Similarly, as we did previously, D8,
12  looking again at 32-1-Z1 at D8, you have a 14.
13        A.   Yes, a 14 was detected.
14        Q.   And that is inconsistent -- that is not
15  from Ms. Johnson, is it?
16        A.   No, she does not have a 14.
17        Q.   And at D21 you had a 30 and a 35.
18        A.   A 30 and 35 were detected for 32-1-Z1 at
19  D21.
20        Q.   And Ms. Johnson was -- the 30 and the 35 do
21  not appear in her profile, do they?
22        A.   That is correct.
23        Q.   And at CSF you found an 8 and a minor peak
24  with respect to 32-1-Z1.
25        A.   Yes, I did.
```

**GA862**

3449

1    Q.    And neither one of those genetic markers is
2 consistent with Ms. Johnson's, is it?
3    A.    No.
4    Q.    And similarly, at D3 you found a 16, 17 and
5 an 18.
6    A.    That is correct, at 32-1-Z1.
7    Q.    For 32-1-Z1.  And neither one of those --
8 neither of those three is consistent with
9 Ms. Johnson, right?
10    A.    That's correct.
11    Q.    And at THO1, for 32-1-Z1 you found a 7 and
12 a 9.3?
13    A.    That is correct.
14    Q.    And neither one of those is consistent with
15 Ms. Johnson, is it?
16    A.    No.
17    Q.    And at --
18    A.    I mean that's correct.
19    Q.    All right.  And at 32-1-Z1 at D16 you found
20 an 11, right?
21    A.    That is correct.
22    Q.    And similarly, Ms. Johnson did not have an
23 11 at that locus, did she?
24    A.    That is correct.
25    Q.    And at D2 you found a 16 and a 21 for

3450

1 32-1-Z1, right?
2    A.    16 and a 21, yes, that is correct.
3    Q.    And neither one of these genetic markers
4 was consistent with Ms. Johnson, right?
5    A.    That is correct.
6    Q.    And at D19 you found a 12.2 and a 13 at --
7 for sample 32-1-Z1, right?
8    A.    Yes, that is correct.
9    Q.    And neither one of these was consistent
10 with Ms. Johnson, right?
11    A.    That is correct.
12    Q.    And at vWA you found a 17 for 32-1-Z1.
13    A.    That is correct.
14    Q.    And that was not consistent with
15 Ms. Johnson either, was it?
16    A.    That is correct.
17    Q.    And at D18 you found a minor peak for
18 32-1-Z1.
19    A.    That is correct.
20    Q.    And that was not consistent with
21 Ms. Johnson, was it?
22    A.    No.
23    Q.    And at D5 you found a 13 for 32-1-Z1.
24    A.    That's correct.
25    Q.    And that was not consistent with

3451

1 Ms. Johnson, right?
2    A.    That's correct.
3    Q.    So, moving along.  I want to ask you about
4 another issue.  One of the particular challenges
5 associated with interpretation of mixtures is the
6 issue of drop out, is it not?
7    A.    You can have drop out when there is a --
8 the amount of DNA that a contributor adds to the DNA
9 profile is very low.  That means you won't detect
10 all of their genetic markers at all of the sites
11 tested.
12    Q.    So, that is drop out something that you
13 then associate basically with small amounts of DNA?
14    A.    Or it could be when the DNA is degraded.
15    Q.    All right.  And I'd ask you to assume that
16 you had a single -- a known single source sample,
17 you would expect that there would be one or two
18 alleles at each locus, right?
19    A.    That's correct.
20    Q.    And I'm asking if you were comparing that
21 sample with a profile of a suspect, if at one locus
22 the allele of the suspect was not present, by virtue
23 of the laws of genetics that's an exclusion, is it
24 not?
25    A.    At that one locus?

3452

1    Q.    Yeah.
2    A.    Yes, you would say that that person's DNA
3 is not detected at that locus.
4    Q.    Even if the other genetic markers were
5 present in the sample?
6    A.    Well, you asked me a specific question
7 about that locus.  Only for that locus would you say
8 that he's not detected.  You wouldn't use that for
9 the entire profile.  You have to look at the entire
10 profile.
11    Q.    If a -- an individual's -- if you looked at
12 two known -- two single source samples, right, you
13 knew they were single source samples.
14    A.    Are you talking about reference samples?
15    Q.    Yeah, say you lined them up one next to
16 another one, right, and there was a difference in
17 one locus.  You would know they weren't from the
18 same person, correct?
19    A.    That's correct.
20    Q.    Okay.  Now, one of the concepts that the
21 lab talks about is exclusion, right?  We've talked
22 about people being excluded as contributors.  Is
23 that --
24    A.    That is correct.
25    Q.    And then another concept that you have

3453

1  testified about is inclusion, right?
2      A.   That is correct.
3      Q.   And by inclusion that means that that
4  sample, that that suspect could possibly be a
5  contributor to the sample?
6      A.   Suspect, or that individual, whoever it is,
7  is included as a contributor when you see all of the
8  genetic markers that they have in their DNA profile
9  are also observed in the DNA profile of the sample,
10  of the evidence.
11      Q.   And in your lab you have established
12  thresholds for the identification of alleles, have
13  you not?
14      A.   Yes.
15      Q.   And again, genetic markers, that's the same
16  term as alleles, right?
17      A.   Yes.
18      Q.   All right.  And with the exception of
19  14-21, all of the samples you have testified to, the
20  standard is 75 RFUs or greater as demonstrated on
21  the electropherograms, right?
22      A.   That is correct.
23      Q.   And those thresholds were set on the basis
24  of extensive tests that were performed by the lab,
25  were they not?

3454

1      A.   Yes, during our validation studies.
2      Q.   They're not just pulled out of the air, are
3  they?
4      A.   No.
5      Q.   And in some cases they actually may even
6  differ from what the manufacturers recommend,
7  correct?
8      A.   I'm not sure what the manufacturer has
9  recommended.  I know they differ from what other
10  labs may use.  I know everybody's validation, they
11  may choose their threshold based on their
12  validation.
13      Q.   And in some labs the threshold is higher.
14  You know that in your field, right?
15      A.   Yes.
16      Q.   And in some it may be even lower, right?
17      A.   Perhaps.
18      Q.   You are not sure if any are lower than 75?
19      A.   I don't know.
20      Q.   But you do know, for example, some are
21  higher?
22      A.   Yes.
23      Q.   And --
24      A.   That's also -- we also validate -- we also
25  go through a validation for each instrument, too.

3455

1      Q.   Correct.  And each machine kind of has to
2  be -- basically you want to make sure not only is
3  the brand of the machine -- I take it one machine
4  differs from another machine even if they're the
5  same brand?
6      A.   There are slight differences.
7      Q.   Okay.  When you replicate DNA you sometimes
8  get things that are not true genetic markers, do you
9  not?
10      A.   I would say they don't represent what's
11  actually in the extracted sample.  They're a product
12  of the amplification process.  I think that's what
13  you mean.
14      Q.   Yes.  So, in other words, sometimes when
15  you replicate it you get other things?
16      A.   You get the stutter peaks which we've
17  talked about earlier.
18      Q.   All right.  And there is -- also you can
19  also get something called a blob?
20      A.   Yes.  That's not recognized as a peak.
21  That's a dye artifact.
22      Q.   And you might get a spike?
23      A.   Yes, that's from -- that instrumentation.
24  It's not actually from the amplification process.
25      Q.   And that's the reason why you set a

3456

1  threshold to distinguish genetic material from other
2  things?
3      A.   Well, you can still get dye blobs,
4  stutters, spikes higher than the threshold, but you
5  are trained to recognize those things, and we know
6  through our validation and our training how to
7  recognize those specific things and that they're not
8  a true reflection of what's actually amplified --
9  that's extracted from the sample.
10      Q.   Because when you are doing that you are
11  putting in something where you know the profile and
12  the machine is giving you something in addition to
13  what you knew you were putting in there, right?
14      A.   I'm not sure I understand that explanation.
15      Q.   Well, the way you do your validation is you
16  know what you are starting with and you are checking
17  to see whether the machine is telling you -- is
18  accurately reporting what you are putting in there.
19      A.   That is correct.  That's part of the
20  validation, is to run samples that we know the DNA
21  profile of and to make sure that that's the result
22  that we get when we use the instrument and the
23  amplification procedure.
24      Q.   Now, depending on the amount of DNA that
25  you have, one thing that we know is that when you

**GA864**

3457

1  amplify it sometimes an allele -- or sometimes a
2  genetic marker that you know is in the sample just
3  doesn't appear.
4      A.  Well, that's because there is -- the
5  quantity of that amount of DNA in the sample is so
6  low that it's not being detected.
7      Q.  Okay.  And the way you know that it was
8  there and in the amplification process it kind of
9  disappears is you know what you are starting with.
10     A.  Right, that's part of the validation
11 procedure.
12     Q.  Now, this issue about genetic markers, is
13 drop out a term that you are comfortable term with
14 in this context?  Do you know the term of drop out?
15     A.  Well, I know what it refers to.  It means
16 that it's so low in the starting material that when
17 it's amplified you are not detecting it.  As you
18 said, we know that through validation that once the
19 amount -- we know the optimal amount of DNA to
20 amplify, and as that amount is reduced less -- is
21 reduced as the input for the amplification process
22 you will see allelic drop out.
23     Q.  And in your lab you basically set the
24 optimum amount of DNA as between one -- what is the
25 optimum amount of DNA for amplification that your

3458

1  lab has identified?
2      A.  The target amount is one nanogram, but
3  sometimes when you amplify something that you know
4  -- say for touch or wearer, we know from experience
5  that those often contain mixtures.  So, it's
6  possible sometimes you put a little more in, because
7  obviously if it's a mixture that one nanogram is not
8  coming all from that one individual.  So, through
9  experience we've learned that sometimes you have to
10 increase the amount of input DNA depending on the
11 type of sample, and sometimes the first
12 amplification procedure you might see that what you
13 put in was too low, so you re-amp with more.
14     Q.  And, in fact, in this case on many of the
15 samples you did.  Did you re-amp them?
16     A.  No, most of these samples the amount of DNA
17 was low and I amplified the maximum volume.  I mean,
18 I'd have to go through and check each one, but as I
19 recall most of them were amplified using the maximum
20 volume.
21     Q.  And one of the things that you sometimes
22 change when you are -- when you are actually trying
23 to -- when you are putting them into the -- when you
24 are injecting them, you might change the amount of
25 time you inject them for, correct?

3459

1      A.  That is correct.  And our instruments are
2  validated up to a certain amount of time for
3  injection.
4      Q.  And if it's -- for example, if you think
5  it's going to be a large amount of DNA you know
6  that, perhaps from your yield gel, or whatever, you
7  might only inject it for five seconds.
8      A.  Standardly I always start at five second,
9  see what I get, and then if I need to I reinject it
10 longer.
11     Q.  Okay.  And the maximum amount of time that
12 you inject is 30 seconds?
13     A.  It depends on the instrument.  There are
14 some instruments that the maximum amount of time is
15 20 seconds.
16     Q.  Okay.  And sometimes what happens when you
17 inject it, you don't get a complete profile; is that
18 correct?
19     A.  Some samples I have gotten no results from
20 in this case and some samples I got a partial
21 profile.
22     Q.  And then sometimes you reinject it for a
23 longer period of time to see what comes up the
24 second time around, right?
25     A.  That's correct.  I usually start at five

3460

1  seconds and then I'll move up according to what I
2  see.
3      Q.  Now, this issue that I was just asking you
4  about as far as drop out, that doesn't happen all
5  the time, does it?
6      A.  If you start with the optimal amount of DNA
7  you would not expect to get drop out for a single
8  source sample, for a robust single source sample
9  that's not degraded.
10     Q.  And if you start -- let's say you've
11 diluted -- let's say you are doing the validation
12 test, you start with a known standard and you use
13 less of it than you normally would.  You might find
14 that there is drop out, right?
15     A.  At some point you'll start seeing drop out.
16     Q.  And it doesn't always happen in a
17 predictable way, does it?
18     A.  No, it's called stochastic fluctuation.
19     Q.  What stochastic fluctuation means is that
20 it happens by chance, right?
21     A.  Correct.  But there are some sites that we
22 see it happening more than others.
23     Q.  Okay.  And by chance it means that
24 sometimes it happens and sometimes it doesn't,
25 right?

**GA865**

3461

1     A.   There are some sites that amplify more
2  efficiently.  So, even when there is less DNA we
3  typically still see a result, and they're other
4  sites that we see drop out going on first.
5     Q.   And this happens basically when you are
6  amplifying those smaller quantities of DNA.
7     A.   Are you talking about drop out?
8     Q.   Yeah.
9     A.   Yes.  Or, as I said before, degraded DNA.
10    Q.   Okay.  And your protocol talks about this,
11 does it not, the stochastic zone?
12    A.   We have -- I'm not sure what you mean by
13 that.  I'm sorry.
14         MR. SHEEHAN:  Okay.  Could I just have
15 CC-6 brought up for a moment, please.
16    Q.   Do you recognize Defendant's Exhibit CC-6
17 for identification?
18    A.   Yes, I do.
19    Q.   As part of your protocol?
20    A.   Yes.
21    Q.   And does that protocol discuss the problems
22 involved with, among other things, drop out,
23 particularly Section 7.5 of that?
24    A.   Yes.  Yes, it does.
25    Q.   And was this protocol in effect at the time

3462

1  that you analyzed these samples?
2     A.   Yes.
3     Q.   Okay.
4         MR. SHEEHAN:  I would offer at this
5  point in time, your Honor, that exhibit, which I've
6  just described as CC-6.
7         THE COURT:  This is not the entire
8  protocol, right?
9         MR. SHEEHAN:  No, it's just this section
10 of the protocol.
11        THE COURT:  All right, it's a full
12 exhibit.
13    Q.   If you wouldn't mind, I'm just really
14 asking you at this moment in time about Section 7.5
15 of that protocol, the top section.  What this -- can
16 you tell us as far as what does this mean by
17 stochastic -- this section here talks about, given
18 the possibility of stochastic allele sampling,
19 especially with low quantity or degraded samples,
20 single peaks less than 150 RFUs are interpreted with
21 caution.  What is that telling you as a scientist?
22    A.   Just that those low level peaks we always
23 interpret with caution.
24    Q.   And is that because if the -- if on your
25 testing you've determined that there is low quantity

3463

1  DNA there, that it is more likely to be exhibiting
2  stochastic problems?
3     A.   That, or there is a contributor to that
4  mixture.  That could also be a minor contributor to
5  the mixture.
6     Q.   Okay.  Or a contributor might actually --
7  one allele might magnify and the other might not,
8  right?
9     A.   That is correct.  Might amplify.
10    Q.   And as far as the -- is it fair to equate
11 below 150 RFUs with the stochastic fluctuation?
12    A.   Yes.
13    Q.   All right.  Now, you knew about this
14 stochastic fluctuation when you are starting with
15 known samples, right, and diluting them?
16    A.   That is correct.
17    Q.   But when you are talking about an unknown
18 sample, you don't really know whether there has been
19 drop out or not, do you?
20    A.   Well, you look at the DNA profile and see
21 if you have very minor peaks, and if you do, you
22 know that there might be drop out.  But if you have
23 high robust peaks, then you would not assume drop
24 out.
25    Q.   So, when you say if you look at the minor

3464

1  peaks, that tells you that there might be drop out,
2  the fact is, you don't really know that, do you?
3     A.   No, I don't know because I don't know
4  what's in my starting material because it's an
5  evidentiary sample.
6     Q.   Correct.  Now, in 13-Z1, you included James
7  Reid as a possible contributor because all of his
8  genetic markers were there at all loci, right?
9     A.   James Reid is included as a contributor to
10 the DNA profile from item 13-Z1.
11    Q.   And the reason for that was that all of his
12 genetic markers were present at all loci?
13    A.   That's correct.
14    Q.   Now, you've also testified that Azibo
15 Aquart cannot be excluded as a potential contributor
16 to that sample, right?
17    A.   That is correct.
18    Q.   You are not including him as a contributor,
19 are you?
20    A.   No.
21    Q.   And the reason for that is that his alleles
22 do not match those seen on the sample at CSF and
23 D2S, right?
24    A.   That is correct.
25    Q.   As far as drop out, it doesn't always

3465

```
1   happen at the same place, does it?
2       A.   No, but we know from our studies and our
3   experience that certain loci we see drop out
4   occurring first.
5       Q.   Okay, but which loci -- it doesn't always
6   happen at the same place, does it?
7       A.   No.
8       Q.   And when it happens it doesn't always
9   involve the same alleles, does it?
10      A.   No.
11      Q.   So, with an unknown sample you have one
12  level of uncertainty as to whether there was drop
13  out at all, right?
14      A.   That is correct.
15      Q.   And a second level of uncertainty as to if
16  there was drop out at which locus it took place?
17      A.   That is correct.
18      Q.   And a third level of uncertainty as to if
19  there was drop out of which alleles dropped out,
20  right?
21      A.   That is correct.
22      Q.   You could answer those questions with a
23  known sample because you would know what you were
24  starting with, right?
25      A.   That is correct.
```

3466

```
1       Q.   But you can't answer those questions with
2   an unknown sample, can you?
3       A.   That is correct.
4       Q.   Now, you also found at 9-Z1, shifting your
5   attention to that sample, you concluded there that
6   Azibo and Azikiwe Aquart could not be excluded as
7   potential contributors, right?
8       A.   That is correct.
9       Q.   And that's the third category that the lab
10  uses; one is included, one is excluded, and the
11  third is cannot be excluded?
12      A.   There is also inconclusive.
13      Q.   So, there are four categories, right?
14      A.   Correct.
15      Q.   Now, what you can tell us is that if --
16  with respect to 9-Z1 --
17           MR. SHEEHAN:  I wonder if we could bring
18  up MM-5 for a moment, please.
19      Q.   As far as 9-Z1 is concerned, the places
20  where you found -- where you did not find Mr. --
21  either Aquarts loci, that was D21, right?  That was
22  one of those places?
23      A.   Yes.
24      Q.   D2S, that was the second place?
25      A.   D2, yes.
```

3467

```
1       Q.   D2, I'm sorry.  And FGA, that was the third
2   place, right?
3       A.   That is correct.
4       Q.   And the allele or the genetic marker at
5   D21, that was not --
6       A.   Excuse me, could you just hold on.  I'd
7   like to pull out some notes.
8       Q.   Yeah, sure.
9       A.   Thank you.  Okay, I'm sorry.
10      Q.   No.
11      A.   Okay.
12      Q.   You did not find -- for example with
13  respect to Azikiwe Aquart -- well, let's first look
14  at the sample.  At D21 you had a 29, did you not, in
15  the sample itself, 9-Z1?
16      A.   At D21?
17      Q.   Yep.
18      A.   I'm sorry.
19      Q.   Maybe I'm missing -- no, it's a bad
20  question.  You are right, in D21, in the sample
21  itself, you did not find a 29, did you?
22      A.   That is correct.
23      Q.   And Azikiwe Aquart had a 29, did he not?
24      A.   That is correct.
25      Q.   Okay.  One thing that -- what you can tell
```

3468

