# 12-5086

*To Be Argued By:*
TRACY LEE DAYTON

## United States Court of Appeals

### FOR THE SECOND CIRCUIT

### Docket No. 12-5086

———

UNITED STATES OF AMERICA,

*Appellee,*

-vs-

AZIBO AQUART, aka D, aka Dreddy, aka Jumbo,
aka Azibo Smith, aka Azibo Siwatu Jahi Smith,

*Defendant-Appellant,*

(For continuation of caption, see inside cover)

———

ON APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF CONNECTICUT

**GOVERNMENT APPENDIX-VOLUME IV (GA901 – GA1200)**

DEIRDRE M. DALY
*United States Attorney*
*District of Connecticut*

TRACY LEE DAYTON
JACABED RODRIGUEZ-COSS
SANDRA S. GLOVER
*Assistant United States Attorneys*

LESLIE R. CALWELL
*Assistant Attorney General*

SUNG-HEE SUH
*Deputy Assistant*
*Attorney General*

DAVID M. LIEBERMAN
*Attorney*
*Criminal Division*
*Appellate Section*

AZIKIWE AQUART, aka Zee, Nathaniel Grant, aka
Correctional Officer Stone, EFRAIN JOHNSON,

*Defendants.*

# TABLE OF CONTENTS

Trial Transcript – Volume I dated April 20, 2011 ......................................GA1

Trial Transcript – Volume II dated April 21, 2011....................................GA65

Trial Transcript – Volume III dated April 25, 2011 ................................GA115

Trial Transcript – Volume IV dated April 26, 2011.................................GA171

Trial Transcript – Volume V dated April 27, 2011 ..................................GA238

Trial Transcript – Volume VI dated April 28, 2011..................................GA298

Trial Transcript – Volume VII dated April 29, 2011 ...............................GA355

Trial Transcript – Volume VIII dated May 2, 2011..................................GA423

Trial Transcript – Volume IX dated May 3, 2011....................................GA494

Trial Transcript – Volume X dated May 4, 2011 .....................................GA547

Trial Transcript – Volume XI dated May 5, 2011....................................GA605

Trial Transcript – Volume XII dated May 9, 2011 ..................................GA655

Trial Transcript – Volume XIII dated May 10, 2011 ...............................GA707

Trial Transcript – Volume XIV dated May 11, 2011 ...............................GA767

Trial Transcript – Volume XV dated May 12, 2011..................................GA819

Trial Transcript – Volume XVI dated May 13, 2011 ...............................GA850

Trial Transcript – Volume XVII dated May 16, 2011...............................GA893

Trial Transcript – Volume XVIII dated May 17, 2011 ............................GA952

Trial Transcript – Volume XIX dated May 18, 2011 ..............................GA1008

## <u>TABLE OF CONTENTS</u> (cont'd)

Trial Transcript – Volume XX dated May 20, 2011 ...............................GA1036

Trial Transcript – Volume XXI dated May 23, 2011 .............................GA1089

Transcript of Guilt Phase Charge Conference – Volume I
    dated May 13, 2011 ................................................................................GA1097

Transcript of Guilt Phase Charge Conference – Volume II
    dated May 18, 2011 ...............................................................................GA1124

Guilt Phase Verdict Form dated May 23, 2011 ......................................GA1137

Trial Transcript – Volume XXII dated May 31, 2011 ...........................GA1140

Trial Transcript – Volume XXIV dated June 1, 2011 ...........................GA1201

Trial Transcript – Volume XXV dated June 2, 2011 .............................GA1237

Trial Transcript – Volume XXVI dated June 3, 2011 ...........................GA1285

Trial Transcript – Volume XXVII dated June 6, 2011 ..........................GA1342

Trial Transcript – Volume XXVIII dated June 7, 2011 .........................GA1404

Trial Transcript – Volume XXIX dated June 13, 2011 .........................GA1435

Trial Transcript – Volume XXX dated June 14, 2011 ...........................GA1472

Trial Transcript – Volume XXXI dated June 15, 2011 ..........................GA1479

Transcript of Penalty Phase Charge Conference – Volume I
    dated June 6, 2011 .................................................................................GA1483

Transcript of Penalty Phase Charge Conference – Volume II
    dated June 7, 2011 .................................................................................GA1502

Special Verdict Form (Penalty Phase) dated June 15, 2011 ..................GA1523

Motion for Mistrial dated May 23, 2011 .................................................GA1537

## TABLE OF CONTENTS (cont'd)

Ruling on Defendant's Motion for a Mistrial dated February 21, 2012  GA1542

Transcript of John Taylor's Guilty Plea dated October 18, 2010 ........... GA1555

Transcript of John Taylor' Sealed Cooperation Agreement Plea
    Dated October 18, 2010 ...................................................................... GA1565

Transcript of John Taylor's Sentencing Hearing dated April 16, 2012 . GA1569

Trial Transcript of Efrain Johnson – Volume VII dated February 16, 2012
    [Testimony of John Taylor] ............................................................... GA1580

Trial Transcript of Efrain Johnson – Volume VIII dated February 17, 2012
    [Testimony of John Taylor] ............................................................... GA1643

Trial Transcript of Efrain Johnson – Volume IX dated February 21, 2012
    [Testimony of Lashika Johnson] ....................................................... GA1712

Failed Change-of-Plea Hearing Transcript of Efrain Johnson
    dated March 8, 2011 .......................................................................... GA1731

Transcript of Azikiwe Aquart Change of Plea dated August 26, 2011 .. GA1742

Government Exhibit 100A ........................................................................ GA1751

Government Exhibit 102A ........................................................................ GA1754

Government Exhibit 109 .......................................................................... GA1755

Government Exhibit 110 .......................................................................... GA1756

Government Exhibit 111 .......................................................................... GA1757

Government Exhibit 112 .......................................................................... GA1758

Government Exhibit 114 .......................................................................... GA1759

Government Exhibit 116G ....................................................................... GA1760

## TABLE OF CONTENTS (cont'd)

Government Exhibit 116H ........................................................................GA1761

Government Exhibit 116I.........................................................................GA1762

Government Exhibit 116J ........................................................................GA1763

Government Exhibit 117H ........................................................................GA1764

Government Exhibit 117J ........................................................................GA1765

Government Exhibit 120-1 ........................................................................GA1766

Government Exhibit 120-2 ........................................................................GA1767

Government Exhibit 120-3 ........................................................................GA1768

Government Exhibit 120-5 ........................................................................GA1769

Government Exhibit 120-6 ........................................................................GA1770

Government Exhibit 121-4 ........................................................................GA1771

Government Exhibit 121-6 ........................................................................GA1772

Government Exhibit 121-8 ........................................................................GA1773

Government Exhibit 121-10 ......................................................................GA1774

Government Exhibit 122-3 ........................................................................GA1775

Government Exhibit 122-5 ........................................................................GA1776

Government Exhibit 122-7 ........................................................................GA1777

Government Exhibit 123-1 ........................................................................GA1778

Government Exhibit 124 ...........................................................................GA1779

Government Exhibit 127 ...........................................................................GA1780

## TABLE OF CONTENTS (cont'd)

Government Exhibit 128A.................................................................GA1781

Government Exhibit 129A.................................................................GA1782

Government Exhibit 129B.................................................................GA1783

Government Exhibit 130 .................................................................GA1784

Government Exhibit 136 .................................................................GA1785

Government Exhibit 137 .................................................................GA1786

Government Exhibit 139 .................................................................GA1787

Government Exhibit 140 .................................................................GA1788

Government Exhibit 164 .................................................................GA1789

Government Exhibit 165 .................................................................GA1790

Government Exhibit 231A.................................................................GA1791

Government Exhibit 245 .................................................................GA1792

Government Exhibit 246 .................................................................GA1801

Government Exhibit 247 .................................................................GA1807

Government Exhibit 247A.................................................................GA1817

Government Exhibit 249 .................................................................GA1822

Government Exhibit 263 .................................................................GA1828

Government Exhibit 264 .................................................................GA1837

Government Exhibit 273 .................................................................GA1847

Government Exhibit 274 .................................................................GA1850

## <u>TABLE OF CONTENTS</u> (cont'd)

Government Exhibit 275 ........................................................................GA1852

Government Exhibit 276 ........................................................................GA1860

Government Exhibit 277 ........................................................................GA1864

Government Exhibit 278 ........................................................................GA1866

Government Exhibit 279 ........................................................................GA1868

Government Exhibit 300 ........................................................................GA1870

Government Exhibit 300A.......................................................................GA1871

Government Exhibit 301 ........................................................................GA1872

Government Exhibit 302 ........................................................................GA1873

Government Exhibit 305 ........................................................................GA1874

Government Exhibit 306 ........................................................................GA1888

Government Exhibit 307 ........................................................................GA1889

Government Exhibit 308 ........................................................................GA1890

Government Exhibit 314 ........................................................................GA1891

Government Exhibit 315 ........................................................................GA1906

Government Exhibit 316 ........................................................................GA1907

Government Exhibit 319 ........................................................................GA1908

Government Exhibit 322 ........................................................................GA1909

Government Exhibit 400 ........................................................................GA1924

TABLE OF CONTENTS (cont'd)

Government Exhibit 403 ........................................................................ GA1925

Government Exhibit 404 ........................................................................ GA1926

Government Exhibit 414 ........................................................................ GA1927

Government Exhibit 424 ........................................................................ GA1928

Government Exhibit 433 ........................................................................ GA1929

Government Exhibit 435 ........................................................................ GA1930

Government Exhibit 447 ........................................................................ GA1931

Government Exhibit 451 ........................................................................ GA1932

Government Exhibit 464 ........................................................................ GA1933

Government Exhibit 465 ........................................................................ GA1934

Government Exhibit 467 ........................................................................ GA1935

Government Exhibit 506 ........................................................................ GA1936

Government Exhibit 514 ........................................................................ GA1939

Government Exhibit 3 .......................................................................... GA1943

Government Exhibit 4 .......................................................................... GA1944

Government Exhibit 9 .......................................................................... GA1945

Government Exhibit 12A........................................................................ GA1952

3601

1  A.  Yes, this is the letter I wrote.

2  MS. DAYTON:  Your Honor, I'd ask to move

3  471 into evidence.

4  MR. SHEEHAN:  Objection, hearsay.

5  THE COURT:  I don't have a copy of that.

6  MS. DAYTON:  It's in the original 3500,

7  your Honor.  That's the evidentiary copy.

8  THE COURT:  What is the purpose of this

9  offer?

10  MS. DAYTON:  She is the one that raised

11  the issue of contamination.  It comes from the same

12  file as all of the other documents that have been

13  put into evidence.

14  THE COURT:  You can inquire as to who

15  did that and when they did it and how they did it,

16  but it doesn't seem to me that this needs to be a

17  full exhibit.

18  MS. DAYTON:  Okay.

19  Q.  Do you feel that you have to hide the fact

20  that a contamination has occurred?

21  A.  No.

22  Q.  And who alerted the government that there

23  was a contamination?

24  A.  I did.

25  Q.  How?

3602

1  A.  Through a letter.

2  Q.  So you disclosed the fact that there had

3  been a contamination?

4  A.  Correct, and then I amended the report.

5  Q.  To reflect that?

6  A.  Yes.

7  Q.  I want to draw your attention back to

8  Government's Exhibit 464, which you looked at on

9  direct.  It's in the ones that were handed out last

10  week.  I'll show you the piece of evidence.

11  MS. DAYTON:  Approaching, your Honor,

12  with Government's Exhibit 136A.

13  Q.  Do you recognize that package?

14  A.  Yes, I recognize the laboratory label, the

15  evidence label that's on it, and I recognize the ID

16  number, the submission number, and my coworker Maria

17  Warner's initials on it.

18  Q.  And what is that item?

19  A.  Submission 13.

20  Q.  And what were your conclusions, if you

21  could remind us, with respect to who's included and

22  who could not be excluded?

23  MR. SHEEHAN:  Objection, outside the

24  scope of the cross.

25  THE COURT:  Overruled.

3603

1  You may answer.

2  THE WITNESS:  I'm sorry, I didn't hear

3  you.

4  A.  The results demonstrated that item 13-Z1,

5  swabbing of the partial latex glove, is a mixture.

6  James Reid is included as a contributor to the DNA

7  profile from item 13-Z1.  Azibo Aquart cannot be

8  eliminated as a contributor to the DNA profile from

9  item 13-Z1.

10  Q.  What is it about this item of evidence that

11  causes you to say the defendant cannot be

12  eliminated?  What are your -- what are the results

13  that made you come to that conclusion?

14  A.  Because not all of his genetic markers that

15  are in Mr. Aquart's DNA profile were also detected

16  in item 13-Z1.  And again, I'm not saying that that

17  particular genetic marker that was detected in the

18  DNA profile from the evidence came from one

19  particular person.  There is nothing that tells me

20  that, say, a 14 came from a particular person with a

21  14.

22  Q.  So, in other words, the 14 in D8 could have

23  come from James Reid, it could have come from Azibo

24  Aquart, it could have come from both, you can't say?

25  A.  I can't say.

3604

1  Q.  You don't deconstruct like that?

2  A.  No.  But given a DNA profile from evidence,

3  there is nothing that tells me that any particular

4  genetic marker came from any particular person for

5  non-intimate samples.

6  Q.  And are there any loci -- let me find a

7  better way to ask this question.  You said that

8  certain of the defendant's genetic markers are not

9  present.  Are there any loci where you got a result

10  that you didn't get any of the genetic markers

11  consistent with the defendant?

12  A.  No.

13  Q.  So he's present at every loci?

14  MR. SHEEHAN:  Objection.  A, it's

15  leading, and B, I think it mischaracterizes her

16  testimony.

17  THE COURT:  Sustained.

18  Q.  Can you explain what is going on with

19  respect to the defendant's profile in relation to

20  the partial latex glove in submission 13-Z1?

21  A.  At CSF Mr. Aquart has a 11, 12 and I did

22  not detect the 12.

23  Q.  Did you detect the 11?

24  A.  Yes, an 11 was detected.  And at D2 Mr.

25  Aquart has a 21, 23.  A 21 was detected, but the 23

3605

```
1   was not detected.
2      Q.   Counsel also asked you about some genetic
3   markers that he said couldn't be accounted for by
4   particular people.  Here at D8 can the 12 be
5   accounted for by either Azibo Aquart or James Reid?
6      A.   No.
7      Q.   Are there any known samples that you
8   received where the person can account for the 12?
9           MR. SHEEHAN:  I object to the form of
10  this question, your Honor.  May we approach?
11          THE COURT:  Yes.
12          (Sidebar conference)
13          MS. DAYTON:  I can reask it if it's a
14  form issue.  I can reask.
15          MR. SHEEHAN:  If counsel's intent is she
16  has excluded other people as being contributors, it
17  seems to me looking at the known samples, I don't
18  understand what -- there is no relevance to that.
19          MS. DAYTON:  It's sort of my point
20  exactly, but counsel asked several times about
21  markers that were present that couldn't be accounted
22  for by the knowns, and these ones can be.
23          MR. SHEEHAN:  No, I never asked about
24  markers that were present, I asked -- she had
25  excluded individuals and I asked about the presence
```

3606

```
1   of other markers that were not attributable to the
2   people that she either included or could not
3   exclude.
4           MS. DAYTON:  No, he actually went
5   further to say can they be explained by any of the
6   knowns.
7           MR. SHEEHAN:  I didn't ask that.  I
8   would have no reason for asking that and I didn't.
9           MS. DAYTON:  We can go back in the
10  transcript.  He did.
11          THE COURT:  What is the point here?
12          MS. DAYTON:  It was to counteract what
13  he asked.
14          THE COURT:  You are asking her -- you
15  confirmed that the defendant -- there is no loci --
16          MS. DAYTON:  Do you know what, I'll just
17  move on.  I don't want to fight about it.
18          (Sidebar concluded)
19      Q.   I've decided to just move on.
20      A.   Okay.
21      Q.   I'm going to ask you about population
22  studies.  Do you remember being asked about
23  population studies?
24      A.   Yes.
25      Q.   And sample sizes in population?
```

3607

```
1      A.   Yes.
2      Q.   I'm going to show you what's I've marked
3   Government's Exhibit 468 for identification.  This
4   comes from John Butler's learned treatise.  I'd ask
5   you if it's an accurate representation?
6      A.   Yes, those are two pages of his book.
7           MS. DAYTON:  Your Honor, at this time I
8   would ask to admit Government's Exhibit 468.
9           MR. SHEEHAN:  Objection.
10          THE COURT:  Basis for your objection?
11          MR. SHEEHAN:  It's not encompassed
12  within the learned treatise rule to admit the
13  document itself.
14          THE COURT:  I think she can testify from
15  the document.  It doesn't come in as an exhibit
16  itself.
17          MS. DAYTON:  Your Honor, this is in
18  direct response to I believe Defendant's Exhibit BB,
19  the NRC report, which they put into evidence.
20          MR. SHEEHAN:  Your Honor, is counsel
21  arguing it?  Maybe we can approach the bench.
22          THE COURT:  I'll see you.
23          (Sidebar conference)
24          THE COURT:  You showed BB to the jury,
25  but did you not put that in evidence?
```

3608

```
1           MR. SHEEHAN:  I did, and they had no
2   objection to it.
3           THE COURT:  Okay.  So, this is also from
4   Butler?  Is that from Butler?
5           MS. DAYTON:  No.
6           MR. SHEEHAN:  I think it is from Butler.
7   That's what you said.
8           MS. DAYTON:  No, mine is from Butler,
9   yours wasn't.
10          MR. SHEEHAN:  Mine was the NRC report.
11          THE COURT:  So what's the problem here?
12          MR. SHEEHAN:  Well, first of all, it
13  doesn't go in evidence under the rules.
14          THE COURT:  I think that's right.  I
15  think you can put it up.  She can testify from it.
16          MS. DAYTON:  So I can show it to the
17  jury?
18          THE COURT:  Sure.
19          (Sidebar concluded)
20      Q.   Okay, I'm going to draw your attention to
21  page 476 of John Butler's book where he talks about
22  population data and sample size.  And what does he
23  say about appropriate sample sizes for determining
24  statistical frequencies?
25      A.   Should I just read what it says here?
```

3609

```
1      Q.   Sure.
2      A.   "Most published population data includes on
3   the order of 100 to 200 STR types per locus per
4   population examined.  See Table" 20-1 -- sorry "20.1
5   in a key paper in 1992 entitled Sample Size
6   Requirements For Addressing the Population Genetic
7   Issues of Forensic Use of DNA Typing," and I'll just
8   say his last name, Chakraborty.  "Concluded that 100
9   to 150 individuals per population could provide an
10  adequate sampling for genetic locus provided that
11  allele frequencies below one percent were not used
12  in forensic calculations.  The concept of minimum
13  allele frequencies will be discussed below.  Evert
14  and Gill arrived at a similar conclusion with
15  multi-locus matches of DNA profiles, namely that 100
16  to 120 individuals per locus per population were
17  sufficient for robust likelihood calculations."
18            Again, I'd just like to say we don't do
19  likelihood calculations.
20     Q.   So, does your lab use sample sizes between
21  100 and 200 as recommended by John Butler?
22     A.   Yes.  That's the size that we use.
23     Q.   And are you familiar with studies that deal
24  with variance between smaller population samples and
25  larger population samples?
```

3610

```
1      A.   I'm not sure.
2      Q.   Do you know what, forget that question.
3            MS. DAYTON:  Motion to withdraw it, it's
4   getting too detailed.  Sorry.
5            THE COURT:  Please ignore the question.
6            MS. DAYTON:  Ignore what I said.
7      Q.   Okay.  So when you do calculate statistics,
8   do the statistics -- like if you determine that
9   someone is included, and then you give a statistic
10  such as one in a thousand, what does that actually
11  mean?  Does the one in a thousand include the person
12  that's already included or does it apply to other
13  individuals?
14           MR. SHEEHAN:  Your Honor, objection to
15  the form of the question.  It assumes a fact that's
16  not there.
17           THE COURT:  I'm going to sustain the
18  objection.
19     A.   What it means is that --
20     Q.   I need to ask you a different way.
21           THE COURT:  She's going to redo the
22  question.
23           THE WITNESS:  I'm sorry.
24     Q.   Say in a sample where you find that a known
25  is included, okay, and then you calculate the
```

3611

```
1   statistical -- you do your statistical analysis.
2   Can you explain what the statistical analysis
3   actually means?
4      A.   For a mixture we're asking what is the
5   rarity of finding another individual in those three
6   major population groups that we have in our database
7   who could be included as a contributor to that DNA
8   profile.
9      Q.   So, it's -- I'm sorry, I just want to stop
10  you before you go on.  So it's another individual
11  being included.  You've already included the known
12  person?
13           MR. SHEEHAN:  Objection.  A, it's
14  misleading, and B, it's mischaracterizing the
15  evidence.
16           THE COURT:  Overruled.  If that is a
17  correct clarification you can say so.  If it's not,
18  I'm sure you will say so.  Shall we start over?
19           THE WITNESS:  I understood her question.
20     A.   We make our conclusion and then we do our
21  statistical analysis based on our database for the
22  frequency of genetic markers.  That's why for some
23  samples I have three or two individuals who are
24  included and then the statistical evaluation is the
25  same number because I'm asking the question how many
```

3612

```
1   people in those three population groups would you
2   expect to find who would be included as a
3   contributor.
4      Q.   And that means included in addition to the
5   original known?
6            MR. SHEEHAN:  Objection, leading.
7            MS. DAYTON:  I'm trying to clarify, your
8   Honor.
9            MR. SHEEHAN:  I think she is muddying it
10  up.
11           THE COURT:  No, I'm going to permit the
12  question.
13           When you say the database, the
14  statistical analysis, does that include the person
15  that you are -- have done the profile on or not.
16     A.   No, our database was done several years ago
17  and it's based -- it's convenience samples.  The
18  person's DNA profile from any case is not entered
19  into our statistical database.
20     Q.   I think we're not getting at the -- going
21  back to 15-Z2 that counsel just asked you about,
22  Azikiwe Aquart is included as a contributor; is that
23  correct?
24     A.   Yes, Mr. Azikiwe Aquart is included as a
25  contributor.
```

3613

```
 1      Q.   So my question is, the one in a thousand or
 2   one in 1500 doesn't apply to the likelihood that its
 3   him, does it?
 4           MR. SHEEHAN:  Objection.
 5           THE COURT:  Would you rephrase your
 6   question.
 7      Q.   Are the statistical frequencies related to
 8   the chance of finding another person in the
 9   population that's already included?
10           MR. SHEEHAN:  I'm going to object, your
11   Honor.  I think it mischaracterizes what she said.
12           THE COURT:  Overruled.
13      A.   It means separate from those three
14   individuals, I'm asking how many people in those
15   three populations could be a contributor.  So, if it
16   was one in a thousand, then if I took a thousand
17   unrelated African-Americans and obtained their DNA
18   profile, I would expect approximately one individual
19   in that thousand who also could be an - I won't say
20   also --who could be a contributor to that DNA
21   profile.
22      Q.   Okay, that's fine.  And why do you use a
23   seven billion person ceiling?
24      A.   Because we -- seven billion is the
25   approximate population of the world, and we use a
```

3614

```
 1   ceiling.  We don't give the actual calculated number
 2   if it's more rare than less than one in seven
 3   billion.
 4      Q.   Do some labs use higher numbers than that?
 5           MR. SHEEHAN:  Objection.
 6           THE COURT:  Sustained.
 7      Q.   What is an identity statement?
 8      A.   An identity statement would be if you've
 9   got a single source DNA profile and compared it to
10   an individual and they matched and you said that DNA
11   is from that individual.  That would be an identity
12   statement.
13      Q.   Does the lab give those?
14      A.   No.
15      Q.   And you were asked a lot about asterisk
16   peaks and you mentioned those are considered in
17   evaluating the data; is that correct?
18      A.   That is correct.
19      Q.   Are they used to include people in the
20   data, asterisk peaks?
21      A.   Well, you can't be included if your -- if
22   the genetic marker that you have has the potential
23   of being an asterisk peak, no, you would still be
24   cannot be eliminated at that locus.
25      Q.   Will you exclude someone based on an
```

3615

```
 1   asterisk peak?
 2      A.   Yes, if -- but again --
 3      Q.   Not just one peak, I'm not asking.  But can
 4   it be used to a known person's benefit, in other
 5   words?
 6      A.   If you have at a short amplicon, say at
 7   D19, and the person's genetic markers are not
 8   detected, but there are asterisk peaks that are
 9   detected and they're not one of those asterisk
10   peaks, then that would be strong evidence to
11   eliminate the person.
12      Q.   Okay.
13      A.   But again, as I've stated earlier, we
14   always look at the entire DNA profile when we're
15   doing our comparisons to one known profile.
16      Q.   Drawing your attention back to 13-Z1.  What
17   was your statistical conclusion with respect to the
18   defendant's profile?
19           MR. SHEEHAN:  Objection, outside the
20   scope of the cross.
21           THE COURT:  Overruled.
22      Q.   Go ahead, you can answer.
23      A.   The expected frequency of individuals who
24   cannot be eliminated as a contributor to the DNA
25   profile at all loci tested except for CSF and D2
```

3616

```
 1   from item 13-Z1, which is a swabbing of partial
 2   latex glove, is approximately one in 79 million in
 3   the African-American population, approximately one
 4   in two billion in the Caucasian population, and
 5   approximately one in 630 million in the Hispanic
 6   population.
 7      Q.   Now, counsel asked you last week about a
 8   possible ten percent margin of error and you agreed
 9   there could be a --
10           MR. SHEEHAN:  Objection, misstates --
11   mischaracterizes my question.  It's a factor of ten.
12           THE COURT:  I'm going to ask you to
13   rephrase.  And don't lead, please.
14           MS. DAYTON:  I'm actually not even going
15   to bother.
16      Q.   Do you know how many people there are in
17   the State of Connecticut?
18      A.   There is about 3.5 million.
19      Q.   And how about in the United States?
20      A.   There is over 300 million.
21      Q.   And there has been a lot of questions about
22   contamination at the lab and staff members getting
23   their profile on the lab -- on evidentiary items at
24   the lab.  Did the defendant ever work at the lab?
25           MR. SHEEHAN:  Objection, outside the
```

3617

1   scope of the cross.

2             THE COURT:  Overruled.

3       A.   Not to my knowledge, no.

4       Q.   Okay.

5             MS. DAYTON:  Thank you.  I have nothing

6   further.

7             THE COURT:  All right, recross.

8   RECROSS-EXAMINATION

9   BY MR. SHEEHAN:

10      Q.   Do you see this is Exhibit 467.  I'm going

11  to move it up just so it's a little clearer.  That's

12  Exhibit 467, right?

13      A.   Yes, it says that on the sticker.

14      Q.   Okay.  Had you seen that before this

15  morning?

16      A.   I'm not sure if I saw some chart that may

17  have included that, but I don't recall specifically.

18      Q.   Okay.  And have you had any discussions

19  about 32-Z1 between Friday and this morning?

20      A.   No, your Honor -- I mean, no.  Sorry.

21      Q.   No, thank you.  Yeah, yeah, let's not muck

22  things up.

23            THE COURT:  What, you don't like that?

24            MR. SHEEHAN:  Now I have to say I'm

25  flattered, but that's not me.

3618

1       A.   No, I hadn't had those -- any discussion.

2       Q.   Okay.  Now, what you -- I believe on

3   redirect examination you were -- you noted that

4   there was no 13 at D8, right?

5       A.   That's correct.

6       Q.   And that's one of the smallest of the

7   amplicons, right?

8       A.   That's one of the shorter of the DNA that

9   are amplified.

10      Q.   And there were no minor peaks noted at that

11  location either, correct?

12      A.   That is correct.

13      Q.   And similarly, with respect to D19, down in

14  the middle there, that is also one of the shorter

15  amplicons, is it not?

16      A.   Yes, that is correct.

17      Q.   And there were no minor peaks noted there,

18  were there?

19      A.   That's correct.

20      Q.   And there was no 14 for the -- in that

21  sample?

22      A.   That's correct.

23      Q.   And at D7 there was no match whatsoever,

24  was there, between the defendant's profile and the

25  sample?

3619

1       A.   That's correct.

2       Q.   And at D16 you did not note any minor

3   peaks, did you?

4       A.   No.

5       Q.   And there was no match between the

6   defendant and -- the defendant's profile and that in

7   the sample of 32-1-Z1?

8       A.   That's correct.

9       Q.   And did I ask you about vWA?

10            THE COURT:  No.

11      Q.   I did?

12            THE COURT:  No, you didn't.

13      Q.   VWA, that is one of the smaller amplicons,

14  is it?

15      A.   It's the next one to the right of D19.  So,

16  it's smaller than TPOX, but not smaller than the

17  smallest ones.

18      Q.   Okay.  Well, it's larger than D19 and

19  smaller than TPOX and smaller than D18, right?

20      A.   That's correct.

21      Q.   And in that -- with respect to TPOX, there

22  was nothing that corresponded in 32-1-Z1 to the

23  defendant's profile, was there?

24      A.   That's correct.

25      Q.   And FGA, although that's one -- there was

3620

1   no minor peaks noted on that sample, were there?

2       A.   That's correct.

3       Q.   And again, there was nothing in that locus

4   that corresponded to the defendant's genetic

5   markers, was there?

6       A.   That's correct.

7       Q.   And when you discovered the contamination

8   in that -- when you discovered the contamination at

9   the lab, the way that you were able to do that was

10  that you were able to -- you got a match of the

11  staff member's profile, right?

12      A.   I was notified that there was a match

13  because I had put the DNA profile from that

14  evidentiary sample into CODIS and then when the

15  additional staff member's DNA profiles were added it

16  hit on it, what we call a hit, and I was notified

17  from the CODIS administrator.

18      Q.   All right.  And as far as access to any

19  other samples of people involved in collecting the

20  evidence, you were not presented with any additional

21  known samples in this case, were you, for people

22  involved in collecting the evidence?

23      A.   The actual submissions that were sent in?

24      Q.   Yeah.

25      A.   No.

3621

1      Q.   Or the -- as far as you know, you received
2   no notification that you were asked to look at the
3   profiles, for example, of the -- I'm sorry, the --
4   why am I having a mental -- it happens.  The
5   emergency responders, the ambulance people.  EMTs,
6   thank you.
7      A.   No, I was never given any DNA profiles from
8   any emergency personnel.
9      Q.   And if I could just do this, thank you very
10  much for all of your patience.
11          THE COURT:  All right, thank you
12  redirect.
13          MS. DAYTON:  No, thank you.
14          THE COURT:  All right, thank you then,
15  Ms. Roy.  You are excused.  And you may go.
16          We will take our brief recess.
17          (Jury exited the courtroom.)
18          (Recess)
19          THE COURT:  All right, who is the next
20  witness, please?
21          MS. DAYTON:  Shamarr Myers, your Honor.
22          THE COURT:  And you all have resolved
23  the --
24          MR. SHEEHAN:  We did, your Honor.
25          THE COURT:  -- motion.

3622

1          MR. SHEEHAN:  Yes.
2          THE COURT:  All right, then we'll bring
3   in the jury.
4          MS. DAYTON:  Do you want to bring the
5   witness first?
6          MR. MARKLE:  He's incarcerated.
7          THE COURT:  Is she incarcerated?
8          MS. DAYTON:  He.
9          THE COURT:  Bring in the jurors, please.
10          (Jury entered the courtroom.)
11          THE COURT:  All right, please be seated,
12  ladies and gentlemen.
13          I'll ask you to stand, sir, raise your
14  right hand, and the oath will be administered to
15  you.
16          S H A M A R R   M Y E R S
17  Having first affirmed, was examined and testified as
18  follows:
19          THE WITNESS:  Shamarr Myers, m-y-e-r-s,
20  Bridgeport.
21          THE COURT:  You may proceed.
22  DIRECT EXAMINATION
23  BY MS. DAYTON:
24      Q.   You can pull that closer to you so you
25  don't have to lien over.

3623

1          Good morning, Mr. Myers.
2      A.   Good morning.
3      Q.   Mr. Myers, how old are you?
4      A.   Thirty-three.
5      Q.   You said that your town of residence is
6   Bridgeport.  Is that where you are living right now?
7      A.   Yes.
8      Q.   And are you living on the street or are you
9   incarcerated?
10      A.   I'm incarcerated.
11      Q.   At what jail?
12      A.   New Haven, Connecticut.
13      Q.   New Haven, Connecticut you are at right
14  now?
15      A.   Whalley Ave.
16      Q.   Did you grow up in Bridgeport?
17      A.   Yes.
18      Q.   And how long did you live in Bridgeport?
19      A.   My whole life.
20      Q.   And you were born there, too?
21      A.   Yes.
22      Q.   Who did you live with while you were
23  growing up?
24      A.   My mother.
25      Q.   Do you have any siblings?

3624

1      A.   Yes.
2      Q.   How many?
3      A.   One son.
4      Q.   One.  How old is he?
5      A.   Ten.
6      Q.   Did -- I'm sorry, you have a son you said?
7      A.   Yes.
8      Q.   That's ten, okay.  Do you have any
9   brothers?
10      A.   Yes.
11      Q.   How many brothers do you have?
12      A.   Three.
13      Q.   And how old is your oldest brother?
14      A.   Probably about 40.
15      Q.   And your second older brother?
16      A.   About 37.
17      Q.   And the next one?
18      A.   He's deceased.
19      Q.   He's deceased.  And how did he die?
20      A.   In a robbery gone bad in New York City.
21          THE COURT:  Could you pull the
22  microphone down.  It adjusts every way.  And speak
23  into it, please.
24      Q.   How old were you when your brother died?
25      A.   Like 12.

GA906

3625

```
1      Q.   Okay.  And after that happened, did it
2  affect you?
3      A.   Yeah.
4      Q.   And after that happened, did you stay
5  living at home or did you go somewhere?
6      A.   No, I used to run away.
7      Q.   And where would you go when you would run
8  away?
9      A.   Anywhere.
10     Q.   How old were you when you were doing this,
11 starting to run away?
12     A.   Like 12 or 11.
13     Q.   Was there a particular group of people that
14 you would stay with?
15     A.   Yeah, a couple friends.
16     Q.   And how did you know these people?
17     A.   From my brother.
18     Q.   Your deceased brother?
19     A.   Yes.
20     Q.   And while you were staying with these
21 people, did you get involved in any illegal
22 activity?
23     A.   Yes.
24     Q.   What did you do?
25     A.   Started selling drugs.
```

3626

```
1      Q.   What kind of drugs?
2      A.   Crack and heroin.
3      Q.   Crack cocaine?
4      A.   Yes.
5      Q.   And where?  What area were you selling
6  drugs in?
7      A.   In Marina Village Projects.
8      Q.   Marina Village Projects?
9      A.   Yes.
10     Q.   Where is that located?
11     A.   In the south end of Bridgeport.
12     Q.   Drawing your attention to around the time
13 of 2000, were you arrested for selling drugs?
14     A.   Yes.
15     Q.   And what type of drug were you selling at
16 that time?
17     A.   Heroin.
18     Q.   And when you got arrested, did they take
19 you to court?
20     A.   Yes.
21     Q.   Did you get out?
22     A.   On bail.
23     Q.   On what?
24     A.   On bail.
25     Q.   And did you go back to court?
```

3627

```
1      A.   Yes.
2      Q.   Did you wind up getting arrested again?
3      A.   Yes.
4      Q.   What happened?
5      A.   I got arrested with crack and heroin.
6      Q.   Well, going back to the first one, the
7  2000, did you end up getting convicted for that?
8      A.   Yes.
9      Q.   And what was your conviction for?
10     A.   For possession with intent to sell.
11     Q.   How long did you do in custody?
12     A.   I got six and a half years for both cases.
13     Q.   What was your second case?
14     A.   It was ran concurrent to end up with six
15 and a half years.
16     Q.   What type of case was it?
17     A.   Drugs.
18     Q.   And what sort of drugs were you selling
19 that time?
20     A.   Heroin and crack.
21     Q.   Do you also have a conviction for stealing
22 a car?
23     A.   Yes.
24     Q.   What happened in that case?
25     A.   I got arrested because I was on the run and
```

3628

```
1  I took a bounty hunter's truck and got away.
2      Q.   You took a bounty hunter's truck?
3      A.   Yes.
4      Q.   And you got away?
5      A.   Yes.
6      Q.   They caught you, apparently.
7      A.   Yeah, a few weeks later.
8      Q.   And you said -- did you get convicted for
9  that, too?
10     A.   Yes.
11     Q.   And what was that conviction for?
12     A.   Assault in the First or Second Degree, a
13 Larceny Third.
14     Q.   Okay.  And how long did you end up serving
15 in custody before you were released?
16     A.   They gave me five years concurrent to my
17 six-and-a-half-year sentence.
18     Q.   So, it all went together?
19     A.   Yes.
20     Q.   And do you know what year you were released
21 from custody?
22     A.   December '06.  2006.
23     Q.   Did you eventually start selling drugs
24 again?
25     A.   Yes.
```

**GA907**

3629

```
1     Q.   Did you get arrested again?
2     A.   Yes.
3     Q.   When did you get arrested the last time?
4     A.   February 4, '09.
5     Q.   What were you selling then?
6     A.   Heroin.
7     Q.   And have you been incarcerated since you
8  got arrested for that case?
9     A.   Yes.
10    Q.   And have you pled guilty in that case or
11 did you go to trial?  What happened with that case?
12    A.   I pled guilty.
13    Q.   I'm going to show you what's been marked
14 Government's Exhibit 240 for identification.  I'm
15 going to show you this document and I'm going to
16 show you the last page, page 8.  Do you recognize
17 this document?
18    A.   Yes.
19    Q.   And is this your signature?
20    A.   Yes.
21    Q.   And what is this document?
22    A.   A plea agreement.
23         MS. DAYTON:  Your Honor, at this time I
24 would ask that Government's Exhibit 240 be moved
25 into evidence.
```

3630

```
1         MR. SHEEHAN:  No objection.
2         THE COURT:  Full exhibit.
3     Q.   I'll leave that there with you.  What
4  exactly did you plead guilty to?
5     A.   To conspiracy to possess and intent to sell
6  100 to 400 grams of heroin.
7     Q.   And how much time based upon that agreement
8  are you facing?
9     A.   Five to seven and a half years.
10    Q.   Is there a mandatory minimum?
11    A.   Five years.
12    Q.   Have you -- you said you've been detained.
13 You've been in custody since the time you got
14 arrested in February of 2009?
15    A.   Yes.
16    Q.   And have you been at the jail that you are
17 at now the whole time?
18    A.   No.
19    Q.   Where were you before?
20    A.   In Wyatt Detention Center in Rhode Island.
21    Q.   And while you were at Wyatt Detention
22 Center in Rhode Island, did you meet anyone who's
23 present in this courtroom right now?
24    A.   Yes.
25    Q.   Could you please point to that person and
```

3631

```
1  say what he or she is wearing.
2     A.   White shirt, blue tie.
3         MS. DAYTON:  Indicating the defendant
4  for the record, your Honor.
5         THE COURT:  Yes.
6     Q.   Did you also meet the defendant's brother?
7     A.   Yes.
8     Q.   I'm going to show you what's in evidence as
9  Government's Exhibit 207.  I'm going to try.  This
10 should come up on the screen next to you on your
11 right.  Theoretically.
12         How did you meet the defendant to begin
13 with?
14    A.   Through another friend of mines (sic) that
15 was on my indictment.
16    Q.   That was on your indictment?
17    A.   Yes.
18    Q.   So, a co-defendant?
19    A.   Yes.
20    Q.   What was that person's name?
21    A.   George Sanchez.
22    Q.   How did you meet the defendant's brother?
23    A.   Through the same person.
24    Q.   Do you know, did George Sanchez introduce
25 them to you both at the same time, meaning the
```

3632

```
1  defendant and his brother?
2     A.   No.
3     Q.   Who did you meet first?
4     A.   His brother.
5     Q.   And where -- was his brother in the same
6  part of the jail as you?
7     A.   Yes.
8     Q.   And can you describe how that works, how
9  the jail is -- I mean, is it everyone is all in one
10 big area or are there separate areas?
11    A.   We got two-man cells, 36 cells.
12    Q.   And were you actually in the same cell with
13 him?
14    A.   No.
15    Q.   You said 36 cells.  Is that for the whole
16 jail?
17    A.   No, in the block.  In the one block.
18    Q.   One block.  And do you remember what block
19 you were on when you first met the defendant's
20 brother?
21    A.   K.
22    Q.   And when you met the defendant, where did
23 you meet him?
24    A.   K-Pod.
25    Q.   Also in K?
```

3633

1    A.    Yes.
2    Q.    And was the defendant in K at the same time
3  his brother was in K?
4    A.    No.
5    Q.    So what -- when you and the defendant were
6  on the same block, were you acquaintances, were you
7  friendly?  How was it?
8    A.    We was friendly.
9    Q.    Did you talk often?
10   A.    Yes, every day.
11   Q.    And did you ever speak to the defendant
12  about how he made a living when he was out on the
13  street?
14   A.    Yes.
15   Q.    What did he tell you?
16   A.    That he sold drugs.
17   Q.    Did he tell you what type of drugs he sold?
18   A.    Yes.
19   Q.    What did he tell you?
20   A.    Crack.
21   Q.    Did he tell you from where he sold the
22  drugs?
23   A.    Yes.
24   Q.    Where did he tell you he was selling when
25  he was on the street?

3634

1    A.    From Bloody 5th to Charles Street.
2    Q.    What is Bloody 5th?
3    A.    5th Street, Bridgeport.
4    Q.    Why is it called Bloody 5th?
5    A.    Because a lot of people been getting killed
6  over there through the years.
7    Q.    And then you said he also mentioned Charles
8  Street?
9    A.    Yes.
10   Q.    What did he tell you about Charles Street?
11   A.    That he used to hustle over there.
12  Somebody brought him over there.
13   Q.    What's it mean to hustle?
14   A.    Sell drugs, get money.
15   Q.    Did he tell you who had actually brought
16  him over there?
17   A.    Yes.
18   Q.    Who brought him over there?
19   A.    He told me Demetrius Thomas.
20   Q.    Did he tell you anything about -- you said
21  he said Demetrius Thomas brought him over there.
22  Where is "there"?
23   A.    Charles Street.
24   Q.    Was there a certain location on Charles
25  Street, or just on the street?

3635

1    A.    Like a complex, building.
2    Q.    Did the defendant tell you about anyone
3  that he worked with at that complex or that
4  building?
5    A.    Yes.
6    Q.    Who did he tell you about?
7    A.    About Womble and Nate.
8    Q.    Do you know Womble?
9    A.    No.
10   Q.    Do you know Nate?
11   A.    Yes.
12   Q.    How do you know Nate?
13   A.    He basically grew up with us.
14   Q.    Grew up with "us" is who?
15   A.    Like he used to hang in Marina Village.
16   Q.    So, you knew him from when you were out on
17  the street?
18   A.    Yes.
19          MR. SHEEHAN:  Objection, leading.
20          THE COURT:  Sustained.
21   Q.    Did the defendant tell you anything
22  specific about Womble?
23   A.    No.  He said he was his lieutenant.
24   Q.    What does that mean, based upon your
25  experience selling drugs, to have a lieutenant?

3636

1    A.    He just collects the money.
2    Q.    The lieutenant collects the money?
3    A.    Uh-huh (indicating affirmatively).  Pass
4  out the work.  Pass out the drugs.
5    Q.    You said "work."  Is that a word for drugs
6  also?
7    A.    Yes.
8          MR. SHEEHAN:  Objection, leading.
9          THE COURT:  Overruled.
10   Q.    And collects money from what?
11   A.    The proceeds.
12   Q.    Proceeds of what?
13   A.    The narcotics.
14   Q.    Did the defendant mention anyone else
15  working with him?
16   A.    No.
17   Q.    Do you know where in the building the
18  defendant was selling drugs from?  Did he tell you
19  that?
20   A.    He said some old man house.
21   Q.    And did he say where the old man's house
22  was?
23   A.    Yeah, like downstairs somewhere, like close
24  to the basement.
25   Q.    Did the defendant talk to you at all about

3637

```
1   his brother?
2       A.   No.  He just said that he had to show him
3   the way, like he wasn't a street person.
4       Q.   The brother wasn't a street person?
5       A.   No.
6           MR. SHEEHAN:  Objection, leading.
7           MS. DAYTON:  Your Honor, I'm just having
8   a hard time hearing the witness.
9           THE COURT:  Speak into your microphone,
10  please.
11          Thank you.
12      Q.   Did the defendant -- did the defendant
13  speak to you about whether or not he had any
14  competition in the area?
15          MR. SHEEHAN:  Objection, leading.
16          THE COURT:  Sustained.
17      Q.   Did the defendant ever -- did you and the
18  defendant ever talk about other people who might
19  have been selling drugs in the area?
20      A.   Yes.
21      Q.   What did the defendant tell you, if
22  anything?
23      A.   That there was some Puerto Ricans and some
24  Jamaicans over there.
25      Q.   And what did the defendant tell you with
```

3638

```
1   respect to the Puerto Ricans and Jamaicans, if
2   anything?
3           MR. SHEEHAN:  I'm going to object.  May
4   we approach?
5           THE COURT:  Yes.
6           (Sidebar conference)
7           MR. SHEEHAN:  This is not among any of
8   the acts delineated by the government in any of the
9   previous filings.  The first I heard about this,
10  that this witness would testify about this, is last
11  night.  It's not -- it's not -- if it's offered as
12  bad acts, it's under 404.  It hasn't -- we have not
13  had any notice that they were relying on this.
14          THE COURT:  Okay, what is the testimony?
15          MS. DAYTON:  That he ran them off.
16  That's it.  That's the testimony, that he ran them
17  off.  It's in the 302s.
18          THE COURT:  Why is running them off
19  404(b)?
20          MR. SHEEHAN:  I think she's claiming
21  this as other bad acts, your Honor.
22          MS. DAYTON:  I'm not claiming anything.
23  I'm claiming that this is a discussion that he had
24  with this witness.
25          MR. SHEEHAN:  It is being offered
```

3639

```
1   whether she -- I think that it is -- if it comes in,
2   it comes in as other bad acts.  We have not had
3   notice of that.
4           THE COURT:  Is there anything more than
5   he ran them off?
6           MS. DAYTON:  No.
7           THE COURT:  So why does that not fall
8   under 404(b), other crimes, wrongs or acts?
9           MS. DAYTON:  First of all, it goes to
10  the racketeering enterprise.  He's charged in the
11  racketeering enterprise with dealing with
12  competition, by not allowing him to be there, so
13  it's not -- it's proof of the enterprise.  It's the
14  defendant's own statements that he ran a guy off.
15  I'm not intending to spend a lot of time on it.  In
16  fact, we've now drawn more attention to it than
17  otherwise would have been drawn to it.
18          THE COURT:  So, if I give that same
19  limiting instruction.
20          MS. DAYTON:  I can just move on.  It's
21  really not that important.
22          THE COURT:  All right.
23          (Sidebar concluded)
24      Q.   I'm going to draw your attention now, since
25  we have this working, do you recognize whose picture
```

3640

```
1   in Government's Exhibit 207?
2       A.   No.
3       Q.   Okay, you don't recognize that person?
4       A.   I don't know, it looks like I seen him
5   before.  He look like Dreddy's brother, but he ain't
6   got the glasses on.
7       Q.   What glasses?
8       A.   He wears some gold frames.
9       Q.   The brother wears gold frames?
10      A.   Yes.
11          MR. SHEEHAN:  Objection to leading.
12          THE COURT:  Sustained.
13      Q.   I'm going to show you another picture.
14  It's Government's Exhibit 216.  Do you recognize who
15  this is?
16      A.   Yes.
17      Q.   Who is that?
18      A.   Nate.
19      Q.   This is the person you spoke about earlier?
20      A.   Yes.
21      Q.   Do you know if he had a nickname?
22      A.   Rag.
23      Q.   Rag?
24      A.   Yes.
25      Q.   Is that what you knew him as growing up?
```

3641

1    A.   Yes, both Nate and Rag.
2    Q.   Did you ever have any other discussions
3  with the defendant about his brother aside from
4  hustling?
5    A.   No, not really.
6    Q.   Did you and the defendant ever talk about
7  travelling?
8    A.   Yes.
9    Q.   And what was the discussion?
10    A.   He told me he used to go down south and
11  different type of places.  He told me about one time
12  they went down south and they was in two different
13  cars and the other car got pulled over and they had
14  a gun in there and the cops took it and let them go.
15    Q.   Did the defendant say who was in the other
16  car?
17    A.   Yes, his brother and somebody else.
18    Q.   His brother and somebody else?
19    A.   Yes.
20    Q.   Did he tell you who the somebody else was?
21    A.   No, I don't recall.
22    Q.   And you said there was two cars?
23    A.   Yes.
24    Q.   Who was in the car that didn't get pulled
25  over, if the defendant told you?

3642

1    A.   Dreddy.
2    Q.   And did he say who he was with in his car?
3    A.   I think he said his baby mother.
4    Q.   Do you know his baby mother's name?
5    A.   No.
6    Q.   Did the defendant -- when you say Dreddy,
7  who are you talking about?
8    A.   Azibo.
9    Q.   Okay.  So you refer to him as what, Azibo?
10    A.   Dreddy.
11    Q.   As Dreddy, okay.  Did the defendant ever
12  tell you if he had problems in the Charles Street
13  building?
14    A.   Yes.
15    Q.   And what did he tell you?
16    A.   He had problems with the Jamaicans and the
17  Puerto Ricans.
18    Q.   Did he tell you if he had problems with
19  anyone else?
20    A.   Some other people that was selling drugs in
21  the building.
22    Q.   And what did he tell you about those
23  people?  Did he tell you what type of drug they were
24  selling?
25    A.   Yes.

3643

1    Q.   What was it?
2    A.   Crack.
3    Q.   And did he tell you if they sold in the
4  building or outside of the building?
5        MR. SHEEHAN:  Objection, leading.
6  Objection to leading.
7        THE COURT:  Overruled.  Did he tell you
8  whether they sold in the building or outside of the
9  building.  Overruled.
10    A.   Inside the building.
11    Q.   And did the defendant tell you if he had
12  any discussions with these people?
13    A.   Yes.
14    Q.   What did he tell you?
15    A.   He said he told them they had to go.
16    Q.   He told them they had to go?
17    A.   Yes.
18    Q.   Did he say anything else?  Did the
19  defendant say anything else to you about these
20  people?
21    A.   Yes.
22    Q.   What?
23    A.   He said they had to die.
24    Q.   When did he tell you they had to die?
25    A.   Just about after April.  After April of

3644

1  2010.
2    Q.   Why do you know it's after April?
3    A.   Because I had copped out.
4    Q.   What does that mean, you had copped out?
5    A.   I had took my plea.
6    Q.   And why does that trigger your memory?
7    A.   Because I remember the date is around April
8  Fools Day.  So it was after April.
9        THE COURT:  I'm sorry, what year are we
10  talking about?
11        THE WITNESS:  2010.
12        THE COURT:  Thank you.
13    Q.   Did you ever go to the law library?
14    A.   Yes.
15    Q.   And what do you do at the law library?
16    A.   Study case law.
17    Q.   Why?
18    A.   To help with our case.
19    Q.   Did you ever see the defendant in the law
20  library?
21    A.   Yes.
22    Q.   Did you ever have a strange incident while
23  you were in the law library with the defendant?
24    A.   Yes.
25    Q.   What was that?

3645

```
1    A.   I had got a pop up on my computer.
2    Q.   What do you mean by a pop up?
3    A.   It was a message on my screen.
4    Q.   Like it literally popped up?
5    A.   Yes.
6    Q.   What was the message?
7    A.   It said, "Mr. Myers, this is the FBI, would
8  you like to help us help you."
9    Q.   Did it look like an official request from
10 the FBI?
11   A.   I don't know at the time.
12   Q.   So when you saw this, what did you do?
13   A.   I went back, I pressed the yes button to
14 see if it was playing around, a joke or something.
15   Q.   When you pressed the yes button, what
16 happened?
17   A.   It went away.
18        THE COURT:  I'm sorry, pressed what
19 button?
20        THE WITNESS:  The yes button.
21   Q.   It went away?
22   A.   Yes.
23   Q.   Where was the defendant in the law library
24 with respect to where you were sitting?
25   A.   Right next to me.
```

3646

```
1    Q.   What was he doing right next to you?
2    A.   Reading, too.
3    Q.   Was he reading books, on the computers?
4    A.   On the computer.
5    Q.   So, you were both on computers?
6    A.   Yes.
7    Q.   Did you mention this pop up to the
8  defendant?
9    A.   Yes.
10   Q.   What did he tell you, if anything?
11   A.   Nothing.  Like I told him about the pop up.
12 He didn't know if it was true or not.
13   Q.   That's what he said to you?
14   A.   Yes.
15   Q.   Did you do anything else?  Did you contact
16 the FBI?  Did you do anything at that point?
17   A.   I asked my lawyer.
18   Q.   And what --
19   A.   I told my lawyer I had seen a pop up on the
20 computer.
21   Q.   And without telling us what your lawyer
22 said, did anything further come of that?
23   A.   Yes.
24   Q.   At any point have you looked at any
25 paperwork with the defendant?
```

3647

```
1    A.   Yes.
2    Q.   How did that come about?
3    A.   Cuz seeing the people I knew, people that
4  he knew, stuff like that.
5    Q.   What do you mean by that, seeing?  Who
6  asked you to see if they knew people?
7    A.   Like we both know people from the same
8  hood, and then the pop up came and I told him about
9  it.
10   Q.   Okay.  What's a hood?
11   A.   A part of -- a part of the neighborhood.
12   Q.   And did the defendant ever show you any
13 paperwork?
14   A.   Yes.
15   Q.   What did it relate to?
16   A.   His case.
17   Q.   And what type of information with respect
18 to his case?
19   A.   A couple witnesses.  A guy that they tried
20 to contact, he said the government tried to contact,
21 see if he was going to testify on him.  His name
22 Mose (ph).
23   Q.   Mose?
24   A.   Yes.
25   Q.   Do you know who Mose is?
```

3648

```
1    A.   Yes.
2    Q.   Who is it?
3    A.   Anthony Armstead.
4    Q.   How do you know Anthony Armstead?
5    A.   He's on my case.  He's a co-defendant.
6    Q.   Was there anything in that paper -- what
7  time period are we talking about here?
8    A.   After April 2010.
9    Q.   When you say after April, like
10 December 2010 or like May 2010?
11   A.   Around May 2010.  Like May, June.  It was
12 hot.  It was hot outside.
13   Q.   Did the defendant have anything in his
14 paperwork with respect to you at that time?
15   A.   Not at that time.
16   Q.   Okay.  At some point did he show you
17 something that related to you?
18   A.   Yes.
19   Q.   What did he show you?
20   A.   A picture.
21   Q.   One picture?
22   A.   Yes, it was a picture of me.
23   Q.   Do you know why?
24   A.   No.  Because they was looking for somebody
25 named Shamarr.
```

**GA912**

3649

1    Q.   Was that person you?
2    A.   No.
3    Q.   And when the defendant showed you this
4    picture, what did he say to you?
5    A.   Nothing.  He just said "Look."
6    Q.   Okay.  And did that -- was there any
7    further conversation?
8    A.   Yeah.  I asked him why they got a picture
9    of me.
10   Q.   What did he tell you?
11   A.   He said it's -- his private investigator
12   gets pictures, and they get the names from
13   everybody, all the Shamarrs that are around to get
14   an idea who it was.
15          MR. SHEEHAN:  Object to discussing
16   what -- I'm sorry.  Withdraw the objection.
17          THE COURT:  Have you finished your
18   answer?
19          THE WITNESS:  Yes.
20          THE COURT:  Okay.
21   Q.   At some point did the defendant ask you to
22   help him?
23   A.   Yes.
24   Q.   And what did the defendant ask you to do
25   initially?

3650

1    A.   He wanted me to talk to his private
2    investigator.
3    Q.   And tell his private investigator what?
4    A.   Something that I knew about a case, about
5    the case.
6    Q.   Did you know anything about the case?
7    A.   Yes.
8    Q.   What did you know?
9    A.   Only that this guy named Jazz told me that
10   the kid Womble was giving this other dude a kite,
11   and the other dude was talking about it, telling
12   it's his get out of jail free card.
13   Q.   What is a kite?
14   A.   A letter.
15   Q.   And what kind of letter is it?
16   A.   Just some -- a little message to get
17   across.
18   Q.   And is that something that you send when
19   you are out of custody or in custody?
20   A.   In custody.
21   Q.   Okay.
22   A.   Or out.
23   Q.   Or out?
24   A.   Yes.
25   Q.   And to whom is -- to what type of person is

3651

1    it sent?
2    A.   To the person that they trying to get the
3    message to.
4    Q.   And what did you know?  You said you knew
5    something about kites and Womble.  Explain that.
6    A.   This guy Jazz, I know -- he told me that
7    the guy Womble is working in the kitchen and that he
8    was sending -- well, he was sending the letters
9    through the kitchen worker.
10   Q.   To whom?
11   A.   To Dreddy.
12   Q.   To Dreddy?
13   A.   They never made it to Dreddy.
14   Q.   So Jazz told you this.  Do you know if it's
15   true?
16   A.   No.
17   Q.   And did the defendant tell you why he
18   wanted you to tell his investigator this?
19   A.   Why?
20   Q.   Yes.
21   A.   Why?
22   Q.   Why?
23   A.   Because he wanted me to help him like get
24   it out to the jury that it could have been somebody
25   else that committed the crime.

3652

1    Q.   What did the defendant say he was going to
2    do for you, if anything, at this point?
3    A.   He was going to find this chick that I used
4    to know.
5    Q.   And what's the woman's name?
6    A.   Simone.
7    Q.   How did the defendant know about Simone?
8    A.   I told him.
9    Q.   Okay.  Did the defendant -- did you agree
10   to help the defendant?
11   A.   Yes.
12   Q.   And what happened next after you agreed?
13   A.   He wrote me a list of things he wanted me
14   to do for him.
15   Q.   Now, before the defendant wrote you this
16   list, did you contact the government or did you
17   contact your attorney?
18   A.   Yes.
19   Q.   And what was the purpose of contacting your
20   attorney?
21   A.   I told my lawyer -- I asked him about it.
22   Q.   And what did your lawyer tell you?
23   A.   He told me I better not.
24   Q.   You better not?
25   A.   Yeah, he said I better not help him, I

3653

```
1    would get smoked.
2       Q.   What's that mean, you'd get smoked?
3       A.   I'd get --
4            MR. SHEEHAN:  Well, I'm going to object
5    to what the lawyer said about what would happen to
6    him.
7            MS. DAYTON:  It goes to state of mind.
8            MR. SHEEHAN:  Okay, I'll withdraw it.
9            THE COURT:  All right.  Have you
10   finished your answer?
11           THE WITNESS:  Yes.
12      Q.   What does that mean you'd get smoked?
13      A.   Like when I go for sentencing.
14      Q.   All right.  Did your -- did you come in to
15   see the government?
16      A.   Yes.
17      Q.   And do you remember approximately when that
18   was?
19      A.   No.
20      Q.   Was it before or after your birthday?
21      A.   After.
22      Q.   And was it before or after the defendant
23   wrote you this list of things he wanted you to say?
24   The first time you came in.
25      A.   Before.
```

3654

```
1       Q.   And how were you transported from jail?
2       A.   The marshals brought me to Hartford.
3       Q.   To Hartford?
4       A.   Yes.
5       Q.   And when you got to Hartford, did you meet
6    with the government?
7       A.   Yes.
8       Q.   And did you actually have a conversation
9    with the government?
10      A.   No, I told them I didn't want to talk.
11      Q.   Why?
12      A.   Cuz I didn't want nothing to do with the
13   case, and I was scared.
14      Q.   Then why did you -- well, did the
15   government call you in or did you request to meet
16   with the government?
17      A.   I requested it through my lawyer.
18      Q.   So, then why if you requested it did you
19   then get there and say you didn't want to talk to
20   the government?
21      A.   I don't know, I was scared and I just
22   changed my mind.
23      Q.   Did the government threaten you in any way?
24      A.   No.
25      Q.   Were you -- were you sent back to jail?
```

3655

```
1       A.   Yes.
2       Q.   Were you asked -- I'll move on.  So, when
3    you went back to jail, did you have a discussion
4    with the defendant?
5       A.   Yes.
6       Q.   And what was the discussion with the
7    defendant about?
8       A.   I told him whatever he did, they wanted him
9    bad.
10      Q.   That whatever the defendant did they wanted
11   him bad?
12      A.   Yes.
13      Q.   Did you tell him that you met with the
14   government?
15      A.   Yes, I told him I seen the government.
16      Q.   Why?
17      A.   I don't know, I just did.
18      Q.   I mean, is that a good idea, to tell other
19   people in jail when you meet with the government?
20           MR. SHEEHAN:  Objection.
21      A.   No.
22           THE COURT:  Basis?
23           MR. SHEEHAN:  Form of the question,
24   among other things.
25           THE COURT:  Would you rephrase your
```

3656

```
1    question.
2            MS. DAYTON:  Sure.
3       Q.   What's it mean to cooperate?
4       A.   Be a snitch, a rat.
5       Q.   Is that a good thing?
6       A.   No.
7       Q.   When you were brought into Hartford, was
8    there anyone else in the marshal's lockup that you
9    recognized?
10      A.   The first time or the second?
11      Q.   The first time.
12      A.   Yes.
13      Q.   And who was that person?
14      A.   Scott Timmons.
15      Q.   How did you recognize Scott Timmons?
16      A.   He's basically like on my case.
17      Q.   Did you tell Scott Timmons you were meeting
18   with the government?
19      A.   No.
20      Q.   Was Scott Timmons a defendant who was
21   locked up at Wyatt at the same time?
22      A.   Yes.
23      Q.   So, when you went back to Wyatt and you
24   talked to the defendant and you told him you met
25   with the government, why?  Why would you tell him
```

3657

```
1   that?
2       A.   I don't know, just in case something else
3   came out.
4       Q.   What do you mean by that?
5       A.   Like if somebody else knew something.
6       Q.   Knew something about what?
7       A.   That I went to see the government.
8       Q.   So, you told the defendant before someone
9   else did?
10      A.   Yes.
11           MR. SHEEHAN:  Objection to leading.
12           THE COURT:  Sustained.
13      Q.   Did you tell the defendant whether or not
14  you actually agreed to speak with the government
15  when you came in that first time?
16      A.   No.
17      Q.   You didn't tell him anything?
18      A.   I didn't tell him.  I told him that I was
19  in there and I didn't speak with them.
20      Q.   After that time, did the defendant give you
21  anything?
22      A.   Yes.
23      Q.   What did he give you?
24      A.   A letter.
25      Q.   What sort of letter?
```

3658

```
1       A.   It was like the letter that -- the things
2   he wanted me to do for him if I was going to help
3   him.
4       Q.   And do you know exactly when this was?
5       A.   Not exactly, but I know it was after April
6   sometime.
7       Q.   And at some point did the defendant get
8   moved off your block?
9       A.   Yes.
10      Q.   Do you know when that was?
11      A.   It was in the summer sometime.
12      Q.   Summer of?
13      A.   Summer of 2000.  Probably like August.
14      Q.   Of 2000?
15      A.   '10.
16      Q.   '10, okay.  So between the time you came to
17  see the government and August 2010, the defendant
18  gave you this letter?
19      A.   Yes.
20      Q.   And did he actually hand it to you
21  physically?
22      A.   Yes.
23      Q.   I'm going to show you what's been marked
24  for identification as Government's Exhibit 506.  And
25  I'll leave this with you.  Do you recognize what
```

3659

```
1   that is?
2       A.   Yes.
3       Q.   What is it?
4       A.   It's the letter he wrote to me.
5       Q.   And how do you recognize it?
6       A.   Cuz he gave it to me.
7            MS. DAYTON:  Your Honor, at this time I
8   would ask for Government's Exhibit 506 to be moved
9   into evidence.
10           MR. SHEEHAN:  I wonder if I could just
11  confer briefly with counsel.
12           THE COURT:  Yes.
13           MS. DAYTON:  I just want to show him
14  something.
15           MR. SHEEHAN:  I'm sorry, we just have a
16  question.
17           No objection, your Honor.
18           THE COURT:  506 is a full exhibit.
19           MS. DAYTON:  Thank you, your Honor.
20      Q.   Now, do you know how the government came to
21  be in possession of that item?
22      A.   Yes.
23      Q.   How?
24      A.   I gave it to them.
25           MS. DAYTON:  Your Honor, at this time I
```

3660

```
1   would ask to publish this to the jury.
2            THE COURT:  You may.
3       Q.   I'm going to draw your attention to the
4   first full page where it says "Interview Focus
5   Points.  Kite Story."  Did you write anything on
6   this document yourself?
7       A.   No.
8       Q.   And was it like this when the defendant
9   gave it to you?
10      A.   Yes.
11      Q.   Now, on the first page --
12           MS. DAYTON:  Can we turn down the lights
13  a little, your Honor, please.
14      Q.   So, in the beginning, the first part, did
15  you write this "Rodney Big Man Womble"?
16      A.   No.
17      Q.   So, this first part of the story where it
18  talks about BCC and a kitchen worker, do you know
19  what this is about?
20      A.   That's about the kites.
21      Q.   And it mentions Jazz.  Is this all stuff
22  that you told the defendant?
23      A.   Yes.
24      Q.   It says here by the asterisk "Months later,
25  Dimp still had them and showed them to you.  He had
```

3661

1  a few." Who is Dimp?
2      A.  Demetrius Thomas.
3      Q.  The person you mentioned earlier?
4      A.  Yes.
5      Q.  Did Dimp actually show you anything?
6      A.  No.
7      Q.  So, do you actually have any idea what the
8  kites said that Jazz told you about?
9      A.  No.
10     Q.  And did Demetrius Thomas, did he ever even
11 speak to you about these alleged kites?
12     A.  No.
13     Q.  So, here by the second asterisk, or two
14 asterisks where it says "You do not remember exactly
15 what they said."  Did you ever see them to forget
16 what they said?
17     A.  No.
18     Q.  Moving down here to sort of the middle of
19 the page where it says "Confidential until courtroom
20 outburst," and then to the right of that it says
21 some stuff in quotes "Everybody knows who did it.
22 They know, too.  Letho did that shit.  They don't
23 care.  They just want to kill Dreddy.  (Look at
24 jury)."  What is this about; if you know?
25     A.  That's what he wanted me to say on the

3662

1  stand.
2      Q.  And what's the "look at jury" mean?
3      A.  Look at them.
4      Q.  So, you were supposed to look at them while
5  you were having --
6      A.  An outburst.
7      Q.  -- an outburst.  Now, in this part of the
8  letter it also talks about Simone Rivera.  Who is
9  Simone Rivera?
10     A.  A friend I had.
11     Q.  Okay.  And that's the Simone you discussed
12 before?
13     A.  Yes.
14     Q.  And why did you want her found, or did you?
15     A.  I did, because I lost contact with her when
16 I got picked up.
17     Q.  And so how did the defendant say he was
18 going to have her found for you?
19     A.  His private investigator.
20     Q.  And it mentions here that "Notes:  For
21 investigator, you tell him when you came home you
22 started messing with this Spanish girl named Simone
23 Rivera, age, last known address, et cetera, in
24 conversations."  And it goes on and it starts
25 talking about some guy putting "her through some

3663

1  pain because she was young and he was wild and
2  robbing people and beefing with other people and
3  still never had no money, but thought he was
4  impressing her.  He told her he did it."  Do you
5  know what this is about?
6      A.  Yes, that's about Letho.
7      Q.  Who is Letho?
8      A.  This guy, he got killed during a robbery,
9  home invasion in Bridgeport.
10     Q.  So, he's dead?
11     A.  Yes.
12     Q.  And who put this stuff about Letho in here?
13     A.  Dreddy.
14     Q.  And to your knowledge did Simone Rivera
15 ever date Letho?
16     A.  No.
17     Q.  So, when the defendant suggested that this
18 would be something that you could say Simone told
19 you, what did you tell the defendant?
20     A.  I told him it sounded stupid.
21     Q.  And what did the defendant tell you?
22     A.  He said don't worry about it, it's his
23 private investigator, they do what I tell them to
24 do.
25     Q.  Moving on to the next page, where it has

3664

1  ".2) Bridgeport Federal Relationship and Snitch
2  (False Witness Mentality to Get Off)."  In the first
3  line it says, "This is where you can't try to
4  remember shit, you just freestyle and go from what
5  you know from seeing shit happen."  What does that
6  mean?
7      A.  Basically he wanted me to let the jury know
8  that in past cases the feds took an informant and
9  took they testimony knowing they was lying.
10     Q.  And that's what the defendant wanted you to
11 say?
12     A.  Yes.
13     Q.  And it also is underlined several times
14 that "regardless if you were" -- well, not the whole
15 thing is underlined.  "Regardless if you were
16 involved or if you don't really know what's going on
17 and people do it left and right because it's easy to
18 do or the feds get desperate, and the big plus is
19 they'll make sure you go home no matter what you
20 did."  Has that been your experience, that you've
21 been let out of jail?
22     A.  No.
23     Q.  Did anyone ever tell you you were going to
24 go home no matter what you did?
25     A.  No.

3665

1   Q.   When you first came in in May of 2010 and
2   said you didn't want to talk, did anyone beg you
3   talk to them?
4   A.   No.
5   Q.   Did anyone threaten to make your case worse
6   if you didn't talk to them?
7   A.   No.
8   Q.   Moving down to the three asterisks right
9   here.  It says to "Talk about being arrested for
10  your indictment.  They tried to feel you out first
11  before bringing you in and asked you questions about
12  this case.  And it was already a few years old and
13  you thought it was over by now."  When you got
14  arrested in April -- excuse me, in February of 2009,
15  did anyone talk to you about this case?
16  A.   No.
17  Q.   Did anyone talk to you about this case
18  before you were arrested?
19  A.   No.
20  Q.   Did anyone talk to you about this case any
21  time before May of 2010?
22  A.   No.
23  Q.   So is this a true statement in this
24  document?
25  A.   No.

3666

1   Q.   It then says "They gave out peoples names,
2   dates, times and where they were from and how they
3   were involved with Charles Street."  And then it
4   puts in quotes "All I would had to do was remember
5   some of that stuff.  Later I was in the courthouse
6   with all of the other guys arrested and a couple of
7   them said the same thing."  Do you know what this is
8   referring to?
9   A.   No, I don't remember.
10  Q.   Were you arrested with several people?
11  A.   Yes.
12  Q.   And that was in February 2009?
13  A.   Yes.
14  Q.   Did anybody in your case tell you that the
15  government was trying to talk to them about the
16  defendant's case at that time?
17  A.   No.
18  Q.   Going down to the four asterisk point here,
19  it says "Point the finger at prosecutors and agents
20  at the table and say things 'they' specifically
21  said."  It has in there that "They or they had
22  someone contact you via e-mail to find out if you
23  were willing to help."  Do you know what that refers
24  to?
25  A.   The pop up.

3667

1   Q.   Do you believe that came from the FBI?
2   A.   No.
3   Q.   And then it goes on that, "They came at you
4   even after you told your lawyer you didn't know
5   anything to help them and they told you 'don't worry
6   about that' and started askin what do I want and
7   making you promises and telling you things about the
8   case."  Did anyone give you information about this
9   case?
10  A.   No.
11  Q.   Did anyone give you any specifics about the
12  defendant?
13  A.   No.
14  Q.   Have you been promised anything?
15  A.   No.
16  Q.   It also goes on to say "She said something
17  about bags and bats."  Do you know what this is a
18  reference to?
19  A.   No.
20  Q.   Did anyone from the government tell you
21  anything about bags or bats?
22  A.   No.
23  Q.   Do you have any idea how the victims died
24  in this case?
25  A.   No.

3668

1   Q.   It also goes on to say that "You were
2   promised you'd be put somewhere nice and when you
3   got out" -- and when I get out get me a good job.
4   This one is hard to read.  Sorry.  "To get me a good
5   job."  Is that accurate?  Did anyone tell you you
6   would be put somewhere nice and that someone would
7   get you a job?
8   A.   No.
9   Q.   And then there is a third sort of half-page
10  with this.  It's impossible to see.  And it says at
11  the top "The Order."  And there is three
12  subsections.  "Getting out the kites to the street."
13  Does that correspond to his, the defendant's, first
14  section in the letter?
15  A.   Yes.
16  Q.   And No 2 is the "Feds tryin to recruit you
17  and your Co-Ds."  What's a Co-D?
18  A.   A co-defendant.
19  Q.   It also says here "You didn't want the 851
20  and they made you promises and told you things about
21  the case when you told them you didn't know anything
22  that would help."  What's an 851?
23  A.   That's a second offender notice.
24  Q.   Are you a second offender?
25  A.   Yes.

3669

```
1      Q.   Did you -- what does a second offender
2  notice do to your mandatory minimum?
3      A.   It doubles your mandatory minimum.
4      Q.   When the defendant wrote this letter, had
5  you already pled guilty?
6      A.   Yes.
7      Q.   Before you ever spoke to the government
8  about this case, had you already pled guilty?
9      A.   Yes.
10     Q.   And did you plead guilty to an 851?
11     A.   No.
12     Q.   Did anyone promise you that if you plead
13 guilty you wouldn't have to plead guilty to the
14 second offender notice?
15     A.   No.
16     Q.   That was already done before you ever
17 even --
18          MR. SHEEHAN:  Objection, leading.
19          THE COURT:  Sustained.
20          MS. DAYTON:  I'll move on.
21     Q.   And then in this final section, it relates
22 back to "Messed with Rivera after Letho and she told
23 you he did it because he was beefing with someone
24 over there."  Did the defendant indicate if he was
25 going to have someone go talk to Simone Rivera?
```

3670

```
1      A.   Yes.
2      Q.   What did he say?
3      A.   His private investigator.
4      Q.   And did you say anything to him about that?
5      A.   Yeah, that's when I told him I would look
6  like a liar when he mentioned my name.
7      Q.   Why would you look like a liar?
8      A.   Because she not going to know nothing about
9  Letho.
10     Q.   She never dated Letho?
11     A.   No.
12     Q.   When you got this letter from the
13 defendant, what did you do with it?
14     A.   I didn't really pay no mind to it, I just
15 threw it under my bed.
16     Q.   And did you take it out for any reason
17 after you threw it under your bed?
18     A.   Yeah, cuz I was packing all my stuff and I
19 just put it in a legal folder I had.
20     Q.   At any point did you and the defendant look
21 at it again together?
22     A.   Yes.
23     Q.   And how did that come to be?
24     A.   He just came to my cell one day.
25     Q.   "He" meaning the defendant?
```

3671

```
1      A.   Yes.
2      Q.   Go ahead.
3      A.   He just picked it up, looked at it, handed
4  it back to me.
5      Q.   At that point had you brought it into the
6  government yet?
7      A.   No.
8      Q.   At some point after the defendant gave you
9  this letter, did you speak to the government again?
10     A.   Yes.
11     Q.   Was that your idea or the government's
12 idea?
13     A.   Mines.
14     Q.   And how did you relay that message to the
15 government that you wanted to speak to the
16 government?
17     A.   Through my lawyer.
18     Q.   And when you came in to speak to the
19 government, did you bring anything with you?
20     A.   Yes.
21     Q.   What?
22     A.   The letter.
23     Q.   And had you already shown it to your
24 lawyer?
25     A.   Yes.
```

3672

```
1      Q.   Why did you come forward with this letter?
2      A.   Why?  I don't know, just tell the truth.
3      Q.   Okay.  Have you entered into a proffer or
4  cooperation agreement with the government?
5      A.   No.
6      Q.   So, do you have any promises at this point?
7      A.   No.
8      Q.   So how are you hoping that testifying is
9  going to help you?
10     A.   I don't know, it's up to the judge.
11     Q.   Have you met anyone else that has any
12 relationship to this case while you've been
13 incarcerated?
14     A.   Yes.
15     Q.   Who?
16     A.   Poot.
17     Q.   Poot?
18     A.   Yes.
19     Q.   Do you know -- is that his whole name,
20 Poot?
21     A.   Efrain Johnson.
22     Q.   Where did you meet him?
23     A.   I met him at North Ave.
24     Q.   When was that?
25     A.   A few months ago.
```

3673

```
1      Q.   How did you meet him?
2      A.   Through my cellie.
3      Q.   Your cellie?
4      A.   Yes.
5      Q.   And that's your -- the person you live with
6  right now?
7      A.   Yes.
8      Q.   And what did your cellie -- how did he
9  introduce him to you?
10          MR. SHEEHAN:  Objection.
11          THE COURT:  Basis?
12          MR. SHEEHAN:  What he's saying?  I think
13  she's asking what he's being told by somebody else.
14          THE COURT:  How did he introduce him.
15     Q.   Did he actually introduce you to him?
16     A.   Not like that.  But he was getting books
17  from him, so he let me read them.
18     Q.   Getting books from him?
19     A.   Yes.
20     Q.   Did you know Efrain Johnson before that?
21     A.   No.
22     Q.   And prior to meeting the defendant, did you
23  know anything about the murders on Charles Street?
24     A.   No.
25     Q.   Okay, thank you.
```

3674

```
1            Have been sentenced yet.
2      A.   No.
3      Q.   Have you gone for sentencing?
4      A.   Yes.
5      Q.   And was that, before or after you came back
6  in with this letter?
7      A.   After.
8      Q.   And what happened when you went for
9  sentencing?
10          MR. SHEEHAN:  Objection.
11          THE COURT:  Basis?
12          MR. SHEEHAN:  To what was done in court,
13  a separate court proceeding?
14          MS. DAYTON:  I'll ask a different
15  question.  I can ask a different did question.
16     Q.   So have you been finally sentenced yet?
17     A.   No.
18     Q.   And what are you hoping you get?
19     A.   My lawyer is asking for five years, the
20  mandatory minimum.
21          MS. DAYTON:  Thank you.  I have nothing
22  further at this time.
23          THE COURT:  All right,
24  cross-examination.
25  CROSS-EXAMINATION
```

3675

```
1  BY MR. SHEEHAN:
2      Q.   Good afternoon, Mr. Myers.
3      A.   Good afternoon.
4      Q.   My name is Michael Sheehan.  I'm one of the
5  lawyers for Azibo Aquart.  You've told us that you
6  just turned 33.
7      A.   Yes.
8      Q.   Last month?
9      A.   Yes.
10     Q.   And you've been selling drugs on the
11  streets of Bridgeport since you were 12?
12     A.   Yes.
13     Q.   And it's fair to say that when you were not
14  in jail you were dealing for most of those 20 years?
15     A.   Yes.
16     Q.   And for you, anyway, that was a way of
17  making a living.
18     A.   Yes.
19     Q.   You were making pretty quick money that
20  way?
21     A.   Yes.
22     Q.   You were making lots of money at times?
23     A.   Yes.
24     Q.   It's not an easy life, though, is it?
25     A.   No.
```

3676

```
1      Q.   It's a life where you distrust everybody,
2  right?
3      A.   Yes.
4      Q.   You certainly distrust the police because
5  you are trying to avoid them, right?
6      A.   Yes.
7      Q.   And you distrust your customers because you
8  are not sure what they're going to do, right?
9      A.   Yes.
10     Q.   And you distrust the people you work with?
11     A.   Yes.
12     Q.   And the people who work for you?
13     A.   Yes.
14     Q.   Did you have people working for you during
15  those -- some parts of those 20 years?
16     A.   Yes.
17     Q.   And it's also a life of deception, is it
18  not?
19     A.   Yes.
20     Q.   Obviously -- did you have contact with the
21  police over those 20 years?
22     A.   By getting arrested?
23     Q.   Yeah.
24     A.   Yes.
25     Q.   Other contacts with them?
```

3677

1    A.   No.

2    Q.   So when you get arrested you lie to them,

3  don't you?

4    A.   Yes.

5    Q.   And you lied to the coworkers, people that

6  you are working with from time to time?

7    A.   Yes.

8    Q.   And sometimes you lie to your customers,

9  right?

10    A.   Yes.

11    Q.   Sometimes you sell them good dope, right?

12    A.   Yes.

13    Q.   Sometimes it's not so good, right?

14    A.   Yes.

15    Q.   And you lie to your family about what you

16  are doing?

17    A.   No.

18    Q.   Okay.  And over those 20 years people have

19  tried to help you at various times, have they not?

20    A.   Yes.

21    Q.   And you are also looking over your

22  shoulder, aren't you?

23    A.   Yes.

24    Q.   You are always looking for your own escape

25  route, right?

3678

1    A.   No, not.

2    Q.   Trying to figure out how you are going to

3  get out of this situation if things go wrong.

4    A.   Not really.

5    Q.   You need to have a story to tell, don't

6  you?

7    A.   No.

8    Q.   Cops come up to you and say, what are you

9  doing here, you say, I'm just visiting a friend,

10  right?

11    A.   Yes.

12    Q.   Cops come up to you and say, why are you on

13  the corner, you say, hey, I'm just going into the

14  Wal-Mart, or whatever it is, right?

15    A.   Yes.

16    Q.   Now, that life that you lived for those

17  last 20 years, that's a life of violence, isn't it?

18    A.   Yes.

19    Q.   And you mentioned that your brother was

20  shot and killed, right?

21    A.   Yes.

22    Q.   And that was a robbery going down, right?

23    A.   Yes.

24    Q.   Your brother was trying to rob somebody and

25  he got shot and killed?

3679

1        MS. DAYTON:  Objection, relevance.

2        MR. SHEEHAN:  Counsel brought it up,

3  your Honor.

4        THE COURT:  Overruled.

5    A.   Yes.

6    Q.   And you have seen people beaten?

7    A.   Yes.

8    Q.   And you've seen a lot of guns around,

9  right?

10    A.   Yes.

11    Q.   And you carried a gun from time to time,

12  didn't you?

13    A.   Yes.

14    Q.   And you participated in the violence on the

15  streets, didn't you?

16    A.   Yes.

17    Q.   In fact, you were wearing a bulletproof

18  vest from the age of ten, weren't you?

19    A.   Yes.

20    Q.   Now, in 2002 you told us that you had an

21  assault conviction, right?

22    A.   Yes.

23    Q.   In fact, it was two convictions, wasn't it?

24    A.   It was a couple people there.

25    Q.   And there were two counts of Assault Two

3680

1  that you were convicted of, right?

2    A.   Yes.

3    Q.   And at that same time you were also

4  convicted of Larceny Two, weren't you?

5    A.   Yes.

6    Q.   And you, yourself, have been a victim of

7  violence, haven't you?

8    A.   Yes.

9    Q.   You've been robbed?

10    A.   Yes.

11    Q.   You've been kidnapped?

12    A.   Yes.

13    Q.   You've been shot?

14    A.   Yes.

15    Q.   And you've got prior drug convictions,

16  right?

17    A.   Yes.

18    Q.   2000 we talked about one for drug sale,

19  right?

20    A.   Yes.

21    Q.   And you also had one -- that's a felony,

22  right?

23    A.   Yes.

24    Q.   And in 2001 you also had a Failure to

25  Appear in the First, right?

3681

1   A.   Yes.
2   Q.   And then in 2002 you were convicted again
3   of drug sales, right?
4   A.   I was in jail 2002.
5   Q.   Okay.  Do you remember what your actual
6   convictions are?
7   A.   They're basically all same charges.
8   Q.   So, we had one for the sale of narcotics,
9   and that one was September 21st -- I'm sorry
10  October 5, 2001, right?  I'm sorry, September 21st,
11  2001?
12  A.   No.
13  Q.   No?  Would looking at a document maybe help
14  you remember?
15  A.   It was March.  It was March 10th and
16  March 21st.
17  Q.   When you got busted?
18  A.   Yes.
19  Q.   I'm asking really when -- sorry, because
20  maybe my question was confusing.  When you got
21  convicted it was on September 21st on that case,
22  right?
23  A.   I don't recall.
24  Q.   Okay.  Would looking at a document help
25  you?

3682

1   A.   Yes.
2   Q.   Maybe.  Let me just show you this.
3        MS. DAYTON:  Your Honor, I would request
4   to see it if this is being shown to the witness.
5        THE COURT:  Mr. Sheehan, on your way
6   back, would you put the microphone down.
7        MR. SHEEHAN:  Like this, your Honor?
8        THE COURT:  Just so it picks you up.
9   A.   September 21st, that's when I got arrested
10  because I was on the run.
11  Q.   Of 2001?
12  A.   Yes.
13  Q.   And you also had another sale case from
14  March 21st, 2000, right?
15  A.   Yes.
16  Q.   All right.  And fair to say when you were
17  arrested in the federal case, you were looking at
18  the possibility of an 851 notice, right?
19  A.   Yes.
20  Q.   And that's something that you had -- you
21  were aware of, right?
22  A.   Yes.
23  Q.   And actually when you were arrested in that
24  case you were charged with both a heroin conspiracy
25  and a crack conspiracy, right?

3683

1   A.   Yes.
2   Q.   And on that crack conspiracy what you were
3   charged with was being involved with more than
4   50 grams of crack, right?
5   A.   Yes.
6   Q.   And on that case alone, if the government
7   had filed an 851 and you'd been convicted, you were
8   looking at -- it could have been a life, right?
9   A.   I don't think life, but some time.
10  Q.   20-year mandatory minimum if they doubled
11  the 10-year offense, right?
12  A.   Yes.
13  Q.   Now, when you got arrested on February 4,
14  2009, that was your first federal charge, right?
15  A.   Yes.
16  Q.   You'd spent time in jail previously, but on
17  state charges, right?
18  A.   Yes.
19  Q.   In fact, you hadn't been out of jail for
20  very long before you got arrested on the federal
21  case, right?
22  A.   Yes.
23  Q.   You'd been out of jail on March 21st, 2008,
24  and then you got arrested less than a year later,
25  right?

3684

1   A.   Yes.
2   Q.   And you understood that you were in a lot
3   of difficulty at that time, right?
4   A.   Yes.
5   Q.   In fact, there were a lot of people that
6   got arrested with you, weren't there?
7   A.   Yes.
8   Q.   Forty-two of them?
9   A.   Yes.
10  Q.   And fair to say in the beginning you felt
11  like you'd gotten hit by a truck as far as the
12  seriousness of what you were looking at, right?
13  A.   Yes.
14  Q.   I mean, the other stuff you could kind of
15  do the state time, that wouldn't have been a big
16  problem, would it?
17  A.   No.
18  Q.   But now there was all of this federal time,
19  right?
20  A.   Yes.
21  Q.   And one of the other problems with the
22  federal time is that there is no place around here
23  to do it, is there?
24  A.   No.
25  Q.   I mean, the closest place you could end up

3685

1   with is Otisville, New York, right?
2       A.   Yes.
3       Q.   And you could end up anywhere in the
4   country as far as where you were sentenced to,
5   right?
6       A.   Yes.
7       Q.   So, during that period of time you're going
8   -- spending a lot of it, there will be no family for
9   you, right?  Hard for people to visit you when you
10  are far away, isn't it?
11      A.   Yes.
12      Q.   And between February 4th of 2009 and
13  April 10th of 2010, you're trying to figure out how
14  to work out the best deal for yourself, right?
15      A.   Yes.
16      Q.   Now, another big problem with federal court
17  for somebody like yourself, or a big difference
18  between federal and state court, is that in state
19  court you generally know what your sentence is going
20  to be if you make a deal, right?
21      A.   Yes.
22      Q.   I mean, the lawyer -- basically you have an
23  agreement and that's pretty much the sentence you
24  know that the judge is going to give you, right?
25      A.   Yes.

3686

1       Q.   But in federal court you really don't know
2   what that judge is going to give you, do you?
3       A.   Not precise, no.
4       Q.   And another problem you had was that
5   because of your record you weren't sure whether or
6   not you were a career offender, right?
7       A.   Yes.
8       Q.   And, in fact, your plea agreement talks
9   about that, doesn't it?
10      A.   Yes.
11      Q.   Let me draw your attention to this
12  paragraph, the second paragraph on page 4 of
13  Government's Exhibit 240, which is the plea
14  agreement.  Do you see that paragraph there where it
15  starts "in addition"?
16      A.   Yes.
17      Q.   And it references the possibility that you
18  are a career offender?
19      A.   Yes.
20      Q.   And that was up in the air, wasn't it?
21      A.   No, because before I signed it my lawyer
22  said I wasn't a career offender.
23      Q.   And this agreement said if the probation
24  officer decides that you are, and the judge agrees,
25  you might be a career offender, right?

3687

1       A.   Yes.
2           MS. DAYTON:  Objection.  It's very
3   misleading.  The PSR had come out already, the
4   probation report.
5           MR. SHEEHAN:  Am I missing something or
6   do we have another witness in here?
7           THE COURT:  Go ahead with your next
8   question.
9       Q.   Okay, now in this agreement you were
10  looking at a mandatory minimum sentence of five
11  years, right?
12      A.   Yes.
13      Q.   And the government had promised that if
14  your sentence was not more than 92 months --
15  actually you promised that, if your sentence was not
16  more than 92 months you weren't going to appeal,
17  right?
18      A.   Yes.
19      Q.   And the ultimate question of what your
20  sentence was, was going to be up to Judge Thompson
21  who was handling that case, right?
22      A.   Yes.
23      Q.   You didn't like being in jail, did you?
24      A.   No.
25      Q.   You lose your freedom in jail, right?

3688

1       A.   Yes.
2       Q.   You really lose your ability to make
3   choices, right?  You don't have much to choose from.
4       A.   No.
5       Q.   You eat what they give you, right?
6       A.   Yes.
7       Q.   You wear whatever clothes you get, right?
8       A.   Yes.
9       Q.   And you can buy things in the commissary,
10  but they're pretty limited, right?
11      A.   Yes.
12      Q.   You most of the time are sharing a cell
13  with somebody that you never met before, right?
14      A.   Yes.
15      Q.   There is no privacy, is there?
16      A.   No.
17      Q.   It's never quiet, is it?
18      A.   No.
19      Q.   You can't let your guard down for a minute,
20  can you?
21      A.   No.
22      Q.   You've got to follow orders, right?
23      A.   Yes.
24      Q.   Sometimes from correction officers that you
25  don't very much like.

3689

1    A.    Yes.
2    Q.    You can't be with your family, right?
3    A.    Yes.
4    Q.    I mean, maybe they can visit sometimes.
5    A.    Yes.
6    Q.    But it's not very often, right?
7    A.    Yes.
8    Q.    Sometimes you can maybe talk to them on a
9    phone or through a glass when they come to visit.
10   A.    Yes.
11   Q.    That was certainly the way it was at Wyatt,
12   right?
13   A.    Yes.
14   Q.    You are separated from your children --
15   your child?
16   A.    Yes.
17   Q.    You know that's hard on your son.
18   A.    Yes.
19   Q.    Your life in jail just has a deep sense of
20   loss, doesn't it?
21   A.    Yes.
22   Q.    Every day is like that, right?
23   A.    Yes.
24   Q.    And suddenly you were looking at more time
25   than you'd ever looked at before when you got into

3690

1    this plea agreement, right?
2    A.    Yes.
3    Q.    And when you got out of that plea
4    agreement, you were looking at more time than you'd
5    ever spent in jail before, right?
6    A.    Yes.
7    Q.    And for you anyway, at the age of 32, life
8    was kind of ticking away for you, wasn't it?
9    A.    Yes.
10   Q.    Your record made it hard to find work when
11   you got out, right?
12   A.    Yes.
13   Q.    And one of the things that really bothered
14   you was that you were just a little fish in that
15   case where you got arrested, weren't you?
16        MS. DAYTON:  Objection, relevance.
17        MR. SHEEHAN:  I'm going to his state of
18   mind, your Honor.
19        THE COURT:  All right, go ahead.
20   A.    Yes.
21   Q.    You were on the punky end of a couple
22   wiretaps for two months, right?
23   A.    Yes.
24   Q.    And the other thing that bugged you was the
25   big people in your case were making all these deals,

3691

1    right?
2    A.    I don't know.
3    Q.    You didn't know that?
4    A.    No, I know that they made deals.
5    Q.    Yeah.  And that didn't bother you?
6    A.    Somewhat.
7    Q.    It will bothered you a lot, didn't it?
8    A.    I said somewhat.
9    Q.    You kept track of all the deals, didn't
10   you?
11   A.    Yes.
12   Q.    So, when you entered your plea on
13   May 9th -- I'm sorry, on April 1st, 2010, you knew
14   what you were looking at, right?
15   A.    Yes.
16   Q.    If the judge really liked you, you might
17   get away with five.
18   A.    Yes.
19   Q.    But then you went looking to talk to the
20   government, right?
21   A.    Yes.
22   Q.    Because you wanted to improve your
23   situation, didn't you?
24   A.    Yes.
25   Q.    And so you decided -- let me ask you about

3692

1    these other deals that you heard people were
2    getting.  Did you think those people were lying to
3    get those deals?
4    A.    I don't know.
5    Q.    How about you?  Did you think that they
6    were lying about you to get better deals for
7    themselves?
8    A.    No.
9    Q.    Did you think they were lying about other
10   people to get better deals for themselves?
11   A.    I don't know.
12   Q.    You don't know for sure, but I'm asking you
13   what you were thinking.
14        MS. DAYTON:  Objection, relevance.  It
15   calls for speculation.
16        MR. SHEEHAN:  I'm asking as his state of
17   mind, your Honor.
18        MS. DAYTON:  He answered.
19        MR. SHEEHAN:  I don't think he did.
20        THE COURT:  His answer was he didn't
21   know.
22        MR. SHEEHAN:  Right, and I'm asking what
23   he thought.  If I was asking what he knew, your
24   Honor, it would be a hearsay problem, I admit, but
25   I'm asking him what he was thinking at the time.

3693

1         THE COURT:  Did you have any thoughts
2 about whether they were lying to get themselves
3 better deals?
4         THE WITNESS:  I didn't know most of the
5 individuals on my case.
6    Q.  How about the ones you did know?
7    A.  No.
8    Q.  Now, you'd been at Wyatt for about -- for
9 more than a year before you decided to plead, right?
10    A.  Yes.
11    Q.  And then you went to try and get your
12 situation better.  You decided to have this meeting,
13 right?  You asked your lawyer to set up the meeting.
14    A.  Yes.
15    Q.  And then you changed your mind, right?
16    A.  Yes.
17    Q.  And you came back and you told Azibo that
18 the feds had wanted to talk to you, right?
19    A.  Yes.
20    Q.  Now, by that point in time you were friends
21 with Azibo?
22    A.  Yes.
23    Q.  You were on the same block, right?
24    A.  Yes.
25    Q.  People in jail talk about their cases,

3694

1 don't they?
2    A.  Somewhat.
3    Q.  You did, didn't you?
4    A.  Everybody knew my case.
5    Q.  And you would talk about it, right?
6    A.  Yes.
7    Q.  You'd talk about the witnesses in your
8 case?
9    A.  Yes.
10    Q.  And you had reviewed the paperwork that
11 your lawyer showed you about the case?
12    A.  I didn't really have no paperwork.
13    Q.  Did you listen to any of the phone
14 conversations?
15    A.  Just the CD, yes.
16    Q.  And there were a lot, right?
17    A.  Yes.
18    Q.  And you'd go over -- you understood who was
19 saying what against you, right?
20    A.  Yes.
21    Q.  So, when you came back and met with Azibo,
22 you said, the feds wanted to talk to me, I didn't
23 ask to see them, right?
24    A.  Yes.
25    Q.  And you said to him, they really want you,

3695

1 right?
2    A.  Yes.
3    Q.  Had you been told that by anybody before
4 you went to that meeting?
5    A.  No.
6    Q.  You knew what he was charged with, didn't
7 you?
8    A.  Yes.
9    Q.  "He" meaning Azibo?
10    A.  Yes.
11    Q.  Prison at Wyatt, there is really one
12 building, isn't there?
13    A.  Yes.
14    Q.  And almost everybody at Wyatt is waiting
15 for their case to be decided, right?
16    A.  Yes.
17    Q.  And everybody there is looking at federal
18 charges, aren't they?
19    A.  Yes.
20    Q.  And when you are in jail, when you were in
21 jail doing your bid, meaning when you were sentenced
22 on other cases, you could settle into a routine,
23 couldn't you?
24    A.  Yes.
25    Q.  And people weren't really picking at you

3696

1 about your old cases, were they?
2    A.  No.
3    Q.  But at Wyatt that's about all you've got to
4 do, right?  Everybody is picking about their cases,
5 isn't it?
6    A.  Yes.
7    Q.  And everybody's talking about snitches,
8 aren't they?
9    A.  Yes.
10    Q.  Because a snitch in a prison, they're not
11 really looked upon very well, are they?
12    A.  Yes.
13    Q.  And your opinion, anyway, was that a lot of
14 those snitches just lie on people, right?
15    MS. DAYTON:  Objection, vague.
16    THE COURT:  You mean just as a general
17 matter does he think snitches lie?
18    MR. SHEEHAN:  Yes.
19    THE COURT:  Do you think snitches lie?
20    THE WITNESS:  Some.
21    Q.  Do you remember working out this letter, a
22 letter that -- a letter that you went Judge
23 Thompson?
24    A.  What you mean, for my sentencing?
25    Q.  Yeah.

3697

1    A.   Yes.

2    Q.   And he was the person who was going to

3 sentence you, right?

4    A.   Yes.

5    Q.   And you told him that when you get out you

6 wanted to set up a little organization, right?

7    A.   Yes.

8    Q.   And one of the things you told him was you

9 wanted to tell kids about federal prison, right?

10    A.   No.

11    Q.   You told him you wanted to tell kids about

12 your federal experience.

13    A.   About my whole life experience.

14    Q.   Well, you told him about your whole life

15 experience.  And you also told him you wanted to

16 tell them about your federal experience, didn't you?

17    A.   I don't recall.

18         MS. DAYTON:  This is a multiple page

19 document.  I haven't seen the document before.  I

20 would like an opportunity to read it.

21         MR. SHEEHAN:  No objection, your Honor.

22 Time to break for lunch?

23         THE COURT:  All right, that's a good

24 idea.

25         (Jury exited the courtroom.)

---

3698

1         THE COURT:  All right, Mr. Myers, please

2 don't discuss your testimony over lunch and we'll

3 have you back in a half an hour.  Thank you.

4         Can we help by giving you another

5 complete photo?

6         MR. SHEEHAN:  That might be helpful,

7 your Honor.

8         THE COURT:  Will there be anything we

9 need to take up before we resume again after lunch?

10         MS. DAYTON:  No.

11         THE COURT:  Okay.

12         MS. RODRIGUEZ-COSS:  No, your Honor.

13 The only thing, our handwriting expert brought some

14 exhibits, demonstrative aids.  They've been shown to

15 counsel.  They have to be propped up, and we brought

16 an easel to do that to facilitate showing them.  The

17 only thing is if we do it far away from the jury,

18 they really can't see it.  So, we would request to

19 do it at least somewhere around here.

20         THE COURT:  All right, and just have the

21 witness bring the mic.  That will be fine.

22         MS. RODRIGUEZ-COSS:  And then the

23 defense move --

24         THE COURT:  But tell the witness to pick

25 up the mic.

---

3699

1         All right, stand in recess.  I'm sorry,

2 one more thing.  I have reviewed the DCF records.

3 I've reviewed the statutes 17a-28 with respect to

4 the records.  There is no minor child involved.

5 Those involved are now adults.  It is -- the full

6 record has relevance to Azibo Aquart's childhood,

7 and even though there may be separate documents of

8 sort of an agency processing nature related to Azizi

9 Aquart, they're so interspersed with his

10 guardianship of Azibo Aquart, it would be -- you

11 can't meaningfully separate them out.  What I am not

12 going to, however, give you is an evaluation and

13 treatment recommendation which seems to relate --

14         MS. RODRIGUEZ-COSS:  Is that by Dr.

15 Liefland?  Is that Dr. Liefland?

16         MR. SHEEHAN:  Is that related to Azibo

17 Aquart, your Honor?

18         THE COURT:  No, Azizi.  Only Azizi

19 Aquart.  And doesn't seem, therefore, to be related

20 to --

21         MR. SHEEHAN:  Was that in the context of

22 his application to the guardianship?

23         THE COURT:  He was also the subject of

24 DCF --

25         MR. SHEEHAN:  Right.

---

3700

1         THE COURT:  -- scrutiny.  Yes, as the

2 guardian.

3         MS. RODRIGUEZ-COSS:  Your Honor, will

4 the Court review that document again in light of the

5 fact he's expected to be a witness for the defense

6 in the case.  And so for any reason we may be able

7 to use or would be --

8         MR. SHEEHAN:  Do you know what I could

9 do, your Honor, I'm happy to take -- I have a set of

10 documents and I am happy to take a look and see if

11 that is part of those, and if I've already gotten

12 it, then maybe we can work out something.  I don't

13 know.

14         THE COURT:  It seems -- it is dated

15 November '95.  The request for the evaluation -- it

16 is Azizi Aquart was taken.  It is an evaluation, the

17 cover letter says for substance abuse or dependency.

18         MR. SHEEHAN:  Could I ask who the author

19 of that is, your Honor?  That will just make it

20 easier for me.

21         THE COURT:  Lisa Stenfanko,

22 s-t-e-n-f-a-n-k-o, a licensed clinical social

23 worker.

24         MR. SHEEHAN:  Your Honor, perhaps we

25 could deal with that one tomorrow.  If you want to

**GA925**

3701

```
1   turn over those.
2            THE COURT:  I will turn these over, I
3   will keep the other out.
4            MS. RODRIGUEZ-COSS:  So what's your
5   proposition?
6            MR. SHEEHAN:  I'm going to look -- I'm
7   going to see if I have a copy of the other one.  I'm
8   not sure.
9            THE COURT:  The cover letter is to Lisa
10  Stenfanko, case worker.  It's captioned "substance
11  abuse and dependency evaluation."
12           MS. RODRIGUEZ-COSS:  I guess we would
13  submit, your Honor, that any information provided by
14  the subject with regards to his background,
15  upbringing, childhood.
16           MR. SHEEHAN:  I'm not sure I'm providing
17  it.  That's all I'm going to say.  If I were to
18  provide it, I would certainly give it to you.
19           MS. RODRIGUEZ-COSS:  You are going to
20  provide it to who?
21           MR. SHEEHAN:  If I were going to be
22  providing it.
23           THE COURT:  So that's all for now.  We
24  will recess for lunch.
25           MR. SHEEHAN:  All right.
```

3702

```
1            (Recess)
2            THE COURT:  Would you please bring in
3   the witness.  Who is the next witness.
4            MS. RODRIGUEZ-COSS:  James Viadero and
5   then Special Agent Kevin Kline, your Honor.
6            THE COURT:  Special agent?
7            MS. RODRIGUEZ-COSS:  Kevin Kline.
8            THE COURT:  Would you please bring in
9   the jury.
10           (Jury entered the courtroom.)
11           THE COURT:  Please be seated, ladies and
12  gentlemen.  We'll continue cross-examination --
13           MR. SHEEHAN:  Thank you, your Honor.
14           THE COURT:  --  by Mr. Sheehan of
15  Mr. Myers.
16  Q.  Mr. Myers, I had just asked you about a
17  letter that you sent to Judge Thompson in the
18  context of your sentencing.  Do you remember that
19  question?
20  A.  Yes.
21  Q.  And I was showing you this document.  I've
22  highlighted part of it.  And I wonder if looking at
23  that document refreshes your recollection, causes
24  you to remember what you said to Judge Thompson on
25  this issue?
```

3703

```
1   A.  Yes.
2   Q.  And what you said to Judge Thompson is you
3   want the kids to know about your federal experience
4   as you watched so-called friends lie?
5            MS. DAYTON:  Your Honor, he's reading
6   from a document that's not in evidence.  If he would
7   like to put it in evidence we have no objection, the
8   whole document.
9            THE COURT:  I'm going to sustain the
10  objection.  Do you want the letter to go in?
11           MR. SHEEHAN:  I'd like to ask the
12  question to the witness.
13  Q.  What you said to Judge Thompson on this
14  point was that you wanted to tell the kids about
15  your federal experience as you watched so-called
16  friends lie on friends to get lower sentences,
17  right?
18  A.  Yes.
19  Q.  And that was your federal experience,
20  right?
21  A.  Yes.
22  Q.  Now, that's really part of the hazard of
23  Wyatt, isn't it?
24  A.  Yes, somewhat.
25  Q.  And you went to the feds to try and help
```

3704

```
1   yourself, right?
2   A.  No, not really, because I had the
3   opportunity when I first got arrested, and I fired
4   my lawyer for it.
5   Q.  You fired your lawyer?
6   A.  Yes.
7   Q.  For suggesting that to you?
8   A.  She suggested I cooperate.
9   Q.  And that was something that you told other
10  people in the prison, right?
11  A.  What?  About what I said about the lawyer?
12  Q.  Yeah.
13  A.  Yes.
14  Q.  I got rid of my punk lawyer because she
15  just wanted me to cooperate, right?
16  A.  Yes.
17  Q.  I'm a stand-up guy, right?
18  A.  Yes.
19  Q.  And then you did decide to cooperate,
20  right?
21  A.  Yes.
22  Q.  And when you came back to Wyatt, after that
23  first trip, you told everybody they were pressuring
24  me, I'm not going to cooperate, right?
25  A.  Yes.
```

3705

1    Q.   And you knew that when friends lie on
2  friends to get lower sentences, that stings, doesn't
3  it?
4    A.   Yes.
5    Q.   And you told Azibo, hey, I'm a stand-up
6  guy, right?
7    A.   Yes.
8    Q.   And he asked you for help, didn't he?
9    A.   Yes.
10   Q.   You said okay, right?
11   A.   Yes.
12   Q.   You said you weren't going to turn on him,
13 right?
14   A.   Yes.
15   Q.   And the plan was finally to show the system
16 what happens when snitches tell the truth, right?
17   A.   Yes.
18   Q.   It would be kind of funny if that ever
19 happened, wouldn't it?
20        MS. DAYTON:  Objection, vague,
21 irrelevant.
22        THE COURT:  Do you want to rephrase that
23 question?
24   Q.   It would have been a good show, wouldn't
25 it?

3706

1    A.   Yes.
2    Q.   You could show how friends lie on friends,
3  right?
4    A.   Yes.
5    Q.   And then you got the letter from Azibo,
6  right?
7    A.   Yes.
8    Q.   It was like a get out of jail card for you,
9  wasn't it?
10   A.   I didn't really think nothing of it.  I
11 didn't never think that I really was going to get a
12 chance to help.  No, I didn't think so.
13   Q.   So you took that letter and you showed it
14 to your lawyer, right?
15   A.   Yes.
16   Q.   And you showed it to your lawyer to help
17 yourself, right?
18   A.   I didn't think it had no relevance.
19   Q.   It's just like you were just packing up
20 your cell and you said to your lawyer, hey, do you
21 want to see the -- you know, isn't this interesting?
22   A.   No.
23   Q.   No.  You knew that letter had to deal with
24 Charles Street, didn't you?
25   A.   Yes.

3707

1    Q.   You knew they were prosecuting him for
2  Charles Street, didn't you?
3    A.   Yes.
4    Q.   And he wrote that letter and gave that to
5  you, didn't he?
6    A.   Yes.
7    Q.   Did your lawyer twist your arm to give him
8  that letter?
9    A.   No.
10   Q.   So then you gave the letter to your lawyer,
11 right, for him to give to the government?
12   A.   No, I gave it to them.
13   Q.   For what?
14   A.   Cuz I didn't think that this is really
15 going to happen.  I didn't know really how serious
16 it was, and I thought I was going to be gone and I
17 didn't have to help him.
18   Q.   You didn't have to help him?
19   A.   Yes.
20   Q.   And that letter doesn't say that Azibo said
21 he had to kill those people, does it?
22   A.   No.
23   Q.   It wasn't hard to add that detail in, was
24 it, for you?
25   A.   No.

3708

1    Q.   Just another friend, right?
2    A.   Yes.
3    Q.   Taking care of yourself, right?
4    A.   No.
5    Q.   You hope that when you go into court the
6  government's going to say what a good boy Shamarr
7  was.  That's what you hope, right?
8    A.   Yes.
9    Q.   Look what he did for us, look how he helped
10 us, right?
11   A.   Yes.
12   Q.   You hope they're going to file a motion so
13 the judge doesn't even have to give you five years,
14 right?
15   A.   Yes.
16   Q.   And you hope with that motion and your
17 testimony you'll walk out of there, right?
18   A.   It's up to the judge.
19   Q.   And that's what you are hoping, isn't it?
20   A.   Yes.
21   Q.   Take care of yourself, right?
22   A.   Yes.
23        MR. SHEEHAN:  I don't have any further
24 questions.
25        THE COURT:  Redirect?

3709

1          MS. DAYTON:  Thank you, your Honor.
2    REDIRECT EXAMINATION BY
3    BY MS. DAYTON:
4          Q.   Good afternoon, Mr. Myers.  Counsel just
5    asked you about a get out of jail free card.  Did
6    the government let you out of jail when you handed
7    over the letter?
8          A.   No.
9          Q.   You are still in jail now?
10         A.   Yes.
11         Q.   And counsel asked you a lot of stuff about
12   snitches and people who told on you.  Were you
13   selling heroin when you got arrested?
14         A.   Yes.
15         Q.   So the people who spoke to the government
16   about you and said you were selling heroin, were
17   they lying or telling the truth?
18         A.   They was telling the truth.
19         Q.   Counsel also asked you about whether or
20   not -- well, just about snitching in general.  Have
21   you ever cooperated with the government before?
22         A.   No.
23         Q.   Has anyone ever given you a letter like
24   this one before, like the one the defendant gave
25   you?

3710

1          A.   No.
2          Q.   And just to clarify, did you plead before,
3    plead guilty before or after the defendant gave you
4    this letter?
5          A.   Before.
6          Q.   And you were asked a lot of questions about
7    being a career offender.  You mentioned that your
8    attorney told you you are not one; is that correct?
9          A.   Yes.
10         Q.   So did you expect to be sentenced as a
11   career offender?
12         A.   No.
13         Q.   And have you reviewed your presentence
14   report?
15         A.   Yes.
16         Q.   And does the probation officer find that
17   you are a --
18         MR. SHEEHAN:  Objection.
19         Q.   That you are or are not?
20         MR. SHEEHAN:  Objection.
21         THE COURT:  Relevance, please.
22         MR. SHEEHAN:  Hearsay, among other
23   things.  He's asked about a document.  There is no
24   evidence of this document.
25         MS. DAYTON:  It goes to his state of

3711

1    mind.
2          MR. SHEEHAN:  I don't think -- they
3    haven't provided the document even though they're
4    sitting on it.
5          MS. DAYTON:  Objection.  May we
6    approach?  The Court was given PSRs.
7          MR. SHEEHAN:  Not this one.
8          THE COURT:  The issue about whether or
9    not he qualified for career offender status was
10   certainly raised.
11         MR. SHEEHAN:  It was, your Honor.
12         THE COURT:  In cross-examination.
13         MR. SHEEHAN:  Right.
14         THE COURT:  So if the question is
15   whether or not after reviewing his presentence
16   report he had any expectation that he wouldn't be
17   considered a career offender, that's a fine
18   question.
19         MR. SHEEHAN:  I don't know what he's
20   reviewing, your Honor, what he's relying upon.  It's
21   something we've never seen.
22         THE COURT:  But you asked him about, in
23   the state of mind exception, what his anticipation
24   or expectation was.
25         MR. SHEEHAN:  I did, your Honor.

3712

1          THE COURT:  I think this can be -- this
2    can be pursued, but not in terms of what the
3    presentence report said.  I agree that would be
4    hearsay.  But what he expected would be the outcome
5    at his sentencing after speaking with his lawyer and
6    after reviewing the presentence report.
7          So, if you'd rephrase your question.
8          MS. DAYTON:  Yes.  Thank you, your
9    Honor.
10         Q.   Based upon the review of the presentence
11   report, did you expect that you would be sentenced
12   as a career offender?
13         A.   No, I wasn't a career offender.
14         Q.   Counsel asked you also about wearing a
15   bulletproof vest when you were ten.  Do you remember
16   that?
17         A.   Yes.
18         Q.   Why were you wearing a bulletproof vest
19   when you were ten?
20         A.   Because my brother was doing a lot of -- he
21   was doing a lot of things in the neighborhood and
22   somebody tried to kill me before.
23         Q.   So, who asked to you wear that bulletproof
24   vest.
25         A.   My brother.

**GA928**

3713

1  Q.  So were you drug dealing at ten?
2  A.  No.
3  Q.  And were you wearing a bulletproof vest
4  because you were drug dealing?
5  A.  No.
6  Q.  You were also asked about an organization
7  that you want to set up.  Do you remember those
8  questions?
9  A.  Yes.
10  Q.  What is that organization?
11  A.  It's called Listen Up.  It's about
12  basically keeping kids off the street, going through
13  the same things I've been going through in my life.
14  Q.  Did you come up with this yourself?
15  A.  Yes.
16  Q.  And did you create a logo?
17  A.  Yes.
18  Q.  And did you send that to the judge?
19  A.  Yes.
20  Q.  And did you set goals and kind of -- for
21  the organization?
22  A.  Yes.
23      MR. SHEEHAN:  Objection, irrelevant,
24  outside the scope of the cross.
25      THE COURT:  Overruled.  The subject of

3714

1  his -- this is all in his letter to Judge Thompson?
2      MS. DAYTON:  Yes, it is.
3      THE COURT:  Overruled.
4  Q.  And you said earlier that you -- well, what
5  do you want to talk to kids about in Listen Up?
6  A.  About the dangers of street life and drug
7  dealing.
8  Q.  And did you write the letter yourself?
9  A.  Yes.
10      MS. DAYTON:  Your Honor, I'd ask to show
11  the document to the jury.
12      MR. SHEEHAN:  Objection.
13      THE COURT:  Sustained.
14      MS. DAYTON:  May we approach?
15      THE COURT:  You may.
16      (Sidebar conference)
17      MS. DAYTON:  Counsel has repeatedly
18  suggested that Mr. Myers is lying.  Mr. Myers'
19  handwriting looks nothing like the defendant's
20  handwriting.  And while I'm not seeking to admit
21  this document, I would like to show his handwriting
22  because it's relevant to whether or not the
23  defendant wrote the other one and that he did not
24  write it.
25      MR. SHEEHAN:  Give me a break.  That

3715

1  isn't even close.
2      MS. DAYTON:  That's my point exactly.
3      MR. SHEEHAN:  So --
4      THE COURT:  It's not being offered for
5  its substance, but for its handwriting?
6      MS. DAYTON:  That's exactly right, your
7  Honor.
8      MR. SHEEHAN:  That is such hogwash.
9      MS. DAYTON:  That's nice.  Do you know
10  what, your Honor, I would ask that counsel be
11  instructed to stop saying I muddied the waters, to
12  stop making comments about me on the record.  And
13  now, I mean, you know, it's just inappropriate.
14      THE COURT:  You can show this to the
15  jury, pick out an exemplar, compare it to the
16  defendant's, but it won't be a full exhibit.
17      MS. DAYTON:  That's fine, your Honor
18  thank you.
19      (Sidebar concluded)
20  Q.  And did you write the letter yourself?
21  A.  Yes.
22  Q.  Did anyone help draft it for you?
23  A.  No.
24  Q.  I'm going to go show you what was earlier
25  in evidence as 506, Government's 506.

3716

1      Did you write this letter I'm showing you
2  right now?
3  A.  No.
4  Q.  It's 506.  Okay.  Now I'm going to show you
5  your letter.  Whose handwriting is this?
6  A.  That's mines.
7  Q.  Okay.  And in it you talk about the
8  organization?
9      MR. SHEEHAN:  Objection.  I'm objecting,
10  your Honor.
11      THE COURT:  Sustained.
12  A.  Yes.
13  Q.  This is your handwriting?
14  A.  Yes.
15  Q.  And this is the letter you sent to the
16  judge?
17  A.  Yes.
18  Q.  Thank you.
19      Why did you sell drugs?
20  A.  I first started selling drugs because I ran
21  away from home and I didn't have nowhere to stay, I
22  needed money.
23  Q.  Why did you continue to sell drugs?
24  A.  It just became a pattern.
25  Q.  Did you smoke crack?

3717

1    A.   No.
2    Q.   Did you sell drugs to support a habit?
3    A.   No.
4    Q.   Have you ever killed a competitor?
5    A.   No.
6          MR. SHEEHAN:  Objection, your Honor.
7          THE COURT:  Basis?
8          MR. SHEEHAN:  Irrelevant.
9          THE COURT:  Overruled.  The issues of
10 the things that he had experienced when you examined
11 him about being a drug dealer, that it was hard,
12 makes this appropriate.  Go ahead.
13    Q.   And in prison, in custody, whether at Wyatt
14 or anywhere else, do you sleep in a bed?
15    A.   Yes.
16    Q.   Are you fed?
17    A.   Yes.
18    Q.   How many meals a day?
19    A.   Three.
20    Q.   Are you allowed to engage in any sporting
21 activities?
22    A.   Yes.
23    Q.   What kinds?
24    A.   They got basketball and handball, you could
25 work out.

3718

1    Q.   What about -- say that again?
2    A.   They have a pullup bar.
3    Q.   What about electronic things, TVs, radios,
4 computers, do you have access to those?
5    A.   Yes.
6    Q.   All three of them?
7    A.   Yeah, they have TV in the day room.
8    Q.   Okay.
9    A.   Computer in the law library.  You could buy
10 a radio from the commissary.
11    Q.   You could buy a radio from commissary?
12    A.   Yes.
13    Q.   Are you allowed to have a TV in your cell?
14    A.   No.
15    Q.   At any prison or just the one you are at
16 now?
17          MR. SHEEHAN:  Objection.
18          THE COURT:  I'm sorry?
19          MR. SHEEHAN:  I object, your Honor.
20 It's irrelevant and also he's --
21          THE COURT:  Sustained.
22    Q.   Okay.  What about books, do you have books?
23    A.   Yes.
24    Q.   And you mentioned the law library before.
25 What is the law library?

3719

1    A.   Well, they have law books in there and
2 computers and typewriters.
3    Q.   When you were in custody with the
4 defendant, what did he do during the day?
5          MR. SHEEHAN:  Objection.
6    A.   Work out, go to the law library.
7          MR. SHEEHAN:  Objection.  Outside the
8 scope of the cross.
9          THE COURT:  Sustained.
10    Q.   Counsel asked you a lot of questions about
11 lying.  Are you lying now?
12    A.   No.
13          MR. SHEEHAN:  Objection.  It's an
14 improper question.
15          THE COURT:  Overruled.  It's rhetorical,
16 but...
17    Q.   Are you?
18    A.   No.
19          MS. DAYTON:  Thank you.  I have nothing
20 further.
21          THE COURT:  Any recross?
22 RECROSS-EXAMINATION
23 BY MR. SHEEHAN:
24    Q.   You entered your plea on April 1st, right,
25 in your federal case?

3720

1    A.   Yes.
2    Q.   And then you filed a motion to continue
3 that through your lawyer, right?
4    A.   Yes.
5    Q.   And then you filed a second motion to
6 continue that through your lawyer.
7          MS. DAYTON:  Objection.  Outside the
8 scope of redirect.
9          MR. SHEEHAN:  It isn't, your Honor.
10          THE COURT:  How so?
11          MR. SHEEHAN:  Your Honor, because she
12 asked about has he been sentenced yet.  She has
13 opened up that area.
14          MS. DAYTON:  No, I did that on direct.
15          THE COURT:  That's not her redirect.
16 Only that he pled before he got the defendant's
17 letter.
18    Q.   You haven't been sentenced, right?
19    A.   No.
20          MR. SHEEHAN:  I have no further
21 questions.
22          MS. DAYTON:  Your Honor, just before the
23 witness gets off the stand, I should have marked the
24 sample of his writing as Government's Exhibit 515
25 for identification purposes, for the record.  I've

3721

```
1   done so now.
2             THE COURT:  Thank you.  All right.
3             MS. DAYTON:  Thank you.
4             THE COURT:  Thank you.
5             Then, we will excuse you, Mr. Myers.  You
6   may step down.
7             Will the government please call its next
8   witness.
9             MS. RODRIGUEZ-COSS:  Yes, your Honor.
10  We call James Viadero.
11            THE COURT:  All right, sir, if you will
12  take the stand and remain standing.  Raise your
13  right hand and you will be sworn.
14            J A M E S   V I A D E R O
15  Having first affirmed, was examined and testified as
16  follows:
17            THE WITNESS:  Captain James Viadero,
18  last name is V-i-a-d-e-r-o, Bridgeport, Connecticut.
19            THE COURT:  You may proceed.
20  DIRECT EXAMINATION BY
21  MS. RODRIGUEZ-COSS:
22     Q.   Captain, can you tell us who you work for?
23     A.   Bridgeport Police Department.
24     Q.   And how long have you been employed by the
25  Bridgeport police?
```

3722

```
1      A.   Twenty-six years.
2      Q.   I want to bring your attention to
3   November 29th, 2005.  Can you tell the members of
4   the jury what was the nature of your duties on that
5   day?
6      A.   At the time I was assigned as a lieutenant
7   in the detective bureau.
8      Q.   And what, if anything, transpired on
9   November 29, 2005?
10     A.   That day we assisted Statewide Narcotics
11  with the execution of a search warrant.
12     Q.   And where was that?
13     A.   WJ Detailing on Elizabeth Street in
14  Bridgeport.
15     Q.   And when you say you assisted in the
16  execution of a search warrant, exactly what did that
17  entail?
18     A.   At the time they had a search warrant, I
19  believe it was for narcotics, they requested
20  additional personnel from our detective bureau to
21  help with the search after executing the warrant.
22     Q.   And did you actually participate in that
23  search?
24     A.   Correct.
25     Q.   Did you take part in the seizure of any
```

3723

```
1   evidence?
2      A.   Yes, I did.
3      Q.   I'm bringing your attention to what has
4   been marked Government Exhibit 502.  Can you tell me
5   whether you recognize that document?
6      A.   Yes, I do.
7      Q.   How so?
8      A.   I seized it on that date and turned it over
9   to Trooper Mirto (ph).
10     Q.   And just one more question.  What caused
11  you to seize this particular item?
12     A.   At the time we're looking for anything
13  narcotics related, records.  It had an address on it
14  that it came from one of our correctional institutes
15  in Connecticut.  Upon opening it up and looking
16  inside, it was some information in there that led me
17  to believe it might be pertinent to the
18  investigation.
19            MS. RODRIGUEZ-COSS:  Your Honor we would
20  submit Exhibit 502 subject to later connection.
21            MR. SMITH:  No objection subject to
22  connection, your Honor.
23            MS. RODRIGUEZ-COSS:  Thank you.  We have
24  nothing further for Captain Viadero.
25            THE COURT:  All right.  502 is
```

3724

```
1   provisionally an exhibit.
2             Cross-examination?  Is there any
3   cross-examination?
4             MR. SMITH:  No, your Honor.
5             THE COURT:  Now you may go.
6             THE WITNESS:  Thank you.
7             THE COURT:  And you are excused.
8             Please call your next witness.
9             MS. RODRIGUEZ-COSS:  We call Special
10  Agent Kevin Kline.
11            THE COURT:  May I see counsel at
12  sidebar, please.
13            (Sidebar conference)
14            THE COURT:  He is talking about what, or
15  she?
16            MS. RODRIGUEZ-COSS:  He who?
17            THE COURT:  Kline.
18            MS. RODRIGUEZ-COSS:  Oh, Mr. Kline took
19  the exemplars from the defendant.
20            THE COURT:  So we're not yet at the
21  defendant's motion about blood spatter expert.
22            MS. RODRIGUEZ-COSS:  No, no, this is all
23  going towards the foundation for the handwriting
24  expert, and he will be our next witness after
25  Mr. Kline.
```

3725

1       MS. DAYTON:  The handwriting, not the

2  blood spatter.

3       (Sidebar concluded)

4       THE COURT:  Sir, would you please take

5  the stand and please remain standing.  Raise your

6  right hand.  The oath will be administered.

7       K E V I N   K L I N E

8  Having first affirmed, was examined and testified as

9  follows:

10      THE WITNESS:  Kevin James Kline,

11  K-l-i-n-e.

12      THE COURT:  Town of residence.

13      THE WITNESS:  New Haven, Connecticut.

14      THE COURT:  You may proceed.

15  DIRECT EXAMINATION BY

16  MS. RODRIGUEZ-COSS:

17    Q.  And can you tell the members of the jury

18  how you are employed?

19    A.  I'm employed as a special agent with the

20  FBI.

21    Q.  And how long have you been a special agent

22  with the FBI?

23    A.  For 20 years.

24    Q.  And were you at some point in time assigned

25  to work on the case of United States v. Azibo

3726

1  Aquart?

2    A.  Yes.

3    Q.  Bringing your attention -- well, bringing

4  your attention to what has already been marked

5  Government Exhibit 506 and Government Exhibit 507

6  and 507A.  Bringing your attention first to what has

7  been marked Government Exhibit 506, do you recognize

8  this document?

9    A.  Yes, I do.

10    Q.  And how so?

11    A.  This is a handwritten document in which we

12  were trying to ascertain who the author of the

13  document was.

14    Q.  And what steps, if any, did you take,

15  Agent Kline, in order to ascertain who the author of

16  this document was?

17    A.  In an effort to determine who the author

18  was, we initially -- in an effort to determine if

19  the defendant was the author of the document, I had

20  contacted our --

21    Q.  Let me hold you right there.

22      MS. RODRIGUEZ-COSS:  Are you all right?

23      THE COURT:  I will survive.  A bit

24  noisy, but go ahead.

25    Q.  Go ahead.

3727

1    A.  In an effort to determine if the defendant

2  was the author of this document, we initially

3  contacted the laboratory division at FBI

4  headquarters to determine the process by which we

5  would obtain handwriting exemplars to determine if

6  the defendant was the author of the document.

7    Q.  And when you talk about handwriting

8  exemplars, what are you referring to?

9    A.  Well, what we are referring to is taking

10  the document in which the author is in question and

11  obtaining a handwritten document for which we know

12  who the author is, and then having it conducted by a

13  forensic analyst to determine if the handwritings

14  are similar so a definitive decision could be made

15  as to who authored the document.

16    Q.  Let me bring your attention now to what we

17  have marked Government Exhibit 507 and 507A.  Taking

18  first Government Exhibit 507, can you tell me what

19  that is?

20    A.  Government Exhibit 507 is a handwriting

21  exemplar that was taken from the defendant on

22  January 28, 2011.

23    Q.  And these exemplars were obtained how

24  exactly?

25    A.  After consultation with forensic experts at

3728

1  our laboratory division, the protocol was to create

2  a document under the same circumstances as the

3  document that is in question.  So for Government

4  Exhibit 506, which is a handwritten document on

5  unlined white paper, we replicated the same type of

6  paper.  Additionally, not to have the defendant copy

7  the entire document, we determined a portion of the

8  document that needed to be copied.  We -- I typed it

9  on plain paper, provided it to the defendant, and

10  had the defendant copy it five times on five

11  separate sheets of paper that are similar or the

12  same to the type of paper that was used for the

13  original document.

14    Q.  And so Government Exhibit 507A, is that the

15  typed piece of paper that you provided the

16  defendant?

17    A.  Yes, it is.

18    Q.  All right.

19      MS. RODRIGUEZ-COSS:  Submitting, your

20  Honor, Government Exhibit 507 and 507A.

21      MR. SMITH:  No objection.

22      THE COURT:  Full exhibits.

23    Q.  So, bringing your attention first to

24  Government Exhibit 506, is that the handwritten

25  document you were trying to ascertain who had

3729

1  authored it?
2      A.    That is correct.
3      Q.    And bringing your attention to 507A, what
4  are we looking at here?
5      A.    That is a portion of the document in
6  question which I typed out to make it easier for the
7  defendant to copy.
8      Q.    And that's like -- is it a typewritten
9  version of a portion of 506?
10     A.    That is correct.
11     Q.    And then bringing your attention to 507,
12 what are we looking at here?
13          MS. RODRIGUEZ-COSS:  Can we Dimp the
14 lights a little?  Is that possible?
15     A.    Yeah.  507 is the document which was then
16 handwritten.
17     Q.    And let me hand it back to you.  How many
18 times did you have the defendant write over the
19 contents of Government Exhibit 507A?
20     A.    I had the defendant write the Document five
21 times.
22     Q.    Five times?
23     A.    Yes.
24     Q.    And is that the norm?
25     A.    Yeah, that is the norm.

3730

1      Q.    Bringing to your attention now what have
2  been marked 501 and 501A, and Government
3  Exhibit 502.  Bringing your attention first to
4  Government Exhibit 502, can you tell me,
5  Agent Kline, whether you recognize that document?
6      A.    Yes, I do.
7      Q.    And what is that?  How do you recognize it?
8      A.    I recognize it as this is a document
9  consisting of a handwritten letter, handwritten
10 envelope and a letter inside which we were trying to
11 ascertain who the author of this letter was.
12     Q.    And did you follow the same procedure with
13 this exhibit as you did with Exhibit 506?
14     A.    Yes, I did.
15     Q.    So let me bring to your attention what have
16 been marked Government 501 and 501A, and can you
17 tell me if you recognize those?
18     A.    I do.
19     Q.    And how do you?
20     A.    Government Exhibit 501A is a handwritten
21 portion of the letter contained in the envelope that
22 is Government's Exhibit 502.  This is the
23 handwritten portion of the letter which was provided
24 to the defendant which the defendant was requested
25 to copy five times.  The handwritten exemplars taken

3731

1  from the defendant were then copied on this tablet
2  of paper and there were five of those.  They make up
3  Government's Exhibit 501.
4      Q.    Let me bring to your attention to what has
5  been marked 503 and 503A.  Let me know which one of
6  those came from Government Exhibit 502.
7      A.    Government Exhibit 503 and 503A are the
8  exemplar that was typewritten of the portion of this
9  letter, and then the exemplar is taken from the
10 defendant that originally emanates back to
11 Government's Exhibit 502.
12          MS. RODRIGUEZ-COSS:  We would submit
13 Government Exhibit 503 and 503A.
14          MR. SMITH:  No objection.
15          THE COURT:  501 was what?  Is that the
16 same as 503?
17          MS. RODRIGUEZ-COSS:  No, your Honor,
18 we'll connect 501 with the next question.
19          THE COURT:  Thank you.
20          Full exhibit.
21     Q.    So, let me bring now your attention to
22 Government Exhibit 502.  Tell us what we're looking
23 at here.
24     A.    That is the letter that was contained in
25 the envelope that we were trying to ascertain who

3732

1  the author of that document was.
2      Q.    And you had the defendant write a portion
3  of that several times; is that correct?
4      A.    That is correct.
5      Q.    So Government Exhibit 503A corresponds to a
6  portion of Government Exhibit 502; is that correct?
7      A.    That is correct.
8      Q.    And Government Exhibit 503, is what?
9      A.    Government Exhibit 503 are the exemplars
10 which the defendant hand wrote five times.
11     Q.    Bringing your attention now to what has
12 already been marked Government Exhibit 500, tell me
13 if you recognize that item.
14     A.    I do.
15     Q.    And how so?
16     A.    Government Exhibit 500 is a letter that was
17 obtained in the course of the underlying
18 investigation in this matter, which we were trying
19 to ascertain who the author of this letter was.
20     Q.    And did you follow the same procedure with
21 that letter as you did with Government Exhibit 502
22 and 506?
23     A.    Yes.
24     Q.    And so did you prepare then a sample of
25 that typewritten for the defendant to write in his

3733

```
1    own handwriting?
2         A.   Yes.
3         Q.   And so bringing your attention now, then,
4    to what has been marked Government Exhibit 501 and
5    501A, can you tell us what those are?
6         A.   Yes.  501A is the typewritten portion of
7    the initial letter which was provided to the
8    defendant to copy five times.  Government
9    Exhibit 501 are the five copies of the five
10   exemplars which were taken from the defendant.
11        MS. RODRIGUEZ-COSS:  Submitting, your
12   Honor, Government Exhibit 501 and 501A.
13             MR. SMITH:  No objection.
14             THE COURT:  Full exhibits.
15        Q.   Bringing your attention first to what has
16   been marked Government Exhibit 500.
17        MS. RODRIGUEZ-COSS:  I'm sorry, did we
18   Dimp the lights or did they go back up?
19             THE COURT:  They went back up.  We like
20   to keep as much light shed as we can.
21        MS. RODRIGUEZ-COSS:  There we go.
22        Q.   Bringing your attention to what has been
23   marked Government Exhibit 500, can you tell us what
24   that is?
25        A.   That is the initial letter for which we
```

3734

```
1    were trying to ascertain who the author was.
2         Q.   And bringing your attention now to
3    Government Exhibit 501A, can you tell us what this
4    is?
5         A.   501A is the typewritten portion of that
6    letter which was provided to the defendant which the
7    defendant was to copy so we could determine if his
8    handwriting matched the initial document.
9         Q.   And bringing your attention then to
10   Government Exhibit 501, can you tell us what this
11   is?
12        A.   Government Exhibit 501 is the pad of paper
13   containing the five exemplars which were taken from
14   the defendant.
15        Q.   And bringing your attention now to what has
16   already been marked Government Exhibit 504 and
17   Government Exhibit 505 and 505A, can you tell us
18   first, do you recognize Exhibit 504?
19        A.   Government Exhibit 504 is a letter which
20   was obtained in the underlying investigation for
21   which we were trying to determine who the author of
22   the letter was.
23        Q.   All right.  And now bringing your attention
24   to what has been marked Government Exhibit 505, what
25   is that?
```

3735

```
1         A.   Government Exhibit 505 and 505A initially
2    is the typewritten copy of a portion of Government
3    Exhibit 504 which was provided to the defendant and
4    from which handwriting exemplars were obtained.
5    Government Exhibit 505 is the pad of paper
6    containing the five exemplars which were taken from
7    the defendant on January 28, 2011.
8         MS. RODRIGUEZ-COSS:  Submitting, your
9    Honor, Government Exhibit 505 and 505A.
10             MR. SMITH:  No objection.
11             THE COURT:  Full exhibits.
12        Q.   Bringing your attention first, Agent Kline,
13   to Government Exhibit 504, can you tell us what
14   we're looking at here?
15        A.   Government Exhibit 504 is the initial
16   letter for which we were trying to ascertain who the
17   initial author was.
18        Q.   And bringing your attention to Government
19   Exhibit 505A, can you tell us what this is?
20        A.   Government Exhibit 505A is a typewritten
21   portion of the initial letter which was provided to
22   the defendant from which handwriting exemplars were
23   obtained from the defendant.
24        Q.   And bringing your attention to Government
25   Exhibit 505, can you tell us what this is?
```

3736

```
1         A.   Government Exhibit 505 is the pad of paper
2    containing five exemplars or five copies of the
3    defendant's handwriting of the typewritten portion
4    of the initial letter.
5         Q.   And where were these exemplars obtained
6    from the defendant?
7         A.   They were obtained here at the United
8    States courthouse in New Haven.
9         Q.   And who was present for that?
10        A.   Myself and two task force officers.
11        Q.   And in addition to the defendant, anyone
12   else?
13        A.   The defendant's attorney.
14             MS. RODRIGUEZ-COSS:  We don't have
15   anything further for Agent Kline, your Honor.
16             THE COURT:  Any cross-examination for
17   Agent Kline?
18             MR. SMITH:  No.  Thank you, Agent Kline.
19             THE COURT:  All right, thank you, sir.
20   You may step down.  You are excused.
21             We'll let the light shine on the
22   courtroom.
23             And ask government to call its next
24   witness.
25             MS. RODRIGUEZ-COSS:  We would like to
```

**GA934**

3737

1  call Mr. John Sardone.
2          MR. SHEEHAN:  Your Honor, while
3  Mr. Sardone is coming in, could we just approach?
4          THE COURT:  Yes.
5          (Sidebar conference)
6          MR. SHEEHAN:  I'm sorry, were you going
7  to give the jury a kind of timeframe today or just
8  through --
9          THE COURT:  Well, I gave them -- early
10  this morning I said that I thought that they would
11  have the case before the end of the week.
12          MR. SHEEHAN:  Okay.  That's fine.  Yeah,
13  I think that's fine.
14          THE COURT:  We're still on track.
15          MR. SHEEHAN:  Yeah.  And you don't have
16  to say anything else.
17          THE COURT:  And that it will be a little
18  sooner is yet to be seen.
19          MR. SHEEHAN:  Yeah.
20          MS. RODRIGUEZ-COSS:  Do you know what,
21  while we're up here, Mr. Sardone is supposed to be
22  away this week and he interrupted that trip to be
23  here today.  I don't expect to be long with him.
24          MR. SHEEHAN:  We're not going to be
25  long.

3738

1          MS. RODRIGUEZ-COSS:  I expect
2  45 minutes.
3          THE COURT:  Okay.
4          (Sidebar concluded)
5          THE COURT:  All right, you may proceed.
6  Please raise your right hand, sir.
7      J O H N   R.   S A R D O N E
8  Having first affirmed, was examined and testified as
9  follows:
10          THE WITNESS:  My name is John R.
11  Sardone, S-a-r-d-o-n-e, I live in New York City.
12          THE COURT:  You may proceed.
13  DIRECT EXAMINATION BY
14  MS. RODRIGUEZ-COSS:
15      Q.   And can you tell us, Mr. Sardone, how are
16  you employed?
17      A.   I'm employed as a forensic document
18  examiner with the Federal Bureau of Investigation.
19      Q.   How long have you been employed in that
20  capacity?
21      A.   With the FBI I've been employed
22  approximately 17 years.
23      Q.   As a documents examiner?
24      A.   That is correct.
25      Q.   And prior to that, sir, where were you

3739

1  employed?
2      A.   I was employed by the New York City Police
3  Department.  My last assignment was at the police
4  laboratory in the question documents unit.
5      Q.   And how long were you with that department,
6  sir?
7      A.   In the question documents unit, I was there
8  approximately 13 years.
9      Q.   Can you tell us about your educational
10  background.
11      A.   I have an applied Associate's of science
12  degree, awarded from New York City Community
13  College.  I have a Bachelor of Science degree
14  awarded from John Jay College of Criminal Justice,
15  and I have a Master's of Science degree awarded from
16  Saint Johns University.
17      Q.   And just to give the jury a bit of an idea
18  of how you develop your expertise in documents
19  examination.
20      A.   Basically I underwent a two-year
21  apprenticeship training at the New York City police
22  laboratory studying under court qualified and
23  certified document examiners.  I then underwent a
24  two-year independent research at the New York City
25  Police Department, again studying under court

3740

1  qualified document examiners.  I also attended two
2  courses sponsored by the FBI at their training
3  facility in Quantico, Virginia.  Two courses at
4  their Rochester Institute of Technology, the
5  advanced handwriting course sponsored by the
6  Tallahassee, Florida department, and also a survey
7  question documents which was a graduate course
8  offered by John Jay College of Criminal Justice.
9      Q.   During the course of your time -- during
10  the course of your career as a documents examiner,
11  have you had occasion to testify in court as an
12  expert document examiner?
13      A.   Yes, I have.
14      Q.   How many occasions, approximately?
15      A.   Approximately over 70 occasions.
16      Q.   Have you been offered as an expert
17  documents examiner and not accepted by a court?
18      A.   No, I have not.
19          MS. RODRIGUEZ-COSS:  Your Honor, we
20  would offer Mr. Sardone as an expert in documents
21  examination at this time.
22          MR. SHEEHAN:  No objection.
23          THE COURT:  All right, that
24  certification will apply and the jury has had the
25  previous instruction.

3741

1    MS. RODRIGUEZ-COSS:  Thank you.

2    Q.  Now, Mr. Sardone, can you please give the

3  jury of an idea what it is, the process you

4  undertake when you receive a document and are being

5  asked to try and ascertain who wrote that document.

6    A.  Basically the methodology involved in

7  handwriting identification is a four-stage process.

8  Initially the first stage would be the analysis

9  stage where the document is examined to see, number

10  one, if it's original; number two, if it's naturally

11  prepared; and number three, are there sufficient

12  characteristics within the item that was submitted

13  to lend for either identification or elimination.

14    Q.  All right, let me -- let's go over those

15  three again.

16    Why is it important to know whether the

17  document is an original document or not?

18    A.  It is extremely important that the document

19  be an original because on copies you do lose detail

20  and clarity in your handwriting.  Certain

21  characteristics that we look for, such as pen

22  pressure, various connecting strokes, are not seen

23  in copies that readily.

24    Q.  And then you said that you consider whether

25  it was -- it was freely and naturally prepared.

3742

1  What do you mean by that?

2    A.  By that I mean we look at the writing

3  itself to see if there is any interruptions, any

4  stops, any breaks, the presence of tremor, which

5  would indicate there is something wrong with the

6  handwriting.

7    Q.  And then you said you looked to see whether

8  the document contains sufficient characteristics for

9  comparison.  What did you mean by that?

10    A.  Certain characteristics in your handwriting

11  would be the way you begin or end a letter, how you

12  connect various letter, height relationships.

13  Basically they're characteristics that are repeated

14  in your handwriting.  And a document examiner, given

15  a sufficient known to compare to a question, can

16  reach a conclusion of either identity or

17  non-identity, but based on these individual

18  characteristics.

19    Q.  So, once you have examined the document and

20  you're convinced it is an original document, that

21  was freely and naturally prepared and contains

22  sufficient characteristics for comparison, what do

23  you proceed to do?

24    A.  First, the item that is in question, by

25  that I mean we do not know where that item -- that

3743

1  handwriting originated from, that is first done.

2  And then the same process is done to either

3  exemplars or samples of handwriting that we do know

4  where they come from, and those are designated as

5  knowns.

6    Q.  So, you take both the unknown writing as

7  well as the known writing through the same analysis;

8  is that correct?

9    A.  That is correct.

10    Q.  All right.  And so once you do that, what

11  do you proceed to do?

12    A.  The next stage of the examination would be

13  the comparison, a side-by-side comparison of both

14  the question and the known, again, looking at the

15  various characteristics that may or may not be

16  present in both the question and the known.

17    Q.  And when you are doing that side-by-side

18  comparison, what are you looking for?

19    A.  Again, you are looking for certain

20  characteristics that are in your handwriting, things

21  such as the way you begin a letter, end a letter,

22  how they are connected, the spacing, the slant.

23  These are some of the characteristics that I look

24  at.

25    Q.  And do you consider -- in reaching your

3744

1  conclusion, do you consider both similarities and

2  differences?

3    A.  Yes, that is correct.

4    Q.  So, let me bring your attention then to

5  what has been marked Government Exhibit 506 and 507.

6    Bringing your attention first to Government

7  Exhibit 506, can you tell me if you recognize that

8  document?  And you can remove that from the plastic

9  if it would make it easier for you to examine that.

10    A.  Yes, I recognize Government Exhibit 506.

11    Q.  And how do you recognize that?

12    A.  Both sheets of paper bear my designations,

13  again, dealing with question and known.  So, the --

14  in this particular case, Government's Exhibit 506 is

15  an item which were designated Q-5 and Q-6 and it is

16  on the document itself, and it also bears my

17  initials JRS.

18    Q.  So, when you receive a document that you

19  are being provided with for purposes of conducting a

20  comparison, you assign that document an

21  identification number; is that correct?

22    A.  That is correct.

23    Q.  And bringing your attention now to

24  Government Exhibit 507, do you recognize that

25  document?

**GA936**

3745

```
1     A.   I recognize Government's Exhibit 507 as
2  known samples of handwriting.  It bears the initial,
3  my initials, JRS, and it also bears my designation
4  K-1, meaning the author is known.
5     Q.   All right.  And did you have an opportunity
6  to conduct a comparison between Government's
7  Exhibits 506 and 507?
8     A.   Yes, I did.
9     Q.   And what conclusion, if any, did you reach?
10    A.   A reached a positive conclusion that the
11 samples that were provided for me in Government's
12 Exhibit 507, that author did prepare the exhibits in
13 Government's Exhibit 506, my Q-5 and Q-6.
14    Q.   I bring to your attention what has been
15 marked Government Exhibit 502 and 503.  Bringing
16 your attention first to Government Exhibit 502, can
17 you tell me if you recognize that exhibit?
18    A.   Yes, I do recognize Government's
19 Exhibits 502.  Again, this is question evidence that
20 was received by me, it contains the designation Q-9
21 and Q-10, meaning at the time that I first received
22 it, the evidence was unknown, the author was
23 unknown, and it also bears my initials, JRS.
24    Q.   And bringing your attention to Government's
25 Exhibits 503, do you recognize that exhibit?
```

3746

```
1     A.   Yes, I do.  I recognize Government's
2  Exhibits 503 as a known sample.  We do know at this
3  time where this sample originated from, has the
4  designation K-1, and it also has my initials, JRS.
5     Q.   Did you have an opportunity to conduct a
6  comparison between Government Exhibit 502 and
7  Government Exhibit 503?
8     A.   Yes, I did.
9     Q.   What conclusion, if any, did you reach?
10    A.   I reached a conclusion of positive
11 identification, that the author of the Government
12 Exhibit 503 did prepare the question writing on
13 Government Exhibits 502.
14    Q.   All right.  Bringing your attention to what
15 have been marked Government Exhibits 500 and 501.
16 Bringing your attention first to Government
17 Exhibit 500, can you tell me if you recognize that
18 document?
19    A.   I recognize five sheets in Government
20 Exhibits 501.
21    Q.   All right.
22    A.   There is one sheet here I don't recognize.
23    Q.   Which sheets do you recognize?
24    A.   The sheets that I recognize bear the
25 designations of Qs again.  It's Q-11, Q-12, Q-13,
```

3747

```
1  and Q-14.  Again, that's my designation of question
2  evidence and it also bears my initials.
3     Q.   And the last sheet inside that exhibit,
4  does not bear that designation; is that correct?
5     A.   That is correct.
6     Q.   All right.  Bringing your attention now to
7  what has been marked Government Exhibit 501, do you
8  recognize that document?
9     A.   Yes, I do.
10    Q.   And what is that?
11    A.   This is a -- Government Exhibit 501 is
12 known handwriting samples of -- that's been
13 designated as K-1 and it bears my initials, JRS.
14    Q.   All right.  And again, with respect to the
15 four items of evidence in Government Exhibit 500
16 that you do recognize and bear your initials, did
17 you have an opportunity to conduct a comparison
18 between that handwriting and the handwriting
19 contained in Government Exhibit 501?
20    A.   Yes, I did.
21    Q.   And what conclusions, if any, did you
22 reach?
23    A.   With the exception of the initials that
24 appear on the evidence that was designated as Q-14,
25 excluding that, those initials, everything else was
```

3748

```
1  identified as being prepared by the author of the
2  known writing in Government's Exhibit 501.
3     Q.   All right.
4          Let me bring to your attention what has been
5  marked Government Exhibits 504 and 505.
6          First, with regard to Government
7  Exhibit 504, can you tell me if you recognize that
8  document?
9     A.   Yes, I do.
10    Q.   And how so?
11    A.   Government Exhibits 504 has my designation
12 of Q-7 and Q-8 and it bears my initials, JRS.
13    Q.   And bringing your attention now to Q --
14 sorry.  To Government Exhibit 505, do you recognize
15 that exhibit?
16    A.   Yes, I do.
17    Q.   And how is that?
18    A.   Government Exhibits 505 are known samples,
19 they bear the designation K-1 and also my initials,
20 JRS.
21    Q.   And again, Mr. Sardone, let me ask you, did
22 you have an opportunity to compare the writing in
23 Government Exhibits 504 and 505?
24    A.   Yes, I did.
25    Q.   And what conclusion, if any, did you reach?
```

3749

1    A.   I concluded that the author of the known
2  sample K-1 in Government Exhibits 505 did prepare
3  the question writing on pages Q-7 and Q-8 in
4  Government Exhibits 504.
5    Q.   All right.
6         Let me ask you, Mr. Sardone, did you bring
7  with you some exhibits today?
8    A.   Yes, I did.
9    Q.   And what were they -- what are they?
10   A.   They are enlargements of portions of some
11 of the question writing and also portions of the
12 known writing to help demonstrate to members of the
13 jury and the Court how I reached my conclusions.
14        MS. RODRIGUEZ-COSS:  I would like to
15 proceed to use those at this time.
16        THE COURT:  All right, we're going to
17 need to rearrange people in the courtroom.
18        Mr. Smith, are you cross-examining on
19 this.
20        MR. SHEEHAN:  No, I am, your Honor.
21        THE COURT:  Mr. Sheehan.
22        MR. SHEEHAN:  Thank you.
23        THE COURT:  Would you like to reposition
24 yourself?
25        MR. SHEEHAN:  Yeah, that will be fine.

3750

1         THE COURT:  And then, Mr. Sardone, we
2  need to get these charts closer to the jury.  Would
3  you bring the microphone with you, please.
4         MS. RODRIGUEZ-COSS:  And there is a
5  pointer behind you I think would be useful if you
6  brought with you as well.
7         THE COURT:  In that way we'd occupy both
8  your hands.
9         THE WITNESS:  Thank you, your Honor.
10   Q.   All right.  So, Mr. Sardone, I'm bringing
11 your attention to what has been marked Government
12 Exhibit 509, could you tell the members of the jury
13 what we're looking at here?
14   A.   Basically this is four times enlargement of
15 portions of the question evidence and also the known
16 evidence.
17   Q.   All right.  And we see some little arrows
18 there on both portions of Government Exhibit 509,
19 what are those?
20   A.   Yes, those are indicators where I did find
21 similarities between the question and the known,
22 hopefully to help demonstrate to the members of the
23 jury some of the characteristics that I look at.
24        Again, I look at beginning strokes,
25 ending strokes, the way letters are connected from

3751

1  one letter to another, the spacing, the size of
2  letters.  These are some of the characteristics that
3  I look at.
4    Q.   And can you take us through those
5  similarities you have there pointed out there on
6  that exhibit.
7    A.   All right.  Again, we look at placement on
8  the line and also the way a particular letter is
9  ended.  If we look at the E in the question, we see
10 that that E is hovering or slanted on the leg of the
11 H.  If we also look at the E, again, in the -- in
12 the question, again it is hovering towards that H.
13 Bringing your attention to the known, in the --
14 again, the E is hovering on that leg of the H.  A
15 similarity, something -- the characteristic that the
16 author continuously does.
17        When the author ends an H, again, it's
18 referred to as a terminal stroke.  There is a little
19 hook, a little ending on bottom of the H in "how."
20   Q.   With your permission I'm going to move it
21 over.
22   A.   I'm sorry.
23   Q.   That's all right.  Go ahead.
24   A.   Can everyone see now?
25        THE COURT:  Can all the members of the

3752

1  jury see this?  Stand up if you need to.
2    A.   I left off at the endings of Hs.  So the H,
3  the ending of H, this little tic mark, this little
4  terminal stroke is under the O in "how."  If we look
5  at the terminal stroke of the H under "have," there
6  is a little tic mark for "how" in the question.  If
7  we look again, going down to the known, there is
8  that tic mark by the O for "how."  If we look for
9  "have," there is that little tic mark.
10 Characteristics repeating themselves.
11        In the word "easy" there is an upper case
12 A.  After the author finishes what's referred to as
13 cross bar, he immediately goes into this S.  The S A
14 combination.  We see that A T combination, the cross
15 bar into the T.  We see that A N combination in
16 "stand."  The author is finishing the A, going right
17 into his next letter.  A habit repeating itself.  We
18 go down into the knowns.  Again, we look for -- I
19 have to compare similar letter, letter combinations.
20 Here is the A N in "stand."  The A S in "easy."
21 That cross bar into the next letter.  Habits
22 repeating themselves.
23        Spacing we look at.  Look at the word
24 desperate."  D E S stop.  A little space, then the P
25 E R T.  Desperate.  D E S, stop, P E R S -- P E R.

3753

1 Habits repeating themselves.
2 The I dot. The author makes a -- the
3 sender, the I dot, and goes into his next letter for
4 "is." If we look at the "is" in the known, we see
5 that I dot into the next letter for "is." These are
6 some of the characteristics that I found both in the
7 known and the question to lead me to the
8 identification that this author prepared this
9 writing.
10 Q. And Mr. Sardone, this is a portion of
11 Government Exhibit 506.
12 A. That is correct.
13 Q. All right. Let me bring to your attention
14 to what has been marked Government Exhibit 510. And
15 just before you start that, let me just -- is that a
16 portion of Government Exhibit 500?
17 A. Yes, it is.
18 Q. All right. And go ahead, just walk us
19 through the similarities you found between the
20 Government Exhibit 500 and 501.
21 A. Again, if we look at certain
22 characteristics such as what's referred to as
23 connecting strokes, but they're also referred to as
24 drag strokes. We look at the lower case T into the
25 H. The author starts with a little tic mark and

3754

1 drags the cross bar into the H in "through," in
2 "things," in "through," in "things" in the question.
3 We go down to the known, there is that little tic
4 mark, that introductory stroke, drag stroke into the
5 H. In "through," in "things," in "through," in
6 "things." Habits repeating themselves.
7 The A, the upper case R A to another
8 letter. The A T in "that," the A R in "bear." In
9 the question, A S in "has" in the question looking
10 at the knowns A T in "that," A R in "bear." A S in
11 "has." The I dot in "is" in the question into the
12 next letter for "is." For this I dot drag stroke
13 into the S in the question. Looking at the known, I
14 dot in the "this," into the S. I dot into the S for
15 "is" right above it for "his." Again,
16 characteristics repeating themselves which led me to
17 identify the author of the known writing as
18 preparing the question writing.
19 Q. All right. Bringing your attention to what
20 has been marked Government Exhibit 508; is that a
21 portion of what was previously marked Government
22 Exhibit 502?
23 A. Yes.
24 Q. All right. What similarities did you find
25 between 502 and 503?

3755

1 A. Similarities, again, the A into the next
2 letter, it's an upper case A going into the next
3 letter for the "can," A N. "Car," A R, "can" A N,
4 "car," A R. The author also has a habit of pointing
5 a terminal stroke, placing it below the succeeding
6 letter after he writes the letter L. L D in
7 "should," here is the L D combination in "should."
8 Again, spacing, the S stop, a space for "should."
9 S, the space for "should." Here is the L D
10 combination in "could" in the question. The L D
11 combination for "could" in the known.
12 We're not machines. We don't write
13 exactly the same each and every time, and if I saw
14 two writings exactly the same I would know there is
15 some sort of manipulation, but there are certain
16 habits that repeat themselves in your handwriting
17 which leads me to believe or leads me to indicate a
18 known sample was produced in the question sample.
19 Q. Let me show you Government Exhibit 511.
20 And was that prepared from Government Exhibit 504?
21 A. Yes, it was.
22 Q. All right. Can you tell us what
23 similarities you found between 504 and 505?
24 A. Again, if we look at the combinations of
25 the upper case A to its succeeding letter, we look

3756

1 at the word "as," the A S combination in the
2 question, and the A S combination in the known. We
3 look at in "wasn't," A S combination in "wasn't," in
4 the known, the A S combination. That terminal
5 stroke of the L under the succeeding letter in
6 "old." That terminal stroke in the known under the
7 succeeding letter. The D. The spacing between the
8 double E in "seem." "Seem." The I dot in "his" in
9 the question, for "his." The I dot again for "his"
10 in the known. Again, the I dot for I N in
11 "dealing." I dot, I N combination in "dealing."
12 These are some of the characteristics that I
13 observed to lead me to the conclusion that the
14 author of the known writing did prepare the question
15 writing.
16 Q. Thank you. And I might have you go back.
17 MS. RODRIGUEZ-COSS: Your Honor, we
18 would like to submit Government's Exhibit 508, 509,
19 510 and 511 as summary charts prepared by
20 Mr. Sardone?
21 MR. SHEEHAN: No objection.
22 THE COURT: All right, they are full
23 exhibits.
24 MS. RODRIGUEZ-COSS: Thank you.
25 Q. Let me the bring your attention back to

3757

1  Government's Exhibit 506 and 507. You indicated or
2  pointed out to us some of the similarities you found
3  between those two documents. I want to ask you, did
4  you identify any differences?
5      A.  Any differences per se? There was things
6  that I couldn't identify such as the overwriting,
7  and cross-outs and also some of the upper case
8  lettering I didn't have.
9      Q.  So if you don't have a sample of a
10 particular or precise type of letter you can't
11 conduct a comparison?
12     A.  That's correct, you need the same letter to
13 letter combinations.
14     Q.  Were there any symbols used specifically in
15 Government Exhibit 506?
16     A.  Yes, there were.
17     Q.  All right. And let me put it back in the
18 podium perhaps and we can.
19         With respect to those symbols did you find
20 any differences?
21     A.  In this submission I found, yes, there were
22 differences, yes.
23     Q.  All right. Bringing your attention to
24 Government Exhibit 506, we talk about symbols, can
25 you see that there?

3758

1          MS. RODRIGUEZ-COSS: Can we Dimp the
2  lights a little bit, your Honor, perhaps?
3          THE COURT: Yes.
4      Q.  So, when you indicated that there was a
5  symbol that you found a difference, can you tell us
6  what that was?
7      A.  Yes.
8          THE WITNESS: Your Honor, may I step
9  down?
10     Q.  There is a longer pointer actually behind
11 you that may assist you better and you can stand up.
12     A.  This is the symbol that was not consistent
13 with the knowns. This ampersand sign.
14     Q.  Bringing your attention to Government
15 Exhibit 507, how is that symbol portrayed?
16     A.  You would see that.
17     Q.  So, that was a difference; is that correct?
18     A.  That is correct.
19     Q.  And why does that difference not lead you
20 to change your conclusion?
21     A.  My conclusion was basically on the
22 comparable writing that I had, and those are not
23 consistent, so I excluded them from my
24 identification.
25     Q.  And is that something that happens often,

3759

1  that you may find one particular characteristic
2  where you find a difference?
3      A.  Yes, there are occasions.
4      Q.  And when you mentioned previously
5  "overwriting," what were you talking about?
6      A.  Basically there is portions in that writing
7  where there is more than one line as an overwriting.
8  And then there is also areas that are obliterated.
9      Q.  Let me put that back on the screen for you,
10 see if you can tell what you mean by overwriting.
11     A.  On that line going to "put to death."
12 There is an obliterated area there. "Feed me,"
13 that's overwriting. Those will be the areas that I
14 was referring to. Up on top there is obliterated
15 between "snitch" and "false."
16         MS. RODRIGUEZ-COSS: We have nothing
17 further for Mr. Sardone, your Honor.
18         THE COURT: All right,
19 cross-examination.
20 CROSS-EXAMINATION BY
21 BY MR. SHEEHAN:
22     Q.  Good afternoon, Mr. Sardone.
23     A.  Good afternoon, Counselor.
24     Q.  In your experience have you seen situations
25 where people have tried to disguise their

3760

1  handwriting?
2      A.  Yes, I have.
3      Q.  And there is no evidence of that in this
4  case, is there?
5      A.  Not to -- no, I didn't identify.
6          MR. SHEEHAN: I don't have any further
7  questions.
8          THE COURT: Any redirect?
9          MS. RODRIGUEZ-COSS: No, your Honor.
10         THE COURT: All right, Mr. Sardone,
11 thank you very much. You may step down. You are
12 excused.
13         THE WITNESS: Thank you.
14         THE COURT: Will the government call its
15 next witness, please.
16         MR. MARKLE: The government calls
17 Special Agent Munger, your Honor.
18         THE COURT: All right, sir, please raise
19 your right hand.
20     C H R I S T O P H E R   M U N G E R
21 Having first affirmed, was examined and testified as
22 follows:
23         THE WITNESS: My name is Special Agent
24 Christopher Munger, it's M-u-n-g-e-r. Bridgeport,
25 Connecticut.

3761

1        THE COURT:  All right, you may proceed.
2        MR. MARKLE:  Thank you, your Honor.
3    DIRECT EXAMINATION
4    BY MR. MARKLE:
5        Q.   Special Agent Munger, can you tell us how
6    you are employed?
7        A.   I work for the FBI.
8        Q.   And for how long have you worked for the
9    FBI?
10       A.   About 15 1/2 years.
11       Q.   And prior to that did you have any law
12   enforcement experience?
13       A.   No.
14       Q.   And as an FBI agent what are your
15   responsibilities?  What are you assigned to
16   presently?
17       A.   I am currently assigned to the field
18   intelligence group in New Haven, but prior to that I
19   was assigned to the Bridgeport Safe Streets Task
20   Force.
21       Q.   And just briefly, what were the Safe
22   Streets Task Force responsibilities and duties?
23       A.   Responsibilities covered all gang, slash,
24   drug activity in Fairfield County.
25       Q.   And did there come a time when you were

3762

1    assigned to the prosecution that's the subject of
2    this trial?
3        A.   Yes.
4        Q.   And for how long have you worked on this
5    investigation?
6        A.   I believe I was assigned -- I joined the
7    task force in May of '06 and I was immediately
8    assigned to this case.
9        Q.   And were you familiar with an individual by
10   the name of Azikiwe Aquart?
11       A.   Yes, I was.
12       Q.   And were you present when he was arrested?
13       A.   Yes, I was.
14       Q.   And could you tell us where that happened
15   and when?
16       A.   That happened at -- it happened on May 24th
17   of 2006 and it was at a hip-hop shop on Grand
18   Avenue, or Grand Street, in Bridgeport.
19       Q.   And was he arrested based on -- was there a
20   warrant that had been issued for his arrest?
21       A.   Yes, there was.
22       Q.   And did you help execute that arrest?
23       A.   Yes, I did.
24       Q.   And at the time he was arrested, what, if
25   anything, was seized from -- were any cell phones

3763

1    seized from Mr. Aquart?
2        A.   Two cell phones were seized from Azikiwe
3    Aquart.
4        Q.   And did you or members of your arrest team
5    take those into possession?
6        A.   Yes.
7        Q.   And who was responsible for maintaining
8    those cell phones once they were seized from
9    Mr. Aquart?
10       A.   I was.
11       Q.   And what, if anything, did you do with
12   those phones after you seized them?
13       A.   They were logged into evidence and
14   eventually a search warrant was conducted on those
15   phones.
16       Q.   When the you say "logged into evidence,"
17   were they secured in a safe place?
18       A.   They were secured in a safe place, yes.
19       Q.   Were they maintained subsequently by the
20   FBI?
21       A.   Yes.
22       Q.   And was anyone allowed to, after you were
23   in possession of them or after you secured them, do
24   anything to the phones, to touch the phones?
25       A.   No.

3764

1        Q.   And when you say a search warrant was
2    obtained, do you recall when a search warrant was
3    obtained for the phones?
4        A.   It was September of 2009.  I don't know the
5    exact date.
6        Q.   And what did the search warrant allow you
7    to do in regards to the phones seized from
8    Mr. Aquart?
9        A.   It allowed me to search the contents of the
10   phone, the electronic contents.  So that would be
11   the address book, recent phone calls, any
12   information, descriptive information, recent calls,
13   incoming, outgoing phone calls, all that kind of
14   stuff.
15       Q.   Were you there when the search was
16   performed of the phone?
17       A.   Yes, I was basically the one who did it.
18       Q.   I'm sorry?
19       A.   I was the one who conducted the search.
20       Q.   And that that was pursuant to a court
21   authorization?
22       A.   Yes.
23       Q.   When you say you searched the contacts or
24   the address book, what does that mean?  What's in
25   there?

3765

```
1        A.   In the address book in any cell phone when
2   you store -- if I was to store your name I would
3   scroll through it, see your name, identify your
4   name, and then the number that corresponds with it.
5   And I went through from A to Z on the contents of
6   the address book, which was one portion.
7        Q.   And do you know what the telephone number
8   was for that phone?
9        A.   There were two phones.
10       Q.   Okay.  Were both phones searched?
11       A.   Yes.
12       Q.   Were both -- did both reveal significant
13  information to you?
14       A.   Yes.
15       Q.   And what was that information?
16       A.   The contents of the phone, like the address
17  book, there were significant numbers located within
18  the address book stored.
19       Q.   And what -- for instance, tell us what that
20  was that was of significance to you in your
21  investigation.
22       A.   One of them was the name Puty or Put and
23  Put Two.
24            MR. SMITH:  Object, your Honor.  Is he
25  talking about what the phone says itself?
```

3766

```
1            MR. MARKLE:  Yes, exactly.
2            MR. SMITH:  May we approach?
3            THE COURT:  Yes.
4            (Sidebar conference)
5            MR. SMITH:  Are there cell phone
6   captures of this like with Judith's phone?
7            MR. MARKLE:  I don't think they're
8   printed out.
9            MR. SMITH:  Okay.  I've never received
10  any documents.
11           MR. MARKLE:  His record says that Put's
12  number.  Why do you guys keep saying you don't have
13  it?
14           MR. SMITH:  I'm just saying I don't know
15  if these are cell phone captures.  Again, I haven't
16  seen anything.  I haven't seen the search warrant,
17  that I'm aware of.  I'm not saying you didn't
18  provide it, I'm not accusing you of that.
19           MR. MARKLE:  I'm sorry, but this phone
20  he did observe Put that he'll testify to, and you
21  have that in a report, the 302.
22           (Sidebar concluded)
23       Q.   Special Agent Munger, you were about to say
24  what you saw in the contacts or the address book
25  that was significant to you.
```

3767

```
1        A.   I saw -- one of the things that jumped out
2   at me was Put and Put 2, and there are phone numbers
3   ascribed to them.
4        Q.   When you say "Put," p-u-t?
5        A.   P-U-T.
6        Q.   Why was that significant to you?
7        A.   At the time I did the search warrant the
8   name, nickname, street name Pootney was relevant to
9   me.
10       Q.   How is it relevant to you?
11       A.   Because it is the street nickname for --
12           MR. SMITH:  Objection.  Hearsay.
13           THE COURT:  Basis?
14           MR. SMITH:  Hearsay.
15           MR. MARKLE:  It's been established.  But
16  it's not offered for the truth at this time, it's
17  offered for why it's significant to this agent.
18           THE COURT:  All right, for that limited
19  purpose then I will permit it.
20           MR. MARKLE:  Thank you.
21       Q.   What did you understand Put to refer to?
22       A.   Short for Pootney, which was Efrain
23  Johnson.
24       Q.   And what was the number next to Put in
25  Azikiwe Aquart's telephone contacts?
```

3768

```
1        A.   I would have to --
2            MR. MARKLE:  If I may have a moment,
3   your Honor.
4        Q.   Did you prepare a 302 or report concerning
5   your review of the telephone?
6        A.   Yes.
7        Q.   If I showed you your 302, would that
8   refresh your recollection?
9        A.   Yes.
10       Q.   Ask you to take a look at that report and
11  see if that refreshes your recollection.
12       A.   Yes, it does.
13       Q.   And does that reflect the name that you are
14  referring to, Put, p-u-t?
15       A.   Yes, it does.
16       Q.   And is there a phone number that you recall
17  being associated with that in the contacts of
18  Azikiwe Aquart's phone?
19       A.   Yes.
20       Q.   And what was that number?
21       A.   Under Put it was 549-4624.
22       Q.   And was there another number that was
23  significant?
24       A.   For Puty 2, which was, P-u-t-y 2, it was
25  203-543-2540.
```

3769

1    Q.   In the course of your investigation had you

2  learned whether or not Mr. Efrain Johnson had more

3  than one cell phone?

4    A.   Yes.

5    Q.   How did you know that?

6    A.   It was determined during interviews that he

7  had carried two different cell phones.

8    Q.   Was there anything else significant in the

9  contacts of Mr. Azikiwe Aquart's phone?

10   A.   Yes, there was a listing there for Z.

11   Q.   Do you remember what that number is, or do

12  you need to refresh your recollection?

13   A.   615-8307.

14   Q.   That was next to the number -- the letter

15  Z?

16   A.   Just the letter Z.

17   Q.   Does Z have any significance to you based

18  on your investigation?

19   A.   Yes, determined that was --

20       MR. SMITH:  Objection.  This is hearsay

21  again, your Honor.

22       MR. MARKLE:  Again it's offered for the

23  same purpose, your Honor, not for the truth of the

24  matter, but to show why that number was something of

25  significance to him.

3770

1        THE COURT:  Do you understand that

2  limitation then?  It is only because in his

3  investigation or throughout -- through his

4  investigation he associated the Z or the Put with

5  these numbers, not that actually -- not the truth of

6  the fact that they were actually associated.  Okay?

7  So that's the limitation for both of those.

8        MR. MARKLE:  Thank you, your Honor.

9        THE COURT:  Okay.  Did we get the answer

10  on that?

11       THE WITNESS:  Should I answer it?

12   Q.   I thought we did, but, I'm sorry, yes, then

13  you can.

14   A.   The number that was associated with Azikiwe

15  Aquart.

16       MR. SMITH:  I'm sorry, your Honor, I'm

17  not clear on that.

18   A.   Through the course of my investigation I

19  learned that that number was used by Azikiwe Aquart.

20       THE COURT:  That was not what the

21  question was.  The question was --

22   Q.   What was the significance of Z to you based

23  on your investigation up 'til that time?

24       MR. SMITH:  Objection, your Honor, I'm

25  going to ask that that be stricken, the last answer.

3771

1        THE COURT:  It may be.  It will be.

2  Please disregard it.

3    Q.   What did you understand Z -- who did you

4  understand Z to refer to based on your

5  investigation?

6        MR. SMITH:  Objection, relevance.

7        THE COURT:  Overruled.

8    A.   I understood Z to be Azikiwe Aquart.

9    Q.   And showing you Government's Exhibit 269

10  and 270, do you recognize the telephones that are

11  269 and 270?

12   A.   Yes.

13   Q.   And how recognize those?

14   A.   Those were the cell phones that were taken

15  at the time of the arrest of Azikiwe Aquart.

16   Q.   And other than performing -- in addition to

17  the search warrant that was performed, did you

18  inspect one or both of those phones?

19   A.   Yes, in order to do the search warrant --

20  or what I did for the search warrant is I also took

21  as many identifying factors -- identifying features

22  off of the phone, like serial numbers, MZ numbers,

23  SIM card numbers, to help with the identification.

24  In order to do that, usually you have to take apart

25  the phone.

3772

1    Q.   And is there what is known as an

2  international mobility equipment identifier number?

3    A.   Yes.

4    Q.   And did you look for that, that's commonly

5  called an IMEI?

6    A.   We call it an MZ, but, yes.

7    Q.   You call it what?

8    A.   MZ number, but yes, you are correct.

9    Q.   Did you look for that or ascertain that as

10  to either phone?

11   A.   Yes, for both.

12   Q.   As to the phone that had Put and had Z and

13  the numbers you just indicated next to it, did you

14  get an IMEI number?

15   A.   Yes.

16   Q.   And what kind of phone is that?

17   A.   This is a T-Mobile phone, Motorola.

18   Q.   And what number is that, what exhibit

19  number is that?

20   A.   269.

21   Q.   And in regards to that phone, can you tell

22  us what the IMEI number is on that?

23   A.   Yes, if I could just take this apart.

24       IMEI number for this phone is

25  0102800020496130.

3773

```
1      Q.   Thank you.
2           Now, in addition to seizing the two phones
3   from Azikiwe Aquart, did you also have occasion to
4   be present when Efrain Johnson was arrested?
5      A.   Yes, I was.
6           THE COURT:  I'm sorry, seized the phones
7   from Azikiwe or Azibo?
8           MR. MARKLE:  Azikiwe.
9           THE COURT:  Okay.
10          MR. MARKLE:  Did I misspeak before?
11          THE COURT:  No.
12     Q.   Those two phones were from Azikiwe Aquart,
13  correct?
14     A.   Azikiwe, yes.
15     Q.   Now, in addition -- well, as to Efrain
16  Johnson, were you present when he was arrested?
17     A.   Yes, I was.
18     Q.   And do you recall the date of that arrest?
19     A.   March 6, 2007.
20     Q.   And do you recall where that -- where did
21  that take place?
22     A.   It followed a controlled purchase on East
23  Main Street.  It ended up being at the corner of
24  Noble and, I believe, Beecher Street.  It was -- we
25  stopped the car as it was moving.
```

3774

```
1           MR. MARKLE:  Before I forget, your
2   Honor, I would offer 269 and 270 as full exhibits.
3           MR. SMITH:  No objection.
4           THE COURT:  Full exhibits.
5      Q.   And when he was arrested, did you have an
6   arrest warrant?
7      A.   Yes, we did.
8      Q.   That was issued by a federal judge?
9      A.   Yes.
10     Q.   Federal court.  And was Mr. Johnson placed
11  under federal arrest?
12     A.   Yes, he was.
13     Q.   And shortly after he was arrested, or at
14  that time, close in time, was he searched?
15     A.   Yes.
16     Q.   And were any cell phones -- what was he
17  arrested for?
18     A.   He was arrested for selling crack cocaine.
19     Q.   And were any cell phones seized from
20  Mr. Johnson at the time of his arrest?
21     A.   Yes.
22     Q.   And who took possession of those cell
23  phones?
24     A.   I took possession of those cell phones.
25     Q.   And do you recall, was it one or more?
```

3775

```
1      A.   It was two.
2      Q.   And do you recall what types?
3      A.   Not off the top of my head.
4      Q.   Did you maintain possession of that cell
5   phone after he was arrested?
6      A.   The cell phones were processed and put into
7   evidence.
8      Q.   And secured so people could not tamper?
9      A.   Exactly.
10     Q.   Or have access to them?
11     A.   Yes.
12     Q.   And did you ever do anything to remove or
13  change the SIM card in either of those phones?
14     A.   No.
15     Q.   Did you examine those phones at a later
16  date?
17     A.   We never actually executed a search warrant
18  on those phones.
19     Q.   Did you ever examine them to obtain the
20  IMEI number or the SIM card number?
21     A.   Yes.
22     Q.   Did you in fact have a -- get a SIM card
23  number from that phone?
24     A.   Yes.
25     Q.   And do you recall what the SIM card number
```

3776

```
1   was?
2      A.   No, I would need to see that.
3      Q.   I'm going to show you what's been marked
4   Government Exhibit 271 and 272, ask you if you
5   recognize these two cell phones?
6      A.   Yes, I do.
7      Q.   And are those the two phones you seized
8   from Efrain Johnson?
9      A.   Yes.
10     Q.   And in regards to the silver phone, what
11  number is that?
12     A.   That is Government's Exhibit No. 271.
13     Q.   And have you previously or could you now
14  open that phone and tell us what the SIM card number
15  is for that phone?
16     A.   I can.  Okay, it's right here, it is
17  000808318478300.
18     Q.   Thank you.
19          And that's the SIM card in the silver
20  Motorola cell phone?
21     A.   Yes.
22     Q.   And that's exhibit No. -- I'm sorry, once
23  again?
24          THE COURT:  271.
25     A.   271.
```

3777

1    Q.   And that phone, Special Agent Munger, was
2  never subjected to a full search of all contacts and
3  addresses in it.
4    A.   No, it was not.
5        MR. MARKLE:  May I just have one moment?
6    Q.   Special Agent Munger, as to the other
7  phone, was that phone searched?  Was that phone
8  searched?
9    A.   It was in the same capacity this one was,
10 but there was no search warrant executed on each one
11 of these.
12   Q.   Just for identifying information.
13   A.   Yes.
14   Q.   But no full search of contacts or address
15 book.
16   A.   No.
17   Q.   Do you know why that was not pursued?
18   A.   I don't recall.  I think at the time we put
19 it into evidence and were going to do a search
20 warrant and it didn't become important at that time.
21   Q.   But you did note the SIM card number and
22 any other identifying numbers of either of those
23 phones; is that correct?
24   A.   Yes.
25   Q.   Thank you.

3778

1        THE COURT:  All right, if you are
2  finished, cross-examination.
3        Your Honor, I think I failed to move
4  those in as full exhibits like I did before.  May I
5  now?
6        THE COURT:  Yes.
7        MR. SMITH:  Again your Honor, I most
8  graciously will permit them.
9        THE COURT:  Yes, Mr. Smith gets gracious
10 points today.
11       MR. SMITH:  I'm sorry, your Honor, could
12 I just have a moment?
13       THE COURT:  Yes.
14 CROSS-EXAMINATION
15 BY MR. SMITH:
16   Q.   Agent Munger, the second phone that you
17 seized from Azikiwe Aquart.
18   A.   Yes.
19   Q.   The phone number for that phone, do you
20 recall it?
21   A.   Not off the top of my head, I have to see
22 the --
23   Q.   You were present at the arrest of Efrain
24 Johnson.
25   A.   Yes.

3779

1    Q.   He was arrested along with another person.
2    A.   With two other individuals.
3    Q.   With two other individuals.
4        MR. SMITH:  No further questions.  Thank
5  you, your Honor.
6        I'm sorry, your Honor, if I may have just
7  a moment.
8    Q.   Do you think looking at your report might
9  refresh your memory as to the second phone that you
10 searched?
11   A.   Yes.
12   Q.   And does looking at that refresh your
13 memory as to the second number?
14   A.   Yes.
15   Q.   What is that number?
16   A.   203-953-5068.
17       THE COURT:  That's as to Exhibit 270?
18       MR. SMITH:  I believe so, your Honor.  I
19 have no further questions your Honor.
20       THE COURT:  Any redirect?
21       MR. MARKLE:  Just very briefly.
22 REDIRECT EXAMINATION
23 BY MR. MARKLE:
24   Q.   Special Agent Munger, two other people were
25 arrested with Efrain Johnson?

3780

1    A.   Yes.
2    Q.   But the two phones you just testified
3  about, who were they seized from?
4    A.   They were seized from Efrain Johnson.
5        MR. MARKLE:  Nothing further.
6        THE COURT:  All right, Agent Munger,
7  thank you.  You may step down.
8        MR. SMITH:  I'm sorry, your Honor, I did
9  have brief recross.
10       THE COURT:  All right.
11 RECROSS EXAMINATION
12 BY MR. SMITH:
13   Q.   Was any telephone ever seized from Azibo
14 Aquart, to your knowledge?
15   A.   I'm sorry?
16   Q.   Any phone seized from Azibo Aquart, to your
17 knowledge?
18       MR. MARKLE:  Objection, your Honor,
19 that's obviously beyond the subject of redirect.
20       THE COURT:  It is.
21       MR. SMITH:  Thank you, your Honor.
22       THE COURT:  All right, you are excused.
23 You may step down.
24       Who is the government's next witness?
25       MR. MARKLE:  Detective Caruso, your

**GA945**

3781

1  Honor, but --
2          MR. SHEEHAN:  Your Honor, in light of
3  the fact we have four minutes, I wonder if -- we
4  could break early?
5          MR. MARKLE:  I could introduce him.
6          THE COURT:  I don't know.  We want to
7  maximize every minute of the jury's time.  All
8  right.
9          MS. RODRIGUEZ-COSS:  Your Honor, in that
10 regard, we had previously offered Exhibit 500, 502
11 subject to connection.  We believe we've provided
12 that connection, we would like to submit them as
13 full exhibits now.
14         THE COURT:  Let me excuse the jury, they
15 don't need to be here for this exciting exchange.
16         So I will see you tomorrow at 9:30.  Have
17 a pleasant afternoon, although it's a bit drizzly.
18         (Jury exited the courtroom.)
19         THE COURT:  All right, the conditional
20 exhibit you said was 500?
21         MS. RODRIGUEZ-COSS:  Yes, ma'am.
22 Through -- well, Lashika Johnson.  It was submitted
23 through Lashika Johnson.
24         THE COURT:  All right.  Any objection to
25 500 as a full exhibit now?

3782

1          MR. SHEEHAN:  No, your Honor.
2          THE COURT:  All right, 500 is in as a
3  full exhibit.  And that was all.
4          MS. RODRIGUEZ-COSS:  And 502.  That was
5  today, Captain Viadero testified and then we
6  provided additional foundation through Mr. Sardone.
7          MR. SHEEHAN:  Your Honor, I think the
8  only thing that comes in through him is the letter
9  itself.  I don't know if they're offering the
10 envelope.  He certainly didn't claim the envelope.
11         THE COURT:  Did not claim what?
12         MR. SHEEHAN:  The envelope.
13         THE COURT:  So 502, the letter itself,
14 there is no objection, and that will be in as a full
15 exhibit.
16         MS. RODRIGUEZ-COSS:  Your Honor, we
17 would submit that while we certainly did not make a
18 claim that we compared the writing on the envelope,
19 the letter was found inside that envelope.  It was
20 properly identified by Captain Viadero.  The letter
21 inside the envelope was identified as the
22 defendant's handwriting, and we would submit the
23 government exhibit should come in completely.
24         THE COURT:  What if they were separated
25 out so that distinction is made clearer?

3783

1          MR. SHEEHAN:  To whom, your Honor?
2          THE COURT:  To the jury.  So that 502,
3  because that was the number used in Mr. Sardone's
4  testimony, comes in as 502 and the envelope comes in
5  as 502A.
6          MR. SHEEHAN:  I don't think the envelope
7  should come in at all, your Honor.
8          THE COURT:  Well, what do you do
9  about --
10         MR. SHEEHAN:  There is no foundation for
11 the envelope.
12         THE COURT:  But Captain Viadero's
13 testimony was that they -- when they executed the
14 search warrant, that this is what he found, the
15 envelope with the letter in it.
16         MS. RODRIGUEZ-COSS:  Correct.
17         MR. SHEEHAN:  But this is months after
18 all of these events, your Honor.  The fact that
19 there is something in an envelope -- the handwriting
20 person not only didn't claim that it was
21 Mr. Aquart's -- he wasn't identifying that as from
22 Mr. Aquart.
23         MS. RODRIGUEZ-COSS:  And Mr. Sheehan
24 will be free to point that out to the jury, but the
25 letter was relevant.

3784

1          THE COURT:  What relevance does it have?
2          MS. RODRIGUEZ-COSS:  Well, your Honor.
3          THE COURT:  What if it was a manilla
4  envelope?
5          MS. RODRIGUEZ-COSS:  No, I think it's --
6  well, if it was simply a manilla envelope it may not
7  have much relevance, but this particular letter
8  happened to come from a correctional facility where
9  Mr. Aquart was housed.  So I think that makes it
10 very relevant that the letter in there is his
11 handwriting.
12         THE COURT:  But that's exactly what you
13 don't have, is that the letter -- the handwriting on
14 the envelope.
15         MS. RODRIGUEZ-COSS:  The letter came
16 from a correctional facility via the post office.
17 Inside that envelope, that's what we have in
18 evidence.  That's what we found.  We found that
19 letter inside that envelope.  We can't erase the
20 evidence envelope.
21         MR. SHEEHAN:  We have no way of knowing
22 whether that envelope came there in -- whether that
23 letter came there in that envelope than she does.
24 She can't do that, your Honor, because she doesn't
25 know.

3785

```
 1          MS. RODRIGUEZ-COSS:  It's called a
 2   reasonable inference, your Honor.
 3          THE COURT:  I don't know why based
 4   solely on Captain Viadero's testimony that that --
 5   you are saying that because the letter inside is
 6   identified to the defendant and because the envelope
 7   came from a correctional facility and Mr. Aquart was
 8   housed at a correctional facility at that time,
 9   that's what's the reasonable inference?
10          MS. RODRIGUEZ-COSS:  That the letter
11   came in that envelope.  That the letter was in fact
12   mailed in that envelope.  He -- Viadero seized it as
13   he found it, the letter inside the envelope.  And in
14   fact what called his attention to the letter was the
15   fact that it came from a correctional facility.  So
16   doesn't that make it more likely that the defendant
17   did indeed write the letter, which is a disputed
18   fact in this case?
19          MR. SHEEHAN:  Your Honor, the letter --
20   the issue is not -- the handwriting person has
21   testified that it was Mr. Aquart's handwriting on --
22          THE COURT:  The letter.
23          MR. SHEEHAN:  The letter.  So at this
24   moment in time that's in evidence.  The envelope,
25   there was no identification of the envelope as
```

3786

```
 1   coming from Mr. Aquart.  In fact, the envelope, the
 2   handwriting person was not asked that question, and
 3   his report indicates that he doesn't know.  So,
 4   that's why -- I assume that's why they didn't ask
 5   it.  But in any case, that doesn't establish that
 6   the envelope comes in.
 7          THE COURT:  But I don't understand if
 8   the testimony was I executed the search warrant, I
 9   found this, this is the way it came, why the two
10   things don't come in just separately marked.
11          MR. SHEEHAN:  The way it came, Viadero
12   doesn't know how it came.
13          THE COURT:  He knows how he found it.
14          MR. SHEEHAN:  Viadero knows whenever he
15   did the search that's how he found it.
16          THE COURT:  Right.
17          MR. SHEEHAN:  He doesn't know how it
18   came there.  He doesn't know where it's mailed from.
19   He has an envelope with a letter in it, an opened
20   envelope with a letter in it.
21          THE COURT:  Yes.
22          MR. SHEEHAN:  That's all he's got.
23          THE COURT:  But that's what the exhibit
24   is.
25          MR. SHEEHAN:  The letter is the -- the
```

3787

```
 1   letter -- the handwriting person has the foundation
 2   to link the letter to Mr. Aquart.  Okay.  So the
 3   letter comes in.  The handwriting person does not
 4   link --
 5          THE COURT:  That's why I'm separating
 6   the two.
 7          MR. SHEEHAN:  Yeah, I'm not fighting the
 8   letter.
 9          THE COURT:  No, no.  But it seems to me
10   that the exhibit should come in as it was found.
11   But to make the distinction that you are trying to
12   make we should have 502 and 502A.  502A is how we
13   will designate the envelope.
14          MR. SHEEHAN:  Well, I would just object
15   to 502A and so the record reflects that.
16          THE COURT:  Okay.
17          Anything else?  Who else will we have
18   tomorrow?
19          MR. MARKLE:  Detective Caruso, Detective
20   Donaldson, and Lauren Dellavolpe and Lativia
21   Whittingham, your Honor.  It all pertains to the
22   phone issues.  And then we will have the medical
23   examiner.
24          MS. REYNOLDS:  Medical examiner, Dr.
25   Susan Williams also who did the autopsy of Basil
```

3788

```
 1   Williams.
 2          And, your Honor, in that regard, I turned
 3   over some additional photographs to the defense and
 4   I have copies for your Honor's book, which I'm
 5   preparing the tabs for as we speak.  I'll pass those
 6   up to Patty when I'm done.
 7          She may be using a skull.  But she's
 8   unable to use the plastic skull, but she'll use the
 9   photos of the inside of the head.  Counsel had them
10   before, but I provided them to counsel, the ones we
11   intend to use.
12          THE COURT:  So the telephone witnesses
13   are Dellavolpe and who else?  Just Ms. Whittingham?
14          MR. MARKLE:  Lativia Whittingham
15   Detective Donaldson.
16          THE COURT:  Donaldson.
17          MR. MARKLE:  And Detective Caruso.
18          THE COURT:  He's also a telephone
19   witness?
20          MR. MARKLE:  Yes, your Honor.
21          THE COURT:  Okay.  All right.  And then
22   in addition to that, and Ms. Williams --
23   Dr. Williams, will that get us through tomorrow?
24          MR. MARKLE:  I don't think so, your
25   Honor.  I mean, we'll get the government through the
```

3789

1    end of its case, but I don't think it will take the
2    whole day.
3            MS. REYNOLDS:  It should be relatively
4    quick.
5            THE COURT:  Who will be the defendant's
6    first witness?
7            MR. SMITH:  Well, your Honor, the
8    government has just spoken to me.  We had subpoenaed
9    Detective DelMonte for tomorrow afternoon.  There is
10   an issue with him in terms of his, I guess some
11   medical issues.  But I was going to discuss that
12   with a little more detail with the government.
13           THE COURT:  Okay, so who is plan B?
14           MR. SMITH:  I suppose either Agent
15   Munger or Agent Syrax, if he is present.
16           THE COURT:  Does that get us into the
17   issue we started discussing on Friday, about prior
18   inconsistent statements, and have you done something
19   on that?
20           MR. SMITH:  All three of those witnesses
21   will get us into that issue, your Honor.  And I did
22   file something Saturday on that issue.
23           MR. SHEEHAN:  The government has also
24   filed something, your Honor.
25           THE COURT:  But it wasn't something

3790

1    that, as I remember, allowed me to make much of a
2    meaningful ruling to help you.
3            MR. SHEEHAN:  I don't think, your Honor,
4    can realistically, under the circumstances, short of
5    us detailing, as the government has requested and as
6    I think is not warranted, the questions that we
7    intend to ask.
8            THE COURT:  All right.  Let me ask.  Can
9    you tell me, because I'm now developing quite a
10   stack of notes, which witnesses -- which law
11   enforcement witness goes with --
12           MR. SHEEHAN:  Your Honor, I'm not quite
13   sure why we have to do that.  I guess we don't.
14           THE COURT:  Well, then, we'll just take
15   a lot of time when we get the first objection.  You
16   don't have to do it.  That's how we'll do it.
17           MR. SHEEHAN:  Right.
18           MS. RODRIGUEZ-COSS:  Your Honor, may we
19   address that issue?
20           THE COURT:  I'm not going to make them
21   tell you exactly what they're going after.
22           MS. RODRIGUEZ-COSS:  Well, your Honor,
23   they don't need to tell us exactly what they're
24   going after.  We know they're going after prior
25   inconsistent statements and the cases demonstrate

3791

1    that the defense generally makes a proffer to the
2    Court that places the Court in a position to make a
3    decision whether or not the statement is in fact
4    inconsistent.  Two, you know, whether or not the
5    evidence or the testimony to which they are bringing
6    in the statement is admissible, whether it's to a
7    collateral matter, and therefore --
8            THE COURT:  I understand that.  I think
9    it's a question of timing.
10           MS. RODRIGUEZ-COSS:  Well, your Honor,
11   we've only just heard a couple days ago, through a
12   subpoena of government agents, that the defense had
13   an intent to do this.
14           THE COURT:  I understand that.
15           MS. RODRIGUEZ-COSS:  We immediately
16   requested compliance with the subpoena, which I'm
17   not even certain we had so far.  They're required to
18   alert the agency what questions they will pose to
19   the agent to make sure their questions will not
20   invade any sort of investigative privilege or any
21   other privilege the agency may seek to protect.
22           MR. SMITH:  If I may, your Honor.
23           THE COURT:  Tell me about that.
24           MR. SMITH:  If I may.  I was contacted
25   by counsel for the FBI asking for some

3792

1    clarification.  I provided that.  I have received no
2    indication that that was insufficient at this point.
3            MR. SHEEHAN:  I also think that's
4    arguably unconstitutional.  They can't -- the
5    government has no right to sequester its witnesses
6    or require for purposes of cross-examination
7    somebody to identify each area of questioning so
8    that their witnesses can then prepare in advance.
9    That isn't warranted.  And I think that's what
10   they're -- to the extent they're asking for that,
11   there is no merit to that.
12           MS. RODRIGUEZ-COSS:  I think defense
13   counsel is experienced enough to know that when it
14   comes to government agents there is a statute that
15   applies that requires them to place the agency on
16   notice as to what questions they will ask so that
17   the agency may assert any privilege it may have
18   under the law.  That's well established.
19           THE COURT:  What's that statute, please?
20           MS. RODRIGUEZ-COSS:  It's code of
21   regulations.  I don't have the specific cite right
22   here in front of me, but the Code of Federal
23   Regulations provide --
24           THE COURT:  I don't remember seeing that
25   in your brief.

3793

1      MR. SHEEHAN:  They haven't moved to
2  suppress it, your Honor.
3          THE COURT:  Pardon me?
4          MR. SHEEHAN:  There has been no motion
5  to quash the subpoenas and I think that we have done
6  more than we had to with respect to the agency.
7  What we have --
8          THE COURT:  What did you do?
9          MR. SHEEHAN:  What we've told the agency
10 is that we want to cross-examine these people with
11 respect to statements that they took from witnesses
12 in the context of this case.  To the extent that
13 they ask more and say, well, what question do you
14 want to ask this person about that statement, I
15 think that invades our rights, the defendant's
16 rights under the Sixth Amendment.  That's basically
17 what they're asking for with respect to this idea of
18 a proffer.
19         MS. RODRIGUEZ-COSS:  Very well, your
20 Honor, if the defense is going to limit this
21 questioning of government agents to prior interviews
22 of government witnesses, that's fine.  And I don't
23 think they need to tell us exactly each question
24 that they will ask the agent.  However, for the
25 Court to conduct its analysis, I think the Court's

3794

1  question is fair, what agent will be cross-examined
2  with respect to what witness, and exactly what
3  statements it is they consider are inconsistent and
4  material to this case.  Otherwise --
5          THE COURT:  I may need to know that, but
6  I'm not going to require it now.
7          MS. RODRIGUEZ-COSS:  All right.
8          MR. SHEEHAN:  There was one other issue,
9  your Honor, that had been raised, but I think is
10 resolved, was a claim that -- in the chambers
11 conference that the government was making that if a
12 witness said they did not recall, that somehow or
13 another that was not an inconsistency.  And I think
14 that the case law on that is clear.  They don't seem
15 to be challenging that issue.
16         MS. RODRIGUEZ-COSS:  We did challenge it
17 in our submission.  The defense asserted --
18         THE COURT:  Wait, let me find that in
19 your submission.
20         MS. RODRIGUEZ-COSS:  I believe it's the
21 United States v. Lombardi from the Second Circuit.
22 I believe.
23         THE COURT:  And that's in your brief?
24 I'm not seeing it.
25         MS. RODRIGUEZ-COSS:  Your Honor, in the

3795

1  section where it says number one, whether the
2  statement is inconsistent, paragraphs 2 and 3,
3  provide examples of what may or may not be
4  inconsistent statements.  And one of those, either
5  paragraph 2 or 3, refers to a claimed lack of
6  memory.  And it is for the Court to decide whether
7  the claimed lack of memory is in good faith or
8  whether it is an attempt by the witness to avoid
9  addressing the prior inconsistent statement.
10         THE COURT:  Is that possibly U.S. v.
11 Insana.
12         MS. RODRIGUEZ-COSS:  Yes, ma'am, I think
13 so.
14         THE COURT:  Let me look at your
15 citations.  And for the time being we're just where
16 we are.  If you wouldn't mind letting me know -- is
17 there any further issue with this CFR reference?
18         MS. RODRIGUEZ-COSS:  Well, we'll have to
19 see where -- the civil division of the U.S.
20 Attorney's office is handling that.
21         THE COURT:  If it's a question about
22 what a government witness said in an investigative
23 or preparatory interview, does that potentially fall
24 under that?  It seems difficult to think that would
25 be covered, but I'm not familiar with this.  So, if

3796

1  you think it's implicated, let me know.
2          MS. RODRIGUEZ-COSS:  Yes, ma'am.
3          THE COURT:  All right.  Anything else?
4  Then we'll see you tomorrow at 9:30.
5          MR. SHEEHAN:  Your Honor, let me just
6  address for a moment, just scheduling down the road.
7  Based on -- thinking back on our status conference.
8  I looked at -- if, in fact, there is a penalty phase
9  in this case, I think I had said to the Court we
10 were looking at two or three days.  I think after I
11 went back and looked through more, and I'm going to
12 give the government a copy of -- I wanted to file
13 under seal our notice at this time.  And I'm giving
14 the government a copy of it.  As to the expert
15 witnesses that your Honor had directed us to file by
16 today, I have that.  I would just request that that
17 be orally -- I have a sealing envelope, I would
18 request that that be filed under seal.
19         THE COURT:  And why does it have to be
20 filed under seal?
21         MR. SHEEHAN:  Because there is no
22 penalty phase of the case yet.
23         THE COURT:  So it should be filed under
24 seal until a penalty phase, if any.
25         MR. SHEEHAN:  Yes, if there is one,

3797

```
1   right.
2           THE COURT:  So for that short duration.
3           MR. SHEEHAN:  So, I would offer that at
4   this time.
5           THE COURT:  Well, that will just get
6   docketed, right?
7           MR. SHEEHAN:  Yes.  And I have -- and
8   I'll discuss this with the government afterwards, a
9   copy for them which includes -- I did not file with
10  the Court the CVs of two of the people, and I didn't
11  file one of the other documents because I don't
12  think really it makes sense filing that with the
13  Court at this juncture.
14          THE COURT:  All right, I would be
15  interested in seeing them at some point.
16          MR. SHEEHAN:  Yes, I will once we get to
17  that point, your Honor.
18          The other thing I was going to mention
19  is, in thinking about it, I think we might really be
20  looking at maybe closer to four days on our end.  So
21  I'm just -- I didn't want to prompt, you know, a
22  notice to the jury that was -- we haven't talked
23  about it at all yet, but I just wanted to alert the
24  Court that that's what it's looking like at this
25  point.
```

3798

```
1           THE COURT:  All right.  And the
2   government's view of the length of its case remains
3   about two days: is that right?
4           MS. REYNOLDS:  Two to three days, your
5   Honor, yes.
6           THE COURT:  You keep sneaking it out
7   there longer.  All right.
8           MR. SHEEHAN:  I think we're all -- while
9   I understand that we want to give the jurors a
10  realistic timeframe, we're all worried that --
11          THE COURT:  We should err on the long
12  side.
13          MR. SHEEHAN:  Go for short and err for
14  long.
15          THE COURT:  Now, tell me about -- the
16  government will finish tomorrow.  I didn't hear you
17  referencing Mr. Martin as a witness.
18          MS. DAYTON:  Your Honor, we have decided
19  that if there is a penalty phase we'll put him on
20  then.
21          THE COURT:  Okay.
22          MR. SMITH:  Then I'll just tell the
23  Court I'll renew my motion to preclude at this time.
24          THE COURT:  You need to do it then.  I
25  can only keep track of so many balls in the air.
```

3799

```
1   All right.
2           MS. RODRIGUEZ-COSS:  Was the Court done?
3           THE COURT:  So long as the defendant has
4   witnesses for tomorrow, we just need to keep moving.
5           MR. SMITH:  Yes, your Honor.
6           THE COURT:  And you anticipate how much
7   time -- how much time this week, Mr. Smith or
8   Mr. Sheehan?
9           MR. SMITH:  I would think by midday on
10  Wednesday we would be concluded, maybe a little
11  after that perhaps.
12          THE COURT:  So, it's still safe to
13  assume that we will charge and you will close on
14  Thursday.
15          MR. SHEEHAN:  My only concern, your
16  Honor, would be if it takes a little bit longer, I
17  think there should be at least some kind of a break
18  between when the evidence closes and when -- and the
19  charge.  So if the evidence concludes on Wednesday,
20  let's say, I don't think -- I think it would be
21  possible we could charge the jury on Thursday.  But
22  if we go over into Thursday, I don't think that it
23  would be -- I think we should then charge the jury
24  on Friday.
25          THE COURT:  That may be.  From what you
```

3800

```
1   were saying, it sounded as if we would close
2   evidence on Wednesday by your prediction now.
3           MR. SHEEHAN:  It is possible that we
4   could close on Wednesday.
5           THE COURT:  And what about the
6   government's rebuttal case?
7           MS. DAYTON:  We don't know at this time.
8           MS. RODRIGUEZ-COSS:  It would depend on
9   what we hear.
10          THE COURT:  Okay.  All right then, I'm
11  thinking if that's what is going on here, it may, in
12  fact, not be possible to have government start a
13  penalty phase on the 26th, we may need to postpone
14  the beginning of that, because there may be so
15  little time.  But why don't we just leave that open.
16  I don't know if that makes a difference for your
17  witnesses, Mr. Sheehan.
18          MR. SHEEHAN:  In terms of what?  I'm
19  sorry?
20          MR. SMITH:  Only in that we would need
21  some lead time for out of the district and out of
22  country witnesses.
23          THE COURT:  You said you would have them
24  here by the 31st.
25          MR. SMITH:  Correct, but if we're going
```

**GA950**

3801

```
 1   to be pushing that back further and further, we
 2   would certainly want to let the marshals know that,
 3   otherwise they're here on the 31st and being lodged
 4   for who knows how long.  If the government is not
 5   starting on the 26th and we're contemplating they
 6   start on the 31st, we might have to think about
 7   pushing that back.  Those are logistical matters.
 8            THE COURT:  Well, given those logistics,
 9   should we just say that the government will start
10   any penalty phase, if there is one, on the 31st and
11   just have that be fixed?
12            MR. SHEEHAN:  That makes sense to me,
13   your Honor.
14            THE COURT:  Because I don't want the
15   marshals having to house several people for several
16   days.
17            MS. RODRIGUEZ-COSS:  Your Honor, we
18   would really like to get to the penalty phase as
19   soon as possible.
20            THE COURT:  I understand that.
21            MS. RODRIGUEZ-COSS:  Certainly not a
22   long weekend in between.  Well, let's see.
23            THE COURT:  Why don't we see how --
24            MS. RODRIGUEZ-COSS:  Why don't we see
25   how long it takes this week.  Obviously if we go
```

3802

```
 1   through Friday, that may be the situation we'll be
 2   in anyway.
 3            THE COURT:  Okay.
 4            MS. RODRIGUEZ-COSS:  One last matter, if
 5   defense counsel is done with his notice.
 6            Your Honor, we wanted to bring this up
 7   with the Court before approaching anyone.  We would
 8   like to consult a psychologist for the penalty phase
 9   in anticipation of having to confront the testimony
10   of Dr. James or Mr. James Shannon, who is the school
11   psychologist that worked with the defendant.  We're
12   now being provided with an expert notice which
13   includes Marva Lewis, who is apparently a
14   social-cultural psychology person for penalty.  We
15   would like to consult Dr. Michael Welner.  And the
16   reason we'll haven't reached out to Dr. Michael
17   Welner is --
18            THE COURT:  Who is he?
19            MS. RODRIGUEZ-COSS:  He's from the
20   forensic panel in New York, and he's someone that
21   I've worked within the past.  When Ms. Mosley was
22   appointed firewall counsel I referred her to the
23   forensic panel.  I don't know, and because I can't
24   talk to her about this, who she consulted there.  In
25   other words, I don't know whether she consulted with
```

3803

```
 1   Mr. Welner or whether she consulted -- it's a really
 2   very large practice and given the areas that Mr.
 3   Sheehan subsequently disclosed, I don't think it was
 4   Dr. Michael Welner who she would have worked with
 5   but...
 6            MR. SHEEHAN:  I don't mind disabusing
 7   counsel of her mistake, because she'd have no reason
 8   to know, but Dr. Welner was involved.  So I think
 9   they should look.  If in fact they're going to look
10   somewhere, they should look elsewhere.
11            MS. RODRIGUEZ-COSS:  What I wanted to
12   ask is may we ask firewall counsel if Dr. Welner was
13   involved?
14            MR. SHEEHAN:  You can ask the Court.
15            THE COURT:  Do you want me to tell you?
16            MS. RODRIGUEZ-COSS:  Yes, if the Court
17   knows.
18            THE COURT:  Yes, he was.  He
19   participated in a number of our conferences.
20            MS. RODRIGUEZ-COSS:  Well, that answers
21   my question.  Thank you.
22            THE COURT:  All right, anything else?
23   Thank you very much.  We'll see you tomorrow.
24            MR. SHEEHAN:  I would say on that one
25   you could have trusted me because we had a backup.
```

3804

```
 1            (Proceedings concluded)
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

3805

```
 1              I N D E X
 2    WITNESS                              PAGE
 3    CHRISTINE ROY
 4    Continued cross-Examination by Mr. Sheehan   3572
 5    Redirect Examination by Ms. Dayton           3582
 6    Recross-Examination by Mr. Sheehan           3617
 7
 8    SHAMARR MYERS
 9    Direct Examination by Ms. Dayton             3623
10    Cross-Examination by Mr. Sheehan             3675
11
12    JAMES VIADERO
13    Direct Examination by Ms. Rodriguez-Coss     3721
14
15    KEVIN KLINE
16    Direct Examination by Ms. Rodriguez-Coss     3725
17
18    JOHN SARDONE
19    Direct Examination by Ms. Rodriguez-Coss     3738
20    Cross-Examination by Mr. Sheehan             3759
21
22    CHRISTOPHER MUNGER
23    Direct Examination by Mr Markle              3760
24    Cross-Examination by Mr. Smith               3778
25
```

3806

```
 1
 2         I certify that the foregoing is a
 3    correct transcript from the record of proceedings in
 4    the above-entitled matter.
 5                        5/17/11
 6                         Date
 7
 8                   /S/   Sharon Montini
 9                      Official Reporter
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

3807

```
 1         UNITED STATES DISTRICT COURT.
 2             DISTRICT OF CONNECTICUT
 3    * * * * * * * * * * *    *
                               *
 4    UNITED STATES OF AMERICA,  * Case No 6cr160(JBA)
                               *
 5         Plaintiff,          *
                               *
 6         vs.                 *
                               *
 7    AZIBO AQUART             * May 17, 2011
                               *
 8         Defendant.          *
                               *
 9    * * * * * * * * * * * *   *
10            TRIAL TRANSCRIPT
11            VOLUME XVIII
12    BEFORE:  THE HONORABLE JANET BOND ARTERTON U.S.D.J.,
                                      and jury
13
      Appearances:
14    FOR THE GOVERNMENT:  ALINA REYNOLDS, ESQ
                           TRACY DAYTON, ESQ.
15                         PETER MARKLE, ESQ.
                           JACABED RODRIGUEZ-COSS
16                         United States Attorney's Office
                           915 Lafayette Blvd
17                         Bridgeport, CT 06604
18
      FOR THE DEFENDANT   MICHAEL SHEEHAN, ESQ
19    AZIBO AQUART:        Sheehan & Reeve
                           139 Orange Street
20                         New Haven CT 06510
21                         JUSTIN SMITH, ESQ.
                           383 Orange Street
22                         New Haven, CT 06511
23
      Court Reporter:     Sharon Montini, RMR
24
      Proceedings recorded by mechanical stenography,
25    transcript produced by computer
```

3808

```
 1         THE COURT:  Good morning, counsel,
 2    ladies and gentlemen, Mr. Aquart.
 3         MR. SHEEHAN:  Good morning.
 4         MS. DAYTON:  Good morning, your Honor.
 5         THE COURT:  What, no tie?
 6         MR. SHEEHAN:  Went a little casual
 7    today, your Honor.
 8         THE COURT:  Please be seated.  The jury
 9    is here.  We are ready to proceed.  And the first
10    witness will be who?
11         MR. MARKLE:  Detective Donaldson, your
12    Honor.
13         THE COURT:  Donaldson, all right.
14         MR. MARKLE:  The witness after him is
15    Lativia Whittingham and the witness after Lativia
16    Whittingham is Lauren Dellavolpe, the phone analyst.
17         Your Honor, there is an issue, your
18    Honor, still as to the phone chart.  I have a copy,
19    if I could hand it to the Court.  The three charges
20    the government proposes to use.
21         THE COURT:  Is this different from what
22    I had before?
23         MR. SMITH:  Your Honor, Exhibit 279 and
24    280 are the same, I believe, attached to my motion.
25         MR. MARKLE:  The first two there is no
```

**GA952**

3809

```
1   objection to, as I understand it, your Honor.  The
2   third one there are changes.  It had previously the
3   names that we, the government, believed were
4   attributable to the phones.  We have removed those
5   from page 3 of that chart, or page 2 and 3, so they
6   don't reflect anyone's name by any particular phone.
7            THE COURT:  So, if I were to look at the
8   fourth page and fifth page, they are calls from a
9   number and to a number, is there any objection to
10  that?
11           MR. SMITH:  No, your Honor.
12           THE COURT:  Your objection is to 278.
13           MR. SMITH:  Yes.
14           THE COURT:  Well, as to the bottom one,
15  Agent Munger testified that that 615-8307 was from
16  the cell phone seized from Azikiwe Aquart.  What's
17  wrong with that?
18           MR. SMITH:  Well, your Honor, I
19  understand that that's the testimony, but this is --
20  this legend is essentially a summary of the
21  testimony, it's -- and second of all, as to the
22  agents who will be introducing this, it's hearsay as
23  to that agent.
24           MR. MARKLE:  Your Honor, she's not an
25  agent.
```

3810

```
1            THE COURT:  Let me understand the
2   objection.  You don't object to the fact -- to the
3   claim that the evidence has linked up the listed
4   telephone numbers on the left with the cell phone
5   descriptions on the right.
6            MR. SMITH:  I do, your Honor.
7            THE COURT:  Let's go through that.  You
8   don't -- you think the evidence does not support
9   that 549-4624 is the cell phone seized from Efrain
10  Johnson?
11           MR. SMITH:  Your Honor, we intend to
12  dispute the facts in regards to the case.  Now, yes,
13  there is evidence that's been introduced to that.
14  However, that does not mean it's conclusively true.
15  And that's really for the jury to decide.
16           THE COURT:  Okay.  Is there any of this
17  that you say there is no evidence of?  I mean,
18  assuming Ms. Whittingham's testimony will be as
19  anticipated.
20           MR. SMITH:  Well, your Honor, again,
21  there may be testimony in evidence as to each one of
22  these.
23           THE COURT:  I understand that.  I want
24  to know, is there any claim there is none on?
25           MR. SMITH:  Well, obviously, we don't
```

3811

```
1   know what Ms. Whittingham will say.  Presumably
2   she'll say this.  Presumably Detective Donaldson
3   will testify as to the second number.  So I suppose
4   if that came in, then, yes, there would be evidence
5   of that; but again, your Honor --
6            THE COURT:  So your objection is this
7   chart really is not part of the -- of what the
8   government's witness can testify to because that's
9   not part of what he examined.
10           MR. SMITH:  Correct.  She examined phone
11  records.  This information provided by the
12  government to her is my understanding.  Also it's
13  essentially argument in the sense of a summary
14  chart.
15           THE COURT:  Mr. Markle, what is your
16  response on that?
17           MR. MARKLE:  Your Honor, my response is
18  it gives context to the chart that follows, which is
19  something the witness can testify to.  And I think
20  the remedy would be for your Honor to instruct the
21  jury that the first page is not the testimony of
22  Ms. Dellavolpe, it is merely an aid for the jury and
23  it's based on evidence that they can or -- may rely
24  on or may choose not to rely on that they've heard
25  in the course of the trial.
```

3812

```
1            It's the government's summary chart, it's
2   not evidence in and of itself that establishes that
3   549-4624 is Efrain Johnson's phone.  So I think if
4   they're charged that it's based on evidence that's
5   been presented in the course of the trial, as you'll
6   tell them many times after today, that it's up to
7   them to decide the facts, and that it is merely a
8   way that they can put some -- that they can put the
9   evidence together with the phones, if they choose to
10  do that, that's up to them.
11           THE COURT:  Why is that properly done in
12  the form of this chart along with these other
13  documents that are, in fact, the result of -- so I
14  guess I'm confusing it.  This is not Donaldson's
15  testimony; this is Dellavolpe's testimony.
16           MR. MARKLE:  Dellavolpe, yes, your
17  Honor.
18           THE COURT:  So, she develops this phone
19  call to this phone at what time, and the link-in of
20  who is calling whom becomes what the jury has to do.
21           MR. MARKLE:  Correct.
22           THE COURT:  So why isn't that done more
23  appropriately during closing argument when you
24  argue, as you heard from the testimony of so and so,
25  this number is from Efrain Johnson's cell.  And then
```

3813

1  you can make whatever charts you want during your
2  closing, this is from Lashika Johnson's, and do it
3  back and forth that way which gives the jury the
4  opportunity to carry out what their function is,
5  which is remembering what the testimony was,
6  accepting or rejecting it, and then putting the
7  inferences into the document itself?  Isn't that
8  where that should be done?
9          MR. MARKLE:  I think it can be done
10  there, but I don't think that precludes us from
11  doing it here, your Honor with, as I say, the
12  instruction that this is a summary of evidence
13  that's come before them again for them to either
14  choose to rely on or not.  Because otherwise,
15  they're just seeing a bunch of numbers with times.
16          THE COURT:  I know that, and I recognize
17  that this, without that link-up, is not terribly
18  useful.  But if Dellavolpe is only relying on --
19  well, how is she going to say these cell phone
20  numbers were who?  She wasn't presumably in the
21  courtroom.
22          MR. MARKLE:  Correct, your Honor.
23          THE COURT:  So how would she know?
24          MR. MARKLE:  She will not say whose cell
25  phone belonged to who.

3814

1          THE COURT:  I'm sorry, I thought 278 was
2  being offered through her.
3          MR. MARKLE:  It is, your Honor, but
4  that's why I said as to the first -- the page that
5  we're having an issue with, that is not Dellavolpe's
6  testimony, that is not -- that's why I say the jury
7  could be instructed that she is not testifying to
8  this, these numbers and the associated people as --
9          THE COURT:  I guess I misunderstood you.
10  I thought this was being offered through her.
11          MR. MARKLE:  I guess I would offer the
12  chart -- I don't know how to do it then, your Honor.
13  The chart itself of the phone calls would be offered
14  through her.
15          THE COURT:  Right.
16          MR. MARKLE:  But the first page with the
17  numbers associated with people was -- it would be
18  offered through her, but not as her testimony.
19          THE COURT:  I think that it, for the
20  reasons you articulate, it's problematic to have her
21  be giving that testimony.  I understand that you
22  need to link these in and I'm -- I just don't think
23  it's going to come in through her.
24          MR. MARKLE:  Your Honor, maybe I'm not
25  being clear.  This would not be offered

3815

1  necessarily -- it's not offered for the truth of
2  this.  This is the evidence that came before that
3  would inform her analysis.  It's not being offered
4  that she's -- she is not saying that this phone is
5  Efrain Johnson's phone or this phone is any one
6  person's phone.
7          THE COURT:  But it is being offered for
8  the truth, that it was their phone.  Otherwise, it
9  doesn't have any meaning.
10          MR. MARKLE:  But that's based on other
11  evidence that's come before.
12          THE COURT:  I understand that, but
13  that's -- I mean, I have -- it would be conceivable
14  that Agent Munger, for instance, who has been
15  sitting here through trial, can go -- essentially do
16  the summary, but it's really like a pre-summation.
17          Let's think about that.  I'm finding
18  difficulty in having this -- how Dellavolpe will be
19  able to use this chart in a way that's different
20  from counsel's summation.  But we can think of it a
21  little bit further and maybe there is some further
22  ideas.  Why don't we get started with the jury.
23  Okay?
24          MR. MARKLE:  Thank you, your Honor.
25          (Jury entered the courtroom.)

3816

1          THE COURT:  Good morning, ladies and
2  gentlemen.  You can think of it this way, the
3  flowers are growing and you are being very attentive
4  and I thank you for that.  Please be seated.
5          I'll ask the government's next witness
6  please to raise your right hand, sir, and the clerk
7  will administer the oath to you.
8          R I C H A R D   D O N A L D S O N
9  Having first affirmed, was examined and testified as
10  follows:
11          THE WITNESS:  Detective Richard
12  Donaldson, D-o-n-a-l-d-s-o-n, Bridgeport,
13  Connecticut.
14          THE COURT:  All right, you may proceed.
15          MR. MARKLE:  May I just have one moment,
16  your Honor.
17  DIRECT EXAMINATION
18  BY MR. MARKLE:
19      Q.  Detective Donaldson, could you tell us how
20  you are employed?
21      A.  With the Bridgeport police.
22      Q.  And for how long have you been so employed?
23      A.  Just over 21 years.
24      Q.  And what is your present position with the
25  Bridgeport police?

3817

1      A.   I'm currently assigned to the FBI Organized
2 Crime Task Force.
3      Q.   And prior to that, could you briefly tell
4 us what your experience was with the Bridgeport
5 Police Department?
6      A.   Prior to the FBI Organized Crime Task Force
7 I was assigned to the FBI Safe Streets Task Force;
8 prior to that I was assigned to the DEA Task Force
9 in Bridgeport; and prior to that I was assigned to
10 the FBI Connecticut Violent Crimes Fugitive Task
11 Force.
12      Q.   And in 2005 were you -- where were you
13 assigned?
14      A.   I was assigned to the FBI Safe Streets Task
15 Force.
16      Q.   And while being a member of the Safe
17 Streets Task Force were you involved in the
18 investigation United States v. Aquart?
19      A.   Yes, I was.
20      Q.   And were you involved in that investigation
21 from the beginning?
22      A.   Yes.
23      Q.   From August 24, 2005, on?
24      A.   Yes.
25      Q.   And in the course of that investigation,

3818

1 did certain telephone numbers become of interest to
2 you and fellow officers?
3      A.   Yes.
4      Q.   And in regards to those numbers, were
5 investigative steps taken to see if you could garner
6 any information based on those telephone numbers
7 provided to you?
8      A.   Yes.
9      Q.   Specifically, was there a number that was
10 provided to you in the investigation in which you
11 personally took investigative steps?
12      A.   Yes.
13      Q.   And what number was that?
14      A.   It was 203-243-7132.
15      Q.   And why was that number of interest to you?
16      A.   It's a number that kept coming up on toll
17 analysis and information that we were receiving
18 during -- around the time of the homicide.
19      Q.   And when you say "toll analysis," what did
20 you mean by that?
21      A.   We had somebody that was running different
22 numbers, obtaining subscriber information, numbers
23 that we were getting off of other phone numbers.
24      Q.   And based on your interest in that
25 telephone number, 243-7132, did you obtain

3819

1 subscriber information for that telephone?
2      A.   Yes, we did.
3      Q.   And do you remember who the subscriber of
4 that phone was?
5      A.   Yes.
6      Q.   Who was that?
7      A.   Mark Canney.
8      Q.   And did you have any other information
9 regarding Mr. Canney?
10      A.   No.
11      Q.   Did you take any investigative steps to
12 locate or find out if there was a Mr. Canney?
13      A.   Yes.
14      Q.   And did you find out who Mark Canney was?
15      A.   No.
16      Q.   What efforts did you take in that regard?
17      A.   Several computer checks through the police
18 department and other databases.
19      Q.   And were you able to ever -- able to
20 identify a Mark Canney?
21      A.   No.
22      Q.   And was there an address associated with
23 Mr. Canney?
24      A.   No.
25      Q.   In regards to further efforts as to

3820

1 203-243-7132, what did you do?
2      A.   On February 4, 2006, I called in to the
3 telephone number.
4      Q.   You actually called that telephone number?
5      A.   Yes, I did.
6      Q.   Did you personally do that?
7      A.   Yes, I did.
8      Q.   And when you did that, did you do that from
9 -- what was the purpose of that?
10      A.   To identify who might answer the phone.
11      Q.   And were you prepared to record that
12 conversation?
13      A.   I was recording it.
14      Q.   And did you record it from the minute you
15 dialed to the minute it ended?
16      A.   Yes, I did.
17      Q.   And did anyone answer that phone?
18      A.   I got a voicemail recording.
19      Q.   And did you proceed to record the voicemail
20 message?
21      A.   Yes, I did.
22      Q.   And when was that done?
23      A.   That was February 4, 2006.
24      Q.   And was the entire message recorded?
25      A.   Yes, it was.

**GA955**

3821

```
1       Q.    And why was it recorded?  Why if you had a
2   conversation or got a voice message, why did you
3   record it?
4       A.    Just for concerns if it was ever deleted
5   prior to us having to go back.
6       Q.    And was that message and the recording of
7   that message altered in any way by you?
8       A.    No.
9       Q.    And what did you do after you finished
10  recording that message?
11      A.    I secured the message and turned it in to
12  FBI evidence.
13      Q.    And do you know what, if anything, was
14  subsequently done with that recording that you made?
15      A.    No.
16      Q.    Do you know, did you record it on a CD or a
17  cassette?
18      A.    A cassette.
19      Q.    Do you know that cassette was -- what, if
20  anything, was done with that cassette?
21      A.    Yes.
22            MR. SMITH:  Objection.  Asked and
23  answered.
24            THE COURT:  Overruled.
25      Q.    Do you?
```

3822

```
1       A.    Yes, it was turned into a CD.
2       Q.    And have you had occasion to listen to that
3   CD?
4       A.    Yes, I have.
5       Q.    And is it a true and accurate recording of
6   the message that you recorded on February 4, 2006?
7       A.    Yes, it is.
8       Q.    And does it have the complete message?
9       A.    Yes.
10      Q.    Voicemail message?
11      A.    Yes.
12      Q.    And does it have an introduction by you?
13      A.    Yes, it does.
14      Q.    What's your introduction consist of?
15      A.    Usually the date, the time.
16      Q.    Showing you Government Exhibit 609, do you
17  recognize this CD and the label on it?
18      A.    Yes.
19      Q.    And have you had occasion to listen to
20  Government's Exhibit 609?
21      A.    Yes, I have.
22      Q.    And is that a true and accurate depiction
23  or true and accurate recording of the conversation
24  or the voicemail that you recorded?
25      A.    Yes, it is.
```

3823

```
1       Q.    Were you present -- what, if anything, was
2   done with this recording after you preserved it and
3   had it?
4             MR. SMITH:  Objection.  Asked and
5   answered.
6             THE COURT:  I think you asked him that.
7             MR. MARKLE:  Not in terms of securing it
8   and preserving it.
9       Q.    Was it every played for anyone?
10      A.    Yes, it was.
11      Q.    Who was that?
12      A.    Shante Pettway.
13      Q.    And when it was played for Ms. Pettway were
14  you present?
15      A.    Yes, I was.
16      Q.    And who else was present if you recall?
17      A.    Alina Reynolds from the U.S. attorney's
18  office.
19      Q.    Was there any other agent or officer
20  present?
21      A.    Yes, Special Agent Chris Munger.
22      Q.    And was the -- did you tell Ms. Pettway
23  what was on the recording?
24            MR. SMITH:  Objection, hearsay.
25            THE COURT:  No, overruled.  But not what
```

3824

```
1   you told her, but did you tell her.
2             Did you tell her anything about what was
3   on the recording she was going to hear?
4             THE WITNESS:  No, your Honor.
5       Q.    What did you tell or ask her to do?
6             MR. SMITH:  Objection, hearsay.
7             THE COURT:  Why is that not hearsay?
8   What is it offered for?
9             MR. MARKLE:  The relevance is that he
10  didn't tell her the name of the person, he asked her
11  to identify it.
12            MR. SMITH:  Your Honor --
13            THE COURT:  Right.
14            MR. MARKLE:  If Mr. Markle is going to
15  testify.
16            THE COURT:  Wait, hold on.
17            MR. MARKLE:  She asked me a question.
18            THE COURT:  Hold on.  All right, I asked
19  you, did you tell her anything about what she was
20  going to hear.  I think that covers that.  Let's go
21  to the next question.
22      Q.    Was the recording or message played for
23  Ms. Pettway?
24      A.    Yes, it was.
25      Q.    And was it played more than once?
```

3825

1    A.   Yes, it was.

2    Q.   And why was that?

3    A.   Originally we played it on a laptop

4  computer and the sound quality was extremely low, so

5  we had to get speakers.

6    Q.   Did you tell her whose voice was on the

7  recording?

8    A.   No.

9         MR. SMITH:  Objection.

10        THE COURT:  Sustained.

11   Q.   Was she able to listen to the recording?

12   A.   Yes.

13   Q.   Was she able to hear the recording?

14   A.   Yes.

15   Q.   And did she -- was she threatened in any

16  way?

17        MR. SMITH:  Objection.

18        THE COURT:  Overruled.

19   A.   No.

20   Q.   Was she coerced in any way to make an

21  identification?

22   A.   No.

23   Q.   Was she promised anything in terms of

24  making an identification?

25   A.   No.

3826

1    Q.   Was she able to make an identification of

2  the person's voice on the voicemail message you

3  recorded?

4         MR. SMITH:  Objection, hearsay.

5         THE COURT:  No, this is just whether she

6  was or not, not who, but was she able to make an

7  identification of the person's voice on the

8  voicemail message you played for her.

9         THE WITNESS:  Yes, your Honor.

10   Q.   She was able to?

11   A.   Yes.

12   Q.   And after listening to the recording, did

13  she identify the voice on the voicemail message?

14        MR. SMITH:  Objection, hearsay.

15        MR. MARKLE:  It's yes or no, your Honor.

16        THE COURT:  Isn't that the same question

17  you just asked her -- him?  I'm going to --

18        Did she identify the voice?

19        THE WITNESS:  Yes.

20        THE COURT:  Next question.

21   Q.   Did you know Shante Pettway's relationship

22  to the defendant, Azibo Aquart?

23   A.   Yes.

24   Q.   And what was that relationship?

25        MR. SMITH:  Objection, hearsay.

3827

1         THE COURT:  Well, do you claim that

2  question?

3         MR. MARKLE:  I'll withdraw it, your

4  Honor.

5    Q.   Did Ms. Pettway ever --

6         MR. MARKLE:  I have no further

7  questions.  I would offer 609 as a full exhibit,

8  your Honor.

9         MR. SMITH:  No objection.

10        THE COURT:  All right, 609 is a full

11  exhibit.

12  CROSS-EXAMINATION

13  BY MR. SMITH:

14   Q.   Good morning, Detective Donaldson.

15   A.   Good morning.

16   Q.   I'm Justin Smith, I'm one of the attorneys

17  who represents Mr. Aquart.  You talked about the

18  investigative measures you took to identify the

19  telephone.

20   A.   Yes.

21   Q.   Did you ever find out where the telephone

22  was purchased?

23   A.   No.

24   Q.   So you didn't try to find out if it had

25  been purchased with a credit card or any other means

3828

1  that might identify the purchaser?

2    A.   No.

3    Q.   And the phone call that you made was on

4  February 4, 2006.

5    A.   Yes.

6    Q.   And you do not know where that phone was at

7  the time you made the phone call.

8    A.   No.

9         MR. SMITH:  I have no further questions.

10  Thank you, your Honor.

11        THE COURT:  All right, anything further?

12        MR. MARKLE:  No, your Honor.

13        THE COURT:  All right, thank you,

14  Detective Donaldson, you may step down.  You are

15  excused.

16        MR. MARKLE:  Government would call

17  Lativia Whittingham.

18        THE COURT:  All right, Ms. Whittingham,

19  if you will remain standing when you reach the

20  stand, raise your right hand.

21        L A T I V I A   W H I T T I N G H A M

22  Having first affirmed, was examined and testified as

23  follows:

24        THE WITNESS:  Lativia Whittingham,

25  W-h-i-t-t-i-n-g-h-a-m, Bridgeport, Connecticut.

3829

1        THE COURT:  All right.  You may proceed.

2        MR. MARKLE:  Thank you, your Honor.

3   DIRECT EXAMINATION

4   BY MR. MARKLE:

5        Q.   Ms. Whittingham, how old are you?

6        A.   Twenty-seven.

7        Q.   And how far have you gone in school?

8        A.   College, a year and a half, three

9   semesters.

10       Q.   And are you presently employed?

11       A.   Yes.

12       Q.   And what kind of work do you do?

13       A.   I work at Yale-New Haven Hospital.

14       Q.   In what capacity?

15       A.   I work as environmental service.

16       Q.   And Ms. Whittingham, are you related to

17  Tina Johnson one of the victims in this case?

18       A.   Yes.

19       Q.   And what's your relationship?

20       A.   She's my mother.

21       Q.   And are you related to Leroy Whittingham?

22       A.   Yes.

23       Q.   How is he related to you?

24       A.   He's my brother.

25       Q.   In August of 2005 where were you living?

3830

1        A.   In Shelton, Connecticut.

2        Q.   And who were you living with at that time?

3        A.   My mother.

4        Q.   And who was your -- do you know where your

5   mom was living then, Ms. Whittingham?

6        A.   Shelton, Connecticut.

7        Q.   And did she ever live anywhere else during

8   that time?

9        A.   She stayed in Bridgeport at Basil's

10  apartment.

11       Q.   And where was that?

12       A.   In Charles Street, 215, apartment 101.

13       Q.   And in Bridgeport?

14       A.   Yes.

15       Q.   And would you visit her there?

16       A.   Yes.

17       Q.   Often?

18       A.   Multiple times a day.

19       Q.   And would you speak to her on the phone

20  when she was there?

21       A.   Yes.

22       Q.   Did she have a cell phone in 2005?

23       A.   Yes.

24       Q.   Did you have a cell phone in 2005?

25       A.   Yes.

3831

1        Q.   Do you recall calling your mother on your

2   cell phone to her cell phone?

3        A.   Yes.

4        Q.   And what was your -- do you recall what

5   your telephone number was at the time?

6        A.   Yes.

7        Q.   What was your phone number?

8        A.   203-545-7582.

9        Q.   And do you recall your mother's cell phone

10  number?

11       A.   Yes.

12       Q.   And what was that?

13       A.   203-543-4209.

14       Q.   And how do you remember your number?

15       A.   That was my first cell phone, I got it my

16  first year of college and I had it all the way up

17  from 2002 up until 2005, the same number.

18       Q.   I'm sorry?

19       A.   The same number.

20       Q.   And how do you remember your mom's cell

21  phone number?

22       A.   I have a diary I kept back then and I had

23  her number and a few other people numbers in that

24  diary.

25       Q.   And do you remember the last time you

3832

1   called her on 543-4209?

2        A.   It was either that morning, that Tuesday

3   morning, or it was that Monday night.  I ran out of

4   time that Monday.

5        Q.   When you say that Monday or Tuesday --

6        A.   Because I ran out of time either Monday

7   night or Tuesday morning, because Tuesday night I

8   got money from my mother to put time on my phone.

9        Q.   And you used it after that, but you were

10  running out of time?

11       A.   Yeah.

12       Q.   So when you say Monday or Tuesday, are you

13  saying -- when in respect to the -- when you found

14  out your mom had been murdered?

15       A.   Well, that day was Wednesday morning.  We

16  ain't had no -- I ain't had no time on my phone, my

17  sister ain't have no time on her phone.  We was in

18  Shelton.  So we ain't find out until we drove down

19  to Bridgeport and stopped by my grandmother house

20  and they took us -- we had to go to Charles Street.

21       Q.   So, your last conversation or call to your

22  mother was?

23       A.   Off my cell phone it was either Monday

24  morning, but -- Tuesday morning or Monday night, but

25  I spoke to her that evening from my grandmother

**GA958**

3833

```
1   house number.  I called her before I stopped by
2   seeing her before I went to Shelton.
3       Q.  Did you call her on her cell phone?
4       A.  Yeah.
5       Q.  Did she have any other way of being
6   contacted?
7       A.  No.  It was -- that was her only cell
8   phone.
9       Q.  So, you are saying either the night before
10  the murder --
11      A.  From my cell phone.  I spoke to her the
12  night before the murders that Tuesday night from my
13  grandmother house phone.
14      Q.  On her cell phone?
15      A.  To her cell phone.
16      Q.  Thank you.
17          MR. MARKLE:  No further questions, your
18  Honor.
19          THE COURT:  All right,
20  cross-examination.
21          MR. SMITH:  Just a moment, your Honor.
22  CROSS-EXAMINATION
23  BY MR. SMITH:
24      Q.  Hi, Ms. Whittingham, I'm Justin Smith.  I'm
25  one of the attorneys representing Mr. Aquart.
```

3834

```
1       I was just a little confused.  When was the
2   last time that you recall using your cell phone to
3   call your mother's cell phone?
4       A.  It was either Monday night or Tuesday
5   morning.  I ran out of time on Tuesday.
6       Q.  Okay.  And the diary that you referenced,
7   do you still have that?
8       A.  Yes, I do.
9       Q.  Okay.  And your brother Leroy, did he have
10  a cell phone at the time?
11      A.  No, my brother Jamar had a cell phone at
12  the time.
13      Q.  Do you recall that number?
14      A.  No.
15      Q.  Okay.  I have nothing further.
16          MR. SMITH:  Thank you, your Honor.
17          THE COURT:  All right.  Anything
18  further?
19          Thank you, Ms. Whittingham.  You may step
20  down, you are excused.
21          MR. MARKLE:  Government would call
22  Lauren Dellavolpe.
23          THE COURT:  All right, if you would
24  remained standing, please, raise your right hand.
25          L A U R E N   D E L L A V O L P E
```

3835

```
1   Having first affirmed, was examined and testified as
2   follows:
3               THE WITNESS:  Lauren Dellavolpe,
4   D-e-l-l-a-v-o-l-p-e, 600 State Street, New Haven.
5           THE COURT:  Counsel, you may proceed.
6           MR. MARKLE:  Your Honor, just before I
7   start questioning Ms. Dellavolpe, there is a
8   stipulation regarding phone records that I would
9   like to offer the records and read to the jury.
10          THE COURT:  All right, thank you.
11          MR. MARKLE:  The stipulation reads:
12  "The United States of America v. Azibo Aquart, it is
13  hereby" -- it's Exhibit No. 281, your Honor.
14          "It is hereby stipulated and agreed by
15  and between the United States of America by
16  Assistant United States Attorney Peter Markle and
17  the defendant Azibo Aquart, by his attorneys Michael
18  Sheehan and Justin Smith as follows:
19          "If called to testify a custodian of
20  records for AT&T would testify that Government
21  Exhibit 273 is a fair and accurate copy of telephone
22  records including, but not limited to, subscriber
23  information maintained in the ordinary course of
24  business by AT&T for calls made between August 1st,
25  2005 and August 31st, 2005 to and from cellular
```

3836

```
1   telephone No. 203-583-2198 subscribed to by Rodney
2   Womble, 555 Trumbull Avenue, Bridgeport,
3   Connecticut.
4           "Furthermore, the duration of a call
5   begins when there is a connection, meaning when the
6   call was answered by a recipient or went into
7   voicemail.
8           "B, if called to testify a custodian of
9   records from AT&T would testify that Government
10  Exhibit 274 is a fair and accurate copy of
11  subscriber information maintained in the ordinary
12  course of business by AT&T for cellular telephone
13  No. 203-615-8307, subscribed to by Joe Clark, 2010
14  Main Street, Bridgeport, Connecticut."  If called to
15  testify.  --
16          "C, if called to testify a custodian of
17  records for Sprint Nextel would testify that
18  Government Exhibit 275 is a fair and accurate copy
19  of telephone records including, but not limited to,
20  subscriber information maintained in the ordinary
21  course of business by Sprint Nextel for calls made
22  between June 1st, 2005, and August 31st, 2005, to
23  and from cellular telephone No. 203-504-0599
24  subscribed to by Ron Tonalds at 12 West Avenue,
25  Norwalk, Connecticut.
```

3837

1    "Furthermore, the duration of a call does
2 not necessarily mean that the call is answered by a
3 recipient or went into voicemail.
4    "D, if called to testify a custodian of
5 records for Sprint Nextel would testify that
6 Government Exhibit 276 is a fair and accurate copy
7 of telephone records including, but not limited to,
8 subscriber information maintained in the ordinary
9 course of business by Sprint Nextel for calls made
10 between August 1st, 2005, and August 31st, 2005, to
11 and from cellular telephone number 203-549-4624
12 subscribed to by Kytha Shaw, P.O. Box 54988, Irvine,
13 California.
14    "Furthermore, the duration of a call does
15 not necessarily mean that the call was answered by a
16 recipient or went into voicemail.
17    "E, if called to testify, a custodian of
18 records for Sprint Nextel would testify that
19 Government Exhibit 277 is a fair and accurate copy
20 of telephone records including, but not limited to,
21 subscriber information maintained in the ordinary
22 course of business by Sprint Nextel for calls made
23 between August 1st, 2005, and August 31st, 2005, to
24 and from cellular telephone No. 203-545-6682
25 subscribed to by Lashika Johnson at 1322 Stratford

3838

1 Avenue, Bridgeport, Connecticut.
2    "Furthermore, the duration of a call does
3 not mean that the call was answered by a recipient
4 or voicemail.
5    "It is hereby and stipulated and agreed
6 that Government Exhibits 273, 274, 275, 276 and 277
7 of this" -- are admissible -- it reads wrong, your
8 Honor, I'm sorry.  "Of this stipulation are
9 admissible in evidence."  And it's signed by myself
10 and Attorney Smith for Azibo Aquart.
11    THE COURT:  I'm sorry, I missed what 273
12 was.
13    MR. MARKLE:  273 is --
14    THE COURT:  503-2189 -- 8?
15    MR. MARKLE:  Is 583-2198.
16    THE COURT:  All right.
17    MR. MARKLE:  Subscribed to by Rodney
18 Womble.  And your Honor, the record, Government's
19 Exhibits 273, 274, 275, 276 and 277 are in the
20 envelopes I'm handing to the clerk.
21    THE COURT:  All right.  And 281 is the
22 stipulation itself.
23    MR. MARKLE:  281 is the stipulation
24 itself, yes.
25    THE COURT:  Very well.  Those are now

3839

1 full exhibits and those records have been turned
2 over to counsel.
3    All right.
4 DIRECT EXAMINATION
5 BY MR. MARKLE:
6    Q.   Hi.
7    A.   Good morning.
8    Q.   Ms. Dellavolpe, can you tell us how you are
9 employed?
10    A.   Yes.  At the Federal Bureau of
11 Investigation.
12    Q.   You are going to go have to move -- you can
13 move it.  And for how long have you been employed by
14 the FBI?
15    A.   Since May of 2009.
16    Q.   And what is your present position with the
17 FBI?
18    A.   I am a staff operations specialist.
19    Q.   And what are your responsibilities and
20 duties as a staff operations specialist?
21    A.   I do research and analysis on our
22 investigative cases.
23    Q.   And prior to being a staff operations
24 specialist, what was your assignment?
25    A.   I was support services technician.

3840

1    Q.   And was that with the FBI?
2    A.   It was, yes.
3    Q.   And so, for how long have you been with the
4 FBI?
5    A.   Since May of 2009.  So about two years.
6    Q.   And prior to that did you work for any law
7 enforcement agency?
8    A.   Yes, I worked for the U.S. Secret Service
9 in White Plains, New York.
10    Q.   And for how long was that?
11    A.   Two and a half years.
12    Q.   And did you attend college?
13    A.   I did.  I went to the Sacred Heart
14 University.
15    Q.   And when did you graduate?
16    A.   In 2007.
17    Q.   What -- no, go ahead.
18    A.   With a Bachelor's in criminal justice and
19 history.
20    Q.   And did you thereafter pursue any other
21 degrees?
22    A.   I did.  I got my Master's degree in
23 national security and public safety from the
24 University of New Haven.
25    Q.   And as the support services person and a

3841

1  staff operations specialist, what type of cases do
2  you work on?
3      A.   I was originally assigned to gang and
4  organized crime cases, but in December of 2010 I got
5  reassigned to the joint terrorism task force.  So, I
6  currently work international terror.
7      Q.   And part of your responsibility and duties
8  is to analyze data and records?
9      A.   Yes.
10     Q.   And voluminous data and records?
11     A.   Yes.
12     Q.   And does that include phone analysis?
13     A.   It does, that's one of my primary duties.
14     Q.   As one of your primary duties, what do you
15 mean when you say "phone analysis."  What does that
16 mean to you?
17     A.   Well, it depends on the situation or the
18 investigation.  But we look to identify users of
19 telephone numbers, connections between cases and
20 other associates, or frequency, to determine close
21 circle of associates of a subject or target.
22     Q.   And you've done that for the last several
23 years.
24     A.   Yes.
25     Q.   And on a variety of cases.

3842

1      A.   Yes.
2      Q.   And did there come a time when you were
3  assigned to the investigation of the homicides in
4  Bridgeport?
5      A.   Yes, in September 2009.
6      Q.   And in what capacity were you assigned to
7  that case?
8      A.   I was responsible for reviewing all of the
9  call detail records that we had obtained.
10     Q.   And have you continued to work on that case
11 up until today?
12     A.   Yes.
13     Q.   Interrupted by other responsibility, but --
14     A.   Yes.
15     Q.   But continuing 'til today.
16     A.   Uh-huh (indicating affirmatively).
17     Q.   And did you work closely with the agents in
18 that regard?
19     A.   I did.
20     Q.   And are you familiar with some of the facts
21 of the case?
22     A.   Yes.
23     Q.   And when you were first assigned, were
24 there specific phone numbers and information that
25 the agents were interested in?

3843

1      A.   There were.
2      Q.   And did you take independent steps to put
3  together any information?
4      A.   Yes.
5      Q.   So there were some that you were directed
6  to and some you found on your own?
7      A.   Yes.
8      Q.   How did you find information on your own?
9  What steps did you take?
10     A.   By reviewing all of the records, by
11 cross-referencing them against each other to see if
12 there were any patterns or connectivity between
13 different numbers that we had already subpoenaed.
14     Q.   And in order to do that, what sort of
15 information did you collect to perform that
16 analysis?
17     A.   We collected subscriber data and call
18 detail records.
19     Q.   When you say "subscriber data," can you
20 tell us what you mean by that?  What does that
21 include or provide you with?
22     A.   Sure.  When we get subscriber data from a
23 telephone company, it, at minimum, includes the
24 subscriber name and address.  Oftentimes we get more
25 information, such as identifiers like date of birth

3844

1  or Social Security number.  Activation date on an
2  account, potential cancellation date, if the account
3  is no longer in use.  We also get identifiers like a
4  SIM card number or an IMEI number that can help us
5  further identify the phone.
6      Q.   What is an IMEI number?
7      A.   It is an international mobility equipment
8  identifier.  It's basically like a fingerprint for a
9  physical handset cell phone.
10     Q.   So, you can -- can you change your cell
11 phone number?
12     A.   Yes.
13     Q.   Can you change your cell phone's IMEI
14 number?
15     A.   No.  You would have to purchase another
16 physical cell phone.
17     Q.   So, that number always stays with that
18 physical phone?
19     A.   Yes.
20     Q.   And called detail records, can you explain
21 what information is provided in those?
22     A.   Sure.  It is something similar to what you
23 would receive on your billing statement for your
24 cell phone.  It's an itemized list of incoming and
25 outgoing calls.  They usually include date, time of

3845

1   the call and the duration of the call.
2      Q.   And when you say -- did you say incoming
3   and outgoing?
4      A.   Yes, incoming and outgoing.
5      Q.   What do you mean by that?
6      A.   Any calls that the subject places or
7   receives would be listed on the call detail records.
8      Q.   Now, how do you obtain subscriber
9   information and call detail records?
10     A.   We'll use administrative subpoenas through
11   the FBI.
12     Q.   And did you use those in this case?
13     A.   Yes.
14     Q.   And did you have to subpoena information
15   from multiple carriers?
16     A.   We did.
17     Q.   Do you recall what carriers you subpoenaed
18   in the course of this investigation?
19     A.   Yes, we subpoenaed from Sprint, AT&T and
20   T-Mobile.
21     Q.   And were you provided with some or all of
22   the records that you requested?
23     A.   Yes.
24     Q.   Do different carriers have different
25   formats for keeping their records?

3846

1      A.   Yes.  Each telephone company keeps these
2   records as a form of a billing statement.  So, each
3   of the records are unique to each company, however
4   they decide to bill their customers.
5      Q.   So, are they always useful to you or do you
6   have to really pore over them?
7      A.   We have to pore over them.  They're never
8   exactly the same, so.
9      Q.   And did the respective carriers provide
10   numbers that were called from specific numbers that
11   you provided to them?  Bad question.  In other
12   words, you provided them with specific numbers?
13     A.   Yes.
14     Q.   And asked for the call detail and
15   subscriber information?
16     A.   Yes.
17     Q.   And they, in turn, did they provide you
18   with information that allowed you to see outgoing
19   calls from those specific numbers?
20     A.   Yes, outgoing and incoming.
21     Q.   And did each of those carriers provide
22   information that allowed you to determine the date
23   of the call?
24     A.   Yes.
25     Q.   The time of the call?

3847

1      A.   Yes.
2      Q.   The duration of the call?
3      A.   Yes.
4      Q.   Specifically, did you obtain call detail
5   records and subscriber information for a telephone
6   No. 203-243-7132?
7      A.   Yes.
8      Q.   And do you recall what period of time you
9   were able to get records for that phone?
10     A.   Yes, August 1st, 2005 through August 31st,
11   2005.
12     Q.   Were you also -- did you also obtain call
13   detail records and subscriber information for
14   telephone No. 203-543-4209?
15     A.   Yes.
16     Q.   And, again, what period of time?
17     A.   August 1st, 2005, through August 31, 2005.
18     Q.   Do you know what carrier provided that
19   information for those two phones?
20     A.   Yes, it was T-Mobile.
21     Q.   And do you know the difference between a --
22   what -- do you know what a prepaid cell phone is?
23     A.   Yes, a prepaid phone is something that you
24   would pay in advance for and if you ran out of
25   cellular minutes you could call or go to a store and

3848

1   put money on your account and you would obtain more
2   minutes.
3      Q.   And do you know if one or both of those
4   phones were prepaid or not?
5      A.   Yes, subscriber data indicated they were
6   both prepaid.
7      Q.   And when a phone is a prepaid phone, is
8   there billing information included with it?
9      A.   Oftentimes not.  No bill information or an
10   assigned contract is required for a prepaid
11   telephone.
12     Q.   As to all of the phones, when was
13   203-243-7132 activated?
14     A.   It was activated on August 24th, 2004.
15     Q.   And do you recall when it was -- when or if
16   it was ever deactivated?
17     A.   I believe it was deactivated in November of
18   2006.
19     Q.   Do you know if -- do the records that you
20   obtained show whether or not a phone -- when
21   additional minutes are put on a phone?
22     A.   Yes, with T-Mobile they provide to us the
23   last refill date on the minutes.
24     Q.   And the refill means added minutes for
25   calls?

**GA962**

3849

1    A.    Yes.

2    Q.    Do you know if there was a refill date as

3    to 203-243-7132?

4    A.    Yes, subscriber data specified it was

5    August 24, 2005.

6    Q.    Do you know the date of the homicides in

7    this case?

8    A.    Yes.

9    Q.    Was it that same date?

10   A.    Yes.

11   Q.    Do you know who the subscriber for 243-7132

12   was?

13   A.    Yes, it was limited as Mark Canney.

14   Q.    Are you aware of a voicemail message that

15   was on telephone number 203-243-7132?

16          MR. SMITH:  Objection, relevance.

17          THE COURT:  The question, are you aware

18   of a voicemail message on that number?

19          THE WITNESS:  Yes.

20          THE COURT:  Your next question.

21   Q.    In regards to the subscriber information,

22   are you aware, were you ever made aware of a Mark

23   Canney?

24   A.    No.

25   Q.    Was there an address provided for

3850

1    Mr. Canney?

2          MR. SMITH:  Objection, relevance.

3          THE COURT:  Overruled.

4    A.    There was not.

5    Q.    When was telephone number 203-543-4209

6    activated?

7          THE COURT:  Activated or deactivated?

8          MR. MARKLE:  Activated.  I'm on to the

9    next phone.

10         THE COURT:  Yes, I know.

11   Q.    Activated.

12   A.    Yes, it was activated July 15th, 2005.

13   Q.    Do you know when that phone was

14   deactivated?

15   A.    We do not.  It was subpoenaed in 2006, it

16   had not yet been deactivated.

17   Q.    Do you know if minutes were ever refilled

18   on that phone?

19   A.    Yes, according to the subscriber data it

20   was August 23, 2005.

21   Q.    Do you know who the subscriber for that

22   phone was?

23   A.    There was no name listed on the account.

24   Q.    Are you aware in regards to T-Mobile

25   prepaid phones, are the -- are the records kept in

3851

1    Eastern daylight time or Pacific daylight time?

2    A.    The billing records for prepaid T-Mobile

3    are held in Pacific daylight time.

4    Q.    And were you aware of that when you

5    conducted your analysis of certain phone calls?

6    A.    Yes.

7    Q.    And so your analysis took that into

8    consideration?

9    A.    It did.  We added three hours to each of

10   the call times to obtain an Eastern daylight time.

11   So, if you are looking at the records for

12   203-543-4209 or for 203-243-7132, you have to add

13   three hours to the billing statement?

14   A.    Yes.

15   Q.    Did you obtain call detail records and

16   subscriber information for Sprint Nextel phones?

17   A.    Yes, we did.

18   Q.    And specifically 203-504-0599?

19   A.    Yes.

20   Q.    And do you know when -- what period of time

21   did you get billing records?

22   A.    June 1st, 2005, through August 31, 2005.

23   Q.    And when was that phone activated?

24   A.    That was activated March 9th, 2005.

25   Q.    And are you -- was that phone deactivated

3852

1    or still active when your subpoena was issued?

2    A.    Our subpoena indicated that it was expired

3    or cancelled on February 16th, 2006.

4    Q.    And do you know who the subscriber, the

5    listed subscriber for that phone was?

6    A.    Yes, it was Ron Tonalds at 12 West Avenue

7    in Norwalk, Connecticut.

8    Q.    In the course of the investigation, did

9    that name ever -- was that ever -- did you ever put

10   a person with that name?

11         MR. SMITH:  Objection.

12         MR. MARKLE:  I'll withdraw it.

13   Q.    Do you know if a Ron Tonalds existed?

14   A.    No.

15   Q.    Did you also get subscriber information and

16   call detail records for 203-549-4624?

17   A.    Yes.

18   Q.    And for what period of time?

19   A.    August 1st, 2005, through August 31, 2005.

20   Q.    Do you know when that phone was activated?

21   A.    That was activated February 15th, 2005.

22   Q.    And again, is there a deactivation date?

23   A.    There was not one when we had subpoenaed

24   it; it had yet to be deactivated.

25   Q.    Do you know who the subscriber was listed

3853

1    on, the subscriber information for that phone?
2        A.   Yes, it was Kytha Shaw.
3        Q.   And was there an address for Kytha Shaw; do
4    you recall?
5        A.   There was a P.O. Box listing from Irvine,
6    California which is a standard -- if no address is
7    provided, that's the address Sprint Nextel puts on
8    the account.
9        Q.   And do you know whether a SIM number, S-I-M
10   number was on the subscriber information?
11       A.   Yes, it was.
12       Q.   And do you recall what that was?
13       A.   I do not.
14       Q.   But it's on the subscriber information for
15   telephone No. 549-4624?
16       A.   Yes.
17       Q.   Did you also get call detail record and
18   subscriber information for 203-545-6682?
19       A.   Yes, we did.
20       Q.   And do you know for what period of time?
21       A.   August 1st, 2005, through August 31st,
22   2005.
23       Q.   And when was that phone activated?
24       A.   That phone was activated in June, June 23
25   of 2005.

3854

1        Q.   And again, was that phone deactivated, to
2    your knowledge?
3        A.   No, it was active through our subpoena
4    reply.
5        Q.   Do you know who the -- who was the listed
6    subscriber for that phone?
7        A.   Lashika Johnson.
8        Q.   And did she -- or did Lashika -- was there
9    an address associated with Lashika Johnson on the
10   subscriber information?
11       A.   There was.  It was 1322 Stratford Avenue in
12   Bridgeport, Connecticut.
13       Q.   Now, as to those phones, was there a need
14   to make any adjustment for Eastern daylight time?
15       A.   No, those were provided to us in Eastern
16   daylight time.
17       Q.   And as to those phones, is there any way to
18   determine if a conversation as opposed to a call
19   going to voicemail was made?
20       A.   No, there is no way for us to determine.
21       Q.   So you can just say that there was a
22   connection, you can't say whether there was
23   conversation.
24       A.   For Sprint phones no connection is actually
25   required.  The duration begins counting when you

3855

1    place a call and it hits off the closest cell tower.
2    So, no connection is needed for there to be a
3    duration.
4        Q.   So, you only know if there was an attempt
5    to contact.
6        A.   Right.
7        Q.   Did you obtain call detail records and
8    subscriber information for an AT&T cell phones?
9        A.   Yes, we did.
10       Q.   Specifically, 203-583-2198?
11       A.   Yes.
12       Q.   And for what period of time?
13       A.   August 1st, 2005 through August 31st, 2005.
14       Q.   And when was that phone activated according
15   to the subscriber information?
16       A.   That was activated July 14th, 2005.
17       Q.   And was it deactivated?
18       A.   It was.  It had a deactivation date of
19   12/21, 2005.
20       Q.   And who was the subscriber for that phone?
21       A.   Rodney Womble.
22       Q.   And was there an address provided?
23       A.   There was.
24       Q.   And what was that?
25       A.   555 Trumbull Avenue in Bridgeport,

3856

1    Connecticut.
2        Q.   Did you also get subscriber information for
3    203-615-8307?
4        A.   Yes.
5        Q.   Did you get -- is that while -- is that all
6    you got from the cell companies at our request,
7    subscriber information?
8        A.   Yes, we got subscriber information.
9        Q.   And when was that phone activated?
10       A.   It was activated on August 24th, 2005.
11       Q.   The same day as the homicides?
12       A.   Yes.
13       Q.   And when was it deactivated, if it was?
14       A.   Deactivated on April 18, 2006.
15       Q.   And who was the subscriber for that phone?
16       A.   Joe Clark.
17       Q.   Was there an address provided?
18       A.   There was.  2010 -- I'm sorry.
19       Q.   No, go ahead.
20       A.   2010 Main Street in Bridgeport,
21   Connecticut.
22       Q.   And do you know whether or not a Joe Clark
23   existed?
24       A.   No.
25       Q.   And do you always simply rely on subscriber

3857

1  information for your analysis?
2      A.   Certainly not.
3      Q.   Why not?
4      A.   In a prepaid phone it's not required that
5  you provide a license or any other identifying
6  information when you start an account.  So we can't
7  rely on simply subscriber data, we would have to
8  corroborate it with other information.
9      Q.   And what kind of information do you look
10 for for a corroboration?
11     A.   We use confidential human source reporting
12 or electronic surveillance or electronic intercepts.
13     Q.   And do you look to see what phones are
14 calling what phones?
15     A.   Yes.
16     Q.   Would that inform your analysis?
17     A.   That would.
18     Q.   When you say "confidential human sources,"
19 what we refer to as confidential informants?
20     A.   Yes.
21     Q.   Did you look at call detail records for a
22 telephone 203-382-0284?
23     A.   Yes.
24     Q.   And do you recall who that was subscribed
25 to?

3858

1      A.   I do not.
2      Q.   Were you made aware of a call made to 911
3  on August 24, 2005, at 10:14 a.m.?
4      A.   Yes.
5      Q.   And were you provided with the number that
6  called 911?
7      A.   I was.
8      Q.   And what was that number?
9      A.   It was 203-996-2047.
10     Q.   Did you obtain call detail records for
11 phone No. 203-543-4209?
12     A.   Yes.
13     Q.   Did the cell phone that called 911,
14 996-2047 ever contact 543-4209?
15     A.   Yes, it did.
16     Q.   And when did it contact that number?
17     A.   Three times on the morning of August 24,
18 2005.
19     Q.   Do you recall approximately or at what time
20 it called -- that 996-2047 called 543-4209?
21     A.   Yes 9:17, 9:18 and 9:35 a.m.
22     Q.   Do you know whether or not those calls were
23 answered?
24     A.   It shows a zero duration on the call detail
25 records.

3859

1      Q.   Did you conduct an analysis of the call
2  detail records for 203-243-7132?
3      A.   Yes.
4      Q.   And what did you look for in regards to
5  that phone number?
6      A.   We looked for several things.  Connectivity
7  with other phone numbers that we had knowledge of
8  who the subscribers or users were.  Any unusual
9  patterns or activities that we noticed.
10     Q.   There was testimony that the defendant
11 received a call on the morning of August 24th, 2005
12 and was heard asking "why are you calling me on this
13 phone"?
14          MR. SMITH:  Objection.  Before we even
15 get there.
16          THE COURT:  Pardon me?
17          MR. SMITH:  He's reciting testimony.
18          THE COURT:  Yes.  Do you want to finish
19 the question?
20          MR. SMITH:  He can finish the question.
21     Q.   Do the call detail records reveal whether
22 or not 203-243-7132 received an incoming call on
23 August 24, 2005?
24          MR. SMITH:  Objection.  May we approach?
25          THE COURT:  Yes, you may approach.

3860

1          (Sidebar conference).
2          MR. SMITH:  I'm going to object to the
3  form of the question that there was testimony that a
4  call was made.  He can ask was a call made from one
5  number to another number on a particular date or
6  time, but this idea of there was testimony that this
7  happened, I think that's totally improper.
8          THE COURT:  Mr. Markle?
9          MR. MARKLE:  There was testimony and I'm
10 asking her if a call was corroborative of that.
11         MR. SMITH:  That's argument.  That's
12 something they can argue, so and so testified that
13 there was a call and the phone records support that.
14 That's done in closing, not during his direct
15 examination of this witness.
16         MR. MARKLE:  I'm not arguing it now.
17 I'm saying there was testimony that a call was made
18 and does her analysis show a call, in fact, was made
19 that morning.  And then the next question would be
20 what time and it's going to show the victims' phone
21 called the 7132 phone.
22         MR. SMITH:  That's argument.  Right
23 there, assuming it's the victims' phone, your Honor.
24         THE COURT:  Wait a minute.  I'm sorry,
25 oh, okay.  So we know what Tina Johnson's phone

3861

```
1   number is.
2           MR. SMITH:  Well, there has been
3   testimony as to what that number is, your Honor.
4           MR. MARKLE:  Her daughter just testified
5   to her number.
6           THE COURT:  Correct.  And the question
7   is going to be on 8/24 did 243-7132 receive an
8   incoming call and what was the incoming call.  And
9   that number is expected to be 543-4209.
10          MR. MARKLE:  Correct.
11          THE COURT:  That seems fair.
12          MR. SMITH:  Well, your Honor, I have no
13  objection to asking did one number call another
14  number on a particular date and time.  My objection
15  is to Mr. Markle saying there has been testimony
16  about X, Y and Z and does this support that.  That's
17  getting really far afield into argument, your Honor.
18          THE COURT:  Is your objection the word
19  "support."
20          MR. SMITH:  My objection is there has
21  been testimony and there has been evidence and there
22  has been whatever else Mr. Markle plans on saying.
23  I think it's an improper question to say -- for him
24  to summarize previous testimony and then say now is
25  there a call that shows that.  Again, this goes just
```

3862

```
1   to my argument of the chart.  Yes, there has been
2   some testimony and/or evidence in regards to phone
3   number ownership, but for Mr. Markle to summarize
4   what that is and then ask the witness is there a
5   call, that's exactly what the chart does.
6           MR. MARKLE:  I think I am -- I'm allowed
7   to put it in some context, and if I'm wrong, you
8   have cross, and you can say there is no proof of
9   that or whatever you think.
10          MR. SMITH:  No, your Honor, if I get up
11  and say isn't it true there no proof of that --
12          THE COURT:  The problem is how else is
13  the government going to put in context the question
14  that they are asking this witness?
15          MR. SMITH:  Your Honor, just as the
16  government can put in context in their argument in
17  closing what they believe the record, phone records
18  show, by saying you heard testimony from so and so
19  that says this number belonged to this person, but
20  to do it in their direct, it's essentially a
21  summation in their direct, same as that chart is.
22          THE COURT:  You are going to put in the
23  time of the incoming call from Tina Johnson's number
24  on October 24?
25          MR. MARKLE:  August.
```

3863

```
1           THE COURT:  I mean August 24, to the
2   number for which you have a voicemail message which
3   Shante Pettway identified?
4           MR. MARKLE:  Correct.
5           MR. SMITH:  Again, your Honor, I have no
6   objection to him saying from number 243-7132, was
7   there a call to the number that is alleged to be
8   Tina Johnson.
9           THE COURT:  Let's restrict it to that.
10  The record will, therefore, be established even if
11  the precise reason this is being adduced is not
12  immediately evident to the jury.  So let's have the
13  question asked of this witness in that form.  Okay?
14          MR. MARKLE:  Without the preface?
15          THE COURT:  Right.
16          (Sidebar concluded)
17          THE COURT:  Counsel, we're going to take
18  our morning break at this point.
19          (Jury exited the courtroom).
20          THE COURT:  I'm sorry, one of the jurors
21  needed a break.  We're going to stop serving coffee
22  in the jury room.  Is there anything that we can
23  take advantage of?
24          MR. SMITH:  Your Honor?
25          THE COURT:  On further colloquy.
```

3864

```
1           MR. SMITH:  I think we haven't finally
2   decided the chart issue unless you want to wait
3   until that comes up.  And I think --
4           THE COURT:  Well, what is your thinking
5   on that, Mr. Markle?
6           MS. DAYTON:  Should we excuse the
7   witness?
8           THE COURT:  Yes.
9           There are -- cell phone 583-2198 is
10  identified to Rodney Womble.  That would seem to me
11  to be fine.
12          We have Ms. Whittingham's testimony
13  today as to what her mother's cell phone number was,
14  that is as the jury heard it.  I can't remember
15  whether John Taylor's cell phone was identified to
16  him by name.  Was that?
17          MS. DAYTON:  He testified.
18          THE COURT:  He testified that's what it
19  was.
20          MR. SMITH:  I would note, your Honor, on
21  cross he did not recall the exact same number.  He
22  misidentified the number on cross when asked to
23  recall it from memory.
24          THE COURT:  All right.  But nonetheless,
25  he did identify that.  Lashika Johnson's cell phone
```

3865

1    number is identified by her and the subscriber
2    records.  And so what that leaves is the 7132 that
3    Detective Donaldson testified about that takes
4    several links back.
5           Who testified to Efrain Johnson's cell
6    phone?
7           MR. MARKLE:  That was Special Agent
8    Munger, your Honor.  It was seized from Mr. Johnson
9    and the SIM number was matched.
10          MR. SMITH:  No, it wasn't, your Honor.
11   He said there is a SIM number and that's all he
12   said.  This is the SIM number from this phone.
13   There was no matching to Mr. Johnson.
14          THE COURT:  So the SIM number matches to
15   the phone, but not to Efrain Johnson, that's what
16   you are saying.
17          MR. SMITH:  Your Honor, in short, what
18   this is, this first page, it is argument.  These
19   are --
20          THE COURT:  I understand your position.
21   There are certain questions, though.  Mostly what I
22   want to ask the government is --
23          MR. MARKLE:  Your Honor, can I just --
24   the SIM card, the SIM number does match on Efrain
25   Johnson.

3866

1           THE COURT:  It matches the phone seized
2    from Efrain Johnson.
3           MR. MARKLE:  It matched.  And the Kytha
4    Shaw subscriber information.
5           THE COURT:  The SIM number.
6           MR. MARKLE:  Yes.
7           THE COURT:  Yes.
8           MR. MARKLE:  Every one of these the
9    government would argue is well established.
10          THE COURT:  I understand that.  It's the
11   "will argue" that gets us into the problem.
12          MR. MARKLE:  But for these purposes,
13   your Honor, it's to put into context what the
14   witness is testifying to and why her attention would
15   be drawn, why she would do an analysis of the five
16   or six phones I've asked her about.  They weren't
17   just picked out of the blue.  And she's not, again,
18   saying that this is truly Efrain Johnson's phone,
19   but this is why --
20          THE COURT:  But it's not Efrain
21   Johnson's phone.  It really isn't relevant, is it?
22          MR. MARKLE:  But I'm not relying on her
23   to say, your Honor.  I am going to argue to the jury
24   it's been established and, therefore, Ms.
25   Dellavolpe's analysis is relevant and important.

3867

1           THE COURT:  So, let me ask you this.
2    She develops all these numbers for you.  She shows
3    where the calls are coming from and going to on
4    August 24.  The caption -- what is she going to be
5    able to do that you can't do in closing?
6           MR. MARKLE:  Well, she could probably
7    articulate it a lot better, your Honor, but really
8    nothing except it leaves her testimony totally out
9    of context.  It just -- it's just a chart without
10   any meaning.
11          THE COURT:  But the meaning comes from
12   how you draw all the links together.  Isn't that
13   right?
14          MR. MARKLE:  Yes, your Honor, but I
15   guess that's why -- I mean, I could take the chart
16   in final argument and insert every name that I think
17   goes with every number based on the evidence.
18          THE COURT:  And how would that be
19   particularly different from what you want to ask her
20   to do?
21          MR. MARKLE:  Because I'm not asking her
22   to necessarily do that.  I'm not asking her -- I'm
23   going to argue to the jury that that's what the
24   evidence proves.  I'm asking her it's -- it's not
25   offered for the truth, it's offered to show why

3868

1    these numbers were of significance and why she
2    performed her analysis.
3           THE COURT:  So tell me what her answer
4    would be.  You are going to give me sort of a
5    proffer Q and A.
6           MR. MARKLE:  Well, as I was doing with
7    the 7132, if that had a cell phone with a voicemail
8    message that was identified as Azibo Aquart, that
9    number would obviously be of relevance to her and
10   she would, therefore, look into it.  And did her
11   subsequent analysis reveal that that number was in
12   touch with other people associated with Azibo
13   Aquart, like John Taylor and Efrain Johnson.  And so
14   it leads to why she performed an analysis and then
15   it puts into context why that analysis is relevant.
16          THE COURT:  But she doesn't know any of
17   that other than what you told her.  That's where the
18   problem comes in.
19          MR. MARKLE:  That's why I think at the
20   beginning --
21          THE COURT:  It's not a 2006 chart.  I
22   mean, it doesn't come in under 2006.
23          MR. MARKLE:  That portion of it.  I
24   agree except, again, it's not offered for the truth.
25   I know your Honor says it is, but not through this

3869

1  witness.

2  THE COURT:  It seems to me that you can

3  certainly have her be identifying on this chart

4  which is the number she found registered to Womble

5  to Canney, to all those kinds of things, and that

6  she was then directed to find the connectivity among

7  those.  But it seems to me that sort of beyond

8  that -- of the ones where she did the subscriber

9  information, some of which identify the real person,

10 some of which are fake people.

11 MR. MARKLE:  Well, I don't mean to put

12 off the inevitable, your Honor, but perhaps I can

13 finish her examination and before I offer that chart

14 ask your Honor just once more, perhaps, based on her

15 testimony, it will make more -- it will make more

16 sense to your Honor how the government is attempting

17 to use it.

18 THE COURT:  All right.

19 MR. MARKLE:  I won't offer it obviously

20 before then.

21 THE COURT:  We can do that.  I'm just --

22 so, let me see how you plan to do that.  All right,

23 let us take a five-minute recess.

24 (Recess)

25 THE COURT:  All right, please be seated

3870

1  and we'll bring in the jury.

2  Please be seated, ladies and gentlemen.

3  All right.  Mr. Markle you may continue.

4  MR. MARKLE:  Thank you, your Honor.

5  Q.  Ms. Dellavolpe, I was asking you if the

6  cell phone that called -- I'm sorry, did you, in

7  regards to your analysis of 203-243-7132, do the

8  call detail records reveal whether or not that cell

9  number received an incoming call on the morning of

10 August 24, 2005?

11 A.  Yes, it did.

12 Q.  And did you obtain -- at what time did that

13 telephone 243-7132 receive a call?

14 A.  There were several incoming calls on the

15 morning of August 24, 2005, but there was one call

16 in particular that stood out.

17 Q.  I'm sorry, one call in particular?

18 A.  Yes.

19 Q.  And at what time was that call?

20 A.  10:25 a.m.

21 Q.  And what number called 203-243-7132 at

22 10:25 a.m.?

23 A.  203-543-4209.

24 Q.  In regards to 543-4209, the phone that

25 called there, going back, the call that called

3871

1  the -- the cell phone that called 911, was that in

2  touch with 543-4209?

3  A.  Yes, it was.

4  Q.  How many times on the morning of

5  August 24th?

6  A.  Three times, at 9:17, 9:18 and 9:35.

7  Q.  And that same phone, 203-543-4209 placed a

8  call at 10:25 to 243-7132?

9  A.  Yes.

10 Q.  And do you know whether there was a

11 connection made?

12 A.  It does show a duration of two minutes.

13 Q.  You cannot say whether there was

14 conversation or not?

15 A.  No.

16 Q.  Could you determine whether this call to

17 243-7132 was or was not blocked?

18 A.  Yes, on the call detail records for

19 203-543-4209 it shows that the outgoing call to that

20 7132 at 10:25 was initiated with a B 67, which is

21 indicative of attempting to block your caller ID.

22 Q.  So the person making the call was

23 attempting to block the number?

24 A.  Yes.

25 Q.  But obviously it shows up on the call

3872

1  detail records?

2  A.  It does.

3  Q.  Now, did you in the course of your analysis

4  identify a cell phone associated with John Taylor?

5  A.  Yes.

6  MR. SMITH:  Objection.

7  MR. MARKLE:  Well, I'll withdraw it.

8  Q.  And what phone number did you associate

9  with John Taylor?

10 MR. SMITH:  Objection.  May I voir dire?

11 MR. MARKLE:  I'll withdraw.

12 Q.  Did you identify a cell phone number that

13 made calls to Pinetops, North Carolina?

14 A.  Yes, we did.

15 Q.  And was out of all the numbers I've asked

16 you about, was there one or more phones that called

17 Pinetops, North Carolina?

18 A.  There was one phone.

19 Q.  And do you know what the number of that

20 phone was?

21 A.  Yes, it was 203-504-0599.

22 Q.  And do you know whether or not that

23 telephone, 504-0599 was in contact with

24 203-243-7132?

25 A.  Yes, it was.

3873

```
1       Q.   And do you know approximately how many
2   times that -- how many numbers in the Pinetops,
3   North Carolina area that phone called?
4       A.   There were over twenty numbers with the 252
5   area code in North Carolina.
6       Q.   Over twenty different numbers?
7       A.   Different unique numbers, yes.
8       Q.   And did you review the records for that
9   504-0599 phone which was in touch with Pinetops,
10  North Carolina for the month of August?
11      A.   Yes.
12      Q.   2005?
13      A.   Yes.
14      Q.   And was there contact between that phone
15  and the phone which you said had the defendant's
16  voicemail message on it?
17           MR. SMITH:   Objection.
18           MR. MARKLE:   I'm sorry.
19      Q.   The phone that was identified as having a
20  voicemail message on it?
21           MR. SMITH:   Objection.
22           THE COURT:   Overruled.  You mean from
23  just the previous testimony?
24           MR. MARKLE:   Yes, your Honor.
25           THE COURT:   And obviously, the jury will
```

3874

```
1   make its determinations and decisions about having
2   heard each witness, the credibility of each witness,
3   but just for reference sake, you can do it that way.
4           MR. MARKLE:   Thank you, your Honor.
5       A.   Yes, it did have contact with.
6           THE COURT:   I'm sorry, can you repeat
7   the question?
8       Q.   Was there contact between the 203-504-0599
9   telephone number and the phone that you identified
10  that you indicated had a voicemail message on it?
11      A.   Yes.
12      Q.   You don't know the voice on that voicemail
13  message, correct?
14      A.   Correct.
15      Q.   When was the first time between those two
16  phones in August of 2005?
17      A.   I believe it was August 14, 2005.
18      Q.   And when was the last time those two phones
19  were in contact in August of 2005?
20      A.   August 24, 2005.
21      Q.   And do you know through your analysis on
22  what day in August of 2005 that phone was in contact
23  with 243-7132 the most?
24      A.   Yes, it was August 24th, 2005, with 27
25  total calls.
```

3875

```
1       Q.   Between 243-7132 and 504-0599?
2       A.   Yes.
3       Q.   The calls between 1:50 a.m. and 5:00 a.m.,
4   did you examine that time period?
5       A.   Yes.
6       Q.   Were the calls steady or intermittent
7   during that time period on August 24, 2005?
8       A.   Between those two phones the calls were
9   steady.  I believe there were about 21 different
10  calls between that time period.
11      Q.   And when was the last telephone call to or
12  from 243-7132 prior to 5:04 a.m. on August 24, 2005?
13      A.   Can you repeat the question?
14      Q.   Do you know when was the last contact with
15  243-7132 prior to 5:04 a.m. on August 24th?
16      A.   At 5:03 a.m.
17      Q.   And do you know who that was with?
18      A.   Yes, it was the 7132 number calling the
19  504-0599 number.
20      Q.   And do you know when the next call after
21  5:04 -- after 5:03 a.m., then is there a period of
22  time where there is no calls to or from 243-7132?
23           THE COURT:   It would be just easier if
24  we just used the last four digits since it's --
25           MR. MARKLE:   That will be fine.
```

3876

```
1           THE COURT:   If nobody has any objection,
2   that's a quicker way to keep track of this.
3           MR. SMITH:   No objection.
4           THE COURT:   All right.  So you have the
5   what you call the Pinetops number will be called
6   0599 and the voicemail number will be called 7132.
7           MR. MARKLE:   7132, yes.
8           THE COURT:   Let's see if that is more
9   efficient for understanding the testimony.
10          Now I'm going to ask you to reask your
11  last question.
12          MR. MARKLE:   Thank you, your Honor.
13      Q.   Between 5:04 was there a period of time
14  where there was no phone activity, calls to or from
15  the 7312 phone?
16      A.   Yes, from 5:03 to 5:44 a.m. on the morning
17  of August 24th.
18      Q.   And what was the first call after that gap
19  of time?
20      A.   It was the 4624 number calling the 7132
21  number.
22      Q.   Did you review the call detail records for
23  -- I will spell it out the first time 203-549-4624?
24      A.   Yes.
25      Q.   And did you review the subscriber
```

3877

```
1   information for 4624?
2       A.   Yes.
3       Q.   And who was the subscriber for that phone?
4           MR. SMITH:  Objection.  Asked and
5   answered earlier.
6           MR. MARKLE:  I want to remind the jury,
7   your Honor?
8           THE COURT:  That's all right.
9       A.   Kytha Shaw.
10      Q.   Was the 4624 number in contact with the
11  7132 number in August of 2005?
12      A.   Yes, it was in contact only on August 24,
13  2005.
14      Q.   So prior to August 24, 2005, there was no
15  contact?
16      A.   Correct.
17      Q.   And after August 24, 2005, no contact?
18      A.   Correct.
19      Q.   How many times on August 24, 2005, was 4624
20  in contact with the voicemail phone?
21      A.   Seven times.
22      Q.   And do you know when the first call on
23  August 24th, 2005 was between those two phones?
24      A.   Yes, at approximately 1:47 a.m.
25      Q.   Do you know when the last call was between
```

3878

```
1   those two phones?
2       A.   I can't recall.  I would have to look at
3   the --
4       Q.   Do you know whether there was any contact
5   between those two phones, between 5:04 a.m. and
6   5:43 a.m. on August 24, 2005?
7       A.   No contact.
8       Q.   What phones were called, out of all of the
9   phones you analyzed, what phones were called or in
10  contact with 7132 between 5:04 a.m. and 5:43 a.m.?
11      A.   None.
12      Q.   7132 had no phone activity during that
13  period of time?
14      A.   Correct.
15      Q.   Did the Pinetops No. 0599, did that phone
16  make or receive any calls from anyone between 5:04
17  and 5:43 a.m. on August 24th, 2005?
18      A.   None.
19      Q.   Did the 4624 number make or receive any
20  calls from anyone between 5:04 a.m. and 5:43 a.m. on
21  August 24th, 2005?
22      A.   No.
23      Q.   So, prior to this 40-minute void of calls,
24  who was the last person 7132 called?
25          MR. SMITH:  Objection.
```

3879

```
1       Q.   What was the last number?
2       A.   0599.
3       Q.   The Pinetops number?
4       A.   The Pinetops number.
5       Q.   Associated with Pinetops, North Carolina?
6       A.   Uh-huh (indicating affirmatively).
7       Q.   And following the 40-minute void, what was
8   the first phone that 7132 contacted?
9       A.   The 4624 number.
10      Q.   Earlier in the morning of August 24th,
11  2005, did you look at the early morning hours in the
12  phone calls?
13      A.   Yes.
14      Q.   Who were the first five calls placed to or
15  from what number -- what numbers were called?  Let me ask
16  you this.  Did you identify a phone that was
17  subscribed to by Lashika Johnson?
18      A.   Yes.
19      Q.   And what was that phone number?
20      A.   545-6682.
21      Q.   And looking at the first -- first five
22  calls placed on August 24th, 2005, from or to 7132,
23  were there any to the Lashika Johnson phone?
24      A.   Yes.
25      Q.   How many?
```

3880

```
1       A.   I believe three.
2       Q.   And again in the early morning hours of
3   August 24, 2005, did the 7132 phone contact 4624?
4       A.   Yes.
5       Q.   Do you remember what time the first call
6   between 7132 and Lashika Johnson or 4624 was?
7       A.   Yes, I believe at 1:47 a.m.
8       Q.   A.m.?
9       A.   A.m.
10      Q.   Do you know, did you identify a telephone
11  that was subscribed to by Rodney Womble?
12      A.   Yes.
13      Q.   Do you recall that telephone number?
14      A.   Yes, it was 203-583-2198.
15      Q.   Were there any calls from the 7132 number
16  to the Rodney Womble phone?
17      A.   Yes, there were three calls to the 2198
18  phone on the morning of August 24.
19      Q.   And were those incoming or outgoing?
20      A.   They were outgoing from the 7132 number.
21      Q.   So, 7132 called the Womble phone?
22      A.   Yes.
23      Q.   And were they answered?
24      A.   No.
25      Q.   And how do you know that?
```

3881

1    A.   When AT&T provided us the call detail
2  records for the 2198, Rodney Womble phone, it
3  specified that those calls rolled to voicemail,
4  which indicates to us that it was not answered by
5  someone, rather the voicemail.
6    Q.   Did you -- were you aware of the subscriber
7  information or subscriber data for 203-615-8307?
8    A.   Yes.
9    Q.   And were you aware, did it provide an IMEI
10 number?
11   A.   Yes, it did.
12   Q.   And were you aware that a telephone was
13 seized from Azikiwe Aquart in the course of the
14 investigation?
15   A.   Yes.
16   Q.   And do you know whether or not the IMEI
17 number matches?
18   A.   Yes, it did.
19   Q.   And that's attributed -- that's associated
20 with 203-615-8307, correct?
21   A.   Yes.
22   Q.   Do you know when that phone was activated?
23   A.   On August 24, 2005.
24   Q.   Can you determine at what time or where
25 that phone was activated?

3882

1    A.   Unfortunately not through the subscriber
2  data, no.
3    Q.   Based on information that you did have, can
4  you determine when that phone 615-8307 was first
5  used?
6    A.   We can't determine its first use, but we
7  can show the first time we see it through our
8  records, the records we already have.
9    Q.   And what time was that?
10   A.   That was on 11:26 a.m. on the morning of
11 August 24, 2005.
12   Q.   So that was approximately one hour after --
13 well, strike that.
14      Was there subsequent contact between the
15 7132 phone and the 8307 phone?
16   A.   Yes, there were about nine -- there were
17 nine additional calls that day.
18   Q.   In your review of August of 2005 of the
19 7132 phone, did you determine whether it called a
20 phone number 382-0284?
21   A.   Yes, it did.
22   Q.   And did you know whose phone that was?
23   A.   Yes.
24   Q.   And how many phone calls were made to the
25 0284 number?

3883

1    A.   I believe -- I'm not sure, I would have to
2  check.
3    Q.   Do you have notes or anything that would
4  refresh your recollection?
5    A.   I could, yes.
6    Q.   You are looking at a chart of phone calls
7  or notes regarding phone calls.
8    A.   Yes.
9    Q.   Does that refresh your recollection?
10   A.   It does.
11   Q.   So, we can't look at it.  Do you know how
12 many calls?
13   A.   There were eight calls in August of 2005.
14   Q.   And are you familiar -- do you know how
15 many calls -- 545-6682, who was that subscribed to?
16   A.   Lashika Johnson.
17   Q.   Do you know whether 7132 -- how many times
18 the 7132 number contacted Lashika Johnson in August
19 of 2005?
20   A.   Yes, 35 times.
21   Q.   Now, you don't know if these, any of these
22 people or these phones were associated with -- had
23 another phone?  These are the only phones you knew
24 about for them, correct?
25   A.   Correct.

3884

1    Q.   And so whether they were using other phones
2  you cannot say; is that correct?
3    A.   No, I couldn't say.
4    Q.   And whether they were using land lines or
5  regular phones you don't know, do you?
6    A.   No.
7    Q.   Do you know whether in August of 2005 the
8  7132 phone called any phones with an area code that
9  started with 9?
10   A.   Yes, it did have contact.
11   Q.   And was there more than one phone with an
12 area code that started with 9 contacted by the 7132
13 number?
14   A.   No, there was one phone number.
15   Q.   And do you remember what that area code
16 was?
17   A.   Yes, it was 954.
18   Q.   And do you know whether or not the 7132
19 called -- the phone with the voicemail message,
20 called that area code 954 on August 24, '05?
21   A.   Yes, it did.
22   Q.   And do you know how many times there was
23 contact between those two phones?
24   A.   I can't recall.  I know in the morning
25 hours there were three specific.

3885

```
1       Q.    The morning of August 24?
2       A.    Yes.
3       Q.    2005?
4       A.    Yes.
5       Q.    Now, did you prepare a graph which depicts
6   some of what you've testified today?
7       A.    Yes, I did.
8       Q.    And is it a true and accurate graph or
9   representation of the call frequency you've talked
10  about?
11      A.    Yes.
12      Q.    Or that you analyzed.  And was it -- how
13  did you prepare it?  Based on an analysis of what
14  records?
15      A.    The 7132 records.
16      Q.    And I'm going to show you what's been
17  marked 279, called Overall Call Frequency, and ask
18  you if you recognize that graph?
19      A.    Yes.
20      Q.    And what does that graph depict?
21      A.    That depicts all of the incoming, outgoing
22  calls divided by day for the 7132 phone.
23            MR. MARKLE:  Your Honor, I would offer
24  Government's 279, to which I understand there is no
25  objection.
```

3886

```
1            MR. SMITH:  No objection.
2            THE COURT:  All right.  That is a full
3   exhibit.
4            MR. MARKLE:  Your Honor, rather than
5   waiting, I have copies I can hand out to the jury.
6   It might even be better than on the big screen.
7            THE COURT:  All right.
8            MR. MARKLE:  Handing the original to the
9   clerk, your Honor.  Copy to the witness.
10           THE COURT:  Does that machine have a
11  different mood every day?
12           MS. REYNOLDS:  I think when I try to use
13  it, your Honor.
14           THE COURT:  Stay away then.
15           So, this 7132, what we're calling the
16  voicemail number.
17           MR. MARKLE:  Yes, your Honor.
18      Q.    So, Ms. Dellavolpe, looking at Government's
19  Exhibit 279, you have it in front of you.
20      A.    Yes.
21      Q.    And you said this is overall call frequency
22  based on the voicemail numbers, an analysis of the
23  information obtained from the voicemail number?
24      A.    Yes, it is.
25      Q.    And in regards to -- well, that's sort of
```

3887

```
1   self-evident, but if you look at the chart, what day
2   has the highest frequency of phone calls on the
3   voicemail message number?
4       A.    August 24, 2005.
5       Q.    And how many phone calls are there to or
6   from the voicemail number on that day?
7       A.    Ninety-seven calls.
8       Q.    And as your graph depicts, from the 18th to
9   the 24th of 2005, was that the highest rate of calls
10  over the course of the month of August?
11      A.    Yes, it is.
12      Q.    And again, although it's on -- it's on the
13  chart, what is the next highest rate of calls to the
14  voicemail number in August of 2005 other than on
15  August 24th?
16      A.    August 22nd.
17      Q.    Now, these reflect calls to the voicemail
18  number from what phones?
19      A.    Any phones that called him.
20      Q.    It's not limited to the phones we've talked
21  about earlier?
22      A.    No, it is not.
23      Q.    This is the overall, as you labeled it,
24  call frequency?
25      A.    Yes.
```

3888

```
1       Q.    And did you also prepare a second chart
2   which is called Telephonic Contact with
3   203-243-7132, August 2005 frequency chart?
4       A.    Yes, I did.
5       Q.    Showing you what's been marked Government
6   Exhibit 280, do you recognize that chart?
7       A.    Yes.
8       Q.    What do you recognize that to be?
9       A.    This is the chart comparing contact with
10  7132 with three other significant phone numbers.
11      Q.    And was this chart prepared by you?
12      A.    Yes.
13      Q.    And is it a true and accurate depiction
14  graphically of the analysis you performed in regards
15  to the voicemail phone?
16      A.    Yes.
17      Q.    And its contact with 0599, 4624 and 8307?
18      A.    Yes.
19            MR. MARKLE:  I would offer Government's
20  Exhibit 280, your Honor.
21            MR. SMITH:  No objection.
22            THE COURT:  Full exhibit.
23      Q.    Now, Ms. Dellavolpe, looking at that second
24  chart, there is an indication that there -- well,
25  there are certain calls that are marked in blue; is
```

3889

1    that correct?
2       A.   Yes.
3       Q.   And that's the 0599 call?
4       A.   Yes.
5       Q.   Number.
6       A.   Uh-huh (indicating affirmatively).
7       Q.   And what does your chart show in regards to
8    0599 and 7132, the voicemail number?
9       A.   They spoke in the month of August from
10   August 14, 2005, to August 24, 2005, where contact
11   stopped after that date.
12      Q.   And the 0599 number is -- is that the same
13   number that's associated with Pinetops, North
14   Carolina?
15      A.   It is.
16      Q.   And is it fair to say based on Exhibit 280
17   that the most calls between the voicemail phone and
18   the Pinetops phone were on the August -- what day?
19      A.   August twenty --
20             MR. SMITH:  Objection, leading.
21             MR. MARKLE:  I tried to stop myself.
22             THE COURT:  Do you want to -- I think he
23   stopped himself in time.
24      A.   It was August 24, 2005.
25      Q.   And how many calls were there on that day?

3890

1       A.   Twenty-seven calls.
2       Q.   And leading up to that day, is it fair --
3    how many calls were there on August 19th between the
4    Pinetops phone and the voicemail phone?
5       A.   Twenty.
6       Q.   And how many on August 20th, 2005?
7       A.   Twenty-six.
8       Q.   August 21st?
9       A.   Six.
10      Q.   August 22nd?
11      A.   Eighteen.
12      Q.   August 23rd?
13      A.   Three.
14      Q.   And then the 24th, you testified.  After
15   that there is no blue on your chart.  Why is that?
16      A.   There was no further contact between the
17   7132 number and the 0599 number.
18      Q.   And on August 24th, next to the blue there
19   is what appears to be a brown mark.
20      A.   Yes.
21      Q.   And that's the 4624 phone.
22      A.   Uh-huh (indicating affirmatively).
23      Q.   And you indicated that that phone -- when
24   was that phone in contact with the voicemail phone?
25      A.   Seven times, only on August 24, 2005.

3891

1      Q.   And then the green is the phone that has
2    the IMEI number that was associated with Azikiwe
3    Aquart.
4      A.   Yes.
5      Q.   The phone seized from him.  And how many
6    times on August 24th is 8307, that phone in contact
7    with the voicemail phone?
8      A.   Ten times.
9      Q.   And thereafter, the graph depicts in green
10   the continuing contact between those two phones.
11      A.   Yes.
12      Q.   Now, in regards to the green 8307, which
13   begins on August 24 and is not seen before, why is
14   that?
15             MR. SMITH:  Objection to the form of the
16   question.
17             MR. MARKLE:  I'll withdraw it.
18      Q.   In regards to the green phone, 8307, it is
19   not depicted on the graph before August 24, 2005,
20   correct?
21      A.   Correct.
22      Q.   Do you know why that is?
23      A.   It was activated on August 24, 2005.
24             MR. MARKLE:  Your Honor, I'm going to
25   offer a third chart, only pages 1 and 2.  I'm going

3892

1    to remove the first page.
2             THE COURT:  All right.
3             MR. MARKLE:  I think that -- do you have
4    any objection?
5             MR. SMITH:  No.
6             MR. MARKLE:  Unfortunately I didn't
7    remove the pages from all of the copies and the
8    machine is not working.  If you could just bear with
9    us for a moment.
10           THE COURT:  Maybe someone else with less
11   electronically bad luck than Ms. Reynolds could
12   fiddle with our machine.
13           MS. REYNOLDS:  We've contacted Carlos
14   Perez from our office.  It's a court projector.  For
15   some reason --
16           MR. MARKLE:  I could ask some
17   preliminary.
18      Q.   Showing you what's marked Government
19   Exhibit 278, do you recognize that chart?
20      A.   Yes.
21      Q.   How do you recognize that?
22      A.   This is a depiction of the call detail
23   records for 7132.
24      Q.   And again, the information contained on
25   that chart, where is it obtained from?

3893

```
1      A.   Administrative subpoena 7132.
2      Q.   And is it based only on the records of
3  7132, the voicemail phone?
4      A.   Yes.
5      Q.   And what does that chart depict?
6      A.   It depicts the time and the incoming and
7  outgoing calls.
8      Q.   And for what period of time, what date?
9      A.   For August 24, 2005.
10     Q.   What period of time?
11     A.   Midnight or 1:47 a.m. to 12:35 p.m. or
12  midnight to noon.
13     Q.   And you had testified that -- is this a
14  true and accurate depiction of the information you
15  garnered from 7132 phone analysis?
16     A.   Yes.
17     Q.   And these are the calls to and from that
18  phone during this period of time, correct?
19     A.   Yes.
20          MR. MARKLE:  The government would offer
21  it as a full exhibit.
22          THE COURT:  I understand there is no
23  objection.
24          MR. SMITH:  No objection.
25          THE COURT:  Full exhibit.
```

3894

```
1          MR. SMITH:  Just the two pages.
2      Q.   Ms. Dellavolpe, if you look at the first
3  several calls, do those -- on August 24, 2005, do
4  those -- the 7132, the voicemail phone, is in touch
5  with 4624.  Do you know who that -- let me ask you
6  this.  Strike that.
7          The 7132 phone is in touch with 6682.  Do
8  you know whose phone that was?
9      A.   It was subscribed to Lashika Johnson.
10          MR. SMITH:  Objection.  I'm sorry.  It's
11  based on the subscriber information, that's fine.
12     Q.   Do you know whose phone that was based on
13  subscriber information?
14     A.   Lashika Johnson.
15     Q.   And do you know -- and this shows that
16  phone was called two times during that early morning
17  hours.
18     A.   Yes.
19     Q.   And at 1:50:42 a.m. on August 24th, '05,
20  the voicemail phone is in contact with what we've
21  been calling the Pinetops phone; is that correct?
22     A.   Yes.
23     Q.   Are there additional calls between those
24  two phones?
25     A.   Yes, there are several.
```

3895

```
1      Q.   And they're depicted on your chart?
2      A.   Yes.
3      Q.   In the order in which they were received
4  and at the time in which they were received?
5      A.   Yes.
6      Q.   That's true for all the calls?
7      A.   Yes.
8      Q.   And there is a phone number on here with a
9  954 number of prefix.  Is that the phone you
10  referred to as starting within area code 954?
11     A.   Yes.
12     Q.   And the one and only 954 number?
13     A.   Yes.
14     Q.   And you spoke about a gap of time or a void
15  of calls.  If you turn to the second page, is
16  depicted at 5:03:46, is there a call?
17     A.   There is.
18     Q.   And who is the voicemail phone in touch
19  with at that time?
20     A.   The Pinetops 0599 number.
21     Q.   And at 5:44 -- from 5:03 to 5:44 are there
22  no calls?
23     A.   No calls.
24     Q.   But you didn't just leave them out, there
25  are no calls?
```

3896

```
1      A.   Correct.
2      Q.   At 5:44 a.m. what is the voicemail phone in
3  touch with, what number?
4      A.   4624 number.
5      Q.   And if we look on the chart at August 24,
6  2005, at 10:25:57 a.m., the voicemail message phone
7  gets a call from what number?
8      A.   The 4209 number.
9      Q.   And shortly after that call, what's the
10  next call to the area code 954 number?
11     A.   At 10:37 and followed by another call at
12  10:56.
13     Q.   And what's the number in common to all the
14  calls?
15          THE COURT:  Do you want to use the ELMO
16  now?
17          MR. MARKLE:  I think I'm just about done
18  with the chart.  But thank you.
19          THE COURT:  Thank you, Mr. Robertson.
20  You can give a tutorial to everybody.
21          MS. DAYTON:  I think press the on
22  switch.
23     Q.   What number is in common to all the numbers
24  listed on Government -- on the chart?  On -- yes, on
25  279, I think it is.  I'm sorry.
```

3897

1          MS. DAYTON:  278.
2     Q.   278.
3     A.   The number in common with every itemized
4  item here is 7132.
5     Q.   Does the phone subscribed to Rodney Womble
6  ever call or contact the phone that we're calling
7  the Pinetops phone?
8     A.   No.
9     Q.   Does the phone subscribed to Rodney Womble
10 ever call the 4624 number?
11    A.   No.
12    Q.   Does the Rodney Womble subscribed phone
13 ever call the 615-8307 number?
14    A.   No.
15    Q.   Does that phone, the 615-8307 seized from
16 Azikiwe Aquart, does that phone ever call or contact
17 the Taylor phone, the Pinetops phone?
18    A.   No.
19    Q.   Does it ever call or contact the 4624
20 number seized from Efrain Johnson?
21    A.   No.
22    Q.   Does the phone seized from Efrain Johnson,
23 4624, ever call or contact the Taylor phone?
24    A.   No.
25    Q.   Does it ever call or contact the phone

3898

1  seized from Azikiwe Aquart, 615-8307?
2     A.   No.
3     Q.   I think I've asked most variations, but
4  does the Pinetops phone ever contact the 4624 phone
5  seized from Efrain Johnson?
6     A.   No.
7     Q.   Does it ever contact the phone 8307 seized
8  from Azikiwe Aquart?
9     A.   No.
10    Q.   Does the voicemail phone, 7132, ever call
11 or contact the phone seized from Azikiwe Aquart and
12 activated on August 24th?
13    A.   Yes.
14    Q.   And does the voicemail phone ever call or
15 contact the 4624 number seized from Efrain Johnson?
16    A.   Yes.
17    Q.   And does the voicemail phone, 7132, ever
18 call or in contact with the Pinetops phone?
19    A.   Yes.
20    Q.   Is the voicemail phone in contact with the
21 Pinetops phone before and after the murders on
22 August 24, 2005?
23    A.   Yes.  But not after August 24.
24    Q.   On the 24th after the murders?
25    A.   Yes.

3899

1     Q.   On what date was the -- on what date was
2  the voicemail phone, the 7132 phone, activated?
3     A.   August 24th, 2004.
4     Q.   And on what date was -- I'm sorry.  The
5  phone that was seized from Azikiwe Aquart, when was
6  that activated?
7          MR. SMITH:  Objection.  This has been
8  asked and answered.
9          MR. MARKLE:  I'll withdraw it.  I'll
10 withdraw it.
11    Q.   When did the 7132 voicemail phone last
12 purchase additional minutes?
13    A.   August 24, 2005.
14    Q.   And when was the last time that that phone
15 made an outgoing call?
16    A.   At 2:17 p.m. on August 24, 2005.
17    Q.   And when was the last time it received an
18 incoming call?
19    A.   The last incoming call with a duration was
20 received 2:34 p.m. on August 24, 2005.
21    Q.   And were there other incoming calls?
22    A.   There were.
23    Q.   And did they show any duration?
24    A.   No.
25    Q.   And what do you conclude from that?

3900

1          MR. SMITH:  Objection.  It calls for
2  speculation.
3          THE COURT:  Why don't you rephrase the
4  question so that --
5     Q.   If there was no duration, was there a
6  connection made?
7     A.   No.
8     Q.   Do you see from your analysis whether or
9  not the voicemail phone, 7132, was used after 2:34
10 for the remainder of August 2005?
11    A.   From the call detail records it shows no
12 use.
13    Q.   You have no outgoing calls from that phone?
14    A.   No.
15    Q.   And the incoming calls were not answered?
16    A.   Correct.
17    Q.   Based on no duration.
18    A.   Uh-huh (indicating affirmatively).
19    Q.   Correct?
20    A.   Yes.
21    Q.   The same phone that minutes were put on on
22 that same day.
23    A.   Yes.
24          MR. MARKLE:  I have nothing further at
25 this time, your Honor.  Thank you.

3901

1    THE COURT:  May I see counsel at sidebar
2  before cross begins.
3    (Sidebar conference)
4    THE COURT:  So I thought you were going
5  to offer the chart and ask me to reconsider the
6  chart at the end of her testimony.
7    MR. MARKLE:  I was.
8    THE COURT:  I think there is a way to do
9  that and that is -- and you may not need to do that
10  now because I think we came up with a shorthand.
11    MR. SMITH:  I think it was clear to the
12  jury in my opinion, your Honor.
13    THE COURT:  So the problem is that it's
14  a cell phone seized from him, that's fine.  But it's
15  a cell phone with the voicemail message, that it's
16  the cell phone subscribed to Lashika Johnson, that
17  it's the Pinetops cell phone, cell phone subscribed
18  to Rodney Womble, and otherwise, that that is a
19  proper kind of summary that would be of assistance
20  to the jury.  I would certainly instruct them that
21  it's all based on the testimony of witnesses whose
22  individual credibility they will assess, but it
23  provides the sorting function that is useful to the
24  jury in understanding these lists of telephone
25  numbers.

3902

1    MR. SMITH:  Your Honor, I am still
2  objecting.  This is usurping the function of the
3  jury and the danger is that if this is attached to
4  those records, the jury is going to say, oh, well,
5  this is what this means, without making an
6  independent --
7    THE COURT:  This is what it means.  It
8  is a cell phone registered to.  It's exactly what it
9  means.  That is what it means.
10    MR. MARKLE:  And I think with your
11  instruction --
12    MR. SMITH:  But, your Honor, if I may, I
13  just want to make the record if the Court is going
14  to let this in, I think it's improper, I think it's
15  argument, I don't think it comes in under the
16  summary chart rule.  I think it states facts that
17  are --
18    THE COURT:  Such as?
19    MR. SMITH:  Such as ownership of the
20  phone.  I know this doesn't say exactly this is
21  Efrain Johnson's phone, but it's akin to doing that.
22  It's suggesting to the jury that these facts have
23  been established beyond dispute and our challenge is
24  muted when I get up and say this is not what this
25  says.

3903

1    THE COURT:  Do you need this anymore?
2    MR. MARKLE:  I think it still is helpful
3  to the jury.  I'm not sure how clear my examination
4  was without it when they look.
5    THE COURT:  If you used four numbers,
6  it's clearer.
7    MR. MARKLE:  I wish you had stopped me
8  earlier.
9    THE COURT:  You went back, you reverted.
10    MR. SMITH:  Your Honor, he referred to
11  the Pinetops number, he referred to the Lashika
12  number, I think that's clear.  The jury has the
13  ability to take notes and recall.
14    THE COURT:  It goes very fast.  There
15  are very many numbers, there are interrelationships,
16  there is timing.
17    MR. MARKLE:  I would propose using it.
18  I will make the changes that I wish I had thought
19  of.  I think that's as watered down -- is based on
20  the evidence -- as it could probably be, with an
21  instruction it's not evidence in and of itself.
22    MR. SMITH:  The problem is it's an
23  exhibit.
24    THE COURT:  Munger could do it.
25    MR. SMITH:  The problem, if it goes to

3904

1  the jury as an exhibit --
2    THE COURT:  That's a whole separate
3  question, whether it's going to be a chart for the
4  jury, whether it's going to go to the jury.
5    MR. SMITH:  Your Honor, might I make a
6  suggestion?
7    THE COURT:  Yes.
8    MR. SMITH:  If the government thinks
9  this will assist the jury, they could use -- they
10  could use this in their summation as a demonstrative
11  exhibit in their summation.
12    THE COURT:  Somewhere the jury has to be
13  able to relate the telephone numbers, just as I have
14  needed to do that during this testimony to --
15    MR. MARKLE:  And I did.
16    THE COURT:  You cannot remember these
17  numbers.  So somewhere they're going to get a
18  summary.
19    MR. SMITH:  Your Honor, there are
20  literally thousands of photos in as part of the
21  exhibits, are we going to make a summary chart of
22  what each photo depicts?
23    THE COURT:  That's not to this argument.
24    MR. MARKLE:  I would propose if the
25  graphs in the chart come in as evidence and this

3905

1  would just be an aid to the jury, it will not be
2  evidence.
3            MR. SMITH:  How does it come in as an
4  exhibit if it's not evidence, your Honor?
5            THE COURT:  I think Munger needs to do
6  this.  But you need to clean up this chart so that
7  it is simple because he was here and heard the
8  evidence and he can relate it to the exhibit number,
9  whatever it is, so they have what they're supposed
10 to be relying on that this summarizes.
11           MR. MARKLE:  I can do that.
12           THE COURT:  It seems to me that's the
13 fair way to do it, because otherwise the pattern and
14 inferences from these cell phone numbers is not
15 going to be available to this jury.  So somehow they
16 have to have a chart.  And I'm going to leave it to
17 you all to figure this out and how to best caption
18 each of these entries.  And it's to the -- we've had
19 the testimony, and it may be testimony of so and so,
20 exhibit number.  I don't know whether that
21 assists -- is more palatable to the defendant or
22 less palatable.
23           MR. SMITH:  It's not palatable at all,
24 but my objection stands.
25           THE COURT:  You want exhibit and witness

3906

1  or not?
2            MR. SMITH:  I'm sorry, your Honor, I
3  don't understand the question.
4            THE COURT:  If you had your -- a chart
5  that associates the telephone numbers with the cell
6  phones they came from is going to come in.  So do
7  you think it is more useful to the jury in focussing
8  them on the testimony that it summarizes by using
9  witness name and exhibit number or not?
10           MR. SMITH:  I think it would be -- that
11 goes to argument, your Honor.  So, for instance,
12 just to give you an example, cell phone seized from
13 Efrain Johnson, okay, that -- yes, that one may
14 arguably be one.  Cell phone from which voicemail
15 message was retrieved.  Okay.  I guess this could be
16 cell phone subscribed to Lashika Johnson, that's
17 what is on the phone records.  Cell phone as being
18 testified to as belonging to -- not saying it is his
19 or it is -- and similarly testified to as being.
20           THE COURT:  Identified by John Taylor as
21 his cell phone.
22           MR. SMITH:  Some -- I suppose we could
23 work out the language in some way as to that.
24           MR. MARKLE:  I mean -- okay.
25           MR. SMITH:  Because it sounds like it's

3907

1  coming in, so I would prefer to have some control
2  over it.
3            MR. MARKLE:  That's what this was
4  intended to do, but not artfully done.  I know you
5  are not agreeing to it.
6            MR. SMITH:  I guess I want the record to
7  be clear that my objection is to that it comes in,
8  but I will look at the language with Mr. Markle to
9  work that out.
10           THE COURT:  It seems to me if we do it
11 that way then this chart will fairly represent and
12 summarize the evidence on which they are based.  And
13 I will instruct them that they are not -- it's not
14 independent evidence, but that it is summaries which
15 are no better than the testimony on which they were
16 based.  And it's up to them to decide whether they
17 credit the testimony and exhibits on which they're
18 based.  Okay?
19           MR. MARKLE:  Yes, your Honor.
20           MR. SMITH:  Do you have any other
21 witnesses after this person or are you resting?
22           MR. MARKLE:  We have the medical
23 examiner.  Well finish this up and then I could call
24 Munger if I need to do that after.
25           (Sidebar concluded)

3908

1            THE COURT:  All right then.  Cross
2  examination.
3            MR. SMITH:  Thank you, your Honor.
4  CROSS-EXAMINATION
5  BY MR. SMITH:
6       Q.  Good morning.
7       A.  Good morning.
8       Q.  Is it Agent Dellavolpe?
9       A.  SOS.
10      Q.  SOS?
11      A.  Staff operations specialist.
12      Q.  How about Ms.?
13      A.  Sure.
14      Q.  Okay.  Ms. Dellavolpe, my name is Justin
15 Smith.  I'm one of the attorneys who represents
16 Azibo Aquart.
17          For each of these records that you looked at
18 there is no way for you to tell from your analysis
19 of the records who possessed a particular phone at
20 any particular time, correct?
21      A.  Correct.
22      Q.  You had discussed a particular phone number
23 that had called Ms. Johnson's, what is alleged to be
24 Ms. Johnson's number, on the morning of the 24th
25 three times, I think you said it was a 996 number.

3909

1    A.   Yes.

2    Q.   Is that correct?

3    A.   Yes.

4    Q.   Does that number appear anywhere else in

5 those records?

6    A.   It does not.

7    Q.   So, from August 1st to August 31st, that

8 number does not appear anywhere else?

9    A.   Just on the August 24th.

10    Q.   Okay.  And in those same records of -- this

11 is the 543-4209 number, Rodney Womble appears in

12 those records.

13    A.   I don't recall.

14    Q.   Could I direct your attention to

15 August 16th in the records, if you could take a

16 look.

17    A.   I don't have that.

18    Q.   You don't have them.  That would be helpful

19 if you had them, wouldn't it?

20         MR. SMITH:  If I can have a moment, your

21 Honor, I have to see if I have an extra copy here.

22    Q.   We'll come back to that in a moment.

23         This chart that you prepared in regards to

24 the phone calls on August 24th, in regards to number

25 243-7132, those are not all of the calls on that

---

3910

1 phone on that date, correct?

2    A.   Correct.

3    Q.   In fact, there were quite a few other calls

4 interspersed with those calls?

5    A.   There were.

6    Q.   And in terms of -- you were talking about a

7 gap in time, was there another gap in time of calls

8 between phone number, what we've called the Pinetops

9 number, and the 7132 number?

10    A.   Could you rephrase that?

11    Q.   Yes.  You had mentioned a gap of time where

12 there were no calls on the 7132 number.  Was there

13 also another gap between calls between the Pinetops

14 number, 0599, and 7132?  Specifically, I'm pointing

15 -- I'm directing you to 1:53 a.m.

16    A.   Yes, yes.

17    Q.   And that gap runs from 1:53 a.m. until the

18 next connected call at 3:04 a.m.?

19    A.   Yes.

20    Q.   So, that's a little over an hour.

21    A.   Yes.

22    Q.   And you don't have records for 7132 beyond

23 August 31st.

24    A.   Correct.

25    Q.   So, you do not know if there are any calls

---

3911

1 on that toll record after that date.

2    A.   Correct.

3    Q.   And, in fact, you don't have toll numbers

4 for the 4209 number -- I mean, you do have toll

5 records for 4209, but not beyond August 31st.

6    A.   Correct.

7    Q.   And to your knowledge, that phone was never

8 seized from anyone.

9    A.   Not to my knowledge, no.

10    Q.   Okay.  You don't know when the 4209 number

11 was deactivated, correct?

12    A.   No, I do not.

13    Q.   For all we know that phone could still be

14 in use.

15    A.   Yes.

16         MR. SMITH:  I'm sorry, your Honor, just

17 a moment.

18    Q.   Showing you the records for the 543-4209

19 number, bringing your attention to August 10th.

20         THE COURT:  This is the number that

21 Ms. Whittingham just testified about?

22         MR. SMITH:  Correct, your Honor.

23         THE COURT:  Okay.

24    Q.   August 10, 11:51 a.m. which I guess would

25 actually be 2:51 p.m. Eastern standard time.

---

3912

1         THE COURT:  You need to say yes or no

2 for the court reporter's benefit.

3    A.   Yes, Eastern daylight time.

4    Q.   Eastern daylight time, I apologize.  There

5 are two outgoing calls to that number.

6    A.   Yes.

7    Q.   And going to the number subscribed to

8 Rodney Womble.

9    A.   Yes.

10    Q.   And turning your attention to August 13th,

11 on the record what shows 6:54 a.m.; is that correct?

12    A.   Yes.

13    Q.   But that would be 9:54 a.m.

14    A.   Correct.

15    Q.   Eastern standard time?

16    A.   I'm sorry, Eastern daylight time.

17    Q.   I apologize, Eastern daylight time.  Shows

18 an outgoing call from 543-4209 --

19    A.   Yep.

20    Q.   -- going to the number subscribed for

21 Rodney Womble.

22    A.   Correct.

23         MR. SMITH:  Just a moment, your Honor.

24         I have nothing further, your Honor.

25 Thank you.

3913

```
1              THE COURT:  Any redirect?
2              MR. MARKLE:  Yes, your Honor, just very
3   briefly.
4   REDIRECT EXAMINATION
5   BY MR. MARKLE:
6       Q.   You were asked, you don't know who
7   possessed a cell phone at a particular time, and
8   that's true, correct, you don't?
9       A.   Correct.
10      Q.   Did you look for association between -- the
11  association between the voicemail number 7312 and
12  the other numbers you talked about?
13      A.   Yes.
14      Q.   Was there association, at least
15  telephonically, between the other numbers you've
16  gone over for us this morning?
17      A.   Yes.
18      Q.   Does that indicate there was an association
19  between the people using those phones?
20              MR. SMITH:  Objection.
21              THE COURT:  Sustained.
22      Q.   You also mentioned that there were two
23  periods -- there was another period of time in which
24  there were no phone calls.
25      A.   Yes.
```

3914

```
1       Q.   And if you look at the gap that Attorney
2   Smith just asked you about, the three calls prior to
3   the gap he referred to, do you know who the
4   voicemail phone is contacting there?
5       A.   The three calls prior to the gap would be
6   4624, the Pinetops, 0599, and 4624 again.
7       Q.   And after that gap who are the calls to?
8              MR. SMITH:  I'm going to object to the
9   form of the question.
10             THE COURT:  What numbers are they to.
11      Q.   What numbers are -- what number is
12  contacted by the 7132 phone?
13             THE COURT:  And the gap you are meaning
14  is the 1:53 to 3:04 a.m. on August 24th; is that
15  what you are --
16             MR. MARKLE:  Yes, your Honor.  I'll be
17  more specific.
18      Q.   You have testified that there was a gap
19  from 1:53 to 3:04.  I'm not sure.
20      A.   1:53 to 3:04 where there were no calls
21  between 7132 and the Pinetops 0599.
22      Q.   But there is not a gap of time of that --
23  there is not a gap in the phone call making during
24  that time, correct?
25      A.   Correct.
```

3915

```
1       Q.   So as opposed to the time period I asked
2   you about, in which -- is it fair to say there was
3   no telephonic contact?
4       A.   Correct.
5              MR. SMITH:  Objection to the leading.
6              MR. MARKLE:  I'll withdraw it.
7       Q.   The time period that I asked you about,
8   5:03 to 5:44 a.m.
9       A.   Yes.
10      Q.   Do you know whether any of the phones that
11  we've talked about were used during that period of
12  time?
13      A.   None of them were used from 5:03 to
14  5:44 a.m.
15      Q.   And in the gap of time that Attorney Smith
16  asked you about, are those phones in use during that
17  period of time?
18      A.   Yes.
19      Q.   Thank you.
20             THE COURT:  All right, anything further?
21             MR. SMITH:  No, your Honor.  Thank you.
22             THE COURT:  All right then, thank you,
23  Ms. Dellavolpe.  You are excused and you may step
24  down.
25             THE WITNESS:  Thank you.
```

3916

```
1              MS. REYNOLDS:  Your Honor, at this time
2   government calls Dr. Susan Williams.
3              I'm keeping my fingers crossed with the
4   machine.
5              THE COURT:  Don't go near it.  No
6   coughing, no sneezing.
7              All right, Dr. Williams, will you please
8   remain standing and raise your right hand.
9       S U S A N   W I L L I A M S
10  Having first affirmed, was examined and testified as
11  follows:
12             THE WITNESS:  I'm Dr. Susan Williams,
13  W-i-l-l-i-a-m-s, and my town of residence is Avon,
14  Connecticut.
15             THE COURT:  All right, you may proceed.
16             MS. REYNOLDS:  Thank you, your Honor.
17  DIRECT EXAMINATION
18  BY MS. REYNOLDS:
19      Q.   Dr. Williams, where do you work?
20      A.   I work at the Office of the Chief Medical
21  Examiner.
22      Q.   And what position do you have at the Office
23  of the Chief Medical Examiner?
24      A.   I'm an associate medical examiner.
25      Q.   How long have you been an associate medical
```

3917

```
1   examiner with the Connecticut Office of the Chief
2   Medical Examiner?
3       A.   Almost seven years.
4       Q.   Can you please describe for the jury what
5   your duties and responsibilities are as an associate
6   medical examiner.
7       A.   My duties and responsibilities are to
8   determine cause and manner of death.
9       Q.   And in order to do that, do you perform
10  autopsies of bodies that come to the chief medical
11  examiner's office?
12      A.   I do.  I do external examination, and if
13  necessary an internal examination, autopsy of the
14  decedent to determine the cause and manner of death.
15      Q.   Approximately how many autopsies do you
16  perform in a year's time?
17      A.   Approximately 300.
18      Q.   When is it that the Office of the Chief
19  Medical Examiner would become involved in order to
20  have someone make yourself make that type of
21  determination of the cause of death?  What types of
22  cases do you get involved in?
23      A.   Unattended deaths are called to our office
24  by the police officers responding, and hospitals
25  also call in cases of deaths within 24 hours of
```

3918

```
1   admission.  And our office is involved in any case
2   that the cause of death is not obvious or if the
3   manner of death is something other than natural or
4   assumed something other than natural.  Is it a
5   possible suicide, possible homicide, possible
6   accident, that's when our office becomes involved.
7       Q.   Can you please describe for the jury what
8   your educational background is and your training and
9   experience in this area of being a medical examiner
10  and specifically forensic pathology?
11      A.   I went to the University of Vermont College
12  of Medicine where I earned my medical degree.  I did
13  a year and a half residency of general surgery at
14  Albany Medical Center and then transferred to
15  pathology and did a residency at Albany Medical
16  Center.  I also did a year fellowship at Jefferson
17  University Hospital in cytopathology.
18           Cytopathology is Pap smears, or if you
19  had a tumor in your neck I would aspirate some cells
20  out of that and find out if it was cancer.  And I
21  also did a two-year fellowship in forensic pathology
22  at the chief medical examiner's office in
23  Philadelphia.
24           I'm nationally board certified in
25  pathology, anatomic and clinical, as well as
```

3919

```
1   cytopathology and forensic pathology.  And I have a
2   license in the State of Connecticut as -- a
3   physician's and surgeon's license.
4       Q.   And prior to obtaining your license in the
5   State of Connecticut, were you licensed in any other
6   states?
7       A.   I've also been licensed in Pennsylvania and
8   Michigan.
9       Q.   Have you testified as an expert in the area
10  of forensic pathology prior to today?
11      A.   Yes, I have.
12      Q.   Approximately how many times have you
13  testified as an expert in the area of forensic
14  pathology?
15      A.   Approximately 40 or 50.
16      Q.   And in what courts have you testified?
17      A.   I've testified in Philadelphia and a couple
18  of surrounding counties in Pennsylvania, and
19  multiple jurisdictions in Connecticut.
20      Q.   State court?
21      A.   In the state, yes.
22      Q.   Have you previously testified in federal
23  court?
24      A.   I have not testified in federal court.
25      Q.   And on all of those prior times when you
```

3920

```
1   testified in state court -- I'll wait until you pour
2   your water.
3           THE COURT:  It's safer to take that top
4   all the way off.
5       Q.   In all of those previous times that you
6   testified as an expert in the area of forensic
7   pathology in state courts, were you qualified as an
8   expert on all those prior occasions?
9       A.   Yes, I was.
10      Q.   Were you ever not qualified as an expert in
11  the area of forensic pathology?
12      A.   No.
13           MS. REYNOLDS:  Your Honor, at this point
14  the government would offer Dr. Susan Williams as an
15  expert in the area of forensic pathology.
16           MR. SMITH:  No objection.
17           THE COURT:  All right.  Then she is so
18  certified.  And I've told you previously what that
19  means, and she will be able to give her opinions as
20  a forensic pathologist.  All right.
21           MS. REYNOLDS:  Thank you, your Honor.
22      Q.   Dr. Williams, let me draw your attention to
23  August of 2005.  At that time period were you
24  working as a medical examiner at the office of the
25  chief medical examiner's office here in Connecticut?
```

3921

1    A.   I was.

2    Q.   And more specifically, drawing your

3  attention to August 25th of 2005, were you working

4  that day?

5    A.   Yes, I was.

6    Q.   And were you assigned on that day to

7  perform, conduct the autopsy of an individual later

8  identified as Basil Williams?

9    A.   I was.

10    Q.   Can you generally describe to the jury how

11  it is once a body arrives at the medical examiner's

12  office, how that case gets assigned to a particular

13  medical examiner.

14    A.   We have a board and there is basically an

15  order, and on this particular day I got Mr.

16  Williams.  And so I would do the autopsy and then he

17  becomes my case for the remainder of the time.

18    Q.   Is there a case number that gets assigned

19  to each case?

20    A.   Yes, there is.

21    Q.   And do you recall what the case number was

22  for Mr. Basil Williams?

23    A.   Mr. Williams is 05-10594.

24    Q.   And what is the purpose of that case number

25  that gets assigned to each particular case?

3922

1    A.   That case number follows the decedent.  We

2  always refer to that case number, any photographs,

3  evidence that pertains to that decedent has that

4  number on it.

5    Q.   And were there -- do you know who -- which

6  police department had made the request for the

7  medical examination of Basil Williams?

8    A.   The Bridgeport Police Department.

9    Q.   And do you recall whether or not any

10  members of the Bridgeport Police Department

11  attended, just for observation purposes, the autopsy

12  of Basil Williams?

13    A.   Yes, Detectives Joette Devan and Joseph

14  Gallagher were in attendance.

15    Q.   Is that common practice in a case such as

16  this one where there has been a murder?

17    A.   Yes.

18    Q.   Now, in addition to attending the autopsy,

19  do you recall whether Detective Devan provided you

20  with some Polaroids of the crime scene that they had

21  investigated?

22    A.   There were some Polaroids of the crime

23  scene.

24    Q.   And did those Polaroids become part of your

25  records that you maintained in this case and that

3923

1  you used eventually to prepare a report?

2    A.   Yes.

3    Q.   And are you aware of whether or not any

4  representatives from the medical examiner's office

5  had actually responded to the scene in Bridgeport

6  before the bodies were removed?

7    A.   Yes.  Our Investigator Camargo and one of

8  our associate medical examiners responded to the

9  scene.

10    Q.   Now, can you describe what the first steps

11  are that you took once the case of Basil Williams

12  was assigned to you.  What is the first thing that

13  you do when you begin to perform a autopsy?

14    A.   So, what I do when I perform a autopsy is

15  we weigh and take a height on the decedent.  We take

16  photographs of them with their clothing on, then

17  with their clothing off.  And I examine the body and

18  see if I see any evidence, any injury.  And then we

19  photograph the injuries if they exist.  And so

20  that's the external examination.

21        And then we do the internal examination,

22  which is opening up the body and looking at the

23  organs, looking at any internal injury on the body.

24    Q.   And throughout the course of the autopsy

25  that you perform are photographs taken?

3924

1    A.   Yes.

2    Q.   And do you eventually prepare a report

3  based on what you -- the tests you conduct or the

4  autopsy you perform, the photos you took, do you

5  then perform a -- prepare a report at the end of all

6  of that?

7    A.   I do.

8    Q.   And let me show you what I demarked

9  Government's Exhibit 305 and also 305A and have you

10  take a look at that, see if you -- and starting with

11  Government's Exhibit 305, what's contained in that

12  exhibit?

13    A.   This exhibit contains the police

14  notification of the cause and manner of death as

15  well as my typed autopsy report and a copy of the

16  toxicology report.

17    Q.   All right.  And does that report fairly and

18  accurately constitute the report you prepared in

19  connection with the autopsy of Basil Williams?

20    A.   It does.

21    Q.   And then taking a look at Government's

22  305A, what are those photographs of?

23    A.   Those are copies of four Polaroid scene

24  pictures of Mr. Williams.

25    Q.   And are those the Polaroid scene pictures

3925

1  you obtained from Detective Devan when you began
2  your participation in this case of Basil Williams?
3       A.  I don't recall if Detective Devan or if
4  Inspector Camargo took these photographs, but these
5  photographs are in my chart.
6       Q.  So you utilized these photographs.  These
7  are the photographs you used and viewed in
8  preparation of your report?
9       A.  Right.
10      Q.  And they're maintained as part of the
11 records kept on file under case number 05-10594 for
12 Basil Williams?
13      A.  That's correct.
14           MS. REYNOLDS:  Your Honor, at this time
15 I would move as full exhibits Government's 305 and
16 305A.
17           MR. SMITH:  May I voir dire briefly,
18 your Honor.
19           THE COURT:  You may.
20 VOIR DIRE EXAMINATION
21 BY MR. SMITH:
22      Q.  Dr. Williams, you said there was a police
23 notification as part of your report.
24      A.  The front page of Exhibit 305 is the police
25 notification.  It's a piece of paper that the police

3926

1  get if they attend the autopsy or if they request.
2  It just has the cause and manner of death written on
3  it.
4       Q.  Is that part of your report?  I mean, do
5  you consider it part of your report?
6       A.  It's in the file, but it's not page 1 of my
7  report.  Page 1 of my report starts -- page 1.
8           MR. SMITH:  May I just take a look, your
9  Honor?
10           THE COURT:  Yes.
11           MR. SMITH:  No objection, your Honor, to
12 either exhibit.
13           THE COURT:  305 and 305A are full
14 exhibits.
15 CONTINUED DIRECT EXAMINATION
16 BY MS. REYNOLDS:
17      Q.  And taking a look on your monitor there or
18 up on the screen, showing you page 1 of your report,
19 you had indicated that the first thing that you do
20 is do -- you do an external examination of the body,
21 in this case of Basil Williams, correct?
22      A.  Correct.
23      Q.  And can you tell us what it was that you
24 determined once you examined Mr. Williams as far as
25 his height and his weight and his appearance

3927

1  externally?
2       A.  Mr. Williams was 139 pounds and
3  approximately 62 inches, which is 5 feet 2 inches.
4  He was wearing a pair of denim shorts, underwear,
5  and sneakers at the time that I examined him.  He
6  had black curly hair, brown eyes.
7       Q.  And did you determine the age of
8  Mr. Williams?
9       A.  Mr. Williams' reported age was 54.
10      Q.  And in your report, which was based on your
11 external examination, you write -- did you write
12 that the body is of a black male appearing older
13 than his stated age of 54 years?  Is that what you
14 wrote in your report?
15      A.  Yes, yes.
16      Q.  So, Dr. Williams, after -- you mentioned
17 after you do the external examination -- well, let
18 me ask you this.  In addition to determining
19 Mr. Williams's age and his height and his weight, do
20 you then continue to look at the body and see if you
21 can note or see any injuries from the outside of the
22 body, on the outside of the body?
23      A.  I do.
24      Q.  And what did you find in this case as you
25 did your -- completed your external examination of

3928

1  Mr. Williams?
2       A.  Mr. Williams had some abrasions and
3  contusions on his face.  He had contusions and a
4  couple abrasions also on his scalp underneath his
5  hair.  He had some contusions on his elbow, left
6  elbow, and a small incised wound.  He also had
7  contusion on his right forearm and a small incised
8  wound on his right elbow.
9       Q.  And as you've indicated, you photographed
10 all of those injuries; is that correct?
11      A.  That is correct.
12      Q.  I'm going to hand up to you what has been
13 demarked Government Exhibit 300, 300A and 302 at
14 this time and ask you to take a look at those
15 photographs.  And starting with Government's
16 Exhibit 300, is that a photograph -- well, do you
17 recognize that photograph?
18      A.  This is a photograph of Mr. Williams's face
19 at the autopsy.
20      Q.  And then taking a look at the Government's
21 300A, do you recognize that photograph?
22      A.  300A is a view of Mr. Williams's face from
23 the right side after we had shaved his head.
24      Q.  And then taking a look at Government 302,
25 do you recognize that photograph?

3929

1    A.   This is a photograph of Mr. Williams's left
2  elbow area.
3    Q.   And do the photographs in 300, 300A and 302
4  fairly and accurately depict the injuries that you
5  observed in those areas that are photographed?
6    A.   Yes.
7       MS. REYNOLDS:  Your Honor, I would move
8  at this time as full exhibits Government's
9  Exhibit 300, 300A and 302.
10      MR. SMITH:  No objection.
11      THE COURT:  Full exhibits.
12    Q.   Doctor, starting with Government's 300 --
13      MS. REYNOLDS:  Your Honor, if we could
14  dim the lights a bit, please.
15    Q.   There is a pointer right there.  If you
16  could use that pointer and just using the photo up
17  on the screen and the pointer in Government's 300,
18  if you could just describe the injuries that you
19  observed that are depicted in the photograph?
20    A.   On his right eyelid --
21      THE COURT:  I'm going to ask you to pick
22  up the microphone also and take it with you.  It's
23  wireless and that way we can hear you.
24    A.   Okay.  The right eyelid has a contusion.
25  And a contusion is a bruise, meaning blood in the

3930

1  soft tissue underneath the skin.  He also had a
2  bruise on the left lower eyelid.  He has abrasion
3  and contusion of this right lower lip.  And he has
4  little small abrasions on his forehead between his
5  eyebrows.  There is some injuries up on the right
6  part of his head, but I believe we have a better
7  photograph of that.
8    Q.   And what is the difference -- well, between
9  -- you mentioned abrasions and then did you mention
10  laceration as well, or just abrasion?
11    A.   Abrasion.
12    Q.   And what is an abrasion?
13    A.   So, an abrasion is like when you skin your
14  knee, the very top part of the skin comes off and
15  you get that red look, and then once it dries it
16  looks kind of like reddish-brown and dried.  And
17  that's what we're looking at here in the center of
18  his eyebrows.  And he's got a little bit of abrasion
19  on his lip and up in the corner of his face that
20  we'll see better later.
21    Q.   And then what type of -- well, do you have
22  an opinion as to, with regard to the bruises or
23  contusions that you've pointed out, how that could
24  be created, that type of injury could occur?
25    A.   Those were direct impacts.

3931

1    Q.   And direct impact with what?
2    A.   There is -- it's just a contusion, so it
3  was a blunt object, something -- it could be
4  something padded because it's not an abrasion, no
5  abrasion, like something padded, like the edge of a
6  sofa couch, you know, someone's hand, something
7  that's soft rather than really hard.
8    Q.   And then, again, you saw abrasions to the
9  middle -- just for purposes of the record, you
10  pointed out to the middle of between his two eyes
11  above his nose there is some abrasions there, and
12  then also on his lip; is that correct?
13    A.   On his lip, that is correct.
14    Q.   And then there were other abrasions which
15  we'll see in other photographs.
16    A.   Correct.
17    Q.   And then showing you what we've marked and
18  what's in evidence as Government 300A.  After you
19  examined the outside -- or examined the outside of
20  Mr. Williams's face and head, do you then proceed to
21  shave his hair off?
22    A.   Yes, we did.
23    Q.   And then as you look at Government's
24  Exhibit 300A, can you describe what injuries are
25  depicted in this photograph?

3932

1    A.   There is a triangular abrasion on his right
2  cheek, and the contusion of the right eyelid is also
3  visible in this picture.  And it's unfortunately in
4  a shadow, but he has contusion behind his ear, right
5  here.
6    Q.   And that's his right ear?
7    A.   That's his right ear.
8    Q.   And again, did you have an opportunity to
9  compare when you went to prepare your report the
10  photographs and the injuries that you had observed;
11  for example, the abrasion shown in Government 300A
12  and the crime scene photographs that you received?
13    A.   Yes.
14    Q.   And do you have an opinion as to what could
15  have caused those injuries, the abrasion
16  specifically shown in 300A after you looked at the
17  crime scene photos?
18    A.   The decedent had tape over his face,
19  covering his whole face up to his nose and extending
20  around the back of his head.  I'm not sure, but it's
21  possible that that abrasion was related to the tape.
22    Q.   You don't know for sure but it's a
23  possibility having looked at the duct tape,
24  photographs of the duct tape around his face?
25    A.   Right, the duct tape was over that area.

3933

1  So, it could have been associated with the duct
2  tape.
3      Q.   And what's the difference -- then you
4  mentioned what's shown on Mr. Williams's face are
5  abrasions.  What would a laceration be?
6      A.   A laceration is a tear in the skin and it's
7  caused by a blunt force object as opposed to a sharp
8  force object like a knife, and so we can tell the
9  difference between those two.  It's usually more
10 jagged.  We can see something called tissue
11 bridging.  The blood vessels don't break apart, only
12 the skin, so we see that.  A lot of times there are
13 abrasions on the margins of the tear, so we know
14 that's a blunt object as opposed to an stab wound or
15 an incised wound that was done with a knife or
16 something else very sharp like that.  That's just a
17 clean cut in the skin so that's the difference.
18     Q.   Those are the differences.  Okay.  I'll ask
19 you to just keep that mic as close as possible to
20 you so we can all hear you.
21     I'll show you at this time Government
22 Exhibit 302.  Does this depict the injury that you
23 observed to Mr. Williams's elbow area?
24     A.   It does.  This is the back of his left
25 elbow.  You can see this red is the contusion and

3934

1  this is an incised wound right here.
2      Q.   When you say an incised wound, what do you
3  mean?
4      A.   There is -- it's a sharp force injury, and
5  the sort of two kinds of sharp force injuries, there
6  is an incised wound and a stab wound.  A stab wound
7  means it's narrower than it is deep.  Say it's a
8  half an inch deep -- a half an inch wide on the skin
9  but it goes this to the skin four inches, so that's
10 a stab wound.  But an incised wound is longer on the
11 skin than it is deep.  It's just the opposite.  So
12 if I had a big five-inch superficial cut here on my
13 arm, it's five-inches long, but it only goes into my
14 skin about a quarter of an inch, that's an incised
15 wound.
16     Q.   And then the red area that you pointed out
17 around the incised wound and going up Mr. Williams's
18 elbow and arm, what is that?
19     A.   That's contusion, bruising, hemorrhaging
20 under the skin.
21     Q.   And did you have an opportunity to compare
22 these injuries as you observed them in the
23 photographs and some of the crime scene photographs?
24 Were you aware once you looked at those photos
25 whether there was any duct tape around his elbow and

3935

1  arm area?
2      A.   There was duct tape around his elbow, the
3  upper arm area and his -- well, elbow, upper arm
4  area, I guess I would describe it.
5      Q.   Do you have an opinion -- or what is your
6  opinion with regard to what could have caused those
7  type of contusions shown in Government's Exhibit 302
8  and the incised wound shown in Government's
9  Exhibit 302?
10     A.   So, the contusion is, again, blunt force
11 trauma that can be caused by anything.  Him hitting
12 his arm up against something, someone hitting him.
13     Q.   I'm just going to ask you again to hold
14 that mic.  I know it's a balancing act to hold the
15 mic.
16     A.   So someone hitting him with an object.  And
17 the incised wound is, again, a sharp instrument.
18 I'm not sure if, you know, it's a possibility that
19 was used to do something with the tape.  I'm not
20 sure, but there is a possibility.
21     Q.   All right.  You can have a seat for a
22 moment.  Let me hand up to you what I've previously
23 demarked Government Exhibit 301, 301A and have you
24 take a look at these photographs.
25     Showing you Government Exhibit 301 and 301A,

3936

1  do you recognize what's depicted in those
2  photographs?
3      A.   Actually, these are pictures of the left
4  side of the face and left side of the head and back
5  of the head of Mr. Williams.
6      Q.   So, again, can you describe for the members
7  of the jury as you continue your external
8  examination what you would be looking at here in
9  Government Exhibit 300 -- sorry, 301 and 301A?
10     A.   I have contusions on the side, on the left
11 side of Mr. Williams's scalp and a small incised
12 wound on the left side of his forehead.
13     Q.   Okay.  And are some of those contusions
14 also shown in 301A?
15     A.   Yes.
16     Q.   And these two photographs fairly and
17 accurately depict the injuries that you observed in
18 the area of Mr. Williams's head and scalp, correct?
19     A.   They do.
20     MS. REYNOLDS:  Your Honor, at this time
21 I would move as full exhibits Government Exhibits
22 301 and 301A.
23     MR. SMITH:  No objection.
24     THE COURT:  Full exhibits.
25     Q.   And starting then with 301A, taking a look

3937

1  at that photograph, it's a dark picture, but if you
2  could use the pointer and just describe what
3  injuries it is that you see in Government's 301A.
4  If you can see.
5     A.  Can you turn the lights down a little?
6         MS. REYNOLDS:  Your Honor, could we turn
7  the lights down a little lower.  Is that possible?
8         THE COURT:  We'll have a dull courtroom
9  when they go back on.
10     A.  So, in the corner of his forehead on the
11  upper left there is a triangular injury right here,
12  and right underneath that there is a small linear
13  injury.  The linear injury is a small abrasion and
14  the triangular injury is a small incised wound.  And
15  if you go more over the ear, there is a small
16  contusion.  And up on the top of the photograph
17  there are two oval contusions, one in this sort of
18  area and one I believe over here.  I am having a
19  hard time seeing it.  The top contusion has a small
20  line of abrasion on its superior aspect.
21     Q.  Let me show you Government's Exhibit 301.
22     A.  That's better.
23     Q.  Let's use Government Exhibit 301.  And if
24  you can again point out the injuries that you
25  observed.

3938

1     A.  So, again, this is the triangular incised
2  wound and a small abrasion underneath it.  This is a
3  small contusion directly above his ear and there are
4  two sort of oval abutting contusions also.  And this
5  more upper contusion has an area of central
6  abrasion.
7     Q.  When you say it has an "area of central
8  abrasion" what did you meant by that?
9     A.  So, the outer part.  This big area is a
10  contusion that's blood underneath the skin, a
11  bruise, and the center portion has abrasion or the
12  top of the skin, or scalp in this case, has been
13  abraded off.
14     Q.  And after you observed these injuries and
15  you've looked at these photographs, can you tell
16  from looking at these injuries approximately how
17  many points of impact Mr. Williams would have
18  sustained on his head, in his head area?
19     A.  Actually, it doesn't show up.  We need to
20  go through one more thing on this.  I'm just going
21  to walk in front of it for a second and then I'll
22  step back.  This area right here.
23     Q.  On the back, the top right-hand corner of
24  the photograph?
25     A.  Yes.

3939

1     Q.  What is that area?
2     A.  That's another contusion which is basically
3  on the back of the decedent's head.
4     Q.  So, approximately how many different
5  contusions did you observe and can be seen in the
6  photograph?
7     A.  So, there is the contusion behind the right
8  ear that we talked about on the previous photograph
9  and we have a contusion here, here and here.  So,
10  four separate impact sites.
11     Q.  So, those four separate impact sites would
12  have been caused by four separate blows, in your
13  opinion?
14     A.  Four separate impact sites on the head,
15  yes.
16     Q.  Four separate impact sites.  Now, after you
17  make the observation of the outside of
18  Mr. Williams's head and the different injuries that
19  he sustained in that area, what do you do next?
20     A.  Next we do the internal examination.  We
21  open up and look at the organs in the chest, the
22  organs in the abdomen, and we also reflect the
23  scalp, look at underneath the scalp, look at the
24  skull, and then open up the skull and look at the
25  brain.

3940

1     Q.  And if you want to have a seat you can have
2  a seat and drink your water.
3         I'm going to hand up a few more photographs
4  to you.  Let me hand you what's been demarked
5  Government's Exhibit 303 and 303A.  I'm going to ask
6  you to take a look at those and see if those
7  fairly -- well, what are those photographs of?
8     A.  303 is a photograph of the back of the
9  decedent's skull and 303A is a photograph of the
10  decedent's skull from the top.
11     Q.  And do those two photographs, the
12  Government's 303 and 303A fairly and accurately
13  depict the injuries that you observed once you began
14  your internal evaluation of the injuries sustained
15  by Mr. Williams in the head area?
16     A.  Yes, they do.
17         MS. REYNOLDS:  Your Honor, at this time
18  the government would move as full exhibits, 303 and
19  303A.
20         MR. SMITH:  No objection.
21         THE COURT:  Full exhibits.
22     Q.  And showing you then Government's
23  Exhibit 303, I'm going to ask you to get up again
24  and use the pointer and bring the microphone with
25  you if you could.

3941

1    Can you describe for the jury what injuries
2  you observed to the skull area?
3    A.  So, this is a photograph after we reflected
4  the skull -- I mean after we reflected the scalp of
5  the back of the decedent's skull and coming around
6  to the right side.  This being the back and over to
7  the right-hand side of your photograph being the
8  right side of his head.  You can see that the skull
9  is multiply fractured in this photograph.
10    Q.  Approximately how many fractures do you
11  see?
12    A.  There is a lot of fractures.  Like an
13  eggshell fracture if you -- you know, it's not like
14  I can say this is a five-inch fracture because
15  they're all -- like an eggshell fracture or like a
16  puzzle pieces, the whole left side of the skull and
17  the back and top of the skull are all of these
18  different pieces, fractured pieces.
19    Q.  And were those fractures to the skull, what
20  was their relationship to what you had observed as
21  far as the outside injury, the contusions that you
22  saw on the outside of Mr. Williams's head?
23    A.  The large contusion that was on the back of
24  his head was in this area.
25    Q.  So, showing --

3942

1    A.  Centrally.  The right-hand contusion that
2  extended behind his ear was in the area to the right
3  of the photograph.
4    Q.  So you could relate where you would see a
5  contusion on the outside of his head, when you went
6  inside to do the internal examination of the skull
7  there were fractures in those same areas?
8    A.  Right.
9    Q.  And then showing you Government's
10  Exhibit 303A, can you describe what injuries appear
11  in Government 303A and what angle we're observing in
12  this photograph?
13    A.  So, we're observing this photograph from
14  the top down.  The label on the top of the
15  photograph is the front and the lower portion of the
16  photograph is the back of the head, and we're
17  looking at fractures on the top back of the head and
18  left side of the head.  There is also -- I don't
19  know if you can see that membrane here, that right
20  here, that's the periosteum that has been partially
21  reflected, but all of --
22    Q.  Let me stop you there.  When you say the
23  periosium --  what you just said, what does that
24  mean?  That's why I went to law school.
25    A.  The periosteum is just a thin membrane

3943

1  that's just over the bone.  It just means over the
2  bone, actually.
3    Q.  When you say it was reflected?
4    A.  We like to use Latin just to confuse
5  people.
6        Here you can see this color is different
7  than this.  This is the actual bone and this has the
8  layer over it.  So this might appear as a
9  fracturing, but it's not.  But this, this is a
10  fracture and this and this and here, here, all these
11  other things are fractures.
12    Q.  Again, that eggshell type fracture?
13    A.  Right.
14    Q.  And based on your experience and your
15  performance of hundreds of autopsies, do you have an
16  opinion -- what is your opinion as to the level
17  of force that would have to be used in order to
18  result in injuries such as what we're observing in
19  Government's Exhibit 303A?
20    A.  It requires a lot of -- it requires a lot
21  of force to fracture the skull, you know, in a lot
22  of places such as this.
23    Q.  And in your opinion what type of weapon
24  could cause these type of injuries that we're
25  observing in Government 303A?

3944

1    A.  Looking at the skin there is contusions
2  there, impact sites.  The decedent's head came in
3  contact with a blunt instrument or some sort of
4  blunt weapon to cause the contusions and these
5  associated skull fractures underneath.
6    Q.  And when you say some type of blunt
7  instrument, could these injuries be consistent with
8  -- or are these injuries consistent with a baseball
9  bat having been used to cause to inflict the wounds?
10    A.  Yes.
11    Q.  Are they consistent with some type of pipe
12  or other blunt instrument of that nature hat could
13  have caused these type of injuries?
14    A.  A big pipe?
15    Q.  A big pipe.
16    A.  Yeah.
17    Q.  You used your hands.  What opinion do you
18  have as far as the surface area of whatever the
19  blunt instrument was?
20    A.  An instrument that would have a surface
21  area similar -- at least the size of the contusions
22  that I'm seeing.  Of course, you are talking about,
23  the head is rounded and the instrument is rounded,
24  so I want to see something that's -- would hit the
25  side of the head and leave a contusion that size.

3945

```
1   So you wouldn't want a little tiny pipe like you
2   might use, like you might see underneath your sink,
3   the little three-quarter inch wide ones, I don't
4   think it was something like that.
5       Q.   So, in your opinion it would have to --
6   whatever the blunt instrument was, if it was a bat
7   or some other blunt instrument, it would have to
8   have enough surface area to cause the contusions
9   that you previously described Mr. Williams
10  sustained, correct?
11      A.   That's correct.
12      Q.   Now, in your opinion, would the blunt
13  instrument used to cause the injuries that you
14  observed during the course of performing the autopsy
15  of Mr. Williams, would it have an edged -- an edge
16  to it?  Did you see any injuries consistent with
17  something that would have an edge to it?
18      A.   I didn't see anything.  The fact that the
19  decedent has a thick layer of duct tape as well as a
20  lot of -- you saw in the first picture a lot of
21  thick hair.  That's padding, what I'm seeing.  I
22  don't see any pattern on any of those injuries, I
23  just see oval contusions and the one contusion with
24  the abrasion on it, but there is nothing patterned
25  here to give me an idea of exactly what this weapon
```

3946

```
1   was.
2       Q.   So, you can't offer an opinion to exactly
3   what weapon was used?
4       A.   That's correct.
5       Q.   And again, what are some of the reasons why
6   you wouldn't be able, based on your training and
7   experience and your performance of hundreds of
8   autopsies, why you wouldn't be able to say exactly
9   what type of instrument was used?  You mentioned --
10  can you just describe again what -- why it is you
11  wouldn't be able to say exactly what type of
12  instrument was used?
13           MR. SMITH:  Objection.  Asked and
14  answered.
15           THE COURT:  I'm going to permit her to
16  explain the limitations of her opinion.
17      A.   The only time that we can say exactly what
18  the instrument was is when we have a pattern.
19  Sometimes you can have a pattern on the skin or --
20  sometimes like if you hit someone in the head with
21  the round end of a hammer, and just hit them, boom,
22  once, really hard, you can see the -- you get a
23  depressed skull fracture and it's in the shape of
24  that hammer.  So we could say this person has a
25  depressed skull fracture and was hit with something
```

3947

```
1   that was round like that shape.
2            So those are the times when we can say
3   what the weapon was, if we have a pattern on the
4   skin and we have a pattern on the bone, as opposed
5   to in this case I don't have a specific pattern
6   either on the skin or on the bone.
7            In addition to that, I don't even have
8   just the head, I have the head with duct tape on it.
9   So, even if the thing that came in contact with the
10  decedent's head had something on it, it wouldn't
11  make an impact on the decedent's scalp because there
12  was so much hair and tape in between the object and
13  the decedent's scalp.
14      Q.   So, then going back to Government's
15  Exhibit 301, when you were observing the injuries to
16  the outside of Mr. Williams's head, and you
17  mentioned depressed injuries versus just contusions.
18  Can you describe, using Government's Exhibit 301,
19  how you are able to determine or what conclusions
20  you reached with regard to those injuries?
21      A.   So, as I said before, we have the two oval
22  contusions here, here and here.  This one has an
23  abrasion, the higher contusion.  And there is no
24  pattern.  Like if I hit you with the end of the
25  muzzle of a gun you might have a circular contusion
```

3948

```
1   and abrasion on the side of your head where I hit
2   you because the gun has a pattern; whereas, these
3   are just oval contusions.  I can't say exactly what
4   caused them.
5       Q.   Okay.  And looking at Government 301 and
6   then 301A, were you able to observe an injury that
7   appeared not to have been created prior to -- you
8   know, at the crime scene?  A newer injury or a
9   fresher wound, could you comment on that to the
10  jury?
11      A.   If you look directly behind the left ear.
12      Q.   Over here where my pen is?
13      A.   Right.  Right in this area right there,
14  there is a little rectangular area that looks red.
15      Q.   So, what is that?
16      A.   That is actually an artifact of when we
17  shaved the decedent's hair off.
18      Q.   So, that red area you just pointed to, you
19  mentioned --
20      A.   It's this area here.  It looks a little bit
21  different than the rest of the head.  That's where
22  we just sloughed off a little bit of the skin when
23  we were shaving the head.
24      Q.   And how is that injury different from, say,
25  some of the other injuries observed on -- I'll show
```

**GA987**

3949

1  you the other photo, some of the other injuries
2  observed?
3      A.  So, this is the same injury.  Well, this is
4  the same artifact from us shaving that I was talking
5  about on the other photograph.  And you can see,
6  actually, one of them is paler than the other.
7  After it, after we shaved off the skin, like
8  sometimes a little bit of blood just from gravity
9  comes to the surface.  One of them is redder than
10  the other because we've wiped it off for the
11  photograph because it's not part of his injuries.
12  It's something that happened while we were trying to
13  prepare him for his photograph.
14          So these contusions that I described
15  and this abrasion are pre-mortem or antemortem,
16  before the decedent died.  You can see this is a
17  real abrasion, it has this reddish-maroon look to
18  it, as opposed to this.  It looks like just the
19  surface of the skin has been -- has come off.  And
20  that is a postmortem artifact due to us shaving his
21  scalp.
22      Q.  All right, you can have a seat again.
23          This postmortem artifact, did you note that
24  in your report that you prepared in this case?
25      A.  I did not.

3950

1      Q.  And why not?
2      A.  Because it wasn't part of the -- part of
3  his injuries.  It was something that we did and it
4  really probably was not very visible at autopsy.
5  Like once that's wiped off and in, like, regular
6  lighting, it probably wasn't even visible.  But
7  that's what it is, it's an artifact of the autopsy
8  procedure.
9      Q.  And then I wanted to show you again in
10  Government 303A, again we're going inside the skull.
11          When you were talking about the
12  depressed fractures, are there any depressed
13  fractures such as you have described versus the
14  injuries that you saw?  Are there any depressed
15  fractures seen in this photograph?
16      A.  There is no pattern, depressed fracture in
17  this such as you would get from the end of a hammer.
18  All of these fractures are loose, like puzzle
19  pieces.  So if you push in on them they are
20  depressed, but it's not like a pattern, like I was
21  talking about when I talked about the hammer.
22      Q.  Okay.  So, again, neither on the outside --
23  just to clarify, neither on the outside of
24  Mr. Williams's head or once you did the internal
25  examination did you see any patterned depressed

3951

1  fractures or any patterned injuries.
2      A.  That's correct.
3          MS. REYNOLDS:  And, your Honor, let me
4  just -- I think I may have failed to move in
5  Government Exhibit -- the Polaroids, Government's
6  Exhibit 305A.  If I did, I would move those.
7          THE COURT:  305 and 305A are in.
8          MS. REYNOLDS:  Okay.  Just double
9  checking.  Thank you, your Honor.
10      Q.  And, Doctor, what did you observe with
11  regard to the brain area once you get past examining
12  the skull area?  What did you observe and what
13  opinions did you arrive at with regard to
14  Mr. Williams's brain?
15      A.  So, once we photographed the skull
16  fractures, then we removed the skull and examined
17  the brain.  The brain had global, sort of all over
18  the brain in the hemispheres, subarachnoid
19  hemorrhage.  And what that is, is the brain has this
20  thin, tiny little layer, little membrane overlying
21  it, and there was hemorrhage between that membrane
22  and the brain, so we call that sub, under, arachnoid
23  hemorrhage.  And it was thicker subarachnoid
24  hemorrhage on the side, the right side and the left
25  side and the front.  And then the rest of the brain

3952

1  was just sort of covered with a very thin layer.
2  And that happens when the brain is jostled around,
3  those little tiny vessels under there bleed and you
4  get this subarachnoid hemorrhage.
5      Q.  And, Doctor, once you complete both your
6  external and internal evaluation and your autopsy,
7  is it also part of the procedure that toxicology
8  tests are done on the victim's body?
9      A.  Yes, it is.
10      Q.  And do you know whether or not toxicology
11  was done in this case?
12      A.  Yes, toxicology was done in this case.
13      Q.  And can you describe what tests were
14  performed and what the results of those tests were?
15      A.  We do a basic -- we screen for things.  So
16  we do an acid and a base screen and we test for
17  alcohol and -- what the decedent had was nicotine as
18  well as codamine, which is a byproduct or a
19  metabolite, as it were, of nicotine, and also
20  ethanol, or alcohol.
21      Q.  And there is no cocaine or other narcotic
22  substance that came back in the toxicology report?
23      A.  That is correct.
24      Q.  Dr. Williams, in your opinion what was the
25  cause of death of Basil Williams?

3953

1    A.    Blunt traumatic head injury.

2    Q.    And you list that opinion at the end of

3    your medical examiner's report.

4    A.    Yes.

5    Q.    And in your opinion, what was the manner of

6    death of Mr. Williams?

7    A.    Homicide.

8         MS. REYNOLDS:  Your Honor, if I could

9    just have one moment.

10        Nothing further.  Thank you, Doctor.

11        MR. SHEEHAN:  Could we approach, your

12   Honor, just before --

13        THE COURT:  Yes.

14        (Sidebar conference)

15        MR. SHEEHAN:  Your Honor, I'm wondering,

16   we have shortened our presentation, we're not -- we

17   have decided not to put on Dr. Baden.  Is there a

18   way we could get an hour for lunch today?  And the

19   reason why I'm making that request is, it's

20   significantly easier for me to talk to Mr. Aquart

21   here in light of the stage of the case where we are.

22   I can't -- the marshals try to get him out of here.

23   I can get some time at the end of the day, but I

24   think that if I had a little extra time at lunch,

25   that would be helpful, just mapping the rest of this

3954

1    case out.  So with that --

2         MS. DAYTON:  Government, of course, has

3    no objection.  Now we get the brownie points.

4         MR. SHEEHAN:  Yeah, here.

5         THE COURT:  She is your last witness or

6    you are going --

7         MS. DAYTON:  Yeah, we have a couple

8    stipulations and stuff we need to read in.

9         MS. REYNOLDS:  She is the last witness.

10        THE COURT:  You are not going to put

11   Munger back on?

12        MS. DAYTON:  Us?  No, they are.

13        MR. SHEEHAN:  That won't be -- we will

14   finish certainly by tomorrow.  What I'm saying here

15   is, I need some time to figure out what the final

16   act is going to be.

17        THE COURT:  Okay.

18        MR. SHEEHAN:  That's why I'm asking for

19   an extra hour.

20        MS. DAYTON:  And just while I'm thinking

21   about it -- no pressure obviously.

22        MR. SHEEHAN:  Oh, no.

23        MS. DAYTON:  If the final act is the

24   defendant does not testify, I would ask to have the

25   waiver, his acknowledgement of his right to testify

3955

1    and his waiver of that right on the record.

2         THE COURT:  Well --

3         MS. DAYTON:  If that's his choice.

4         THE COURT:  I will address him and

5    advise him directly that he has the right to

6    testify.

7         MR. SHEEHAN:  Right.

8         THE COURT:  That it is his decision,

9    that it is a decision he should make after

10   consultation with you, but that it is his decision

11   and has he made a decision.

12        MR. SHEEHAN:  Right.

13        THE COURT:  Okay?  But I need to know

14   when we're there.

15        MS. DAYTON:  Well, I was wondering if

16   you wanted to, after we dismiss the jury and

17   witness, just to address him on that fact so he can

18   have some time to speak to his attorney about that

19   today during the hour.

20        MR. SHEEHAN:  I don't think that would

21   be helpful for your Honor to do that before we've

22   had our conversation.

23        MS. DAYTON:  Okay.  Or not.

24        (Sidebar concluded)

25        THE COURT:  Ladies and gentlemen, we're

3956

1    going to take lunch now.  We're going to take an

2    hour for lunch, so if you would kindly be back at

3    2:00, we will proceed.  Thank you.  We'll stand in

4    recess.

5         (Jury exited the courtroom.)

6         THE COURT:  All right, Dr. Williams, we

7    will take an hour for lunch, we will then return for

8    your cross-examination.  Please don't discuss your

9    testimony with anyone and we'll see you at 2:00.

10   Thank you.

11        We'll stand in recess.

12        (Recess)

13        THE COURT:  All right, shall we bring

14   the jury in.

15        MR. SMITH:  I'm sorry, you have a

16   housekeeping matter.  I do, too.

17        MS. DAYTON:  On Government's

18   Exhibit 246A-1, which came in with Frank Hodges on

19   April 26th, there was an error in it.  It said

20   Bridgeport Hospital instead of St. Vincent's

21   Hospital.  We've redone it.  Both parties have

22   re-signed it and we gave it to Patty this morning.

23   So, we're just going to substitute it.

24        THE COURT:  That's fine.  All right.

25        MR. SMITH:  Your Honor, the other

3957

```
 1   issue --
 2           THE COURT:  You just need to make sure
 3   the right one, and only one of them, gets into the
 4   evidence that goes to the jury.
 5           MS. DAYTON:  Yes.
 6           MR. SMITH:  The other issue is the issue
 7   of timing in regards to the penalty phase.  Travel
 8   arrangements, some are being made as we speak in
 9   terms of flights, hotel.  We didn't really resolve
10   the other day about when the defendant would
11   actually begin.
12           THE COURT:  Right.
13           MR. SMITH:  So, I don't know if we're
14   any closer to knowing that.
15           THE COURT:  Well, it keeps changing,
16   doesn't it?
17           MR. SMITH:  And we would need --
18           THE COURT:  How long is your case on
19   guilt?
20           MR. SHEEHAN:  We'll be done tomorrow,
21   your Honor.
22           MR. SMITH:  We will be done by tomorrow.
23   I don't know if the government had any plans for
24   rebuttal.
25           MS. RODRIGUEZ-COSS:  Not so far.  We
```

3958

```
 1   haven't heard the case yet.
 2           THE COURT:  Well, you know who the
 3   witnesses are.
 4           MS. RODRIGUEZ-COSS:  But we don't know
 5   yet what they're going to say as of this point.  We
 6   don't anticipate any rebuttal I think at this point.
 7           THE COURT:  So, then if that's the case,
 8   and that's a shorter prospect, perhaps we should go
 9   back to the plan of starting Thursday the 26th on
10   the government's case, which means that your
11   witnesses would not be called before the 31st.
12           MR. SMITH:  Correct.  That sounds like
13   what the schedule is, your Honor.
14           THE COURT:  All right.  Then let's --
15           MS. DAYTON:  Your Honor, there were
16   also -- I'm sorry.
17           THE COURT:  Go ahead.
18           MS. DAYTON:  There were two more things
19   that we had brought up last Friday that I just
20   wanted to address, again related to the testimony of
21   Jackie Bryant, just because we're coming close to
22   ending our case.
23           There had been the issue about the grand
24   jury transcript and about her statement to the
25   police from 8/27/05.  Counsel had offered one page
```

3959

```
 1   of the grand jury transcript and he had offered the
 2   entirety of the statement May 27, '05.  Correct.
 3           MR. SMITH:  I believe that's correct,
 4   your Honor.
 5           THE COURT:  I'm not sure I have a copy
 6   of that.  Do I?
 7           MS. DAYTON:  Of which?
 8           THE COURT:  Bryant's grand jury that the
 9   defendant was offering.
10           MR. SMITH:  Just the page, your Honor?
11           MS. DAYTON:  Well, I have -- here is
12   both.
13           THE COURT:  All right, and the statement
14   that she gave to the police?
15           MS. DAYTON:  Yes.  They're not marked.
16   I don't know what the numbers are.
17           MR. SMITH:  They're K and L, your Honor
18   from the defense side.  K is the statement.  There
19   is the page from the grand jury testimony.
20           THE COURT:  So I will need that.  And
21   what else?
22           MS. DAYTON:  So I just gave copies up.
23           THE COURT:  All right.
24           MS. DAYTON:  But the government had said
25   that we didn't think the one page should go in, that
```

3960

```
 1   the entire grand jury --
 2           THE COURT:  I understand that.
 3           MR. SMITH:  May I approach, your Honor?
 4           MS. DAYTON:  Is that the same thing?
 5           THE COURT:  I have the police report.
 6           MR. SMITH:  The statement is the
 7   statement.
 8           MS. DAYTON:  I just gave it to her.
 9           MR. SMITH:  This is what I had redacted
10   out.  I'm sorry, I'm giving the copy to the
11   government.
12           THE COURT:  I remember the issue now.
13   Okay, anything else?
14           Let's bring the jury in.
15           MS. DAYTON:  And we're going to have two
16   more stipulations to read into testimony -- I mean,
17   read into the record.
18           THE COURT:  The police report was coming
19   in as a prior inconsistent statement?
20           MR. SMITH:  I think it was because there
21   was no mention of something in there, your Honor.
22           THE COURT:  Why don't you clarify that.
23           (Jury entered the courtroom.)
24           THE COURT:  All right, please be seated,
25   ladies and gentlemen.  Cross-examination of Dr.
```

3961

```
1   Williams.
2   CROSS-EXAMINATION
3   BY MR. SMITH:
4       Q.   Good afternoon, Dr. Williams.
5       A.   Good afternoon.
6       Q.   I'm Justin Smith.  I'm one of the attorneys
7   who represents Mr. Aquart.  I think you had
8   testified on direct in regards to there was alcohol
9   found in Mr. Williams' system?
10      A.   That's correct.
11      Q.   And what was the level on that?
12      A.   The level was 0.24 percent.
13      Q.   Thank you.  You had talked about that it
14  was possible that the weapon used in this case was a
15  baseball bat; is that correct?
16      A.   That is correct.
17      Q.   Would it be also possible that it was other
18  blunt objects?
19      A.   Yes.
20      Q.   Table leg, for instance?
21      A.   Big table leg.
22      Q.   Okay.  And you had mentioned a pipe?
23      A.   And, again, something bigger as opposed a
24  little small thing.
25      Q.   When you say "a little small," are we
```

3962

```
1   talking 2- to 3-inches in diameter?  Would that be
2   sufficient, do you believe, to cause these types of
3   wounds?
4       A.   More like three.
5       Q.   Okay.  And also I think you talked about
6   the padding of the head provided by the hair and the
7   duct tape.
8       A.   Correct.
9       Q.   And that can actually mask the object,
10  isn't that correct, in a way?
11      A.   It can -- if there is a pattern on the
12  object it can make me not able to see that on the
13  scalp because of the fact that it's not hitting the
14  scalp directly.
15      Q.   Right, it's hitting the hair or the tape or
16  both first?
17      A.   Right.
18      Q.   Okay.  And when you say that the wounds are
19  consistent with a baseball bat, you are not saying
20  that the wounds are anymore likely a baseball bat
21  than any other blunt force object, correct?
22      A.   Correct.
23           MR. SMITH:  I don't believe I have
24  anything further, your Honor.  Thank you.
25           THE COURT:  Redirect.
```

3963

```
1            MS. REYNOLDS:  No.  Thank you, your
2   Honor.
3            THE COURT:  All right, thank you, Dr.
4   Williams.  You are excused.  You may step down.
5   Thank you.
6            Will the government call its next
7   witness.
8            MS. DAYTON:  Your Honor, the government
9   has two stipulations is would like to read into
10  evidence.
11           THE COURT:  All right.
12           MS. DAYTON:  The first is Government's
13  Exhibit 284.  "United States v. Azibo Aquart."
14           "It is hereby stipulated and agreed by
15  and between the United States of America, by
16  Assistant United States Attorney Tracy Lee Dayton,
17  and the defendant Azibo Aquart, by his attorneys
18  Michael Sheehan and Justin Smith, as follows:
19           "If called to testify, Bernadette
20  Graham, custodian of records for the Connecticut
21  Department of Motor Vehicles, would state that
22  Government Exhibit 282 is a fair and accurate copy
23  of documents kept in and maintained in the ordinary
24  course of business by the State of Connecticut
25  Department of Motor Vehicles.
```

3964

```
1            "According to Government Exhibit 282,
2   the below described vehicles were registered to
3   Azibo Smith as of September 12, 2005.  A 2004 red
4   Cadillac CTS, a 1996 blue Cadillac Deville, a 1996
5   green and tan Chevy Tahoe, and a 1993 grey Chevy
6   Lumina.
7            "Government Exhibit 282 is a fair and
8   accurate copy of documents kept and maintained in
9   the ordinary course of business by the State of
10  Connecticut Department of Motor Vehicles.
11           According to Government Exhibit 283, a
12  black Toyota Corolla was registered to Azikiwe
13  Aquart as of September 15, 2005.
14           "It's hereby and stipulated and agreed
15  Government Exhibit 282 and with 283 and the
16  stipulation are admissible into evidence.
17           Signed by me, Tracy Lee Dayton, Michael
18  Sheehan and Justin Smith in presence of the
19  defendant.
20           At this time we would like to move 282,
21  283 and 284 into evidence.
22           MR. SHEEHAN:  No objection.
23           THE COURT:  They then are now exhibits.
24           MS. DAYTON:  Thank you.  And then
25  Government's Exhibit 472, "United States v. Azibo
```

**GA991**

3965

```
 1   Aquart."
 2           "It is hereby stipulated and agreed by
 3   and between the United States of America, by
 4   Assistant States Attorney Alina P. Reynolds, and
 5   defendant Azibo Aquart, by his attorneys Michael
 6   Sheehan and Justin Smith, as follows:
 7           "The known fingerprints that were
 8   received by the Connecticut Forensic Science
 9   Laboratory and used by Latent Fingerprint Examiner
10   Jonathan Pleckaitis for comparison with latent
11   fingerprints developed on evidence received in
12   laboratory case No. ID-05-19367 and laboratory case
13   No. ID-06-003506 are the true and known prints of
14   the following individuals:  Azibo Aquart, Azikiwe
15   Aquart, Linwood Bember, Nathaniel Grant, Efrain
16   Johnson, Tina Johnson, James Platt, James Reid,
17   James Rucker, John Taylor, Basil Williams, Rodney
18   Womble.
19           "It is hereby and stipulated and agreed
20   that the stipulation is admissible into evidence.
21   Signed by Alina P. Reynolds, Assistant United States
22   Attorney, and by Michael Sheehan and Justin Smith,
23   in the presence of the defendant."
24           We'd ask that Government's Exhibit 472
25   be moved into evidence as well.
```

3966

```
 1           THE COURT:  All right, that is a
 2   stipulation that is a full exhibit.
 3           MS. DAYTON:  Your Honor, at this time,
 4   other than some outstanding evidentiary issues, the
 5   government rests its case-in-chief.
 6           THE COURT:  All right, what I am going
 7   to do, ladies and gentlemen, is excuse you for five
 8   minutes while we take care of the last little
 9   issues, and then we'll have you back in here.  Thank
10   you.
11           (Jury exited the courtroom.)
12           THE COURT:  All right, be seated,
13   please.
14           Now, Mr. Aquart, you've heard the
15   government's case-in-chief has now concluded.  The
16   opportunity now is for the defendant to present such
17   evidence as counsel wish to present, but part of
18   that may be your testimony, and I'm advising you
19   that you have the right to testify in this trial.
20   That opportunity is coming up very soon.
21           You have no -- are under no requirement
22   to testify.  I will advise the jury if you do not
23   testify that they can't hold that against you
24   because you are exercising your right not to say
25   anything.  But the decision on whether to testify or
```

3967

```
 1   not is yours and yours alone.  But you should make
 2   that decision after consultation with your attorneys
 3   who will provide you with good and reasoned input
 4   that will inform your decision.
 5           Have you made any decision yet as to
 6   whether or not you wish to testify?
 7           MR. SHEEHAN:  Well, your Honor, I don't
 8   think we're prepared to answer that yet.
 9           THE COURT:  I thought that's what you
10   were doing over lunch.
11           MR. SHEEHAN:  We were discussing it over
12   lunch.  I think Mr. Aquart may make -- at this point
13   in time we have not finally committed ourselves to
14   that position.
15           THE COURT:  All right.
16           MR. SHEEHAN:  I would say that certainly
17   before the close of our case we'll advise the Court
18   of what our position is.
19           THE COURT:  All right then, with that
20   who will be your first witness?
21           MR. SHEEHAN:  Your Honor, at this point
22   I would like to move for a judgment of acquittal on
23   the grounds that I don't believe that the government
24   has made a prima facie case for purposes of either
25   -- of any of the charges in this matter, and I would
```

3968

```
 1   rest on the record as it stands.
 2           THE COURT:  Is there anything in
 3   specific that you claim is deficient about the
 4   government's case in support of your motion for
 5   judgment of acquittal?
 6           MR. SHEEHAN:  No, your Honor, the record
 7   as a whole.
 8           THE COURT:  Does the government wish to
 9   be heard?
10           MS. DAYTON:  The government believes
11   that the record amply supports that we have
12   established our prima facie case that the defendant
13   has -- in fact, we think it goes far beyond that as
14   proof beyond a reasonable doubt that the defendant
15   has committed the crimes charged in the indictment.
16           THE COURT:  Is there any additional
17   claim that there is any remaining evidence to be
18   tied up or any evidence that requires any particular
19   finding by the Court as to its admissibility in the
20   context of a conspiracy proved?
21           MR. SHEEHAN:  No, your Honor.
22           THE COURT:  All right, your motion is
23   noted.  I'm going to deny it without prejudice to
24   renew after the close of all evidence.  Or I should
25   say the next opportunity would be after the close of
```

3969

1   all evidence.

2          MS. DAYTON:  Your Honor, the only thing

3   is that -- you said are there any other findings on

4   the conspiracy.  There are with regard to

5   co-conspirator statements.  You are supposed to make

6   a _Geaney_ finding on the record.

7          THE COURT:  That's why I'm asking you,

8   is anybody pressing that those things made expressly

9   as opposed to throughout the trial in admitting the

10   evidence?  Because I would like to have a list of

11   who you want me to make the particular findings

12   about.

13          MS. DAYTON:  Okay, do you want that

14   right now?

15          THE COURT:  Yes.

16          MS. DAYTON:  Okay, there is Frank

17   Hodges, Juanita Hopkins, Jackie Bryant, Judith

18   Rivera, Rodney Womble, John Taylor, Lashika Johnson,

19   Venro Fleming.  We believe that's it, your Honor.

20   Oh, and Randi Washington.  I apologize, how could I

21   forget Mr. Washington.  Sherrell Randolph from the

22   peanut gallery.

23          THE COURT:  Why don't we do this later

24   on.

25          MS. REYNOLDS:  We can prepare a list.

3970

1          THE COURT:  All right, who will be your

2   first witness, Mr. Sheehan?

3          MR. SHEEHAN:  Your Honor perhaps could

4   help here and maybe -- my first witness I had

5   intended to call, and I had spoken to counsel about

6   this yesterday, her name is Jennifer Skrutski, and

7   she is an individual who is employed by the

8   Bridgeport public schools in the payroll benefit

9   office.  Counsel had indicated that they would --

10   and what Ms. Skrutski would be offering testimony on

11   is the fact that she has reviewed the records of the

12   Bridgeport public schools and, in fact, Frankie

13   Hodges, after reviewing all of those records, there

14   is a record reflecting the fact that Mr. Hodges

15   applied to be a substitute teacher in the year 1982

16   through 1983, that was the only year that he

17   registered for work with the Bridgeport Board of

18   Education, and that he never received any payments

19   from the Bridgeport schools, Department of

20   Education, indicating that he did not work during

21   the course of that year.  Those would be offered as

22   essentially business records in the context of

23   proving a negative, which I think is -- it's proving

24   the absence of something by reference to the

25   business records.

3971

1          And I am apologizing to the Court.  I

2   think the issue that the government intended to

3   raise on that was whether that was collateral, and

4   thus, precluded from being admitted.

5          And I had Ms. Skrutski here under

6   subpoena, and she is literally about to give birth

7   and had to go back for a two o'clock appointment.

8   So, I sent her -- I'm sorry, it would be under

9   803(10).  I sent her back hoping that we could

10   simply resolve this issue first and she could come

11   in tomorrow.

12          THE COURT:  Who is your next witness?

13          MR. SHEEHAN:  Our next witness I believe

14   is Detective DelMonte.

15          THE COURT:  All right, why don't you

16   call Detective DelMonte.  And we will bring the jury

17   back in.

18          (Jury entered the courtroom.)

19          THE COURT:  All right, please be seated,

20   ladies and gentlemen.  The government has rested,

21   meaning that it has completed its evidence in its

22   case-in-chief.  It is now the opportunity, but not

23   any requirement, that the defendant offer evidence

24   in its case if it wishes to.  There is no

25   requirement that it do so, and I will now invite --

3972

1   have now invited counsel to call their first

2   witness.

3          And, sir, I'll ask you to stand, raise

4   your right hand and the oath will be administered to

5   you.

6          W A R R E N   D E L M O N T E,

7   Having first affirmed, was examined and testified as

8   follows:

9          THE WITNESS:  By name is Warren

10   DelMonte, d-e-l capital M o-n-t-e, and my address is

11   300 Congress Street, Bridgeport, Connecticut.

12          THE COURT:  You may proceed.

13   DIRECT EXAMINATION

14   BY MR. SMITH:

15      Q.  Hi.  Is it detective, did you say, or

16   captain?

17      A.  Detective.

18      Q.  Detective DelMonte.  Hi, Detective

19   DelMonte.  Can you please tell us how you are

20   employed?

21      A.  I'm employed for the City of Bridgeport.

22      Q.  And what do you do for them?

23      A.  My current assignment is I work in the

24   Youth Bureau.

25      Q.  And prior to that were you employed as a

3973

```
1    police officer with Bridgeport?
2        A.   Yes, I was.
3        Q.   And how long were you employed as a police
4    officer with the Bridgeport Police Department?
5        A.   Twenty-two years.
6        Q.   And when did you leave that employment with
7    the Bridgeport Police Department?
8        A.   My present -- I'm still employed.
9        Q.   Oh, you are still there, you are just in a
10   different division?
11       A.   Yes.
12       Q.   Okay.  And in 2005 -- August of 2005, were
13   you employed as a police officer with Bridgeport?
14       A.   Yes, I was.
15       Q.   And in the course of your employment in
16   August of 2005, were you assigned to assist in the
17   investigation of the murders at 215 Charles Street?
18       A.   Yes, I was.
19       Q.   And in the course of that interview --
20   excuse me, in the course of that investigation, did
21   you have an occasion to interview a Jacqueline
22   Bryant?
23       A.   No, I did not.
24       Q.   You did not interview a Jacqueline Bryant?
25       A.   Not to my knowledge.
```

3974

```
1            MR. SMITH:  Could we bring up DG 519.  I
2    apologize, we can take that down.
3            Your Honor, may I have just a moment.
4            THE COURT:  Yes.
5            MR. SMITH:  I apologize.
6        Q.   Detective DelMonte, did you have the
7    occasion to interview a Randi Washington?
8        A.   Yes, I did.
9        Q.   Okay.  In the course of your interview with
10   Mr. Washington, did he describe to you any incident
11   in which he was asked to pistol whip another person?
12       A.   Not that I recall.
13       Q.   Okay.  You don't recall him at any point
14   saying he was asked to pistol whip another person?
15       A.   I can't say for sure.
16            MR. SMITH:  Could we bring up 2873,
17   please.
18       Q.   Is that a copy of the interview or -- the
19   interview you conducted with Mr. Washington?
20       A.   Yes, it is.
21       Q.   Okay.  Would you like to look through that
22   and make sure that there is no instances of him
23   asking that?
24            MS. REYNOLDS:  Is this just one page of
25   the report?
```

3975

```
1            MR. SMITH:  I'm planning to go through
2    the pages, your Honor.
3            THE COURT:  Do you want to see it?
4            MS. REYNOLDS:  Yes, so I can get the
5    date.
6            MR. SMITH:  It's on the screen.
7            MS. REYNOLDS:  I want to see the
8    whole --
9            MR. SMITH:  Can we go to the next page.
10       Q.   You can tell us when you are finished,
11   Detective.
12       A.   Done.
13            MR. SMITH:  Next page, please.
14       A.   I'm done.
15            MR. SMITH:  The next page, please.
16       A.   I'm done.
17       Q.   Okay.
18            MR. SMITH:  The next page, please.
19       A.   Done.
20            MR. SMITH:  The next page, please.
21       A.   Done.
22            MR. SMITH:  The next page, please.
23       A.   Done.
24            MR. SMITH:  And the next.
25       A.   I'm done.
```

3976

```
1            MR. SMITH:  And the next page, please.
2        A.   I'm done.
3            MR. SMITH:  The next page, please.
4        A.   I'm done.
5        Q.   Okay.
6            MR. SMITH:  Next page, please.
7        A.   Done.
8        Q.   Okay.
9            MR. SMITH:  The next page, please.
10       A.   Done.
11            MR. SMITH:  Next page, please.
12       Q.   I promise, we're getting there.
13       A.   Done.
14            MR. SMITH:  Okay, next page, please.
15       A.   Done.
16            MR. SMITH:  Next page, please.
17       A.   I'm done.
18       Q.   Okay?
19            MR. SMITH:  The next one, please.
20       A.   I'm done.
21       Q.   Okay?
22       A.   Done.
23       Q.   Okay, I think this is the last one.
24       A.   Done.
25       Q.   Okay.  So, again, Detective DelMonte --
```

3977

1    MS. REYNOLDS:  Your Honor, I'm going to
2  object.  If we can approach.
3        (Sidebar conference)
4    MS. REYNOLDS:  Your Honor, my objection
5  is that this is not the statement.  If the purpose
6  of this testimony was related to an inconsistent
7  statement made by Randi Washington with regard to
8  roughing people up or hitting people, this is not
9  the statement that the witness was shown and
10 confronted with at the time he testified.  It's a
11 different statement.
12       I have that.  I on redirect offered the
13 witness an opportunity to explain the question and
14 answer.  This is a different statement.  He can't
15 be -- in other words, he can't be impeached by a
16 statement that he wasn't asked about on
17 cross-examination.  This is a different statement.
18 Randi Washington gave upwards of eight signed, sworn
19 statements.  This is not the statement that he was
20 crossed on and then questioned on on redirect by
21 myself.
22       MR. SMITH:  Your Honor, the reason this
23 is relevant is that we are making a charge of recent
24 fabrication as to Randi Washington, and this detail
25 of pistol whipping someone, he does not say it to

3978

1  Detective DelMonte and he does not say it to
2  Detective Munger until March of this year.  And it
3  is my intention to go through with Detective
4  DelMonte that he did not say it to Detective
5  DelMonte and he did not say it to Agent Munger on
6  multiple interviews.
7        THE COURT:  I take it this witness can't
8  testify about Agent Munger.
9        MR. SMITH:  No, of course not.  I'm only
10 asking him about this particular statement that he
11 gave.  And in fact, my cross, I asked him, you were
12 interviewed several times and you had two signed
13 affidavits and two signed statements, to which he
14 answered -- one of which was in his own handwriting,
15 to which he answered, and I asked him never once in
16 all of those interviews or in your interviews with
17 the FBI did you tell the agents about being asked to
18 pistol whip someone on Charles Street.
19       MS. REYNOLDS:  And the witness answered
20 that he believed he had.
21       MR. SMITH:  Well, your Honor --
22       MS. REYNOLDS:  And then he explained
23 when he had.  And you cannot impeach at this point
24 on a statement that is not inconsistent, and you
25 can't impeach on prior omission.  And that's what

3979

1  they're trying to do.  He was not asked in this
2  statement whether Dreddy said to him to pistol whip
3  anybody.  If he had given an inconsistent answer at
4  that point, then they could impeach him with a prior
5  inconsistent statement.  It is improper to impeach
6  on prior omission.  These are questions and answers,
7  and unless he was asked a question about pistol
8  whipping, counsel cannot try to impeach by prior
9  omission.
10       The second issue is there was specific
11 questioning about a specific statement about -- the
12 witness recalled that he had said early on in his
13 interviews he had talked about hitting people, and
14 then he was asked further on cross and on redirect
15 about that statement.  That should be the limit of
16 the defendant's attempt now at this time to impeach.
17       THE COURT:  What is the date of this
18 statement he just read?
19       MR. SMITH:  This statement is March 2nd,
20 2006.
21       MS. REYNOLDS:  He was asked about --
22       THE COURT:  Just a moment, please.
23       You asked about him July 11, 2006,
24 November 6, 2007, August 26, 2009, April 22, 2010,
25 March 2011.

3980

1        MR. SMITH:  I believe I asked him going
2  all the way back to his arrest, your Honor.  Maybe
3  I'm incorrect about that, but that was my
4  recollection.
5        THE COURT:  March 2nd is, that when his
6  arrest was?
7        MR. SMITH:  Yes.
8        MS. REYNOLDS:  I thought it was
9  February 22nd.
10       MR. SMITH:  This interview was
11 March 2nd.
12       MS. REYNOLDS:  The arrest was
13 February 22nd.
14       THE COURT:  So he was questioned about
15 this statement and he was asked at the end of the
16 statement:  You were asked if he wanted to add
17 anything -- everything you knew about Dreddy, right.
18 "At the end of the statement you were asked if you
19 wanted to add anything to that statement."
20       "I don't remember."
21       And then he did remember that he was
22 asked whether there was anything he wanted to add.
23 And then he signed the statement.
24       He asked:  The handwritten statement,
25 you wrote out the statement in your own handwriting,

3981

1  you swore it was true.
2          And then it jumps to you went through a
3  bunch of the interviews with the FBI.
4          The ones that I read.  "Two signed
5  statements."
6          "One was in your own handwriting."
7          "And never once in all those or in your
8  interviews with the FBI did you tell the agents
9  about being asked to go pistol whip a guy in Charles
10  Street."
11         Ms. Reynolds objected, saying "As to all
12  of those dates, there was a final interview where he
13  did."
14         I said, "Well, you can redirect."  And I
15  refashioned the question, "Did you at any time in
16  all of those interviews tell them about being asked
17  to pistol whip someone."
18         The witness:  "Yes."
19         "You did?"
20         "Yes."
21         "Which ones?"
22         "Probably the last ones."
23         "The very last one?"
24         "Yes.  Not just the last, one of the
25  last ones."

3982

1          "So you told them April 22nd?"
2          So forth.
3          MR. SMITH:  Well, your Honor, also on
4  redirect the government brought up this particular
5  statement about which I'm asking DelMonte and they
6  pointed to some -- near the end of the interview,
7  isn't that where you are telling them about it.
8          MS. REYNOLDS:  That's not the statement.
9  That's my whole point.  I did redirect on the
10  statement he was crossed on.  I asked him to explain
11  the answers and he explained the answers.  That's
12  not in the statement.  The other thing, your Honor,
13  I would point to the record on page --
14         THE COURT:  I don't have the record.  I
15  have only what I could vaguely anticipate.
16         MS. REYNOLDS:  In the transcript of
17  Randi Washington on page 2075 he's asked about the
18  March statement.  He's asked nowhere --
19         THE COURT:  This is the one that we're
20  talking about?
21         MS. REYNOLDS:  Yes.  "Nowhere in the
22  statement does it say I then went to Charles Street
23  and Dreddy asked me to go inside and pistol whip
24  somebody, does it?  This doesn't say that anywhere
25  in this statement, does it?"

3983

1          The answer was:  "Also in that statement
2  I told you --"
3          Question:  "Sir, I'm asking you to
4  answer my question simply yes or no.  It does not
5  say that in this statement."
6          Answer:  "No, it doesn't say that."
7          MR. SMITH:  That's the handwritten
8  statement, your Honor.  I was crossing him on his
9  handwritten statement, not the statement to
10  DelMonte.  They're confused about which statement
11  this is.  I showed him his handwritten statement and
12  asked him to show me where in it he said he had been
13  asked to pistol whip somewhere.  He said it's not in
14  there ultimately, because it's not, and so I had
15  asked him were you interviewed by DelMonte and did
16  you tell him, and the answer --
17         MS. REYNOLDS:  And this is -- the
18  witness already admitted that was the statement from
19  March 3rd.
20         THE COURT:  There seem to be two
21  statements here.  There is a written statement and,
22  you know, you must have it identified.
23         MS. REYNOLDS:  This is March 3rd, 2006.
24         MR. SMITH:  And the one to DelMonte is
25  March 2nd, 2006.

3984

1          THE COURT:  I'm not going to be able to
2  resolve it unless you show me what it is you showed
3  him for him to read that he agreed it wasn't in
4  there.
5          MS. REYNOLDS:  That's not me.  That's
6  him on cross-examination.
7          MR. SMITH:  After consulting my
8  technical person to do that?  Do we want to take a
9  brief recess to do this?  I don't want to keep doing
10  this --
11         THE COURT:  Here is the problem.  There
12  are apparently two March 2nd --
13         MR. SMITH:  No, I'm sorry, there is a
14  March 2nd statement.
15         THE COURT:  Yes.
16         MR. SMITH:  March 2nd statement.
17  March 3rd is a handwritten statement.
18         THE COURT:  And that's what he referred
19  to in following up.
20         MR. SMITH:  Who referred to?  I'm sorry.
21         THE COURT:  I just read that to you from
22  the excerpt I have.
23         MS. REYNOLDS:  The March 3rd, 2006
24  statement is what he was cross-examined about with
25  regard to the pistol whipping incident.

3985

```
1          THE COURT:  So there is the statement
2   that he -- that was referred to as a couple of days
3   later, I guess after his arrest, March 2nd.  "On
4   March 2nd the Bridgeport police took a statement
5   from you and then you signed the statement, right?"
6          "Yes."
7          "And then they asked you, like the next
8   day, to have you handwrite a statement, right?"
9          Which are we talking about here?
10         MR. SMITH:  We're talking about --
11         THE COURT:  Which did you ask Washington
12  about?
13         MR. SMITH:  Well, your Honor, I believe
14  I asked him about all of his statements and whether
15  he had previously told any agent in all of those
16  statements or interviews about --
17         THE COURT:  Do you know, this is just
18  absurd to be doing it while the jury waits.  I'm
19  going to send them home.  Do you have another
20  witness today?  Is there anything more from him?
21         MR. SMITH:  There are a few other
22  witnesses, your Honor, but I would hate to call him
23  back tomorrow.  But if we need to resolve it.
24         THE COURT:  How am I going to resolve
25  it?
```

3986

```
1          MR. SMITH:  I understand.
2          THE COURT:  I don't have the two
3   exhibits.  Ms. Reynolds says that he was asked about
4   one and he said no, that there wasn't anything about
5   pistol whipping.  If that's true, this is not
6   inconsistent, if this is what he reviewed.  If you
7   show me something else that he reviewed or was asked
8   whether he gave that statement, then that's fine.
9          MR. SMITH:  Okay.
10         THE COURT:  But I need to see it.  Do
11  you want to go back and get it?
12         MR. SMITH:  Yes.  Are we excusing the
13  jury?
14         THE COURT:  No, just if you can go back
15  and get it we can resolve this.
16         MR. SMITH:  You were asking for?
17         THE COURT:  Whatever it is that you are
18  saying this is inconsistent with his testimony.
19         MR. SMITH:  Your Honor, maybe it's not
20  clear.  What I'm saying is inconsistent with his
21  testimony, it's not like I'm saying you said A here
22  today and last time you said B.  What I'm saying is
23  you said A here today and prior to today you never
24  said A before to any agent to whom you'd been
25  interviewed.  It's a charge of recent fabrication,
```

3987

```
1   and so the absence of any in these prior statements
2   is what I'm asking.
3          THE COURT:  Can I have the record of Mr.
4   Washington's full testimony to look at this?  Would
5   you mark what you are saying shows that it's not a
6   prior inconsistent statement.
7          MS. REYNOLDS:  Right now?
8          THE COURT:  With the exhibit.
9          MS. REYNOLDS:  Yes, I can try to find
10  that.  It's the handwritten.
11         THE COURT:  I don't have the --
12         MS. REYNOLDS:  I know.  Just so it's
13  clear, based on our discussions, it's the March 2nd,
14  2006.  It's his handwritten statement -- no
15  March 3rd, 2006, is his handwritten statement, and
16  that's what he was asked about during
17  cross-examination, and I'll go find all the
18  statements.
19         MR. SMITH:  I will find where I asked
20  about the statement to DelMonte.
21         (Sidebar concluded)
22         THE COURT:  Do you all want to take a
23  recess or would you just like keep sitting here
24  because there is more room here than there is in the
25  jury room?  I'm sorry, we just need to do this.
```

3988

```
1          MR. SHEEHAN:  Could I approach, your
2   Honor, just for a minute?
3          (Sidebar conference)
4          MR. SHEEHAN:  Your Honor, we just have a
5   whispering problem, and the whispering problem is
6   the government is so close to the jury.  I realize
7   they may find some of the things we're doing from
8   time to time vexing, but if the jury can hear their
9   comments among each other --
10         THE COURT:  I've warned them beforehand.
11         MS. DAYTON:  I don't think we were even
12  just talking about work stuff.
13         MR. SHEEHAN:  It just was -- it was
14  audible.  What I'm just worried -- I'm not -- I'm
15  just cautioning, just bringing this to the
16  attention.
17         MS. DAYTON:  Actually my question that I
18  had just whispered was, was the Court given its
19  binders of 3500 material, and I was going to stand
20  up and come ask.
21         THE COURT:  Well, the answer is no.
22         MS. DAYTON:  Wonderful.  We made them
23  for you.  So, they're sitting in our office, because
24  everything is in there.  So, I'm not sure why we
25  didn't deliver them to you because we have like
```

3989

```
 1   eight binders for you, the same ones we gave the
 2   defense and they'd be all there.  So, we'll have
 3   those brought over.
 4        THE COURT:  Well, I don't know what I
 5   need them for at this point.
 6        MS. DAYTON:  You don't want to use them
 7   for like a planter?
 8        MR. SHEEHAN:  I don't think we need them
 9   at this point.
10        MS. DAYTON:  That's what I was
11   whispering.
12        MR. SHEEHAN:  I'm just saying.
13        MS. DAYTON:  The other thing is Mr.
14   Smith is really loud over here and I can hear every
15   word he says over there.  You are not, the others
16   are not, but Mr. Smith, he has a deeper voice and I
17   just think it carries.
18        MR. SHEEHAN:  Well, I'll work on that.
19        MR. SMITH:  Your Honor, the portion of
20   the transcript is 2051.  Now, I did not bring the
21   statement from Detective DelMonte that I asked him
22   about.  The reason is because I'm not required to
23   actually show him the statement under the rule.  I
24   confront him with the statement, but I'm not
25   required to show it to him under 613.
```

3990

```
 1        THE COURT:  Let me have the
 2   government's.
 3        MS. REYNOLDS:  I don't have the
 4   statements, your Honor.  I asked somebody -- your
 5   Honor wants the actual statements?
 6        THE COURT:  Well, do you know what, I'm
 7   just going to let him testify because there are
 8   obviously two statements that seem to be reflected
 9   in the transcript here.  The fact that he says he
10   told agents -- he was asked:  "And never once in all
11   those or in your interviews with the FBI did you
12   tell the agents about being asked to go pistol whip
13   a guy at Charles Street?"
14        His answer to my rephrased question:
15   "Did you at any time at all in all of those
16   interviews tell them about being asked to pistol
17   whip someone?"
18        He said:  "Yes."  And he says:  "The
19   last one."
20        Is this one of the last ones?
21        MS. REYNOLDS:  No, it's the first.
22        MR. SMITH:  I go on to ask him was it
23   the very last one?  And he says there were ones
24   before that where he told them.  So, it's not clear,
25   your Honor, where it is that he told the agents --
```

3991

```
 1        THE COURT:  One of the last.  This would
 2   be one of the first.
 3        MS. REYNOLDS:  Right.
 4        MR. SMITH:  Correct.
 5        MS. REYNOLDS:  And when asked about the
 6   March 2006 statement he agreed that it wasn't in
 7   there.  So, I think it would be misleading to ask
 8   him about all of the statements because there is
 9   nothing inconsistent.  He agreed in the beginning he
10   didn't say it and then at the end he did.  So there
11   is no inconsistencies and he's rebutted his claim of
12   recent fabrication.
13        THE COURT:  So he talks about the stress
14   of jumping in the river and then he's asked:  "And
15   you never said in any of those interviews after
16   you're past the stress of your arrest."
17        "Yes."
18        "You never said anything about pistol
19   whipping Smiley?"
20        "Yeah, it's in there.  I told him.  I
21   told him."
22        "You believe it's in there?"
23        "Yes, it should be."
24        MR. SMITH:  That's why it's not clear,
25   your Honor, and I would need to ask him about each
```

3992

```
 1   of these interviews.
 2        MS. REYNOLDS:  But he agreed when he was
 3   shown a specific statement.
 4        THE COURT:  That may be, but why does
 5   that preclude his somewhat murky record that he told
 6   them at the beginning?
 7        MS. REYNOLDS:  Because it's not
 8   inconsistent because he went on to explain.  He may
 9   not have said it in full detail.  He talked about
10   the purple fish and he remembered something later
11   on.  He explained he may not have said it in that
12   much detail, he might have mentioned something about
13   beating people up, and in fact he did in the
14   statement that we're not calling --
15        THE COURT:  It wasn't inconsistent in
16   the statement that you examined him on.  But did you
17   examine him on all of the other statements?  I don't
18   believe so.
19        MS. REYNOLDS:  Well --
20        MR. SMITH:  Did I examine him on all the
21   other?
22        THE COURT:  The government.
23        MS. REYNOLDS:  I was redirecting him as
24   to the specific question about ever telling anyone
25   early on in interviews about pistol whipping because
```

3993

1  he had also explained that he may not have said it
2  in that much detail and then he explained, yeah, I
3  told them about roughing up.  That's what he said.
4  I didn't ask him about each -- I only asked him
5  about the one he was attempting to be impeached
6  upon.  I just don't see that there is an
7  inconsistency with regard to this statement.
8          THE COURT:  What precisely is the
9  consistency -- inconsistencies you are pointing to,
10 Mr. Smith?
11         MR. SMITH:  Your Honor, again, he was
12 asked if he told someone about this before,
13 specifically asked did you tell them that you were
14 asked to pistol whip someone.  And he sort of
15 waffled around and said, well, you know, I, you
16 know, I think I told them, I didn't tell them, yeah,
17 I think I told them early on, there was a lot of
18 stress.
19         It's simply the fact that he gave a
20 detailed statement in his direct statement about
21 being pistol whipped.
22         THE COURT:  I'm trying to block you.
23 Apparently the jurors can hear you.
24         MR. SMITH:  He was being asked in direct
25 and he gave a very detailed statement about being

3994

1  asked to go and pistol whip someone.
2          THE COURT:  Here is the question.  I am
3  now on page 207o.  "Mr. Washington, we were talking
4  before the break about the story that you were --
5  that you told about going into Charles Street to
6  pistol whip the person."
7          "Yes."
8          "When did you tell the agents about
9  that?"
10         "I want to -- I probably told them at
11 the beginning.  Not probably, I told them at the
12 beginning, but I probably didn't go into full detail
13 about the whole situation."
14         Question:  "Okay, let's work backwards.
15 You told them about this on March 9, 2011?"
16         "Right."
17         "Yes or no?"
18         "Yes."
19         "Did you tell them about that on
20 April 22, 2010?"
21         "Yes."
22         It's equivocal.
23         "We just talked about it on March 9,
24 2011."
25         "So you didn't tell them about it on

3995

1  April 22nd?"  Which I gather is 2010.
2          "Not in Bridgeport, no.  But like I
3  said, when I first came in I said something about
4  it, but I didn't go into full detail.  No."
5          What year is this?
6          MS. RODRIGUEZ-COSS:  2006.
7          MS. REYNOLDS:  Yeah, 2006.
8          THE COURT:  Well, he says here that he
9  told them in the beginning and Mr. Smith claims this
10 is the beginning.  Why is that not inconsistent?
11         MS. REYNOLDS:  Because he said he didn't
12 tell them in that much detail.  He was asked a
13 specific question about --
14         THE COURT:  Well, pistol whipping and
15 full detail, if there is no mention of pistol
16 whipping, that's different from lack of full detail,
17 isn't it?
18         MS. REYNOLDS:  But there is a mention of
19 roughing people up at Dreddy's request, and he
20 explained that on redirect.  In 2006 he was asked
21 about doing favors for Dreddy and he described,
22 yeah, he asked me to rough people up, I did it.
23         MR. SMITH:  That's not what the
24 statement said, your Honor.  That's a
25 mischaracterization of the statement.

3996

1          THE COURT:  Now how am I going to
2  resolve that?
3          MR. SMITH:  The mischaracterization of
4  the statement?  We could get the statement.
5          THE COURT:  I'm going to let you exam
6  him or did he ever -- did he ever say "pistol
7  whipping."  But somebody is going to go into
8  roughing up.
9          MR. SMITH:  I understand.
10         (Sidebar concluded)
11  Q.   Sorry, Detective DelMonte.  Do you recall
12 looking through that statement of Mr. Washington's?
13  A.   Yes, I do.
14  Q.   In that statement, did Mr. Washington state
15 to you that he had been asked to pistol whip
16 someone?
17  A.   Not as far as I read.
18  Q.   Okay.  And in the course of your
19 investigation, did you have a chance --
20         THE COURT:  I'm sorry, there is no date
21 on that.
22         MR. SMITH:  I'm sorry.
23  Q.   And the date of that statement, do you
24 recall that date?
25  A.   No, I don't.

3997

```
1              MR. SMITH:  Could we bring up, just to
2    refresh your memory, DG 2873.
3        Q.   Does looking at that refresh your memory as
4    to the date of that interview?
5        A.   Yes.
6        Q.   And what was that date?
7        A.   March --
8              THE COURT:  Don't read from the
9    document.  It's not in evidence.  Just does it
10   refresh your recollection --
11             THE WITNESS:  Yes, it does.
12             THE COURT:  -- when you interviewed him.
13             THE WITNESS:  Yes, your Honor.
14             THE COURT:  From your refreshed
15   recollection, when did you interview him?
16             THE WITNESS:  March 2006.
17       Q.   Okay.  Do you know the specific day?
18       A.   No.
19       Q.   Would looking at that document maybe a
20   little more zoomed in help you?
21       A.   March 2nd.
22       Q.   Okay, thank you.  And did there come a
23   time, Detective, when you interviewed Juanita
24   Hopkins?
25       A.   Yes.
```

3998

```
1        Q.   Okay.  And did Ms. Hopkins tell you in the
2    course of that interview that --
3              THE COURT:  Can you -- "did there come a
4    time" is not specific enough.
5              MR. SMITH:  I apologize, your Honor.
6        Q.   I believe this is September 15, 2005?
7              THE COURT:  That's the question, did he
8    interview her in September 2005?
9              MR. SMITH:  Yes.
10             THE COURT:  Do you remember interviewing
11   Juanita Hopkins in September 2005?
12             THE WITNESS:  I remember interviewing
13   her.  I'm not sure if it was September or October.
14             MR. SMITH:  Could we bring up DG 1029,
15   please.
16       Q.   Maybe looking at the bottom of that
17   document.  I'm sorry.
18       A.   August 2005.
19       Q.   Okay.  Do you think that's the correct date
20   for the interview or do you think that could be a
21   typo?
22       A.   It could be a typo.
23       Q.   Because the date of that is August 15th; is
24   that correct?
25             THE COURT:  Well, let's not testify
```

3999

```
1    about a document that is not in evidence.
2              MR. SMITH:  I'm sorry, your Honor.
3        Q.   But you do recall interviewing Juanita
4    Hopkins?
5        A.   Yes.
6        Q.   And this would have been either, you said,
7    in September or October of 2005?
8        A.   Correct.
9        Q.   And in that interview, did Ms. Hopkins tell
10   you that Mr. Hodges stepped out of the apartment and
11   Stone also stepped out of the apartment with him?
12       A.   I would have to see the document in order
13   to refresh my recollection.
14             MR. SMITH:  Could we enlarge the middle
15   portion of that, please.
16       Q.   Does that refresh your recollection?
17       A.   Yes, it does.
18       Q.   And so did in fact Ms. Hopkins tell you
19   that a person named Stone stepped out of the
20   apartment with Frankie?
21       A.   Yes.
22       Q.   Okay, thank you.  And did there come a
23   time, Detective DelMonte, when you also interviewed
24   a gentleman by the name of Frankie Hodges?
25       A.   Yes.
```

4000

```
1        Q.   And in the course of your interview with
2    Mr. Hodges, did he say -- I'm sorry, and this
3    interview was on August 30, 2005?  Do you recall?
4        A.   I do recall it was towards the end of
5    August 2005.
6        Q.   That you interviewed Mr. Hodges?
7        A.   Yes.
8        Q.   And in the course of that interview, did
9    Mr. Hodges say anything to you about Jackie Bryant
10   coming to apartment 211 the night that Azibo asked
11   him to knock on the door?
12       A.   I don't recall.
13       Q.   Okay, would looking perhaps at your report
14   help?
15       A.   Yes.
16             MR. SMITH:  Could we bring up DG --
17             MS. REYNOLDS:  Your Honor, I'm going to
18   object again.  And we can approach.
19             THE COURT:  I'll see you at sidebar.
20             (Sidebar conference.
21             THE COURT:  So, the question before the
22   witness is did Frank Hodges tell you in the
23   August '05 interview that Jackie Bryant came to
24   apartment 211 the night the defendant asked Hodges
25   to knock on the door.  Is that the question?
```

4001

```
1         MR. SMITH:  I'm sorry I missed that,
2    your Honor, I was trying to find the reference to
3    the cross.
4         THE COURT:  The question to the witness
5    is, when you interviewed Frank Hodges in August of
6    '05, did he tell you that Jackie Bryant came to
7    apartment 211 the night the defendant asked Hodges
8    to knock on the door.
9         MR. SMITH:  Correct.
10        MS. REYNOLDS:  And our objection, your
11   Honor, is similar to the last objection, but even
12   more so in that we don't believe Frank Hodges when
13   he testified was asked whether he said that when he
14   was interviewed at that time by Detective DelMonte.
15   So without him --
16        MR. SMITH:  They can redirect.
17        MS. REYNOLDS:  No, without the witness
18   Frank Hodges being asked about this, there is no
19   inconsistent statement to impeach him on.
20        THE COURT:  What statement are you
21   impeaching him on?
22        MR. SMITH:  Your Honor, I asked Mr.
23   Hopkins in my cross where --
24        THE COURT:  I didn't seem to pick that
25   up.
```

4002

```
1         MR. SMITH:  This is page 866 of the
2    transcript.  He testified on direct that Jackie
3    Bryant was there in the building that night, and I
4    asked him whether when he was interviewed on
5    August 30th he did not tell DelMonte that Jackie was
6    in the building that night, and he said "I don't
7    recall."  And I asked him if in later interviews he
8    had said that Jackie was there and, again, he
9    couldn't recall.
10        So, he's testified on direct, I've
11   confronted him whether he told anyone that
12   previously, in previous interviews, his answer was
13   "I don't remember," which again I think is the same
14   as a denial for purposes of impeachment.  So, again,
15   I'm asking did he in fact tell Detective DelMonte in
16   his interview that he had seen Jackie there.
17        THE COURT:  Okay, he testifies at trial
18   that he saw Jackie, he does not testify -- excuse
19   me, he does not tell the agent?  Is that what you
20   are saying?
21        MR. SMITH:  Correct.
22        THE COURT:  And you are saying that his
23   not telling is a prior inconsistent statement?
24        MR. SMITH:  Correct.
25        MS. DAYTON:  He's trying to impeach him
```

4003

```
1    with -- now he's asking him about a 9/15/05
2    interview when he asked Frank Hodges about a 9/30/05
3    interview.
4         MR. SMITH:  That was Hopkins.
5         MS. DAYTON:  You said 9/30.
6         MR. SMITH:  I meant to say 8/30.  He
7    wrote it as 8/15 on the statement, but it's actually
8    9/15.
9         THE COURT:  What were you -- what pages
10   were you reading from?
11        MR. SMITH:  I was reading from 866, your
12   Honor, starting on line 14.
13        THE COURT:  So, how is -- I just am not
14   seeing how what you have pointed me to is
15   inconsistent.
16        MR. SMITH:  Your Honor, he testifies at
17   trial.
18        THE COURT:  Yes, and then we have a
19   blank slate on his having testified inconsistently
20   at any other time.
21        MR. SMITH:  Well, your Honor, it goes to
22   his credibility in that if he says it at some point
23   in time, but there is interview one, no mention of
24   any of this, interview two no mention of any of
25   this, interview three no mention of -- no mention of
```

4004

```
1    this, and interview four, oh, yeah, Jackie was
2    there, too, I think that is inconsistent and goes to
3    his credibility.  Now, if the government on cross of
4    Detective DelMonte says:  Well, did you ask him
5    that?  I don't remember if I asked him that or not,
6    or I did ask it, and whatever the answer is.
7         THE COURT:  All we have is:  "When you
8    were interviewed on August 30th about this you
9    didn't say that Jackie was there at all in the
10   building that night."
11        "Okay."
12        "Correct?"
13        "I don't recall."
14        "Okay."
15        "And again on September 23, 2005, you
16   didn't mention Jackie at all?"
17        "Correct.  I don't recall, it's so long
18   ago.  I mean, I told them what I told them."
19        "Okay."
20        "I mean, of course after a period of
21   time of reflecting on it I got the story straight."
22        MR. SMITH:  That's exactly the point.
23        THE COURT:  "You got the story straight,
24   right?"
25        "Okay."
```

4005

```
1              "It wasn't until September 28th of 2005
2  that you mentioned Jackie Bryant, correct?"
3              "I don't recall.  I don't know when I
4  included her because I know it was Doris and Jackie.
5  That's the only two who came in the apartment."
6              "And you go on -- when the agents
7  interviewed you they told you they already talked to
8  Jackie."
9              "Okay."
10             "Correct?"
11             "I don't recall."
12             I don't see what he's going to testify
13 is inconsistent with what he is saying.  That's
14 my -- you need to help me understand your position.
15             MR. SMITH:  It's inconsistent in the
16 sense that it would be as if I said, did you tell
17 Detective DelMonte that Jackie was there that night?
18 Yes, I did.  And then if I asked Detective DelMonte
19 he said no, he never told me that.
20             THE COURT:  Right, that would be pretty
21 clear.
22             MR. SMITH:  And it's really no different
23 if I say, did you tell Detective DelMonte this or
24 you didn't tell them, asking it in the negative.
25 I'm asking in the negative, you didn't tell
```

4006

```
1  Detective DelMonte, and he says I don't remember.
2  It's the same as a denial.
3              THE COURT:  The prior inconsistent
4  statement is only going to credibility, and so not
5  being able to recall is something that doesn't bear
6  one way or another on credibility in and of itself.
7              MR. SMITH:  Your Honor, if I'm trying to
8  impeach a prior inconsistent statement, any witness
9  could just take refuge in the fact I don't remember
10 making a statement.
11             THE COURT:  I understand your argument,
12 and to the extent they make a statement otherwise,
13 whether they remember it or not, is -- well, I
14 realize the government differs with me on this.  I
15 agree with you that doesn't insulate that prior
16 inconsistent statement.
17             MR. SMITH:  Right.
18             THE COURT:  This is not a prior
19 inconsistent statement.
20             MR. SMITH:  It's --
21             THE COURT:  It's no statement.
22             MR. SMITH:  It's the absence of
23 information that he later then now says, oh, of
24 course.
25             THE COURT:  But that's not inconsistent
```

4007

```
1  with something that he says he said earlier.  That's
2  the problem.
3              I'm going to sustain the objection.
4              (Sidebar concluded)
5       Q.  Again I apologize, Detective.  In your
6  interview with Mr. Hodges, did Mr. Hodges tell you
7  that Azibo hit him in the head with a gun?
8       A.  I believe so.
9       Q.  Okay, thank you.
10             And in your interview with Mr. Hodges,
11 he was interviewed in regards to seeing some men in
12 black on a few nights before the homicides; do you
13 recall that?
14      A.  Yes, I do.
15      Q.  Okay.  And this interview, again, is
16 August 30th of 2005?
17      A.  As I stated before, it was towards the end
18 of August.
19      Q.  Okay.  Would looking at something refresh
20 your memory as to that?
21      A.  Yes.
22             MR. SMITH:  Could we bring up DG 960.
23      Q.  Does that refresh your memory as to the
24 date of the interview?
25      A.  Yes.
```

4008

```
1              MR. SMITH:  I'm sorry, could we bring up
2  DG 995.  I'm sorry, could you take that down,
3  please.
4       Q.  In that interview on August 30, 2005, did
5  Mr. Hodges tell you that the three males dressed in
6  black were inside the laundry room across from 101?
7       A.  I believe so.
8       Q.  And not on the second floor, correct?
9       A.  Correct.
10      Q.  Okay.  And I apologize, I wanted to go
11 back.  I had asked you some questions about Ms.
12 Hopkins.  Do you recall those?
13      A.  Yes.
14      Q.  Okay.  And I had asked you about Stone
15 stepping out of the apartment.  You recall that was
16 -- Ms. Hopkins was referring to that a few days
17 before the homicide, correct, of an incident a few
18 days before the homicides?
19      A.  I don't recall.
20             MR. SMITH:  Can we bring up DG.
21             THE COURT:  It is 3:30.
22             MR. SMITH:  Your Honor, this will be my
23 last question, then perhaps the government can
24 start.
25             THE COURT:  Is anyone in a rush?  Let's
```

4009

```
1   see if we can finish with this witness.
2           All right, what is the pending question?
3           MR. SMITH:  I'm sorry, this was in
4   regards to when it was that Ms. Hopkins made the
5   statement about Stone stepping out of the apartment.
6   Or not when she made the statement, but when she was
7   referring to it.  I'm sorry.
8           Maybe the first few lines.
9           MS. REYNOLDS:  Your Honor, I believe
10  this was asked and answered, unless it's a
11  different --
12          THE COURT:  You are getting --
13          MR. SMITH:  I was trying to get context
14  to when Ms. Hopkins was talking about when she made
15  the statement about Stone stepping out of the
16  apartment, your Honor.
17          THE COURT:  Not when she said it.
18          MR. SMITH:  No, your Honor, when she's
19  referring to.
20          THE COURT:  When she was referring to.
21          MR. SMITH:  Absolutely.
22          THE COURT:  All right, go ahead.
23  Q.    So, that first half of that page, you can
24  take a look at that.  Did that refresh your memory
25  as to when she was referring to?
```

4010

```
1   A.    Yes.
2   Q.    And when was she referring to?
3   A.    That Sunday night.
4   Q.    Before the homicides?
5   A.    Yes.
6   Q.    Okay.  Thank you, Detective DelMonte.
7           MR. SMITH:  I don't have any further
8   questions.
9           THE COURT:  Cross-examination.
10  CROSS-EXAMINATION
11  BY MS REYNOLDS:
12  Q.    Good afternoon, Detective.
13  A.    Good afternoon.
14  Q.    Detective, you were assigned to this case
15  after the murders occurred with a team of detectives
16  and subsequently with a team of FBI agents, correct?
17  A.    Correct.
18  Q.    And you were asked a lot of questions about
19  a statement that you took from Randi Washington.  Do
20  you recall those questions?
21  A.    Yes.
22  Q.    And just so we're clear, and you were shown
23  this on the screen, you interviewed Mr. Washington
24  on March 2nd of 2006; is that correct?
25  A.    Correct.
```

4011

```
1   Q.    And that was one of these question and
2   answer interviews where you would pose a question
3   and Randi Washington would answer it, correct?
4   A.    That's correct.
5   Q.    And that was all typed down and
6   subsequently shown to Mr. Washington and signed by
7   him, correct?
8   A.    That's correct.
9   Q.    And that is a statement that counsel was
10  asking you about?
11  A.    Yes.
12  Q.    And that's an 18-page statement, correct?
13  A.    Correct.
14  Q.    And then at the time this investigation was
15  actually still ongoing, correct?
16  A.    That's correct.
17  Q.    Do you know whether or not Mr. Washington
18  was interviewed by other agents and other
19  detectives?
20  A.    I'm not sure.
21  Q.    Okay.  But on this occasion you were the
22  one doing the questions and answers, correct?
23  A.    Correct.
24  Q.    And you asked him about working for the
25  defendant as a lookout, correct?
```

4012

```
1   A.    That's correct.
2   Q.    And you asked him about how much he got
3   paid as a lookout for the defendant?
4   A.    Yes.
5           MR. SMITH:  Objection, outside the
6   scope.
7           THE COURT:  Sustained.
8   Q.    Did you ask him -- or you didn't ask him
9   about whether or not he committed any assaults for
10  the defendant, did you?
11  A.    No.
12  Q.    Okay.
13          MS. REYNOLDS:  Nothing further.  Thank
14  you, your Honor.
15          THE COURT:  Anything further?
16          MR. SMITH:  Just one quick question your
17  Honor.
18  REDIRECT EXAMINATION
19  BY MR. SMITH:
20  Q.    Detective DelMonte, when you are
21  interviewing someone you don't just literally sit
22  there and ask them a question and type it out; you
23  have a pre-interview with them, correct?
24  A.    Correct.
25  Q.    So you've talked to them first, gotten the
```

4013

```
1   information from them?
2           MS. REYNOLDS:  Objection.  Leading, your
3   Honor.
4           THE COURT:  Sustained.
5       Q.  So, do you speak to them first?
6       A.  That's correct.
7       Q.  And then do they give you the information
8   that they have?
9           MS. REYNOLDS:  Objection, leading.
10          THE COURT:  Sustained.
11      Q.  What information -- what do you learn when
12  you talk to them the first time?
13          MS. REYNOLDS:  Objection, beyond the
14  scope.
15          THE COURT:  I'm going to permit it.
16      A.  Answer the question?
17      Q.  Yes.
18          THE COURT:  This is with respect to the
19  statement that you took on March 2nd, '06.  What is
20  it that you do?  What do you learn when you -- in
21  the first interview?
22      A.  I usually try to make them as comfortable
23  as possible.  I ask them what they like, what they
24  dislike, where they live, if they're into any type
25  of sports and everything.  Prior to getting into the
```

4014

```
1   initial interview, that's what I usually do.
2       Q.  Okay.  And is that what you did in this
3   particular interview?
4       A.  I don't exactly recall.
5       Q.  Okay.  So, did you -- let me put the
6   question this way:  You learned information from Mr.
7   Washington first; is that correct?
8           MS. REYNOLDS:  Objection, leading.
9           THE COURT:  Sustained.
10          MR. SMITH:  Your Honor, I'm trying to
11  get the context of the next question.
12          THE COURT:  It's still leading.  It's
13  your witness.
14          MR. SMITH:  Your Honor, I think under
15  611(c) I should be allowed to lead in this
16  situation.
17          MS. REYNOLDS:  We don't think Mr.
18  DelMonte is a hostile witness.
19          MR. SMITH:  He's identified with an
20  adverse people.
21          MS. REYNOLDS:  Oh, I --
22          THE COURT:  No, just ask the questions
23  in direct form, please.
24      Q.  When did you type up the information from
25  Mr. Washington?
```

4015

```
1       A.  In March.
2       Q.  In the specific interview we're talking
3   about?
4       A.  The same day.
5       Q.  Did you type up the information after you
6   had spoken to him?
7       A.  Yes.
8       Q.  And then did you ask him to review it?
9       A.  Yes, I did.
10      Q.  And did he review it?
11      A.  Yes, he did.
12      Q.  Okay.  And did you ask him to sign it?
13      A.  Yes.
14      Q.  And then did he sign it?
15      A.  Yes, he did.
16          MR. SMITH:  I have nothing further, your
17  Honor.
18          THE COURT:  Anything further?
19          MS. REYNOLDS:  No, thank you, your
20  Honor.
21          THE COURT:  All right, thank you.
22  Detective DelMonte.  You are excused.  You may step
23  down.
24          Ladies and gentlemen, we are concluded
25  for the day.  It is our anticipation that we may
```

4016

```
1   conclude the evidence tomorrow, may, and that would
2   mean that you will be charged and hear closing
3   arguments on Thursday, and you should, therefore,
4   plan for purposes -- planning purposes, Thursday,
5   Friday and thereafter until you reach a verdict to
6   be here from 9:00 to 5:00.  Okay?  So, if you need
7   to make some other arrangements, let me know.  If
8   there is a problem with that, also let me know.
9   Have a pleasant evening.
10          JUROR:  That doesn't include weekends,
11  right?
12          THE COURT:  No weekends.
13          (Jury exited the courtroom.)
14          THE COURT:  All right, counsel, is there
15  anything more that we can take up at this point?
16  I'll hear you on the issue of Ms. Skrutski about to
17  give birth.  Why don't you be seated and I'll hear
18  from the government on that question.
19          MR. MARKLE:  Can I just interrupt with
20  one simple matter?
21          THE COURT:  I welcome simple matters.
22          MR. MARKLE:  Exhibit 278, part of 278,
23  the front page of the phone chart was redone, and
24  counsel has looked at it and has voiced objection
25  still.  He is satisfied if it's going to come in,
```

4017

1  this should be the form it should come in.  This is
2  the --
3          THE COURT:  Yes, I know what it is.
4          MR. MARKLE:  I can offer it in front of
5  the jury tomorrow and then, your Honor, if you want
6  to give an instruction that it's not independent
7  evidence, would that be more appropriate.
8          THE COURT:  May I see it?  All right, do
9  you want to be heard any further?  You just object
10  to this being given at all.
11          MR. SMITH:  That is correct, your Honor.
12          THE COURT:  And I've articulated why I
13  think it is important to have the rest of
14  Exhibit 278 have some form of identification of what
15  those numbers represent given the large number of
16  numbers, and particularly the frequency and the
17  sequences and the timing that has the -- that has
18  inferences the government would like the jury to
19  draw.
20          I don't think any of this in any way
21  unduly substitutes for evidence.  It correctly
22  relates telephone number to the evidence, and I will
23  instruct them that it is not in and of itself
24  evidence.  I think this will be of significant
25  assistance to the jury in understanding what both

4018

1  sides are arguing.  All right, we'll do that
2  tomorrow morning.
3          MR. MARKLE:  Thank you, your Honor.
4          THE COURT:  Okay.  The issue with Frank
5  Hodges was his testimony that he worked back in the
6  '80s as a Bridgeport school teacher, and that is
7  what Ms. Skrutski is being offered to rebut; is that
8  right?
9          MR. SHEEHAN:  Yes, your Honor, that is
10  true.
11          THE COURT:  All right.
12          MS. RODRIGUEZ-COSS:  And so, your Honor,
13  the defense had an opportunity to cross-examine Mr.
14  Hodges on that issue.  They confronted him with that
15  information.  He provided his testimony and his
16  explanation thereto.  We would submit that if the
17  defense is moving -- we really aren't sure pursuant
18  what rule they're moving under.  If they're moving
19  under Rule 608, which would be a prior inconsistent
20  of conduct of that witness, then that rule clearly
21  states extrinsic evidence is inadmissible.  If
22  they're moving under Rule 613(b) --
23          THE COURT:  Well, let's not guess.
24  Let's just find out.
25          You are offering Ms. Skrutski's

4019

1  testimony under -- well, he did say 803(10).  He
2  gave us that.
3          MS. RODRIGUEZ-COSS:  803(10)?
4          MR. SHEEHAN:  803(10) is the -- well,
5  Ms. Skrutski is coming in -- her testimony would be
6  offered under 803(10) as a business record, but what
7  I believe is --
8          THE COURT:  Well, 803(10) is the
9  absence.
10          MR. SHEEHAN:  Right.
11          THE COURT:  Of such a record.  Okay.
12          MS. RODRIGUEZ-COSS:  Your Honor, what we
13  would submit what they are trying to do is to
14  impeach Mr. Hodges with this information.
15  Therefore, that constitutes extrinsic evidence of
16  the statements with regards to the credibility of
17  the statements of the witness.  Under that
18  proposition, your Honor, we would submit it's
19  inadmissible.
20          Extrinsic evidence of a collateral
21  matter to the issues is inadmissible, and I think
22  this is a perfect example of what we were alerting
23  the Court to during the charge conference.  This is
24  a collateral matter.  This issue bears no relevance
25  to the facts that are in dispute in this case.  And

4020

1  the Second Circuit has held in United States v.
2  Rivera, for example, at 273 F. App 55, specifically
3  at page 58, that impeachment by prior inconsistent
4  statement must relate to a material rather than a
5  collateral matter.  And a collateral matter, your
6  Honor, has been defined as a matter that could not
7  have been introduced for any purpose independent of
8  the impeachment itself.  And I think this is a
9  perfect example of what that is.
10          This is a collateral matter to the facts
11  that are at issue in this case, and I think pursuant
12  to 613(b) we would move to exclude it as a
13  collateral matter.
14          And finally, your Honor, pursuant to
15  403, we would submit that this is an issue that
16  should be excluded from evidence as it is simply
17  taking the attention of the jury away from the facts
18  that are at issue in this case and bringing their
19  attention to something that is of no consequence in
20  this case.
21          THE COURT:  Anything further?
22          MR. SHEEHAN:  Yes, your Honor.  I think
23  it is of material interest to Mr. Hodges'
24  credibility.  And it's also of interest to Mr.
25  Hodges' relationship with the government because Mr.

4021

1  Hodges, as he testified, told the government this
2  fact, and I believe that that basically goes into
3  the kind of vouching that's going on and the
4  interrelationship there, and this fact, easily
5  verifiable by a phone call, in fact was false.  And
6  not only was that a false fact, but it's a false
7  fact that Mr. Hodges has testified to here in court.
8       So, Mr. Hodges is -- if this witness's
9  testimony is credited, as I believe it may well be,
10 Mr. Hodges -- it's not a matter of a prior -- it
11 doesn't -- in one sense it doesn't matter that at
12 one point in time Mr. Hodges applied to work for the
13 Bridgeport schools and then didn't show up, that's
14 not -- there is nothing -- that's not an act of
15 misconduct.  What's at issue here is Mr. Hodges
16 saying that he was working for the Bridgeport public
17 schools, and this witness will say that's just not
18 the case.
19      THE COURT:  All right, I -- go ahead.
20      MS. RODRIGUEZ-COSS:  I'm sorry.  There
21 has been no evidence of the government vouching for
22 the credibility of this witness or any other
23 witness.
24      THE COURT:  Other than putting them on
25 and permitting him to say that.  That's I think what

4022

1  the defendant is saying.
2       MR. SHEEHAN:  And, your Honor, he's
3  offering -- and offering them a plea agreement and
4  offering them a -- and offering them a cooperation
5  agreement.  All of those stand.  Now, it's not as if
6  counsel is standing up and saying we know Mr. Hodges
7  is telling the truth.  That would be vouching, that
8  would be wrong.  But I think that in all of the
9  context of this case with cooperating witnesses and
10 the relationship at issue, that's why this becomes a
11 matter of importance.
12      THE COURT:  Is there any case law you
13 want me to look at it?
14      MR. SHEEHAN:  No, your Honor.
15      MS. RODRIGUEZ-COSS:  Your Honor, we
16 would submit to the Court this does not fit under
17 609.  This does not fit under 608.  Both of those
18 rules govern the impeachment of the credibility of a
19 witness.  This does not fit under 613.  What this
20 witness purports --- or would purport to testify is
21 that she looked at the payroll records and could not
22 find a payment to Mr. Hodges.  Does that establish
23 absolutely that he did not work as a substitute
24 teacher as he claims that he did?  And in any event,
25 we submit to the Court it's collateral to the issues

4023

1  in this case.  They had an opportunity to
2  cross-examine, he provided his response.  And I
3  think that that is sufficient for the jury to take
4  into account that issue with respect to the
5  credibility of Mr. Hodges.
6       THE COURT:  Okay, let me take a look at
7  this, and I know you don't want to bring her back if
8  she's --
9       MR. SHEEHAN:  She's coming in tomorrow
10 morning, so I think we can --
11      THE COURT:  So we'll just rule then.
12      MR. SHEEHAN:  We can rule then.  I
13 wanted -- you know, we got her coming in tomorrow
14 morning.
15      THE COURT:  Okay.  All right.
16      MR. SHEEHAN:  Could I just raise one
17 other issue with the Court?  I think that in the
18 context of the witnesses, the law enforcement
19 witnesses who are the people who apply for probable
20 cause warrants, search warrants, who are the people
21 who investigate the case, who ultimately are the
22 people who write the reports on whose bases the
23 government proceeds ahead, the people who testify, I
24 think that leading questions are appropriate because
25 even though they may not be -- I'm not quite sure

4024

1  who, if not law enforcement, who is the government?
2  Who is the other party in the case?  I think they
3  are -- we have the case agents that are sitting here
4  in court, we have the officers who investigated the
5  case from the start, and in some cases filled out
6  the search warrant applications.  I think that
7  leading questions are appropriate, your Honor.
8       MS. REYNOLDS:  Well, I'm sure Mr.
9  Sheehan does think they're appropriate, but that's
10 not the law.  There is not a single case I can think
11 of that says when the defense calls a witness they
12 can lead that witness regardless of what that
13 witness does for a living.
14      MR. SHEEHAN:  No, it --
15      MS. REYNOLDS:  And I would also ask if
16 we could have a list or a lineup of who they expect
17 to call tomorrow.
18      THE COURT:  Who will be called tomorrow?
19 The issue is not -- I have already ruled that when
20 you -- even when you are calling an officer on
21 direct you have to stick to direct until such time
22 as it's demonstrated that you are -- that that
23 witness should be cross-examined.
24      MR. SHEEHAN:  I just want to make
25 sure --

4025

```
 1              THE COURT:  If it were one of the
 2   government's witnesses who you were recalling, this
 3   would be a very different question, I think.
 4              MR. SHEEHAN:  Well, your Honor, could I
 5   just --
 6              THE COURT:  No, actually I can't listen
 7   to you any longer on that.  If you want to raise it
 8   again tomorrow, that's fine.
 9              MR. SHEEHAN:  Okay, that's fine.
10              THE COURT:  I really must go.
11              MR. SHEEHAN:  And our witnesses
12   tomorrow, we would expect, would be -- well,
13   Detective Vargas will be here tomorrow briefly.
14              THE COURT:  Are you saying Vargas or
15   Bargas?
16              MR. SHEEHAN:  Vargas was one of the
17   officers who processed the crime scene.  We had
18   subpoenas out to two officers, but one apparently is
19   in Florida it turns out.  Good for her.  And then we
20   have Special Agent Munger.  We have --
21              MR. SMITH:  Special Agent Syrax and Task
22   Force Officer Juan Gonzalez.
23              MS. RODRIGUEZ-COSS:  I'm sorry, what was
24   the last name.
25              THE COURT:  Juan who?
```

4026

```
 1              MR. SMITH:  Gonzalez, your Honor.
 2              MS. RODRIGUEZ-COSS:  Is that it?
 3              MR. SMITH:  I believe so.
 4              MR. SHEEHAN:  And maybe Skrutski, the
 5   woman that I had mentioned, Ms. Skrutski who works
 6   for Bridgeport public schools.
 7              THE COURT:  Okay.  Now, in the charge we
 8   talked about identifying who the experts were.  I
 9   haven't received a list of that.
10              MS. REYNOLDS:  I'll send that.
11              THE COURT:  Can I have that right away
12   because I want to send you another -- you will see
13   that the charge that Mr. Kretman has sent you
14   doesn't have that in it.
15              MS. REYNOLDS:  I'll send it as soon as I
16   get back to the office.  I apologize for not getting
17   that to the Court earlier.
18              THE COURT:  All right then, I will see
19   you and all of these witnesses-- we're comfortable
20   are going to be finished tomorrow?
21              MR. SMITH:  It depends on the number of
22   sidebars.  I imagine, your Honor, yes.
23              MS. REYNOLDS:  We renew our motion in
24   that regard because there was a lengthy delay and
25   had we known a little bit more about the substance
```

4027

```
 1   of the intent to impeach we could have addressed
 2   this issue outside the presence of the jury.  That
 3   was the whole purpose for filing our motion.
 4              THE COURT:  I understand.  The one thing
 5   we have to do on Thursday is be finished no later
 6   than four o'clock.  That's just -- I am
 7   somewhere else.  I'm next door.  The other thing is,
 8   speaking of next door, I think we should do the
 9   penalty phase in that courtroom.
10              MR. SHEEHAN:  That would be fine, your
11   Honor.
12              THE COURT:  I'm going to make sure it's
13   available and just have another courtroom.  We will
14   not have alternates, and so everybody will fit in
15   the jury box, right?  They get excused at the end.
16              MS. RODRIGUEZ-COSS:  They don't have to.
17              THE COURT:  They're not going to
18   deliberate on the guilt phase.
19              MS. RODRIGUEZ-COSS:  Well, we can
20   discuss it, your Honor, but it's been done both
21   ways.
22              MR. SHEEHAN:  They cannot deliberate on
23   the guilt phase.
24              MR. STERN:  No, they cannot deliberate
25   on the guilt phase, but that does not necessarily
```

4028

```
 1   exclude them from being substituted in the penalty
 2   phase deliberations.  It's been done both ways.
 3              THE COURT:  All right, I'll hear you on
 4   that, but let's get that cleared up pretty soon.
 5              Okay, thank you.  We'll see you tomorrow
 6   at 9:30.
 7              (Proceedings concluded)
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

4029

```
 1           I N D E X
 2   WITNESS                                PAGE
 3   RICHARD DONALDSON
 4   Direct Examination by Mr. Markle       3816
 5   Cross-Examination by Mr. Smith         3827
 6
 7   LATIVIA WHITTINGHAM
 8   Direct Examination by Mr. Markle       3282
 9   Cross-Examination by Mr. Smith         3833
10
11   LAUREN DELLAVOLPE
12   Direct Examination by Mr. Markle       3908
13   Cross-Examination by Mr. Smith         3839
14   Redirect Examination by Mr. Markle     3913
15
16   SUSAN WILLIAMS
17   Direct Examination by Ms. Reynolds     3916
18   Cross-Examination by Mr. Smith         3961
19
20   WARREN DELMONTE
21   Direct Examination by Mr. Smith        3972
22   Cross-Examination by Ms. Reynolds      4010
23   Redirect Examination by Mr. Smith      4012
24
25
```

4030

4031

```
 1        I certify that the foregoing is a
 2   correct transcript from the record of proceedings in
 3   the above-entitled matter.
 4              5/18/11
 5              Date
 6
 7          /S/  Sharon Montini
 8          Official Reporter
 9
```

4031

```
 1        UNITED STATES DISTRICT COURT.
 2        DISTRICT OF CONNECTICUT
 3   * * * * * * * * * * * *    *
                                *
 4   UNITED STATES OF AMERICA,  * Case No 6cr160(JBA)
                                *
 5            Plaintiff,        *
                                *
 6       vs.                    *
                                *
 7   AZIBO AQUART              * May 18, 2011
                                *
 8            Defendant.        *
                                *
 9   * * * * * * * * * * * *    *
10            TRIAL TRANSCRIPT
11            VOLUME XIX
12   BEFORE:  THE HONORABLE JANET BOND ARTERTON U.S.D.J.,
                                         and jury
13   Appearances:
14   FOR THE GOVERNMENT:  ALINA REYNOLDS, ESQ
                          TRACY DAYTON, ESQ.
15                        PETER MARKLE, ESQ.
                          JACABED RODRIGUEZ-COSS
16                        United States Attorney's Office
                          915 Lafayette Blvd
17                        Bridgeport, CT 06604
18
19   FOR THE DEFENDANT    MICHAEL SHEEHAN, ESQ
     AZIBO AQUART:        Sheehan & Reeve
20                        139 Orange Street
                          New Haven CT 06510
21                        JUSTIN SMITH, ESQ.
                          383 Orange Street
22                        New Haven, CT 06511
23
24   Court Reporter:    Sharon Montini, RMR
25   Proceedings recorded by mechanical stenography,
     transcript produced by computer
```

4032

```
1          THE COURT:  Good morning, Counsel.
2  Mr. Aquart, ladies and gentlemen.
3          I have two motions filed this morning by
4  the defense.  Does the government wish to be heard?
5          MS. RODRIGUEZ-COSS:  Yes, your Honor.
6  With regards to the motion in support of impeachment
7  by omission, I don't think the government is
8  debating that impeachment by omission is appropriate
9  in certain circumstances.  I think we briefed that
10 issue in our memorandum with regard to prior
11 inconsistent statements.  And we would just submit
12 to the Court that we would ask the Court to make an
13 analysis prior to admitting the statement as to
14 whether or not the omission was in good faith or
15 just a passing omission or whether the integrity of
16 the record demonstrates it was a purposeful and
17 intentional omission where the witness was actually
18 trying to avoid providing an answer to the question
19 posed.
20         THE COURT:  It sounds to me like you are
21 asking the Court to stand in place of a jury, aren't
22 you?
23         MS. RODRIGUEZ-COSS:  Well, no, your
24 Honor.  I think the jurisprudence in this area calls
25 for the Court to make that determination, to look at
```

4033

```
1  the record and determine whether or not the
2  statement, the prior inconsistent statement that the
3  defense is submitting into evidence is, in fact,
4  inconsistent.  That is the first element.
5          THE COURT:  But inconsistent may be in
6  good faith or it may be motivated by the whole
7  purpose of the impeachment.  That's for the jury.
8          MS. RODRIGUEZ-COSS:  Inconsistent may be
9  by omitting to provide a fact.  And United States v.
10 Leonardi, for example, in the Second Circuit states,
11 that where a witness simply adds an additional fact
12 to previously disclosed facts it's not a purposeful
13 omission and, therefore, it's not a prior
14 inconsistent statement.
15         THE COURT:  So what were the facts there
16 to which --
17         MS. RODRIGUEZ-COSS:  In Leonardi?
18         THE COURT:  Yes.
19         MS. RODRIGUEZ-COSS:  I'll pull up the
20 case, your Honor.
21         So there the defendant had provided
22 information about a robbery and had apparently,
23 during the course of an interview, failed to provide
24 information about the sale of a second handgun.  And
25 I believe the statement went to that alleged
```

4034

```
1  omission of a second sale of a handgun.
2          THE COURT:  And the result was?
3          MS. RODRIGUEZ-COSS:  The result was that
4  the court upheld the exclusion of the prior
5  inconsistent statement because it concluded that the
6  fact -- the just augmented information previously
7  described and the prior silence was simply too
8  ambiguous to have any probative force.  That would
9  be at page 756, your Honor.
10         THE COURT:  The exception does seem
11 to -- yes, seems to be cabined also by whether or
12 not the question was asked.
13         MS. RODRIGUEZ-COSS:  Absolutely, and we
14 definitely --
15         THE COURT:  Well, let's take these up as
16 they come along.
17         MS. RODRIGUEZ-COSS:  Very well.
18         THE COURT:  But the issue of impeachment
19 by omission, while I don't know that it's been
20 expressly recognized by the Second Circuit, the
21 logic makes sense to me, and the question is how
22 shall it be applied.
23         The second motion that the defendant
24 filed is the motion to permit defense to ask leading
25 questions of government agents.
```

4035

```
1          MS. RODRIGUEZ-COSS:  Right.
2          THE COURT:  Is there any dispute that
3  government agents may be -- are people who are
4  identified with the government and, thus, may be
5  asked leading questions?
6          MS. RODRIGUEZ-COSS:  Absolutely we
7  dispute that, your Honor.  They provide or move
8  under Rule 611(c), which provides for a party being
9  able to treat a witness as a hostile witness.  And
10 even under Rule 611(c) the moving party, whether it
11 be the defendant or the government, needs to first
12 call the witness to the stand and demonstrate that
13 the witness is being hostile before requesting
14 permission under Rule 611(c) to treat the witness as
15 a hostile witness.
16         I've never seen a single case that would
17 stand for the proposition that the Court is to
18 presume that because it is a government agent on the
19 stand he necessarily is hostile to the defense.  I
20 think it would be completely to the contrary.
21         THE COURT:  What about United States v.
22 John Freeman, at 302 F.2d 347, the Second Circuit in
23 1962, which said "When a defendant calls government
24 agents to the stand in an effort to establish some
25 part of his defense he should be given whatever
```

4036

```
 1   reasonable leeway in bringing out whatever may be
 2   relevant to the issues before the jury.  It is
 3   pointless to require a showing, such as the trial
 4   judge indicated might be necessary, that such
 5   witnesses are hostile."
 6           MS. RODRIGUEZ-COSS:  So, in this case
 7   the defense is calling a government witness to
 8   provide testimony as to prior inconsistent
 9   statements.  And the Court is allowing the defense
10   to question the government agents as to the prior
11   inconsistent statements.  The agents are answering
12   those questions to the best of their ability.  If we
13   take the witness yesterday afternoon as an example.
14   I don't see how that is inconsistent with providing
15   the defense all the leeway that they need to bring
16   in the relevant facts to their defense.
17           THE COURT:  Why do you consider
18   Detective DelMonte as a government agent?
19           MS. RODRIGUEZ-COSS:  Why do I consider
20   him as a government agent?
21           THE COURT:  Yes.
22           MS. RODRIGUEZ-COSS:  He was at the time
23   that he conducted the interviews employed by the
24   Bridgeport Police Department.  Unless the Court
25   refers to federal agents when it says government
```

4037

```
 1   agents.
 2           THE COURT:  Well, when I read this
 3   motion, perhaps I should ask Mr. Sheehan.  You are
 4   referring to government agents.  I read that as
 5   federal agents.  Is that what you intended?
 6           MR. SHEEHAN:  No, your Honor, I intend
 7   that more broadly.
 8           THE COURT:  Okay, what's encompassed by
 9   government agent?
10           MR. SHEEHAN:  The agents that were
11   involved in the handling of this case, albeit, it
12   started as a -- although it started as a state
13   court -- as a Bridgeport investigation, it got
14   federalized.  There never was a state court
15   prosecution on the matter, and in that context what
16   those officers were doing was as an agency of the
17   prosecution in this case.  It would be a different
18   situation, for example, if I was --
19           THE COURT:  So you say that that person
20   is by virtue of being a participant in the
21   investigation in this case a witness identified with
22   an adverse party.
23           MR. SHEEHAN:  Yes, your Honor.  And I
24   would distinguish -- for example, if I were calling
25   a New Haven police officer to show that Mr. Aquart
```

4038

```
 1   was, you know, somewhere else who had no involvement
 2   in the case.
 3           THE COURT:  Right.
 4           MR. SHEEHAN:  Then it would seem to me
 5   that would be a different set of circumstances.  Or
 6   if I was calling perhaps somebody who had no
 7   connection with the case, an IRS agent unrelated to
 8   the prosecution of the case.  Then I think what the
 9   Court -- what the rule might contemplate is not as
10   clear.
11           But I think what the rule also did, and
12   that's in light of Freeman and then the subsequent
13   expansion of the rule, the rule itself was intended
14   to be broader than the normal requirement of
15   providing -- of proving that the witness is hostile.
16   And the advisory committee notes indicate that that
17   expansion to consider people aligned with, was
18   intended just to facilitate exactly what we're doing
19   right here.
20           THE COURT:  Ms. Rodriguez, we now have
21   that limited to just law enforcement who are
22   involved in the investigation of this case.
23           MS. RODRIGUEZ-COSS:  Even so, your
24   Honor, we would rely on Rule 611 which clearly
25   states leading questions should not be posed on the
```

4039

```
 1   direct examination of a witness.  And even in cases
 2   where a witness is demonstrated to be a hostile
 3   witness, it is the discretion of the Court to allow
 4   interrogation by leading questions.  We would submit
 5   to the Court based on the record thus far that
 6   government agents, or at least the ones involved in
 7   this case that have testified -- and again, we refer
 8   to the example yesterday afternoon -- have not shown
 9   any hesitation in responding fully and accurately as
10   possible to the defense questions.
11           If this is what it should be, that is, a
12   truth-seeking mission, so that the jury is placed in
13   a position to fairly evaluate the facts, we would
14   submit to the Court that allowing the defense to
15   start by leading these agents is not going to assist
16   in that truth-seeking mission that a trial should
17   be.
18           MR. SHEEHAN:  Your Honor, I would
19   dispute any characterization of a trial as a
20   truth-seeking mission.
21           THE COURT:  All right, we have already
22   taken that out of the charge.
23           MR. SHEEHAN:  Yes, but I would also --
24           MS. RODRIGUEZ-COSS:  We would --
25           MR. SHEEHAN:  -- the discretion inherent
```

4040

1  in the Court under Rule 611 --
2              THE COURT:  I understand.
3              MR. SHEEHAN:  -- is not --
4              THE COURT:  I understand the parties'
5  position.  Thank you.
6              MS. RODRIGUEZ-COSS:  And just with
7  respect to Mr. Sheehan's point on the truth, your
8  Honor, Rule 611 starts by saying that the
9  presentation of evidence is making interrogation and
10 presentation effective for the ascertaining of the
11 truth.  That is why we are here.
12             THE COURT:  No, you are right, that is
13 ostensibly why we are here.  All right.
14             Let's bring in the -- let me -- I have
15 examined the issue about Mr. Hodges' employment as a
16 schoolteacher, and the arguments about whether
17 defendant should be permitted to call Ms. Skrutzler.
18             MR. SHEEHAN:  Skrutski (ph), your Honor.
19             THE COURT:  From the Bridgeport
20 Department of Education to testify that Hodges
21 was -- that there is no record that he performed
22 work or was paid for work as a substitute teacher,
23 contrary to his trial testimony that he was a
24 substitute teacher in the Bridgeport school system.
25 And I have taken into consideration the arguments on

4041

1  both sides, recognizing that 608(b) says "specific
2  instances of the conduct of a witness for the
3  purpose of attacking or supporting the witness's
4  character for truthfulness other than conviction of
5  a crime as provided in Rule 609 may not be proved by
6  extrinsic evidence."
7              The instance of the conduct here is the
8  defendant's claim that Hodges misrepresented his
9  employment background; that is, therefore, his
10 employment or non-employment by the Bridgeport
11 school system goes not to an issue of the
12 defendant's guilt or nonguilt, but to impeach the
13 credibility of the witness.
14             The argument of defense counsel that
15 Hodges' record of non-employment may be admissible
16 under 803(10) seems to me misses the point of
17 whether or not it is admissible to begin with.  If
18 it were for a material issue in the case this
19 exception may well apply and permit its
20 admissibility.  However, where issues that are
21 directed to the witness's credibility only, which
22 this necessarily is, and they don't address any of
23 the elements of the charges or defenses, they're
24 characterized as collateral and not admissible under
25 Rules 402 and 403, contrary to defendant's arguments

4042

1  in United States v. Shoreline Motors, a Second
2  Circuit decision from January 14th of this year,
3  2011, Westlaw 117079, *6.
4              This issue was examined and the district
5  court was deemed to have properly precluded the
6  testimony of a defense witness called to impeach the
7  credibility of one of the government's witness's
8  answers that had been given on that witness's
9  cross-examination.  See also U.S. v. Thomas, 467
10 F.3d 49 at 56 from the First Circuit, 2006, and
11 Wilson v. McCauley, 303 F.3d 1207 at 1216, 10th
12 circuit, 2002.
13             In Wilson a sexual harassment action,
14 testimony about the defendant's alleged extramarital
15 affairs was deemed inadmissible under 608(b) to
16 impeach the physician's deposition testimony that he
17 had never solicited or had adulterous relationships
18 while employed at the hospital, because testimony
19 about the physician's sexual history was, quote,
20 wholly collateral, end quote, and extrinsic evidence
21 is not permitted to prove collateral matters.
22             I think that is applicable here.
23 Regardless of whether evidence of Bridgeport public
24 school records, or the absence thereof, is exempted
25 from the hearsay preclusion, this evidence only

4043

1  bears on Hodges' character for truthfulness, not any
2  claim, charge or defense.  And whether Hodges ever
3  worked for the Bridgeport Police Department is
4  wholly collateral and may not be rebutted through
5  extrinsic evidence.  And Ms. Skrutski, to the extent
6  she is called to give that testimony, and for that
7  purpose, will be precluded.
8              All right.  I think that is about as far
9  as we have time to go this morning.
10             MR. SHEEHAN:  Your Honor, for that
11 purpose I would just like to offer, mark as
12 identification Defendant's Exhibit 5Q.  I have
13 provided copy to counsel.  What I did on that is I
14 have lined through Mr. Hodges' Social Security
15 number.  Exhibit QQQQQ reflects the substance of
16 what Ms. Skrutski would testify to, those two
17 documents, and I would ask that that be marked for
18 identification and included for the record.
19             THE COURT:  All right, may I see it?
20             MR. SHEEHAN:  Yes, your Honor.
21             THE COURT:  All right.  The record will
22 reflect defendant's -- when you say 5Q, you mean
23 QQQQQ.
24             MR. SHEEHAN:  I do, your Honor.
25             THE COURT:  All right.  For

4044

```
1    identification as the document that Ms. Skrutski
2    would have offered if not precluded from testimony.
3    Thank you.
4            MR. SHEEHAN:  Thank you, your Honor.
5            THE COURT:  All right.  Are we ready to
6    proceed?
7            MR. SHEEHAN:  We are.  And we would call
8    Detective Vargas at this time, your Honor.
9            THE COURT:  May we have the jury,
10   please.
11           Has the government prepared a list of
12   the witnesses to be used with the jury instructions?
13           MS. REYNOLDS:  No, but we are, your
14   Honor.
15           MS. DAYTON:  We had to wait until
16   they're done to add everyone onto it.  So we can do
17   it at the close of their case today.
18           THE COURT:  And you all have received
19   the charge?
20           MS. REYNOLDS:  Yes.
21           MS. RODRIGUEZ-COSS:  Yes, your Honor, we
22   have a few typos.
23           THE COURT:  Okay, at the break or at
24   lunch, let's do that.
25           MR. SHEEHAN:  I'm wondering, your Honor,
```

4045

```
1    if we could do the charge -- I think we're likely
2    to -- well, if we finish at a reasonable time, I
3    have not had a chance to go through that, your
4    Honor.
5            THE COURT:  Maybe Mr. Smith has.
6            MR. SHEEHAN:  No, because he's attached
7    to me on this one.
8            THE COURT:  All right.
9            (Jury entered the courtroom.)
10           THE COURT:  Well, good morning.  Another
11   cloudy day for you.  We are ready to proceed.  We
12   are nearing the end of evidence, but your continued
13   attention is needed.
14           Please be seated.  The government --
15   excuse me, the defendant is invited to call his
16   witness, and we have a witness on the stand.  You
17   must be the person who was called.  Please raise
18   your right hand, sir, and the oath will be
19   administered to you.
20           R I C A R D O   V A R G A S
21   Having first affirmed, was examined and testified as
22   follows:
23           THE WITNESS:  Detective Ricardo Vargas.
24   300 Congress Street, Bridgeport, Connecticut.
25           THE COURT:  All right, you may proceed.
```

4046

```
1    DIRECT EXAMINATION BY
2    BY MR. SHEEHAN:
3        Q.   Detective Vargas, good morning.
4        A.   Good morning.
5        Q.   I would like to ask you, you were involved
6    in the processing of the crime scene at 215 Charles
7    Street on August 24th and 25th, 26th, I believe?
8        A.   Yes, sir.
9        Q.   And your responsibilities in that regard
10   included taking the photos, did they not?
11       A.   That's correct.
12       Q.   Let me ask you first, when you -- in terms
13   of processing that crime scene, how are you attired?
14   What were you wearing?
15       A.   That particular crime scene we had to
16   utilize Tyvek suits.  There was a lot of blood in
17   the apartment.
18       Q.   Can you describe the Tyvek suits that you
19   wore for the jury?
20       A.   A Tyvek suit is a full body paper-like
21   substance that covers your entire body except for
22   your feet and your hands.
23       Q.   And how about for those of us with some or
24   declining hair on top, how does that work?
25       A.   They also have a hood.
```

4047

```
1        Q.   And were you wearing masks at the time?
2        A.   Yes.
3        Q.   What is the mask consist of?
4        A.   It's a regular -- I think the product was a
5    3-M type mask you could get at a hardware store
6    type.
7        Q.   And would it be your -- you've obviously
8    had training in processing -- in the processing of
9    crime scenes, have you not?
10       A.   That's correct.
11       Q.   And you're aware of the importance of
12   preventing contamination of the crime scene?
13       A.   Absolutely.
14       Q.   And let me ask you, would that include not
15   bringing items into the crime scene other than your
16   equipment for processing?
17       A.   Just the equipment needed.
18       Q.   Let me show you what's been previously
19   introduced in evidence as -- and I apologize, it's
20   not a great copy on this -- but Exhibit 117H --
21   Government's Exhibit 117H.  And is that one of the
22   photos that you took of the living room at this
23   time?
24       A.   Yes.
25       Q.   And I don't know if we can -- this area
```

4048

1  that my finger is now indicating, towards the table
2  in that area, were those the items on that table as
3  you found it?
4      A.   Yes.  Yes.
5      Q.   And were you processing this -- let me ask
6  you this question.  The document that I have placed
7  in front of you, which I would mark Defendant's five --
8  I'll identify for the record as Defendant's five --
9  Defendant's 5R, which is RRRRR?
10             THE COURT:  Rrrrr.
11             MR. SHEEHAN:  Yes, definitely we'll
12  figure out a better system than this.
13     Q.   That document, Defendant's RRRRR is again a
14  picture, is it not, of that table in the living room
15  during the processing of the crime scene?
16     A.   Yes.
17             MR. SHEEHAN:  I would offer that at this
18  time, your Honor.
19             MS. REYNOLDS:  No objection.
20             THE COURT:  All right, that is a full
21  exhibit.
22             Did you publish that?
23             MR. SHEEHAN:  Yes, I was going to ask.
24  I just asked Mr. Smith to help me in that regard.
25     Q.   Okay.  Again, the quality on the screen is

4049

1  not so hot, but this is the picture, is it not, of
2  the living room -- and maybe if I zoom it out the
3  other way we get the whole image in there.  That was
4  a picture you took of the living room as part of
5  your processing and documenting the treatment of the
6  crime scene, right?
7      A.   Yes, that's an overall view from the living
8  room looking towards the front door.
9      Q.   And let me ask you about this photo and ask
10  you if you can identify that, similarly identify
11  that as part of the living room?
12     A.   Yes.
13     Q.   And again, that reflects, does it not, the
14  door?  There are some markings on the door at that
15  point in time.
16     A.   Yes.
17     Q.   Which would have been added in the course
18  of processing the scene, right?
19     A.   Correct.
20     Q.   But otherwise this reflects the picture in
21  the living room as of the time that you were
22  processing the crime scene?
23     A.   This photo shows the front door opened,
24  yes.
25     Q.   Okay.  And it's an accurate photo of what

4050

1  was taken at that time.
2      A.   Yes.
3             MR. SHEEHAN:  I would offer this, your
4  Honor.
5             THE COURT:  Now, I'm sorry, did you mark
6  this as SSSSS, perchance?
7             MR. SHEEHAN:  Yes, five Ss.
8             THE COURT:  Five Ss.  Okay, it's a full
9  exhibit.
10             MR. SHEEHAN:  I think I'd better ask for
11  another sticker.
12     Q.   And again, showing you Exhibit SSSSS, here
13  is the door, is it not, where you marked -- put
14  certain items on?
15     A.   Yes.
16     Q.   And these items that are now on the table,
17  the Coke bottle or the soda bottle and the -- what
18  appears to be the coffee cup and other items, those
19  are items that were being used by officers who were
20  processing the scene, right?
21     A.   I believe so, yes.
22     Q.   Okay.  And let me ask you --
23             MR. SHEEHAN:  If I might take 120-2.
24     Q.   Showing you what has been previously
25  introduced into evidence as Government

4051

1  Exhibit 120 -- 120-2, that photo represents the body
2  of Mr. Williams as it was found when you went into
3  that apartment.
4      A.   No.
5      Q.   Okay.  Because Mr. Williams previously had
6  that cushion on him, did he not?
7      A.   Well, I take photographs in particular
8  sequence and in layers, and that is probably one of
9  my -- that's when we're taking evidence and marking
10  evidence.  So that would be a later photograph of
11  the victim.
12     Q.   And let me ask you this question, sir:
13  With respect to the white bag that is in that
14  photograph, was that white bag ever seized as
15  evidence?
16     A.   I believe it was.
17     Q.   Okay.  And was that white bag in that same
18  position when Mr. Williams' body was discovered?
19     A.   In this particular photo?
20     Q.   Yes.
21     A.   It was in that position, yes.
22     Q.   Okay.  Showing you what has been marked as
23  Government Exhibit -- what has been introduced as
24  Government Exhibit 120-3.  Do you recognize that as
25  one of the photos that you took of Mr. Williams'

4052

```
1   body?
2        A.   Yes, sir.
3        Q.   And the marker on -- the marker No. 1,
4   below that is the -- is a white bag, correct?
5        A.   Correct.
6        Q.   And is it your recollection that that white
7   bag was in precisely that position when, in fact,
8   Mr. Williams' body was viewed at the scene?
9        A.   In that particular photo there were items
10  that were moved so -- that were on top of it.
11       Q.   Okay.
12       A.   My point of focus in this photograph was
13  item No. 1, which is the duct tape.
14       Q.   Correct.  And how about the bag?
15       A.   The bag was part of the photograph.
16       Q.   Had the bag been moved, to your knowledge?
17       A.   There is a possibility.
18       Q.   Okay.  And the area above the 1, that is
19  the -- one of the handle areas of the bag, is it
20  not?
21       A.   Yes.
22       Q.   And in looking at that bag, you don't see
23  any duct tape on that in this picture, do you?
24       A.   From that angle, no.
25       Q.   Okay.  And I want to ask you about one
```

4053

```
1   other photo, and I'm trying to see if I have an
2   extra copy of this.  And I don't believe that I do,
3   so let me just show this to counsel.
4             MR. SHEEHAN:  This one would be 5Ts for
5   identification.
6        Q.   Asking you to take a look at Exhibit TTTTT
7   for identification, which is on your screen, is this
8   in fact a photo of -- one of the photos that you
9   took at the crime scene?
10       A.   Yes.
11       Q.   Okay.  And does this reflect the scene as
12  of the time -- I believe in this context you had
13  moved the bureau to take the picture.
14       A.   That's correct.
15       Q.   And this photo was taken in the same
16  bedroom where Mr. Williams' body was recovered; if
17  you can recall?
18       A.   I believe that photograph -- that might
19  have been where the two victims were.
20             MR. SHEEHAN:  I wonder if we could bring
21  up for -- I believe it is Exhibit 177.  I'm sorry,
22  crime scene photo 177, 178.  Well, let's leave that
23  a question mark.
24       Q.   Let me ask you this.  In any case, what we
25  have marked as Exhibit TTTTT for identification,
```

4054

```
1   that was one of the photos that you took in the
2   processing of this crime scene, right?
3        A.   Yes.
4             MR. SHEEHAN:  I would offer that at this
5   time, your Honor.
6             THE COURT:  All right.
7             MS. REYNOLDS:  Except, your Honor, he's
8   not identified which room it's a picture of or what
9   it's a picture of.
10       Q.   Let me ask you, is this a picture -- your
11  recollection is that it might be the other bedroom;
12  is that correct?
13       A.   I would need an overall view.  That's the
14  close-up shot of a rear of what appears to be like a
15  dresser.  I would need an actual overall view of the
16  rooms.
17       Q.   Do you -- is this in the crime scene
18  itself --
19       A.   Yes.
20       Q.   -- that you are looking at?
21       A.   Yes.
22       Q.   So, you are not certain which room it's in.
23       A.   That is correct.
24       Q.   But in any case, what you had, you knew in
25  order to get to this item, you pulled a bureau back,
```

4055

```
1   right?
2        A.   Yes.
3        Q.   And this is as you found it when you pulled
4   that bureau back?
5        A.   That's correct.
6             MR. SHEEHAN:  I would offer it, your
7   Honor.
8             THE COURT:  It's a full exhibit.
9             MS. REYNOLDS:  Can we not put in the
10  comments.
11             THE COURT:  Pardon me?
12             MR. SHEEHAN:  That seems to be a
13  reflection of the screen.
14             MS. RODRIGUEZ-COSS:  We've never had
15  that reflection before.
16             MR. SHEEHAN:  I don't know where that's
17  coming from, your Honor.
18             Do you want to try again?
19             MS. REYNOLDS:  No, that's fine.  I just
20  didn't know what it was.
21       Q.   Drawing your attention to this blue bag
22  that my finger is pointing to, was that item seized?
23       A.   In this particular photograph, this only
24  depicts what's behind the dresser.
25       Q.   Correct.
```

4056

```
1     A.   I don't know what number, if it was seized
2   what item number, unless there is a placard along
3   with the photo.
4            THE COURT:  Could you pull the
5   microphone to you or you to the microphone, please.
6     Q.   Okay.  And let me ask you, the plastic bag
7   that my finger is indicating now in the center,
8   right below this package of cigarettes, do you know
9   if that item was seized?
10    A.   The actual objects that were seized I
11  wouldn't know unless there is an identifier, a
12  placard number that was identified for that
13  particular item as being seized.
14    Q.   Is this plastic bag that is see in
15  Defendant's Exhibit TTTTT consistent with the kind
16  of bag that would be used for holding crack cocaine,
17  if you know, sir?
18    A.   Do you have a close-up view of the bag?
19    Q.   Well, let's see what happens here.  It's
20  going to kind of fade out on me.  And I'm not
21  talking about the individual baggies.
22    A.   It is known narcotics dealers usually use
23  plastic bags.
24           MR. SHEEHAN:  I have no further
25  questions of Detective Vargas, thank you, your
```

4057

```
1   Honor.
2   CROSS-EXAMINATION
3   BY MS. REYNOLDS:
4     Q.   Good morning, Detective.
5     A.   Good morning.
6     Q.   Detective, you were part of a three-person
7   crime scene team at the crime scene at 215 Charles
8   Street, correct?
9     A.   Yes.
10    Q.   That was yourself, Detective Paul Ortiz and
11  Detective Joette Devan.
12    A.   Yes.
13    Q.   And you were in charge of photographing and
14  also videotaping the scene.  Was that your primary
15  responsibility at the scene?
16    A.   Yes.
17    Q.   And it was Detective Ortiz who was the
18  evidence custodian who actually seized the items,
19  documented the items that were seized, and then
20  processed each item as evidence, correct?
21    A.   Correct.
22    Q.   But you were there and you were present,
23  the three of you, while you processed the scene,
24  correct?
25    A.   Yes.
```

4058

```
1     Q.   And you were there for three days; is that
2   fair to say?
3     A.   Yes.
4     Q.   And the first thing you did was call the
5   medical examiner's office in and process the
6   evidence from the victims' bodies; is that fair to
7   say?
8     A.   After we made our assessment, yes, we made
9   that decision.
10    Q.   Right.  First you assessed and came up with
11  a plan on how to process the scene because there was
12  so much evidence to process in that apartment,
13  correct?
14    A.   Yes.
15    Q.   And then you dealt with first the three
16  victims' bodies?
17    A.   That's correct.
18    Q.   So, your photography of the scene focused
19  first on the evidence that was seized from the
20  victims' bodies and the victims' bodies themselves;
21  is that fair to say?
22    A.   No.
23    Q.   No?  All right.  What did you do first?
24    A.   I take photographs of the overall scene
25  without anything being touched and then we make a
```

4059

```
1   determination on the second -- if we start
2   collecting evidence, we start putting placards down,
3   and then we take the photo of the placard and
4   identifying item.
5     Q.   So, you first start with the overall --
6   without moving anything, correct?
7     A.   That's correct.
8     Q.   Just to clarify.  And then once you start
9   identifying pieces of evidence you start documenting
10  them with the Bridgeport evidence number; fair to
11  say?
12    A.   That is correct, yes.
13    Q.   And so you photograph first without the
14  placards and then when you are adding the placards
15  you take photos after that also?
16    A.   Yes.  The first set is everything in its
17  original position.
18    Q.   And throughout that entire process, when
19  you and Detective Devan and Detective Ortiz were in
20  there, you were wearing gloves and wearing the Tyvek
21  suits you had described, correct?
22    A.   That is correct.
23    Q.   And throughout that entire process -- and
24  it was, again, three days, correct?
25    A.   Yes.
```

GA1015

4060

1    Q.   And it was three days at the end of August.
2    A.   Yes.
3    Q.   And it was very hot inside that apartment.
4    A.   Yes.
5    Q.   No air conditioning?
6    A.   No.
7    Q.   In one of the photos you see later on that
8  Mr. Sheehan just showed you, the door is open.  Was
9  that so you could have some air in that apartment at
10  that point?
11    A.   Some ventilation.
12    Q.   And there was some drinks on the table when
13  that photo was taken.  That was later on in the
14  process, correct, after you had removed the bodies
15  and removed most of the evidence from the scene?
16    A.   After the original photos were taken.
17  Nothing was placed in the entire apartment.
18    Q.   So, you took the original photos, then you
19  start discovering evidence, you start documenting
20  that evidence, then you start removing that
21  evidence; is that fair to say?
22    A.   That is correct.
23    Q.   And then later on you come back to the
24  apartment on the third day to take measurements and
25  take other photos, correct?

4061

1    A.   Yes.
2    Q.   And you've indicated you weren't the
3  seizing officer, but let me show you -- you were
4  there when items of evidence were seized, correct?
5    A.   Yes.
6    Q.   And showing you what's in evidence as
7  Government's 123A, and looking at the label there,
8  does that identify the evidence that's contained in
9  that exhibit?
10    A.   Yes.
11    Q.   And what's contained in that exhibit?
12    A.   One plastic bag with a blue plastic bag
13  adhered by duct tape.
14    Q.   And does it say where that was recovered
15  from?
16    A.   Yes, location was found on the floor
17  closest to the southwest wall of the northwest
18  bedroom within apartment 101, 215 Charles Street,
19  Bridgeport, Connecticut.
20    Q.   And again, you didn't fill out those
21  labels, that was Detective Ortiz's job at the same
22  time, correct?
23    A.   Yes.
24    Q.   But he documents where it was seized from
25  and what it is.

4062

1    A.   That is correct.
2    Q.   And inside there, is the blue -- you can
3  open it up.  Does that contain what's described in
4  the label?
5    A.   Yes.
6    Q.   And as items of evidence were seized --
7        MS. REYNOLDS:  May I just have a moment,
8  your Honor?
9    Q.   Well, let me ask you this:  As items of
10  evidence were seized, you didn't move them -- well,
11  strike that.
12       You indicated before that in order to get
13  some of the photographs you would, in fact, have to
14  remove some things that were near, for example, the
15  victim's body, in this case Basil Williams' body; is
16  that fair to say?
17    A.   It's a possibility, yes.
18    Q.   To get some of the angles and be able to
19  photograph the duct tape on the face, for example,
20  to get the right angle, you might have to move some
21  items?
22    A.   That is correct.
23    Q.   Did you take those items out into the
24  parking lot and then bring them back in or did you
25  just move them a little bit out of the way so you

4063

1  could get the right angle you were trying to take?
2    A.   Most likely just maybe within arm's reach.
3    Q.   And, for example, with what's contained in
4  Government's Exhibit 123, the blue plastic bag
5  adhered with a piece of duct tape to the white
6  Walgreen's bag, do you remember either Detective
7  Joette Devan or Detective Paul Ortiz or yourself
8  removing that item from where it was found and
9  taking it into another room or taking it outside for
10  a while?
11    A.   No.
12    Q.   And did you ever let the defendant, Azibo
13  Aquart, inside the apartment to touch any of the
14  duct tape that was seized or any of the bags that
15  were seized from the victims' apartment?
16    A.   No.
17    Q.   And did you ever take that bag and the
18  evidence contained in Government's Exhibit 123 and
19  go find Azibo Aquart or Azikiwe Aquart and have them
20  touch it and then bring it back to the crime scene?
21    A.   No, it was collected and immediately
22  sealed.
23        MS. REYNOLDS:  Nothing further, your
24  Honor.
25        THE COURT:  Anything further,

4064

```
1    Mr. Sheehan?
2            MR. SHEEHAN:  No, your Honor.  Thank
3    you.
4            THE COURT:  All right, thank you, sir.
5    You may step down.  You are excused.
6            THE WITNESS:  Thank you.
7            THE COURT:  All right.  Will the
8    defendant call its next witness.
9            MR. SMITH:  Your Honor, the defense
10   calls task force agent, or task force officer, Juan
11   Gonzalez.
12           THE COURT:  All right.  Officer
13   Gonzalez, if you will take the witness stand.
14           THE WITNESS:  Thank you.
15           THE COURT:  Please raise your right hand
16   and you will be sworn.
17           J U A N   G O N Z A L E Z
18   Having first affirmed, was examined and testified as
19   follows:
20           THE WITNESS:  Juan Gonzalez, Jr.,
21   G-o-n-z-a-l-e-z, Bridgeport, Connecticut.
22           THE COURT:  All right you may proceed.
23   DIRECT EXAMINATION
24   BY MR. SMITH:
25       Q.   Good morning, Officer Gonzalez.
```

4065

```
1        A.   Good morning.
2        Q.   I'm Justin Smith.  I'm one of the attorneys
3    who represents Mr. Aquart.
4            Officer Gonzalez -- it is Officer Gonzalez?
5        A.   It's Sergeant Gonzalez.
6        Q.   I apologize.  Sergeant Gonzalez, can you
7    tell us how you are employed please.
8        A.   I'm employed by the Bridgeport Police
9    Department.
10       Q.   And what are your duties there?
11       A.   I am the sergeant assigned to the chief's
12   office.  I supervise detectives and officers in
13   various task forces, federal and state task forces.
14       Q.   Are you currently assigned to a federal
15   task force?
16       A.   Yes.
17       Q.   What task force is that?
18       A.   The FBI task force.
19       Q.   And were you so employed on August 24,
20   2005?
21       A.   Yes.
22       Q.   And you've been deputized as a federal
23   officer since then?
24       A.   Yes.
25       Q.   I'll bring your attention to -- let me go
```

4066

```
1    back.
2            Were you assigned to assist in the
3    investigation of the murders at Charles Street?
4        A.   Yes.
5        Q.   And as part of that investigation were you
6    -- or did you interview Juanita Hopkins?
7        A.   I was part of the investigative team, yes.
8        Q.   So, you did, in fact, attend interviews
9    with Ms. Hopkins?
10       A.   I believe so, yes.
11       Q.   And as part of your interview with Juanita
12   Hopkins, was that on May 7, 2010?
13       A.   I'm not sure on the exact date.
14       Q.   Would looking at something refresh your
15   recollection as to that?
16       A.   Sure.
17       Q.   Does looking at that document refresh your
18   recollection of the date of the interview?
19       A.   May 7, 2010.
20       Q.   Now, as part of that interview,
21   Sergeant Gonzalez, did Ms. Hopkins state to you --
22   well, let me ask this:  When you were doing the
23   interview with Ms. Hopkins, did there come a time
24   when you discussed with her an incident wherein she
25   went down and robbed Tina Johnson of drugs?
```

4067

```
1        A.   I don't recall that.
2            MR. SMITH:  Could we bring up DG 1172.
3        Q.   That full paragraph in the middle, this is
4    page 5 of that.
5            Does that refresh your recollection as to
6    the subject matter, part of the subject matter of
7    that interview?
8        A.   Yes.
9        Q.   So this refreshes your recollection that
10   you discussed the fact that Juan Hopkins -- I'm
11   sorry, Juanita Hopkins had robbed Tina Johnson; is
12   that correct?
13       A.   That's what she said on that day, yes.
14       Q.   And is it also -- specifically, did
15   Ms. Hopkins state on that date that it was clear to
16   her that at that point Velma had been selling
17   for Tina Johnson?
18       A.   Yes.
19       Q.   Okay.  Now, in part of that same interview,
20   the subject matter in regards to Ms. Hopkins'
21   activities on the morning that the homicides were
22   discovered, that was a subject of discussion as
23   well?
24       A.   Yes.
25       Q.   And as part of that there came a time that
```

4068

1   Ms. Hopkins -- where she discussed what she did in
2   terms of going to Judy's apartment.
3       A.   I'm not sure on what day you are referring
4   to.
5       Q.   This is, again, May 7, 2010, that
6   interview?
7       A.   Yes.
8       Q.   And I draw your attention to page 7.
9            MR. SMITH:  If we could bring up
10  DG 1174.
11           THE COURT:  I'm sorry.  I think the
12  question may have been what time are you referring
13  to in the question as opposed to which interview.
14           MR. SMITH:  I apologize.
15      Q.   Do you recall there was discussion about
16  Ms. Hopkins leaving the apartment at some point to
17  go purchase crack cocaine on the morning of the
18  homicides?
19      A.   If you show me where to look.  I don't have
20  an independent recollection.
21      Q.   Would maybe looking at that report assist
22  you?  This is page 7, that first full paragraph.
23      A.   Yes.
24      Q.   So, that refreshes your recollection as to
25  the fact that Ms. Hopkins discussed going out and

4069

1   buying cocaine that morning.
2       A.   Yes.
3       Q.   And in that statement did Ms. Hopkins say
4   that after returning from buying the cocaine that
5   Mr. Aquart instructed her to take the money to
6   Judith Rivera's apartment and give it to Z?
7       A.   You are going to have to repeat that
8   question.  I'm sorry.
9       Q.   I apologize.
10           Did Ms. Hopkins state in that interview with
11  you that Mr. Aquart, Azibo, had instructed her to
12  take the money to Rivera's apartment and give it to
13  Z?
14      A.   Instructed them to bring the money.
15      Q.   Meaning Hodges and Hopkins.
16      A.   Correct.
17      Q.   So, in fact, she did say that during that
18  interview?
19      A.   Yes.
20      Q.   Okay.  Thank you, Sergeant Gonzalez, I have
21  no further questions.
22      A.   Thank you.
23           THE COURT:  All right, redirect.
24           MS. DAYTON:  No, thank you.
25           THE COURT:  Cross.

4070

1            MS. DAYTON:  No, thank you.
2            THE COURT:  Thank you.  Thank you,
3   Sergeant, you are excused.  You may step down.
4            THE WITNESS:  Thank you.
5            THE COURT:  All right, will the defense
6   call its next witness, please.
7            MR. SMITH:  Yes, your Honor, the defense
8   would call Special Agent Michael Syrax.
9            THE COURT:  All right, Agent Syrax, if
10  you will take the stand, remain standing.  The oath
11  will be administered to you.
12           M I C H A E L   S Y R A X
13  Having first affirmed, was examined and testified as
14  follows:
15           THE WITNESS:  My name is Michael Syrax,
16  spelled S-y-r-a-x, and my business address is 600
17  State Street, in New Haven Connecticut.
18           THE COURT:  All right, you may proceed.
19  DIRECT EXAMINATION
20  BY MR. SMITH:
21      Q.   Good morning, Agent Syrax.
22      A.   Good morning.
23      Q.   Could you tell us how you are currently
24  employed.
25      A.   I'm employed as a special agent with the

4071

1   Federal Bureau of Investigation and currently
2   assigned to the New Haven field division.
3       Q.   And were you so employed in August of 2005?
4       A.   Yes, I was.
5       Q.   And were you assigned to investigate along
6   with others the murders that occurred at 215 Charles
7   Street?
8       A.   Yes, I was.
9       Q.   As part of your investigation, did there
10  come a time when you interviewed Juanita Hopkins?
11      A.   Yes.
12      Q.   And that was on October 3rd, 2005?
13      A.   The date sounds correct.
14      Q.   And in that interview, did the discussion
15  of -- did you discuss with Ms. Hopkins the existence
16  of a table leg in an apartment there in apartment
17  211?
18      A.   Yes, I recall that.
19      Q.   And in that interview, did Ms. Hopkins tell
20  you that one week before -- approximately one week
21  before the homicides Rodney Womble had picked up the
22  table leg and said he was going to beat Reid with
23  the table leg?
24      A.   I recall she said that he had picked up the
25  table leg, walked around the apartment with it, and

4072

1 threatened an individual. Without seeing my report
2 I can't recall specifically who it was, but I do
3 recall something similar to that.
4     Q.    Would looking at your report perhaps
5 refresh your memory?
6     A.    Yes.
7     Q.    Did that refresh your memory as to what
8 Ms. Hopkins had told you?
9     A.    Yes.
10     Q.    And she, in fact, told you that Womble had
11 picked up the table leg and said he was going to
12 beat Reid with the leg.
13     A.    Yes, the word "beat" is in there.
14     Q.    Thank you.
15         Did there also come a time, Agent Syrax,
16 when you had occasion to interview Frank Hodges?
17     A.    Yes.
18     Q.    And one of those interviews occurred on
19 September 23, 2005; is that correct?
20     A.    That sounds accurate, yes.
21     Q.    And on that date did Mr. -- and there came
22 a time in that interview when you discussed with him
23 an incident where he saw three males dressed in
24 black in the building.
25     A.    Yes.

4073

1     Q.    And in the course of that interview, did he
2 in fact tell you that when he saw the three males
3 dressed in black he saw them in the laundry room
4 across from apartment 101?
5     A.    Yes.  And I believe in the hallway at some
6 point.
7     Q.    At some other point he may have told you it
8 was in the hallway; is that right?
9     A.    Correct, yes.
10     Q.    But you do recall specifically at one point
11 he did say they were standing in the laundry, the
12 room across from 101.
13     A.    Yes.
14     Q.    Okay.  And you had occasion to interview
15 Frank Hodges on September 28, 2005; is that right?
16     A.    Yes.
17     Q.    Is that correct?  Okay.
18         And in that interview did Mr. Hodges say
19 specifically that the men he saw dressed in black
20 were in the laundry room on the second floor of the
21 Charles Street apartments?
22     A.    If I can see my report I could accurately
23 determine that.  Okay.
24     Q.    And in that interview he did not say
25 specifically that the men were standing in the

4074

1 laundry room on the second floor; is that correct?
2     A.    The report says that he saw them standing
3 somewhere behind Hodges, either in the stairwell or
4 in the laundry room.
5     Q.    In fact, didn't he say that he heard the
6 sounds of people walking behind him down the stairs?
7     A.    Yes.
8     Q.    Now, in that same interview there was a
9 discussion in regards to people from whom Mr. Hodges
10 had purchased cocaine; is that correct?
11     A.    Yes.
12     Q.    And, in fact, did he tell you in that
13 interview that one of the people from whom he did in
14 fact purchase cocaine was Boozine?
15     A.    I know he had interaction with Boozine, and
16 if I could check my report.
17     Q.    Of course.  And the reference might be
18 DG 998 in the lower left-hand corner of that, if
19 that's easier for you.
20         Turning your attention to the first
21 paragraph.
22     A.    Yes, Boozine is listed among others from
23 whom he purchased cocaine.
24     Q.    Thank you.
25         Turning your attention, Agent, did you also

4075

1 have the occasion to interview Rodney Womble?
2     A.    Yes, I did.
3     Q.    Okay.  And one of those interviews occurred
4 on September 20, 2005; is that correct?
5     A.    That sounds accurate.
6     Q.    And on that occasion there was a discussion
7 in regards to Mr. Womble witnessing a -- claim to
8 have witnessed an assault by Mr. Aquart against
9 Ms. Hopkins' brother.
10     A.    Yes.
11     Q.    And in that interview, did, in fact,
12 Mr. Womble tell you that Mr. Aquart had struck
13 Hopkins' brother in the head with a table leg?
14     A.    I recall the description of the assault.
15 To confirm with what -- I'll have to look at my
16 report to be sure.
17     Q.    Sure.
18     A.    Okay, the table leg is referenced in the
19 report.
20     Q.    And specially, it's referenced Mr. Womble
21 says that Mr. Aquart struck Ms. Hopkins' brother
22 with the table leg.
23     A.    Yes.
24     Q.    Okay, thank you.
25         And you had also interviewed Mr. Womble on

4076

```
1   September 8, 2005; is that correct?
2       A.   Yes, that is correct.
3       Q.   And that was the date of his arrest.
4       A.   Yes.
5       Q.   And in that interview did Mr. Womble -- the
6   description of persons that Mr. Womble knew had come
7   up.
8       A.   Yes.
9       Q.   And did Mr. Womble tell you in the course
10  of that interview that he, in fact, had seen Frank
11  Hodges just a few days before his arrest?
12      A.   I believe so, yes.
13      Q.   Those are all of the questions I have.
14  Thank you.
15      A.   Thanks.
16           THE COURT:  I'm sorry, a few days before
17  Womble's or Hodges' arrest?
18      Q.   To be clear, that was -- Mr. Womble was
19  relating to you that he had seen Mr. Hodges just a
20  few days before Mr. Womble's arrest.
21      A.   I believe that's accurate, yes.
22           MR. SMITH:  Thank you.
23           THE COURT:  Cross-examination.
24  CROSS-EXAMINATION BY
25  BY MS. DAYTON:
```

4077

```
1       Q.   Good morning --
2       A.   Good morning.
3       Q.   -- Agent Syrax.  How are you?
4       A.   Good.
5       Q.   Are you still involved with this case?
6       A.   No.
7       Q.   You were reassigned.
8       A.   Yes.
9       Q.   To where?
10      A.   I was reassigned to the New Haven division,
11  to two different squads in the interim period.
12      Q.   What are the squads?
13      A.   I was assigned to the counterintelligence
14  squad for a period of approximately two and a half
15  years.  I'm now the weapons master instruction
16  coordinator assigned to the counterterrorism squad.
17      Q.   Have you spent a lot of time reviewing your
18  reports in the past five and a half years, or you
19  were on to other duties?
20      A.   Correct, I was on to other duties.
21      Q.   Counsel asked you about a couple of
22  interviews with both Juanita Hopkins and Frank
23  Hodges.  First he asked you -- well, he just asked
24  you about an assault that Womble said he saw the
25  defendant commit, right?
```

4078

```
1       A.   Yes.
2       Q.   And Womble said that he saw the defendant
3   beat someone with a table leg; is that correct?
4       A.   Yes.
5       Q.   And then he asked you about an interview of
6   Frank Hodges on September 23, 2005.  Do you remember
7   him asking you that?
8       A.   Yes, I do.
9       Q.   And do you still have that report there?
10      A.   Yes.
11      Q.   If I can draw your attention to page 2, the
12  second to last full paragraph.
13      Frank Hodges told you that the defendant
14  knocked on the door of apartment 211 between 4:30
15  and 6:00 a.m. the Sunday night before the murders,
16  right?
17           MR. SMITH:  Objection.  Outside the
18  scope.
19           THE COURT:  How is that claimed to be
20  within the scope?
21           MS. DAYTON:  This relates to the three
22  people dressed in black clothing.  He didn't just
23  say three people dressed in black clothing.
24           MR. SMITH:  I asked about the location
25  of the three people.
```

4079

```
1            THE COURT:  May I see you at sidebar,
2   please.
3            (Sidebar conference)
4            THE COURT:  All right, so you asked
5   about whether he said that the men in black were in
6   the laundry room, in the hallway on the first floor,
7   on the second floor.
8            MR. SMITH:  That's correct, your Honor.
9            THE COURT:  What does this relate to?
10           MS. DAYTON:  Okay, so this relates to
11  that, one, it wasn't just three men in black, it was
12  the defendant with three men in black.  And it's
13  very misleading as it's been left with the jury.  He
14  went down to apartment 101 and he saw men standing
15  in the laundry room across from apartment 101.  He
16  was then interviewed five days later, a long
17  interview, and I want to bring out, number one, he
18  told them at that point that Jackie Bryant had been
19  present.  That was a question that got raised
20  yesterday about whether or not he ever said that
21  Jackie Bryant was present, your Honor.  Your Honor,
22  recalls that yesterday.
23           MR. SMITH:  And that was precluded by
24  your Honor.  I was not allowed to continue that line
25  of questioning.
```

4080

```
1         MS. DAYTON:  And in this one he says
2    that -- actually I can just skip this one.
3         THE COURT:  You were -- you did get to
4    ask whether Jackie Bryant said Stone left with
5    Hodges.  Is this the same sequence?
6         MR. SMITH:  This is -- yes, but I was
7    asking that of his interview with Ms. Hopkins.  This
8    relates to Mr. Hodges' statements.
9         MS. DAYTON:  Oh, yes, here.
10        THE COURT:  I don't think that has
11   anything to do with this cross-examination --
12   this --
13        MS. DAYTON:  I can stay away from the
14   Bryant thing.  On the 28th, five days later he
15   explains in more detail that on the way downstairs
16   he saw the three individuals in black clothing.  He
17   heard them in the hallway.  They stopped on the
18   stairs.  He knocked on the door and Aquart was
19   standing behind him in the stairwell of the laundry
20   room.
21        So, rather than leaving them with the
22   impression that there was just three men in black,
23   it was the defendant with them and different
24   locations.  There is a lot more to this statement.
25        MR. SMITH:  Let me see what you are
```

4081

```
1    referencing.
2         MS. DAYTON:  He just asked him about
3    this exact report, these exact two reports,
4    actually, and these particular sections of the
5    reports.
6         Again I didn't ask about Mr. Hodges
7    knocking on the door, I asked about the location of
8    the three men.
9         THE COURT:  I think the location is what
10   you were asking about.
11        MR. SMITH:  Exactly.
12        THE COURT:  If there are more statements
13   that relate to the location, that seems to me a fair
14   area for your examination.
15        MR. SMITH:  Yes, but the part about
16   Mr. Hodges knocking on the door.
17        THE COURT:  No.
18        MS. DAYTON:  While we're here, just to
19   avoid coming back up, he also asked about Juanita
20   Hopkins and what she had said about Z being at
21   Judy's house.  Well, in the interview --
22        THE COURT:  Wait.  I'm sorry.
23        MS. DAYTON:  Do you recall those?
24        THE COURT:  No, he didn't ask this
25   witness.
```

4082

```
1         MS. DAYTON:  I know he didn't ask this
2    witness, but he asked a witness, the last witness
3    about that.  This witness interviewed Ms. Hopkins
4    five years before that last witness and we're
5    allowed to bring in a prior consistent statement on
6    a claim of recent fabrication.
7         Aquart called apartment 211 and said you
8    ain't learned your lesson.  I know you cooking up in
9    my house, instructed Hopkins to open up the door to
10   the apartment.  When she opened the door she was met
11   by an unknown subject who was identified by the name
12   Zee.  She described him.  Aquart told Hopkins Zee
13   would be watching the people in the apartment and
14   she believed he was across the hall in Judy's
15   apartment before he came to 211.  So it's far more
16   fulsome.
17        THE COURT:  The problem is that you are
18   doing that through this witness based on his direct
19   examination that has nothing to do with it.  It
20   seems to me that it's your rebuttal case, if
21   anything, that that comes in on.  The question --
22        MS. DAYTON:  It will go to rebuttal.
23        THE COURT:  The question is whether we
24   are going to be efficient and use this witness once
25   or send him out and bring him back.
```

4083

```
1         MS. DAYTON:  Your Honor, to me it feels
2    like it would be much more efficient --
3         THE COURT:  Let me ask Mr. Smith.
4         MR. SMITH:  If this is restricted on the
5    prior consistent statement of seeing Zee at the
6    door, I have no quarrel with --
7         MS. DAYTON:  It's what I just said.
8    That paragraph, I'm not going to go beyond that.
9         MR. SMITH:  Well, I think there is
10   extraneous things about "you ain't learned your
11   lesson, you cooking in my house."  I think that is
12   beyond when she saw Zee, the part where she says she
13   answers the door, Zee is there.
14        THE COURT:  This is not an invitation to
15   read in a whole report that isn't in evidence.  So,
16   if you want to ask him whether in fact Bryant in an
17   interview said that she had seen Zee at the door
18   in --
19        MS. DAYTON:  It's Hopkins.
20        THE COURT:  I'm sorry.
21        MR. SMITH:  It does get confusing, your
22   Honor.
23        MS. DAYTON:  I mean, but there should be
24   some context.  Aquart sent him to the door, she
25   opened the door and believed he had been in Judy's
```

**GA1021**

4084

```
1   apartment before that.
2           THE COURT:  I don't agree.  What you are
3   doing is, you have a prior consistent statement that
4   you say rebuts the recent fabrication of an
5   inconsistent statement of not having seen Zee or
6   mentioned Zee as having been there.  That's all
7   there is to it.  It's not putting in a whole other
8   set of evidence.
9           MS. DAYTON:  Okay.
10          THE COURT:  All right.  Any other areas
11  that we should preview?
12          MR. SMITH:  That's up -- it's her cross,
13  so I don't know.
14          (Sidebar concluded)
15      Q.   Do you remember what I asked you?
16      A.   Could you refresh my recollection?
17      Q.   Okay.  Did Hodges mention that he saw D and
18  three other males standing in the laundry room
19  across from apartment 101?
20      A.   Yes.
21      Q.   So not just three other males?
22      A.   Yes.
23      Q.   And you spoke to him again on the 28th.
24  Counsel asked you about that September 28, 2005; is
25  that correct?
```

4085

```
1       A.   Yes.
2       Q.   And drawing your attention to page 9, the
3   first full paragraph, Hodges again reiterated that D
4   had come to the door, correct?
5       A.   To the door, yes.
6       Q.   Of apartment 211.
7       A.   Yes.
8       Q.   And that on the way downstairs to apartment
9   101, Hodges saw three individuals in black clothing,
10  correct?
11          MR. SMITH:  I'm going to object.
12  Reading directly from the report.
13          THE COURT:  Sustained.
14      Q.   He indicated, Frank Hodges indicated --
15          THE COURT:  We're trying to talk to him
16  about his refreshed recollection, not just reading
17  from the report.
18          MS. DAYTON:  Right, but --
19          THE COURT:  So let's just ask about the
20  subject matter areas and what he recalls Mr. Hodges
21  saying.
22      Q.   Okay.  Do you recall Mr. Hodges telling you
23  he saw three individuals in the hallway?
24      A.   Yes.
25      Q.   And do you recall Mr. Hodges telling you
```

4086

```
1   that he saw or heard several individuals walking
2   behind him on the stairwell?
3       A.   Yes.
4       Q.   And do you recall Mr. Hodges telling you
5   that Aquart was also standing besides -- behind him
6   somewhere near the laundry room?
7       A.   Yes.
8       Q.   And then counsel asked you some questions
9   about Juanita Hopkins.  You interviewed her on
10  September 28, 2005; is that correct?
11      A.   Yes.
12      Q.   And on that day, did you speak to her about
13  an individual named Zee?
14      A.   I remember speaking with her about an
15  individual known as Zee.  I can't be sure that's the
16  specific day.
17      Q.   Would looking at your report refresh your
18  memory?
19      A.   Yes.
20      Q.   If I could ask you to look at the 9/28/2005
21  report, page 3, first full paragraph, please.
22      A.   I have a different report here.
23      Q.   You do?
24      A.   I believe so.
25          Yes, I remember this incident.
```

4087

```
1       Q.   You do?
2       A.   Yes.
3       Q.   Okay.  That refreshed your memory?
4       A.   Yes.
5       Q.   And can you please tell us where
6   Ms. Hopkins said she saw Zee that morning, the
7   morning of the murders?
8       A.   An individual knocked on the door and she
9   opened the door and this person known to her as Zee
10  was at the door, he was essentially checking on
11  them.
12      Q.   The door to where?
13      A.   The door to apartment 211.
14      Q.   Did she say if she knew where Zee had been
15  before he came to 211?
16          MR. SMITH:  Objection.  Outside the
17  scope.
18          THE COURT:  Sustained.
19      Q.   Do you know if Zee had been in Judy's
20  apartment -- did she know if Zee had been in Judy's
21  apartment that morning?
22          MR. SMITH:  Objection.  The same.
23          THE COURT:  I'm going to sustain the
24  objection.
25          MS. DAYTON:  Nothing further.  Thank
```

**GA1022**

4088

```
1    you.
2                THE COURT:  All right.  Any redirect.
3                MR. SMITH:  No, your Honor.
4                THE COURT:  All right, Agent Syrax,
5    thank you.  You are excused.  You may step down.
6                Why don't we take a 15-minute recess,
7    ladies and gentlemen.
8                (Jury exited the courtroom.)
9                THE COURT:  All right, can I understand
10   with respect to claimed prior inconsistent
11   statements of Jackie Bryant what the signed
12   statement is that -- what the signed statement is
13   inconsistent with?
14               MR. SMITH:  I'm going to use the best of
15   my recollection, your Honor.
16               THE COURT:  Do you want to look at it
17   again?
18               MR. SMITH:  Well, if I recall --
19               THE COURT:  Because I've looked through
20   it and then I've looked through bits of the
21   testimony and --
22               MR. SMITH:  As I recall, your Honor, I
23   think it was the fact that I confronted her in
24   regards to her failure to tell the officer in that
25   first interview that she had actually witnessed
```

4089

```
1    Frank Hodges knocking on the door as she left the
2    apartment building, as she had testified here.  And
3    also I believe in the Grand Jury testimony.
4                THE COURT:  So you asked her "On
5    August 27th when the detectives interviewed you, you
6    never mentioned seeing them" meaning the men in
7    black, "in the hallway before you went into the
8    building; is that correct?"
9                "I don't recall if I said it to them or
10   not."  Okay.
11               "So that night you said you had gone into
12   211; is that right?
13               "Yes."  And then we move to, "But in your
14   interview just a couple days after the murders you
15   didn't tell the police that D came to the door that
16   night."
17               "Maybe they didn't ask me.  I don't know
18   why I didn't tell them.  But I told them at one
19   point."
20               Is that what this is about?
21               MR. SMITH:  I believe that's part of it,
22   but I thought I also confronted her in regards to --
23   I'll have to stand on the transcript if it's not
24   there.  I thought I had confronted her on the fact
25   she didn't actually witness Frank Hodges knock on
```

4090

```
1    the door or did not state she had witnessed Frank
2    Hodges knocking on the door.
3                THE COURT:  On the door of 101?
4                MR. SMITH:  Correct.
5                She had specifically talked about
6    leaving the apartment building and not seeing that.
7                MS. DAYTON:  Your Honor, then the
8    government sought to put the Grand Jury transcript
9    in.
10               THE COURT:  We're going to get to that.
11   Then you go on and you say "You talked yesterday
12   about when you left the building you saw Hodges
13   knocking on the door of 101, but in that same
14   statement to the police you didn't tell them that."
15               And she says, "Sir, at that time I don't
16   know of every little detail was just popping up
17   freshly in my mind or whatever."  So forth.
18               So those are the two points.  And she is
19   asked in her statement, "What can you tell me about
20   the incident that happened at 215 Charles Street on
21   August 23rd."  And she does not mention those
22   things.  And that's the reason you want her
23   statement?
24               MR. SMITH:  That is correct, your Honor.
25               THE COURT:  All right.  So that will be
```

4091

```
1    admitted.  But now you have offered this little
2    piece of the Grand Jury testimony that says "You've
3    provided this Grand Jury information that you're
4    aware of that is the truth."
5                "Yeah, I mean that's what I know, that's
6    everything I know."
7                How can the jury determine whether there
8    is an omission, inconsistent omission unless they
9    have the full Grand Jury transcript?  And that's
10   what the government is offering.
11               MR. SMITH:  I think when I pressed her I
12   think her testimony was, well, maybe it's not in
13   there.  "It's probably not in there, but I know I
14   told somebody at some point."
15               THE COURT:  Are you pressing this little
16   snippet from the Grand Jury testimony?
17               MR. SMITH:  Well, your Honor, I think
18   it's important because it goes to the fact --
19               THE COURT:  If you are -- so the answer
20   is yes?
21               MR. SMITH:  Yes.
22               THE COURT:  So, now I want to know how
23   in the world the jury can ascertain either the
24   consistency or inconsistencies of her testimony here
25   versus her Grand Jury testimony with all of its
```

4092

1   inconsistencies by omission as you claim unless it
2   has a copy of it.  And so --
3           MR. SMITH:  Perhaps that is the better
4   practice, your Honor.  That way the jury can see
5   that she did not tell the Grand Jury about Azikiwe
6   visiting her and attempting to bribe her apparently,
7   or whatever that is.  So then I would move to have
8   the entire Grand Jury.
9           THE COURT:  Then let's -- and that will
10  include that last page.  I guess it's not a last
11  page.
12          MR. SMITH:  There might have been --
13          THE COURT:  Oh.
14          MR. SMITH:  -- juror questioning after
15  that.
16          THE COURT:  Well, there is some -- and
17  from Mr. Glasser.  All right, well, if that's the
18  way to get the prior -- the inconsistencies by
19  omission in, and the government has no objection,
20  then let's mark these two exhibits.
21          Had you already marked them?  Or shall
22  we?
23          MR. SMITH:  I think I had premarked the
24  statement as K and I had marked the redacted one as
25  L.  We could do the entire transcript as L-1

4093

1   perhaps.
2           MS. DAYTON:  I think we --
3           THE COURT:  We're not going to put the
4   separate statement in because it's a part of the --
5   it's page 31 of the Grand Jury testimony, so would
6   you mark these two then.
7           MS. DAYTON:  I think the government
8   offered the Grand Jury transcript, so I'll mark that
9   and --
10          MR. SMITH:  That's fine.
11          THE COURT:  So, let's get these two in
12  and so that takes care of that.
13          MR. SHEEHAN:  And your Honor is going to
14  give an instruction on inconsistent statements as
15  part of the charge, and I would just ask when we get
16  to that.  For example, your Honor could indicate
17  that whether an inconsistent statements or
18  consistent statements, those are offered with
19  respect to general credibility, they are not
20  evidence of what the evidence is, it is what the
21  witness testified to.
22          MS. DAYTON:  Well, prior --
23          MR. SHEEHAN:  So, for example --
24          MS. DAYTON:  Prior consistent -- prior
25  inconsistent statements are admitted for the truth

4094

1   being asserted.
2           MR. SHEEHAN:  Well, no.  I think prior
3   inconsistent statements are offered for purposes of
4   impeaching what the person said.
5           THE COURT:  Does that mean that they are
6   not substantive evidence?
7           MR. SHEEHAN:  Correct.
8           MS. DAYTON:  So under 801(d)(1),
9   statements are not hearsay if they're inconsistent
10  with the declarant's testimony and was given under
11  oath subject to the penalty of perjury at trial.  It
12  goes on, or consistent with declarant's testimony
13  and offered to rebut, express an implied charge,
14  against the declarant of recent fabrication.
15          They're not hearsay.
16          MR. SHEEHAN:  Your Honor, that
17  statement, the Grand Jury statement is not, she was
18  not subject to cross-examination about that
19  statement.  Your Honor, she testified in the Grand
20  Jury; we weren't parties to the Grand Jury.
21          MS. DAYTON:  They cross-examined her
22  here.
23          THE COURT:  I think it's subject to
24  cross-examination.  Does that -- that doesn't --
25  that can't mean for the statement.

4095

1           MR. SHEEHAN:  Your Honor, if what she's
2   saying there in the Grand Jury is not substantive
3   evidence, what she is saying on the stand is the
4   substantive evidence.
5           THE COURT:  All right, let me take a
6   look at what we have in the charge there and what
7   amendment should be made.  After we finish evidence
8   today we'll also go over anything else that you
9   have, that you want changed or added or repaired.
10          Why don't we take a ten-minute recess
11  ourselves.  Who is your next witness?
12          MR. SMITH:  It would be Agent Munger,
13  your Honor.
14          THE COURT:  I'm sorry?
15          MR. SMITH:  Agent Christopher Munger.
16          MS. RODRIGUEZ-COSS:  Is that the last
17  witness?
18          MR. SMITH:  Yes.
19          THE COURT:  All right.  After Agent
20  Munger, you will rest.
21          MR. SHEEHAN:  Yes, your Honor.
22          THE COURT:  All right.  Then the time
23  has come for me to ask Mr. Aquart the question I
24  asked him yesterday.
25          MR. SHEEHAN:  I think it has, your

4096

1  Honor.
2           THE COURT:  All right.  So, Mr. Aquart,
3  do you remember I told you yesterday that you had
4  the right to testify.  Did you understand that?
5           THE DEFENDANT:  Yes.
6           THE COURT:  And do you also understand
7  that there is no requirement that you testify?
8           THE DEFENDANT:  Yes, your Honor.
9           THE COURT:  And do you understand that
10 if you take the stand and you decide to testify, you
11 will expose yourself to cross-examination by the
12 prosecutors?  Do you understand that?
13          THE DEFENDANT:  Yes, your Honor.
14          THE COURT:  All right.  If you do not
15 take the stand, I will tell the jurors that they
16 can't hold that against you in any way because
17 that's your right.  Do you understand that?
18          THE DEFENDANT:  Yes, your Honor.
19          THE COURT:  And have you had the
20 opportunity that you wanted to discuss with
21 Mr. Sheehan and Mr. Smith whether you should or
22 should not testify in your trial?
23          THE DEFENDANT:  I have, your Honor.
24          THE COURT:  Pardon?
25          THE DEFENDANT:  I have.

4097

1           THE COURT:  You have?
2           THE DEFENDANT:  Uh-huh (indicating
3  affirmatively).
4           THE COURT:  And are you satisfied with
5  their ability to answer your questions on making
6  this decision?
7           THE DEFENDANT:  Yes, your Honor.
8           THE COURT:  And have you made a decision
9  on whether you will testify or not?
10          THE DEFENDANT:  Yes, your Honor.
11          THE COURT:  And will you testify or not?
12          THE DEFENDANT:  No, I won't, your Honor.
13          THE COURT:  You will not testify.  All
14 right.  Very well then.
15          All right.  Then we will take our recess,
16 and I gather that Agent Munger will be the
17 defendant's last witness.
18          Will there be anything from the
19 government?
20          MS. DAYTON:  Not at this point, your
21 Honor.  We don't anticipate anything.
22          THE COURT:  All right, then we
23 anticipate we are about to close the evidence.  If
24 there are any little things left, please remember
25 them now.  Thank you.  We stand in recess.

4098

1           MR. SHEEHAN:  Could I ask, your Honor,
2  perhaps after we close, in terms of having a final,
3  just review of the charge, if we could have, say, an
4  hour in between, or something like that, just so I
5  could go through it.
6           THE COURT:  Would you do one thing.
7  Would you -- we'll excuse the jury.
8           MR. SHEEHAN:  Yes.
9           THE COURT:  For early and long lunch.  I
10 want you to look through all of the exhibits.  I
11 want to make sure there is nothing left out that the
12 jury needs to see or hear, like stipulations or
13 anything like that.
14          MR. SHEEHAN:  Oh, okay.
15          THE COURT:  Just make sure that before I
16 excuse them today we have presented them with
17 everything they need, so we have a clean slate
18 tomorrow.  Okay?
19          MS. DAYTON:  Womble's transcript needs
20 to be redacted still.  That Rodney Womble thing that
21 went in from 20 years ago.
22          MR. SMITH:  There was a lot of
23 objections and extraneous materials not his
24 testimony.
25          THE COURT:  Has that been done?

4099

1           MR. SMITH:  No, your Honor, I don't
2  think it has.
3           MR. SHEEHAN:  Could I make this
4  suggestion.  I think we can work to do that and I
5  don't -- if for any reason either the government --
6  if we had a marking problem or something like that
7  we would not object to just, you know, if something
8  had not been -- if it had been marked, we can't just
9  find it, whatever.
10          THE COURT:  Start your to-do list so we
11 don't end up with loose ends that detracts from the
12 jury's concentration.  So first on the list will be
13 clean up Womble's statements.  Okay.
14          MR. MARKLE:  Your Honor, I just had a
15 brief discussion with counsel.
16          THE COURT:  Yes, ma'am.
17          MR. MARKLE:  I don't know if the Court
18 would consider, both sides would appreciate perhaps
19 starting final arguments on Friday so we had a day
20 to just sort of gather our thoughts, and we'd be
21 ready to go first thing Friday.
22          MR. SHEEHAN:  That would be very
23 helpful, your Honor.
24          MR. MARKLE:  I know it pushes us back a
25 little bit, but things have moved pretty well this

4100

```
1    week.
2           THE COURT:  Other than the sentencing
3    and the oral argument I had planned for Friday,
4    there is no reason why we can't do it.
5           MR. MARKLE:  I'm sorry, your Honor.
6           THE COURT:  All right, no, you all have
7    been very hardworking on this case, and pulling all
8    of this together for the purposes of effectively
9    closing I think justifies this.  Let me begin to
10   make the rearrangements in my schedule.
11          We would start at 9:30.  That probably
12   suggests that we're not going to start a penalty
13   phase, if any, until after Memorial Day.
14          MR. SHEEHAN:  It's looking more and more
15   like that.
16          THE COURT:  But why don't we see.  Okay.
17          MR. SMITH:  I was just going to say
18   starting after Memorial Day would be good for the
19   jurors as well to maybe have that break.
20          THE COURT:  Well, I don't know if that's
21   good or not good.  I'd like not to.
22          MR. SHEEHAN:  Well, your Honor, could I
23   just -- I have discussed this with counsel in other
24   capital cases, and I think that a break is
25   generally --
```

4101

```
1           THE COURT:  And there will be some
2    break.
3           MR. SHEEHAN:  -- for all parties.
4           THE COURT:  The question is does it have
5    to be a --
6           MR. SHEEHAN:  Well, the break -- I'm
7    just saying the break we're talking about, even if
8    we were to start right after Memorial Day, is not
9    outside the breaks in other cases, generally.
10          MS. DAYTON:  But maybe we can decide
11   when and if we have a verdict what the break should
12   be, like instead of, like, trying to guess right
13   now.  We don't know if it's going to take -- we
14   don't know what's going to happen with the jury.  So
15   we should decide when it becomes relevant.
16          THE COURT:  All right.  We will keep it
17   in flux.  Stand in recess.
18          (Recess)
19          THE COURT:  All right, are we ready for
20   the jury?
21          MS. DAYTON:  Yes.
22          MR. SHEEHAN:  Yes, we are, your Honor.
23          MS. DAYTON:  Half of the government, but
24   I'll represent.
25          THE COURT:  I told you the government is
```

4102

```
1    everywhere.
2           (Jury entered the courtroom.)
3           THE COURT:  Please be seated, ladies and
4    gentlemen.
5           Mr. Smith, will you call your next
6    witness please.
7           MR. SMITH:  Yes.  Thank you.  The
8    defense calls Special Agent Christopher Munger.
9           THE COURT:  Agent Munger, please raise
10   your right hand, even though you were previously
11   sworn, you will be sworn again.
12       C H R I S T O P H E R   M U N G E R
13   Having first affirmed, was examined and testified as
14   follows:
15          THE WITNESS:  My name is Special Agent
16   Christopher Munger, M-u-n-g-e-r, and New Haven,
17   Connecticut.
18          THE COURT:  All right.  You may the
19   proceed.
20          MR. SMITH:  Thank you, your Honor.
21   DIRECT EXAMINATION
22   BY MR. SMITH:
23       Q.   Agent Munger, can you please tell us how
24   you are employed.
25       A.   I'm employed with the FBI.
```

4103

```
1        Q.   And how long have you been so employed?
2        A.   Fifteen years.
3        Q.   I'll give you a second before I ask the
4    next question.
5        A.   Go ahead.
6        Q.   And in the course of your employment, did
7    there come a time when you were assigned to
8    investigate the murders at 215 Charles Street in
9    Bridgeport?
10       A.   Yes.
11       Q.   And in the course of that investigation,
12   did you have an occasion to -- or multiple occasions
13   to interview Randi Washington?
14       A.   Yes.
15       Q.   Okay.  And the dates of those interviews,
16   one was on July 11, 2006?
17       A.   I believe so.  I have interviewed him
18   numerous times and I don't remember the dates.
19       Q.   Can I give you the reports that you
20   prepared?
21       A.   Yes.  Thank you.
22       Q.   So, you recall interviewing him on July 11,
23   2006?
24       A.   Yes.
25       Q.   And in the course of that interview, did
```

4104

```
1   you discuss with him the topic of his claimed
2   employment with Mr. Aquart?
3       A.   Yes.
4       Q.   And in addition to that, what he said were
5   his duties working for Mr. Aquart.
6       A.   Was the question did we discuss that?
7       Q.   Yes.
8       A.   Yes.
9       Q.   And did he tell you in that interview on
10  July 11, 2006, whether he was asked to pistol whip
11  anyone in Charles Street?
12      A.   Can I quickly?
13      Q.   You may take a look, yes, of course.
14      A.   No, he didn't.
15      Q.   And you interviewed him again on
16  November 6, 2007; is that correct?
17      A.   Yes.
18      Q.   And in the course of that interview did you
19  discuss the fact that Mr. Washington said he worked
20  for Mr. Aquart?
21      A.   Yes.
22      Q.   And his duties for Mr. Aquart?
23      A.   Yes.
24      Q.   And in that interview on November 6, 2007,
25  did Mr. Washington ever state that he had been asked
```

4105

```
1   to pistol whip someone at Charles Street?
2       A.   Can I just quickly check?
3       Q.   Of course.
4       A.   No, he did not.
5       Q.   And you interviewed him again on August 26,
6   2009.
7       A.   Yes.
8       Q.   And in the course of that interview you
9   discussed Mr. Washington's claimed employment for
10  Mr. Aquart.
11      A.   I believe so.  Just quickly checking.  Yes.
12      Q.   And the duties that he would have in that
13  employment.
14      A.   Yes.
15      Q.   And did he in that interview specifically
16  state to you that he had been asked to pistol whip
17  someone at Charles Street?
18      A.   Quickly checking.
19      Q.   Of course.
20      A.   No, he didn't.
21      Q.   And again, you interviewed Mr. Washington
22  on April 22, 2010; is that correct?
23      A.   Yes.
24      Q.   And again in the course of that interview
25  you discussed his employment with Mr. Aquart.
```

4106

```
1       A.   I assume so.  Yes.
2       Q.   And the duties that he was to perform
3   there.
4       A.   Yes.
5       Q.   And on April 22, 2010, did Mr. Washington
6   ever state to you that he was asked to pistol whip
7   someone at Charles Street?
8       A.   No.
9       Q.   And as part of your investigation, Agent
10  Munger, did you also have occasion to interview
11  Rodney Womble?
12      A.   Yes.
13      Q.   And do you recall interviewing Mr. Womble
14  on January 10, 2010?  I'm sorry, maybe I got this
15  wrong.  I'm sorry January 21st, 2010.
16      A.   I don't remember.
17      Q.   Would looking at your report assist you?
18      A.   That would help.  Thanks.
19           Yes.
20      Q.   And in the course of that interview, I'm
21  directing your attention to the lower left-hand
22  corner, DG 3662.  In that interview with Mr. Womble,
23  did you discuss the quantity of crack cocaine that
24  Mr. Womble said was being sold from apartment 211?
25      A.   Yes, you are referring to the last two
```

4107

```
1   paragraphs on page 2, right?
2       Q.   That's probably correct.
3       A.   Yes.
4       Q.   So, that was discussed.
5       A.   Yes.
6       Q.   Okay.  And he told you that the average
7   number of packs sold on a Monday was two packs.
8       A.   Yeah, he laid out an average week and then
9   I --
10      Q.   An average week?
11      A.   Yeah.
12      Q.   So, for him an average week was, Monday was
13  average two packs, correct?
14      A.   Yes.
15      Q.   Tuesday it was two packs.
16      A.   Yes.
17      Q.   On Wednesday it was two to four packs.
18      A.   Yes.
19      Q.   Then on Thursday he stated it was four to
20  five packs.
21      A.   Yes.
22      Q.   On Friday he stated four to five packs.
23      A.   Yes.
24      Q.   Then on Saturday it was six to seven packs.
25      A.   Yes.
```

**GA1027**

4108

1    Q.   And on Sunday it was one to two packs.
2    A.   Yes.
3    Q.   And if we were to add those numbers up on
4  the low end and the high end, it would be fair to
5  say that they average 21 to 27 packs per week?
6    A.   I can't add that fast, but.
7    Q.   Can we try and --
8    A.   Are you saying the low end?
9    Q.   Yeah, the low end.
10   A.   I can do the low end.  21.
11   Q.   And on the high end would be approximately
12  27?
13   A.   Yes.
14   Q.   Okay.  And also, Agent Munger, in the
15  course of your investigation you had the occasion to
16  interview Lashika Johnson?
17   A.   Yes.
18   Q.   And that was on multiple occasions.
19   A.   Yes, multiple occasions.
20   Q.   Okay.  And I'm just going to go ahead and
21  hand you your reports in case you need to refresh
22  your memory as to dates.
23   A.   Thank you.
24   Q.   And one of the occasions on which you
25  interviewed Ms. Johnson, Lashika Johnson, was

4109

1  September 18, 2008.
2    A.   Yes.
3    Q.   And you discussed her knowledge of -- her
4  involvement with Mr. Aquart?
5    A.   Just checking because --
6    Q.   That's fine.
7    A.   They tend to vary.  Yes.
8    Q.   And her knowledge of Azikiwe Aquart.
9    A.   Yes.
10   Q.   And in that interview on September 18,
11  2008, did Lashika Johnson tell you that sometime
12  after the murders she had gone to Charles Street to
13  pick up Azikiwe Aquart?
14   A.   Just give me one second.
15        No, she didn't.
16   Q.   And you had occasion to interview her again
17  on September 24, 2008.
18   A.   Yes.
19   Q.   And in that interview, did Ms. Johnson tell
20  you that after the murders she had gone to Charles
21  Street to pick up Azikiwe Aquart?
22   A.   No.
23   Q.   And you had occasion to interview her again
24  on October 14, 2008.
25   A.   Yes.

4110

1    Q.   And in the course of that interview, did
2  Ms. Johnson tell you that after the murders she went
3  to Charles Street to pick up Azikiwe Aquart?
4    A.   No.
5    Q.   And you had occasion to interview her again
6  on October 22, 2008.
7    A.   Yes.
8    Q.   And in the course of that interview did
9  Ms. Johnson tell you that after the murders she went
10  to Charles Street to pick up Azikiwe Aquart?
11   A.   No.
12   Q.   And finally, Agent Munger, you had occasion
13  to interview Lashika Johnson on January 20, 2010.
14   A.   Yes.
15   Q.   And in the course of that interview, she
16  did not tell you that after the murders she went to
17  Charles Street to pick up Azikiwe Aquart.
18   A.   I'm sorry, do you mean -- is this the final
19  time I talked with her?
20   Q.   January 20, 2010, is the date I'm referring
21  to.
22   A.   Yes.  You just said "final," I didn't know
23  if you meant the final time.
24   Q.   I just meant finally in my preparatory
25  statements.

4111

1        THE COURT:  Finally for him.
2        THE WITNESS:  I understand.  Yes, I do
3  remember doing the interview.
4    Q.   And in the course of that interview, did
5  she tell you that after the murders she went to
6  Charles Street to pick up Azikiwe Aquart?
7    A.   No.
8    Q.   And Agent Munger, also as part of your
9  investigation did there come occasions where you
10  interviewed John Taylor?
11   A.   Yes.
12   Q.   And one of those occasions was
13  December 2nd, 2009.
14   A.   Yes.
15   Q.   And that was in Pinetops, North Carolina.
16   A.   Yes, it was.
17   Q.   And that interview, at the end of that
18  interview Mr. Taylor was arrested; is that correct?
19   A.   Yes, he was.
20   Q.   Okay.  I'm going to hand you your
21  statements in the event you need to refer to them.
22   A.   I would appreciate that.
23   Q.   And referring directly to that interview on
24  the lower left-hand corner, this would be DG 2719.
25        MR. SMITH:  We can bring that up if that

**GA1028**

4112

```
1   would assist.
2       Q.   In the course of that interview, did
3   Mr. Taylor tell you that on the night of the murders
4   they parked their car on the side of the building
5   while Dreddy and Ziggy went into the apartment?
6       A.   Which paragraph are we talking?
7       Q.   Sure.
8       A.   I'll read the whole page, I thought I heard
9   you say the paragraph.
10      Q.   No, I'm sorry, I did not.  I can refer you.
11      Just a moment, Agent Munger.  I'll direct
12  you to where you need to be.  I apologize.  It was
13  the next page.  Directing you to the bottom
14  paragraph.
15           MS. DAYTON:  What page?
16           MR. SMITH:  I'm sorry, this would be
17  page 9.
18           MS. DAYTON:  Your Honor, I'm going to
19  object.
20           THE COURT:  May I see you at sidebar?
21           MR. SMITH:  Yes, your Honor.
22           (Sidebar conference)
23           THE COURT:  Base of the objection?
24           MS. DAYTON:  So, Mr. Taylor denied
25  nothing about lying.  He admitted every single lie
```

4113

```
1   that he -- he was confronted word by word, line by
2   line, from this particular report.  In fact, to the
3   point where I came up to sidebar and objected, and
4   your Honor noted to Mr. Sheehan that it had sort of
5   -- he had made his point.  He repeatedly admitted
6   his lies and he repeatedly said what was the truth.
7   There was only two areas where he was asked
8   something and couldn't remember.
9           Should I be insulted she rolled away?
10          THE COURT:  I can still hear you because
11  you are talking so loud.
12          MS. DAYTON:  I know.  I was making fun
13  of myself, though.
14          So there was only two areas where he
15  asked a question and he said "I don't know," and he
16  was confronted with it.  One had to do with whether
17  or not he identified Judith Rivera as the person who
18  knocked on the door, and I just had a complete brain
19  freeze on other one, but there was only two areas
20  where he said "I don't know."
21          MR. SMITH:  Your Honor, actually in the
22  transcript, it's clear in that, in the course of the
23  cross-examination Mr. Taylor did not recall making
24  particular statements to the agents at the interview
25  in Pinetops.  He was asked, the first question, I
```

4114

```
1   just asked his response was "I don't recall" and
2   there is a series of these.  The reason, your Honor,
3   again, we could get into my memo of yesterday about
4   not remembering being the equivalent of a denial.
5   These are very elaborate details about the event and
6   I think the fact that Mr. Taylor is saying very
7   elaborate details about the event which he then
8   later can't even recall what he says, goes to
9   directly to his credibility.
10          MS. DAYTON:  Okay, so I just want to let
11  counsel and the Court know, that if they go through
12  every single statement having to do with every
13  single issue which they claim is inconsistent, then
14  my plan is to go back through that report and bring
15  up everything he did say that he also testified to
16  at trial.  And I think the government would be well
17  within their rights to do that, especially based
18  upon Mr. Sheehan's representation at sidebar that
19  the argument to the jury is going to be, in fact,
20  that Mr. Taylor is making up what he said.
21          THE COURT:  So, if you are setting out
22  by way of examining Mr. Munger all the things that
23  he said that are inconsistent with his testimony now
24  by way of claiming that he's just making them up
25  now, and you go through this with Mr. Munger,
```

4115

```
1   doesn't that then trigger the right to rebut with
2   prior consistent statements?
3           MR. SMITH:  If they can find one in the
4   five or six 302s, your Honor.  I can just tell you
5   -- I mean, of course they're welcome, if they can
6   find a consistent statement.  I suppose they could,
7   in fact, do that.
8           THE COURT:  Okay, then that settles
9   that.
10          MS. DAYTON:  That's fine.  That works
11  for me.
12          MR. SMITH:  Okay.  But again, it would
13  have to be, just to be clear, it has to be
14  consistent to what I am asking about specific points
15  in time.
16          THE COURT:  No, no, I don't think that's
17  right.
18          MS. DAYTON:  It's not.
19          THE COURT:  Because the problem is --
20  oh, I see what you are saying.  Right.  That it's
21  consistent with Taylor's testimony to rebut the
22  charge of recent fabrication.
23          MS. DAYTON:  So, for instance, your
24  Honor --
25          MR. SMITH:  I'm actually not saying this
```

4116

```
1   is recent fabrication -- well, no.  Let me rephrase.
2   It's all fabrication, essentially.
3           THE COURT:  The inference of that, his
4   testimony here, the details that he did not give in
5   his interviews to Munger imply that he's making it
6   up now.  That's your claim?
7           MR. SMITH:  Well, just to give you --
8           THE COURT:  Because they're inconsistent
9   and the theory is that if they really were true he
10  would have said them at a time closer to the time of
11  the event.  That's the theory, right?
12          MR. SMITH:  No, this is not -- this is
13  not recent fabrication, your Honor.  This is just
14  generally credibility.  He states in Pinetops, for
15  instance, I see Dreddy stick his head out of the
16  window of the building.
17          THE COURT:  All right.
18          MR. SMITH:  That's inconsistent with his
19  trial testimony.
20          THE COURT:  Right.
21          MS. DAYTON:  But he was asked about it
22  and he admitted it.
23          MR. SMITH:  No, he didn't.  Actually, in
24  the transcript he said "I don't recall."
25          MS. DAYTON:  Then that was the only
```

4117

```
1   other one.
2           MR. SMITH:  No, there was a whole
3   series, about 15 statements he says I don't remember
4   saying that to the agent, I don't remember saying
5   that to the agent.
6           MS. DAYTON:  Here is the thing.  For
7   instance, if he says you didn't tell him that you
8   had bats, you told them you didn't go in, I could
9   say you went in there and you were standing there.
10  It doesn't have to be the exact same sentence.
11          THE COURT:  Right, but it's not some
12  other unrelated --
13          MS. DAYTON:  I get it.
14          THE COURT:  Okay.
15          MS. DAYTON:  But it doesn't have to line
16  up with his part, if he asks him about page 9 and I
17  ask him about page 13.
18          THE COURT:  No.
19          MR. SMITH:  I understand, your Honor,
20  but the problem, she's not going to find a prior
21  consistent statement.
22          MS. DAYTON:  That's for argument.
23          (Sidebar concluded)
24      Q.   Agent Munger, I'm going to move on to
25  another area.
```

4118

```
1        You interviewed John Taylor on April 29,
2   2010; is that correct?
3      A.   Yes.
4      Q.   And in the course of that interview you
5   showed him a photo of Judith Rivera; is that
6   correct?
7      A.   Yes.
8      Q.   Showing you what's been previously marked
9   as Government's Exhibit 217.  Is that the photo that
10  you showed Mr. Taylor?
11     A.   Yes.
12     Q.   Okay.  And when you showed him that photo
13  on April 29, 2010, he told you that was not the
14  Hispanic or Puerto Rican woman that he had seen in
15  the apartment on the second or third floor, correct?
16     A.   He said that, but it's saying, what I wrote
17  was, did not -- Taylor did not recognize the person
18  in the photos, and states that the --
19          THE COURT:  Please don't read from your
20  report.
21          THE WITNESS:  I'm sorry.
22     A.   It references a Hispanic or Puerto Rican
23  woman earlier.  I would have to find out.
24     Q.   Please take a look.
25     A.   The way I wrote it I'm unsure of because
```

4119

```
1   he's referenced in previous -- it must be reference
2   from a previous interview.
3      Q.   Okay.  Your recollection in a previous
4   interview he had discussed a Spanish or Puerto Rican
5   woman who knocked on the door of apartment 101 a few
6   days before the murders.
7      A.   I do recollect him referencing -- that's
8   one example of him referencing a Hispanic woman that
9   he had seen at Charles Street.
10     Q.   And because previously he had referenced a
11  long-haired -- black long-haired Spanish woman in
12  Pinetops, correct?
13     A.   I would have to look for that.
14     Q.   Sure.
15     A.   Do you want me to go through?
16     Q.   Sure.
17     A.   Okay.  This is 18 pages.  This is going to
18  take a while, do you have a --
19     Q.   I do, actually.  This would be DG 2720 to
20  2721.
21     A.   Yes.  He referenced a Spanish woman there.
22  I can't -- I don't know if when I wrote the
23  description on the photo identification, or the lack
24  of, whether -- because he's made multiple references
25  to situations in Charles Street involving a Hispanic
```

4120

```
1    female.
2        Q.   So, it's unclear to you how many Hispanic
3    women he's referred to over the course of his
4    interviews?
5        A.   I can tell you I remember this and I can
6    think of at least one other example.
7        Q.   Okay.  And was that the example of the
8    woman who knocked on the door of apartment 101 that
9    he had described?
10       A.   I'd have to see that because I don't
11   remember if he said that was a Hispanic female or he
12   said that was a black female, but throughout the
13   course of the interviews he's made at least two, and
14   I wasn't clear enough when I did the photo
15   identification.
16       Q.   But in this interview, he told you that he
17   did not recognize the person in the photo, correct?
18       A.   He said he did not -- without reading, he
19   said he did not recognize the woman.
20       Q.   In the photo you showed him.
21       A.   In the photo.  He said a general statement
22   and then a specific statement.
23       Q.   Okay.  So, let's -- we can break it down.
24   This was the interview on April 29, 2010.
25       A.   Yes.
```

4121

```
1        Q.   And you showed him this photo, correct?
2        A.   Yes.
3        Q.   And he told you that he did not recognize
4    that photo; is that correct?  I have follow-up
5    questions.
6        A.   Yes.
7        Q.   Okay.  You understand this to be the photo
8    of Judith Rivera, correct?
9        A.   I understand this to be the photo of Judith
10   Rivera, yes.
11       Q.   And Taylor further stated that the
12   woman depicted in this photograph --
13            THE COURT:  Please don't read from the
14   report.
15       Q.   He stated that the woman depicted in this
16   photograph was not the same person that he had,
17   himself, had previously described as the Puerto
18   Rican or Hispanic woman, correct?
19       A.   Yes, but that's the way I wrote it.
20   Looking at it now it's unclear because it's earlier
21   in this 302.
22       Q.   Did you take that to mean there were
23   multiple Hispanic women he was referencing in his
24   reports?
25       A.   No, but there were different -- it was a
```

4122

```
1    long -- the story, the layout was long and involved
2    and there were different, you know, components of
3    it.  And I failed to articulate exactly which one I
4    must have asked him.
5        Q.   Okay.  You also had occasion to interview
6    him again on June 18, 2010; is that correct?
7        A.   Yes.
8        Q.   And in the course of that interview, you
9    showed him some photos from the crime scene; is that
10   correct?  And I'm referring you to page 5.
11       A.   Yes.
12       Q.   He was shown photos, crime scene photos.
13       A.   Yes.
14       Q.   And specifically, he was shown photos of a
15   floral-patterned couch, correct?  Is that your
16   recollection?
17       A.   Yes.
18       Q.   Showing you what's been previously marked
19   as Government's Exhibit 117J, was that one of the
20   photos shown to John Taylor?
21       A.   If the Government exhibit number is the
22   same as -- because this number I used here is the
23   crime scene number, I believe.
24            MR. SMITH:  If we can bring up the crime
25   scene photos 116, 117.
```

4123

```
1        Q.   Are those the photos that you showed
2    Mr. Taylor?
3        A.   We showed him that, yes, those photos.
4        Q.   Okay.  And Mr. Taylor identified the floral
5    couch depicted in that photo as the one that was
6    propped against the door of the apartment 101.
7        A.   That's what I wrote here, yes.
8        Q.   What you wrote was accurate.  It's what he
9    stated at the time.
10       A.   I believe so.
11            MR. SMITH:  Your Honor, I would mark
12   this Defendant's -- we might be up to the U maybe.
13   UUUUU.
14            THE COURT:  All right.  This is the
15   photo that you used in your interview of June 18,
16   2010, with Mr. Taylor.
17            THE WITNESS:  Yes, your Honor.
18            THE COURT:  All right, so we'll mark
19   that then as UUUUU.
20            MR. SMITH:  We'll mark that for ID for
21   now.  But if I could just go back and show --
22            THE COURT:  All right.
23            MR. SMITH:  -- the agent the government
24   exhibit maybe that would save us time from doing a
25   new exhibit.
```

4124

1     Q.   And the photos in 116 and 117, Bridgeport
2  crime scene photographs, are those accurately
3  depicted in Government Exhibit 117J?
4     A.   I believe so.  Can you show me?
5     Q.   Would you like to look at these?
6     A.   Can I see them side-by-side?
7          MR. SMITH:  If you could please bring up
8  Bridgeport 116 and 117.
9     A.   Yes, I believe they're the same.
10    Q.   So again, these are the photos that you
11 showed Mr. Taylor, to be clear, correct?
12    A.   Yes.
13    Q.   And that is the photos that he identified
14 at that time as being the couch that was used to
15 prop up the front door of 101 when they entered the
16 apartment?
17    A.   Again, yes.
18         MR. SMITH:  Your Honor, I would think at
19 this time mark this as Defendant's UUUU and move it
20 as an exhibit.
21         THE COURT:  All right.  It's really five
22 Us, right?
23         MR. SMITH:  Yes, I'm sorry.  I lost
24 track of my Us.
25         THE COURT:  I know.  Loss of Us.

4125

1          MR. SMITH:  Thank you.  Agent Munger, I
2  have no more questions.
3          THE COURT:  All right,
4  cross-examination.
5          MS. DAYTON:  Yes, thank you, your Honor,
6  briefly.
7  CROSS-EXAMINATION
8  BY MS. DAYTON:
9     Q.   Good afternoon, Agent Munger.
10    A.   Good afternoon.
11    Q.   Agent Munger, how many years have you been
12 working on this case?
13    A.   It would be five years now.
14    Q.   And the investigations continued up through
15 the time of trial.
16    A.   Yes.
17    Q.   And you've conducted literally hundreds of
18 interviews related to this case.
19    A.   I would estimate hundreds, yes.
20    Q.   And what is a 302?  There has been
21 reference to a 302, what is that?
22    A.   A 302 is the -- after conducting an
23 interview, that's how I memorialize the interview,
24 or the FBI.  It's an FBI document.
25    Q.   So, it's the FBI's version of a police

4126

1  report, right?
2     A.   Correct.
3     Q.   For instance, you mentioned the police
4  report from December 2nd, 2009, with John Taylor was
5  18 pages long.
6     A.   Yes.
7     Q.   And that's 18-single spaced pages long.
8     A.   Yes.
9     Q.   And when you write these documents, what is
10 the purpose of writing them, a 302?
11    A.   Writing a 302 is to memorialize the
12 interview, you know, what transpired, the
13 information I obtained.
14    Q.   Does that include things that are -- that
15 you believe to be true?
16    A.   Yes.
17         MR. SMITH:  I'm going to object.
18         THE COURT:  Basis?
19         MR. SMITH:  It's calling for his
20 opinion, your Honor, as to what the truth is.
21         THE COURT:  Do you want to rephrase your
22 question as to -- your question is whether he
23 selects what to put in there?
24         MS. DAYTON:  Yeah.
25         THE COURT:  Why don't you ask it that

4127

1  way.
2     Q.   Are you selective with respect to the
3  statements that you choose to include in your 302?
4     A.   No.
5     Q.   So, if a witness tells you something it
6  goes in there?
7     A.   Yes.
8     Q.   Is that true even if you know someone to be
9  lying?
10    A.   Yes.
11         MR. SMITH:  Objection.  Same basis.
12         THE COURT:  Overruled.
13    Q.   And when you first speak to a witness, you
14 don't have any way of knowing all the information
15 they have in their head about a particular incident,
16 do you?
17    A.   No.
18    Q.   And in your 15 years of experience, has it
19 been your experience --
20         MR. SMITH:  I'll wait for the question.
21         MS. DAYTON:  He's perched.
22    Q.   -- that if you don't ask a precise question
23 you don't get a precise answer?
24         MR. SMITH:  I'm going to object as being
25 outside the scope.

4128

1      THE COURT:  I'm going to permit the
2  question.
3      A.  Can you ask it again?
4      Q.  Sure.
5      A.  I was distracted.
6      Q.  In your 15 years of experience as an FBI
7  agent, has it been your experience that if you don't
8  ask a precise question you don't get a precise
9  answer?
10     A.  That is correct.
11     Q.  So, counsel asked you about -- well, and is
12  it fair to say that you've interviewed several
13  witnesses in this case on several occasions?
14     A.  Yes.
15     Q.  So, counsel asked you questions about Randi
16  Washington.  Do you remember those?
17     A.  Yes.
18     Q.  Did you specifically ask Mr. Washington did
19  the defendant ever tell you to pistol whip someone
20  on the second floor of Charles Street?
21     A.  Did I ever ask him that?  No, I did not
22  specifically ask him that.
23     Q.  And did you ever specifically ask Lashika
24  Johnson, did you go to pick up Azikiwe Aquart on the
25  day or the day after the murders at Charles Street?

4129

1      A.  No, I did not.
2      Q.  At some point Lashika Johnson did tell you
3  though, correct, that she went to the Charles Street
4  apartments to pick up Azikiwe Aquart either the day
5  of or the day after the murders?
6      A.  Yes.
7      Q.  And you memorialized that in a 302.
8      A.  Yes, I did.
9      Q.  And that was prior to this trial, correct?
10     A.  Yes.
11     Q.  Counsel also asked you questions regarding
12  Mr. Womble and drug quantities.  Do you remember
13  those questions?
14     A.  Yes.
15     Q.  And that Mr. Womble had previously stated
16  that it was 21 packs at the low end, 27 packs at the
17  high end.
18     A.  Yes.
19     Q.  I hate to ask you to do math, but that's
20  somewhere between 73.5 grams of crack cocaine and
21  94.5 grams of crack cocaine a week.
22     A.  I believe so.
23     Q.  Okay.
24          MS. DAYTON:  I have nothing further.
25  Thank you.

4130

1          THE COURT:  All right.  Redirect.
2          MR. SMITH:  Thank you, your Honor.
3  REDIRECT EXAMINATION
4  BY MR. SMITH:
5      Q.  You were asked about conducting interviews,
6  Agent Munger, and you were trained by the FBI in how
7  to interview people.
8      A.  Yes.
9      Q.  And you were trained to write reports.
10     A.  Yes.
11     Q.  And you were trained to write reports that
12  were accurate.
13     A.  Yes.
14     Q.  Because accurate information in the course
15  of an investigation is important, correct?
16     A.  Yes.
17     Q.  Other people will rely on that information.
18     A.  Yes.
19     Q.  You might rely on it, as you did today.
20     A.  Yes.
21     Q.  Your supervisors might rely on that
22  information.
23     A.  Yes.
24     Q.  The U.S. attorneys might rely on that
25  information.

4131

1      A.  Yes.
2      Q.  A court of law might rely on that
3  information.
4      A.  Yes.
5      Q.  And when you interviewed many of the
6  subjects in this case, before the interview begins
7  -- well, let me ask you this:  Several of the people
8  who were interviewed in this case were interviewed
9  under a proffer agreement, correct?
10          MS. DAYTON:  Objection.  Outside the
11  scope.
12          MR. SMITH:  She asked about interviews
13  with witnesses, your Honor.
14          THE COURT:  So you're asking whether the
15  interviews of Washington and Lashika Johnson were
16  under proffer agreements?
17          MR. SMITH:  Yes, we can do that, your
18  Honor.
19          THE COURT:  Okay.
20     Q.  Mr. Washington was under a proffer
21  agreement during his interviews, correct?
22     A.  Yes.
23     Q.  And it's your understanding that when
24  someone is under a proffer agreement they've agreed
25  to be fully truthful.  Correct?

4132

1    A.    Yes.

2    Q.    And provide all of the information that

3  they're aware of of criminal wrongdoing.

4    A.    Yes.

5    Q.    Either by themselves or others.

6    A.    Yes.

7    Q.    And Lashika Johnson, when you interviewed

8  her, she was under that same proffer agreement,

9  correct?

10    A.    Yes, I believe so.

11    Q.    And again, she had the same obligations.

12    A.    Yes.

13    Q.    All right.

14          MR. SMITH:  I have nothing further, your

15  Honor.  Thank you.

16          THE COURT:  All right.  Anything?

17          MS. DAYTON:  A couple questions.

18  RECROSS-EXAMINATION

19  BY MS. DAYTON:

20    Q.    When you first interviewed Lashika Johnson

21  she was sort of hostile to you, wasn't she?

22    A.    Yes, I would say so.

23    Q.    She was the defendant's girlfriend and in

24  love with the defendant; is that fair?

25          MR. SMITH:  I'm going to object as to

4133

1  specifics of what was said in the interview, it's

2  outside the scope of my redirect.

3          THE COURT:  Why don't we -- I'm not sure

4  where you are going with this and whether you are

5  mixing trial testimony from his interview testimony,

6  his interview statements.

7          MS. DAYTON:  I can come tell you.

8          THE COURT:  Hostile, you have.  Why

9  don't you reask the question.

10    Q.    Is it fair to say that Ms. Johnson was not

11  law enforcement friendly?

12    A.    That is correct.

13    Q.    And that snitching was not a part of her

14  culture.

15          MR. SMITH:  Objection.  It's hearsay,

16  your Honor.

17          THE COURT:  Sustained.

18          MS. DAYTON:  I'm not going to ask any

19  more questions.  Thank you.  Thank you.

20          MR. SMITH:  I have nothing further, your

21  Honor, thank you.

22          THE COURT:  All right.  Then Agent

23  Munger, thank you.  You are excused.  You may step

24  down.

25          Will there be anything further?

4134

1          MR. SHEEHAN:  No, we rest at this time,

2  your Honor.

3          THE COURT:  All right.  Anything further

4  from the government?

5          MS. DAYTON:  No, your Honor.

6          THE COURT:  All right.  Ladies and

7  gentlemen, we have come to the end of evidence in

8  this case.  The next thing will be my instructions

9  of law, the closing arguments of counsel, and then

10  you will be excused to begin your deliberations.  We

11  aren't going to do that until Friday.  We're going

12  to take tomorrow off and ask you to please come back

13  on Friday at 9:30.  And anticipate staying until

14  five or later if you all collectively choose to do

15  so.

16          You still remain under an obligation to

17  not discuss the evidence with anyone because even

18  though you've now heard all of the evidence, you

19  have not heard the instructions of law in their

20  complete form.  You will have copies during the

21  delivery of the charge that you can also use during

22  your deliberations.  But you also have not heard the

23  closing arguments of counsel, and those arguments,

24  while they are not evidence, they are how they would

25  believe the evidence should be viewed.  And until

4135

1  you have heard all of that, you can't begin to make

2  your decisions and discuss it with each other.  And

3  then certainly you can't discuss it with anyone else

4  until the whole case is over.

5          So, tomorrow will be your day off, we'll

6  have you back at 930 on Friday morning.  Again,

7  leave your notebooks here, they will be secured, but

8  they will be returned to you for any further

9  note-taking that you want to make.

10          All right then, we will see you on

11  Friday at 9:30.  Thank you very much.

12          (The jury exited the courtroom)

13          THE COURT:  All right, Counsel, will you

14  be ready to discuss any further issues on the charge

15  in an hour?

16          MR. SHEEHAN:  An hour or an hour and a

17  half?

18          THE COURT:  Do you want to come back at

19  2:00?

20          MR. SMITH:  That would be fine.

21          MR. SHEEHAN:  2:00 would be great, your

22  Honor.

23          THE COURT:  All right, I have oral

24  argument on a case at 4:00.

25          MR. SHEEHAN:  We'll be all --

4136

```
 1          THE COURT:  I think we covered most of
 2  the areas.
 3          MR. SHEEHAN:  I think we did, your
 4  Honor.  I don't think -- I just wanted to look at it
 5  with a moment of reflection.
 6          THE COURT:  That's fine.  We will be
 7  back at 2:00 for a final charge conference.
 8          MS. DAYTON:  The only thing I want to
 9  put out for people to think about over the hour and
10  a half is how we're going to handle the alternates,
11  how many we're going to keep and for how long.
12          THE COURT:  There is a thought I have
13  had, which is to excuse No. 5 and 6, to keep four of
14  them, and just excuse them from deliberation, but
15  advise them that they will be called back for the
16  penalty phase.
17          MR. SHEEHAN:  I would object to that,
18  your Honor.
19          THE COURT:  Okay, tell me why.
20          MR. SHEEHAN:  What I think --
21          THE COURT:  The plan of four versus six
22  or any?
23          MR. SHEEHAN:  Well, I think what your
24  Honor can do is keep those four through purposes of
25  deliberation.
```

4137

```
 1          THE COURT:  Actually, I'll keep all six.
 2          MR. SHEEHAN:  If your Honor wants to
 3  keep all six.
 4          THE COURT:  There is no reason to
 5  differentiate.
 6          MR. SHEEHAN:  And then, but if in fact
 7  there is a verdict, the alternates cannot sit on the
 8  penalty phase.
 9          THE COURT:  Okay.  You say that --
10          MR. SHEEHAN:  Because the penalty phase
11  by statute has to be the same jury that decided the
12  case unless for some reason a whole new jury is
13  impaneled.  So, to have the alternates in on the --
14  alternates who were not involved in the deliberation
15  to be then coming in on the penalty phase, I think
16  is unwarranted under the statute.
17          THE COURT:  What is the statutory
18  reference that you are making?
19          MS. RODRIGUEZ-COSS:  That Mr. Sheehan is
20  making?
21          MR. SHEEHAN:  No, I think it's under the
22  federal death penalty statute, your Honor.
23          THE COURT:  All right, why don't we all
24  take a look at that and have further discussion.
25  And then there is one last thing, and that is how we
```

4138

```
 1  will -- juror No. 6 wants to know if we can conclude
 2  by four o'clock on Friday as it is her daughter's
 3  senior prom.
 4          MR. SHEEHAN:  It sounds good to me, your
 5  Honor.
 6          THE COURT:  So, the answer will be yes.
 7  If we begin closing at -- excuse me, charging at
 8  9:30, if that takes approximately an hour, the
 9  government then proceeds with its closing.  Let me
10  just say, using an hour, assuming a 15-minute break
11  in between the charge and the government, that takes
12  us to 11:45.  If the defendant uses the full one and
13  a half hours, that will take us to 1:15, and then it
14  will probably take us to 1:30 because we would need
15  a break between the two.
16          MR. SHEEHAN:  Maybe what we can do is an
17  early --
18          THE COURT:  Can't make it that early for
19  lunch.  Think about the logistics of --
20          MR. SHEEHAN:  No, I'm just thinking
21  about the logistics of stopping the closing in the
22  middle.
23          MS. DAYTON:  No, she's saying finish it.
24          THE COURT:  I'm saying, but if the
25  defendant finishes at 1:30, the jury -- and we're
```

4139

```
 1  going to have to take another 15-minute break and
 2  then the government goes 'til 2:15.
 3          MS. DAYTON:  Wouldn't we let them eat
 4  lunch?
 5          THE COURT:  That's my question is when
 6  would we have lunch.  So think about the logistics
 7  of when that will happen.  Okay.  Because you can
 8  see that there is some awkwardness.  It may well be
 9  that it is an early lunch, but after the
10  government's initial closing.  Think about how that
11  will do and we'll see you at two o'clock.
12          MR. SHEEHAN:  Can I just indicate for
13  the Court the statute, the federal death penalty
14  statute relevant to this is 18 U.S.C. 3593(b).  So
15  Subsection B which -- and in fact it specifies if
16  there is a verdict before the jury that determined
17  the defendant's guilt --
18          THE COURT:  Okay, thank you, I'll take a
19  look at that.  All right.
20          MR. SHEEHAN:  Your Honor, I don't think
21  Mr. Aquart needs to be -- well, I don't think --
22          THE COURT:  No, he doesn't.
23          MR. SHEEHAN:  So --
24          THE COURT:  Right.
25          MR. SHEEHAN:  That will be fine.
```

4140

```
1              THE COURT:  All right then, thank you
2    very much.  We'll stand in recess.
3              (Recess)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

4141

```
1                    I N D E X
2    WITNESS                                    PAGE
3    RICARDO VARGAS
4    Direct Examination by Mr. Sheehan          4045
5    Cross-Examination by Ms. Reynolds          4057
6
7    JUAN GONZALEZ
8    Direct Examination by Mr. Smith            4064
9
10   MICHAEL SYRAX
11   Direct Examination by Mr. Smith            4070
12   Cross-Examination by Ms. Dayton            4076
13
14   CHRISTOPHER MUNGER
15   Direct Examination by Mr. Smith            4102
16   Cross-Examination by Ms Dayton             4125
17   Redirect Examination by Mr. Smith          4130
18   Recross-Examination by Ms. Dayton          4132
19
20
21
22
23
24
25
```

WITNESS — PAGE
RICARDO VARGAS
Direct Examination by Mr. Sheehan — 4045
Cross-Examination by Ms. Reynolds — 4057
JUAN GONZALEZ
Direct Examination by Mr. Smith — 4064
MICHAEL SYRAX
Direct Examination by Mr. Smith — 4070
Cross-Examination by Ms. Dayton — 4076
CHRISTOPHER MUNGER
Direct Examination by Mr. Smith — 4102
Cross-Examination by Ms Dayton — 4125
Redirect Examination by Mr. Smith — 4130
Recross-Examination by Ms. Dayton — 4132

4142

```
1              I certify that the foregoing is a
2    correct transcript from the record of proceedings in
3    the above-entitled matter.
4                   5/19/11
5                   Date
6
7                   /S/  Sharon Montini
8                   Official Reporter
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

4143

```
1              UNITED STATES DISTRICT COURT.
2              DISTRICT OF CONNECTICUT
3    * * * * * * * * * * * *    *
                                *
4    UNITED STATES OF AMERICA,  * Case No 6cr160(JBA)
                                *
5              Plaintiff,       *
                                *
6         vs.                   *
                                *
7    AZIBO AQUART               * May 20, 2011
                                *
8              Defendant.       *
                                *
9    * * * * * * * * * * * * *  *
10              TRIAL TRANSCRIPT
11              VOLUME XX
12
13   BEFORE:  THE HONORABLE JANET BOND ARTERTON U.S.D.J.,
                                              and jury
14   Appearances:
     FOR THE GOVERNMENT:  ALINA REYNOLDS, ESQ
15                        TRACY DAYTON, ESQ.
                          PETER MARKLE, ESQ.
16                        JACABED RODRIGUEZ-COSS
                          United States Attorney's Office
17                        915 Lafayette Blvd
                          Bridgeport, CT 06604
18
19   FOR THE DEFENDANT    MICHAEL SHEEHAN, ESQ
     AZIBO AQUART:        Sheehan & Reeve
20                        139 Orange Street
                          New Haven CT 06510
21
22                        JUSTIN SMITH, ESQ.
                          383 Orange Street
23                        New Haven, CT 06511
24   Court Reporter:      Sharon Montini, RMR
25   Proceedings recorded by mechanical stenography,
     transcript produced by computer
```

**GA1036**

4144

1      (Jury entered the courtroom.)
2      THE COURT:  Good morning, ladies and
3  gentlemen.  Please be seated.  You will find on your
4  seats a notebook that contains a copy of the
5  instructions I am about to give you, a copy of the
6  indictment, a copy of the list of witnesses that you
7  heard, and a copy of the verdict form that
8  ultimately you will be filling out.  I give the
9  instructions to you in both oral form and written
10 form because we know that adults learn differently,
11 some learn more quickly or more thoroughly from
12 hearing material, others learn more easily from
13 reading it, and so I will give it to you in both
14 forms, and you are welcome to listen or to read
15 along as suits you.
16     I will now instruct you on the law to be
17 applied in this case.  And you must take the law as
18 I give it to you.  If any attorney or any witness or
19 any exhibit states a different legal principle from
20 that which I state to you in my instructions, it's
21 my instructions that you must follow.  And the
22 instructions as a whole constitute the law of the
23 case.  And they must be applied as a whole.  So, you
24 should not single out any one instruction or ignore
25 others.

4145

1      And regardless of any opinion that you
2  may have as to what the law is or ought to be, it
3  would be a violation of your sworn duty to base a
4  verdict on any view of the law other than the
5  instructions of the Court.  And it would also be a
6  violation of your sworn duty if you were to base any
7  finding of fact on anything other than the evidence
8  presented to you in this case.
9      Now, I, as the presiding judge, have
10 performed two functions during the trial.  First, I
11 decided what evidence is admissible for your
12 consideration, and of course you heard me doing that
13 throughout the trial.  And secondly, it is my role
14 to instruct you on the law that you are to apply to
15 the facts.  I gave you some preliminary instructions
16 before evidence began to orient you, but now, after
17 the close of evidence, is the time that you are
18 receiving the full and final instructions.
19     As members of the jury, you are the sole
20 and exclusive judges of the facts.  You pass upon
21 the evidence.  You determine the credibility of the
22 witnesses.  You resolve such conflicts as there may
23 be in the testimony.  You draw whatever reasonable
24 inferences you decide to draw from the facts as you
25 have determined them, and you determine the weight

4146

1  of the evidence.
2      And in determining these issues, no one
3  may invade your province or functions as jurors.  In
4  order for you to determine the facts, you must rely
5  on your own recollection of the evidence.
6      Because you are the sole and exclusive
7  judges of the facts, I do not mean to indicate in
8  this charge or in any ruling that I made during
9  trial any opinion as to the facts or whether the
10 government has proved its case or what your verdict
11 should be.  And you, of course, will dismiss from
12 your mind completely any evidence that I struck from
13 the case.
14     Now, our courts operate under an
15 adversarial system in which it is the role of the
16 lawyers to press as hard as they can for their
17 respective positions.  And in fulfilling that role,
18 they have not only the right, but the obligation to
19 make objections to the introduction of evidence that
20 they feel is improper under the federal rules.  The
21 application of these rules of evidence is not always
22 clear, lawyers often disagree, and so it has been my
23 job as the judge to resolve these disputes.  But
24 it's important for you to realize, however, that my
25 rulings on the evidentiary matters has nothing to do

4147

1  with the ultimate merits of the case, and the
2  rulings are not to be considered as points scored
3  for or against one side or another.
4      During the course of the trial, there
5  have of course been numerous occasions for the
6  attorneys to confer with me out of your hearing.  In
7  the interest of justice and in order to expedite the
8  trial, it was perfectly proper that we held
9  conferences at the sidebar between counsel and the
10 Court.  You are not too muse or venture on what was
11 being discussed, and likewise, you should have no
12 resentment towards any attorney who requested the
13 sidebar conference.
14     And similarly, one cannot help becoming
15 involved with the personalities and the styles of
16 the attorneys, but it's important for you as jurors
17 to recognize this is not a contest among attorneys.
18 You are to decide this case solely on the basis of
19 the evidence.  Remember, that statements and
20 characterizations of the evidence by the attorneys
21 is not itself evidence.  Insofar as you find their
22 closing arguments helpful, take advantage of them,
23 but it's your memory and your evaluation of the
24 evidence in the case that controls.
25     Now, although the defendant, Azibo

4148

1  Aquart, has been indicted, you must remember that an
2  indictment is only an accusation.  It is not
3  evidence.  The defendant has pleaded not guilty to
4  all the charges in the indictment.
5       And the law presumes the defendant to be
6  innocent of the charges against him.  The burden is
7  on the government to prove the guilt of the
8  defendant beyond a reasonable doubt.  This burden
9  never shifts to the defendant for the simple reason
10 that the law never imposes upon a defendant in a
11 criminal case the burden or the duty of calling any
12 witnesses or producing any evidence.  And,
13 therefore, I instruct you that you must presume the
14 defendant innocent throughout your deliberations
15 until such time, if any, that you as a jury are
16 satisfied that the defendant has proved -- excuse
17 me, that the government has proved the defendant's
18 guilt beyond a reasonable doubt.
19       In short, the defendant began the trial
20 with a clean slate and no evidence against him and
21 this presumption of innocence alone is sufficient to
22 acquit him unless, after careful and impartial
23 consideration of all of the evidence in the case,
24 you as jurors are unanimously convinced beyond a
25 reasonable doubt of his guilt.

4149

1       It is not required that the government
2  prove guilt beyond all doubt.  Reasonable doubt is
3  not a caprice or a whim; it is not a speculation or
4  a suspicion.  And it is not sympathy.  Proof beyond
5  a reasonable doubt is sufficient to convict.
6  Reasonable doubt is a doubt based upon reason and
7  common sense.  It is a doubt that a reasonable
8  person has after carefully weighing all of the
9  evidence, or lack of evidence.  It is a doubt that
10 would cause a reasonable person to hesitate to act
11 in a matter of importance in his or her personal
12 life.  Proof beyond a reasonable doubt must,
13 therefore, be proof of such convincing character
14 that a reasonable person would not hesitate to rely
15 and act upon it in the most important of his or her
16 affairs.
17       If, after fair and impartial
18 consideration of all of the evidence you have a
19 reasonable doubt on any element of any of the eight
20 crimes charged, it is your duty to acquit him on
21 that crime.  On the other hand, if, after fair and
22 impartial consideration of all of the evidence, you
23 are satisfied of the defendant's guilt beyond a
24 reasonable doubt, then you should vote to convict
25 him on that particular count.

4150

1       Under the United States Constitution a
2  defendant has no obligation to testify or present
3  any evidence because it's the government's burden to
4  prove his guilt beyond a reasonable doubt.  A
5  defendant is never required to prove that he is
6  innocent, and you must attach no significance to the
7  fact that Azibo Aquart did not testify.  No adverse
8  inference may be drawn by you because he did not
9  take the witness stand.  You must not consider this
10 against the defendant in any way in your
11 deliberations in the jury room.
12       Now, you've heard evidence about the
13 involvement of certain other people in the
14 conspiracy referred to in the indictment.  You may
15 not draw any inference, favorable or unfavorable,
16 towards the government or the defendant from the
17 fact that certain persons are not on trial before
18 you.  The fact that these individuals are not on
19 trial before you is not your concern.  You are not
20 being asked whether any other person has been proved
21 guilty.  Your verdict should be based solely upon
22 the evidence or lack of evidence as to this
23 defendant in accordance with my instructions and
24 without regard to whether the guilt of other people
25 has or has not been proven.

4151

1       Now, when I say the government has to
2  "prove" a fact to you, I mean it has to prove a fact
3  to you beyond a reasonable doubt as I've just
4  explained what that term means, even if I don't
5  always repeat these exact words.  And similarly,
6  when I say you must "find" a fact in order to return
7  a guilty verdict, you must find that fact to have
8  been proved by the government beyond a reasonable
9  doubt even if I just use the word "find."
10      However, as I've already instructed you,
11 the defendant has no burden or duty to prove or
12 disprove any element.  The burden is at all times on
13 the government to prove guilt beyond a reasonable
14 doubt.
15      Now, I'm going to get to the substantive
16 crimes charged and the law you are to apply.  The
17 indictment in this case is not evidence.  It
18 describes the charges the government makes against
19 defendant Azibo Aquart.  It is an accusation giving
20 notice to the defendant of the charges against him.
21      The indictment contains eight counts,
22 and you must consider each count separately and
23 return a separate unanimous verdict of guilty or not
24 guilty for each.  Whether you find the defendant
25 guilty or not guilty on one count should not affect

**GA1038**

4152

1    your verdict as to another count.

2          Although it's necessary for the

3    government to prove beyond a reasonable doubt that

4    the offenses were committed on dates reasonably near

5    the dates alleged in the indictment, it is not

6    necessary for the government to prove that the

7    offenses were committed precisely on the dates

8    charged.

9          You have a copy of the indictment.  Its

10    text forms part of these instructions as a

11    specification of the government's charges, and I

12    will now describe the elements of each of these

13    charges.

14          In describing these charges and their

15    elements, I will not read them to you in the order

16    in which they appear in the indictment for the

17    reasons that I will explain to you momentarily.

18          Before charging the eight counts, the

19    indictment begins with "introduction to all counts"

20    as follows:  At various times relevant to this

21    fourth superseding indictment, in the District of

22    Connecticut and elsewhere:

23          1.  Azibo Aquart, also known as Azibo

24    Smith, D, Dreddy and Jumbo, the defendant herein,

25    together with Azikiwe Aquart, also known as Z and

4153

1    Ziggy; Efrain Johnson, also known as Pootney; Rodney

2    Womble, also known as Big Man; John Taylor, also

3    known as Big Boy; Frankie Hodges, also known as

4    Steve; Juanita Hopkins, also known as Vanessa;

5    Nathaniel Grant, also known as Stone; Randi

6    Washington, also known as Bear; James Rucker, also

7    known as Pops; Sherrell Randolph, also known as

8    Sherrel Jones; and Judith Rivera, who are not named

9    as defendants herein, and others known and unknown

10    to the grand jury, were officers, members and

11    associates of a criminal organization referred to in

12    the superseding indictment as the "Aquart

13    Enterprise" or the "enterprise," whose members and

14    associates engaged in various acts and criminal

15    activity, including murder, conspiracy to murder,

16    assault and narcotics trafficking.  The Aquart

17    Enterprise operated primarily within the Charles

18    Street Apartments located at 215 Charles Street,

19    Bridgeport, Connecticut.

20          2.  The Aquart Enterprise, including its

21    leadership, membership and associates, constituted

22    an "enterprise" as defined in Title 18, United

23    States Code, Section 1959(b)(2), that is, a group of

24    individuals associated in fact which was engaged in,

25    and the activities of which affected, interstate and

4154

1    foreign commerce.  The enterprise constituted an

2    ongoing organization whose members functioned as a

3    continuing unit for a common purpose of achieving

4    the objectives of the enterprise.

5          3.  Defendant Azibo Aquart founded and

6    was leader of the enterprise whose members and

7    associates distributed cocaine base, primarily in

8    Bridgeport, Connecticut.  Azibo Aquart employed

9    street-level narcotics dealers, including Hodges and

10    Hopkins, among others, to sell drugs on behalf of

11    the enterprise.  Defendant Azibo Aquart employed

12    Womble as a "lieutenant" to provide the dealers with

13    crack cocaine, to collect drug proceeds and to

14    supervise and maintain control over the day-to-day

15    operations of the enterprise.  Azikiwe Aquart was

16    employed by Azibo Aquart to supervise and maintain

17    control over the activities of the street-level

18    dealers.  Defendant Azibo Aquart also recruited and

19    employed Grant, Washington and Taylor to act as

20    lookouts to warn the members and associates of the

21    enterprise of police activity in and around the

22    Charles Street Apartments, as well as of the

23    trafficking activity of rival dealers that

24    threatened the vitality of the drug enterprise.

25    Efrain Johnson associated with, and was recruited

4155

1    by, the defendant Azibo Aquart to participate, and

2    did participate, in the murders of Tina Johnson,

3    James Reid, and Basil Williams in order that Johnson

4    could gain entrance to and maintain and increase his

5    position in the enterprise and as consideration for

6    a promise and an agreement to pay anything of

7    pecuniary value from the enterprise.  John Taylor

8    also associated with, and was recruited by, the

9    defendant Azibo Aquart to participate, and he did

10    participate, in the murders of Tina Johnson, James

11    Reid and Basil Williams in order that Taylor could

12    gain entrance to and maintain and increase his

13    position in the enterprise and as consideration for

14    a promise and for an agreement to pay anything of

15    pecuniary value from the enterprise.

16          The indictment goes on to describe goals

17    and purpose of the enterprise charged.

18          4.  The members and associates of the

19    Aquart Enterprise sought, among other things, to:

20          a. preserve and protect the power,

21    territory and profits of the Aquart Enterprise

22    through the use of intimidation, violence and

23    threats of violence;

24          b. promote and enhance the criminal

25    activities of the Aquart Enterprise and its members

4156

```
 1   and associates;
 2          And c, generate income for members and
 3   associates of the Aquart Enterprise through the sale
 4   and distribution of narcotics.
 5          Means and methods of the enterprise:
 6          5.  The members and associates of the
 7   Aquart Enterprise carried out criminal activities in
 8   furtherance of the conduct of the enterprise's
 9   affairs.  Azibo Aquart, who is the defendant herein,
10   and other members and associates of the enterprise,
11   participated in the conduct of the affairs of the
12   enterprise by the following means and methods, among
13   others:
14          a, obtaining large quantities of crack
15   cocaine which were then repackaged and distributed
16   in retail quantities to the street-level dealers at
17   locations in and around the Charles Street
18   Apartments in Bridgeport, Connecticut.  The members
19   and associates distributed the narcotics, after
20   which the defendants and their associates would
21   collect payment of the narcotics trafficking
22   proceeds from the dealers employed by the
23   enterprise;
24          And b, committing, attempting to commit,
25   and threatening to commit acts of violence,
```

4157

```
 1   including murder, attempted murder and assault, to
 2   protect and expand the Aquart Enterprise's criminal
 3   operations.  These acts of violence were often
 4   perpetuated in a conspicuous manner in order to
 5   maintain control over members of the enterprise and
 6   to deter anyone who posed a threat to the continued
 7   vitality and success of the criminal activities of
 8   the enterprise.
 9          In particular, in or about the summer of
10   2005, the enterprise became involved in a narcotics
11   trafficking dispute with a rival over the right to
12   sell crack cocaine within the Charles Street
13   Apartments.  This distribute resulted in members of
14   the enterprise confronting their rival and her
15   associates.
16          Looking specifically at Counts One, Two
17   and Three and Four.  Counts One through Four charge
18   the defendant with violating Title 18, United States
19   Code, 1959 which provides:  "Whoever, for the
20   purpose of maintaining or increasing position in an
21   enterprise engaged in racketeering activity, murders
22   any individual in violation of the laws of any state
23   or the United States, or attempts or conspires to do
24   so, shall be guilty of a crime."
25          Counts Two, Three and Four, charge the
```

4158

```
 1   defendant Azibo Aquart with the substantive crimes
 2   of murder in aid of racketeering, and Count one
 3   charges him with conspiracy to commit those
 4   substantive crimes.  Conspiracy is a separate
 5   stand-alone crime.  I'm going to begin to describe
 6   the law applicable to counts Two, Three and Four,
 7   because I think it will help you better understand
 8   the separate crime of conspiracy to commit those
 9   crimes.
10          So we'll start with Two, Three and Four,
11   murder in aid of racketeering.  Each of those counts
12   charge the defendant with murder in aid of
13   racketeering, with Count Two relating to the murder
14   of Tina Johnson, Count Three relates to the murder
15   of James Reid, and Count Four relates to the murder
16   of Basil Williams.
17          The charge in the indictment is the same
18   for each victim and it reads as follows:
19          At paragraph 9.  At various times
20   relevant to this superseding indictment, the Aquart
21   Enterprise, as more fully described in paragraphs 1
22   through 5 above, which are realleged and
23   incorporated as if fully set forth in this
24   paragraph, constituted an enterprise defined in
25   Title 18, United States Code, Section 1959(b)(2),
```

4159

```
 1   that is, a group of individuals associated in fact,
 2   which was engaged in, and the activities of which,
 3   affected, enterprise and foreign commerce.
 4          Paragraph 10.  From in or about the fall
 5   of 2004, to in or about August 2005, the
 6   above-described enterprise, and I read you those
 7   paragraphs earlier, through its members and
 8   associates, engaged in racketeering activity as
 9   defined in Title 18, United States Code, Sections
10   1959(b)(1) and 1961(1), namely narcotics
11   trafficking, in violation of 21, United States Code,
12   841(a)(1) and 846, and acts involving murder, in
13   violation of the laws of the State of Connecticut.
14          Paragraph 11.  On or about August 24,
15   2005, in the District of Connecticut, Azibo Aquart,
16   also known as Azibo Smith, D, Dreddy and Jumbo, the
17   defendant herein, together with Azikiwe Aquart, also
18   known as Z and Ziggy; and Efrain Johnson, also known
19   as Pootney; and John Taylor, who are not named as
20   defendants herein, as consideration for the receipt
21   of, and as consideration for a promise and an
22   agreement to pay, anything of pecuniary value from
23   the enterprise, and for the purpose of gaining
24   entrance to and maintaining and increasing their
25   position in the enterprise, an enterprise engaged in
```

4160

1   racketeering activity, did unlawfully, willfully and
2   knowingly murder Tina Johnson, Count Two, James
3   Reid, Count Three, and Basil Williams, Count four,
4   in violation of Connecticut General Statute Section
5   53a-54a, 53a-54c, and 53a-8a, all in violation of
6   18, United States Code, 1959(a)(1) and Title 18,
7   United States Code, Section 2.
8           Now, the elements of each of Counts Two
9   Three and Four, which the government must establish
10  beyond a reasonable doubt, are the following five
11  elements of the offense:
12          1, that on or about the date charged,
13  which is August 24, 2005, an enterprise affecting
14  enterprise commerce existed;
15          2, that the enterprise was engaged in
16  racketeering activity;
17          3, that the defendant held a position in
18  the enterprise;
19          4, that the defendant knowingly and
20  intentionally murdered another individual;.
21          And 5, that at least one of the
22  defendant's purposes in murdering that individual
23  was to maintain or increase his position in the
24  racketeering enterprise.
25          Let's start with count one -- excuse me,

4161

1   element one, which is the same for Counts Two, Three
2   and Four, that the government must prove beyond a
3   reasonable doubt, is that an enterprise affecting
4   interstate commerce existed.
5           An enterprise is defined to include any
6   association, or group of individuals associated in
7   fact, which is engaged in, or the activities of
8   which affect, interstate or foreign commerce.
9           An enterprise does not have to have a
10  particular name, or indeed, any name at all.  To
11  establish that an enterprise existed, the government
12  must prove that there was in fact, during the period
13  charged, the group of individuals as described in
14  the indictment:  1, a common or shared purpose of
15  engaging in a course of conduct; 2, an ongoing and
16  continuing formal or informal organization or
17  structure; 3, core personnel who functioned as a
18  continuing unit; and 4, an organization with an
19  existence separate and independent from the
20  racketeering activity.
21          The group may be organized for a
22  legitimate and lawful purpose, or it may be
23  organized for an unlawful purpose.  The personnel of
24  the enterprise may change and need not be associated
25  with the enterprise for the entire period alleged in

4162

1   the indictment.
2           Interstate commerce is commerce between
3   one state and another.  The defendant need not have
4   intended, or even known, that the acts of the
5   enterprise would affect such commerce.  The
6   enterprise's affect on interstate or foreign
7   commerce need not have been substantial.  Indeed, a
8   minimal effect is sufficient and can be established
9   by showing either that the enterprise itself, or the
10  racketeering activities of those associated with it,
11  affected interstate commerce.  So that's the first
12  element.
13          The second element of Counts Two, Three
14  and Four that the government must prove beyond a
15  reasonable doubt as to each count is that the
16  enterprise engaged in racketeering activity on or
17  around the time charged -- the time of the charged
18  offense, August 24, 2005.  The RICO, or Racketeer
19  Influenced and Corrupt Organization statute, Title
20  18 U.S. Code 1961, defines the term "racketeering
21  activity" to mean the commission of certain crimes,
22  including, as the indictment charges in this case,
23  any acts involving murder in violation of the laws
24  of Connecticut or narcotics trafficking in violation
25  of federal law.

4163

1           The government need only prove the
2   existence of one of the racketeering activities, not
3   both, in order to satisfy this element.
4           It is for you to determine whether the
5   enterprise engaged in these activities as charged.
6   And you should give the words "engaged in" their
7   ordinary and every day meaning.
8           For an enterprise to be engaged in
9   racketeering activity it is enough to show that the
10  enterprise committed or was planning to commit some
11  racketeering activity within a period of time short
12  enough under all of the circumstances so that it is
13  appropriate to say that the enterprise was engaged
14  in racketeering activity.
15          In order for the state crime of murder
16  to be considered as a racketeering act, the
17  government must prove to you beyond a reasonable
18  doubt that the enterprise, through its members,
19  committed or attempted to commit murder, in
20  violation of Connecticut General Statutes 53a-54a,
21  which states "a person is guilty of murder when,
22  with intent to cause the death of another person, he
23  causes the death of such person or of a third
24  person."
25          In order for the enterprise's dealing or

4164

1  trafficking of narcotics to be considered a
2  racketeering act, the government must prove beyond a
3  reasonable doubt that the defendant knowingly or
4  intentionally distributed or possessed with intent
5  to distribute a controlled substance, which is a
6  violation of 21, United States Code, 841(a)(1), or
7  the government must prove beyond a reasonable doubt
8  that two or more persons entered into a conspiracy,
9  understanding or agreement to distribute narcotics,
10 and that the defendant knowingly and willfully
11 became a member of that narcotics conspiracy, which
12 is a violation of 21, United States Code, 846.
13 Controlled substances and narcotics include cocaine
14 base, also referred to as crack cocaine.
15        The legal concept of possession of
16 narcotics may differ from the every day usage of
17 that term, so I'll explain it in some detail.
18 Actual possession is what most of us think of as
19 possession; that is, having physical custody or
20 control of an object.  So, for example, if you find
21 the defendant had drugs on his person, you may find
22 he had possession of drugs.  However, a person need
23 not have actual physical custody of an object in
24 order to have -- to be in legal possession of it.
25 If an individual has the ability and intent to

4165

1  exercise substantial control over an object that he
2  does not have in his physical custody, then he is in
3  possession of that item.  An example of this from
4  everyday experience would be a person's possession
5  of items he keeps in a safe deposit box in a bank.
6  Although the person doesn't have physical custody of
7  those items, he exercises substantial control over
8  them and so has legal possession of them.
9        The law also recognizes that possession
10 may be sole or joint.  If one person alone possesses
11 something, that is sole possession.  However, it is
12 possible that more than one person may have the
13 power and intention to exercise control over the
14 drugs, and this is called joint possession.  If you
15 find that the defendant had such power and
16 intention, then he possessed the drugs under this
17 element even if he possessed the drugs jointly with
18 another.
19        Possession of drugs cannot be found
20 solely on the ground that the defendant was near or
21 close to the drugs.  Nor can it be found simply
22 because the defendant was present at a scene where
23 drugs were involved, or solely because the defendant
24 associated with a person who did control the drugs
25 or the property where they were found.  However,

4166

1  these factors may be considered by you in connection
2  with all the other evidence in making your decision
3  of whether the defendant possessed the drugs.
4        The word "distribute" means to deliver
5  cocaine base, crack cocaine.  "Deliver" is defined
6  as the actual, constructive or attempted transfer of
7  a narcotic.  Simply stated, the words "distribute"
8  and "deliver" mean to pass on, or to hand over to
9  another, or cause to pass on or hand over to
10 another.  Distribution does not require a sale.
11 Activities in furtherance of the ultimate sale, such
12 as vouching for the quality of the drugs,
13 negotiating for or receiving the price, and
14 supplying or delivering the drugs, may constitute
15 distribution.
16        In short, distribution requires a
17 concrete involvement in the transfer of cocaine
18 base.  When I say that you must find the defendant
19 possessed with intent to distribute cocaine base, I
20 do not mean that you must find the defendant
21 intended personally to distribute or deliver cocaine
22 base.  It is sufficient if you find the defendant
23 intended to cause or assist the distribution of
24 cocaine base, crack cocaine.  You may consider the
25 amount or the quantity of drugs involved in

4167

1  determining his intent to distribute.  The alleged
2  racketeering activities must relate to the operation
3  of the charged enterprise.  Criminal acts committed
4  independently by individuals that are unrelated to
5  the goals or activities of the enterprise do not
6  qualify as racketeering activity.
7        We are now on the third element of
8  Counts Two, Three and Four that the government must
9  prove beyond a reasonable doubt, and that is that
10 the defendant Azibo Aquart held a position in the
11 racketeering enterprise.
12        A defendant held a position in the
13 enterprise if he knowingly and intentionally
14 associated himself with the enterprise.  A defendant
15 need not have been associated with the enterprise
16 for the entire period of its existence, but the
17 defendant must have been associated with the
18 enterprise at the time he committed the crime
19 charged.
20        The defendant's association with the
21 enterprise must have been knowing.  That is, he must
22 have been connected to it the enterprise in some
23 meaningful way and had knowledge of the existence of
24 the enterprise through a general awareness of some
25 of its purposes, activities and personnel.

4168

```
 1        The fourth element of Counts Two, Three
 2  and Four that the government must prove beyond a
 3  reasonable doubt for each of these counts is that
 4  the defendant, Azibo Aquart, knowingly and
 5  intentionally murdered Tina Johnson, Count One,
 6  James Reid, Count Two, and/or Basil Williams, count
 7  -- Count Two, Count Three and Count Four, and/or
 8  caused their deaths during a robbery or attempted
 9  robbery.
10        In order to convict the defendant of
11  murder, the government must prove beyond a
12  reasonable doubt that:  1, that the defendant
13  intended to kill another person; 2, that in
14  accordance with that intent, the defendant acted so
15  as to cause the death of that individual.
16        The indict also charges the defendant
17  with "felony murder" committed during a robbery.
18  Connecticut law defines the crime of felony murder
19  as follows:  When a person is guilty -- a person is
20  guilty of murder when, acting either alone or with
21  one or more persons, he commits or attempts to
22  commit robbery, and, in the course of and in
23  furtherance of such crime or flight therefrom, he,
24  or another participant, if any, causes the death of
25  a person other than one of the participants.
```

4169

```
 1        Thus, in order to convict the defendant
 2  of felony murder, the government must prove beyond a
 3  reasonable doubt:
 4        1, the defendant, either alone or with
 5  others, committed or attempted to commit a robbery;
 6        And 2, in the course of the robbery, or
 7  during flight from the robbery, he, or another
 8  participant, caused the death of a person other than
 9  one of the participants.
10        In turn, robbery is defined under
11  Connecticut law as a person's guilty of robbery
12  when, in the course of committing a larceny, he uses
13  or threatens the immediate use of physical force
14  upon another person for the purpose of:
15        1, preventing or overcoming resistance
16  to the taking of the property or to the retention
17  thereof immediately after the taking; or
18        2, compelling the owner of such property
19  or another person to deliver up the property or to
20  engage in other conduct which aids in the commission
21  of the larceny.
22        The essential elements of robbery under
23  Connecticut state law are, 1, the use or threat of
24  use of physical force, 2, for the purpose of
25  stealing property.
```

4170

```
 1        Element four may be satisfied by proof
 2  beyond a reasonable doubt that Azibo Aquart aided or
 3  abetted the murders of Tina Johnson, Count Two,
 4  James Reid, Count Three, and/or Basil Williams,
 5  Count four.  Aiding and abetting is defined in 18,
 6  United States Code, Section 2, as:
 7        a, whoever commits an offense against
 8  the United States or aids, abets, counsels,
 9  commands, induces or procures its commission, is
10  punishable as a principal.
11        2, whoever intentionally causes an act
12  to be done, which if directly performed by him or
13  another would be an offense against the United
14  States, is punishable as a principal.
15        A person who aids or abets another to
16  commit an offense is just as guilty of that offense
17  as if he committed it.  Thus, you may find the
18  defendant guilty of the crime charged if you find
19  beyond a reasonable doubt that the government has
20  proved that another person actually committed the
21  offense with which the defendant is charged and that
22  the defendant aided or abetted that person in the
23  commission of the offense.
24        You must first find that another person
25  has committed the crime charged.  Obviously, no one
```

4171

```
 1  can be convicted of aiding and abetting the criminal
 2  acts of another if no crime was committed by the
 3  other person in the first place.  But if you do find
 4  that a crime was committed, then you must consider
 5  whether the defendant aided or abetted the
 6  commission of the crime.
 7        In order to aid or abet another to
 8  commit a crime it's necessary that the defendant
 9  intentionally and knowingly associated himself in
10  some way with the crime and that he intentionally
11  and knowingly sought by some act to help make the
12  crime succeed.
13        Participation in a crime is intentional
14  if action is taken voluntarily and intentionally or,
15  in the case of a failure to act, with the specific
16  intent to fail to do something that the law requires
17  to be done; that is, with a bad purpose either to
18  disobey or to disregard the law.
19        The mere presence of the defendant where
20  a crime is being committed, even coupled with
21  knowledge by the defendant that a crime is being
22  committed, or the mere acquiescence by the defendant
23  in the criminal conduct of others, even with guilty
24  knowledge, is not sufficient to establish aiding and
25  abetting.  An aider and abettor must have some
```

4172

1  interest in the criminal venture and must have
2  performed some act that facilitated or encouraged
3  the crime.
4         To determine whether a defendant aided
5  or abetted the commission of the crime with which he
6  is charged, ask yourself three questions:
7         1.  Did he participate in the crime
8  charged as something he wished to bring about?
9         2.  Did he associate himself with the
10 criminal venture knowingly and intentionally?
11        And 3.  Did he seek by his actions to
12 make the criminal venture succeed?
13        If he did, then the defendant is an
14 aider and abettor, therefore guilty of this crime.
15 If, on the other hand, your answer to these
16 questions is no, then the defendant is not an aider
17 and abettor, and the government will have failed to
18 prove the defendant's criminal liability for aiding
19 and abetting one or more of the murders alleged.
20        The last element, the fifth element of
21 Counts Two, Three and Four that the government must
22 prove beyond a reasonable doubt is that at least one
23 of the defendant's purposes in committing the murder
24 was to maintain or increase his position in the
25 racketeering enterprise.

4173

1         In deciding what the defendant's purpose
2  was in committing a particular act, you must
3  determine what he had in mind.  Since one cannot
4  look into a person's mind, you may attempt to
5  determine his purpose by considering all the facts
6  and circumstances before you.  It is not necessary
7  that the defendant acted with the sole or principle
8  purpose of maintaining or increasing his position in
9  the enterprise.  If you find that the defendant
10 acted for more than one purpose, but one of those
11 purposes was to maintain or increase his position in
12 the enterprise, then you should find this element
13 satisfied.  If, however, you find the defendant was
14 not motivated at all by the desire to maintain or
15 increase his position in the enterprise, but was
16 motivated only by other factors, then you must find
17 the defendant not guilty of this count.
18        In determining whether the defendant's
19 purpose was to maintain or increase his position in
20 the enterprise, you should give those words their
21 ordinary meaning.  You should consider all of the
22 facts and circumstances in making that
23 determination.  For example, you are may consider
24 what, if any, association with, or position in, the
25 enterprise the defendant had at the time of the

4174

1  alleged murder -- at the time the alleged murder was
2  committed, and the extent, if at all, the commission
3  of the alleged crime served to help the defendant
4  maintain, uphold or enhance his position within the
5  enterprise.  If the defendant committed the crime
6  because he knew it was expected of him by reason of
7  his membership in the enterprise, or if he committed
8  the crime because he thought it would enhance his
9  position or prestige within the enterprise, or if he
10 committed it because he thought it was necessary to
11 maintain the position he already held, that element
12 would be established.  Those are examples of the
13 purposes that satisfy this element, but they're not
14 meant to be exhaustive.
15        In order to convict the defendant of this
16 count, you must unanimously agree that the
17 government has proved beyond a reasonable doubt that
18 one of the defendant's motives for the murder was to
19 maintain or increase his position in the enterprise.
20        I'm going to now go back to Count One,
21 which is conspiracy to commit murder in aid of
22 racketeering having already now instructed you on
23 what murder in aid of racketeering is.
24        Specifically Count One of the indictment
25 charges:

4175

1         6.  At various times relevant to the
2  superseding indictment, the Aquart Enterprise, as
3  described in paragraphs 1 through 5 above, which I
4  read to you earlier, which are realleged and
5  incorporated as if fully set forth in this
6  paragraph, constituted an enterprise as defined
7  under 18, United States Code, 1959(b)(2), that is, a
8  group of individuals associated in fact which was
9  engaged in, and the activities of which affected,
10 interstate commerce.
11        7.  From in or about the fall of 2004,
12 to in or about August 2005, the above-described
13 enterprise through its members and associates
14 engaged in racketeering activity defined in 18 U.S.
15 Code 1959(b)(1) and 1961(1), namely, narcotics
16 trafficking, in violation of 21, United States Code,
17 841(a)(1) and 846, and acts involving murder, in
18 violation of the laws of the State of Connecticut.
19        Paragraph 8.  In or about August 2005,
20 and continuing to on or about August 24, 2005, in
21 the District of Connecticut, Azibo Aquart, also
22 known as Azibo Smith, D, Dreddy and Jumbo, the
23 defendant herein, as consideration for the receipt
24 of, and as consideration for a promise and an
25 agreement to pay, anything of pecuniary value from

4176

the enterprise, and for the purpose of gaining
entrance to and maintaining and increasing his
position in the enterprise, an enterprise engaged in
racketeering activity, did unlawfully, willfully and
knowingly conspire to murder Tina Johnson and her
associates, in violation of Connecticut General
Statute 53a-54a -- 48a -- excuse me. Connecticut
General Statute section 53a-48(a), 53a-54c, and
53a-54a. All in violation of 18, United States
Code, 1959(a)(5).

Count One charges conspiracy to commit
murder in aid of racketeering. A conspiracy is a
kind of criminal partnership, a combination or an
agreement of two or more persons to join together to
accomplish some common unlawful purpose in which
each member becomes the agent of every other member.
The crime of conspiracy to violate a law is an
independent offense. It is separate and distinct
from the actual violation of the specific laws which
I have told you we call substantive crimes.

The government need not show that the
alleged members of the conspiracy entered into any
express or formal agreement or that they directly
stated between themselves the details of the scheme
or its object or purpose, or the precise means by

4177

which the object or purpose was to be accomplished.
Similarly, you do not need to find that the alleged
conspirator stated, in words or in writing, what the
scheme was, its object or purpose, or every precise
detail of the scheme, or the means by which its
object or purpose was to be accomplished. What the
government must prove is that there was a mutual
understanding, either spoken or unspoken, between
two or more people to cooperate with each other to
commit the unlawful act charged in the indictment.

You may of course find that the existence
of an agreement to disobey or disregard the law has
been established by direct proof. However, since
conspiracy is, by its very nature, characterized by
secrecy, you may also infer its existence from all
of the circumstances and the conduct of the parties
involved because actions often speak louder than
words. The acts and the statements of others were
admitted into evidence against the defendant because
these acts and statements were committed by persons
who the government charges were confederates or
co-conspirators of the defendant. Whether or not
they were in fact co-conspirators is solely for you
to decide. The reason for allowing this evidence to
be received against the defendant has to do with the

4178

nature of the crime of conspiracy. As I just told
you, a conspiracy is often referred to as a
partnership in crime. Thus, as in other types of
partnerships, when people enter into a conspiracy to
accomplish an unlawful end, each and every member
becomes an agent for the other conspirators in
carrying out the conspiracy.

Accordingly, the reasonably foreseeable
acts, declarations, statements and omissions of any
member of the conspiracy and in furtherance of the
common purpose of the conspiracy, are deemed under
the law to be the acts of all the members, and all
the members are responsible for such acts,
declarations, statements and omissions.

If you find beyond a reasonable doubt
that the defendant was a member of the conspiracy
charged in the indictment, then any acts done or
statements made in furtherance of the conspiracy by
persons also found by you to have been members of
that conspiracy may be considered against the
defendant even if such acts were done and statements
were made in the defendant's absence and without his
knowledge.

For the government to prove conspiracy to
murder in aid of racketeering, it must establish

4179

beyond a reasonable doubt the following five
elements:

1, that on or about the date charged in
Count One, August 24, 2005, an enterprise affecting
interstate commerce existed;

2, that the enterprise was engaged in
racketeering activity;

3, that the defendant held a position in
the enterprise;

4, that the defendant knowingly and
intentionally conspired with others to murder
another individual;

And 5, that at least one of the
defendant's purposes in conspiring to murder another
individual was to maintain or increase his position
in the racketeering enterprise.

The first three elements of Count One,
each of which the government must prove beyond a
reasonable doubt, that is, on or about August 24,
2005, an enterprise affected interstate commerce
existed; that the enterprise was engaged in
racketeering activity; and that the defendant held a
position in the enterprise, all of those are the
same as the first three elements for Counts Two,
Three and Four, which you can find again on pages 21

4180

1   to 25, and they apply here as the first three
2   elements, but I'm not going to repeat them again.
3       Element four that the government must
4   prove beyond a reasonable doubt to establish the
5   offense of conspiracy to commit murder in aid of
6   racketeering is that the defendant Azibo Aquart
7   knowingly and intentionally conspired with others to
8   murder, that is, to intentionally cause the death of
9   another individual.
10      In deciding whether Azibo Aquart was, in
11  fact, a member of the conspiracy, you should
12  consider whether the defendant knowingly and
13  intentionally joined the charged conspiracy to
14  commit murder in aid of racketeering. Did he
15  participate in it with knowledge of its unlawful
16  purpose and with the specific intention of
17  furthering its business or objective? The question,
18  therefore, is whether the defendant joined the
19  conspiracy with an awareness of at least some of the
20  basic aims and purposes of the unlawful agreement.
21      The defendant's knowledge is a matter of
22  inference from facts proved. In that connection, I
23  instruct you that to become a member of the
24  conspiracy, the defendant need not have known the
25  identities of each and every other member, nor need

4181

1   he have been apprised of all their activities.
2   Moreover, the defendant need not have been fully
3   informed as to all of the details, or the scope, of
4   the charged conspiracy in order to justify an
5   inference of knowledge on his part.
6       It is sufficient if the defendant joined
7   in the conspiracy's unlawful purpose. A
8   conspirator's liability is not measured by the
9   extent or duration of his or her participation.
10  Indeed, each member may perform separate and
11  distinct acts and may perform them at different
12  times. Some conspirators may play major roles,
13  while others play minor roles in the scheme. An
14  equal role is not what the law requires. In fact,
15  even a single act committed by the defendant may be
16  sufficient to draw him within the ambit of the
17  conspiracy.
18      But I want to caution you, however, that
19  a defendant's mere presence at or near the scene of
20  an alleged crime does not, by itself, make him a
21  member of the conspiracy. Similarly, mere
22  association with one or more members of a conspiracy
23  does not automatically make the defendant a member.
24  A person may know, or be friendly with, a
25  conspirator without being a co-conspirator himself.

4182

1   Mere similarity of conduct or the fact that they may
2   have assembled together to discuss common aims and
3   interests, does not establish proof that the
4   defendant became a member of the conspiracy.
5       I also want to caution you that mere
6   knowledge or acquiescence, without participation, in
7   the unlawful plan is not sufficient. Moreover, the
8   fact that the acts of a defendant, without
9   knowledge, merely happened to further the purposes
10  or objectives of the conspiracy, does not make the
11  defendant a member. More is required under the law.
12  What is necessary is that the defendant must have
13  participated with knowledge of the purposes of the
14  charged conspiracy and with the intention of aiding
15  in the accomplishment of that unlawful end.
16      In sum, the defendant, with an
17  understanding of the unlawful character of the
18  alleged conspiracy, have intentionally engaged,
19  advised or assisted in it for the purpose of
20  furthering the illegal undertaking. He thereby
21  becomes a knowing and willing participant in the
22  unlawful agreement, that is to say, a conspirator.
23      And the last and fifth element that the
24  government must prove beyond a reasonable doubt is
25  that at least one of the defendant's purposes in

4183

1   conspiring to murder another individual was to
2   maintain or increase his position in the
3   racketeering enterprise. In discussing the fifth
4   elements of Counts Two, Three and Four, previously
5   on pages 30 and 31, I described to you the relevant
6   factors to consider in determining the defendant's
7   purposes and whether those purposes are to maintain
8   or increase position in the racketeering enterprise.
9   Those instructions are applicable here, but I will
10  not repeat them.
11      I'm going to move now to the law on the
12  substantive crimes of under Five, Six and Seven,
13  drug-related murders.
14      Counts Five, Six and Seven charge the
15  defendant with murder while engaged in a drug
16  trafficking offense. These charges in the
17  indictment, which are the same for each victim, read
18  as follows:
19      Paragraph 18. On or about August 24,
20  2005, in the District of Connecticut, Azibo Aquart,
21  also known as Azibo Smith, D, Dreddy and Jumbo, the
22  defendant herein, together with Azikiwe Aquart, also
23  known as Z and Ziggy, and John Taylor, who are not
24  named as defendants herein, while engaged in an
25  offense punishable under Title 21, United States

4184

```
1   Code, 841(b)(1)(A), to wit:  Conspiracy to
2   distribute and to possess with intent to distribute
3   50 grams or more of a mixture and substance
4   containing a detectable amount of cocaine base,
5   crack cocaine, a Scheduled II controlled substance,
6   did knowingly and intentionally kill and command,
7   induce, procure and the cause the intentional
8   killing of Tina Johnson, Count Five, James Reid,
9   Count Six, and Basil Williams, Count Seven, and such
10  killing did result.  All in violation of Title 21,
11  United States Code, 848(e)(1)(A) and Title 18,
12  United States Code, Section 2.
13        For the government to prove the offenses
14  charged in Counts Five, Six and Seven, it must
15  establish beyond a reasonable doubt each of the
16  following four elements as to each count:
17        1, that the defendant was engaged in or
18  working in furtherance of the conspiracy to
19  distribute or possess with intent to distribute
20  50 grams or more of a mixture containing cocaine
21  base, crack cocaine, charged in Count Eight of the
22  indictment;
23        2, that the defendant knowingly and
24  intentionally killed or commanded or induced or
25  procured or caused the intentional killing of the
```

4185

```
1   charged victim;
2         3, that the killing of the charged
3   victim actually resulted from the defendant's
4   actions;
5         And that such killing occurred because
6   of and as part of the defendant's engaging in or
7   working in furtherance of the conspiracy to
8   distribute or to possess with intent to distribute
9   50 grams or more of cocaine base.
10        Count One, the first -- excuse me,
11  element one, the first element the government must
12  prove beyond a reasonable doubt as to each of
13  Counts Five, Six and Seven, is that the defendant
14  was engaged in or working in furtherance of a
15  conspiracy to distribute or possess with intent to
16  distribute 50 grams or more of a mixture containing
17  cocaine base.
18        To find this element proved, you must
19  have found the defendant guilty of the conspiracy
20  charged in Count Eight, which I will describe
21  momentarily.  If you do not find the defendant
22  guilty on that count, Count Eight, you must find the
23  defendant not guilty on Counts Five, Six and Seven.
24        The second element which the government
25  must prove beyond a reasonable doubt is that the
```

4186

```
1   defendant intentionally killed or counseled,
2   commanded, induced, procured or caused the
3   intentional killing of Tina Johnson, Count Five,
4   James Reid, Count Six, and/or Basil Williams, Count
5   Seven while engaged in a narcotics conspiracy.
6         To satisfy this second element, the
7   government must prove beyond a reasonable doubt that
8   the defendant deliberately and purposefully engaged
9   in conduct with the intent to cause the death of
10  Tina Johnson, James Reid and Basil Williams.
11        The third element that the government
12  must prove beyond a reasonable doubt is that the
13  killing of the charged victim actually resulted from
14  the defendant's action.  This element may be
15  satisfied by proof under the definition of aiding
16  and abetting that I previously gave you described in
17  Counts Two, Three and Four, which you can find at
18  pages 27 to 29, the defendant aided and abetted the
19  killing.
20        The fourth element the government must
21  prove beyond a reasonable doubt is that the killing
22  of Tina Johnson, Count Five, James Reid, Count Six,
23  and/or Basil Williams, Count Seven, occurred because
24  of and as part of the defendant's engaging in the
25  drug conspiracy charged in Count Eight.  The term
```

4187

```
1   "while engaging in" means more than coincidence in
2   time with a drug conspiracy.  It requires not only
3   that the crime occurred during the time period
4   covered by the drug conspiracy, but also that the
5   killing was related in some meaningful way to the
6   drug conspiracy.
7         Moreover, the defendant's participation
8   in the killing must be related to the drug
9   conspiracy.  You may find that the killing was
10  related to the drug conspiracy if you find that
11  there was a connection between the defendant's role
12  in the killing and his participation in the drug
13  conspiracy.  For example, proof that a person who
14  engaged in a drug conspiracy who kills his spouse in
15  a purely non-drug related domestic dispute would not
16  satisfy this element.
17         The government must prove that at least
18  one of the defendant's purposes or motives in the
19  killing of the charged victim was related to the
20  activities of the drug conspiracy that's charged in
21  Count Eight.  It is not necessary for the government
22  to prove that this was the sole purpose, or even the
23  primary purpose, for the killing.  What the
24  government must prove is that there was some
25  substantive connection between the defendant's role
```

4188

1  in the narcotics trafficking conspiracy and his role
2  in the killing, even if there were other motives or
3  purposes for the killing.
4          And now we get to Count Eight which
5  charges the defendant with conspiracy to distribute
6  or possess with intent to distribute narcotics, in
7  violation of 21, United States Code, 841(a)(1),
8  841(b)(1)(A)(iii) and 846.  Again, I read from the
9  indictment:
10         Paragraph 21.  From in or about the fall
11 of 2004, to in or about August 2005, in the District
12 of Connecticut and elsewhere, Azibo Aquart, also
13 known as Azibo Smith, D, Dreddy and Jumbo, the
14 defendant herein, together with Azikiwe Aquart, also
15 known as Z and Ziggy; Rodney Womble, also known as
16 Big Man; John Taylor, also known as Big Boy; Frankie
17 Hodges, also known as Steve; Juanita Hopkins, also
18 known as Vanessa; Sherrell Randolph, also known as
19 Sherrel Jones; Nathaniel Grant, also known as Stone;
20 Randi Washington, also known as Bear; Judith Rivera;
21 and James Rucker, also known as Pops, who are not
22 named as defendants herein, together with others
23 known and unknown to the grand jury, did knowingly
24 and intentionally conspire to distribute and to
25 possess with intent to distribute 50 grams or more

4189

1  of a mixture and substance containing a detectable
2  amount of cocaine base, crack cocaine, a Schedule II
3  controlled substance, contrary to 21, United States
4  Code, 841(a)(1).  All in violation of Title 21,
5  United States Code, Sections 841(a)(1), 841(b)(1)(A)
6  (iii) and 846.
7          So, now we go to the elements for Count
8  Eight.  The government must prove beyond a
9  reasonable doubt each of the following three
10 elements:
11         1, two or more persons entered into the
12 particular unlawful agreement;
13         2, the defendant knowingly and
14 intentionally became a member of the conspiracy;
15         And 3, members of the conspiracy
16 conspired to commit an unlawful act, here the crime
17 of distribution or possession with intent to
18 distribute cocaine base, crack cocaine, in an amount
19 of 50 grams or more.
20         The first element of Count Eight that
21 the government must prove to you beyond a reasonable
22 doubt is that two or more persons entered the
23 unlawful agreement charged in Count Eight of the
24 indictment.  As I described to you in discussing
25 Count One, in order for the government to satisfy

4190

1  this element, you need not find that the alleged
2  members of the conspiracy met together and entered
3  into any express or formal agreement.  And
4  similarly, you need not find the alleged conspirator
5  stated, in words or writing, what the scheme was,
6  its object or its purpose, or every precise detail
7  about the scheme or the means by which its object or
8  purpose was to be accomplished.
9          What the government must prove is that
10 there was a mutual understanding, either spoken or
11 unspoken, between two or more people to cooperate
12 with each other to accomplish an unlawful act, for
13 purposes of this count, the distribution or
14 possession with intent to distribute narcotics.
15         You may, of course, find the existence of
16 an agreement to disobey or disregard the law has
17 been established by direct proof.  However, as I
18 earlier described, since conspiracy is, by its very
19 nature, characterized by secrecy, you may also infer
20 its existence from the circumstances of this case
21 and the conduct of the parties.
22         In a very sense, then, in the context of
23 conspiracy cases, actions often speak louder than
24 words.  And in this regard you may, in determining
25 whether an agreement existed here, consider the

4191

1  actions and statements of all those you find to be
2  participants as proof that a common design existed
3  on the part of the parties involved to act together
4  to accomplish an unlawful purpose.
5          The second element which the government
6  must prove beyond a reasonable doubt to establish
7  the offense of conspiracy is that the defendant
8  knowingly, intentionally and voluntarily became a
9  participant in or member of the conspiracy.  Before
10 you may find that a defendant was a member of the
11 conspiracy, the evidence must first show beyond a
12 reasonable doubt that the conspiracy was knowingly
13 formed and that the defendant knowingly participated
14 in the unlawful plan, with knowledge of its unlawful
15 purpose, and with the intent to advance or to
16 further some objective or purpose of that
17 conspiracy.
18         And I've instructed you on what
19 constitutes membership in a conspiracy and the
20 factors to be considered in discussing element four
21 of Count One, which you can refer back to on pages
22 37 and 38.  That same analysis applies here, but I
23 will not repeat it.
24         Three, element three.  The third element
25 of the conspiracy charge that the government must

4192

1  prove beyond a reasonable doubt is that the
2  conspiracy had as its objective the crime of
3  distribution or possession with intent to distribute
4  cocaine base, crack cocaine, in an amount of
5  50 grams or more.  In this regard, you need not
6  decide whether the defendant knew the type or
7  quantity of drug alleged in the indictment.  Rather,
8  you need only decide whether the offense or offenses
9  for which you found the defendant guilty involved
10  the type and quantity of drug charged in the
11  indictment.  And you will -- there will be a place
12  on your verdict sheet in which you will be able to
13  indicate your determination about the question of
14  drug quantity.
15       If you find the defendant guilty of Count
16  Eight, and that Count Eight involved cocaine base,
17  crack cocaine, you are asked to determine the amount
18  of cocaine base involved over the course of the
19  conspiracy.  In determining the amount of cocaine
20  base involved, you are charged that the defendant is
21  responsible for:
22       A, all acts and omissions committed,
23  aided, abetted, counseled, commanded, induced,
24  procured or intentionally caused by the defendant;
25       And B, in the case of a jointly

4193

1  undertaken criminal activity, a criminal plan,
2  scheme, endeavor, or enterprise undertaken by the
3  defendant in concert with others, whether or not
4  charged as a conspiracy, all reasonably foreseeable
5  acts and omissions of others in furtherance of the
6  jointly undertaken criminal activity, that occurred
7  during the commission of the crime charged, and in
8  preparation for that offense.
9       The weight of the controlled substance
10  refers to the entire weight, of either the pure
11  substance of cocaine base, or any mixture or -- or
12  of any mixture of the substance containing a
13  detectable amount of the controlled substance.  The
14  weight includes not only the weight of the substance
15  involved in any crimes committed by the defendant,
16  but also includes the amount involved in any other
17  criminal activity by other persons who were members
18  of the conspiracy, provided that:  1, the other
19  crime was committed in furtherance of the criminal
20  conspiracy alleged in Count Eight; and 2, that both
21  the defendant and the person who committed the
22  criminal acts were members of that conspiracy; and
23  3, that the criminal activity of the other person
24  whose drugs you are attributing to the defendant to
25  determine the overall quantity was reasonably

4194

1  foreseeable to the defendant.
2       That completes my charge on the
3  substantive law that you are to apply to the eight
4  counts in the indictment.  Let me now just give you
5  some guidelines for deliberation that you will also
6  be bound to follow, after which we will take a brief
7  recess.
8       You are to perform the duty of finding
9  the facts without bias or prejudice as to either
10  party and with an attitude of completeness fairness
11  and impartiality.  The fact that the prosecution is
12  brought in the name of the United States of America
13  entitles the government to no greater consideration
14  than that accorded to the other party in this case.
15  By the same token, it is entitled to no less
16  consideration.  All parties, whether the government
17  or individuals, stand equal before the law and are
18  to be dealt with as equals in a court of justice.
19  However, it is the government that bears the burden
20  of proving Azibo Aquart guilty beyond a reasonable
21  doubt.
22       The issue of possible punishment of the
23  defendant should not in any sense enter into or
24  influence your deliberations at this stage of the
25  proceedings.  Your function is to weigh the evidence

4195

1  in the case and to determine whether or not the
2  government has proved beyond a reasonable doubt that
3  the defendant is guilty of the crimes charged solely
4  upon the basis of such evidence.
5       And under your oath as jurors, you cannot
6  allow consideration of the potential punishment
7  imposed on the defendant, if he is convicted, to
8  influence your verdict in any way or in any sense
9  enter your deliberation.
10       Similarly, under your oath as jurors you
11  are not to be swayed by sympathy.  You are to be
12  guided solely by the evidence in the case, and the
13  crucial, central question you should ask yourself as
14  you sift through the evidence is:  Has the
15  government proved the guilt of the defendant beyond
16  a reasonable doubt?
17       It is for you alone to decide whether
18  the government has met its burden of proof on each
19  of the crimes charged and based only on the evidence
20  introduced and the subject -- and subject to the law
21  as I'm charging you in these instructions.  If you
22  were to let fear, prejudice, bias, sympathy
23  interfere with your thinking, there is a risk that
24  you would not arrive at a true and just verdict.
25       Your verdict must be based solely upon

4196

the evidence developed at trial or the lack of
evidence.  And it would be improper for you to
consider in reaching your decision as to whether the
government sustained its burden of proof any
personal feeling you may have about the defendant's
race, religion, national origin, sex or age.  All
persons are entitled to the presumption of innocence
and the government has the burden of proof, as I
will describe in a moment.

It is equally important for you not to
allow any feelings you may have about the nature of
the crimes charged to interfere with your
decision-making process.  Your verdict must be based
exclusively upon the evidence or lack of evidence in
the case.

Now, during the trial, as well as in
these instructions, you heard the term "inference,"
and you will be asked to infer, on the basis of your
reason, experience and common sense, from one or
more established facts the existence of some other
fact.

An inference is not a suspicion or a
guess.  It's a reasoned, logical decision to
conclude that a disputed fact exists on the basis of
another fact which you know exists.  And there are

4197

times when different inferences may be drawn from
the same facts.  The government will ask you to draw
one set of inferences, the defense will ask you to
draw another, and it will be for you, and you alone,
to decide what inferences, if any, you will draw.

This process of drawing inferences from
facts in evidence is not a matter of guesswork or
speculation.  An inference is a deduction or a
conclusion which you, the jury, are permitted to
draw, but not required to draw, from the facts which
have been established by either direct or
circumstantial evidence.  And in drawing inferences
you should exercise your common sense, and you may
draw such reasonable inferences from the facts as
you find to be justified in light of your
experience.

Whatever inferences you may draw,
however, must, taken together with all the other
evidence in the case, meet the standard of beyond a
reasonable doubt as to each of the elements for each
of the crimes charged.

Now, I spoke with you at the beginning of
the case a little bit about what was and was not
evidence.  Let me expand.

The evidence that you will use to decide

4198

what the facts are comes in three forms:  One is
sworn testimony of the witnesses, both on direct and
cross-examination, as well as any ensuing redirect
or recross examination;

2, exhibits that have been received by
the Court in evidence;

And 3, stipulations reached by the
parties.

If evidence was received only for a
limited purpose, you must consider such evidence
only for the limited purpose I instructed you on
when it was offered.

Now, when deciding facts you must
disregard the following things which are not
evidence:

1.  The arguments or statements by
lawyers are not evidence;

2.  Questions I ask -- questions that
were asked of the witnesses are not evidence;

3.  Objections to questions or to
offered exhibits are not evidence.  In this regard,
attorneys have a duty to their client to object when
they believe the evidence should not be received,
and you should not be influenced by the objection or
the Court's ruling on the objection.  If the

4199

objection was sustained, ignore the question.  If
the question was -- if an answer had been given
already, ignore the answer.  If the objection was
overruled, treat the answer as evidence as you would
any other answer.

And anything that you may have seen or
heard outside the courtroom is not evidence.  Your
verdict must be based solely upon the evidence or
the lack of evidence developed at trial, and you are
not to engage in speculation or guesswork.

I mentioned at the outset that there are
two different types of evidence which you may
properly use in deciding whether the government has
or has not proved that the defendant is guilty
beyond a reasonable doubt, and one type of evidence
is called direct evidence.  Direct evidence is, as
its name suggests, a witness's testimony as to what
he or she saw, heard or observed.  In other words,
when a witness testifies about what is known to him
or her of his own knowledge by virtue of his own
senses, what he or she sees, feels, touches, hears,
that's all direct evidence.

Circumstantial evidence is evidence
which tends to prove a disputed fact by proof of
other facts.  So, let me give you an illustration.

4200

```
 1   Let me ask you to assume that it was a sunny day
 2   today.  That may be hard to assume with all of this
 3   rain, but let me ask you to assume that.  And that
 4   you were here in the courtroom that has no windows,
 5   you were listening to the evidence, and you saw
 6   people coming into the courtroom and they had
 7   raincoats that looked very soggy, they were shaking
 8   umbrellas.  Now, you have no direct evidence that
 9   there has been a change in the weather, but it would
10   be reasonable for you to infer, based on what you
11   saw and your own common sense, that the weather had
12   changed and it was now raining outside, and would
13   continue to rain for the whole week.
14          You infer on the basis of your reason,
15   your experience and your common sense from an
16   established fact, the wet and soggy people, whether
17   or not some other fact has been proved, a change in
18   the weather.
19          Circumstantial evidence is of no
20   value -- no less value than direct evidence, and the
21   law makes no distinction between direct and
22   circumstantial evidence, only that, as I explained
23   before, you must be satisfied with the defendant's
24   guilt beyond a reasonable doubt from all the
25   evidence in the case.
```

4201

```
 1          Speculation, guesswork or intuition
 2   cannot be substituted for proof.  You must be
 3   satisfied beyond a reasonable doubt from the
 4   evidence, whether it be direct or circumstantial,
 5   that the defendant committed the crimes set forth in
 6   the indictment that every element of the crimes
 7   charged, as I described them to you, has been
 8   proved.
 9          Now, during the course of this trial the
10   government offered evidence tending to be show that
11   on prior occasions the defendant either possessed
12   weapons or committed certain assaults as testified
13   to by witnesses, including Frankie Hodges, Jackie
14   Bryant, Juanita Hopkins and Venro Fleming.  The
15   defendant, Azibo Aquart, has not been charged with
16   committing these acts and the evidence was offered
17   only for limited purposes:  As evidence of the
18   existence and manner and means of the racketeering
19   enterprise and the defendant's role in it, and as
20   evidence of the existence of the drug conspiracy and
21   its alleged nature, scope and method of activity.
22          If you choose to credit this testimony
23   you may use it only for this limited purpose.  You
24   may not consider it as evidence that the defendant
25   had a bad character or general propensity to engage
```

4202

```
 1   in acts of violence or as evidence that the
 2   defendant committed the murders alleged in this
 3   case.
 4          Now, charts and summaries were prepared
 5   by the government and the defendant.  They've been
 6   admitted into evidence.  They've been shown to you
 7   during the trial for the purpose of explaining facts
 8   that are allegedly contained in books, records, or
 9   other documents that are in evidence in this case.
10   And you may consider the charts or summaries as you
11   would any other evidence admitted during this trial
12   and give it such weight and importance as you feel
13   it deserves.
14          The government also offered evidence in
15   the form of audiotape recordings.  These
16   conversations were recorded with at least the --
17   with the knowledge of at least one of the parties to
18   the conversation.  The use of this procedure to
19   gather evidence is entirely lawful, and the
20   government is entitled to use tape recordings in
21   this case.  The government prepared transcripts of
22   the tape recordings and they were distributed to you
23   to aid you or guide you or assist you in listening
24   to the tapes.  These transcripts, however, are not
25   evidence.  And if you heard something different from
```

4203

```
 1   what appeared in the transcript, then what you heard
 2   is controlling.
 3          You'll remember that the attorneys for
 4   the government and the defendant entered into
 5   certain stipulations as to the existence of certain
 6   facts.  Thus, no further evidence as to those facts
 7   was offered.  Each stipulation, such stipulations,
 8   constitute evidence and you may regard such
 9   stipulations as evidence of facts proved.
10          Now, you were further instructed that the
11   government's not required to use any particular
12   investigative techniques to prove its case.  And
13   similarly, the law does not require calling as
14   witnesses all persons who may have been involved in
15   the case or who may appear to have some knowledge of
16   the issues in the case.  Thus, it is not your
17   concern whether or why certain persons have or have
18   not been arrested or called as witnesses.  Nor does
19   the law require that all things mentioned during the
20   course of the trial be produced as exhibits.  Your
21   verdict must be based only on the evidence that has
22   been presented, or lack of evidence, and the
23   witnesses who have testified, from which you must
24   determine whether the government has proved the
25   defendant guilty beyond a reasonable doubt.
```

4204

Now, you've had an opportunity to observe all the witnesses and you have a list in your notebooks of who they were to help give you a refreshed recollection. It is your job now to decide how believable each witness was in his or her testimony. You are the sole judges of the credibility of each witness and of the weight to be given to his or her testimony. It must be clear to you by now that you are being called upon to resolve various factual issues in the face of very different pictures painted by the government and by the defense.

In deciding whether the government has met its burden of proof, you will be making judgments about the testimony of the witnesses that you listened to and observed. In making those judgments, you should carefully scrutinize all of the testimony of each witness, the circumstances under which each witness testified, and any other matter in evidence that may help you decide the truth and the importance of each witness's testimony.

I'm going to give you some factors which you may take into account in making your credibility determinations. Did the witness seem to be honest,

4205

candid and forthright? Did the witness have any reason not to tell the truth or seem as if he was hiding -- he or she was hiding something or being evasive? Did the witness have an interest in the outcome of the case? Did the witness have a good memory? Did the witness have the opportunity and the ability to observe accurately the things he or she testified about? If the witness appeared to be -- to be trying to be honest, was he or she nonetheless mistaken? Was the witness's testimony supported by other evidence or did it differ from the testimony of other witnesses or other evidence? Was the witness trying to give you some information accurately or was he or she trying to persuade you of something? Was the witness's testimony and attitude on cross-examination consistent with his or her testimony and attitude on direct examination? Did the witness have a relationship with the government or with the defendant that may have affected how he or she testified? Did the witness have some incentive, loyalty or motive that might cause him or her to shade the truth, or did the witness have some bias, prejudice or hostility that may have caused the witness, consciously or not, to give you something other than a completely accurate

4206

account of the facts he or she testified to?

Your decision about whether or not to believe a witness may depend on how that witness impressed you, applying the factors I have given you and your common sense. How much you choose to believe a witness may be influenced by the witness's bias. Also bear in mind that people sometimes forget things. A contradiction within a witness's testimony or between witnesses may be the result of an innocent lapse of memory or it may be an intentional falsehood. Similarly, different people observing an event may testify about it differently. They may do so because they remember it differently or because one of them is not being truthful. Inconsistencies or discrepancies in the testimony of a witness or between the testimony of different witnesses may, or may not, cause you to discredit such testimony.

If you find that a witness has knowingly testified falsely concerning any matter you have a right to distrust the testimony of such an individual concerning other matters. You may reject all the testimony of that witness or give it such weight or credibility as you think it deserves. You are not required to accept testimony even though the

4207

testimony is uncontradicted and the witness is not impeached. You may decide, because of the witness's bearing and demeanor or because of the inherent improbability of his or her testimony, or for other reasons sufficient to you, that such testimony is not worthy of belief.

The testimony of a single witness may be sufficient to convince you beyond a reasonable doubt of guilt if you believe the witness has truthfully and accurately related what in fact occurred. Conversely, the testimony of a single witness may produce in your minds reasonable doubt as to the existence of an essential element of an offense.

You must decide what is the most accurate, credible, trustworthy and reliable evidence. The weight of the evidence as to a particular fact is not determined by the number of witnesses or exhibits. It is the quality of the evidence that supports a finding as to a particular fact that should control.

In sum, what you should try to do in deciding credibility is to size a person up in light of his or her demeanor, the information and explanations given, and all the other evidence in the case, just as you would in any important matter

4208

where you are trying to decide if a person is
truthful and straightforward and accurate in his or
her testimony. In deciding questions of
credibility, you use your common sense, your good
judgment and your life experience.

Now, you'll remember that we had several
witnesses that we called expert witnesses, those
individuals referred to experts in a particular
field. Specifically, ATF Special Agent Kurt
Wheeler, an expert in interstate nexus; medical
experts, Dr. Malka Shah, Dr. Frank Evangelista, Dr
Susan Williams; and Forensic Examiner John
Pleckaitis, the latent print examiner; Christine
Roy, DNA; John Sardone, handwriting; and Maria
Warner, trace evidence.

A witness qualified as an expert may be
permitted to testify to his or her opinions on those
matters about which he or she has special knowledge,
skill, experience, education or training. Such
testimony is presented to you on the theory that
someone who is experienced and knowledgeable in the
field can assist you in understanding the evidence
or in reaching an independent decision on the facts.

In weighing this opinion testimony, you
may consider the witness's qualification, reason for

4209

his or her opinions, facts upon which the opinions
are based, reasons for testifying, as well as all
the other considerations that ordinarily apply when
you are deciding whether or not to believe a
witness's testimony. You may give the testimony
whatever weight, if any, you find it deserves in
light of all of the evidence in the case. You
should not, however, accept opinion testimony merely
because I allowed the witness to testify concerning
his or her opinion. And nor should you substitute
it for your own reason, judgment and common sense.
Determination of the facts in this case rests solely
with you.

Now, some of the testimony that you heard
was the testimony of law enforcement officers and
the government agents. The testimony of a law
enforcement witness is entitled to no special
suspicion or no special credibility simply because
that witness is a member of law enforcement. An
officer who takes the witness stand subjects his or
her testimony to the same examination and the same
tests as any other witness, including consideration
of whether testimony may be colored by a personal or
professional interest in the outcome of the case.

The testimony of people employed by the

4210

government or law enforcement agencies is entitled
to neither more nor less credibility than the
testimony of any other witness. And its exclusively
your province as jurors to give the testimony of law
enforcement personnel the credibility you find it
deserves applying the same instructions as are
applied to any other witness. You should recall the
witness's demeanor on the stand, his manner or her
manner of testifying, the substance of the
testimony, any bias or interest, and weigh it and
balance it just as carefully as you would the
testimony of any other witness.

Now, you also heard witnesses who
testified that they actually were involved in
planning and carrying out certain crimes with the
defendant. The law allows the use of accomplice
testimony. Indeed, it is the law in federal courts
that the testimony of accomplices may be enough in
itself -- in itself for conviction if the jury finds
that the testimony establishes guilt beyond a
reasonable doubt. It is also the case, however,
that accomplice testimony is of such a nature that
it must be scrutinized with great care and viewed
with particular caution when you consider how much
of that testimony to believe.

4211

I've given you some general
considerations on credibility, I won't repeat them
all here, but let me say a few things that you may
want to consider during your deliberation on the
subject of accomplice witnesses.

You should ask yourselves whether these
witnesses would benefit more by lying or by telling
the truth. Was their testimony made up in any way
because they believed or hoped that they would
somehow receive favorable treatment by testifying
falsely? On the other hand, did they believe that
their interests would be best served by testifying
truthfully? If you believe the witness was
motivated by hopes of personal gain was -- that the
witness was motivated by hopes of personal gain, was
the motivation one which would cause him or her to
lie or was it one that would cause him or her to
tell the truth? Did the motivation color the
witness's testimony?

In sum, you should look at all of the
evidence in deciding what credence and what weight,
if any, you want to give to the accomplice
witnesses.

Now, there has also been testimony from
government witnesses who pled guilty after entering

4212

into an agreement with the government to testify.
The government promised to bring those witnesses'
cooperation to the attention of the sentencing
court. More specifically, the cooperating witnesses
in this case have been promised that if they
testified truthfully and completely and fully they
will receive what is called a 5K1.1 letter from the
government. Upon such a motion by the government
stating that a defendant provided substantial
assistance in the investigation or prosecution of
another person who has committed a crime, the court
may impose a sentence below the mandatory minimum
sentence. Two factors to keep in mind are: One,
only the government can make such a motion, and it
cannot be compelled to do so; and two, the
sentencing court has complete discretion as to
whether or not it will grant that motion, and is
free, in any event, to impose any sentence within
the minimum and maximum authorized by law. Final
determination as to the sentence to be imposed rests
with the court.

　　　　The government is permitted to enter
into this kind of agreement. I instruct you there
is nothing improper of the government's use of
cooperating witnesses. You should not concern

4213

yourselves with how you personally feel about the
use of such witnesses because that's really besides
the point. Put another way, your task is to decide
whether the government has proved the guilt of the
defendant beyond a reasonable doubt regardless of
whether the evidence was obtained by the use of a
cooperating witness. You, in turn, may accept the
testimony of such a witness and convict the
defendant on the basis of this testimony if it
convinces you of the defendant's guilt beyond a
reasonable doubt.

　　　　A copy of each of these cooperation
agreements has been offered in evidence. I want to
caution you, however, that the agreement itself is
not evidence that the witness has, in fact,
testified truthfully. It may only be considered by
you in deciding whether the witness has an interest
in the outcome of the case which would motivate him
to testify falsely, or whether it was in his
interest to testify truthfully regardless of the
outcome.

　　　　You should bear in mind that a witness
who has entered into such an agreement has an
interest different than any ordinary witness. A
witness who hopes that he or she will receive a

4214

lighter sentence by giving testimony favorable to
the prosecution may have a motive to testify
falsely. Therefore, you must examine his or her
testimony with great caution and weigh it with great
care. If, after scrutinizing his or her testimony,
you decide to accept it, you may give it whatever
weight, if any, you find it deserves.

　　　　You've also heard testimony and argument
about the nature and effect of the plea and
cooperation agreements. That testimony and argument
is in large measure concerned with the witness's
motivation to testify and his or her understanding
of the agreements. Your sole concern, however, is
to evaluate the witness's credibility, a matter
which I just instructed you.

　　　　You are further instructed you are to
draw no conclusions or inferences of any kind about
the guilt of defendant Azibo Aquart simply from the
fact that a government witness pled guilty to a
charge against him or her. That witness's decision
to plead guilty was a personal decision about his or
her own guilt. Apart from the testimony that the
witness gave, the simple fact of his or her guilt
may not be used by you in any way against or
unfavorably to the defendant here on trial.

4215

　　　　Now, you also heard evidence that
witnesses made statements on earlier occasions which
counsel argues is inconsistent with that witness's
trial testimony. Evidence of a prior inconsistent
statement is not to be considered by you as
affirmative evidence bearing on the defendant's
guilt. Evidence of the prior consistent statement
was placed before you for the limited purpose of
helping you decide whether to believe the trial
testimony of that witness, and if you find that the
witness made an earlier statement that conflicts
with his or her trial testimony, you may consider
that fact in deciding how much of his or her trial
testimony, if any, to believe.

　　　　In making this determination, you may
consider whether the witness purposely made a false
statement or whether it was an innocent mistake,
whether the consistency -- excuse me, the
inconsistency concerns an important fact or whether
it had to do with a small detail, whether the
witness had an explanation for the inconsistency,
and whether that explanation appealed to your common
sense.

　　　　It is your exclusive duty, based on all
of the evidence and your own good judgment, to

**GA1054**

4216

1  determine whether the prior statement was,
2  inconsistent and, if so, how much, if any, weight
3  should be given to the inconsistent statement in
4  determining whether to believe all or part of the
5  witness's testimony.
6          Now, during the course of the trial
7  you've also heard testimony from witnesses who had
8  previously appeared and testified under oath either
9  before the grand jury or at some other proceeding.
10 The prior sworn testimony of some witnesses has been
11 read to you, and you may consider this prior
12 testimony as affirmative substantive evidence in
13 this case, not just as it relates to those
14 witnesses's credibility, which is the case with
15 other inconsistent testimony, as I just explained to
16 you.
17         In other words, if you believe that a
18 witness's prior testimony was truthful, you may
19 consider that testimony just as if the witness had
20 testified to the same effect while on the witness
21 stand at trial.  You should judge the credibility of
22 the prior sworn testimony in the same way that you
23 would judge the credibility of testimony given at
24 trial.  As with any inconsistent testimony, you may
25 also consider a witness's prior testimony when

4217

1  deciding whether to believe the trial testimony of
2  the witness.
3          You have also heard testimony of
4  witnesses who were previously convicted of crimes
5  punishable by more than one year in prison or
6  involving dishonesty.  Those prior convictions were
7  put into evidence only for you to consider in
8  evaluating that witness's credibility.  You may
9  consider the fact that the witness who testified is
10 a convicted felon in deciding how much of his or her
11 testimony to accept and what weight, if any, it
12 should be given.
13         I've now concluded the instructions that
14 relate to your duties and the specific claims in the
15 case.  After you've heard the closing arguments of
16 counsel, I will add a few more general instructions
17 about your deliberations.
18         We will now take, however, a 15-minute
19 recess.  Leave your notebooks here on your chair.
20 Each side has up to an hour and a half for their
21 closing argument.  The government, who bears the
22 burden of proof, will begin and has the opportunity
23 as well to rebut.  We will start with the
24 government's closing argument, take a half hour
25 lunch, and then come back for the defendant's

4218

1  closing argument and the government's rebuttal
2  argument, if any.  So that's how we will plan the
3  rest of the day.
4          You are excused and we will reconvene in
5  15 minutes.
6          (Jury exited the courtroom.)
7          THE COURT:  All right, counsel we will
8  take a 15-minute recess.
9          MS. DAYTON:  Your Honor, could we
10 address two quick things?
11         THE COURT:  Yes.
12         MS. DAYTON:  Number one, on page 19 of
13 the charge, your Honor, it varies from the
14 indictment.  After the words "racketeering activity"
15 in the second line, it should read:  Did murder Tina
16 Johnson, Count Two, James Reid, Count Three, and
17 Basil Williams, Count four.  Unlawfully, willfully,
18 knowingly, and in the perpetration of, and in
19 attempt to perpetrate, a robbery, and then in
20 violation of Connecticut General Statute Section
21 53a-54a, 53a-54c and 53a-8a.  So it's just a little
22 variance from the indictment.  You did instruct them
23 on felony murder and you instructed them on robbery
24 and larceny and everything, but it just is
25 different.

4219

1          THE COURT:  All right, we'll correct the
2  page and then we will substitute that in their
3  books.
4          MS. DAYTON:  And then the only other
5  thing the government would ask, if you could
6  instruct the jury as a matter of law that crack
7  cocaine is a Schedule II controlled substance,
8  cocaine base.
9          THE COURT:  You don't think that's clear
10 enough from the instructions?
11         MS. DAYTON:  It's in the indictment, but
12 not the charge.
13         THE COURT:  Practically every time I say
14 cocaine base we say crack cocaine.
15         MS. DAYTON:  No, it's a Schedule II
16 controlled substance.  Not that it's also called
17 cocaine base or crack cocaine, that it is a Schedule
18 II controlled substance.
19         THE COURT:  If you look at page 40 it
20 says detectable amount of cocaine base, crack
21 cocaine, a Schedule II controlled substance.
22         MS. DAYTON:  Right, that's just the
23 wording of the indictment.  We were just -- if you
24 could just instruct them, too.
25         THE COURT:  It's just that crack cocaine

4220

```
1    is a --
2            MR. SHEEHAN:  Actually I think it's
3    cocaine base is a Schedule II controlled substance.
4            MS. DAYTON:  The government is fine with
5    having that in your final instructions, your Honor,
6    after they -- whenever.
7            THE COURT:  All right, and then there is
8    one other page that I want to change, which is page
9    66, I did not read the part that says "nor by which
10   party produced the most witnesses or exhibits"
11   because we had intended to take that out.  Okay, so
12   we will make changes on these three pages,
13   substitute that in their book, and then when we're
14   finished with that, then we can proceed.
15           Thank you very much.
16           MR. SHEEHAN:  Could I just get a
17   clarification, your Honor.  Is it -- and I'm sorry
18   if I didn't hear.  Is it your Honor's intent that at
19   the end of all you're going to do your final
20   conclusion and final instruction?
21           THE COURT:  After they've heard all the
22   closings.
23           MR. SHEEHAN:  All right.  Thank you,
24   your Honor.
25           THE COURT:  I want to make a collection
```

4221

```
1    of objections to the charge as a matter of the
2    appellate record.  So, if you -- because it is the
3    clearest way for the circuit to be able to know what
4    was acquiesced to in the course of the charge
5    conference versus what remains as an objection.  You
6    don't have to do the whole thing, but you need to
7    identify what the objections -- what part objection
8    is taken to.  We'll do that, unless there is
9    something substantive now we hadn't previously
10   discussed or that we can't change now.  It's a
11   matter of just summarizing which areas of the charge
12   there is objection to.
13           MR. SHEEHAN:  Can then -- but the last
14   few pages, that you are going to say at the end,
15   your Honor?
16           THE COURT:  Yes.
17           MR. SHEEHAN:  Okay.  I just was --
18           THE COURT:  And I'm also going to add in
19   the Schedule II --
20           MR. SHEEHAN:  I got it.
21           THE COURT:  -- part.  All right.
22   Anything further?
23           MS. DAYTON:  No, your Honor.
24           THE COURT:  Thank you very much.  We'll
25   stand in recess for a little while.
```

4222

```
1            (Recess)
2            THE COURT:  All right, I understand the
3    substitutions have been made.  And are we ready to
4    proceed.
5            MR. MARKLE:  Yes, your Honor.
6            THE COURT:  Mr. Markle, you are going to
7    close for the government?
8            MR. MARKLE:  I am going to.
9            THE COURT:  Will you be closing and
10   doing rebuttal closing as well?
11           MR. MARKLE:  No, AUSA Dayton will do the
12   rebuttal, your Honor.
13           THE COURT:  All right, let's bring the
14   jury in.
15           (Jury entered the courtroom.)
16           THE COURT:  Please be seated, ladies and
17   gentlemen.  Closing argument on behalf of the
18   government will start with Mr. Markle.
19           You may proceed, sir.
20           MR. MARKLE:  Thank you, your Honor.
21           Good afternoon, ladies and gentlemen of
22   the jury.  On April 20, 2011, the evidence in this
23   case began and you entered 215 Charles Street,
24   Bridgeport, Connecticut.  Soon you, unlike Tina
25   Johnson, James Reid and Basil Williams, will be able
```

4223

```
1    to leave Charles Street alive.  All of this, their
2    deaths, their brutal murders, the ensuing
3    investigation, this trial, all because the defendant
4    had competition, and rather than take on the
5    competition, take on the challenge, he decided to
6    eliminate the competition because he had to send a
7    message.  Even his co-conspirator, John Taylor,
8    realized the senselessness of their action, "These
9    people didn't need to die."  And now you know all
10   the defendant did not want you to know.  He only
11   wanted the drug world to know that he ruled Charles
12   Street, not you.
13           The evidence he left behind and the
14   trail of witnesses who finally were able to stand up
15   to him and tell what they saw and heard allowed you
16   to see the face behind the mask when he invaded
17   their home armed with everything he thought he
18   needed to commit and cover up his crime.
19           He forced his way into their home, and
20   as humble as it may have been, it was their home.
21   Yes, a place where Tina did illegal things,
22   possessed, used and sold drugs, but also their home
23   where they drank with friends, visited with family,
24   watched television, played cards, ate, slept, where
25   they lived their lives until August 24, 2005.  He
```

4224

```
1   had three accomplices, two bats, one gun, enough
2   duct tape to wrap them like mummies, masks, gloves
3   and a drill.
4            But it began to unravel even while he
5   was still committing the crimes; the gloves tore,
6   the DNA was secreted, and the fingerprints were left
7   behind.  Even the drilling left more evidence; it
8   didn't prevent LeRoy Whittingham from discovering
9   what he never wanted to find.
10           And it wasn't only what they left
11  behind, but also what they took with them that
12  proves him guilty beyond a reasonable doubt.  A cell
13  phone charger, but no cell phone.  The victim's cell
14  phone is missing, and as we now know, at 10:25 a.m.,
15  minutes after the victims are found dead, it is
16  significantly and eerily calling what the evidence
17  establishes was the defendant's phone.
18           This is my opportunity to address you on
19  behalf of the government and all the AUSAs who have
20  participated, who have had the privilege of
21  appearing in her Honor's courtroom, presenting the
22  evidence in this case amassed by the FBI and
23  Bridgeport Police Department.  We apologize if we've
24  caused delays, if we spoke too loudly at counsel
25  table, if we have done anything to distract or deter
```

4225

```
1   you from doing your duty, rendering a just verdict.
2   We have practically sat in your jury box because of
3   the set up in the courtroom.
4            But we are not you.  We do not find the
5   facts, we present the evidence.  Hopefully, but not
6   always, as clearly or articulately as should be.
7   Hopefully, but perhaps not always, asking the
8   questions you would want answered.  But we trust
9   your individual and collective recall will help you
10  find the truth.  Please know that we greatly
11  appreciate the personal sacrifice exacted from your
12  lives and the time you have devoted to this trial.
13           A trial does not begin with opening
14  arguments or end with closing arguments.  It begins
15  with selecting a fair and impartial jury, and it
16  ends with you, the jury, reaching a fair verdict.
17  And that is the way it should be, people with no
18  interest in the outcome other than to do justice.
19  Our words are not evidence because we, the
20  attorneys, were not there.  But the witnesses were,
21  so I will talk about them and the facts that
22  establish the defendant's guilt beyond a reasonable
23  doubt.
24           On the first day of this trial, as I
25  said, you entered 215 Charles Street.  First with
```

4226

```
1   LeRoy Whittingham, who futilely and sadly went over
2   to his mom and said, "Get up, Mom."  And then with
3   the EMT Karen O'Donnell who entered with the
4   intention of saving lives, but as soon as she saw
5   them she knew they were dead and recognized the
6   importance of preserving the crime scene.  And then
7   with crime scene investigators.  Clues were
8   everywhere, but it took days to gather them, months
9   to analyze them, years to put them all together.
10           But in the end, as you are about to
11  leave Charles Street, you now know what happened,
12  how, why, and most importantly, who committed these
13  three murders.  You have been able to view this
14  horrible crime scene through the eyes of LeRoy
15  Whittingham, the eyes of Karen O'Donnell, the eyes
16  of Detective Joette Devan and Detective Paul Ortiz,
17  the eyes of the medical examiners, the eyes of John
18  Taylor, the eyes of Christine Roy, the eyes of John
19  Pleckaitis.  An open window, a screen outside on the
20  ground, screws on the table, seemingly innocuous
21  clues.  Duct tape, latex gloves, a missing cell
22  phone, a door drilled shut from the inside, DNA yet
23  to be analyzed, fingerprints yet to be identified,
24  blood splattered all over her room.
25           Over the next several weeks you learned
```

4227

```
1   the significance of each and every piece of
2   evidence, and you hardly need the cooperating
3   witnesses, but they give context and further meaning
4   to the evidence.  And the evidence and the analysis
5   of the evidence and the witnesses and the
6   corroboration of them, like Tina Johnson's phone
7   used after she had been murdered, directs you to the
8   defendant.
9            But could the DNA analysis be wrong?
10  Could the fingerprint identifications be mistaken?
11  Could this be the first case ever where two people
12  have the same fingerprints?  The evidence tell you
13  of course not.  Where Christine Roy, a scientist
14  dedicated to her field, who follows protocol, who
15  testifies to findings, not beliefs, to conclusions,
16  not expectations, could she have butchered her
17  analysis?  The evidence tells you of course not.
18  Does she exhibit examiner bias?  Her only bias was
19  to perform her analysis professionally,
20  scientifically and following every last lab
21  protocol.
22           And we know they got it right because if
23  we go back in time from August 24, 2005 to the
24  beginning you learn more than this defendant ever
25  wanted you to know about him.
```

4228

As of the fall of 2004 to August of 2005, a drug conspiracy existed. Certain members came and went, but the unlawful activity of distributing crack cocaine continued unabated and the leader remained the same. The defendant was the boss, the leader of this prolific crack trafficking operation; an enterprise. Not necessarily a sophisticated operation, but efficient, well entrenched, secure. Business is good before Womble in 2004, and with Womble into 2005. The evidence establishes that for month after month, day in and day out, 24 hours a day the customers are content and consistent.

And the evidence establishes that the quantity of crack cocaine far exceeded 50 grams. Even the most conservative estimate would approximate a kilo, a thousand grams, over the course of the entire conspiracy. Various witnesses, Hopkins, Hodges and Bryant, among them told you a pack was produced using three and a half grams of crack, and that a pack was made up of 46 individual bags of crack. Womble told you they sold 21 to 27 packs a week. If each pack consisted of three and a half grams, Agent Munger told you that would constitute approximately 73 to 94 grams a week,

4229

between 292 and 376 grams a month, close to 2,900 to 3,700 grams of crack cocaine in a 10-month period. But even assuming only one pack a day, an estimate so conservative not even suggested by any of the witnesses, a week's worth of sales would be 24 and a half grams, or almost one hundred grams a month, 24 hours a day, seven days a week, a conspiracy for 10 months at the least, you have evidence of virtually a thousand grams.

The defendant is responsible under the law for what was reasonably foreseeable; for every pack, every bag, every gram of crack the members of his conspiracy distributed. He profited from every bag sold, and now he is properly held accountable for the entire quantity sold by his coworkers, his co-conspirators. And in addition, distribution includes what was given to his lieutenant in crack for payment, to his sellers in crack for payment, and to his lookouts in crack for payment.

And you have the testimony of Lashika Johnson and Sherrell Randolph regarding bagging or observing additional large quantities of crack cocaine for street-level distribution. The operation was so busy at times that Sherrell Randolph had to stand in and provide sellers with

4230

additional crack when Rodney Womble was not available. So, the employees, the sellers, were doing their job selling his crack, 46 bags in a pack, each bag $10.

Discipline and punishment along the way is imposed when they engage in any activity not designed to further his, the defendant's, profit. Like some bosses, he rewards his sellers with bonuses when they perform well, and he imposes sanctions when they violate the enterprise's rules. But his sanctions are unusually severe, because this is the drug world, a racketeering activity intended to reap him all of the profit, and no violation was too insignificant to ignore, and no competition, as Tina and his friends sadly learned, was to be tolerated.

And the evidence establishes that the defendant, while leaving much of the day-to-day crack operation up to his lieutenant, his sellers, his lookouts, took it upon himself to assault, physically assault those who violated the rules of his crack enterprise. Witness after witness described how he physically beat and injured them, not because he was upset they were selling crack, but because they were selling someone else's crack.

4231

After all, he decided where the crack would be sold from, he decided who would sell, how much they were paid, who would be lookouts. When new hires had to be made, what role they would play in his organization. He provided the crack. He packaged the crack or paid others to assist him. He controlled the quantities, the locations, the personnel, and even the competition. And in Womble he had a lieutenant he could rely upon and who always and consistently reported back to the boss.

And you heard from Venro Fleming, Judith Rivera, Jackie Bryant, Frank Hodges, Juanita Hopkins, Sherrell Randolph, Rodney Womble, pack after pack of crack cocaine, a steady stream of customers addicted to his drug, from the defendant to Womble, or Squeaky before him, to Fleming, Bryant, Hopkins and Hodges for sale on the street. And the money always made its way back to the boss. Despite raids and arrests, his enterprise survived.

Was Rodney Womble a drug dealer? The evidence is he was. And a convicted felon. Same is true for John Taylor. But in the defendant's world, in his business, these were job requirements, not disqualifiers. They were our witnesses, but his co-conspirators. The defendant needed people to

4232

play a role, and their role was in the drug
operation. If you need a roofer, you call a roofer;
if you need a bondsman, you call a bondsman; if you
need a lieutenant in your drug operation, you look
to Big Man, Rodney Womble. He observed and
reported, and the defendant reacted. And later, as
the relationship with Womble begins to falter, he
loses the defendant's gun, he is messing up the
defendant's money, who does the defendant look to to
fill the void? Another person he can trust, his
brother Azikiwe. Need a person who will obey you,
an extra body to come up from Norwalk in case the
victim's son shows up and creates a problem, look to
Yes Yes, John Taylor.

You have the proffer agreements, the
plea agreements, the cooperation agreements. There
are no secret hidden agreements or deals. Their
agreements are in writing in evidence, not like the
conspiratorial agreements, secret and hidden,
between the defendant and his accomplices, his
co-conspirators. Some witnesses face life terms of
imprisonment, some 40 years, some 20, some 10, some
are not charged. The defense is not content with
any of those. We do not have to satisfy the
defense, we have to satisfy you.

4233

Will the witnesses receive
consideration, leniency for testifying? That is up
to the sentencing judge. They will be sentenced,
their cooperation will be made known. We do not
know what their sentence will be, nor do they. That
is properly and solely for the sentencing judge to
determine. Ask Womble, Taylor, Myers and others
what deal they've received so far. None. They sit
in prison based on charges brought by the
government. They were arrested and held without
bond. They pled guilty and remain held without
bond. They signed cooperation agreements and remain
without bond. They testified and they held remain
in prison without bond. They didn't get immunity,
they got federal charges.

Nowhere in any one of those agreements
will you find anything that says or suggests that to
hope for, let alone receive, leniency you must say
something bad, negative or even say anything about
the defendant except the truth. If you lie, you are
in worse trouble than you are now. Have they lied
in the past? Yes. Have they lied in the course of
this investigation? Sometimes. That is not a
revelation. AUSA Dayton told you that in the first
ten minutes of this trial.

4234

The question is did they tell the truth
on the witness stand. Did John Taylor want to
confess to killing three people when law enforcement
visited him in Pinetops? Of course not. But when
he realized the gravity of the situation, he began
to tell what happened. Did it all come out at once
with every detail accurately recited and reported?
No. He admitted he lied. He also told us what we
know, he was a bad liar. It was over time, a
progression of meetings and questions and answers.
Was it easy to admit what he and others did to these
three victims? No. But at some point John Taylor
realized, what he told all of you here in court,
what happened to those people didn't need to happen.

And when he testified he told you they
had bats. And Womble tells us the defendant told
him to go buy a bat. And the medical examiners for
each of the three victims say that each of them was
bludgeoned to death and their injuries are
consistent with a baseball bat. And Efrain Johnson
made admissions to his sister and he tells his
sister they had bats. And Taylor testified that the
defendant had a gun. Randi Washington and Sherrell
Randolph and Lashika Johnson and the gun boxes with
his prints tells us he had guns available to him.

4235

And Taylor testified that they had duct
tape purchased at Walgreen's and latex gloves, and
crime scene investigators find a Walgreen's plastic
bag in the victims' home and latex gloves in the
victims' home and duct tape binding every victim.
And Hopkins tells you there is a Walgreen's in the
immediate area. And Taylor shows the agents the
Walgreen's they went to. He testified that Efrain
Johnson was there and participated and Efrain
Johnson's DNA is found. And Efrain Johnson admits
to his sister that he was there and participated,
and they had bats and gloves and masks and tape and
he helped tie them up.

And he testified that Azikiwe Aquart was
there and participated, and Azikiwe's DNA and
fingerprints are found. The phone records
corroborate Taylor and the debit charges corroborate
Taylor. On his trip south with the defendant the
car stop in Cumberland County corroborates Taylor.
And Lashika corroborates Taylor. She heard a fourth
voice, a deep voice. They came back to her
apartment. She lived on a one-way street with a
pool hall nearby, just as Taylor described it.
Taylor corroborated in ways he could not have known
of, could not have imagined.

4236

1      This evidence does not demonstrate good
2 fortune, it demonstrates truthfulness,
3 believability.  And when he saw what the defendant
4 was doing to the victims, holding a bag over his
5 head, and after hearing the victim wailing through
6 her duct-taped mouth, he asked the defendant, "What
7 are you doing?"  And the reply was, "Come get you
8 some."  The same person who, when told of Tina's
9 rival drug selling, said, "I'll take care of it."
10 The same person who told Shamarr Myers, these people
11 had to be moved out.  The same person whose DNA and
12 prints are found at the murder scene.
13      And he testified he left with Azikiwe
14 who later offered him the phone he had stolen from
15 their apartment and Taylor refused to take it.  And
16 again, he is corroborated, no cell phone is found at
17 the crime scene.  10:25 a.m. the victim's phone
18 calls the defendant's phone.  And later that morning
19 Lashika heard the defendant, "Why would you be
20 calling me from this cell phone," he says to the
21 speaker.  And he sounded aggravated.
22      Facts should be susceptible to
23 corroboration, and Taylor's testimony is
24 corroborated by virtually every witness presented in
25 this case.  You should examine the testimony of

4237

1 cooperating witnesses as you should view the
2 evidence presented over the course of this trial.
3 View it in its entirety.  Use your common sense.  Is
4 it internally consistent?  Is it corroborated?  Like
5 the DNA profile, do not just look at one site, you
6 need to look at the entire profile.  You cannot pick
7 and choose, you need the full, entire picture.
8      When cooperators say something bad about
9 themselves or each other, the defense wants you to
10 believe that.  When they say something bad about the
11 defendant, suddenly they lose all credibility.  When
12 did they begin to fall out of favor with the
13 defendant?  When they began to cooperate.  Are they
14 afraid -- is he afraid of the truth or the lies?
15 When they threatened Jackie Bryant and tried to
16 bribe her because she had reported the assault, it
17 wasn't because she was making something up, they
18 weren't bribing her because she was giving false
19 information, they were bribing her because she was
20 giving truthful information.
21      When Christine Roy says a piece of
22 evidence is contaminated you are to believe her, but
23 when she says the defendant's DNA profile is found,
24 her abilities are suddenly suspect.  When she
25 excludes the defendant as a contributor, her

4238

1 protocol and findings are acceptable, but when she
2 includes the defendant or his brother or Efrain
3 Johnson or John Taylor as a contributor, her
4 protocols and findings are suddenly faulty.
5      This is not how you should treat the
6 evidence.  Use your common sense, assess the
7 credibility of witnesses, decide who and what is
8 believable, determine if they are corroborated.
9 Examine all the evidence in arriving at a just
10 verdict.  Who exposed the lies?  Who kept
11 investigating until there was proof beyond a
12 reasonable doubt as to all involved in these crimes?
13 If law enforcement was so set on getting the
14 defendant, why didn't the investigation end with his
15 arrest?  How is it that John Taylor is arrested
16 years and years later and charged?
17      Law enforcement acted properly, as the
18 evidence demonstrated.  They gathered information
19 from witnesses, they followed leads, they
20 corroborated information, whether small details or
21 great details.  The defendant drove a red Cadillac,
22 they confirmed it with DMV records.  The defendant
23 made and received phone calls, they confirmed it
24 with call detail records and subscriber information
25 and data analysis.  The defendant went and paid for

4239

1 everything along the way down south, on the trip
2 down south, they confirmed it by getting debit
3 charges and bringing in the Cumberland County car
4 stop.  The defendant's handwriting, he's believed to
5 be the author of letters, they get a handwriting
6 expert, confirmed by an expert.  DNA, same thing.
7 Fingerprints, same thing.
8      The danger of focussing on a suspect is
9 when law enforcement does it to the exclusion of all
10 others.  This is precisely what they did not do
11 here.  They focused, but continued their
12 investigation and garnered more information
13 regarding the defendant as well as his conspirators.
14 They strove to solve this case, not close it.
15      If Christine Roy is so biased for the
16 government, why did she reveal the one time evidence
17 was contaminated after she discovered it?  Why did
18 she then deem that item inconclusive?  Why did she
19 then re-examine each and every item she analyzed?
20 Because she's the consummate professional, a
21 scientist determined to perform her job, and the
22 only outcome she is concerned with arriving at is
23 the correct scientifically valid outcome.  She
24 employs and follows the same protocol as to all.
25 The protocol used to exclude the examiner is the

4240

1   same protocol which excludes the defendant from DNA
2   samples taken from Tina's fingernail clippings, even
3   though the defendant's genetic markers are found at
4   ten of 15 sites.
5          If Womble was so intent on helping
6   himself by getting the defendant, why did he say he
7   bought a bat but never say he gave it to the
8   defendant?  Is that the testimony you would expect
9   if he was merely trying to please the government?
10         You need to focus on what you know, what
11  the evidence has established.  The courtroom does
12  not allow for conjecture and speculation to
13  interfere with or to divert you from seeking the
14  truth.
15         So back to what you know, what the
16  evidence has established.  Back to what the
17  defendant called the "building," 215 Charles Street,
18  apartment 211.  This was the center of the
19  defendant's world.  A world you perhaps never knew
20  existed before the start of this trial.  A world he
21  never wanted law enforcement or you to ever know
22  about.  A place where ordinary items take on new and
23  nefarious meanings and uses.  Baggies for crack, not
24  kids' sandwiches; jewelers' bags, little inside
25  baggies, not for diamonds but for his precious

4241

1   crack; razors used to shave crack, not faces; straws
2   used to bag crack, not to drink from; plastic
3   containers used for his marijuana, not for gum
4   balls; drills used for repelling, not repairing;
5   latex gloves used to prevent detection, not for
6   cleaning; bats used as murder weapons, not for ball
7   games.
8          All to establish, operate, run, protect,
9   maintain his drug conspiracy.  All fueled by a
10  desperate need to control, dominate and profit; a
11  dictatorship, not a democracy, at 215 Charles
12  Street.  A drug conspiracy, which is perhaps not the
13  most significant charge in the indictment, but the
14  charge which underlies all the others.  And Hodges,
15  Bryant, Fleming, Womble, Rivera, Sherrell Randolph,
16  Randi Washington, Shante Pettway, John Taylor,
17  Juanita Hopkins, Lashika Johnson, Shamarr Myers, the
18  defendant's letters, the defendant's prison calls
19  Officer Simpson, Officer Rosado in the raids on
20  Charles Street, all establish the existence of a
21  crack conspiracy operating from 211 Charles Street;
22  an unlawful agreement amongst a varied group of
23  people all led and controlled by the defendant with
24  the intention to distribute crack cocaine.
25         Sellers came and went, lookouts came and

4242

1   went, lieutenants changed periodically, but the
2   conspiracy continued uninterrupted, and the
3   defendant was not only the common, but the constant
4   denominator.  All established the existence of an
5   enterprise, the Aquart Enterprise, whose
6   racketeering activity involved drug trafficking and
7   assault.
8          More witnesses, Taylor, Lashika, Roy,
9   Pleckaitis, Womble, Evangelista, Shaw and Williams,
10  establish that this racketeering activity also
11  involved murder and conspiracy to commit murder.
12  And others who proved that the guns that he bought
13  and possessed travelled in interstate commerce.  So,
14  the enterprise affected interstate commerce.  And
15  they sold crack which affected interstate commerce.
16  And he travelled to New York to buy drugs affecting
17  interstate commerce.  And the defendant was the
18  founder, he was the leader, he was the ruler of the
19  enterprise, and he committed these acts of murder to
20  maintain and enhance his leadership position.
21         You have direct eyewitness evidence and
22  physical evidence that establishes he murdered Tina
23  Johnson.  You have evidence that he aided and
24  abetted his brother who killed James Reid.  And the
25  evidence shows he killed Basil Williams just as he

4243

1   did Tina.  But even if he did not strike fatal
2   blows, as the Judge instructed you, he is guilty as
3   an aider and abettor.  The defendant was not merely
4   present, he was present for a reason, and armed with
5   a bat and a gun.  The defendant did not just
6   associate with this criminal enterprise, he led it.
7          And why did everyone call him, treat him
8   like the boss?  How can you conclude his position,
9   the one he sought to enhance and maintain in the
10  enterprise, was founder and leader?  Because the
11  witnesses, one after another, told you he provided
12  the crack, he set the prices, he hired and paid the
13  sellers, he chose and paid the lookouts, he took
14  care of Pops, he arranged to use Judith's apartment,
15  he collected the money, he scheduled the bagging
16  sessions, he provided the necessary paraphernalia,
17  disciplined the workers, he bonded out his
18  employees, he planned the murders, he committed the
19  murders.
20         And to be a leader, a boss, he needed
21  followers, workers, and he needed them to remain
22  loyal.  And he keeps them loyal in various ways.  He
23  buys them groceries, he gives them bonuses, he lets
24  them keep some of the profit, he feeds their
25  addiction.  Sometimes it's in less inviting ways.

4244

He assaults Hodges, he assaults Juanita, he assaults
Sullivan and Fleming.  They cannot report it to the
police, fearing their own arrest or retaliation.
They cannot even tell treating doctors what really
happened.  How convenient for the defendant that the
crack he profited from was the drug that kept him in
control of his workers.  Their addiction meant they
needed him and would have to endure his rules.  And
he knew it and he took advantage of it.  And now you
know why he needed their loyalty, why intimidation
had a purpose; it deterred misconduct and it
deterred revelation.

Until this trial, Hodges, Womble,
Fleming, Hopkins, Rivera, Lashika, Taylor, they
never stood up to the defendant.  They either left
him or obeyed him, but they never questioned him,
opposed him or stopped him.  This fear he instilled,
the intimidation he created was a means by which he
perpetuated and protected his enterprise.  Their
silence was golden.  Their testimony was feared.
That is why he wrote letters and used the time on
his prison calls to implore people to remain
steadfast or to make up false stories or to keep the
business going or to make sure bonds were made or to
move evidence.

4245

And did he have unexplained wealth of a
drug trafficker, large quantities of cash?  Stacks
of money observed by Randi Washington together
bunched or banded in amounts of 250 filling a
kitchen cabinet practically.  A shoebox filled with
cash seen by Lashika when they go to New York
together.  He pays for the gas, the hotels, the food
on the trip south.  He owns four vehicles, including
a Tahoe and red Cadillac.  His Cadillac, unlike
Womble's, is new.  And his own legitimate income is
purportedly from a car wash job.  And he pays for
Pops' groceries.  He has 211 Charles Street, Hallet
Street, Read Street apartments.  He buys thousands
of dollars worth of guns, ammo, extended clips,
speed loader and laser sites.  He spent $500 in one
day at the firing range.

And from December of 2005 through
July 2005, all appears fine, business is thriving,
Womble or Sherrell are constantly and consistently
obtaining crack from the defendant, giving it to
Hodges and Juanita at 211 -- for sale at 211 Charles
Street.  He had the office, Hallet Street, for
bagging, packaging, stashing cocaine, crack cocaine.
He had the building, Charles Street, for selling,
and profiting from that crack cocaine.  There are

4246

discipline issues along the way, he takes care of
that.  There is police raids, he takes care of that.

And Judith Rivera and Randi Washington
confirmed the existence of this crack operation, and
they tell us that in conjunction with it there is a
lookout apartment.  And Washington, corroborated by
seizure of gun boxes and other items, and the
defendant's fingerprints and gun records, provided
clear evidence that the defendant had his own
personal gun buyer in Washington.  The defendant
chose the gun or the speed loader or the laser site,
and all he had to do was pay Washington his buyer's
fee and the defendant received his arsenal of
weaponry, tools of the trade.  He told Sherrell he
felt naked without his gun, like not having his left
shoe on, because, as defense counsel said in opening
argument, drug dealing is a dangerous business, and
no one knew that better than the defendant.

This is what the evidence establishes
about the defendant prior to August 24, 2005.

But in August of 2005, the evidence
establishes a series of events transpire which
culminate in the murders of Tina, James and Basil.
In early August 2005, Rodney Womble throws away the
defendant's gun during a police chase.  Womble does

4247

not want to let the defendant know he had to dump
his gun.

In August the defendant receives a batch
of crack cocaine which is of poor quality.
Customers are complaining and going elsewhere.  In
August, Tina Johnson's sales increase as the
defendant's decline.  She benefits from his batch of
poor quality crack cocaine.

In August, from August 14th to 20th, the
defendant goes south with Shante and his two
co-conspirators, Taylor and Azikiwe.  And while the
defendant's away, Womble tells him that he
confronted Tina, but she won't stop selling.  The
defendant tells Womble, "I will take care of it."
The defendant tells Taylor, "I have a problem to
take care of when we return.  I have to move some
people out."

On August 20, 2005, the defendant does
return to Bridgeport and he meets with Womble
immediately and Womble is short on drug money and
Womble tells the defendant that Tina is still
selling from apartment 101 and the defendant tells
Womble to go buy a baseball bat and gives him money.
And in August of 2005, you know from the evidence,
that Tina is not deterred by Womble's threats.  In

4248

1  August Tina is not deterred by the defendant's
2  threats.  In August Tina will not even heed the
3  advice of her friend, Jackie Bryant, to stop selling
4  out of 101.
5       And in August of 2005, the defendant
6  continues to develop, cultivate his association with
7  his co-conspirator John Taylor.  In August, within
8  days of the murder, Lashika hears the defendant tell
9  her brother "I need you to help me handle
10 something."  In August, within days of the murder,
11 the defendant has Hodges knock on Tina's door in a
12 vein attempt to enter.  In August Jackie sees four
13 men in black inside Charles Street.  And Taylor
14 tells you why and who they were.
15      As of August 21st, Sherrell Randolph,
16 Rodney Womble, Hopkins and Hopkins and the phone
17 records establish that Womble is not only avoiding
18 the defendant, he has stopped working as his
19 lieutenant.  In late August, around the same time,
20 Azikiwe has taken over for the absent Womble.  And
21 by August 24th, Taylor and Azikiwe and Efrain
22 Johnson are suddenly in the picture.  And by August
23 24, 2005, a bat has been ordered, duct tape has been
24 purchased, and a problem he needs to take care of
25 has been identified.

4249

1       And on August 24, 2005 the calls begin.
2  From 1:47 a.m. to 1:55 a.m. on the morning of August
3  24, 2005, the defendant's cell phone contacts or is
4  contacted by Lashika Johnson two times, Efrain
5  Johnson five times, John Taylor two times.  At 2:03
6  and at 2:04 he calls Rodney Womble, but Womble
7  doesn't take his call.  From 2:16 a.m. to 5:03 a.m.
8  the morning of August 24, 2005, the defendant's
9  phone is in contact with John Taylor twenty times.
10      And then from 5:04 a.m. to 5:43 a.m.,
11 the defendant's phone calls no one and no one calls
12 him.  And the Efrain Johnson phone calls no one and
13 no one calls him.  And the John Taylor phone calls
14 no one and no one calls him.  You now know why.
15 Taylor tells us that they are all together, Taylor,
16 the defendant, Efrain Johnson and Azikiwe Aquart,
17 the same Azikiwe Aquart who lost his phone and gun
18 when they travelled south and who later that morning
19 will activate a new cell phone.  And Taylor tells us
20 why they are together and why there are no phone
21 calls made or received.  They are in the process of
22 committing a home invasion, binding the defendants
23 defenseless -- binding the victims defenseless,
24 beating them with baseball bats, stealing her cell
25 phone and money, and taking their lives and then

4250

1  fleeing the murder scene, for Tina had violated the
2  most sacred of rules, she stood up to the defendant
3  and his lieutenant.  She challenged his stranglehold
4  on crack dealing at 215 Charles Street, and if his
5  operation was going to be challenged, then he had no
6  choice, in his mind, as he told Womble, but to take
7  care of it.
8       But he didn't take care of it, he took
9  care of them, Tina, James and Basil.  The evidence
10 establishes that he gathered his forces, amassed his
11 weapons, donned his mask, his gloves, and invaded
12 their home, armed with duct tape and bats and a gun
13 and a drill.  This was not a random act of violence,
14 this was planned, well orchestrated.
15      It was August 24, 2005, and having been
16 unsuccessful previously, this morning he was
17 determined to enter their home with no intention but
18 to rob and eliminate the competition and to let
19 others in the drug world know that his reign over
20 215 Charles Street would continue.  He was there to
21 send a message, a message to those who dared to sell
22 crack on his turf, no one sells here, no one
23 competes with his enterprise, no one interferes with
24 his racketeering activity, no one reduces his
25 profits.

4251

1       And the evidence is that he, and/or his
2  co-defendants, bound the victims so tightly you
3  could barely cut the tape off of them, so vigorously
4  that the duct tape, once removed, stood on its own.
5  A message to others.  And if that wasn't sufficient,
6  the evidence establishes that the defendant and his
7  brother, aided by Efrain Johnson and John Taylor and
8  baseball bats, bludgeoned them to death, leaving
9  blood spatter from the floor to the ceiling and on
10 every wall in Tina's room.  No one dare sell in 215
11 Charles Street, and the message was loud and clear.
12      And if not for the diligent work and
13 professionalism of dedicated law enforcement
14 officers from the Bridgeport Police Department and
15 agents of the FBI, and forensic experts like
16 Christine Roy and John Pleckaitis, and the testimony
17 of those who had been used or abused or intimidated
18 in the past, to finally come into this courtroom and
19 tell you what they knew, Bryant, Hopkins, Hodges,
20 Judith, Sherrell, Fleming, Womble, Taylor, Myers, do
21 you think anyone would have dared sell from 215
22 Charles Street ever again without the defendant's
23 approval?
24      Some saw it coming, Taylor saw it
25 happen.  Taylor saw and heard the sights and sounds

4252

1  of murder.  He saw things that made a convicted
2  felon cry while he relived it on the witness stand.
3  He saw the beginning, and LeRoy and EMT Karen
4  O'Donnell, and now you, saw the ending.  Taylor
5  said, "What happened to those people didn't need to
6  happen."  But the defendant told Shamarr Myers they
7  had to go, the defendant had to take care of it.
8          And Taylor testified and recalled the
9  brutality as if he was at apartment 101 again and
10  was watching it all happen again.  Question:  "As
11  you went into the door --  or as you went to the
12  door, what happened next?"
13          Taylor answer:  "That's when Dreddy had
14  went up to the door and said -- kicked the door in,
15  boom, kicked the door again, boom.  That's when
16  everybody went in behind, it's like boom, boom,
17  started going in.  When I heard somebody say 'who is
18  it,' then that's when the door came open, and when
19  the door came open, that's when all of us went
20  inside."
21          Question:  "Who was in first?"
22          Answer:  "Dreddy."
23          Question:  "And who is the person who
24  kicked the door open?"
25          Answer:  "Dreddy."

4253

1          The door is forced opened, the couch is
2  propped up against the broken door; the couch from
3  the living room, not the floral couch.  The photos
4  show you which couch.  Taylor told you which couch.
5  The couch Bryant said she slept on.  The couch that
6  belongs and was against the wall until they invaded.
7  A couch on which a piece of latex glove is later
8  found.  At this point, with the couch against the
9  door, no one can enter and no one can exit.  The
10  victims are held hostage.
11          And Taylor is asked:  "And as you are
12  standing there, what happens?  What are you doing?
13  Do you just stand there?  Do you move around?"
14          Answer:  "At the time I was just
15  standing there, you know, the only thing I know --
16  he, Dreddy, had went back, and the only thing I'm
17  hearing is duct tape" and he described the sound.
18          Question:  "What did you see?"
19          Answer:  "Dreddy and Ziggy duct taping."
20          Question:  "Who are they duct taping."
21          Answer:  "The male and the female."
22          Question:  "In the left bedroom?"
23          Answer:  "Yes."
24          Question:  "So you see the defendant and
25  his brother duct taping people.  What happens next?

4254

1  What do you do?"
2          Answer:  "So now I'm back and forth,
3  that's all.  I'm hearing this duct taping, duct
4  tape, so I went back and forth, running back and
5  forth, going back and forth looking, and all of a
6  sudden everybody is finished up, don't hear no more
7  duct tape."
8          Question:  "What happened next?"
9          Answer:  "All of a sudden you start
10  hearing nothing, nothing."  And then he described a
11  sound he heard, a wailing sound.
12          Answer:  "And I said, I go back, I go
13  back, and I look, I said, 'Yo, what are you doing?'
14          Question:  "You go where to look?"
15          Answer:  "I go back.  I'm like, like,
16  'wow.'  So when I go back, when I go back and look,
17  I look, I seen them.  He was standing over like
18  this, over, and start hitting her."
19          Question:  "Who is standing like that?"
20          Answer:  "Dreddy."
21          Question:  "Okay, you indicated, you put
22  the pointer over your head and knocking down in
23  front of you.  And who is he hitting?"
24          Answer:  "The female, staying right
25  there."

4255

1          Question:  "Is she on the floor?"
2          Answer:  "Yes."
3          Question:  "And when the defendant is
4  hitting her.  What's he hitting her with?"
5          Answer:  "The bat."
6          Question:  "What is she doing?"
7          Answer:  "What could you do but yell.
8  The only thing you can do.  And she was just yelling
9  and when I -- just laying there and he's standing
10  over her, and Ziggy is standing on the other side
11  doing the same thing to the other guy.  I'm like,
12  'Yo, what are you doing?'  And then he said, 'Yo,
13  come and get you some.'"
14          And later in his testimony he describes
15  the defendant wielding his bat and swinging the bat.
16  And in an answer to a question he says:  "Okay,
17  that's when I walked back from the window, went back
18  and looked.  Dreddy was standing over the victim's
19  body bashing her like it was a meat cleaver, that he
20  was at a meat market beating them.  His brother was
21  over there doing the same thing.
22          And Taylor leaves followed by Azikiwe
23  Aquart who now has the victim's cell phone.  The
24  defendant remains.  And when the defendant was done,
25  he drilled their apartment door shut.  He knew they

4256

```
1   weren't going to escape, they were wrapped so tight
2   in duct tape, their heads, her mouth, their wrists,
3   their ankles, even if he had not bludgeoned them to
4   death, they could not escape.  But he did not want
5   them discovered.  He needed time to get away, move
6   his car, get rid of their clothes, the bats, the
7   drill, the duct tape, the mask.
8           And at 5:44 the silence is broken and
9   the telephone activity resumes, and so do the
10  associations.  Azibo and Taylor, Azibo and Efrain
11  Johnson, three of the four people who Taylor told
12  you committed these crimes are connected by these
13  phone records, and the fourth conspirator didn't
14  have his own cell phone, he only had the victim's
15  cell phone.  And at 10:25 Tina Johnson's cell phone,
16  in the hands of Azikiwe Aquart, makes an outgoing
17  call to the defendant's phone, the same phone that
18  is in contact with the defendant's friend Efrain
19  Johnson, the defendant's friend John Taylor, the
20  defendant's girlfriend Lashika Johnson, the
21  defendant's mother -- the mother of the defendant's
22  child, Shante Pettway, and later Azikiwe, his
23  brother, the phone with his voice on the message.
24  It is his phone.
25          And later that morning that same phone,
```

4257

```
1   the defendant's phone, places three calls to a cell
2   phone with a 954 area code, consistent with the
3   testimony of Juanita Hopkins who said her phone's
4   area code began with a 9 and that the defendant
5   called her the morning of the murders to tell her to
6   hide any crack and give any money to Azikiwe, that's
7   at the apartment.
8           In one hour after Tina's phone places
9   the blocked -- attempted blocked call to the
10  defendant's phone, and the defendant is heard asking
11  "why are you calling me on this phone," Azikiwe
12  Aquart's newly activated cell calls the defendant's
13  phone at 11:26 a.m.
14          The defendant is in contact with the
15  Efrain Johnson phone only on August 24, 2005 and no
16  other day in August.  The same Efrain Johnson whose
17  DNA is found on a piece of latex glove in apartment
18  101 stuck to duct tape removed from Tina's bound
19  body.  The defendant is in contact with John Taylor
20  27 times in total on August 24, consistent with
21  Taylor being a co-conspirator involved in and
22  witnessing the murders.  The same person the
23  defendant wants to bond out after Taylor is
24  arrested.  And as of 11:25 a.m. that morning he is
25  in contact with Azikiwe, his brother, the fourth
```

4258

```
1   person involved, whose prints and DNA are also found
2   at the scene.
3           And Lashika Johnson tells you more about
4   the defendant on August 24, '05.  He comes to her
5   home after the murders with his co-conspirators.
6   They are loud, they wake her.  She hears four
7   voices.  When she finally walked into the room she
8   only sees three, Azikiwe, Azibo and her brother
9   Efrain.  The defendant and his brother are sitting
10  in their underwear and the defendant instructs her
11  to take two garbage bags and a drill and to throw
12  them into a dumpster blocks away from her building,
13  and then has her move her car so it appears he was
14  home all night.  He then has her get him clothes and
15  shoes to change into.  And she told you she did as
16  directed and asked no question.  Question:  "Why
17  didn't you question what he was having you do?"
18          Answer:  "Usually like you -- you just
19  don't ask questions.  You just do what you are told,
20  and I do."
21          She, too, listened to the boss.
22          And then you learned more about the
23  defendant and his co-conspirators and what they were
24  doing on August 24, '05, through the testimony of
25  Christine Roy, cross-examined for three days and the
```

4259

```
1   only error she was found to have made was a typo she
2   noted on one of her many reports.  The defendant's
3   DNA profile found on the cuff of a latex glove found
4   on the couch used to hold the door shut, in the same
5   room where Taylor said the defendant entered because
6   his glove tore and he removed it and put on new
7   gloves as Taylor held the bag.  The defendant could
8   not be excluded.
9           His DNA profile is there, according to
10  Roy, just as John Taylor said he was.  And Efrain
11  Johnson's DNA profile is found on a piece of latex
12  glove caught in the duct tape removed from Tina
13  Johnson's body.  And DNA on a stocking of Azikiwe
14  Aquart is included as a contributor.  And Tina's DNA
15  profile is found.  And James Reid's DNA profile is
16  found.  And Basil Williams DNA profile is found.
17  All found in apartment 101 where they belonged.  The
18  defendant, his brother, Taylor and Efrain Johnson
19  did not belong there.
20          And then you learn more about the
21  defendant on August 24th through the testimony of
22  John Pleckaitis.  Thirty years as a latent print
23  examiner.  He told you fingerprints are unique to
24  each individual.  And the duct tape seized from
25  apartment 101 located near Basil Williams' head,
```

4260

1    Exhibit 123, bears the fingerprint of the defendant,
2    and it is surrounded on both sides by a blue plastic
3    bag and a Walgreen's bag, both of which bear the
4    prints of his brother, his co-conspirator.
5            Two brothers connected to these murders
6    by a piece of duct tape and John Taylor and a
7    forensic scientist. Were the bags moved? Yes. You
8    know that from photos taken by crime scene
9    investigators. But movement does not explain the
10   prints. They were moved inches, not miles. They
11   were moved by crime scene investigators, not members
12   of the public. They were moved away, but in arm's
13   length of Basil Williams' fractured skull, not into
14   the defendant's hands. Movement does not cause a
15   print to be left; touching, handling, being present
16   does. It was not exposed to outsiders after 10:15
17   a.m., only intruders who had been present earlier.
18           That's what you know about the defendant
19   on August 24, '05. And he would want you to believe
20   that as far as he knew nothing had happened at
21   apartment 101 at 215 Charles Street. But he can't
22   distance himself from those he committed this crime
23   with. His prints and DNA are with their prints and
24   DNA at 101 Charles Street. His phone is in contact
25   with all of their phones. Look at the graph, if

4261

1    that -- the phone chart, the graph. If that
2    depicted seismic activity, you would know that an
3    earthquake struck on August 24, 2005.
4            And then he is arrested. His efforts to
5    conceal his involvement continue, but instead they
6    just serve to tie him to people he now wants to say
7    he hardly knew and to evidence he wants to distance
8    himself from. He tells Shante to move his stuff out
9    of Read Street, three gun boxes, police reports, a
10   Gun and Ammo magazine with his address and name,
11   extended clip, ammunition. And more prints are
12   found by Mr. Pleckaitis. The blue gun box had
13   Washington's prints on it, the man who bought the
14   gun for the defendant, but the owner's manual and
15   the instruction manual have the defendant's prints.
16           And the prison calls begin where you
17   hear him trying to have people help John Taylor make
18   bond. And the prison calls begin where he urges
19   Azikiwe to continue the crack operation; the same
20   brother who retrieves the defendant's firearms from
21   Lashika's house. He has moved, discarded, attempted
22   to hide all the evidence you now know about, but
23   there is more to do and more associations are
24   revealed. He writes a letter to Hodges' attorney;
25   Hodges, his crack seller. He writes a letter to

4262

1    Lashika to keep quiet and get rid of the letter
2    after she reads it; Lashika, his girlfriend who gets
3    rid of his clothes and the drill. He writes a
4    letter to Venro Fleming, intimidating Fleming;
5    Fleming, his seller, the victim of his assault. He
6    authors a letter, a script for a witness. He knows,
7    the witness, nothing.
8            These are the acts of a guilty man.
9    They demonstrate consciousness of guilt. A
10   desperate, controlling guilty mind urging phantom
11   witnesses to lie, to accuse law enforcement of
12   things they did not do. A desperate attempt to
13   establish a fictitious story with a detailed script
14   and instructions on how to tell it, how to sell it.
15   The problem being that Shamarr Myers tells you what
16   the evidence tells you, it is entirely baseless, it
17   is all made up. And the handwriting expert, John
18   Sardone, tells you the author of this concocted
19   story is the defendant.
20           The defense can point to memories that
21   faded over the last six years, but the refrain is
22   always the same. The defendant was the boss, the
23   defendant made the decisions, the defendant provided
24   the crack, the defendant collected the proceeds,
25   inflicted the punishment, hired the help, took

4263

1    advantage of the addicted, decided who and when
2    co-conspirators would be bonded out, how much they
3    would be paid and when, and who did what.
4            He cannot erase the tape recorded
5    conversations, he cannot make the DNA go away, he
6    cannot cause the fingerprints to magically
7    disappear, just as the government cannot make them
8    magically appear. His fingerprints are literally
9    and figuratively on everything; on gun manuals, gun
10   operating instructions, on duct tape inches from the
11   fractured skull of the viciously murdered skinny
12   man, Basil Williams. You have eyewitnesses,
13   physical evidence, you have DNA, fingerprints, his
14   writing, his prison calls.
15           It is not coincidence, it is not bad
16   luck, it is not ill-fortune, it is not speculation,
17   it is not conjecture. It is proof beyond a
18   reasonable doubt. The kind of evidence, consistent,
19   corroborated from multiple sources. The kind of
20   evidence you should demand of us, the kind of
21   evidence you now have, the kind of evidence you can
22   properly rely upon to make an important decision in
23   your lives.
24           The defense began this case telling you
25   that drug dealing is a dangerous business and that

4264

1    those engaged in such activity assumed the risk
2    inherent in that activity.  It is a dangerous
3    business, but no one assumes the risk that became a
4    reality for Tina, James and Basil.  And even if they
5    had, that changes nothing in regard to the
6    defendant's guilt beyond a reasonable doubt.  No one
7    deserved to die, not Tina, not James, not Basil, who
8    had nothing whatsoever to do with drug selling.  139
9    pounds, barely over five feet tall, now dead with a
10   crushed skull surrounded by the fingerprints and DNA
11   of the defendant and his brother.
12           On August 24, 2005, the defendant acted
13   in accordance with the laws of his enterprise.  He
14   did not need live testimony, corroboration, phone
15   records, DNA, fingerprints, physical evidence,
16   handwriting identification.  He had enough evidence
17   of Tina's wrongdoing.  He was prepared to render his
18   verdict.  And despite her minimal threat to his
19   prolific crack operation, he imposed his punishment
20   on her and her friends, James Reid and Basil
21   Williams.  You are held to a much higher standard.
22   The government is held to a much higher standard.
23   That standard is proof beyond a reasonable doubt.
24   It is the standard which the evidence in this case
25   has met.

4265

1           Ironically in the end the defendant
2    could not silence Tina.  We cannot hear her voice,
3    but she was able to speak volumes.  Despite three
4    days of intensive searching, crime scene
5    investigators found a charger, but no cell phone.
6    Taylor tells us why.  Azikiwe took it.  He offers it
7    to Taylor, but he refuses it.  So Azikiwe keeps it.
8    And within minutes of Tina being found murdered, her
9    phone is used to make an outgoing call.  It is the
10   last time that phone will ever be used.  And
11   although we do not hear her voice, her phone tells
12   us that the defendant is guilty because, like every
13   other piece of credible evidence in this case, it
14   leads to the defendant.
15           Your job sitting in judgment of another
16   person is never easy no matter how strong the proof.
17   But you did not take an oath to do the easy thing,
18   you took an oath to do justice.  If you view the
19   evidence in its entirety, if you take the law as
20   Judge Arterton has instructed you, if you utilize
21   your common sense, draw proper and reasonable
22   inferences, then you will conclude that the evidence
23   establishes that this defendant is guilty of each
24   and every charge in the indictment.  Thank you.
25           Thank you, your Honor.

4266

1           THE COURT:  All right, thank you.
2           Ladies and gentlemen.  We're going to
3    take a half-hour lunch at this time.  When you
4    return you will hear from defense counsel and the
5    rebuttal closing of the government.  Please leave
6    your material in the courtroom.
7           (Jury exited the courtroom.)
8           THE COURT:  All right, if there is
9    nothing further, we stand in recess for a half an
10   hour.
11           (Recess)
12           THE COURT:  All right, counsel, are we
13   ready for the jury?
14           MR. SMITH:  Yes, your Honor.
15           MS. DAYTON:  Sorry, we're missing a
16   prosecutor.
17           THE COURT:  All right, we're ready for
18   the jury.
19           (Jury entered the courtroom.)
20           THE COURT:  Please be seated, ladies and
21   gentlemen.  We'll proceed now to closing argument on
22   behalf of the defendant.
23           Mr. Smith.
24           MR. SMITH:  Thank you, your Honor.
25           Good afternoon, ladies and gentlemen.  I

4267

1    would like to thank you on behalf of Mr. Aquart, Mr.
2    Sheehan and myself.  We realize and appreciate the
3    sacrifice that you have made throughout these many
4    weeks.  Our system of justice, as you have seen,
5    sometimes clumsy, goes in fits and starts, but the
6    jury system is the hallmark of the American system
7    of justice, and we have entrusted this most
8    important of all tasks, the highest office in the
9    land, as the Judge told you at the beginning of this
10   process, to you.
11           If I or Mr. Sheehan have done anything
12   to upset you or to annoy you in any way throughout
13   the course of this trial, for that we apologize and
14   simply ask that you do not hold that against Mr.
15   Aquart.
16           I'd also like to remind you that my
17   remarks, the government's remarks, these are not
18   evidence.  And I'd ask you to rely simply on your
19   own memories of what the evidence is if I misstate
20   something or if you believe that it's different than
21   what anyone states.
22           As we know, the government has the
23   burden of proving the charges to you beyond a
24   reasonable doubt.  They have the burden of proving
25   the existence of a drug conspiracy and a conspiracy

4268

1  to commit murder.  As for the drug conspiracy, you
2  might well find that the government has in fact met
3  that burden.  In the time afforded to me, I'd like
4  to discuss with you the murders and the conspiracy
5  to commit the murders.
6          And with respect to those murders, I
7  submit that based on all of the evidence the
8  government has failed to prove Mr. Aquart guilty
9  beyond a reasonable doubt, and you, therefore, must
10  acquit him of those charges.
11          When I first spoke to you a few weeks ago
12  I told you that chronology was important.  The
13  police developed a suspect and then they developed
14  the evidence.  The police knew there was a drug
15  operation at 215 Charles Street, specifically in
16  apartment 211.  They'd been there three times in the
17  past year in raids.  The investigators also learned
18  that Ms. Johnson was selling drugs from apartment
19  101.  And when the investigators came to believe
20  that Mr. Aquart was the one who controlled apartment
21  211, they had a suspect.
22          Now, the government spent a great deal
23  of time talking to you about the motive, limitation
24  of competition, but think about the other testimony
25  that we've heard.  There were other apartments

4269

1  selling drugs at 215 Charles Street.  And we'll talk
2  a little more about that as we go along.  But
3  really, if your job is to protect and maintain a
4  drug operation, does it make sense for someone to
5  commit murders in that building where all of the
6  attention of the police and the prosecutors is going
7  to be from that moment forward?  You, in essence,
8  would be shutting down your own operation.
9          So, let's turn to the physical evidence
10  that the government has talked about.  First, the
11  fingerprint.  A single fingerprint from Mr. Aquart
12  was found on a piece of duct tape attached to a bag
13  inside apartment 101.  What we know is a bag like
14  that is an easily movable object.  We also learned
15  that there was traffic between apartments 211 and
16  apartment 101.  Ms. Johnson and Mr. Reid were
17  customers of 211 in the summer before the murders
18  occurred.  Jacqueline Bryant was back and forth
19  between the two apartments.  Ms. Hopkins and Mr.
20  Hodges told you they went back and forth between the
21  two apartments.  Maybe others, customers, we don't
22  know.  But we do know there was that traffic.  And
23  the only thing you know from that fingerprint is
24  that it was deposited on a piece of duct tape under
25  a fold, meaning it was deposited on the duct tape

4270

1  prior to the fold occurring.
2          The limitations of fingerprint
3  technology and examination do not tell us when that
4  fingerprint was deposited on the duct tape.  The
5  limitations of fingerprint examination do not tell
6  us where that duct tape was when the fingerprint was
7  deposited.  But, again, it's under the fold of the
8  tape.  And at some point we know a piece of duct
9  tape comes to be attached to a bag.
10          But what you don't know as well from the
11  physical evidence, really from any other testimony,
12  is when or where that piece of duct tape came to be
13  on that bag.
14          And while we're on the topic of this
15  bag, what bag are we talking about exactly?  We have
16  these crime scene photos in evidence, Defense
17  Exhibit F.  Mr. Williams, photo of his head from
18  afar, there is no bag there.  Let's look at Defense
19  G.  Now the pillow is removed, there is no bag
20  there.  Government's Exhibit 120-1, maybe here on
21  the edge of the picture there is a bag.  And
22  Government 120-2, there is a bag by his head.  Where
23  does this come from?  And now Government 120-3,
24  there is a bag, it's laying in the blood, the handle
25  is clearly visible, there is no tape on it.  Let's

4271

1  look at comparison, Defendants G, 120-3.  On the
2  left, bag lying in blood, on the right, no bag.
3          Why does it matter about this bag?  The
4  journey of this bag tells us how the evidence was
5  treated.  You can follow it through the pictures, at
6  least through the pictures supplemented by the
7  defense, to those provided by the government.  And
8  this raises doubts as to how the crime scene was
9  processed and the evidence was collected, especially
10  when you see photo that were not offered by the
11  government.
12          Defendant's RRRRR, photo of the scene,
13  early on perhaps, we don't know.  And Defendant's
14  SSSSS, soda bottles, coffee cups, things at the
15  scene from the detective's own testimony should not
16  be there.  You don't bring things inside the crime
17  scene.  Did they drink the soda and coffee with
18  their masks on?  We don't know.
19          Let's also talk about a lack of physical
20  evidence.  You've heard the description of Azibo
21  Aquart and Azikiwe Aquart.  You've heard the
22  description of Azikiwe Aquart from the officers from
23  North Carolina who testified to the traffic stop.
24  And yet in this scene where are the hairs from
25  either Azibo or Azikiwe Aquart?  It's an apartment,

4272

1    scene, things are strewn about, there are no hairs.
2              Let's turn to other physical evidence,
3    the DNA.  DNA is a marvel of modern science, but
4    it's so small it takes complicated machines and
5    processes to even see it.  You don't even see it,
6    you see a representations of it in a graph, an
7    electropherogram.  But that's not the end.  Once
8    that's seen in that form, it has to be interpreted.
9    Now with a single source sample, meaning one person
10   contributed to that, that might not be that
11   difficult, but when it comes to mixtures, things do
12   begin to get complicated.
13             And when the government presented the
14   DNA evidence to you they gave you a very simple
15   story, what were Ms. Roy's conclusions.  We,
16   throughout our questioning, presented to you how did
17   she reach those conclusions.  We know that took a
18   long time, days, and we apologize for the time that
19   that took, and we appreciate your patience and
20   diligence throughout that part of the trial.  But if
21   you did not understand the process and the science,
22   or in some cases maybe the lack of science,
23   underlying those results, you would be unable to
24   make an informed decision as to whether you can
25   actually rely on the end result.

4273

1              Let's talk a little bit about something
2    that might have initially seemed quite plain.  9-Z2
3    was a piece of latex found in duct tape on
4    Ms. Johnson.  Ms. Roy told you that Efrain Johnson
5    is a contributor, and the odds of him being a
6    contributor -- or anyone having that profile is one
7    in seven billion.  And the reason she came to that
8    conclusion is because his profile matched at every
9    site, ever locus that we talked about almost.
10             We look at Defense Exhibit NN, it
11   matched at every site except D19; there is a 12
12   there.  It's an extra genetic marker.  And the lab
13   has to say, well, that's consistent with being a
14   mixture.  They didn't call any other sample that.
15   They were all mixtures or single source samples.
16   But this one is consistent with being a mixture.
17   So, they can't say it's a mixture because there is
18   only one or two genetic markers at each location
19   unless you know from the start what you are looking
20   for, and that brings up the issue of observer bias.
21   But we'll come back to that in a moment.
22             But what does this mean?  What does this
23   sample mean?  It means if this is from one person,
24   this really is a single source sample.  It's not
25   Efrain Johnson because there is a marker there that

4274

1    he doesn't have.  And if it's two people, it's so
2    closely matched at every single site except this
3    one, virtually an identical twin.  And if this
4    really isn't a genetic marker at all, maybe it's
5    some just artifact of the machine.  We don't know.
6    And if this genetic marker, or what appears to be a
7    genetic marker, can pop up in this sample, it can
8    happen anywhere in any of the samples.
9              So, let's turn our attention to 13-Z1.
10   It's a fragment of latex type material.  The
11   government told you it was found on a couch in the
12   living room.  You'll recall, ladies and gentlemen,
13   it was found under the cushion.  We know it's not
14   the same gloves that were found in the bedrooms;
15   different materials, at least seemingly, vinyl
16   versus latex of some kind.  Is that really in your
17   common sense someplace a piece of latex could just
18   fall, under the cushion?  And in your common sense
19   is it -- someone would simply jam something like
20   that in that in an attempt to dispose of evidence?
21             Now, the government might argue that this
22   latex looks similar to the latex found in the duct
23   tape, the fragments that were recovered from the
24   bodies, but the fact is you don't know that.  There
25   was no testing done to see if the fragments in the

4275

1    latex and the fragment found under the cushion in
2    the living room is the same chemical composition.
3              They also found a bag of latex gloves
4    under the bed in one of the bedrooms.  We don't know
5    why that's there.  There is no DNA on it, there is
6    no fingerprints on it from Mr. Aquart, or Azikiwe
7    Aquart, on either of those gloves or bags.  Maybe
8    they were part of Ms. Johnson drug operation.  We
9    know she was dealing.  Maybe she was cooking there,
10   too, cooking the crack.  We just don't know.
11             And again, Mr. Reid's complete profile
12   was included on 13-Z1, so he's included as a
13   contributor, but not Mr. Aquart's, his genetic
14   markers do not match at three occasions.
15             We also know that there are genetic
16   markers in that evidentiary sample found under the
17   cushion of that couch that do not match either Mr.
18   Reid or Mr. Aquart.  And whoever contributed those
19   genetic markers could have contributed the genetic
20   markers that the lab attributed to Mr. Aquart.
21             Let's look at another piece of evidence,
22   14-1-Z1.  You'll remember these are the two gloves,
23   one found inside one another in the bedroom where
24   Ms. Johnson and Mr. Reid were found.  First, where
25   exactly is this found?  Detective Devan admitted in

4276

1  her notes that -- her notes say it's under the bed
2  by the wall.  The photo shows the gloves are clearly
3  outside from under the bed.  Were the gloves moved
4  for ease of taking the photo?  We don't know that.
5  Detective Vargas told us sometimes we move stuff
6  around to take photo, but no one could tell us if
7  that's what the case is here.
8          And again, is this someplace, under a
9  bed, that you would expect someone to dispose of
10  something related to a crime scene?  And if this
11  glove is related to the crime itself, why is there
12  no blood on these gloves?  We've all seen the photo
13  of that scene.  Not a drop of blood is on these
14  gloves.  And, again, these gloves are completely
15  different material than the latex fragments that are
16  found in the duct tape.  And in some locations on
17  this profile, 14-1 Z1, there are seven or eight
18  genetic markers.
19          Let's take a look at Defendant's ZZZ, at
20  D21 and FGA.  D21, one, two, three, four, five, six,
21  seven -- eight genetic markers.  At FGA one, two,
22  three, four, five, six -- seven genetic markers.
23  And you heard about the possible combinations of
24  persons who could contribute those genetic markers
25  when the number of genetic markers begin to

4277

1  increase.  Five genetic markers, 15 combinations.
2  Six genetic markers, 21 possible combinations of
3  people.  Seven genetic markers, 36 possible
4  combinations of people who could have contributed to
5  those samples.
6          We know that there are unknown persons
7  contributing these genetic markers.  And what is it
8  to say that those unknown persons contributing those
9  genetic markers were not contributing the same
10  genetic markers attributed to either Azibo or
11  Azikiwe Aquart?  And in addition to the number of
12  people who might have been contributing those
13  genetic markers, what about the types of genetic
14  markers that were being contributed?  We heard about
15  regular genetic markers, sometimes called alleles,
16  and then we heard about the prime alleles.  Same
17  length, different sequence.  These genetic markers
18  by length were attributed to Azibo and Azikiwe.  So
19  we know if under the testing done at the lab we see
20  a 17 genetic marker, we know its length, but we
21  don't know the sequence.
22          Let's look at Defendants LL-1.  17, 17
23  prime; same length, different sequence.  Defendant's
24  LL-2, same here, 15, 15 prime; same length,
25  different sequence.  LL-3, 35, 35 prime; same

4278

1  length, different sequence.  And LL-4, 29, 29 prime;
2  same length, different sequence, meaning different
3  genetic markers.  But for the lab's purposes they
4  are assumed to be the same.
5          Is this what you'd expect of science,
6  forensic science?  This case is about proof, not
7  assumptions.  The government did not talk about
8  this, but we did with Ms. Roy.  Other samples.
9  8-Z3, duct tape which was taken from Ms. Johnson's
10  ankle.  DNA is there, it's not from Ms. Johnson or
11  any other known tested individual.  In the duct
12  tape, 10-Z1, duct tape from Mr. Reid's head, again
13  DNA is there, we don't know whose it is.  It's not
14  from any of the known suspects or profiles that were
15  submitted.  12-Z1, the duct tape from Mr. Reid's
16  angles.  Again the same thing, DNA, we don't know
17  whose it is.  And 32-Z1, DNA from Ms. Johnson's
18  fingernails, DNA there, we don't know whose it is.
19          Yes, the DNA is complicated and it took
20  a while to tell you the whole story, and again we
21  appreciate your patience with that, but you do need
22  these facts to come to a fair decision in this case.
23          And that of course brings us to the
24  issue of contamination.  It's not something that's
25  possible, it's not something we're asking you to

4279

1  speculate about, it happened in this case.  I think
2  the government said something that Ms. Roy
3  discovered the contamination.  She did not.  If
4  you'll recall the testimony, the CODIS administrator
5  found that out.  Ms. Roy had no idea until she was
6  told there is contamination here, and then she went
7  back and looked at it.  And remember these swabs get
8  consumed in testing.  That's why this has to be
9  gotten right the first time.  There was one item of
10  evidence where the staff member matched at every
11  location, and because of that, the lab concluded
12  that the previous conclusions about that sample were
13  now inconclusive.  And that's the proper the
14  scientific approach.  And they found the
15  contamination because they had access to the staff
16  member's profile, and that's a good thing.
17          But what they did not have access to was
18  the profiles of others who could have also
19  potentially contributed DNA to these samples.  The
20  police officer who processed the scene; the EMTs who
21  entered the scene and did chest compressions on
22  Ms. Johnson; Mr. Whittingham who held his mother
23  when he found her; the woman who entered the
24  apartment with Mr. Whittingham, or anyone else who
25  might have entered the scene when Mr. Whittingham

4280

```
1    was away from the scene on the 911 call.
2          We know that the ability to detect DNA
3    is so sensitive that even speaking can deposit DNA
4    on an item, especially when we're talking about the
5    very low quantities they were testing in the samples
6    in this case.
7          But aside from the other possible
8    contamination outside the lab, we have the issue of
9    whether other samples were contaminated in the lab.
10   And a perfect example of this is the observer bias.
11   When Ms. Roy compared Mr. Aquart's profile to
12   evidentiary samples she found that although Mr.
13   Aquart's genetic markers did not appear at certain
14   sites, she concluded, well, there could be drop out
15   here, meaning the genetic markers are there, we just
16   don't see them, the machine didn't see them this
17   time, and therefore, she concluded Mr. Aquart could
18   not be excluded.  But when the staff member's
19   genetic markers were also missing, well, there can't
20   be drop out here, she's excluded.
21         Let's look at Defendant's HHHHH.  These
22   were all sites where minor peaks occurred and the
23   suspects were not excluded, meaning while I saw a
24   minor peak there might be a drop out here, I can't
25   exclude the suspect.  The staff person was not
```

4281

```
1    subjected to the same treatment.  Ms. Roy says,
2    well, we don't do it that way.  The point is she
3    should.  It should be evenhanded.  This was the only
4    way to avoid the observer bias.
5          We're not asking you to conclude that
6    Ms. Roy manipulated data or consciously forced
7    anyone to fit or not fit inside of a profile.  But
8    observer bias, the problem that an interpretation is
9    driven by or colored by knowing who you are
10   comparing the samples to; it exists.  She had
11   evidence in the form of an evidence report with the
12   suspect's name on it, Azibo Aquart.  And Rodney
13   Womble, we don't know what happened with Womble, but
14   we know by the time the testing began he was
15   cooperating and his DNA profile was never provided
16   to the lab.
17         She knew that the staff person was not a
18   suspect.  Is this why the different treatment?  We
19   don't know.  And Marie Warner, the tech who
20   collected the evidence, did the swabbings, said
21   something interesting.  She said, "Do you know,
22   contamination is not necessarily a terrible thing."
23   I suppose there could be worse things at the lab, I
24   suppose it could burn down and all of the evidence
25   would be lost, but it's definitely not a good thing
```

4282

```
1    because it casts doubt on the reliability of this
2    evidence, and if contamination is in the sample
3    where they found it, isn't it just as possible that
4    it could have occurred elsewhere and they just
5    didn't see it.
6          Finally as to the DNA, we talked with
7    Ms. Roy about the statistics.  The lab did a sample
8    in 1999 of less than 200 people in each population
9    group, African-American, Caucasian and Hispanic.
10   These people volunteered to give a DNA profile, and
11   they self-identified the race.  They tested the
12   profiles, and for that they extrapolate from each of
13   these less, less than 200 people, one in seven
14   billion.  And what the government does not bring out
15   is the uncertainty associated with that statistical
16   model.  An uncertainty by a factor of ten; not ten
17   percent, but ten times.  So, even if things are done
18   right, a finding that Mr. Aquart could not be
19   excluded, and the odds of that are one in 140, it
20   could be as little as one in 14.
21         So, when you consider the entire picture
22   regarding DNA, the statistical uncertainty, the
23   missing genetic markers, the unknown sequence of
24   those genetic markers, the contamination, and the
25   problem of observer bias, it doesn't add up to much,
```

4283

```
1    and it's nowhere close to being sufficient proof
2    upon which you can base a conviction.
3          So, let's turn to the records the
4    government says prove certain things.  Yes, Azibo
5    Aquart owned cars.  Yes, Azibo Aquart had a bank
6    account.  Yes, Azibo Aquart went south with John
7    Taylor.  Yes, there were telephones involved in a
8    drug operation.  What these records do not prove in
9    any way, shape or form is who committed the murders,
10   or even when the murders were committed.
11         The government has selectively pulled
12   out phone calls from these records, specifically the
13   one phone they attribute to Mr. Aquart, but you
14   should look at those records carefully and not rely
15   just on those summary chart.  There are other calls
16   in those records.  There are calls to information,
17   411, calls to 800 numbers.  We don't know what
18   numbers these are.  We don't know why these are
19   being called, there is no record of that.
20         And you should ask how those records
21   match with the testimony of the witnesses.  Lashika
22   Johnson says I'm asleep after I get back from the
23   club and the next thing I know Azibo is in the
24   apartment.  But she's on the phone supposedly
25   calling him at 4:17 a.m.  Taylor told you, well, the
```

4284

story about Azikiwe losing his phone at a rest stop
down south, and then he testifies that on the night
that he came up to Bridgeport he had to call Azikiwe
to get directions. You have to ask yourself if
these records truly match the other evidence in this
case.

And the government points to a gap where
all the phones are apparently not calling or being
called, the phones that they have chosen, and they
say, well, this is clearly the time of the murders.
Well, there is a gap in Taylor's records from 1:53
a.m. to 3:04 a.m. There is a gap in Efrain
Johnson's records from 12:38 a.m. to 1:50 a.m.
There is a gap in the phone attributed to Mr. Aquart
from 2:21 a.m. to 3:04 a.m. But these gaps don't
line up, so the government ignores them and asks you
to ignore them, too, they're just gaps in phone
records.

And as far as the time the murders
occurred, there is no evidence whatsoever of that.
None of the medical examiners could determine a time
of death, let alone an instrument. Remember they
said consistent with a bat, and in response to my
questions consistent with a dozen other things,
table legs, tire irons, pipes.

4285

And recall the photos of the victims.
They were all dressed. And Mr. Reid and Mr.
Williams were found with their shoes on. And Jackie
Bryant testified that Ms. Johnson stopped selling at
midnight, she closed up shop. So, they're fully
dressed, including shoes, at five in the morning?

The government tries to squeeze these
records for information that is not there. And they
are trying to prove to you that this phone,
543-4209, was Ms. Johnson's phone and it was taken
from the apartment by Azikiwe Aquart to call Azibo.
Again, again Taylor's story about the phone down
south. But furthermore, we cannot even be sure this
was Ms. Johnson's phone in the first place. The
phone has never been recovered, certainly not from
Azibo or Azikiwe Aquart. And yet the phone that
called 911 on the morning of the murders does appear
on the phone records of the phone that the
government attributes to Ms. Johnson. But
Mr. Whittingham testified he had a cell phone for
months and his mother had a cell phone for months
and he called her all the time, but that number is
nowhere else on those records. And Ms. Whittingham
testified that LeRoy didn't even have a cell phone
at the time. That doesn't match up. What is going

4286

on?

And why is Rodney Womble, who by his own
testimony has been fighting with Ms. Johnson, his
number is appearing in those phone records? He
never told you he called Ms. Johnson. He told you
he threatened her in the hallway in person. Even
assuming we know -- or even assuming, if you were to
credit the testimony of Ms. Whittingham, as she
recalled her mother's phone number and her own, the
last phone number -- the last phone call from that
number is on August 21st, 2005. And we simply do
not know if Ms. Johnson was in possession of this
phone on the night of the murders.

And remember what else we know about the
amount of the time the apartment was unattended
between the time of the discovery of the bodies and
arrival of emergency personnel. Mr. Whittingham
entered the apartment through the window. He was
completely distraught. That is understandable, he
had just found his mother. He did not recall when
he testified here that he went out through the front
door and then re-entered the front door and then
exited the apartment through the window. But he did
recall that when he talked to the grand jury just a
few months after the murders, and that testimony is

4287

in evidence.

And we also know that after he left the
apartment he did make a call to 911, a call that
lasted for over seven minutes. Seven minutes that
that apartment is unattended, unsecured. Seven
minutes that people in the building knew there were
drugs that had been sold out of that apartment. We
don't know if someone else went in there, took
something, touched some things. We just don't know,
but it is possible.

So we've discussed how the physical
evidence has failed to rise to the level of proof
beyond a reasonable doubt and that the records
similarly fail to rise to the level of proof beyond
a reasonable doubt.

So, what we're left with are the
cooperating witnesses, either those who were charged
or those who were not charged but could have been.
And what we saw for many of these people is that
they were in various stages of recovery from drugs
and alcohol. Perhaps that's commendable. But the
people who testified here, though they may now be in
a better place, are still the same people who are in
and around Charles Street in 2005. Still exists the
same pressures to cooperate, to testify. Same fear

4288

1  of prosecution and the same serious issues regarding
2  the reliability of their memories.
3          Ms. Bryant, Jacqueline Bryant, we heard
4  from her.  She used to sell drugs from apartment
5  211.  By her own account certainly no friend of Mr.
6  Aquart's, but she was friends with Ms. Johnson in
7  apartment 101.  She sold crack with her.  She was
8  high much of the time.  And Ms. Bryant was
9  interviewed by the police just three days after the
10 murders, August 27, 2005.  And of course she wanted
11 to help the police, she wanted to help them find the
12 person who killed her friend.  So she went in, she
13 gave the police a statement.  She read the
14 statement, she signed the statement.  She told them
15 what she saw a couple nights before the murders.
16 She saw men in black in the hallway outside of
17 Ms. Johnson's apartment.  Then she went up to
18 apartment 211, she smoked some crack, she left the
19 apartment building.
20         What she did not say in that interview
21 is that D, Dreddy, Mr. Aquart, came to the door at
22 apartment 101.  That's a detail, a story that's
23 added later.  She also did not say she saw Frank
24 Hodges knocking on the door of apartment 101.  And,
25 in fact, if you look at Defendant's Exhibit K, she

4289

1  was specifically asked that question.  "When you
2  left the apartment, did you see anything else when
3  you left the building?"
4          "No, I just walked out the front."
5          So seeing Frank Hodges is new.  Three
6  days after she doesn't say that.  And then in her
7  testimony she adds yet another story.  Azikiwe
8  Aquart was trying to bribe her with money and crack
9  to smoke.  By her testimony this occurred a few
10 weeks after the murders, but long before her grand
11 jury testimony in November.  Again, she went to the
12 grand jury, she was asked all kinds of questions
13 about the drug operation, about selling from 211,
14 about the alleged assault by Mr. Aquart, about the
15 night she saw the men in black in the building,
16 about arguments between Womble and Ms. Johnson, and
17 not once in all of that grand jury testimony did she
18 say that Azikiwe Aquart had tried to bribe her.
19         So, maybe Ms. Bryant did see three men
20 in black in the hallway in 215 Charles Street one
21 night, but you simply cannot credit the other
22 testimony because it would be natural to tell
23 everything you knew as early on as you could to help
24 the police.
25         We also heard from Juanita Hopkins.

4290

1  She's an extremely heavy user of crack cocaine at
2  the time.  She would stay up for days.  She had to
3  drink cheap liquor just to fall asleep.  And then a
4  few weeks after the murders, she gets arrested.
5  She's never been in jail before, it's serious, she's
6  being told she's going to spend a lot of time in
7  prison, and she is scared.  The agents ask her about
8  Mr. Aquart, about the drug operation, about the
9  murders.  She agrees to cooperate.  She gets a
10 lawyer, she signs a proffer agreement and later a
11 cooperation agreement.  And in both of those she
12 agrees to tell the truth and to not commit new
13 crimes.
14         She immediately breaks the deal, she
15 commits new crimes.  She steals from her treatment
16 program; she gets discharged from the treatment
17 program.  She doesn't tell her lawyer, she doesn't
18 tell the government, the probation officer.  She
19 doesn't even tell the judge.  She lies to them all
20 by just saying I'm supposed to be in treatment, I'm
21 not there.  Then she possesses new drugs.  That's a
22 crime.  The deal is not off yet.  And she possesses
23 drugs less than 24 hours after she signs the
24 cooperation agreement.  "I agree not to commit any
25 new crimes," 24 hours later, she's at a treatment

4291

1  program with a positive urine for cocaine.  None of
2  that matters, the deal is not off.
3          She told you a story about seeing
4  Azikiwe at the apartment the morning of the
5  homicides.  The first time she tells the agents
6  about this, he is standing at the door to 211 when
7  she opens the door.  Later she's told to go down the
8  hallway to Judy's apartment to see him.  And then
9  when she testifies here she's back to his standing
10 at the door.  All of this she claims to have
11 observed on the morning after smoking crack,
12 drinking Bukoff, going out to buy more crack to cook
13 and to smoke.  And, really, how reliable is
14 someone's ability to perceive in that condition?
15 And would you rely on her ability to perceive and
16 remember events from that time, things that are of
17 the utmost importance to you?  Would you rely on
18 them?
19         But we did learn something from Ms.
20 Hopkins, something about the drug world, just how
21 common robberies are.  She was ordered by Womble to
22 rob Velma, which she did along with Mr. Hodges, and
23 she told the agents they were able to confirm that
24 Velma was selling for Ms. Johnson.  She told you
25 about Womble robbing the customers coming out of

4292

101. She really shed some light just how common robberies are in the drug world, as did Venro Fleming when he told you about the time four or five men busted into the apartment at 211 and holding .45 caliber handguns and robbed him. It is common.

This building was wide open. Anyone could get in any time, day or not.

Frank Hodges, here is a man who had opportunities. He was college educated, had special training in computers, came from a good family. He decided to sell drugs. He continued to do that for years. Convictions for dealing. He gets arrested at the raids, he just goes right back to dealing. But he made the decision to take care of himself after the last raid at 211; he offered to snitch. He told you that the officer he offered to snitch for was going to let him continue selling drugs from 211 unabated. Officer Rosado told you I would never say that to anyone.

So, then later that year the murders occur and the cops come to see Mr. Hodges and they're very interested in Mr. Aquart, they ask him about the drug operation, they ask him about men in black in the building. They ask him about the murders and if Mr. Aquart is involved. So he's

4293

sitting there in the police station and he wants to get out of there quick. So, he starts talking, and he talks about drugs being sold from 211. He tells them about a story of men in black and Mr. Aquart asking him to knock on the apartment of the door 101. And he tells them about a story about Mr. Aquart hitting him in the head with a gun.

Then the police let him go. He thinks, got out of that mess. But he didn't, he's arrested a few weeks later, this time by the federal agents. He knows this is serious because he's been dealing for a long time. Fed time is serious. He's a career offender; he's looking at life. And he's reminded of that by the agents.

So, he hasn't talked himself out of the mess, he's talked himself into the mess. He can't take back what he said before, so he begins telling them stories. And he can't remember everything he told them or when he told it to them. He told you saw men in black in the building that night in the second floor laundry room. Second floor laundry room. He told Agent Syrax he saw the men in the first floor laundry room. He told you what the men were wearing, but before he had signed a written statement describing the men in black, and that

4294

statement didn't say anything about rubber gloves or bandanas.

And Mr. Hodges said something very interesting in response to my questions. He said, "After a period of time of reflecting on it, I got the story straight."

I said, "You got the story straight?"

He said "Right."

Because that's what each of these people had to do. Each of the people who cooperated with the government had to get the story straight because from their perspective it is the government who decides what is true and what is not. If they say something and the government says that's not true, well, then it's not true. And if they insist on continuing to say it, they're going to have problems. So they have to say something until the government says, okay, you've got the story straight.

That brings us to Mr. Womble. Rodney Womble came in here like all of the witnesses. He raised his hand, he swore to tell the truth; looked you in the eye and swore to tell the truth. But we now know to Mr. Womble swearing to tell the truth means absolutely nothing. He swore to tell the

4295

truth when he signed a statement taken by the Bridgeport police regarding the Shawn Newsome shooting. That's Exhibit N, page 4 at the bottom, "subscribed to and sworn before me." He signed that. And he swore to tell the truth when he testified in the Shawn Newsome case, Exhibit N, at the top, "having been duly sworn."

And then he told completely opposite stories. Exhibit N: "Shawn pulled out the gun and shot Lorenzo."

At trial: "I don't think Shawn was there at the time they was fighting him."

Another example, further in the statement of the police: "Rodney, I'm going to show you a photo array consisting of six black males. Do you recognize any of them."

"Yes, No. 2."

"Who is No. 2?"

"Shawn Newsome, the one who shot Lorenzo last night."

"Are you positive?"

"Yes."

"Was Shawn wearing a hoodie that night?" At trial.

"I didn't see him that night."

4296

1    When I questioned Mr. Womble about this,
2  he told you, well, I may have told the cops about
3  that, I don't remember what I said at trial, luckily
4  we have what he said at trial. You have it in
5  evidence.
6    And you have to evaluate Mr. Womble's
7  testimony in light of what we know about his very
8  clear willingness to lie after swearing to tell the
9  truth. And the problem for you is you don't know
10  which is the lie and which is the truth.
11    And knowing all of that, you now have a
12  context for Mr. Womble sitting in a kitchen in
13  Bridgeport in 2005 when the police come through the
14  door. He's got a pocket full of crack, he's on
15  parole, he's got a record. In fact, he's a career
16  offender. He's got big problems. So, the first
17  thing he does, he lies. "I found that crack on the
18  floor and I just stuck it in my pocket."
19    But that lie doesn't work and they
20  trundled him off to the state police barracks. And
21  he's into an even deeper hole because when he
22  arrives, the FBI is there. And now they're talking
23  federal time, maybe life, and the agents are asking
24  about Mr. Aquart. Womble knows he sold drugs at
25  211. The agents are asking about guns and murders.

4297

1  And Womble knows he's been seen arguing with Tina
2  Johnson, threatening her with a table leg. So, he's
3  got to start talking, and fast. And he does, he
4  tells them stories. Tells them he's working for Mr.
5  Aquart, but he starts to distance himself, whoa,
6  whoa, I wasn't really part of that at the end. They
7  had a falling out, he says. At first it was over
8  Mr. Womble losing some crack. Later he changes
9  that, well, no, it's really I lost a gun. At some
10  point the agents say, whoa, two stories, what's
11  going on here? Oh, it's both, I was taking his
12  crack and I lost his gun. And then he came here in
13  front of you and now, well, it was just really the
14  gun again. A gun he conveniently attributed to Mr.
15  Aquart. A gun he tells you he went home and got
16  after a confrontation at a nightclub. A
17  confrontation, he leaves, he doesn't have to come
18  back, but he does. He comes back with a gun and he
19  threatens to shoot a man in the club. A gun which
20  then he conveniently claims to have thrown out of
21  the car window. A gun that's never found.
22    And then there is a story about a
23  baseball bat. One day he tells the agents his
24  story. Not in his first interview or his second
25  interview or his third interview or his fourth

4298

1  interview. But then there is a story about a bat.
2  A bat that he has no proof that he ever purchased.
3  No one went with him, he doesn't have a receipt.
4  And one day it mysteriously disappears from his
5  apartment. "I don't know where it went."
6    And when I pressed Mr. Womble on all of
7  these stories and differences and the different
8  tales that he told, he, too, said something very
9  interesting. He said, "I wasn't really on board
10  with what he was doing in the beginning." But
11  eventually he got on board. He, too, like Mr.
12  Hodges, got the story straight.
13    For Mr. Womble, his job is really only
14  to take care of himself, whatever the consequences.
15  And the consequences of what Mr. Womble says don't
16  matter to him. Because the prosecutor asked Mr.
17  Womble, "Did Shawn Newsome get convicted?" He said,
18  "Yep." It doesn't matter whether Mr. Womble lies or
19  not as long as the conviction gets had. That's
20  what's important. And for Mr. Womble to take care
21  of himself, he has got to get on board. And again,
22  it's the government who determines whether Mr.
23  Womble gets on board, or has gotten on board. And
24  he tells you, well, I lied a lot in the beginning,
25  but I'm telling you the truth now. That's not for

4299

1  him to determine, it's not for the government to
2  determine, it's you who determines that. Each of
3  you individually as a juror must come to your own
4  assessment about the credibility of each of these
5  witnesses. And really, can you really believe the
6  word of an acknowledged liar like Mr. Womble?
7    Ms. Randolph, she loved Rodney Womble,
8  but then he's in jail after he gets arrested. She
9  wants to help him get out. That means protecting
10  him, if she can. They're talking on the phone every
11  single day, sometimes multiple times a day, and she
12  knows he's telling her that he's cooperating. But
13  they also talk about what needs to be done, and that
14  means throwing away some evidence before the cops
15  end up there at the apartment. So she puts
16  something in a bag, she throws it over a fence. And
17  then eventually the police do come to her apartment
18  in October of 2005. They search that apartment.
19  There is no baseball bat, of course. There is no
20  Mac-10.
21    And Ms. Randolph, well, then she gets
22  arrested. She knows they're talking to Mr. Womble,
23  now they want to talk to her. And they do talk to
24  her. None of these interviews are recorded. Much
25  like any of these witnesses, there is no recorded

4300

interviews. We don't know what was actually said or asked. But the subject of Womble throwing away a gun does come up and she dutifully confirms that story, oh, yeah, he threw away the gun. And the subject of bagging at Hallet Street comes up and she confirms, yeah, we did that, too. And the subject whether Womble was at the apartment that night, that comes up, oh, yeah, he was here, we were trying to get high. And she tells them all of this after having talked to Womble on the phone every day.

So, after confirming all of Womble's stories, she gets out on bond, and she immediately breaks the conditions of her bond, she continues to talk to Womble. She knew she wasn't supposed to have any contact with co-defendants, but she did. She uses drugs; that's a new crime. Fails to complete her programs. Her deal is still in place, she's out. She told you, I don't expect to go back to prison.

This brings us to Mr. Washington. Mr. Washington, certainly a character. He's arrested one night in March 2006 in Bridgeport walking down the street soaking wet, his car is smashed up in the river. You might recall, quite a tale. But he's also got over twenty firearms in his name. So, he's

4301

got some explaining to do. And he explains, yeah, I bought a lot of guns for other people, and then the ATF shows up. Now, this is bad for him because these are the guys who investigate gun crimes, including false purchase of firearms. So, he has to help himself out. He knows at this point that Mr. Aquart has been arrested. He knows Mr. Aquart -- that there was a drug operation at Charles Street. He knows there were murders at Charles Street.

He tells them I worked for Mr. Aquart as a lookout. I didn't work there very long. And he's asked about this employment again and again and again. He gives a signed statement, 18 pages, after his arrest. He writes out a statement at their request in his own handwriting, signs that, three pages long. He signs two affidavits for the agents from the ATF. He goes through four interviews with the FBI, July 11, 2006, November 6, 2007, August 25, 2009, April 22, 2010, and before all those interviews he had already pled guilty and signed a cooperation agreement, I promise to tell you everything I know, promise to be honest, I promise to tell you about all of the crimes I know about or anyone else did. And not once in any of those interviews, not until almost the eve of trial, did

4302

Mr. Washington tell a story about asking -- being asked to go into Charles Street and pistol whip somebody. That is brand new.

And Mr. Washington tried to explain to you, well, do you know, I quit working for Mr. Aquart because his conscience finally got to him. This is the same conscience that had Mr. Washington flooding the streets of Bridgeport with over 20 firearms intended for a drug turf war by Mr. LP. The same conscience that led Mr. Washington to rob another man while they were illegally purchasing firearms with LP. The same conscience which led him to try to maim or kill LP after LP robbed him the night he got arrested by running him down with his car, or trying to.

Mr. Washington may be a lot of things, but a man of conscience is not one of them. And another thing he is not is reliable when he tells you these new stories that he's never told before.

The government brought Judith Rivera here to talk to you. She seems to be on the road to recovery. I'm sure you all wish her well. But, again, the Ms. Rivera we saw here is not the Ms. Rivera who lived on Charles Street in 2005. Ms. Rivera was so drunk all of the time she experienced

4303

blackouts. And by her own testimony she started using crack cocaine so she could stay up even longer and continue to drink. In fact, she was asked, "Is it fair to say that your memories of what were happening in your life in August of 2005 are very, very cloudy?"

Answer: "Yes."

One point she testified Mr. Aquart and a few other men were in her apartment one night. But when does she tell us this -- or when did she tell the agents this? Years after the supposed event. And would you really rely on her memory or her ability to perceive something from that time for anything of importance to you?

We did learn a couple of things from Ms. Rivera. Charles Street was not an exclusive two-apartment drug operation. It was not 101 and 211. She said on the morning of the murders she went to 101 to see if she could get drugs, but no one answered the door. And then she went to Boozine's apartment next door and asked to get drugs. Frank Hopkins denied it, but the agents confirmed he told the agents Boozine was selling, too. She then goes up to 211. She goes up to the third floor. There is a plenty of places in Charles

4304

1  Street to get drugs.  This is not this exclusive
2  operation.  That building was a 24-hour drugstore
3  that was wide open and was a target.  Any of those
4  apartments were targets for anybody looking for
5  drugs, cash or both.
6      That brings us to Lashika Johnson.
7  March 7, 2007, the police knock on Lashika Johnson's
8  door.  They questioned her about murders and bloody
9  clothes.  She didn't know her brother was arrested
10 at this time.  She said she didn't know anything
11 about the murders at all.  Later she learns her
12 brother is arrested.  At some point they tell her,
13 it's not clear, but they tell her, hey, there is a
14 warrant for your arrest, you'll need a lawyer, and
15 they help her get one.
16      Eventually they talk to her again,
17 September of '08, over three years after the
18 murders.  And by this time she knows her brother is
19 charged for the murders and that he is facing the
20 death penalty potentially at that time.  And she's
21 been talking to him this entire time, either through
22 visits, on the phone or in writing.
23      So, at that first meeting with the
24 agents she signs a proffer agreement.  She admits
25 she's been selling one to two pounds of marijuana a

4305

1  week, including at Charles Street.  And so she now
2  says, oh, yeah, I -- there is some bloody clothes,
3  and she gets rid of them.  And they ask her about a
4  power drill.  I don't know anything about a power
5  drill, never saw one.  And the agents say, we don't
6  believe you.  She knows if they don't believe her,
7  that's trouble.  So, the story changes.  Now there
8  is a power drill in the bag of clothes.  And slowly
9  over time she adds new stories; another interview
10 another story.
11      Now, Azibo is getting a phone call from
12 his brother.  That's a new story.  And now Efrain is
13 confessing the murders to her; another interview,
14 another story.  Now Azibo is arriving at her
15 apartment in a Cadillac; another interview, another
16 story.  And Lashika said something also interesting,
17 things just kept popping into her mind.  At trial
18 something new popped into her mind, that Azibo told
19 her to go pick up Azikiwe at Charles Street sometime
20 after the murders.  That detail did not pop into her
21 mind in her interview on September 18, 2008.  It
22 didn't pop into her mind on September 24, 2008 or
23 October 14, 2008 or on October 22, 2008 or on
24 January 20.  2010.  At trial a new detail that just
25 popped into her mind.

4306

1      And what do all these new stories tell
2  us?  She's a storyteller.  If you can't entrust your
3  most serious affairs to this person, because either
4  things just pop into her mind or she just makes them
5  up, you can't rely on her.
6      John Taylor.  We watched Mr. Taylor
7  testify.  Maybe he sort of looked like the fool, guy
8  from down south, not too sophisticated.  Maybe you
9  should go back and listen to those tapes where he's
10 talking about trying to get bailed out.  He doesn't
11 seem too unsophisticated on those tapes.  He doesn't
12 seem like a fool there.  He's got convictions going
13 back to the age of 17.  He's in the highest criminal
14 history category.  He knows how things work.  He's
15 home, asleep in Pinetops, North Carolina, December
16 2nd, 2009, and at least five agents, some from
17 Connecticut, standing there at his doorstep.  By his
18 own words, they all rush in on him, they start
19 asking him questions.
20      Now, Taylor knows a story, but where
21 does this story come from?  He's part of a drug
22 operation back in Connecticut.  He went down south
23 with Azibo and Azikiwe a few days before the
24 murders.  He knows that.  He came back to
25 Connecticut with them.  He was incarcerated at the

4307

1  Bridgeport jail after the murders.  We know from
2  Shamarr Myers how jails work, everyone sits around
3  talking about your cases, what's going on.  And do
4  you really believe for a minute that John Taylor had
5  no idea that these murders had occurred at Charles
6  Street when he was at the Bridgeport jail?  Didn't
7  hear a word about it, according to him.
8      But his problem when he's sitting in
9  that recliner back in Pinetops, he wants those
10 agents out of his house.  He didn't want to admit
11 his involvement in the drug operation.  He's not
12 certain of all of the details.  What he has is
13 sketchy knowledge from the grapevine and other
14 sources.  He might lack some legal sophistication,
15 but he has other strengths, other strengths that
16 help him survive as a convict, as a guy on the
17 streets.  He's got an imagination.  Remember Fan?
18 And he's got a keen sense on how to pick up on
19 clues.  And he's not at all burdened by a
20 conscience.  He'll say whatever he thinks he needs
21 to say to get him out of trouble.
22      So, he's sitting there in that recliner
23 in Pinetops, and he starts telling stories.  The
24 agents say, we don't believe that.  But wouldn't
25 you, as jurors really like to know what happened in

4308

1  that dining room in Pinetops?  It's the age of
2  technology.  The agents there, they have
3  BlackBerry's with photos on them.  You don't think
4  anybody could have brought along a video recorder, a
5  tape recorder, something that would tell us what he
6  said, when he said, how he said it, what they said
7  in return?  How they said it to him, we don't know.
8         But he starts talking, and they tell him
9  again he's lying.  At some point he tries the tears.
10  He does have a sense of drama.  But that doesn't
11  work because the agents are still sitting there when
12  he looks up.  So, he tells more stories, and they
13  tell him again you are lying, until finally he tells
14  them just enough, just enough stories to put himself
15  on the hook.
16         Ironically in his mind he thought he was
17  wiggling off the hook.  Remember his testimony about
18  how surprised he was that he got arrested?  But they
19  do arrest him and take him back to Connecticut and
20  he learns he's facing the death penalty.  So now
21  he's got to tell more stories.  So the problem for
22  John Taylor is that he really doesn't know the
23  details, but he is sure willing to improvise.
24         Let's take for example a simple example,
25  these blue rubber gloves.  The government will say,

4309

1  well, this is a small detail, don't worry about it.
2  But is it?  Isn't this a window into the way John
3  Taylor thinks and how he works.  He tells everybody
4  time and time again they were all wearing blue
5  gloves.  He even tells the judge that when he pleads
6  guilty, they're all wearing blue gloves.
7         But that doesn't fit the evidence.
8  There is no blue gloves in that room.  There is no
9  fragments of blue gloves at the scene, or even in
10  the duct tape, anywhere.  So then his testimony to
11  you gets revised.  Now he's the only one wearing
12  blue gloves.  And how does he account for his other
13  statements about blue gloves?  He says he lied.  Why
14  lie about others wearing blue gloves?  What's the
15  point of that?  The fact is he never knew what color
16  those gloves were.
17         It's not the only example.  Let's talk
18  about this couch.  He should know about that if this
19  story is true.  He propped a couch up against the
20  door.  He says he did it with Mr. Aquart's
21  assistance.  In fact, he told you he stood by that
22  couch looking down the hallway.  Less than a year
23  ago they showed him pictures, including the picture
24  of a couch, this couch, Defendant's UUUUU.  117, the
25  floral couch, they showed him this picture.  Did

4310

1  they show him pictures of other couches?  We don't
2  know, they didn't record that interview.  But he
3  says to them, yep, that's the couch, that's the one
4  we propped up against the door.  Then he comes here
5  and he testifies to you, he says, no, it's this
6  couch that gets propped up against the door,
7  Government Exhibit 117-E.  This one, down here in
8  the lower left, this is the one he now remembers
9  moving against the door.  And he says specifically
10  to you, I never said anything about that other
11  couch, the floral couch.  But we know that's not
12  true, he did tell the agents that.  The fact is he
13  never knew whether there was even a couch in that
14  apartment at all.
15         Let's talk about this Hispanic woman.
16  His story is he's in her apartment.  His story is
17  that she knocks on the door of apartment 101 for
18  him.  His story is they all hang out in her
19  apartment for a while.  His story is that he's going
20  to be a lookout in that apartment.  But do you know
21  what, he doesn't remember her either.  How do we
22  know that?  Because last year in another yet
23  unrecorded interview the agents show him this photo,
24  Exhibit 217.  We all know who that is.  That's
25  Judira Rivera.  And he says to the agents, I don't

4311

1  recognize that person.  Not only does he not
2  recognize that person, he specifically says that is
3  not the Hispanic or Puerto Rican woman he had told
4  them about before.
5         Is that alone reason enough not to doubt
6  his story?  The government didn't show him this
7  photo at trial because he'd already told them I
8  don't know who that is.  We show it to him, oh,
9  yeah, that's her.  There is something wrong with
10  that.  Is this an innocent failure of memory?  Maybe
11  the government will tell you that.  But what that
12  should really do is compel you to hesitate that his
13  testimony here at trial is reliable.  So can you
14  really believe somebody who turns a story 180
15  degrees at trial?
16         We don't know the end of John Taylor's
17  story, but you know that he'd do enough, whatever it
18  took, to protect himself.  Whether it works or not,
19  that's not your concern.  Your concern is his utter
20  lack of reliability.
21         Shamar Myers gave us a window into how
22  cooperation works.  The picture of life in jail, at
23  least federal detention centers, where, as he told
24  the judge, "Friends lie on friends.  I watch it all
25  the time."  And they lie to get lower sentences.

4312

1   And so Shamarr goes to Mr. Aquart and he says, hey,
2   the feds are pressuring me, they want you.  Shamarr
3   says, though, I'm a stand-up guy, I'm not going to
4   do that, I'm not going to snitch on you.  He might
5   even have told Azibo, hey, I got your back, don't
6   worry, buddy.
7           But he didn't.  He offers to help Azibo,
8   then he gets this letter and he's off to the feds.
9   Was what was in that letter wrong about snitches?
10  It seems certainly consistent with Mr. Myers'
11  experience, just friends lying on friends.  And of
12  course it wasn't hard to add in that little detail
13  about "they had to go."  That's the easy part.
14  That's not in that letter.
15          But that letter is Myers' ticket out.
16  Just another friend lying on a friend, not the kind
17  of person that you can believe.
18          So what are we left with?  Well, you are
19  left with phone records that in many cases directly
20  contradict the testimony of the witnesses.  You are
21  left with serious questions about how the evidence
22  was collected in this case, which bags were
23  collected, where they were found, whether they were
24  dropped in blood or not.  Where were these gloves
25  found?  Were they even connected to the murders at

4313

1   all?
2           We're left with serious questions about
3   the reliability of the DNA evidence.  You see the
4   government only wants you to see the results, they
5   don't want you to see the process.  They don't want
6   you see how subjective it was.  But you did need to
7   see that process so you can determine if you in fact
8   can rely on those results, because it's not the
9   experts that decide these cases, it's you.
10          And we're left with the testimony of the
11  cooperating witnesses.  Now, the thing about the
12  cooperating witnesses is that their testimony was
13  really, in a way, like the DNA results.  That's what
14  you saw when they testified here.  You saw the end
15  result, the final polished product.  What you truly
16  did not get to see, what the government did not show
17  you, was the process.  We tried to explore that
18  process.  Myself or Mr. Sheehan would ask many of
19  these witnesses whether they made a particular
20  statement to a particular agent, particular person
21  at a particular time, and the government would often
22  ask these same witnesses the same things.  Did they
23  tape that interview, Mr. Hodges?  Did they have you
24  sign a statement, Mr. Womble?  Did they ask you to
25  view the report for accuracy, Mr. Taylor?  The

4314

1   answer was always no.  Why not?  Why not record the
2   interview?  Why not sign the statement?  Why not
3   have the witness review the report for accuracy?
4   What don't you know about what happened in those
5   meetings?  Sometimes six, seven, eight, nine
6   meetings per witness.  If they're telling the truth
7   why that many meetings?  What don't you know?  Why
8   don't you know it?
9           The government has brought the most
10  serious charges it can in this case.  Why shouldn't
11  you know exactly how it was that Frank Hodges got
12  the story straight?  Why shouldn't you know exactly
13  how it was that Rodney Womble got on board.  Why
14  shouldn't you know exactly how it was that things
15  kept popping into Lashika Johnson's mind?  Why
16  shouldn't you know how it was a woman in Judith
17  Rivera's condition in August 2005 can remember some
18  detail five years later about men in her apartment?
19  Why shouldn't you know exactly how John Taylor's
20  story evolved and then changed again right before
21  your eyes?  You should know.  You deserve to know.
22          But, unfortunately, you don't know.  And
23  if you don't know how the end result is reached, how
24  the polished product got put in front of you, and
25  whether that's for DNA results or the testimony of

4315

1   these witnesses, then what you don't know is whether
2   you can truly rely on that testimony or those
3   results.  And if you don't know whether you can rely
4   on that testimony or those results, then that's a
5   reasonable doubt.  And if you have a reasonable
6   doubt, any of you, you must vote not guilty.  And
7   that is what I'm asking you to do, find Mr. Aquart
8   not guilty.
9           Thank you again for your time.
10          THE COURT:  Thank you.  We'll take a
11  five minute recess and we'll conclude with the
12  government's rebuttal closing.
13          (Jury exited the courtroom.)
14          THE COURT:  I'm going to just put this
15  supplemental charge on their chairs so they know
16  what is supplemented and they can just put it in
17  their notebooks.  Anything further?  We stand in
18  recess.
19          (Recess)
20          THE COURT:  All right, please be seated.
21  Are we ready for the jury?
22          MS. REYNOLDS:  Can we have one second
23  just to let this heat up.  It's ready.
24          THE COURT:  Let's bring in the jurors.
25  I'm going to need to tell them about this charge

4316

```
1    sitting on their chair before you start.
2                MS. DAYTON:  No.
3                THE COURT:  I'm going to need to do that
4    before you start.
5                MS. DAYTON:  I'm kidding.
6                THE COURT:  Otherwise, they'll sit on
7    that.
8                MR. SHEEHAN:  You are sending them at
9    four because of that -- okay.
10               (Jury entered the courtroom.)
11               THE COURT:  All right, please be seated,
12   ladies and gentlemen.  There is one very short
13   supplemental charge that's on your chair.  Just
14   stick it in your instructions notebook, and I'll go
15   over it with you after the government finishes its
16   rebuttal.  And that will be done by Ms. Dayton.
17               You may proceed.
18               MS. DAYTON:  Thank you, your Honor.
19               Good afternoon.  Do you know, I want to
20   just start by commenting on a couple things the
21   defense said.  Number one, according to the defense,
22   John Taylor falsely confessed to three counts of
23   brutal, horrific murder so that he could frame the
24   defendant.  Because the defense literally said that
25   Taylor got this entire story from jail and the
```

4317

```
1    reason that he doesn't know what couch was pushed up
2    to the door was that he wasn't there.  Okay, that
3    makes no sense at all.  Why would this man plead to
4    three counts of murder because he's, you know, not
5    the country bumpkin that he sounded like here in
6    court?  Is that what they're trying to say to you?
7    It's literally ridiculous.
8                Or they're talking about Shamarr Myers
9    and how he's a snitch.  Do you know, the reason
10   people don't like the word "snitch" is because
11   snitch means you are telling on someone.  Like they
12   didn't like Jackie Bryant for snitching because she
13   was telling the truth, they don't like Shamarr Myers
14   for snitching.  I mean, they've basically conceded
15   that Azibo Aquart wrote this letter that he gave to
16   Shamarr.  And so what is Shamarr Myers' major
17   violation?  That he broke their friendship?  That he
18   violated their pinkie swear because he came forward
19   and he gave this letter to law enforcement, a letter
20   that asked him to come in to a court, perjure
21   himself and lie, pretend someone else committed
22   these murders?
23               Do you know, it's quite telling to hear
24   the defense repeatedly get up and blame the victims
25   for their own murders.  It's how this case started,
```

4318

```
1    by them saying the drug trade is a dangerous one and
2    people who engage in it do so at their own peril,
3    including the victims in this case, and that they
4    assumed these risks.  The defense continued this
5    theme throughout trial and throughout the closing,
6    suggesting basically that the victims died as a
7    result of some sort of drug turf war.
8                Yes, this has to do with drug turf, the
9    defendant's drug turf.  But this was not a war.  War
10   connotes two sides fighting.  This was not a war,
11   this was a slaughter.  More importantly, this was
12   not the victims' fault, this is his fault.  He did
13   this.  He planned this.  He targeted Tina, he bought
14   everything he needed to kill them, he picked his
15   crew, he went over to their house, he broke their
16   door down, and he bludgeoned them to death.  He
17   brutally murdered the victims.  That is his fault,
18   no matter how you look at it.
19               Now, the defense has made much of the
20   fact that the police focussed on the defendant from
21   the outset of this case, as if it's somehow horrible
22   that law enforcement would focus on the person that
23   all of the evidence suggested from the get-go was
24   responsible for these murders.  I mean, isn't that
25   what the police are supposed to do, catch the guilty
```

4319

```
1    guy?  And the defense --
2                MR. SHEEHAN:  I'm going to object to
3    that last characterization, your Honor.  I don't
4    think that it's appropriate for counsel to be making
5    those comments.  It's up to the jury to make that
6    determination.
7                THE COURT:  The jury understands that
8    the jury will decide whether the government has
9    proved beyond a reasonable doubt.  That is your
10   determination, and yours alone, and I will ask Ms.
11   Dayton to continue.
12               MS. DAYTON:  Thank you, your Honor.
13               And the defense has repeatedly suggested
14   that law enforcement focused on the defendant to the
15   exclusion of everybody else, and there is absolutely
16   no evidence to support that.  Number one, Christine
17   Roy told you that when she first received this case
18   in 2005, there were two suspects named, the
19   defendant and Rodney Womble.
20               You also heard, as was stated earlier,
21   that the investigation of this case did not cease in
22   September of 2005 with the defendant's arrest.  That
23   is what you would have expected if the police were
24   only focused on the defendant.  It was after the
25   defendant's arrest, in fact, that several other
```

4320

1 people were arrested for engaging in the narcotics
2 conspiracy, including Rodney Womble, Sherrell
3 Randolph, Frank Hodges, Juanita Hopkins, James
4 Rucker, to name a few. The police then arrested
5 Randi Washington in February 2006 for gun
6 trafficking, including for the sales that he made to
7 the defendant. The FBI then arrested Azikiwe Aquart
8 in May of 2006, Efrain in March of 2007, and John
9 Taylor in December of 2009. So ask yourself, how
10 does the fact that the other three perpetrators of
11 this horrible crime were arrested eight months,
12 18 months, and four and a half years after the
13 defendant's arrest even remotely accord with the
14 proposition that the police were only focused on the
15 defendant? It doesn't.
16        What it establishes is that the police
17 and the government followed investigative leads
18 whenever they came in and to wherever they led, be
19 it Bridgeport or Norwalk or North Carolina.
20        Counsel has also made much of the fact
21 that the government met with several witnesses on
22 several occasions. We've heard the litany of dates
23 that these witnesses were met with. Yes, the
24 government does not shy away from that fact. We
25 bear the burden of proof in this case and it is the

4321

1 government's responsibility to investigate
2 thoroughly and to prepare the case and the witnesses
3 for trial. And in a case of this magnitude where
4 the defendant brutally murdered three people, it is
5 truly the government's responsibility, and you
6 should hold the government to its responsibility, to
7 meet its burden of proof.
8        MR. SHEEHAN: Again I'm objecting to
9 counsel's characterization. Counsel is not
10 characterizing the evidence, she's stating her
11 opinion.
12        THE COURT: I have instructed that it is
13 the government's burden of proof beyond a reasonable
14 doubt on each element of each crime. That is your
15 job, that is your responsibility, and that is your
16 responsibility alone. No matter what counsel may
17 say one way or another, it is your responsibility,
18 and that is the standard to which the government is
19 held. I think you understand that.
20        You may proceed.
21        MS. DAYTON: Thank you.
22        As John Taylor said, the victims in this
23 case were killed for no reason, they should not have
24 been killed and it should never have gotten to that
25 point. So, if it took several meetings with

4322

1 witnesses to find out every detail about what they
2 knew, then it took several meetings. And if it took
3 100 times sitting down with John Taylor or Lashika
4 Johnson to uncover every last thing that a human
5 being could know about these brutal beatings, then
6 it took 100 meetings.
7        If there is any question about the
8 thoroughness and the intent of the government's
9 investigation in this case, ask yourself this: How
10 would you know that any witness had lied on a prior
11 occasion if law enforcement hadn't documented that
12 fact? Again, you've heard repeatedly about the
13 meetings with these witnesses and then you've heard
14 that the government, be it in the form of the
15 Bridgeport Police Department or the Federal Bureau
16 of Investigation, documented pretty much every
17 detail of these meetings, including every time a
18 witness didn't tell the truth. Despite that,
19 counsel argues to you that somehow the government's
20 not actually looking for the truth, that we're only
21 looking for those facts that corroborate witnesses
22 who implicate the defendant.
23        Now, what's interesting is we just saw a
24 good example of that type of behavior. Counsel
25 stood up here and they told you -- they talked to

4323

1 you about a bunch of witnesses. Judith Rivera was
2 one that came up a lot, and they basically said she
3 was too stoned, high and blacked out to remember a
4 thing about 2005. But they then went on to rely
5 upon Ms. Rivera's memory to try to establish, oh,
6 but there is other people selling drugs in the
7 building.
8        So there is no evidence, however, that
9 the government is picking and choosing its facts or
10 only looking for evidence that corroborated the
11 witnesses that implicated the defendant. For
12 instance, ask yourself why did the government
13 request that John Pleckaitis, the fingerprint
14 examiner, compare the latents that were picked from
15 the scene not only against the defendant's prints,
16 but of those of John Taylor, Efrain Johnson, Azikiwe
17 Aquart, Linwood Bember, who you heard was Wobie,
18 Nathaniel Grant, who you heard was Stone, Rodney
19 Womble, and a host of other people if we were only
20 interested in making a case against the defendant?
21        Look, the fact that Pleckaitis found
22 both the defendant and his brother's fingerprints on
23 the bloody bag next to Basil's crushed skull is no
24 one's fault but their own. Obviously they weren't
25 careful enough with their latex gloves.

4324

1       And moreover, the issue about the
2   movement of the bag, this bag, there has been so
3   much talk about this blue bag in this bag.  It's a
4   red herring, or, as Randi Washington may say, a
5   purple fish.  It's not as if they took this bag,
6   went over to Lashika Johnson's house, said to the
7   defendant, hey, would you be so kind as to put your
8   fingerprints on this bag right on the duct tape,
9   that would be good, and then brought it back to the
10  scene.
11      The evidence was Detective Gallagher
12  picked it up, realized he shouldn't have picked it
13  up, and put it back down.  Okay, it's not ideal, but
14  it doesn't make the defendant innocent.
15      You know, then there was discussion
16  about how there is traffic back and forth between
17  apartment 211 and the victims' apartment, like there
18  is drugs being purchased by Tina and James perhaps
19  in apartment 211, and who knows who is going back
20  and forth.  And then there was discussion about
21  this, like, seven-minute window when LeRoy was on
22  the phone screaming for help.  Like what is it,
23  someone grabbed the bag from apartment 211 with the
24  defendant's fingerprints on it and ran downstairs
25  and, like, shoved it next to Basil's head and left

4325

1   the building?  It's not reasonable.  It's not
2   reasonable at all.
3       What about the testimony of Christine
4   Roy?  She told you that -- she testified over the
5   course of the last five years she repeatedly
6   reanalyzed evidentiary samples against new
7   submissions of known DNA at the government's
8   request.  She even analyzed the evidence against the
9   victims' DNA even though it's very clear the victims
10  didn't kill themselves.  Why would the government
11  continue to make such requests if we were only
12  trying to get the defendant?  Especially in a case
13  of submission 13, the one you've heard so much
14  about.  Government's Exhibit 136A, the cuff that
15  broke off the latex glove that the defendant was
16  wearing.  Why ask the lab to perform a DNA
17  comparison against John Taylor's DNA in 2010 when we
18  had known for years that the defendant's DNA profile
19  was already on that item?
20      MR. SHEEHAN:  I'm going to object.  The
21  way counsel is arguing in the context of this "we"
22  that she is using, it's clear that she's identifying
23  her position as counsel for the government.
24      THE COURT:  All right.
25      MR. SHEEHAN:  And I think that's an

4326

1   inappropriate argument.
2       THE COURT:  I think the jury understands
3   it's the government, and I'll ask that that be the
4   way that it be phrased from now on.
5       MS. DAYTON:  Thank you, your Honor.
6       The defense has also brought up the fact
7   that Womble's DNA was not submitted for testing.
8   Well, first of all, you know Womble is a convicted
9   felon, and you know from Christine Roy that Womble
10  -- excuse me, that the CODIS database is made up of
11  the DNA of convicted felons.  And, in fact, you know
12  that's how they originally got the hit on Efrain
13  Johnson and proved that he, too, was part of these
14  murders.  And while the defense has absolutely no
15  burden of proof in this case, the government bears
16  the entire burden of proof, and that never shifts,
17  you did hear that there was a DNA expert at the lab
18  during much of the DNA testing observing what was
19  going on.
20      MR. SHEEHAN:  I'm going to object, your
21  Honor.  May we approach?
22      THE COURT:  Yes.
23      (Sidebar conference)
24      MR. SHEEHAN:  Counsel is not only
25  alluding to facts that are not in evidence, but

4327

1   facts that are incorrect.  We do not have, and have
2   never had, and are not allowed, any access to the
3   CODIS database.  That is not available, and the
4   implication of her question is that it is.  And I
5   would ask that the jury be instructed that the CODIS
6   database is a database that's available only for law
7   enforcement.
8       MS. DAYTON:  I wasn't suggesting that.
9   I didn't say that.  And I also object to him
10  objecting when it was Mr. Smith who did the
11  argument.
12      THE COURT:  I will make the
13  clarification that the CODIS database is only
14  available to law enforcement.
15      MS. DAYTON:  Your Honor, I object to
16  that because I didn't say what he said.
17      THE COURT:  I won't say that you said
18  it.  I will say just for clarification.
19      MS. DAYTON:  Okay, and I would ask that
20  he not be allowed to object since this was Mr.
21  Smith's argument.
22      THE COURT:  That's -- his job is -- it's
23  only one objecting, it's not two.
24      (Sidebar concluded)
25      THE COURT:  I just wanted to clarify, in

4328

1  case there was any confusion, the CODIS database is
2  a database only available to law enforcement.
3          You may proceed.
4          MS. DAYTON:  There is absolute no
5  evidence in this record whatsoever to suggest that
6  Womble's DNA was at that crime scene.  That, too, is
7  telling.  As telling as the fact that on
8  cross-examination the defense never asked Womble a
9  word about whether or not he was involved in this
10 murder.  In fact, they were far more concerned with
11 the murder case that he testified in 20 years ago.
12         Look, admittedly we agree on one thing,
13 the DNA testimony, it was complex, dry, and the
14 presentation was long and the statistics are hard to
15 understand.  You heard all of these numbers, one in
16 a thousand, 1 in seven billion.  And then with
17 respect to the latex cuff from the defendant's
18 glove, you heard one in 79 million.
19         So, what does that actually mean?  It
20 means that the defendant's genetic markers, some of
21 the defendant's genetic markers showed up at all 15
22 of the sites that they test.  There were only --
23         MR. SHEEHAN:  Objection.
24         MS. DAYTON:  There were only two --
25         MR. SHEEHAN:  That is

4329

1  mischaracterization of the evidence.
2          THE COURT:  The jury will remember what
3  the evidence is.  I have instructed them that it is
4  their memory that controls, and if counsel or any
5  witness states anything differently, it's your
6  memory that controls.
7          MS. DAYTON:  There are only two out of
8  30 of the defendant's genetic markers missing.  28
9  of the 30 were present.  What are the odds of that?
10 You are more likely to win the lottery.
11         So, the chance of another person with
12 virtually the same DNA as the defendant, they would
13 have to have 28 of the same markers also
14 contributing their DNA to that latex glove, is one
15 in 79 million.  And remember, that one person, that
16 one in 79 million, had to have access to apartment
17 101, a reason for being there wearing latex gloves,
18 and a motive to kill Tina, James and Basil.
19         And there has also been a lot of
20 discussion about discrepancies between the
21 witnesses' testimony, and yes, there are
22 discrepancies between some of the witnesses'
23 testimony.  But do these inconsistencies prove that
24 they're just not telling the truth?  No.  If we all
25 left this room right now and were separately asked

4330

1  about the events of this trial, there is no question
2  that everybody would have different memories and
3  different things would stick out in your mind.
4  That's why they have instant reply in sports, and
5  that's why the Judge instructed you that two people
6  watching the same event may remember it differently.
7  It doesn't necessarily mean that they're lying.
8          Inconsistencies, or as the defendant
9  pointed out in his letter to Venro Fleming, an
10 inability to remember, does not necessarily mean a
11 person is lying.  Rather, it means they haven't
12 memorized a story and they're recalling events to
13 the best of their ability to do so.  For instance,
14 the witnesses didn't have the luxury of turning to
15 one another and saying, hey, how many crack, packs
16 of crack did we sell on that day in August 2005?  Or
17 which one of us did the defendant beat up first?
18         Notably, there are discrepancies in what
19 has been presented to you in the defense argument as
20 well.  For instance, they said to you that when
21 Lativia Whittingham, Tina's daughter, testified as
22 to what Tina's phone number was, essentially she
23 must have been mistaken.  But then they talked about
24 calls from Tina's phone to Rodney Womble.  So which
25 is it, it's her phone or it's not her phone?  But

4331

1  again, you'll have those records and you could look
2  at them.  And they're actually not from Rodney
3  Womble to Tina, they're from Tina to Rodney Womble.
4  And from all we've heard about Tina, perhaps she was
5  calling to yell at him for instructing Juanita
6  Hopkins to rob Velma.  You remember the robbery that
7  Juanita could remember even through her drug-induced
8  haze.  Or maybe she was calling to buy drugs.
9  Notably, there are no calls from Tina to the
10 defendant.
11         There were also several suggestions that
12 the government was prepping witnesses by telling
13 them what to say.  Again, there is no evidence of
14 that.  The witnesses repeatedly came in here and
15 testified that they were here to tell the truth.
16 So, the only evidence you have regarding anyone
17 telling witnesses what to say at trial in terms of
18 lying comes in the form of the defendant's own
19 letters.  Take a look at those and ask yourself why
20 would the defendant write letters like this to
21 somebody if he didn't think that person had a lot of
22 dirt on him?
23         For instance, the letter to Frank
24 Riccio, who is Frank Hodges' attorney, there the
25 defendant pointed out that if Hodges pled guilty it

4332

1  would give the accusations an air of truth.  Okay,
2  well, Hopkins told you the accusations were
3  truthful, he was selling drugs with the defendant --
4  for the defendant.  And in the process of explaining
5  why Riccio should not allow Hodges to plead guilty
6  to conspiracy, the defendant managed to describe the
7  Charles Street building to a T, including apartment
8  211, the drug apartment, and apartment 202, the
9  lookout apartment.  How is it that the defendant was
10  able to do that?  Well, that's right, it was the
11  defendant's building where the defendant ran his
12  narcotics trafficking enterprise.
13          Or how about that letter to Venro
14  Fleming where the defendant alternates between
15  apologizing to Fleming because the last time he saw
16  him he beat him up and threatening Fleming, saying,
17  do you know, warning him, we found you even in South
18  Carolina, and instructing Fleming as to what to say
19  if the police ever showed up to talk to him.
20          As was made clear by that letter, as
21  well as by Shamarr Myers, the defendant has
22  obviously spent some time in the law library because
23  he quite competently defined conspiracy when telling
24  Venro Fleming what not to say.
25          The defense says that we have not proven

4333

1  our case, and the government submits that is just
2  not correct.  The government has proven its case
3  beyond a reasonable doubt with, among other
4  evidence, the defendant's own words in form of the
5  letters and actions.  The script that the defendant
6  gave to Shamarr Myers is unbelievable consciousness
7  of guilt.  Despite the fact that the defendant told
8  Shamarr Myers that the victims had to die, he then
9  instructed Myers to take the stand in a case that
10  Myers knew nothing about and to lie.  He told Myers
11  to come in here and say Lethos did it.  Lethos,
12  somebody who happens to be dead.  Notably, not even
13  the defendant suggested that Myers should try to
14  blame this on Womble.
15          In substance, the defense has argued
16  that you should not credit any of the testimony or
17  any of the witnesses in this case, from Christine
18  Roy to Joette Devan to John Taylor.
19          With respect to the crime scene, for
20  instance, counsel repeatedly asked you to ask
21  yourself is this where you'd expect to find this
22  item of evidence, like with respect to pieces of
23  latex gloves, or Exhibit No. 14, whether it was
24  under the bed or not.  Look, this is a crime scene,
25  not a cleaning service, things aren't tidy and neat.

4334

1  But he did ask you one question, where is the
2  defendant and his brother's hair.  And perhaps you
3  can answer that it's under their ski masks.
4          So, with respect to the cooperating
5  witnesses, the argument is something along the lines
6  of the witnesses are lying and framing the defendant
7  because it's in their best interest to do so.  Now,
8  mind you, the defense did not want you to reject the
9  entirety of those witnesses' testimony.  For
10  instance, the parts where the witnesses admitted
11  that they sold drugs and they committed other
12  crimes, well, they wanted you to accept that
13  testimony.  And they definitely want you to believe
14  the parts where the witnesses admitted openly that
15  they had lied to law enforcement in the past.  But
16  then they want you to disregard the rest of their
17  testimony and stop listening right at the parts
18  where the witnesses are telling you why the
19  defendant is guilty of the crimes with which he's
20  been charged.
21          However, it's not that simple.  For in
22  order to disbelieve all of the cooperating witnesses
23  you would have to believe that they not only all
24  decided to frame the same innocent man, but that
25  they somehow managed to get all of the evidence in

4335

1  this case to completely corroborate what they had to
2  say.  For instance, that includes the fingerprint
3  evidence, the DNA evidence, the ATF records related
4  to the guns that Washington sold to the defendant,
5  the gun seized in North Carolina, the medical
6  records related to the defendant's myriad beatings
7  of the workers, the narcotics dealers who worked for
8  him, the DMV records showing that the defendant
9  owned four different cars, which is pretty good for
10  a guy who worked at a car wash, the Wachovia Bank
11  records showing the defendant paying for the whole
12  trip down south, depositing large quantities and
13  cash, and even his grocery trip to the Piggly
14  Wiggly, the only grocery store in Pinetops, North
15  Carolina.
16          And of course there is the phone
17  records.  I mean, wow, how did those witnesses get
18  those 97 phone calls on the defendant's phone on the
19  day of the murders without him even realizing it.
20  And with all due respect the witnesses, and this is
21  not meant to be a criticism of these witnesses, but that's a
22  pretty elaborate frame job for a bunch of
23  individuals who never had the opportunity to
24  graduate from high school.
25          And of course, in order for this frame

4336

1  job to succeed, the witnesses would have had to have
2  planned it five or six years ago, because what the
3  evidence established was that most of them have not
4  seen each other or the defendant for over five
5  years.  So, you know, never mind that there are some
6  people who have never met each other, like John
7  Taylor and Jackie Bryant, but putting them aside,
8  you would have to believe the ones who do know each
9  other decided five or six years ago, before they got
10 arrested, that if they did get arrested that they
11 would lie in order to get the defendant.  But just
12 to make their lies believable, they wouldn't just
13 say, oh, the defendant is a drug dealer and he was
14 involved in these murders, no, first they would say,
15 one, that they were drug dealers, thereby resulting
16 in their own federal convictions and time in federal
17 prison; two, they'd lie and say that all of their
18 friends were also drug dealers, thus ensuring that
19 they all went to federal prison, which, as you've
20 heard, is no retreat; and then three, they would say
21 that the defendant was the leader of the narcotics
22 trafficking organization for which they worked and
23 that he ran the organization, ruled it with guns and
24 violence and beatings, some of which resulted in
25 death, in order to maintain his dominance in this

4337

1  organization.
2        There is no evidence to support the
3  suggestion that the witnesses in this case colluded
4  or conspired in order to falsely implicate the
5  defendant.  The only evidence of conspiracy is the
6  evidence that shows that the witnesses in fact
7  conspired with the defendant to sell narcotics and
8  that the defendant entered into a conspiracy to
9  murder Tina, James and Basil.
10       During opening statements both the
11 government and the defense asked you to listen to
12 the cooperators very closely and to scrutinize their
13 testimony and compare it to all of the other
14 evidence in this case, and you've now had the
15 opportunity to do that.  You've had the opportunity
16 to hear them testify, observe their demeanor, to
17 learn about their lives, to see these events through
18 their eyes, and some of it was just not pretty.
19       You saw how hard it was for John Taylor
20 to look at the picture of James and Tina, even
21 harder than for some of the people in this
22 courtroom.  It appeared that was because he had
23 already lived that once and it was very hard for him
24 to live it again.  So, now you are going to have the
25 opportunity to follow through with the comparison

4338

1  that we've spoken to you about, "we" meaning both us
2  and the defense, and to go back in the jury room
3  with the evidence, because when you go back there
4  you get to take all of the evidence with you and
5  you'll get a chance to handle the exhibits and
6  literally to get a feel for the corroboration.
7        You can listen to the 911 tape and hear
8  LeRoy's desperate pleas for help.  And you can read
9  the letters that the defendant wrote to -- well, a
10 lot of people; Venro Fleming, Willy Jackson, Shante
11 Pettaway, Frank Riccio, Efrain Johnson and Shamarr
12 Myers.  You can listen to prison calls.  You can
13 listen to the defendant tell his brother "these are
14 our streets."  And to yell at Shante that he's the
15 pro because he would have already had John Taylor
16 bailed out of jail.  And listen to him tell his
17 brother "tell Womble I want my money or its
18 curtains."
19       And then there is reading material
20 galore, medical records, DMV records, bank records,
21 and the ever-telling phone records.  Literally,
22 dozens of calls between the defendant and admitted
23 murderers and drug dealers, many of whom you have
24 heard from in the past four weeks in this courtroom,
25 people the defendant picked to work for him and who

4339

1  he now, who the defense now says are lying about
2  him.  You can also examine the photos more closely,
3  both the crime scene photos and the autopsy photos,
4  and see some of the defendant's handiwork, the
5  horrifying things he did to these victims.
6        Look, the defense would like you to
7  believe that this was some random act of violence.
8  Take a look at this crime scene.  Does this look
9  random to you?  He targeted Tina because she stood
10 up to him, and he beat them to death with baseball
11 bats.  This is not random, this was personal.  The
12 defendant killed the victims in order to maintain
13 his dominance in his organization, to send a message
14 to others who may dare to sell drugs in that
15 building, and to punish Tina for selling on his
16 turf.
17       The defendant broke into the victims'
18 home in the middle of the night when they were most
19 vulnerable.  He duct taped them.  He rendered them
20 defenseless, breaking James's elbow and Tina's wrist
21 in the process.  I'm going to show you a picture --
22       MR. SHEEHAN:  Your Honor, may we
23 approach?
24       MS. DAYTON:  Why?
25       THE COURT:  I'll see you.

4340

```
1         (Sidebar conference)
2              MR. SHEEHAN:  Your Honor, had set time
3    limits?
4              THE COURT:  She has about two more
5    minutes.
6              MR. SHEEHAN:  I'm sorry.
7              MS. DAYTON:  Excuse me.  He objected
8    like four times, which took up some of my time.  I'm
9    almost done.  But I object to him standing up.  It's
10   ridiculous.
11        (Sidebar concluded)
12             THE COURT:  All right, you may proceed.
13             MS. DAYTON:  Thank you.
14             The defendant encased the victims' faces
15   in duct tape creating a virtual death mask, and then
16   he and his -- well, he encased James' face and
17   Basil's face in duct tape creating a death mask.  He
18   left Tina's eyes uncovered, perhaps to make her
19   watch.  The defendant and his brother then brutally
20   beat the life out of Tina and James, and he left
21   them lying in a pool of their own blood.  The
22   evidence suggests that after Azikiwe Aquart, Efrain
23   Johnson and John Taylor had left the apartment, the
24   defendant then turned his attention and his bat to
25   Basil Williams, and he crushed Basil Williams' skull
```

4341

```
1    like an egg shell.
2              The defendant then went into the front
3    room and he drilled the door shut getting Basil's
4    blood on the front door lock in the process.  The
5    defendant entombed the victims in their own
6    apartment ensuring that nobody could save them.  And
7    he succeeded.  About that, there is no reasonable
8    doubt.  And the government asks you to return the
9    only verdict that is demanded by the evidence in
10   this case, and that is a verdict of guilty on all
11   charges.
12             Thank you.
13             Thank you, your Honor.
14             THE COURT:  Thank you.
15             All right, ladies and gentlemen, I'm
16   going to give you just a few more instructions
17   before we conclude.
18             You'll remember that the legal
19   principles that I stated to you in the instructions
20   are the ones you are to follow, and if you think
21   that anyone else has in any way stated a different
22   instruction, it is my instructions that you are to
23   follow.
24             In addition, I remind you that
25   statements and characterizations of the evidence by
```

4342

```
1    counsel are not evidence, and you were so instructed
2    in that regard in the section on role of attorneys.
3              I have added one more very brief
4    instruction to make sure that you are clear that
5    under 21, United States Code, 812, cocaine base,
6    also known as crack cocaine, is a Schedule II
7    controlled substance.  And if you would please add
8    that instruction to your book, then the substantive
9    instructions would be complete.
10             You were permitted to take notes during
11   the course of the trial; some did, some didn't.  Any
12   notes that you took should be used only as memory
13   aids.  Don't give your notes precedence over your
14   own individual recollection of the evidence.  And if
15   you didn't take notes, you should rely on your own
16   recollection of the proceedings and you should not
17   be influenced by the notes of any other jurors.
18   Please remember, notes are not evidence, they must
19   not be shared, and it is your recollection of the
20   evidence that is what counts.
21             I remind you that in order for you to
22   find the defendant Azibo Aquart guilty on any count
23   the government must prove all essential elements of
24   that count beyond a reasonable doubt as I explained
25   to you in the instructions that you have a copy of.
```

4343

```
1    If the government succeeds, your verdict should be
2    guilty on that count.  If it fails, your verdict
3    must be not guilty on that count.  In order to
4    return a verdict, it is necessary that each juror
5    agree with and to it.
6              Your verdict must be unanimous.  Each of
7    you must make your own decision, but you must also
8    consider impartially all of the evidence or the lack
9    of evidence and the views of your fellow jurors.  It
10   is your duty to consult with one another and to
11   deliberate with a view to reaching an agreement if
12   you can do so consistent with the individual
13   judgment of each juror.  Remember, at all times you
14   are not partisan, you are judges.  You are judges of
15   the facts and your sole interest is to determine if
16   the government has met its burden of proof.
17             In the course of your deliberations do
18   not hesitate to re-examine your individual view or
19   to change your opinion if the deliberations and
20   views of your fellow jurors convince you that your
21   view is erroneous.  However, you should not
22   surrender your conscientious opinion on how the
23   issues should be decided, which must be reflected in
24   your final vote.  Your verdict, whether guilty or
25   not guilty, must be unanimous.
```

4344

1       The first thing you'll do when you
2   retire to the jury room is to select one among you
3   to be your foreperson. Your foreperson will preside
4   over your deliberations and be your spokesperson
5   back here in court. After you have retired to begin
6   your deliberations, you may not leave the jury room
7   without first notifying the marshal who from now on
8   will be outside your door and who will escort you
9   wherever you need to go. And what that will do is
10  ensure that no one has any belief that there has
11  been any undue or improper influence on you during
12  your deliberations. If one of you is not in the
13  jury room, you must stop your deliberations. No
14  deliberation may take place without all jurors being
15  present.
16      You will see in your notebooks that you
17  have the verdict form I referred to. And your
18  process is ultimately to answer the questions that
19  are asked. When you've reached a unanimous verdict,
20  as to your verdict, your foreperson will fill in the
21  answers, date and sign the verdict form and then
22  inform the marshal that you've reached a verdict.
23      And you will see that the verdict form
24  tracks the indictment, although not entirely in the
25  same order. Count One, conspiracy to murder in aid

4345

1   of racketeering: We, the jury, unanimously find the
2   defendant, Azibo Aquart, not guilty or guilty. The
3   same for Count Two, murder in aid of racketeering of
4   Tina Johnson, Count Three of James Reid, Count Four
5   of Basil Williams. And as to each, analyzing all of
6   the elements that I've charged you, you will assess
7   whether or not the government met its burden of
8   proving guilt. If not, you must return a verdict of
9   not guilty.
10      You'll see after Count Four we jump to
11  Count Eight, conspiracy to distribute or possess
12  with intent to distribute 50 grams or more of
13  cocaine base. And that's because if you find the
14  defendant not guilty on that count, as I instructed
15  you that finding of conspiracy is one of the
16  essential elements of Five, Six and Seven. So it
17  seemed a logical way to make sure that you would be
18  properly following the instructions.
19      If you find the government has proved
20  the defendant's guilt on Count Eight, conspiracy to
21  possess to distribute or possess with intent to
22  distribute 50 grams or more of cocaine base, then
23  you will answer the two drug quantity questions.
24  You are asked whether you unanimously find the
25  reasonable and foreseeable quantity of a mixture and

4346

1   substance containing cocaine base involved in Count
2   Eight was 50 grams or more, yes or no, 280 grams or
3   more, yes or no. And then you will proceed if you
4   have found the defendant guilty of Count Eight to
5   answer Count Five, Count Six and Seven. If you
6   found him not guilty, then the instructions direct
7   that you would find -- you must find not guilty
8   verdicts. That will conclude your deliberations,
9   your foreperson will sign the verdict form with the
10  time and date and will advise the marshal outside
11  the door that you have reached a verdict. You do
12  not give the verdict form to the marshal, give it
13  only to me when you come back into court.
14      During your deliberations you must not
15  communicate with or provide any information to
16  anyone by any means about this case. You may not
17  use any electronic device or media such as
18  telephone, cell phone, smart phone, iPhone,
19  BlackBerry, computer, Internet service, text, IM
20  service, Internet chat room blog, website, Facebook,
21  My Space, LinkedIn, YouTube or Twitter. Nothing. I
22  may have left some things out, but nothing. The
23  power of the jury is your deliberation among
24  yourselves solely on the basis of the evidence that
25  was presented to you and your recollections of it.

4347

1       You will have all of the exhibits with
2   you. If you want to have any testimony read back,
3   you must request that. Remember, it's not always
4   easy to locate what it is you want, particularly in
5   a long trial like this, so be very specific about
6   what witness and specifically what you think it is
7   that you want read back. I'm looking for key words
8   to search off of in particular.
9       Any requests for testimony, any
10  questions you have, any communications with the
11  Court in any respect, must be made in writing,
12  signed by your foreperson, folded over and given to
13  one of the marshals who will bring it to me. I'll
14  respond to your request as promptly as I can, either
15  in writing or I'll bring you back into courtroom so
16  that I can address you. I must caution you,
17  however, that in any communication that you have
18  with the Court, you should never specify any
19  numerical divide that may exist amongst you at that
20  time. Your deliberations are confidential and will
21  forever be confidential.
22      Again, I tell you that nothing I have
23  said in the instructions, nothing I have said or
24  done during trial has been done or said to suggest
25  to you in any way what I think your verdict should

4348

1  be.  That is your province.  What the verdict is is
2  your exclusive duty and your exclusive
3  responsibility, and I thank you.
4  It comes the time now for me to ask the
5  clerk to please draw the numbers of those who are
6  the alternate jurors.  You will be excused from
7  further attendance here in court, but you are not
8  being discharged.  You must remain under the same
9  instructions not to discuss the case, not to do any
10  research about the case, but to hold yourself ready
11  in the event that during the deliberations any of
12  the jurors becomes unable to continue to serve, in
13  which case you will be called back to replace that
14  juror and the deliberations will begin all over
15  again.  So, the direction that you not speak about
16  the case to anyone remains until you are finally
17  discharged from service in this case, and you are
18  not discharged at this time.
19  Will you please call the numbers of the
20  alternates.
21  THE CLERK:  No. 17, No. 15, No. 18, No.
22  14, No. 16, and No. 13.
23  THE COURT:  All right, ladies and
24  gentlemen, who are the alternates.  You have our
25  thanks, and we may still have you as jurors in this

4349

1  case, so hold yourself ready.
2  The jurors for the case are now excused
3  to begin your deliberation.  It was agreed that
4  today you could leave at four o'clock.  And best of
5  luck with the prom.  You may go with the Court's
6  thanks.
7  JUROR:  Could I ask you, with regard to
8  the telephone communication, again, you said no
9  telephone calls?
10  THE COURT:  Not while you are
11  deliberating.
12  JUROR:  So we have to exit and then you
13  can make a phone call?
14  THE COURT:  That would be all right, but
15  not about this case.
16  (Jury exited the courtroom.)
17  THE COURT:  All right, counsel, is there
18  a summary that you will -- will you please make a
19  summary of any objections that you continue to have
20  to the charge.  You may be seated.
21  MR. SHEEHAN:  Your Honor, with respect
22  to the charge, we have none.  With respect to the
23  verdict form, I continue to take the position that
24  the reference to the 280 -- the request for the jury
25  to make a finding with respect to the 280 grams or

4350

1  more is not warranted under the statute.
2  THE COURT:  It's noted.
3  Anything else with respect to the charge
4  as given?  Anything from the government?
5  MS. DAYTON:  No your Honor.
6  THE COURT:  Very well then.
7  MR. SHEEHAN:  Your Honor, I would
8  also -- I realize your Honor has said previously
9  that any motion for a mistrial has to be in writing.
10  I think that counsel's argument was an expression of
11  personal opinion, it was repeated, and under those
12  circumstances I would ask that there be a mistrial.
13  THE COURT:  And I'll ask you to
14  memorialize that in writing with appropriate case
15  law and attribution from the record that you will
16  soon have.
17  MR. SHEEHAN:  I will do that, your
18  Honor.
19  THE COURT:  All right, anything further?
20  All right, thank you very much.
21  MS. DAYTON:  I think the last juror here
22  isn't -- might have taken her stuff back there.
23  THE CLERK:  I'll get it out.
24  THE COURT:  All right then, if there is
25  nothing further we stand in recess.

4351

1  MR. SHEEHAN:  Did your Honor send them
2  home?
3  THE COURT:  No, I said they could go at
4  four.  So why don't you all stay here until Ms.
5  Villano tells you they have actually left.
6  MR. SHEEHAN:  I was just thinking we
7  need to review the --
8  MS. DAYTON:  What time do we come on
9  Monday?
10  THE COURT:  Nine o'clock.
11  MR. SHEEHAN:  Does your Honor want us to
12  be physically in attendance here or is it sufficient
13  if I was at my office, which is about three minutes
14  away?
15  THE COURT:  I would prefer you to be
16  here one, or the other of you, to be able to respond
17  to any questions.  You don't have to be in the
18  courtroom, I will actually be having a hearing, but
19  you need to be able to be reached with great
20  promptness.
21  MR. SHEEHAN:  Well, I'm about as close
22  as the government is if they're in their building
23  next door.  I don't know what your --
24  THE COURT:  I prefer to have you in the
25  courtroom, certainly for the first day.

4352

```
1              MR. SHEEHAN:  That will be fine, your
2    Honor.
3              THE COURT:  All right.  Ms. Torday will
4    be back.
5              MS. DAYTON:  Do the alternates know what
6    to do on Monday?  I don't think it was necessarily
7    clear to them what they're supposed to do.
8              THE COURT:  Are the alternates still
9    there?
10             MS. RODRIGUEZ-COSS:  Is the court going
11   to bring the jury back on Monday at 9:30?
12             THE COURT:  They go in at nine o'clock.
13   They do not come in here.
14             THE CLERK:  The alternates left.
15             THE COURT:  Everyone has left.  All
16   right, we stand in recess.
17             (Recess)
18
19
20
21
22
23
24
25
```

4353

```
1              I certify that the foregoing is a
2    correct transcript from the record of proceedings in
3    the above-entitled matter.
4
5                      5/22/11
6                        Date
7
8                 /S/  Sharon Montini
9                    Official Reporter
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

4354

```
1                 UNITED STATES DISTRICT COURT
2                   DISTRICT OF CONNECTICUT
3    * * * * * * * * * * *      *
                                *
4    UNITED STATES OF AMERICA,  * Case No 6cr160(JBA)
                                *
5              Plaintiff,       *
                                *
6         vs.                   *
                                *
7    AZIBO AQUART              * May 23, 2011
                                *
8              Defendant.       *
                                *
9    * * * * * * * * * * * *     *
10                   TRIAL TRANSCRIPT
11                    VOLUME XXI
12   BEFORE:  THE HONORABLE JANET BOND ARTERTON U.S.D.J.,
                                        and jury
13   Appearances:
14   FOR THE GOVERNMENT:  ALINA REYNOLDS, ESQ
                          TRACY DAYTON, ESQ.
15                        PETER MARKLE, ESQ.
                          JACABED RODRIGUEZ-COSS
16                        United States Attorney's Office
                          915 Lafayette Blvd
17                        Bridgeport, CT 06604
18
19   FOR THE DEFENDANT   MICHAEL SHEEHAN, ESQ
     AZIBO AQUART:       Sheehan & Reeve
20                        139 Orange Street
                          New Haven CT 06510
21                        JUSTIN SMITH, ESQ.
                          383 Orange Street
22                        New Haven, CT 06511
23
     Court Reporter:     Sharon Montini, RMR
24
     Proceedings recorded by mechanical stenography,
25   transcript produced by computer
```

4355

```
1              THE COURT:  All right, counsel, the jury
2    has advised it has a verdict.  In the event the
3    verdict is a guilty verdict -- oh, please be seated.
4    The question of the schedule of commencement of a
5    penalty phase is now at hand.  I have received the
6    requests for charge at the penalty phase from the
7    defendant.  Also from the government?
8              MS. RODRIGUEZ-COSS:  I'm sorry, your
9    Honor?  Yes, we did, we filed it yesterday.
10             THE COURT:  So we have the instructions.
11   Is there any reason we can't be ready to go on
12   Thursday?
13             MS. DAYTON:  We can be ready.
14             MR. SHEEHAN:  I think it's pretty soon,
15   your Honor.
16             THE COURT:  What --
17             MR. SHEEHAN:  I actually think -- I
18   mean, we've raised this issue before.
19             THE COURT:  What do we need to get done
20   before the penalty phase starts?
21             MR. SHEEHAN:  I think your Honor will
22   have -- there are some motions before the Court.  I
23   expect there will be more motions before the Court
24   tomorrow.  I think in terms of what --
25             THE COURT:  The additional motions are
```

4356

```
1   your anticipated motions?
2             MR. SHEEHAN:  Yes, your Honor.  I think
3   there is really one key issue that I wanted to get
4   before the Court, and that really has to do with, in
5   addition to motions I filed, the Armstead issue, and
6   I think that that --
7             THE COURT:  Tell me what the "Armstead
8   issue" means.
9             MR. SHEEHAN:  Well, your Honor may
10  recall that we had listed as a potential expert a
11  Mark Bezy.  The government had proposed among its
12  aggravating facts an assault that Mr. Aquart is
13  alleged to have committed in the prison.
14            THE COURT:  I'm sorry, I thought
15  Armstead was a case.
16            MR. SHEEHAN:  No.
17            THE COURT:  With which I was not
18  familiar.  I know what you are talking about then.
19            MR. SHEEHAN:  So, I think the question
20  is whether that issue, whether that specific event
21  is an appropriate aggravator.  Now, what the
22  government has argued is that -- at least orally had
23  previously raised the issue of some of our
24  mitigators, and the question of Mr. Bezy, in the
25  context of what I had noticed his area of expertise,
```

4357

```
1   and I think in one sense if the Armstead matter was
2   not an issue, which -- so, that's really the main
3   substantive issue that I still see before the Court
4   in that context.
5             MS. DAYTON:  Your Honor?
6             THE COURT:  And that motion has --
7             MR. SHEEHAN:  Not.
8             THE COURT:  -- not been filed yet.
9             MR. SHEEHAN:  No, it will be filed by
10  the end of the day today.
11            MS. DAYTON:  The government has no
12  problem with maybe doing the arguments on the
13  motions on Thursday and then perhaps starting
14  Friday.  We can do that.
15            MR. SHEEHAN:  It just seems that, your
16  Honor, the jury I think will be -- has worked very
17  hard throughout this process.
18            THE COURT:  What if we do this:  I don't
19  know, since I don't have all the briefing on all the
20  motions, I don't even have all the motions yet.
21  When can I get the government's responsive
22  memoranda?
23            MR. SHEEHAN:  To motions that I have
24  filed?
25            THE COURT:  To the motion that is to be
```

4358

```
1   filed that has some significant importance.
2             MS. DAYTON:  We've learned to read Mr.
3   Sheehan's mind.  We'll file it by tomorrow, or if he
4   files his -- when are you going to file yours?
5             THE COURT:  End of today?  Is that what
6   you had in mind?
7             MR. SHEEHAN:  Yeah, by the end of today,
8   which I guess is running sometime before 11:59 at
9   the rate we're going.  I mean, I appreciate that.
10            THE COURT:  Why don't we do this:  Why
11  don't we tell the jury to come back on Friday, but
12  we may postpone them until the following Tuesday.
13            MR. SHEEHAN:  That would be fine, your
14  Honor.
15            THE COURT:  All right, let's do that.
16  And then the issue of the alternates, as whether or
17  not they can participate in the penalty phase jury,
18  it seems to me is an issue that's only joined if and
19  when we need to use an alternate.  Isn't that right?
20            MR. SHEEHAN:  Well, no, it's joined
21  actually as of -- it's joined as of day one of the
22  penalty phase.
23            MS. DAYTON:  That's right, they would
24  have to be here for the penalty phase.
25            THE COURT:  But the issue of whether or
```

4359

```
1   not -- but the issues you raise in your opposition
2   to retaining alternates really becomes focused if an
3   alternate is needed during the deliberation phase
4   since they continue to be advised -- or they will be
5   advised not to discuss anything with each other and
6   not during the penalty phase.
7             MR. SHEEHAN:  I think that really begs
8   the mental -- I think that pushes the mental
9   gymnastics of the alternates to the limit and
10  beyond.  I think if the alternates are sitting
11  through the penalty phase, while it is true that
12  they are not --
13            MS. DAYTON:  This part can be dealt with
14  later, your Honor.
15            MR. SHEEHAN:  I think that we can deal
16  with that later in that sense, but I guess what I'm
17  not saying is -- I don't think we can wait until --
18  at least I would ask, urge the Court and suggest to
19  the Court that it would be improper for the
20  alternates to start as alternates on the jury.
21            THE COURT:  The logistical issue is
22  letting them know when to come back potentially.
23            MR. SHEEHAN:  I understand that.
24            THE COURT:  And the courtesy would be to
25  give them as much notice as possible.  But we could
```

4360

1  do that, and if you prevail in your argument, then
2  they could be dismissed when they come back.
3          MR. SHEEHAN:  Yeah, I would think that
4  just being notified to be on call is not a change in
5  their status except for whether or not that notice
6  is going -- I'm assuming that there will be some
7  coverage which many jurors, alternates, might
8  consider as, well, they decided that case.  But we
9  can deal with that at that point in time.
10         THE COURT:  And is there any reason if
11 alternates are asked to return and hear the penalty
12 phase evidence, if that's the phase we're going
13 into, is there any -- do we need more than three?
14         MR. SHEEHAN:  I wouldn't think so, your
15 Honor.
16         MS. DAYTON:  No, not from the
17 government's perspective, your Honor.
18         THE COURT:  All right, so that would be
19 jurors 13, 14 and 15.  If that is the case should
20 the Court excuse 18 -- discharge, 18, 17 and 16?
21         MR. SHEEHAN:  Well, I think so.
22         MS. DAYTON:  Yes, the government is okay
23 with that, your Honor.
24         THE COURT:  Any other logistical issues
25 that you would anticipate?

4361

1          MR. SHEEHAN:  No.  Could I just say, I
2  am covering for Attorney Smith.  I'm sort of
3  covering for the home for today, so we have no
4  problem with that, if the Court doesn't, and I hope
5  the Court doesn't mind his absence.
6          THE COURT:  No, I understand.  And Mr.
7  Aquart is here.
8          MR. SHEEHAN:  Right.
9          THE COURT:  And are we ready to bring in
10 the jury?
11         MR. SHEEHAN:  We are.
12         (Jury entered the courtroom)
13         THE COURT:  Good afternoon, ladies and
14 gentlemen.  Please be seated.  I'm advised by your
15 note that the jury has reached a decision.
16         JUROR:  That is correct.
17         THE COURT:  And you all are changing
18 seats.  What is your number, sir?
19         JUROR:  11.
20         THE COURT:  And you are the foreperson?
21         JUROR:  That is correct.
22         THE COURT:  And the verdict form that
23 you are going to hand to the clerk is the unanimous
24 decision of all the jurors?
25         JUROR:  That is correct.

4362

1          THE COURT:  Please hand it to the clerk.
2          All right, Mr. Foreperson, I'm going to
3  return the verdict form to you, ask you to stand and
4  read it.  After that I will ask each individual
5  juror as I call your number to stand and advise
6  whether or not the verdict that your foreperson has
7  read is your -- is your verdict.  In that way, as
8  you were told during voir dire, I can be certain
9  that the verdict is a unanimous verdict.  All right?
10 I'll return this to be read.
11         I'll ask the defendant to stand.
12         Stand, please, and read the verdict of
13 the jury.
14         JUROR:  On Count One, conspiracy to
15 commit murder in aid of racketeering:  We, the jury,
16 unanimously find the defendant, Azibo Aquart,
17 guilty.
18         On Count Two, murders in aid of
19 racketeering of Tina Johnson:  We, the jury,
20 unanimously find the defendant, Azibo Aquart,
21 guilty.
22         Count Three, murder in aid of
23 racketeering of James Reid:  We, the jury,
24 unanimously find the defendant, Azibo Aquart,
25 guilty.

4363

1          Count Four, murder in aid of
2  racketeering of Basil Williams:  We, the jury,
3  unanimously find the defendant, Azibo Aquart,
4  guilty.
5          Count Eight, conspiracy to distribute or
6  possession with intent to distribute 50 grams or
7  more of cocaine base:  We, the jury, unanimously
8  find the defendant, Azibo Aquart, guilty.
9          We, the jury, unanimously find that the
10 reasonable and foreseeable quantity of a mixture or
11 substance containing cocaine base, crack cocaine,
12 involved in Count Eight was 280 grams or more.
13         THE COURT:  You answered both questions?
14         JUROR:  We did.
15         THE COURT:  Read both answers, please.
16         JUROR:  And also we found that it was
17 50 grams or more also.
18         Count Five, intentional killing of Tina
19 Johnson while engaging in the drug conspiracy
20 charged in Count Eight:  We, the jury, unanimously
21 find the defendant, Azibo Aquart, guilty.
22         Count Six, intentional killing of James
23 Reid while engaging in the drug conspiracy charged
24 in Count Eight:  We, the jury, unanimously find
25 defendant, Azibo Aquart, guilty.

4364

1          And Count Seven, intentional killing of
2   Basil Williams while engaging in the drug conspiracy
3   charged in Count Eight:  We, the jury, unanimously
4   find the defendant, Azibo Aquart, guilty.
5          THE COURT:  All right, if you will hand
6   the verdict form back to the clerk, please.  We will
7   start with juror No. 1.  The foreperson may be
8   seated.
9          Juror No.1, would you please stand.  Is
10  the verdict that your foreperson read your verdict?
11         JUROR:  Yes, it is.
12         THE COURT:  All right, thank you.  Juror
13  No. 2, is this your verdict?
14         JUROR:  Yes, it is, your Honor.
15         THE COURT:  Thank you.  Juror No. 3, is
16  this your verdict?
17         JUROR:  Yes, it is.
18         THE COURT:  Thank you.  Juror No. 4, is
19  this your verdict?
20         JUROR:  Yes, it is.
21         THE COURT:  Juror No. 5, is this your
22  verdict?
23         JUROR:  Yes, it is.
24         THE COURT:  Juror No. 6, is this your
25  verdict?

4365

1          JUROR:  Yes, your Honor.
2          THE COURT:  Juror No. 7, is this your
3   verdict?
4          JUROR:  Yes.
5          THE COURT:  Juror No. 8, is this your
6   verdict?
7          JUROR:  Yes, it is.
8          THE COURT:  Juror No. 11 has read this.
9   This was your verdict as well?
10         JUROR:  Yes, your Honor.
11         THE COURT:  Juror No. 10?
12         JUROR:  Yes, your Honor.
13         THE COURT:  Juror No. 9?
14         JUROR:  Yes, it is.
15         THE COURT:  And juror No. 12?
16         JUROR:  Yes, your Honor.
17         THE COURT:  Thank you.  This being the
18  unanimous verdict of all the jurors, it is accepted
19  and we will proceed to the penalty phase.
20         The penalty phase, ladies and gentlemen,
21  will begin -- evidence in the penalty phase will
22  begin no earlier than this Friday May 27th at 9:30.
23  There are a number of matters I need to take up.  If
24  they cannot be finalized by Friday, evidence will
25  start the following Tuesday after Memorial Day, and

4366

1   you will be advised as early as we know what day
2   that will be.  So, if you will plan to please return
3   here at 9:30 to consider with respect to each of
4   these counts of conviction, 1 through 7, what shall
5   be the penalty.
6          You must not discuss this case anyone,
7   not even with the jurors with whom you have been
8   deliberating in order to reach this verdict.  And
9   may not do so until you are charged with the law
10  that is to be applied at the penalty phase.  And the
11  same reasons apply.  And that is that while you have
12  some understanding of the task that is at hand, you
13  do not know the complete charge on the law you are
14  to apply.  I will again give you some preliminary
15  instructions when you start, but that will not be a
16  substitute for the full and complete charge that you
17  will receive after you hear the evidence at the
18  penalty phase.  Therefore, you must not discuss the
19  case with anyone and you must not -- you must be
20  careful not to read anything in any media coverage
21  or view anything in any television or other
22  coverage, and you must stay off the internet and any
23  of the social media means.
24         So that I believe completes what I need
25  to advise you of as to the next phase.  We will see

4367

1   you on Friday morning at 9:30 unless otherwise --
2   you are otherwise advised, in which case it will be
3   Tuesday, but it will not be earlier.  We anticipate,
4   without certainty, that the evidence phase, the
5   presentation of evidence may take six days with the
6   closing arguments and the instructions on the law to
7   follow that.  So, I think we are pretty much on
8   schedule for what I told you to anticipate, and if
9   counsel have nothing further that the jury should be
10  advised of at this time --
11         MS. DAYTON:  Nothing from government,
12  your Honor.
13         MR. SHEEHAN:  No, your Honor.  Thank
14  you.
15         THE COURT:  Then I will release you for
16  the day and see you back here Friday at 9:30.  Thank
17  you very much for your service.
18         We stand in recess.
19         (Jury exited the courtroom.)
20         THE COURT:  All right, there are a
21  number of motions that are already pending from the
22  defendant.  I'm not aware that the government has
23  filed any motions.
24         MR. SHEEHAN:  The government has, your
25  Honor.

4368

```
1          THE COURT:  Okay.
2          MR. SHEEHAN:  There is a motion.
3          THE COURT:  Is it --
4          MR. SHEEHAN:  I filed a motion dealing
5   with victim impact.  The government has filed a
6   motion dealing with sort of the flip side of that, I
7   would say.  I think if we could -- I don't know, it
8   might make sense, your Honor, to reconvene on
9   Thursday and deal with all of the motions at that
10  point, or alternatively if you wanted to consider
11  them earlier.
12         THE COURT:  Well --
13         MS. DAYTON:  I'm sorry, your Honor, your
14  Honor had instructed defense that if there was a
15  guilty verdict today they had to turn over
16  discovery, Jencks material, list of mitigators and a
17  list of witnesses.  So we would ask for those
18  materials at this time.  And we don't know if there
19  will be additional motions filed based upon that
20  information.  So, it's hard to say.  And plus, we
21  will be responding to some of the motions filed by
22  the defense.  So we can do that as quickly as
23  possible, but we have to have the opportunity to go
24  through any items from counsel.
25         MR. SHEEHAN:  Yes, your Honor.  I was
```

4369

```
1   directed -- I think the one difference I would have
2   is I was not directed to file Jencks material
3   because I opposed filing Jencks material and the
4   Court did not rule on that.
5          THE COURT:  About your witnesses.
6          MR. SHEEHAN:  Yes, your Honor.  I think
7   the other question really, and I do have the list of
8   mitigating factors -- a draft list of mitigating
9   factors that I was directed to provide.  I have a
10  witness list that I have -- will provide to the
11  government which includes the addresses of our
12  proposed penalty phase witnesses.  The one I would
13  file with the Court does not include their addresses
14  because I don't think that's appropriate in a court
15  filing at this time.
16         And I will turn over to the government
17  the material that has been relied upon by Mr. Bezy.
18  I think they may have that already, but it would be
19  good if we could synchronize.  I don't know if they
20  have the corrections records.  I know you have some
21  of them.
22         MS. DAYTON:  Whatever you are going to
23  rely on we'll take.
24         MR. SHEEHAN:  So, I think we could
25  accomplish those things, your Honor.  I don't happen
```

4370

```
1   to have the disk of those materials physically with
2   me at this moment, but by the end of the day I will
3   have those, and by the end of the day, I mean by,
4   you know, three o'clock or something.
5          THE COURT:  All right, so --
6          MR. SHEEHAN:  I have the other material.
7   I have the witness list and I have the mitigating --
8   the proposed mitigating factors list.  I think the
9   one question that the government raised, and not by
10  motion, but we've had discussions I believe in
11  chambers on this, so it would be on the record of
12  course, but was the question of notes.  And I don't
13  think that with respect to any -- I can represent to
14  the Court that we don't have any statements under
15  Jencks.  As far as any of the -- any of the
16  witnesses, what we -- so, there is no written
17  statements or substantially verbatim accounts or
18  reports that have been signed by any of the
19  witnesses.
20         MS. DAYTON:  Your Honor, couple things.
21  One, we believe there is also a psychologist that's
22  going to testify and we would like anything the
23  psychologist relied upon as well.  With respect to
24  Jencks, the --
25         MR. SHEEHAN:  Well, could I-- perhaps
```

4371

```
1   if we could deal with them one at a time.  I will
2   provide the government with the sort of -- the
3   psychologist did not rely upon -- the psychologist
4   did not evaluate Mr. Aquart, nor did she review any
5   of his records.  I will provide the government with
6   the publicly available material that the
7   psychologist relied upon in addition to her
8   experience.  I think that -- I'm also in the process
9   of getting a -- which I don't have yet, but
10  essentially getting a PowerPoint presentation that I
11  will provide the government a copy of that as soon
12  as we get that.
13         THE COURT:  When you say you will supply
14  to the government publicly available material relied
15  on by the psychologist, is that to distinguish from
16  some other material relied on by the psychologist?
17         MR. SHEEHAN:  No, I mean the
18  psychologist is relying upon her universe of
19  experience in the field and her knowledge in the
20  field.  There were certain specific publications
21  included among -- that the psychologist references,
22  and those will be provided to the government.  But
23  there was no material that was provided -- in short,
24  I will provide the government with everything that I
25  am aware of in terms of specific documents relied
```

4372

```
1    upon by the psychologist.  There was nothing with
2    reference to Mr. Aquart.
3                THE COURT:  And with respect to what
4    we're calling the Jencks issue, what remains
5    undisclosed that you are taking the position you
6    have no obligation to provide to the government?
7                MR. SHEEHAN:  A number of the witnesses
8    were interviewed over a period of time by our
9    mitigation specialist, Anna Bulkin, essentially she
10   was working on my behalf, and that -- so her notes
11   do reflect the interviews that she had with the
12   witnesses.  They were not verbatim, they were not
13   adopted, they were not reviewed by the witnesses.
14               THE COURT:  They would be the functional
15   equivalent at the guilt phase of 302s.
16               MR. SHEEHAN:  I wouldn't say that.  I
17   think they would be the functional equivalent of
18   essentially the handwritten notes.
19               THE COURT:  Of agents?
20               MR. SHEEHAN:  Yes, your Honor.
21               THE COURT:  All right, so that remains
22   the one part that's in dispute.
23               MR. SHEEHAN:  And I think we've
24   already -- as far as psychologists, Mr. Shannon, he
25   relied on nothing that I know of other than his
```

4373

```
1    meetings with the -- Azibo and his brother Azizi,
2    and there are no notes of that that I'm aware of.
3    The only document reflecting that has long since
4    been provided to the government.
5                THE COURT:  Okay.
6                MR. SHEEHAN:  When I reference material
7    relied upon by Mr. Bezy, that is -- essentially Mr.
8    Bezy was a longtime employee of the Federal Bureau
9    of Prisons.  The material that was provided to him
10   by us consisted of Mr. Aquart's records in the
11   Department of Corrections and at Wyatt, including
12   the material that was provided to us by the
13   government, and what I will do with the government
14   is give them a copy of all of that material, and
15   hopefully they will, you know, will understand -- I
16   think they have some of it.  I don't know how much
17   of it they have.  I mean, I've seen some of it at
18   various points.
19               The other thing that I will do is
20   provide the government with a copy of whatever other
21   material was -- that we might rely upon in the
22   sentencing phase, and I'll provide that to the
23   Court.  I think that I can get that to them by the
24   end of the day on Tuesday.
25               MS. DAYTON:  Your Honor, we were
```

4374

```
1    supposed to have discovery today, immediately, not
2    by the end of the day tomorrow, not any other time.
3    And I would like to respond to a couple of things
4    Mr. Sheehan just said.  Number one, with respect to
5    Marva Lewis, the government will likely be making a
6    motion.  We can't see what the relevance of her
7    testimony would be if she didn't examine the
8    defendant, didn't examine the defendant's records
9    and has no personal knowledge about this case.  And
10   when Mr. Sheehan turns over whatever she did rely on
11   that has nothing to do with the case, we don't want
12   just what he thinks she relied upon, we want what
13   she actually relied upon.
14               THE COURT:  I assume that's what will be
15   turned over and that will be verified with her.
16               MR. SHEEHAN:  Yes.  I mean, she is a
17   trained psychologist, your Honor.  In part what
18   she's relying upon is her experience and knowledge.
19   It's a little bit like saying turn over all of the
20   law books that you ever read.  I'm not asking her to
21   do that.
22               THE COURT:  She will have certain
23   opinions.  She will base that opinion not only on
24   her experience, but on the literature in the field.
25               MR. SHEEHAN:  Correct.
```

4375

```
1                THE COURT:  And it's that literature in
2    the field that you are going to be turning over.
3                MR. SHEEHAN:  Well, it's a summary, your
4    Honor.  For example, the issue of risk factors that
5    we identified in our disclosure are factors
6    identified by, among others, the Department of
7    Justice, as well as the Attorney General of the
8    United States, and what they basically relate to is
9    the correlation of risk factors and how that
10   intersects with predictions of violent conduct.
11   There is a whole body of knowledge on that that Dr.
12   Lewis would be testifying about.  So I'm not -- I
13   don't think it makes sense to -- I don't know any
14   way to do that.
15               THE COURT:  You indicated these are
16   publicly available and you will be at least
17   referencing them so that they can be found.
18               MR. SHEEHAN:  I will be giving them a
19   copy of whatever.  Yeah, I will be providing them
20   with a copy of that.
21               THE COURT:  So that Dr. Lewis would not
22   be mentioning or referencing articles or
23   publications in addition to what you will turn over.
24               MR. SHEEHAN:  Any specific articles or
25   publications, I don't contemplate that, no, your
```

4376

1  Honor.
2      THE COURT:  She will be precluded.
3  That's the issue, if she hasn't -- if those articles
4  haven't been disclosed such that the other side
5  knows what the basis is, then there is a significant
6  chance that she can't talk about them in her
7  testimony.  But I think that's the contemplation
8  here, right?
9      MR. SHEEHAN:  Yes.
10     MS. DAYTON:  Your Honor, again, the
11  government would submit, and we will write this,
12  we'll put it in writing, that this is so vague and
13  so general as to be irrelevant.
14     THE COURT:  And I'll get your motion on
15  that.  When will I get that motion?
16     MS. DAYTON:  Well, we don't even have
17  the documents yet, so it's hard for us to put it in
18  writing.
19     THE COURT:  No, you were beginning to
20  articulate your position earlier last week and so I
21  wondered whether you had undertaken any work on
22  that.
23     MS. DAYTON:  No, we're waiting to get
24  whatever.  And we'd also ask if there is any report
25  she generated in this case, as well as if Mr. Bezy

4377

1  has generated a report, because obviously he has
2  looked at the defendant's documents and specific
3  prison records with respect to the defendant, and if
4  he's going to come in here and testify as an expert,
5  the same with Ms. Lewis or Dr. Lewis, we would
6  expect that they generated reports and the
7  government would request not only the underlying
8  documents, but the reports.
9      MR. SHEEHAN:  A, they have not generated
10  reports, and while the government might expect it,
11  there is no requirement that they do so.
12     THE COURT:  All right, so there is none,
13  so that takes care of that.
14     MS. DAYTON:  And with respect to the
15  Jencks material, your Honor, the notes that you
16  appropriately pointed out sound exactly like 302s --
17     THE COURT:  That's not what he said.  He
18  said it's like the agents' notes who prepare the
19  302.
20     MS. DAYTON:  I heard what he said, but
21  the agents actually do make reports of what people
22  say.  And, your Honor, we can't -- if the witnesses
23  are going to come in here -- the government turned
24  over its Jencks material a month before testimony,
25  more than a month before testimony started in this

4378

1  case, and part of the reason of doing that was to
2  avoid unnecessary delays during the course of the
3  trial, and for the defense, they have a very long
4  witness list that they originally provided.  We
5  don't have any idea how many of those people they're
6  actually putting on.  But for the government not to
7  get anything before these witnesses take the stand,
8  it's quite likely that we will be asking for time
9  after they testify in order to investigate what
10  they've said, do the research on what they've said.
11  We don't -- we haven't been given anything on these
12  witnesses, not rap sheets, not birth dates, not what
13  they're going to say.  We don't even know who
14  interviewed them.  So, it's impossible for us to
15  call --
16     THE COURT:  Well, you know Anna Bulkin
17  interviewed them.
18     MS. DAYTON:  We know she interviewed
19  some of them.  The defense has multiple
20  investigators.  We don't know which investigators
21  were present with Anna Bulkin, or if any, and how
22  many times these people were interviewed, where they
23  were interviewed, what they said, if they changed
24  what they said at any point.  So it's impossible for
25  us to even begin to prepare to impeach any of their

4379

1  testimony or not to impeach their testimony if we
2  don't have anything to prepare with, and that's the
3  situation we're in right now.  We have no idea who
4  they're calling and what the people are going to
5  say, and we can't even go speak to their
6  investigators to interview them about what the
7  witnesses said.
8      So, we would ask that the Court direct
9  counsel -- request that counsel turn over the Jencks
10  material in advance, just like the Court requested
11  that of the government, in order to avoid
12  unnecessary delay and the possibility of losing
13  jurors during the case of the trial.
14     THE COURT:  So, Mr. Sheehan, your
15  objection has been to turning over the notes of the
16  interviewers.  First question is, is there more than
17  one interviewer on the mitigation witness list?
18     MR. SHEEHAN:  Other than counsel, I
19  don't think so, your Honor.
20     THE COURT:  And then, secondly, you have
21  a list of dates when each of the interview -- yes,
22  the interviews were under taken.
23     MR. SHEEHAN:  I don't.  I mean, I could
24  assemble a list of dates.
25     THE COURT:  Presumably Ms. Bulkin could

4380

```
1   do that.
2           MR. SHEEHAN:  We could assemble a list
3   of dates, yes, your Honor.
4           THE COURT:  Why don't you do that per
5   witness.  That gives the government some information
6   as to when the interviewing took place and by whom,
7   and I will take up the issue of whether or not
8   you're obligated to turn over the notes as an analog
9   to agent notes.  Has that issue been briefed?
10          MR. SHEEHAN:  Not to my knowledge, your
11  Honor.  In this case, no.
12          MS. DAYTON:  Your Honor, we didn't
13  realize there were absolutely no reports of
14  witnesses.  I mean, they have so many witnesses it
15  just never occurred to the government that somebody
16  preparing a death penalty would not create reports
17  of their interviews of the witnesses.
18          THE COURT:  Would you then -- it will be
19  your motion to compel the notes.
20          MS. DAYTON:  Yes.
21          THE COURT:  So why don't we get that
22  filed as soon as possible, and you will have all of
23  the other information to go along with that.  Okay,
24  what else remains outstanding other than the notes
25  of the interviewer of the penalty phase witnesses?
```

4381

```
1   Are you going to provide a more focused list of
2   mitigation witnesses?
3           MR. SHEEHAN:  I don't know what your
4   Honor -- no is the short answer.
5           THE COURT:  Ms. Dayton said it was a
6   long list.
7           MR. SHEEHAN:  Oh, I have a list of
8   people.
9           THE COURT:  The question is has this
10  become shorter as you focus on the penalty phase as
11  an actuality?
12          MR. SHEEHAN:  No.
13          THE COURT:  And has that mitigation list
14  been filed with the court?
15          MR. SHEEHAN:  No, because here we are.
16  It was going to be filed when I got back to the ECF
17  to file that.
18          THE COURT:  So I will get a copy.
19          MR. SHEEHAN:  I actually have a copy.
20          THE COURT:  All right.
21          MR. SHEEHAN:  That I can provide to both
22  the government.
23          THE COURT:  Okay.
24          MR. SHEEHAN:  But it's not -- it has not
25  been ECF filed.
```

4382

```
1           THE COURT:  Other than the interviewer
2   notes, the government's motion to preclude Lewis
3   and/or Bezy, what other motion is the government
4   anticipating?
5           MS. DAYTON:  We don't know yet at this
6   time.  We would ask that they identify in their
7   witness list --
8           MR. SHEEHAN:  I'm sorry, your Honor, I
9   have to give them the -- I'll give them both.
10          MS. DAYTON:  If these people are
11  friends, family, what they are, because it may be
12  cumulative at a certain point.  So we would ask --
13  we can see there is a person with the last name
14  Aquart, so we can figure out that's the defendant's
15  brother.
16          THE COURT:  Why don't I let you bring on
17  whatever motion you have now that you've been
18  provided with the witness list.
19          MS. DAYTON:  I'll just hand these up.
20  These have not been ECF filed, so I will file these,
21  your Honor, and I'll just indicate in the proposed
22  -- as I indicated previously, the addresses have
23  been provided to the government.
24          THE COURT:  And the defendant's
25  forthcoming motion by the end of the day is to
```

4383

```
1   preclude the evidence about the Armstead beating in
2   its entirety.
3           MR. SHEEHAN:  Yes.
4           THE COURT:  And then there is also a
5   motion to preclude some aspect of the victim -- the
6   victim witnesses' testimony.
7           MR. SHEEHAN:  Well, it's not so much
8   to -- that motion is essentially asking that we get
9   a representation of what those witnesses -- that
10  there be a -- what is, in essence, a proffer to the
11  Court as to what those witnesses might say in light
12  of the sensitivity associated with victim impact
13  testimony.  And I believe the government had
14  indicated that they were going to call two members
15  per family.  I think that had been represented.
16          THE COURT:  All right, the proffer
17  issue, is that a motion that has been filed or will
18  be filed?
19          MR. SHEEHAN:  Has been filed, your
20  Honor.  And I think the government has responded to
21  that.
22          MS. DAYTON:  Yes.
23          THE COURT:  All right, then that's
24  joined.  All right, any other motion?
25          MR. SHEEHAN:  Well, I filed a very
```

4384

```
 1   lengthy motion, your Honor, addressed to the issue
 2   of prosecutorial argument which is before the Court.
 3   I don't know if it's made its way to chambers.
 4           THE COURT:  Just before I came on the
 5   bench.  So, I have not had a chance to look at that.
 6   Does that have any aspect to it with respect to
 7   closing arguments for the penalty phase?
 8           MR. SHEEHAN:  Yes.
 9           MS. DAYTON:  That's all it's about.
10           MR. SHEEHAN:  That's what it's about.
11           MS. DAYTON:  He filed two motions, one
12   that had to do with the government's closing in the
13   guilt phase and one, the lengthy one, is the one
14   that has to do with the penalty phase closing
15   arguments.
16           THE COURT:  So that is one, in fact, I
17   have not had a chance to take a look at.  All right,
18   well, let's optimistically set down argument for
19   9:30 on Thursday the 26th, and if it is necessary or
20   we're able to do any part of that earlier, I will
21   let you know, but it looks to me as if I will barely
22   have all of the briefing in, in which case if I
23   can't do it on Thursday, I'll do it on Friday.
24   Okay.
25           MR. SHEEHAN:  Thank you, your Honor.
```

4385

```
 1           MS. DAYTON:  Thank you, your Honor.
 2           THE COURT:  All right, anything else?
 3           MS. DAYTON:  No, your Honor.
 4           THE COURT:  If not we stand in recess.
 5           (Proceedings concluded)
 6
 7
 8           I certify that the foregoing is a
 9   correct transcript from the record of proceedings in
10   the above-entitled matter.
11
12                    5/24/11
13                     Date
14
15                /S/  Sharon Montini
16                 Official Reporter
17
18
19
20
21
22
23
24
25
```

1

```
 1             UNITED STATES DISTRICT COURT
 2               DISTRICT OF CONNECTICUT
 3   * * * * * * * * * * *      *
                                *
 4   UNITED STATES OF AMERICA,  *  Case No 6cr160(JBA)
                                *
 5           Plaintiff,         *
                                *
 6        vs.                   *
                                *
 7   AZIBO AQUART               *  MAY 13, 2011
                                *
 8           Defendant.         *
                                *
 9   * * * * * * * * * * * *     *
10     TRANSCRIPT OF GUILT PHASE CHARGE CONFERENCE
                     VOLUME I
11
12   BEFORE:  THE HONORABLE JANET BOND ARTERTON U.S.D.J.,
                                     and jury
13   Appearances:
14   FOR THE GOVERNMENT:   ALINA REYNOLDS, ESQ
                           TRACY DAYTON, ESQ.
15                         PETER MARKLE, ESQ.
                           JACABED RODRIGUEZ-COSS
16                         United States Attorney's Office
                           915 Lafayette Blvd
17                         Bridgeport, CT 06604
18   FOR THE DEFENDANT     MICHAEL SHEEHAN, ESQ
     AZIBO AQUART:         Sheehan & Reeve
19                         139 Orange Street
                           New Haven CT 06510
20
                           JUSTIN SMITH, ESQ.
21                         383 Orange Street
                           New Haven, CT 06511
22
23   Court Reporter:    Sharon Montini, RMR
24
     Proceedings recorded by mechanical stenography,
25   transcript produced by computer
```

2

```
 1           THE COURT:  All right, I did not pick up
 2   that there were very many disagreements as to the
 3   substantive law, but I am happy to hear about
 4   improvements and omissions.  My first question is,
 5   is venue in dispute?  Venue was a charge in the
 6   government's proposed charge.
 7           MR. SHEEHAN:  Venue is not in dispute,
 8   your Honor.
 9           THE COURT:  So, we do not have to charge
10   that.  All right, and then I'm going to take the
11   portion of what is and is not evidence and put it
12   into the bullets that the -- in the form the
13   government proposes because I think that it is
14   clearer.  So, if you look at government's --
15           MR. SHEEHAN:  In yours or theirs?
16           THE COURT:  No, this is theirs.  Mine is
17   all run together.  In any event, I'll give that to
18   you on Monday.  And the only other things are these
19   slight changes or additions or modifications to the
20   ones you have the copies of.  There is --
21           MS. REYNOLDS:  We're on what you handed
22   out?
23           THE COURT:  I'm just telling you those
24   are not substantive changes, they're more stylistic.
25   But could you tell me who I should list here as all
```

3

```
1   the expert witnesses.
2           MS. DAYTON:  Do you want us just to
3   e-mail you a list?  Is that easier?
4           THE COURT:  And then I will have it.
5           MR. SMITH:  Dr. Baden, your Honor.
6           THE COURT:  B-a-d-e-n.  What's his first
7   name?
8           MR. SMITH:  Michael.
9           MS. REYNOLDS:  John Pleckaitis --
10          THE COURT:  If you want to just e-mail
11  it, that would be fine, we can just add that in.
12  And that will go up through the end of trial.
13          MS. REYNOLDS:  Correct.
14          THE COURT:  Just those who have
15  testified.  And then there was also -- I wanted you
16  to take a look at the section on the law enforcement
17  witnesses.  I started that list, but I haven't
18  finished that list.
19          MS. REYNOLDS:  We have it.
20          THE COURT:  So if you wouldn't mind
21  e-mailing me that as well.
22          MR. SHEEHAN:  Why are we listing the
23  witnesses?
24          THE COURT:  I'm going to charge first
25  and then you'll close.  This will at least begin to
```

4

```
1   bring back the names to them who is in what category
2   and may just serve as a bit of a refresher.
3           MR. SHEEHAN:  Well, but -- yeah, my only
4   concern is you are listing some.  Are you listing
5   all of the witnesses?
6           THE COURT:  I'm listing all where the
7   charge applies to them.
8           MS. RODRIGUEZ-COSS:  Like all experts.
9           THE COURT:  Experts and law enforcement.
10          MR. SHEEHAN:  Well --
11          MR. MARKLE:  Some will be your
12  witnesses.
13          MR. SHEEHAN:  It just seems to me that I
14  don't see a purpose for the Court listing the
15  witnesses.
16          THE COURT:  Well, I do for experts
17  because those are separately designated.
18          MR. SHEEHAN:  So why for law enforcement
19  then?
20          THE COURT:  Well, just because it serves
21  to refresh their recollections.  And I would be glad
22  to do it for cooperating witnesses as well.
23          MR. SHEEHAN:  Well, I'm not asking your
24  Honor to do that.  I think one of the concerns I
25  have with respect to law enforcement is that it --
```

5

```
1   while you are telling them that they're, you know,
2   to be treated like anybody else, I don't know then
3   why the Court is coming in -- it seems to me it
4   operates as a form of just sort of reinforcing their
5   status, which we're not -- which they're also being
6   told to disregard.  I realize that you have, you
7   know, a special charge on experts because they can
8   do something different from what other people do,
9   but I don't think that I -- my concern is just to a
10  kind of a mixed message coming out.
11          THE COURT:  I'm using this as a means of
12  refreshing their recollection on who were witnesses.
13  This is not something that would just have been
14  testified to two or three days ago.  I don't see the
15  harm in it.  I don't understand your claim that it
16  reinforces their status as opposed to identifies
17  them.
18          Does the government wish me to do this
19  or do you not feel strongly?  I think it's useful
20  for the jury.
21          MS. RODRIGUEZ-COSS:  In my experience
22  they've always been listed.
23          THE COURT:  That may be, but that
24  doesn't mean we don't reconsider whether it's a good
25  idea or not.  That's what we are doing here.
```

6

```
1   Because I usually do list them.
2           MS. RODRIGUEZ-COSS:  I thought we were
3   talking about experts.
4           MS. DAYTON:  Law enforcement.  We don't
5   have an opinion.
6           THE COURT:  All right, we'll leave the
7   law enforcement out and list experts.  Okay.
8           MS. DAYTON:  Michael, list experts,
9   leave law enforcement out?
10          MR. SHEEHAN:  Yeah.
11          MS. RODRIGUEZ-COSS:  I thought we were
12  talking about experts.
13          THE COURT:  Now, let's start with the
14  substantive charge at 12.
15          MR. SHEEHAN:  Well, actually, could we
16  go back to 7?  My objection --
17          MS. RODRIGUEZ-COSS:  Page 7?
18          MR. SHEEHAN:  Page 7 on the role of
19  attorneys.  I have -- I don't like the clause that's
20  "in which we hope that the truth will emerge"
21  because what that suggests to me is dilution of the
22  burden of proof, and the issue that's before the
23  jury is not really a matter of coming to an ultimate
24  answer as to what happened, they're not there to --
25  they're not there to, you know, sort of fill in the
```

7

```
1   blanks and try to guess at the truth, and so that's
2   why I think that line leads them astray.  I think
3   the ultimate issue is going to be whether or not --
4           THE COURT:  So if we changed that "our
5   courts operate under an adversarial system in which
6   it is the role of the attorneys to press as hard as
7   they can for their respective positions."
8           MR. SHEEHAN:  That's fine.
9           THE COURT:  Anything else before page
10  11?
11          MR. SHEEHAN:  I did on page 8, your
12  Honor.  Later on you included, but I think it should
13  be included here as well, at the bottom of the page,
14  "carefully weighing all of the evidence or lack of
15  evidence."  You do note it later on in the charge
16  and the government noted it in their charge, that a
17  jury can take into account the lack of evidence as
18  well.
19          THE COURT:  All right.
20          MR. SHEEHAN:  The other --
21          MS. RODRIGUEZ-COSS:  What line is that?
22          THE COURT:  Three from the bottom.
23          MR. SHEEHAN:  The other one I was
24  concerned about, your Honor, is we had proposed on
25  page 5 of our charge, which would come in right
```

8

```
1   after "I therefore instruct you, you must presume
2   the defendant is innocent until you are satisfied,"
3   the paragraph that says "you may not infer that Mr.
4   Aquart was guilty of participating in criminal
5   conduct merely from the fact that he associated with
6   people who were guilty of wrongdoing and Mr. Aquart
7   is not on trial for any act or any conduct not
8   specifically charged in the indictment."
9           MS. DAYTON:  That's covered later
10  several times, that mere associate is not sufficient
11  to find the defendant guilty.
12          MR. SHEEHAN:  I agree it's covered
13  later.  I think it's also important that it be
14  consistently covered, particularly in light of the
15  limiting instruction that the Court is going to give
16  on other bad acts.
17          MS. DAYTON:  The Court, you just said,
18  is giving a limiting instruction, so why does it
19  need to be repeated again?
20          THE COURT:  Here is the problem:  When
21  you repeat it so many times it tends to make people
22  cancel out.  So, I would rather -- and I don't think
23  that it really actually fits here.  I mean, the
24  presumption of innocence is just an absolute
25  presumption.  So, I looked at that, I put it
```

9

```
1   somewhere else.
2           All right, what's next?
3           MR. SHEEHAN:  I think I jumped ahead,
4   and I'm sorry to have to be paging.
5           MS. REYNOLDS:  Are we on page 12?
6           MR. SHEEHAN:  I don't have anything up
7   to page 23.
8           THE COURT:  What's your next one?
9           MS. RODRIGUEZ-COSS:  I have on page 17.
10          MR. SHEEHAN:  12 did you have something?
11          MS. RODRIGUEZ-COSS:  No, we were up
12  to --
13          THE COURT:  That was just where the
14  substantive law started.  17?
15          MS. RODRIGUEZ-COSS:  Your Honor, there
16  is -- three lines from the bottom, I just had a
17  suggestion, "it is a separate, stand-alone crime,"
18  to substitute "conspiracy" for "it" just to clarify
19  that is what the Court is referring to.
20          THE COURT:  Okay.
21          MS. REYNOLDS:  And there is a comma
22  missing in the title.
23          THE COURT:  I'm sorry after "two."
24          MS. REYNOLDS:  After "two."
25          THE COURT:  I see that.  The shame of
```

10

```
1   it.
2           MS. DAYTON:  The one before "and."
3           THE COURT:  The other comma will come
4   out.
5           MS DAYTON:  That's where you meant for
6   it to go.
7           MR. SHEEHAN:  I got something on page
8   20.  I think on 3, the issue is that the defendant
9   held a position.  That's what we're being charged
10  with.  I don't think it's a big deal one way or
11  another, but that's what the government had, that's
12  what we had.
13          THE COURT:  All right, do you agree with
14  that?
15          MS. DAYTON:  Fine.
16          THE COURT:  Are there other places where
17  that change will need to be made?
18          MR. SHEEHAN:  I don't think so, your
19  Honor.
20          MS. REYNOLDS:  Page 23.
21          MR. SHEEHAN:  I had something on page
22  23, too.
23          MS. REYNOLDS:  It should be U.S.C.
24  841(A)(1).
25          MS. DAYTON:  I have a few things on this
```

11

```
1   page, actually.
2              THE COURT:  Okay, whose first?
3              MS. DAYTON:  It says "which is a
4   violation of 21 U.S.C. 841(a)(1)," instead of
5   (c)(1), and then the next line the word "or" is
6   spelled with an "E."  A typo.
7              MR. SHEEHAN:  What?
8              THE COURT:  Oh, yes.
9              MS. DAYTON:  And then in the next line,
10  instead of "and those persons," starting with a
11  comma, instead of "and those persons knowingly and
12  willfully became members," it should be "and that
13  the defendant knowingly and willfully became a
14  member of that narcotics conspiracy."
15             MR. SHEEHAN:  And on this page, your
16  Honor, I am requesting that you add in that
17  paragraph that we have at the -- on our page 48,
18  "The alleged racketeering activities must relate to
19  the operation of the charged enterprise.  Criminal
20  acts committed independently by individuals."
21             MS. DAYTON:  I thought that was clear
22  from somewhere else.
23             THE COURT:  All right, we'll add that
24  in.
25             MS. DAYTON:  Your Honor, the government
```

12

```
1   made an error.  We intended to -- there's the
2   definition for "distributed" and "possessed," and I
3   think I moved it from one place to another and ended
4   up --
5              MS. RODRIGUEZ-COSS:  Ended up deleting.
6              MS. DAYTON:  Ending up deleting rather
7   than adding.  Usually the word "distribution" and
8   "possessed," it can either be explained here or in
9   the narcotics section.  I think that's what
10  happened, I moved it back and forth from the ones
11  you read before trial.
12             THE COURT:  Where would it first appear?
13             MS. DAYTON:  Well, it appears right
14  here.
15             THE COURT:  On 23?
16             MS. DAYTON:  Yeah, they "distributed or
17  possessed with intent to distribute a controlled
18  substance."
19             THE COURT:  So, we can add those
20  definitions at that point?  And do you have a
21  proposed definition?
22             MS. DAYTON:  So, I think it was in the
23  ones you did before we started the case.
24             MS. RODRIGUEZ-COSS:  The ones we sent
25  in.
```

13

```
1              MS. DAYTON:  Yeah, originally, but I can
2   resend them.
3              THE COURT:  That's okay.  All right,
4   what's the next thing on which we have something?
5              MR. SHEEHAN:  I had something on page --
6   I think it's clearer on 25 "knowingly and
7   intentionally" because we're using "intentional" and
8   then suddenly we have "willful."
9              THE COURT:  What do you suppose the
10  difference is?
11             MR. SHEEHAN:  I don't know except we're
12  generally using --
13             THE COURT:  Isn't it an oxymoron to say
14  accidentally murdered somebody?
15             MR. SHEEHAN:  Well, that would be
16  manslaughter.
17             MS. DAYTON:  No, that's not an accident.
18  Manslaughter is intentional.
19             MR. SMITH:  I suppose if you murdered
20  the wrong person.
21             THE COURT:  Do you think "knowingly and
22  intentionally" improves the jury comprehension in
23  what they're doing here?
24             MR. SHEEHAN:  I thought it did in a
25  hugely important way.
```

14

```
1              MR. SMITH:  And I think "intentionally"
2   was the word we used through voir dire most of the
3   time.
4              MS. DAYTON:  You used "knowing,"
5   "intentional," "no excuse," "no justification."
6              THE COURT:  "Not an accident," "didn't
7   have a fight."
8              Okay, what's the next one?
9              MR. SHEEHAN:  I just wanted that word
10  changed, that's all.
11             THE COURT:  All right, what's next?
12             MR. SHEEHAN:  Oh, on page 27 I thought
13  you should add after the last -- when we're talking
14  about aiders or abettors, "an aider or abettor must
15  have some interest in the criminal venture and must
16  have performed some act that directly facilitated or
17  encouraged the crime."
18             THE COURT:  Put that after the second
19  full paragraph?
20             MR. SHEEHAN:  Right.
21             THE COURT:  Do you have that?
22             MS. DAYTON:  But that's two paragraphs
23  above.  It says "willfully and knowingly associated
24  himself in some way with the crime, and he willfully
25  and knowing sought by some act to help make the
```

15

```
1   crime succeed."  It's right there.
2           MR. SHEEHAN:  Well, then we could just
3   take out the line about "an aider and abettor must
4   have some interest in."  I'm just saying when we
5   first -- up here we say --
6           THE COURT:  I'm behind you.  Where is it
7   that we have already said that?
8           MS. DAYTON:  Go to 27, your Honor.
9   Right here, "in that he willfully."
10          THE COURT:  And what was it you wanted
11  to add?
12          MR. SHEEHAN:  I wanted to add in "and
13  must have performed some act that directly
14  facilitated or encouraged the crime."
15          THE COURT:  So, you are down at the
16  fourth full paragraph.
17          MR. SHEEHAN:  Yes, I am.
18          THE COURT:  And you want "an aider or
19  abettor must have had some interest in the criminal
20  venture and must have performed some act."
21          MR. SHEEHAN:  "That directly facilitated
22  or encouraged the crime."
23          MS. DAYTON:  Why "directly"?  It's just
24  an act that encouraged or facilitated.
25          THE COURT:  Okay.  All right.
```

16

```
1           MR. SHEEHAN:  And let's see.  Just a
2   small point, but on 35.
3           THE COURT:  Anything before 35?
4           MS. DAYTON:  This is really stupid, but
5   on 31 it appears that the font changes.  I don't
6   know if anyone cares, but I noticed.
7           THE COURT:  I guarantee we will have a
8   uniform font.
9           MR. MARKLE:  Send it to Tracy, she'll
10  clear it up.
11          THE COURT:  We will make sure we have
12  one font.
13          MR. SHEEHAN:  So --
14          THE COURT:  Was there something?
15          MS. DAYTON:  Substantive, no.
16          MR. SHEEHAN:  35 where it says "two or
17  more persons," at the top, the heading, "element
18  one," instead of just saying "involved," I think it
19  should say "two or more persons entered into
20  agreement."
21          THE COURT:  "Agreed"?  Just put
22  "agreed"?
23          MS. RODRIGUEZ-COSS:  "Agreed" is fine.
24          MS. REYNOLDS:  We should change 34 where
25  you list that "two or more persons agreed" just to
```

17

```
1   keep it consistent.
2           MR. SHEEHAN:  Good point.  Then I move
3   up to page 37.
4           THE COURT:  Okay.
5           MR. SHEEHAN:  I think this second
6   sentence here, what is necessary is that he must
7   have participated with knowledge of the purpose.  I
8   don't know at least one --
9           MS. DAYTON:  I'm sorry, what paragraph?
10          THE COURT:  The second full paragraph.
11  The indictment charges two things.  And I know the
12  government's charge also just had one purpose, but
13  the indictment charged the narcotics and the murder,
14  so that's why I put it in there, and that's why we
15  discuss these things.  Do you want me to get the
16  indictment out and show you what I mean?
17          MR. SHEEHAN:  I think you've got it in
18  here, don't you?
19          THE COURT:  I don't know if I have all
20  of it.
21          MS. DAYTON:  Yeah, murder.  No, no, you
22  are right.  You are definitely right.
23          MR. MARKLE:  That it charges both.
24          MS. DAYTON:  The conspiracy, but the
25  racketeering enterprise.  We're still on the
```

18

```
1   racketeering.
2           MS. RODRIGUEZ-COSS:  I thought we were
3   in the conspiracy.
4           MS. DAYTON:  We're in element one,
5   conspiracy to commit.
6           THE COURT:  Murder in --
7           MS. RODRIGUEZ-COSS:  We're in -- I
8   believe we're in --
9           THE COURT:  Count One.
10          MS. RODRIGUEZ-COSS:  Count One, which is
11  conspiracy to commit murder in aid of racketeering.
12  And it's conspiracy to kill Tina Johnson and her
13  associates.
14          THE COURT:  But the racketeering has two
15  purposes.
16          MS. REYNOLDS:  Right.
17          THE COURT:  Right?
18          MR. SHEEHAN:  But if he participated
19  in -- if he participated with knowledge of --
20          THE COURT:  So look at paragraph 7 of
21  the indictment.  It says:  From on or about the fall
22  of 2004 to on or about August of 2005, the
23  above-described enterprise, it members and
24  associates, engaged in racketeering activity, namely
25  narcotics trafficking, in violation of and acts
```

19

```
1   involving murder in violation of.
2             MS. RODRIGUEZ-COSS:  So, we will prove
3   the existence of an enterprise through racketeering
4   activity either being the murder or the narcotics
5   trafficking.  But Count One charges conspiracy to
6   commit murder, so we have to prove the existence of
7   a conspiracy -- of the enterprise, and we have to
8   prove that the enterprise engaged in racketeering
9   activity.  But the offense itself, it's conspiracy
10  to commit murder of Tina Johnson and her associates.
11  So I would --
12            MR. SHEEHAN:  He has to have
13  participated with knowledge of the purpose of that
14  conspiracy, it seems to me.
15            MS. RODRIGUEZ-COSS:  Contrary to, for
16  example, the drug trafficking conspiracy, which
17  actually has two goals, distribution and possession
18  with intent to distribute.
19            THE COURT:  All right, so if you have
20  conspiracy to murder in aid of racketeering, you are
21  saying conspiracy to murder in aid of the activity
22  of narcotics trafficking and murder.  So, I don't
23  understand why it's just murder.
24            MS. DAYTON:  So, I think we actually
25  have something missing from this charge.  I think
```

20

```
1   that -- do you have ours?
2             THE COURT:  Here.
3             MS. DAYTON:  Counts Two, Three and Four.
4             MS. RODRIGUEZ-COSS:  Right.
5             THE COURT:  Let's just stick with what
6   -- we are focused narrowly on page 37 on whether or
7   not the defendant must have participated in the
8   conspiracy with at least -- with knowledge of at
9   least one or two purposes.  So, is what you are
10  saying that it's one or two purposes of the
11  racketeering?
12            MS. DAYTON:  Yeah, I think something is
13  missing.  I think it got condensed.  I'm looking
14  back at ours, your Honor.  So, there is more -- it's
15  not three elements, it's five elements, and so it
16  has to be -- for Count One is five elements.  It's
17  that an enterprise affecting interstate commerce
18  existed, that the enterprise -- it's in ours at
19  page -- well, the printout says 25 of 52 -- that the
20  enterprise was engaged in racketeering activity;
21  that the defendant was associated with or held a
22  position - it could just say "held a position"; that
23  the defendant knowingly and willfully conspired with
24  others to murder another.
25            THE COURT:  I'm sorry.
```

21

```
1             MS. DAYTON:  I'm sorry.
2             THE COURT:  No, I want to know what the
3   position part is on the elements of conspiracy.
4             MS. DAYTON:  It's conflated, that's the
5   problem.  So with respect to the enterprise we can
6   show it through showing that he engaged in
7   racketeering -- in narcotics trafficking or murder,
8   but with respect to the conspiracy, it's only
9   conspiracy to murder another individual.  So it's
10  missing some stuff, is what happened.
11            THE COURT:  Okay.
12            MS. DAYTON:  So it got conflated.  So
13  Mr. Sheehan's right.
14            MR. SHEEHAN:  Oh, my heart.
15            MS. DAYTON:  I know.
16            THE COURT:  So, then let's go back to
17  the indictment, which is where it's charged, and
18  tell me why it is that within the racketeering
19  activity, which is charged as narcotics and
20  murder --
21            MS. DAYTON:  Right, and the next
22  paragraph is the conspiracy just to murder.  It's
23  two different parts.
24            THE COURT:  But it's all under Count
25  One.
```

22

```
1             MS. DAYTON:  Right.  But basically first
2   we have to prove that an enterprise existed that
3   engaged in racketeering activity.
4             THE COURT:  You are talking about Count
5   One.
6             MS. DAYTON:  Count One.
7             THE COURT:  Okay.
8             MS. DAYTON:  We have to prove an
9   enterprise existed that engaged in racketeering
10  activity, and the racketeering activity can be
11  either narcotics trafficking or murder.  Next we
12  have to prove that the defendant was a member,
13  basically.  Because we didn't do "associated with,"
14  we did do "a member."
15            THE COURT:  And is that to substitute
16  for what you were saying earlier "held a position
17  in"?
18            MS. DAYTON:  Right.  Yeah, he just had
19  held a position in.  And so, you know, first it's
20  that the enterprise existed that affected interstate
21  commerce; second, that the enterprise engaged in
22  racketeering activity, and that would be either the
23  narcotics trafficking or the murder; third, he held
24  a position in it; fourth, he knowingly and willfully
25  conspired with others to murder another person.
```

23

```
1           So the conspiracy is separate.  The
2   conspiracy --
3           THE COURT:  So that's what we have as
4   element No. 3, that just gets pushed down to five.
5   But now you have in your charge "to maintain or
6   increase his position in the racketeering
7   enterprise."  Is that correct?
8           MS. DAYTON:  Yeah.  Yeah, for VCAR.
9           THE COURT:  And that differs from
10  becoming a member of the conspiracy?
11          MS. DAYTON:  Yes, he has to do it.
12  Basically, say, for instance, that a murder for
13  hire, if you just hire someone outside, you just pay
14  them to commit a murder and they're not part of your
15  racketeering enterprise, they're not trying to
16  become a part of your racketeering enterprise, then
17  it would be a pecuniary gain VCAR.  This is
18  different.  He did it for the purpose of maintaining
19  or increasing his position.
20          So he's in the enterprise, he's trying
21  to increase his position in the enterprise.  We have
22  to prove that it wasn't just an enterprise that,
23  like, made Xerox machines, but that it's one that
24  engaged in narcotics trafficking or murder, and as a
25  member of an enterprise engaged in narcotics
```

24

```
1   trafficking or murder, he actually conspired with
2   someone to murder someone and his reason for doing
3   so was to increase his position or maintain his
4   position in the enterprise.
5           I have it -- we have it in ours at 25.
6   If you look at the Wilson instructions, Judge
7   Garaufis, from Ronell Wilson, that was -- you know,
8   this is a pretty traditional VCAR instruction.  I
9   can give you a lot of others, too.
10          THE COURT:  Now what I had thought made
11  sense is to charge the substantive offenses first,
12  because there's just too much undefined if you start
13  with conspiracy first.  The elements of the
14  conspiracy that you've laid out as the elements of
15  conspiracy to commit murder in aid of racketeering,
16  are any of the elements of the substantive crimes
17  affected?
18          MS. DAYTON:  No.
19          THE COURT:  We've gotten past those.
20  All right.
21          Mr. Sheehan, do you agree that in fact
22  there are these five elements?  I should say do you
23  have any disagreement with the --
24          MR. SHEEHAN:  For the government, what
25  we're looking at then is on page 34?  Is that where
```

25

```
1   we're going back to?
2           MS. RODRIGUEZ-COSS:  Yes, right.
3           THE COURT:  All right, so if we do
4   that --
5           MR. SHEEHAN:  I don't know, I'll say for
6   the moment until I -- we are going to add in two
7   more elements, and one of those is that the
8   racketeering enterprise existed?
9           THE COURT:  The enterprise affecting
10  interstate commerce existed, that the enterprise was
11  engaged in racketeering activity.
12          MR. SHEEHAN:  Yep.
13          THE COURT:  To commit murder and/or
14  narcotics trafficking; that the defendant became a
15  member of that conspiracy; that the members of the
16  conspiracy -- that the members conspired to commit
17  murder in aid of racketeering; that the defendant --
18          MR. SHEEHAN:  So the conspiracy is that
19  he knowingly and willfully became a member of the
20  conspiracy to commit the murder?
21          MS. RODRIGUEZ-COSS:  No, wait.  One is
22  he became a member of the conspiracy.
23          MS. DAYTON:  No, that he held a position
24  in the enterprise.
25          MR. SHEEHAN:  Let's start with there is
```

26

```
1   an enterprise.
2           MS. DAYTON:  Yep.
3           MR. SHEEHAN:  The enterprise affects
4   interstate commerce.  The enterprise engages in
5   racketeering.  Then the next thing --
6           MS. DAYTON:  Let's pause there for a
7   second.  Those are just general, they have nothing
8   specifically to do with the defendant.  Those are
9   the general elements.
10          MR. SHEEHAN:  Right.
11          MS. DAYTON:  Now, let's go on.
12          THE COURT:  But they are elements of
13  this.
14          MS. DAYTON:  They are elements of the
15  crime, for sure.
16          THE COURT:  And then you get to two or
17  more people agreed.
18          MR. SHEEHAN:  To do what?
19          MS. DAYTON:  Then you get the defendant
20  held a position to -- so the enterprise existed.
21  The enterprise engaged in racketeering activity.
22  Now you say the defendant had a position in this
23  enterprise.
24          MR. SHEEHAN:  Okay.
25          MS. DAYTON:  And that he knowingly and
```

27

```
1   willfully conspired with other people to murder an
2   individual.
3           MR. SHEEHAN:  In the course of that.
4           MS. DAYTON:  And that one of his
5   purposes in doing so, in conspiring to murder, was
6   to maintain or increase his position.
7           MR. SHEEHAN:  That sounds okay.
8           MS. DAYTON:  So it goes from sort of the
9   general to the specific.
10          MR. SHEEHAN:  Not enough that he's a
11  member of the organization.  It's not enough that he
12  joins a conspiracy.  He has to join the conspiracy
13  for the purpose of maintaining his position.
14          MS. DAYTON:  It's harder for us to
15  prove, is what it comes down to.
16          MR. SHEEHAN:  They're really going to
17  struggle.
18          MS. DAYTON:  But that's what the law.
19          MR. SHEEHAN:  No, I realize it.
20          THE COURT:  All right, so we are
21  straightened out.  All right, so then we have to
22  rework the description of the elements.  Do we have
23  them elsewhere?
24          MS. DAYTON:  No.
25          THE COURT:  That's what is left out.
```

28

```
1           MS. RODRIGUEZ-COSS:  The first two are
2   in there already.
3           MS. DAYTON:  You mean do you have them
4   in Counts Two, Three and Four?  Counts Two, Three
5   and Four had all five elements.
6           MR. SHEEHAN:  So on page 20, for
7   example, you have five elements.
8           MS. DAYTON:  The enterprise engaged in;
9   held a position; knowingly, intentionally.  It's the
10  same thing, one is just conspiring and one is
11  actually doing.
12          THE COURT:  So we don't have to repeat
13  those, we can just refer back.
14          MS. DAYTON:  Yes.
15          THE COURT:  All right, what's next?
16          MR. SHEEHAN:  Well, I thought
17  stylistically on 42 "engaged in conduct" in the
18  second paragraph "with the intent to cause."
19          MS. DAYTON:  I'm sorry, there is
20  something missing on page 40.  It should say in
21  paragraph 1 "to distribute or to possess with intent
22  to distribute."
23          MR. SHEEHAN:  Yeah, we were hoping you
24  would forget about that one.
25          THE COURT:  Wait, was engaged in to
```

29

```
1   possess?
2           MS. DAYTON:  It should say "to
3   distribute or to possess with intent to distribute."
4           MS. REYNOLDS:  41.
5           MR. SHEEHAN:  It is in the fourth
6   paragraph.
7           THE COURT:  Should this be, in 4 on page
8   40, this "to distribute and to possess" or "or."
9           MR. MARKLE:  "Or."
10          THE COURT:  It's "or," right?
11          MS. DAYTON:  Yes.
12          THE COURT:  Okay.  I know case law says
13  conjunctive really means "or," but I find a little
14  difficulty with that.  We'll just do "or."
15          MS. DAYTON:  Then on the next page, it
16  says "continuing criminal enterprise," but it should
17  say "conspiracy to distribute or to possess with
18  intent to distribute."
19          MR. SHEEHAN:  Because this is not an
20  enterprise.
21          MS. RODRIGUEZ-COSS:  It's plain old
22  conspiracy.
23          MR. SHEEHAN:  "Of the conspiracy."
24          THE COURT:  Okay.
25          MR. SHEEHAN:  I actually thought we
```

30

```
1   could simplify 42 a little bit just to say "engaged
2   in" at the last paragraph there, "engaged in conduct
3   with the intent to cause the death of Tina Johnson,
4   James Reid and Basil Williams," and then just stop
5   there.
6           THE COURT:  "Deliberately and
7   purposefully engaged in conduct intended to."
8           MS. DAYTON:  "With the intent to."
9           MR. SHEEHAN:  "With the intent to cause
10  the death of."
11          THE COURT:  All right.
12          MR. SHEEHAN:  And then on page 47.
13          MS. DAYTON:  I had something on 44.
14  Just a little tiny clarification.  Third line up
15  from the bottom, it says "prove there was some
16  substantive connection between the defendant's role
17  in the."  I would just say "narcotics trafficking
18  conspiracy and his role in the killing," just
19  because I -- just to make it clear because there is
20  plenty of conspiracies charged.
21          THE COURT:  All right, so on the last
22  three lines of 44 it will say:  "What the government
23  must prove is that there was some substantive
24  connection between the defendant's role in the
25  narcotics trafficking conspiracy and his role in the
```

31

```
1   killing, even if there are other motives or purposes
2   for the killing."  Yes?  Okay.
3           MR. SHEEHAN:  My next one is 47.
4           MS. RODRIGUEZ-COSS:  On 45 there is a
5   correction at the top.
6           MS. DAYTON:  We need the "distribute and
7   to possess" again.
8           THE COURT:  Would you like "and/or,"
9   "or"?
10          MS. DAYTON:  "Or."  And in the first
11  line of it, too.
12          THE COURT:  All right.
13          MR. SHEEHAN:  One on 47.  I would just
14  say "two or more persons agreed" like we did before.
15          THE COURT:  Do you think that is going
16  to do it?
17          MR. SHEEHAN:  Well, "two or more persons
18  entered into agreement," I think is actually a
19  little longer.
20          THE COURT:  Agreed to what?
21          MR. SHEEHAN:  Well, it's really entered
22  into the unlawful agreement, but it's such a short
23  -- I mean, it's just really more like the heading.
24          THE COURT:  You want this for the
25  symmetry of what we had previously?
```

32

```
1           MR. SHEEHAN:  What?
2           THE COURT:  "Had agreed," but I'm
3   wondering if it's a little bit too truncated.  I
4   think they need to --
5           MR. SHEEHAN:  I think if we say what we
6   want to say we don't need a heading.  I mean, in a
7   way --
8           MS. REYNOLDS:  Just the whole first
9   sentence.
10          MR. SHEEHAN:  It's nice to have headings
11  for symmetry, but this one takes over.
12          THE COURT:  All right, we'll do "agreed"
13  and then the element is described.
14          MR. SHEEHAN:  Right.
15          MS. DAYTON:  47 do we want "conspiracy
16  as defined earlier" in the -- just so they --
17          THE COURT:  Okay, we've said "this
18  element is the same as element one of Count One."
19  Is that what you mean?
20          MS. DAYTON:  I was thinking -- yeah, we
21  could do it that way, or "conspiracy as defined in
22  element one of Count One."  Or we could just leave
23  it, it doesn't matter.  I have no strong opinion on
24  it.
25          THE COURT:  So, to the extent we have
```

33

```
1   defined these elements earlier, but I'm not so sure
2   that we have -- I wanted to just incorporate them by
3   reference so I don't have to repeat them again, but
4   the elements of the VCAR conspiracy got so --
5           MR. SHEEHAN:  We're up into the drug
6   world now.  We're out of VCAR, right?
7           THE COURT:  No, I know, but that was the
8   only other time we talked about what a conspiracy
9   was.
10          MS. DAYTON:  Yeah, we re-redefined it in
11  ours, conspiracy.
12          THE COURT:  "Redefined" it meaning
13  defined it again?
14          MS. RODRIGUEZ-COSS:  Just the same
15  instruction.
16          MS. DAYTON:  Made it a little shorter,
17  but kind of reminded them what a conspiracy is.
18  That's on page 45 of ours.
19          THE COURT:  Your pages aren't numbered.
20          MS. DAYTON:  I know, I'm sorry.  I'm
21  going from -- the pages are not numbered.  It's this
22  page.  I think it starts on the page before "as I
23  explained in connection with Count One."
24          THE COURT:  So, we'll just shorten it
25  up, but not completely, just refer back.  All right,
```

34

```
1   then where are we?  Who's got something?  What's the
2   next page?
3           MS. DAYTON:  On 49 in the second full
4   paragraph, it says, "if you find the defendant
5   guilty you are asked to determine the amount of
6   cocaine base involved," and I would just ask to add
7   "over the course of the conspiracy."
8           THE COURT:  Okay.
9           MR. SHEEHAN:  My next one is not 'til
10  56, so if anybody has something in between.
11          THE COURT:  On the verdict form they
12  don't have to make a calculation, do they?  Is it
13  sufficient for them to return a verdict that they
14  found 50 or more grams?
15          MR. SHEEHAN:  Right.
16          MS. DAYTON:  On the bottom of 55 we had
17  a suggestion.  On the bottom of 55, "whatever
18  inferences you may draw, however, must, taken
19  together with all of the other evidence in the
20  case," not just the inferences themselves.
21          MR. SHEEHAN:  56 I had an issue.
22          THE COURT:  Okay.
23          MR. SHEEHAN:  And my issue is I would
24  like to delete "regardless of who called them" and
25  "regardless of who offered them" because I think it
```

35

```
1   draws --
2            THE COURT:  Okay, I know what you are
3   saying.
4            MR. SHEEHAN:  Great.
5            THE COURT:  I'm going to -- this is the
6   area that I'm going to go back to the way the
7   government formulated it, which was what I call
8   bullet points, because I think that's --
9            MR. SHEEHAN:  What page?
10           THE COURT:  It's Section 10.
11           MR. SHEEHAN:  "The evidence."  I don't
12  have a problem with 10A.
13           THE COURT:  All right, so we'll rework
14  that.  What's next?
15           MR. SHEEHAN:  The other one I had, and I
16  don't know whether you are going to rework it, but
17  on 56 "at times a lawyer" and you say "on
18  cross-examination may have incorporated."  I think
19  if we just say "at times a lawyer may have
20  incorporated."
21           THE COURT:  Well, usually on direct they
22  don't assume certain facts to be true.
23           MR. SHEEHAN:  Usually.
24           THE COURT:  All right, I'll take that
25  out.
```

36

```
1            MR. SHEEHAN:  More often it happens on
2   cross, I agree.
3            THE COURT:  Okay.
4            MS. DAYTON:  Something on 60.
5            MR. SHEEHAN:  Oh, I had something on 59,
6   which is really I'm asking you to -- this is the
7   uncharged act.  Instead of saying "similar acts" I
8   would say "uncharged acts."
9            THE COURT:  Would you like "uncharged
10  criminal acts."
11           MR. SHEEHAN:  I think "uncharged acts."
12  I don't know, Uncharged mayhem.
13           THE COURT:  Anything else?
14           MR. SHEEHAN:  Then I think here "the
15  defendant possessed weapons."  You had a limiting
16  instruction for both.  So you have "the defendant
17  possessed," you have "the defendant committed
18  certain assaults."
19           THE COURT:  After "Fleming" and
20  "possessed weapons," is that what you want?
21           MR. SHEEHAN:  Either "possessed weapons"
22  or "committed certain assaults," "has not been
23  charged with these acts."
24           MS. RODRIGUEZ-COSS:  You want to add
25  that?
```

37

```
1            MR. SHEEHAN:  I'm okay adding that.  I
2   don't care.
3            THE COURT:  "The defendant possessed
4   weapons and committed certain assaults as testified
5   to by."  Okay.
6            MR. SHEEHAN:  Then it seems to me the
7   bottom part is what I'm asking about, which is the
8   way that it's charged here.  So I'm asking on our
9   page 65.
10           MS. DAYTON:  Wait, explain.  You are
11  trying to add something from yours?
12           MR. SHEEHAN:  Yeah, "you may not
13  consider it as evidence of the defendant's bad
14  character or general propensity to engage in any
15  acts of violence or as evidence" -- I mean, the
16  particular thing I'm concerned about here as
17  evidence that he was more likely to commit or
18  participate in the murders of Tina Johnson, James
19  Reid or Basil Williams.  If, in fact, these acts are
20  being considered as rendering it more likely that he
21  committed or participated in the murders, then it's
22  -- we're just into propensity.
23           MS. RODRIGUEZ-COSS:  No, but they're
24  being submitted as evidence that he more likely
25  participated in the conspiracy and in the
```

38

```
1   enterprise, and so to say that -- to exclude them
2   from consideration by the jurors, I just wouldn't
3   say that, period.  I would just leave it the way it
4   is because they can consider --
5            MR. SHEEHAN:  As what?
6            MS. RODRIGUEZ-COSS:  -- whether he
7   participated in the conspiracy to distribute
8   narcotics, and then participation in the
9   distribution makes it more likely he participated in
10  the murders.  Of course it does.
11           MR. SHEEHAN:  That's the problem with
12  the uncharged acts.  That's why the limiting
13  instruction, if it is not linked -- that's why the
14  limiting instruction, if it's not linked to the
15  crime, makes no sense.
16           MS. RODRIGUEZ-COSS:  That's not correct.
17           MR. SHEEHAN:  It's asking that jurors to
18  do a kind of gymnastics.
19           THE COURT:  It differentiates between
20  general propensity and bad character and actual
21  conduct vis-a-vis --
22           MR. SHEEHAN:  But the point is that the
23  bad --
24           THE COURT:  -- crimes that are charged.
25           MR. SHEEHAN:  The bad character or
```

39

```
1  general propensity is what they're arguing is -- you
2  are saying, well, you can't consider it as evidence
3  of bad character, you can just consider it as
4  evidence that he committed the murders.
5             MR. MARKLE:  It's evidence that he --
6             MS. RODRIGUEZ-COSS:  That he
7  participated.
8             MR. MARKLE:  Like enforcing his rules
9  and disciplining.
10            MS. RODRIGUEZ-COSS:  Maintaining his
11 position, right.
12            MR. SHEEHAN:  But the point is I
13 think --
14            MR. MARKLE:  It is through bad acts.
15            MR. SHEEHAN:  The purpose of the
16 limiting instruction is to say that these acts are
17 not being -- are not evidence of his bad character
18 or general propensity, just --
19            MS. REYNOLDS:  It says that.
20            MR. SHEEHAN:  Just that he engaged in
21 these bad acts.
22            MS. RODRIGUEZ-COSS:  No, that he engaged
23 in criminal conduct such as conspiracy to distribute
24 narcotics, such as participation in an enterprise,
25 such as holding a leadership position within that
```

40

```
1  enterprise.  That's the criminal conduct that he's
2  charged with, and the assaults can certainly be
3  considered in support of those charges.
4             MS. DAYTON:  And in fact it's charged
5  that way in the indictment.
6             MS. REYNOLDS:  Right.  It's direct
7  evidence of a manner or means of an enterprise.
8             MR. SHEEHAN:  Well, anyhow.
9             THE COURT:  Well, if what you want to do
10 is change this a little bit more that "it is offered
11 for the limited purpose, that is, evidence of the
12 manner and means of the racketeering enterprise
13 and/or that a drug conspiracy existed."
14            MS. REYNOLDS:  That's fine.
15            MR. SHEEHAN:  I'm not saying that's fine
16 because I think that's the same problem, but -- so
17 I'm just noting my objection.
18            THE COURT:  As to the manner and means.
19            MS. DAYTON:  It's also his role in the
20 enterprise.
21            THE COURT:  Now, we have this
22 racketeering enterprise, which of course confuses
23 people, but we've defined the two terms separately.
24            MS. DAYTON:  We could say that that is
25 as evidence of the existence, manner and means, the
```

41

```
1  existence and manner and means of the racketeering
2  enterprise as well as the defendant's role in the
3  enterprise.
4             MS. RODRIGUEZ-COSS:  Right.
5             MS. DAYTON:  You may also consider the
6  evidence as -- "you may also consider it as evidence
7  the drug conspiracy existed."
8             THE COURT:  All right.  So, then we
9  would then take out this last part that says "and
10 its alleged nature, scope and methods of activity"?
11            MS. DAYTON:  No, keep that for the drug
12 conspiracy part.
13            MR. SHEEHAN:  What they're being asked
14 to infer from the assault on Hopkins, say, is that
15 he murdered Johnson, Reid and Williams.
16            THE COURT:  No, that he enforced his
17 role in the enterprise as the leader of the
18 enterprise.
19            MR. SHEEHAN:  I don't think that any --
20 I don't think that that kind of mental gymnastics is
21 possible.
22            THE COURT:  If you want to propose
23 something that makes it possible.
24            MR. SHEEHAN:  That's why I was proposing
25 that --
```

42

```
1             THE COURT:  But what you were proposing
2  is that they don't consider it as evidence of the
3  crimes charged, which of course isn't being done.
4             MR. SHEEHAN:  It isn't being offered --
5  yes, what I am proposing is that in order to --
6  consistent with the limited purpose of the evidence
7  that the jury heard that they cannot consider --
8  that that evidence is not being offered to show that
9  he was more likely to participate or commit the
10 murders of Tina Johnson, James Reid or Basil
11 Williams.  Because, otherwise, what the jury is
12 doing is inferring from uncharged acts that he
13 committed this particular crime as alleged.  That's
14 my contention.
15            MS. RODRIGUEZ-COSS:  I think there is
16 overwhelming --
17            THE COURT:  I'm just going to change
18 that last line slightly to say "you may not consider
19 it evidence that the defendant had a bad character
20 or general propensity to engage in."  We'll get this
21 all worked up and get another draft out to you all.
22            MS. DAYTON:  60 just should say "summary
23 charts prepared by the government and the defense."
24            MR. SHEEHAN:  Do you know on 63 -- are
25 we up to 63?
```

**GA1107**

43

```
1            MS. DAYTON:  I have 61.
2            MR. SHEEHAN:  61.
3            THE COURT:  Are you looking at the new?
4            MS. DAYTON:  The new one.
5            MS. REYNOLDS:  The transcripts -- in
6  other words, the transcripts are not -- we did not
7  move them into evidence.  We just moved the
8  audiotapes.
9            MS. DAYTON:  They also weren't shown on
10 the screen.
11           MS. REYNOLDS:  They were distributed in
12 the transcript binders.
13           THE COURT:  Okay.
14           MR. SHEEHAN:  I would just ask, what is
15 the point of saying "including, in this case, the
16 prison calls," "the prison calls the defendant"?
17 I'm not sure why the Court wants to instruct on
18 that.
19           THE COURT:  "With the knowledge of the
20 defendant"?
21           MR. SHEEHAN:  Yeah, I'm asking that you
22 don't -- the Court not instruct that those were
23 taped with the knowledge of the defendant.  The
24 Court doesn't know that.  The jury might conclude
25 that.
```

44

```
1            THE COURT:  Except for that little thing
2  that --
3            MR. SHEEHAN:  Yeah, well, nobody pays
4  attention to that anyway.
5            THE COURT:  Apparently.
6            MR. SHEEHAN:  You are darn right.  It's
7  not an item of news.  They don't listen to their
8  lawyers.
9            MS. DAYTON:  "Listen, I don't want to
10 say anything because we're being recorded."  Can you
11 remove the brick?
12           MR. SHEEHAN:  63 is my next concern.  I
13 would object to "it is not your concern which
14 techniques were used."  The jury can have whatever
15 concerns they wish to have.  So, I don't think the
16 Court should be saying "it's not your concern."  And
17 then the only other issue I would have --
18           THE COURT:  So what about the "concern"
19 in the next section?
20           MS. REYNOLDS:  Right.
21           MS. DAYTON:  Yes, they shouldn't have
22 any concern about that?
23           MR. SHEEHAN:  Yeah, they can be
24 concerned about that.
25           MS. DAYTON:  They can't consider people
```

45

```
1  who aren't here.
2            MR. SHEEHAN:  No, they can't consider
3  people who aren't here.
4            MS. RODRIGUEZ-COSS:  They can consider
5  people who aren't here?
6            MR. SHEEHAN:  Particularly in this case
7  which techniques were used.  I think in the context
8  of cooperation, when you are saying it's not your
9  concern which techniques were used, we had a lot of
10 witnesses exhibit a concern, which is addressed in
11 part by the Court's instruction when it comes to
12 cooperating witnesses.
13           THE COURT:  Shall --
14           MR. SHEEHAN:  But to say you can't have
15 any concern I think is problematic.  So, I can live
16 with the second one if you can get rid of the first
17 one.
18           THE COURT:  I'll get rid of the first
19 one, but is what we are really saying is you should
20 not speculate whether and why?
21           MR. MARKLE:  That is exactly right.
22           MR. SHEEHAN:  Whether, why and what?
23           THE COURT:  "Certain persons have or
24 have not been arrested"?
25           MR. SHEEHAN:  That's okay.
```

46

```
1            MR. MARKLE:  I think that's how it
2  should be.
3            MR. SHEEHAN:  Wait a minute, no, let me
4  go back, because we do talk about that.  I mean, I
5  think, for example -- I mean, you may have a charge in
6  there -- let's see, "you shouldn't speculate about
7  why certain persons have not been arrested."  Well,
8  for example --
9            THE COURT:  So if you just take that
10 next line out.
11           MR. MARKLE:  You shouldn't speculate.
12           THE COURT:  "Similarly, the law does not
13 require calling as witnesses all persons who may
14 have been involved in the case."
15           MR. SHEEHAN:  Right.  It's one thing to
16 say the law does not require calling all persons,
17 it's another thing to say --
18           THE COURT:  Well, does that improve
19 this?  So it would read now, "You are instructed
20 that the government is not required to use any
21 particular investigative techniques.  Similarly, the
22 law does not require calling as witnesses all
23 persons who may have been involved."
24           MR. SHEEHAN:  That's fine.
25           THE COURT:  "Nor does the law require
```

47

1  all things mentioned during the trial be produced as
2  exhibits."
3          MR. SHEEHAN:  That's fine.  Then I would
4  just add in --
5          THE COURT:  So what is left out is
6  "whether and why people have or have not been
7  arrested."
8          MR. SHEEHAN:  Right.
9          THE COURT:  Do you care about that?
10         MR. SHEEHAN:  Yeah, I mean, I like the
11  way you just did it.
12         THE COURT:  Leaving that out.
13         MR. SHEEHAN:  Yeah.
14         THE COURT:  All right, any problem with
15  that?  Let's see what that looks like when we put it
16  all together.
17         MR. SHEEHAN:  So the only other thing
18  here, "your verdict must be based on the evidence
19  that has been presented or lack of evidence."
20         THE COURT:  Okay.
21         MR. SHEEHAN:  I just had a style change
22  on 64, the last full paragraph on that.  And I think
23  your Honor may work -- I don't know if you are going
24  to put that in with the other, move it, but "did the
25  witness appear to know what he or she was talking

48

1  about and did the witness strike as you someone," I
2  would just put it down here.
3          THE COURT:  So what I liked was -- I
4  thought it was better for reference the way you --
5          MS. RODRIGUEZ-COSS:  The bullets.
6          THE COURT:  If you look at Section 11 of
7  the government's.
8          MS. DAYTON:  Actually, we were going to
9  ask to add in G from ours into yours, but I don't
10  know if you are going to adopt ours.
11         THE COURT:  Well, I sort of liked the
12  way this was all laid out and it seemed pretty
13  comprehensive.
14         MR. SHEEHAN:  It's all such bolstering.
15         THE COURT:  Why so?
16         MS. RODRIGUEZ-COSS:  How so?
17         MS. DAYTON:  "Did the witness have a
18  personal interest in the outcome of the case" is
19  bolster?
20         MR. SHEEHAN:  Did --
21         MS. RODRIGUEZ-COSS:  "Motive to tell the
22  truth"?
23         MR. SHEEHAN:  "Did the witness seem to
24  be honest or dishonest?"  "Did the witness have any
25  reason" --

49

1          MS. DAYTON:  "Not to tell the truth or
2  to tell the truth"?  I mean, I think B is the
3  opposite of A.
4          MR. SHEEHAN:  Right.
5          MS. DAYTON:  So, we don't need "or
6  dishonest" because B already covers that.
7          MR. SHEEHAN:  It doesn't have to be any
8  particular reason, any reason.
9          THE COURT:  To lie?
10         MR. SHEEHAN:  Or not to tell the truth.
11         THE COURT:  I'm not going to put them
12  both in.  I'll just leave "not to tell the truth."
13  Okay.
14         MR. SHEEHAN:  "Did the witness have a
15  personal -- have an interest in the outcome of the
16  case?"  "Did the witness have" instead of "seem to,"
17  "did the witness appear to understand the questions
18  clearly?"  It's depending on who was asking them.
19         MS. RODRIGUEZ-COSS:  That's true.
20         THE COURT:  Let me substitute that one
21  for --
22         MR. SHEEHAN:  Not a function of the
23  question.
24         THE COURT:  "Did the witness testify
25  differently on direct than on cross-examine."

50

1          MS. DAYTON:  We have that here.
2          THE COURT:  Is that already here?
3          MS. DAYTON:  J.
4          MS. REYNOLDS:  This is just standard
5  stuff.
6          MS. RODRIGUEZ-COSS:  It's just in bullet
7  form.
8          MS. DAYTON:  It goes back to my OCD.
9          THE COURT:  What is it you don't like
10  about F?
11         MS. DAYTON:  Because some people didn't
12  understand some of his questions.  We don't have an
13  objection to removing it.
14         MR. SHEEHAN:  F can go, I guess.
15         MS. DAYTON:  Mr. Sheehan finds it
16  personally offensive.
17         THE COURT:  All right, are we all set
18  with the rest of them?  There is a little bit
19  unsymmetrical.
20         MR. SHEEHAN:  Do we have in here the
21  idea of was the witness honest but nonetheless
22  mistaken?
23         MS. RODRIGUEZ-COSS:  I don't think
24  that's in the list.
25         THE COURT:  Let me just mess with these

51

```
 1   issues.  But I just want to lay it out that way,
 2   though.
 3                MS. DAYTON:  Our next thing is 67, but I
 4   think you covered it.
 5                MR. SHEEHAN:  On 65, if you are going to
 6   use some of the language on 65, which you may take
 7   out where it says "two or more persons may."
 8                THE COURT:  Right.
 9                MR. SHEEHAN:  "May see or hear it
10   differently," I don't think -- I think that's --
11   that doesn't need to be in there.
12                THE COURT:  Well, certainly not if we're
13   going to incorporate it somewhere else.
14                MS. DAYTON:  Yeah, and I do think if you
15   are going to have "L" in, that's fine, but if not, I
16   think this is a fair thing to say to them.
17                THE COURT:  We'll get the point across.
18                MS. DAYTON:  Okay.
19                MR. SHEEHAN:  I had here on 67 in
20   your -- in the middle of it.
21                THE COURT:  There is a new one?
22                MS. DAYTON:  You added the "shes,"
23   right?  Yeah, that's what I did, too.
24                MR. SHEEHAN:  I'm sorry?
25                THE COURT:  There was a little bit of
```

52

```
 1   reorganization.
 2                MR. SHEEHAN:  I thought you could add in
 3   "the facts upon which the opinions are based."  Do
 4   we have that, the "reasons for the opinions"?
 5                THE COURT:  Start at the beginning of
 6   the sentence.
 7                MR. SHEEHAN:  "In weighing this opinion
 8   testimony," the way it is right now, "you may
 9   consider the witness's qualification, his or her
10   opinions."
11                THE COURT:  It's really the substance.
12                MR. SHEEHAN:  "The facts upon which the
13   opinions are based, the reasons given for the
14   opinions, as well as all of the other
15   considerations."  Just go back to the text.
16                THE COURT:  "The substance of his or her
17   opinions, the facts on which the opinions are based,
18   the reason for testifying."
19                MR. SHEEHAN:  "The reasons given for the
20   opinions."
21                THE COURT:  Isn't that the substance of
22   the opinion?  Substitute that for "reasons for the
23   opinion."
24                All right, what's next?
25                MS. DAYTON:  I've got nothing more on
```

53

```
 1   that one.  I would just jump to the law enforcement.
 2                THE COURT:  Other than not naming them?
 3                MR. SHEEHAN:  Other than not naming
 4   them, I would say here "an officer who takes the
 5   witness stand and subjects his or her testimony to
 6   the same" -- 0h, "an officer who takes the witness
 7   stand subjects his or her testimony to the same
 8   examination as any other witness," comma, "including
 9   consideration of whether his or her testimony may be
10   colored by personal or professional."  I would skip
11   "is entitled to neither more or less" because we are
12   saying that, then we say that --
13                MS. DAYTON:  We object to singling out a
14   particular witness, saying that -- they're law
15   enforcement witnesses.  It's different than an
16   accomplice witness.  You don't say -- I mean, there
17   is no reason to say they have some sort of
18   professional bias.  You could say they don't get any
19   more or any less credibility than anyone else.
20                THE COURT:  Well, the way we have it
21   here --
22                MS. RODRIGUEZ-COSS:  We have no
23   objection to the way it is.
24                MS. DAYTON:  Well, I mean, I have less
25   objection, but I don't think that you need to -- you
```

54

```
 1   know --
 2                MR. SHEEHAN:  Well, frankly, the problem
 3   I have is I think it raises a problem here.  The way
 4   the Court has it there in terms of "it's perfectly
 5   legitimate for defense counsel to try to attack"
 6   seems to me to raise a problem.
 7                THE COURT:  I'll take out "perfectly."
 8                MS. DAYTON:  We would ask you to take
 9   that whole sentence out.
10                MR. SHEEHAN:  Yeah, I would take out
11   "the testimony of people" "is entitled to neither
12   more or less credibility," and just go from "any
13   other witness, including consideration of whether
14   his or her own testimony."
15                MS. DAYTON:  You've totally lost me.
16                THE COURT:  You have jumped back into
17   "the testimony of people employed by the government
18   and other law enforcement agencies is entitled to
19   neither more nor less credibility than the testimony
20   of any other witness."
21                MR. SHEEHAN:  We start at the top.  The
22   way it reads right now "the testimony of a law
23   enforcement witness is entitled to no" -- so we got
24   that, right?  Then "an officer who takes the witness
25   stand subjects his or her testimony to the same
```

55

```
1   examination and same test as any other witness."
2   And then what I would jump to from there is I would
3   add in two words "including consideration" -- well,
4   three words -- four words, "whether his or her
5   testimony may be colored by personal or professional
6   interest in the outcome of the case."
7            THE COURT:  So you just move that up.
8            MR. SHEEHAN:  Yep.
9            THE COURT:  And take the rest out.
10           MS. DAYTON:  The government doesn't
11  think that the "professional or personal interest"
12  -- we think you already dealt with credibility of
13  witnesses and what issues people should view with
14  respect to credibility, and why it needs to be
15  singled out for law enforcement officer is somewhat
16  unclear.
17           THE COURT:  Because they're law
18  enforcement.
19           MS. DAYTON:  But still.  You don't --
20           THE COURT:  I'm going to tentatively put
21  it in this way and we'll see how it reads.
22           MR. SHEEHAN:  My final, I think -- no, no,
23  well, close to my final, page 70, I would request
24  that we have, the short paragraph, "a copy of these
25  agreements has been offered as evidence," I would
```

56

```
1   add in the paragraph that we had requested on page
2   24, which is --
3            MS. RODRIGUEZ-COSS:  I'm sorry.
4            THE COURT:  Page 70.
5            MS. RODRIGUEZ-COSS:  Right, but what
6   page of yours?
7            MR. SHEEHAN:  24.  Wherein we asked:  "I
8   want to caution you that the agreement itself is not
9   evidence that the witness has, in fact, testified
10  truthfully.  It may only be considered by you in
11  deciding whether they have an interest in the
12  outcome of the case which would motivate him to
13  testify falsely or whether it is in his interest to
14  testify truthfully regardless of the outcome."
15           THE COURT:  Is that the only reason --
16  the only consideration?
17           MR. SHEEHAN:  Well, I don't think -- my
18  key concern is that the evidence is not -- the
19  agreement is not evidence that they have testified
20  truthfully.
21           THE COURT:  I understand that, and I
22  think that's fair.  I just want to know about --
23           MR. SHEEHAN:  I think, actually, why not
24  just put in that one line, "I want to caution you
25  that the agreement itself is not evidence that the
```

57

```
1   witness has, in fact, testified truthfully."
2            MS. DAYTON:  So --
3            MR. SHEEHAN:  The government -- we have
4   already got that the government's permitted to enter
5   into these kinds of agreements.
6            MS. DAYTON:  We have a proposal.  So on
7   page 70, which is the one -- fourth paragraph down
8   where it says -- we had objected, we were planning
9   to object to "a witness who realizes that he or she
10  may be able to receive a lighter sentence by giving
11  testimony favorable to the prosecution has a motive
12  to testify falsely."  We would request taking that
13  out, and we're fine with subbing in the paragraph
14  from defense 24, "I want to caution you that the
15  agreement is not evidence that a witness has, in
16  fact, testified truthfully.  It may only be
17  considered by you in deciding whether the witness
18  has an interest in the outcome of this case which
19  would motivate him or her" --
20           MR. SHEEHAN:  Yeah, but I'm backing up.
21           MS. DAYTON:  "To testify falsely or
22  whether it is in his or her interest to testify
23  truthfully regardless of the outcome."
24           MR. SHEEHAN:  That's why I'm backing up.
25           MS. RODRIGUEZ-COSS:  You are backing out
```

58

```
1   of what you just proposed?
2            MR. SHEEHAN:  Exactly.  It's
3   consistency.  Because one of the problems is that I
4   think that the way I have it there does suggest -- I
5   mean, it gives up something that is of a legitimate
6   concern.
7            MS. RODRIGUEZ-COSS:  I think it's for a
8   jury to decide.
9            MR. SHEEHAN:  Yes, it is.
10           MS. RODRIGUEZ-COSS:  Then that's how you
11  have it worded.
12           MR. SHEEHAN:  I don't think so.
13           THE COURT:  So why don't we just put in
14  that first line that you have, because I think that
15  follows appropriately after "a copy of these
16  agreements have been offered into evidence."  I
17  don't know why we're saying it's "largely
18  self-explanatory."  That's not very instructive.  "I
19  want to caution you the agreement itself is not
20  evidence the witness has testified truthfully."
21           MS. DAYTON:  But we would like the next
22  line, too, your Honor, versus the one that's
23  currently in.
24           MS. RODRIGUEZ-COSS:  The second
25  sentence.
```

59

```
1           MS. DAYTON:  "It may only be considered
2   by you in deciding whether they have an interest in
3   the outcome of the case which would motivate him or
4   her to testify falsely or whether it is in his or
5   her interest to testify truthfully."
6           MR. SHEEHAN:  Well, actually, even
7   though I proposed it, I don't think it's right.
8           MS. REYNOLDS:  It's more right than the
9   second sentence because the second sentence in the
10  last paragraph only has the motive to testify
11  falsely and agreement.
12          MS. RODRIGUEZ-COSS:  As an established
13  fact, and it should be something for the jury to
14  decide.
15          MS. REYNOLDS:  Unless you change that
16  second "entering into an agreement may be influenced
17  by the possibility that he or she may be able to
18  receive a lighter sentence."
19          MR. SHEEHAN:  Which one do you like?
20          MS. REYNOLDS:  The one you have.
21          MS. RODRIGUEZ-COSS:  It covers both the
22  motive to testify truthfully or to lie, and it
23  should be for the jury to decide whether or not
24  that's a fact.  You shouldn't instruct it is.
25          MS. REYNOLDS:  Right, the way that
```

60

```
1   second sentence reads now, it's just saying --
2           MS. DAYTON:  We'd argue that the
3   cooperation agreements are motive to testify
4   truthfully, because if they don't they're going to
5   jail forever based upon what they pled to; for
6   instance, in the case of John Taylor.  So they argue
7   that's a motive to lie, we argue it's a motive to
8   tell the truth.
9           MR. SHEEHAN:  But the fact is your
10  ability to give them that deal, which I don't have,
11  does give them a motive to testify falsely.
12          THE COURT:  Well, there was another
13  section.
14          MS. RODRIGUEZ-COSS:  Or maybe motive to
15  testify truthfully.
16          MS. DAYTON:  I've violated people's
17  cooperation agreements before and they've spent the
18  rest of their life in jail.
19          MR. SHEEHAN:  But you have the capacity
20  to enter into these agreements.
21          MS. DAYTON:  I'm listening.
22          MR. MARKLE:  Don't we talk about that?
23          THE COURT:  There was a section that
24  somebody talks about -- where do you think it is?
25          MR. MARKLE:  Right, on page 69 we say
```

61

```
1   "whether these witnesses benefit more by lying or
2   telling the truth."
3           MS. RODRIGUEZ-COSS:  And that's fine,
4   the way that's worded.
5           MR. MARKLE:  And I think that should be
6   referenced back to the agreement.
7           MS. RODRIGUEZ-COSS:  The instruction
8   should be consistent.
9           MS. DAYTON:  It's on your 69.
10          THE COURT:  So, on the government's
11  Section 22 it sets out in more detail about who can
12  do what under 5K1.1.
13          MR. SHEEHAN:  22?
14          THE COURT:  Which I was considering
15  putting back in.  Yes, under "punishment of
16  cooperating witnesses," which is sort of a
17  substitute of "the agreement is largely
18  self-explanatory."
19          MS. DAYTON:  It's sort of like DNA.
20          MR. SHEEHAN:  Only the government can
21  make such a motion and it has complete discretion as
22  to whether or not to do so.
23          MS. DAYTON:  So, that's not true.
24          MR. MARKLE:  Well, not complete because
25  there is bad faith.
```

62

```
1           MS. DAYTON:  Yeah, and if we ripped up
2   agreements like you said, every judge in this
3   district would be -- we'd be in front of the Circuit
4   all the time, we would get appealed for not giving
5   people 5Ks.  We just had an appeal on that and, you
6   know, so --
7           MR. SHEEHAN:  How did you do?
8           MS. DAYTON:  We lost.
9           MR. SHEEHAN:  On not giving a 5K?
10          MS. DAYTON:  Yeah.
11          MR. SHEEHAN:  You should have given it
12  then.
13          MS. RODRIGUEZ-COSS:  It's not as easy as
14  you make it sound to break up a cooperation
15  agreement.  There has to be a factual finding.
16          THE COURT:  I think this adds useful
17  information for the jury and I would propose that "a
18  copy of the agreements have been offered as
19  evidence."  We will then do the next line, and then
20  add the government's Section 22, and let's see how
21  that reads.  Then, we're done.
22          MR. SHEEHAN:  Let me ask you this:  Why
23  is the Court saying that they have been promised
24  this?  I mean, part of it is now the Court is in on
25  -- becomes a party to the -- the whole problem and
```

63

```
1   the back and forth on plea and cooperation
2   agreements is this tension between the vouching that
3   goes on, which is inherent in the agreement itself,
4   coupled with the ability to provide consideration.
5   So, somewhere in there there is a mush factor.  I
6   think once the Court is saying here what they have
7   been promised, the Court doesn't know what they have
8   been promised.
9           MS. DAYTON:  It's in the agreement.
10          MS. RODRIGUEZ-COSS:  It's written.
11          MR. SHEEHAN:  The agreement says what
12  they have been promised, but somebody might not
13  believe the agreement.
14          MR. MARKLE:  What they've been promised
15  in the agreement?
16          MS. RODRIGUEZ-COSS:  Are you objecting
17  to 22?
18          MR. SHEEHAN:  I'm looking at having the
19  Court make the instruction as it is set forth at the
20  beginning of Section 22 --
21          MS. DAYTON:  How about if it says "the
22  agreement states."
23          MR. MARKLE:  The agreement --
24          MS. DAYTON:  "That the cooperating
25  witness will receive" -- you know, "if they testify
```

64

```
1   truthfully, completely and fully they will receive a
2   5K letter from the government" instead of "they have
3   been promised."
4           MR. SHEEHAN:  It doesn't really say
5   that, that's the problem.  First of all, the
6   agreements never say that if you testify truthfully,
7   completely and fully you'll receive a 5K letter from
8   the government.  What the agreement says is if you
9   provide substantial assistance in the prosecution of
10  other people.  If you testify truthfully, that may
11  not be substantial assistance because it depends on
12  what you say.
13          MS. REYNOLDS:  But substantial
14  assistance --
15          MS. DAYTON:  It says "upon such a motion
16  by the government stating the defendant has provided
17  substantial assistance."  That's the next line.
18          MR. SHEEHAN:  That one is fine.
19          MS. DAYTON:  Well, maybe you can do some
20  sort of hybrid of this.
21          THE COURT:  We'll work on this.
22          MS. DAYTON:  But I do still want to --
23          MR. MARKLE:  It's misleading to say
24  "substantially assisted" and not "the truth,"
25  though.  I think that sounds like you just help the
```

65

```
1   government.
2           MS. DAYTON:  Yeah.
3           THE COURT:  Let me see what we can work
4   out.  I know you object, but I don't know whether it
5   will prevail.
6           MS. DAYTON:  We don't want to
7   necessarily say "motive to testify falsely" or
8   "motive to tell the truth," we just want to add it
9   could go both ways.
10          MS. RODRIGUEZ-COSS:  The way it's worded
11  right now, it seems like you are instructing the
12  jury the witness has such a motive, which may not be
13  correct.  They may have such a motive, but they --
14          THE COURT:  That's why the word "may" is
15  there.
16          MS. RODRIGUEZ-COSS:  No, no, it's not.
17  It has "has a motive to testify falsely."
18          MS. REYNOLDS:  It doesn't have "may" in
19  it.
20          THE COURT:  I've got the picture.
21          MS. REYNOLDS:  "A witness who has
22  entered into such an agreement may be influenced by
23  the possibility that he or she may be able to
24  receive a lighter sentence by giving testimony
25  favorable to the prosecution."  Because they could
```

66

```
1   be influenced to testify truthfully or to testify
2   falsely.  This just says "has a motive to testify
3   falsely."
4           MS. DAYTON:  We like the defense
5   submission from page 24.
6           MR. SHEEHAN:  The withdrawn one?
7           MS. RODRIGUEZ-COSS:  We'll propose it,
8   your Honor.
9           THE COURT:  Is there anything else?
10  What's next?
11          MR. SHEEHAN:  My only -- I get to 75.
12  Do you have something before that?
13          MS. RODRIGUEZ-COSS:  Let me see, yeah,
14  74.  I don't believe there were any -- there was any
15  witness who was impeached by a prior conviction that
16  involved dishonesty or false statement.
17          MR. SHEEHAN:  Yeah, there is larceny.
18          MS. DAYTON:  Larceny.
19          MR. SMITH:  Who had one?
20          MS. DAYTON:  Lashika.
21          MR. SHEEHAN:  3 and 6.  3, and I almost
22  ended up with in a punch in the nose.
23          MS. DAYTON:  Involving dishonesty.
24          MS. REYNOLDS:  I had a question on 73 at
25  the end.
```

67

```
 1              MR. MARKLE:  I think there is grand
 2   jury.
 3              THE COURT:  Whittingham's testimony, and
 4   that's an open issue.  I have gone back and looked
 5   at the grand jury testimony, compared it to his
 6   testimony at trial.  It is inconsistent with respect
 7   to the front door and the window, and that page from
 8   the grand jury testimony will be permitted to come
 9   in.
10              MS. DAYTON:  We still had an open matter
11   on Jackie Bryant, too, which we never settled, which
12   we don't have to do right now.
13              THE COURT:  Well, where is my list of
14   pending issues.
15              That's the issue the defendant claims
16   that Jackie never told law enforcement about Azikewe
17   at apartment 211 until this week?
18              MS. DAYTON:  Well, no, it was they said
19   that she was asked a question in the grand jury,
20   basically, do you have anything else to say, and she
21   said no, and then I put in part of her grand jury
22   testimony to a question and an answer relating to
23   something else.
24              MS. RODRIGUEZ-COSS:  You were
25   submitting --
```

68

```
 1              MS. DAYTON:  He was submitting just the
 2   last page and I was saying we should put the whole
 3   thing in.
 4              MR. SHEEHAN:  The whole transcript?
 5              MS. DAYTON:  The whole transcript.  It's
 6   misleading just to say "is there anything else"
 7   without showing what she did say, and I have to go
 8   back to the actual transcript.
 9              THE COURT:  Do you want to withdraw your
10   request for that last page?
11              MR. SMITH:  I think it was responsive.
12              THE COURT:  You want her whole grand
13   jury testimony to go in?
14              MR. SHEEHAN:  No.
15              MR. SMITH:  No.
16              THE COURT:  How is the jury supposed to
17   determine what "anything else" means if they don't
18   know what was already said.  Your choice.  Think
19   about it.
20              MR. SMITH:  I will think about it.
21              MR. SHEEHAN:  Pick your poison.
22              MR. MARKLE:  Judge, one of the matters,
23   sort of along those lines, is the Womble transcript
24   that was put in from the prior trial.  I finally
25   read it, because I didn't have a lot of time, but
```

69

```
 1   there is a whole bunch of sidebars that I think
 2   should be redacted.  There is a lot of just -- there
 3   is like 50 pages of just talking about objections,
 4   just the lawyers and the judge.
 5              MR. SHEEHAN:  We can agree.
 6              MR. MARKLE:  I redacted it and I meant
 7   to give it to you.
 8              MR. SMITH:  If you give me a copy.
 9              MR. MARKLE:  I think we'll all agree it
10   comes out.
11              MR. SMITH:  If it's not his testimony
12   directly, that's fine.
13              MR. MARKLE:  It's clearly not.
14              MS. DAYTON:  I had -- I also offered
15   Jackie Bryant's report, her sworn statement, and
16   that never got dealt with either.
17              THE COURT:  Was that objected to?
18              MR. SHEEHAN:  Yep.
19              THE COURT:  And why was it offered?
20              MS. DAYTON:  I don't remember.
21              MS. REYNOLDS:  I think it was the same
22   thing.
23              MS. DAYTON:  It was a prior consistent
24   statement, I just don't remember what --
25              MR. SMITH:  Not on Azikiwe.
```

70

```
 1              MS. DAYTON:  No, it was a different
 2   issue.
 3              MS. REYNOLDS:  Rebuttal, claim of recent
 4   fabrication.
 5              MS. DAYTON:  It's her signed statement.
 6              THE COURT:  The "recent fabrication"
 7   meaning which particular facts?
 8              MS. REYNOLDS:  That's what we don't --
 9              MS. DAYTON:  I can't remember right now.
10              MR. SMITH:  I don't remember what she
11   recently fabricated besides Azikiwe.
12              MS. DAYTON:  No, there was something
13   else.  I have to go back to the transcript.
14              MR. SMITH:  I try to keep my recent
15   fabrication issues to minimum.
16              THE COURT:  All right, would you see
17   what it is that you all want to do with her then.
18              MR. SHEEHAN:  I'm up to 75.  I don't
19   know if anybody --
20              MR. MARKLE:  74, the last line "deciding
21   how much weight," I think "how much of his
22   testimony," I think "weight" should come out on the
23   very last line.
24              MR. SHEEHAN:  "How much of his
25   testimony," you could just --
```

71

```
1          MS. DAYTON:  And it should be "his or
2  her."
3          MR. MARKLE:  And "what weight."
4          THE COURT:  Yes.
5          MR. SHEEHAN:  On 75, with respect to
6  this last full paragraph on that page, I would
7  request that the Court add in "the lack of
8  evidence," "you should consider impartially all of
9  the evidence or lack of evidence and the views of
10 your fellow jurors," and then I'm fine with "it is
11 your duty to consult," but I would add in what we
12 have on page 69.
13         THE COURT:  Your 69 or the draft?
14         MR. SHEEHAN:  Our 69.
15         MS. RODRIGUEZ-COSS:  Are you sure you
16 want to go there?
17         MR. SHEEHAN:  "Each juror is entitled to
18 his or her opinion."  That middle paragraph, the
19 third paragraph.  What I don't like is the last
20 sentence, "until a verdict is agreed it is not a
21 unanimous verdict," and then I don't like --
22         THE COURT:  It's true.
23         MR. SHEEHAN:  That is a fact, but the
24 other thing is "remember," "your sole," and I don't
25 like "your sole."
```

72

```
1          THE COURT:  It can be "unless a verdict
2  is agreed to it is not a unanimous verdict."
3          MR. SHEEHAN:  But what it seems to be
4  implying here is --
5          MS. DAYTON:  I don't even know where you
6  guys are.
7          THE COURT:  75.
8          MR. SHEEHAN:  We're looking at the
9  Court's instruction, line 75 -- page 75, the third
10 paragraph.
11         THE COURT:  Fourth line.
12         MR. SHEEHAN:  I think that this is
13 already basically saying here you have to reach a
14 unanimous verdict, which I don't think is
15 appropriate, unless they're not -- unless they're
16 expressing some concerns, and even then I usually
17 don't think it's appropriate, but I lose on that
18 one.  But I think at this juncture the suggestion of
19 a hung jury is not helpful.
20         MS. RODRIGUEZ-COSS:  We agree with that,
21 your Honor.
22         MR. SHEEHAN:  So the way I thought --
23         THE COURT:  I'm sorry, where did you get
24 to the hung jury?
25         MS. RODRIGUEZ-COSS:  Paragraph six, we
```

73

```
1  would object to paragraph six.
2          MS. DAYTON:  "Unless a verdict is agreed
3  to by each juror it's not a unanimous verdict."  He
4  wants that line out.
5          MR. SHEEHAN:  Right.
6          MS. DAYTON:  Fine.
7          MR. SHEEHAN:  And then the other line I
8  want out is "to seek the truth."
9          THE COURT:  Where is -- oh, "your sole
10 interest is to determine if the government has met
11 its burden of proof."
12         MR. SHEEHAN:  Right.  And then "if you
13 decide to" -- where we got here, starting at the
14 last sentence on the page, "however, you should not
15 surrender your honest convictions as to the facts."
16         MS. DAYTON:  You don't like the word
17 "conviction"?
18         THE COURT:  Who refrained from saying
19 some document was "executed" by?
20         MR. SHEEHAN:  That was my twitch.
21 Instead of "solely because of," I would say "simply
22 because you are outnumbered."
23         MS. DAYTON:  That sounds like it's sort
24 of like people ganging up on them.
25         MS. RODRIGUEZ-COSS:  Actually, I can't
```

74

```
1  believe I'm going to say this, I think Michael has a
2  point.  That last paragraph on page 75, the last
3  paragraph on page 75 and the sixth paragraph on page
4  76, really sounds very closely to an Allen charge
5  which I would submit at this juncture --
6          MS. DAYTON:  Not the sixth paragraph.
7  The second full paragraph on --
8          MS. RODRIGUEZ-COSS:  I was kind of going
9  from both pages together.  And I don't know that we
10 need to --
11         MS. DAYTON:  Yeah.
12         MS. RODRIGUEZ-COSS:  -- go there.
13         MR. SHEEHAN:  We could just take that
14 whole paragraph out.
15         THE COURT:  This one "if you take a
16 vote"?
17         MR. SHEEHAN:  Yeah.
18         THE COURT:  All right.
19         MR. SHEEHAN:  Now --
20         THE COURT:  But we're back on "you
21 should not surrender your honest convictions to the
22 facts that you find or the weight or the effect of
23 the evidence solely because you are out voted," is
24 that what you want?
25         MR. SHEEHAN:  "Simply because you were
```

75

1  outnumbered."

2          MS. DAYTON:  Why don't we just leave

3  it --

4          THE COURT:  Isn't that what "the opinion

5  of your fellow jurors" is?

6          MR. SHEEHAN:  Well, the problem I

7  guess "solely because of".

8          MS. DAYTON:  How about we just do

9  this --

10          MR. SHEEHAN:  Suppose "you

11  surrendered" --

12          MS. DAYTON:  I have a suggestion, "In

13  the course of your deliberations, do not hesitate to

14  re-examine," I'm at the bottom of 75, "your

15  individual view or to change your opinion if the

16  deliberations and the views of your fellow jurors

17  convince you your view is erroneous."  And then go

18  to "your final vote must reflect your conscientious

19  conviction as to how the issues should be decided."

20  Just get rid of the other sentence "your verdict,

21  whether guilty or not, must be unanimous."

22          MR. SHEEHAN:  I'm sorry, I lost you.  I

23  don't have my tabs.

24          MS. RODRIGUEZ-COSS:  Take out that last

25  sentence.

76

1          MS. DAYTON:  Just take it out.

2          MR. SHEEHAN:  That seems fine.  Well,

3  let me -- I had one -- okay, on the next page, and I

4  don't know, I put this to your Honor, "your request

5  for testimony or any questions you have about the

6  legal instructions I've given you," do you want to

7  -- I mean, I think the fact is if they have a

8  question about the legal instructions --

9          MS. RODRIGUEZ-COSS:  Do you know, I

10  think in a short trial I would agree with that, but

11  I think we've -- it is so long that I think it's

12  fair to let them know that if they do want to have

13  read --

14          THE COURT:  I don't think that is what

15  his issue is.

16          MR. SHEEHAN:  No, no, my tiptoe in there

17  is whether the Court --

18          THE COURT:  Whether I want them to start

19  asking more questions about the legal instructions.

20          MR. SHEEHAN:  Right.

21          MR. MARKLE:  They're going to have the

22  instructions, right?

23          THE COURT:  I'm going -- right now my

24  inclination is not to do that.

25          MR. SHEEHAN:  Okay.

77

1          THE COURT:  I have not noticed a shyness

2  on the part of jurors to say "what in the world does

3  that mean."  It's very hard, as you know, to

4  formulate a charge more so than we've already done

5  it, and sometimes --

6          MR. SHEEHAN:  I mean, I've got to admit,

7  if they don't understand what you are saying, I

8  usually think, well, maybe it's good for the home

9  team.

10          MS. DAYTON:  We have a couple of things

11  we would like to add that were in ours that aren't

12  in yours.  So, our number 15.

13          MR. SHEEHAN:  Section 15?

14          MS. DAYTON:  It's Section 15, "uncalled

15  witnesses."

16          MR. SHEEHAN:  We've got that.

17          THE COURT:  Remember we did put that --

18  we worked on that section.

19          MS. DAYTON:  I thought we had there is

20  no duty to call all witnesses.

21          THE COURT:  Right.

22          MS. DAYTON:  But we don't have that both

23  sides have the same power to subpoena.

24          MR. SHEEHAN:  Well, but we have --

25          THE COURT:  But they don't have any duty

78

1  to do that.  That's my apprehension there.  It

2  suggests that --

3          MS. DAYTON:  But they are going to call

4  people.

5          THE COURT:  I understand that.

6          MS. DAYTON:  I would see if they didn't,

7  but since they are going to, they can't say, well,

8  the government didn't call this person, because they

9  are going to put on a case.

10          MR. SHEEHAN:  I don't have the same

11  power to subpoena witnesses.  I have no power to

12  give them immunity.

13          MS. DAYTON:  I don't have power to give

14  anyone immunity.  That comes from the Department of

15  Justice.

16          MR. SHEEHAN:  You work for the

17  Department of Justice.  The Department of Justice

18  has the capacity to give people immunity.

19          MS. RODRIGUEZ-COSS:  That is not

20  correct.  If you call a witness and the witness

21  takes -- says they plead the Fifth and the United

22  States has the power to grant immunity, you may

23  request such immunity from the Department of

24  Justice, and many times it's been granted.

25          MR. SHEEHAN:  I may request it and they

79

1  may decide to give it to me.
2          MS. DAYTON:  I have the same problem.
3          MR. SHEEHAN:  No.
4          MS. DAYTON:  How was it when you worked
5  for the Department of Justice?
6          MR. SHEEHAN:  Not so hot, that's why I
7  left.
8          MS. DAYTON:  You can't just grant
9  immunity.
10          MR. SHEEHAN:  I can't even remember, it
11  was a nightmare.
12          THE COURT:  So your complaint is that
13  you don't think you have the same power to compel
14  witnesses?
15          MR. SHEEHAN:  I do have a power to
16  compel witnesses to be here, that's clear.  I do not
17  have the same power as the government.  I don't have
18  the power to prosecute people for perjury; I rely on
19  the government to prosecute people for perjury.  I
20  am not in an equivalent position with the government
21  with respect to witnesses.
22          THE COURT:  So, can we simply say the
23  government and the defense have the power to
24  subpoena witnesses?
25          MR. SHEEHAN:  No, because I think it's

80

1  calling attention -- basically it's a burden
2  shifting.
3          THE COURT:  Well, that's my greater
4  concern about it, which is why I didn't put it in in
5  the first place.
6          MS. DAYTON:  But I would agree if they
7  weren't calling witnesses.  But since they're
8  calling Dr. Baden and Christopher Munger, and
9  they're calling Jay Jay Gonzalez and they're calling
10  Michael Syrax, they're putting on a case.
11          MR. SHEEHAN:  That does not mean -- I
12  don't think that elicits -- I mean, while you may
13  make that argument, I don't think the Court should
14  basically be saying here -- and I think you run a
15  risk of making that argument, that you're going to
16  -- there is going to be a risk there.  So, you do
17  what you want on that.  I think that the risk here
18  is that we don't have the burden of proof, and even
19  if we decide to put on some witnesses, we still
20  don't have the burden of proof.
21          MS. DAYTON:  I get the law, but here is
22  the thing, I'm fully entitled to say the defense
23  could have called this person and didn't, a police
24  officer, for instance.
25          THE COURT:  But you would only say that

81

1  if the defendant said, wholly crow, why didn't they
2  call so and so.
3          MS. DAYTON:  Right.
4          THE COURT:  And at that point it may
5  mean we need a supplemental charge on the issue.
6          MS. DAYTON:  That's fine.  Okay.  And
7  then No. 23 in ours, the interviews of witnesses.
8          THE COURT:  Now, I wasn't really sure
9  that came in, that anybody actually was asked
10  whether they'd been interviewed or prepared.
11          MS. DAYTON:  Your Honor, where have you
12  been?  He asked every single witness, had you met
13  with the government on October 8th, had you met with
14  the government on November 21.
15          THE COURT:  The government.
16          MR. SHEEHAN:  Yeah, government.
17          THE COURT:  The government.
18          MR. SHEEHAN:  Right.
19          THE COURT:  But this says "attorneys for
20  the government."
21          MS. DAYTON:  Then it should just say
22  "the government."
23          THE COURT:  And we specifically left
24  that out.
25          MS. DAYTON:  Then we can just take out

82

1  the word "attorneys," that "there was testimony at
2  trial that the government interviewed witnesses."
3          MR. SHEEHAN:  But where are we going
4  with that, then you should not draw any unfavorable
5  inference from that testimony?
6          MS. RODRIGUEZ-COSS:  Right.
7          MS. DAYTON:  Right, there is nothing
8  unlawful or improper.
9          MR. SHEEHAN:  That's different from
10  unlawful or improper.  Unfavorable is up to the jury
11  to decide.
12          MR. DAYTON:  No, it's not.  That's like
13  saying they should draw an unfavorable inference
14  with you meeting with the defendant.  We're allowed
15  to meet with witnesses as many times as we want and
16  there is nothing improper or unfavorable about it.
17  You suggested that we were telling our witnesses
18  what to say.  That's a different issue.  I'm not
19  saying that she should add, the Judge should add,
20  you know, oh, and you can't presume that the
21  government didn't tell the witnesses what to say.
22          MR. SHEEHAN:  Well, that's exactly what
23  you are saying there.
24          MS. DAYTON:  No, just the fact that we
25  met with them or prepared them is not unfavorable

83

1 and they shouldn't draw an unfavorable inference.
2 We do have a duty to prepare for trial, and if we
3 came in here unprepared, it would be a problem.
4        MR. SHEEHAN:  Okay, so I think that
5 whole thing should go out.
6            THE COURT:  I tend to agree because I
7 think it's too prickly, and I think that telling
8 them what they can or cannot draw as an inference
9 from the testimony is far too problematic.
10       MS. RODRIGUEZ-COSS:  Would the Court at
11 least agree they should be charged there is nothing
12 unlawful or unethical about meeting with a witness
13 before they testify?  I mean, it's a big issue.  A
14 lot of people, there is -- their experiences are
15 more with the state and there are a lot of district
16 attorneys' offices who deal with incredible loads of
17 cases where they don't actually have time to meet
18 with witnesses, and most witnesses don't meet with
19 either government or the prosecution before they
20 testify.  That's not the case in federal court, and
21 I think that counsel through his cross-examination
22 was trying to imply to the jury that there was
23 something wrong with us meeting with our witnesses
24 on X number of occasions, and I think it's a common
25 instruction to provide to the jury that there is

84

1 nothing wrong with meeting with a witness,
2 interviewing them before trial.  If the Court wants
3 to characterize it or instruct the jury what
4 inference, if any, they should draw, then that's
5 fine.
6            MS. DAYTON:  Just take out the middle
7 sentence.
8            MS. RODRIGUEZ-COSS:  We're entitled to
9 the instruction it's okay, it's not improper to meet
10 with a witness before.
11           THE COURT:  So maybe there is
12 something --
13           MR. SHEEHAN:  I've never heard of any.
14           MS. DAYTON:  It was in Wilson.  Also it
15 was in the Ronell Wilson case.  Unequivocally Judge
16 Garaufis gave the instruction.
17           MR. SHEEHAN:  It was not in Perez.
18           THE COURT:  I think it would go better
19 "there is no obligation to call all the witnesses"
20 and so -- where did we have all that?
21           MR. MARKLE:  It's not improper for
22 either side to.
23           MS. RODRIGUEZ-COSS:  That's fine, too.
24           MR. MARKLE:  So it's not just like the
25 government gets away with something.

85

1            MS. DAYTON:  And that's fine with taking
2 "you should not draw any unfavorable inference from
3 that testimony," though, again, that was part of the
4 Wilson charge, but if we just go with the first
5 sentence and the third sentence.
6            MR. SHEEHAN:  Do you know what, I don't
7 like the Wilson charge.
8            MS. DAYTON:  Yes, but it's gone up on
9 appeal and it was fine.
10           MR. SHEEHAN:  There are parts of it that
11 on appeal they said that the judge was within his --
12           MS. DAYTON:  That wasn't one.
13           MR. SHEEHAN:  -- was within his
14 discretion to deal with it.  It's not a mandated
15 charge.  It's ultimately up to the Court.
16           MS. DAYTON:  Right.
17           MR. SHEEHAN:  To decide what is
18 appropriate.
19           MS. RODRIGUEZ-COSS:  But it's been
20 approved.
21           MR. SHEEHAN:  I don't think that's
22 appropriate.
23           MS. DAYTON:  Well, the government does,
24 and it wasn't disputed at the appellate level and
25 there was no problem with that instruction.  And I

86

1 referred to it because it was the last death penalty
2 case in this district that has already gone up on
3 appeal.
4            THE COURT:  Not in this district.
5            MR. SHEEHAN:  Not in this district at
6 all.
7            THE COURT:  I meant in this Circuit that
8 went up on appeal and has come back down.
9            MS. DAYTON:  And we also thought for the
10 defendant that No. 25 and 26 should be added about
11 other persons not on trial and the duty to consider
12 only this defendant.
13           MR. SHEEHAN:  I'm not asking for that.
14           MS. DAYTON:  We had it, but then it's
15 gone.  We talked about it in the beginning.
16           MR. SHEEHAN:  Yeah, I think it is in
17 there.
18           MS. REYNOLDS:  I think it is.
19           MR. SHEEHAN:  It's already in here.
20           MR. MARKLE:  We talked about people not
21 charged.
22           MS. DAYTON:  We talked about not
23 charged.
24           MR. MARKLE:  People who are charged.
25           MS. DAYTON:  The Judge instructed

87

1　everybody when they first came in there were other
2　defendants who were going to be tried separately, so
3　I think we should address this issue.
4　　　　　MR. SHEEHAN:　Yep.　So, maybe we should
5　put that in.
6　　　　　MS. DAYTON:　Unless you want them to
7　think Azikiwe pled guilty, which I'm fine with.
8　　　　　THE COURT:　He can't, can he?
9　　　　　MS. RODRIGUEZ-COSS:　Can he plead
10　guilty?　He can plead guilty to the charges in the
11　indictment.　He can plead guilty anytime he wants.
12　　　　　THE COURT:　Can he plead guilty with a
13　death penalty?
14　　　　　MS. RODRIGUEZ-COSS:　Sure, and then what
15　we would have is only the second phase.
16　　　　　THE COURT:　Where is the part you were
17　referring to?
18　　　　　MS. DAYTON:　25 and 26, your Honor.
19　　　　　MR. SHEEHAN:　25?　Yeah, 25 and 26 are
20　fine.　I thought they were in there.
21　　　　　THE COURT:　Okay, who are the government
22　witnesses?
23　　　　　MR. SHEEHAN:　You are not listing them,
24　are you?
25　　　　　THE COURT:　I'm looking at -- you all

88

1　were talking, I was working on something.
2　　　　　MS. DAYTON:　25, 26.
3　　　　　THE COURT:　Of yours?
4　　　　　MS. DAYTON:　Ours, the government's.
5　　　　　THE COURT:　Did we want to say that
6　these individuals are not on trial or why these
7　individuals are not on trial?
8　　　　　MS. RODRIGUEZ-COSS:　Why?
9　　　　　MR. SHEEHAN:　Why not just take that
10　sentence out.
11　　　　　THE COURT:　Because I'm telling them
12　what not to do.
13　　　　　MR. SHEEHAN:　Right.　"The fact that
14　these individuals are not."　Just say "the fact,"
15　that would work.
16　　　　　THE COURT:　So, if you combine those two
17　and collapse them and you say, "The fact that these
18　individuals are not on trial before you is not your
19　concern.　You are not being asked whether any other
20　person has been proven guilty.　Your verdict should
21　be solely upon the evidence or lack of evidence as
22　to this defendant."
23　　　　　MR. SHEEHAN:　Right.
24　　　　　THE COURT:　And just leave out all the
25　other stuff.

89

1　　　　　MR. SHEEHAN:　Yeah, I think that's fine.
2　　　　　THE COURT:　And that is going to go
3　where?
4　　　　　MS. DAYTON:　You can put it at the end,
5　I guess.
6　　　　　MR. SHEEHAN:　At the beginning.
7　　　　　MS. DAYTON:　Whatever I didn't say is a
8　good place to put it.
9　　　　　MR. SHEEHAN:　Maybe you can do it right
10　after "role of attorneys."
11　　　　　THE COURT:　What about after
12　"presumption of innocence and burden of proof."
13　　　　　MR. SHEEHAN:　Well, I think presumption
14　of innocence is so particularized to the defendant
15　that sort of a generic statement -- that this
16　generic characterization might fit in better after
17　"role of the attorneys."
18　　　　　THE COURT:　What if it fits into
19　evidence, "what is evidence."
20　　　　　MR. SHEEHAN:　Or you could put it after
21　"defendant's right not to testify" if you want.
22　　　　　THE COURT:　Yes, let's put it in after
23　"right not to testify."　All right, shall we -- if
24　there is nothing else.
25　　　　　MS. RODRIGUEZ-COSS:　We had a couple of

90

1　things.　I don't know if the Court wanted to --
2　　　　　THE COURT:　No, keep going.
3　　　　　MS. RODRIGUEZ-COSS:　Nothing to do with
4　the charge, though.
5　　　　　THE COURT:　Okay, is this your best shot
6　at the charge?　I'll work through these things and
7　give you another draft and then we'll have another
8　conference.　If there is any supplemental charges
9　that you think of --
10　　　　　MR. SHEEHAN:　Okay.
11　　　　　THE COURT:　-- prompted by this, please
12　get that to me as soon as possible.
13　　　　　All right, what's next?
14　　　　　MS. RODRIGUEZ-COSS:　Well, just so --
15　we're winding down, obviously the government expects
16　to rest next week, the Court has previously advised
17　the defense they would not be able to wait forever
18　prior to giving us notes as to what experts they
19　intended to call in penalty, and I think we're at a
20　juncture where we really should have notice of at
21　least what expert witnesses, if any, the defense
22　intends to call during the penalty phase.
23　　　　　THE COURT:　Why postpone it?
24　　　　　MR. SHEEHAN:　Huh?
25　　　　　THE COURT:　Why postpone it?

91

1      MR. SHEEHAN: Well, let's figure out.
2      THE COURT: Because you expect a very
3  long jury deliberation over the guilt phase?
4      MR. SHEEHAN: Well, hope springs
5  eternal, thus I get out of bed in the morning,
6  proceed through the day.
7      THE COURT: What if you made your
8  decisions by Monday. It's not going to get any
9  easier to make the decision if I give you more time,
10  and it does have some --
11      MR. SHEEHAN: Can we talk scheduling for
12  a second and figure that out? So, let's say you
13  rest, it sounds like, on Tuesday.
14      MS. RODRIGUEZ-COSS: It sounds like,
15  yes, and I think Tuesday before the end of the day.
16      MS. DAYTON: You will be done with
17  Christine by then, right?
18      MR. SHEEHAN: Yes.
19      THE COURT: He's going to be done with
20  Christian by 10:30 or earlier.
21      MR. SHEEHAN: Anyhow, without rising to
22  the bait.
23      MS. RODRIGUEZ-COSS: We anticipate
24  resting Tuesday morning before lunch.
25      MR. SHEEHAN: Okay. Do you want us to

92

1  start right then as opposed to starting on
2  Wednesday?
3      THE COURT: A seamless web.
4      MR. SHEEHAN: So, let's say we start on
5  Tuesday. I would say we are likely to finish
6  Wednesday.
7      THE COURT: So we'll charge and close on
8  Thursday.
9      MR. SHEEHAN: So if we charge and close
10  on Thursday, let's say the jury gets the case on
11  Thursday, if they come back with a verdict on
12  Friday, are you having us start on Monday?
13      THE COURT: The government's going to
14  start the following Thursday and has about two days,
15  right?
16      MS. RODRIGUEZ-COSS: So the Court is
17  envisioning us starting the next Thursday, which is
18  not even a full week from the verdict time. So, all
19  the more reason why we need --
20      MR. SHEEHAN: So Thursday is what day?
21      MS. RODRIGUEZ-COSS: 26th of May.
22      MS. DAYTON: I think we'll be more than
23  two days.
24      THE COURT: We had told the defendant to
25  have their -- have your out of town folks --

93

1      MS DAYTON: They said they didn't want
2  to do it before the 31st.
3      MS. RODRIGUEZ-COSS: But you would be
4  ready to go on the 31st.
5      MR. SHEEHAN: How long do you see?
6      MS. RODRIGUEZ-COSS: Two days.
7      MS. REYNOLDS: Two to three.
8      MS. RODRIGUEZ-COSS: Two days.
9      THE COURT: The 26th and 27th.
10      MS. RODRIGUEZ-COSS: We're still working
11  from 9:30 to 3:30?
12      THE COURT: Do you want to go longer?
13      MR. SHEEHAN: No, I don't think it's
14  fair to the jury.
15      MS. DAYTON: You are so magnanimous.
16      THE COURT: I think we're pushing
17  everybody just fine.
18      MS. RODRIGUEZ-COSS: I think two days,
19  and if we go over two days it won't be by much.
20      THE COURT: So we'll have that three-day
21  weekend before the defendant starts, or before you
22  finish, and then we should be -- you anticipated two
23  days for your penalty phase.
24      MR. SHEEHAN: I would say we're looking
25  at probably three. More like three.

94

1      MS. DAYTON: We'd ask for discovery,
2  too. We also haven't received any witness
3  statements, any discovery, any documents, any
4  anything.
5      MR. SHEEHAN: Now, you have some issues
6  that -- there is, for example, the DCF subpoena
7  sitting there.
8      MS. RODRIGUEZ-COSS: Actually that's on
9  my list of things to bring up.
10      THE COURT: I have it on my pile.
11      MS. RODRIGUEZ-COSS: We would renew our
12  request.
13      THE COURT: I'll give that to you
14  Monday.
15      MR. SHEEHAN: Because we have DCF
16  witnesses.
17      MS. RODRIGUEZ-COSS: All the more
18  reason.
19      MR. SHEEHAN: What else do you have
20  under seal?
21      THE COURT: Nothing.
22      MR. SHEEHAN: Nothing?
23      MS. RODRIGUEZ-COSS: I guess, your
24  Honor, the other thing -- we will file a request in
25  writing. The other thing we will file is a motion

**GA1120**

95

```
 1   for proposed mitigating factors.
 2              THE COURT:  Yes, I need them anyhow
 3   because I've got to draft --
 4              MR. SHEEHAN:  I don't think we should be
 5   required to do that until after we've gotten a
 6   verdict.
 7              THE COURT:  And then you can do it
 8   immediately after that.
 9              MR. SHEEHAN:  Yeah.
10              MS. DAYTON:  What about discovery?
11              MR. SHEEHAN:  As far as witness
12   statements I am --
13              MS. DAYTON:  Yeah.
14              MR. SHEEHAN:  If we have any witness
15   statements they will be turned over.
16              THE COURT:  When?
17              MR. SHEEHAN:  I don't think we have any,
18   actually.
19              MS. DAYTON:  So you have no idea what --
20              MR. SHEEHAN:  No, I have plenty of ideas
21   of what they're going to say.
22              MS. DAYTON:  So we would ask for notes
23   since there is no memorialization.
24              MS. RODRIGUEZ-COSS:  By investigators.
25              MR. SHEEHAN:  I'm not going to provide
```

96

```
 1   those.
 2              MS. RODRIGUEZ-COSS:  We would request
 3   reports of investigators.
 4              MR. SHEEHAN:  I don't think that's
 5   appropriate.
 6              MS. RODRIGUEZ-COSS:  I think the Court
 7   has discretion.
 8              MR. SHEEHAN:  The Court does not have
 9   discretion to grant that order.
10              THE COURT:  Why?
11              MR. SHEEHAN:  Because where does it come
12   from?  You don't have discretion to -- you don't
13   have discretion to compel them to make an early
14   Jencks disclosure.  You don't have discretion to
15   compel them to turn over notes.  I mean, they do,
16   and the reason why they do turn them over is because
17   of the problems of I think -- and it's appropriate
18   -- because there are all these Brady implications
19   which are not there for the defense.
20              THE COURT:  Okay.  So what is your plan,
21   immediately upon a guilty verdict you are going to
22   turn over a list of the names of all your witnesses?
23              MR. SHEEHAN:  Yeah.
24              THE COURT:  And you are just going to
25   carry it around with you waiting for a verdict?
```

97

```
 1              MR. SHEEHAN:  Hoping against hope.
 2              MS. DAYTON:  Your Honor, we disagree
 3   that you don't have the power to, one, order the
 4   government to turn things over if you see fit, and
 5   two, to order the defense to turn things over.
 6   There is a discovery obligation by the defense.
 7              THE COURT:  There is a discovery
 8   obligation, but --
 9              MS. RODRIGUEZ-COSS:  Which would include
10   Giglio, we would submit, your Honor.
11              MR. SHEEHAN:  It doesn't -- Giglio?
12              MS. RODRIGUEZ-COSS:  Yes, Giglio.
13              MS. DAYTON:  Prior convictions.
14              MS. RODRIGUEZ-COSS:  That's right, any
15   information you have that could be used to impeach
16   your witnesses.  Giglio doesn't just apply to the
17   government, it applies to anyone who puts up a
18   witness.
19              MR. SHEEHAN:  That's interesting.  I
20   don't accept that proposition.  I don't have to tell
21   you things about people.
22              THE COURT:  Let's go back to the expert
23   witness issue.  I think that needs to be disclosed
24   earlier.  Are you all set with -- is it just Baden?
25   No, he's at the liability.
```

98

```
 1              MR. SHEEHAN:  Right.
 2              THE COURT:  I mean he's at guilt.
 3              MS. RODRIGUEZ-COSS:  I thought the Court
 4   said Monday --
 5              THE COURT:  Is there any other expert
 6   you intend to offer at the penalty phase?
 7              MR. SHEEHAN:  Yes.
 8              THE COURT:  And will you disclose that
 9   on Monday?
10              MR. SHEEHAN:  Yes.
11              THE COURT:  Okay, with any
12   memorialization of what the opinion --
13              MR. SHEEHAN:  With a summary.
14              THE COURT:  -- basis.
15              MR. SHEEHAN:  With a summary of what it
16   is, correct.
17              THE COURT:  So the defendant's penalty
18   expert will be closed on Monday the 16th.  The
19   defendant's witness list and related discovery will
20   be turned over immediately upon a guilty verdict.
21              MR. SHEEHAN:  Yeah, immediately, I would
22   ask the following day just to --
23              THE COURT:  We are too short on days.
24   That's why I said bring it in your pocket.
25              MR. SHEEHAN:  Too short for what?  In
```

99

```
1   the sense of?
2           THE COURT:  People have to prepare.
3           MS. RODRIGUEZ-COSS:  We have a right of
4   rebuttal.
5           THE COURT:  And I don't want to lose
6   time because we have mishaps over preparedness.
7   We're taking so much of these jurors' time that
8   efficiency is a real hallmark, and the longer it
9   gets, the more that becomes important.  What else?
10          MS. RODRIGUEZ-COSS:  The list of
11  mitigation factors upon a guilty verdict, I believe
12  you said.
13          THE COURT:  And the list of mitigating
14  factors is also going to be --
15          MR. SHEEHAN:  That is not in any way,
16  shape or form a final list of the mitigation factors
17  that we would propose.
18          THE COURT:  Give me your best shot
19  immediately after a verdict, a guilty verdict.  It
20  doesn't mean you can't supplement it, but at least
21  we get started, and you can supplement it.
22          MR. SHEEHAN:  Well, on that one, I can
23  certainly say I understand what your Honor is
24  directing me to do, without agreeing to it, but if
25  you are ordering me to do it, that's what --
```

100

```
1           THE COURT:  We've --
2           MR. SHEEHAN:  That's what I will do.
3           THE COURT:  We've been at this case.
4           MR. SHEEHAN:  I don't think I should
5   have to do that, I'm objecting to do it, but you've
6   ordered me to do it.
7           THE COURT:  I have before indicated that
8   it is my inherent authority to keep this trial
9   running as efficiently as possible.
10          All right, anything else?
11          MS. RODRIGUEZ-COSS:  Your Honor, the
12  only other thing we have, and we are preparing to
13  also file a motion in writing, but the defense has
14  subpoenaed a certain number of government agents,
15  and I believe the civil department is dealing with
16  requesting full compliance with the Code of Federal
17  Regulations from the defense.  In any event, I
18  believe the intent is to solicit prior inconsistent
19  statements by certain government witnesses.  In that
20  regard, your Honor, I would submit that in order for
21  the Court to undertake its analysis as to the
22  admissibility of that testimony it would be
23  necessary for the defense to identify what
24  statements they are proposing are inconsistent.  And
25  so we need to know exactly what it is they intend to
```

101

```
1   solicit from the government agents.
2           THE COURT:  Why is that not identifiable
3   from the witnesses -- the government's witnesses who
4   were examined on, isn't it true you told so and so
5   such and such?
6           MS. RODRIGUEZ-COSS:  Well, I think the
7   characterization --
8           THE COURT:  Because it's not going to be
9   inconsistent if they didn't already testify about
10  it.
11          MS. RODRIGUEZ-COSS:  I think we may have
12  the defense soliciting testimony that the government
13  will submit is not inconsistent.  In addition to
14  that, I think we will move to exclude matters that
15  are collateral to the case, and before -- unless we
16  know what it is they intend to ask the government
17  agents, we will have to wait until they solicit
18  testimony to make the argument before the Court and
19  the Court would have to determine, one, whether the
20  statement was made by the witness previously;
21  whether, if so, it is inconsistent; even if it is
22  inconsistent, whether it's a collateral matter.  And
23  that's a pretty significant analysis, we would say.
24          THE COURT:  So, if in fact by definition
25  inconsistent has to be something the witness -- the
```

102

```
1   government witness referenced, right, why can't the
2   government essentially do a summary of all the
3   things that that witness was questioned about as to
4   what he or she told agents and then that would be of
5   great assistance to the Court.
6           MS. DAYTON:  It's not the government's
7   job.  It's them calling the witnesses.
8           MR. SHEEHAN:  So what you would like is
9   a script?
10          MS. DAYTON:  Hang on.  The problem is
11  there is many instances where they asked, for
12  instance, John Taylor, isn't it true you said this,
13  and he said --
14          MS. RODRIGUEZ-COSS:  Yes.
15          MS. DAYTON:  "I lied."  So they should
16  not be able to bring it in because it's an admission
17  he lied.
18          MR. SHEEHAN:  We don't intend to bring
19  that in.
20          MS. DAYTON:  Or he said "I don't know,"
21  "I don't remember."  That's not inconsistent.
22          MR. SHEEHAN:  It is inconsistent.
23          MS. RODRIGUEZ-COSS:  No, it's not.  We
24  will brief that, your Honor, but our proposition
25  will be if the witness says "I don't remember,"
```

103

1   simply saying "I don't remember" does not create a
2   prior inconsistent statement.
3          MR. SMITH:  Your Honor, under the rule
4   the witness is afforded an opportunity to deny or
5   explain the statement.  If the answer is "I don't
6   remember" that doesn't change the fact they were
7   afforded an opportunity to deny or explain the
8   statement, and then we are allowed under the rule to
9   impeach with extrinsic evidence, which is the agents
10  testifying that yes, they did say that to me on a
11  certain date.
12         MS. DAYTON:  They explained it.  They
13  said "I don't know."
14         MR. SMITH:  No, they said "I don't
15  remember."  If they testify at trial I did X and
16  they previously told an agent I did Y, if the answer
17  is, did you tell the agent Y, and you say I don't
18  remember, that doesn't eviscerate our ability to
19  prove that they said I did Y.
20         THE COURT:  Do you want to move in
21  limine that you can do that, giving me the
22  authority.
23         MR. SHEEHAN:  Why do we need to move in
24  limine?
25         THE COURT:  Because I want the authority

104

1   so I can rule properly.
2          MR. SHEEHAN:  This position is
3   ridiculous.  They want a script.
4          MS. RODRIGUEZ-COSS:  It's not
5   ridiculous.
6          MS. DAYTON:  We'll brief it, your Honor.
7          THE COURT:  They're not getting the
8   script, but the question is what is the ballpark,
9   and I did or did not say something is consistent or
10  inconsistent, that's easy.  The issue of "I don't
11  remember" and whether that's inconsistent is an
12  issue.  You take the position that that entitles you
13  to question the government's people about what in
14  fact they did say.  I'd like to hear about that from
15  you.  And then the other is things that -- well, I
16  guess you have conceded that he admitted he lied.
17         MR. SHEEHAN:  Yeah, I'm not going to ask
18  the agent did he say it when he's admitted he said
19  it and it is a lie.  I'm not going over that again.
20         MS. RODRIGUEZ-COSS:  The third issue
21  would be collateral matters.
22         THE COURT:  So what's an example of a
23  collateral matter?
24         MS. RODRIGUEZ-COSS:  An example of a
25  collateral matter will be, for example, your Honor,

105

1   let's take Juanita Hopkins.  She took the stand, was
2   asked, "where did you regularly store the narcotics
3   within the apartment," and she said, well, I think I
4   used to put them in the kitchen cupboard, and in an
5   agent's report it appears a statement by Juanita
6   Hopkins saying, oh, I just put them in the drawer of
7   my bedroom night table, and they want to bring in
8   the agent to say, well, she told me -- or I remember
9   her telling me that she put it in the night table
10  rather than in the kitchen cupboard.
11         Is that something that is material to
12  the issues that are to the facts that are at issue
13  here?  We would submit that's a collateral matter.
14         THE COURT:  Well, it may be lesser, but
15  it's not collateral.  It's all about the activities
16  of the narcotics operation.
17         MS. RODRIGUEZ-COSS:  She's not denying
18  that she sold narcotics, she's not denying that she
19  sold crack cocaine, she's not denying that she sold
20  it from apartment 211, she's not denying that she
21  kept narcotics stashed away somewhere inside that
22  apartment.  So there is a prior inconsistent
23  statement as to specifically where in the apartment.
24  I think those are the sort of things that the Court
25  has discretion to say I'm not going to let you bring

106

1   in extrinsic evidence of prior inconsistent
2   statements.  They had an opportunity to
3   cross-examine the witness on the matter, the jury
4   had an opportunity to listen to the testimony.  I
5   think that would be a matter that you would be
6   creating basically a whole other side trial just on
7   those issues.
8          MR. SMITH:  Are you saying in the
9   statements that I did not confront a witness about?
10         MS. RODRIGUEZ-COSS:  No, no, statements
11  that you did confront the witness about and got an
12  answer on cross-examination.
13         MR. SHEEHAN:  So what you are saying is
14  that --
15         THE COURT:  Leave out the little lies.
16         MR. SHEEHAN:  Why?
17         MR. SMITH:  I think that's a tactical
18  decision for us to make.
19         MS. RODRIGUEZ-COSS:  No, I think it's
20  within the realm of the discretion of the Court to
21  allow it or not.
22         THE COURT:  I don't think it's something
23  I can rule on now.
24         MS. RODRIGUEZ-COSS:  No.  Right, I
25  agree.

107

```
1              THE COURT:  If it doesn't have to do
2    with the criminal activity, you may be right.  If
3    it's details of the criminal activity, it's probably
4    going to come in.
5              MS. DAYTON:  Okay.
6              MR. SMITH:  So to be clear, you are
7    asking for a briefing on the portion of the "don't
8    remember."
9              THE COURT:  Yes.
10             MR. SMITH:  I can do that.
11             THE COURT:  And the caption you need for
12   your brief is a motion in limine to permit you to do
13   that because of the following case law.  Okay.
14             MS. REYNOLDS:  Where there is something
15   "would it refresh your recollection," they said
16   "no," so pose that line of questioning?  That's all
17   part of "I don't remember"?
18             MR. SMITH:  Yeah, I agree, either they
19   said "I don't remember" and I say "would this help
20   you," they said "no."
21             THE COURT:  This is a generic -- this is
22   a generic issue we can deal with as a matter of law.
23   So, let's do that.  All right.  And I think we
24   should probably be prepared to have that in so I can
25   look at it by over the weekend.
```

108

```
1              MS. DAYTON:  I suggest not getting it in
2    at 11:30 at night.  I'd like to point out jury
3    instructions came at 10:24 and I said I'm glad I'm
4    not the only one working.
5              THE COURT:  All right, thank you.
6
7
8              I certify that the foregoing is a
9    correct transcript from the record of proceedings in
10   the above-entitled matter.
11
12                        7/25/11
13                         Date
14
15                   /S/  Sharon Montini
16                    Official Reporter
17
18
19
20
21
22
23
24
25
```

109

```
1                 UNITED STATES DISTRICT COURT
2                   DISTRICT OF CONNECTICUT
3    * * * * * * * * * * *    *
                              *
4    UNITED STATES OF AMERICA,  * Case No 6cr160(JBA)
5              Plaintiff,       *
                                *
6         vs.                   *
                                *
7    AZIBO AQUART              * MAY 18, 2011
                                *
8              Defendant.        *
                                *
9    * * * * * * * * * * * * *   *
10    TRANSCRIPT OF GUILT PHASE CHARGE CONFERENCE
                    VOLUME II
11
12   BEFORE:  THE HONORABLE JANET BOND ARTERTON U.S.D.J.,
                                      and jury
13   Appearances:
14   FOR THE GOVERNMENT:  ALINA REYNOLDS, ESQ
                          TRACY DAYTON, ESQ.
15                        PETER MARKLE, ESQ.
                          JACABED RODRIGUEZ-COSS
16                        United States Attorney's Office
                          915 Lafayette Blvd
17                        Bridgeport, CT 06604
18   FOR THE DEFENDANT  MICHAEL SHEEHAN, ESQ
     AZIBO AQUART:      Sheehan & Reeve
19                      139 Orange Street
                        New Haven CT 06510
20
                        JUSTIN SMITH, ESQ.
21                      383 Orange Street
                        New Haven, CT 06511
22
23
     Court Reporter:    Sharon Montini, RMR
24
     Proceedings recorded by mechanical stenography,
25   transcript produced by computer
```

110

```
1              MR. SHEEHAN:  Did your Honor want us to
2    go through the pages.
3              THE COURT:  I'm just reading the
4    government's memorandum on retaining alternates.
5              MR. SHEEHAN:  Your Honor, I just got a
6    copy of that when I walked in.  I wonder if I might
7    have a chance to just look at it.
8              THE COURT:  Well, we're both doing that.
9              MR. SHEEHAN:  Well, I mean, I haven't
10   looked at the cases.
11             THE COURT:  All right, so we'll exam
12   this issue further and see how that comes out.  We
13   have not finished all the evidence.  The parties had
14   agreed that the issue of the admissibility of
15   statements of co-conspirators could await the
16   conclusion of evidence where the Court would have
17   available both the statements that were
18   provisionally admitted as statements of a
19   co-conspirator along with all the independent
20   evidence to satisfy the requirements under Geaney
21   and Bourjaily.  We are now at that point, and the
22   co-conspirators whose statements are at issue and
23   which were provisionally admitted were John Taylor,
24   Lashika Johnson, Jacqueline Bryant, Rodney Womble,
25   Sherrell Randolph, Judith Rivera, Venro Flemming,
```

111

```
 1   Frank Hodges, Juanita Hopkins, Azikiwe Aquart whose
 2   statements were received through the testimony of
 3   Taylor and Bryant, Randi Washington and Shante
 4   Petway. If I've left any co-conspirator out, please
 5   let me know. I have not heard anything specifically
 6   or generally from the defense that any of these
 7   persons was not demonstrated by the total trial
 8   evidence to not be a potential co-conspirator, but
 9   is there anything that I have missed in the
10   defendant's position?
11           MR. SHEEHAN: Other than just generally
12   asserting that it is not appropriate, your Honor.
13   But I'm not making any specific claim.
14           THE COURT: Well, we have now had
15   evidence for four weeks, or have we lost track of
16   time?
17           MR. SHEEHAN: I have lost track of time.
18           THE COURT: The standard for Geaney is
19   still preponderance of the evidence. It seems that
20   there is little doubt, given the testimony of what
21   these participants did in and of themselves, the
22   details they give that corroborate other
23   co-conspirators, the other independent evidence of
24   the activities of the defendant with respect to the
25   two -- with respect to murders on August 24, 2005,
```

112

```
 1   and the crack cocaine trafficking, that those two
 2   conspiracies were -- were proved to have existed,
 3   that Mr. Azikiwe Aquart and each of these
 4   co-conspirators were members of one or the other, or
 5   both, that the statements that they made that were
 6   offered as 801(d)(2)(E) statements of
 7   co-conspirators were made during the course of the
 8   one or both of the conspiracies, and that they were
 9   made in furtherance of the conspiracy.
10           The testimony was extensive that, while
11   at the risk of sounding conclusory right now, to go
12   back and recite what all of the testimony would be
13   that would demonstrate the existence of the two
14   conspiracies seems to me would be unnecessary,
15   particularly where it's only a generalized objection
16   from the defendant.
17           So, I think the Geaney findings are
18   appropriately made on this basis and that the
19   statements that would have been conditionally
20   admitted are appropriately admitted in light of the
21   full record of the evidence in this trial.
22           We will move to the charge itself and go
23   through it page by page.
24           MR. SHEEHAN: Your Honor, to jump ahead,
25   my first page would be page 38.
```

113

```
 1           THE COURT: Do we have anything before
 2   then?
 3           MR. SHEEHAN: No.
 4           MS. RODRIGUEZ-COSS: Correction on page
 5   23, your Honor.
 6           THE COURT: All right.
 7           MS. RODRIGUEZ-COSS: In the first
 8   paragraph, three lines from the bottom should read
 9   that "the defendant knowingly and willfully became a
10   member of that narcotics conspiracy."
11           MR. SHEEHAN: Page 23?
12           MS. RODRIGUEZ-COSS: Right, first
13   paragraph, three lines from the bottom says
14   "willfully became members," it should say "a
15   member."
16           THE COURT: Okay.
17           MS. RODRIGUEZ-COSS: And then you said
18   what, page 38?
19           MR. SHEEHAN: My next page, your Honor,
20   was page 38. There was just an -- on the second
21   full paragraph you just got a "knowledge of the
22   purpose." Somehow "at" got stuck in there.
23           THE COURT: I'm sorry, what is the
24   correction?
25           MR. SHEEHAN: That second full
```

114

```
 1   paragraph, your Honor, "what is necessary is that
 2   the defendant must have participated with knowledge"
 3   and mine says --
 4           THE COURT: Oh, I see.
 5           MR. SHEEHAN: It's just a typo, your
 6   Honor.
 7           THE COURT: Of the purposes, okay.
 8           MR. SHEEHAN: I'm up to 43.
 9           MS. RODRIGUEZ-COSS: On page 42, your
10   Honor, in the text on the first paragraph, it should
11   be "furtherance of a conspiracy to distribute or
12   possess with intent to distribute 50 grams or more."
13           MR. SHEEHAN: 43, your Honor, I think
14   that the last sentence is duplicative of what we
15   just said above, and I don't think it adds anything.
16   First of all, we said that they "deliberately and
17   purposely engaged" and I don't think we need to then
18   say "to act intentionally."
19           THE COURT: When you say "above," you
20   mean somewhere earlier than beginning "element two"?
21           MR. SHEEHAN: Well, we say that "the
22   defendant intentionally killed" and then we say
23   that --
24           MS. RODRIGUEZ-COSS: What "intentional"
25   means.
```

115

```
1          MR. SHEEHAN:  Then we say "he
2    deliberately and purposely engaged in conduct."  So,
3    I think that satisfies that.
4          THE COURT:  Okay.
5          MR. SHEEHAN:  My next one jumps up to
6    page 59.  I don't know if the government had
7    anything before that.
8          MS. RODRIGUEZ-COSS:  Just on page 47, on
9    the third element on that page, if we can just
10   insert in parens "crack cocaine" the way we have
11   throughout the rest of the instructions after
12   "cocaine base."
13         THE COURT:  Now that we know "base" is a
14   northern term.
15         MR. SHEEHAN:  Little tidbits of
16   knowledge we pick up.
17         THE COURT:  What do they call it in the
18   south?
19         MS. DAYTON:  Crack.
20         THE COURT:  It's just crack?
21         All right, what's next?
22         MR. SHEEHAN:  I went to 59.
23         MS. RODRIGUEZ-COSS:  Go ahead.
24         MR. SHEEHAN:  On 59, your Honor, again,
25   this is the objection that I had made in the
```

116

```
1    previous conference.  I think that at the end of
2    uncharged acts it should say "or to commit the
3    murders charged in this case."  Because otherwise
4    the --
5          MS. RODRIGUEZ-COSS:  Your Honor, we
6    would renew our objection to that.
7          MR. SHEEHAN:  I haven't quite finished.
8          THE COURT:  Let me just hear it.
9          MR. SHEEHAN:  Otherwise I think what
10   they are using these basically to show is that
11   because they did those acts they are more likely to
12   have committed the murders, which is the propensity
13   argument.
14         MS. RODRIGUEZ-COSS:  We would object to
15   that change, your Honor.  I think the instruction as
16   written is consistent with what the jury is normally
17   charged when 404(b) evidence, for example, is
18   introduced, and in that sense we think it's
19   sufficient.
20         THE COURT:  This wasn't offered as
21   404(b).
22         MS. RODRIGUEZ-COSS:  No, I mean, but
23   what I'm saying, it is the same concept, that the
24   evidence is admitted for a limited purpose and not
25   to prove the propensity for violence or the bad
```

117

```
1    character of the defendant.  And that's what the
2    instruction states very clearly.
3          MR. SHEEHAN:  But, your Honor, the
4    general propensity to engage in acts of violence in
5    the context of this case, first of all, the specific
6    acts of violence that he is charged with, and the
7    only acts of violence he's charged with, are the
8    robbery, which the jury may understand is an act of
9    violence, but certainly the murders, which any jury
10   would reasonably understand is an act of violence,
11   and I think that in that context it is at best
12   confusing to say that you may not consider it as
13   evidence of bad character or a general propensity to
14   act -- to engage in acts of violence, but to leave
15   out there the question as to whether or not you can
16   consider those previous assaults as evidence that he
17   committed the murders charged in this case.
18         THE COURT:  What are you proposing?
19         MR. SHEEHAN:  Well, I had previously --
20         THE COURT:  Well, you had previously had
21   something that seemed to preclude them
22   considering --
23         MR. SHEEHAN:  Correct.
24         THE COURT:  -- this evidence in this
25   case on the charges at all.
```

118

```
1          MR. SHEEHAN:  What I am proposing --
2    yeah, well, I lost on that one, your Honor.
3          THE COURT:  Not surprisingly.
4          MR. SHEEHAN:  Well, that may be, but
5    backing up is not necessarily the worst thing.  But,
6    in any case, what I'm suggesting, your Honor, is
7    that the language be added after "engaged in acts of
8    violence," comma, "or to commit the murders charged
9    in this case."
10         MS. RODRIGUEZ-COSS:  Your Honor, the
11   reason we oppose that is because it is contradictory
12   to the Court's instructions as a whole.  So, for
13   Count Two, Three and Four, we are instructing the
14   jury that the existence of an enterprise is an
15   element of the offense of murder in aid of
16   racketeering.  And for Counts Five, Six and Seven we
17   are instructing the jury that it is an element of
18   the offense of a murder carried out in furtherance
19   of a drug conspiracy to find the existence of a
20   conspiracy first.  And so now in this instruction we
21   are telling them that they may consider these acts
22   to establish those two elements.  And so then to
23   then in that same instruction tell them -- or
24   specify that they can't consider them in determining
25   whether or not he committed those murders is
```

119

```
1   completely contradictory.  I think the instruction
2   is clear and sufficient as it is right now and we
3   would object to adding the proposed language by the
4   defendant.  I think it would be misleading and
5   confusing to the jury to do that.
6              THE COURT:  All right, I'll take that
7   under advisement and if there is to be any change
8   we'll get that out you shortly.  What's next?
9              MR. SHEEHAN:  Your Honor, I jump to page
10  65.  I don't know whether --
11             MS. RODRIGUEZ-COSS:  I don't have
12  anything before then.
13             MR. SHEEHAN:  Your Honor, what I would
14  request is that paragraph F, that bullet.
15             MS. RODRIGUEZ-COSS:  F?
16             MR. SHEEHAN:  The top, subsection F,
17  that it state "Was what the witness said supported
18  by other evidence or did the witness's testimony
19  differ from other witnesses or evidence."  That I
20  would be okay with.  I think, in essence, right now
21  F and G are very similar, if not duplicative.
22             THE COURT:  They do seem a bit similar.
23             MR. SHEEHAN:  What I would suggest is
24  that we say "did the witness's testimony appear to
25  be honest but nevertheless mistaken," which was one
```

120

```
1   of the issues that we had requested that the charge
2   -- one of the concepts that we'd ask the charge
3   include.  And we had also added -- and I think the
4   Court's previous charge had language in this section
5   which was:  "Does the witness have some incentive,
6   loyalty or motive that might cause him or her to
7   shade the truth, or does the witness have some bias,
8   prejudice or hostility that may have caused the
9   witness, consciously or not, to give you something
10  other than a completely accurate account of the
11  facts he or she testified to."  And I think what
12  that language that I am requesting does is that it
13  flags the possibility of a motive to shade the truth
14  because of bias.
15             THE COURT:  So, we would just substitute
16  that which we had in in the previous charge in that.
17             MR. SHEEHAN:  Yes, your Honor.
18             THE COURT:  The sequential sentences and
19  just stick it in there.
20             MR. SHEEHAN:  Yes.
21             THE COURT:  That makes sense.  Any
22  problem from the government?
23             MS. RODRIGUEZ-COSS:  No.
24             MR. SHEEHAN:  The next, and it's just
25  again a minor point, but on page 66 of the charge,
```

121

```
1   in the second paragraph, the second line or the
2   second sentence, "the weight of the evidence as to a
3   particular fact."  I would ask that the Court delete
4   the language of "necessarily" because I think it
5   suggests that number of witnesses or exhibits could
6   ever resolve the issue whereas the issue is never
7   resolved by that.  So, if the language said it's not
8   determined by the number of witnesses nor by which,
9   it's the quality, that is the basic concept that I
10  think is at issue.  And in the context of a criminal
11  case, as in this one anyway, most often most of the
12  evidence and most of the witnesses are produced by
13  the government, I think it raises issues as to
14  burden of proof to suggest that it might be
15  determined by the number of witnesses.
16             THE COURT:  So you just want to take
17  that one word out.
18             MR. SHEEHAN:  Yeah.  I should have just
19  said it simply.  I apologize.
20             THE COURT:  Fine.
21             MS. DAYTON:  Why start now?
22             MR. SHEEHAN:  I wondered if I could get
23  a rise.
24             THE COURT:  All right, what's next?
25             MR. SHEEHAN:  My next issue is the
```

122

```
1   bottom of 76 going over into 77.
2              THE COURT:  Can I see whether we have a
3   list of expert witnesses yet.
4              MS. RODRIGUEZ-COSS:  We sent it in.
5              THE COURT:  We do?
6              MR. SHEEHAN:  I don't know if the
7   government had anything before that, your Honor.
8              MS. RODRIGUEZ-COSS:  What page did you
9   say?
10             MR. SHEEHAN:  The last sentence of 76
11  going over to 77.
12             MS. RODRIGUEZ-COSS:  Well, at page 71,
13  your Honor, we thought paragraph 2 was going to be
14  replaced by the paragraph proposed by defense
15  counsel at 24, or were we mistaken on that?
16             THE COURT:  Wait a minute.  "You should
17  bear in mind that a witness has entered," that
18  paragraph?
19             MS. RODRIGUEZ-COSS:  Right, this is the
20  paragraph where the Court explained further what a
21  cooperation agreement is and a 5K1, and on page 70,
22  and then on the second page, what the defense
23  previously proposed at page 24 of their jury charge.
24             MR. SHEEHAN:  My recollection, your
25  Honor, is that I backed up on that, and my primary
```

123

```
 1   concern was, and in fact I think it has been
 2   addressed by the Court's instruction, that the
 3   agreement itself is not evidence that the witness
 4   has, in fact, testified truthfully.
 5            MS. RODRIGUEZ-COSS:  Well, the concern
 6   the government has, your Honor, is that the way it
 7   is worded at this time it assumes that the witness
 8   will get a lighter sentence by providing favorable
 9   testimony to the prosecution, and so we would submit
10   that's not entirely correct.  It's an issue of fact
11   for the jury to determine whether or not that -- I
12   mean, we always tell witnesses it is their role to
13   testify truthfully whatever it is.
14            THE COURT:  What if we change it to
15   "hopes."
16            MR. SHEEHAN:  I actually think "may"
17   covers that possibility, your Honor.  I think
18   "hopes" is fine as well.
19            THE COURT:  "Who hopes he or she will
20   receive a lighter sentence."  That's really what's
21   going on here.
22            MS. RODRIGUEZ-COSS:  Well, I don't know
23   why we can't simply say that they should "bear in
24   mind a witness who has entered into such an
25   agreement has an interest in this case different
```

124

```
 1   than any ordinary witness because they may be able
 2   to receive a lighter sentence or they are testifying
 3   with the hope of receiving a lighter sentence."  I
 4   don't think that that fact depends on whether the
 5   testimony is favorable or not to the government or
 6   on the outcome of the case, which I thought the
 7   language at page 24 of the proposed charge by the
 8   defense sort of summarized very well that point, "it
 9   may only be considered by you in deciding whether
10   the witness has an interest in the outcome of the
11   case which would motivate him to testify falsely or
12   whether it is in his interest to testify truthfully
13   regardless of the outcome."
14            MR. SHEEHAN:  I realize I'm being
15   pillared with that having put it in.  I've withdrawn
16   it.  I don't think it's accurate.  It was stupid of
17   me to do it.  I should not have put it in.  I
18   withdraw it.  I think that the issue here -- I think
19   in fact the witness -- I think it's generally true
20   that a witness does not -- under a cooperation
21   agreement often does not have an interest in the
22   same way in the outcome of the case.  I think that
23   the way this language is set forth in the charge
24   does accurately summarize the nature of the
25   witness's interest.
```

125

```
 1            THE COURT:  Is the interest -- this is a
 2   bit pedantic, but is it the "interest in the outcome
 3   of the case" or the "interest in the case"?
 4            MR. SHEEHAN:  Actually I don't think in
 5   many ways it's --
 6            MS. RODRIGUEZ-COSS:  Either.
 7            MR. SHEEHAN:  I think the reality --
 8            THE COURT:  So "has an interest," just
 9   take that out entirely?
10            MR. SHEEHAN:  No, I think they do have.
11   They are --
12            THE COURT:  That's what --
13            MR. SHEEHAN:  Well, your Honor could say
14   -- I think if you were to say "a witness who's
15   entered into such an agreement is different than an
16   ordinary witness," that would be fine.
17            MS. RODRIGUEZ-COSS:  I wouldn't object
18   to just saying "has an interest different than any
19   ordinary witness."  Not that they have a particular
20   interest in the case, but has an interest different
21   than any ordinary witness.
22            MR. SHEEHAN:  I would sacrifice the "in
23   this case."  I think that will be fine, without
24   adopting my previous.
25            THE COURT:  "Has an interest different
```

126

```
 1   than any ordinary witness."  "A witness who hopes
 2   that he or she will receive a lighter sentence by
 3   giving testimony favorable to the prosecution may
 4   have a motive to testify falsely.  Therefore, you
 5   must examine his or her testimony with caution."
 6            MS. RODRIGUEZ-COSS:  If the Court is
 7   then going to proceed with this language, can we
 8   then just add the phrase from the proposed language
 9   the government was urging.
10            THE COURT:  That was on 22?
11            MS. RODRIGUEZ-COSS:  Page 24 of the
12   defense charge:  "By giving testimony favorable to
13   the prosecution may have a motive to testify falsely
14   or truthfully."  It is for the jury to decide what
15   is motivating this witness to testify or what their
16   motive may be because of the cooperation agreement.
17   The jury may conclude based on the language of the
18   cooperation agreement that it is in the best
19   interest of the witness to actually testify
20   truthfully and that may be their motive.
21            MR. SHEEHAN:  Your Honor, I think that
22   cuts -- the appropriateness of this instruction is
23   to advise the jury it has to be treated with extra
24   caution.  I think the language that's chosen here
25   accomplishes that.  It is not the same as saying,
```

127

1  you know, look at it this way, they might be
2  testifying more truthfully or less truthfully.  That
3  says nothing.  I think that the purpose of the
4  instruction is to advise the jury that there is a
5  special relationship of sorts that they have to bear
6  in mind in ultimately assessing the credibility of
7  that witness.  The Court does not --
8              THE COURT:  Do you think that purpose is
9  retained if you just say "a witness who hopes that
10 he or she will receive a lighter sentence" -- or
11 "such a witness hopes that he or she will receive a
12 lighter sentence by giving testimony favorable to
13 the prosecution," period?
14             MR. SHEEHAN:  That's fine, your Honor.
15 Well, actually that doesn't say anything, though.
16 We're missing the point.
17             MS. RODRIGUEZ-COSS:  It kind of ended
18 awkwardly.  Can the Court read that again?
19             MR. SHEEHAN:  It ends up --
20             THE COURT:  "Such a witness hopes that
21 he or she will receive a lighter sentence by giving
22 testimony favorable to the prosecution."
23             MR. SHEEHAN:  And?
24             THE COURT:  "Therefore, you must
25 examine" -- do you know, I'm just going to leave it

128

1  the way it is now.  I'm going to go back and look at
2  the infamous page 24 of the defendant's.
3              MR. SHEEHAN:  The withdrawn 24.
4              MS. RODRIGUEZ-COSS:  And newly proposed
5  by the government.
6              THE COURT:  And there was a Section 22
7  of the government's that I was going to look at.  I
8  obviously looked at them and rejected them when I
9  did this draft, but I'll go look at them again.
10 Okay, what's next?
11             MS. RODRIGUEZ-COSS:  That's all the
12 government had, your Honor.
13             THE COURT:  Okay.
14             MR. SHEEHAN:  Okay, and then I jumped to
15 page 76, your Honor.  The Court's previous
16 instruction had a -- the jury was informed that they
17 "should not surrender his or her honest and
18 conscientious view of how the issues should be
19 decided," and I would submit that if this, the last
20 sentence here were changed --
21             MS. RODRIGUEZ-COSS:  In 76 you mean?
22             MR. SHEEHAN:  I'm sorry, the bottom of
23 76.  I think that sentence was fine.  If the Court
24 were to add in following that --
25             MS. RODRIGUEZ-COSS:  It's there.  It

129

1  says "your final vote must reflect your
2  conscientious."
3              MR. SHEEHAN:  I'm sorry, I didn't
4  finish.  I guess I stopped to breathe or something.
5  What I'm suggesting is that after -- "if the views
6  of your fellow jurors convince you your view is
7  erroneous," then put in a period, "however, you
8  should not surrender your conscientious opinion on
9  how the issues should be decided."
10             MS. RODRIGUEZ-COSS:  Your Honor, I think
11 that sort of comes very close to the language of an
12 Allen charge that I thought both parties had agreed
13 was inappropriate at this stage of the instructions.
14 Did I get that wrong?  In the previous charge
15 conference.
16             MR. SHEEHAN:  Yeah, in the other one we
17 got into discussing what happens if you have no --
18 if you can't -- the objection we had previously was
19 when -- was a suggestion of deadlock.  I don't think
20 this is any suggestion of deadlock, but it is
21 conveying the instruction that I think is
22 appropriate at this time that a juror should not
23 surrender his or her conscientious opinion as to how
24 the issues should be decided.
25             THE COURT:  So then you just run the

130

1  sentence "and your final vote."
2              MS. RODRIGUEZ-COSS:  If we're going to
3  add that language, your Honor, then I would suggest
4  it would be then necessary to say:  "However, then
5  you shouldn't hesitate to do so if you are convinced
6  that your original position is wrong."  And then
7  we're really getting into --
8              MR. SHEEHAN:  That would be fine.
9              MS. RODRIGUEZ-COSS:  -- the language of
10 an Allen charge before we start deliberating.
11             THE COURT:  We've already said that:
12 "In the course of your deliberations do not hesitate
13 to re-examine your original view."
14             MS. RODRIGUEZ-COSS:  Then I would say,
15 again, the government's satisfied with the
16 instruction as is.
17             THE COURT:  All right, I think it's a
18 better balance when you are saying:  "Don't hesitate
19 to re-examine your view.  However, you should not
20 surrender your conscientious opinion."
21             MR. SHEEHAN:  The final issue I would
22 raise, your Honor, is --
23             THE COURT:  "On how the issue should be
24 decided:  Which should --
25             MR. SHEEHAN:  I'm sorry, I interrupted

131

```
 1  the Court.
 2          THE COURT:  So what you are really --
 3  what we really mean to say here is "however, don't
 4  hesitate to re-examine your view," and then
 5  "However, you should not surrender your
 6  conscientious opinion on how the issues should be
 7  decided which must be reflected in your" --
 8          MR. SHEEHAN:  "Final vote."
 9          MS. RODRIGUEZ-COSS:  Exactly.
10          THE COURT:  "Reflected in your final
11  vote."  Okay.
12          MR. SHEEHAN:  Final point I would make,
13  your Honor, is after further reflection in thinking
14  about it, at the bottom of the page "your request
15  for testimony," I would add in "or further legal
16  instruction."
17          MS. RODRIGUEZ-COSS:  I'm sorry, what
18  part of that page?
19          MR. SHEEHAN:  That last sentence.
20          MS. RODRIGUEZ-COSS:  "Your request for
21  testimony"?
22          MR. SHEEHAN:  And then I would add in
23  "further legal instruction."  I think it has been a
24  lengthy trial, your Honor, it is a complicated
25  charge.  I think they will have the instructions
```

132

```
 1  with them, but if there is confusion on that point,
 2  I think that it is appropriate the jurors seek
 3  guidance from the Court.
 4          THE COURT:  But I don't know that I'm
 5  inviting them to have further legal instruction as
 6  opposed to clarifying.
 7          MR. SHEEHAN:  "Clarifying" would be
 8  fine, your Honor.
 9          THE COURT:  Of course that assumes this
10  isn't clear.
11          MR. SHEEHAN:  I would not suggest that,
12  your Honor, that's why I thought further, but --
13  hey.
14          THE COURT:  So what if we just said
15  "your request for testimony or any questions or any
16  communication with the Court should be made in
17  writing."
18          MS. DAYTON:  Yes.
19          MR. SHEEHAN:  If your Honor, prefers
20  that.
21          THE COURT:  I'm not really interested in
22  planting the idea that these instructions that may
23  be difficult for them are going to be supplemented
24  freely when we've put our work into doing the best
25  we can at this stage.  So we'll just leave it as
```

133

```
 1  "questions" and that gets the point across without
 2  expressly inviting.  You know how hard it is to
 3  refine a charge, to give further instruction as
 4  opposed to clarifying something that we hadn't
 5  really seen as a complication.
 6          MR. SHEEHAN:  Well, my only --
 7          THE COURT:  So, let's do that.
 8          MR. SHEEHAN:  All right, the concern I
 9  have is that obviously in any case it's important
10  that the jury understand the instructions, and this
11  one it seems the stakes are of the highest order,
12  but as the Court wishes.
13          THE COURT:  So, we're going to say any
14  request for testimony, any questions or any
15  communications should be made in writing.  Okay.
16          MR. SHEEHAN:  Could I just say, your
17  Honor, finally, you said kind words at the
18  conclusion of the presentation and I, on behalf of
19  the defendant and Mr. Smith and myself, really do
20  want to thank the Court and all your staff as well
21  who worked -- so, you know, thank you.  I know it
22  was very -- it was a long stretch, and we do
23  appreciate that.
24          THE COURT:  Well, you are kind.  Thank
25  you very much.  You all have stayed with the rigor
```

134

```
 1  of the program quite valiantly.  That's to say from
 2  the voir dire on.
 3          MS. DAYTON:  The voir dire was the worst
 4  part.
 5          MR. SHEEHAN:  But I think, you know,
 6  certainly on our behalf, and from Mr. Aquart's
 7  perspective as well, just we do feel that people
 8  worked very hard, all people involved.  So -- and we
 9  wanted to thank the Court.
10          THE COURT:  Thank you.
11          MR. SHEEHAN:  And especially Ms.
12  Montini.
13          THE COURT:  There is the hero.
14          MR. SHEEHAN:  Our hero who shall be sung
15  valiantly.
16          MS. DAYTON:  Just two more things.  One,
17  if we could get an opportunity to look at the
18  finalized verdict form.
19          THE COURT:  Yes.  Okay, we haven't done
20  one yet.
21          MS. DAYTON:  I don't think we're going
22  to have a verdict today.  So we're probably fine.
23  Just kidding.  We can do it tomorrow or we can do it
24  while the jury is out.
25          THE COURT:  I'll send you one in a
```

135

```
1   little while.
2           MS. DAYTON:  And then the other thing.
3           THE COURT:  It's very simple.  It's
4   really each count:  Do you find the defendant
5   guilty?  No/yes.  And then do you find that the
6   government proved -- is it 50 or more, or more than
7   50?
8           MS. DAYTON:  50 or more.
9           THE COURT:  50 or more.
10          MS. DAYTON:  And then we also have to
11  have the 280 or more, just because the law has
12  changed, and while it's not retroactive, we would
13  just ask to have it in there.
14          MR. SHEEHAN:  It's going to be pretty --
15          MS. DAYTON:  We do this regularly for
16  lower quantities.  I mean, if you have a five kilo
17  case, they do five kilos, 500 kilos, they have
18  lesser included.  This is more included, just for
19  the purpose of -- the law hasn't been finally
20  decided on this.  It appears that it's not
21  retroactive, but just to cover.
22          THE COURT:  All right.
23          MR. SHEEHAN:  Well --
24          MS. DAYTON:  And do you want just
25  guilty, not guilty versus yes, no?
```

136

```
1           THE COURT:  Not guilty, guilty.  That's
2   the way they always want it.
3           MS. RODRIGUEZ-COSS:  Not guilty, guilty.
4   Not yes, no.
5           THE COURT:  Right.
6           MR. SHEEHAN:  I think on the 280, I
7   don't think that the verdict form should reflect
8   that question to the jury.  I don't think that it
9   tells the jury anything meaningful.
10          THE COURT:  It tells us.
11          MR. SHEEHAN:  But we've been talking
12  throughout the context of this case about plea
13  agreements, many of which have 50 grams or more of
14  crack cocaine, and suddenly we're interjecting the
15  280.  I don't think it -- it throws -- it makes
16  everything seem like -- you know, it makes it very
17  difficult to understand.
18          THE COURT:  So what if we don't have
19  that.
20          MS. RODRIGUEZ-COSS:  Is the defense
21  objecting to that?
22          MR. SHEEHAN:  I'm saying that it adds a
23  level of confusion to this jury as to the way this
24  case has been presented from the start.  Had Mr.
25  Aquart been charged with more than 280 grams, then
```

137

```
1   it may have made sense.  As it is, he has been
2   charged with more than 50 grams.  I'm basically
3   saying here, given the status of the indictment that
4   was returned by the grand jury, I don't think that
5   at this juncture we should be asking the jury
6   additional questions.
7           THE COURT:  Now is our chance to ask the
8   jury whatever it is we need in order to not have to
9   retry this case.
10          MS. DAYTON:  Right.
11          MR. SHEEHAN:  That's not the defendant's
12  perspective on this matter.
13          THE COURT:  Let me hear how the
14  government sees the problem and why we need to have
15  that.
16          MS. DAYTON:  First of all, we could do
17  it as a special separate verdict form that could
18  remain sealed until they've determined on Count
19  Eight the quantity.  If they find it's over 50 grams
20  or more of crack cocaine, then they could be
21  directed, okay, now open that, and do you find it,
22  you know, beyond 280 grams of crack cocaine as well.
23  So they'll make the decision just solely based on
24  the law.  You know, there have been decisions about
25  the retroactivity in other circuits.  It hasn't been
```

138

```
1   finally decided in the Second Circuit, and Count
2   Eight, and then Count Five, Six and Seven are
3   reliant upon an 841(b)(1)(A) count, which is
4   50 grams or more, which is now 280 grams or more,
5   and while it says that it's not the time of
6   conviction that matters, it's the time that the
7   conduct actually occurred, it would really seem a
8   shame to spend all of this time on this trial to
9   have the circuit decide, yes, that this is
10  retroactive over a quantity of cocaine, crack
11  cocaine that we believe we have proven regardless.
12  And so if -- we don't have to make it very
13  complicated.  If they find the man not guilty on
14  Count Eight, then they don't open the envelope.  If
15  they found him guilty on Count Eight, they open the
16  envelope and go to the special verdict which has
17  only to do with quantity, that's it.
18          MR. SHEEHAN:  Your Honor, I don't think
19  it solves the problem.  The problem, if there is a
20  retroactivity problem, it is really a problem that
21  goes back to the indictment at issue in this case.
22  It doesn't get amended by virtue of --
23          THE COURT:  You may be right, but what
24  we can do at this stage is essentially hedge our
25  bets.  And you may be right there is no hedging you
```

139

1  can do because you have to charge it and prove it
2  and it varies the indictment to change the amounts,
3  but why don't we just do this now prophylactically.
4  You may be absolutely right that there is no such
5  thing as doing it prophylactically, but I don't
6  think that means we don't do it.
7        MR. SHEEHAN:  I would object, your
8  Honor, because I think it adds another issue in the
9  case that's not in the indictment.  If, in fact, the
10 jury finds the defendant guilty we're going to go to
11 a penalty phase of the case.  I don't think we
12 should be add questions that are not raised in the
13 indictment simply to satisfy a question down the
14 road.
15       THE COURT:  I have your position well in
16 mind.  I like the idea of the sealed special
17 verdict.  I think some explanation may be useful as
18 to why they're being asked that.
19       MS. DAYTON:  Well, I think we can -- I
20 mean, we can say that you don't open this envelope
21 until you've decided all eight charges.  I mean, I
22 think they should decide all their eight charges.
23       THE COURT:  Should they return their
24 verdict?  Should they return their verdict form and
25 then be asked to --

140

1        MS. DAYTON:  The government doesn't
2  think they have to.  It's just a quantity thing.
3  This is not unusual to have multiple quantities.
4        THE COURT:  What is the explanation you
5  would give them?
6        MS. DAYTON:  I wouldn't give them one.
7  It's a legal issue and they're making a factual
8  determination.  It's just, you know, if you feel
9  that the government has proved 50, do you believe
10 that the government has proved 280?  I don't think
11 they have to be given an explanation.  We don't give
12 them an explanation as to why, you know, Congress
13 chose 50.
14       THE COURT:  No, but we give them an
15 explanation for why it's 50, it's in the indictment.
16       MS. DAYTON:  It's right in the
17 indictment, right.
18       THE COURT:  Let me put together -- in a
19 case of this length and with so many witnesses -- do
20 I have a list of witnesses now?
21       MS. DAYTON:  We'll do that.
22       THE COURT:  Would you please put a
23 rubber band on Ms. Reynolds' finger because I want
24 -- I just want to slip it in their notebook.
25       MS. DAYTON:  Yes, no problem.

141

1        THE COURT:  Along with a copy of the
2  indictment.
3        Now, is there anything we need to do to
4  the fourth superseding indictment?
5        MS. DAYTON:  It has Counts Nine and Ten
6  in it, which have been redacted, have been severed
7  from this case.  The special findings do not go to
8  the jury at this time.  And Azikiwe Aquart and
9  Efrain Johnson are also charged in that indictment,
10 and so we propose changing it the way it was changed
11 for the purpose of the charge, rather than redacting
12 them out, which could be to the detriment of the
13 defense because it looks like they already pled
14 guilty, just put their names in small letters
15 instead of capital letters, so their names are still
16 in there, but it just reads as Azibo Aquart who is
17 the main defendant, and then we can just remove
18 Counts Nine and Ten and remove the special findings
19 so it's not even a bunch of white.  I mean, I don't
20 know if they care if there is a bunch of white out
21 or black out.
22       MR. SHEEHAN:  No, I'm not fond of white
23 out or black out.
24       THE COURT:  All right, why don't you do
25 that, get it -- look at it really carefully, make

142

1  sure that we have everything in the form that you
2  want, because that needs to go also in their
3  notebooks.
4        MR. SHEEHAN:  Your Honor, I should just
5  indicate, after conferring with government I
6  requested that Ms. Villano remove just -- pick up
7  the notebooks.  Not the individual notebooks, but
8  the evidence binders, et cetera, that were over
9  there, and those have been put in the corner.  I
10 don't think -- they're not to go to the jury room
11 anyway.
12       MS. DAYTON:  They're actually still
13 there.  I can see them.  And the one issue which I
14 didn't think about before is we don't know if they
15 made notes on these things.
16       THE COURT:  Have they been picked up
17 yet?
18       MS. DAYTON:  They're sitting there.
19       MR. MARKLE:  They're sitting there.
20       THE COURT:  In other words, if you
21 redistributed them would you get them back to the
22 right person?
23       MR. SHEEHAN:  Some have been picked up.
24       MS. DAYTON:  No, they're all here.  No,
25 she took their notebooks, she didn't take their

143

```
1    stuff.
2              MR. MARKLE:  Maybe from the two jurors.
3              MR. SHEEHAN:  She did remove some of
4    them.
5              THE COURT:  All right, we'll take a look
6    and see what they've put in them and see if that
7    presents a problem.  Otherwise, we'll collect that
8    all.
9              MS. DAYTON:  And then the last issue we
10   wanted to raise was we had made a motion for opening
11   statements with respect to the trial, and by that we
12   meant both phases.  We think this is an unusual type
13   of trial and if there is a sentencing phase we think
14   that an opening would be important to help educate
15   the jury as to what is to come and what their role
16   is at that point, and so we are requesting to be
17   permitted an opening statement for the sentencing
18   phase if there should be one.
19             MR. SHEEHAN:  Agreed.
20             THE COURT:  I think it's of use.  I
21   think it really is of use to the jury.  Would you
22   tell me, just while I have you here, two things.
23   One is, what is the government's case at the penalty
24   phase?  Who are the witnesses?  Because I have
25   discovered that coming into this case at the
```

144

```
1    relative last minute I have felt unfamiliar with all
2    the witnesses and nature of the evidence.  So, I can
3    catch up at least for the penalty phase.
4              MS. DAYTON:  We're going to have two
5    members of each victim's family testify.  We're
6    going to have Anthony Armstead testify.  The
7    allegation is he was assaulted by the defendant
8    while at Wyatt.  There will be some other
9    individuals from Wyatt who will testify regarding
10   that assault as well.  There will be John Sullivan.
11             THE COURT:  Is the assault by the
12   defendant related --
13             MS. DAYTON:  To the case?
14             THE COURT:  -- to the case?
15             MS. DAYTON:  No, he just beat him up
16   really badly.  And John Sullivan, who we've heard
17   some about the assault during the trial, will be
18   testifying.  The government plans to put on Tom
19   Martin, who is the blood spatter expert, and I
20   believe that's it.
21             MS. RODRIGUEZ-COSS:  As of today.
22             MS. DAYTON:  As of today that's what we
23   know.  We're looking at what the defense disclosed
24   in terms of experts they plan to call.
25             THE COURT:  And who are those experts?
```

145

```
1              MR. SHEEHAN:  Oh, your Honor, Dr. Marva
2    Lewis and --
3              THE COURT:  Dr. Marva Lewis testifies
4    about what?
5              MR. SHEEHAN:  She is a -- she is a
6    teaching expert who will testify about risk and
7    protective factors and their correlation with
8    essentially acts of violence, and she has not
9    examined -- she has not examined the defendant.  We
10   expect that her testimony will be after other people
11   have testified about the events and circumstances of
12   the defendant's life.  The other person is Mark
13   Bezy, who is, for want of a better term I would call
14   him -- he is a prison expert who was a former warden
15   and longtime member of the Federal Bureau of Prisons
16   who will discuss the ability of the Bureau of
17   Prisons to house Mr. Aquart if he is sentenced to
18   life in prison, as well as prison conditions
19   generally.
20             THE COURT:  Now, there is no aggravating
21   factor of danger in prison, right?
22             MS. DAYTON:  Right, so we will allege --
23             MR. SHEEHAN:  Yes and no.
24             MS. DAYTON:  We have not alleged future
25   dangerousness.  So as far as the government is
```

146

```
1    concerned, Mr. Bezy's testimony is irrelevant.
2              THE COURT:  Well, it may be, but we're
3    not going to have a very -- the rules of evidence
4    are not going to preclude that testimony.
5              MS. RODRIGUEZ-COSS:  Well, your Honor, I
6    would submit --
7              MS. DAYTON:  Hang on.
8              We're going to make a motion on that,
9    your Honor, because there is case law to suggest it
10   should be precluded.
11             THE COURT:  Does he have a report or a
12   summary?  Have you submitted a summary of what he's
13   talking about?
14             MR. SHEEHAN:  I have not.  I've just
15   given -- yes, I have given a summary that they can
16   safely house Mr. Aquart, and he's going to talk
17   generally about conditions in the Bureau of Prisons.
18   I have indicated that the documents that he would be
19   relying upon, in addition to his own experience as a
20   member of the Bureau of Prisons for many years,
21   including a warden at Terri Haute where he finally
22   retired, would be Mr. Aquart's prison record from
23   his juvenile -- well, not juvenile, from his prison,
24   imprisonment at Manson.  Actually, there is a little
25   bit of juvenile stuff.  Manson, juvenile Manson, and
```

147

```
 1   then within the Connecticut Department of
 2   Corrections, including his housing at the --
 3   including his imprisonment at Wyatt, which
 4   encompasses the materials provided to us from the
 5   government with respect to the Armstead incident.
 6            MS. DAYTON:  Your Honor, the government
 7   again submits, and we will do this in writing, that
 8   conditions of a defendant's housing is not a
 9   mitigating factor.  And so while there are some
10   relaxed standards of evidence, that doesn't include
11   evidence that's completely irrelevant.
12            MR. SHEEHAN:  Well, I guess that's what
13   they're going to do.  They'll make that claim.  I
14   would note, your Honor, that unlike the cases -- and
15   we can -- obviously if there is a motion, we will
16   deal with that.  One of the things -- and why I say
17   yes or no, is that they are specifically relying
18   upon not only the case, not only what Mr. Aquart is
19   charged with in this case, but also including a
20   specific act within the prison setting, and they may
21   say we're not claiming that it is future
22   dangerousness, there is no such thing as future
23   dangerousness unless it is something that is --
24   there is no specific mitigating factor that says
25   future dangerousness, it is something that the
```

148

```
 1   government --
 2            THE COURT:  You mean aggravating factor.
 3            MR. SHEEHAN:  I'm sorry, aggravating
 4   factor.  It is one of the non-statutory aggravating
 5   factors, and that's the general rubric that it comes
 6   in under federal -- under the federal death penalty
 7   statute.
 8            THE COURT:  But it's not here in this
 9   case.  It's not claimed in this case as a
10   non-statutory aggravator.
11            MR. SHEEHAN:  I'm just saying they have
12   described a vehicle with four wheels, a steering
13   wheel column encased in steel that goes along the
14   highway generally occupied by passengers, but they
15   have just not called it a car.
16            THE COURT:  All right.
17            MS. DAYTON:  No, we did call it Aquart.
18   I thought that was the funny.
19            THE COURT:  You do entertain yourself,
20   don't you.
21            MS. DAYTON:  I do, actually.  I wouldn't
22   say it if I didn't think it was funny.
23            THE COURT:  All right, when will you
24   file your motion?
25            MS. RODRIGUEZ-COSS:  Well --
```

149

```
 1            MS. DAYTON:  Soon.
 2            THE COURT:  Shortly after a verdict?
 3            MS. RODRIGUEZ-COSS:  Oh, yeah.
 4            MS. REYNOLDS:  After the list of
 5   witnesses.
 6            THE COURT:  Or before the witness list.
 7            MS. DAYTON:  Your Honor, we'd also ask
 8   for discovery with respect to the psychologist that
 9   they were discussing, what she is relying upon, what
10   she's going to testify to.  The government still
11   hasn't received anything.  We want the records she's
12   reviewed.
13            MR. SHEEHAN:  She's reviewed no records.
14            MS. DAYTON:  So, she's going to testify.
15   Then it's irrelevant, it has nothing to do with this
16   case.
17            MS. DAYTON:  That's not true, your
18   Honor.
19            THE COURT:  Why don't we do this:  As I
20   recall, you are going immediately upon a guilty
21   verdict, if any --
22            MR. SHEEHAN:  Right.
23            THE COURT:  -- you are going to make
24   certain other disclosures.
25            MR. SHEEHAN:  Correct.
```

150

```
 1            THE COURT:  And that will inform the
 2   government a great deal more about your witnesses
 3   and the nature of their testimony.
 4            MR. SHEEHAN:  Right.  Well, it will give
 5   us -- yes.
 6            THE COURT:  And so based on that we will
 7   undoubtedly have further colloquy.
 8            MR. SHEEHAN:  Undoubtedly.  That is
 9   correct, your Honor.
10            MS. DAYTON:  What she said.
11            THE COURT:  A day without colloquy would
12   be no day at all.
13            All right, anything else that you
14   anticipate we need to look at?
15            MR. SHEEHAN:  I will be filing, your
16   Honor, a set of proposed initial penalty phase
17   instructions.
18            THE COURT:  Okay, I've been working on
19   that, so the sooner you can do that after you close.
20            MR. SHEEHAN:  Right.  And the other
21   thing that I will be filing is a motion in limine
22   with respect to the victim impact statement --
23   testimony, but I have not prepared that.
24            THE COURT:  All right.
25            MS. DAYTON:  I have.
```

151

1	MR. SHEEHAN:  I have a draft, but I've
2	not finalized it, and I would try to get that to the
3	Court.
4	THE COURT:  And has there been any
5	decision reached about whether Mr. Aquart wishes to
6	allocute?  I realize it's very premature here, but
7	you are thinking about speaking to him about that at
8	the appropriate time?
9	MR. SHEEHAN:  I frankly would be
10	surprised if that happened in this case.
11	MS. RODRIGUEZ-COSS:  We intended to file
12	a motion with regards to that, and it would be the
13	position of the government that if Mr. Aquart wishes
14	to address the jury it should be from the witness
15	stand and subjecting himself to cross-examination.
16	THE COURT:  And I have previously ruled
17	in other death penalty cases that we do not require
18	an allocution of a defendant at the sentencing phase
19	to be under oath.
20	MS. RODRIGUEZ-COSS:  And we will invite
21	the Court to reconsider that ruling.
22	THE COURT:  And you will -- so that's
23	what you need to write against.
24	MS. RODRIGUEZ-COSS:  Very well.
25	MR. SHEEHAN:  Well, your Honor, I

152

1	don't -- exactly.  I don't anticipate that right
2	now, but I don't know.
3	THE COURT:  List of mitigators, that
4	will come in right after the guilty verdict.  Could
5	we possibly get it any earlier?
6	MR. SHEEHAN:  No.
7	THE COURT:  Okay.  It's not exclusive,
8	it just helps me understand.
9	MR. SHEEHAN:  I know.  I will try to get
10	that, but I really am not --
11	THE COURT:  All right.
12	MR. SHEEHAN:  -- not inclined to provide
13	that a minute before I need.
14	THE COURT:  What else do we need to do?
15	You have all of the exhibits straightened out.
16	MR. SMITH:  Your Honor, Mr. Markle I'm
17	sure has ink-stained fingers from redactions in the
18	Womble transcript.  Those have been done.  I've
19	approved of those.  So we will relabel the redacted
20	version as M still, unless the Court thinks we
21	should put in M or M1.
22	THE COURT:  I don't see any reason to do
23	that.
24	MR. SMITH:  We can just put it in as M
25	then.

153

1	THE COURT:  Tell Ms. Villano that
2	tomorrow.  Can I see your hands?
3	Any other issues big or small?  All
4	right, so if anything comes up, let me know, and
5	otherwise we'll see you at 9:30 on Friday morning.
6	How are we going to divide up the day?
7	Have you done any further thinking about that?
8	MS. DAYTON:  We don't have a strong
9	opinion on it, so whatever the defense would like.
10	MR. SHEEHAN:  So, I'm just thinking if
11	we were to start at --
12	THE COURT:  9:30.
13	MR. SHEEHAN:  I think what --
14	THE COURT:  Is that a fair estimate,
15	that the government will use about an hour to begin
16	with and then half an hour in rebuttal?
17	MR. MARKLE:  Yes.
18	MS. DAYTON:  Justin, do you think you
19	are a full hour and a half?
20	MR. SMITH:  Probably.
21	MR. SHEEHAN:  I think if we had an early
22	lunch, your Honor.
23	THE COURT:  So why don't we take lunch
24	after the government's closing.  Okay, we'll plan
25	for that then.

154

1	MS. DAYTON:  Are we going to bring them
2	in lunch?
3	THE COURT:  It's one reason I need to
4	know this.  Do you know, we don't need to do that
5	until they're actually deliberating.  So, I think in
6	this case no.  I wish we had larger jury rooms.
7	Although it allows them to be well fortified.  Let's
8	do it.  All right, we will -- the only wrinkle is if
9	lunch doesn't get itself served there, but we have
10	some margin here.  So, I will order up lunch for
11	noon and then we'll just -- we'll still keep a half
12	hour for lunch.  That will be all right.
13	MR. SHEEHAN:  That will be fine.
14	MR. SMITH:  That's fine, your Honor.
15	MS. DAYTON:  And then there is a -- then
16	Mr. Smith's argument and a 15-minute break and then
17	my argument, is that how it would work?
18	MR. SMITH:  That will be fine, your
19	Honor.
20	THE COURT:  Okay.  It's a plan.  Thank
21	you very much.  We stand in recess.
22
23
24
25

1
2          I certify that the foregoing is a correct
3   transcript from the record of proceedings in the
4   above-entitled matter.
5
6                    7/25/11
7                     Date
8
9              /S/__Sharon Montini
10                Official Reporter
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

United States District Court
District of Connecticut
FILED AT    NEW HAVEN
5/23/ 20 11
Roberta D. Tabora, Clerk
B Tabora
Deputy Clerk

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| United States of America | |
| v. | Criminal No. 3:06cr160 (JBA) |
| Azibo Aquart | |

## VERDICT FORM

A.  COUNT ONE (conspiracy to murder in aid of racketeering).   We the Jury unanimously find the Defendant AZIBO AQUART:

         Not Guilty ☐              Guilty ☑


B.  COUNT TWO (murder in aid of racketeering of Tina Johnson).  We the Jury unanimously find the defendant AZIBO AQUART:

         Not Guilty ☐              Guilty ☑


C.  COUNT THREE (murder in aid of racketeering of James Reid).  We the Jury unanimously find the defendant AZIBO AQUART:

         Not Guilty ☐              Guilty ☑


D.  COUNT FOUR (murder in aid of racketeering of Basil Williams).  We the Jury unanimously find the defendant AZIBO AQUART:

         Not Guilty ☐              Guilty ☑

E.   COUNT EIGHT (conspiracy to distribute or possess with intent to distribute 50 grams or more of cocaine base).  We the Jury unanimously find the Defendant AZIBO AQUART:

               Not Guilty ☐               Guilty ☑

*If you answered "Guilty," proceed to "Drug Quantity Found."*

DRUG QUANTITY FOUND:

We the Jury unanimously find that the reasonable and foreseeable quantity of a mixture or substance containing cocaine base (crack cocaine) involved in Count Eight was:

     (a)   50 grams or more

               Yes ☑               No ☐

     (b)   280 grams or more

               Yes ☑               No ☐

F.   COUNT FIVE (intentional killing of Tina Johnson while engaging in the drug conspiracy charged in Count Eight).  We the Jury unanimously find the defendant AZIBO AQUART:

               Not Guilty ☐               Guilty ☑

G.   COUNT SIX (intentional killing of James Reid while engaging in the drug conspiracy charged in Count Eight).  We the Jury unanimously find the defendant AZIBO AQUART:

               Not Guilty ☐               Guilty ☑

2

H.  COUNT SEVEN (intentional killing of Basil Williams while engaging in the drug conspiracy charged in Count Eight).  We the Jury unanimously find the defendant AZIBO AQUART:

Not Guilty ☐         Guilty ☑

Dated at New Haven, Connecticut this _23_ day of May, 2011, at 11:46 a.m./p.m.


_____

SIGNATURE OF FOREPERSON


/S/

PRINTED NAME OF FOREPERSON

3

**GA1139**

4386

```
 1                UNITED STATES DISTRICT COURT
 2                  DISTRICT OF CONNECTICUT
 3   * * * * * * * * * * *        *
                                  *
 4   UNITED STATES OF AMERICA,    *  Case No 6cr160(JBA)
 5              Plaintiff,        *
                                  *
 6         vs.                    *
                                  *
 7   AZIBO AQUART               *  May 31, 2011
                                  *
 8              Defendant.        *
                                  *
 9   * * * * * * * * * * * *      *
10                 TRIAL TRANSCRIPT
11                  VOLUME XXII
12   BEFORE:  THE HONORABLE JANET BOND ARTERTON U.S.D.J.,
13                                       and jury
     Appearances:
14   FOR THE GOVERNMENT:  ALINA REYNOLDS, ESQ
                          TRACY DAYTON, ESQ.
15                        PETER MARKLE, ESQ.
                          JACABED RODRIGUEZ-COSS
16                        United States Attorney's Office
                          915 Lafayette Blvd
17                        Bridgeport, CT 06604
18
     FOR THE DEFENDANT:   MICHAEL SHEEHAN, ESQ
19   AZIBO AQUART:        Sheehan & Reeve
                          139 Orange Street
20                        New Haven CT 06510
21                        JUSTIN SMITH, ESQ.
                          383 Orange Street
22                        New Haven, CT 06511
23                        BEVERLY VAN NESS, ESQ.
24   Court Reporter:   Sharon Montini, RMR
25   Proceedings recorded by mechanical stenography,
     transcript produced by computer
```

4387

```
 1            THE COURT:  Good morning, counsel.
 2   Please be seated.  The matters to be covered this
 3   morning before we begin the penalty phase involve
 4   issues of law.  Is it, Mr. Sheehan, necessary for
 5   Mr. Aquart to be present?
 6            MR. SHEEHAN:  No, your Honor.
 7            THE COURT:  All right then, let's start
 8   with the issue of the defendant's motion for 702 and
 9   Daubert hearing with respect to the testimony of
10   Thomas Martin.
11            The testimony of Thomas Martin was
12   summarized at Thursday's argument by the government
13   in ways that exceeded the terms set out in the
14   report that the Court has had available.  The
15   government's response to the defendant's motion for
16   hearing seems to have tempered the offering
17   somewhat, and so I wonder if it makes sense to
18   confirm on the record what it is that remains in
19   dispute.
20            Mr. Sheehan, I don't understand your
21   motion to include a challenge to the science or the
22   professional undertaking of blood spatter expertise,
23   particularly since you have submitted the
24   affidavit -- excuse me, the CV of Mr. Kish who you
25   have consulted as a blood stain pattern analyst.
```

4388

```
 1            Mr. Smith, are you arguing this?
 2            MR. SMITH:  Yes, your Honor.
 3            THE COURT:  So, is that correct?
 4            MR. SMITH:  That's correct, I'm not
 5   challenging the scientific validity of blood stain
 6   analysis.  It's the third prong of 702 and the
 7   application of the facts to the methodology in this
 8   case.
 9            THE COURT:  All right.  Now, I take it
10   that it is only with respect to certain aspects of
11   Mr. Martin's proposed testimony that you take issue
12   as outside the area of this area of expertise --
13   this field of expertise.
14            MR. SMITH:  Well, taking the
15   government's representations on their face --
16            THE COURT:  Now, the question is which
17   ones.
18            MR. SMITH:  Well, that's what's not
19   clear to me.
20            THE COURT:  Then let's start with the
21   entirety of your challenges and sort through to see
22   which ones are actually being pressed.
23            MR. SMITH:  Well, your Honor, at the
24   motions hearing, as you'll recall, the government
25   expanded upon some of the opinions that Mr. Martin
```

4389

```
 1   will be giving, and that was the basis of my motion,
 2   my challenge.  The response from the government then
 3   appears to retract those and sort of brings him back
 4   to within his report.
 5            THE COURT:  If he is brought back within
 6   his report, does your challenge remain?
 7            MR. SMITH:  Well, if he's brought back
 8   within his report, what I would do at that point,
 9   your Honor, is renew my motion to preclude his
10   testimony as unnecessary and as not being helpful to
11   the jury to determine a material fact in issue.
12            THE COURT:  And what would be different
13   from the motion that I ruled on Thursday?
14            MR. SMITH:  Well, I can't say what went
15   into your Honor's decision on Thursday, but it
16   seemed that -- you seemed to be somewhat swayed by
17   the government's argument that there would be
18   additional opinions offered and that in fact would
19   inform the jury's decision, but perhaps I'm
20   mistaken.
21            THE COURT:  The subject matter of the
22   testimony, which went to the defendant's state of
23   mind and heinousness of the crime were the two areas
24   in which, at a minimum, the Court thought Mr.
25   Martin's testimony was relevant and more than what a
```

4390

1  lay person would know or observe and be able to
2  analyze from the blood spatter pictures.  Ms. Dayton
3  expanded and elaborated on additional opinions that
4  he would give which prompted your motion
5  appropriately, and here we are.  So, I'm trying to
6  sort out in the interest of dispatch, since we're
7  going to start at 9:30, what remains in dispute.
8         MR. SMITH:  Your Honor, well, I mean,
9  again, if Mr. Martin is confining his testimony to
10 that contained in his report, I don't -- I'm not
11 sure that there is a dispute.  Again, my motion was
12 based upon the additional opinions that were
13 proffered at the hearing.
14        THE COURT:  All right, let me then turn
15 to the government.  Who will be arguing this?
16        MS. DAYTON:  Me.
17        THE COURT:  All right, at the hearing
18 you had a number of expansions on what was contained
19 in his report.  Tell me which of those you are no
20 longer offering but instead will urge inferences to
21 be drawn by the jury.
22        MS. DAYTON:  Well, your Honor, at the
23 hearing I was arguing, and I realize it wasn't
24 clear, I went back and read the transcript, both
25 what his conclusions were and what the government

4391

1  believed the reasonable inferences are therefrom,
2  which is exactly why we did this proffer.  We will
3  present the evidence as it's outlined -- I mean,
4  there will be additional evidence, he's not going to
5  recite his report, he's going to provide information
6  on the -- on blood spatter analysis in general, how
7  it's conducted, so the jury can understand, use a
8  PowerPoint, which was shown to Mr. Smith this
9  morning, which is very general, it's on
10 directionality and different types of pooling and
11 saturation and transfers elucidating the different
12 types of stains.  We would use the photographs that
13 are contained in the report, and we would use those
14 to both show the different kinds of patterns that he
15 discussed, including the fact that there are
16 expiration spatters by Mr. Williams head and how
17 those were produced, specifically air coming from a
18 liquid blood source.
19        I mean, the testimony is largely
20 outlined on pages 9, 10 and 11 of the government's
21 motion, but Mr. Martin will testify, as it indicates
22 in his report, specifically with respect to
23 Ms. Johnson, that based upon the blood spatter and
24 the blood both to her face, the back of her head,
25 left side of her head, that that's an indication

4392

1  that she changed positions during the course of the
2  assault.  That's clearly outlined in his report.
3         And with respect to Mr. Reid, I think
4  confining myself to what seemed to be the area of
5  gravest issue, that there is the spatters around the
6  room, there is different directionality on the
7  ceiling, on the wall, near the floor, and that
8  indicates -- that could indicate either that Mr.
9  Reid was moving or that the person that was hitting
10 him was moving around to hit him in different
11 manners.
12        He'll also talk about the force of the
13 blows, the number of blows.  He won't say, oh, they
14 were hit eight times or something like that, but
15 will indicate based upon the amount of blood on the
16 ceiling, the fact that a -- to create that sort of
17 blood, a blunt object would be hitting a liquid
18 blood source several times because that quantity of
19 cast-off is not going to come from one hit.
20        And he'll testify regarding the manner
21 in which the weapon was used, both in overhand
22 chopping motion and the directionality of that for
23 the ceiling and the wall behind, as well as what
24 would be more of a clubbing motion for some of the
25 blood on the side walls.  He'll talk about the type

4393

1  of object that could have been used, the quantity of
2  blood that would have to be on that object to leave
3  that sort of cast-off around the location.  Around
4  the room I mean.  You know, I'm giving an outline,
5  but it's largely outlined again both in his report
6  and in our motion.  He will not opine on the state
7  of consciousness except to say that Ms. Johnson was
8  definitely -- definitely changed positions during
9  the course of the assaults.  He won't say,
10 therefore, she was conscious.
11        THE COURT:  All right.  Mr. Smith, now
12 that has been confirmed definitively, what, if
13 anything, do we need to examine Mr. Martin on today
14 for the purpose of determining whether it passes --
15 whether his testimony passes the Daubert and/or 702
16 expert testimony requirements?
17        MR. SMITH:  Your Honor, our expert, Mr.
18 Kish, is here.  Can I just have a moment to consult
19 with him?
20        THE COURT:  Sure.
21        MR. SMITH:  Your Honor, I think those
22 generalized things sound like they are within Mr.
23 Martin's report.  The issue I think becomes if the
24 inferences to be drawn from his testimony are just
25 as likely as, for instance, a reverse scenario, then

4394

1  that, to me, is not helpful to a jury, and maybe
2  that is something we should explore.
3  THE COURT:  You mean the more likely
4  than not as opposed to possibility?
5  MR. SMITH:  Correct.  For instance, if A
6  is possible, that she was changing positions during
7  the assault, but if the hypothetical is posed, isn't
8  it just as possible that, for instance, she was
9  moved after the assault, and if that's a
10  possibility, I don't understand how that informs the
11  jury's position.
12  THE COURT:  So it seems to me that that
13  issue in which Mr. Martin's opinions will be stated
14  in terms of, in essence, more probably than not, but
15  to a reasonable degree of scientific certainty
16  because that is his -- because he's offered as a
17  scientific expert, and you cross-examine him on
18  "isn't it just as likely that," what that does is it
19  doesn't make his testimony less useful to the jury,
20  but it gives the jury the capability of weighing and
21  assessing the credibility and weight of the
22  testimony.
23  MR. SMITH:  I understand.
24  THE COURT:  So it seems to me that
25  that's where that lies, and so the question about

4395

1  number of blows, for instance, and whether or not
2  whose to say it wasn't one well placed blow as
3  opposed to a number of blows, that's all subject of
4  cross-examination that you will conduct advised by
5  the principles and limitations that your expert
6  describes to you.
7  MR. SMITH:  Yes, your Honor.  The other
8  issue is, it is possible that I would call Mr. Kish
9  in our case.  I would ask for an exception to the
10  sequestration order so he may watch Mr. Martin
11  testify.  Part of his testimony might be based on
12  opinions rendered by Mr. Martin.
13  THE COURT:  I'm going to make that
14  exception because that is typically the way an
15  expert is able to serve as rebuttal expert, is
16  having heard the testimony.  It certainly is the
17  most efficient way to do it rather than requiring
18  the expert to remain outside the room where in fact
19  he can't assist you during this and then reviewing
20  only the transcript.  The issue --
21  MR. SMITH:  Thank you, your Honor.
22  THE COURT:  -- of what you are going
23  to -- what and when you are going to tell the
24  government about Mr. Kish is going to be a wholly
25  separate issue.

4396

1  MS. DAYTON:  Your Honor, we don't have a
2  proffer with respect to what -- and Mr. Kish has not
3  written a report and he was not contacted about this
4  case for the first time this weekend.  And so the
5  government objects to him remaining in.
6  THE COURT:  Well, I'm going to let him
7  remain in for the purposes I outlined.  As I said,
8  the issue of his testimony and the timing, et cetera
9  of his disclosure, if in fact the defense determines
10  to put him on, I will hear you on.  I'm not making
11  any ruling on that.
12  MS. DAYTON:  Thank you, your Honor.
13  THE COURT:  All right.  Well, if this
14  flurry of Memorial Day briefing has resolved and
15  focused us for trial, then we can proceed, and I
16  guess there is no need to actually interrogate Mr.
17  Martin before the hearing.  Okay.
18  MR. SMITH:  Thank you, your Honor.
19  THE COURT:  Then we're all set on that.
20  And the next issue -- why don't we go to victim
21  impact.  Now, if I understand the defendant's
22  further motion, it relates to three things.  One is
23  the picture of the group gathered at Tina's funeral,
24  the second is the picture of Ms. Johnson in the open
25  casket, and the third -- I guess there are four

4397

1  things -- is Ms. Johnson's brother's poem, and the
2  fourth is the victim's daughter's testimony of how
3  the nature of the crime impacted their ability to
4  put their mother to rest.
5  Are there any other areas that we need to
6  focus on?
7  MR. SHEEHAN:  Your Honor, with the
8  Court's permission I'd like Attorney Van Ness to
9  address this issue because she's really been the one
10  that's covering it.
11  THE COURT:  That's fine.
12  MR. SHEEHAN:  Thank you, your Honor.
13  THE COURT:  You're welcome.
14  MS. VAN NESS:  Good morning, your Honor.
15  THE COURT:  Good morning.
16  MS. VAN NESS:  We have since our filing
17  received a couple other letters.  I don't know if
18  you have copies.
19  THE COURT:  No.
20  MS. VAN NESS:  One from Ms. Johnson's
21  mother and one from her husband.
22  THE COURT:  Do you have copies for me?
23  MS. RODRIGUEZ-COSS:  We apologize, your
24  Honor, we do not.  We didn't know this was going to
25  be raised this morning.

4398

```
 1            MR. SHEEHAN:  I can provide -- I have a
 2   copy, your Honor.  I can provide those.
 3            We can probably just agree, but --
 4            THE COURT:  All right, there are
 5   characteristics of these two letters that are in
 6   common with Ms. Johnson's brother's poem in that
 7   they express opinions about what the penalty should
 8   be, about their views of the defendant, and that
 9   ordinarily would be excluded.
10            MS. RODRIGUEZ-COSS:  When we provided
11   the letters to counsel we advised we were well aware
12   there were portions of the letters that would need
13   to be redacted.
14            THE COURT:  What have you redacted?
15            MS. RODRIGUEZ-COSS:  We haven't redacted
16   yet.
17            THE COURT:  Well, here is what's going
18   to get redacted.  It seems to me that with respect
19   to Terry Walley, Ms. Johnson's older brother, I hate
20   to do violence to his poetry, but the phrase "what
21   those that took her life will never grasp" needs to
22   come out.  I propose the phrase "there are times
23   when anger strangles my heart through this cowardly
24   act" should come out.
25            Ms. Van Ness?
```

4399

```
 1            MS. VAN NESS:  Yes, your Honor, Mr.
 2   Sheehan received today some -- I guess a revised
 3   version of this poem and there is an additional --
 4            MS. RODRIGUEZ-COSS:  It's not a revised
 5   version of the poem.  It's a different poem.
 6            MS. VAN NESS:  This is a different poem?
 7            THE COURT:  The poem I am reading starts
 8   with "I'll never again hear the joy of my sister's
 9   smile."
10            MS. VAN NESS:  This is an additional
11   poem by Mr. Walley?
12            MS. RODRIGUEZ-COSS:  I believe so.  This
13   is a poem that was attached to a flyer prepared for
14   her funeral when she was buried.
15            MS. VAN NESS:  All right, your Honor,
16   we'll bring this up to you.  But there is a phrase
17   in here "in some hoodlum's mind he decided it was
18   her time."
19            THE COURT:  I'm sorry, say that again.
20            MS. VAN NESS:  "In some hoodlum's mind
21   he decided it was her time."
22            THE COURT:  Why would that stay in, Ms.
23   Rodriguez?
24            MS. RODRIGUEZ-COSS:  Again, your Honor,
25   we advised counsel we wanted to discuss these
```

4400

```
 1   documents with them and we understood -- we said any
 2   reference to the defendant or the offense we would
 3   agree to redact.
 4            THE COURT:  All right, so that would
 5   come out.  The first poem "I'll never again hear"
 6   has -- are you satisfied with that redaction?
 7            MS. VAN NESS:  Yes, your Honor.
 8            THE COURT:  And then with respect to the
 9   March 26th letter?
10            MS. VAN NESS:  May 26th, your Honor?
11            THE COURT:  May, excuse me.
12            MS. RODRIGUEZ-COSS:  I'm sorry, your
13   Honor, is that from the husband or the mother?
14            THE COURT:  The family of Tina Johnson.
15            MS. RODRIGUEZ-COSS:  I believe it was
16   written by her mother, yes.
17            THE COURT:  Tenth line from the bottom,
18   I think the portion "she was denied the privilege of
19   living her life by four young men, this senseless
20   act of violence" comes out.  So that it reads "this
21   has left our family and friends at a great loss,"
22   and we pick up again "we will never forget Tina,
23   James and Basil."  The remaining portion is all
24   directed to their opinion of appropriate sentence
25   and their anger against the defendant.
```

4401

```
 1            Any problem with that, Ms. Van Ness?
 2   Does that satisfy you.
 3            MS. VAN NESS:  That's fine, except, your
 4   Honor, the PS I would object to as well.
 5            THE COURT:  That's fine.
 6            MS. VAN NESS:  And I don't know, is
 7   there a way to make this clear, that this is from
 8   Ms. Johnson's mother as opposed to the family since
 9   she authored it?
10            MS. RODRIGUEZ-COSS:  We're intending on
11   marking it through one of her granddaughters.  We
12   can certainly ask her who wrote the letter.
13            MS. VAN NESS:  Okay.
14            THE COURT:  And then the August 20 --
15   this -- from her husband "I lost the love of my
16   life," the portion that seems to me inappropriate
17   starts with the third line down "what those four men
18   did was wicked, cowardly and unthinkable.  They can
19   never replace or fill the space that is left."  That
20   should come out.  As should "nothing that happens in
21   court can bring her back" through "I leave it up to
22   Selassie to make his final judgment.
23            MS. RODRIGUEZ-COSS:  I'm sorry, your
24   Honor, beginning when?
25            THE COURT:  "Nothing that happens in
```

4402

```
1    court can bring her back."
2              MS. RODRIGUEZ-COSS:  Okay.
3              THE COURT:  Through "I leave it up to
4    Selassie to make his final judgment."
5              Ms. Van Ness, does that satisfy you with
6    respect to that letter?
7              MS. VAN NESS:  Yes, it does, your Honor.
8    Just to be clear, the letter would stop "our
9    grandkids grow up" and the rest is deleted?
10             THE COURT:  Yes.
11             MS. VAN NESS:  That's fine, thank you.
12             THE COURT:  That takes care of that.
13   The remaining issue, I believe, is the issue about
14   the funeral, and what I'm going to do is permit the
15   discussion by witnesses as to the funeral insofar as
16   it includes the impact on the daughter and the
17   family members of how the crime impacted their
18   ability to essentially perform the final rites on
19   Ms. Johnson, that is, the daughter can testify that
20   she couldn't kiss or hug her mother because the
21   bones were too broken and would move, and they
22   couldn't dress her in the white suit they wished
23   because her bones were too broken, and that instead
24   dressed her in the robe that had been bought for
25   her, but not for this occasion.
```

4403

```
1              The picture of the open casket will be
2    precluded because the essence of the impact of the
3    crime on the victims is told through their
4    testimony, not through the photograph, and I think
5    will suffice and avoid any risk of excessiveness
6    potentially being characterized as inflammatory.  I
7    think it does nothing to diminish the victim's
8    family's description of the impact of this crime on
9    them as they prepared to give their final good-bye.
10             Anything further on that?
11             MS. RODRIGUEZ-COSS:  No, your Honor.
12             MS. VAN NESS:  Just that we accept your
13   ruling, your Honor.  I do believe this portion of
14   the testimony is not specifically relevant, as I
15   said in the papers, and I won't repeat myself to.
16             THE COURT:  And I disagree.  I think it
17   is very relevant to how the nature of the crime had
18   impact on the family members and that that is an
19   appropriate area and is not inflammatory, but is
20   harsh reality.
21             Is there anything else about the -- that
22   I haven't considered about the victim impact
23   evidence?
24             MR. SHEEHAN:  No.  I would just
25   indicate, your Honor, that we have worked out an
```

4404

```
1    agreement with the government that Ms. Johnson is
2    not going to testify about the alleged assault --
3    I'm sorry, Whittingham is not going to testify about
4    the circumstances of the alleged assault on the
5    pros --
6              THE COURT:  The female victim.
7              MR. SHEEHAN:  And I'm not going there
8    either.  And nor am I really -- as a practical
9    matter, I don't anticipate any cross-examination of
10   Ms. Whittingham that in any way deals with her
11   relationship or her knowledge of the defendant.
12             THE COURT:  So, does that mean then we
13   have six prior acts of violence that are being
14   asserted?
15             MS. RODRIGUEZ-COSS:  Right.
16             THE COURT:  Okay.
17             MS. VAN NESS:  Your Honor, just briefly,
18   the photo of the funeral you are also allowing in;
19   is that correct?
20             THE COURT:  No, the description of who
21   was there and what it was like as it segues with
22   this testimony of how it wasn't as they wished it
23   could have been.
24             MS. VAN NESS:  So both of the related
25   photos are excluded.
```

4405

```
1              THE COURT:  Right, but not the testimony
2    that relates to them.
3              All right, anything else about victim
4    impact?  All right, thank you.
5              Next is the procurement aggravator.  As
6    you can see from the preliminary charge I sent you
7    I've considered the arguments on that, and now that
8    the parties have more fully briefed the issue of
9    whether there is sufficient evidence of procurement
10   for that aggravator to go to the jury.  The Court
11   has concluded that there is -- that the aggravator
12   in the notice of intent provides procurement of the
13   offense by payment.  The defendant procured the
14   commission of the homicide offense by payment,
15   promise of payment for anything of pecuniary value,
16   which tracks the 3292(c)(7).
17             The defendant looks at United States v.
18   Bernard and maintains that the fact that Aquart
19   offered Taylor a position in the enterprise where
20   Taylor didn't commit the murders or conceivably know
21   that they would be murders, in the defendant's view
22   precludes this aggravator.  Bernard also, however,
23   focused on the mindset of the defendant, although
24   that was the next one, (c)(8), in which he was the
25   one receiving some pecuniary gain.
```

4406

1	The evidence is ample in the record that
2	Aquart offered Taylor a position in the enterprise
3	in order to procure Taylor's assistance with what he
4	was going to do at Mr. William's apartment
5	constituting felony murder to which Mr. Taylor has
6	pled guilty to three counts.  Whether Mr. Taylor
7	knew of the full details of the defendant's plan, it
8	seems to me, is irrelevant for the (c)(7) factor,
9	and, thus, the defendant's motion to preclude that
10	aggravator, it seems to me, should be denied.
11	Is there anything further that I have
12	either misconstrued the nature of the argument or
13	otherwise?
14	MS. VAN NESS:  Your Honor, I'll be
15	brief.  Just to be clear, it's not simply Mr.
16	Taylor's intent that I'm relying on, but also his
17	actions, and the argument is that he has to aid in
18	the action -- in the commission of the murder.
19	THE COURT:  And I don't view the
20	aggravator as requiring that so long as Aquart was
21	providing something of pecuniary value to get other
22	people to assist him with his murders, whether or
23	not they knew it would be murders, where they knew
24	it would likely be a felony of some sort, which Mr.
25	Taylor believed would be a robbery or roughing them

4407

1	up in the course of which murders occurred.  Okay,
2	so we're clear on that.
3	Let's talk about the defendant's motion,
4	870, to preclude the testimony of the proposed new
5	witness Mr. Singh, which the defendant says the
6	timing of the disclosure contravenes Section 3432
7	requiring that at least three entire days before the
8	commencement of trial, excluding intermediate
9	weekends and holidays, which would of course cut out
10	vast amounts of time in this case, be furnished with
11	a copy of the indictment, a list of the veniremen
12	and witnesses to be produced at trial, et cetera.
13	The government's position is that 3432 applies to
14	trial witnesses to be produced for proving the
15	indictment, not a non-statutory aggravator, and the
16	witness wasn't known to them prior to the com --
17	three days prior to the commencement of trial and
18	has only now been disclosed, A, for safety reasons,
19	and B, now that the Court has determined to permit
20	the testimony concerning the Armstead assault even
21	though the government knew about this witness some
22	weeks earlier.
23	Who will argue this for the government?
24	MS. REYNOLDS:  Me, your Honor.
25	THE COURT:  Apart from the issue of

4408

1	whether 3432 applies, where late disclosure is made
2	on the eve of trial, and in some drafts of the
3	parties' proposal about the preliminary instruction
4	it was to the effect that this is a second trial,
5	but in the -- on the eve of that penalty phase,
6	starting where the defense team has its hands full
7	of preparing witnesses, cross-examination, opening
8	statements, and hopefully everybody is working on
9	the requests for charge, why is it fair to spring
10	Singh on them now?
11	And I'm particularly concerned to hear
12	you tell me why the existence of another witness was
13	not identified when we had a colloquy about who
14	would be the witnesses on the Armstead assault a
15	lifetime or so ago; that would be about a week.
16	When I asked who would be the witnesses and I was
17	told Armstead, a Wyatt official, and that there were
18	two witnesses who had been interviewed, but who
19	had -- who assert the Fifth Amendment, there was no
20	mention of this other eyewitness.  Why is it fair to
21	spring it on the defense now?
22	MS. REYNOLDS:  Well, first of all,
23	Stephen Singh is not an eyewitness.  He is a witness
24	to the events surrounding the assault.  And we would
25	object to the characterization of springing the

4409

1	witness where this whole assault was identified for
2	the defense at the time it happened years ago.
3	THE COURT:  Sure, but the "springing"
4	term that I've been using that you take umbrage at
5	is that it has all been out there for quite some
6	while and Mr. Singh's role or testimony, I gather,
7	has not been.
8	MS. REYNOLDS:  Not until we knew for
9	sure that the Court was going to allow the testimony
10	with regard to the assault and we were able to move
11	him.  The main reason why he wasn't disclosed
12	immediately on April 13th after he was interviewed
13	and the information he provided was digested was,
14	first of all, he's a penalty phase witness that we
15	didn't think would add or change in any way if he
16	was disclosed a bit later after he was made safe.
17	The defense's strategy, there was nothing -- in
18	other words, this wasn't a new subject matter, a new
19	witness about something different, some new assault
20	that the defendant was involved in being disclosed a
21	little bit later than all of the other information
22	in this case.  This was simply an additional witness
23	to events that the defense has been aware of and
24	that the defense knew that the government would seek
25	to introduce at a penalty phase for years.

4410

So, I don't think that it hampers the defense in any way. We disclosed him as soon as the Court ruled. It's a literally a three-page 302 about another prisoner who was present at the Wyatt Detention Facility at the time that the assault occurred who has additional information.

THE COURT: And what is -- you said he is not an eyewitness. Tell us what his testimony is. I don't have the 302 or any information about what his testimony would be other than he has some knowledge of this assault.

MS. REYNOLDS: I can pass up a copy of the 302, your Honor, and I did outline essentially what he would testify about in our response, but this defendant -- Mr. Singh, was housed at Wyatt with Mr. Aquart, and again that was another reason for not disclosing him. But he would essentially testify that when Anthony Armstead arrived at the Wyatt Detention Facility, when he was placed in C Pod, which is where Mr. Aquart and Mr. Singh were housed, that Mr. Aquart immediately noticed Mr. Armstead and said that Mr. Armstead had done something to him back at the Manson Youth facility where Mr. Aquart and Mr. Armstead had apparently been housed together when they were younger, and

4411

that he was going to get him.

At the time that he, that Mr. Armstead, was there, he was doing exercises and Mr. Aquart told Mr. Singh, who he had befriended -- they talked about their cases, they talked about other things. Anyway, Mr. Aquart told Mr. Singh, I'm going to get him, I'm going to get him now, he's exercising, he's getting tired, I can take him right now. He explained how he wanted to assault Mr. Armstead. Mr. Singh basically told him it probably wasn't a good idea to do it right then and there in the middle of the open area.

And then a few days later there was a discussion between Mr. Aquart and Mr. Singh about locks at the Wyatt Detention Facility. They issue locks that prisoners use to lock their foot lockers, which are under their beds, and Mr. Singh understood that Mr. Aquart was looking for an additional lock, and that he was looking for an additional lock to use during the assault of Anthony Armstead.

Mr. Singh would further testify that a couple weeks later, when Mr. Armstead was assaulted, that on the day of the assault, he actually had gone to the showers. Mr. Singh would also describe the layout.

4412

THE COURT: "He" being who?

MS. REYNOLDS: Mr. Singh.

THE COURT: Had gone to the shower?

MS. REYNOLDS: Had gone to the showers. Mr. Singh would also describe the layout of C Pod, how many prisoners are there, where Mr. Singh's cell was in relation to Mr. Aquart's cell, where Mr. Singh's cell was in relation to Juan Hernandez's cell, which is where the Anthony Armstead assault took place.

And then Mr. Singh would describe on the day of the assaults when he came out of the showers, he observed the victim, Anthony Armstead, walking down the stairs bleeding profusely from his face, numerous cuts all over his face and head. Mr. Singh would testify that he went back to his, Mr. Singh's, cell, and that he noticed when he went to the sink it looked as if someone had washed blood in his sink, and he saw some drips of blood on the floor, and he cleaned that up. Then he, Mr. Singh, went to his foot locker, he saw that his lock was locked, which he normally kept it open, and when he opened it, it was wet and it had looked like it had been washed with -- that blood had been on it and it had been washed in the sink.

4413

Mr. Singh would further testify that there is a prisoner next to him in the cell who was also sometimes friendly with Mr. Aquart and had been very friendly with Azikiwe Aquart, an individual named Trent, and that Trent told him that Mr. Aquart had gone into Mr. Singh's cell, had gotten changed and had given him, Trent, the bloody clothes, and that Trent had gotten rid of the bloody clothes.

Mr. Singh would also testify that a few weeks later -- well, he will testify that there was an immediate lockdown in the jail for three days, that the guards came to get Mr. Aquart, and that Mr. Aquart was a couple cells down from Mr. Singh, and Mr. Singh saw when the guards came to get him Mr. Aquart was laughing because they were looking at his hands, but he didn't have any injuries on his hands, and he was laughing when they took him out of the cell, and they put Mr. Aquart in lockdown, protective custody for several days.

He would also testify, Mr. Singh would testify, that a few weeks later at the barbershop he met up again with Mr. Aquart who then asked him, commented, "did you like my work," referring to his handiwork on Mr. Armstead.

So, again, as we outlined he would

4414

1   testify about events leading up to and after the
2   assault, and we believe his testimony is obviously
3   relevant.  It's not unduly prejudicial.  We have
4   disclosed the 302 and Mr. Singh's plea and
5   cooperation agreement, because he is a federal
6   inmate who's charged in a narcotics case in our
7   office and has pled and entered into a cooperation
8   agreement.  We would make him available to testify
9   at a later time if the defense needs additional time
10  to prepare.  We can make him available at any time.
11  But again, we don't believe that this is anything
12  new or that different that it would change the
13  defense's strategy or that they don't have, or
14  haven't had, sufficient time to prepare
15  cross-examination of Mr. Singh or to prepare to call
16  additional witnesses who they may call to counter
17  his --
18          THE COURT:  I take it all of the past
19  record and so forth of Mr. Singh have also been
20  produced?
21          MS. REYNOLDS:  Yes, your Honor.
22          THE COURT:  You mentioned that you
23  anticipated asking him about what this person called
24  Trent told him.  Why would that be admissible other
25  than the fact that you are going to tell me that the

4415

1   Rules of Evidence don't apply in the penalty phase?
2           MS. REYNOLDS:  Well, that would be a
3   good reason we would argue.  I think it tells the
4   full story.  I don't think it's unduly -- you know,
5   it's not unreliable information.  He, Mr. Singh,
6   would explain who this Trent person is, how he knows
7   him, that he's in the next cell over, that they've
8   had other discussions.  This is what happens in a
9   jail when there is an assault, everybody talks about
10  it, and he would offer firsthand information about
11  what happened with regard to this assault.  I don't
12  think it's someone from outside calling him and
13  saying something about the defendant.  It's
14  immediate information that happened at the time that
15  explains how the defendant got rid of the clothes.
16  It shows, you know, his planning and his preparation
17  for this assault, similar to his planning and
18  preparation for other assaults.  And the defense is
19  free to cross-examine Mr. Singh about that
20  conversation or any other conversations and to try
21  to attack his recollection of that conversation.
22          So, you know, I think he should be able
23  to testify -- allowed to testify about all of the
24  events surrounding his knowledge of the assault and
25  the defendant's involvement in the assault.

4416

1           THE COURT:  So, this Trent guy explains,
2   in part, what Mr. Singh was seeing when he sees the
3   blood on the floor and in his, Mr. Singh's, cell.
4           MS. REYNOLDS:  Correct, your Honor.  Mr.
5   Singh, as I said, was in the showers during -- when
6   the assault was happening.  So, he gets back to his
7   cell after the assault has happened and the
8   defendant has been in his cell to put -- apparently
9   put his lock back and change.
10          THE COURT:  All right, let me hear
11  further from the defense.
12          MR. SHEEHAN:  You've just heard a pack
13  of nonsense, your Honor.  What they're saying is
14  really not supported by the record.  They knew, at
15  least as of April 13th, about this witness, and to
16  say now that they provided everything is absolutely
17  contrary to fact.  To say now that they've given us
18  enough time --
19          THE COURT:  Let's get to specifics.
20  They say they've given you the 302, the plea
21  agreement, the cooperation agreement and the <u>Giglio</u>
22  material.
23          MR. SHEEHAN:  I've got no <u>Giglio</u>
24  material whatsoever.  As of Friday night I got the
25  302.  I got the copy of the plea and the cooperation

4417

1   agreement in the 2006 -- I got the plea agreement in
2   the 2009 case, I got the cooperation agreement in
3   the 2006 case.  I got nothing about what happened
4   between -- actually it was a 2005 case.  In the four
5   years that he's been basically working for them as
6   an informant, and then he happens to get busted in
7   2009 when he is setting up sales while he's pending
8   sentencing in the first case, I am able to piece
9   together some of this from Pacer entries.  I have
10  none of the underlying sealed documents that have
11  accompanied him since the time he marched into the
12  federal system as a thrice convicted felon back in
13  2005 and then continued his so-called work up to
14  that date.
15          The suggestion that they waited until
16  your Honor ruled on this motion is ridiculous.  It
17  is offensive.  The fact is that there was no
18  challenge at that point in time that they were
19  waiting on.  What they clearly did is they
20  sandbagged the situation.  And for that reason they
21  should be precluded from putting on Mr. Singh.  They
22  had us provided with information from the warden of
23  the facility after information that had been sent to
24  Judge Hall advising him that no -- advising her that
25  no weapon had been used, and since April 13th, at

4418

```
1    least, if not before that time, and I have no reason
2    to believe that it was not -- that they didn't have
3    representations of this fact before April 13th, but
4    in any case, as of April 13th they had information
5    that Singh was claiming that his lock was used in
6    the incident.  And they sat like cheshire cats just
7    smiling away while we toiled on this issue.
8              Now they've provided us with a 302 that
9    indicates that there were other people in the
10   institution who had knowledge of this, something
11   completely contrary to the position that they had
12   always maintained.  They had disclosed Hernandez and
13   Vargas as their witnesses previously.  We had
14   travelled to Pennsylvania to look for them, or
15   wherever they were.  We tracked them down.  What do
16   they think I'm supposed to do in the penalty phase,
17   stand there like a puppet while they put their
18   person on and just say, oh?  I haven't done any
19   investigation.  I haven't had time to do any
20   investigation.  I can just hurl accusations --
21             THE COURT:  Let me understand what
22   further you want to do.  You want the Giglio
23   material, you want --
24             MR. SHEEHAN:  I want him out.
25             THE COURT:  I understand that, too.
```

4419

```
1    Which includes what he's been up to as a
2    confidential informant or cooperator since entry
3    into federal detention, which you said is, what, in
4    2005?
5              MR. SHEEHAN:  Well, actually he gets --
6    the circumstances of what I've been able to deduce
7    from the Pacer entries on his two cases is that he
8    gets arrested in a proceeding -- he gets arrested in
9    September 7th of '05 by federal agents.  At that
10   point in time he appears to have been involved in
11   more than 100 grams of cocaine to a confidential
12   witness.  They basically seal that for a chunk of
13   time.  And then Mr. Singh gets out of jail.  Mr.
14   Singh, by the way, seems to already have been a
15   career offender by that juncture, but he gets out of
16   jail and goes back to doing his little business, or
17   whatever it is, on bail, and pursuant to this
18   cooperation, plea and cooperation agreement in 2006,
19   he marches on.  I don't know what he's doing in that
20   period of time as a cooperator except that I do know
21   that in 2009 he still hasn't been sentenced on that
22   2005 arrest, and through circumstances, it looks
23   like fortuitousness as it were, they basically catch
24   him on an undercover sale that become the basis for
25   the 2009 case.
```

4420

```
1              Now, at that time I take it they seem to
2    concede that his utility as a cooperator is somewhat
3    tarnished, perhaps, under their standards.  In any
4    case, he remains in custody on that 2009 case until,
5    it seems like, at some point in time, at least there
6    is a suggestion in the 302, that there is a proffer
7    agreement.  He makes these statements on April 13th.
8    I don't have that proffer agreement.  I know what a
9    standard proffer agreement is, so I can assume that
10   it probably looks something like that.  I don't know
11   what he's doing this for.  I don't know what
12   consideration has been offered to him for purposes
13   of the April 13th deal.  Is this part of his
14   cooperation?  Is this the bundle of material that
15   he's been working on since back when he was first
16   brought into federal custody in 2005?  I need those
17   circumstances.
18             Now, it's not an easy process.  I
19   appreciate the Court's staff willingness -- I'm
20   getting back from the Court at -- you know, last
21   night, I know -- I know everybody has been working
22   on this, as have we, in order to get this matter
23   before the jury.  I know we have imposed on the
24   jury.  I understand that.  But they've opened an
25   entire panoply of things that I just can't do at the
```

4421

```
1    same time as I'm trying to prepare for the penalty
2    phase.  I think it's fundamentally unfair what
3    they're doing.
4              So, I don't think my -- I don't think
5    our issues are solved by just saying, well, let's
6    wait another day on Mr. Singh, let's wait two days,
7    let's wait ten days, let's wait whatever.  I think
8    the answer is he should be precluded.  They knew
9    about it.  If they told us on April 13th we could
10   have started working on these things.  But as it
11   was, I tried calling his lawyer.  Fat chance finding
12   her.  A, because I wanted to find out what it was
13   about.  I didn't know anything as to what it was
14   about when the name Stephen Singh came up.  I didn't
15   even know who he was.
16             I finally -- I filed -- I made inquiry.
17   I didn't get the 302 as initially represented.
18   Maybe it went into cyberspace, maybe it didn't, I
19   don't know, but by the time I had filed that motion
20   I had what I had to present to the Court.  It was
21   Friday night, it was the start of that long weekend,
22   I can't access material.  And as the Court
23   indicated, I am trying to prepare an opening
24   statement.  I am trying to coordinate witnesses so
25   that we can accommodate both the Court's schedule,
```

4422

1  the jurors' schedule, and this is an utter total
2  distraction and it's unfair.
3            THE COURT:  All right, anything further,
4  Ms. Reynolds?  Do you want to respond to any of what
5  Mr. Sheehan has said?  He says he didn't get the 302
6  until Friday night and that he doesn't have a whole
7  lot of Giglio material.  He doesn't have any Giglio
8  material.
9            MS. REYNOLDS:  Well, it's our
10 understanding Mr. Singh has not testified before and
11 there are no sworn statements.  We certainly
12 provided everything that we have.  I can look
13 into -- I see that the plea agreement that we
14 provided is from his most recent plea.  So I will
15 make sure that I get him the plea agreement --
16           THE COURT:  When was it you intended to
17 offer him?
18           MS. REYNOLDS:  We can offer him at the
19 end, your Honor.  We can -- I think our lineup was
20 going to be the blood spatter expert, who needs to
21 testify today, and then we were going to go to the
22 Armstead assault.  But he would be the last
23 witness -- so, we can -- we don't have to offer him
24 today, we could offer him at the end.
25           THE COURT:  Well, as it stands now the

4423

1  defense does not have everything that it needs to
2  properly cross-examine someone on areas that are
3  quite proper areas of cross-examination, that is,
4  credibility because of prior cooperation and
5  consideration for here.
6            MS. REYNOLDS:  Well, I should just
7  clarify, your Honor, they have his rap sheet, they
8  have his plea and cooperation agreements.  I don't
9  think they're entitled to all of the underlying
10 reports of any cooperation he's offered in the past
11 that does not go to credibility, and it has nothing
12 to do with his testimony in this case.  I'm not sure
13 what --
14           THE COURT:  Why does it have nothing to
15 do with his testimony in this case?  If he's
16 cooperated before, if he's been provided with
17 consideration in return for his testimony before,
18 certainly that bears, at least in some respect, on
19 his credibility.
20           MS. REYNOLDS:  Well, certainly they can
21 ask him.  And they have his cooperation agreement
22 and when it was dated, and he's been cooperating,
23 but as to underlying reports and things he's
24 cooperated which are under seal or anything like
25 that, that doesn't go to his credibility.  He can

4424

1  testify generally that from the moment he entered
2  into his cooperation agreement --
3            THE COURT:  Why do you say it doesn't go
4  to credibility just because they're under seal?
5            MS. REYNOLDS:  Your Honor --
6            THE COURT:  How do we know whether it
7  goes to his credibility if it's sealed and hasn't
8  been examined?
9            MS. REYNOLDS:  Well, do you know --
10           THE COURT:  What if I were to order the
11 seal released?
12           MS. REYNOLDS:  Well, your Honor, I can
13 certainly -- we would certainly bring out through
14 this witness what we bring out through all other
15 cooperating witnesses, what his understanding is of
16 his cooperation agreement, and I think that
17 obviously goes to his testimony in this case.  But
18 the specifics about another case are not relevant
19 here.
20           THE COURT:  I don't really understand
21 why when I asked you who the witnesses would be on
22 the Armstead assault there wasn't any mention of the
23 existence of anybody else when at that time you had
24 this 302 as to who he was and that he did have
25 knowledge of this.

4425

1            MS. REYNOLDS:  Well, your Honor,
2  obviously the defendant was aware of who Mr. Singh
3  is, and again it went back to safety issues.  If we
4  even intimated I think at some time, say --
5            THE COURT:  But in a colloquy with the
6  Court to say your witnesses are Armstead and the
7  Wyatt warden or person who interviewed who did the
8  investigation and that was all, isn't that a little
9  bit less than fully disclosing what should be coming
10 down -- what is to be coming down the pike?
11           MS. REYNOLDS:  I don't remember exactly
12 that colloquy, but I do remember on several
13 occasions colloquy with the Court where we indicated
14 we may have additional witnesses at the penalty
15 phase when we were discussing the final witness
16 list.
17           MS. DAYTON:  That --
18           THE COURT:  I understand that.
19           MS. DAYTON:  That colloquy was with me,
20 your Honor.  I believe it was on the phone, so I'll
21 take responsibility for it.  I said Mr. Armstead, we
22 had the conversation about Juan Hernandez and Andrew
23 Zayac.
24           THE COURT:  Who would take the Fifth.
25           MS. DAYTON:  Right.  And I said, I

4426

```
1    thought, there was two more Wyatt witnesses.  I'm
2    not going to say -- it was my confusion.  I don't
3    know -- I don't have the transcript in front of me
4    exactly what I said.  I did not say Mr. Singh,
5    absolutely, and I think at that point we hadn't even
6    determined if he was going to be called or had not
7    -- that was like two weeks ago on a Friday, maybe.
8    It was me, and Mr. Smith speaking, too, your Honor.
9             THE COURT:  All right, well, I'm going
10   to reserve because I don't think the defendant has
11   what the defendant needs, from what Mr. Sheehan
12   tells me.  It may be that the government would
13   provide him with the things that he needs.  It may
14   mean that we need a proffer session with Mr. Singh,
15   I don't know, but I am mindful that investigations
16   of witnesses can take time, that taking time in the
17   middle of a trial is, at best, disruptive.
18            MS. DAYTON:  Your Honor, just on that
19   point, the government would like to point out that
20   the defense disclosed last week their 23 witnesses
21   plus their experts and didn't provide us reports for
22   experts.  So we're left to guess, essentially, what
23   these people are going to go say.  So the government
24   also has a right to present its case under the law,
25   and that we have -- we're talking one witness here
```

4427

```
1    who Mr. Aquart was fully aware of because, this is
2    primarily based on discussions that Mr. Aquart had
3    with Mr. Singh, versus the litany of family and
4    friends and other witnesses who the defense provided
5    to us, probation officers which we had to get court
6    orders to speak with.  And so comparing one witness,
7    you know, and denigrating the government and
8    government counsel is highly inappropriate to begin
9    with, calling it rubbish and whatever else Mr.
10   Sheehan said.
11            THE COURT:  That may be true, and I
12   would certainly, if I heard anything like that in
13   opening or closings, I would immediately step in.  I
14   don't think the rules of evidence are two wrongs
15   make a right, but I'm just going to reserve on the
16   motion to preclude that witness.
17            We have the issue of the defendant's
18   motion, No. 887, to preclude the hearsay with
19   respect to the Armstead assault.  The defendant
20   seeks to preclude police reports containing
21   statements from Juan Hernandez and Andrew Zayac,
22   Wyatt inmates, taken in 2009, as barred by Crawford
23   or its rationale with respect to the inability of
24   the defendant to cross-examine those who made
25   statements.  I don't have a copy of the police
```

4428

```
1    reports at issue.  It's, therefore, difficult to
2    know with precision what is at issue.  The parties
3    have briefed this matter as to whether Crawford does
4    apply, whether the right of confrontation that was
5    the heart of Crawford applies at the penalty phase.
6    All of that will be taken under consideration, but I
7    don't have the police reports.  Do I need them?
8             MR. SHEEHAN:  I don't think so, your
9    Honor, but I'm happy to provide them to the Court.
10            MS. REYNOLDS:  Your Honor, just for the
11   record, we are not seeking to introduce these
12   statements on our direct case.
13            THE COURT:  Okay.
14            MS. REYNOLDS:  So that may make it
15   easier for the Court.  We reserve the right if they
16   somehow in cross-examination open the door to that
17   information coming out at that point to seeking to
18   use them in a rebuttal case.  And there is also tape
19   recordings that go along with those statements.
20            THE COURT:  So for now the defendant's
21   motion can be granted by agreement, that the
22   government -- with respect to the government's, what
23   we'll call, case-in-chief, reserving, as is
24   appropriate, in the event the door is somehow opened
25   for some or all of this to come in.  I would still
```

4429

```
1    like to have a copy of the police reports.
2             The next is this issue on the motion to
3    preclude testimony regarding unavailable videotape,
4    889.  I'm not quite sure I understand why a
5    duplicate of that video has any different qualities
6    than the original, although the defendant seems to
7    think that it does.
8             MS. RODRIGUEZ-COSS:  Your Honor?
9             THE COURT:  I haven't -- the government
10   hasn't had a chance to respond to that, so why don't
11   I hear from you.
12            MS. RODRIGUEZ-COSS:  Your Honor, what
13   happens is that the Wyatt correctional facility has
14   the video, digital video surveillance system, and
15   it's a proprietary program that they have to run
16   their digital surveillance cameras so that images on
17   those cameras are very clear.  I think the way
18   Captain Alfonso described it, it's like watching TV.
19            So when the assault occurred, they
20   immediately went and reviewed their surveillance
21   cameras with regards to the relevant areas and were
22   able to identify certain individuals through the
23   review of that video.  Sometime later they cut out
24   the relevant portion and saved it.  When they do
25   that, they don't save it with the same program, the
```

4430

```
1    same computer program, they save it as a different
2    file, and when that is done the image loses clarity,
3    loses resolution because it's now being saved under
4    a different program.
5              And so it's not that a video was
6    destroyed -- or that it didn't exist.  Captain
7    Alfonso will be able to testify that he reviewed the
8    recorded images in their system, he will be able to
9    testify as to what he saw on that system that very
10   evening.  However, what we have of that recorded
11   interview does not comport with what he observed
12   because of the computer files and the difference in
13   the programs used to save that portion of the video.
14             And so the government would submit, your
15   Honor, that that goes to the weight of the evidence
16   and to credibility of Captain Alfonso as to what he
17   claims he saw, but certainly not to the
18   admissibility of the video.  What we do have now,
19   because although it's not as clear as the original
20   video that he observed, it is sufficiently clear
21   that you can appreciate where the assault took
22   place, you can appreciate the area.  Mr. Armstead
23   was able to see himself coming out of the cell after
24   the assault took place.  So o it does have probative
25   value.
```

4431

```
1              THE COURT:  So, what is this proprietary
2    business about Wyatt when a crime has been committed
3    and they -- are you saying they don't have to just
4    hold on to the original because they are a private
5    outfit?
6              MS. RODRIGUEZ-COSS:  Your Honor, I'm not
7    saying anything of the sort.
8              THE COURT:  I'm just curious whether
9    there should be some changes in the procedures at
10   Wyatt.
11             MS. RODRIGUEZ-COSS:  And wouldn't I love
12   to have a video that was saved under their program.
13   We called FBI headquarters, we had them review what
14   we have to see if it could in any way be enhanced.
15   Believe me, if the government wished anything, it
16   wished to have the original video with the clarity
17   that Captain Alfonso has.  This occurred back in
18   2009 before it became relevant for a penalty phase
19   in this trial.  When we did ask them to check and
20   see whether a copy in the original program, or their
21   program, had been saved, it hadn't, and it was too
22   late to go back because what happens is every so
23   often the videos are recorded over.  And so unless
24   they specifically saved it for a particular reason,
25   it's just going to record over.  That's how
```

4432

```
1    surveillance systems run.
2              THE COURT:  So, if this were a BOP run
3    facility would that same problem exist, or do you
4    not know?
5              MS. RODRIGUEZ-COSS:  I do not know.  I
6    know in the past when I've had incidents in prison
7    and it is a BOP facility, BOP has gotten us the
8    program.
9              THE COURT:  The original one.
10             MS. RODRIGUEZ-COSS:  The original
11   program so we can see or observe the video as it
12   was.  Yes, we've had that with BOP facilities, and I
13   think that perhaps -- or perhaps the Bureau of
14   Prison, because they are a federal facilities, are
15   aware of this and do take those measure.  However,
16   the Wyatt correctional facility did not.
17             THE COURT:  Now, isn't the defense a
18   little handicapped, as you are, in not having the
19   original and having -- but having to cross-examine
20   Captain Alfonso who saw the original and is going to
21   testify, if I understand this right, about what he
22   saw on the original that is contrary to what one can
23   see on the copy?
24             MS. RODRIGUEZ-COSS:  Well, it's not that
25   it's contrary than what you can see on the copy,
```

4433

```
1    it's that it's not as clear.  But they did
2    produce -- they did prepare a report
3    contemporaneously with having reviewed the video.
4    The report indicates the different times at which
5    they claim they observed different things on the
6    video.  So the defense has that, and will have the
7    opportunity to use that during the cross-examination
8    of Captain Alfonso.  And so, is it perfect?  No,
9    it's not perfect.  Is it inadmissible?  Absolutely
10   not.
11             THE COURT:  What, his testimony or the
12   video?  I'm not talking about the video, I'm talking
13   about his testimony as to the not video.
14             MS. RODRIGUEZ-COSS:  Right, I don't
15   think his testimony as to the not video is
16   inadmissible.  He can testify as to what his own
17   personal perceptions were and what he observed.
18             THE COURT:  From the original video.
19             MS. RODRIGUEZ-COSS:  Yes.
20             THE COURT:  All right, who will argue
21   this for the defense?
22             MR. SHEEHAN:  I guess I should moderate
23   my tone, your Honor, because it does seem like we're
24   getting more similar statements.  The first
25   statement, which I would characterize as similar,
```

4434

```
1   is, well, we didn't know this would be relevant for
2   a penalty phase.  That's -- that strains the
3   imagination.
4           THE COURT:  So, we know surveillance
5   systems recycle themselves.  We know if you don't
6   preserve it it gets lost.  We know that whatever
7   Wyatt as a private facility under contract is or
8   isn't doing is problematic in terms of saving
9   evidence of what appears to have been considered to
10  be a crime potentially -- a crime at the time and
11  was under investigation.
12          But the narrow issue here is, A, are you
13  disputing that the less clear version should be
14  admissible or -- and I understand you have a best
15  evidence argument, but best evidence usually is not
16  dispositive if the original is explained to have
17  been lost.
18          But secondly, your argument about the
19  captain, Captain Alfonso's testimony as to that
20  original, are you -- you're not disputing, are you,
21  that the various witnesses can say this is what you
22  are seeing on this video, this is pod D, this is
23  where you go from A to B, this is me, that is Mr.
24  Armstead, et cetera.
25          MR. SHEEHAN:  Well, we do have the video
```

4435

```
1   queued up, your Honor, and the reality is on the
2   video you -- there are two problems here.  One is
3   first -- first of all, I don't think whether Wyatt
4   is a contract facility or not matters a wit in the
5   context of this case.  If --
6           THE COURT:  I'm merely observing for
7   other reasons.
8           MR. SHEEHAN:  Yeah, no, I realize that,
9   but essentially if they're a contract facility
10  they're under contract with the United States
11  Department of Justice.
12          THE COURT:  Okay.
13          MR. SHEEHAN:  Now, as far as what -- the
14  first issue I think the Court has identified Alfonso
15  is anticipated, and now I guess we -- my motion, I
16  didn't understand it was going to be Alfonso because
17  we had no report indicating, but that's okay.
18          THE COURT:  I'm sorry, I thought there
19  is a report prepared at the time Captain Alfonso
20  viewed the original --
21          MR. SHEEHAN:  No.
22          THE COURT:  -- that has been provided to
23  you.
24          MR. SHEEHAN:  No, the reports we have
25  are from Captain Colburn (ph).
```

4436

```
1           MS. RODRIGUEZ-COSS:  All right, so
2   Captain Coburn signs the report, but they were
3   together when they viewed the video.
4           MR. SHEEHAN:  I'm just saying I have no
5   reports from Captain Alfonso.  But, in any case, I'm
6   willing to accept captain -- the fact -- in fact the
7   Captain Coburn report says that Captain Alfonso went
8   to review the video.  So the issue is Captain
9   Alfonso is going to be talking about a video that he
10  reviewed that nobody else can see because what we
11  have is not what he reviewed, and what we have --
12          THE COURT:  I understand that.
13          MR. SHEEHAN:  Okay.
14          THE COURT:  But what is it about his
15  testimony, and that is what was in his report, that
16  is different or at odds with the video run on the
17  different program, which I think under 1004(2) is
18  admissible because the original is not available.
19  The further ramifications are what we're talking
20  about.  And what -- we're doing this while we're
21  waiting for two jurors to arrive.
22          MR. SHEEHAN:  Well, what they're saying
23  here, I mean, if you look at their report.
24          THE COURT:  I don't have their report.
25          MR. SHEEHAN:  Yes, I think you do, your
```

4437

```
1   Honor.  It's part of my motion.  But perhaps I
2   can -- it's the attachments to that motion to 889.
3   Does your Honor have those?
4           MR. SMITH:  Your Honor, I have an extra
5   copy.
6           THE COURT:  That probably would speed
7   things up since we carefully copied and reviewed the
8   motion the minute sequence of this yesterday.  I
9   know I have a copy and have read it, but I didn't
10  seem to have brought it out.  Oh, yes, I did read
11  this.
12          MR. SHEEHAN:  I actually have --
13          THE COURT:  So what in this do you claim
14  is contrary to what is in the video that will be
15  offered and will be permitted to be offered?
16          MR. SHEEHAN:  We don't see detainee
17  Armstead going into cell 27.  Let's start with that
18  as a top one.  We don't see detainee Aquart, the
19  defendant in this case, standing on top tier.  We
20  don't see him go to his cell, cell 29, and then
21  enter cell 27.  We don't see detainee Abeladejo exit
22  C-27 and hurry away from the scene.  We don't see
23  detainee Aquart --
24          THE COURT:  Slow down.
25          MR. SHEEHAN:  Basically all of that
```

4438

1    third paragraph, your Honor, is he essentially --
2    until we get to the last sentence where we see -- up
3    until the last -- the second to last sentence we
4    cannot determine that from the video.
5            MS. RODRIGUEZ-COSS:  So that's not --
6            MR. SHEEHAN:  What we do get, we can see
7    detainee Armstead walking out of the cell and
8    proceeding towards -- actually I don't even see that
9    on the video.  I see detainee Armstead ultimately
10   being walked out of his cell, the downstairs cell.
11   The rest is a blur of pixels.  I can pick out
12   Officer Edwards, I believe I can see who appears to
13   be, assuming it's a she, maybe, walking down towards
14   the cell where Armstead is now.  The difficulty that
15   this raises for us is that the officers will be
16   testifying in this case.
17           Captain Alfonso will be testifying not
18   about what he saw and observed on the block, but
19   about what he saw and observed on the video, which
20   was in any case so substantially mutilated in the
21   copying process, if in fact it was clear in the
22   beginning, which I don't know, and I don't think
23   that there is -- so, what we're really being left
24   with is that assessment of I saw it on the video.
25           MS. RODRIGUEZ-COSS:  Your Honor, two

4439

1    things.  If we may?
2            THE COURT:  Okay.
3            MS. RODRIGUEZ-COSS:  One, we would
4    request that the Court view the video because we
5    disagree with Mr. Sheehan.  You can see the
6    defendant posted on the second tier.  Mr. Sheehan
7    may not be able to identify him, but Mr. Alfonso
8    knows actually where Mr. Aquart is.  You can see Mr.
9    Abeladejo coming out of the cell.  He was wearing a
10   boot, and so you can see him limping away.  You can
11   see Mr. Armstead then walk away out of that cell.
12   So, there are certain things you can see and
13   appreciate that will be very helpful for the jury to
14   place this in context.
15           THE COURT:  So what if -- and I will
16   look at the video, but what if Alfonso and Armstead
17   testified from this video about where Armstead is,
18   which cell he's going into, where the defendant is
19   and how they recognize him, where Abeladejo is and
20   how they recognize him, as opposed to saying, well,
21   I can't see it here, but I could see it on the
22   original.  You are saying there is plenty Captain
23   Alfonso can testify about what he see on this video.
24           MS. RODRIGUEZ-COSS:  Right.
25           THE COURT:  Why not limit his testimony

4440

1    to that?
2            MS. RODRIGUEZ-COSS:  Well, your Honor,
3    because he saw -- the thing is, when the Court sees
4    the video it will become more evident.  The
5    perspective of the camera, let's say the camera was
6    at the top of the block here in the back of the
7    courtroom and then the cell where the assault takes
8    place is where the door that leads to the judge's
9    chambers is.  So the further away you are from the
10   camera, the less the resolution, but the closer you
11   are to the camera the better the resolution.  That's
12   why you can see where the defendant is standing at
13   the tier where Alfonso says he's standing, and then
14   you see the person walk by the cell and then come
15   back towards the cell, the way Alfonso says it
16   happened when he viewed that immediately,
17   immediately following the assault.
18           He'll say then saw the defendant exit
19   the cell and go into the cell where Singh says he
20   disposed of his shirt and where he had gotten the
21   lock out of.  And so those things are relevant.  And
22   why can't Mr. Alfonso testify to that?  If the
23   defense is so concerned with the jury not being able
24   to see or compare the clarity of the video, we can
25   certainly arrange for the jury to have a visit to

4441

1    Wyatt correctional facility and observe the
2    surveillance system there.
3           THE COURT:  I don't think they can
4    observe what was on that original video.
5           MS. RODRIGUEZ-COSS:  No, but they can
6    appreciate, your Honor, and in fact we are trying to
7    see if we can cut a clip with the original program
8    of the relevant area so that the jury can compare
9    the quality of the video that Mr. Alfonso saw with
10   the quality of the video that will be submitted in
11   evidence in this case, and I think that is relevant
12   and probative and something for the jury to weigh.
13          THE COURT:  Let me -- I think seeing the
14   video is useful.  Let me move on.  We still don't
15   have all of our jurors here, by the way.  I'll take
16   up the issue of the unsworn allocution after I've
17   looked at the case law addressing this issue since I
18   last addressed it.  So that will remain.  The motion
19   to preclude the testimony of Marva Lewis will remain
20   under advisement to give the defendant an
21   opportunity to respond to Ms. Lewis -- period.  And
22   the issue of residual doubt is also still pending.
23          Mr. Sheehan, is that something you
24   intend to the respond to because you are going to
25   make a claim of residual doubt.

**GA1153**

4442

1       MR. SHEEHAN:  Do you know, I.
2       THE COURT:  You might not have gotten to
3  that.
4       MR. SHEEHAN:  I have not gotten to that,
5  your Honor.
6       THE COURT:  It would be useful to me if
7  you could whip through the 26 pages and tell me
8  whether you are going to be pressing in your closing
9  or cross-examination the issue of residual doubt
10  before I start to work on that.
11       MR. SHEEHAN:  I will try to do that,
12  your Honor.
13       THE COURT:  I think that covers all that
14  we can cover, doesn't it?  So what remains is the
15  opportunity to see the video -- oh mitigators.
16       MS. RODRIGUEZ-COSS:  Was the court
17  intending on --
18       THE COURT:  Taking a brief recess?  Yes.
19       MS. RODRIGUEZ-COSS:  Or discussing the
20  charge at all?
21       THE COURT:  Yes, I was.  We will do
22  that.  Why don't we take a five-minute recess.  I'm
23  going to see if Mr. Aquart can be brought into the
24  courtroom before we do the video.  Okay.
25       MS. RODRIGUEZ-COSS:  Very well, your

4443

1  Honor.
2       THE COURT:  We will stand in recess for
3  five minutes.
4       (Recess)
5       THE COURT:  All right, good morning,
6  Mr. Aquart.
7       THE DEFENDANT:  Good morning.
8       THE COURT:  Please be seated.  Let's
9  queue up the video and the government can describe
10  what the proffered testimony will be.
11       Is there some description that you want
12  to supplement here about what --
13       MS. RODRIGUEZ-COSS:  Yes.
14       THE COURT:  -- you claim can be seen on
15  this video?
16       (Tape played)
17       MS. RODRIGUEZ-COSS:  Okay, so this is
18  obviously the pod where the defendant was being
19  housed.  When they refer to the second tier, they're
20  referring to the second floor.  The cell where the
21  arrow is right now is where cell 27 was where the
22  assault took place.  And so you can appreciate the
23  layout.  You can see the movement of the defendant
24  inmates, your Honor.
25       THE COURT:  All right, do you want to

4444

1  fast-forward.  I understand this is a 20-minute --
2       MS. RODRIGUEZ-COSS:  We can go around to
3  18:40, I think.
4       THE COURT:  The portion that it is
5  claimed --
6       MS. RODRIGUEZ-COSS:  Stop right -- okay.
7       THE COURT:  --  that the defendant can be
8  identified.
9       MS. RODRIGUEZ-COSS:  Right, if you let
10  it run.  I just saw him on the screen.  And I
11  apologize, your Honor, I didn't know we were going
12  to view the video, otherwise I would have brought my
13  specific times with me.
14       The individual walking out right now
15  that you can see at the top on the right-hand side
16  is Nelson Abeladejo.
17       THE COURT:  I'm sorry, the top?
18       MS. RODRIGUEZ-COSS:  Go back to 18:44.
19       THE COURT:  Going up the stairs?
20       MS. RODRIGUEZ-COSS:  No, we'll see an
21  individual coming out of cell 27 walking on the top
22  tier over here with the --
23       THE COURT:  You can tell that because he
24  has that white thing on his foot?
25       MS. RODRIGUEZ-COSS:  Because he has the

4445

1  boot on his leg, correct, and he's limping away from
2  the cell.  So, according to Captain Alfonso's
3  report, the defendant enters cell 27 just before
4  Nelson Abeladejo comes out.  But previously -- go
5  back to maybe 18:43.  According to Captain Alfonso,
6  he saw the defendant posted at the top of the tier.
7       18:43:00.  Here.
8       THE COURT:  And that's who?
9       MS. RODRIGUEZ-COSS:  That he'll testify
10  is the defendant.  And you see him later walk toward
11  cell 27, go past it and then go back.
12       THE COURT:  Okay, can I ask you a
13  question?
14       MS. RODRIGUEZ-COSS:  Yes.
15       THE COURT:  Mr. Aquart has some very
16  distinctive braids.
17       MS. RODRIGUEZ-COSS:  Yes.  And he will
18  say that he actually -- that is the feature that he
19  observed.  He observed an African-American male with
20  very long dreads, and he'll also testify that there
21  was no one else in this pod that fit that
22  description.
23       THE COURT:  Could you back that up.  Can
24  that be seen in any fashion from this image?
25       MS. RODRIGUEZ-COSS:  To 100 degree of

4446

```
 1   certainty, your Honor?
 2              THE COURT:  No, to any degree.
 3              MS. RODRIGUEZ-COSS:  Well, he'll testify
 4   that he saw it to 100 percent certainty.
 5              THE COURT:  But that's the issue, he's
 6   testifying from seeing the original.  The question
 7   is what can he tell from this.  He can -- so he can
 8   see the dreads --
 9              MS. RODRIGUEZ-COSS:  I think so.
10              THE COURT:  -- down the back.  All
11   right.
12          I hope that all of the jurors will soon
13   be here.  Let me switch from this video to the
14   preliminary charge and explain that the Court has
15   determined to preliminarily give the jurors -- it's
16   a preliminary charge, it's not the final charge.  It
17   is the charge that is intended to give them the
18   framework for this structured analysis they're going
19   to have to do and familiarize them with threshold --
20   gateway mental state, statutory aggravators,
21   non-statutory aggravators, mitigators, and some of
22   the law that's attendant to it.  They will not have
23   copies of this.  I don't -- there may well be things
24   that change by the time the final and full charge is
25   given.
```

4447

```
 1              But for the time being, I'm
 2   restructuring, number one, to be another defendant
 3   or defendants equally culpable and will be not
 4   punished by death, because it is the equally
 5   culpable requirement under the statute and the Court
 6   is not going to rule that John Taylor or Efrain
 7   Johnson are equally culpable.  That's going to have
 8   to be determined by the jury and the comparators
 9   that the defendant wishes to make can be argued.
10          With respect to --
11              MR. SHEEHAN:  Could I just, your Honor,
12   on that one.  I don't know if your Honor is inviting
13   comment or not.
14              THE COURT:  Only comment that's not
15   already been made in the briefing.
16              MR. SHEEHAN:  Well, what your Honor has
17   basically done is taken the mitigating factor that
18   we have proposed and changed it.  We are not
19   proposing, and our proposal does not say, equally
20   culpable.
21              THE COURT:  Then why is it relevant?
22              MR. SHEEHAN:  I think it is relevant
23   that the jury could find that they were involved in
24   the commission of this crime and that they are not
25   going to be punished by death.  A jury could take
```

4448

```
 1   that into account in considering whether even if
 2   their level of involvement might not have been the
 3   same as Mr. Aquart's, the fact that they were
 4   involved and were subject to the death penalty for
 5   their involvement, and it will not be imposed upon
 6   them, it seems to me a jury could completely take
 7   that into account.  In other words, a jury might
 8   conclude, well, Mr. Aquart had a planning role,
 9   Mr. Johnson and Mr. Taylor participated in the
10   murders.  There is evidence that will be introduced
11   at the penalty phase about Mr. Johnson's role.
12              THE COURT:  All right, so what I
13   understand you to be clarifying is that you are not
14   claiming equally culpable.
15              MR. SHEEHAN:  Right, the way that we
16   have written the --
17              THE COURT:  No, I know that you wrote
18   it, but the only statutory mitigator seemed to
19   relate to equally culpable.
20          Here is what I'm going to do.  I'm going
21   to leave out factor number one altogether.  We can
22   add in the factor as you articulate it if you
23   continue to press it for the comparison of Efrain
24   Johnson and -- excuse me -- yes, and John Taylor,
25   but I'll just leave that out for now and then I'll
```

4449

```
 1   hear you as to whether or not the fact that lesser
 2   culpable people -- the fact that lesser culpable
 3   people will not be sentenced to death for their role
 4   in the murders is a mitigating factor that should be
 5   submitted.  And I'll hear from the government at
 6   that point.  I had not understood that the view that
 7   -- when you say you didn't adhere to the language of
 8   equally culpable is of no relevance, that you meant
 9   we weren't even claiming that.
10          Now, the next is the mitigators the
11   government seeks to strike, which is that he'll be
12   imprisoned for the rest of his life without
13   possibility of release and lifetime imprisonment is
14   a severe punishment.  It doesn't seem to me, while
15   I'll hear you further on that, the likelihood that
16   this concept will be submitted to the jury in some
17   form is likely, but not decided.
18          There is one linguistic thing I would
19   like you to consider, using the language will be
20   imprisoned for the rest of his life without
21   possibility of parole as opposed to release.  There
22   is actually a portion of the statute that provides
23   when a defendant sentenced to life without release
24   reaches age 70, with having served 30 years, and
25   where the Bureau of Prisons certifies that that
```

4450

1   person is of no risk to the public, that the Bureau
2   of Prisons can bring on a motion with those
3   representations and then the court could make a
4   decision with respect to release.  So technically
5   I'm trying to be accurate.
6           MS. RODRIGUEZ-COSS:  Your Honor, and we
7   appreciate that.  And I think that's part of the
8   reason why this should not be listed as a mitigating
9   factor.  It has --
10          THE COURT:  Well, I don't think --
11          MS. RODRIGUEZ-COSS:  The Court informs
12  already in its instructions that if the defendant is
13  not sentenced to death he will be sentenced to life
14  in prison without parole.
15          THE COURT:  I understand.
16          MS. RODRIGUEZ-COSS:  The Court is
17  instructing the jury.  I'm sure it will be in the
18  final charge as well.  I think it will be clear to
19  the jury that is what will happen.  However, how
20  does that mitigate?
21          THE COURT:  I'm sorry to interrupt you.
22  I understand your argument and I will hear it
23  further, but given they're going to hear this in one
24  form or another, and given that it is related to the
25  choice they will be making, I'm going to leave it in

4451

1   for the time being.
2           The next factor that the defendant --
3   pardon me, the government challenges is what was
4   called factor three, the favorable plea agreements
5   offered to cooperating witnesses weighs against
6   imposition of death for Azibo Aquart.  I am inclined
7   to agree with the government that other cooperating
8   witnesses' plea agreements don't have anything to do
9   with the defendant's character, background, or
10  circumstances of the capital offense for which he
11  was convicted.  But we're going to consider how the
12  relative culpability ultimately will play out anyhow
13  by the end of the evidence and what the defendant is
14  pressing.
15          So, I'm going to leave that out for the
16  time being, although I will need to hear -- I will
17  need to be persuaded that other drug conspiracy
18  members' plea agreements don't bear on the
19  defendant's sentence, although they may well have
20  impacted the jury's credibility determinations.
21          The next is what's called factor four,
22  the victims voluntarily chose to engage in a
23  dangerous and illegal activity that a circumstance
24  that contributed to their deaths.  And the
25  defendant, as I understand it, urged this under

4452

1   3592(a)(7), "Victim's consent- The victim consented
2   to the criminal conduct that resulted in the
3   victim's death."
4           I note that Mr. Reid and Mr. Williams
5   never had anything to do with Mr. Aquart's drug
6   operations.  Have I misunderstood what you were
7   urging, Mr. Sheehan?
8           MR. SHEEHAN:  Your Honor, first of all,
9   I don't think -- we're not claiming it under the
10  statute.  What we are claiming is that their
11  involvement in drug trafficking and by that -- and I
12  think the evidence in this case would show that at
13  minimum Mr. -- certainly Ms. Johnson and Mr. Reid
14  were involved in the drug dealing, and that
15  Mr. Williams allowed them to use his apartment for
16  purposes of their drug dealing.  That would make
17  Mr. Williams equally involved, or at least certainly
18  legally culpable for allowing other people to use
19  the apartment as an aider and abettor.
20          Now, maybe he himself was not personally
21  dealing drugs, but he was allowing other people to
22  do that.
23          MS. RODRIGUEZ-COSS:  The language
24  proposed by the defense is that these victims
25  involved themselves in a dangerous activity.  So,

4453

1   first of all, I disagree wholeheartedly there is any
2   shred of evidence that shows Mr. Williams involved
3   himself in any dangerous activity, much less
4   foreseen the consequences of what happened to him.
5           Second, Tina Johnson, even if the
6   evidence does show she was distributing some amount
7   of crack cocaine from that apartment, was doing so
8   inside an apartment, inside a building to customers
9   that predominantly she knew.  So how does that
10  constitute engaging in such an incredibly dangerous
11  activity she might have brought that on herself?
12          MR. SHEEHAN:  I don't think the jury
13  needs to necessarily accept the government's
14  characterization of that evidence as they have done
15  it.  She was running a -- she was running a drug
16  trafficking activity out of that apartment.
17          THE COURT:  The issue remains whether
18  her drug operation constitutes consent to the actual
19  criminal conduct that resulted in her death.
20          MR. SHEEHAN:  No, because I don't have
21  to tailor the mitigator to the specific language of
22  the statute, your Honor.
23          THE COURT:  So this is a non-statutory
24  mitigator?
25          MR. SHEEHAN:  Yes.  It is consistent

4454

1 with the language -- it does not necessarily have to
2 embrace all four corners of the language of the
3 statutory mitigator.
4 THE COURT: All right. I'm not going to
5 put that on the list of the mitigating factors. I'm
6 going to change to say Mr. Aquart is asserting --
7 the mitigating factors Mr. Aquart is asserting
8 include the following, and that will not be
9 dispositive of everything. You will probably have
10 to persuade me how -- whether it is you don't think
11 Beckford was correctly decided or whether you think
12 that it shows that a victim's participation in drug
13 trafficking activities alone is sufficient to
14 constitute consent to the criminal conduct that
15 caused her death, whether or not it tracks the
16 statute or not.
17 The next is factor which is Azibo
18 Aquart's execution would cause others to suffer
19 grief and loss. The Court has ruled that execution
20 impact evidence would be admissible.
21 Factor 27 which was at age 17 Azizi
22 Aquart, the defendant's older brother, was
23 ill-equipped to handle the responsibility of being a
24 guardian of a 13-year old. The government says that
25 states nothing about the defendant, but the defense

4455

1 is -- or not the defense, the mitigator asserted is
2 that during the defendant's formative years he was
3 raised by someone ill-equipped to handle that
4 responsibility and, thus, bears on the background.
5 MS. RODRIGUEZ-COSS: We submitted that's
6 covered in No. 20, your Honor.
7 MR. SHEEHAN: I'm sorry, I didn't hear
8 counsel.
9 MS. RODRIGUEZ-COSS: It's covered in the
10 previous mitigating factor.
11 THE COURT: And we have looked at factor
12 34 about the Bureau of Prison's ability to safely
13 and securely confine the defendant if sentenced to a
14 life sentence. The Court has ruled on that and that
15 will at least go in this preliminary list of
16 mitigating factors.
17 All right, I think -- is there anything
18 else about the preliminary charge that has not been
19 the subject of all the prolific briefing or that --
20 MS. RODRIGUEZ-COSS: We would just like,
21 your Honor, to address the first eligibility factor.
22 We did not brief it extensively. We objected to it.
23 THE COURT: The 18-year-old?
24 MS. RODRIGUEZ-COSS: Yes, ma'am.
25 THE COURT: Now, your concern is that

4456

1 there is no written stipulation that unequivocally
2 definitively says he's not disputing age 18.
3 MS. RODRIGUEZ-COSS: Well, that's one,
4 your Honor. But even if there is a stipulation by
5 the parties that he was at least 18 years old on
6 August 24, 2005, I don't believe that that
7 eliminates the fact that the jury needs to pass upon
8 that eligibility factor.
9 There are certain threshold intent
10 factors that the jury must find beyond a reasonable
11 doubt before the defendant becomes death eligible
12 and under Ring v. Arizona these eligibility factors
13 have been treated as elements of the offense and,
14 therefore, since Ring v. Arizona the government has
15 always included these factors in its indictment.
16 And so we think it's important for the jury to be --
17 for the element to be submitted to the jury and for
18 there to be a finding by the jury beyond a
19 reasonable doubt that that is so.
20 THE COURT: Now, Mr. Sheehan, you were
21 going to submit a written stipulation that
22 Mr. Aquart is not disputing that he was over age 18
23 at the time.
24 MR. SHEEHAN: We're going to put in his
25 birth certificate, your Honor. We're going to

4457

1 establish his date of birth and we'll submit a
2 stipulation that he was over 18. If they want more
3 than that, we will put in a stipulation.
4 THE COURT: So, what's wrong with the
5 charge -- it doesn't have to be done in the
6 preliminary instruction, but ultimately that one of
7 the elements is that they be over 18, that the
8 parties do not dispute the defendant has stipulated,
9 you may therefore find that?
10 MR. SHEEHAN: Because, what really -- do
11 you know --
12 THE COURT: I know what you are saying.
13 It starts a drum roll.
14 MR. SHEEHAN: Exactly. That's exactly
15 why they do that.
16 THE COURT: But I want to make sure the
17 issues of Ring, what has to be found by a jury,
18 doesn't require the formality of the jury's finding
19 even though the defendant doesn't dispute it. So,
20 I'm going to leave it as it is now, but I'd like to
21 have some further thought on that because after all
22 this work on everybody's part, I don't want
23 something like that to become a problem.
24 MR. SHEEHAN: But I think, your Honor,
25 just very briefly.

4458

```
1           THE COURT:  It would probably only have
2   to become a problem only if it was part of your
3   appeal.
4           MR. SHEEHAN:  Correct.  On that, we have
5   clearly indicated that we are agreeing --
6           THE COURT:  I understand.
7           MR. SHEEHAN:  --  that that not be
8   included.  So --
9           THE COURT:  The question is whether even
10  on an undisputed fact Ring requires that the jury
11  find a particular thing.  I don't think that's how
12  Ring should be read.  I think Ring says where a
13  determination is being made that is -- and it is one
14  that is required to be made by a jury, the jury has
15  to make it.  So the question is what happens with a
16  stipulation.
17          MR. SHEEHAN:  But I can also waive any
18  element.
19          THE COURT:  Well, that's --
20          MS. RODRIGUEZ-COSS:  We'd like to see
21  some authority on that, your Honor.
22          MR. SHEEHAN:  The United States Supreme
23  Court has ruled that you can waive an element.
24          THE COURT:  All right.  We're going to
25  have further -- just because we need to keep up your
```

4459

```
1   writing styles, and so, therefore, we will have to
2   definitely have more briefing on this.  I'm not
3   going to put the age 18 in now because we know it
4   will not be a disputed element.  Whether they have
5   to pass on it and therefore it goes in the final
6   instructions we'll hold open.  We're still missing
7   one juror.
8           MS. DAYTON:  Have we had contact with
9   that juror?
10          THE COURT:  Yes, he is stuck at exit 57.
11          MS. DAYTON:  Okay.
12          THE COURT:  He is an alternate.
13          MS. RODRIGUEZ-COSS:  Your Honor, just
14  the very last point with respect to the charge, if
15  we may.
16          On page 9, on the last full paragraph
17  there, the Court indicates that beginning in the
18  second sentence, "Instead, as jurors, you are called
19  upon to make a unique, individualized judgment about
20  the appropriateness in sentencing another human
21  being to death."  We would submit that they will be
22  called upon to determine whether they should
23  sentence the defendant to death, not any other human
24  being.
25          MR. SHEEHAN:  Do you know why they don't
```

4460

```
1   like that?  Because they don't like the suggestion
2   that Mr. Aquart is a human being.
3           THE COURT:  But what they're doing is
4   making the unique, individualized judgment about the
5   appropriateness in sentencing the defendant to death
6   or to life with no parole.  I think --
7           MR. SHEEHAN:  No, that's not what
8   they're doing.
9           THE COURT:  It's okay, that's what the
10  jury is doing.
11          MR. SHEEHAN:  Yes, but basically what
12  they're objecting to is the suggestion in the charge
13  that their responsibility is whether or not -- it is
14  that their responsibility is to make a unique,
15  individualized determination about the
16  appropriateness in sentencing another human being to
17  death.  I think that's an important --
18          THE COURT:  Your evidence in mitigation
19  is that Mr. Aquart is an individual whose life has
20  worth and all of that will be able to be argued.
21  I'm just going to put what their duty is here which
22  is with respect to this defendant, but I'm going to
23  put it in the alternative in that fashion.
24          And all our jurors are here.
25          MR. SHEEHAN:  In the alternative meaning
```

4461

```
1   what, may I ask, your Honor?
2           THE COURT:  Meaning it will now say you
3   are called upon to make a unique, individualized
4   judgment about the appropriateness in sentencing the
5   defendant to death or to life without parole.
6           All right, anything further before we
7   begin?  All right, please bring in the jury.
8           (Jury entered the courtroom.)
9           THE COURT:  All right, good morning,
10  ladies and gentlemen.  Please be seated.  Are you
11  all in the right order?  So we have 16, 15, 14 and
12  13 those last four?  Yes?
13          16 and 15, yes.  And you are 14?
14          THE CLERK:  He's 18.
15          THE COURT:  New 16, formerly 18.  16,
16  15, 14.  You are the new 14?
17          JUROR:  I was always 14.
18          THE COURT:  You were always 14 and you
19  are 13.
20          JUROR:  I was 15.  I'm the new 13.
21          We're all here, your Honor.
22          THE COURT:  No, I need to keep you in
23  order.  All right.  Okay.
24          JUROR:  9 swapped with 10.
25          THE COURT:  Yes, we swapped you out
```

4462

1  earlier, so 9 and 10 are as we had before.  Okay.  I
2  regret that those cars that decided to get into an
3  accident this morning did not respect our time
4  start, but here we are.  And we are now ready for
5  phase two.
6           Members of the jury you have unanimously
7  found the defendant, Azibo Aquart, guilty of six
8  capital counts.  Capital counts mean that the death
9  penalty is a possible punishment for each offense of
10 murder in aid of racketeering and drug-related
11 murder with respect to Tina Johnson, which was
12 Counts Two and Five; James Reid, which was
13 Counts Three and Six; and Basil Williams, which was
14 Counts Four and Seven.  And, therefore, we are now
15 beginning the penalty phase of this trial where you
16 must now consider the appropriate sentence as to
17 each of these counts.
18          As to Counts Two through Seven, you must
19 now consider whether imposition of a sentence of
20 death is justified or whether the defendant should
21 be sentenced to life imprisonment without
22 possibility of release as to Counts Two through
23 Seven.  And these decisions are left exclusively to
24 you, the jury.  Whether you determine that Azibo
25 Aquart should be sentenced to death or to life

4463

1  imprisonment without parole, the Court is required
2  to impose that sentence.  There is no parole in the
3  federal system, as I have told you earlier, and so a
4  life sentence means precisely that, the defendant
5  would spend the rest of his life in prison.
6           The penalty phase is, in effect, a second
7  trial, although now the sole issue for your
8  consideration, having found guilt, is punishment.
9  You should note, however, that in making all the
10 determinations that you are required to make, which
11 I will be outlining for you in this preliminary
12 instruction, that you make at this phase of the
13 trial, you may still consider any relevant evidence
14 that was presented in the first phase, in the guilt
15 phase, as well as information that is presented at
16 this phase, the penalty phase of the trial.
17          This term "information," as I've just
18 used it, is sometimes used to describe that which is
19 presented to you in these proceedings, although for
20 the purposes -- for your purposes the term
21 "evidence" and "information" have the same meaning.
22 The term "information" is used at the penalty phase
23 because some of the rules of evidence that were
24 applicable at the guilt phase don't apply to the
25 penalty phase.  But for your purposes, evidence and

4464

1  information mean the same thing.
2           Now, during the penalty phase that we are
3  now starting, there will be opening statements by
4  both sides.  You'll remember that statements by
5  counsel are not evidence, they aren't a substitute
6  for evidence, but they are a roadmap for you as to
7  option as to what they -- what their evidence, the
8  information, to be presented to you will be.  And
9  after the opening statements then witnesses will
10 testify and be cross-examined.
11          Following that, there will be
12 instructions from the Court which will, again, be
13 much fuller and detailed than the ones I'm giving
14 you now which are preliminary, introductory and
15 hopefully orienting you to the rather unique task
16 that you have at hand.
17          You will after the instructions again
18 hear the closing arguments of counsel.
19          What I am going to tell you is just
20 shorthand for my full and final instructions which
21 you will receive both orally and in writing after
22 you've heard all of the information to be presented
23 at this penalty phase.  Now, obviously it is
24 impossible for me to overstate the importance of the
25 decision before you or the careful and thorough

4465

1  consideration that you must give to this matter.  I
2  remind you that at the time you were selected as
3  jurors each of you assured me that if the case
4  required a capital punishment hearing, that is, this
5  penalty phase, that you would follow the law as I
6  instructed was applicable, and it is imperative that
7  you do that now.
8           Now, through this phase of the trial you
9  are going to hear the term "aggravating factors" and
10 "mitigating factors," and you will remember that
11 some of the questioning when you were questioned as
12 jurors related to those terms.  In general, these
13 factors relate in some way to the circumstances of
14 the crime or the personal traits, character or
15 background of the defendant, Azibo Aquart.
16          An aggravating factor is one that tends
17 to suggest a death penalty is -- a death sentence is
18 appropriate.  A mitigating factor is one that tends
19 to suggest that a life sentence is appropriate.  A
20 mitigating factor is any aspect of Azibo Aquart's
21 character or background or any circumstances of the
22 offense or any other relevant factor or circumstance
23 that might indicate that Azibo Aquart should be
24 sentenced to life in prison.  A mitigating factor is
25 not offered to justify or excuse the defendant's

4466

1  conduct of which he now stands convicted by your
2  verdict, and indeed need not have connection to the
3  offense.
4      Although Congress has left to juries
5  under the federal Death Penalty Act whether a
6  defendant in Azibo Aquart's situation should be
7  sentenced to death or life imprisonment, it has
8  specifically narrowed and channeled your discretion
9  by requiring certain findings to be made by you
10 before you can even consider the death penalty.
11     A sentence of death on a particular count
12 may be considered if, but only if, you have made the
13 following two preliminary findings:  First, you must
14 find unanimously and beyond a reasonable doubt that
15 Azibo Aquart's actions and his intent satisfied one
16 of the two mental states, we call these gateway
17 factors.  One, that the defendant, Azibo Aquart,
18 intentionally killed Tina Johnson, Counts Two and
19 Five; James Reid, Counts Three and Six; and Basil
20 Williams, Count Four and Seven; or, two, that the
21 defendant, Azibo Aquart, intentionally participated
22 in an act contemplating that the life of a person
23 would be taken or intending that lethal force would
24 be used in connection with a person, other than one
25 of the participants in the offense, and the victim

4467

1  died as a direct result of the act.
2      So you must make a finding on whether
3  either one of these mental states has been proved
4  beyond a reasonable doubt on each count before you
5  proceed further on that count.  If you find it has
6  not, then you go no further on that count.  If you
7  do find it's been proved, then you proceed to make
8  findings on specific aggravating factors as to that
9  count or those counts.
10     I instruct you that even if you find one
11 of the gateway required mental states has been
12 proved to exist, that gateway mental state is not
13 itself an aggravating factor and it must not be
14 weighed by you in deciding whether or not to impose
15 a sentence of death.  It is a threshold element.  It
16 is a gateway factor on which you are required to
17 make a finding before you can even get to the issue
18 of whether a death sentence should be considered.
19     Next, before you may consider the
20 imposition of a death sentence, you must find
21 unanimously and beyond a reasonable doubt that the
22 government has proved the existence of at least one
23 of five statutory aggravating factors that it
24 claims.
25     The government alleges five statutory

4468

1  aggravating factors with regard to each count:  One,
2  that Mr. Aquart committed the homicide offense in an
3  especially heinous, cruel or depraved manner in that
4  it involved torture or serious physical abuse;
5      Two, that Mr. Aquart procured the
6  commission of the homicide offense by payment or
7  promise of payment of anything of pecuniary value;
8      Three, that Mr. Aquart committed the
9  homicide offense as consideration for the receipt or
10 the expectation of the receipt of anything of
11 pecuniary value;
12     Four, that Mr. Aquart committed the
13 homicide offense after substantial planning and
14 premeditation to cause the death of another person;
15     And that, five, Mr. Aquart intentionally
16 killed or attempted to kill more than one person in
17 a single criminal episode.
18     You must be unanimous on any of those
19 aggravating factors that you find or that factor
20 can't be used in your deliberations.
21     So, if, after fair and impartial
22 consideration of all of the evidence and information
23 presented to you in the case, if any one of you
24 finds as to a particular count that no required
25 mental state has been proved beyond a reasonable

4469

1  doubt or that no statutory aggravating factor has
2  been proved beyond a reasonable doubt, then your
3  deliberations are over as to that count and the
4  Court will impose on the defendant, Azibo Aquart, a
5  sentence of life without parole for that count.
6      If you do unanimously find the existence
7  of at least one mental state and at least one
8  aggravating factor, then you'll proceed to the
9  balancing stage of the analysis which will require
10 your findings about non-statutory aggravating
11 factors and mitigating factors.
12     First, you will consider whether you
13 unanimously find that the government has proven
14 beyond a reasonable doubt the existence of either of
15 the following two non-statutory aggravating factors
16 that it alleges with respect to each count.  One,
17 the defendant committed criminal acts of violence
18 that posed a serious threat to the lives and safety
19 of persons other than the victims in this case, and
20 engaged in a continuing pattern of violent criminal
21 conduct; and two, as reflected by the victims'
22 personal characteristics as individual human beings
23 and the impact of the offenses on the victims and
24 their families, the defendant caused loss, injury
25 and harm to the victims and their families.

4470

Your finding that any non-statutory aggravating factor exists, and that's the two I just mentioned, must be unanimous and it must be beyond a reasonable doubt. The defendant does not have to disprove any factor or produce any evidence or prove that he should be allowed to live, it's the government that must persuade you beyond a reasonable doubt that the death penalty is the appropriate sentence in the case.

Please understand that the law permits you to consider only the specific statutory and non-statutory factors claimed by the government that I've identified for you. You are not free to consider other facts in aggravation that you may have heard or that you may have inferred exist.

Now, even though the defendant has no obligation to disprove any of those factors or produce any evidence, the defendant is permitted to introduce information of mitigating factors, and you must decide whether any one of you finds that Azibo Aquart has established the existence of any of the enumerated mitigating factors by a preponderance of the evidence.

The defendant is entitled to present the evidence in mitigation which consists of a broad

4471

range of information about Azibo Aquart's background, record, character and circumstances of the offense. The evidence in mitigation presented -- the mitigation factors must be considered by you when determining whether Azibo Aquart should or should not receive the death penalty and instead should be punished by spending the rest of his life prison. After your consideration of the evidence, however, the weight, if any, that you give to the mitigating factor that you find is your decision.

In addition, any one of you may individually and independently find the existence of a mitigating factor to have been factually established regardless of the number of other jurors who may agree, and such juror or jurors must consider that factor and give it whatever weight those jurors think it deserves.

Now, there are important distinctions that I do want to highlight for you with respect to proof of mitigating factors. Mr. Aquart has the burden of proving any mitigating factor, but his burden is different. The defendant is not required to prove beyond a reasonable doubt the existence of a mitigating factor. He need only establish its

4472

existence by a preponderance of the evidence. That is to say, you need only be convinced that it is more likely true than not true in order to find that a mitigating factor exists. And secondly, a unanimous finding is not required.

Finally, you are not limited in your consideration to the specific mitigating factors submitted to you. If, in addition to those specific circumstances claimed by the defendant there is anything about the circumstances of the offense, the defendant's background record, character or anything else relevant that you individually believe mitigates against imposition of the death penalty, you are free to consider that factor in the balance as well.

Now, the mitigating factors that Mr. Aquart asserts include the following -- in the final instructions I will give you the final listing, but for now it includes the following: If not sentenced to death Azibo Aquart will be imprisoned for the rest of his life without possibility of parole;

Lifetime imprisonment is a severe punishment;

Azibo Aquart's execution would cause

4473

others to suffer grief and loss;

Azibo Aquart grew up in a community characterized by violence and crime;

Before age 16 Azibo Aquart lived in 19 places, different places;

Azibo Aquart attended eight different schools in nine years;

Throughout his childhood, Azibo Aquart lacked adequate parental supervision;

Azibo Aquart was exposed to emotional and physical abuse by his mother;

Azibo Aquart's parents sold -- both sold illegal drugs;

Azibo Aquart's father, Richard Aquart, exposed Azibo Aquart and his brothers to violence, drug dealing and other criminal activity;

Richard Aquart stored illegal weapons in the home;

From the time Azibo Aquart was five, Richard Aquart was a fugitive who used aliases;

When Azibo Aquart was 11 his father was sent to prison for eight years and then deported to Jamaica;

Richard Aquart was a poor role model. Azibo Aquart's parents and others around him taught

4474

1  him to distrust the police and the judicial system
2  and to disregard the law;
3            Azibo Aquart grew up in an environment
4  where illegal drug use was accepted;
5        The Aquart children were picked on,
6  bullied because of their cultural differences;
7            When he was 12 Azibo Aquart's mother
8  drowned;
9        From the time of his mother's death,
10 Azibo Aquart had no meaningful adult supervision;
11       Following his mother's death, Azibo
12 Aquart's life was characterized by exposure to drug
13 dealing and to acts of violence;
14       When Azibo Aquart was 13 his brother,
15 Azizi Aquart, was shot three times and nearly died;
16       For several months after his brother was
17 shot Azibo Aquart was left with no supervision
18 whatsoever;
19            At age 17, Azizi Aquart was ill-equipped
20 to handle the responsibility of being the guardian
21 of a 13-year old;
22            Azibo Aquart's close relatives and
23 family friends failed to properly care for him after
24 his mother's death or his brother's shooting;
25       Although social service providers and

4475

1  juvenile court officials identified Azibo Aquart as
2  an at-risk child, no effective action was taken;
3            While incarcerated as a young adult,
4  Azibo Aquart obtained his GED;
5            At the Enfield Correctional Center Azibo
6  Aquart was a certified literacy tutor who helped
7  other inmates;
8            Azibo Aquart has encouraged people close
9  to him to pursue their education;
10       While growing up, Azibo Aquart was
11 exposed to many of the risk factors associated with
12 later violent criminal activity;
13       If Azibo Aquart is sentenced to life
14 imprisonment the Bureau of Prisons has the
15 capability of safely and securely confining him;
16        And lastly, the last mitigating factor,
17 Azibo Aquart's life has value.
18       That should familiarize you with a
19 preliminary list of mitigating factors that the
20 defendant claims.
21       After determining which mitigating
22 factors exist, the next step is for each of you to
23 individually engage in a balancing process in which
24 you will weigh the aggravating factor or factors
25 that all 12 jurors have unanimously and beyond a

4476

1  reasonable doubt found to exist against any
2  mitigating factor or factors that you individually
3  or with other jurors have found to exist by a
4  preponderance of the evidence.  The jury must
5  consider whether it is unanimously persuaded that
6  the aggravating factor or factors you found proved
7  sufficiently outweigh the mitigating factor or
8  factors found to exist to justify a sentence of
9  death, or in the absence of any mitigating factors,
10 whether the aggravating factor or factors alone are
11 sufficient to justify a sentence of death.
12       Please note, as I have told you before,
13 that even a finding that the aggravating factors
14 sufficiently outweigh the mitigating factors does
15 not require that you impose a sentence of death
16 because there is never any legal requirement that
17 the death sentence be imposed by the jury.
18       In carrying out this weighing and
19 balancing process, you, as members of this jury, are
20 not mere fact finders.  Instead, as jurors you are
21 called upon to make a unique individualized judgment
22 about the appropriateness in sentencing the
23 defendant to death or to life without parole.  And
24 this is not a mechanical process.  The decision is
25 not determined by raw numbers.  Members of a death

4477

1  penalty jury do not simply count factors.  Instead,
2  individual jurors consider such factors
3  qualitatively assessing the weight and value of each
4  factor.
5            Whether or not the circumstances of this
6  case, as I've told you before, justify a sentence of
7  death or a sentence of life without release is a
8  decision that the law leaves entirely to you.
9  Please do not take anything that I say or do during
10 this phase of the trial as indicating any -- being
11 any evidence of what I think your verdict should be.
12 That is exclusively left to you.
13       As we begin this process there are two
14 final points I want to emphasize or reemphasize.
15 The first is that you are never required to return a
16 verdict of death.  The law provides you with
17 guidance in making a decision, but your decision on
18 this question of life or death is a uniquely
19 individual judgment which the law in the final
20 analysis leaves up to each of you.
21       And the second thing is that in order to
22 impose a sentence of death, all 12 jurors must agree
23 that death is the appropriate sentence.  If at the
24 conclusion of the deliberations any one juror on any
25 one count concludes that life imprisonment without

4478

```
1    possibility of release is the appropriate sentence,
2    that is the sentence that the Court must impose on
3    that count.
4         Now, I'm going to review and elaborate on
5    all of these points for you after you've heard all
6    of the information to be presented at this phase and
7    before you begin your deliberations.  Again, you
8    will have that in writing to be able to refer to it
9    during your deliberations.  You will also have a
10   special verdict form which will assist and guide you
11   in the order and analysis that you are to proceed,
12   and my final and definitive instructions you will
13   also have with you during its delivery to you and
14   for your reference during your deliberations.
15        The order that you not discuss this case
16   with anyone or any of the evidence in this case and
17   that you do no independent research related in any
18   way to this case remains in full force and effect.
19        Thank you for your attention.  I hope
20   this preliminary set of instructions will orient you
21   as you begin to hear the information presented to
22   you.  And we will now move to the opening statements
23   by counsel.
24        MR. SHEEHAN:  Just before we do that,
25   could we approach briefly your Honor?
```

4479

```
1         THE COURT:  Certainly.
2         (Sidebar conference)
3         MR. SHEEHAN:  I apologize, your Honor.
4    What I missed was when your Honor read 9, that
5    wasn't really what we were saying.  Because when we
6    had No. 9 as our special factor we were saying that
7    he was exposed to the emotional and physical abuse
8    of his mother and it got turned into "by his
9    mother," which was not what we were claiming.
10        THE COURT:  All right.
11        MS. DAYTON:  You mean the father abused
12   her, is that the allegation?
13        MR. SHEEHAN:  The men in her life.
14        MS. DAYTON:  The men in her life.  Okay.
15        THE COURT:  All right.  I'll make that
16   correction.  Anything else?
17        MR. SHEEHAN:  No.
18        MS. DAYTON:  Do you want to break before
19   arguments start?
20        MR. SHEEHAN:  I'd love to use the
21   bathroom for five minutes.
22        THE COURT:  We would not want to
23   encroach on your opening.  Are you going to open?
24        MS. DAYTON:  No, Ms. Rodriguez-Coss is.
25   Thank you, your Honor.
```

4480

```
1         (Sidebar concluded)
2         THE COURT:  All right, I'm going to
3    correct one of the factors.  Azibo Aquart was
4    exposed to emotional -- the emotional and physical
5    abuse of his mother.
6         We are going to take a five-minute recess
7    and then you will hear the opening statements and we
8    will move immediately into the information to be
9    presented to you.  Again, leave your notebooks in
10   the courtroom, don't discuss the case, all the
11   orders from the guilt phase.
12        We stand in recess.
13        (Recess)
14        THE COURT:  All right.  We'll bring back
15   in the jury.
16        Please be seated.  Ms. Rodriguez-Coss, I
17   understand, will be opening.
18        So as a point of personal preference, I
19   know I have been calling you Ms. Rodriguez
20   throughout the trial.  Do you use both names?  We'll
21   change.
22        (Jury entered the courtroom.)
23        THE COURT:  All right.  Please be
24   seated, ladies and gentlemen.  Opening for
25   government is Ms. Rodriguez-Coss.
```

4481

```
1         MS. RODRIGUEZ-COSS:  Ladies and
2    gentlemen, August 24, 2005, began like any other
3    day.  Lativia Whittingham and her sister Erica,
4    early that morning they set out for 215 Charles
5    Street with their children to see their mother, Tina
6    Johnson, who had promised to bring her grandchildren
7    to the zoo.  But on the way over there they learned
8    something terrible had happened at 215 Charles
9    Street, so they dropped the children off at an
10   aunt's house and headed for the building.
11        When they got there they found the
12   building surrounded by yellow tape and the police
13   would not let them inside to see their mother.  They
14   had already seen what Leroy discovered earlier that
15   morning, that their mother, Tina Johnson, had been
16   brutally murdered.  Lativia and her sister, Erica,
17   would never see their mother alive again.  Instead
18   of a trip to the zoo, Lativia, Erica, their older
19   brother Jamar and Leroy found themselves planning a
20   funeral.
21        The girls wanted to bury their mother in
22   a white suit, but the funeral director told them
23   that because of their mother's injuries it would be
24   very difficult to get her in a suit.  So they
25   selected instead a wraparound African outfit, one of
```

4482

the colorful outfits Tina loved to wear. Lativia
and Jamar brought the clothes down to the funeral
home and Lativia insisted on placing the headdress
on her mother herself. Once she did, she was told
by the funeral director she could not touch her
mother again. She could not touch her mother again
because Tina Johnson had no firm bone structure in
her face.

The evidence will show that because of
the manner in which the defendant chose to kill Tina
Johnson, her children were denied the opportunity to
give their mother a final hug or a kiss good-bye.

The evidence will also show that the
family of James Reid had been calling him all
weekend before August 24, 2005. His brother George
was visiting from Ohio, and George and James had not
seen each other in a while, but James did not come
home that weekend. So, instead, on August 24, 2005,
George headed for Charles Street. And he, too,
found the building surrounded by yellow tape. And
he also was not let inside. George would never see
his brother James alive again. Tippy, as his mother
Mary called him since he was little, because he
would walk on his tippy-toes, had also been brutally
murdered. His murder has left his mother, Mary,

4483

with a broken heart. His father, James, passed away
two years ago, still waiting for those responsible
for his son's murder to be brought to justice. Mary
will testify before you during this part of the case
and she will tell you what it's like to live every
day knowing that her son James will never be home
again.

And the evidence will also show that the
family of Basil Williams checked in on him often.
His brother, John David, would call him every week
and Basil would sometimes go and watch John David
practice cricket. And his sister, Pamela, would
sometimes bring him dinner or bring him groceries
down to Charles Street. The evidence would show
that Basil used to live in Stamford with his wife,
Georgia, and several years ago they had decided to
cell their house and move down south where they
wanted to spend the rest of their lives together.
But Georgia got sick and she passed away
unexpectedly and Basil never recovered from her
loss. He didn't have much after her death and
eventually he moved to Charles Street. John David
and Pamela talked to their brother the week before
August 24, 2005. After that day neither one of them
would see their brother, Basil, alive again.

4484

Ladies and gentlemen, we talked a lot
about the death penalty with each of you
individually at the beginning of this case. And
then we asked you to set all of those thoughts aside
because the first part of this case had nothing to
do with punishment, it had to do with whether or not
the defendant committed the murders charged in the
indictment. But now all of those things we talked
about come back into play. Now we are where the
government told you we may be at some point in this
case. Now you have found the defendant guilty
beyond a reasonable doubt of intentional
premeditated murder. No self-defense, no insanity,
knew exactly what he was doing, thought about it and
did it anyway. The evidence has demonstrated that
the defendant killed three unarmed, defenseless
people. So now it is about life or death. And in
this part of the case we will ask you to focus not
just on the defendant's criminal conduct, but to
focus on the three human beings whose lives he so
brutally ended on August 24, 2005.

The law actually provides a reasoning
process for you to arrive at your sentencing
decision. In this part of the case we'll ask you to
consider again all of the evidence you've already

4485

heard. We will not present that evidence to you
again. You will rely on your memory and your notes
as to what witnesses have said. In the first part
of the case you considered that evidence to decide
whether or not the defendant was guilty of the
crimes that he was charged with. Now that you have
found him guilty, in this part of the case you will
consider the evidence this time in support of the
intent threshold factors and the aggravating
factors, factors which you must find before you can
consider the death penalty in this case.

You will first consider whether the
defendant acted with the appropriate intent in
committing the murders. The government submits that
the defendant intentionally killed Tina Johnson. We
will ask you to recall the testimony of John Taylor
who testified that the defendant himself, after
tying Tina Johnson's hands and wrists and gagging
her with duct tape, beat her repeatedly as she lay
defenseless on the floor of her own bedroom. That
evidence, the government submits, establishes the
first intent factor with regards to the murder of
Tina Johnson, that is, that the defendant
intentionally killed the victim.

We submit that the defendant also

1  intentionally killed Basil Williams.  The evidence
2  establishes that Basil Williams and Tina Johnson
3  were killed in the same manner.  Both bodies were
4  covered.  In addition, you'll recall that the blood
5  of Basil Williams was found on the lock on the
6  inside door of apartment 101.  Now, clearly, Basil
7  did not leave his own blood on that look.  It was
8  transferred there by someone from where he was
9  laying dead.  And you have heard evidence that
10  indicates that it was the defendant himself who
11  sealed that apartment door.  So the government
12  submits that the first intent factor also applies to
13  the murder of Basil Williams.  That the defendant
14  intentionally killed the victim.
15         Now, you've also heard evidence that the
16  defendant aided and abetted the murder of James
17  Reid.  We will ask you to consider again the
18  evidence submitted in support of that murder in the
19  guilt part of the case.  That evidence established
20  that the defendant himself kicked down the door of
21  apartment 101; that he pointed a gun at Basil
22  Williams and pushed him, forced him back into his
23  bedroom and down on the floor; that he then turned
24  that weapon to James and Tina Johnson and pushed
25  them back into their bedroom and down on the floor.

1  And the evidence showed that he acted in concert
2  with Efrain Johnson and his brother, Azikiwe Aquart,
3  in tying the victims inside their own bedroom, and
4  that Azikiwe Aquart killed James Reid in the same
5  manner and at the same time as the defendant killed
6  Tina Johnson.  Therefore, we submit that the second
7  intent factor read to you by the Court this morning
8  applies to the defendant for the murder of James
9  Reid.  He intentionally participated in an act, a
10  home invasion, robbery, contemplating that the life
11  of a person would be taken or intending that lethal
12  force would be used against the person, and the
13  victim, James Reid, died as a direct result of that
14  act.  Those are the threshold intent factors you
15  will be asked to consider.
16         Next, you would consider statutory
17  aggravating factors.  As the Court stated this
18  morning, factors which the law recognize aggravate
19  the crime.  You must find at least one statutory
20  aggravating factor in order for the defendant to
21  become eligible for the death penalty.  We will
22  prove five.
23         First, that he committed the crimes, that
24  he committed the murders of Tina Johnson, James Reid
25  and Basil Williams for pecuniary gain.  That is,

1  that he committed the murders in the expectation of
2  receiving something of value.  Now, the gain doesn't
3  need to be immediate.  And, in fact the government
4  doesn't have to prove that the defendant gained
5  anything at all.  What we must prove is that when he
6  committed the murders of Tina Johnson, James Reid
7  and Basil Williams, he did so expecting to receive
8  something of value.  And the government submits that
9  when the defendant killed Tina Johnson, James Reid
10  and Basil Williams, he expected his drug proceeds to
11  increase.  The evidence established that Tina
12  Johnson was cutting into the profits of his drug
13  trafficking operation, and in killing Tina Johnson,
14  James Reid and Basil Williams, the defendant
15  expected that those proceeds would increase again.
16  Therefore, he committed the murders for pecuniary
17  gain.
18         Second, that he committed the murders
19  after substantial planning and premeditation.  The
20  evidence in this case establishes that the defendant
21  made a conscious decision to solve the Tina problem
22  by killing Tina Johnson and her associates.  And the
23  evidence also establishes that he planned those
24  murders carefully.  First, he recruited his crew.
25  Big Man, John Taylor, in case Tina Johnson's son

1  showed up and to act as a lookout during the
2  murders.  Efrain Johnson to help him tie the victims
3  because there were three of them.  And Azikiwe
4  Aquart, his brother, to help him kill the victims.
5  He made sure that they would not be recognized by
6  ensuring that they wore dark clothing and masks.
7  Next, the defendant made sure he brought along
8  everything he needed to carry out his deadly plan, a
9  gun to subdue the victims, duct tape to tie them up,
10  and two bats to kill them with.  He even thought
11  about erasing any trace of his presence at the crime
12  scene by wearing latex gloves.  That part of the
13  plan did not work.  And the defendant also brought
14  along a drill to seal the door, to delay detection,
15  delay long enough to get rid of the bats, get rid of
16  the clothes and get rid of the drill.  That
17  evidence, the government submits, establishes
18  substantial planning and premeditation to killing
19  Tina Johnson, James Reid and Basil Williams.
20         Third, that he procured the commission of
21  the offense by payment, that is, that he offered
22  something of value to someone else in exchange for
23  their assistance in the murders.  We will again ask
24  you to recall the testimony of John Taylor, who told
25  you that the defendant asked for his help.  The

4490

1  defendant told John Taylor he had a problem in his
2  building and he needed to move some people out, and
3  he promised John Taylor a spot in his drug
4  enterprise, a spot at 215 Charles Street where he
5  could cell drugs and make money.
6          Now, when considering this particular
7  statutory aggravating factor, we'll ask you to
8  concentrate on the intent and mental state of the
9  defendant.  It is of no consequence that John Taylor
10  was not fully aware of the full extent of the
11  defendant's deadly plan.  What is relevant is that
12  when the defendant offered something of value to
13  John Taylor in exchange for his assistance, he
14  intended to kill Tina Johnson, James Reid and Basil
15  Williams.
16          Fourth, that the defendant committed the
17  murders in an especially heinous, cruel and depraved
18  manner in that they involved torture or physical
19  abuse to the victims.  The testimony established
20  that the hands and wrists of each of the three
21  victims in this case were wrapped with duct tape so
22  strongly, so tightly that the detectives had trouble
23  getting the scissors underneath to cut them off.
24  Karen O'Donnell, the first EMT to respond to the
25  crime scene has described it as very angry.  The

4491

1  government submits that constitutes torture.
2          Each of the victims was physically
3  beaten.  Tina Johnson had a bruised eye, she had
4  bruises in her mouth, one of her wrists was broken.
5  James Reid had bruises on his arms, one of his
6  elbows was broken.  Basil Williams had a bruised
7  eye, bruises on his arms.  The government submits
8  that is evidence of physical abuse beyond that which
9  was necessary to cause death.  Tina Johnson was
10  gagged with duct tape, part of her head wrapped with
11  duct tape, but her eyes were left uncovered.  She
12  was made to watch the demise of her boyfriend, James
13  Reid.  That, the government submits, is torture.
14  James Reid and Basil Williams had their entire face
15  wrapped in duct tape.  That, in and of itself, the
16  government submits, is torture.  But significantly
17  enough, each of them was left a small opening for
18  them to breathe.  Indicating that both victims were
19  kept alive for an indefinite period of time before
20  they were killed.  That, the government submits, is
21  torture.
22          And in support of this statutory
23  aggravating factor we will also ask you to recall
24  the testimony of John Taylor.  Specifically when he
25  was describing how the defendant killed Tina

4492

1  Johnson.  You will recall that John Taylor when he
2  saw the defendant swinging a bat at Tina Johnson
3  said, "Yo, what are you doing?"  And the defendant
4  answered, "Come, get you some," clearly indicating
5  that he was reveling in the crime that he was
6  committing.  That, the government submits, is
7  evidence of depravity.
8          And finally, we will ask you to consider
9  the fact that the defendant intended to kill, and
10  killed, more than one person in a single criminal
11  episode.  Now, the evidence in this case clearly
12  establishes that three victims were killed on
13  August 24, 2005, during the course of a single
14  criminal episode.  So we will just ask you to bear
15  in mind that in order for you to find this
16  particular statutory aggravating factor, you need
17  not find that the defendant killed each victim
18  himself.  What you must find is that the defendant
19  intended each of the three victims be killed.  We
20  submit the evidence establishes that the defendant
21  indeed had that intent.  Now, those are statutory
22  aggravating factors.
23          We've also provided notice of two
24  non-statutory aggravating factors.  Those are
25  factors that the government proposes or submits

4493

1  aggravate the offense.
2          First, that the defendant participated in
3  other acts of violence.  Indeed, we submit that the
4  evidence will show that the defendant participated
5  in a pattern of violent conduct, a pattern of
6  violent conduct that began with the assault of
7  Jackie Bryant in November of 2004.  We will ask you
8  to recall the testimony of Ms. Bryant who testified
9  before you and said that the defendant struck her
10  repeatedly in the face until she passed out, and
11  that when she came to she realized a ceramic ashtray
12  had also been broken on her knee.
13          A pattern of violent conduct that
14  continued with the assault of Frank Hodges in
15  January of 2005.  Mr. Hodges also testified before
16  you and we'll ask you to recall his testimony, how
17  the defendant violently assaulted him to the point
18  that he had to seek medical attention.  His medical
19  records are in evidence in this case and they
20  indicate that Mr. Hodges suffered a broken nose and
21  bruised ribs at the hands of the defendant.
22          That pattern of violent conduct continued
23  with the assault on Venro Fleming.  You will recall
24  Mr. Fleming who indicated he went back to apartment
25  211 at Charles Street to visit Pops and that he had

4494

a violent encounter with the defendant who he
perceived as having pushed him, but when his friend
saw Mr. Fleming's face he realized he was seriously
injured. And Mr. Fleming also sought medical
attention and his records are also in evidence in
this case, and they indicate that Mr. Fleming also
suffered a facial fracture at the hands of the
defendant.

A pattern of violent conduct that
continued with the assault of Juanita Hopkins and
her brother, John Sullivan, and we'll ask you to
recall the testimony of Ms. Hopkins who testified
that the defendant assaulted her with a firearm, as
well as her brother, striking him on the side of the
head and causing injuries to his ears. We will
submit the records, the medical records of Mr. John
Sullivan that reflect the injuries that he also
suffered at the hands of the defendant. And that
pattern continued after the defendant's arrest.

We will call Anthony Armstead to the
stand, an inmate who was violently assaulted by the
defendant while in prison, and you will have an
opportunity to review photographs of Mr. Armstead's
injuries, injuries he also suffered at the hands of
the defendant. And we will submit that the

4495

defendant's participation in this pattern of violent
conduct weighs in favor of the imposition of the
death penalty in this case.

And a second non-statutory aggravating
factor that we will submit for your consideration is
victim impact. We will submit evidence as to the
impact that the murders have had on the families of
the victims. Tina Johnson had four children, Jamal,
Lativia, Erica and Leroy. You will hear from
Lativia and Erica during this part of the case and
they'll tell you their mother loved them
unconditionally. They will tell you their mother
had a drug problem for as long as they can remember,
but they would also tell you that Tina Johnson and
their father, Leroy Whittingham, her husband of
27 years, provided for them economically and
emotionally. They'll tell you no matter what they
did Tina Johnson was there to support them and to
help them. Tina Johnson had four grandchildren when
she was killed. Three have been born since her
death. Dantaycha the oldest, was six years old when
her grandmother passed and she doesn't remember much
about her grandmother anymore. Lativia will tell
you that she fears the day will come when Dantaycha
won't remember her grandmother at all.

4496

You'll also hear from Mary Reid, James'
mother, and her son Jason. And they will tell you
that James Reid graduated high school, worked at a
computer company, was a loving son and a dedicated
brother. Jason will take the stand before you and
tell you how James helped to raise him and always
looked after him. Mary and Jason will tell you how
much their family has suffered because of James'
murder.

The evidence will also show that Basil
Williams was one of five siblings that moved here
from Barbados in the 1970s, like every other
immigrant, looking for a better life. Basil worked
painting houses. He had nothing to do with the sale
of drugs at 215 Charles Street. In fact, over the
last months of his life some thought he had the
onset of dementia because he would often talk to
himself as if his wife Georgia was still sitting
there next to him. Basil's family will tell you
that every week they would tell his mom that he's
okay and he's doing well because she has Alzheimer's
and, although she attended her son's funeral and
endured that pain, she no longer remembers that he's
dead. But Pam and John David remember that their
brother is dead and they will tell you how much they

4497

have suffered and continue to suffer as a result of
Basil's brutal murder.

THE COURT: That's 20 minutes, Ms.
Rodriguez-Coss.

MS. RODRIGUEZ-COSS: May we have
60 seconds, your Honor, to wrap it up?

THE COURT: Yes.

MS. RODRIGUEZ-COSS: Thank you.

So, what is the appropriate punishment
for a murderer who killed for greed, for money, and
not a lot of money because the evidence establishes
that Tina Johnson was not selling a large amount of
drugs? What is the appropriate punishment for
someone who killed three people, planned to kill,
and killed them in an especially heinous, cruel and
depraved manner? The government submits that the
appropriate punishment is death.

And ladies and gentlemen of the jury, we
know that the decision that you have been chosen to
make is not an easy decision. The government is
confident that each of you is equipped based on your
life experiences to know what is just and what is
right. At the beginning of this case each of you
assured the Court that if in a penalty phase the
evidence justified the imposition of a death

4498

```
 1  sentence you could sentence the defendant to death.
 2  At the end of this case the government will come
 3  back before you and we will ask you to sentence
 4  Azibo Aquart to death because the evidence you will
 5  consider in this part of the case will justify the
 6  death penalty and because death is the only
 7  punishment that will do justice in this case.
 8          Thank you.  Thank you, your Honor.
 9          THE COURT:  All right, and for the
10  defendant, Mr. Sheehan.
11          MR. SHEEHAN:  Thank you, your Honor.
12          THE COURT:  You may have three extra
13  minutes.
14          MR. SHEEHAN:  Thank you, your Honor.
15          When this process of jury selection
16  started several months ago, I think it was, for some
17  people, all of you were told that the charges, they
18  were told this by the Court, that the charges in
19  this case involve the murders of three people, all
20  of whom were bludgeoned to death in the context of a
21  dispute over drug territory.  All of you were deemed
22  suitable for service as jurors in this case.  And
23  all of you, we know, have made great sacrifices of
24  your time and your emotions to serve on this case.
25          On behalf of Mr. Aquart and Mr. Smith,
```

4499

```
 1  and certainly myself, I again thank you for your
 2  work to date.  In our system juries decide cases.
 3  That is the way it should be, and we respect your
 4  decision.  Your work, however, is not done.  When
 5  you were selected as jurors you also, each and every
 6  one of you, agreed that you could keep an open mind
 7  to the question of punishment if you found Azibo
 8  guilty of these crimes.  And each and every one of
 9  you agreed that if you found him guilty you could
10  thereafter listen with an open mind to both the
11  evidence that might be offered in aggravation and
12  also to the evidence that we put before you as to
13  why a sentence of life without release is
14  appropriate here.
15          Because you agreed that you could and you
16  would do this, you were selected in this case to
17  carry out this most serious responsibility.  Rest
18  assured the mitigation evidence is not offered to
19  excuse the crimes that you have convicted Azibo of.
20  He will certainly be punished.  And the choice that
21  the law confides in each and every one of you is
22  whether he should be executed in prison or die in
23  prison after a life spent in confinement.
24          We've heard from many of the witnesses
25  who testified in previous -- in the guilt phase of
```

4500

```
 1  this trial that the conditions of life in prison are
 2  harsh.  In this phase of the case you will hear
 3  evidence from a seasoned professional correctional
 4  officer of the federal Bureau of Prisons, Mark Bezy,
 5  about why and how the controls that are available to
 6  the Bureau of Prisons, how the Bureau of Prisons
 7  will be able to safely and securely house Azibo if
 8  he is sentenced to life in prison.
 9          You are going to also hear the story of
10  Azibo's life from the people who knew him and from
11  his family, and that they knew him from his earliest
12  days.  This evidence will come in bits and pieces
13  as many people have parts of the story to
14  communicate, and sometimes their accounts are going
15  to overlap and sometimes their perspectives may
16  vary.  We ask your patience in this regard.
17          You will learn about his mother, Sonia
18  Smith, known to many as Sister Judah, who came from
19  Jamaica and overcame many obstacles and worked hard
20  all of her short life to provide a better life for
21  herself and her children.  You'll learn about her
22  dreams and her aspirations from her friend, Desta
23  Meghoo, who is here from Ethiopia and who watched
24  and dreamed with Sonia about her plans.
25          You will hear from Sonia's friend, Ife
```

4501

```
 1  Felix, and others about the circumstances of Sonia's
 2  tragic death by drowning when Azibo was only
 3  12 years old.  You will also hear from friends and
 4  family members as to how this tragic circumstance
 5  set Azibo and his two older brothers, Azizi and
 6  Azikiwe, adrift in the world.  You'll learn about
 7  the culture that Azibo and his family grew up with,
 8  which is different from the culture most of us are
 9  familiar with.
10          And you'll learn about Azibo's father,
11  Richard Aquart, a charismatic person in many
12  respects, a person who in some people inspired love,
13  but in all respects a dreadful role model for Azibo
14  and his brothers.  You see, Richard's business was
15  as a drug dealer and throughout most of their young
16  lives Richard was living under assumed names and was
17  one step ahead of the law.  The year before Sonia
18  drowned, Richard was finally apprehended and
19  imprisoned and ultimately deported after his
20  sentence was completed.  Although he and Sonia had
21  split up when Azibo was young, his influence and his
22  presence marked his sons and handicapped them in
23  many ways.
24          Sonia, while not perfect by any means,
25  was trying to get out from that life of crime and
```

4502

1  trying to protect her children both from their
2  father's influence and from the pull of the streets
3  that surrounded them.  But she was tragically taken
4  from them.
5        You'll hear from Carole Porter, a friend
6  of Sonia who was present at Azibo's birth and who
7  will provide you with insights into what his family
8  was like and how Sonia's death shattered Azibo's
9  prospects for the future.  You'll hear from Lillian
10  Reid, also a friend of Sonia, who will testify about
11  Azibo's early years in Bridgeport and how he and his
12  brothers were often left uncared for and
13  particularly about the impact of what happened when
14  Sonia was taken from them.
15        You'll hear from Mike Adams, a friend of
16  Richard Aquart, who knew the family well and who can
17  also tell you about the darker side of Richard's
18  personality and the impact that this had on his
19  children.  These facts will be further substantiated
20  by the testimony of Chris Samuels who saw firsthand
21  how Richard and his sons were living and working in
22  Bridgeport.  You'll hear from Gillian Walcott who
23  lived with Richard and the older boys in Hartford.
24  And she'll tell you how this experience impacted not
25  only on the older boys, but also on Azibo's life.

4503

1  You'll hear from Azizi Aquart, who will testify
2  about growing up, being in and out of trouble, and
3  how ironically being shot at the age of 17 was
4  probably what saved his life.  He will also tell you
5  about his efforts to keep things together after his
6  mother died, and how and why he was unable to
7  provide essential adult guidance for Azibo.
8        You'll hear about Sonia's estrangement of
9  her own family in part because of the embrace of
10  Rastafarian faith and in part because of her
11  family's disapproval of her relationship with
12  Richard and other factors, and how this estrangement
13  left the boys so exposed when she died.
14        You'll hear about the chaotic period in
15  the boys' life when they moved from place to place
16  looking for help, but because of their background,
17  deeply suspicious of any efforts to really assist
18  them.  You'll hear from Sharon Headley, who briefly
19  took in Azibo after his mom's death and about her
20  dealings with the Department of Family Services and
21  how, although Azibo's needs were recognized at that
22  time, they were not really addressed.
23        You'll hear from Loretta Jay, a DCF
24  worker at the time, about how dreadful the impact of
25  this, the loss, was on the three boys.  You'll learn

4504

1  from juvenile probation officer Jonathan Davis and
2  Diane Hart D'Amato about Azizi and Azibo's
3  interactions with the juvenile justice system and
4  how strong the pull of the streets could be when
5  children, children have no adult anchors to secure
6  them.
7        You'll hear from James Shannon, a school
8  psychologist who provided counseling services to
9  Azibo and Azizi when Azibo was in the 8th grade in
10  Bridgeport, and about Azibo's needs for a consistent
11  adult presence in his life at such a critical age.
12  You'll hear from Nasheika Bennett Aquart, Azibo's
13  sister-in-law about how she and Azizi, then
14  teenagers, with a new baby of their own, tried to
15  build a home for all of the brothers and in their
16  youth and inexperience failed to provide the
17  structure and guidance that Azibo needed.  You'll
18  learn from Mary McCoy, Azibo's teacher at Enfield
19  Correctional Center how Azibo earned his GED in
20  prison and how he became a literacy tutor for other
21  inmates.  You'll learn from Dr. Marva Lewis, a
22  sociocultural psychologist about risk factors and
23  the importance of protective factors and how this
24  impacts on the likelihood that children will turn to
25  violence.  We'll ask you to put this theoretical

4505

1  knowledge together with the story of Azibo's life as
2  a framework for understanding what brings him before
3  you today.
4        One thing that you may have come to more
5  fully appreciate already in this case is that people
6  have different facets to them.  Yes, you have found
7  Azibo guilty of these terrible crimes, but other
8  people who have known him and his circumstances will
9  testify as to his promise and his human
10  characteristics that they value in him to this day.
11  They won't be asking you to excuse Azibo because
12  they know you have found him guilty of these crimes.
13  What they will provide for you is insight into his
14  life and understanding of his circumstances.
15        After you have heard all of these
16  witnesses, we will ask you to impose a sentence of
17  life without release.  We respect the seriousness of
18  the task that you have agreed to assume.  Our system
19  requires people just like yourselves who have agreed
20  to and are willing to listen to and meaningfully
21  consider all of the evidence that the law requires.
22  At the end of the case each of you will individually
23  be asked to make your own judgment about which of
24  these two punishments should be imposed here.  We
25  thank you in advance for agreeing to undertake this

4506

1  responsibility and to consider all of this evidence
2  with an open mind.
3           Thank you.
4           THE COURT:  All right, thank you.  We
5  are now to begin the presentation of information in
6  this case.  Will te government call its first
7  witness.
8           MS. DAYTON:  Yes, your Honor, the
9  government calls Tom Martin.
10          THE COURT:  All right, Mr. Martin.
11          THE WITNESS:  Yes, ma'am.
12          THE COURT:  Please come to the witness
13 stand, remain standing, raise your right hand and
14 the oath will be administered to you.
15          T H O M A S   M A R T I N
16 Having first affirmed, was examined and testified as
17 follows:
18          THE WITNESS:  Good morning.  My name is
19 Thomas L. Martin, M-a-r-t-i-n, Red Hook, New York.
20          THE COURT:  All right, you may proceed.
21          MS. DAYTON:  Thank you, your Honor.
22 Before we start, for the purposes of Mr. Martin's
23 testimony, we've made some jury aids to -- that
24 match an exhibit book.  We'd ask to pass these out
25 at this time so we don't have to interrupt the

4507

1  testimony.  It's going to be Government's Exhibit 1A
2  through P and the defense has no objection to its
3  admission in its entirety.
4           THE COURT:  All right, so you've
5  reviewed that then, Mr. Sheehan?
6           MS. DAYTON:  It's Mr. Smith, your Honor.
7  There is also going to be a PowerPoint which will be
8  Government's Exhibit 19 which I believe the defense
9  has no objection to as well.
10          MR. SMITH:  No objection, your Honor.
11          THE COURT:  All right then, they are
12 admitted and you may proceed.
13          MS. DAYTON:  Thank you, your Honor.
14 DIRECT EXAMINATION
15 BY MS. DAYTON:
16    Q.   Good morning.
17    A.   Good morning, ma'am.
18    Q.   What do you do for a living?
19    A.   I am a forensic consultant.
20    Q.   And how long have you been a forensic
21 consultant?
22    A.   I started my company in 2006, so about five
23 years now privately.
24    Q.   And what exactly is a forensic consultant?
25    A.   I have a company where I consult on cases

4508

1  involving crime scene reconstruction or
2  forensic-related matters, and I also offer training
3  in the field of forensics, crime scene
4  reconstruction and death scene investigations.
5    Q.   What did you do before becoming a forensic
6  consultant?
7    A.   I was a sworn New York state trooper for
8  22 years.  I began my service in 1988, in the fall,
9  and I just retired this past October.  For 20 of my
10 22 years I was assigned to the forensic
11 identification unit.  We have ten of those
12 throughout New York State, and I retired as a
13 supervisor of the forensic unit.  It goes from --
14 the area I covered was from the New York City line
15 up to an area a little bit south of the city of
16 Albany and on the eastern side of the Hudson River.
17          And the unit I worked in for 20 years and
18 supervised upon my retirement was basically a
19 full-time, full service crime scene response unit.
20 We handled everything from basic crime scene
21 documentation through things like note-taking,
22 photographs, measurements, that type of thing, and
23 handled aspects of evidence collection, and we would
24 reconstruct crime scenes.  From the time I was
25 assigned there, about my first two years I was

4509

1  actually on a part-time basis, I was still a road
2  trooper, but I worked with the unit part-time.  I
3  moved there full-time in 1992.
4           So, from my last 18 years assigned to
5  that unit I did nothing -- I had no other
6  responsibilities other than crime scene processing.
7  We were on call 24 hours a day, seven days a week.
8  We responded to crime scenes that were reported to
9  us by other troopers or by any agency that would
10 request our assistance.  And I did nothing but crime
11 scene investigations and evidence interpretations
12 during that time.
13    Q.   Can you please describe your education and
14 training in forensics.
15    A.   Sure.  I have a Bachelor of Science degree
16 in criminal justice, and I suppose my forensic
17 training started with the first six months I did at
18 the New York State Police Academy in Albany.  From
19 there I received more than a thousand hours of
20 instruction in many related fields including, but
21 not limited to, criminal investigations, crime scene
22 investigations, and evidence collection procedures.
23          Once I was assigned to the forensic unit
24 in 1990, I attended many, many courses over the next
25 20 years totaling more than 1800 hours of specific

4510

1  instruction.  Just in general, some of the fields
2  that I received specific training in were crime
3  scene reconstruction, crime scene photography,
4  evidence collection procedures, latent fingerprint
5  development and identification procedures, blood
6  stain pattern analysis.  A kind of a miscellaneous
7  field, that I call it, certain courses that aid in
8  death scene investigations, such as identifying,
9  locating and excavating human remains, forensic
10  entomology, the collection and study of insects on
11  decomposed remains, that type of thing.
12     Q.   Could you please describe a little more
13  fully your training with respect to blood stain
14  pattern analysis.
15     A.   Sure.  I was first trained in blood stain
16  pattern analysis in 1998.  I received my basic
17  training right here at the University of New Haven,
18  in the Institute of Forensic Science.
19          In that basic course, it's mostly
20  hands-on.  You actually have the opportunity to work
21  with animal blood, usually pig's blood or sheep's
22  blood, and we actually produce blood stains by
23  different mechanisms.  We actually produce them in
24  the lab.  Some are by passive mechanisms, where
25  blood will just drip with the speed of gravity, the

4511

1  speed at which gravity will pull it, other times we
2  introduce different types of forces to different
3  quantities of blood in different circumstances to be
4  able to firsthand observe the dynamics of blood
5  motion, what the resulting spatter stains look like
6  when introduced by different types of forces to that
7  blood.
8          After finishing that initial training
9  I've attended many different conferences and
10  symposiums where topics of blood stain have been
11  discussed.  In a effort to stay abreast of that, I
12  constantly read different books, periodicals,
13  articles, whatever the issues are and facts around
14  blood stain spatter analysis stay on top of it, and
15  I practice it just about every day.
16     Q.   When you say you practice it, what do you
17  mean?
18     A.   Since the time I was initially trained both
19  as a New York state police crime scene investigator
20  responding to crime scenes, actually documenting and
21  analyzing scenes firsthand as they are reported to
22  us.  I also take cases now as a private consultant,
23  and I did when I was still with the state police for
24  other police departments within New York State where
25  I actually received cases into my office and I

4512

1  review them, going through the case review, the
2  different reports, photographs, things that are
3  generated, and I'll render an opinion based on those
4  cases that come in for review.
5          In New York State I was primarily
6  responsible to serve that one area I described, but
7  there were very few blood stain analysts in New York
8  city, so I ended up taking many cases from most of
9  the 62 counties in New York.
10     Q.   And do you teach?
11     A.   I teach quite extensively throughout the
12  United States.  Yes, ma'am.
13     Q.   What do you teach?
14     A.   I teach all kinds of courses related to
15  crime scene and death scene investigations.  For
16  instance, I teach 2- to 4-hour programs as part of
17  larger multidisciplinary programs.  I teach specific
18  courses in homicide and questioned death scene
19  investigation, and I teach courses specific to blood
20  stain pattern analysis.  There is a two and a half
21  day, 20-hour course and 40-hour course for blood
22  stain pattern analysis.
23     Q.   How long have you been teaching in the
24  field of blood stain pattern analysis?
25     A.   In the field of the blood stain

4513

1  specifically probably close to ten years now.  I
2  started off with making it part of a bigger death
3  scene type program and then moved into the specific
4  courses a few years back.
5     Q.   And as part of your personal training and
6  your teaching, you mentioned creating blood spatter
7  in a lab, do you continue to do this now as a
8  private consultant?
9     A.   Yes, ma'am.  Regularly.  It's an important
10  part of really understanding and observing blood
11  stains.  It's important to know what creates
12  different stains.  It's important to know the type
13  of surfaces that stains land on.  A lot of them
14  react differently.  A blood stain deposited on a
15  seatbelt will react and look much different than a
16  blood stain deposited here on this hard surface of
17  this desk.
18          So it's important to continually do that.
19  I experiment with blood.  In every course I have I
20  run different exercises with the students,
21  experiment with different types of materials and
22  mechanisms, as part of the scientific method, as
23  part of going through and reviewing cases, on
24  occasion we'll need to experiment with blood stains
25  to verify a conclusion or test a hypothesis.  I had

4514

1  an -- I do this quite often when I run my classes
2  throughout the country.  I also have a lab,
3  obviously, in my office with the state police where
4  I can conduct those experiments as well.
5      Q.   Do you belong to any professional
6  organizations?
7      A.   Yes, ma'am.  I'm currently a member of the
8  International Association for Identification, the
9  American Academy of Forensic Sciences and the
10  International Association of Blood Stain Pattern
11  Analysis.  And I also serve on two different -- we
12  call them technical working groups, or TWIGs.
13  They're National Institute of Justice based
14  consulting committees, where we meet a couple of
15  times a year, make suggestions on some of the
16  research and the development type needs that would
17  promote and help, you know, forensic community and
18  law enforcement in determining, you know, different
19  things at crime scenes.  Once those recommendations
20  are made they're put out by the National Institute
21  of Justice as grant solicitations.  So people are
22  actually offered grants to do these research and
23  development type things and then we'll meet back
24  again, review those grants and solicitations, make
25  more recommendations to the National Institute of

4515

1  Justice and they allocate money for different
2  research and development needs.
3      Q.   Have you ever appeared on television as a
4  blood stain analysis expert?
5      A.   Yes, a few times.  Today's market, or media
6  market, that's almost unavoidable, especially when
7  you work just outside of New York City.  Most of
8  those programs are based there, so I've done that
9  several times.  A couple times on Court TV, True TV
10  as an expert guest commentator.  Different programs,
11  Forensic Files, as well as a series, an HBO series
12  called Autopsy.  There was a Court TV series called
13  Trace Evidence that I was asked to appear on once
14  for blood stains.  And I filmed several episodes for
15  the Discovery Channel for different -- their
16  different subsidiaries, I guess you'd call it, Crime
17  and Investigation Channel and Discovery Science and
18  that type thing.
19      Q.   How many cases, approximately, do you think
20  you've handled in the entirety of your career
21  involving blood stain pattern analysis?
22      A.   Well, I don't keep specific numbers on
23  that, but I can tell you that my unit I was assigned
24  to full-time for 18 years would average about 500
25  major crime investigations a year.  That would make

4516

1  about 9,000 cases total, not all of those, you know,
2  deal with bloodshed, but even if you assume just a
3  small number of those, 10 percent or so, it would, I
4  would say, easily it would be a thousand cases.
5      Q.   And are you consulted now or were you --
6  you mentioned that you were consulted sometimes by
7  the law enforcement agency.  Are you consulted
8  sometimes now by other agencies in terms of blood
9  spatter analysis?
10      A.   Yes, ma'am, quite often.
11      Q.   What type of agencies?
12      A.   Mostly other police departments or agencies
13  that actually conduct crime scene investigations.
14  They're looking for some insight, information on
15  what they may -- what may be present at the crime
16  scenes.  I've been consulted by prosecutors' offices
17  throughout New York State and throughout the
18  country.
19      I teach at different symposiums and
20  people will contact me later on with questions.
21  More recently, since I retired I have been consulted
22  a couple of times by defense attorneys as well.
23      Q.   Have you ever testified as a forensic
24  expert in court?
25      A.   Yes, ma'am, many times.

4517

1      Q.   What types of courts?
2      A.   Mostly New York State, county courts, but I
3  have testified in federal district courts as well.
4      Q.   And have you ever previously qualified
5  specifically in the area of blood stain pattern
6  analysis as an expert?
7      A.   Yes, ma'am, many times.
8      Q.   Okay.  And have you ever been denied
9  qualification as a blood spatter expert by any
10  court?
11      A.   Never.
12      MS. DAYTON:  Your Honor, at this time I
13  would offer Mr. Martin under 702 as an expert in
14  blood stain pattern analysis.
15      MR. SMITH:  No objection.
16      THE COURT:  All right.  And you'll
17  recall the explanation you have from the last phase
18  on what being an expert opinion witness means and
19  how you are to assess that evidence.
20      So, he may be so certified and you may
21  proceed.
22      MS. DAYTON:  Thank you.
23      Q.   I keep saying blood stain pattern analysis.
24  Can you tell the jury what that is?
25      A.   Sure.  Blood stain pattern analysis is an

4518

1 examination of blood stains we see at the crime
2 scene, their shapes, their positions, their
3 distribution patterns, their impact angles, in an
4 effort to apply some underlying scientific
5 principles. You know, we know how blood reacts
6 under different forces and different mechanisms
7 because we've studied that for so many years. We
8 apply those principles with the other information we
9 receive at a given crime scene in an effort to, you
10 know, be able to determine what caused those stains
11 to appear in the configurations in which we find
12 them there at that scene.
13    Q.   And what exactly does the word "spatter"
14 mean?
15    A.   Spatter is not to be confused with
16 splatter. A lot of people call it blood splatter.
17 Splatter is a verb; spatter is the noun. So you
18 would splatter blood to produce spatter. Spatter is
19 the end result of the mechanism to cause blood to be
20 propelled through the air.
21    Q.   Just generally, what are some of the
22 different types of spatter that you can detect?
23    A.   Well, we subcategorize, I guess, blood
24 stains into three basic overall broad categories.
25 We call them passive stains, spatter stains, and

4519

1 altered stains.
2       Spatter stains are basically blood stains
3 that are produced when you introduce an energy or a
4 force to a liquid blood source. It causes the
5 blood, the liquid blood, to kind of break up into
6 smaller droplets and be propelled through the air
7 before it lands on a target surface.
8       And we subcategorize spatter into two
9 different groups. We have what we call impact
10 spatters, which are spatters -- let's pretend I have
11 some liquid blood in my hand. As long as I hold in
12 my hand the liquid blood in the cup, it will just
13 sit there all day. When I introduce force to it and
14 bring some kind of force or mechanism in to
15 interrupt the blood and cause it to break up and
16 spatter outward, we call that impact spatter. Blood
17 spatter is the result of some kind of force or
18 object coming down and making contact with liquid
19 blood and dispersing it through the air.
20       We have what we call cast-off spatters,
21 if you will. Just for a second pretend I have,
22 again, blood in my hand. Pretend I have a blunt
23 object or knife or something that would hold blood
24 when it came in contact with the blood. When I
25 bring that blunt object down on to the liquid blood,

4520

1 blood will collect on the end of the object, and
2 when I pull it back up again in order to bring it
3 down a second time or a subsequent time, blood will
4 be cast-off, liquid will be cast-off from the object
5 due to its motion. So, when I come down and impact
6 the surface, it will produces an impact spatters,
7 when I pull it away, it will produce cast-off
8 spatters.
9       We also have what we call expiration
10 spatters which is blood that's basically propelled
11 through the air, broken up into droplet form.
12 Propelled through the air, it comes out from the
13 nose, the mouth, the wound, some kind of expulsion
14 of air that propels blood in the body outward.
15    Q.   Do you know, I'm going to stop you for a
16 second. I'm going to pull up a PowerPoint.
17       MS. DAYTON: Your Honor, this is the
18 Government's Exhibit Number 19. We have it on a
19 disk and the defense has been provided a copy. At
20 this time we would move in into evidence, please.
21       THE COURT: All right. It's a full
22 exhibit. You actually had moved it in earlier.
23       MS. DAYTON: Yes.
24       THE COURT: Without any opposition. All
25 right.

4521

1    Q.   I'm going to just walk you through. Have
2 you had an opportunity to view this PowerPoint
3 previously?
4    A.   Yes, ma'am.
5    Q.   And did you in fact create this PowerPoint?
6    A.   I did.
7    Q.   You had mentioned earlier different types
8 of stains. In particular, passive stains. Using
9 Government's Exhibit 19, we'll call it A, flow
10 patterns, can you explain what this is?
11    A.   Sure. This is a grouping of passive
12 stains. First of all, I'll subcategorize passive
13 stains.
14       First of all, we have what are called
15 flow patterns. A flow pattern is when blood is
16 deposited on an object, it has enough volume to
17 subsequently flow when it comes in contact with that
18 object. So the photograph you see here it depicts
19 some blood droplets that landed on the wall. The
20 volume of those drops was heavy enough so once they
21 landed on the wall, gravity pulled them down for a
22 point and it created a flow, a subsequent flow after
23 those initial deposits.
24       MS. DAYTON: Your Honor, can we dim the
25 lights a little bit.

4522

 1    MR. SMITH:  Your Honor, may I request
 2  something that we verify the photos we are seeing
 3  are not related to this case.  These are for
 4  demonstration.
 5    Q.   That's right.  These photos are not from
 6  this case?
 7    A.   They are not from this case at all.  I use
 8  these for training in my blood spatter courses to
 9  identify, explain different kinds of blood stains,
10  just for illustration purposes.
11    MR. SMITH:  Thank you.
12    Q.   And here we'll call this B, the passive
13  stain pools.  Can you the please explain what this
14  is?
15    A.   Yes.  Blood pools are formed again just
16  from passive flow of blood.  As blood leaves the
17  body, just by the force of gravity, as it's just
18  flowing as a liquid would flow, and it collects in a
19  low lying area, if you will, and it just creates a
20  pool or puddle, and we call those blood pools.
21    Q.   And the third type of passive stain is
22  saturation stain what is that?
23    A.   A saturation stain is really the same idea
24  as a pooling of blood, but this time when the blood
25  leaves the body it collects, it's absorbed into an

4523

 1  absorbent material.  It saturates that material.
 2  It's the same idea as pooling, but because it's an
 3  absorbent material, we call that at saturation
 4  stain.
 5    Q.   This has just a shirt that's been saturated
 6  by blood?
 7    A.   That is correct.
 8    Q.   And here is -- what's this depict?
 9    A.   This depicts what we call drip stains.
10  When blood just flows from an object, just passively
11  at the speed at which gravity will pull it, if you
12  look in the upper left-hand corner of that
13  photograph, you just see a little illustration of a
14  finger with a small drop of blood under it, just to
15  kind of depict blood coming from the cut finger, the
16  blood drop dislodges and falls away from the finger,
17  free falls to the tabletop or the ground, or where
18  it hits.  You'll notice there are two different
19  objects in there.  There is a piece of hardwood
20  flooring and to the left of that there is a small
21  piece of carpeting.
22    This is an exercise that I had done in
23  one of my past courses that I taught in blood stain
24  pattern analysis, and it's basically meant to
25  illustrate the different appearances that a blood

4524

 1  drop will take on as it strikes different target
 2  surfaces.
 3    When blood drops strike a hard nonporous
 4  surface, as in hardwood flooring, the surface
 5  tension will hold the blood drop together and will
 6  tend to stay intact.  So the blood droplet will
 7  essentially flatten out and spread all over that
 8  hard surface, but you can see it maintains its
 9  rounded edges and surface tension has been
10  maintained, so you can actually see part of the
11  bubble part, if you will, of the drop as well.
12    In the carpeting you will see carpeting
13  is more absorbent and also breaks the surface
14  tension of the blood when it strikes the carpeting.
15  So the blood strikes the carpeting, it pulls it more
16  into the carpeting rather than spreading it out on
17  the hard nonporous surface.
18    So these are blood drops we just
19  typically see free fall to the earth at the speed of
20  gravity and take on different appearances depending
21  on the fiber that they strike.
22    Q.   Moving on to spatter stains, can you
23  describe what this is, Exhibit E.
24    A.   This is -- these are impact -- example of
25  impact spatter stains that I started to describe

4525

 1  earlier.  Impact spatters, again, when you have
 2  liquid blood source and something comes in contact
 3  with that source, it causes the blood to break up,
 4  be dispersed through the air and land on surrounding
 5  target surfaces.  So here you could see the rock
 6  that's used to strike the person over and over
 7  again.  You can see that the impact spatters are on
 8  the rock, and in conjunction with what we call
 9  direct transfer contact stain, I'll explain that a
10  little bit later on in better detail, but you can
11  see the small spatters that ensue because of the
12  impact or the force that was introduced to that
13  blood source.
14    Q.   What are we looking at here?
15    A.   This is actually, you can actually see a
16  combination of impact spatters and cast-off spatters
17  on this photograph.  On the very bottom would be the
18  impact spatters from the object coming down into the
19  blood source and dispersing the blood.  Toward the
20  top, the top two drawers, it is probably best
21  illustrated in that photo of the dresser.  You see
22  those linear type shapes or patterns, arrangements
23  of blood spatters, those would be the cast-off.
24    Q.   Would it help you to get up and point to
25  it?

4526

1     A.    Certainly.
2     Q.    There is a pointer right behind you.  If
3  you could just remember to keep your voice up.
4           THE COURT:  Or you could carry the
5  microphone with you.
6     A.    Is this okay?  Is my voice okay.
7           On the bottom drawer here, you can see
8  most of these have more of what I'll call impact
9  angle, and I'll describe that more shortly as well,
10 but they strike more straight into the dresser door.
11 These would be more consistent with the object
12 coming down to the blood source.  You can see here
13 linear type pattern up on the top going in different
14 directions.  That's more consistent with the
15 cast-off.  So, again, when the object goes down, it
16 creates the impact.  When it comes up again, it can
17 cast blood off in these different types of trails.
18 That would indicate it was being brought back up
19 again.
20    Q.    You are indicating, sort of a back and
21 forth motion with your arm for the cast-off?
22    A.    That is correct, yes.
23    Q.    And then there is another picture here
24 labeled cast-off.  If you could describe what we're
25 looking at here.

4527

1     A.    This is another example of cast-off spatter
2  but it's on a ceiling.  This would be somewhat
3  directly above where the assault is taking place.
4  This is from the object being lifted from the blood
5  source up toward the ceiling and casting blood up
6  onto the ceiling.
7     Q.    And what is an altered stain?
8     A.    Altered stains are just blood stains that
9  have something else come in contact with them.  We
10 start with transfer stains or direct contact between
11 a blood source and a non-blood source.  We call this
12 a swipe stain.  If I have liquid blood on my hand
13 and I touch a clean surface that's void of blood,
14 the liquid blood from my hand will transfer on to
15 that clean surface.  It makes a direct contact or
16 transfer swipe stain, as you can see here, palm of a
17 hand on to a white carpet.
18    Q.    And here is a wipe stain?
19    A.    Sure.  In contradiction to that or in
20 conjunction with a wipe stain is when you have blood
21 already on the surface and something comes in
22 contact with that blood stain after its initial
23 deposit and causes its initial formation to change.
24 This was made by accident in one of my classes where
25 there was a blood stain on the bench and when I kind

4528

1  of leaned over to reach something my necktie went
2  through and kind of wiped through the blood stain.
3  Made a nice exhibit, but the idea you have here,
4  blood is already on the surface, something comes in
5  contact with it and it creates a wipe stain.
6     Q.    And getting into the issue of
7  directionality, how do you interpret directionality
8  of a blood stain?
9     A.    The directionality is determined by what's
10 called a wave cast-off or more commonly called a
11 tail, if you can direct your attention --
12    Q.    You can step off here.
13    A.    The large droplet you see here, it's coming
14 down from -- and I'm going to point to its origin up
15 here, if you will, coming down to the lower left.
16 This is called the wave cast-off, or tail.  As the
17 blood drop strikes, its momentum kind of takes it
18 forward, kind of forward and, for lack of a more
19 scientific way of calling it, creates this cast-off,
20 or more often called a tail.  The tail points the
21 direction in which the spatter splattered.
22          I tell my students it's like a finger
23 pointing, going this or in this case going that way,
24 from the top right down to the lower left.
25    Q.    And here there is an angle of impact.  What

4529

1  is this, what are we looking at?
2     A.    We can calculate the angle of impact from
3  blood spatters at a scene and we can use very simple
4  math equation to do that, but just to give you
5  overall general idea of it, the more circular your
6  blood stains appear, the more directly they strike
7  their target surface.  So at 90 degrees, or the
8  stains you see in the far right-hand corner there,
9  which is labeled 90 degrees, a blood spatter like
10 that would come in mostly at 90 degrees almost
11 straight on into its target surface.
12          As you start to increase the angle of the
13 impact, the blood drops start to become more and
14 more oblong and you start to the see the tail
15 starting to form more and more prominently.  The
16 wave cast-off starting to form more prominent.  So a
17 40-degree angle you see the blood stains start to
18 become more oval.  The blood starts at a 30-degree
19 angle, the stain is much more oval or oblong,
20 starting to appear a little more prominent still and
21 very acute angle.  At a 10-degree angle the blood
22 droplet is hitting almost horizontally to it -- or
23 vertical, to its vertical surface, you can see a
24 nice long, elliptical stain here with a pretty long
25 tail.

4530

1    Q.    Without getting too much into a physics
2  lesson or a geometry lesson, how do you actually
3  determine an angle of impact?
4    A.    Very simply by dividing the width by the
5  length of the blood stain coming up with a sine
6  function and then correlating it to its impact
7  angle.  There are actually things that make that
8  easier.  We can -- a program I have, an Excel
9  program, that programs and does the calculations for
10 it.  It's a very simple math equation.
11   Q.    What are we looking at here?
12   A.    Again, just an example from a recent class.
13 It's a blood stain that struck at 80 degrees, so not
14 quite exactly straight on, but altered just a little
15 bit, straight on in.  You can see the largely round
16 resulting spatter.
17   Q.    And the object in the middle, the long
18 metal object, what is that being used for?
19   A.    This is an -- it's a tool that a colleague
20 of mine made and kind of calculates different
21 angles.  We can set that at 80 degrees, 70 degrees,
22 so we can approximate the angle of impact during the
23 exercise.
24   Q.    What this?
25   A.    That, again, here is a blood stain, and the

4531

1  exact angle is not recorded here, but it's probably
2  about a 10 degree or so angle of impact and you can
3  see that -- again, set that to the proper setting on
4  the stain, let the blood drop fall on it, it's very
5  acute angle long, elliptical stain with the long
6  tail.
7    Q.    It has the tail and then there is other
8  parts of the blood dripping down.  Do those have a
9  name?
10   A.    That's just all part of the tail.
11 Basically the force from the impact of the spatter
12 striking and just kind of forcing that down.
13   Q.    Thank you.  You can go ahead take a seat.
14       So, what types of information can you
15 determine from doing blood stain pattern analysis?
16   A.    Well, depending on the scene and the
17 circumstances and the evidence involved, there are
18 times we can approximate the distance from the blood
19 source to its target surface, you know,
20 corresponding target surface.  We can sometimes get
21 general understanding of the amount of force that
22 was used.  A lot of force versus a little force.
23 Sometimes we can give information that may suggest
24 the type of object it was.  We can help corroborate
25 or refute different statements that may be made by

4532

1  witnesses in the case of somebody who had seen the
2  event, t may corroborate or refute stories.  We can
3  sometimes sequence blood spatter events.  For
4  instance, if there a transfer of some kind on a
5  wall, there may be spatters put on top of it, may
6  help us reconstruct events that way.  So there is a
7  number of different things we can.
8    Q.    Are there particular factors or things you
9  need in order to form a blood stain pattern
10 analysis?
11   A.    Yes, ma'am.  There is actually several of
12 them.  The first thing you need to know is basically
13 the underlying principles underlying the science of
14 blood stain pattern analysis.  You need to know
15 about the properties of blood, the dynamics,
16 characteristics of blood in flight.  The dynamics,
17 different mechanisms that produce different types of
18 stains.  You need all of the crime scene
19 information.  I always tell my students don't stop
20 at the blood stains, look beyond the blood stains.
21 You need to know the location of them, where they
22 are in the room, what else is there in and around
23 where the blood-letting event took place.  We need
24 to have lab results.  So we need some kind of
25 laboratory results, not just to tell us it's in fact

4533

1  blood at that location, but we like to know whose
2  blood it is, who is the source of that blood that we
3  find in our stains.
4        At times experimentation.  There are
5  times we need to go back into the lab and try to
6  reproduce those blood stains, see how they react
7  with different target surfaces.  And probably most
8  importantly you need a good amount of common sense
9  and logic and experience.  Experience of being able
10 to have been at those crime scenes, look at those
11 stain distribution patterns, been able to maybe size
12 them up later with other facts that come in through
13 the case, be able to test your opinions over and
14 over again.  The repeatability or predictability of
15 what happens when you have different mechanisms of
16 force to the blood.
17   Q.    Is it possible for you to do a blood stain
18 pattern analysis without actually going to the scene
19 of a particular crime?
20   A.    Yes, ma'am.  I do that quite often.
21   Q.    Did you perform an analysis with respect to
22 this case?
23   A.    I did, yes.
24   Q.    And what sort of documentation or items did
25 you use to conduct your analysis?

4534

1    A.   I reviewed several different reports
2  including the crime scene investigation report,
3  autopsy reports from all three decedents.  I
4  reviewed hundreds of crime scene photos, crime scene
5  video, and a laboratory report containing DNA
6  results.
7    Q.   And did you, in addition to reviewing the
8  crime scene reports, did you speak or meet with the
9  crime scene investigators?
10   A.   Yes, I did.
11   Q.   And what did you do with all of these items
12 that you just talked about reviewing?  What was the
13 purpose of reviewing all of those items?
14   A.   I reviewed all of those items to
15 specifically see if I could give any information as
16 to the interpretation or analysis of the blood
17 stains that were found at the scene.
18   Q.   And did you write a report?
19   A.   Yes, I did.
20   Q.   And what is the importance of writing a
21 report?
22   A.   Writing a report basically does a couple
23 things.  One, it presents your opinions and findings
24 so that they're clear and understood by all those
25 who read the report.

4535

1    Q.   The second thing I like to do with my
2  reports is -- my reports kind of, more or less
3  follow the methodology that I use to go through and
4  review the case.  Starting with, you know, questions
5  to be answered, the materials I reviewed,
6  observations made and eventual conclusions and
7  opinions that I've drawn.
8    Q.   With respect to your report in this case,
9  did you include anything other than conclusions?  I
10 mean, does the report have photographs or anything
11 like that in it?
12   A.   Yes, ma'am.  I also attached a crime scene
13 diagram that was provided to me generated by the
14 agency that investigated the scene.  And I also
15 attached photographs by which you can refer to the
16 report so that the language is a little more clear.
17   Q.   I'm going to start to direct your attention
18 to some photographs.
19        MS. DAYTON:  Your Honor, I'm going to
20 trouble you on the lights again.
21        These are all contained within the
22 binders that have been provided.
23   Q.   This is Government's Exhibit 1A.  Have you
24 had a chance to look through this these binders?
25   A.   This should be in connection with my

4536

1  report, so yes.
2    Q.   So the photograph is taken from the report.
3  Do you recognize what this is a photograph of?
4    A.   Yes, ma'am.
5    Q.   And what is this a photo of?
6    A.   This is a photograph of the decedent Basil
7  Williams in the northwest bedroom, and it depicts
8  him in the condition in which he was found.
9    Q.   You said you reviewed hundreds of
10 photographs in connection with this case; is that
11 correct?
12   A.   Yes, ma'am.
13   Q.   Did you put all of those hundreds of
14 photographs in your report?
15   A.   No.
16   Q.   And you chose approximately how many to
17 include in your report?
18   A.   I don't remember exactly, but I think it
19 was around a dozen.
20   Q.   And what was the significance of choosing
21 this photograph?
22   A.   Basically to show the position in which the
23 this victim was found, the way he's bound, and to
24 kind of illustrate where blood was found and where
25 blood wasn't found within that immediate scene.

4537

1    Q.   Now, with respect to the pillow and the
2  blanket that are over Mr. Williams' head, would
3  those items absorb blood spatter?
4    A.   Sure.
5    Q.   And so what would happen to blood if it was
6  coming out of Mr. Williams' body?
7    A.   If it was coming into those items?
8    Q.   Yes.
9    A.   It would be absorbed into the absorbent
10 material.
11   Q.   What kind of stain would that create?
12   A.   It depends on the mechanism to produce
13 those stains.  It could be spatter format, if it was
14 force.  It could be absorbant stains if it was
15 passive, that kind of thing.
16   Q.   I'm going to show you 1B.  And what was the
17 significance of this photograph?
18   A.   This photograph depicts essentially the
19 main area of bleeding from Mr. Williams.  This was
20 -- basically the majority of the blood stains in
21 this bedroom on or around Mr. Williams were confined
22 to this area with a few spatter exceptions.
23   Q.   And the fact that Mr. Williams' nose is
24 uncovered, was that of any relevance to you in your
25 findings?

4538

A. Yes. Just to show that the duct tape completely covers the mouth and only partially covers the nose, that just a -- you know, the possibility of small amounts of air coming through the part of the nostril that are exposed.

Q. I'll show you Government's Exhibit 1C. Now, what are we looking at here?

A. Okay. This is the area directly in front of Mr. Williams' nose. You can see two different types of blood stains that are readily discernible there. The first is a pooling type stain. You can see where the blood collects in that one area on top of the carpeting. And in the periphery of that pooling stain you'll see some blood spatters on the carpeting in and around where that pooling is.

Q. You spoke before -- if you need to get up to it and point to it, that's the probably easier for you. So, what would account for pooling?

A. Pooling would be a draining of blood from Mr. Williams' nose as blood started to just leave the nose and collect outside the body. It would collect in this pooled area that you see here.

Q. And what would account for the spatters?

A. Well, spatters would be produced in this particular area by one or two ways, either from

4539

impact from a force or energy, the striking by blunt force, or from expiration spatters, from blood being forced through the nose through the flow of air.

Q. So, in order for blood to be forced through the nose from the exhalation of air, what would need to be in the nose area or in the lung area, I guess.

A. Blood and air.

Q. And you were pointing to the area right outside the pool?

A. Yes, ma'am. You see the spatters here.

Q. Now, did you observe blood anywhere else on Mr. Williams' body?

A. Very small amounts of what appear to be spatters on the backs of the area where his hands were bound.

Q. I'm going to show you Government's Exhibit D. Can you see the spatters? This is 1D, excuse me, to which you are referring?

A. Yes, ma'am. I direct your attention to the upper right-hand corner on the duct tape primarily. You see some small spatter stains.

Q. And what type of -- what would cause that spatter in that location, if you know?

A. Well, again, some kind of energy or force that breaks blood up into small droplets and they

4540

land on that target surface.

Q. I'm going to show you Government's Exhibit E. What was relevant to you about this photograph?

A. Directing your attention to the upper left hand corner of that photograph, you'll see a pillow kind of standing up, open end, and I'm pointing to areas on the upper right-hand corner of the pillow, and maybe the top center of the pillow, which would be saturation stains, blood has actually been absorbed up into that pillowcase.

Q. Is that the type of thing you were talking about could come from the blood from Mr. Williams' head?

A. Yes, ma'am. It's like a liquid blood source being soaked up into the absorbent material.

Q. I want to show you one more photo of Mr. Williams. This is 1F. Again, what was relevant to you, what drew your attention about this particular photograph?

A. Again, you can see the stain we spoke about before, the pooling with the spatters in periphery. There is also a small contact or swipe stain over on the duct tape which would be on the left forehead area of Mr. Williams. On the duct tape of the left forehead area of Mr. Williams.

4541

Q. And could rubbing the weapon over his head cause that?

A. Any contact between the blood source and that source could, sure.

Q. And this photo also is a little more clear with respect, could you point out the pooling and the expirated or impact spatters by his nose?

A. Sure. This would be the pooling area where the blood collected and you can see the spatters here between the pool, actually some right close here, next to Mr. Williams' nose and some actually on the nose.

Q. Thank you. Moving into the next room, was there any significant differences that you observed between what was characterized as the northwest bedroom and the southwest bedroom?

A. Yes, ma'am. There was a huge difference in the amount of blood spatters around the room. The northwest bedroom was primarily void of blood spatters except in very concentrated area I just described. In the southwest bedroom there was blood spatters pretty much everywhere.

Q. I direct your attention to Government's Exhibit 1G, and do you know what this is a photograph of?

4542

1    A.   Yes, ma'am.  These are two bedding type
2    materials, I suppose.  I'd best describe them as.
3    These are just inside the room to the southwest
4    bedroom and you can see in each of those materials a
5    saturation staining, blood that's been absorbed up
6    into that absorbent material.
7        Q.   There appear to be droplets both on the
8    sheet near -- in the middle near the saturation
9    stain and around it.  What would those be, if you
10   know?
11       A.   Those would be most consistent with drip
12   stains.  I gave the illustration before of the blood
13   drop coming from the illustrated fingertip.
14   Basically that's just passive blood that just free
15   falls from whatever items it's falling off of and it
16   just free falls at the speed gravity would pull it
17   until it lands on its target surface, which in this
18   case shows sheet material or carpeting.
19       Q.   So, could that be for instance from
20   dropping off a weapon?
21       A.   Sure.  Any blood source that has enough
22   volume to drip off.
23       Q.   In terms of sort of the property of blood,
24   is it thin like water, or what's it like?
25       A.   Blood is more viscous than water.

4543

1    Depending on the literature you read, I've seen it
2    recorded as four times more viscous than water up to
3    six times more viscous than water.  Basically it's
4    thicker, it has more viscosity than water.
5        Q.   How does that impact the speed or the --
6    well, the speed with which it drips off an item, if
7    at all?
8        A.   Depending on the height at which it
9    travels, usually over four feet high would be impact
10   or the resulting spatter size will stay pretty much
11   constant.  If it's at a much lower altitude or
12   distance from its target surface, it could be
13   significantly smaller.
14       Q.   I'm going to show you Government's
15   Exhibit 1H, do you recognize what's depicted in this
16   photograph?
17       A.   Yes, ma'am, this is a photograph that I
18   reviewed.  It depicts victim Tina Johnson as she was
19   in the southwest bedroom.
20       Q.   And what drew your attention with respect
21   to this particular photograph?
22       A.   Primarily the spatters that are present on
23   Ms. Johnson's shirt.  You can see up in the shoulder
24   area there is significant spatters, and as you zoom
25   in there, down the center of the back, and I believe

4544

1    if you move that photograph down more towards the
2    hands, there are clearly spatters that extend all
3    the way down her back.
4            The initial position in which she was
5    found by responding personnel, the initial
6    photographs I saw showed her lying on her back.  So
7    the fact that there is spatters, moving blood down
8    Ms. Johnson's back, would clearly mean she was not
9    in that position of lying on her back at the time
10   that that blood was moving at a time that that force
11   was being applied.
12       Q.   So in other words, her back would have had
13   to have been exposed during the attack at some
14   point?
15       A.   At some point at least, yes.
16       Q.   And you indicated -- could you just show
17   the jury using the pointer where the spatter is that
18   you are discussing?
19       A.   I'm pointing to a few of them.  You see
20   them down the back, reaching almost down to the
21   hands.
22       Q.   And there is a large stain that's in the
23   middle of the picture in the middle of Ms. Johnson's
24   shirt.  There is a large stain to the left.  What is
25   that, if you know?

4545

1        A.   This stain?
2        Q.   Yes.
3        A.   This would be saturation stain, the blood
4    that's being absorbed into the top of her shirt.
5        Q.   From where?
6        A.   From the blood-letting injuries of the
7    head.
8        Q.   And with respect to over here on the
9    shoulder, what is that, if you know?
10       A.   This area?
11       Q.   Yes.
12       A.   This looks like it could be a combination
13   of transfer stains and spatter stains.  We see a
14   direct contact swipe type stains and we also see
15   some spatters in and among there.
16       Q.   Thank you.  I'm going to show you what's
17   been marked Government's Exhibit I.  Government 1I,
18   excuse me, and try to narrow in.
19   First, again with respect to Ms. Johnson, what was it
20   about this photograph that drew your attention?
21       A.   Well, the photo of Ms. Johnson shows, first
22   of all, the duct tape where it was and how it binds
23   the mouth.  It also shows a swipe stand or transfer
24   stain in a triangular shape on the front of the
25   shirt, and you can also see more spatters in the

4546

1  front of the shirt as well as over here on the
2  shoulder.
3     Q.  So in order for the spatters to be on the
4  front of her shirt, what position would Ms. Johnson
5  had to have been in during the attack?
6     A.  She would have to be face up or on her side
7  or some way that area of the shirt is exposed so
8  that the moving blood could land on the shirt.
9     Q.  So, airborne blood couldn't get on her
10 front or her back unless the front and/or back were
11 facing the wall towards the direction of the impact
12 spatter?
13    A.  That's correct, yes.
14    Q.  Okay.  And in terms of that sort of -- that
15 conclusion, was there anything in the documentation
16 that you reviewed that would support the finding --
17 well, what did you conclude from the fact that there
18 was spatter on the front and the back of
19 Ms. Johnson's shirt?
20    A.  Well, again, when you look beyond the blood
21 stain, so in conjunction with where the blood stains
22 are on Ms. Johnson, the fact they're on the front of
23 her and on the back of her, the fact that the
24 autopsy report states she has blood-letting injuries
25 on three different sides of her head, face, the

4547

1  side, back of her head, and the fact she was injured
2  on three sides of her head, the front and the back
3  of her would indicate to me she changed positions
4  during that attack.  That she was, you know, her
5  front and her back were exposed at different points
6  during that attack.
7     Q.  I'm going to draw your attention a little
8  more closely to Mr. Reid.  And can you describe what
9  it is that drew your attention to this photograph
10 with respect to Mr. Reid?
11    THE COURT:  And the number on this photo
12 is which?
13    MS. DAYTON:  It's the same photograph,
14 your Honor, it is still 1H, excuse me.
15    THE COURT:  1I?
16    MS. DAYTON:  1I I meant.  I have a
17 problem with my alphabet.
18    Q.  Go ahead.
19    A.  We see a number of different stains here in
20 the area that -- depicted around the head of
21 Mr. Reid.  We can see some pooling blood that starts
22 to coagulate immediately on top of Mr. Reid's head.
23 I'm pointing to like the center of the photograph,
24 up to the top.  From that area I just indicated
25 moving over to the left there are some absorbent

4548

1  bedding type materials again with saturation stains,
2  blood that's been absorbed up into those different
3  items.  We can also see some spatter stains in and
4  around the area between Mr. Reid's head and
5  Ms. Johnson's head, and we can see some transfer
6  stains, some spatter stains on the back of
7  Mr. Reid --
8     Q.  You can step off.
9     A.  -- as I've indicated here on the far right
10 upper part of the photograph.
11          In addition to that, Mr. Reid's left
12 shoulder as I'm indicating, again, the right side
13 lower portion of the photograph, there are some
14 absorption stains or blood that's been absorbed up
15 in the left shoulder of his shirt.
16    Q.  Where does it mean that blood is being
17 absorbed from -- on the left shoulder, Mr. Reid's
18 left shoulder?
19    A.  Well, Ms. Johnson's head is in close
20 proximity.  It appears as though some of these items
21 have been moved from the original location, so there
22 would be different areas of the blood.
23    Q.  So, some of the sheets that have saturation
24 stains could have caused the saturation stain on his
25 shirt as well?

4549

1     A.  That's correct, yes.
2     Q.  So, with respect to the spatters on the
3  back of Mr. Reid's shirt, do you have an opinion as
4  to how those spatters would have gotten there?
5     A.  Those are spatters that are caused when
6  energy or force is introduced to a liquid blood
7  source and causes that blood to break up and land on
8  Mr. Reid's shirt in spatter form.
9     Q.  Thank you.  I'm going to draw your
10 attention now to Government's Exhibit 1J.  Do you
11 recognize this photograph 1J?
12    A.  Yes, I do.
13    Q.  And what was it about this photograph that
14 drew your attention?
15    A.  This is a photograph showing a wall and the
16 ceiling in the southwest bedroom where Mr. Reid and
17 Ms. Johnson were found.  If you look at the spatters
18 there on the ceiling and on the wall -- I'm going to
19 first point to the spatter on the ceiling in the
20 upper center portion of the photograph and moving
21 downward to the top of the wall, somewhere
22 underneath that initial area of spatters we see
23 spatters that are most consistent with cast-off,
24 from blood collecting onto an object being thrown
25 off onto the ceiling and that part of the wall

4550

1  during the course of the motion that was produced.
2          We can also see from these spatters a lot
3  of them are very large.  My own experience, much
4  larger than you would typically see from cast-off
5  and some of them are so large that they subsequently
6  flow, so you can actually see -- I'm pointing almost
7  to the exact center of the photograph.  Just as one
8  example, there is a large spatter stain here and it
9  subsequently flows down the wall.  So it had enough
10  volume to it once it landed on the wall it was able
11  to flow again.  That's what I would consider a
12  significant amount of blood.
13      Q.   Are you aware of how high this ceiling is?
14      A.   It was reported to me in the reports 9 feet
15  3-7/8ths inches high.
16      Q.   You said this is most consistent with
17  cast-off spatter.  What is it about this spatter
18  that makes it more consistent with cast-off than,
19  say, impact spatter?
20      A.   When you look at, first of all, the size
21  of the droplets are very large; second, look at the
22  rest of the scene, look at where the victims are,
23  where the majority of other impact spatters are
24  found, which are pretty much low to the floor near
25  the carpeting.  So that's a pretty good distance

4551

1  from where the victims' heads would be close to the
2  floor, you know, over nine feet high to the ceiling,
3  that's too far of a distance for small spatters to
4  travel.  It's also -- they're very large stains.
5  Generally, as a general rule when evaluating
6  spatters, the greater the amount of force that's
7  introduced to the blood source, the smaller the
8  resulting spatters.  So if you hit something with a
9  little bit of force you have one size spatter that
10  results; if you strike it with a significant lot of
11  force, they're much smaller spatters that are
12  produced.  These stains are much too large than we
13  typically see with impact spatters.
14      Q.   So, you mentioned that there is also --
15  they're very heavy drops.  So, what type of item
16  would need to be used in order to get that, those
17  type of heavy drops all the way up to a 9-foot 3-7/8
18  inch ceiling?
19      A.   Well, the way I would describe the object
20  to produce those is something that's got enough
21  surface area to hold a large amount of blood.  This
22  pointer has a very small area.  If this pointer came
23  in contact with a liquid blood source, there is only
24  so much blood that could adhere to the pointer
25  because of the small surface area.  If you had

4552

1  something with a large surface area it could hold a
2  lot more blood to produce much larger spatters.  In
3  addition to that, the item that was used would have
4  to be long enough to extend up toward the ceiling to
5  be able to propel those cast-off stains onto the
6  ceiling and the upper part of the wall without being
7  long enough to actually strike the ceiling.  Because
8  there is no evidence of any kind of direct contact
9  with any kind of instrument against the ceiling.
10      Q.   So, based upon your experience, do you
11  believe that these could be consistent with the use
12  of a bat as the weapon?
13      A.   A bat would fit that description, sure.
14      Q.   The picture that you showed earlier during
15  the demonstration of different types of blood, there
16  was one with blood on the ceiling.  What type of
17  murder scene was that from?
18      A.   That was from a baseball bats.
19      Q.   Now, in terms of -- there seems to be some
20  tail in these pictures.  In terms of directionality,
21  can you determine what type of motion would have
22  been used to hit the victims in order to result in
23  these types of tails?
24      A.   Well, again, the object would have to
25  extend up toward the ceiling without striking it.

4553

1  Most of these spatters that I'm pointing to, the
2  upper ceiling area, kind of the center to the left
3  portion of the photograph as you see it, most of
4  them have little appreciable directionality.  Not
5  that they're kind of straight into the ceiling, but
6  they're not really at very acute angles.  As you get
7  closer to this wall many of these stains start to
8  show those wave cast-off or those tails showing more
9  and more directionality as you get farther back
10  toward the wall.  So the item that was used would
11  extend up toward this way somewhat, maybe with a
12  slight angle to it, and the angle increasing as you
13  get closer to the back wall.
14      Q.   So, in terms of the actual physical motion
15  used, would you -- or did you attempt to replicate
16  this at all or have you ever attempted to replicate
17  something like this?
18      A.   No.  But you would know that the object
19  would come from its blood source up toward that
20  ceiling area to be able to produce those spatters.
21      Q.   Like in an overhand motion, you are
22  indicating?
23      A.   Correct.  Overhand motion up and over
24  toward the ceiling.
25      Q.   I'm going to move on to the next photograph

4554

1  which is Government's Exhibit 1K, which is just a
2  little more of a close-up of some of the larger
3  blood spatters.  What was it that drew your
4  attention here?
5     A.   Just an example of the size and
6  distribution pattern of the blood spatters on the
7  back wall.  I believe this is wall A, as it was
8  labeled in the crime scene diagram.  You can see
9  some -- these large size spatters, the large drops
10 actually flow subsequent to that, we can see some of
11 the tails in among here, starting to move down
12 toward the wall.
13    Q.   Now, you mentioned earlier that in order to
14 create a heavy spatter like that there would have to
15 be a significant amount of blood on a particular
16 object.  How does -- how do you go about creating a
17 liquid pool of blood.  It doesn't just, you know,
18 like I don't have any blood on me right now, what
19 would you have to do to create a liquid pool of
20 blood?
21    A.   Liquid pools of blood take time to develop.
22 One of the things I neglected to talk about with
23 impact spatter before is when you take a blunt
24 instrument, or sharp instrument for that matter, and
25 you strike someone with it, the first blood rarely,

4555

1  if ever, produces spatter.  My hand is clean and
2  void of liquid.  So I can pound it all day long and
3  we're not going to see any spatter.  If I poured
4  some liquid from a cup into my hand, now I strike
5  it, it does spatter.  So it disperses.  So you
6  obviously have to have liquid blood before the
7  spatter will disperse.  Blood pools and volumes of
8  blood take time to come out of the body.  So once
9  the body is struck the first time it doesn't
10 spatter, it causes the wound.
11       So the first time you strike someone the
12 wound opens up, you pull the instrument or the
13 weapon away, blood starts to come to the surface and
14 it's subsequent strikes that are now striking the
15 liquid blood that's coming to the surface that
16 causes the blood to spatter, causes the blood to get
17 on the object and subsequently be cast-off.  So
18 obviously, the more times you strike an object the
19 more blood that's produced, the more blood that
20 comes to the surface, the more holes or wounds that
21 are opened, the more blood keeps coming more and
22 more to that surface of the wound.  Now, that
23 instrument is brought down over and over again, it's
24 creating heavier amounts of impact spatter because
25 there is more blood available to spatter, it's

4556

1  catching more blood on the instrument.  It's
2  logical, the more blood there is on the surface, the
3  more blood there is to be cast-off.
4     Q.   And based upon your examination of the
5  evidence in this case and the other supporting
6  documentation, can you form an opinion as to how
7  many times the victims in this bedroom may have been
8  hit?
9     A.   I would never put an actual hard number on
10 it but I can very comfortably say many, many times.
11    Q.   Thank you.  I'm going to move on to
12 Government's Exhibit 1L.
13       Just showing 1L for the record.  And what is
14 it that drew your attention in this photograph?
15    A.   This is a photograph that depicts the, I
16 call it the area of heaviest concentration of
17 spatters on the ceiling.  This would be the ceiling
18 area, and you can just see the heaviest
19 concentration or grouping distribution pattern of
20 cast-off spatters.  If I can direct your attention
21 to the lower left center portion, let's say the
22 lower left quadrant, roughly, of that photograph,
23 there is little, you know, an appreciable or
24 discernible directionality there.  Most of those
25 spatters seem round for the most part.  As you

4557

1  extend more toward the back wall you'll notice on
2  the right-hand side of the photograph you can start
3  to see some tails starting to form on some of these
4  spatters.  You see a little more elliptical stains
5  and they start to show more pronounced
6  directionality.
7     Q.   And do these -- this is the ceiling, D?
8     A.   Yes, ma'am.
9     Q.   And the tails in this case, do you know in
10 which way -- which way they're pointing?
11    A.   They're pointing toward the -- it's toward
12 wall A.  There was the a wall labelled as wall A on
13 the crime scene diagrams.
14    Q.   Which on the diagram -- I'll just put that
15 up for the moment.
16    A.   I don't want to call it the back wall
17 because I'm not sure of the whole configuration of
18 the apartment.
19    Q.   The wall behind the bed where the largest
20 concentration of cast-off was?
21    A.   That is correct.  You are pointing to wall
22 A now.
23    Q.   So, they were pointing in the direction of
24 wall A?
25    A.   Yes, ma'am.

**GA1182**

4558

1     Q.   And showing you Government's Exhibit 1M,
2  for the record, and what was it about this that drew
3  your attention?
4     A.   This is a photograph again of the ceiling.
5  It shows an area of cast-off spatters on the ceiling
6  and most of these have little -- again, little
7  appreciable directionality.  Most of them are the
8  more circular in shape indicating they're striking
9  more -- maybe not exactly at 90 degrees, but more
10  straight on type angle as opposed to an acute angle.
11     Q.   Can you say why there would be more
12  directionality sort of in the areas right by where
13  the ceiling meets the wall A?
14     A.   It would be a little further from its
15  source.  So as the blood is being thrown off the
16  object, if I were to throw blood, if I had blood on
17  this pointer and I threw it kind of straight in, you
18  would see more circular spatters here.  If I get
19  into the same motion and kind of flick blood toward
20  the screen, some didn't hit the screen head-on, they
21  started to fall this way, as gravity started to pull
22  them before they struck the screen, they would have
23  more of an acute angle.  You would see more of a
24  discernible angle.
25     Q.   So the fact that the ceiling would be flat

4559

1  above the object and the wall would be sort of a
2  different angle?
3     A.   That's correct.  That would be fair to say,
4  sure.
5     Q.   Okay.  That was not terribly clear.  Moving
6  on to Government's Exhibit 1N, what is this a
7  photograph of?
8     A.   This is a photograph of some spatters that
9  are on the lower part of the door as you enter into
10  the southwest bedroom.
11     Q.   What was it about this photo that drew your
12  attention?
13     A.   The number of spatters and where they are.
14  They're all very low to the wall.  In the subsequent
15  photograph you continue on which would be to the
16  left of this photograph as you see it, and these
17  spatters again have little appreciable
18  directionality to them indicating to me that the
19  source of that blood was also low to the wall.
20     Q.   And in terms of the fact that there is
21  little directionality, so what sort of motion or
22  what would create the spatter with less
23  directionality?
24     A.   It would be the motion that would be blood
25  coming in more directly into the wall.

4560

1     Q.   So, more of a side motion?
2     A.   Correct.  Not dripping from above.  There
3  is not a blood source up high and dripping down low.
4  This is a blood source in or around the same height,
5  as you see here, and blood coming more directly into
6  those locations.
7     Q.   Let me move on to the next photo which is
8  Government Exhibit 1O, which depicts the side of the
9  door and then more spatter.  Do you know which wall
10  this is in the room?
11     A.   This is labeled as wall C in the southwest
12  bedroom.
13     Q.   So, this would be all the way directly
14  across from --
15     A.   That's correct.  This would be the door
16  that opens up into the room.  The previous
17  photograph you saw some blood spatters on the bottom
18  of that door.  This would be that door, this piece
19  of furniture has been moved and the rest of the
20  spatters we're seeing on the current photograph
21  would be along this wall, I suppose, underneath that
22  piece of furniture.
23     Q.   And that's the ones we're looking at in O,
24  1O?
25     A.   That's correct.  Yes, ma'am.

4561

1     Q.   So, do you know in terms of your review of
2  the documentation about how far the victims were
3  from this wall?
4     A.   I didn't have a measurement of that but
5  just in looking at the photographs, it looked like
6  it was a few feet, just to approximate.
7     Q.   And so based upon your expertise, can you
8  determine how it is that these spatters got onto
9  wall C?
10     A.   Well, just in evaluating these spatters and
11  also evaluating the other, you know, items in the
12  room where the victims were found, the furniture
13  there, et cetera, these spatters were most likely be
14  classified as either impact spatters from force
15  striking a blood source or possibly cast-off
16  spatters, if the motion was brought backward toward
17  the wall, you know, in more direct type of a path,
18  if you will.  Again, look at the rest of the
19  information at the scene and the location of the
20  different pieces of furniture and the victims and
21  that type of thing.  In order for this to be
22  cast-off -- I wouldn't rule it out as cast-off, but
23  for it to be cast-off, the object producing it would
24  have to come back toward the wall this way.  And
25  there seems to be very little room in which to do

4562

```
 1  that without striking something.  So this is
 2  probably more likely, in my opinion it's more likely
 3  it comes from some kind of an impact force and the
 4  spatter was travelling in the direction of the force
 5  lower to the ground and toward the wall.
 6      Q.  So, in terms of impact, could it be from
 7  the weapon striking the victim for instance?
 8      A.  Sure.
 9      Q.  Now, there is an outlet in this photograph
10  do you know approximately how far off the floor a
11  common outlet is?
12      A.  Standard outlet is about 18 inches off the
13  floor to the center of the outlet, that I'm
14  depicting kind of where the screw goes in kind of
15  between the top and the bottom of the outlet.
16      Q.  You noted there had been furniture in here.
17  Is there anything in the picture that could indicate
18  that to you even if you hadn't seen the diagram?
19      A.  Yes, ma'am.  We have in this photograph
20  what we call voids within the pattern.  If I can
21  direct your attention to the far right, you see an
22  area of spatter.  As you remember, too, you get
23  closer to that door the spatters were more
24  prominent, more of them.  We see an absence of
25  spatters here, kind of a void area.  We have an area
```

4563

```
 1  of spatters here, as I'm indicating, again, toward
 2  the bottom right-hand side of the photograph, more
 3  toward the center of the photograph we see an
 4  absence of spatters or void.
 5      Void areas within spatter patterns are an
 6  indication there is was something in front of that
 7  area to prevent those spatters from striking the
 8  wall.  So there was some kind of object there that
 9  took on the spatters in that location rather than
10  allowing them to go forward and strike the wall like
11  the other spatters.
12      Q.  And one more photograph, Government's
13  Exhibit -- this is P, for the record.  There appear
14  to be different types of blood spatter along the
15  bottom here, the baseboard, can you explain what
16  we're looking at in terms of the larger versus the
17  smaller?
18      A.  We've got just, you know, some smaller
19  spatters, we've got some larger areas.  Spatters
20  here again could be from a cast-off motion or just a
21  larger volumes of blood that are being projected
22  toward the wall.
23      Q.  So, for these items, for the blood to go on
24  the wall they would have had to remain -- there is
25  enough force for it to remain airborne travelling
```

4564

```
 1  under the furniture?
 2      A.  That would be correct, yes.
 3      Q.  Okay.  And these are just larger spatter.
 4  Why would it have a little tail type thing?
 5      A.  Some of that I would have to look at closer
 6  under a magnification.  It possibly started to
 7  coagulate, form larger spots, if you will, or
 8  gelatinous type of blood after it began to coagulate
 9  a little bit, and maybe it was projected on the wall
10  that way.
11      Q.  Based upon the fact that there are -- there
12  is blood spatter with different directionality on
13  several walls, three walls and the ceiling, can you
14  come to a conclusion as to how that could have been
15  caused?
16      A.  Well, the mechanism used to generate the
17  force that called the spatter, particularly the
18  cast-off spatter, would have been in each of those
19  directions, the mechanism would have been such that
20  it caused blood to be propelled on all of those
21  different surface areas.
22      Q.  So, when you say the mechanism, does that
23  mean whoever was wielding the weapon would have been
24  moving?
25      A.  At least the bat would have been moving.
```

4565

```
 1      Q.  The bat?
 2      A.  Or the object would be moving.
 3      Q.  Around the victim?
 4      A.  Sure.  In some form or fashion to produce
 5  spatters on those different areas, sure.
 6      Q.  Can directionality also change based upon
 7  the victim moving?
 8      A.  In the cast-off?
 9      Q.  Yes.
10      A.  It could, sure.  Just -- well, let's --
11  that's one of the variables we kind of take into
12  account with analyzing blood stain is victim moving.
13  You have to account if the victim moved, and if so,
14  to what degree, and what direction, that type of
15  thing.
16          MS. DAYTON:  Okay.  One moment, please,
17  your Honor.
18      Q.  And you spoke earlier about force.  Based
19  upon your training and your experience are you able
20  to determine how much force would need to be used to
21  create this sort of spatter on the ceiling in
22  particular?
23      A.  It would be not just from the blood stains,
24  but from the autopsy reports and the injuries to the
25  victims, it would be a great amount of force to be
```

4566

1  able to cause those injuries, cause that amount of
2  bleeding and then subsequently cast that bleeding
3  off onto the ceiling in that amount.
4      Q.  Okay.  Thank you.
5          MS. DAYTON:  The government has nothing
6  further at this time, your Honor.
7          THE COURT:  All right, why don't we take
8  our lunch break and we'll come back at 1:30.  Thank
9  you very much.
10         All right.  Mr. Martin, we'll get you
11  back at 1:30.  Please don't discuss your testimony
12  with anyone.
13         THE WITNESS:  Yes, ma'am.
14         THE COURT:  All right, anything before
15  we take our lunch break?
16         MR. SMITH:  No, your Honor.
17         THE COURT:  If nothing further, we'll be
18  back at 1:30.
19         (Recess)
20         THE COURT:  All right, Counsel, please
21  be seated.  Where is Mr. Martin?
22         MS. DAYTON:  Right here.
23         THE COURT:  All right, sir, would you
24  return to the stand, you remain under oath and we'll
25  bring in the jury.

4567

1          (Jury entered the courtroom.)
2          THE COURT:  Please be seated, ladies and
3  gentlemen.  And Mr. Smith will cross-examine
4  Mr. Martin.
5          You may proceed.
6  CROSS-EXAMINATION
7  BY MR. SMITH:
8      Q.  Hi, Mr. Martin.  My name is Justin Smith.
9  I'm one of the attorneys for Mr. Aquart.  Actually,
10  I think you answered all of the questions we had on
11  your direct testimony and I don't have any
12  questions.  So thank you for being here.
13     A.  Thank you, sir.
14         THE COURT:  All right.  Then, sir, you
15  are excused and you may --
16         MS. DAYTON:  Your Honor, are you
17  kidding?
18         THE COURT:  I'm not kidding.  You may
19  go.  Thank you.  You are excused.
20         Will the government please call its next
21  witness.
22         MS. RODRIGUEZ-COSS:  We call Anthony
23  Armstead.
24         THE COURT:  All right, sir, will you
25  please remain standing.  Sir, remain standing, raise

4568

1  your right hand, the oath will be administered to
2  you.
3          A N T H O N Y   A R M S T E A D
4  Having first affirmed, was examined and testified as
5  follows:
6          THE WITNESS:  Anthony Armstead,
7  A-r-m-s-t-e-a-d, Bridgeport, Connecticut.
8          THE COURT:  You may proceed.
9          MS. RODRIGUEZ-COSS:  Thank you, your
10  Honor.
11  DIRECT EXAMINATION BY
12  MS. RODRIGUEZ-COSS:
13     Q.  Good afternoon, Mr. Armstead.
14     A.  Good afternoon.
15     Q.  I'm going to ask you to two things.  First,
16  if you could move that chair a little bit closer to
17  that desk.  And then I'm going to ask you to pull
18  that microphone towards you.  There we go.
19         Can you tell us, Mr. Armstead, where do you
20  live?
21     A.  Bridgeport, Connecticut.
22     Q.  And are you living in the free community
23  right now?
24     A.  No.
25     Q.  Are you confined?

4569

1      A.  Yes.
2      Q.  Can you tell us where?
3      A.  USP Big Sandy, Kentucky.
4          THE COURT:  I'm going to need you to
5  speak a little louder, sir, even with the
6  microphone, you're very soft-spoken.
7      Q.  Everyone in the courtroom --
8          THE COURT:  Can you spell the place
9  where you are confined?
10         THE WITNESS:  United States
11  penitentiary, Big Sandy.
12     Q.  Okay.  And why are you there?
13     A.  I got indicted in 2009 on a conspiracy
14  case.
15     Q.  On a conspiracy to do what?
16     A.  To cell narcotics.
17     Q.  All right.  And what did you do or what
18  happened to your case?
19     A.  I received 96 months.
20     Q.  So was that pursuant to a trial or to a
21  plea of guilty?
22     A.  To a plea of guilty.
23     Q.  And while you were pending trial, where
24  were you housed?
25     A.  At the Donald Wyatt facility in Rhode

4570

```
1   Island.
2       Q.   I want to bring your attention to
3   October 2nd of 2009.
4       A.   Okay.
5       Q.   And can you please tell the members of the
6   jury what happened to you that day?
7       A.   I was assaulted.
8       Q.   By whom?
9       A.   By the defendant.
10      Q.   All right.  And can you tell us, the person
11  you just pointed out, what is he wearing?
12      A.   He's wearing a blue shirt, sweater, and a
13  tie.
14          MS. RODRIGUEZ-COSS:  I'd like the record
15  to reflect the witness has identified the defendant,
16  your Honor.
17          THE COURT:  It may.
18      Q.   Mr. Armstead, what I would like you to do
19  is tell the members of the jury exactly what
20  happened that day that led up to that assault.
21      A.   It was around 6, 6:30 in the evening, I was
22  watching TV, me and another individual.  A guy by
23  the name of Juan Hernandez, who was in the corner
24  cell, he asked to speak to me.  So I got up, came
25  around, I went upstairs, I went into the cell.  So,
```

4571

```
1   we started discussing the issue that we was talking
2   about.
3       Q.   What were you talking about?
4       A.   We was talking about another defendant, one
5   of my co-defendants on my indictment not coming back
6   from court that day.
7       Q.   Why was that important to you?
8       A.   Because at the time it was a lot of people
9   were cooperating and you -- normally if you don't
10  come back from court it means that you cooperated.
11  So, we was discussing him not coming back from
12  court.
13      Q.   Okay.  And what happened while you were
14  speaking with Mr. Hernandez?
15      A.   When I was speaking with Mr. Hernandez,
16  another individual by the name of -- I think his
17  name is Vasquez, an older gentleman, he came into
18  the cell and he was explaining it to me because I
19  had asked him how -- I asked Juan, how did he know
20  Terrence didn't come back from court.  So he told me
21  the individual who told him.  So, I called him
22  upstairs, he comes to the cell.  So I am -- I'm
23  speaking to this individual who know what happened.  So he
24  tells me, you know, that Terrence didn't come back
25  from court.  I'm like, "How do you know?"
```

4572

```
1           "They just didn't bring him back yet."
2   He said, "We rode down together, they didn't bring
3   him back yet.  They took him out."  I'm, like, all
4   right, he leaves.
5       Q.   Then what happened?
6       A.   Another individual comes into the cell and
7   we was talking about the same thing, him and
8   Terrence were cellies.  So, we still discussing
9   Terrence and whether he didn't come back from court.
10      Q.   Do you remember that individual's name?
11      A.   His name is Nelson.  I don't know how you
12  pronounce his last name, but his first name is
13  Nelson, nickname Pill Back (ph).
14      Q.   How do you think you pronounce his last
15  name?
16      A.   Abeladejo.
17      Q.   Abeladejo?
18      A.   Yeah, something like that.
19      Q.   Go ahead.
20      A.   We started discussing him not coming back
21  from court.  So he leaves out, we discuss it for a
22  little while and he leaves out.  So me and Juan
23  continue to talk.  So as me and Juan continue to
24  talk, the defendant comes on my right side into the
25  cellway entrance.  So I look at him and he says,
```

4573

```
1   "You know who I am?"  I look at him, "No."  As I
2   proceed to turn back and talk to Juan, he struck me.
3       Q.   Where did he strike you?
4       A.   He struck me on the right side.
5       Q.   And then what happened?
6       A.   When that happened, I kind of, like, like
7   tried to brace myself.  I don't know if I hit the
8   bunk or not, but I fell down and I got into a
9   crouching position to try to protect myself while I
10  was being struck.
11      Q.   All right.  So when you were in the
12  crouching position, were you still being struck?
13      A.   Yes.
14      Q.   And then what happened?
15      A.   Then I was trying to -- my main concern was
16  to get out of the cell before -- the cell, because
17  the doors lock.  So my whole thing was to get out of
18  the cell.  I didn't know if I was being jumped or
19  not, so I just -- my main concern wasn't really
20  trying to look up and defend myself, it was just to
21  get out of the cell.
22      Q.   Did you see anyone other than the defendant
23  strike you?
24      A.   No.
25      Q.   Were you able to get out of the cell?
```

4574

1  A.  Yes.

2  Q.  How?

3  A.  I was -- I backed -- I came out the cell

4  backwards.  I was -- I don't know if it was my sense

5  of awareness, but I was able to get out of the cell,

6  though.

7  Q.  What did you do when you got out of the

8  cell?

9  A.  I got out the cell, I kind of like tried to

10  regain my consciousness, and I walked down the tier.

11  I walked down the stairs.  I walked to my cell to

12  look at my injuries.  I looked in the mirror, I was

13  bleeding everywhere.

14  Q.  And what happened?  Did you receive help?

15  A.  What do you mean, did I receive help?

16  Q.  Well, you said you looked in the mirror and

17  you were bleeding everywhere.

18  A.  After that I step out the cell and I called

19  the individual who I was watching TV with and I told

20  him to come here.  So when he came to the cell,

21  he's, like, "What happened?"  And I'm like, "I don't

22  know.  I think I just got jumped."  So he's like,

23  "By who?"  So I just pointed, like, to the direction

24  to where it happened at.  So he said, "You need to

25  go to the hospital."  So I'm like, "No, no, it's all

4575

1  right."

2  But at the time the CO was coming to lock

3  the door because it was being count time, so when

4  she gets to the cell, she sees the injury and she

5  sees the blood, so she asked me what happened.  I

6  told her I don't know.  When I told her I don't

7  know, she hit the button, she hit the button to let

8  them know an incident happened in the unit, and so

9  all the COs came.

10  Q.  Did you eventually go to the hospital?

11  A.  Yes.

12  Q.  And did you receive treatment there?

13  A.  Yes.

14  Q.  I want to bring your attention to what has

15  been marked, what has been marked Exhibits 3, 4, 5,

16  6 and 7.

17  MS. RODRIGUEZ-COSS:  No objection from

18  counsel, your Honor.

19  THE COURT:  All right, they are full

20  exhibits.

21  Q.  So, let me bring your attention

22  Mr. Armstead to what has been marked Government

23  Exhibit Number 3.  Do you recognize that photograph?

24  A.  Yes.

25  Q.  Who is that?

4576

1  A.  That's me.

2  Q.  And when was that photograph taken in

3  relation to the assault by the defendant?

4  A.  That was taken after the assault.

5  Q.  So, that same evening?

6  A.  Yes, on October 2nd.

7  Q.  Is that before you went to the hospital?

8  A.  Yes.

9  Q.  Let me bring your attention to what has

10  been marked Government Exhibit No. 4.  Can you tell

11  us what we're looking at here?

12  A.  You are looking at another injury.

13  Q.  You said you went to the hospital.  What

14  treatment, if any, did you receive, for example, on

15  this wound here?

16  A.  I received seven stitches.

17  Q.  And how about here, over your left eye?

18  A.  I received four stitches.

19  Q.  Bringing to your attention what has been

20  marked Government Exhibit No. 5, what are we looking

21  at here?

22  A.  Another injury as a result of the attack.

23  Q.  And what treatment did you receive with

24  respect to this injury?

25  A.  Three staples.

4577

1  Q.  Bringing to your attention what has been

2  marked Government Exhibit No. 6, can you tell us

3  what we're looking at here?

4  A.  A bruised lip.

5  Q.  And finally bringing your attention to what

6  has been marked Government Exhibit Number 7, is that

7  the right side of your face?

8  A.  Yes.

9  Q.  And what medical treatment, if any, did you

10  receive here and underneath your eye?

11  A.  Two stitches underneath the eye and three

12  stitches on the lip.

13  Q.  And let me bring to your attention to what

14  has been marked Government Exhibit No. 9.  While

15  we're waiting for counsel to look at that, how long

16  had you been at this unit?

17  A.  Two days.

18  Q.  I think you called it a pod.  Did you call

19  it a pod?

20  A.  Yes.

21  Q.  When you use the term "pod," what are you

22  referring to?

23  A.  A housing unit.

24  Q.  A housing unit?

25  A.  Uh-huh (indicating affirmatively).

4578

1    Q.   So, is there a limited number of inmates in
2  that housing unit?
3    A.   Yes.
4    Q.   So not every inmate in the institution has
5  access to that housing unit; is that correct?
6    A.   No.
7    Q.   And you said you had been there for two
8  days?
9    A.   Yes.
10   Q.   Had you spoken to the defendant prior to
11 the assault over the course of those two days?
12   A.   No.
13   Q.   And how do you know the defendant?
14   A.   I don't.
15   Q.   Where do you know him from?  You don't know
16 him?
17   A.   No.
18   Q.   You said you were from Bridgeport.  Did you
19 know him from before you were arrested?
20   A.   No.
21   Q.   Let me bring to your attention what has
22 been marked Government Exhibit No. 9.
23        MS. RODRIGUEZ-COSS:  Do you have an
24 objection?
25        MR. SMITH:  No objection.

4579

1    Q.   All right.  Specifically to page 3 of that
2  exhibit.
3        THE COURT:  Absent objection,
4  Government's 9 is a full exhibit.
5        MS. RODRIGUEZ-COSS:  Thank you, your
6  Honor.
7    Q.   And were these the discharge documents you
8  received from the hospital?
9    A.   Yes.
10   Q.   After treatment?
11   A.   Yes.
12   Q.   And there in the top line it says "multiple
13 facial and scalp lacerations and puncture wounds
14 secondary to assault."  Did you feel like you were
15 hit with anything?
16   A.   No.
17   Q.   Did you see any weapon?
18   A.   No.
19   Q.   I'll bring to your attention what has been
20 marked Government Exhibit No. 8.  Can you see that
21 clearly there?
22   A.   Yes.
23        THE COURT:  All right, absent objection,
24 this a full exhibit.
25        MR. SMITH:  No objection.

4580

1        MS. RODRIGUEZ-COSS:  Thank you, your
2  Honor.
3    Q.   Can you tell us what we're looking at here?
4    A.   You are looking at a cell.
5    Q.   Do you recognize that cell?
6    A.   Yes.
7    Q.   What cell is that?
8    A.   That's the cell that Juan Hernandez was
9  occupying at the time where the assault took place.
10   Q.   And can you tell the members of the jury
11 where you were standing when the assault took place?
12   A.   I was standing right by that towel, but
13 against the wall.
14   Q.   You are looking at the bottom left-hand
15 corner here?
16   A.   Yes.
17   Q.   Okay.  And where was Juan?
18   A.   Juan was sitting on the stool.
19   Q.   So, over here?
20   A.   Yes.
21   Q.   And why did you go up to his cell?
22   A.   To talk to him.
23   Q.   Why didn't he come down to talk to you?
24   A.   Because he was on a 48-hour lockdown.
25   Q.   What does that mean?

4581

1    A.   That means if you get in trouble they lock
2  you in your cell 48 hours.  You have to eat in your
3  cell, you can't come out.
4    Q.   So, you can't come out of your cell, but
5  the door to your cell is open?
6    A.   Well, his door shouldn't even have been
7  open at the time.
8    Q.   It should not have been opened?
9    A.   But it was.
10   Q.   And you were able to walk inside?
11   A.   Yes.
12   Q.   Now, let me bring your attention to what
13 has been marked Government Exhibit No. 2.
14        THE COURT:  I take it there is no
15 objection to that.
16        MR. SMITH:  No objection, your Honor.  I
17 apologize.
18        THE COURT:  All right, full exhibit.
19   Q.   Do you recognize Government Exhibit No. 2,
20 Mr. Armstead?
21   A.   Yes.
22   Q.   And whose signature is this here?
23   A.   Mines.
24   Q.   And who made that circle around the
25 defendant's face?

4582

```
1        A.   I did.
2        Q.   And whose initials are these?
3        A.   Mines.
4        Q.   And when were you shown this photo array?
5        A.   On 5/25.
6        Q.   And what were you asked to do?
7        A.   I was asked to point out the individual who
8    I think assaulted me.
9        Q.   Now, you said you didn't know the defendant
10   from Bridgeport; is that correct?
11       A.   Yes.
12       Q.   Had you been in prison previously before
13   being at the Wyatt correctional institution?
14       A.   Yes.
15       Q.   Did you spend time in a juvenile
16   institution?
17       A.   Yes.
18       Q.   What juvenile institution was that?
19       A.   Manson Youth Institution.
20       Q.   Do you recall when you were at Manson
21   Youth?
22       A.   From November of 1996 to August of 1997.
23       Q.   Do you recall ever -- well, strike that.
24            Now, Mr. Armstead, let me ask you, were you
25   interviewed by investigators from the Wyatt
```

4583

```
1    correctional institution following the assault?
2        A.   Yes.
3        Q.   Did you tell them who assaulted you?
4        A.   No.
5        Q.   Why not?
6        A.   At the time I was thinking of safety and
7    security of my well-being further down the line.
8        Q.   And were you interviewed with agents in
9    this case at some point in time?
10       A.   Yes.
11       Q.   Did they ask you who assaulted you?
12       A.   Yes.
13       Q.   And did you tell them?
14       A.   Yes.
15       Q.   And when did you tell them?
16       A.   I told them --
17       Q.   The first time that agents from this case
18   interviewed you with regard to your assault, did you
19   tell them who assaulted you?
20       A.   No.
21       Q.   And why not?
22       A.   Because of the prison that I was in.
23       Q.   And where were you when that interview took
24   place?
25       A.   I was in U.S.P., Big Sandy.
```

4584

```
1        Q.   And what was your concern?
2        A.   My concern was my safety.
3            MS. RODRIGUEZ-COSS:  The courts
4    indulgence, your Honor.
5        Q.   When you say you had a concern for your
6    safety, what do you mean?
7        A.   Well, in a federal penitentiary when you
8    first get there you have to show your paperwork, and
9    if in your paperwork it shows you cooperated with
10   the government it could bring harm to you.
11       Q.   When you say that you have to show your
12   paperwork, who do you show your paperwork to?
13       A.   You show the paperwork to the inmates.
14       Q.   So, to the other inmates.  You are not
15   talking about management of the facility?
16       A.   No, not the management.  I'm talking about
17   inmates from your state.
18       Q.   They'll ask you for your paperwork?
19       A.   Yes.
20       Q.   And they'll review your paperwork?
21       A.   Yes.
22       Q.   Mr. Armstead, you had an opportunity to
23   view a surveillance videotape from the Wyatt
24   correctional facility?
25       A.   Yes.
```

4585

```
1        Q.   And when was that?
2        A.   On 5/25.
3            THE COURT:  5/25 of this year?
4            THE WITNESS:  Yes.
5            (Sidebar conference).
6            MS. RODRIGUEZ-COSS:  I think the Court
7    allowed the video.
8            THE COURT:  I did allow the video.
9    What's the objection?
10           MR. SMITH:  Your Honor --
11           THE COURT:  You moved to exclude it on
12   best evidence.  I ruled under 104 -- under 1004(2)
13   that the duplicate is admissible.
14           MR. SHEEHAN:  It's not a duplicate.
15           MR. SMITH:  It's not a duplicate if it
16   doesn't accurately represent the original, for
17   starters, your Honor.  Second of all, the previous
18   witness said, well, I viewed a better copy and I can
19   tell you what's on it.
20           THE COURT:  The previous witness?
21           MR. SMITH:  Captain Alfonso, I reviewed
22   it, I can tell you what's on it because I reviewed
23   it.
24           THE COURT:  Well, that may not come in.
25           MR. SMITH:  I don't understand how this
```

4586

```
1    witness can represent what's on this videotape.
2              THE COURT:  He's looked at it.  I'm
3    going to let him testify from it.  It may not be as
4    good as, but it's not different from in the sense of
5    having different subject matter or different angles,
6    so forth.  Right?
7              MR. SMITH:  Well, again, your Honor, our
8    objection stands.
9              THE COURT:  Okay.
10             (Sidebar concluded)
11        Q.   So, Mr. Armstead, I'll bring your attention
12   to what has been marked Exhibit No. 10.
13             MS. RODRIGUEZ-COSS:  Can we turn the
14   lights down, your Honor?
15             THE COURT:  Yes.
16        Q.   Mr. Armstead, do you recognize that image
17   on the screen right now?
18        A.   Yes.
19        Q.   Can you tell us what we're looking at?
20        A.   You are looking at C Pod.
21        Q.   Let me pause it here.
22             MS. RODRIGUEZ-COSS:  And let the record
23   reflect we've paused at 18:38:51.
24        Q.   There is a pointer right behind you,
25   Mr. Armstead.  Can you, using that pointer, let the
```

4587

```
1    jury know where were you sitting before you went to
2    Mr. Hernandez's cell.  You can stand up if you need
3    to.
4              MS. RODRIGUEZ-COSS:  Let the record
5    reflect the witness is pointing to the back corner
6    visible in the center of the image, your Honor.
7        Q.   And where is Mr. Hernandez's cell?
8              MS. RODRIGUEZ-COSS:  So let the record
9    reflect he's pointing to the cell at the middle of
10   the image on the second floor.
11             Is that correct, Counsel?
12             MR. SMITH:  Yes.
13        Q.   And you said that you stood up and you
14   walked up the stairs.  What stairs did you walk up?
15             MS. RODRIGUEZ-COSS:  Let the record
16   reflect the witness is pointing to the stairs
17   visible on the right side of that image.
18             And let me just let that play.
19             (Tape played)
20             MS. RODRIGUEZ-COSS:  I'm going to bring
21   the video to 18:40.
22        Q.   You said you were sitting down in that area
23   where we can see there are tables and chairs.  What
24   were you doing?
25        A.   Watching TV.
```

4588

```
1        Q.   And when Mr. Hernandez called you up to his
2    cell, how did he do that?
3        A.   He had someone else get my attention and
4    when I leaned back he was leaning over the railing
5    like in his doorway, like, waving to me.
6        Q.   All right.
7              MS. RODRIGUEZ-COSS:  I'm going to
8    fast-forward to 18:43.
9        Q.   When you previously viewed the videotape,
10   Mr. Armstead, did you recognize any individual on
11   the videotape?
12        A.   I recognized myself, I recognized Nelson.
13        Q.   All right.  I'll go back a little bit.
14             Do you see that individual that was walking
15   along the top of the tier?
16        A.   Yes.
17        Q.   Do you recognize that individual?
18        A.   Yes.
19        Q.   Who was that?
20        A.   That's Nelson.
21        Q.   How were you able to recognize him?
22        A.   Because at the time he had pulled an
23   Achilles tendon and he had a black boot on his leg.
24             MS. RODRIGUEZ-COSS:  May the record
25   reflect your Honor, we stopped the video at
```

4589

```
1    18:44:17.
2              THE COURT:  All right, it may.
3        Q.   Bringing your attention again to the image
4    now, do you recognize anyone else?
5        A.   Yes, myself.
6        Q.   Can you tell the jury how you recognize
7    yourself in the video?
8        A.   Because I was leaning to the side and I was
9    trying to wipe the blood off my face and I was
10   wearing black and white Air Jordans at the time.
11        Q.   Using that pointer --
12             MS. RODRIGUEZ-COSS:  Let the record
13   reflect the video has been stopped at 18:45:40.
14        Q.   Can you tell us where you see yourself on
15   that video?
16             MS. RODRIGUEZ-COSS:  Let the record
17   reflect the defendant has pointed to the upper
18   right-hand corner of the video.
19        Q.   Where is your cell?
20             MS. RODRIGUEZ-COSS:  Let the record
21   reflect the defendant is pointing to the first
22   doorway seen on the first floor to the right of the
23   stairway seen in the center of the image.
24        Q.   So, if your cell is there, why did you walk
25   down the other way of the tier?  Why didn't you go
```

4590

1  down those stairs we see on the video?
2      A.   I don't know, I was really just trying to
3  gain consciousness.  I wasn't all the way there.  No
4  particular reason.
5      Q.   Let me ask you, did you see the defendant
6  again after the assault?
7      A.   Did I see him again?
8      Q.   Yeah.
9      A.   No.
10     Q.   Did you remain in that unit?
11     A.   No.
12     Q.   Where were you transferred to?
13     A.   I was housed in the hospital for seven days
14  and then I was moved to another pod.
15     Q.   And why did you change your mind about
16  testifying with regards to this assault?
17     A.   Because it wasn't right.
18     Q.   Have you ever signed a cooperation
19  agreement with the government?
20     A.   No.
21     Q.   Did you cooperate in your case?
22     A.   No.
23     Q.   Are you expecting anything from the
24  government in return for your testimony here today?
25     A.   No.

4591

1      Q.   Do you still have any cases pending?
2      A.   No.
3      Q.   Do you have any state cases pending?
4      A.   No.  I have a violation of probation.
5      Q.   A violation of probation?
6      A.   Yeah, but I don't have any state cases
7  pending.
8      Q.   Has that been resolved?
9      A.   No.
10     Q.   Do you expect any sort of favorable
11  assistance from the federal government in respect to
12  that violation of probation?
13     A.   No.
14     Q.   Has the federal government promised to do
15  anything in exchange for your testimony?
16     A.   No.
17          MS. RODRIGUEZ-COSS:  The Court's
18  indulgence, your Honor.  We have no further
19  questions for Mr. Armstead, your Honor.
20          THE COURT:  All right,
21  cross-examination.
22          MR. SMITH:  Thank you, your Honor.
23  CROSS-EXAMINATION
24  BY MR. SMITH:
25     Q.   Hi, Mr. Armstead.

4592

1      A.   How are you doing?
2      Q.   My name is Justin Smith.  I'm one of the
3  attorneys who represents Mr. Aquart.
4  You were interviewed immediately after the assault,
5  right?
6      A.   Yes.
7      Q.   Like they were asking you at your cell when
8  you returned to your cell what had happened.
9      A.   Yes.
10     Q.   You told them you didn't know.
11     A.   Yes.
12     Q.   You went to the hospital that night.
13     A.   Yes.
14     Q.   They asked you what happened.
15     A.   Yes.
16     Q.   You told them you didn't know.
17     A.   Yeah, that was a lie.
18     Q.   Okay.  You were interviewed the next day by
19  the prison investigators, right?
20     A.   Yes.
21     Q.   And again you told them you did not know
22  who assaulted you?
23     A.   Yes, and that was a lie.
24     Q.   In fact, you told them you did not even
25  know who Mr. Aquart was.

4593

1      A.   Yes, that was correct.
2      Q.   And the investigators told you that you
3  needed to straighten out your story.
4      A.   Excuse me?
5      Q.   The investigators at that interview the
6  next day told you you needed to straighten out your
7  story.
8      A.   What do you mean straighten out my story?
9      Q.   They told you, did they not, that you
10  needed to straighten out your story?
11     A.   No.
12     Q.   They didn't tell you that?
13     A.   They didn't say I need to straighten out my
14  story, no.
15     Q.   And they also told you that, you know, if
16  you didn't talk to them your stay at Wyatt could be
17  like hell.
18     A.   Excuse me?
19     Q.   They told you if you didn't talk to them
20  that your stay at Wyatt could be like hell.
21     A.   No, I don't recall that.
22     Q.   You don't recall them telling you that
23  either?
24     A.   No.
25     Q.   Would something refresh your memory in

4594

```
 1  regards to that?
 2      A.   Possible, but I don't recall that.
 3              MR. SMITH:  May I have just a moment,
 4  your Honor?
 5              THE COURT:  Yes.
 6      Q.   They took your statement.  They taped that
 7  interview, correct?
 8      A.   Yes.
 9              THE COURT:  So the purpose of showing
10  him this is to see whether or not --
11              MR. SMITH:  This would refresh his
12  memory, your Honor.
13              THE COURT:  -- whether or not he has any
14  refreshed recollection.
15              MS. RODRIGUEZ-COSS:  About what someone
16  else told him?
17              THE COURT:  Of what investigators said
18  to him.  Prison investigators, you mean?
19              MR. SMITH:  That is correct, your Honor.
20              THE COURT:  That is straighten out your
21  story or tell -- or your stay could be hell.  This
22  is not to say what is on that document, which is not
23  in evidence, Mr. Armstead, it's only whether looking
24  at it gives you any refreshed recollection about
25  what prison investigators may have said to you when
```

4595

```
 1  they interviewed you shortly after the assault.
 2  Does it refresh your recollection?
 3              THE WITNESS:  No.
 4              THE COURT:  Okay.
 5              MR. SMITH:  We'd offer the statement
 6  your Honor as an exhibit.
 7              MS. RODRIGUEZ-COSS:  About what someone
 8  else asked him?
 9              MR. SMITH:  Yes, your Honor.  It goes to
10  Mr. Armstead's state of mind.
11              MS. RODRIGUEZ-COSS:  It's not even a
12  substantive question and we would object to that.
13              THE COURT:  I'm going to hear you at a
14  recess on that.  I think that since it doesn't
15  refresh his recollection in any way it's not
16  dependent on his testimony, so I'll ask you to go
17  on.  Okay?
18              MR. SMITH:  That's fine, your Honor.
19  Thank you.
20      Q.   Mr. Armstead, at some point after you were
21  assaulted you did get sentenced on your federal
22  case, right?
23      A.   Correct.
24      Q.   Now, you've spent time in prison before
25  this.
```

4596

```
 1      A.   Correct.
 2      Q.   And all the time that you spent in prison
 3  were at facilities within the state of Connecticut.
 4      A.   Correct.
 5      Q.   And after you got sentenced you got
 6  moved --
 7      A.   Yes.
 8      Q.   -- out of Wyatt.  Where did you go first?
 9      A.   I went to MDC Brooklyn.
10      Q.   MDC Brooklyn.  And then where did you go?
11      A.   I went to Atlanta.
12      Q.   Atlanta?
13      A.   Yes.
14      Q.   How long were you in Atlanta?
15      A.   Five days.
16      Q.   Five days, okay.  And then where did you
17  go?
18      A.   I went to Kentucky.
19      Q.   So, Big Sandy?
20      A.   Yes.
21      Q.   And you had no part in the decision of
22  where they were going to send you, did you?
23      A.   No.
24      Q.   And being in Kentucky, it's pretty tough
25  for your family to come see you.
```

4597

```
 1      A.   Yeah.  But I've had a visit, though.
 2      Q.   I understand you've had visits, yes, but
 3  it's not easy for your family, it's an expense to go
 4  down there to see you.
 5      A.   Yes, it's an expense.
 6      Q.   Fair to say they probably come less than
 7  they used to if you were at Wyatt or a facility in
 8  Connecticut?
 9      A.   Correct.
10      Q.   And then you had been at Big Sandy until
11  you were brought back here?
12      A.   Correct.
13      Q.   Now, you had said that one of the reasons
14  you didn't want to tell the investigators down in
15  Big Sandy, meaning the agents who came to see you
16  there, was that you had to show your paperwork?
17      A.   Just cooperating is just -- you know, it's
18  not the daily routine in the penitentiary.
19      Q.   When you met with the agents, did they come
20  see you at Big Sandy?
21      A.   Yes.
22      Q.   Okay.  So you got pulled out of your cell?
23      A.   Yeah, I got pulled away from work, yes.
24      Q.   And when you talked to you you said "I
25  don't know who hit me," right?
```

4598

1    A.   Yes.
2    Q.   You didn't say to them, look, I know who
3 hit me, but I'm not going to testify, I just don't
4 want to be part of it.  You didn't say anything like
5 that?
6    A.   I told them that I didn't want to testify
7 and I did tell them that, you know, I know what
8 happened, but, you know, I don't want to testify.
9    Q.   Are you saying you told the agents you
10 identified Mr. Aquart at that --
11    A.   I didn't identify him at that time.
12    Q.   Okay.
13    A.   But I did make them aware, yeah, I know
14 what happened.
15    Q.   Okay.  And so, there was no paperwork
16 showing that you had been assaulted by Mr. Aquart.
17    A.   No.
18    Q.   No paperwork you had to show anyone at Big
19 Sandy?
20    A.   No.
21    Q.   Okay.
22    A.   But it's on my sentencing transcripts I was
23 assaulted at Wyatt, but it doesn't say who I was
24 assaulted by.  It was under investigation at the
25 time.

4599

1    Q.   I understand.  Where are you going from
2 here?
3    A.   I'm going back to Kentucky.
4    Q.   Back to Kentucky.  And it's, again, not up
5 to you to where they send you.
6    A.   No, I'm going back to restrictive housing
7 unit where I was placed after the agents came to see
8 me.
9    Q.   And they can send you anywhere in the
10 country.
11    A.   Who do you mean?
12    Q.   The Bureau of Prisons.
13    A.   Yes.
14    Q.   And you have no control over where that's
15 going to be.
16    A.   No.
17         MR. SMITH:  Can I have just a moment,
18 your Honor?
19         THE COURT:  Yes.
20    Q.   So after the agents came to see you at Big
21 Sandy you said you got put in restrictive housing?
22    A.   Yes.
23    Q.   After you told them "I don't know who
24 assaulted me"?
25    A.   Yes.

4600

1    Q.   And you could have sat there forever in
2 restrictive housing.
3    A.   No.
4    Q.   Well, they placed you there because the
5 agents had come to see you.
6    A.   Yeah, but the process is they do a threat
7 assessment and then you go to another facility.
8    Q.   They do a threat assessment and then what?
9 I'm sorry?
10    A.   They transfer you.  They can't keep you in
11 restrictive housing.  They have to place you in
12 another facility.
13    Q.   So, you could have been moved even farther
14 away at that point.
15    A.   Correct.
16    Q.   And again, you had no control over any of
17 that.
18    A.   No.
19         MR. SMITH:  Nothing further, your Honor.
20         THE COURT:  Redirect?
21 REDIRECT EXAMINATION
22 BY MS. RODRIGUEZ-COSS:
23    Q.   Mr. Armstead, very quickly, why were you
24 placed in restrictive housing in Kentucky?
25    A.   Because after you guys came to see me

4601

1 another inmate came into my cell around
2 six-something in the morning with a knife and told
3 me I F'd up and I got to go.  And I said, "For
4 what?"  He said, "Because you was talking to those
5 people?"
6    Q.   And when they said because you were talking
7 to those people, what people were they referring to?
8    A.   They were referring to the FBI.
9    Q.   That had gone to interview you at Big
10 Sandy?
11    A.   Yes.
12    Q.   And just one last question.  Counsel asked
13 you about Big Sandy and whether your family could go
14 visit you there.  The facility itself, how does it
15 compare to the facility where you were at Wyatt
16 correctional institution?
17    A.   What do you mean?
18    Q.   Well, are they similar?  Are they
19 dissimilar?  For example, we just saw an image on
20 the video and we saw sort of a common area where
21 people could sit and watch TV.
22    A.   Yes.
23    Q.   Do you have that sort of facility at Big
24 Sandy as well?
25    A.   Yes, in that aspect it's similar.

4602

```
1          MS. RODRIGUEZ-COSS:  Nothing further,
2  your Honor.
3          THE COURT:  All right, anything further,
4  Mr. Smith?
5          MR. SMITH:  Your Honor, I would just
6  renew the motion to put the statement in evidence.
7          THE COURT:  I'll take that up
8  separately.
9          We will mark that as Defendant's A for
10  identification.  If there is no further questioning
11  of Mr. Armstead, then you may go, sir.  You are
12  excused.  And you may step down.  All right.
13          Will the government call its next
14  witness, please.
15          MR. MARKLE:  Yes, your Honor.  Captain
16  Alfonso.
17          MR. SHEEHAN:  Your Honor, could we
18  approach before Captain Alfonso?
19          THE COURT:  Yes.
20          (Sidebar conference)
21          THE COURT:  Can I see the report that
22  we've just marked.
23          MR. MARKLE:  I'm sorry, the report?
24          THE COURT:  The report that we marked as
25  Defendant's A for identification, an investigation
```

4603

```
1  report the defendant is offering on which the
2  government has objection.
3          MS. RODRIGUEZ-COSS:  It's not a report,
4  it's a transcript of a recorded interview.
5          THE COURT:  All right.
6          MR. SHEEHAN:  I believe that Alfonso is
7  going to be asked to testify based upon his review
8  of the videotape and I don't think that should be
9  allowed.
10          THE COURT:  Okay.  This videotape that
11  they've been seeing that Mr. Armstead testified to?
12          MR. SHEEHAN:  But he's not -- he's not
13  testifying as to this videotape.  What he's
14  testifying to is his -- what he sees on this
15  videotape based upon what he's seen on the other
16  videotape.  He's clearly never seen the incident in
17  question.  So, he's testifying based upon the other
18  videotaping, just as your Honor, I think, fell prey
19  to the problem of suggestibility.  So that once
20  you've seen a videotape, then you say, oh, now, I
21  remember what that is.  I think that that's exactly
22  what Alfonso is going to be doing.  That's what is
23  improper about this.
24          THE COURT:  Okay.
25          MS. RODRIGUEZ-COSS:  Your Honor, it's
```

4604

```
1  not improper.
2          THE COURT:  Let me ask you first, are
3  you just going to question him about this video that
4  is now in evidence?
5          MS. RODRIGUEZ-COSS:  No, we intended to
6  do both.  We intended to ask him -- to have him say
7  what he observed on the original videotape using
8  this videotape.
9          THE COURT:  I'm going to preclude that
10  question.
11          MS. RODRIGUEZ-COSS:  Your Honor --
12          THE COURT:  So you can ask him about
13  this DVD.
14          MS. RODRIGUEZ-COSS:  Your Honor, I think
15  that's really unfair to the government.
16          THE COURT:  Fine.  That's the ruling.
17          MS. RODRIGUEZ-COSS:  May we just say
18  that this motion was filed by the defendant
19  yesterday.  They've had this evidence for years.
20  They've just filed this motion yesterday at
21  something like 7:00 p.m., was it, we received it.
22          THE COURT:  Let's start with what we
23  have on the DVD that has been offered into evidence,
24  okay.
25          MS. RODRIGUEZ-COSS:  We haven't
```

4605

```
1  instructed the witness not to refer to the fact that
2  he reviewed a videotape that night.  We would like
3  to brief this issue.  We think we are right.
4          THE COURT:  He can testify that he
5  reviewed it.  He can testify -- and in fact I think
6  the defendant will cross-examine him that he can't
7  really see what he sees.
8          MS. RODRIGUEZ-COSS:  So I think maybe I
9  am misunderstanding then the Court's ruling.  He can
10  testify as to what he saw that night when he
11  reviewed it?
12          THE COURT:  No.
13          MS. RODRIGUEZ-COSS:  That's past
14  recollection recorded.
15          THE COURT:  No, it's not.  He doesn't
16  have a recollection.
17          MS. RODRIGUEZ-COSS:  He has a report.
18  He has a report that was prepared contemporaneously
19  with reviewing that videotape and I don't think the
20  analysis should be any different than when a piece
21  of evidence is destroyed to bring an example.  I
22  understand Judge Hall just allowed testimony about a
23  video that had been destroyed in a case, and I'm
24  certain if we were allowed the opportunity we would
25  come up with cases that would allow us.
```

4606

```
1            THE COURT:  You've got many other
2   attorneys out here, get them going on their
3   research.  Let's just start with the DVD he's got
4   right now.
5            (Sidebar concluded)
6                J O E   A L F O N S O
7   Having first affirmed, was examined and testified as
8   follows:
9            THE WITNESS:  Joe Alfonso.  Last name,
10  A-l-f-o-n-s-o.  Pawtucket, Rhode Island.
11           MS. DAYTON:  Your Honor, I'm sorry to
12  interrupt, may we approach for one instant?
13           THE COURT:  Yes.
14           (Sidebar conference)
15           MS. DAYTON:  So the case in which Judge
16  Hall just decided this exact same issue, I can give
17  your Honor the facts, but first of all, the case
18  number is 309CR136, assigned to Judge Hall.  It's
19  United States v. Andrew Zayac, Z-a-y-a-c.  And the
20  circumstances are --
21           THE COURT:  Zayac?
22           MS. DAYTON:  Yeah.
23           THE COURT:  The one taking the Fifth in
24  this?
25           MS. DAYTON:  I surround myself with
```

4607

```
1   these people, because this was my case, too.
2   Basically there was a video, a surveillance video in
3   a lobby of an apartment building and the
4   investigators watched it the night after the murder,
5   the day after the murder, and they saw the victim
6   walking around and him leaving in the clothes that
7   he was wearing when he was then later found dead,
8   showing that he never came back, basically, is what
9   it established.  He left, he never came back.  He
10  was found in the same clothes he appears to be
11  wearing in the video.
12           The video got taped over because of --
13  just it got taped over by accident before they got a
14  copy of it.  And Judge Hall in the past, I don't
15  know, month and a half, ruled that it's not a
16  Crawford issue because it's nontestimonial in
17  nature.  There is no spoliation issue because it
18  wasn't done on purpose, it was an accident.  And it
19  in fact was to the government's detriment not to
20  have it, not to the benefit, and that she is
21  allowing in the case the investigators to testify to
22  what they saw on the video.
23           She did not issue a written ruling, so we
24  can't bring it up, but this was literally, I want to
25  say, within the last two months, it was while I was
```

4608

```
1   on trial here because Mr. Gustafson and Mr. Leaming
2   were handling the hearing because I'm here.
3            THE COURT:  So, the claim by the
4   defendant had been that a security video was
5   testimonial?
6            MS. DAYTON:  They tried to say that it
7   was Crawford and she said no, it wasn't.
8            THE COURT:  Because it's not
9   testimonial?
10           MS. DAYTON:  Right.
11           THE COURT:  And how does that compare
12  with a security video in a detention facility where
13  the purpose is to enable the prison officials to
14  investigate crimes that take place?
15           MS. DAYTON:  Well, honestly, arguably,
16  that's what the video was in this place also for,
17  because it's in the Bronx in a very bad area and
18  they would keep security there so that they could
19  watch what was going on in the building, but here
20  again, what was an accidental thing --
21           THE COURT:  There is no claim here that
22  there is anything purposeful about the
23  unavailability of this original.
24           MS. DAYTON:  Right.  So, it would be
25  akin to if he had seen what he's testifying to
```

4609

```
1   versus seeing on it a video, because they watch it
2   as a security camera, it's not just for the purpose
3   of testifying.  It's like the same in airports where
4   they have security cameras all over the place.  They
5   don't save all of those in an airport, they don't
6   save them in perpetuity.  In fact, at Wyatt it's
7   taped over every 90 days.  So what happens is the
8   primary purpose of these cameras is to be able to
9   keep a watch on different areas of the prison at the
10  same time because they don't have enough guards to
11  be everywhere in the prison at the same time.  It
12  also records.  It's the exact same thing as in an
13  airport.  The exact same thing as the security
14  camera in the building in the Bronx.  You attempt to
15  watch the security to the extent possible.
16           THE COURT:  Does the issue turn on
17  whether it's testimonial or not?
18           MS. DAYTON:  I do not believe it does.
19  It's his observations.  He can be cross-examined
20  about his observations.  But it was part of Judge
21  Hall's ruling was that it was not testimonial in
22  nature.
23           THE COURT:  So you say that what he
24  would testify about is what he saw on the video
25  that's not available, and you equate that with what
```

4610

```
1   he saw on the street that can't be replicated
2   either?
3           MS. DAYTON:  Exactly.  And in fact here
4   there is at least corroboration that he saw it
5   because there is a video, even though it's a worse
6   quality.  But yes, what he saw on the street could
7   never be replicated.
8           THE COURT:  So why then should he not be
9   permitted to testify about what he saw as any other
10  observation of what a person sees that is then
11  subject to cross-examination and/or corroboration?
12          MR. SHEEHAN:  Because he's testifying
13  about -- he's testifying in this context about a
14  document in a sense, and it's not in evidence, and
15  he's testifying basing his conclusions on that
16  document, which is not in evidence.  And there is no
17  duplicative copy of that document that would
18  ensure --
19          THE COURT:  Why is there a difference
20  between what he is looking at that you call a
21  document and what he would look at if he looked out
22  the window.
23          MR. SHEEHAN:  Because, A, it is a
24  document under the federal rules.
25          THE COURT:  But analytically, why does
```

4611

```
1   that make a difference as to why he can't be
2   examined on what he saw?
3           MR. SHEEHAN:  Because he -- because in
4   essence what -- I can't cross-examine him.
5           THE COURT:  But you can.
6           MR. SHEEHAN:  On something I can't see
7   that he claims to have seen?
8           THE COURT:  How can you cross-examine
9   him any more on what he observed real-time versus
10  what he observes on a video.
11          MR. SHEEHAN:  Because that's why there
12  is that difference.  The document is giving him, in
13  essence, a whole cover of legitimacy that doesn't
14  necessarily exist on what his observations might
15  happen to be.  He is standing there studying this
16  particular video, and now he says it's here, take my
17  word for it, and there is really nowhere to go with
18  that.
19          THE COURT:  So you are much happier if
20  he just -- it was that he looked at a video and saw
21  the following versus --
22          MR. SHEEHAN:  No.
23          THE COURT:  -- testifies that this is
24  what you can see on the reprogrammed, less clear
25  video?
```

4612

```
1           MR. SHEEHAN:  No.  I'm not much happier,
2   I'm not happy at all.
3           THE COURT:  Assume you are not happy at
4   all, but the question -- you are unhappy with
5   adverse witnesses.  So let's start with that as a
6   premise.  I'm trying to understand what the
7   difference is analytically between a person
8   testifies as to what she saw in real life versus
9   what they saw on television.
10          MR. SHEEHAN:  Because what they saw on
11  television wouldn't be evidence.  There would be a
12  production process involved in it.
13          THE COURT:  But what they saw is what
14  I'm asking about.  Why does matter in terms of
15  reliability between what they saw in real life
16  versus what they saw on television?
17          MR. SHEEHAN:  Because the underlying
18  issue is not what they saw, it's what happened.  And
19  what -- so, if I say I saw a car accident on
20  television, that wouldn't be proof of the car
21  accident, that would be proof that I saw a program
22  on television that talked about a car accident.
23          THE COURT:  So let's say you have one of
24  the now omnipresent telephone -- cell phone
25  photographers taking a picture of the car accident
```

4613

```
1   and showing you, this is what I saw, what is the
2   difference analytically between the person who sees
3   it before his eyes versus the person who is shown a
4   picture of it?
5           MR. SHEEHAN:  Because there is a whole
6   intervention of the technology aspect of it.
7           THE COURT:  And why is that significant?
8           MR. SHEEHAN:  Because that brings in a
9   whole capability of distortion.  We don't know how
10  that was produced and that's why the rule covers
11  photographs, covers videos.  That's why the rule is
12  there.
13          MS. DAYTON:  Your Honor, I'd like to
14  point out, number one, the Federal Rules of Evidence
15  don't apply.
16          THE COURT:  I --
17          MS. DAYTON:  Okay, but even if that was
18  the claim, there was some kind of claim of recent
19  fabrication or somehow they destroyed it, the fact
20  that he didn't do that is corroborated by the fact
21  that we do have a copy of the video, albeit not a
22  good one.  So, you know -- and this is, again, he's
23  questioning -- excuse me.  The defense just
24  questioned Anthony Armstead about an event that took
25  place and he was looking at a video and talking
```

4614

1    about it.  I mean, there is just no discernible
2    difference at all.
3              THE COURT:  Except Armstead actually saw
4    it happen because he was a participant in it.
5              MS. DAYTON:  Right.  But he also
6    testified there is me on the video, there is Nelson,
7    but he didn't see -- like, Mr. Armstead did see him
8    walk away.  He saw it on the video and he recognized
9    who it is because of the boot on his foot.  So he
10   can be cross-examined, he can be questioned about
11   the video.  He can be questioned about the
12   technology, the fact that they can't make a good
13   copy of it.  He can be asked all of these questions,
14   but in terms of -- it's -- number one, it's
15   unequivocally relevant, and the question is, is
16   there some sort of prejudice to the defendant.  And
17   the answer is no, your Honor, they have the ability
18   to cross-examine the witness who is here not only
19   about the technology and the failure of the
20   technology, but about what he saw on the technology.
21             And so based upon that, and this is not,
22   you know, shockingly enough, not a novel issue
23   because it didn't just occur, and Judge Hall just
24   similarly realized.  He is someone testifying to
25   what is observed on the grainy video.  And I'd like

4615

1    to note in Zayac there was no recreation of it, it's
2    gone.
3              THE COURT:  Do you have any other
4    questions for this witness that don't relate --
5              MR. SHEEHAN:  He's doing it, I thought.
6              MR. MARKLE:  It's going to be pretty
7    much the video, but I can do it.  We can go slow.
8              MS. DAYTON:  It's not going to take
9    45 minutes to question this man.
10             THE COURT:  Who is your next witness?
11             MS. RODRIGUEZ-COSS:  We don't expect
12   Mr. Smith would waive cross on Tom Martin.
13             THE COURT:  We can begin this witness's
14   testimony and then bring him back the next day after
15   there has been appropriate time for reflection and
16   briefing, appropriate time being 12 hours or more.
17             MS. DAYTON:  He lives in Rhode Island
18   too, your Honor.
19             THE COURT:  Well, he can come in on the
20   shuttle with Mr. Aquart.
21             MS. DAYTON:  On the bus.
22             MR. SHEEHAN:  He's not even at Wyatt.
23             MR. MARKLE:  He what?
24             MR. SHEEHAN:  He's not even at Wyatt.
25             MS. RODRIGUEZ-COSS:  Who is not at

4616

1    Wyatt?
2              MR. SHEEHAN:  Aquart is not at Wyatt.
3              THE COURT:  That's true.  In any event,
4    why don't we interrupt his testimony, let people
5    reflect on the arguments that have been made.  I
6    think the arguments that are made, now I'd like to
7    hear the defendant's considered response because
8    they're different from what was being asserted this
9    morning and we'll pick him up tomorrow.  So you can
10   either not call him now --
11             MR. MARKLE:  I think it's not worth
12   starting.  It will be so --
13             MS. RODRIGUEZ-COSS:  He would be able to
14   testify what his position was and what his duties
15   were and about the pod and everything, but I don't
16   think it will go more than ten minutes.
17             THE COURT:  But you can be hustling
18   around to find one of your victims' family.
19             MS. DAYTON:  There are people here but
20   we would like to warn them.
21             MR. MARKLE:  Can we just take a short --
22             MS. RODRIGUEZ-COSS:  No, your Honor,
23   they're not prepared to take the stand today.  They
24   were going to take the stand tomorrow.  The changing
25   the courtrooms, several of the family members were

4617

1    prepped in the other courtroom.  The change in
2    courtroom has affected them tremendously.
3              THE COURT:  What about the letters and
4    poems, are they being read through witnesses or can
5    they be offered and read at this time?
6              MS. RODRIGUEZ-COSS:  They could be read
7    at this time.  I'd have to redact.
8              MS. DAYTON:  We just need five minutes
9    to get that together, ten minutes.
10             THE COURT:  Why not -- all right.  We'll
11   take a ten-minute recess and then we'll do the
12   letters.
13             MS. DAYTON:  We'll figure out what we're
14   going to do.
15             MR. MARKLE:  I'm thinking about it, if
16   it's going to be worth it.
17             (Sidebar concluded)
18             THE COURT:  All right, ladies and
19   gentlemen, we're going to take a 15-minute break and
20   then we will be back, the same rules apply.
21             (Jury exited the courtroom.)
22             THE COURT:  All right.  We stand in
23   recess.
24             (Recess)
25             THE COURT:  Please be seated.

4618

```
1           All right, where is Mr. Markle?
2   Mr. Markle, have you made any determination?
3           MS. DAYTON:  We're going to call him
4   tomorrow, your Honor.
5           THE COURT:  All right, and are you
6   prepared to proceed with further evidence?
7           MS. DAYTON:  We're going to read two
8   letters and two poems, your Honor.  Your Honor, our
9   little white-out thing just ran out, so we're not
10  going to hand them to the jury right now.
11          THE COURT:  That's all right.  You can
12  clean up the redactions after we finish today, if
13  all that is being done is these are being read to
14  the jury.  Okay?
15          All right, are you ready?
16          MR. MARKLE:  Yes, your Honor.
17          (Jury entered the courtroom.)
18          THE COURT:  Please be seated, ladies and
19  gentlemen.  The government will call Captain Alfonso
20  tomorrow.  But so we will move to the government's
21  next evidence.
22          MS. DAYTON:  Your Honor, at this time we
23  would ask to read a couple letters that were written
24  and a couple poems by family members of the victims
25  in this case.
```

4619

```
1           THE COURT:  All right.  Will you
2   identify who the author is and then we will mark
3   that and then you can read it.
4           MS. DAYTON:  Okay, your Honor, the first
5   we're not going in order, but the first is
6   Government's Exhibit 23.
7           THE COURT:  All right, do you want to
8   use the microphone?
9           MS. DAYTON:  Sure.  It's Government's
10  Exhibit 23 and it's written by Leroy Whittingham,
11  Sr., Ms. Johnson's husband.
12          THE COURT:  All right.
13          MS. DAYTON:  Thank you.  It says, "On
14  August 24, 2005, I lost the love of my life.  I
15  spent 27 years with Tina.  We shared four wonderful
16  children and a lifetime of memories.  The early '90s
17  we bought a home in Jamaica, so when we were done
18  raising our children we would go to live there and
19  live out our golden years enjoying retirement,
20  relaxing on the beach and looking forward to
21  watching our grandkids grow up."  And then it's
22  signed, "her loving husband, Leroy W."
23          There is a second letter, Government's
24  Exhibit 24, that's written by the Barbara Johnson on
25  behalf of the family of Tina Johnson.  And it's
```

4620

```
1   dated May 26, 2011.  It says, "This is a hard letter
2   to write because we can't begin to understand how as
3   a family we came to an abrupt halt in our lives.
4   That morning in August of 2005 still doesn't seem to
5   have happened.  On that day a link of our family
6   chain was broken never to be repaired.
7           "The night before this horrible crime we
8   were talking on the phone.  I was at work that night
9   and when we finished talking she said 'I'm going
10  home tomorrow, so I'll see you later.'  But she was
11  so brutally the murdered instead.  There has been
12  and still is a great emptiness in our lives.  Tina
13  was loved by her children, sisters and brothers,
14  nieces and nephews, cousins and friends.  She was my
15  baby girl and I'm still having sleepless nights over
16  her untimely death.  We will never forget Tina,
17  James and Basil.
18          "The family of Tina Johnson, Barbara
19  Johnson and family."
20          MS. RODRIGUEZ-COSS:  Your Honor, we are
21  also submitting Government's Exhibit 21, which is a
22  flyer prepared for Ms. Johnson's funeral, and I just
23  want to post the flyer before reading the poem that
24  is in the back of this exhibit.  It's a four-page
25  document and it ends with a poem written by her
```

4621

```
1   brother, Terry Walley.  And the poem reads, "This is
2   a tale of woe.  We recently we lost a loved one.
3   Our reactions different.  See, at one time my mother
4   had eight children, four boys, four girls.  Sure, we
5   fought like siblings do, but we loved each other.  I
6   can't express the other's pain.  This you see has my
7   private hurt.  I've lost my baby sister to the mean
8   streets.  Words will never suffice to what I feel.
9   When I look in my mother's eyes I can see hurt and
10  pain.  One thing I've learned is bring it to the
11  doorstep of God.  Send us overnight express carried
12  by heavenly angels.  Her face I will not see again,
13  but her face will be etched in my heart.  It's not
14  every day God grants you a sister, most notably one
15  known as Baby.  Sometimes they're quite mouthy, but
16  you love them just the same.  Never take them for
17  granted because you only get one."  Written by Terry
18  Walley.
19          And Government Exhibit 22 is the second
20  poem written by Mr. Walley in honor of his sister.
21  "To whom it may concern, I'll never again hear the
22  joy, the joy of my sister's smile.  Never again will
23  I hear my telephone ring and see her number.  Those
24  moments spent between older brother and younger
25  sister, gone forever.  Through all of this pain and
```

4622

1  angst I remember my baby sister.  I knew of her pain
2  and joy.  I knew of her many self-doubts.  Is that
3  Tina, my baby sister?  Was a loving mother.  A
4  friend to all that knew her.  As the oldest child, I
5  was given a scary duty, to guide, to care, to listen
6  without being judgmental.  My duties included
7  coercion when needed.  These stated facts are a part
8  of the inner workings of family life.  My baby
9  sister Tina had the rare and unique ability to bring
10 calmness regardless of the situation.  Understand,
11 my baby sister Tina was more than flesh and bone,
12 she was a joyous spirit created and owned by God,
13 given as a gift to my family."  By Terry Walley, her
14 big brother.
15        MS. REYNOLDS:  Your Honor, we have one
16 additional letter which we will mark as Government's
17 Exhibit No. 20.  And it's a letter written yesterday
18 actually from his sister-in-law, Eleanor Lane, from
19 Basil Williams's sister-in-law, and it says.  "To
20 whom it may concern:  Basil Williams was my
21 brother-in-law and friend.  His untimely passing was
22 devastating to me and my children, especially my
23 daughter since it was on her birthday such a tragedy
24 happened.  Basil and his wife Georgia took care of
25 my daughter and son at night when I was at work and

4623

1  they loved him.  They loved him.  He was funny and
2  quiet, dependable and trustworthy, and his wife, who
3  is also deceased, kept him safe, and they -- and the
4  love they had was special.  Basil will always be
5  missed and will be remembered as being funny and
6  special by his family, especially by me and my
7  family.  Respectfully yours, Eleanor Lane."
8        THE COURT:  All right, does that
9  conclude the government's evidence for today?
10        MS. RODRIGUEZ-COSS:  Yes, ma'am.
11        THE COURT:  All right, ladies and
12 gentlemen, we'll see you at 9:30 tomorrow morning.
13 All the rules apply.
14        Juror No. 15, why don't you remain here
15 for a moment.
16        (Jury exited the courtroom.)
17        THE COURT:  Please be seated, Counsel.
18 Juror No. 15, you are requesting to be excused from
19 further service on this jury; is that correct?
20        JUROR:  That's what I asked.  I did
21 return early to be here today.  I also requested to
22 know what the length is because, as you can see, I'm
23 having to do cancellations and change things and
24 right now I know nothing other than to come back
25 tomorrow morning at 9:30.

4624

1        THE COURT:  As I'm sure you can
2  appreciate, it is impossible to be specific about
3  time periods.
4        JUROR:  Right.
5        THE COURT:  Matters come up that affect
6  that, that can't be anticipated.  The Court will not
7  be sitting June 8, 9, 10, but will resume again on
8  the 13th and proceed for whatever portion of that
9  week is necessary to, A, finish the evidence, and to
10 submit the matter to the jury for its deliberation,
11 and then for whatever time it takes the jury to do
12 that deliberation.
13        JUROR:  But you anticipate ending at
14 3:30 and beginning at 9:30?
15        THE COURT:  I anticipate keeping those
16 hours, until the point at which the jury is charged
17 and closing arguments are given and deliberations
18 begin, in which case that would be a day that would
19 be until five.
20        Is that of any assistance to you?
21        JUROR:  If I'm not going to be excused
22 then what I'll do is just start making train
23 reservations for every day because until I pick up a
24 ticket I can have it recharged back.  But it's of
25 some help to know if I'm not being excused that I

4625

1  can get a train ticket for Tuesday night and come
2  back in Monday morning of next week.
3        THE COURT:  That's correct.  So the
4  question for you is, knowing as best as the Court
5  can tell you what the schedule will be, are you
6  requesting to be excused or not?
7        JUROR:  That --
8        THE COURT:  You are on vacation.
9        JUROR:  I've already -- I informed the
10 university that I probably will not be able to honor
11 the award I was given for the rest of this week.  So
12 I already told them that.  I guess it was Friday.
13 So they're not exactly expecting me to show the rest
14 of this week.  For the rest -- I'll do what I need
15 to do.  I have a lot of other people hollering at
16 me, but I will do what I need to do.  I just mostly
17 wanted to have some idea of timeframe so I can start
18 making train reservations because unfortunately the
19 closer to train time the more -- yeah.
20        THE COURT:  The more expensive it is.
21        JUROR:  Yes.
22        THE COURT:  Well, that is, I can -- the
23 only thing definitive I can tell you is we will not
24 sit 8, 9 and 10, and thus you can take a train
25 Tuesday night come back Monday morning, the 13th.

4626

```
1        JUROR:  It is 9:30 because Amtrak does
2  have a really early train that comes in.
3        THE COURT:  Okay.  Thank you very much
4  for your willingness to continue.
5        (Juror exited the courtroom.)
6        THE COURT:  All right, tomorrow -- well,
7  I'll receive the defendant's further briefing in
8  support of its motion to preclude testimony of
9  Captain Alfonso as to what he saw on the video that
10 he viewed and contemporaneously made his --
11       MR. SHEEHAN:  He didn't make a report,
12 your Honor.
13       THE COURT:  He made notes.  He did not
14 make notes?
15       MR. SHEEHAN:  Apparently not.
16       MR. MARKLE:  No, your Honor, it's a
17 report written by another correctional officer.
18       MR. SHEEHAN:  Captain Coburn, I think.
19       MR. MARKLE:  I think they were together
20 when they watched the video.
21       THE COURT:  So the three things that we
22 have some evidence of, or no reason -- could have
23 evidence of is that A, he did see the original
24 video; B, that we have Mr. Armstead's testimony that
25 he was attacked and that he was attacked by the
```

4627

```
1  defendant, and whatever other corroborative details
2  there are.  I think that's the extent of what we
3  have so far.  So why don't we analyze what it is
4  that makes his testimony unreliable, since that is
5  of course the heart of the hearsay exclusion, and so
6  whether or not we are technically under -- since we
7  are not technically under the Federal Rules of
8  Evidence, it seems to me that we should be looking
9  at the essence of the concept of reliability to
10 determine whether or not his testimony should be
11 admissible.  And if the defendant is claiming that
12 it's testimonial implicating Crawford, then we
13 should get at that as well.  I think probably, in
14 the interest of time, simultaneous briefing would be
15 in order.
16       MS. DAYTON:  The other issue, your
17 Honor, would be Mr. Singh, because the government
18 doesn't have very many witnesses in the penalty
19 phase.  We have six victim witnesses.
20       THE COURT:  I am no further along in the
21 analysis.  If you haven't turned over Giglio
22 material -- I recognize you are going to say you
23 don't have to, but you also then, on the other hand,
24 tell me that this is a different trial in which
25 regular rules don't apply.  So I don't know where
```

4628

```
1  you stand with respect to turning over the Giglio
2  material before he testifies in order not to have to
3  postpone his cross-examination in order for the
4  defendant to prepare its cross-examination.
5        MS. DAYTON:  No, I understand that, your
6  Honor.  It's not so much that we're saying we don't
7  have to turn over Giglio, we're saying that what
8  they're requesting is not Giglio.  They're
9  requesting -- it would be similar to requesting, you
10 know, the reports from Anthony Armstead's drug
11 arrest from 2009 or from John Taylor's drug arrest
12 from 2000.
13       THE COURT:  I'm going to let you all
14 fight that out and tell me what status you are and
15 what the defendant claims it needs and why you need
16 it, and we can take that up when all of the dust has
17 settled.  I don't have anything more right now other
18 than the defendant's claim that material was not
19 turned over to them and/or was not turned over to
20 them timely.  And so it seems to me we should wait
21 to see if there are further developments.
22       MS. DAYTON:  Okay, we'll be turning them
23 over some information today.
24       THE COURT:  All right then.
25       MR. SHEEHAN:  Your Honor, I do think
```

4629

```
1  that your Honor mentioned reliability.  In that
2  context, I think that the Armstead interview notes
3  should -- the transcript of the Armstrong interview
4  should come in to evidence.
5        MS. DAYTON:  Armstead.
6        MR. SHEEHAN:  It is not hearsay.  Of
7  course who cares, in one sense, as far as the
8  federal rules are concerned at this point in time,
9  but what it is, is certainly a prior inconsistent --
10 a series of prior inconsistent statements in which
11 not only does he not identify Mr. Aquart, he's
12 specifically asked about Mr. Aquart in which he
13 specifically told his life will be hell if he
14 doesn't get his story straight.
15       All of those things I think can come in,
16 and since it was provided to us by the government I
17 don't think that there is any real argument about
18 the accuracy of the transcript.
19       THE COURT:  The examination that -- the
20 cross-examination suggested that this was FBI agents
21 going to see him at Big Sandy.  It does not appear
22 to be that.  It appears to be Wyatt people talking.
23       MR. SHEEHAN:  We never got any reports
24 on this alleged FBI interview at Big Sandy.
25       THE COURT:  This thing is at Wyatt.
```