# 12-5086

*To Be Argued By:*
TRACY LEE DAYTON

---

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

## Docket No. 12-5086

_____

UNITED STATES OF AMERICA,
*Appellee,*

-vs-

AZIBO AQUART, aka D, aka Dreddy, aka Jumbo,
aka Azibo Smith, aka Azibo Siwatu Jahi Smith,
*Defendant-Appellant,*

(For continuation of caption, see inside cover)

_____

ON APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF CONNECTICUT

---

**GOVERNMENT APPENDIX-VOLUME V (GA1201 – GA1500)**

DEIRDRE M. DALY
*United States Attorney*
*District of Connecticut*

TRACY LEE DAYTON
JACABED RODRIGUEZ-COSS
SANDRA S. GLOVER
*Assistant United States Attorneys*

LESLIE R. CALWELL
*Assistant Attorney General*

SUNG-HEE SUH
*Deputy Assistant*
*Attorney General*

DAVID M. LIEBERMAN
*Attorney*
*Criminal Division*
*Appellate Section*

AZIKIWE AQUART, aka Zee, Nathaniel Grant, aka
Correctional Officer Stone, EFRAIN JOHNSON,

*Defendants.*

# TABLE OF CONTENTS

Trial Transcript – Volume I dated April 20, 2011 ......................................GA1

Trial Transcript – Volume II dated April 21, 2011.....................................GA65

Trial Transcript – Volume III dated April 25, 2011 ................................GA115

Trial Transcript – Volume IV dated April 26, 2011.................................GA171

Trial Transcript – Volume V dated April 27, 2011 ..................................GA238

Trial Transcript – Volume VI dated April 28, 2011.................................GA298

Trial Transcript – Volume VII dated April 29, 2011 ...............................GA355

Trial Transcript – Volume VIII dated May 2, 2011..................................GA423

Trial Transcript – Volume IX dated May 3, 2011.....................................GA494

Trial Transcript – Volume X dated May 4, 2011 ......................................GA547

Trial Transcript – Volume XI dated May 5, 2011......................................GA605

Trial Transcript – Volume XII dated May 9, 2011 ...................................GA655

Trial Transcript – Volume XIII dated May 10, 2011 ...............................GA707

Trial Transcript – Volume XIV dated May 11, 2011 ...............................GA767

Trial Transcript – Volume XV dated May 12, 2011..................................GA819

Trial Transcript – Volume XVI dated May 13, 2011 ...............................GA850

Trial Transcript – Volume XVII dated May 16, 2011..............................GA893

Trial Transcript – Volume XVIII dated May 17, 2011 ............................GA952

Trial Transcript – Volume XIX dated May 18, 2011 ..............................GA1008

## <u>TABLE OF CONTENTS</u> (cont'd)

Trial Transcript – Volume XX dated May 20, 2011 ...............................GA1036

Trial Transcript – Volume XXI dated May 23, 2011 .............................GA1089

Transcript of Guilt Phase Charge Conference – Volume I
    dated May 13, 2011...............................................................GA1097

Transcript of Guilt Phase Charge Conference – Volume II
    dated May 18, 2011...............................................................GA1124

Guilt Phase Verdict Form dated May 23, 2011......................................GA1137

Trial Transcript – Volume XXII dated May 31, 2011 ...........................GA1140

Trial Transcript – Volume XXIV dated June 1, 2011 ............................GA1201

Trial Transcript – Volume XXV dated June 2, 2011 .............................GA1237

Trial Transcript – Volume XXVI dated June 3, 2011............................GA1285

Trial Transcript – Volume XXVII dated June 6, 2011 ..........................GA1342

Trial Transcript – Volume XXVIII dated June 7, 2011 .........................GA1404

Trial Transcript – Volume XXIX dated June 13, 2011 ..........................GA1435

Trial Transcript – Volume XXX dated June 14, 2011 ...........................GA1472

Trial Transcript – Volume XXXI dated June 15, 2011 ..........................GA1479

Transcript of Penalty Phase Charge Conference – Volume I
    dated June 6, 2011................................................................GA1483

Transcript of Penalty Phase Charge Conference – Volume II
    dated June 7, 2011................................................................GA1502

Special Verdict Form (Penalty Phase) dated June 15, 2011 ..................GA1523

Motion for Mistrial dated May 23, 2011.................................................GA1537

## TABLE OF CONTENTS (cont'd)

Ruling on Defendant's Motion for a Mistrial dated February 21, 2012  GA1542

Transcript of John Taylor's Guilty Plea dated October 18, 2010 ........... GA1555

Transcript of John Taylor' Sealed Cooperation Agreement Plea
    Dated October 18, 2010 ..................................................................... GA1565

Transcript of John Taylor's Sentencing Hearing dated April 16, 2012 . GA1569

Trial Transcript of Efrain Johnson – Volume VII dated February 16, 2012
    [Testimony of John Taylor] ............................................................. GA1580

Trial Transcript of Efrain Johnson – Volume VIII dated February 17, 2012
    [Testimony of John Taylor] ............................................................. GA1643

Trial Transcript of Efrain Johnson – Volume IX dated February 21, 2012
    [Testimony of Lashika Johnson] ..................................................... GA1712

Failed Change-of-Plea Hearing Transcript of Efrain Johnson
    dated March 8, 2011 ........................................................................ GA1731

Transcript of Azikiwe Aquart Change of Plea dated August 26, 2011 .. GA1742

Government Exhibit 100A ...................................................................... GA1751

Government Exhibit 102A ...................................................................... GA1754

Government Exhibit 109 ........................................................................ GA1755

Government Exhibit 110 ........................................................................ GA1756

Government Exhibit 111 ........................................................................ GA1757

Government Exhibit 112 ........................................................................ GA1758

Government Exhibit 114 ........................................................................ GA1759

Government Exhibit 116G ..................................................................... GA1760

## TABLE OF CONTENTS (cont'd)

Government Exhibit 116H ........................................................................ GA1761

Government Exhibit 116I ......................................................................... GA1762

Government Exhibit 116J ........................................................................ GA1763

Government Exhibit 117H ........................................................................ GA1764

Government Exhibit 117J ......................................................................... GA1765

Government Exhibit 120-1 ....................................................................... GA1766

Government Exhibit 120-2 ....................................................................... GA1767

Government Exhibit 120-3 ....................................................................... GA1768

Government Exhibit 120-5 ....................................................................... GA1769

Government Exhibit 120-6 ....................................................................... GA1770

Government Exhibit 121-4 ....................................................................... GA1771

Government Exhibit 121-6 ....................................................................... GA1772

Government Exhibit 121-8 ....................................................................... GA1773

Government Exhibit 121-10 ..................................................................... GA1774

Government Exhibit 122-3 ....................................................................... GA1775

Government Exhibit 122-5 ....................................................................... GA1776

Government Exhibit 122-7 ....................................................................... GA1777

Government Exhibit 123-1 ....................................................................... GA1778

Government Exhibit 124 .......................................................................... GA1779

Government Exhibit 127 .......................................................................... GA1780

## TABLE OF CONTENTS (cont'd)

Government Exhibit 128A.........................................................................GA1781

Government Exhibit 129A.........................................................................GA1782

Government Exhibit 129B.........................................................................GA1783

Government Exhibit 130 ..........................................................................GA1784

Government Exhibit 136 ..........................................................................GA1785

Government Exhibit 137 ..........................................................................GA1786

Government Exhibit 139 ..........................................................................GA1787

Government Exhibit 140 ..........................................................................GA1788

Government Exhibit 164 ..........................................................................GA1789

Government Exhibit 165 ..........................................................................GA1790

Government Exhibit 231A.........................................................................GA1791

Government Exhibit 245 ..........................................................................GA1792

Government Exhibit 246 ..........................................................................GA1801

Government Exhibit 247 ..........................................................................GA1807

Government Exhibit 247A.........................................................................GA1817

Government Exhibit 249 ..........................................................................GA1822

Government Exhibit 263 ..........................................................................GA1828

Government Exhibit 264 ..........................................................................GA1837

Government Exhibit 273 ..........................................................................GA1847

Government Exhibit 274 ..........................................................................GA1850

## TABLE OF CONTENTS (cont'd)

Government Exhibit 275 ........................................................................ GA1852

Government Exhibit 276 ........................................................................ GA1860

Government Exhibit 277 ........................................................................ GA1864

Government Exhibit 278 ........................................................................ GA1866

Government Exhibit 279 ........................................................................ GA1868

Government Exhibit 300 ........................................................................ GA1870

Government Exhibit 300A ...................................................................... GA1871

Government Exhibit 301 ........................................................................ GA1872

Government Exhibit 302 ........................................................................ GA1873

Government Exhibit 305 ........................................................................ GA1874

Government Exhibit 306 ........................................................................ GA1888

Government Exhibit 307 ........................................................................ GA1889

Government Exhibit 308 ........................................................................ GA1890

Government Exhibit 314 ........................................................................ GA1891

Government Exhibit 315 ........................................................................ GA1906

Government Exhibit 316 ........................................................................ GA1907

Government Exhibit 319 ........................................................................ GA1908

Government Exhibit 322 ........................................................................ GA1909

Government Exhibit 400 ........................................................................ GA1924

## TABLE OF CONTENTS (cont'd)

Government Exhibit 403 ....................................................................GA1925

Government Exhibit 404 ....................................................................GA1926

Government Exhibit 414 ....................................................................GA1927

Government Exhibit 424 ....................................................................GA1928

Government Exhibit 433 ....................................................................GA1929

Government Exhibit 435 ....................................................................GA1930

Government Exhibit 447 ....................................................................GA1931

Government Exhibit 451 ....................................................................GA1932

Government Exhibit 464 ....................................................................GA1933

Government Exhibit 465 ....................................................................GA1934

Government Exhibit 467 ....................................................................GA1935

Government Exhibit 506 ....................................................................GA1936

Government Exhibit 514 ....................................................................GA1939

Government Exhibit 3 ........................................................................GA1943

Government Exhibit 4 ........................................................................GA1944

Government Exhibit 9 ........................................................................GA1945

Government Exhibit 12A.....................................................................GA1952

4630

```
1        MS. DAYTON:  But that's not true, what
2   they just said.  They received a 302.
3        MR. SHEEHAN:  Wait a minute.  I did not
4   receive a 302 regarding the Big Sandy trip.  The 302
5   that I have is 5/25.
6        THE COURT:  Do you know what, it's not
7   useful to me to say yes, he does, and he says, no,
8   he doesn't have it.  So I'm going to let you all get
9   that straightened out.  If there is anything you
10  want to confirm in any supplemental briefing, of
11  course I will read it, but we can also reserve time
12  tomorrow to hear you.
13       MR. SMITH:  Your Honor, just so -- I
14  apologize if I did not make that clear in my
15  cross-examination of Mr. Armstead.  This statement
16  that we're proposing be entered was taken shortly
17  after, actually the day after.
18       THE COURT:  That's what you can tell
19  from the context.
20       MR. SMITH:  The investigators at Wyatt,
21  and that's what I specifically crossed about, did
22  you tell them the next day about Mr. Aquart.
23       THE COURT:  So it seems to me we should
24  start, keeping with our tradition, we start early
25  tomorrow.  I would propose 8:45 and I can hear you
```

4631

```
1   at that point.  All right?
2        MS. DAYTON:  Yes, thank you, your Honor.
3        THE COURT:  Thank you very much.  We
4   stand in recess.
5        (Recess)
```

4632

```
1              I N D E X
2   WITNESS                          PAGE
3   THOMAS MARTIN
4   Direct Examination by Ms Dayton       4506
5   Cross-Examination by Mr. Smith        4567
6
7   ANTHONY ARMSTEAD
8   Direct Examination by Ms. Rodriguez-Coss   4568
9   Cross-Examination by Mr Smith         4591
10
11
12        I certify that the foregoing is a
13  correct transcript from the record of proceedings in
14  the above-entitled matter.
15              6/1/11
16              Date
17
18          /S/  Sharon Montini
19          Official Reporter
```

4633

```
1             UNITED STATES DISTRICT COURT
2              DISTRICT OF CONNECTICUT
3   * * * * * * * * * * *    *
                                *
4   UNITED STATES OF AMERICA,    * Case No 6cr160(JBA)
                                *
5             Plaintiff,         *
                                *
6        vs.                     *
                                *
7   AZIBO AQUART                 * June 1, 2011
                                *
8             Defendant.         *
                                *
9   * * * * * * * * * * * *     *
10              TRIAL TRANSCRIPT
11              VOLUME XXIV
12  BEFORE:  THE HONORABLE JANET BOND ARTERTON U.S.D.J.,
                                        and jury
13  Appearances:
14  FOR THE GOVERNMENT:   ALINA REYNOLDS, ESQ
                          TRACY DAYTON, ESQ.
15                        PETER MARKLE, ESQ.
                          JACABED RODRIGUEZ-COSS
16                        United States Attorney's Office
                          915 Lafayette Blvd
17                        Bridgeport, CT 06604
18
19  FOR THE DEFENDANT     MICHAEL SHEEHAN, ESQ
    AZIBO AQUART:         Sheehan & Reeve
20                        139 Orange Street
                          New Haven CT 06510
21                        JUSTIN SMITH, ESQ.
                          383 Orange Street
22                        New Haven, CT 06511
23
24  Court Reporter:       Sharon Montini, RMR
25  Proceedings recorded by mechanical stenography,
    transcript produced by computer
```

**GA1201**

4634

```
1          THE COURT:  Good morning, Counsel.  Good
2   morning, Mr. Aquart.  I guess you are on your own
3   this morning.  Please be seated.
4          MS. REYNOLDS:  I think counsel are in
5   their little room.
6          All right, I understand, Counsel, that
7   there has been a resolution to the disputes with
8   respect to Witness Singh and Captain Alfonso.
9          MR. SHEEHAN:  There has, your Honor.
10         MS. DAYTON:  Yes.  We --
11         MR. SHEEHAN:  We have some good news.
12         MS. DAYTON:  In speaking last night
13  Mr. Sheehan said that he would agree to the
14  relevance, admissibility, I should say, of Alfonso's
15  testimony regarding the original videotape.  In
16  return, we are not going to seek to put Mr. Singh on
17  in our case-in-chief.  We stated to Mr. Sheehan that
18  if something was brought out, I gave a couple
19  examples to Mr. Sheehan that would suggest we needed
20  Mr. Singh in rebuttal, that we would not say for
21  sure that we wouldn't call him in rebuttal, but we
22  will not call him in our case-in-chief.
23         THE COURT:  All right.
24         MR. SHEEHAN:  And if -- if something
25  unforeseen comes out, then we can deal with Mr.
```

4635

```
1   Singh at that point.
2          The other -- the good news/bad news part
3   of it is apparently there is a scheduling --
4          MS. DAYTON:  There is.
5          MR. SHEEHAN:  -- problem.
6          MS. DAYTON:  The Whittingham family had
7   another tragedy last night.  One of their cousins
8   was shot in the head up in Boston during a robbery
9   and killed.  And so they went up there and they
10  don't want to leave the family right now.  Lativia
11  Whittingham is up there with her brother, Jamal.
12  They will come back tonight to testify tomorrow, but
13  they don't want to leave their sides right now.  It
14  happened in the middle of the night.  She went up
15  there three in the morning.
16         So what we had asked, we're prepared with
17  all of our other witnesses.  If we can go forward
18  with our other witnesses, start the defense case and
19  then just have the two Whittingham women tomorrow
20  morning, Lativia Whittingham and Erica Whittingham.
21         MR. SHEEHAN:  We're trying to balance
22  that request, your Honor, against our concern
23  about -- so could we delay on that decision, your
24  Honor, until we kind of see where we are timewise
25  and have a chance to think -- we just heard this two
```

4636

```
1   minutes ago.
2          MS. DAYTON:  Well, we just learned it
3   this morning.
4          MR. SHEEHAN:  Well, five minutes ago.
5          THE COURT:  We'll work it out.
6          MR. SHEEHAN:  I mean my concern -- all
7   right.
8          THE COURT:  In terms of working things
9   out, when will I get your requests for charge and,
10  most particularly, your proposed verdict form?
11         MS. DAYTON:  We'll try to work on that
12  this afternoon.
13         THE COURT:  We're going to need to do
14  charge conferencing early next week.
15         MS. DAYTON:  Yes.  And we also need to
16  have a Daubert hearing, or requested a Daubert
17  hearing on Marva Lewis.
18         THE COURT:  True.  I'm waiting for the
19  defendants.
20         MR. SHEEHAN:  Right, I hope to have
21  something for you, your Honor, by the end of the day
22  today.
23         THE COURT:  All right then, and I will
24  tell the jurors that we're not sitting on the 8th,
25  9th and 10th as well.
```

4637

```
1          MR. SHEEHAN:  Your Honor, with the
2   Court's permission, Jean Barrett is resource counsel
3   and I would just ask that she be allowed to sit in
4   the front row with our mitigation specialist.
5          THE COURT:  Fine, welcome.
6          MS. BARRETT:  Thank you, your Honor.
7          THE COURT:  All right.  Let's bring in
8   the jury.  And is Captain Alfonso ready to go?
9          MR. MARKLE:  Yes, your Honor.
10         THE COURT:  All right, why don't we
11  bring him in.
12         (Jury entered the courtroom)
13         THE COURT:  Please be seated, ladies and
14  gentlemen.  Good morning.  Before we proceed with
15  the testimony of Captain Alfonso, I wanted to advise
16  you we will not be sitting on Wednesday, June 8th,
17  Thursday, June 9th, and Friday, June 10th.
18         JUROR:  I couldn't hear you.  I'm sorry.
19         THE COURT:  June 8, 9 and 10 we will not
20  be sitting.  So you can make other plans for those
21  days.
22         All right.  And I will keep you apprised
23  of where we are as best I can for the week of the
24  13th as soon as I am in a position to do that.
25         All right then, Mr. Markle will proceed
```

4638

1  with Captain Alfonso.
2          Good morning.
3          THE WITNESS:  Good morning, ma'am.
4          THE COURT:  You remain under oath.  We
5  started there and didn't get very far.  Go ahead.
6          J O S E P H   A L F O N S O,
7  Having previously been sworn, was examined and
8  testified as follows:
9  DIRECT EXAMINATION
10 BY MR. MARKLE:
11     Q.   Captain Alfonso, can you the tell us how
12 you are employed?
13     A.   I'm A correctional captain at the Wyatt
14 Detention Facility in Central Falls, Rhode Island.
15     Q.   And what is your position there?
16     A.   Captain, first shift, shift commander.
17     Q.   And what are your responsibilities as a
18 captain of the first shift?
19     A.   In charge of approximately anywhere between
20 40 to 50 security staff and also in charge of the
21 detainee population throughout the entire facility.
22          THE COURT:  Could you speak a little
23 slower.
24          THE WITNESS:  Yes, ma'am.  The detainee
25 population throughout the entire facility.

4639

1      Q.   And how large is Wyatt correctional?
2      A.   At this current moment the population is
3  approximately 600 -- the count this morning was 672.
4      Q.   And how many people work under you or do
5  you supervise?
6      A.   On my shift alone it is approximately 46.
7      Q.   And how many years have you been at Wyatt
8  correctional facility?
9      A.   Approximately ten years.
10     Q.   And did you begin as a captain or as a --
11 what would be your starting position?
12     A.   I began as a correctional officer.
13     Q.   And worked your way up to captain?
14     A.   Yes, sir.
15     Q.   And how many shifts are there at Wyatt for
16 the correctional officers?
17     A.   There is three shifts.
18     Q.   And what are the shifts?
19     A.   Seven a.m. to 3:00 p.m. would be the first
20 shift; 3:00 p.m. to 11:00 p.m. would be the second
21 shift; and 11:00 p.m. to 7:00 a.m. would be the
22 third shift.
23     Q.   Are you familiar with what's been referred
24 to as C Pod?
25     A.   Yes, sir.

4640

1      Q.   And what is that?
2      A.   That is one of the housing units on the
3  older wing of the facility.
4      Q.   And are you familiar with the location of
5  cells in the C Pod area?
6      A.   Yes, sir.
7      Q.   And for how long have you been involved
8  with the C Pod area?
9      A.   I've worked in the facility ten years.
10 I've dealt with -- we conduct rounds in every unit
11 every day.  So, I'm very familiar with C Pod.
12     Q.   Can inmates who are in another pod access
13 C Pod?
14     A.   No.  The only way is if another detainee is
15 under the supervision of an escort.
16     Q.   Say that again.
17     A.   No other detainee in any area can access
18 another unit unless they are being escorted by a
19 supervisor on work detail or any kind of detail.
20     Q.   So, there are inmates designated to C Pod
21 as their housing area?
22     A.   Yes, sir.
23     Q.   And no one is allowed unless accompanied by
24 a correctional officer?
25     A.   Yes, sir.

4641

1      Q.   On October 2nd, 2009, were you employed as
2  a captain at Wyatt correctional?
3      A.   Yes, sir.
4      Q.   And were you working in the C Pod area?
5  Were you responsible for C Pod?
6      A.   I was responsible for that wing of the
7  facility that night.
8      Q.   That wing?
9      A.   Yes.
10     Q.   And at approximately 6:30, 6:35 p.m. that
11 evening, did anything unusual happen?
12     A.   The housing unit officer that evening
13 initiated a 10-33, which is a call for assistance to
14 the unit.
15     Q.   A 10-33?
16     A.   Yes, sir.
17     Q.   And what does that mean, a call for
18 assistance?
19     A.   It's just if the officer suspects something
20 or she just needs additional assistance from other
21 staff.
22     Q.   And did you respond to that call?
23     A.   Yes, sir.
24     Q.   And what, if anything, did you do?
25     A.   As soon as I reported to the area I spoke

**GA1203**

4642

1  with the staff, the unit officer, to try to get a
2  summary of what was going on.  She had told me to
3  report to cell 11, that the detainee that was in
4  that cell, Detainee Armstead, had blood all over his
5  face when he walked by her officer station.
6      Q.  So, she had observed Anthony Armstead?
7      A.  Yes, sir.
8      Q.  And what, if anything, happened after that?
9      A.  As soon as I was briefed by the officer I
10 reported to cell 11, I observed his injuries when he
11 was standing in his cell.  I immediately told the
12 other responding staff to secure the unit.
13     Q.  Who was in cell 11?
14     A.  Detainee Armstead and his cellmate.
15     Q.  And I'm going to show you what's been
16 marked Government's Exhibit 3, ask you if you
17 recognize this photograph?
18     A.  Yes, sir.
19     Q.  And what do you recognize Government's
20 Exhibit 3 to be?
21     A.  That is Detainee Armstead.
22     Q.  And is that a true and accurate depiction
23 of Mr. Armstead on October 2nd?
24     A.  Yes, sir.
25     Q.  That's how you saw him when you went to

4643

1  cell 11?
2      A.  He had been washing his face.  It was a
3  little more bloodier, but yes.
4      Q.  And did you observe other wounds to
5  Mr. Armstead?
6      A.  He had several wounds on the front, side
7  and back of his head.
8      Q.  I'm going to show you what's been marked
9  Government's Exhibit 4, and ask you if you recognize
10 the injuries depicted in that photograph?
11     A.  Yes, sir.
12     Q.  And is that, again, how Mr. Armstead
13 appeared on October 2nd?
14     A.  Yes, sir.
15     Q.  What, if anything, did you do in regards to
16 Mr. Armstead and his injuries?
17     A.  As soon as I observed him in the cell, at
18 that time I instructed him to stop what he was
19 doing, washing himself.  I immediately removed his
20 cellmate from that cell for his safety and had his
21 cellmate removed from the unit, and then as soon as
22 his -- as soon as that unit was secure for safety, I
23 then removed him from the unit and brought him to
24 the health services unit to seek medical attention.
25     Q.  And at that time did you interview or speak

4644

1  to Mr. Armstead?
2      A.  Yes, as soon as we arrived in the medical
3  unit we kind of talked and tried to see what state
4  of mind he was in.  We asked him what had happened,
5  does he know who assaulted him.  At that time he
6  said no.
7      Q.  And did you have much -- did you have
8  further involvement with Mr. Armstead at that time?
9      A.  After that, the other captain on call,
10 Captain Coburn, took the lead on him and I began
11 working on the video footage and what occurred in
12 the unit.
13     Q.  In regards to the video footage, what are
14 you referring to?
15     A.  The housing unit video DVR footage in that
16 unit.
17     Q.  Is the entire housing area videotaped?
18     A.  Yes.  There is two different cameras in
19 that unit to cover the entire unit.
20     Q.  Are you talking about C Pod now?
21     A.  Yes, sir.
22     Q.  Is the videotape running all the time,
23 24 hours a day?
24     A.  Yes, sir.
25     Q.  And is it monitored?  Is it live monitored?

4645

1      A.  Yes, sir.
2      Q.  And is the videotape, is the recording
3  preserved?
4      A.  Yes, sir.
5      Q.  For how long is the recording preserved?
6      A.  Approximately 90 days.
7      Q.  And what happens to it after that?
8      A.  It needs to stay current for 90 days.  So
9  any footage after that 90-day period, it would just
10 continue to get recorded, so we would lose the
11 footage.
12     Q.  It's recorded over?
13     A.  Yes.
14     Q.  And have you investigated prison assaults
15 previously?
16     A.  Yes, sir.
17     Q.  And approximately how many?
18     A.  Probably over a dozen.
19     Q.  And were inmates injured in those assaults?
20     A.  Yes.
21     Q.  Were weapons used in those assaults?
22     A.  Several, yes.
23     Q.  What types of weapons have been used?
24     A.  Locks in the socks.
25     Q.  Locks in socks?

4646

1    A.    Padlocks put into socks, batteries placed
2    into socks, chairs, food trays.
3    Q.    Food trays, the actual tray used as a
4    weapon?
5    A.    Yes.
6    Q.    Why do inmates have locks?
7    A.    To secure any of their personal legal
8    matters in their cell.
9    Q.    Does every inmate have a lock?
10   A.    They have to purchase them.  And if they're
11   indigent there are steps for them to go through to
12   receive a lock.
13   Q.    In your experience, have inmates been
14   cooperative in your investigations?
15   A.    No, sir.
16   Q.    And why is that?
17   A.    Fear for their own safety.
18   Q.    In regards to the videotape, you said you
19   undertook the mission to review that?
20   A.    Yes, sir.
21   Q.    And did you in fact do that?
22   A.    Yes, sir.
23   Q.    And was that tape helpful to you in
24   investigating this assault?
25   A.    Yes, sir.

4647

1    Q.    Did you interview any witnesses in regards
2    to the assault?
3    A.    That evening I interviewed about 10 to 12
4    detainees.
5    Q.    And do you recall reviewing the video?
6    A.    Yes, sir.
7    Q.    And that was done on October 2nd?
8    A.    Yes, sir.
9    Q.    And in regards to the video that you
10   reviewed -- you have seen the video -- I'm going to
11   show you what's been marked Government's Exhibit 10.
12   Have you seen that before?
13   A.    Yes, sir.
14   Q.    And this is a DVD of the -- what is this?
15   A.    It's the DVD of the footage from C Pod that
16   evening.
17         MR. MARKLE:  Offer Government's
18   Exhibit 10 as a full exhibit, your Honor.
19         MR. SHEEHAN:  I think it's already in.
20         THE COURT:  I think it's in already.
21   Q.    And Government's Exhibit 10, is that -- in
22   terms of clarity, how does that compare to what you
23   viewed on October 2nd?
24   A.    It's not as clear.  It's a little
25   distorted, but still able to visually determine who

4648

1    was who in the unit.
2    Q.    On the video that you reviewed on
3    October 2nd, where did you review that?
4    A.    On the computer in the office.
5    Q.    And how was the clarity on that video?
6    A.    Much better.
7    Q.    And were you able to distinguish individual
8    inmates?
9    A.    Yes.
10   Q.    And does the video record the time of the
11   events?
12   A.    Yes, sir.
13   Q.    And when you make a copy of it, how is that
14   done?
15   A.    The footage is saved off the actual server
16   from the DVR onto the hard drive of the computer,
17   and then from the computer we could put it onto a
18   CD.
19   Q.    And that's where it tends to lose clarity?
20   A.    Yes, sir.
21   Q.    And did you -- after reviewing it and after
22   doing your investigation, did you prepare a report
23   of your investigation?
24   A.    Yes, sir.
25   Q.    And did your fellow officers?

4649

1    A.    There were several supervisors that
2    conducted interviews and also did reports.
3    Q.    Other supervisors, did you say?
4    A.    Yes, sir.
5    Q.    But for clarity, is Government's 10 a true
6    and accurate depiction what was videotaped on
7    October 2nd?
8    A.    Yes, sir.
9    Q.    Were any deletions, additions, changes made
10   to that videotape?
11   A.    No, sir.
12   Q.    So, do you recall approximately what time
13   anything of significance was observed by you on that
14   videotape?
15   A.    Approximately 18:42, which would be
16   6:42 p.m.
17   Q.    18, that would be 6:42?
18   A.    6:42 p.m., yes, sir.
19   Q.    What, if anything, did you first observe?
20   A.    You see a lot of movement on the top tier
21   of that unit.  Detainees just acted very
22   suspiciously, and then just see the movement of
23   Detainee Armstead from the lower tier moving up to
24   cell 27 where the assault took place.
25   Q.    And just before I show you the videotape,

4650

1    can you show us where -- are you familiar with an
2    inmate named Azibo Aquart?
3        A.    Yes, sir.
4        Q.    And do you see him here in court today?
5        A.    Yes, I do, sir.
6        Q.    Where is he seated?  Or describe him,
7    please.
8        A.    He's seated to my left with the long
9    dreads.
10            MR. MARKLE:  May the record reflect he's
11   pointed to the defendant, your Honor?
12            THE COURT:  It may.
13       Q.    Do you know what cell at the time, in
14   October of 2009, Mr. Aquart was housed in?
15       A.    He was housed in cell C-29.
16       Q.    C-29 which is at the top of the --
17       A.    Top tier.
18       Q.    Of the diagram I put on?
19       A.    Yes, sir.
20       Q.    Are you familiar with Anthony Armstead?
21       A.    Slightly.
22       Q.    Did you know what cell -- or learn what
23   cell Armstead was housed in?
24       A.    Previous to the assault, no.
25       Q.    I'm sorry?

4651

1        A.    Prior to the assault, my involvement, no.
2        Q.    How about after?  You said you went to 11?
3        A.    Yes.  Afterwards, yes.
4        Q.    And was that Cell 11?
5        A.    Yes, sir.
6        Q.    And was that on -- is this top tier that's
7    depicted on the screen right now?
8        A.    Yes, it is, sir.
9        Q.    And was Mr. Armstead's cell on the top tier
10   or the lower tier?
11       A.    Lower tier.
12       Q.    And do you know, did you learn through your
13   investigation where the assault took place of
14   Mr. Armstead?
15       A.    Yes, sir, in Cell C-27.
16       Q.    C-27 which is on the right-hand corner as
17   you look on the screen?
18       A.    Yes, sir.
19       Q.    Now, you said approximately 6:42 you saw
20   something that turned out to be significant to you.
21   What was that?
22       A.    At approximately 6:42 Detainee Aquart is
23   seen standing on the tier in front of Cell 24, and
24   then it is observed that Detainee Armstead's going
25   up the rear stairwell towards Cell 27.

4652

1        Q.    I'm going to play for you Government's
2    Exhibit 10 and ask you if you see on the videotape
3    --
4            (Tape played).
5        Q.    You first said you saw Mr. Aquart?
6        A.    Yes, sir.
7        Q.    And could you just point out to the ladies
8    and gentlemen of the jury where you see him?
9        A.    He's at the top tier with the brown T-shirt
10   and the white thermal.
11       Q.    If you could take that pointer, if you can
12   reach it on the screen, show us where Mr. Aquart
13   was.
14            Thank you.  Pointing to the right side of
15   the --
16       A.    Yes, sir.
17       Q.    -- of the videotape?
18       A.    Yes, sir.
19       Q.    And he was observed doing what?  Just
20   standing there at that time?
21       A.    Yes, sir.
22       Q.    What did you next observe; if you recall?
23       A.    Up the stairs right here is Detainee
24   Armstead walking into Cell 27, and then --
25       Q.    You saw Mr. Armstead go up from the lower

4653

1    tier?
2        A.    Yes.  He entered Cell 27.  And then one of
3    the key ways we'll determine who is who is, this is
4    Detainee Albaladejo who had a black air cast on his
5    leg.
6            THE COURT:  Do you know what would be
7    helpful, I think if you would grab up the mic.
8        Q.    You said now -- okay.  So you saw --
9    Mr. Aquart is where now?
10       A.    He is standing right here, top tier.
11       Q.    Right side of the video?
12       A.    Yes, sir.
13       Q.    And you observed Mr. Armstead go into
14   Cell 27?
15       A.    Yes, sir.
16       Q.    And you pointed to someone on the stairs.
17   Could you just repeat what you said about him?
18       A.    That was Detainee Albaladejo, he will be
19   entering Cell 27 here shortly.  We determined it was
20   him, he was the only detainee in that unit that had
21   a black air cast on his leg.
22       Q.    And how did you determine that that was
23   Mr. Aquart on the right-hand side of the video?
24       A.    His long hair, African-American male with
25   long dreads.

4654

```
1      Q.   Were his dreads unusually long?
2      A.   Yes.
3      Q.   And was anyone else in C Pod, did anyone
4   else in C Pod have long dreads at the time?
5      A.   At that time, no.
6      Q.   And no one else had access to C Pod?
7      A.   No.
8      Q.   So, no one in C Pod had long dreads like
9   Mr. Aquart?
10     A.   At that time, no.
11     Q.   And I'm going to continue the tape and if
12  you tell us what you see of significance.
13          (Tape played).
14     Q.   That's Mr. Albaladejo going up the stairs?
15     A.   Yes, sir.
16     Q.   With the boot.  And where the does he
17  proceed to go?
18     A.   Across the top tier and then he's going to
19  enter cell C-27.
20     Q.   That's C-27 that he just went into at
21  18:42, 6:42?
22     A.   Yes, sir.
23     Q.   46.  And what, if anything, did you next
24  observe?
25     A.   Shortly thereafter, Detainee Aquart is
```

4655

```
1   going to be seen walking down the tier and then he's
2   going to be standing in front of cell C-29.
3      Q.   That's his cell?
4      A.   Yes.
5      Q.   So at 18:43:11 he starts to proceed toward
6   cell C-29; is that correct?
7      A.   Yes, sir.
8      Q.   And what do you observe after he heads to
9   -- he, Mr. Aquart, goes to C-29?
10     A.   He stands there for roughly a short time,
11  less than a minute.
12     Q.   And where do you see him go next?
13     A.   Shortly here I see him move towards cell
14  C-27.
15     Q.   Do you see that now on the --
16     A.   Yes, sir.
17     Q.   So, at 18:43:49 he's proceeding toward what
18  cell?
19     A.   Cell C-27, sir.
20     Q.   And where does he go?
21     A.   He enters the cell.
22     Q.   At 18:43:52 he enters the cell?
23     A.   Yes, sir.
24     Q.   And do you recall if anything -- what, if
25  anything, you observed next?
```

4656

```
1      A.   Detainee Albaladejo is seen exiting the
2   cell and walking down the tier.  He exists the cell
3   now.
4      Q.   At 18:44:05, approximately?
5      A.   Yes, sir.
6      Q.   How do you recognize him?
7      A.   By the black air cast, boot.
8      Q.   Did you see Mr. Aquart exit the cell at
9   this time?
10     A.   No, he exists approximately a minute later.
11     Q.   So at this time Mr. Armstead is in there
12  and Mr. Aquart?
13     A.   Yes, sir.
14     Q.   And who do you first see exit the cell?
15     A.   Detainee Aquart.  At this time you are
16  seeing Detainee Aquart exiting the cell walking
17  across the top tier towards Cell 32.
18     Q.   So, Detainee Azibo Aquart exits C-27.
19     A.   Yes, sir.
20     Q.   And he the proceeds to which area?
21     A.   Cell 32.
22     Q.   And his cell was 29?
23     A.   Yes, sir.
24     Q.   So, he goes past his cell?
25     A.   Yes.
```

4657

```
1      Q.   Do you know whose cell was C-32?
2      A.   At the time I think it was Detainee Singh.
3      Q.   And do you know whether or not he entered
4   that cell?
5      A.   Yes.
6      Q.   Do you know how long he remained in that
7   cell?
8      A.   It was roughly -- in Cell 32, sir?
9      Q.   Yes.
10     A.   It was roughly a minute.  And Detainee
11  Armstead is seen walking down the tier limping right
12  here.
13     Q.   That's Mr. Armstead?
14     A.   Yes, sir.
15     Q.   And is Mr. Armstead -- cell C-11, is that
16  the fastest way to C-11?
17     A.   No.
18     Q.   Is the route he took away from C-29 and
19  C-32?
20     A.   Yes, sir.
21     Q.   And it's the long way back to C-11?
22     A.   Yes, sir.
23     Q.   And how long did Mr. Aquart remain in C-32;
24  do you know?
25     A.   It was approximately a minute that he was
```

**GA1207**

4658

```
1   in cell 32.
2        Q.   And how long was he in C-27, approximately?
3        A.   A little over a minute.
4        Q.   Did you continue to watch the video and
5   observe where Mr. Armstead went?
6        A.   Yes, sir.
7        Q.   Let me ask you this:  Do you know where
8   Mr. Aquart went after he left C-32?
9        A.   After he left C-32 he went back to his
10  cell, which was C-29.
11       Q.   Do you see Mr. Armstead again in the video?
12       A.   That's Detainee Armstead.  And that's
13  Detainee Aquart exiting Cell 32 and just went into
14  Cell 29.
15       Q.   Where is Mr. Armstead?
16       A.   He's walking down onto the lower tier.
17  He's going to walk into the middle and he's going to
18  enter his cell, C-11.
19       Q.   So, at the time Mr. Aquart leaves C-32 and
20  enters C-29, Mr. Armstead goes to his cell?
21       A.   Yes, sir.
22       Q.   That's then where you met -- you can sit
23  down.
24       A.   Thank you, sir.
25       Q.   That's where you met up with Mr. Armstead
```

4659

```
1   in C-11?
2        A.   Yes, sir.
3        Q.   And observed the injuries you just
4   described, you just noted on the photos?
5        A.   Yes, sir.
6        Q.   During the time that you observed in the
7   video anyone going or coming from C-27, did you see
8   anyone other than Mr. Aquart or Mr. Armstead leave
9   after Mr. Albaladejo left?
10       A.   No, sir.
11       Q.   Did you see anyone enter after Mr. Aquart
12  and Mr. Armstead entered C-27?
13       A.   No, sir.
14       Q.   There is no audio to the videotape,
15  correct?
16       A.   Yes, there is no audio.
17       Q.   And the video does not when -- without
18  zooming in or having control over the video, can you
19  see into the cell with the video?
20       A.   No, sir.
21       Q.   Did you observe any weapon in the hands of
22  any of the individuals that you saw in the
23  videotape?
24       A.   No, sir.
25       Q.   After observing the video and conducting
```

4660

```
1   interviews, was part of the investigation to search
2   for any evidence?
3        A.   Yes.
4        Q.   And do you know what cells were searched?
5        A.   Cell 27, Cell 29 and Cell 32.
6        Q.   And Cell 32?
7        A.   Yes.
8        Q.   Were any -- was any bloody clothing found?
9        A.   In those cells, no.
10       Q.   And was bloody clothing found in C-11?
11       A.   Yes, the clothing that he had on and a
12  towel he was using to wash the blood off his face
13  with.
14       Q.   He, Mr. Armstead?
15       A.   Yes, sir.
16       Q.   Were any weapons found in C-27, 29, 32 or
17  11?
18       A.   No, sir.
19       Q.   In your experience, have you learned how
20  prisoners have gotten rid of evidence?
21       A.   Through investigations and comments we
22  have.
23            MR. SMITH:  I'm going to object to this
24  line of questioning.  What's the relevance?
25            MR. MARKLE:  There was no evidence
```

4661

```
1   found.  I thought I would see whether there was an
2   explanation.
3            THE COURT:  I'm going to permit this.
4            This is, in this instance this is just
5   your general experience.
6            THE WITNESS:  Yes, ma'am.
7            THE COURT:  And you bring that general
8   experience to bear when you are doing investigations
9   of prison assaults.
10           THE WITNESS:  Yes, ma'am.
11           THE COURT:  You may proceed.
12       Q.   In what ways has evidence been disposed of?
13       A.   They've flushed it down the toilet, they've
14  disposed of it in the trash cans in the units.
15  They've attempted to hide it in light fixtures.
16  Anywhere that they think we won't look.
17       Q.   In any event, your search in this matter
18  was unsuccessful?  The only evidence you found was
19  the bloody clothing of Mr. Armstead?
20       A.   Yes, sir.
21       Q.   Do you know why the video loses clarity
22  when it's clipped or prepared as this is?
23       A.   In order for us to save a 90-day period on
24  the DVR server themselves, we've have to lose
25  something in order to save that much, that large of
```

4662

```
1   a time span.  And what we lose when we save it, we
2   lose the clarity.
3       Q.   And how much better is the clarity of the
4   video you reviewed on October 2nd, 2009?
5            MR. SMITH:  Objection.  Asked and
6   answered.
7            THE COURT:  This is a comparative thing;
8   is that the question?  How much -- okay.
9            I'm not quite sure how you are going to
10  answer it, but can you tell us in what respect the
11  original is clearer than the video that you've been
12  testifying from.
13           THE WITNESS:  The way it's pixeled,
14  ma'am, the pixels on the screen.  It's -- once we
15  save it off that system, it crunches and that's why
16  you get the poor quality.
17      Q.   Is there any doubt that what you saw on
18  October 2nd, 2009, is there any doubt in your mind
19  that you saw Mr. Armstead enter C-27?
20      A.   I'm sorry?  Say that again, sir.
21      Q.   Is there any doubt that you saw
22  Mr. Armstead ender C-27?
23      A.   No, sir.
24      Q.   Is there any doubt that you saw Mr. Aquart,
25  this defendant, enter C-27 shortly after
```

4663

```
1   Mr. Armstead entered?
2       A.   No, sir.
3       Q.   Is there any doubt that the defendant had
4   long dreadlocks that were apparent to you in the
5   videotape you saw on October 2nd, 2009?
6       A.   No, sir.
7       Q.   Is there any doubt in your mind that on the
8   videotape you saw on October 2nd, 2009, that
9   Mr. Armstead came out of that cell injured?
10      A.   No, sir.
11           MR. SMITH:  Your Honor, I'm going to
12  object to this.  This is just a repeat of all of his
13  testimony asking him if he has a doubt about his own
14  testimony.
15           THE COURT:  Overruled.
16           MR. MARKLE:  I have no further
17  questions, your Honor.
18      Q.   You can answer that question.
19      A.   No, sir, no doubt.
20      Q.   And the injuries to Mr. Armstead, did he
21  appear to have any injuries prior to entering C-27?
22      A.   Yes, he was limping.
23      Q.   Prior?
24      A.   Yes, prior to entering C-11.
25      Q.   No, prior to going into C-27?
```

4664

```
1       A.   No, sir, no injuries.
2       Q.   Did Mr. Armstead exhibit any -- did you
3   notice any blood?
4       A.   No, sir.
5       Q.   Did you notice any limping by him?
6       A.   No, sir.
7       Q.   When he came out of C-27, did you?
8       A.   Yes, sir.
9       Q.   And when you saw him in C-11, did you see
10  those injuries?
11      A.   Yes, sir.
12           MR. MARKLE:  May I have just one moment,
13  your Honor?
14           THE COURT:  Yes.
15           MR. MARKLE:  Nothing further, thank you,
16  your Honor.
17           THE COURT:  All right,
18  cross-examination.
19           MR. SMITH:  Thank you, your Honor.
20  CROSS-EXAMINATION
21  BY MR. SMITH:
22      Q.   Hi, Captain Alfonso.  My name is Justin
23  Smith.  I'm one of the attorneys who represents
24  Mr. Aquart.
25           So, on the evening of October 2nd, you
```

4665

```
1   learned about the assault, correct?
2       A.   Yes, sir.
3       Q.   And you began your investigation; is that
4   right?
5       A.   Yes, sir.
6       Q.   Along with Captain Coburn?
7       A.   Yes, sir.
8       Q.   And you said at some point you sort of
9   split up, you went to view the video?
10      A.   Yes, sir.
11      Q.   And Captain Coburn was talking to Detainee
12  Armstead?
13      A.   Yes, sir.
14      Q.   But you would have, after viewing the
15  video, reported your findings back to Captain
16  Coburn?
17      A.   Yes, sir.
18      Q.   And you are aware Captain Coburn
19  memorialized what you reported to him?
20      A.   No, sir.
21      Q.   Okay.  Were you aware that he wrote a memo
22  to Michael Iarossi?
23      A.   The initial e-mail?
24      Q.   Yes.
25      A.   Yes.
```

4666

1    Q.   You are aware of that?
2    A.   Yes.
3    Q.   And initially, and I think you talked about
4 this in your direct examination, that you had to
5 view the video to figure out who was who?
6    A.   Yes.
7    Q.   And initially it wasn't clear who was who;
8 is that correct?
9    A.   Yes, sir.
10   Q.   So, initially you did not -- you were not
11 able to identify certain persons just by looking at
12 the video.
13   A.   No, not the parties involved.
14   Q.   Okay.  After viewing the video you went
15 back and you began to interview detainees?
16   A.   Yes, sir.
17   Q.   And then you gathered additional
18 information from those detainees?
19   A.   Yes, sir.
20   Q.   And it was based on that information that
21 you began to piece together who you believed was who
22 in the video, correct?
23   A.   Yes, sir.
24   Q.   Okay.  And it was only, again, after
25 getting that additional information then you were

4667

1 able to make positive identifications of people in
2 the video?
3    A.   Well, no.  I mean, we know he was the only
4 detainee in that unit with long dreads.
5    Q.   Okay.
6    A.   So for Detainee Aquart we knew who he was.
7    Q.   Right.
8    A.   And Detainee Albaladejo because of the
9 boot.
10   Q.   Right.  And Albaladejo was in that cell
11 C-27 for at least a full minute before Detainee
12 Aquart entered, correct?
13   A.   Yes, sir.
14   Q.   Okay.  And you also learned as part of your
15 investigation that the person who was assigned to
16 cell C-27 was Juan Hernandez?
17   A.   Yes, sir.
18   Q.   And he attempted to clean the cell before
19 the assault could be discovered?
20   A.   Yes, sir.
21   Q.   But he wasn't fully successful in that?
22   A.   No, sir.
23        MR. SMITH:  Can I have just a moment,
24 your Honor?
25        THE COURT:  Yes.

4668

1        MR. SMITH:  Nothing further, your Honor.
2 Thank you.
3        THE COURT:  All right.  Redirect.
4        MR. MARKLE:  Yes, your Honor.
5 REDIRECT EXAMINATION
6 BY MR. MARKLE:
7    Q.   Just to be clear, Captain Alfonso, when you
8 looked at the video, do you see the defendant,
9 Mr. Aquart?
10   A.   Yes, sir.
11   Q.   And you could identify him with or without
12 interviews being done; is that correct?
13   A.   Yes, sir.
14   Q.   Is the same true for Mr. Armstead?
15   A.   At the time, yes.
16   Q.   And is it true for Mr. Albaladejo?
17   A.   Yes, sir.
18   Q.   And so absent any interviews, you can still
19 tell us what you saw on that video which you just
20 described in court today.
21   A.   Yes, sir.
22        MR. MARKLE:  Thank you.
23        THE COURT:  All right, anything further?
24 RECROSS-EXAMINATION
25 BY MR. SMITH:

4669

1    Q.   We talked a little bit about that report
2 that Captain Coburn prepared, the e-mail to Michael
3 Iarossi.  In there no identifications of any
4 detainees are made, correct?
5    A.   As I can recall --
6    Q.   Other than Armstead, I should say.
7    A.   Yes.  I mean, I didn't type the report, so
8 I wouldn't know.
9    Q.   But he would have recorded what you had
10 reported to him.
11   A.   Yes.
12   Q.   Okay.  And so, if he reported that the only
13 detainee that had been identified at that initial
14 viewing was Armstead, that would be correct?
15   A.   Yes.
16        MR. SMITH:  Okay, I have nothing
17 further.  Thank you.
18        MR. MARKLE:  Just briefly, your Honor.
19 REDIRECT EXAMINATION
20 BY MR. MARKLE:
21   Q.   Captain Alfonso, did you speak to
22 Mr. Hernandez, Inmate Hernandez?
23   A.   That evening, I don't recall.
24   Q.   Did you speak to him later on, or was he
25 interviewed?

GA1210

4670

```
1     A.   He was interviewed.
2     Q.   Are you aware of what he told the captain?
3     A.   That, I cannot recall.
4     Q.   Thank you.
5          THE COURT:  All right, Captain Alfonso,
6     you may step down.  You are excused.
7          THE WITNESS:  Thank you, ma'am.
8          THE COURT:  All right.  Will the
9     government call its next witness, please.
10         MS. DAYTON:  Yes, your Honor, the
11    government calls John Sullivan.
12         THE COURT:  Mr. Sullivan, would you come
13    over to the witness stand over there, and when you
14    get there remain standing, please, and raise your
15    right hand.
16         J O H N   S U L L I V A N
17    Having first affirmed, was examined and testified as
18    follows:
19         THE WITNESS:  John Sullivan,
20    S-u-l-l-i-v-a-n, I'm residing in New Haven,
21    Connecticut.
22         THE COURT:  Mr. Sullivan, would you pull
23    your chair up closer, and then would you pull the
24    microphone down towards you.  It's wireless so you
25    can move it around to be comfortable, but you need
```

4671

```
1     to talk into it, all right?
2          All right.  You may proceed.
3          MS. DAYTON:  Thank you, your Honor.
4     DIRECT EXAMINATION
5     BY MS. DAYTON:
6     Q.   Good morning, Mr. Sullivan.
7     A.   Good morning.
8     Q.   Mr. Sullivan, how old are you?
9     A.   Fifty-two.
10    Q.   And where were you born?
11    A.   Greenville, South Carolina.
12    Q.   At some point did you leave South Carolina
13    then?
14    A.   When I was little.
15    Q.   Where did you move?
16    A.   Bridgeport.
17    Q.   Where in Bridgeport?
18    A.   PT, I believe.
19    Q.   PT Barnum?
20    A.   Yeah.
21    Q.   And did you grow up in PT Barnum?
22    A.   Yeah.
23    Q.   Who did you live with while you were --
24    A.   My mother and father.
25    Q.   And did you have brothers and sisters?
```

4672

```
1     A.   Brothers and sisters, yeah.
2     Q.   How many brothers and sisters do you have?
3     A.   I got all together, like, nine brothers and
4     about six sisters.
5     Q.   And where did you go to high school?
6     A.   High school, I went to Harding.
7     Q.   Did you graduate from high school?
8     A.   No.
9     Q.   What happened?
10    A.   11th grade.
11    Q.   Why did you leave high school?
12    A.   Some things was going on and I almost died.
13    I almost drowned in the swimming pool, East Side
14    Middle School swimming pool, so at that time a lot
15    of things was happening, so I just left.
16    Q.   At some point while you were a teenager did
17    you start using drugs?
18    A.   Yeah, at a young age.
19    Q.   How old were you?
20    A.   Twelve, 13.
21    Q.   And what sort of drugs did you start using?
22    A.   Marijuana.
23    Q.   And was it only marijuana or did it
24    graduate to something else?
25    A.   It escalated, definitely.
```

4673

```
1     Q.   And did you also start selling drugs?
2     A.   Yeah, started selling at the same time.
3     Q.   And what were you selling?
4     A.   Marijuana, dope, coke.
5     Q.   What's dope?
6     A.   Dope is a down high.
7     Q.   Is that heroin?
8     A.   Heroin, yeah.
9     Q.   And you said that you also started using
10    other drugs.  What were you using in addition to
11    marijuana?
12    A.   Coke, drinking.
13    Q.   And would you say that you have had
14    difficulty with an addiction throughout your life?
15    A.   Yeah.
16    Q.   Okay.  And is it fair to say that you've
17    sold drugs for a long time?
18    A.   Yeah.
19    Q.   Okay.  And that you have several prior
20    convictions for drug dealing?
21    A.   Yes, I do.
22    Q.   And how long have you been out of jail?
23    When is the last time you got out of jail?
24    A.   About eight months ago.
25    Q.   And are you on probation now?
```

4674

1    A.    No.
2    Q.    You are done?
3    A.    Yeah.
4    Q.    And have you been able to control your
5    addiction?
6    A.    Yeah.
7    Q.    Drawing your attention to the summer of
8    2005, where were you living at that time?
9    A.    Park Avenue, Bridgeport.
10   Q.    And do you -- you mentioned that you have
11   several brothers and sisters.
12   A.    Yeah.
13   Q.    Do you have a sister named Juanita?
14   A.    Yes, I do.
15   Q.    Is she your full sister?
16   A.    We have the same father, different mothers.
17   Q.    A half-sister?
18   A.    Yeah.
19   Q.    And where was Juanita living during the
20   summer of 2005?
21   A.    All over the place.  All over the place,
22   but she had moved in with my niece at one time.  She
23   was living on Charles Street.
24   Q.    And I'm going to show you a photograph
25   that's in evidence from Government's Exhibit 102.

4675

1         You can look at your screen next to you to
2    your right or the big screen.  Do you recognize what
3    this is a photograph of?
4    A.    Charles Street.
5    Q.    And is that the Charles Street you were
6    talking about where she was living?
7    A.    Yeah.
8    Q.    And I'm going to show you a photograph,
9    Government's Exhibit 213.  Who is that?
10   A.    My sister.
11   Q.    Juanita?
12   A.    Yes.
13   Q.    Did she go by any other names at that time?
14   A.    At that point she went by the name Vanessa.
15   Q.    Do you know who gave her that name?
16   A.    I have no idea.
17   Q.    You mentioned that she was staying with
18   your niece.  Where was your niece living?
19   A.    On the second floor, but I can't give you
20   an apartment number or nothing like that.
21   Q.    The second floor in Charles Street?
22   A.    Yeah.
23   Q.    And what is your niece's name?
24   A.    Aisha [ph].
25   Q.    And did Aisha live alone or with someone

4676

1    else?
2    A.    No, she lived with her daughter, her little
3    daughter, my nieces.
4    Q.    Her baby?
5    A.    Yeah.
6    Q.    And so Juanita was living with her.  Did
7    you ever go over there to visit?
8    A.    Yeah.
9    Q.    How often would you first go over there
10   initially when Aisha started living there?
11   A.    I went over there when I was on that side
12   of town.
13   Q.    Was that frequent?
14   A.    Yeah.
15   Q.    At any point did Juanita start doing
16   anything from Charles Street other than just
17   visiting her daughter?
18   A.    Yeah.  My niece and my sister was having a
19   fallout because she was hanging at an apartment that
20   was down the hall.
21   Q.    Juanita was hanging out at that apartment?
22   A.    Yeah.  And she was bringing other people to
23   my niece's apartment and she didn't like that.
24   Q.    What was Juanita doing at the other
25   apartment?  Did she have a drug problem?

4677

1    A.    Yeah, she did, definitely.
2    Q.    And what was the drug?
3    A.    Smoking base.
4    Q.    Base being crack cocaine?
5    A.    Yeah.
6    Q.    And did she also start selling crack?
7    A.    Yeah.
8    Q.    Do you know from where she was selling
9    crack?
10   A.    Out of one of them apartments on the second
11   floor.
12   Q.    Do you know whose apartment it was?
13   A.    Some old guy who lived there, I guess.
14   Q.    Do you remember his name or what you called
15   him?
16   A.    No, I barely seen him.  I might have seen
17   him like maybe once or twice, the old guy.
18   Q.    Do you remember seeing his photograph
19   before and recognizing him?
20   A.    Yeah.  If I seen it, yeah.
21   Q.    Okay.  I'm going to show you what's in
22   evidence, it's Government's Exhibit 229.  Do you
23   recognize him?
24   A.    Yeah, that's him.
25   Q.    That's -- it was his apartment?

4678

```
1       A.   Yeah, I guess.
2       Q.   And was there anyone else who hung out --
3   well, did you ever go into that apartment?
4       A.   Yeah, I did.
5       Q.   And other than Juanita, did you know anyone
6   else who hung out there?
7       A.   Her boyfriend.
8       Q.   And what was his name?
9       A.   I think they called him Frank, I believe.
10      Q.   A friend of Juanita's?
11      A.   Yeah.
12      Q.   And showing you Government's Exhibit 212,
13  do you recognize who this person is?
14      A.   Yeah, that's him.
15      Q.   That's Frank?
16      A.   Yeah.
17      Q.   And what was Frank doing there, if you
18  know, in that apartment?
19      A.   The same thing my sister was doing there.
20      Q.   What's that?
21      A.   Getting high and selling.
22      Q.   Now, did Juanita ever tell you for whom she
23  was selling drugs?
24      A.   Yeah, she said she was selling drugs for a
25  kid named Womble and Dreddy.
```

4679

```
1       Q.   Do you see either of those people in this
2   courtroom today?
3       A.   Yeah, I see Dreddy.
4       Q.   Can you point to him and say what he's
5   wearing?
6       A.   The guy right there, a sweater and a tie.
7            MS. DAYTON:  Indicating the defendant
8   for the record, your Honor.
9            THE COURT:  The record may so indicate.
10           MS. DAYTON:  Thank you.
11      Q.   And do you know Womble?
12      A.   Yeah, me and Womble, we know each other.
13      Q.   How do you know him?
14      A.   Because Womble lived on the north end and
15  my family, some of my family members lived on the
16  north end when I was younger.  And when I used to go
17  on that side of town, and me and Womble used to, we used
18  to hang out.  So I knew of him, he knew of me.
19      Q.   I'm going to show you Government's
20  Exhibit 210.  Who is that?
21      A.   That's Womble.
22      Q.   And did Juanita tell you what Womble's role
23  was with respect to the drugs that were being sold
24  from the apartment?
25      A.   Yeah, I guess lieutenant or whatever.  I
```

4680

```
1   don't know.
2       Q.   Okay.  And did she say what the defendant's
3   role was?
4       A.   I guess that was his spot, that was -- he
5   was the enforcer.  I don't know.  I guess, yeah.
6       Q.   What does that mean that it was his spot?
7       A.   He was selling out of there.  That was his
8   place.
9       Q.   Okay.  Did you ever see the defendant in
10  Charles Street?
11      A.   Once.
12      Q.   Prior to that time, had you ever seen the
13  defendant?
14      A.   I seen him, but I didn't know who he was.
15      Q.   Where did you see him previously?
16      A.   One time I walking down Stratford Avenue,
17  and I'm a guy that likes nice cars, and I seen this
18  nice car coming up Stratford Avenue, a candy apple
19  red Cadillac, and I'm like, damn, that's a nice car.
20  So, from there I went over, because I wasn't driving
21  at the time, I went over to Oasis to catch the bus
22  and that same car pulled inside Oasis, and I was
23  looking at the car, and the guy that was driving the
24  car, he looked at me, because he was talking to
25  somebody.  He looked at me and I was just admiring
```

4681

```
1   his car, and he said, "What are you looking at?
2   Don't be so nosey."  Or something to that effect.
3   But then the bus came and I just jumped on the bus.
4       Q.   And who was driving that candy apple
5   Cadillac?
6       A.   I guess it was the guy, Dreddy, because not
7   even a week later, you know, I am driving my car and
8   the same, the same Cadillac is in front of me, and
9   my sister's sitting next to me, sitting on the
10  passenger seat, and she says -- I said, "That's a
11  nice car, Neet," and she said, "Yeah, that's
12  Dreddy's car."
13      Q.   That's Juanita that said that to you?
14      A.   Yeah, and that's when I knew who Dreddy
15  was.
16      Q.   And it was the same candy apple red --
17      A.   Yeah.
18      Q.   -- Cadillac?
19           During the summer of 2005, did you go to
20  Charles Street often?
21      A.   Yeah, well, I did.
22      Q.   Why?
23      A.   Well, a couple times my sister would call
24  me over there.
25      Q.   Juanita would?
```

4682

1    A.    Yeah.
2    Q.    Why would she call you over?
3    A.    She would call me over there.  It was kind
4  of strange.  It was kind of weird.  She would call
5  me over there and she would just want me to be
6  around her, I guess, you know, and...
7    Q.    Did she tell you why?
8    A.    No, not really, but it was like -- I felt
9  kind of uncomfortable because I sell drugs, it's no
10 secret I sell drugs.
11   Q.    Okay.
12   A.    And it was so much traffic in there I felt
13 uncomfortable.
14   Q.    What do you mean uncomfortable?
15   A.    Because she was dealing with people she
16 shouldn't be dealing with, and I would tell her,
17 "Neet, you don't even know these people you dealing
18 with.  Why you in here?  Why you in here?"
19         You know, it's like she didn't want to
20 leave.  She wanted me to come over there a lot of
21 times and just -- I would go over there for, like,
22 maybe 15, 20 minutes to just, you know, sit around.
23 And then a few times my wife, because her and my
24 wife is really, really good friends, you know, and
25 she would go with me sometimes at night because, you

4683

1  know, we just felt something was going to happen,
2  something wasn't right.  And the rest of my family
3  knew that, but they didn't want to do anything.
4    Q.    Okay.  Now, you said you sell drugs.  Do
5  you still sell drugs?
6    A.    No.
7    Q.    You sold drugs then at that time?
8    A.    Yeah, of course.
9    Q.    And did you ever give Juanita drugs?
10   A.    I did, because sometimes I would go over
11 there and that guy, Frank --
12   Q.    Yes.
13   A.    -- her boyfriend, he would -- I would go
14 over there and he would be all beat up or something.
15   Q.    Frank would be beat up?
16   A.    Yeah.  Black eye or ribs.  I called it
17 get-my-money lumps.
18   Q.    What do you mean by that?
19   A.    Get-my-money lumps.
20   Q.    Okay.
21   A.    And I didn't want that to happen with my
22 sister.  She wasn't hurt or harmed or nothing, but
23 she would explain to me she had messed up they
24 money.
25   Q.    What does that mean, messed up the money?

4684

1    A.    She had smoked their money up or their
2  drugs up.  She can't get the money, so, you know.
3  And I never sold nothing out of that building, but I
4  was selling at that time, so sometimes I would give
5  her the money to, to pay them back, or I would just
6  give her the drugs and let her sell it and get, you
7  know, get their money.
8         But my whole point was why would you sell
9  for somebody that's going to, you know, harm you or
10 do something to you.  So you need to get out of this
11 situation.
12         So, me and my wife would go there at
13 times and try to talk her into coming with us, you
14 know.  Sometimes she would leave, sometimes, you
15 know, she wouldn't.  You know, but the times that
16 she would leave, I'd bring her home to my house and
17 the next day I wake up and I'm looking, "Where is
18 Juanita?"  And my wife would be like, you know, "You
19 know your sister, she's back in that building
20 again."
21   Q.    Okay.
22   A.    So.
23   Q.    Did you ever have an incident with the
24 defendant?
25   A.    Yeah, I did.

4685

1    Q.    And drawing your attention to July of 2005,
2  did the incident occur at the Charles Street
3  building?
4    A.    Yeah.
5    Q.    What happened?  Where were you on that day,
6  or where were you at the time you had the incident?
7    A.    My sister had called me over there.
8    Q.    And where did you go?
9    A.    I went to Charles Street.
10   Q.    Into the same apartment?
11   A.    Yeah.
12   Q.    Was this your niece's apartment or the
13 apartment --
14   A.    No.
15   Q.    -- where the drugs were being sold?
16   A.    My niece had moved out at the time.
17   Q.    So --
18   A.    By then.
19   Q.    What were you doing there?
20   A.    My sister called me over there, but she --
21 that night -- but she didn't even, she just wanted
22 me to hang out with her, I guess.  She didn't want
23 no money or nothing, she just wanted me to hang out
24 with her.
25   Q.    When you got there, other than Juanita, who

4686

1 else was there; if you remember?
2     A.   There was a few people in there.
3     Q.   Do you remember any of them?
4     A.   No, not really.  My sister, Frank.  I don't
5 know who was in the old guy's room, but there was
6 some girls in there, you know, I mean in the
7 apartment as well as me.
8     Q.   And what happened?
9     A.   I was just like sitting there getting --
10 sitting there getting high and just chilling, and I
11 was about to leave, actually, because I had got a
12 phone call.  But before I could leave Dreddy had
13 came in there, and I didn't even know who Dreddy
14 was, I didn't even, you know, I didn't even really
15 pay him no mind, I didn't think he paid me any mind.
16     Q.   And when he came in what happened?
17     A.   Come to find out, the girl Tina, I guess
18 every time I was coming over there she was telling
19 him or Womble or somebody that I was coming over
20 there selling drugs or cooking up, which that wasn't
21 true.
22     Q.   Okay.
23     A.   That wasn't.
24     Q.   So, when the defendant came in, what
25 happened?

4687

1     A.   So when he came in, I guess he looked at me
2 and I looked at him and then he told everybody to
3 leave.
4     Q.   And what happened after he told everyone to
5 leave, what did you do?
6     A.   Everybody was leaving out and I was the
7 last one to get up to leave to go to the door, and
8 when I got to the door he stopped me, and the way he
9 stopped me, when he stopped me, he -- I didn't even
10 see it coming, he whooped out an Uzi or something
11 and he hit me in the head and he hit me in the ear.
12     Q.   An Uzi gun?
13     A.   Yeah.
14     Q.   And what did the gun actually look like?
15     A.   A black Uzi.  A full-clip Uzi.
16     Q.   A full-clip?
17     A.   Yeah, I guess.
18     Q.   So, like one of the long clips?
19     A.   No.  Yeah, long clip, but it was short.
20 The gun was short.
21     Q.   You indicated on the left side of your head
22 and your ear.  The defendant hit you twice?
23     A.   Yeah.
24     Q.   With the gun?
25     A.   Yeah.

4688

1     Q.   Was anyone else in the room while you were
2 being hit?
3     A.   My sister and Frank.
4     Q.   Did you see --
5     A.   And I think Womble.
6     Q.   And Womble?
7     A.   I think so, yeah.
8     Q.   And did you see the defendant hit anyone
9 else with the gun?
10     A.   No, no.
11     Q.   Did you see him hit your sister with
12 anything?
13     A.   I know she was screaming, but I don't think
14 he hit her.
15     Q.   What was she screaming?
16     A.   She wanted the altercation to stop, I
17 guess.
18     Q.   And did the defendant say anything to her?
19     A.   Told her to shut up.
20     Q.   And did he say anything to you?
21     A.   He was like -- he was telling me, did -- he
22 was asking me why I was there and was I selling
23 anything out of that apartment.
24     Q.   What did you tell him?
25     A.   I was telling him, no, I'm just -- you

4689

1 know, at the time she went by the name of Vanessa --
2 but I was, like, "Neet's my sister, I'm just here
3 chilling with her."
4     Q.   What did the defendant say?
5     A.   He was -- he didn't really believe me.  He
6 had me go in my pocket, he looked at my ID and, you
7 know, at that time I was, like, I just wanted to --
8 I wanted to really kill him, that's what I wanted to
9 do.
10     Q.   Okay.  Did you hit him back?
11     A.   Didn't touch him.
12     Q.   Were you bleeding?
13     A.   Yeah, profusely.
14     Q.   Did the defendant say anything else to you?
15     A.   He was, like, "Ain't nobody selling out of
16 here.  If I catch somebody selling out of here I'm
17 going to take you somewhere in the basement or
18 something and have you sell my drugs for free.
19 Ain't nobody selling out of here but me and Womble."
20         And I'm, like, "Yo, I'm not trying to
21 sell out of here.  I'm just here chilling with my
22 sister."  And I guess Frank and the old man was
23 telling him, and he's, like, yeah, they really
24 brothers and sisters, and I guess he believed it and
25 then he got a call or something and then he bounced.

4690

```
1    Q.   He bounced?  He got a call and he left?
2    A.   He left, yeah.
3    Q.   After the defendant left, what happened?
4    A.   My sister tried to get me, tried to talk me
5    into letting Womble take me to the hospital, but at
6    that time I'm done.
7    Q.   You don't want Womble to take you to the
8    hospital?
9    A.   I don't want nobody to do nothing.
10   Q.   Did you go to the hospital though?
11   A.   Yeah, I did.
12   Q.   Which hospital did you go to?
13   A.   St. Vincent's Hospital.
14   Q.   Did Juanita go to the hospital, too?
15   A.   No.
16   Q.   How did you get to the hospital?
17   A.   I walked.
18   Q.   And when you got there, what did you tell
19   them had occurred?
20   A.   I told them that I was on Charles Street
21   and I got robbed.
22   Q.   Why didn't you tell them the truth?
23   A.   Because if nobody never told -- if nobody
24   wouldn't have never told the police about the
25   altercation, about me and Dreddy, I wouldn't be here
```

4691

```
1    right now.  I told the police I got robbed on the
2    streets of Charles Street.  I told them nothing
3    about the apartment, nothing that went on with me
4    and him because I don't -- whatever happen in the
5    streets, I don't put the police in on none of that.
6         So somebody told the police about the
7    altercation me and him had had and that's what get me
8    here right now.
9    Q.   Okay.  So, you did go to the hospital.
10   These are your records.
11        THE COURT:  What exhibit is this?
12        MS. DAYTON:  I'm sorry, your Honor, it's
13   Government Exhibit 12A.  We've actually entered a
14   stipulation.  If I may read the stipulation before I
15   show the record.
16        THE COURT:  All right.
17        MS. DAYTON:  "It's hereby stipulated and
18   agreed by and between the United States of America
19   by Assistant United States Attorney Tracy Lee Dayton
20   and the defendant, Azibo Aquart, by his attorneys,
21   Michael Sheehan and Justin Smith as follows:
22        "If called to testify Ellen Burquist, a
23   custodian of records for the St. Vincent's Medical
24   Center in Bridgeport, Connecticut, would state that
25   Government's Exhibit 12A is a fair and accurate copy
```

4692

```
1    of medical records maintained in the ordinary course
2    of business by St. Vincent's Medical Center for
3    medical treatment provided to John Sullivan on
4    July 20, 2005.
5         "It's hereby stipulated and agreed that
6    Government's Exhibit 12A and this stipulation are
7    admissible in evidence."  And it's signed by me and
8    Justin Smith in the presence of the defendant.
9         It's Government's Exhibit 12A.  We would
10   ask to move 12A and B into evidence, your Honor.
11        THE COURT:  All right, they are full
12   exhibits.
13        MS. DAYTON:  Thank you, your Honor.
14   Q.   So you indicated that you had been
15   assaulted in your left ear and that your left head
16   was split -- the left side of your head?
17   A.   Yes.
18   Q.   What sort of treatment did you get?
19   A.   Stitches.
20   Q.   Okay.  And did you get stitches in more
21   than one location?
22   A.   Yes, my head and my ear.
23   Q.   Your head and your ear?
24   A.   Yes.
25   Q.   And you said you were bleeding profusely.
```

4693

```
1    Were you still bleeding profusely at the time you
2    got to the hospital?
3    A.   Yes, I was.
4    Q.   And how did they deal with your wounds?
5    A.   They stitch me up and cleaned me up and
6    shipped me home.
7    Q.   Did you have to go back for further care?
8    A.   No.
9    Q.   And here it indicates that this is what you
10   told them occurred.  You were walking from your
11   sister's house and got jumped by another man, got
12   hit on the left side of the face and ear with a gun.
13   A.   Yes.
14   Q.   Is that correct?
15   A.   Yes.
16   Q.   Did you ever go back to the Charles Street
17   building again?
18   A.   No, I don't think I did.
19   Q.   Did you ever see the defendant again before
20   today?
21   A.   No.
22   Q.   Did you testify in the Grand Jury in this
23   case?
24   A.   Yeah.
25   Q.   Back in November of 2005?
```

4694

```
1      A.   Yes.
2      Q.   And at that time did you identify the
3   defendant as being the one who beat you in the head
4   with a gun?
5      A.   I denied it at first, but...
6      Q.   But when you actually testified in the
7   Grand Jury did you tell the truth?
8      A.   Yeah.
9      Q.   Thank you.
10          MS. DAYTON:  I have nothing further at
11  this time.
12          THE COURT:  All right,
13  cross-examination.
14  CROSS-EXAMINATION
15  BY MR. SMITH:
16     Q.   Hi, Mr. Sullivan.
17     A.   Hi.
18     Q.   My name is Justin Smith.  I'm one of the
19  attorneys representing Mr. Aquart.
20          You were talking a little bit about the code
21  of the streets, you don't talk about what happens.
22     A.   I try not to.  I wouldn't be here now if
23  people wouldn't have put my name in it.
24     Q.   I understand.  The U.S. attorney was asking
25  you some questions about when you went to the
```

4695

```
1   hospital.  Shortly after you went to the hospital
2   and you told the staff that you were jumped by
3   another man, the police came to see you at the
4   hospital, correct?
5      A.   Yes.
6      Q.   And they took a report from you.
7      A.   Yes.
8      Q.   Asked you what happened.
9      A.   Yeah.
10     Q.   And when they asked you that, you told them
11  that you were assaulted in a hallway in Charles
12  Street?
13     A.   I don't -- I know I didn't tell them I was
14  in that apartment.  It might have been in a hallway
15  or on the street.  I just -- no, I didn't tell them
16  what happened, that incident.
17     Q.   You also told them that there was a big guy
18  wearing tan clothing who hit you with a gun.
19     A.   Probably did.  I had to make up some type
20  of a story.
21     Q.   Okay.  And you also said that you had
22  testified at the Grand Jury?
23     A.   Yes.
24     Q.   Okay.  And you were asked at the Grand Jury
25  if you ever dealt drugs from apartment 211, correct?
```

4696

```
1      A.   Yes.
2      Q.   And you said you didn't, right?
3      A.   Yes.
4      Q.   But you never said anything about giving
5   drugs to Vanessa, did you?
6      A.   I probably didn't.  But I didn't give it to
7   her for me to sell, I gave it to her so she could
8   get they money and won't nothing happen to her.
9   That's my sister.  I don't want to see nothing
10  happen to her.
11     Q.   But you didn't tell the Grand Jury that you
12  were giving drugs to Vanessa, whatever the reason?
13     A.   I probably didn't.
14     Q.   You've never been told that you were going
15  to be prosecuted for perjury, right?
16     A.   They just told me that I would be
17  prosecuted if I lied on the stand.
18     Q.   Okay.  But they didn't say anything you said at
19  the Grand Jury you would be prosecuted for?
20     A.   I didn't know it was going to get this far,
21  that I would -- I didn't think I would be here.
22          MR. SMITH:  May I have just a moment,
23  your Honor?
24          THE COURT:  Yes.
25     Q.   In that first time you spoke with the
```

4697

```
1   police at Charles Street, you actually told them a
2   pretty detailed story, right?
3      A.   Well, I tried to.  I tried to.  At the time
4   I tried to tell them where they don't know that it
5   happened in that apartment.  So that's why I said
6   that I got jumped, I got robbed.
7      Q.   Right.  You told the hospital staff you got
8   jumped and you got robbed?
9      A.   Yeah.  And I am pretty sure I told the
10  police that too.
11     Q.   You didn't tell the police that in fact you
12  were in the hallway at Charles Street?
13     A.   It's been so long ago I probably did.
14     Q.   And that one of the gentlemen came out and
15  -- one of the males -- it was a male?
16     A.   It's been like five years go.  I probably
17  did, but whatever I told them it's written down.
18     Q.   Okay.  So, in that report, Mr. Sullivan,
19  you said that you saw a man come up to you and say
20  that's the motherfucker?
21     A.   I probably did.  It's been so long ago.  I
22  can't remember.
23     Q.   And then you saw a guy come up with a black
24  Uzi type gun and hit you in the head.
25     A.   Yeah, I told them some type of story that I
```

4698

1  got jumped.  I don't remember if I told them it
2  happened in the hallway or out on the streets, but I
3  know I didn't tell them that happened in that
4  apartment.
5      Q.   And you told them the man with the Uzi was
6  thick and heavyset and wearing all tan clothing and
7  shirt and pants?
8      A.   Yeah, something like that.
9      Q.   Okay.  And you said that you had seen these
10 people in Bridgeport before?
11     A.   The people?
12     Q.   You told the police you had seen these
13 people in Bridgeport before.
14     A.   I don't remember.
15     Q.   Did you tell them that you could identify
16 the person if you saw them again?
17     A.   I don't remember.
18     Q.   Okay.  At the time that this occurred,
19 Mr. Sullivan, you said you were in the apartment
20 getting high?
21     A.   Yeah, at the time this occurred, yeah.
22     Q.   And during that time, summer of 2005, you
23 were high quite a bit?
24     A.   Yeah, quite a bit, yeah.
25     Q.   Were you drinking as well?

4699

1      A.   No, I don't really drink.  At the time of
2  the accident, right before the accident, matter of
3  fact, I was smoking a base cigarette.
4      Q.   Smoking a what?
5      A.   A base cigarette.
6      Q.   A base cigarette is?
7      A.   With base in the cigarette.
8      Q.   Okay.  And that's a way to disguise the
9  fact that you are smoking crack at the time?
10     A.   Yeah, I guess, yeah.
11     Q.   But specifically you gave them a
12 description of the guy who hit you, right?
13     A.   I just basically told them just about the
14 first thing that came to the top of my head, yeah.
15     Q.   And the description that you gave them was
16 that the male with the Uzi was thick, heavyset, and
17 was wearing all tan clothing, right?
18     A.   Yeah.
19     Q.   And that the other guy --
20     A.   I didn't want them to go up in that
21 apartment.
22     Q.   But you also --
23     A.   My sister is there.
24     Q.   I'm sorry.  But you also told them the
25 other guy who did not hit you is the one who had

4700

1  dreadlocks, right?
2      A.   Excuse me?
3      Q.   You told them that the other person, the
4  one who did not hit you with the gun is the person
5  who had the dreadlocks.
6      A.   I don't remember saying that.  It could be
7  written down there, but I don't remember saying
8  that.
9      Q.   Okay, but you believe the police would have
10 written down what you told them.
11     A.   Yeah, so I probably did tell them that.
12     Q.   Okay.
13     A.   But right now I don't remember saying that.
14 It's probably written down.
15     Q.   Would looking at something maybe refresh
16 your memory?
17     A.   Sure.  "Mr. Sullivan" --
18     Q.   I'm sorry, to yourself.
19     A.   I don't remember saying that.
20     Q.   You don't remember saying that.  Okay.
21         MR. SMITH:  I have nothing further, your
22 Honor, thank you.
23             THE COURT:  All right, anything further?
24             MS. DAYTON:  Just really brief.
25 REDIRECT EXAMINATION

4701

1  BY MS. DAYTON:
2      Q.   When the police talked to you,
3  Mr. Sullivan, counsel just asked you if you told
4  them that one of the suspects had long dreadlocks.
5  Do you remember telling them that?
6      A.   No.  I don't remember -- I don't know how
7  they got dreadlocks because I don't remember saying
8  anything about any dreadlocks or anything.
9      Q.   And so you have no idea what you said to
10 the police at that time?
11     A.   No, I don't remember saying nothing.  I
12 don't think I said anything about dreadlocks.
13     Q.   But if the report says dreadlocks, you said
14 before if you said it it would be in the report?
15     A.   Right.  So I had to, I guess, but I don't
16 remember now saying it.  But if I had said it, then
17 it had to be in the report.
18     Q.   Okay.  Thank you.
19         MS. DAYTON:  I have nothing further.
20 RECROSS-EXAMINATION
21 BY MR. SMITH:
22     Q.   And if you said that the man who hit you
23 was not the man with the dreadlocks, that would be
24 right, correct?
25     A.   That would be in the report.

**GA1218**

4702

1    Q.   Okay, thank you.
2         MS. DAYTON:  Can we approach?
3         THE WITNESS:  But for the record --
4         MS. DAYTON:  One second.
5         THE COURT:  We have a lot of that
6    for-the-record stuff.
7         (Sidebar conference)
8         MS. DAYTON:  It says, "Suspect one,
9    black man, 5'9, dreadlocks, white tank top, jeans,
10   thin build."  And then you open it up and it says
11   "Mr. Sullivan then saw suspect one come up with a
12   black Uzi type gun and hit him in the head."  The
13   police mixed it up here in the body.
14        MR. SMITH:  That's your assumption.  He
15   stated the male with the Uzi was thick, heavyset,
16   and was wearing tan clothing.
17        MS. DAYTON:  I think it was misleading
18   to the jury because he said suspect one.
19        MR. SMITH:  We will enter the report.
20        MS. DAYTON:  That's fine.  We'll enter
21   the report.
22        (Sidebar concluded)
23        MR. SMITH:  Your Honor, at this time
24   we'll move to enter the report.
25        MS. DAYTON:  The government agrees.

4703

1         THE COURT:  To commemorate this moment
2    of agreement should we have a joint exhibit?
3         MS. DAYTON:  Maybe we can have a purple
4    sticker.
5         MR. SHEEHAN:  Your Honor, if we can call
6    that P-KK.  Yesterday, your Honor, we marked for
7    identification A, but we're just going to call that
8    P-A, so I want to be clear.
9         MS. DAYTON:  Are we done with
10   Mr. Sullivan?
11        MR. SMITH:  Yes.
12        THE COURT:  The police report, the date
13   is what?
14        MR. SMITH:  I'm sorry, your Honor, this
15   is July 21, 2005.
16        THE COURT:  All right then.
17        Mr. Sullivan, you are excused, sir, you
18   may step down.
19        THE WITNESS:  Thank you.
20        THE COURT:  All right, why don't we take
21   a recess, ladies and gentlemen.  For 15 minutes.
22        (Jury exited the courtroom)
23        THE COURT:  All right, Counsel, who will
24   the next government witness be?
25        MS. REYNOLDS:  Your Honor, the next

4704

1    government witness will be Mary Reid, James Reid's
2    mom, and then Jason Reid, his younger brother, and
3    then we have Pamela Williams, Basil Williams's
4    sister, and John David Williams.
5         THE COURT:  Very well.  We'll stand in
6    recess.
7         (Recess)
8         THE COURT:  All right, Counsel, please
9    be seated.
10        MR. SHEEHAN:  Your Honor, it looks like
11   the government's existing witnesses will finish up
12   before lunch.
13        MS. RODRIGUEZ-COSS:  Or close
14   thereafter.
15        MR. SHEEHAN:  Or close thereafter, the
16   people that are here.  I do not -- I do not think
17   that we should take a break into -- I think we
18   should take -- I understand, as far as their
19   remaining witnesses, they're not available due to
20   unforeseen circumstances.  I think they should come
21   on tomorrow morning and then the defense should
22   start its case.  I don't think that we should be in
23   the position of starting our case and then having it
24   interrupted by the remaining witnesses.
25        THE COURT:  You are asking to forego two

4705

1    or three hours of trial time?
2         MR. SHEEHAN:  I'm not asking anything
3    except that I be allowed to present my case in a
4    coherent manner after the government has rested.
5    Because of unforeseen circumstances the government
6    is not able to complete their case.
7         THE COURT:  I understand that.
8         MR. SHEEHAN:  So, I'm not asking for
9    anything other than the right to put on our case in
10   a coherent fashion.
11        THE COURT:  How many witnesses are you
12   going to have?
13        MR. SHEEHAN:  In total?
14        THE COURT:  Yes.
15        MR. SHEEHAN:  I think we've listed about
16   24.
17        THE COURT:  Are you calling 24
18   witnesses?
19        MR. SHEEHAN:  We may call about 24, we
20   may call a few less.
21        THE COURT:  And how long do you estimate
22   it will take to put on 24 witnesses?
23        MR. SHEEHAN:  I had estimated the
24   outside amount of time would be four days.  I would
25   note, your Honor, that although the government's

4706

1  penalty phase production is relatively short, it
2  encompasses the entire trial. And so I think when
3  I'm saying I'm putting on witnesses that might take
4  four days --
5           THE COURT: I'm only talking about
6  scheduling.
7           MR. SHEEHAN: Oh, I see.
8           THE COURT: I represented to the jury
9  that they're going to be finished by the middle of
10 June and with delays we're going to have a hard time
11 meeting that. Let's proceed as best we can. All
12 right.
13          MR. SHEEHAN: I'm sorry, your Honor,
14 proceed in what? May I ask the Court for -- I have
15 witnesses. I don't want the -- I don't want to
16 proceed today if the government is not going to rest
17 on the penalty phase. So I'm --
18          THE COURT: I understand. Today we will
19 be able to finish the testimony of the families of
20 Mr. Williams and Mr. Reid; is that right?
21          MS. REYNOLDS: That is correct, your
22 Honor.
23          THE COURT: And that will leave only
24 Ms. Johnson's family members to testify tomorrow.
25          MS. REYNOLDS: That's correct.

4707

1           THE COURT: And how many are there?
2           MS. REYNOLDS: Two family members per
3  family. So today we have four witnesses scheduled,
4  and I should note I had indicated Jason Reid was
5  going to testify, but it's actually going to be
6  his -- another brother, Brian Reid. But it is two.
7  We have a total of four additional witnesses lined
8  up for today.
9           THE COURT: And how long is your
10 anticipation of the Whittinghams?
11          MS. RODRIGUEZ-COSS: About an hour and a
12 half.
13          THE COURT: All right. And then you
14 will be ready to proceed.
15          MR. SHEEHAN: Exactly, your Honor.
16          THE COURT: All right, we'll do it that
17 way.
18          MR. SHEEHAN: Thank you, your Honor.
19          THE COURT: Bring in the jury, please.
20          MS. REYNOLDS: Should I have Mary Reid
21 come up here?
22          THE COURT: Yes, please.
23          (Jury entered the courtroom)
24          THE COURT: Please be seated, ladies and
25 gentlemen. All right, I understand the government's

4708

1  next witness is Mary Reid. Ms. Reid, would you
2  kindly stand up and raise your right hand and the
3  oath will be administered to you. I know that chair
4  has no rollers on it.
5           M A R Y    R E I D
6  Having first affirmed, was examined and testified as
7  follows:
8           THE WITNESS: Mary Reid, R-e-i-d
9  (redacted).
10          THE COURT: Just your town of residence.
11          THE WITNESS: Oh, okay, Bridgeport,
12 Connecticut.
13          THE COURT: All right, you may proceed.
14          MS. REYNOLDS: Thank you, your Honor.
15 DIRECT EXAMINATION
16 BY MS. REYNOLDS:
17   Q.   Good morning, Ms. Reid. I'm just going to
18 ask you to make sure you talk right into the
19 microphone, okay. I know -- just to make sure
20 everyone can hear you.
21   A.   Okay.
22   Q.   Where are you originally from?
23   A.   Stamford, Connecticut.
24   Q.   And you grew up in Connecticut?
25   A.   Yes.

4709

1   Q.   And you said you currently reside in
2  Bridgeport.
3   A.   Yes, ma'am.
4   Q.   And you've been living there for a while.
5   A.   Twenty years.
6   Q.   And did you work while you lived there?
7   A.   Yes.
8   Q.   And are you recently retired from your job?
9   A.   Yes.
10  Q.   And what did you do?
11  A.   I worked for HealthNet claims in Shelton,
12 Connecticut.
13  Q.   And how long did you work there?
14  A.   Fifteen years.
15  Q.   And were you married?
16  A.   Yes.
17  Q.   And what was your husband's name?
18  A.   James Reid.
19  Q.   And was James Reid, Jr., your son?
20  A.   Yes.
21  Q.   And your husband, James Reid, did he -- is
22 he still living or is he deceased?
23  A.   He's deceased.
24  Q.   And when did he pass away?
25  A.   February 2011.

4710

1    Q.   And showing you what's Government's
2  Exhibit 15A.
3         MS. REYNOLDS:   And I don't believe there
4  is any objections to any of the photographs we
5  intend to introduce at this time, your Honor.
6         THE COURT:   All right.
7         MR. SHEEHAN:   No, there is not.
8    Q.   So, just showing you this photograph, if
9  you can see it up there on your monitor.
10   A.   Yes, that's him.
11   Q.   That's your husband?
12   A.   Yeah.
13   Q.   And did he work?
14   A.   No, he was disabled.
15   Q.   And what was his disability?
16   A.   He had heart problems and diabetes.
17   Q.   Okay.  And you said he passed away
18  recently.  Did he have other health complications as
19  well?
20   A.   Yes.
21   Q.   And what ultimately were --
22   A.   Cancer.
23   Q.   Now, how many children did you and James
24  have?
25   A.   Four.

4711

1    Q.   And can you tell us what their names --
2  what their current ages are?  If you know.
3    A.   James 46, I think, Brian 40 -- 43 -- 42.
4  George 43, Jason 33, and I have two adopted
5  children.  One is 12 and one is seven.
6    Q.   And the seven-year-old, is that a little
7  girl?
8    A.   Yeah.
9    Q.   And what's her name?
10   A.   Tiara Reid.
11   Q.   And the 12-year-old, is that a boy?
12   A.   Yes, he's named after his brother James and
13  his dad, James III.
14   Q.   And you said you have Brian and George and
15  Jason are your other sons.
16   A.   Yes.
17   Q.   Where does George live?
18   A.   Ohio.
19   Q.   And where do Brian and Jason live?
20   A.   Jason and Brian both live in Bridgeport.
21   Q.   And you're still obviously living in
22  Bridgeport as well, correct?
23   A.   Yes.
24   Q.   Is there a plan to move now that you've
25  retired from your job?

4712

1    A.   Yes, when everything gets settled I'm
2  planning to move to North Carolina.
3    Q.   With your younger children?
4    A.   Yes.  And Brian, and hopefully Jason.
5    Q.   Okay.  Do they know that or?
6    A.   Yeah, they know it.
7    Q.   All right.  I want to talk to you about
8  James, your son.
9    A.   Yes.
10   Q.   And first of all, let me ask you, did he
11  have a nickname when he was growing up?
12   A.   Yes, his name was Tippy because when he was
13  young he used to walk on his tiptoes, so I named him
14  Tippy.
15   Q.   So you gave him that name?
16   A.   Yes.
17   Q.   And when he was growing up -- well, where
18  did you live when the family, when the kids were
19  growing up?  Did you live in Bridgeport at that
20  time?
21   A.   No, I lived in Stamford on Greenwood Hill.
22   Q.   And did Tippy and the other kids go to
23  school in Stamford?
24   A.   Yes.
25   Q.   And did Tippy like to play sports when he

4713

1  was growing up?
2    A.   He played all kind of sports.  His main one
3  was basketball, and his main thing, he was a
4  counselor at Stamford Boys Club also.
5    Q.   Okay.  And when he -- so, he worked as a
6  student at the Boys Club?
7    A.   Yes.
8    Q.   And how long did he work as a counselor at
9  the Boys Club in Stamford?
10   A.   All through his youth.
11   Q.   And was there a time that he got an award
12  from that organization?
13   A.   Yes, he did.
14   Q.   And what?
15   A.   He got several awards.
16   Q.   Could you tell us about that?
17   A.   Okay, he got awards on counseling kids.  He
18  used to help the young ones with their homework.  He
19  got -- he got an award for that also.  Yeah.  And he
20  used to help out with the senior citizens, too, and
21  handicapped and disabled when he was young.
22   Q.   Did James, or Tippy, graduate from high
23  school?
24   A.   Catholic High, yes.
25   Q.   And he went to Catholic High in Stamford?

**GA1221**

4714

1    A.    Yes.
2    Q.    After that did he go to college?
3    A.    Yes, he did.  He went to UB.
4    Q.    University of Bridgeport?
5    A.    Bridgeport, yeah.
6    Q.    And what did he study there?
7    A.    His major was computers.
8    Q.    And did he always like math as he was
9  growing up?
10    A.    Yes, yes.
11    Q.    And after he graduated from University of
12  Bridgeport with a computers major, did he work?
13    A.    Yes, he used to work at Norelco in Stamford
14  on High Ridge Road.
15    Q.    And what was Norelco?
16    A.    I think they were involved -- this has been
17  a long time -- into computers.  He used to work the
18  11:00 to 7:00 shift there.  He worked there for
19  maybe about seven years.
20    Q.    Okay.  Do you know if he worked at any
21  other places?
22    A.    Well, he was grown then, so I'm sure he
23  did.  I think he used to work at People's Bank also.
24  That was before Norelco.  People's Bank first, then
25  Norelco.  And then when I moved to Bridgeport,

4715

1  shortly after, maybe about two years after, he moved
2  out.  Then he moved with his brother Brian.
3    Q.    So did Tippy always work?
4    A.    Yes, he did.  He has a daughter who now is
5  about 20, 21.  He always supported that little girl.
6    Q.    And where does his daughter live?
7    A.    She lives in Stamford also.
8    Q.    And showing you Government's Exhibit 15G
9  that's in evidence absent objection.  Is that
10  Aleisha?
11    A.    Yeah, that's Aleisha.  She got a smile like
12  him.
13    Q.    And you said Tippy always supported her and
14  had a good relationship with her?
15    A.    Yeah.  That's his only child.
16    Q.    You said that you moved, you and your
17  family moved to Bridgeport at some point.  Do you
18  remember approximately when that was?
19    A.    I think March.  What year, no.
20    Q.    Do you remember the month?
21    A.    Yeah, it was in March sometime we moved.
22    Q.    But you had been in Bridgeport for a while?
23    A.    I been in Bridgeport for about 25 years.
24    Q.    Okay.  You said around the same time Tippy
25  moved -- or did there come a time that Tippy moved

4716

1  in with his brother Brian in Bridgeport?
2    A.    He stayed with me for a while, but you know
3  how young men are.
4    Q.    He didn't want to live with mom?
5    A.    So some of the things he liked to do with
6  girls he couldn't do at my house, so he moved in
7  with his brother.
8    Q.    Okay.  And Brian was living in Bridgeport
9  at the time?
10    A.    Yeah.
11    Q.    And where is Tippy in the lineup of
12  brothers?
13    A.    He's the older.
14    Q.    He's the oldest.  And Brian is next in
15  line?
16    A.    Brian is next to Jason.  It's Tippy,
17  George, Brian, Jason, Jimmy and Tiara.
18    Q.    All right.  And George, how long has George
19  been living in Ohio?  Has he been there for a while?
20    A.    About ten years.  Yeah.
21    Q.    And what does George do out there?  Do you
22  know?
23    A.    Don't ask me because I don't know.
24    Q.    Okay.
25    A.    I know he works.  What he does, I have no

4717

1  idea.
2    Q.    Okay.  Is he married or --
3    A.    Yes.  And he has a couple of kids, too.
4    Q.    And so when Tippy or James moved in with
5  Brian, do you know if he was working at that time?
6    A.    He always worked, yes.
7    Q.    And do you know where he was working at
8  that time?
9    A.    Brian and James were working together at a
10  furniture store.  Arrow, I think that's the name of
11  it.  Yeah.
12    Q.    Was there a time, if you know, that Tippy
13  moved out from Brian's apartment and moved over to
14  the area of Charles Street?
15    A.    I didn't know he moved on Charles Street.
16  I didn't know he moved out of Brian's house.  Some
17  things they don't tell me.
18    Q.    All right.  In the summer of 2005, what was
19  it like in that summer?  Did you -- what was your
20  relationship with Tippy like at that time?
21    A.    They all came over because I have a nice
22  sized backyard, and they always would stop, you
23  know, through to see their dad, because their dad
24  wasn't well.  So, we saw them.
25    Q.    And how often would Tippy stop in to see

4718

```
1   his dad or to see you?
2       Q.   Maybe once or twice a week he would stop
3   through there on his runs to see how his father was.
4       Q.   And what --
5       A.   It could be more, I don't know, because I
6   wasn't home.
7       Q.   You were working?
8       A.   Yes.
9       Q.   So when you were at work, Tippy and the
10  brothers would take care of dad, or check in on dad
11  at least?
12      A.   Well, Jason took care of his dad because he
13  lived there with us.  They would check in on him.
14      Q.   All right.  And what kind of things did you
15  and your family like to do together with Tippy and
16  your other children?
17      A.   Well, the young men were all grown so, you
18  know, the old folks like me is out of the loop.  So
19  they hung around together a lot.
20      Q.   Okay.
21      A.   Yeah.
22      Q.   Did you all get together for family
23  holidays or birthday celebrations?
24      A.   They would stop through there.  They had
25  their lady friends and they did their thing.
```

4719

```
1       Q.   As Tippy was growing up did he have a lot
2   of lady friends?
3       A.   Yeah, he had a lot of lady friends, yeah.
4       Q.   Was he ever married?
5       A.   No, no.
6       Q.   And he just has his one daughter?
7       A.   And a granddaughter.
8       Q.   He has a granddaughter?
9       A.   Yeah.
10      Q.   So, this an older picture, obviously?
11      A.   Of Aleisha, yes.
12      Q.   Of Aleisha growing up in school.  How old
13  is Aleisha now?
14      A.   I think she's about 21.  Yeah, 21.
15      Q.   And how old is --
16      A.   The baby?
17      Q.   The baby.
18      A.   She's a year and a half.  Yeah.
19      Q.   Let me show you another photo, Government's
20  Exhibit 15B.  I know that's kind of dark, but if you
21  can look on your monitor.  So --
22      A.   Tippy is the one with the coat.
23      Q.   Tippy is this one with the coat?
24      A.   Yeah.  That's Jason.
25      Q.   The youngest brother?
```

4720

```
1       A.   Yeah.  And that's George.
2       Q.   That's George.  And you roll your eyes at
3   George.  Does he have -- what's George's personality
4   like?
5       A.   I don't know.  George is my child that I
6   tried to roll in and pray for him.
7       Q.   And what about Tippy?
8       A.   He's a good guy.  He really is.  He's very
9   laid back like his dad.  He's a good person.
10      Q.   And he's holding Jason here.  What was the
11  relationship between Tippy and Jason like when Jason
12  was young like this and growing up?
13      A.   He had Jason a lot.  They all did, but
14  Jason and Tippy had like a special little bond there
15  like Brian and Tippy did.  George was the wayward
16  one.  But they were all very close.  They were.
17      Q.   And showing you this photograph,
18  Government's Exhibit 15C.  Who is in that
19  photograph?
20      A.   That's Tippy and Jason.
21      Q.   So, Tippy and Jason again together?
22      A.   Yeah.
23      Q.   Did Tippy help take care of Jason as he was
24  growing up?
25      A.   Yes.  He used to take him up to the Boys
```

4721

```
1   Club all the time.
2       Q.   And even into when Tippy grew up and was
3   older and Jason was older, did they maintain that
4   special bond between bothers?
5       A.   It was Brian and Tippy had a special bond.
6   Jason and Tippy got a special bond after Jason got
7   older.  They weren't that close before, but when
8   they got old -- except when he was a baby, but they
9   got a -- each of them have a special bond with their
10  brother.
11      Q.   And what was that like?  What was it about
12  Tippy as the older brother that led to the special
13  bonds?  I'm sorry.  What --
14      A.   He could talk to them, you know, on their
15  level.  He was, like, the peacemaker between Brian
16  and George.  He would keep peace because they used
17  to battle a lot.  But he kept the peace.  A good
18  guy.
19      Q.   What other qualities about your son James
20  do you remember the most?
21      A.   The best qualities, he had a giving heart.
22  Anyone that takes time with seniors and take them
23  places, bring them back, very trustworthy.  That was
24  his special gift that he had.  He would do without
25  to make sure someone else had.
```

4722

1    Q.   And let me show you Government's
2  Exhibit 15D.  I know it's dark there.  Is that a
3  photo of James when he was growing up?
4    A.   Yeah, that's a photo of James and his
5  basketball trophy.
6    Q.   You say basketball was his favorite sport?
7    A.   Yeah.
8    Q.   And showing you Government's Exhibit 15F,
9  what's that a photograph of?
10   A.   I wish it was much clearer.  That was him
11 graduating from Catholic High in Stamford.
12   Q.   I want to ask you some questions about the
13 weekend before James was killed.  At that time it
14 was a summer weekend.  Was George in town, do you
15 remember?
16   A.   Yeah, George was in town.
17   Q.   And what was going on that weekend?  Were
18 you trying to have a little family get-together, a
19 barbecue at your house, or were the boys trying to
20 do that?
21   A.   No, we were trying to get them together to
22 help cut the grass at my house.
23   Q.   Okay, or that.
24   A.   Yes.
25   Q.   All right, so who was at your house that

4723

1  weekend?
2    A.   It was George, Brian, Jason and my two
3  younger ones.  They were there and they were trying
4  to get my son to come over, but he said he was
5  tired, so he didn't come.
6    Q.   Did they call him on the phone?
7    A.   Yeah, they called him a lot on the phone,
8  yeah, to come over but he didn't want to come.
9    Q.   And your husband was in the home at that
10 time, too?
11   A.   Yeah, he was sick.  Yeah.
12   Q.   And do you know the morning -- well, did
13 George, do you know if George went over to Charles
14 Street when Tippy wouldn't come over to go look for
15 him to see if he could see him?  Do you know?
16   A.   No, I don't think so.  I think he went
17 after.
18   Q.   After?
19   A.   Yeah.
20   Q.   Right?
21   A.   But not that day, no.
22   Q.   How did you find out your son had been
23 killed?
24   A.   George.
25   Q.   George called you?

4724

1    A.   Yeah.
2    Q.   So, had he gone over to Charles Street?
3    A.   Yeah.
4    Q.   And he saw the crime scene tape?
5    A.   Yes.
6    Q.   And where were your other kids at that
7  time, if you know?
8    A.   Well, Jason lives with me, so he was there.
9  And they went and got Brian because we weren't for
10 sure, because we were never notified by the police
11 or anything.  And George said that it was definitely
12 my son.  So we went down to the police department
13 and that's when I knew it was my son that was one of
14 the victims.
15   Q.   And did you then plan a funeral for your
16 son?
17   A.   Yes.
18   Q.   Did a lot of -- well, who came?  Where was
19 the funeral?
20   A.   The funeral was in Bridgeport.  I had a
21 kind of private -- in Bridgeport.  It's a day you'll
22 never forget.  It took a toll on my husband because
23 he never really got better after that because he
24 couldn't do nothing to help us with this or either
25 try to console me, because he was quite ill.  And it

4725

1  took a toll on him.  I don't think he wanted to live
2  anymore, he just gave up.
3    Q.   Let me show you Government's Exhibit 15H.
4  Is that your favorite picture of your son?
5    A.   Yeah.  That was on his casket, too.
6    Q.   And what do you miss the most about losing
7  James?
8    A.   When he was murdered, I was murdered, too
9  because I wanted to die.  And if it wasn't for those
10 two young kids, I think I would have committed
11 suicide.
12        It took a toll on us, and it still is.
13 It still is.  My little one is in counseling and my
14 12-year-old just got out of counseling and he might
15 have to go back because of all the tension that's in
16 our house.  And I know I have to go back myself.
17        MS. REYNOLDS:  Nothing further at this
18 time, your Honor.
19        THE COURT:  Thank you.
20        Cross-examination.
21 CROSS-EXAMINATION
22 BY MR. SHEEHAN:
23   Q.   Mrs. Reid, I don't have any questions of
24 you.  Thank you very much.
25   A.   Thank you.

4726

```
1        THE COURT:  All right, Mrs. Reid, thank
2   you.  You may step down.  You are excused.
3        Will the government please call the next
4   witness.
5        MS. REYNOLDS:  Yes, your Honor.  The
6   government calls Brian Reid.
7        THE COURT:  Mr. Reid, please remain
8   standing and the oath will be administered to you.
9        B R I A N   R E I D
10  Having first affirmed, was examined and testified as
11  follows:
12        THE WITNESS:  Reid, Brian.  Reid,
13  R-e-i-d.
14        THE COURT:  And your town.
15        THE WITNESS:  Bridgeport, Connecticut.
16        THE COURT:  You may proceed.
17  DIRECT EXAMINATION
18  BY MS. REYNOLDS:
19     Q.   Brian, how old are you?
20     A.   Forty-two.
21     Q.   And do you currently work?
22     A.   Not at the moment.
23     Q.   Did you have a job before?
24     A.   Yes, I did.
25     Q.   And what did you do?
```

4727

```
1      A.   I was working for Arrow Discount Furniture
2   on Main Street, but with my brother.
3      Q.   And how did you get that job at Arrow
4   Discount?
5      A.   Through my brother, James.
6      Q.   And what did James do to get you that job?
7      A.   Well, the company was hiring, he just came
8   to my house one day, knocked on the door, said
9   "Let's go, let's go to work, let's get us some
10  money."
11     Q.   And you worked there together with James?
12     A.   Yes, yes.
13     Q.   How long did you work there in total?
14     A.   Seven years.
15     Q.   And how long did James and you work there
16  together?
17     A.   About five, six years.
18     Q.   And at that time was James living with you?
19     A.   Yes, he was.
20     Q.   And were you both living in Bridgeport?
21     A.   Yes.
22     Q.   And Brian, are you currently married?
23     A.   No, I'm not married.
24     Q.   Okay.  Any do you have any children?
25     A.   Yes, I have children.
```

4728

```
1      Q.   And are they in Connecticut?
2      A.   Yes.
3      Q.   How many children do you have?
4      A.   I got four boys.
5      Q.   And when you lived with James, was it just
6   you and James living in the home?
7      A.   No, it was me, my girlfriend, my kids, and
8   my brother James.
9      Q.   And when James lived there with you, did he
10  help out around the house?
11     A.   Yes, he did.
12     Q.   Tell us about that.  What was he like as a
13  roommate?
14     A.   He was so funny.  He always make me laugh.
15     Q.   Why did he --
16     A.   We so close.  He used to make me laugh, you
17  know, play with my kids.  My kids loved him, loved
18  him a lot.  He was a good uncle.
19     Q.   What do you remember, in addition to that,
20  the most about growing up with your brother James?
21     A.   He was always there for me.
22     Q.   And when you say --
23     A.   You know, if I get in a fight, he was
24  there.  Homework, you know, telling me things that I
25  should know growing up.  Taught me how to play
```

4729

```
1   basketball, pool.  Taught me how to play pool, you
2   know.  He used to take me to the Boys Club; he was a
3   counselor there.  We used to go on field trips, New
4   York.  I always was with him.  I used to have fun
5   with him, I miss him daily.
6      Q.   What do you miss most about James?
7      A.   His happiness.  He was a good-hearted
8   person.  If you were down and out, he'll help you.
9   He'll help you out.
10     Q.   And let me show you Government's
11  Exhibit 15E.  I don't know if you can see it.
12        MS. REYNOLDS:  We can pass these out
13  later to the jury, your Honor.
14     Q.   Do you remember if this was Christmas
15  morning one year?
16     A.   Yeah, that's Christmas morning.
17     Q.   What was Christmas morning like?
18     A.   Oh, it was -- it was beautiful on
19  Christmas.  Used to have toys coming out the living
20  room.
21     Q.   And is this James over here on the left
22  side of the picture?
23     A.   Yeah.  Yep.
24     Q.   And is your dad?
25     A.   That's my dad.
```

4730

```
1    Q.   In the middle, and this is --
2    A.   That's George and that's Jason.
3    Q.   And where are you?
4    A.   I probably was playing with something.
5    Q.   Okay.  And I want to draw your attention to
6  2004, 2005 time period.  Was Tippy, or James, living
7  with you at that time?
8    A.   Yes.
9    Q.   And at some point did he move out?
10   A.   Yes.
11   Q.   Okay.  And do you know where he moved to or
12 where he started staying?
13   A.   On Charles Street.
14   Q.   And did you want him to move out?
15   A.   No, I begged him not to go.
16   Q.   You liked having him around?
17   A.   Yes.
18   Q.   Did you continue to work with him after he
19 moved out at the furniture store?
20   A.   Well, he found him another job and I stayed
21 where I was at.  So he had found, took another job.
22   Q.   So, you stayed at Arrow Furniture?
23   A.   Yes, I did.
24   Q.   And he was working somewhere else?
25   A.   Uh-huh (indicating affirmatively).
```

4731

```
1    Q.   And did you ever go over to Charles Street
2  to visit Tippy?
3    A.   Yeah.
4    Q.   Okay.
5    A.   Yes.
6    Q.   And do you know who he was staying with
7  over there?
8    A.   I knew he was staying with Bezil-- Basil.
9  Yeah.
10   Q.   And did he have -- do you know if Tippy had
11 a girlfriend at the time?
12   A.   Yes.
13   Q.   And who was that?
14   A.   Tina.
15   Q.   Did you have a chance to meet Tina?
16   A.   Yes.
17   Q.   And did you meet her over at Charles Street
18 or somewhere else?
19   A.   I met her through him introducing me.  Not
20 on Charles Street, he brung her by the house.
21   Q.   He brought her over to your apartment?
22   A.   Yes.
23   Q.   Or your house?
24   A.   Uh-huh (indicating affirmatively).
25   Q.   And that summer, did you continue to see
```

4732

```
1  your brother?
2    A.   Yes.
3    Q.   How often would you see your brother?
4    A.   Like almost every day, you know.  Almost
5  every day.
6    Q.   And did you and your brother James and your
7  other brother check up on your dad during the day
8  sometimes?
9    A.   Yes.
10   Q.   And how was your dad doing that summer?
11   A.   He was sick.  He was sick, so we used to go
12 by and check on him.
13   Q.   I wanted to ask you about the last time you
14 saw James alive.  Do you remember when the last time
15 you saw him was?
16   A.   I think it was -- the last time I saw my
17 brother alive was through that week.
18   Q.   That week before he was killed?
19   A.   Uh-huh (indicating affirmatively).
20   Q.   And when you saw him, do you remember where
21 you saw him?
22   A.   Yeah, he came to the job and called me out,
23 was talking to me.  We was talking about stuff.
24 That's the last time I seen him.
25   Q.   Did you talk to him on the phone after that
```

4733

```
1  time?
2    A.   No.
3    Q.   And that weekend when George came to visit
4  from Ohio --
5    A.   Yes.
6    Q.   -- were you over at your family's house, at
7  your mom's house?
8    A.   Yes.
9    Q.   And dad's house.  And were you and your
10 brothers trying to call James to come over?
11   A.   Yeah, we was trying to call him.  My
12 brother was kind of hard head, he didn't want to
13 come.
14   Q.   So, he never made it over to the house that
15 weekend?
16   A.   No, no.
17   Q.   Where were you the morning that George
18 found out he had been -- that James had been killed?
19   A.   I was living up here in New Haven.  I came
20 up here, my brother came, drove up -- actually it
21 wasn't George, it was my brother Jason who came up
22 and got me.  But I found out on the news first.
23   Q.   You were watching the news?
24   A.   Yeah, that's where I found out, the news.
25   Q.   And when you heard that?
```

4734

1      A.   I was in denial.
2      Q.   I'm sorry, what?
3      A.   I was in denial.  I didn't want to believe
4   it.
5      Q.   And how did you feel when you talked to
6   your brother Jason and your brother George?
7      A.   I was screaming.  I was screaming.  I was
8   screaming real bad.
9      Q.   Were you by yourself at that time?
10      A.   No, I was with my girlfriend.  I was with
11   my girlfriend.
12      Q.   Were your kids there?
13      A.   Yeah.
14      Q.   Did you then come with Jason to Bridgeport?
15      A.   Yes.  Yes.
16      Q.   Where did you go?
17      A.   We went directly to my mom's house.
18      Q.   Did you see your mom and dad?
19      A.   Yes.
20      Q.   And can you tell us what that was like for
21   the family?
22      A.   That was terrible.  That's why my father
23   passed away.  I think he just couldn't take it no
24   more, his first son, first born, just deteriorated
25   after that.

4735

1      Q.   What do you miss the most about your
2   brother James?
3      A.   His heart.  He was a good man.  I miss him.
4   He was fun to be around with.  His name is James,
5   but for us it's Tippy because he used to love to
6   play, make me laugh all the time.  All the time.  He
7   had a big heart.
8           MS. REYNOLDS:  Nothing further, your
9   Honor.
10           THE COURT:  Thank you.
11   Cross-examination.
12   CROSS-EXAMINATION
13   BY MR. SHEEHAN:
14      Q.   Mr. Reid, I don't have any questions.
15   Thank you very much.
16           THE COURT:  All right, sir, you are
17   excused.  You may step down.
18           MS. REYNOLDS:  Your Honor, I was just
19   going to pass these out, the photos to the jury,
20   just because some of them were difficult to see.
21           THE COURT:  That will be fine.
22           All right.  I'll ask the government to
23   call its next witness, please.
24           MS. REYNOLDS:  Yes, your Honor.  At this
25   time the government calls Pamela Williams.

4736

1           THE COURT:  Ms. Williams, will you
2   please come to the witness stand and remain
3   standing.  And raise your right hand.
4           P A M E L A   W I L L I A M S
5   Having first affirmed, was examined and testified as
6   follows:
7           THE WITNESS:  It's Pamela Williams,
8   W-i-l-l-i-a-m-s.  And I live in Stratford,
9   Connecticut.
10           THE COURT:  You may proceed.
11           MS. REYNOLDS:  Thank you, your Honor.
12   DIRECT EXAMINATION
13   BY MS. REYNOLDS:
14      Q.   Ms. Williams, where are you and your family
15   originally from?
16      A.   From Barbados.
17      Q.   And do you remember how long ago it was
18   when you and your family came to live in the United
19   States?
20      A.   We came in 1977.
21      Q.   And I'm just going to move the microphone a
22   little closer just so I can make sure everybody can
23   hear you.
24           So, you left Barbados in 1977, you said?
25      A.   Yes.

4737

1      Q.   And did the family come directly to live in
2   Connecticut?
3      A.   Yes.
4      Q.   What part of Connecticut?
5      A.   We lived in Stamford.
6      Q.   And who came at that time from Barbados,
7   from your family?
8      A.   It was myself, my brother David, we call
9   him John as well, John David, and Basil.  And I say
10   Basil, you guys say Basil.
11      Q.   We call him Basil, but it's actually Basil?
12      A.   Basil from Barbados.
13      Q.   How many brothers and sisters total do you
14   have?
15      A.   Six brothers, no sisters.
16      Q.   So, you are the only girl?
17      A.   Yes.
18      Q.   Okay.  And you mentioned John David and
19   Basil.  Who are the other brothers?
20      A.   I have my brother Ian, and he was in Canada
21   at the time and he came later, and my brother
22   Trevor, he was already here with my mom and my
23   stepfather.
24      Q.   And --
25      A.   And I have two other brothers that lived in

4738

```
1   England.  One has passed away, but I have Edward
2   that lives in England, and Tony had passed, passed
3   away in '84.
4       Q.   So, Tony and Edward had lived in England?
5       A.   England.
6       Q.   What part of England?
7       A.   London.
8       Q.   And Edward still lives in London?
9       A.   Yes.
10      Q.   And what was your -- or what is your mom's
11  name?
12      A.   Odessa.
13      Q.   And you said your mom was already in
14  Connecticut when you came from Barbados?
15      A.   Yes.
16      Q.   Was she with your father?
17      A.   My stepfather.
18      Q.   Stepfather.  And so about how old was Basil
19  when you left Barbados to come live in the United
20  States?
21      A.   I don't remember.
22      Q.   About how old were the kids?  Were you
23  grown already or --
24      A.   Yes, yes.
25      Q.   So, you were grown.  You had gone to school
```

4739

```
1   in Barbados?
2       A.   Yes.
3       Q.   And you came.  And where did you live when
4   you first came to Connecticut?
5       A.   In Stamford.
6       Q.   And did you all live together in Stamford?
7       A.   Yes, we did.
8       Q.   Before Basil left, did he have a daughter
9   in Barbados?
10      A.   Yes, he did.
11      Q.   Was he married?
12      A.   No.
13      Q.   And what's his daughter's name?
14      A.   Her name is Karen.
15      Q.   And does Karen still live in Barbados?
16      A.   Yes, she does.
17      Q.   And does Karen -- and did Basil have any
18  grandchildren?
19      A.   Yes.
20      Q.   And how many grandchildren?
21      A.   Three grandchildren.
22      Q.   And showing you what's been marked as
23  Government's Exhibit 16E, a photograph, is that a
24  picture of Karen?
25      A.   That's Karen.
```

4740

```
1       Q.   And is that one of her children?
2       A.   Yes, it's her youngest, Ashton.
3       Q.   And is this your mom in the photo?
4       A.   That's my mom.
5       Q.   Your mom is back living in Barbados now?
6       A.   Yes.
7       Q.   Was Basil, did he get married eventually
8   when he was in Connecticut?
9       A.   Yes.
10      Q.   And who did he marry?
11      A.   Georgia.
12      Q.   And did Georgia and Basil continue to live
13  in Connecticut?
14      A.   Yes.  Stamford.
15      Q.   In Stamford.  What did Basil do for a
16  living?
17      A.   When we he first came to Stamford he was a
18  -- he worked at a printery, a printing company, and
19  then eventually he did painting.  He was a painter.
20      Q.   And did he like to paint?
21      A.   Yes.
22      Q.   Did he sometimes paint your home?
23      A.   Yes, he painted my kitchen for me.
24      Q.   He did?
25      A.   Yeah.
```

4741

```
1       Q.   And did Georgia work?
2       A.   Yes, she was a nurse's aide.
3       Q.   And did they have any children of their
4   own?
5       A.   No.
6       Q.   Did Georgia have children?
7       A.   She had kids, yeah.
8       Q.   And did Georgia's children live with Basil
9   and Georgia sometimes?
10      A.   Oh, yeah, one of them.
11      Q.   One of them did?
12      A.   Yeah.  Yeah, the others were older kids.
13      Q.   And can you describe what Basil was like as
14  a brother and growing up?  Tell us about him.
15      A.   Growing up in Barbados we were a nice, good
16  family.  We played games together, I remember him
17  just loving to laugh.  He loves to laugh.  He loves
18  people.  Always liked to work in the house,
19  cleaning.  And when he came to my house he was
20  always helping to try to clean.  And we always have
21  picnics together.  We would go to Booth Park in
22  Greenwich and have family picnics.  Thanksgiving and
23  Easter and Christmas we always have family times
24  together either at my Mom's home or eventuality at
25  my home, or at my brother David's and his wife.
```

**GA1228**

4742

```
1    Q.   And so you were all very close?
2    A.   Yes.
3    Q.   Let me just show you Government's Exhibit
4  16B, is this your mom?
5    A.   That's my mom.
6    Q.   And that was before she moved back to
7  Barbados?
8    A.   Yes.  She had never gone to see the
9  Rockettes and she was planning on going back and I
10 wanted her to get some time in the City and I took
11 her to see the Rockettes.  So that was a picture at
12 Rockefeller Center.
13   Q.   And let me ask you about Basil and Georgia.
14 What was their relationship like?
15   A.   Oh, they were happy together.  He called
16 her Georgie.  I think she was probably his
17 everything.  Because after Georgia -- she was
18 diabetic and she had her legs amputated.  They were
19 planning on moving, to go to South Carolina to
20 retire there.  And then she took very ill, had her
21 leg amputated and never recovered from that, and she
22 finally passed away.
23        We all went down to South Carolina to the
24 funeral, and then my brother, I guess, just went to
25 pieces after, after that.
```

4743

```
1    Q.   After losing Georgia?
2    A.   Yes.
3    Q.   Was Basil able to get -- well, did Georgia
4  want to go down to South Carolina after she took a
5  turn for the worst?
6    A.   Yes.  She wanted to be buried there because
7  it was like pretty much towards the end, and they
8  got an ambulance to drive her to South Carolina.
9    Q.   And Basil was able to get her down there?
10   A.   Yes.
11   Q.   And how long was she down there before she
12 passed away?
13   A.   It wasn't very long after that.
14   Q.   Weeks?
15   A.   Yeah.
16   Q.   Did you all go down to the funeral in South
17 Carolina?
18   A.   We just rented a van.  We went down to the
19 funeral, my mom, my brother David and myself, we
20 drove down.
21   Q.   And you said Basil just was never the same
22 after that?
23   A.   No, he wasn't.  He just fell to pieces,
24 pretty much.
25   Q.   Did his plans to move down south obviously
```

4744

```
1  changed after that?
2    A.   Yes.
3    Q.   And do you know if there came a time that
4  Basil had an accident at work when he was painting?
5    A.   Yes, he fell from the ladder.  He was
6  working with a company, I'm not sure of the name of
7  the company, but he fell and hurt himself and he was
8  not able to go back to work for a very long time.
9    Q.   So, he was out on disability?
10   A.   Yes.
11   Q.   And do you know if there was a lawsuit
12 where --
13   A.   Yes, there was.  Georgia had started the
14 lawsuit, and after she had passed, then he received
15 a settlement from that lawsuit.
16   Q.   In connection with the fall that he had
17 taken?
18   A.   Yes, in connection with the fall.
19   Q.   After Georgia passed and Basil couldn't
20 work anymore, did he move from Stamford?
21   A.   He moved from Stamford, and initially he
22 lived with Georgia's -- I think it was her oldest
23 daughter and her husband, and then he -- they were
24 eventually moving, and he got an apartment on Main
25 Street in Bridgeport.
```

4745

```
1    Q.   What do you do for a living?
2    A.   Real estate.
3    Q.   And when Basil was looking for a place to
4  live, did you help him find a place to live?
5    A.   Yes, when he did get the settlement I spoke
6  to him about it, and I thought it would have been a
7  good idea, because I didn't like the apartment where
8  he was living, I just didn't like that, the
9  building, so I suggested that he purchase something.
10 At least he would have a place of his own.  And
11 that's when he purchased -- what he could afford at
12 the time was the apartment on Charles Street.
13   Q.   And you helped him --
14   A.   Yes.
15   Q.   -- purchase that apartment?
16   A.   Uh-huh (indicating affirmatively).
17   Q.   On Charles Street?
18   A.   Yes.
19   Q.   And he moved in there, obviously?
20   A.   On the first floor, yeah.
21   Q.   And did you -- after he moved in there, did
22 you visit him?
23   A.   Yes, I would call, try to call him a couple
24 times.  I did go there a couple times to visit him,
25 but when I would go I could never find him, he was
```

**GA1229**

4746

```
 1   not there.  And once I did go and I saw a lady at
 2   the window and I asked for him, because I was taking
 3   him dinner.  Before that I would take, you know, go
 4   to the grocery store and shop for him or take him to
 5   the grocery store, and that day I was taking him
 6   dinner, and somebody was at the window and I asked
 7   for my brother, and the lady said he wasn't there.
 8   And I said where is he, and she said he went to look
 9   for a job.  And I asked her who she was and she said
10   Tina, because I wasn't aware somebody else was
11   there.
12       Q.   Was that the only time you met Tina?
13       A.   Yes, that's the only time I saw her.
14       Q.   And did you ever meet Tippy, or James?
15       A.   No.
16       Q.   And you said you would visit with your
17   brother, take him grocery shopping?
18       A.   Yes, before he moved to Charles Street, at
19   the apartment I would pick him up, take him to the
20   grocery store to shop and --
21       Q.   And what were those times like with your
22   brother as you --
23       A.   They were good times.  I enjoyed doing it
24   because he didn't drive.  He didn't have a vehicle,
25   so --
```

4747

```
 1       Q.   And where is your office where you work?
 2       A.   It's on Main Street.
 3       Q.   In Bridgeport?
 4       A.   Yes.
 5       Q.   Did Basil ever visit you there?
 6       A.   Yes, he has.  A couple of times he's
 7   visited.
 8       Q.   He would just come by?
 9       A.   Yes, he would come by.  If he needed
10   something he would come by and ask, you know.  Was
11       Q.   And you said you took him dinner.  What was
12   his -- did he have a favorite?
13       A.   Oh, yeah.  He liked fish and he always
14   wanted -- he said you should always have a fish
15   dinner.
16       Q.   He would say that?
17       A.   He liked fish.
18       Q.   Do you know if Basil drank alcohol?
19       A.   Yes, he did.
20       Q.   And after Georgia died, did he seem to turn
21   more to alcohol?
22       A.   He just got -- he was, like, depressed, I
23   guess.  He was very depressed, and I guess that was
24   his way of drowning his pain.  He was -- he drank a
25   lot.
```

4748

```
 1       Q.   Ever see him --
 2       A.   But he never bothered anybody as far as I
 3   know.  I remember him drinking, even at home he
 4   would drink in his apartment and -- but on weekends
 5   he was, like, Sundays he would just watch the ball
 6   games.  Never drank on a Sunday.  He would watch the
 7   ball games all day.  But he was very depressed.
 8       Q.   And did he ever -- did you know or did you
 9   ever see him use drugs or any other --
10       A.   No, he never used drugs or sold drugs.
11   Never.
12       Q.   And did he, in addition to visiting you at
13   your office, did you and the family get together in
14   other spots sometimes or go anywhere else together?
15       A.   Well, other than family, our family homes
16   just for holidays, we would always get together.
17       Q.   Was there a favorite holiday or a favorite
18   thing to celebrate in your family with your
19   brothers?
20       A.   I think it was Christmas and Thanksgiving.
21   Those were the times that -- we looked forward to
22   those, where everybody would be together.
23       Q.   And tell us what Basil was like at those
24   family gatherings at the holidays.
25       A.   Oh, he was always funny, making us laugh.
```

4749

```
 1   He has a funny way of laughing, and I miss that.
 2   I'll never be able to -- I can just, you know, hear
 3   it in my head sometimes.
 4       Q.   Let me just show you other photos.  You
 5   mentioned that his daughter, Karen, has how many
 6   children?
 7       A.   She has three kids.
 8       Q.   And just showing you this photograph, it's
 9   kind of dark, Government's Exhibit 16D.  Is this two
10   of her other kids?
11       A.   Yes, that's Monifer and Ashton.
12       Q.   And did Karen ever come up from Barbados to
13   visit Basil?
14       A.   Oh, yes, she visited.  When Georgia was
15   alive she would come on vacations and spend summers
16   with them.
17       Q.   And so they were close even though they
18   were far away?
19       A.   They were close.  And he would call all the
20   time.  Phone bills were always very high because he
21   would call and talk to them for a long time.
22       Q.   And did he get to meet his grandchildren?
23       A.   Just one, just the oldest one, which is
24   Camara.  She would come to visit, too, with Karen,
25   but he never met Monifer or Ashton.  He would just
```

4750

1 talk to Monifer, but he never met the last two kids.
2    Q.    And did he -- did Basil get a chance to go
3 back to Barbados at all?
4    A.    No, he never did.
5    Q.    Do you and your other brothers go back?
6    A.    Oh, yes.
7    Q.    Let me show you Government's Exhibit 16C,
8 this photograph.  Is this your mom?
9    A.    That's my mom.
10    Q.    And who is in her arm?
11    A.    That's my nephew, Jermain.
12    Q.    And is that Basil in the back?
13    A.    That's Basil, yes.
14    Q.    Where was this photo taken?
15    A.    That was in my mom's kitchen.  We just
16 loved to sit around and talk.  And I'm not sure if
17 that was a holiday time, but it was just one of
18 those times that we would get together.
19    Q.    What was your mom's relationship with Basil
20 like?
21    A.    Oh, she was -- he was always funny, so she
22 enjoyed talking to him and she -- now she's in a
23 nursing home and doesn't remember a whole lot, but
24 when I do call, which is like twice a week, I would
25 call her now and she's always asking for him.  Even

4751

1 though she doesn't remember probably most of -- some
2 of her other kids, she would say, "Have you talked
3 to Basil?"  And "Why won't he call?"  Or "Why won't
4 he write?"
5    Q.    Your mom -- let me ask you this:  Where
6 were you when you found out your brother had been
7 killed?
8    A.    I was visiting one of my parishioners at
9 St. Vincent's Hospital.  It was in the afternoon and
10 we were just sitting talking, and the TV was on, so
11 I looked and they said there was a murder.  And then
12 they mentioned Charles Street condos, and I knew
13 that's where my brother lives and I just told the
14 parishioner, I said, I have to go because I'm not
15 sure, you know, this building here, it was just down
16 the street from St. Vincent's.  So I drove there,
17 and when I got there it was all taped off and I
18 tried to locate a police officer to ask which
19 apartment or do you know who the name of the person,
20 and he asked me my name and I told him my name, and
21 then he said, "Could you come with me down to the
22 police station."  And that's how I found out, when I
23 got to the police station, that my brother was one
24 of the victims that were murdered in there.
25    Q.    And what did you feel at that time?

4752

1    A.    Well, I don't know.  I felt my emotions.  I
2 was just devastated and I was trying to find out
3 what happened and try to get some information.
4 There was one lady that I had met when I was there
5 that I knew that worked at the juvenile courts, and
6 she went with me to the police station as well.
7    Q.    Did you call your other brothers?
8    A.    Yeah, I just started calling everybody.
9    Q.    And was your mom still living in
10 Connecticut at the time?
11    A.    At the time she was in Barbados.  She came
12 back for the funeral.
13    Q.    You planned the funeral?
14    A.    Yes, I did.
15    Q.    And was it in Connecticut?
16    A.    Yes.
17    Q.    And you said your mom came back.  Was your
18 brother from London able to come?
19    A.    No, my brother wasn't able to come at the
20 time.  My brother Trevor, he came, he flew in from
21 South Dakota, and my nieces from South Dakota and
22 Washington, they all came.
23    Q.    And what was it like to have to tell your
24 mom about Basil?
25    A.    I had to have -- I couldn't call to tell

4753

1 her directly, but I called a friend in Barbados and
2 asked them to please go to the house to tell her.
3    Q.    She was able to come for the funeral you
4 said.  At that time had she started getting ill or
5 she was okay?
6    A.    No, she was fine.  She was fine.
7    Q.    So, you said now she's in a nursing home.
8 Does she have some Alzheimer's?
9    A.    Yes, she pretty much -- her short term
10 memory is gone.
11    Q.    So, you call her every week?
12    A.    I call her like two, three times a week,
13 and my brother calls all the time as well and she
14 just asks.  You know, one of the first things she
15 ever says, "How is Basil?  Why doesn't he write?
16 Why doesn't he call?"  And I say "He's okay.
17 Everybody is okay."  I just don't know what to say.
18    Q.    Let me show you a photo that's in evidence
19 Government's Exhibit 16F.  I'm going to remark it,
20 the number.  Is that -- do you know where that photo
21 was taken?
22    A.    That was taken at my niece's wedding.
23    Q.    And your niece, which niece?
24    A.    Her name is Kathy.  That's my brother
25 David's daughter.

4754

1    Q.   And was Basil also close with Georgia's
2  family, her sister-in-law and her kids?
3    A.   Yes, they were.  They were close.
4    Q.   And did a lot of the nieces and nephews
5  spend time with Basil and Georgia?
6    A.   Yeah.  Matter of fact, Basil, he babysat
7  for Jermain and Ashante when they were smaller.  Two
8  of the kids, he babysat sometimes for them.
9    Q.   And what do you miss most?
10    A.   I miss his laughter, I miss talking to him,
11  I miss having him, like, just being there.  Just
12  being there.
13         MS. REYNOLDS:  Nothing further, your
14  Honor.  Oh, one second.
15         Nothing further, your Honor.
16         THE COURT:  All right, thank you.
17  Cross-examination.
18  CROSS-EXAMINATION
19  BY MR. SHEEHAN:
20    Q.   Mrs. Williams, I have no questions.  Thank
21  you very much.
22         THE COURT:  All right, Ms. Williams, you
23  may step down.  You are excused.
24         Ladies and gentlemen, I think we'll take
25  lunch at this time.  Let's take lunch 'til one

4755

1  o'clock and then we can return.  We stand in recess.
2         (The jury exited the courtroom)
3         THE COURT:  All right, Counsel, will
4  there be anything else before we take lunch?
5         MR. SHEEHAN:  No, your Honor.
6         MS. REYNOLDS:  No, your Honor.
7         THE COURT:  Very well, we stand in
8  recess.
9         (Recess).
10         THE COURT:  All right, Counsel, please
11  be seated.  We'll bring in the jury.
12         And you have one more witness today; is
13  that correct?
14         MS. REYNOLDS:  Yes, your Honor, just
15  John David Williams, and it shouldn't be a very long
16  witness.
17         (Jury entered the courtroom.)
18         THE COURT:  All right, please be seated,
19  ladies and gentlemen.
20         Will you please call your next witness.
21         MS. REYNOLDS:  Yes, your Honor, the
22  government calls John David Williams.
23         THE COURT:  Mr. Williams, if you would
24  kindly come to the stand and while you remain
25  standing with your right hand raised, the oath will

4756

1  be administered to you.
2         J O H N   D A V I D   W I L L I A M S
3  Having first affirmed, was examined and testified as
4  follows:
5         THE WITNESS:  John David Williams,
6  W-i-l-l-i-a-m-s, Stamford, Connecticut.
7         THE COURT:  You may proceed.
8         MS. REYNOLDS:  Thank you, your Honor.
9  DIRECT EXAMINATION
10  BY MS. REYNOLDS:
11    Q.   Good afternoon, Mr. Williams.
12    A.   Good afternoon.
13    Q.   I understand you have a bad cold today.
14    A.   And sore throat.
15    Q.   So, we'll try to get through this, but if
16  you need water or anything, just let me know.
17    A.   Yes.
18    Q.   Mr. Williams, I wanted to ask you about
19  what it was like growing up with your brother Basil.
20  Can you tell us about your relationship with Basil
21  and what it was like growing up first in Barbados
22  when you were little?
23    A.   Yes, we were always close.  Very, very
24  close.  You know, if he was going away he would call
25  me, tell me he want to go along and I would go and,

4757

1  you know, he was a good, very good guy.  Very good
2  guy.
3    Q.   Are you older or younger than he is?
4    A.   I am older.  Two and a half years older
5  than him.
6    Q.   Then you and Pamela and Basil came together
7  when you moved to Connecticut?
8    A.   Yes.
9    Q.   From Barbados?
10    A.   Yes, 1977.
11    Q.   And you've lived in Connecticut since that
12  time?
13    A.   Yes, ma'am.
14    Q.   And when Basil married Georgia, were you --
15  did you spend a lot of time with them?
16    A.   Well, I didn't go to the wedding because I
17  knew about it late, but he came by about a week
18  after and he told me, you know.
19    Q.   So, you didn't go to their wedding?
20    A.   No, I didn't go to the wedding.
21    Q.   But after they got married, did they
22  live --
23    A.   Yes, we were very close, me, him, and his
24  wife.  If sometimes he misbehaved his wife would
25  call me and tell me, and I would go to the apartment

4758

1   and, you know, I would talk to him. And he's always
2   quiet. Always quiet. He wouldn't come -- I would
3   talk to his wife. He would never come between us,
4   the wife's opinion or anything, he would wait until
5   I leave, and then he and his wife would, you know,
6   sit and talk. But she always come and complain to
7   me when he done something wrong. Always.
8       Q.   And you would help out with their --
9       A.   Yes. He was a -- he never bothered a fly,
10  never ever bothered a fly. Sometimes -- you know, I
11  had two jobs. I worked military electronics
12  32 years. I got laid off in September last year. I
13  still have my part-time job in the Marriott for
14  27 years, and he come sometimes, come to the
15  Marriott, he used to smoke and he would ask, he
16  would come and ask "Is David at work?" And the guys
17  would say "David is off today." And he would turn
18  around, and the guys would ask him what he need, you
19  know, and he would say he just wanted some money to
20  get some cigarette. Because at the time his foot
21  was broken, he couldn't work. So whenever I seen
22  him I just give him some money to put in his pocket.
23  And if I'm not there the guys at the Marriott would
24  give him money to get cigarettes or bus fare to get
25  home. And then when I get to work the following day

4759

1   they would tell me, I would reimburse them.
2       Q.   So Basil would come visit you at your
3   second job at the Marriott?
4       A.   Yes, yes.
5       Q.   And what did you do -- or what do you do?
6       A.   I am a doorman at the Marriott for 27 years
7   now.
8       Q.   And you said the guys, are these other guys
9   that you would work with there at the Marriott?
10      A.   Yes.
11      Q.   And so Basil got along with all of your
12  friends?
13      A.   Yes. Everybody. Everybody. Sometime I
14  would go to practice. I play cricket. I would go
15  to practice, but he would not practice. But he
16  always voicing an opinion. If someone do wrong on
17  the field, he would tell them they are wrong, they
18  shouldn't do that, and he would walk around, you
19  know, and talk with the guys when the game is over.
20  I live close by the park, but he live further, and
21  someone would always take him home. They would
22  never let him walk, no.
23      Q.   So, you still play cricket?
24      A.   Yes, ma'am, I try.
25      Q.   You try. And did Basil play cricket as

4760

1   well?
2       A.   Basil, he loved the game, but Basil don't
3   want to play. I know we play the game in Brooklyn,
4   and I played in the American Cricket League,
5   33 years, and we were short, and the guys asked
6   Basil, we have a pants and a shirt could fit you,
7   would you play so that we will have enough guys on
8   the ground. And the guy was, I think it was 96 now,
9   going to have a score of the century, and hit the
10  ball in the air, and Basil caught it and he got out
11  at 96. And when the end of the game, they lift him
12  off the field like he was man of the match. Yeah,
13  but he would never come and join the team and play.
14  He would be always around, but he wouldn't play it.
15      Q.   Except for that one man of the match?
16      A.   That game we were short.
17      Q.   And so he would come to your practices?
18      A.   Yeah, he would come, yeah.
19      Q.   And that was in Stamford area?
20      A.   Yes, in Stamford, yep.
21      Q.   And how often would he come see you
22  practice?
23      A.   Maybe usually we practice on Tuesdays and
24  Thursdays.
25      Q.   And he would try to make those practices?

4761

1       A.   Yes, yes, ma'am.
2       Q.   And you said all the guys you played with
3   were all so friendly with him?
4       A.   Yes, Basil didn't have a -- everybody loved
5   Basil. Sometimes he used to joke with the guys,
6   sometimes he would tell the guys, stop drinking the
7   hard liquor, stop drinking the hard liquor, and when
8   someone would send him to the store to buy a bottle
9   of liquor, a bottle of Bacardi, Basil would bring
10  back wine.
11      Q.   Bought wine instead of --
12      A.   He would buy a bottle of wine instead. All
13  the guys would crack up, joking, but he was always
14  friendly, very friendly guy.
15      Q.   Let me ask you, let me show you
16  Government's Exhibit 16A. I'll show you this
17  photograph.
18      A.   Yes.
19      Q.   And so is this your sister Pamela here?
20      A.   Yes, ma'am.
21      Q.   And is this Basil in the back?
22      A.   Yes.
23      Q.   And this is you?
24      A.   Yes.
25      Q.   And this is your mom?

**GA1233**

4762

```
1      A.    Uh-huh (indicating affirmatively).
2      Q.    And who are the other two?
3      A.    The other two, the last one behind my mom,
4  that's Trevor.
5      Q.    That's your other brother?
6      A.    Yeah, he's in the Air Force, and that's
7  Ian.  Ian.
8      Q.    And Ian, is he the one that lived in
9  Canada?
10     A.    He used to live in Canada, but he lives in
11 Fairfield, Connecticut now.
12     Q.    And who is this?
13     A.    That's Ian's daughter.
14     Q.    And these are other nephews?
15     A.    Yes.
16     Q.    And do you know when this picture was
17 taken?
18     A.    I know it taken Booth Park, but I don't
19 remember what year.
20     Q.    And Booth Park is where?
21     A.    In Greenwich.  My mother used to live in
22 Greenwich.  It's a big park.  We used to go there
23 and barbecue.  We have family come up from
24 Manhattan, Basil and his wife, and we all, the whole
25 family assemble there and we have barbecue.
```

4763

```
1      Q.    You would have family picnics there?
2      A.    Yes.
3      Q.    And get everyone together?
4      A.    Yes.
5      Q.    What was Basil like at those family
6  picnics?
7      A.    Basil was always around with the kids.
8  Always, always.
9      Q.    Were you -- you said you were close with
10 Georgia and she used to call you?
11     A.    Yes, yep.
12     Q.    And what was Basil's relationship with
13 Georgia like?
14     A.    They used to get along pretty good.  In
15 fact, I know Georgia before Basil know her.  Yeah,
16 because I used to live in an apartment before I got
17 married, and Georgia had a cousin who used to live
18 in the same building.  That's how I met Georgia.
19 But Basil used to live with my mother, I was by
20 myself.
21     Q.    And they were very close, Georgia and
22 Basil?
23     A.    Very close, yes.
24     Q.    And you said you are married, right?
25     A.    Yes, ma'am.
```

4764

```
1      Q.    And do you have children?
2      A.    Yes.
3      Q.    And how many children?
4      A.    Two.
5      Q.    And --
6      A.    One girl.
7      Q.    Did Basil get to spend time with your
8  children?
9      A.    Yes, but always around with the kids.
10 Always with the kids.  Always around, yes, ma'am.
11     Q.    And did they enjoy --
12     A.    Yep.
13     Q.    -- spending time with their uncle?
14     A.    Yes, ma'am.  Yes, ma'am.
15     Q.    We heard from Pamela that Georgia got sick.
16 She had diabetes?
17     A.    Yes.  I think I told you this story, or I
18 told someone the story before, because both of them
19 bought Chinese food, and the Chinese food poison
20 both of them, but Georgia was a diabetic, very bad
21 diabetic and both of them went to the hospital.  And
22 Basil came out, but they kept Georgia.  Georgia was
23 in there for a while, and it start like to amputate
24 her toes, right up to her hips, both legs.
25     Q.    Because of a poison in her blood?
```

4765

```
1      A.    Yes, ma'am, from that she got food
2  poisoning.  So then she said she want to go back to
3  Carolina and look for her relatives, you know, and
4  Basil told me the ambulance, I think -- I don't
5  remember how much money they paid, but the ambulance
6  took her back there, the Monday, into the hospital,
7  and she died Friday.
8      Q.    The Friday after she got there?
9      A.    Yes.
10     Q.    And Basil was with her?
11     A.    Yes.
12     Q.    And were you able to make it down to the
13 funeral?
14     A.    Yes, ma'am.  Me and my sister and my
15 mother, we paid someone a couple hundred dollars, we
16 drove down and drove back up.  I stayed at the
17 Marriott down there.
18     Q.    And what was it like for Basil after he
19 lost his wife, Georgia?
20     A.    Well, it was rough on him.  It was very,
21 very rough on Basil.  He felt it.  Even at the
22 funeral he was -- they had the casket over the grave
23 and he never stay around, he was just walking around
24 and shaking his head, and like that, you know.  But
25 it was rough on him.
```

4766

```
 1     Q.   And after that did he end up -- he moved to
 2   the Bridgeport area?
 3     A.   Yes.
 4     Q.   Did you still see him a lot during that
 5   time?
 6     A.   Yeah, yeah.  He used to come by my job when
 7   I was doing my first job, he used -- I used to see
 8   him once in a while.  He would go by the park
 9   sometime, but I would never be in the park.  I only
10   go to the park when I go to practice.  But the guys
11   would tell me, your brother is over there, and, you
12   know, I took him home and take him to the bus
13   station.  He used to catch two buses to get from
14   Stamford to Bridgeport.
15     Q.   He didn't have a car?
16     A.   No.
17     Q.   And did you talk to him on the phone in
18   that time?
19     A.   Yes.  Yeah, he used to call me once in a
20   while.  Even the week before he died he had called
21   me.
22     Q.   And when you talked to him the week before
23   he was killed --
24     A.   Yes.
25     Q.   -- what did you talk about?  Do you
```

4767

```
 1   remember?
 2     A.   No, he called me and tell me he want to get
 3   those people out his apartment.  So I said, "Well,
 4   my sister bought the apartment for you, you
 5   shouldn't let the people stay there."  And the
 6   argument stopped there, you know, I never -- and
 7   then I was at work the following week and my sister
 8   called me and she give me the news, you know, that
 9   Basil had got killed, murdered.  So, I told my
10   manager, and I leave the same time, I went home, and
11   I don't remember what day, but we went to identify
12   the body, and then like a couple days after we went
13   to the apartment and I saw the blood on the floor,
14   up the wall, up in the ceiling splattered.
15     Q.   Did you go get -- go get his things out of
16   there?
17     A.   Yes.
18     Q.   This was after the police --
19     A.   Yes, most of the things that wasn't
20   damaged, you know, like it had like a water leak in
21   the building.
22     Q.   And who did you go to the apartment with?
23     A.   My sister.
24     Q.   Pamela?
25     A.   Yeah.
```

4768

```
 1     Q.   When you found out he was killed, can you
 2   describe what feelings came over you?
 3     A.   Well, we was very close.  You know, I said,
 4   Basil never bothered nobody.  Basil would walk away.
 5   If you tell Basil two words, Basil walk and go
 6   around about his business, he don't want to look
 7   back at you.
 8     Q.   What do you miss most about your brother
 9   Basil?
10     A.   Seeing him.  He always around.  Something,
11   he would come sit around, my wife cook, we sit down
12   there like that.  One thing my sister said, Basil
13   would have a couple of drinks during the week, but
14   you see Saturday or Sunday, whether it's college
15   football or NFL, Basil wouldn't touch liquor.  He
16   wouldn't touch one.
17     Q.   He liked to watch his sports?
18     A.   Every weekend, yes, ma'am.
19     Q.   What other things did Basil like to do?
20     A.   Well, I know he like -- he's a good, very
21   good painter because I know I had a friend who used
22   to drive a bus, and he's retired now, and he told me
23   that this guy, he do a job, paint job for him, and
24   it was very good, and I asked him what was the guy's
25   name.  He tell me "Basil."  I pronounce it
```

4769

```
 1   different, they said Basil.  I said, "That's my
 2   brother."  And he said, "I didn't know that's your
 3   brother."  And I asked him if he know that he got
 4   murdered, he tell me no, he didn't.
 5     Q.   So, this was recently?
 6     A.   That is about a year after.  About a year
 7   after.
 8     Q.   And he had had painting done by your
 9   brother?
10     A.   Yeah.  My brother had paint his entire
11   inside of his house.  Yep.  This guy was a bus
12   driver in Stamford.
13     Q.   Do you remember the last time you saw Basil
14   alive?
15     A.   The last time.  Got to be about roughly two
16   weeks before his death.
17     Q.   And do you know --
18     A.   And the last time I talked to him was about
19   a week before his death.
20     Q.   And the last time you saw him, where did
21   you see him?
22     A.   I saw him in Stamford.
23     Q.   And where were you in Stamford?
24     A.   Downtown Stamford.  He tell me he went to
25   check out a job.  So, I asked him if he get the job,
```

4770

```
1   and he said, well, he got to wait a few more days
2   before they call him.
3        Q.   And how did he seem at that time?
4        A.   He was all right.  He was okay.  He was
5   okay.
6        Q.   After you found out from Pamela and
7   identified the bodies, did you help plan the funeral
8   for your brother?
9        A.   Yes, I always -- my sister, my sister, me
10  and my sister is the closest of my family.  We all
11  the same mother, all the same father.  I'm the last
12  of the first four, we all father the same.  I very
13  close to my sister.
14       Q.   And were you able to get your mom to come
15  to the funeral?
16       A.   Yes.  Yep.
17       Q.   Do you still --
18       A.   I talk to my mother every week.  She would
19  ask me, first she ask me for my granddaughter, know
20  how she's doing, and then she would ask me how Basil
21  is doing.  I said, "Mommy, Basil is okay."  "Is he
22  behaving his self?  Are you sure?"  I said, "Yeah,
23  behaving his self."  But she's -- she don't remember
24  anything.
25       Q.   What is that like for you and your family
```

4771

```
1   having --
2        A.   It's tough.  It's tough.  It's tough.  Very
3   tough.
4             MS. REYNOLDS:  No further questions,
5   your Honor.
6             THE COURT:  Thank you.
7   Cross-examination.
8   CROSS-EXAMINATION
9   BY MR. SHEEHAN:
10       Q.   Mr. Williams, I don't have any questions
11  either.  Thank you.
12       A.   Thank you.
13            MR. SHEEHAN:  You are welcome.
14            THE COURT:  All right, Mr. Williams,
15  thank you.  You may step down, sir.  You are
16  excused.
17            I understand that we have no further
18  witnesses to be presented by the government today.
19            MS. DAYTON:  That's right, your Honor,
20  we will have two more tomorrow morning.
21            THE COURT:  All right then, ladies and
22  gentlemen, we will recess early, but we will
23  reconvene at 9:30 tomorrow morning.  Thank you very
24  much.
25            (Jury exited the courtroom)
```

4772

```
1             THE COURT:  All right, Counsel, then I'm
2   going to get the defendant's response to the
3   government's Daubert motion as soon as possible, and
4   I would like your request for charge and verdict
5   forms no later than tomorrow morning.  Thank you
6   very much.  We'll stand in recess.
7             (Proceedings concluded at 1:30 p.m.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

4773

```
1                      I N D E X
2   WITNESS                                      PAGE
3   JOSEPH ALFONSO
4   Direct Examination by Mr. Markle             4638
5   Cross-Examination by Mr. Smith               4664
6   Redirect Examination by Mr. Markle           4668
7   Recross-Examination by Mr. Smith             4668
8   Re-Redirect Examination by Mr. Markle        4669
9
10  JOHN SULLIVAN
11  Direct Examination by Ms. Dayton             4571
12  Cross-Examination by Mr Smith                4694
13  Redirect Examination by Ms. Dayton           4700
14  Recross-Examination by Mr. Smith             4701
15
16  MARY REID
17  Direct Examination by Ms. Reynolds           4708
18  Cross-Examination by Mr. Sheehan             4726
19
20  BRIAN REID
21  Direct Examination by Ms. Reynolds           4726
22  Cross-Examination by Mr. Smith               4735
23
24
25
```

4774

```
 1   PAMELA WILLIAMS
 2   Direct Examination by Ms. Reynolds          4736
 3   Cross-Examination by Mr. Sheehan            4754
 4
 5
 6   JOHN DAVID WILLIAMS
 7   Direct Examination by Ms. Reynolds          4756
 8   Cross-Examination by Mr. Sheehan            4771
 9
10
11
12          I certify that the foregoing is a correct
13   transcript from the record of proceedings in the
14   above-entitled matter.
15                      6/2/11
16                      Date
17
18                      /S/  Sharon Montini
19                      Official Reporter
20
21
22
23
24
25
```

4775

```
 1              UNITED STATES DISTRICT COURT
 2              DISTRICT OF CONNECTICUT
 3   * * * * * * * * * * * *     *
                                 *
 4   UNITED STATES OF AMERICA,   *  Case No 6cr160(JBA)
 5              Plaintiff,        *
                                 *
 6      vs.                       *
                                 *
 7   AZIBO AQUART               *  June 2, 2011
                                 *
 8              Defendant.        *
                                 *
 9   * * * * * * * * * * * *     *
10                TRIAL TRANSCRIPT
11                 VOLUME XXV
12   BEFORE:  THE HONORABLE JANET BOND ARTERTON U.S.D.J.,
                                          and jury
13   Appearances:
14   FOR THE GOVERNMENT:  ALINA REYNOLDS, ESQ
                          TRACY DAYTON, ESQ
                          PETER MARKLE, ESQ.
15                        JACABED RODRIGUEZ-COSS
16                        United States Attorney's Office
                          915 Lafayette Blvd
17                        Bridgeport, CT 06604
18
19   FOR THE DEFENDANT    MICHAEL SHEEHAN, ESQ
     AZIBO AQUART:        Sheehan & Reeve
                          139 Orange Street
20                        New Haven CT 06510
21                        JUSTIN SMITH, ESQ.
                          383 Orange Street
22                        New Haven, CT 06511
23
24   Court Reporter:    Sharon Montini, RMR
25   Proceedings recorded by mechanical stenography,
     transcript produced by computer
```

4776

```
 1          THE COURT:  Good morning, counsel,
 2   ladies and gentlemen, Mr. Aquart.
 3          THE DEFENDANT:  Good morning, your
 4   Honor.
 5          MR. SHEEHAN:  Good morning, your Honor.
 6          THE COURT:  Are our witnesses here and
 7   ready to go?
 8          MS. RODRIGUEZ-COSS:  Yes, ma'am.
 9          THE COURT:  All right then, let's bring
10   in our jurors.
11          (Jury entered the courtroom.)
12          THE COURT:  Good morning, ladies and
13   gentlemen.  Please be seated.  All right, we are
14   ready to proceed.
15          Ms. Rodriguez-Coss, will the government
16   call its next witness.
17          MS. RODRIGUEZ-COSS:  Yes, your Honor, we
18   call Lativia Whittingham.
19      L A T I V I A   W H I T T I N G H A M
20   Having first affirmed, was examined and testified as
21   follows:
22          THE WITNESS:  Lativia Whittingham,
23   W-h-i-t-t-i-n-g-h-a-m, Bridgeport.
24          THE COURT:  You may proceed.
25   DIRECT EXAMINATION
```

4777

```
 1   BY MS. RODRIGUEZ-COSS:
 2      Q.  Okay, so, two things.  Can you bring your
 3   chair up closer.  There you go.  And now pull that
 4   microphone towards you.  The base moves, so you can
 5   actually put -- okay.
 6          `So, Lativia, I want to bring your attention
 7   to what has been marked Government's Exhibit 14B.
 8   Can you tell us who that is?
 9      A.  That's my mother, Tina Johnson.
10      Q.  And when was that photograph taken?
11      A.  It was taken in summer of '05 in Basil
12   Williams' apartment.
13      Q.  And who took that picture?
14      A.  I did.
15      Q.  Did you take a lot of pictures of your
16   mother?
17      A.  All the pictures.  I had an obsession of
18   taking pictures.  I like to document stuff.
19      Q.  And so, where did you grow up?
20      A.  I was born and raised in Stamford,
21   Connecticut.  I grew up with my mother and my father
22   and my three siblings.
23      Q.  And what was your father's name?
24      A.  Leroy Whittingham.
25      Q.  And who are your siblings?
```

4778

1    A.   Jamar Whittingham, Erica Whittingham, Leroy
2  Whittingham.
3    Q.   And how old are you?
4    A.   I'm 28, in August.
5    Q.   August what?
6    A.   August 15th.
7    Q.   And how old are your siblings?
8    A.   My sister will be 27 on August 27th, and my
9  little brother is 23, and my older brother will be
10  31 in September.
11    Q.   And you said you lived with your parents?
12    A.   Yes.
13    Q.   I'll bring your attention to what has been
14  marked Government Exhibit 14A.
15        MS. RODRIGUEZ-COSS:   Your Honor, we may
16  want to keep the lights down a little bit.
17        THE COURT:   You are going to keep going
18  through pictures?
19        MS. RODRIGUEZ-COSS:   Yes, ma'am.
20    Q.   So, this is 14A.  Can you tell us what
21  we're looking at here?
22    A.   That's a picture of my mother and my father
23  back in 1976 when they first met.
24    Q.   And how old is your mom then?
25    A.   She was 13.

4779

1    Q.   And until when were your parents together?
2    A.   Oh, 2003.
3    Q.   And do you know what happened?  Briefly.
4    A.   She found out about some extramarital
5  affairs he was having that produced some children
6  outside their wedlock, and she was rather upset
7  about it, so they had separated, and they were
8  separated for two years at the time of her murder.
9    Q.   And where is your father from?
10    A.   Jamaica.
11    Q.   I'll bring your attention to what has been
12  marked Government Exhibit 14M.  Who are these two?
13    A.   That's my mother and my father.  We was on
14  vacation in Florida.  Every summer we took a family
15  vacation.  We was on a family vacation in Florida at
16  my grandmother's house, my father and mother, and
17  then right after this we went to Jamaica for a
18  month.  We stayed a month in Florida then and we
19  went to Jamaica for a month.
20    Q.   So, Lativia, tell us how big of a part was
21  your mother in your life?
22    A.   She was a huge part.  She was our backbone.
23  She was the glue that kept us all together.  Not
24  just her immediate family, meaning her husband and
25  her kids, but her brothers and her sisters and her

4780

1  nieces and her nephews.  When someone didn't have
2  some place to live, they came and stayed at our
3  house.  And most of the times they stayed for years.
4  Not for a few months, but for years until they got
5  back on their feet.
6    Q.   And when you think about your mom, you
7  remember her, what do you remember the most?
8    A.   Her cooking.  My mother was an excellent
9  cook.  She was like a chef.  That was one of her
10  dreams, actually, was to open up her own restaurant.
11  She wanted to be back to school for culinary and
12  then open up her own restaurant.
13    Q.   And so, and when you were growing up in
14  Stamford, what sort of activities did you
15  participate in?
16    A.   All types of activities.  In Stamford we
17  had a South End Community Center and everything in
18  there we was able to do for free.  I grew up in the
19  -- how can I say, I want to say shelter, but we
20  lived an excellent childhood.  I mean, we got to go
21  to the park, we got to play basketball, swimming,
22  they took us to wrestling matches, basketball games.
23        We had what we called the South End
24  Cleanup, which is all of the kids would volunteer to
25  walk around, clean up the neighborhood, clean up

4781

1  people's yards.  We would paint fences.  And they
2  would throw us a big party, cookout, every year.
3  So, I grew up on the south end of Stamford for
4  years.  Same friends I went to school with from
5  preschool up to high school.  I had a good life.
6    Q.   And who would bring you to all of these
7  activities?
8    A.   My mother.  She even supported my dreams of
9  wanting to be an actress.
10    Q.   How is that?
11    A.   Because she used to actually take the time
12  out to bring me to the City on auditions, and they
13  would put up the money for my photos and everything
14  like that.  Everything we was interested in or
15  anything we wanted to pursue, she always had our
16  back.  She always gave us the extra push that we
17  needed and encouragement we needed to succeed at
18  whatever we did.
19    Q.   And Lativia, do you have children?
20    A.   I have three.
21    Q.   And what are their ages?
22    A.   My daughter, Dantaycha, is 12, my son
23  Tyrese is eight, and my other son Nicholas is three.
24    Q.   And when was Dantaycha born?
25    A.   She was born March 1st, 1999.

4782

```
1     Q.   How old were you then?
2     A.   I was 15.
3     Q.   How was that, the news of you expecting
4  Dantaycha taken by your mother and father?
5     A.   My mother was disappointed.  My father was
6  angry.  He was angry.  I remember them having a long
7  discussion about it, and I was in my bedroom and I
8  heard it.  And my father, he was just so upset, and
9  my mother, she talked to him and she explained to
10 him that regardless of how I got in this situation,
11 I was in this situation, and we was going to come
12 together as a family to do what we had to do.
13          After they finished talking, he came into
14 my bedroom and he told me how much he loved me and
15 that they was going to be there for me to help me
16 through whatever I needed to do.  They wanted to
17 make sure I graduated from high school, they wanted
18 to make sure I went on to college.  So, they backed
19 me up.  They helped me a lot.  But that didn't mean
20 I didn't have to raise my kid.  That meant that I
21 went to school, I went to work, and I came home and
22 I parent my child.  That's how much she made it
23 work.
24          So I was in school, she babysat.  She
25 kept them.  Once homework was done, now, here goes
```

4783

```
1  your child.  She showed me how to be a mother.  She
2  didn't take over being a mother, she showed me how
3  to be a mother so that I was able to be one to my
4  child.
5     Q.   Did you graduate from high school?
6     A.   Yes, I did.
7     Q.   Bringing your attention to what has been
8  marked Government Exhibit 14H.
9          MS. RODRIGUEZ-COSS:  It's kind of a
10 little bit dark.  Your Honor, can we dim that a
11 little bit?  Thanks.
12     Q.   Who is that?
13     A.   That's me and my daughter Dantaycha.
14     Q.   Dantaycha?
15     A.   Yes.
16     Q.   Where was that photograph taken?
17     A.   That was taken at Central High School the
18 day of my graduation.  My mother took that picture
19 right after I walked and got my diploma.
20     Q.   And we'll bring your attention to what has
21 been marked Government Exhibit 14G.
22     A.   That was my prom day.  That was the night
23 of my prom.  And that was right before I was about
24 to leave to go to my prom.  And my mother just
25 wanted to take lots and lots of pictures of me.  I
```

4784

```
1  was her first child to go to the prom.  My older
2  brother, he didn't do the dressy dressing-up thing.
3  He didn't want to go to his prom.
4          So when I went to my prom it was the
5  nails, the makeup, the dress.  I had three dresses;
6  we had to have options.  My mother bought me three
7  dresses, and then the day of the prom we sat and put
8  on all three dresses and figured out which one
9  worked the best.  This is the one my mother said I
10 looked the best in, so that's the one I wore.
11     Q.   Did you go on to college?
12     A.   Yes.  I went to Housatonic.
13     Q.   For how long?
14     A.   I did three semesters, and I was going back
15 September of '05 for my fourth semester and then
16 August 24th happened and I could not start school in
17 September.
18     Q.   Why not?
19     A.   I was too heartbroken.  Devastated.  I
20 wasn't even sure if I still wanted to live without
21 my mother, to be here in this world without the one
22 person who loved me unconditionally and all the
23 time.
24          The only reason why after a few months I
25 was able to pull myself together is because I had to
```

4785

```
1  be here for my children.  I had to make sure I gave
2  them the kind of a life that my mother gave me and
3  without me being here and them being left here, they
4  wouldn't have got that unconditional love from no
5  one else but me, so I couldn't leave them by their
6  selfs.
7     Q.   I'll bring your attention to what has been
8  marked Government Exhibit 14F.
9     A.   This is my baby shower for my son Tyrese,
10 the eight-year-old.  This is the baby shower she
11 threw for me.  We had it at Stamford Bennigan's.
12     Q.   Bringing your attention to what has been
13 marked Government Exhibit 14O, who is that?
14     A.   That is my son Tyrese.
15     Q.   And how old -- when was this photograph
16 taken?
17     A.   This was taken at his second birthday
18 party.  A few months before my mother passed in
19 March, March of '05.  He had just turned two.
20     Q.   Does he remember his grandmother?
21     A.   No.  No.
22     Q.   I'll bring your attention to what has been
23 marked Government Exhibit 14T.
24     A.   This is my mother.  My daughter was in Girl
25 Scouts when we lived in Shelton and this was her
```

4786

```
1   bridging ceremony that they had at the end of the
2   year for her to go on.  And like always, my mother
3   attends everything for her grandchildren or her
4   children, so here she is present with my daughter,
5   Dantaycha, and with my niece Diana at my daughter's
6   bridging ceremony.
7       Q.  When was that photograph taken in relation
8   to when your mom passed?
9       A.  That was taken the summer of '05.  June.
10      Q.  And so Dantaycha was, what six when your
11  mom passed?
12      A.  Uh-huh (indicating affirmatively).
13      Q.  Does she remember your mom?
14      A.  Yeah, a little.  She remembers.  She
15  remembers her a little.  She remember grandma used
16  to buy her all the pretty dresses.  She remember
17  grandma always taking her to the park and the zoo.
18  And she remember my mother cooking.  She remember
19  that.  She said she'll never forget her.  She was
20  six when my mother passed.
21      Q.  Are there things that she doesn't remember?
22      A.  Yeah.  She doesn't -- she does not remember
23  how much my mother loved her.  She just hears
24  stories and she see pictures and she recall little
25  things that happened when she was younger, but she
```

4787

```
1   doesn't understand the depth of how much my mother
2   loved her.
3           She was the first grandchild, so she was
4   extremely spoiled.  My mother went shopping for her.
5   Every pay period my mother went shopping for her.
6   Every time she was able to take her to the carnival,
7   to the zoo, to Playland, Lake Compounce, she was
8   gone with her grandkids, and Dantaycha doesn't
9   remember, doesn't remember that.
10      Q.  And how do you feel about that?  How does
11  that affect you?
12      A.  It breaks my heart that my daughter can't
13  experience the type of love I felt from my mother.
14  That she doesn't have a grandfather, a grandmother,
15  and now another grandmother.  She has only one
16  grandparent left.  Out of four, she has one left.
17  She had two, now she only has one.
18      Q.  You said every pay period my mother bought
19  Dantaycha something.  Did your mom work?
20      A.  Oh, yeah, she always worked.  There was
21  never a time she did not work.  She always worked.
22      Q.  What did she do for a living?
23      A.  Towards the end probably the past six,
24  seven years she was working as a CNA.
25      Q.  As a what?  I'm sorry?
```

4788

```
1       A.  As a CNA, a certified nursing assistant.
2       Q.  Okay.
3       A.  She was working for that for the past seven
4   years.  She mainly did private duty cases.  She
5   worked out of Redding, Waterbury, Darien, Greenwich.
6   She had a patient she would go and take care of.
7   And she did that for seven years.  And most her
8   patients were long-term patients that she had.  Most
9   of them was in their final stages of life and she
10  was there helping to care for them so that they
11  could be home instead of in the convalescent
12  hospital.
13      Q.  I want to bring your attention to what has
14  been marked Government Exhibit 14N.  What is that?
15      A.  That's my daughter Dantaycha.  She was
16  baptized two years after my mother passed, so my
17  mother didn't get a chance to be there for this, to
18  see her baby being baptized.
19      Q.  I'll bring your attention to what has been
20  marked Government Exhibit 14L.
21      A.  I threw my mother a surprise birthday party
22  for her 40th.  She had no idea that I was going to
23  do this.  And this picture was taken at the 40th
24  birthday party I had for her two years before she
25  died.
```

4789

```
1       Q.  So, your mother was 42 when she was killed?
2       A.  Yes.
3       Q.  And how did you manage to get her there
4   without her knowing?
5       A.  Well, we came up with this big scheme.  She
6   was working that day and, like I told you, she does
7   private duty work for a patient, so it was kind of
8   hard to get someone to cover.  I also did CNA work,
9   and my grandmother, my mother's mother also did CNA
10  work.  So, we came up with the plan that my
11  grandmother was going to come to keep the patient
12  because she had to leave for an emergency, you know,
13  she had to leave, and I was coming to get her and
14  she had to leave, something with my little brother.
15  It always had something to do with Poppy, something
16  to do with Poppy because we know she leave
17  automatically.  So we told her it was this thing to
18  do with Poppy.  So when she got there and she seen
19  all of those people, she realized it was for her
20  40th.  She had the biggest smile on her face.  And
21  she didn't have a clue.  And I planned it for weeks
22  without her knowing anything.  At the time we were
23  living in the same house together, I was living with
24  my mother, and she had no clue.
25          And that's my cousin in the picture with
```

1  her, her first niece.  That's her niece.  And they
2  are extremely close and her birthday is the day
3  after my mother's.  So it was -- she tried to, you
4  know, horn in on my mother's 40th birthday party.
5  So that's why she's in the picture, too.  And she
6  felt like it was her birthday too and she should
7  celebrate.
8      Q.   Did you put some candles for her on the
9  cake?
10     A.   Yeah.
11     Q.   So you mentioned that your grandmother
12 covered for her at work so that she could
13 participate in this birthday party.  Tell me a
14 little bit about your grandmother.
15     A.   This is my mother's -- my grandmother's
16 last born daughter.  She was the baby girl of the
17 family.  Out of eight kids she was the baby girl.
18 And they had an especially close relationship.  She
19 always went by, you know, check on my grandmother,
20 make sure my grandmother was fine.  She cooked for
21 her, fed her.  Stuff like that.  They had a really
22 tight relationship, her and my mother.  They talked
23 every day on the phone to each other.  My mother
24 stop by there, check on my grandmother, as much as I
25 would stop by and check on her.  It was like a

1  cycle, she checked on her mother, I checked on her.
2  This is just something that we did.
3      And this -- it's been devastating for my
4  grandmother without her mother here.  It's like a
5  hole missing.  Nothing could fill it.  There is
6  nothing that we could put in there that can fill --
7  to fill that hole, to fill the void we missing
8  without her.  There is nothing.  I always feel empty
9  on June 26th and August 24.  I break down crying
10 every day for the whole day.  I don't even go to
11 work on those days.  I cry the whole day.  The whole
12 day I'll sit there and I'll cry because I don't have
13 her.  And this been almost six years and I cry every
14 single day on the 24th of August and on the 26th of
15 June.  I cry.
16     Q.   Why is the 26th of June important?
17     A.   Because that was the day she was born.
18 That was the day she started taking breaths of life.
19 Without her, me and my siblings wouldn't be here,
20 and without us, our grandkids -- her grandkids
21 wouldn't be here.
22     Q.   You said that she didn't just take care of
23 her immediate family, that she also helped her
24 brothers and sisters.  Can you tell us a little bit
25 about that?

1      A.   In every family you have people who's not
2  always able to do the things that they need to do as
3  parents.  And she had seven brothers and sisters,
4  and not all of them was always able to fight
5  addictions or other things.  Some of them would lose
6  their home, some of them would be on the street, and
7  then their kids would be left with nobody.  Times
8  like that, that's when my mother stepped in.  She
9  took them into her home.  She raised them.  She fed
10 them, she clothed them.  She kept them.  She loved
11 them.  And until their mother or the father was able
12 to get their self clean enough to come back and get
13 their kids, she was the one who did that.  It didn't
14 matter if it was all four of her kids and she got
15 three of her nephews and two of her nieces, we all
16 in the same house and we going to make it work
17 because we family.  You don't never turn your back
18 on your family.  You do whatever you have to do to
19 for your family.
20      That's how she raised us, and that's --
21 she ain't just preach it, but she lived it.  Even
22 her friends, they didn't have someplace to go, she
23 would bring them in.  That's just the type of person
24 that she was.
25     Q.   Lativia, when did you first consciously

1  know that your mom was using drugs?
2      A.   I must have been like 10 or 11 or
3  something.  For the longest -- I mean, I just
4  thought, you know, she had split personalities,
5  like, you know, one minute she be fine the other
6  minute she just had this look on her face.  It was
7  never angry, she was just always -- at that time
8  when she had that look on her face you could get
9  anything from her, which wasn't like regular mom,
10 you know, because regular mom you can't do certain
11 things, but she got like that you could ask for
12 anything, she would give it to you.
13      But at the DARE program at school, back
14 when I was growing up they had something called the
15 DARE program and cops would come in, a cop or
16 officer would come into your classroom and they
17 explain to you about the different drugs and the
18 different effects it had on people and stuff like
19 that.  And that was the first time I connected what
20 -- maybe how she acted could be connected to drugs.
21 But it wasn't until I probably got older, older,
22 older, I really realized, yeah, she did drugs.
23 Because I never seen it.  I mean, she didn't get
24 high in front of us or anything like that.
25     Q.   How old --

4794

```
 1     A.   She was never missing or MIA or on the
 2   street or robbing or stealing, nothing like that.
 3   She went to work, came home, we did our homework,
 4   she cook, maybe she pop into the bathroom, come out
 5   of the bathroom, look a little different, but it
 6   kept going.  We wasn't on the street, we wasn't
 7   being raped or molested, no clothes on our back, not
 8   being fed.
 9           The other thing, she didn't only hide it
10   from us, but she hid it from my father.  She was
11   very good at hiding that.  She didn't want him to
12   know what she did and he didn't know what she did.
13   He might have suspected, but I think he felt as long
14   as she did what she had to do and she was a mother,
15   she was a wife, and she went to work, she took care
16   of her family, then it's fine.  She didn't let him
17   see it and she didn't never let us see it.  I have
18   never once seen my mother getting high, never, ever.
19   It's just not something she would allow us to do.
20           And I understand everybody have -- me
21   being an adult now, I understand that everybody has
22   addictions, whether it's alcohol or something else,
23   it's addiction.  That don't mean you stop loving
24   them because they addicted to something.  That
25   doesn't change your love for them.  I loved my
```

4795

```
 1   mother.  I loved her more.  She was vulnerable like
 2   anybody else.  She had a problem just like anybody
 3   else had a problem.  But she dealt with it.  She did
 4   not let it overcome her or take her.  She dealt with
 5   it.  She did a good job.  She raised all four of her
 6   kids.  We ain't never once been taken away from her.
 7   We ain't never one day go without eating, never,
 8   ever.  We went on summer vacations.  Every summer we
 9   went away.  We did things as families all the time.
10   We went to church together, we celebrate
11   anniversaries together, we had Thanksgiving dinners
12   together.  We spent Christmas together.  We brought
13   the New Year's in together.  We was a family
14   regardless of what she did.  We was a family.
15     Q.   Did there come a time in your life when you
16   learned where your mother was purchasing those
17   drugs?
18     A.   I mean, not really.  I mean, as I got
19   older, older, teenage years, towards the end of
20   this, I mean, only place I knew she hung out was on
21   Charles Street as far as that.  I mean, that's the
22   only place as I became older that I know that she
23   would hang out.  I wasn't silly.  I knew she was
24   going there with her friends and getting high and
25   probably having a drink, playing some cards or
```

4796

```
 1   whatever, that's what she do, but she came home
 2   every night.  She got off work, went to go hang out
 3   with her friends every night, and then she came
 4   home.
 5     Q.   Once she started staying at Charles Street
 6   did you go see her there?
 7     A.   Every day, multiple times a day.
 8     Q.   Did you know Basil?
 9     A.   Yes, I knew Basil.
10     Q.   And how did you know Basil?
11     A.   Oh, I met Basil when I went to Charles
12   Street to see my mother.  She introduced me to him.
13   She told me she knew him from Stamford.  They grow
14   up, you know, around the same time.  Somebody from
15   Basil family is related to one of my uncle's wives.
16   So they knew each other.  He was older, like her
17   age.  I didn't know too many of her friends from
18   Stamford because I was a kid in Stamford, so I ain't
19   really know who, you know, she socialize with or
20   knew.  But she knew a lot of people because she was
21   born and raised in Stamford.  So she knew everybody
22   from Stamford.  So when she met Basil, it was
23   somebody she knew from Stamford.
24     Q.   Did you get to know him a little bit?
25     A.   Yes, yes.
```

4797

```
 1     Q.   What was he like?  What did you think he
 2   was like?
 3     A.   Basil was funny.  He was old.  I mean, once
 4   I went into the apartment and I heard two, you know,
 5   I heard a man voice and then I heard a woman voice,
 6   I know it was just my mother and Basil in the
 7   apartment.  So I'm like, "Ma, who Basil talking to?"
 8   She like, "Girl, Basil back there talking to his
 9   self."  Because his wife had passed away and
10   sometimes he would think she was still here and he
11   would talk to her and he would talk in his voice to
12   her and then he would respond or whatever he ask in
13   a female voice as if she was still there with him.
14   And my mother used to, like, take care of Basil.
15   Cook for him, help keep the house clean, make sure
16   he did what he had to do.  That was just the type of
17   person she was.
18           When she first went he didn't have any
19   lights on in his apartment, she helped get his
20   lights on in the apartment.  She would go grocery
21   shopping for his apartment.  He liked to drink a
22   lot.  You know, he was a drinker.  Most alcoholics,
23   they would rather just have they drinks or whatever,
24   but her thing, you've got to eat, too, because as
25   y'all can see, she was a very healthy woman.  She
```

4798

1  liked to cook, she liked to eat.  She did.  And most
2  people who smoke crack are rather skinny, but she
3  was not like that because she like to eat.  And she
4  would get high and she would cook and clean up
5  everything.  Those was her effects from getting
6  high, she wanted to cook up everything and she
7  wanted to clean the house from top to bottom.
8  That's what she did.
9      Q.  How about Tippy?  Did you know Tippy?
10     A.  Yeah, we knew Tippy.  We ain't like Tippy
11  when we first met Tippy.
12     Q.  Why not?
13     A.  We always thought our parents was going to
14  get back together and we figured if she had a
15  boyfriend, how was her and my father going to get
16  back together.  So we didn't like Tippy when we
17  first met him.  We gave Tippy a hard time, we really
18  did.  And it wasn't until a year in we realized he
19  wasn't going anywhere and then, you know, my mother
20  talked to us and she was, like, she wanted to be
21  happy, too, and could we just give him a chance and
22  stop being so hard on him.  So we backed off, all of
23  us, me and all my brothers and sister backed off.
24         And he was all right.  Tippy was cool.
25  Tippy was cool, Tippy was funny.  Do you know what

4799

1  I'm saying?  He loved my mother.  That's what made
2  it more easier for us to back off, because we knew
3  he loved her.  Do you know what I'm saying?
4         But as children you always want to see
5  your parents stay together, you know.  You always,
6  you know, they going to be together forever.  After
7  27 years, to me, that felt like forever to me.  So I
8  just thought they would just stay together, you
9  know, 27 years, why break up now.  But to me also, I
10 think the split with my father also sent her into
11 like a little depression stage, you know, after
12 being with a man for 27 years and then not to be
13 with him anymore, it was devastating.  And it was
14 something that I talked to my mother about.  It was
15 something that was hard for her to deal with.  You
16 know.
17        And then when she met Tippy she didn't
18 seem so depressed anymore.  You know, she was having
19 fun, she was going out with her friends, she was
20 getting out the house.  Which is big, because before
21 she wasn't leaving the house, she would go to work,
22 she'd come home, she home with the grandkids, which
23 was fine with me for a while, but then I'm, like,
24 all right, mom, life goes on.  You've got to get
25 back out there.  Do you know what I'm saying?  Then

4800

1  then she met Tippy and she was happy.  So we
2  couldn't say anything, she was happy.  As long as
3  she's happy, I'm happy.  As long as you make my
4  mother happy, I'm fine with you.
5      Q.  I want to bring your attention to what has
6  been marked Government Exhibit 14R.
7      A.  That is my grandfather, my father and my
8  two brothers, Leroy and Jamar.  We at the airport on
9  our way to Jamaica for a family vacation and my
10 mother is just like me, she like to document
11 everything, so she took like a thousand photos in
12 the airport.  And getting her men, her boys was one
13 of the photos that she took, and there they go.  She
14 loved her family.  Her family was the top priority
15 for her for whatever she did.  And she always made
16 sure we knew how much she loved us.  She told us
17 every single day how much she loved us.  It wasn't
18 one day that went by that she didn't say I love you.
19     Q.  Let me show you Government Exhibit 14E.
20     A.  Wow, this is a throwback.  Okay, this is me
21 and my mother in Jamaica.  We was at Points River in
22 Jamaica, and this ankle bracelet I got on the bottom
23 of my leg, she just had one of the men make it for
24 me with seashells and everything.  And we wanted to
25 take a picture by the boat so we could have

4801

1  memories.  We took thousands of pictures all the
2  time, me and my mother, and this is my favorite
3  picture of me and my mother right here.
4      Q.  Let me bring your attention to what has
5  been marked 14S.
6      A.  That's my mother again.  That's my mother
7  in Jamaica.  My mother used to swear she could fly.
8  So she liked to pose and smile, and she was -- she
9  really was.
10     Q.  And on the back of this photograph?
11     A.  I wrote that.  I am -- like I said, I like
12 to take pictures and I like to get them developed
13 and I like to write on the back who is in the
14 picture or the date of the picture so I can have for
15 my memories or bring me back to the time, and I must
16 have been like 13 when I wrote this.  It says "My
17 mother, Tina, in Jamaica.  Ain't she cute."  That's
18 what I wrote.
19     Q.  Bringing your attention to Government
20 Exhibit 14U.
21     A.  That's my mother and father sleeping.  I
22 snapped that picture of them, too.
23     Q.  And when was that taken?
24     A.  This was taken in probably like 2001, 2002,
25 I took this picture.  My father had cut his dreads

**GA1243**

4802

1  by this time and she was growing dreads at this
2  time.  She would go back and forth with the dreads.
3  When they first met she had dreads and then she cut
4  them and then she had them and then she cut them.
5  And now she was growing them back, but then she cut
6  them again.
7      Q.  Bringing your attention to Government
8  Exhibit 14P, who is that?
9      A.  This was my mother's dog.  She had this dog
10  for eight years.  This dog protected my mother with
11  its life.  She loved this dog so much.  This dog was
12  like one of her other children.  It really was.
13  Spike was one of her kids.  And she loved Spike and
14  Spike loved my mother, too.  He really did.  He was
15  getting old, he was getting sick and she still kept
16  her dog, take her dog to the vet, get the medicine.
17  She loved her dog, and that's Spike.  We got
18  pictures of Spike because she used to document her
19  dog.  Her dog was like one of her kids, so she had
20  pictures of Spike up in the house, too.
21      Q.  Lativia, when was the last time you spoke
22  to your mom?
23      A.  August 23, 2005.
24      Q.  And what did you talk about?
25      A.  I had stopped by there because I was about

4803

1  to go home in Shelton and I wanted to pick her up
2  because I wanted her to go home because I was hoping
3  if I got her to go home then I could keep her to
4  babysit so I could go out.  That was -- I'm being
5  honest, that was the truth.  I went over there,
6  "Come on, Mom, don't you want to go home tonight?"
7  And she was like, "No, not tonight."  Her exact
8  words was "D is supposed to be getting some bitches
9  to fuck me up and I'm not going anywhere.  Just
10  bring my grandbabies down tomorrow and I'll take
11  them to the zoo."
12          And I said, "Ma, stop playing with D, he
13  not wrapped too tight."
14          MR. SHEEHAN:  Your Honor, may we --
15          THE COURT:  Please ask your next
16  question to direct --
17          MS. RODRIGUEZ-COSS:  Your Honor --
18          THE COURT:  I'll see you at sidebar.
19          (Sidebar conference)
20          THE COURT:  Your objection?
21          MR. SHEEHAN:  Your Honor, she is moving
22  well outside victim impact now.  I think she's
23  talking about the offense, she's talking about the
24  defendant.  I thought that was completely outside
25  the groundwork as we've established it.

4804

1          MS. RODRIGUEZ-COSS:  I did -- I thought
2  she was just going to say I went over there to help
3  get her to babysit and we were going to move on.  I
4  had instructed her not to mention the other
5  statements that she remembered her mother making and
6  we have no objection to it being stricken and not
7  considered.
8          THE COURT:  Okay.  Then you need to ask
9  questions to direct her answer a bit more so that
10  she doesn't run afoul.
11          (Sidebar concluded)
12          THE COURT:  All right.  Ladies and
13  gentlemen, I'm going to strike the last sentence of
14  the testimony, ask you to disregard it, ask
15  Ms. Rodriguez-Coss to just continue.
16          MR. SHEEHAN:  Can we approach?
17          (Sidebar conference)
18          MR. SHEEHAN:  I think in reality we need
19  more than the last sentence.
20          MS. RODRIGUEZ-COSS:  The complete
21  answer?
22          MR. SHEEHAN:  Let's take a look where
23  she started talking about --
24          THE COURT:  Starting with "her exact
25  words."

4805

1          MR. SHEEHAN:  I think where she started
2  talking about D said he was going to get --
3          THE COURT:  "Her exact words were D is
4  supposed to be getting some bitches."
5          MR. SHEEHAN:  Right.  So if we were to
6  start -- is that the last sentence?
7          MS. RODRIGUEZ-COSS:  She is quoting.
8          THE COURT:  The last two sentences,
9  that's what you want to be struck.
10          MR. SHEEHAN:  Yeah.  And I'll file a
11  motion for mistrial, too, but I'll do that in
12  writing.
13          THE COURT:  Is there an additional
14  instruction you want me to give the jury?
15          MR. SHEEHAN:  I think you should tell
16  the jury that --
17          THE COURT:  That witnesses are not
18  permitted to comment.
19          MR. SHEEHAN:  Right.
20          THE COURT:  On either the defendant or
21  the offense and -- because that is solely for the
22  jury to make a determinations about and, therefore,
23  the sentences will be struck.
24          MR. SHEEHAN:  Well, I would ask for that
25  in addition to my motion for mistrial.

4806

1   THE COURT:  And you'll put that in
2  writing?
3   MR. SHEEHAN:  Yes.
4   (Sidebar concluded)
5   THE COURT:  All right, ladies and
6  gentlemen, it's improper for a witness at this stage
7  to comment on the defendant or the offense.  That is
8  an area that is solely up to you.  And, therefore,
9  the last two sentences of the testimony are being
10  struck; that is, the part that starts, "Her exact
11  words."  You must disregard that.  The witness
12  improperly offered it.  Thank you.
13   All right.  Let's continue.
14   Q.   Lativia, your mom didn't come home with you
15  that night; is that correct?
16   A.   No.
17   Q.   Tell us what happened the next morning.
18   A.   The next morning we woke up, like we do any
19  other morning, got myself washed up and dressed, I
20  got my kids washed up and dressed, and my sister got
21  off the city bus over to Shelton, piled the kids in
22  the car, like we normally do, to take the kids to my
23  mother so they could go to the zoo.  Got down there.
24  NOTE.
25   Q.   What happened on the way to Charles Street?

4807

1   A.   I seen the street was blocked off and we
2  knew something with wrong.  So I parked the car in
3  the middle of the street and jumped out, me and my
4  sister, and we ran up the street all the way to the
5  house until some officers stopped us from going up
6  the steps, and I just kept asking them, tell them
7  I'm looking for Tina Johnson in the first floor
8  apartment, just where she at?  And they wasn't
9  saying anything.  They was just, like, have to go
10  down to the police department.  And I'm not
11  understanding why I'm going to the police
12  department.  I'm, like, where is she?
13   And then somebody put us in a car and
14  the officer is driving us down there, and as he's
15  driving us down there the realization that my mother
16  is dead hit me.  I came to that realization because
17  I seen the white truck parked outside the building.
18  The white truck is a crime scene investigation.
19  They only come for homicides, dead bodies, and the
20  officer who drove us, he looked in the mirror
21  and he gave us his condolences and then when we
22  walked through the front door I seen my grandmother
23  and my two brothers sitting in there crying.  And he
24  told us she passed away.
25   Q.   Let me bring your attention to what has

4808

1  already been marked Government Exhibit 21.  Who had
2  that prepared?
3   A.   We had those made up for my mother's
4  funeral to hand out to the people.  All of the
5  pictures we could find of her, with her kids, by
6  herself or her grandkids, we put them in there with
7  some poems to hand out to the people.
8   Q.   And who -- let me ask you this:  Who made
9  the arrangements for the funeral?
10   A.   Me, my brothers, sister, my father.
11   Q.   And who decided what she was going to wear?
12   A.   Me and my brothers and sisters.  My mother
13  had this thing about wearing African clothing.  That
14  was her style.  So, my grandmother had purchased her
15  an outfit that she seen, and my mother didn't know
16  that my grandmother had got it for her, it was going
17  to be a surprise for her.  When she died my
18  grandmother still had it in her closet, she never
19  gave it to my mother yet, so we chose to put her in
20  that and bury her in that with her head wrapped.
21  She liked to wrap her hair up.  She used to wrap her
22  hair up in turbans and everything, so we wrapped her
23  head up in a turban as if she was here.
24   Q.   Who placed that on her?
25   A.   I did.

4809

1   Q.   What, if anything, were you told by the
2  funeral director after you did that?
3   A.   That we couldn't touch her anymore.
4   Q.   And --
5   A.   Couldn't touch the body anymore.
6   Q.   Did he explain why?
7   A.   Yeah.  She had some broken limbs and her
8  head still had blood that was coming out and they
9  had like a plastic wrap wrapped around her head so
10  the blood wouldn't soak on everything.  And so I
11  just tied the turban over the plastic they had
12  wrapped around her head.
13   Q.   Was that African outfit your first thought
14  for the funeral?
15   A.   Yeah.  That's what --
16   Q.   Had you thought about burying her in a
17  suit?
18   A.   Well, we was going to do a white linen suit
19  to do the pureness, but with the type of way they
20  would have had to put it on her body it would have
21  been difficult because of her injuries.  So we went
22  for the African outfit, because it's like just a
23  dress that was bigger form fitting, and the head
24  wrap so they didn't have to put in sleeves and pants
25  legs and everything.  So we went with something

4810

```
1   simpler for her.
2       Q.   Lativia, what happened to your mom's
3   belongings?
4       A.   Right after she died, Hurricane Katrina
5   happened.  So we packed up her clothing and her
6   shoes and stuff and we donated it to the Hurricane
7   Katrina victims.  We donated it, which is something
8   she would have wanted us to do.
9       Q.   And where were those belongings?  Take your
10  time.
11      A.   At her house in Shelton.  I didn't go home
12  for a month after she died.  I couldn't walk in the
13  door.  I couldn't see her bedroom, I couldn't see
14  her stuff on her dresser.  I couldn't bring myself
15  to walk through the doors.  So I didn't go home for
16  a month.  And then we finally went home together as
17  a family, me and my brothers and sisters and my
18  father, and we packed up all her clothes and
19  everything and we donated it.  And then my father,
20  he took all of the photos and everything that she
21  saved so he could have it.  And he took all that
22  stuff for us.
23      Q.   Was he there for the funeral?
24      A.   Yes, he was.  He was there.  That was the
25  first time I ever saw my father cry was when he
```

4811

```
1   found out that my mother passed.  That was the first
2   time I ever seen him break down and cry when he
3   found out she passed, and he just went to my
4   grandmother and he told my grandmother how much he
5   loved her for the past 27 years and that she will
6   always be his wife and that they was meant to be and
7   the type of love that they shared would never be
8   broken even in death, she would always be his wife.
9       Q.   Lativia, let me bring your attention to the
10  last exhibit I'm going to show you, Exhibit 14C.
11  Where was that photograph taken?
12      A.   That was taken in Jamaica.  My mother and
13  father went there for their anniversary and they was
14  at James Bond Beach, not too far from our house in
15  Jamaica, and he took that picture of her.
16      Q.   And who wrote the words on the back?
17      A.   I did.  "My mommy, I love you, mom.  Mad
18  love to the end."  I was young when I wrote that,
19  but that was always how I felt about my mother.
20  Always.  Even looking at that picture and the words
21  I written all of these years after that, that's
22  still how I feel about my mother.
23          MS. RODRIGUEZ-COSS:  We have no further
24  questions for this witness, your Honor.
25          THE COURT:  All right,
```

4812

```
1   cross-examination.
2           MR. SHEEHAN:  Thank you, your Honor.
3   CROSS-EXAMINATION
4   BY MR. SHEEHAN:
5       Q.   Ms. Whittingham, I don't have any
6   questions, thank you very much.
7           THE COURT:  All right, Ms. Whittingham,
8   you are excused.  You may step down.
9           Will government please call its next
10  witness.
11          MS. RODRIGUEZ-COSS:  Yes, your Honor,
12  we'll call Erica Whittingham.
13      E R I C A   W H I T T I N G H A M
14  Having first affirmed, was examined and testified as
15  follows:
16          THE WITNESS:  Erica Whittingham,
17  W-h-i-t-t-i-n-g-h-a-m, in Bridgeport.
18          THE COURT:  You may proceed.
19  DIRECT EXAMINATION
20  BY MS. RODRIGUEZ-COSS:
21      Q.   I am going to show you what's been marked
22  Government Exhibit 14J.  Can you tell us what we're
23  looking at?
24      A.   That's a picture of me and my mother at
25  my --
```

4813

```
1           THE COURT:  Could you pull the
2   microphone over toward you, please.
3       A.   That's a picture of me and my mother at my
4   baby shower.
5       Q.   And Erica, can you tell the members of the
6   jury why that photograph is so significant to you?
7       A.   Well, out of my two kids, at the time that
8   she was still here, that's the only picture we got
9   really when I was pregnant.  And during my pregnancy
10  she was very supportive and there for me and -- I
11  don't know.
12      Q.   Was she there when they were born?
13      A.   Yeah, she was.
14      Q.   Was she with you?
15      A.   Yes, she was.
16      Q.   Did she coach you?
17      A.   She coached me a lot.  Told me to stop
18  screaming and just push, because at the time I was
19  16 -- well, I was 15 when I got pregnant, I had my
20  daughter when I was 16, and really didn't know what
21  to expect.  And when it was that time, she was there
22  and she just started yelling at me, telling me to
23  just stop yelling and to just push, and that's what
24  I did.
25      Q.   And how many children do you have?
```

4814

1     A.  I have three.

2     Q.  And how old are they?

3     A.  My oldest daughter is ten, my second

4 daughter is six, and my newborn is six months.

5     Q.  And what are their names?

6     A.  Diana is the oldest one, Ianna (ph) is the

7 second oldest and Akila (ph) is the third.

8     Q.  Bringing your attention to what has been

9 marked Government's Exhibit 14D.

10     A.  Yes, that's my mother, my newborn baby,

11 Diana, and my niece, Dantaycha. We took this --

12 well, I took this picture. We went to go see my

13 brother, and while we was there we was taking photos

14 because I hadn't seen him during my pregnancy, I

15 didn't see him, so we went out there after I had the

16 baby and we took some pictures together.

17     Q.  Did she help you take care of that baby?

18     A.  In a sense, yes, she did. In a way she

19 did.

20     Q.  In what way?

21     A.  Well, as far as like showing me what to do

22 when it got ill, but other than that she made me do

23 the mothering. She just coaching me on how to be a

24 mother, basically.

25     Q.  So you had to do the dirty work?

4815

1     A.  I had to do the changing, the feeding, the

2 waking up in the middle of the night. The only

3 thing she would probably do, when I first came home

4 I was very exhausted, she came to my house a couple

5 of days and stayed and, you know, helped me with the

6 baby. But other than that, she is, like, you are on

7 your own, just call me when you need me, and that

8 was about it.

9     Like my sister stated, when it was time

10 to go to school, those was the times that she took

11 the baby. When it was time for me to work, that was

12 the only time she took the baby. But other than

13 that, raising them and loving them and showing them

14 what to do, she coached me on how to do that and

15 supported me on it.

16     Q.  And when you remember your mom now, what do

17 you remember the most?

18     A.  I remember she used to -- when I was little

19 she always used to call me Eewee.

20     Q.  Why?

21     A.  Because we had a little dog named Peewee

22 and I always used to chase the dog around and she

23 was, you know, we're going to name you Eewee. He's

24 Peewee and you are Eewee. She used to call me Eewee

25 and we used to always do things together, Playland

4816

1 and family outings, cookouts, Thanksgiving,

2 Christmas. She used to just always just be there

3 for me.

4     Q.  I'll bring your attention to what has been

5 marked Government Exhibit 14K. Where was this

6 taken?

7     A.  That was taken at Wharton Park in

8 Bridgeport. This was our family day to her. I

9 don't know what reason, she just got up that day and

10 she wanted all her kids together. We have another

11 photo where it's all of us together and the one

12 that's not in there is Leroy. But that was her day.

13 She felt bright and chipper that day. And I didn't

14 want to go, at the time I was pregnant, and she's,

15 like, you are going, we're going to go take these

16 pictures whether you like it or not. And that's how

17 this picture came about because she made us take

18 pictures of each other.

19     Q.  Let me bring your attention to what has

20 been marked Government Exhibit 14I.

21     A.  That's a picture of me and my mother at

22 Disney World. We was on some type of little coaster

23 thing that was bringing us from one side to the

24 other side, and we was just viewing Disney World

25 while we was on top because there is some type of

4817

1 thing that takes you around.

2     Q.  And finally, let me bring your attention to

3 what has been marked Government Exhibit 14Z.

4     A.  This is a poem.

5     Q.  Can you see it clearly there?

6     A.  Yeah, I could. I could.

7     Q.  Okay.

8     A.  This a poem that I wrote for my mother. At

9 the time I was being bad and --

10     Q.  How old were you around?

11     A.  Twelve, 13 at the time when I wrote this.

12 And this is the first time that I was basically

13 separated from my mother because I didn't want to

14 listen to what I had to do. Well, basically, go to

15 school, I didn't want to listen, and I just was

16 being bad. And finally from being bad I was

17 basically sent to Mehall (ph), detention, and I was

18 away from her probably like two weeks, and it felt

19 like forever. And I just said, do you know what, I

20 won't do this anymore and I wrote this poem to her.

21     Q.  Can you read that to us.

22     A.  Yeah, sure. It says "Poem for my mother.

23 My love will be there for one person. My mind will

24 always say her name and that my name is my mother."

25 You got to remember I was 13 when I wrote this so a

4818

```
 1   lot of things I probably was just writing and forgot
 2   some words.  "I would think about her day and night.
 3   I would think of her arms wrapped around me.  I
 4   think of the love in my heart.  That's what love is.
 5   I think about every day people say a friend is like
 6   a dollar in your pocket, but your mother will always
 7   be," that says there?  Yeah, "Your mother will
 8   always be there and that's love."  And it says,
 9   "love, Erica Whittingham."  And at the bottom it
10   says "P.S. take care and tell my sister and my
11   brother I said hi and that I said I love them.  Pray
12   in faith and you will not live in doubt."
13            That was my poem to her because the time
14   I was gone from her all I did is just cry and cry,
15   and I wanted to be back home so bad.  So I made sure
16   that I did what I had to do to make sure I stayed
17   out to be with her.  And it was times that -- those
18   two weeks would be times that can't be replaced.
19      Q.    And how have you been impacted by her
20   death?
21      A.    The summer of August when her death had
22   happened, my 21st birthday was a couple days after
23   her death.
24      Q.    When is your birthday?
25      A.    August 27th.  It impacted me a lot.  At one
```

4819

```
 1   point in time I wanted to take her place.  I just
 2   wished that she wasn't there and I was.  I wanted to
 3   take her pain.  I wanted to take her place.  I
 4   wanted to be where she was at because I didn't think
 5   I could raise my kids or love my kids the way that
 6   she did with me.  So, that's what I had prayed for
 7   for a long time, that it could be me and not her.
 8   Because she loved me so much that I didn't think I
 9   could do that for my kids.  And my grandmother just
10   kept telling me to stop praying for that, stop
11   wishing you could take her spot.
12            But that's what I wanted to do at the
13   time, I wanted to take her spot, because I was just
14   on the phone with her maybe a day or two before her
15   death, and she was on the phone with me and she's
16   like, "Oh, did you get the stuff that I sent to your
17   sister from you?"  I was, like, "What stuff?"  She
18   said, "I sent you perfume and a pocketbook."  I'm,
19   like, "No, she came over here and told me you got
20   her that for her birthday," because our birthdays
21   are like a week and some change apart from each
22   other.  And she's like, "Oh, no, I am going to call
23   her right now.  I want you to get your stuff right
24   now.  She had got her a pocketbook and I got you a
25   pocketbook."
```

4820

```
 1            She called me, we was on the phone maybe
 2   a day before she died, two days before she
 3   died, and when she called me, basically she asked me
 4   did I get it.  I told her, yeah, but I didn't have
 5   any time on my phone to talk to her.  I had probably
 6   like four or five minutes.  She was on the phone
 7   telling me not to rush off.  I said, like, "Look, I
 8   don't have any time on my phone.  I'll come down
 9   there tomorrow to see you."  Ray, Ray, Ray.  And
10   then the phone disconnected us.
11            The following morning, I think it was the
12   day before, the following morning I got up because I
13   didn't go to sleep until maybe around three, four
14   o'clock.  I got up, maybe six, seven o'clock, I had
15   to wait on a bus to come.  I quickly got my kids
16   dressed because for some reason I just -- I told her
17   I was coming down there to get $10 from her to put
18   on my phone because I didn't have any minutes.  And
19   she didn't like me being home by myself with the
20   kids and not having, you know, any access to call
21   anyone.
22            So I had got up, got the kids dressed,
23   got on the bus.  And it's like a bus that come from
24   Ansonia, as it was going into Shelton, it's like a
25   highway by our house, by my mother's house.  As the
```

4821

```
 1   bus was turning to get on the highway, I quickly
 2   pressed the thing and he kept telling me, no, I
 3   can't let you out.  And I'm begging, please, please,
 4   I don't have any money, I have to get out here.  So
 5   he opened the door and I seen my sister's car parked
 6   in front of the house and I knocked on the door and
 7   told her I was glad I caught her.  And she was
 8   telling me she was going down there to go see my
 9   mother, and I said, yeah, I had to go see her, too.
10   And we got in the car.  Unusual though because
11   usually the kids is screaming, fighting, pulling at
12   each other's hairs, but the whole ride was very
13   quiet.
14            We got down to Bridgeport.  I don't know
15   what we stopping over my aunt's house for, but we
16   stopped over there and my aunt came running outside
17   and she's telling us that we have to go to the
18   police department, and she had said something about
19   my mother was shot or something.  And I'm, like,
20   what?  I'm like, well, I'm not going to go to the
21   police department, maybe we need to go over there.
22   But I just seen a look in my aunt's face like it was
23   more than just that.
24            So me and my sister jumped in the car,
25   we let the kids out, and jumped in the car.  On the
```

4822

1  way over to Charles Street they had it blocked off
2  from, I would say, Madison Avenue, Madison and
3  Charles Street, they had it blocked off.  So, we
4  went through, and it's like a little side street
5  that runs off of Charles Street that would let you
6  out on Willard Street.  And we took the little side
7  street because we couldn't go any further because
8  they had police posted up there.  And as my sister's
9  turning, I'm yelling and screaming at her telling
10 her go, go.  As she reached the Walgreen's.  While
11 the car was still moving we jumped out of the car
12 like a bat out of hell.  And as I'm running over to
13 the house I see a whole bunch of police officers, a
14 crowd of people, crime scene truck.  And once I seen
15 the crime scene truck I just knew that there was
16 more than just her being shot.
17        I tried to run towards the building, but
18 there was police officers there to stop us.  We just
19 kept screaming, you know, my mother's name, asking
20 is she okay.  And he basically asked us to get into
21 the squad car, and on our way there, as we got
22 closer to the police department, he explained to us
23 that our mother and two other men had passed away in
24 the apartment.  And when we arrived at the police
25 department I seen my grandmother and my two brothers

4823

1  and at that time the only thing I can really
2  remember is I broke my hand and they immediately
3  rushed me to the hospital because I wasn't thinking
4  clearly and I just kept punching the wall.  So I
5  basically shattered my knuckles and stuff and I went
6  to the hospital.  So from that point on in, I was
7  just in the hospital.
8        Q.   When did you see her again?
9        A.   Huh?
10       Q.   When did you see her again?
11       A.   Who?
12       Q.   Your mom.
13       A.   When did I see her before her death?
14       Q.   When did you see her before she was buried?
15       A.   When I went to the funeral home they were
16 very -- now I know the purpose, but at that point in
17 time, the funeral home that we picked out, they were
18 very -- I would say afraid their selves.  It came to
19 point in times we used to go there just to set up
20 funeral arrangements, when we came in they made sure
21 all doors was locked, they had men in security
22 surrounding the funeral home.  My brothers and my
23 siblings and them was looking for me the day to go
24 view my mother's body, but at this time I had
25 separated myself from everyone and everything.  No

4824

1  one could find me.  No one could locate me.  But I
2  just knew that day when I spoke to the lady that
3  was the day of the viewing of the body, they had
4  proceeded without me and I came later that day.
5        Later that day when I got there, it was
6  just me and my cousin.  And when I walked in,
7  normally, I mean, usually she got right up behind
8  us, locked the door, called the men to go guard, and
9  as we was going in to go see the body and I was
10 reaching over to give my mother a kiss -- well,
11 actually, I was looking at her first to reassure
12 that it was her, just looking for little marks and
13 stuff like that.  And when I seen her bracelets on
14 her hand I knew it was her.  And as I tried to reach
15 in to give her a kiss and properly -- you know,
16 usually when they bury you they put your hands like
17 this on your chest, and my mother hands wasn't on --
18 it wasn't like that, it was just laying to the side.
19 And I was asking the lady why isn't her hands
20 normally together?  And as I was reaching in to, I
21 guess, try to put her hands, they came out, she told
22 me I couldn't touch her.  And I asked her, well, why
23 couldn't I touch her.  And she explained to me that
24 my sister and them was just there not too long ago
25 and she allowed them to fix the band around her head

4825

1  and that her body couldn't be touched anymore
2  because all of the injuries that she had to her
3  body.
4        So I was just left to basically look at
5  her.  I wasn't able to even lien in to give her a
6  kiss because they said the body was already moved
7  and they didn't want it to be moved or touched
8  again.  And the last time I had seen the body was at
9  the funeral.
10       Q.   What do you miss the most about her?
11       A.   Her cooking.  Her cooking.  Just her moral
12 support, period.  Just growing up, simply love,
13 going through all of the different boyfriends and
14 the schoolwork.  You know, with my kids, when I
15 needed a break with my daughter, because at the time
16 it was really just my daughter because I didn't have
17 my second daughter until 2004.  And, I mean, I just
18 really miss her hugs, her kisses, her telling me it
19 will be okay when I was down.  Outings that we used
20 to do.  Our trips.  Stuff like that.  I used to just
21 go to her house just to sit around her.  And
22 sometimes she used to be, like, no, don't come sit
23 around me, go, get up, do something.  You are young,
24 go, go.  Stuff like that I miss.  I just know that
25 it's hard because I can't never hear my mother say

4826

```
1   Eewee or her give me a hug or her coming to get my
2   daughter.  When she wanted to come get my daughter
3   she would come and get her for days, maybe weeks,
4   take her shopping, they go out, you know, stuff like
5   that.  That will be missed.  That can't be replaced.
6           MS. RODRIGUEZ-COSS:  We don't have
7   anything further for Ms. Whittingham, your Honor.
8           THE COURT:  All right, thank you.
9   Cross-examination.
10  CROSS-EXAMINATION
11  BY MR. SHEEHAN:
12     Q.  Ms. Whittingham, I don't have any questions
13  for you.  Thank you very much.
14     A.  Okay.
15          THE COURT:  All right, Ms. Whittingham.
16  You are excused, you may step down.
17          Does the government have additional
18  witnesses?
19          MS. RODRIGUEZ-COSS:  No, your Honor, we
20  do not.
21          MS. DAYTON:  Your Honor, we have a
22  stipulation.  We'd ask that all of the pictures be
23  moved into evidence.  I believe there is no
24  objection to them.  I don't know if they were
25  formally moved in.
```

4827

```
1           THE COURT:  All right, very well.
2           MS. DAYTON:  Your Honor, we have one
3   short letter that we would like to read from Karen
4   Hurdle who is the daughter of Basil Williams.  It's
5   been shown to the defense already.
6           MR. SHEEHAN:  It has, your Honor.
7           MS. DAYTON:  And then a stipulation.
8   This will be Government's Exhibit 16G.
9           "My name is Karen Hurdle.  I live in
10  Barbados.  I have three kids, and the ages range
11  from 14 to seven years.  I'm 37 years.  The only
12  child of Basil Williams.  I would spend time with
13  him and his wife, Georgia Williams, during the
14  summer holidays until I finished the high school.  I
15  came to spend longer time with the family.
16          "Basil Williams, my father, was a nice
17  and caring person when you get to know him.  My kids
18  and I would talk to my father on the telephone on
19  weekend for hours.  He will get to know the
20  children.  The kids and I was planning to visit they
21  grandfather for the first time to see him in person.
22  The oldest see him at age three.  It is hard to talk
23  about what happened to my father, they grandfather.
24  He did not deserve to go that way.
25          "He did not keep a lot of friends and he
```

4828

```
1   would stick to himself.  The last time I saw my
2   father alive, that was 11 years when my daughter and
3   I was coming back to Barbados.  And to hear that my
4   father was murdered in his own place, I was shocked
5   and the family have to see the sight of this now.
6   Now my kids are without a grandfather, father,
7   brother to talk to.  He was a hard worker.  And when
8   he lost his wife it hit him hard."
9           THE COURT:  Thank you.  And then there
10  is a stipulation.
11          MS. DAYTON:  Yes, your Honor.
12          This will be Government's Exhibit 13 for
13  the record, your Honor, and it's "The United States
14  v. Azibo Aquart.  It is hereby stipulated and agreed
15  by and between the United States of America, by
16  Assistant United States Attorney Tracy Lee Dayton,
17  and the defendant, Azibo Aquart, by his attorneys,
18  Michael Sheehan and Justin Smith, that Azibo
19  Aquart's birth date is September 19, 1981, and that
20  he was 23 years of age on August 24, 2005.
21          "It is hereby stimulated and agreed that
22  this stipulation is admissible in evidence."  It
23  says "R," my programmer, signed by me, by Justin
24  Smith, by Michael Sheehan, and the defendant Azibo
25  Aquart.
```

4829

```
1           We'd ask to move this into evidence.
2           MR. SHEEHAN:  No objection.
3           THE COURT:  All right then, that is a
4   full exhibit as well.
5           MS. DAYTON:  Your Honor, at this time
6   the government would rest its penalty phase
7   case-in-chief based upon the evidence presented here
8   and in the first phase of the trial.
9           THE COURT:  Very well.  Ladies and
10  gentlemen, we'll take a 15-minute recess.
11          (Jury exited the courtroom.)
12          THE COURT:  All right.  Who will be
13  defendant's first witnesses, Mr. Sheehan?
14          MR. SHEEHAN:  Lillian Reid followed by
15  Carol Porter.
16          MR. SMITH:  Your Honor, we have an order
17  printed if that will assist the Court.
18          THE COURT:  Oh, all right.  All I have
19  is May 23rd.
20          MR. SHEEHAN:  This is our proposed list
21  as of this date.  As we've indicated to the
22  government, that might change as we are going on.
23          THE COURT:  All right.  Will, that will
24  be helpful.
25          MR. SHEEHAN:  Then a copy of that has
```

4830

```
1   been provided to the government as well, your Honor.
2            THE COURT:  Thank you.  All right, is
3   there anything further?
4            MR. SHEEHAN:  No.  I can just indicate,
5   your Honor, we did give a set of possible exhibits
6   to the government.  We have provided a folder.  We
7   didn't get it in a binder form, but we have provided
8   those in separate folders for the Court.
9            THE COURT:  Okay.
10           MR. SHEEHAN:  Those are copies.
11           THE COURT:  All right.  If there is
12  nothing further then we'll recess for 15 minutes.
13           (Recess).
14           THE COURT:  All right, you may be
15  seated.  We'll bring in the jury.
16           MR. SHEEHAN:  Your Honor, with the
17  Court's permission, could I have Ms. Reid take the
18  witness stand.
19           THE COURT:  Yes.
20           MR. SHEEHAN:  Thank you.
21           THE COURT:  Ms. Reid, you can be seated
22  until the jury comes in and then I'll also ask you
23  to stand and be sworn.  All right?
24           (Jury entered the courtroom)
25           THE COURT:  Please be seated, ladies and
```

4831

```
1   gentlemen.  Mr. Sheehan.
2            MR. SHEEHAN:  Yes, your Honor.
3            THE COURT:  You are calling your first
4   witness, Lillian Reid.
5            Ms. Reid, would you kindly stand.
6            MR. SHEEHAN:  Thank you, your Honor.
7            THE COURT:  And raise your right hand
8   and the oath will be administered to you.
9            L I L L I A N   R E I D
10  Having first affirmed, was examined and testified as
11  follows:
12           THE WITNESS:  Lillian Reid, R-e-i-d,
13  Bridgeport.
14           THE COURT:  All right, you may proceed.
15  DIRECT EXAMINATION
16  BY MR. SHEEHAN:
17    Q.  I think -- I don't think you need -- I
18  think you are good right there.  You just need to
19  speak into the microphone and you can move it
20  towards you.
21    A.  Okay.
22    Q.  Good morning again, Ms. Reid.
23    A.  Good morning.
24    Q.  Can you tell us -- you indicated that you
25  live in Bridgeport.  How long have you lived in
```

4832

```
1   Bridgeport?
2     A.  Over 42 years.
3     Q.  Okay.  And are you working now?
4     A.  No, I'm taking care of my mother.
5     Q.  And how old is your mom?
6     A.  She's 88.
7     Q.  And what was the last full-time job that
8   you had?  What kind of work were you doing before
9   you started taking care of your mom?
10    A.  I was in human service.  I was an intake
11  coordinator for a daycare facility which I had
12  worked for for over 11 years.  I recently, since
13  October, I'm not working, I'm taking care of my
14  ailing mom.
15    Q.  And what kind of facility is it you were
16  working at?
17    A.  It's a daycare facility.  I'm an intake
18  coordinator there.
19    Q.  What are your responsibilities as an intake
20  coordinator?
21    A.  My responsibility is to enlist children
22  within the daycare and be a liaison for their mom
23  where resources are concerned.
24    Q.  And where was your daycare that you worked
25  at?
```

4833

```
1     A.  It's in Bridgeport.
2     Q.  Now, do you know the defendant, Azibo
3   Aquart?
4     A.  Yes, I do.
5     Q.  And how long -- when did you first meet
6   him?
7     A.  I was there for his birth.
8     Q.  How is it that you -- let me go back a
9   little bit then before Azibo's birth and ask you,
10  when did you first meet his mom?
11    A.  I met his mom in Jamaica.  I went on a
12  vacation.
13    Q.  Are you originally from Jamaica?
14    A.  Yes, I am.
15    Q.  And 42 years, that takes us back to about
16  1970.  Somewhere around there?
17    A.  Yes.
18    Q.  '69?
19    A.  Yeah.
20    Q.  Is that when you came to Bridgeport from
21  Jamaica?
22    A.  I came in '70.
23    Q.  Okay.
24    A.  1970, to be exact, November.  So I was a
25  resident of Bridgeport more than 42 years.
```

4834

1    Q.   Okay.  And you indicated that you first met
2  Azibo's mom in Jamaica.
3    A.   Yes.
4    Q.   And what was her name?
5    A.   Sonia Smith.
6    Q.   Okay.  And how did you meet her in Jamaica?
7    A.   I went on a vacation and I met her through
8  a friend of mine.
9    Q.   And what was your friend's name?
10    A.   Elizabeth Jones.
11    Q.   Okay.  And how was it that Elizabeth -- who
12  introduced you to Sonia?
13    A.   Elizabeth.
14    Q.   And did Elizabeth have a relationship at
15  that time with somebody?
16    A.   Yes.
17    Q.   And who was -- who did Elizabeth have a
18  relationship with?
19    A.   Isa.
20    Q.   Isa.  And do you know, does Isa have a
21  different name, another name?
22    A.   It escapes me right now.  We called him
23  Isa.  I called him Isa.
24    Q.   That's Richard Aquart.
25    A.   Oh, that's Richard, his real name.

4835

1    Q.   Right?
2    A.   Richard Aquart.
3    Q.   And when was the next time that you met
4  Sonia?
5    A.   I met her approximately two, maybe a year
6  and a half after she was in the States.
7    Q.   At the time that you met Sonia, was Azibo
8  born?
9    A.   No, he wasn't.
10    Q.   Did Sonia have any children at that time?
11    A.   Yes, she did.
12    Q.   And who were those children?
13    A.   Azizi and Azikiwe.
14    Q.   Now, did you meet the kids in Jamaica when
15  you first met --
16    A.   No, I didn't.
17    Q.   And how is it that Sonia got -- came to the
18  United States; if you know?
19    A.   I don't know, but I -- I actually don't
20  know, but I was told that Isa sent for her.
21    Q.   Okay.  Now, was Isa in the United States at
22  that time?
23    A.   Yes, he was.
24    Q.   And do you know whether initially Sonia had
25  papers to come to the United States?

4836

1    A.   I learned after that she didn't have legal
2  papers.
3    Q.   When Sonia came here for that first time,
4  did she have any of her children with her?
5    A.   Yes.  If I remember correctly.
6    Q.   Okay.  And which kids did she have with
7  her?  Child or children?
8    A.   Azizi and Azikiwe.
9    Q.   And after a point in time -- actually, was
10  Isa, or also known as Richard, was Isa here at that
11  time?
12    A.   Yes.
13    Q.   And did Sonia -- was Sonia living with Isa
14  when she first came here to Connecticut?
15    A.   No.
16    Q.   Where was Isa living at that time?
17    A.   I'm not sure.
18    Q.   When Sonia came here for the first time was
19  Elizabeth here at that time as well?
20    A.   Yes, she was.
21    Q.   And did -- and was Elizabeth pregnant at
22  that time with a child from Richard?
23    A.   Yes, she was.
24    Q.   Now, was Sonia aware of that fact when she
25  came here?  Was she aware of the pregnancy?

4837

1    A.   She didn't aware of who the father was.
2    Q.   And at some point in time did Elizabeth
3  find out that Richard was the father of Elizabeth's
4  child?
5    A.   Sonia found out that Richard was the father
6  of Elizabeth's child when she visited her at the
7  hospital.  She told me when she look in the nursery
8  what she saw is Azibo.
9    Q.   And how did Sonia respond to that?
10    A.   She was very hurt to the point where she
11  turned her -- she turned herself in to go back home.
12    Q.   To go back to Jamaica?
13    A.   She report herself illegal so she could go
14  back home, that's how hurt she were.
15    Q.   And did she later come back to Bridgeport?
16    A.   Yes, she would.
17    Q.   Did you come to know Richard in Bridgeport?
18    A.   Yes.
19    Q.   And what is Richard like?
20    A.   I think Richard is self-centered.  I think
21  Richard is a Casanova.
22    Q.   A Casanova?
23    A.   A ladies man.
24    Q.   Did Sonia -- why did Sonia -- did Sonia
25  tell you why she was coming back to Richard?

4838

1      A.   It was her dream to be always with Richard
2  and make a family.  And she always want a family, a
3  husband, wife and children, and it was her desire,
4  was always with Richard.
5      Q.   Now, you said that you were there when
6  Azibo was born, right?
7      A.   Yes.
8      Q.   Did Azibo have a nickname within his
9  family?
10     A.   Jumbo.
11     Q.   And do you know why they called him Jumbo?
12     A.   Because he was a chubby, cuddly, lovely
13 baby.
14     Q.   Did you learn that Richard was involved in
15 drug dealing?
16     A.   Yes.
17     Q.   And when did you learn that?
18     A.   Ever since I know Richard.
19     Q.   Was the fact that Richard was involved in
20 drug dealing, was that general knowledge in the
21 family, in his family?
22     A.   I believe so.
23     Q.   Do you know whether or not the kids were
24 exposed at a young age to that drug dealing?
25     A.   I believe so.

4839

1      Q.   Let me ask you this:  I'm going to show you
2  a picture and ask if you can identify the people in
3  this picture.
4           MR. SHEEHAN:  And, your Honor, this is
5  Defendant's Exhibit -- and if I -- I'm going to --
6  maybe if I could make one statement on the record
7  that might carry us through this.
8           I have designated the first letter to be
9  P, just to make it clear that these are for the
10 penalty phase exhibits.  So, what I would propose is
11 I will, unless otherwise noted, I'll just reference
12 this as Exhibit E.
13          THE COURT:  All right.
14          MR. SHEEHAN:  But the P will appear on
15 the document itself.
16          THE COURT:  All right.
17          MR. SHEEHAN:  But given the problem I
18 have with numbers.  All right.
19     Q.   I'm going to ask you to look at either the
20 monitor in front of you or the large screen at
21 Defendant's Exhibit E and ask if you can identify
22 the people in that picture?  Do you know who's in
23 that picture?
24     A.   Yes, I do.
25     Q.   Okay, and could you tell us who the woman

4840

1  is in the picture?
2      A.   Sonia.
3      Q.   All right.  And who is the man to her left?
4      A.   Isa.  Richard.
5      Q.   Okay.  And who are the two boys with the
6  Big Wheels there?
7      A.   Azikiwe and Azizi.
8      Q.   And you know -- which boy is older?
9      A.   Azizi.
10     Q.   Okay.  And who is sitting in the, sort of
11 filling up that whole little carriage?
12     A.   Jumbo.  Azikiwe -- Azibo.
13     Q.   Azibo, all right.
14          I have one other picture I'd like to see if
15 you can identify for us, and that is Exhibit H.
16          And can you tell us who the woman is with
17 the smile in that picture?
18     A.   Sonia.
19     Q.   And who are the two boys with the tams on
20 their heads?
21     A.   Azizi in back and Azikiwe in front, and
22 Jumbo in Sonia's lap.
23     Q.   Okay.  Now, when Sonia -- after Azibo was
24 born, did you continue to have contact with Sonia?
25     A.   Yes.

4841

1      Q.   And how often would you see or talk to
2  Sonia?
3      A.   Almost daily.
4      Q.   And do you know where Sonia was living
5  during this period of time?  If you remember where
6  she was living.
7      A.   I believe she was living at Adams Street
8  when he was an infant.
9      Q.   Okay.  And did there come a time that, as
10 far as you know -- do you know where Yarrington
11 Court is?
12     A.   Yes.
13     Q.   And in fact you live right near there now,
14 correct?
15     A.   Yes.
16     Q.   Do you remember Sonia living at Yarrington
17 Court?
18     A.   Yes.
19     Q.   What was your relationship with Sonia when
20 Azibo was a small child?
21     A.   That was my best friend.
22     Q.   And did the kids have a nickname for you or
23 a --
24     A.   It's not a nickname.
25     Q.   What did they call you?

4842

```
1        A.     Auntie Lil.
2        Q.     Was it somewhat unusual for you and Sonia
3   to be friends?
4        A.     Well, others seen it as unusual, but we
5   didn't.  And the reason for it is because I wasn't a
6   Rastafarian and Sonia was a Rastafarian.
7        Q.     Was Sonia open -- I mean, was Sonia
8   accepting of you in the fact that you weren't a
9   Rastafarian?
10       A.     Yes, she was acceptive of me.
11       Q.     When you were living in Jamaica, what was
12  the position of Rastafarian in Jamaica?
13       A.     It's not embraced.  That's the question.
14  It's not something the culture embrace easily, if
15  that's the question.
16       Q.     Yeah, how did they fit in Jamaican society.
17       A.     It's looked down at, the culture is looked
18  down at.
19       Q.     Now, did there come a time when Sonia got
20  married?
21       A.     Yes.
22       Q.     And let me show you Exhibit D.  Do you see
23  Defendant's Exhibit D in front of you there?
24       A.     Yes.
25       Q.     Were you a witness to Sonia's wedding with
```

4843

```
1   Ernest Reardon?
2        A.     Yes.
3        Q.     And is the date of that wedding
4   September 13, 1984?
5        A.     Yes.
6        Q.     Do you know if Sonia ever lived with
7   Mr. Reardon?
8        A.     No, she haven't.
9        Q.     And do you know what the purpose of that
10  wedding was?
11       A.     To become legal.
12       Q.     Now, did Sonia talk to you about her
13  concerns about the children?
14       A.     She always speak to me about the concern of
15  her children.  Yes, she have spoke about the concern
16  of her children.
17       Q.     And what was her concern?
18       A.     Her main concern was the Bible.  The second
19  was education, and overall providing for them.
20       Q.     Okay.  And was she worried about anything
21  else?  Was she worried about, for example, their
22  father's influence on them?
23       A.     She was very concerned.  At one point her
24  last move was to move them out locally to Stamford
25  so they won't be influenced.
```

4844

```
1        Q.     Now, did Sonia work together with you in
2   any type of work?
3        A.     Yes, she had worked with me with special
4   need kids.
5        Q.     And was that a position that you helped her
6   to get?
7        A.     Yes.
8        Q.     And did she enjoy that work?
9        A.     Yes, she did.
10       Q.     And was it difficult for her leaving her
11  children alone when she went to work?
12       A.     There were one incident that I heard her
13  crying in the kitchen.  And when I went to ask
14  what's the matter, she explained that she wish she
15  was home cooking breakfast for her kids, but instead
16  she have to be here cooking so she will be able to
17  provide for them.
18       Q.     And where was Richard at that time?
19       A.     I don't know.
20       Q.     Who would be in charge of the kids when
21  Sonia was not at home?
22       A.     At most time it would be Azizi.
23       Q.     And how did Sonia present herself to the
24  outside world?
25       A.     She was a lovely lady.  Everyone respected
```

4845

```
1   her.  Very religious and friendly.
2        Q.     And how was she inside to you?
3        A.     She was tored up because of Richard, the
4   struggle she had been through, she herself not
5   having a mother or sisters or nobody.
6        Q.     When you say she had -- she herself had no
7   mother or sisters or anybody, to your knowledge, did
8   Sonia have family in Jamaica?
9        A.     She have family in Jamaica and Canada.
10       Q.     And do you know where her mom lived?
11       A.     Canada.
12       Q.     And what was Sonia's relationship with her
13  mother?
14       A.     She had none.  She tried, and several time
15  got her here so they could have a relationship, but
16  it never panned out.
17       Q.     And do you have any sense that -- did Sonia
18  share with you that her -- did her faith, her
19  Rastafarian faith in any way interfere with her mom?
20       A.     Yes.
21       Q.     In what way?
22       A.     Her mom didn't like it and don't want
23  anything to do with her.  If I may, Sonia also
24  shared with me before she was a Rastafarian her
25  family didn't like her because of her complexion.
```

**GA1254**

4846

1  Q.  And what was the matter with Sonia's
2  complexion?
3  A.  She's very dark.
4  Q.  Well, is that -- why would that be a
5  problem in Jamaica?
6       MS. REYNOLDS:  Your Honor, I'm going to
7  object at this point.  And can we approach?
8       MR. SHEEHAN:  Well, I can go on.  I'll
9  just move on, your Honor.
10       THE COURT:  All right.
11  Q.  You mentioned that she had had a difficult
12  relationship with her mother, and you said she
13  invited her here.  What did she invite her here for?
14  A.  So they could be bond.  So the children
15  could meet their grandmother, so she could have the
16  family she never had, her children could have the
17  family that she never had.
18  Q.  Did she -- as far as you know, did she end
19  up reconciling with Isa, with Richard?
20  A.  No.
21  Q.  Now, what was Azibo's place in the family
22  as a young child, that you observed?
23  A.  Azibo was the baby.
24  Q.  And did there come a point in time when
25  Sonia got into another relationship?

4847

1  A.  Yes, she did.
2  Q.  And what was the name of the person she got
3  in that relationship with?
4  A.  Skibo (ph).
5  Q.  Skibo?
6  A.  Yeah.
7  Q.  And did she tell you why she got into that
8  relationship?
9  A.  Yes.
10  Q.  And how did she describe that to you?
11       MS. RODRIGUEZ-COSS:  Your Honor, I'm
12  sorry, can we approach at this time?
13       THE COURT:  Yes.
14       (Sidebar conference)
15       MS. RODRIGUEZ-COSS:  Your Honor, we need
16  to know where the defense is going with this because
17  so far we've heard the life history of the mother
18  and how the family has been affected by being a
19  Jamaican, and how the mother has been affected by
20  her religion, and how the mother has gone through
21  some hard things, but the mother is not on trial,
22  the defendant is.  So the testimony has to be about
23  the defendant.  So can we have a proffer whether the
24  rest of this testimony is going to relate to the
25  defendant in any way?

4848

1       MR. SHEEHAN:  It will, your Honor.  The
2  point is that in order to understand the defendant
3  we have to understand the family that he grew up in,
4  and that's what this witness is providing us with,
5  some insight into those early years.  And we'll
6  build on that just as we do from the beginning.
7       MS. RODRIGUEZ-COSS:  Well, your Honor, I
8  think.  He should offer a little bit more so the
9  Court can have some guidance on that.
10       THE COURT:  Now, the problem is that
11  there has been a lot before Azibo was born.
12       MR. SHEEHAN:  Yes.
13       THE COURT:  When will we get to him?
14       MR. SHEEHAN:  We're getting to him right
15  now, your Honor.
16       THE COURT:  All right.  All right.
17       (Sidebar concluded)
18  Q.  Do you know how Sonia's new relationship
19  with Skibo impacted on Azibo?
20  A.  Yes.
21  Q.  Can you tell the members of the jury how
22  that impacted on him?
23  A.  He believed that -- I believe that he
24  believed that the new relationship put him on the
25  back burner.

4849

1  Q.  And how did that relationship with Skibo
2  impact on Azizi?
3  A.  He believed there is a man that come in to
4  take his place.
5  Q.  Now, did there come a time when the older
6  boys, Azizi and Azikiwe, went to live with their
7  dad?
8  A.  Yes.
9  Q.  Did you know from Sonia why she let the
10  boys go live with him?
11  A.  They asked.  And they always live at home,
12  but they asked and their mom, Sonia, granted that.
13  Q.  And was Richard still involved in drug
14  dealing at that time?
15  A.  Yes.
16  Q.  Now, you mentioned that at some point in
17  time Sonia moved to Stamford.  Do you know why it
18  was that she moved to Stamford?
19  A.  Because she know the children -- not the
20  children, but the kids were threatened with getting
21  in trouble.
22  Q.  And do you know, if you can recall at this
23  time, approximately when it was that Sonia moved to
24  Stamford?
25  A.  No, I don't recall the year.

4850

```
1     Q.  Do you know -- did you continue to have
2  contact with Sonia while she was in Stamford?
3     A.  It wasn't as frequent as when she was
4  living in Bridgeport because at this time now she's
5  working in New York and living in Stamford.  So it
6  wasn't as frequent.
7     Q.  And what kind of work was Sonia doing in
8  New York?
9     A.  She owned a salon and a boutique.
10    Q.  And what kind of a salon was it?
11    A.  It was called Ital Pamper; she take care of
12 dreadlocks.
13    Q.  She did hair?
14    A.  Yes, she does hair.
15    Q.  And what kind of boutique, what was she
16 selling?
17    A.  Clothing.
18    Q.  And how long did she have that store, if
19 you know?
20    A.  She had it, Ital Pamper came about while
21 she was living on Captain Avenue.  She always have
22 the boutique; however, she was doing it from her
23 car.  And when she opened a salon she incorporated
24 it.
25    Q.  And did there come a time when you were
```

4851

```
1  informed that Sonia had died?
2     A.  Yes.
3     Q.  When was that; if you remember?
4     A.  The day after, 1994.
5     Q.  The day after Memorial Day?
6     A.  Yes.
7     Q.  And how did you hear about that?
8     A.  Someone that know me and know her told me.
9     Q.  And how was it that Sonia died?
10    A.  She died in a freak water current,
11 something, trying to save somebody, some children.
12    Q.  She drowned?
13    A.  She drowned.
14    Q.  And did you go to the wake?
15    A.  Yes, I did.
16    Q.  In 1994, that would -- May of '94, would
17 mean that Azibo was 12 years old at that time.  Is
18 that about right?
19    A.  Yes.
20    Q.  Did you see how Azibo responded at the
21 wake?
22    A.  Yes.
23    Q.  How was that?
24    A.  It was sad.
25    Q.  After their mom died, did you keep up with
```

4852

```
1  the family, with the three boys?
2     A.  No.
3     Q.  Did you know where they went?
4     A.  I was told that friends have them in New
5  York.
6     Q.  When you say 'friends,' what kind of
7  friends were you --
8     A.  The religion that Sonia belongs to, 12
9  Tribes of Judah sisters have them from that tribe.
10    Q.  Do you know if --
11    A.  The Rastafarian religion members had them.
12    Q.  And did you later learn that they -- did
13 they stay with those --
14    A.  I later learned that they didn't stay.
15    Q.  And where did they go?
16    A.  I learned that Azikiwe is in Hartford,
17 Azizi is living with a friend, and I learned that
18 Jumbo is here, there, and everywhere.
19    Q.  Here, there, and everywhere?
20    A.  Yes.
21    Q.  After Azibo [sic] died, did he come to your
22 house?
23    A.  There was one year that Azibo came to my
24 house.
25    Q.  Can you -- was that shortly after mom,
```

4853

```
1  Sonia, died or was that later?
2     A.  No, it wasn't shortly after.  It was
3  several years after she died.
4     Q.  And what was Azibo doing at that time?
5     A.  He showed up at my house.
6     Q.  Where was he living?
7     A.  I think he had nowhere else to go, that's
8  why he showed up.
9     Q.  And how long did he stay at your house?
10    A.  Approximately a week.
11    Q.  And what happened after that?
12    A.  He left.  I learned thereafter that he went
13 to jail.  He got arrested.
14    Q.  So, he went to jail after he had been to
15 your house?
16    A.  Yes.
17    Q.  And did he tell you what happened after his
18 mom had died, where he lived?
19    A.  No, he never told me where he lived, but I
20 would learn after the fact that he was there, here,
21 even in a shed in some backyard.  I would learn
22 after it happened.
23    Q.  And did you have any correspondence with
24 Azibo at any time?
25    A.  Yes, after his visit with me and he got
```

4854

1   incarcerated, he wrote me.
2       Q.   And what did he say?
3       A.   He thanked me for that week.  He thanked me
4   for that week, how secure he feel.
5       Q.   Is there a reason that you did not step in
6   after Sonia died to be in a position to take care of
7   Azibo?
8       A.   I didn't know how.  And given that I wasn't
9   a Rastafarian and they took charge, I didn't know
10  how to intervene.
11          MR. SHEEHAN:  I don't have any more
12  questions, Ms. Reid.  Thank you.
13          THE COURT:  All right,
14  cross-examination.
15  CROSS-EXAMINATION
16  BY MS. REYNOLDS:
17      Q.   Ms. Reid, how old was the defendant when
18  Sonia moved to Stamford?  You said she moved to
19  Stamford at some point.  How old was the defendant
20  at that time?
21      A.   I believe Jumbo was in his teens.
22      Q.   In his teens?
23      A.   Yes.
24      Q.   And you mentioned that he had got -- kids
25  -- she had moved because the kids were getting into

4855

1   trouble.  What kind of trouble were the kids getting
2   into?
3       A.   The oldest son got arrested.
4       Q.   Did you know what kind of trouble Azibo was
5   getting into?
6       A.   No.
7       Q.   And you mentioned a few times after Sonia
8   died you learned about what was going on with the
9   kids and the family; is that correct?  And who were
10  you learning this information from?
11      A.   People who know me.  For example, the lady
12  that Jumbo slept in the shed know that I know Sonia
13  and I know Jumbo.  So, she told me when she see me
14  thereafter.
15      Q.   What was her name?
16      A.   Emily Blackwood.
17      Q.   And you haven't kept in touch with Azibo
18  recently.  Or have you?
19      A.   The last time I saw Azibo I was visiting a
20  friend that he know also, and he was driving by, I
21  didn't recognize him, but he recognized us and
22  stopped and spoke to us.
23      Q.   And when was that?
24      A.   I don't know.  I don't recall at this
25  present moment what year it were, but at that time

4856

1   he was working for a car dealership.
2       Q.   So, it was more than five years ago?
3       A.   It was.
4       Q.   Is that fair to say?
5       A.   Yes, yes.
6           MS. REYNOLDS:  Nothing further, your
7   Honor.
8           THE COURT:  Any redirect?
9           MR. SHEEHAN:  No, thank you very much.
10  Ms. Reid.
11          THE COURT:  All right, thank you,
12  Ms. Reid.
13          THE WITNESS:  Thank you.
14          THE COURT:  You may step down.  You are
15  excused.
16          All right, will the defense please call
17  your next witness.
18          MR. SHEEHAN:  Yes, Carol Porter, your
19  Honor.
20          THE COURT:  Ms. Porter, would you please
21  come over to the witness stand, and when you get
22  there please remain standing and raise your right
23  hand.
24              C A R O L   P O R T E R
25  Having first affirmed, was examined and testified as

4857

1   follows:
2           THE WITNESS:  Carol Porter, P-o-r-t-e-r,
3   East Hartford, Connecticut.
4           THE COURT:  You may proceed.
5           I'm sorry, we don't have a chair on
6   wheels, but would you pull that up and then arrange
7   the microphone so that you can speak into it.  All
8   right?  Thank you.
9   DIRECT EXAMINATION
10  BY MR. SHEEHAN:
11      Q.   Good afternoon, Ms. Porter.
12      A.   Good afternoon.
13      Q.   You told us that you're now living in
14  Hartford.
15      A.   Yes.  It's East Hartford, but still
16  Hartford County.
17      Q.   East Hartford?
18      A.   Yeah.
19      Q.   I'm a little bit challenged here, but I
20  know --
21      A.   That's correct.
22      Q.   If I can't hear you other people might not
23  hear.
24          THE COURT:  Pull the microphone closer
25  to you, please.

4858

1    Q.   You can slide that.  There is no cord on
2  it.  How old are you?
3    A.   Fifty.
4    Q.   And how long have you lived in East
5  Hartford?
6    A.   Since '90.  1990.
7    Q.   And what kind of work do you do?
8    A.   I'm a charge nurse at a long-term care
9  facility.
10    Q.   A charge nurse?
11    A.   Uh-huh (indicating affirmatively).
12    Q.   What does a charge nurse do?
13    A.   I'm licensed.  I take care of actually a
14  combination of elderly, middle-aged people coming
15  from the hospital for rehab, substance abuse, and
16  some mental illness.
17    Q.   Are you chilly?
18    A.   A little.
19    Q.   Let me ask you this:  How long have you
20  been involved in the nursing profession?
21    A.   Since '91.
22    Q.   Now, do you know Azibo Aquart?
23    A.   Yes, I do.
24    Q.   And how long have you known him?
25    A.   Well, I was in the hospital when his mother

4859

1  gave birth to him.
2        MR. SHEEHAN:  Your Honor, at this time I
3  would just offer into evidence Exhibit B, which is
4  the birth certificate.
5        THE COURT:  All right, that's
6  Defendant's B.
7    Q.   And let me ask you, Azibo's name on his
8  birth certificate is Azibo Smith; is that correct?
9    A.   Yes.
10    Q.   And was that Sonia's last name as well,
11  Smith?
12    A.   Yes, it is.  Well, yes.
13    Q.   And did you know Sonia by a different name
14  other than just Sonia?
15    A.   Sonia Judah, but I mostly called her Sonia.
16    Q.   And you say Sonia Judah.  How is it that
17  you first met Sonia?
18    A.   I met her at a gathering in New York.  I
19  was introduced to her by another friend.  It was a
20  Bible meeting at the 12 Tribes.
21    Q.   And were you -- are you a member or were
22  you a member at that time of the 12 Tribes?
23    A.   Yes, I was a member at that time.
24    Q.   And what is the 12 Tribes, if you could
25  tell us just very briefly.

4860

1    A.   A religious organization professing
2  orthodox faith.  It's basically based off the Bible,
3  but Rastafarian origin.
4    Q.   And what was Sonia like as a person?
5    A.   Friendly, loving.  Generous.  Very
6  considerate, smiling most of the time.  She
7  introduced me to a lot of people because I was not
8  as outgoing as she was.
9    Q.   Did you know Richard Aquart?
10    A.   Yes, I knew him.
11    Q.   And when did you first meet Richard Aquart?
12    A.   Actually I saw him prior to meeting Sonia.
13  I would see him around different gatherings just
14  briefly before meeting Sonia.
15    Q.   And was Richard also a member of the 12
16  Tribes?
17    A.   Yes.
18    Q.   By the way, did Sonia achieve some
19  prominence in the 12 Tribes, any kind of position
20  of --
21    A.   Yes.  She would sit up and represent the
22  Tribe of Judah, which is people that were born in
23  the month of July.  She sat up and represented some
24  of the women.  We would go to different places and
25  basically preach like the evangelists.

4861

1    Q.   And is that where she got the name Sister
2  Judah?
3    A.   Yes.
4    Q.   When you met Sonia, where was she living at
5  that time?
6    A.   She was living, I was told, in Bridgeport
7  with another -- with another woman named Elizabeth.
8    Q.   And did you know Elizabeth?
9    A.   I didn't know her personally.
10    Q.   Did you know -- did you come to learn that
11  Elizabeth herself had a relationship with Richard?
12    A.   Yeah, I knew of her in that sense, that he
13  was dating Elizabeth, yes.
14    Q.   At the same time that he was living with
15  Sonia?
16    A.   He brought Sonia here, and he apparently
17  brought her to live in Elizabeth's home while they
18  were both seeing each other.  I don't think Sonia
19  knew at the time, though.
20    Q.   And did Sonia end up moving near where you
21  lived at that time?  Were you living in Bridgeport
22  then?
23    A.   I was living in Bridgeport, yes.
24    Q.   And how often would you see Sonia in
25  Bridgeport?

4862

1    A.   I saw her often because at the same time
2  that she was expecting Azibo, I was expecting my
3  son.  So we got close.  I moved, it's not even a
4  block, a few houses away from her.
5    Q.   And how far apart is your son and Azibo?
6    A.   Five days.
7    Q.   You mentioned that you were with Sonia when
8  Azibo was born.  Did you also know him as Jumbo?
9    A.   Yeah.  He got the name Jumbo because he was
10  so chubby when he was a baby.  So we called him
11  Jumbo, like a butterball turkey, because he was so
12  big.
13    Q.   And was Richard there when Azibo was born?
14    A.   No.
15    Q.   Do you know if Sonia was living with
16  Richard at that time?
17    A.   I couldn't say living because I hardly saw
18  him.  Once in a while he would come around, but she
19  didn't see him for quite awhile after she had Jumbo.
20    Q.   She didn't see "him" who?
21    A.   Richard didn't see Sonia or the baby for
22  quite some time after she had the baby.
23    Q.   And did Richard have another name that he
24  was known by among the 12 Tribes?
25    A.   Isa.

4863

1    Q.   Isa?  How was Sonia's relationship with
2  Richard as she described it to you?
3    A.   She described it as if he was her husband
4  and that she was in love with him, but I didn't see
5  him play that role.
6    Q.   Did that bother her?
7    A.   It did.
8    Q.   In what way?
9    A.   A lot of times she was depressed, crying.
10  I don't know if everyone knew, but around me there
11  is a lot of times she was crying and talking about
12  the situation.  I know the children saw it because
13  her oldest son would try to comfort her sometimes.
14    Q.   Now, where were you living at this time in
15  Bridgeport?
16    A.   It was Carol Avenue.
17    Q.   And how far away did Sonia live from you?
18    A.   It was a few houses away on a side street.
19  Like maybe three, four houses away.
20    Q.   And how was Azibo as a young child?
21    A.   He was a happy baby most of the time.  He
22  clinged to his mother.  I know initially when his
23  father came around it was like he didn't know him
24  when he would come around.
25    Q.   Do you know what Sonia's relationship was

4864

1  with her family?
2    A.   As far as I know, her father, I think,
3  passed away.  Her mother was not -- from what she
4  described, her mother didn't like her.  She tried to
5  reach out to her mother several times but they
6  didn't have a good relationship.
7    Q.   What was life like for Sonia and yourself
8  at that time after Jumbo was born in the Bridgeport
9  community?
10    A.   Financially it was difficult.
11    Q.   Why is that?
12    A.   I couldn't find a stable job at the time.
13  I had to rely on services.  It would barely cover
14  the rent, so there was a lot of times there was --
15  it was difficult finding food.
16    Q.   And was that true for Sonia as well?
17    A.   Yes.  She had much more difficulty because
18  at least I would get a job occasionally and I could
19  apply for services.  She couldn't.
20    Q.   Do you know, at that time were you getting
21  help from anybody, financial help?
22    A.   Well, I had applied for services to get
23  help.  Financially, no, but if I needed support I
24  had my grandmother, my parents.  That's part of the
25  reason why I left Bridgeport.

4865

1    Q.   Now, when you say you applied for support,
2  did you have a legal status at that time?
3    A.   Yes, I'm a citizen.
4    Q.   And do you know whether Sonia had any legal
5  status?
6    A.   As far as I know she didn't at the time.
7    Q.   And what was Sonia doing to make a living
8  for herself?
9    A.   She knitted hats, clothing.  She sewed.
10  She would style hair.  Whatever she could do.
11    Q.   Do you know whether Sonia got involved in
12  any marijuana selling?
13    A.   I heard it, but she never really showed
14  that to me.  I thought maybe it was the children's
15  father that might have brought it around.
16    Q.   Then did Sonia, in terms of your closeness
17  with Sonia, did Sonia help you with the birth of
18  your daughter as well?
19    A.   She did.  My first daughter, I couldn't
20  make it to the hospital, I went into labor, and she
21  delivered her.
22    Q.   And was Sonia having financial problems at
23  that time?
24    A.   She was still having financial problems.  I
25  know there was a time when she did some work, and I

**GA1259**

4866

```
1   think it was like housekeeping work, something like
2   that, like a homemaker.  She told me about it.  At
3   one point I was able to get a job taking care of
4   someone, too, briefly.
5       Q.  Now, are you still active in the 12 Tribes?
6       A.  No.
7       Q.  Thinking back on it now, with your
8   perspective of now, what was the place of women in
9   the 12 Tribes community?
10          MR. MARKLE:  Your Honor, I'm going to
11  object.  The government doesn't see the relevance.
12          THE COURT:  Can you make it specific to
13  the circumstances?
14          MR. SHEEHAN:  Yes.
15      Q.  How did Sonia and yourself as women fit in
16  with the 12 Tribes community at that time?
17          MR. MARKLE:  I still object.
18          THE COURT:  I'm going to overrule the
19  objection.
20      A.  Well, basically the man was the head.  We
21  were subservient to the male.  You would have a
22  husband, whoever your partner was was considered
23  your husband and you would be faithful to that
24  person.  They didn't go according to the Bible.
25  They didn't promote birth control.  You weren't
```

4867

```
1   supposed to use birth control.  A lot of rules and
2   regulations, basically.
3       Q.  You indicated that at some point in time
4   you left Bridgeport.  Why did you leave Bridgeport?
5           MR. MARKLE:  Your Honor, I'm not sure of
6   the relevance of why she left Bridgeport.
7       Q.  Well, let me ask you this question.  What
8   was Bridgeport like for you and Sonia at that time?
9       A.  Well, at that time it was difficult to
10  survive and I couldn't see staying there with -- I
11  was experiencing poverty, which I didn't experience
12  prior to moving there.  The situation with the
13  people that we were around was not conducive to
14  raising children.  There was a lot of activity that
15  was against the law, and I couldn't deal with police
16  being in my life, so I left.
17      Q.  Was, as far as you know at that time,
18  Richard involved in drug dealing?
19      A.  That's what I heard.
20      Q.  And were drugs a part of the 12 Tribes --
21      A.  Some people that were members --
22      Q.  -- community?
23      A.  -- yeah, were involved in that.
24      Q.  Did Richard have a reputation at that time
25  in the community?
```

4868

```
1       A.  He had a reputation for doing a lot of
2   things, selling drugs, stealing.  A lot of things.
3       Q.  Do you know, did there come a time when
4   Sonia sent the boys to live, the older boys to live
5   with their father?
6       A.  I know there was a struggle because he was
7   insisting that they come to stay with him.
8   Initially she said she didn't want to send them, but
9   there was a lot of arguing back and forth that she
10  was keeping them away from him.  And she didn't
11  really want them around him because of his
12  activities.
13      Q.  And why then did she let the boys go to
14  live with Richard?
15      A.  I know they had a lot of arguments.
16  Finally the oldest, her oldest son was a bit
17  rebellious, he wanted to be with his father.  I
18  don't know if that was her final decision, but I
19  know that played a big role in it.  And it was
20  difficult taking care of him resisting and wanting
21  to be with his father.
22      Q.  And do you know if Richard at the time that
23  the older boys came to live with him, was he still
24  involved in drug dealing?
25      A.  As far as I know he always was.
```

4869

```
1       Q.  Now, do you know when it was that Sonia
2   started her relationship with Skibo?  Did she tell
3   you about that?
4       A.  She did tell me about it.  There was some
5   difficulty in that, too, because I guess the boys
6   didn't really want her to be with anyone else but
7   their father.  I can't tell you exactly what year,
8   but she did tell me about him.
9       Q.  Okay.  Was that -- did she describe that
10  relationship that she had with Skibo to you?
11      A.  Said he was kind, he was helping her
12  financially.  He wanted to be in a committed
13  relationship with her.  She seemed happier.  I
14  thought he had some type of health food business in
15  New York.  I can't really remember all of the
16  details.
17      Q.  Okay.  What were the men in the 12 Tribes
18  community like?
19          MR. MARKLE:  I'm going to object, your
20  Honor.
21          THE COURT:  I'm going to sustain the
22  objection to the question in that form.  This needs
23  to relate to the defendant and his background.
24      Q.  To your knowledge, was Sonia bringing the
25  boys to 12 Tribes events?
```

4870

1    A.   Yes.
2    Q.   And were the boys exposed to and
3 participants in the 12 Tribes community?
4    A.   Yes.
5    Q.   And what were the men like in the 12 Tribes
6 community at that time?
7    A.   Well, it's a big community.  So, some were
8 friendly and cordial, some were family oriented,
9 some were controlling, some were like gangsters.  So
10 you had a big community of all types of men.
11   Q.   And how about the circle of men around
12 Richard?  Did you have an opinion about them?
13   A.   Well, the group that he supposed -- the
14 group that Richard was around, they called them,
15 they were considered like a posse.  They were more,
16 like, you would say they were more controlling than
17 the other men.  They more -- they were like similar
18 to a gang, but they would call them posse, not gang.
19   Q.   And "posse" you mean like a group of people
20 together?  Is that what you mean?
21   A.   Yeah.
22   Q.   And how is it that you -- when did you
23 learn about Sonia's death?
24   A.   A friend, a close friend called me and told
25 me.

4871

1    Q.   And did you attend the funeral?
2    A.   Yes, I did.
3    Q.   And where was that funeral held?
4    A.   I can't remember if it was Queens.  It was
5 in New York.
6    Q.   Okay.  And do you remember the program from
7 that funeral?
8    A.   No, it's been a long time.  I don't
9 remember the program.
10   Q.   All right, let me show you something and
11 see if you can identify this.  And if you can, just
12 tell us whether you can identify that or not.
13   A.   Yes.
14   Q.   And is that the program for Sonia's
15 funeral?
16   A.   Yes, it is.
17        MR. SHEEHAN:  I would offer that at this
18 time as Exhibit C.
19        MR. MARKLE:  No objection.
20        THE COURT:  All right.
21        MR. SHEEHAN:  With the Court's
22 permission.
23   Q.   Let me ask you, is this, what we have
24 before us, the program for Sonia's funeral?
25   A.   Yes.

4872

1    Q.   And did you ever go to the Ital Pamper
2 store that's referenced?
3    A.   No, I never made it there.
4    Q.   Had you ever met Sonia's mother, Faye
5 Henry?
6    A.   I didn't meet her, no.
7    Q.   Did you ever see her?
8    A.   She had pictures of her.  I didn't meet her
9 personally.  I met her sister.  One of her sisters.
10   Q.   What sister did you meet?
11   A.   To be honest, I don't remember her name.
12 She came up with her mother.
13   Q.   And is this a picture of Sonia on the back?
14   A.   That's Sonia.
15   Q.   And did you observe -- did you see Jumbo
16 after Sonia's death?
17   A.   Yes, I did.
18   Q.   And how did he respond to that, to his
19 mom's death?
20   A.   He was -- he seemed to be in turmoil.  He
21 would try to cry and couldn't cry unless he was by
22 himself.  You would go to hug him, initially he'll
23 let you hug him and then he'd go somewhere by
24 himself.  He stayed with me briefly and I would see
25 him try to interact with my children and then pull

4873

1 away.
2    Q.   And do you remember where he went to?
3    A.   He was staying with Marcie (ph) first and
4 then he -- I thought maybe he would stay with me
5 because he knew the children, but he didn't want to
6 stay, he was restless, he couldn't sleep.  He just
7 seemed like in a lot of anguish.
8    Q.   And do you know why it was that -- well, do
9 you know where Azizi and Azikiwe went immediately
10 after Sonia's death?
11   A.   Initially after I was told another sister,
12 the person that was in Florida with them was with
13 them.  I wasn't sure.  Azizi, shortly after that I
14 was told he went to see the attorney about Sonia's
15 life insurance policy, but this is hearing from
16 other people.  Another sister in Hartford Azikiwe
17 went to stay with.  And then I was told Azizi came
18 and got Azibo.
19   Q.   Thinking back on it now, is there a reason
20 that as a friend of Sonia you were not able to take
21 a more active role in --
22   A.   I thought about it over the years many
23 times if I could have done something else, because
24 when he initially came with me I really thought he
25 would stay with me.  I wrestled with calling DCF,

**GA1261**

4874

```
1   but I've heard so much negative things about them
2   that I didn't call them.  I actually didn't know
3   what to do.  I thought maybe he would stay with me,
4   but then he went to Marcie.  I hoped he would stay
5   with her and we could keep in touch, but once Azizi
6   took Jumbo, I didn't know where he was, so I
7   couldn't contact them.  That year was the last I saw
8   Jumbo up until this point.
9            MR. SHEEHAN:  Thank you very much.  I
10  have no further questions.
11           And let me just offer this, your Honor.
12           THE COURT:  All right, cross-examination
13  then.
14           MR. MARKLE:  Thank you, your Honor.
15  CROSS-EXAMINATION
16  BY MR. MARKLE:
17    Q.   Good afternoon, Ms. Porter.
18    A.   Good afternoon.
19    Q.   Ms. Porter, it's fair to say that the
20  defendant had a good, caring mother?
21    A.   Yes, she was.
22    Q.   For too short a period of time, obviously,
23  but she was a good mother while she lived?
24    A.   Yes, she was.
25    Q.   And she took care of her son?
```

4875

```
1     A.   Yes.
2     Q.   And she supported her son?
3     A.   As best as she could.
4     Q.   I know you explained there were difficult
5   times, but she took care of her children, did she
6   not, during those times?
7     A.   Yes, she did.
8     Q.   And you said you had a son the same age as
9   the defendant?
10    A.   Yes.
11    Q.   And he went through those difficult times
12  as well?
13    A.   He went through difficult times until I
14  left Bridgeport.  He was three when I left.
15    Q.   He was what?
16    A.   When I left my son was three.
17    Q.   You left when your son was three?
18    A.   I left Bridgeport when my son was three
19  years old.
20    Q.   So, the defendant was three years old when
21  you left Bridgeport?
22    A.   Yes.
23    Q.   So, the times you are talking about are
24  from birth to age three?
25    A.   No, I saw him after.  Throughout the years
```

4876

```
1   I saw him because we went to meetings every week in
2   New York.
3     Q.   So, you would see him once a week in New
4   York?
5     A.   Yeah.
6     Q.   When he would attend the meeting with his
7   mom?
8     A.   Yes.
9     Q.   But other than that -- so it wasn't daily
10  contact, correct?
11    A.   Not daily after I left Bridgeport, no.
12    Q.   And from the age of birth to three you said
13  he was a happy child, taken care of?
14    A.   He was a happy child.
15    Q.   And when you left, who did you go with?
16  Where did you go from Bridgeport?
17    A.   To Hartford.
18    Q.   And who did you live with?
19    A.   With my children.
20    Q.   And did you have a husband?
21    A.   No.  I was not married legally, no.
22    Q.   So, you were on your own with your
23  children.  How many children?
24    A.   I have four.
25    Q.   And you said Richard had a reputation.  Had
```

4877

```
1   you ever seen Richard dealing in drugs?
2     A.   No, but he would talk about it.
3     Q.   He would talk about it?
4     A.   Yeah.
5     Q.   In front of you?
6     A.   He talked about it in front of everybody.
7     Q.   Even though he knew you disapproved of it?
8     A.   Yes.
9     Q.   But you never saw him with drugs?
10    A.   Smoking.
11    Q.   Did you ever see him selling drugs?
12    A.   No.
13    Q.   And when the boys went with Richard, were
14  you around when that happened?
15    A.   I would speak to his mother and she told me
16  about it.
17    Q.   But that's when you were already in
18  Hartford, correct?
19    A.   Yes, but the person he was staying -- they
20  were staying with in Hartford, I was told.
21    Q.   You were told?
22    A.   Yeah.
23    Q.   But these aren't things you observed?
24    A.   Okay, the person he stayed with, I know she
25  lived in Hartford.
```

4878

```
1      Q.   You are saying the person who stayed with?
2      A.   Richard.
3      Q.   That Richard stayed with?
4      A.   Uh-huh (indicating affirmatively).
5      Q.   But would you see the boys with Richard?
6      A.   Not --
7      Q.   Or just hear about it?
8      A.   I would see them.  I saw them with him when
9  they went to New York.
10     Q.   But you didn't spend time, you weren't
11 spending time with the defendant when he was with
12 Richard, correct?
13     A.   If we were at a gathering I would see the
14 children with him there.
15     Q.   You would see them.  Now, you are saying in
16 New York?
17     A.   When we go to the 12 Tribe meetings.
18     Q.   When you go to the meetings?
19     A.   Yeah, if he brought them I would see them.
20     Q.   And those are the meetings where you said
21 there is good people and bad people at those
22 meetings, like, I guess, anywhere in life.
23     A.   Uh-huh (indicating affirmatively).
24     Q.   Is that correct?
25     A.   Yes.
```

4879

```
1      Q.   And there were some male figures that were
2  good role models I assume, correct?
3      A.   Yes.
4      Q.   And Richard took him to those meetings
5  where those decent people would be, correct?
6      A.   Yes.
7      Q.   So, Mr. Aquart was -- the defendant was
8  exposed to good and bad role models, male, female,
9  at those meetings?
10     A.   Yes.
11     Q.   And you said you learned of Sonia's death
12 from a friend who knew you were close to her.
13     A.   Yes.
14     Q.   And is that -- were you still in Hartford
15 at that time?
16     A.   Yes.
17     Q.   And when was the last time you had seen
18 Sonia?
19     A.   I can't remember.  She would come up to
20 Hartford and visit sometimes.
21     Q.   She would stop in and spend some time with
22 you?
23     A.   Yeah.
24     Q.   And would the defendant be with her?
25     A.   Yes.
```

4880

```
1      Q.   So, when was the last time you saw the
2  defendant?
3      A.   The year that she died.
4      Q.   And since then you have had no contact with
5  him?  You said he stayed with you a short while
6  after she passed away?
7      A.   Yes.
8      Q.   Did you tell him to leave your house?
9      A.   No, he wanted to go back to the sister that
10 he was staying with.
11     Q.   And you said that he was in turmoil, you
12 felt, or observed?
13     A.   That's what it seemed to me.
14     Q.   Was that at the funeral of his mom that you
15 are talking about?
16     A.   Then, and when he was with me, too.
17     Q.   In the days immediately after her death?
18     A.   I can't say it was the days immediately.
19 Maybe a couple weeks.  But while he was with me,
20 that's what I saw.
21     Q.   Very close in time to his mom's death?
22     A.   Yes.
23     Q.   And you said then after that -- how old was
24 he then?
25     A.   About 13.
```

4881

```
1      Q.   And so for about the next ten years you
2  really didn't know anything about him?
3      A.   I would hear once in a while the past
4  couple years.
5      Q.   But you had no personal contact with him?
6      A.   No.
7      Q.   And do you know Sonia's mother?  Are you
8  still in touch with her, his grandmother?
9      A.   I was never in touch with her.
10     Q.   You were never in touch with her?
11     A.   No.
12          MR. MARKLE:  May I have just one moment
13 your Honor?
14          THE COURT:  Yes.
15     Q.   Did you know Sonia's other children?
16     A.   His brothers and his sisters.
17     Q.   And did she have other children?
18     A.   Yes.
19     Q.   Did you know them at all?
20     A.   I knew Azikiwe and I knew Azizi and her
21 first daughter.  And after she passed, I didn't -- I
22 knew them as babies, I didn't know them like I knew
23 the boys.
24     Q.   She had six children?
25     A.   Yes.
```

4882

```
 1      Q.    Altogether.  Thank you.
 2              THE COURT:  Redirect.
 3              MR. SHEEHAN:  Yes, just briefly.
 4   REDIRECT EXAMINATION
 5   BY MR. SHEEHAN:
 6      Q.    Mr. Markle asked you about your moving to
 7   East Hartford.  Did you have people to help you in
 8   East Hartford?
 9      A.    Yes, I did.
10      Q.    And who was there to help you?
11      A.    I have my grandparents and my father came
12   up from New York to assist me.  I had my mother if I
13   needed her.
14      Q.    And where was your mom living at that time?
15      A.    In New York.
16      Q.    And were they all helping you when you were
17   having your children?
18      A.    At that time, because of the part of 12
19   Tribes, no.
20      Q.    Did they help you after you had moved to
21   Hartford?
22      A.    Yes.
23      Q.    And the smoking that you referred to,
24   that's marijuana.
25      A.    Yes.
```

4883

```
 1      Q.    And it's fair to say that at least for some
 2   members in the Rastafarian community marijuana that
 3   is a regular part of their lives; is it not?
 4      A.    Yes.
 5      Q.    Not for everybody?
 6      A.    No, not for everyone, but quite a few
 7   people.
 8              MR. SHEEHAN:  I don't have anything
 9   further.
10              THE COURT:  All right, thank you very
11   much, Ms. Porter.  You may step down.  You are
12   excused.
13              Will you please call your next witness.
14              MR. SHEEHAN:  Yes, Maribel Corcho, your
15   Honor.
16              THE COURT:  All right.  Ms. Corcho,
17   would you please come over here to the witness stand
18   and then the oath will be administered to you.  So
19   please remain standing and raise your right hand.
20            M A R I B E L   C O R C H O
21   Having first affirmed, was examined and testified as
22   follows:
23              THE WITNESS:  Maribel Corcho,
24   C-o-r-c-h-o, Caledon Ontario, Canada.
25              THE COURT:  Thank you, you may proceed.
```

4884

```
 1   DIRECT EXAMINATION
 2   BY MR. SHEEHAN:
 3      Q.    And Ms. Corcho, what is your relationship
 4   with Azibo?
 5      A.    I am his aunt.  I am his mother's second
 6   sister.
 7      Q.    Okay.  And your mom's name is?
 8      A.    Faye Henry.
 9      Q.    And your sister Sonia, her name is Sonia
10   Smith?
11      A.    Sonia Smith.
12      Q.    And what's the age relationship between you
13   and Sonia?
14      A.    A little over four years.  There was a
15   four-plus-year difference between us.
16      Q.    And Sonia is four years older or four years
17   younger?
18      A.    Four years older, I'm sorry.
19      Q.    Where were you born?
20      A.    Jamaica.
21      Q.    And how long have you lived in Canada?
22      A.    A little over 30 years.
23      Q.    And I'm trying to do the math.  How old are
24   you now?
25      A.    I will be 50 next year.  I am 49.
```

4885

```
 1      Q.    All right.  And Sonia was your older
 2   sister, but she had a different father from you?
 3      A.    Yes, she did.
 4      Q.    And when was it that you first got to know
 5   Sonia?
 6      A.    Well, I had known her all my life.  We had
 7   -- she would come to visit because I was raised by
 8   my maternal grandmother, and she came to visit as we
 9   were growing up on and off.  We became true siblings
10   when she was about 14 or so.  She came, she spent an
11   entire summer and we bonded at that point.
12      Q.    So, that would have meant you were about
13   nine or ten?
14      A.    Yeah, nine, ten.
15      Q.    And at that point in time where were you
16   living -- who were you living with?
17      A.    I was living with my maternal grandmother.
18   My mother's mother.
19      Q.    And where was your mom?
20      A.    My mom at that point would have been
21   already in Canada.
22      Q.    And how long had you mother been in Canada?
23      A.    You are asking me to think of a lot of
24   years.  Maybe about three or four prior to that.
25      Q.    Now, was Sonia at the time that you met
```

4886

```
 1   her, was she involved in a relationship with Isa
 2   Aquart?
 3        A.   No, that came about a year or so after.  A
 4   year, year plus.  She was about 15 when she first
 5   met him.  I knew of him in a relationship with her
 6   when she was, oh, 15 plus.
 7        Q.   And did Sonia at some point become involved
 8   with the 12 Tribes religion?
 9        A.   Yes, in about the same time as meeting
10   Richard she took on the 12 Tribe banner.
11        Q.   And was that a source of friction between
12   her and your mother?
13        A.   That's -- yes, very much so.  In our
14   culture, even to this day, although it is better
15   accepted, it was frowned upon.  It was considered a
16   disgrace, especially as a daughter.  So, yes, it was
17   a consistent source of friction between not only my
18   mother, but my grandmother as well.
19        Q.   And do you remember when it was that Azizi
20   and Azikiwe were born?
21        A.   Yes, Azizi was born in Jamaica.  I remember
22   the fact that she was pregnant and she was a
23   Rastafarian and she was pregnant for this gentleman
24   that they did not consider worthy, again, just
25   created major issues.
```

4887

```
 1        Q.   And how did Sonia -- how was Sonia as a
 2   mom?
 3        A.   She was an amazing mom.  She embraced
 4   motherhood.  She started being more focused about
 5   things, and whenever you spent time with her she had
 6   them with her.  She very much took to motherhood.
 7        Q.   Do you remember when it was -- at some
 8   point in time did you move to Canada to be with your
 9   mom?
10        A.   Yes.
11        Q.   How old were you then?
12        A.   Sixteen.
13        Q.   And -- 16?
14        A.   Sixteen, yes.
15        Q.   And did Sonia come to Canada as well?
16        A.   Not at that time.  She came, I would say,
17   maybe a year and a half, two years after.  It did
18   not work well.  They fought a lot, and she decided
19   that it was just not worth it, because she was
20   thinking of coming to Canada and living, but the
21   long-term visit did not go well.
22        Q.   When you say they fought a lot, who fought
23   a lot?
24        A.   My mom and Sonia.  My mom and Sonia about
25   Richard, my mom and Sonia about her hair, my mom and
```

4888

```
 1   Sonia about pretty much her entire lifestyle.
 2        Q.   What was the issue with her hair?
 3        A.   She was a lock.  She was a dreadlock, and
 4   again, that was not a good thing.
 5        Q.   And did she talk to you about her
 6   relationship with -- "she" meaning Sonia, talk to
 7   you about her relationship with Richard?
 8        A.   Yeah.  At that point it had become
 9   love/hate relationship.  She loved him, she thought
10   the world set in him, but she was not happy with his
11   role as father.  She was not happy with his role as
12   man of the family, if you want to put it that way.
13   So at that point, yeah, they had started to fight a
14   lot.
15        Q.   And did you come to learn that Richard was
16   involved in drug dealing?
17        A.   Yeah.
18        Q.   And how did you hear about that?
19        A.   Sonia told me.  She had had yet another
20   blowout, and I had come to visit.  She was in New
21   York at that point and I had come to visit and I'd
22   asked where Richard was and she had told me that he
23   had been arrested.  And I was shocked.  For what?
24   And she told me that that was the reason and some of
25   the fights they had been having was because of his
```

4889

```
 1   lifestyle.
 2        Q.   Now, did you also visit her in Bridgeport?
 3        A.   Yes.
 4        Q.   So when you visited her in New York, was
 5   this before she had moved to Bridgeport?
 6        A.   Yes.
 7        Q.   After -- do you remember when it was that
 8   Azibo was born?
 9        A.   Yes.  I have another sister on my paternal
10   sister and she was pregnant along with Sonia.  It
11   was just the way it worked out that every time one
12   was pregnant the other one was, so I actually had
13   two nephews that year, because the third child is
14   the same age as Jumbo.  I'm sorry, Azibo.
15        Q.   Now, did Sonia talk to you about why she
16   stayed in Bridgeport?
17        A.   I don't know if we ever talked about why,
18   but I know that economically at one point she could
19   not move.  There just was not enough money.  It just
20   was not feasible.  Even when she started the
21   business, it just was not feasible for her to pack
22   up the boys and move to New York at that time.  If
23   there were any other reasons I was not aware of
24   them.
25        Q.   How often were you seeing Sonia or talking
```

4890

1   to her, let's say, after she moved to Bridgeport and
2   up to the time of her death?
3     A.  I would say we would talk no less than once
4   a month.  I saw her -- I did most of the travelling
5   at that point because I only had one child, it was
6   easier for me to come than for her to visit, and I
7   would say five, six times a year.
8     Q.  And how did you learn about Sonia's death?
9     A.  I got a phone call from a gentleman, an
10   official in Florida, to tell me that she had passed,
11   she had been drowned and they needed verification of
12   certain things about her.
13     Q.  And did you attend -- were you and your mom
14   able to attend the funeral?
15     A.  Yeah, I came up.  I left Canada -- I'm
16   sorry.  I left Canada the next day and came to New
17   York.  My mom and the rest of the family came at
18   varying degrees along the way, and we buried her the
19   Tuesday following.
20     Q.  And did you see Azibo at that time after
21   his mom had died?
22     A.  Yeah.
23     Q.  And how did he respond to that?
24     A.  He was -- Azibo then was a very stoic
25   little boy and he was as stoic as you could expect

4891

1   him to be.  Not a lot of tears, just a lot of anger
2   and a lot of withdrawing from us.  The other boys
3   cried more.  He just -- he just -- he wanted to be
4   by himself.  Until the funeral day.
5     Q.  And what happened on the funeral day?
6     A.  My sister spent most of her adult life as a
7   12 Tribes of Israel.  And towards the end --
8     Q.  Your sister Sonia?
9     A.  My sister Sonia, sorry.  And towards the
10   end she had started to talk about changing faith,
11   which I guess for us would be like being a Catholic
12   and becoming a Pentecostal.  And so she was going to
13   change to Nyahbinghi.  And that is where she was at
14   the time she died, she went down to Florida for a
15   gathering.  Anyway, they don't believe, the
16   Nyahbinghis don't believe looking on the dead.  So a
17   friend of hers had the boys removed from the actual
18   service, but when we got to the grave site the
19   consensus was we would honor the Nyahbinghi at the
20   service but we would honor the 12 Tribes at the
21   gravesite, so the boys were then allowed to see
22   their mom.  And as she was being lowered, we saw the
23   first real emotions out of Jumbo.  I'm sorry, Azibo.
24   He let out this wail that just would have sounded --
25   I don't think I would ever forget it, I still hear

4892

1   it in my head.  And he dove for the coffin.  He
2   wanted to go down with his mother.  And varying
3   uncles and friends grabbed him and then he got away
4   and he took off.  And they went after him.  And I
5   think for me at that moment I watched him shatter,
6   and as far as I'm concerned he has never actually
7   come back from that moment.
8     Q.  Is there a reason that after -- well, do
9   you know where the boys went after Sonia's death?
10     A.  They were a little disjointed.  They were
11   with friends.  Jumbo spent a little bit of time with
12   us in Canada, and after that they were living, all
13   three of them, with a friend of their father's, a
14   female friend, but they were bounced around a little
15   bit for a while after.
16     Q.  And is there any particular reason that --
17   well, let me ask you:  Did you later learn that
18   Azizi had been shot?
19     A.  Yeah.  That was another phone call.  A year
20   hadn't even quite gone by and then we heard that
21   Azizi was almost killed and on touch and go for a
22   couple of days.  To say the least, not a great time
23   for me.
24     Q.  And is there a reason that after Azizi was
25   shot that your family was -- was your mother in a

4893

1   position to --
2     A.  Well, for us in Canada we would have needed
3   the children to be signed over to her -- us.  My
4   mother was willing to take them.  But at that point,
5   by the time all of this had gone down, Azizi was now
6   18 and he had taken over guardianship of his
7   brothers.  And so he did not want to do this.  Their
8   father did not want them that far away, and so our
9   hands were kind of tied.  There wasn't a lot we
10   could do about it from our side unless we had the
11   cooperation over here.
12     Q.  And after that, did you basically lose
13   track of your nephews?
14     A.  On and off.  I would ask about them and I
15   would -- you know, over the years I made friends
16   with some of the Israelites, so I would go to the
17   headquarters and I would ask about them.  So I would
18   get little snippets of information.  But no, they
19   had pretty much gone into the woodwork, and I had no
20   real contact again in terms of personal hands on
21   contact after.
22     MR. SHEEHAN:  I have no further
23   questions, your Honor.
24       THE COURT:  All right, shall we take
25   lunch at this time, half an hour lunch and then we

4894

```
1   will return.  Ms. Corcho, if you'll return in a half
2   hour, please.
3               (Jury exited the courtroom.)
4           THE COURT:  All right.  Ms. Corcho,
5   please don't discuss your testimony with anyone and
6   be back at 1:30 and we'll finish your testimony.
7   All right.  Thank you.
8               We'll stand in recess.
9               (Recess)
10          THE COURT:  All right, let's bring in
11  the jury.
12              (Jury entered the courtroom.)
13          THE COURT:  You may proceed, Ms.
14  Rodriguez-Coss.
15  CROSS-EXAMINATION
16  BY MS. RODRIGUEZ-COSS:
17      Q.   Ms. Corcho, I just have a few questions for
18  you.  So the defendant never lived in Jamaica; is
19  that correct?
20      A.   As far as I know he was staying there for a
21  period of time, but I do not know the length of
22  time.
23      Q.   In Jamaica?
24      A.   Yes, but not in terms of living there for
25  years.  I know he was there for extended visits.
```

4895

```
1       Q.   Do you know how old he was when that
2   happened?
3       A.   At one point he was -- I would say maybe
4   about six, but, again, that's a long time ago, I
5   don't remember.
6           THE COURT:  Could you speak into the
7   microphone.
8       A.   I'm sorry, I don't remember the exact age,
9   but he was fairly young.
10      Q.   So, you recall him having visited Jamaica
11  at the age of six, but he never lived in Jamaica,
12  right?
13      A.   Not for any length of time that I know of.
14      Q.   And the problems that Sonia experienced
15  with Richard while she was still living in Jamaica,
16  that was before he was born; is that correct?
17      A.   They started before he was born.
18      Q.   Right.  And when your sister came to Canada
19  and stayed with you for that extended stay, that was
20  before the defendant was born also?
21      A.   Yes, at that point Azibo was not born.
22      Q.   So, your sister finally moved to the United
23  States at some point; is that correct?
24      A.   Yes.
25      Q.   And do you recall when that was?
```

4896

```
1       A.   No, at that point Azizi was born, I want to
2   say Azikiwe was born as well, but, again, I was a
3   lot younger then and I didn't keep track of the
4   timeline.
5       Q.   Right.  So would it be fair to say when
6   your sister first moved to the United States you
7   didn't see her very often, you were already living
8   in Canada?
9       A.   Yes, when she first moved.
10      Q.   You didn't see each other?
11      A.   We didn't see each other that often.
12      Q.   Were you there when the defendant was born?
13      A.   Was I physically there?
14      Q.   Yes.
15      A.   No.
16      Q.   And shortly after the defendant was born
17  the mom separated from Richard Aquart; is that
18  correct?
19      A.   Yes.
20      Q.   Do you recall how old the defendant was
21  when that happened?
22      A.   Very young.  Maybe two or three.  Again, I
23  just remember him being young, but agewise I don't
24  know the exact.
25      Q.   Right.  And she, your sister Sonia, started
```

4897

```
1   a business while she was living in Bridgeport; is
2   that correct?
3       A.   Yes.
4       Q.   And what sort of business was that?
5       A.   It was called Ital Pamper.  She had decided
6   that all these wonderful ladies with beautiful
7   dreadlocks needed someplace to take care of their
8   hair naturally.  She was quite an entrepreneur.  She
9   was the first person who thought of importing shea
10  butter.  She loved hair.  If your hair was natural,
11  that was what she specialized in.
12      Q.   Do you recall when she started that first
13  business in Bridgeport?
14      A.   The boys were relatively young.  Maybe
15  five, six years before she passed.  Somewhere in
16  that timeline.
17      Q.   Five or six years before she passed?
18      A.   Yeah, somewhere in that timeline.
19      Q.   And she did well for herself in that
20  business?
21      A.   Not as well as she hoped.  She went into it
22  expecting the community that she had dedicated her
23  life to would have supported her.  Unfortunately for
24  whatever reason she did not get community support,
25  but it was relatively successful, but not as she
```

**GA1267**

4898

1 projected in her business plan. But she did fairly
2 well.
3     Q. Enough to support herself?
4     A. Yeah. She still needed help, but yes, she
5 was.
6     Q. And you said that the defendant came to
7 stay with you for some time after his mother passed;
8 is that correct?
9     A. Yeah, for that first summer we had him for
10 a bit.
11     Q. That first summer you had him for a little
12 bit?
13     A. Yeah.
14     Q. And then did I hear you correctly, you
15 really haven't seen him since?
16     A. No, I've seen him, but that close contact
17 where I had a home base, his mom was there, this was
18 someplace I felt at home and I could walk in, I
19 could reprimand him, I no longer had that.
20     Q. I see.
21     A. In terms of having full contact with him
22 and then it just petered out.
23     Q. It just petered out. So when was the last
24 time you saw the defendant before it petered out?
25     A. After Azizi was shot was the last time I

4899

1 physically spent any time with him.
2     Q. After Azizi was shot. And so you spent
3 time with him where?
4     A. We were here in Connecticut and I came out
5 for just a weekend and I saw, well, I won't say -- I
6 saw him and his brother, and it was not pleasant
7 because at that point my mother and Azizi were not
8 on speaking terms. It was not a pleasant visit.
9     Q. And after that is when things petered out
10 and you had lost contact?
11     A. No real personal contact just through word
12 of mouth.
13     MS. RODRIGUEZ-COSS: We have no further
14 questions.
15     Q. Thank you for your responses. We have no
16 further questions.
17     THE COURT: All right.
18     MR. SHEEHAN: Thank you. I'm all set.
19     THE COURT: All right. Thank you,
20 Ms. Corcho. Thank you. You are excused.
21     Will you please call your next witness.
22     MR. SMITH: Your Honor, may I approach
23 just briefly before we call the next witness.
24     THE COURT: Yes.
25     (Sidebar conference)

4900

1     MR. SMITH: Your Honor, this witness is
2 going to discuss some of the criminal acts and
3 arrests of Richard Aquart. This next witness, Mike
4 Adams. He doesn't obviously know all of the details
5 about the arrests. I'm planning to introduce some
6 records. I could either just introduce all of the
7 records now before we put him on the stand and go
8 through them, or I could do it with him, although
9 he's not a person who can authenticate the records
10 or anything. Some of them are records we've
11 gathered in regards to Richard Aquart's criminal
12 history.
13     THE COURT: And how does the
14 circumstances of these crimes relate to the
15 defendant?
16     MR. SMITH: Well, Mr. Adams would talk
17 about the fact that Richard Aquart was arrested, he
18 was dealing drugs.
19     THE COURT: Okay, but --
20     MR. SMITH: He was on the run.
21     THE COURT: But where is the nexus with
22 Mr. Aquart?
23     MR. SMITH: Well, your Honor, it is
24 Mr. Aquart's father and he was around and -- it
25 wasn't as if Mr. Aquart was completely -- it wasn't

4901

1 as if Mr. Azibo Aquart had zero contact with Richard
2 Aquart through these years after the separation of
3 the parents.
4     THE COURT: That's fine, but the
5 testimony doesn't show -- that nexus becomes hard to
6 understand how it relates or impacts the defendant.
7     MR. SMITH: I can introduce them at the
8 end of the testimony if the Court would think that's
9 more appropriate. Mr. Aquart, at one point was
10 jailed and deported and, therefore, thereafter, no
11 longer --
12     THE COURT: Is this when he was living
13 with the family or not?
14     MR. SMITH: Not living with the family,
15 your Honor.
16     THE COURT: But seeing the family.
17     MR. SMITH: It was not like a complete
18 break. I know that's what the government thinks is
19 happening here, but it's not a complete break.
20     MS. DAYTON: The other thing about the
21 documents, your Honor, is there is a rap sheet and
22 then there is certified convictions and we don't see
23 the purpose of the certified convictions going in if
24 the rap sheet is going in or vice-versa because it
25 makes it look like, you know, these people, they're

4902

1  not calling Department of Corrections person to
2  testify as to what this is.  It looks like there is
3  a --
4          MR. SMITH:  Your Honor, I guess the
5  government can argue that the criminal history is
6  not as bad as we're trying to make it out.
7          THE COURT:  So the question is does the
8  rap sheet encapsulate all of these convictions?
9          MR. SMITH:  No, there were convictions
10 in New Jersey that are not contained in the
11 Connecticut rap sheet, your Honor.  In addition, the
12 convictions are important, your Honor, they're
13 necessary to show because it's not clear from the
14 rap sheet that Mr. Aquart at one point was convicted
15 and then absconded from sentencing, and was on the
16 run essentially from the law, while -- but was still
17 in the Bridgeport area.
18         MS. DAYTON:  I don't actually understand
19 how you prove this is him.  There is nothing here
20 that says this is Richard Aquart, the one from New
21 Jersey, and the government objects to it going in.
22 I just got these, your Honor.
23         THE COURT:  Do you think that it makes
24 sense, since the next witness can't authenticate any
25 of these anyhow, to leave the admission and

4903

1  admissibility of these records to another point so
2  we can get through the witness?
3          MR. SMITH:  We could, your Honor, we
4  could save it, but I think this is an appropriate
5  time to bring these records in, either before or
6  after his testimony.
7          THE COURT:  But they're not made -- how
8  do they relate to his testimony if he doesn't know
9  about the specific convictions?
10         MR. SMITH:  Your Honor, I think it's
11 absolute -- this witness may not himself know about
12 all of the specific convictions, but he will talk
13 about some of the arrests and eventually
14 deportation, et cetera.  But Mr. Aquart, Richard
15 Aquart's criminality is absolutely relevant.
16         THE COURT:  That's fine.  All I'm saying
17 is can't we take this witness and his testimony and
18 deal with the objections that the government has to
19 the documentary evidence of that?
20         MR. SMITH:  We could do it afterwards,
21 your Honor.
22         I take it you have no objection to the
23 photo.
24         MS. DAYTON:  No, it's a lovely photo.
25         (Sidebar concluded).

4904

1          MR. SMITH:  Your Honor, the defense
2  would call Mike Adams.
3          THE COURT:  All right, Mr. Adams, that's
4  the witness stand.  If you will kindly go over
5  there, remain standing and raise the your right
6  hand.
7          M I C H A E L   A D A M S
8  Having first affirmed, was examined and testified as
9  follows:
10         THE WITNESS:  My name is Michael, last
11 name is Adams, last name is spelled A-d-a-m-s, and
12 from Raleigh.
13         THE COURT:  You may proceed.
14 DIRECT EXAMINATION
15 BY MR. SMITH:
16     Q.   Is that Raleigh, North Carolina?
17     A.   Yes, it is.
18     Q.   Mr. Adams, how long have you lived in North
19 Carolina?
20     A.   I've been in North Carolina now 15 years.
21     Q.   Before that where did you live?
22     A.   I lived in Connecticut.
23     Q.   And specifically what town did you live in?
24     A.   I lived in Bridgeport.
25     Q.   What do you currently do for a living?

4905

1      A.   I am an administrator.  I own and operate a
2  facility for mentally disabled and mentally ill
3  individuals.
4      Q.   And when you were in Connecticut what did
5  you do for work?
6      A.   I worked for AIC, Alternative Incarceration
7  in Stamford.
8      Q.   And what is AIC?
9      A.   Alternative -- it was an alternative
10 program for individuals that were -- would otherwise
11 have been incarcerated.
12     Q.   And what did the program do for these
13 individuals?
14     A.   We supervised them in their ability of
15 seeking jobs, of seeking activities to stay out of
16 the street and out of the activities that they had
17 involved themselves in to get into trouble.
18     Q.   What level of education did you obtain?
19     A.   I have a Bachelor's degree.
20     Q.   And in what subject matter?
21     A.   In psychology.
22     Q.   Okay.  Did there come a time when you met a
23 Richard Aquart?
24     A.   Yes, sir.
25     Q.   I'm going to show you a photo.  I don't

4906

1  believe the government has any objection to it.  It
2  is Defendant's Exhibit G.  Do you recognize that
3  photo?
4      A.   Yes, I do.
5      Q.   And who is that?
6      A.   That is Richard Aquart.
7      Q.   Do you know where that photo was taken?
8      A.   It was taken at an institution that he was
9  incarcerated.
10      Q.   And you know the defendant here, Azibo
11  Aquart?
12      A.   Yes, I do.
13      Q.   And what name do you know Azibo by?
14      A.   I've known him as Jumbo all of his life.
15      Q.   Okay.  And what name did you know Richard
16  Aquart by?
17      A.   I knew Richard by Johnny.  When I first met
18  him as Johnny, and then got to know him as --
19  probably didn't know him as Richard until the latter
20  part of our relationship.
21      Q.   You called him Johnny?
22      A.   Yes.
23      Q.   And when did you meet Richard?
24      A.   I met him in the late '70s, early '80s.
25      Q.   And how did you meet him?

4907

1      A.   I met him through a gentleman that we both
2  referred to as Uncle Henry.  And Uncle Henry was a
3  carpenter, a master carpenter or technician that did
4  work on houses and knew how to do a whole lot of
5  things and a lot of skills.
6      Q.   And did Uncle Henry do work for you?
7      A.   Yes, he did.
8      Q.   Did you own property in Bridgeport?
9      A.   Yes.
10      Q.   And where did you own property?
11      A.   I owned property in Bridgeport, and he was
12  very instrumental in showing me and teaching me how
13  to do different things to the property and keeping
14  the cost down and keeping the property up.
15      Q.   And were these rental properties?
16      A.   Yes, they were.
17      Q.   And did that include at some point owning a
18  rental property on Stratford Avenue?
19      A.   Yes.
20      Q.   And did you start any business dealings
21  with Richard Aquart?
22      A.   Richard and I had developed a plastic
23  recycling business.  We were tied in with a company
24  called Lephant [ph] Electronics which re -- I'm
25  going to say recycled or remanufactured phones.  And

4908

1  the phones that got scrapped we ran an operation
2  where we would strip the wiring naturally for its
3  value and we would chip the plastic and break the
4  plastic down into different classifications so it
5  could either be sold for PC plastic or a higher
6  grade plastic.
7      Q.   And when you first met Richard, did you
8  meet Azibo's mother or brothers?
9      A.   When I first met Richard I met him and I
10  really didn't know that he had a family at first.  I
11  met him and we got to be acquainted and knew each
12  other.  And just one day he said out of the blue
13  that he was working on a house over on Adams Avenue,
14  and he had said to me that he had to get the house
15  ready because he said mom and the kids are coming.
16  I said, "Mom and the kids?"  So, you know,
17  naturally, eventually, met his wife and the kids.
18      Q.   How long after you met Richard did you meet
19  them, do you think?
20      A.   How long after?
21      Q.   How long after you met Richard did you meet
22  Sonia and the kids?
23      A.   Within weeks that they were here.
24      Q.   But I mean after the first time you met
25  Richard and were introduced to him and then the time

4909

1  you met Sonia and the kids?
2      A.   Oh, within a year.  It was within a year
3  span.
4      Q.   And when you first met Richard were you
5  aware he was engaged in anything illegal?
6      A.   No, I didn't.
7      Q.   Did you later become aware he was engaged
8  in illegal activity?
9      A.   Long -- yes, down the road.  I can't tell
10  you exactly how long, but I did know that he was
11  very charismatic, very intelligent individual and
12  had no idea he had any dealings with anything
13  illegal or otherwise.  Didn't find that out until
14  way later.
15      Q.   So, whatever his dealings with illegal
16  stuff he kept private, at least initially?
17      A.   Yeah, he was a private individual.  And he
18  was the kind of person that everybody loved.  I mean
19  he was -- you know, if there was to use the word
20  "don," I mean people in high political places knew
21  him, street people knew him, grandma knew him.
22  Everybody knew him and felt very safe with him, and
23  everyone, most of all, respected him.
24      Q.   And when you say don, you mean like Mafia
25  don?

4910

```
1      A.   When I say a don, I look at more of an
2   image of a person that kind of everyone looks up to
3   and gives respect to.
4      Q.   So, a man of the community?
5      A.   Right.  A man of the community, you know,
6   people felt safe around him just the fact that he
7   was there and, you know --
8      Q.   At some point you did become aware of his
9   illegal activity; is that right?
10     A.   Yes.
11     Q.   How did that happen?
12     A.   He had called and he had actually asked me
13  to bail him out of jail.
14     Q.   And did you do that?
15     A.   I did that.
16     Q.   How did you do that?
17     A.   I bailed him out of jail by putting up one
18  of my pieces of real estate.
19     Q.   And what was Richard doing that you became
20  aware of?
21     A.   He was -- I came to find out that he had
22  been arrested for selling marijuana.
23     Q.   And did you also come to learn whether
24  Richard was worried about immigration issues?
25     A.   Later on I did.  And it was later on in the
```

4911

```
1   fact that I think he had got arrested again and that
2   was when the immigration -- I became aware of the
3   fact that he had some immigration concerns.
4      Q.   And were you aware of whether he was using
5   any other names?
6      A.   Yes, I then understood that he had used
7   other names, and that's where his issue was.  And
8   like I said, I didn't find out that he was Richard
9   Aquart until that time.
10     Q.   And what other names were you aware of that
11  he had?  Or that he used?
12     A.   He had been known as, like I said, Johnny
13  Donovan at one point.  And I'm not really familiar
14  with other names, but I knew that there were other
15  names.
16     Q.   And did Richard have properties that he
17  used to further his drug business?
18     A.   Well, he had properties.  He had properties
19  that I knew that he rented out and he had properties
20  that I can't say positively that I knew whether he
21  had people working out of them or not.  But he did
22  have other properties.
23     Q.   Were you aware of a house on Adams Street
24  at one point?
25     A.   Yes, I was.
```

4912

```
1      Q.   What was happening at Adams Street as far
2   as you were aware?
3      A.   As far as I was aware it was a house where
4   he lived, his family lived, and that's all I've ever
5   known it to be.
6      Q.   What -- did Richard have a reputation at
7   all in regards to his ability to be violent?
8      A.   He didn't have a reputation as a violent
9   person, but he had a reputation as a stern person.
10  He said what he meant, he meant what he said, and
11  people respected him.
12     Q.   Would they maybe sometimes fear him as
13  well?
14     A.   Perhaps some fear.
15     Q.   Were you aware of a time where Richard was
16  owed some money by someone?
17     A.   Yes.
18     Q.   And did Richard attempt to get the money
19  back?
20     A.   I didn't know exactly how much it was, but
21  I knew it was a sizable amount of money, and what he
22  did was, he had -- this individual, he had asked for
23  this individual on a number of occasions to come and
24  be accountable as far as the money that was owed.
25     Q.   And was this illegal money, as far as you
```

4913

```
1   were aware?
2      A.   I don't know.  I don't know whether it was
3   illegal money or what type of debt it was.  I just
4   know that the way he dealt with it was he poured
5   some gas at this guy's front door and took a book of
6   matches and stuck one match in the air and pushed it
7   under the door.
8      Q.   And that was the message?
9      A.   That was the message.
10     Q.   Did Richard get paid?
11     A.   As far as I know he did.
12     Q.   What was your impression of Sonia around
13  this time?
14     A.   A very strong individual.  Very strong,
15  very much mother, momma.
16     Q.   And what was her relationship with Richard
17  like?
18     A.   They had a rocky relationship in the aspect
19  that they didn't always get along.  And throughout
20  this I found myself as the communicator.
21     Q.   Sort of a go-between?
22     A.   Exactly.
23     Q.   Why weren't they getting along?
24     A.   I don't know all of the personal things
25  that took place between a husband and a wife, but I
```

4914

```
1   do know that Richard had other relationships, and
2   the knowledge of those other relationships had
3   become known from time to time, and I'm assuming
4   that -- well, I know it created problems.
5       Q.   Between he and Sonia?
6       A.   Right.
7       Q.   And at any point were you helping Sonia
8   with the kids?
9       A.   Well, at one point in time the kids lived
10  on Capital Avenue and I owned a flower shop on Main
11  Street, so it's about a block away.  So I was in,
12  you know, I was in communication with the kids on a
13  daily basis in the aspect they would come home from
14  school, come through the flower shop.  They would
15  sometimes work, help keep it clean.
16           I had a program in the flower shop where
17  it was called tabletoppers where we delivered
18  flowers to restaurants and the kids would come and
19  they would ride with me in the afternoon to deliver
20  the flowers and set up the flowers on the tables,
21  and they would help me on holidays like Valentine's
22  Day, Easter, Mother's Day, flower holidays.  We had
23  street locations.  So I had, you know, a good
24  relationship with all of the kids.
25       Q.   Was Sonia around a lot at this time?
```

4915

```
1       A.   She was around.  And I mean, like I said,
2   you know, she was mother, but there were times she
3   had -- at one point she had a beauty salon that she
4   was involved in and it kept her away from the house.
5   And so there were times where the kids were -- you
6   know, that she wasn't there to create structure,
7   but, you know, the kids maintained.
8       Q.   And where was the beauty salon?
9       A.   It was in New York.
10      Q.   So, she was travelling there?
11      A.   She was going back and forth, yes.
12      Q.   Were there periods of time she was gone?
13      A.   Yes.
14      Q.   Would this be days sometimes?
15      A.   Sometimes.
16      Q.   And who was left in charge of the kids?
17      A.   Azizi was primarily in charge to make sure
18  everyone got out, went to school, that they got, you
19  know, that they had food.  I kind of put myself in
20  the position of an overseer to make sure that they
21  never -- that there was never a time that they
22  didn't have food and that they didn't have things
23  that they really had -- really needed or really
24  needed to have.
25      Q.   How old do you think Azizi was around this
```

4916

```
1   time?
2       A.   He was a young teen.  I can't give you
3   exact, you know, his exact age at the time, but I
4   know he was a young teen.
5       Q.   And what was Azibo like around this time?
6       A.   He was -- well, when Azibo was younger he
7   had -- his preference was to be up under momma.
8   She -- you know, he felt comfortable there.  A lot
9   of times when the kids would go elsewhere or would
10  do other things, he would prefer to be around the
11  house.  There were times when I felt at the time
12  that he had, say, a temper tantrum.  You know, it
13  was -- a lot of times that was brought on by the
14  fact that if mother -- if Sonia wasn't there, then
15  he had to take orders from Azizi, and, you know, a
16  child ruling another child is not always the best
17  issues.
18           So we've had times where when he would
19  get mad he might leave the house, and we spent time
20  going to look and find out where Azibo would be or
21  what might -- you always think the worst.  I can't
22  let him get hurt.  So everybody just got into it,
23  knowing if he got upset that he might leave, he
24  might take off, he might -- you know, we were always
25  on alert for that.
```

4917

```
1       Q.   And how old was he around this time?
2       A.   I'm going to say from four -- I've known
3   him all his -- I've known him up until the time he
4   was 12 I was around.  So, I'm going to say at the
5   time he was anywhere from four to six, seven years
6   old.
7       Q.   And was Sonia able to sort of calm him down
8   when he would have --
9       A.   She had a way.  She definitely had the
10  ability to talk to him, to soothe him, to calm down.
11      Q.   And when there were issues at home, how
12  would Sonia handle that?  I mean, is it something
13  she would take care of at home or would she seek
14  outside help?  How would that work?
15      A.   Well, issues as far as?
16      Q.   If she had issues with the kids.
17      A.   She would deal with it.  She was a strong
18  individual.  She would deal with it.  She would
19  discipline the kids.  She didn't have any problems
20  with that, and she would deal with that.  I mean,
21  from time to time she would bring it to Richard's
22  attention if something took place or he needs to
23  speak to one of them about something, but she would
24  deal with it.
25      Q.   And what if anything happened, say, at
```

4918

```
1    school with one of the kids?
2        A.   Well, really, I mean, in particular she was
3    the kind of person that if there was a problem in
4    school, if Jumbo had a bad day in school, she would
5    be there the next morning.  She would go directly to
6    the school if he came home with a note and she'd
7    deal with it.
8        Q.   And, but would she want anyone coming to
9    the house?
10       A.   That was the purpose.  Her purpose was she
11   didn't want social workers around.  She didn't want
12   people snooping into their life.  She didn't want
13   people to deal with their lifestyle or to, you know,
14   bring questions about.
15       Q.   And why not?
16       A.   Well, just in the fact that she -- there
17   would be times that she wouldn't be there and she
18   didn't want, you know, people to pass judgment on
19   that.  And I guess, you know, whatever lifestyle or
20   whatever, she just didn't want that oversight and
21   that vision on her life.  So she did what she had to
22   do to keep that away.
23       Q.   At some point did the older boys, Azizi and
24   Azikiwe, go to live with Richard?
25       A.   Yes.
```

4919

```
1        Q.   And where was Richard at the time?
2        A.   He was in Hartford.
3        Q.   And was Jumbo still seeing his father at
4    this time?
5        A.   Yeah, Jumbo would.  Jumbo would go, but
6    Jumbo wouldn't stay the length of time that they
7    would stay.  In other words, he might go and stay
8    the weekend and go back.  But for a couple of
9    reasons.  One, the -- usually -- I mean, Azizi and
10   Azikiwe felt that they had a little bit more freedom
11   when they were around dad, so picking on Jumbo would
12   be a little bit more accessible.  So, you know,
13   staying out of the way of that, a lot of times he
14   would choose not to be where they were at.
15       Q.   At some point did Richard have an apartment
16   on Linwood Avenue in Bridgeport?
17       A.   Yes.
18       Q.   And what was happening at the apartment?
19       A.   There was drug activity.
20       Q.   And were Azizi and Azikiwe around that?
21       A.   Yes.
22       Q.   And what were they doing?
23       A.   At one point they had taken part in running
24   the operation.
25       Q.   And they were how old, do you think?
```

4920

```
1        A.   Teens.
2        Q.   Were there any firearms there, too?
3        A.   Yes.
4        Q.   And were Azizi and Azikiwe, did they have
5    access to those firearms?
6        A.   Yes.
7        Q.   And was Jumbo around at that time as well?
8        A.   No.
9        Q.   Would he come visit?
10       A.   I'm sure he would come and visit and come
11   back and forth.  And I'm pretty sure he'd been there
12   and he had seen it, but I don't know how frequent he
13   would be there because, like I said, it wasn't a
14   situation I was there every day.  You know, I just
15   knew of it.
16       Q.   Did Azizi and Azikiwe look up to Richard?
17       A.   Yes.  They -- very much so.
18       Q.   What was their --
19       A.   Well, it was like, you know, child looks up
20   to their father.  You know, your father is --
21   Richard was a very -- is a very charismatic
22   individual, and when you see your father has that
23   kind of respect and stature and how people look at
24   him, you know, you want your father to feel that --
25   you know, to have a certain feeling about you, and
```

4921

```
1    they looked up to him.
2        Q.   And did Jumbo look up to him like that,
3    too?
4        A.   Yeah.
5        Q.   Did it seem like Jumbo wanted to be like
6    his father?
7        A.   I can't tell you that, you know -- I can't
8    tell you what his aspirations were, but I know he
9    looked up to him.  I remember seeing at that
10   particular time when he was younger Jumbo looked to
11   his father, I just want love, I want attention, I
12   want love, like most kids want.
13       Q.   Do you think he was getting much of that
14   from Richard?
15       A.   I don't think he got as much from his
16   father as he should have or as he wanted in the
17   aspect that his father was more on the tune of, you
18   know, you are going to grow up and be a man and you
19   are going to be strong and you are going to be this,
20   and he just kind of instituted that more than the
21   nurturing.
22       Q.   Was Azibo close to any of Richard's family?
23       A.   Richard, one of Richard's brothers, Paul,
24   had come here from Jamaica, and it was like magic.
25   It was like Jumbo just had a click.  They just
```

4922

1  clicked.  They communicated.  You know, you could
2  see a glitter in his eye and, you know, they had a
3  good relationship.
4      Q.  And when was Paul around from?
5      A.  Paul was around, I can't give you exact
6  dates.
7      Q.  That's okay.  Azibo was young at the time?
8      A.  Yes.
9      Q.  And what happened to Paul as far as you are
10  aware?
11      A.  He ended up going back to Jamaica and there
12  was an uprising in Jamaica and two of Jumbo's uncles
13  were killed in that uprising, and Paul was one of
14  them.
15      Q.  And how did Jumbo handle that?
16      A.  It was devastating.
17      Q.  Do you know -- you don't recall about how
18  old he was?
19      A.  You know, he had such a sadness about other
20  things, just kind of a downtrodden sadness.  I mean,
21  how can you measure someone's loss or their
22  depression.  So, I mean, I can't just, you know, I
23  just know that he was affected by -- well, affected
24  by it.
25      Q.  You had mentioned earlier when -- you were

4923

1  speaking about having property on Stratford Avenue
2  in Bridgeport.
3      A.  Yes.
4      Q.  What was that area like when you bought the
5  property?
6      A.  It was an enterprising place.  It was --
7  you know, there was a lot of traffic there, a lot of
8  people came there.  People would come for their
9  entertainment for food, culturally, stores.  There
10  was a lot of good things going on with it.
11      Q.  And did you witness any change in that
12  area?
13      A.  It deteriorated just like you would never
14  believe.  Just -- I mean, between shootings and
15  between drug traffic and between, you know,
16  businesses closing down.  It just changed.  It just
17  turned into -- I mean, it went from Hollywood to
18  horror.
19      Q.  And were the police trying to do anything
20  with that situation?
21      A.  They were, you know, starting to block off
22  streets and -- you never knew what was going to
23  happen next.  Because it got to the place where, you
24  know, it was just that -- it was a neighborhood that
25  I guess was in the midst of all of it, and so they

4924

1  just started making changes and just changed
2  everything.
3          MR. SMITH:  I don't have any further
4  questions, your Honor.
5          THE COURT:  All right,
6  cross-examination.
7          MS. DAYTON:  Thank you, your Honor.
8  CROSS-EXAMINATION
9  BY MS. DAYTON:
10      Q.  Good afternoon, Mr. Adams.
11      A.  Good afternoon.
12      Q.  How are you?
13      A.  Good mand yourself?
14      Q.  I'm well, thank you very much.
15          You were just talking about this particular
16  area of Bridgeport that deteriorated.  Was that
17  because of people selling drugs?
18      A.  Drugs was a part of it.
19      Q.  Selling crack?
20      A.  I will be honest with you, I didn't know
21  what was being sold.  I know that drugs was a part
22  of it, but I just knew population of people owning
23  their own homes and the healthy content of a
24  neighborhood left and a whole content of new people
25  came and just turned it into a nightmare.

4925

1      Q.  And you knew the defendant as a child?
2      A.  Yes.
3      Q.  And you haven't seen him basically since he
4  was a child, right?
5      A.  No.
6      Q.  Did you know his sisters Mandy, Mindy and
7  Sheba?
8      A.  No, I didn't.  I knew of them but I did not
9  know them.
10      Q.  Do you know where they were?
11      A.  Pardon me?
12      Q.  Did you know where they lived?
13      A.  To my knowledge I think in Florida.
14      Q.  So you knew Richard and Sonia?
15      A.  Yes.
16      Q.  And you knew Richard partly from playing
17  soccer with him?
18      A.  Playing soccer.  I loved reggae music.  We
19  would go to beaches, fish.  Did a lot of different
20  things together.
21      Q.  Were you involved in the 12 Tribes with
22  him?
23      A.  No, I wasn't.
24      Q.  From your description of Sonia, she was a
25  good parent, right?

**GA1274**

4926

1    A.   Yes.

2    Q.   You said she would discipline them,

3    correct?

4    A.   Yes.

5    Q.   And she could soothe them?

6    A.   Yes.

7    Q.   And she provided for them?

8    A.   Yes.

9    Q.   And Richard provided for them as well, too?

10   A.   Exactly.

11   Q.   Not perhaps the ideal parent, but he loved

12   his kids.

13   A.   Yes, definitely loved them.

14   Q.   And you mentioned that you went over to

15   Linwood Avenue.  How did you come about seeing drugs

16   and firearms in the house?

17   A.   Well, just in the fact that this particular

18   day I was looking for Richard and instead of finding

19   him I found the two kids there, and they were there

20   and firearms were there, and it was shocking.  It

21   was actually shocking because I felt that I had a

22   pretty close relationship with Richard and, you

23   know, something like that was going on, I thought

24   that, you know, someone would say something.

25   Q.   Did you say something?

4927

1    A.   Did I say something?

2    Q.   Yeah.

3    A.   I spoke to the oldest son, Azizi, at the

4    time.  I asked him, "Is this what you want?"  And we

5    never did get an answer, but I asked the question.

6    Q.   Did you speak to Richard?

7    A.   Yeah, I spoke to him about that.

8    Q.   What did he tell you?

9    A.   He didn't give me a direct answer and I was

10   kind -- kind of had an attitude about the fact of

11   not getting a direct answer, because if they were

12   there and whatever was going on, I felt that he

13   should either -- if he didn't know about it, he

14   should know about it, and if he did, you know, I

15   wasn't satisfied with his response.

16   Q.   So, you are not sure if that was Richard's

17   drugs and guns or if it was Azibo and Azikiwe's

18   drugs and guns?

19   A.   Exactly, exactly.

20   Q.   And the defendant wasn't there?

21   A.   Exactly.

22   Q.   Azizi was a smart kid, right?

23   A.   Yes.

24   Q.   He got in some trouble?

25   A.   Yes.

4928

1    Q.   But he went on to go to college?

2    A.   Yes.

3    Q.   And Azikiwe was kind of a bookworm also,

4    correct?

5    A.   Yes, ma'am, very much so.

6    Q.   But the defendant, he was a troubled child,

7    right?

8    A.   Yes.

9    Q.   Even before his mom died?

10   A.   Oh, yes.  As I explained, we've had many

11   days where if he lost his temper you could expect

12   you need to be in alert mode because you don't know

13   what might take place.

14   Q.   He had a bad temper?

15   A.   Yes.

16   Q.   He would run away a lot?

17   A.   He'd run away.  Kind of, if his mom wasn't

18   there, he had to do something to calm down because

19   once he got -- once his temper had gotten enraged,

20   calming down was the issue.

21   Q.   In fact, you described him as having a lot

22   of rage, right?

23   A.   Yes.

24   Q.   And that rage was very apparent?

25   A.   Yeah, if you knew them, yeah.  If you knew

4929

1    him, yes.

2    Q.   And you described him as it was almost like

3    dealing with a bull?

4    A.   Yeah.

5    Q.   That he would huff and puff and he wouldn't

6    calm down easily?

7    A.   Exactly.

8    Q.   And he not only showed rage with people,

9    but he mistreated animals, too, didn't he?

10   A.   I wouldn't say that he abused animals, but

11   he might play with them a little bit more firmer

12   than you would think, you know, that someone has.

13   So I've never seen him abuse an animal, but, you

14   know, just -- maybe a little bit firmer than he

15   would normally be.

16   Q.   Even as a child?

17   A.   As a child.

18   Q.   You said that he was pretty rough with

19   dogs, in particular you mentioned that.

20   A.   In particular one day a dog that his father

21   had, and my concern at that particular time was I

22   didn't know the temperament of the dog, so, and it

23   was on my property and I didn't know whether, you

24   know, would this dog turn and become -- you know, it

25   was a Doberman, but we'd never seen the dog be

4930

```
1   aggressive, but I didn't know.  You know, every
2   animal has their limit.
3      Q.   True.  And you knew that the defendant was
4   going to be a problem, you just didn't know where or
5   when, right?
6              MR. SMITH:  I object to that
7   characterization.
8              THE COURT:  I'll sustain the objection.
9   Would you rephrase.
10     Q.   Did you believe that the defendant was
11  going to get himself in some serious trouble?
12             MR. SMITH:  I'm going to object.
13  Speculation.
14             THE COURT:  Overruled.
15             This is at the timeline that you knew
16  him were you thinking anything along those lines.
17     A.   I was actually feeling that if at some
18  point he didn't seek help or help didn't find him,
19  that there could be some problems.
20     Q.   And this is even before his mom died you
21  thought this, correct?
22     A.   Yeah.  I mean because it was -- the temper
23  was known.
24     Q.   And, in fact, isn't it true that you
25  weren't shocked to hear that the defendant was
```

4931

```
1   involved in a triple homicide?
2              MR. SMITH:  I'm going to object.
3              THE COURT:  Sustained.
4              MS. DAYTON:  Can we approach on that?
5              THE COURT:  Just ask the next question
6   please.
7              MS. DAYTON:  That's --
8              THE COURT:  That's your last question?
9              MS. DAYTON:  Yeah.
10             THE COURT:  I'll see you.
11             (Sidebar conference)
12             THE COURT:  I'll hear your objection in
13  full.
14             MR. SMITH:  Your Honor, asking
15  someone -- she's basically asking about prediction
16  of behavior of Mr. Aquart.  He has no --
17             THE COURT:  That's not what the question
18  is.  The question to which you objected was were you
19  surprised when you learned he had been arrested for
20  a triple homicide.
21             MS. DAYTON:  Involved.
22             THE COURT:  Involved in a triple
23  homicide.
24             MR. SMITH:  Your Honor, what his
25  surprise is is irrelevant, whether he is surprised
```

4932

```
1   or not.  It's also prejudicial to the jury.  I'm
2   asking about the defendant's background, not
3   predictions about his behavior from other persons.
4              THE COURT:  Well, actually you are.
5   That's the whole purpose of your psychologist's
6   testimony, as I understand it.
7              MR. SMITH:  Your Honor, we're not
8   offering 12.2.
9              THE COURT:  No, no, that there is a
10  relationship between childhood privation and
11  criminal activity.  If that's not predictive I don't
12  know what is.
13             MR. SMITH:  I understand, your Honor.
14             THE COURT:  Okay.  What is your -- can
15  you rephrase that question?  What are you getting
16  at?
17             MS. DAYTON:  That he expected that the
18  defendant -- that he -- exactly what I said, he told
19  me that he was not shocked to hear that the
20  defendant was involved in a triple homicide because
21  based upon the defendant's behavior before his
22  mother died he was so rage filled.  I think it's
23  relevant.  And they're putting on Marva Lewis to
24  talk about predictors and --
25             THE COURT:  So you are going to ask him,
```

4933

```
1   A, did he learn about this, and when he learned
2   about it what was his response, if anything.
3              MS. DAYTON:  I'm cross-examining him.
4   Why can't I say "you weren't surprised."  It's not
5   my witness, your Honor.  I don't have to ask him an
6   open-ended question.
7              THE COURT:  I'm trying to get not -- I'm
8   trying to have your witness not be commenting about
9   the crime itself.
10             MS. DAYTON:  He's not, he's commenting
11  about --
12             THE COURT:  I'm focusing on the
13  defendant.
14             MS. DAYTON:  I am.  I am.  Were you
15  shocked the defendant was involved in this?  That's
16  a direct on the defendant.  That's not were you
17  shocked to hear a triple homicide occurred in
18  Bridgeport.  It's the defendant's involvement.
19  That's exactly what I'm asking him about
20  specifically.
21             MR. SMITH:  Your Honor --
22             MS. DAYTON:  They're literally calling
23  Marva Lewis who has never met the defendant to talk
24  about predictors of negative behavior as an adult
25  from stuff that happens when they're a child.  Every
```

4934

```
1   person he's putting on, it has nothing to do with
2   the defendant, for the most part it's about Sonia
3   and Richard and --
4           THE COURT:  Okay, okay, let's stick with
5   our issue at hand.  There is this -- the mitigation
6   evidence is all about the relationship,
7   predictability of his action as an adult from his
8   experience as a child.
9           MR. SMITH:  I don't know that.
10          THE COURT:  Why would this be
11  irrelevant?  Why would the testimony of someone who
12  knew him and heard -- learned that he had murdered
13  people or was involved in murders, why is that not
14  exactly in the track we're talking about?
15          MR. SMITH:  Your Honor, I don't know
16  that it's -- let me think about this for a moment.
17  I think it's a situation of, yes, it's possible that
18  childhood violence is going to lead to that.  I
19  don't know that this witness is going to be able to
20  comment the childhood violence is related to this.
21          THE COURT:  No, she's not talking about
22  childhood violence, she's talking about his
23  character.  And the character that he observed that
24  he's described.  I mean, I think it's a proper
25  question if it is framed in the context of what he
```

4935

```
1   knew and had observed about the defendant as a boy.
2           MS. DAYTON:  That's how it was phrased.
3           MR. SMITH:  It was phrased as are you
4   shocked.  Maybe we should ask him how he felt.
5           MS. DAYTON:  I don't have to ask him how
6   he felt, I'm on cross-examination.
7           THE COURT:  Look, just try to stick with
8   the program a bit here.  Would you please ask that
9   in several questions and not just were you shocked
10  to learn, just you learned about it, what was your
11  reaction when you learned about it.
12          MS. DAYTON:  But here is the thing, your
13  Honor, that is such a general question.  I'm not
14  asking a general question.  You know, he might say I
15  was upset by the three people who died, he could say
16  a lot of things.
17          THE COURT:  And then you can follow up,
18  were you shocked by this.
19          MS. DAYTON:  Fine.
20          (Sidebar conference.)
21  Q.   Sorry about that, Mr. Adams.
22  A.   Okay.
23  Q.   So, did there come a time when you learned
24  that the defendant had been arrested for involvement
25  in a triple homicide?
```

4936

```
1   A.   Actually not.  Well, there came a time, but
2   it was when I was contacted.
3   Q.   Recently?
4   A.   Recently.
5   Q.   And when you were contacted and heard that
6   he had been involved in a triple homicide, convicted
7   of it in fact, what was your reaction?
8   A.   I think even though -- I think it was you,
9   we talked on the phone.
10  Q.   You spoke with someone from the government,
11  yes.
12  A.   Right.  I was more surprised that Azikiwe
13  was involved.  And I really didn't have any thoughts
14  about, you know, my concerns about his -- about his
15  rage or what could have caused it or any of those
16  things did run across my mind, but I didn't have any
17  other feelings with that.
18  Q.   You weren't surprised to hear that the
19  defendant was involved in this?
20  A.   I was surprised that both of them were
21  involved, but I was more surprised about Azikiwe
22  than Jumbo.
23  Q.   Well, isn't it true you said before you
24  weren't surprised to hear that the defendant had
25  been involved in a triple homicide based upon the
```

4937

```
1   rage that he exhibited as a child?
2   A.   As I recall, what I believe was I was more
3   surprised that Azikiwe was involved in anything like
4   that and I wasn't -- I can't say that I wasn't -- I
5   didn't expect that from him.  I can say I didn't
6   expect that.
7   Q.   Right?
8   A.   But I was just saying that knowing that he
9   had a rage, that's something that could have created
10  that.
11  Q.   Thank you very much for answering my
12  questions.
13  A.   You are welcome.
14          THE COURT:  All right, redirect.
15          MR. SMITH:  Thank you, your Honor.
16  REDIRECT EXAMINATION
17  BY MR. SMITH:
18  Q.   Mr. Adams, as you said something to
19  Ms. Dayton just now, you said if he didn't find help
20  or if help didn't find him, meaning Azibo?
21  A.   Right.
22  Q.   What did you mean by that?
23  A.   Just in the fact that, I mean, we all have
24  issues, we all have problems, but sometimes certain
25  issues and certain problems we have, we know at some
```

**GA1277**

4938

1  point in time that something is going to come out of
2  it.
3      Q.   And you talked before that Sonia wasn't
4  particularly interested in having anyone help her,
5  right?
6      A.   Exactly.
7      Q.   And you, yourself, have seen the difference
8  that intervention for people can make, correct?
9      A.   Yes.
10     Q.   Because you ran the AIC program.
11     A.   Yes.
12     Q.   Lots of troubled kids.
13     A.   Yes.
14     Q.   Some of them with anger issues.
15     A.   Yes.
16     Q.   And did your program help them?
17     A.   Programs do help.  I mean, if I can
18  identify -- if I can identify what causes something
19  to happen, people can redirect their anger.  They
20  can redirect things that caused them to become
21  angry.
22     Q.   Thank you very much.
23          MS. DAYTON:  Nothing further.  Thank
24  you, your Honor.
25          THE COURT:  All right, thank you,

4939

1  Mr. Adams, you may step down.  You are excused.
2          THE WITNESS:  Thank you.
3          MR. SHEEHAN:  Your Honor, our next
4  witness is Desta Meghoo.
5          MS. RODRIGUEZ-COSS:  Your Honor, can we
6  approach before Ms. Meghoo, it was?
7          THE COURT:  Yes.
8          (Sidebar conference)
9          MS. RODRIGUEZ-COSS:  Your Honor, we
10  understand that the witness is here to testify as a
11  family friend, someone who knew the mother before
12  she had passed.  Ms. Meghoo currently runs a
13  foundation out of New York that works with children
14  from Jamaica, Africa, and so forth.  It's been
15  represented to us by the defense that's not the
16  content of her testimony.  We would object to any
17  questioning into that area of her background.  In
18  other words, we would ask it be limited to her
19  knowledge of the defendant's family and her
20  knowledge of the defendant.
21          THE COURT:  Well, can't the jury know
22  what she's doing now?  Everybody gets asked where
23  they work, where they used to work, what their
24  schooling was, to identify the witness.
25          MS. RODRIGUEZ-COSS:  Well, I guess where

4940

1  they work, what her schooling was may be relevant,
2  but I would object to any further diving into the
3  foundation and the work that they do and so forth
4  because, as far as we're concerned, the defendant
5  was never a part of that foundation, never part of
6  any of those programs.  In fact, I think it
7  developed well after the mom passed away.
8          THE COURT:  What's --
9          MR. SHEEHAN:  I don't know what they're
10  talking about.  The point is she works, she lives in
11  Ethiopia.  I can put on what she does in Ethiopia.
12  I can put on her background.
13          THE COURT:  I think you can.
14          MS. RODRIGUEZ-COSS:  But to what extent?
15          THE COURT:  What you don't need is a
16  full program analysis of all her programs.
17          MR. SHEEHAN:  Do you know what?
18          THE COURT:  Is that what you are
19  intending?  Just tell me what you are intending.
20          MR. SHEEHAN:  No, no.
21          THE COURT:  Okay.  Is she from Addis
22  Ababa.
23          MR. SHEEHAN:  She's from Addis Ababa.
24          (Sidebar concluded)
25          THE COURT:  All right, Ms. Meghoo, would

4941

1  you please stand and raise your right hand and the
2  oath will be administered to you.
3          D E S T A   M E G H O O
4  Having first affirmed, was examined and testified as
5  follows:
6          THE WITNESS:  Desta Meghoo, M-e-g-h-o-o,
7  Addis Ababa.
8  DIRECT EXAMINATION
9  BY MR. SHEEHAN:
10     Q.   And where is Addis Ababa?
11     A.   It's in Ethiopia.
12     Q.   And how long have you lived in Ethiopia?
13     A.   Since July 2005, six years.
14     Q.   And what kind of work do you do in
15  Ethiopia?
16     A.   I'm a development consultant.
17     Q.   And what does a development consultant do?
18  What do you do as a development consultant?
19     A.   I work with various organizations and
20  institutions on various things from expanding
21  markets to community development and outreach.
22  Using the arts to relay messages, social messaging
23  for youth and children, such as HIV and ending
24  violence against women and other social issues.
25     Q.   And are you involved in other initiatives

4942

1  in Ethiopia?
2      A.    Yes, we have an initiative called the
3  Children's Village where we care for children who
4  are orphaned or homeless, or what they call OVC,
5  otherwise vulnerable children, and we basically
6  provide support for feeding, clothes and school
7  means and other means.
8      Q.    Prior to moving to Ethiopia what kind of
9  work did you do?
10     A.    Prior to that I was the managing director
11 for the Bob Marley Foundation.  I was the managing
12 director.
13     Q.    And when did your association with the
14 Marley family start?
15     A.    In 1987, '88.
16     Q.    And what did you do on behalf of the Marley
17 family?
18           MS. RODRIGUEZ-COSS:  Your Honor, we
19 would raise the issue we raised at sidebar at this
20 point.
21           THE COURT:  Overruled.  In general
22 terms.
23     Q.    Yeah.
24     A.    At that time I did management.
25     Q.    What did management consist of?

4943

1      A.    Artist management for Rita Marley, Bob
2  Marley's wife.  As an artist I would negotiate
3  contracts, book her tours, anything affiliated to
4  her musical career.
5      Q.    And what is your education -- what is your
6  educational background?
7      A.    I have a Bachelor's degree in business and
8  professional management and a juris doctorate law
9  degree.
10     Q.    When did you get your law degree?
11     A.    I got my law degree in '90 -- 2000.  2001,
12 sorry.
13     Q.    And how -- prior to living in Ethiopia
14 where did you live?
15     A.    I lived in Ocala, Florida.
16     Q.    And how long were you there from?
17     A.    From 1994 to 2005.
18     Q.    And before Ocala where in Florida did you
19 live?
20     A.    I lived in Coral Springs.
21     Q.    Okay.  And when did you first move to Coral
22 Springs?
23     A.    I moved to Coral Springs in 1992.
24     Q.    And are you a -- is your religious faith
25 Rastafarian?

4944

1      A.    It is.
2      Q.    And is it of a particular group of the
3  Rastafarian religion?
4      A.    Yes, I am.
5      Q.    And could you tell us what group that is?
6      A.    It's called the Nyahbinghi.
7      Q.    Now, let me ask you, did you -- have you
8  ever -- when did you first meet Azibo's mother,
9  Sonia?
10     A.    Approximately 1990 -- 1988.
11     Q.    And where did you meet her?
12     A.    I met her in New York City in Harlem.
13     Q.    And what was she doing at that time?
14     A.    At that time she had a business called Ital
15 Pamper where she was providing cosmetic care and
16 health care for people with dreadlocks or natural
17 hair.
18     Q.    And where were you living at that time?
19     A.    At that time I was also in Harlem.
20     Q.    And what were you doing there?
21     A.    I was doing management, artist management.
22     Q.    Was that also associated with Rita Marley
23 or was that other artists as well?
24     A.    Other artists as well.
25     Q.    How often would you go to Ital Pamper]?

4945

1      A.    As often as possible.  Possibly once a
2  month, and at times she would travel with me.
3      Q.    And --
4            MS. RODRIGUEZ-COSS:  I'm sorry, Counsel.
5  I didn't hear.
6            MR. SHEEHAN:  Once a month.
7            THE COURT:  "And at times she would
8  travel with me."
9            MR. SHEEHAN:  To Ital Pamper.
10     Q.    And did you know from Sonia whether she had
11 children at that time?
12     A.    Yes.
13     Q.    And how many children did she have?
14     A.    When we first met there were four -- or
15 three, the three boys when we first met.
16     Q.    And those three are, what are their names?
17     A.    Azizi, Azikiwe and Azibo.
18     Q.    And did you ever visit with Sonia in
19 Connecticut?
20     A.    No, I did not.
21     Q.    And did you know who the boys' father was?
22     A.    Not personally, no.
23     Q.    Did you know him as Richard Aquart?
24     A.    Yes, I did.
25     Q.    And had Sonia described her relationship

4946

```
1    with Richard to you?
2         A.   Briefly.
3         Q.   And how did she describe that?
4         A.   As a scenario that was not as productive as
5    she would want, she would like as a mother and as a
6    woman.
7         Q.   What was the problem she was telling you
8    about?
9         A.   The nature of his lifestyle.  His
10   activities that he was associated with.  And more
11   importantly, always emphasizing the children, that
12   she wanted, you know, a better life for her
13   children, and this is why she had opened her shop
14   and was working on some of the projects she was
15   working on.
16        Q.   You mentioned the nature of his lifestyle.
17   Did she tell you what she was concerned about about
18   his lifestyle?
19        A.   Not in great detail, but clearly, it was
20   not legal activity.
21        Q.   Okay.  And what kind of -- did she tell you
22   what kind of illegal activities he was involved in?
23        A.   No.
24        Q.   Is it fair to say she was a fairly private
25   person?
```

4947

```
1         A.   Yes.
2         Q.   Now, you also mentioned that she was
3    concerned about her children.  What concerns did she
4    tell you about her children in these early days?
5         A.   Well, as a working mother trying to provide
6    the best for her children, she was concerned about
7    their education, concerned about opportunities,
8    concerned about even their behavior.  You know, at
9    times when they would spend time away from her, just
10   wanted to put them in the best environment possible.
11        Q.   Did you -- did there come a time then that
12   you became closer friends with her?
13        A.   Yes, around '91, '92 we became very close.
14        Q.   And did you spend time together,
15   concentrated time together with her?
16        A.   That was, again, in the early '90s, and by
17   then I was in Florida because I first moved to Fort
18   Lauderdale, North Lauderdale, rather, in '91 and she
19   started visiting me there in Florida.
20        Q.   And did you travel together in Jamaica as
21   well?
22        A.   Yes, in '92 we did.
23        Q.   And how long did you spend together there?
24        A.   Jamaica, probably about two weeks in
25   Jamaica.
```

4948

```
1         Q.   And by that time how many children did
2    Sonia have?
3         A.   Six.
4         Q.   And how many children did you have?
5         A.   Seven.
6         Q.   And what were the -- as far as the age
7    range of her children compared to your children, how
8    did that fit in?
9         A.   Almost identical.
10        Q.   And did that, because you had this number
11   of children together, did that create anything
12   between you?
13        A.   Absolutely.  There was a very special bond.
14   And I, too, after the seventh child was
15   transitioning, going through a divorce with my
16   husband.  And again, I moved to Florida, away from
17   New York City to try to get a better life and
18   planned to go back to school and so forth.  So, we
19   shared a lot.  And again, being both very private
20   women, it was important to have this confidante that
21   you could share this information with and just
22   advise each other, help each other.
23        Q.   And when you met her, you indicated by
24   that -- well, I'm sorry, when you travelled together
25   when you became closer, by that point she had six
```

4949

```
1    children.  You mentioned the three boys.  What were
2    the other the three children?
3         A.   Three girls.
4         Q.   And were those from a different father than
5    Richard Aquart?
6         A.   Yes, they were.
7         Q.   And what was her relationship -- did she
8    describe to you her relationship with that person?
9         A.   Yes.
10        Q.   How did she describe it?
11        A.   Generally abusive.
12        Q.   And did she give you any specifics about
13   that?
14        A.   Again, private person, but she did.  You
15   know, there was one particular incident that was
16   outstanding where she was punched.  And beyond that,
17   there was a lot of verbal abuse, verbal abuse.  And
18   that punch was during a pregnancy actually.
19        Q.   And did she have other problems -- did she
20   describe other problems with him other than what, as
21   far as the relationship was concerned?
22        A.   Again, most of, most of all of our
23   conversations were on how to get out, how to be a
24   better woman, a better provider for the family,
25   therefore, less reliance or dependence on the
```

4950

1  fathers of the children.
2      Q.   Okay.  Now, you indicated that you were
3  transitioning at that time and at the same time she
4  was talking about transitioning.  Were there
5  differences in your situation and hers?
6      A.   Yeah, I had a great support system around
7  me.  She was pretty much on her own.  You know, mom
8  and siblings and so forth were not in the country.
9  And although I was divorcing, my husband was
10  supporting the children and it was not a volatile
11  relationship.  So, the support system was a big
12  difference between us I believe.
13      Q.   Did she talk to you at all about her
14  relationship with her family in Canada?  Or Jamaica,
15  for that matter?
16      A.   Again, you know, our conversations would be
17  one percent of the challenges or the problems, and
18  the rest of the time was spent trying to figure out
19  how to fix it.  So beyond knowing vaguely that she
20  had left home at a very early age and had a lot of
21  dreams and aspirations, I didn't get a lot of the
22  details.  And again, I came into her life at the
23  latter part.  I didn't even know any of the family
24  members and so forth.
25      Q.   Now, when was this that you actually first

4951

1  met the boys, meaning Azibo, Azikiwe and Azizi?
2      A.   The first time spending time with them she
3  brought them to my home in '94, May '94.
4      Q.   And what was -- did you form an impression
5  at that time about Azibo?
6      A.   Yes.
7      Q.   And what was that?
8      A.   He was a lively little boy that needed a
9  lot of attention.
10      Q.   And was he big for his age?
11      A.   Oh, yes, hence the name Jumbo.
12      Q.   Now, was Sonia concerned -- did Sonia
13  express concerns to you about Azibo?
14      A.   Yes.
15      Q.   And what did she tell you?
16      A.   Well, in school he wasn't as focused, he
17  would, you know, get into trouble and so forth.  And
18  there was also the sibling rivalry.  He was the
19  third of, you know, the three boys, and so, you
20  know, you are rivaling for attention.  So, she was
21  very concerned.  And the concern also stemmed from
22  the fact that she knew how bright, you know, he was,
23  and she saw the potential, but he was a handful.
24      Q.   And did she talk to you about her own
25  efforts to kind of balance her business and take

4952

1  care of her children?
2      A.   Absolutely.  Absolutely.  And like most
3  working mothers, you know, the juggling and children
4  are in school and you are doing, you know, work and
5  so forth, it was a very big concern because she
6  adored, not loved, she adored her children.  You
7  know, and they were beautiful, bright.  They were
8  good children.
9      Q.   Did she have -- did she tell you about
10  whether she had backup and support when she was at
11  work in New York?
12      A.   Not really.  You know, obviously you have
13  community members and extended family, because even
14  with the Rastafarian community we all consider
15  ourselves brothers and sisters to some degree, but
16  the consistency that was required was just not
17  there, it was not available.
18      Q.   Did Sonia express concerns about Richard's
19  influence on her children?
20      A.   Yes.
21      Q.   And what did she say?  What did she tell
22  you about that?
23      A.   She wanted the children to have a chance to
24  get an education and have a better way of life.  You
25  know, that's what was emphasized, getting these boys

4953

1  educated, you know, and having a better way of life.
2      Q.   And how did that conflict -- or did that
3  conflict with what she saw as Richard's influence?
4      A.   Yes.
5      Q.   And in what way did it conflict?
6      A.   Well, I would think, because, again, like I
7  said, I don't know Mr. Richard, I don't know, I
8  never met him, but it appeared to me that she wanted
9  the children to get an education, get professions,
10  and have an opportunity that did not involve --
11  involve the kind of risks that their dad was
12  involved in.
13      Q.   And did she tell you what that was?
14      A.   Again, as I mentioned before, you know,
15  illegal activity.
16      Q.   And did she tell you what kind of illegal
17  activities he was involved in?
18      A.   Not specifically, no.
19      Q.   Now, in May of '94, is that the time that
20  Sonia came with the boys to your house?
21      A.   Yes.
22      Q.   And what was the circumstances of that?
23      A.   We had an international Rastafarian
24  gathering where elders and delegates in the movement
25  from around the world had gathered at an Indian

4954

```
1   reservation in Florida.
2        Q.   And were you and Sonia talking about plans
3   at that time about her leaving Connecticut?
4        A.   Yeah, absolutely.  From the very first
5   visit actually, you know, she was very interested
6   and we were discussing, and I was telling her how my
7   transition had been, being down there with the seven
8   children, and my the husband still being in New
9   York.  So yes.  And part of bringing the boys down
10  was to see how they would adjust and assimilate in
11  the environment.
12       Q.   And did you have an impression as to
13  whether this was an important point in Sonia's life
14  or not?
15       A.   Absolutely.
16       Q.   And what was your impression about that?
17       A.   Absolutely.  I felt that she had made the
18  decision that indeed she's going to move and it's a
19  matter of the logistics.  And even when she left and
20  the boys were with me, that's one of the things we
21  discussed, let's see how the boys and the family get
22  along and how they like it here, so forth.  So yes,
23  she was.
24       Q.   And in that short visit did you have reason
25  to be optimistic as to how that would be?
```

4955

```
1        A.   Oh, yes.
2        Q.   And then after that gathering concluded,
3   did Sonia depart -- you were at Coral Gables at the
4   time?
5        A.   Coral Springs, yes.
6        Q.   And did Sonia go somewhere?
7        A.   Yes, she went to American Beach near
8   Jacksonville, Florida.
9        Q.   And what was the reason for her going to
10  American Beach?
11       A.   There was a festival there and she had just
12  developed some new hair products and she wanted to
13  go and sell the products and promote her business.
14  Any opportunity for festivals she always took
15  advantage, so she went for that purpose.
16       Q.   And that was on Memorial Day weekend in
17  '94?
18       A.   Yes.
19       Q.   And did you subsequently get a phone call?
20       A.   Yes.
21       Q.   About what happened there?
22       A.   Yes.
23       Q.   And what were you told?
24       A.   I was asked to come and identify --
25  identify her body.  Because I had all the children
```

4956

```
1   and it was about five hours drive, I had to identify
2   the body over the phone.
3        Q.   So, they asked you to identify her body
4   over the phone?
5        A.   Yes.
6        Q.   And was it your responsibility to tell her
7   children about that fact?
8        A.   Yes.
9        Q.   How did the boys react to that news?
10       A.   Three almost completely different
11  reactions.  Azizi, as big brother, tried to go into
12  management mode.  Azikiwe, I remember he just
13  started eating and eating.  He just wouldn't stop
14  eating.  He was eating everything.  And Azibo, I
15  would just say shock.  Just say shock.
16       Q.   Do you remember how the boys got back up to
17  Connecticut?
18       A.   I think they flew.  Do you know, after the
19  ID everything is really blurry.  I think we flew up.
20       Q.   And did you come back up to Connecticut for
21  the wake?
22       A.   Yes.
23       Q.   Now, are wakes part of the Nyahbinghi
24  tradition?
25       A.   No.
```

4957

```
1        Q.   Did you bring the boys to the wake?
2        A.   I did.
3        Q.   And what happened at the wake?
4        A.   I sat in the van with my three smaller
5   children while the boys were in the wake.
6        Q.   And did you end up in some kind of a
7   confrontation at that point?
8        A.   The van was surrounded by several, I guess,
9   friends, friends of Sister Judah and they were --
10  well, I know that was one of the things, they
11  thought I had had the baby, because our daughters,
12  my seventh child and her daughter were the same age
13  and looked quite similar.  So they were getting
14  aggressive and, you know, I think they were also
15  very upset because she was with me when she drowned.
16       Q.   Did you meet Sonia's mother at the funeral
17  or after the funeral?
18       A.   Yes.
19       Q.   Had you expressed a willingness to take the
20  boys with you back to Florida?
21       A.   Yes.
22       Q.   What did her mom say to you?
23       A.   She said no.
24       Q.   And did she say why?
25       A.   She said it was her responsibility, it was
```

4958

```
1   her daughter and that she would take care of the
2   children.
3        Q.   And is that what ended up happening?
4        A.   No.
5        Q.   And did you learn what happened after that?
6        A.   Yes.
7        Q.   And what was that?
8        A.   The boys were basically on their own.
9        Q.   They were what?
10       A.   On their own.  You know, different members
11  of the family, the community tried to help at
12  different times, but these were three boys just on
13  their own.
14       Q.   Now, in the period of time that you knew
15  Sonia and then in your observations of the boys when
16  they were there in Florida, and thinking back on
17  your own experience as a mother, do you have an
18  opinion as to whether Azizi at that time had the
19  skills to be in charge of his younger brothers?
20       A.   No, he did not.  Not at all.
21       Q.   And did Azizi, do you have an opinion as to
22  whether Azizi had the skills to control in any way
23  his younger brothers' behavior?
24       A.   Not at all.  He was a teenager himself and
25  also devastated of the loss of his mother.  She was
```

4959

```
1   the one constant force in their life, one positive
2   example, constant positive example in their life,
3   and it's gone.  She's gone.
4        Q.   And did you later run into Azibo, see Azibo
5   again?
6        A.   In '95 I came up and I took them to
7   Toronto, we had another Nyahbinghi gathering there
8   and I took the boys there.
9        Q.   And what was your impression of him at that
10  time?
11       A.   It was just so good to see them, you know,
12  and when the family, you know, everybody was happy,
13  you know.  But clearly you could tell these are boys
14  that are just, you know, they're on their own.
15            MR. SHEEHAN:  I don't have any more
16  questions.
17            THE COURT:  Cross-examination.
18  CROSS-EXAMINATION
19  BY MS. RODRIGUEZ-COSS:
20       Q.   Do you need a moment?
21       A.   I'm okay.
22       Q.   Are you okay?  I just have a few questions.
23  So, when you went to Jamaica with your
24  friend Sonia in '92, I believe you said?
25       A.   Yes.
```

4960

```
1        Q.   The children went with her?
2        A.   No.
3        Q.   Okay.  So the children did not go with her?
4        A.   No.
5        Q.   You went by yourself?
6        A.   Correct.
7        Q.   Were your children with you?
8        A.   No.
9        Q.   I see.  So it was just the two of you on
10  vacation together?
11       A.   No, I was there working.  As I said, I was
12  representing Rita Marley and there was a Bob Marley
13  festival, so it was my responsibility to go down,
14  and I had been organizing.  So it was work.
15       Q.   Okay.  And the business that she owned in
16  New York where you -- I guess, you were a customer
17  of hers?
18       A.   I was.
19       Q.   That was her business?
20       A.   Correct.
21       Q.   Okay.  And you said that she talked to you
22  about the girls' father.  What was his name?
23       A.   Skibo.
24       Q.   Do you know his full name?
25       A.   No, I don't.  David.
```

4961

```
1        Q.   David ^ chk Skibo?
2        A.   I don't know his -- Skibo is the name that
3   he was called.
4        Q.   Do you think it was David Skibo?
5        A.   David was the first name and Skibo was the,
6   I guess you call it common name, or nickname.
7        Q.   I see.  So you don't know his last name?
8        A.   I don't.
9        Q.   Do you know the girls' last name?
10       A.   The girls, no.
11       Q.   And did you ever meet Skibo?
12       A.   I did.
13       Q.   How many times?
14       A.   Maybe three or four times.
15       Q.   Three or four times.  And where did you see
16  him?
17       A.   In Harlem.
18       Q.   At the beauty salon?
19       A.   Yes.
20       Q.   Was he helping out?
21       A.   No.  Sometimes he would bring the girls by
22  or pick the girls up, if, you know, she was in there
23  working and had the children.
24       Q.   So, the information that you have that the
25  relationship between Sonia and Skibo was somewhat
```

4962

```
1    abusive is only from Sonia?
2         A.    Correct.
3         Q.    You didn't see that?
4         A.    No.
5         Q.    Did you ever visit their home?
6         A.    No.
7         Q.    Do you know if that incident that you
8    described was reported to the police?
9         A.    I'm not sure.
10        Q.    Did you do anything else other than listen
11   to your friend about that?
12        A.    I asked at the time my husband, who had
13   also known him, because my husband was a physician
14   assistant in the Harlem area, if he felt it was
15   appropriate to maybe try and talk to him.
16        Q.    Did he?
17        A.    I don't know.
18        Q.    And just one last question.  You said that
19   you felt that Azizi was not equipped to assume the
20   guardianship for his two brothers, and you talked
21   about his lack of ability to control his younger
22   brothers' behavior.  What did you mean by that?
23        A.    A 18-yearold boy with no experience, no
24   support, just didn't have the skills or the
25   capacity.  Do you know, whether it's going to PTAs
```

4963

```
1    or following up with a child.  I mean, as a seasoned
2    parent it's difficult enough, but as a 18-year old
3    in that scenario.
4         Q.    So, you are drawing from your own personal
5    experience as a parent in your opinion, because you
6    had only met Azizi once at that point, right?
7         A.    Absolutely, once.
8         Q.    And so you'd only spent a few days with
9    him?
10        A.    That's correct.
11        Q.    And did you see any particularly concerning
12   behavior on the part of the younger brothers that
13   led you to that opinion?  Or is it just your general
14   perception of --
15        A.    I think it's both, because, again, you
16   know, I observed them, especially in the absence of
17   Sister Judah, they're playing and I, too, have
18   teenagers and it's not that they were abnormal,
19   these are kids going through, you know, what they're
20   going through.  And then at a devastating time line
21   that as well.  I didn't even have the faculties to
22   properly deal with it.
23        Q.    So your opinion is not based on specific
24   examples, but just your general perception of what a
25   18-year-old can and can't do?
```

4964

```
1         A.    My observation, yeah.
2              MS. RODRIGUEZ-COSS:  We have nothing
3    further, your Honor.
4              THE COURT:  Anything further?
5              MR. SHEEHAN:  No, thank you very much,
6    your Honor, I appreciate it.
7              THE COURT:  All right, thank you,
8    Ms. Meghoo.  Safe travel back.  You are excused.
9              Ladies and gentlemen, we're going to
10   recess for the day.  And reconvene tomorrow at 9:30.
11   Thank you very much.
12             (Jury exited the courtroom)
13             THE COURT:  All right, Counsel, we are
14   in recess until tomorrow at 9:30.
15             MR. SMITH:  Your Honor, 9:30 can we take
16   up the issue of Mr. Aquart's criminal records before
17   we begin or 9:15 if the Court wishes.
18             THE COURT:  I can't do it at 9:15.  We
19   will figure out a time to take that matter up.
20             MR. SMITH:  All right.  Thank you.
21             THE COURT:  But I would like to start
22   with a witness at 9:30.
23        (Proceedings concluded at 3:10 p.m.)
24
25
```

4965

```
1                   I N D E X
2    WITNESS                                      PAGE
3    LATIVIA WHITTINGHAM
4    Direct Examination by Ms. Rodriguez-Coss    4776
5    Cross-Examination by Mr. Sheehan            4812
6
7    ERICA WHITTINGHAM
8    Redirect Examination by Ms. Rodriguez-Coss  4812
9    Cross-Examination by Mr. Sheehan            4826
10
11   LILLIAN REID
12   Direct Examination by Mr. Sheehan           4831
13   Cross-Examination by Ms. Reynolds           4854
14
15   CAROL PORTER
16   Direct Examination by Mr. Sheehan           4857
17   Cross-Examination by Mr. Markle             4874
18   Redirect Examination by Mr. Sheehan         4882
19
20   MARIBEL CORCHO
21   Redirect Examination by Mr. Sheehan         4884
22   Cross-Examination by Ms. Rodriguez-Coss     4894
23
24
25
```

4966

```
 1   MICHAEL ADAMS
 2   Direct Examination by Mr. Smith          4904
 3   Cross-Examination by Ms. Dayton          4924
 4   Redirect Examination by Mr. Smith        4937
 5
 6   DESTA MEGHOO
 7   Direct Examination by Mr. Sheehan        4941
 8   Cross-Examination by Ms. Rodriguez-Coss  4959
 9
10         I certify that the foregoing is a correct
11   transcript from the record of proceedings in the
12   above-entitled matter.
13
14                  6/3/11
15                  Date
16
17              /S/  Sharon Montini
18              Official Reporter
19
20
21
22
23
24
25
```

4967

```
 1              UNITED STATES DISTRICT COURT
 2              DISTRICT OF CONNECTICUT
 3   * * * * * * * * * * *    *
                              *
 4   UNITED STATES OF AMERICA, * Case No 6cr160(JBA)
 5              Plaintiff,     *
 6        vs.                  *
 7   AZIBO AQUART             * June 3, 2011
 8              Defendant.     *
 9   * * * * * * * * * * * *   *
10              TRIAL TRANSCRIPT
11              VOLUME XXVI
12   BEFORE:  THE HONORABLE JANET BOND ARTERTON U.S.D.J.,
13                                        and jury
     Appearances:
14   FOR THE GOVERNMENT:   ALINA REYNOLDS, ESQ
                           TRACY DAYTON, ESQ.
15                         PETER MARKLE, ESQ.
                           JACABED RODRIGUEZ-COSS
16                         United States Attorney's Office
                           915 Lafayette Blvd
17                         Bridgeport, CT 06604
18
     FOR THE DEFENDANT     MICHAEL SHEEHAN, ESQ
19   AZIBO AQUART:         Sheehan & Reeve
                           139 Orange Street
20                         New Haven CT 06510
21                         JUSTIN SMITH, ESQ.
                           383 Orange Street
22                         New Haven, CT 06511
23
24   Court Reporter:     Sharon Montini, RMR
25   Proceedings recorded by mechanical stenography,
     transcript produced by computer
```

4968

```
 1         THE COURT:  Good morning, counsel.
 2         MR. SHEEHAN:  Your Honor, I wonder while
 3   we're waiting for Mr. Aquart to come down, I had --
 4   I prepared a copy -- the government already has
 5   these materials -- of Dr. Lewis's CV and a copy of
 6   the PowerPoint presentation and the various
 7   documents, that, among others, that she would rely
 8   on.  I would offer that up to the Court at this
 9   time.
10         THE COURT:  All right.
11         MR. SHEEHAN:  And then also for the
12   convenience of the Court, with respect to the motion
13   in limine regarding Efrain Johnson, I have the
14   copies of the 302s.
15         MS. DAYTON:  Are those all of them?
16         MR. SHEEHAN:  Yes.  I'll show the
17   government.
18         Actually, it's not.  It doesn't include
19   the drug -- I think there was one or two that were
20   solely, for example, on the drug buy.  But I think
21   this covers all of the statements.  And if the
22   government thinks there is more, I'm happy to submit
23   those.
24         Your Honor, I think that's all of them.
25   And I would just indicate to the Court that we do
```

4969

```
 1   anticipate Dr. Lewis being here for Monday, if that
 2   is --
 3         THE COURT:  And I understand the way you
 4   intend to present her testimony is by hypothetical
 5   based on the evidentiary record that you will have
 6   established by then.
 7         MR. SHEEHAN:  Yes, your Honor.  And
 8   actually, you know, Dr. Lewis, I think there may be
 9   a miss -- there may be a misconception, and if I
10   have contributed to that I apologize.  Dr. Lewis is
11   talking about risk and protective factors.
12   Dr. Lewis is not going to be asked to render an
13   opinion specific to Mr. Aquart.  Rather, what I'm
14   ultimately going to ask the jury, based upon the
15   knowledge that Dr. Lewis is sharing with them on
16   these risk and protective factors, I'm going to ask
17   the jury to apply that as well to the evidence in
18   this case.  The evidence in this case is going to
19   come from the witnesses.
20         THE COURT:  And when you say you are
21   going to ask the jurors to apply the -- Dr. Lewis's
22   knowledge, tell me more precisely what you mean.
23         MR. SHEEHAN:  Well, your Honor, I
24   think -- if I might.  I'm sorry, could I just reach
25   down here for a second?
```

4970

1        The Virginia Supreme Court opinion in the
2  Andrews case, your Honor, and I have it at page 33
3  of the LEXIS version, which I think would be 280 --
4  I'm sorry, 699 S.E. 2d. I find it hard to get
5  through these pages. I guess this is the LEXIS
6  version, your Honor, where they summarized the
7  testimony of --
8        THE COURT: I'm sorry, could you finish
9  up that cite, please.
10       MR. SHEEHAN: Yes, it's 280 VA231 at
11  298. And --
12       THE COURT: You had a Southeast cite, or
13  no?
14       MR. SHEEHAN: I have a Southeast cite
15  which is 699 Southeast2nd 237 at 275. And for some
16  reason when I just published it off LEXIS, I don't
17  know whether your Honor's chambers uses LEXIS or
18  West.
19       THE COURT: West.
20       MR. SHEEHAN: It came out on page 33.
21  But there they testified the testimony of Dr.
22  Caroline Berry, which was in many ways parallel to
23  what Dr. Lewis would testify in this case -- I do
24  have an extra copy.
25       THE COURT: I have it, thank you.

4971

1       MS. DAYTON: I'll take it.
2       MR. SHEEHAN: In that case, your Honor,
3  Dr. Berry's testimony was -- the Supreme Court of
4  Virginia held it was error to exclude Dr. Berry's
5  testimony. The Circuit Court had excluded her
6  testimony on the grounds that it was not admissible
7  inasmuch as it was not particularized to the
8  defendant in question, and that was held to be
9  error.
10       And I think the same is true in this
11  circumstance, that once the juror -- now, it is true
12  that some jurors may appreciate how risk factors
13  operate, but I don't think that is a matter of
14  generalized knowledge, and the studies that
15  Dr. Lewis relies upon in part, as well as her own
16  expertise in the area, is why her testimony becomes
17  relevant in this regard. What the jury will see is
18  that from the evidence in the case, and that
19  actually -- and indeed from many of the mitigating
20  factors that are claimed in this matter, they will
21  then be able to apply that to the circumstances of
22  the case.
23       I think that one of the arguments that we
24  heard, both in voir dire and ultimately what I think
25  some of the arguments that we may hear in the

4972

1  closing phase of the case, is the situation that,
2  well, he made these particular choices. Now,
3  Dr. Lewis is not going to say that Mr. Aquart made
4  choices or not because she's not involved directly
5  in -- she's not trying to say that he didn't make
6  choices. The criminal culpability in this matter
7  has already been established. But I think that the
8  case law, what the case law does establish is that
9  it is relevant mitigation.
10       THE COURT: So, how does -- let me turn
11  to the government. Is your claim actually a Daubert
12  claim? You seek a Daubert hearing?
13       Well, let me see. Well, my system has
14  failed. You had sought, I believed, a Daubert
15  hearing.
16       MS. RODRIGUEZ-COSS: Correct.
17       THE COURT: But the challenge is not to
18  Lewis's methodology, but the relevance of that
19  methodology as a mitigator. Isn't that right?
20       MS. RODRIGUEZ-COSS: Well, I think the
21  challenge is on both factors, your Honor. One is
22  the methodology. We've not been provided with any
23  prior testimony of Ms. Lewis. We have searched for
24  that, we've not located any. She appears to be new
25  to the capital litigation field. We're not aware of

4973

1  her having testified in a criminal capital case to
2  provide similar testimony, and quite honestly what
3  has been disclosed by the defense we understand is
4  not sufficient to establish that there is an
5  established field out there that shows that there
6  are these risk factors from which she can draw --
7       THE COURT: I'm not sure I understand
8  that argument since --
9       MS. RODRIGUEZ-COSS: I guess what the
10  government is trying to ascertain is whether what
11  Ms. Lewis would testify to would actually lead to
12  the conclusions she wants the jury to draw.
13       And there are two prongs to that
14  analysis, and one is does she meet the standard in
15  Daubert, and two, is it too general in the sense
16  that it doesn't relate to the defendant. Because
17  she hasn't interviewed the defendant, she hasn't
18  examined the defendant.
19       THE COURT: Right, and the -- the offer
20  is that the hypothetical to be put to her as the
21  basis for her opinion --
22       MS. RODRIGUEZ-COSS: Right.
23       THE COURT: -- will be based on the
24  evidence here.
25       MS. RODRIGUEZ-COSS: Right. And we

1  would object to a hypothetical being put to an
2  expert witness at the penalty phase because the
3  principle that stands behind the penalty phase is
4  one of individualized sentencing.  And so if she's
5  going to offer an opinion, we submit it must relate
6  to the defendant in this case.
7           In other words, if she meets the first
8  prong -- let's assume for sake of argument here that
9  the Court understands that she is a qualified expert
10  in the field of, I believe it is risk of violence to
11  juveniles.  Let's assume the Court concludes that
12  she can testify generally in that sense.  Then I
13  think the next prong is, well, how do we know that
14  those factors or those generalizations apply to this
15  particular defendant.  And I think that we can,
16  based on the record as is right now, we can say she
17  would not pass that standard.  She hasn't
18  interviewed him, she hasn't examined him.  She would
19  not be able to say or draw from concrete examples in
20  the defendant's background to say he fits the
21  paradigm.
22           THE COURT:  I need to stop you there
23  because that's exactly what a hypothetical does,
24  doesn't it?  And if a hypothetical is based on the
25  evidence presented here, that that then for an

1  expert's testimony becomes the bridge.
2           MS. RODRIGUEZ-COSS:  That was not the
3  opinion offered in writing to the government I
4  believe.
5           THE COURT:  I don't have any of that.
6  Is there something that you can share with me with
7  respect to what her testimony was described to be?
8           MR. SHEEHAN:  Well, I did file the
9  expert disclosure, your Honor, and I don't know --
10  if I might.
11           THE COURT:  Filed the expert disclosure
12  with the Court, or just with --
13           MR. SHEEHAN:  Yes, but it was under seal
14  at that point.  So I don't know if it ever got --
15  what I said, your Honor, I could just -- it's a
16  short paragraph.  I described Dr. Lewis's background
17  and the fact that her resume had been provided to
18  the government.  I indicated that she would testify
19  as a teaching expert on the subject of adolescent
20  risk and protective factors.  I referenced that she
21  did not examine the defendant nor did she review his
22  records.  I indicated that instead her opinions will
23  be related to the general topic of risk and
24  protective factors and the effect such factors can
25  have on adolescent development and violence.  I

1  indicated that she would testify based on her
2  experience and training as well as the conclusions
3  of numerous published studies dealing with
4  resiliency, risk and protective factors, and the
5  impact this has on human development.
6           I also provided the government with
7  copies of the materials that I just gave the Court
8  today, which included the PowerPoint presentation,
9  which also included the United States Department of
10  Justice, Office of Justice Programs, comprehensive
11  national survey on children's exposure to violence.
12           THE COURT:  So she's being offered as an
13  expert on adolescent risk and protective factors and
14  their impact on adolescent development.
15           MR. SHEEHAN:  Yes, your Honor.
16           THE COURT:  That's her expertise.
17           MR. SHEEHAN:  Correct.  And among other
18  things I've given them are the materials that she's
19  relied upon.  Frankly, I don't think there can be
20  any serious debate, but that risk -- that risk
21  factors have an impact.  Indeed, the government,
22  albeit wearing a different hat, has concluded the
23  same thing through the reports of the Department of
24  Justice as well as the Surgeon General's report, a
25  copy of which also is attached and provided to the

1  Court.
2           I think the question is -- the other
3  article was an article by Dr. Michael Schrader,
4  again, for the Department of Justice, in this area.
5  So I think really as far as their request for a
6  Daubert hearing, I think, A, it's -- they've
7  conflated a Daubert hearing with a voir dire on a
8  witness's -- on that particular witness's
9  qualifications.  That is not a Daubert issue.  And
10  they've also, your Honor, basically, really, are
11  attacking the notion, which is not -- I don't think
12  is subject to a Daubert hearing, the notion that
13  risk factors -- well, they're not challenging that
14  as far as I read it.  What they are saying is that
15  no matter what, as far as risk factors, even if
16  those risk factors do have an impact on adolescent
17  development, since Dr. Lewis did not examine
18  Mr. Aquart, her testimony is irrelevant to the jury.
19  And that's not a Daubert issue either.
20           THE COURT:  All right, we'll pick up
21  this argument later.
22           MS. RODRIGUEZ-COSS:  Can we just --
23           THE COURT:  Well --
24           MS. RODRIGUEZ-COSS:  Thirty seconds.
25           May we, your Honor, very briefly.  We were

4978

1   forced to file a Daubert motion because as the Court
2   can evaluate from the disclosure it's not sufficient
3   for the government to fully comprehend the nature of
4   this testimony.
5           Second, the question is even if she
6   passes the Daubert hearing do the risk factors have
7   an impact on this defendant.  And that only becomes
8   relevant if the expert can say I interviewed the
9   defendant, I interviewed family members and friends,
10  then I reviewed his record of conduct and I examined
11  the defendant and I can tell you the defendant was
12  impacted and affected by these risk factors that I
13  have generally found to exist.
14          And that is the greater objection to this
15  testimony, your Honor.
16          MR. SHEEHAN:  Your Honor, just briefly.
17  It is unusual when the government walks you into an
18  appellate mine field, and that's exactly what
19  they're asking the Court to do here.  Indeed, the
20  Virginia Supreme Court's most recent opinion is an
21  example of what happens if that argument prevails.
22  But I don't think that there is any support for
23  their claim on that regard.
24          THE COURT:  All right, thank you.
25          Who is the first witness for today?

4979

1           MR. SHEEHAN:  Azizi Aquart, your Honor.
2           With the Court's permission I'll just
3   have Mr. Aquart come in and sit down.  Would that be
4   okay, or do you want me to wait until the jury is
5   impaneled?
6           THE COURT:  No, that's fine.
7           Mr. Aquart, where were you during the
8   fire drill?
9           THE DEFENDANT:  I was locked in a cell
10  waiting to burn.
11          (Jury entered the courtroom.)
12          THE COURT:  Good morning, ladies and
13  gentlemen.  We had a little extra outing there
14  planned for you, or not so planned.  I can't tell
15  you what the origin of it was, but we could smell
16  it.  Please be seated.
17          All right then, we'll proceed with the
18  defense's next witness.
19          Sir, will you stand please, raise your
20  right hand and you will be sworn.
21          A Z I Z I   A Q U A R T
22  Having first affirmed, was examined and testified as
23  follows:
24          THE WITNESS:  Azizi J. Aquart,
25  A-q-u-a-r-t, and I reside in Bridgeport,

4980

1   Connecticut.
2           THE COURT:  You may proceed.
3   DIRECT EXAMINATION
4   BY MR. SHEEHAN:
5       Q.  Good morning again, Mr. Aquart.
6       A.  Good morning.
7       Q.  You are Azibo's oldest brother?
8       A.  Yes, I am.
9       Q.  Let me ask you, where were you born?
10      A.  I was born in Kingston, Jamaica.
11      Q.  And when was that?
12      A.  June 29, 1977.
13      Q.  And so you are four years older than Azibo.
14      A.  Yes, I am.
15      Q.  And you have a brother in between, one
16  other brother; is that correct?
17      A.  Yes, we do.
18      Q.  And what is his name?
19      A.  Azikiwe.
20      Q.  And who were your parents?
21      A.  My mother is Sonia Smith and my father is
22  Richard Aquart.
23      Q.  And were your parents active in -- were
24  your parents involved in the 12 Tribes religion --
25  faith?  I guess faith we will call it, right?

4981

1       A.  Yes, you would call it faith.  Yes.
2       Q.  And is that a group basically within the
3   Rastafarian tradition?
4       A.  Yes, it's one of the -- what we call
5   Mansions of Rastafari.  You refer to it as a church.
6   One of the churches of Rastafari.
7       Q.  And were your parents involved in that
8   before you were born?
9       A.  Yes, my mother actually sits on the bench
10  and my father helped find one of the original
11  chapters in Kingston.
12      Q.  And how old was your mother when you were
13  born?
14      A.  Sixteen, seventeen.
15      Q.  And how old was your dad?
16      A.  I believe in his early 20s.
17      Q.  And had your father had children prior to
18  you?
19      A.  Yes.
20      Q.  Now, was your mom still in school when she
21  had you?
22      A.  Yes, she was.
23      Q.  And was she able to complete her high
24  school?
25      A.  Yes, she did.

4982

1    Q.    Growing up, who did your mom live with?
2    A.    After the -- she lived with her father's
3 side of her family.  After his death she lived with
4 her older sister.
5    Q.    And did your mom get along with her mother?
6    A.    Yes and no.  Depending on what timeframe
7 we're talking about.  Yes.
8    Q.    Were there frictions between them over the
9 fact that -- was your grandmother Rastafarian?
10   A.    No, she was not.
11   Q.    And was that a source of friction between?
12   A.    That's right.
13   Q.    Between her and your mom?
14   A.    Yes, that's correct.
15   Q.    Now, did your father have family -- did
16 your father have a larger family in Jamaica as well?
17   A.    Yes, he did, several brothers and sisters.
18   Q.    And can you just tell us, in a nutshell,
19 just a very small version, what 12 Tribes is.
20   A.    12 Tribes is an organization based on faith
21 in African tradition and in the faith of Rastafarian
22 founded in Kingston, Jamaica, in the early '70s.
23 And basically is a Christian organization that has
24 Rasta and African traditions melded into it.  Myself
25 and my brothers and my family members have been

4983

1 members for at least 30 years, and it has grown to
2 have chapters throughout the country and throughout
3 the world.  We have several houses around the world.
4    Q.    And what was the --just again, in a very
5 short nutshell, what was the position of -- well, 12
6 Tribes, or Rastafarians in general, within Jamaican
7 society?
8    A.    At the time of my birth we were considered
9 more or less outcasts.  It was an alternative
10 lifestyle and it wasn't really something the
11 authorities or the population at large considered to
12 be good or positive at the time.  This was before,
13 you know, Bob Marley became what he is now.  So --
14   Q.    And were there struggles within Jamaica
15 between Rastafarians and others?
16   A.    Yes.  At that time it wasn't uncommon for a
17 dread to be held down and beaten in the street by
18 police officers, or for the practitioners of Rasta,
19 if you were known to be a practicer of Rasta, you
20 would lose your job, you'd be kicked out of school,
21 you would be kicked out of the family.
22   Q.    And the dreadlocks, is that a
23 characteristic of Rastafarians generally or 12
24 Tribes in particular?
25   A.    That is correct.  The locks signify a

4984

1 commitment or a vow between yourself and God, and
2 it's a very big feature in Rasta culture.
3    Q.    And is marijuana, does that occupy a part
4 in the Rastafarian faith?
5    A.    Yes, it does.
6    Q.    And in what way?  Just briefly.
7    A.    Used in spiritual practices, used in --
8 medicinal uses.  It's often referred to -- or a lot
9 of Rastas believe referred to in the Bible.  So,
10 therefore, they feel a deeper connection to God by
11 being associated with it.
12   Q.    Now, when did you first come to the United
13 States?
14   A.    In the early '80s.
15   Q.    And how old were you at that time?
16   A.    Under four.
17   Q.    And how did you get into the United States?
18   A.    As an illegal immigrant we came in using
19 false documents.
20   Q.    And do you remember how you came in
21 yourself?
22   A.    I came on an airplane through Kennedy
23 Airport, I believe it was.  I was dressed as a
24 little girl.
25   Q.    Had you made attempts to get papers to

4985

1 authorize you to visit here with your mother?
2    A.    My mother had.  My family had, yes, and we
3 were unsuccessful.
4    Q.    Do you know, did you come in with either --
5 when you first came to the United States, did you
6 come with either one of your parents?
7    A.    No, I did not.
8    Q.    And how was it that Azikiwe came to the
9 United States?
10   A.    He came with my mother at a later time from
11 Canada.
12   Q.    And about how long a period of time was it
13 between the time that you came and the time that
14 Azikiwe came?
15   A.    A matter of weeks or months.
16   Q.    And had your dad been to the United States
17 -- was your dad in the United States at the time
18 that you got here?
19   A.    When I arrived, yes.  I didn't arrive with
20 my father, I met him once I was here.
21   Q.    Okay.  And had he been in the United States
22 previously?
23   A.    To my knowledge, yes.
24   Q.    As a very young child, did you have an
25 understanding of what your father did for a living?

4986

1    A.   As a young child, no.
2    Q.   Now, when you came to the United States,
3 where did you first settle?
4    A.   We lived in New York, in Brooklyn.
5    Q.   And is there a center, a 12 Tribe center in
6 New York?
7    A.   Yes.  As a matter of fact, my mother help
8 found that out and she sat on the bench of that
9 house, the Brooklyn house, that was the original
10 location.  It later moved to Queens.
11    Q.   Were your friends and family circle at that
12 time, in your early youth, were they centered on
13 basically the 12 Tribes community?
14    A.   Honestly, they were the only people we had
15 day-to-day dealings with, or constant dealings with.
16 They were our only friends, our only family.
17    Q.   And when you first came to Brooklyn, where
18 did you live?
19    A.   Address-wise or with who?
20    Q.   With whom.  I'm sorry.  Well, I understand
21 you came here first, then at some point your mom
22 came.  And where did you live at that time as a
23 family unit?
24    A.   Well, we stayed with other brothers and
25 sisters from 12 Tribes of Israel.  We basically

4987

1 lived in multiple family apartments where several of
2 us would live in each room or each floor, share
3 beds, that kind of thing.
4    Q.   When you say you lived with other families
5 within your -- was that within the 12 Tribes
6 community again?
7    A.   That is correct, other brothers and sisters
8 from 12 Tribes.
9    Q.   And as you think back on it, in those very
10 early days, did your parents appear to get along
11 well?
12    A.   Yes.
13    Q.   Now, did there come a point in time when
14 you moved to Bridgeport?
15    A.   Yes.
16    Q.   And when was that?
17    A.   I would say about '80, '81.  Right before
18 the birth of my brother.
19    Q.   And do you remember where it was when you
20 first moved to Bridgeport, where you lived?
21    A.   Yes.  We lived in another community house
22 here in Bridgeport off of Stratford Avenue, and then
23 we got our own apartment after that.
24    Q.   Okay.  And at that time what was your mom
25 doing as far as work?  This is before -- if you

4988

1 remember, this would be before Azibo was born.
2    A.   I'm not quite sure.  She always had
3 something to do with nursing or working at the
4 hospital, but I'm not quite sure what she did for
5 work.  I was kind of young.
6    Q.   And what was the economic situation of your
7 family at that time?
8    A.   We were poor.  Relatively very poor
9 compared to the poor people around us.  We didn't
10 have clothes.  We shared clothes, we shared things
11 with our cousins.  Being that we were illegal, there
12 wasn't a lot of things that we could get or do
13 freely.  So, we struggled quite a bit.  We
14 struggled.
15    Q.   And did you learn at some point that your
16 father was involved in selling marijuana?
17    A.   Yes.
18    Q.   And when was it that you first became aware
19 of that?
20    A.   Probably five years old when people start
21 to come in and out of the house, when I start -- I
22 realize people are coming in and out of the house
23 and my father has a lot of friends.
24    Q.   And what was your father -- as far as your
25 understanding, in your father's marijuana business,

4989

1 was he dealing out of the house?  In those early
2 days how was he doing that?
3    A.   They would have something known as an herb
4 gates, which is a house or a place that they would
5 use to sell marijuana.  He had a separate residence,
6 a separate address in Bridgeport that he maintained.
7 And we called it Daddy's house, but really as an
8 older person I know that's where he sold marijuana.
9    Q.   Now, do you remember when it was that
10 your -- where you were living when your brother was
11 born?
12    A.   Yes, Summerfield Avenue.
13         MR. SHEEHAN:  And, your Honor, at this
14 time I would offer into evidence Plaintiff's
15 Exhibit --
16         THE COURT:  Defendant's.
17         MR. SHEEHAN:  P-SS, which is a map of
18 Bridgeport on a PowerPoint presentation.
19         THE COURT:  All right.
20         You called this P-SS.
21         MR. SHEEHAN:  Yes, your Honor.  And I,
22 again, I'll try to remember, I'm going to drop the P
23 reference.
24    Q.   Now, you indicated that you first lived at
25 105 Summerfield.  Is that where I'm indicating here

4990

1   on the chart?
2       A.  Yes, Summerfield is where we lived after we
3   lived in the group house.  Basically that's where
4   Azibo was born.
5           MR. SHEEHAN:  Could you take that down
6   just for a second.
7       Q.  And let me show you previously introduced
8   Exhibit B, referencing the -- that's your brother's
9   birth certificate.  And that references 105
10  Summerfield Avenue; does it not?
11      A.  That is correct.
12      Q.  And your father is not listed on that birth
13  certificate, is he?
14      A.  That's correct.  At that time we didn't say
15  that we had a father.  We were taught not to.
16      Q.  And why is it that you were taught to say
17  that you did not have a father?
18      A.  We were trained that certain questions had
19  to have certain answers at that age.  Because we did
20  not have documents we couldn't tell our real names.
21  When people asked us if we had parents, you would
22  say, yeah, mommy, or whomever adult you were with
23  would be the parent.  But usually, because of my dad
24  not being documented or having legitimate work or,
25  now that I'm older I know being involved in criminal

4991

1   activity, we were taught never to say that we had a
2   father or that he had a name or -- it was never
3   spoken.
4           Even on that you can see the correction
5   where they thought my mother was from the Virgin
6   Islands, because a lot of the paperwork was -- we
7   have a word for it, bandulu.  It basically means at
8   some point she used the Virgin Islands information
9   to get here or get registered, registered into the
10  hospital, and then after a certain point it was
11  revealed that she's from Jamaica, so it was
12  corrected.
13          This is kind of common for what we did at
14  that time.  We would basically use other people's
15  paperwork or change names and addresses to -- in
16  this case he needed to be signed out of the
17  hospital.
18      Q.  And, in fact, the upper part of Exhibit B
19  reflects that that was corrected in January of 1998,
20  correct?
21      A.  That is correct, which would have been
22  right around the time we became legal.
23      Q.  Now, was your father around when Azibo was
24  born?
25      A.  Yes and no, in the sense that he lived with

4992

1   us and we were exposed to him on and off, yes.  No
2   in the sense that he was not there every day.  He
3   spent quite a bit of the time back and forth from
4   our house in Bridgeport to the other houses or other
5   areas of New York.  So, he was always back and
6   forth.
7       Q.  And was he involved with another -- in
8   another relationship at the time that Azibo was
9   born?
10      A.  At the time Azibo was born he began to date
11  or go out with the woman that would become my
12  sister's mother, Angela, yes.
13      Q.  Okay.  In fact, did he subsequently have a
14  child with Angela?
15      A.  Yes, my other brother, Richie.
16      Q.  And Richie wasn't the first child your
17  father had when he was living with your mother --
18      A.  That is correct.  During the time we were
19  in Jamaica --
20      Q.  -- by another woman?
21      A.  That is correct.  During the time we were
22  in Jamaica my sister is born from -- my sister is
23  from another woman, Catherine Sobers.
24      Q.  And what was that sister's name?
25      A.  That sister Adika (ph) also known as Alisia

4993

1   (ph).
2       Q.  And her last name is Sobers?
3       A.  I believe so.  She's older now, so I'm not
4   sure what last name she's using.
5       Q.  You said Catherine.  Are you thinking of
6   Elizabeth Sobers, that's --
7       A.  Elizabeth Sobers.
8       Q.  Okay.  And did your mom know about the
9   relationship between your father and Elizabeth
10  Sobers when she came here to the United States?
11      A.  Yes.
12      Q.  Was the fact that your father had many
13  different women, was that a source of conflict
14  between he and your mother?
15      A.  Oh, yes.
16      Q.  Now, are Azibo and Azikiwe and yourself the
17  only children who share the same parents?
18      A.  That is correct.
19      Q.  Thinking back on Summerfield Avenue, was
20  your father in his -- were firearms a part of your
21  father's trade?
22      A.  Yes.
23      Q.  And as a child, were you taught to deal
24  with firearms?
25      A.  Yes.  Most of the -- yes, most of the

4994

1   firstborns were taught to handle weapons.
2           THE COURT:  Could you please speak into
3   the microphone to make sure you are amplified
4   sufficiently.
5           THE WITNESS:  Okay.
6           THE COURT:  Thank you.
7           THE WITNESS:  I'm sorry.
8      Q.   And when was it that you were first taught
9   to begin to handle firearms, at what age?
10     A.   Before I started school in America.
11     Q.   And --
12     A.   So four or five, all the way through.
13     Q.   And at that point you were living at
14  Summerfield Avenue?
15     A.   That is correct.
16     Q.   Now, was there an incident when you were
17  living at Summerfield Avenue when you dialed 911 on
18  the phone?
19     A.   Yes, there was.
20     Q.   And how is it -- why as a young child, why
21  did you dial 911?
22     A.   We recently had received a television, and
23  one of the commercials at that time was if you
24  needed help or if you were in an emergency to pick
25  up the phone and dial 911.  So we were kind of in

4995

1   the living room alone, myself and with my other
2   brother, and the commercial comes on, and even
3   though my parents were there and there were other
4   adults in the house, they weren't in the same rooms
5   as we were, they were kind of in the hallway and
6   downstairs in the driveway, so we're just kind of
7   sitting there watching television, the commercial
8   comes on and says if you need help or if you are
9   home alone dial 911.  So I walk over and I pick up
10  the phone and I dial 911, and a kind of chaos ensues
11  from there.
12     Q.   How is it that chaos ensued, or why is it?
13     A.   I didn't know at the time, but we were
14  illegal, so we didn't have any documentation.  My
15  father was in the house.  Apparently, you know,
16  there was weapons in the house, there was drugs in
17  the house.  So, I basically put everybody in the
18  middle of the risk, running the risk of being
19  arrested, or basically tearing our whole family
20  apart without even knowing it by just following the
21  instructions on the TV.
22     Q.   And did you get a lesson from your parents
23  about that being a mistake at that time?
24     A.   Oh, yeah.  Oh, yeah.  I was disciplined.
25     Q.   Now, after living at Summerfield, did you

4996

1   next move to Yarrington Court?
2      A.   That is correct.
3           MR. SHEEHAN:  Could we put SS back up on
4   the board for a second, please.
5      Q.   So, that would be the first move that you
6   remember during at least Azibo's lifetime?
7      A.   That is correct.
8      Q.   Correct?
9      A.   That is correct.
10     Q.   And when Azibo was born, were there -- was
11  there any -- did he have problems with his legs?
12     A.   Yeah.  He actually had to wear orthotic
13  braces or pediatric braces to actually position his
14  feet.  In Jamaica we call it bent foot or bowlegged,
15  but my mother wanted him to walk properly, so she
16  allowed the doctors to put him in braces, these
17  metal braces attached to shoes.  It made it
18  difficult because he was about one, two years old at
19  the time.  It made it hard to sleep.  You know, he'd
20  roll over on the bed and fall off the bed because of
21  the weight of the braces.  Everybody is running
22  around, he was waiting there, waiting to be picked
23  up.  My father was totally against it, but my mother
24  wanted him to have a chance to have proper legs.
25     Q.   Why was your father against it at the time?

4997

1      A.   The philosophy at the time for a lot of the
2   bredrens, or the men in the culture, was to be
3   anti-medicine or to be against doctors or
4   conformity.  So, braces on your child, no, that's
5   not what God wanted.  Everything was supposed to be
6   natural.  So God was against it.
7      Q.   We've seen this picture yesterday, but if
8   you could identify it.  This is Exhibit E.
9      A.   On the bottom left-hand side that's me in
10  the middle.  In the stroller is Azibo.  On the right
11  on the bottom is Azikiwe holding onto his Big Wheel.
12  In the yellow shirt is my father, Richard, and next
13  to him in the red is my mother, Sonia.
14     Q.   And do you actually still remember those
15  Big Wheels to this day?
16     A.   Yeah, we were some of the first kids on the
17  block to have Big Wheels.  So, it was kind of a big
18  deal.  Dad brought them home and set them up and
19  everything.  It was a big deal.
20     Q.   And looking at Azibo -- and let me ask you
21  this:  How did Azibo, if you know, how did he get
22  the nickname of Jumbo?
23     A.   One of my aunts, not my blood aunt, but
24  someone from the 12 Tribes organization, when he was
25  very first born, the moment they saw him that was

4998

```
1   the response, boy, how big he is.  Inpontwa (ph),
2   he's very large.  He's huge.  In Bridgeport they
3   have the tradition of the circus with the Ringling
4   Brothers, so Jumbo the Elephant was very big in
5   Bridgeport, and hence, the name Jumbo.  It stuck
6   with him ever since.
7        Q.   In those early days in Bridgeport, were
8   there other members of the 12 Tribes that your
9   family was associated with?
10       A.   Yes, quite a few.  Quite a few.  At least a
11  half a dozen or more families.
12       Q.   And would -- how is it -- would the kids be
13  left alone or how did that -- how were the kids
14  taken care of?
15       A.   Community grouping.  Usually there was one
16  of us that was old enough or one adult that would
17  not be travelling to an event or being part of the
18  function, so that adult would be the designated
19  caretaker, and all the other kids would be brought
20  to that location.  So, usually at any given time
21  there would be half a dozen or dozen of us together
22  being supervised or monitored either by an older
23  child or an adult.
24       Q.   And by an older child, how old were those
25  children at that time when they were expected to
```

4999

```
1   sort of take on that kind of responsibility?
2        A.   Eleven, 12, give or take.  That was old
3   enough.
4        Q.   And --
5        A.   My cousin used to watch us, yes.
6        Q.   And was there a time that you recall when
7   you were in Yarrington Court when there was a --
8   when something happened to one of your baby sitters?
9        A.   Yes.
10       Q.   What was that?  Just briefly.
11       A.   We were left alone while they went on a
12  function in New York, about a dozen of us.  The
13  young lady that was watching us passed away in my
14  living room.
15       Q.   And when that happened, did anybody notify
16  the police or other authorities?
17       A.   Not any of the children, no.
18       Q.   Why is that?
19       A.   That's what we were trained to do, not to
20  call the police, not to pick up the phone, not to --
21  we were afraid to call the police.  So we wouldn't
22  call the police, we'd wait and contact an adult or
23  wait 'til one of the family members would get back.
24       Q.   Now, I believe on the map -- we were
25  looking at Yarrington Court.  Did your father have
```

5000

```
1   another residence at that time, or a place?
2        A.   Yes, at that time he maintained the other
3   house on Adams Street.
4        Q.   Okay.
5        A.   We never actually lived there, but we spent
6   quite a bit of time there, myself and my cousins.
7             MR. SHEEHAN:  If I might, your Honor.  I
8   don't know if this is going to work or not.
9        Q.   How good are you at maps?
10       A.   I'm good.
11       Q.   All right.  Can you point out on this map
12  of Bridgeport where Adams Street is?
13       A.   Actually, if you slide it over a little
14  bit.
15       Q.   This way?
16       A.   Yes.
17            THE COURT:  You are going to need to
18  either speak much louder or take the microphone with
19  you, please.
20       Q.   Let me just first situate ourselves.  We're
21  here in Yarrington Court, and where was Adams Street
22  in relation to Yarrington Court?
23       A.   Yarrington Court is here.  Adams Street?
24       Q.   Oh, I see it.  You are not that good.
25  Right down here.  Is that Adams Street right there?
```

5001

```
1        A.   Yes, it is, it's across from Newfield.
2   Okay, so from Yarrington Court, it's literally just
3   a couple streets over, and down to Adams Street area
4   here.  So we used to ride our bicycles from the
5   house to Adams Street.  And our school is actually
6   right here.  This is our school.
7        Q.   We're going to come back to schools.
8             MR. SHEEHAN:  Your Honor, I would offer
9   this map at this time as Exhibit --
10            THE COURT:  Is this different from SS?
11            MR. SHEEHAN:  Yes, because this is just
12  a street map.  I just have a blowup of this that
13  might be more instructive, if I could just briefly
14  publish that to the jury.
15            THE COURT:  You may.
16            MR. SHEEHAN:  Show them that.
17       Q.   So, why don't you come over here,
18  Mr. Aquart, if you don't mind, and we'll just show
19  them on the blowup, because maybe it was not clear.
20  But can you show us where Summerfield -- well, we
21  just found Adams Street.
22            THE COURT:  You are going to have to
23  keep your voices up.
24       Q.   That's Yarrington Court?
25       A.   This is Yarrington Court.  This is where we
```

5002

```
1   actually resided and lived.
2           JUROR:  Can't hear you.
3       A.  This is where we lived on Yarrington Court.
4   So, my brothers and I lived here, and the house
5   where my father did his business was over here on
6   Adams Street.  So, basically it would be just one
7   back street and then another two major streets over
8   to get to Newfield.  So as little kids we would ride
9   our bicycles or walk with our cousins from home or
10  from school between the two houses.
11          So, live here, played there, next to --
12  you know, went to see my dad or if you wanted to be
13  around my dad.
14      Q.  You can take your seat back.
15          MR. SHEEHAN:  Your Honor, I'll mark the
16  larger one as SS-2.  Offer that in evidence.
17          THE COURT:  All right.
18      Q.  Now, what was Adams Street?
19      A.  Adams Street was an herb gates, or a drug
20  house.  That's where my father sold marijuana.
21      Q.  And what was your -- did your dad have
22  another name other than Richard?
23      A.  Yes.
24      Q.  Other names that he used?
25      A.  Yes.  Well, in 12 Tribes he wasn't known as
```

5003

```
1   Richard, he was known as Isa, which was short for
2   his tribe, Issachar.  In Bridgeport, though, he was
3   known as Johnny.  So, I was Johnny's son in
4   Bridgeport.
5       Q.  And how often as children would you go from
6   Yarrington over to Adams Street?
7       A.  Daily.  It was our other house.  We would
8   visit it.  My father maintained a garden, I had my
9   birthday parties there.
10      Q.  And that was also -- at Adams Street was
11  also an herb gate during your childhood?
12      A.  Yes, it was.
13      Q.  Did you have -- you and your brothers
14  encounter problems as children with your -- with the
15  fact that you were Rastafarian?
16      A.  Yes.  Although it's because -- we were
17  Rastas, but they didn't know that then.  All they
18  saw was difference, we were different, and they
19  picked on us constantly.  We fought on the way to
20  school, fought on the way home from school.  We
21  fought in school.  People would pull our head covers
22  off even though we had permission to wear head
23  covers.  We'd be teased.  They would sing songs to
24  us.  It was -- we'd call it bullying now and it
25  wouldn't be tolerated, but at that time even
```

5004

```
1   teachers joined in.
2       Q.  And were you called names?
3       A.  Yeah, things like African booty-scratcher,
4   Jamaican booty-scratcher, doodie boy.  All types of
5   things.  All types of things.
6       Q.  Now, you indicated that at time in your
7   early childhood you were poor and yet we see the Big
8   Wheels.  How did that -- how did those two things
9   fit together?
10      A.  Well, now that I'm older I know why my dad
11  would disappear for a while.  He would come back and
12  he would have A pocket full of money and change, or
13  we'd have new boots, new clothes, new coats, the Big
14  Wheels.  He was basically selling to supplement our
15  family income.  So, it would be feast and famine.
16  We would have nothing and then we would have Big
17  Wheels.
18      Q.  And what was Yarrington Court set up like,
19  the setup in your apartment in Yarrington Court?
20      A.  As a child?
21      Q.  Yes.
22      A.  Front room originally had a pool table in
23  it.  The first room off of that was my bedroom where
24  me and my brothers shared a bunkbed, then the
25  kitchen with a little eat-in area, my mother's
```

5005

```
1   bedroom -- my mother and father's bedroom right off
2   of that, and a bathroom and back hallway.  Literally
3   just two rooms.
4       Q.  And did there come a time when your dad was
5   involved in a struggle with other individuals in
6   Bridgeport?
7       A.  Yes.
8       Q.  What was that about?
9       A.  There was conflict between rival crews, or
10  rival gangs, rival sellers.  Specifically the
11  Dominicans at that time and the Jamaicans were
12  warring, or basically having turf wars, and several
13  people had gotten shot.  A couple of the people that
14  we were close to as children were shot.
15      Q.  And do you have a recollection of being in
16  the house during one of these episodes, in the house
17  at Yarrington?
18      A.  Yes.  One of my biggest memories of
19  Yarrington is as a child my father putting me and my
20  brothers in the closet, handing me my pistol and
21  telling me if anybody comes through the door that I
22  don't know to shoot them because we were in the
23  middle of war.  So, that's one of my biggest
24  memories of the house.
25      Q.  And you talked about individuals being
```

5006

```
1   shot.  Did you observe anybody being shot at that
2   time?
3       A.  Yeah.
4       Q.  Or had been shot?
5       A.  Yeah.  We had an uncle that was shot, and
6   then he was actually brought back to our house and
7   my mother and the other sisters nursed him in our
8   living room.
9       Q.  And you indicated that you had been taught
10  about not revealing who your father was.  Did that
11  extend to when you were at school?
12      A.  Definitely.
13      Q.  Did people -- did you -- among your own
14  peer, though, peers, was your father's identity
15  generally known?
16      A.  Among my 12 Tribes peers, my cousins, yes,
17  he was well-known, but amongst anyone else, no.
18      Q.  And did you learn that your mother was to
19  some extent involved in drug dealing in those early
20  days as well?
21      A.  Yes, I did.
22      Q.  And what was she doing?
23      A.  Basically transporting and serving as a
24  mule for my father.
25      Q.  Now, at some point in time your mom got
```

5007

```
1   married to a man named Ernest Reardon.  Do you know
2   who that fellow is?
3       A.  As a matter of fact I do.  He actually
4   worked for my dad.
5       Q.  Did he and your mom, as far as you know,
6   ever live together?
7       A.  No.
8       Q.  Let me ask you about this picture which has
9   been introduced in evidence yesterday as Exhibit H,
10  and ask if you can identify the people in that
11  picture.
12          Who is the toothless guy?
13      A.  That would be me, with my hand on my
14  brother Azikiwe's shoulder.  Directly to my left is
15  my mother, and on her left is Azibo.
16      Q.  And it looks like at that point Azibo has
17  got a little scowl on his face.  Is there a story
18  connected to that?
19      A.  Yeah.  I think that one he showed us his
20  screw face, either because he wanted to stand up or
21  didn't want to stand up, didn't want to wear the
22  head cover he had on because you can see his braids
23  are messed up.  And the necklaces, we were all
24  wearing our necklaces at that time, and you can see
25  in his hand he actually had another necklace that he
```

5008

```
1   wanted to wear.  So there was a lot of
2   I-don't-want-to-do-this kind of thing going on.
3       Q.  And what's the -- you mentioned the screw
4   face.  What's the screw face?
5       A.  It's a word for a facial expression or
6   moniker-ism my father and the elder and uncles and
7   bredrens would say, "Show me your screw face, show
8   me your screw face."  It was the most hardest,
9   intimidating face you could show.  You would be
10  rewarded for a good -- a good screw face.  It would
11  show you are ready for whatever.
12      Q.  At that time in your early life did you
13  feel like you were part of the larger community in
14  Bridgeport?  Or how did you feel that you were --
15      A.  I was --
16      Q.  -- as children?
17      A.  As children?  No.  Not part of the larger
18  community in Bridgeport?  No.  Just part of our
19  community within Bridgeport.
20      Q.  Okay.  I'm going back here then to
21  Exhibit SS.  And was your next move then over to
22  Carol -- actually to Central Avenue?
23      A.  Yes.
24      Q.  So that's also in the same general vicinity
25  as Summerfield and Yarrington?
```

5009

```
1       A.  That is correct.  Further away from
2   Stratford Avenue, though.  That was why my mother
3   moved us from.
4       Q.  And what was the issue on Stratford Avenue?
5       A.  Stratford Avenue is a notorious strip in
6   Bridgeport.  It's basically where the crime and the
7   drugs happened.  And we had lived there originally
8   because it was cheap rent, but it's not a good place
9   to be.
10      Q.  And going back, in order to get from
11  Yarrington over to Adams Street, are you crossing
12  Stratford Avenue?
13      A.  No.
14      Q.  Okay.
15      A.  It's all on the same side.
16      Q.  Then at the time that your mom moved --
17  actually when you moved to Central Avenue, were your
18  parents living together?
19      A.  No, that's the point when my mother kind of
20  separates from my father and they begin to break up.
21      Q.  And during that period of time when your
22  father was -- by the time, that point when your
23  parents had separated, were you -- was your mom
24  working at that point in time?
25      A.  Yes.
```

5010

```
1      Q.   And when she was working, who was taking
2   care of the children?
3      A.   Well, we were kind of home alone mostly, or
4   we would stay with a nanny or a sitter.  But we were
5   latchkey kids.  We basically came home from school,
6   let ourselves in, made sandwiches or tea.  I cooked
7   tea and stuff like that.  But that's what we did.
8      Q.   Now, was your mother also at that time
9   going to college, taking college courses?
10     A.   Yes.  At Housatonic, as a matter of fact.
11  Yeah.
12     Q.   And was she involved in a -- do you know if
13  she got her GED?
14     A.   I believe it was her equivalency she got
15  from going to Housatonic.  And in order for her to
16  do that, she actually used to bring my brother to
17  the daycare center at the school.
18     Q.   Okay.  Before your parents split up, did
19  you know anybody outside of -- pretty much outside
20  of the 12 Tribes community?
21     A.   My teachers.  That's it.
22     Q.   Now, at some point in time did your mom let
23  you cut your dreads?
24     A.   Yes.  Right around the time of this move.
25     Q.   And did that have any association with the
```

5011

```
1   friction between your parents as far as you knew at
2   that time?
3      A.   Oh, yes.  Oh, yes.  Yes, my father had no
4   wishes for us to trim or anything like that.
5      Q.   And did your mother become involved in
6   designing clothes?
7      A.   Yes.  She begins to do fashion shows and
8   create accessories and designs.  She had always done
9   designs as part of 12 Tribes, meaning clothes and
10  sewing clothes, but then that became -- that becomes
11  a thing for her and then it develops into her own
12  business later on.
13     Q.   And did you have any contact with your
14  maternal grandmother at that time?
15     A.   Yes.  She -- this is one of the first times
16  we get gifts from her.  I believe she comes down to
17  visit shortly after this.  Yeah, this is the first
18  time we actually get to know that we have a
19  grandmother, per se.
20     Q.   And then later did you move actually --
21  then you moved to North Avenue?
22     A.   That is correct.  After Central.
23     Q.   Okay, so from Central Avenue it is a move
24  over to North Avenue.  That's the next move.  Let's
25  see if we can do this right.
```

5012

```
1      A.   There you go.
2      Q.   Now, thinking back on it now, did your
3   mother come to the United States with a particular
4   mindset, mentality in mind?  A thought, a plan?
5      A.   Yes.  Maybe my father's plan, but yes.
6      Q.   Did that plan of your mom's change over
7   time?
8      A.   Definitely, yes.
9      Q.   And in what way did that change?
10     A.   My mother became more focused on us having
11  the best opportunities and enjoying what America had
12  to offer and seeing the best for her kids.  That
13  became her goal, her focus.  My dad never shared
14  that.
15     Q.   And what was your dad's goal?
16     A.   My dad's goal was to rape America.  That
17  was basically how he expressed it to us.  And what
18  we were taught as children was that America was foul
19  and that the only thing good was to take as much as
20  you can and then leave.
21     Q.   Do you remember in July of 1986 going to
22  Indian Wells in Shelton?
23     A.   Yes.
24     Q.   And what happened at that time?
25     A.   That's the year of the car accident.  We
```

5013

```
1   would go to Indian Well regularly because it's a
2   natural spring.  Part of our rituals involved
3   natural springs, and in Connecticut Indian Wells is
4   one of the few.  So a large group of us would go
5   every year at different times of year.
6           During this trip my mother is driving a
7   carload of our -- me and my brothers as well as a
8   couple of our 12 Tribes cousins, and we get
9   sideswiped on Route 8, I believe it is, and the car
10  flips over a couple of times.  My mother ends up
11  with a broken back, damaged neck, my brother ends up
12  with a broken leg, and the rest of us have cuts and
13  bruises and scratches.  It was pretty messed up.
14     Q.   When you say your brother ended up with a
15  broken leg, which brother is that?
16     A.   My brother Azibo.  He actually stood in a
17  cast for several months after that, immobile.
18          MR. SHEEHAN:  Your Honor, at this time
19  we would offer Plaintiff's Exhibit J, which are the
20  medical records.
21          THE COURT:  Defendant's.
22          MR. SHEEHAN:  Yeah, P.  Yes, Defendant's
23  J.
24          THE COURT:  These are medical records
25  related to July 6, 1986?
```

5014

```
1         MR. SHEEHAN:  Yes, your Honor.
2         THE COURT:  All right, they are a full
3    exhibits.
4         MR. SHEEHAN:  I'm going to just publish
5    at this point the first page of that, your Honor.
6    And if I might just ask the Court's assistance.
7    Q.   At this point in time you were living on
8    North Avenue?
9    A.   That is correct.
10   Q.   And there was a two-car accident and his
11   left leg was broken?  Azibo's left leg was broken?
12   A.   That's correct.
13   Q.   And let me ask you, thereafter, was Azibo
14   in a cast?
15   A.   Yes, they actually put him in a full lower
16   body cast because they needed him to be immobilized,
17   and he spent most of that summer on the couch with a
18   fan on him watching everybody else play.
19   Q.   And who was in charge of his care at that
20   time while he was in the cast?
21   A.   My mother.  And then when she wasn't there
22   we were kind of home alone, so -- my stepfather was
23   there at that point, starting to become part of the
24   picture, but really he was alone.
25   Q.   And was your mom working at that point in
```

5015

```
1    time?
2    A.   Yes, she was.
3    Q.   And so 1986, do you remember when it was
4    where your mom was working at that point in time?
5    A.   I believe she might have been at the
6    Catholic home, Notre Dame Catholic Home I believe at
7    that point.  I'm not sure.
8    Q.   What was she doing at the Notre Dame
9    Catholic Home?
10   A.   She always worked in nursing assistant type
11   positions or nursing home type positions as a
12   caretaker.
13   Q.   And going back to Exhibit SS, did you
14   shortly thereafter move to Capitol Avenue?
15   A.   That is correct.
16        MR. SHEEHAN:  And at this point in time,
17   your Honor, I would offer as an exhibit
18   plaintiffs -- I'm sorry, TT which are the school
19   records from Bridgeport.  I think it's TT-1, your
20   Honor.
21        THE COURT:  All right.
22   Q.   And I'm going to show you, these are
23   Azibo's school records from Bridgeport, are they
24   not?
25   A.   That is correct.
```

5016

```
1    Q.   And again, I note that there is no father
2    listed on those.
3    A.   That's correct.
4    Q.   There is a reference here to a Rose
5    McKinney on the right.  Who was Rose McKinney?
6    A.   My mother had some Americans watching us.
7    Rose McKinney was Nanny, she was our nanny.  She was
8    an elderly black woman in the neighborhood, she
9    actually lived right on Stratford Avenue, and her
10   thing was taking care of other people's kids.  So
11   when my mother needed to go to work, or at that
12   point she was separated from my dad, didn't want us
13   to stay with my dad, she would bring us to Nanny's
14   house, and we would stay with Nanny.  And her kids
15   would watch us, basically, because she had teenage
16   daughters and younger son.  So they would watch us
17   until mom came home.
18   Q.   Let me ask you, I'm going to jump ahead if
19   I might for a moment and see if we can get this
20   school picture in place.
21        Did there come a time later on when you
22   moved to Stamford?
23   A.   Yes.
24   Q.   And that's where you were living when your
25   mom died, right?
```

5017

```
1    A.   That's correct.
2    Q.   And after Stamford, did Azibo go to school
3    for a short period of time in New York City?
4    A.   Yes.
5    Q.   And that was before he came and lived with
6    you and --
7    A.   Azikiwe.  That is correct.  That's correct.
8        MR. SHEEHAN:  Your Honor, at this time I
9    would offer as an exhibit Defendant's Exhibit TT-2
10   and -3, which concludes the school records for
11   Stamford and New York.
12        THE COURT:  All right.  So TT-2 is
13   Stamford and TT-3 is New York.  All right, very
14   well.
15   Q.   Now, I'm going to go back to Exhibit SS,
16   and I wonder, let's just deal with moves for a
17   moment at this point in time, if we could.
18        You were living on, you indicated that your
19   mom moved to North Avenue and that was the period of
20   time that she started separating from your father.
21   A.   Central and North, correct.
22   Q.   Okay.  Central to North.  And then from
23   there you moved to Capitol Avenue?
24   A.   That's correct.
25   Q.   And where was the next place that your mom
```

5018

1  moved to with Azibo; if you remember?
2      A.  It would have probably been New York after
3  Capitol, and then City View.
4      Q.  Well, let's see what we have next here.  Do
5  you remember the move to Chestnut Street that's
6  reflected in the school records, Exhibit TT-1?
7      A.  No, because I lived in Hartford when they
8  moved to Chestnut.  So, at the time when they moved
9  to Chestnut, myself and my other brother now lived
10 with my dad.  My mother, my stepfather and my
11 sisters and Azibo lived on Chestnut.
12     Q.  And did you ever visit at Chestnut?
13     A.  Yes, I did.
14     Q.  Okay.  And after Chestnut did they next
15 move to Henderson, your mom and Azibo?
16     A.  That's correct.  My mother bought a half --
17 bought a house on Henderson.
18     Q.  And what happened -- do you know what
19 happened as far as that house was concerned?
20     A.  No.  Again, I was living mostly with my dad
21 in Hartford and they were in transition between
22 Jamaica and Connecticut.  So, my mother was always
23 travelling at that point.
24     Q.  Okay.  And after Henderson Street, do you
25 know where your mom -- I'm sorry, after Henderson,

5019

1  let's see what we have next.
2          Now, the map, that chart, indicates an
3  unknown.  Do you recall what happened at that point
4  in time from Henderson?
5      A.  That would have been the time they lived in
6  Jamaica.  My brother spent some time living in
7  Jamaica at that age.
8      Q.  Okay.  And after Jamaica, where did your
9  mom live at that point?  Where do we come -- let's
10 go to the next.
11     A.  She goes to City View and she splits her
12 time between Manhattan and Mama Benji's house on
13 City View Avenue in Bridgeport.
14     Q.  Now, City View, was that a place that your
15 mom rented?  You mentioned a Mama Benji?
16     A.  Mama Benji was another member of 12 Tribes
17 and had become very close with my mother.  She was
18 not a blood relative, but she and my mother were
19 like sisters.  So she extended her house to my
20 family to help us.
21     Q.  After City View did they then move --
22 actually is that the point in time you went briefly
23 to New York City with your mom?
24     A.  That is correct.
25     Q.  And we're going to come back to this, but

5020

1  just very briefly, why did you go to New York City
2  at that point from City View?  Actually, were you
3  back with your mom?
4      A.  I was back with my mother at that point,
5  that's correct.
6      Q.  And when you are back, does that mean
7  Azikiwe was back with you?
8      A.  That's correct.
9      Q.  And why did you all go to New York at that
10 point?
11     A.  My mother wanted to get us out of
12 Bridgeport and away from, as much as possible, as
13 much of the negative stuff as possible.  And her
14 business.  She had her business in New York.
15     Q.  And after New York, where then -- did she
16 come back to Bridgeport?
17     A.  Not really.  We actually get a condo in
18 Stamford after that.
19     Q.  So, let's see what we got.  So from there
20 we go to 3 Morgan Street in Stamford?
21     A.  That's correct.
22     Q.  And that's actually the period of time in
23 May of that year, at the end of that year, Memorial
24 Day, May of '94, that's when your mom is drowned in
25 Florida?

5021

1      A.  That is correct.
2      Q.  And then after Morgan Street, Azibo then
3  goes to New York.  Is that that period of time?
4      A.  That is correct, he lived with Sister
5  Sharon in New York.
6      Q.  That's Sharon Headley; is it not?
7      A.  That is correct.  Another sister from 12
8  Tribes.
9      Q.  And subsequently did he -- after leaving
10 Sharon, let's see where we go next.  Do you remember
11 the move to Fifth?
12     A.  Yes, that's after I get him back we go to
13 Fifth Street.
14     Q.  And what was Fifth Street like?
15     A.  Fifth Street was right off the avenue.  It
16 was --
17     Q.  Sorry to interrupt, but by "the avenue,"
18 you mean what avenue?
19     A.  Stratford Avenue.
20     Q.  Okay.
21     A.  So it's a drug area.  It's a pretty hard
22 area to live in, lots of crime, but it was the only
23 place we could stay.
24     Q.  And at that point in time when you say
25 "we," who was living at Fifth Street?

5022

```
1      A.   On Fifth Street at that point it's myself,
2    my younger brother Azikiwe and my younger brother
3    Azibo.  Now, three of us.
4      Q.   And from Fifth Street did you then make
5    another move within Bridgeport?
6      A.   Yes.  Huff Avenue is an apartment I rented
7    where we all lived together again.
8      Q.   And how old were you at this time?
9      A.   I'm 18, give or take.
10     Q.   And who was living with you at Huff?
11     A.   Myself, my two brothers, Azikiwe and Azibo,
12   and my fiancee at the time, Nasheika, and she's
13   pregnant with my son.
14     Q.   And from Huff was there then another move
15   to Ogden?
16     A.   That is correct.
17     Q.   And who lived at Ogden?
18     A.   Again, myself, Nasheika, my wife, and my
19   two younger brothers, Azikiwe and Azibo.
20     Q.   Okay.  And then from Ogden did you move to
21   Williams Street?
22     A.   That is correct.
23     Q.   And who was living there at Williams
24   Street?
25     A.   At Williams Street, my son is born at that
```

5023

```
1    point, so it's Azikiwe, Azibo, myself, my son and my
2    fiancee, Nasheika.
3      Q.   And is that the last place that you lived
4    together with Azibo?
5      A.   As a family, yes, that is correct.
6      Q.   And I wonder if we might just look at the
7    schools on this for a second.
8           You indicated when you first started school.
9    What school were you in?
10     A.   McKinley School off of Stratford Avenue.
11     Q.   Azibo, it appears from the school records,
12   started in Webster.
13     A.   That is correct.
14     Q.   So, all right.  We see Webster is marked,
15   there is a white part over here, right?
16     A.   We lived at North Avenue at that time.
17     Q.   And after Webster did he go to Madison?
18     A.   That is correct.
19     Q.   And then his next school appears to have
20   been Blackham.
21     A.   That is correct.
22     Q.   Now, why was all of this bouncing from
23   schools; if you know?
24     A.   At that point the -- the Webster School is
25   because we lived on North Avenue.  And then later
```

5024

```
1    Chestnut Street.  But we moved.  Every time we moved
2    we were in a different school district.  My mother
3    would move us, basically, as you can see, from the
4    worst part to the better parts of Bridgeport, and
5    the schools followed suit.  So, every time we moved,
6    we needed a new school.  Azibo kind of fell right
7    into that.
8      Q.   So your mom was actually trying to find
9    better schools for you within Bridgeport as well?
10     A.   As a matter of fact, yeah.  The move from
11   Central to North is basically crossing that line,
12   and then the move from North to Capitol, there is a
13   -- we call it the North End.  It's a line in
14   Bridgeport.  It's an imaginary line, but this is a
15   line in Bridgeport, this is where poor people live,
16   this is where rich people live.  My mother moved us
17   to the first street across that line to Capitol
18   Avenue.
19     Q.   The next school after Blackham, where do
20   you go next?  Back to Madison, do you know why that
21   happened?
22     A.   As far as I understand it may have been due
23   to the fact that they were in and out of the
24   country.  So, when they came back, they just
25   registered him back into to Madison.  I know he had
```

5025

```
1    used a couple different addresses.  But, again, at
2    this point when he goes back to Madison I'm in
3    Hartford.  So, I'm visiting him.
4      Q.   And how often -- when would you and your
5    brother visit your mom in Bridgeport?
6      A.   Not often.  Maybe twice a year at this
7    point.  Azikiwe spent a little more time than I did
8    because I'm supposed to stay with my father.
9      Q.   And was Azibo coming up to visit you in
10   Hartford?
11     A.   That's correct.
12     Q.   And who in addition to your father were you
13   living with in Hartford?
14     A.   My stepmother at that time and my brother
15   Azikiwe.  It was just the four of us.
16     Q.   Okay.  And after going back, it appears
17   back to Madison, what's the -- do you remember that
18   he then goes up to Hallen School?
19     A.   That is correct.
20     Q.   And after Hallen School, he then goes to
21   New York; is that our next move?
22     A.   In between Hallen and --
23     Q.   I'm sorry.
24     A.   In between kind of Hallen and Cloonan, yes,
25   he's kind of spending time in New York with my
```

5026

```
1   mother, back and forth.
2        Q.   Cloonan is in Stamford?
3        A.   That is correct.  It seems like the Jamaica
4   portion is missing from the schools.  Yeah.
5        Q.   And in fact we don't have records for that
6   Jamaica portion.
7        A.   Right.
8        Q.   But, in any case, he goes to Cloonan from
9   Hallen, and then his next school is -- where is the
10  next school?
11       A.   He's in New York with Sharon.  So Sharon
12  registers him into school in New York.
13       Q.   And that's where we see IS 238 on the chart
14  there?
15       A.   That is correct.
16       Q.   Then the last school that we have is back
17  up to Hooker?
18       A.   Once I have him back I registered him into
19  Hooker.
20       Q.   And at that point in time you're back.
21  Essentially, it looks like you are somewhere between
22  Fifth and Howe and the Ogden.  Is that about right?
23       A.   That's correct.  I registered him in school
24  when I'm in Huff Avenue, 257 Huff Avenue, and Hooker
25  was the farthest school away from anything negative
```

5027

```
1   that I could find.
2            MR. SHEEHAN:  And, your Honor, at this
3   time I would offer as an Exhibit SS-2, which is a --
4            MR. SMITH:  Actually it should be 3.
5            MR. SHEEHAN:  3.  I'm sorry.
6            If I could just briefly show this to the
7   jury.
8            THE COURT:  That's SS-3 and it's another
9   map.
10           MR. SHEEHAN:  Yes, this map is the same
11  map as what they see on the screen.  So I would
12  offer that at this point.
13           THE COURT:  It's a full exhibit.
14           MR. SHEEHAN:  I don't think I need the
15  easel.  Thank you, Maria.  I think we're okay.  I'll
16  show it briefly to the members of the jury.
17       Q.   Now, I want to go back to when you were
18  living at -- you mentioned your stepfather.  That
19  was Skibo?
20       A.   Yes, Skibo.
21       Q.   And what is Skibo's last name?
22       A.   Johnson.
23       Q.   When did your mom become involved with
24  Mr. Johnson?
25       A.   When do I first realize that she is?
```

5028

```
1        Q.   Yeah, when did you become aware of that?
2        A.   At North Avenue, when we lived on North
3   Avenue is when he starts making his presence really
4   felt.  By the time we moved to Capitol Avenue he's
5   my stepfather.
6        Q.   And at Capitol Avenue, did you share a room
7   with your brothers?
8        A.   Yes.
9        Q.   And was mom working at that time?
10       A.   Yes, and -- yes, that's when she begins to
11  make Ital Pamper as well.
12       Q.   We're going to come back -- well, what is
13  Ital Pamper, actually?
14       A.   It's a natural hair and beauty salon
15  founded by my mother focused on the care of natural
16  hair products, things like shea butter.
17       Q.   And when your mom wasn't there, was Skibo
18  around all the time?  Or what was Skibo's presence
19  in the house at that point in time?
20       A.   He would bring us groceries, he would play
21  music.  He would be there in the mornings now when
22  we'd wake up.  He would pick us up and drop us off
23  from the shop or to my mother or to New York.  At
24  this point my sisters, my mother is pregnant with my
25  soon-to-be sisters.  So, he's an ever-growing
```

5029

```
1   presence in the house.
2        Q.   And did you have responsibilities in the
3   house as the oldest son?
4        A.   Yes.
5        Q.   And what were they?
6        A.   Things like get myself and get my brothers
7   ready, organize chores, make meals, cleaning,
8   laundry, baby-sitting.
9        Q.   And were there times when you were
10  frequently in charge of all of -- of your brothers,
11  just you?
12       A.   Yes.
13       Q.   And how often would that be?
14       A.   Meaning day-to-day or --
15       Q.   Yeah.
16       A.   How many hours a day?
17       Q.   Was it every day that you -- there would be
18  a period of time when you would be in charge?
19       A.   Yes, because we came home from school by
20  ourselves, and at least for the first hour or so it
21  would be myself and one or two of my brothers.  And
22  then later my sisters.
23           We were latchkey kids.  So we had our
24  key, we came home from school, do your chores, do
25  your homework, make sure the house is clean, make
```

**GA1300**

5030

1  sure your brother doesn't get in trouble.  That was
2  my instructions.
3      Q.   And was corporal punishment something that
4  your mother regularly used?
5      A.   Do you mean did she beat us?
6      Q.   Yeah.
7      A.   Yes.
8      Q.   Was that part of your culture, as you
9  understood it?
10     A.   Yes, Jamaicans beat their kids.  Yes.
11     Q.   And was that something that she -- how
12 would she do that?  How would that be implemented?
13     A.   It was different ways.  At the time we were
14 living at Capitol Avenue she started doing a thing
15 where she would allow us to beat each other, to kind
16 of share the punishment or share the burden in a
17 way.  Belts, hangers, whatever was close at hand was
18 what my mom would use.  She demanded respect,
19 demanded us not to lie.  So she enforced discipline
20 strictly, the way she remembered and the way she
21 grew up.
22     Q.   And did you -- was that kind of corporal
23 punishment imposed on you?
24     A.   Yeah.  Yeah, I got the scars.  I got beat
25 by my mother.  I was hard-headed.

5031

1      Q.   When you say you've got the scars, did you
2  literally get the scars?
3      A.   Yeah, I was beat.  I have a scar from a
4  broomstick injury from my mother.  Yes.
5      Q.   And do you remember her hitting you or your
6  brothers with anything else other than the
7  broomstick?
8      A.   Belts, hangers, telephone, shoes.  Yeah.
9  Yes.
10     Q.   Was your dad, Richard, was he involved in
11 the scene at this point in time, when you are living
12 on Capitol Avenue?  I guess that's where we are.
13 Yeah.
14     A.   When we were living on Capitol he's giving
15 us gifts, we're getting birthday presents once in a
16 while, school shopping occasionally.  But again, my
17 stepfather stepped into the picture.  So, my
18 stepfather is there.  My dad is nowhere to be found.
19 He's scarce and he makes an appearance once in a
20 while.
21     Q.   And let me show you this picture which is
22 Exhibit K.
23          MR. SHEEHAN:  I'd offer it, your Honor.
24          THE COURT:  All right.
25     Q.   Do you recognize that Mother of the Year

5032

1  certificate?
2      A.   Yeah, it was a Mother's Day gift from me
3  for her.
4      Q.   And so, in May of 1987, how old were you at
5  that time?
6      A.   It's an old picture, but I'm ten years old
7  at that point.  About to be.  Yeah, ten years old.
8      Q.   And how old is Azikiwe?
9      A.   Azikiwe is two years younger, he's eight
10 years old, and Azibo is six.
11     Q.   Do you why Azibo would have -- why he was
12 using Smith at that time while the other two of you
13 were using Aquart?
14     A.   Azibo is Smith.  Azibo is not an Aquart.
15 My father was never around to sign his birth
16 certificate or his papers.  Only myself and my other
17 brother are Aquarts.  Azibo's last name is Smith
18 like my mother's.
19     Q.   Is it pretty fair to say thinking back at
20 that point in time to you and your brothers your mom
21 was a super mom?
22     A.   Definitely.  Definitely.
23     Q.   Now, in fact, do you remember at -- let me
24 show you just one other picture and see -- actually
25 let me pass on that.

5033

1      Do you remember getting a job with Mike
2  Adams?
3      A.   Yes.  Yes, I do.
4      Q.   And what was Mr. Adams' relationship to
5  your father?
6      A.   He was one of my father's many friends and
7  business associates.  He later becomes like an uncle
8  to us.  He becomes very close to the family.
9      Q.   And how often would you go to New York?
10     A.   At least twice, three times a month, easy.
11     Q.   So, I'm trying to go back at this point in
12 time after your mother is involved with Skibo.
13 Would you go into New York with him?
14     A.   Not really.  I was still only going to 12
15 Tribes functions with my mother.  Azibo would travel
16 more with Skibo than I would because I was more
17 grounded here in Bridgeport, more in school, whereas
18 my sister and my brothers would travel with my
19 mother more.
20     Q.   Did you learn that Skibo was also involved
21 in drugs?
22     A.   Yes.  When we would go to see him, that's
23 pretty much what we would do.  He didn't have a job,
24 that was -- we knew that, but then, you know, he
25 would buy cars and trucks and so forth and lots of

5034

```
1   jewelry and flashy clothes.  And then when he
2   finally did go to work he lived -- didn't live
3   anywhere.  He basically had apartments and houses.
4   And that's when me and my brother, we were old
5   enough, we kind of realized he does the same thing
6   daddy does, he sells.
7       Q.   And were there some conflicts with your
8   father at that time as far as Skibo was concerned?
9       A.   Oh, yeah.  He paid Skibo a nice visit on
10  our porch on Capitol Avenue at one time and
11  basically threatened him.  It was sort of over the
12  relationship thing, you know, old man, new man
13  thing, but it was a lot over drug territory and the
14  fact that Skibo is now selling to people that my
15  father used to sell to.  So my father wanted to let
16  him know.
17      Q.   When he threatened him, what did he
18  threaten him with?
19      A.   A .44-caliber Bulldog on the porch.  It's a
20  revolver.
21      Q.   Now, at some point in time was your
22  sister -- do you remember your sister Mandy being
23  born?
24      A.   Yes, I do remember Mandy.
25      Q.   Showing you previously what's
```

5035

```
1   Plaintiff's -- I'm sorry, Exhibit F.
2           MR. SHEEHAN:  Your Honor I would offer
3   that at this time.
4           THE COURT:  All right, it's Defendant's
5   F.
6       Q.   And is that a picture of the three of you
7   and your mom and Mandy?
8       A.   Yes.  Yes, it is.  I'm in the back with the
9   glasses on and --
10      Q.   Right.
11      A.   -- to my left is Azibo in the yellow, to my
12  right is Azikiwe, and directly in front of me is my
13  mother, and on her lap is my newborn little sister
14  Mandy.
15      Q.   And is there kind of a -- at that point in
16  your life is there an -- as far as the 12 Tribes
17  were concerned, were there rites of passage for
18  young men?
19      A.   Yes.  At that age of that picture I'm at
20  the beginnings of it where Bible studies, certain
21  reasonings, training, a lot of different things were
22  happening, yes.
23      Q.   And was your mom doing fashion shows and
24  other things?
25      A.   Yes, this is the beginning.  At this point,
```

5036

```
1   yeah, she's already hosted a couple fashion shows,
2   she's gotten commissions from a couple organizations
3   to host their events and fashion shows.  She's
4   working with the Special Olympics kids at this
5   point, and she's getting ready to open the salon in
6   New York.
7       Q.   Okay.  And I'm going to show you, if I
8   might, Exhibit N.
9           MR. SHEEHAN:  I'll offer at this time
10  Exhibit N, your Honor.
11      Q.   I wonder if we could turn -- once your
12  Honor gets a chance.
13          THE COURT:  All right, N is a business
14  certificate for Ital Pamper.
15          MR. SHEEHAN:  Yes, your Honor.
16      Q.   Exhibit N is the business certificate for
17  Ital Pamper.  And it is dated in November of 1989.
18  Was your mom involved for some period of time before
19  November of '89 in going to New York and setting up
20  the store, as far as you remember?
21      A.   Yes.
22      Q.   In any case, is your recollection that
23  certainly by this period of time Ital Pamper was
24  pretty much a going concern?
25      A.   That's correct.
```

5037

```
1       Q.   And there is an address.  There is a
2   reference here to Sonia Reardon?
3       A.   That is correct.
4       Q.   That was your mother's married name?
5       A.   That is correct.
6       Q.   And there is an address, 1601 Chester
7   Street in the Bronx.  Did you ever live at Chester
8   Street in the Bronx?
9       A.   No, we didn't.
10      Q.   Do you know whether that address had to do
11  with anything?
12      A.   More than likely it's one of the 12 Tribes
13  sister's home address.
14      Q.   And how often would your mom go into the
15  store or to the salon?
16      A.   Daily.  She would commute back and forth
17  between Connecticut or spend days at a time in New
18  York.
19      Q.   And when your mom was gone, who was in
20  charge?
21      A.   I guess I would be.  I don't know, it was
22  just us together.
23      Q.   By this point in time we've got Mandy.  So
24  how did that work?
25      A.   She would carry Mandy with her.
```

5038

```
1      Q.  So Mandy would go into the City and you
2  would be in charge of your brothers?
3      A.  That is correct.
4      Q.  Now --
5              THE COURT:  Mr. Sheehan, is this an
6  appropriate time for us to take a short break?
7              MR. SHEEHAN:  Yes, that would be fine,
8  your Honor.
9              THE COURT:  Let's do that then.
10             Ladies and gentlemen, we'll take a
11 ten-minute recess.
12             (Jury exited the courtroom)
13             THE COURT:  All right, Mr. Aquart, if
14 you will kindly be back in ten minutes.  Don't
15 discuss your testimony with anyone.  Thank you.
16             MR. SHEEHAN:  Thank you, Judge.
17             THE COURT:  We're in recess.
18             (Recess)
19             THE COURT:  All right, we are ready for
20 the jury?
21             MR. SHEEHAN:  We are, your Honor.
22             MS. DAYTON:  Actually --
23             MS. RODRIGUEZ-COSS:  Could we approach?
24             MS. DAYTON:  Yeah, let's do it at
25 sidebar.  Can we approach real quickly?
```

5039

```
1              THE COURT:  Yes.
2              (Sidebar conference).
3              MR. MARKLE:  We wanted to just raise the
4  concern if Mr. Sheehan intends to ask him the impact
5  of the execution on his brother or what the impact
6  will be on him.  I'm not sure if you are intending
7  to ask that.
8              MR. SHEEHAN:  Yeah, at the end.
9              MS. RODRIGUES-COSS:  And the Court had
10 held that in abeyance, that specific question.
11             THE COURT:  All right, now I don't see
12 why that's not a proper question when the issue is
13 the jury's weighing of factors facing the death
14 penalty versus factors weighing against the death
15 penalty.  Why is that not a factor weighing against
16 the death penalty?
17             MS. RODRIGUEZ-COSS:  Your Honor, because
18 then at that point it's not a factor relating to the
19 defendant, but a factor relating to the witness.
20 It's a factor that indicates to the jury how the
21 witness will be impacted, and so the pain and
22 suffering that the witness would suffer rather than
23 something that reflects on the defendant himself.
24             THE COURT:  Yes.
25             MS. RODRIGUEZ-COSS:  And so I think that
```

5040

```
1  the point of weighing, carrying out the weighing
2  process, the jury should consider the
3  characteristics -- the character, the background of
4  the defendant and whether or not he deserves to be
5  sentenced to death rather than --
6              THE COURT:  What is -- why is this a
7  matter to be weighed with respect to what happens to
8  Azibo Aquart's life?
9              MR. SHEEHAN:  Well, it's one of our
10 mitigating factors, and I think your Honor has
11 already ruled on execution impact.  I think what
12 they're saying here is I can't ask the question.
13             THE COURT:  They are saying that.
14             MR. SHEEHAN:  Okay.  Well, how does the
15 jury -- I can't ask the question?
16             THE COURT:  That's what they're saying.
17             MR. SHEEHAN:  So --
18             THE COURT:  When we get to your question
19 I will be able to rule.  Thank you.
20             MR. SHEEHAN:  I mean, my point is -- the
21 facts are relevant to mitigation and, therefore, I
22 should be allowed to ask the question to the
23 witness.
24             THE COURT:  Okay.
25             MR. SMITH:  Your Honor, if I may, if his
```

5041

```
1  execution impacts people, that does speak to his
2  character.
3              THE COURT:  That's what we had said
4  before.
5              MR. SMITH:  I understand.
6              MR. SHEEHAN:  Yeah.
7              MR. SMITH:  And that's why I think the
8  question is absolutely proper.
9              MS. RODRIGUEZ-COSS:  Well, I think the
10 fact that his execution may impact people comes
11 through the witnesses testifying about their
12 opinions as to the character of the defendant and
13 things the witnesses can draw upon, examples from
14 their experience and exchange with the defendant.
15 But the specific question of how will his execution,
16 potential execution affect you is really an indirect
17 message to the jury, don't kill him.  And so why
18 should a defense witness be able to tell the jury
19 don't kill him when the government witnesses can't
20 tell the jury kill him?
21             THE COURT:  Because it is offered as
22 evidence that the defendant's character is such that
23 if he is executed his loss will impact someone.  I
24 don't know how to go further than that.
25             MS. RODRIGUEZ-COSS:  Well, but I
```

5042

```
1   think --
2              MR. SHEEHAN:  Your Honor, I think --
3              THE COURT:  I don't want to argue this
4   anymore.
5              (Sidebar concluded)
6              THE COURT:  Bring in the jury, please.
7              (Jury entered the courtroom.)
8              THE COURT:  Please be seated, ladies and
9   gentlemen.  Continued examination of Mr. Aquart by
10  Mr. Sheehan.
11             MR. SHEEHAN:  Thank you, your Honor.
12     Q.  I think we moved up to 1989.  Did there
13  come a time when you -- when you -- you mentioned it
14  before, a period of time when you moved with your
15  dad to Hartford.  How did that come about?
16     A.  I asked my mother -- or let my mother know
17  that it was time that I needed to live with my
18  father.  It came after an incident with a neighbor
19  where I had gotten into trouble for something I
20  didn't do, and my sister was alive at that point, my
21  stepfather was in the house, and it seemed like it
22  was time for me to live with my dad.
23     Q.  And were there conflicts between you and
24  Skibo at that point in time?
25     A.  I mean, he's not my dad.  He could never be
```

5043

```
1   my dad.  He could never punish me.  He was well
2   aware of that because of the threatening by my
3   father, of course.  He -- at that point he was only
4   focused on Azibo and the girls.  So, conflict, not
5   really, just you are not my dad, don't try to punish
6   me, that kind of thing.
7      Q.  And by that point in time was your dad, as
8   far as you knew, was he a fugitive?
9      A.  At that point, no.  I didn't know he was a
10  fugitive at that point, but he was indeed on the run
11  at that point, yes.
12     Q.  And was he using different names?
13     A.  He'd always used different names, so it
14  wouldn't have been different to us.
15     Q.  Was he using the name of Donovan Aquart?
16     A.  When we'd go to live with him, as a matter
17  of fact, yes, he did.  Donovan was the name of my
18  uncle.
19     Q.  What was the -- so you mentioned that you
20  and Azikiwe go to live with your dad.  And who was
21  the person that your dad was living with at that
22  time?
23     A.  At that time it was my stepmother, Gillian.
24  Gillian Walcott.
25     Q.  Gillian Walcott?
```

5044

```
1      A.  That is correct.
2      Q.  And did your mom have any -- did your mom
3   express any reservations about you and Azikiwe going
4   to live with Richard?
5      A.  Not to us, but definitely, yes, she did.
6      Q.  And what was it like for you and Azikiwe
7   going to live with your dad?
8      A.  It's like night and day.  We went from
9   being part of a larger family to being the only two
10  children in the household.  My stepmother did
11  everything she could to make us feel comfortable.
12  My dad basically did everything he could to make us
13  feel special, and we were living like two princes.
14     Q.  And was your dad involved -- still involved
15  at that point in the drug dealing?
16     A.  Yes, very much so at that point.  Yes.
17     Q.  Now, where did you first live in Hartford?
18     A.  On Congress Street, which is right off of
19  downtown.
20     Q.  And then did you later move?
21     A.  Yes, we moved to Campfield Avenue, which is
22  the south end of Hartford.
23     Q.  And was your dad much for discipline when
24  you were in Hartford?
25     A.  Yes and no.  He was very strict about
```

5045

```
1   things that bothered him, but overall, it was very
2   lax.  We got to stay up late at night, we travelled
3   a lot.  So, whereas with my mom, she would make sure
4   we went to school every single day, my dad was a
5   little looser about that kind of rule, for instance.
6      Q.  And what kind of travelling were you doing
7   with your dad?
8      A.  We spent a few weeks in Ohio, we spent a
9   few weeks in New York.  We would travel around
10  visiting what I thought was family, but later on
11  come to find out these were my father's drug
12  operations throughout the country.
13     Q.  And how often would you see Azibo after you
14  moved to Hartford?  Would he come and visit?
15     A.  Yes, but only on, like, extended holidays
16  from school.  So he would spend, you know, the
17  Christmas break with us or a portion of the summer
18  break, a couple days at a time, maybe a week at a
19  time.
20     Q.  Did it appear to you at that time that
21  Azibo wanted to be with you?
22     A.  Definitely.  Definitely.
23     Q.  And did he express that to your father?
24     A.  Yes, on the visits he would.  And even
25  before we came he would.  But on the visits, you
```

5046

1    know, there would always be that moment of, "I don't
2    want to go back home to mommy.  I want to stay here.
3    Why can't I stay here?"  And then the explanation
4    from my dad.
5        Q.    And what was the explanation from your dad?
6        A.    Mommy needed you, you are too young, you
7    can't handle this life.  Things like that.  He never
8    would come out and say why, he would just make up a
9    reason or say a reason.
10       Q.    Now, do you know at that point in time that
11   you were in Hartford whether Skibo and your mother
12   were having problems?
13       A.    Yes, I had become aware of that.  Yes.
14       Q.    And were they living together?  Or what was
15   your understanding of that situation?
16       A.    At that point we're at now they're
17   beginning to separate, living in separate houses and
18   even in separate countries.
19       Q.    And by separate countries what do you mean?
20       A.    They maintained a house in Kingston,
21   Jamaica, and she maintained the apartments here in
22   New York or City View.
23       Q.    And you indicated that your dad was doing
24   this kind of travelling.  Did you get involved in
25   helping him in those travel activities?

5047

1        A.    Not at first, but after the first year,
2    yes.  I began -- one of the rites of passage is to
3    learn how to drive.  So, my dad was teaching both
4    myself and my brother how to drive.  He bought us
5    cars, that kind of thing.
6        Q.    And did you actually get involved in his
7    drug business at that point in time in Hartford?
8        A.    Yes.  At that point in time, yes.
9        Q.    And what were you doing?  What were your
10   responsibilities at that point?
11       A.    At first it was just holding money or
12   counting money, and then later on holding product
13   and then moving into deliveries and so forth.
14       Q.    And were you actually involved in any sales
15   at that point in time yourself?
16       A.    At first, no.  Later on I would then be
17   given a list of clients that I would deliver to or
18   pick up from, pick up things from.
19       Q.    And do you remember a time when federal
20   authorities showed up in Campfield?
21       A.    Yes.  During one of our breaks where we
22   were going back and forth between the house in
23   Hartford and New York, I come home and my mother at
24   the time, my stepmother, tells me that we had
25   visitors.  Plus there was always rumors they were

5048

1    visiting other 12 Tribe members or other family
2    members who knew us and asking about our dad.  So
3    there were people asking about my dad, was the
4    rumor, and then it was confirmed, yeah, we had been
5    visited by federal authorities.
6        Q.    And after you heard about that, what
7    happened as far as Hartford was concerned?
8        A.    No longer we lived in Hartford.  We were
9    shipped out of town back to my dad.  Because my dad
10   was not staying in the apartment with us at that
11   point.
12       Q.    And why wasn't he staying there at that
13   point?
14       A.    Well, because he was wanted, basically.
15       Q.    And when you got shipped back to Hartford,
16   who got shipped back to Hartford?
17       A.    When we left out of Hartford we were -- it
18   was myself and Azikiwe, and we went back to
19   Bridgeport.  But not to my mother or anyone.  My
20   father basically gave us our own apartment in
21   Bridgeport.
22       Q.    And how old were you at that time?
23       A.    Sixteen.
24       Q.    And where did he give you the apartment?
25       A.    He actually gave us our old apartment on

5049

1    Yarrington Court.  He rented it out again and was
2    using it as a fortress.
3        Q.    As a fortress, what do you mean as a
4    fortress?  What was it like?
5        A.    Well, it was drastically changed from when
6    we were younger.  Security bars on all the windows,
7    double security doors, fire doors.  Even eliminated
8    one of the entrances.  And then he created a safe
9    room in the back.  What used to have been my
10   parents' bedroom was now a safe room.
11       Q.    Now, where was your mom at that time?
12       A.    Between New York and --
13       Q.    When you came back from Hartford --
14       A.    She was in New York.
15       Q.    -- to Bridgeport, do you remember where
16   your mom was living?
17       A.    Not really because I didn't really see her.
18       Q.    Okay.
19       A.    But I was aware she was in New York and
20   back and forth between Connecticut and New York.
21       Q.    And was that the time when she was living
22   at Sister Benji's house?
23       A.    Mama Benji, that is correct.
24       Q.    Mama Benji, I'm sorry.  And so you were
25   living at Yarrington Court.  Was your dad carrying

5050

```
1   on business in Bridgeport at that point in time?
2      A.   Yes, he still maintained several herb
3   houses.  One of them was on Linwood Avenue.  So, he
4   would spend the majority of his time on Linwood and
5   we would be spending the majority of our time on
6   Yarrington or going to school, because he registered
7   us in school.  So, we went to school.
8      Q.   And what was on Linwood Avenue?
9      A.   Linwood was an herb gates that he
10  maintained, and basically that's where they sold the
11  herb and, also I found out, cocaine.
12     Q.   And were you and Azikiwe involved in the
13  operation at Linwood at all?
14     A.   Yes.
15     Q.   And what would you do?  Or what were your
16  responsibilities?
17     A.   My responsibility specifically was to watch
18  the door during sales and do transactions if no one
19  else was available.  Count stock, take inventory,
20  transport product back and forth from the safe
21  house.  Be on guard duty if guard duty was
22  necessary.  Empty out the house at night, count
23  money, make deposits, make transfers, meet with
24  clients.  Pretty much --
25     Q.   Did Azibo visit you at Linwood?
```

5051

```
1      A.   Yes, once or twice, yes.
2      Q.   Was he aware of what was going on at
3   Linwood?
4      A.   Yes.  At this point he's older, he's going
5   through rites of passage, he's witnessed other
6   bredren selling, he now knows what his dad does, he
7   knows what we do.  So, yes.
8      Q.   And were there also weapons at the house at
9   Linwood?
10     A.   Yes.  We were armed at all times.
11     Q.   Now, did your mom later find out about
12  Linwood?
13     A.   Yes.
14     Q.   And what did she say about that?
15     A.   She was none too pleased.  She wanted us
16  out of there as soon as possible and not involved.
17  She wanted us to be normal kids, but my dad had
18  other ideas.
19     Q.   And did you become involved in gang
20  activity at that time?
21     A.   Yes.
22     Q.   You and your brother Azikiwe?
23     A.   Yes.
24     Q.   And what gang was that with?
25     A.   We joined the Bush mob.
```

5052

```
1      Q.   And was the Bush mob a gang in Bridgeport?
2      A.   Yes.
3      Q.   And then did you get arrested at that point
4   in time?
5      A.   That's correct.
6      Q.   And after you got arrested, who got you out
7   of jail?
8      A.   My mother.  My mother.
9      Q.   And how old were you then?
10     A.   Sixteen.
11     Q.   And once your mom got you out of jail, what
12  steps did she take?
13     A.   She begins to separate me from my dad, take
14  me out of Bridgeport.  Immediately we -- you know,
15  she takes me to New York for a couple weeks.
16  Everything that I had had to go, all my clothes,
17  everything, and I started fresh.  She wanted to give
18  us a fresh start.
19     Q.   And was that an issue with your dad, or by
20  that point did she just take over?
21     A.   It was an issue with my dad definitely, but
22  she did just take over at that point.  She was
23  assertive at that point and she took over.
24     Q.   And now you mentioned that you moved to New
25  York at that point in time.  Do you remember who you
```

5053

```
1   stayed with in New York?
2      A.   Sister Isa Char and some of the other
3   coworkers from my mother's salon in New York.  They
4   had an apartment in New York, so we would stay with
5   them.  And you know, Mama Benji's house when we came
6   back to Bridgeport.  But, yeah, we stayed in New
7   York with Sister Isa Chard.
8      Q.   And after New York is when you moved to
9   Stamford; is that correct?
10     A.   That's correct.  She got everything
11  together.  She reacquired Azikiwe.  Because Azikiwe
12  wasn't with us, she got Azikiwe, and we moved into
13  the apartment in Stamford.
14     Q.   Where had Azikiwe been?
15     A.   With one of the other workers for my dad.
16     Q.   And so you got the apartment at that point
17  in time in Stamford, correct?
18     A.   That's correct.
19     Q.   Did you learn then that your father had
20  been arrested?
21     A.   Yes, within -- yes, he gets arrested
22  shortly after -- shortly after we get the apartment.
23  That's correct.
24     Q.   So, you go to Stamford.  In terms of the
25  move to Stamford, let me show you the first page of
```

5054

```
1   exhibit TT-2.  Does that date of April of 1993, does
2   that seem about right in your recollection as to
3   when you went to Stamford?
4       A.   Yeah, that sounds right.
5       Q.   And prior to that time you'd been in New
6   York, right?
7       A.   That's correct.
8       Q.   And when you were in New York were you
9   enrolled in school?
10      A.   No.
11      Q.   And when you were in New York was Azikiwe
12  enrolled in school?
13      A.   No.
14      Q.   Or Azibo, for that matter?
15      A.   No.
16      Q.   What were you doing during the day while
17  you were New York?
18      A.   We worked at my mom's shop and we took care
19  of our sisters.
20      Q.   Because by that point in time your mom had
21  two other kids?
22      A.   That is correct.
23      Q.   All right.  And then -- and who was in
24  charge of the kids in New York?  How did that work?
25      A.   Well, in New York she did have a designated
```

5055

```
1   helper, a woman named Bungie, which was -- Sister
2   Isa Char's daughter was the nanny, if you would, for
3   my sisters, and also my mother's personal assistant,
4   too.  So she was the primary caregiver for the
5   girls.  And for the most part when my mother was
6   working it was the same orders, watch your sisters,
7   make sure your brothers didn't get in trouble.  The
8   same thing, watch ourselves.
9       Q.   And when your mom was out, whose
10  responsibility was it to get you and your brothers
11  off to school?  How would that work?
12      A.   It would be our own.  We'd get ourselves
13  off.  It would be us.
14      Q.   Now, having previously been in Hartford and
15  then kind of living on your own with your brother at
16  Yarrington Court, what was that transition like for
17  you and your brother in going to Stamford?
18      A.   Hard.  It was very hard, not only because
19  now we have a parent over us, but hard because I was
20  used to paying rent, I was used to acting and living
21  like an adult, and here I have to be a child.  So it
22  was hard.  It was hard for her to deal with us, you
23  know, under the influence of our dad.  We were still
24  basically our dad's little soldiers, you know.
25      Q.   Your dad's little soldiers, what do you
```

5056

```
1   mean by that?
2       A.   That's what he called us.  That's what he
3   told us to be.  We were raised and trained to be
4   soldiers in his army.
5       Q.   And did you end up -- how did your stay in
6   Stamford work out?
7       A.   Not so good.  I ended up becoming arrested
8   in Stamford for possession.
9       Q.   And did you get expelled from school?
10      A.   Yes, I did.
11      Q.   And then in May of that year, 1994, you
12  went to Florida with your mom and brothers?
13      A.   That's correct.  My mother was part of a
14  function called The Gathering, and basically during
15  the time period, after The Gathering, when we were
16  all getting ready to come back up is when my mother
17  passed away in Florida.
18      Q.   When your mom -- after your mom -- well,
19  let me ask you this:  Who told you that your mom had
20  died, if you remember?
21      A.   I believe it was Mama Desta, she came into
22  the room and told me.
23      Q.   And how did you -- did you come back up to
24  -- how was it you got back up to Connecticut after
25  your mom had died in Florida?
```

5057

```
1       A.   I flew on a plane with me and my brothers.
2       Q.   And where was Jumbo immediately after your
3   mom died, after the funeral?
4       A.   I really don't know.  I think New York.
5       Q.   Okay.  You had mentioned Sister Sharon
6   before?
7       A.   That is correct.
8       Q.   Was that something you were involved in
9   arranging or is it just something you found out
10  about?
11      A.   No, I was told basically that's where my
12  brother was, and because I knew who she was and the
13  relationship we had with her, it was like, oh, okay.
14      Q.   After your mom had died, did you get help
15  and assistance from the 12 Tribes community?
16      A.   No, no.
17      Q.   What did you -- where did you and Azikiwe
18  go immediately after your mom died?
19      A.   Back to Florida.
20      Q.   And how long did you stay in Florida?
21      A.   Several weeks.  Several weeks.  My mother's
22  original plan before she passed away was for us as a
23  family to move to Florida, so it seemed natural for
24  us to go back to where she wanted us to go to.
25      Q.   And then when you came back to Connecticut,
```

**GA1307**

5058

```
1   where did you -- what happened, by the way, to the
2   Stamford apartment?
3       A.   That was the reason we came back.  We had
4   to come back to get our stuff and to clean out the
5   apartment.  Because my mother basically took care of
6   six children on her own, there was no cushion, the
7   rent was not paid up.  We were living in a condo and
8   the association did not really have a heart, so they
9   basically seized all of our property and put it into
10  storage.
11          So when we came back we were trying to
12  deal with the cleanup of the house and whatever
13  family mementos and whatever else we could get, and
14  that's why we had came back up.
15      Q.   Was there any thought of you and your
16  brothers staying with Skibo?
17      A.   No.  We never lived with him, so it
18  wouldn't have made sense.  Plus, he never was
19  concerned about us, he was only concerned about my
20  sisters.
21      Q.   Was there any thought of you and your
22  brothers going to live with your mother's relatives
23  in Canada?
24      A.   That was briefly brought up by one of my
25  mother's sister specifically, but because we had no
```

5059

```
1   relationship with them for the entire period of our
2   lives, it wasn't an option.  These people didn't
3   know us, they didn't share the same faith as us,
4   they didn't really understand who we were, and they
5   didn't agree with who we were, as meaning 12 Tribes
6   or Rasta.  So, that wasn't an option.  It was worse
7   than being adopted.
8       Q.   And did your mother have an insurance
9   policy?
10      A.   Yes.
11      Q.   And did she have a little bit of money in
12  the bank; as far as you know?
13      A.   We found out after cleaning out the
14  apartment that yes, she did.
15      Q.   And did you at some point in time go to DCF
16  for help?
17      A.   Correct.  After the money in the bank wore
18  off, ran out, and we needed a place to live.
19          THE COURT:  I'm sorry, Mr. Sheehan,
20  we're going to take a brief recess.
21          MR. SHEEHAN:  Oh, okay.  Thank you.
22          (Jury exited the courtroom.)
23          THE COURT:  I'm sorry, one of our jurors
24  is going to be sick.
25          MR. SHEEHAN:  Oh, okay.
```

5060

```
1           THE COURT:  We will just take five
2   minutes.
3           MR. SHEEHAN:  That will be fine, your
4   Honor.
5           THE COURT:  If we could continue the
6   discussion in which --
7           MR. SHEEHAN:  Do you want Mr. Aquart to
8   stay there probably for five minutes?  It makes as
9   much sense --
10          THE COURT:  Let's just recess.
11          Before we do that, may I ask what the
12  government's position is with respect to the
13  defendant's motion to admit the Efrain Johnson 302s.
14          MS. DAYTON:  Yes, we object.  We will be
15  filing a motion probably tonight.
16          THE COURT:  All right, we're in recess.
17          (Recess)
18          THE COURT:  All right, I think everyone
19  has returned to good health and we'll bring the jury
20  back in.
21          (Jury entered the courtroom)
22          THE COURT:  All right, ladies and
23  gentlemen.  Please be seated.
24          All right, we'll continue with the
25  direct examination of Mr. Aquart.
```

5061

```
1       Q.   I had just asked you about the -- whether
2   there was an insurance policy.  And let me show you
3   exhibit -- Defendant's Exhibit R and ask you, is
4   that the insurance policy -- let me make it a little
5   smaller.  Is that the insurance policy in question?
6       A.   Yes, it is.
7       Q.   And I note on that policy that you were the
8   named beneficiary of that policy?
9       A.   That's correct.
10          MR. SHEEHAN:  And I would offer that at
11  this time.
12          THE COURT:  All right, that is a full
13  exhibit.
14      Q.   Let me ask you, I see there a reference on
15  Exhibit R to an attorney, Christopher Hynes.
16      A.   Okay.
17      Q.   Was he the -- was he involved in some kind
18  of probate proceedings as a guardian in this matter?
19      A.   I believe he was appointed guardian ad
20  litem.  He was part of the law firm we retained to
21  handle all of our -- everything from the
22  guardianship application to my emancipation to this.
23  He was part of that law firm.
24      Q.   Okay.  Because at this time you were
25  17 years old?
```

5062

1    A.   That is correct.
2    Q.   Now, your dad at this point in time was in
3  jail, was he not?
4    A.   That is correct.
5    Q.   Were you visiting with your father when he
6  was in jail?
7    A.   We visited him once or twice, yes.
8    Q.   And would you talk to him by phone while he
9  was in jail?
10   A.   Yes, we did communicate with him by phone.
11   Q.   And let me just show you Exhibit V.  And
12  who is this a picture of?
13   A.   That's Azibo on the phone.
14   Q.   Okay.  And did you know who he was talking
15  to at that time?
16   A.   Probably my dad because that's the
17  apartment on Ogden Street.  So, I recognize all the
18  stuff.  So probably my dad.
19   Q.   And I want to go back to -- you went to
20  Florida, then you came back, and at some point in
21  time you understood that Azibo was staying in New
22  York with Sister Sharon?
23   A.   That's correct.
24   Q.   And then what happened as far as Azibo was
25  concerned?

5063

1    A.   I received a phone call that they were
2  having problems, and within maybe about a week or so
3  after the first phone call we got another phone call
4  that Sharon is on her way, she can no longer take
5  care of him and she will be dropping him off to us.
6    Q.   Did Sharon tell you about what problems she
7  was having with Azibo?
8    A.   Not in detail.  Just along the lines that
9  he was a handful, he was hard to handle, she had
10  other children as well.
11   Q.   And when Azibo arrived, where did you go at
12  that point?
13   A.   We immediately got -- we started staying
14  with Auntie Carla, which is another aunt.  This one
15  was my wife's aunt, actually, and she allowed us to
16  stay in her apartment off of Fifth Street.
17   Q.   Was Fifth Street at that point -- is that
18  the same Fifth Street we talked about earlier?
19   A.   Yes, it is.  Yes, it is.
20   Q.   And then how long did you stay at Auntie
21  Carla's house?
22   A.   Briefly.  Briefly.  We had an incident and
23  we were basically kicked out of Auntie Carla's
24  house.
25   Q.   And then from there where did you go?

5064

1    A.   We rented Huff Avenue, but I ended up going
2  into the hospital right after that and then when we
3  come back out --
4    Q.   Before we get to the hospital, let me ask
5  you, did you ever stay at Sister Benji's house?
6    A.   Yes, I did.
7    Q.   And was that after your mom had passed as
8  well?
9    A.   Yes, Mama Benji was the executrix of the
10  estate.
11   Q.   Okay.  And how long did you stay -- in fact
12  I notice on Exhibit -- I'm sorry.  On Exhibit R
13  there is a reference to 87 City View Avenue.
14   A.   Yeah.
15   Q.   Is that a typo?
16   A.   That's actually a typo.  It should be 37
17  City View.  That's because as the administrator for
18  the estate, I just used her address for everything.
19   Q.   And did you for a period of time also go
20  back up to Hartford?
21   A.   Yes, I spent maybe about a week or two with
22  Mama Pinkie in Hartford.  That's where we were able
23  to see my sisters.
24   Q.   And what's Mama Pinkie's other name?  Do
25  you know what her name is?

5065

1    A.   Eleanor Cooper.
2    Q.   Now, you indicated that at some point in
3  time you applied to become emancipated?
4    A.   That is correct.
5    Q.   And why did you apply to become
6  emancipated?
7    A.   Because it would give me the rights of a
8  legal adult.  I had no legal adult to speak on my
9  behalf.
10   Q.   Now, I'm going to jump up to February of --
11  so your mom passed away the end of May in 1994.
12  We've had this period of time in between.  And then
13  going up to February of 1995, did something happen
14  to you in February of 1995?
15   A.   Yes.
16   Q.   And what was that?
17   A.   I was shot down on the streets of
18  Bridgeport.
19   Q.   Okay.  And where were you when you were
20  shot down?
21   A.   On Fairfield Avenue on the west side of
22  Bridgeport.
23   Q.   And who were you with when you were shot?
24   A.   My younger brother Azikiwe.
25   Q.   And who was living with you at that time?

5066

1    A.    My younger brother Azibo and my fiancee who
2  was pregnant at the time.
3    Q.    And your fiancee's name is?
4    A.    Nasheika.
5          MR. SHEEHAN:  At this time I would offer
6  Exhibit Y-1 through 7, which is certain hospital
7  records related to that.  And I'm just going to show
8  you the -- I'm sorry.
9          THE COURT:  This is the Bridgeport
10  Hospital record?
11          MR. SHEEHAN:  Yes, it is.
12          THE COURT:  Admitted.
13          MR. SHEEHAN:  It's Exhibit Y-1 through
14  Y-7.
15          THE COURT:  All right.
16    Q.    And on Y-1 is the discharge summary, and it
17  appears that you were -- the date that you were shot
18  was February 25, '95?
19    A.    That's correct.
20    Q.    And how long a period of time were you in
21  the -- and it reflects you were discharged a little
22  bit more than a month later?
23    A.    That is correct.
24    Q.    Is that correct?
25    A.    That's correct.

5067

1    Q.    And is that consistent with your
2  recollection of how long you were in the hospital?
3    A.    That's correct.
4    Q.    And how is it that you came to be shot?
5    A.    Members from the rival gang that I was a
6  part of realized that we were on their side of town.
7  Dreads became associated with the Bush Mob.  I had
8  dreads still.  Even though I was no longer a part of
9  the Bush Mob, they basically identified me as a Bush
10  Mob member and began shooting at us.
11    Q.    And after -- when you got -- actually when
12  you were in the hospital, were you concerned about
13  the fact that people had retaliated against you?
14    A.    Yeah, our life was pretty much in danger,
15  so we kind of went into protective custody where I
16  was under an alias name in the hospital.  My
17  brothers were split up again, and even my wife they
18  pulled out of high school and she didn't go to
19  school for a while during the time I was in the
20  hospital because of the concern of retaliation.
21    Q.    And when you got out of the -- actually in
22  that month that you were in the hospital, do you
23  know where Azibo was?
24    A.    Not specifically, no.  They would bring him
25  to visit me, but I'm not clear as to where he stayed

5068

1  most of the time.
2    Q.    And when you got out of the hospital, where
3  did you go?
4    A.    At first back to Fifth Street until I was
5  healthy enough, and then we moved into our apartment
6  on Huff Avenue.  And then we moved to Ogden Street,
7  which was basically a better apartment.
8    Q.    During this period of time, as you moved
9  from place to place, did you have ongoing contact
10  with the Department of Children and Families?
11    A.    Yes.  We had originally asked for help.
12  They then turned around and gave us the option of
13  going to group homes or boys' homes.  So, yes, we
14  did have interaction with them, mostly to avoid them
15  at that point.  At the point that you are talking
16  about we were avoiding them.
17    Q.    Were you honest with them about the
18  circumstances of your father as far as who he was
19  and where he was?
20    A.    At that point I don't believe so, no.
21    Q.    And were you getting assistance from the 12
22  Tribe members, other than the family members that
23  you stayed with?
24    A.    No.  The organization never extended a hand
25  to us.

5069

1    Q.    What impact did the death of your mother
2  have on Azibo from your observations at that time?
3    A.    It must have been devastating.  She was the
4  only consistent force in his life.  It happened
5  right after my father got arrested, the dad he never
6  knew.  I can't imagine what it did to him.
7    Q.    Now, it sounds like in your family as a
8  first son you had a lot of responsibility.  Is that
9  fair to say?
10    A.    That's correct, firstborn has privileges,
11  firstborn has responsibilities.
12    Q.    How did -- for you, how did being shot
13  affect you?
14    A.    It changed everything about me pretty much.
15  I'm not sure.  At the time I'm not sure how it
16  changed me, but looking back on it now, that marks
17  the point where I really changed the way I live,
18  changed the way I move.  I put away guns, I put away
19  drugs, I put away pretty much all the negative
20  things so that I can stay focused on -- because I
21  had a baby on the way now, I had my brothers.  It
22  made me more adult, more mature.
23    Q.    And did there come a point in time in
24  August of '95 when Azibo picked up a juvenile case?
25    A.    Yes, yes.

5070

1  Q.  And at this point in time, were you -- did
2  you have a guardianship petition pending?
3  A.  Yeah, after emancipating myself I
4  immediately applied for guardianship of both my
5  brothers, and I later received it.
6  Q.  Showing you Exhibit Z, guardianship.  Is
7  this the guardianship petition that was -- you were
8  appointed in August 16th of 1995?
9  A.  That's correct.
10  Q.  Now, at that point in time, in August of
11  1995 -- well, actually, when was your son born?
12  A.  October of '95.
13  Q.  And what was Nasheika's situation in August
14  of '95?  I mean, she was pregnant.  Were you all
15  living together?
16  A.  She was pregnant, we were all living
17  together, but she was basically back and forth
18  between my apartment and her mother.  Because her
19  mother really didn't approve of her being pregnant
20  as a teenager.  So there was conflict in her house
21  and she spent a lot of time with us.
22  Q.  Are you still married to Nasheika?
23  A.  Yes, I am married to Nasheika.
24  Q.  How many children do you have?
25  A.  I have three sons and a daughter.

5071

1  Q.  How old are -- your sons are how old?
2  A.  Thirteen, eight and nine.
3  Q.  And your daughter?
4  A.  My daughter is two years old.
5  Q.  And after that initial probation -- after
6  Azibo got arrested on that juvenile charge, how did
7  you respond to that?
8  A.  The same way my mother responded to me
9  getting in trouble, with anger, disappointment, you
10  know, a lot of harsh talking.  I did try to
11  discipline him a lot.  I pushed him real hard to
12  hold up to a certain standard.  I might have pushed
13  him too hard at that point.  I didn't understand
14  then that he might have been hurting or anything
15  like that.  But basically he had messed up.  He was
16  messing stuff up.  He was making it harder for us to
17  function as a unit, as a team, and I let him know.
18  Q.  Now, did DCF get involved in your life
19  because of his juvenile cases?
20  A.  Yes, they did.
21  Q.  And was that upsetting to you?
22  A.  Yes.  Any type of law enforcement
23  involvement, any type of government involvement or
24  anything like that was the worst thing that could
25  happen, especially since, you know, the last time

5072

1  they were involved they wanted to put us in a group
2  home.  So I didn't want my little family to be
3  destroyed again.
4  Q.  And did you continue in 12 Tribes
5  functions?
6  A.  Yes.  Not as actively as when my parents
7  were around, but yes, I did my best to try to keep
8  that tradition going.
9  Q.  And let me show you Exhibit FF.  Is that
10  picture of you and your brothers?
11  A.  Yeah, that's us.  That's our family.
12  That's me with my wife.
13  Q.  Nasheika?
14  A.  My future wife, my newborn son, and next to
15  her is my middle brother Azikiwe, and on the end
16  there is Azibo.
17  Q.  And is there any significance to the fact
18  that everybody was wearing white at this?
19  A.  Yes.  The events and the -- the events for
20  12 Tribes usually was a color theme based on the
21  month.  This particular event happened in January,
22  the color theme for that month was white for the
23  Tribe of Joseph.  So we all dressed in white, bought
24  them all clothes and stuff, and we all went down and
25  made it a special occasion.  It was the first time

5073

1  my son is old enough to leave with anyone, so that's
2  why my wife gets to go with us.
3  Q.  Did there come a time finally when the
4  police came to your house?
5  A.  Yes.
6  Q.  Looking for Azibo?
7  A.  Yeah, this is after a while.  He's been --
8  he's gotten in trouble for other things.  He's not
9  listening to house rules and that kind of thing.
10  Just a general me and him disconnect as far as where
11  I think he should be and where he wants to be.
12  Q.  Let me ask you this:  As a father now and
13  thinking back on those responsibilities, do you feel
14  that at 17 you were equipped to be the guardian for
15  your younger brother?
16  A.  No, no.
17  Q.  And in what way do you think that you were
18  not an appropriate guardian for him?
19  A.  Besides my age and the fact that I didn't
20  have any real support structure around me, we were
21  basically kids.  We were kids raising kids.  I was a
22  poor substitute for my dad or my mother.  I had no
23  awareness of what he was going through emotionally.
24  We just did the best we could.  We just did the best
25  we could.

5074

```
1    Q.   And let me ask you this:  You realize that
2    the -- that in this case the alternative sentences
3    that the jury must consider are a sentence of either
4    life imprisonment or the death penalty.  What impact
5    do you believe that -- if Azibo was sentenced to
6    death, what impact would that have on you and your
7    family?
8        A.   It would be devastating because he's never
9    gotten a chance to really live, and now with my sons
10   never getting a chance to have an uncle, it almost
11   feels like the cycle is going to repeat itself
12   again.  It would be devastating.
13           There is so many of us that his presence
14   has touched and there is so many of us that know the
15   good things about him, that just a thought of it
16   doesn't make sense.
17           MR. SHEEHAN:  I don't have any further
18   questions, your Honor.
19           THE COURT:  All right,
20   cross-examination.
21   CROSS-EXAMINATION
22   BY MR. MARKLE:
23       Q.   Good afternoon, Mr. Aquart.
24       A.   Good afternoon.
25       Q.   Mr. Aquart, are there any rules you know
```

5075

```
1    the defendant has followed?
2        A.   Yes.
3        Q.   Has he ever followed your rules?
4        A.   Yes.  Not always, but yes.
5        Q.   Not often?
6        A.   Not often, I agree.
7        Q.   Your mom's rules?
8        A.   Yes and no.
9        Q.   Your dad's?
10       A.   Yes and no, again.
11       Q.   The laws?
12       A.   Yes and no.
13       Q.   Mostly no?
14       A.   Again, depending on which -- I'm not sure
15   about that.
16       Q.   And obviously you're his brother, you still
17   love him?
18       A.   Yes, I do.
19       Q.   You did your best to do what you could do
20   to make him a good person, correct?
21       A.   Yes.
22       Q.   And are you feeling responsible for where
23   he is today?
24       A.   I always feel responsible for him.  That's
25   the way I was trained.
```

5076

```
1        Q.   For all your brothers and children?
2        A.   That's right.
3        Q.   Now, let's go back to your mom.  Your mom's
4    dad died when she was very young, correct?
5        A.   That is correct.
6        Q.   How old was she when he died?
7        A.   I believe 12.
8        Q.   And she had you at a very young age; is
9    that correct?
10       A.   That's correct.
11       Q.   How old was she when she had you?
12       A.   I believe 16 or 17.
13       Q.   And she raised you with your best interest
14   in mind; is that correct?
15       A.   That is correct.
16       Q.   You have no doubts about that, do you?
17       A.   No, I don't.
18       Q.   You said she's a virtuous woman?
19       A.   That's -- yeah, that's correct.
20       Q.   And you recalled many events when you were
21   only four or five at the beginning of your
22   testimony, and I know it's been a long day so I'm
23   not specific, but when you were about five?
24       A.   Yes, my mother and my family are big on
25   history.  So, yes.
```

5077

```
1        Q.   And you remember those?
2        A.   Yes.
3        Q.   And have you talked to a defense
4    investigator before today about those?  Have you
5    talked to somebody from the defense about what you
6    were asked about today?
7        A.   Yes.  About our history, yes.
8        Q.   A couple of times you met with people?
9        A.   Yes.
10       Q.   And did they take notes of the interview
11   with you?
12       A.   Yes.
13       Q.   And did you give a written statement to
14   them?
15       A.   Did I write a statement for them?  No, I
16   don't think so.
17       Q.   And it wasn't videotaped or recorded, was
18   it?
19       A.   Not that I'm aware of, no.
20       Q.   Just notes were taken?
21       A.   I would say yes.
22       Q.   And I'd just ask you this:  You talked
23   about marijuana as though there was something wrong,
24   but in the 12 Tribe is marijuana forbidden or okay?
25       A.   In 12 Tribes, yes, it is not allowed.  In
```

**GA1312**

5078

```
1    Rasta culture it is okay.
2        Q.    So there a conflict there?
3        A.    That is correct.  That is correct.
4        Q.    And in terms of being an outcast due to
5    your religion or your culture, that's kind of come
6    and gone, correct?  Is that fair to say?
7        A.    I was harassed on the way in here by the
8    guards.  So I would say yes, it is easier to be a
9    Rasta, but, no, it's not.
10       Q.    Still not a perfect world?
11       A.    No.
12       Q.    But it's much improved than when you began?
13       A.    I agree.  Yes, definitely.  Definitely.
14       Q.    And the stigma is less significant
15   although, again, as you just pointed out, it's not
16   gone.
17       A.    Yes.
18       Q.    And you said you were arrested and
19   convicted as you were relating your past history.
20   Was that charged as a youthful offender charge?
21       A.    I said I was arrested, yes.
22       Q.    Were you a youthful offender?
23       A.    No.
24       Q.    You weren't treated as a youthful offender?
25       A.    In Stamford, yes.
```

5079

```
1        Q.    So, you have no adult record; is that
2    correct?
3        A.    That is correct.
4        Q.    You have a perfectly clean record as an
5    adult?
6        A.    That is correct.
7        Q.    And your mom went to school, right?
8        A.    Yes.
9        Q.    She went to high school?
10       A.    Yes.
11       Q.    Got her degree?
12       A.    Yes.
13       Q.    Did she go to college?
14       A.    Some studies here in America, yes.
15       Q.    She raised you boys until her untimely
16   death?
17       A.    Yes.
18       Q.    She worked as a nurse, correct?
19       A.    That is correct.
20       Q.    She started her own business?
21       A.    That's correct.
22       Q.    She wanted to get you guys to the United
23   States for a better life.
24       A.    That is correct.
25       Q.    You just have to say correct.
```

5080

```
1        A.    That's a fair statement, yes.
2        Q.    Or whatever the answer is.
3        A.    Yes.
4        Q.    She did provide for you when she wasn't
5    around, right?  You said there were nannies and
6    caretakers for the children?
7        A.    That is correct.
8        Q.    And she moved you from home to home, as
9    Mr. Sheehan took us on that tour, but it was always
10   with the interest to get you into a better place and
11   a better school.
12       A.    That's correct.
13       Q.    To better your life.
14       A.    That is correct.
15       Q.    And during all of that time your brother is
16   with your mom, correct?
17       A.    That is correct.
18            THE COURT:  I think you need to specify
19   which brother.
20       Q.    Your brother Azibo is with your mom,
21   correct?
22       A.    That is correct.
23       Q.    He's -- Azibo is not with your dad, right?
24       A.    That's correct.  He lived --
25       Q.    I'm sorry.
```

5081

```
1        A.    That's correct.
2        Q.    When you say you are being trained to be a
3    soldier, your brother Azibo is not with you with
4    your dad, that's you and Azikiwe, correct?
5        A.    Yes, he is.  He's sitting on the bed in his
6    braces watching us being trained, and then he
7    doesn't see us as we live with my dad.
8        Q.    When you are in Hartford with your dad?
9        A.    Yes.
10       Q.    You said your brother Azibo came once or
11   twice.
12       A.    He visits us on holidays and weekends and
13   summer vacation.
14       Q.    So, he's not there every day, 24 hours a
15   day, like you and Azikiwe?
16       A.    No, that's correct.
17       Q.    And he's not with you and Azikiwe when your
18   dad -- he, Azibo, is not with you and Azikiwe when
19   your dad is training you in all facets of the drug
20   operation he's running, correct?
21       A.    No, he's only visiting and hearing stories.
22       Q.    Sporadically visiting?
23       A.    That is correct.
24       Q.    He's not trained how to deal with the
25   clients?  Azibo is not?
```

**GA1313**

5082

```
1    A.   Only what Skibo showed him.
2    Q.   I'm sorry?
3    A.   Only what Skibo, his stepfather, showed
4  him.
5    Q.   Does your father, Richard, tell him to deal
6  with his clients?
7    A.   No.
8    Q.   Does he tell Azibo to bring product to his
9  clients --
10    A.   No.
11    Q.   -- like he did to you and Azikiwe?
12    A.   That's correct.  No.
13    Q.   Does he tell Azibo to go collect money from
14  his clients?
15    A.   No.
16    Q.   And he's not with you when your dad says
17  take this gun and make sure nobody walks in this
18  room, correct?
19    A.   Yes.
20    Q.   He's there when that happens?
21    A.   That's correct.
22    Q.   Is he given a gun by your father?
23    A.   No, he's a baby at that point.  He's a
24  child.
25    Q.   How old is he?
```

5083

```
1    A.   Two, three.
2    Q.   So, perhaps wouldn't even know what's going
3  on.
4    A.   He knows what's going on.
5    Q.   You knew what's going on?
6    A.   There was blood on the floor.  He knows
7  what's going on.
8    Q.   There was blood on the floor?
9    A.   Yes.
10    Q.   You said your father said here is a gun and
11  if anyone walks through the door take care of them?
12    A.   That's correct.
13    Q.   And there is blood on the floor?
14    A.   The house had blood on the floor from the
15  wound that he had, yes.
16    Q.   From the wounds that your father had?
17    A.   Correct.
18    Q.   And you know your brother Azibo saw that?
19    A.   There was no way he could not have.  But
20  again, I didn't question him as to what he remembers
21  about it.  So, no, I'm not sure.
22    Q.   Wouldn't you try to keep that from your
23  little two-year old brother from seeing?
24    A.   Tuck him under my arm, listen to my dad.
25  That's what I did.
```

5084

```
1    Q.   And try to keep him from seeing that?
2    A.   Try to keep him safe, that's what I tried
3  to do.
4    Q.   And back to your mom.  When your mom goes
5  to college, when she's attending classes to get her
6  GED or college classes, she makes sure that the
7  children are in a daycare center, right?
8    A.   That's correct.
9    Q.   And the defendant is with your mom?  The
10  defendant, your brother Azibo, is with your mom the
11  majority of time we're talking about; is that
12  correct?
13    A.   That's correct.
14    Q.   And then he's not with your dad, Richard,
15  whose name he doesn't even use, correct?
16    A.   That's correct.
17    Q.   And the defendant, your brother Azibo, is
18  with the mom who wanted you all to get away from the
19  negative, correct?
20    A.   That is correct.
21    Q.   And even your stepfather, Mr. Johnson, he's
22  focused in a positive way on the defendant, your
23  brother Azibo, correct?  You said he was focussed on
24  your sister and Azibo, correct?
25    A.   That's correct.
```

5085

```
1    Q.   He cared about Azibo, correct?
2    A.   Because he thought he could earn his way to
3  my mother's heart through Azibo.
4    Q.   Well, whether or not you know his motives
5  and whatever they were, he was good to your brother
6  Azibo, correct?
7    A.   That's correct.  He bought him gifts and
8  material items, yes.
9    Q.   He didn't abuse him, did he?
10    A.   Yes, he did beat him.
11    Q.   He beat him.  I said did he abuse him?
12    A.   Anything other than a hand is abuse.  So
13  the answer to your question is yes.
14    Q.   And that's what --- would you consider your
15  mother was abusive?
16    A.   As an adult now, yes, I would.
17    Q.   And your father was abusive?
18    A.   Definitely.
19    Q.   I thought it was part of the discipline?
20    A.   It's part of the discipline, it's part of
21  the culture, but the definition is still abuse.
22    Q.   And you left your mom to be with your dad,
23  correct?
24    A.   That's correct.
25    Q.   And he was a fugitive, correct?
```

5086

1    A.   Not that I was aware of.  But yes, that's
2  correct.
3    Q.   Well, you became aware of it, correct?
4    A.   Correct.
5    Q.   Did you leave him when you became aware of
6  that?
7    A.   No.
8    Q.   And he was a drug dealer, correct?
9    A.   That's correct.
10   Q.   You didn't leave him when you became aware
11 of that, correct?
12   A.   That's correct.
13   Q.   And he used you as part of his drug
14 operation?
15   A.   That's correct.
16   Q.   But, again, your brother, the defendant,
17 Azibo Aquart, was not part of that operation,
18 correct?
19   A.   That's correct.
20   Q.   Now, when you said you moved to a fortress
21 or an apartment that was like a fortress back in --
22   A.   Yarrington Court.
23   Q.   In Bridgeport?
24   A.   In Bridgeport, that is correct.
25   Q.   Who lived there with you at that time?

5087

1    A.   Myself and my brother Azikiwe.
2    Q.   And again, defendant Azibo was not there?
3    A.   That is correct.
4    Q.   And when your father began drug dealing --
5  on Linwood Avenue, was it?
6    A.   That's correct.
7    Q.   He had another spot?
8    A.   That's correct.
9    Q.   Who lived there?
10   A.   My father and his workers.
11   Q.   And did you live there?
12   A.   No.
13   Q.   Did Azikiwe?
14   A.   No.
15   Q.   Did Azibo?
16   A.   No.
17   Q.   And you would go there quite often, though,
18 you said?
19   A.   That's correct.  That's correct.
20   Q.   But the defendant, Azibo Aquart, did not?
21   A.   Not as often as we did.  He only visited
22 there several times.
23   Q.   You said one or two times?
24   A.   Yeah, one or two times.
25   Q.   So, again, he wasn't exposed to your

5088

1  father's drug dealing at Linwood Avenue other than
2  perhaps those one or two times?
3    A.   Okay.  Yes.
4    Q.   And the people who joined the Bush Mob,
5  that was you and Azikiwe, correct?
6    A.   That is correct.
7    Q.   Your brother, the defendant, Azibo, did
8  not?
9    A.   That's correct.
10   Q.   And after you're arrested, I don't know if
11 it's the YO arrest or whatever arrest, but you say
12 that's when your mom came and got you out?
13   A.   Yes.
14   Q.   Your mom basically comes to your rescue at
15 that point, correct?
16   A.   That is correct, because my father is
17 unable to get us out.
18   Q.   He is unable to get you out?
19   A.   Correct.  He has no legal standing.  He's
20 not listed as my parent.
21   Q.   And she wants you back?
22   A.   And she wants us back.
23   Q.   And have the better life?
24   A.   That is correct.
25   Q.   The life she's been trying to give to

5089

1  Azibo?
2    A.   That's correct.  She recently gets him back
3  from Jamaica at that point, yes.
4    Q.   And that's the same mom who had custody of
5  Azibo, your brother, during this entire time?
6    A.   That is correct.
7    Q.   And you said you went from being an adult
8  to a child when you had to return back to your mom?
9    A.   That's what it felt like to me, yes.
10   Q.   And that didn't feel good then?
11   A.   No, not at all.
12   Q.   In hindsight, maybe it was better than you
13 thought?
14   A.   It was fantastic in hindsight.  It was what
15 I needed.  But I was so used to being -- you know,
16 my dad has us a certain way, so I was used to being
17 that way.  It was hard.
18   Q.   But you had handled responsibilities before
19 that?
20   A.   That's correct.
21   Q.   Before you went with your dad you had cared
22 for your two younger brothers.
23   A.   That is correct.
24   Q.   Even before your mom had passed away.
25   A.   That is correct.

**GA1315**

5090

```
1      Q.   So you knew how to undertake
2  responsibilities, just you weren't free like you
3  were with your dad.
4      A.   Free is the right word, yes.
5      Q.   Maybe a bad word.
6      A.   Yeah.
7      Q.   But it was a freedom.
8      A.   That is correct.
9      Q.   And with your mom, the responsibilities
10 were to get yourself to school.
11     A.   Yes.
12     Q.   Get your brother's to school.
13     A.   Yes, make sure they make it there.
14     Q.   Get Azibo to school.
15     A.   Yes.
16     Q.   Get your brothers back home and do their
17 homework.
18     A.   Yes.
19     Q.   Get Azibo to do his homework.
20     A.   Yes.
21     Q.   Get your brothers home safe.
22     A.   Yes.
23     Q.   Get Azibo safe.
24     A.   Yes.
25     Q.   Take care of him.
```

5091

```
1      A.   Yes.
2      Q.   Now, when your mother obviously tragically
3  died, it was a number of people who drowned?  It was
4  a horrible occurrence where ten or 11 people
5  drowned?
6      A.   That is correct.
7      Q.   And you were not present at that beach, but
8  you were in Florida at the time?
9      A.   That is correct.
10     Q.   Same as your brothers?
11     A.   That is correct.
12     Q.   You were all together?
13     A.   That's correct.
14     Q.   And that's because your mom brought you all
15 down there together as a family?
16     A.   That's correct.
17     Q.   And when you came home, you said there were
18 limited options in terms of where to live.
19     A.   Yes.
20     Q.   Why didn't the -- why wasn't your community
21 more helpful to you?  Why wouldn't they provide any
22 assistance?
23     A.   We lived in a separate state from the
24 church itself, number one.  Number two, in the city
25 where we lived at the point where my mother dies,
```

5092

```
1  there were no 12 Tribes members in Stamford, number
2  two.  And then number three, in Bridgeport where we
3  had more people from the -- more people from the
4  church, more people that knew us, it was also the
5  mess of Bridgeport.
6           So, it was really no resources.  There
7  was really no resources.  The women that were
8  closest to my mother at the time of her death were
9  the ones that tried to help us, and that continued,
10 to try to help us.
11     Q.   And you said your mother had an estate.
12 There is a $100,000 insurance policy, correct?
13     A.   That is correct.
14     Q.   And that money eventually became available
15 to you and your brothers?
16     A.   That is correct.
17     Q.   And was that $100,000 monitored or
18 supervised by you at some point?
19     A.   That is correct.
20     Q.   And did you use that to help support your
21 brothers, including Azibo?
22     A.   That's correct.
23     Q.   And to make sure he had food and clothing
24 and a place to stay?
25     A.   That's correct.
```

5093

```
1      Q.   And you used it in the best interest of
2  Azibo and Azikiwe?
3      A.   That is correct.
4      Q.   And was there other money available to you?
5  You mentioned an estate.  Was there any other --
6  anything else your mother left for you to live on?
7      A.   No, other than the couple dollars she had
8  in the checking account, which was gone long before
9  I got Azibo, that was it.  We fought the case and
10 got the insurance money right around the time that I
11 get custody and so forth of my --
12     Q.   You got custody of your brother Azibo?
13     A.   Correct.
14     Q.   So, you did have that money at least to
15 help you for a period of time?
16     A.   That is correct.
17     Q.   And you used it, again, in the best
18 interest of you and your brothers?
19     A.   That's correct.
20     Q.   Now, you and your brothers moved something
21 like nine times?
22     A.   As a group?
23     Q.   Yes.
24     A.   Yes, easily.
25     Q.   I didn't count them, but close to ten times
```

5094

```
1   we could say?
2       A.   That's right.
3       Q.   And you and your brothers went to close to
4   ten different schools during that period of time.
5       A.   Yes.
6       Q.   And you and your brothers, including Azibo,
7   tragically endured the death of your mom, correct?
8       A.   That is correct.
9       Q.   And you and your brothers had a dad who was
10  incarcerated for a great period of time, correct?
11      A.   That's correct.
12      Q.   And you and your brothers, including Azibo,
13  had a father who exposed you to drugs and guns and
14  other illegal things.
15      A.   That's correct.
16      Q.   And you and your brothers had a mom who
17  cared for you and your safety and your well-being
18  and your education.
19      A.   Yes.
20      Q.   It's shared amongst all three of you to
21  varying degrees, correct?
22      A.   Yes.
23      Q.   And you attempted to go to high school,
24  correct?
25      A.   That's correct.
```

5095

```
1       Q.   And you in fact completed high school,
2   didn't you?
3       A.   That is correct.
4       Q.   And did you in fact attend college?
5       A.   Yes, I did.
6       Q.   And did you complete college?
7       A.   No, I have not.
8       Q.   How far did you get in college?
9       A.   Semester away from my degree.
10      Q.   One semester?
11      A.   That is correct.
12      Q.   But you did well in college.
13      A.   Yes, I did.
14      Q.   And it is the demands of family that are
15  sort of holding you back right now?
16      A.   That's correct.
17      Q.   I didn't mean to blame them, but
18  circumstances.
19      A.   That's true.
20      Q.   And you after seeking your degree and
21  almost obtaining it, sought legitimate employment,
22  correct?
23      A.   That's correct.
24      Q.   And you obtained legitimate employment,
25  correct?
```

5096

```
1       A.   Yes.
2       Q.   And so when did you stop going -- attending
3   college?
4       A.   The first time was when my second child was
5   born and most recently when my daughter was born.
6       Q.   And since then have you been employed?
7       A.   Yes.
8       Q.   The entire time?
9       A.   Yes.
10      Q.   So from, let's say, 2000 -- what year was
11  it the first time you stopped attending college?
12      A.   '98.
13      Q.   So, from 1998 to 2011 you've had legitimate
14  employment to help support your family?
15      A.   Yes.
16      Q.   And was there a point in time where you
17  even started your own business?
18      A.   Yes, yes, I did.
19      Q.   And was that successful?
20      A.   Yes, it was to a point.
21      Q.   And do you still have that business?
22      A.   No, I do not.
23      Q.   But you had your own business and it was
24  successful, as you said, to a point?
25      A.   Yes.
```

5097

```
1       Q.   And you now have four children?
2       A.   Yes, I do.
3       Q.   And you've attempted to be a good father?
4       A.   Yes, I have.
5       Q.   And you've provided care and support to
6   your children throughout that -- their entire lives?
7       A.   Yes, I have.
8       Q.   And it's fair to say, Mr. Aquart, isn't it,
9   that your mom tried to give you and your brothers
10  the best life possible?
11      A.   Yes, she did.
12      Q.   And even Ms. Headley tried to take care of
13  Azibo after your mom's death.
14      A.   Yes.
15      Q.   And give him a good life.
16      A.   Yes.
17      Q.   And then you tried to give your brother the
18  best life possible under the circumstances?
19      A.   Yes, I did.
20      Q.   And you promised to keep the family
21  together, right?
22      A.   Yes, I did.
23      Q.   And provided loving care and food and
24  clothing and education and safety and everything
25  that goes with that promise.
```

**GA1317**

5098

```
1      A.   Yes, I did.
2      Q.   And you even attended counseling sessions
3   with your brother Azibo?
4      A.   Yes, we did.
5      Q.   In an effort to help him out?
6      A.   Correct?
7      Q.   And do you recall that people commented
8   upon you, they said that:  Azizi has done his best
9   to keep his brothers together and done his best to
10  provide and care for them.
11     A.   It was understood that's --
12     Q.   Do you recall that being written about you?
13     A.   Yes.
14     Q.   And is it true?
15     A.   Yes, it is.
16     Q.   And:  Azizi is an intelligent, articulate
17  man, promised to keep the family together and
18  fulfilled this promise.  And:  There is a
19  significant bond between these young men and he
20  should be commended for his efforts to keep the
21  family together.
22          Do you agree with those comments?
23     A.   Yes, I would.
24     Q.   I'm sorry?
25     A.   Yes, I would.
```

5099

```
1      Q.   And there is a very close sibling
2   relationship.  All the brothers have a good
3   intelligence ability and Azizi stresses the
4   importance of education to his brothers.
5          Would you agree with that.
6      A.   Yes, that's what my mother wanted me to do.
7      Q.   I'm sorry?
8      A.   Yes.
9      Q.   And Azizi moved them to a better
10  neighborhood.  He has done a tremendous job in
11  keeping the brothers together and providing for
12  them.
13          Would you agree with that.
14     A.   Yes.
15     Q.   It's fair to say you've done all you could
16  for your brother Azibo?
17     A.   Yes.  Yes.
18     Q.   Now, did you eventually become aware of
19  your brother's drug dealing?
20     A.   Yes.
21     Q.   And have you ever been to Charles Street?
22     A.   Yes.
23     Q.   And have you seen what went on at Charles
24  Street?
25     A.   No.
```

5100

```
1      Q.   Did you know that he was the head of the
2   operation at Charles Street?
3      A.   No.
4      Q.   Did you know that there were guns involved
5   with his operation?
6      A.   No.
7      Q.   Did you know that there were beatings
8   involved with his operation?
9      A.   No.
10     Q.   He wouldn't want you to know that, correct?
11     A.   No.
12     Q.   That's a part of his life he wants to keep
13  hidden from you, his older brother, correct?
14     A.   Yes, I would assume so.
15     Q.   Do you have any idea what your brother was
16  doing in 2004 and 2005?
17          MR. SHEEHAN:  Objection.  Outside the
18  scope of the direct.
19          MS. DAYTON:  Redirect?  It's cross.
20          THE COURT:  I'm going to permit it
21  because -- oh, in 2005, that's your question.
22          MR. MARKLE:  I said 2000 through 2005, I
23  think, your Honor.
24          THE COURT:  And no, I'm going to permit
25  the question.
```

5101

```
1      A.   I'm sorry.  Can you rephrase it.
2          THE COURT:  Do you have any idea what
3   your brother was doing in 2004 and 2005.
4      A.   I believe that's when his daughter was
5   made.
6      Q.   I'm sorry?
7      A.   He had a daughter.
8      Q.   And do you know what he was doing in
9   regards to drug dealing during that time?
10     A.   No, I do not.
11     Q.   Do you know the extent of the operation
12  that he ran?
13     A.   No, I do not.
14     Q.   Do you know the conduct that was behind
15  that operation?
16          MR. SHEEHAN:  I'm going to object, your
17  Honor.
18     A.   No, I do not.
19          MR. SHEEHAN:  This is outside the scope
20  of the direct.
21          THE COURT:  Well, he's already answered
22  the question.
23          MR. SHEEHAN:  Well, then I --
24          THE COURT:  Mr. Markle's earlier
25  questions to which there was no objection.  So do we
```

5102

1  need to go over that again?
2              MR. MARKLE:  No, your Honor.
3              THE COURT:  Okay.
4      Q.   Mr. Aquart, when is the last time you
5  visited your brother in prison?
6      A.   Over two years ago.
7      Q.   I'm sorry?
8      A.   Over two years ago.
9      Q.   Over two years ago?
10     A.   That is correct.
11     Q.   And do you recall what prison that was at?
12     A.   No, I don't.
13     Q.   The last two years you have not visited
14 him?
15     A.   That is correct.
16     Q.   And when is the last time you spoke to him
17 on the phone from prison?
18     A.   Probably longer than that.
19     Q.   Longer than that?
20     A.   Yes.
21     Q.   And when is the last time you've written or
22 he's written to you?
23     A.   Not me directly.  He usually -- they write
24 the children.
25     Q.   You've had no correspondence with him

5103

1  directly?
2      A.   Not in a couple years, no.
3              MR. MARKLE:  May I just have a moment,
4  your Honor?
5              No further questions, thank you.
6              THE COURT:  All right, redirect.
7              MR. SHEEHAN:  May I have one second,
8  your Honor?
9              THE COURT:  Yes.
10 REDIRECT EXAMINATION
11 BY MR. SHEEHAN:
12     Q.   I just want to go over, Mr. Markle was
13 asking you some questions about when you took on the
14 responsibility of keeping your family together.  Do
15 you agree with the assessment that you were taking
16 on a little bit more than you could actually handle?
17     A.   Yes.  Yes.
18     Q.   And do you agree with the assessment that
19 at the age of 18 you, yourself, also needed
20 additional direction in your life?
21     A.   Yes.
22     Q.   And during these years that you lived with
23 your dad in Hartford --
24     A.   Yes.
25     Q.   -- were you talking to your brother when he

5104

1  would come and visit with you?
2      A.   Yeah, we talked on the phone all the time,
3  talked to him, talked to mommy, my stepmother and my
4  mother stayed in constant communication even though
5  my mother and my father didn't.  So, you know, the
6  channels of communication were always open.  She
7  always knew what we were doing.  He always knew what
8  we got for grades, we knew what he got, that kind of
9  thing.
10     Q.   Did your brother know what was going on
11 with your dad at that point in time?
12     A.   At that point, yes.  Yeah.
13             MR. SHEEHAN:  I don't have any further
14 questions.
15             MR. MARKLE:  Nothing further, your
16 Honor.
17             THE COURT:  All right then, Mr. Aquart.
18 Thank you very much.  You may step down.  You are
19 excused.
20             All right.  Will the defense call its
21 next witness, please.
22             MR. SHEEHAN:  Yes.  Gillian Walcott,
23 your Honor.
24             THE COURT:  All right, Ms. Walcott, when
25 you get to the stand, please remain standing and

5105

1  raise your right hand and the oath will be
2  administered to you.
3              G I L L I A N   W A L C O T T
4  Having first affirmed, was examined and testified as
5  follows:
6              THE WITNESS:  My name is Gillian
7  Walcott, New Britain, Connecticut.  W-a-l-c-o-t-t.
8              THE COURT:  All right, you may proceed.
9  DIRECT EXAMINATION
10 BY MR. SHEEHAN:
11     Q.   Yes, Ms. Walcott, could you skooch your way
12 up a little closer to the microphone there so we can
13 all hear you.
14             And when did you first move to the -- where
15 were you born?
16     A.   I was born in London, England.
17     Q.   And when did you first move to the United
18 States?
19     A.   1980.  August of 1980.
20     Q.   And where did you move to?
21     A.   To Hartford, Connecticut.
22     Q.   And when was it that you -- when you came
23 to Connecticut, were you involved at that point in
24 time with the 12 Tribes organization?
25     A.   When I first came, no I wasn't, but I

5106

```
1    joined probably about a year or so after that.
2        Q.   And living in -- growing up in England,
3    were you involved in the Rastafarian faith at all?
4        A.   Yes.
5        Q.   Okay.  And when was it that you first met
6    Richard Aquart?
7        A.   Probably '83 or so.  '82 or '83.
8        Q.   And how were you introduced to -- or how
9    did you meet him?
10       A.   Through a function the 12 Tribes of Israel
11   kept in New York.  It was a party.
12       Q.   And what do you do -- let me back up just
13   for a minute.
14           What do you do for a living now?
15       A.   At the moment I'm temping.  I'm an
16   administrative assistant.
17       Q.   And what were you doing prior to temping?
18       A.   I was a mortgage processor and
19   administrator.
20       Q.   And how long did you do that for?
21       A.   For about ten years.
22       Q.   And before being involved in mortgage
23   processing, what kind of work were you doing?
24       A.   Coordinating, office coordinating.
25       Q.   And going back then to Richard, who
```

5107

```
1    introduced him to you?
2        A.   A friend of mine.  She was also a member of
3    the 12 Tribes of Israel.
4        Q.   Do you remember who that was?
5        A.   That was Eleanor.
6        Q.   Eleanor?
7        A.   Eleanor Cooper.  I'm sorry.
8        Q.   And that's known to you as Miss Pinkie?
9        A.   Yes, Pinkie.  Sorry.
10       Q.   And when did you become involved, first
11   become involved with Richard, romantically involved?
12       A.   1985.
13       Q.   And how old was Azibo at that time?
14       A.   Oh, my gosh.  Azibo was about four or five.
15   Somewhere around there.  About three or four.  Very
16   young.  I can't give you an exact age.
17       Q.   Do you remember whether he had any -- was
18   he in a cast at that point in time?
19       A.   Yes, yes.
20       Q.   Would that date then back to the time of
21   that car accident?
22       A.   Yeah.  That had to have been a little after
23   '85, though, when we met -- when we started dating
24   at '85 he wasn't in a cast at that time.  So maybe
25   about '86 or late '85.
```

5108

```
1        Q.   And did Richard and you live together
2    starting in 1985?
3        A.   Yes.
4        Q.   Where was that?
5        A.   In Hartford.
6        Q.   And was Richard on the run at that time?
7        A.   No.
8        Q.   As far as you knew?
9        A.   No.
10       Q.   Okay.  Were you aware that he had a -- had
11   prior convictions in Connecticut?
12       A.   No.
13       Q.   Were you aware that he had a case --
14   actually, let me see something.  If I might.
15           I take it you were not aware of a
16   Connecticut conviction, of a Connecticut arrest in
17   1985, were you?
18       A.   No.
19       Q.   And --
20       A.   You mean prior to me dating him?  I didn't
21   know of any convictions.
22       Q.   Okay.  And were you aware of a -- that's a
23   little bit later.  All right.
24           And what did Richard do for a living?
25       A.   At that time I think he owned like a small
```

5109

```
1    gaming room and mechanic shop.
2        Q.   When you first met him?
3        A.   Right.
4        Q.   And did you come to learn that Richard was
5    a drug dealer?
6        A.   Yep, soon after.  Yes.
7        Q.   And did you know Sonia Smith?
8        A.   Yes.
9        Q.   And would you have -- did there come a time
10   in 1989 that Azizi and Azikiwe came to live with
11   you?
12       A.   Yes.
13       Q.   And what was your understanding as to why
14   they came?
15       A.   They were wanting to be with their father.
16   They wanted to live with their father.
17       Q.   And at that point in time were you aware
18   that Richard was a drug dealer?
19       A.   Yep.  I had an understanding that, you
20   know, he was doing things on the sly, yes.
21       Q.   And how long were the boys with you?
22       A.   From then until I think '92, maybe.  '93.
23   '3 or '4, yeah.
24       Q.   And during that period of time where was
25   Richard?
```

**GA1320**

5110

1    A.    In and out of the house.
2    Q.    More in or more out?
3    A.    At the beginning more in and at the end
4  more out.
5    Q.    And would Jumbo come to visit you in
6  Hartford?
7    A.    Uh-huh (indicating affirmatively).  Yes.
8  Sorry, yes.
9    Q.    And how often would he come up?
10   A.    It would be on summer vacations, tried a
11 few times, but I think maybe it became a little bit
12 too much for him, so he would go home a little
13 earlier than the time that we thought he would be
14 staying.  If he came for the summer it would end up
15 not being for the whole summer, but a part of the
16 summer.
17   Q.    All right.  And how did he do on those
18 vacations?
19   A.    I didn't think he did too well.
20   Q.    He did not do too well?
21   A.    I don't think so.
22   Q.    And why was that?
23   A.    I think he kind of felt like the odd man
24 out.
25   Q.    And in what way did you get that

5111

1  impression?
2    A.    There would be times when -- we liked to
3  watch a lot of movies, and we would be all huddled
4  up on the bed or on the couch or whatever, and Jumbo
5  just seemed -- just seemed a little wanting to be a
6  part of, but not sure how to, you know, be a part
7  of.  I don't know how to explain it.  We'd be on the
8  bed and he'd be at the edge of the bed.  You had to
9  kind of encourage him to come.
10   Q.    And did you bring that to Richard's
11 attention?
12   A.    Oh, yeah.
13   Q.    That Azibo was having difficulties?
14   A.    Oh, yes.
15   Q.    And what did Richard say about that?
16   A.    That I didn't know what I was talking
17 about.
18   Q.    And did it appear to you that Jumbo was
19 yearning to be with his father?
20   A.    Yes, yes.
21   Q.    Now, when the boys were -- the older boys
22 were in Hartford, what was life there like for them?
23   A.    I tried to make it a family and as
24 comfortable as possible.  They went to school, they
25 did after-school activities.

5112

1    Q.    And did you have an impression as to how
2  that life in Hartford for the older boys compared to
3  the life that Azibo was having, experiencing with
4  Sonia?
5    A.    It may have seemed as if we were having a
6  lot of fun.  I tried to make it as fun and as loving
7  as possible.  Not to say that him being with his
8  mother wasn't fun or wasn't loving, but we just
9  really had a fun time at home.
10   Q.    Now, beginning in 1991 to 1993, where
11 was -- was that the period of time you are talking
12 about when Richard was mostly out?
13   A.    Out of the house.
14   Q.    And during that period of time who was
15 taking care of the boys?
16   A.    I was.  And when I was at work then they
17 would, you know, go to school and come home and -- I
18 was and they were.
19   Q.    And did you see -- and at that point in
20 time, why was it that Richard wasn't around?
21   A.    He was doing more things that kids didn't
22 need to be seeing.
23   Q.    I'm sorry, more?
24   A.    He was doing more things that the children
25 didn't need to be seeing.

5113

1    Q.    And what kind of things were those?
2    A.    Illegal activities.
3    Q.    And what kind of illegal activities are you
4  talking about?
5    A.    He was involved in drugs.
6    Q.    And at that point in time had you been
7  informed that he had been arrested and was on the
8  run?
9    A.    Yes.
10   Q.    And how did that impact on you, the fact
11 that Richard was arrested and a fugitive and yet
12 sort of still being in and out?
13   A.    This was horrible.  I wasn't used to that
14 life.
15   Q.    And then did you know at that point in time
16 Richard also set up operations in Hartford -- in
17 Bridgeport, or was he continuing operations in
18 Bridgeport?
19   A.    I think so.  I think so.
20   Q.    Did you know about the address at Linwood
21 in Bridgeport?
22   A.    Yes.
23   Q.    And did you know about the house in
24 Yarrington Court?
25   A.    I knew that there were two houses, I didn't

**GA1321**

5114

1   know -- I mean, I know the name Linwood, but
2   Yarrington Court --
3       Q.   Did there come a period of time when the
4   federal authorities came to your house in Hartford
5   looking for Richard?
6       A.   Oh, yeah.
7       Q.   And what do you recall about that?
8       A.   They almost kicked down the door and
9   totally ransacked the house looking for him.
10      Q.   And after that point in time, did Richard
11  come back to Hartford, to your house?
12      A.   I don't think so.  Maybe once.  I don't
13  think so.
14      Q.   And did you go to see Richard and the boys
15  later at Linwood?
16      A.   Yes.
17      Q.   And how many times did you see them there
18  before Richard was arrested?
19      A.   Maybe four times.
20      Q.   And what else did you observe at Linwood
21  when you went there?
22      A.   The kids just seemed a little more
23  unsettled than when they were at my house.
24      Q.   And in what way did things seem a little
25  more unsettled?

5115

1       A.   They just seemed more -- I don't know.
2   Just -- I mean, I didn't see any drugs, but I saw
3   that they just seemed like they weren't being taken
4   care of.  I don't know how to --
5       Q.   And by the way, did you see -- was Jumbo
6   with the boys at Linwood when you went there?
7       A.   Yes.
8       Q.   And were they talking about guns in the
9   house?
10      A.   They would talk, yes.
11      Q.   And what were they saying about that?
12      A.   Just that there were guns.
13      Q.   And was it clear to you that drug dealing
14  was going on from that house?
15      A.   Yes.
16      Q.   And was it clear to you that Azibo was
17  witnessing what was happening around him?
18      A.   Possibly, yes.
19      Q.   Do you know what Richard's reputation was
20  at that time?
21      A.   Yes.
22      Q.   And what was that reputation?
23      A.   He was not someone to be crossed.
24      Q.   And do you have an opinion as to whether or
25  not the boys looked up to Richard?

5116

1       A.   Definitely.  Definitely.
2       Q.   And in those days in Bridgeport, do you
3   know, was Richard with them all of the time?
4       A.   I'm sorry?
5       Q.   Was Richard with them in Bridgeport at the
6   end all the time?
7       A.   I don't think all the time.
8       Q.   And did the boys talk to you about what
9   they heard about their father, his reputation?
10      A.   It was just known.  They just knew.  It was
11  just known.
12          MR. SHEEHAN:  I don't have any more
13  questions of Ms. Walcott.
14          THE COURT:  All right,
15  cross-examination.
16  CROSS-EXAMINATION
17  BY MS. RODRIGUEZ-COSS:
18      Q.   Ms. Walcott, just a couple questions.  So,
19  while the boys were with you in Hartford you
20  provided as good a home as you possibly could for
21  them.
22      A.   Yes.
23      Q.   You loved them.
24      A.   Yes.
25      Q.   They were family to you.

5117

1       A.   Yes, definitely.
2       Q.   And when the defendant came to visit, you
3   loved him as well.
4       A.   Yes.
5       Q.   And you provided for him.
6       A.   Yes.
7       Q.   And he was family to you.
8       A.   Yes.
9       Q.   And you went to Linwood only three or four
10  times you said?
11      A.   Yes.
12      Q.   And the times that you went there you
13  didn't see any drugs there?
14      A.   No, no.
15      Q.   And so aside from the three or four times
16  that you went to Linwood, you really can't speak to
17  what the defendant might have seen or had not seen
18  at that address; is that correct?
19      A.   No.
20      Q.   All right.
21          MS. RODRIGUEZ-COSS:  We have nothing
22  further, your Honor.  Thank you.
23          THE COURT:  All right, redirect.
24          MR. SHEEHAN:  No, I think all the
25  questions have been asked.  Thank you, your Honor.

**GA1322**

5118

```
1              THE COURT:  Thank you.  All right,
2   Ms. Walcott.  You may step down.  Thank you.  You
3   are excused.
4              Please call your next witness.
5              MR. SMITH:  Your Honor, the defense
6   would call Eleanor Cooper.
7              THE COURT:  All right, Ms. Cooper, if
8   you would kindly come over to the witness stand and
9   raise your right hand and the oath will be
10  administered to you.
11        E L E A N O R   C O O P E R
12  Having first affirmed, was examined and testified as
13  follows:
14             THE WITNESS:  Eleanor Cooper,
15  C-o-o-p-e-r, Windsor, Connecticut.
16             THE COURT:  All right.  You may proceed.
17             MR. SMITH:  Thank you, your Honor.
18  DIRECT EXAMINATION
19  BY MR. SMITH:
20     Q.   Good afternoon, Ms. Cooper.
21     A.   Good afternoon.
22     Q.   Can you tell us how you are currently
23  employed?
24     A.   I work for the Department of Social
25  Services in the State of Connecticut.
```

5119

```
1      Q.   And what town do you that in?
2      A.   Hartford County.
3      Q.   How long have you been doing that?
4      A.   Seventeen years next month.
5      Q.   And have you lived in the United States
6   your whole life?
7      A.   No, since I was 13.  Twelve.
8      Q.   And where did you live before then?
9      A.   New York.
10     Q.   In New York.  But were you born outside of
11  the United States?
12     A.   I was born in Jamaica, West Indies.
13     Q.   When was it you came to Connecticut?
14     A.   May of '78, I think.
15     Q.   And were you a member of the 12 Tribes?
16     A.   Yes, I was.
17     Q.   And when did you become involved with the
18  12 Tribes?
19     A.   1976.
20     Q.   And what is 12 Tribes?
21     A.   It's a religious organization.  The 12
22  Tribe deal with the 12 sons of Abraham, and the
23  organization basic is to repatriation back to
24  Africa.
25     Q.   And did you hold a position in 12 Tribes?
```

5120

```
1      A.   Yes, I do.
2      Q.   What was that?
3      A.   I'm executive sister.  I'm from the Tribe
4   of Asher, Asher First.
5      Q.   And did you know the Aquart family?
6      A.   Yes, I did.
7      Q.   Were they also members of 12 Tribes?
8      A.   Yes.
9      Q.   And how did you come to meet the family?
10     A.   I met the family first -- the father was a
11  school friend of my husband, and so he talked about
12  him.  So I met him on one of my trips to Jamaica.  I
13  met him first and I met the mother later.
14     Q.   And when you say a school friend, you mean
15  your husband and Richard had attended back in --
16     A.   In Jamaica.
17     Q.   -- in Jamaica.  Okay.  And did Sonia hold
18  any positions in 12 Tribes?
19     A.   She was an executive second.  She was Judah
20  second, meaning she was a backup if that person
21  didn't show up.
22     Q.   And do you go by any other names?
23     A.   Pinkie.  They call me Pinkie.
24     Q.   And how did you get that name?
25     A.   My aunt gave me that name.
```

5121

```
1      Q.   Your aunt did?
2      A.   I was always dressed in pink.
3      Q.   And of course you know Mr. Aquart, Azibo
4   Aquart, the defendant here?
5      A.   I do.
6      Q.   And what would you normally call Mr.
7   Aquart?
8      A.   Jumbo.
9      Q.   Jumbo.  When was the first time you
10  remember seeing Jumbo?
11     A.   I saw him when he was a baby, and the next
12  time I saw him he was in the hospital.  He had
13  broken his leg or something and I went to visit.  He
14  was still a child then.  About eight, I think.
15     Q.   And were you able to observe some
16  interactions of the family, the Aquart family?
17     A.   Yes, I did.
18     Q.   And what was Richard's attitude towards
19  Jumbo; do you know?
20     A.   Richard was so busy that I don't think he
21  -- my attitude was that he didn't pay a lot of
22  attention to him.  He was running around a lot, you
23  know, and so he wasn't around, from my perspective,
24  much for Jumbo.
25     Q.   What was Richard doing; to your knowledge?
```

5122

```
 1      A.   Well, I really don't know what he was
 2  doing.  I wasn't part of his life then, you know.
 3  But I knew whatever he was doing -- I heard things,
 4  but I could not tell you what he was doing.
 5      Q.   What was the reputation about what he was
 6  doing?
 7      A.   He was doing things that were illegal.
 8      Q.   Does that include drug dealing?
 9      A.   Yeah.
10      Q.   How would you describe Richard as a person?
11      A.   He's a very intelligent man, very
12  articulate, smart, but it's about him.  He's very me
13  consuming person.
14      Q.   When you say he's about him, what did you
15  mean?
16      A.   He loved you or liked you as long as he was
17  getting something from it or was benefiting from it.
18  You know, he seemed to take more than he gives.  You
19  know, he's very manipulating.  Very intelligent so
20  he could manipulate.
21      Q.   And how did Richard view his children?
22      A.   I thought he used them for his advantage.
23      Q.   Why did you think that?
24      A.   Again, because of some of the things I
25  heard, and things that I heard led me to believe
```

5123

```
 1  that he was using them for his advantage, for what
 2  they could do to help him to make the money or get
 3  to where he wanted to reach in life.
 4      Q.   And you said Richard was a good friend of
 5  your husband?
 6      A.   Yeah.
 7      Q.   Did a lot of your knowledge of Richard come
 8  from your husband?
 9      A.   No, because they talked from school.  From
10  my knowledge, it's from my own interaction.  I
11  usually judge people on my own interaction with
12  them.  So once I got to know him more, I would
13  always see him again in those circumstances, or I
14  had a mutual friend that he dated, so I got to know
15  him a little better.
16      Q.   Who is the mutual friend?
17      A.   Gillian.
18      Q.   Gillian Walcott?
19      A.   Yes.
20      Q.   And was there a time when Richard's older
21  sons, Azizi and Azikiwe, were living with Richard in
22  Hartford and Gillian?
23      A.   Yes.
24      Q.   Do you know where Jumbo was at that time?
25      A.   No, because at that point I wasn't talking
```

5124

```
 1  to Richard at all.  So, I knew they were there, but
 2  I never had any interaction with them.
 3      Q.   And why were you not talking to Richard?
 4      A.   Because an incident happened in my family
 5  that I thought it best to cut ties with him.
 6      Q.   And what was that?  I don't mean to
 7  embarrass you, but what was that incident?
 8      A.   It had to do with my then 16-year-old
 9  daughter.
10      Q.   Can you tell us a little more detail?
11           MS. RODRIGUEZ-COSS:  Your Honor, can we
12  approach on this, please.
13           THE COURT:  Yes.
14           MR. SMITH:  All right, your Honor, we'll
15  just move on.
16      Q.   What was Azibo's relationship with his
17  mother like?
18      A.   Close as a son could be with his mom.  He
19  was a baby, but at that time she also had other --
20  she has six children, not three, and she was trying,
21  as a single mom trying to take care of the boys and
22  also her daughters.  So she was basically -- she had
23  her own business.  I thought she was very
24  enterprising, she had her own business, and again,
25  trying to juggle taking care of the kids.  I saw her
```

5125

```
 1  as a very industrious young woman.
 2      Q.   It sounds like you weren't particularly
 3  close with Sonia.  Is that right?
 4      A.   We weren't close, but I respected her.  I
 5  knew who she was.  We weren't friends that we talked
 6  on the phone every day, but when we came together we
 7  would talk about things we had in common, her
 8  children and so forth.  So we had a good
 9  relationship, but we weren't, say, girlfriends that
10  went shopping and things like that, no.
11      Q.   And did you know of Sonia's relationship
12  with Skibo?
13      A.   A little bit of it.
14      Q.   And do you know what her relationship was
15  like with him?
16      A.   Not good.  Not -- the little that I knew.
17      Q.   And how is it -- I mean, was that from her?
18  Or how did you understand that?
19      A.   From her not talking to me directly, but I
20  remember one situation where we were at a meeting
21  and -- we were in a park and I think something had
22  happened to the boys.  They were either incarcerated
23  or something.  She was away in Canada and she had no
24  idea what happened to her sons, and when she came
25  back she heard that they were either in juvenile or
```

5126

```
1  something, and the guy had basically left them
2  there.  She was so upset.  She was talking in
3  general, but I was sitting right there, and she was
4  just so upset that he could have just left her
5  children and just forgot about them.  And she was in
6  tears talking about the way he treated the children.
7        And another occasion we talked about how
8  he was not basically being, you know, the kind of
9  father he needed to be for the boys.
10     Q.   And did there come a time when Sonia had
11 invited you to go to Florida?
12     A.   Yeah, that's when she died, actually.
13     Q.   And did you go?
14     A.   No, I didn't, because -- it was either
15 Memorial Day or Mother's Day.  It was a holiday, and
16 I called her, like, the day before, and I said "Are
17 we going on the trip?  We going to buy the ticket?"
18 Maybe it was a week before.  And she said, no, she
19 goes every year standby.  I don't like lines.  It's
20 the airport we are talking about, it's holidays,
21 we're going to have to be in a line, so I changed my
22 mind because we were just going on standby.
23     Q.   But at some point you found out about her
24 death?
25     A.   The same day, actually.  A friend of mine
```

5127

```
1  called me.
2      Q.   And how did -- a friend called you.  I'm
3  sorry.
4      A.   Yeah, a friend called me.
5      Q.   At some point after Sonia had passed, did
6  Jumbo and his brothers stay with you?
7      A.   For a while, yeah.
8      Q.   Do you know how long?
9      A.   It was on and off.  Some stayed more than
10 others because of -- three of them were there, but
11 one may go back to Bridgeport and come back.  But
12 they were there for a while.  I can't say how long.
13 Jumbo was the one that stayed with me the least,
14 unfortunately.
15     Q.   Did you have your own children at this
16 time?
17     A.   I had four children.
18     Q.   Quite a house full then with the boys
19 there?
20     A.   Yeah, but they were disciplined.  They were
21 teenagers, so they weren't a problem.
22     Q.   And specifically how did Jumbo behave while
23 you were there?
24     A.   Jumbo was fine.  No respect problem.  No
25 problem with him.
```

5128

```
1      Q.   But did there come a time when he left the
2  house?
3      A.   Actually, I asked him to leave.
4      Q.   Why was that?
5      A.   Something happened and I blamed him for it
6  and he --
7      Q.   What had happened?  I'm sorry.
8      A.   Well, my then-husband -- there was some
9  money missing in my house and I accused him of
10 taking it.
11     Q.   When you say "accused him"?
12     A.   Jumbo.
13     Q.   Jumbo?
14     A.   Of taking it.  He denied it, swore he
15 didn't do it.  I asked him to leave, and he did
16 without any problems.  I found out later he didn't
17 take the money, my then-husband stole the money, and
18 I had to apologize to him.
19     Q.   And what happened when you apologized to
20 him?
21     A.   He was gracious.  He never had a problem
22 with me.  He accepted it because he knew I just -- I
23 was genuine with the apology.  I really felt bad
24 about accusing him.
25     Q.   But he told you it was okay?
```

5129

```
1      A.   Yes, he did.
2      Q.   Do you know where he went after he left
3  your house?
4      A.   He went back to Bridgeport, I think.  I'm
5  not sure.
6      Q.   And did anyone ultimately accept
7  responsibility for all three boys after Sonia's
8  death; that you know of?
9      A.   No.  Some of us tried.  A couple of us.
10 They stayed with Sister Desta for a while, they
11 stayed with me for a while, and then they left.  One
12 by one they went back to Bridgeport.
13     Q.   And what about Sonia's mother?
14     A.   I never met her.  I know they didn't have a
15 good relationship.  I heard -- I tried to contact
16 her through a friend to see if she would take the
17 boys and she wasn't interested in them.
18     Q.   Not interested in the boys?
19     A.   No.
20     Q.   Eventually did Azizi get custody of the
21 boys, the younger brothers?
22     A.   I'm not sure.  After Azizi turned 18 --
23 they stayed with me until he turned 18, that is the
24 oldest one, he left.  And at this time he started
25 having a family, he left, and then the boys, one by
```

**GA1325**

5130

```
1   one left.
2       Q.   Okay.
3            MR. SMITH:  I have nothing further, your
4   Honor.
5            THE COURT:  Cross-examination.
6            MS. DAYTON:  No, thank you, your Honor.
7            THE COURT:  Thank you, Ms. Cooper.  You
8   are excused.  You may step down.
9            MR. SHEEHAN:  Your Honor, we would call
10  Khadijah Jumaralli.
11           THE COURT:  All right.  Ms. Jumaralli,
12  would you please remain standing, raise your right
13  hand and you will be sworn.
14         K H A D I J A H   J U M A R A L L I
15  Having first affirmed, was examined and testified as
16  follows:
17           THE COURT:  Actually, will you spell
18  both names, please.
19           THE WITNESS:  K-h-a-d-i-j-a-h, last name
20  is J-u-m-a-r-a-l-l-i.
21           THE COURT:  All right.  And your town of
22  residence?
23           THE WITNESS:  Bridgeport, Connecticut.
24           THE COURT:  Thank you.
25           You may proceed.
```

5131

```
1            MR. SHEEHAN:  Thank you.
2   DIRECT EXAMINATION
3   BY MR. SHEEHAN:
4       Q.   Good afternoon, Ms. Jumaralli.
5       A.   Good afternoon.
6       Q.   Where were you born?
7       A.   I was born in Costa Rica.
8       Q.   Are you a U.S. citizen now?
9       A.   Yes, I am.
10      Q.   And where did you grow up?
11      A.   I grew up in Stamford, Connecticut.
12      Q.   And how long did you live in Stamford?
13      A.   I lived in Stamford since 1967 'til '85.
14      Q.   And where are you living now?
15      A.   I'm living in Bridgeport, but I commute
16  back and forth to the Dominican Republic.
17      Q.   And right now are you presently employed?
18      A.   No, I'm not.
19      Q.   But you have a big domestic responsibility
20  that you've undertaken?
21      A.   Yeah, I have a special needs child that I
22  take care of.
23      Q.   And how old is your son?
24      A.   My son is 32 years old.
25      Q.   And does he basically need your care
```

5132

```
1   full-time?
2       A.   Yes, he does.  24 hours.
3       Q.   Now, how long is it that you've been in a
4   position just to be his caretaker?  I mean, when was
5   the last time you were working before that?
6       A.   2006.
7       Q.   In 2006 or '7?
8       A.   2006.  Yeah, 2006, I decided to leave my
9   job.
10      Q.   Prior to 2006, what kind of work were you
11  doing?
12      A.   I was a clinical administrative coordinator
13  for a substance abuse agency.
14      Q.   And how long did you do that kind of work?
15      A.   I did that for nine years.
16      Q.   And before that, what kind of work did you
17  do?
18      A.   Before that I worked for PNC Bank,
19  executive secretary, administration duties.
20      Q.   And how long did you work there?
21      A.   Possibly six months to a year.  Something
22  in between that.
23      Q.   And how many children do you have in
24  addition to your son, disabled son?
25      A.   I have six children in all.
```

5133

```
1       Q.   And when did you first meet -- well, you
2   know -- obviously you know Azibo Aquart, right?
3       A.   Yes, I do.
4       Q.   And what do you know him as?
5       A.   I know him as Jumbo.
6       Q.   Jumbo?
7       A.   We call him Jumbo, yes.
8       Q.   And you knew his mother as well, correct?
9       A.   Yes, I did.
10      Q.   And what did you know her as?
11      A.   I know her as Sonia.
12      Q.   Sonia?
13      A.   Yes, Reardon.
14      Q.   Okay.
15      A.   We called her Judah.
16      Q.   And were you a member of the 12 Tribes as
17  well?
18      A.   Yes, I was.
19      Q.   And are you still a member of the 12
20  Tribes?
21      A.   I haven't been in many years because of my
22  responsibility.  I don't have the time, so I haven't
23  ventured into going to meetings.
24      Q.   And when was the first time you met Sonia?
25      A.   I met Sonia for the first -- officially --
```

5134

```
1   I met Sonia officially maybe about a year before
2   Jumbo's 7th birthday.
3       Q.   Okay.  And at that time were you more
4   actively involved in the 12 Tribes?
5       A.   At the time no, not really.  I was not as
6   active as I had gotten a few years after.
7       Q.   And how was the circumstance?  How did you
8   meet her?
9       A.   I met her through a friend of mine that
10  introduced us.
11      Q.   And after that initial meeting did you get
12  to know her?
13      A.   Yes, I did.  She came to live with me after
14  that initial meeting.
15      Q.   And when she came to live with you, where
16  was that?  Where was she living?  Where were you
17  living at that time?
18      A.   I was living on City View Avenue in
19  Bridgeport.
20      Q.   And was that at 37 City View?
21      A.   37 City View Avenue, yes.
22      Q.   And what was Azibo like at that time as a
23  child?
24      A.   Very happy-go-lucky, you know, funny.
25      Q.   And where was -- did you -- you indicated
```

5135

```
1   that Sonia came to live with you and your children.
2   Who did she come to live with you with?
3       A.   She came to live with me with Jumbo.
4       Q.   And where were her -- did she have other
5   children at that time?
6       A.   She had Azizi and Azikiwe, and she also had
7   Mandy and Mindy.
8       Q.   And where were Mandy and Mindy living?
9       A.   Mandy and Mindy when she came to live with
10  me were in Jamaica with their father.
11      Q.   And where was Azibo -- I'm sorry, Azikiwe
12  and Azizi living?
13      A.   I wasn't -- I am not sure where they were
14  living at the time.  I didn't follow up with
15  their -- where they were.
16      Q.   Did you believe -- you were told they were
17  living with their father?
18      A.   Yes.
19      Q.   And do you know, did Sonia tell you why the
20  older boys were living with their father?
21      A.   No, she did not.
22      Q.   And did Sonia ever tell you that she asked
23  Richard to take Azibo?
24      A.   Yes and no.  Azibo wanted to go and live
25  with his father, and sometimes she would say yes to
```

5136

```
1   him, and then she would say, well, he's not leaving
2   my side, I want to raise him differently.
3       Q.   And how old is Azibo in relation to your
4   own children?
5       A.   Azibo and my fourth child are the same age.
6       Q.   And that's your oldest daughter?
7       A.   My fourth child.
8       Q.   Okay.
9       A.   She's 30 years.  She's going to be 30.
10      Q.   And how old was Azibo when he moved in with
11  you with Sonia?
12      A.   Probably around 10, 11, possibly.
13      Q.   And how was Azibo's relationship with his
14  mother at that time?
15      A.   They had a good relationship.  I mean, you
16  know, he wanted her attention.  You know, he wanted
17  to be with her.  The relationship was good.  I mean,
18  as a mother with the discipline and so on, the
19  relationship was good.
20      Q.   And was Sonia involved at that time in
21  running her business in New York?
22      A.   Yes.
23      Q.   And what kind of hours did that entail,
24  going that distance on her part?
25      A.   She would leave in the morning, probably
```

5137

```
1   maybe about 8:30, 9:00, and she would come back
2   7:00, 8:00.  It just depends on I'm assuming her
3   clientele and what she had to do.  She didn't really
4   have a scheduled time to be back.
5       Q.   Were there periods of time where she was
6   there overnight and gone for days on end?
7       A.   No more than two days, I would say.
8       Q.   And during those periods of time, who would
9   take care of Azibo?
10      A.   I would.
11      Q.   And how was Azibo as far as you were
12  concerned?  Was he difficult to take care of?  What
13  kind of child was he?
14      A.   No, he never disrespected me.  If I said he
15  couldn't go somewhere, he wouldn't go.  I was his
16  guardian while his mother was not there.  So he did
17  listen.
18      Q.   And was there an incident, a problem at
19  school that you became aware of?
20      A.   Yes.  I was called from work one day and --
21  the school called and asked somebody to come and
22  pick up Azibo.  He had a crush on this young lady,
23  and he had a cologne, so he put the cologne on and
24  the cologne was -- it was very, very strong, so it
25  made the teacher and the classroom ill.  So they
```

5138

1   asked me to come and pick him up because it was a
2   disruption to the teacher and the class.
3      Q.   And now, you mentioned that when Sonia came
4   to live with you the girls were living -- the two
5   girls at that point in time were living with their
6   father?
7      A.   Yes, in Jamaica.
8      Q.   Did Sonia talk to you about her
9   relationship with Skibo?
10     A.   Not fluently, but bits and pieces.  The
11  relationship was damaged.  He wanted her to move to
12  Jamaica with him and she didn't want to move back
13  because she wanted a better life for her children
14  here.  She had just opened up her business and was
15  trying to get it off the ground.
16     Q.   And did she ever tell you about any
17  physical incidents between her and Skibo?
18     A.   There was an incident when they were living
19  on Henderson and it got abusive.  You know, it just
20  got abusive.
21     Q.   In what way did he get abusive?
22     A.   They were fighting.  I don't know exactly
23  what the fighting was about, but it was a bit
24  abusive.
25     Q.   And did he tell you -- did she tell you

5139

1   that he hit her?
2      A.   Yes.
3      Q.   Now, at some point in time she moved back
4   to Stamford.  She moved to Stamford, I'm sorry, from
5   City --
6      A.   From City View.
7      Q.   From City View, right?
8      A.   Yes.
9      Q.   Just before that did she learn that her
10  older sons were back in Bridgeport?
11     A.   That, I don't know.  I don't know.
12     Q.   Did she tell you -- she took her older sons
13  with her to Stamford?
14     A.   To Stamford, right.
15     Q.   Did she tell you why she was doing that?
16     A.   She was trying to make a better life for
17  them.  She wanted all of her children together.
18     Q.   And did she tell you of any concern she had
19  about Richard?
20     A.   No, I never spoke about Richard at all.
21     Q.   With her?
22     A.   No.
23     Q.   Okay.  Now, let me ask you, did you learn
24  at some point in time -- were you told about the
25  fact that Sonia had drowned in Florida?

5140

1      A.   Yes, I did.  I'm sorry, yes, I was.
2      Q.   And how did you hear that news?
3      A.   I received a call.  My daughter received a
4   call while I was at work from Isa Char, which is
5   another sister.  I got home and I called.  I called
6   the store and Isa Char was not there.  A couple
7   calls in between.  I was told that Judah had passed
8   on.
9      Q.   And did you go with the -- did you go to
10  Sonia's wake?
11     A.   Yes, I did.
12     Q.   And did you actually help the boys and
13  Desta to clean out the apartment in Stamford?
14     A.   Yes, I did.
15     Q.   And did you see Azibo there at the wake and
16  the funeral?
17     A.   Yes, I did.
18     Q.   And how was he responding to that?
19     A.   He was displaced.
20     Q.   And in what way did he appear displaced to
21  you?
22     A.   He was not himself.  He was moping around,
23  hands in his pocket, very quiet, which is unusual
24  for him.  I mean, he's smiling and joking, and, you
25  know, it was very unusual for him.

5141

1      Q.   Did Sonia's mother appear at the wake?
2      A.   Yes, she did.
3      Q.   Now, had you talked to Sonia about her
4   relationship with her mother prior to this?
5      A.   Just the basics.  Her and her mother did
6   not have a relationship.
7      Q.   And what happened at the wake as far as
8   Sonia's mother was concerned?
9      A.   Her mother was concerned about insurance
10  papers, you know, what Sonia had in her house, what
11  she could get.  Basically, you know, she wanted to
12  go to the house and see what was in the house and
13  scope it out, I gather.
14     Q.   And did she -- as far as you know, did she
15  express any interest in taking the boys back with
16  her?
17     A.   None.
18     Q.   After the funeral, do you know where Jumbo
19  went?
20     A.   No.  I heard he had gone with another
21  sister out of New York.
22     Q.   And did there come a point in time after
23  that that the boys actually came to stay with you?
24     A.   Yes.  They had gone back to Florida and
25  after they came back from Florida, Azizi and Azikiwe

5142

1　came back and stayed with me.
2　　Q.　And at some point in time did Azibo come
3　back and stay with you as well?
4　　A.　No, he did not.
5　　Q.　And how long were the boys there with you?
6　　A.　A couple months.
7　　Q.　And during that period of time Azibo did
8　not come back?
9　　A.　To stay with me, no.
10　　Q.　And was there a reason that the boys, the
11　older boys did not stay with you?
12　　A.　Yes.　They were -- if they would leave on
13　Friday, then I wouldn't see them back 'til probably
14　Sunday at one o'clock.　I have rules and regulations
15　at my house and they weren't being followed, so, you
16　know, they had to go somewhere else.
17　　Q.　So, do you know where they went?
18　　A.　No, I did not.
19　　Q.　And did you later learn that Azizi had been
20　shot?
21　　A.　Yes, I did.　I received a call at
22　five o'clock in the morning that Azizi had been
23　shot.
24　　Q.　And did you go to the hospital and visit?
25　　A.　When I got the call at five o'clock I

5143

1　jumped out of bed and took a shower, went to the
2　hospital, then I got in to see him.　You know,
3　devastating.
4　　Q.　Now, do you know where Jumbo was at that
5　time?
6　　A.　I do not.
7　　Q.　And do you know where Azikiwe was at the
8　time?
9　　A.　No, I do not.
10　　Q.　And do you recall what the relationship was
11　-- at this point in time, after Azizi's shooting, he
12　then ultimately ended up moving to Williams Street,
13　was it?
14　　A.　Yes, he did.　He bought a condo on Williams
15　Street.
16　　Q.　Okay.　Were you actually involved in
17　helping the family as the executor of the estate?
18　　A.　I didn't get the check or sign any papers
19　because by the time the forms went through and
20　everything, Azizi was of age to handle the funds.
21　　Q.　And after that period of time, did you
22　become aware, have an impression as to what the
23　relationship was between Azibo and Azizi?
24　　A.　The relationship was strained.
25　　Q.　In what way was it strained, at least as

5144

1　far as you could see?
2　　A.　It was strained because Azizi was the older
3　one and Jumbo thought he was old enough to do his
4　own business.　To take care of himself, rather.
5　　Q.　And after -- there was a period of time
6　that Azibo was in jail; was there not?
7　　A.　Who, Azibo?
8　　Q.　Yeah.
9　　A.　Yes, I had heard that.
10　　Q.　And after that, did you have occasion to
11　see him?
12　　A.　Not until after he came out.
13　　Q.　And once he came out?
14　　A.　I didn't go and visit him.
15　　Q.　Did you have any later contact with him?
16　　A.　Yes, he came to the house to visit me a few
17　times after that.
18　　Q.　And what was his -- how was his
19　relationship with you?
20　　A.　His relationship with me was very good.　He
21　came and visited, and we sat and talked and, you
22　know, sometimes he ate, sometimes he sat around and
23　talked to the girls.
24　　Q.　And what was his relationship with your
25　daughters?

5145

1　　A.　Close.　They were pretty close.　They joked
2　around, they sat around the table and laughed and
3　joked.
4　　Q.　Did you have any impression on what the
5　impact of Sonia's death was on Azibo?
6　　A.　I think it had a major impact on him.
7　　Q.　And in what way?
8　　A.　You know, he wanted to be close to his
9　mother.　You know, after she passed, you know, he
10　was displaced.　You know, his life turned upside
11　down.
12　　Q.　And thinking back, based on your experience
13　with Azibo and Azizi, do you think that Azizi had
14　sufficient maturity and experience to take on the
15　responsibility for his younger brother?
16　　A.　No, I don't think so.
17　　Q.　And why is that?
18　　A.　Azizi was only 18 years old.　He had just
19　turned 18.　I don't think an 18-year-old, to take on
20　the responsibility of two teenage boys is easy.　As
21　well, young teenage boys, it's easy for Azizi.　He
22　was going through his own, you know, his own also.
23　　Q.　His own what?
24　　A.　His own life.　He has a young lady
25　pregnant, you know, trying to live his life as well.

5146

```
1              MR. SHEEHAN:  I have no further
2    questions.  Thank you.
3              THE COURT:  Okay, cross examination.
4    CROSS-EXAMINATION
5    BY MS. RODRIGUEZ-COSS:
6         Q.   Good afternoon, Ms. Jumaralli.
7         A.   Good afternoon.
8         Q.   So you referred to the defendant's mom as
9    Sonia Reardon?
10        A.   Yes.
11        Q.   And where does Reardon come from?
12        A.   I don't know.
13        Q.   You don't know.  Did you know Ernest
14   Reardon?
15        A.   No.
16        Q.   Did she ever mention Ernest Reardon to you?
17        A.   No.
18        Q.   And you had the opportunity to observe the
19   defendant's mother with him closely, right?  He
20   lived with you?
21        A.   Yes.
22        Q.   And she was a good mother?
23        A.   Yes, she was.
24        Q.   She was dedicated?
25        A.   Yes.
```

5147

```
1         Q.   She looked out for her son?
2         A.   Yes.
3         Q.   She worked hard to make sure she provided
4    as best as they could for her son?
5         A.   That's what she was trying to do.
6         Q.   And you mentioned that the defendant was in
7    juvenile detention; is that what you said?
8         A.   No, I didn't say that.
9         Q.   I'm sorry?
10        A.   Juvenile detention?  I don't know about
11   juvenile.  I didn't know whether it was juvenile.  I
12   know he was locked up.  Whether it was juvenile or
13   regular --
14        Q.   Oh, I see.  And in any event, you didn't go
15   visit him there?
16        A.   No.
17        Q.   Do you know why he was locked up?
18        A.   I heard that it was because of a gun.
19        Q.   You heard that it was?
20        A.   That's what I heard.
21        Q.   And he came to visit you afterwards.
22        A.   After he came out, yes.
23        Q.   Did you talk to him about that?
24        A.   No.
25        Q.   Did you offer him any guidance?
```

5148

```
1         A.   I always offer him guidance.
2         Q.   You did.  You did offer him guidance?
3         A.   Always.  When he came to the house, always.
4         Q.   What was your guidance to him?
5         A.   Ask him what he's doing, where he should be
6    going, so forth.
7         Q.   Did you advise him he should stay in
8    school?
9         A.   Yes, yes.
10        Q.   Did you advise him to stay away from guns?
11        A.   Yes, I advised him to stay off the street.
12        Q.   But he was very strong-headed, wasn't he?
13        A.   Strong-headed?  What sense?  Explain.
14        Q.   Well, you mentioned that he and Azizi had
15   some conflict.  He didn't want to follow Azizi's
16   rules.
17        A.   Well, I mean Azizi is 18 years old, and
18   he's not much older than Azizi (sic).  I think, you
19   know.
20        Q.   Nonetheless, he was his older brother,
21   though, right?
22        A.   Yes.
23        Q.   He challenged him?
24        A.   I don't know about challenge.  I know about
25   disagreements.  I don't know about challenge.
```

5149

```
1         Q.   Well, you just said he had a strained
2    relationship with Azizi.
3         A.   It depends what you call strained and what
4    I call strained.
5         Q.   What do you call strained?
6              MR. SHEEHAN:  Would you let the witness
7    answer the question.
8              THE COURT:  I'm going to let her answer.
9    Go ahead.
10        A.   Your strained and my strained might be two
11   different things.  Strained to me might be they just
12   didn't agree on certain things.
13        Q.   So, Azizi established a home, however?
14        A.   Yes.
15        Q.   And he obtained guardianship of the
16   defendant; did you know that?
17        A.   Yes.
18        Q.   Did you know that he tried to get him into
19   the best school possible?
20        A.   No, I don't know.
21        Q.   Did you know that he attended counseling
22   sessions with him?
23        A.   No, I didn't know.
24        Q.   How often did you see Azizi and the
25   defendant during that time?
```

5150

```
1        A.   Every so often.  They didn't come by all
2   the time.
3        Q.   I see.  And let me ask you, Ms. Jumaralli,
4   did you know the defendant as an adult?  Did you
5   continue to see him as an adult?
6        A.   Yes.
7        Q.   When was the last time you saw him?
8        A.   Last time I saw him, datewise, I don't
9   remember, but he came by the house to drop by a
10  Mother's Day card.
11       Q.   And when was that?
12       A.   Datewise, I don't remember.  Maybe 2003,
13  2004.
14       Q.   I see.  And since then did you know what he
15  was doing in 2003, 2004 to earn a living?
16       A.   No, I didn't know what he was doing outside
17  after he left my house.
18       Q.   All right.
19            MS. RODRIGUEZ-COSS:  We have nothing
20  further, your Honor.  Thank you.
21            MR. SHEEHAN:  Thank you.  I have nothing
22  further.
23            THE COURT:  All right, Ms. Jumaralli,
24  thank you, very much.  You are excused.  You may
25  step down.
```

5151

```
1            All right.  Call your next witness,
2   please.
3            MR. SHEEHAN:  Yes, Sharon Headley, your
4   Honor.
5            THE COURT:  All right.  Ms. Headley,
6   this is the witness stand over here.  And if you'll
7   remain standing the oath will be given to you.
8        S H A R O N   H E A D L E Y
9   Having first affirmed, was examined and testified as
10  follows:
11            THE WITNESS:  Sharon is the first name
12  and Headley is the last.  H-e-a-d-l-e-y.
13            THE COURT:  All right.  And your town of
14  residence.  I'm speaking.  Your town of residence?
15            THE WITNESS:  I live in Long Island, New
16  York.
17            THE COURT:  Thank you.
18  DIRECT EXAMINATION
19  BY MR. SHEEHAN:
20       Q.   And sometimes in Jamaica.
21       A.   And Jamaica, I'm supposed to say.
22       Q.   And are you retired now?
23       A.   I am somewhat retired.  I'm a physician
24  assistant by profession, but I --
25       Q.   You are a what by profession?
```

5152

```
1        A.   Physician assistant.  And so a couple of
2   years ago when the health care system started to
3   change, I decided with my kids are all grown that I
4   wanted to go to Jamaica, try to do something else
5   different there.
6        Q.   Okay.  And you still -- sometimes you are
7   in Jamaica, sometimes you are up here in New York?
8        A.   Yeah, because my kids are all here and my
9   grandson.
10       Q.   And let me ask you this:  You indicated you
11  were a physician's assistant.  How long were you
12  involved in that profession?
13       A.   Sixteen years.
14       Q.   And where was the last place that you
15  worked full-time as a physician's assistant?
16       A.   St. Barnabas Hospital in the Bronx.
17       Q.   And how long did you work at St. Barnabas?
18       A.   Well, I worked for them for a total of, I
19  think, 10 or 11 years.  See, what happened is they
20  had a contract for records, Island Health Services,
21  and so I was employed by them, but working at
22  Riker's Island.  When they lost the contract I went
23  uptown to the main hospital to work there.
24  Continued.
25       Q.   And Riker's Island is a large prison
```

5153

```
1   complex?
2        A.   Yes, it is.
3        Q.   In New York, is it not?
4        A.   Yes, it is.
5        Q.   And I take it St. Barnabas, they were
6   providing the health care?
7        A.   Health care, correct, but I had been at
8   Riker's prior to that because I was under the
9   previous health care providers, Montefiore.  So I
10  had been at Riker's for a total of 11 years.
11       Q.   Now, how is it that you -- well, let me ask
12  you this:  Did you know Sonia Smith?
13       A.   Yes, we were all part of the same
14  organization.
15       Q.   And what organization was that?
16       A.   That was the 12 Tribes of Israel.
17       Q.   And when did you become a 12 Tribes member?
18       A.   1979.
19       Q.   And are you the still a member?
20       A.   Yes, I am.
21       Q.   And was that the way that you first met
22  Sonia through the 12 Tribes?
23       A.   Yeah.
24       Q.   Now, how did you know -- or did you know
25  Richard Aquart?
```

5154

1  A.  He was the -- well, through 12 Tribes of
2  Israel also actually, and then subsequently he
3  became involved with my girlfriend, one of my
4  friends.
5  Q.  And what was your girlfriend's name that
6  Richard was involved with?
7  A.  Gillian.  Gillian Walcott -- Gillian.
8  Q.  That was Gillian who just testified here
9  earlier?
10  A.  Correct.
11  Q.  And in May of 1994, did you learn that
12  Sonia had drowned?
13  A.  Correct.
14  Q.  How close were you with Sonia before her
15  death?
16  A.  We were not very close after Richard got
17  involved with Gillian, because Gillian and I were
18  very close then, but I still knew her and we used
19  to, you know, see each other at 12 Tribe functions
20  and so on.
21  Q.  Okay.  And is it fair to say that during
22  that period of time you were closer to Gillian?
23  A.  Correct.
24  Q.  And in any case, did you go to Sonia's
25  funeral?

5155

1  A.  Yes, I was there because I had known the
2  children, and the children were friends with my
3  children.  And so because of their loss, I was
4  trying to be supportive on their behalf.  So I was
5  at the funeral, correct.
6  Q.  So when you say her children knew your
7  children, where would they know your children from?
8  A.  We all used to go to the meetings.  We'd
9  all get together at times when Gillian would come
10  down with them to New York or if I ever visited
11  Connecticut.  I would see them on and off.
12  Q.  And where was the 12 Tribes meeting place
13  at that time?
14  A.  In New York.
15  Q.  And where in New York?
16  A.  First it was on Nostrand and then it moved
17  to Queens.
18  Q.  So, Brooklyn first and then to Queens?
19  A.  To Queens, yes.
20  Q.  When you say that your children knew
21  Sonia's children, which children were closest?
22  A.  All of them.  Basically, it was about
23  equally close, because -- we saw the older two more
24  so than Jumbo, but we knew all of them.  Whenever
25  there was an event or something, they were all

5156

1  almost always there.  So the kids interacted with
2  them a lot.
3  Q.  And after the funeral, what happened as far
4  as Jumbo was concerned?
5  A.  Well, after the funeral and we were all
6  there at the church hall, or whatever, and everybody
7  was trying to get ready to go their separate ways, I
8  asked him, you know, where he was going or he -- I
9  don't remember exactly how it went down, but somehow
10  he said he wasn't sure where he was going to be
11  going.  And I said, well -- he asked me, I think,
12  can he come home with me, and then the kids, yeah,
13  mommy, let him come, let him come.  So I said, okay,
14  fine, we'll bring him home until they figure out
15  what was going to happen with him.
16  Because at the time his mother's death
17  was sudden, his father was away at the time and
18  there was just a lot of things up in the air, and he
19  had been living with his mother prior to her dying,
20  unlike the other two.  So I knew for sure that even
21  if the other two had somewhere to go he probably was
22  going to be -- had to be provided for because he was
23  with his mother when she died, or living actively
24  with her.
25  Q.  What about the grandmother, were there any

5157

1  contacts with the grandmother that you were aware
2  of?
3  A.  She was at the funeral.  And I had a
4  conversation with her actually at the funeral.  I
5  asked her and she said, well, he's not coming back
6  to Canada.  I think she lives in Canada, or
7  somewhere in Canada at the time, she did.  "Well, he
8  can't come with me, I haven't made provisions for
9  him."  And then I asked and nobody seemed to know
10  where he was going.  So at that point I said, okay,
11  decided to take him in since I had children around
12  the same age and they were friends.  And I liked him
13  a lot.  He was really a nice child.  We didn't have
14  a problem.
15  Q.  And what about Skibo, did you have any
16  conversations with him about that?
17  A.  With?
18  Q.  With Sonia's -- with the husband -- with --
19  do you know -- well, Sonia by that point in time had
20  some other children.
21  A.  Right.  Oh, Skibo, yes.
22  Q.  Yeah, Skibo.
23  A.  Well, I didn't know him that well.  I had
24  only seen him maybe once.  So, we didn't have a
25  relationship.  Sonia's -- the last three -- or two

5158

```
1    children, girls' father, I didn't know him like
2    that.  And so after the funeral, I think the next
3    day or two days later, when I realized that this
4    might be a permanent situation, I tried to contact
5    him to find out if he knew how to get documents to
6    get Azibo into school, since all my kids are in
7    school and he was going to be at the house, I wanted
8    him to go to school also.  So that's how come.  That
9    was my first even conversation with this guy.
10       Q.   And did he express any interest in taking
11   responsibility --
12       A.   Absolutely not, no.
13       Q.   -- for Azibo?
14       A.   No.  As a matter of fact he didn't even try
15   to help me get papers.  He was totally
16   non-responsive.  And at one point I wasn't even able
17   to reach him.  And then I decided to reach out to
18   another friend who knew his mother and knew them, to
19   ask her to be -- you know, to get involved in trying
20   to get some kind of paperwork for Azibo to go to
21   school.  And that was how I got his documents to get
22   him into school.  She somehow made contact with him
23   and after a couple of weeks he gave to her whatever
24   I was asking for.
25       Q.   And so you just -- he just came home from
```

5159

```
1    the funeral with you?
2        A.   Yeah, basically.  I liked Azibo from the
3    get-go.  He was really nice kid.  You know, he got
4    along well with my children, he was respectful.  I
5    didn't have a problem with him.  And I was figuring,
6    you know, one other child, you know, I was feeding
7    three already, so I would try to make it four.  And
8    since he didn't have anywhere to go and he seemed
9    lost at the time, also, like not belonging anywhere,
10   so I was kind of trying to get him -- or give him
11   some sort of stability and support based on his
12   circumstance.
13       Q.   And so the funeral was -- Sonia's death was
14   in late May.  And when was it that you were finally
15   able to get him enrolled in school?
16       A.   I think by the time everything worked, it
17   wasn't before that September.  I think the summer
18   came.  It's been so long.  I think, I'm not sure if
19   he got in the end of that semester or he was able to
20   start in September, but it was sometime, you know, a
21   couple months after.
22       Q.   And did you actually have to contact a
23   lawyer who was representing -- a lawyer in
24   Connecticut about getting him into school?
25       A.   Yeah, they told me that some guy was
```

5160

```
1    handling Sonia's estate, whatever, and so I did
2    reach out to him.  I also reached out to social
3    services because he was having problems falling
4    asleep and he was not adjusting or dealing with the
5    death well, I thought.  He was very, very -- didn't
6    say too much, he was always -- if I asked him if he
7    was okay, he said yes, all right.  I reached out to
8    the lawyer told him that he needed some sort of
9    intervention, some sort of counseling.  Being a
10   single parent with three children of my own, I
11   wasn't financially able to afford a counselor.
12       Q.   Let me go back on the school time.  I just
13   wanted -- if I could look at --
14            Let me show you a document from Exhibit
15   TT-3, and I'm going to put that on your screen right
16   there.  And let me ask you this:  This appears to
17   indicate that you got him into IS 238 in
18   September 21st of 1994.  Does that sound about right
19   to you?
20       A.   That's about right.
21       Q.   So, at that point in time you had already
22   had him for almost three months, right?
23       A.   Yeah, about three, almost four months,
24   yeah.
25       Q.   Let me ask you to take a look at that.
```

5161

```
1    This was a letter, was it not, from Attorney Hynes,
2    September 19th, trying to get you assistance to get
3    him into school.  So does that basically -- so is
4    that about right?
5        A.   Yeah.
6        Q.   To the middle of September, a little bit
7    beyond that?
8        A.   Right, right, that's correct.  Because like
9    I said, at the end -- it was around the end of May,
10   so school was about to be on vacation, and nobody
11   seemed to know at the time where his records were,
12   where anything was for him.  So by the time I did
13   get in touch with the people who could help, it was
14   like time for the new semester to start.
15       Q.   Okay.  And so he -- at that point in time,
16   you mentioned -- you were telling us that Azibo
17   appeared to be lost to you.  In what way did he
18   appear to be like that?
19       A.   He never spoke a lot.  He never said much.
20   You know, he always would seem down, depressed,
21   whatever.  And I'd always ask, are you okay, do you
22   need anything.  He'd always say, I'm fine, I don't
23   need anything.  And then one weekend I was doing my
24   usual housecleaning and, you know, doing the under
25   the bed and searching clean, and I saw a bottle of
```

5162

```
1   Jamaican rum, and I'm -- I was, like, what is this
2   doing here.  And I asked him was this his, because I
3   knew it wasn't my children's because they didn't
4   have access to rum or anything like that in the
5   house.  He said, yes.  He had admitted to me he had
6   been drinking at nights because he wasn't able to
7   sleep.  And so I realized at that time that he
8   really needed some kind of intervention.  I spoke to
9   the lawyer and he said to call social services, or I
10  decided to call social services on my own because I
11  didn't see any help coming from anywhere.  So, I
12  called them.
13     Q.   Before we get to those first calls was
14  Azibo travelling back and forth at that point in
15  time?
16     A.   Yes.  He would ask to go to see his
17  brothers.  I probably let him go once a month on a
18  weekend.  I would give him bus fare to go, or the
19  train, rather, and he'd come back, leave on a Friday
20  and come back on a Sunday.
21     Q.   And where were his brothers living at that
22  time?
23     A.   They were living in Bridgeport, I think.
24     Q.   And did you have an understanding about how
25  Jumbo, as far as between his parents, how his
```

5163

```
1   relationship was between his mom and his dad?  How
2   did he fit in there?
3      A.   I don't know that there was a major
4   relationship existing between him and his father
5   because he was not at any point, I could remember,
6   living for a long period of time with his father.
7   But he was very close with his mother because he was
8   living with her and the other little girls.  She had
9   them subsequently.  So he was very close to his mom.
10  He was -- like always there, help her with the kids,
11  all of that.  He used to tell me that he took care
12  of his little sisters when she went out to work or
13  if she had to go somewhere.  He was always with his
14  mother, always.
15     Q.   Now, did Azibo also tell you that he wanted
16  to be with his father at various points?
17     A.   Yeah, I think he was a little bit jealous
18  of the relationship of his older brother with the
19  father because they were always with the father and
20  they seemed to be having more fun.  You know, he was
21  a kid, he didn't know any other way.
22     Q.   Now, at some point in time you indicated
23  that you reached out to social services.  And do you
24  remember when that was approximately?
25     A.   No, I'm over 50, I don't remember that.  It
```

5164

```
1   was sometime -- gee, I think it was when he was in
2   school.  When he started school.  It was during the
3   school time because -- yeah, it might have been
4   September, October, somewhere.
5      Q.   And let me just show you a document.
6      A.   I'm not sure.
7      Q.   Showing you a document here, do you need to
8   borrow reading glasses, are you okay?
9      A.   I could squint and see.
10          THE COURT:  What document number is
11  this?
12          MR. SHEEHAN:  We're going to give it a
13  number which is -- call this WW-1.
14     Q.   This date that's on there.
15     A.   That's October, right?
16     Q.   Yeah.
17          MR. SHEEHAN:  Do you have any objection
18  to WW-1?
19     Q.   So, it was October 4th, about the right
20  date?
21          THE COURT:  I'm sorry, the right date
22  for what?
23     Q.   When you contacted social services in the
24  year 2004?
25     A.   '94.
```

5165

```
1      Q.   Oh, yeah.  1994.  All right.  And did you
2   tell them at that time that Azibo was a problem
3   child and you wanted to get him into counseling?
4      A.   I didn't say he was a problem child.  I
5   said he was having problems and that I needed to get
6   him into counseling because he wasn't handling his
7   mother's death very well.
8      Q.   Okay.  And had you also told them at one
9   point, did you tell them that he had just kind of
10  come here after the funeral and never left?
11     A.   Right.  That was exactly what happened.
12     Q.   And did you also express a concern that you
13  had at that time that Azibo had a history of running
14  away and you didn't want that to be on your watch?
15     A.   Right.  I told them that, you know, he was
16  having problems since the death, and that, you know,
17  he needed to get some sort of counseling.  I don't
18  know what was going to happen with him and I didn't
19  want anything to happen with him while he was with
20  me.
21     Q.   And you mentioned there that he had a
22  history of running away?
23     A.   Yes.
24     Q.   Did you not?
25     A.   Yeah.  He had run away before.  I was told
```

**GA1334**

5166

```
1    that by somebody.
2        Q.    And at that point in time you just had this
3    child who kind of landed on your door and you didn't
4    have any real legal status, did you?
5        A.    Correct.  Besides the letter the lawyer
6    sent to me giving me permission to get him enrolled
7    in school, I didn't have anything else, no.
8        Q.    But that wasn't -- you knew that wasn't
9    legal custody, guardianship?
10       A.    No, it wasn't.  It was just getting him
11   into school.
12       Q.    And then over the next several months did
13   you continue to keep Azibo at your house?
14       A.    Yes.
15       Q.    And I'm asking you at some point in time
16   later on did you tell -- did you contact social
17   services and say that you -- it really was too much
18   for you?  You needed help and you couldn't continue
19   doing this?
20       A.    I basically told them that, listen, yeah,
21   that this child needed counseling.  He needed help,
22   and if somebody didn't help me, I didn't know what
23   else to do with him, I don't know how much longer I
24   could keep him without getting him some help.  I
25   might have mentioned that, yeah, I think I did.
```

5167

```
1        Q.    And at that point you basically said you
2    are ready to put him on a train, somebody help me?
3        A.    I didn't do that, though.  I mean, I was at
4    my wits end because, like I said, I was trying to
5    get somebody to get this child some help and it
6    wasn't happening.  But when he actually left it was
7    after his brother said that he wanted them all
8    together.  I mean, reluctantly, I said -- I let him
9    go but it wasn't because I wanted to, and it wasn't
10   because -- I thought it was the best thing for them
11   to be together, to support each other, but I wasn't
12   sure his brother was able to take care of him.  Do
13   you know what I mean, without --
14       Q.    Right.
15       A.    -- assistance.
16       Q.    And in fact you -- and at that point in
17   time I guess Azibo had had a problem in school, he
18   had gotten suspended?
19       A.    Yeah, he kind of left school.  I dropped
20   him off to school and he somehow find his way back
21   home.
22       Q.    He found his way back home without school
23   in between, I take it?
24       A.    He missed a few classes.
25       Q.    And that was a pretty big responsibility
```

5168

```
1    considering you had your own three kids to deal
2    with.
3        A.    Yeah, it wasn't what I expected, but in the
4    same breath, I mean, and as much as he had that
5    problem in school, at home he was not a problem in
6    terms of discipline.  He always listened to whatever
7    I told him.  He would always do what I told him.
8    And as long as he was in the house there was no
9    problems with him and the children.  They never
10   fought.  There was no sibling rivalry; him being in
11   the house, I thought it might have created.  But he
12   was never a disciplinary problem for me per se.  My
13   thing was he's not sleeping, he's drinking and he
14   was cutting classes, which showed signs of a
15   problem, a child's problems to me.
16       Q.    And finally at some point in time did you
17   actually bring him back up to Bridgeport?
18       A.    His brother, yeah.  His brother and I
19   communicated, Azizi, and he said, do you know, my
20   mom has left us a little money and I'm going to get
21   an apartment and all of us are going to live
22   together, I think it's the best thing for us just to
23   be together right now and support each other.  I
24   didn't have custody of him either way, so.
25       Q.    And based on your own experience as a
```

5169

```
1    parent, did you have reservations at that time about
2    Azizi's ability to actually do that?
3        A.    Because he was a child.  He was 17, he was
4    going to be 18.  He was a child.  I mean, they're
5    all teenagers.  I mean, how much control could he
6    have.
7        Q.    Now, after Azibo left your house, was it in
8    February of 2004?
9        A.    February, March the following year.
10       Q.    Did you continue to have contact with him?
11       A.    Somewhat.  When I was able to reach him,
12   yeah.
13       Q.    And when was the last time you spoke to
14   him?
15       A.    Oh, God, you mean prior to today?
16       Q.    Yeah, prior to seeing him today.
17       A.    I saw him five years ago.  Four, five years
18   ago.  2005 it was.
19       Q.    Before he got arrested in this case?
20       A.    Yeah, that summer before.
21       Q.    And what was the circumstances of that?
22       A.    The organization was having a celebration
23   and he came down with his brothers.  My children
24   were there, myself, and we saw him, all embraced,
25   we're happy to see him.  Had a wonderful time as
```

5170

```
1   usual, because he's a really charming, sweet, child.
2   He's really a loving child.  And so I made him
3   promise me that he would come spend at least a week
4   or two out of the summer with me, and he promised to
5   go.
6           MR. SHEEHAN:  I have no further
7   questions, your Honor.
8           THE COURT:  Cross-examination.
9   CROSS-EXAMINATION
10  BY MS. RODRIGUEZ-COSS:
11      Q.   So, Ms. Headley, in all truthfulness, you
12  found the defendant to be a handful?
13      A.   Not really.
14      Q.   Not really?
15      A.   No.
16      Q.   So, if the defendant's brother Azizi told
17  this Court that you told him he was a handful and
18  couldn't handle him anymore and brought him back to
19  Bridgeport, is he incorrect?
20      A.   No.
21           MR. SHEEHAN:  I object to the form of
22  that.
23      A.   I thought it would be a lot for him.
24           THE COURT:  Excuse me, Ms. Headley, hang
25  on.
```

5171

```
1           MR. SHEEHAN:  I object to the form of
2   that question, your Honor.
3           THE COURT:  I'm going to sustain the
4   objection.  You may rephrase.
5       Q.   Do you disagree that you told his older
6   brother Azizi that he was a handful and you couldn't
7   handle him anymore?
8       A.   I might have told Azizi that I didn't think
9   he could handle him because he was so young.
10  Because I thought Azizi, being a child, would have a
11  harder time handling him than I could, only because
12  of his age.
13      Q.   You brought him back to Azizi, correct?
14      A.   No, I did not bring him back to Azizi.
15  Azizi told me that they got a place and that they
16  are all going to live together.
17      Q.   So, if Azizi believed you brought him back
18  because you felt he was a handful for you, that's
19  incorrect?
20           MR. SHEEHAN:  Object to the form of the
21  question.
22           THE COURT:  Sustained.
23      A.   I'm not --
24           THE COURT:  Just a --
25      A.   As far as I can remember --
```

5172

```
1           THE COURT:  Ms. Headley, there is no
2   question pending.  It's going to get reasked.
3       Q.   You told the Department of Social Services
4   he was a problem child.
5       A.   I told them he was a child with problems.
6   What they wrote, they might have rephrased it.  I
7   told them it was a child with problems.  Did you
8   also see that I said, he needed counseling.
9       Q.   Yep, I do.
10      A.   That's the only reason why.
11      Q.   So you agree they did understand you to
12  mean he was a problem child.
13           MR. SHEEHAN:  Objection.
14           THE COURT:  Sustained.  It's been asked
15  it's been answered.  Please move to the next
16  question.
17      Q.   So, did you know he had problems before he
18  came to live with you?
19      A.   He didn't have any problems before he came
20  to live with me as far as I knew.
21      Q.   Did you visit him in Bridgeport?
22      A.   No, I didn't visit him in Bridgeport.
23      Q.   Did you visit his home anywhere else?
24      A.   I had only -- yes, matter of fact, I had
25  seen him.  I think while at some point in Hartford
```

5173

```
1   when he was visiting with Gillian or something.  I
2   didn't see him to be a problem child at the time.
3       Q.   Did you ever visit his home with his
4   mother?
5       A.   No, ma'am.
6       Q.   But nonetheless, you said he had a history
7   of running away?
8       A.   I was told.
9       Q.   I see.  So you didn't have any personal
10  knowledge of that.
11      A.   No, ma'am.
12      Q.   And you said that you last saw him in the
13  summer of 2005.
14      A.   I think.  Like I said, my dates might be
15  wrong, but I saw him, yeah, I think it was
16  July 2005.
17      Q.   Were you aware he was running a drug
18  operation at that time?
19      A.   No.
20      Q.   Did you socialize with him?
21      A.   Yes.
22      Q.   Where did you socialize with him?
23      A.   At the -- where the event was being held.
24      Q.   So that was in the summer of 2005.  And so
25  between the time that you brought him back to
```

Bridgeport and when you saw him in 2005, how often would you see the defendant?

A. I never brought him back to Bridgeport.

Q. Okay. Did you ask his brother to come get him?

A. No, I didn't ask his brother to come get him. His brother told me he was going to bring him down because he had gotten a place for all three of them to be together.

Q. Okay. So, after he left your home in 1994, and so between then and the summer of 2005, how often did you see and interact with the defendant?

A. I didn't see him very often because he lived in Bridgeport, I lived in New York. I had two jobs. He would communicate with the children more so than I, than with me.

Q. Did you see him once?

A. I saw him maybe a few times. About four, five maybe. Like at intervals. Rarely, but not -- you know, it's not like I only saw him once or whatever, and I hadn't seen him for a long gap before -- I saw him maybe about five years, five years before. I saw him in 2004. It had been sporadic. I would see him -- wouldn't see him a few months or years, I would see him again. I don't



know the timing, but I had seen him in between then at some point.

Q. Was that always at the gatherings?

A. Pretty much. I think.

MS. RODRIGUEZ-COSS: Thank you, Ms. Headley.

We have no further questions, your Honor.

THE COURT: All right, redirect.

MR. SHEEHAN: I'm actually done.

THE COURT: All right then, so are we.

Thank you, Ms. Headley. You are excused. You may step down.

Ladies and gentlemen, we will adjourn for the weekend. Be back Monday at 9:30. We are only sitting two days next week, please remember. And I think we are still on track to be sure the evidence is completed by, as I said, mid-June. All right, very good. Enjoy your weekend.

(Jury exited the courtroom)

THE COURT: All right, what we have as loose ends are the police records of Richard Aquart.

Mr. Sheehan, have you coordinated them so that we just have one per conviction?

MR. SHEEHAN: Well, we have one -- we have one file per conviction, your Honor.



THE COURT: Okay, what I am trying --

MR. SHEEHAN: Not the police records, but these are the court records.

THE COURT: What I'm trying to ensure is that we don't have -- we're not -- we don't have a conviction showing up on an NCIC and a separate court record.

MR. SHEEHAN: Well --

THE COURT: If you do that then they can be admitted.

MR. SHEEHAN: What we will do, your Honor, is we're going to redact the -- we will redact the NCIC to reflect only the ones that are not on the court records, and there are two.

THE COURT: Why don't you do that, show that to the government, and then we'll see where we are. There was one record that Ms. Dayton thought had some question as to whether or not it actually was Richard Aquart's. Have you straightened that out.

MR. SMITH: Your Honor, we have been -- we did go back to the records provided by DOC, and we have a letter dated September 8, 1999, from the warden - to the warden at Brooklyn Correctional Institute in Connecticut from.



MR. SHEEHAN: Wait a minute. I'm sorry.

THE COURT: In other words, I don't want the jury to think there are more convictions than there are.

MR. SHEEHAN: Correct.

THE COURT: So one document per conviction.

MS. DAYTON: The government, they've sent us something that connects the two, so we have no problem with the New Jersey one, and we have no problem with just the rap sheet goes in, which shows his other four convictions. It's the underlying documents for two of the Connecticut ones that --

MR. SHEEHAN: Let me just explain the issue on that.

MS. DAYTON: Why don't we do it off line and we don't have to bother the Judge. Maybe we can work it out.

MR. SHEEHAN: If we could work it out that would be so nice.

MS. DAYTON: It's my warm and fuzzy Friday.

MR. SHEEHAN: We'll probably have to worry about it Monday morning.

THE COURT: This is what happens when

5178

```
1    you get worn down.
2            MS. DAYTON:  Yes.  I just want to leave.
3            THE COURT:  One other thing is the
4    recorded investigative statement by Mr. Armstead
5    that defense sought to introduce on two points of
6    claimed inconsistencies.  Have you looked through
7    that?  Do you really want the whole record in there?
8            MR. SMITH:  I have no objection myself
9    to the whole record.
10           THE COURT:  I'm asking you, are you
11   still pressing that?
12           MR. SHEEHAN:  Yes.
13           MR. SMITH:  Yes.
14           MS. DAYTON:  That's fine.  The
15   government is fine with that.
16           THE COURT:  All right, in it goes.
17           MR. SHEEHAN:  How nice.  I must have
18   agreed to something I didn't want to, but there you
19   go, you have to live with those consequences.
20           THE COURT:  All right.  Then we're going
21   to make every effort to get you a draft charge
22   shortly so that we can have a charge conference on
23   -- start a charge conference on Monday at --
24           MS. DAYTON:  How about 7:00 a.m.
25           THE COURT:  We could do that.  Is that
```

5179

```
1    what you want to do?
2            MS. DAYTON:  I'm a morning person.
3            THE COURT:  I wasn't -- we could do it
4    in the morning?
5            MR. SHEEHAN:  She thought it was a joke.
6            MS. DAYTON:  I would actually do it in
7    the morning, but they would kill me.
8            THE COURT:  Let's just start it right
9    after we finish the day.  All right.  I'll hold that
10   afternoon open, and then we'll continue it if
11   necessary on Tuesday.  But we may well be charging
12   and closing Monday the 13th at the rate we're going,
13   yes?
14           MR. SHEEHAN:  I think there is a -- I
15   don't know.  I think there is a decent chance, but
16   not cemented --
17           THE COURT:  That's fine.
18           MR. SHEEHAN:  -- that we will actually
19   finish our case on Tuesday.
20           THE COURT:  That's fine.  I'm just
21   trying to get us in a position in the event you do.
22           MR. SHEEHAN:  Right.  I think --
23           THE COURT:  Because I will not be
24   around.  I will be at the circuit conference.
25           MR. SHEEHAN:  I think at some point
```

5180

```
1    we're going to obviously need a final conference
2    when your Honor decides -- I mean, we still have
3    these mitigating factors issues somewhat up in the
4    air.
5            THE COURT:  Right.  That's what we will
6    discuss at the charge conference.
7            MR. SHEEHAN:  Okay.
8            MR. STERN:  Your Honor, so the defense
9    has cut back on some witnesses already, I believe,
10   and can we get a better idea now, a clearer idea of
11   who the witnesses will be on Monday?
12           MR. SHEEHAN:  Yes, I think on Monday
13   we're actually going to -- let me find what I have.
14           MS. DAYTON:  While they're doing that,
15   there was also a motion filed last night about the
16   witness Mark Bezy.
17           THE COURT:  Is he testifying Monday?
18           MR. SHEEHAN:  Yes.  I don't know if the
19   government objects to that.
20           THE COURT:  So, part of what you were
21   seeking to preclude the government from questioning
22   Mark Bezy on was the defendant allegedly used a lock
23   to assault Mr. Armstead.  But there is no evidence
24   of that.
25           MR. SHEEHAN:  Right.
```

5181

```
1            THE COURT:  So that would not be an area
2    of examination, presumably.
3            MR. SHEEHAN:  I think not.
4            THE COURT:  Well, maybe you could get
5    your position figured out and we could come in early
6    on Monday morning.
7            MS. DAYTON:  No, we do have our
8    position.  We think we should -- he purports to be
9    an expert on assaults, amongst other things, and the
10   injuries on Mr. Armstead look nothing like something
11   that would happen with someone's fists.  And so I
12   think it's fair to ask him on cross-exam whether or
13   not it appears -- he supposedly looked at all of the
14   evidence related to the Armstead assault -- that he
15   could have been assaulted with a weapon.  He has no
16   way of knowing if he was assaulted with a weapon or
17   not.
18           THE COURT:  So how does that go to the
19   security measures at federal facilities?
20           MS. DAYTON:  That they use -- that they
21   make weapons?  They create weapons.
22           THE COURT:  And why is it that that
23   can't be asked of him in the way that gets at what
24   his expertise is, which is, isn't it true that there
25   are weapons that make their way into any facility.
```

5182

1              MS. DAYTON:  That's fine.
2              THE COURT:  And then are you going to
3    question him about a threat made against Rodney
4    Womble or are you going to question him more
5    generally about how do you keep an inmate from
6    making threats against people using the telephone?
7              MS. DAYTON:  Well, he's going to talk
8    about the defendant and how the defendant could be
9    safe and secure.  So I do think that is absolutely
10   fair, because there is evidence of that.  It came in
11   through a phone call where the defendant was saying
12   tell Rodney Womble that, or Womble, whatever, that
13   he owes me $1,500 or it's curtains.  And there was
14   evidence of that that came in.  So, I do think
15   that's fair to ask him about.
16             THE COURT:  But --
17             MR. SHEEHAN:  He can't --
18             MS. DAYTON:  He didn't stop that.
19             THE COURT:  I'm just trying to figure
20   out what the form of the question is so I can
21   understand what the cross-examination is that the
22   defendant seeks to prohibit.  I think the subject
23   matter of threats by inmates on telephones is
24   certainly fair game.
25             MR. SHEEHAN:  Sure.

5183

1              THE COURT:  And if in fact he's saying
2    he examined the records, he can be asked about
3    whether he considered the threat to Womble.
4              MR. SHEEHAN:  Well, it isn't in the
5    records that he's been provided, your Honor, because
6    it isn't in the prison records.  So what we're
7    trying to do at this point is to have -- is to
8    basically say that the government can ask, for
9    example, can prisoners use telephones to communicate
10   threats.  And then he may say yes, and he may say
11   no, but what they can't ask Mr. Bezy is, are you
12   aware that Mr. Aquart used the telephone to threaten
13   Mr. Womble.
14             THE COURT:  Well, assuming they won't do
15   it that way, they can still say if you learned that
16   the defendant threatened Rodney Womble, however it
17   is, would that change your opinion?
18             MR. SHEEHAN:  I think that's improper.
19   It doesn't matter.  Rodney Womble versus anybody
20   else, your Honor.  I think the form of that question
21   would be objectionable.
22             THE COURT:  I don't think it is
23   because --
24             MR. SHEEHAN:  It would be making an
25   assumption.

5184

1              THE COURT:  No, it goes to whether or
2    not the records on which he is forming his opinion
3    and giving his opinion is in fact full and complete.
4    I think that's entirely proper.  There may be
5    something about the form that isn't quite up to
6    snuff, but I think the subject matter somehow is a
7    proper area for cross-examination of any expert,
8    whether they've left something out of their
9    consideration.
10             MR. SHEEHAN:  No.  I agree he can be
11   asked if, in fact, you were aware that an inmate had
12   used, or even Mr. Aquart had used the telephone to
13   communicate a threat, would that change your
14   opinion.  But I think he can't be asked if you were
15   aware that Mr. Aquart.  Because it's assuming a fact
16   that's not in evidence.
17             THE COURT:  Which fact?
18             MR. SHEEHAN:  That Mr. Aquart used the
19   phone to communicate a fact -- a threat to Mr.
20   Womble.  And it's also one of those specific acts.
21             THE COURT:  Didn't Mr. Womble testify
22   about that?  Or am I forgetting.
23             MR. SHEEHAN:  No, but they took that out
24   of the aggravating factors, your Honor, and now
25   they're backing it in this way.

5185

1              MS. DAYTON:  No, we're not backing it
2    in.  They're putting on someone to talk the security
3    in a prison that we actually objected to the person
4    getting on the stand.  And there's a telephone call
5    where the defendant says it to his brother, Azikiwe
6    Aquart.  So, it's definitely in evidence.  It's the
7    defendant's own voice talking to Azikiwe Aquart from
8    prison.
9              THE COURT:  And what witness did that
10   come in through?
11             MS. DAYTON:  Shante Pettway.
12             THE COURT:  The subject matter is not
13   improper.  And the third is the complaint made
14   against Bezy by a deputy warden.
15             MR. SHEEHAN:  We raised that simply --
16             THE COURT:  Is that sought to be raised?
17             MS. DAYTON:  It actually goes beyond
18   what is put in the defense motion.  There was an
19   entire OIA investigation against Mr. Bezy.  He told
20   his deputy warden that she was fucking stupid.  Are
21   you dumb, where have you worked before this, did you
22   learn anything.
23             And it was in the context -- and it was
24   in a room full of people in front of the executive
25   board of the prison when they were having a

5186

```
1   discussion, in fact, about weapons in prison.  And
2   they were talking about how prisoners can create
3   shanks out of plastic trays using thread and he
4   started -- well, attacking her verbally in front of
5   a room full of people.
6        In addition to that, and that was a
7   sustained finding.  It's not that nothing came of
8   this.  That was a sustained finding.  In addition to
9   that, he was accused of misusing his position for
10  personal gain.  And there was, like, four or five
11  different grounds, including having his subordinates
12  teach his son how to box, take care of his pets
13  while he was gone, type up on work and personal time
14  applications for him to leave the Bureau of Prisons
15  after this investigation started against him and to
16  go to a private prison, where he did ultimately go.
17  Amongst other things.  All of those, with the
18  exception of one, I believe there were five grounds,
19  one was not found to be true, the other four were
20  sustained against him.
21       Mr. Bezy talks about, including in his
22  resume and in the testimony that counsel references,
23  about basically what a stellar career he had.  He
24  retired two years short of his appropriate
25  retirement age, suddenly departed after 30 years at
```

5187

```
1   the Bureau of Prisons.  And all of these were
2   sustained.  He was interviewed about these
3   allegations, and in fact he went in and - you know,
4   let's just put it, it's not like he's not aware of
5   what's going on.  So, the fact he left before he
6   could be disciplined is sort of irrelevant.  It goes
7   to his credibility, especially the fact that he
8   misused his position for personal gain.  So we do
9   think it's a fair area of cross-examination.
10           THE COURT:  Mr. Sheehan?
11           MR. SHEEHAN:  Your Honor, I don't think
12  it's -- there is no findings in this regard, and if
13  there were --
14           THE COURT:  Well, she says there are.
15           MS. DAYTON:  There are, and I have the
16  report and I can provide it to the Court and
17  counsel.  I assumed they had it based upon the fact
18  that they filed a motion on it, but I have the
19  records from the chief counsel of the Bureau of.
20  Prisons.  We received it pursuant to trial subpoena.
21           MR. SHEEHAN:  I expect if the questions
22  are asked did he do the following thing, the answer
23  will be a sustained series of nos, and that will be
24  the end of the inquiry.
25           THE COURT:  But if the question is was
```

5188

```
1   he disciplined for --
2           MR. SHEEHAN:  The answer is no.
3           MS. DAYTON:  He wasn't disciplined.  He
4   retired before he could be disciplined.  But he was
5   investigated, he left under investigation, and they
6   found them all to be true.  And it's sort --
7           THE COURT:  When you say they found them
8   to be true, I don't quite understand.
9           MS. DAYTON:  It's just how OIA speaks.
10  They did an investigation and they're all sustained
11  allegations.  They found that he did all of these
12  things and he in fact used his position for personal
13  gain inappropriately.
14           THE COURT:  All right, here is -- I'd
15  like to see the records.  The besmirchments, if you
16  will, are appropriate cross-examination, but I don't
17  want them to take on a life of their own, and I
18  don't want them to become an entire piece of
19  satellite evidence.
20           MS. DAYTON:  Understood.
21           MR. SHEEHAN:  By that, your Honor, I
22  take it if the answer is no, that's the end of the
23  inquiry.
24           THE COURT:  I assume they'll ask a
25  question to which the answer can't be no.  So I
```

5189

```
1   don't know what the question is going to be.
2           MR. SHEEHAN:  Then that question would
3   be improper.
4           THE COURT:  Why?
5           MR. SHEEHAN:  Were you investigated?  So
6   what.  That's not a proper --
7           THE COURT:  Did the investigation on
8   allegations of such and such conclude with a finding
9   of sustained.
10           MR. SHEEHAN:  Why is that relevant?
11           THE COURT:  Because if he's holding
12  himself out there as a --
13           MR. SHEEHAN:  The question is whether he
14  did the act or not.  If he says I did not do the
15  act, that ends the inquiry.
16           MS. DAYTON:  He admitted doing the act.
17  Josh is copying it right now.
18           THE COURT:  Let me look at the record to
19  see, but I do think the area of unstellarness is
20  proper cross-examination for stellarness.  So with
21  that articulate direction for you all, why don't we
22  conclude.  Have a nice weekend.
23           MS. RODRIGUEZ-COSS:  Your Honor, we had
24  one more matter.  We sort of interrupted.  Counsel
25  was going to tell us who he was going to call on
```

5190

```
1   Monday and how, to what extent, his witness list has
2   been reduced.
3              THE COURT:  Okay.
4              MR. SHEEHAN:  I could indicate that we
5   would be starting with Loretta Jay, and then
6   proceeding to go Diane Hart D'Amato, Jonathan Davis.
7   Well, I got to figure juggling, but basically at
8   this point in time, I'm not going to call, as I've
9   advised the government, either Chris Samuels,
10  Sulaika Jumaralli or Ernest Reardon.  And so far
11  everybody else remains on our list.  And I'm
12  anticipating, hoping that I can get through Mr. Bezy
13  and Marva Lewis on Monday.  I may actually start
14  with them because I don't want to have experts
15  hanging around at --
16             MS. RODRIGUEZ-COSS:  So you anticipate
17  ending before the end of the day on Tuesday?
18             MR. SHEEHAN:  Well, I can't fit
19  everybody in on Monday, so I think I might finish on
20  Tuesday.
21             THE COURT:  All right.
22             MR. SHEEHAN:  I don't think I'll finish
23  on Monday.
24             THE COURT:  We haven't quite finished up
25  our colloquy on Marva Lewis.  Do you have time to do
```

5191

```
1   that now?
2              Why don't we take a recess and then we
3   can do that.  All right.  Actually, counsel, I have
4   a hearing at 4:00.  Let's do that 8:30 on Monday.
5        (Recess)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

5192

```
1                    I N D E X
2   WITNESS                                    PAGE
3   AZIZI AQUART
4   Direct Examination by Mr. Sheehan          4980
5   Cross-Examination by Mr. Markle            5074
6   Redirect Examination by Mr. Sheehan        5103
7
8   GILLIAN WALCOTT
9   Direct Examination by Mr. Sheehan          5105
10  Cross-Examination by Ms. Rodriguez-Coss    5116
11
12  KHADIJAH JUMARALLI
13  Direct Examination by Mr. Sheehan          5131
14  Cross-Examination by Ms. Rodriguez-Coss    5146
15
16  ELEANOR COOPER
17  Direct Examination by Mr. Smith            5118
18
19  SHARON HEADLEY
20  Direct Examination by Mr. Sheehan          5151
21  Cross-Examination by Ms. Rodriguez-Coss    5170
22
23
24
25
```

5193

```
1
2        I certify that the foregoing is a correct
3   transcript from the record of proceedings in the
4   above-entitled matter.
5                      6/4/11
6                      Date
7
8               /S/  Sharon Montini
9                 Official Reporter
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**GA1341**

5194

```
 1              UNITED STATES DISTRICT COURT

 2               DISTRICT OF CONNECTICUT

 3    * * * * * * * * * * *        *
                                   *
 4    UNITED STATES OF AMERICA,    * Case No 6cr160(JBA)
                                   *
 5              Plaintiff,         *
                                   *
 6          vs.                    *
                                   *
 7    AZIBO AQUART              * June 6, 2011
                                   *
 8              Defendant.         *
                                   *
 9    * * * * * * * * * * *        *

10              TRIAL TRANSCRIPT

11              VOLUME XXVII

12    BEFORE:  THE HONORABLE JANET BOND ARTERTON U.S.D.J.,
                                        and jury
13
      Appearances:
14    FOR THE GOVERNMENT:  ALINA REYNOLDS, ESQ
                           TRACY DAYTON, ESQ.
15                         PETER MARKLE, ESQ.
                           JACABED RODRIGUEZ-COSS
16                         United States Attorney's Office
                           915 Lafayette Blvd
17                         Bridgeport, CT 06604

18
      FOR THE DEFENDANT    MICHAEL SHEEHAN, ESQ
19    AZIBO AQUART:        Sheehan & Reeve
                           139 Orange Street
20                         New Haven CT 06510

21                         JUSTIN SMITH, ESQ.
                           383 Orange Street
22                         New Haven, CT 06511

23

24    Court Reporter:    Sharon Montini, RMR

25    Proceedings recorded by mechanical stenography,
      transcript produced by computer
```

5195

```
 1         THE COURT:  Good morning, counsel,

 2    ladies and gentlemen.  Please be seated.

 3         MR. SHEEHAN:  Good morning, your Honor.

 4         THE COURT:  I've just been reading your

 5    late-breaking responses to each other's motions.

 6    Our purpose is to start with the admissibility of

 7    the testimony of Marva Lewis on which we had

 8    colloquy last Friday.  The government's position

 9    when we last considered the motion, as I recall, was

10    that while her testimony may meet the standards of

11    Daubert, it's too generalized to apply to this

12    defendant.  The defendant argues taking the risk

13    factors that have been recognized and responding to

14    a hypothetical formulated from the educed in the

15    information at the penalty phase, that she is in a

16    position to opine whether he was -- whether the

17    defendant was at risk of violence because of the

18    abuse and neglect suffered in childhood and offers

19    this as mitigating against his moral culpability for

20    his crimes where the privations of childhood were

21    beyond his control.

22         Have I articulated the defendant's

23    position?

24         MR. SHEEHAN:  I think so, your Honor,

25    except to say that Dr. Lewis will not be making an
```

5196

```
 1    opinion specific to Mr. Aquart.  What she will be

 2    identifying are recognized risk factors that we

 3    believe are supported by the evidence in the case,

 4    and she will be talking about the correlation

 5    between risk factors, protective factors and

 6    violence.  So in that sense -- for example, as far

 7    as -- she will not be giving a specific opinion as

 8    to the defendant.  I think --

 9         THE COURT:  So, where does the

10    hypothetical come in then?

11         MR. SHEEHAN:  Well, the hypotheticals

12    come in basically asking her, for example, Dr.

13    Lewis would teenage exposure to teenage gangs or to

14    parental criminality, are those the kind of risk

15    factors that are at issue in the -- that are

16    important?  Would the absence of parental guidance

17    at critical points in a child's life, would that be

18    the kind of risk factors that are recognized?  Would

19    a brother's involvement, a sibling's involvement in

20    criminal activity?

21         So, in essence, I'm really asking her to

22    talk about factors that have been presented.  I

23    don't think that -- you can't really -- and I think

24    that's the importance of her testimony, that those

25    factors -- now none of those factors she will say,
```

5197

```
 1    and I think that that's what the risk factor

 2    analysis tells us, none of those factors are

 3    necessarily determinative of an outcome in a

 4    specific case.  And she'll also talk about

 5    resiliency, and I think that what the jury can

 6    appreciate from her testimony is because of the

 7    circumstances of his life he was at increased risk.

 8    It's not a causal connection directly in the sense

 9    that because of A -- and I would anticipate the

10    government, having seen other -- based on my view,

11    they may basically say, well, that doesn't say that

12    just because those things happen necessarily

13    somebody is going to go out and murder three people,

14    and I think she'll say no, I'm not saying that, what

15    I'm saying is that from what we see from strong risk

16    factors and weak protective factors is an increased

17    vulnerability on the part of -- in this formative

18    period of adolescent development.

19         I actually -- as in the Andrews case out

20    of Virginia, her evidence helps to put in context

21    why a jury might conclude that his -- that these

22    risk factors in his background diminish his moral

23    culpability in this crime such that --

24         THE COURT:  But that's going to be

25    argument or inference, that's not going to be the
```

5198

```
1   substance of her testimony.
2              MR. SHEEHAN:  Correct.
3              THE COURT:  Of her opinion; is that
4   right?
5              MR. SHEEHAN:  Yes, your Honor, but she
6   gives it context.
7              THE COURT:  All right.
8              MR. SHEEHAN:  As does the research that
9   surrounds her opinion.
10             THE COURT:  All right, Ms. Reynolds has
11  arrived to argue the motion.
12             MS. REYNOLDS: Yes, your Honor.  I
13  apologize for not being here Friday.
14             THE COURT:  Good morning.  Anything
15  further on this?
16             MS. REYNOLDS:  Your Honor, the
17  government when it filed its motion, the concern was
18  that the testimony would be too general, and then
19  the defense replied indicating that they would be
20  asking hypothetical questions which we took as
21  hypothetical questions about this defendant,
22  applying her methodology about risk factors to this
23  defendant's situation through hypothetical
24  questions, which we think all in all would be
25  appropriate testimony for an expert.  Now it seems
```

5199

```
1   like they're going back to the very general world of
2   risk factors and they're apparently not going to ask
3   specific hypothetical questions about this defendant
4   and the risk factors he was exposed to.
5              So, again, we're back to where we
6   originally were when we filed the motion, which is
7   this appears to be too general.  If you look at the
8   slide show, they've now added pictures from the
9   movie The Blind Side.  I mean, it's very general.  I
10  don't think there is any relevance to any movies.
11  In fact, the jury is instructed not to look at the
12  Internet, not to look at things like movies.  It
13  appears to be going more and more general to the
14  point where now they're talking about, you know,
15  people portrayed in films.
16             So, again, our concern is that while we
17  recognize that it may be appropriate under the case
18  law to offer expert testimony to give an opinion
19  about risk factors and relate those to mitigation
20  for this defendant, it's not appropriate to just
21  generally talk about risk factors.
22             So, I guess we would ask for more of an
23  offer of proof exactly what conclusions they're
24  going to have Ms. -- Dr. Lewis draw related to this
25  defendant.
```

5200

```
1              THE COURT:  So, Mr. Sheehan, as I
2   interpreted what you said, when you itemized the
3   categories that you would be asking Dr. Lewis about,
4   are these recognized risk factors, I take it you
5   were just summarizing the category captions as
6   opposed to recapitulating what she will already have
7   talked about, such as exposure to gangs or whatever
8   it was, and that you will be -- that your questions
9   will be encapsulating what has been the evidence.  I
10  thought that's what you were saying.  So that you
11  would be saying if at the age of 12 you lost your
12  mother and were exposed to gangs in your
13  neighborhood, if you were at the age of something or
14  other and exposed to your father having guns and
15  selling drugs, I mean, I take it --
16             MR. SHEEHAN:  Yes.
17             THE COURT:  That's the way you are going
18  to do it as opposed to just recapitulating.
19             MR. SHEEHAN:  Yes.
20             THE COURT:  I think that a hypothetical
21  that takes exactly the testimony, the evidence, and
22  asks her whether that's a risk factor that renders
23  an adolescent more at risk for violent behavior is
24  the form of the question, that makes it then
25  possible for the jury to use Dr. Lewis's testimony
```

5201

```
1   as a means of -- as a context, as you say, for
2   evaluating all of these childhood factors.  But just
3   to say in general terms -- let me go back and find
4   the one that seemed really general.
5              Would the absence of parental guidance
6   at critical points in a child's life, that sounds
7   like the conclusion.  That sounds like the risk
8   factor as opposed to the specific facts here that
9   were educed that would constitute absence of
10  parental guidance at critical points in a child's
11  life.  But I assumed from your statements that you
12  were just -- that that's what you were doing.
13             MR. SHEEHAN:  Yes, your Honor.
14             THE COURT:  Okay.  I think that given
15  that proffer that the testimony of Dr. Lewis
16  certainly seems to fit the criteria for Daubert.
17  Her testimony is grounded on facts and data that
18  come from significant national research, some of
19  which was either adopted by or under the auspices of
20  the justice department.  There isn't any dispute
21  that her recapitulation of what the results of this
22  research has been is a product of reliable
23  principles and methods, and that what she is going
24  to do is take these factors and have the facts
25  describe to her such that she can say whether or not
```

5202

```
1   this is one of those factors, and that seems to me
2   to be a proper application of principles and methods
3   to the facts of the case.  So, given that proffer,
4   I'm going to deny the motion in limine and we should
5   be, therefore, ready to proceed with Dr. Lewis.
6              Now, the next issue is Efrain Johnson
7   statements to law enforcement.  I'm a little bit
8   confused, and I have not -- the government seems to
9   be asserting a confrontation right, which would not
10  seem to be applicable.
11             MS. DAYTON:  Well, no.  The government's
12  asserting that the statements were completely
13  unreliable and it's not a free-for-all in the
14  sentencing phase.  It's not whatever the defense
15  wants to get in the defense gets in.  The statements
16  that they're offering do not fall under the
17  declarations against interest hearsay exception.
18  They were made to law enforcement officers in an
19  effort for Johnson to cooperate with the government.
20  The defendant -- that defendant, Johnson, was never
21  offered a cooperation agreement because it was never
22  determined that he was able to tell the truth.  We
23  could not corroborate the majority of what he said.
24  And, in fact, even at the end he couldn't tell the
25  truth.  As your Honor saw, he came in here, and as
```

5203

```
1   Mr. Sheehan saw, because he was sitting here, too,
2   Johnson lied during his plea allocution.
3              THE COURT:  Well, I don't know that he
4   lied.  He certainly did not allocute to the crime in
5   the indictment.  But the question here is where his
6   statements -- well, whether or not the government
7   could corroborate.  This is different from whether
8   or not they would have been admissible by the
9   government at the guilt phase, which they certainly
10  wouldn't have been since, as the government argues
11  here, they're clearly testimonial and Mr. Johnson is
12  clearly not available.  So, as to the defendant they
13  would not have been admissible against the
14  defendant.
15             MS. DAYTON:  Correct.
16             THE COURT:  And so why is it -- how is
17  it that the government argues that they enjoy the
18  same position as the defendant with respect to the
19  admissibility of out of court statements by an
20  unavailable witness where that witness's statements
21  have in part been previously offered?
22             MS. DAYTON:  So these statements haven't
23  been in part previously offered.  The government
24  offered a declaration against --
25             THE COURT:  Other statements.
```

5204

```
1              MS. DAYTON:  -- made years before.
2              THE COURT:  Other statements of Mr.
3   Johnson.
4              MS. DAYTON:  Right.
5              THE COURT:  Were previously offered.
6              MS. DAYTON:  But that's different, your
7   Honor.  Those statements --
8              THE COURT:  Well, why is that different?
9              MS. DAYTON:  Because those were
10  statements made in private to his sister versus to
11  law enforcement under situations where you'd expect
12  him to tell the truth.
13             THE COURT:  They're not testimonial,
14  that's right, that's why they came in.
15             MS. DAYTON:  But they were considered
16  declaration against interest because they have the
17  inherent reliability because they were not made to
18  law enforcement and because they were made under a
19  situation that was private.  The capital
20  jurisprudence makes clear that the government and
21  the defendant both enjoy the right to a
22  constitutional trial, and for evidence to be offered
23  that has absolutely no reliability, such as the
24  statements here, the jurisprudence on declarations
25  against interest, including ones having to do
```

5205

```
1   specifically with capital cases, make clear that the
2   statement offered has to have its own inherent
3   reliability.  And for instance in Green v Georgia,
4   the statement was found to be reliable precisely
5   because it was made to a person who was not in law
6   enforcement.  In Buchanan, however, the court kept
7   out -- the district court was found properly to have
8   kept out statements, the Fourth Circuit held,
9   because there was no inherent reliability in those
10  statements because instead of being made
11  spontaneously to a friend under a situation where
12  you would expect a person to be telling the truth,
13  they were made to the defendant's mitigation expert
14  by friends and family of the defendant.  So it's not
15  a situation where there was inherent reliability.
16             Here, again, these statements were
17  Johnson's statements.  Unlike the declarations
18  against interest, the ones that were made shortly
19  after the crime to his sister in private under a
20  situation where you would expect the defendant to
21  tell the truth, Johnson to tell the truth, and they
22  were so far against his penal interest that, you
23  know, they had inherent reliability for all of those
24  reasons, here Johnson spent the majority of time
25  talking to law enforcement trying to shift blame to
```

5206

```
1   the defendant, to Azikiwe Aquart and to John Taylor.
2          Nothing about Johnson's statements could
3   be corroborated except the fact the four of them
4   were there.  But even that Johnson claimed not to be
5   able to recognize Taylor.  Johnson claimed that he
6   hadn't been there on the earlier run when they tried
7   to get into the apartment.  Johnson claimed to law
8   enforcement not to have seen bats or masks though he
9   told his sister years before he ever spoke to law
10  enforcement that they had in fact had bats and
11  masks.
12         THE COURT:  Was that in the denial,
13  bats?  Was that in his statements that I have?  I
14  don't remember that.
15         MS. DAYTON:  Yes.  Well, the defense
16  gave you those statements, but it should be in
17  there.
18         THE COURT:  Tell me what the date of
19  that statement would be.
20         MS. DAYTON:  I think it's the last
21  statement.  The 2009 statement, your Honor.
22         THE COURT:  I have a 2010 as the latest.
23         MS. DAYTON:  Hang on, I need to -- I
24  believe that would be the one, your Honor.  He was
25  brought in and specifically confronted.  In 2009 was
```

5207

```
1   when he declined to identify John Taylor.
2          MR. SHEEHAN:  He did in 2010, your
3   Honor.
4          MS. DAYTON:  Yes, 2010 he denied the
5   bats and the ski masks.
6          MR. SHEEHAN:  I think your Honor does
7   have that one.  At least I intended to give it to
8   your Honor.  That's the one that is accompanied --
9   well, there is actually two.
10         MS. DAYTON:  Can you hand it up?
11         MR. SHEEHAN:  Sure.  This was the last
12  one, your Honor.
13         THE COURT:  So, Mr. Sheehan, are you
14  going to argue this?
15         MR. SHEEHAN:  Yes, your Honor.
16         MS. DAYTON:  Could I point out a few
17  more inconsistencies before we go on?
18         THE COURT:  Yes.
19         MS. DAYTON:  So, Johnson repeatedly
20  tries to say, for instance, that Tina Johnson was
21  attacked in the front living room.  He says it in
22  the proffer from March 7, 2007, November 20, 2008,
23  and also August 11, 2008.  He says that she was --
24  that she's the one who answered the door and that
25  she was attacked in the front room, tied up there
```

5208

```
1   and dragged to the back.  There is absolutely no
2   evidence to corroborate that whatsoever.  There is
3   no blood on the floor in the front room.  The
4   defense position, and what they've maintained
5   throughout, is there was a couch in the hallway.  So
6   it would have been impossible to drag a woman of Ms.
7   Johnson's size down that hallway.  But there is
8   nothing to suggest that ever occurred.  There are no
9   drag marks, there is nothing.  All the evidence
10  suggests she was attacked back in the bedroom.
11         But the reason that Johnson lied about
12  this was precisely to minimize his behavior.  The
13  reason he said it was in the front room was to avoid
14  putting himself in the back bedroom where Ms.
15  Johnson and Mr. Reid were killed.
16         He also talks about the fact that there
17  was -- the only weapon that he ever saw was some
18  alleged sliding metal pipe, making it sound like
19  something a police officer would use, like a police
20  officer baton, and there is no evidence to suggest
21  that any of the victims were hit with such an item.
22         At one point --
23         THE COURT:  So tell me why you say that?
24  Because none of the witnesses -- or all of the
25  witnesses who were cause of death witnesses said
```

5209

```
1   that it could have been a pipe of enough diameter.
2          MS. DAYTON:  Right, two-inches is not
3   much of a diameter, your Honor.  They all said it
4   needed to be something of a large diameter.  And
5   also according to Tom Martin it had to be a weapon
6   that would be sufficiently large to hold enough
7   blood to create the sort of cast off that was seen
8   all around the entire room in every -- well, just in
9   the back bedroom, in the southwest bedroom; notably
10  not in the front room where Johnson claimed the
11  beating originally took place.
12         Johnson also, of course, trips himself up
13  at one point because he talks about Tina getting hit
14  over a bed, and then when he's reminded that he said
15  that, oh, you actually said it was in the living
16  room, he then said, oh, well, there was sofa bed in
17  the living room.  And this is in the March 7, 2007,
18  on page 3, and there was of course no sofa bed in
19  the living room.
20         Johnson, his entire process with the
21  government was attempting to minimize his own
22  behavior.  And despite the defense claim in their
23  newest filing that the reason the government didn't
24  put on Efrain Johnson and John Taylor is because
25  their views or their statements were diametrically
```

5210

```
1   opposed is just blatantly incorrect.  The last time
2   the government spoke to Mr. Johnson was over a year
3   ago and it was determined that he had the inability
4   to tell the truth.  The government stopped speaking
5   with him, proffering him or anything else.  They
6   continued with Mr. Taylor because his testimony, his
7   statements were actually able to be corroborated by
8   the evidence, and it wasn't until six months or
9   eight months after the government stopped speaking
10  with Mr. Johnson that Taylor pled guilty to a
11  cooperation agreement, which occurred in front of
12  your Honor, of course.
13       So, the case law in the Second Circuit
14  makes clear that for statements to be considered
15  reliable they had to have been made under a
16  situation where the person is speaking to someone
17  they believe to be an ally, not to law enforcement,
18  as explained in Sasso, which is 59 F.3d 341 at 349
19  Second Circuit 1995.
20       Latine holds the same, that the
21  accomplice made the statement to a perceived ally,
22  not to police, and thus was not seeking to curry
23  favor or in a coercive atmosphere.  Latine is 25
24  F.3d 1162 at 1166, Second Circuit 1994.
25            Green v. Georgia, specifically -- which
```

5211

```
1   is 442 U.S. 95, 1979, talked about the reliability
2   of the statement because it was not made to law
3   enforcement, that it was made to a friend.
4        And the case law on this has always held
5   the same, your Honor.  So it's not -- it doesn't
6   have to do with a right to confront, it has to do
7   with putting reliable information in front of the
8   jury.  And if the information is not reliable, it's
9   not meant for the jury to hear because it's
10  confusing, it's misleading, and it's inappropriate.
11  It's an inappropriate way to get what is alleged to
12  be a mitigating factor in front of the jury when
13  it's not actually a mitigating factor and there is
14  no evidence to support the reliability.
15            THE COURT:  So, let me ask you this:  He
16  does contradict himself in instances, but where he
17  places himself at the scene of the triple murder,
18  and I thought talked about participating in the
19  masking type binding up of them where he talked
20  about Taylor saying he was doing it too slowly --
21  and there was something else.  These are rather
22  inculpating statements, aren't they?
23            MS. DAYTON:  So, the fact that he makes
24  one inculpating statement does not make the whole
25  statement reliable.  That's the government's
```

5212

```
1   contention.  Number one, even in trying to -- even
2   in making this inculpating statement, he's
3   minimizing.  He's saying, I didn't want to tape him
4   up, Taylor handed me the tape and demanded that I do
5   it, and then took it away from me and I stood
6   against the wall and then I got scared and I left.
7   And there is nothing to corroborate that, period.
8        There is, again, no evidence whatsoever,
9   forensic or otherwise, to suggest that Tina Johnson
10  was taped up in the front room or beaten there or
11  dragged down the hall.  This all happened in the
12  back southwest bedroom.  And so by making that
13  statement, whether or not he inculpates himself with
14  one statement, that doesn't open the door to a host
15  of completely unreliable statements.
16       Do you know if he said, oh, I was the
17  driver on a bank robbery, I never went in the bank,
18  and then it turned out there was video of him going
19  in the bank, we wouldn't let his statement in he was
20  the driver because there is proof that it's not
21  credible, that it's minimizing behavior; even though
22  he puts himself in the crime, he minimizes his role.
23       And that's the issue here, is he
24  minimizing, is he making his statement in a
25  situation that is inherently unreliable, and the
```

5213

```
1   case law from the Second Circuit on up to -- well,
2   Second Circuit, Fourth Circuit, up to the Supreme
3   Court says, yes, this was made in a situation that
4   is inherently unreliable.  And your Honor heard John
5   Taylor testify, you've seen the forensic evidence,
6   and the government would submit that you can also
7   take that into consideration when making a
8   determination about the reliability of Johnson's
9   statements to law enforcement and that -- and find
10  them unreliable based upon what you heard.  The
11  government would submit that John Taylor's testimony
12  was very credible.
13       We also, as we said in the motion, find
14  it notable that the defense tactic was not to say
15  that he was there and more involved, but to say that
16  he wasn't there at all.  And so now to try to shift
17  and say, okay, he was there and he's more
18  responsible than, you know, Efrain Johnson or so
19  responsible the defendant shouldn't be found to be
20  as responsible is ludicrous.  It's just -- it's
21  gamesmanship.  And this is meant to be a fair trial
22  for both the defendant and for the government, your
23  Honor, and putting on inherently unreliable
24  testimony, the government has no way to effectively
25  rebut that, and we do under 3593 have the right to
```

5214

```
1   rebut testimony, and if something --
2            THE COURT:  So when you say you have no
3   way to effectively rebut this, why is it that you
4   can't do so as you've been doing this morning, in
5   referencing the other statements that are
6   contradictory and demonstrably false?
7            MS. DAYTON:  But, your Honor, if you
8   feel that the testimony is such that the government
9   would have to sit there and argue it that way, I
10  mean, isn't that a finding that it's unreliable?
11           THE COURT:  You didn't answer my
12  question.
13           MS. DAYTON:  Because that's not how --
14           THE COURT:  Why shouldn't you --
15           MS. DAYTON:  Because that isn't how we
16  should be forced to spend our time arguing to the
17  jury, on something that shouldn't be let in, period,
18  because it's unreliable, inherently unreliable.
19  Your Honor, I don't know if you had the opportunity
20  to read the cases, but when you put these next to
21  each, other courts routinely exclude exactly this
22  type of information, including from the penalty
23  phase.
24           The fact that the defendant is facing
25  the death penalty doesn't mean he gets to throw
```

5215

```
1   whatever he wants to at the wall and see what
2   sticks.  We have a right to a fair trial.  If
3   evidence is unreliable it should not be allowed in,
4   period, regardless of who is promoting that
5   evidence.  And we can't call a witness unless -- you
6   know, we could -- we can't call a witness.  We can't
7   call Efrain Johnson to the stand and cross-examine
8   him.  We can't call his attorneys, who acknowledge
9   that they knew he was lying.  There is, like, really
10  nothing we can do.  It's unreliable testimony.  It's
11  almost impossible to sit there and prove that it's a
12  lie, and for us to have to spend the hour, or
13  whatever you give us, arguing to the jury, you know,
14  that this is unreliable and you shouldn't believe
15  it, it's misleading and confusing and it shouldn't
16  be allowed to be presented to the jury, period.
17           THE COURT:  All right, let me hear from
18  the defense.  Thank you.
19           You don't dispute that this is made --
20  that these statements are testimonial.
21           MR. SHEEHAN:  No.
22           THE COURT:  And you don't dispute that
23  they purport to minimize Mr. Johnson's involvement.
24           MR. SHEEHAN:  They characterize his
25  involvement in a way that does not make him --
```

5216

```
1   certainly does not make him as culpable as either
2   Mr. Aquart or his brother or, indeed, as culpable as
3   Mr. Taylor.
4            THE COURT:  That would be minimizing his
5   role in order to accomplish --
6            MR. SHEEHAN:  I don't know what happened
7   in that room, your Honor.
8            THE COURT:  We're just looking at the
9   statements.  Now, are you offering all of these
10  statements?  Are there other statements that he made
11  that you are not offering?
12           MR. SHEEHAN:  I am offering those
13  portions of the statements where he describes his
14  role and the role of Mr. Taylor.  The jury has
15  already found Mr. Aquart to be guilty of these
16  crimes.
17           THE COURT:  You've given me a collection
18  of reports and pictures.  Is that what you mean by
19  you are offering the portions of the statements
20  where he describes his role and the role of Mr.
21  Taylor?
22           MR. SHEEHAN:  Yes, those.  I'm sorry,
23  what I am -- I have given you all of what I thought,
24  and if I missed that 2010 one, I apologize for that.
25  I have given you all of his 302s.  I am not offering
```

5217

```
1   all of those 302s.
2            THE COURT:  What are you offering so I
3   know what we're talking about?
4            MR. SHEEHAN:  So on the March 6th 30 --
5   March 6th investigation.
6            THE COURT:  Wait, I'm sorry.  Hold on a
7   moment.  I have March 14, 2007.
8            MR. SHEEHAN:  Yes, that's it.  The date
9   of the transcription is March 14th, but the
10  investigation was on March 6th.  I'm offering that
11  portion of the statements starting on the bottom of
12  page 2 where he knocked on the door pretending to be
13  a customer and then proceeding up to -- through
14  where "Big Dude" -- which I believe is who he is --
15  is the fourth person -- "grabbed the woman and
16  rushed into the living room and then Big Dude handed
17  the rubber gloves to Johnson," which takes us
18  through to the end of "Big Dude finished wrapping
19  her hands and feet," and then at the end of that
20  paragraph that "Johnson saw Big Dude."
21           THE COURT:  I'm sorry, hold on.  All
22  right, the hands and feet.  Then what?
23           MR. SHEEHAN:  "Johnson saw Big Dude pull
24  an object from inside" --
25           THE COURT:  We leave the next part out,
```

5218

1  the next sentence out?
2          MR. SHEEHAN:  Yes, I'm just offering his
3  role, not the role of Azibo or Azikiwe.
4          THE COURT:  "Johnson backed up to the
5  wall and watched," is that also offered?
6          MR. SHEEHAN:  No, your Honor, I wasn't
7  offering that.  But I can.  I was not offering that.
8          THE COURT:  So you pick up again at
9  "Johnson saw Big Dude pull an object from inside
10  pants pocket."
11          MR. SHEEHAN:  "And strike the unknown
12  female on the right side of the head."
13          THE COURT:  Is that the portion of the
14  March 6th statement that you are claiming?
15          MR. SHEEHAN:  Yes, your Honor.  The next
16  one is on March 7, 2007.  And on the second page of
17  that where he -- towards the bottom, last full
18  paragraph where "Big Man and Aquart told Johnson
19  that his job was to knock on the apartment door and
20  to pretend to be a drug customer."
21          THE COURT:  I'm sorry, I'm on March 7th.
22  The last full paragraph starts "in the summer of
23  2005."  Is that where you are?
24          MR. SHEEHAN:  Page 2.  I'm sorry.  No,
25  on page 2 of the March -- the investigation date on

5219

1  the bottom left is the controlling one, your Honor,
2  but on page 2 of that.
3          THE COURT:  What's the first line of the
4  paragraph you are referring to?
5          MR. SHEEHAN:  First line is "Johnson" --
6          THE COURT:  "Johnson and Big Man," okay.
7          MR. SHEEHAN:  But what I am proposing
8  here is "Big Man and Aquart told Johnson that his
9  job was to knock on the apartment door and pretend
10  to be a drug customer.  Johnson knocked on the door
11  while the others waited around the corner.  When an
12  unknown female occupant answered the door, they bum
13  rushed her charging into the apartment."
14          THE COURT:  Is that all for this report?
15          MR. SHEEHAN:  And then "Big Man and
16  Johnson pushed the unknown female into the living
17  room.  Big Man handed rubber gloves to Johnson and
18  told him to put them on and instructed Johnson to
19  tape the unknown female up.  Johnson began taping
20  her hands.  When the unknown female started
21  screaming, Big Man punched her in the face and she
22  stumbled to the ground.  Big Man told Johnson to
23  tape her feet together.  When Big Man grew impatient
24  with the speed at which Johnson was taping the
25  unknown female's feet, he ripped the duct tape out

5220

1  of Johnson's hands."
2          And then on the -- not the next
3  paragraph, but the following paragraph, Big Man
4  said -- "Johnson said that Big Man pulled a long
5  metal pipe from his pants and smacked the unknown
6  female on the right side of the head while she was
7  leaning over the bed."
8          THE COURT:  Hold on.  That's in the last
9  paragraph?
10          MR. SHEEHAN:  No, I'm sorry, it's in --
11  we -- it's in the --
12          THE COURT:  All right, I see it.  So
13  it's the first full paragraph.
14          MR. SHEEHAN:  I think on page 3.  It is
15  the second full paragraph where it starts with
16  "Johnson said that."
17          THE COURT:  Okay.
18          MR. SHEEHAN:  "Big Man pulled a long
19  metal pipe from his pants and smacked the unknown
20  female on the right side of the head."
21          THE COURT:  All right.
22          MR. SHEEHAN:  "While she was leaning
23  over the bed."
24          THE COURT:  All right.
25          MR. SHEEHAN:  "Johnson described the

5221

1  metal pipe as approximately two-inches thick and
2  ten-inches long."
3          THE COURT:  Anything further from that
4  report?
5          MR. SHEEHAN:  "Johnson ran out of the
6  apartment when Big Man struck the female."
7          And then on the report dated August 11,
8  2008, on page 4, the last sentence of the -- I'm
9  sorry, the second to last paragraph, the last
10  sentence of that, "While standing outside the door
11  unknown male No. 1 gave Johnson cream-colored latex
12  gloves to put on."
13          And then in the following paragraph,
14  "Johnson knocked on the door and a female voice
15  answered 'Who is it?'  Johnson answered, 'Yo, what
16  up?'  When she cracked the door open the unknown
17  male No. 1 pushed Johnson through the door and they
18  all bum rushed into the apartment.  The unknown male
19  and Johnson pushed the woman into the living room.
20  The unknown male told Tina to shut up and to get on
21  the ground.  Johnson heard a metallic thud sound
22  when the unknown male No. 1 hit the woman."
23          And then on the following page "Unknown
24  male No. 1 handed the duct tape to Johnson and told
25  him to duct tape her hands and legs.  Johnson did

5222

```
1   not move fast enough, so the unknown male ripped the
2   tape from him and took over taping Tina."
3           Finally, your Honor, in the 302 dated
4   October 2nd, 2008, on the bottom October 9th --
5           THE COURT:  Just one moment.  I have
6   date of transcription October 1st and it was taken
7   on September 25th.  Is that the one you are talking
8   about?
9           MR. SHEEHAN:  No, it's the following
10  one, your Honor, the date of transcription is 10/9
11  2008.
12          THE COURT:  I don't have that.
13          MR. SHEEHAN:  It's 10/2, 2008.  It has
14  the pictures attached to it, your Honor.
15          THE COURT:  I just have pictures.  I
16  don't have any 10/2.
17          MR. SHEEHAN:  That's a six-page report.
18          THE COURT:  Would you give that to me
19  marking out what it is you are claiming?
20          Does that finish the proffer?
21          MR. SHEEHAN:  Yes, your Honor.
22          THE COURT:  Okay.  Then I will have it
23  completely here and I can consider the arguments.
24          MR. SHEEHAN:  Would your Honor like me
25  to just hand it up.  It's not a big section.  I can
```

5223

```
1   just hand that in.
2           THE COURT:  No, just mark it.
3           MS. DAYTON:  Your Honor?
4           THE COURT:  Do you have that report?
5   Yes, you must.
6           MS. DAYTON:  But I have a response to
7   some of what he said here.
8           THE COURT:  I'll tell you what, we will
9   take up further argument.  Because I don't think
10  I've actually heard the defendant's argument, and
11  then I'll hear the government.  But I think we
12  should get going with the jury.  But at least I have
13  a complete record to look at, which I did not
14  earlier.
15          And then the only other matter we have
16  that remains is what will be appropriate for
17  cross-examination of Mr. Bezy.  I'm wondering if it
18  makes some sense to wait to hear the direct of Mr.
19  Bezy before we actually make that ruling.
20          Would that be satisfactory to the
21  government?
22          MS. DAYTON:  That's fine, your Honor.
23          THE COURT:  All right.
24          MR. SHEEHAN:  The only question I have,
25  your Honor, is on that one -- and the reason why I
```

5224

```
1   ask for -- filed the motion -- I guess that's fine,
2   your Honor.  That would be fine.
3           THE COURT:  All right.  Who will be the
4   first witness today?
5           MR. SMITH:  That would be Loretta Jay.
6           THE COURT:  That's still going to be
7   Loretta Jay?
8           MR. SMITH:  Although, your Honor, we did
9   want to offer into evidence -- I think we have come
10  to an agreement with the government as to Richard
11  Aquart's criminal records.
12          THE COURT:  Have you come to some
13  agreement about that?
14          MR. SHEEHAN:  We did, your Honor.
15          MS. DAYTON:  You look so shocked.
16          THE COURT:  I'm just looking
17  inquisitively whether or not that is true.
18          MS. DAYTON:  It is.  We're going to put
19  in the rap sheet, the New Jersey prior conviction,
20  and then one underlying -- then we're going to make
21  clear on the rap sheet it says robbery, but he was
22  convicted of larceny.  And then there is one
23  underlying document from the rap sheet that they're
24  going to make clear it's not an additional
25  conviction, that it relates to one of the
```

5225

```
1   convictions on the rap sheet.
2           MR. SMITH:  So I would propose --
3           THE COURT:  This is a different set of
4   pictures than I have.  Okay, so I entirely did not
5   have that report.
6           MR. SHEEHAN:  I apologize for that, your
7   Honor.
8           THE COURT:  All right.  Fine.  And that
9   will be called Defendant's what?
10          MR. SHEEHAN:  We have what?
11          MR. SMITH:  I'm sorry, is there a
12  question?
13          MR. SHEEHAN:  What exhibit?
14          MR. SMITH:  Your Honor, this is P-LL.
15  P-MM and P-PP.
16          THE COURT:  All right, we have been here
17  a while.  I would like to take a five-minute recess
18  and then we can go for longer.
19          Good morning, Mr. Aquart.
20          THE DEFENDANT:  Good morning.
21          THE COURT:  And then I think we have
22  accomplished what we can accomplish to begin.  All
23  right, we'll take a five-minute recess.
24          (Recess)
25          THE COURT:  All right, please be seated.
```

5226

```
1    We'll bring in the jury.  And is Loretta Jay here?
2              MR. SHEEHAN:  Yes.
3              THE COURT:  Would you bring her in.
4              MR. SMITH:  Your Honor, before she
5    begins her testimony I am going to offer those of
6    Mr. Aquart, publish those to the jury.
7              MR. SHEEHAN:  We can bring in Ms. Jay as
8    well.
9              MR. SMITH:  We can bring her in now, if
10   you would like.
11             (Jury entered the courtroom.)
12             THE COURT:  Good morning, ladies and
13   gentlemen.  I realize we're starting later than I
14   told you, but we have been here long before that
15   sorting out the various issues that are necessary to
16   make this as efficient a presentation and use of
17   your time.  So, although we got a little bit off to
18   a late start, I think we have saved time in the long
19   run.  So, if you'd kindly be seated.
20             We will continue with the defense
21   evidence, information as we call it at this phase.
22             And, Mr. Smith, you have an agreed-upon
23   exhibit to offer.
24             MR. SMITH:  That's correct, your Honor.
25   By agreement the defense is offering exhibits
```

5227

```
1    regarding Richard Aquart's criminal history.  The
2    first of those is the rap sheet for Mr. Aquart,
3    which is horribly illegible on this, but I would
4    point out a couple of things.  We will also be
5    offering P-MM, which is the certified copy of the
6    judgment of conviction of Mr. Aquart for a case of
7    sale -- in 1985 sale of narcotics.  That is
8    reflected in the rap sheet so it shouldn't be -- the
9    jury should not be confused to think this is an
10   additional conviction.  There is rap sheet also
11   showing an arrest No. 1 in 1984 which was resolved
12   on March 1st of 1985.  At the bottom of the sheet
13   which shows a robbery in the first degree, but it
14   appears that Mr. Aquart, Richard Aquart, eventually
15   pled to a larceny in the second degree.  The rap
16   sheet for the jury's information is a printout kept
17   by the State of Connecticut police in regards to the
18   arrests and convictions, dispositions for any
19   particular individual within the State of
20   Connecticut.
21             Exhibit P-MM is the certified copy of
22   the sale and the conviction, the charge of the sale
23   of drugs and conviction of Mr. Aquart.  The notes
24   demonstrate, the docket notes --
25             MS. DAYTON:  May we approach?
```

5228

```
1              THE COURT:  I don't think the docket
2    notes are going to come in.
3              MR. SMITH:  Your Honor, the docket notes
4    demonstrate Mr. Aquart's --
5              THE COURT:  I'll speak with you about
6    that later.  All right, either they will be in
7    evidence or they won't be in evidence.  And the jury
8    will have them with them in the jury room.
9              MR. SMITH:  The final document is P-PP,
10   and this is the conviction from the State of New
11   Jersey, the government agrees that Millard J
12   Wolcott -- or Millard J. Walcott, is in fact an
13   alias used by Richard Aquart at the time.
14             So, your Honor, maybe at a break we can
15   take up the addition to MM.
16             THE COURT:  That will be fine.
17             MR. SMITH:  I'd also like to clarify
18   that the New Jersey drug case is not reflected on
19   the Connecticut rap sheet.
20             THE COURT:  This is the Millard J
21   Walcott one.
22             MR. SMITH:  That is correct, your Honor.
23             THE COURT:  And that's because it's a
24   Connecticut rap sheet.
25             MR. SMITH:  That is correct, your Honor,
```

5229

```
1    maintained by the Connecticut Department of Public
2    Safety.
3              THE COURT:  All right.
4              MR. SMITH:  Your Honor, we're prepared
5    to proceed --
6              THE COURT:  All right, then.
7              MR. SMITH:  -- with Ms. Jay.
8              THE COURT:  All right, Ms. Jay, if you
9    would kindly stand, raise your right hand, and you
10   will be sworn.
11             L O R E T T A   J A Y
12   Having first affirmed, was examined and testified as
13   follows:
14             THE WITNESS:  Loretta Jay, j-a-y,
15   Fairfield.
16             THE COURT:  All right, you may proceed.
17             MR. SMITH:  Thank you, your Honor.
18   DIRECT EXAMINATION
19   BY MR. SMITH:
20      Q.  Good morning, Ms. Jay.
21      A.  Good morning.
22      Q.  Could you please tell us how you are
23   currently employed?
24      A.  I do consulting.
25      Q.  And what kind of consulting work do you do?
```

**GA1350**

5230

1      A.   Business organization consulting
2  specializing in children and family and specialized
3  health care needs.
4      Q.   And how long have you been doing that?
5      A.   About ten years.
6      Q.   And prior to that how were you employed?
7      A.   I worked for the Department of Children and
8  Families.
9      Q.   And when did you first start working for
10 the Department of Children and Families?
11     A.   In January 1989.
12     Q.   And what did you do when you first began
13 there?
14     A.   I was a social worker trainee and then a
15 social worker, and then I progressed as a children
16 services consultant and then a social work
17 supervisor.
18     Q.   And at some point were you working in
19 Bridgeport?
20     A.   Yes.
21     Q.   And when was that; do you recall?
22     A.   I worked in the Bridgeport office for the
23 Norwalk -- for the town of Norwalk, or the Norwalk
24 community, from '89 to '91, and then from '91 to '93
25 I worked in Bridgeport investigations.  I then left

5231

1  and went to Stamford, and I returned to Bridgeport
2  later on.
3      Q.   Okay.  And during your time that you worked
4  in Bridgeport, what was Bridgeport like?
5      A.   It was a tough city.  There were -- there
6  was a lot of crime, a lot of violence, a lot of
7  gunfire.  We required police escort to some
8  neighborhoods and some communities.  There were
9  Jersey barriers dividing streets in some
10 neighborhoods so that police could cordon off
11 criminals to stop them.
12     Q.   So, you actually had to sometimes have a
13 police officer escort you into those areas?
14     A.   Yes.
15     Q.   And did there come a time when you worked
16 on a case involving Azibo Aquart?
17     A.   Yes.
18     Q.   And how did that come about?
19     A.   That was when I was in the Stamford office
20 and there was a petition -- a report was received to
21 determine if Mr. Aquart and his siblings -- they had
22 a guardian ad litem.  There was a suggestion that
23 the guardian ad litem was not caring for them.
24     Q.   And why is it that you remember this
25 particular case?

5232

1      A.   When it came in it was not a typical abuse
2  or neglect case, it was there were children who were
3  without a parent.  They were on vacation in Florida,
4  and they watched their mother drown while trying to
5  save another child, and it was a chilling story and
6  experience, and the kids were shell shocked from the
7  experience, it appeared.  They were -- it was very
8  upsetting for all of us as parents and as people.
9      Q.   And were you aware that Mr. Aquart and his
10 siblings were of Jamaican descent?
11     A.   Yes.
12     Q.   And were you familiar with some aspects of
13 Jamaican culture at that time?
14     A.   Yes.
15     Q.   And why is that?
16     A.   I work with families who are Jamaican.  I
17 was also supposed to marry someone who was Jamaican.
18 So, I had personal involvement as well at the time.
19     Q.   And also were you -- did there come a time
20 when you were working -- was Azizi Aquart on that
21 case?
22     A.   Yes.
23     Q.   And what was your impression of Azizi at
24 the time?
25     A.   Distrustful, scared, protective, not

5233

1  willing to engage with the system.
2      Q.   And given your knowledge of Jamaican
3  culture at the time, were you surprised by that?
4      A.   No, it's consistent.
5      Q.   Now, as part of your work on this case, you
6  would have kept records; is that correct?
7      A.   Yes.
8      Q.   And that would include intake sheets and
9  case activity notes and things of that nature?
10     A.   Yes.
11     Q.   And when you take those notes, are they
12 kept simultaneously as you are doing your work on
13 the case?
14     A.   Yes.
15     Q.   I'm going to show you what's been marked as
16 Defendant's Exhibit P-WW.
17          MR. SMITH:  Your Honor, the government
18 would like to approach.
19          THE COURT:  All right.
20          (Sidebar conference)
21          MR. SMITH:  I'm sorry, I should bring a
22 copy for you.
23          THE COURT:  It's not in my exhibit.
24          MR. SMITH:  I apologize.  I'll bring you
25 a copy.

5234

```
1          THE COURT:  Let me hear what the
2  government's objection is.
3          MS. RODRIGUEZ-COSS:  So the defense just
4  indicated for the first time that they intend to
5  introduce the entire DCF file into evidence, and we
6  object.  First of all, he hasn't laid a foundation
7  as to what in these documents is relevant.  He's
8  just asked her whether she was essentially -- well,
9  we don't know if she was the case manager.  I have
10 her in my list as the point of contact with DCF, and
11 through her we're submitting the entire DCF file?
12 We would object.  I think they need to be more
13 specific as to why every single piece of paper in
14 here is relevant and with regards to what.
15         THE COURT:  Are you going to lay a
16 further foundation?
17         MR. SMITH:  Well, I was about to ask her
18 if these case activity notes are her handwriting, to
19 which she would say yes.  Not every piece of paper
20 in this set is produced by her, your Honor, but the
21 government subpoenaed the DCF records, as we know,
22 and I don't understand why now they're objecting to
23 them going in.
24         THE COURT:  Let me see the foundation
25 that you lay.  What are you going to do with the
```

5235

```
1  notes?
2          MR. SMITH:  I'm going to -- she does not
3  have specific memories as to certain things that
4  occurred during her investigation.  I was going to
5  take her back through her notes as a recorded
6  recollection, which I think is reliable, as she's
7  already testified it was made simultaneously with
8  her investigation, and ask her about certain aspects
9  of the investigation and conclusions.
10         THE COURT:  Will you first use these to
11 refresh recollection and then if the recollection is
12 unrefreshed -- is that your proffer?
13         MR. SMITH:  No, your Honor.  My proffer
14 is to enter this as an exhibit.
15         MS. RODRIGUEZ-COSS:  Your Honor, that's
16 not how --
17         MR. SMITH:  We can try doing refreshed
18 recollection.  But if she's unable to refresh her
19 recollection --
20         THE COURT:  Then that will apply to
21 those documents that are her notes.  And then what
22 about the other stuff?
23         MR. SMITH:  Well, your Honor, I still
24 think it's relevant insofar as the records contain
25 the opening date, the closing date of the file,
```

5236

```
1  things like that.
2          THE COURT:  Can't she testify to that?
3          MR. SMITH:  I suppose she could, yeah.
4          THE COURT:  All right, let's have her
5  testimony as best she can recall it refreshed and
6  see where we are.
7          (Sidebar concluded)
8     Q.  Ms. Jay, when was this case opened; as far
9  as you recall?
10    A.  In 1994.
11    Q.  Do you recall approximately when?
12    A.  September.
13    Q.  Would showing you a document perhaps
14 refresh your recollection as to the exact date?
15    A.  Yes.
16    Q.  Okay.
17    A.  September 29th.
18    Q.  And that's in 1994?
19    A.  Yes.  I'm sorry.
20    Q.  And your understanding was Christopher
21 Hynes was the -- was he the guardian of the estate
22 or guardian ad litem; do you recall?
23    A.  I thought it was guardian ad litem, but it
24 could have been of the estate.
25    Q.  Okay.  And to your recollection who at that
```

5237

```
1  point was watching Azibo?
2     A.  I need to check the records.  I believe it
3  was Ms. Waders (ph).  Oh, Azibo.  Excuse me.  He was
4  in New York, in New York City, with a family there.
5     Q.  And do you recall that person's name?
6     A.  I'm sorry, I do not recall the name
7  offhand.
8     Q.  Okay, do you think maybe looking at
9  something would refresh your recollection?
10    A.  Yes, it would.  He was living with Sharon
11 Headley.
12    Q.  And that was in New York?
13    A.  In Queens, I believe.
14    Q.  Okay.  And you had talked about Azizi and
15 your recollection that he wasn't particularly open
16 to assistance from DCF; is that correct?
17    A.  Yes.
18    Q.  And do you recall that Mr. Aquart was
19 seeking emancipation, Azizi Aquart?
20    A.  Yes.
21    Q.  And did you have advice for Azizi Aquart at
22 that point?
23    A.  We had offered services through Department
24 of Children and Families that included everything
25 from supportive community services as well as a
```

5238

1  group home, coming into DCF care.
2      Q.  And was Mr. Azizi Aquart open to that?
3      A.  No, he was not.
4      Q.  And did you also advise him that you
5  thought Azibo should receive counseling?
6      A.  Yes.
7      Q.  And was he open to that suggestion?
8      A.  I don't recall specifically.
9      Q.  And you had talked about Ms. Waders.  Is
10  that where Azizi and Azikiwe were staying?
11      A.  Yes.
12      Q.  And that was your recollection, correct, of
13  where they were staying?
14      A.  Yes.
15      Q.  And do you recall whether Azibo Aquart was
16  sometimes coming up to stay with Ms. Waders and the
17  boys?
18      A.  He had come up and Azikiwe had -- Azizi had
19  brought him back to New York.
20      Q.  And was Ms. Waders having trouble with
21  Azizi and Azikiwe at that time?
22      A.  Azizi and Azikiwe?  Not specifically.  I
23  think there were some problems, yes, but she was
24  managing.
25      Q.  And at some point did it appear to you that

5239

1  Ms. Headley was having difficulty with Azibo as
2  well?
3      A.  Yes.
4      Q.  And was she -- what was she doing to help
5  Azibo, that you were aware of?
6      A.  He was living with her.  She was caring for
7  him.
8      Q.  Do you know if she was trying to obtain
9  services for him?
10      A.  She was trying to initially, and then
11  towards the end of our involvement she was advised
12  to call New York child protective services.
13      Q.  Because there is only so much the DCF could
14  do here in Connecticut for her?
15      A.  DCF had no legal authority to get involved
16  with a child out of state.
17      Q.  And at some point this DCF case was closed,
18  correct?
19      A.  Yes.
20      Q.  Do you remember when that was?
21      A.  January 1995.
22      Q.  Okay.  So the case was only open about four
23  months?
24      A.  Yes.
25      Q.  And none of the boys were ever taken into

5240

1  protective custody for DCF?
2      A.  No.
3      Q.  Did you know if you ever actually even met
4  with Azibo?
5      A.  I do not believe I did.
6      Q.  Do you think you met with Azizi at some
7  point?
8      A.  Yes.
9      Q.  What was your overall impression of this
10  case?
11      A.  It was a sad, a very sad situation.  They
12  were left without -- I think that they were left
13  without parents and without substitute caregivers
14  who were committed to them and to seeing that they
15  got what they needed as children growing into
16  adults.
17      Q.  Did you get the impression that Azizi was
18  well equipped to be taking on the role of parenting?
19      A.  No.
20      Q.  And at this time period, what kind of
21  caseload was DCF carrying?
22      A.  Very high caseload.  I don't know, it could
23  have been anywhere 30, 40, even 60 cases at the
24  time.  I don't recall what my caseload was at the
25  time specifically, but they were high over different

5241

1  periods.
2      Q.  And how do you think DCF was handling
3  things at this time?
4      A.  I think that it was a department that was
5  -- you know, this is -- how do I put it?  It was
6  struggling.  The department changed a lot by the
7  time I left with lower caseloads, caseloads of ten,
8  and staff increased.
9      Q.  So that the staff, at least later, by the
10  time you left, was perhaps in a better position to
11  pay more attention to the cases to assist where it
12  was needed?
13      A.  Well, smaller caseload allows you to do
14  more hands-on work.
15      Q.  Okay.
16          MR. SMITH:  I have nothing further at
17  this time, your Honor.  Thank you.
18          THE COURT:  Cross-examination.
19  CROSS-EXAMINATION
20  BY MR. MARKLE:
21      Q.  Good morning, Ms. Jay.
22      A.  Good morning.
23      Q.  Ms. Jay, I'm not clear, who was the
24  guardian at the time you were involved in this
25  matter?

5242

1    A.   Who was the guardian of the children?
2    Q.   Yeah.
3    A.   Christopher -- I don't have it in front of
4  me.  The guardian ad litem.
5    Q.   And you never met with the defendant, Mr.
6  Azibo Aquart?
7    A.   No.
8    Q.   So you know nothing about him in
9  particular, correct?  You know the facts
10  surrounding.
11    A.   I know the facts surrounding him and what I
12  was told.
13    Q.   But you never had an opportunity to speak
14  with him and form any opinion as to him back in
15  those years?
16    A.   No.
17    Q.   And you said that the children watched
18  their mother die.  Who told you that?
19    A.   That was in the report received.
20    Q.   So you don't know if that's correct?
21    A.   I wasn't there, so I only know what I was
22  told.
23    Q.   And you don't remember who told you that or
24  who said that to put it in the report?
25    A.   I do not recall.

5243

1    Q.   So if that's inaccurate, you are relying on
2  some incorrect information?
3    A.   I'm relying on the information that was
4  brought to my attention.
5    Q.   And you said that Azibo was living in New
6  York with Ms. Headley at the time?
7    A.   Yes.
8    Q.   So your concerns about the crime rate and
9  the crime in Bridgeport, those didn't affect Azibo
10  Aquart because he wasn't in Bridgeport.
11        MR. SMITH:  I'm going to object as to
12  the time period we're talking about.
13        THE COURT:  Basis for your objection?
14        MR. SMITH:  The time period we're
15  speaking about.
16        THE COURT:  The time period is the time
17  period he was living with Ms. Headley.
18        Do you know what time period was,
19  approximately.
20    A.   I only know from the September '94 'til
21  January '95, that he was mostly living with Ms.
22  Headley at the time.  I don't know before or after.
23    Q.   So, he was not exposed to the crime in
24  Bridgeport that you talked about during those five
25  months, correct?

5244

1    A.   During those five months.
2    Q.   At least those five months.
3    A.   You know, not to my knowledge.
4    Q.   Do you know when he, Azibo Aquart, lived in
5  Bridgeport?
6    A.   No, I don't.
7    Q.   So, you have no idea what he was exposed to
8  in Bridgeport?
9    A.   I spoke to what Bridgeport was like, not
10  what he was exposed to.
11    Q.   What you were exposed to and what others
12  who lived there were, not him.
13    A.   Yes.
14    Q.   And as to Azizi, did you say that Azizi
15  Aquart appeared to be distrustful?
16    A.   Of the system, yes.
17    Q.   But he was willing to take on the
18  guardianship of his brother, correct?
19    A.   Yes.
20    Q.   And he wanted to do what was best for his
21  brother?
22    A.   I think that -- my recollection is that he
23  was -- yes, that was his goal.
24    Q.   And you have no idea of how he did in fact
25  care for his brother, do you?

5245

1    A.   No.
2    Q.   And whether he was a good provider or not?
3    A.   I don't know.
4    Q.   You have no knowledge of that?
5    A.   No.
6    Q.   And how often did you meet with Azizi
7  Aquart?
8    A.   I believe just one time.
9    Q.   Just one time?
10    A.   I believe so.  Oh, actually, no.  Yeah, I
11  think it was one time.
12    Q.   Over the five months you were assigned to
13  the case?
14    A.   Yes.
15    Q.   Correct?
16    A.   Yes.
17    Q.   And did you know that the defendant, Azibo
18  Aquart, was resisting help?
19    A.   I did not know.
20    Q.   Did you know that he was not willing to,
21  what you call, come in to care?
22    A.   I did not know.
23    Q.   And what's coming in to care mean?
24    A.   It would mean the Department of Children
25  and Families would become the legal custodian and

5246

```
1   guardian of the children, or child.
2       Q.   So, if Azizi Aquart was resistant to that
3   it meant he wanted to keep his brother with him, not
4   with some foster family, correct, or in the custody
5   of DCF?
6       A.   Yes.
7       Q.   He wanted to keep the family together?
8       A.   Yes.
9       Q.   And did you know that reports were done
10  concerning Azizi Aquart and he was considered a
11  responsible young man?
12          MR. SMITH:  I'm going to object.
13  Whether she knows these report exist.  I suppose she
14  could be asked if she knows.
15          THE COURT:  That's what she is asked.
16          Do you have reports that you reviewed as
17  part of your handling this case concerning Azizi
18  Aquart.
19          THE WITNESS:  The Department of Children
20  and Families was not assessing Azizi as a -- no, I
21  don't have reports.
22      Q.   So, you have no idea whether there was a
23  significant bond between Azizi Aquart and his
24  brother Azibo Aquart?
25      A.   Not through formal reports.
```

5247

```
1       Q.   Through any means?
2       A.   I have what different parties involved at
3   the time -- what they have reported.
4       Q.   And was that what was reported?
5       A.   That there was a bond?  There were some
6   difficulties between the two.
7       Q.   I'm sorry?
8       A.   There were difficulties between the two.
9       Q.   You didn't know there was a significant
10  bond that people thought should be maintained?
11      A.   Well, they were siblings.  So, as you
12  heard, I suppose there was a significant bond.
13      Q.   But it was more than just siblings.  Azizi,
14  an 18-year-old, wanted to take responsibility for
15  his brother.
16      A.   Yes.
17      Q.   And wanted to care for him, correct?
18      A.   Yeah.  Well, yes.
19      Q.   And did you know that Azizi, although being
20  noted to be young, should be commended for the
21  efforts he demonstrated to keep his family together?
22  Did you ever hear that information?
23          MR. SMITH:  I'll object to reading from
24  a document that she hasn't seen.
25          THE COURT:  It's not purporting to be a
```

5248

```
1   quote.  The question is had you ever read any
2   reports or come in to any information that concluded
3   Azizi should be commended for his efforts.
4           THE WITNESS:  No.
5       Q.   Or that he had been referred to as a young
6   man who had done better than most adults do in such
7   a situation?
8       A.   No.
9       Q.   Wouldn't that information be important to
10  you in determining where Azibo Aquart and his
11  brother should be placed?
12      A.   I wasn't making that determination.
13      Q.   I thought your role was to find a place for
14  them to live and people willing to accept them?
15      A.   No.
16      Q.   That was not your role?
17      A.   That was not my role.
18      Q.   That's DCF's role at times, correct?
19      A.   At times it is, but that was not our role
20  in this case.
21      Q.   What is your role in this case?
22      A.   In this case it was to determine -- to
23  offer placement for the boys, which was refused.
24  They did not want to come in to placement; they
25  wanted to work on it their own.  They did not want
```

5249

```
1   to meet with us, they did not want to work with us,
2   and they had a plan of their own.  We were not
3   assessing the -- we were not assessing Azizi to be a
4   guardian.  We were not involved with that at all.
5       Q.   But when you are saying a place to live,
6   you were offering foster home, correct?
7       A.   A foster home or a group home or a shelter.
8       Q.   And that's what they didn't want to do,
9   correct?
10      A.   Yes.
11      Q.   And that's not unusual, is it?
12      A.   That adolescents refuse?  No, that's not
13  that common.
14      Q.   That three brothers would want to stay
15  together rather than be put into foster homes?
16      A.   That's common, sure.  That's
17  understandable.
18      Q.   That's common?
19      A.   That three brothers would want to stay
20  together?
21      Q.   Yeah.
22      A.   Certainly.
23      Q.   And, again, you have never met Azibo
24  Aquart?
25      A.   No.
```

5250

```
1     Q.    And you met his brother once?
2     A.    I believe so.
3     Q.    And did you ever meet Azikiwe Aquart?
4     A.    Yes.
5     Q.    How many times?
6     A.    Once.
7           MR. MARKLE:  I have nothing further.
8  Thank you.
9           THE COURT:  Redirect.
10 REDIRECT EXAMINATION BY
11 MR. SMITH:
12    Q.    Mr. Markle was asking you some questions
13 about whether Azibo was in Bridgeport from September
14 of '94 to January of '95.  To your knowledge he was
15 not there?
16    A.    He was not living there.
17    Q.    You worked in Bridgeport in the early '90s,
18 before '94?
19    A.    Yes.
20    Q.    And the description of Bridgeport that you
21 had then that you needed a police escort, that was
22 that time period you are talking about?
23    A.    Yes.
24    Q.    And again, your role was not to determine
25 Azizi's ability to be a parent at that point; is
```

5251

```
1  that correct?
2     A.    No, it was not.
3     Q.    That was out of your hands?
4     A.    Yes.
5     Q.    But it was your opinion you didn't think he
6  was probably ready for that?
7     A.    Yes, that is correct.
8           MR. SMITH:  I have nothing further.
9  RECROSS-EXAMINATION
10 BY MR. MARKLE:
11    Q.    Did you ever go to the Aquart home?
12    A.    There was no Aquart home.
13    Q.    So, this police escort and the violence,
14 you have no idea what impact it had on the defendant
15 or any of his brothers or his family, correct?
16    A.    I don't know how it affected them.  I know
17 how it affected the community in Bridgeport.
18    Q.    But you would have to know where they lived
19 to make that assessment or that conclusion, correct,
20 how it impacted them?
21    A.    I guess.  I mean --
22    Q.    In other words, Mr. --
23    A.    I don't know what street it was.  I don't
24 know what street they lived on, that's true.
25    Q.    When you say you needed police escort to go
```

5252

```
1  do some of your work, that was not a police escort
2  to the home where Azibo was residing, correct?
3     A.    Correct.
4     Q.    So, you weren't referring to the defendant
5  and his placement and his home?
6     A.    No, I was speaking to the City of
7  Bridgeport at the time.
8     Q.    Thank you.
9           MR. SMITH:  Nothing further, your Honor.
10          THE COURT:  All right, thank you, Ms.
11 Jay.  You are excused.  You may step down.
12          Please call your next witness.
13          MR. SMITH:  Your Honor, the defense
14 calls Diane Hart D'Amato.
15          THE COURT:  Ms. D'Amato, if you would
16 kindly come over to the witness stand right over
17 here, and then remain standing with your right hand
18 raised, please.
19     D I A N E   H A R T   D' A M A T O
20 Having first affirmed, was examined and testified as
21 follows:
22          THE WITNESS:  Diane Hart D'Amato,
23 Hyphen, d-a-m-a-t-o, and I work in Bridgeport.
24          THE COURT:  You may proceed.
25          MR. SMITH:  Thank you.
```

5253

```
1  DIRECT EXAMINATION
2  BY MR. SMITH:
3     Q.    Good morning, Ms. D'Amato.
4     A.    Good morning.
5     Q.    How are you currently employed?
6     A.    I'm a juvenile probation officer with the
7  State of Connecticut.
8     Q.    And what town do you work in?
9     A.    In Bridgeport.
10    Q.    And how long have you been doing that?
11    A.    Over 20 years.
12    Q.    And has all of that time been in
13 Bridgeport?
14    A.    I work in Bridgeport, and I've covered
15 Trumbull as well.
16    Q.    And did you attend college?
17    A.    Yes, I did.
18    Q.    Where did you go?
19    A.    Southern University here in New Haven.
20    Q.    And in the 1990s you were employed as a
21 juvenile probation officer, correct?
22    A.    Yes.
23    Q.    And that was in Bridgeport?
24    A.    Yes.
25    Q.    And was there a particular type of juvenile
```

5254

```
1   probation case you were working on, or cases?
2       A.  I was an intensive supervision officer for
3   the first 10 years of my career.
4       Q.  Could you explain what that is.
5       A.  Me and my -- my partner and I had high risk
6   clients that were detained, and then they would
7   assign them to us to supervise in the community.  We
8   would see them three to five times a week, and we
9   would work in the evenings as well.
10      Q.  Who was your partner at the time?
11      A.  Jonathan Davis.
12      Q.  And during your time as an intensive
13  probation officer, did you have the occasion to meet
14  Azizi Aquart?
15      A.  Yes, he was my client at one time.
16      Q.  And do you know how that came about?
17      A.  Well, he was detained, I believe it was for
18  drugs or a car, maybe both.  We interviewed him and
19  we took him on our caseload.  Our caseload is capped
20  at 25 kids.  As a team we had 25 kids, and that's
21  what I remember.
22      Q.  And did you prepare a predisposition study
23  in regards to this matter, or was one prepared in
24  regards to this matter for Azizi?
25      A.  Yes, I always wrote --
```

5255

```
1           THE COURT:  I'm sorry, are you referring
2   to Azizi?
3           MR. SMITH:  Yes.  I'm sorry.
4           THE COURT:  Okay.
5       Q.  For Azizi Aquart?
6       A.  I always write reports.  I can't tell you
7   specifically.
8       Q.  Would looking at something help refresh
9   your memory?
10      A.  Yes.  Yep, I see it.
11      Q.  So, as far as you are aware, there was a
12  report prepared?
13      A.  Yes.
14      Q.  And would looking at that portion of that
15  report refresh your memory as to what the reason
16  that Mr. Azizi Aquart was referred to you for?
17      A.  Yes, I didn't actually just read it right
18  now.  Whatever I wrote.  So, it was for -- oh, motor
19  vehicle and possession of marijuana.  That would be
20  accurate.
21      Q.  And was that weapon in a motor vehicle?
22      A.  If that's what I wrote.  I didn't read the
23  whole thing right now.
24      Q.  I'm sorry.
25      A.  I'm sorry.  Oh, I see, yeah, weapon in the
```

5256

```
1   motor vehicle.  Yep.
2       Q.  And what was your impression of Azizi at
3   that time?
4       A.  I felt he was going to go to college, he
5   was going to do very well in life.  He was very
6   smart, very stylish.  However, he was a little
7   parentified (sic) in terms of him trying to be like
8   the father to the other siblings.  I worked really
9   hard with him on that, trying to be a kid.  I'd
10  always tell them you are only a kid once, not twice.
11  And Jonathan and I, we would take the kids out to
12  play basketball, go to the arcade, go out to dinner.
13  We always did stuff out of our own pocket, and I
14  remember really pushing Azizi to join us in like
15  going to the arcade, and I remember I was finally
16  able to see him laugh, be like a kid.  He was very,
17  very smart, and I really felt he was going to do
18  well in life.
19      Q.  And the time period that you were
20  supervising him, this is before his mom had passed;
21  is that right?
22      A.  Right, it was before.
23      Q.  So, do you know about how old he was at
24  that time?
25      A.  Sixteen.
```

5257

```
1       Q.  Did it appear to you that Azizi's father
2   was around?
3       A.  I never met him.  I remember him being in
4   jail.  That's what I remember.
5       Q.  So as far as you were aware he was
6   incarcerated?
7       A.  He was incarcerated.  And that's why I
8   thought that Azizi was trying to take on like a
9   father figure for his siblings.
10      Q.  Okay.  And you said he didn't really seem
11  like he was much of a kid at that point?
12      A.  No, he was more mature than the other kids
13  in our group and stuff.  But I know when I finished
14  working with him, you know, I really saw like a
15  softer side to him.  You know, I thought he was
16  trying to be more like a kid.
17      Q.  And later, after you stopped supervising
18  Azizi, did you come into contact with him again?
19      A.  Not until we got Azibo.
20      Q.  So Azibo came into the intensive
21  supervision program?
22      A.  Yes.
23      Q.  And had Azizi and Azibo's mom passed at
24  this point?
25      A.  At that time she had drowned, yes.
```

5258

1    Q.   Did you see a change in Azizi after his
2  mother's death?
3    A.   A huge change.  A really, really huge
4  change.
5    Q.   How would you describe that?
6    A.   He was hardened.  He was bitter.  He even
7  told me that, Diane, I'm not the same person that
8  you knew I was.  And I was really, really upset
9  about it.
10    Q.   And how was he in terms of accepting your
11  assistance?
12    A.   He told me he did not want my assistance,
13  that he did not want me to try to help him.  He even
14  had a baby, I think it was a boy, and most kids that
15  I meet -- I'm not a big fan of teenage parents, but
16  when they do have children they bring them to me,
17  Diane, hold him or her, and, you know, this is my
18  baby, this is my daughter.  He wasn't like that.
19  Like you couldn't even -- it was stand off.  You
20  couldn't even like go near the baby.  He was
21  completely different.
22    Q.   So very closed off to you?
23    A.   Very closed off, and just angry.  And I
24  really was very, very upset about it.  I talked
25  about it a lot with Jonathan, my partner.

5259

1    Q.   And you had a chance to, of course, observe
2  Azibo at this time as well, correct?
3    A.   Yes.
4    Q.   And what was your impression of him at this
5  time after his mother's death?
6    A.   Azibo, same thing, bright, smart, but very
7  hurt, very sad, very -- he had no parents, he had an
8  older brother who was bitter.  So, basically he was
9  being raised by nobody.  I remember I was very upset
10  that DCF even gave Azizi custody.  It was not
11  appropriate.  And he was angry.  He'd just come at
12  me a lot verbally to challenge me on stuff, and I
13  believe it was because his mother had passed away.
14  That was very, very, very painful, very traumatic.
15         And, you know, he threatened me one time
16  with a dog.  I was doing a home visit by myself
17  checking on him, and we were outside, and there was
18  a Pit Bull behind like a stockade fence, and it was
19  barking at me, and he was like "I'm going to open
20  that.  I'm going to open that.  It's going to get
21  you.  It's going to kill you."  So I stood up to him
22  and I said, "Open the gate, let the dog out."  He
23  laughed.  He didn't open the gate.  But then I
24  really had to go at him.  I really chewed him out,
25  "Don't you ever disrespect me like that again."

5260

1  That was horrible.
2         If I would talk to him in my office
3  alone, try to talk about his feelings, he would do
4  this, look around the office, act like he didn't
5  hear me.  We tried hard with him, but I felt that
6  the death of his mother really pushed him over the
7  limit.
8    Q.   And it appeared to you that he was really
9  trying to avoid your assistance as well?
10    A.   He was avoiding it because I think it was
11  too painful, like he had too much pain inside of
12  him.  That's what I thought.
13    Q.   What types of services besides your coming
14  to see him did Azibo have at that point; if you are
15  aware?
16    A.   I believe Jonathan referred him to
17  counseling or something, but I wasn't the primary
18  PO, so I don't remember.
19    Q.   And did you think that maybe an alternative
20  placement for Azibo might have been more
21  appropriate?
22    A.   I think that he definitely needed a
23  therapeutic foster home.  That definitely would have
24  been perfect for him.
25    Q.   And to your knowledge that was never done?

5261

1    A.   No.
2    Q.   What was Bridgeport like at this time?
3    A.   Really bad.  Really, really out of control.
4  The gangs, the violence, the drug selling.  It was
5  horrible.  Very difficult for a child to live at
6  that time.
7    Q.   Especially if they had some exposure to the
8  streets?
9    A.   Yeah.  Yeah, very, very, very difficult.
10    Q.   Were a lot of kids dying at that time?
11    A.   All the time.  I've lost 35 people in my
12  career.  And I remember there was one point I was
13  going to a funeral every week for three weeks in a
14  row.  It was horrible.  Horrible.  I can't even,
15  like, express how bad it was at that time.
16    Q.   And for someone who sort of gets into the
17  streets like that, would it be common for older
18  persons, or older kids even, to use younger kids to
19  sell drugs?
20    A.   All the time.  That was the common
21  practice.  Common.
22    Q.   Why?
23    A.   Because --
24         MR. MARKLE:  Your Honor, I'm going to
25  object.

5262

```
1      A.   Because --
2            THE COURT:  Just a moment, there's an
3   objection.
4            MR. MARKLE:  I'm going to object,
5   relevance.
6            THE COURT:  Will you make that more
7   specific.
8            MR. SMITH:  I'm asking what the
9   conditions in Bridgeport were like at the time and
10  the structure of the drug trade, your Honor.
11           THE COURT:  Okay, I would like a little
12  bit more foundation what "common" means.  She says
13  it's common.
14      Q.   In your experience sometimes older
15  teenagers or even adults would use children to sell
16  drugs?
17      A.   Yes.
18      Q.   And you saw that happen several times?
19      A.   All the time.  All the time.
20      Q.   So, why, in your experience, was that
21  common?
22      A.   Common?
23      Q.   Why would they do that?
24      A.   Because if the juvenile got arrested they
25  would only do like a year, whereas if an adult got
```

5263

```
1   arrested they would do a lot of time.  A lot of
2   times the juveniles just got a slap on the wrist and
3   they're released, so they would use the juveniles
4   for that.
5            MR. SMITH:  I have nothing further at
6   this time, your Honor.
7            THE COURT:  Cross-examination.
8   CROSS-EXAMINATION
9   BY MR. MARKLE:
10      Q.   Good morning.
11      A.   Good morning.
12      Q.   Ms. D'Amato, do you know whether Azibo
13  Aquart was involved in selling drugs?
14      A.   Yes, I remember that he was.
15      Q.   Back when you were --
16      A.   Yeah, yeah.
17      Q.   -- supervising him?
18      A.   Yeah.
19      Q.   How about after you stopped supervising
20  him?
21      A.   I don't know.
22      Q.   Were you aware of his life-style at all?
23      A.   I was aware of his life-style when we were
24  working with him only.
25      Q.   How about after that?
```

5264

```
1      A.   I don't know.
2      Q.   So, you knew him as a kid, not as a man,
3   correct?
4      A.   Correct.
5      Q.   And as a man you don't know if he was
6   selling drugs for somebody else?
7      A.   I don't know.
8      Q.   Or whether people were selling drugs for
9   him?
10      A.   I don't know that.
11      Q.   Whether he was assaulting people for
12  someone else or people were assaulting for him?
13      A.   I don't know that either.
14      Q.   You don't know if he was running a drug
15  operation or just working for one?
16           MR. SMITH:  Objection.  This is
17  cumulative.  She knows nothing about after the time
18  she was supervising him.
19           THE COURT:  Overruled.
20      Q.   Do you know if he was running a drug
21  operation or just working for one?
22           THE COURT:  You are referring to the
23  period of time after she had him on her supervision.
24      Q.   Well, I'll ask both.  While he was on
25  supervision, do you know whether he was running a
```

5265

```
1   drug operation?
2      A.   I don't know that he was running a drug
3   operation.  I know he was on the streets a lot.
4      Q.   And after he was on supervision do you have
5   any idea?
6      A.   I have no -- I was not in contact with him
7   after he was off supervision.
8      Q.   You had a case load of 25 kids you said,
9   correct?
10      A.   Between me and my partner, yes.
11      Q.   He was a kid when you saw him, correct?
12      A.   Yes.
13      Q.   He hadn't grown up into a man yet, correct?
14      A.   No.
15      Q.   And 25 is not that many, correct?
16      A.   Correct.
17      Q.   It kept you busy, I'm sure.
18      A.   Very busy.
19      Q.   But you were able to manage your caseload
20  at that time?
21      A.   Yes.
22      Q.   And you said that Azizi was a very
23  intelligent young man?
24      A.   Yes.
25      Q.   He was trying to do his best?
```

**GA1359**

5266

1    A.   Back when he was 16, yes.

2    Q.   Your concern was that he was trying to do

3  too much, correct?

4    A.   He was more mature than the other kids that

5  we worked with.

6    Q.   But he was trying to do too much, not too

7  little?

8    A.   Yeah, he was trying to do too much

9  parental.

10    Q.   You wanted him to sort of enjoy the life of

11  a child rather than take on the responsibility of an

12  adult?

13    A.   That is correct.

14    Q.   But he was the one who wanted to take on

15  the responsibility of an adult, correct?

16    A.   When he was 16?  I think that was -- I

17  think his mother had him do that.  I can't say he

18  wanted it.  I just think that was the way he was

19  raised.

20    Q.   Well, we can agree he was a mature young

21  man?

22    A.   Yes.

23    Q.   And how often did you see him after his mom

24  passed away?

25    A.   Once my case was closed with Azizi I did

5267

1  not see him at all.  I don't keep in contact with my

2  ex-clients.

3    Q.   So, when the case was closed -- by the time

4  the case was closed had his mother passed away?

5    A.   I don't remember when she passed away.  I

6  just remember Jonathan telling me that the mother

7  had passed away, she had drowned, and I thought that

8  was very sad.

9    Q.   You mentioned a hardened Azizi, a bitter

10  Azizi.

11    A.   When he was older.  When he had custody of

12  Azibo.

13    Q.   And how many times did you see him during

14  that period of time?

15    A.   When we supervised Azibo?

16    Q.   Yeah.

17    A.   I don't know.  Three times a week at least.

18    Q.   Azizi?

19    A.   Well, if we did a home visit Azizi was

20  there.  He was always there.

21    Q.   He was always there?

22    A.   That I remember.

23    Q.   Three times a week.  For how long was this?

24    A.   You would have to look at the documents.  I

25  don't remember.

5268

1    Q.   Was it months?

2    A.   Yeah, it was months.

3    Q.   And for how long would you do a home visit?

4    A.   Depending on the case.  It could be

5  anywheres from 15 minutes to a half hour to an hour.

6  It depended what was going on, what we were talking

7  about.

8    Q.   And did you talk to Azizi or did you talk

9  to Azibo?

10    A.   Both.

11    Q.   And you could sense that he was a bitter

12  person at that time as opposed to how he was before

13  his mom died?

14    A.   Yes.

15    Q.   And that wasn't unusual, was it?

16    A.   No.

17    Q.   I mean, his mother had tragically passed

18  away.

19    A.   I understand, but I work with many kids,

20  and many kids have gone through a lot of tragedies,

21  too, and they still talk to you, open up.  They

22  still talk to you about it.  He was just different

23  than other kids.

24    Q.   Who was different?

25    A.   Azizi.

5269

1    Q.   And amongst those people, I'm sure there

2  are some people who were like Azizi, correct?

3    A.   Yeah, this one just sticks out in my mind

4  for some reason.

5    Q.   He's the first one that turned bitter and

6  different because a parent passed away?

7    A.   He was the first one that had custody of a

8  14-year-old child.

9    Q.   Ms. D'Amato, I understand --

10    A.   That's the first one.

11    Q.   I understand it's a unique circumstance.

12    A.   It's unique, you are right.

13    Q.   But his bitterness and upset, that wasn't

14  that unique for a child or a 16-year-old who lost

15  their parent, correct?

16    A.   I can't say that.  I don't know.

17    Q.   And Azibo came into intensive probation,

18  correct?

19    A.   Yes, supervision, yes.

20    Q.   And it would be at these times -- you were

21  not the primary probation officer; is that what you

22  are saying?

23    A.   I was the primary for Azizi and Jonathan

24  was the primary for Azibo.

25    Q.   So, you would go on the visits, though, for

5270

```
1    Azibo?
2         A.   Yeah, we are a team, and we cover each
3    other, too.  So if I was out sick he would see my
4    clients and if he was out sick I would see his
5    clients.  We were a team.
6         Q.   And was Jonathan present when Azibo
7    threatened you with a Pit Bull?
8         A.   No, I was by myself.
9         Q.   But you weren't the primary?
10        A.   No, but we covered each other's cases.
11        Q.   I'm just trying to understand.
12        A.   I'm sorry.
13        Q.   Sometimes you would visit Azibo alone?
14        A.   Yes.
15        Q.   And sometimes Jonathan would?
16        A.   Yes.
17        Q.   And the time with the Pit Bull you were
18   alone?
19        A.   Yes.
20        Q.   And you felt the defendant was trying to
21   test you?
22        A.   Yes.
23        Q.   And he was not communicative with you,
24   correct?
25        A.   Correct.
```

5271

```
1         Q.   He was much better with Jonathan; is that
2    correct?
3         A.   I can't say that.  You would have to ask
4    Jonathan.
5         Q.   I'm sorry?
6         A.   I mean, you have to ask Jonathan.  But I
7    think if it was the two of us he would pick on me
8    more, yes, that is correct.
9         Q.   He a better relationship with Jonathan?
10        A.   I don't know that.  I just know he would
11   just try to test me a lot.
12        Q.   Well -- okay.
13        A.   You have to ask Jonathan, you know.
14        Q.   Would he test Jonathan?
15        A.   Yeah.
16        Q.   Did he threaten him with the Pit Bull?
17        A.   No.
18        Q.   Did you ever have Azibo -- a psychological
19   evaluation performed of Azibo Aquart?
20        A.   You would have to ask Jonathan.  I wouldn't
21   do that; it wasn't my case.
22        Q.   But you are partners.  Wouldn't you know if
23   a psychological evaluation was done?
24        A.   I don't remember that.  I have had
25   thousands of kids.  I don't remember that.  He would
```

5272

```
1    know that.
2         Q.   So, you don't know what was at the heart of
3    his problems?  You don't know whether it was his
4    mom, whether he was like that before, whether it was
5    some other event in his life?
6         A.   Well, my gut feeling, it was the death of
7    his mother and lack of a father.
8         Q.   I understand it's your gut feeling, but you
9    don't know that, do you?
10        A.   I don't know that, no.
11        Q.   And do you know -- let me ask you:  Do you
12   know anything about Azizi after you stopped being
13   the intensive probation officer for Azibo?
14        A.   No.
15        Q.   So approximately when did that stop?
16        A.   You have the documents.
17             THE COURT:  I'm sorry, you said do you
18   know anything about Azizi after she stopped being
19   intensive probation officer for Azibo.
20             MR. MARKLE:  Yes, it was my
21   understanding.  Maybe I can -- I think that's right.
22        Q.   But you were the intensive probation
23   officer for Azibo Aquart, correct?
24        A.   For Azizi, and I was partners with --
25        Q.   I'm sorry, for Azizi.  And then you would
```

5273

```
1    accompany Jonathan Davis for Azibo Aquart?
2         A.   Yes.
3         Q.   And at some point in 1995, '96 that ended?
4         A.   Whatever your documents say.  I don't
5    remember.
6         Q.   You don't remember when you last saw them?
7         A.   Well, whenever he got arrested and he
8    was sent to the adult system, and I haven't seen him
9    since that day.
10        Q.   So, is it fair to say you haven't seen him
11   or Azizi in ten years?
12        A.   Yes.
13        Q.   So you have no idea what kind of person
14   Azizi became after you last saw him?
15        A.   No, I don't.
16        Q.   In ten years?
17        A.   I have no idea.
18        Q.   And you don't have any idea what kind of
19   care Azizi provided to his brothers during that
20   time?
21        A.   I have no idea.
22        Q.   And despite him being bitter and hardened,
23   you have no why whether he was a good caretaker or
24   not?
25        A.   That is correct, I have no idea.
```

5274

1   Q.   You have no idea in terms of Azibo Aquart
2   what might have happened to him in the last decade,
3   good or bad?
4   A.   No, just whatever was on the news, that's
5   it.
6   Q.   So, you have no idea whether there has been
7   other events in his life that have shaped the person
8   he's become or not?
9   A.   Right, I have no idea.
10  Q.   You have no idea what structure support
11  guidance Azizi provided to his brother Azibo during
12  the last decade?
13  A.   Right, that is correct.
14  Q.   Do you know that he's only one semester
15  short, he, Azizi, of completing college like you
16  thought he would do?
17  A.   I didn't know that.  I'm not surprised.
18  That's good.
19  Q.   So he's overcome that bitterness that you
20  saw and gotten back on the right road?
21       MR. SMITH:  I'm going to object,
22  speculation.
23  A.   I don't know.
24       THE COURT:  Sustained.
25  Q.   Do you know that he's the father of four?

5275

1   A.   No.
2   Q.   Do you know that he's full-time employed?
3        MR. SMITH:  I'm going to object, your
4   Honor.  This is all asked and answered.
5        THE COURT:  It is.
6        MR. SMITH:  She has not seen him in ten
7   years.
8        THE COURT:  She has said she does not
9   know anything about him after he went out of her
10  care.
11  Q.   Do you know that back at the time when he
12  was a young man caring for his brothers he was
13  written up as someone who should be commended for
14  the work and effort he's put towards his brothers'
15  welfare?
16  A.   Written up by who?
17  Q.   In a juvenile probation report?
18  A.   Again, I don't remember all of that, no.
19  Q.   And again, you wouldn't be surprised from
20  the person you knew?
21  A.   Right.
22  Q.   Thank you.
23  A.   You are welcome.
24       THE COURT:  All right, redirect.
25       MR. SMITH:  Nothing further, your Honor.

5276

1   Thank you.
2        THE COURT:  All right, Ms. Hart-D'Amato,
3   thank you.  You are excused.  You may step down.
4        Will the defense call the next witness,
5   please.
6        All right, sir, will you kindly come
7   over here to the witness stand, and when you get
8   over there, if you will remain standing with your
9   right hand raised, the oath will be administered to
10  you.
11           J O N A T H A N   D A V I S
12  Having first affirmed, was examined and testified as
13  follows:
14       THE WITNESS:  Name is Jonathan Davis,
15  last name is spelled d-a-v-i-s, resident of
16  Bridgeport, Connecticut.
17       THE COURT:  Thank you.  You may proceed.
18       MR. SMITH:  Thank you, your Honor.
19  DIRECT EXAMINATION
20  BY MR. SMITH:
21  Q.   Good morning, Mr. Davis.
22  A.   Good morning.
23  Q.   Mr. Davis, how are you currently employed?
24  A.   With the State of Connecticut, juvenile
25  probation.

5277

1   Q.   And in what town?
2   A.   In Bridgeport.
3   Q.   And how long have you been employed there?
4   A.   Nineteen years.
5   Q.   And were you part of the intensive
6   supervision program?
7   A.   Yes.
8   Q.   And was that back in the 1990s?
9   A.   Yes.
10  Q.   And was Diane Hart-D'Amato -- what was her
11  role there?
12  A.   She was my partner.  She was also an IS
13  probation officer, too.
14  Q.   IS meaning intensive supervision?
15  A.   Yes.
16  Q.   And did you attend college?
17  A.   Yes, I did.
18  Q.   Where did you go?
19  A.   Central State in Wilberforce, Ohio.
20  Q.   Prior to becoming a probation officer, what
21  did you do?
22  A.   I worked in the school system, also
23  community organizations.
24  Q.   And how long have you -- do you live in
25  Bridgeport currently?

5278

```
1      A.   Yes.  I grew up in Bridgeport.
2      Q.   So, you lived there your entire life?
3      A.   Yes.
4      Q.   And were you familiar with the Aquart
5  family?
6      A.   I knew them from the community.
7      Q.   Before you became a probation officer?
8      A.   Yes.
9      Q.   And what was your -- you knew the father,
10 Richard Aquart?
11     A.   Well, I knew -- yeah, knew of him.  It was
12 like an inner city environment, so I met him before,
13 and the mother.
14     Q.   And what was your impression of Richard
15 Aquart?
16     A.   You know, he was -- at that time when I met
17 him, you know, this was like the early '80s, he was
18 very distinguished, and very cultured, into 12
19 Tribes.
20     Q.   But you later came to find out he had some
21 issues with the law?
22     A.   Right.  Yes.
23     Q.   And you said you had met the mother Sonia
24 as well?
25     A.   Yes.
```

5279

```
1      Q.   What was your impression of her?
2      A.   Oh, yes, she was very active in the
3  community as well.  You know, very involved in like
4  the holistic life-style, and also she was part of
5  the 12 Tribe.
6      Q.   And did it seem like she had a role in
7  trying to keep the family together?
8      A.   That's -- yes.
9      Q.   And did there come a time when you worked
10 with Azizi Aquart?
11     A.   Along with Diane.
12     Q.   Diane was the primary officer supervising
13 him?
14     A.   Yes, yes.
15     Q.   And later did you work with Azibo Aquart?
16     A.   Yes.
17     Q.   Okay, and how did that come about?
18     A.   I think he got charged with possession of
19 marijuana.  He was placed in detention.
20     Q.   And at some point you were assigned to
21 supervise him?
22     A.   Yes.
23     Q.   And that was on intensive probation?
24     A.   Yes.
25     Q.   And at the time that you were working with
```

5280

```
1  Azibo, is this before or after his mom's death?
2      A.   This is after his mother's death.
3      Q.   As part of your supervising Azibo, you
4  would have prepared -- or someone in the office
5  would prepare reports based on the information that
6  you had?
7      A.   Yes.
8      Q.   Including a predispositional study?
9      A.   Yes.
10     Q.   And the predispositional study, what is
11 that?
12     A.   It's a social study of his education,
13 background, his social life, trying to give the
14 court a picture of the type of person that he is.
15     Q.   And of course that report has to be
16 accurate when you make it; is that right?
17     A.   Yes.
18     Q.   And it would include your opinions and
19 assessments?
20     A.   Absolutely.
21     Q.   Okay.
22          MR. SMITH:  Your Honor, at this time I
23 would offer P-EE-1 for identification,
24 predispositional study as an exhibit.
25          THE COURT:  Would you show it to the
```

5281

```
1  government, please.
2          It appears there is no objection, your
3  Honor.
4          THE COURT:  All right, it may be
5  admitted.
6          MS. DAYTON:  I thought it was for
7  identification.
8          MR. SMITH:  I'm sorry, I'm offering it
9  as a full exhibit.
10         THE COURT:  Would you have him look at
11 it and describe his role in its preparation, please.
12         MR. SMITH:  Yes, your Honor.
13     Q.   Mr. Davis, on the last page, that appears
14 that there is a signature line for a William Carlos.
15     A.   Yes.
16     Q.   Who is that?
17     A.   My supervisor.
18     Q.   He's the one who actually would have signed
19 this report; is that correct?
20     A.   Yes, your Honor -- yes.
21     Q.   Is the report essentially based on
22 information provided to you to Mr. Carlos?
23     A.   Yes.
24          MR. SMITH:  On that basis, your Honor, I
25 would offer the report.
```

5282

```
1          THE COURT:  Is there any objection?
2          MS. DAYTON:  No, there is not actually.
3    Thank you.
4          THE COURT:  All right, full exhibit.
5          MS. DAYTON:  I'm sorry, may I just get
6    the Exhibit Number EE-1.
7          MR. SMITH:  P-EE-1.  A poor choice of
8    exhibit letters.
9          THE COURT:  It depends on whether you
10   have little children.
11   Q.   I want to turn your attention to part of
12   that report.  You had talked about here some of your
13   assessment of Azizi; is that correct?
14   A.   Yes.
15   Q.   And looking under "probation officer
16   observations" on the screen there, you had written
17   in that second paragraph starting here that, "His
18   brother and guardian, Azizi, has done a tremendous
19   job in keeping them all together and providing for
20   them, but it is felt that Azizi is taking on a
21   little more than he can actually handle.  He is a
22   mature 18-year old, but he, too, needs some
23   direction in his own life."
24          Is that an accurate assessment of your
25   feeling at the time?
```

5283

```
1    A.   Yes.
2    Q.   Your opinion of Azizi, I take it was he was
3    pretty mature for his age?
4    A.   Yes.
5    Q.   And that he was somebody who probably was
6    more advanced than other kids his age?
7    A.   Yes.
8    Q.   But at some point you did file a petition
9    for neglect against Azizi, did you not?
10   A.   Yes.
11   Q.   I'm showing you what's been marked for
12   identification as Defendant's P-EE-2.  Take a look
13   at that.
14   A.   Yes.
15   Q.   Is that your signature that appears on
16   that?
17   A.   Yes.
18   Q.   And this is the neglect petition you filed
19   in regards to Azizi Aquart?
20   A.   Yes.
21   Q.   Or I should say -- I'm sorry, it's in
22   regards to Azibo Aquart, but stating or alleging
23   that he was being denied proper care and attention?
24   A.   Yes.
25          MR. SMITH:  Your Honor, I would offer
```

5284

```
1    P-EE-2 as a full exhibit.
2          THE COURT:  Absent objection, it's a
3    full exhibit.
4          MR. SMITH:  Thank you.
5    Q.   As part of that you prepared an affidavit,
6    as part of the petition; is that right?
7    A.   Yes.
8    Q.   And it was determined that Mr. Aquart's --
9    or Sonia Smith was deceased?
10   A.   Yes.
11   Q.   And that the father was incarcerated at
12   Cheshire?
13   A.   Yes.
14   Q.   And that Azibo Aquart was 14 years of age
15   and had a history of poor judgment?
16   A.   Yes.
17   Q.   And he was clearly at risk in a home
18   without proper supervision and structure?
19   A.   Yes.
20   Q.   And that would have reflected your
21   assessment at the time; is that right?
22   A.   Yes.
23   Q.   And, I'm sorry, that paragraph just above
24   that, you had made some home visits and you
25   encountered a home setting that was poorly
```

5285

```
1    supervised by Azizi?
2    A.   Yes.
3    Q.   In fact, he was -- your assessment was he
4    was rarely home to supervise Azibo; is that right?
5    A.   Right.
6    Q.   And at some point you also would have filed
7    or prepared a closed case summary?
8    A.   Yes.
9    Q.   And was that done in this matter; that you
10   are aware of?
11   A.   I don't quite remember.  It's so long.
12   Q.   If I showed you something, would that
13   refresh your memory?
14   A.   Yes.
15          MR. SMITH:  This is marked Defendant's
16   for identification P-EE-3.
17   A.   Yes.
18   Q.   And does your signature appear there on the
19   second page?
20   A.   Yes.
21          MR. SMITH:  Your Honor, I would move --
22          MS. DAYTON:  I don't know what you are
23   showing.
24          MR. SMITH:  I'm sorry, I thought you had
25   a copy.  I apologize.
```

5286

1    MS. DAYTON:  No objection.
2    THE COURT:  P-EE-3 is a full exhibit.
3    Q.   And as part of that closed case summary,
4  you had sort of summarized your -- what your
5  observations were during the intensive supervision
6  of Azibo; is that right?
7    A.   Yes, that's right.
8    Q.   And at the time that this report was filed,
9  that would have been the time that this was done?
10   A.   Yes.
11   Q.   And at that time things seemed to be
12 somewhat settled; is that right?
13   A.   Yes.
14   Q.   Azibo had been in full compliance with his
15 court orders?
16   A.   Yes.
17   Q.   And at that time Azizi was in full
18 compliance with the DCF service agreement?
19   A.   Yes.
20   Q.   You had filed a neglect petition and there
21 had been a study done by DCF; is that right?
22   A.   Yes.
23   Q.   And Azibo did well on intensive
24 supervision, but at that point he was still dealing
25 with the death of his mother?

5287

1    A.   Yes.
2    Q.   And he had only recently begun to talk
3  about that with you; is that right?
4    A.   Yes.
5    Q.   And he was trying to do everything right so
6  he wouldn't be separated from his brother; is that
7  right?
8    A.   Yes.
9    Q.   And that he would be letting Azizi and his
10 mother and himself down if he were to be separated?
11   MS. DAYTON:  Your Honor, I'm going to
12 object as leading.
13   A.   Yes.
14   THE COURT:  Let's have his testimony,
15 please.
16   Q.   Let me just ask you this:  In regards to
17 your assessment at the time, in that first
18 paragraph, starting in the middle, it says "However,
19 Azizi is only 18 years old, with legal
20 responsibility for a 14-year-old and a 16-year-old.
21 His resources are limited.  He is also a new father
22 to his own infant son and feels this added
23 responsibility."
24   And then you wrote "It is the opinion of
25 this intensive supervision probation officer that

5288

1  Azizi is overwhelmed with his responsibilities."
2  And that it was his responsibility to keep them
3  together.
4    Was that your opinion at the time?
5    A.   Yes.
6    Q.   And what was your impression of Azibo at
7  the time?
8    A.   Non-compliant to some degree.  It seems
9  like it was kind of hard to engage him.  He had a
10 lot going on, losing his mother and the major
11 changes in his life.
12   Q.   And did it appear to you that he was
13 resisting your attempts to help him?
14   A.   He wasn't open for it, yes.
15   Q.   And do you think Azizi was somewhat
16 resistant as well?
17   A.   Yes.
18   Q.   Why do you think that's so?
19   A.   Well, I just think that he was just very
20 angry, and I think it was more probably because --
21 you know, thinking that the system is trying to, you
22 know, take his brother away.  And, you know, there
23 was a little immaturity on his part at that time.
24   Q.   And ultimately what was your goal in
25 working with Azibo?

5289

1    A.   Well, basically I knew that he needed, you
2  know, really to be placed out of the home.  I did
3  make some attempts to place him in a residential,
4  because he also is smoking marijuana and there was
5  some psychological problems that was going on just
6  as well.  So, I took him on some pre-placement
7  visits, or at least one.
8    MR. SMITH:  Marking for identification
9  P-EE-4.
10   Q.   Would it be your practice to write case
11 updates?
12   A.   Yes.
13   Q.   On occasion?
14   A.   Uh-huh (indicating affirmatively).
15   Q.   I'm going to show you what's been marked
16 for identification as P-EE-4.  Is that an update
17 that you would have prepared?
18   A.   Yes.
19   Q.   In regards to this case.
20   MR. SMITH:  Your Honor, I would offer as
21 a full exhibit P-EE-4.
22   THE COURT:  Absent objection, it's a
23 full exhibit.  What's the date on it, please?
24   MR. SMITH:  Your Honor, it's not dated,
25 but we may be at least able to give a timeframe

5290

```
 1   based on the body of the text in the document.
 2       Q.   This would be the case summary we were just
 3   speaking of?
 4       A.   Yes.
 5       Q.   And you noted in that first paragraph, did
 6   you not, that after Azibo's released from Mead Hall
 7   detention his behavior seems to be unstable?
 8       A.   Yes.
 9       Q.   And on February 8, 1996, he tested positive
10   for marijuana.  I'm sorry, his urine did.
11       A.   Yes.
12       Q.   So, this document would have been prepared
13   sometime after February 8, 1996; is that right?
14       A.   Yes, yes.
15       Q.   And your assessment at the time, is it
16   correct, that Azibo appeared to have a lot of
17   unresolved issues concerning his mother's sudden
18   death?
19       A.   Yes.
20       Q.   And finally those last two paragraphs, that
21   was your recommendation at the time, that he should
22   be placed in a residential placement school?
23       A.   Yes.
24       Q.   Okay.  And to your knowledge was he ever
25   placed in a residential placement school?
```

5291

```
 1       A.   No.
 2       Q.   Do you know what happened?
 3       A.   Well, he got arrested.
 4       Q.   Okay.  And was there something different
 5   about that particular arrest?
 6       A.   Yeah, that was when they changed the law.
 7   He was perhaps the first one to be transferred.  If
 8   you were 14 and over and you committed an SJO,
 9   serious juvenile offense, you would be transferred
10   to adult court.
11       Q.   Is that what happened to Mr. Aquart?
12       A.   Yes.
13       Q.   And once he was transferred to the adult
14   court, your ability to assist him ended at that
15   point, I take it?
16       A.   Yes.
17       Q.   What was -- at this time that you were
18   supervising Azibo, what was Bridgeport like?
19       A.   Well, it was heavy crime, drugs.  That was
20   it.  There was a lot of murders and death in the
21   community.
22       Q.   And from your own experience supervising
23   kids, was it easy for them to get sucked into life
24   on the streets?
25       A.   Yes.
```

5292

```
 1       Q.   And what part of town -- did you grow up in
 2   Bridgeport?
 3       A.   Yeah, on the east end of Bridgeport.
 4       Q.   That would have been around Stratford
 5   Avenue?
 6       A.   Stratford Avenue.
 7       Q.   And you were kind of able to see the
 8   changes in that area over time?
 9       A.   Oh, yes.
10       Q.   What kind of changes did you see?
11       A.   I seen it go from a community to more
12   disparity, more criminal activities, crime.  Just
13   deteriorating.
14       Q.   Okay.
15            MR. SMITH:  I have nothing further at
16   this time, your Honor.  Thank you.
17            THE COURT:  All right,
18   cross-examination.
19            MS. DAYTON:  Can we approach for one
20   second.
21            MR. SMITH:  I'm sorry, your Honor, I
22   apologize.  There is one other --
23            MS. DAYTON:  Come here for a second.
24            MR. SMITH:  Your Honor, I apologize.
25   There was one other document I just wanted to ask
```

5293

```
 1   Mr. Davis about.
 2            THE COURT:  Do you want to do that after
 3   a recess?  One last document?  Yes, no?
 4            MR. SMITH:  Yes, one last document.  I
 5   apologize.
 6            THE COURT:  Is this going to be EE-5?
 7            MR. SMITH:  That is correct, your Honor.
 8   May I approach, your Honor?
 9            THE COURT:  You may.
10       Q.   Take a look at that, Mr. Davis, see if you
11   recognize your signature on that document.
12       A.   Yes.
13       Q.   Is that another case summary that you
14   prepared?
15       A.   Yes.
16            MR. SMITH:  I'd offer P-EE-5 as a full
17   exhibit.
18            MS. DAYTON:  No objection.
19            THE COURT:  All right, it is a full
20   exhibit.
21       Q.   And this would have been prepared sometime
22   I guess after April 4, 1996?
23       A.   Yes.
24       Q.   And it showed Azibo's urine tested positive
25   for alcohol?
```

5294

```
1    A.   Yes.
2    Q.   And then it was sometime after this date
3  that the supervision ended; is that correct?
4    A.   Yes.
5    Q.   And he was transferred to the adult docket?
6    A.   Yes.
7    Q.   Do you recall exactly what date that was?
8    A.   No.
9         MR. SMITH:  I have nothing further, your
10 Honor.
11        THE COURT:  All right, ladies and
12 gentlemen, we'll take a 15-minute recess.
13        (Jury exited the courtroom.)
14        THE COURT:  Mr. Davis, if you'll be back
15 here please in 15 minutes, and don't discuss your
16 testimony.
17        Mr. Smith, we have noted on Friday that
18 you intended to call Bezy and Lewis.  Are they going
19 to fill out the rest of the day, or do you have
20 another witness?
21        MR. SMITH:  We have another witness in
22 the form of Mary McCoy at a minimum.
23        THE COURT:  Will she be called before
24 Bezy and Lewis?
25        MR. SMITH:  Yes, your Honor.
```

5295

```
1         THE COURT:  All right, we'll take a
2  15-minute recess.
3         MR. SHEEHAN:  Your Honor, could I just
4  clarify?  What we anticipate is --
5         THE COURT:  Ms. Dayton will be excused.
6         MR. SHEEHAN:  I'm sorry.
7         THE COURT:  When you mark the exhibits.
8         MR. SHEEHAN:  I don't want to go there.
9         MR. SMITH:  The power of suggestion.
10        MR. SHEEHAN:  We would anticipate Mary
11 McCoy and then James Shannon and then Mr. Bezy, and
12 if there is -- oh, Mary McCoy, Mr. Bezy, James
13 Shannon, and then Dr. Lewis, which I think will take
14 up the rest of the day because -- and then tomorrow
15 we have two relatively -- I would think actually,
16 not relatively, two briefer witnesses, which will
17 conclude our case.
18        THE COURT:  And that's Bennet and Felix.
19        MR. SHEEHAN:  Yes, your Honor.
20        THE COURT:  All right, thank you.  We
21 stand in recess.
22        (Recess)
23        THE COURT:  All right, will you please
24 bring in the next witness.  I think we should
25 probably do cross-examination first.
```

5296

```
1         MR. SMITH:  We have no objection if they
2  forego that, your Honor.
3         (Jury entered the courtroom.)
4         THE COURT:  Please be seated, ladies and
5  gentlemen.  Cross-examination of Mr. Davis.
6         MS. DAYTON:  Thank you.
7  CROSS-EXAMINATION
8  BY MS. DAYTON:
9    Q.   Good morning, Mr. Davis.
10   A.   Good morning.
11   Q.   How are you?
12   A.   Great.
13   Q.   Good.  Mr Davis, you grew up on the east
14 end of Bridgeport, correct?
15   A.   Yes.
16   Q.   In the area that you were describing as
17 kind of a difficult, bad area to grow up in?
18   A.   Yes.  I mean, I grew up in the time when it
19 was a good area because I grew up in the '50s or
20 early '60s.
21   Q.   How old are you?
22   A.   I'm 55.
23   Q.   Wow, good for you.
24   A.   God bless.
25   Q.   Sorry.  You have children?
```

5297

```
1    A.   Yes, I do, I have one.
2    Q.   And you grew up, you went to college?  Yes?
3    A.   Yes.
4    Q.   And you became a probation officer?
5    A.   Yes.
6    Q.   So not everybody who grows up in Bridgeport
7  gets involved in crime; is that correct?
8    A.   Not everybody.  I mean, but there is, you
9  know, there is a certain percentage that do.
10   Q.   That's every city, right?
11   A.   Yeah.  Any inner city.
12   Q.   Okay.
13   A.   Yeah.
14   Q.   And there are several police officers on
15 the Bridgeport Police Department who grew up in
16 Bridgeport, correct?
17   A.   Absolutely.
18   Q.   Now, you said that the defendant committed
19 an SJO.  What is that?
20   A.   Serious juvenile offense.
21   Q.   And what did he do?
22   A.   I believe that was robbery first degree.
23   Q.   What's first degree robbery?
24   A.   Well, I think he if you stick someone up.
25   Q.   With a weapon you mean?
```

5298

```
1    A.   Right.
2    Q.   And that's what terminated his juvenile
3  probation?
4    A.   Yes.  No, terminated juvenile.  That's when
5  he went into the adult system.
6    Q.   I'm sorry.  That terminated, like ended,
7  the juvenile?
8    A.   Absolutely right.
9    Q.   He became an adult?
10   A.   Right.
11   Q.   So, you met the Aquart family in '81 or '82
12  before the defendant was --
13   A.   Yes.
14   Q.   Early.
15   A.   Before I became a probation officer.
16  Right.
17   Q.   So, you didn't meet the defendant at that
18  time, right?
19   A.   No.
20   Q.   And you knew Sonia and Richard sort of from
21  the community?
22   A.   Right.
23   Q.   And you said Sonia was active in community
24  services, yes?  And Richard was very cultural, very
25  well-respected, I think you said?
```

5299

```
1    A.   Right, at that particular time.
2    Q.   And they seemed to you an intact family,
3  correct?
4    A.   As far as I know, yeah.
5    Q.   And you never personally witnessed any
6  abuse or neglect at that time; is that correct?
7    A.   No, but I didn't know him that closely.
8  No.
9    Q.   And then from after you knew them in the
10  early '80s, you in fact didn't have any contact with
11  the family again until the mid-'90s when Azizi came
12  under Diane Hart-D'Amato's supervision, correct?
13   A.   Yes.
14   Q.   So, you have no idea sort of what happened
15  in those 14 years or so; is that correct?
16   A.   Correct.
17   Q.   And when Azizi ended up in the system you
18  went to the house with her to make home visits,
19  correct?
20   A.   Yes.
21   Q.   And you said that Sonia was still alive at
22  that time?
23   A.   Yes.
24   Q.   And then in 1995 the defendant's case
25  appeared in front of you.
```

5300

```
1    A.   Right.
2    Q.   Correct?  And you took on that case.
3    A.   Yes.
4    Q.   And your first visit with the defendant
5  wasn't stellar, was it?
6    A.   Repeat that again.
7    Q.   Your first visit with the defendant was
8  difficult, right?
9    A.   Yes.
10   Q.   He was stoned?
11   A.   Stoic, yeah.  He was looking, you know,
12  almost like just looking up and not looking at me,
13  not engaging.
14   Q.   Okay, but wasn't he also stoned?
15   A.   I couldn't -- I can't determine that
16  because I didn't take his urine at that particular
17  time.
18   Q.   And he seemed to have no emotion, correct?
19   A.   Right, yes.
20   Q.   And you began intensive supervision with
21  him.
22   A.   Yes.
23   Q.   And you'd meet with him three days a week,
24  correct?
25   A.   Yes.
```

5301

```
1    Q.   And the defendant was also in group
2  therapy, right?
3    A.   Yeah, I -- yes.
4    Q.   And he was getting individual therapy,
5  correct?
6    A.   Yes.
7    Q.   With Dr. Shannon?
8    A.   Right.
9    Q.   And so he was in fact getting services?
10   A.   Yes.
11   Q.   But nonetheless, he was difficult and
12  confrontational, right?
13   A.   Yes.
14   Q.   And you would make visits to the house
15  during the day and in the evening, right?
16   A.   Yes.
17   Q.   And Azizi was always there, wasn't he?
18   A.   Not all the time.
19   Q.   So, if your partner said that he was always
20  there, that would be incorrect?
21   A.   Yes.  I mean, this -- when you say he was
22  always there, I mean there were some times he wasn't
23  there.
24   Q.   What, like after school?
25   A.   Or, see, we work in the evenings, we work
```

**GA1368**

5302

```
1   from like 6:00 to 8:00, and sometimes we would go
2   there and Azibo would be home by himself.
3       Q.   It's not unlawful for a 14-year-old to be
4   home by themselves, right?
5       A.   That's why I filed -- I mean, I filed the
6   136, you know, after I seen that he was not being
7   properly supervised.
8       Q.   Okay, well, we talked about this report,
9   it's been admitted as P-EE-1 for the defense.
10      I'm just going to show you.  It should show
11  up on your screen, too.  Under siblings.  You could
12  probably look right at your screen next to you so
13  you don't have to crane your neck.
14      So, you said that Azizi "Presented himself
15  as a very intelligent, articulate young man.  And
16  he's trudged through all sorts of negative
17  roadblocks to get to where he is now and he asked to
18  be emancipated mainly so he could get custody and to
19  care for his younger brothers."  Correct?
20      A.   Yes.
21      Q.   You said, "Although he's young and known to
22  this court, it's felt he should be commended by this
23  court for the efforts he's demonstrated in keeping
24  his family together."  Right?
25      A.   Yes.
```

5303

```
1       Q.   "And for his age he's gone far beyond being
2   responsible and has done a better job than most
3   adults that come before this court."  Right?
4       A.   Yes.
5       Q.   So, things weren't horrendous in the house
6   to cause you to write that, correct?
7       A.   Right.
8       Q.   Turning your attention to the home and
9   economic conditions, they were living in a
10  two-bedroom apartment on Ogden Street, correct?
11      A.   Yes.
12      Q.   And Azizi had in fact moved there to get
13  his brothers out of a neighborhood that wasn't as
14  good as this one, right?
15      A.   Yes.
16      Q.   And they had a living room, kitchen, and
17  dining room?
18      A.   Uh-huh (indicating affirmatively).
19      Q.   And that your home investigation found that
20  the home was appropriate, right?
21      A.   Right.
22      Q.   And they were getting assistance from the
23  State, correct?  Monetary assistance.
24      A.   I don't know about that.
25      Q.   And their rent was $450 a month?
```

5304

```
1       A.   Right.  That's what is reported.
2       Q.   And did you know that they had a $100,000
3   insurance policy as well from their mom's death?
4       A.   No, I didn't know anything about that.
5       Q.   And your observations in fact were that you
6   were concerned about separating Azibo from his
7   brothers due to the bond that was established and
8   the promise and responsibility that Azizi has been
9   able to keep to his parents, correct?
10      A.   Yes.
11      Q.   And that Azibo was doing fine in the
12  community, in school and at home.
13      A.   Uh-huh (indicating affirmatively).
14      Q.   Is that right?
15      A.   Yes.
16      Q.   Okay.  So, you actually initially said
17  support placement would not be recommended.
18      A.   Right.
19      Q.   So, thereafter, Azibo kept getting in
20  trouble, right?
21      A.   Yes.
22      Q.   Even though he was doing well in school and
23  getting like B's in school, right?
24      A.   Uh-huh (indicating affirmatively).
25      Q.   And he was playing basketball and
```

5305

```
1   practicing three times a week.
2       A.   Yes.
3       Q.   So, he was having a life of a relatively
4   normal teenager, correct?
5       A.   Uh-huh (indicating affirmatively).
6       Q.   I'm sorry.  You have to say yes or no for
7   the --
8       A.   Yes, yes.
9       Q.   Okay.  But he was becoming violent and
10  confrontational and difficult for his brother to
11  handle, right?
12      A.   Yes.
13      Q.   So, you ended up filing a petition for him
14  to be removed, correct?
15      A.   Yes.
16      Q.   And that's even though he was compliant,
17  but you thought it would be easier on Azizi?
18      A.   Right.  There were some concerns about even
19  Azizi being -- you know, even though I said he was
20  mature for his age, right, it just seemed like it
21  was becoming overwhelming for him to control his
22  brother, supervise his brother.
23      Q.   But the reality is it wasn't really Azizi,
24  it was the defendant, right?
25      A.   Well, I think it was both.  Both,
```

5306

1  combination.
2      Q.   But the defendant became stubborn,
3  noncompliant, and just wanted to do what he wanted
4  to do.
5      A.   Right.  Absolutely.
6      Q.   And he didn't want to go to a group home,
7  right?
8      A.   No.
9      Q.   And he was -- he was difficult, but that's
10  not unlike a lot of kids you have, right?
11     A.   Right, right.
12     Q.   So, you have a lot of kids that have tragic
13  lives; is that fair to say?
14     A.   Yes.
15     Q.   So, children who have lost one or both
16  parents.
17     A.   Yeah, but this -- yeah, I mean, I've been
18  on the job 19 years.  I mean, I have never had a
19  case where the mother drowned.
20     Q.   Okay.
21     A.   Okay.
22     Q.   But you've had a case where a mother died,
23  say, from HIV?
24     A.   I had, yes.
25     Q.   And where a parent was shot and killed?

5307

1      A.   I had some cases like that.
2      Q.   And sometimes kids even have HIV from their
3  parents, correct?
4      A.   Yes.
5      Q.   And is it fair to say that many of those
6  kids nonetheless went on to lead good, productive
7  lives?
8      A.   I mean, yeah, some of them.  Some of them.
9  I can't say -- I can't speak for all of them because
10  I don't stay in contact with them, so I don't know
11  what happens to them.
12     Q.   But have you ever read about one of your
13  other prior supervisees committing a triple
14  homicide?
15     A.   No.
16          MS. DAYTON:  Thank you.  I have nothing
17  further, your Honor.
18          THE COURT:  All right, any redirect?
19  REDIRECT EXAMINATION
20  BY MR. SMITH:
21     Q.   Did you respect Azizi Aquart for what he
22  was trying to do?
23     A.   Yes.
24     Q.   Did you think he was really able to do it?
25     A.   No.  I know he needed some support.

5308

1      Q.   And do you think ultimately he got that
2  support that he needed?
3      A.   I don't think he was open for that type of
4  support.
5      Q.   You were asked about the circumstances of
6  the robbery case.  Were you aware that it was over
7  $1?
8      A.   I vaguely heard something like that.
9      Q.   And were you aware further there was no
10  weapon involved?
11     A.   Right, I did hear that, too.
12     Q.   That essentially Azibo just went up to
13  another kid and demanded the dollar.
14     A.   Right.
15          MR. SMITH:  I have nothing further, your
16  Honor.
17          THE COURT:  Anything further?
18  RECROSS-EXAMINATION
19  BY MS. DAYTON:
20     Q.   Well, with that case there was no weapon
21  found, right?
22     A.   Right.  That's -- I mean, I don't remember.
23  I just -- you know, because when that case came
24  through, I mean, again, that's been like 16 years
25  ago, but I just remember them saying he didn't have

5309

1  a weapon; he acted like he had a weapon.
2      Q.   Right.  He acted like he had a weapon and
3  threatened to kill the victim, correct?
4      A.   Something like that.
5          MS. DAYTON:  Thank you, nothing further.
6          THE COURT:  All right.  Anything
7  further?
8          MR. SMITH:  Nothing further, your Honor.
9          THE COURT:  All right, Mr. Davis, thank
10  you very much.  You are excused.
11          All right, would you please call your
12  next witness.
13          MR. SMITH:  Yes, your Honor.  The
14  defendant calls Mary McCoy.
15          THE COURT:  Ms. McCoy, would you please
16  come over to the witness stand over here.  And then
17  remain standing and raise your right hand, please.
18          M A R Y   M c C O Y
19  Having first affirmed, was examined and testified as
20  follows:
21          THE WITNESS:  Mary McCoy, M-c-C-o-y,
22  Waterbury, Connecticut.
23          THE COURT:  You may proceed.
24  DIRECT EXAMINATION
25  BY MR. SMITH:

5310

1    Q.   I guess it's still morning.  Good morning,
2  Ms. McCoy.
3    A.   Good morning.
4    Q.   How are you currently employed?
5    A.   I'm employed by the Department of
6  Corrections, USD-1, as a state school teacher.
7    Q.   I'm going to ask you a favor.  Could you
8  pull that microphone a little bit closer to you?
9    A.   Yes.
10    Q.   So, essentially you are working as a
11  teacher with the Department of Corrections; is that
12  right?
13    A.   Yes.
14    Q.   And where are you currently working?
15    A.   At Manson Youth Institution in Cheshire.
16    Q.   And how long have you been doing that?
17    A.   In Cheshire, since January of 2003.
18    Q.   And prior to January of 2003, were you
19  employed working at a different facility?
20    A.   Yes.  Since 1997 to end of 2002 at Enfield
21  medium.
22    Q.   Enfield medium is a correctional
23  institution in Connecticut?
24    A.   It's an adult correctional facility, yes.
25    Q.   And you were working as a teacher there as

5311

1  well?
2    A.   Yes.
3    Q.   While you were working at Enfield, what
4  were your duties?
5    A.   I taught all subjects, preparing students
6  to take the GED.  I taught some language arts, some
7  reading and some math.
8    Q.   And did there come a time when you taught
9  Azibo Aquart?
10    A.   Yes.
11    Q.   And you know Mr. Aquart here, you recognize
12  him?
13    A.   Yes.
14    Q.   And did Mr. Aquart at Enfield enroll in GED
15  classes?
16    A.   Yes, he did.
17    Q.   I'm going to show you what's been marked
18  for identification as P-AAA-1.
19        MR. SMITH:  Your Honor, government has
20  no objection to these being entered as full
21  exhibits.
22        THE COURT:  All right.  And there is
23  AAA, 1, 2, 3, 4 and 5; is that correct?
24        MR. SMITH:  That is correct, your Honor.
25        There is a screen also on your right

5312

1  that's difficult for us to see.  If we could have
2  the lights down a little, please.  Thank you.
3    Q.   Up in the upper left-hand corner that has
4  Mr. Aquart's name on it; is that right?
5    A.   Yes.
6    Q.   And it's showing class number two in the
7  upper left-hand corner of the grid that says
8  Ms. McCoy.
9    A.   Yes.
10    Q.   That would be you.
11    A.   That's me.
12    Q.   So, the circle at 1:15 to 2:05 shows the
13  language class.
14    A.   Yes.
15    Q.   So, Mr. Aquart was a student of yours at
16  some point.
17    A.   Yes.  And I believe it says language 105,
18  which is the highest level that was taught, GED
19  level.
20    Q.   And, in fact, Mr. Aquart, when he would
21  have come to Enfield, he would have had to act
22  pretty quickly to enroll; is that right?
23    A.   Yes, because of his age.  The younger the
24  student the quicker they get into school.
25    Q.   All right.  So showing you -- this would

5313

1  have been a form that informed a new inmate at
2  Enfield what his rights were.
3    A.   Yes.
4    Q.   And it appears Mr. Aquart did express
5  interest in going to school; is that right?
6    A.   Yes.
7    Q.   And then this would have been the intake
8  form; is that right?
9    A.   Yes.
10    Q.   Okay.  And if you were to enter the classes
11  to take the GED, what were the requirements that you
12  would have to do for that?
13    A.   At first he would be tested on the test of
14  adult basic education to find what level he was at,
15  or if he had been in school prior, as I believe he
16  had been, when he had been at MYI when he was
17  younger, and then he would be entered into school,
18  assigned an adviser, one of his teachers, and I
19  can't remember if I was his adviser or someone else
20  was, I just can't remember.  And then he would start
21  school.  And with the -- at some point when we felt
22  he was ready he would take the preGED.  If he passed
23  it, then he would take the GED.
24    Q.   Okay.  And during the studies did he have
25  any particular problem with any area, that you can

5314

1  recall?
2      A.  No, he did very well.  Oh, well, math was
3  definitely his weakest area.
4      Q.  And I'm showing you what's been marked
5  Defendant's Exhibit P-AAA-2.  This would have been a
6  study form for him, I guess?
7      A.  Yes.  We did those periodically to let him
8  know how he was doing and to keep him officially in
9  there.
10     Q.  And at this time it looked like he was
11 doing well.
12     A.  He was doing very well, yes.  He was a very
13 quiet student.
14     Q.  But making good progress?
15     A.  Making excellent progress.
16     Q.  And then this -- what was the purpose of
17 the team meeting at the top there?
18     A.  Because there were always assorted
19 teachers, it was thought to -- it was a good thing
20 to get everybody together and discuss the student
21 amongst ourselves, and also to keep track of how he
22 was following up on his studies in other classes.
23     Q.  And showing that Roman Numeral II,
24 observation, assessment interview results, that top
25 line there, showing the math at 6.7.  Does that kind

5315

1  of reflect his difficulties there?
2      A.  Yes.  He was what I call an intuitive math
3  person.  He was flat out rotten at doing the actual
4  process, but he could manage to arrive at the right
5  answer.  He -- the way his mind worked, he would get
6  there, but couldn't tell you how he got to the
7  answer.  And on something like the test of the adult
8  basic education you can't get away with that.  It
9  shows up if you can't do the steps.
10     Q.  But, in any event, he did manage to pass
11 the GED; is that right?
12     A.  Yes, he did.
13     Q.  And showing what's been marked as
14 Defendant's Exhibit P-AAA-3, would this reflect his
15 test results?
16     A.  Yes.
17     Q.  And that he was, in fact, issued his
18 diploma?
19     A.  Yes.  Yes, he was.
20     Q.  And that was June 29, 2001?
21     A.  Yes.
22     Q.  And after obtaining his GED, did he still
23 continue to work with you?
24     A.  At that point he volunteered, or he asked
25 if he could become a tutor in my classes, and I did

5316

1  hire him, so to speak, because it was considered an
2  official job.  At that point I had also picked up an
3  ESL class, and that was the class that I
4  particularly needed someone's help with.
5      Q.  And ESL, can you tell us what that is?
6      A.  English as a second language, or TESOL,
7  teaching English to speakers of other languages.
8      Q.  So, there were several people, part of the
9  prison population who weren't able to speak English?
10     A.  Yes.
11     Q.  Or at least not well.
12     A.  Yes.  We had a variety at that time.  We
13 had some Ukrainians, we had a couple -- a person
14 from Poland, someone from mainland China, and,
15 again, assorted Hispanic students who had not
16 grown-up speaking English.
17     Q.  So Mr. Aquart assisted you with that class
18 primarily.
19     A.  Yes, in particular he assisted me with -- I
20 had a computer program that helped with the
21 teaching, and when I got the program it was a
22 one-on-one program, so I could not work -- at that
23 time I had 21 students in my class.  I couldn't take
24 the time to work individually with students during
25 class time, so Mr. Aquart actually mastered the

5317

1  program, which I subsequently never did, and he
2  worked with the students, set up a schedule for
3  them, so they each got 20 minutes to half an hour on
4  a regular basis, and he would sit and work with
5  them.
6      Q.  Why did you choose Mr. Aquart to be your
7  tutor?
8      A.  Because he showed an interest.  He was
9  well-spoken.  He worked well with other people,
10 whether they be young or old, and he had patience
11 with them.  And I saw that he was an intelligent
12 person, and I had kind of high hopes for him.
13     Q.  And at some point did he also get certified
14 as a literacy tutor?
15     A.  Yes.  At Enfield we ran a program, I ran it
16 at the time, but it involved other instructors as
17 well, and we trained -- according to the Literacy
18 Volunteers of American, we trained students who had
19 received their GED to become literacy volunteers.
20     Q.  What did that entail for them to do?
21     A.  That would entail working -- they had to
22 undergo the training program first.  After they had
23 gone through the classroom training, then they had
24 to work for a period of 30 days minimum with a
25 student who needed assistance with reading.  And we

5318

1    have students who have never gone to school ever and
2    had to start with learning the alphabet, and that
3    work was done not during the class time, but totally
4    on their own.  They would set up times where they
5    would meet in an empty classroom or in the library
6    with their assigned student and complete that.  And
7    only once they had completed that, were they
8    certified as literacy volunteers.
9        Q.   And Mr. Aquart did get that certification?
10       A.   Yes, he did.
11       Q.   And when you said they were working outside
12   of class hours, when he was a tutor, what were his
13   hours?
14       A.   When he was a tutor he worked in my
15   classroom for -- from the time when school was
16   called in the morning, which was usually about 8:30,
17   8:15 to 8:30, until school recessed at 11:45.  And
18   then he would come back in the afternoon around one
19   o'clock until 3:00, 3:15.
20       Q.   Was Mr. Aquart always in attendance?
21       A.   He was always there.  I don't recall him
22   ever missing a single time.
23       Q.   And so the literacy volunteer, I take it he
24   was receiving some amount of pay for being a tutor;
25   is that right?

5319

1        A.   He received $1.75 a day.  That was the job
2    pay for that, and that was later cut to what it is
3    now, which is $0.75 a day for any job any inmate
4    does.
5        Q.   But the literacy volunteer, that was above
6    and beyond that, he wasn't being paid for that.
7        A.   No, he was not paid for that.
8        Q.   I want to show you what has been marked as
9    Defendant's Exhibit P-AAA-4.
10            Would that be the certificate showing his
11   certification?
12       A.   That shows that he had completed it, and
13   it's signed by Bob Matney who was the principal and
14   myself.
15       Q.   And for his work as a tutor, do you recall
16   awarding him a certificate of appreciation?
17       A.   I probably did.  I don't recall.
18       Q.   Showing you the second page of P-AAA-4.
19       A.   Yes.  We often presented these to our
20   tutors who were -- not as a rule to any tutor,
21   because some tutors would last three days, but to
22   tutors who actually did -- he helped me a great deal
23   because -- not that there were problems with the
24   class, but working individually with many students
25   is difficult, and most of the students who attend

5320

1    school did -- well, both the adults and the younger
2    ones, they need a lot of individual help, and that
3    makes it easier.
4        Q.   And finally, I was going to show you one
5    last certificate.  This would have been, I guess,
6    certificate of appreciation for his work as the
7    literacy volunteer.
8        A.   Yes.
9        Q.   And during the course of his work there,
10   would you have given him performance evaluations?
11       A.   Yes.
12       Q.   Or would he have been given performance
13   evaluations?
14       A.   Yes.
15       Q.   And I'm showing you what's been marked as
16   Defendant's Exhibit P-AAA-5.  Would this have been
17   prepared perhaps with some input by you as well?
18       A.   Yes, that, and again, he was excellent in
19   completing his job.  Now, this particular reviewer
20   was Doug Shiery [ph] who was also a state school
21   teacher, and he also worked with him on occasion,
22   his room was right next to mine.  And Mr. Shiery and
23   I often collaborated on classes.  So yes, that's
24   definitely very true.
25       Q.   And you would agree with his comments and

5321

1    recommendations at bottom there?
2        A.   Yes.
3        Q.   And how long did he work for you as a
4    tutor, if you recall?
5        A.   He worked for me from the time he got his
6    GED until Governor Rowland took me off in
7    December 2003, and I moved on to Manson Youth
8    Institution.
9        Q.   So, you sort of had a forced departure from
10   Enfield.
11       A.   Yes.
12       Q.   Due to budget cuts, I take it.
13       A.   It was one of those -- it was rescinded in
14   six months and I was offered the opportunity to go
15   back to Enfield, but by that time I had settled in
16   at Manson Youth and decided to stay there.
17       Q.   Okay.  In addition to just helping you in
18   the class, would Mr. Aquart assist you with anything
19   else?
20       A.   He assisted me with maintenance, if you can
21   call it that, keeping all of the computers running.
22   Because I had made an effort to get as many
23   computers as possible available to the students, and
24   some of them were donated by AT&T, and I came here
25   to New Haven to pick them up, but they needed a lot

5322

```
1   of maintenance and upkeep, and he was certainly in
2   charge of that.  He maintained records for me, not
3   on any crucial information about other inmates, but
4   on testing scores and so on, recording them on the
5   computer.  He was just helpful in whatever needed to
6   be done at the time.
7       Q.  So, he was willing to do whatever it was
8   you asked?
9       A.  He was willing to do whatever.
10      Q.  And amongst the other tutors that you had
11  around that time, or maybe since, how would you say
12  Mr. Aquart ranks?
13      A.  I would rank him right up at the top.  He
14  was probably the best tutor.  I've had tutors
15  before, but they -- it's one of those quirky things
16  where in prison no inmate can tell another inmate
17  what to do, it's just not allowed.  And sometimes if
18  I had another tutor -- or tutors I've had before
19  would become a little -- they would tell other
20  inmates what to do, and then you have to stop that,
21  but that was never the case here.
22      Q.  Sometimes a tutor would let his position go
23  to his head maybe?
24      A.  A little bit, which is hard not to do
25  because you are actually almost teaching someone
```

5323

```
1   what to do and, but he never did.
2       Q.  And do you know if Mr. Aquart took any
3   other courses while he was there?
4       A.  I do know that he took college courses that
5   were offered at the time.  I believe there were
6   business courses, because I specifically remember
7   when he signed up for it he knew he had a Social
8   Security number, he didn't know what it was, and he
9   couldn't sign up for the college courses without a
10  Social Security number.  So, I assisted him in
11  contacting the Social Security office in Baltimore
12  to get him a Social Security -- his Social Security
13  number so he could take the courses.
14      Q.  And you were able to do that?
15      A.  Yes.
16      Q.  Did Mr. Aquart ever discuss his personal
17  situation with you?
18      A.  Yes and no.  He did talk at times about the
19  fact that he had lost his mother.  But he was a very
20  private individual.  To this day I don't know what
21  he was in for.  He would talk about the future and
22  what he planned to do and what he wanted to do, but
23  really his private life, not really, no.
24      Q.  Was it your understanding that he had spent
25  some time living in the streets?
```

5324

```
1       A.  Yes.
2       Q.  And what did he talk about the future,
3   about things he wanted to do?
4       A.  The business courses got him interested in
5   going into business.  And he at one time mentioned
6   something about used cars, like going to auctions,
7   buying cars, getting them fixed up and selling used
8   cars, something like that.
9       Q.  Did you ever have any contact with him
10  after he left Enfield -- or after you left Enfield,
11  I should say?
12      A.  I received a letter from him addressed to
13  me at Manson Youth Institution telling me that he
14  had been approved for parole and mentioned the fact
15  that they had questioned why he was wearing a
16  bulletproof vest, or something like that, and he
17  said, well, there were people who wanted to kill me.
18  And then as a matter of policy, I do not respond to
19  any mail that I receive from inmates.  And then the
20  next time I heard from him he sent me a Mother's Day
21  card, which was a very nice card.
22      Q.  Do you know why he sent you a Mother's Day
23  card?
24      A.  I believe probably he felt a little bit
25  like I was a mother figure to him.  I have a little
```

5325

```
1   bit of that effect.  I tend to mother my students.
2       Q.  Overall, what was your impression of
3   Mr. Aquart?
4       A.  I liked him.  He was a good student.  I
5   thought he was one who would make it on the outside.
6           MR. SMITH:  Thank you.  I have no
7   further questions.
8           THE COURT:  All right,
9   cross-examination.
10  CROSS-EXAMINATION
11  BY MS. RODRIGUEZ-COSS:
12      Q.  Ms. McCoy, I have just a couple questions.
13          So, inmates actually got paid to go to
14  school at Enfield; is that correct?
15      A.  Yes.  That's true of the whole prison
16  system.  The reason being that when you attend
17  school you cannot hold another job, and the majority
18  of inmates do not receive anything, any money from
19  home, and so on -- so this is their only means of
20  buying commissary items.
21      Q.  And you found the defendant to be a rather
22  intelligent young man?
23      A.  Yes, I did.
24      Q.  In fact, he had no learning disabilities?
25      A.  None that I could discern.
```

**GA1374**

5326

```
1       Q.   And he was taking classes with you at the
2   highest level.
3       A.   Yes.
4       Q.   And he approved your classes.
5       A.   Excuse me?
6       Q.   He approved your classes?  He passed your
7   classes?
8       A.   Yes, he did.
9       Q.   I believe he was registered in the GED
10  program in January of 2001, and approved the GED by
11  June; is that correct?
12      A.   Yes.
13      Q.   And then he subsequently registered in
14  college level business classes; is that correct?
15      A.   Yes, I believe so.
16      Q.   So, he left the Enfield correctional
17  institution well equipped to find a legal job and
18  make something positive of his life; is that not
19  true?
20      A.   Yes.
21      Q.   In fact, you yourself said you had high
22  hopes for him.  You expected he would be one of the
23  ones who would make it.
24      A.   Yes.
25      Q.   And he was 20 when he approved the GED; is
```

5327

```
1   that correct?
2       A.   Somewhere around there, yes.
3       Q.   And he was in fact paroled.
4       A.   Yes.
5            MS. RODRIGUEZ-COSS:  We have nothing
6   further, your Honor.
7            THE COURT:  All right, anything further?
8            MR. SMITH:  Nothing further, your Honor.
9   Thank you.
10           THE COURT:  Thank you, Ms. McCoy, you
11  are excused.  You may step down.
12           Will you please call your next witness.
13           MR. SHEEHAN:  Call Mark Bezy, your
14  Honor.
15           THE COURT:  All right, Mr. Bezy, would
16  you come over to the witness stand, please, and
17  please stand and raise your right hand.
18              M A R K    B E Z Y
19  Having first affirmed, was examined and testified as
20  follows:
21           THE WITNESS:  Mark Bezy, B-e-z-y.  I
22  live in San Tan Valley, Arizona.
23           THE COURT:  You may proceed.
24  DIRECT EXAMINATION
25  BY MR. SHEEHAN:
```

5328

```
1       Q.   Good afternoon, Mr. Bezy.
2       A.   Good afternoon.
3       Q.   Can you tell us, sir, what you are doing
4   for a living right now?
5       A.   I own a correctional consulting company.
6       Q.   And what do you do in a correctional
7   consulting company?  What kind of services do you
8   provide?
9       A.   I provide services to attorneys.  I've
10  worked with some federal defender's offices
11  regarding manners of -- matters of corrections and
12  prison environments.
13      Q.   And is there a name for that company or is
14  it just --
15      A.   It's Mark A. Bezy & Associates.
16      Q.   And are there other people that work with
17  you in that company?
18      A.   I do get some advice from other people at
19  times, yes.
20      Q.   And prior to working in that -- how long
21  have you been doing that kind of living -- that kind
22  of work as a consultant?
23      A.   From about 2008 to today.
24      Q.   Okay.  And prior to going into consulting,
25  did you have another business that you were involved
```

5329

```
1   with?
2       A.   From 2006 to 2008, I was an independent
3   contractor for a company out of Texas called
4   Creative Corrections.  They had the contract for the
5   Immigrations and Custom Enforcement Agency and we
6   were hired to go around and conduct their annual
7   retention reviews of facilities that held ICE
8   detainees.  We would spend three to four days there
9   and compile a written report for ICE.
10      Q.   And where were those reports submitted to?
11  When you say to ICE, what would happen in those
12  reports?
13      A.   They were sent to the company in Texas and
14  then they would forward them up to Washington D.C.,
15  to the ICE office up there.  And then it would come
16  back to the district that had the facility we
17  audited them in.
18           THE COURT:  And ICE means what?
19           THE WITNESS:  Immigration Customs
20  Enforcement.
21           THE COURT:  Thank you.
22      Q.   That used to be the immigration department,
23  basically?
24      A.   Right, used to be immigration services, INS
25  or -- yeah, INS.
```

5330

1    Q.   Immigration and Naturalization Services.
2    A.   Naturalization services.
3    Q.   And prior to working for that Creative
4  Corrections, were you also involved in correctional
5  activity?  Did you have another job?
6    A.   Prior to, yes.  I retired in 2006 from the
7  federal Bureau of Prisons.
8    Q.   Okay.  And in that little gap in between
9  your retirement in 2006 and then going to Creative
10 Consultants, what did you do?
11   A.   I retired in 2006 and I went to work -- I
12 went to work for the GEO Group out of Boca Raton,
13 Florida.  It's a private prison company.  I ran a
14 private prison in Florence, Arizona.  Our client was
15 the Arizona Department of Corrections.
16   Q.   And how many inmates were in that facility?
17   A.   I ran a thousand-bed sex offender unit down
18 there.
19   Q.   How many staff would have been generally --
20 how many staff were involved in that facility?
21   A.   With the programming and security staff we
22 probably had a couple hundred.
23   Q.   Now, you mentioned that prior to that you
24 were involved -- you were an employee of the federal
25 Bureau of Prisons, correct?

5331

1    A.   Correct.
2    Q.   I'm going to kind of flip this around and
3  instead of going from recent, I'm going to go back
4  and ask you when it was that you started working for
5  the Department of Corrections?
6    A.   I started 1978 as a correctional officer at
7  the federal -- a correctional institution in Oxford,
8  Wisconsin.
9    Q.   What is your educational background?
10   A.   I have a Bachelor of Science from the
11 University of Nebraska in criminal justice.
12   Q.   And did you have your Bachelor's degree
13 when you started with the Department of Corrections?
14   A.   Yes.
15   Q.   And what was your -- what were your first
16 responsibilities as a correctional officer?
17   A.   Basically to operate the inmate housing
18 unit, supervise the inmate details and provide
19 security and correctional coverage for the
20 institution.
21   Q.   And this you mentioned was in Oxford,
22 Wisconsin?
23   A.   Correct.
24   Q.   What level of facility was that?
25   A.   Oxford at that time was a medium security

5332

1  facility.
2    Q.   And how long is it that you stayed at
3  Oxford; if you can recall?
4    A.   I believe it was approximately five years.
5    Q.   And after Oxford, what was your next
6  assignment within the federal correctional center?
7    A.   I was promoted to GS-9 lieutenant at the
8  federal prison camp in Duluth, Minnesota.  I
9  activated that facility.
10   Q.   And let me ask you, what's the difference
11 between a camp and a medium security facility?
12   A.   A camp has no perimeter security.  The
13 inmates are usually -- well, they're all low to
14 community custody inmates, they don't require a
15 secure perimeter.
16   Q.   So is there even like a picket fence around
17 it?
18   A.   No.
19   Q.   And how about a medium level facility, what
20 is -- what distinguishes that from a camp?
21   A.   Everything above a camp -- at a minimum
22 security we had a double perimeter fence, chain
23 linked with razor wire, man barrier wire in between,
24 and outside we ran armed mobile patrols 24 hours a
25 day.

5333

1    Q.   What's the man wire?
2    A.   Man barrier wire.
3    Q.   What is that?
4    A.   It's a fancy name for barbed wire,
5  concertina wire.  It's designed differently.  It's
6  designed to -- if you get into it, it actually
7  fights you.  I mean, it's there as a deterrent to
8  keep people in a prison.
9    Q.   Okay.  And, now, you set up the camp you
10 mentioned in Minnesota, was that your next
11 assignment?
12   A.   Correct.
13   Q.   And then after that did you go to another
14 institution within the Bureau of Prisons?
15   A.   Yes.  I was transferred to the federal
16 correctional institution in Phoenix, Arizona as a
17 GS-11 lieutenant for activation of that facility.
18   Q.   And what's entailed?  What's meant by
19 activation of the facility?  What are you doing when
20 you are activating a facility?
21   A.   It was a brand new facility.  We went in
22 and we had to write the policies and procedures for
23 it, we had to hire the staff, we had to get the
24 institution ready for receiving medium security
25 inmates.

5334

1    Q.    And how long -- and what was -- that's
2    called an FCI?
3    A.    Yes.  FCI.
4    Q.    What level of security would the FCI be?
5    A.    Phoenix was a medium.
6    Q.    Okay.  So you started at a medium, then
7    went to the camp and then to a medium facility --
8    A.    Correct.
9    Q.    -- is that sort of the trajectory?
10        And after working with the Bureau of Prisons
11   in Arizona, where did you go next?
12   A.    I was transferred then to western regional
13   office in Belmont, California.  I was the assistant
14   correctional service administrator there.  My job
15   duties there were involved with overseeing the
16   inmate disciplinary transfer for disciplinary
17   purposes for inmates, close supervision transfers,
18   conducting compliance reviews of the facilities
19   within the region.  And I was also the agency
20   representative on the California prison gang task
21   force.
22   Q.    But you were in Belmont, but you were
23   working with people in California; is that correct?
24   A.    No, Beaumont was after I retired.
25   Q.    I'm sorry.

5335

1    A.    Belmont, California.  Belmont.  Right.
2    Q.    And how long were you at Belmont?
3    A.    Approximately 18 months to two years.
4    Q.    Is it -- for people in a management track,
5    is it common that they move around within facilities
6    in the Bureau of Prisons?
7    A.    Yes.
8    Q.    After Belmont, where did you go next?
9    A.    I was moved, I was transferred to the
10   federal correctional institution in Raybrook, New
11   York, it was a medium security male institution, as
12   captain.
13   Q.    Okay.  So you had been lieutenant, now you
14   are jumped up to captain?
15   A.    Correct.
16   Q.    And at Raybrook, what were your general
17   responsibilities there?
18   A.    I was responsible for the daily operation
19   of the correctional services department overseeing
20   the lieutenants and the correctional staff and
21   ensuring that the institution was safe and secure.
22   Q.    And how many inmates were at Raybrook when
23   you were there, roughly; if you can recall?
24   A.    I believe about 900.
25   Q.    And how many staff would you have been

5336

1    supervising at Raybrook?
2    A.    Probably around 150.
3    Q.    And is it -- let me ask you this:  You had
4    your Bachelor's degree when you went to the Bureau
5    of Prisons.  Was that pretty much a job requirement
6    at that time?
7    A.    It wasn't a requirement but it did help
8    having a degree, yes.
9    Q.    And do most of the federal correctional
10   officers have a Bachelor's degree or more?
11   A.    Today, yes.
12   Q.    And what is the, I guess for want of a
13   better word -- let me ask you this:  What is the
14   mission statement for the federal Bureau of Prisons?
15   What's your responsibility?
16   A.    It's to safely house and incarcerate
17   offenders in a secure facility.
18   Q.    So now we've got you up to Raybrook.  And
19   from Raybrook, where did you go next within the
20   Bureau of Prisons?
21   A.    I was promoted to captain at the Federal
22   Medical Center in Lexington, Kentucky.
23   Q.    And what's a medical center?
24   A.    It -- when I first went there it held
25   females, female offenders.  Then we went to a coed

5337

1    population for a short period of time, and then it
2    was moved to back to a male population.
3        But it was to provide medical treatment,
4    hospitalization for sick offenders.
5    Q.    And after Lexington, where did you go next?
6    A.    Then I moved to the United States
7    Penitentiary in Marion, Illinois as captain.
8    Q.    And how long were you in Marion?
9    A.    Approximately three and a half years.
10   Q.    That's a different level facility than
11   either the medium or the camp; is it not?
12   A.    Correct.
13   Q.    What's the difference between U.S.
14   penitentiary and a medium level security?  I guess
15   those are called FCIs, are they?
16   A.    Correct.
17   Q.    So, let's call it a USP, United States
18   penitentiary, versus an FCI.  What's the difference?
19   A.    At a USP there is more physical security,
20   there is a higher staff to inmate ratio, and there
21   is just more -- there is more control and it's more
22   of a restrictive environment than at an FCI.
23   Q.    When you say there is more staff to inmate,
24   what is the -- at least when you went to Marion,
25   what was the ratio of staff to inmates?

5338

1      A.   I had -- I had responsibility for
2   approximately just under 400 inmates and I had 250
3   staff.
4      Q.   And where was -- so you said you were there
5   for three years at Marion?
6      A.   Correct.
7      Q.   And at that time where was Marion in the
8   sort of hierarchy, as it were, of penitentiaries?
9   Was there anything unique about Marion at that time?
10     A.   Marion was the most secure facility in the
11  Bureau of Prisons.  It had three functions:  It
12  housed the control unit.  It had a general
13  population, which is -- which was totally different
14  from a regular population.  It was very restrictive.
15  Inmates were allowed out of their cell for
16  approximately 12 hours a week.  When they were out
17  of the unit they were in handcuffs.  All the staff
18  carried batons, and the staff had constant hands on
19  of the restraints when an inmate was out of the
20  unit.
21     Q.   Now, within the Bureau of Prisons, the
22  levels of facility, are there more than one
23  penitentiary?
24     A.   Yes, there is approximately 16
25  penitentiaries today.

5339

1      Q.   Okay.  And is the level of security in the
2   United States penitentiaries, are they generally
3   consistent with each other?
4      A.   Yes.
5      Q.   And do they have essentially the same
6   policies and procedures within the penitentiaries?
7      A.   They're all governed by national policies
8   and procedures, but the warden has the right to
9   implement local procedures, some local procedures,
10  too.
11     Q.   And while you were at Marion, were you
12  involved with setting up another facility within the
13  Bureau of Prisons?
14     A.   At that time they had made the decision to
15  move the mission of Marion to the administrative
16  maximum facility they had just built in Florence,
17  Colorado.  So in '95 we moved the general population
18  and the control unit from Marion, Illinois over to
19  the ADX.
20     Q.   Okay.  And is ADX the kind of pinnacle
21  control unit within the Bureau of Prisons now?
22     A.   Yes, it's the only facility of that type in
23  the Bureau.
24     Q.   And that's in Florence, Colorado, is it
25  not?

5340

1      A.   Correct.
2      Q.   And between the ADX and the U.S.
3   penitentiaries, are there other facilities within
4   the Bureau of Prisons that are -- sort of fit in
5   that more restrictive area?
6      A.   Yes, currently there is three what they
7   call SMU, special management units.  Lewisburg,
8   Pennsylvania was converted from a regular open
9   population penitentiary to an SMU.  There is a unit
10  in Talladega, Alabama, and Oakdale, Louisiana, too.
11     Q.   And what's the difference between an SMU
12  and a United States penitentiary as far as the level
13  of control over inmates?
14     A.   At an SMU inmates are confined in their
15  cells.  There is single recreation or small group
16  recreation.  They're there for anywhere from 18 to
17  24 months.  They have to complete a phase program
18  before they're released back to population.  And
19  there is no guarantee they'll complete the phases.
20     Q.   Okay.  And so we've got these SMUs.  And is
21  there another level of facility somewhere between
22  the SMUs and the ADX?
23     A.   There is one what they call CMU,
24  communication management unit in Terre Haute,
25  Indiana.

5341

1      Q.   What's the difference between a CMU and,
2   say, a United States penitentiary?
3      A.   The CMU inmates are placed in there for
4   monitoring, very strict monitoring of their
5   communications, whether it's verbal, written, any
6   contact they have with anyone outside the prison.
7      Q.   Okay.  Now, after Marion, where did you go
8   next within the Bureau of Prisons?
9      A.   I was promoted then to the correctional
10  services administrator in the north central regional
11  office in Kansas City, Missouri.
12     Q.   And what area of the country does that
13  north -- is it the north central?
14     A.   Correct.
15     Q.   What area, what states does the north
16  central office control?
17     A.   We controlled Colorado, Illinois,
18  Wisconsin, Minnesota, Missouri.  Basically the north
19  central portion of the United States.
20     Q.   And how many institutions are there, or
21  were there at that time in that region?
22     A.   I believe at that time there was 16 to 18.
23     Q.   And what level of facilities were there
24  within the north central region in the Bureau of
25  Prisons?

5342

1  A. We had the -- we had all securities from
2 the ADX in Colorado to prison camps. We had high
3 rises in Chicago, metropolitan correctional centers
4 that housed -- they're administrative level where we
5 can house all security levels of individuals.
6  Q. And what were your general responsibilities
7 as a correctional services administrator?
8  A. I was the resource person for all the
9 institutions in that region regarding security and
10 correctional practices. I conducted, again, audits
11 and reviews of the facility operations. I was
12 involved with the -- myself and my staff oversaw the
13 disciplinary transfer process of the inmates. I was
14 involved in the initial placement of inmates in the
15 ADX, the control unit, and also it would go on into
16 special reports for the regional director or
17 Washington as needed, do after-action reports.
18  Q. And in that context as a correctional
19 service administrator, did you meet with your other
20 colleagues in other -- who were at similar levels in
21 other regions of the country?
22  A. Yes.
23  Q. And did you become aware of the facilities
24 that those individuals were supervising?
25  A. Yes.

5343

1  Q. And how close a contact as a correctional
2 service administrator would you have with, say,
3 well, like the northeast region? Would that be a
4 regular contact? Or how often would you be talking
5 to those people?
6  A. You'd probably talk to them on a weekly
7 basis, if not more, because if I had a difficult
8 problem in my region that I needed to place in his
9 region, I would have to contact him and see if he
10 would accept the case. Or he'd contact me to see if
11 I would accept cases out of his region.
12  Q. And when you say a difficult contact -- I
13 think you used the word a difficult contact or
14 something.
15  A. A management issue.
16  Q. Okay. And would that include moving
17 inmates?
18  A. It would -- we would approve them, I would
19 accept them into the north central region into a
20 facility. They would accept them into the
21 northeast. But the movement was coordinated by the
22 -- by a different group within the BOP and the
23 marshals service.
24  Q. The physical movement?
25  A. The physical movement, correct.

5344

1  Q. That's where you'd go to Oklahoma or
2 something to get to next door?
3  A. Yeah, correct.
4  Q. Okay. And after serving as a
5 correctional -- how long did you do that, the
6 correctional service administrator?
7  A. I believe it was about approximately three
8 and a half years.
9  Q. And after that did you get another position
10 within the federal Bureau of Prisons?
11  A. I was promoted to the associate warden at
12 the United States penitentiary in Leavenworth,
13 Kansas.
14  Q. So, would this be the second United States
15 penitentiary that you were directly involved with,
16 one in Marion and now at Leavenworth?
17  A. Correct.
18  Q. But in the course of your service as a
19 correctional service administrator you were well
20 familiar with other policies and procedures in other
21 United States penitentiaries?
22  A. Correct.
23  Q. And how long did you serve as an associate
24 warden at Leavenworth?
25  A. I believe it was three, three and a half

5345

1 years.
2  Q. And what are the job responsibilities of an
3 associate warden? What do you do there?
4  A. When I first went there I was associate
5 warden of custody where I oversaw, I was responsible
6 for the correctional services department, and ISM,
7 and I believe one other small department. We housed
8 1200 high security inmates. We developed security
9 operations and programs for the inmates.
10  Q. Okay. And after -- so you are an associate
11 warden at Leavenworth. How many staff did you
12 supervise? I'm sorry, if you've already said it.
13  A. At Leavenworth it was probably I think 200
14 and -- I think it went to high it was 230 plus and
15 at the low maybe 220.
16  Q. And how many adults were at the high
17 security facility at Leavenworth when you were
18 there?
19  A. We averaged approximately 1200.
20  Q. And after Leavenworth, where you were an
21 associate warden, did you get another promotion
22 within the Bureau of Prisons?
23  A. I was promoted to the warden at the federal
24 correctional institution in Elkton, Ohio.
25  Q. And how long did you remain as a warden at

5346

1   that facility?
2       A.   I believe it was two years.
3       Q.   Okay.  So you called it federal
4   correctional institution, so that's basically -- now
5   you are back to a medium level facility?
6       A.   At that time Elkton was a low security.  It
7   had a double secure perimeter and it also it had
8   what we call a satellite low.  It was a hybrid
9   institution, kind of between a camp and a low.  It
10  was a camp that somebody had put a single fence
11  around and made it a secure facility.  It was
12  something the Bureau had done at a couple locations.
13      Q.   And how long did you stay in Elkton?
14      A.   Approximately two years.
15      Q.   And after Elkton did you get another
16  promotion within the Bureau of Prisons?
17      A.   I was promoted to the warden at the United
18  States Penitentiary in Terre Haute, Indiana.
19      Q.   And what is the -- how many inmates are at
20  Terre Haute in the United States penitentiary there?
21      A.   I was there -- when I arrived we were in
22  the process of constructing and activating a new
23  penitentiary there, too.  So initially we had
24  approximately 900 inmates in the old original
25  penitentiary, which was built in the 1930s.  We

5347

1   brought the new penitentiary online and we moved
2   that population from the old penitentiary into the
3   new penitentiary.  And at the same time we
4   backfilled the old penitentiary with medium security
5   inmates.  So -- and I had a federal prison camp
6   there.  When it was all over, I had approximately
7   3500 inmates.
8       Q.   And is that also where the federal death
9   row is?
10      A.   Correct.
11      Q.   And how many inmates are there on the
12  federal death row?
13      A.   There --
14      Q.   Or were at that time?
15      A.   At that time there was approximately 35 to
16  37.
17      Q.   And how large a staff was it that you were
18  supervising as the warden in Terre Haute?
19      A.   I had a staffing complement of 650 staff.
20  I was responsible for the three facilities.  So I
21  had -- I oversaw all three facilities.
22           MR. SHEEHAN:  Your Honor, at this time I
23  would offer Mr. Bezy as an expert in the Bureau of
24  Prisons practices, policies and procedure.
25           MS. DAYTON:  No objection.

5348

1            THE COURT:  Then Mr. Bezy will be so
2   qualified and the jury will remember the earlier
3   instruction of what that means.  All right.
4       Q.   And how long was it, sir, that you remained
5   at Terre Haute?
6       A.   Approximately two years.
7       Q.   Now, in this case at my request, sir, have
8   you reviewed the prison records for the defendant,
9   Mr. Aquart?
10      A.   Yes.
11      Q.   Before today you never saw Mr. Aquart, did
12  you?
13      A.   No.
14      Q.   Before you walked in this courtroom.
15      A.   No, I had to look for him.
16      Q.   And that included his records from the
17  Connecticut Department of Corrections and the Wyatt
18  Detention Facility in Rhode Island?
19      A.   Correct.
20      Q.   And in addition, sir, you are aware, are
21  you not, you've been informed that Mr. Aquart has
22  been found guilty of violations of federal law as
23  regards his role in the murders of three people who
24  were beaten to death in the context of drug cases?
25      A.   Yes.

5349

1       Q.   Actually, before we go on further on the
2   specifics as to Mr. Aquart, can you tell us, sir,
3   what -- and tell the members of the jury, what is
4   the process by which the Bureau of Prisons gets an
5   inmate?
6       A.   There is a guilty finding in a court, then
7   there is a -- the court, the judgment and commitment
8   paperwork is sent to the Bureau of Prisons.  It's a
9   little bit different today, it changed right after I
10  retired in '06.  But when I was in, it would go --
11  each region had its own regional designator.  The
12  paperwork would come to a regional designator.  They
13  would determine based upon review of the material,
14  past criminal history, the instant offense, they
15  would determine what security level the individual
16  met or required, and then they would assign him to a
17  facility.
18      Q.   And is there a role in that process for a
19  recommendation from the court?
20      A.   Yes.
21      Q.   And is there a role in that process for a
22  recommendation from the United States attorney's
23  office?
24      A.   Yes.
25      Q.   And I take it ultimately it's up to --

5350

```
 1   well, actually, the Bureau of Prisons itself is
 2   within the Department of Justice, is it not?
 3       A.   We are a component of the Department of
 4   Justice.
 5       Q.   And the Department of Justice is headed by
 6   the Attorney General of the United States?
 7       A.   Yes.
 8       Q.   Now, are there a set of general procedures
 9   that the Bureau of Prisons follows in determining
10   what level of facility an inmate should be sentenced
11   to?
12       A.   Yes.  The Bureau uses a classification
13   process where, again, like I said, they'll look at
14   the past criminal record, the conviction of the
15   instant offense, and any other data that's provided,
16   the presentence report, and they'll make a
17   determination on what security needs the individual
18   requires, and then they'll place him at the
19   appropriate facility.
20       Q.   And let's say somebody, for example, had no
21   prior criminal record and was convicted of a
22   nonviolent offense, where would such a -- and was
23   sentenced to, say, a sentence of less than three
24   years.  Where would that individual likely be housed
25   within the Bureau of Prisons?
```

5351

```
 1       A.   More than likely, based upon if it was no
 2   violence in the background, they would probably go
 3   to a federal prison camp.
 4       Q.   And let's say that somebody was sentenced
 5   to a -- was convicted of a crime of violence, but
 6   had a sentence of approximately -- had no prior
 7   criminal record, had a sentence of approximately
 8   five to 10 years, where would that person likely be
 9   sentenced within the -- where would that person
10   likely be designated within the Bureau of Prisons?
11       A.   At a minimum -- it would be at a low secure
12   facility, and it may even be at a medium security
13   facility based upon the violence.
14       Q.   And let's assume that an individual is
15   convicted of a federal offense in Connecticut where
16   would that individual -- well, let me ask you two
17   questions:  First of all, where would that
18   individual likely be sentenced?  Let's say it is a
19   medium -- it would be a medium facility, an FCI.
20   Where would that person likely be designated to?
21       A.   The Bureau likes to try to keep an inmate
22   within a 500 mile radius of their home, but based
23   upon the population pressures today that is just --
24   its almost impossible.  So, it comes down to
25   wherever the bed space is.  So it could be one of
```

5352

```
 1   anywhere around the country at that point.
 2       Q.   And are you aware of any limitations on
 3   where the Bureau of Prisons can send an inmate to
 4   complete his or her sentence?
 5       A.   No, the Bureau has that discretion to
 6   assign inmates to the institutions.
 7       Q.   And in assigning individuals to
 8   institutions, in addition to the circumstances of
 9   their particular crime, does the Bureau of Prisons
10   take into account any other factors?
11       A.   Can you repeat that?
12       Q.   Yeah, maybe it's -- well, let me ask you
13   this: Do they try to separate individuals?  Are
14   there separation procedures generally in effect or
15   considered in making classification determinations?
16       A.   If there -- if they're made official
17   separatees, that's a process we will go by based
18   upon written documentation of cooperation, something
19   that happened in the past, where those two inmates
20   would never be in the same facility at the same
21   time.
22       Q.   Okay.  And that kind of cooperation, that
23   kind of documentation is typically provided, is it
24   not, by the U.S. attorney's office?
25       A.   Yes, it can come from them.
```

5353

```
 1       Q.   And it can also come from intelligence
 2   garnered within the Bureau of Prisons itself?
 3       A.   Correct.
 4       Q.   And alternatively, sometimes the Court may
 5   have some impact on that --
 6       A.   Yes.
 7       Q.   -- in terms of a recommendation.
 8            But ultimately, that's up to the Bureau of
 9   Prisons.
10       A.   Yes.
11       Q.   And how many inmates are there at the
12   present time who are actually serving time within
13   the Bureau of Prison facilities, federal Bureau of
14   Prison facilities?
15       A.   The Bureau has the responsibility for
16   216,000 offenders, but only approximately 179,000 of
17   those are actually in the federal Bureau of Prisons
18   physical custody.
19       Q.   And of those 179,000 -- is that what you
20   said?
21       A.   Correct.
22       Q.   Of those 179,000 individuals, how many of
23   those are serving a sentence of life without
24   release?  Natural life.
25       A.   From the data I looked at last week,
```

5354

```
1    approximately 6100.
2        Q.   Now, I'm asking you to assume, sir, for a
3    moment -- actually before we make any assumptions,
4    you know, do you not, that the options that are
5    before this jury in sentencing Mr. Aquart are either
6    a sentence of life without release or the death
7    sentence.
8        A.   Yes.
9        Q.   You are aware of that.  I'm going to ask
10   you to make an assumption for us here, sir, that in
11   the event that the jury's decision here would be a
12   sentence of life without release, if the jury were
13   to sentence Mr. Aquart to a sentence of life without
14   release, in view of his -- in light of his records
15   that you've reviewed and the actual circumstances of
16   this case, do you have an opinion on what level of
17   facility he is most likely to be designated to?
18       A.   At a minimum he would go to United States
19   penitentiary.
20       Q.   Okay.  And, again, is there a role for the
21   U.S. attorney's office in at least sending
22   recommendations in that regard?
23            MS. DAYTON:  Objection.
24       A.   Yes.
25            THE COURT:  Basis?
```

5355

```
1            MS. DAYTON:  There is no basis for that.
2            THE COURT:  That's cross-examination.
3    All right.  The question was, is there a role for
4    the U.S. attorney's office in at least sending
5    recommendations in that regard.
6            Is that really the way you wanted to ask
7    that question?
8            MR. SHEEHAN:  Yes.  Did it sound -- as
9    your Honor said, maybe I'll -- you did quote me,
10   your Honor.  Let me ask you that.
11       Q.   Were you involved in classification issues
12   at any point in time in your career within the
13   Bureau of Prisons?
14       A.   Yes.
15       Q.   Does the Bureau of Prisons consider
16   requests from the U.S. attorney's office as far as
17   level of facility for an inmate?
18       A.   Yes.
19       Q.   And similarly, does the Bureau of Prisons
20   not only request, but in fact entertain suggestions
21   from the court as far as the level of security of an
22   inmate?
23       A.   They consider it, yes.
24       Q.   But ultimately it's up to the Bureau of
25   Prisons, right?
```

5356

```
1        A.   Yes.
2        Q.   And can you -- so, in response to my
3    question, where would Mr. Aquart likely be
4    designated to, your answer to that is?
5        A.   At a minimum it would be a United States
6    penitentiary.
7        Q.   Can you, sir, based upon your 20 -- let's
8    see, 20-plus years of service with the -- actually
9    27 years -- how long were you with them?
10       A.   Twenty-eight.
11       Q.   Twenty-eight years.  Based upon your
12   28 years of experience with the Bureau of Prisons,
13   and your knowledge to date, can you imagine any
14   circumstances under which Mr. Aquart would be
15   sentenced to a facility of a lower level of security
16   than a United States penitentiary?
17       A.   No.
18       Q.   Now, within a United States penitentiary,
19   how is it, sir, that -- are there methods of
20   discipline that are available within a United States
21   penitentiary?
22       A.   There are methods of discipline with all
23   federal Bureau of Prison facility.  There is a
24   program statement on inmate discipline where if an
25   inmate violates one of the standards of inmate
```

5357

```
1    discipline he's afforded normally a hearing, and
2    then it can be handled at the UDC unit team level or
3    it can go up to the disciplinary hearing officer who
4    can sanction an inmate into disciplinary segregation
5    status.
6        Q.   And tell me, can you tell us, sir, what it
7    is -- let's -- let me ask you this:  What is the
8    daily regimen for an inmate who is in a United
9    States penitentiary?  Not in any kind of
10   disciplinary status, but what's the regular kind of
11   schedule like on a day-to-day basis?
12       A.   At the most it's a two-man cell.  The cells
13   are unlocked approximately anywhere between 5:30 to
14   6:00 a.m. In the morning inmates are given an
15   opportunity to take a shower, get cleaned up.  Then
16   there is chow call that is called.  The doors to the
17   units are opened up for a period of ten minutes at a
18   time.  Inmates walk to the dining room, they're
19   given approximately 20 to 30 minutes to eat their
20   meal in the morning, and then they're called back to
21   the unit.  There would be a work call.  Inmates that
22   are working would go to their job assignments.
23       Q.   Before we -- let me interrupt you just
24   there and ask you, you mentioned a work call.  Is
25   it -- is it up -- are all inmates in a United States
```

5358

1   penitentiary, do they all have jobs?
2      A.   Yes.  Unless they're medically unable to
3   work, yes.
4      Q.   And suppose an inmate just doesn't want to
5   work?
6      A.   He doesn't have a choice.  He's locked up.
7      Q.   So, we got to they go off to work.  Then
8   what happens?
9      A.   Then the inmates that are not on work
10  status would go to programming.  If they're on their
11  day off they would have the opportunity to go to
12  recreation.  Approximately around 10:30 in the
13  morning all the activities would cease.  Inmates in
14  the programming areas would return to their units.
15  Approximately -- then you would have the dining room
16  call for diabetics, people that require special
17  meals.  At approximately 11:00 a.m., then the dining
18  room is open.  It's called by work detail.  After
19  you feed the work details, then you call the units.
20  Then everybody goes back to work.  Then it's the
21  same process, where it's either programming in the
22  afternoon or recreation for day off people.
23          At approximately 3:30 there is a recall,
24  all of the inmates report back to their unit unless
25  they're on an official outcount, and those outcounts

5359

1   are at a minimum normally for food service or
2   emergency work details.  Then at 4:00, okay --
3      Q.   I want to interrupt you.  An outcount,
4   what's with all of this counting.  Why are you doing
5   that within a penitentiary?
6      A.   That's one of our systems.  That's how we
7   know, we maintain who we have.
8      Q.   Okay.  And how often a day do you --
9   basically does everybody get counted?
10     A.   Everybody gets counted normally at least
11  five times a day, official counts.  Then there is
12  detail accountability checks at four o'clock, there
13  is what we call a stand-up count where all inmates
14  have to be standing in their cells.  That's an
15  official four o'clock stand-up count.
16          Then after that is cleared where
17  everybody is there, the dining room is open for the
18  evening meal.  Again, they're called by unit to the
19  evening meal.  After the dining room is cleared,
20  then the yard can be opened back up.  Usually at
21  about, depending on the darkness, at dusk the
22  inmates are recalled back into their units.  Terre
23  Haute, at 8:45 we locked them in their cells for the
24  evening.
25     Q.   And you mentioned -- let's deal with

5360

1   Terre Haute because that was the most recent
2   penitentiary you were at.  Is there a physical
3   barrier around that facility?
4      A.   The new institutions that the -- the new
5   model they're building, the new institutions --
6   well, the old one too, had a double chain linked
7   fence.  It had gun towers on the perimeter, and the
8   new one, the design of the facility, there is a
9   double chain link fence and then the design of the
10  facility, everything is encapsulated in kind of a
11  circular, the rec yard, everything enters into the
12  center of the structure itself where inmates can no
13  longer see outside.  If they want to see light, they
14  have -- the sky is there, but there is no windows
15  that show the outside anymore.
16     Q.   And you mentioned these gun towers.  Are
17  those gun towers manned throughout the day?
18     A.   At the new penitentiaries there is a center
19  gun tower that's manned.  Normally, I manned mine
20  24 hours a day.  Some institutions man them just for
21  16 hours a day.  But there is a physical center
22  tower inside the institution.
23     Q.   Are correctional officers typically armed?
24     A.   Inside, no.
25     Q.   And why is that?

5361

1      A.   If they're armed it could be taken away.
2      Q.   Okay.  And with respect to those gun
3   towers, are those accessible by inmates?
4      A.   No.
5      Q.   And I take it the officers in the -- by
6   definition, those officers in the gun tower, they
7   are armed, are they not?
8      A.   Correct.
9      Q.   With rifles basically?
10     A.   There is a variety of lethal to less lethal
11  weapons up there.
12     Q.   And you mentioned just as an example about
13  you have a four o'clock stand-up count.  Suppose I'm
14  an inmate and I just say, do you know, Mr. Warden, I
15  don't feel like getting out of my bed.  And you said
16  to me, well, Mr. Sheehan, are you sick, and I say
17  no, I just bug off.  What happens within a facility
18  in that context?
19     A.   He'd go to special housing unit.  That is a
20  prohibited act, failing to stand count.
21     Q.   And what is the special housing unit?
22  What's the difference between that and the general
23  population within the United States penitentiary?
24     A.   Every secured facility in the Bureau of
25  Prisons has a special housing unit.  Basically it's

5362

```
1   a unit within each institution where you can
2   segregate inmates from the general population for
3   pending -- they're pending a violation of an
4   institution rule.  An inmate can request protection
5   or staff can determine there is a need for
6   protection for that inmate and place them in there.
7        There is two basic statuses in it, you
8   are in administrative detention; that's the status
9   where you're normally in a two-man cell.  You get
10  five one-hour periods of recreation a week, three
11  showers, and you have the same property that an
12  inmate would have on the yard, but it's very scaled
13  down, it's very limited.
14       Then there is disciplinary segregation
15  part of the unit, too, where an inmate is sanctioned
16  by the disciplinary hearing officer for violation of
17  inmate discipline policy, and they're put in there.
18  It's less restrictive property, again it's five
19  hours of recreation a week and three showers.
20  Q.   Now, so we have -- at least one component
21  appears to have double cells, right?  Is that the
22  ad-seg unit?
23  A.   MDX has double cells, too.  There are some
24  cells that are set up for single, you have one bed
25  in it, too.
```

5363

```
1   Q.   And so I get -- when you say I get five
2   hours of recreation a week, what is that?  What does
3   that mean?
4   A.   You are taken out of your cell five times a
5   week for one hour at a time.  You are escorted in
6   restraints to a -- the special housing unit has its
7   own recreation area.  In that there are secure
8   recreation enclosures where you can put one
9   individual or you can put up to, I think when I was
10  there we could put up to six people in one.  They
11  would be uncuffed.  Once the door is locked,
12  uncuffed, and then they would be in there for
13  recreation for an hour.
14  Q.   And you mentioned you could have -- when
15  you were there in some places you could have up to
16  six inmates in a particular location.  Is there
17  single area recreation?
18  A.   They're all the same size, but depends on
19  the status of the inmate.  Some inmates are single
20  rec, single housed, single basically everything.
21  Those individuals are put in recreation enclosures
22  by themselves.  They're housed by themselves.
23  Q.   In this recreation enclosure, is it like
24  being in a pen?
25  A.   Some people attribute that to it, yes.
```

5364

```
1   Q.   Well, do I have fencing all around me?
2   A.   Yeah, it's totally enclosed with either
3   woven fabric or chain link.
4   Q.   What about above me, what's up there?
5   A.   Same thing, concrete on the ground, chain
6   link around.
7   Q.   Okay.
8        Now, you mentioned that there are these SHUs
9   within each facility?
10  A.   Secured facility.
11  Q.   Secured facility.  So that would certainly
12  encompass within each United States penitentiary,
13  right?
14  A.   Yes.
15  Q.   You might not have a SHU if you were in a
16  camp, that's not a secure facility?
17  A.   No.
18  Q.   Now, you mention -- as far as this SHU is
19  concerned, how long can an inmate be kept in the
20  SHU?
21  A.   Depending on the circumstances they can be
22  in there for extended periods of time.
23  Q.   More than a day?
24  A.   Yes.
25  Q.   What's an extended period of time?
```

5365

```
1   A.   Some cases are reviewed every 90 days.
2   Some people are in there for longer.  Some inmates
3   refuse to populate in a penitentiary or in FCI and
4   they're housed in special housing unit for as long
5   as they refuse population.
6        THE COURT:  Mr. Sheehan, is this a good
7   time to take a break.
8        MR. SHEEHAN:  This would be a great
9   time, your Honor, thank you.
10       THE COURT:  Ladies and gentlemen, we'll
11  take a half hour.  Leave your notes here, don't
12  discuss the case, we'll be back at a quarter to two.
13       (Jury exited the courtroom)
14       THE COURT:  All right, Mr. Bezy, if you
15  will kindly be back at quarter to two and don't
16  discuss your testimony.  We stand in recess.
17       (Recess)
18       THE COURT:  All right.  Please be
19  seated.  Mr. Bezy, if you would like to return to
20  the stand, we'll bring the jury in.
21       (Jury entered the courtroom.)
22       THE COURT:  Please be seated, ladies and
23  gentlemen.  Continued direct examination of Mr. Bezy
24  by Mr. Sheehan.
25       MR. SHEEHAN:  Thank you, your Honor.
```

5366

```
1    Q.   Mr. Bezy, you had -- I had asked you a
2    couple of questions about the ADX unit at Florence.
3    Could you tell us, just in general, how that differs
4    from the standard United States penitentiary?
5    A.   The ADX was opened in 1995 to replace the
6    control unit or the security program at USP Marion.
7    It has three functions:  It has a general
8    population, which is the program that most people
9    end up going to there for, and they're there for a
10   period of normally -- they can work their way out in
11   three years depending on their conduct.  There is no
12   guarantee that they can work through the program,
13   but it's a phase program where they start out in
14   very restrictive and then they can, after they're
15   teamed by the staff there, they're put into
16   different phases of the operation where eventually
17   the final phase is at the USP Florence next door,
18   but there is no guarantee they'll get through the
19   program.
20   Q.   When you say people are initially placed
21   there, how do they get placed there?
22   A.   There is a recommendation made by the
23   institutional warden to the regional director.  Now
24   it's forwarded up to Washington and a designation
25   center in Grand Prairie, Texas who do the paperwork,
```

5367

```
1    and it's approved by, I believe the assistant
2    director out of -- correctional programs out of
3    Washington who will make the final determination, or
4    that it will go to the ADX GP.
5    Q.   Some people, are they designated to the ADX
6    GP?
7    A.   Approximately 5 percent of the population
8    at ADX is directly from the court.  The population
9    of the ADX is, I think 492 is their max.
10   Q.   And in comparison with a U.S. prison, if I
11   were sent to the ADX unit, would I have the same
12   kind of housing?
13   A.   No, ADX, it's all single cell.  It's more
14   secure than a USP.  Most of the cells have a solid
15   doors and then a vestibule and then a grilled door
16   inside.  It's all single rec and single cell.
17   Q.   And what is the approximate size of the
18   cell at the ADX unit?
19   A.   It's a standard cell.  I don't recall
20   off --
21   Q.   And what's in that cell?
22   A.   You have in one corner a stainless steel
23   shower, you have a concrete bed, you have a concrete
24   writing table that is built in the wall.  You have a
25   concrete stool for the desk, and then you have a
```

5368

```
1    stainless steel toilet and sink combination.
2    Q.   How are inmates removed from their cells?
3    How does that process work?
4    A.   Well, they're all in full restraints when
5    they come out.  In general pop they're handcuffed
6    from behind.  At the grille door staff get ahold of
7    the restraints.  There is at least one other officer
8    there with a baton.  So they're always under direct
9    staff supervision.
10   Q.   And you indicated that that period lasts,
11   the initial period anyway, at least in your
12   understanding is at least three years?
13   A.   Well, they're teamed in, I believe it's
14   12 months with set review periods, but, again, the
15   staff look at each individual case and they weigh
16   each individual case separately.
17   Q.   What kind of controls are there within the
18   Bureau of Prisons with respect to monitoring of
19   communications?  Let's say at a United States
20   penitentiary or higher level facility.
21   A.   For written correspondence, all outgoing
22   correspondence is turned in to the unit officer.
23   It's not sealed.  Staff will check the
24   correspondence.  The morning staff from midnight to
25   eight will review the correspondence, check it for
```

5369

```
1    contraband.  There is also hot lists for inmates if
2    they're of a particular interest their mail is
3    forwarded directly to the investigator's office,
4    it's further read down there.  The unit officer
5    would then seal the mail and then it would go
6    outside to the post office.
7    Incoming mail is picked up by institution
8    staff at the post office.  It's taken, it's screened
9    by metal detectors or X-ray machine.  Each letter is
10   then opened and checked for contraband.  Again, if
11   there is a unique interest in the inmate, that mail
12   will go to the investigator's office before it
13   will go to the inmate.
14   Q.   And how about on phones, are there
15   restrictions on phones?
16   A.   Yes.  Each inmate is authorized, there is
17   allowed 300 minutes of phone time each month.  All
18   calls are either collect or the inmate can buy them
19   and put them on a debit card system where he's
20   paying for the phones.  They're allowed 15-minute
21   phone calls, and then the way the system is set up
22   there is dead time, usually I think it's 45 minutes
23   or so between calls, so an inmate can't just sit on
24   the phone for back to back calls, so it opens it up
25   for other inmates to use the phone.  All calls are
```

5370

```
1   recorded and subject to live monitoring.  Some are
2   live monitored.
3       Q.   Now, at a communications -- you mentioned
4   they have CMUs.  Are those controls even more
5   strict?
6       A.   Yeah, the CMU, all phone calls are live
7   monitored.
8       Q.   And how about letters?
9       A.   They can -- if it's a unique individual, if
10  it's written in a foreign language, then there is
11  staff that will be sent that reads that language, or
12  if there is unique coding or material of interest,
13  it can be sent to somebody that focuses on that
14  inmate or a group, and it will be looked at that
15  way.
16      Q.   And does the warden have power, for
17  example, to restrict mail or phone privileges?
18      A.   Yes.  Both privileges.  The warden can pull
19  and suspend phone privileges for periods of time,
20  and then as part of the disciplinary sanction you
21  can take phone periods, you can take the phone
22  privilege away for indefinite periods of time.
23           The warden can also by -- if there is a
24  threat to the overall running of the institution or
25  the community, people can be put on restricted
```

5371

```
1   correspondence requirements, too.
2       Q.   As warden did you actually do that with
3   respect to some inmates; that is, restrict their
4   phone and their correspondence?
5       A.   If it was a subject -- as far as the
6   written correspondence, if it was an ongoing
7   investigation, yes, I restricted who they could
8   write to and reviewed all of their incoming and
9   outgoing correspondence.
10           As far as phones, when I was a warden at
11  Ohio they allowed smoking at that time inside.  It's
12  supposed to be in the yard, inmates are not
13  compliant, so we talked to them, they didn't want to
14  listen, so if they were caught smoking in the unit
15  by the officer, I suspended their visitation, phones
16  and commissary for a year.  That became a little bit
17  burdensome on the staff, so then I decided I'll quit
18  selling tobacco to them and that worked even better.
19           At Terre Haute if you were caught either
20  possessing an intoxicant or making intoxicants,
21  again, I suspended -- I had the DHO suspend the
22  phone, visitation, commissary for a year, first
23  offense.
24      Q.   You mentioned that, like ADX, after that
25  three years, there is a kind of a step-down
```

5372

```
1   procedure?
2       A.   It's possible, yes.  There is inmates that
3   I put there in 1995 that are still in that process,
4   that are still in that unit.
5       Q.   And what criteria does the ADX use as far
6   as moving inmates in or out?  What is their
7   criteria?
8       A.   Again, it's a referral.  It's -- they're
9   afforded due process hearing, and if there is a
10  recommendation for placement, then they're sent to
11  the ADX.
12      Q.   Now, is there kind of an intelligence
13  gathering mechanism that you used when you were a
14  warden at the facilities?
15      A.   Yes, I had my own local investigator,
16  special investigative supervisor.  He had, I think
17  up to six people working for him.  Then the region
18  has an intelligence staff.  There is a central
19  office intelligence staff and then there is a group
20  out in Sacramento, California, that is a joint
21  intelligence group with all federal law enforcement
22  and there is one in Pennsylvania too.
23      Q.   And when you were the warden how often
24  would you actually walk through your facility?
25      A.   I went -- I would tour my special housing
```

5373

```
1   unit every Tuesday at one o'clock.  I would take
2   certain staff with me.  At that time I woke up every
3   inmate in that unit to make sure they were alive and
4   well and breathing, and if they had any issues they
5   could address it with me then.  Then I would proceed
6   up to the special confinement unit and do the same
7   there.
8           Every day at eleven o'clock I would go to
9   the dining room and I stood mainline while the
10  inmates ate.  I spent an hour plus there every day,
11  so if an inmate had an issue of concern he could
12  address it with me personally.  It diffused a lot of
13  issues, and it's a source of good information, too.
14      Q.   Let me ask you to assume the following:
15  Let's assume that an individual had been convicted
16  of a triple homicide in connection -- in the context
17  of a drug operation and his conviction was in 2011,
18  and that individual was also found to have assaulted
19  another inmate at the end of 2009 while in a
20  detention facility pending trial.  And assume
21  further that if the United States attorney or the
22  Department of Justice were lobbying hard for
23  designation for ADX, do you have an opinion as to
24  where that individual is likely to be designated?
25      A.   Very likely he could go into the GP at the
```

5374

1   ADX or with the right amount of pressure he could go
2   to the control unit at the ADX too.
3       Q.   What's the difference between the control
4   unit?
5       A.   Control unit is a unit within the ADX where
6   based upon an inmate's behavior, most of them are
7   there for -- they have taken another life of an
8   inmate while they're incarcerated, escaped, or very
9   unique threat to the safety and security of the
10  institution.  There can be a recommendation for
11  placement in the control unit.
12          There they're afforded a due process
13  hearing where they can call witnesses.  Hearing
14  administrator presides over the hearing and then
15  there is a recommendation for placement.  If they're
16  approved, then the unit team of the control unit
17  will establish a period of time for their placement.
18          When I was involved in it, if it was --
19  if it involved a homicide within one of the federal
20  prisons, they normally got 60 months, and now I
21  understand they're giving them 72 months in there.
22  Again, it's behavior based.  They get credit for the
23  months they're in there with clear conduct.  If
24  they've mismanaged or don't program, that month can
25  be taken away from them.  So, they have to do --

5375

1   they'll do it in a control unit.  It's not
2   additional time, it's just time that the Bureau says
3   you will be in this unit.
4       Q.   Now, in your experience over the 20-plus
5   years, have you worked in facilities which had
6   individuals who were doing a sentence of life
7   without parole?
8       A.   Yes, every -- when I was at Terre Haute,
9   when I left, when I retired, I had about
10  approximately, I think, 12 to 1500, and out of that
11  300 were doing natural life.
12      Q.   How is it that correctional staff, in your
13  opinion, how do they maintain control over inmates
14  who are doing life without parole?  It seems kind of
15  like those inmates have nothing to lose.
16      A.   Penitentiaries are set up to be restrictive
17  in a control environment, and basically the only
18  decision an inmate has in a penitentiary is whether
19  they're going to follow the rules or not.  If they
20  don't, then there is policies and procedures for
21  inmate discipline on that.  Most of them do program.
22  It's a controlled environment that, you know, for
23  safety and security.
24      Q.   Is there a difference between short-term
25  and long-term prisoners in terms of maintaining,

5376

1   difficulty in maintaining control?
2       A.   Some of the younger short-term inmates can
3   be problematic because they know they have a ticket
4   out after a certain number of years.  My experience,
5   people doing long time are normally less
6   problematic.
7       Q.   And let me ask you, does the fact that you
8   have the same inmates in these penitentiaries for a
9   long time, does that impact on the stability within
10  that institution?
11      A.   Yeah, inmates in a penitentiary tend to --
12  they get into their own program of doing their time,
13  staff know who they are.  It's not a real transient
14  population.  They're there for extended periods of
15  times, for years, so they know the staff, staff know
16  them, and, you know, if the warden is out there and
17  about taking care of business, it's a safe
18  environment.
19      Q.   When you basically walked the facility,
20  were you armed or guarded by other staff?
21      A.   No, I walked by myself.
22      Q.   Do you have an opinion as to whether well
23  run and well managed facilities, are they effective
24  in minimizing violence?
25      A.   Yes, they are.

5377

1       Q.   And based upon your review of the
2   defendant's records within the Department of
3   Corrections and the records from Wyatt, do you have
4   an opinion to a reasonable degree of certainty on
5   the ability of the Bureau of Prisons to securely and
6   safely house the defendant if he's sentenced to life
7   without parole?
8       A.   I believe they can safely and securely
9   house him.
10          MR. SHEEHAN:  I have no further
11  questions of Mr. Bezy.  Thank you, your Honor.
12          THE COURT:  All right,
13  cross-examination.
14  CROSS-EXAMINATION
15  BY MS. DAYTON:
16      Q.   Good afternoon, Mr. Bezy.
17      A.   Hello.
18      Q.   I'm Tracy Dayton.  I'm an assistant United
19  States attorney in the District of Connecticut.
20          So you've worked a lot of places, huh?
21      A.   Yes.
22      Q.   You moved around a lot?
23      A.   Yes.
24      Q.   With your children?
25      A.   Yes.

5378

```
1     Q.   They were okay with that?
2     A.   Yes.
3     Q.   And you moved a lot because the Bureau of
4  Prisons is always changing and trying to update; is
5  that right?
6     A.   No, at that time if you wanted a promotion
7  you had to relocate for promotion purposes.
8     Q.   But the Bureau of Prisons is always trying
9  to update and become more modern in terms of housing
10 prisoners; is that correct?
11    A.   Yes.
12         THE COURT:  Would you see if your mic is
13 working?
14         MS. DAYTON:  Yeah.  Can you hear me?  I
15 don't think it's working.
16         THE COURT:  Is it flashing?
17         MS. DAYTON:  Maybe Mr. Sheehan turned it
18 off before I got up here.
19         MR. SHEEHAN:  It would be a brotherly
20 thing to do, your Honor.
21    Q.   Can you hear me okay?
22    A.   Yes.
23    Q.   Okay.  So, and you, at the time you
24 retired, were at Terre Haute, right?
25    A.   Correct.
```

5379

```
1     Q.   You were the warden there?
2     A.   Yes.
3     Q.   And at the time you retired you had just
4  been investigated for unprofessional conduct and
5  misusing official position for personal gain, right?
6         MR. SHEEHAN:  May I approach?
7         THE COURT:  Yes, I'll hear you.
8         (Sidebar conference)
9         THE COURT:  What are you doing?  I have
10 not ruled on that and we're going to have a point at
11 which I would rule on that.  I've heard direct and I
12 am not persuaded yet, and there may be something in
13 cross-examination, that is, discipline for
14 profanity.  Using staff to look after his dog and to
15 do an application doesn't relate to his knowledge of
16 procedures.  Now, it may be that there is going to
17 be something that will change that, but this was a
18 pending issue in which I had not ruled.
19         MS. DAYTON:  Your Honor, you ruled on
20 the profanity.  You said yesterday that the fact
21 that he was using profanity against his deputy
22 warden goes to his stellarness or non-stellarness.
23 Do you remember we all laughed about that?
24         THE COURT:  I recall that.
25         MS. DAYTON:  So you did rule on that.
```

5380

```
1  That's what I just asked him about.
2         THE COURT:  Having heard -- and then
3  today I said I would rule on it after I heard his
4  direct testimony.
5         MS. DAYTON:  But I didn't know you had
6  withdrawn your prior ruling, your Honor.  I would
7  not do something in bad faith.
8         THE COURT:  The problem is that I don't
9  see how that relates to his knowledge of designation
10 and BOP procedures.  There may well be something
11 that will cause that to be, to relate, but having
12 heard what his testimony is and the fact that he
13 didn't hold himself out as having certificates of
14 stellarness --
15         MS. DAYTON:  Your Honor, his resume
16 starts with what a well-respected career he had.
17         THE COURT:  His resume is not in
18 evidence.
19         MS. DAYTON:  He questioned him directly
20 from the resume.  His entire first half hour came
21 directly from the resume.  Mr. Sheehan was literally
22 reading from his resume.
23         THE COURT:  Fine.  It's every place he
24 ever was, every promotion he ever got.  There was
25 nothing about awards, recognitions, certificates of
```

5381

```
1  excellence.
2         MS. DAYTON:  Your Honor, you allowed
3  them to ask Mr. Hodges whether or not he had ever
4  been a teacher at a school in 1985.  They've put
5  this person up there as an expert, you worked for
6  the Bureau of Prisons for 30 years.  He retired two
7  years short of retirement.
8         THE COURT:  I understand that, why don't
9  you get some foundation here before you go right to
10 that question.
11         MS. DAYTON:  Because Mr. Sheehan laid
12 all the foundation.
13         THE COURT:  I don't recall any
14 foundation about his retiring before and under
15 circumstances that would suggest he was trying to
16 avoid discipline.  I will hear it.
17         MS. DAYTON:  I wasn't going to say he
18 retired to avoid discipline, I was going to say he
19 retired two years short of his retirement and when
20 he did there had just been sustained allegations
21 against him, and the allegations came, as you can
22 see from what I gave you, precisely because they
23 were talking about issues related to weapons in
24 prison, which has directly to do with his testimony
25 here, the safety of prison.
```

5382

```
 1              THE COURT:  Well, that's fine, but
 2   that's not the way you've gone about it.  If in fact
 3   what you are talking about is his knowledge and
 4   expertise on security and his profanity, berating of
 5   staff person who questioned something about
 6   security, that's far closer than what you are doing
 7   right now.
 8              MS. DAYTON:  He mocked his deputy
 9   warden.
10              THE COURT:  I understand.
11              MS. DAYTON:  So I'll ask him about that.
12              MR. SHEEHAN:  About what?
13              MS. DAYTON:  About mocking his deputy
14   warden, about she was trying to recreate what he had
15   talked about with respect to making a weapon and he
16   started mocking her in front of a room full of
17   executives.
18              THE COURT:  I understand.  I've read all
19   the reports.  I want it to relate to something
20   having to do with his testimony.  If in fact he was
21   reprimanded for --
22              MS. DAYTON:  He wasn't reprimanded, he
23   retired.
24              THE COURT:  Excuse me.  He was -- the
25   charge was sustained, and that's all there is.  Do
```

5383

```
 1   you wish to be heard?
 2              MR. SHEEHAN:  I'm --
 3              THE COURT:  She's going to get it in
 4   eventually.
 5              MR. SHEEHAN:  Why?
 6              THE COURT:  Because it relates to
 7   security and his attitude about security.
 8              MR. SHEEHAN:  They're just rewarding bad
 9   behavior.
10              MS. DAYTON:  That's not fair because I
11   went off your Honor's ruling from yesterday.
12              MR. SHEEHAN:  Totally unfair.
13              THE COURT:  No, I think Ms. Dayton had a
14   basis for believing, though I don't understand what
15   she might have thought when I said I would reserve
16   until after I heard the direct.
17              MR. SHEEHAN:  It's inconceivable.
18              MS. DAYTON:  I can explain that,
19   actually, if you allow me, because I would never
20   honestly intentionally disobey your Honor's ruling.
21   I thought you were saying if he went into it and
22   brought it all out that you weren't going to let me
23   go back into it; that's what I thought you -- I
24   understood you meant.  And maybe I'm stupid.  That's
25   what you didn't want, that it be belabored.
```

5384

```
 1              THE COURT:  I don't want it belabored,
 2   but I wanted to hear the direct.  As to using staff
 3   to prepare an application and watching the dogs --
 4              MS. DAYTON:  I'll stay away from that.
 5              THE COURT:  -- those are so de minimis.
 6              MS. DAYTON:  I'll stay away from that.
 7              THE COURT:  But if he is acting
 8   unprofessional with the issue of security, I think
 9   that does bear on it.
10              MR. SHEEHAN:  There is no claim that he
11   was acting unprofessional with respect to the issue
12   of security.  The claim, I take it, is that in the
13   context of running an institution he's spoken in a
14   disrespectful tone to the deputy warden.
15              THE COURT:  The subject was
16   shank-making.
17              MR. SHEEHAN:  Yeah, whatever the subject
18   is, you don't get it, you don't get -- do we go into
19   the whole substance of the conversation?
20              THE COURT:  No.
21              MR. SHEEHAN:  Then what am I left with?
22   The problem is admittedly one should not speak that
23   way to people that one works with.  Fine.  I think
24   that if -- the people I work with under torture they
25   might admit that at some point in my life I spoke
```

5385

```
 1   that way with them.  I suspect other people might
 2   also have done that.  It doesn't mean what he's
 3   saying here is any less worthy of credence.
 4              THE COURT:  It is to the issue of
 5   following their policy.
 6              MR. SHEEHAN:  But the issue was he used
 7   bad language.
 8              THE COURT:  I understand that.
 9              MR. SHEEHAN:  In the Bureau of Prisons.
10              THE COURT:  You certainly are not going
11   to get into all of the detail, but it seems to me
12   that if he violated Bureau of Prisons' policy which
13   he knew existed in the context -- on the subject
14   matter of security, that from that at least there is
15   some challenge to his authoritativeness on why all
16   of these policies will be followed such that
17   Mr. Aquart can be safely and securely housed.  Now,
18   I would think that it's not a major failure, but it
19   is nonetheless by the warden a failing, and it is a
20   failing to follow a policy.  And to the extent that
21   failure to follow policy is an admission that all
22   may not be perfect in the Bureau of Prisons, and
23   therefore his opinion that he can be safely and
24   securely housed is --
25              MR. SHEEHAN:  Do you know what, this is
```

**GA1389**

5386

```
1   a setup.  This is has nothing -- this is a guy who
2   leaves the Bureau of Prisons and they trolled his
3   record for something he never got a copy of.
4              THE COURT:  I'm not going to permit any
5   testimony of relationship between his leaving the
6   Bureau and this because there isn't --
7              MR. SHEEHAN:  That's what she just
8   asked.
9              THE COURT:  No.
10             All right.  So we're going to leave
11  out -- the question will be rephrased.  We'll leave
12  out misusing official position for personal gain.
13  Ms. Dayton said she was leaving that out because it
14  has to do with taking the dogs out and filling out
15  applications.  The timing is also not going to be
16  the subject of your question.  If you are claiming
17  that it has to do with his -- the security issue,
18  then it needs to be framed in that context and only
19  that context, and it's about one question.
20             MS. DAYTON:  I'm going to ask him, you
21  were having an executive meeting, you were
22  discussing shanks in prison, and she tried to
23  recreate this and you said X to her.  Because there
24  is no way to get there without --
25             THE COURT:  I don't want all of the
```

5387

```
1   details of it.  If the purpose is that he himself
2   was the -- the cause was found -- was sustained for
3   his violation of whatever that policy was.
4              MR. SHEEHAN:  But do you know what, he
5   was never notified of it.  How does he know that
6   cause was sustained.  He was never told that.  This
7   thing they dragged out of the sewer to get back at a
8   guy who has the effrontery to testify.
9              THE COURT:  So, tell me why it matters
10  if he doesn't know.  Because you are saying he
11  doesn't know how to answer that question?
12             MR. SHEEHAN:  Yeah, because their point
13  is, and I think what they're trying to say, well,
14  you were disciplined for this.  I wasn't
15  disciplined.
16             THE COURT:  But he wasn't disciplined.
17             MS. DAYTON:  I'm not trying to say that.
18             MR. SHEEHAN:  What are you saying then?
19             MS. DAYTON:  He was interviewed during
20  the course of the investigation of him.  To say he
21  doesn't know -- and he also lied under oath about
22  it.  The last time he testified he said he wasn't
23  under investigation and then they went and got the
24  documents and he had to come back from that.  I'm
25  not even going to bother going into that issue.
```

5388

```
1              THE COURT:  So the phrase is the charge
2   was sustained for directing unprofessional comments
3   and profanity towards a subordinate officer.
4              MS. DAYTON:  And what he said.
5              THE COURT:  In violation of the
6   standards of employee conduct.  And to the extent
7   that shows that wardens themselves don't always
8   follow policy, that relates to his opinion that
9   Aquart can be safely and securely detained.  I don't
10  need to know the substance of the unprofessional
11  comments and profanity.
12             MS. DAYTON:  Your Honor, I can --
13  that's --
14             THE COURT:  No, I'm just not going to
15  let you do it because it really doesn't matter
16  whether he called her a dumbhead or the F word.  The
17  point of it to be relevant is that wardens
18  themselves don't always follow the rules and, thus,
19  there can be a security breach.  Other than that I
20  don't understand why it could be -- why it's
21  relevant.
22             MS. DAYTON:  Okay, fine.
23             MR. SHEEHAN:  How is the question going
24  to be asked because I have no confidence that it's
25  going to be asked unless you tell them not to.
```

5389

```
1              MS. DAYTON:  Thank you very much for
2   this vote of confidence.  I got it.
3              MR. SHEEHAN:  No, I need to know.  I
4   mean, I think this was ridiculous.
5              THE COURT:  I've articulated how it will
6   be asked.
7              (Sidebar concluded)
8       Q.   Sorry for the interruption.
9             Mr. Bezy, is it true that there was a
10  sustained allegation against you for using profane,
11  obscene, and otherwise abusive language with your
12  deputy warden while you were the warden at Terre
13  Haute?
14      A.   Yes.
15      Q.   And so is it fair to say that not everybody
16  always follows the rules and regulations of the
17  prison?
18      A.   Not -- I can't say that, no.
19      Q.   Well, you didn't, correct?
20      A.   That occurred at a daily closeout of my
21  executive staff.  There was six to eight people
22  there.  I asked her in front of everybody something,
23  she made a comment, I made a comment.  It was a
24  robust discussion.  I asked her, excuse me, to ask
25  her where the fuck she worked and was she really
```

5390

```
1    that stupid.  Okay, during my closeouts it was a
2    time we debated issues.  We had -- they could say
3    things to me at that point, I could say things to
4    them.  It was open debate.  It was their chance to
5    input.  That's the comment I made.
6         Q.   And this was in the context of discussing
7    the security of the prison, correct?
8         A.   Yeah.  We did that every day at 3:30 in the
9    afternoon.
10        Q.   And discussing the fact that prisoners were
11   making shanks out of plastic trays from where they
12   went to eat, correct?
13        A.   No, it was from the special housing unit.
14        Q.   So they were using plastic trays from the
15   special housing unit to make shanks?
16        A.   Yes.
17        Q.   So, you talked about the prison, the count
18   as of today.  Essentially, it's over 213,000
19   prisoners in federal custody, right?
20        A.   Correct.
21        Q.   216, you said?
22        A.   216.
23        Q.   And 179 of them are in BOP facilities?
24        A.   Correct.
25        Q.   And so the remainder --
```

5391

```
1              MR. SHEEHAN:  Your Honor, I think the
2    record is 179,000.
3         A.   Yeah.
4         Q.   179,000.  Sorry, I misspoke.  The remainder
5    are in privately-managed facilities; is that right?
6         A.   Privately-managed facilities, county jails,
7    home confinement, and local -- yes.
8         Q.   And so privately-managed facility including
9    like Wyatt correctional in Rhode Island; is that
10   correct?
11        A.   No, because they're detainees.  They're
12   under the care and custody of the U.S. Marshal
13   Service.  He hadn't been sentenced yet, so he's not
14   under the care of the Bureau.
15        Q.   And 93.5 percent of the prison population
16   is male; is that correct, approximately?
17        A.   Yeah, it sounds right.
18        Q.   And you said that over 6,000 -- I believe
19   you said over 6100 prisoners are serving life right
20   now.
21        A.   Correct.
22        Q.   And that's including over 5500 prisoners
23   for murder, aggravated assault and kidnapping?
24        A.   I believe that's what the figures say.
25        Q.   And approximately 100 for national security
```

5392

```
1    threats like terrorism and things like that.
2         A.   Uh-hum.
3         Q.   And then explosives, arson, serious sexual
4    offenses, drug-related offenses make up the majority
5    of the remainder of the prisoners; is that correct?
6         A.   Mainly drug offenses, yes.
7         Q.   And there is currently 57 inmates facing
8    the death penalty, correct?
9         A.   Correct.
10        Q.   And they're all at Terre Haute where you
11   used to work?
12        A.   Yes.
13        Q.   Or Terre Haute, is that the right way to
14   say it?
15        A.   Either way.
16        Q.   And Florence ADMAX that you talked about,
17   that has several levels of security, correct?
18        A.   The ADMAX.
19        Q.   Well, there is the ADMAX and then there is
20   a penitentiary and then there is a lower security
21   facility.
22        A.   It's a complex.  There is four institutions
23   there.
24        Q.   And there is -- the four institutions each
25   have a different level of security, correct?
```

5393

```
1         A.   Right.
2         Q.   And the ADMAX, the most secure one that you
3    were talking about, there are only 490 beds there,
4    correct?
5         A.   Correct.
6         Q.   And 430 of those are reserved for male
7    prisoners?
8         A.   They're all reserved for male prisoners.
9         Q.   Well, there are some female prisoners that
10   could go there, correct?
11        A.   For what?
12        Q.   For murder, for serious issues?
13        A.   There is a -- there is two or three females
14   right now with the sentence of death and they're in
15   Carswell, Texas, that are housed at a total separate
16   facility.  The Bureau wouldn't mix them like that.
17        Q.   And as of last week 449 of the beds ADMAX
18   were full, right, at Florence?
19        A.   Correct.
20        Q.   And you said, that 5 percent of prisoners
21   are sent directly there, classified directly to
22   Florence, correct?
23        A.   They're direct core commitments.
24        Q.   So that would be 22 people?
25        A.   Yeah.
```

5394

```
1    Q.   The other 95 percent of the inmates don't
2  go to Florence unless they're sent there from
3  another facility for having committed a serious
4  infraction at one of those other facilities,
5  correct?
6    A.   The Bureau will take state placements on
7  several occasions, too.
8    Q.   So, if someone commits a murder in a state
9  facility, it's possible that they would be housed at
10 Florence because the state doesn't have a sufficient
11 facility to hold them?
12   A.   Correct.
13   Q.   And the 5 percent that are sent directly
14 there are usually really high profile prisoners who
15 can't safely be housed somewhere else, right?
16   A.   No, it's the order of the court.
17   Q.   Well, didn't you say before that Bureau of
18 Prisons ultimately decides where people go, right?
19   A.   Correct, but if there is enough with the
20 courts, the attorney general, and U.S. attorney's
21 office.  The U.S. attorney is deemed to be a law
22 enforcement agency head.  He has the discretion to
23 make a strong recommendation into the ADX or
24 placement.  And being that the U.S. attorney works
25 for the AG, just like the director of the Bureau
```

5395

```
1  does, I would imagine it would happen.  I never saw
2  one that didn't happen.
3    Q.   So, the U.S. attorney really only makes
4  recommendation on separations; isn't that correct,
5  keeping people who could be dangerous to each other
6  separated from one another?
7    A.   No, they've made conditions of confinement
8  too.
9    Q.   And even a federal judge can't order you to
10 place somewhere -- someone at a particular prison;
11 isn't that right?
12   A.   I believe there was one judge that did
13 that, though.
14   Q.   But you don't have to follow that, do you?
15   A.   In this case, the Bureau did.
16   Q.   So, that's one?
17   A.   Right.
18   Q.   And the high profile people we are talking
19 about are people like Richard Reid who was the
20 attempted shoe bomber, correct?
21   A.   Correct.
22   Q.   And Robert Hanssen who is serving life for
23 espionage?
24   A.   Correct.
25   Q.   And Faisal Shazad who did the Times Square
```

5396

```
1  attempted bombing; is that right?
2    A.   If that's -- yeah.
3    Q.   Terry Nichols, the person who cooperated in
4  the Oklahoma bombing case against Timothy McVeigh?
5    A.   Correct.
6    Q.   And so it's people who have -- are very
7  high profile, in other words?
8    A.   Those, I think those people you just said
9  are on SAM, special administrative measures.
10 They're housed in a separate unit totally within the
11 ADX.
12   But those are some of the 5 percent that
13 would be sent, directly sent there regardless of
14 where they're housed, right?
15   A.   It's possible, yes.
16   Q.   And once they go there -- I'm sorry, you
17 said earlier that someone who is sent to ADX,
18 eventually, it's a three-year program, and they try
19 to program out?
20   A.   That's the ultimate goal of the program,
21 but it didn't always happen.
22   Q.   Can you explain to the jury what that means
23 to program out.  It's not lingo we use every day.
24   A.   Well, their confinement, when they go
25 before the review committee they look for any
```

5397

```
1  incident reports, misbehavior issues, they look at
2  their association with staff, that's a big key
3  thing, and whether the offense that put them in the
4  ADX has been mitigated enough to warrant their
5  moving through the program.
6    Q.   Okay.  And people in fact do step down and
7  go to lesser programs, right?
8    A.   Some.
9    Q.   You mentioned in fact that there are some
10 inmates at supermax who you put there in 1995,
11 right?
12   A.   Yes, ma'am, I moved them there, yes.
13   Q.   But that's only two, correct?
14   A.   No, I checked.  There is a few more than
15 two.
16   Q.   But not all 449?
17   A.   No.
18   Q.   Okay.  And even though Florence, which I'm
19 using Florence and supermax interchangeably, is very
20 secure, there are still assaults and homicides
21 there; is that correct?
22   A.   I believe there has been one homicide
23 there.
24   Q.   Okay.
25   A.   But then they changed the operation based
```

5398

```
1   on that, too.
2        Q.  Is that the 2005 murder of Manuel Torrez?
3        A.  Correct.
4        Q.  And he was beaten to death in the yard at
5   supermax, correct?
6        A.  Correct.
7        Q.  By Richard Santiago and Silvestre Rivera?
8        A.  Yes.
9        Q.  And Santiago was at supermax because he
10  killed a prison guard in Fresno, right?
11       A.  I'm not aware of what he did.
12       Q.  And in fact there was another murder at
13  supermax in 2008, Gary Douglas Watland killed
14  somebody.
15       A.  That was at USP, it wasn't the ADX.
16       Q.  But at Florence?
17       A.  There are four facilities there.  They each
18  have their own warden.  There are four distinct
19  separate facilities.  They do not all have the ADX
20  function, they all have their own function there.
21       Q.  But this would have been the place, for
22  instance, if he stepped down from supermax, he would
23  go, for instance, to the USP, right, at Florence?
24       A.  There is one unit there at the USP that is
25  set aside for their step program, step-down program.
```

5399

```
1   He could have gone to any of the 16 penitentiaries
2   that are open and functioning.
3        Q.  And he was -- he was serving a life
4   sentence for murder when he stabbed inmate Mark
5   James Baker in the head with a makeshift metal
6   shank, right?
7        A.  Correct.
8        Q.  Can you explain for the jury what a shank
9   is?
10       A.  It's a homemade weapon.
11       Q.  And how do they make it?
12       A.  Prison made.  They can make them a variety
13  of ways.  They can find a piece of steel, hone it on
14  the concrete, sharpen it.  They can mold a trash bag
15  into a weapon.  They can do a variety of different
16  options to make weapons.
17       Q.  And there are other types of weapons that
18  are used in prisons, too, right?
19       A.  Oh, yes.
20       Q.  Like locks, like combination locks?
21       A.  Uh-huh (indicating affirmatively).
22       Q.  I'm sorry, you need to say yes or no.
23       A.  Yes.
24       Q.  And sometimes they put those inside socks
25  so that they don't leave the same type of mark?
```

5400

```
1        A.  No, it gives them a better swing when they
2   do it.  It's not for marking purposes.
3        Q.  So, a better swing, and sometimes they
4   attach it to, like, a rope or string to get a better
5   swing, too?
6        A.  Yes.
7        Q.  What other kinds of weapons have you seen?
8        A.  Toothbrushes sharpened, pencils, SHU
9   strings.  Anything they can make.
10       Q.  It's dangerous, right?
11       A.  It's the environment.
12       Q.  And like a guard got stabbed in the eye at
13  the Metropolitan Correctional Center; is that
14  correct?
15       A.  Yes.
16       Q.  And he has permanent brain damage?
17       A.  Yes.  But again, there was policies and
18  procedures in place that weren't done that day that
19  allowed that to happen.
20       Q.  So it was the guard's fault?
21       A.  I'm not saying it's the guard's fault.  The
22  guard didn't do what he was supposed to do.  And
23  that's what happens most of the time when things
24  happens.
25       Q.  Okay.  But the person had created the shank
```

5401

```
1   prior to the day that the guard was stabbed in the
2   eye, correct?
3        A.  I can't speak, I wasn't there.
4        Q.  Okay.  And then in 2006, Tyler Bingham and
5   Barry Mills, I believe you are familiar with him,
6   were both convicted for racketeering and conspiracy
7   for ordering assaults and murders from their cells
8   at the Florence supermax, correct?
9        A.  Right.
10       Q.  And just in December of 2010, two guards
11  were assaulted by an inmate in supermax, right?
12       A.  I'm not aware of it.  It's possible, yes.
13       Q.  So even in a really secure prison, inmates,
14  if they want to, can attack a guard?
15       A.  It's possible.
16       Q.  And so you also talked about infractions in
17  prison, like the failure to stand for a count.  Not
18  every infraction sends a prisoner to SHU, correct?
19  To the special housing unit?
20       A.  No, there is different levels.  There is
21  the 100 level through 400 level.  And depending on
22  the level of the severity of the incident, sometimes
23  it's automatic lookup, sometimes it's not, it's a
24  lower level.
25       Q.  I'm sorry, go ahead.
```

5402

1    A.   For the lower level, it's not.

2    Q.   So, for instance, as you testified to

3 earlier, they may just lose their privileges for

4 phone calls, correct?

5    A.   There is a variety of sanction

6 opportunities that's available to the staff.

7    Q.   But is it fair to say that inmates -- I

8 mean, these are people who are convicted

9 criminals -- look for ways to exploit guards and/or

10 the weaknesses of the prisoner system -- I mean the

11 prison system?

12    A.   Some do.

13    Q.   And sometimes guards may have lapses in

14 procedures that allow assaults to happen more

15 easily; is that fair to say?

16    A.   Yes.

17    Q.   And in fact, there is just not enough

18 guards to watch every prisoner, correct?

19    A.   Well, staffing is set by Congress, funding.

20 And if Congress doesn't provide the money.  But

21 the -- you know, they're staffed up to 97 percent of

22 what they're supposed to be.

23    Q.   Well, Congress is notorious for not doing

24 very well with money; is that fair to say?

25    A.   Yeah.

5403

1    Q.   And you were talking about when you were at

2 Leavenworth you had 1200 prisoners and 250 staff,

3 correct?

4    A.   Correct.

5    Q.   But that wasn't 250 prison guards, was it?

6    A.   Yeah, I think it was -- yes, it was.

7    Q.   Doesn't staff include like the people who

8 serve the food and the people who take care of the

9 facilities in other manners?

10    A.   In the context I stated there was 200

11 correctional staff there, which included the

12 lieutenants, the captain and the correctional

13 officers.  There are extra staff.  Like I said, at

14 Terre Haute I had up to 650.  I only had

15 approximately 400, maybe 450 correctional staff, but

16 all of these other staff are qualified law

17 enforcement staff, too.

18    Q.   And with respect to the United States

19 prisons, that's where most people who are convicted

20 of very serious crimes go, correct?

21    A.   Correct.

22    Q.   And those you mentioned, the cell doors

23 open at 5:00 a.m., correct?

24    A.   Correct.

25    Q.   And they close somewhere between 8:45 at

5404

1 Terre Haute and maybe 10:00 p.m. somewhere else that

2 stays light later, correct?

3    A.   That's a call up to the warden.  He can

4 lockdown the evening whenever he feels like.  It's a

5 local call.

6    Q.   But generally speaking, 5:00 a.m. to

7 9:00 p.m. the cell doors are open, correct?

8    A.   Right.

9    Q.   And prisoners are allowed out of their

10 cells, you said, to work?

11    A.   Yes.

12    Q.   And to go for educational classes?

13    A.   Uh-huh (indicating affirmatively).

14    Q.   And to go for recreation?

15    A.   Yes.

16    Q.   And they recreate together, correct?  They

17 play basketball?

18    A.   At an open penitentiary, yes.

19    Q.   And they eat together?

20    A.   Yes.

21    Q.   So there are lots of prisoners in one place

22 at one time, fair enough?

23    A.   You limit it.  You control it.  That's why

24 you call the dining room, you call them in sequence.

25 You know.  You don't put them all in, the thousand

5405

1 in there at one time.  You feed them and push them

2 out.  In a rec yard, now the penitentiaries have

3 gone to a split compound where only half is out at

4 one time.

5    Q.   But even with all of these controls, is it

6 fair to say that there are dozens of serious

7 assaults on staff every year?

8    A.   Yes.

9    Q.   So in 2010, there were 59 serious assaults

10 on staff members; is that correct?

11    A.   It's possible, yes.

12    Q.   And in 2009, there was 107 serious assaults

13 on staff, correct?

14    A.   Yes.

15    Q.   And in 2008, there was 92 serious assaults

16 on staff, correct?

17    A.   If you say so.

18    Q.   And there was also a murder in 2008 of a

19 prison guard, correct?

20    A.   Yes.

21    Q.   Jose Rivera?

22    A.   Yes.

23    Q.   A veteran who had done two tours in Iraq,

24 he came back and worked in the prison for ten months

25 before he was stabled to death by two inmates.

5406

```
1     A.    Yes.
2     Q.    And they assaulted him with a homemade
3   knife, correct?
4     A.    Yes.
5     Q.    Chased him down and stabbed him to death.
6     A.    Yes.
7     Q.    And you are going to testify in that case,
8   too, aren't you?
9     A.    No, not yet.
10    Q.    You've been retained?
11    A.    Not officially, no.
12    Q.    What do you make an hour?
13    A.    I charge $175 an hour plus expenses.
14    Q.    And expenses including travelling expenses?
15    A.    Yes.
16    Q.    Testifying expenses?
17    A.    It's the same.  I just charge a flat rate.
18    Q.    What was your rate in this case?
19    A.    It's $175 an hour.
20    Q.    How many hours did you work on this case?
21    A.    The initial contract I believe was for
22  25 hours.
23    Q.    Okay.  And what's it up to now?
24    A.    It just whatever this -- how long I'm here.
25    Q.    And so since you've retired -- you retired
```

5407

```
1   in 2006, right?
2     A.    Correct.
3     Q.    Essentially what you've done, what you do
4   for a living now is to testify in cases about
5   alleged lapses in Bureau of Prisons policies?
6     A.    No, I'm retained by -- I've been retained
7   by private attorneys now.  I discuss prison related
8   issues.  Some of them are lapses in policy, correct.
9     Q.    Including how inmates who have already
10  murdered a guard can be safely housed in prison?
11    A.    We did it for years.
12    Q.    And you testified in the case of Mark Snarr
13  and Edgar Garcia?
14    A.    Correct.
15    Q.    Who stabled two prison guards?
16    A.    One.
17    Q.    Well, they stabbed one guard 23 times,
18  stabled a second guard who wouldn't give up his
19  keys, and then entered an inmate's cell, stabbing
20  him 50 times and killed, correct?
21    A.    I don't know.  I didn't count -- I don't
22  know the amount of stab wounds, but correct.
23    Q.    In addition to the staff assaults there are
24  about ten inmate homicides a year, right?
25    A.    That varies.
```

5408

```
1     Q.    Sometimes it's more?
2     A.    It could be.
3     Q.    Sometimes it's less?
4     A.    Right.
5     Q.    But regardless, too many people are dying
6   in the Bureau of Prisons?
7     A.    To sum it up, the Bureau does a good job
8   given what they have to deal with, the staffing,
9   everything else.  The Bureau does a good job.  They
10  set the standard for the corrections in this country
11  today.  They do a good job, but sometimes things
12  happen, and that's part of the nature of the beast
13  in the prison.
14    Q.    Things happen, like people slip their
15  cuffs.
16    A.    If they're put on correctly you can't slip
17  the cuffs.
18    Q.    Well, you can hit against the wall that
19  makes the double lock come undone, correct?
20    A.    If you are doing your job that doesn't
21  happen.
22    Q.    So, if someone fails to do their job
23  correctly by accident, they don't deserve to get
24  assaulted, correct?
25    A.    Correct.
```

5409

```
1     Q.    And in fact, just in Terre Haute where you
2   used to work, are you familiar with the assaults
3   from just this past month, May of 2011?
4     A.    I don't track them personally anymore, no.
5     Q.    But would it shock you to know that --
6         MR. SHEEHAN:  I'm going to object to the
7   form of the question.
8         MS. DAYTON:  Okay.  I'll rephrase.
9     Q.    Are you aware that an assault, there was
10  assault on staff in a housing unit that resulted in
11  that staff member's shoulder being dislocated?
12    A.    No, I'm not aware of that.
13    Q.    On the same day, May 2nd, 2011, an inmate
14  punched an officer in the face?
15        MR. SHEEHAN:  I'm going to object to
16  that.
17        THE COURT:  What's the basis of your
18  objection?
19        MR. SHEEHAN:  He already said he wasn't
20  aware of the incident and now she's asking -- I
21  object to the form of the question.
22        THE COURT:  I can't tell whether it's
23  the same incident or a different incident in the
24  same facility.
25        MS. DAYTON:  It's a different incident
```

5410

```
1    in a the same facility.
2              THE COURT:  Overruled.
3        Q.   And then on May 13th there were 11 inmates
4    fighting in the rec area.  Were you familiar with
5    that incident?
6        A.   No.
7        Q.   On May 16th, this is still Terre Haute, two
8    inmates were fighting with homemade shanks in the
9    SHU unit.
10       A.   No.
11       Q.   Are you familiar with Shannon Agofsky?
12   He's on death row?
13       A.   He came after I left.  But I know who he
14   is.
15       Q.   He was in for murder and then he killed an
16   inmate in one of those rec cages that you talked
17   about, right?
18       A.   Correct.
19       Q.   And now he's on death row as well?
20       A.   Yes.
21       Q.   Have you seen the photographs of what the
22   defendant did to his victims in this case?
23       A.   No.
24       Q.   Have you seen the photographs of the
25   assault on Anthony Armstead?
```

5411

```
1        A.   Yes.
2        Q.   That's a serious assault, isn't it?
3        A.   If you want to call it that, yeah.
4        Q.   This man -- was this is after he had,
5    Government's Exhibit 3 from the penalty phase, this
6    was after he had been washed up.  Would you consider
7    this a serious assault?
8        A.   Possible.
9        Q.   Possible?
10       A.   Yeah.
11       Q.   Okay.  And the fact that he got stitches
12   and staples on his face, this is Government's
13   Exhibit 4 from the penalty phase, his head was cut
14   open behind his ear, his eye, that someone should
15   get disciplined for that, right?
16       A.   Supposed to, yes.
17       Q.   So, you -- are you aware that the defendant
18   had a history of assaultive conduct before this
19   case?
20       A.   I read his DOC file and what Wyatt
21   provided, yes.
22       Q.   But were you provided, for instance, the
23   evidence in this case like the reports and things
24   like that?
25       A.   I did review the police report, yes.
```

5412

```
1        Q.   And so you've never interviewed the
2    defendant, right?
3        A.   No.
4        Q.   And you no longer work for the Bureau of
5    Prisons; is that fair?
6        A.   Correct.
7        Q.   And you haven't in five years.
8        A.   Correct.
9        Q.   So, you don't know where the defendant is
10   going to be designated, correct?
11       A.   I have a professional opinion on it, yes.
12       Q.   But you don't know where the defendant is
13   going to be designated, correct?
14       A.   No, I don't.
15       Q.   And you don't get a say in it, do you?
16       A.   No.
17       Q.   And you don't know whether he could
18   continue a pattern of assaultive conduct.
19       A.   It's possible.
20       Q.   Thank you.  Thanks for answering my
21   questions.
22             MS. DAYTON:  I have nothing further at
23   this time, your Honor.
24             THE COURT:  Redirect.
25   REDIRECT EXAMINATION
```

5413

```
1    BY MR. SHEEHAN:
2        Q.   Mr. Bezy, in these cases where you're
3    contacted by lawyers like myself who are appointed
4    by the court, how do you get paid?
5        A.   I submit a voucher and I wait until they
6    pay me.
7        Q.   And who do you submit the voucher to?
8        A.   Sometimes I sent it to the government,
9    sometimes I submit it to the attorneys.
10       Q.   And ultimately, you get paid by the court,
11   right?
12       A.   Yes.
13       Q.   I have no further questions.
14             THE COURT:  All right, thank you,
15   Mr. Bezy.  You may step down.  You are excused.
16             Will you call your next witness, please.
17             MR. SHEEHAN:  Yes.  James Shannon, your
18   Honor.
19             THE COURT:  All right, Mr. Shannon, if
20   you will remain standing with your right hand
21   raised, the oath will be administered to you.
22             J A M E S   S H A N N O N
23   Having first affirmed, was examined and testified as
24   follows:
25             THE WITNESS:  My name is James Shannon,
```

5414

1  last name is spelled S-h-a-n-n-o-n, and I live in
2  Bridgeport, Connecticut.
3          THE COURT:  You may proceed.
4          MR. SHEEHAN:  Thank you, your Honor.
5  DIRECT EXAMINATION
6  BY MR. SHEEHAN:
7      Q.   Good afternoon, Mr. Shannon.
8      A.   Good afternoon.
9      Q.   And you told the members of this jury that
10 you live in Bridgeport.  How long have you lived in
11 Bridgeport?
12     A.   All my life.  63 years now.
13     Q.   And when did you graduate from college?
14     A.   1969.
15     Q.   And what was your undergraduate degree in
16 college?
17     A.   I was a psychology major.
18     Q.   And after graduating from college, what did
19 you do next?
20     A.   I became a teacher in the Bridgeport
21 schools.
22     Q.   And how did you jump from a psychology
23 major right into a teacher slot?
24     A.   Well, they had a program there that allowed
25 you to get a Master's degree in a short period of

5415

1  time.  It was two years, I believe.  It was through
2  the summer and one school year and you become a
3  teacher.  And I was able to teach temporarily until
4  I had that Master's degree.
5      Q.   Where did you get your Master's degree in
6  teaching?
7      A.   University of Bridgeport.
8      Q.   So, you started teaching in the Bridgeport
9  public schools.  What level?  What grade level were
10 you teaching?
11     A.   Seventh and eighth grade.
12     Q.   And how long did you teach at that level?
13     A.   Thirteen years.
14     Q.   And after that -- or actually while you
15 were pursuing -- while you were teaching, were you
16 also pursuing further education?
17     A.   Yes, I was pursuing a degree in school
18 psychology.
19     Q.   And did you ultimately get a Master's in
20 that?
21     A.   Yes, I did.
22     Q.   And did you also get a Master's degree in
23 any other area?
24     A.   Yes, I have a Master's degree in marriage
25 and family therapy as well as school psychology.

5416

1      Q.   And so we've got you now, 1969, so let's
2  add 13, so that's 1982, thereabouts.  Did you change
3  your position at that time?
4      A.   Yes I became a school psychologist, and I
5  was a school psychologist for approximately
6  15 years.
7      Q.   And after being -- was that also in the
8  Bridgeport public schools?
9      A.   Yes, it was.
10     Q.   And how did it work as being a school
11 psychologist?  Were you assigned to one school or
12 did you bounce around from school to school?
13     A.   We usually had a few schools we needed to
14 cover.
15     Q.   And after being a school psychologist for
16 15 years, did you get another position within the
17 Bridgeport public schools?
18     A.   Yes, I became the director of pupil
19 services for the Bridgeport schools.
20     Q.   And how long did you occupy that position?
21     A.   For five years.
22     Q.   And what are you doing now?
23     A.   I'm working part-time as a school
24 psychologist still with the Bridgeport schools.
25     Q.   And how long have you been sort of

5417

1  partially retired?
2      A.   Three years now.
3      Q.   And tell us just a little bit, what did you
4  do as the director of pupil services.  What does
5  that involve?
6      A.   Well, the responsibilities were varied and
7  many.  I was in charge of the guidance counselors
8  with the school system, I was in charge of
9  suspension and expulsion, the alternative programs,
10 school nurses, code of discipline, many different
11 responsibilities.
12     Q.   And going back to when you were a school
13 psychologist, what was your primary function at that
14 time?  What would you do within the schools?
15     A.   Well, we would go to the schools and we
16 would do a psychological evaluation.  If there was
17 any suspicion of youngsters having learning
18 problems, if there was any suspicion that they
19 needed some special education services, we'd do a
20 psychoeducational evaluation.
21     Q.   Is that primarily involved with what they
22 call the PPT process?
23     A.   The PPT process is what happens prior to
24 doing the evaluation, yes.
25     Q.   So, you are setting up kids who are in need

5418

```
1   of special educational services?
2       A.   Or evaluating them, yes.
3       Q.   Did you also provide some counseling
4   services when you were a school psychologist?
5       A.   Yes.   I became involved very often with the
6   families of the youngsters that I was dealing with.
7   If there were referred to me because of behavior
8   problems, I would try to solicit the support of the
9   family to help get the youngster become more
10  successful, whether it was at home or at school.
11      Q.   And did your teaching in marriage and
12  family therapy in any way change your focus as far
13  as being a school psychologist, or at least expand
14  it?
15      A.   Yes.   I really tried to focus on working
16  with the families to try to utilize their strength
17  and support in helping youngsters be more successful
18  when it wasn't an educational problem, academic
19  problem, rather.
20      Q.   And now let me ask you this question:   Do
21  you remember meeting the defendant, Azibo Aquart?
22      A.   Yes.
23      Q.   And where was it that you first met him?
24      A.   One of my assignments was the Mead Hall
25  Detention Center, which was a detention center for
```

5419

```
1   youthful offenders.   And when I went there the staff
2   asked me if I would sit and talk with him.
3       Q.   And did they ask -- did they tell you or
4   give you an indication of why they wanted you to
5   talk to you him?
6       A.   All of the staff seemed to like him.   He
7   was a likable youngster.
8           MS. RODRIGUEZ-COSS:   May we approach at
9   this moment?   May we approach?
10          THE COURT:   Is there an objection?
11          MS. RODRIGUEZ-COSS:   Yes, ma'am.
12          THE COURT:   I'll hear you.
13          (Sidebar conference)
14          MS. RODRIGUEZ-COSS:   So what we were
15  told, Mr. Shannon's testimony would be limited to
16  the four corners of this piece of paper right here,
17  and now we're going into a completely different
18  area.   We have requested notes, we have requested
19  other reports, we have requested data, and we have
20  received nothing because it was represented to us
21  that there was nothing.   And so now not only are we
22  hearing Mr. Shannon has a vivid recollection of this
23  youngster, the defendant, outside of this report,
24  but he's coming up with information that another
25  person --
```

5420

```
1           MR. SHEEHAN:   That what?
2           MS. RODRIGUEZ-COSS:   Information that
3   another person has provided him.   We continuously
4   filed discovery requests, particularly with respect
5   to Mr. Shannon mand we were given nothing.
6           MR. SHEEHAN:   There is nothing.
7           THE COURT:   All right, so he has no
8   notes.
9           MR. SHEEHAN:   Right.
10          THE COURT:   He has no records.   He just
11  has his independent recollection.
12          MR. SHEEHAN:   That's all.   He met him,
13  we're going to move on.
14          MS. RODRIGUEZ-COSS:   The Court, I
15  thought, was very clear when we had a hearing
16  pertaining to Mr. Shannon's testimony that his
17  testimony would be limited to this report and what's
18  stated on this piece of paper right here.
19          MR. SHEEHAN:   No, he's talking about how
20  he met him.   He met him there at Mead.
21          MS. RODRIGUEZ-COSS:   He referred to he's
22  at school.   He's in Hooker school.
23          THE COURT:   That's what he's talking
24  about now.
25          MR. SHEEHAN:   As they know from the
```

5421

```
1   school record if they look at them, he starts at
2   Hooker, he goes to Mead Hall, he goes back to
3   Hooker.   It's all in that school year.   It's all in
4   the records.   They're in evidence.
5           MS. RODRIGUEZ-COSS:   Does the witness
6   have any notes that have been used to refresh his
7   recollection with regard to this?
8           MR. SHEEHAN:   No.
9           MS. RODRIGUEZ-COSS:   We'd like to see
10  those notes.
11          MR. SHEEHAN:   I know you'd like to see
12  them, but they don't exist.
13          THE COURT:   It seems to me this is
14  context for how he knows him and then we'll get into
15  the substance of this.
16          So you may proceed.
17          (Sidebar concluded)
18      Q.   Mr. Shannon, you indicated that you first
19  met Azibo at Mead Hall.
20      A.   Yes.
21      Q.   And the guards asked you to meet him there.
22      A.   Yes.
23      Q.   Right?
24          How often would you go to Mead Hall?
25      A.   Once a week.
```

5422

```
1    Q.   And when you met Azibo at -- actually, let
2  me ask you this:  Did you ever do an evaluation of
3  Azibo?
4    A.   No, I did not.
5    Q.   If it had been a school referral --
6    A.   Yes.
7    Q.   -- initially a school referral, would your
8  normal process have been to do an evaluation?
9    A.   Not necessarily.  We would first talk with
10 the teachers and see what interventions we could
11 provide to see if the youngster would respond to
12 that.  The last thing we would do is do a
13 psychological evaluation.
14   Q.   And in this case you never did one, right?
15   A.   No, no one asked.
16   Q.   And then when you met him at Mead Hall --
17   A.   Yes, sir.
18   Q.   -- did he tell you anything about his own
19 circumstances?
20   A.   Yes, he did.
21   Q.   What did he tell you?
22   A.   He told me that he had just lost his mom,
23 and he had something in his possession, I can't
24 recall what it was, it was a newspaper article or a
25 note from her, but he was holding onto it.  It was
```

5423

```
1  like a prized possession, and it gave me the
2  impression that he was grieving at that time.
3    Q.   And did you later see -- meet his brother?
4    A.   Yes.
5    Q.   Azizi?
6    A.   Yes, I did.
7    Q.   And what was, so we have -- Azibo is at
8  Mead Hall, and then subsequently did he go back to
9  school at Hooker?
10   A.   Yes, he did.
11   Q.   And did you meet with Azibo and Azizi on a
12 number of occasions at Hooker school?
13   A.   Yes, I did.
14   Q.   And what was -- who was taking care of
15 Azibo while he was at Hooker school?
16   A.   Azizi, his brother.
17   Q.   And do you remember what Azizi's situation
18 was, his own personal situation was at that time?
19   A.   Do you know, I've been wracking my brain
20 trying to remember these things.  It's been a long
21 time.  But I do remember that he was also a young
22 fellow who had just lost his mother, and I think he
23 was just a couple years older than Azibo at the
24 time, and it was my impression that he was
25 struggling.  He had a child.  He talked to me about
```

5424

```
1  going back to school.  I remember he accompanied him
2  one day to the courtroom and he had the baby in tow
3  with him when he went to stand with his brother
4  before the judge.
5    Q.   And was Azizi expressing any difficulties
6  that he was having with Azibo at that time?
7    A.   I can't recall if he was expressing
8  anything specifically, but it was my recollection
9  that he was frustrated with Azibo and Azibo's lack
10 of response to his rules.
11   Q.   Did you tell him -- did you get the
12 impression that Azibo was pushing on the boundaries
13 of the limits?
14   A.   Yes, yes.
15   Q.   And do you remember specifically talking to
16 Azibo back at Hooker and giving him a pen?
17   A.   Yes, I did.  I remember.
18   Q.   And what sticks in your mind about that?
19   A.   Well, Hooker still wasn't one of the
20 schools that I was assigned, I just went to Hooker
21 on subsequent occasions after Azibo left the
22 detention center specifically to see him.  And one
23 day I brought a pen, and I told him that the pen
24 represents freedom, because the youngsters in the
25 detention center weren't allowed to have pencils or
```

5425

```
1  pens, they would take them from them.  They were
2  very strict about making sure they didn't have them.
3        So, I brought the pen to him and I said,
4  I want you to look at it this pen and try to
5  remember this represents freedom.  This is something
6  you should hold on to it when you look at it to try
7  to remember, you know, to behave yourself so you
8  don't get in trouble.
9    Q.   And at that point in time did you
10 understand as well that Azibo's father was in
11 prison?
12   A.   Yes.
13   Q.   And at some point later on down the road in
14 September -- or, I'm sorry, in March of '96, were
15 you asked to provide a letter in the context of some
16 DCF or juvenile proceedings?
17   A.   Yes.
18   Q.   And let me show you this document and ask
19 if this is the letter that you provided.
20   A.   Yes, it is.
21        MR. SHEEHAN:  Your Honor, I would offer
22 at this time Defendant's Exhibit DDD.  I understand
23 there is no objection.
24        THE COURT:  All right, it is an exhibit.
25   Q.   First, I'm going to start at the top and
```

5426

```
1   see here if that date, that March 19, 1996, does
2   that sound about right to you?
3       A.   Yes.
4       Q.   And at that point in time, the first
5   paragraph indicates that Azibo has been
6   participating in family and individual therapy.  Was
7   it a structured kind of therapy that you were
8   providing?  Can you tell us what kind of counseling
9   you were providing at that point?
10      A.   It really wasn't a structured kind of
11  particular therapy.  It was just really kind of
12  talking to him and listening to him and, you know,
13  just trying to be an advocate for him.
14      Q.   And then the next paragraph -- and I am
15  just going to read that into the record.  "Azibo is
16  a bright, articulate young man who has been candid
17  and cooperative in each of our sessions."
18          Was that true at the time you wrote that?
19      A.   Yes.
20      Q.   And then it proceeds, "Initially our
21  session included his older brother and guardian,
22  Azizi Aquart, who also demonstrates an intellectual
23  strength and well-developed communication skills."
24          And was that true as well?
25      A.   Yes.
```

5427

```
1       Q.   Now, had both of them talked to you about
2   the loss that they suffered from the death of their
3   mother?
4       A.   Azibo did.  I don't recall if Azizi did.
5       Q.   And let me ask you this:  You also noted
6   that Azizi has assumed the guardianship of his two
7   younger brothers.  And you also referenced his own
8   family responsibilities and the fact that he was
9   attempting to further his education at the college
10  level.
11      A.   Yes.
12      Q.   Did you have an opinion at that time
13  whether Azizi had sufficient, a sufficient level of
14  experience and maturity to be the parent for his
15  youngest brother?
16      A.   No, my impression was that he was really
17  struggling in trying to take care of his younger
18  brother.
19      Q.   You also indicated in that letter that
20  there was a mutual respect and emotional bond that
21  existed between the brothers.  Is that something
22  that you observed?
23      A.   Yes.
24      Q.   But you noted that it is your concern that
25  Azibo has and may continue to push against the
```

5428

```
1   boundaries and rules that Azizi has imposed.
2       A.   Yes.
3       Q.   This certainly puts Azibo at risk.  Is that
4   also true?
5       A.   Yes, it is.
6       Q.   Let me ask you this:  Based on your
7   experience as a psychologist, is it unusual for
8   15-year-olds or 14-year-olds to push against
9   boundaries?
10      A.   Is it unusual?
11      Q.   Right.
12      A.   No.
13      Q.   Is it unusual for 14-year-olds to push
14  against rules?
15      A.   Absolutely.  Adolescents push against
16  rules, yes.
17      Q.   And is there a difference, in your
18  experience anyway, between the ability of an older
19  brother who is 18 to effectively impose boundaries
20  and rules than there would be with respect to a
21  parent of a child?
22      A.   Well, he certainly did impress me that he
23  was struggling imposing the rules on Azibo, and
24  Azibo was pushing against the boundaries and
25  subsequently getting in trouble.  This is something
```

5429

```
1   I talk to parents all the time about as far as
2   providing rules and boundaries with youngsters,
3   particularly adolescents.
4       Q.   And what's the significance of having of
5   having those kind of effective presentation of rules
6   and boundaries?  How does that work in case?
7       A.   There is a quality we call resilience, and
8   resilience is a term that refers to a youngster's
9   ability to be successful in life and negotiating the
10  turbulence of adolescence, and they're created by
11  protective factors.  And parents instill these
12  protective factors in children.  One of them is
13  self-control.  And that's done by providing rules,
14  boundaries and limits for the youngsters to follow.
15      Q.   And do you have an opinion as to whether a
16  18-year-old is generally an effective boundary
17  setter for a 14 year old?
18      A.   It would be very difficult.
19      Q.   You mentioned protective factors.  Is there
20  a protective factor that is critical in your
21  opinion?
22      A.   Well, there are several protective factors,
23  and it really amounts to a social and emotional
24  strength.  One of them is attachments.  That means
25  love and nurturing of an adult in your life, that is
```

5430

1  primary.  And the second is teaching them
2  self-control through providing boundaries and rules
3  and limits.  And there is a metaphor that I share
4  with parents.  Would you like me to share it with
5  you?
6      Q.   Yes.  If you would share it with the jury.
7      A.   I talk to parents oftentimes about being
8  out on the bow of a boat and imagining you are out
9  at the bow of the boat and the boat is well at sea,
10 how you might feel without any guardrail.  And then
11 ask them to imagine -- of course the usual response
12 is they're anxious and nervous way out on the bow of
13 the boat.  And I ask them to imagine a big, strong
14 iron guardrail appears, how they might feel.  And
15 they say they feel safe and secure.
16          And I say our children, your children
17 and my children are on that boat, bow of that boat,
18 and the guardrail is made up of those rules and
19 limits we provide for our children.  And that makes
20 them feel safe on an emotional level.  And you might
21 ask if it makes them feel safe on an emotional
22 level, why do they give us a hard time when we put
23 rules in place.  And I would say just imagine you on
24 the bow of the boat and you might push on the
25 guardrail to see if it's strong, if it's going to

5431

1  hold you in good stead if it starts to get rough out
2  here at sea.  If the guardrail goes over, now the
3  belief is, maybe I have to keep pushing harder to
4  see if the guardrail is here.
5          So I use that metaphor to describe to the
6  parents when children are giving us a hard time,
7  they're really just testing the boundaries and we
8  need to stay strong with them.  So that the
9  turbulence we often experience with adolescents,
10 they're pushing on the boundaries, and us as
11 parents, we have to provide that strong boundary.
12 But the nice part of the story is that once they
13 feel the strength of the boundary, then they stop
14 pushing on it and we have less tension on us.
15     Q.   And why is it that a parent, an effective
16 parent might have more of an ability to do that than
17 a sibling who is close in age to his younger
18 sibling?
19     A.   Well, for a variety of reasons.  They don't
20 have the -- oftentimes they don't have the authority
21 that a parent might have.  And it was my impression
22 that he was just thrust into this role with the
23 death of his mom.  So he hadn't had a lot of
24 experience in dealing with a brother who is just a
25 couple years younger.

5432

1      Q.   And on this, the second to last paragraph
2  here where you noted that Azibo is a salvageable
3  youngster who is at a critical point in his
4  development, was that what you felt at that time?
5      A.   Yes, that was my impression at the time.
6          MR. SHEEHAN:  I don't have any further
7  questions, Mr. Shannon.
8      Q.   Let me ask you this:  Before today, had you
9  seen Azibo since back in 1996?
10     A.   No, I haven't seen him since 1996.
11     Q.   All right.  And before we showed you a copy
12 of this letter --
13     A.   Yes.
14     Q.   -- did you have in your -- did you actually
15 have this letter in your possession?
16     A.   No, I didn't.  No.
17     Q.   And did you have in your possession any
18 notes or reports about any of your meetings with
19 Azibo?
20     A.   No, no.
21     Q.   And Azizi?
22     A.   No, I had nothing.  There was no official
23 documents because I never did an evaluation.
24     Q.   Okay.
25          MR. SHEEHAN:  I have no further

5433

1  questions, your Honor.
2          THE COURT:  All right.
3  Cross-examination.
4  CROSS-EXAMINATION
5  BY MS. RODRIGUEZ-COSS:
6      Q.   Good afternoon, sir.  So, you hadn't seen
7  your letter since 1996?
8      A.   No.
9      Q.   And you hadn't seen the defendant?
10     A.   No.
11     Q.   And you hadn't had any occasion to go back
12 to your -- any file with regards --
13     A.   No.
14     Q.   -- to Azibo Aquart?
15     A.   No.
16     Q.   So, you are basically testifying from
17 having reviewed your letter?
18     A.   That's correct.
19     Q.   Because this all took place 15 years ago.
20     A.   That's correct.
21     Q.   Do you know when the defendant's mother
22 died?
23     A.   No, I don't know exactly when.
24     Q.   All right.  Would it -- so, you met with
25 him in the fall of '95, was it, or '96?  Because

5434

```
1    your letter --
2         A.   I believe it was in the fall of '95.
3         Q.   All right.  And you are not aware that his
4    mother had died actually in May of '94?
5         A.   I wasn't sure exactly when, no.
6         Q.   And he wasn't referred to you because of
7    the loss of his mother, right?
8         A.   No.
9         Q.   He was referred to you for behavioral
10   problems.
11        A.   I don't even recall that there were
12   behavioral problems.
13        Q.   I thought you just testified that he was --
14             MR. SHEEHAN:  Your Honor, I would just
15   ask that he be allowed to answer the question.
16             THE COURT:  Yes.
17             MS. RODRIGUEZ-COSS:  I'm sorry.  I
18   apologize.
19        Q.   Go ahead, Mr. Shannon.
20        A.   When I went to Mead Hall the staff referred
21   him to me, but I don't believe it was because of him
22   demonstrating any behavioral problems in juvenile
23   hall.  They just asked me to speak with him.  They
24   thought he would be a good candidate to speak with
25   me.
```

5435

```
1         Q.   So, but he was in Mead Hall because he had
2    committed --
3         A.   Yes.
4         Q.   -- juvenile violations.
5         A.   Yes.
6         Q.   Which are really criminal violations, only
7    when you are younger than 18 they're called juvenile
8    violations?
9         A.   Yes.
10        Q.   Do you know what those violations were?
11        A.   I think it was a marijuana charge.
12        Q.   All right.  And he was intellectually fine,
13   right?
14        A.   Yes, he seemed to be.
15        Q.   In fact, you found him to be quite
16   articulate.
17        A.   Yes.
18        Q.   And you didn't notice any learning
19   disabilities, right?
20        A.   No.
21        Q.   And you certainly didn't see any need to
22   have him psychologically evaluated, otherwise you
23   would have asked for that.
24        A.   Correct.
25        Q.   And you certainly didn't see any need to
```

5436

```
1    have him referred to a psychiatrist, otherwise you
2    would have.
3         A.   Correct.
4         Q.   Nor did you have him assessed for any sort
5    of brain damage because you didn't notice any sort
6    of impairment.
7         A.   Correct.
8         Q.   All right.  And you were impressed that his
9    older brother had also demonstrated intellectual
10   strength.
11        A.   Si.  Yes.
12        Q.   All right.  I haven't had that one in a
13   while.
14             And you did note that there was respect
15   and a particular bond between the brothers.
16        A.   Yes.
17        Q.   And so, and you also didn't note that there
18   was anything wrong with the rules and the boundaries
19   that Azizi was trying to impose.
20        A.   Wrong with the rules?
21        Q.   Right.  You didn't.
22        A.   No.
23        Q.   You didn't find anything wrong with what
24   Azizi was trying to do.
25        A.   No.
```

5437

```
1         Q.   In fact, it was the defendant would kept
2    pushing against those boundaries.
3         A.   Yes.
4         Q.   And those rules.
5         A.   That is correct.
6         Q.   An antisocial character would push against
7    rules and boundaries, wouldn't it?
8         A.   Yes.
9         Q.   And you felt that Azibo Aquart needed to
10   have the rules reinforced to him at all times.
11        A.   Yes.
12        Q.   You recommended that he be placed in a
13   residential home where he would have staff
14   reenforcing those rules 24/7.
15        A.   Well, I thought that he needed an
16   environment where there were some boundaries and
17   rules that were enforced, yes.
18        Q.   And there are times where children are in
19   fact referred to residential homes where rules and
20   regulations and boundaries are enforced
21   continuously, but nonetheless, they fail to
22   function; isn't that correct?
23        A.   Yes.
24        Q.   In this case there is no way for you to
25   know --
```

**GA1402**

5438

1    A.    No.
2    Q.    -- whether he would have performed
3  adequately in that.
4    A.    No, that's correct.
5    Q.    In that environment.
6    A.    That's correct.
7    Q.    In fact, there are people or children who
8  are referred to those sorts of environments and
9  still go on to commit murder or assaults?
10   A.    I would guess.
11   Q.    You would guess or you would agree with me?
12   A.    Well, I don't know of any specific
13  instance.
14   Q.    So, you don't know of any specific instance
15  where you've had that happen in cases where you've
16  worked?
17   A.    Correct.
18   Q.    And you described the defendant at that
19  time as someone who you thought was salvageable?
20   A.    Yes.
21   Q.    Does that mean you thought he could be
22  redirected?
23   A.    Yes.
24   Q.    And have you written that about other
25  children that you had in counseling sessions or

5439

1  assisted?
2    A.    Oh, yes.
3    Q.    Throughout the school years?
4    A.    Sure.
5    Q.    And have some of them sometimes
6  disappointed you nonetheless?
7    A.    Yes.
8    Q.    When you wrote the letter, you were trying
9  to keep him out of juvenile detention; is that
10  correct?
11   A.    Yes.
12   Q.    That was what the court was considering,
13  correct?
14   A.    Yes.
15   Q.    And you were trying to assist in the
16  defendant's staying out of juvenile detention.
17   A.    That's correct.
18   Q.    And when I say "juvenile detention," we are
19  talking about a lockdown facility, correct?
20   A.    Yes.
21   Q.    So you wrote the report in an effort to
22  assist the Court, but also assist the defendant; is
23  that correct?
24   A.    Yes.
25   Q.    You would agree with me that the Court

5440

1  would have at that time had more information than
2  you had.
3    A.    Sure.
4    Q.    The court would receive information from
5  probation officers.
6    A.    Yes.
7    Q.    They'd receive information from family and
8  friends.
9    A.    Yes.
10   Q.    They'd receive information from social
11  workers.
12   A.    Yes.
13   Q.    And ultimately, the court declined to
14  follow your recommendation; is that correct?
15   A.    Yes.
16         MS. RODRIGUEZ-COSS:  Nothing further,
17  your Honor.
18         THE COURT:  Redirect.
19         MR. SHEEHAN:  No, I'm all set with
20  Mr. Shannon.  Thank you very much.
21         I wonder if we could -- just.
22         THE COURT:  Let me excuse Mr. Shannon.
23  Thank you sir, you are excused.  You may step down.
24         (Discussion held off the record)
25         THE COURT:  All right, ladies and

5441

1  gentlemen, we're going to finish for the day right
2  now and we will be back at 9:30 tomorrow.  Our
3  anticipation, but that is not always borne out, is
4  that we will finish the evidence tomorrow.  You will
5  recall that we are then not sitting for Wednesday,
6  Thursday and Friday.  And so if the schedule is as
7  anticipated, you will come back on Monday for the
8  instructions of law and the closing arguments and
9  will begin your deliberation.  So you should plan to
10  be here all day.  All right.
11         Very well then, we'll see you tomorrow
12  at 9:30.
13         (Jury exited the courtroom.)
14         THE COURT:  All right, then I will see
15  you at quarter to four.
16
17
18
19
20
21
22
23
24
25

5442

```
                    I N D E X

WITNESS                                    PAGE

LORETTA JAY

Direct Examination by Mr. Smith            5229

Cross-Examination by Mr. Markle            5241

Redirect Examination by Mr. Smith          5250

Recross-Examination by Mr. Markle          5251


DIANE HART D'AMATO

Direct Examination by Mr. Smith            5252

Cross-Examination by Mr. Markle            5263


JONATHAN DAVIS

Direct Examination by Mr. Smith            5276

Cross-Examination by Ms. Dayton            5296

Redirect Examination by Mr. Smith          5307

Recross-Examination by Ms. Dayton          5308


MARY McCOY

Direct Examination by Mr. Smith            5309

Cross-Examination by Ms. Rodriguez-Coss    5325
```

5443

```
MARK BEZY

Direct Examination by Mr. Sheehan          5327

Cross-Examination by Ms. Dayton            5537

Redirect Examination by Mr. Sheehan        5412


JAMES SHANNON

Direct Examination by Mr. Sheehan          5413

Cross-Examination by Ms. Rodriguez-Coss    5433
```

        I certify that the foregoing is a correct

transcript from the record of proceedings in the

above-entitled matter.

                    6/7/11
                    Date


                    /S/  Sharon Montini
                    Official Reporter

---

5444

```
            UNITED STATES DISTRICT COURT

             DISTRICT OF CONNECTICUT

* * * * * * * * * * *        *
                             *
UNITED STATES OF AMERICA,    * Case No 6cr160(JBA)
                             *
         Plaintiff,          *
                             *
      vs.                    *
                             * June 7, 2011
AZIBO AQUART                 *
                             *
         Defendant.          *
                             *
* * * * * * * * * * * *      *

               TRIAL TRANSCRIPT

               VOLUME XXVIII

BEFORE:  THE HONORABLE JANET BOND ARTERTON U.S.D.J.,
                                        and jury

Appearances:
FOR THE GOVERNMENT:   ALINA REYNOLDS, ESQ
                      TRACY DAYTON, ESQ.
                      PETER MARKLE, ESQ.
                      JACABED RODRIGUEZ-COSS
                      United States Attorney's Office
                      915 Lafayette Blvd
                      Bridgeport, CT 06604


FOR THE DEFENDANT     MICHAEL SHEEHAN, ESQ
AZIBO AQUART:         Sheehan & Reeve
                      139 Orange Street
                      New Haven CT 06510

                      JUSTIN SMITH, ESQ.
                      383 Orange Street
                      New Haven, CT 06511


Court Reporter:    Sharon Montini, RMR

Proceedings recorded by mechanical stenography,
transcript produced by computer
```

5445

        THE COURT:  Good morning, counsel,

ladies and gentlemen, Mr. Aquart.  Please be seated.

        I'm aware that we are coming to the end

of the evidence in this case.  Mr. Sheehan advises

that you will not be calling Dr. Lewis.

        MR. SHEEHAN:  Correct, your Honor.  We

have two witnesses, and then there is the question

-- the first question we're hoping we could address

was the Johnson statements.

        THE COURT:  Okay, before I do that, I

want to address Mr. Aquart.

        Sir, you have the right to testify at

this stage.  It's the same right that I described to

you at the guilt phase, although obviously your

testimony would be of a different nature.  If you

testified you would be subject to cross-examination,

but it is your right, it is your decision, but you

should make that decision with the assistance of

your very able counsel.  It's your right not to

testify, it's your right to testify.  I will, if you

choose not to testify, as you heard me before, I

will instruct the jurors that they can't hold that

against you.

        There is also an open question about

whether you can allocute, which means, in essence,

5446

```
1   make a statement to the jurors who are performing
2   this sentencing function, while not under oath and
3   not subject to cross-examination.  And there has
4   been a motion, I think it's by the government, to
5   prohibit that.  It is a question I have not ruled
6   on, but if you were so inclined, I would rule on
7   that, and then you could make your decision
8   accordingly.
9            On the other hand, if it is your
10  determinations you aren't going to say anything
11  under any circumstances, then I would not need to
12  make that ruling.  But I need you to be sure to talk
13  to Mr. Sheehan and Mr. Smith and to be able to tell
14  me what your decision is going to be such that I can
15  be assured that you know you have this right to
16  testify and the right not to testify.
17           And if you are considering an allocution,
18  as I've described that to you, then I will rule on
19  whether or not you can do that.  Okay?
20           THE DEFENDANT:  Yes, your Honor.
21           MR. SMITH:  Your Honor, I've already had
22  that discussion with Mr. Aquart this morning.  My
23  understanding is he does not wish to either testify
24  or allocute.
25           THE COURT:  Have you -- you have had
```

5447

```
1   that discussion, then, Mr. Aquart?
2            THE DEFENDANT:  Yes, your Honor.
3            THE COURT:  All right.  And you have now
4   made up your mind, and either way, under either form
5   of addressing the jury, you are not going to do
6   that; is that correct.
7            THE DEFENDANT:  Yes.
8            THE COURT:  All right.  And you
9   understand that you could do that.
10           THE DEFENDANT:  Yes, I choose not to.
11           THE COURT:  So we will -- I will
12  consider that you are well advised and that you have
13  made an informed and knowledgeable decision.  Okay.
14           Now, the issue raised by the defendant's
15  motion to admit certain statements from Efrain
16  Johnson made to law enforcement raises very
17  difficult questions with respect to admissibility of
18  evidence at a penalty phase in a capital case.  The
19  case law is not easily guiding the outcome of this
20  decision.  I think the only two cases that the
21  government relied on that dealt with precluding
22  defendant's evidence at a penalty phase going to
23  either an aggravator or a mitigator are the Buchanan
24  decision from the Fourth Circuit and the Davis
25  decision also from the Fourth Circuit.
```

5448

```
1            I have looked at all of the cases that
2   the parties have cited and find the greatest
3   guidance to come in a more general form from Fell,
4   relying in part or following the precepts of Gregg,
5   that the heightened reliability that is sought at
6   the penalty phase is achieved by more, not less,
7   evidence on the aggravating and mitigating factors
8   for the jury to consider so long as it is relevant,
9   so long as it doesn't unfairly prejudice the
10  defendant and so that it doesn't confuse the jury.
11  Fell recognizes that the evidence at this stage is,
12  "more diffuse," than that which is relevant at the
13  guilt phase.
14           The factors I have looked at after
15  considering the arguments on both sides --
16           MS. DAYTON:  Your Honor, I'm sorry, may
17  I interrupt you for a moment, because yesterday you
18  didn't let me respond.  You didn't let me -- you
19  didn't give me an opportunity because the jury came
20  back in and you said that you would let me respond
21  and that I would have additional time to argue on
22  this.
23           THE COURT:  Why do I have all these
24  notes about what you were arguing?
25           MS. DAYTON:  Well, I had spoken, then
```

5449

```
1   Mr. Sheehan spoke, and then you said you were going
2   to give me an opportunity to respond.
3            THE COURT:  All right.
4            MS. DAYTON:  And I think some of the
5   things that I wanted to say with respect to the
6   unreliability of Johnson's statements is, one, he
7   does not only minimize his role, but -- and he gives
8   little bits and pieces, like first he claims he spit
9   on Tina Johnson and then he says that he never went
10  past the front room.  But then he keeps
11  contradicting himself by saying he's bent over a
12  bed.  He also -- there is evidence by Johnson's own
13  statements, but also from his sister, that Johnson
14  spent time with the Aquarts after the murders.  And
15  the whole theory that was put forth during the guilt
16  phase is that Big Man, so to speak, was Womble, that
17  the other person who committed this crime was
18  Womble.  And you could see in Johnson's statements
19  that he's trying to put this off on Womble.
20           There is no testimony that Taylor was Big
21  Man.  He was Black and he was Yes Yes, and they keep
22  saying, and Johnson keeps saying Big Man and Big
23  Dude to try to insinuate that it was Womble.  But
24  the most interesting part is that Efrain Johnson
25  never identifies John Taylor.  He never -- he
```

5450

1   pretends not to know who he is when he looks at his
2   pictures.  He's shown two separate lineups and in
3   neither of those does he identify John Taylor.  And
4   so -- and the defense in fact argued to the jury
5   that John Taylor wasn't there, and that he got all
6   his statements from being at the Bridgeport
7   Correctional Center and hearing about them from
8   other people, allegedly including Womble.
9           They said the reason he didn't know about
10  the color of the gloves was because he wasn't there.
11  The reason he didn't know about which couch was in
12  front of the door was because he wasn't there.  And
13  so, you know, that's one thing about the
14  unreliability.
15          Number two, parsing the statements the
16  way they have, is not giving -- it's beyond
17  confusing and misleading to the jury.  You know,
18  they claim, the defense, that things such as moaning
19  and punching don't go -- that they only go to guilt,
20  when, in fact, those, as opposed to Johnson's other
21  statements, actually go to issues such as torture.
22  Or, for instance, throughout the 302s, Johnson makes
23  statements that definitely go to the issue of
24  procurement because he repeatedly states that he was
25  recruited by Aquart to engage in these crimes by the

5451

1   promise of payment, and in particular weed, he was
2   getting paid in weed.
3           But so, the government thinks that these
4   should not come in, period, because Johnson
5   minimizes his behavior, he minimizes his sister's
6   behavior, he lies about recognizing Taylor, he says
7   he didn't ever see bats, he didn't ever see gloves,
8   when clearly the jury accepted John Taylor's
9   testimony.  They came back with a verdict in fewer
10  than three hours, your Honor.  And to put these in
11  without putting Johnson on the stand or anyone else
12  is just to throw, again, mud, when, you know -- and
13  to parse them especially is beyond confusing and
14  misleading.
15          The government thinks they should come
16  in, period, but if they're going to come in at all,
17  then they should all come in in their entirety,
18  including the part where the government and the FBI
19  agents are telling him that he's lying.
20          And we should also be able to call a
21  witness who will testify that Johnson came in here
22  and he tried to plead guilty to three counts of
23  murder, said he was guilty of three counts of murder
24  and then lied about knowing that Aquart was a crack
25  dealer and lied about his own crack dealing.  And we

5452

1   can give your Honor all the other 302s that the
2   defense didn't give you showing like five or six
3   undercover buys made from Johnson where they bought
4   crack from him.  But also in the proffer statements,
5   with his attorney there, he said he sold crack for
6   Aquart on three or four occasions and then he came
7   in here and he lied and he told your Honor, I didn't
8   even know he sold crack.
9           So your Honor has seen firsthand that
10  Johnson can't tell the truth, that he minimizes his
11  own role in these offenses, that he minimizes his
12  behavior, period.  For the defense to argue we
13  didn't put him on as a trial strategy is blatantly
14  false.  He wasn't given a cooperation agreement.  He
15  wasn't going to be called as a witness, and that was
16  decided over a year ago.  It has nothing to do with
17  trial strategy, it has to do that the government
18  doesn't suborn perjury, it's that Johnson clearly
19  stated that Aquart was the leader, that he did this.
20  The government wasn't going to put him on to say
21  that because he couldn't tell the truth about
22  himself and his own role.
23          If the defense wants to submit a
24  mitigator to the jury saying that John Taylor and
25  Efrain Johnson are not going to be sentenced to

5453

1   death for their role in this offense, the government
2   stipulates, that's fine, we'll agree that's been
3   proven.  But to put these in to prove that, these
4   statements do not prove that.  That's a given.  The
5   Attorney General is not seeking the death penalty on
6   them and we agree.
7           THE COURT:  Mr. Sheehan.
8           MR. SHEEHAN:  I think -- I thought your
9   Honor had reached a decision.  I'm waiting to hear
10  your Honor's decision.
11          THE COURT:  No, I want to hear your
12  response to what the government, in essence, is
13  saying; that Mr. Johnson's testimony is so
14  unreliable on truthfulness that it should not be
15  permitted.  Or if it is to be permitted it should
16  not be limited to just the statements you identified
17  to me yesterday as the statements which are the ones
18  you seek.  And I understand that you are seeking to
19  offer these on a mitigator, that is, that
20  co-defendants of different roles -- excuse me, will
21  not be sentenced to death for their role, which the
22  government now agrees to stipulate to, and the
23  aggravator of heinous, cruel and depraved, that is,
24  to cast doubt on Taylor 's credibility, including
25  the very damaging -- you want some statement

**GA1406**

5454

1    highlighted in the government opening at the penalty
2    phase.
3               Is there any other purpose for which you
4    are offering this?
5               MR. SHEEHAN:  No, your Honor.
6               THE COURT:  And so would you please
7    respond then to, A, the claim that Johnson's
8    testimony is unreliable because he minimizes his
9    role, contradicts himself, and then the government's
10   argument that if your portions come in, all of them
11   should come in.
12              MR. SHEEHAN:  Well, first of all, with
13   respect to minimizing role, I think the same
14   argument is appropriate with respect to Mr. Taylor.
15   Ultimately the jury has to make a determination on
16   that issue in the context of the mitigators.  I
17   think as far as contradicting himself, that is --
18   Mr. Taylor's testimony itself is a bundle of
19   contradictions.  What the government is, in essence,
20   saying, is because they -- whether we'd say
21   strenuously or vehemently or categorically, or
22   whatever adjective they choose to use, they do not
23   believe Mr. Johnson, and whether categorically or
24   strenuously or whatever, they do believe all of what
25   Mr. Taylor said.

5455

1               I think obviously that's substituting
2    their own personal opinion for that of the jury.
3    The fact that Mr. Johnson was involved in and
4    arrested in crack dealing well after Mr. Aquart was
5    arrested in this case, that crack dealing had
6    nothing to do with Mr. Aquart as they well know.  So
7    I don't quite know how that fits into their argument
8    here except in a general obfuscation sense.
9               The fact that Mr. Johnson did not pick
10   out Mr. Taylor out of the photo ID, we're not
11   offering that as evidence.
12              THE COURT:  All right.  So that gets to
13   the next thing.  If you offer your statements, why
14   shouldn't the government be permitted to put in
15   Mr. Johnson's other statements that it says show
16   contradictions and -- contradictions.
17              MR. SHEEHAN:  I think if they put in
18   their statements that are limited to the areas that
19   we're talking about, and to the extent there are
20   contradictions in those statements that contradict
21   the issues that we are raising, which are narrowed,
22   basically to what happened in terms of entering into
23   the apartment and what happened within the
24   apartment, that would probably -- that would be
25   appropriate.

5456

1               I think if there -- if their general
2    sense is, and, for example, they seem to want to put
3    in all the 302s about Mr. Johnson's crack dealing
4    afterwards.  I don't think that has anything to do
5    with anything.  I think that they're offering to put
6    in Mr. Johnson's statement to the Court at the time
7    of the sentencing that he was not involved in crack
8    dealing.  I don't think that has anything to do with
9    the subject matter that we're narrowly offering
10   these statements on.
11              THE COURT:  You are aware that he said
12   at his attempted proffer, because you were there,
13   that -- I don't mean proffer, allocution, that he
14   helped Mr. Aquart tape up, I think it was Tina
15   Johnson.  I mean, I just want you to remember these
16   things because if you are permitted, they're going
17   to be permitted.
18              MR. SHEEHAN:  Well --
19              THE COURT:  So the issues are entering
20   the apartment, dealing with the victims, who did
21   what.  Those are the areas that your statements go
22   to, right?
23              MR. SHEEHAN:  Yes, your Honor.
24              THE COURT:  Well, here is what I think.
25   The jury has no other evidence about the nature of

5457

1    the murders committed in the apartment other than
2    Mr. Taylor, and then, of course, the physical
3    evidence.  And so given that this goes to the very
4    central issue of whether Azibo Aquart's actions were
5    heinous, cruel and depraved, the issue of Taylor's
6    credibility, that he in large part did nothing other
7    than be a lookout, when Johnson's statement is that
8    he and Johnson were involved with taping the
9    victims, there has been comment on the evidence
10   supporting heinous, cruel and depraved as to how
11   tight the tape was, and as I previously mentioned,
12   Mr. Aquart's statement about "Come and get you
13   some," so I think these are pretty central issues on
14   a statutory aggravator and on the relative roles.
15              I don't think statements to the police
16   are inherently totally unreliable.  The
17   descriptions, and I went back and read Mr. Taylor's
18   testimony as well, are of an inherently chaotic and
19   fast moving scene of substantial emotional impact.
20   Mr. Johnson's statements certainly are inculpatory,
21   and more so than Mr. Taylor's, that he got Tina
22   Johnson to open the door, that he joined the bum's
23   rush into the apartment, that he helped to tape the
24   victims knowing criminal violence was going to go
25   on, and then was going on and did nothing.

5458

1        And I don't think that his testimony is
2   at -- his statements are at odds with the physical
3   evidence since he describes Taylor as striking one
4   blow, which the government's expert testified would
5   not be enough to cause the splatter that was found
6   in the bedroom, and thus the absence of blood in the
7   other room where he seems to be locating the initial
8   masking, taping undertaking is not expressly
9   contradicted.  And DNA testimony about the duct tape
10  binding on Ms. Johnson couldn't exclude Taylor.
11       So, I think that following the reasoning
12  of Fell, that this -- the defendant should be
13  permitted to offer these statements.  But the
14  government certainly will be permitted to offer all
15  of the statements that bear on the subject matter of
16  the defendant's selections relating to entering the
17  apartment, dealing with the victims and who did what
18  in their various iterations.  In that way the
19  government has the same opportunity -- has the
20  opportunity to demonstrate what Johnson is saying is
21  in his statements du jour, when he had said other
22  contradictory things or statements that indicate
23  his, you know, either prior claim of lack of
24  knowledge or contrary statements, including his
25  inability to identify Taylor.

5459

1        I think that is the appropriate
2   resolution to a difficult question, so we will
3   proceed on that basis.
4        MS. DAYTON:  Your Honor, just for
5   clarification, since they're putting this in to go
6   towards the heinous, cruel and, you know, towards an
7   aggravator, the government intends to put in the
8   testimony that he -- that Johnson heard moaning and
9   punching coming from back in Williams's room; the
10  fact that the defendant -- Johnson said in this
11  court that it wasn't Taylor he was helping tape,
12  that it was the defendant he was helping tape,
13  because that all goes to relative roles, too.  And
14  we're going to put in pyramid issue because they're
15  going to argue that.  And that he was -- he said
16  repeatedly he got paid.  We're going to put in the
17  fact that he saw the drills because that also goes
18  to depraved nature of this crime.
19       THE COURT:  But the drills part is not
20  what he is being offered on here.
21       MS. DAYTON:  But why?  The government
22  is --
23       THE COURT:  You have that evidence
24  already in, that's why.
25       MS. DAYTON:  I understand.  But they're

5460

1   putting something in, we should be able to go after
2   the credibility, and the fact that --
3        THE COURT:  You can on the same
4   statements on the same subject matters that he is
5   putting this in on.  It's not an opportunity to
6   review the guilt phase evidence, and you can -- you
7   certainly will be permitted to talk about the
8   internal and express contradictions to the extent --
9        MS. DAYTON:  Your Honor, any witness
10  who, quote-unquote, testifies, their credibility is
11  at issue.  And regardless of what -- for instance
12  when Mr. Taylor testified, regardless what the
13  government asked him, they asked him about every
14  single statement in every single 302 that was
15  written about him, and your Honor did not limit them
16  on that.  The DNA is another good example, they had
17  Ms. Roy up there, you know, for three days
18  questioning her credibility.
19       THE COURT:  Let's not rehash the
20  evidence.
21       MS. DAYTON:  But the issue is the
22  government is being limited on their attack on
23  Efrain Johnson's credibility.  That was exactly why
24  there is --
25       THE COURT:  No, you are dividing this

5461

1   up.  You are conflating his credibility with your
2   ability to use this as a springboard to reinforce
3   your evidence on the cruel, heinous and depraved
4   aggravator.  I will let you put in, I think it's
5   appropriate, that he heard the moaning and so forth,
6   because it suggests that Mr. Johnson's sequence of
7   events is, at best, inaccurate.  But not the whole
8   scene of -- that goes to the heinous, cruel and
9   depraved aggravator.  You certainly will be
10  permitted to put in his sworn statement to the Court
11  that he helped Aquart -- Azibo Aquart tape the
12  victims as opposed to this.  You certainly have the
13  opportunity to demonstrate -- to -- yes, demonstrate
14  the lack of credibility and/or bias such that the
15  witness statements should not be given weight.  But
16  I don't think it's appropriate for the Court to be
17  making a decision about whether Johnson is truthful
18  and accurate when, in fact, it may have been that
19  what he said to the Court at his attempted
20  allocution was not truthful and accurate.
21       So, that's how we're going to deal with
22  it.  It's difficult and I'm trying to be fair, but
23  not exclude defendant's evidence that is relevant on
24  the issue of cruel, depraved and heinous.  The other
25  of the stipulation we can just put in the charge.

5462

```
1           MS. DAYTON:  Well, we won't stipulate
2    then.  That's the thing, if they're going to get to
3    put on relative culpability, the government is not
4    going to stipulate.  Because we're saying we would
5    stipulate to avoid creating this whole misleading,
6    confusing mess.  But we're not going to stipulate.
7           THE COURT:  All right.  Well, that makes
8    then two very central issues of the relative roles
9    and the heinous, cruel and depraved.  Okay, then I
10   think we are ready to begin.
11          MR. SMITH:  Your Honor, Agent Munger
12   left the courtroom.  He was under subpoena.
13          THE COURT:  Where is he?
14          MR. SMITH:  It's unknown.
15          MS. RODRIGUEZ-COSS:  They gave us an
16   order of witnesses and we went by their order of
17   witnesses.
18          THE COURT:  So you have Ms. Bennett or
19   Ife Felix available.
20          MR. SHEEHAN:  But that's simply, your
21   Honor, because I told them that -- I said to them
22   this morning that the first issue I was asking the
23   Court to deal with was Mr. Johnson.  And I noted
24   that --
25          MS. DAYTON:  He's coming back.  I don't
```

5463

```
1    know what the problem is.
2           THE COURT:  Could we start with one of
3    the witnesses who is available and as soon as he
4    gets back -- why did he leave?
5           MS. DAYTON:  Because I asked him to go
6    get a better, clearer photographic lineup of
7    Mr. Johnson because the one -- it's black, and you
8    can't see it.
9           THE COURT:  All right.  Let's start with
10   one of your other witnesses.
11          MR. SHEEHAN:  I just think the problem
12   with that, I don't want to interrupt the witnesses
13   because --
14          MS. DAYTON:  You don't have to.
15          MR. SHEEHAN:  Your Honor, these
16   witnesses do not have anything to do with that.
17          THE COURT:  Of course, and they won't
18   have anything to do no matter what order you put
19   them in.
20          MR. SHEEHAN:  But they do have something
21   to do --
22          THE COURT:  Mr. Sheehan, I would like,
23   please, to begin the evidence here.
24          MR. SHEEHAN:  Well if you order us to
25   do, we'll comply.
```

5464

```
1           THE COURT:  I am.
2           MR. SHEEHAN:  I am respectfully
3    asking --
4           THE COURT:  I'm directing you to call
5    your next witness.
6           MR. SHEEHAN:  And I'm objecting, your
7    Honor, to not being able to call Mr. Munger at this
8    time.
9           THE COURT:  He'll be back.  Okay.
10          Can you put in a call and make sure he's
11   back soon.
12          MS. DAYTON:  I need a minute just so I
13   can call him.
14          THE COURT:  Would you call him to tell
15   him.
16          MS. REYNOLDS:  And we have a
17   paralegal --
18          THE COURT:  Would you call him.
19          Please bring in the jury.
20          (Jury entered the courtroom.
21          THE COURT:  Good morning, ladies and
22   gentlemen.  For the same reasons as yesterday, we
23   have been delayed, but we are, we believe, on the
24   final day of evidence.  Kindly be seated.
25          All right, I will ask the defendant's
```

5465

```
1    next witness to please stand, raise your right hand
2    and you will be sworn.
3
4           N A S H I E K A H   B E N N E T T
5    Having first affirmed, was examined and testified as
6    follows:
7           THE WITNESS:  My name is Nashiekah
8    Bennett, last name is spelled B-e-n-n-e-t-t.  Town
9    of residence is Bridgeport, Connecticut.
10          THE COURT:  Ms. Bennett, would you also
11   spell your first name, please.
12          THE WITNESS:  N-a-s-h-e-i-k-a-h.
13          THE COURT:  Thank you.  All right, you
14   may proceed.
15   DIRECT EXAMINATION
16   BY MR. SHEEHAN:
17   Q.   Good morning, Ms. Bennett.
18   A.   Good morning.
19   Q.   You are married to Azizi Aquart, are you
20   not?
21   A.   Yes, I am.
22   Q.   And I'm going to ask you to pull the
23   microphone towards you a little bit and speak right
24   into it.
25   A.   Okay.
```

5466

```
 1      Q.   You speak kind of softly.
 2           And that would mean that you are Azibo's
 3  sister-in-law.
 4      A.   That is correct.
 5      Q.   When did you first meet Azizi?
 6      A.   I met Azizi initially when we were babies,
 7  children, growing up, and continued to meet him over
 8  the course of a few years.  And then in 1994 we
 9  actually met again in high school.
10      Q.   And what year were you in high school in
11  1994?
12      A.   I was a sophomore.
13      Q.   And what high school was that?
14      A.   Bassick.  Bassick High School.
15      Q.   And that's in Bridgeport?
16      A.   Bridgeport.
17      Q.   And at that time how old were you?
18      A.   At that time I was 15.
19      Q.   And where were you living?
20      A.   At that particular time when I met Azizi I
21  was living at home.
22      Q.   Okay.  And after meeting Azizi, did you and
23  he get into a romantic relationship?
24      A.   Yes, we did.
25      Q.   And how soon after you met him in your
```

5467

```
 1  sophomore year did you and he get involved,
 2  romantically involved together?
 3      A.   Very soon.  Several months within meeting
 4  him.
 5      Q.   And at that time did you continue living
 6  with your mom?
 7      A.   I continued living with my mother for a
 8  couple more months, yes.
 9      Q.   And how was your relationship with your mom
10  at that time?
11      A.   Pretty rocky.  We didn't have the best
12  communication, and she was a very strict, strict
13  parent.
14      Q.   And when you first started in this romantic
15  -- dating, let's call it, dating Azizi, were you
16  aware that his mom had died?
17      A.   Not at all.
18      Q.   And did you meet his -- had you ever met
19  any of his other family members at the time that you
20  got involved with him?
21      A.   Only Azikiwe.  Azikiwe Aquart.
22      Q.   And at that time do you know where -- well,
23  now, do you know where Azibo was living at the time
24  you and Azizi got together?
25      A.   No.
```

5468

```
 1      Q.   Now, when was it that you first met Azibo?
 2      A.   I met Azibo about March of 1995.
 3      Q.   And did you at some point learn that you
 4  were -- you were going to have a child with Azizi?
 5      A.   Yes.
 6      Q.   And when did you find out that you were
 7  pregnant?
 8      A.   February of '95.
 9      Q.   And when was that in relationship to when
10  Azizi got shot?
11      A.   I found out I was pregnant a week before
12  Azizi was shot.
13      Q.   And you indicated that -- did you
14  actually -- were you able to visit Azizi in the
15  hospital?
16      A.   Initially, no.  A few weeks thereafter I
17  was able to see him in the hospital.
18      Q.   And at the time that you first met Azibo,
19  where were you living?
20      A.   At that point we were staying with my aunt.
21      Q.   What's your aunt's name?
22      A.   Carla Turner.
23      Q.   And where was Ms. Turner living?
24      A.   She was living on Fifth Street in
25  Bridgeport, Connecticut.
```

5469

```
 1      Q.   And when you say, "we were staying with my
 2  aunt," who was staying with your aunt?
 3      A.   Azizi, myself, Azikiwe and my aunt's
 4  children.
 5      Q.   And so you were 16 at that time, or 15?  Do
 6  you remember how old?
 7      A.   At that point, yeah, I was about 16.  At
 8  that point in '90 -- beginning of '95.
 9      Q.   And Azizi was 17?
10      A.   Yes.
11      Q.   And was Azizi going to school at that time?
12      A.   Yes, he was going to Bassick High School.
13      Q.   Okay.  And how about Azikiwe, was he also
14  living with Azizi?
15      A.   Yes, he was.
16      Q.   And with yourself, right?
17      A.   Yes.
18      Q.   And how old was Azikiwe?
19      A.   Azikiwe had to be about 14, 15, right in
20  that age range.
21      Q.   And then you indicated that in March of '95
22  Azibo also came to live with you?
23      A.   That's correct.
24      Q.   Now, when was your son born?
25      A.   My son was born October of '95.
```

5470

```
 1      Q.   And at the time that your son was born,
 2   were you still living with your aunt, Carla?
 3      A.   No, not at that time.
 4      Q.   Where were you living at that time?
 5      A.   At that time we were living close to
 6   Harding High School.  I believe it was Huff Avenue.
 7      Q.   Huff Avenue?
 8      A.   Yes.
 9      Q.   How many children do you have now?
10      A.   At this time I have four kids.
11      Q.   Okay.  And your oldest son is how old?
12      A.   He will be 16 this year.
13      Q.   And after the 16-year old, what's the next
14   in order?
15      A.   Fourteen, 12 and two.
16      Q.   And the two-year old is your daughter?
17      A.   Correct.
18      Q.   And the 12 and the 14-year-old are also
19   sons?
20      A.   Yes.
21      Q.   And are you working now?
22      A.   At this time, no.
23      Q.   And is that because you are in the process
24   of relocating?
25      A.   Absolutely.
```

5471

```
 1      Q.   And where are you hoping to move to?
 2      A.   Atlanta, Georgia.
 3      Q.   And prior to this relocation starting,
 4   where were you working?
 5      A.   I've been working at Affinion Group.
 6      Q.   What kind --
 7      A.   Affinion Group.
 8      Q.   Affinion?
 9      A.   Uh-huh (indicating affirmatively).
10      Q.   What kind of work is that?
11      A.   Customer service, phone work.
12      Q.   And how long have you been at Affinion
13   Group?
14      A.   Almost 12 years.
15      Q.   And has it always been in kind of customer
16   service, in that same area?
17      A.   Yes.
18      Q.   When you learned that you were pregnant,
19   were you -- did you stop going to school?
20      A.   No.  Not at all.
21      Q.   In fact, were you enrolled in a special
22   program at Wesleyan that summer?
23      A.   Yes, I was.
24      Q.   And were you able to complete that?
25      A.   Yes, I was able to complete it.
```

5472

```
 1      Q.   Now, actually, how long did you stay at
 2   Aunt Carla's?
 3      A.   Just a few months after Azizi was shot.
 4   Just a few weeks, actually.  Not that long.
 5      Q.   And was there a big concern when Azizi was
 6   shot as to your safety and other family members'
 7   safety?
 8      A.   Yes.  Definitely his brothers was a
 9   concern, and my mother and myself, we were a little
10   nervous about my safety and my unborn child's
11   safety.
12      Q.   And did you have any understanding why
13   Azizi was shot, what it was about?
14      A.   Not a full understanding, no.
15      Q.   What was your understanding?
16      A.   Honestly, I just thought that he was just
17   like an innocent bystander, to be honest with you.
18   I wasn't sure.
19      Q.   Okay.  And so from Aunt Carla's, is that
20   when you went from there to Huff -- Howe?  Is it
21   Howe or Huff?  I'm sorry.
22      A.   Huff.
23      Q.   Did you go from Aunt Carla's to Huff, or
24   was there anyplace in between?
25      A.   I believe there is one street that I'm
```

5473

```
 1   forgetting the name of right now.
 2      Q.   Okay.  And when you moved out of Aunt
 3   Carla's, who moved with you?
 4      A.   We all moved.  Azikiwe, Azizi, Jumbo --
 5   Azibo and myself.
 6      Q.   And did you know him at that time mostly as
 7   Jumbo?
 8      A.   Yes.
 9      Q.   Is that a family name?
10      A.   Yes, definitely.
11      Q.   And how was Azibo doing in those days
12   emotionally?
13      A.   Azibo back then, I believe he was a typical
14   younger brother.  He made me laugh a lot.  He was
15   very -- just fun to be around.  Just like a typical
16   jokester.  And that was the majority of the time.
17   But there were times he was sad also.
18      Q.   And what was the sadness about?
19      A.   My understanding back then, I just felt he
20   missed his family, maybe missed his sisters in New
21   York, definitely missed his mom.
22      Q.   And as a 16-year old yourself, were you
23   able to provide much guidance and support to him at
24   that time?
25      A.   Absolutely not.
```

5474

```
1    Q.  Now, did -- in your opinion, did Azizi's
2  shooting, the fact that Azizi was shot, did that
3  have any impact on Azibo?
4    A.  Yes, I think it did.  I feel that he just
5  kind of maybe added more questions to his young
6  life.  It made him feel a little more out of place,
7  lost.
8    Q.  And after -- well, at some point in time
9  did -- was Azizi able to get the insurance proceeds
10 from his mom's --
11   A.  Yes, he was.
12   Q.  -- estate?
13   A.  Yes.
14   Q.  And prior to that time, how were you all
15 living?
16   A.  Prior to that time we were -- my mom would
17 literally stick money in my baby's bag every now and
18 then and I would just go home and find it in the
19 bag.  I had a little part-time, after school job
20 thing.  It wasn't a real job.  But we were just
21 pretty much struggling.
22   Q.  And it sounds like -- did you and your mom
23 kind of make up at this point in time?  Or what was
24 your relationship?  How was that relationship?
25   A.  No, we didn't make up.  But I think she
```

5475

```
1  just played the part she felt she needed to play.
2  She did the best she could as a grandmother and
3  provided what she could for everyone surrounding the
4  baby.
5    Q.  And once you got -- once Azizi got the
6  insurance proceeds, how did that financially affect
7  you and Azibo and Azikiwe and all of you?
8    A.  I think it definitely relieved us.  I
9  really didn't know much about it until it was told
10 to me a couple weeks later.  But I think at that
11 point there was a sense of relief, a sense of we
12 will be able to take care of ourself now.
13 Everybody, we tried -- Azizi tried to provide as
14 much as he could at that point.
15   Q.  And thinking back from your present wizened
16 old age of 32, back to when you were 16, do you
17 think that you were able as a family at that time to
18 financially handle that money?
19   A.  No.  I think about that a lot and I don't
20 think that the money should have been placed in the
21 hands of someone so young.  And I feel that we did
22 what we could with the money and that it was
23 spent -- you know, we didn't go hungry after that,
24 but I think there should have been a little bit more
25 guidance.
```

5476

```
1    Q.  And what did you do with the money in terms
2  of -- how was that money spent?
3    A.  The money was spent definitely on food,
4  clothes and shelter.  Definitely entertainment.  You
5  know, we didn't -- we cooked, but we didn't cook
6  every day.  So there were times we would definitely
7  get takeout and, you know, get clothing, or the
8  baby's needs were provided, gas, that sort of thing.
9    Q.  Was takeout a big deal?
10   A.  For me it was a big deal.  I think that
11 when growing up my mom was very strict and she was
12 always someone that cooked three meals a day, and
13 for me that was kind of tiresome, and I was able to
14 get takeout when I wanted takeout, and it just kind
15 of just made life feel a little freer.  I don't
16 know.  It just made it easier.  It was like a treat
17 that we were able to get that I never got when I was
18 younger.  So it was a big deal for me.
19   Q.  Did you feel that Azizi had authority over
20 Azikiwe and Azibo?
21   A.  I think Azizi had -- not 100 percent
22 authority.  There was more love than authority
23 there.  But I don't think that he was able to manage
24 teenage boys being a teenager himself.
25   Q.  Now, you were in Bridgeport at this time,
```

5477

```
1  and can you tell me what kind of pressures were on
2  teenage boys such as Azikiwe and Azibo at that time?
3         MR. MARKLE:  Objection to that, your
4  Honor.  I don't really see how the witness can do
5  that.
6         THE COURT:  I'll sustain the objection
7  to the question in that form.
8    Q.  Were drugs all around you?
9    A.  Yes, drugs were all around us.  You had
10 limited choices.  You either picked up a gun or you
11 picked up a baby.  I mean, there was very limited
12 choices for black kids in Bridgeport.  And, you
13 know, you had a choice, and if you didn't have
14 certain guidance around you, you were definitely
15 going to make the wrong choice or if you didn't have
16 something making you make the right choice you were
17 going to make the wrong choice.
18   Q.  How about you as a young woman, were those
19 pressures different?
20   A.  Yes and no.  The pressures were a little
21 bit easier to maneuver around.  I think I just
22 wasn't as pulled into the streets as a -- it wasn't
23 as dazzling to me the way it would be for a young
24 man.
25   Q.  And you mentioned that there was love in
```

5478

```
1    your family.  Were there any parents, any adults
2    telling you what to do, checking on when you came
3    home?
4        A.   Definitely not.
5        Q.   Were there adults giving you advice and
6    counseling?
7        A.   There was -- there were adults around, but
8    I don't feel that they were able to give us advice
9    and counseling.
10       Q.   Did Azizi -- you knew Azizi before he was
11   shot and after he was shot, did you not?
12       A.   Yes.
13       Q.   Did you think that his shooting, did that
14   impact on him?
15       A.   Other than obviously all of the, you know,
16   the physical aspects of it, I think up to a point,
17   and maybe even a little after, there was a sense of
18   we're invincible.  And I think the shooting kind of
19   opened his eyes a little bit to the realities of
20   what he was dealing with and that he really wasn't
21   invincible and that there was trouble right on his
22   doorstep.
23       Q.   And so you had the baby.  And actually let
24   me show you this picture.  I'm going to show you
25   what is Exhibit DD.
```

5479

```
1        MR. SHEEHAN:  I'd like to offer that
2    into evidence at this time, your Honor.  And I
3    understand there is no objection.
4        THE COURT:  All right, it's a full
5    exhibit.
6        MR. SHEEHAN:  Could I just ask that the
7    lights be turned down slightly.  All right, thank
8    you.
9        Q.   Who is in that picture?
10       A.   That is Azibo and my eldest son, Jacque
11   (ph).
12       Q.   And from the size of the plug in his mouth,
13   can you make -- can you give us an estimate as to
14   how old Jacque was at that time?
15       A.   Jacque is about three months at that time.
16       Q.   And were you then living at Howe Avenue, or
17   if you remember?
18       A.   Yes, this is -- yes, this is when we were
19   all living in our apartment together.
20       MR. SHEEHAN:  Thank you, your Honor.
21       Q.   How did Azizi and Azibo get along when you
22   were all living together after your baby was born?
23       A.   There was obvious love there.  I think
24   there was also maybe a distance there.  There was --
25   I think a sadness from Azizi that he couldn't really
```

5480

```
1    provide for his brother.  He just -- he just finally
2    came to the realization that he wasn't the one that
3    should have been in place for his brothers, and I
4    think, like I said, there is a love there.  I think
5    also Azibo, being the younger brother, maybe
6    questioned authority, maybe tested it a little bit.
7    Just typical younger brother stuff.  But I think
8    there was a definite love and loyalty there.
9        Q.   And how did the impact of the streets seem
10   to affect Azibo?
11       A.   When Azibo was home, he didn't really have
12   the streets.  I mean, like I said, when he was home
13   it was like having a brother, a kid brother there,
14   an uncle, somebody to play with, someone to tickle,
15   someone to joke around.  I often remember he was
16   always -- I could look at him and I would crack up.
17   He reminded me of home, my brothers that I missed.
18       Q.   How about the streets on the outside?
19       A.   There is a part of us that we just kind of
20   left certain things, including our shoes, by the
21   doorstep, and just looking back, I don't remember
22   him bringing the streets into the house.  I don't
23   remember him having that kind of mentality in the
24   house.
25       Q.   Do you remember when it was that he first
```

5481

```
1    got involved in juvenile cases?
2        A.   Uh-huh (indicating affirmatively).
3        Q.   I think you have to say yes.
4        A.   Yes, I remember.
5        Q.   And how did that impact on the family
6    relationship?
7        A.   For me, it was the first time that I had to
8    deal with that, so I was saddened and really
9    concerned.  Azizi, himself, initially it kind of
10   weakened him a little bit.  I don't think he knew
11   what to do fully, and I just think it kind of
12   confused us, kind of had us scramble a little bit,
13   but it also opened our eyes to what we were really
14   dealing with.
15       Q.   When you say opening your eyes, what were
16   you opening your eyes to?
17       A.   Just the reality of what can happen to a
18   family.  I think at a certain point we were ignorant
19   to certain things or not thinking that we would have
20   to deal with it, we would just come up, grow up,
21   struggle through, become adults, and one day look
22   back and laugh at everything.
23       Q.   And did there come a time when the police
24   came to your house and raided it?
25       A.   Yes.
```

5482

1    Q.   And how did that impact on things?
2        Actually before I -- let me withdraw that
3    question just for a moment, and let me ask you this:
4    Did you know or were you aware Azizi himself had had
5    trouble with the police?
6    A.   Yes.
7    Q.   Was that common in your community?
8    A.   Absolutely.
9    Q.   And so at some point in time thereafter,
10   did the police come to your house?  There was a raid
11   at the house?
12   A.   Yes.
13   Q.   And how did that impact on you and Azizi as
14   far as Azibo was concerned?
15   A.   To be honest with you, I think it angered
16   Azizi.  It saddened me.  I think it kind of really
17   broke my heart.  And my children were -- they were
18   little, so they were really afraid.
19   Q.   And what steps did you and Azizi take at
20   that time?
21   A.    I think watching my eldest a little bit
22   harder, just -- for me, trying to understand a
23   little bit more as to why all of this was happening,
24   it just -- just trying to be a little bit more
25   close-knit in regards to our children.

5483

1    Q.   And did that include -- was Azibo somewhat
2    excluded at that point in time?
3    A.   I don't think he was -- not from me.  But I
4    think Azizi kind of hardened a little bit at that
5    point.
6    Q.   Now, your son is -- you have a 16-year-old
7    and a 14-year-old and a 12-year-old.  And thinking
8    now from your parenting experience, do you feel that
9    you and Azizi had the maturity and experience to
10   take care of and provide guidance for Azibo?
11   A.   No, I don't feel we had that.
12   Q.   It's not easy even with your own kids, is
13   it?
14   A.   Not even with my own children.  You
15   struggle.  And it's easier having another able
16   person, logical person to help me with them.
17   Q.   And your two older boys are home-schooled
18   now?
19   A.   Yes.
20   Q.   And the reason you did that?
21   A.   When my eldest turned 13, 14, he started --
22   I started to see the pull, I started to notice that
23   if something drastic didn't happen that he would
24   just be another example of what could happen if
25   we're not careful.

5484

1    Q.   Now --
2    A.   I just want --
3    Q.   I understand Azibo has -- Azibo has been in
4    jail for some time now, since this case.  Is he
5    still part of your family?
6    A.   It's almost like Azibo -- in terms of -- in
7    terms of my children, it's almost like Azibo is only
8    in another state.  I mean, my children constantly
9    talk about him, they constantly talk about the
10   family.  There is like a certain love and respect
11   for him that my boys have, and they definitely will
12   always consider him part of the family.  I consider
13   him part of my family.
14   Q.   And what impact would it have on you and
15   your children if he were to be sentenced to death?
16   A.   It would be a negative thing, for my
17   children especially.  There is a great sense of loss
18   already.  They randomly cry.  For them to be tough
19   little boys, they randomly cry.  And I know that the
20   loss -- at least at this point they know their uncle
21   is here.  I think that, you know, the loss of their
22   uncle would be tragic for them.  Especially my
23   eldest.
24        MR. SHEEHAN:  I don't have any more
25   questions for Ms. Bennett, your Honor.  And I would

5485

1    offer this up at this time.
2        THE COURT:  All right,
3    cross-examination, Mr. Markle.
4        MR. MARKLE:  Thank you, your Honor.
5    CROSS-EXAMINATION
6    BY MR. MARKLE:
7    Q.   Good morning, Ms. Bennett.
8    A.   Good morning.
9    Q.   Ms. Bennett, how many times have you
10   visited the defendant while he's been incarcerated?
11   A.   I have not.
12   Q.   Not at Wyatt?
13   A.   No, I have not.
14   Q.   And not at any previous institution he's
15   been held at?
16   A.   I have not.
17   Q.   And you haven't taken your children there?
18   A.   I have not.
19   Q.   And you haven't gone with your husband?
20   A.   No, I have not.
21   Q.   And have you talked to him on the phone?
22   A.   I have not spoken to him.
23   Q.   Have your children talked to him on the
24   phone?
25   A.   No.

5486

```
1     Q.   And have you written to him?
2     A.   I have.
3     Q.   And how many times have you written to him?
4     A.   Maybe twice.
5     Q.   Twice?
6     A.   Yes.
7     Q.   In like five, six years?
8     A.   Yes.
9     Q.   And you did provide love and support and
10   food and shelter to the defendant, didn't you?
11    A.   Yes.
12    Q.   So, it's not your fault he's where he is,
13   it's his fault, correct?
14    A.   I wouldn't agree.
15    Q.   You provided all that you could; is that
16   correct?
17    A.   All that I could as a 15, 16, 17-year-old,
18   yes.
19    Q.   And the insurance money was used to benefit
20   him as well as you and his brothers?
21    A.   This is true.
22    Q.   It was used properly, correct?
23    A.   Not without the guidance of an adult, I
24   wouldn't agree.
25    Q.   Well, what guidance do you need other than
```

5487

```
1    food, shelter, clothing?
2     A.   I think unconditional love is the best
3    guidance and that he did not have.
4     Q.   But he did have love.
5     A.   Not love from a parent, which is needed.
6     Q.   But he had your love.
7     A.   An outsider, a stranger, sister-in-law.
8     Q.   His brother's love.
9     A.   Not the love of a father and a mother.
10    Q.   I understand.  It's not a perfect situation
11   by any means, correct?
12    A.   Absolutely not.
13    Q.   But under the circumstances he had your
14   love and care.
15    A.   He did.
16    Q.   He had his brother's love and care,
17   correct?
18    A.   Correct.
19    Q.   Were you in court when his brother
20   testified?
21    A.   I was not.
22    Q.   And do you know that some very nice things
23   were said about his brother and the efforts he made
24   on behalf of Azibo to help him out through these
25   difficult times?
```

5488

```
1     A.   I'm sure.
2     Q.   You'd agree with that.  You saw it.
3     A.   Yes.
4     Q.   And his brother suffered these same
5    hardships, correct?
6     A.   Not to the extreme, no.
7     Q.   Azizi lost his mom, too, correct?
8     A.   He did.
9     Q.   And Azizi didn't have his father either,
10   did he?
11    A.   He did not.
12    Q.   And Azizi went to high school, didn't he?
13    A.   He didn't complete it.
14    Q.   Azizi didn't complete high school?
15    A.   No, he wasn't able to complete it.
16    Q.   Didn't Azizi go to college?
17    A.   He ended up getting his GED years after,
18   yes.
19    Q.   So did Azibo, by the way.  So they both
20   accomplished things, correct?
21    A.   This is true.
22    Q.   When they put their mind to it?
23    A.   I agree.
24    Q.   And Azizi went to college, correct?
25    A.   Yes.
```

5489

```
1     Q.   And he's just a semester short of getting
2    his college degree.
3     A.   This is true.
4     Q.   And he's raised four children with you.
5     A.   That is correct.
6     Q.   Successfully, correct?
7     A.   We're trying.
8     Q.   The same person who lost his mom and whose
9    father was incarcerated, Azizi, did all of that,
10   correct?
11    A.   Azizi, but he also had a son that kept him
12   going.  He also had something to wake up to.  He
13   also had something to go to sleep -- put to sleep.
14   It was a different situation for Azizi, he had a
15   wife that loved him.
16    Q.   And he had a drive to do something right
17   with his life, correct?
18    A.   He also had the guidance of his father in
19   those years, needed and necessary with his dad that
20   Azibo did not have.
21    Q.   He had guidance of his father?
22    A.   He did have some time with his father, some
23   love, some actual pouring in, hands on.
24    Q.   Do you know what his father did?
25    A.   I'm aware of his father.
```

5490

```
1      Q.   Do you know the good and the bad that his
2   father did?
3      A.   Absolutely.
4      Q.   It's not the kind of guidance you would
5   encourage, is it?
6      A.   Not all of it, no.
7      Q.   He was a -- he offered better guidance than
8   his dad, didn't he, to your children?
9      A.   I would say yes.
10      Q.   And to his brother Azibo?
11      A.   I would say he was physically there for his
12   brother Azibo, yes.
13      Q.   And you had difficult times, too, correct?
14      A.   I did.
15      Q.   Strained relationship with your mom,
16   correct?
17      A.   Absolutely.
18      Q.   You were pregnant at a very young age?
19      A.   Yes.
20      Q.   And you still managed to get through high
21   school, correct?
22      A.   I did.
23      Q.   You put your mind to it and got through
24   high school.
25      A.   Yes, I did.
```

5491

```
1      Q.   And didn't you, in fact, do -- you did
2   extremely well in high school, correct?
3      A.   Yes, I did.
4      Q.   Like top of the class, or close to?
5      A.   Uh-huh (indicating affirmatively).  I was.
6      Q.   In the Wesleyan special program?
7      A.   Yes.
8      Q.   College, Wesleyan College -- University,
9   we're talking about, correct?
10      A.   That is correct.
11      Q.   And you then got a job and were employed
12   for the last 12 years, correct?
13      A.   That is correct.
14      Q.   And Azizi was employed for the last 10,
15   12 years, correct?
16      A.   Yes.
17      Q.   But Azibo chose a different sort of life,
18   correct?
19      A.   Yes, he did.
20      Q.   And your son is 16 years old, correct?
21      A.   Absolutely.
22      Q.   He's been exposed to a lot of bad things
23   out there, correct?
24      A.   Yes.
25      Q.   The streets of Bridgeport.
```

5492

```
1      A.   Yes.
2      Q.   The brutality and violence of Bridgeport.
3      A.   That is correct.
4      Q.   And with your help and Azizi's he's doing
5   okay, though, right?
6      A.   Yes, he is.  But he needed the help of
7   Azizi and myself.  Without having logical adults
8   that cared for you --
9      Q.   I understand.  I am not saying that Azibo
10   had a mom and dad that were good role models.
11      A.   Or even aunts, uncles, or even those put in
12   place.
13      Q.   He had a mom who was a terrific role model,
14   but her life was taken much too early, correct?
15      A.   That is correct.
16      Q.   But he did, again, have food and clothing
17   and shelter and you and Azizi?
18      A.   But there is also a need for more.
19      Q.   Yes.  I understand.
20      A.   Yes.
21      Q.   He did have all of that, right?
22      A.   He did, yes.
23      Q.   And when his brother was shot, you said it
24   opened up Azizi's eyes.
25      A.   Yes.
```

5493

```
1      Q.   But it didn't change Azibo, did it?
2      A.   I'm not sure.
3      Q.   And when you said his brother got hardened
4   because of his involvement with illegal activity,
5   you still stayed available to him, correct?
6      A.   As much as I could, yes.
7      Q.   And your younger children, did they even
8   meet Azibo?
9      A.   Yes.
10      Q.   But very briefly?
11      A.   The youngest one, the 12-year-old very
12   briefly.  The two older ones had more exposure.
13      Q.   And the two-year old, obviously not.
14      A.   No.
15      Q.   No contact.
16      A.   No contact.
17      Q.   And did you know anything about the
18   involvement of the defendant, Azibo, on the streets
19   of Bridgeport?
20      A.   Not really.  Not really.
21      Q.   Did you know that he was the head of an
22   ongoing drug operation for a year or more?
23      A.   No.
24      Q.   Did you know that he owned thousands of
25   dollars worth of guns and ammunition and laser
```

5494

```
1   sights and speed loaders?
2       A.   No.
3       Q.   Did you have any idea he was involved in
4   any of that?
5       A.   No.
6       Q.   Did you know that he was responsible for
7   the beatings of four, five people?
8            You have to answer out loud.
9       A.   I overheard this information in the past
10  few months, yes.  The past -- the reason why we're
11  here, right.
12      Q.   But you had no idea he was physically
13  beating people up.
14      A.   No.
15      Q.   Because they were interfering with his drug
16  operation.
17           MR. SHEEHAN:  I'd object, your Honor.
18           THE COURT:  Basis?
19           MR. SHEEHAN:  She said she didn't know,
20  so now he's just testifying, your Honor.  I think
21  there is no basis to proceed with these questions.
22           THE COURT:  Overruled, but I think you
23  have the question and answer now.
24           Well, the question sounds to have been
25  interrupted.
```

5495

```
1            You had no idea he was physically beating
2   people up because they were interfering with his
3   drug operation.  Did you know that?
4            THE WITNESS:  No.
5       Q.   So, since 2004 have you had any involvement
6   with the defendant?
7       A.   Not very much, no.
8       Q.   So all through 2004 and 2005 when he was
9   not incarcerated, you really had no involvement with
10  him?
11      A.   No, I didn't have much involvement with
12  him.
13      Q.   So you don't know if he was the leader of a
14  drug operation or just a follower.
15           MR. SHEEHAN:  Objection.
16           MR. MARKLE:  I'm testing her knowledge
17  of the defendant.
18           THE COURT:  She said she didn't know
19  anything about his involvement.
20      A.   That wouldn't be something that we spoke
21  about or was brought to my attention, no.
22      Q.   And you said there were drugs all around
23  and you could either pick up a gun or a baby.
24      A.   Uh-huh (indicating affirmatively).
25      Q.   And to your knowledge Azizi did what?
```

5496

```
1       A.   Picked up his baby.
2       Q.   And took care of his baby.
3       A.   Yes.
4       Q.   And Azibo picked up the gun.
5       A.   I'm not sure what Azibo picked up --
6       Q.   He didn't pick up the baby.
7       A.   -- or what was handed to him.
8       Q.   Didn't pick up the baby, correct?
9       A.   Picked up my children several times.
10      Q.   But then you didn't want him around your
11  children, correct?
12      A.   I didn't have a problem with him being
13  around my children.
14      Q.   His brother who loved him didn't want him
15  around your children, correct?
16      A.   Once things got really heightened, his
17  brother questioned whether or not his children would
18  be safe or what would happen in the midst of -- with
19  his children present, yes.
20      Q.   He was worried that his brother would not
21  be a good influence on your children, correct?
22      A.   At that point, yes.
23      Q.   Thank you.
24           MR. MARKLE:  Thank you.
25           MR. SHEEHAN:  I have no further
```

5497

```
1   questions for Ms. Bennett, your Honor.
2            THE COURT:  All right, thank you.
3   Ms. Bennett.  You may step down.  You are excused.
4            MR. SMITH:  Your Honor, the defendant
5   calls Special Agent Christopher Munger.
6            C H R I S T O P H E R   M U N G E R
7   Having first affirmed, was examined and testified as
8   follows:
9            THE WITNESS:  My name is Special Agent
10  Chris Munger, M-u-n-g-e-r, Bridgeport, Connecticut.
11           THE COURT:  You may proceed.
12  DIRECT EXAMINATION
13  BY MR. SMITH:
14      Q.   Good morning, Agent Munger.
15      A.   Good morning.
16      Q.   Just to refresh the jury's recollection,
17  you were one of the FBI agents assigned to
18  investigate these murders.
19      A.   Yes.
20      Q.   And in the course of that investigation,
21  you conducted a series of interviews with Efrain
22  Johnson.
23      A.   Yes.
24      Q.   Efrain Johnson was determined to be the
25  third -- or the fourth person, or the third person,
```

5498

```
 1  involved in the homicides.
 2      A.  Yes.
 3      Q.  Okay.  I'm going to hand you some of your
 4  reports now, so if you need to reference those.
 5          In the course of your investigation, you
 6  interviewed Efrain Johnson on March 6, 2007; is that
 7  correct?
 8      A.  Yes.
 9      Q.  That was almost immediately after his
10  arrest.
11      A.  It was the night of his arrest, yes.
12      Q.  I'm turning your attention -- you prepared
13  a 302 in regards to that; is that correct?
14      A.  Yes, I did.
15      Q.  Now, a 302 is the FBI report that
16  memorializes that interview.
17      A.  Yes.
18      Q.  And I'm turning your attention to the
19  bottom of page 2 of that March 6th report.
20          In the course of that interview, Johnson
21  discussed with you what his role was and the role of
22  others.
23      A.  Yes.
24      Q.  And he told you in the course of that
25  interview that he had knocked on the door pretending
```

5499

```
 1  to be a crack cocaine customer.
 2      A.  Yes.
 3      Q.  And when the unknown female opened the
 4  door, they all bum rushed the door.  He told you
 5  that as well.
 6      A.  Yes.
 7      Q.  And he told you that someone he referred to
 8  as Big Dude grabbed the woman and rushed into the
 9  living room.
10      A.  I believe he said -- I would have to read
11  it.
12          MS. DAYTON:  Objection, leading.
13          THE COURT:  Sustained.
14          MR. SMITH:  Your Honor, this is, and as
15  before, a witness associated with the adverse party.
16          MS. DAYTON:  Your Honor, they called
17  him.
18          THE COURT:  I'm going to sustain the
19  objection.
20      Q.  All right, did he tell you --
21          THE COURT:  We would like the testimony
22  to come from Mr. Munger.
23      Q.  Did he tell you when the unknown female
24  opened the door they all bum rushed the door?
25      A.  Yes.
```

5500

```
 1      Q.  And did he tell you that Big Dude
 2  grabbed --
 3          MS. DAYTON:  Objection.
 4      Q.  And rushed into the --
 5          MS. DAYTON:  Leading.
 6          THE COURT:  Why don't you ask him what
 7  he told him.
 8      Q.  After he told you that they bum rushed the
 9  door, what did he tell you in that interview?
10          MR. SHEEHAN:  Could we approach, your
11  Honor.
12          (Sidebar conference).
13          MR. SHEEHAN:  The reason why I think
14  it's important that we be allowed to lead this
15  witness is because we have indicated the narrow area
16  that we intend to question him on.  If he goes other
17  places, then that's going to just open up other
18  avenues, and that's why I think we should be allowed
19  to lead.
20          MS. DAYTON:  They should have prepared
21  the witness.  They called him, they -- do you know
22  what, you asked me --
23          THE COURT:  Stop it.
24          MS. DAYTON:  Not to attack you.
25          THE COURT:  Just stop it.
```

5501

```
 1          MS. DAYTON:  We had a conversation off
 2  the record.  He asked me to not attack him at
 3  sidebar, and he repeatedly does it.
 4          THE COURT:  I just asked you to stop
 5  that.  I don't want any more of this.  Everybody is
 6  very tense and I want you to keep it under control,
 7  all of you.
 8          You can ask him to refer to his 302 and
 9  what did he tell you next.  That is going to keep
10  him on the beam.
11          MR. SHEEHAN:  Okay.
12          MR. SMITH:  That's fine.
13          (Sidebar concluded)
14      Q.  I apologize for the interruption, Agent
15  Munger.
16          I had asked you about Mr. Johnson telling
17  you about the fact that they bum rushed the door.
18  What did he tell you after that?
19      A.  Directly after that?
20      Q.  Yes.
21      A.  He said they bum rushed the door, that --
22          THE COURT:  You can refer to your report
23  if you would like to.
24          THE WITNESS:  Thank you.
25      A.  He said that as they pushed in he -- the
```

5502

```
1   Big Dude and he went into the living room pushing
2   the woman in, and that the two brothers ran down the
3   hallway.
4        Q.  All right.
5        A.  And pushed or followed an unknown male into
6   a back bedroom.
7        Q.  And what did he tell you next?
8        A.  He said that Big Dude handed him rubber
9   gloves and instructed him to put them on.
10       Q.  When you say "him," you are referring to
11  Mr. Johnson?
12       A.  Yes.  Sorry.
13       Q.  And what did he tell you next?
14       A.  Mr. Johnson began taping the female
15  victim's hands.  And do you want me to keep going?
16       Q.  Yes, please.
17       A.  During that time she was asking what was
18  going on.  He said to calm down.  The Big Dude
19  punched her.  Big Dude ripped the tape out of
20  Johnson's hands and finished the taping himself, and
21  that's when Johnson said he backed up and became
22  more of an observer.
23       Q.  What did he say next?
24       A.  Well, he said he put his back up to the
25  wall and watched.  Then he was trying to see down --
```

5503

```
1   he was trying to see down the hallway to see what
2   was going on there.  I'm trying not to miss
3   something here.  He tried to see in the bedroom
4   where Azibo and Azikiwe took the unknown male, but
5   all he could hear were sounds of punching and
6   moaning.  He saw the Big Dude pull an object out of
7   the side of his pants and strike the unknown female
8   on the right side of the head.  And that's when he
9   said he ran out of the apartment.
10       Q.  Johnson said he ran out of the apartment?
11       A.  He ran out.
12       Q.  You had occasion to interview Mr. Johnson
13  again on March 7, 2007; is that right?
14       A.  Correct.
15       Q.  And in the course of that interview -- I'm
16  turning your attention to page 2 so you can
17  reference that if needed.  And the second to last
18  paragraph, about halfway down, I'm referencing that,
19  in regards to what Mr. Johnson told you that his job
20  was.
21       What did he tell you his job was that night
22  at the apartment?
23       A.  He said that his job was to knock on the
24  apartment door while the others waited around the
25  corner, and then when the unknown female answered
```

5504

```
1   the door they would bum rush her, charging in the
2   apartment.
3        Q.  Okay.  And what did he tell you next?
4        A.  That Big Man and he pushed the female into
5   the living room while Azibo and Azikiwe pushed an
6   unknown male into a bedroom.  Big Man handed him
7   rubber gloves.
8        Q.  Meaning to Johnson?
9        A.  I'm sorry.  Big Man handed Mr. Johnson
10  gloves, told him to put them on, and instructed
11  Johnson to tape the female up.  This was going on in
12  the living room, I think.
13       Q.  Then what did he tell you?
14       A.  She started screaming.  Big Man punched her
15  in the face.  She stumbled to the ground.
16       Q.  What did he tell you next?
17       A.  Big Man told Johnson to tape her feet
18  together.  The Big Man grew impatient with the speed
19  in which Johnson was taping her feet and ripped the
20  duct tape out of his hands, and that's when
21  Mr. Johnson backed up against the wall and watched
22  what was going on.
23       Q.  And what did he tell you next?
24       A.  He said that he's in the living room.  He
25  says the bedroom door was partially open and he
```

5505

```
1   tried to peek down the hallway and all he heard was
2   thumping and moaning from the room that Azibo and
3   Azikiwe went in.
4        Q.  And what did he tell you next?
5        A.  Big Man pulled a long metal pipe out of his
6   pants and smacked the unknown female on the right
7   side of the head while she was leaning over the bed.
8        Q.  And what did he tell you next?
9        A.  At that point we reminded him he had told
10  us that they were in the living room, not in the
11  bedroom.  And so he then said there was a sofa bed.
12       Q.  And then did he describe the pipe?
13       A.  He described the pipe as approximately
14  two-inches thick, ten-inches long.  This is the one
15  that supposedly came out of the pants.
16       Q.  And then what did Johnson tell you?
17       A.  He ran out of the apartment, and when -- he
18  said he ran out when Big Man struck the unknown
19  female.
20       Q.  Turning your attention to an interview you
21  did with Mr. Johnson on August 11, 2008.
22       A.  A particular page?
23       Q.  Yes, page 4, please.  Starting in that
24  fourth paragraph down, about middle part of the
25  paragraph, wherein Mr. Johnson is describing which
```

**GA1419**

5506

1  door that Azibo told him it was.
2       Would you describe what Mr. Johnson told you
3  in regards to that?
4      A.   The fourth paragraph?  If I'm understanding
5  you correctly, they came up to the first floor,
6  Azibo told Johnson which door it was.  And then
7  Johnson and the unknown male walked up to the door
8  where they were all gathered -- or when they were
9  all gathered, while standing outside, that's when
10 the Big Man now gets the gloves outside.  So,
11 unknown male hands him cream-colored latex gloves
12 outside the apartment now.
13     Q.   This is what Mr. Johnson is telling you,
14 that the Big Dude is handing him, Johnson, the
15 cream-colored gloves?
16     A.   No, I'm sorry, unknown male, who is
17 identified in this as the Big Dude.  Sorry.
18     Q.   And what did he tell you next?
19     A.   He knocked on the door.  A female voice
20 answered, "Who is it?"  He said, "Yo, what's up?"
21 She cracked the door open.  At that point -- in this
22 report it's referred to as unknown male, but it is
23 the Big Dude -- pushed Johnson through the door.
24 And they all bum rushed in.  Johnson and the unknown
25 male pushed the woman into the living room, and the

5507

1  unknown male told her to shut up, get on the ground
2  and Johnson heard a metallic thud sound.
3      Q.   When?
4      A.   When it hit the woman.
5      Q.   When who hit the woman?
6      A.   When the unknown male, the Big Dude.
7      Q.   Okay.  And what did Mr. Johnson tell you
8  next?
9      A.   That the unknown male, slash, Big Dude,
10 handed the duct tape to Johnson and told him to duct
11 tape her hands and her legs.
12     Q.   And what did he tell you next?
13     A.   And once again, he didn't move fast enough,
14 so the other guy, the Big Dude, ripped the tape from
15 his hand and took over the taping of the woman.
16     Q.   And then what did he tell you?
17     A.   And he -- and in this one he says the
18 unknown male told Johnson to leave.
19     Q.   And finally there was an interview on
20 October 2nd, 2008, correct?
21     A.   Yes.  I'm sorry.
22     Q.   That's all right.
23     Turning your attention to page 3, the fifth
24 paragraph down.  What did Mr. Johnson tell you in
25 that interview?

5508

1      A.   I'm sorry, say that again.
2      Q.   This is the fifth paragraph down.
3      A.   Second from the bottom?
4      Q.   Page 3, yeah, second from the bottom.
5      A.   What was your question now?
6      Q.   What did he tell you in regards to that
7  part of the interview?
8      A.   He said they stacked in the stairwell.  He
9  doesn't remember anyone walking by with a black bag.
10 He remembers the unknown male, slash, Big Dude,
11 handed Johnson a pair of rubber gloves, Johnson went
12 up to the door and knocked.  Once the door was
13 slightly opened, Johnson pushed into the
14 apartment -- or Johnson was pushed into the
15 apartment from behind, and the unknown male moved in
16 the center of the living room with the female.
17 Female was shoved to the ground.  Azibo and Azikiwe
18 ran down the hallway and pushed a black male into
19 the room on the right.
20     Q.   And then what did he tell you?
21     A.   The unknown male held Tina down.  I'm
22 sorry, the female.  At this point, referring to Tina
23 Johnson, and told Efrain Johnson to duct tape her
24 hands.  He says, Johnson says, he was doing a lousy
25 job and moving too slowly, the unknown male grew

5509

1  impatient, shoved Johnson against the wall, took
2  over.  Johnson stated that the female was leaning
3  over a bed while she was being taped.
4      Q.   What did he tell you then?
5      A.   He stood there for a few minutes, looked
6  down the hall, heard a lot of tussling noise from
7  down the hall.  He then departed the apartment and
8  going down the stairwell into the underground
9  parking garage.
10     Q.   To your understanding when he was referring
11 to Big Dude in these interviews, he was referring to
12 John Taylor?
13          MS. DAYTON:  Objection.
14     A.   At the time we didn't --
15          THE COURT:  Basis?
16     Well, I'm going to let him answer the
17 question.  Did you know --
18     Q.   What was your understanding about who
19 Mr. Johnson was referring to when he said Big Dude?
20     A.   There was a series of interviews over a
21 year, I think a year, 18 months, at different
22 points.  We didn't know if he was making the
23 character up to lessen his role, and then at this
24 point I did not -- he was not identified.  We did
25 not identify John Taylor, so it was just a large

5510

```
1   male that we were still trying to identify at that
2   point.
3           MR. SMITH:  I have nothing further, your
4   Honor.
5           THE COURT:  All right, shall we take a
6   brief recess?
7           MS. DAYTON:  Sure.
8           THE COURT:  Take a 15-minute recess.
9           (Jury exited the courtroom)
10          THE COURT:  All right, Mr. Munger, we'll
11  be back in 15 minutes.  Please don't discuss your
12  testimony.
13          (Recess).
14          THE COURT:  All right, Mr. Munger, why
15  don't you come back to the stand and we'll bring
16  back the jury.
17          MS. DAYTON:  I'm sorry I didn't stop at
18  sidebar when you told me to.  I am apologizing.
19          THE COURT:  I don't want any more
20  sniping at one lawyer to another.  I am going to
21  stop it in its tracks and whoever is doing it is
22  going to be the one who is the target of that.  I
23  understand that emotions are running high, but it is
24  not only unseemly, it's unprofessional to snipe at
25  each other.
```

5511

```
1           Please bring the jury in.
2           (Jury entered the courtroom.)
3           THE COURT:  Please be seated, ladies and
4   gentlemen.  Cross-examination of Agent Munger.
5           MS. DAYTON:  Thank you, your Honor.
6   CROSS-EXAMINATION
7   BY MS. DAYTON:
8       Q.  Good morning, Agent Munger.
9       A.  Good morning.
10      Q.  Can you please explain to the jury what a
11  proffer is.
12      A.  A proffer is when somebody comes in, a
13  subject, comes in with his attorney, sits down with
14  assistant U.S. attorneys and the agents or the task
15  force officers.  They enter into an agreement and
16  they basically tell their side of the story.
17  They're supposed to tell everything, anything and
18  everything, and tell the truth.
19      Q.  And usually the proffers, that's another
20  word for a meeting, right?
21          MR. SMITH:  I'm going to object --
22      A.  Yes.
23          MR. SMITH:  -- as this being outside the
24  scope.
25          THE COURT:  The statements on which
```

5512

```
1   Mr. Munger was questioned were proffer sessions.
2           THE WITNESS:  Yes.
3           THE COURT:  Overruled.
4       Q.  And proffer sessions are designed to work
5   towards a cooperation agreement, correct?
6       A.  Yes.
7       Q.  And Efrain Johnson never got a cooperation
8   agreement, did he?
9       A.  No.
10      Q.  And that's because it was determined he was
11  lying.
12          MR. SMITH:  Objection.
13          THE COURT:  Sustained.
14      Q.  So, you first met with him on March 6th of
15  2007.
16      A.  Yes.
17      Q.  And at that time Johnson said he hadn't
18  been to Charles Street for eight or nine years,
19  correct?
20      A.  Yes.
21      Q.  And then you showed him a DNA lab report
22  showing his DNA was found at the scene.
23      A.  Yes.
24      Q.  And then --
25          MR. SMITH:  Objection.  This is all
```

5513

```
1   outside the scope.
2           THE COURT:  No, it's not, because his
3   later statements -- how far back does eight or nine
4   years ago.  No, it goes back to the time -- I'm
5   going to permit that question.
6       Q.  And then after -- you showed him a DNA lab
7   report, correct?
8       A.  Yes, I did.
9       Q.  And then he changed his story and said that
10  Dreddy told him to knock on the door to see if the
11  occupants would sell him drugs, right?
12      A.  Yes.
13      Q.  And he claimed that a woman answered the
14  door.
15      A.  Yes.
16      Q.  And he said that he spit in this woman's
17  face, right?
18      A.  Yes.
19      Q.  And then they left, correct?  That's what
20  he said to you?
21      A.  Yes.
22      Q.  Okay.  And then, he was confronted, Johnson
23  was confronted with the fact that his DNA was
24  actually on a piece of latex glove stuck in the duct
25  tape, correct?
```

5514

```
1        A.    Yes.
2        Q.    And he asked if he could start over?
3        A.    Yes.
4        Q.    And after that he said the defendant called
5   him on the day of the murders, right?
6        A.    Yes.
7              MR. SMITH:  Objecting as being outside
8   the scope.
9              THE COURT:  Sustained.
10       Q.    And that he, being Johnson, the defendant,
11  Azikiwe Aquart, and someone he kept referring to as
12  a Big Dude went over to Charles Street in the middle
13  of the night on the day of the murders, correct?
14       A.    Yes.
15       Q.    And he kept calling Taylor -- well, he
16  never called him Taylor, did he?
17       A.    No, he never did.
18       Q.    Or John?
19       A.    Nope.
20       Q.    Or Fitzgerald?
21       A.    No.
22       Q.    Or Yes Yes?
23       A.    No.
24       Q.    Or Black?
25       A.    No.
```

5515

```
1        Q.    He just kept calling him Big Dude, right?
2        A.    Big Dude.
3        Q.    And he said they went to Charles Street,
4   and Johnson said he knocked on the door, right?
5        A.    Yes.
6        Q.    And he said again that Tina answered it,
7   correct?
8        A.    He said a female, but yes.
9        Q.    A female.  And he did not admit that the
10  door was kicked in, did he?
11       A.    He said to the contrary, she opened the
12  door and they pushed through once there was a, you
13  know, a crack in the --
14       Q.    Once it was opened.
15       A.    Yes.
16       Q.    Okay.  And Johnson didn't admit that the
17  defendant had a gun, did he?
18       A.    No, he did not.
19       Q.    And he said that all four rushed into the
20  living, correct?
21       A.    He said he and the Big Dude went into the
22  living room, pushed the woman back in the living
23  room, and Azibo and Azikiwe went down the hallway
24  and pushed a man into the back right bedroom.
25       Q.    Which would be Basil Williams, right?
```

5516

```
1        A.    Yes.
2        Q.    Now, at first Johnson claimed that it was
3   the Big Dude who hit Tina, right?
4        A.    Yes.
5        Q.    And he later, on November 20, 2008,
6   admitted that he, quote-unquote, touched the victim
7   first, right?
8        A.    The female victim.  Which date?
9        Q.    November 20th of 2008.  Drawing your
10  attention to the fourth paragraph down.
11       A.    I don't have that 302.
12       Q.    I'm sorry.  You just have the one the
13  defense gave you?
14       A.    Yes.
15       Q.    Okay.
16             THE COURT:  So November 20, 2008, what
17  did he say about touching the victim.
18             THE WITNESS:  Johnson said he touched
19  the victim Tina Johnson first because he was the
20  first one in the door.
21       Q.    And Johnson claimed that he tripped over
22  Tina, correct?
23       A.    Yes.
24       Q.    And that he knocked her down?
25       A.    He push her down and -- yes.
```

5517

```
1        Q.    So, he pushed her down, not the Big Dude.
2        A.    Yes.
3        Q.    Okay.  And on this date he was shown a
4   photographic lineup, wasn't he?
5        A.    Yes.
6             MS. DAYTON:  This has been shown to the
7   defense and I understand they have no objection.
8             Is that correct.
9             MR. SMITH:  No objection.
10            MS. DAYTON:  We'd ask to admit
11  Government's Exhibit 17 for the penalty phase, your
12  Honor.
13            THE COURT:  All right.
14       Q.    And though this is a bit dark, do you see
15  John Taylor in that lineup?
16       A.    Yes, I do.
17       Q.    What number is he?
18       A.    He's No. 6.
19       Q.    So right here?
20       A.    Yes.
21       Q.    And when you showed this to Johnson, did he
22  identify Taylor?
23       A.    No, he did not.
24       Q.    Did he say he recognized anyone in those
25  photos?
```

5518

```
1     A.   He didn't recognize anyone.
2     Q.   Okay.  And did you again later meet with
3  Johnson on May 4th, 2009, to show him a different
4  photographic lineup?
5     A.   Yes, and I don't have that here.
6     Q.   Okay.  Is that the right date?
7     A.   Yes.
8          MS. DAYTON:  Your Honor, the government
9  seeks to admit Government Exhibit 18 for the penalty
10  phase.  It's my understanding there is no objection.
11          MR. SMITH:  No objection.
12          THE COURT:  All right.
13     Q.   And did you show him this photographic
14  lineup?
15     A.   Yes, I did.
16     Q.   Is John Taylor in there?
17     A.   Yes.
18     Q.   What No. -- well, where is he?
19     A.   He's in -- it would be No. 7.
20     Q.   Right here?
21     A.   Yes.  That's him.
22     Q.   And did Johnson admit to you that he
23  recognized Taylor?
24     A.   He did not recognize any individuals
25  contained in the array -- the photo array.
```

5519

```
1     Q.   Despite the fact that he admitted he had
2  gone and committed a murder with this person.
3     A.   Yes.
4     Q.   Now, you testified on direct that Johnson
5  told you that Taylor gave him tape to tape Tina up;
6  is that correct?
7     A.   Yes.
8     Q.   And he claimed when he wasn't moving fast
9  enough that the Big Dude, who he couldn't identify,
10  ripped the tape out of his hands and finished taping
11  Tina's hands and feet.
12     A.   Yes.
13     Q.   And said this all happened in the living
14  room, correct?
15     A.   Yes.
16     Q.   Though on the various days he said it
17  happened on the ground and then on a bed and then on
18  a sofa bed.
19          MR. SMITH:  I'm going to object to the
20  compound form of the question.
21          THE COURT:  Sustained.
22     Q.   First he said --
23          THE COURT:  Just ask him what he told
24  him and on what date.
25     Q.   So, on 3/6/07 he told you that it happened
```

5520

```
1  on the ground, correct?
2     A.   I believe so.  Just give me one second.
3          Yes.
4     Q.   And the very next day, 3/7/07, you
5  interviewed him again, right?
6     A.   Yes.
7     Q.   And this time he said that Tina was
8  attacked on the bed, correct?
9     A.   He made the comment that the Big Dude hit
10  her while she was leaning over the bed.
11     Q.   And you reminded him that he had previously
12  said it was on the ground.
13          MR. SMITH:  I'm going to object.
14          THE COURT:  Basis?
15          MR. SMITH:  What he -- we're talking
16  about what Mr. Johnson told him.
17          THE COURT:  That was part of the direct
18  examination.  I'm going to permit the question.
19     Q.   Is that right?
20     A.   Can you ask it again?
21     Q.   And you reminded him that he had previously
22  said it was in the living room on the ground.
23     A.   Yes, I think I specifically said there was
24  no bed in the living room.
25     Q.   And what did Mr. Johnson tell you then?
```

5521

```
1     A.   He said it was a sofa bed.
2     Q.   There was no sofa bed in that apartment,
3  correct?
4     A.   No.
5     Q.   And so -- he also said that Tina was -- or
6  that the woman was taped, hands and feet, in that
7  front living room, correct?
8          THE COURT:  What date are you referring
9  to?
10          MS. DAYTON:  On 3/6 and 3/7/07.  Well,
11  repeatedly, your Honor.
12     A.   Yes.
13     Q.   And you're aware Tina died in the back
14  southwest bedroom, correct?
15          MR. SMITH:  Objection.  It's outside the
16  scope what he has knowledge of.  It's what
17  Mr. Johnson told him about what happened.
18          THE COURT:  I think it could be
19  rephrased.
20     Q.   Did you remind Mr. Johnson that Tina died
21  in the back bedroom?
22     A.   Yes.
23     Q.   And Tina weighed over 250 pounds, correct?
24     A.   I know she was a large woman.
25          MR. SMITH:  Object as to the relevance
```

5522

```
1   of this.
2              THE COURT:  Overruled.
3      Q.   So, she would have had to have been dragged
4   back there fully taped.
5              MR. SMITH:  Objection, speculation.
6              THE COURT:  Sustained.
7      Q.   And Johnson told you on 3/6 and 3/7/07 that
8   he could hear the sounds of punching and moaning
9   coming from the room where the defendant was with
10  Mr. Williams, correct?
11     A.   Yes.
12     Q.   And he said he also heard thumping coming
13  from that room although he claimed he couldn't see
14  into the room.
15     A.   Yes.
16     Q.   And he said that -- Johnson told you,
17  however, that he knew that the defendant and Azikiwe
18  were in that room.
19     A.   Yes.
20     Q.   Now, on August 11, '08, do you have that?
21     A.   Yes, I do.
22     Q.   Turning your attention to page 5, paragraph
23  three, Johnson claimed he was only in the apartment
24  for eight minutes; is that correct?
25     A.   Yes.
```

5523

```
1      Q.   Although previously on the 7th he admitted
2   that he was in the -- excuse me, March 7th of 2007,
3   he admitted he was in the apartment for 25 minutes;
4   is that correct?
5      A.   Give me one second.
6      Q.   Okay.  Drawing your attention to page 3.
7      A.   That helps.  Thank you.
8      Q.   Second full paragraph, last line.
9      A.   Yes.  He said he was in the apartment for
10  approximately 25 minutes.
11     Q.   And then later in October 2nd of 2008,
12  drawing your attention to page 4, first full
13  paragraph, Johnson admitted that the whole event
14  took 30 to 45 minutes; is that correct?
15     A.   Which paragraph?
16     Q.   The first full paragraph.
17     A.   Yes.  He said the whole event took 30 to
18  45 minutes.
19     Q.   And that he waited in the car for about
20  15 minutes of that.
21     A.   Fifteen to 20 minutes, yes.
22     Q.   Johnson also told you that -- he claimed
23  that Big Dude got rid of the clothes after the
24  murders, correct?
25              MR. SMITH:  Objection, outside the
```

5524

```
1   scope.
2              THE COURT:  Sustained.
3      Q.   Were you here in this court when Johnson
4   came in here to plead guilty?
5      A.   Yes, I was.
6      Q.   And during that plea, he had to tell the
7   court under oath what he did wrong, correct?
8      A.   Yes.
9      Q.   And isn't it true that during that
10  statement -- excuse me, during that sworn statement,
11  that Johnson said "I helped Dreddy gain access to
12  someone's house and I taped the person up and that's
13  it"?  Did you hear him say that?
14     A.   I heard him say that.
15     Q.   And then he -- and then the Court asked,
16  "And you helped someone.  Who is the someone?"  And
17  Johnson replied "Azibo."  Did you hear that?
18     A.   Yes.
19     Q.   And then the Court asked, "And you helped
20  him do what?"  And Johnson responded, "Tape Tina
21  Johnson up and I drove him from the scene."
22          Did you hear that?
23     A.   Yes.
24     Q.   So, he never said a word about Taylor
25  having anything to do with the taping, did he?
```

5525

```
1      A.   That is correct.
2      Q.   Now, prior to him coming in -- and that was
3   just an attempt at a straight plea, correct, and not a
4   cooperation agreement?
5      A.   That is correct.
6              MR. SMITH:  Objection.  Object as to the
7   relevance of that.  Ask that it be stricken.
8              MR. SHEEHAN:  May we approach on that?
9              THE COURT:  I'm going to permit it.
10             MR. SHEEHAN:  Can we approach on that,
11  your Honor?
12             THE COURT:  Yes.
13             (Sidebar conference)
14             MR. SHEEHAN:  Your Honor, he was seeking
15  to get credit.  The distinction between a straight
16  plea and a cooperation agreement makes no sense in
17  the context for this jury's understanding.  That's
18  the problem with the question.
19             THE COURT:  What's the purpose of the
20  question?
21             MS. DAYTON:  To show that -- well, they
22  asked about his impressions before of what Johnson
23  was saying to them.
24             MR. SMITH:  Not in a direct sense, your
25  Honor.  I asked what his understanding of who Big
```

**GA1424**

5526

```
1   Dude was.  It was confined to that very small area.
2         MS. DAYTON:  Then I'll go back into the
3   February 2010 proffer where he was confronted, told
4   that he was contradicted, and he denied all of this.
5   I'll do that instead.
6         MR. SMITH:  Your Honor, that's -- what
7   someone else said, from the point of view of this
8   witness, this may well be the truth.  The government
9   doesn't get to decide that.  And the other problem
10  with asking about the plea, your Honor, what type of
11  plea, is that it suggests the government has the
12  authority to offer plea deals and that they didn't
13  offer such a plea deal to Mr. Johnson, and it's a
14  form of vouching.
15        THE COURT:  It seems to me what's
16  relevant for the jury's purposes is he came in to
17  plead guilty, to tell truthfully what he did.  And
18  that's been in and we should continue.  I'm going to
19  strike the business about the cooperation agreement
20  which is just between the defendant and the
21  government.  The Court doesn't play a role in the
22  cooperation agreement other than to make sure he
23  knows what it says.
24        MS. DAYTON:  If I may just add one
25  thing, your Honor.  The reason I asked it is because
```

5527

```
1   during the guilt phase of the trial and during
2   argument, the defense repeatedly referred to the
3   fact that only the government has the right to
4   decide who is telling the truth and who is not, and
5   that as long as we say something that benefits --
6   someone said something that benefited us, we'd put
7   them on the stand.
8         THE COURT:  But you've already
9   established he never had a cooperation agreement.
10        MS. DAYTON:  Okay.  I'll move on, but I
11  am going to ask about that.
12        THE COURT:  Let me look at this.
13        MR. SMITH:  Your Honor, that is
14  absolutely outside the scope.
15        THE COURT:  So this is just with respect
16  to the first attempt of breaking in and he denied
17  taking part in that attempt.
18        MS. DAYTON:  And the bats and the ski
19  masks.
20        THE COURT:  But that hasn't been --
21        MS. DAYTON:  Your Honor, but the bats go
22  directly to the heinous issue and he did bring up
23  the alleged pipe.
24        THE COURT:  Right.
25        MS. DAYTON:  And so this goes to that
```

5528

```
1   issue.  He claims he never saw any other weapons,
2   and this goes directly to the issue of the weapons
3   that were used.
4         THE COURT:  No, he doesn't say that.  He
5   says he denies wearing a ski mask or seeing any
6   baseball bats.
7         MS. DAYTON:  Right.
8         MR. SMITH:  That's not inconsistent.  He
9   didn't see the murders by his own accounting.
10        THE COURT:  Well --
11        MS. DAYTON:  Your Honor, you even said
12  yesterday that --
13        THE COURT:  But what he's talking about
14  here is not any other weapon.  He didn't asked about
15  any other weapon.  He just denied seeing baseball
16  bats.
17        MS. DAYTON:  He was repeatedly
18  throughout the course of the proffers asked about
19  weapons, and they were allowed to bring in the pipe.
20  And if that goes to the heinousness, well, so does
21  the baseball bats.  They opened the door to the
22  weapons.
23        THE COURT:  But how does this contradict
24  the earlier statements that he gave about what
25  Taylor had --
```

5529

```
1         MS. DAYTON:  Your Honor, it goes to his
2   -- number one, it goes to his credibility.  Number
3   two, it was established that you could see
4   everything in that apartment.  It was like
5   500 square feet; no matter where you were standing
6   you could see into the rooms.  There is no way that
7   he didn't see baseball bats.  And there is no way
8   that these victims were all killed with a ten-inch
9   pipe.  Your Honor acknowledged as much this morning
10  when you said that Martin testified that one small
11  hit wouldn't have caused this.  They raised the
12  issue of the heinous, cruel and depraved manner.  I
13  have a right -- and relative roles.  And so this was
14  the whole reason I said none of this should come in,
15  period, because it's like -- it gets confusing.  But
16  they raised the issue of what weapon was used to
17  strike people and if they're saying that relative
18  culpability, well, hitting someone with a ten-inch
19  pipe versus hitting someone was a baseball bat is a
20  whole different thing.
21        THE COURT:  So the statement that he
22  makes on February 8, 2010, is whether he was aware
23  of the use of baseball bats or ski masks.
24        MS. DAYTON:  And the attempt.
25        THE COURT:  It says in homicides.
```

5530

1      MS. DAYTON:  Well, it's poorly written.
2      THE COURT:  He denied wearing a ski mask
3  or seeing any baseball bats.
4      MS. DAYTON:  And this was specifically
5  after his sister told us that, you know, he had said
6  about the baseball bats and the ski masks.
7      THE COURT:  Anything further?
8      MR. SMITH:  I think your original
9  analysis was correct, your Honor.  He made
10  statements about what he witnessed.  When they come
11  to him and say, well, was there these baseball bats,
12  and he says no, that may conflict with other
13  witnesses, that's true, but that's not how you
14  impeach -- if Mr. Johnson was on the stand, well,
15  you know, isn't it true that so and so said there
16  were baseball bats there, that would be an improper
17  question in terms of trying to impeach him.  This is
18  just a general impeachment of his credibility.  They
19  can introduce Mr. Johnson's record, they can bring
20  up the inconsistent statements, but this is not
21  inconsistent with his prior statement.  He never
22  said before I did see baseball bats and now he's
23  denying it.
24      THE COURT:  Well, it's somewhat
25  inconsistent with his sister's testimony on what he

5531

1  said.
2      MR. SMITH:  Again, your Honor, it may be
3  inconsistent with some other witness's testimony,
4  but on direct I asked him about what happened in the
5  apartment.  He told the agents from his point of
6  view what he saw.  Now, this is not necessarily
7  inconsistent because he left by his own account
8  before the murders occurred.  Now --
9      THE COURT:  It seems to me that none of
10  these statements that the defendant's have put in
11  gets to whether he did or did not see baseball bats
12  or ski masks.  So, I'm not sure, other than a broad
13  attack on his credibility, which is what I was not
14  going to permit, only where the statements that were
15  offered were contradicted or not credible.
16      MS. DAYTON:  Your Honor, he claimed that
17  the only weapon he saw was a ten-inch pipe.
18      THE COURT:  I don't think that's
19  accurate.  He says I saw the ten-inch of pipe, he
20  didn't say that was the only thing he saw.  I don't
21  remember any testimony read from the 302 in which he
22  said that was the only weapon he saw.
23      MS. DAYTON:  Your Honor, they put on
24  Johnson to attack Taylor's credibility.
25      THE COURT:  Correct.

5532

1      MS. DAYTON:  I am only attacking
2  Johnson's credibility with Johnson's statements
3  versus -- but you are right, number one, it does
4  conflict with -- his own testimony basically.
5      THE COURT:  So that's for argument.
6      MS. DAYTON:  No, but not if I can't get
7  it in.  I can't argue it if I can't get it in.  And
8  he claims -- they have left the inference that these
9  murders were committed with a ten-inch pipe.  And
10  the defendant, this defendant, Johnson, contradicted
11  himself.  He told Lashika Johnson that he saw
12  baseball bats and he was wearing a ski mask and that
13  he saw the victims get hit with a baseball bat.
14      MR. SMITH:  I don't believe that's an
15  accurate representation of the testimony of
16  Ms. Johnson, Lashika.
17      MR. MARKLE:  That she saw -- I don't
18  know about being hit, but there were gloves and
19  masks.
20      MR. SMITH:  I disagree, your Honor, I
21  think he said he knew those things had been disposed
22  of, but he didn't say he saw them.
23      MS. DAYTON:  He did say he saw them.
24      THE COURT:  Okay.  The testimony has
25  been that he took -- said he took part in the first

5533

1  attempt.
2      MS. DAYTON:  No, he --
3      THE COURT:  To get into apartment, no.
4      MR. SMITH:  No, your Honor, the portions
5  of the 302 I read were talking about the night of
6  the murders.  I did not ask any questions about the
7  first attempt or any other time.
8      THE COURT:  So the spitting was the
9  second attempt?
10      MR. SMITH:  I believe that's what --
11      MR. SHEEHAN:  This is the only time.
12      MR. SMITH:  This is the only time that
13  was ever discussed.
14      MS. DAYTON:  Your Honor, but going back
15  to relative culpability, if their whole argument
16  this morning was based on relative culpability, and
17  if relative culpability is truly the reason they
18  wanted this in, then relative culpability has to do
19  with the baseball bats, has to do with the relative
20  culpability, and him lying about it also has to do
21  with it because he can't tell the truth about
22  anything.  That's the whole point.  It leaves the
23  jury with a misimpression about his testimony, or
24  his statements.
25      THE COURT:  I'll permit the government

5534

```
1   to ask what he said when asked about the ski mask or
2   seeing any baseball bats because he has testified as
3   to what he did see in the other statements.  This is
4   within the scope of that.  And this may be argued as
5   to whatever he told Lashika Johnson, which I urge
6   people to check the transcript before arguing it.
7   So I'm going to permit that he denied wearing a ski
8   mask or seeing any baseball bats, but that's all.
9            MS. DAYTON:  Okay.  Thank you.
10           (Sidebar concluded)
11           THE COURT:  So, ladies and gentlemen,
12   I'm going to strike the last question and answer.
13   And you are to understand that discussion to have
14   been with respect to a proceeding in which Efrain
15   Johnson attempted to enter a guilty plea.  All
16   right.
17      Q.  Do you have the proffer statement from
18   February 8, 2010?
19      A.  No, I don't.
20      Q.  Did you ask Efrain Johnson about ski masks
21   and baseball bats?
22      A.  Yes, we did.
23      Q.  What did he tell you?
24      A.  He denied -- we asked if he was aware of
25   the use of baseball bats or ski masks.  He denied
```

5535

```
1   seeing any baseball bats or wearing any ski masks.
2      Q.  And so during the course of speaking with
3   Johnson, did you also ask him about selling crack
4   cocaine?
5            MR. SMITH:  Objection, outside the
6   scope.
7            THE COURT:  Sustained.
8      Q.  Do you know how the defendant Johnson -- I
9   mean how the defendant knew Johnson?
10           MR. SMITH:  Objection, outside the
11   scope.
12           THE COURT:  Sustained.
13      Q.  Did Johnson ever acknowledge -- well, he
14   claimed to have seen this ten-inch pipe come out of
15   Taylor's pants, correct?
16      A.  Yes.
17      Q.  And he never acknowledged seeing any other
18   weapon, did he?
19      A.  That is correct.
20      Q.  Thank you.
21           MS. DAYTON:  I have nothing further,
22   your Honor.
23           MR. SMITH:  We have no further
24   questions, your Honor.  Thank you.
25           THE COURT:  All right, Agent Munger,
```

5536

```
1   thank you.  You may step down.
2            All right, will the defense please call
3   the next witness.
4            MR. SMITH:  Yes, your Honor.  The
5   defense calls Cheryl Kennedy.
6            C H E R Y L   K E N N E D Y
7   Having first affirmed, was examined and testified as
8   follows:
9            THE COURT:  Thank you.  Good afternoon.
10           THE WITNESS:  Cheryl Kennedy.
11   K-e-n-n-e-d-y, Manhattan, New York.
12           THE COURT:  All right, you may proceed.
13   DIRECT EXAMINATION
14   BY MR. SMITH:
15      Q.  Hi, Ms. Kennedy.  I'm going to just ask you
16   to pull that microphone a little closer to you.
17      A.  Is that better?
18      Q.  Yes, thank you.
19           Cheryl Kennedy, is that your legal name?
20      A.  Yes.
21      Q.  Do you go by any other name?
22      A.  Yes.  Ife Felix.
23      Q.  What name does that signify?
24      A.  I'm an artist and I wrote a couple books,
25   so that's my artist name.  It sounds prettier than
```

5537

```
1   Cheryl Kennedy.
2      Q.  I agree.  You are currently living where?
3   I'm sorry.
4      A.  In Manhattan.
5      Q.  In Manhattan.  And how long have you lived
6   there?
7      A.  About 40-something years.
8      Q.  Were you born in the U.S.?
9      A.  No.  Jacksonville, Florida.
10      Q.  And did there come a time -- well, let me
11   ask you this:  What are you doing now?
12      A.  I'm full-time artist.
13      Q.  And what kind of art do you do?
14      A.  Mixed media.  Traditionally it was
15   quilting, but I do art quilting as opposed to
16   traditional quilting.
17      Q.  I'm just going to ask you once more, pull
18   that mic just a little bit closer.
19      A.  I'm sorry, better?
20      Q.  I just want to make sure everybody can hear
21   you.
22      A.  That's better?
23      Q.  That's better.
24           And was there a time that you met Sonia
25   Smith?
```

5538

```
1      A.    Yes.
2      Q.    And do you remember when that was?
3      A.    We became friends, you know, an episode
4   about '91 to '94, 'til her death.  I was always
5   interested in reggae, Jamaican music.  When I was in
6   college I got very much interested in reggae, the
7   literature of the Caribbean writers, so I spent a
8   lot of time in Jamaica and I would run into her
9   occasionally.
10     Q.    Did you see her in other places as well?
11     A.    Yes, in New York City, in Harlem.
12     Q.    What was she doing in New York at that
13  time?
14     A.    She was running a hair salon for natural
15  hair, dreadlocks, grooming them, taking care of
16  people.
17     Q.    What were you doing at the time?
18     A.    I was on the other side of the shop working
19  the boutique.  My background is in fashion, I worked
20  in 7th Avenue fashion houses when I was younger, and
21  so I got involved with her in the shop.
22     Q.    Okay.  So you were -- the shop was sort of
23  connected?
24     A.    Yes.
25     Q.    And I want to show you a picture.  I
```

5539

```
1   believe there is no objection.  This is -- I'm
2   sorry, Defense Exhibit P-BBB.
3           Is that Sonia in the picture?
4      A.    Yes, it is.
5      Q.    And where was that picture taken?
6      A.    At the shop, in the office.  Yes.
7      Q.    And how long did you work at the store?
8      A.    From about '90 -- from '92 to her passing.
9      Q.    Was she living in New York at the time that
10  you met her?
11     A.    No, she was living in Connecticut.
12     Q.    Do you know where?
13     A.    Stamford.  I wasn't sure.  I was never
14  sure.
15     Q.    Okay.  So, was she commuting?
16     A.    Yes.
17     Q.    And how was she doing that?
18     A.    She was driving.
19     Q.    And when she was in New York, how long was
20  would she stay at a time?
21     A.    Sometimes she would leave at the end of the
22  day and go back up to Connecticut, or sometimes she
23  stayed with me at my apartment or some other place.
24  Probably with -- I'm not really clear.  I don't
25  remember, but I knew she stayed with me sometimes.
```

5540

```
1      Q.    Okay.  And during the course of the time
2   that you knew her, did you come to meet her sons?
3      A.    Yes.
4      Q.    And do you remember what their names were?
5      A.    Oh, wow.  There was a lot of Azibos and
6   Azikiwe.  Aziza.  Is that --
7      Q.    Azizi, does that sound --
8      A.    Azizi, okay.  That's the oldest, yes?
9      Q.    Yes.
10     A.    Okay.
11     Q.    And of course you know the defendant here.
12     A.    Azibo.
13     Q.    What name did you know him by?
14     A.    Jumbo.  But Azibo also.
15     Q.    And would you see Azibo in New York
16  sometimes?
17     A.    Yes.
18     Q.    How often would he --
19     A.    He came down with his mom more so than the
20  other brothers.  I saw him when she came down
21  regular -- you know, sometimes she came down with
22  him.  Okay.
23     Q.    And there were times she was there without
24  him?
25     A.    Right.
```

5541

```
1      Q.    And where were the boys when she was there?
2   Do you know?
3      A.    I don't know.
4      Q.    At some point did she start a relationship
5   with a man in New York?
6      A.    Not -- as far as the children?  Not -- the
7   father of the -- the father of the girls?
8      Q.    That's what I'm asking.
9      A.    Yes, yes.  That relationship was going when
10  I met her.
11     Q.    So, she --
12     A.    She had the two little girls already, and
13  when she and I were friends she had the third little
14  girl.
15     Q.    Okay.
16     A.    Yes.
17     Q.    And by what name did you know him?
18     A.    The man?
19     Q.    Yes.
20     A.    Skibo.  But I -- yes.
21     Q.    Skibo.  And how was her relationship with
22  Skibo?
23     A.    It was volatile.  You know, up and down.
24  Up and down.  I think at that time she was weaning
25  her way out of that relationship because it wasn't a
```

**GA1428**

5542

```
1   good relationship.  It wasn't a healthy
2   relationship.
3       Q.   Why do you say that?
4       A.   He was not a nice person.  A few times in
5   the shop he came in and they had a verbal
6   altercation.  He -- what do you call it -- hit her
7   head with his head.
8       Q.   Like a head butt?
9       A.   Yes, a head butt.  And she got a big
10  bruise.  I had asked would you like to call the
11  police, she said no, leave it alone, you know.
12      Q.   Were you aware of other physical
13  altercations?
14      A.   Not physical altercations, no.
15      Q.   Did you observe him being verbally abusive?
16      A.   Verbally, yes.  He was always yelling.
17      Q.   And did there come a time, for instance,
18  that he had purchased a car for her?
19      A.   Yes.  She had a Nissan Sentra, I think it
20  was, and she could never fit all of the children in
21  the car.  So I think at one point he bought her a
22  Quest which it had just came out.  And I remember
23  her saying it's a nice car, but I still can't fit
24  all of my children in the car.  You know, it was six
25  of them, and she's the driver, it just can't fit all
```

5543

```
1   of her children in the car.
2       Q.   And what did she take that to mean?
3       A.   That he didn't want -- Skibo did not want
4   the boys in the car.  He wanted her and his girls.
5   He was not interested in her sons.
6       Q.   And at some point was -- did Skibo have
7   custody of the girls?
8       A.   Yes.
9       Q.   Could you tell us about that?
10      A.   At one point -- well, most of the time he
11  would come to visit her to see the girls.  You know,
12  he would come in and then the drama would start,
13  whatever, the verbal fighting would start.  And this
14  went on every time she went -- I mean he came over
15  to see the kids.  She got tired of it.  She says,
16  okay, listen, you take the kids, I'll come visit
17  them.  That was a way of kind of just like not
18  having so much drama in her life.  So she gave him
19  custody of the girls and said, you keep them, I'll
20  come visit them, that would cut down on some of the
21  drama.
22      Q.   Okay.  Did Sonia ever discuss the boys'
23  father?
24      A.   Not with me.  Very -- not with me, no.
25      Q.   How would you consider your relationship
```

5544

```
1   with Sonia?
2       A.   She was like my sister.  She was the same
3   age as my younger sister, and they used to say they
4   were twins because they were both my sisters.
5       Q.   They looked somewhat alike?
6       A.   No, they were just the same age.  Yeah.
7       Q.   And what was Sonia doing at this time, I
8   mean, in terms of the business?
9       A.   What do you mean?
10      Q.   Well, how was the business going?  Let's
11  put it like that.
12      A.   It was going okay.  She would come in
13  usually about ten o'clock, she would have
14  appointments lined up, and she would come in and
15  begin working.  You know, she would do people's
16  hair.
17      Q.   And how was the shop as a financial going
18  concern?
19      A.   Well, we didn't make a whole lot of money,
20  but we made money.  You know, just enough to keep
21  the bills going, pay the bills, you know, and it was
22  a lot of fun.  It wasn't work, it was fun.
23      Q.   Were there times when you were having
24  trouble at the shop financially?
25      A.   Every now and then, yeah.  Yes.
```

5545

```
1       Q.   And was Skibo involved financially with the
2   shop?
3       A.   You know, I didn't really know that, but I
4   know a few times he did bail us out.  He'd pay the
5   rent or something that, you know, but he
6   didn't -- he wasn't like at the shop every day.  He
7   came in rarely, but he did have an appearance there
8   every now and then.
9       Q.   What was your knowledge of Sonia's
10  relationship with her mother?
11      A.   Oh, she told me that we had sort of a
12  similar background.  Her mother abandoned her when
13  she was a little baby and left her on the bed.  I
14  remember she said she left her on the bed propped up
15  very nicely.  When the father went to sea to fish
16  and when he came back, he was there, you know, he
17  came, she was not there.  And she hadn't seen her --
18  they were estranged for a long, long time and that
19  the mother was in Canada.  So she didn't have a good
20  relationship with her mom.
21      Q.   And did there come a time when you were
22  visiting in Florida?
23      A.   Yes.
24      Q.   Would this have been May of '94?
25      A.   Yes, Memorial Day.  Memorial weekend.
```

**GA1429**

5546

```
1      Q.   Who were you with down in Florida?
2      A.   I was with my family, my grandmother.
3      Q.   I'm sorry, where were you at?
4      A.   We were in Jacksonville, Florida for the
5  weekend, and it was at a like a street festival, a
6  three-day weekend festival.
7      Q.   What kind of festival?
8      A.   African, kind of African festival.  They
9  had vendors, they had shows, free shows, dance
10 classes.  Just stuff like that.  And we took stuff
11 down to sell.  So we were vending and, you know,
12 having a good time there, meeting new people.
13     Q.   And did Sonia come visit you while you were
14 there?
15     A.   Yes.
16     Q.   And did you guys go to the beach?
17     A.   Yes.  We went to the beach.
18     Q.   What beach did you go to?
19     A.   We went to -- they call it Ferndene Beach,
20 but it's American Beach on the coast, close to
21 Georgia.
22     Q.   And how --
23          MS. RODRIGUEZ-COSS:  I'm sorry, your
24 Honor, may we approach for a minute.
25          THE COURT:  Yes.
```

5547

```
1          (Sidebar conference)
2          MS. RODRIGUEZ-COSS:  Your Honor, if the
3  defense intends to get into the exact manner in
4  which the mother died and have this witness describe
5  the drowning, we have an objection to that.  It's
6  been established already that the defendant was not
7  there and he did not live through that, and so we
8  don't think it's relevant.  And even if it were
9  relevant in any way, we think it's unduly
10 prejudicial.  He was not exposed to his mother's
11 death.  He didn't witness it.  He was in another
12 house with another person when it happened.  He was
13 told about it later.  So I think to have this
14 witness describe the exact manner in which the
15 mother drowned is not relevant to the issues at hand
16 here.
17          THE COURT:  Mr. Smith, where are you
18 going with this?
19          MR. SMITH:  Your Honor, I am intending
20 to ask this witness, she is an eyewitness to the
21 drowning of Sonia Smith.
22          THE COURT:  Yes.
23          MR. SMITH:  The fact that Sonia Smith
24 has drowned is a mitigator we're allowed to present
25 evidence on.
```

5548

```
1          THE COURT:  Right.  It's a mitigator
2  because of its impact on the defendant.
3          MR. SMITH:  That is correct, your Honor,
4  but this jury has heard varying versions of how this
5  occurred, she was trying to save someone, that the
6  boys witnessed it.  I want to make clear for the
7  jury exactly the circumstances of it.  And I think
8  it is relevant and it's our mitigator to prove by --
9  in a manner that we see fit, and I believe this
10 is --
11          THE COURT:  But wait a second.  There is
12 one witness who, the teacher, who thought that Azibo
13 had seen the mother drown.
14          MR. SMITH:  There was also a reference
15 to the DCF records, I think that he had seen --
16 something in reference that the kids had seen their
17 mother drown.
18          THE COURT:  I thought that was all the
19 same testimony.
20          MR. SMITH:  I may be mistaken.
21          THE COURT:  In any event, the woman who
22 they were staying with at the time.
23          MR. SMITH:  Desta.  Ms. Meghoo.
24          THE COURT:  Ms. Meghoo clearly said they
25 were with her when the mom drowned.  So, I don't
```

5549

```
1  understand what that has to do with a mitigator for
2  the defendant.  If she wants -- if she told Azibo
3  all these details such that it impacted him, that's
4  one thing, but just having her be an eyewitness to
5  something that Azibo was not an eyewitness to seems
6  worlds apart.
7          MR. SMITH:  Again, your Honor, this is
8  our mitigator.  I want to be clear.
9          THE COURT:  Tell me what the mitigator
10 is then.
11          MR. SMITH:  The mitigator is that Sonia
12 Smith drowned.
13          MS. RODRIGUEZ-COSS:  It's been proven.
14          MR. SMITH:  Your Honor, that's their
15 opinion.
16          THE COURT:  You can -- you can certainly
17 have her say that yes, she drowned.
18          MR. SMITH:  Your Honor, I don't believe
19 it's proper to handcuff my ability to present my
20 case.
21          THE COURT:  What more is it she is going
22 to testify to?
23          MR. SMITH:  She's going to testify that
24 there were no lifeguards at the beach that day, that
25 this was primarily a black beach.
```

5550

```
 1          MS. RODRIGUEZ-COSS:  That's not
 2  relevant.  How is that relevant?
 3          MR. SMITH:  Because it's describing the
 4  circumstances of her drowning, your Honor.
 5          THE COURT:  I understand that.  What I
 6  don't understand is why it is a mitigator.  The
 7  mitigator is --
 8          MR. SMITH:  You've already approved it
 9  as being a mitigator, it's been charged to the jury
10  in the preliminary instructions.
11          THE COURT:  Yes, that the mom died --
12  that the mom drowned.
13          MR. SMITH:  Yes.
14          THE COURT:  There is nothing that
15  disputes that.  And the mitigator is not how she
16  drowned, because he never knew, unless you can tie
17  this in, that he knew any of these details.  It
18  seems to me that this is purely an irrelevant
19  description that may improperly invoke sympathy.
20  And so the question why it's a mitigator is that the
21  mom drowned and that all of a sudden this little
22  12-year-old who saw his mother that morning didn't
23  see his mother ever again.  But I'm really not
24  understanding why the details of how she drowned,
25  unless Azibo knew or Azikiwe knew them or Azizi knew
```

5551

```
 1  them, bears on the mitigator.
 2          MR. SMITH:  Your Honor, again, there has
 3  been conflicting testimony as to what happened that
 4  day.  I think it should be clear to the jury.
 5          THE COURT:  What's the conflicting
 6  testimony?
 7          MR. SMITH:  The kids witnessed her
 8  drowning.  That did not happen.
 9          THE COURT:  Well, you can clarify that
10  she was there when Sonia drowned, that the kids were
11  not there when Sonia drowned, and that is what she
12  would testify to.
13          MR. SMITH:  That the manner in which she
14  drowned, she was not attempting to save someone
15  else.  That's been testimony that's been put in
16  front of this jury.  It's a misnomer.
17          MS. RODRIGUEZ-COSS:  Nobody has put that
18  in front of the jury.
19          THE COURT:  Yes, there was somebody.
20          MS. RODRIGUEZ-COSS:  No, your Honor.
21          THE COURT:  Yes, there was.  There was
22  someone who said she died helping save other
23  children.  I don't remember which witness it was,
24  but why --
25          MR. SMITH:  Because, your Honor --
```

5552

```
 1          THE COURT:  If you want to say that she
 2  wasn't trying to help save anybody, that's fine.
 3  But whatever else, that it was a black beach, that
 4  there weren't any lifeguards -- I mean, if Azibo had
 5  known that and that made the rage go up in him, that
 6  would be fine, but that's not where you are going
 7  with this.  And I don't want something that is going
 8  to really be solely there for sympathy and not the
 9  mitigating impact on this defendant to be confusing
10  the jury.  So you are welcome to ask did she see her
11  drown.  Did she see her drown?
12          MR. SMITH:  She almost drowned herself.
13          THE COURT:  And --
14          MR. SMITH:  That day.
15          THE COURT:  And the kids weren't with
16  her.
17          MR. SMITH:  Correct.
18          THE COURT:  And she wasn't helping save
19  anybody.  I don't know whether you want that or not.
20  But beyond that, I don't see those details have any
21  remote relevance to what is the mitigating impact on
22  the defendant.
23          MR. SMITH:  So I'm supposed to ask a
24  series of yes or no questions whether she witnessed
25  this or not?  I'm trying to understand the
```

5553

```
 1  Court's --
 2          THE COURT:  The only purpose it has
 3  relevance here is that the kids weren't -- didn't
 4  see her drown.  She saw her drown, so she knows the
 5  kids weren't there.  And that the -- it's up to you
 6  whether you want to say she was trying to save
 7  somebody or not.  And that whether or not the kids
 8  knew the details of the drowning, which I leave to
 9  you.  There hasn't been any indication from anybody
10  that they did know, other than that she had drowned.
11          MR. SMITH:  And would I be precluded
12  from asking about lifeguards at the beach?
13          THE COURT:  Right.
14          MR. SMITH:  All right.
15          THE COURT:  I really don't think that
16  bears on a mitigator for him if he didn't know it.
17  I'm really pressed to understand that.
18          MS. RODRIGUEZ-COSS:  Your Honor, in
19  light of the fact that Mr. Smith just proffered that
20  the witness almost drowned herself, we would ask
21  that he lead this area because it could turn
22  incredibly emotional on something that has nothing
23  to do with the issues at hand here.  This is now
24  someone who experienced this, who observed someone
25  else not make it, and really just will appeal to the
```

5554

```
1   emotions and the sympathy of the jury for something
2   that was not experienced by the defendant himself.
3            So I would ask that Mr. Smith be
4   instructed to just simply lead to establish that she
5   drowned and the children were not there.
6            THE COURT:  Well, you can ask the
7   question as you want, but I don't think we need to
8   get into her near drowning, do we?
9            MR. SMITH:  I'm just saying, your Honor,
10  it's difficult to even tell -- I mean, okay, she
11  drowned.  And I could do that?  Sure.  But I mean
12  that's completely out of context.
13           THE COURT:  I don't understand.  You
14  haven't explained to me what the context is that
15  bears any relevance.  So let's go on, okay.
16           MR. SMITH:  All right.
17           (Sidebar concluded)
18  Q.   I apologize for the interruption,
19  Ms. Felix.  You were talking about being at the
20  beach that day with Sonia, right?
21  A.   Yes.
22  Q.   Were you talking on the beach?
23  A.   Yes, we were.  My sister and I and Judah
24  were sitting on the beach and we were talking about
25  just, you know, kids, our lives, you know, just
```

5555

```
1   whatever you talk about with your girls, just life
2   and what she expected from her children.  Yeah, so
3   we were on the beach talking.
4   Q.   Was she talking about what she wanted to
5   do, what her plans were?
6   A.   Her plan was to get a bigger place for all
7   of her children in Connecticut.  I am not sure
8   where.  She was just going to do something
9   different.  She was going to get rid of -- you know,
10  move away from the man, try to get him out of her
11  life, and get a house for her children.
12  Q.   Did Sonia at some point go into the water?
13  A.   Yes.  Yes, we talked, and then as a matter
14  of fact we laughed and we said, okay, we'll have
15  breakfast tomorrow at IHop, let's go.  So we went to
16  the water, and she and I were talking maybe, you
17  know, just toes in the water and then to the middle
18  calf.  We were just talking, standing in the water,
19  yeah.
20  Q.   And eventually did Sonia swim?
21  A.   No, what happened was --
22           MS. RODRIGUEZ-COSS:  Your Honor, can we
23  have a sidebar at this point?
24           THE COURT:  Ms. Kennedy, did -- is that
25  when Sonia drowned?
```

5556

```
1            THE WITNESS:  Yes, but it wasn't that
2   quickly.
3            THE COURT:  But that's the day that she
4   drowned.
5            THE WITNESS:  Yes.
6            THE COURT:  All right, you may continue,
7   Mr. Smith.
8   Q.   Were you pulled from the water as well?
9   A.   Yes.  Yes, sir.
10  Q.   And what did you see when you were pulled
11  from the water?
12           MS. RODRIGUEZ-COSS:  Objection, your
13  Honor.  Relevance.
14           THE COURT:  I'm going to sustain the
15  objection.
16  Q.   Did you go to Sonia's funeral?
17  A.   No, I wasn't able to.
18  Q.   Why?
19  A.   I was still in the hospital, intensive
20  care.
21  Q.   Why were you in intensive care?
22           MS. RODRIGUEZ-COSS:  Objection, your
23  Honor, relevance.
24           THE COURT:  Overruled.
25  A.   Because I had taken in a lot of water.  I
```

5557

```
1   had got the beginning of pneumonia, and so I was in
2   intensive care.  They airlifted me from the beach to
3   the hospital.
4   Q.   Did you eventually return to New York?
5   A.   Yes, about -- about maybe ten days later.
6   Q.   And what happened when you got back to New
7   York?
8   A.   Oh, boy.  Everybody, you know, wanted to
9   know what happened.  I didn't -- what do you mean
10  what happened?  What do you mean?
11  Q.   When people asked you what happened, what
12  did you say?
13  A.   I told them what happened:  That we were in
14  an accident; six people died that day; that Sonia
15  was one of them; that -- they all knew, and, you
16  know, we were all very, very upset and sad.  But,
17  yeah, I came back to New York.  I tried to pull --
18  you know, pull my life together.  My friend was
19  gone.
20  Q.   What happened with the shop?
21  A.   The shop -- what's his name?  Skibo, he
22  came and he just put locks on everything.  And I
23  never went back after that.  But I heard that he
24  put -- you know, he shut everything down.  I did
25  take him to small claims court because I had a few
```

5558

```
1   things there that were kind of -- for me they were
2   valuable, but I never got them.  And that was that.
3   And I was just sad.
4       Q.   When you -- sometime later, did you ever
5   see Azibo again?
6       A.   Yes.
7       Q.   Can you tell us about it?
8       A.   It might have been about maybe a year
9   later, I was walking with a friend on 125th Street,
10  and this young man said "Ife," and I looked at him,
11  saw him, he says, "You don't know me?"  And so I
12  started to think, well, maybe I was his teacher,
13  because I taught for a few years.  And I said, "Were
14  you my student?"  He said, "No," and he looked very
15  hurt.  He said, "You don't know me?"  And I said,
16  "No."  And when he said his name we all started
17  crying because this is the first I saw him since
18  before his mom passed, and I didn't recognize him.
19  And I should have, but he had grown so.  And that
20  was the last time I saw him until -- I mean, until
21  now.
22      Q.   When you knew Azibo when he was around the
23  shop with mom, what was your impression of him?
24      A.   He was very sweet.  He was 10, 11.  He was
25  so helpful to his mom, with the girls.  He was very
```

5559

```
1   sweet.
2       Q.   When you say the girls?
3       A.   His younger sisters.
4       Q.   Would he help watch them?
5       A.   Yes.  Yes, he took them out to play to the
6   park down the block while we worked.  He was
7   wonderful.
8       Q.   Ms. Felix, thank you, I have no further
9   questions.
10      A.   Thank you.
11           THE COURT:  All right.
12  Cross-examination.
13  CROSS-EXAMINATION
14  BY MS. RODRIGUEZ-COSS:
15      Q.   Ms. Felix, do you need a moment, I just
16  have a couple questions for you.
17      A.   I'm okay.
18      Q.   All right.  So the boutique was not yours?
19      A.   No.
20      Q.   I see.  So Ms. Smith had the hair salon and
21  then the boutique that went along with that.
22      A.   Yes.
23      Q.   I see.  Okay.  And your interactions with
24  her were all in New York.
25      A.   Yes.
```

5560

```
1       Q.   You never visited her home in Stamford.
2       A.   Yes, I did.  I went twice.  When the last
3   baby was born I took the train and I spent the day
4   with her.  And then when she had the apartment, she
5   moved into the apartment and she had all of the
6   children in the apartment, I went to visit her.  I
7   believe I even spent the night.  Yeah.
8       Q.   And those were the only two occasions you
9   remember?
10      A.   Yes, ma'am.
11      Q.   All right.  And when she died --
12      A.   Yes.
13      Q.   -- and you were at the beach, her children
14  were not there, correct?
15      A.   No.
16      Q.   And you said that you bumped into the
17  defendant at 125th Street in New York.
18      A.   Yes.
19      Q.   Have you seen him since?
20      A.   No.  Not at all.  He gave me --
21      Q.   I'm sorry?
22      A.   He gave me a phone number and, you know, I
23  said I would call, and I think I called maybe two
24  weeks later and I was unable to get through.
25      Q.   All right.
```

5561

```
1       A.   And so that was that.
2       Q.   So, it would be fair to say you have not
3   known the defendant as an adult?
4       A.   No.
5       Q.   No knowledge as to what he was like as an
6   adult?
7       A.   No.
8       Q.   Or what he did or how he earned a living as
9   an adult?
10      A.   No, ma'am.
11           MS. RODRIGUEZ-COSS:  We have nothing
12  further, your Honor.
13           MR. SMITH:  No further questions, your
14  Honor.
15           THE COURT:  All right, thank you then,
16  Ms. Kennedy.  Ms. Felix, you are excused.  You may
17  step down.
18           THE WITNESS:  Thank you.
19           MR. SHEEHAN:  We rest at this time.
20           MR. SMITH:  We have one more.
21           MR. SHEEHAN:  We almost rest.
22           MR. SMITH:  Your Honor, I don't think
23  the government has any objection.  We would enter
24  Defendant's Exhibit P-Q.  I think you have a copy,
25  your Honor.
```

5562

```
1            THE COURT:  All right, this is P-Q.
2            MR. SMITH:  Yes, your Honor.
3            THE COURT:  There is no objection?
4            MS. DAYTON:  That is correct, your
5   Honor.
6            THE COURT:  And it is the Florida
7   certificate of Sonia's death.
8            MR. SMITH:  Correct, your Honor.
9            Certificate of death of Florida,
10  certified copy showing the deceased as Sonia Smith,
11  Sonia Angela Smith, and the date.  That's all we
12  have, your Honor.  The defense rests.
13           THE COURT:  All right, is there anything
14  further?
15           MS. DAYTON:  The government rests, your
16  Honor.
17           THE COURT:  Very well.
18           Ladies and gentlemen, you have now heard
19  all of the evidence, or information, for this phase.
20  You have not yet received the full set of
21  instructions nor have you heard the closing
22  arguments.  So you still remain under an obligation
23  not to discuss this case with anyone.
24           Please leave your notebooks here.  Please
25  return Monday at 9:30 and please plan to spend the
```

5563

```
1   day because you will receive the instructions, you
2   will hear the closing arguments, and you will begin
3   your deliberation.  All right.  Then I will see you
4   on Monday and you are excused for today.
5            JUROR:  You said 9:30?
6            THE COURT:  9:30.
7            (Jury exited the courtroom.)
8            THE COURT:  All right, Counsel, we need
9   to continue our charge conference.  But why didn't
10  we do that after lunch.  Ms. Van Ness was going to
11  submit something -- is there anything further on
12  that?
13           I'm sorry?
14           MR. SHEEHAN:  We're going to make an
15  oral argument on that.
16           MS. DAYTON:  Your Honor, there is one
17  thing, I forgot to do this, like, last week.  The
18  day that Juror No. 9 was sick, the woman was wearing
19  orange today, as she walked by she made a joke to
20  me, "I think I'm pregnant."  I told Mr. Sheehan, but
21  I just wanted to put it on the record, she made a
22  joke.
23           MR. SHEEHAN:  That was the day she was
24  eating -- drinking, eating the crackers, the Coke
25  and crackers.
```

5564

```
1            THE COURT:  Coke and crackers?
2            MS. DAYTON:  Yes.  And I told Mr.
3   Sheehan what she said.
4            MR. SHEEHAN:  In fact, she gave me a big
5   smile, so I think she knew we communicated the joke.
6            MS. DAYTON:  I just wanted to clarify.
7            THE COURT:  She is our juror who has had
8   a bit of ill health.
9            MS. DAYTON:  Thank you.
10           THE COURT:  So why don't you come back
11  at two, and enjoy what we used to call lunch.
12           All right, we'll stand in recess.
13           (Recess)
14
15
16
17
18
19
20
21
22
23
24
25
```

5565

```
1                    I N D E X
2   WITNESS                                    PAGE
3   NASHIEKAH BENNETT
4   Direct Examination by Mr. Sheehan          5465
5   Cross-Examination by Mr. Markle            5485
6
7   CHRISTOPHER MUNGER
8   Direct Examination by Mr. Smith            5497
9   Cross-Examination by Ms. Dayton            5511
10
11  CHERYL DAVIS
12  Direct Examination by Mr. Smith            5536
13  Cross-Examination by Ms. Rodriguez-Coss    5559
14
15
16           I certify that the foregoing is a correct
17  transcript from the record of proceedings in the
18  above-entitled matter.
19                    6/8/11
20                     Date
21
22                /S/  Sharon Montini
23                 Official Reporter
24
25
```

5566

```
 1              UNITED STATES DISTRICT COURT
 2                DISTRICT OF CONNECTICUT
 3   * * * * * * * * * * *       *
                                 *
 4   UNITED STATES OF AMERICA,   *  Case No 6cr160(JBA)
                                 *
 5            Plaintiff,         *
                                 *
 6         vs.                   *
                                 *
 7   AZIBO AQUART               *  June 13, 2011
                                 *
 8            Defendant.         *
                                 *
 9   * * * * * * * * * * * *     *
10                  TRIAL TRANSCRIPT
11                  VOLUME XXIX
12   BEFORE:  THE HONORABLE JANET BOND ARTERTON U.S.D.J.,
13                                          and jury
     Appearances:
14   FOR THE GOVERNMENT:  ALINA REYNOLDS, ESQ
                          TRACY DAYTON, ESQ.
15                        PETER MARKLE, ESQ.
                          JACABED RODRIGUEZ-COSS
16                        United States Attorney's Office
                          915 Lafayette Blvd
17                        Bridgeport, CT 06604
18
     FOR THE DEFENDANT     MICHAEL SHEEHAN, ESQ
19   AZIBO AQUART:         Sheehan & Reeve
                           139 Orange Street
20                         New Haven CT 06510
21                         JUSTIN SMITH, ESQ.
                           383 Orange Street
22                         New Haven, CT 06511
23                         BEVERLY VAN NESS, ESQ.
24   Court Reporter:       Sharon Montini, RMR
25   Proceedings recorded by mechanical stenography,
     transcript produced by computer
```

5567

```
 1            THE COURT:  All right then, we will
 2   bring the jurors in.
 3            Good morning, Mr. Aquart.
 4            THE DEFENDANT:  Good morning, your
 5   Honor.
 6            (Jury entered the courtroom.)
 7            THE COURT:  Good morning, ladies and
 8   gentlemen.  Please be seated.
 9            It is now my duty to again instruct you
10   on the law that's applicable to this sentencing
11   phase in this case.  After that, you will hear the
12   closing arguments of counsel.  We will give you the
13   charge, that you have a copy of in your notebooks,
14   you will hear the closing argument of the
15   government, and we will then break for a half hour
16   lunch.  You will then hear the closing argument of
17   defense counsel and the rebuttal closing of the
18   government, and then a few final instructions from
19   me.  And after that, you will then begin your
20   deliberations in accordance with these instructions
21   that I'm going to give you.
22            Counts Two through Seven on which you
23   found the defendant Azibo Aquart guilty carry the
24   potential for the death penalty; that is, they are
25   each known as capital counts.  The sole question
```

5568

```
 1   before you is whether the defendant Azibo Aquart
 2   should be sentenced for his capital offenses to life
 3   imprisonment without release or the death penalty.
 4   There is no parole in the federal system, so a life
 5   sentence means precisely that.
 6            The selection between these very serious
 7   choices is yours, and yours alone, to make.  Whether
 8   you determine that Azibo Aquart should be sentenced
 9   to death or to life imprisonment without the
10   possibility of release, the Court is required to
11   impose that sentence which you chose.
12            If you have found -- you have found
13   defendant Azibo Aquart guilty of the following
14   capital counts of the indictment:  Counts Two, Three
15   and Four, murder in aid of racketeering of Tina
16   Johnson, James Reid and Basil Williams; and
17   Counts Five, Six and Seven, drug-related murder of
18   Tina Johnson, James Reid and Basil Williams.  These
19   are the six counts at issue at this stage, and you
20   must approach the sentencing decision before you
21   separately as to each count and with an open mind.
22            I cannot stress to you enough the
23   importance of your giving careful and thorough
24   consideration to all of the evidence.  And
25   regardless of any opinion that you may have as to
```

5569

```
 1   what the law is or should be, it would be a
 2   violation of your oaths as jurors to base your
 3   sentencing decision on any view of the law other
 4   than that which I give you now in these final
 5   instructions.
 6            A special verdict form has been prepared
 7   that you must complete.  This verdict form details
 8   the specific findings you are required to make and
 9   will aid you in making your findings in the proper
10   order and in properly performing your deliberative
11   duties.
12            Although Congress has left it wholly to
13   you, the jury, to decide defendant Azibo Aquart's
14   punishment, it has narrowed and channeled your
15   discretion in specific ways by requiring that you
16   consider and weigh any aggravating and mitigating
17   factors proved in this case.  These factors have to
18   do with the circumstances of the crime, the personal
19   traits, character or background of defendant Azibo
20   Aquart, or anything else relevant to the sentencing
21   decision.
22            Aggravating factors are those that would
23   tend to support imposition of the death penalty.  By
24   contrast, mitigating factors are those that suggest
25   that life in prison without the possibility of
```

5570

1  release is the appropriate sentence in this case.
2  Your task is not simply to decide what
3  aggravating and mitigating factors have been shown
4  to exist.  Rather, you are called upon to evaluate
5  any such factors and to make a unique,
6  individualized choice between the death penalty and
7  life in prison without the possibility of release.
8  The law does not assume that any defendant such as
9  Azibo Aquart found guilty of premeditated murder
10  should be sentenced to death.  Thus, your decision
11  on the question of his punishment is a uniquely
12  personal, moral judgment which the law leaves up to
13  each of you.
14  However, the decision to impose the
15  death sentence on Azibo Aquart must be a unanimous
16  decision.  If all 12 of you do not unanimously agree
17  that a sentence of death should be imposed on a
18  particular count, then the sentence will be life
19  imprisonment without possibility of release.
20  The government at all times and as to all
21  counts has the burden of proving beyond a reasonable
22  doubt a threshold mental state factor, at least one
23  statutory aggravating factor, and any non-statutory
24  aggravating factors.  Even if the government proves
25  the things it is required to prove, you are still

5571

1  not required to impose the death penalty.  There is
2  never any such requirement in the law.
3  The definition of reasonable doubt is
4  the same as I instructed you at the guilt phase.  It
5  is doubt based upon reason and common sense.  It is
6  a doubt that a reasonable person has after carefully
7  weighing all of the evidence.  It is a doubt which
8  would cause a reasonable person to hesitate to act
9  in a matter of importance in his or her personal
10  life.  Proof beyond a reasonable doubt must,
11  therefore, be proof of such convincing character
12  that a reasonable person would not hesitate to rely
13  and act upon it in the most important of his or her
14  own affairs.
15  A reasonable doubt is not a caprice or a
16  whim, it is not a speculation or suspicion, and it
17  is not sympathy.  Beyond a reasonable doubt does not
18  mean beyond all doubt.  A reasonable doubt may arise
19  from the evidence or the lack of evidence.
20  The burden is at all times on the
21  government to prove the threshold and aggravating
22  factors, which I will be describing to you shortly,
23  beyond a reasonable doubt.  This burden never shifts
24  to the defendant who never has the burden of
25  disproving the existence of anything on which the

5572

1  government bears the burden of proof beyond a
2  reasonable doubt.  The law does not require a
3  defendant to produce any evidence that a particular
4  aggravating factor does not exist or that death is
5  not an appropriate sentence.  In addition, the law
6  does not require the defendant to testify.  You may
7  draw no inference against him from the fact that he
8  has chosen not to testify.  That fact must not be
9  considered by you in any way in arriving at any
10  aspect of your sentencing decision.
11  Defendant Azibo Aquart is entitled to,
12  but not required to, present evidence of mitigating
13  factors.  Here, defendant Azibo Aquart asserts a
14  number of mitigating factors, and it is his burden
15  to establish any mitigating factors by a
16  preponderance of the evidence.
17  To prove something by a preponderance of
18  the evidence is a lesser standard of proof than
19  proof beyond a reasonable doubt.  To prove something
20  by a preponderance of the evidence is to prove that
21  it is more likely true than not true.  It is
22  determined by considering all of the evidence and
23  deciding what evidence is more believable.  It is
24  proof that a fact is more than 50 percent likely to
25  be true.

5573

1  Whether a factor is proved beyond a
2  reasonable doubt by the government or by a
3  preponderance of the evidence by the defendant is
4  not determined by the number of witnesses or
5  exhibits presented; rather, it is the quality and
6  the persuasiveness of the evidence which controls.
7  In making all of the determinations you
8  are required to make in this phase of the trial, you
9  may consider any information presented during this
10  penalty phase and any relevant evidence from the
11  guilt phase of the trial.  Recall that for our
12  purpose here the terms "evidence" and "information"
13  have the same meaning.
14  In deciding what the facts are, you may
15  have to decide what testimony you believe and what
16  testimony you do not believe.  You may believe all
17  of what a witness said, or only part of it, or none
18  of it.  In deciding what testimony of any witness to
19  believe, consider the witness's intelligence, the
20  opportunity the witness had to see or hear things
21  testified about, the witness's memory, any motives
22  that the witness may have for testifying a certain
23  way, the manner of the witness while testifying,
24  whether that witness said something different at an
25  earlier time, the general reasonableness of the

5574

```
 1   testimony, and the extent to which the testimony is
 2   consistent with other evidence that you believe.  In
 3   addition to deciding the credibility of each
 4   witness, you also decide what weight or significance
 5   you will give to each witness's testimony.
 6            Now, you will recall during the course of
 7   this phase of the trial you heard the testimony of
 8   individuals referred to as experts in a particular
 9   field.  Specifically Tom Martin, blood spatter, and
10   Mark Bezy, prison conditions.  A witness qualified
11   as an expert may be permitted to testify to his or
12   her opinion about which he or she has special
13   knowledge, skill, experience, education or training.
14   Such testimony is presented to you on the theory
15   that someone who is experienced and knowledgeable in
16   a particular field can assist you in understanding
17   the evidence or in reaching an independent decision
18   on the facts.
19            In weighing an expert's opinion
20   testimony, you should consider his or her
21   qualifications, the reasons for his opinions, the
22   facts upon which the opinions are based, the reasons
23   for testifying, as well as all the other
24   considerations that ordinarily apply when you are
25   deciding whether or not to believe any witness's
```

5575

```
 1   testimony.  And you may give the opinion testimony
 2   whatever weight, if any, you find it deserves in
 3   light of all of the evidence in the case.
 4            You should not, however, accept either
 5   expert's opinion testimony merely because I allowed
 6   the witness to testify as an expert concerning his
 7   opinion.  And nor should you substitute it for your
 8   own reason, judgment and common sense.  The
 9   determination of the facts in this case rests solely
10   with you.
11            Now, I'm going to discuss with you the
12   deliberative process that you will shortly be
13   engaging in and discuss with you the steps that you
14   must follow in deciding the sentence for each of the
15   six counts.
16            First, you must decide whether the
17   government has proven beyond a reasonable doubt that
18   the defendant, Azibo Aquart, was at least 18 years
19   old at the time of the capital offense.  That's a
20   statutory requirement.
21            Second, you must decide whether the
22   government has proven beyond a reasonable doubt at
23   least one of two threshold mental states claimed by
24   the government, and I will be describing that
25   shortly.
```

5576

```
 1            Third, you must decide whether the
 2   government has proven beyond a reasonable doubt at
 3   least one of the five statutory aggravating factors
 4   claimed.
 5            Fourth, you must decide whether the
 6   government has proven beyond a reasonable doubt
 7   either or both of the non-statutory factors it
 8   claims.
 9            Fifth, you must decide whether any of
10   you find that any mitigating factors have been
11   proved by Azibo Aquart by a preponderance of the
12   evidence.
13            Sixth, each of you must weigh the
14   aggravating factors you have all found to exist and
15   any mitigating factors you have individually found
16   to exist to determine the appropriate sentence.  In
17   regard to each capital count you must decide whether
18   the aggravating factors you have found to exist for
19   that offense sufficiently outweigh the mitigating
20   factors found to exist for that offense beyond a
21   reasonable doubt so as to justify imposing a
22   sentence of death on defendant Azibo Aquart for that
23   offense; or, in the absence of any mitigating
24   factors, whether the aggravating factors alone are
25   sufficient to justify imposing a sentence of death
```

5577

```
 1   on the defendant, Azibo Aquart, for that offense.
 2            And then seventh, you must then
 3   unanimously decide whether to sentence the defendant
 4   Azibo Aquart to death or to life in prison without
 5   release for each of the six counts.
 6            Now, I'm going to go through each of
 7   those steps with you.  The first one, finding as to
 8   the defendant's age.  Under the Federal Death
 9   Penalty Act, before jurors may consider imposition
10   of the death penalty they must first unanimously
11   agree that the defendant was at least 18 years of
12   age at the time of the offense, and the parties have
13   stipulated that the defendant, Azibo Aquart, was
14   23 years of age on August 24, 2005.  You will find
15   that stipulation at Exhibit 13F.  You will indicate
16   your finding in Section 1 of the special verdict
17   form and continue your deliberations.
18            The next step, finding a threshold
19   mental state factor.  Before you may consider
20   imposition of the death penalty for any count, you
21   must first unanimously find that the government has
22   proved beyond a reasonable doubt the existence as to
23   that count of a threshold mental state factor.  The
24   government claims two:  One, that the defendant,
25   Azibo Aquart, intentionally killed Tina Johnson or
```

5578

1  Basil Williams; or, two, that the defendant, Azibo
2  Aquart, intentionally participated in an act,
3  contemplating that the life of a person would be
4  taken or intending that lethal force would be used
5  in connection with a person, and Tina Johnson, James
6  Reid and Basil Williams died as a direct result of
7  that act.
8          Although I will be discussing the capital
9  counts of conviction collectively, in your
10  deliberations regarding the existence of the
11  threshold mental state factor and statutory
12  aggravating factors, you must treat each count
13  separately.
14          Your findings as to whether the
15  government has proved the existence beyond a
16  reasonable doubt of a particular threshold mental
17  state factor must be separate and unanimous as to
18  each count.  And with regard to your findings, you
19  may not rely solely on your earlier verdict of guilt
20  or your factual determinations in the guilt phase of
21  the trial.  Instead, you must now each decide this
22  issue for yourselves again, considering all of the
23  evidence from both the guilt and penalty phases.
24          Any finding that a threshold mental
25  state factor has been proved as to a particular

5579

1  count must be based on defendant Azibo Aquart's
2  personal actions and intent.  Intent may be proven
3  by any statements made and acts done by defendant
4  Azibo Aquart, considering all of the facts and
5  circumstances in evidence which may aid in a
6  determination of his intent.  You may, but are not
7  required to, infer that a person intends the natural
8  and probable consequences of his acts knowingly done
9  or knowingly omitted.
10          If you unanimously find beyond a
11  reasonable doubt that one of the claimed threshold
12  mental state factors exists as to a count, you will
13  indicate that finding on the appropriate line of
14  Section II of the special verdict form which
15  provides a space for you to indicate whether you
16  find the government has proved one of the claimed
17  threshold mental state factors in regard to each
18  victim and associated counts.  If you do not
19  unanimously find one of these claimed threshold
20  mental state factors to have been proved with
21  respect to any of the counts, your deliberations
22  will be complete and you will just complete the
23  certification in Section VIII of the special verdict
24  form.  For any count you do not unanimously find
25  that the government has proven the existence of one

5580

1  claimed threshold mental state factor, your
2  deliberative task as to that count will be over, and
3  the Court will impose a mandatory life imprisonment
4  without possibility -- sentence of life imprisonment
5  without possibility of release on that count.
6          I instruct you that if you find that one
7  claimed mental state factor is proved to exist, it
8  is not an aggravating factor and may not be weighed
9  by you in deciding whether or not to impose a
10  sentence of death.  It is simply a separate
11  requirement, a threshold under the Federal Death
12  Penalty Act which must be fulfilled before you are
13  permitted to make any further findings.  And this is
14  because not all murders are eligible for the death
15  penalty.  Only those murders that satisfy a
16  threshold mental state factor, and as I will
17  describe shortly, a statutory aggravating factor,
18  justify consideration of the death penalty.
19  However, a finding that a claimed threshold mental
20  state factor has been proved beyond a reasonable
21  doubt cannot, in and of itself, justify a death
22  penalty precisely because it is not an aggravating
23  factor to be weighed.  As I will explain to you,
24  more is required before you may decide that the
25  death penalty is to be imposed rather than a

5581

1  sentence of life in prison without possibility of
2  release.
3          So now we'll go to the third step
4  regarding statutory aggravating factors.  If you
5  unanimously find that the government has proven the
6  existence of any threshold mental state factor as to
7  a particular count or counts, you then must proceed
8  to determine whether the government has proven
9  beyond a reasonable doubt the existence of at least
10  one statutory aggravating factor.  The government
11  alleges five statutory aggravating factors for each
12  count:
13          1.  That the defendant committed the
14  homicide offense in an especially heinous, cruel or
15  depraved manner in that it involved torture or
16  serious physical abuse;
17          2.  That the defendant procured the
18  commission of the homicide offense by payment or
19  promise of payment of anything of pecuniary value;
20          3.  That the defendant committed the
21  homicide offense as consideration for the receipt,
22  or in the expectation of receipt, of anything of
23  pecuniary value;
24          4.  That the defendant committed the
25  homicide offense after substantial planning and

5582

1 premeditation to cause the death of Tina Johnson,
2 James Reid and Basil Williams;
3          And 5.  That the defendant intentionally
4 killed or attempted to kill more than one person in
5 a single criminal episode.
6          The law directs you to consider and
7 decide separately as to each count for which you
8 have found the existence of a threshold mental state
9 factor whether the government has proved beyond a
10 reasonable doubt the existence of any of these five
11 statutory aggravating factors that it claims.  You
12 are reminded that to find the existence of a
13 statutory aggravating factor as to a particular
14 count, your decision must be unanimous as to that
15 aggravating factor.  If you are not unanimous on a
16 particular statutory aggravating factor, that factor
17 cannot be used in your deliberations.  Any finding
18 that any of these factors has been proven must be
19 based on Azibo Aquart's personal actions and intent.
20          If you find that any of the five
21 statutory aggravating factors exists as to any count
22 or counts, you are to indicate that finding on the
23 appropriate line in Section III of the Special
24 Verdict Form for that count.  If you do not
25 unanimously find that one of the five statutory

5583

1 aggravating factors has been proved with respect to
2 any one of the counts, your deliberations are
3 finished and you should proceed directly to the
4 certification in Section VIII of the Special Verdict
5 Form.
6          For any count you do not unanimously
7 find that the government has proved any of the five
8 statutory aggravating factors, your deliberative
9 task as to that count will be over and the Court
10 will impose a mandatory sentence of life in prison
11 without possibility of release on that count.
12          All right, now I'm going to instruct you
13 with more detail on these five specific statutory
14 aggravating factors claimed by the government.
15          The first statutory aggravating factor
16 the government alleges is that the defendant
17 committed the homicide offense in an especially
18 heinous, cruel or depraved manner in that it
19 involved torture or serious physical abuse to Tina
20 Johnson, Counts Two and Five; James Reid, Counts
21 Three and Six; and Basil Williams, Counts Four and
22 Seven.
23          To establish the defendant killed the
24 victim in an especially heinous, cruel or depraved
25 manner, the government must prove that the killing

5584

1 involved either torture or serious physical abuse to
2 the victim.  However, just because an offense
3 involves torture or serious physical abuse does not
4 mean that it was committed in an especially heinous,
5 cruel or depraved manner.  Rather, you must decide
6 whether any proven torture or serious physical abuse
7 rendered the murder especially heinous, especially
8 cruel or especially depraved.
9          You must not find this factor to exist
10 unless you unanimously agreed as to whether torture,
11 serious physical abuse or both has been proved
12 beyond a reasonable doubt.  In other words, all 12
13 of you must agree that it involved torture and was,
14 thus, heinous, cruel or depraved, or all 12 of you
15 must agree it involved serious physical abuse to the
16 victim and was thus heinous, cruel and depraved, or
17 that it involved both.
18          "Heinous" means extremely wicked or
19 shockingly evil, where the killing was accompanied
20 by such additional acts of torture or serious
21 physical abuse of the victim as to set it apart from
22 other killings.
23          "Cruel" means the defendant, by
24 torturing the victim, intended to inflict a higher
25 degree of pain than is involved in just killing the

5585

1 victim.
2          "Depraved" means the defendant relished
3 the killing or showed indifference to the suffering
4 of the victim as evinced by torture or serious
5 physical abuse of the victim.
6          "Torture" includes mental as well as
7 physical abuse of the victim.  In either case, the
8 victim must have been conscious of the abuse at the
9 time it was inflicted and the defendant must have
10 specifically intended to inflict severe mental or
11 physical pain or suffering on the victim, apart from
12 killing the victim.
13          "Serious physical abuse" means a
14 significant or considerable amount of injury or
15 damage to the victim's body.  Serious physical
16 abuse, unlike torture, may be inflicted either
17 before or after death, and does not require that the
18 defendant be conscious of the abuse at the time it
19 was inflicted.  However, the defendant must have
20 specifically intended the abuse in addition to the
21 killing.
22          The word "especially" means highly or
23 unusually great, distinctive, peculiar, particular
24 or significant, when compared to other killings.
25          Pertinent factors in determining whether

5586

1  a killing was especially heinous, cruel or depraved
2  may include infliction of gratuitous violence on the
3  victim above and beyond that necessary to commit the
4  killing and the helplessness of the victim.
5          Further, you may only consider the
6  actions of the defendant.  You may not consider the
7  manner in which any other person committed or
8  participated in the murder.
9          Your finding as to this statutory
10 aggravating factor must be indicated in the
11 appropriate space in Section III of the Special
12 Verdict Form.
13         The next statutory aggravating factor
14 alleged by the government is that the defendant
15 procured the commission of the homicide offense by
16 payment or promise of payment of anything of
17 pecuniary value.
18         To establish that the defendant procured
19 the commission of the offense by payment or promise
20 of anything of pecuniary value, the government must
21 prove beyond a reasonable doubt that the defendant
22 arranged to have someone else commit the offense or
23 assist in committing it.
24         To "procure" means to obtain, induce or
25 cause to take place.  The words "payment or "promise

5587

1  of payment" should be given their ordinary, everyday
2  meaning, which includes giving or offering
3  compensation in return for services.  "Anything of
4  pecuniary value" means money, property or anything
5  else having some economic value, benefit or
6  advantage.
7          Your finding as to this statutory
8  aggravating factor must be indicated in the
9  appropriate space in Section III of the Special
10 Verdict Form.
11         The third statutory factor alleged by
12 the government, that the defendant committed the
13 murders as consideration for the receipt, and in
14 expectation of the receipt, of something of
15 pecuniary value.
16         The words "expectation of receipt"
17 should be given their ordinary, everyday meaning,
18 which includes obtaining or expecting to obtain.
19 "Something of pecuniary value" means anything in the
20 form of money, property or anything else having some
21 economic value, benefit or advantage.
22         In order to prove this statutory factor,
23 the government must prove that the defendant, Azibo
24 Aquart, killed the victim referred to in the
25 particular count with the expectation of receiving

5588

1  something of pecuniary value.  It is not sufficient
2  for you to find that he committed any offense other
3  than murder with the expectation of receiving
4  something of pecuniary value.  And your finding as
5  to this aggravating factor will be indicated in the
6  appropriate space in Section III of the Special
7  Verdict Form.
8          The fourth statutory aggravating factor
9  alleged by the government is that the defendant
10 committed the homicide offense after substantial
11 planning and premeditation to cause the death of
12 Tina Johnson, Counts Two and Five; James Reid,
13 Counts Three and Six; and Basil Williams,
14 Counts Four and Seven.
15         In order to prove this statutory factor
16 against the defendant, the government must prove
17 that he engaged in substantial planning and
18 premeditation to cause the death of the victim named
19 in the particular count you are considering.  It is
20 not sufficient for you to find that the defendant
21 engaged in substantial planning and premeditation to
22 commit any offense other than murder.
23         "Planning" means mentally formulating a
24 method for doing something or achieving some end.
25         "Premeditation" means thinking or

5589

1  deliberating about something and deciding beforehand
2  whether to do it.
3          "Substantial" planning and premeditation
4  means a considerable or significant amount of both
5  planning and premeditation.
6          If you've reached the stage where you
7  are considering statutory aggravating factors, you
8  will necessarily have found both that the defendant
9  is guilty of participation in the murder and that he
10 intended to commit the murder or intended lethal
11 force would be used as specified in the threshold
12 mental factor you found.  However, the substantial
13 planning and the premeditation statutory aggravating
14 factor requires more.  To find that the government
15 has satisfied its burden of proving that the
16 defendant engaged in substantial planning and
17 premeditation to cause the death of a victim, you
18 must find that the defendant's actual planning and
19 premeditation was considerable, large, or
20 significant in relation to that which would be
21 necessary to commit the homicide offense.
22         Your finding as to this statutory factor
23 will be indicated in the appropriate space in
24 Section III of the Special Verdict Form.
25         The fifth statutory factor, statutory

**GA1440**

5590

aggravating factor alleged by the government, is
that the defendant intentionally killed or attempted
to kill more than one person in a single criminal
episode.

The government must prove to you beyond a
reasonable doubt that the defendant intentionally
killed or attempted to kill more than one person in
a single criminal episode, and you must unanimously
agree on the particular actual victims. You may
only consider the actions of the defendant. You may
not consider the manner in which any other person
committed or participated in the murder.

"Intentionally killing" a person means
killing a person on purpose; that is, willfully,
deliberately or with a conscious desire to cause the
person's death, and not just accidentally or
involuntarily.

A "single criminal episode" is an act or
series of related criminal acts which occur within a
relatively limited time and place, or are directed
at the same person, or are part of a continuous
course of conduct related in time, place or purpose.

A person of sound mind and discretion may
be presumed to have intended the ordinary and
natural and probable consequences of his knowing and

5591

voluntary acts. However, this presumption is not
required. Thus, you may infer, but are not required
to infer, from the defendant's conduct that the
defendant intended to kill a person if you find: 1,
that the defendant was a person of sound mind and
discretion; 2, the person's death was an ordinary,
natural and probable consequence of the defendant's
acts; and 3, that the defendant committed these acts
knowingly and voluntarily.

Your finding as to this statutory factor
will be indicated in the appropriate place in
Section III of the Special Verdict Form.

Finally, as to the statutory aggravating
factors claimed, let me reiterate, if you do not
unanimously find that the government has proved
beyond a reasonable doubt at least one statutory
aggravating factor as to a count, your deliberations
as to that particular count have concluded.

Now, we go to the step of considering the
non-statutory aggravating factors. If, and only if,
you have unanimously found that the government has
proved the existence of a threshold mental state
factor and at least one of the statutory aggravating
factors as to a particular count or counts, you must
then consider whether the government has proved the

5592

existence of a "non-statutory aggravating factor"
with regard to that count or those counts. You must
agree unanimously, and separately as to each count,
that the government has proved beyond a reasonable
doubt the existence of any alleged non-statutory
aggravating factor before you may consider that
non-statutory aggravating factor in your
deliberations.

The law permits you to consider only the
two non-statutory aggravating factors that are
claimed by the government and which are particularly
listed below. You are not free to consider any
other facts in aggravation that you conceive of on
your own. You may not consider the relative cost to
taxpayers in executing the defendant Azibo Aquart
rather than incarcerating him in prison pursuant to
a life sentence without possibility of release.

The statutory -- excuse me, the
non-statutory aggravating factors alleged by the
government are as follows:

1. Other specific acts of violence.
The first non-statutory aggravating factor that the
defendant alleges is that the defendant committed
criminal acts of violence that posed a serious
threat to the lives and safety of persons other than

5593

the victims in this case, and that the defendant
engaged in a continuing pattern of violent criminal
conduct.

The government alleges the following
assaults by defendant as other specific acts of
violence as establishing a continuing pattern of
violent criminal conduct: 1. Assault on Frank
Hodges;

2. Assault on Jackie Bryant;

3. Assault on Venro Fleming;

4. Assault on Juanita Hopkins;

5. Assault on John Sullivan;

And 6. Assault on Anthony Armstead.

These are the only acts you are
permitted to consider. You may not consider any one
of these acts unless you first determine that the
government has proved beyond a reasonable doubt that
the defendant in fact committed it.

In order for you to find this
aggravating factor proven, you must unanimously
agree that, A, any such acts posed a serious threat
to the lives and safety of the victims, and B, that
acts so found demonstrate that the defendant engaged
in a continuing pattern of violent criminal conduct.

"Pattern" means a mode of behavior or

5594

1 series of acts that are recognizably consistent.

2 Let me caution you, the government does

3 not assert, nor has the government established, that

4 if sentenced to life imprisonment without

5 possibility of release, Azibo Aquart will present a

6 future danger to any other person. It would,

7 therefore, be improper for you to consider -- to

8 allow consideration of any notion of future

9 dangerousness to enter into your deliberations or

10 into your individual determination as to the

11 appropriate sentence. The only purpose for which

12 the acts of violence listed above have been admitted

13 for your consideration are to establish the

14 non-statutory aggravating factor of "other specific

15 acts of violence" as I have just described. They

16 have not been admitted for any other purpose and may

17 not be considered for any other purpose.

18 The second non-statutory aggravating

19 factor alleged by the government is that the

20 defendant caused loss, injury, and harm to the

21 victims and their families, including, but not

22 limited to, the following:

23 A. The defendant caused the death of

24 the victims who enjoyed a strong relationship with

25 their families, including their parents, their

5595

1 siblings, and their children and grandchildren;

2 B. The victims' families have suffered

3 severe and irreparable harm. The victim, Tina

4 Johnson, Counts Two and Five provided financial and

5 emotional support to her entire family. The other

6 two victims, James Reid, Counts Three and Six, and

7 Basil Williams, Count Four and Seven, provided

8 emotional support to their families.

9 You have heard evidence concerning the

10 impact of the victims' deaths on their families.

11 This evidence is, by it's nature, emotional. I

12 instruct you that you should not permit the

13 emotional component of this evidence to overwhelm

14 your ability to follow the law and make a sentence

15 determination that takes into account all of the

16 evidence that you have heard. Your decision about

17 whether or not to impose the death penalty may not

18 be based on undue sympathy, passion and prejudice.

19 Because the law does not permit a

20 victim-impact witness to state or to indicate

21 whether he or she personally favors or opposes the

22 death penalty in this case, you should draw no

23 inference from the fact that no victim-impact

24 witness has testified as to his or her view on the

25 subject and you should not speculate on the subject.

5596

1 Again, your findings regarding each

2 non-statutory aggravating factor must be separate

3 and unanimous with regard to each count you are

4 considering. You must also unanimously agree that

5 the government has proved beyond a reasonable doubt

6 that the non-statutory aggravating factors alleged

7 by the government are, in fact, aggravating, that

8 is, that they make the crime worse, more serious or

9 severe and thus may be considered in favor of the

10 death penalty. Thus, there are two basic findings

11 on the non-statutory aggravating factor that the

12 government must prove beyond a reasonable doubt:

13 1. That the factor alleged by the

14 government has been established; and

15 2. That the factor is aggravating.

16 Again, an aggravating factor is a fact

17 or circumstance that would tend to support

18 imposition of the death penalty.

19 If you unanimously find that the

20 government has proved either non-statutory

21 aggravating factor beyond a reasonable doubt as to

22 any count or counts, you will indicate that in

23 Section IV on the Special Verdict Form.

24 Even if you do not find a non-statutory

25 aggravating factor proven with regard to any counts,

5597

1 you will still continue your deliberations and

2 consider the death penalty as a possible sentence,

3 but obviously you may not base any determination

4 that the death penalty is appropriate on the claimed

5 but unproved non-statutory aggravating factor.

6 You'll note this instruction is different

7 from the instructions for threshold mental state and

8 statutory aggravating factors where, if you didn't

9 find the threshold mental state factor or at least

10 one statutory factor, you could not proceed to

11 deliberate further on that particular count.

12 Please understand that you can consider

13 in your sentencing decision only those statutory and

14 non-statutory factors that you unanimously found

15 proved beyond a reasonable doubt, and you may not

16 give any further consideration to any statutory and

17 non-statutory aggravating factor that you do not

18 find so proved.

19 All right, we're now at the fifth step,

20 mitigating factors. Before you may consider the

21 appropriate punishment for any capital count for

22 which you have unanimously found beyond a reasonable

23 doubt at least one threshold mental state factor and

24 at least one statutory aggravating factor, you must

25 consider whether the defendant has established the

5598

existence of any mitigating factors.  A mitigating
factor is not offered to justify or excuse the
defendant's conduct with respect to the offense of
conviction.  Instead, a mitigating factor is a fact
about the defendant's background, record or
character, or about the circumstances surrounding
the capital offenses, or anything else relevant that
would suggest in fairness that a sentence of life
imprisonment without the possibility of release is a
more appropriate punishment than a sentence of death
in this case.

The law does not require that there be a
connection between the mitigating evidence and the
crime committed.  It is not necessary, for example,
for the defense to establish that evidence of a bad
childhood led to the commission of the offense.
Thus, whether or not the mitigating factors have a
direct connection to the crimes does not affect
their status as mitigating circumstances that you
are required to consider.

Unlike aggravating factors which you
must find proved beyond a reasonable doubt, in order
for you to consider them in your deliberations, the
law does not require unanimity with respect to
mitigating factors.  Any one juror persuaded of the

5599

existence of a mitigating factor must consider it in
his or her sentencing decision.

It is the defendant's burden to establish
any mitigating factors by a preponderance of the
evidence as I previously defined that term on page
4.  This lesser standard of -- this is a lesser
standard of proof under the law than proof beyond a
reasonable doubt which is the standard for which the
government is held.

The defendant claims as mitigating
factors the following:

1.  Neither John Taylor nor Efrain
Johnson will be sentenced to death for their roles
in the murders of Basil Williams, James Reid or Tina
Johnson;

2.  One or more -- excuse me, one or
more victims chose to engage in illegal drug
trafficking activities, a circumstance that
contributed to their deaths;

3.  If not sentenced to death, Azibo
Aquart will be in prison for the rest of his life
without possibility of release;

4.  Lifetime imprisonment is a severe
punishment;

5.  Azibo Aquart's execution would cause

5600

others to suffer grief and loss;

6.  Azibo Aquart grew up in communities
characterized by violence and crime;

7.  Before age 16 Azibo Aquart lived in
16 different places;

8.  Azibo Aquart attended eight
different schools in nine years;

9.  Throughout his childhood Azibo
Aquart lacked adequate parental supervision;

10.  Azibo Aquart was exposed to
emotional and physical abuse inflicted on his
mother;

11.  Azibo Aquart's parents both sold
illegal drugs;

12.  Azibo Aquart's father, Richard
Aquart, exposed Azibo Aquart to violence and drug
dealing;

13.  Richard Aquart stored illegal
weapons in the home;

14.  From the time Azibo Aquart was
five, Richard Aquart was a fugitive who used
aliases;

15.  When Azibo Aquart was 11 his father
was sent to prison for eight years and then deported
to Jamaica;

5601

16.  Richard Aquart was a poor role
model;

17.  Azibo Aquart's parents and others
around him taught him to distrust the police and the
judicial system and to disregard the law;

18.  Azibo Aquart and his brothers,
Azizi and Azikiwe, were picked on and bullied
because of their cultural differences;

19.  When he was 12 Azibo Aquart's
mother drowned;

20.  From the time of his mother's death
Azibo Aquart had no meaningful adult supervision;

21.  When Azibo Aquart was 13 his
brother, Azizi Aquart, was shot three times and
nearly died;

22.  At age 17 Azizi Aquart was
ill-equipped to handle the responsibility of being a
guardian of a 13-year-old;

23.  Azibo Aquart's close relatives and
friends failed to properly care for him after his
mother's death and his brother's shooting;

24.  Although social service providers
and juvenile court officials identified Azibo Aquart
as an at-risk child, no effective action was taken;

25.  While incarcerated as a young adult

**GA1443**

5602

1    Azibo Aquart obtained his GED;

2         26.  At the Enfield Correctional Center,

3    Azibo Aquart was a certified literacy tutor who

4    helped other inmates;

5         27.  If Azibo Aquart is sentenced to

6    life imprisonment the Bureau of Prisons has the

7    capability of safely and securely confining him;

8         And 28.  Azibo Aquart's life has value.

9         In Section V of the Special Verdict Form

10    you are asked to report for each mitigating factor

11    considered the number of jurors who found a

12    particular mitigating factor to be established by a

13    preponderance of the evidence.

14         In addition to the mitigating factors

15    specifically raised by the defendant, the law

16    permits each of you to consider anything about the

17    circumstances of the offense or anything about

18    defendant Azibo Aquart's background, record or

19    character or anything else relevant that you

20    individually believe mitigates against the

21    imposition of the death penalty.

22         The law does not limit your consideration

23    of mitigating factors to those that are articulated

24    in advance.  As such, if there are any mitigating

25    factors not argued by the attorney for the defendant

5603

1    Azibo Aquart, but which any juror on his or her own

2    or with others finds to be established by a

3    preponderance of the evidence, that juror must

4    consider it in his or her sentencing determination.

5         In Section V of the Special Verdict Form

6    you are asked to identify any such additional

7    mitigating factors that one or more of you

8    independently finds to exist.

9         In short, your discretion in considering

10    mitigating factors is much broader than your

11    discretion in considering aggravating factors.  And

12    this was a choice expressly made by Congress in

13    enacting the Federal Death Penalty Act.  As I

14    already mentioned, the existence of a mitigating

15    factor is a distinct consideration from whatever

16    weight, if any, should ultimately be given -- I'm

17    going to start that over.  As I have mentioned, the

18    existence of a mitigating factor is a distinct

19    consideration from whatever weight, if any, should

20    ultimately be given to that factor in your

21    deliberations.  For example, any number of jurors

22    may find a particular mitigating factor is proved to

23    exist, but those individual jurors might later

24    choose to give that particular mitigating factor

25    different levels of significance during your

5604

1    weighing process.

2         With this distinction in mind, Section V

3    of the Special Verdict Form only asks you to report

4    how many jurors found the existence of a particular

5    mitigating factor to be established by a

6    preponderance of the evidence.

7         After you have completed your findings

8    regarding the existence or non-existence of

9    mitigating factors, then you will proceed to weigh

10    the aggravating factors and mitigating factors with

11    regard to each of the counts for which you have

12    unanimously found the threshold mental state factor

13    and at least one statutory aggravating factor, and

14    that brings us to the weighing step, step VI.

15         If, and only if, you unanimously find

16    that the government has proven beyond a reasonable

17    doubt the existence of a threshold mental state

18    factor and at least one statutory aggravating factor

19    with regard to any count, and after you have

20    considered whether the government has proved any

21    non-statutory aggravating factor, and after you have

22    determined whether Azibo Aquart has proven by a

23    preponderance of the evidence the existence of any

24    mitigating factors, then you must engage in a

25    weighing process.

5605

1         This weighing process asks whether you

2    are unanimously persuaded beyond a reasonable doubt

3    that the aggravating factors sufficiently outweigh

4    any mitigating factors, or, in the absence of any

5    mitigating factors, that the aggravating factors are

6    in and of themselves sufficient to justify a

7    sentence of death.

8         Each juror must individually decide

9    whether under all of the facts and circumstances in

10    this case a sentence of death has been proved

11    justified.  You are to conduct this weighing process

12    separately with regard to each of the counts for

13    which you have found the mental state element and at

14    least one statutory aggravating factor.  The

15    specific offenses in the counts for which you are

16    considering the sentence are not aggravating factors

17    and, thus, may not be considered themselves as

18    aggravating factors in your weighing process.  This

19    means, for example, that the fact that Count two

20    charges murder in aid of racketeering while Count

21    five charges a drug-related murder are not

22    aggravating factors to be weighed in the balancing

23    to decide what the sentence should be on those two

24    counts since both counts relate to the death of Tina

25    Johnson.

**GA1444**

5606

1      You must independently weigh the
2 aggravating factor or factors that you unanimously
3 found to exist, and each of you must weigh any
4 mitigating factors that you individually or with
5 others found to exist.  Remember, you are not to
6 weigh the threshold mental state factors as any part
7 of this process nor any aggravating factors you
8 didn't find proved nor the nature of the specific
9 counts of conviction.
10      In engaging in the weighing process you
11 must avoid any influence of passion, prejudice or
12 any other arbitrary consideration.  Your
13 deliberations should be based on the evidence you
14 have seen and heard and the law on which I have
15 instructed you.  The process of weighing aggravating
16 and mitigating factors, or weighing aggravating
17 factors alone if you find no mitigating factors, in
18 order to determine if a death sentence is justified,
19 is by no means a mechanical process.  In other
20 words, you should not simply count the total number
21 of aggravating and mitigating factors and reach a
22 decision based on which number is greater.  Rather,
23 you should give -- you should consider the weight
24 and the value of each factor.
25      The law contemplates that different

5607

1 factors may be given different weights or different
2 values by different jurors.  Thus, you may find that
3 one mitigating factor outweighs all the aggravating
4 factors combined, or that the aggravating factor,
5 proved do not, standing alone, justify imposition of
6 the sentence of death beyond a reasonable doubt.
7 Similarly, you may instead find beyond a reasonable
8 doubt that a single aggravating factor sufficiently
9 outweighs all mitigating factors combined so as to
10 justify a sentence of death.
11      Each juror is to decide individually
12 what weight or value is to be given to a particular
13 aggravating or mitigating factor in the
14 decision-making process.  If you do not unanimously
15 determine beyond a reasonable doubt that the
16 aggravating factors sufficiently outweigh the
17 mitigating factors so as to justify a sentence of
18 death as to any count, then you may not consider the
19 death penalty for that count and you will reflect
20 that determination in Section VI.
21      Remember that even a finding that the
22 aggravating factors sufficiently outweigh the
23 mitigating factors to justify a sentence of death
24 does not require that you impose a sentence of
25 death.  There is never any requirement that the

5608

1 death sentence be imposed.  Your determination of
2 what the sentence shall be will be the result of
3 your carefully weighing these various factors and
4 making a unique, individual judgment about the
5 sentence that is appropriate for the defendant Azibo
6 Aquart.
7      And the seventh and last step is your
8 determination of sentence.  Whether or not the
9 circumstances in this case persuade you that a
10 sentence of death is called for is a decision that
11 the law leaves entirely to you.  Remember that
12 before the sentence of death can be imposed, all 12
13 jurors must agree that beyond a reasonable doubt
14 death is in fact -- let me do that again.  Remember,
15 that before a sentence of death can be imposed, all
16 12 jurors must agree that beyond a reasonable doubt
17 death is in fact the appropriate sentence knowing,
18 as I have told you, no juror is ever required by the
19 law to impose a death sentence.  The decision is
20 yours as individuals to make.  Any one of you may
21 decline to impose a death sentence.  You do not have
22 to give a reason for your decision.  The law has
23 given each of you the discretion to temper justice
24 with mercy.
25      Bear in mind that in order to find that

5609

1 a sentence of death should be imposed on defendant
2 Azibo Aquart, the jurors must first have unanimously
3 concluded that beyond a reasonable doubt a death
4 sentence is justified because the aggravating factor
5 or factors sufficiently outweigh any mitigating
6 factors, as I discussed earlier.  However, once it
7 is imposed, I cannot change it.  I will have no
8 discretion and I must then sentence the defendant to
9 death.
10      If you unanimously determine that the
11 defendant, Azibo Aquart, should be sentenced to life
12 in imprisonment without possibility of release,
13 record that determination in Section VII of the
14 Special Verdict Form.  If you unanimously determine
15 that the defendant Azibo Aquart shall be sentenced
16 to death, record that determination in Section VII
17 of the Special Verdict Form.
18      It is your duty as jurors to discuss the
19 issue of punishment with each other in an effort to
20 reach agreement if you can do so.  However, each of
21 you must decide the question of punishment for
22 yourselves, but only after full consideration of the
23 evidence with the other members of the jury and
24 respectful consideration of their views.  While you
25 are discussing this matter, do not hesitate to

5610

1  re-examine your own opinion and to change your mind
2  if you become convinced that you are wrong.  But do
3  not give up your honest beliefs as to the weight or
4  the effect of the evidence or the appropriate
5  sentence for Azibo Aquart solely because others
6  think differently or simply to get the case over
7  with.
8          In consideration of whether the death
9  sentence is appropriate, you must not consider the
10 race, color, religious beliefs, national origin or
11 sex of either Azibo Aquart or of any victim.  You
12 are not to return a sentence of death unless you
13 would return a sentence of death for the crime in
14 question without regard to the race, color,
15 religious beliefs, national origin or sex of either
16 Azibo Aquart or any victim.
17         To emphasize the importance of this
18 consideration, Section VIII of the Special Verdict
19 Form contains a certification statement.  Each juror
20 should carefully read that statement and sign your
21 name in the appropriate place if the statement
22 accurately reflects the manner in which each of you
23 reached your individual decision.
24         Now, after you have heard counsel from
25 both sides in their closing arguments, I'll give you

5611

1  a few final instructions about the verdict form and
2  your deliberations.
3          At this point we will take a five-minute
4  recess, you will then hear the government's closing
5  argument.  We will then take a half hour for lunch,
6  return for the defendant's closing argument and the
7  government's rebuttal argument.  You still must not
8  discuss this case.
9          We will stand in recess.
10         (Jury exited the courtroom.)
11         THE COURT:  All right, counsel, do you
12 want to just take the five-minute recess and I'm
13 have you put your pinpoint objections on the record
14 when we finish everything.
15         MS. RODRIGUEZ-COSS:  We're ready now.
16         THE COURT:  All right, go ahead.
17         MR. SHEEHAN:  Your Honor, Attorney Van
18 Ness is going to handle this.
19         MS. RODRIGUEZ-COSS:  Should we address
20 the Court from counsel table?
21         THE COURT:  That's fine.
22         MS. RODRIGUEZ-COSS:  Your Honor, as
23 previously indicated, the government objects to the
24 definition of mitigating factor at pages 2, 28, 31,
25 34 and 35.

5612

1          We object to the jury being informed of
2  the consequences of not reaching a unanimous verdict
3  at pages 2, 11 and 14.
4          The government also objects to the
5  statement that there is never a requirement to
6  impose the death penalty at page 3, 35, 36.  The
7  position of the government is once the jury
8  determines the death penalty is justified, a verdict
9  of death shall be returned.
10         We object to the two-step
11 decision-making process both in the instructions and
12 on the verdict form as described on pages 7 and 8.
13         We object to the standard of beyond a
14 reasonable doubt with regards to the weighing
15 process as well as to the final decision as
16 described on page 7 and 33, 34, 35 and 36.
17         We object to the Court not instructing
18 at page 21 that the jury can consider whether the
19 defendant by himself or in concert with others
20 intentionally killed or intended to kill more than
21 one person, as found by U.S. v Ortiz.
22         At page 23, we object to the reference
23 to the cost of execution versus the cost of
24 imprisonment for life.
25         And at page 24 we object to the

5613

1  government has to prove each act underlying the
2  non-statutory aggravating factor other acts of
3  violence beyond a reasonable doubt.
4          As stated previously we object to the
5  inclusions of mitigating factors 3, 4, 5 at page 29,
6  and the inclusion of mitigating factors 22 and 27 on
7  page 30.
8          And finally, your Honor, we again
9  understand that the jury should have been requested
10 to report on only on those mitigating factors they
11 found to exist and to have been mitigating at page
12 32 pursuant to United States v. Allen.
13         Your Honor, can we incorporate by
14 reference our papers at document No. 925.
15         THE COURT:  In support of these
16 objections, yes, of course.
17         MS. RODRIGUEZ-COSS:  Thank you.
18         THE COURT:  All right, defendant.
19         MS. VAN NESS:  Yes, your Honor.  The
20 defense objects to your refusing to charge that
21 there is a presumption in favor of a life sentence
22 on page 2.
23         We except to your inclusion of the
24 requirement that the jury find that the defendant is
25 over 18.

5614

```
1        On page 16, we object to your inclusion
2   of the helplessness of the victim in making a
3   finding as to the heinous, cruel, depraved
4   aggravating factor.
5        On page 17, with respect to the
6   procurement aggravating factor, we object to your
7   Honor's refusal to include an instruction that it is
8   not sufficient for the jury to find that the
9   defendant promised to pay someone to commit any
10  offense other than murder with respect to that
11  aggravating factor.
12       On page 24, with respect to the
13  unadjudicated acts of violence aggravating factor,
14  in the paragraph where you've charged the jury they
15  are required to find beyond a reasonable doubt that
16  the defendant committed each act, we would ask you
17  to also include the fact that he intentionally
18  committed each act in order for it to be considered.
19       And then, finally, with respect to
20  mitigating factor No. 2, on page 29, we object to
21  your Honor's failure to include the concept that
22  drug trafficking is a dangerous activity.
23       And your Honor while I'm up here, I
24  would also object in advance to the verdict sheet,
25  the failure to include non-unanimity on the verdict
```

5615

```
1   sheet as an option for each count for the jury.
2        THE COURT:  All right, thank you very
3   much.
4        Let's take three minutes and then we'll
5   be back for the government's closing.
6        (Recess)
7        THE COURT:  All right, please be seated,
8   ladies and gentlemen.  We will bring in the jury.
9        (Jury entered the courtroom)
10       THE COURT:  Please be seated, ladies and
11  gentlemen.  The government will now give its closing
12  argument; Tracy Dayton to deliver it.
13       MS. DAYTON:  Thank you, your Honor.
14       Good morning.  I want to begin by
15  thanking you on behalf of the Court, the defense and
16  the government for your participation in this case.
17  You've shown an incredible amount of dedication
18  despite the fact it's been a very long process.  We
19  appreciate the sacrifices, the personal sacrifices
20  you have made and the time that you have devoted to
21  this case.  You've been incredibly attentive and
22  served with distinction, and for that we all thank
23  you.
24       We've now come to the close of this case.
25  You've already found the defendant guilty of three
```

5616

```
1   horrific murders, so now we've come to the time
2   where you must decide what his punishment should be.
3   No one is going to suggest to you that this is an
4   easy process or that it's an easy decision.  It's
5   not.  In fact, it's likely one of the most difficult
6   decisions that you'll ever be called upon to make.
7   Which is why the government wants to spend some time
8   going through with you how you go about making that
9   decision, how you decide what justice demands when a
10  man like the defendant, who the evidence shows has
11  absolutely no regard for human life, brutally and
12  cruelly murders three defenseless human beings.
13       In a moment I'm going to speak with you
14  about the process that you must follow in coming to
15  your decision.  But before I do, I want to focus you
16  back on the victims in this case.  One of the
17  factors that you may consider is the rippling
18  effects that this case had not only on the victims,
19  but on their families.  In evidence you have several
20  photos that were admitted in order to give you a
21  glimpse of Tina, of James, and of Basil, the people
22  that they were and the lives that they lived.  We
23  ask that before you return a verdict in this case,
24  that each and every one of you look at each and
25  every photograph to try to understand the loss that
```

5617

```
1   was suffered.
2        What you'll notice as you look at these
3   photographs is that there are large portions of the
4   victims' lives that are not represented, parts that
5   can never be replaced and photographs that will
6   never be taken.
7        For instance, here is a photograph of
8   Tina holding Lativia's and Erica's first born
9   children.  But where is the photograph of Tina
10  holding Akeela, Erica's now six-month-old child, the
11  granddaughter that Tina will never hold.
12       Here is a photograph of James with his
13  brothers, but where is the photograph of James as
14  the best man at his brother Jason's wedding, a
15  wedding that he'll never attend.
16       And here is a photograph of Basil with
17  his family, with his mom Odessa.  But where is the
18  photograph of Basil taking care of Odessa, his mom,
19  the woman who can't even remember that he's dead.
20  Odessa Williams, Barbara Johnson and Mary Reid,
21  three women, three mothers, who had to bury their
22  own children.
23       The government asks that when you look at
24  these photos you think about the moments that make
25  up a lifetime, you think about the incredible loss
```

5618

1  that has been suffered, and about the fact that
2  Lativia couldn't even hug her mother good-bye, that
3  she was denied that right to closure, all because in
4  bludgeoning Tina to death the defendant left her
5  without enough bone struck to hold her face in
6  place. Think about the fact that John David will
7  never hear Basil yelling to him from the sidelines
8  of a cricket game, and James will never again laugh
9  with his brothers.
10       Look at this photo of Leroy with Tina.
11  Look at the smile on her face. Tragically this is
12  not how Leroy will remember his mother. Rather, his
13  last vision of his mother is of Tina covered in duct
14  tape, covered in blood, bound and gagged. There is
15  no amount of help and no amount of intervention that
16  can ever make that vision go away.
17       A few moments ago the Judge instructed
18  you on the procedure that you must follow in making
19  a determination as to the appropriate and justified
20  sentence in this case. You've already found the
21  defendant guilty of six counts of capital murder,
22  and so now you must move on to the eligibility
23  threshold factors that the Judge instructed you on.
24       First, you have to determine if the
25  defendant was 18 years of age or older at the time

5619

1  he committed these murders. About this, there is no
2  dispute. The government and the defense have
3  stipulated that the defendant was 23 years of 18 on
4  October 24, 2005, when he killed Tina, James and
5  Basil.
6       Next, you must determine whether or not
7  the government has proven to you beyond a reasonable
8  doubt at least one of the preliminary intent
9  factors. We have alleged two. The government
10  submits to you that based upon the evidence that you
11  already relied upon in finding the defendant guilty
12  of intentional murder, that we have proven to you
13  beyond a reasonable doubt that he intentionally
14  murdered Tina and Basil. Specifically, the evidence
15  established beyond a reasonable doubt that the
16  defendant intentionally killed Tina and Basil by
17  personally beating them to death with a baseball
18  bat.
19       With respect to all three victims, the
20  evidence established beyond a reasonable doubt that
21  the defendant intentionally participated in an act,
22  which in this case is a home invasion robbery,
23  contemplating that the life of a person would be
24  taken or that lethal force would be used against
25  another person, and that the victims, Tina, James

5620

1  and Basil, died as a result of that act.
2       Simply put, the government submits that
3  repeatedly bludgeoning someone over the head with a
4  baseball bat is the intentional infliction of lethal
5  force.
6       After you find that the threshold
7  eligibility factors have been satisfied, you must
8  move on to consider whether or not the government
9  has proven beyond a reasonable doubt at least one
10  statutory aggravating factor. Here we have alleged
11  not just one, but five, and we submit to you that
12  we've proven them all beyond a reasonable doubt.
13       The first aggravating factor that the
14  government has proven is that the defendant procured
15  the commission of the murders by the promise of
16  payment. With respect to this factor, you learned
17  that the defendant did not just associate with this
18  criminal enterprise, he led it. Witness after
19  witness came in here and told you that the defendant
20  supplied the crack, he set the prices, he chose the
21  drug apartment, he arranged for the lookout
22  apartment, he hired the lookouts, he hired and paid
23  the sellers, he collected the money, he disciplined
24  the workers, and when it was necessary, he bonded
25  out his employees. And when it was time to

5621

1  eliminate the competition, he told his lieutenant
2  "I'll take care of it," and then he hired his team.
3  You heard from Taylor that the defendant's currency
4  was drugs and that while they were in Georgia he
5  told Taylor that he was having a problem and that he
6  needed Taylor's help. In exchange, he promised to
7  set Taylor up in Charles Street so that Taylor could
8  make money earning drugs.
9       The next aggravating factor that the
10  government submits it has proven beyond a reasonable
11  doubt is that the defendant committed these murders
12  with the expectation of pecuniary gain. Here the
13  evidence, we submit, is crystal clear. The
14  defendant committed these murders to maintain his
15  drug territory. The evidence you heard was that the
16  defendant benefited, profited from every bag of
17  crack that was sold. Every bag was important to
18  him. In fact, he repeatedly sent people to the
19  hospital over messing up a few bags of crack.
20       Part of the reason the defendant wanted
21  Tina dead was that she was impinging upon his
22  profits. She was taking his customers and he wanted
23  them back, and he chose to make that happen by
24  literally eliminating the competition. The fact
25  that the defendant, who made thousands of dollars a

5622

1   week in the drug trade, would murder three people
2   over a few dollars is overwhelming evidence not only
3   of the defendant's greed and his intent to derive
4   pecuniary gain, but also his utter lack of respect
5   for human life.
6           The next aggravating factor that the
7   government submits it has proven to you beyond a
8   reasonable doubt is that the defendant engaged in
9   substantial planning and premeditation.  The
10  evidence that you heard is that the defendant
11  started planning the victim's demise long before he
12  actually murdered them.  You heard that the
13  defendant was not about to tolerate Tina selling
14  drugs in his building, and the defendant let her
15  know that.  You heard about the fight between Tina
16  and the defendant from Jackie Bryant.  Ms. Bryant
17  told you that that fight was enough to scare her,
18  but Tina didn't back down.  So then the defendant
19  instructed Womble to set upon Tina, but she still
20  didn't back down.
21          So then the defendant went into action.
22  First, while in Georgia, he explained the problem he
23  was having with Tina to his brother, Azikiwe Aquart,
24  and he hired Taylor for his team.  Next, when they
25  returned to Bridgeport, he immediately met with

5623

1   Womble and he gave him money in order to buy a bat.
2   The government submits this is evidence that the
3   defendant had not only decided that he was go to go
4   murder the victims, but he had decided precisely the
5   weapon he was going to use to do it.
6           The defendant then met up with Azikiwe
7   and Taylor and they began shopping around different
8   stores to buy duct tape.  You heard that they went
9   to several stores and that the defendant did not
10  rest until he found what he wanted at Walgreen's
11  where he bought not only the duct tape, but the
12  latex gloves designed to mask his presence at the
13  scene.
14          They then met up with Johnson and they
15  converged upon the victims' home.  The defendant
16  enlisted the help of Frank Hodges in order to get
17  them in the door, but it didn't work, no one
18  answered when Frank knocked.  So, did this deter the
19  defendant?  The evidence shows no, it didn't.
20  Rather than give up or abandon his plan, the
21  defendant found a way to perfect it.  He once again
22  gathered his forces, amassed his weapons, donned his
23  ski masks and his gloves, and then he kicked in the
24  victims' door, invaded their home armed with
25  baseball bats, a gun, duct tape and a drill.  Even

5624

1   the scene inside the apartment shows that this was
2   all very well-orchestrated.  The victims were not
3   scattered about the apartment.  Rather, the evidence
4   shows that they were subdued with a gun, thoroughly
5   hog-tied with the duct tape, and then beaten to
6   death in their own bedrooms.
7           The defendant's actions after he killed
8   the victims also speaks significantly to the
9   substantial planning that went into these crimes.
10  After he murdered the victims, the defendant walked
11  into the front room, but he didn't walk out the
12  front door.  Rather, he took the drill he had
13  brought and he stood there drilling the door shut
14  and sealing the victims in their own home.  The
15  defendant then turned around, walked back into the
16  room where Tina and James were lying in pools of
17  their own blood, and he stepped over them like they
18  were trash to climb out the bedroom window.
19          The defendant then arranged to conceal
20  the evidence by having Lashika Johnson get rid of
21  the clothing, and he set about looking for a place
22  to move his business, explaining to Taylor that the
23  murders had brought a lot of heat on the building.
24  This was not a spontaneous act of violence, this was
25  a well-orchestrated execution.

5625

1           Next, the government must prove that the
2   defendant intended to murder more than one victim in
3   a single criminal episode.  Here the evidence shows
4   that the defendant not only intended to, but he did
5   murder three victims.  As you'll remember, the
6   defendant's real issue was with Tina.  It's arguable
7   that he could have satisfied his need for revenge
8   and proven his dominance in the drug trade by
9   killing Tina alone.  He had that option.  He was
10  wearing a ski mask, he could have turned and walked
11  out the door and chosen to spare James and Basil,
12  chosen to let them live to see their families again.
13  But he didn't.  Instead, the defendant chose to
14  murder all three victims at the same time.  The
15  government submits that it's clear from the evidence
16  that when the defendant kicked down the apartment
17  door to 101, that he intended for everybody in that
18  apartment to die.
19          The evidence also established beyond a
20  reasonable doubt that the defendant personally
21  killed both Tina and Basil by beating them over the
22  head with baseball bats.  The evidence also shows
23  that the defendant, in concert with his brother,
24  bound James, and that Azikiwe Aquart then beat James
25  to death in accordance with the defendant's wishes.

**GA1449**

5626

Killing one person is horrible; beating three people to death is beyond comprehension. The government submits it has proven this factor beyond a reasonable doubt and that it should receive great weight in your deliberations.

The final factor that further sets this case and this defendant apart from others is the shockingly heinous, cruel and depraved manner in which the defendant killed the victims. If you look at the definition of depraved, it states that the defendant must have relished the killings or he must have shown indifference to the victim's suffering, meaning that he knew she was suffering but he continued to harm her anyway.

Here, the fact that the defendant continued to bludgeoned Tina as she began to wail is evidence of his complete indifference to her pain. While it may have been the pleasure of retaliation that provoked him to invite Taylor to come and get him some, the government submits that this is incontrovertible evidence of the defendant's depravity.

All three victims, Tina, James and Basil, were subject to torture and serious physical abuse. All three were duct taped with such a

5627

ferocity that James' elbow and Tina's wrist broke in the process. They were duct taped so tightly and with so many layers that it was hard to get the tape off. They couldn't even cut it off without cutting the victim. But once it was removed, the tape stood up on its own.

Even looking at the evidence it's hard to say what's worse, the fact that Tina's eyes were left uncovered, the mental torture that she must have experienced watching the man she loved get bludgeoned to death, watching his skull get crushed and his blood splatter all over the room, or the fact that both James and Basil had their faces completely covered in duct tape with the exception of the holes that were left for their noses.

Ask yourself, why would someone leave a hole for the victim's nose unless he wanted to make sure that the victim didn't suffocate before he had a chance to beat him over the head with the baseball bat.

You saw the photograph of Tina in life. Here is what she looked like when the defendant was done with her. The evidence has established that Tina was alive during her attack. According to the medical examiner, she was bludgeoned on the front,

5628

back and side of her head, and you can see that, meaning that she had to have changed positions during the course of the assault. That's confirmed by Tom Martin's testimony that Tina had blood spatter both on the front and the back of her shirt, which the government submits could not have happened unless Tina changed position during the assault.

You also saw the photograph of James in life. And here is what he looked like when the defendant and his brother were done with him. The evidence establishes that James, like Tina, was repeatedly struck on his head. Again, Tom Martin explained that pooling of blood does not begin until after the first blow that actually breaks the skin. Therefore, in order for James' blood to have covered the walls and the ceiling in the way that it did, James would have -- James would had to have been hit repeatedly from several angles or while he was still moving, soaking the bat in blood and casting the blood off around the room. James, like Tina, had his skull crushed; pieces of it were lodged in his brain.

And then there was Basil. Basil who never hurt anyone in life. Basil who made his brothers laugh in life. And here is what he looked

5629

like when the defendant was done with him. Basil, who the evidence shows, experienced death not once, but twice. As Basil lay in his room, his face and his head covered with duct tape, he could not see or speak, but the evidence is that he could breathe through that nose hole. And the government submits that Basil, like John Taylor, could hear the sounds of death from the room next door, the deafening sound of silence, and then the sound of his friend Tina, the woman who had taken care of him, getting bludgeoned to death, her high-pitched wail and her pain and fear as the defendant beat the life out of her.

Yet, there was absolutely nothing that Basil could do about it. How could he even cry? The duct tape was so tight, where would the tears go? So Basil, all 5'2, 139 pounds of him, was left to lie there and to wait and anticipate his own death, an indescribable mental anguish. And Basil did die at the hands of the defendant. The evidence shows from the expirated blood spatter right by his nose that his last breaths were through his own blood before his skull was crushed to pieces.

How does one accurately describe the gratuitous violence that the defendant inflicted

5630

1  upon the victims?  And how does James' mother
2  explain to his daughter that the last impression
3  that anyone will ever have of her father's face is
4  the one that he left in this death mask.
5       The law only requires the government to
6  prove one threshold factor and one statutory
7  aggravating factor in order for the defendant to be
8  considered eligible for the death penalty.  Here,
9  the government submits that we've not only proven
10 all five aggravating factors, that we've also proven
11 beyond a reasonable doubt two non-statutory
12 aggravating factors that should also weigh into your
13 deliberations.
14       The first we already spoke about, and
15 that is the effect that these murders had on the
16 victims and upon their families, the families to
17 whom they were all incredibly close.  The defendant
18 robbed the victims of their lives, he stole years
19 from them, decades during which they should have
20 been playing with their grandchildren, loving their
21 children, laughing with their siblings and caring
22 for their aging parents.  Instead, the defendant
23 devastated three families.  He deprived Tippy's dad
24 of his will to live and left Erica wanting to take
25 her mom's pain and her mom's place.  The defendant

5631

1  broke the hearts of three families and he left them
2  all with a permanent void.
3       The next non-statutory aggravating
4  factor that the government submits it has proven to
5  you beyond a reasonable doubt is that the defendant
6  engaged in a continuing course of criminal, violent
7  conduct.  The defendant's unrelenting and escalating
8  campaign of violence, one serious assault after
9  another, makes these crimes, his murders, even
10 worse.  Think for a minute about the defendant's
11 mentality.  He left the day-to-day operations of his
12 drug trafficking organization up to his lieutenant.
13 However, he took it upon himself to be the enforcer,
14 to physically assault people when they violated his
15 rules, although the evidence showed sometimes he
16 needed no provocation at all.  You have heard about
17 the assaults and seen the medical records for most
18 of his victims.  Jackie Bryant, Venro Fleming, Frank
19 Hodges, Juanita Hopkins, John Sullivan, and of
20 course Anthony Armstead.
21       What the evidence has established is
22 that the defendant tormented the weak, he attacked
23 the unsuspecting, and he brutalized those who were
24 too scared to fight back.  This factor speaks to the
25 depth and breadth and seriousness of the defendant's

5632

1  ongoing conduct, and we submit should also weigh
2  heavily into your deliberations.
3       After you've considered the aggravating
4  factors, then you need decide if the defense has
5  proven to you any of the 28 mitigating factors that
6  they claim exist.  Only one of the proposed
7  mitigators relates to the crimes that the defendant
8  committed, and that's No. 1.  Specifically No. 1
9  states that neither John Taylor nor Efrain Johnson
10 will receive the death penalty for their roles in
11 the offense.
12       The defense is trying to bolster this
13 factor by relying upon Johnson's statements to law
14 enforcement, statements which are not only
15 internally inconsistent and not only inconsistent
16 with the forensic and testimonial evidence, but also
17 inconsistent with the defendant's theory of the case
18 during the guilt phase.
19       For instance, Johnson claims that the
20 only weapon he saw was a ten-inch pipe that Taylor
21 allegedly whipped out of his pocket.  Well, you know
22 from the medical examiners and Tom Martin that the
23 victims were not killed with a ten-inch pipe.  There
24 was blood on the walls and blood dripping from the
25 ceiling, and the slaughterhouse effect in the

5633

1  southwest bedroom must have been made, as you
2  learned from Tom Martin, with a weapon of sufficient
3  length and surface area to splatter that quantity of
4  blood up to the 9'3 7/8 inch ceiling.
5       So ask yourself, why did the defense
6  introduce Johnson's statements?  The government
7  submits that it was in an effort to shift blame from
8  the defendant to Taylor, to make Taylor look like he
9  was more involved in these offenses than he
10 testified to here at trial.  But you saw Taylor
11 testify and you saw him get cross-examined; the
12 cross-examination where he wasn't asked one question
13 about what role he actually played in the offense.
14 Why?  Because then the defense theory was that
15 Taylor wasn't even there for the murders.
16      MR. SHEEHAN:  I'm going to object, your
17 Honor.  May we approach?
18      THE COURT:  You may.
19      (Sidebar conference)
20      MR. SHEEHAN:  Your Honor, for the
21 reasons we have stated in our previously filed
22 motion in limine, I believe that counsel's arguments
23 at this point, in effect comparing what issues were
24 raised at the guilt phase, constitutes a form of
25 denigrating the offense -- denigrating the defense.

5634

```
1   We had no obligation at the guilt phase to present a
2   theory of defense.  Indeed, what we were challenging
3   was whether or not the government had proven its
4   case beyond a reasonable doubt.
5           For the reasons that we set forth in
6   section 23 -- 24 -- I'm sorry, on 23 in that memo, I
7   think this whole argument, to the extent that
8   they're trying to say, well, this is what they
9   argued in the guilt phase, constitutes an improper
10  form of argument and it should be precluded.
11          MS. DAYTON:  The government disagrees,
12  and it's almost over anyway.
13          MR. SHEEHAN:  I --
14          THE COURT:  To the extent that the
15  government is claiming that there is something wrong
16  or different or flawed about what defense counsel
17  did by having an inconsistent theory, I'm going to
18  sustain your objection.  I will instruct the jury
19  that what -- that the --
20          MS. DAYTON:  May we --
21          THE COURT:  -- decisions by defense
22  counsel are not -- on how to litigate the case are
23  not relevant at the penalty phase.
24          MS. DAYTON:  They're the agents for the
25  defendant and the defendant claimed that Taylor
```

5635

```
1   wasn't there and now he's --
2           THE COURT:  It's all about the
3   defendant, it's not about their counsel.
4           (Sidebar concluded)
5           THE COURT:  All right, ladies and
6   gentlemen, I'm sustaining the defense's objection
7   and I will ask you to not take into account in your
8   deliberations at the penalty phase the strategic
9   conduct of counsel.  This is for you to assess based
10  on what you find proved and what you conclude about
11  the defendant and the government's proof.
12          All right, you may continue.
13          MS. DAYTON:  So, is it true that neither
14  Taylor nor Johnson will receive the death penalty
15  for their roles in the offense?  Yes, that is true.
16  But the government submits that there is a very good
17  reason for that.  The evidence has established that
18  the defendant was substantially more culpable, bore
19  more responsibility for these crimes than either
20  Taylor or Johnson.  This was his building, his drug
21  operation.  He planned this, he hired his crew, he
22  premeditated these murders.  He personally killed
23  Tina and Basil, and he personally chose to end the
24  lives of the three victims.
25          The defendant has also raised three
```

5636

```
1   potential mitigators related to prison.  First, if
2   he's not sentenced to death that he will be
3   sentenced to life in prison.  Yes, that is true and
4   that is the law.  The government submits that does
5   absolutely nothing to mitigate the defendant's
6   vicious crimes in this case.
7           MR. SHEEHAN:  I object.
8           THE COURT:  A mitigator does not have to
9   relate to the crimes.  The jury will consider that
10  as argument only.
11          MS. DAYTON:  Second, the defendant
12  states that life imprisonment is severe punishment.
13  What you learned about life imprisonment you learned
14  from the defendant's expert, Mark Bezy, and from
15  Anthony Armstead.  What you heard is that the cell
16  doors open at 5:00 a.m. and they stay open until
17  approximately 9:00 p.m.  During that time period the
18  inmates can work, attend classes, play basketball,
19  played handball, shop in the commissary, go to the
20  law library, go to the yard, hang out in common
21  areas, watch TV, talk and play cards.  Inmates can
22  write letters, talk on the phone, and receive
23  visitors.  They're fed --
24          MR. SHEEHAN:  I'm going to object.  May
25  I approach?
```

5637

```
1           MS. DAYTON:  Your Honor.
2           THE COURT:  What is --
3           MR. SHEEHAN:  This was specifically --
4           THE COURT:  Very rapidly.
5           MR. SHEEHAN:  This was specifically
6   raised, your Honor.
7           (Sidebar conference)
8           MR. SHEEHAN:  In our motion in limine at
9   section 16 we objected to their commenting on the
10  cost or comforts.  This is not the cost, this is the
11  comforts of life imprisonment.  There was no
12  objection to that.
13          MS. DAYTON:  I'm not --
14          MR. SHEEHAN:  This motion in limine was
15  sustained.  It's at page --
16          MS. DAYTON:  I'm not talking about the
17  comfort of prison, I'm talking about the evidence
18  that they put on through their expert.  I'm talking
19  directly from the evidence that was derived at
20  trial.  I've never seen counsel object like is
21  happening in this trial during the closing argument.
22          MR. SHEEHAN:  Your Honor, could I
23  address that?
24          THE COURT:  Can you just wait a sec.
25  The primary focus of your objection is cost.  It has
```

5638

```
1   not been the direction of her argument.  The
2   mitigator has been that life in prison is harsh.
3   She is taking the evidence that has been educed that
4   may bear against a finding that that mitigator has
5   been proved or that it mitigates.  I do not
6   understand her argument to be implying that the jury
7   should consider the cost of food, shelter and so
8   forth, and I have specifically, over the
9   government's objection, charged that cost is not a
10  consideration.
11         To the extent she limits it to the
12  harshness as opposed to claiming that it would not
13  be sufficient justice to sending him to those
14  circumstances, I don't think that the objection
15  should be sustained so long as it's confined to
16  rebutting that mitigator.
17         MR. SHEEHAN:  Your Honor, could I just
18  indicate for the record that I'm objecting as well
19  with respect to the comforts of prison as being an
20  appropriate factor for the government to be arguing.
21         And the reason why, despite counsel's
22  objections, the reason why I am making these
23  objections is because of the myriad of cases which
24  hold that if you don't object you waive it.
25         THE COURT:  That's fine, and I'm simply
```

5639

```
1   putting it in the context of this argument, that she
2   is responding to this express mitigator that life in
3   prison would be harsh and not on the government's
4   own argument making the suggestion that life
5   imprisonment is either costly or comfortable.
6         (Sidebar concluded)
7         THE COURT:  The objection is overruled
8   the argument is focused only on the mitigator
9   related to life imprisonment is harsh and for no
10  other reason.
11         MS. DAYTON:  So, is prison restrictive?
12  Yes.  But the government submits that, again, does
13  not mitigate the fact that the defendant callously
14  and viciously murdered three human beings.
15         Third, the defendant claims that if
16  sentenced to life in prison that he can be securely
17  housed by the Bureau of Prisons.  Again, you saw
18  Mark Bezy testify, the defendant's expert.  The
19  government respectfully submits that you should
20  accord his prediction about where the defendant
21  might be housed absolutely no weight.  Mr. Bezy does
22  not work for the Bureau of Prisons, he is not
23  consulted by the Bureau of Prisons, and as he
24  acknowledged, he does not know where the defendant
25  might ultimately be sentenced.
```

5640

```
1         And then there are 19 proposed
2   mitigators that all appear to be varying ways of
3   saying the defendant had a difficult childhood.
4   Let's examine those.  By all accounts the defendant
5   was born into the arms of a loving and nurturing
6   mother.  She has been repeatedly described as a
7   wonderful woman who was caring, intelligent and
8   industrious.  Who could ask for a better role model?
9   The defendant lived with her for the first 12 years
10  of his life; arguably, his most formative years, the
11  time when you learn right from wrong and when you
12  establish your moral core.
13         You also heard that the defendant's
14  biological father, Richard Aquart, although not an
15  ideal parent, was not only intelligent, charismatic
16  and well-liked and respected in the community, but
17  also that he clearly loved and provided for his
18  children.  Yes, he was a drug dealer, he sold
19  marijuana, and that is bad, but the evidence also
20  showed that he largely insulated the defendant from
21  his drug dealing activities.
22         You remember when the defendant was very
23  young, less than two years old, his parents
24  separated and the defendant stayed living with his
25  mother.  The defendant's mother eventually remarried
```

5641

```
1   his stepfather, Skibo; Skibo, who Azizi told you,
2   cared for the defendant and defendant's stepsisters
3   to the exclusion of Azizi and Azikiwe.  And on the
4   occasions when the defendant went to visit his
5   father, he also had the loving, care and nurturing of
6   his stepmother Gillian Walcott.
7         There is nothing to suggest that the
8   defendant was deprived of love or nurturing during
9   the first 12 years of his life.  He had a roof over
10  his head, food to eat, clothes to wear, Big Wheels,
11  bicycles and birthday parties.  The defendant was
12  surrounded by people who loved him and by people who
13  tried to give him guidance and discipline.
14         You learned that when the defendant was
15  not in school or in the company of a parent or
16  stepparent, that he was either in daycare or with
17  his nanny, Rose McKinney, with a family friend or
18  with his brother Azizi.  There was testimony that
19  somehow it was so damaging that the defendant would
20  somehow be left with his older brother, but Azizi
21  summed it up the best when he said "being the oldest
22  comes with both privileges and responsibility," like
23  keeping an eye on your kid brother.
24         When the brother was 12 his mother
25  tragically drowned.  No one disputes that was a
```

5642

1  horrible loss.  In fact, the government agrees that
2  it is horrible to have one's mother taken away from
3  them.  And the year after his mother's death sounds
4  like it was also difficult.  The defendant was
5  understandably sad and not yet settled.  He spent
6  some time in the company of his maternal aunt and
7  then several months with Sharon Headley.
8  Interesting, you'll see the school records from that
9  period where the defendant actually did okay in
10  school.  Soon, however, the defendant became too
11  much for Ms. Headley to handle.  He stopped
12  following her rules.  But this really was not new
13  behavior.  In fact, the evidence you heard was that
14  the defendant was a handful before his mother passed
15  away.  As Mr. Adams told you, the defendant would
16  run away when the defendant didn't get his way.  He
17  was filled with rage, rough with people and with
18  animals, and he had to be handled with kid gloves.
19      So, the defendant returned home to live
20  with Azizi, which worked out very well because Azizi
21  wanted him back.  Azizi had stepped up, become
22  emancipated and used the $100,000 insurance policy
23  that his mother had left him and the state
24  assistance that he was receiving to obtain a
25  two-bedroom apartment and to take care of his

5643

1  brothers.  And by all accounts he did a great job.
2  In fact, you'll remember the probation report that
3  actually said he did a tremendous job and he did
4  much better than most adults in his situation.
5      But the evidence shows that soon the
6  defendant didn't want to follow Azizi's rules
7  either.  First, he got caught with marijuana.  Not
8  exactly a major violation, but notable in the fact
9  that the entire system came running to his rescue.
10  The defendant was placed on intensive probation and
11  he had two probation officers coming to see him
12  three times a week.  He repaid them by threatening
13  to sic a Pit Bull on Ms. Hart-D'Amato.  The
14  defendant also started going to individual therapy,
15  group family and family therapy.  Mr. Shannon told
16  you that's not because there was anything wrong with
17  the defendant psychologically, but rather they were
18  trying to give him any needed support.  And how did
19  the defendant respond?  Well, he made a choice.  He
20  decided to go out and rob somebody.  He said he had
21  a weapon, threatened to kill them over what turned
22  out to be a dollar.  So, the defendant ended up in
23  jail, which is what happens to people who decide to
24  live outside the rules and restrictions placed upon
25  them by society.

5644

1      But even in jail the defendant was not
2  cast aside.  Rather, he was provided with an
3  education and given the tools to succeed by a woman
4  who quite obviously cared about the defendant and
5  his development, Ms. McCoy.  In fact, you heard over
6  and over again that the defendant is actually an
7  intelligent and articulate person who has the
8  capability and had the foundation to live a
9  law-abiding life.  He chose not to.  He was given
10  the guardrails about which Mr. Shannon spoke and the
11  defendant decided to dive over them.  He did not
12  want to be reined in, he wanted to rule, and the
13  government respectfully submits it's not about his
14  mother's death, that it's about him.
15      So, let's talk for a minute about what
16  the defendant did when he got out of jail at
17  20 years old with a GED and business level college
18  courses.  College business courses.  Let's
19  review the evidence about all the good deeds that
20  the defendant did as an adult to bring value to his
21  life and to the lives of those around him.  It's
22  going to be a very short discussion because you
23  heard absolutely no evidence whatsoever about
24  anything the defendant did positively as an adult.
25  It's not as if he was at Charles Street acting as a

5645

1  literacy tutor or encouraging Ms. Hopkins to return
2  and finish her education.
3      The defendant had different aspirations.
4  He took his GED and he put his math skills to work
5  breaking down kilos of crack cocaine and counting
6  the proceeds from his crack sales.  He took his
7  business savvy and he started a prolific drug
8  trafficking enterprise.  Rather than picking up a
9  baby, like Azizi did, he picked up guns and baseball
10  bats.  He even turned his pen of freedom into a
11  weapon of destruction using it to manipulate,
12  harass, threaten and suborn perjury.
13      If you have any question about whether
14  or not the defendant had an option not to turn out
15  this way, you need look no further than his brother
16  Azizi; a man who also lost his mother, whose father
17  was a drug dealer, who himself sold drugs, joined a
18  gang, was shot at 16, and became a father at 17.
19  Yet Azizi managed to attend high school, to attend
20  college, to remain legitimately and gainfully
21  employed for well over a decade, all the while
22  providing for his family, his now four children, and
23  trying to keep his family together.  The government
24  submits this is not about whether the defendant had
25  an ability to understand the morality of his

5646

1   actions.  The defendant had a moral compass; he
2   chose to point it in the wrong direction.
3           If you need any further insight into the
4   value that the defendant places on human life,
5   consider the fact that the defendant brutally
6   murdered Tina, James and Basil when his then
7   17-year-old girlfriend, Shante Pettway, was eight
8   months pregnant with his child.  That speaks volumes
9   about the defendant's character and his moral fiber,
10  and the government submits tells you more about the
11  defendant than any defense witness who testified
12  here before you.  And that's likely because none of
13  the defense witnesses who testified had seen or
14  spoken to the defendant in years, most of them for
15  well over a decade.  Even Azizi and his wife have
16  not seen or spoken to the defendant in over two
17  years.
18          As you've learned, not every murder
19  warrants the death penalty.  But the evidence has
20  proven to you that the defendant and his crimes are
21  in a different league.  He has truly given meaning
22  to the word heinous.  The evidence has proven to you
23  that the defendant is a cold and calculating
24  murderer.  He killed for money, he killed because he
25  could, and he killed because he enjoyed it.  The

5647

1   defense tries to mitigate this horrible crime by
2   claiming that the defendant had a bad childhood and
3   that the victims had it coming, but they didn't.
4   They didn't deserve to die, much less to die in the
5   tormented manner in which they did.  In fact, while
6   the defense has presented 28 factors that he claims
7   amounts to mitigation, you must remember what is
8   important is not the quantity of factors, but, as
9   the Judge told you, the quality.  And what the
10  government submits is that when you scrutinize these
11  factors, really take a look at them, you'll see that
12  these so-called mitigators actually carry and
13  deserve no true weight.
14          Sometimes there comes a case where the
15  factors and the defendant combine to form the
16  perfect storm, a storm of events and actions and
17  conduct that leaves such a wake of devastation that
18  the only just penalty is death.  Here, sadly, you
19  have that perfect storm.  No murder is tolerable and
20  no murder is without its graphic, gruesome and
21  tragic consequences.  But these murders,
22  individually and collectively, demand a punishment
23  beyond the ordinary for they are extraordinary in
24  their senselessness, their callousness and their
25  execution.  And the government submits it's not just

5648

1   the murders, it is the violent and inhumane way in
2   which the defendant chose to live his life.  The
3   evidence shows that he dehumanized people, he fed
4   their addictions, he used them and he abused them,
5   and then he murdered the victims so that he could
6   prove his dominance in the drug trade.  It is the
7   defendant who tipped the scales and it is the
8   defendant's actions that have proven that the death
9   penalty is the appropriate and justified sentence in
10  this case.
11          As you heard before, a trial does not
12  begin with opening statements and it does not end
13  with closing arguments.  Rather, it begins with
14  picking a fair and impartial jury and it ends with
15  you, the jury, coming to a just and fair verdict.
16          Ladies and gentlemen, that is what the
17  government asks you to do now, to do justice, to let
18  your verdict speak of the loss of Tina, of James and
19  of Basil, to let your verdict speak to the loss
20  suffered by all of those who loved them, and to let
21  it speak of the fact that the defendant slaughtered
22  three defenseless human beings, tortured them to
23  death over a few bags of crack.
24          The government expects that the defense
25  will ask for your mercy, but the government submits

5649

1   that the defendant has not earned your mercy.
2   Prison is what he's asking for and the death penalty
3   is what he has earned.  Thank you.
4           Thank you, your Honor.
5           THE COURT:  Ladies and gentlemen, we
6   will take a half an hour for lunch, I think your
7   lunch has arrived, and then we will return and hear
8   the defendant's closing argument and the
9   government's rebuttal closing.  Please still do not
10  discuss the case with each other.
11          (Jury exited the courtroom.)
12          THE COURT:  All right, counsel, we will
13  return at ten minutes past one.
14          MR. SHEEHAN:  Your Honor, before we do
15  that, let me indicate I would be moving for a
16  mistrial at this time.  I think that in addition to
17  the reasons set forth at the bench, in closing
18  argument she was -- at the end she was asking for
19  the death sentence on behalf of the victims of the
20  crime, which I think is improper.  She was
21  suggesting that there has to be a nexus between the
22  mitigation despite your Honor's earlier comments to
23  that effect.  Your Honor's earlier correction of her
24  comments, she was suggesting that there has to be a
25  nexus between the mitigation and the ultimate

5650

```
1   decision in the case, which is an improper statement
2   of law and it violates what we had specifically
3   requested in our motion in limine and what the Court
4   had granted absent any government objection.  And
5   indeed, throughout I think that her argument was
6   demonizing the defendant in a way contrary to the
7   arguments set forth in our motion in limine, which
8   was granted by the Court absent objection,
9   specifically with respect to section 24.  I've
10  already mentioned with respect to the denigrating of
11  defense counsel with respect to 23, and I think that
12  the -- that sums it up.
13          THE COURT:  All right.  And you will
14  follow that up with a written motion and supporting
15  case law.
16          MR. SHEEHAN:  Yes.
17          THE COURT:  All right, we will take
18  lunch.
19          (Recess)
20          THE COURT:  All right, we'll bring the
21  jury in.
22          (Jury entered the courtroom.)
23          THE COURT:  Please be seated, ladies and
24  gentlemen.  Mr. Sheehan will close for Mr. Aquart.
25          You may proceed.
```

5651

```
1           MR. SHEEHAN:  Thank you, your Honor.
2           And good afternoon, everyone.  And I
3   join the government in thanking you for all of the
4   reasons that were said by Attorney Dayton.
5           Let's talk about photos.  What do we see
6   here in this photo?  A happy family:  A mom looking
7   strong and healthy; dad bending over two older boys
8   on their new Big Wheels; a big baby, Jumbo, tucked
9   into or almost sprawling out of the stroller.  A
10  nice picture.  Does that picture tell the whole
11  truth?  Does any picture tell the whole truth?
12  Certainly not this one.  You don't see the betrayal
13  that greeted Sonia when she arrived from Jamaica
14  with the two other boys to learn about the other
15  woman and the other child waiting for Richard in
16  Bridgeport.  You don't see Richard as a hustler, as
17  a charismatic, self-centered guy.  You don't see him
18  as a big-time drug dealer.
19          What you don't see in this picture is
20  the vulnerability of all of these children.  And you
21  don't see the fragility of their situation,
22  undocumented without any social service system to
23  help them.  It's true they had a community in the 12
24  Tribes, but it was a community that kept them out of
25  the mainstream.  And indeed, for them, the
```

5652

```
1   mainstream was the problem.
2           What you can't see in this picture is
3   that for Sonia there was no place to go back to.
4   And what you don't see in this picture is how much
5   of all of her time and energy and emotional
6   resources would have to be spent just to hang on.
7           Let's look at the next photo.  What do
8   see here?  A beautiful smile on Sonia.  We see the
9   open countenances on the older boys.  And we see the
10  toddler.  I submit to you this is the kind of photo
11  that we all have to see in our brothers' and
12  sisters' family photo albums.  They're going to have
13  that photo and they're going to say, well, look at
14  Michael.  And they joke, look at that funny little
15  frown on his face, and Michael is going to just have
16  to smile and say, gees, thanks for keeping that
17  photo.  Kind of funny in the family gatherings when
18  everybody gets together to share the albums.
19          But what we don't see in this photo is
20  really the screw face, the story that Azizi told us.
21  We don't see how children are encouraged not to show
22  feelings.  We don't see children being taught only
23  to be soldiers; not soldiers for a larger cause, but
24  instead dad's soldier in dad's army on dad's
25  campaign.  And what's his campaign?  To get
```

5653

```
1   everything he can from America.
2           Well, dad's not in this picture, you
3   might ask.  He isn't, but we know from the evidence,
4   and even if this photo doesn't show it, that he's
5   around.  He's there with all of his charisma and all
6   of his negative influences.
7           Let's look at the next photo.  Mother of
8   the year photo.  And here we have three beautiful
9   boys.  We have the touching handwriting of all of
10  them.  Aziboo Smith down at the bottom, pretty
11  typical for a six-year-old.  To her sons, no doubt,
12  she was the mother of the year.  But let's look
13  behind that certificate and ask ourselves at the
14  time of this certificate, where is dad?  And let's
15  look at the court records that you have in front of
16  you.
17          Well, we know from the first page that
18  dad has been arrested on his drug case.  And we know
19  from the second page, and this section right here
20  that's highlighted, that he's already been
21  convicted, he's filed a motion for acquittal, and
22  then his bond is called and forfeited, and the
23  reason for that is dad is a fugitive as of December
24  of 1986, a fugitive from Connecticut.  And that is
25  what is going on behind the certificate.
```

5654

And it's not as if dad just jumped bond
and took off. Would that he had. No, he's there in
all of their lives. And where is he? Well, he's up
in Hartford under one of his assumed names and he's
still running drugs. What do we know about that
period in between the screw face photo and the mom
of the year? We know that the male role model in
Azibo's life is the guy with the gas can on the
porch pouring that gas on the porch of the fellow
who owes him the money and then slipping the match
under the door. We don't have a photo of that, but
you do have Mike Adams' testimony, Mike Adams who
came up here from North Carolina to tell you about
it.

And let's look at the next photo. What
do we have there? That's a photo of Sonia, the boys
and her daughter. And, again, what do we see there?
A confident, beautiful smile on Sonia's face. And
what is that? That's the outer face that her
friends have told us about, Lillian and Desta. The
outer face that she presents to the outside world.
Interestingly here, none of the boys have their
dreads. Do you see Azibo in his white sweatshirt
there and the two older boys? And maybe Richard's
influence -- you might say, well, there is no

5655

dreads, maybe Richard's influence has kind of waned
a bit, sort of maybe he's not really around. That
looks like a happy family photo.

But let's think about what's behind that
photo from what other people who testified here.
You know about Sonia's difficult relationship with
Skibo, the baby's father. And what about that guy
Richard? Or is it Donovan? What's his name? What
is his name right now? Well, we get an answer to
that because you've got the New Jersey records in
here. And let's focus in on who the New Jersey guy
is. Oh, yes, Millard Walcott. That's also Richard
Aquart, everybody agrees to that. And what's he
arrested with back on January 14, 1988? Possession
of cocaine, unlawful possession of a weapon, all of
that. And what happens after this? He goes on the
run in New Jersey as well.

So, now in January of '88, which is the
time of -- about the time of that family photo there
with the baby, behind this is Richard. Richard, a
double fugitive. Richard using Millard Walcott to
get away with stuff. And we also know where Richard
is. He's up in Hartford. And what do we know about
this time? We know that Sonia is about to send the
older boys up to him.

5656

These photos show the promise in their
lives. The other records and their testimony show
the peril in their -- in Azibo's early life. And
this is how the stage was set.

As good parents we try to protect our
children. As good parents we try to guard them.
Their lives to us are precious, their futures are
ours to shape. We're not always perfect, but as
good parents we all try our best and we try to
protect them from things that are behind those
photos because as parents we know those things can
harm children. As Jim Shannon told you, we are the
strong barrier that keeps our kids from falling into
the sea. Azibo did not fall into the sea, he was
thrown into it. And the life that once held promise
and future and hope for the future has now been
reduced to dying in prison.

Let's look at this slide here. And the
Judge told you this in her instructions over and
over again, life in prison means exactly that, no
parole, no release. He will never -- by your
verdict, you have decided that he will never come
out of prison alive.

And let's look at that second slide
because this really paints the picture here for you.

5657

It's not where Azibo will die, but how will he die.
The only issue here is will he be strapped to a
gurney in an execution chamber or will he die in the
time that was ordained for him.

Judge Arterton has given you the
framework for deciding this issue, and we
appreciate, all of us do, the careful attention
you've given to these instructions, but I want to
submit to you a couple of things. The first is what
this case, what it is not about. And at this point
in the case, as the Judge has instructed you, this
is not about excuses. We're not blaming. It's not
a blame game. We're not avoiding responsibility.
And certainly it's not an issue of justification.

Instead, what is it about? It's about
your unique and individual choice between life and
death. It's about whether another human being lives
or dies. It's about for each of you is death the
only answer. It's about the power that the law has
given to you of life and death, the power the law
has entrusted in each and every one of you to temper
justice with mercy, and the power that the law has
given to each and every one of you to weigh the
alternatives.

We recognize the burden that you have

5658

agreed to assume. Congress, although it has given
you various factors to consider, has left that
ultimate decision in each of your hands. As Judge
Arterton has told you at all stages in these
proceedings, starting from jury selection to her
preliminary instructions, and again today, death is
never required. The only circumstance under which
the death penalty is imposed is if each and every
one of you agree. And if not, the law requires that
the sentence be life without release. The law
answers that question as to what happens if everyone
does not agree. This is your framework and this is
what sets the stage for you.

I want to briefly address those
statements you've been given in the penalty phase
from Efrain Johnson. Because he is not available to
testify, the law makes those statements available to
you. And what that information, that new
information strongly suggests is that John Taylor
was much more involved in these murders than he
previously testified to. And what it suggests is
that Mr. Taylor minimized his role. That renders
his credibility on other aspects of what happened in
that apartment somewhat suspect. We're not
suggesting to you that the conflicting story, that

5659

information that was provided by Mr. Johnson in any
way should shake your conclusion about Azibo's guilt
for these murders, but it does bear on what
punishment should be applied to him in this case.

The government has suggested, well, don't
believe Mr. Johnson because he was only excusing
himself. But isn't it equally, equally likely that
Taylor was doing precisely the same thing? The fact
is the Court -- or the government has certainly
conceded neither Taylor nor Johnson will be punished
by a sentence of death. Yes, these additional
statements from Johnson, they did implicate both
Azibo and Azikiwe, and we do not challenge again the
guilty verdicts, but they paint a different picture
not only of Taylor's role, but also of Johnson's
role.

Well, why does that matter you might
ask. Generally in a non-capital case the punishment
that other people get, indeed the punishment that a
defendant gets, is a matter for the court, and it's
not a matter for you, the jury, to speculate on.
But here in this one unique circumstance your
responsibility is different. That's because in this
case, unlike a non-capital case, each and every one
of you are the sentencers, and the law requires that

5660

you consider the whole picture in deciding Azibo's
sentence. The fact that others were also involved
in the offense and will not receive a death sentence
is something that you can and should consider in
deciding on the punishment for Azibo.

One of the other things that you are also
required to consider is the fact that one or more of
the victims were engaged in drug dealing.
Understanding no one is saying that it is okay to
kill drug dealers, but what we are saying, however,
is that in deciding to deal drugs people do take on
risks. And the reason they take on the risks is
because of the benefits. The benefits that they're
seeking are making money that they would not have
otherwise made. That's why people sell drugs. And
one of the risks is the risk of violence. And it's
not okay to kill drug dealers, and these three
people did not deserve to die, but because it's not
okay to kill drug dealers, Azibo will be in prison
for the rest of his life.

What will his life be like in prison?
From Mr. Bezy we know that Azibo, if sentenced to
life without release, is going to be at a U.S.
penitentiary or higher designation facility. The
government tells you just ignore the fact that Mr.

5661

Bezy comes before you with more than 27 years of
experience within the Federal Bureau of Prisons.
Mr. Bezy told you about his rise through the ranks
from being a correctional officer to a lieutenant to
a captain; about his assignments as a correctional
services administrator in the north central office
which managed a whole conglomeration of prisons;
about his appointments and responsibilities as
warden at various camps, medium security facilities,
those are the FCIs he talked about, and U.S.
penitentiaries; and about his knowledge of all of
the Bureau of Prisons' procedures and policies.

Was he an expert? This was conceded.
What was the challenge to his credibility? That on
one occasion he used intemperant language to a
deputy warden in an internal meeting? Does this in
any way render his opinion less reliable? Not at
all.

What we learned from Mr. Bezy is that
the Federal Bureau of Prisons can, with a reasonable
degree of certainty, safely and securely house Azibo
for the rest of his life. Will he be deprived of
almost everything that we recognize as freedom; the
ability to choose who to live with, the ability to
choose where to work, the ability to choose when to

5662

```
1   go for a walk, the ability to choose what to wear as
2   clothes, where to live, who he can associate with,
3   all of the pleasures we associate with freedom?  The
4   answer to that is yes.  But will he be a danger to
5   others?  The answer to that is no.
6            It's critical that you understand that
7   this testimony has to be fit in with the Court's
8   instructions in this case.  As Judge Arterton has
9   instructed you, all of the evidence, all of the
10  evidence regarding the assaults, including the
11  assault against Mr. Armstead, are not being offered
12  and cannot be considered by you as any kind of
13  evidence that Azibo would commit further dangerous
14  acts in prison.  It would be improper for you to
15  consider this one act in prison over a
16  five-and-a-half-year period as anything further than
17  a single action.  You have the instructions with you
18  on this, and it is right there on page 24 of those
19  instructions, and I just want to read that to you at
20  this moment, and this slide summarizes it.  "The
21  government does not assert, nor has the government
22  established, that if sentenced to life without
23  possibility of release Azibo Aquart will present a
24  future danger to anyone.  It would, therefore, be
25  improper for you to allow any consideration of any
```

5663

```
1   notion of future dangerousness to enter into your
2   deliberations or into your individual determinations
3   as to the appropriate sentence."
4            What does Mr. Bezy tells us about the
5   choices available to inmates doing life without the
6   possibility of release in the United States
7   penitentiary or higher?  The only decision that an
8   inmate has in a penitentiary is whether they are
9   going to follow the rules or not.  If they don't,
10  they're locked up for 23 hours a day.  In fact, it's
11  a little bit more than that, as I recall his
12  testimony, because there is five hours a week out of
13  that cell.  Maybe they add in the shower time in
14  addition.  But it means that all of your life you
15  are in that cell.  And that's just within the
16  prison, the United States penitentiary.  The Federal
17  Bureau of Prisons can also send people to what they
18  call the special management units, or that ADX
19  facility that Mr. Bezy told us about in Colorado
20  that he helped to set up.
21            It's true that some people in prison
22  don't get the message, but everybody knows the
23  consequences and almost all of them do get the
24  message.  The fact is that the Bureau of Prisons has
25  the controls and the expertise in place to house
```

5664

```
1   Azibo if he is sentenced to life without the
2   possibility of release.
3            Mr. Bezy has also explained the
4   difference in general between lifers or short-term
5   inmates and why -- that's sort of kind of initially
6   a paradoxical issue, but why is it that long-termers
7   are easier to manage.  And the fact is there are
8   incentives in place to go with the program which
9   other inmates may not have as strongly.  The same
10  staff, the same inmate population, the concern
11  generally without -- throughout the institution of
12  basically people finding their place.
13            I want you to remember as well that Mr.
14  Bezy was not just talking in the abstract.  He told
15  us his opinion after a complete review of Azibo's
16  file and the circumstances of this case.  Was there
17  anything that the government brought out that
18  contradicted this opinion?  Well, I guess you could
19  say the intemperant remark.  But other than that,
20  was there any evidence?  None.  What about the
21  Armstead photos?  But Mr. Bezy was fully familiar
22  with those.
23            Is there violence in prison from time to
24  time?  Yes, this is a sad fact.  And the government
25  asked Mr. Bezy about those statistics.  And you have
```

5665

```
1   the testimony there.  But my recollection is that
2   Mr. Bezy said -- or was asked, well, 59 serious
3   assaults on staff in 2010.  If the prison population
4   in 2010 was 179,000 inmates, that would be a rate of
5   about three incidents per every 10,000 people.
6   That's not a high measure by any means considering
7   that everybody in there is convicted of crimes.
8            But also take into account that there
9   was no evidence presented to you that Azibo ever so
10  much as made a threat or took any negative actions
11  directed against staff members.  Those issues that
12  were suggested by cross-examination of Mr. Bezy
13  about what happens in prison are really red
14  herrings.  Don't get distracted by them.  You should
15  rest assured that if sentenced to life there is no
16  reason to believe, and indeed as the instructions
17  from the Judge remind you, you are prohibited from
18  inferring that Azibo would be a danger to anyone.
19  Does Azibo need to be executed to protect others or
20  society in general?  No.
21            On the basis of these factors alone,
22  there are substantial reasons to conclude that death
23  is not necessary and that the correct sentence here
24  is life without the possibility of release.  But
25  there is really much more to it than that.
```

5666

I want to go back to the circumstances of Azibo's life and I want to ask you to think back to the voir dire. All of you were asked if you were open to considering the circumstances of a child's life in the context of mitigation. And my recollection is that at least some of you said yes, sure. Others expressed a little hesitation, well, do you know, the circumstances of childhood, people said, that doesn't excuse a crime for me. And then either the Judge or one of the defense lawyers or one of the prosecution tried to help you to make it clearer. And all of you understood in the end that this is not about -- evidence is not offered to excuse the crime at all. And in fact all of you, all of you expressed an openness to seeing this evidence as possible grounds for mitigation as a reason to consider life instead of death. If you hadn't been open to this possibility, I assure you, you would not have been qualified to sit as a juror on this case.

Now, Sonia was a remarkable woman in many ways, but I submit she was unlucky in her choice of partners. Richard, dashing and charismatic, he seems to have had quite a magnetic power over women, and it's not surprising a teenage Sonia, escaping to

5667

what perhaps was, for her, a much less desirable life in Jamaica, may have found Richard's charisma irresistible, and then, with her kids in tow, two of them, the older boys, arrives in the United States to find the whole underlying circus, shall we call it, or tragedy, shall we call it, the other pregnant woman right there. And what Lillian Reid tells us is that then she was ready to, or in fact I think Lillian actually said she did go back to Jamaica. But really what was there to go back to Jamaica to? What was there for her? I don't think there was much. And so what was her choice? Hang on and make due was her only realistic choice.

What kind of a dad was Richard? Well, they concede he was a criminal. The government suggests that Richard's convictions, well, weren't really all that important. Who knew about them? Were they secrets? Well, maybe in the beginning to outsiders they might have been. Mike Adams doesn't seem to have caught on until he posted property as collateral. Maybe that's the one where Richard jumped the bail. As far as friends and family, though, it's hard to believe that Richard's status was a secret. In fact, everyone who testified here told you that they either personally knew him or his

5668

reputation in that tight 12 Tribes community as being a drug dealer.

Well, what does this matter? Who teaches us more than our parents? Was Sonia herself involved, at least partially, in the drug world? The evidence suggests that was the case, initially anyway, as a mule. A "mule" meaning somebody who was bringing drugs in and out for Richard. After all, women are somewhat less likely to attract attention. And if she was only directly involved in the beginning, wasn't she at least passively involved throughout the many years Richard was such a presence in their lives? Indeed, for many years didn't she have to frame her life around the cycles of Richard's boom and bust activities?

Let's look back at that photo of the Big Wheels again and just remember what Azizi told us: Sometimes we got Big Wheels and sometimes we had nothing. Dad would come in with the big present or else we wouldn't have toilet paper.

I think from all the evidence you can conclude that Sonia over time developed strength and over time her goals were independent goals, they weren't Richard's goals, and that over time her goal was not to rape America, but to find a better life

5669

here for herself and her children. But the fact is that she had this guy here, this man, the father of her boys, around her until the time that he was ultimately arrested, and not arrested on those cases where he was the fugitive, but arrested when he actually went to jail.

He wasn't there physically necessarily with her, but he was taking care of the boys and a continual presence in their lives. Indeed, she even sent the older boys to live with him in Hartford while she was struggling to build an alternative life with Skibo. Why did she do this, you might ask. Richard was a fugitive at the time. Mike Adams had told you about posting the bond. We know he skipped out in December of '86. We know he had New Jersey looking for him since he got arrested there in 1988. Why would she send the boys to him, the older boys? The answer is, well, maybe she had no better choices. Maybe she was having a hard time dealing with the older boys herself. Or maybe, and perhaps quite likely, in her opinion as she saw it Richard was not all bad. Almost everybody, I submit to you, is more than the sum of their bad acts.

One thing that we have seen from some of the witnesses in this case is that people who engage

5670

1  in criminal activity do not necessarily have all of
2  their family turn their backs entirely on them.  And
3  the other thing we know, and here the evidence is
4  overwhelming, is that Sonia's world was so narrow
5  and so confined -- I mean, for the longest time she
6  seems to have had no papers.  She never had a strong
7  family to fall back on.  Her choice to send the boys
8  to Richard may have seemed like the only possible
9  option to her.
10        Lillian Reid tells us about the sham
11 marriage to Ernest Reardon that Sonia embarked upon.
12 Carol Porter tells us about the economic hardship in
13 those early days in Bridgeport.  The government
14 asked, well, how was Carol able to pull her children
15 out of that world?  And the answer is she moved.
16 And how did she move?  She had family, her
17 grandmother in East Hartford, her father in New
18 York, to help her.
19        Sonia, as we can see from the map, and
20 this is the map that we introduced to you, never
21 found a stable place to raise her children.  Let's
22 look at the places where Azibo lived before the age
23 of 16, and the schools.  The blue is the places.
24 And then let's look at the schools that Azibo
25 attended, and that's the white.  Now, the government

5671

1  suggests, hey, there is nothing unremarkable about a
2  person moving to get better locations.  But what
3  they ignore is the fact that for this family each
4  move, because they were so isolated, only diminished
5  the sense of connection with other people and
6  diminished any moderating impact of friends and
7  neighbors on the negative factors that were there in
8  the family.  Sonia, as we know from Maribel and
9  Desta and others, never had the relationship with
10 her mother to back her up and give her alternatives
11 that might have enabled her to make a clean break
12 with Richard and to protect her children from his
13 negative influence.
14        How big a presence was Richard in
15 Azibo's life?  We know from Carol Porter and Lillian
16 Reid that Richard was not around when Azibo was
17 born.  But we also know he was never really very far
18 away.  Azizi tells us that his parents split up,
19 finally split up when the boys were younger, and my
20 recollection is that he said it was shortly before
21 Azibo started school.  But we also know that Richard
22 was a continuing presence in all of their lives,
23 including Azibo.  We know that the older boys moved
24 up to Hartford to live with Richard and Gillian, and
25 we know that Azibo visited them there.  From Azizi's

5672

1  testimony and the school records, we know this was
2  right about the time that Sonia moved to Chestnut
3  Street, which from our school records says 1990, and
4  at that point in time Azibo would have been around
5  nine years old, Azizi would have been 13, and
6  Azikiwe would have been 11.
7        But we also know that throughout this
8  period of time Richard would be at 12 Tribes
9  functions with his posse.  We can all appreciate, I
10 hope, how this would capture a young boy's
11 imagination.  We can also assume from the evidence
12 that although Richard may have been up in Hartford
13 with Gillian, he continued to run his herb gates.
14 And I don't think that's an organic garden anybody
15 is talking about.  It's a drug house, and he's
16 running that out of Bridgeport.
17        Mike Adams tells us how all of the boys,
18 including Azibo, looked up to Richard, and about
19 Richard's reputation in the community.  Gillian also
20 tells us about Azibo yearning to be with his father
21 and also being on the outside during the Hartford
22 years.
23        Why does this matter?  I think if there
24 is one thing that we all know for sure, it's that
25 childhood matters for all of us.  For Azibo growing

5673

1  up in Bridgeport, a latchkey kid surrounded by
2  crime.  In fact, do you recall Azizi's testimony
3  about that Adams Street house?  Wasn't that the
4  stash house on the other side of Stratford Avenue?
5  That's where dad had his activities.  That was a
6  place to play.
7        To know that your father was part of
8  this, to know that you live in an isolated
9  community, isolated from the larger population, what
10 this all means is that you are extremely at risk.
11 And what to adults, what to adults appear to be
12 choices, to children become simply the way things
13 are and become the reality to be adjusted to and to
14 become the reality that shapes who we later become.
15        Unlike other children, in Azibo's world,
16 the last place in the world you would look for help
17 was the 911 call.  Think back to Azizi's testimony
18 and then reflect on this in light of our experience
19 as parents and adults.  Do you know, we wouldn't
20 want our children calling 911, and the reason for
21 that is because that 911 call is reserved for true
22 emergencies, and as parents we might discipline our
23 children for calling that number unnecessarily.
24        But for the Aquarts at that point in
25 time, the issue was not that they didn't want to

GA1461

1  inconvenience the emergency responders, but rather
2  that they did not have any emergency responders in
3  their life at all.  A baby dies, a baby-sitter dies,
4  and no one calls the police.  This tells us volumes
5  about that subculture that these children grew up
6  in.  It was isolated; you could not trust outsiders.
7        For Sonia, the beginning life with Skibo
8  may well have seemed more promising.  But what we
9  learned from Desta Meghoo, who came here from
10 Ethiopia, and Khadijah Jumaralli and from Ife Felix,
11 Cheryl Kennedy, is that there were lots of problems
12 there, and that these problems included verbal and
13 physical abuse.  And from all that we have heard, it
14 is clear that Skibo never bonded with the boys.  And
15 we also learned from Azizi that Skibo himself was
16 involved in illegal activities.
17        Given that Sonia had allowed her older
18 boys to move up to Hartford with their father and
19 that she allowed Azibo to visit them there, how
20 truly effective was she in protecting Azibo from all
21 of these bad influences?  Did she try?  The evidence
22 is that she was trying.  But was it effective?
23 Let's think back on her response when she learned
24 that Azizi had been arrested in Bridgeport.  Here
25 she did take action.  But how was it, you might ask,

1  that things got so bad?  Prior to this we know the
2  older boys had been back in Bridgeport and the
3  federal authorities were in hot pursuit of Richard
4  up in Hartford, and this Linwood Avenue address
5  we've got over here on the second side of the map,
6  that was an ongoing drug operation in full tilt
7  where her 15-year-old and her 13-year-old were armed
8  and dealing drugs, and where Azibo, then ten or 11,
9  was visiting and like a sponge taking everything in.
10       Was Sonia just too busy to pick up on
11 the signals before Azizi's arrest?  Maybe she -- she
12 certainly had a lot of pressures.  She had a new
13 store, she had new babies, she was commuting from
14 Bridgeport to New York.  She was basically camped at
15 her friend Khadijah's house.  It's not to fault her,
16 but it's simply she had too many responsibilities to
17 effectively shoulder them all.
18       Again, what does this mean?  Again, how
19 do children learn?  How many times has a child
20 called your attention to what you previously said
21 even if you didn't say it directly to him or her?
22 How many times does a child call your attention to
23 what you did even if you had not intended it to be
24 an example for him or her?  What do children learn
25 from their peers, from their older brothers and

1  sisters?  Is it only what we want them to learn, or
2  is it what they see and observe all around them?
3  Why is it that we say that actions speak louder than
4  words?  Because it's true.  Children know that.  And
5  that's why environment matters.
6        Do you know, even that move out of
7  Bridgeport, was that the right step?  Well, there
8  was certainly something to be said for it because
9  there were the boys hooked up with criminal
10 activity.  But it also meant moving away from any
11 other adult support system.  And it also meant
12 piling more responsibilities on Azizi to keep
13 everything, including his two younger brothers, in
14 place.
15       And how did he do in that?  Well, we
16 know from his testimony, and we can infer from all
17 of the facts, that part of his responsibility was to
18 get him and his brothers off to school.  Let's look
19 at Azibo's Stamford records here and those are in
20 evidence.  And let's take a look at just how well he
21 was doing.  Fifteen times tardy in that last
22 quarter.  That's when they just enrolled in
23 Stamford.  Sixteen times tardy from the first
24 quarter.  The following year, 20 times tardy, 35
25 times tardy, and then in that final quarter, and

1  that's the quarter where Sonia died, 27 days absent
2  and 11 days tardy.  Is that the sign of somebody
3  getting their younger brother off to school?
4        The grades, the government says, looked
5  okay.  Well, they don't to me.  They look rotten.
6  Putting aside the music and computer, a few Cs, and
7  then all Ds and Fs.  Would any one of us want their
8  kids to bring home that report card?  Was that a
9  good experience?  Let's look at the next page as
10 well.  Well, here is what we see.  Was this kid at
11 risk?  "Properly placed, but needs strong
12 supervision and structure.  Would benefit from
13 alternative placement."  What's that in education
14 speak?  It says things weren't all that well in
15 Stamford.
16       And what else do we know about Stamford
17 where we put Azizi in charge?  How does Azizi do?
18 Well, not so good.  Got expelled from school for
19 bringing drugs.  He also told us about a police case
20 in Stamford.  We may be sure that Sonia was not
21 pleased with these developments, but again, isolated
22 in Stamford, working to set up her business in New
23 York, how many choices did she have?
24       But what all of these facts, the
25 tardiness, the grades, Azizi's expulsion, Azizi's

5678

1 criminal case tell us is, again, the protective
2 system around Azibo was extraordinarily fragile.
3           And then by the time that Sonia travelled
4 to Florida with the boys in May of 1994, was
5 progress being made?  By Desta's account there was.
6 Ife, too, has given us grounds for hope.  Grounds
7 for hope as they sat there on the beach talking
8 about the future.  Maybe free of Skibo in a new
9 place she could put it all together.  And
10 unfortunately this was not to be and the riptide
11 took her, the one constant presence in Azibo's life
12 was taken away forever.  Let's look at that funeral
13 program.  That's what the boys got instead of a mom.
14 Was she a virtuous woman?  I'm sure she was.  Where
15 did this leave the boys?
16           Now is the time, if ever there was one,
17 when consistent adult intervention was required.
18 Richard was locked up.  Unlikely that he would have
19 been much of a positive help, but in any case, he
20 was clearly out of the picture.  Skibo, no interest.
21 Grandma seems to either have been unwilling or
22 unable to take an active role.  The 12 Tribes, well,
23 aside from the women who provided temporary housing
24 in the immediate aftermath of Sonia's death, there
25 was never a sustaining help from that source either.

5679

1           And how did this impact on Azibo?
2 Recall Maribel's testimony about his wail of sorrow,
3 how much he was shattered.  Now the government tells
4 us of course he was sad but, do you know, bad things
5 happen to people and some of them get beyond it.
6 Does that simplistic answer do for anybody?  The
7 better question is what would we want done for our
8 children if they were cast adrift at the age of 12
9 and 14 and 17.
10           The government suggests that Azizi
11 stepped in to fill the breach.  Well, unlike some of
12 the adults in their lives, it's true that he tried.
13 But was he really equipped to do the task?  What we
14 know from the facts is that he had recently been
15 involved in criminal activity himself.  He had been
16 helping his father at Linwood Avenue, in Yarrington
17 Court in Bridgeport.  He had been in with the Bush
18 Mob gang.  He had been expelled from school for
19 drugs.  And most importantly, he had no experience
20 or no confidence in the outside world.  Recall the
21 testimony of Diane Hart-D'Amato.  "You can't help
22 me," he told her.
23           One thing we hopefully learn as children
24 and then take with us as adults, is that when the
25 task is too big we enlist help, but enlisting help

5680

1 was contrary to all of his training.  Sonia Headley
2 told us about the impact of -- Sharon Headley told
3 us about the impact of Sonia's death on Azibo.
4 Drinking rum to fall asleep.  Ask yourself why did
5 he go to New York with somebody he barely knew?  Was
6 it because his brothers were somewhat foreign to him
7 after the years in Hartford, years that he had
8 observed but was not allowed to fully share?  Or was
9 it that he recognized, maybe subconsciously, that he
10 needed guidance and structure from others that these
11 brothers could not provide for themselves, let alone
12 for him.  And ask yourself why did Azizi take on all
13 the responsibility for Azibo and why did he resist
14 seeking help from the outside.  I think that we can
15 answer this question from all that we have seen
16 about their lives.  Maybe he had promised his mom
17 and dad to keep the family together, but also
18 remember that they never, never had been taught to
19 trust anyone from the outside for help.
20           Ask yourself this:  Was Sonia's legacy,
21 that insurance policy, was money what was really
22 needed here?  Maybe the money was good for Azizi in
23 allowing him and Nasheika to set up their own little
24 island, a little island where you could get takeout
25 food whenever you wanted, a little island where you

5681

1 didn't have nosey adults butting into your business,
2 a little island where you were free from the
3 pressures of Nasheika's mom to do what she wanted, a
4 place of freedom for them.  But maybe that money
5 also tricked Azizi into thinking he could go it
6 alone, he could take on what all the professionals
7 who had tried to intervene had recognized, take on a
8 situation where help was desperately needed for
9 Azibo.
10           And here I'd ask you to think about the
11 testimony of Jonathan Davis and Diane Hart-D'Amato
12 and Loretta Jay and James Shannon.  Think, too,
13 about this:  Just how strong was the pull of the
14 streets when Azizi finally got the boys back
15 together?  Where was that?  Fifth Street, at Auntie
16 Carla's.  Fifth Street, the bloody Fifth Street.
17 Well, that is the area that Mike Adams talked about
18 that had descended from Hollywood to horror.  This
19 was in Bridgeport where from Loretta Jay we're told
20 that social workers needed escorts from police.
21           And then let's think of the next
22 development, Azizi gets shot.  For him that may well
23 have been the wake-up call.  And from what I would
24 guess, that some, if not all of us, have seen in our
25 own lives, and what we have certainly seen from some

5682

1  of the witnesses in this case, the fact is that
2  redemption can come from unexpected sources and
3  redemption comes at unexpected times.  Recall how
4  Judy Rivera fell to the bottom and now seems to have
5  gotten her life back on track.  Think about Venro
6  Fleming looking at his arrest photo and then shaking
7  his head, that now he's another person.  Think about
8  the hope expressed by Juanita Hopkins that maybe she
9  can get her life together.  Yes, redemption does
10 happen sometimes.  And maybe for Azizi that was an
11 act of redemption.
12         But also think of it this way.  Think of
13 the perspective of the shooting from Azibo's point
14 of view.  Mom had just been taken away.  By what?  A
15 random wave.  Azizi had just been shot.  He had been
16 bounced around from place to place.  Suddenly
17 everything is uncertain.  How do people respond to
18 uncertainty?  How do youngsters respond to
19 uncertainty?  How do we push against the boundaries?
20 Is it surprising that Azizi's efforts now at this
21 time to direct and guide Azibo would have
22 encountered some resistance?
23         Azizi tried, but he had a lot on his
24 plate.  He had a new baby, he had a young
25 girlfriend, he had a need to finish their schooling.

5683

1  Think about Jonathan Davis's initiation of that
2  neglect proceeding.  Jonathan goes to the house and
3  Azizi is not there.  We see that in Exhibit EE-2, "a
4  home setting that was poorly supervised in that the
5  older brother was rarely home to supervise him."
6         True, in the end, all of the adults had
7  kind words and no doubt kind thoughts for Azizi's
8  efforts.  But the fact is that everyone who thought
9  about it realized that that task was too large for
10 any 18-year-old.  In the opinion of this
11 intensive -- "it is the opinion of this intensive
12 supervision probation officer that Azizi is
13 overwhelmed with his responsibilities and feels that
14 it is his responsibility to keep them together."
15 Yes, he felt responsible, but he was overwhelmed and
16 he didn't trust anybody.
17     You found that Azizi committed these
18 crimes, and these crimes are facts.  The fact is
19 that Azizi -- Azibo's life -- I'm sorry, you found
20 that Azibo committed these crimes and that is a
21 fact.  But the fact is that Azibo's life was marred
22 by tragedy.  Sonia was an amazing woman and her loss
23 is one we can appreciate.  Do the circumstances of
24 Azibo's childhood excuse the crime?  That's never
25 been the question.  Do they weigh in favor of a

5684

1  sentence of life imprisonment?  The answer is yes.
2         I want to also bring to your attention
3  again the testimony of Mary McCoy.  And let's look
4  at that certificate of appreciation.  The fact is
5  that Azibo will spend the rest of his life in
6  prison.  Has he demonstrated a capacity to care for
7  and act kindly in a positive way towards others in
8  that harsh environment of a prison?  Yes, he does.
9  Do people care about Azibo?  Absolutely.  His
10 brother, Azizi; his sister-in-law, Nasheika; Mary
11 McCoy, who recalled with fondness the Mother's Day
12 card; Lillian Reid, who remembers his stay with her
13 and his thanks for having provided him with a
14 refuge; Desta makGOO, who I mentioned before came
15 here from Africa to testify on his behalf and who
16 recalled his short stay with appreciation; Eleanor
17 Cooper, who told us about Azibo's willing acceptance
18 of her apology after falsely accusing him of
19 stealing from her and putting him out; ago DEECH
20 shall, who remembered the cologne incident and his
21 kindness towards her children; Sharon Headley, who
22 recalled his thanks to her at later 12 Tribe
23 functions; James Shannon, who saw both the peril and
24 the promise in his life and who came here before you
25 to testify.

5685

1         And also consider the testimony of
2  Shante Pettway in the guilt phase of this case, the
3  mother of their child Angel.  Shante, who
4  demonstrated affection and concern even though she
5  was called to testify against him.
6         One of the mitigating factors you are
7  allowed to consider is whether Azibo's execution
8  would cause others to suffer grief and loss.  Why,
9  am I asked, is this relevant?  The reason why it's
10 relevant is that each of you needs to bring to bear
11 all of your own experiences in deciding this
12 question.  We don't screen out your sensibilities.
13 We don't tell you to consider only this or only
14 that.  We don't give you a formula for a decision.
15 Instead, we ask you to bring your own sense of
16 compassion and decide this issue.  Consider the
17 testimony of all of these witnesses and how they
18 testified.
19         And, finally, I want to address the
20 issue of mercy.  In the instruction Judge Arterton
21 told you that each of you has been given by the law
22 the discretion to temper justice with mercy.  Maybe
23 that's not fair, maybe we shouldn't put that
24 responsibility on you, but the fact is that we do.
25 The government has argued to you that Azibo is not

**GA1464**

5686

1  entitled to mercy.  Look at what he did in this
2  case, they've argued.  But that's not really what
3  mercy is about.  Mercy is not something that is
4  earned.  Nobody is entitled to mercy.  Nobody really
5  has a right to it.  Mercy really is our response to
6  tragedy, it's our recognition of potential, it's our
7  expression of hope.  It's our willingness to say
8  that death is not the answer, to say that there is
9  an opportunity for rehabilitation and redemption if
10 his life is spared.  That act of mercy is really the
11 redemption for all of us.
12        There has been, no doubt, too much
13 killing.  That killing has to stop, and it can stop
14 here with us, and it can stop now, and life
15 imprisonment, for that reason, is the appropriate
16 sentence in this case.
17        For all of these reasons, I ask that
18 this be your verdict.  It is an individual decision,
19 and I urge you to respect one another when you begin
20 to deliberate.  If a juror truly believes death is
21 the answer, that juror is entitled to believe that.
22 And if a juror believes that life is the answer,
23 that juror is entitled to believe that.  In the
24 process of deliberation, I urge all of you to talk
25 together, to deliberate together, to express your

5687

1  feelings to each other, and to recognize that each
2  of you individually needs to make the decision that
3  your mind and your heart require.  Please, I ask
4  you, let the killing stop with you.
5        Thank you very much.
6        THE COURT:  All right, thank you.
7        Rebuttal closing on behalf of the
8  government by Ms. Reynolds.
9        MS. REYNOLDS:  Thank you, your Honor.
10        Members of the jury, Mr. Sheehan
11 mentioned that actions speak louder than words, and
12 they do.  What this case is about is what the
13 defendant decided to do, the choices he made as an
14 adult.  This is a defendant who chose baseball bats
15 as his murder weapon even though he had a gun.  This
16 is a defendant who broke into the home of the
17 victims in the middle of the night.  This is a
18 defendant who brought duct tape.  He made sure to
19 bring duct tape, and he wrapped the victims in it,
20 and then bludgeoned them to death after they were
21 utterly defenseless.  This is the defendant who
22 thought to bring a drill with him so he could seal
23 the front door of their apartment and entomb all
24 three of the victims in their own home.  This is a
25 defendant who deserves the death penalty.

5688

1        Now, Mr. Sheehan -- I want to first
2  address the arguments Mr. Sheehan made about the
3  defendant's childhood and the defendant's
4  background.  He talked at length about the witnesses
5  that they presented during the penalty phase.  You
6  heard from witness after witness that the defense
7  presented who knew the defendant when he was a
8  child, who knew him when he was a born, when he was
9  a toddler, when he was 12 and 13 years old.  But
10 interestingly, most of them didn't know the
11 defendant as an adult.  In fact, most of them told
12 you they hadn't even seen the defendant since the
13 time he was 12 or 13 years old.
14        And when you think about what you heard
15 from the defense in mitigation in this case, these
16 witnesses and what they told you, they told you
17 about the 12 Tribes, they told you about the
18 defendant's father's narcotics trafficking activity,
19 they told you about the tragic death of the
20 defendant's mother.  But when you sift through
21 everything they told you about the defendant's
22 background and his childhood, and when you really
23 shake it out, there is nothing of consequence left.
24        There is nothing that should -- you
25 should give any weight to about the defendant's

5689

1  background and childhood, because on August 24th of
2  2005 this defendant wasn't a kid who had just lost
3  his mother.  This defendant wasn't some wayward
4  person who had nowhere to go.  This defendant wasn't
5  a drug addict who had succumbed to his addiction, or
6  someone with mental illness.  No, he was the
7  founding partner and the leader of a violent and
8  prolific crack enterprise.  He was the boss, he made
9  the decisions, he decided what the rules would be,
10 and he enforced those rules.
11        And let's talk about rules because --
12 well, before I do that, let me add, the defendant
13 was 23 years old.  He wasn't a kid who had slipped
14 through the cracks.  He was someone who was the boss
15 of his own organization.  You'll recall the
16 testimony.  He was the one driving around in the
17 fancy Cadillacs.  He was the one driving around in
18 the black Chevy Tahoe.  He was the one who made
19 every decision.  He managed every aspect of that
20 drug organization, from where the product would be
21 packaged and how it would be packaged, from where it
22 would be sold, to how much it would be sold for and
23 by whom it would be sold.  And all of those profits
24 came right back up to line the defendant's pockets.
25        And so the evidence is that the

5690

defendant was well aware of rules.  He made his own
rules.  He made sure to enforce the rules.  Some of
what the defense has argued today is that they're
arguing that the defendant didn't have proper rules
and boundaries, he didn't have a proper father
figure in place when he was a child, and therefore,
he wasn't able to know right from wrong.  But again,
think about what the defendant did as an adult.  He
had his own enterprise.  He made the rules.  He knew
right from wrong.  He chose not to follow society's
rules.  He wanted to follow his own rules, the rules
that would benefit him.  That's what he did.  Those
were his choices.

Now, Mr. Sheehan has told you and has
discussed with you again the testimony you heard
about what happened after the defendant's mother
tragically passed away.  He told you about Azizi,
and you heard Azizi testify.  He took guardianship
of his brothers, and he tried his best.  He imposed
rules, but the defendant didn't want to follow those
rules either.  He didn't want to follow any rules
unless they benefited him.

Mr. Sheehan told you today in his
argument and went on about all of the other people
who tried to help the defendant along the way.  And

5691

there were numerous people.  Sonia's friends, you
heard from many of them who tried to give the
defendant a second chance, tried to help him when he
was a child.  But the defendant threw all of those
second chances away as well.  He was given many of
those chances.

Azizi did his best; he set rules, he
kept the family together.  And now, all of these
years later, they say he was ill-equipped, but at
the time he was commended.  Azizi was commended for
keeping the family together and for taking on that
responsibility.  He did his best.  Make no mistake
about it, Azizi didn't fail the defendant, the
defendant failed Azizi.  The GED teachers and the
juvenile probation officers didn't fail the
defendant, he failed them, because the lack of a
father figure and the tragic loss of your mother at
a young age does not equal a lack of freewill.
People grow up, and when they grow up they make
choices, and they have the freewill to make choices
and they choose to do the right thing.

But that's not what this defendant did.
And you saw that Azizi, he could have chosen, like
his brother Azizi did, to go to college, to raise a
family, to be a productive, law-abiding citizen.

5692

That's not what this defendant chose.  He chose
differently.  He chose to live a life of violence
and a life of crime.  Those were his choices.  It is
not the fault of Azizi that the defendant made those
choices when he became an adult.  It is not the
fault of the City of Bridgeport that the defendant
made those choices when he became an adult.  It is
not the fault of Jonathan Davis, his juvenile
probation officer, or the GED teacher.  These were
his choices.  In the end he acted, he chose.

And what did he choose?  He chose to
carefully plan and execute, plan, to murder three
people inside their homes.  He chose a path of
death, a path that led to the brutal murder of Tina,
James and Basil.

Now, I wanted to discuss that a little
bit further, because the defense argued about the
people that were in place during the defendant's
childhood, and there were -- you heard testimony
from Mr. Shannon.  Even Mr. Shannon, a psychologist,
told you when he testified the defendant was
articulate, he was intelligent.  He didn't see any
learning disability, evidence of any learn
disabilities.  He didn't see the need to order a
psychological examination or psychiatric

5693

examination.  And he gave advice to the defendant.
He gave him that pen.  Do you remember you heard Mr.
Shannon testify about that, that this will be your
freedom, this will be your chance out, education and
a pen.  But the defendant chose to ignore that as
well.  All along the way people tried to help him
when he was a child, but he chose differently.

I want to address also one of the
arguments that the defendant made to you just a few
minutes ago, or the defense made, and that is this
idea and this mitigator that they're proposing to
you about the assumption of the risk, that somehow
the victims were involved in such a dangerous
activity that they contributed to their own murders.
They've argued from the beginning of this trial that
the victims assumed the risk, and now they're
arguing to you that somehow Tina and James' use of
crack cocaine and Tina's sale of small amounts of
crack cocaine was so dangerous an activity that it
contributed to their own murders.

You should give absolutely no weight to
that suggestion.  Tina, James and Basil were at home
asleep.  What could possibly be so dangerous about
that activity to lead to their own murders or
contributed to their own murders?  Tina, James and

5694

1  Basil were not drug kingpins defending their stash
2  and their kilograms of crack cocaine.  They were
3  unarmed.  They weren't engaged in some running gun
4  battle through the streets of Bridgeport with Tina's
5  crew shooting at the defendant's crew.  That's not
6  what happened here.  They were at home asleep.
7        It is the defendant who engaged in
8  violent acts.  It is the defendant who injected
9  danger into that situation.  It is the defendant who
10 carefully planned to ambush them and slaughter them
11 in their own home.
12       I also wanted to address another one of
13 the arguments that defense counsel made to you, and
14 that is the execution impact.  And Mr. Sheehan
15 talked to you and argued to you that if the death
16 penalty is imposed there will be an impact obviously
17 on Azizi and his wife and the children.  And you
18 heard Azizi and his wife testify to you about what
19 that would mean to them.  But you should remember
20 that it is the defendant who long ago abandoned his
21 family.  It's the defendant who long ago abandoned
22 Azizi and Azizi's wife, his sister-in-law, and his
23 nieces and nephews.  The defendant wasn't writing
24 letters to his nieces and nephews.  He wasn't
25 calling his nieces and nephews.  When he went on

5695

1  trips to Busch Gardens, it wasn't with his family
2  and friends.  No, he took his co-conspirators, John
3  Taylor and Azikiwe, who brought a gun.  He took the
4  opportunity for a nice trip to Busch Gardens to help
5  plan the murders and to further his drug trafficking
6  business.
7        The defendant wasn't busy writing
8  letters from jail to his family and friends.  Who
9  was he writing to?  He was writing to Venro Fleming
10 who he had viciously assaulted, and he was
11 threatening Venro in that letter.  He was writing to
12 Frankie Hodges' lawyer and telling Frankie Hodges'
13 lawyer, trying to plant the suggestion that Mr.
14 Hodges should not plead or cooperate in this case.
15 He was busy writing to Shante Pettway, yes, the
16 mother of his newborn child.  And remember those
17 letters.  He wasn't asking her how the baby was
18 doing or how she was doing, he was ordering her to
19 go see some lawyers and trying to plan -- or trying
20 to plant the suggestion that the statements that
21 Jackie Bryant and John Sullivan had made to the
22 police should be discredited.  That's what he was
23 doing.
24       And who was he calling from jail?  He
25 wasn't calling Azizi, he wasn't calling his

5696

1  sister-in-law, or the nieces and nephews.  He was
2  busy calling Shante.  And you heard him.  Remember
3  those calls, how he spoke to Shante, how he
4  manipulated and controlled her and how he ordered
5  her to get Azikiwe on the phone.  He ordered both of
6  them to bond John Taylor out of jail.  That's how he
7  was using his phone privileges and his mail
8  privileges, not to keep in touch with friends and
9  family.  In short, the defendant communicated with
10 people not out of concern, he communicated with
11 people if it served his interest.
12       And this case is not about the
13 predictions that Mr. Bezy has made.  You look at the
14 evidence.  You should focus on the choices and the
15 acts the defendant has made time and again in his
16 life.  He has engaged in a pattern of assaults and
17 he continued that pattern of assaults with the
18 assault of Anthony Armstead.
19       What sets this case apart is how the
20 defendant chose to murder Tina, Basil and James.
21 The defendant's actions here do speak louder than
22 words, and they speak about his moral culpability.
23 The evidence clearly shows that the defendant had
24 intended to go to their apartment, the apartment of
25 Tina, James and Basil, with the intent to kill them.

5697

1        How he committed those murders, how he
2  have carried out his plan is what makes these
3  murders worse.  The defendant had a gun, but he
4  didn't shoot his victims.  These murders would have
5  been horrific enough if he had gone in there and
6  shot them all and gotten it over quickly.  But he
7  didn't do that.  Instead, he killed them in a
8  totally depraved manner.  He relished in each and
9  every act of depravity.  He systematically tied the
10 victims up with duct tape, duct tape that he made
11 sure to bring with him to that apartment.  He tied,
12 gagged, bound Tina Johnson, a defenseless woman, and
13 when she was down on the ground he raised a bat
14 above his head and smashed it into her head
15 repeatedly, and each time he did it he brought all
16 his force on to her head.
17       But the depravity didn't end there
18 because when he was done hitting Tina over the head
19 with that bat --
20       MR. SHEEHAN:  Your Honor, I'm going to
21 object.  May we approach?
22       THE COURT:  Yes.
23       (Sidebar conference).
24       MR. SHEEHAN:  Your Honor, I think this
25 is well beyond rebuttal.  The purpose -- I did not

5698

1  in any sense attack or challenge any of the
2  aggravators alleged by the government in this case,
3  and what we're hearing right now is a complete
4  repeat of those matters, which is not proper
5  rebuttal argument.
6        MS. REYNOLDS:  Your Honor, I submit it
7  goes to the defendant's actions.  The entire theme
8  of rebuttal is to rebut the mitigators.  This is
9  about how the defendant acted.  I think it's fair
10 argument.  That's what rebuttal is about.
11        THE COURT:  What do you say to the fact
12 that the subject of the details of the murders
13 themselves were not a part of the cross-examination
14 -- closing argument?
15        MS. REYNOLDS:  Because I am arguing to
16 the jury this is why they should impose the death
17 penalty, the depravity, the heinous nature and --
18        THE COURT:  But the question is if
19 that's not raised in the defendant's closing, what
20 are you rebutting?
21        MS. REYNOLDS:  Mercy arguments, general
22 arguments that his life and background mitigate in
23 favor of life.  I'm saying you have to go back to
24 what he did in that apartment.
25        THE COURT:  What you need to do is you

5699

1  need to relate them to his arguments, not just a
2  stand-alone repeat of the gory details.  So, if what
3  you are doing is saying the defendant asked for your
4  mercy, this is why redemption and mercy don't apply,
5  but not just a freeform, untethered argument,
6  statements, relating back to the details of the
7  crime which in and of themselves were not the
8  subject of the closing argument.  Okay?
9        MS. REYNOLDS:  Okay.
10        (Sidebar concluded)
11        MS. REYNOLDS:  Mr. Sheehan in his
12 arguments talked to you about mercy.  The government
13 submits the defendant doesn't deserve your mercy,
14 and that is because of what he did inside that
15 apartment.  What sets this case apart, as I was
16 about to say, is that after the defendant beat
17 Tina's head with a baseball bat, he turned to John
18 Taylor and he asked, do you want to get some, too?
19        What sets this case apart and what makes
20 mercy not appropriate for this defendant is what he
21 did inside that apartment, because as he was beating
22 Tina, he watched as his brother beat and bashed
23 James' head with so much force that James' blood
24 covered all the walls in that room and reached the
25 ceiling over nine feet above.

5700

1        What sets this case apart is the
2  extensive planning and premeditation that took
3  place.  And what sets it apart is that the defendant
4  relished in each and every act as he underwent it
5  and that plan went forward.
6        What sets this case apart is that the
7  defendant wrapped Basil Williams with duct tape and
8  he beat him over the head so hard that his skull
9  shattered like an eggshell and his brain shook
10 inside his head.
11        What is the moral character of a person
12 who commits such a heinous, such a cruel and such a
13 depraved crime?  Is that the person that deserves
14 the minimum sentence under the law?  The government
15 submits the answer is no.
16        Tina's brother wrote "I'll never again
17 hear the joy of my sister's smile."  The defendant
18 has robbed Tina's grandchildren of a loving
19 grandmother and he has robbed and stolen from Jamar,
20 Latavia, Erica and Leroy all of those small moments
21 that they loved to share with their mother, their
22 impromptu family picnics, the surprise birthday
23 gifts, and the good cooking.  James's brother Brian
24 told you that what he misses most about his brother
25 James is his happiness.

5701

1        MR. SHEEHAN:  Your Honor, I'm going to
2  renew my objection.
3        THE COURT:  Please relate this to the
4  arguments of the defendant.
5        MS. REYNOLDS:  I make these arguments,
6  the government makes these arguments, members of the
7  jury, because the defense has asked you for mercy
8  for the defendant, and we argue that he doesn't
9  deserve your mercy.  We understand that you are
10 merciful people capable of mercy, but he doesn't
11 deserve your mercy, and the reason is that he stole
12 from the victims moment after moment that they will
13 not be able to share with their family.
14        You heard from Brian that he misses his
15 brother's good heart.  You heard from Mary Reid that
16 she gave James the name Tippy because he walked on
17 his tiptoes all the time when he was a young boy.
18 The defendant has robbed Brian and Jason of that
19 special bond they shared with their older brother.
20 And the defendant has shattered Mary Reid's life by
21 so brutally taking her oldest son.
22        Basil's only daughter wrote her dad Basil
23 was a caring and good man, and she lamented she will
24 never be able to make that trip from Barbados to
25 Connecticut so that Basil could meet his younger

5702

```
1   grandchildren.  The defendant stole from Basil's
2   brother, John David, and his sister, Pam, those
3   office visits he would come by in the afternoon.  He
4   stole from them the ability to spend time with their
5   brother.  He stole from Basil the opportunity to
6   spend time with his grandchildren and his daughter
7   in Barbados, and to spend time with his ailing
8   mother so that she wouldn't have to keep asking as
9   her dementia gets worse, "where is Basil?  Why
10  hasn't he called me?"
11          Basil's sister told you that he was a
12  funny man and he had a funny way of laughing and
13  that she could still hear it in her head sometimes,
14  and that she misses just knowing he was there, just
15  having him around.
16          The defense is asking you to impose a
17  sentence of life and they argue that it's a severe
18  enough punishment.  But in this case it's the most
19  lenient punishment that you could possibly impose.
20  He wants you to choose life when he deliberately
21  took the lives of three human beings.  They have
22  asked you for mercy, and, again, there is no doubt
23  that you are all capable of mercy.  The law, as Mr.
24  Sheehan pointed out in the slides, and as the Judge
25  instructed you, the law entitles you to temper
```

5703

```
1   justice with mercy, but it does not require you to
2   do so.  What about this defendant entitles him to
3   any mercy?  What about what the defense has
4   presented entitles the defendant to your mercy?
5   Nothing.  He does not deserve to live out the rest
6   of his days in jail.
7          You must now make this most serious and
8   difficult decision.  It is a serious and difficult
9   decision, and we ask when you carefully weigh the
10  evidence you've heard you return the only verdict
11  and the only sentence that is supported by the
12  evidence, and the only just sentence, we'd ask that
13  you sentence the defendant to death.  The
14  defendant's inhumane acts call out for the death
15  penalty in this case.  The defendant earned the
16  death penalty.  The defendant deserves the death
17  penalty.  The defendant should pay the ultimate
18  price for so brutally taking the lives of Tina,
19  James and Basil.
20          THE COURT:  All right, thank you.
21          Now, ladies and gentlemen, the Court's
22  instructions, of which you have a copy for your
23  reference and used as I was delivering them to you,
24  and may certainly, and should, refer to them during
25  the deliberation, are the instructions that you are
```

5704

```
1   to follow.
2          If any attorney or any witness or any
3   exhibit suggests a different principle, please
4   remember that it is the Court's instructions that
5   you must follow.
6          I've referenced in these instructions a
7   Special Verdict Form that was prepared to assist you
8   during your deliberations, and it's in the front
9   pocket of your notebooks.  And you are required to
10  record your decisions on this form.  Section 1 gives
11  you the place to record your findings as to the
12  defendant's age.  Section 2 has the space to record
13  your findings on the threshold mental state factors
14  that I described to you and gives you the
15  instructions if you answered no to all of the counts
16  for both of the mental state factors, that you're
17  finished and you should just go to the certification
18  in Section VIII.
19          Section III is the place where you will
20  record your findings on whether the government has
21  met its burden of proving beyond a reasonable doubt
22  each or any of the five statutory aggravating
23  factors that it claims.
24          Section IV gives you the section -- the
25  space to record your findings on whether the
```

5705

```
1   government has proved beyond a reasonable doubt the
2   two non-statutory aggravating factors that it
3   claims.
4          Section V then gives you -- Section IV,
5   the two non-statutory aggravating factors being
6   continuing pattern of acts of violence and victim
7   impact.
8          Section V contains the space for you to
9   record your findings on each of the mitigating
10  factors indicating the number of jurors who found
11  that factor proved by a preponderance of the
12  evidence.  Obviously if nobody did, you put zero, if
13  everybody did you put 12, and whatever it is in
14  between.
15          You will also find at the end of that
16  section, after No. 28, a place where you may add
17  additional mitigating factors that any member of the
18  jury has found to exist.  If they're more than that,
19  you just use the back of that page.
20          Section VI is where you record your
21  findings on your weighing process.  And you will see
22  that it is for each count and relates those counts
23  to each victim, and asks as to those counts on which
24  you found the threshold mental state and at least
25  one statutory aggravating factor, whether you
```

**GA1469**

5706

```
1   unanimously find beyond a reasonable doubt that the
2   aggravating factors sufficiently outweigh all of the
3   mitigating factors, or in the absence of mitigating
4   factors, that the aggravating factors themselves
5   justify a sentence of death, and you answer that yes
6   or no as it is set out.
7           And then Section VII of the Special
8   Verdict Form is the place where you will record your
9   determination of the sentence for each count.  You
10  will see that for example, Count two, Tina Johnson,
11  there are two entries:  We, the jury, unanimously
12  find that the defendant, Azibo Aquart, should be
13  sentenced to death.  Or, we, the jury, unanimously
14  find that the defendant, Azibo Aquart, should be
15  sentenced to life imprisonment without the
16  possibility of release.  And you do that for each
17  count which will cover all three victims.
18          Section -- the foreperson will then date
19  at the bottom of that the date that you signed this,
20  and you will see that each juror, after you have
21  finished Section VII, the determination of sentence,
22  must sign your name indicating that that sentence
23  above reflects the jury's unanimous decision.  And
24  the foreperson will indicate the date of signing.
25          And then Section VIII is the
```

5707

```
1   certification I described in which each of you has
2   to certify that consideration of race, color,
3   religious belief, national origin or sex of either
4   the defendant or the victims was not involved in
5   reaching your decision.  And each of you sign that
6   and the foreperson then gives the date and time in
7   which you have completed your form, signs it,
8   advises the marshal outside your door that in fact
9   you have reached the determinations that are
10  required.
11          So, I've now outlined for you the rules
12  of law that are applicable to your consideration of
13  the death penalty and the process by which you
14  should determine the facts and weigh the evidence,
15  and in just a moment you will retire to the jury
16  room.  The importance of your deliberations should
17  be obvious.  I remind you that you can return a
18  decision sentencing Azibo Aquart to death only if
19  all 12 of you are unanimously persuaded beyond a
20  reasonable doubt that the death sentence is in fact
21  the appropriate sentence in this case.
22          When you are in the jury room, please
23  discuss all aspects of the sentencing issues among
24  yourselves with candor and frankness, but also with
25  a due regard and respect for the opinions of each
```

5708

```
1   other.  Each of you must decide this question for
2   yourself and not merely go along with the
3   conclusions of your fellow jurors.  In the course of
4   your deliberations, no juror should surrender his or
5   her conscientious belief of what's the truth, what's
6   the weight and what's the effect of the evidence and
7   what should be the outcome as determined by that
8   your juror's individual conscience and evaluation of
9   the case.  Remember that the parties and the Court
10  are relying on you to give full, considered and
11  mature consideration to the sentencing decision.
12  And by doing so you carry out to the fullest your
13  oaths as jurors.
14          If it becomes necessary during your
15  deliberations for you to ask for testimony to be
16  read back or to ask questions or seek clarification
17  or to communicate with me for any reason, simply
18  tell me, send me a note that identifies what the
19  question or issue is that's signed by your
20  foreperson.  Don't attempt to communicate with the
21  Court or any court personnel other than by means of
22  such a signed note.  I will not communicate with any
23  member of the jury touching on your sentencing
24  decision other than in writing or orally back here
25  in the courtroom.
```

5709

```
1           When you've reached the decision, then
2   you'll just send me a note that your foreperson
3   signs that you've completed your deliberations, but
4   you should not state what your determinations are.
5   And in no communication with the Court should you
6   ever give any numerical count of where you stand in
7   your deliberations except as that is required in the
8   final Special Verdict Form when you have completed
9   your work.  Whatever determinations you reach, the
10  foreperson must complete the Special Verdict Form
11  accordingly and be prepared to report to the Court
12  the jurors' findings as to the threshold mental
13  state factor, the aggravating or mitigating factors,
14  the weighing decision and the sentencing decision,
15  and the foreperson will sign and indicate it, as
16  will the jurors, in signing the sentence
17  determination and the certification section.
18          I again remind you that nothing I have
19  said in these instructions, nothing I have said or
20  done during the trial has been said or done to
21  suggest to you in any way what I think the outcome
22  should be.  What the sentencing decision should be
23  is your exclusive duty and your responsibility, and
24  I thank you for your service as jurors.
25          It comes the time that I must again
```

5710

1  excuse, but not discharge, the alternates.  And
2  again I want to make clear that you remain in
3  readiness to step in and step up as jurors if it is
4  required because of the inability of a juror to
5  continue.  Thus, you must still not discuss this
6  case.  You must hold yourself in readiness to be
7  called back.  You are not being discharged and you
8  won't be discharged until the jury has returned its
9  verdict in this case.  And I again thank you for
10  your service as alternates and will continue to
11  thank you while you hold yourself in readiness even
12  though you are not part of the deliberative process
13  at this stage and may not be at all.
14          So, you are excused to go home, making
15  sure that we know where to be in touch with you, and
16  we will advise you of the point at which you are
17  discharged or need to be recalled.  Thank you very
18  much.
19          Ladies and gentlemen of the jury, you
20  should retire to begin your deliberative process.
21          (Jury exited the courtroom.)
22          THE COURT:  All right, counsel, I will
23  ask you to remain in the near vicinity of the
24  courtroom, if not the courtroom itself, in the event
25  the jury needs further instruction or detail.  When

5711

1  we reach five o'clock I will have Ms. Torday go in
2  and inquire if they wish to continue their
3  deliberation or if they wish to return tomorrow at
4  nine o'clock and continue their deliberation for
5  however long further it takes.  If there are any
6  further directions or instructions to be given to
7  the jury I can give them to them at five o'clock
8  before they leave today.
9          Is there anything further?
10          MS. DAYTON:  Your Honor, we would just
11  submit that perhaps we should just let them
12  deliberate until they say they don't want to
13  deliberate anymore today rather than disturb them in
14  their deliberations.
15          THE COURT:  The only problem is how do
16  they do that?
17          MS. DAYTON:  They send a note saying we
18  want to go home.
19          THE COURT:  I think for the first day
20  that it would be advisable because they don't know
21  quite how to proceed and did not have a chance in
22  the guilt phase to go beyond a day.
23          MS. DAYTON:  The other option would be
24  Ms. Torday go back there now and say that they just
25  let us know when they want to go home tonight by

5712

1  sending a note to the Court.
2          THE COURT:  We can do that.
3          MR. SHEEHAN:  That will be fine, your
4  Honor.  We've got to bring back the exhibits anyway.
5          THE COURT:  That will be fine then, that
6  they are invited to deliberate as long as they want
7  today, that if they wish to leave -- when they wish
8  to leave they should advise by a note.
9          MS. DAYTON:  So should we tell them if
10  they want to stay late the Court would order them
11  diner, which is what we used to do in the Eastern
12  District, which is why I'm asking.
13          MR. SHEEHAN:  Your Honor, I think we
14  told them five o'clock every day, so I think if they
15  want to push it, let's see.
16          THE COURT:  Jurors will request what
17  they need.
18          MS. DAYTON:  Okay.
19          THE COURT:  All right, anything else?
20          MR. SMITH:  Yes, your Honor.  We would
21  like to renew our motion for mistrial based on the
22  comments made in the rebuttal argument.  I know Mr.
23  Sheehan addressed a few of those specifically.
24  There were a few objections that were not made.
25  Specifically, I would note at least on two occasions

5713

1  that Ms. Reynolds suggested that the mitigation
2  evidence showed -- or did not show that the
3  defendant lacked the inability to know right from
4  wrong, thereby suggesting that it had to have a
5  nexus to the crime.  I believe that was improper.
6  And that the bad childhood does not equal a lack of
7  freewill, again, showing that -- suggesting that the
8  mitigators of childhood have a nexus to the crime,
9  which was improper.
10          She said that the jurors should give
11  absolutely no weight to the victims' conduct in this
12  case, a mitigator of contributing -- circumstances
13  contributing to their death.  I think it's improper
14  for her to argue they should give absolutely zero
15  weight to any mitigator.
16          And, finally, I don't know that this
17  particularly falls under any of the things that we
18  briefed in our memorandum regarding improper conduct
19  or improper argument.  She had mentioned at one
20  point Mr. Aquart watching Azikiwe commit some act,
21  or something to that effect in terms of the murders,
22  and I think that's impeding the individualized
23  sentencing decision.  The jury is supposed to
24  consider Mr. Aquart's intent and his actions in
25  relation to the aggravators, no one else's, and

5714

1  that's an express -- in express contradiction to the
2  Judge's earlier instructions.  So we view that as
3  improper.  And I also think it's not supported by
4  the record, something that was not actually in
5  evidence.  And on those we would stand, your Honor.
6  We can brief those in writing as well.
7        THE COURT:  All right, anything further?
8  Thank you very much counsel.
9        Juror No. 15 has asked whether it would
10  be all right, having been excused, for her to leave
11  the state on this off-again, on-again vacation
12  caring for her grandchildren.  I think we can say
13  yes.  We have two other alternates ahead of her.  If
14  there is no objection, we'll give her that
15  direction.
16        MS. DAYTON:  The government has no
17  objection.
18        MR. SHEEHAN:  No, your Honor.  I would
19  just --
20        THE COURT:  All right.  Juror No. 16
21  wants to book some plane reservations.  I propose
22  that Ms. Torday advise him he can do so now, but for
23  next week.
24        MR. SHEEHAN:  And, your Honor, with
25  respect to juror 15, I have no objection to her

5715

1  leaving the state.  I know she's just in Maryland
2  anyway.  So, if for some fluke 13 and 14 were not
3  available, I think we could just call her back.
4        THE COURT:  That's fine.  All right, I
5  think that answers their questions and we will stand
6  in recess.
7        (Recess).
8
9
10        I certify that the foregoing is a correct
11  transcript from the record of proceedings in the
12  above-entitled matter.
13
14        ____6/14/11____
15             Date
16
17        /S/__Sharon Montini__
18           Official Reporter
19
20
21
22
23
24
25

5716

1            UNITED STATES DISTRICT COURT
2              DISTRICT OF CONNECTICUT
3  * * * * * * * * * * *      *
                             *
4  UNITED STATES OF AMERICA,  * Case No 6cr160(JBA)
5           Plaintiff,        *
                             *
6        vs.                  *
                             *
7  AZIBO AQUART             * June 14, 2011
8           Defendant.        *
                             *
9  * * * * * * * * * * * *     *
10            TRIAL TRANSCRIPT
11            VOLUME XXX
12  BEFORE:  THE HONORABLE JANET BOND ARTERTON U.S.D.J.,
                                        and jury
13  Appearances:
14  FOR THE GOVERNMENT:  ALINA REYNOLDS, ESQ
                       TRACY DAYTON, ESQ.
15                     PETER MARKLE, ESQ.
                       JACABED RODRIGUEZ-COSS
16                     United States Attorney's Office
                       915 Lafayette Blvd
17                     Bridgeport, CT 06604
18
19  FOR THE DEFENDANT    MICHAEL SHEEHAN, ESQ
   AZIBO AQUART:        Sheehan & Reeve
20                      139 Orange Street
                        New Haven CT 06510
21                      JUSTIN SMITH, ESQ.
22                      383 Orange Street
                        New Haven, CT 06511
23
24  Court Reporter:     Sharon Montini, RMR
25  Proceedings recorded by mechanical stenography,
    transcript produced by computer

5717

1        THE COURT:  Good afternoon, counsel,
2  ladies and gentlemen, Mr. Aquart.
3        MR. SHEEHAN:  Good afternoon, your
4  Honor.
5        THE DEFENDANT:  Good afternoon, your
6  Honor.
7        THE COURT:  You have been provided with
8  copies of the jurors' recent note which reads:
9  "Your Honor, we are unclear as to whether a
10  unanimous decision for death on one count results in
11  a ruling of the death penalty."
12        I'll hear you on how that should be
13  responded to, Mr. Sheehan.
14        MR. SHEEHAN:  Yes, your Honor.  I think
15  the Court should tell the jury if you unanimously
16  find that the defendant, Azibo Aquart, should be
17  sentenced to death on any of the counts, then I must
18  impose a sentence of death and Mr. Aquart will be
19  executed.
20        THE COURT:  All right, does the
21  government have a position as to what the Court's
22  response should be to this note?
23        MS. DAYTON:  Yes, your Honor.  We would
24  request that you just instruct them "yes" for that
25  count, but you must render a verdict on each

**GA1472**

5718

```
1   individual count.  We very much oppose any language
2   related to "execution" in response to a jury
3   question such as this.  This does not call for that.
4   The jurors are well aware of the consequences of any
5   verdict in this case and it's just not an
6   appropriate response.  We don't even know whether or
7   not they have reached a unanimous verdict.  They
8   could have reached one and are wondering if they
9   have to continue to deliberate.  They could have
10  reached nothing and they're deciding what they
11  should do.
12          THE COURT:  Anything further, Mr.
13  Sheehan?
14          MR. SHEEHAN:  No, your Honor.
15          THE COURT:  I think that I will answer
16  them that it results in a death penalty on that
17  count, but they must render a verdict on each count.
18          MR. SHEEHAN:  Your Honor, I think -- may
19  I have a moment?  I think what their note indicates
20  is that they are -- that there is an ambiguity in
21  their understanding and they are not necessarily
22  aware that the death penalty is mandatory.  So that
23  I think -- that's why I have asked you to instruct
24  them that you must impose -- you, your Honor, must
25  impose a sentence of death.
```

5719

```
1           THE COURT:  The answer to this, when the
2   question asks whether a unanimous decision on one
3   count results in a ruling of the death penalty, I
4   think the answer is, yes, it will result in
5   imposition of the death penalty for that count which
6   I am required to impose, but you must render a
7   verdict on each count nonetheless.
8           MS. DAYTON:  Your Honor, again, the
9   government doesn't believe that you need to add
10  information that they didn't ask for.
11          THE COURT:  I'm not sure that they
12  didn't ask for it because they say "whether a
13  unanimous decision for death on one count results in
14  a ruling of the death penalty," and I think that may
15  well mean imposition of.
16          MS. DAYTON:  Okay, thank you.
17          THE COURT:  That's why I want to answer
18  the question in that form.
19          MS. DAYTON:  Thank you, your Honor.
20          MR. SHEEHAN:  Your Honor, my concern is
21  when the Court says that "you must render a
22  verdict," I think that that is contrary to the law.
23  They do not need to render a verdict, and in fact --
24          THE COURT:  "You must continue to
25  deliberate with an eye to returning a verdict on
```

5720

```
1   each count"?
2           MR. SHEEHAN:  I would ask that the Court
3   add in "if possible."
4           MS. DAYTON:  Your Honor, we would
5   object.  The instructions do not tell them if
6   possible to try to reach a verdict.  They're given
7   two options on verdicts throughout the form.  It's
8   not about "if possible."  We don't instruct a jury
9   try not to hang.  We instruct a jury to reach a
10  verdict.  If they can't reach a verdict, they let us
11  know that.  So even "with an eye" suggests that
12  perhaps they shouldn't deliberate until they reach
13  one.  We're not asking them to rush through a
14  discussion of this magnitude.  They are supposed to
15  deliberate, and your Honor specifically instructed
16  them about deliberating with respect for one another
17  to reach a verdict.
18          THE COURT:  So if they are instructed
19  "but you must continue to deliberate on all
20  remaining counts"?
21          MS. DAYTON:  That's fine.
22          MR. SHEEHAN:  Could your Honor read the
23  whole -- I'm sorry, I'm lost.
24          THE COURT:  "In answer to your question,
25  the answer is yes, a unanimous decision for death on
```

5721

```
1   one count will result in imposition of the death
2   penalty for that count which I am required to
3   impose, but you must continue to deliberate on all
4   remaining counts as well."
5           MR. SHEEHAN:  I think that -- well, one
6   of my concerns is implicit in this response is
7   really an assumption on the part of the Court that
8   they have reached a verdict on one count, which is
9   not what they are saying.  I think if your Honor
10  were to say "but in any event" -- I guess I'm a
11  little bit -- "but even if you were to reach a," or
12  something along the lines, "but even if you were to
13  reach a verdict on one count, you must continue."  I
14  don't want implicit in the Court's response that we
15  are assuming that they have reached a verdict.
16          MS. DAYTON:  The government has no
17  objection to that.
18          MR. SHEEHAN:  Your Honor, this is
19  assuming that your Honor feels that you have to
20  respond to something which is not being asked about
21  the remaining counts.  I think that the first --
22          THE COURT:  I think implicitly they're
23  saying do we have to go on.
24          MR. SHEEHAN:  Well, I would just except,
25  for the record, to "going on," then a -- then
```

5722

```
1   comment, if your Honor is to go on, I would ask that
2   your Honor adopt the language that I have proposed.
3   There was an old state court expression, I would
4   object.  It's an anomaly that we carry with us.
5            THE COURT:  So:  "If you were to reach a
6   unanimous decision for death on one count, it will
7   result in imposition of the death penalty for that
8   count which I would be required to impose.  But even
9   if you were to make such a finding for one count,
10  you must still continue to deliberate on all
11  remaining counts as well."
12           MS. DAYTON:  The government --
13           THE COURT:  Have I captured the essence
14  of what you sought?
15           MR. SHEEHAN:  I believe you have, your
16  Honor.  And thank you.
17           THE COURT:  Is that, in essence, what
18  the government does not object to?
19           MS. DAYTON:  Well, the only objection
20  that we have instead of "make such a finding" is we
21  would ask that you just repeat their language, "if
22  you reach a unanimous verdict on one count, then you
23  must -- even if you were to reach a unanimous
24  verdict on one count, you must continue to
25  deliberate."
```

5723

```
1            THE COURT:  Okay.  All right, let's
2   bring --
3            MR. SHEEHAN:  Could I ask how it's going
4   to finally read, your Honor.
5            THE COURT:  Yes.  I will read them back
6   the question, and I will say:  "The answer to your
7   question is if you were to reach a unanimous
8   decision for death on one count, it will result in
9   imposition of the death penalty for that count which
10  I would be required to impose.  But even if you were
11  to reach a unanimous verdict for one count, you must
12  still continue to deliberate on all remaining counts
13  as well."
14           MR. SHEEHAN:  The final tinkering I
15  would suggest is that that last "must" be changed to
16  "should."
17           MS. DAYTON:  Your Honor, there are clear
18  directions that they must deliberate, and so we
19  would object to changing it to "should."
20           THE COURT:  I'll put "will."
21           MR. SHEEHAN:  I usually like your
22  Honor's suggestions better than the government's.
23  So, I would defer on that one, your Honor.
24           THE COURT:  All right, let's bring them
25  in.
```

5724

```
1            (Jury entered the courtroom.)
2            THE COURT:  Please be seated, ladies and
3   gentlemen.  Good afternoon.  Your foreperson has
4   written the following note, which I will answer:
5   "Your Honor, we are unclear as to whether a
6   unanimous decision for death on one count results in
7   a ruling of the death penalty."
8            If you were to reach a unanimous
9   decision for death on one count, it will result in
10  imposition of the death penalty for that count which
11  I would be required to impose.  But even if you were
12  to reach a unanimous verdict for one count, you will
13  still continue to deliberate on all remaining counts
14  as well.
15           Does that answer your question?
16           JUROR:  Yes.
17           THE COURT:  Who is the foreperson?  The
18  same person as before.
19           JUROR:  Yes.
20           THE COURT:  Yes.  Does that answer your
21  question?
22           JUROR:  I believe it does, yes.
23           THE COURT:  All right, may I ask you to
24  retire to continue your deliberations.  Thank you
25  very much.
```

5725

```
1            (Jury exited the courtroom.)
2            THE COURT:  All right, counsel, if there
3   is nothing further, then we'll stand in recess.
4            (Recess)
5            THE COURT:  Please be seated, ladies and
6   gentlemen, counsel.  You've received copies of the
7   jurors' question:  "Your Honor, if the jury cannot
8   agree unanimously on judgment for a particular
9   count, how does the jury inform the Court?  The
10  options for sentence in Section VII of the special
11  verdict form are written as unanimous only."
12           Mr. Sheehan, what is your proposal for
13  response?
14           MR. SHEEHAN:  My initial proposal, your
15  Honor, is that you tell the jury just to send a note
16  informing you of that fact.
17           THE COURT:  When you say "that fact,"
18  that does not give me any precision with respect to
19  which count.
20           MR. SHEEHAN:  The alternative I would
21  propose, your Honor, is that the jury be instructed
22  just to write that on the special verdict form with
23  respect to the count or counts upon which they
24  cannot reach a unanimous the verdict.
25           THE COURT:  All right, for the
```

5726

1   government?

2          MS. DAYTON:  Thank you, your Honor.  The

3   government would suggest that the jury be asked if

4   they have reached a unanimous verdict on any count,

5   and then they be told that they can return a partial

6   verdict at any time during their deliberations, and

7   to do so is, in fact, to advise the jury -- I mean

8   to advise your Honor that they have not reached a

9   verdict on the remaining counts.  At that time they

10  could be asked if they believed that further

11  deliberations would be helpful in reaching a

12  unanimous verdict.  If the answer is yes, they

13  should be sent back in to continue deliberations on

14  whatever count they have not yet reached a verdict.

15  If the answer is no, then the answer is no.

16         THE COURT:  That does not account for

17  which counts on which they have --

18         MS. DAYTON:  No, I'm sorry, the first

19  question was meant to do that, your Honor, have you

20  reached unanimous verdict on any counts?  If so,

21  which one.  And if so, how many.

22         THE COURT:  Mr. Sheehan?

23         MR. SHEEHAN:  Your Honor, I would oppose

24  the suggestion that they be asked if they have

25  reached a unanimous verdict on any count.  They know

5727

1   how to answer that question.  They have not

2   indicated whether they have or they have not, and I

3   think an inquiry by the Court at this time would be

4   considered an intrusion into their process.  I think

5   that they've asked us a specific question about if

6   they cannot agree unanimously on the judgment, how

7   do they inform the Court.  They could inform the

8   Court either by a note, we have not reached a

9   unanimous judgment on Count One, Count Two,

10  Count Three, however they do it.

11         I mean, this is why, in essence, we

12  asked for that instruction.  But I don't think they

13  should be asked whether they have reached a

14  unanimous verdict on any count because they have not

15  so informed the Court of that fact, and they're not

16  exhibiting any confusion about informing the Court,

17  well, how do we tell you we've done something.  And

18  if the Court were to interject the suggestion that

19  they have reached unanimous verdicts on any

20  particular count, I think that would appear to be an

21  intrusion into the jury process, an improper

22  intrusion.

23         THE COURT:  Does the government wish to

24  be heard further?

25         MS. DAYTON:  I mean, if we want to start

5728

1   with a note -- I mean, this appears to be a note

2   saying that they have not reached a unanimous

3   verdict on particular counts or a count.  But the

4   other way is to instruct them that they can return a

5   partial verdict without asking the first question.

6          THE COURT:  There is another

7   alternative, and that is to give them the verdict

8   form that I had originally proposed in which they

9   can indicate what they found unanimously and where

10  they are unable to reach a decision.  That will give

11  us their unanimous decisions and will be a proper

12  record for their determination that they are unable

13  to reach a unanimous decision.

14         MS. DAYTON:  Are you going to ask them

15  if further deliberations would enable them to reach

16  unanimous decision?

17         MR. SHEEHAN:  Would you like to hear my

18  view before your Honor answers that question?

19         THE COURT:  Sure.

20         MR. SHEEHAN:  I don't think the Court

21  should ask them that question at this time.  I think

22  that if the Court were to do as the Court suggested,

23  which is here is the form, now you know how to fill

24  out the form, that would answer the question without

25  in any way suggesting that either -- they have to

5729

1   reach a unanimous verdict.  I think it would respond

2   exactly to the question that was asked and it would

3   give them a vehicle for reporting that.

4          MS. DAYTON:  The government would just

5   ask that if you do have them send out another note,

6   which is essentially saying what they've said in

7   this note, that they provide your Honor with more --

8   you ask them to provide your Honor with more

9   information.  Are there -- but asking them are there

10  counts that you haven't reached unanimity on is also

11  asking are there counts that you've reached

12  unanimity on.  I don't see why one question is an

13  invasion of their province and one is not.  And so I

14  think that if they don't have unanimity on six

15  counts, then an Allen charge perhaps would not be a

16  worthwhile, you know, tact to take.  But if it's one

17  count, then an Allen charge may be appropriate.  You

18  know, we could -- there is a case where it was

19  suggested you hand papers to the jurors individually

20  and let them each -- you ask them the question,

21  would further deliberations -- do you believe that

22  further deliberations would assist you.

23         THE COURT:  I know that case.

24         MS. DAYTON:  Or ask the foreperson.  We

25  can leave him out.  That's why they have a

5730

```
1   foreperson.  But knowing they've reached unanimous
2   decision on something is essentially achieving the
3   same thing your Honor would achieve by giving them a
4   new verdict form.
5           MR. SHEEHAN:  I don't think it does,
6   your Honor, because the new verdict form really
7   answers the question that they asked.  I would note
8   that the case that counsel is alluding to, there was
9   no objection to polling.  We object to polling.  I
10  think that in the context of this case -- in the
11  context of this question, the Court's original form
12  provides them a vehicle for answering it without
13  making any assumptions, and, indeed, they have not
14  told us anything other than asking for instructions.
15          MS. DAYTON:  So, I guess the
16  government's question then is if we send them back a
17  new verdict form, quote-unquote, number one, we
18  wouldn't want it to be a whole new verdict form
19  because they've obviously spent time working with
20  this one, so we would ask it be a page, number one,
21  although, we object to this procedure, but --
22          THE COURT:  Why are you objecting to
23  this procedure?
24          MS. DAYTON:  Because it's basically
25  saying, okay, the case is over, you can't go back in
```

5731

```
1   and deliberate.
2           THE COURT:  Could we not have anymore
3   comments, please.  I'm listening to her.
4           MS. DAYTON:  It's saying that -- you
5   know, the government feels it sends the message that
6   we're preventing you from going back in and perhaps
7   deliberating further.  So, we would just ask that if
8   a new verdict form is going to go in, that perhaps
9   if they come back with like a lack of unanimity only
10  on a particular charge, that they at least be given
11  the opportunity to go back in and continue
12  deliberations.  And we would just rely upon
13  Lowenfield v. Phelps, p-h-e-l-p-s, for the record,
14  484 U.S. 231, from 1988 where it talks about the
15  propriety of an Allen charge or something of the
16  kind.
17          THE COURT:  I found the case less than
18  thoroughly instructive for this particular
19  circumstance.
20          MS. DAYTON:  Okay.
21          THE COURT:  Their question is how do
22  they inform the Court that they cannot unanimously
23  agree on the judgment for a particular count.
24          MS. DAYTON:  Again, we would --
25          THE COURT:  If I were to ask them
```

5732

```
1   whether they believe that further deliberation could
2   produce agreement or whether their note should be
3   understood to mean that they can't, and then
4   receiving the answer, let's assume it is we can't,
5   then I can give them the revised jury form, Section
6   VII, "Determination of Sentence," and have them --
7   probably should substitute that page for a complete
8   jury instruction noting for them that it's only
9   Section VII that is changed.
10          MR. SHEEHAN:  I think what your Honor
11  could do is give them the changed Section VII and
12  say this form will respond to your inquiry.
13          THE COURT:  I don't want the loose form,
14  I want this in the context of a full jury charge --
15  excuse me, verdict form.
16          MS. DAYTON:  So maybe they should just
17  write it in instead of changing anything.  Because
18  we've all agreed on this form, we've reviewed this
19  form, they can write in "we cannot reach a verdict
20  on X charge."
21          THE COURT:  I want it to say:  "We, the
22  jury, are unable to reach a unanimous decision in
23  favor of a death sentence or in favor of a life
24  sentence.  We understand the consequence of this is
25  that the defendant, Azibo Aquart, will be sentenced
```

5733

```
1   to life imprisonment without possibility of release
2   on this count."
3           MR. SHEEHAN:  And I think your Honor
4   could say -- could give them as a court exhibit this
5   form, which is part of -- and say this form, which
6   is part of the special verdict form that we have
7   previously provided to you, we believe answers your
8   questions.  If you have further inquiry, please send
9   me a note, and then away they go.  But what I don't
10  want to get into, what I would urge the Court not to
11  get into, is a colloquy back and forth with the
12  foreman or certainly -- or with the jury where there
13  is the very risk that we would be invading their
14  province.
15          MS. DAYTON:  Your Honor, the government
16  feels that just allowing them to come out and return
17  a partial verdict is the best way to go because that
18  is what happens in cases where there are multiple
19  counts, if they can't reach a verdict on a count you
20  take the verdict on the remaining.  It's --
21          THE COURT:  Not on a penalty phase case.
22          MS. DAYTON:  But, your Honor, it's not
23  -- at that point it's not up to them whether or not
24  it's a life sentence, it's up to you.  So they've
25  determined that they can't reach a verdict one way
```

5734

```
1    or another, so it's up to your Honor to say then, by
2    law, this is life.  Telling them, well, do you
3    understand that this means it's going to be life
4    almost feels like it's sort of warning them, well,
5    are you sure you want to do life, and I actually
6    think that's to the defendant's detriment.
7           The government feels that if they have a
8    partial verdict they are entitled to return a
9    partial verdict.  They have been instructed in your
10   original instructions what the result of a
11   non-unanimous verdict is.  They can then be asked:
12   Do you feel any further deliberations would allow
13   you to reach a verdict?  If the answer is no, then
14   the answer is no.  And it doesn't matter whether or
15   not they're happy that's going to result in life, or
16   whether it's going to result in life, it results in
17   life.  It's not up to you.
18          MR. SHEEHAN:  Your Honor, I think your
19   suggestion -- I would ask the Court to follow what I
20   understand your suggestion is.  I would ask the
21   Court to give the jury the form indicating that here
22   is the vehicle for answering that question.  I would
23   not assume, nor would I make inquiry, and I would
24   oppose the Court making inquiry as to whether they
25   have reached a verdict on any particular counts.
```

5735

```
1    They have not said that, they have not asked for
2    direction on that, and I don't think it's
3    appropriate for the Court to make --
4           THE COURT:  I didn't say I would.  I
5    said I was going to inquire with respect to their
6    statement "if the jury cannot agree unanimously on
7    judgment for a particular count."
8           MR. SHEEHAN:  And I think --
9           THE COURT:  And to ask them whether they
10   are saying -- whether or not they are saying that
11   they have tried and are unable, or whether they
12   believe that some further deliberation may be able
13   to produce unanimity.
14          MR. SHEEHAN:  But they haven't suggested
15   either one of those problems, your Honor.  What
16   they've asked for is simply a vehicle.  They're not
17   saying we're having difficulty.  They're not
18   expressing --
19          THE COURT:  "We cannot agree unanimously
20   on the judgment" suggesting some difficulty in
21   coming to unanimity.
22          MR. SHEEHAN:  But, your Honor, they've
23   been deliberating for more than seven and a half
24   hours.  Your Honor has instructed them, I believe
25   properly, but on multiple occasions about what
```

5736

```
1    happens, and in this context they're not asking that
2    question.  They're just asking for a vehicle to
3    report to the Court a fact.
4           THE COURT:  If they are reporting that
5    they are unable to reach a unanimous decision on any
6    count, what is your view as to the usefulness of
7    having them return either a revised verdict form or
8    one in which they write "we are unable to reach a
9    unanimous decision in favor of a death sentence or
10   in favor of a life sentence"?
11          MR. SHEEHAN:  The point is I don't know
12   what they're doing there, your Honor, and I don't
13   think it's our purpose -- it is proper for us to ask
14   them that question.  I know what question they're
15   asking us, they're asking us how do we report this
16   fact to the Court.  That's the only question I think
17   we should answer, because to do anything else is to
18   intrude on the jury process.
19          MS. DAYTON:  Then we should tell them --
20          THE COURT:  So the answer to the
21   question should be --
22          MS. DAYTON:  Write a note.
23          THE COURT:  How do you -- "how do we
24   inform the Court" is to say:  "Under such count in
25   which you cannot agree unanimously, you write:  We
```

5737

```
1    are unable to reach a unanimous decision in favor of
2    death or in favor of life."
3           MR. SHEEHAN:  Which is exactly what your
4    Honor was proposing, I believe, when you were
5    suggesting giving them that form so that there would
6    then be a vehicle for them to do that.  But either
7    way is the same.  The advantage of the way your
8    Honor initially suggested is that they have exactly
9    the language that is appropriate in front of them.
10          THE COURT:  All right, I'm going to have
11   a write-in.  I'm going to tell them that they inform
12   the Court by writing in under the two unanimous
13   options their statement that they are unable to
14   reach a decision in favor of a death sentence or a
15   life sentence.  Then when they sign, each juror must
16   sign his or her name and juror number below
17   indicating that the above sentence determinations
18   reflect the jury's decision.  It confirms each of
19   them agreeing that they cannot reach a unanimous
20   decision.  So let's do it that way.
21          MR. SHEEHAN:  Thank you.
22          MS. DAYTON:  The only thing that the
23   government would request is that you say if you have
24   reached a verdict on anything that you fill that in,
25   and if you haven't, then you indicate in such and
```

5738

```
1   such a way, so they don't come back with a half
2   completed verdict form if they've in fact reached a
3   verdict on something.  We're not asking them, we're
4   just suggesting if you haven't done that.
5               MR. SHEEHAN:  I don't think that the
6   Court should be making that inquiry at this time.
7               THE COURT:  It's not an inquiry, it's a
8   direction.
9               MR. SHEEHAN:  Well, it is an inquiry,
10  your Honor, because it is an inquiry that is
11  triggering a particular response.
12              MS. DAYTON:  Your Honor, we're not
13  asking them to answer out loud, we're just
14  instructing them to fill out the verdict form as
15  completely as you possibly can.  If that's a yes,
16  it's a yes; if it's a no, it's a no; if it's a we
17  can't, then it's a we can't.
18              MR. SHEEHAN:  The unanimity is already
19  there on the sheet.  They don't need to be -- they
20  were not asking that question.  I don't think that
21  there should be anything addressed to that question.
22  I think that the only question that they were asking
23  is how do we express to the Court if we are not
24  unanimous on particular counts, and I think that
25  that's how it should be responded to.
```

5739

```
1               THE COURT:  I'm not sure how that
2   differs from what I'm proposing.
3               MR. SHEEHAN:  Not from what you are
4   proposing, but from what they're proposing it's
5   different.
6               THE COURT:  If they are ready to return
7   their verdict, but there are counts for which they
8   do not have a unanimous decision, they can write in
9   as to those counts "we are unable to decide" and
10  return the verdict in that form.
11              MR. SHEEHAN:  But I think the direction
12  is conveying something that is not appropriate to
13  convey at this time in response to their inquiry.
14              MS. DAYTON:  Your Honor, the government
15  obviously disagrees because your Honor instructed
16  them from the beginning that when they have a
17  verdict, they should return it.  And so this is
18  basically saying if you have a verdict.  It's not
19  saying you must, you have to, you'd better have,
20  it's nothing more than "if."
21              MR. SHEEHAN:  And I would oppose that at
22  this time, your Honor.
23              THE COURT:  Well, when they have reached
24  their verdict is not something that directs them to
25  do anything in particular, right?  "When you have
```

5740

```
1   reached your verdict on any counts you may reflect
2   the lack of unanimity where it exists by writing in
3   below the two unanimous options the following:  We
4   are unable to reach a unanimous decision in favor of
5   a death sentence or a life sentence, and that will
6   be how you inform the Court."
7               MR. SHEEHAN:  I think if your Honor were
8   to send that response back we wouldn't even need to
9   bring them in.
10              THE COURT:  I'm going to bring them in.
11              MR. SHEEHAN:  Okay.
12              THE COURT:  Okay?
13              MR. SHEEHAN:  Is your Honor going to
14  actually -- I think it would be helpful if your
15  Honor were also to send a copy of that back with
16  them and say here is a copy of this.
17              THE COURT:  Well, not in its current
18  form.  I think they can manage this, don't you?
19              MR. SHEEHAN:  Your Honor, do you know,
20  the advantage of the written instructions, having
21  listened to your Honor's charge and just considering
22  the linguistic issues that are involved in all of
23  it, I think having it in writing, even though it may
24  be -- I mean, your Honor's penmanship is much better
25  than mine, I think that it does provide them with
```

5741

```
1   something to actually have in front of them, and I
2   think that it is valuable in this context.
3               MS. DAYTON:  The government has no
4   problem with the note going back there, but if it
5   does, we agree that the jury doesn't need to be
6   brought out.  We also agree that you have nice
7   penmanship, your Honor.
8               THE COURT:  We're going to stand in
9   recess briefly.
10              (Recess)
11              THE COURT:  All right, after
12  consideration of your various positions, I propose
13  the final -- the following that I've given you a
14  copy of.
15              MR. SHEEHAN:  No objection.
16              MS. DAYTON:  No objection.
17              THE COURT:  All right, we'll send this
18  into the jurors.
19              MS. DAYTON:  Do you want to read it into
20  the verdict -- into the record?
21              THE COURT:  The following supplemental
22  instruction will be marked as a Court Exhibit:  "As
23  to any counts on which you are unable to come to a
24  unanimous verdict, you may so indicate by writing
25  below the two unanimous verdict options the
```

5742

```
1   following:  We are unable to reach a unanimous
2   verdict in favor of a death sentence or a life
3   sentence."
4              And I'm going to send back -- I'm going
5   to attach it to their note, so we'll send that in to
6   them.  All right.
7              MS. DAYTON:  Thank you, your Honor.
8              THE COURT:  We'll stand in recess.
9              (Recess)
10             THE COURT:  All right, Counsel.
11             MS. DAYTON:  We agree the answer is no.
12             MR. SHEEHAN:  I think the answer is no,
13  but you must unanimously agree to impose a sentence
14  of death on any count.
15             THE COURT:  Can I just answer the
16  question?
17             MS. DAYTON:  Yeah, can we just say no.
18             THE COURT:  If we are -- the note, Court
19  Exhibit 5, "If we are unable to reach a unanimous
20  verdict on any one count, does that mean our choices
21  for other counts are nullified or default to a life
22  sentence?"  It seems to me I just write "no."  That
23  answers their question.
24             MS. DAYTON:  The government agrees.
25             MR. SHEEHAN:  I would ask that you add
```

5743

```
1   "but you must unanimously agree to impose a sentence
2   of death."
3              MS. DAYTON:  The government objects.
4              THE COURT:  I really don't think you
5   want me to say that.
6              MR. SHEEHAN:  Well, then I don't.  I
7   will withdraw the suggestion and go with "no," your
8   Honor.  Thank you.  So the answer is no, your Honor.
9   My -- yes.
10             THE COURT:  All right, we will stand in
11  recess.  Do you want to show counsel the note just
12  in case?
13             MR. SHEEHAN:  Thank you, your Honor.
14             THE COURT:  All right, thank you.
15
16      I certify that the foregoing is a correct
17  transcript from the record of proceedings in the
18  above-entitled matter.
19
20             __7/27/11__
21               Date
22
23             /S/__Sharon Montini__
24             Official Reporter
25
```

5744

```
1              UNITED STATES DISTRICT COURT
2                 DISTRICT OF CONNECTICUT
3   * * * * * * * * * * *      *
                               *
4   UNITED STATES OF AMERICA,  * Case No 6cr160(JBA)
                               *
5           Plaintiff,         *
                               *
6        vs.                   *
                               *
7   AZIBO AQUART              * June 15, 2011
                               *
8           Defendant.         *
                               *
9   * * * * * * * * * * *      *
10             TRIAL TRANSCRIPT
11             VOLUME XXXI
12  BEFORE:  THE HONORABLE JANET BOND ARTERTON U.S.D.J.,
                                            and jury
13  Appearances:
14  FOR THE GOVERNMENT:   ALINA REYNOLDS, ESQ
                          TRACY DAYTON, ESQ.
15                        PETER MARKLE, ESQ.
                          JACABED RODRIGUEZ-COSS
16                        United States Attorney's Office
                          915 Lafayette Blvd
17                        Bridgeport, CT 06604
18
    FOR THE DEFENDANT     MICHAEL SHEEHAN, ESQ
19  AZIBO AQUART:         Sheehan & Reeve
                          139 Orange Street
20                        New Haven CT 06510
21                        JUSTIN SMITH, ESQ.
                          383 Orange Street
22                        New Haven, CT 06511
23
    Court Reporter:       Sharon Montini, RMR
24
    Proceedings recorded by mechanical stenography,
25  transcript produced by computer
```

5745

```
1              THE COURT:  Good morning, counsel.  Good
2   morning, ladies and gentlemen.  Good morning, Mr.
3   Aquart.
4              MR. SHEEHAN:  Good morning, your Honor.
5              THE DEFENDANT:  Good morning, your
6   Honor.
7              THE COURT:  Please be seated.  The jury
8   advises that they have reached a verdict.  I will
9   ask that they be brought in.
10             (Jury entered the courtroom.)
11             THE COURT:  Good morning, ladies and
12  gentlemen.  Please be seated.  I understand from
13  your foreperson's note that you have reached a
14  verdict.  Is that correct?
15             JUROR:  That is correct.
16             THE COURT:  Would you kindly hand the
17  form to the clerk.
18             All right, thank you.  I'm going to
19  return this to the foreperson, ask that you read it,
20  and then I will ask each juror, although you have
21  signed this as your unanimous verdict, I will ask
22  you once again whether the verdict form that Mr.
23  Mathis reads in fact is your verdict.
24             JUROR:  I'm to read the entire document,
25  your Honor?
```

5746

```
 1              THE COURT:  Yes, please.
 2              Mr. Aquart, will you please stand.
 3              JUROR:  For Section I, Finding As to the
 4   Defendant's Age:  We, the jury, unanimously find
 5   beyond a reasonable doubt that the defendant, Azibo
 6   Aquart, was at least 18 years of age on August 24,
 7   2005.  We answered "yes."
 8              For Section II, the Threshold Mental
 9   State Factor:  We, the jury, unanimously find that
10   the government has proved beyond a reasonable doubt
11   that the defendant, Azibo Aquart, intentionally
12   killed:  Tina Johnson, Counts Two and Five; and
13   Basil Williams, Counts Four and Seven.
14              We, the jury, unanimously find that the
15   government has proved beyond a reasonable doubt that
16   the defendant, Azibo Aquart, intentionally
17   participated in an act contemplating that the life
18   of a person would be taken or intending that lethal
19   force would be used in connection with a person, and
20   the victim died as a direct result of that act, with
21   respect to:  Tina Johnson, Counts Two and Five, we
22   answered "yes;" James Reid, Counts Three and Six, we
23   answered "yes;" and Basil Williams, Counts Four and
24   Seven, we answered "yes."
25              Section III, the Statutory Aggravating
```

5747

```
 1   Factors:  We, the jury, unanimously find that the
 2   government has proved beyond a reasonable doubt that
 3   the defendant, Azibo Aquart, committed the homicide
 4   offense in an especially heinous, cruel or depraved
 5   manner in that it involved torture or serious
 6   physical abuse:  With respect to Tina Johnson we
 7   find "yes," James Reid we answered "yes," and Basil
 8   Williams we answered "yes."
 9              We, the jury, unanimously find that the
10   government has proved beyond a reasonable doubt that
11   the defendant, Azibo Aquart, procured the commission
12   of the homicide offense by payment, or promise of
13   payment, of anything of pecuniary value, with
14   respect to:  Tina Johnson we answered "yes," James
15   Reid we answered "yes," Basil Williams we answered
16   "yes."
17              We, the jury, unanimously find that the
18   government has proved beyond a reasonable doubt that
19   the defendant, Azibo Aquart, committed the homicide
20   offense as consideration for the receipt, or in the
21   expectation of receipt, of anything of pecuniary
22   value, with respect to:  Tina Johnson, we answered
23   "yes," James Reid we answered "yes," Basil Williams
24   we answered "yes."
25              We, the jury, unanimously find that the
```

5748

```
 1   government has proved beyond a reasonable doubt that
 2   the defendant, Azibo Aquart, committed the homicide
 3   offense after substantially planning and
 4   premeditation to cause the death of:  Tina Johnson
 5   we answered "yes," James Reid we answered "yes,"
 6   Basil Williams we answered "yes."
 7              We, the jury, unanimously find that the
 8   government has proved beyond a reasonable doubt that
 9   the defendant, Azibo Aquart, intentionally killed or
10   attempted to kill more than one person in a single
11   criminal episode.  We answered "yes."
12              For the Non-Statutory Aggravating
13   Factors:  We, the jury, unanimously find that the
14   government has proved beyond a reasonable doubt that
15   the defendant, Azibo Aquart, committed criminal acts
16   of violence that posed a serious threat to the lives
17   and safety of persons other than the victims in this
18   case, and that by doing so, the defendant engaged in
19   a continuing pattern of violent criminal conduct.
20   We answered "yes."
21              We, the jury, unanimously find that the
22   government has proved beyond a reasonable doubt that
23   the defendant, Azibo Aquart, caused loss, injury and
24   harm to the victims and their family as follows:
25   The defendant, Azibo Aquart, caused the death of the
```

5749

```
 1   victim who enjoyed a strong relationship with his or
 2   her family, including his or her parents, siblings,
 3   children and grandchildren, and the victim's family
 4   has suffered severe and irreparable harm, including
 5   the loss of emotional support from the victim and,
 6   in the case of Tina Johnson, financial support, with
 7   respect to:  Tina Johnson we find "yes," with
 8   respect to James Reid we find "yes," and Basil
 9   Williams we find "yes."
10              For the Mitigating Factors:
11              No. 1.  Neither John Taylor nor Efrain
12   Johnson will be sentenced to death for their roles
13   in the murders of Basil Williams, James Reid and
14   Tina Johnson.  The number of jurors who so find is
15   12.
16              No. 2.  One or more victims choose to
17   engage in -- I'm sorry, chose to engage in illegal
18   drug-trafficking activities, a circumstance that
19   contributed to their deaths.  The number of jurors
20   who so find is 12.
21              No. 3.  If not sentenced to death, Azibo
22   Aquart will be in prison for the rest of his life
23   without the possibility of release.  The number of
24   jurors who so find is 12.
25              No. 4.  Lifetime imprisonment is a
```

5750

```
 1   severe punishment.  The number of jurors who so find
 2   is 12.
 3           No. 5.  Azibo Aquart's execution would
 4   cause others to suffer grief and loss.  The number
 5   of jurors who so find is 12.
 6           No. 6.  Azibo Aquart grew up in
 7   communities characterized by violence and crime.
 8   The number of jurors who so find is 12.
 9           No. 7.  Before age 16, Azibo Aquart
10   lived in 16 different places.  The number of jurors
11   who so find is 12.
12           No. 8.  Azibo Aquart attended eight
13   different schools in nine years.  The number of
14   jurors who so find is 12.
15           No. 9.  Throughout his childhood, Azibo
16   Aquart lacked adequate parental supervision.  The
17   number of jurors who so find is 12.
18           No. 10.  Azibo Aquart was exposed to
19   emotional and physical abuse inflicted on his
20   mother.  The number of jurors who so find is nine.
21           Azibo Aquart's parents both sold illegal
22   drugs.  The number of jurors who so find is 12.
23           Azibo Aquart's father, Richard Aquart,
24   exposed Azibo Aquart to violence and drug dealing.
25   The numbers of jurors who so find is 12.
```

5751

```
 1           Richard Aquart stored illegal weapons in
 2   the home.  The number of jurors who so find is 12.
 3           No. 14.  From the time Azibo Aquart was
 4   five, Richard Aquart was a fugitive who used
 5   aliases.  The number of jurors who so find is 12.
 6           No. 15.  When Azibo Aquart was 11, his
 7   father was sent to prison for eight years and then
 8   deported to Jamaica.  The number of jurors who so
 9   find is 12.
10           No. 16.  Richard Aquart was a poor role
11   model.  The number of jurors who so find is 12.
12           No. 17.  Azibo Aquart's parents and
13   others around him taught him to distrust the police
14   and the judicial system and to disregard the law.
15   The number of jurors who so find is 12.
16           No. 18.  Azibo Aquart and his brothers,
17   Azizi and Azikiwe, were picked on and bullied
18   because of their cultural differences.  The number
19   of jurors who so find is 12.
20           No. 19.  When he was 12, Azibo Aquart's
21   mother drowned.  The number of jurors who so find is
22   12.
23           No. 20.  From the time of his mother's
24   death, Azibo Aquart had no meaningful adult
25   supervision.  The number of jurors who so find is
```

5752

```
 1   two.
 2           No. 21.  When Azibo Aquart was 13, his
 3   brother, Azizi Aquart, was shot three times and
 4   nearly died.  The number of jurors who so find is
 5   12.
 6           No. 22.  At age 17, Azizi Aquart was
 7   ill-equipped to handle the responsibility of being a
 8   guardian of a 13-year-old.  The number of jurors who
 9   so find is 12.
10           No. 23.  Azibo Aquart's close relatives
11   and family friends failed to properly care for him
12   after his mother's death or his brother's shooting.
13   The number of jurors who so find is 12.
14           No. 24.  Although social service
15   providers and juvenile court officials identified
16   Azibo as an at-risk child, no effective action was
17   taken.  The number of jurors who so find is 12.
18           While incarcerated as a young adult,
19   Azibo Aquart obtained his GED.  The number of jurors
20   who so find is 12.
21           No. 26.  At the Enfield Correctional
22   Center, Azibo Aquart was a certified literacy tutor
23   who helped other inmates.  The number of jurors who
24   so find is 12.
25           No. 27.  If Azibo Aquart is sentenced to
```

5753

```
 1   life imprisonment, the Bureau of Prisons has the
 2   capability of safely and securely confining him.
 3   The number of jurors who so find is 12.
 4           No. 28.  Azibo Aquart's life has value.
 5   The number of jurors who so find is 12.
 6           We did find one additional mitigating
 7   factor.  The additional factor found was that the
 8   defendant, Azibo Aquart, has a child.  The number of
 9   jurors who so found was 12.
10           Section VI is the Weighing.  Count Two,
11   Tina Johnson, we unanimously found beyond a
12   reasonable doubt that the aggravating factors found
13   to exist sufficiently outweigh all the mitigating
14   factors found to exist, or in the absence of
15   mitigating factors, that the aggravating factors
16   themselves justify a sentence of death.  Tina
17   Johnson, Count Two, we said "yes."  Count Five, we
18   said "yes."
19           James Reid, Count Three, we said "yes."
20   Count Six, we said "yes."
21           Basil Williams, Count Four, we said
22   "yes."  And Count Seven, we said "yes."
23           Section VII, Determination of Sentence.
24   On Count Two, Tina Johnson, we, the jury,
25   unanimously find that the defendant, Azibo Aquart,
```

5754

```
1   should be sentenced to death.
2            On Count Five, Tina Johnson, we, the
3   jury, unanimously find that the defendant, Azibo
4   Aquart, should be sentenced to death.
5            On Count Three, James Reid, we are
6   unable to reach a unanimous verdict in favor of a
7   death sentence or a life sentence.
8            On Count Six for James Reid, we are
9   unable to reach a unanimous verdict in favor of a
10  death sentence or a life sentence.
11           Count Four, Basil Williams, we, the
12  jury, unanimously find that the defendant, Azibo
13  Aquart, should be sentenced to death.
14           And Count Seven, Basil Williams, we, the
15  jury, unanimously find that defendant, Azibo Aquart,
16  should be sentenced to death.
17           THE COURT:  Thank you.  You'll hand the
18  verdict form to the clerk.  You may be seated.
19           And I will ask each of the jurors,
20  having heard the verdict form read by your
21  foreperson, stand and tell me whether, in fact, this
22  is your verdict.  I recognize that you have signed
23  to that effect, but I want to confirm with you.
24           Mr. Harrison?
25           JUROR:  Yes, that's my verdict.
```

5755

```
1            THE COURT:  Thank you.
2            Mr. Ballenger?
3            JUROR:  Yes, your Honor.
4            THE COURT:  Thank you.
5            Ms. Boilard?
6            JUROR:  Yes, your Honor.
7            THE COURT:  Thank you.
8            Ms. Pollard?
9            JUROR:  Yes, your Honor.
10           THE COURT:  Mr. Ferraro?
11           JUROR:  Yes, your Honor.
12           THE COURT:  Ms. Hickey?
13           JUROR:  Yes, your Honor.
14           THE COURT:  Ms. Shutts?
15           JUROR:  Yes, your Honor.
16           THE COURT:  Ms. Warbin?
17           JUROR:  Yes, your Honor.
18           THE COURT:  Ms. Casiero?
19           JUROR:  Yes, your Honor.
20           THE COURT:  Mr. Niezrecki?
21           JUROR:  Yes, it is.
22           THE COURT:  Thank you.
23           And Mr. Mathis?
24           JUROR:  Yes, your Honor.
25           THE COURT:  And Mr. Santiago?
```

5756

```
1            JUROR:  Yes, your Honor.
2            THE COURT:  Thank you, ladies and
3   gentlemen.  That confirms that the verdict that has
4   been read is the unanimous verdict of the jury, and
5   it is accepted.  You may be seated.
6            Ladies and gentlemen, you have now done
7   your duty.  Making decisions such as you have made,
8   that is not easy, and we are grateful to you for
9   performing this important and difficult assignment.
10  And the reason is that we believe in a system of law
11  that places in our fellow citizens the
12  responsibility for administering justice, a system
13  of self-government in which jurors are drawn from
14  our community to play this central role.  The
15  prominent historian Arthur Schlesinger said:  In the
16  minds of the American colonists, trial by jury was
17  the firmest barrier of English liberty, and it
18  serves today as the voice of the people.
19           You have served your role as jurors and
20  we thank you for your important contribution to our
21  American system of justice.  You are now discharged.
22  You are under no obligation to discuss the case with
23  anyone; any party, any lawyer, the press, anyone.
24  But you do remain under a -- and that is your
25  choice.  You do remain under a legal obligation as
```

5757

```
1   follows, which is reflected in the oath that you
2   took back in April:  You do solemnly swear after
3   your verdict has been announced in court you will
4   speak to no one concerning the deliberations or the
5   vote of the jury or of any individual juror other
6   than yourself unless the presiding judge gives you
7   permission to do so.
8            Thank you very much for your service in
9   this case and for your attentiveness and diligence.
10  I'd like the opportunity to come back to your jury
11  room and thank you personally and answer any
12  questions that I am able to answer if you would care
13  to remain.  Otherwise, you are discharged.
14           (Jury exited the courtroom.)
15           THE COURT:  Please be seated.  With
16  respect to a schedule for posttrial motions, Mr.
17  Sheehan, do you have a request?
18           MR. SHEEHAN:  Yes, your Honor, two
19  weeks.
20           THE COURT:  The government'S opposition
21  in 21 days, any reply in 14 days.
22           Is there any other matter that needs to
23  be addressed or that we need to schedule?
24           MS. DAYTON:  No, your Honor.
25           THE COURT:  Sentencing will be scheduled
```

**GA1482**

5758

1  after the motions have been ruled on if, in fact,
2  they are not granted.
3          Thank you very much.
4          MS. DAYTON:  Thank you, your Honor.
5          THE COURT:  We stand in recess.
6          (Recess)
7
8          I certify that the foregoing is a
9  correct transcript from the record of proceedings in
10  the above-entitled matter.
11
12              7/27/11
13              Date
14
15              /S/  Sharon Montini
16              Official Reporter
17
18
19
20
21
22
23
24
25

---

1

1              UNITED STATES DISTRICT COURT.
2              DISTRICT OF CONNECTICUT
3  * * * * * * * * * * *      *
                             *
4  UNITED STATES OF AMERICA,  * Case No 6cr160(JBA)
5          Plaintiff,         *
                             *
6      vs.                    *
                             *
7  AZIBO AQUART              * June 6, 2011
8          Defendant.         *
                             *
9  * * * * * * * * * * * *     *
10  TRANSCRIPT OF PENALTY PHASE CHARGE CONFERENCE
                VOLUME I
11
12  BEFORE:  THE HONORABLE JANET BOND ARTERTON U.S.D.J.,
13                                       and jury
    Appearances:
14  FOR THE GOVERNMENT:   ALINA REYNOLDS, ESQ
                          TRACY DAYTON, ESQ.
15                        PETER MARKLE, ESQ.
                          JACABED RODRIGUEZ-COSS
16                        United States Attorney's Office
                          915 Lafayette Blvd
17                        Bridgeport, CT 06604
18  FOR THE DEFENDANT     MICHAEL SHEEHAN, ESQ
    AZIBO AQUART:         Sheehan & Reeve
19                        139 Orange Street
                          New Haven CT 06510
20
21                        JUSTIN SMITH, ESQ.
                          383 Orange Street
22                        New Haven, CT 06511
23                        BEVERLY VAN NESS, ESQ.
                          74 Trinity Place
24                        New York, NY 10006
25  Court Reporter:       Sharon Montini, RMR
    Proceedings recorded by mechanical stenography,
    transcript produced by computer

---

2

1          THE COURT:  All right, please be seated.
2  And you are welcome to remain seated while we confer
3  about the draft that you were sent.
4          MR. SHEEHAN:  And, your Honor, Ms. --
5  Attorney Van Ness is going to be the primary person
6  for us on this.
7          THE COURT:  That's fine.
8          MR. SHEEHAN:  Thank you, your Honor.
9          THE COURT:  As before, shall we just
10  start with the beginning?  Who has a comment on what
11  page?
12          MS. RODRIGUEZ-COSS:  Just a
13  typographical error on page 1.  The fourth line from
14  the top.  I think it says "before you is how" and
15  then "whether."  I think it should be "whether
16  defendant Azibo Aquart."  In other words, I think
17  the "how" is extra.
18          THE COURT:  I'm trying to see where you
19  are.
20          MS. RODRIGUEZ-COSS:  Fourth sentence
21  from the top, starting "sole question before you."
22          THE COURT:  Yes, thank you.
23          MS. RODRIGUEZ-COSS:  I don't have
24  anything else on that page.
25          MS. DAYTON:  I just think the font is

---

3

1  really small, and I might just be getting old, but I
2  find it really hard to read on the first page.  It
3  gets bigger in other places.
4          THE COURT:  We'll get those typology
5  issues worked out.
6          MS. RODRIGUEZ-COSS:  On page 2, in the
7  second paragraph, and I guess perhaps I don't know
8  if the Court has made a determination on our motion
9  with regards to the definition of mitigating
10  factors, and if the Court has, then we would just
11  have a standing objection to the language.
12          The second full paragraph on page 2,
13  fourth sentences from the bottom which adds the
14  phrase "or anything else relevant to the sentencing
15  decision," the government filed a motion objecting
16  to that being included in the definition of a
17  mitigating factor.  We, of course, stand by our
18  motion.  We understand that the jury should not be
19  given full discretion with regards to determining or
20  deciding what a mitigating factor is, it should be
21  guided discretion pursuant to the Federal Death
22  Penalty Act, which defines a mitigating factor as
23  anything in the character, background of the
24  defendant or any circumstance of the capital
25  offense.  So --

4

```
 1        THE COURT:  All right, Ms. Van Ness, do
 2  you wish to be heard on either of those two points?
 3        MS. VAN NESS:  Yes, I would like you to
 4  keep the language in that you have.  We filed papers
 5  as well discussing how the language of the statute,
 6  whether the including language for mitigating
 7  factors is not limited to the Lockett test, and we
 8  think that anything that the jurors would find that
 9  would be in support of a sentence of less than death
10  would be relevant in mitigation.
11        THE COURT:  Well, it seems to me that
12  Tennard and Skipper advise in that direction.
13        MS. RODRIGUEZ-COSS:  Which direction?
14        THE COURT:  It says, quote:  The state
15  cannot bar consideration of evidence if the evidence
16  could reasonably -- if the sentencer could
17  reasonably find it warrants a sentence less than
18  death.
19        I think that's also consistent with the
20  direction, although not explicitly, in Feil.  So
21  that's the language that I will keep in, and the
22  government's objection is preserved.
23        I will, however, ask you after the
24  charge has been given again to just give a pinpoint
25  summary of the matters that remain a basis for
```

5

```
 1  objection for appellate clarification.
 2        MS. VAN NESS:  Your Honor, for the
 3  record, the filing that I was referring to where we
 4  briefed this was Document 869.  I have a request on
 5  page 2 as well.
 6        THE COURT:  All right.
 7        MS. VAN NESS:  For you to add the
 8  presumption of life.  That --
 9        MS. RODRIGUEZ-COSS:  What?
10        MS. VAN NESS:  For you to add
11  presumption of life language that we had requested.
12  I can discuss with you where to put it if you agree,
13  but the argument --
14        THE COURT:  Tell me where you are
15  proposing it and then we'll hear further.
16        MS. VAN NESS:  Okay, the fourth
17  paragraph down.
18        MS. RODRIGUEZ-COSS:  On page?  I'm
19  sorry.
20        MS. VAN NESS:  The fourth paragraph.
21        THE COURT:  We don't have four
22  paragraphs.
23        MS. VAN NESS:  I'm sorry, the third
24  paragraph, the last paragraph, after the sentence
25  "the law does not assume that any defendant such as
```

6

```
 1  Azibo Aquart found guilty of premeditated murder
 2  should be sentenced to death," I would ask that you
 3  add "indeed the law carries with it a presumption in
 4  favor of a verdict other than death."
 5        MS. RODRIGUEZ-COSS:  Your Honor, we
 6  would object strenuously to that.  There is no legal
 7  foundation for such a presumption.  There is no
 8  presumption established by the Federal Death Penalty
 9  Act in favor of either sentence.  So, it is clear
10  that -- the Judge, I believe, repeats every other
11  page that a death penalty is not required.
12        THE COURT:  Okay, hang on just a second.
13  I don't recall in your proposed instructions where
14  that came from, where the authority for that came
15  from.
16        MS. VAN NESS:  Well, it comes from -- we
17  wrote a memo on this, your Honor.  I pulled that
18  out.  That was Document 681, and I have a copy here
19  if you would like it, but we went through the
20  statute, and I cited the case Cf. Kansas v. Marsh
21  for the fact that the Federal Death Penalty Act,
22  since the Act says "sufficiently outweigh," that's
23  the test, but since also, as you've repeatedly
24  charged the jury, death is never required, a jury is
25  free to impose a life sentence.  In fact, the Kansas
```

7

```
 1  v Marsh case that I quoted says -- I'm sorry, was
 2  dealing with a statute that is virtually identical
 3  to the Federal Death Penalty Act, and it held, with
 4  respect to that act, because it imposed a burden on
 5  the state to prove an aggravating circumstance, and
 6  if the aggravators are not outweighed by mitigating
 7  circumstances, if these burdens are not met, a life
 8  sentence must be imposed.  Thus, life was the
 9  default sentence.
10        THE COURT:  But isn't that different
11  from presumption?
12        MS. VAN NESS:  I think not because I
13  think if the jurors go in with that being the
14  default sentence, then that clarifies the burden of
15  the government in accord with the way the statute is
16  set up.
17        THE COURT:  Is that not the way this
18  charge is set out, that every time it places the
19  burden on the government and clarifies that there is
20  no obligation to ever impose the death penalty?
21        MS. VAN NESS:  I think that instruction
22  is critical, and I'm very glad that you are
23  including it, but I don't think that's necessarily
24  the same as saying the presumption of life.
25        THE COURT:  And you think it's a default
```

**GA1484**

8

```
1   of -- if the government doesn't prove the
2   aggravators or they don't find the aggravators
3   outweigh or they don't think death is appropriate,
4   that that -- and they know -- or they can't decide,
5   and, therefore, they know that the sentence will be
6   life without release, that that's not -- that that
7   kind of default rubric creates a presumption for
8   life?
9           MS. VAN NESS:  Well, I think that it
10  does, which is why we so argued in this memo and the
11  cited the Supreme Court case which made that clear.
12  Again, I have this produced for your Honor.
13          THE COURT:  This is way back I think
14  during the voir dire.
15          MS. VAN NESS:  It's Document 681.  But
16  that's where the argument was set out fully.
17          THE COURT:  All right, I will go back
18  and look at that.  I did consider your request for
19  this and had at least made the determination that
20  all of these defaults, if you will, suffice, but
21  I'll take a look at that again.
22          MS. VAN NESS:  All right, your Honor.  I
23  just think it clarifies what other instructions you
24  are talking about mean, not that they go into the
25  penalty phase with life as a presumption, it's only
```

9

```
1   unless and until all these burdens are met by the
2   government that they can even think about a death
3   sentence, and even then it's not required.  So, I
4   think it's consistent with there being a presumption
5   of life.
6           MS. RODRIGUEZ-COSS:  Your Honor, we
7   raised this issue, both parties raised this issue
8   before we began voir dire in this case.  We
9   discussed it at length and the Court spent the
10  better of the month that we spent selecting this
11  jury instructing each and every one of these jurors
12  that they are to go into the penalty phase with an
13  open mind without having a default position for life
14  or death, without presuming that either punishment
15  would be imposed.  And I believe that that is
16  correct, that these jurors are to come in to the
17  penalty phase and must certainly enter jury
18  deliberations in the penalty phase with an open mind
19  ready to discuss both evidence in aggravation and
20  evidence in mitigation and then follow the
21  instructions of the Court in determining what the
22  appropriate sentence is to be in this case.
23          To instruct them otherwise, your Honor,
24  would be to read something into the statute and into
25  the single Supreme Court case that the defense is
```

10

```
1   citing that is simply not there.  There has been
2   quite a bit of jurisprudence from the Supreme Court
3   on this subject matter and not a single case --
4           THE COURT:  Tell me what Supreme Court
5   case says that there is no presumption one way or
6   the other.
7           MS. RODRIGUEZ-COSS:  Well, I think the
8   fact that there is no Supreme Court case that says
9   that there is a presumption one way or another
10  speaks --
11          THE COURT:  I guess I misunderstood you.
12  I thought you said there had been quite a bit of
13  jurisprudence from the Supreme Court on this
14  subject.
15          MS. RODRIGUEZ-COSS:  Well, on the
16  subject of capital punishment and deliberations in
17  penalty phases, and not a single Supreme Court case
18  says that the statute establishes a presumption for
19  life.  Not a single case says that, your Honor.
20  That's a pretty significant factor to add or inject
21  into these instructions without any support
22  whatsoever from the case law.
23          THE COURT:  All right, let me -- my
24  initial conclusion had been not to put "presumption
25  of life" in.  I want to go back and examine it one
```

11

```
1   more time.  I have your positions, and we'll
2   consider them.
3           MS. RODRIGUEZ-COSS:  If the defense is
4   done with page 2, your Honor, we had a couple of
5   things we wanted to bring to the Court's attention
6   on that page.
7           THE COURT:  Okay.
8           MS. RODRIGUEZ-COSS:  In that same third
9   paragraph, in the sixth line from the beginning of
10  that paragraph, we would suggest that the language
11  should read "your decision on the question of his
12  punishment is a uniquely moral judgment;" rather
13  than a "personal judgment," a "uniquely moral
14  judgment which the law leaves up to you."
15          THE COURT:  Any disagreement?
16          MS. VAN NESS:  Yes, your Honor, I think
17  it should stay "personal."  It's the individual's
18  decision and I think injecting morality into it is
19  not --
20          MS. RODRIGUEZ-COSS:  But it is --
21          MS. VAN NESS:  It certainly doesn't add
22  anything to the equation.
23          MS. RODRIGUEZ-COSS:  Well, then perhaps
24  "uniquely personal moral judgment."  But it is a
25  moral judgment they are asked to make at this point.
```

12

```
1          THE COURT:  I thought the defendant
2   during voir dire was arguing that they could make a
3   moral judgment, that that was part of what their job
4   was.
5          MS. VAN NESS:  All right, your Honor,
6   why don't we go with "personal moral."
7          MS. RODRIGUEZ-COSS:  And then, your
8   Honor, that same paragraph, the last sentence, we
9   would object at this juncture, on page 2, advising
10  the jury what would happen if they don't reach a
11  verdict.  I think these are the initial instructions
12  to the jury, they're being advised what the
13  consequences of their verdict is, but to begin the
14  instructions early on by telling them what will
15  happen if they do not come to an agreement seems to
16  sort of discourage the fact that we are supposed to
17  encourage the jury to try their hardest to come to
18  an agreement on this very important issue.
19         THE COURT:  You are not saying that they
20  shouldn't be charged this, you are saying they
21  shouldn't be charged this in the beginning?  Is that
22  what you are saying?
23         MS. RODRIGUEZ-COSS:  That they -- is the
24  Court under the impression it will charge what will
25  happen if they do not come to an agreement?
```

13

```
1          THE COURT:  Yes, because it will be on
2   the verdict form.
3          MS. RODRIGUEZ-COSS:  Well, we had an
4   objection to that being on the verdict form as well.
5          THE COURT:  Well, they're going to know
6   what the consequences are.
7          MS. RODRIGUEZ-COSS:  It's almost, your
8   Honor -- we would invite, respectfully, the Court to
9   consider whether or not on a verdict form --
10         THE COURT:  I think death penalty jurors
11  should be informed as best we can of the
12  consequences of everything they do.
13         MS. RODRIGUEZ-COSS:  Well, I think that
14  they're entitled to know that if they sentence the
15  defendant to death or if they sentence the defendant
16  to life that the Court is bound to follow that
17  recommendation, that the Court will sentence the
18  defendant accordingly.
19         THE COURT:  Right.
20         MS. RODRIGUEZ-COSS:  But I think telling
21  them what's going to happen if they don't come to an
22  agreement, that's sort of a subject matter that's
23  not reached with the jury until such time as the
24  jurors come forward and say they're having
25  difficulty reaching an agreement.  We don't submit
```

14

```
1   the verdict form in the guilt phase with "guilty,"
2   "not guilty" and what happens if you don't come to
3   an agreement.
4          THE COURT:  It's a different consequence
5   when they don't come to an agreement in a
6   non-capital case.  When they don't come to agreement
7   in a non-capital case, we retry the case.  That's
8   not true here.
9          MS. RODRIGUEZ-COSS:  We don't always
10  retry the case.  The point is --
11         THE COURT:  But that's the consequence,
12  there is no verdict.  There is nothing.  The
13  government can decide what it wants to do, but it
14  remains an unadjudicated case.
15         MS. RODRIGUEZ-COSS:  Well, your Honor,
16  in that case if the Court is resolved to instructing
17  the jury in that regard, then we would request it be
18  in the instructions, but not on the verdict form.
19         THE COURT:  Your position is noted.
20         MS. RODRIGUEZ-COSS:  Thank you.
21         THE COURT:  Ms. Van Ness, do you wish to
22  be heard on that.
23         MS. VAN NESS:  I think that your Honor
24  is correct and the jurors absolutely should be told
25  what the consequences of their lack of unanimity
```

15

```
1   should be.  They might presuppose that this would
2   have to go back before an entirely new jury and put
3   the victims' family through the agony of the
4   proceeding again, and it's not true.
5          Your Honor, I should also add for the
6   record, it also adds weight to the instruction that
7   it's an individual decision of each juror, and I
8   think that's also a very important part of your
9   instructions.
10         THE COURT:  Of course it's always an
11  individual decision of each juror whether it's a
12  capital case or not.
13         Anything else on page 2?  All right,
14  what's next?
15         MS. RODRIGUEZ-COSS:  At the top of page
16  3, your Honor, the government objects to the jury
17  being instructed that we have the burden of proving
18  beyond a reasonable doubt that death is the
19  appropriate sentence.  We filed objections to the
20  preliminary instructions that contained the same
21  language.  The Court had at that time indicated it
22  was going to hold its decision in abeyance with
23  regards to that particular issue.  We cited the
24  opinion of five different circuit courts that have
25  considered very specifically this specific issue and
```

16

1  held the government bears no burden.  We would also
2  rest on the direct language of the Federal Death
3  Penalty Act, specifically at 3593(e)(3), where the
4  weighing process is described as a process where the
5  jurors are to weigh aggravating factors and
6  mitigating factors and determine whether or not the
7  aggravating factors sufficiently outweigh mitigating
8  factors to justify a sentence of death.
9          The words "beyond a reasonable doubt"
10  are not contained in that decision for a purpose, I
11  believe, your Honor.  It's not a factual
12  determination for the jury to make at that point.
13  At that point, as we recently discussed, the jurors
14  will be making a moral judgment with regards to
15  whether or not the defendant should be sentenced to
16  death for his crimes, and so injecting the term
17  "beyond a reasonable doubt," which is a term that
18  has been associated throughout the trial with a
19  factual determination, is misleading, and we would
20  request that the instruction on page 3 be modified
21  to correctly reflect the statute.
22          MS. VAN NESS:  Your Honor, we've argued
23  -- again, this is in our filing 886 on page 6 --
24  that we think it is important to not leave it to
25  jurors to individually try to figure out what the

17

1  phrase "sufficiently outweigh" means and they should
2  be given some direction by the Court.  I think the
3  circuit courts that have dealt with this have not
4  said that this instruction is impermissible, but
5  also it's not required.  You certainly have the
6  discretion to give it.  I think it's totally
7  appropriate.
8          And I will also say that although I know
9  your Honor does not have to follow what any other
10  district court judge does, I tried to do an informal
11  survey of district court penalty phase presentations
12  within the Second Circuit jurisdiction, and it's not
13  a complete list, granted, because I don't have
14  access to all the instructions for all of those
15  cases, but I did find a total of 16 -- I'm sorry, 14
16  cases, whose names I can list for you, where it's
17  been affirmed that the boundaries of that
18  instruction was in fact given within the circuit,
19  including in Perez by your Honor, and I think that
20  it's important for sort of proportionality within
21  the circuit that the defendant not get a short
22  shrift on this very important instruction.
23          MS. RODRIGUEZ-COSS:  I don't think it's
24  about the defendant getting a short shrift on
25  anything.  It's about the jury not being misled into

18

1  the decision that they ultimately have to make.  And
2  one page --
3          THE COURT:  So you are saying that the
4  term "sufficiently outweigh" does not mean that the
5  government bears the burden of proving that the
6  appropriate sentence is the death penalty?
7          MS. RODRIGUEZ-COSS:  We bear the burden
8  of demonstrating that the aggravating factors
9  sufficiently outweigh the mitigating factors, or
10  that in the absence of mitigating factors, the
11  aggravating factor are sufficient in and of
12  themselves to justify a sentence of death.
13          THE COURT:  And you bear that burden
14  beyond a reasonable doubt?
15          MS. RODRIGUEZ-COSS:  No, ma'am.  I
16  think --
17          THE COURT:  Preponderance of the
18  evidence?  What's the standard?
19          MS. RODRIGUEZ-COSS:  That is -- it's not
20  a standard because it's not a factual determination.
21  As the Court very well just advised, it is a moral
22  judgment for the jurors to make at that point.  All
23  the factual determinations have been made.  We have
24  proven aggravating factors beyond a reasonable
25  doubt, the defense has proven mitigating factors by

19

1  a preponderance of the evidence, now they will
2  consider all the aggravating factors that they deem
3  proven and all the mitigating factors that they deem
4  proven, and they will weigh those factors and make a
5  moral judgment as to whether they understand that
6  the aggravating factors outweigh the mitigating
7  factors sufficiently to justify a sentence of death.
8          I think Congress's use of the term
9  "beyond a reasonable doubt" in other places in that
10  very same section, Section 3593, where it sets forth
11  the process, the rules that governs the penalty
12  phase, is very instructive on the fact it meant for
13  the government to prove aggravating factors beyond a
14  reasonable doubt, it established that standard of
15  proof, it meant for the defense to prove mitigating
16  factors by a preponderance of the evidence, but when
17  it came to the weighing decision, it established a
18  different standard, that the aggravating factors
19  sufficiently outweigh the mitigating factors or that
20  they alone are sufficient to justify a sentence of
21  death.
22          And so I think that we cannot read into
23  that last section of the statute a standard of proof
24  that simply is not there.  We cannot infer that
25  Congress left a standard of proof out when we must

20

```
1   assume that it carefully considered each of these
2   issues, it carefully considered the process,
3   carefully considered the information to be
4   considered by the jury in that very important stage
5   of the proceedings.
6           THE COURT:  All right, anything else
7   that you want to add for the defense?
8           MS. VAN NESS:  No, your Honor, except at
9   that very, very important stage of the proceedings I
10  think the jurors need some guidance, and I think the
11  government should have to prove this beyond a
12  reasonable doubt because otherwise you are leaving
13  the jurors to fashion their own standard which could
14  be, as you said, as low as a preponderance.
15          MS. DAYTON:  Your Honor?
16          THE COURT:  Let me take that under
17  consideration.
18          MS. DAYTON:  Your Honor, we briefed this
19  back in -- the original motions, I want to say April
20  of 2010.  It was a whole section on the weighing
21  process and the standard to be applied.
22          MS. VAN NESS:  Your Honor, would you
23  like me to list the cases that I mentioned from
24  within the circuit?  Because I only had a handful of
25  them in my filing before, but I've since got some
```

21

```
1   more.
2           THE COURT:  Sure.
3           MS. VAN NESS:  And they would be -- I
4   could provide the docket numbers for you.  I don't
5   have them all.  Mohammed, Quiones-Rodriguez,
6   Williams.  Those are all Southern District cases.
7   Barnes, Southern District.  McGriff, Eastern
8   District.  Pitera, which was then Judge Raggi, first
9   death penalty, that was in the Eastern District.
10  Aquilar in the Eastern District.  And Dixon in the
11  Eastern District.
12          MS. RODRIGUEZ-COSS:  I'm sorry, are
13  these all different judges?
14          MS. DAYTON:  Dixon is judge -- I can
15  give you judges for the Eastern District.
16          MS. VAN NESS:  Carillo, Eastern
17  District.  Diaz is Northern district.  Taveras Pepin
18  is the Eastern District.  Your Honor's charge in
19  Perez in Connecticut.  Tucker, the Northern district
20  of New York.  And Walker in the Northern District of
21  New York.
22          THE COURT:  All right, let's move to the
23  next issue.  What page do we find that on?
24          MS. VAN NESS:  Still on your page 3,
25  your Honor.  Can you add in an instruction about how
```

22

```
1   the defendant need not testify in this phase either
2   and no adverse inference could be drawn against him
3   for failing to do so?  This was in our charge
4   request on page 5.  It's just standard language that
5   was not included here.  The top of page 5, first
6   paragraph of page 5.
7           THE COURT:  By the way, there was a
8   pending motion related to unsworn allocution.  Is
9   that moot?
10          MR. SHEEHAN:  Moot.
11          MS. DAYTON:  Could we get a waiver from
12  him on the record for that?
13          MR. SHEEHAN:  No.
14          MS. DAYTON:  Your Honor, the government
15  would ask that you take a waiver on the record from
16  Mr. Aquart.
17          MR. SHEEHAN:  Your Honor, I don't think
18  he needs to waive something that there is no -- I
19  don't think it's appropriate to take a waiver on
20  that issue.
21          THE COURT:  Why not?
22          MR. SHEEHAN:  Because, first of all, he
23  has no obligation to speak, and I don't think he has
24  an obligation even to respond to waiver.
25          THE COURT:  I want to know he knows he
```

23

```
1   has the right to testify and that it's an open
2   issue, and whether it needs to be sworn testimony or
3   just an allocution --
4           MS. VAN NESS:  Your Honor, we would hope
5   that would not include the right to allocute because
6   the government has filed a motion saying that was
7   inappropriate.  So that is not something you ruled
8   on, so it would only be a question of --
9           THE COURT:  So, it's not so moot after
10  all.
11          MR. SHEEHAN:  We have no -- Mr. Aquart
12  has no intention of testifying, or allocuting, for
13  that matter, your Honor.
14          THE COURT:  I am going to address it
15  with him.  And where is it that you propose to put
16  this?  I do see I left that out.
17          MS. VAN NESS:  At the very end of the
18  page, actually.
19          THE COURT:  All right.
20          MS. VAN NESS:  In the paragraph, end of
21  the third paragraph.
22          THE COURT:  Now we're at the bottom of
23  page 3, can we go to some other page?
24          MS. RODRIGUEZ-COSS:  We don't have
25  anything until page 9.
```

**GA1488**

24

```
1           MS. VAN NESS:  Actually, I have
2    something on page 4.
3           THE COURT:  All right.
4           MS. VAN NESS:  Before the -- well, the
5    sentence that you have beginning the second
6    paragraph, the way it's written it refers only to
7    the quality and persuasiveness of the evidence
8    relating to mitigation, and for balance I would ask
9    you to change that sentence to read "whether a
10   factor has been proven either beyond a reasonable
11   doubt by the government or by -- or by a
12   preponderance by the defendant is not determined by
13   the greater number of witnesses or exhibits," et
14   cetera.
15          MS. RODRIGUEZ-COSS:  No objection to
16   that, your Honor.
17          THE COURT:  All right.
18          MS. VAN NESS:  Your Honor, on page 5,
19   you have included an instruction at the bottom of
20   that page about no witness being permitted to state
21   whether he or she personally favors or opposes the
22   death penalty.  We had inserted that particular
23   charge in the victim impact aggravator section
24   associated only with the victim impact witnesses who
25   Payne said that they could not so opine.  Since we
```

25

```
1    have execution impact, so-called, witnesses, I think
2    this instruction would undercut their testimony.
3    They're not, you know, specifically saying their
4    general opinion on the death penalty, but they
5    clearly wanted him spared.  So I would take this
6    instruction out of here and move it to the victim
7    impact section and make it relate only to the
8    victims.
9           MS. RODRIGUEZ-COSS:  Your Honor, is the
10   defense saying that they are in fact bringing
11   execution impact evidence in to convey a message to
12   the jury that the defendant should not be sentenced
13   to death?
14          THE COURT:  I think so.
15          MS. RODRIGUEZ-COSS:  So, I think the
16   Court had agreed that it would be inappropriate for
17   any witness --
18          THE COURT:  No.
19          MS. RODRIGUEZ-COSS:  -- to say --
20          THE COURT:  We've already been through
21   that.  People who are going to be impacted because
22   of the execution are permitted to testify because --
23   if there is in their testimony that they will lose
24   the good qualities about the defendant.
25          MS. RODRIGUEZ-COSS:  That's what the
```

26

```
1    sentence regards.  This sentence, or this
2    instruction by the Court at the end of evidence
3    specifically addresses the fact that no witness can
4    offer an opinion as to what the appropriate
5    punishment should be.  That is, of course, the
6    province of the jury and the jury alone.  And so I
7    don't see why it is inappropriate where the Court
8    has injected it in its instructions.  I don't see
9    why it should be limited to victim impact witnesses.
10   I think that doing that reinforces the very
11   objection that the government had raised to
12   execution impact evidence, that is, that it's really
13   not meant to convey that the defendant has value to
14   the witness, but rather it is sort of a subtle
15   indirect opinion on what the verdict of the jury
16   should be, which is inappropriate.  I think that
17   including it here neutralizes that issue.
18          MS. VAN NESS:  Your Honor, I think this
19   instruction really undercuts the mitigation
20   execution impact evidence, and it also suggests that
21   anybody who implicitly suggested that they would
22   want the defendant to be spared would be providing
23   an improper opinion, which is what this instruction
24   says.  So, again, I would ask you to take this out
25   and include in your victim impact section the
```

27

```
1    request that we made on page 19 and 20 of our charge
2    request, which is specifically directed toward the
3    victim impact witnesses not being allowed to give
4    their opinion on the defendant of the penalty being
5    imposed, which is completely consistent and narrowly
6    consistent with the language in Payne v. Tennessee.
7           MS. RODRIGUEZ-COSS:  No, that's
8    completely incorrect.  Payne v. Tennessee
9    specifically said that a witness should not be
10   allowed to state an opinion as to what the verdict
11   should be.  It specifically limited that type of
12   testimony.
13          MS. VAN NESS:  Your Honor, that was a
14   victim impact decision which authorized this kind of
15   testimony in capital cases which was a clear
16   departure from prior law, and it specifically said
17   that the witnesses could talk about the grief that
18   they had suffered, but they could not testify about
19   their opinions about the punishment or their
20   opinions about the defendant.
21          THE COURT:  I had remembered Payne as
22   standing for -- the propositions of Payne as
23   standing for victim impact testimony.  I'll go back
24   and look at it to see if it's as broad as the
25   government proposes, that is, that no one gets to
```

28

```
1    explicitly or implicitly give testimony reflective
2    of their view on what the sentence should be.
3              All right, what's next?
4              MS. DAYTON:  On 6 there is just a little
5    typo.
6              THE COURT:  All right, what is that?
7              MS. DAYTON:  Ninth line down it says
8    witnesses.  You use an apostrophe, there is no S
9    after it, although a few lines down you have an S
10   with no apostrophe, and it should be witnesses'
11   qualifications, although it doesn't have to be.
12             THE COURT:  All right.
13             MS. DAYTON:  So, I was really helpful
14   there.
15             THE COURT:  So where do you put the
16   apostrophe if witness is plural?
17             MS. DAYTON:  If it's plural it just goes
18   at the end.  I wouldn't put an S after the
19   apostrophe, but a few lines down you do, it has an
20   apostrophe and then the S.  So I just didn't know if
21   you wanted to -- it's just my OCD.
22             MR. SMITH:  Perhaps we can have Ms.
23   McCoy come back and instruct us on this.
24             THE COURT:  I'm looking for the
25   comparative witness.  Where is it?
```

29

```
1              MS. RODRIGUEZ-COSS:  Three lines down.
2              MS. DAYTON:  On the left, right above
3    "find it deserves."
4              THE COURT:  I will work to find the
5    appropriate grammatical symmetry.  All right.
6    Because I think the first is intended to be plural,
7    but go ahead, what's next?
8              MS. VAN NESS:  On page 7, your Honor,
9    this goes back to the issue of whether the
10   defendant's age has to be in the instructions and
11   found by the jury.  I apologize for not having time
12   to put this in writing, but the government mentioned
13   at a prior conference that they believed that Ring
14   would prohibit the passing -- the imposition of a
15   death sentence unless the jury passed on this
16   because it's an element.
17             In Blakely v. Washington, and I have
18   copies for all of this, which was after Apprendi and
19   after Ring, it specifically said that yes, the
20   defendant has a Sixth Amendment right to a jury
21   trial on all of the elements in the offense,
22   including aggravating factors in a capital penalty
23   phase, but they can be waived, and they -- so the
24   stipulation would be perfectly fine.  I just have a
25   quick quote here:  "Nothing prevents a defendant
```

30

```
1    from waiving his Apprendi rights.  When a defendant
2    pleads guilty, the state is free to seek judicial
3    sentence enhancements so long as the defendant
4    either stipulates to the relevant facts or consents
5    to judicial fact-finding."  So, I do have the
6    Blakely decision here, excerpts for you and a copy
7    for the government.  I also call your Honor's
8    attention -- I'm sorry, Blakely is 542 U.S. 296, and
9    the quote that I just made was page 310.
10             Also in Neder v. United States, that was
11   a case where over objection the judge in a
12   non-capital case refused to charge an element of the
13   crime to the jury, the Supreme Court found it was in
14   fact an error because it was over objection, but it
15   found that this kind of error, omitting an element
16   entirely, was subject to harmless-error analysis,
17   and there, because the evidence was completely
18   uncontested and the defense didn't even argue the
19   element on summation, they found it was harmless.
20             Here, we are not objecting to you
21   omitting this, we are asking for it, we are
22   stipulating to the fact, and, therefore, I think
23   that even in your worst nightmares if you thought we
24   would do a switch on a possible appeal, that we
25   would be deemed to have waived it under the Quinones
```

31

```
1    case we have discussed at other times, and also
2    under Neder.
3              THE COURT:  Now, the stipulation that
4    you have in gives his birth date.  It does not --
5    what else does it say?  It does not say that he --
6              MS. RODRIGUEZ-COSS:  It states the date
7    of the offense.  It gives the birth date and the
8    date of the offense.  Your Honor, the government's
9    position is, and we're really baffled by the notion
10   of the defense to undergo an analysis and at the
11   conclusion conclude that it is, at best, harmless
12   error.  I don't understand why the defense wants to
13   invite the Court into any error when the statute is
14   clear that this is a threshold finding, when we have
15   entered into a stipulation as to what the birth date
16   and the date of the offense for the defendant is,
17   and where it is as simple as listing that threshold
18   finding for the jury to make beyond a reasonable
19   doubt.  And so we would oppose that motion by the
20   defense.
21             THE COURT:  So, let me ask you this:
22   You are baffled by the defendant's position, the
23   defendant is baffled by your position, why do you
24   care?
25             MS. RODRIGUEZ-COSS:  Well, I don't see
```

32

1  why -- I care because it's in the statute, because
2  I'm going to -- this is a capital case, and if the
3  defendant is sentenced to death there is going to be
4  an appellate process for ten plus years to come.
5  And so if we can avoid one issue in that appellate
6  process I would rather avoid it at this juncture
7  than have to deal with it for the next ten or
8  12 years on appeal.  It is a threshold finding
9  clearly set forth in the statute and every court
10  that I know of, every district court, has charged
11  the jury in this manner.  We don't see how this is
12  in any way prejudicial to the defendant.  So, that's
13  why we care.
14       MS. VAN NESS:  Your Honor, we had stated
15  before we care only because of the drum roll, which
16  is it's one more thing they have to tick off on
17  their walk down toward punishment, and if it's not
18  necessary for them to reach this issue, we would
19  rather not have to have them reach this issue.  And
20  the Neder case I cited for harmless-error purposes,
21  it's obviously for analogy because there the defense
22  attorney objected to the omission of the element.
23  Here we're not objecting, we're asking.
24       And would your Honor like me to bring
25  these two case up to you, the Blakely case --

33

1       THE COURT:  Sure, then I don't have to
2  print them.
3       MS. VAN NESS:  Your Honor, I just copied
4  what I thought were the relevant pages, but they're
5  marked.
6       MS. DAYTON:  Your Honor?
7       THE COURT:  Yes?
8       MS. DAYTON:  I'll wait a minute.
9       THE COURT:  All right, I have your
10  positions, let's move on.
11       MS. VAN NESS:  Your Honor, I'm sorry,
12  one more thing on page 7.  In your instructions and
13  on the verdict sheet you have two stages for what
14  you have called "sixth" in your outline here on page
15  7.  You have the weighing step, which is six, and
16  then you have the decision-making which is seven.
17  So, I would ask that you, you know, divide those two
18  things up and make them 6 and 7, which is in accord
19  with the rest of your instructions.
20       THE COURT:  All right, that sounds like
21  a plan.
22       MS. DAYTON:  Your Honor, if I can just
23  go back to the age for one instant.  While the
24  government thinks it should stay here, the only way
25  the government would see potentially avoiding the

34

1  error issue is if the defendant personally stood up,
2  said, I admit I was 18 years -- over 18 years of age
3  at the time of these offenses and I waive that being
4  presented to the jury.  If he personally waived
5  that, sort of like someone admitting to a prior
6  conviction.
7       THE COURT:  Okay, this is to the Court
8  or to the jury?
9       MS. DAYTON:  To the Court, because the
10  Court can then take -- I wouldn't say judicial
11  notice, but essentially it is, make a judicial
12  fact-finding, and then the defendant has personally
13  waived the element going to the jury and he's
14  admitting it, and I believe that under the case law
15  you can admit an element of the offense, not in the
16  capital case law, but under, say for instance, felon
17  with a firearm, someone could admit they were a
18  felon, and then you only present the firearm portion
19  to the jury.
20       MR. SHEEHAN:  Your Honor?
21       THE COURT:  So, I presume it would be
22  phrased in terms of he was more than 18 years old on
23  August 24, 2005.
24       MS. DAYTON:  Yes.
25       MR. SHEEHAN:  They've already asked him,

35

1  and I did it, I don't know why I did it, but they
2  asked him to stipulate to his age.  He signed the
3  stipulation.  In retrospect I wouldn't do that
4  again.
5       MS. RODRIGUEZ-COSS:  A stipulation --
6       MR. SHEEHAN:  But the stipulation has
7  been filed.
8       THE COURT:  Well, his birth certificate
9  is in.
10       MR. SHEEHAN:  As is a specific
11  stipulation that was signed by him.
12       THE COURT:  I'm quite surprised we are
13  having such extended discussion about a fact that
14  has no dispute to it, that can be readily -- that
15  there is no dispute to.  On the other hand, the
16  Court can't direct the jury to find any fact.  It is
17  a threshold fact, and if in fact the instruction
18  says that the defendant has stipulated to his birth
19  date -- I'd like to say by simple math it shows he
20  was over 18 at the time, but I hesitate to take any
21  fact-finding away from the jury -- that stipulated
22  that he was over 18 on August 24, 2005, I suppose we
23  would not be having this discussion.  The difference
24  is a bit opaque.
25       MR. SMITH:  Your Honor, I think the

36

1    stipulation, by my memory, said he was age 23 on
2    August 24, 2005.
3              THE COURT:  I don't think it does.  I
4    thought I was looking for that and I don't think it
5    says that, but if it does, then it's easy.  Let's
6    move to the next issue.
7              MS. VAN NESS:  I don't have anything
8    'til page 10.
9              THE COURT:  Anything before page 10?
10             MS. RODRIGUEZ-COSS:  Yes, your Honor.
11   On page 9 the Court had modified the second intent
12   factor from the preliminary instructions that were
13   read to the jury.  And then here we find again
14   instead of "a person," the victim's name inserted in
15   the wrong place of threshold factor number two.  So
16   we would request that the factor be edited again to
17   reflect the format in the preliminary instructions
18   that:  "The defendant intentionally participated in
19   an act contemplating that the life of a person would
20   be taken or intending that lethal force would be
21   used in connection with a person, and the victims,
22   Tina Johnson, James Reid and Basil Williams, died as
23   a direct result of that act."
24             THE COURT:  Any objection from the
25   defendant?

37

1              MS. VAN NESS:  No, your Honor.
2              THE COURT:  All right.  Mr. Smith is
3    right, it does say he was 23 years of age on
4    August 24th.
5              MR. SMITH:  Why I remembered that minor
6    detail, your Honor, is beyond me.
7              THE COURT:  That he was 23 years of age
8    on August 24th.  This is Government Exhibit 13-F.
9    I'm not persuaded we shouldn't keep it in on the
10   verdict form, but let me -- if they're going through
11   something other than the deliberative process on
12   this issue, one might think there is no drum roll.
13   Let's go to the next issue.
14             MS. RODRIGUEZ-COSS:  On the same page,
15   your Honor, page 9, with regards to the listing of
16   the threshold intent factors, we suggest that the
17   end of the factor No. 1 it be, comma, "or," the word
18   "or" added, so it's one or the other.
19             THE COURT:  You mean between 1 and 2.
20             MS. RODRIGUEZ-COSS:  Correct.
21             THE COURT:  So after Williams, it's,
22   comma, "or."
23             MS. RODRIGUEZ-COSS:  Correct.  And at
24   the end of the third paragraph we would suggest
25   adding "although you may consider all of the

38

1    evidence presented in the guilt phase on this
2    question."  The Court is instructing the jury they
3    are to decide intent again, which we agree with, but
4    it's just to make clear that while they have to make
5    that finding again, they may rely on all the
6    evidence presented both in guilt and penalty.
7              MS. VAN NESS:  I'm sorry, where are you?
8              MS. RODRIGUEZ-COSS:  At the end of the
9    third paragraph on page 9.
10             THE COURT:  So the one that starts "with
11   regard to your findings"?  Is this something you are
12   adding?
13             MS. RODRIGUEZ-COSS:  Right, at the end.
14             MS. DAYTON:  It says "instead, you must
15   now decide this issue for yourself," and we would
16   suggest adding, comma, "although you may consider
17   all of the evidence presented in the guilt phase on
18   this question."  Because it looks like they have to
19   disregard it from the fact they have to decide it
20   over.
21             MS. VAN NESS:  Well, haven't they been
22   previously told in the evidence section they can
23   consider all of the relevant evidence from the guilt
24   phase?
25             MS. DAYTON:  Yeah, sometimes things are

39

1    repeated to make it clear.  But I just thought that
2    this here, to make it clear, "you may not rely
3    solely on your earlier verdict of guilty at the
4    penalty."
5              THE COURT:  So, why are we not saying
6    "you must now decide this issue yourself again
7    considering all of the evidence from both the guilt
8    and penalty phases."
9              MS. DAYTON:  That's fine.
10             MS. RODRIGUEZ-COSS:  That's fine.
11             THE COURT:  What's next?
12             MS. VAN NESS:  Page 10, your Honor, in
13   several places, which I can point out, for the
14   threshold intent factor, mental state factor, you
15   have said "at least one" and I think that you should
16   take out the "at least" in all those points because
17   the jurors should not be finding both, they should
18   be finding one or the other.  So, for example, in
19   the first full paragraph, sort of the -- let's see,
20   the fifth line down "if you do not unanimously find
21   at least one claimed factor has been proved."
22             THE COURT:  So, you are saying "if you
23   do not unanimously find that one."
24             MS. VAN NESS:  Exactly.
25             THE COURT:  "Claimed threshold."  I

40

```
1   guess that fits in with "or."
2           MS. RODRIGUEZ-COSS:  Yeah, but it's not
3   correct they can only find one.  They could find
4   one, two, three or four, depending on how many
5   factors are submitted to the jury.  Those factors
6   will not be weighed in the process.  So whether they
7   find one or two, it's of no consequence later on.
8           MS. VAN NESS:  Your Honor, I think those
9   are inconsistent mental states.
10          MS. RODRIGUEZ-COSS:  They're not
11  inconsistent mental states.
12          MS. VAN NESS:  In the one they're asked
13  to conclude whether he intentionally killed a person
14  himself, and then in the next they're asked to
15  conclude whether he participated --
16          THE COURT:  I wanted to ask you about
17  whether or not the government claims that there is
18  evidence to support the conclusion that Azibo Aquart
19  intentionally killed James Reid.
20          MS. RODRIGUEZ-COSS:  No, we're not
21  arguing that to the jury, your Honor.
22          THE COURT:  So why are we putting that
23  in the mental state factor No. 1?
24          MS. RODRIGUEZ-COSS:  Well, your Honor,
25  the Court is listing two factors.  We're just
```

41

```
1   listing two factors with regard to all three victims
2   for the jury to decide which one applies, but we're
3   certainly not arguing that he did.
4           THE COURT:  But this says the factor
5   identified by the government that Aquart
6   intentionally killed Johnson, Reid.
7           MS. RODRIGUEZ-COSS:  I'm sorry, what
8   page is the Court on?
9           THE COURT:  Still on 9, the articulation
10  of the mental state factor.  If the government is
11  not, in fact, claiming that he intentionally killed
12  James Reid, why are we putting it in there?
13          MS. RODRIGUEZ-COSS:  Well, again, your
14  Honor, it's phrased in the alternative.  If the
15  Court wishes to limit it to Tina Johnson and Basil
16  Williams, you know, we have no objection.
17          THE COURT:  It seems to me that's less
18  confusing as to what they're supposed to do, and
19  also gives more meaning to the fact that the two are
20  different intents, and thus, they are in the
21  disjunctive.
22          What is the defendants's view of my
23  rephrasing the first mental state factor that
24  "Aquart intentionally killed Tina Johnson or Basil
25  Williams, or that Aquart intentionally participated
```

42

```
1   in an act contemplating that the life of," keeping
2   it as it is, using what we had in the preliminary
3   instruction?
4           MS. VAN NESS:  We approve of that
5   revision.  No objection.
6           THE COURT:  All right.  Now, we can go
7   to 10.
8           MS. RODRIGUEZ-COSS:  On page 10, your
9   Honor, the very last paragraph on that page.
10          THE COURT:  We were lingering at "at
11  least."  If we put "if you do not unanimously find
12  that one of the claimed threshold mental state
13  factors has been proved with respect to any of the
14  counts your deliberations will be complete."  Why
15  don't we leave it like that.  I think taking out
16  "James Reid" is going to make this a lot less
17  fraught with confusion.
18          MS. VAN NESS:  Your Honor, we still
19  maintain, just for the record, that would lead
20  possibly to an inconsistent finding because the two
21  findings are not identical, and so -- and you are
22  asking them to make a unanimous finding.  So if they
23  find he intentionally killed Ms. Johnson, for
24  example, then they should not also find the other
25  mental state.  They're different mental states.
```

43

```
1           THE COURT:  Why can't they have -- I
2   don't agree with that.  You could intentionally kill
3   and you could intentionally participate in an act
4   contemplating that her life would be taken.  I don't
5   see those as inconsistent.
6           MS. VAN NESS:  Well, I do.  I don't know
7   how else to explain it.  I think they're different.
8   You are asking the jury to parse out different
9   conduct by the defendant and different intent.  The
10  intended lethal force being used, but it's not
11  actually the instrument of the death.  So, I think
12  they're inconsistent.  I thought the reason that
13  your Honor put in two as opposed to four was there
14  is a question as to which people the government
15  alleges or the evidence shows Mr. Aquart killed
16  personally.
17          THE COURT:  I think I'm going to leave
18  "at least" in there.  No, I'm trying to remember
19  now.  At least one, but they could find two.
20          MS. VAN NESS:  Your Honor, co-counsel
21  points out that the statute itself lists the four
22  possible mental states in the disjunctive.  It says
23  one, two, three or four, and you've just rewritten
24  on page 9 with respect to the two charged here "or."
25  So, I think it just invites confusion to "at least"
```

44

1  but I'll rest on what we've said.
2           THE COURT:  So, I'm now a little
3  confused by your position.  Are you opposing the
4  change to "if you do not unanimously find that one
5  of the claimed threshold mental state factors has
6  been proved with respect to any of the counts your
7  deliberations are over"?  Are you opposing that?
8           MS. VAN NESS:  No, your Honor.  My only
9  objection on page 10 was the three instances when
10 the phrase "at least" was inserted before the
11 finding of a mental state factor.  That was my only
12 objection.  If you take out the "at least," I think
13 it reads fine.
14          MS. RODRIGUEZ-COSS:  Your Honor, I think
15 the instruction is clear.
16          THE COURT:  If the jury verdict came
17 back in which they had checked yes for Section II,
18 No. 1A, and No. 2A, yes for both of those, you think
19 that's inconsistent?
20          MS. VAN NESS:  Yes, your Honor, for the
21 reasons I've stated.  But I'm not -- you know, I
22 don't have anything more to say.
23          THE COURT:  Okay.
24          MS. VAN NESS:  I think it's in keeping
25 with the statute, too.

45

1           MS. RODRIGUEZ-COSS:  We disagree, your
2  Honor.
3           THE COURT:  All right, I have the
4  defendant's position that the threshold factors are
5  mutually exclusive.  For the time being I'm going to
6  take out "at least" and we'll move on.
7           MS. RODRIGUEZ-COSS:  At the bottom of
8  page 10, in the last paragraph, the second sentence
9  we believe should read "only those murders that also
10 satisfy a statutory aggravating factor justify
11 consideration."  In other words, in addition to the
12 threshold intent factors.  We believe that's what
13 the Court meant, respectfully.
14          MS. VAN NESS:  I disagree, your Honor.
15 This is the instruction on the threshold mental
16 state, which is also a necessary finding.  So,
17 unless this finding is made --
18          MS. RODRIGUEZ-COSS:  Well, we agree with
19 that.  I just thought there was a transition
20 paragraph into the next section at the end.  I guess
21 maybe we should add both just to make it clear.  I
22 thought the point of the Court was the intent factor
23 alone is not enough.  At least that's how I
24 understood it.
25          MS. VAN NESS:  Your Honor, if you --

46

1  maybe this is a suggestion, to take that sentence,
2  those first two sentences, and move them to the end
3  of the statutory aggravating factor discussion to
4  make it clear that both the threshold mental state
5  and at least one aggravating factor have to be
6  proven because not all murders, people who are
7  convicted of murder are eligible for the death
8  penalty.  So that would be clear both of them are
9  threshold factors.
10          THE COURT:  What it needs to have as an
11 amendment is "only those murders that also satisfy a
12 threshold mental state factor and, as I will
13 describe shortly, aggravating factor, justify
14 consideration of the death penalty."  We could do it
15 that way, in which case we then are keeping in their
16 mind that the threshold mental state factor is not
17 an aggravating factor.
18          MR. SMITH:  Your Honor, I wonder if the
19 Court might entertain my excusing myself for the
20 rest of this portion to attend to some other
21 matters.
22          THE COURT:  All right, now that you've
23 so concisely called our attention to the contents of
24 that stipulation, you've earned your leave.
25          MR. SMITH:  I contributed all I possibly

47

1  could.
2           MS. DAYTON:  I'm going to -- because I
3  wrote the stipulation, I'm done, too.  So, I
4  actually do have to go.  We're not going to deal
5  with the Efrain Johnson stuff anymore today, right?
6           THE COURT:  Right.
7           MS. DAYTON:  We can do that tomorrow
8  morning?
9           THE COURT:  We'll do that at some point
10 tomorrow because it's an issue without a witness,
11 right?
12          MS. DAYTON:  I don't know.  Yeah, I
13 think they would need a witness.
14          MR. SMITH:  We had placed Agent Munger
15 under subpoena.
16          MS. DAYTON:  We would call a witness in
17 rebuttal, for sure.
18          THE COURT:  Would it be somebody other
19 than Munger?
20          MS. DAYTON:  No.  Well, I don't know,
21 maybe we'd call his attorney.
22          MR. SHEEHAN:  Whose attorney?
23          MS. DAYTON:  Mr. Johnson's.
24          THE COURT:  In what world do you think
25 Mr. Johnson's attorney is going to say something

48

```
1   against his client's interest?
2           MS. DAYTON:  I don't know, your Honor.
3   I mean, we were in open federal court on the record
4   when certain representations and stuff were made.  I
5   don't know.  But we do want to be heard further on
6   it, your Honor.
7           THE COURT:  I understand.  I'm still
8   reading.  We're only going to go a half an hour more
9   today anyhow, and then we'll be able to use tomorrow
10  after we complete evidence to finish up.
11          All right, so the issue is where does
12  this clarification fit best.
13          MS. RODRIGUEZ-COSS:  Right.  And we
14  don't whether it's at the end of this section, your
15  Honor, or at the end of --
16          THE COURT:  Combine the two.
17          MS. RODRIGUEZ-COSS:  End of the
18  aggravating section.  We are fine with that.  We
19  were thrown, so maybe the jury would be thrown.
20          THE COURT:  Okay.  All right, what's
21  next?
22          MS. RODRIGUEZ-COSS:  On page 12, unless
23  defense has something before that.
24          MS. VAN NESS:  Yeah, I think this is
25  just oversight on page 11.  The last sentence of the
```

49

```
1   first paragraph "the government alleges five
2   statutory aggravating factors."
3           THE COURT:  All right.
4           MS. RODRIGUEZ-COSS:  And on page 12,
5   second full paragraph, second sentence, it should
6   say "five aggravating factors," plural.
7           THE COURT:  Okay.
8           MS. RODRIGUEZ-COSS:  Second sentence of
9   the second paragraph.
10          THE COURT:  Okay, thank you.
11          MS. RODRIGUEZ-COSS:  On page 13, unless
12  the defense has something before that.
13          MS. VAN NESS:  No.
14          MS. RODRIGUEZ-COSS:  On page 13, your
15  Honor, in the third full paragraph, second sentence,
16  we would submit it should read "torture," comma,
17  "serious physical abuse," comma, "or both."
18          THE COURT:  Now, in your charge you had
19  requested that the jury be queried specifically on
20  what they found.  Are you really --
21          MS. RODRIGUEZ-COSS:  Queried?
22          THE COURT:  Yes, you wanted to have a
23  finding on whether they found torture or whether
24  they found serious physical abuse.
25          MS. RODRIGUEZ-COSS:  In our charge, your
```

50

```
1   Honor?
2           THE COURT:  Where did I get that from?
3   Because as the things are enumerated I think one
4   blends into another, or subsumes another, but --
5           MS. RODRIGUEZ-COSS:  I don't believe we
6   requested that, your Honor.  I think as long as the
7   jury is instructed in the instructions as the Court
8   is intending to do, that they must unanimously find
9   whether it's torture or physical abuse or both, I
10  think that's sufficient.
11          THE COURT:  All right.  What's next?
12          MS. VAN NESS:  Also page 13, the
13  definition of cruel at the bottom, we would request
14  that instead of you saying in the end "in addition
15  to killing the victim," you charge "over and above
16  that involved in the killing."
17          THE COURT:  Here is where it was, Ms.
18  Rodriguez-Coss, on page 16.
19          MS. RODRIGUEZ-COSS:  Of our charge?
20          THE COURT:  "You must not find this
21  factor to exist unless you unanimous agree as to
22  which alternative, torture or serious physical
23  abuse, has been proved beyond a reasonable doubt."
24          MS. RODRIGUEZ-COSS:  Right, and that's
25  what the Court states.
```

51

```
1           THE COURT:  And then I just asked you
2   are you seeking a determination as to whether they
3   find torture or whether they find serious physical
4   abuse, and I thought you said no.
5           MS. RODRIGUEZ-COSS:  I'm sorry, I
6   thought you said we would query the jury on that,
7   i.e. through the verdict form.  I don't think that
8   the Court is instructing them differently than what
9   we requested here.
10          THE COURT:  But you want them -- you
11  want them to tell you whether they find torture or
12  whether they find serious physical abuse?
13          MS. RODRIGUEZ-COSS:  No, we want them
14  instructed they should unanimously agree on torture
15  or physical abuse.  That's the way the Court is
16  instructing here.
17          THE COURT:  All right.
18          MS. RODRIGUEZ-COSS:  The point we made
19  is it could be both.  It doesn't have to be torture
20  or physical abuse, it could be both.
21          THE COURT:  So, we would take out the
22  "in other words" and just leave in "you must not
23  find this factor to exist unless you unanimously
24  agree as to which alternative, torture or serious
25  physical abuse, or both, has been proved beyond a
```

**GA1495**

52

```
1   reasonable doubt. "
2           MS. RODRIGUEZ-COSS:  I think we can
3   leave in that sentence, your Honor, if at the end we
4   simply add, comma, "or both."
5           THE COURT:  I just added it in.  I said
6   "torture or serious physical abuse or both."  Is
7   that not what you are looking for?
8           MS. RODRIGUEZ-COSS:  Yes.  Are you
9   suggesting taking out the explanation that follows?
10          THE COURT:  Oh, I see.  Then you want
11  another "or both."
12          MS. RODRIGUEZ-COSS:  Correct.
13          THE COURT:  Okay.  All right, got it.
14  All right, do you think we should not call them
15  "alteratives" if we have "both" in there?
16          MS. RODRIGUEZ-COSS:  "Modality"?
17          THE COURT:  I'm sure that will add great
18  clarity.
19          MS. RODRIGUEZ-COSS:  "Theory"?
20          THE COURT:  "As to whether."
21          MS. RODRIGUEZ-COSS:  Okay.
22          THE COURT:  "Torture or serious physical
23  abuse or both has been proved."  Just not calling it
24  "an alternative."  Okay, I think we've got it.
25          All right, what's next?
```

53

```
1           MS. VAN NESS:  So on cruel, your Honor,
2   did you accept my request or not, to change the
3   definition of cruel to "cruel means the defendant
4   intended to inflict a high degree of pain by
5   torturing the victim over and above that involved in
6   killing the victim"?  So it's clear this is
7   gratuitous violence, not anything that's necessary
8   to kill the victim.  I just think it makes it
9   clearer.
10          THE COURT:  "The defendant intended to
11  inflict a high degree of pain by torturing the
12  victim over and above that" --
13          MS. VAN NESS:  "Involved in the
14  killing."
15          THE COURT:  "Involved in killing the
16  victim"?
17          MS. VAN NESS:  Yes, your Honor.
18          THE COURT:  All right.  What's next?
19          MS. VAN NESS:  Your Honor, I apologize,
20  I don't have any authority for this, but I would
21  object to the inclusion of "needless mutilation of
22  the victim's body."  And this is on page 14, in the
23  second last paragraph, "pertinent factors."
24          MS. RODRIGUEZ-COSS:  Which paragraph on
25  14?
```

54

```
1           MS. VAN NESS:  The "pertinent factors"
2   paragraph.  The second to the last.  I would object
3   to the "needless mutilation of the victim's body."
4   I think that's almost -- well, I think in order to
5   find this factor proved you have to look at the
6   defendant's intent, and I think the mutilation of
7   the body, needless mutilation of the victim's body,
8   including after the victim is dead, is not something
9   that should go to prove that factor.
10          THE COURT:  Is it the "needless" or the
11  "mutilation" that you object to?
12          MS. VAN NESS:  Well, both so long as the
13  victim is dead.  I mean -- perhaps, your Honor, if I
14  could have an opportunity to check into that further
15  and file something for you because, again, I
16  apologize, I'm not prepared for that, to argue this.
17          THE COURT:  All right, we'll hold that
18  open.  What's next?
19          MS. RODRIGUEZ-COSS:  We don't have
20  anything until page 18.
21          MS. VAN NESS:  I'm sorry, one moment,
22  your Honor.  I just want to except on page 15 to
23  your Honor's instructions on procurement, that it
24  doesn't limit the procurement to the murder itself.
25          MS. RODRIGUEZ-COSS:  I'm sorry?
```

55

```
1           MS. VAN NESS:  The procurement of the
2   homicide offense.  The charge does not --
3           THE COURT:  You say the person had to be
4   hired to do a murder.
5           MS. VAN NESS:  Yes, and that the person
6   had to aid in the commission of the murder, not aid
7   in the commission of a robbery.
8           MS. RODRIGUEZ-COSS:  It doesn't say
9   "robbery."
10          MS. VAN NESS:  This goes back to my --
11          THE COURT:  I'm not quite sure.  This
12  says that: "The defendant procured the commission
13  of the homicide offense by payment or promise of
14  payment of anything of pecuniary value."  It doesn't
15  say that they -- that he procured some other crime.
16          MS. VAN NESS:  Like the insertion in the
17  next -- on page 16 for the pecuniary gain factor
18  where it's limited to: "It's not sufficient for you
19  to find that he committed any offense other than
20  murder with the expectation of receiving something
21  of pecuniary gain."  I think in the procurement
22  aggravated charge you should also have a clause that
23  says the analogous, that "it's not sufficient that
24  you found that he procured the commission of any
25  offense other than murder."
```

56

1    MS. RODRIGUEZ-COSS:  We would object to
2  that, your Honor.
3    THE COURT:  I'm not sure why "procured
4  the commission of the homicide offense" doesn't take
5  care of that.
6    MS. VAN NESS:  Because I believe the
7  government is going to argue, in keeping with your
8  ruling to not strike this aggravator, that the fact
9  that Taylor believed it was a robbery or an assault
10  or an eviction is sufficient to prove this
11  aggravator.
12    THE COURT:  I hope that we're not
13  talking about Taylor's intent at all since the
14  upshot of the ruling is that it's the defendant's
15  intent, that the defendant intended to procure the
16  commission of the homicide by paying someone money.
17    MS. VAN NESS:  To commit the homicide.
18  In other words, I'm excepting to the charge as
19  written which is not in keeping with our argument
20  that we made to strike the aggravator, that it
21  should be limited to procuring the commission of the
22  homicide offense with the person procured having to
23  play a part in committing the murder.  I didn't
24  draft up language because I believed that you would
25  deny that.  I just wanted to except for the record.

57

1    THE COURT:  All right.  And then be sure
2  to do that when we do the summary objections after
3  the charge is given.  That way we keep track of
4  which objections went by way of acquiescence or
5  change and which remain.
6    All right, what's next?
7    MS. RODRIGUEZ-COSS:  Do you have
8  anything before 18?
9    MS. VAN NESS:  I have just one minor
10  suggestion.  I think on page 17, the last paragraph,
11  the first sentence, to be consistent with the two
12  threshold mental states that the -- do you see in
13  the third line, your Honor, "and that he intended to
14  commit the murder as specified," and change that
15  "that he intended to commit the murder or intended
16  lethal force be used as specified."  Just to make it
17  consistent.
18    THE COURT:  All right.
19    MS. VAN NESS:  I have something on 19.
20    THE COURT:  Anything on 18?
21    MS. RODRIGUEZ-COSS:  Yes.
22    THE COURT:  Okay.
23    MS. RODRIGUEZ-COSS:  Your Honor, on that
24  second sentence, we request that "considerable" or
25  "large" be substituted for "substantial," which is

58

1  what the statutory aggravating factor actually
2  indicates.  "The defendant's actual planning and
3  premeditation was substantial in relation to that
4  which would ordinarily be necessary to commit the
5  homicide offense."
6    MS. VAN NESS:  Your Honor, you've
7  defined "substantial" on the prior page as
8  "considerable or significant."
9    THE COURT:  So if we just add the word
10  "substantial" back in; is that what you want?
11    MS. RODRIGUEZ-COSS:  Right, instead of
12  "considerable or large."  Right, I think by
13  inserting "would ordinarily be necessary" I think
14  conveys the meaning the Court is looking for.
15    THE COURT:  But it's a bit tautologist.
16  Now we're saying "find the government has satisfied
17  its burden of proving the defendant engaged in
18  substantial planning and premeditation to cause the
19  death of the victim, you must also find the
20  defendant's actual planning and premeditation was
21  substantial."
22    MS. VAN NESS:  Your Honor, may I suggest
23  we keep in "considerable" and change "large" if you
24  want to say "significant," which would be in accord
25  with your definition.

59

1    MS. RODRIGUEZ-COSS:  We have no
2  objection to "significant."
3    THE COURT:  "In relation to that which
4  would be necessary to commit the homicide offense."
5    Was there a further change that you were
6  looking for, Ms. Rodriguez-Coss.
7    MS. RODRIGUEZ-COSS:  We were suggesting
8  changing "considerable" or "large" to "substantial,"
9  but if the Court wishes to use a different term, we
10  have no objection to "significant."
11    THE COURT:  All right, so let's use
12  "considerable or significant" in relation to that
13  which would be necessary to commit the homicide
14  offense."  Okay.
15    MS. VAN NESS:  We actually do, though,
16  like the "large" because it conveys that it's really
17  substantial, but --
18    THE COURT:  We can put all three
19  "considerable, large or significant."  It gets the
20  message across.  Okay, what's next?
21    MS. RODRIGUEZ-COSS:  Your Honor, that --
22  is that it on that page?
23    THE COURT:  Are we finished with 18?
24    MS. VAN NESS:  Yes.
25    MS. RODRIGUEZ-COSS:  Do you have another

60

```
1   change on 18?
2           MS. VAN NESS:  No, I was going to 19.
3           MS. RODRIGUEZ-COSS:  We would suggest
4   that next to the last paragraph with regards to
5   "having to prove at least one statutory aggravating
6   factor," we thought perhaps that would fit best at
7   the end of the fifth factor, because it's kind of
8   like there after you've gone through four factors,
9   but then you go over another factor.  And so we
10  thought perhaps that was misplaced.
11          MS. VAN NESS:  I think it's worth
12  reminding the jurors as they go through this list.
13          THE COURT:  But if we don't do it each
14  time --
15          MS. RODRIGUEZ-COSS:  You didn't do it
16  each time.
17          THE COURT:  -- then it looks as if -- so
18  let me put this at the end of the aggravating
19  factors.  Okay.
20          MS. RODRIGUEZ-COSS:  On the next page,
21  your Honor, page 19, we had requested a modification
22  to the Eighth Circuit's instruction on multiple
23  killings based on the case of United States v.
24  Ortiz.  So we suggested that in the second
25  paragraph, the second sentence, read:  "The
```

61

```
1   government must prove beyond a reasonable doubt that
2   the defendant by himself or in concert with others
3   intentionally killed or attempted to kill more than
4   one person in a single criminal episode."  And
5   United States v. Ortiz, the Fifth Circuit held that
6   it is sufficient to establish this factor that the
7   defendant intentionally -- or intended to kill each
8   victim, not necessarily that he killed each victim
9   himself.
10          MS. VAN NESS:  Your Honor, we would
11  object to that.  In fact, I was going to ask you to
12  insert in this on this page language that you had
13  used prior -- with prior aggravators to say "you may
14  only consider the actions of the defendant."  I can
15  refer you to, for example, to your instruction on
16  page 14.  But I think this is an individualized
17  decision that the defendant can be sentenced to
18  death only for the acts which the jury finds that he
19  personally performed.
20          THE COURT:  The government is seeking
21  "or performed in concert with others."  Why is that
22  not with respect to the defendant's conduct?
23          MS. VAN NESS:  Well, that begs the
24  question.  If he performs an act, if he helps, for
25  example, beat one of the victims, even though that
```

62

```
1   might not be a lethal blow that he struck, then the
2   jury can consider that act because that's personal.
3   But I don't think he should be sentenced to death
4   based on -- for this aggravator based on the actions
5   of anybody else.  These are over and above the
6   commission of the murders, they're aggravating
7   factors, and you charged with all of the other
8   aggravating factors that the defendant -- that the
9   jury must consider only the defendant's own actions,
10  and I think in fairness, and properly, that you
11  should do so with this particular aggravator as
12  well.  And if they don't find he intentionally
13  killed or attempted to kill with his actions more
14  than one person, then they should not find this
15  aggravator.
16          MS. RODRIGUEZ-COSS:  We're not
17  suggesting the jury should not consider the
18  defendant's acts; clearly, we are.  The jury must
19  consider the defendant's acts, but the defendant's
20  acts in this case were carried out in concert with
21  others and they demonstrate a clear intent that all
22  three victims be killed.  And so following the
23  analysis of United States v. Ortiz, and we're not
24  citing any other cases, we don't believe any other
25  case has considered this particular factor, is that
```

63

```
1   his actions, in concert with others, clearly
2   demonstrates that he had an intent that all three
3   victims be killed.
4           MS. VAN NESS:  That's the threshold
5   mental state factor which they would have found one
6   or the other.  His intent is a mental state.  The
7   language of the aggravator, and as charged in the
8   notice, was intention to kill or attempted to kill.
9   The "attempt to kill" covers his actions with
10  respect to a victim that he does not actually strike
11  the lethal blow.
12          THE COURT:  So you say "attempted to
13  kill" in fact is a proxy for "in concert with
14  others."
15          MS. VAN NESS:  Well, I think the "in
16  concert with others" is misleading because it
17  suggests that just because he had the intent, that
18  if someone else killed -- if one or more of the
19  other people killed one of the victims, that he
20  should -- that this aggravator can be based on that
21  even though he did not participate in that murder.
22          MS. RODRIGUEZ-COSS:  Yes, in fact in
23  Ortiz the defendant didn't kill any of the victims,
24  yet the court found the aggravating factor
25  appropriately applied because "in concert with
```

64

```
1   others" he had intended that more than one victim be
2   killed in a single criminal episode.
3            MS. VAN NESS:  What was the threshold
4   mental state in that case if he did not kill
5   anybody?
6            THE COURT:  Let me go back and look at
7   U.S. v. Ortiz and see what -- now that I have a
8   refinement on the government's argument, see what
9   that looks like.
10           MS. VAN NESS:  So, your Honor, just to
11  be clear, we think the phrase you have at the top,
12  which is the statutory definition, is sufficient,
13  and we would also ask you to add in the language you
14  have in other aggravators.  For example, on page 14:
15  "Further, you may only consider the actions of the
16  defendant.  You may not consider the manner in which
17  any other person committed or participated in the
18  murder."  Those two sentences.
19           THE COURT:  All right, the government
20  doesn't object to that part.
21           MS. RODRIGUEZ-COSS:  Well, we object to
22  "you may not consider the manner in which any other
23  person" -- I'm sorry, can you read that again?
24           THE COURT:  It's the bottom, the last
25  paragraph on 14:  "You may not consider the manner
```

65

```
1   in which any other person committed or participated
2   in the murder."  That's right, isn't it?
3            MS. RODRIGUEZ-COSS:  Yeah, we don't have
4   any objection to the fact that it is the defendant's
5   actions that they must consider, your Honor.
6            THE COURT:  Okay, what's next?
7            MS. RODRIGUEZ-COSS:  On page 21, your
8   Honor.
9            THE COURT:  Anything before that?
10           MS. VAN NESS:  No, your Honor.
11           MS. RODRIGUEZ-COSS:  In the second
12  paragraph, your Honor, we object to the sentence,
13  second sentence there:  "This includes any
14  speculation about the relative cost to the taxpayers
15  of executing a defendant."  I don't see any need to
16  place ideas in the jurors' minds that may not be
17  there.  While we had some jurors during voir dire
18  indicate a concern of this nature, I would submit to
19  the Court that the majority of jurors did not
20  express any thoughts in that regard.  And so I think
21  it's sufficient for the Court to state that they're
22  not free to consider any other facts in aggravation
23  that they conceive of on their own without
24  encouraging actually them entering into speculation
25  by mentioning something like the cost to taxpayers
```

66

```
1   or anything else.
2            So, we would request that that paragraph
3   end with the third -- the second sentence there,
4   "you are not free to consider any other facts in
5   aggravation that you conceive of on your own,"
6   period.
7            MR. SHEEHAN:  Your Honor, could I just
8   briefly respond?  I think -- I don't have a catalog
9   of the actual people who were selected on this jury,
10  but my recollection throughout the voir dire process
11  is that numerous people expressed this concern in
12  their -- certainly in their questionnaires.  Now,
13  ultimately it is true that all of those people,
14  anybody that was selected and who had referenced
15  that was told by the Court that that was not a
16  proper consideration, but I think that it is a huge
17  consideration in people's minds.
18           MS. RODRIGUEZ-COSS:  I wouldn't say that
19  it was a huge consideration, your Honor.  And I
20  think the Court correctly instructed them that was
21  not something they were consider.  Why are we going
22  to again place that in their minds?  If counsel has
23  a concern that the jurors, the 12 jurors selected to
24  make this decision had that concern, I think he
25  should cite the questionnaires of those jurors.
```

67

```
1   Otherwise, we're placing an idea in the jurors' mind
2   that doesn't belong there and shouldn't be there,
3   and certainly should not be referred to by the Court
4   in its instructions.
5            MR. SHEEHAN:  Your Honor, I think that
6   on this issue -- I take it their suggestion that
7   we're placing an idea in their minds is as if it's
8   somehow detrimental to the defendant, that they
9   should not take this into account, it would then
10  cause them to think, oh, we should take it into
11  account.  So as a protective gesture of the
12  defendant's rights they're suggesting that this
13  shouldn't be there, and I would --
14           THE COURT:  So, if we put:  "The law
15  permits you to consider only these non-statutory
16  aggravating factors which are specifically claimed
17  by the government and which are listed below.  You
18  are not free to consider any other facts in
19  aggravation that you conceive of on your own or
20  otherwise speculate."
21           MS. VAN NESS:  Your Honor, I think the
22  fact that a juror didn't expressly volunteer this
23  during the voir dire doesn't mean it's not in their
24  mind.  I think this is a popular misconception.
25  Actually, a false misconception.  That's a double
```

68

```
1   negative.  It's a misconception it costs more, and I
2   think there is nothing wrong with taking that
3   elephant out of the jury room just because it's such
4   a popular misconception, and the fact that we don't
5   know whether any of the jurors that are now sitting
6   voiced this, in which case they would have gotten
7   instruction from you already, but the fact that the
8   jurors did not voice it doesn't mean they don't
9   think it.  So, I don't think there is any downside
10  at all in advising them this would be an entirely
11  inappropriate thing for them to be thinking about.
12          THE COURT:  All right, let me think
13  about it.  What's next?
14          MS. VAN NESS:  A couple very minor
15  things.  On that page, the first sentence, to change
16  -- the second line, a "threshold mental state
17  factor," and in the first sentence of the second
18  paragraph, "the law permits you to consider only the
19  two non-statutory aggravating factors claimed."
20          THE COURT:  All right.
21          MS. RODRIGUEZ-COSS:  At the bottom of
22  page 21, your Honor, I think "other specific acts of
23  violence" was cut off.  I don't know if the Court
24  intended to cut that off.  The language that's
25  specifically set forth in the notice of intent, it
```

69

```
1   read "continuing pattern of criminal conduct,
2   including the following," or was that --
3           THE COURT:  Well, "the following" didn't
4   -- was not permitted as the criminal acts of
5   violence.  So that's why I took it out.
6           MS. RODRIGUEZ-COSS:  I wasn't sure if
7   the Court was -- on page 22, your Honor, I thought
8   the Court was going to instruct that they must find
9   at least two acts.  Is that correct?
10          THE COURT:  I think that a pattern is
11  the fact that they are finding and that they should
12  be free to consider whether two under these
13  circumstances is a pattern or three or five or six.
14  I don't --
15          MS. RODRIGUEZ-COSS:  I see.  All right.
16          THE COURT:  I don't think that I should
17  charge them as a matter of law that a pattern is a
18  specific number.
19          MS. RODRIGUEZ-COSS:  All right.
20          MS. VAN NESS:  Your Honor, could I say
21  with respect to that second paragraph that we
22  reiterate or request on page 22 that you charge that
23  all of those items that we've requested, that he
24  personally committed the act, that he did so
25  intentionally, that it posed a serious threat, that
```

70

```
1   he committed at least three of the acts, and the
2   acts demonstrated he engaged in a pattern are proven
3   beyond a reasonable doubt.
4           If your Honor will not go that far, I
5   would except to that, but I would also ask that you
6   revise the paragraph you've written, which I don't
7   think makes it clear enough, that in order for the
8   jury to even consider an act as to whether it falls
9   into a pattern that they must find unanimously
10  beyond a reasonable doubt that the defendant
11  committed it.
12          Now, I know you've ruled that they must
13  so find, but I don't think that the grammar in that
14  second sentence, respectfully, I don't believe
15  really conveys that as a separate preliminary
16  finding, that they can't even consider the act
17  unless they find beyond a reasonable doubt
18  unanimously that he committed it.
19          MS. RODRIGUEZ-COSS:  So you would insert
20  on the specific acts that "the government proved
21  beyond a reasonable doubt that the defendant
22  committed"?
23          MS. VAN NESS:  Well, I had fashioned an
24  additional sentence:  "These are the only acts you
25  are permitted to consider.  You may not rely on any
```

71

```
1   act unless you first unanimously determined beyond a
2   reasonable doubt the defendant intentionally
3   committed it."
4           THE COURT:  Whoa, slow down.
5           MS. RODRIGUEZ-COSS:  That's inserting an
6   issue we debated extensively, and the government's
7   position was that we didn't have the burden of
8   proving each act beyond a reasonable doubt.
9           THE COURT:  Right, we've done that, but
10  I'm trying to understand the inadequacy that the
11  defendant claims here where it was my intention that
12  they needed to -- that any acts they were
13  considering as part of a pattern, each had to be
14  proved beyond a reasonable doubt.
15          MS. VAN NESS:  I just think the way it's
16  written "in order for you to find this aggravating
17  factor proven, you must unanimously agree on the
18  specific acts that the government proved beyond a
19  reasonable doubt," the "beyond a reasonable doubt"
20  is sort of hanging there.
21          THE COURT:  Let me work on that.
22          MS. VAN NESS:  Again, if you could just
23  have a preliminary sentence that "you may not rely
24  on any act unless you first unanimously determine
25  beyond a reasonable doubt the defendant
```