```
1   us is if the contributor to that sample did not have
2   a 29 at D21, then Azikiwe Aquart could not have been
3   a contributor, right?
4       A.   No, that's not right.
5       Q.   Okay.  The person -- if you knew who had
6   actually contributed to 9-Z1, right?
7       A.   I don't know who contributed to 9-Z1.
8       Q.   Right, I'm asking you to assume for a
9   moment that you did know who contributed.
10      A.   But that's not how we do our comparison.
11  We don't know.  That's why it's an evidentiary
12  sample, unless we know that it comes from someone's
13  body.  Even then we don't know if we're going to
14  detect someone's DNA in the profile that we detect.
15  So, you are asking me to assume something that we
16  normally don't do.
17      Q.   Okay, then I won't ask you to do it for
18  even hypothetical purposes.
19           You did not find a 29 in the sample, did
20  you.
21      A.   At D21 for 9-Z1, no.
22      Q.   Yes.  And similarly, you did not find a 35
23  in the sample at D21, did you?
24      A.   I had a minor peak which was in the
25  position of a 35.
```

**GA867**

3469

1    Q.  All right.  But under the lab's protocol,
2 you would not identify that as a genetic marker,
3 would you?
4    A.  That is correct, but we do use it for our
5 interpretation.
6    Q.  Okay.  And did you have a minor peak at 29?
7    A.  No, I did not.
8    Q.  All right.  And at 18, at FGA, the sample
9 did not have an 18, did it?
10    A.  It had a minor peak that was in the
11 position of an 18.
12    Q.  Okay.  But it was not a genetic marker, was
13 it?
14    A.  No.
15    Q.  Under the lab's criteria?
16    A.  It did not reach the level of being
17 reported, but we do make a note that there is
18 amplified DNA product at the position of the 18
19 genetic marker that is greater than 50 and less than
20 75 RFUs.
21    Q.  Okay.
22    A.  And we use those asterisk peaks or minor
23 peaks in our interpretation.
24    Q.  Do you use the absence of any minor peaks
25 in your interpretation?

3470

1    A.  Yes.  We use all the data that we see.
2    Q.  Okay.
3    A.  In the DNA profile.
4    Q.  So, even --
5    A.  As information when we do our comparison.
6 We don't pick and choose to ignore some data.  I'm
7 not sure really where that question --
8    Q.  The question came from the absence of a
9 minor peak at 29.
10    A.  That's correct.  That's correct, there is
11 no peak at -- minor peak at position 29 in D21.
12    Q.  Okay.  And yet -- because there was no
13 markers there, you are not including them as
14 contributors to the sample, right?  We're in this
15 middle category?
16    A.  I don't understand that question.
17    Q.  All right.  You are not saying they're
18 included as contributors.
19    A.  Right, because not all of their genetic
20 markers were detected in the DNA profile from 9-Z1.
21 In order to say included I would have to find -- I
22 would have had to detect -- all of the genetic
23 markers that are in their DNA profile would also
24 have been detected in the DNA profile in 9-Z1 in
25 order to say included.

3471

1    Q.  Now, when you were testing these -- this
2 sample, you did three injections, did you not?
3    A.  I will have to check my worksheets.
4    Q.  Okay.
5    A.  Okay, yes, I did three injections.
6    Q.  One was on January 31, 2007?
7    A.  Correct.
8    Q.  And that was for 10 seconds, right?
9    A.  Yes.
10    Q.  And the next time was on February 1st,
11 2007?
12    A.  That is correct.
13    Q.  And that was for 20 seconds, right?
14    A.  That is correct.
15    Q.  And the first time you did it on
16 February -- on January 31st, that didn't give you
17 enough information, did it?
18    A.  From looking at the electropherograms from
19 that injection I could see that the peak heights of
20 the highest peak was about a thousand RFUs.
21 Therefore, I knew I could still do a slightly longer
22 injection of that sample and I would not be getting
23 peak heights that are off scale, where you've hit
24 the maximum, where you are above five to six
25 thousand RFUs.  So since I could see that, I went on

3472

1 and did a further injection.
2    Q.  Okay, and the second time you did it for
3 the 20 seconds, right?
4    A.  Correct.
5    Q.  At that time you saw some minor peaks, did
6 you not?
7    A.  Yes, I can see that I marked the
8 electropherograms for the minor peaks.
9    Q.  Okay.  And the third time you gave it a
10 longer injection time to 30 seconds, right?
11    A.  No, it was an injection time --
12    Q.  25?
13    A.  25 seconds.
14    Q.  Right.  And it was that final run that you
15 based your ultimate conclusions on, right?
16    A.  That's correct.
17    Q.  You never ran the sample twice under the
18 same conditions, did you?
19    A.  No.
20    Q.  So you never verified that you would get
21 the same thing if you did it the same way?
22    A.  That's not in our protocol.
23    Q.  And you didn't do it in this case, did you?
24    A.  That's correct because it's not in our
25 protocol.

3473

```
1      Q.   Now, you also found -- in fact, with
2  respect to none of these samples did you do them
3  twice in the same way, did you?
4      A.   That's correct.
5      Q.   As far as 15-Z2 -- changing samples here
6  for a moment.  My apologies for not being clear.
7      A.   Yes, I'm looking at 15-Z2.
8      Q.   And in that area you concluded and
9  testified that Azibo Aquart could not be excluded as
10 a possible contributor, correct?
11     A.   That's correct.
12          MS. DAYTON:  Your Honor, I apologize.
13 May we approach for one moment?
14          THE COURT:  You may.
15          (Sidebar conference)
16          MS. DAYTON:  I just wanted to bring
17 something up now so we didn't have to go back
18 through and find it in the transcript.  Mr. Sheehan
19 was just asking her about verifying her work and if
20 you ever ran it in the same way to get the same
21 thing.  That is exactly the purpose of the second
22 examiner looking at things, to verify.  They look at
23 the data and they verify it.  So, I believe he just
24 opened the door about me asking about verification
25 of her work by Carll Ladd.  Dr. Ladd, who is her
```

3474

```
1  supervisor, goes through all of the work and
2  verifies all of the data and the worksheets.  It was
3  just said 12:15, and I didn't want to have to go
4  back four hours later.
5          THE COURT:  So the question was had she
6  ever ran a sample two times under the same
7  conditions.  And he would have, therefore, run
8  samples under the same conditions.
9          MS. DAYTON:  No, he asked her, you never
10 went back and verified your work.  Basically you
11 never ran it again to verify it.  They don't do it
12 because someone else looks at the data to verify it.
13 That is their protocol instead of running it a
14 second time.
15          MR. SHEEHAN:  That isn't my question.
16          MS. DAYTON:  I know it's not your
17 question.
18          MR. SHEEHAN:  I don't think it's a fair
19 characterization of my question.
20          THE COURT:  You asked her whether she
21 ran her samples.
22          MR. SHEEHAN:  Correct.
23          THE COURT:  Under the same conditions.
24          MR. SHEEHAN:  Right.  Ladd doesn't do
25 that.  Nobody does that.
```

3475

```
1          THE COURT:  Have you asked her whether
2  she has verified anything at this point?
3          MR. SHEEHAN:  No.
4          MS. DAYTON:  Yes.  Yes, he just did.  He
5  asked did you go back and run it again and verify
6  it.  That's why I wanted to bring it up right now so
7  we didn't have to go hunting through the transcript
8  for it.
9          THE COURT:  So you never verified that
10 you would get the same thing if you did it in the
11 same way.
12          MR. SHEEHAN:  That's what I asked.
13 That's not what Ladd does.
14          MS. DAYTON:  We can discuss it later but
15 I just wanted to raise it.
16          (Sidebar concluded)
17     Q.   With respect to 15-Z2, do you have that in
18 front of you now?
19     A.   Yes, I do.
20     Q.   In 15-Z2, you did not find Azibo Aquart's
21 profile to match at three loci, correct?
22     A.   There are three loci that I didn't use in
23 the statistics, yes.
24     Q.   And the reason that you didn't use them in
25 the statistics is because his profile didn't match
```

3476

```
1  at those three loci, correct?
2      A.   Both -- not both of his genetic markers
3  were called at each of those loci.
4      Q.   And those three loci were D21, D2S and vWA,
5  right?
6      A.   That is correct.
7      Q.   Now, under your criteria you cannot
8  scientifically determine whether or not any specific
9  allele has dropped out, can you?
10     A.   For a DNA profile such as this where I see
11 a lot of low level peaks, no, there may be drop out.
12     Q.   There may be drop out, right?
13     A.   That is correct.
14     Q.   So, what we're functioning in is that
15 stochastic zone, as it were, scientifically?
16     A.   Yes.
17     Q.   And where the issue is one of chance,
18 right?
19     A.   Not completely, no.  I would not agree it's
20 totally chance.
21     Q.   I didn't ask you if it was totally chance.
22          MS. DAYTON:  Objection.  The witness may
23 finish her answer.
24          THE COURT:  Let her finish, please.
25     A.   It's not --
```

3477

```
1            THE COURT:  Maybe you were finished.
2     Q.   Go ahead.
3     A.   I was saying it's not totally chance.  We
4  know that some of the sites that we test I would say
5  are more susceptible to the drop out.  At the
6  shorter sites we tend not to see the drop out and at
7  some of the longer fragments of DNA that are tested,
8  those sites we tend to see it there.  So, yes, it's
9  somewhat chance, but it's not completely.  I would
10  say there is some reason for why we see drop out
11  occurring more at some of the sites we test and less
12  at some of the other sites we test.
13     Q.   Now, I want to turn to the frequency
14  computations and I want to ask you about the methods
15  that you use in computing frequencies.
16            Looking at 9-Z1, at the D8 locus you
17  found a 12, a 13, a 14 and a 15 locus -- I'm sorry,
18  genetic marker, did you not?  And a 16.  12, 13, 14,
19  15 and 16.
20     A.   That is correct.
21     Q.   And all of those genetic markers were
22  above, were they not, 75 RFUs?
23     A.   That is correct.
24     Q.   Now, I'm going to ask if we can turn to
25  JJJ, three Js, 1, and you have a similar worksheet
```

3478

```
1  in your file, do you not?
2     A.   Yes, I have it in front of me.
3     Q.   And the difference between what is here on
4  JJJ-1, as compared to the one in your file, is that
5  we have put numbers on the top of each of the locus,
6  right?  Just above the black band we have got those
7  numbers in red.
8     A.   Yes, I see that.
9     Q.   The numbers we have in red correspond, do
10  they not, to the appropriate locus?
11     A.   Yes, they do.
12            MR. SHEEHAN:  Your Honor, at this time I
13  would offer Defendant's Exhibit JJ-1 -- JJJ, three
14  Js, 1.
15            THE COURT:  So this is yours with the
16  loci added across the top; is that right?
17            THE WITNESS:  Yes, because you can't see
18  the loci name very clearly because they're colored.
19            THE COURT:  Okay.  All right, full
20  exhibit.
21            MR. SHEEHAN:  If we could, your Honor,
22  turn down the lights a bit here.
23     Q.   I've just picked out -- I'm just asking you
24  at this moment about one chart.  In fact, lest there
25  be any confusion, you actually do a separate chart
```

3479

```
1  for each of the three population groups, do you not?
2     A.   That is correct.
3     Q.   Okay.  And using this one as just an
4  example, in this case we're looking at the
5  statistics that your study has for Connecticut
6  African-Americans, correct?
7     A.   That is correct.
8     Q.   Now, the method that you use in computing
9  these frequencies is that you look at the percentage
10  of the population that has each of the separate
11  alleles, or genetic markers, right?
12     A.   We look at the frequency of the genetic
13  markers for this example in the African-American
14  population.
15     Q.   So, if we could just focus on D8 for a
16  moment and go down.  All right, so, for example, the
17  12 allele, that's 12 point -- 13 percent of the
18  African-American population in Connecticut?
19     A.   Will have 12 genetic marker.
20     Q.   Okay.  And similarly 18 percent on the 13?
21     A.   Yes.
22     Q.   And going down, that basically gives you
23  the percentages, right?
24     A.   Well, it gives you the frequency.
25     Q.   I'm sorry?
```

3480

```
1     A.   If it was percentage it would be times'd by
2  100.
3     Q.   Just so -- all right, so .129 means
4  12.9 percent, right, if that was percentages?
5     A.   Right.  If you converted that to percent.
6     Q.   All right, but if we keep it at
7  frequencies, it's .129, right?
8     A.   Correct.
9     Q.   And then what you do -- isn't it a fact
10  that what you do is that when you want to look at
11  this complete profile, you are going to basically
12  add those numbers together, meaning you are going to
13  add all of the frequencies associated with D8,
14  right?
15     A.   That is correct.
16     Q.   And that comes up with that number called
17  P?
18     A.   Correct.
19     Q.   Down at the bottom.  And then what you are
20  going to do is under the DNA techniques is you are
21  going to multiply that by itself and that comes out
22  with a .822.
23     A.   Correct.
24     Q.   And you do that for each of the different
25  alleles, or genetic markers.  In other words, you do
```

3481

```
1   the same thing for D7?
2        A.   For each of the loci.
3        Q.   Exactly.  I'm sorry, for each of the loci.
4   You do the same thing for D7, right?
5        A.   That is correct.
6        Q.   All the way across?
7        A.   That is correct.
8        Q.   All right.
9             MR. SHEEHAN:  Now, if we could take down
10  the builds just for a second.
11       Q.   Then what you end up with on the bottom is
12  a bunch of -- you end up with a total of
13  probabilities, is that what they're called.
14  Probabilities of inclusion?
15       A.   Combined probability of inclusion is the
16  CPI.
17       Q.   And the PI, that means the probability of
18  inclusion?
19       A.   Combined probability of inclusion.
20       Q.   I'm sorry, I guess I'm just asking if you
21  could help me, what does this PI thing mean?
22       A.   Probability of inclusion.
23       Q.   All right.  So, we have a probability of
24  inclusion for each locus and then you combine them
25  together, right?
```

3482

```
1        A.   Well, you multiply them together.
2        Q.   Not adding them?  This time you multiply
3   them across?
4        A.   I'm sorry, I think we're getting confused.
5        Q.   I might be confused.  Yeah.  You add going
6   up and down up to the probability, right?
7        A.   Right, you add the frequencies together.
8   Then you square them, or multiply them, by
9   themselves.  Then that gives you the PI for each of
10  the sites that we test.  And then to get the
11  combined probability of inclusion, you multiply the
12  PIs together.  So first you do addition, then a
13  squaring, then a multiplying together.
14       Q.   And each additional allele that you
15  identify in effect gets added in as you are going
16  down, right?
17       A.   That's correct.
18       Q.   All right.  So, under this chart that we
19  have here, this was the combined probability of
20  inclusion for somebody whose profile was in all
21  of -- met all of the different loci, right?  Was
22  included within all of the different loci?
23       A.   For a person who is included as a
24  contributor to the DNA profile from 9-Z1.
25       Q.   In that case, in that bottom figure, it
```

3483

```
1   would be about one over 24,000 people?
2        A.   Approximately one in 24,000
3   African-Americans are included as a contributor in
4   the DNA profile from 9-Z1.
5        Q.   And if there were additional loci -- I
6   mean, if there were additional alleles at any loci,
7   this would increase the percentage of the population
8   who might have been contributors, would it not?
9        A.   Correct.  As you detect more genetic
10  markers there is the possibility of more people who
11  could be a contributor to that DNA profile.
12       Q.   And so establishing the correct figure for
13  each locus is an integral component of the overall
14  statistics, is it not?
15       A.   Well, it's what we detect.  I don't know
16  what you mean by "correct."  It's what we detect.
17       Q.   Well, if there were more contributors it
18  would change, right?
19       A.   Right.  We put the correct numbers into
20  this, yes.  We don't put numbers into here that we
21  haven't detected in the DNA profile.  So these
22  numbers are accurately put in here.
23       Q.   In estimating the probability that either
24  Azibo or Azikiwe Aquart could not be excluded as
25  contributors, you didn't count D21, D2S or FGA, did
```

3484

```
1   you?
2        A.   That's correct.
3             MR. SHEEHAN:  So if we could bring up
4   MM-5.  I'm sorry JJ-2 -- JJJ-2.
5        Q.   Looking at your screen with respect to
6   Defendant's Exhibit JJJ-2 for identification, does
7   this again reflect the frequency chart that you
8   developed in this case?  Again with the slight
9   difference that the numbers on top are red.
10       A.   That's correct.
11       Q.   All right.  And this time you did not
12  include -- this is where you deleted those three
13  loci.  "Deleted" meaning you assigned a 1 to them.
14       A.   That is correct.
15            MR. SHEEHAN:  I'd offer it at this time.
16            THE COURT:  All right, full Exhibit
17  JJJ-2.
18       Q.   Okay.  So, what you did in this case was
19  similar to what you did on the previous exhibit only
20  this time you assigned a number 1 to those three
21  loci, correct?
22       A.   That's correct.
23       Q.   And the net effect of that was to reduce
24  that combined probability of inclusion now down to
25  about one in 140, right?
```

3485

1   A.   That's correct, approximately one in 140 in
2   the African-American population.
3   Q.   Isn't it a fact that once you have
4   recognized the possibility of drop out at any given
5   locus you have no way of giving -- of telling us
6   what the complete picture of the odds associated
7   with that locus is?
8   A.   I'm giving you the frequency from the
9   results that I detected.
10   Q.   And you are also telling us, are you not,
11   that in your opinion there may, may be drop out at
12   certain the loci.
13   A.   Yes, from a low level contributor or a
14   degraded sample.
15   Q.   If, in fact, that person was a
16   contributor -- let's say for example you had
17   additional contributors -- let's go back, in fact,
18   for a moment, if we might, to what was JJJ-1.  At
19   D21, you observed, did you not, five genetic
20   markers?
21   A.   For 9-Z1?
22   Q.   Yep.
23   A.   Yes, I have five genetic markers there.
24   Q.   And the total effect of that is that when
25   we look down at the probability of inclusion on

3486

1   that, about 23 percent of the African-American
2   population could have contributed at that locus,
3   right?
4   A.   That's correct.
5   Q.   In fact, however, you did determine that
6   there was some possibility that other alleles might
7   have been present at that location, right?
8   A.   Yes, it's an asterisk peak.  It doesn't
9   reach the height, the minimum threshold level.  It's
10   not reported as a 35, therefore we can't use it in
11   our statistics.
12   Q.   And because of that you can't really tell
13   us what the total probability of inclusion is, can
14   you?
15   A.   I'm telling you that the probability of
16   inclusion for those genetic markers which were equal
17   to or above the minimum threshold level.
18   Q.   In this case you also assumed that drop out
19   was possible at other loci, did you not?
20   A.   I didn't assume it.  I said it was a
21   possibility.
22   Q.   Okay.  And for example at D13.
23   A.   That's correct, I see D13.
24   Q.   You saw a possibility of drop out for Mr.
25   Johnson.

3487

1   A.   Yes.
2   Q.   And similarly at D18 you found a
3   possibility of drop out for Mr. Johnson.
4   A.   That's correct.
5   Q.   And at D7 you found a possibility of drop
6   out for Mr. Taylor.
7   A.   I'm sorry?
8   Q.   D7.
9   A.   I'm sorry.
10   Q.   You have to look -- it's the later report.
11   A.   Could we go back to Efrain Johnson?
12   Q.   Yes, for Efrain Johnson at D2S you found a
13   possibility of drop out for him, did you not?
14   A.   Actually D21 I think you are referring to.
15   Q.   Okay, D21 you found one and also D2S.
16   A.   Correct.
17   Q.   Okay.  And then we have to shift to Mr.
18   Taylor.
19   A.   Okay.
20   Q.   At D7 you found a possibility of drop out
21   for him.
22   A.   Correct.
23   Q.   At D2S you found a possibility of drop out
24   also for Mr. Taylor.
25   A.   That is correct, though one of his genetic

3488

1   markers was in the asterisk level.
2   Q.   At D18 you found a possibility of drop out
3   for Mr. Taylor.
4   A.   I'm sorry, I'm getting a little lost.
5   Could we go back to the beginning of comparison.
6   Q.   Sure.  Of Taylor?
7   A.   John Taylor, yes.
8   Q.   D7?
9   A.   Yes, there is a possibility of drop out.
10   Q.   D2S?
11   A.   Yes.
12   Q.   D18?
13   A.   Yes.
14   Q.   And FGA?
15   A.   Correct.
16   Q.   If, in fact, the percentages associated
17   with the various genetic markers that you found were
18   possible drop out, if those percentages were added
19   to the chart, the conclusions would change, would
20   they not?
21   A.   Well, for the statistics for those
22   individuals we used 1 as the P value, or PI, because
23   we don't use those loci in the statistical
24   evaluation.  So, it's not -- I don't understand what
25   you are referring to.

3489

1     MR. SHEEHAN:  If we could go back for a
2 moment no JJ-1.  I'm sorry, JJ-2.
3     THE COURT:  JJJ.
4     MR. SHEEHAN:  Yes, your Honor, three Js.
5     Q.   In the case of -- when you were computing
6 the frequencies -- the probability of inclusion for
7 Mr. Aquart, you were assuming that you had a
8 complete picture of the contributors to D13, did you
9 not?
10    A.   No, I'm putting the genetic markers that I
11 detected.
12    Q.   And similarly, with respect to Mr. Aquart,
13 you were assuming that you had a complete picture of
14 the contributors to D18?
15    A.   Again, I'm putting the genetic markers that
16 I detected.  This is -- that's how we do our
17 statistics.  We use the genetic markers that are
18 above the minimum threshold level.
19    Q.   Now, this issue of the way in which you
20 treat the possibility of drop out and compute
21 frequencies associated with low quantity number DNA,
22 that is a contentious issue in your field, is it
23 not?
24    A.   The way we treat it?
25    Q.   Yeah.

3490

1     A.   Or it's various laboratories do mixture
2 interpretation differently?
3     Q.   Okay?
4     A.   I'm not sure which question -- which part
5 of that question.
6     Q.   You are familiar with a Dr. Bruce Budowle?
7     A.   Yes.
8     Q.   And you, in fact, wrote a paper with him,
9 did you not?
10    A.   When our database was published he was one
11 of the authors.
12    Q.   As were you?
13    A.   No.
14    Q.   Okay.  And did you -- you know him to have
15 been a senior forensic scientist at the FBI?
16    A.   I don't know his background specifically.
17 I think I do remember hearing that, that he was at
18 the FBI, but what position he held there I'm not
19 familiar.
20    Q.   Are you aware of his recent publication in
21 the journal of forensic sciences -- Journal of
22 Forensic Science regarding mixture interpretations
23 in forensic case work?
24    A.   Well, I don't know how many different
25 papers he's published recently.  If you are

3491

1 referring to a specific paper.
2     Q.   Yes, I'm asking you about his publication
3 in the Journal of Forensic Science in May of 2009.
4     A.   Yes, I'm familiar with that.
5     Q.   And can you -- is the Journal of Forensic
6 Science a peer review-related publication; to your
7 knowledge?
8     A.   Yes.
9     Q.   And is that -- are the publications in the
10 Journal of Forensic Science something that are
11 reviewed by members of your profession?
12    A.   Yes.
13    Q.   And is Dr. Budowle recognized as one of the
14 authorities in your field?
15    A.   He's one of the contributors to the
16 research in the area of forensic DNA work.
17    Q.   Okay.  And are you familiar with the
18 procedures advocated by Professor Budowle with
19 respect to mixture interpretation?
20    A.   Well, he discusses in this paper -- it's a
21 discussion to present various scenarios to consider
22 in interpretation of mixtures.
23    Q.   And is that something that you have
24 reviewed?
25    A.   Yes, I have.

3492

1     Q.   Now -- if I might have one second.  With
2 respect to that publication -- well, actually does
3 the Connecticut state lab identify loci where some
4 genetic components of the interpretive portion of
5 the sample failed to be detected?  When you are
6 looking at a sample, do you first make an assessment
7 as to where drop out might have taken place before
8 you look at any contributors, before you look at any
9 known suspects?
10    A.   No.  I just look at the DNA profile, I
11 analyze it, I check to see if there is any stutter
12 being called, any spikes, any dye artifact, anything
13 that is not a true representation of amplified DNA.
14 That's what we do as the first step in developing
15 our DNA profile.
16    Q.   And you pick out areas -- do you identify
17 those areas where the genetic -- where the DNA
18 appears to be in the stochastic zone?
19    A.   Yes, you can see that by looking at the
20 peak heights.
21    Q.   All right.  And do you agree with the
22 recommendation from Dr. Budowle that you not include
23 loci in frequency calculations which include DNA
24 material below the stochastic level?
25    A.   No, I follow the protocols in our

**GA873**

3493

```
1    laboratory.
2        Q.   Okay.
3        A.   Those are the protocols as a member of the
4    DNA section that I have to follow.  This paper that
5    you are referring to is a discussion.
6        Q.   All right.
7        A.   It is not a mandate for the laboratories in
8    the United States, or wherever, to follow.  Dr.
9    Budowle has discussed in this paper --
10       Q.   All right.  I asked -- so you do not follow
11   that recommendation or that suggestion?
12           MS. DAYTON:  Objection, asked and
13   answered.
14           THE COURT:  Sustained.
15       Q.   Now, let me ask you this:  Are you familiar
16   with a group called the Scientific Working Group on
17   DNA Analysis?
18       A.   Yes, I am.
19       Q.   And that is -- does that get called SWGDAM?
20       A.   SWGDAM.
21       Q.   SWGDAM.  And what is that group?
22       A.   It's a group of, in this case for the DNA
23   forensic DNA testing, a group of, as it says here,
24   50 scientists representing federal, state and local
25   forensic DNA laboratories in the United States and
```

3494

```
1    Canada.
2        Q.   Okay.  And are you familiar with their --
3    I'm sorry, are you familiar with their recent
4    publication of guidelines approved in January of
5    2010 and published in May of 2010 regarding
6    interpretation of DNA typing -- mixture
7    interpretation of DNA typing?
8        A.   Yes, I'm familiar with it.
9        Q.   And is SWGDAM -- are those guidelines?
10           MS. DAYTON:  I'm going to object to any
11   further questions since this was written after all
12   the DNA testing was done in this case that counsel
13   has been talking about with the witness.
14           THE COURT:  What is your next question?
15           MR. SHEEHAN:  My next question, your
16   Honor?
17           THE COURT:  In other words, if these
18   guidelines came after all her work.
19           MR. SHEEHAN:  May we approach?
20           THE COURT:  Yes.
21           (Sidebar conference)
22           MR. SHEEHAN:  Your Honor, I am
23   challenging her interpretation, her practice as it
24   applies right now in offering this testimony.  These
25   guidelines were promulgated in 2010 which precedes
```

3495

```
1    the date of her testimony today.  I'm not saying
2    that she followed improper procedure at the time
3    that she did it.  What I am saying is that what she
4    did now, not what she's testifying to, is contrary
5    to what those guidelines call for.
6            MS. DAYTON:  And my position is, one,
7    this is also just a paper and a suggestion, a
8    discussion.  It's not her guidelines.  It's not the
9    lab protocol.  The lab protocol has not remotely
10   been changed or been influenced by this paper.  I'm
11   sure, just like judges have different opinions on
12   how they should instruct a jury, different bodies
13   have different opinions on how they should do
14   mixture interpretation.  The lab does not follow
15   this.  It has not changed their protocol to follow
16   it.  This is not done by an accredited, like, group.
17   This SWGDAM doesn't do accreditation for labs.  And
18   this was written after the testing was done in this
19   case.  So, the government's position is it's wholly
20   irrelevant.
21           THE COURT:  So I don't --
22           MR. SHEEHAN:  It's not irrelevant, your
23   Honor, because in fact the method that she's
24   advocating, that she's employing right now, is in
25   fact a very disputed mechanism.  I think that even
```

3496

```
1    though the lab may continue to adhere to that
2    method, that's fine, they can do that, but I think
3    that a jury can learn through this witness with
4    respect to -- under the treatise rule I think
5    that --
6            THE COURT:  But why does this fall under
7    the treatise rule?
8            MR. SHEEHAN:  I think it does, your
9    Honor, because SWGDAM is -- the publications of
10   SWGDAM are basically a very authoritative source.
11           THE COURT:  All I know is it's 50
12   scientists in 50 forensic DNA labs.  I don't know
13   anything more about its learnedness.
14           MR. SHEEHAN:  I think I can go through
15   that with this witness.
16           MS. DAYTON:  Your Honor, I believe she's
17   the wrong witness.  I believe that if counsel wants
18   to do this he needs to do this with the director of
19   the DNA section who is the person who creates the
20   rules, the protocols and, he can question Carll Ladd
21   as to why a change hasn't been made.  This woman
22   works in the lab.
23           THE COURT:  The answer you are going to
24   get from her is I follow my protocols for my lab,
25   right?
```

3497

```
 1         MR. SHEEHAN:  Right, but I think what
 2  I'm also going to get from her --
 3         THE COURT:  And this isn't -- you say
 4  this SWGDAM has different guidelines from your
 5  protocols.
 6         MR. SHEEHAN:  Yes.
 7         THE COURT:  And then?
 8         MR. SHEEHAN:  And then, had those
 9  different guidelines been followed.
10         THE COURT:  But we don't have -- they're
11  not coming into evidence.  There is no foundation
12  that this is a learned treatise that is referred to
13  and relied upon by those in the field.
14         MR. SHEEHAN:  Well, I think I can
15  establish that through this witness, your Honor.
16         MS. DAYTON:  Again, the government would
17  object.  This is a fishing expedition.  This is not
18  a woman who sets protocol.  She has no authority to
19  change protocols.  As she said umpteen times over
20  the past three days, she followed her protocol.
21  And, again, we believe this is the wrong witness to
22  do this with.
23         MR. SHEEHAN:  They can't --
24         THE COURT:  My problem is that if you,
25  in essence, are getting her to agree that there are
```

3498

```
 1  other guidelines or standards or something out there
 2  different from what the protocol that's used, isn't
 3  that the end of the line with her?
 4         MR. SHEEHAN:  Yeah, but then I can
 5  basically explain -- she can I think through the
 6  learned treatise --
 7         THE COURT:  That's where you are losing
 8  me.
 9         MR. SHEEHAN:  No, because what -- in
10  fact I think this woman is not really -- she's been
11  qualified as an expert in this area.  She can
12  recognize the significance of SWGDAM in the field.
13  She may say that she did not herself rely on it,
14  because she didn't, but she can say what it is.
15         MS. DAYTON:  Your Honor, I'm going to
16  point out that she had to read what it was from the
17  front of the paperwork, the 50 people wrote it
18  together.  She didn't offer up, you know, a view of
19  it.  And the only reason she has this is because
20  counsel gave it to her supervisor who does set the
21  lab protocols.  And so, again, I think that this is
22  wholly irrelevant, and that we disagree that she's
23  an expert on DNA lab protocols.  We think she's an
24  expert on DNA analyze and utilizing the protocols
25  given to her, but she is not an expert on
```

3499

```
 1  mitochondrial DNA.  She's not an expert setting
 2  protocol on what standard could be followed.  We do
 3  not think that this should come in -- she read it
 4  off what it was, approximately 50 scientists
 5  representing.  That's what she read into the record.
 6         MR. SHEEHAN:  But, your Honor, this is
 7  really like saying she -- she knows what this is.
 8  This is not that -- this is not just a fringe
 9  lunatic group.
10         THE COURT:  It's quite a gap between
11  that and learned treatise.
12         MR. SHEEHAN:  I think with respect to a
13  learned treatise, if they acknowledge that this is
14  one of the -- it's a respected group.  It's a
15  publication.
16         THE COURT:  That doesn't make it a
17  learned treatise, though.  The whole reason why
18  learned treatises can be examined from is everybody
19  accepts them as authoritative.
20         MR. SHEEHAN:  Not everybody accepts
21  treatises as authoritative.  Then witnesses could
22  just say no.  And people may accept them as
23  authoritative in some respects and not in others.
24  I'm confronting a witness with a publication.
25         THE COURT:  That is not in evidence and
```

3500

```
 1  isn't going to come in to evidence.
 2         MR. SHEEHAN:  But the way it comes into
 3  evidence in this context I think is that the witness
 4  can acknowledge it and the witness can indicate that
 5  under those procedures they were not, for example --
 6         MS. DAYTON:  Not only is this not a
 7  learned treatise, and I'm sad that I even know this,
 8  this is how much time I've spend with DNA, it's
 9  internally inconsistent and the lab does not accept
10  this as an authoritative.
11         THE COURT:  Why don't we start with
12  whether or not this meets the learned treatise.  If
13  not, it seems to me that I don't see where we're
14  going, anywhere other than she'll say we have our
15  protocols, other people have their standards, life
16  goes on, maybe.
17         (Sidebar concluded)
18    Q.  Ms. Roy, prior to -- when did you first
19  start working on DNA?  I think you told us before.
20  Was it 19 --
21    A.  I was -- I received training when I worked
22  at the OCME in New York City.
23    Q.  In 19?
24    A.  I think I started there in 1997.  I started
25  there in December of 1997.
```

**GA875**

3501

1    Q.   Okay.  And before today, had you heard of
2  SWGDAM?
3    A.   Yes.
4    Q.   And when did you first hear about SWGDAM?
5  Is SWGDAM basically a -- can you tell us what
6  position that occupies in the DNA field?
7    A.   Well, there is -- SWGDAM is made up of
8  members in that particular field who work in that
9  particular field, and they look into different
10  aspects of the DNA testing and study it and make
11  reports on it, things that are being discussed in
12  the forensic community, DNA community, such as when
13  YSTRs came out, about the statistics for YSTRs.
14  That's just one example.
15    Q.   Okay.
16    A.   So, it's guidelines, and then it's ongoing
17  discussion in forensic DNA testing as things change
18  and new procedures come online.  It's -- there is an
19  ongoing discussion.
20    Q.   And with respect to SWGDAM, do you know the
21  process of -- are you familiar generally with the
22  process by which a guidelines are identified?
23    A.   Through discussion.  I know there is
24  committees within SWGDAM that look into and
25  investigate different topics.

3502

1    Q.   And are you familiar with the fact that
2  there has been a mixture interpretation committee of
3  SWGDAM working on issues of mixtures for -- between
4  2007 and 2010?
5    A.   Those particular -- oh, yes, I see where
6  that's listed here on the paper.
7    Q.   Now, do those guidelines provide
8  information to labs about the handling of DNA
9  evidence?
10    A.   Of DNA results?
11    Q.   Yes.
12    A.   Yes, they're guidelines.  They're papers
13  for discussion, for review.
14    Q.   Okay.  And do they provide guidelines that
15  are relied upon in the field?
16    A.   As I said, they're reviewed and discussed,
17  but that's all they are.  They're guidelines,
18  they're not mandates.
19    Q.   Do your protocols reference the SWGDAM
20  guidelines?
21    A.   That I don't recall.
22    Q.   Okay.  Were you familiar with the
23  publication of the guidelines on interpretation of
24  mixtures?
25    A.   This paper that you already brought up?

3503

1    Q.   Yes.
2    A.   Yes.
3    Q.   Were you familiar with that when it was
4  published?
5    A.   I don't recall when we -- when this was
6  brought up in the laboratory.
7    Q.   Was it recently?
8    A.   Yes.
9    Q.   Now, let me ask you this:  Are you familiar
10  with how the SWGDAM guidelines would apply with
11  respect to interpretations of samples such as the
12  mixture samples in this case?
13          MS. DAYTON:  I'm going to object to any
14  further questions.  There is no proof this is a
15  learned treatise.  It's a discussion paper, as the
16  witness said repeatedly.
17          THE COURT:  I confess to not
18  understanding the question.  Are you asking her
19  whether she has an understanding about SWGDAM
20  guidelines?
21          MR. SHEEHAN:  Yes.
22          THE COURT:  What does that mean?  What
23  does "understanding" mean?
24    Q.   Do you know how these guidelines apply in
25  the context of mixture interpretations?

3504

1    A.   Again, I follow the protocols that are set
2  forth in the DNA section.  We -- these are
3  guidelines.  They also include other things that we
4  do not do in the laboratory, such as mixture
5  deconvolution and likelihood ratios.  So this paper
6  is a discussion.  As it says right here, this
7  document provides guidelines.  It's not a mandate.
8  So, I could read the paper and understand the paper,
9  but that is not -- but it is not our protocols.  I
10  follow the protocols.  This is a guideline.  They're
11  two separate things.  It's a discussion.  It
12  includes other things in here besides what we've
13  been talking about, which is the peaks at the
14  stochastic level.
15    Q.   So you do understand what these guidelines
16  are saying.
17          MS. DAYTON:  I'm going to renew my
18  objection.
19          THE COURT:  I'm going to sustain the
20  objection.
21    Q.   In this case you do use loci with alleles
22  below the -- the stochastic threshold for
23  statistical purposes do you not?
24    A.   If a peak is above or equal to 75 RFUs,
25  then we include that in our statistical evaluation.

**GA876**

3505

1    Q.    Even though there is other genetic
2    material, suspected genetic material below that
3    level?
4    A.    Correct.  We see an asterisk peak, but we
5    do not include those asterisk peaks in our
6    statistical evaluation because they are not equal to
7    or above 75 RFUs.
8    Q.    Let me ask you this:  You've talked about
9    drop out, right?  We've talked somewhat about the
10   problem, the issues of drop out.  Do you agree that
11   -- and you've told us that you would expect drop out
12   to occur in the larger amplicon -- in the larger
13   loci?
14   A.    It's not that I expect to see it there,
15   it's that's where we often see it occur.
16   Q.    Okay.  And you have reviewed professor --
17   Dr. Budowle' position in that Journal of Forensic
18   Science magazine?
19          MS. DAYTON:  I'm going to object on the
20   same grounds.  It's a discussion.
21          THE COURT:  She said she reviewed it,
22   but then -- now, what's next?
23   Q.    You have reviewed that?
24   A.    Yes, if you are talking about that May 2009
25   paper of his.

3506

1    Q.    Yes.
2    A.    Yes, I reviewed it.  And again, it's a
3    discussion, it's not a mandate.  I have to follow
4    the protocols as set forth in the DNA section at the
5    Connecticut forensic laboratory.
6    Q.    Okay.  And do you agree that your protocols
7    are different from those?
8    A.    Well, this isn't a protocol, it's a paper.
9    Q.    And that your protocol is different from
10   the position advocated in that paper?
11          MS. DAYTON:  I'm going to object as
12   vague because it's a long paper.
13          THE COURT:  Sustained.
14   Q.    Do you agree that your position with
15   respect to the inclusion of loci where there is
16   material below the stochastic level is different
17   from that advocated by Dr. Budowle?
18          MS. DAYTON:  Objection.  It's
19   irrelevant.
20          THE COURT:  I'm not going to ask her to
21   read the paper now.
22   A.    I'm looking for an area that I highlighted.
23          MS. DAYTON:  But, your Honor, it's
24   irrelevant.  It's a paper.
25          THE COURT:  The question of whether or

3507

1    not the -- if there is a difference between her
2    technique and another's may not be irrelevant, but
3    let's just get it one question at a time.
4          MS. DAYTON:  My further objection is
5    this person has not --
6          MR. SHEEHAN:  Your Honor, I'm objecting
7    to speaking objections.
8          THE COURT:  Let's just get an answer to
9    the question, which if you lost the question I would
10   understand.
11   A.    Well, I'm just noting here in his
12   conclusion, the first sentence is "a standard
13   mixture interpretation protocol is not recommended
14   or possible."
15          THE COURT:  Next question, please.  You
16   have a question or lunch.  Those are the choices.
17          MR. SHEEHAN:  Lunch would be good.
18          THE COURT:  Let's do that.
19          MR. SHEEHAN:  Thank you, your Honor.
20          (Jury exited the courtroom.)
21          THE COURT:  All right, now, let me
22   excuse the witness for lunch, see whether there is
23   anything else that we need to take up.  I don't know
24   whether at this point you want to argue the issue in
25   defendant's 788, motion to preclude evidence that

3508

1    the DNA report was reviewed by a second examiner.
2          MS. DAYTON:  Sure.
3          THE COURT:  So the question I suppose
4    is, in part, it's a little bit -- I think a little
5    bit of what the motion is about, which is whether
6    she can testify that a second examiner concurred in
7    her conclusions versus having opened the door to
8    have Dr. Ladd come in to testify that he verified
9    her conclusions.  What is the government's position
10   with respect to the open door?  Because I don't know
11   that the -- well --
12          MS. DAYTON:  Okay, so the government's
13   position is based on two things.  One, yesterday, I
14   think it was yesterday, or the day before, I'm
15   sorry, I can't remember when exactly it was, Mr.
16   Sheehan showed Ms. Roy a document that was not
17   created by her, it was created by another technician
18   in the lab, and he asked her did you use this, did
19   you rely upon it, did you review it, and she said
20   yes, I reviewed it, I relied upon it, he's a
21   technician in the lab.  So, he was asking -- Mr.
22   Sheehan was asking about basically the protocol of
23   having someone else review the work or rely upon
24   reviewed work.  So that was -- I honestly don't even
25   remember which piece of evidence it was.

3509

```
1              Today he was questioning her about you
2    never verified that you get the same thing if you
3    ran it in the same way and in fact you never
4    verified any of this by running it twice.  They have
5    a protocol and their protocol is not to run it
6    twice.  They do the data, then someone else checks
7    all of the data and all the reports and everything,
8    they go back and look at all of the raw data.
9              THE COURT:  So your question is, you
10   said you never verified that you get the same result
11   the same way.  What is your protocol with respect to
12   verification.  Isn't that what the redirect is on
13   that question?
14             MS. DAYTON:  Yes.
15             THE COURT:  It seems to me it is.
16             MR. SHEEHAN:  I don't think so, your
17   Honor, because my question was limited to did you
18   ever run the data the same way twice, and the answer
19   to that was no.
20             THE COURT:  No, you said you never
21   verified that you would get the same thing if you
22   did it the same way.
23             MR. SHEEHAN:  Correct.  That's what I --
24             THE COURT:  She verified it by having
25   Ladd do it the same way.
```

3510

```
1              MR. SHEEHAN:  No.  No, he didn't do it.
2    That's the point.
3              THE COURT:  What did he do?
4              MR. SHEEHAN:  What she does is that she
5    -- well, in the particular samples that we've talked
6    about and their general practice, she does a 10
7    second injection, she follows with a 20 second
8    injection and then a 25 second injection and then
9    she bases her conclusion --
10             THE COURT:  Right.
11             MR. SHEEHAN:  -- on what comes out at
12   the 25 second injection.
13             THE COURT:  Right, I understand that.
14             MR. SHEEHAN:  She never does another 25
15   second injection.
16             THE COURT:  Right.
17             MR. SHEEHAN:  Nor does Ladd, nor does
18   anybody.
19             THE COURT:  So what does Ladd do that
20   verifies it?
21             MR. SHEEHAN:  What Ladd does is simply
22   looks at her report and says, oh, I agree that's an
23   allele, that's a -- Ladd looks at the
24   electropherograms and says, 0h, I agree that's an
25   allele, I agree that's a minor peak.
```

3511

```
1              THE COURT:  So your position is that
2    there is no verification with the second examiner by
3    running the same sample in the same way.
4              MR. SHEEHAN:  Yeah, she doesn't do the
5    same thing twice, which I think --
6              THE COURT:  No, she said she didn't, but
7    you are saying also Ladd doesn't do that.
8              MR. SHEEHAN:  Oh, no, and I don't think
9    that's in dispute, your Honor.
10             MS. DAYTON:  That's somewhat misleading.
11   Number one, you can't run many of the things twice
12   because some of them are consumed.
13             THE COURT:  I understand that.
14             MS. DAYTON:  So that's number one.
15   Number two, their verification process is for Dr.
16   Ladd to take all of the raw data.  He doesn't just
17   look at the reports, he takes all of the raw data
18   we've been looking at for days, the
19   electropherograms, all the worksheets, if you look
20   on everything that Mr. Sheehan is putting in, Mr.
21   Ladd, Dr. Ladd's initials are on it because he has
22   gone back through those to verify all her work.
23             THE COURT:  Okay.  So what happens then
24   on redirect is Ms. Dayton says you didn't verify
25   that you would get the same result if you did it the
```

3512

```
1    same way, does your protocol have any procedure for
2    verification, and she says yes and describes what
3    goes on.  And you can redirect that says, but that's
4    not running the same thing twice, is it?  So it
5    seems to me that's where this whole thing goes, if
6    it must go anywhere.  Because it's not a -- it is
7    not, from what you tell me, that anybody did the
8    same -- essentially reproduced it.
9              MR. SHEEHAN:  No, they don't.
10             THE COURT:  So you can recross on that.
11   But I do think the issue of verification and
12   protocols is quite centrally here, and I understand
13   the inference that the cases have drawn that if she
14   says that it was -- that Dr. Ladd did A, B, C, D and
15   E, that that carries with it an inference that he
16   concurred.  I don't know how you -- I mean, she
17   maybe doesn't use the word he "verified" it, but
18   he -- I mean, that's what their protocol is.  I
19   don't understand how we get around that at this
20   point.
21             MS. DAYTON:  And that's what she was
22   asked.  "Verify" was the word.
23             MR. SHEEHAN:  Well, your Honor, the way
24   we get around it is to recognize that I didn't ask
25   her that question.  The question I asked her --
```

**GA878**

3513

```
1              THE COURT:  The question you asked her
2    was "You never verified that you would get the same
3    thing if you did it the same way."
4              MR. SHEEHAN:  Right.
5              THE COURT:  Does that not suggest that
6    the issue of verification has been put in play?
7              MR. SHEEHAN:  Not generically, the whole
8    issue of verification.  If I had asked her, well,
9    you didn't have anybody else look at these results,
10   did you?  And she said, oh, I did, I had Dr. Ladd
11   look at them then --
12             MS. DAYTON:  He did.
13             MR. SHEEHAN:  -- then I would have
14   opened up the door, but I didn't open that door.
15             MS. DAYTON:  He actually did.  He said
16   it very generally, in fact you didn't go back and
17   rerun any of the evidence, did you?  That was the
18   next question.  That applies to all the pieces of
19   evidence.  It's not their protocol.
20             THE COURT:  No,, his point is that there
21   isn't anything that contradicts that because nobody
22   did that.
23             MS. DAYTON:  Your Honor, but that --
24             THE COURT:  But I do think it leaves
25   improperly before the jury that there is no
```

3514

```
1    verification of any sort that's been done under
2    these protocols.
3              MR. SHEEHAN:  Well, that's why you sit
4    up there.
5              THE COURT:  That's what I conclude, is
6    that we are at the point where the issue of
7    verification of her results has been put in issue,
8    it will not go a great long distance and it will not
9    entitle her to say that Dr. Ladd agreed with her,
10   but it will allow her to clarify that this protocol
11   has a very -- has a verification or a checking
12   element and, you can go into how limited that is or
13   not.
14             MS. DAYTON:  May I just speak to the
15   witness for the purpose of instructing her that I'm
16   going to ask her that and she is allowed to say what
17   the protocol is, but not to say the final, and he
18   agreed with you.
19             THE COURT:  Yes, I think so.
20             All right, anything else, loose ends
21   here before we break for lunch?
22             MR. SHEEHAN:  No, your Honor.
23             MS. DAYTON:  Nothing.
24             THE COURT:  Can I get an estimate of how
25   much longer this witness will be?
```

3515

```
1              MR. SHEEHAN:  About an hour.
2              THE COURT:  Okay.  Very well, we'll be
3    back in a half an hour.
4              (Recess)
5              THE COURT:  All right, let's bring in
6    the jury and the witness.
7              MR. MARKLE:  Your Honor, while that's
8    being done, I brought to counsel's attention, and
9    the Court's attention, there is one witness we were
10   hoping to get on already.  He's going away next
11   week, so I was hoping go by three o'clock if this
12   was not concluded we could interrupt and call that
13   witness.
14             THE COURT:  Who is that?
15             MR. MARKLE:  That's Detective Andrews.
16             THE COURT:  Have you got the charts
17   reworked?
18             MR. MARKLE:  The charts are not going in
19   with him.  We're working on the charts, but that
20   witness will not be until Monday.
21             MR. SHEEHAN:  That's fine by us.
22             THE COURT:  How much time do you think
23   this witness is.
24             MR. MARKLE:  I'm hoping he's just a half
25   hour between the two of us.
```

3516

```
1              THE COURT:  So we'll try to break at
2    three.
3              MR. SHEEHAN:  I hope to be finished.  If
4    not, I'm happy to break at three, your Honor.
5              THE COURT:  Okay.  Bring in the jury.
6              (Jury entered the courtroom)
7              THE COURT:  Please be seated.  Continue
8    cross-examination.
9         Q.   Good afternoon, Ms. Roy.  Do you have a
10   copy of the frequency chart that you used with
11   respect to 9-Z1?  And in particular I'm asking you
12   just to look at one of those charts, namely the
13   chart, the illustrated chart we did before, which
14   was for Connecticut African-Americans not including
15   46 and 60.
16        A.   Which chart do you want me to look at?
17        Q.   Well, if you have those charts out, the
18   9-Z1.  I'm just going to ask you, just for
19   illustration, the African-American charts.  And I'm
20   going to start with what has been previously
21   introduced as JJJ-2, but I'm going to actually ask
22   you to confirm some things while I would mark on a
23   similar copy.
24        A.   You are asking about 9-Z1?
25        Q.   Yes, I am.
```

3517

```
1      A.   The statistics?
2      Q.   Let me do this, actually, first with you.
3  You had two places --
4      A.   I'm sorry, I pulled out the wrong chart.  I
5  thought you didn't want that chart.  Okay, I have
6  that chart.
7      Q.   Now, there were three places on that chart
8  that you did not include for Azibo or Azikiwe
9  Aquart, right?
10      A.   Correct.
11      Q.   And then I want to just ask you, D13 you
12  did not include for -- computations for Efrain
13  Johnson because you found drop out possible at that
14  site, right?  It would be 61.
15      A.   D13?
16      Q.   Yes.
17      A.   Yes.
18      Q.   And similarly, you did not include D18 for
19  Mr. Johnson, did you?
20      A.   That is correct.
21           MR. SHEEHAN:  Your Honor, with the
22  Court's permission, I would just like to mark on
23  this exhibit which ones were not included by putting
24  an asterisk under them, and I would like to show
25  that to the jury as a demonstrative.
```

3518

```
1           THE COURT:  This is based on the
2  testimony you just received?
3           MR. SHEEHAN:  Yes.
4           THE COURT:  But I thought you were
5  looking at D18?
6           MR. SHEEHAN:  Yes, I just made a mark on
7  D13 which was --
8           THE COURT:  Yes.
9           MR. SHEEHAN:  For Efrain Johnson.
10           THE COURT:  Yes.
11           MR. SHEEHAN:  And then I followed that
12  with a mark on D18.
13           THE COURT:  Doesn't that say 16?
14           MR. SHEEHAN:  It does.  So, I will
15  conform that.  D18.  I apologize to all.
16           THE COURT:  All right.
17      Q.   And similarly, as far as Mr. Taylor was
18  concerned, you found drop out possible at D7, did
19  you not?
20      A.   For John Taylor?
21      Q.   Yes.
22      A.   For 9-Z1?
23      Q.   Yes.
24      A.   D7, yes.
25      Q.   Okay.
```

3519

```
1           MS. DAYTON:  Your Honor, I'm going to
2  object because he's mixing different persons'
3  profiles and analysis.
4           THE COURT:  Okay, we have Efrain
5  Johnson, we have John Taylor.  How are you
6  distinguishing those on the chart?
7           MR. SHEEHAN:  What I can do, your Honor,
8  is put a JT for John Taylor above D7, and on Efrain
9  Johnson I will put an EJ above D13, and on Efrain
10  Johnson I'll also put an EJ above D18.
11           THE COURT:  All right.
12      Q.   Now, you also found, for example, drop out
13  for Mr. Johnson on D21, correct?
14      A.   That's correct.
15      Q.   And you also found drop out for Mr. Johnson
16  on D2, right?
17      A.   That's correct.
18      Q.   And you also found drop out for Mr. Taylor
19  on D2, correct?  I believe the 19 and the 24 dropped
20  out -- I mean possible drop out?
21      A.   What was the last locus you asked me about?
22      Q.   I think I was on D18.
23      A.   Yes.
24      Q.   And you had confirmed, D2, did you not?
25      A.   Yes.
```

3520

```
1      Q.   Maybe that's where I misled you.  And then
2  FGA was also John Taylor?
3      A.   Correct.
4      Q.   Is it fair -- with respect, for example, on
5  FGA, if you have concluded that the profile that --
6  what you see on FGA when you are looking at 9-Z1,
7  that for example Mr. Taylor -- there may be drop out
8  there for Mr. Taylor.  Would the same analysis apply
9  for any other known sample where, for example, you
10  only saw one allele?
11      A.   Well, it depends on what the conclusion was
12  of the entire DNA profile when I compared it to the
13  entire DNA profile.
14      Q.   Okay.  But I take it you don't need a minor
15  peak to conclude that drop out might have occurred
16  at that site, right?
17      A.   That's why we have cannot be eliminated.
18  When we see the other genetic evidence, that --
19  enough genetic evidence, that you cannot eliminate
20  that person as a contributor.
21      Q.   But you don't even need to see any genetic
22  information in that particular locus to conclude
23  that drop out might have occurred, right?
24      A.   That's correct.
25      Q.   Okay.  So the indication of minor peaks,
```

**GA880**

3521

1   while it is indicative that drop out might have
2   occurred at a particular locus, is not
3   necessarily -- you don't have to have minor peaks,
4   you could still have drop out?
5        A.   Correct.  When you have very low peaks and
6   you have information about degradation that may be
7   occurring you can get drop out.
8            MR. SHEEHAN:  I would offer this exhibit
9   at this time as a demonstrative, and I'm going to
10  make a change with respect -- I'll just white out
11  that area there.
12           THE COURT:  As a demonstrative it can be
13  used as testimony, but it's not going to be an
14  exhibit.
15           MR. SHEEHAN:  I would offer it as an
16  exhibit, your Honor, as a summation of what she said
17  with respect to this sample.
18           THE COURT:  All right, so these sorts of
19  summaries, if they compile voluminous amounts of
20  material, are proper, but they are only summaries,
21  they are not stand-alone evidence in and of
22  themselves.
23           All right, with that explanation then,
24  we'll designate this with what number -- letter?
25           MR. SHEEHAN:  The underlying document

3522

1   was --
2            THE COURT:  JJJ-2.
3            MR. SHEEHAN:  JJJ-2.  So why don't we
4   call this JJJ-2-1.
5            THE COURT:  All right.
6            MR. SHEEHAN:  We'll make that
7   correction.
8        Q.   Now, do you have the frequency charts that
9   you associated with 14-1-Z1?  And in particular I'm
10  asking you at this time as far as where you did it
11  for all loci.  And again, I'm just asking you, just
12  for point of reference, just to use the
13  African-American frequency.  Do you have that?  I'm
14  sorry.
15       A.   Yes, I do.
16       Q.   And is the document that I have in front of
17  you a copy of that?  Again with the distinction
18  being that we have red numbers on the top to clarify
19  which alleles are at question.
20       A.   Could you move it down a little bit?
21       Q.   Move it which way.
22       A.   So I can see the top where my initials are.
23       Q.   Yes.
24       A.   Yes, that's the same document that I have.
25           MR. SHEEHAN:  I would offer that at this

3523

1   time, your Honor.
2            THE COURT:  Are you going to do
3   something more to it?
4            MR. SHEEHAN:  Actually, yes.
5            THE COURT:  Do you want to just wait and
6   do it at one time.
7            MR. SHEEHAN:  Let's wait and do it at
8   one time, that makes more sense.  Why don't we call
9   this, for the record, JJ -- JJJ.
10           MR. SMITH:  How about JJJ-2-2.
11           MR. SHEEHAN:  JJJ-2-2.
12       Q.   So, let me ask you this:  In computing the
13  frequencies for 14-Z1, when you were considering
14  those frequencies associated with Tina Johnson, you
15  concluded -- you did not include D5 or D13, did you?
16       A.   No, I didn't.
17       Q.   And you also did not include -- when you
18  were computing the frequencies associated with Mr.
19  Taylor, you did not include D7 or D18 or FGA, did
20  you?
21       A.   No, I didn't.
22       Q.   I'm sorry, there is a mistake on this chart
23  it says FG, but it should say FGA above it, right?
24  Do you see where I made that change?  Is that okay?
25       A.   I'm sorry.  Yes.

3524

1        Q.   That was my mistake.  That should say FGA,
2   right?
3        A.   Yes, correct.
4            MR. SHEEHAN:  Your Honor, I would at
5   this time offer this as a summary with respect to
6   the areas where drop out was identified as a
7   possibility by Ms. Roy, and that would be JJJ-2-2.
8            THE COURT:  All right.  And the same
9   instruction goes for a chart that summarizes a large
10  amount of material.
11           MR. SHEEHAN:  And with the Court's
12  permission, I'll just show this to the jury now,
13  indicating those five loci.
14       Q.   And I noticed that what this JJJ-2-2, the
15  configuration is a little bit different in terms of
16  the order.  In other words, we start with D3 and
17  then go to vWA as compared to some of the other
18  charts.
19       A.   That's correct.
20       Q.   And that's because this was done on that
21  earlier Profiler-COfiler system, right?
22       A.   Correct.
23       Q.   So that these -- this configuration of loci
24  represents the 13 instead of the 15?
25       A.   That's correct.

**GA881**

3525

1    Q.  And then I would ask you to take a look at
2  your chart for 15-Z2.  And again, simply for
3  convenience just to look at the Connecticut
4  African-Americans.  Now, just before we turn to the
5  specifics of this, lest there be any confusion, you
6  do one of these for each of the three groups, right,
7  one of these frequency charts for each of the three
8  population groups that you look at?
9    A.  Yes.
10   Q.  And we're just looking at one of them here
11 for purposes of this discussion.  But you have --
12 looking at the chart for 15-Z2, and in particular
13 the one where you did not include Azibo Aquart's
14 sample, which was 46.
15   A.  Yes, I see it.
16   Q.  And there you found -- you concluded that
17 drop out was a possibility at D21, D2 and vWA,
18 right?
19   A.  Yes.
20   Q.  All right.  And similarly, I believe you
21 concluded that Tina Johnson could not be eliminated
22 as a potential contributor.
23   A.  That's correct.
24   Q.  Because you found there might be drop out
25 there as well at D2S, right?

3526

1    A.  D2, yes.
2    Q.  And you found what you considered -- what
3  were possibly minor peaks at FGA and D5, did you
4  not?
5    A.  FGA, D18 and D5.
6    Q.  I'm sorry, FGA, D?
7    A.  18 and D5.
8    Q.  Okay.  Does the --
9        THE COURT:  I'm sorry, that was for
10 whom?  Oh, that was minor peaks, okay.
11       MR. SHEEHAN:  These are minor peaks.
12   Q.  Does the presence of these minor peaks, is
13 that indicative to you of potential drop out?
14   A.  Well, when you see, again, peaks at the 75
15 range to the 125, 150 range, when you get in that
16 level of peaks, it's possible to have drop out, and
17 the fact that I detected peaks in the range of 50 to
18 75, less than 75, that would also indicate that
19 there is low level contributors in this DNA profile.
20   Q.  Okay.  And does the presence of that DNA
21 suggest to you the possibility that there may be
22 drop out at those loci?
23   A.  Yes.
24   Q.  All right.  And that would be at FGA and
25 D5, and also D18, you testified?

3527

1    A.  Yes.  There are minor peaks at each of
2  those three loci.
3    Q.  Are there any additional loci other than
4  the ones we've just -- so that's it on minor peaks,
5  right?  I'm sorry, that's a bad question.  I'll
6  withdraw that question.
7        MR. SHEEHAN:  And what I would do at
8  this time, your Honor, is offer this exhibit as a
9  summary of the areas where Ms. Roy concluded that
10 drop out may be a possibility.
11       THE COURT:  So that's JJJ-2-3.
12       MR. SHEEHAN:  Yes.
13       THE COURT:  All right, that is also a
14 chart, ladies and gentlemen, with the same
15 instruction.
16   Q.  So, we've got the sites you identified.  By
17 the way, that's -- under D21, there is a circle and
18 there is an initial under that.  That's your writing
19 on that, is it not?
20   A.  No.
21   Q.  Okay.
22   A.  It's --
23   Q.  But with respect to the ones that were
24 assigned to the frequency there -- that's your
25 report?

3528

1    A.  I'm sorry, I can't -- I don't understand
2  what you are asking.  That's not my writing, but
3  that was put on there.
4    Q.  Put on there at a later time.
5    A.  At a later time from what?
6    Q.  No, no, I'm just saying that's not -- I'm
7  not claiming it then.  So, I want to make it clear
8  that's not your writing.  I just don't want any --
9  in that regard, I would just ask the jury to
10 disregard those two circles.
11       MS. DAYTON:  Your Honor, the government
12 objects.  We would ask that she be allowed to
13 describe what they are.
14       THE COURT:  She may.
15   Q.  What are they?  I'm sorry.
16   A.  Well, the little squiggle with the circle
17 around it is the initials of my reviewer and
18 cosigner.  And the CBE stands for cannot be
19 eliminated.  He wrote those in when he reviewed this
20 sheet of information when he read the case jacket
21 and all the information for this case.
22   Q.  All right.
23       MR. SHEEHAN:  And with that explanation,
24 your Honor, I would offer this as whatever we're up
25 to.  This is that J -- JJJ.

3529

1          THE COURT:  2-3.
2          MR. SHEEHAN:  2-3.  Now, I wonder if we
3  could bring up Exhibit MMM-2 for identification.
4  Actually if we bring up MMM-1 and 2.  Oh, I'm the
5  guy that's making this a mess.
6      Q.   Let me ask you to look at MMM-1 and 2 for
7  identification.  Do you recognize what these
8  documents reflect?  Are they the -- do these
9  documents accurately reflect the loci that are
10  identified on both the Profiler Plus and the COfiler
11  Plus system as well as the Identifier system?  May
12  we start --
13      A.   I'm checking them.
14      Q.   I was just going to -- yeah, okay.
15      A.   Yes, those are accurate.
16      Q.   All right, let me ask first that we look at
17  MMM-1.
18          MR. SHEEHAN:  And with the Court's
19  permission, I would offer that into evidence at this
20  time.
21          THE COURT:  All right, full exhibit.
22      Q.   Let me ask you, does this chart reflect the
23  genetic markers and gender identification as
24  identified in the Profiler and COfiler systems?
25      A.   Profiler Plus and COfiler.

3530

1      Q.   Profiler Plus and COfiler.
2      A.   And COfiler systems, yes, it does.
3      Q.   You've testified about the changing -- the
4  fact that some areas are larger -- some loci are
5  larger than others in the context of assessing the
6  possibility of drop out.
7      A.   Some -- the fragment of DNA that's looked
8  at in these test sites, some of the test sites the
9  fragment is larger than other fragments.
10      Q.   And is FGA larger than vWA?
11      A.   Yes.
12      Q.   And is vWA larger than D3?
13      A.   Yes.
14      Q.   And similarly, is D18 larger than D21?
15      A.   Yes.
16      Q.   And then D21 is larger than D8?
17      A.   Yes.
18      Q.   And the same is true with respect to the
19  D7, larger than D13?
20      A.   Correct.
21      Q.   And then D5?
22      A.   Correct.
23      Q.   Is the smallest.  And when we shift to the
24  COfiler, again we go from small to large, as it
25  were, D3 is smaller than D16?

3531

1      A.   Correct.
2      Q.   And THO1 is smaller than TPOX and then to
3  CSF?
4      A.   That is correct.
5      Q.   And similarly with -- well, D7 is of --
6  stands alone.  Now, the colors that are indicated
7  here, the blue, green and yellow, those refer to --
8  basically to the colors that the machine picks out,
9  right, or uses for identification purposes?
10      A.   During the amplification procedure the
11  fragments have a florescent tag attached to them.
12      Q.   And that just reflects the tag?  The color
13  reflects the tag?
14      A.   Yes.
15      Q.   And if we could look -- if we could turn
16  now to MMM-2.  That's the chart for the Identifiler,
17  right?
18      A.   Yes.
19      Q.   And is --
20          MR. SHEEHAN:  I would offer that -- I
21  would offer it at this time, your Honor.  If I
22  hadn't, I apologize for putting it up.
23          THE COURT:  Well, you hadn't.
24          MR. SHEEHAN:  And I do apologize.
25          THE COURT:  But it's accurate?

3532

1          THE WITNESS:  Yes.
2          THE COURT:  All right, it's a full
3  exhibit.
4      Q.   And again, is it fair -- are we to
5  understand that, again, these are -- each separate
6  column ranges in size from small to large.
7      A.   Yes.
8      Q.   Okay.  And when you talk about the
9  likelihood of drop out, is what you are saying, for
10  example, that you are more likely to have drop out
11  at CSF than D7?
12      A.   I would say that the larger amplicons,
13  which those are the fragments of amplified DNA, when
14  we look at the DNA profile we tend to see drop out
15  in the longer amplicons, which are for Identifiler
16  CSF, D2, D18 and FGA.
17      Q.   If you -- if in looking at a sample you
18  suspect that there may be drop out, for example at
19  D21, is it fair to infer from that that there may
20  also be drop out at D7?
21      A.   It depends on what the results are at D7.
22  If I see a lot of nice tall peaks and -- that may
23  not be true.  You have to look at the entire DNA
24  profile when you are making your comparisons.
25      Q.   So, in some cases you have inferred that

**GA883**

3533

1   there may have been drop out even when there was no
2   minor peak, correct?
3      A.   Again, you have to look at the entire DNA
4   profile, the size of the peaks, the number of
5   contributors, how many sites that you are testing,
6   are you seeing multiple peaks detected.  All those
7   things, plus if there is evidence of degradation,
8   all of those factors go into your interpretation of
9   the entire DNA profile.
10      Q.   Are you -- so let me ask you this:  If you
11   see what you consider to be evidence of degradation
12   at D21, would that -- would you even see that?
13      A.   What you are looking at is the loci going
14   from the shorter ones to the longer ones.  So, you
15   see -- when you have evidence of degradation, the
16   shorter ones are less -- in general less affected by
17   degradation.  So, those peak heights tend to be
18   taller.  And then if you look at the longer
19   amplified DNA, say you go from D8 to CSF, and the
20   peak heights go from tall to short, that's evidence
21   of degradation and that also can result in allele
22   drop out.
23      Q.   What I'm wondering, if you see what you
24   think is drop out at D21, are you saying that
25   doesn't tell you anything about the likelihood of

3534

1   drop out at D7?
2      A.   What I'm saying is -- you are asking me to
3   make general conclusions.  When we look at each DNA
4   profile from evidence, we look at the entire DNA
5   profile and we compare the known DNA profiles to it.
6   I mean, pointing at this and saying, well, if I see
7   it there and I don't see it there and I see it there
8   and I don't see it there, that's not how it's done.
9   We look at the entire DNA profile when we're making
10   our conclusions.
11      Q.   But when you are looking at the entire DNA
12   profile, this is -- let me ask you this:  When you
13   are looking, for example, at the profile for nine --
14   when you are looking at the profile for 9-21, take
15   as a specific example, are you marking any sites
16   where you think that there may be drop out?
17      A.   The only thing I'm marking on the
18   electropherograms are the minor peaks.
19      Q.   Are you making any other kind of notes that
20   reflect areas where there might be drop out?
21      A.   No.  I make no notes when I'm doing my
22   analysis on my worksheet except for those peaks that
23   I'm removing, as in stutter peaks, dye artifacts,
24   spikes, and then I'm also pointing in the minor
25   peaks that I detect.  Those are the notes that I

3535

1   make.
2      Q.   And so is the only time that you actually
3   make a determination about whether or not there is
4   drop out is when you are comparing that mixed sample
5   with the known samples?
6      A.   Well, I'm looking at the quality or -- the
7   peak heights when I'm doing my analysis.  I am
8   looking at the number of peaks I'm detecting, I'm
9   looking to see if it's -- how many people are -- how
10   many possible contributors there are, more than two,
11   at least two, at least three, at least four.  I'm
12   looking at whether I should reinject.  Is there more
13   information I could get out of that DNA profile?
14   I'm looking to see if I should re-amp if I didn't
15   amp the maximum volume.
16      All of those things I'm looking at.  I'm
17   not sure -- I look at multiple things when I look at
18   that DNA profile.  I'm zooming in, I'm zooming out
19   during the entire time I'm doing my analysis.
20      Q.   And --
21      A.   I recognize when I have low peaks.  Usually
22   when I do my amplification, when I get my quant
23   result, and I have very little DNA, I know I'm not
24   going to do a five second injection and get peaks at
25   4,000 RFUs.  I know that from experience.  So I'm

3536

1   looking at -- I know how much DNA I'm amplifying,
2   and then when I see there are multiple contributors,
3   I know that that initial quantity is now divided by
4   many possible contributors.  So, I'm not looking at
5   any one thing when I'm looking at the DNA profile,
6   I'm looking at multiple things.
7      Q.   In this case before you prepared your
8   combined probabilities of exclusion and before you
9   compared the unknown samples to the known samples,
10   did you make any point of identifying the loci in
11   your unknown samples where there may have been drop
12   out?
13      A.   No, I didn't indicate, mark on the
14   electropherograms that this loci may have drop out.
15   By the looks -- the heights of the peaks and the
16   degradation that's present, D2, and the minor peaks
17   that were detected in 9-21, yes, there is a
18   possibility of allele drop out.  I don't have to
19   mark that.
20      Q.   Are you aware of the problem of observer
21   bias in science?
22      A.   Yes.  I am, yes.
23      Q.   Can you tell the members of the jury what
24   that observer bias is about, what that issue is?
25      A.   Well, analyzing your results when you have

3537

```
1   the known profiles in front of you.
2       Q.   Why is that a problem in forensic science?
3       A.   Because you don't want those known profiles
4   to influence you on your analysis of the evidentiary
5   sample.
6       Q.   And you would agree, would you not, that
7   that's a danger that needs to be worked against, a
8   risk?
9       A.   Well, that's why you don't sit there while
10  you have your results up and while you are doing
11  your results of your analysis with the known
12  profiles there.  Oftentimes we don't have the known
13  profiles.
14      Q.   In this case you did, did you not, at least
15  as far as Mr. Aquart was concerned, from early on?
16      A.   For Azibo Aquart I had his -- the known was
17  submitted 12/13/05.  So, the sample that we've been
18  discussing, 14-1-Z1, that analysis was already done.
19      Q.   Okay, but what was not done was at least
20  there was no -- on your part there was no assessment
21  at that point in time about where drop out was?
22      A.   I don't put a written assessment down, but
23  when I'm looking at the DNA profile I notice things
24  like low level peaks and degradation.  But it's not
25  written down because that's part of our
```

3538

```
1   interpretation of -- our examination and
2   interpretation.  It's not something that we write
3   down.
4       Q.   Now, you testified earlier about the
5   contamination in this case of 16-Z1?
6       A.   Yes, I did.
7       Q.   And you also testified that you had
8   reviewed the rest of the samples and found that none
9   of them were contaminated.
10      A.   That is correct.
11      Q.   And in your opinion that staff member was
12  excluded as a possible contributor to the other
13  samples.
14      A.   That is correct.
15          MR. SHEEHAN:  Let me ask if we could
16  bring up Exhibit 4 W.
17      Q.   Let me ask if you can identify that as --
18  I'm sorry, three W for identification.  WWW.  If you
19  can identify that as the profile that you believe
20  was involved in the contamination of the sample.
21      A.   I don't know that member's profile.  I
22  haven't memorized it.
23          MR. SHEEHAN:  Your Honor, I would.
24      Q.   Do you have your records?  I'm sorry,
25  counsel advised me you might have records reflecting
```

3539

```
1   that.
2       A.   That's correct.
3           MR. SHEEHAN:  I would offer that at this
4   time, your Honor.
5           MS. DAYTON:  So, your Honor, this is
6   protected information in here.  This is someone's
7   personal DNA profile who works for a state agency.
8           THE COURT:  That person is not
9   identified.
10          MS. DAYTON:  It's practically in the
11  record who it is, your Honor.
12          THE COURT:  So, what's your proposal?
13          MS. DAYTON:  My proposal is that counsel
14  should make a copy of it and hand it out to the jury
15  and it should be collected back after that.  For the
16  same reason we redact Social Security and dates of
17  births, this is someone's personal genetic
18  information that works for the state agency.
19          MR. SHEEHAN:  I'm happy at the end of
20  the case -- I think we can --
21          THE COURT:  If it is to be an exhibit in
22  the case it can -- at the conclusion of trial be
23  sealed.  The jury can be instructed that they are
24  not to disclose any of that information, and they
25  are so instructed.
```

3540

```
1           MS. DAYTON:  We weren't suggesting that
2   they would.
3           THE COURT:  And so you can't go out and
4   talk about at D8 there are 13 and 14.  Just don't do
5   that.
6           MS. DAYTON:  That would be bad.
7           THE COURT:  But it is personally
8   identifiable information, so let's use those
9   precautions.
10          MR. SHEEHAN:  That would be fine.
11          MS. DAYTON:  We would ask that it be
12  sealed, your Honor.
13          MR. SHEEHAN:  I think that would apply
14  to a number of the following exhibits, your Honor,
15  and I have no objection to any exhibit that contains
16  this information.
17          THE COURT:  We'll take care of that at
18  the appropriate time post-verdict.  Okay.
19          MR. SHEEHAN:  Okay.
20      Q.   And in this case Exhibit WWW, that is the
21  chart, is it not, that reflects that profile?
22      A.   Yes.
23      Q.   Okay.  Now, I'm going to ask you to take a
24  look at Exhibit ZZZ, and to do this you are going to
25  have to look at your exhibit -- your report with
```

3541

1  respect to 14-1-Z1. And in particular what I'm
2  asking you to do is take a look at whether that
3  Exhibit ZZZ for identification does reflect the --
4      A.   I really can't read that.
5           MR. SHEEHAN: Could we blow that up a
6  little bit. I'm sorry.
7      Q.   Is that a little clearer?
8      A.   And you want me to check the DNA profile
9  for 14-Z1?
10     Q.   Yeah.
11          MS. DAYTON: What exhibit is that?
12          MR. SHEEHAN: This is triple Z, ZZZ.
13     A.   Yes, that's correct for 14-1-Z1. There is
14  supposed to be a Z1 there.
15     Q.   I'm sorry. On the top. Okay.
16     A.   And the chart.
17     Q.   That's what I meant on the top. All right,
18  so it should say 14-1-Z1 instead of 14-1Z. But you
19  know -- that's the sample we're talking about.
20          MR. SHEEHAN: I'd offer it, your Honor.
21          THE COURT: All right, and we'll seal
22  that after trial.
23     Q.   Now, once again this was in the earlier
24  testing period, was it not?
25     A.   Yes.

3542

1      Q.   For when 14-1-Z1 was done?
2      A.   Correct.
3      Q.   So, we have the 13 instead of the 15 loci,
4  right?
5      A.   Correct.
6      Q.   And the staff member's profiles is fully
7  within seven of those loci, is it not? Namely D8,
8  CSF, D3, THO, D5, vWA, and TPOX, right?
9      A.   That's correct.
10     Q.   And the only locus where it was not
11  included at all was at D18?
12     A.   That's correct.
13     Q.   And in the other five loci one of her
14  alleles was present there, was it not?
15     A.   That's correct.
16          MR. SHEEHAN: Your Honor, I might we
17  just approach the bench for a minute.
18          THE COURT: Yes.
19          MR. SHEEHAN: Okay, I'm sorry, we don't
20  need to. All right.
21     Q.   Now, with respect to D7, you had already
22  assumed the possibility of drop out at that locus
23  with respect to Mr. Taylor, had you not?
24     A.   I don't recall. I'll have to look it up.
25          MR. SHEEHAN: Perhaps we could bring up

3543

1  006.
2      Q.   I'm sorry, I think I found it for you.
3      A.   9-Z1?
4      Q.   Yes. No, I'm sorry, I'm looking at
5  14-1-Z1. That's what we're talking about?
6      A.   Okay.
7      Q.   And you had assumed a possibility of drop
8  out at D7 for Mr. Taylor, had you not? Drawing your
9  attention to paragraph 6.
10     A.   I'm sorry. D7, yes.
11     Q.   And this is one of the loci where the staff
12  member's profile was partially present and partially
13  missing. Going back again to ZZZ.
14     A.   That's not how I would interpret it.
15     Q.   Okay, let's take a look at triple Z and
16  take a look at, if you would, D7.
17     A.   The way we interpret our data is by looking
18  at the full DNA profile and by comparing it to the
19  known sample.
20     Q.   And in D7 the missing -- the genetic marker
21  that was missing for the staff person was the 9,
22  correct?
23     A.   She's a 9, 11, and there is an 11 there,
24  but no 9.
25     Q.   Right.

3544

1      A.   But, again, you are pulling out each
2  individual site that we test. We look at the entire
3  DNA profile and compare it to the known profile.
4  Each person's profile gets compared to the entire
5  DNA profile.
6      Q.   And this 9 allele is the same allele you
7  had assumed may have dropped out for Mr. Taylor, is
8  it not?
9      A.   Again, we look at the entire DNA profile
10  when we are making our comparisons to each
11  individual.
12     Q.   And which allele -- which genetic marker
13  was Mr. Taylor missing at D7?
14     A.   He's an 8, 9, and the 9 was not present in
15  D7.
16     Q.   Now, --
17     A.   And again, we look at the entire DNA
18  profile when we make our comparisons.
19     Q.   You had also --
20     A.   So, we're not only looking at D7 when we're
21  making our comparisons, we're looking at all of the
22  loci that we test. So we're getting a full picture
23  of what the DNA profile looks like from 14-1-Z1 when
24  we do our comparisons to the known sample.
25     Q.   And you had also assumed that drop out was

3545

1  possible at D13 for Tina Johnson, had you not?
2      A.   This is the one I want to look at.  She
3  cannot be eliminated as a contributor to the DNA
4  profile from item 14-Z1, and that's at D5 and D13.
5      Q.   And the allele -- the genetic marker that
6  she was missing at D13, that was an 11, was it not?
7      A.   Tina Johnson at D13, correct, the 11 was
8  not called.  But I would also like to add in our
9  experience with this -- with the amplification of
10  D13, that it tends not to show in mixtures.  Many
11  genetic markers we see, even when we have, as in
12  this case, at least four contributors, we often only
13  detect a couple genetic markers at 13.  So, when we
14  see a drop out at D13, that's not what we consider
15  strong evidence to eliminate someone because we know
16  from experience that D13 tends not to amplify as
17  efficiently perhaps as other test sites that we do.
18          So, again, you can see 14-1-Z1 that many
19  of the sites that we test we have multiple genetic
20  markers that are being detected, and then we get to
21  D13 and we have a 12, one genetic marker, and we
22  know from experience that oftentimes D13, when we
23  have multiple contributors, that D13 does not
24  reflect that in its result.
25      Q.   Now, the staff person at D13 was missing --

3546

1  the staff person's profile was a 12, 13 at D13,
2  right?
3      A.   That's correct.
4      Q.   And that 13 was not picked up in the
5  sample.
6      A.   That's correct.
7      Q.   Was it.  And you'd also picked out a minor
8  peak at this locus with respect to the 13, had you
9  not?
10     A.   At 13 I only detected a 12.  There is no
11  minor peak there.
12     Q.   There is no minor peak?
13     A.   No, that's why it's just listed as 12.
14     Q.   Well, did you look at your worksheets on
15  that?
16     A.   14-1-Z1 at D13, the only one -- the only
17  thing that's detected there is a 12.
18          MR. SHEEHAN:  Could I ask you to bring
19  up 4A-2.
20     Q.   Do you see in front of you part of your
21  worksheet on D13?
22     A.   Yes, I see that.
23     Q.   And did you note there that there was a
24  minor peak at the 13 allele?
25     A.   No.

3547

1      Q.   Okay.  What does that D13 on your worksheet
2  signify?
3      A.   That's actually a called peak, 13, and I
4  wrote there, it's shorthand, 13 allele plus an OLA,
5  shoulder, SH stands for shoulder, click on.  This
6  work was done on what we call a slab gel.  And if
7  the DNA does not -- the amplified DNA fragments do
8  not travel in a tight group, then the peak has
9  shoulders, and there were shoulders detected at the
10  13 allele, and the OLA -- NF OLA, which just means
11  that did not fall, that peak that was detected did
12  not fall into one of those bins that was described
13  earlier.  So that is not considered a pick.
14     Q.   Or a minor peak?
15     A.   Or a minor peak, it was clearly a shoulder,
16  and my second analyst agreed with that
17  interpretation.
18     Q.   And there is no minor peak for Tina Johnson
19  there, is there?
20     A.   Tina Johnson has her own DNA profile.
21     Q.   I'm sorry, you are right.  There is no
22  minor peak noted at 11 for D13, is there?
23     A.   No, there is no minor peaks noted there.
24     Q.   And your assumption, in this case any way,
25  your assumption about drop out for Tina Johnson,

3548

1  that did not depend on whether or not there was a
2  minor peak, right?
3      A.   Again, I look at the entire DNA profile
4  when I compare it to the known DNA profile.  And
5  Tina Johnson is an 11, 12, and only a 12 was
6  detected.  Therefore, from that one site she is
7  eliminated.  But overall my conclusion was that she
8  cannot be eliminated as a contributor to the DNA
9  profile from item 14-1-Z1.
10     Q.   And you also assumed a possibility of drop
11  out at FGA for Mr. Taylor, did you not?
12     A.   For 9-Z1?
13     Q.   No, I'm sorry, I didn't mean to mislead
14  you.  For 14-1-Z1?
15     A.   I keep switching back.  So he is a 21 and a
16  24, and there was a minor peak detected at the
17  position of the 24 genetic marker.  So for that
18  locus he cannot be eliminated.
19     Q.   And looking again the ZZZ.
20          THE COURT:  We are at 3 o'clock and we
21  need to take a witness who will not be available
22  next week.
23          MS. DAYTON:  We worked it out.
24          THE COURT:  Oh, you did.
25          MR. SHEEHAN:  That was what I was

3549

```
1   checking with them earlier about.
2            MS. DAYTON:  Thank you, your Honor.
3            MR. SHEEHAN:  I appreciate it.
4        Q.  The 24 was the same allele, the same
5   genetic marker that was missing for the staff
6   person.
7        A.  That's correct.
8        Q.  And at D18 you had assumed drop out for Mr.
9   Taylor on this sample, meaning 14-1-21.
10       A.  Yes, he is a 17, 18.  The 17 was detected
11  and the 18 was an asterisk peak.
12       Q.  And so --
13       A.  So for that test site he cannot be
14  eliminated.
15       Q.  And that was one of the alleles, one of the
16  genetic markers that was missing for the staff
17  person at that locus, right, the 18?
18       A.  Yes.
19       Q.  And you had also noted a minor peak at 13.
20       A.  That's correct.
21       Q.  At that locus.
22       A.  That's correct.
23       Q.  And that minor peak corresponds to the
24  missing genetic marker for the staff person, right?
25       A.  That's correct.
```

3550

```
1        Q.  Now at D21 the staff member's profile was
2   missing the 32.2, correct?
3        A.  That's correct.
4        Q.  Drop out can happen at this locus when you
5   are dealing with low quantity DNA, correct?
6        A.  That's correct.
7        Q.  And with respect to -- all right.  And, in
8   fact, do your electropherograms show an indication
9   of a peak at that location.
10           MR. SHEEHAN:  Perhaps if we could do for
11  identification quadruple E.
12       A.  If it's not called or not asterisked, then
13  as far as our interpretation goes it's not there.
14       Q.  Okay.  Could you take a look at your
15  electropherogram for that item.
16       A.  Yes, I'm looking at it.
17           MR. SHEEHAN:  I wonder if we could just
18  blow up that one section we're talking about in the
19  middle there.
20       Q.  Now, do you see an indication on your
21  electropherogram of some genetic material at that
22  location, namely 32.2?
23       A.  Yes, which is in the stutter position, and
24  it was within our stutter threshold.  And I don't
25  know how high that peak is.
```

3551

```
1        Q.  Now, let me ask you about that stutter
2   issue.  It's a fact, is it not, that stutter product
3   may also -- the presence of stutter product does not
4   mean that there is genetic material there.  That's a
5   bad question.  I'm sorry.
6            MR. SHEEHAN:  If I might have on second,
7   your Honor.
8        Q.  Isn't it a fact that true STR alleles,
9   that's what we mean by genetic material, may exist
10  that are below the stutter threshold?  Do you agree
11  with that?
12       A.  Is it a possibility?  I'm sorry that --
13  you'll have to restate that question.
14       Q.  Do you agree with the fact that true STR
15  alleles may exist that are below the stutter
16  threshold?
17       A.  Could there be in that stutter peak actual
18  amplified DNA?
19       Q.  Yes.
20       A.  That's truly there as the ex -- reflected
21  of the extracted DNA?  Is it a possibility?  Yes,
22  but there is no way to know that.  What you do is
23  you look at the peak height of the main peak and
24  then you look at the peak height of the stutter peak
25  and then you determine the percentage of the smaller
```

3552

```
1   peak to the larger peak, and if it's below our
2   stutter threshold, then we consider a stutter.
3   Unless it's a very, very large stutter -- I mean
4   very, very large peak, which this isn't, and there
5   is -- the stutter peak is at the maximum of the
6   stutter percentage, then we will make a note of
7   that.  But in this case this is not large peak
8   and -- actually, let me look at something.  In my
9   analysis of this sample there was no stutter call
10  that I had to click off.
11       Q.  What does that mean?
12       A.  That the stutter peak as the -- for each,
13  within each loci -- some loci, as the genetic marker
14  gets larger, the percent of the stutter that's
15  allowable and still be called a stutter is --
16  increases.  So we have to check because you can only
17  have one value for that entire locus and that
18  stutter was not called and, therefore, I didn't have
19  to click it off.
20       Q.  May I ask you to look at --
21           MR. SHEEHAN:  See if we can bring up --
22  bring back up quadruple E for identification.
23           MS. DAYTON:  Your Honor, can we
24  approach?
25           THE COURT:  Yes.
```

**GA888**

3553

```
1              (Sidebar conference)
2           MS. DAYTON:  Defense has been
3    cross-examining this witness for almost ten hours at
4    this point, and I'm requesting that the Court at
5    this point -- he demanded certain documents be here
6    by today.  He hasn't even looked at them.  It's
7    3:10; we're ending at 3:30.  At a certain point it
8    just becomes cumulative, harassing.  You could see
9    she's been exhausted, but it's a full six hours
10   today, it's full four hours yesterday, two hours the
11   day before, and the right to cross-examination is
12   not limitless.
13           THE COURT:  I agree with you.  I'm going
14   to finish up today.  We'll see how much more you
15   have to do that is reasonably necessary to be done.
16           MR. SHEEHAN:  Okay.  Your Honor, could I
17   just represent to the Court that this contamination
18   story sequence is the last sequence that we intend
19   in the cross-examination.
20              (Sidebar concluded)
21      Q.   Let me ask you this:  The screen that is in
22   front of you now reflects a blowup of that 31 -- I'm
23   sorry, the 32.2.  Do you see that?
24      A.   The peak that's in front of the 33.2?
25      Q.   Yeah.
```

3554

```
1       A.   Yes.
2       Q.   And that is a blowup from your -- from the
3    document that you previously provided?
4       A.   Yes.
5           MR. SHEEHAN:  I would offer it at this
6    time, your Honor, the blowup.
7           THE COURT:  This is an expansion of an
8    earlier?
9           MR. SHEEHAN:  Yes, it is, your Honor.
10          THE COURT:  What's the other document?
11          MR. SHEEHAN:  The other document we were
12   just looking at is -- well, actually let's put in
13   quadruple E.  I should first introduce quadruple E.
14   So, let's go back to that.  And if we could just put
15   quadruple E before the witness.
16      Q.   This is the electropherogram for 14-1-Z1?
17      A.   Yes.
18      Q.   All right.
19          MR. SHEEHAN:  And I would offer that at
20   this time, your Honor.
21          THE COURT:  All right, it's a full
22   exhibit.
23          MR. SHEEHAN:  Publishing that to the
24   jury.  And the middle section there, I would just
25   ask is the issue in question.
```

3555

```
1       Q.   And that is the blowup from your
2    electropherogram, right?
3       A.   That's correct.
4           MR. SHEEHAN:  I would offer all that as,
5    quadruple E-1, the blowup as well.
6           THE COURT:  That's not stand-alone
7    evidence, it's just a blowup of part of that earlier
8    larger electropherogram?
9           MR. SHEEHAN:  Yes, your Honor.
10          THE COURT:  All right, it's a full
11   exhibit as a chart.
12      Q.   From your material, you do not have a --
13   you cannot tell us the height of that peak, can you?
14      A.   No.
15      Q.   And now --
16      A.   Well, I can tell you.
17      Q.   I'm sorry?
18      A.   I can tell you that -- no, I can't tell you
19   that.  I just -- never mind, sorry.
20      Q.   No, what were you going to say?
21      A.   I temporarily forgot it was in the stutter
22   position.
23      Q.   Oh, because it's about the same size as
24   31.2, isn't it?
25      A.   No, that's not what I was looking at.
```

3556

```
1           THE COURT:  Just go on to the next
2    question, please.
3       Q.   Okay.  Do you always get stutter?
4       A.   Some of the loci tend to have very little
5    stutter.
6       Q.   And how about this loci -- locus?
7       A.   TPOX and THO1 come to the top of my head as
8    having very little stutter in general.
9       Q.   And so as far as this D21, you don't have a
10   recollection?
11      A.   I don't have a recollection.
12      Q.   And the final locus where the staff
13   member's profile does not match is D16 where it was
14   missing the 14.  Looking back at triple Z.
15      A.   That's correct.
16      Q.   Is this a larger locus than D3?
17      A.   Yes, it size is larger than D3.
18      Q.   And you don't need to see minor peaks to
19   assume drop out, do you?
20      A.   Well, you look at the overall DNA profile
21   and the height of the peaks that are detected and
22   whether there is degradation.
23      Q.   And did you run this particular sample
24   twice?  D16 is part of the COfiler system, is it
25   not?
```

3557

1    A.    Yes.

2    Q.    Did you run it twice?

3    A.    No, it was run on the gel electrophoresis

4    once.

5    Q.    And it's quite common when you run a sample

6    a second time at a longer injection time that new

7    alleles might emerge, right?

8    A.    This was done on a gel -- on the slab gel,

9    it was not done on the capillary electrophoresis.

10    Q.    Now, let me move on to the final area that

11    I want to ask you about, which is -- and I

12    appreciate your patience -- 15-Z2.  And here I'm

13    going to ask you to take a look at Exhibit HHH for

14    identification -- I'm sorry, four Hs, HHHH.  What

15    I'm going you to do is compare the staff profile

16    with the profile of the sample.

17    A.    Could you enlarge that 15-Z2 section?

18    Q.    Yep.

19    A.    That's correct.  That's correct, the

20    profile from 15-Z2.

21         MR. SHEEHAN:  I'd offer that at this

22    time, your Honor.

23         THE COURT:  Full exhibit.

24    Q.    And showing you what is four H, that is

25    HHHH, the same alleles of the staff profile are

3558

1    present at 11 out of the 15 loci, are they not?

2    A.    Yes.

3    Q.    And the four loci where they do not match

4    completely are D21, D7, D18 and FGA?

5    A.    That is correct.

6    Q.    On the D20 -- now, for the D21, the

7    staff -- the profile -- the staff profile -- I'm

8    sorry.  For D21, the sample was missing the 32.2?

9    A.    That's correct.

10    Q.    And at D7 it was missing the 9?

11    A.    That's correct.

12    Q.    And at D18 it was missing the 13?

13    A.    That's correct.

14    Q.    And at FGA it was missing the 24, right?

15    A.    That's correct.

16    Q.    You had previously told us that there were

17    a total of five loci where this particular sample

18    indicates the possibility of drop out.  Do you

19    recall that?

20    A.    You are combining results from multiple

21    people.

22    Q.    Yep.

23    A.    And that's -- we do -- as I said before, we

24    look at one individual and we compare it to the

25    entire DNA profile.

3559

1    Q.    Okay.  Well, let's start with on that

2    sample, 15-Z2.

3    A.    Could I just --

4    Q.    I'm sorry, I didn't mean to interrupt you.

5    A.    Well, you said that there was how many loci

6    that I said there was potential drop out?

7    Q.    Five.

8    A.    Where do you get that from?

9    Q.    Well, on 15-Z2 -- let's take a look at

10    what's previously been introduced JJJ-2-1.  JJJ-2-3.

11    At the bottom -- those are your initials at the top,

12    and this is the one that you previously concluded

13    that D21 was a site of --

14    A.    Could you put that down a little bit so I

15    can look at the top, please.

16    Q.    I'm sorry.  Do you know what, I could do is

17    maybe make it a little bit smaller.  How is that?

18    A.    Again, I'd like to state that we compare

19    the known profile to the entire DNA profile, and we

20    had three people who were included, one person who

21    could not be -- could not be eliminated at one

22    locus, and another person who could not be

23    eliminated at three loci, and that the person who

24    could not be eliminated at one locus there is a

25    called genetic marker and an asterisk peak indicated

3560

1    there.  And the individual who could not be

2    eliminated at three loci, two of those loci there is

3    a called genetic marker and an asterisk peak

4    indicated, and at the third loci one of the alleles

5    was not called.

6    Q.    So, getting back to my question -- let me

7    ask you this:  You previously concluded that there

8    were a total of five loci where the sample indicated

9    the possibility of drop out, right?

10    A.    That's a -- that's a combined -- you are

11    looking at multiple people compared to one loci --

12    one DNA profile.  And you've marked cumulative

13    conclusions on this, indicated on this worksheet.

14    Q.    Well, let me ask you this.

15    A.    So, again, you take the individual's

16    profile and compare it to the entirety in a profile,

17    and this profile here from this sample has an

18    indication of at least five contributors.

19    Q.    All right.  Let's see if we can answer my

20    question.

21    A.    Well, I'm trying to.

22    Q.    You had five loci where you had concluded

23    that there was a possibility of drop out?

24    A.    For different individuals.

25    Q.    Okay.

3561

1    A.    That's what this chart shows.  It shows --
2    Q.    What you are saying then is that it --
3          MS. DAYTON:  Objection.
4    Q.    It matters.
5          MS. DAYTON:  Objection.
6    A.    Of course it matters.
7          MS. DAYTON:  May we approach.
8          THE COURT:  I'm going to sustain the
9    objection.  You've asked the question twice, she's
10   given you the answer.  You need to move on.
11         MR. SHEEHAN:  Well respectfully, your
12   Honor, I don't think the answer has been responsive
13   to the question.
14         THE COURT:  You've asked it twice,
15   you've gotten the answer, and she said that no --
16   that your form of the question does not lead her to
17   be able to answer yes or no, and so she's given you
18   the explanation.
19   Q.    Okay.  Well let's look at it this way.  At
20   D21 when we were looking at the staff member's
21   profile, she was missing an allele, right?
22   A.    Could you go back to that?
23   Q.    Yeah.  Let's go back to what I believe is
24   quadruple H.  Quadruple H, right, D21 the staff
25   person was missing an allele?

3562

1    A.    That's correct.
2    Q.    And that's one of the loci where you
3    concluded that Azibo Aquart might have drop out.
4          MS. DAYTON:  Objection, irrelevant.
5          MR. SHEEHAN:  It's not irrelevant, your
6    Honor.
7          MS. DAYTON:  I thought we weren't
8    supposed to do that.
9          MS. DAYTON:  Can we approach then?
10         THE COURT:  No, we're going to conclude.
11   Ladies and gentlemen, you are excused until Monday
12   at 9:30, and I hope I will be able to give you an
13   approximation of what next week will look like
14   because I anticipate -- I'll try to anticipate when
15   in the week we will conclude evidence and the matter
16   will be able to be submitted to you.  All right, so
17   we're getting to close to the point where we could
18   make some calculations.  That may have to be
19   adjusted, but we'll give you some indication.
20         Okay, thank you very much.
21         (Jury exited the courtroom.)
22         THE COURT:  All right, Mr. Sheehan, why
23   do you need more that one more hour to
24   cross-examine?
25         MR. SHEEHAN:  I don't think that I do,

3563

1    your Honor.
2          THE COURT:  All right, you have one hour
3    total on Monday.
4          MR. SHEEHAN:  Well, unless I encounter
5    some unforeseen obstacle.
6          THE COURT:  To complete your
7    cross-examination.  All right, and how long is your
8    redirect?  Do you know, Ms. Dayton?
9          MS. DAYTON:  Dayton.  Whoever you are.
10   I'm hoping it's 15 to 20 minutes, your Honor.
11         THE COURT:  We'll see you briefly
12   Monday.
13         THE WITNESS:  Yes, your Honor.
14         THE COURT:  Have a nice weekend.
15         THE WITNESS:  Thank you, your Honor.
16         THE COURT:  All right, we are going to
17   move into a charge conference, unless there is
18   anything else that's necessary.
19         MR. SHEEHAN:  No, your Honor.
20         MS. DAYTON:  Can I just -- so I don't
21   stand up and do the same objection on Monday
22   morning, counsel is asking Ms. Roy to do a
23   calculation in a manner that the lab does not do it.
24   He's asking her to drop out a bunch of things off of
25   the chart, and she keeps saying the same thing, we

3564

1    take one individual to one sample, one individual to
2    -- and he is putting EJ and JT and AA.  It's a
3    complete misrepresentation.  I object to those being
4    put into evidence.
5          THE COURT:  Well, you didn't at the
6    time.
7          MS. DAYTON:  Your Honor, I did.  He's
8    sitting there writing on it and I did object and
9    then he scribbled it out and then he changed it, and
10   at a certain point, your Honor, it's like we're
11   fighting in front of the jury over -- it becomes
12   everything, because I objected two days ago to any
13   of these notes and things coming in.  Because
14   it's --
15         THE COURT:  Well, that may be, but, do
16   you know, that's not very effective to make a
17   generic prospective objection like that.  But if you
18   want to redirect whether or not those exhibits with
19   the initials have meaning, you are welcome to do
20   that.
21         MS. DAYTON:  Very well thank you.
22         THE COURT:  Who is your next witness
23   after Ms. Roy?
24         MS. RODRIGUEZ-COSS:  Your Honor, we
25   expect on Monday -- well, now we didn't -- we

3565

```
1   thought Mr. Sheehan was going to conclude today.
2   But we expect we will call Shamarr Myers, Detective
3   James Viadero.
4           THE COURT:  Who is Shamarr Myers.
5           MS. RODRIGUEZ-COSS:  He's a witness who
6   will identify a letter we will argue was written by
7   the defendant.
8           MS. DAYTON:  He was on the list.
9           THE COURT:  I just don't remember the
10  name.
11          MS. DAYTON:  Cooperating witness, your
12  Honor.
13          MR. SHEEHAN:  Your Honor, this is one of
14  the handwriting issues that your Honor may recall.
15          THE COURT:  That I may recall?
16          MR. SHEEHAN:  No, remember we went we
17  talked about this.
18          THE COURT:  Yes, all right.  And then
19  does the handwriting expert come on?
20          MS. RODRIGUEZ-COSS:  Then Special Agent
21  Kevin Kline who obtained the samplers, the
22  handwriting samplers from the defendant, and then
23  the handwriting expert will come on, and if we get
24  through that, which at this point I don't know that
25  we will get through much more than that, does the
```

3566

```
1   Court wish the following list?  So will call
2   Detective.
3           MS REYNOLDS:  We should clarify, your
4   Honor, with regard to Detective Caruso, we just
5   substituted him for John Andrews, for Sergeant John
6   Andrews because John Andrews is going to be out of
7   town next week.
8           THE COURT:  So this has something to do
9   with phones.
10          MS. REYNOLDS:  Correct, to identify a
11  number, a phone number, and the records that were
12  provided to counsel, but he was not previously on
13  the list, he was just an add-on to substitute for a
14  witness who won't be here next week.
15          MS. RODRIGUEZ-COSS:  Similarly, your
16  Honor, Laivia Whittingham wasn't originally on the
17  list for the guilt phase.  However, given the
18  defense standpoint with respect to her mother's
19  telephone number, we intend to call her to the stand
20  to only solicit just that one fact.
21          MR. SMITH:  Has she been here, your
22  Honor?
23          MS. RODRIGUEZ-COSS:  Yes, she has been.
24          MR. SMITH:  Okay.  I'm just curious,
25  your Honor.
```

3567

```
1           THE COURT:  What's that, about a 10
2   second witness.
3           MS. RODRIGUEZ-COSS:  Five minutes, I
4   guess.
5           MS. REYNOLDS:  On our part.
6           MS. RODRIGUEZ-COSS:  Special Agent
7   Christopher Munger.
8           THE COURT:  This is still all Monday?
9           MS. RODRIGUEZ-COSS:  No, no, I think we
10  would -- I don't know that we'll get past the
11  handwriting expert on Monday, your Honor.  I'm
12  hoping we will definitely get to him.  I don't know
13  that we'll get much more after that.  I thought the
14  Court wanted the remaining witnesses.
15          THE COURT:  I'm just trying to see what
16  we've got.  So we have for Monday Shamarr Myers,
17  Sardone, Caruso.
18          MS. RODRIGUEZ-COSS:  No, no, I'm sorry,
19  your Honor Shamarr Myers, James Viadero, Kevin
20  Kline.
21          THE COURT:  Wait, I've got to find --
22  who is Viadero?
23          MS. RODRIGUEZ-COSS:  He's a detective
24  who participated in a search and seized one of the
25  letters, your Honor.
```

3568

```
1           THE COURT:  This is coming in on Monday.
2           MS. RODRIGUEZ-COSS:  Yes, ma'am.
3           THE COURT:  All right.
4           MS. RODRIGUEZ-COSS:  And then Special
5   Agent Kevin Kline who obtained the samplers from the
6   defendant and then the handwriting expert.
7           THE COURT:  Five witnesses.
8           MS. RODRIGUEZ-COSS:  Yeah.
9           THE COURT:  All right.  There is a
10  motion in limine with respect to the Tom Martin, the
11  blood splatter expert.  Do you want to leave that
12  til Monday to argue it?
13          MR. MARKLE:  I thinking that was a yes,
14  your Honor.
15          MS. DAYTON:  I said yes.  Sorry.
16          THE COURT:  Why don't we take a
17  ten-minute rest, get some fresh air and I'll see you
18  in chambers.  We'll stand in recess.
19
20
21
22
23
24
25
```

**GA892**

3569

```
 1               I N D E X
 2  WITNESS                          PAGE
 3  CHRISTINE ROY
 4  Continued cross-Examination by Mr. Sheehan   3402
 5
 6
 7
 8          I certify that the foregoing is a
 9  correct transcript from the record of proceedings in
10  the above-entitled matter.
11              5/14/11
12               Date
13
14              /S/   Sharon Montini
15            Official Reporter
16
17
18
19
20
21
22
23
24
25
```

3570

```
 1           UNITED STATES DISTRICT COURT.
 2            DISTRICT OF CONNECTICUT
 3  * * * * * * * * * * *      *
 4  UNITED STATES OF AMERICA,   * Case No 6cr160(JBA)
 5          Plaintiff,          *
 6     vs.                      *
 7  AZIBO AQUART              * May 16, 2011
 8          Defendant.          *
 9  * * * * * * * * * * * *     *
10            TRIAL TRANSCRIPT
11             VOLUME XVII
12  BEFORE:  THE HONORABLE JANET BOND ARTERTON U.S.D.J.,
13                               and jury
    Appearances:
14  FOR THE GOVERNMENT:  ALINA REYNOLDS, ESQ
                         TRACY DAYTON, ESQ.
15                       PETER MARKLE, ESQ.
                         JACABED RODRIGUEZ-COSS
16                       United States Attorney's Office
                         915 Lafayette Blvd
17                       Bridgeport, CT 06604
18
    FOR THE DEFENDANT      MICHAEL SHEEHAN, ESQ
19  AZIBO AQUART:          Sheehan & Reeve
                           139 Orange Street
20                         New Haven CT 06510
21                         JUSTIN SMITH, ESQ.
                           383 Orange Street
22                         New Haven, CT 06511
23
    Court Reporter:      Sharon Montini, RMR
24
25  Proceedings recorded by mechanical stenography,
    transcript produced by computer
```

3571

```
 1       THE COURT:  Good morning, counsel, Mr.
 2  Aquart, ladies and gentlemen.  We'll bring the jury
 3  in in just a moment.
 4       I'm going to give to counsel the DCF
 5  records.  I'll do that at the first break.  There is
 6  one thing I am going to withhold, which I will
 7  describe to you.  We have several late-filed motions
 8  that are pending, one relating to Shamarr Myers.  Is
 9  that something we should take up now?
10       MR. SHEEHAN:  We have worked that out,
11  your Honor.
12       THE COURT:  Okay, thank you.  And then
13  we have, in addition, other motions relating to
14  extrinsic evidence.  Can those wait?
15       MR. SHEEHAN:  Yes, your Honor, I believe
16  they can.
17       THE COURT:  We also had an issue of a
18  summary chart relating to overall call frequency.
19  Has that been resolved?
20       MR. MARKLE:  Not yet, your Honor, but
21  we're attempting to do that.  So, hopefully by the
22  end of the day we can have that resolved.  All
23  right, and we have returning Ms. Roy who will be
24  examined by the defendant for no more than an hour,
25  cross, recross, whatever it is.
```

3572

```
 1       All right, are we ready for the jurors?
 2       MR. SHEEHAN:  We just need the witness,
 3  your Honor.
 4       THE COURT:  Okay, we'll get the witness
 5  and the jurors.
 6       (Jury entered the courtroom.)
 7       THE COURT:  Good morning, how are you?
 8  Please be seated.  Although things change, it is our
 9  anticipation that you will have the case for your
10  deliberation by the end of this week, and I will let
11  you know if anything changes.
12       All right, good morning, Ms. Roy.
13       THE WITNESS:  Good morning, your Honor.
14       THE COURT:  You are becoming just about
15  part of our family, aren't you?
16       THE WITNESS:  No comment.
17       THE COURT:  No, we're almost finished,
18  and we appreciate your attention to the serious
19  matters here.
20       All right, Mr. Sheehan you may proceed.
21       C H R I S T I N E   R O Y
22  Having previously affirmed, was examined and
23  testified as follows:
24  CONTINUED CROSS-EXAMINATION
25  BY MR. SHEEHAN:
```

3573

1    Q.   Good morning, Ms. Roy.
2    A.   Good morning.
3         MR. SHEEHAN:  Can I have Exhibit PPPPP
4  for identification brought up on the witness's
5  screen, please.
6    Q.   Ms. Roy, it might be easier if I showed you
7  a hard copy of it, because I realize that screen is
8  a little difficult to read.
9    A.   Thank you.
10   Q.   You are welcome.  In fact, let's do this
11 because I've got the sticker on that and I have an
12 extra one for you.
13   A.   I actually have my copy here, so you don't
14 have to keep bringing them over.
15   Q.   PPPPP is the electropherogram that you --
16 that was prepared in the course of the analysis of
17 sample 15-22, was it not?
18   A.   Yes.
19   Q.   Actually, on this electropherogram at my
20 request you included the peak heights for the
21 various genetic markers.
22   A.   That is correct.
23        MR. SHEEHAN:  I would offer PPPPP at
24 this time, your Honor.
25        MS. DAYTON:  No objection.

3574

1         THE COURT:  That is a full exhibit.
2         MR. SHEEHAN:  Could I have the lights
3  down a little bit, your Honor.
4         THE COURT:  Yes.
5    Q.   Turning to the locus of D21, you had noted
6  a minor peak -- two minor peaks there, correct?
7    A.   That is correct.
8    Q.   And one of those was 32.2.
9    A.   That is correct.
10   Q.   And that is the same position which
11 corresponds to one of the missing genetic markers
12 for the staff member, is it not?
13   A.   I will have to look that up again.
14        MR. SHEEHAN:  Actually, if we could
15 bring up Exhibit HHHH first, previously introduced
16 in evidence.
17   Q.   Would looking HHHH be helpful?
18   A.   Yes, I have it.  32.2 the staff member has
19 that at D21.
20   Q.   And you had previously testified, had you
21 not, that D7 is a larger amplification -- is it
22 called amplicon?  What is the term?
23   A.   Amplicon, or you could call it fragment of
24 DNA, fragment of amplified DNA.
25        MR. SHEEHAN:  So if I could bring PPPPP

3575

1  back up, please.
2    Q.   So, the D21 locus is a smaller amplicon
3  than D7, right?
4    A.   That's correct.
5    Q.   Now, with respect to D7 at the 9
6  location -- the location that corresponds to a 9 on
7  this sample, there is a peak located there; is there
8  not?
9    A.   Yes, in the stutter position of the 10
10 genetic marker.
11   Q.   Okay.  And as we discussed Friday, it's
12 possible, is it not, that true STR alleles might
13 exist that are below that stutter threshold?
14   A.   Is it possible?
15   Q.   Yes.
16   A.   Yes.
17   Q.   In other words, they could be masked by or
18 contribute to the size of the stutter.
19   A.   But according to our validation that peak
20 is not recorded as a true -- as a reportable genetic
21 marker.
22   Q.   Because you are not sure, right?
23   A.   Because it's below the threshold level of
24 the 10 genetic marker in this D7 for the stutter
25 position.

3576

1    Q.   Okay.  And, in fact, that peak is actually
2  higher than the 8 allele noted; is it not?
3    A.   It looks higher, but that's -- but that
4  doesn't mean that -- that's still within the stutter
5  threshold for the 10 genetic marker in D7.
6    Q.   Now, turning your attention to FGA.  The
7  staff person's profile had a 24 which is not
8  identified as a genetic marker in 15-22, correct?
9    A.   That's correct.
10   Q.   And you did pick up a minor peak at this
11 locus with respect to the 22 position, did you not?
12 I wonder if we could look at FGA there, to the right
13 a little bit.
14   A.   That's correct.
15   Q.   And you don't need to see a minor peak to
16 infer the possibility of drop out, do you?
17   A.   When I see that there is a possibility,
18 yes.
19   Q.   I'm sorry?
20   A.   This --
21   Q.   Well, you do not.
22   A.   This DNA profile has at least five
23 contributors.  So, am I detecting all of the
24 components of all five contributors, at least five
25 contributors at each of the sites tested?  Perhaps

3577

```
1    not.  So, is it possible that there is drop out,
2    yes.
3        Q.    Well, when you say this has five
4    contributors --
5        A.    At least five contributors.
6        Q.    Okay.
7        A.    Evidence of at least five contributors.
8        Q.    It could be as little as three with six
9    loci -- I'm sorry, six genetic markers, right?
10       A.    No.
11       Q.    No?
12       A.    Looking at the overall DNA profile --
13       Q.    No, I'm just looking at this locus.
14       A.    Well, that's not how you would determine
15   the minimum number of contributors to a DNA profile
16   by looking at one locus.
17       Q.    Your report does not reflect a
18   determination as to the minimum number of
19   contributors for the sample, does it?
20       A.    That is correct.
21       Q.    And what you say is that it is a mixture,
22   right?
23       A.    Right.
24       Q.    All right.  And there are no notes
25   reflecting any conclusion as to the minimum number
```

3578

```
1    of contributors, are there?
2        A.    No, except in the table you can count the
3    number of genetic markers that are reported.
4        Q.    Yes, and it appears that there are, at
5    least this locus anyway, six, right?
6        A.    Yes, but other loci there are more than
7    six.
8        Q.    Okay.  And at any loci do you have 10?
9        A.    At D21 I have seven that are reported and
10   two minor peaks that are detected.  So, there is
11   evidence of at least four contributors.
12       Q.    And let me ask you this:  Turning to D18,
13   there the staff person's profile was missing at 13,
14   was it not?
15       A.    That's correct.
16       Q.    And D18 is one of the largest of loci; is
17   it not?
18       A.    It's one of the larger.
19       Q.    In fact, it's two levels larger than vWA,
20   right?
21       A.    VWA is about 150 base pairs to about 220
22   base pairs.
23       Q.    And how -- I'm sorry?
24       A.    And D18 is about 220 to 350.
25       Q.    Okay.  So, and in fact on that chart we
```

3579

```
1    looked at it is, in fact, the largest in that color
2    group?  I forget which color D18 is.  Do you recall?
3        A.    Yellow or -- it's recorded as black.
4        Q.    But it's the largest of the yellow; is that
5    right?
6        A.    That's correct.
7        Q.    Now, if we could just look at --
8              MR. SHEEHAN:  If we could magnify the
9    area of the 15 there.  Going back.
10       Q.    If I could ask you to take a look at that.
11   Okay, to the left of 15 in the 13 position there is
12   what appears to be something on the
13   electropherogram, is there not?
14       A.    I would just like to say that we can always
15   enlarge and go down to base and see minor peaks
16   there that are below our 50 RFUs, but we don't go
17   and say, oh, I see a tiny peak here, I see a tiny
18   peak there, I see a tiny peak there, and that
19   peak there, oh, that must evidence that person is
20   included.  No, we go by what's reported in the
21   overall DNA profile, as I tried to say earlier.
22   It's always that one known profile compared to the
23   overall DNA profile, and magnifying peaks that are
24   not even labeled is not in our protocol.
25       Q.    And if I could ask you to answer my
```

3580

```
1    question.  The area that is highlighted on your
2    chart, that corresponds to the area where the 13
3    would be, correct?
4        A.    Again, that's not an asterisk and it's not
5    reported.
6        Q.    Is it at the 13?
7              MS. DAYTON:  Objection, asked and
8    answered.
9              MR. SHEEHAN:  I don't think it's been
10   answered.
11             THE COURT:  So your question is simply
12   one of location.
13             MR. SHEEHAN:  Yes.
14             THE COURT:  Not quantity.
15             MR. SHEEHAN:  Correct.
16             THE COURT:  All right, you may answer
17   that.
18       A.    It appears to be in the gray bin of the 13.
19   But can I be sure?  No.
20       Q.    Now, let me ask you finally to take a look
21   at vWA.  This was a location when you were assessing
22   the -- whether there might have been drop out for
23   Mr. Aquart.  You had assumed a possibility that the
24   19 allele had dropped out, correct?
25       A.    You are talking about Azibo Aquart?
```

3581

1    Q.   Yes, I am.

2    A.   At vWA the 19 is not called.

3    Q.   And looking at Exhibit PPPPP, there is

4    nothing on that electropherogram, nothing whatsoever

5    that corresponds to the 19 bin, is there?

6    A.   Again, I would like to again stress that we

7    look at the overall --

8    Q.   Perhaps you could answer my question.  That

9    would make it easier.

10   A.   But this is not our way of determining

11   inclusions, cannot be eliminated and eliminated.

12   Q.   But my --

13           THE COURT:  Just a moment, please.  Just

14   a moment, please.  So the question:  Is looking at

15   Exhibit PPPPP, there is nothing on that

16   electropherogram that corresponds to the 19 bin.

17   It's just yes or no.  And then on redirect that

18   qualification can be explored.  Is there -- can you

19   answer that question?

20           THE WITNESS:  From that image I don't

21   know.

22           THE COURT:  Okay.  Next question.

23           MR. SHEEHAN:  Could we blow it up,

24   please.

25   A.   Again, from that image I don't know.  Is

3582

1    there something there at 10 RFUs?  I don't know how

2    low you are expecting me to be able to see a minor

3    peak.

4           MR. SHEEHAN:  I have no further

5    questions.

6           THE COURT:  All right, redirect.

7           MS. DAYTON:  Thank you, your Honor.

8           THE COURT:  Our lighting will remain

9    gloomy for just a little bit.

10           THE WITNESS:  I'm sorry?

11           THE COURT:  Our lighting will remain

12   gloomy for just a couple of minutes while it gets

13   it's potency back.

14   REDIRECT EXAMINATION

15   BY MS. DAYTON:

16   Q.   Good morning.

17   A.   Good morning.

18   Q.   I'm going to call your attention back to

19   last week.  Do you remember counsel asking you if

20   you re-ran each item of evidence to see if you get

21   the same result twice?

22   A.   No, we don't go back re-amplify and --

23           THE COURT:  I'm sorry, the question is

24   do you remember that question.

25   A.   Oh, sorry.  Yes, I do remember that

3583

1    discussion.

2    Q.   Okay.  Is that process included in your lab

3    protocol?

4    A.   No.

5    Q.   Does your lab protocol have any sort of

6    procedures for verification of your results?

7    A.   Yes.

8    Q.   And what are they?

9    A.   After I've completed my analysis I give the

10   electronic data, what's basically called the U

11   drive, and then I give my paperwork to who I've

12   chosen to be my cosigner on the case.  So, in this

13   case it was Dr. Carll Ladd, and I would gave him the

14   paperwork, and he had access to the electronic data

15   and he ran a second analysis and then initialed and

16   dated his second analysis on the work done for this

17   case.

18   Q.   In fact, on many of the documents you could

19   -- there is someone else's initials in the lower

20   right-hand corner?

21   A.   Yes, it kind of looks like a C with a

22   circle surrounding it.

23   Q.   And whose initials are those?

24   A.   That's Dr. Carll Ladd's, who is the

25   supervisor of the DNA section.

3584

1    Q.   Counsel also asked you about mitochondrial

2    DNA testing.  The type of DNA testing that you

3    performed, is that mitochondrial?

4    A.   No, I did DNA testing that's found in the

5    nucleus, which is a compartment in the cell.

6    Q.   What's the difference between mitochondrial

7    and nucleus DNA test?

8    A.   The type of testing that I did is based on

9    length polymorphism, variations of length at

10   specific sites on the nuclear DNA.  Mitochondrial

11   DNA is inherited through your mother, and there is

12   many copies of that mitochondrial DNA in one cell.

13   So, it's for very particular types of evidence and

14   it's looking at the sequence, as we had a little bit

15   of a discussion A, T, G, C, sequencing of

16   mitochondrial DNA.

17   Q.   So, the sequencing that we did talk about,

18   17, 17 prime, is that used in the type of testing

19   that you do?

20   A.   No.

21   Q.   So your lab doesn't sequence in nuclear DNA

22   testing?

23   A.   No.

24   Q.   Does the FBI use sequencing?

25           MR. SHEEHAN:  Objection.

**GA896**

3585

```
1      Q.   Based upon your knowledge and experience
2   and your expertise in this field over a decade, more
3   than a decade, and your previous work at the FBI, do
4   you know if they use sequencing in nuclear DNA
5   testing?
6              MR. SHEEHAN:  Objection.
7              THE COURT:  Basis?
8              MR. SHEEHAN:  First of all, it's
9   hearsay, and secondly, it's irrelevant.
10             THE COURT:  Sustained.
11     Q.   Does any lab in the country use sequencing?
12             MR. SHEEHAN:  Objection.  Same
13  objection.
14             THE COURT:  Sustained.
15     Q.   Let me just point you to the book.  Do you
16  remember this book Forensic DNA Typing?
17     A.   Yes.
18     Q.   That counsel showed you.  Okay.  I'm going
19  to draw your attention -- do you have this book?
20     A.   Yes, I do.
21     Q.   Do you utilize this book in the lab?
22     A.   I wouldn't say that I utilize it.  I
23  utilize it more for when I have to go testify, I
24  like to review it, but we do have copies at the lab,
25  and I have my own copy.
```

3586

```
1      Q.   Okay.  I'm going to draw your attention to
2   page 26 on the lower left-hand side.  Excuse my
3   highlights?
4              MR. SHEEHAN:  I'm object -- oh, all
5   right.  I'm sorry.
6      Q.   So --
7              MR. SHEEHAN:  My apology.
8      Q.   On there is a chart down here, Figure 2.5,
9   and I just want to draw your attention to the short
10  tandem repeat DNA markers discussed in this book.
11  Length polymorphism, what does that mean to you?
12     A.   That means, again, those genetic markers
13  are representative of the number of repeat units
14  that are in -- that are detected in that DNA
15  profile.  So by length polymorphism, the length of
16  something.  Polymorphism just means there are
17  variations within that site.
18     Q.   While they gave an example of sequence
19  polymorphism, right above it, it essentially -- what
20  does this mean right here, "Owing to the fact it's
21  currently not feasible in terms of time and expense
22  to evaluate an individual's entire DNA sequence."
23  What are they referring to there?
24     A.   That the type of testing we do is length
25  polymorphism as I've presented in this case.  We
```

3587

```
1   don't go and sequence the extracted DNA from the
2   evidence nor do we sequence an individual's DNA.
3      Q.   Okay.  This book also at page 158, and at
4   other places throughout the book as well, speaks
5   about mixture interpretation.  Do you remember
6   counsel asking you questions about mixture
7   interpretation?
8      A.   Yes, I do.
9      Q.   I'm going to draw your attention to page
10  158, and Figure 7.4.  Is there anything in Mr.
11  Butler, Dr. Butler's book suggesting you should be
12  doing sequencing in nuclear DNA testing?
13     A.   In his overall book?
14     Q.   I mean, in his mixture -- I'm sorry, in his
15  mixture interpretation theory and his -- the figure
16  right here, is there anything suggesting that you
17  should be doing sequencing in nuclear DNA testing?
18     A.   No.
19     Q.   Counsel also asked you a lot of questions
20  about the contamination issue.  Do you recall that
21  series of questions?
22     A.   Yes, I do.
23     Q.   Do you use the same standards in analyzing
24  all evidence regardless of whether you are comparing
25  it to the known profile of a staff member or the
```

3588

```
1   known profile of the defendant?
2      A.   Yes, it's -- we're always comparing the
3   known profile to the overall profile of the
4   evidentiary sample.
5      Q.   So, you don't -- do you make a decision
6   based on one particular locus?
7              MR. SHEEHAN:  Objection, leading.
8              THE COURT:  Overruled.
9      Q.   Loci, sorry.
10     A.   No.  We're always making, again, the
11  comparison between the overall profile and the
12  known.  We are looking to see what's at each of the
13  test sites.  But, again, it's the overall profile
14  and that one known profile.  We don't do a
15  combination comparison or combined comparison where
16  we're taking multiple known profiles, adding them
17  together and then comparing them to the one
18  evidentiary DNA profile.
19     Q.   So, you just mentioned you don't add things
20  together.  I'm going to draw your attention back to
21  defense Exhibit JJJ-2-1.  When you do your
22  statistical analysis such as this one for 9-21,
23  would you -- well, would you do what the defense did
24  here?  Would you put multiple knowns and compare
25  them against one statistic -- well, explain what you
```

3589

1  do versus what's here.
2      A.   This is a -- I made the conclusion that the
3  known from Mr. Azibo Aquart and Mr. Azikiwe Aquart
4  cannot be eliminated from the DNA profile.  This
5  looks like 9-Z1.  And so the three loci which they
6  were not fully included in were not included in the
7  stats.  The other markings in blue are not something
8  that I would -- I added.
9      Q.   Do you do it like that?  Do you put
10 multiple people in making one comparison?  Like do
11 you compare the knowns against each other, in other
12 words?
13     A.   No, we make one comparison between the
14 known and the overall DNA profile of the evidentiary
15 sample.
16     Q.   And I'm going to show you what's been
17 marked for identification as Government's
18 Exhibit 467.  If you could just take a minute to
19 look at that to see if the numbers on that chart
20 accurately represent the genetic markers from those
21 three items.
22     A.   Yes, this looks accurate.
23          MS. DAYTON:  Your Honor, I move this
24 into evidence first and then ask to publish it to
25 the jury.

3590

1          MR. SHEEHAN:  I'd object, your Honor.
2  With respect to this sample, this witness has
3  testified that Mr. Aquart is excluded as a
4  contributor.  So the publication of this is
5  irrelevant.
6          MS. DAYTON:  Actually, maybe we should
7  approach on that.
8          THE COURT:  All right, come approach.
9          (Sidebar conference)
10         THE COURT:  I was looking for the
11 original summary of her findings.  Anyhow.
12         MR. SHEEHAN:  I can provide what her
13 conclusion --
14         THE COURT:  Do you know that initial one
15 that has all her findings on who's a contributor and
16 who can't be excluded?
17         MR. SHEEHAN:  It's not on there.  It's
18 not on that first list that I gave you.
19         THE COURT:  Okay.
20         MR. SHEEHAN:  In her lab report, in her
21 report she has concluded that Mr. Aquart is excluded
22 as a contributor to this and she's testified to that
23 fact.
24         MS. DAYTON:  Number one counsel
25 specifically asked her about this sample, this

3591

1  particular sample.  So, it's, you know, fair game on
2  redirect.  Number two, counsel spent the last
3  however many hours asking about the exclusion of the
4  staff member from certain items suggesting that she
5  was improperly excluded.  The government is going
6  down this road to show that the defendant benefitted
7  from the same rules of exclusion.  Counsel just
8  acknowledged that she testified to it because he
9  specifically asked her about it.
10         MR. SHEEHAN:  Testified to what?
11         MS. DAYTON:  To this, the 32-1-Z1.
12         MR. SHEEHAN:  Yes, I acknowledge she
13 testified with respect to 32-1-Z1, and she also
14 testified that Mr. Aquart, as everybody else she
15 tested, excluded as a contributor.
16         MS. DAYTON:  Right, excluded despite
17 showing up at ten loci or nine loci, the same as the
18 trace examiner.  He spent all of this time in ZZZ
19 going over where, and in 15-Z1 and 14-1-Z1, showing
20 where the examiner was but she was excluded anyways,
21 and that's the same as the defendant.
22         MR. SHEEHAN:  I'm just alerting the
23 Court if we go down this road we're going to go
24 through each one of these alleles.
25         MS. DAYTON:  That's fine.  I'm not --

3592

1          MR. SHEEHAN:  The concern --
2          MS. DAYTON:  -- threatened by that.
3          MR. SHEEHAN:  It's not a threat.
4          THE COURT:  All right, so she did talk
5  about 32-1-Z1.
6          MS. DAYTON:  Yes.
7          MR. SHEEHAN:  Yes.
8          THE COURT:  And --
9          MS. DAYTON:  Only on cross.  He brought
10 it up.
11         THE COURT:  And the illustration that
12 this chart shows is -- tell me that again.
13         MS. DAYTON:  That several of the
14 defendant's genetic markers are present at several
15 loci, but nonetheless she excluded him.
16         THE COURT:  She excluded him.  I think
17 that's fair.  Overruled.
18         (Sidebar concluded)
19         MS. DAYTON:  Your Honor, I offer Exhibit
20 467 into evidence.
21         THE COURT:  Yes, over objection it's a
22 full exhibit.
23         MS. DAYTON:  May I publish to the jury?
24         THE COURT:  You may.
25     Q.   Okay.  So this is Government's Exhibit 467,

3593

```
1   for the record, and this is a sample.
2           MS. DAYTON: May I bother you to dim the
3   lights, your Honor? Thank you.
4       Q.  Do you remember counsel asking you, I think
5   it was Friday, about 32-1-Z1, which is a sample of
6   Tina Johnson's fingernail clippings?
7       A.  Yes, I recall.
8       Q.  And you've also testified extensively
9   regarding Azibo Aquart's DNA profile and Tina
10  Johnson's profile.
11      A.  Yes.  I would just like to say that it
12  seems that I've just noticed something on this that
13  is not quite right.
14      Q.  What?
15      A.  The asterisk here in 32-1-Z1 under CSF is
16  in red, and I'm not sure that was meant to be in
17  red.
18      Q.  No, it wasn't.  I'll circle that.  This one
19  either.  Okay.
20      A.  And in D18.
21          MS. DAYTON: And in D18, your Honor.
22      Q.  So, the other items in red, counsel asked
23  you several questions about this particular piece of
24  evidence, and do you recall him pointing out that
25  Tina Johnson did not have a 14 at D8?
```

3594

```
1       A.  Yes.
2       Q.  Does the defendant?
3       A.  Yeah, he has a 13, 14.
4       Q.  And counsel asked you whether or not Tina
5   Johnson had a 35 a D21.  Does the defendant?
6       A.  Yes, he does.
7       Q.  And he asked you whether Tina Johnson had a
8   17 at D3.  She doesn't, does she?
9       A.  No, she doesn't.
10      Q.  Does the defendant?
11      A.  Yes, he does.
12      Q.  And at THO, counsel asked you whether Tina
13  Johnson had a 7.  Does she?
14      A.  No, she doesn't.
15      Q.  Does the defendant?
16      A.  Yes, he does.
17      Q.  And he asked you about D2, about whether
18  Tina Johnson had a 21 at D2.  Do you remember that?
19  Does she?
20      A.  She doesn't.
21      Q.  Does the defendant?
22      A.  Yes, he does.
23      Q.  Looking at the overall profile, at how many
24  loci do you see genetic markers which are consistent
25  with the defendant's genetic markers?
```

3595

```
1       A.  I'm not sure I understand that question.
2       Q.  That's probably because it was a bad one.
3   So, the defendant -- you testified that this
4   accurately represents his profile; is that correct?
5       A.  Yes.
6       Q.  Okay.  And the numbers in red minus the
7   asterisks, those accurately represent genetic
8   markers that are consistent with the defendant's
9   genetic markers, is that correct, at D8, D2, CSF,
10  D3, THO, D13, D2, D19, D18, and D5?
11          MR. SHEEHAN: I object to the form of
12  that question, your Honor.
13          THE COURT: Basis for your objection?
14          MR. SHEEHAN: Compound.
15          THE COURT: Do you want her to go
16  through it one by one?
17          MR. SHEEHAN: I don't know if she can
18  even answer it the way it was phrased your Honor.
19          THE COURT: Well, I'm going to ask the
20  witness.
21          Can you answer that question as stated?
22          THE WITNESS: I'm a little -- I am not
23  sure I totally understand.
24          THE COURT: You need to redo that.
25      Q.  Do you see in the evidentiary sample
```

3596

```
1   32-1-Z1?
2       A.  Yes.
3       Q.  Do you in looking at the overall profile
4   see genetic markers that are consistent with
5   possibly -- well, that are similar or the same as
6   genetic markers in the defendant's profile?
7       A.  Yes, there are genetic markers that the
8   number is shared in both 32-1-Z1 and Azibo Aquart's
9   profile.  There are shared genetic markers.
10      Q.  And at how many loci are there shared
11  genetic markers?
12      A.  There are 10 loci where one or more of the
13  genetic markers that Azibo Aquart has that are also
14  detected in 32-1-Z1.
15      Q.  And that's Tina Johnson's fingernail
16  clippings?
17      A.  That is correct.
18      Q.  But, nonetheless, you excluded the
19  defendant from this sample; is that correct?
20      A.  I eliminated him as a contributor to the
21  DNA profile from 32-1-Z1.
22      Q.  Why?
23      A.  Because at D8 the 13 is not present and at
24  D19 the 14 is not present and I consider that two
25  pieces of evidence that out of the whole DNA profile
```

3597

```
1   I would eliminate him as a contributor.
2       Q.  Now, I'm going to -- is this the same sort
3   of analysis that you did with respect to looking at
4   the trace examiner, or the staff profile, in
5   comparison to the evidentiary profiles?
6           MR. SHEEHAN:  I'm objecting to the form
7   of the question.
8           THE COURT:  Sustained.
9       Q.  Do you use a different analysis when
10  looking at staff profile versus a suspect's profile?
11      A.  No, we always look at the DNA profile
12  versus the evidentiary profile, the overall DNA
13  profile.
14      Q.  I'm going to show you Defense Exhibit ZZZ
15  that was admitted on Friday.  Do you recall this?
16      A.  Yes.
17      Q.  And the numbers indicate that, in fact,
18  there is missing alleles for the staff member at
19  several loci; is that correct?
20      A.  Yes, on this chart.
21      Q.  For 14-1 Z1, what was your conclusion with
22  respect to the defendant?
23          MR. SHEEHAN:  I object.  I didn't ask
24  that.  That's outside the scope of the cross.
25          THE COURT:  I'll see you at sidebar.
```

3598

```
1           (Sidebar conference)
2           THE COURT:  My notes have you inquiring
3   about 14-1-Z1.
4           MR. SHEEHAN:  I did, your Honor.
5           THE COURT:  What is it that you say was
6   not within the scope of cross?
7           MR. SHEEHAN:  I was not asking about
8   her -- I was not asking about her conclusions with
9   respect to the defendant as being a contributor on
10  14-1-Z1.
11          THE COURT:  What were you asking?
12          MR. SHEEHAN:  I was asking her about in
13  this context the exclusion of the staff person.
14  Similarly, I was asking her about her conclusions
15  with respect to drop out at various loci on 14-1-Z1.
16          MS. DAYTON:  Your Honor, I'm not
17  confined by the exact questions that he asked.  He
18  asked questions, he put in charts.  This was one of
19  the samples that he addressed with the
20  electropherograms, with the peak heights.  This
21  is -- this area drew a lot of questions about her
22  analysis on this particular mixture.
23          THE COURT:  What is your question?
24          MS. DAYTON:  My question is are the
25  defendant's alleles present at every single site,
```

3599

```
1   all genetic markers which makes it very different
2   than the trace examiner's.
3           THE COURT:  I'm going to permit the
4   question.
5           (Sidebar concluded)
6       Q.  Do you remember the question?
7       A.  Yes, what was my conclusion that I made
8   about Azibo Aquart.  And Mr. Aquart is included as a
9   contributor to the DNA profile from item 14-1-Z1
10  which was demonstrated to be a mixture.
11      Q.  Okay.  And I'm going to approach with
12  what's been marked Government's Exhibit 470.  This
13  is a copy of Defendant's ZZZ with circles on it.
14  Can you compare those circles to the defendant's
15  profile and see if it's an accurate representation.
16      A.  Yes.
17      Q.  Thank you.
18          MS. DAYTON:  Your Honor, I'd ask to move
19  Government's 470 into evidence.
20          MR. SHEEHAN:  Objection for reasons
21  previously stated.
22          THE COURT:  Overruled.
23      Q.  Showing you what is a combination of
24  Defendant's Exhibit ZZZZ and Government's
25  Exhibit 470.  You said that the defendant was
```

3600

```
1   included.  What do these circles represent?
2       A.  Mr. Azibo Aquart's profile, the genetic
3   markers that are also observed in his DNA profile
4   are circled that are also found in 14-1-Z1.
5       Q.  And are all of his genetic markers present
6   at every loci?
7       A.  Yes, he's included because -- I made that
8   conclusion because the genetic markers that were
9   detected in his DNA profile were also observed in
10  the DNA profile that I obtained from 14-1-Z1.
11      Q.  And that's very different than the staff
12  member; is that correct?
13          MR. SHEEHAN:  Objection, leading.
14          THE COURT:  Sustained.
15      Q.  Counsel also asked you about several items
16  of evidence and the presence of markers that are not
17  present in the knowns.  Does that in any way change
18  your conclusions in this case, like the statistical
19  conclusions you come up with?
20      A.  No, we don't -- it's not our job to account
21  for every genetic marker that we detect in a DNA
22  profile from the evidence.
23      Q.  Okay, I'm going to show you a letter.  Do
24  you recognize what Government's Exhibit marked for
25  identification 471 is?
```

**GA900**