# 12-5086

*To Be Argued By:*
Tracy Lee Dayton

## United States Court of Appeals

### FOR THE SECOND CIRCUIT

### Docket No. 12-5086

_____

UNITED STATES OF AMERICA,
*Appellee,*

-vs-

AZIBO AQUART, aka D, aka Dreddy, aka Jumbo,
aka Azibo Smith, aka Azibo Siwatu Jahi Smith,
*Defendant-Appellant,*

(For continuation of caption, see inside cover)

_____

ON APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF CONNECTICUT

### GOVERNMENT APPENDIX-VOLUME VI (GA1501 – GA1750)

DEIRDRE M. DALY
*United States Attorney*
*District of Connecticut*

TRACY LEE DAYTON
JACABED RODRIGUEZ-COSS
SANDRA S. GLOVER
*Assistant United States Attorneys*

LESLIE R. CALWELL
*Assistant Attorney General*

SUNG-HEE SUH
*Deputy Assistant*
*Attorney General*

DAVID M. LIEBERMAN
*Attorney*
*Criminal Division*
*Appellate Section*

AZIKIWE AQUART, aka Zee, Nathaniel Grant, aka
Correctional Officer Stone, EFRAIN JOHNSON,

*Defendants.*

# TABLE OF CONTENTS

Trial Transcript – Volume I dated April 20, 2011 ....................................... GA1

Trial Transcript – Volume II dated April 21, 2011 .................................... GA65

Trial Transcript – Volume III dated April 25, 2011 ................................. GA115

Trial Transcript – Volume IV dated April 26, 2011 ................................. GA171

Trial Transcript – Volume V dated April 27, 2011 .................................. GA238

Trial Transcript – Volume VI dated April 28, 2011 ................................. GA298

Trial Transcript – Volume VII dated April 29, 2011 ............................... GA355

Trial Transcript – Volume VIII dated May 2, 2011 ................................. GA423

Trial Transcript – Volume IX dated May 3, 2011 .................................... GA494

Trial Transcript – Volume X dated May 4, 2011 ..................................... GA547

Trial Transcript – Volume XI dated May 5, 2011 .................................... GA605

Trial Transcript – Volume XII dated May 9, 2011 ................................... GA655

Trial Transcript – Volume XIII dated May 10, 2011 ............................... GA707

Trial Transcript – Volume XIV dated May 11, 2011 ............................... GA767

Trial Transcript – Volume XV dated May 12, 2011 ................................. GA819

Trial Transcript – Volume XVI dated May 13, 2011 ............................... GA850

Trial Transcript – Volume XVII dated May 16, 2011 .............................. GA893

Trial Transcript – Volume XVIII dated May 17, 2011 ............................ GA952

Trial Transcript – Volume XIX dated May 18, 2011 .............................. GA1008

<u>TABLE OF CONTENTS</u> (cont'd)

Trial Transcript – Volume XX dated May 20, 2011 ............................... GA1036

Trial Transcript – Volume XXI dated May 23, 2011 ............................. GA1089

Transcript of Guilt Phase Charge Conference – Volume I
   dated May 13, 2011 .............................................................. GA1097

Transcript of Guilt Phase Charge Conference – Volume II
   dated May 18, 2011 .............................................................. GA1124

Guilt Phase Verdict Form dated May 23, 2011 ...................................... GA1137

Trial Transcript – Volume XXII dated May 31, 2011 ........................... GA1140

Trial Transcript – Volume XXIV dated June 1, 2011 ........................... GA1201

Trial Transcript – Volume XXV dated June 2, 2011 ............................ GA1237

Trial Transcript – Volume XXVI dated June 3, 2011 .......................... GA1285

Trial Transcript – Volume XXVII dated June 6, 2011 ......................... GA1342

Trial Transcript – Volume XXVIII dated June 7, 2011 ........................ GA1404

Trial Transcript – Volume XXIX dated June 13, 2011 ......................... GA1435

Trial Transcript – Volume XXX dated June 14, 2011 .......................... GA1472

Trial Transcript – Volume XXXI dated June 15, 2011 ......................... GA1479

Transcript of Penalty Phase Charge Conference – Volume I
   dated June 6, 2011 ............................................................... GA1483

Transcript of Penalty Phase Charge Conference – Volume II
   dated June 7, 2011 ............................................................... GA1502

Special Verdict Form (Penalty Phase) dated June 15, 2011 ................. GA1523

Motion for Mistrial dated May 23, 2011 .................................................. GA1537

<u>TABLE OF CONTENTS</u> (cont'd)

Ruling on Defendant's Motion for a Mistrial dated February 21, 2012  GA1542

Transcript of John Taylor's Guilty Plea dated October 18, 2010 ........... GA1555

Transcript of John Taylor' Sealed Cooperation Agreement Plea
    Dated October 18, 2010 ..................................................................... GA1565

Transcript of John Taylor's Sentencing Hearing dated April 16, 2012 . GA1569

Trial Transcript of Efrain Johnson – Volume VII dated February 16, 2012
    [Testimony of John Taylor] .............................................................. GA1580

Trial Transcript of Efrain Johnson – Volume VIII dated February 17, 2012
    [Testimony of John Taylor] .............................................................. GA1643

Trial Transcript of Efrain Johnson – Volume IX dated February 21, 2012
    [Testimony of Lashika Johnson] ...................................................... GA1712

Failed Change-of-Plea Hearing Transcript of Efrain Johnson
    dated March 8, 2011 ........................................................................ GA1731

Transcript of Azikiwe Aquart Change of Plea dated August 26, 2011 .. GA1742

Government Exhibit 100A ...................................................................... GA1751

Government Exhibit 102A ...................................................................... GA1754

Government Exhibit 109 ........................................................................ GA1755

Government Exhibit 110 ........................................................................ GA1756

Government Exhibit 111 ........................................................................ GA1757

Government Exhibit 112 ........................................................................ GA1758

Government Exhibit 114 ........................................................................ GA1759

Government Exhibit 116G ...................................................................... GA1760

## TABLE OF CONTENTS (cont'd)

Government Exhibit 116H ........................................................................GA1761

Government Exhibit 116I ........................................................................GA1762

Government Exhibit 116J ........................................................................GA1763

Government Exhibit 117H ........................................................................GA1764

Government Exhibit 117J ........................................................................GA1765

Government Exhibit 120-1 ........................................................................GA1766

Government Exhibit 120-2 ........................................................................GA1767

Government Exhibit 120-3 ........................................................................GA1768

Government Exhibit 120-5 ........................................................................GA1769

Government Exhibit 120-6 ........................................................................GA1770

Government Exhibit 121-4 ........................................................................GA1771

Government Exhibit 121-6 ........................................................................GA1772

Government Exhibit 121-8 ........................................................................GA1773

Government Exhibit 121-10 ........................................................................GA1774

Government Exhibit 122-3 ........................................................................GA1775

Government Exhibit 122-5 ........................................................................GA1776

Government Exhibit 122-7 ........................................................................GA1777

Government Exhibit 123-1 ........................................................................GA1778

Government Exhibit 124 ........................................................................GA1779

Government Exhibit 127 ........................................................................GA1780

## TABLE OF CONTENTS (cont'd)

Government Exhibit 128A................................................................GA1781

Government Exhibit 129A................................................................GA1782

Government Exhibit 129B................................................................GA1783

Government Exhibit 130 ................................................................GA1784

Government Exhibit 136 ................................................................GA1785

Government Exhibit 137 ................................................................GA1786

Government Exhibit 139 ................................................................GA1787

Government Exhibit 140 ................................................................GA1788

Government Exhibit 164 ................................................................GA1789

Government Exhibit 165 ................................................................GA1790

Government Exhibit 231A................................................................GA1791

Government Exhibit 245 ................................................................GA1792

Government Exhibit 246 ................................................................GA1801

Government Exhibit 247 ................................................................GA1807

Government Exhibit 247A................................................................GA1817

Government Exhibit 249 ................................................................GA1822

Government Exhibit 263 ................................................................GA1828

Government Exhibit 264 ................................................................GA1837

Government Exhibit 273 ................................................................GA1847

Government Exhibit 274 ................................................................GA1850

## TABLE OF CONTENTS (cont'd)

Government Exhibit 275 ........................................................................GA1852

Government Exhibit 276 ........................................................................GA1860

Government Exhibit 277 ........................................................................GA1864

Government Exhibit 278 ........................................................................GA1866

Government Exhibit 279 ........................................................................GA1868

Government Exhibit 300 ........................................................................GA1870

Government Exhibit 300A......................................................................GA1871

Government Exhibit 301 ........................................................................GA1872

Government Exhibit 302 ........................................................................GA1873

Government Exhibit 305 ........................................................................GA1874

Government Exhibit 306 ........................................................................GA1888

Government Exhibit 307 ........................................................................GA1889

Government Exhibit 308 ........................................................................GA1890

Government Exhibit 314 ........................................................................GA1891

Government Exhibit 315 ........................................................................GA1906

Government Exhibit 316 ........................................................................GA1907

Government Exhibit 319 ........................................................................GA1908

Government Exhibit 322 ........................................................................GA1909

Government Exhibit 400 ........................................................................GA1924

## TABLE OF CONTENTS (cont'd)

Government Exhibit 403 ...................................................................GA1925

Government Exhibit 404 ...................................................................GA1926

Government Exhibit 414 ...................................................................GA1927

Government Exhibit 424 ...................................................................GA1928

Government Exhibit 433 ...................................................................GA1929

Government Exhibit 435 ...................................................................GA1930

Government Exhibit 447 ...................................................................GA1931

Government Exhibit 451 ...................................................................GA1932

Government Exhibit 464 ...................................................................GA1933

Government Exhibit 465 ...................................................................GA1934

Government Exhibit 467 ...................................................................GA1935

Government Exhibit 506 ...................................................................GA1936

Government Exhibit 514 ...................................................................GA1939

Government Exhibit 3 ......................................................................GA1943

Government Exhibit 4 ......................................................................GA1944

Government Exhibit 9 ......................................................................GA1945

Government Exhibit 12A....................................................................GA1952

72

```
1    intentionally committed it," and then "you must
2    further find that these acts posed a serious threat
3    and that they demonstrate a pattern," that would, I
4    think, make it very clear.
5            And, your Honor, I would also ask you to
6    define "pattern" to the jury consistent with the
7    charge, our request on page 23, that: "Pattern
8    means acts that have the same or similar purposes,
9    results, participants, victims or methods of
10   commission, or otherwise are interrelated by
11   distinguishing characteristics that are not isolated
12   events."
13           THE COURT:  All right, we can go for one
14   more page and then I'm going to have to break off.
15           MS. VAN NESS:  I don't have anything
16   until 23.
17           MS. RODRIGUEZ-COSS:  Yeah, I have
18   something on 23.
19           MS. VAN NESS:  This is just reiterating
20   what we already discussed, your Honor, which I would
21   request on page 23 that you add in the charge for
22   victim relatives specifically that, you know,
23   they're not permitted to give an opinion.  The
24   language that we had in our charge request that
25   we've already discussed, they're not allowed to give
```

73

```
1    an opinion on the penalty of the defendant.
2            And then there was a typo after the
3    "three" -- not a typo, but a word left out after the
4    "three" asterisk, "again, your findings regarding
5    each non-statutory aggravating factor."  Including
6    the word "factor."
7            THE COURT:  Thank you.
8            MS. RODRIGUEZ-COSS:  Does the Court wish
9    us to be heard again on that?  Your Honor, I think
10   we made our position earlier on that suggestion.
11           THE COURT:  Right.
12           MS. RODRIGUEZ-COSS:  We think it's fine
13   where it is right now.
14           THE COURT:  Right, I'm going to consider
15   your arguments on that.
16           MS. RODRIGUEZ-COSS:  So at the bottom of
17   page 23, in the last full sentence, what it says,
18   "you must unanimously agree that the government has
19   proved beyond a reasonable that the non-statutory
20   aggravating factors alleged by the government are,
21   in fact, aggravating," and we would suggest that the
22   language we submitted that they in fact weigh in
23   favor of the death penalty.  So, when we talk about
24   non-statutory aggravating factors are factors that
25   become relevant in the selection phase, I think we
```

74

```
1    could appropriately indicate that those are factors
2    that weigh in favor of the death penalty, not
3    necessarily that make the crime more severe.
4            MS. VAN NESS:  Your Honor, I think the
5    way you have it is correct.  I mean, that's what the
6    definition of aggravating is, it makes the crime
7    worse, because without the aggravating factor, at
8    least one, the defendant is not eligible for the
9    death penalty.
10           MS. RODRIGUEZ-COSS:  We agree that is,
11   in fact, the definition of the non-statutory
12   aggravating factors, your Honor, they aggravate the
13   crime, they make it worse.  Throughout the
14   instructions the defense has requested that the
15   definition of aggravating has been changed to
16   reflect those are factors that weigh in favor of the
17   death penalty.  In non-statutory aggravating factors
18   that's even more so, your Honor, because victim
19   impact, for example, may not make the offense worse,
20   but it certainly weighs in favor of the death
21   penalty.  Similarly, a pattern of violent conduct
22   may not make the crime itself worse, but it
23   certainly weighs in favor of the death penalty.
24           THE COURT:  So, if what we're doing is
25   giving guidance to the jury, isn't what we want to
```

75

```
1    say that they make the crime worse, more serious or
2    severe and, thus, weigh in favor of the death
3    penalty?
4            MS. RODRIGUEZ-COSS:  Your Honor, we're
5    talking about non-statutory aggravating factors.
6    For example, victim impact, it may be misleading to
7    say victim impact makes the crimes more severe,
8    because the jury may look at circumstances
9    immediately surrounding the offense rather than
10   factors which weigh in favor of the death penalty at
11   the selection phase.
12           MS. VAN NESS:  Your Honor, I think
13   victim impact is an expression of the grief and loss
14   that the murders have caused and that makes the
15   murders worse.  So, I think there is nothing special
16   about the victim impact as if it has nothing to do
17   with the crime.  If had nothing to do with the
18   crime, then it shouldn't be a factor for them to
19   consider at all.
20           MS. RODRIGUEZ-COSS:  We can simply add
21   it to the end, your Honor, if that's what the Court
22   wishes to do.
23           THE COURT:  Well, that may give them
24   some guidance more than just saying that it weighs
25   in favor.
```

76

```
1           MS. RODRIGUEZ-COSS:  That's fine.
2           THE COURT:  Let me put that in, see how
3   that looks.
4           All right, are you tired out enough?
5   Shall we pick up at 24 tomorrow?
6           MS. VAN NESS:  I'm done 'till 27, you
7   will be happy to know.
8           MS. RODRIGUEZ-COSS:  We can pick up at
9   24, your Honor.
10          THE COURT:  There is -- we have things
11  to talk about on 24?
12          MS. RODRIGUEZ-COSS:  Not on 24.
13          THE COURT:  Okay, we've already made it
14  to 25.  And perhaps we can get past 25.
15          MS. RODRIGUEZ-COSS:  We can get past 25.
16  My suggestion on 25 was that that paragraph states
17  the same thing as the last paragraph on 24.  I
18  thought it was --
19          THE COURT:  Repetitious.
20          MS. RODRIGUEZ-COSS:  Yes.
21          THE COURT:  Okay.  All right, let me
22  re-read it with that in mind.
23          Okay, let's pick up then with mitigating
24  factors tomorrow after we finish evidence.  Thank
25  you.
```

77

```
1           MR. SHEEHAN:  Your Honor, could I make a
2   request tonight?  Just in terms of our presentation
3   of the mitigation case, your Honor -- I don't -- if
4   your Honor could tell us what your ruling is on
5   Johnson before we put on -- Johnson's statements,
6   Efrain Johnson's statements before we put on our
7   mitigation witnesses.
8           THE COURT:  I'll try to do that.
9           MR. SHEEHAN:  That will be very helpful.
10  Thank you.
11          THE COURT:  All right, we stand in
12  recess.
13
14          I certify that the foregoing is a correct
15  transcript from the record of proceedings in the
16  above-entitled matter.
17
18              7/21/11
19                Date
20
21           /S/  Sharon Montini
22             Official Reporter
23
24
25
```

78

```
1            UNITED STATES DISTRICT COURT.
2              DISTRICT OF CONNECTICUT
3   * * * * * * * * * * *      *
                               *
4   UNITED STATES OF AMERICA,  * Case No 6cr160(JBA)
5            Plaintiff,        *
                               *
6         vs.                  *
                               *
7   AZIBO AQUART               * June 7, 2011
                               *
8            Defendant.        *
                               *
9   * * * * * * * * * * *      *
10   TRANSCRIPT OF PENALTY PHASE CHARGE CONFERENCE
                   VOLUME II
11
12  BEFORE:  THE HONORABLE JANET BOND ARTERTON U.S.D.J.,
                                       and jury
13
    Appearances:
14  FOR THE GOVERNMENT:  ALINA REYNOLDS, ESQ
                         TRACY DAYTON, ESQ.
15                       PETER MARKLE, ESQ.
                         JACABED RODRIGUEZ-COSS
16                       United States Attorney's Office
                         915 Lafayette Blvd
17                       Bridgeport, CT 06604
18  FOR THE DEFENDANT    MICHAEL SHEEHAN, ESQ
    AZIBO AQUART:        Sheehan & Reeve
19                       139 Orange Street
                         New Haven CT 06510
20
                         JUSTIN SMITH, ESQ.
21                       383 Orange Street
                         New Haven, CT 06511
22
                         BEVERLY VAN NESS, ESQ.
23                       74 Trinity Place
                         New York, NY 10006
24
    Court Reporter:     Sharon Montini, RMR
25  Proceedings recorded by mechanical stenography,
    transcript produced by computer
```

79

```
1           THE COURT:  All right, please be seated.
2   We're going to finalize our colloquy from yesterday
3   on the one remaining matter which had been found on
4   page 14.
5           Ms. Van Ness, do you wish to be heard?
6           MS. VAN NESS:  Yes, your Honor.  And I
7   apologize, but one additional very minor correction
8   on 13.  In the second paragraph you say "however,
9   just because an offense involves torture or serious
10  physical abuse does not necessarily mean that it was
11  committed in an especially heinous manner," and I
12  would ask that you take out the "necessarily"
13  because I think that's a question for the jury.  It
14  has to be especially egregious, and if you put "not
15  necessarily" that suggests involving torture or
16  serious physical abuse per se could establish the
17  factor.
18          MS. RODRIGUEZ-COSS:  We disagree with
19  that, your Honor.  I think the point that is being
20  made by the instruction is that physical abuse and
21  torture can establish that an offense was committed
22  in an especially heinous, cruel and depraved manner.
23  So what the Court is saying is it doesn't
24  necessarily establish, but it can establish.  That
25  is the definition given above.
```

```
 1          THE COURT:  I think that's right.
 2  Otherwise it seems to contradict everything that
 3  we're saying.  It leaves it up to them on whether or
 4  not -- where it involved torture and serious
 5  physical abuse that means it was committed in an
 6  especially heinous, cruel or depraved manner.
 7          All right, let's go on -- oh, you want
 8  to talk about mutilation.
 9          MS. VAN NESS:  Yes, on the next page,
10  your Honor.  Actually, with your forbearance, my
11  only request remaining on this is to eliminate
12  entirely the paragraph that includes the "needless
13  mutilation," that is the "pertinent factors"
14  paragraph, which is the second from the bottom, and
15  I will explain why.
16          First of all, I don't think the needless
17  mutilation of the victim's body is factually in this
18  case.  There is certainly an allegation of serious
19  physical abuse, but mutilation, for example, in the
20  Pepin case of dismembering a body or something of
21  that nature, is not in this case.  So, I don't think
22  it's factually apt.  And I also don't think it
23  should be as a matter of law considered
24  appropriately in establishing this aggravator.  But
25  mostly I don't think it's in this case.
```

```
 1          THE COURT:  How do you define
 2  "mutilation"?
 3          MS. VAN NESS:  Well, I was trying to
 4  think of horrible things one could do.  For example,
 5  with a knife, for something like cutting marks in a
 6  person's body or, you know, amputation of fingers or
 7  toes or something like that would be mutilation, or
 8  as in the Pepin case, cutting the body up after the
 9  person has died, but I don't think there is any
10  evidence of that, that kind of mutilation of any of
11  the bodies in this case.  I think it was -- clearly
12  there is an issue about serious physical abuse and
13  whether it was overkill, if you will, but I don't
14  think that this constitutes --
15          THE COURT:  That's an unfortunate term,
16  isn't it?
17          MS. VAN NESS:  I know, I recognize that,
18  but I don't think it's mutilation.  I think it's the
19  manner of the killing.  So, I would object to that.
20          THE COURT:  You recognize Sand includes
21  this paragraph and, thus, it appears in a lot of
22  charges.  I mean, apart from the issue of whether
23  there is any evidence of mutilation.
24          MS. VAN NESS:  Actually, your Honor, I
25  thought Sand had actually had a comment in his
```

```
 1  instructions that postmortem abuse to a murdered
 2  victim's body does not constitute serious physical
 3  abuse.
 4          MS. DAYTON:  Under Webster's mutilate
 5  means to injure by depriving of or harming a part.
 6  That's all it says.
 7          THE COURT:  You are not claiming any
 8  postmortem mutilation.
 9          MS. RODRIGUEZ-COSS:  We are not claiming
10  any postmortem mutilation.
11          MS. DAYTON:  Well, he kept hitting them
12  after they were dead.  If their argument is they
13  weren't alive the whole time, some of the serious
14  physical abuse could have occurred after they were
15  dead.
16          MS. VAN NESS:  But that instruction is
17  in the definition of serious physical abuse your
18  Honor is giving.  So that's a given, because you say
19  the victim doesn't have to be conscious or the
20  serious physical abuse, unlike torture.
21          MS. RODRIGUEZ-COSS:  Your Honor, but we
22  understand the paragraph is instructive to the jury
23  in terms of the types of evidence that can support
24  especially heinous, cruel or depraved, and so we
25  would object to striking the entire paragraph.
```

```
 1          MS. VAN NESS:  Well, I haven't finished
 2  my argument about the clauses, your Honor.  I think
 3  that that mutilation clause is objectionable as a
 4  matter of fact and as a matter of law.
 5          THE COURT:  I hear you on that.  Tell me
 6  about why the whole paragraph.
 7          MS. VAN NESS:  I think the next two, the
 8  "senselessness of the killing" and the "helplessness
 9  of the victim" is inherent in all murders, and so
10  it's not sufficiently narrowing.  I don't think it
11  adds anything to your very specific definitions of
12  what these words mean in the statutory language.
13  All murders are senseless and the victims by
14  definition are helpless, they're not able --
15          THE COURT:  That's not really true, is
16  it?  Some murders are specifically designed for
17  revenge or miscalculated self-defense or something
18  like that.
19          MS. VAN NESS:  Are you talking about
20  helplessness or senselessness?
21          THE COURT:  I'm still working on
22  senselessness.
23          MS. VAN NESS:  Yes, I think right-minded
24  people would say all murders, law-abiding people
25  would say all murders are senseless no matter what
```

84

1  the motive is.  We don't have a senseless murder in
2  the way your Honor is using it in this case.  If you
3  are saying there is a motive here, for example to
4  eliminate the competition, then it's not senseless.
5  It's not right, but it's certainly not without --
6  it's not just randomly coming into the apartment and
7  killing whoever is there with no knowledge of the
8  occupants.  And I think it does basically apply to
9  virtually all murders.  I believe the same is true
10 for helplessness.  Even if you are shot at
11 point-blank range with someone coming in the door,
12 you are at that moment without defense.  So, I think
13 the two are broadly stated and I don't think they
14 add anything to the definitions of this very --
15        THE COURT:  So what are you proposing as
16 an alternative that will be of assistance to the
17 jury in making a determination of whether a
18 particular killing, which you say is always
19 senseless and always involves helplessness, was
20 especially heinous, cruel and depraved?
21        MS. VAN NESS:  I don't think you need
22 any amplification.  The facts can speak for
23 themselves and the parties can argue about the
24 terms.  You've given more definitions in this
25 section than anywhere else, and I think all of those

85

1  definitions are very helpful to the jury to figure
2  out what it is they have to decide, including
3  whether the victim has to be conscious or not
4  depending on whether it's torture or serious
5  physical abuse.
6        MS. RODRIGUEZ-COSS:  Your Honor, we
7  would disagree wholeheartedly with the position of
8  the defense.  We think there are certainly degrees
9  of senselessness and degrees of helplessness, and
10 those are the degrees the jury needs to consider in
11 order to determine whether or not the crime was
12 heinous, cruel or depraved or especially heinous
13 cruel or depraved.
14        THE COURT:  And how does this paragraph
15 assist them in making a determination of that
16 degree?
17        MS. RODRIGUEZ-COSS:  I think this
18 statutory aggravating factor, your Honor, pertains
19 to matters that are -- when you consider all five
20 statutory aggravating factors, pertains to matters
21 that are probably, more than any other statutory
22 aggravating factors, out of the normal average realm
23 of thinking of the jury.  You know, pecuniary gain
24 is something that people can quickly relate to.
25 Substantial planning and premeditation is something

86

1  people can quickly grasp.  What is heinous, cruel
2  and depraved involves a bit more definition because
3  they're not terms people ordinarily think and
4  consider in their daily lives.
5        THE COURT:  We've defined them.
6        MS. RODRIGUEZ-COSS:  Right.  So, I think
7  in addition to that I think the instructions provide
8  guidance in terms of examples of such conduct for
9  the jury to consider and see whether that conduct
10 was present in this case.  And in that sense I think
11 it does help and assist the jury in determining
12 whether or not this aggravating factor has been
13 established.
14        MS. VAN NESS:  Your Honor, I think if
15 you keep in the "senselessness" and "helplessness"
16 you are essentially diminishing the government's
17 burden on this, and I think your definition of
18 "depraved" and "torture" and "serious physical
19 abuse" and the definition of "especially," you tell
20 the jury what they need to know to apply the law to
21 the evidence before them.
22        MS. RODRIGUEZ-COSS:  Your Honor, I think
23 the Court in other instructions during the guilt
24 phase and other parts, you know, oftentimes provides
25 samples or examples of conduct for the jury to

87

1  consider.  Based on the instructions in the guilt
2  phase, I don't think providing the jury with
3  examples of factors that they may consider in any
4  way, shape or form diminishes the burden of proof of
5  the government.  We still have to establish that
6  those factors were present here in the manner that
7  will establish the aggravating factors.
8        THE COURT:  What is it the government is
9  claiming is mutilation of the victims' body?
10       MS. RODRIGUEZ-COSS:  Your Honor, again,
11 we stated before, we have no objection to striking
12 the example of mutilation of the victims' body.
13       THE COURT:  And why does the defense say
14 helplessness of a victim is present in any killing?
15       MS. VAN NESS:  Because the victim is
16 necessarily -- well, because the victim is killed,
17 because the victim is unable to protect themselves.
18 I think the fact that these victims were taped is
19 something that the jury is going to clearly
20 consider, and they can consider that fact within the
21 definitions of torture and depraved that you've
22 given them.  The fact that the victims were beaten
23 repeatedly can be considered within the definition
24 of serious physical abuse.  But I think if you were
25 in the jury room with this pertinent factors

88

```
1   paragraph you might well say this was a completely
2   senseless killing he didn't have to do and so,
3   therefore, I'm going to find this aggravator
4   established.
5           THE COURT:  So we take mutilation out,
6   we take senseless out, we have "gratuitous violence
7   above and beyond" and "helplessness of the victim,"
8   and we say "pertinent factors may include."  What's
9   wrong with that?
10          MS. VAN NESS:  I have no objection to
11  the first clause, I think that's properly in the
12  case, but I think that's covered by your
13  instructions elsewhere.  If you -- so I don't object
14  to the "infliction of gratuitous violence," but for
15  the reasons I stated I object to the "helplessness."
16  So, again, my request would be you take the
17  paragraph out.
18          THE COURT:  All right, let me consider
19  your views and then we'll give you a draft that will
20  contain the decision on that.
21          All right, with that one matter up in
22  consideration, let me ask Mr. Kretman to give you
23  the new and improved charge that reflects
24  consideration of your comments of yesterday and some
25  independent tweaking, and let's move then to page
```

89

```
1   26, the mitigating factor.
2           MS. VAN NESS:  Your Honor, I think we
3   left off yesterday where the government made a
4   request to delete the paragraph on 25.
5           THE COURT:  What you'll see is I made a
6   sort of combination last paragraph in the draft you
7   just got.
8           MS. VAN NESS:  Can I just make a
9   request.  I don't know what your Honor's practice
10  is, but can you mark these different drafts as Court
11  exhibits so that -- being the victim as an appellate
12  lawyer of reading charge conferences such as these
13  without knowing what the parties are referring to, I
14  would just like to have a copy of the drafts in the
15  file so they can be retrieved.  Otherwise, the
16  minutes make no sense.  Would that be all right?
17          THE COURT:  It's hard -- let me see what
18  we can do on that.
19          All right, let's go to mitigating
20  factors.
21          MS. RODRIGUEZ-COSS:  Your Honor, the
22  first page, which I guess has now become page 28 --
23  is the Court going by the new pages?
24          THE COURT:  No.
25          MS. RODRIGUEZ-COSS:  You are still on
```

90

```
1   the old draft.  So, on page 26, again I think this
2   is also -- I can't actually ascertain whether the
3   Court held it in abeyance or decided to go with the
4   all encompassing definition of mitigating factors or
5   "anything else relevant that would suggest"?
6           THE COURT:  I have not limited it as the
7   government has requested.
8           MS. RODRIGUEZ-COSS:  So we would object
9   to that language on page 26, your Honor.
10          THE COURT:  All right, what's next?
11          MS. RODRIGUEZ-COSS:  Unless the defense
12  has something on page --
13          MS. VAN NESS:  Not on page 27.
14          MS. RODRIGUEZ-COSS:  On the next page,
15  for the reasons stated previous on the record and in
16  its papers, we object to mitigating factors 2, 3 and
17  4.  With regards to --
18          THE COURT:  All right, with regard to
19  No. 2, I'm inclined to add "this factor has been
20  proved," because I have told them repeatedly that he
21  will be imprisoned for the rest of his life without
22  possibility of release, and I do not want to have
23  any question in their mind about that.
24          MS. RODRIGUEZ-COSS:  So, we are not
25  objecting to the Court instructing the jury, as it
```

91

```
1   has in other portions of charge, that that is
2   correct, that if not sentenced to death, the
3   defendant will be sentenced to life.  In fact, I
4   think the Court says it in its instructions in more
5   than one place during the charge.
6           So it's the contention of the government
7   that it's not a mitigating factor as such, it's the
8   law.  It's basically an instruction on how the
9   Federal Death Penalty Act works and what the law is.
10  The law is that if he is not sentenced to death, the
11  Court will sentence him to life in prison without
12  release.  It's not a mitigating factor.  And so our
13  objection is that it not be included in this section
14  at all, and we would definitely object to the --
15          THE COURT:  I understand that, and I
16  just don't accept it.  I'm going to put it in, and
17  your objection is noted.
18          MS. RODRIGUEZ-COSS:  Well, then, we
19  definitely, your Honor, would object then to the
20  Court instructing the jury that it's been proved,
21  because then it sort of is the Court placing its
22  weight behind a proposed mitigating factor by the
23  defense with regards to something that has nothing
24  to do with the defendant, it's the law.
25          THE COURT:  That's not why it's here as
```

92

1  a mitigator. It's here as a mitigator to say that
2  what he gets as opposed to the death penalty is
3  being imprisoned for the rest of his life.
4          MS. RODRIGUEZ-COSS: Well, so --
5          THE COURT: Given the cross-examination
6  of Mr. Bezy -- well, let me ask whether the defense
7  has any view about that.
8          MS. RODRIGUEZ-COSS: Can we just add to
9  that, your Honor, before the defense responds, that
10 if the intent is to convey to the jury that life
11 imprisonment is tough and it's hard, then it's
12 encompassed wholly by the proposed mitigating factor
13 No. 3. So, again, we would request that the Court
14 reconsider its view on that.
15         THE COURT: Ms. Van Ness, do you wish to
16 be heard?
17         MS. VAN NESS: I think this is a
18 perfectly valid mitigator, your Honor, and I would
19 ask that you include it. We have submitted papers
20 on that, and it's a mitigator submitted in literally
21 dozens of cases.
22         THE COURT: I am going to keep 2 and 3
23 over the government's objection. We've discussed 4,
24 execution impact, I have ruled on that. What's
25 next?

93

1          MS. VAN NESS: Your Honor, can I go back
2  to before the list of factors. The last sentence at
3  the top when you're explicating what preponderance
4  means, I think, respectfully, that it's a little --
5  a little confusing what "produces in your mind the
6  belief" means, and also you're saying --
7          THE COURT: Now -- go ahead.
8          MS. VAN NESS: You said in the sentence
9  at the top of the page "preponderance means more
10 likely so than not so." Your second sentence "more
11 likely than not true." So, I think that to make the
12 sentence clearer and to also not use the same
13 phrase, but to actually give the jury a little more
14 guidance about what that means, I would request that
15 you use the language we asked for, which is "the
16 factor is established by preponderance if its
17 existence is shown to be more likely so than not so,
18 that is, if the likelihood of the factor is shown to
19 be slightly more than 50 percent." So, we request
20 the math example.
21         MS. RODRIGUEZ-COSS: We certainly know
22 that percentages used in trying to explain what
23 reasonable doubt is are not admitted. I can't draw
24 the Court's attention to any case where the same
25 analysis has been used with regard to preponderance

94

1  of the evidence, but I would submit that it makes
2  sense that it's not something that should be
3  explained to the jury in a matter of percentages.
4          THE COURT: Page 4 uses that.
5          MS. VAN NESS: Page 4? Yes, and so I
6  would just ask that you repeat that.
7          THE COURT: So why don't I just refer
8  back to that?
9          MS. RODRIGUEZ-COSS: We missed that,
10 your Honor. Would the Court reconsider that?
11         THE COURT: No, it's a really easy way
12 for people to understand and its absolutely
13 accurate. It's what "more likely than not" means.
14         So what I can do on the bottom of 26 is
15 just say "it's the defendant's burden to establish
16 any mitigating factors by a preponderance of the
17 evidence as I previously defined that on page"
18 whatever it turns out to be. "This is a lesser
19 standard of proof under the law than proof beyond a
20 reasonable doubt," and then just go on to the
21 mitigating factors.
22         MS. VAN NESS: You can't repeat the over
23 50 percent?
24         THE COURT: No, they can go back and
25 look at page 4. I will give them the specific page

95

1  reference. All right.
2          MS. VAN NESS: Your Honor, there is one
3  factor that you have not included that was proposed
4  by the defense, which is a species of the victim --
5  the statutory victim consent aggravator.
6          THE COURT: We have had that argument
7  and I have -- I don't think that it is appropriate
8  for this case.
9          MS. VAN NESS: Could I just briefly make
10 a couple comments about that?
11         THE COURT: Yes.
12         MS. VAN NESS: First of all, the fact
13 that the victim didn't engage in conduct that led to
14 her own murder, in other words, she didn't
15 participate -- the victims didn't participate in the
16 conduct by which they were killed, that's the
17 statutory mitigator, in this case we're asking for a
18 modification of that because, as in, for example,
19 the Basciano case, which I don't know, I think the
20 government has the verdict sheet in that case
21 because I think they relied on it, but that
22 contained a mitigator where the defendant was
23 charged with killing Mr. Pizzolo, who was a mobster
24 in the Bonanno crime family. He clearly didn't
25 participate in his own murder, it was a contract

96

1   hit, but because he entered that life which was a
2   dangerous life, the defense was permitted to allege
3   precisely the kind of factor we're alleging here, by
4   voluntarily choosing to engage in violent criminal
5   conduct, the victim in this case, Randolph Pizzolo,
6   willingly participated in dangerous and illegal
7   activities, a circumstance that contributed to his
8   death.
9           Our argument is the same could be said
10  for one or more of the victims in this case, and
11  it's up to the jury, obviously, that drug dealing is
12  a dangerous and illegal activity.  In fact, it's a
13  presumption -- it's so dangerous that there is a
14  presumption in the Bail Act that forbids letting a
15  person out on bail if they are engaged in high-level
16  drug dealing.  That's 18 U.S.C. 3142(e)(3)(A), where
17  Congress has said -- I have a copy of this for you
18  and for the government, "Subject to rebuttal by the
19  person, it shall be presumed that no condition or
20  combination of conditions will reasonably assure the
21  appearance of the person as required and the safety
22  of the community if the judicial officer finds that
23  there is probable cause to believe that the person
24  committed," and one of the offense listed is drug
25  distribution in 21 U.S.C. 801 et seq.

97

1           So, I think as your Honor has ruled in
2   the guilt phase that weapons are tools of the drug
3   trade, that drug dealing is clearly a dangerous
4   activity, and the fact that Ms. Johnson was not
5   involved in Mr. Aquart's drug operation, but she
6   nevertheless with selling crack cocaine out of her
7   apartment, that a juror presented with this
8   mitigator could find it true and then give whatever
9   weight that that juror believes it deserves.  It's
10  not a blaming the victim mitigator, it's an offshoot
11  that's factually tailored to this case that's a
12  non-statutory mitigator, and we would ask your Honor
13  to charge this.
14          MS. DAYTON:  Your Honor, with respect to
15  the presumption issue, there is no evidence that
16  this would have been a presumption case, Ms.
17  Johnson's drug dealing.  It has to be ten years to
18  life for that, and basically we heard that she had
19  two 8-balls that she sold.  I mean, that's really
20  like the testimony that we got from Jackie Bryant.
21  And if this was a shootout on the street between
22  drug dealers, or if even they had been awake at the
23  time, you know, maybe there would be some grounds
24  upon which to argue this.  But the testimony is she
25  wasn't dealing drugs at 3:00 a.m. or 4:00 a.m. or

98

1   5:00 a.m., whatever time, that they kicked their
2   door open while they were sleeping -- or while they
3   were not selling drugs, let's put it that way.  And
4   there is no evidence to support that they were --
5   you know, Pizzolo was a violent individual.  It's
6   completely different in Basciano than it is here.
7   And so to say that, you know, Basil Williams who
8   never -- there is no evidence he ever smoked crack,
9   much less sold crack, there is no evidence that
10  James Reid was selling crack, and there is no
11  evidence Tina Johnson was engaged in any crack
12  dealing at the time she was killed.
13          MS. VAN NESS:  It's not that she was
14  selling at the time she was killed, your Honor, it's
15  the fact that she was engaged in drug selling, and
16  we would like the mitigator to one or more of the
17  victims so the jurors can decide if any of them were
18  involved in activities that contributed to their
19  death.  But the motive for the murders was allegedly
20  that she was selling drugs and cutting into the
21  defendant's business and that she was so warned.
22  And so, again, that's not a justification for a
23  murder in any way, but I think it's clear from the
24  facts in this case that this is a mitigator, a
25  charge that one or more jurors could find.  And she

99

1   was engaged in selling drugs, a significant amount
2   of drugs I think for this purpose.
3           MR. SHEEHAN:  Your Honor, even two
4   8-balls is more than a mandatory minimum at the
5   time.
6           MS. DAYTON:  No, that's a five to 40,
7   two 8-balls.
8           MS. VAN NESS:  The point I was making
9   with the bail statute, your Honor, is only that
10  Congress has recognized that presumption for serious
11  drug activity.  Whether or not Ms. Johnson is
12  involved in that level, it's that drug selling is a
13  dangerous activity to the community, and that it is
14  such a serious and dangerous activity to the
15  community that there is the presumption that a
16  person charged with such an offense will not be able
17  to receive bail.
18          Your Honor, I have a copy of that
19  statute, if you'd like it, and also the Basciano
20  verdict sheet.
21          THE COURT:  I have the verdict sheet.
22  Now, originally this was posed as an analog for the
23  3592(a)(7) victim consent.
24          MS. VAN NESS:  Yes.
25          THE COURT:  And so what does that mean,

100

```
1   it's an analog for that?
2           MS. VAN NESS:  I'm sorry, your Honor, I
3   didn't hear you.
4           MS. RODRIGUEZ-COSS:  What does it mean
5   it's an analog.
6           THE COURT:  In other words, if -- when
7   we discussed this earlier we looked at the Johnson
8   case and the Beckford case, particularly in Beckford
9   where the Court has said that a victim's
10  participation in drug trafficking activities is not
11  alone sufficient to constitute consent to the
12  criminal conduct which caused her death even where
13  the murder was drug-related.
14          Are you urging this mitigator or is this
15  another mitigator that you are urging?
16          MS. VAN NESS:  Well, just as your Honor
17  has agreed to charge the role in the offense of Mr.
18  Taylor and Mr. Johnson as a mitigator, that, too,
19  I'm using that term as an analog, that, too, is an
20  analog of the statutory mitigator, which is the
21  equally culpable mitigator.  But it's offered by the
22  defense not as a statutory mitigator, but the
23  language has been changed.  The concept is
24  analogous.  And here, too, the concept of the victim
25  engaging in illegal and dangerous activity which
```

101

```
1   contributed to her death, one or more of the
2   victims, is an analog of the statutory mitigator,
3   but we're not offering the statutory mitigator,
4   we're offering our own language which fits the facts
5   of the case.  So that's what I mean by "analog."
6           MR. SHEEHAN:  Could I just note one
7   other thing, your Honor.  I think counsel probably
8   just misspoke, but even on the crack, the
9   presumption is an offense for which a maximum, not
10  minimum but a maximum, term of imprisonment of ten
11  years or more is prescribed in the Control
12  Substances Act.  Certainly two 8-balls is more --
13  the penalty for more than five grams of crack is 5
14  to 40 years.  So, the maximum penalty for the crack
15  is 40 years, and thus, the statutory presumption
16  would apply because of the danger to the community
17  that is posed by distribution of that amount of
18  crack.  And that's assuming that the court assumed
19  that the only amount in question was the two
20  8-balls.  But the statutory presumption is not a
21  minimum -- does not refer to the minimum, but to the
22  maximum.
23          MS. VAN NESS:  And, your Honor, one
24  additional cite.  Mr. Smith has provided this.  In
25  McVeigh, which is 153 F.3d 1166, the court rejected
```

102

```
1   the government's argument that the defendant was
2   barred from presenting evidence of lesser role,
3   which is a statutory mitigator, because -- I mean,
4   presenting evidence of lesser role because he could
5   not meet the statutory mitigator of minor
6   participation.  So, it does allow -- the defendant
7   can craft his own non-statutory mitigators, it's
8   just Congress has offered some of these mitigators,
9   acknowledged that they're appropriate mitigators,
10  but they're not exclusive, is what I'm trying to
11  say.  The defendant can craft his own.
12          THE COURT:  So, what evidence do you
13  point to that would justify a jury concluding that
14  either Reid or Williams engaged in illegal or
15  dangerous activity which contributed to their
16  deaths?
17          MS. VAN NESS:  Well, Mr. Reid was Ms.
18  Johnson's partner, and counsel can correct me if I'm
19  wrong, but I think he was probably involved in her
20  drug selling activity, or at least he was aware of
21  it.  And Mr. Williams let them use his apartment for
22  these activities.  So even though he was -- there is
23  no evidence that I'm aware of that he was actually
24  selling himself, he was participating or allowing
25  the dangerous activity to be conducted out of his
```

103

```
1   apartment.
2           But, again, your Honor, we're asking, if
3   you will entertain this mitigator, we would like to
4   revise the language to read "one or more victims
5   voluntarily chose to engage in a dangerous and
6   illegal activity, a circumstance that contributed to
7   their deaths."  So the jury is free to parse out
8   what that means with respect to each of these
9   victims, and if they want to find that it applies to
10  all three, they may, and if they want to decide it
11  applies to only two or only one, they may, and then
12  they can give it whatever weight they want.
13          MR. SHEEHAN:  Your Honor, certainly with
14  respect to Mr. Williams, the evidence is that people
15  were smoking crack in his house and that he knew
16  that Tina was dealing crack.
17          THE COURT:  What was the evidence that
18  he knew?
19          MR. SHEEHAN:  He was there.  He was
20  living there, your Honor.  A number of people
21  identified him as living there and they would just
22  spend time smoking crack and playing cards, and Tina
23  had an active trade going on right out of the
24  apartment.  I think what the jury could reasonably
25  conclude is that in exchange for allowing -- he
```

benefited either by virtue of -- as some witnesses said, that Tina was there to help him, but he also would have had to have been -- it's very likely, more likely than not, in any case, more likely than not to have been aware of the activities that were going on, including having Tina shouting out -- engaging in the shouting matches with Mr. Womble about "I'm going to keep dealing drugs and if I'm not going to deal these drugs, nobody is going to deal these drugs."

It might not meet a beyond a reasonable doubt standard, but it's -- I believe a jury could certainly conclude that it was more likely than not that he was allowing this activity to take place in his apartment and in some way, shape or form benefitting from it as opposed to just passive acquiescence, especially since it's his apartment.

Mr. Reid, when he -- the toxicology reports indicate that he was using cocaine at the time of his death. I think a jury might reasonably conclude, at least by a preponderance of evidence, that he similarly knew that -- if he was not directly involved with, but probably was involved in the drug dealing. The crack pipes were all over -- were in that apartment underneath -- in various



locations. My recollection is that the crack pipes were under the cushions of the sofa in the room where Mr. Williams and Ms. Johnson's body was recovered. There were bags that looked consistent with being crack bags behind the bureau in that same room. The blue bag and the little white plastic baggy. The EMT talked about drug packaging material when they came in, right as they immediately came into the apartment.

MS. DAYTON: Your Honor, the government gives in. We've been beaten into submission. Can we move on? Fine, put it in. Let them argue it to the jury.

THE COURT: "One or more victims voluntarily chose to engage in drug trafficking activity, a circumstance that contributed to his or her death."

MS. VAN NESS: Yes, that's okay.

MS. DAYTON: Your Honor, before I forget, I just want to note that where it says -- it shouldn't say "preponderance of the evidence" it should say "preponderance of the information" throughout because it's not considered, quote-unquote, evidence at this point. That's how the standard reads in this statute.



THE COURT: So here is the problem, they can import from the guilt phase.

MS. DAYTON: That's fine. I think -- I would think the defense would want it to say "information." I think you could say "including the evidence from the guilt phase" or something, but I just wanted it to track the standard.

MS. VAN NESS: Your Honor, I'm sorry, but if we could go back to our original proposed language. Instead of "drug trafficking activity" and call it "dangerous and illegal activity."

MS. DAYTON: That we'll object to because that's too nebulas.

THE COURT: I think that -- you are talking about drug trafficking, right?

MS. VAN NESS: Okay.

THE COURT: Now, let's go back to page 26, the original 26, and you think it should say "a preponderance of the information"?

MS. DAYTON: I do, your Honor. If you look at the statute, 3593, it talks about the defendant, it talks about factors established beyond a preponderance of the information. It's at the end of (c), 3593(c) and I mean, the government is okay with it as it is, because you say you are using



"information" and "evidence" interchangeably, but I just wanted the defense to be aware it doesn't exactly track the language of the statute. So, if they wanted to put that objection forth, they should do so.

MS. VAN NESS: We're fine with "evidence" because on page 5 the Judge is instructing "for our purposes 'evidence' and 'information' have the same meaning."

MS. DAYTON: Then the government is fine with it, too.

THE COURT: All right then, what is next?

MR. SHEEHAN: Your Honor, on the sixth mitigating factor, No. 6, I think the evidence is really 15 as opposed to -- I'm sorry, it should be 16, not 19. I'm sorry.

THE COURT: Before age 16 he lived in 16 different places?

MR. SHEEHAN: Yes, your Honor.

THE COURT: All right, what's next?

MS. RODRIGUEZ-COSS: Factor No. 9, your Honor, we're -- I think there was an original modality, which was --

THE COURT: I keep changing this.

108

```
1           MS. RODRIGUEZ-COSS:  "Of his mother."
2    And in that sense, your Honor, the government is
3    wondering what the evidence to support that factor
4    has been.  We heard testimony --
5           THE COURT:  Well, we have Skibo.
6           MS. RODRIGUEZ-COSS:  Well, we heard
7    testimony of two different instances in which Skibo
8    was, one, to have head-butted Ms. Smith and another
9    one struck her in the face.  With respect to either
10   incident there is no evidence the defendant was
11   present when that happened.  So we're wondering what
12   the argument is in support of that factor.
13          MR. SHEEHAN:  I don't think he has -- he
14   does not have to physically have been present there,
15   your Honor.  The family --
16          THE COURT:  It says:  "He was exposed to
17   emotional and physical because towards his mother."
18          MR. SHEEHAN:  Correct.
19          MS. RODRIGUEZ-COSS:  We don't even know
20   whether he knew of it.  There was no evidence to
21   demonstrate or even --
22          THE COURT:  Are you referring to Skibo
23   or Richard Aquart?
24          MR. SHEEHAN:  Well, the emotional would
25   be Richard and I think the emotional and physical
```

109

```
1    would be Skibo.
2           MS. DAYTON:  There is no evidence that
3    Richard Aquart emotionally abused her.  There is
4    evidence that he cheated on her and there is
5    evidence that Skibo and she argued, and then there
6    is these two incidents.  There was no evidence he
7    was present.  I mean, married couples argue and
8    sometimes people in relationships cheat.  I think
9    that would hardly qualify as emotional abuse.  It's
10   not nice, it's a betrayal of trust perhaps, but it
11   wouldn't qualify as emotional abuse.
12          MS. RODRIGUEZ-COSS:  In any event, your
13   Honor, we don't have any evidence presented the
14   defendant was aware of either case.
15          THE COURT:  What are you pointing to
16   specifically?
17          MR. SHEEHAN:  I'm just pointing to the
18   fact that it occurred in the context of that
19   relationship where the defendant was living,
20   including the fact that his brother was observing it
21   and his brother -- I believe there was testimony
22   from at least one of the witnesses that that was one
23   of the contributing factors that caused his brother
24   to leave.
25          THE COURT:  Who said that?
```

110

```
1           MR. SHEEHAN:  I want to say it was --
2           MS. DAYTON:  Azizi left because the
3    neighbor did -- there was some incident with the
4    neighbor and the neighbor --
5           MR. SHEEHAN:  No, that was what Azizi
6    said.
7           MS. DAYTON:  Yeah, he got blamed for it.
8           MR. SHEEHAN:  And then another -- I'm a
9    little bit at a loss to exactly point to who, and it
10   might just be a function of my decaying brain cells.
11          MS. RODRIGUEZ-COSS:  Or lack of
12   evidence.
13          MS. DAYTON:  That was just a joke.
14          MR. SHEEHAN:  We worked out a truce.  I
15   didn't work out a truce with you.
16          MS. REYNOLDS:  We went over the evidence
17   and we didn't see any testimony supporting this
18   factor, so that's why we brought it up.
19          MS. DAYTON:  Yeah, and it was very
20   specific.  Azizi requested to move in with Richard
21   following an incident with a neighbor where Azizi
22   got in trouble for something he didn't do, not
23   because of conflict with Skibo.  It was on June 3rd,
24   2011.
25          THE COURT:  So why don't I get the
```

111

```
1    defendant to --
2           MR. SHEEHAN:  Either point to something
3    or withdraw it.
4           THE COURT:  Tell me what it is that's in
5    the evidence that would support this mitigator.
6           MR. SHEEHAN:  I'll either point to
7    something or withdraw it, your Honor.
8           MS. RODRIGUEZ-COSS:  14, are you
9    insisting on the deportation aspect?
10          MR. SHEEHAN:  He was deported, and I
11   think the evidence supports that.
12          MS. DAYTON:  Your Honor -- I'm sorry,
13   No. 11, it says "Azibo Aquart's father, Richard
14   Aquart, exposed Azibo Aquart," and it says "and his
15   brothers to violence, drug dealing and other
16   criminal activity."
17          THE COURT:  So you want "and his
18   brothers" taken out.
19          MS. DAYTON:  Right.
20          MR. SHEEHAN:  Well, I think the
21   relevance to "and his brothers" is important, your
22   Honor.
23          THE COURT:  You can argue that, because
24   this is a mitigator as to the defendant.  There is a
25   lot that relates to other Aquarts, but we're
```

112

1  concerned with Azibo Aquart.
2          MS. RODRIGUEZ-COSS:  Specifically what
3  is the other criminal activities, your Honor?
4          THE COURT:  Probably guns.
5          MS. DAYTON:  That's violence, isn't it?
6          THE COURT:  Pardon me?
7          MS. DAYTON:  Wouldn't that follow under
8  violence?  Maybe it should say gun trafficking or
9  drug dealing.  Gun possession and drug dealing, the
10  violence is.
11          THE COURT:  Well, I thought what this
12  was getting at was because he was dealing drugs the
13  family -- Azibo was exposed to the violence that
14  goes along with that.
15          MR. SHEEHAN:  And there is evidence
16  they're all tucked into the closet in the context of
17  this war with the Dominicans.
18          MS. DAYTON:  That's violence, isn't it?
19          MR. SHEEHAN:  Where Azizi is --
20          THE COURT:  What are you talking about
21  "other criminal activity"?
22          MR. SHEEHAN:  Well, I would say that --
23  well, we have the firearms, we have the violence.
24  The father is in a fugitive status throughout this
25  period of time.  I think we've established that.

113

1          THE COURT:  But you didn't establish
2  that Azibo as a kid knew that.
3          MR. SHEEHAN:  I think we can -- I think
4  the jury could reasonably infer that Azibo knew that
5  because all of the people around him knew that,
6  including Gillian who was taking care of him at
7  various points in time, including his brothers.
8          THE COURT:  Do you remember Azizi
9  testified how his father used a lot of names, but he
10  didn't understand why that was until later.
11          MR. SHEEHAN:  Correct, but the question
12  is the later.  By later he was 12 years old.
13          THE COURT:  I'm sorry, are you arguing
14  that "other criminal activity" means or includes
15  being a fugitive?
16          MR. SHEEHAN:  Yes, and basically
17  fraudulently representing who you are.
18          MS. RODRIGUEZ-COSS:  That's factor 13
19  then.
20          THE COURT:  So, why is this not just
21  violence and drug dealing when we have he stored
22  illegal weapons in the home as a separate one, he
23  was a fugitive as a separate one.
24          MR. SHEEHAN:  That's fine, your Honor.
25          MS. RODRIGUEZ-COSS:  We have weapons as

114

1  a separate mitigating factor, your Honor.  What
2  exactly is the violence he was exposed to in
3  mitigating factor 11?
4          MR. SHEEHAN:  Among other things he was
5  locked in the closet.
6          MS. RODRIGUEZ-COSS:  Locked in the
7  closet --
8          THE COURT:  The gang warfare?
9          MR. SHEEHAN:  Yes, and have people
10  coming in the house who were shot.
11          MS. RODRIGUEZ-COS:  Are you talking
12  about the incident when he was two years old?
13          MR. SHEEHAN:  This becomes part of the
14  whole family culture, your Honor.  While it's true
15  that at some point in time you might not as a child
16  specifically know why you are stuck in the closet,
17  you certainly know about it later on.
18          THE COURT:  Is the closet what you are
19  talking about for violence?
20          MR. SHEEHAN:  No, that's part of it,
21  your Honor, that they're in the closet with Azizi
22  holding the pistol to guard against the people who
23  are coming in while his father is shot.
24          MS. RODRIGUEZ-COSS:  His father was
25  shot?

115

1          MR. SHEEHAN:  That's what Azizi
2  testified to.
3          MS. DAYTON:  He said it was his uncle.
4          MR. SHEEHAN:  No, there was an uncle
5  that was killed.
6          MS. DAYTON:  The uncle was shot.
7          THE COURT:  You can say violence, but --
8          MS. RODRIGUEZ-COSS:  The father was
9  never shot.
10          THE COURT:  The violence is what all is
11  occurring because of his drug dealing, and whether
12  it's the battle with the Dominicans or whether
13  it's -- you can have violence, but I certainly think
14  being two years old in a closet is hardly a
15  mitigator.  But let's go on.
16          MS. RODRIGUEZ-COSS:  Point 14, your
17  Honor, we were wondering, it says he was sent to
18  prison for eight years and then deported to Jamaica.
19  I don't know that there is any evidence to support
20  he was deported to Jamaica.
21          MR. SHEEHAN:  As opposed to "to
22  Jamaica"?
23          MS. RODRIGUEZ-COSS:  As opposed to what?
24          THE COURT:  "And then deported," is that
25  what you want?

116

```
1              MS. RODRIGUEZ-COSS:  Yes.
2              MR. SHEEHAN:  "And then deported" is
3   fine, your Honor.
4              MS. DAYTON:  No, it doesn't say he
5   was -- there is no evidence he was deported.
6              THE COURT:  Yes, there is.
7              MS. DAYTON:  What is it?
8              THE COURT:  I don't know, somebody said
9   it.
10             MR. SHEEHAN:  No, they testified --
11             THE COURT:  How do I know it otherwise?
12             MS. DAYTON:  They said it a bunch of
13  times.  The defense kept saying it over and over.
14             THE COURT:  Why don't you look at the
15  record, see if you have a witness who says he was
16  deported.
17             MR. SHEEHAN:  Do you know, really, I
18  mean, everyone knows he was deported.
19             THE COURT:  We know that.
20             MR. SHEEHAN:  They know that, I know
21  that.
22             THE COURT:  The question is does the
23  evidence show this.  Is there something the jury
24  could conclude.  All right.
25             MR. SHEEHAN:  Your Honor, I --
```

117

```
1              THE COURT:  Defendant to advise re:
2   Evidence.  And I think part of the problem is that
3   all of us know that, but that is not what's at
4   issue.
5              MR. SHEEHAN:  But, your Honor --
6              THE COURT:  Just tell me who said it.
7              MR. SHEEHAN:  But could I just say we
8   were struggling to get the INS in here, which is
9   like moving a buffalo.  Both sides were doing that
10  in good faith.  We had -- and everybody from the
11  prison records on down knew that Mr. Aquart was
12  deported at the end of his prison term.  Now --
13             THE COURT:  Okay, let's move on.
14  Anything further?
15             MR. SHEEHAN:  Your Honor, I think we
16  were on 29.
17             MS. DAYTON:  I'm sorry, No. 17, "Azibo
18  Aquart grew up in an environment where illegal drug
19  use was accepted."  So, Azizi testified that some
20  people in their faith smoked marijuana, but mostly
21  what the evidence was, was that it was frowned upon.
22  You know, there was a -- between the Rastas and the
23  12 Tribes, there was -- I think Desta Meghoo
24  testified to this.
25             THE COURT:  12 Tribes frowned upon it
```

118

```
1   and Rasta did not.
2              MS. DAYTON:  Right, and they're from 12
3   Tribes.  There is no evidence of anyone using drugs
4   in front of them at any time.
5              MR. SHEEHAN:  I think, your Honor, there
6   was testimony certainly that the father was selling
7   drugs.
8              MS. DAYTON:  That's in here all over the
9   place.
10             MR. SHEEHAN:  And I think that the
11  evidence is that people were smoking, and it wasn't
12  cigarettes they were talking about.
13             MS. DAYTON:  There wasn't evidence of
14  that, actually.
15             MR. SHEEHAN:  What's clear I think is if
16  you are selling --
17             THE COURT:  You are not using,
18  necessarily.
19             MS. DAYTON:  For instance --
20             MR. SHEEHAN:  If you are selling you are
21  accepting that illegal drug use is ongoing.
22             MS. DAYTON:  Well, we have drug dealing
23  in No. 11.
24             THE COURT:  What's the difference
25  between being exposed to drug dealing and being in
```

119

```
1   an environment where illegal drug use was accepted?
2              MR. SHEEHAN:  Probably not much.  Don't
3   hold it against me.
4              THE COURT:  All right, what's next?
5              MR. SHEEHAN:  Yes, your Honor, on 29.
6              MS. DAYTON:  He keeps jumping ahead to
7   29 and I'm jumping to 21 because, again, that seems
8   to be a repeat "following his mother's death, Azibo
9   Aquart's life was characterized by exposure to drug
10  dealing and acts of violence" which we already said
11  Azibo Aquart's father, Richard Aquart, exposed Azibo
12  Aquart to violence and drug dealing.
13             MR. SHEEHAN:  The dad is locked up at
14  that point.
15             THE COURT:  But Azizi did not testify
16  that -- I can't remember, did he testify that he was
17  involved in drug dealing?
18             MR. SHEEHAN:  He did, and he got shot.
19             MS. DAYTON:  Yeah, but then 22 is part
20  of 21.  I'm repeating out loud what Mr. Markle just
21  said.
22             So, I mean it's like compounding.  If
23  the act of violence is that Azizi got shot, well,
24  then 21 and 22 should be combined to indicate what
25  it is actually referring to.
```

120

```
1              MR. SHEEHAN:  Your Honor, could I jump
2  down to --
3              THE COURT:  Let me ask you whether or
4  not there is going to be a consolidation of some of
5  these mitigators so that --
6              MS. DAYTON:  Your Honor, we have the
7  same objection.
8              MR. SHEEHAN:  We could consolidate, your
9  Honor.  Well, I take it the only issue about
10 consolidation is they're separate things.  So, if we
11 were to say 21, exposure to drug dealing, period,
12 then leave 22 as it is, that would be fine.
13             THE COURT:  Because 21 really is covered
14 by either 5 or 10 or 11.  All right, so let's take
15 out 21.  And 22 stays in because that's in there for
16 a separate reason.  Well, we could combine 22 and
17 23, no?
18             MS. DAYTON:  Well, 20, 23 and 25
19 essentially say the same thing.
20             THE COURT:  I think 20 is a little
21 different.  20 is over that whole period of time
22 assuming you don't consider Azizi an adult.  So, why
23 not 22 and 23:  "When he was 13 his brother was shot
24 three times, nearly died, and for several months he
25 was left with no supervision."
```

121

```
1              MR. SHEEHAN:  The problem sometimes,
2  your Honor, is I think juries when they look at
3  compound mitigators, they then get into saying, no,
4  because you don't have each factual component.  In
5  other words, they might agree yes, he was shot three
6  times and nearly died, but they might say, well, but
7  I don't think he was left with no supervision.
8              THE COURT:  All right.
9              MS. DAYTON:  I mean, the fact that Azizi
10 was shot is not really a mitigator to Azibo because
11 they say repeatedly in other places that his life
12 was characterized by exposure to violence.  So,
13 they're just saying it another way again.
14             MR. SHEEHAN:  This is a specific
15 instance of his brother being shot, which is of a
16 different nature than his uncle being shot and a
17 different nature than his father being shot.
18             THE COURT:  So, what if we took 23 out
19 because it is subsumed in 25?
20             MR. SHEEHAN:  That's fine.
21             THE COURT:  All right, anything else?
22             MS. DAYTON:  So 21 and 23 are out,
23 correct?
24             THE COURT:  Correct.
25             MR. SHEEHAN:  Your Honor, 29 we would
```

122

```
1  delete --
2              THE COURT:  All right, we didn't have
3  that.
4              MR. SHEEHAN:  As redundant of 28.  And
5  30 we would delete.  We did not offer Dr. Lewis.
6              THE COURT:  All right, what's next?
7              MS. RODRIGUEZ-COSS:  For purposes of the
8  record, again, on page 29, second full paragraph, we
9  again object to the definition of mitigating factor.
10             THE COURT:  Okay.  I just think that's
11 at odds with Tennard, but your objection is noted.
12             All right, what's next?
13             MS. RODRIGUEZ-COSS:  On page 31, unless
14 the defense has something before then, in the first
15 paragraph the Court does not mention non-statutory
16 aggravating factors.  We believe those need to be
17 added before referring to the existence of
18 mitigating factors.  So, we would suggest that in
19 the third sentence where it says "and after you have
20 determined whether," add "the government has
21 established any non-statutory aggravating factors
22 beyond a reasonable doubt, and further whether Azibo
23 Aquart has proven by a preponderance of the evidence
24 the existence of any mitigating factors, then you
25 must engage in a weighing process."
```

123

```
1              THE COURT:  They don't have to find a
2  non-statutory aggravating factor to get to -- to get
3  on with the job.
4              MS. RODRIGUEZ-COSS:  They don't have to
5  find them, but that's why it says "whether."  "After
6  you determine whether the government has established
7  any non-statutory aggravating factors."  If they do
8  find them, they certainly will weigh them.
9              MS. VAN NESS:  Your Honor, I think the
10 way you have it is correct because you are
11 describing the weighing.  The only way they can even
12 consider weighing anything is if they find the
13 mental state.
14             THE COURT:  I need to move "beyond a
15 reasonable doubt" to the right place.
16             MS. VAN NESS:  And then in the third
17 paragraph you say "you must independently weigh the
18 aggravating factor or factors that you've found."
19 So, I think it's clear.  But they don't even start
20 the process until they have found these two
21 threshold factors, one --
22             THE COURT:  Okay, but if you look at
23 that, we've left out a stage because we jump right
24 to mitigating factors and we haven't mentioned the
25 non statutory aggravators.  So what we are trying to
```

124

1   say is: "Only if you find, unanimously find the
2   government has proved beyond a reasonable doubt the
3   existence of a threshold mental state factor and at
4   least one aggravating factor with regard to any
5   count, and after you have considered whether the
6   government has proved any non-statutory aggravating
7   factor and have determined whether Azibo Aquart has
8   proved the existence of any mitigating factors, then
9   you must engage in a weighing process." I think
10  that's right.
11          MS. VAN NESS: That's fine, your Honor,
12  if you'll add "beyond a reasonable doubt" after the
13  non-statutory aggravating factors.
14          THE COURT: I might not because we say
15  it so much. I would be happy if you think they need
16  it to early on add: "If I don't say it every time,
17  the government still has to prove it beyond a
18  reasonable doubt."
19          All right, what's next?
20          MS. RODRIGUEZ-COSS: The Court had held
21  in abeyance whether or not it would leave in a
22  standard of proof with regards to the weighing
23  process. The government has both in writing and
24  orally objected to that. I believe in the
25  conference we had yesterday afternoon the Court

125

1   indicated it held its decision in abeyance. So we
2   would object to that language here on page 31. As
3   we stated before, both in our papers and orally, the
4   statute is clear that the actual weighing process,
5   the final decision, is not subject to a standard of
6   proof. We've cited at least decisions from I
7   believe it's five different circuits that agree with
8   that interpretation of the Federal Death Penalty
9   Act, that there is no standard of proof for that
10  final decision. We would request that language be
11  stricken.
12          MS. DAYTON: Your Honor, just to add to
13  it, in the motion that we had filed last year, the
14  thrust of the argument was that it's -- and what the
15  case law holds, is it's a process, it's not a
16  factual finding. And so how can a process be beyond
17  a reasonable doubt? Because if you are just
18  weighing something, for instance if you put
19  something on the scales of justice, for instance, it
20  would just balance back and forth and it would have
21  to sufficiently outweigh, and coming to that --
22  going through that process there is no -- you can't
23  give it a mathematical number, you can't -- you
24  know, it's their decision what is sufficient.
25          MS. RODRIGUEZ-COSS: Your Honor, for the

126

1   record, can we just add the cases -- I apologize.
2   Your Honor, for the record, what the cases have
3   specifically said is that it is a reasoned and
4   individualized moral judgment that does not require
5   a finding beyond a reasonable doubt, and in support
6   of that we would cite United States v. Sampson, 486
7   F.3d 13, that's a First Circuit case; United States
8   v. Fields, 483 F.3d 313, that's the Fifth Circuit,
9   your Honor; United States v. Mitchell, that's the
10  502 F.3d 931, that's the Ninth Circuit; United
11  States v. Barrett, 496 F.3d 1079, that's the Tenth
12  Circuit; and United States v. Purkey, 428 F.3d 738,
13  your Honor, the Eighth Circuit. Purkey, cert denied
14  on that issue.
15          THE COURT: Anything you want to add to
16  that, Ms. Van Ness?
17          MS. VAN NESS: Yes, your Honor, I will
18  not reargue what I argued yesterday because I made a
19  full record, but the factual question, which was
20  also argued by the government, the "beyond a
21  reasonable doubt" language is not about a fact, it's
22  about a level of certainty that the jury has, and I
23  don't think there's anything wrong with elucidating
24  for them what the standard is rather than leaving it
25  to their individual decisions as to what

127

1   "sufficiently outweigh" means.
2          And furthermore, the determination as to
3   whether a sentence of death is to be imposed is a
4   moral decision for each juror to make, but that's on
5   the determination step after they've weighed.
6   That's the next step. This weighing decision, I
7   think the government should be required to prove a
8   level of certainty on the weighing step, and the
9   circuit cases that have been cited, again, I don't
10  believe any of them say that it is forbidden for you
11  to do this, and on the contrary, many district
12  judges, as I said yesterday, have charged this
13  language, including your Honor, and I think it's
14  perfectly appropriate not to leave this to the
15  jurors to come up with their own standard. They
16  could come up with a preponderance standard. How
17  could that be with a death sentence?
18          MS. DAYTON: It's actually they can't
19  come up with their own standard, they have to follow
20  the standard that is outlined in 3593, which is
21  sufficiently outweigh.
22          MS. VAN NESS : Right, which could be
23  51 percent.
24          MS. DAYTON: I don't think 51 percent
25  means sufficiently. And your Honor is defining

128

```
1    preponderance to mean 51 percent.  So it's hardly
2    reasonable that they could think a completely
3    different standard had the exact same mathematical
4    equation because your Honor would have defined it
5    that way if it did.  So, again, under a statutory
6    construction the words "reasonable doubt" are all
7    throughout 3593 and they're specifically not here,
8    and it says "sufficiently outweigh."  That's all it
9    says, and that it has to be unanimous, which is a
10   significant issue.
11           THE COURT:  All right, I will again look
12   at those cases.  I thought at least Purkey related
13   to the indictment and not to the -- not to this
14   aspect, but I will look at that again.
15           All right, what's next?
16           MS. VAN NESS:  Your Honor, on page 32,
17   at the end of this second full paragraph I request
18   that you add language that you used in prior steps
19   which is:  "For any count that you do not
20   unanimously find beyond a reasonable doubt that the
21   aggravating factors sufficiently outweigh the
22   mitigating factors so as to justify a sentence of
23   death, your deliberative tasks" --
24           MS. RODRIGUEZ-COSS:  I'm sorry, I lost
25   you.  I apologize, you were going so quickly.  Are
```

129

```
1    you adding language or are you reading from the
2    proposed charge?
3            MS. VAN NESS:  I would like to add
4    language that the Judge has provided in other
5    sections.
6            THE COURT:  And where are we doing that?
7    We're on 32.
8            MS. VAN NESS:  Page 32 at the end of the
9    second full paragraph.
10           THE COURT:  All right, "Each juror is to
11   decide individually."  "You will reflect your
12   determination in Section VI."
13           MS. VAN NESS:  Yes, after that, using
14   language you charged in prior sections, for example
15   on page 10, I would ask you to add:  "For any count
16   that you do not unanimously find beyond a reasonable
17   doubt that the aggravating factors sufficiently
18   outweigh the mitigators so as to justify a sentence
19   of death, your deliberative task as to that count
20   will be over and the Court will impose a mandatory
21   sentence of life without release."
22           THE COURT:  So, doesn't that suggest a
23   process that's a little different than how I had
24   conceptualized it, and that is that you've got all
25   the aggravating factors that are proved beyond a
```

130

```
1    reasonable doubt, you've got all the mitigating
2    factors that are proved by a preponderance of the
3    evidence, and you weigh them collectively.
4            MS. VAN NESS:  Yes.
5            THE COURT:  So why -- I don't understand
6    what you are adding and whether, in fact, it's
7    correct.
8            MS. VAN NESS:  Well, my intent was to
9    add the concept that if they are at the weighing
10   step and they've found all the other burdens have
11   been met, that if they do not unanimously find that
12   the aggravating factors sufficiently outweigh the
13   mitigating factors so as to justify a sentence of
14   death, then they can't go on and impose a death
15   sentence, they're done, and then your Honor would
16   impose life without release.  Just as you've
17   indicated in earlier sections when a critical step
18   has not been reached; for example, finding at least
19   one statutory aggravator.  So, on the weighing step
20   if they don't unanimously make this determination,
21   then they can't go on to the next section, which is
22   determination of a sentence and vote to impose a
23   death sentence, because this penultimate finding
24   will not have been unanimously determined.
25           MS. RODRIGUEZ-COSS:  So, I think in that
```

131

```
1    regard then, your Honor, we intended to raise this
2    when we got to page 33, you know, the government
3    would suggest that the instruction at page 33 really
4    is unnecessary because the instruction on page 31
5    through page 32 explains the process, and so the
6    jury determines whether or not the aggravating
7    factors outweighed the mitigating factors
8    sufficiently to justify a sentence of death, and so
9    to then include sort of a second step to decide what
10   the appropriate sentence is, the government would
11   submit is not something that's envisioned under the
12   statute, and it's somewhat confusing in that regard.
13   And perhaps if the Court wishes to add "and whether
14   the aggravating factors sufficiently outweigh the
15   mitigating factors sufficiently to justify a
16   sentence of death and that a sentence of death is
17   appropriate," rather than include a complete
18   separate instruction, a complete separate step that
19   may confuse the jury.
20           MS. VAN NESS:  Your Honor, the whole --
21   one of the principle instructions you've given these
22   jurors over and over and over again, and you are
23   going to give it to them again now, is that they are
24   never required to impose a death sentence even if
25   they get to this last weighing stage and determine
```

132

```
1  unanimously that the aggravating factors are
2  sufficient to justify a sentence of death.  Even
3  then they're not required to impose a sentence of
4  death.  So, I think dividing up the weighing step
5  and the sentencing determination is completely
6  consistent with your charge and with the Federal
7  Death Penalty Act where it is clear that even if all
8  of these burdens are met by the government, no one
9  is ever required to impose death.
10          And I think if you take -- if you unlock
11 this division and combine it, then I think you are
12 undermining that very important instruction, which
13 is a matter for each individual juror, and this is
14 where in the sentence determination stage the moral
15 judgment of -- the personal moral judgment of each
16 juror comes into play.  They can unanimously agree
17 that they could impose the death penalty because all
18 of these steps have been found, but they don't have
19 to.  So, I think it's been done in many other cases,
20 and I think, I'm almost positive, it was done in
21 Perez, that you separate out the weighing step from
22 what actually, jury, is your decision, and I think
23 that's perfectly appropriate.
24          THE COURT:  The thing you just wanted me
25 to add, doesn't that conflate the distinction
```

133

```
1  between the two?
2          MS. VAN NESS:  No, because here your
3  weighing step, this is your discussion of how they
4  weigh and what the standard is, and if they can't
5  determine unanimously that the aggravators
6  sufficiently outweigh to justify a sentence of
7  death, then they can't impose a death sentence.  If
8  they're not unanimous on this last step, they can't
9  even consider a death sentence.  But if they are
10 unanimous on this last step, they aren't required to
11 impose a death sentence, so they have to go on to
12 the next stage and decide whether they actually want
13 to impose that sentence.
14          MS. RODRIGUEZ-COSS:  I think it's
15 abundantly clear their decision must be unanimous.
16 I think the Court says it previously in the charge
17 and it's clear in this instruction, it is unanimous.
18          MS. VAN NESS:  But we don't want them
19 thinking this is somehow mandatory notwithstanding
20 the charges elsewhere.
21          MS. RODRIGUEZ-COSS:  Nothing about this
22 charge --
23          MS. VAN NESS:  Seriously, this is a
24 decision --
25          THE COURT:  Let me re-read that in
```

134

```
1  contemplation of your viewpoints.  I do want to be
2  sure that they do understand, having once upon a
3  time read a study that resulted from interviews with
4  death jurors who appeared to have misunderstood this
5  point notwithstanding charges that said you never
6  have to impose a death sentence.
7          MS. VAN NESS:  Right, we don't want any
8  confusion this is in any way an automatic death
9  sentence.
10          THE COURT:  I don't want anybody
11 confused on what I'm saying in the charge.
12          MS. RODRIGUEZ-COSS:  I think the Court
13 says it.
14          THE COURT:  Let me reflect on your
15 comments and see how it might be improved to make
16 clear even if they were to unanimously agree that
17 the aggravators outweighed the mitigators they still
18 don't have to impose a penalty of death.  Let me
19 just reflect on that and try to make it as clear as
20 possible.
21          All right, what's next?
22          MS. VAN NESS:  On 33, your Honor, on
23 what I hope you retain as a separate section of the
24 charge and verdict sheet, the actual determination
25 of sentence, in the second paragraph, assuming again
```

135

```
1  I hope that you are going to add the "beyond a
2  reasonable doubt" language for the weighing step, I
3  would ask that you in the "bear in mind" paragraph,
4  in the first sentence that you add "beyond a
5  reasonable doubt" after "unanimously concluded" in
6  the third line.  So it reads -- I'm sorry, so that
7  that sentence will read:  "Bear in mind in order to
8  find unanimously that a sentence of death should be
9  imposed on defendant Azibo Aquart, the jurors must
10 first have unanimously concluded beyond a reasonable
11 doubt that a death sentence is justified."  That
12 would be if your Honor agrees to charge that
13 language, I think it should go here as well as
14 elsewhere.
15          MS. RODRIGUEZ-COSS:  For reasons
16 previously stated --
17          THE COURT:  Do you think there is one
18 too many "unanimously" in that sentence?
19          MS. DAYTON:  I don't know, let's take a
20 vote, see if we're unanimous.
21          MS. VAN NESS:  Yes.
22          THE COURT:  I think the first one needs
23 to come out.
24          MS. VAN NESS:  I agree.
25          MR. SHEEHAN:  We're unanimous about
```

136

```
1   that, your Honor.
2            THE COURT:  All right, what's next?  So
3   the insertion of "beyond a reasonable doubt" is the
4   issue that remains on which the government has given
5   me the five cases and maintains that it's a process,
6   not a factual finding, and thus, it's not subject to
7   that beyond a reasonable doubt.
8            MS. RODRIGUEZ-COSS:  Right.
9            MS. VAN NESS:  I have one last thing on
10  page 35.
11           THE COURT:  35?
12           MS. VAN NESS:  Your Honor, on the duty
13  to deliberate, we had a final sentence in our
14  request to charge which I ask that you insert at the
15  end of your duty to deliberate section, which reads:
16  "Each juror's decision is an individual one which
17  must be respected by the other jurors."  I think
18  that that's certainly a correct statement and I just
19  think that it is an effective instruction for people
20  to be encouraged to come to their own conclusion,
21  notwithstanding all of the instructions you've given
22  that they should try to reach common ground, which
23  are perfectly appropriate instructions, but I think
24  reminding the jurors that they should respect each
25  other's decisions is a useful instruction.
```

137

```
1            MS. RODRIGUEZ-COSS:  I think sentence
2   number two encompasses that:  "Each of you must
3   decide the question of punishment, but only after
4   full consideration of the evidence with other
5   members of the jury."  I don't see how that adds
6   much to this.
7            THE COURT:  I don't -- when you say
8   "must be respected by the other jurors," I don't
9   know what that means.  In the deliberative process
10  they, by definition, are --
11           MS. DAYTON:  Deliberating.
12           THE COURT:  Expressing their views with
13  an idea of persuading others to come to their
14  viewpoint.
15           MS. VAN NESS:  Well, I just think it's a
16  useful sentence to -- in case there is -- there are
17  strong opinions on each side as to what to impose
18  while they are deliberating, while they are in good
19  faith trying to reach a unanimous agreement.
20           MS. DAYTON:  Your Honor, they're allowed
21  to have strong opinions on both sides.  As we
22  started from the very beginning of voir dire, it's
23  very clear that people have very strong opinions on
24  the death penalty, period, and to say they must
25  respect each other almost says -- I mean, this is a
```

138

```
1   jury that's getting along.  You can see they're
2   getting along.  And it sort of insinuates someone
3   back there is going to be bullying or that there is
4   bullying.  The deliberative process is exactly what
5   your Honor instructs them, it is -- it's a weighing
6   and discussing process, and to say they must respect
7   each other, like what does that mean, don't hit each
8   other?  There is no evidence that they've done
9   anything but respect each other.  There is no issue
10  in the first phase of this case that someone was
11  being bullied or forced to act in any manner
12  whatsoever against their will.
13           MS. RODRIGUEZ-COSS:  And it may inhibit
14  jurors from trying to convey their opinions and
15  bring arguments to the attention of other jurors,
16  which is exactly what you don't want in the
17  deliberative process.
18           MS. DAYTON:  Regardless of which way
19  those arguments go.
20           MS. VAN NESS:  Your Honor, I'll rest on
21  what I said, but I am certainly not advocating,
22  trying to encourage jurors not to have strong
23  opinions.  Their opinions can be as strong as they
24  have them.  That is not the import of that request.
25           THE COURT:  So if we added something
```

139

```
1   like in the second sentence:  "However, each of you
2   must decide the question of punishment for
3   yourselves after full consideration of the evidence
4   with the other members of the jury and respectful
5   consideration of their views."
6            MS. RODRIGUEZ-COSS:  That's fine.
7            MS. VAN NESS:  That's fine.
8            THE COURT:  All right, anything else?
9            MS. VAN NESS:  Page 38, your Honor.  The
10  third paragraph in the conclusion on page 38, I
11  would ask that you delete the last clause of that,
12  of the "so doing" sentence.  So it reads:  "By so
13  doing, you carry out your oath as jurors."  I don't
14  think the purpose here is for them to enter a true
15  verdict or a just verdict, they are entering the
16  verdict that they think is required.
17           MS. RODRIGUEZ-COSS:  Well, they're
18  certainly to render a just verdict.  I think that's
19  standard language.
20           MS. VAN NESS:  All of the discussion --
21           THE COURT:  You just want to take out
22  "you will render a true and just verdict"?
23           MS. VAN NESS:  Yes.
24           THE COURT:  But "by doing so you carry
25  out to the fullest your oath as jurors."
```

140

```
1           MS. VAN NESS:  Because of what you've
2  previously said, you have to discuss things.
3           THE COURT:  That's fine.
4           MS. VAN NESS:  It's sort of a sum-up of
5  what you said before.
6           THE COURT:  Anything else?
7           MS. VAN NESS:  One last thing on page
8  39, your Honor.  I think you have left out a step on
9  the second full paragraph.  You asked the jurors to
10 be prepared to report to the Court their findings as
11 to the threshold mental state factor, the
12 aggravating and mitigating factors, the weighing
13 decision and the sentencing decision, because the
14 weighing decision is a separate section of the
15 verdict form that they have to fill out.
16          MS. RODRIGUEZ-COSS:  Note our objection
17 to that, your Honor.
18          THE COURT:  That's because you think 6
19 and 7 are just one.
20          MS. RODRIGUEZ-COSS:  Yes, ma'am.
21          THE COURT:  All right.
22          MS. RODRIGUEZ-COSS:  Your Honor, without
23 repeating ourselves, the objections we have to the
24 instructions with regards to, for example, the --
25          MR. SHEEHAN:  I can't hear counsel.
```

141

```
1           THE COURT:  Use the mic.
2           MS. RODRIGUEZ-COSS:  The objections we
3  have with regards to the standard of proof, for
4  example with regard to the weighing process, would
5  apply to the verdict form as well.  So we understand
6  the Court would consider both.
7           THE COURT:  Right, of course, one is
8  tailored after the other.  There are a lot of
9  changes that need to be made on that.
10          MS. VAN NESS:  I just have one request
11 on the verdict sheet that isn't covered by whatever
12 your rulings will be on all these other matters,
13 which would be on page 13, the weighing
14 determination.  I'm not sure what "not applicable"
15 means.
16          THE COURT:  It means that they aren't
17 getting there with that particular victim.  In other
18 words, that those counts dropped out earlier.
19          MS. VAN NESS:  Do you think that's worth
20 advising?  Because I honestly was a little confused
21 what you meant by that.
22          MS. RODRIGUEZ-COSS:  We actually circled
23 it and have a question mark ourselves.
24          THE COURT:  I can leave it out.  The
25 only reason I put it in is I don't want them filling
```

142

```
1  it out if they shouldn't be getting there and they
2  may need to put something somewhere.
3           MS. VAN NESS:  Your Honor, I understand,
4  and I think that's a good point, but in the proposed
5  verdict sheet we filed there was a little
6  introduction to the space for their findings, which
7  is to "complete the section only with respect to
8  those counts, if any, for which you have unanimously
9  found," you know.
10          MS. DAYTON:  Well, the first thing they
11 have to find is the threshold factors.  So, it's
12 hard to say "complete it only for those you found
13 unanimously."
14          MS. VAN NESS:  The weighing process
15 would only go for those counts that they've made the
16 two threshold findings, the mental state and at
17 least one statutory finding.
18          MS. RODRIGUEZ-COSS:  Right, but they
19 must be listed on the verdict form because we don't
20 know that --
21          MS. VAN NESS:  Then the nonapplicable
22 would make sense.  If you explained at the beginning
23 this is only for counts that qualify, if you will,
24 then the "not applicable" you could say means
25 they're not passing on those counts.
```

143

```
1           MS. DAYTON:  The government suggests we
2  just leave the "not applicable" out.  I can't even
3  say that.  Because both sides were confused by it,
4  and I think that it's very clear from your other
5  instructions what they're supposed to do, if they
6  couldn't come to a unanimous decision on something
7  they're supposed to go to the end.
8           THE COURT:  All right, let me work on
9  that.
10          MS. RODRIGUEZ-COSS:  Your Honor, on that
11 same page, in the paragraph itself, I think you
12 should say "found to exist" after "mitigating
13 factors" as well so that "the aggravating factors
14 found to exist sufficiently outweigh all other
15 mitigating factors found to exist.
16          MS. VAN NESS:  That's fine.  And, again,
17 in keeping with our recent discussion, at the end of
18 the weighing step you say "please proceed to Section
19 VII," and I would, for the reasons I've already
20 articulated, ask you to charge them if they don't
21 say yes for any count, then their deliberations are
22 done.  You know, it's a similar issue, that they
23 shouldn't go on to sentence unless they've said yes
24 about any count.
25          THE COURT:  "If you answered yes for any
```

**GA1518**

144

1    of the counts above, please proceed to Section VII."
2    Okay.
3              MS. RODRIGUEZ-COSS:  Your Honor, I
4    believe we said this last time, I don't recall, but
5    just to be clear, we would object to the third
6    option under each count, that they are "unable to
7    reach a unanimous decision" being included in the
8    verdict form.  We have instances where juries have
9    come to impasses and come to the court for guidance
10   and they go back to deliberate to try to reach a
11   unanimous verdict, and by including that option in
12   the verdict form I think we're discouraging the jury
13   from doing that, and it is their duty to try to
14   deliberate to a unanimous verdict to the best of
15   their ability.  So we would object to that third
16   option being in the verdict form as to each count.
17             MS. DAYTON:  This is especially true
18   because you instruct them at length about what the
19   consequence is of a non-unanimous verdict.  So to
20   put it there as if it's like an option for them to
21   choose, it's discouraging them from carrying out
22   their oaths as jurors to try to reach a unanimous
23   verdict whether that be for life or death.
24             MS. VAN NESS:  Your Honor, I think it's
25   perfectly appropriate to put that down.  It makes it

145

1    absolutely clear that they can't reach a unanimous
2    decision either way.
3              THE COURT:  I think they'll know that,
4    won't they?
5              MS. VAN NESS:  I think it gives force to
6    your instruction and it is an option, that they
7    can't agree.  You are not charging them they should
8    go back and not talk to each other and leave, but if
9    they can't agree, that is their decision, and it has
10   consequences.
11             THE COURT:  You say they have an option
12   not to agree.  What do you mean?
13             MS. VAN NESS:  Well, I mean after they
14   deliberate they have -- if they're unable to agree,
15   that is their decision, that they're unable to
16   agree.  Not an option, I misspoke.
17             MS. RODRIGUEZ-COSS:  If they're unable
18   to agree it's something they may report to the
19   Court, but it's not a sentencing option as such
20   that's normally provided to the jury on a verdict
21   form.
22             MS. DAYTON:  And we repeatedly told them
23   they have two choices here and that they could
24   choose life without parole or they could choose the
25   death penalty, and you've also instructed them as to

146

1    what the consequences of a non-unanimous verdict is.
2              MS. VAN NESS:  Your Honor, again, I
3    think this is a design of a verdict sheet that has
4    been submitted to numerous juries within the Second
5    Circuit jurisdiction and there is nothing -- it's
6    consistent with your instructions and there is no
7    reason not to include it as something they can check
8    off if they honestly are unable to agree after full
9    deliberations.
10             MS. DAYTON:  Just relying on cases that
11   the defense cited, it was not used in Basciano.  It
12   was not used Judge Garaufis in Wilson, it was not
13   used in Fell.
14             THE COURT:  All right, let me consider
15   your views on that.
16             MR. SHEEHAN:  Could I raise one other
17   issue, your Honor?
18             THE COURT:  So, if they are not
19   unanimous as to either life or death, how are they
20   going to report that?
21             MS. DAYTON:  They would come back in,
22   like they would any time, they are having a hard
23   time reaching an agreement and they let the judge
24   know we're having a difficult time reaching an
25   agreement.  At that point it may be appropriate to

147

1    give them the equivalent of an Allen charge and send
2    them back in and see if they can reach a verdict,
3    but we don't instruct a jury from the jump, like in
4    a guilt phase.  In fact, the defense objected to
5    this in the guilt phase when we were doing the
6    instructions because your Honor had what we, both
7    sides, agreed was the equivalent to an Allen charge
8    in there saying what the consequence was of a
9    non-unanimous verdict.  You had that in the original
10   draft of the jury instructions in the guilt phase.
11   Both the defense and the government objected to that
12   saying it was not appropriate to give the equivalent
13   of an Allen charge at the outset before they began
14   deliberation and your Honor took it out.
15             We believe that -- as you've pointed
16   out, this is an outspoken jury.  They haven't had
17   issues.  They -- you know, they get along well.  If
18   they're not reaching a verdict, they'll let us know.
19   You know, they'll come out, they have a foreperson
20   already, and they'll let us know that they're not
21   reaching a verdict.  If they have a question they'll
22   let us know.  They've had questions throughout.  Not
23   throughout, but they've sent questions up to you.
24             THE COURT:  They have not.  What do you
25   mean?

148

```
1          MS. DAYTON:  Yeah, do you remember Mary
2  Brown.  Sorry.
3          THE COURT:  Just one.
4          MS. DAYTON:  Two.  There was the one
5  sitting next to her, and this one, they both asked
6  questions.  They wanted things added to the
7  testimony.  You presented those to the government
8  and the defense and asked if we wanted to tailor our
9  testimony around it.  No one invited them to ask
10 questions; they asked questions anyways.  So there
11 is no reason to believe -- you know, juries follow
12 instructions, and there is no reason to believe that
13 if they're having a problem or they want read
14 back -- you know, they're not given instructions
15 about lots of things.
16         THE COURT:  Is an Allen charge
17 applicable at a penalty phase?
18         MS. RODRIGUEZ-COSS:  Yes, ma'am.
19         MS. VAN NESS:  I would disagree.
20         MS. DAYTON:  Is there any case law from
21 other courts that have decided that?
22         MS. RODRIGUEZ-COSS:  I can try to bring
23 some cases to the attention of the Court.
24         THE COURT:  For the penalty phase?
25         MS. RODRIGUEZ-COSS:  For penalty phase,
```

149

```
1  yes.
2          MS. DAYTON:  But I mean, so --
3          MR. SHEEHAN:  Your Honor, the reason it
4  wouldn't be is because it is a verdict, unlike in
5  the guilt phase.
6          THE COURT:  I'm not so sure that's true.
7          MS. DAYTON:  And whether or not --
8          THE COURT:  It's just they can't decide.
9  That's not a verdict.
10         MR. SHEEHAN:  It is a verdict in the
11 sense of the law compelling --
12         THE COURT:  It results in a sentence.
13 It's not a verdict.  But it's not a verdict.
14         MS. DAYTON:  Right.  We agree with the
15 Court it's not a verdict, it's a default result.
16         THE COURT:  I am interested, and we
17 might as well anticipate it, whether an Allen charge
18 is appropriate for the penalty phase.  So, if you
19 wouldn't mind doing a little work on that.
20         MS. DAYTON:  But regardless, we would
21 say it's not appropriate before they even begin
22 deliberating.
23         THE COURT:  I hear you.
24         MR. SHEEHAN:  We respectfully agree on
25 that.  I should say vociferously.
```

150

```
1          THE COURT:  Respect long since dropped
2  out of the equation.
3          MR. SHEEHAN:  Not towards the Court,
4  your Honor, it's always there.
5          THE COURT:  Is there anything else about
6  the verdict form that strikes you?  Obviously we'll
7  change the mitigators.  We'll take out 1B.  We'll
8  probably take out "not applicable," and we may take
9  out the "determination of sentence," part three,
10 because it's not the jury's determination of
11 sentence, it's the default that results from their
12 inability to determine the sentence.
13         Okay, anything else that you can think
14 of about the verdict form?
15         MS. VAN NESS:  No, not about the verdict
16 form, your Honor, but just on the housekeeping
17 matter that I mentioned earlier.  I have -- or
18 counsel has an e-mail version of this charge and
19 verdict sheet that you sent around for purposes of
20 discussion.  Could I print out a copy?
21         THE COURT:  We have -- we have saved
22 them.  We have saved the drafts.
23         MS. VAN NESS:  So, maybe you can just
24 date them.
25         MS. DAYTON:  And, your Honor, in the
```

151

```
1  meantime we've checked on the issue of deportation,
2  and Richard Aquart was deported.  The federal
3  government says he was deported, so we'll agree it
4  could stay in because we're not going to say he
5  wasn't.
6          THE COURT:  All right.
7          MR. SHEEHAN:  Your Honor, on a
8  housekeeping matter, would -- I think it would be
9  appropriate if your Honor were to charge after the
10 closings.
11         MS. DAYTON:  We don't.
12         THE COURT:  Do you know what, I
13 disagree, and the reason I disagree is I want them
14 to hear the law first because then two things
15 happen.  One, they then take the arguments in
16 context, number one, and number two, it allows you
17 to use the charge, if you choose to, as you weave it
18 into your arguments, and it makes it much more of an
19 integrated whole.  It also eliminates any doubt as
20 to what the Court is going to charge because the
21 Court has already charged and it avoids that awkward
22 form of "the court will charge you" as if you have
23 some special inside knowledge.
24         MR. SHEEHAN:  My objection, your Honor,
25 is that I think that it gives the government an
```

**GA1520**

152

```
1   unfair advantage insofar as they end up with the
2   rebuttal, which then is -- there may be, as was in
3   the guilt phase, a very brief section of the Court's
4   charge, but it totally walks out of the court with
5   -- the jury walks out of the court with just the
6   government's summation.
7          THE COURT:  Actually that's not quite
8   true because I will explain the verdict form to
9   them.  So the last thing they hear is the Court.
10         MR. SHEEHAN:  So, for the record, I
11  would just object to that.
12         THE COURT:  All right.
13         MR. SHEEHAN:  And could I ask this, your
14  Honor?  Your Honor gave us an hour and a half for
15  closing.  I think that it is -- I don't know how
16  much time the government is asking for.  I'm
17  certainly not asking for more than that.
18         MS. DAYTON:  We're fine with an hour and
19  a half.  We're fine with an hour and a half.
20         MR. SHEEHAN:  Do you want less?
21         MS. DAYTON:  No.
22         MR. SHEEHAN:  So I think an hour and a
23  half then, your Honor.
24         THE COURT:  Will that suit you?
25         MR. SHEEHAN:  That will be fine.
```

153

```
1          THE COURT:  And an hour and a half suits
2   the government?
3          MS. DAYTON:  That's fine.  Yes.
4          THE COURT:  Who is closing?
5          MS. REYNOLDS:  Tracy.
6          MS. DAYTON:  I'm closing.  Ms. Reynolds
7   is rebutting.
8          THE COURT:  And who is closing for you?
9          MR. SHEEHAN:  I am, your Honor.
10         And could I also ask, your Honor, I know
11  we have a row reserved for family members.  I wonder
12  if we could have a row reserved for family of the
13  defendant on the other side.
14         THE COURT:  We do?
15         MR. SHEEHAN:  We do?  Somebody put a
16  sign up.  I don't know who put it up.
17         THE COURT:  Would you check with the
18  marshals, make sure they don't have somebody sitting
19  in that row or intended to sit in that row or have
20  any security concerns.
21         MS. DAYTON:  It can't be the first row.
22         MR. SHEEHAN:  I'm not asking for this
23  row, your Honor.  I would ask that if counsel wish
24  to sit in that row, for example Ms. Van Ness, who I
25  might need to turn to at some point in time, she be
```

154

```
1   allowed to sit there, as they have allowed the
2   mitigation specialist to sit there.
3          THE COURT:  That's fine.
4          MR. SHEEHAN:  But it's the next row I
5   was just raising the concern about.
6          MS. DAYTON:  The marshals actually said
7   during the argument that's a problem.  They wanted
8   only law enforcement in that first row.
9          THE COURT:  And so Mr. Sheehan is
10  talking about is the second row.
11         MS. DAYTON:  No, but what he said about
12  Ms. Van Ness sitting in -- not during argument.  I
13  specifically had spoken to the deputy marshal, or
14  marshal, last time, and he said only law enforcement
15  in the first row.
16         So, Ms. Van Ness can sit right next to
17  you, can't she.
18         MR. SHEEHAN:  I, frankly, object.  I
19  mean, we have -- the last time we had all of the
20  Bridgeport police officers sitting right behind us.
21  They have space on the other side.
22         MS. RODRIGUEZ-COSS:  That's because
23  there was no space here.  That was to make space.
24         THE COURT:  Would you take it up with
25  the marshals.  I'm not going to do anything that
```

155

```
1   contravenes their security concerns, but everything
2   else I'm happy to endorse.
3          Okay, what we'll do is get this -- I
4   think what I'd like to do is hear -- I need to hear
5   from the defendant on a couple of the mitigators
6   before I can finalize this.
7          MR. SHEEHAN:  Wasn't there only one?
8          THE COURT:  14 is taken care of, and
9   it's No. 9, exposed to emotional and physical abuse
10  towards his mother.
11         So the sooner you can tell me that, the
12  sooner I can get you back a fully adaptive charge.
13         MS. DAYTON:  What time would you like us
14  here Monday morning to deal with any last minute
15  objections?
16         THE COURT:  Well, I think we should be
17  here at 8:30.
18         MS. DAYTON:  Yes.
19         THE COURT:  That's why I had them come
20  in at 9:30, because inevitably now there can be the
21  triangulation via BlackBerry that will undoubtedly
22  go on, but I am hopeful to get as much to you as I
23  can by six.  So if you can search your record as
24  soon as possible.
25         MR. SHEEHAN:  We have straightened out
```

156

```
1   -- or at least I've gone through -- we've gone
2   through both sets -- I've gone through both sets of
3   exhibits.
4           MS. DAYTON:  What?
5           THE COURT:  And you took out the ones
6   you didn't like?
7           MR. SHEEHAN:  Yeah, right.
8           MS. DAYTON:  He shredded ours.
9           MR. SHEEHAN:  That's a thought.  And
10  there was one exhibit that just seemed to have
11  popped right down where we had a -- maybe we can
12  straighten that out in the morning.
13          THE COURT:  What do you think it is?
14          MR. SHEEHAN:  It was the Itel Pamper
15  business certificate.
16          MS. DAYTON:  It's in there.
17          MR. SHEEHAN:  Yes, it had not been
18  marked.
19          MS. RODRIGUEZ-COSS:  It needs to be
20  marked by the clerk.  She's not here.
21          THE COURT:  Why don't you --
22          MR. SHEEHAN:  It just didn't have an "F"
23  on it.
24          MS. REYNOLDS:  We can meet with Betty.
25          MS. DAYTON:  And, your Honor, there was
```

157

```
1   an issue regarding priors coming in for Richard
2   Aquart about the notes, and my objection at the time
3   was that Mr. Smith was about to read from the notes.
4   We had agreed that the notes could come in, but I
5   just didn't think he should be reading from them to
6   the jury, testifying as to what they meant, in other
7   words, without calling a witness.  But he just --
8           THE COURT:  When you say "the notes" you
9   mean the docket entries?
10          MS. DAYTON:  Yes.  That's fine, they
11  want them to come in to show he's a fugitive.
12  Whether or not it actually shows that, but --
13          THE COURT:  All right.
14          MR. SHEEHAN:  What the docket entries
15  reflect, your Honor, is that there was a -- that
16  essentially there was a verdict in the trial court
17  and then Mr. Aquart skipped on the bond and then
18  years later was apprehended.
19          MS. DAYTON:  Well, it shows there was a
20  failure to appear.  It shows it on his rap sheet,
21  too.
22          THE COURT:  Okay.  If there is no
23  dispute about that then, we'll let them in.  Okay.
24  Thank you very much.
25          MR. SHEEHAN:  Just for the record, your
```

158

```
1   Honor, I think that the one I was talking about was
2   lost -- we'll work it out with Betty.
3           THE COURT:  Okay, thank you.
4           (Proceedings concluded 4:05)
5
6
7           I certify that the foregoing is a correct
8   transcript from the record of proceedings in the
9   above-entitled matter.
10
11              7/21/11
12              Date
13
14          /S/   Sharon Montini
15              Official Reporter
16
17
18
19
20
21
22
23
24
25
```

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

2011 JUN 15 P 12:14

|  |  |
|---|---|
| United States of America | |
| *v.* | Criminal No. 3:06cr160 (JBA) |
| Azibo Aquart. | |

**SPECIAL VERDICT FORM (Penalty Phase)**

**Section I:**     **Finding as to Defendant's Age**

Do you, the jury, unanimously find beyond a reasonable doubt that Defendant Azibo
Aquart was at least 18 years of age on August 24, 2005?

YES ☒          NO ☐

*If you indicated "yes," proceed to Section II.*

**GA1523**

**Section II:**   **Threshold Mental State Factor**

1.   Do you, the jury, unanimously find that the Government has proved beyond a reasonable doubt that Defendant Azibo Aquart intentionally killed

      (a)   Tina Johnson (Counts Two and Five)?

              YES ☒        NO ☐

      (b)   Basil Williams (Counts Four and Seven)?

              YES ☒        NO ☐

2.   Do you, the jury, unanimously find that the government has proved beyond a reasonable doubt that Defendant Azibo Aquart, intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, and the victim died as a direct result of that act, with respect to

      (a)   Tina Johnson (Counts Two and Five)?

              YES ☒        NO ☐

      (b)   James Reid (Counts Three and Six)?

              YES ☒        NO ☐

      (c)   Basil Williams (Counts Four and Seven)?

              YES ☒        NO ☐

*If you answered "no" to all questions in Section II, stop, your deliberations are complete, and you should complete the certification in Section VIII.*

*If you answered "yes" to any question in Section II, continue to Section III.*

2

**Section III.**    **Statutory Aggravating Factors (1. Heinous, Cruel, and Depraved conduct; 2. Procurement by Payment; 3. Pecuniary gain; 4. Substantial planning and premeditation; 5. Multiple victims)**

*Complete Section III only with respect to those counts, if any, to which you answered yes in Section II.*

1.    Do you, the jury, unanimously find that the Government has proved beyond a reasonable doubt that Defendant Azibo Aquart committed the homicide offense in an especially heinous, cruel, or depraved manner in that it involved torture or serious physical abuse, with respect to

      (a)    Tina Johnson (Counts Two and Five)?

            YES ☒        NO ☐

      (b)    James Reid (Counts Three and Six)?

            YES ☒        NO ☐

      (c)    Basil Williams (Counts Four and Seven)?

            YES ☒        NO ☐

2.    Do you, the jury, unanimously find that the Government has proved beyond a reasonable doubt that Defendant Azibo Aquart procured the commission of the homicide offense by payment, or promise of payment, of anything of pecuniary value, with respect to

      (a)    Tina Johnson (Counts Two and Five)?

            YES ☒        NO ☐

      (b)    James Reid (Counts Three and Six)?

            YES ☒        NO ☐

      (c)    Basil Williams (Counts Four and Seven)?

            YES ☒        NO ☐

3

3.   Do you, the jury, unanimously find that the Government has proved beyond a reasonable doubt that Defendant Azibo Aquart committed the homicide offense as consideration for the receipt, or in the expectation of receipt, of anything of pecuniary value, with respect to

     (a)   Tina Johnson (Counts Two and Five)?

               YES ☒          NO ☐

     (b)   James Reid (Counts Three and Six)?

               YES ☒          NO ☐

     (c)   Basil Williams (Counts Four and Seven)?

               YES ☒          NO ☐

4.   Do you, the jury, unanimously find that the Government has proved beyond a reasonable doubt that Defendant Azibo Aquart committed the homicide offense after substantial planning and premeditation to cause the death of

     (a)   Tina Johnson (Counts Two and Five)?

               YES ☒          NO ☐

     (b)   James Reid (Counts Three and Six)?

               YES ☒          NO ☐

     (c)   Basil Williams (Counts Four and Seven)?

               YES ☒          NO ☐

5.   Do you, the jury you unanimously find that the Government has proved beyond a reasonable doubt that Defendant Azibo Aquart intentionally killed or attempted to kill more than one person in a single criminal episode?

               YES ☒          NO ☐

*If you answered "no" to all questions in Section III, stop, your deliberations are complete, and you should complete the certification in Section VIII.*

*If you answered "yes" to any question in Section III, go to Section IV.*

4

**Section IV:** **Non–Statutory Aggravating Factors (1. Continuing Pattern of Acts of Violence; 2. Victim Impact)**

1.    Do you, the jury, unanimously find that the Government has proved beyond a reasonable doubt that Defendant Azibo Aquart committed criminal acts of violence that posed a serious threat to the lives and safety of persons other than the victims in this case, and that by so doing, the Defendant engaged in a continuing pattern of violent criminal conduct?

<div align="center">

YES ☒          NO ☐

</div>

2.    Do you, the jury, unanimously find that the Government has proved beyond a reasonable doubt that Defendant Azibo Aquart caused loss, injury, and harm to the victims and their families, as follows:

> Defendant Azibo Aquart caused the death of the victim who enjoyed a strong relationship with his or her family, including his or her parents, siblings, children and grandchildren, and the victim's family has suffered severe and irreparable harm, including the loss of emotional support from the victim and, in the case of Tina Johnson, financial support, with respect to

    (a)    Tina Johnson (Counts Two and Five)?

<div align="center">

YES ☒          NO ☐

</div>

    (b)    James Reid (Counts Three and Six)?

<div align="center">

YES ☒          NO ☐

</div>

    (c)    Basil Williams (Counts Four and Seven)?

<div align="center">

YES ☒          NO ☐

</div>

<div align="center">5</div>

**Section V:     Mitigating Factors**

For each of the following mitigating factors, indicate in the space provided, the number of jurors, if any, who find that Defendant Azibo Aquart has proved that factor by a preponderance of the evidence.

1.  Neither John Taylor nor Efrain Johnson will be sentenced to death for their roles in the murders of Basil Williams, James Reid, and Tina Johnson.

    Number of jurors who so find: ___12___

2.  One or more victims chose to engage in illegal drug–trafficking activities, a circumstance that contributed to their deaths.

    Number of jurors who so find: ___12___

3.  If not sentenced to death, Azibo Aquart will be imprisoned for the rest of his life without possibility of release.

    Number of jurors who so find: ___12___

4.  Lifetime imprisonment is a severe punishment.

    Number of jurors who so find: ___12___

5.  Azibo Aquart's execution would cause others to suffer grief and loss.

    Number of jurors who so find: ___12___

6.  Azibo Aquart grew up in communities characterized by violence and crime.

    Number of jurors who so find: ___12___

7.  Before age 16, Azibo Aquart lived in 16 different places.

    Number of jurors who so find: ___12___

6

8.     Azibo Aquart attended 8 different schools in 9 years.

       Number of jurors who so find: _____12_____

9.     Throughout his childhood, Azibo Aquart lacked adequate parental supervision.

       Number of jurors who so find: _____9_____

10.    Azibo Aquart was exposed to emotional and physical abuse inflicted on his mother.

       Number of jurors who so find: _____9_____

11.    Azibo Aquart's parents both sold illegal drugs.

       Number of jurors who so find: _____12_____

12.    Azibo Aquart's father, Richard Aquart, exposed Azibo Aquart to violence and drug dealing.

       Number of jurors who so find: _____12_____

13.    Richard Aquart stored illegal weapons in the home.

       Number of jurors who so find: _____12_____

14.    From the time Azibo Aquart was 5, Richard Aquart was a fugitive who used aliases.

       Number of jurors who so find: _____12_____

15.    When Azibo Aquart was 11, his father was sent to prison for 8 years and then deported to Jamaica.

       Number of jurors who so find: _____12_____

16.    Richard Aquart was a poor role model.

7

Number of jurors who so find: ___12___

17. Azibo Aquart's parents and others around him taught him to distrust the police and the judicial system and to disregard the law.

Number of jurors who so find: ___12___

18. Azibo Aquart and his brothers Azizi and Azikiwe were picked on and bullied because of their cultural differences.

Number of jurors who so find: ___12___

19. When he was 12, Azibo Aquart's mother drowned.

Number of jurors who so find: ___12___

20. From the time of his mother's death, Azibo Aquart had no meaningful adult supervision.

Number of jurors who so find: ___2___

21. When Azibo Aquart was 13, his brother, Azizi Aquart, was shot three times and nearly died.

Number of jurors who so find: ___12___

22. At age 17, Azizi Aquart was ill-equipped to handle the responsibility of being the guardian of a 13 year-old.

Number of jurors who so find: ___12___

23. Azibo Aquart's close relatives and family friends failed to properly care for him after his mother's death or his brother's shooting.

Number of jurors who so find: ___12___

24. Although social service providers and juvenile court officials identified Azibo Aquart as an at-risk child, no effective action was taken.

8

Number of jurors who so find: __12__

25. While incarcerated as a young adult, Azibo Aquart obtained his GED.

Number of jurors who so find: __12__

26. At the Enfield Correctional Center, Azibo Aquart was a certified literacy tutor who helped other inmates.

Number of jurors who so find: __12__

27. If Azibo Aquart is sentenced to life imprisonment, the Bureau of Prisons has the capability of safely and securely confining him.

Number of jurors who so find: __12__

28. Azibo Aquart's life has value.
Number of jurors who so find: __12__

9

GA1531

In addition to the mitigating factors outlined above, you may add any additional mitigating factors that any member of the jury finds. If you need additional space, write "CONTINUED" at the bottom of the page and use the back of this page.

Additional Factor Found (A)

The defendant Azibo Aquart has a child.

Number of jurors who so find: __12__

Additional Factor Found (B)

_____

Number of jurors who so find: _____

Additional Factor Found (C)

_____

Number of jurors who so find: _____

Additional Factor Found (D)

_____

Number of jurors who so find: _____

*Go to Section VI.*

10

**Section VI:    Weighing**

As to counts on which you found a threshold mental state and at least one statutory aggravating factor(s), do you unanimously find beyond a reasonable doubt that the aggravating factor(s) found to exist sufficiently outweigh all of the mitigating factors found to exist, or in the absence of mitigating factors, that the aggravating factor(s) themselves justify a sentence of death?

**Tina Johnson**
Count Two:          YES ☒          NO ☐

Count Five:         YES ☒          NO ☐


**James Reid**
Count Three:        YES ☒          NO ☐

Count Six:          YES ☒          NO ☐


**Basil Williams**
Count Four:         YES ☒          NO ☐

Count Seven:        YES ☒          NO ☐

*Please proceed to Section VII Sentencing Determination.*

11

**Section VII:  Determination of Sentence**

### Count Two (Tina Johnson)

_X_  We, the jury, unanimously find that Defendant Azibo Aquart should be sentenced to death.

____  We, the jury, unanimously find that Defendant Azibo Aquart should be sentenced to life imprisonment without the possibility of release.

### Count Five (Tina Johnson)

_X_  We, the jury, unanimously find that Defendant Azibo Aquart should be sentenced to death.

____  We, the jury, unanimously find that Defendant Azibo Aquart should be sentenced to life imprisonment without the possibility of release.

### Count Three (James Reid)

____  We, the jury, unanimously find that Defendant Azibo Aquart should be sentenced to death.

____  We, the jury, unanimously find that Defendant Azibo Aquart should be sentenced to life imprisonment without the possibility of release.

_X_  We are unable to reach a unanimous verdict in favor of a death sentence or a life sentence.

### Count Six (James Reid)

____  We, the jury, unanimously find that Defendant Azibo Aquart should be sentenced to death.

____  We, the jury, unanimously find that Defendant Azibo Aquart should be sentenced to life imprisonment without the possibility of release.

_X_  We are unable to reach a unanimous verdict in favor of a death sentence or a life sentence.

12

**Count Four (Basil Williams)**

_X_    We, the jury, unanimously find that Defendant Azibo Aquart should be sentenced to death.

_____    We, the jury, unanimously find that Defendant Azibo Aquart should be sentenced to life imprisonment without the possibility of release.

**Count Seven (Basil Williams)**

_X_    We, the jury, unanimously find that Defendant Azibo Aquart should be sentenced to death.

_____    We, the jury, unanimously find that Defendant Azibo Aquart should be sentenced to life imprisonment without the possibility of release.

_Each juror must sign his or her name and juror number below, indicating that the above sentence determinations reflect the jury's unanimous decisions:_

[jury signatures with juror numbers #1 through #12]

_The foreperson shall indicate the date of signing:_

June **15**, 2011

_Go to Section VIII._

13

**GA1535**

**Section VIII: Certification**

By signing below, each juror certifies that consideration of the race, color, religious beliefs, national origin, or sex of the defendant or the victims was not involved in reaching his or her individual decision, and that the individual juror would have made the same recommendation regarding a sentence for the crime or crimes in question regardless of the race, color, religious beliefs, national origin, or sex or the Defendant, or the victims.

*The foregoing responses reflect the jury's determinations in the penalty phase.*

So say we all, dated at New Haven, Connecticut, this 15 day of

June , 2011, at 10 o'clock a.m./p.m.

_____
Signature of Foreperson

14

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

---------------------------------------------------------X

UNITED STATES OF AMERICA

        -against-                          No.  3:06  CR 160  (JBA)

AZIBO AQUART,                            May 23, 2011

        Defendant.

---------------------------------------------------------X


<u>MOTION FOR MISTRIAL</u>

      The defendant hereby moves for a mistrial on the basis of prosecutorial

misconduct in the closing argument. Specifically, the prosecutor repeatedly stated her

personal opinion as to the guilt of the government. She also referred to facts not in

evidence. As such, the defendant's right to a fair trial was violated and a mistrial should

be declared.

      It is highly improper for any attorney for the government to intimate to the jury his

or her own personal beliefs or opinions.  The Supreme Court has held that a

prosecutor's "vouching" poses twin dangers:

> Such comments can convey the impression that evidence not presented to the
> jury, but known to the prosecutor, supports the charges against the defendant
> and can thus jeopardize the defendant's right to be tried solely on the basis of
> the evidence presented to the jury; and the prosecutor's opinion carries with it
> the imprimatur of the Government and may induce the jury to trust the
> Government's judgment rather than its own view of the evidence.

*United States v. Young*, 470 U.S. 1, 18-19 (1985) (citing *Berger v. United States*, 295

U.S. 78, 88-89 (1935)).

      In this case, in her rebuttal closing, the prosecutor repeatedly violated this

cardinal principle. For example, she argued: "This is not the victims' fault, this is his fault. He did this. He planned this. He targeted Tina, he bought everything he needed to kill them, he picked his crew, he went over to their house, he broke their door down, and he bludgeoned them to death. He brutally murdered the victims. That is his fault, no matter how you look at it" (Tr. 172 - 173).

Similarly, she argued: "I mean, isn't that what the police are supposed to do, catch the guilty guy?" (Tr. 173). She also argued: "We bear the burden of proof in this case and it is the government's responsibility to investigate thoroughly and to prepare the case and the witnesses for trial. And in a case of this magnitude where the defendant brutally murdered three people, it is truly the government's responsibility, and you should hold the government to its responsibility, to meet its burden of proof (Tr. 175).

In discussing the fingerprint evidence, she argued: "Look, the fact that Pleckaitis found both the defendant and his brother's fingerprints on the bloody bag next to Basil's crushed skull is no one's fault but their own. Obviously they weren't careful enough with their latex gloves" (Tr. 178). In discussing the DNA evidence, she argued: "Why ask the lab to perform a DNA comparison against John Taylor's DNA in 2010 when we had known for years that the defendant's DNA profile was already on that item?" (Tr. 180). She further alluded to facts outside the record in disparaging the fact that the lab never compared the samples with Rodney Womble's DNA profile. There she argued, "The defense has also brought up the fact that Womble's DNA was not submitted for testing. "Well, first of all, you know Womble is a convicted felon, and you know from Christine Roy that Womble, excuse me, that the CODIS database is made up of the DNA of

2

convicted felons." (Tr. 180). The clear implication of this argument is that the lab had in fact compared Womble's profile with the CODIS database, a fact which is not in evidence and is contrary to the CODIS procedures. Not content to let that misstatement alone, she continued: " And, in fact, you know that's how they originally got the hit on Efrain Johnson and proved that he, too, was part of these murders." (Ibid.) With respect to Johnson's profile, Ms. Roy testified that she inputted the profile for 13-Z-1 into the CODIS database. There was no evidence that she inputted any of the other sample profiles, nor would these have been within the CODIS protocols as CODIS does not look at complex mixtures. The implication of the prosecutor's argument, however, was that had Womble's profile been in the CODIS database, that the lab would have been notified of this fact. This is not supported by the evidence in this case and is contrary to fact. To cement the implication, she argued further: "There is absolutely no evidence in this record whatsoever to suggest that Womble's DNA was at that crime scene" (Tr. 182). The implication here is that they looked for such evidence, a fact which is unsupported by the record.

She further stated her opinion when she argued: " You can also examine the photos more closely, both the crime scene photos and the autopsy photos, and see some of the defendant's handiwork, the horrifying things he did to these victims. He targeted Tina because she stood up to him, and he beat them to death with baseball bats. This is not random, this was personal. He targeted Tina because she stood up to him, and he beat them to death with baseball bats. This is not random, this was personal. The defendant killed the victims in order to maintain his dominance in his organization, to send a message to others who may dare to sell drugs in that building,

3

and to punish Tina for selling on his turf. The defendant broke into the victims' home in the middle of the night when they were most vulnerable. He duct taped them. He rendered them defenseless, breaking James's elbow and Tina's wrist in the process... The defendant encased the victims' faces in duct tape creating a virtual death mask, and then he and his -- well, he encased James' face and Basil's face in duct tape creating a death mask. He left Tina's eyes uncovered, perhaps to make her watch. The defendant and his brother then brutally beat the life out of Tina and James, and he left them lying in a pool of their own blood. The defendant then went into the front room and he drilled the door shut getting Basil's blood on the front door lock in the process. The defendant entombed the victims in their own apartment ensuring that nobody could save them. And he succeeded. About that, there is no reasonable doubt." (Tr. 193-195).

These expressions of personal opinion permeated the rebuttal argument. They were not random or isolated. As such, a mistrial is warranted.

Respectfully submitted,

DEFENDANT AZIBO AQUART

By_____/s/_____
Michael O. Sheehan
Sheehan & Reeve
139 Orange Street, Suite 301
New Haven, CT 06510
203) 787-9026 (phone)
(203) 787-9031 (fax)
msheehan@sheehanandreeve.com
Federal Bar No. ct05450

4

Justin T. Smith, Esq.

<u>CERTIFICATION OF SERVICE</u>

I hereby certify that the foregoing was filed electronically and served by mail upon anyone unable to accept electronic filing on May 23, 2011

_____/s/_____
Michael O. Sheehan

5

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>    *Plaintiff*, | Civil No. 3:06cr160 (JBA) |
| *v.* | |
| AZIBO AQUART,<br>    *Defendant*. | February 21, 2012 |

RULING ON DEFENDANT'S MOTION FOR A MISTRIAL

Defendant Azibo Aquart moves for a mistrial on the ground that the Government committed prosecutorial misconduct in its rebuttal summation during the guilt phase proceedings of his trial. He argues that the Government prosecutor repeatedly stated her personal opinion as to the guilt of the defendant and referred to facts that were not in evidence. As a result, Mr. Aquart asserts that his right to a fair trial was violated and a mistrial should be declared. The Government defends its conduct as properly responsive to Defendant's summation. For the reasons discussed below, Defendant's Motion [Doc. # 829] will be denied.

I.    Discussion

A.    The Legal Standard

"Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33. However, it is a "rare case" in which improper comments in a prosecutor's summation are so prejudicial that a new trial is required. *United States v. Rodriguez*, 968 F.2d 130, 142 (2d Cir. 1992). "[A] criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be

determined whether the prosecutor's conduct affected the fairness of the trial. *United States v. Young*, 470 U.S. 1, 11 (1985). "An aggrieved party must show more than mere trial error to secure reversal; he must demonstrate misconduct so egregious that, when viewed in the context of the entire trial, it substantially prejudiced him." *United States v. Newton*, 369 F.3d 659, 680 (2d Cir. 2004) (citing *United States v. Shareef*, 190 F.3d 71, 78 (2d Cir. 1999)).

The Supreme Court has counseled prosecutors "to refrain from improper methods calculated to produce a wrongful conviction" *Berger v. United States*, 295 U.S. 78, 88 (1935), but has also made clear that the adversary system permits the prosecutor to "prosecute with earnestness and vigor." *Id.* In other words, "while he [or she] may strike hard blows, he [or she] is not at liberty to strike foul ones." *Id.* While a prosecutor is generally prohibited in closing argument from offering personal beliefs or opinions to the jury, *see United States v. Rivera*, 22 F3d 430, 437 (2d Cir. 1994), even the expression of an opinion may be permissible if it "clearly communicate[s] nothing more than a comment on the evidence." *United States v. Jaswal*, 47 F.3d 539, 544 (2d Cir. 1995).

A prosecutor is also precluded from vouching for the credibility of the Government's witnesses, because "[v]ouching may prejudice a defendant by suggesting to a jury that there is additional evidence, not introduced at trial but known to the prosecutor, that supports the witness's credibility," *see United States v. Newton*, 369 F.3d at 680, and because the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence. *United States v. Young*, 470 U.S. at 18–19. In *Newton*, the Second Circuit found that most of the statements that defendant challenged did not qualify as vouching. For example, statements in which the prosecutor "submitted" certain credibility conclusions for jury consideration,

2

such as "We submit to you . . . that [Ms. Wright] testified truthfully," did not amount to vouching. *Id.* at 681–82. (Citing *United States v. Perez*, 144 F.3d 204, 210 (2d Cir. 1998)) (approving the use of "I submit" to urge the jury to reach certain conclusions without impermissibly interjecting the prosecutor's personal beliefs into the case). The Second Circuit found that other statements, such as the prosecution's assertions that "[t]hese are credible witnesses" and "[t]hey came in here and told the truth," did raise a vouching concern, but concluded that none of the prosecutor's statements were so prejudicial as to warrant reversal. *Id.* at 682.

### B.   The Challenged Statements

As support for his prosecutorial misconduct claim, Defendant cites to large portions of the Government's rebuttal summation to argue that the prosecutor expressed her personal opinion or belief that Defendant was guilty. Citing the "fair response" doctrine, the Government responds by arguing that its rebuttal summation "appropriately responded to defense counsel's arguments and was based entirely upon evidence in the trial record." (Gov't Opp'n [Doc. # 852] at 3.) Under the "invited" or "fair response" doctrine, the defense summation may open the door to an otherwise inadmissible prosecution rebuttal. *United States v. Tocco*, 135 F.3d 116, 130 (2d Cir. 1998) ("Each of the challenged statements in the prosecution's rebuttal were fair responses to the defense summation. Defendant cannot now complain about the issues raised and the atmosphere created by his own making through the defense summation. To the extent that any of the comments could be labeled improper, none were so egregious as to infect the proceedings in such a manner as to deprive defendant of due process of the law.").

3

    *1.    The Statement that "this is his fault"*

In the first statement that Defendant challenges, but made no contemporaneous objection at trial, AUSA Tracy Dayton argued:

> This is not the victims' fault, this is his fault. He did this. He planned this. He targeted Tina, he bought everything he needed to kill them, he picked his crew, he went over to their house, he broke their door down, and he bludgeoned them to death. He brutally murdered the victims. That is his fault, no matter how you look at it.

(Tr. 172–173.)

Read without context, this statement could constitute an expression of AUSA Dayton's personal opinion. However, in the Defendant's summation, defense counsel implied that the victims, by engaging in drug trafficking and working out of the Charles Street apartment, had placed themselves in harm's way. For example, during his summation, Defense counsel reminded the jury of Judith Rivera's testimony, arguing,

> We did learn a couple of things from Ms. Rivera. Charles Street was not an exclusive two–apartment drug operation. It was not [just apartments] 101 and 211. She said on the morning of the murders she went to 101 to see if she could get drugs, but no one answered the door. And then she went to Boozine's apartment next door and asked to get drugs. . . She then goes up to 211. She goes up to the third floor. There [are] plenty of places in Charles Street to get drugs. This is not this exclusive operation. That building was a 24–hour drugstore that was wide open and was a target. Any of those apartments were targets for anybody looking for drugs, cash, or both.

(Tr. 158:12–14.) Earlier in the summation, Defense counsel referenced another witness's testimony, in which the dangers of the "drug world" were discussed: "But we did learn something from Ms. Hopkins, something about the drug world, just how common robberies are." (Tr. 146:4–6.)

4

Standing alone, the statement that "this is his fault" could be improper, as it treads too closely to an expression of the prosecutor's personal opinion. However, considered within the context of the defense's summation, it is clear that the prosecutor was responding to defense counsel's insinuations that the victims put themselves in danger because of their involvement with the "drug world" and that they knew that the apartment building was a dangerous location. *Tocco*, 135 F.3d at 130 ("the defense summation may open the door to an otherwise inadmissible prosecution rebuttal").

> 2.      *The Statement that the Police Are Supposed to "catch the guilty guy"*

Next, Defendant challenges as improper the prosecutor's argument that "I mean, isn't that what the police are supposed to do, catch the guilty guy?" (Tr. 173:9–11.) In context, the prosecutor said:

> Now, the defense has made much of the fact that the police focused on the defendant from the outset of this case, as if it's somehow horrible that law enforcement would focus on the person that all of the evidence suggested from the get–go was responsible for these murders. I mean, isn't that what the police are supposed to do, catch the guilty guy?

(Tr. 172:4–11.) To innoculate the potential that jurors might construe this statement as an expression of the prosecutor's opinion of Defendant's guilt, the Court reminded the jury, "The jury understands that the jury will decide whether the government has proved [guilt] beyond a reasonable doubt. That is your determination, and yours alone, and I will ask Ms. Dayton to continue." (Tr. 172:17–21.) Further, viewed in its entirety, this argument is responsive to the Defense's argument that the police had improperly focused their attention on Mr. Aquart from the beginning. At the beginning of his summation, Defense counsel argued,

5

The police developed a suspect and then they developed the evidence. The police knew there was a drug operation at 215 Charles Street, specifically in apartment 211. They'd been there three times in the past year in raids. The investigators also learned that Ms. Johnson was selling drugs from apartment 101. And when the investigators came to believe that Mr. Aquart was the one who controlled apartment 211, they had a suspect.

(Tr. 122:22–123–6.)

> 3.     The Statement that "It is the Government's responsibility to investigate
>
>         thoroughly"

Defendant next objected to the Government's remark in the underlined portion of

the following statement:

MS. DAYTON: Counsel has also made much of the fact that the government met with several witnesses on several occasions. We've heard the litany of dates that these witnesses were met with. Yes, the government does not shy away from that fact. We bear the burden of proof in this case and it is the government's responsibility to investigate thoroughly and to prepare the case and the witnesses for trial. And in a case of this magnitude where the defendant brutally murdered three people, it is truly the government's responsibility, and you should hold the government to its responsibility, to meet its burden of proof.

MR. SHEEHAN: Again I'm objecting to counsel's characterization. Counsel is not characterizing the evidence, she's stating her opinion.

THE COURT: I have instructed that it is the government's burden of proof beyond a reasonable doubt on each element of each crime. That is your job, that is your responsibility, and that is your responsibility alone. No matter what counsel may say one way or another, it is your responsibility, and that is the standard to which the government is held. I think you understand that.

(Tr. 175:5–176:4.) The Government's statement responds to Defendant's summation

challenging the meaning of many of the cooperating witnesses' meeting and being

extensively interviewed by the government:

6

And we're left with the testimony of the cooperating witnesses. Now, the thing about the cooperating witnesses is that their testimony was really, in a way, like the DNA results. That's what you saw when they testified here. You saw the end result, the final polished product. What you truly did not get to see, what the Government did not show you, was the process. We tried to explore that process. Myself or Mr. Sheehan would ask many of these witnesses whether they made a particular statement to a particular agent, particular person at a particular time, and the government would often ask these same witnesses the same things.

Did they tape that interview, Mr. Hodges? Did they have you sign a statement, Mr. Womble? Did they ask you to view the report for accuracy, Mr. Taylor? The answer was always no. Why not? Why not record the interview? Why not sign the statement? Why not have the witness review the report for accuracy? What don't you know about what happened in those meetings? Sometimes six, seven, eight, nine meetings per witness. If they're telling the truth why that many meetings? What don't you know? Why don't you know it?

(Tr. 167:20–168:18.)

Even if the Government's statements constitute a form of self–vouching, they were not made in a vacuum and the Court focused the jury on its responsibility to determine that the Government met its high burden of proof. In the Court's view, the Government's remarks were insufficient to cause jurors to abdicate their responsibilities and instead rely on the government's self–confidence in its case. *United States v. Young,* 470 U.S. 1, 18–19 (1985).

#### 4. *The Statement Regarding Fingerprint and DNA Evidence in the CODIS Database*

Defendant also challenges AUSA Dayton's statement during rebuttal summation where she rhetorically asked: "Why ask the lab to perform a DNA comparison against John Taylor's DNA in 2010 when *we* had known for years that the defendant's DNA profile was

7

**GA1548**

already on that item?" (Tr. 180:1–4 (emphasis added).) In the full context of the statement,
the Government's argument followed a reference to the forensic science examiner Christine
Roy's expert testimony that she conducted testing over the course of five years against
several known submissions of DNA, not just the Defendant's, stating:

> She told you that—she testified over the course of the last five years she
> repeatedly re–analyzed evidentiary samples against new submissions of
> known DNA at the government's request. She even analyzed the evidence
> against the victims' DNA even though it's very clear the victims didn't kill
> themselves. Why would the government continue to make such requests if
> we were only trying to get the defendant? . . . Why ask the lab to perform a
> DNA comparison against John Taylor's DNA in 2010 when we had known
> for years that the defendant's DNA profile was already on that item?

(Tr. 179:14–22; 180:1–4.)

Defense counsel objected immediately, arguing, "The way counsel is arguing in the
context of this 'we' that she is using, it's clear that she's identifying her position as counsel
for the government." (Tr. 180:5–8.) The Court responded, "I think the jury understands it's
the government, and I'll ask that that be the way that it be phrased from now on." (Tr.
180:12–14.)

Next, Defendant argues that it was improper for the Government to "allude to facts
outside the record" when AUSA Dayton "disparag[ed] the fact that the lab never compared
the samples with Rodney Womble's DNA profile." (Def.'s Mot. for Mistrial at 2.) There, the
Government argued,

> The defense has also brought up the fact that Womble's DNA was not
> submitted for testing. Well, first of all, you know Womble is a convicted
> felon, and you know from Christine Roy that Womble—excuse me, that the
> CODIS database is made up of the DNA of convicted felons.

8

(Tr. 180:16–21.) Defense counsel objected to these statements, arguing that "Counsel is . . . alluding to facts that are not in evidence," and that "We do not have, and have never had, and are not allowed, any access to the CODIS database. That is not available, and the implication of her question is that it is." (Tr. 181:9–14.) In response, the Court instructed the jury, "I just wanted to clarify, in case there was any confusion, the CODIS database is a database only available to law enforcement." (Tr. 182.)

The Government argues that this statement was made in response to many statements made by the defense during summation that questioned the accuracy of DNA evidence and that argued that another person, Rodney Womble, could have committed the murders instead of the Defendant. For example, Defense counsel stated: "And Rodney Womble, we don't know what happened with Womble, but we know by the time the testing began he was cooperating and his DNA profile was never provided to the lab." (Tr. 135:22–136:1.)

The Government's statements, viewed in the context of Defendant's summation, appear to be a proper response to the defense's argument that evidence was incomplete and that Rodney Womble was a possible alternate suspect. Further, these statements which followed a reference to the DNA examiner's testimony that she had conducted testing over the course of five years against several known submissions of DNA, not just Defendant's DNA, was based on the facts in evidence: that (1) Womble is a convicted felon, (2) that the CODIS database is made up primarily of the DNA profiles of convicted felons, and (3) the CODIS database had detected Efrain Johnson's profile on an evidentiary item submitted to CODIS by Ms. Roy. Given these facts, it was not improper for the Government to respond to Defendant's argument by reasoning to the jury that CODIS *could* have detected Womble's

9

DNA profile, as it had detected Johnson's, if Womble's DNA profile had in fact been present on the evidentiary items.

Defendant also challenges the statements made by the prosecutor when discussing fingerprint evidence. The prosecutor had stated,

> Look, the fact that Pleckaitis found both the defendant and his brother's fingerprints on the bloody bag next to Basil's crushed skull is no one's fault but their own. Obviously they weren't careful enough with their latex gloves. And moreover, the issue about the movement of the bag, this bag, there has been so much talk about this blue bag in this bag. It's a red herring, . . . It's not as if they took this bag, went over to Lashika Johnson's house, said to the defendant, hey, would you be so kind as to put your fingerprints on this bag right on the duct tape, that would be good, and then brought it back to the scene. The evidence was Detective Gallagher picked it up, realized he shouldn't have picked it up, and put it back down. Okay, it's not ideal, but it doesn't make the defendant innocent.

(Tr. 178:6–10.)

As the Government argues, this, too, was an invited response to the defense's summation challenge to the Government's evidence. Defense counsel had argued that "[t]he limitations of fingerprint technology and examination do not tell us when that fingerprint was deposited on the duct tape. The limitations of fingerprint examination do not tell us where that duct tape was when the fingerprint was deposited." (Tr. 124:12–23.) He had also maintained that the Government had handled the evidence in the case poorly: "the journey of this bag tells us how the evidence was treated. You can follow it through the pictures, at least through the pictures supplemented by the defense, to those provided by the government. And this raises doubts as to how the crime scene was processed and the evidence was collected, especially when you see photos that were not offered by the government." (Tr. 125:13–21.) Defense counsel also noted that there was a seven–minute

10

period of unfettered access to the apartment, arguing "We don't know if someone else went in there, took something, touched some things. We just don't know, but it is possible." (Tr. 141:17–20.) On these bases, Defense counsel concluded his summation, arguing that "the physical evidence has failed to rise to the level of proof beyond a reasonable doubt and that the records similarly fail to rise to the level of proof beyond a reasonable doubt." (Tr. 141:21–25.)

The Government's rhetoric responds to the arguments made in challenging the Government's evidence and procedures and was not out of bounds. *Tocco*, 135 F.3d at 130 (citing *United States v. Rivera*, 971 F.2d 876, 883 (2d Cir.1992)) ("The prosecutor's remarks were legitimate responses to counsel's arguments that Rivera had, in essence, been framed by the cooperating witnesses and the government. The challenged statements were an attempt to focus the jury's attention upon the evidence and away from defense counsel's claims.").

### 5. *The Statement that "This was not random, this was personal"*

Finally, Defendant challenges specific sections of the Government's rebuttal summation to which defense counsel did not contemporaneously object, in which the prosecutor asserted that: "You can also examine the photos more closely, both the crime scene photos and the autopsy photos, and see some of the defendant's handiwork, the horrifying things he did to these victims," and that "Look, the defense would like you to believe that this was some random act of violence. Take a look at this crime scene. Does this look random to you? He targeted Tina because she stood up to him, and he beat them to death with baseball bats. This is not random, this was personal." (Tr. 193:12–21.)

11

During the defense summation, defense counsel emphasized that "anyone" could have gotten into Apartment 101, arguing "This building was wide open. Anyone could get in any time, day or not [sic]" (Tr. 146:16–17), and that the "building was a 24–hour drugstore that was wide open and was a target. Any of those apartments were targets for anybody looking for drugs, cash or both" (*id.* 158:12–17). Viewing the specific challenged portions of the Government's concluding statements in their full context, the prosecutor was responding to Defendant's insinuations that the murders could have been random acts of violence, and suggesting to the jury the specific inferences they could draw based on the evidence presented. For example, in the same concluding section of her rebuttal summation, AUSA Dayton argued

> The evidence suggests that after Azikiwe Aquart, Efrain Johnson and John Taylor had left the apartment, the defendant then turned his attention and his bat to Basil Williams, and he crushed Basil Williams' skull like an egg shell.
>
> The defendant then went into the front room and he drilled the door shut getting Basil's blood on the front door lock in the process. The defendant entombed the victims in their own apartment ensuring that nobody could save them. About that, there is no reasonable doubt. And the government asks you to return the only verdict that is demanded by the evidence in this case, and that is a verdict of guilty on all charges.

(Tr. 195:6–21.) "The government had broad latitude in the inferences it may reasonably suggest to the jury during summation," *Edwards*, 342 F.3d at 181, including when responding to arguments made in the defense summation, and here, these statements did not exceed the scope of permissible latitude.

In sum, that the Court interposed directions to the jury in response to certain Government statements reflected the Court's impression at the time that a cautionary note

12

was useful for both the prosecutor and the jury. However, the Court finds that none of the Government's arguments, alone or collectively, could be seen to have resulted in unfair or substantial prejudice to the Defendant. Where an objection with some potential merit was made, the Court gave a curative instruction designed to mitigate any ill–effects and restore the jury's focus. The Court concludes that a contextual assessment of the challenged statements shows them to have responded to the Defense's own summation, without substantial prejudice to Defendant. *See Newton*, 369 F.3d at 680.

II.     Conclusion

For the reasons discussed above, Defendant's motion [Doc. # 829] for a mistrial on the guilt phase of his trial is DENIED.

IT IS SO ORDERED.

_____/s/_____
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 21st day of February, 2012.

13

1

```
 1              UNITED STATES DISTRICT COURT
 2                DISTRICT OF CONNECTICUT
 3  * * * * * * * * * * *      *
                               *
 4  UNITED STATES OF AMERICA,  * Case No.10cr61(JBA)
 5              Plaintiff,      *
                               *
 6        vs.                   *
                               *
 7  JOHN TAYLOR,               * October 18, 2010
                               *
 8              Defendant.      *
                               *
 9  * * * * * * * * * * * *     *
10            TRANSCRIPT OF GUILTY PLEA
11  BEFORE:  THE HONORABLE JANET BOND ARTERTON, U.S.D.J.
12
    Appearances:
13  FOR THE PLAINTIFF:     TRACY DAYTON, ESQ
                           ALINA REYNOLDS, ESQ.
14                         PETER MARKLE, ESQ.
                           U. S. Attorney's Office
15                         915 Lafayette Blvd
                           Bridgeport, CT 06604
16
    FOR THE DEFENDANT:     CHARLES TIERNAN, ESQ.
17                         Lynch, Traub, Keefe &
                           Errante
18                         52 Trumbull Street
                           New Haven CT 06510
19
                           ROBERT CASALE, ESQ
20                         250 West Main Street
                           Branford, CT 06405
21
    Court Reporter:        Sharon Montini, RMR
22                         141 Church Street
                           New Haven, CT 06510
23
24  Proceedings recorded by mechanical stenography,
    transcript produced by computer.
25
```

2

```
 1       THE COURT:  Good morning, counsel.
 2  Please be seated.  We're here this morning in the
 3  matter of United States of America v. John Taylor,
 4  10cr61.  May I have appearances, please.
 5       MS. DAYTON:  Tracy Dayton for the
 6  government, your Honor, here with Peter Markle and
 7  Alina Reynolds.
 8       THE COURT:  Good morning.  And for the
 9  defendant?
10       MR. CASALE:  Robert Casale for Mr.
11  Taylor, who is present.  And Charles Tiernan is also
12  appearing in this case.
13       MR. TIERNAN:  Good morning, your Honor.
14       MS. DAYTON:  Your Honor, also, for the
15  record, some of the victims in this case -- all of
16  the victims were notified.  Some of the victims'
17  family members, who are also victims, are present in
18  court.  There are also agents in court and a few
19  other people from the U.S. attorney's office.
20  That's it.
21       THE COURT:  All right.  Could I see
22  counsel at sidebar just for a moment, please.
23       (Sealed per Court order)
24       THE COURT:  All right, in this matter
25  today, Mr. Taylor, I understand that you wish to
```

3

```
 1  change your plea to guilty and plead guilty to
 2  Counts One, Two and Three of the indictment that
 3  charge you with murder in aid of racketeering, in
 4  violation of 18, United States Code, Section
 5  1959(a)(1) with reference to the murder of Tina
 6  Johnson, James Reid and Basil Williams.  Is that
 7  your understanding of our purpose here today --
 8       THE DEFENDANT:  Yes, ma'am.
 9       THE COURT:  -- of this proceeding.
10  Before I can accept your guilty plea, I need to ask
11  you a number of questions while you are under oath
12  to make sure that the plea you seek to enter, if you
13  do, is a valid plea.  A valid plea is one that is
14  made voluntarily and not under any threat or
15  coercion.  It is one that is a knowing plea, meaning
16  you know what rights you are giving up, there is a
17  factual basis for a valid plea, and you must be
18  deemed competent to enter a plea.
19       So, if you don't understand my
20  questions, please say so, I will reword the question
21  if you need it.  Please do not hesitate to speak
22  with your attorneys at any time just by stepping
23  back from the microphone.  I'll ask the clerk to
24  place you under oath.
25       (Oath administered)
```

4

```
 1       THE COURT:  Now, Mr. Taylor, you have
 2  been sworn.  Your answers to my questions will be
 3  subject to penalties for perjury or making a false
 4  statement if you willfully fail to answer
 5  truthfully.  Do you understand?
 6       THE DEFENDANT:  Yes, ma'am.
 7       THE COURT:  I want to review certain
 8  rights before we go any further.  You have the right
 9  to remain silent, which means you are not required
10  to make any statement.  If you do make a statement,
11  that statement can and probably would be used
12  against you if the matter were to go to trial.  Do
13  you understand?
14       THE DEFENDANT:  Yes, ma'am.
15       THE COURT:  Even if you make a
16  statement, you may stop at anytime.  Do you
17  understand?
18       THE DEFENDANT:  Yes, ma'am.
19       THE COURT:  You have the right to
20  counsel, which means you have the right to be
21  represented by an attorney at every stage of the
22  criminal proceedings against you, and if you cannot
23  afford counsel, one will be appointed for you at no
24  cost to you.  Do you understand?
25       THE DEFENDANT:  Yes, ma'am.
```

5

1       THE COURT:  And you do indeed have two
2   counsel who have been appointed to represent you in
3   this capital case.
4       Please give me your full name, tell me
5   any other names you have used or been known by.
6       THE DEFENDANT:  My name is John F.
7   Taylor.
8       THE COURT:  "F" stands for.
9       THE DEFENDANT:  Fitzgerald.  Most time
10  most people call me Big Boy.
11      THE COURT:  All right, any other names
12  or nicknames that you have been generally known by?
13      THE DEFENDANT:  That's it.
14      THE COURT:  How old are you, sir?
15      THE DEFENDANT:  I'm 34.
16      THE COURT:  Thirty-four?  What is your
17  education or schooling?
18      THE DEFENDANT:  9th.
19      THE COURT:  Completed?
20      THE DEFENDANT:  8th.
21      THE COURT:  Completed 8th.  And where
22  did you start 9th?
23      THE DEFENDANT:  Southwest Edgecombe.
24      THE COURT:  Where is that?
25      THE DEFENDANT:  North Carolina.

6

1       THE COURT:  And when was that?
2       THE DEFENDANT:  I can't tell you right
3   now off the top of my head, your Honor.
4       THE COURT:  Have you had any difficulty
5   in communicating with your lawyers for any reason?
6       THE DEFENDANT:  No.
7       THE COURT:  Are you now or have you
8   recently been under the care of any physician, a
9   doctor, a psychiatrist, any social worker, any
10  counselor for any condition, emotional or physical?
11      THE DEFENDANT:  No.
12      THE COURT:  In the past 48 hours, have
13  you taken any narcotic drugs, any medication, any
14  pills or any alcohol?
15      THE DEFENDANT:  No, ma'am.
16      THE COURT:  Have you ever been
17  hospitalized or treated in an outpatient program for
18  any narcotic addiction or other substance abuse,
19  including alcohol?
20      THE DEFENDANT:  No, ma'am.
21      THE COURT:  As you stand here today, is
22  your mind clear?
23      THE DEFENDANT:  Yes, ma'am.
24      THE COURT:  Do you understand what is
25  going on?

7

1       THE DEFENDANT:  Yes, ma'am.
2       THE COURT:  Mr. Casale and Mr. Tiernan,
3   have you had any difficulty for any reason in
4   communicating with Mr. Taylor?
5       MR. TIERNAN:  No.
6       MR. CASALE:  No.
7       THE COURT:  And have you discussed this
8   case meaningfully with your client, meaning have you
9   had enough time and information to permit meaningful
10  discussion with him about the counts in the
11  indictment?
12      MR. CASALE:  If the Court please, we
13  have spent more hours with Mr. Taylor than we might
14  have spent if the case went to trial.  Actually,
15  we've spent a considerable amount of time because,
16  as you know, Mr. Taylor does not have an educational
17  background, had considerable difficulty in
18  understanding the federal charges, since his only
19  experience has been in the state court, and the
20  consequences of a plea in the federal court where
21  there is no, quote, deal locked in with the judge.
22      So, we have spent considerable time
23  going through this and, in effect, trying to educate
24  him on what the case is about and what a plea would
25  entail and what the consequences might be.  And so

8

1   the answer, in sum, is yes, we have spent
2   considerable time with him.
3       THE COURT:  And does he in your opinion
4   understand the rights that he will waive if he
5   pleads guilty here today?
6       MR. CASALE:  I believe he does, yes.
7       THE COURT:  Does he understand the
8   nature of these proceedings?
9       MR. CASALE:  Yes.
10      THE COURT:  Do you have any doubt as to
11  Mr. Taylor's competence to enter a guilty plea at
12  this time?
13      MR. CASALE:  None whatsoever.  Mr.
14  Taylor is not an incompetent person.  What he may
15  have lacked in formal education, he sort of backed
16  up with a sense of street.  So, he understands.
17  He's competent.
18      THE COURT:  And you have advised him of
19  the maximum sentence and fine that can be imposed?
20      MR. CASALE:  Yes, that the maximum is
21  life and the minimum is life.
22      THE COURT:  And you have discussed with
23  him the operation of the federal sentencing
24  guidelines to the extent they bear on the Court's
25  imposition of a sentence?

**GA1556**

9

```
 1                MR. CASALE:  Yes, we have.
 2                THE COURT:  And are there -- what have
 3    you advised him are the collateral consequences of a
 4    guilty plea to this charge?
 5                MR. CASALE:  Well, beyond the prospect
 6    of forever in prison, the collateral consequences
 7    are, of course, consequences that he has experienced
 8    in the past given state court convictions, the
 9    denial of right to vote, the denial of a permit,
10    pistol permit and the absolute prohibition against
11    owning or possessing firearms.
12                THE COURT:  All right.  So that in this
13    case there are no additional collateral consequences
14    to Mr. Taylor that he has not already experienced by
15    being previously convicted of felonies other than
16    what consequences flow from a life imprisonment?
17                MR. CASALE:  I don't believe there are.
18    There is no forfeiture involved here.  So, you know,
19    the remote possibility of holding political office,
20    I don't see whether any -- am I missing anything?
21    Are there any other consequences?  No.
22                MS. DAYTON:  The only -- Tracy Dayton
23    for the government, your Honor.  The only potential,
24    I guess, collateral issue is restitution and special
25    assessments, but those are not collateral I think in
```

10

```
 1    the way your Honor is referring.
 2                THE COURT:  All right, Mr. Taylor, have
 3    you had enough time and enough information to
 4    discuss your case with your attorneys?
 5                THE DEFENDANT:  Yes, ma'am.
 6                THE COURT:  Are you satisfied to have
 7    them represent you?
 8                THE DEFENDANT:  Yes, ma'am.
 9                THE COURT:  Is there anyway in which you
10    are not fully satisfied with their advice and
11    representation?
12                THE DEFENDANT:  No, ma'am.
13                THE COURT:  You have received a copy of
14    the indictment, have you?
15                THE DEFENDANT:  Yes, ma'am.
16                THE COURT:  Would you kindly put that in
17    front of Mr. Taylor.  And have you consulted with
18    your attorneys about the charges in that indictment?
19                THE DEFENDANT:  Yes, ma'am.
20                THE COURT:  Do you understand the
21    charges?
22                THE DEFENDANT:  Yes, ma'am.
23                THE COURT:  I'll ask you a little bit
24    later to tell me what you understand you are charged
25    with, but right now I want to make sure that you
```

11

```
 1    understand that even if you are guilty, you don't
 2    have to plead guilty, because it is the requirement
 3    under our system of law that the government prove
 4    the guilt of a defendant beyond a reasonable doubt.
 5    If the government can't meet that burden of proof,
 6    the jury has the duty to find the defendant not
 7    guilty even if the defendant is guilty.  Do you
 8    understand that distinction?
 9                THE DEFENDANT:  Yes, ma'am.
10                THE COURT:  That's why I will explain
11    that in certain cases in which a jury after trial
12    returns a verdict of not guilty, even though those
13    who were in court listening to the evidence thought
14    the defendant probably was guilty, what the jury is
15    saying is that the government failed to meet its
16    burden of proof that the defendant is guilty, not
17    that it found the defendant innocent.  Do you
18    understand that reasoning?
19                THE DEFENDANT:  Yes, ma'am.
20                THE COURT:  That's why I'm saying even
21    if you are guilty, you have a choice.  You may plead
22    guilty, as you've indicated you apparently wish to
23    do, or you may change your mind and say to the
24    government "meet your burden of proving my guilt
25    beyond a reasonable doubt."  And you exercise that
```

12

```
 1    option by saying "not guilty" when you are asked
 2    later on in this proceeding "how you plead."  Do you
 3    understand?
 4                THE DEFENDANT:  Yes, ma'am.
 5                THE COURT:  All right.  If you change
 6    your mind about entering a guilty plea and decide to
 7    go to trial and plead not guilty, under the
 8    Constitution and the federal laws you are entitled
 9    to a speedy, public trial with a jury with the
10    assistance of counsel at every stage of the
11    proceedings against you on the charges contained in
12    the indictment.  Do you understand those rights?
13                THE DEFENDANT:  Yes, ma'am.
14                THE COURT:  At trial, you are presumed
15    innocent.  The government has to overcome that
16    presumption of innocence and prove you guilty by
17    competent evidence and beyond a reasonable doubt.
18    You have no obligation to prove that you were
19    innocent.  If the government fails, the jury has to
20    find you not guilty.  Do you understand?
21                THE DEFENDANT:  Yes, ma'am.
22                THE COURT:  In the course of the trial
23    you have certain other rights.  You have the right
24    of confrontation.  That means that the witnesses for
25    the government must come in to court and testify in
```

13

```
1   your presence.  You also have the right of
2   cross-examination, meaning your counsel has the
3   right to cross-examine all of the government's
4   witnesses.  Your counsel also has the right to
5   object to evidence offered by the government, to
6   offer evidence on your behalf, and to use a subpoena
7   to obtain the attendance of witnesses at trial to
8   testify on your behalf.  Do you understand those
9   rights?
10          THE DEFENDANT:  Yes, ma'am.
11          THE COURT:  At trial you would have the
12  right to testify if you chose to do so, but you
13  could not be required to testify.  A further
14  extension of the right to remain silent that I went
15  over with you at the beginning is the constitutional
16  guarantee that no defendant in a criminal case can
17  ever be forced to take the witness stand at trial
18  and say anything that could be used to show his or
19  her guilt of the crime charged.  So, if you decided
20  to go to trial but you decided not to testify, I
21  would instruct the jury that you were exercising
22  your right and they couldn't hold it against you in
23  any way.  Do you understand?
24          THE DEFENDANT:  Yes, ma'am.
25          THE COURT:  If you plead guilty, on the
```

14

```
1   other hand, I'm going to be asking you questions
2   about what it is you did in order to satisfy myself
3   that, in fact, you really are guilty of the charges
4   that you seek to plead guilty to.  You will have to
5   answer my questions and acknowledge your guilt then,
6   and in doing that you are going to be giving up
7   exactly the right I have been speaking about, and
8   that is the right not to say anything that shows you
9   are guilty of the crimes you are charged with.  And,
10  if you answer my questions falsely under oath, your
11  answers may be used against you in a prosecution for
12  perjury or making a false statement.  Do you
13  understand?
14          THE DEFENDANT:  Yes, ma'am.
15          THE COURT:  If you plead guilty and if I
16  accept your plea, you are going to be giving up your
17  constitutional right to a jury trial and these other
18  rights I've been discussing.  Please understand,
19  there will be no trial for you of any kind.  Do you
20  understand?
21          THE DEFENDANT:  Yes, ma'am.
22          THE COURT:  If you are adjudicated
23  guilty, you may be deprived of certain federal
24  rights and benefits.  We've discussed that under the
25  term "collateral consequences."  It appears that you
```

15

```
1   may already have been deprived of these rights, the
2   right to vote, to hold public office, to serve on a
3   jury or to possess firearms, by virtue of your prior
4   felony convictions.  Are you a citizen of the United
5   States?
6           THE DEFENDANT:  Yes, ma'am.
7           THE COURT:  Otherwise, you may be
8   subject to deportation and not permitted back into
9   the country.  You will not be deemed a prevailing
10  party and can't seek attorney's fees or litigation
11  expenses, and under the Justice for All Act, a DNA
12  sample will be collected by the Bureau of Prisons or
13  the probation office for analysis and indexing.  The
14  government also reserves the right to notify any
15  state or federal agency that might license you or
16  with whom you might do business of the circumstances
17  of your conviction, and with the permission of the
18  Court, could notify your employers of the
19  circumstances.  Do you understand those
20  consequences?
21          THE DEFENDANT:  Yes, ma'am.
22          THE COURT:  Also, by pleading guilty you
23  are waiving your right to have DNA testing performed
24  on physical evidence related to this case that is in
25  the government's position and to have that physical
```

16

```
1   evidence preserved.  As a result, any physical
2   evidence in the government's possession will likely
3   be destroyed or otherwise unavailable for DNA
4   testing in the future for you if you went to trial.
5   However, if you were convicted, you could file a
6   motion seeking DNA testing of such physical evidence
7   for the purpose of showing innocence, and that is
8   under 18, United States Code, 3600 and 3600(a).
9           Mr. Taylor, are you willing to give up
10  your right to a trial and these other rights I've
11  been discussing with you?
12          THE DEFENDANT:  Yes.
13          THE COURT:  I understand there is a
14  written plea agreement.  Would you put that in front
15  of Mr. Taylor, please.
16          Mr. Taylor, have you read this plea
17  agreement?
18          THE DEFENDANT:  Yes.
19          THE COURT:  And do you understand it?
20          THE DEFENDANT:  Yes, ma'am.
21          THE COURT:  And have you discussed it
22  with your attorneys?
23          THE DEFENDANT:  Yes, ma'am.
24          THE COURT:  Have you yet signed it?
25          THE DEFENDANT:  No, ma'am.
```

17

```
1       THE COURT:  All right, let me ask Ms.
2   Dayton to outline the terms of this agreement, and
3   then if you understand and are in agreement with
4   those terms, you may signify that by your -- by
5   signing it.
6       MS. DAYTON:  Your Honor, under the terms
7   of the plea agreement the defendant has agreed to
8   plead guilty to Counts One, Two and Three of the
9   indictment, each of which charge murder in aid of
10  racketeering, in violation Title 18, United States
11  Code, Section 1959(a)(1).  The murders are of Tina
12  Johnson, James Reid and Basil Williams.
13      Would you like me to go through the
14  penalties as well, your Honor?
15      THE COURT:  Yes.
16      MS. DAYTON:  The penalties for the
17  charges, each count, carries the exact same
18  penalties; it's mandatory life imprisonment.  The
19  defendant will also be subject to a $250,000 fine on
20  each count.  The Court may also order a term of
21  supervised release of up to five years to begin at
22  the expiration of any term of imprisonment that is
23  imposed.  If the defendant violates any term of
24  supervised release during that five years, he could
25  be sent back to prison for up to five years with no
```

18

```
1   credit for the time already served.
2       The defendant will also be ordered to
3   pay a $100 special assessment on each count of
4   conviction for a total of $300.
5       The government, in turn, for the
6   defendant's plea has agreed to recommend that the
7   Court reduce the defendant's overall offense level
8   by two points for acceptance of responsibility, plus
9   at the time of sentencing the government, assuming
10  the defendant has not violated any terms of the plea
11  agreement, will make a motion for a third point off
12  the guidelines, your Honor.
13      The guidelines in this case, these are
14  agreed upon by both the government and the defense,
15  are a level 43.  After all three counts have been
16  grouped, minus three points for acceptance of
17  responsibility, it would actually bring the
18  defendant to a 43.  It's 43 for each murder count,
19  plus three points for the combined offense level
20  units, minus three points for acceptance of
21  responsibility, for a total offense level 43.
22      The defendant's criminal history
23  category based upon his prior record is Criminal
24  History Category VI, your Honor, which brings his
25  range of imprisonment to life and his fine range
```

19

```
1   from 25,000 to $250,000 pursuant to 5E1.2(c)(3).
2       The government further agrees that once
3   the defendant has pled guilty and at the time of
4   sentencing, the government will move to dismiss the
5   remaining count against the defendant, and this will
6   satisfy his criminal liability for the offense that
7   underlies the indictment in the District of
8   Connecticut.
9       The defendant has further agreed not to
10  appeal or collaterally attack his sentence in a
11  habeas corpus proceeding, and if the sentence does
12  not exceed life and a five-year term of supervised
13  release, even if your Honor reaches that guideline
14  from a method that's different than what's outlined
15  in the plea agreement.
16      Your Honor, has already covered the
17  trial consequences.
18      Finally, the defendant has waived the
19  statute of limitations, which means that if for any
20  reason this plea is overturned, the defendant has
21  agreed that the government would still have a right
22  to reinstitute the criminal proceedings in this
23  matter.  And then under the Hyde agreement, the
24  defendant has agreed that he was correctly arrested
25  in this case.
```

20

```
1       THE COURT:  All right, Mr. Taylor, the
2   government has outlined the terms of the written
3   agreement.  Does the written agreement that you have
4   in front of you fully and accurately reflect your
5   understanding of the agreement that you have entered
6   into with the government?
7       THE DEFENDANT:  Yes, ma'am.
8       THE COURT:  And does this document
9   reflect the entire agreement that you have reached
10  with -- let me say that differently.  Has the entire
11  agreement you've reached with the government been
12  put down in writing?
13      THE DEFENDANT:  Yes, ma'am.
14      THE COURT:  Have any promises been made
15  to you that have not been put down in writing?
16      THE DEFENDANT:  No, ma'am.
17      THE COURT:  Other than the promises that
18  are in the written agreement, has anyone made any
19  other promises that have caused you or induced you
20  to plead guilty?
21      THE DEFENDANT:  No, ma'am.
22      THE COURT:  Has anyone threatened you or
23  intimidated you in any way that has caused you to
24  decide to plead guilty?
25      THE DEFENDANT:  No, ma'am.
```

21

```
1          THE COURT:  Has anyone made any promises
2   to you as to what your sentence will be?
3          THE DEFENDANT:  No, ma'am.
4          THE COURT:  With the statutory mandatory
5   life sentence it is difficult to see about promises.
6   But do you understand that, in fact, no one knows
7   what your sentence will actually be until it is
8   imposed on the day of sentencing?
9          THE DEFENDANT:  Yes, ma'am.
10         THE COURT:  You have acknowledged in the
11  plea agreement that you are waiving your statute of
12  limitations defense, if you had one, and you also
13  understand that your plea agreement doesn't bind any
14  other federal or state or local authority.  So, if
15  there is any civil or administrative consequence
16  that results from a guilty plea, that's within the
17  province of those agencies.  Do you understand that?
18         THE DEFENDANT:  Yes, ma'am.
19         THE COURT:  All right.  And that
20  includes potential tax matters.  Do you understand
21  that if before sentencing you were to violate a term
22  or condition of the agreement, if you were to engage
23  in any criminal activity, that the government must
24  void your agreement?
25         THE DEFENDANT:  Yes, ma'am.
```

22

```
1          THE COURT:  And if that agreement is
2   voided for any proper reason, you may not be
3   permitted to -- you will not be permitted to
4   withdraw your plea of guilty.  Do you understand
5   that?
6          THE DEFENDANT:  Yes, ma'am.
7          THE COURT:  Now, importantly, while you
8   would otherwise have a right to appeal your sentence
9   if you believed it was unlawful under the law, you
10  have specifically agreed that you will not appeal or
11  collaterally attack in any proceeding, including,
12  but not limited to, a motion under 28, United States
13  Code, 2255 or 2241, the conviction or the sentence
14  of imprisonment that's imposed by the Court if that
15  sentence does not exceed life imprisonment and a
16  five-year sentence of supervised release no matter
17  what analysis the Court uses to reach that sentence.
18  Do you understand?
19         THE DEFENDANT:  Yes, ma'am.
20         THE COURT:  If you believe there is a
21  fundamental flaw or unconstitutional aspect to your
22  plea and conviction resulting from that, including
23  unconstitutional ineffective assistance of counsel,
24  that fundamental claim of unconstitutionality is not
25  waived by your plea agreement.
```

23

```
1          I'll ask then if you understand the plea
2   agreement and are in agreement with its terms, to
3   sign it and it may be filed with the clerk.
4          You have signed both the plea agreement
5   and the stipulation of offense conduct.  This
6   stipulation of offense conduct does not necessarily
7   reflect all of the information that may be before
8   the Court at the time of sentencing.  Do you
9   understand that?
10         THE DEFENDANT:  Yes, ma'am.
11         THE COURT:  It only represents that
12  which you and the government agree you will not
13  dispute at sentencing.
14         Let's discuss the sentencing scheme.  Do
15  you understand, Mr. Taylor, that as to the offense
16  of murder in aid of racketeering, the criminal
17  statute provides a maximum penalty and a minimum
18  penalty of life imprisonment and a fine of up to
19  $250,000.  The Court may also impose a term of
20  supervised release of up to five years beginning at
21  the end of any term of imprisonment, and if you were
22  to violate a condition of supervised release, you
23  could be sentenced to a further term of up to five
24  years more no matter how much time you'd served on
25  supervised release.  Do you understand?
```

24

```
1          THE DEFENDANT:  Yes, ma'am.
2          THE COURT:  I don't suppose the
3   alternative fine statute applies, does it?
4          MS. DAYTON:  No, your Honor.  Thank you.
5          THE COURT:  Because the statutory fine
6   is up to $250,000.  If a fine is imposed and it's --
7   imposed and it's over $2,500, interest will be
8   charged on the unpaid balance on an amount not paid
9   within 15 days after the entry of judgment.  If your
10  payments are past due, the government may seek to
11  impose a statutory penalty on the principal amount
12  of the fine which is delinquent.  And you will be
13  obligated to pay a special assessment of $300, that
14  is $100 on each count of conviction, under 18,
15  United States Code, 3013, which you've agreed to pay
16  to the clerk of the court on or before the day of
17  sentencing.
18         Is restitution an issue in this case, or
19  are we leaving that open?
20         MS. DAYTON:  We're leaving it open at
21  this time, your Honor.
22         THE COURT:  All right, there may be an
23  issue of restitution that is required, and that is
24  the gist of the rider concerning restitution that's
25  attached to your plea agreement.
```

25

1    Under the Booker decision from the
2  Supreme Court, the application of the sentencing
3  guidelines is advisory, it is not mandatory.  The
4  Court is required to determine and consider the
5  applicable sentencing guidelines along with other
6  factors that are set out at 18, United States Code,
7  3553(a) in order to tailor an appropriate sentence
8  in your case.  Facts at the sentencing determination
9  are made by the Court, not a jury; they're made by a
10 preponderance of the evidence, not beyond a
11 reasonable doubt; it's based upon input from you,
12 the government, your lawyers and the probation
13 office who will be preparing the presentence
14 investigation report on you.  You have no right to
15 withdraw your guilty plea if your sentence or the
16 guideline application is different from that which
17 you anticipated.  Do you understand is that.
18       THE DEFENDANT:  Yes, ma'am.
19       THE COURT:  And that is different from
20 the statutory minimum and maximum, which does
21 ordinarily bind the Court with certain exceptions.
22 Your plea agreement contains a guidelines
23 stipulation which Ms. Dayton has outlined.  You
24 understand that the -- that stipulation, while it
25 may reflect the agreement of you and the government

26

1  as to what you believe the guidelines are, it does
2  not bind the Court.  Do you understand that?
3       THE DEFENDANT:  Yes, ma'am.
4       THE COURT:  So, only when we get to
5  sentencing and have the presentence report and we
6  hear from you, your lawyer and the government, only
7  then can you know with certainty what the guidelines
8  will be, whether there will be grounds to depart
9  from them, or whether they should be found
10 inapplicable and a non-guideline sentence imposed.
11 While you and the government have stipulated to your
12 criminal history, that also does not bind the Court
13 and that determination will be made by the Court.
14 And, again, you can't withdraw your guilty plea if
15 the Court calculates your sentence or criminal
16 history differently than you and the government have
17 agreed.
18       I pointed out specifically a waiver of
19 the right to appeal your conviction if you believe
20 your guilty plea was -- your sentence, if you
21 believe it's contrary to law, and that which you
22 reserved if you believe your guilty plea was
23 unlawful, involuntary or there is some fundamental
24 defect in the proceedings.  In any event, any notice
25 of appeal must be filed within ten days of judgment

27

1  being entered in your case.  If you are unable to
2  pay the cost of an appeal, you may proceed in forma
3  pauperis and at your request the clerk will file the
4  notice for you.  As well, if you cannot afford
5  counsel for your appeal, the Court will appoint one
6  for you at no cost to you.  Do you understand that
7  timetable and the portion of an appeal that you have
8  waived pursuant to your plea agreement?
9       THE DEFENDANT:  Yes, ma'am.
10      THE COURT:  Do you understand the rights
11 that you are waiving with respect to a trial and the
12 other rights that I have identified for you?
13      THE DEFENDANT:  Yes, ma'am.
14      THE COURT:  You indicate you wish to
15 plead guilty to Counts One, Two and Three that
16 charge you with murder in aid of racketeering.  I'm
17 going to ask the government to explain what the
18 elements of this offense are.  That means what are
19 the facts, each of which the government must prove
20 beyond a reasonable doubt before you could be
21 convicted by a jury if you changed your mind and
22 decided to go to trial.
23      All right, Ms. Dayton.
24      MS. DAYTON:  Thank you, your Honor.  If
25 the government were to proceed to trial -- excuse

28

1  me, if the defendant were to proceed to trial, the
2  government would have to prove that the defendant,
3  acting with one or more persons, in this case the
4  government would be proving three, committed or
5  attempted to commit a robbery; that during the
6  course of such robbery --
7       THE COURT:  And the three the government
8  would be proceeding -- we're just doing elements.
9  I'm sorry, go ahead.  We'll do that later.
10      MS. DAYTON:  In the course of and in
11 furtherance of the robbery, one or more of the
12 participants in that crime caused the death of a
13 person, other than one of the participants in the
14 robbery, in violation of the laws of the State of
15 Connecticut; that the defendant participated in the
16 criminal act as consideration for the receipt of, or
17 as consideration for a promise or agreement to pay
18 anything of pecuniary value, meaning that the
19 defendant did that so that he could or did get
20 something of monetary value from an enterprise or
21 organization engaged in racketeering activity, here
22 the government would prove it was narcotics
23 trafficking activity; and that the defendant acted
24 knowingly and intentionally.
25      THE COURT:  All right, Mr. Taylor, would

29

```
1   you please tell me in your own words what it is that
2   this indictment charges you with in the first three
3   counts; not what you did, what it charges you with
4   doing?
5           THE DEFENDANT:  Give me a little more
6   understanding.
7           MR. CASALE:  Just tell her what you did.
8           THE COURT:  No, I don't want to hear
9   what he did.  I want to hear what he is charged with
10  doing.  So she described you had to have acted with
11  one or more people and in the -- to commit a
12  robbery.
13          THE DEFENDANT:  Yes.
14          THE COURT:  And in the course of that
15  robbery somebody who wasn't a participant in the
16  robbery died, and that you participated in that
17  criminal act for money or something that came from
18  what is called an enterprise engaged in racketeering
19  activity.
20          THE DEFENDANT:  Yep.
21          THE COURT:  Drug trafficking, and that
22  you acted knowingly and intentionally.  Do you
23  understand that's what you are charged with?  Okay.
24          Now, is there any question that you have
25  for the Court, for your attorneys?  Because we are
```

30

```
1   now at the key event that brings us here today in
2   which you are going to tell me what it is you did
3   that shows that you are guilty of that charge that
4   we just identified the parts of.  Any questions for
5   me?
6           THE DEFENDANT:  No, ma'am.
7           THE COURT:  Any questions for your
8   lawyers?
9           THE DEFENDANT:  No, ma'am.
10          THE COURT:  All right, then, please tell
11  me what it is that you did that shows you are, in
12  fact, guilty of these three charges that you are now
13  offering to plead guilty to.
14          THE DEFENDANT:  Your Honor, I was
15  involved with a murder that happened and --
16          THE COURT:  Now, what was the context of
17  that murder?  Was it a robbery?
18          THE DEFENDANT:  Yes, ma'am.
19          THE COURT:  All right, tell me about
20  that.
21          THE DEFENDANT:  We went in to go rob
22  those people.
23          THE COURT:  "We" is who?
24          THE DEFENDANT:  The other three guys
25  with me, Azibo --
```

31

```
1           THE COURT:  Do you know their names?
2           THE DEFENDANT:  Azibo, Dreddy (ph) and
3   the light-skinned guy, chubby guy.  Efrain Johnson.
4           THE COURT:  All right, you said you went
5   in to rob those people.  Who were "those people"?
6           THE DEFENDANT:  The people that was in
7   the house, is what I was told.
8           THE COURT:  All right, and then what
9   happened?
10          THE DEFENDANT:  Once we got inside, we
11  got inside, that's when I seen duct tape, bats and
12  guns -- a gun.  Once I got inside I was told to look
13  out the window for -- a lookout.  Then after that
14  they was in the room -- say their name?
15          MR. TIERNAN:  Yeah.
16          THE DEFENDANT:  Azibo and Azikiwe was
17  duct taping the two people in the room on the left,
18  while Johnson was watching, and I was looking out
19  the other side -- out of the window.  After that, I
20  went back and I seen Azikiwe and -- Aquart standing
21  over Tina and the other guy swinging on top of her
22  head with a bat.  And when I asked him what he
23  doing, he said, "Come and get some," and from there
24  I left.
25          THE COURT:  Who said "come get some?"
```

32

```
1   Do you remember?  It's not important if you don't
2   remember.
3           THE DEFENDANT:  Azibo.
4           THE COURT:  And you left.  Tell me about
5   the money.
6           THE DEFENDANT:  Well, the only thing was
7   way before that, your Honor, that he -- before all
8   of this happened, he -- Azibo said that he wanted --
9   he needed my help in Connecticut.  That's what it
10  is.  I hadn't never knew what it was.  When we got
11  back to Connecticut, that's when he told me to come
12  up to Bridgeport.  When I came up to Bridgeport,
13  that's what happened.
14          THE COURT:  Now, do you remember we went
15  over one of the elements is that you participated in
16  this robbery because of a promise or an agreement to
17  pay you something from the narcotics trafficking.
18          THE DEFENDANT:  The only thing he said,
19  that he was going to put me into their enterprise.
20          THE COURT:  So, you would be able to
21  make your money from profiting in the -- in the
22  Aquart drug trafficking.
23          THE DEFENDANT:  Yes, ma'am.
24          THE COURT:  And when you tell me of the
25  activity that you did, you did this knowingly and
```

33

1  intentionally to participate in this robbery?
2          THE DEFENDANT:  Yes, ma'am.
3          THE COURT:  All right, I'm going to ask
4  the government to summarize what it claims you did
5  that makes you guilty of the charges that you are
6  intending to plead guilty to and the government's
7  evidence as to those charges.  I want you to listen
8  because I want you to tell me after she finishes
9  whether you agree with her summary, whether there
10 are parts that you disagree with.  All right.
11         MS. DAYTON:  Thank you, your Honor.
12 Your Honor, if we were to proceed to trial the
13 government would prove that the defendant, John
14 Taylor, in conjunction with Azibo Aquart, Azikiwe
15 Aquart and Efrain Johnson went over to the victims'
16 house on the night of August 24th, 2005.
17         THE COURT:  When you say "victim," would
18 you identify exactly who you speak of.
19         MS. DAYTON:  Yes, your Honor, Tina
20 Johnson, James Reid and Basil Williams.  The three
21 of them were living in the apartment at 215 Charles
22 Street, your Honor, in apartment 101.  The four
23 defendants, including the defendant here today, went
24 to the house, the apartment; that defendant Taylor
25 believed they were going there for a robbery; that

34

1  they broke into the house and attacked the victims;
2  that the defendant Taylor stood as a guard and a
3  lookout while the other three defendants in his
4  view, in Taylor's view, duct taped the victims, and
5  then Azibo and Azikiwe Aquart beat the victims to
6  death with baseball bats.
7          The government would further prove that
8  the defendant's reason for agreeing to participate
9  in the offense was that he was given narcotics to
10 sell, in particular crack cocaine, and that he was
11 promised that he would be given additional narcotics
12 to sell and be able to earn money by participating
13 in the Aquart drug trafficking enterprise.
14         We would prove this, your Honor,
15 partially through the defendant's statement that he
16 gave in North Carolina in December of last year, and
17 there are also several other witness statements
18 regarding the drug trafficking organization and the
19 events on the night of August 24th, 2005.
20         Your Honor, there is forensic evidence
21 from the murder scene.  There is also recorded phone
22 calls between the defendant and other individuals,
23 including Azikiwe Aquart and Azibo Aquart's
24 girlfriend, the mother of his child, that implicate
25 his involvement both in this crime and in the

35

1  narcotics trafficking enterprise.  There are toll
2  records from the night of the murders, and there is
3  many items of corroborative evidence, your Honor,
4  regarding the defendant's involvement with the
5  Aquarts.
6          THE COURT:  All right, Mr. Taylor,
7  you've heard the government's summary.  Do you agree
8  with this?
9          THE DEFENDANT:  Yes, ma'am.
10         THE COURT:  Do you agree with that
11 timeframe of August 24th, 2005?
12         THE DEFENDANT:  Yes, ma'am.
13         THE COURT:  Do you agree that you were
14 given some crack cocaine and promised that you would
15 be given additional drugs and participation in the
16 Aquart enterprise?
17         THE DEFENDANT:  Yes, ma'am.
18         THE COURT:  Is there anything you
19 disagree with in the government's summary?
20         THE DEFENDANT:  No, ma'am.
21         THE COURT:  Now, I understand that you
22 have prepared a petition to be submitted to the
23 Court to enter a plea of guilty.  I have a copy of
24 that.  Would you put that in front of Mr. Taylor,
25 please.

36

1          Have you read that and reviewed it with
2  your attorney?
3          THE DEFENDANT:  Yes, ma'am.
4          THE COURT:  Attorneys.  And is that your
5  signature on the --
6          THE DEFENDANT:  Yes, ma'am.
7          THE COURT:  -- bottom of page 14.  All
8  right.
9          And have you reviewed this before we
10 began, Ms. Dayton?  Any comment?
11         MS. DAYTON:  Nothing other than what's
12 already been addressed, your Honor.  No comments.
13 Yes, I did review it before.
14         THE COURT:  All right, if that has been
15 signed then by counsel and by Mr. Taylor, it may be
16 handed to the Court for filing.
17         So with respect to your education, would
18 it be correct to say you have completed 8th grade?
19 May I circle that?  And I'll ask you to initial
20 that.
21         THE DEFENDANT:  Yes, ma'am.
22         THE COURT:  Just correct that minor
23 change, and then I will ask that the clerk put Mr.
24 Taylor to plea.
25         All right, please put Mr. Taylor to

37

```
1    plea.
2           THE CLERK:  This is the case of United
3    States of America v. John Taylor, case No. 3:10cr61.
4    You are charged in Counts One through Three of the
5    indictment with a violation of Title 18, United
6    States Code, Section 1959(a)(1); how do you plead to
7    Counts One through Three of the indictment?
8           THE DEFENDANT:  Guilty.
9           THE CLERK:  The defendant pleads guilty
10   to Counts One through Three of the indictment, your
11   Honor.
12          THE COURT:  Thank you.
13          All right, on the basis of the petition
14   that Mr. Taylor and his counsel have signed; based
15   on the answers that Mr. Taylor has given while under
16   oath, on the record, and in the presence of his
17   counsel to the Court's questions; based on the
18   remarks of defense counsel and those of the
19   assistant U.S. attorney, I find Mr. Taylor is
20   competent to enter a guilty plea; he knows of his
21   right to a trial and the other attendant rights; he
22   knows what the maximum and minimum possible sentence
23   is; maximum period of supervised release; what the
24   maximum period of reincarceration for violations of
25   supervised release is; he knows that the guidelines
```

38

```
1    are not binding, but they must be considered by the
2    Court; he knows of his statutory right to appeal his
3    sentence, and that he has waived his right to appeal
4    if his sentence is life and supervised release is
5    not more than five years.
6           I also find there is a factual basis for
7    the defendant's plea; that he has knowingly and
8    intelligently waived his right to a jury trial; that
9    he has entered his plea voluntarily, knowingly and
10   of his own free will.  Accordingly, a finding of
11   guilty on Charges One, Two and Three shall enter
12   forthwith.
13          The case is referred to the probation
14   office now for a presentence investigation report.
15   The officer from the U.S. probation office will
16   prepare the presentence investigation report which
17   will be submitted to the Court to assist in
18   determining the appropriate sentence.  Probation
19   officers work for the court, they don't work for the
20   government.  So generally your cooperation with
21   probation will be of benefit to you.  It's very
22   important that you discuss with your attorney what
23   you say to the probation officer because this
24   presentence report is very important in the
25   calculation of guidelines and consideration of your
```

39

```
1    sentence.  Please review it with your attorney, and
2    at sentencing the first question I will ask you is
3    whether you have read it, understood it and given
4    what response to it you wanted to give to the
5    probation officer or through your lawyers.
6           There is no issue of bond.  Shall I
7    leave the issue of a schedule for the sentencing and
8    the presentence report to be submitted by counsel to
9    the Court?
10          MS. DAYTON:  Yes, please, your Honor.
11          MR. CASALE:  Yes.
12          THE COURT:  All right, I would
13   appreciate receiving that then.  And in that you may
14   want to consider whether a presentence report can be
15   begun versus whether it should await other events,
16   and let me know your thoughts on that.
17          MS. DAYTON:  Thank you, your Honor.
18          THE COURT:  Since the government will
19   not be seeking the death penalty, will it be
20   necessary to have both counsel continue to represent
21   Mr. Taylor, or can we go with one now?
22          MR. CASALE:  Well, as I explained to
23   government counsel earlier, I assumed that today
24   would be my bow-out day.  What I would like to do is
25   stay on even if your Honor sort of cuts off the CJA
```

40

```
1    funding.  I'm not concerned about that.  We've come
2    a long way with Mr. Taylor and we would like to see
3    it through, and I have no problem just staying on
4    pro bono if that's the case.
5           THE COURT:  Well, that's gracious of
6    you.  We will consider Mr. Tiernan then to be the
7    CJA counsel from this point on.  I will set the
8    scheduling based on your input.
9           MS. DAYTON:  Your Honor, just for the
10   record, with respect to another defendant in this
11   case against whom the government is not seeking the
12   death penalty, I believe two counsel were allowed to
13   remain on that case.  I didn't know if your Honor
14   wanted to take that into consideration, with respect
15   to Efrain Johnson.  I didn't know if it was
16   relevant, I just wanted to make sure that was on the
17   record.  I believe Judge Dorsey made that --
18          THE COURT:  Was there a reason for that?
19          MS. DAYTON:  I think it was because the
20   relationship had been developed with both counsel
21   and it was allowed to remain that way because of the
22   seriousness of the case.  I believe that was the
23   reason, your Honor.
24          THE COURT:  It doesn't sound any
25   different here, does it?
```

41

```
1              MS. DAYTON:  No.
2              THE COURT:  Shall we keep you on as CJA
3    counsel, Mr. Casale?
4              MR. CASALE:  Never opposed to getting a
5    check from the government.
6              THE COURT:  All right, it will continue
7    unchanged then.
8              All right, if there is nothing further
9    then, we will stand in recess.  Thank you.
10             MR. TIERNAN:  Thank you, your Honor.
11             (Proceedings adjourned 12:35).
12
13
14             I certify that the foregoing is a
15   correct transcript from the record of proceedings in
16   the above-entitled matter.
17
18                      12/23/10
19                      Date
20
21                   /S/Sharon Montini
22                   Official Reporter
23
24
25
```

1

```
1              UNITED STATES DISTRICT COURT
2              DISTRICT OF CONNECTICUT
3    * * * * * * * * * * *     *
                               *
4    UNITED STATES OF AMERICA, * Case No.10cr61(JBA)
5              Government,      *
                               *
6        vs.                    *
                               *
7    JOHN TAYLOR,               * October 18, 2010
8              Defendant.       *
                               *
9    * * * * * * * * * * * *    *
10                  TRANSCRIPT SEALED
11   BEFORE:  THE HONORABLE JANET BOND ARTERTON, U.S.D.J.
12
     APPEARANCES:
13   FOR THE GOVERNMENT:    TRACY DAYTON, ESQ
                            ALINA REYNOLDS, ESQ.
14                          PETER MARKLE, ESQ.
                            U. S. Attorney's Office
15                          915 Lafayette Blvd
                            Bridgeport, CT 06604
16
     FOR THE DEFENDANT:     CHARLES TIERNAN, ESQ.
17                          Lynch, Traub, Keefe &
                            Errante
18                          52 Trumbull Street
                            New Haven CT 06510
19
                            ROBERT CASALE, ESQ
20                          250 West Main Street
                            Branford, CT 06405
21
     Court Reporter:        Sharon Montini, RMR
22                          141 Church Street
                            New Haven, CT 06510
23
24   Proceedings recorded by mechanical stenography,
     transcript produced by computer
25
```

2

```
1              THE COURT:  All right.  Could I see
2    counsel at sidebar just for a moment, please?
3              (Sidebar conference)
4              THE COURT:  Counsel, I wanted to ask you
5    how you wanted to proceed with respect to the
6    cooperation agreement given that there are people in
7    the courtroom other than the defendant's family
8    members.  Obviously the Court's desire is not to
9    close the courtroom if at all possible.  The
10   victims' families are here?
11             MS. DAYTON:  Let me -- Tina Johnson is
12   one of the victims.  Her family members are here.
13   The other two victims, their family members are not,
14   though they have been notified.  I think the
15   government could ask them not to discuss it outside
16   the courtroom and I think that they would honor
17   that.  It's really up to you.
18             THE COURT:  Now, at this point have you
19   not disclosed Mr. Taylor --
20             MS. DAYTON:  We have not.
21             THE COURT:  -- to the remaining
22   defendants in the case?
23             MS. DAYTON:  We have not.  We were
24   waiting until he actually pled, your Honor.
25             MR. CASALE:  We have made it clear to
```

3

```
1    the other lawyers that Mr. Taylor was going to
2    cooperate.
3              MS. DAYTON:  They're aware.
4              MR. CASALE:  There is no surprise.
5              THE COURT:  If that is the case, why are
6    we sealing -- we're not filing the plea agreement
7    today -- excuse me, the cooperation agreement?
8              MS. DAYTON:  For his safety in custody,
9    because once it gets filed there is a very bad thing
10   that happens in the jails where people want to see
11   the paperwork, and it becomes very dangerous for
12   these guys.  We are going to be seeking to put him
13   in witness security prior to trial for his own
14   safety.  We think that there is a serious risk of
15   injury to him if his cooperation was widely known
16   and it was publicly disclosed.
17             THE COURT:  Are you satisfied to have
18   the cooperation agreement reviewed in open court
19   with the promise from the people in the gallery not
20   to disclose it?
21             MS. DAYTON:  I don't know, perhaps it's
22   better if we do it, if your Honor would permit, the
23   cooperation agreement in the robing room rather than
24   close the courtroom.
25             THE COURT:  It's the same thing.  It's
```

4

```
1   the same effect.  If you do it outside the courtroom
2   you have, in effect, closed the courtroom.
3           MS. DAYTON:  We can ask them to step
4   out.  That's better.  I think they'll willingly do
5   that.
6           THE COURT:  You do?
7           MS. DAYTON:  Yes.
8           THE COURT:  That is of their own
9   volition, to absent themselves.  The courtroom
10  remains open and we will simply seal the
11  transcript --
12          MS. DAYTON:  Correct.
13          THE COURT:  -- of the proceedings.  Now
14  at what point do you want to discuss the cooperation
15  agreement?
16          MS. DAYTON:  Perhaps we should just do
17  the whole plea agreement and then do the cooperation
18  agreement at the end.  We can just end the
19  proceedings, so to speak, and do it separately.
20          THE COURT:  There is the point of
21  colloquy where he is asked if any other promises
22  have been made which potentially impacts the
23  contents of the cooperation agreement.  Do you want
24  to do the cooperation agreement first?
25          MS. DAYTON:  That's still the same
```

5

```
1   issue, when he's asked that question?
2           THE COURT:  I will tell him in the
3   colloquy as to the cooperation agreement he can
4   answer that and know he is answering it to include
5   both agreements.
6           MS. DAYTON:  Okay, let's do that.  So
7   we'll go speak with them now, if your Honor would
8   just give us a minute.  I don't think it's going to
9   be a problem.
10          THE COURT:  All right.  May I ask a
11  question?  The plea agreement identifies that he is
12  -- by virtue of the sentencing guidelines, that he
13  is looking at life.  Is it a statutory -- is it
14  statutorily mandated?
15          MS. DAYTON:  It's statutory.  It's life
16  or death, your Honor.
17          THE COURT:  And he is -- is there to be
18  a part of the colloquy that he is entering a plea in
19  order to avoid a death penalty?
20          MS. DAYTON:  It's not in lieu, your
21  Honor.  The attorney general made a decision not to
22  seek death against him.
23          THE COURT:  Does his cooperation
24  agreement give him the opportunity for a sentence
25  less than life?
```

6

```
1           MS. DAYTON:  Right.
2           THE COURT:  Why don't we proceed, if you
3   think that's the proper way to go, on the
4   cooperation agreement first.
5           MS. DAYTON:  Okay, great.  Thank you.
6           MR. CASALE:  Could I just call your
7   attention, we made two mistakes in the plea
8   petition, one of them being we didn't identify that
9   the minimum mandatory sentence absent any 5K1
10  departure is life.  We need to include that.
11          And the another concern, the question
12  of, would you still plead guilty if a statement you
13  gave to police could not be used.  It's kind of a
14  complicated question because it assumes no other
15  evidence.  In this case the answer to that question
16  would be yes also because there would be other
17  evidence developed.
18          This gentleman's statement to law
19  enforcement, your Honor may not be aware, was a
20  voluntary statement.  It was -- he was not under
21  arrest, he was not in custody, it was given in his
22  own residence in North Carolina.  We don't see any
23  suppressible issues associated with that statement.
24          So with those two corrections, the plea
25  petition is fine.
```

7

```
1           THE COURT:  All right.  And have you
2   made those corrections on the --
3           MR. CASALE:  We've made them on their
4   copy.
5           THE COURT:  I don't have a copy of the
6   petition.
7           MR. TIERNAN:  The Court doesn't have a
8   copy.
9           MS. DAYTON:  I thought we e-mailed it.
10          THE COURT:  I have a copy only of the
11  plea agreement.
12          MS. DAYTON:  Do you have the original?
13          MR. CASALE:  I was ahead of myself then.
14  We can correct it before it gets to you.
15          MS. DAYTON:  Scratch what he said.
16          (Sidebar conference concluded)
17          MS. DAYTON:  Thank you, your Honor.  We
18  have discussed it with Tina Johnson's family
19  members; there's actually six of them here now.
20  They are outside.  They were told that they have an
21  absolute right to be in the courtroom, that it was
22  their option to be in here, but that for purposes of
23  the first part of the proceeding, if they didn't
24  mind staying outside that would be better, and we
25  explained to them why.  They understand and they
```

8

```
 1  have voluntarily chosen to stay outside the
 2  courtroom, but they would like to be back in for the
 3  plea agreement portion of this.
 4          THE COURT:  And with respect to the
 5  remaining persons in the courtroom?
 6          MS. DAYTON:  They're all law
 7  enforcement, your Honor, or with the U.S. attorney's
 8  office, and we don't think that poses any issue
 9  whatsoever as long as the defense has no objection.
10          MR. TIERNAN:  No objection, your Honor.
11          MR. CASALE:  None.
12          MS. DAYTON:  We can identify them for
13  the record, if that's what your Honor would like.
14          THE COURT:  If you are satisfied that
15  they are all law enforcement, the defense is
16  satisfied to have them here, then we can proceed.
17          MS. DAYTON:  Thank you so much, your
18  Honor.
19          THE COURT:  Mr. Taylor and counsel,
20  would you come to the lectern.
21          Good morning, Mr. Taylor.
22          THE DEFENDANT:  Good morning, ma'am.
23          THE COURT:  We have two separate matters
24  to take up today, the cooperation agreement that you
25  have apparently entered into with the government and
```

9

```
 1  your plea agreement with the government which
 2  assumes that you will be entering a plea of guilty.
 3  That does not obligate you to, and at the ultimate
 4  moment you will be asked how do you plead, and I
 5  will go over that with you, but what I want to do
 6  first is to review the terms and conditions of the
 7  cooperation agreement, doing it in open court, but
 8  having no one here remaining in the courtroom whose
 9  knowledge of your cooperation agreement could
10  endanger you in some way.
11          The cooperation agreement and the
12  transcript of this part of the proceedings will be
13  sealed.  The government has moved for that sealing.
14  I have no objection from the defense counsel.  And
15  it is because, while the plea agreement will be a
16  matter of public record, given the danger to you of
17  the cooperation agreement being a matter of public
18  record, or even being identified in the court docket
19  as a sealed motion, given your custodial status
20  right now, the risk to you, by the representation of
21  the government, is too high, and thus it is
22  reasonably narrowed, I believe, to just have the
23  plea agreement on the public record, but let the
24  U.S. attorney's office retain the finalized
25  cooperation agreement and file it publicly at the
```

10

```
 1  time you are sentenced.
 2          Do you understand?
 3          THE DEFENDANT:  Yes, ma'am.
 4          THE COURT:  All right then, I understand
 5  that there is a cooperation agreement that you have
 6  entered into with the government.  Is that correct?
 7          THE DEFENDANT:  Yes, ma'am.
 8          THE COURT:  I'm going to ask Ms. Dayton
 9  to set out what the requirements and potential
10  benefits are to you and what the government's
11  obligations and responsibilities are just to make
12  sure that you understand what the substance of your
13  cooperation agreement is.
14          Ms. Dayton.
15          MS. DAYTON:  Thank you, your Honor.
16  Your Honor, under the terms of the cooperation
17  agreement, the defendant has agreed, and therefore
18  is required to plead guilty to Counts One, Two and
19  Three of the indictment.  In each of those counts
20  he's charged with murder in aid of racketeering, in
21  violation of Title 18, United States Code, Section
22  1959(a)(1).
23          Your Honor, once the defendant pleads
24  guilty to those, he is, under the terms of the
25  cooperation agreement, required to cooperate with
```

11

```
 1  the government, and to do so, he must provide us
 2  information regarding his own criminal activity,
 3  provide information regarding the criminal activity
 4  of others with which he was involved in this case,
 5  and other criminal activity in which he was engaged
 6  in his life.
 7          He's also required to be truthful,
 8  accurate, and complete at all times.  And he's
 9  required to testify if asked to do so.  It is
10  believed in this case that he will, in fact, be
11  asked to do so.
12          His cooperation includes being debriefed
13  by members of the -- officers and agents from the
14  FBI and other law enforcement agencies as well as by
15  the U.S. attorney's office.
16          In the event that the defendant abides
17  by all of these agreements, the government has
18  agreed that it will recommend to the Court that the
19  --pursuant to a 5K1.1 motion, that the defendant
20  have the opportunity to receive a sentence less than
21  what the mandatory minimum would otherwise be in
22  this case, which is life for each of those counts.
23          In the 5K agreement the government has
24  agreed that it will write in there what cooperation
25  and substantial assistance the defendant has
```

12

```
1    provided.  It's also believed that the defendant
2    will have testified in this court in front of your
3    Honor.  The letter will also contain information
4    regarding the defendant's criminal history and his
5    role in this offense.
6              The government has also agreed if the
7    defendant requests, and we believe this will be his
8    request, that he will be recommended for the witness
9    security program.  That is something the government
10   does, we make the recommendation.  However, the
11   decision whether or not he is accepted into the
12   program lies with the U.S. marshal's service, your
13   Honor.
14             And if there is any breach of this
15   agreement, in other words, if the defendant does not
16   provide truthful or accurate or complete information
17   or refuses to testify when asked to do so, the
18   government will not file the 5K motion and the
19   defendant's guilty pleas to the three counts in the
20   plea agreement, three counts of murder will stand.
21             THE COURT:  All right.  Mr. Taylor, do
22   you understand -- you've read the cooperation
23   agreement, have you?
24             THE DEFENDANT:  Yes, ma'am.
25             THE COURT:  Have you reviewed it with
```

13

```
1    your attorneys?
2              THE DEFENDANT:  Yes, ma'am.
3              THE COURT:  Do you agree with the terms
4    and conditions of the plea agreement that are set
5    out in that that Ms. Dayton has summarized?
6              THE DEFENDANT:  Yes, ma'am.
7              THE COURT:  Have you had enough time to
8    discuss this agreement with your lawyers?
9              THE DEFENDANT:  Yes, ma'am.
10             THE COURT:  Would you kindly indicate by
11   your signature that you have read it --
12             THE DEFENDANT:  Yes.
13             THE COURT:  -- that you've had enough
14   time and that you accept and understand the terms.
15             THE DEFENDANT:  Yes, ma'am.
16             THE COURT:  You've already signed this?
17             THE DEFENDANT:  No, I'll sign it right
18   now.
19             THE COURT:  Okay.
20             Let me address the question to Mr.
21   Tiernan and Mr. Casale.
22             Have you reviewed and explained this
23   cooperation agreement --
24             MR. TIERNAN:  Yes, your Honor.
25             MR. CASALE:  Yes, your Honor.
```

14

```
1              THE COURT:  -- to Mr. Taylor, and does
2    he, in your opinion, understand the agreement and
3    consequences of breach that are set out?
4              MR. CASALE:  We believe he understands
5    it.
6              THE COURT:  In the copy that I have
7    before me it indicates on the signature line that it
8    is a plea agreement letter.  Is that what you mean?
9              MR. CASALE:  Correct.  I'm sorry?
10             THE COURT:  As opposed a cooperation
11   agreement.
12             MR. CASALE:  This document, yes.  I
13   might be misunderstanding the Court.
14             THE COURT:  I have a copy of the
15   cooperation agreement in which the signature line
16   indicates that he has read "the plea agreement
17   letter" and I'm not quite sure whether that is what
18   you intended to write as opposed to "the cooperation
19   agreement letter."
20             MR. CASALE:  I think, if the Court
21   please, that is a typographical error.  That should
22   read "cooperation agreement."  We will correct it
23   and initial the correction.
24             THE COURT:  Thank you.
25             And, Mr. Taylor, you'll notice earlier
```

15

```
1    in the cooperation agreement it says you acknowledge
2    no other promises, agreements or conditions have
3    been entered into other than those set forth in the
4    plea agreement.  I think that probably means plea
5    agreement and cooperation agreement.
6              When we get to the point later in the
7    next stage when I ask you whether any other promises
8    have been made to you, you may assume that my
9    question, in referring to the plea agreement,
10   includes the cooperation agreement.  So you don't
11   have to reference a separate cooperation agreement
12   and you will still be truthful in your response.  Do
13   you understand?
14             THE DEFENDANT:  Yes, ma'am.
15             THE COURT:  All right.  And with respect
16   to your cooperation -- go ahead.
17             (Discussion held off the record between
18   defendant and counsel)
19             THE COURT:  With respect to the
20   cooperation agreement, does this cooperation
21   agreement that you have read and signed constitute
22   the whole cooperation agreement that you have with
23   the government?
24             THE DEFENDANT:  Yes, ma'am.
25             THE COURT:  Have any other promises with
```

16

```
 1   respect to your cooperation by the government not
 2   been put down in this document?
 3              THE DEFENDANT:  No, ma'am.
 4              THE COURT:  Has anybody else made any
 5   other kinds of representations or promises to you
 6   about your cooperation and its consequences?
 7              THE DEFENDANT:  No, ma'am.
 8              THE COURT:  All right, that may be
 9   signed.
10              While you do that, Ms. Dayton would you
11   kindly stand and raise your right hand and swear
12   that the contents of your affidavit with respect to
13   Mr. Taylor's anticipated guilty plea and the
14   cooperation agreement and the need for the sealing
15   and retention from the public record of the
16   cooperation agreement is true and accurate to the
17   best of your knowledge and belief.
18              MS. DAYTON:  I do swear, your Honor.
19              THE COURT:  All right, I have granted
20   the motion to seal for the reasons I've set forth on
21   the record.  I will seal the motion to seal the
22   affidavit in support and the cooperation agreement
23   and place it in the custody of the U.S. attorney for
24   filing at sentencing.
25              Is there anything else that needs to be
```

17

```
 1   taken up in this phase of our proceeding?
 2              MS. DAYTON:  No.  Thank you, your Honor.
 3              THE COURT:  All right, the transcript of
 4   the proceedings to this point will be sealed, and
 5   from now on they remain unsealed.  You may invite
 6   any members of the public who have voluntarily left
 7   the courtroom to return.
 8              MS. DAYTON:  Thank you, your Honor.
 9
10
11
12        I certify that the foregoing is a correct
13   transcript from the record of proceedings in the
14   above-entitled matter.
15
16              2/10/14
17              Date
18
19              /S/   Sharon Montini
20              Official Reporter
21
22
23
24
25
```

1

```
 1              UNITED STATES DISTRICT COURT
 2                 DISTRICT OF CONNECTICUT
 3   * * * * * * * * * * * *      *
                                  *
 4   UNITED STATES OF AMERICA,    *  Case No 10cr61(JBA)
                                  *
 5              Government,       *
                                  *
 6         vs.                    *
                                  *
 7   JOHN TAYLOR                  *  April 16, 2012
                                  *
 8              Defendant.        *
                                  *
 9   * * * * * * * * * * * * *    *
10           TRANSCRIPT of SENTENCING HEARING
11   BEFORE:  THE HONORABLE JANET BOND ARTERTON U.S.D.J.,
12
13   Appearances:
14   FOR THE GOVERNMENT:   TRACY DAYTON, ESQ.
                           ALINA REYNOLDS, ESQ
15                         PETER MARKLE, ESQ.
                           United States Attorney's Office
16                         915 Lafayette Blvd
                           Bridgeport, CT 06604
17
18
19   FOR THE DEFENDANT     ROBERT CASALE, ESQ
                           250 West Main Street
20                         Branford, CT 06405
21                         CHARLES TIERNAN, ESQ
                           Lynch, Traub, Keefe & Errant
22                         52 Trumbull Street
                           New Haven, CT 06506
23
     Court Reporter:       Sharon Montini, RMR
24
     Proceedings recorded by mechanical stenography,
25   transcript produced by computer
```

2

```
 1              THE COURT:  Good afternoon, counsel,
 2   ladies and gentlemen.  Please be seated.
 3              We're here this afternoon for the
 4   sentencing hearing in United States v. John Taylor,
 5   10cr61.  May I have appearances, starting with the
 6   government.
 7              MS. DAYTON:  Tracy Dayton, Alina
 8   Reynolds and Peter Markle for the government.  Good
 9   afternoon.
10              THE COURT:  Good afternoon.
11              MR. CASALE:  Robert Casale and Charles
12   Tiernan for Mr. Taylor, who is present.
13              THE COURT:  Good afternoon, gentlemen.
14   Good afternoon, Mr. Taylor.
15              THE DEFENDANT:  Good afternoon.
16              THE COURT:  And Mr. Rafferty, who
17   prepared the presentence report, is also here.
18              May I ask Mr. Taylor and his counsel to
19   please come to the lectern.
20              Mr. Taylor, Mr. Rafferty has prepared
21   the presentence report about you.  Have you reviewed
22   that report with your attorneys?
23              THE DEFENDANT:  Yes, ma'am.
24              THE COURT:  And do you understand what
25   is in the report.
```

3

```
1           THE DEFENDANT: Yes, ma'am.
2           THE COURT: And have you given what
3  input you wanted, either to Mr. Rafferty when you
4  spoke to him or through your lawyer, about what is
5  in this report?
6
7           THE DEFENDANT: No.
8           THE COURT: You've -- in other words,
9  after you have studied what is in the report, if
10 you've had something you wanted to say about what's
11 in the report?
12          THE DEFENDANT: No, ma'am.
13          THE COURT: You've had a chance to do
14 that, though?
15          THE DEFENDANT: Yes, ma'am.
16          THE COURT: Okay. And you've done it to
17 the extent you wanted to?
18          THE DEFENDANT: Yes, ma'am.
19          THE COURT: All right, any reason why we
20 should not proceed to impose sentence on you today?
21          THE DEFENDANT: No.
22          THE COURT: All right, let me then
23 proceed to clarify what is or is not in dispute. I
24 have received memoranda, memorandum in aid of
25 sentencing from defendant, defendant's counsel, and
```

4

```
1  the government's memorandum in support of its 5K
2  motion detailing Mr. Taylor's role in this
3  prosecution.
4           With respect to the factual statements
5  that are contained in the presentence report, are
6  there no factual -- no disputes over the factual
7  contents that remain that bear on sentencing?
8           MR. CASALE: Correct.
9           THE COURT: All right, is that true for
10 the government as well?
11          MS. DAYTON: Yes, your Honor.
12          THE COURT: Then the Court will adopt
13 the factual statements in the presentence report
14 with one exception. The criminal history does not
15 include a September '05 state conviction.
16 Defendant's memorandum recalls that -- recalls for
17 the Court that there was that conviction, and I
18 believe that adds three more criminal history
19 points, bringing it to 16. That does not affect
20 anything else about the calculation since Mr. Taylor
21 is a Criminal History VI. But I will ask Mr.
22 Rafferty to amend the PSR to add that conviction.
23          All right, Mr. Taylor is here today,
24 having been convicted by his guilty plea to three
25 counts of murder in aid of racketeering, in
```

5

```
1  violation of 18, United States Code, 1959(a)(1).
2           While as a matter of statute a
3  conviction under that provision carries a mandatory
4  life sentence, we nonetheless look at the
5  application of the advisory guidelines using the
6  November 2011 manual. There does not seem to be any
7  dispute as to Mr. Rafferty's analysis of the
8  guideline application for the convictions of
9  Counts One, Two and Three separately because there
10 is no grouping under 3D1.2. Under 2E1.3(a)(2) and
11 2A1.1(a), for first degree murder, the offense level
12 for each of these is 43, and the combined unit
13 addition brings it up to a 46.
14          Mr. Taylor is -- having accepted
15 personal responsibility for these offenses under
16 3E1.1(a), gets a two-level reduction, and I look to
17 Ms. Dayton for a motion with respect to the third
18 point.
19          MS. DAYTON: Yes, your Honor, we make
20 that motion.
21          THE COURT: All right, that oral motion
22 will be granted, three levels are applied, to reduce
23 the total offense level under the advisory
24 guidelines to 43. And there is to dispute about
25 that analysis, correct?
```

6

```
1           MR. CASALE: No, there is not.
2           THE COURT: And the criminal history
3  category is VI. By my calculation, Mr. Taylor has
4  -- I guess this will be the 12th conviction. And
5  even under the guidelines the imprisonment range is
6  life. So, we have a motion from the government
7  brought under 5K1.1, and the Court can, therefore,
8  depart, and will depart from that mandatory minimum,
9  and the difficult challenge is how, applying all of
10 the appropriate 3553 factors and Mr. Taylor's
11 individual circumstances, an appropriate sentence
12 should be tailored.
13          Mr. Casale, do you want the government
14 to go first in outlining the grounds for the 5K
15 motion or do you want to go first and then they can
16 do that?
17          MR. CASALE: I think, if the Court
18 please, the government can go first -- should go
19 first.
20          THE COURT: All right.
21          MR. CASALE: I understand they might
22 have one of the family members of the victims
23 present, too, so we would prefer to respond
24 afterwards.
25          THE COURT: All right, very well. Thank
```

7

```
1    you for noting that.
2             Ms. Dayton, who is present from --
3    notices have been given to the victims' families?
4             MS. DAYTON:  Notices were given to all
5    of the victims' families for the 3:15 time, your
6    Honor.  So, with the changed time this morning, I'm
7    not sure we were able to get in touch with
8    everybody, but three of Ms. Whittingham's children
9    are here, and two of them would like to address the
10   Court actually on behalf of Mr. Taylor.
11            THE COURT:  All right, and if you would
12   like, and if it perhaps makes more sense, I could
13   hear argument and then recess until 3:15 and then
14   the other victims' family members may wish to be
15   heard.
16            MS. DAYTON:  I think we're actually okay
17   because I think at this point these are the three
18   who will be here.  Yes.  No, I think we're okay.
19            THE COURT:  So that -- all right.  I
20   regret in moving the time up I did not think about
21   inconvenience to the victims.  I'm sorry.
22            MS. DAYTON:  I appreciate that, your
23   Honor, but three of them are here and, like I said,
24   Latavia Whittingham and Erica would both like to
25   address the Court.
```

8

```
1             THE COURT:  All right, shall we start
2    with you?
3             MS. DAYTON:  Sure, your Honor.
4             THE COURT:  Any order is fine with me.
5             MS. DAYTON:  Can we start with the
6    victims?
7             THE COURT:  Yes.
8             MS. DAYTON:  Since they're here.
9             THE COURT:  All right.
10            MS. DAYTON:  Thank you.
11            Why don't you come forward.
12            THE COURT:  Good afternoon.
13            MS. LATAVIA WHITTINGHAM:  Hi.  How are
14   you doing?
15            THE COURT:  You need to state your name
16   for the record.
17            MS. LATAVIA WHITTINGHAM:  Latavia
18   Whittingham.
19            MS. ERICA WHITTINGHAM:  Erica
20   Whittingham.
21            MS. LATAVIA WHITTINGHAM:  I'm Tina
22   Johnson's daughter, her oldest.  This whole process
23   has been very difficult, very long, very emotional.
24   Throughout the whole process, John Taylor has been
25   honest for the most part.  I guess it took a lot of
```

9

```
1    courage for him to get up there on the stand and say
2    what he had to say.  It also took a lot from us, you
3    know, and I'm going to leave it up to you to decide
4    whatever his punishment should be, but consider he
5    did help bring this whole case to justice.  I think
6    he should receive some type of leniency from you.
7    That would be up to you, of course.
8             I have no hard feelings, no hatred.  The
9    my relationship with God, I learned to forgive and I
10   learned to move on because that's what my mother
11   would want us to do, and it's closure for us.
12   That's it.
13            THE COURT:  All right.
14            MS. ERICA WHITTINGHAM:  This has been a
15   long, long, long, long journey, and yes, for the
16   most part he has been honest somewhat.  And like my
17   sister said, I'm going to leave that in your hands
18   to decide his fate.  And that's all I have to say.
19            THE COURT:  When you say honest for the
20   most part, I wasn't sure I understood that.
21            MS. ERICA WHITTINGHAM:  Just as far as
22   when everything came out he decided that he wanted
23   to --
24            MS. LATAVIA WHITTINGHAM:  Eventually
25   tell the truth.
```

10

```
1             MS. ERICA WHITTINGHAM:  Tell the truth
2    about it, getting on the stand, basically pointing
3    them out, telling what everyone did.  It helped out
4    a lot, but at the same time my mother is gone.  I
5    just feel like he could of did better than what he
6    did besides just leaving the scene without calling
7    911.  He had numerous opportunities to do that,
8    which he didn't do, and he was caught four years
9    later.  So, I just feel like whatever punishment you
10   give him, it's well deserved.
11            MS. LATAVIA WHITTINGHAM:  I just want
12   you to remember that my mother was a loving, caring,
13   heartwarming person, and to this day, seven years
14   later, we still keep her in our hearts.  Our entire
15   family, all three of the victims, Basil's family,
16   Tippy's family, all three families was hurt by this
17   incident.  It took a lot out of all three of us.  I
18   have -- my mother have grandkids that don't know
19   her, that will never get to know her, and just
20   showing them pictures and trying to explain to them
21   who she was doesn't make up for her not being here.
22   Do you understand what I'm saying?  That's it.
23            Thank you.
24            THE COURT:  Thank you.
25            MS. DAYTON:  Your Honor, would you like
```

11

```
1   me to --
2              THE COURT:  Yes, thank you.
3              MS. DAYTON:  So, this has been a very
4   long journey for the victims and for the prosecution
5   as well, speaking on behalf of all three of us and
6   Ms. Rodriguez-Coss who couldn't be here today.
7              So, I first met Mr. Taylor in Pinetops,
8   North Carolina because I happened to be one of the
9   individuals on the trip when he was caught.  Mr.
10  Taylor is -- I completely agree with Ms.
11  Whittingham's family that it would have been a lot
12  better if he had walked out of the apartment and
13  called 911 or done something different.
14             Now, having known him for several years
15  and had the opportunity to get him -- get to know
16  him very well in preparing for trial, I know a lot
17  more about who he is as a human being and what his
18  strengths and his limitations are, and how he
19  managed to rely on his strengths to help bring
20  everybody to justice, including himself.
21             When he was arrested on December 2nd,
22  2009, we actually did not go to the house with an
23  arrest warrant, we went to the house with a warrant
24  to collect his DNA, and I, along with two of the
25  officers who are present in court, Sergeant Gonzalez
```

12

```
1   and Detective Donaldson, spoke to Mr. Taylor for
2   five hours.
3              During that time period he spent about
4   seven minutes trying to lie and say he had no idea
5   what we were talking about.  After that time period
6   he spent about an hour trying to minimize his
7   behavior.  And with all due respect to Mr. Taylor,
8   his attempts to minimize were incredibly
9   unsophisticated.  He tried to lie about Azibo
10  Aquart's name, but the best name he could come up
11  with was calling him fan because there was a ceiling
12  fan overhead, and he actually ended up telling us
13  the entire truth.
14             And when I say the "entire truth," I
15  don't mean every detail about the truth, but as much
16  as he could remember not having discussed this event
17  for four years.  And I think he did that without
18  even realizing he was doing that.  He told us about
19  the fact that Efrain Johnson, who he just knew as
20  the Big Guy; and Dreddy, Azibo Aquart; and Ziggy,
21  who was Azikiwe Aquart, were present.  He told us
22  about the trip down south and that they had been
23  caught with a gun, which he had no way of knowing
24  that we would have known that walking into his
25  cousin's and aunt's house down in Pinetops, North
```

13

```
1   Carolina.
2              He told us about their trip and who they
3   visited, all of which we were able to corroborate
4   eventually.  And he told us an incredible amount of
5   information that we just didn't know.  For instance,
6   we had no idea that bats were used to kill these
7   victims.  We knew that they were bludgeoned to
8   death; we did not know what they had been bludgeoned
9   to death with.  And without Mr. Taylor's information
10  and testimony, and when I say "information," I mean,
11  sitting in his living room on December 2nd, 2009, he
12  told us about the bats.  Mr. Taylor is not somebody
13  who would have had the ability to make that up and
14  have Tom Martin come in here and three coroners, or
15  medical examiners, come in here and testify, yes,
16  all of the wounds were consistent with having been
17  caused by a bat.
18             We didn't know that Azibo Aquart had a
19  gun with him.  And that is nothing that we could
20  have known without Mr. Taylor giving us that
21  information.  But it went to explain a lot,
22  including why the victims didn't yell out for help,
23  because they had a gun pointed at them, and because
24  the walls in Charles Street were incredibly thin and
25  if they had yelled they would have been heard.
```

14

```
1              We did not know where the duct tape had
2   been bought, but it made an awful lot of sense after
3   he told us and we found a Walgreens bag inside the
4   location and we were able to go back and corroborate
5   that information.
6              And he provided us all of that
7   information not only without a lawyer, but without
8   having the benefit of having seen one piece of
9   evidence in relation to this case.  It's not like he
10  had seen police reports or forensic reports or
11  anything.  And with all due respect to Mr. Taylor,
12  even if he had seen them he couldn't have read them
13  because he struggles with illiteracy.  But he had
14  seen nothing and he knew nothing about what was
15  going on in Connecticut.
16             I think it's very difficult for the
17  victims' family and it was difficult for the
18  prosecution to understand how do you live with this
19  for four years and not come forward if you feel so
20  bad about what's gone on.  And when I say feel so
21  bad, you saw the emotion he experienced when he
22  talked about what went on in that room.  And I think
23  when we walked into Pinetops, North Carolina he was
24  horrified we were there, terrified of us, yet at the
25  same time knew we were coming, did not fight with us
```

15

```
1   about being arrested.  We had no arrest warrant, by
2   the way.  He was arrested just on an on-site arrest
3   based upon his information, and was completely
4   cooperative with the arrest, albeit somewhat shocked
5   about being arrested because I still don't think he
6   fully grasped what his role had been in the offense
7   based on the fact that he never put his hands on the
8   victims.
9           Having spent a lot of time with him in
10  proffers, and Mr. Markle and Ms. Reynolds having
11  done so as well in preparing for both trials, he,
12  with the help of his lawyers, began to understand,
13  you know, what felony murder means, you know, if you
14  go there and you know something horrible is going to
15  happen, you are responsible for what happens.
16          But based upon Dr. Baranoski's report
17  and just experience with Mr. Taylor, it's very clear
18  that what is reasonably foreseeable to one person
19  may not be grasped in the same way by another.  And
20  Mr. Taylor sits here as someone who has been
21  convicted of three counts of felony murder, and
22  that's exactly what he did, I do not quibble with
23  what he's been convicted of, but his ability to
24  truly understand what was going to go on inside the
25  apartment at Charles Street is in question based
```

16

```
1   upon his abilities to reason.
2           Despite his difficulties, Dr. Baranoski
3   says that he has some learning disorders.  He's had
4   no real solid family growing up.  Mr. Taylor, when
5   we found him in North Carolina, had actually stopped
6   selling drugs and was working, which is incredibly
7   unusual, as your Honor knows.  Sadly, incredibly
8   unusual.  Hopefully that meant he was trying to turn
9   his life around and, you know, had either aged out
10  of drug dealing, as we talk about, or had given it
11  up.
12          But regardless, he's become -- his
13  maturity level has increased a lot over the two
14  years.  He's been very honest, even when it was
15  very, very hard for him, when pressed really hard by
16  the government, by the agents, and by his own
17  counsel.  And he has bizarrely managed to make
18  friends with a lot of guards in the different
19  facilities in which he's been incarcerated, which
20  is, of course, as you know, really unusual.  He gets
21  along with people very well.
22          And so while he did a horrible thing, he
23  also has done a very good thing since then.  He has
24  really helped bring to justice Azibo Aquart who
25  deserved to be brought to justice.
```

17

```
1           Mr. Taylor's testimony unequivocally
2   made the difference for Azikiwe Aquart between not
3   wanting to plead guilty and deciding to plead
4   guilty.  And, in fact, it was his testimony that
5   swayed us in our decision about what was the
6   appropriate way to dispose of that case and deciding
7   that, in fact, a life sentence, three life
8   sentences, would be appropriate for Mr. Aquart.
9           And Mr. Aquart, when he pled guilty in
10  front of Judge Underhill, stated on the record
11  during his allocution that he did exactly what Mr.
12  Taylor said he did.  He stated that he personally
13  killed Mr. Reid and that he assisted in the deaths
14  of Ms. Whittingham and Mr. Williams.  So, lest there
15  was any question about Mr. Taylor's credibility, I
16  think Azikiwe Aquart's plea allocution really spoke
17  volumes to that.
18          And then despite the fact that he was on
19  the stand for days during Mr. Aquart's case, and,
20  look, he put himself in this position, but he had to
21  come back and do it again, which is not easy, and to
22  undergo another difficult and sometimes demeaning
23  cross-examination, he said he would do what he was
24  asked to do because that's what he said he would do.
25          And when we were -- when we asked him,
```

18

```
1   which we did several times, why are you cooperating?
2   You are going to jail for a long time why, are you
3   cooperating?  He said, because I did a bad thing and
4   I want to try to make it right.
5           So, based upon his cooperation, which
6   was incredibly extensive and very important in a
7   difficult case, important to this district,
8   important a lot more for the victims' families, and
9   Mr. Taylor's part in that, the government believes
10  that he's incredibly worthy of a significant
11  downward departure and, thus, the basis for our
12  motion, your Honor.
13          THE COURT:  Now, something that you said
14  earlier, which is, what's foreseeable to one person
15  is different from another.
16          MS. DAYTON:  Right.
17          THE COURT:  And that it's uncertain what
18  Mr. Taylor contemplated would happen.
19          MS. DAYTON:  Right.
20          THE COURT:  I don't understand what's so
21  difficult to understand about wearing ski masks,
22  going back twice, going in the middle of the night,
23  having baseball bats, knowing one of the members of
24  the group has a gun, and busting in on people who
25  are presumably otherwise asleep doesn't give some
```

19

1  foreseeability that bad harm is going to come.

2      MS. DAYTON:  I unequivocally think he

3  knew bad harm was going to come.  I'm not saying he

4  didn't know that.  Looking at the crime scene photos

5  in this case, I think it's almost beyond someone's

6  comprehension that Azibo Aquart would -- and Azikiwe

7  Aquart would go in there and mummify people with

8  duct tape.  I think that is beyond anyone's

9  comprehension.  I consider myself a relatively

10 sophisticated human being.  If I saw someone walking

11 in with bats and duct tape, I would think they were

12 going to be tied up.  I would not think their faces

13 would be covered and holes poked in their nose so

14 they could stay alive while they are being beaten to

15 death.  And I don't think that's foreseeable.  And I

16 really don't think it's foreseeable to someone who

17 has an 80 IQ and who has a difficult time making

18 logical conclusions.  For instance, when Dr.

19 Baranoski's tested him and said -- I forget the

20 woman's name, I think her name was Mildred --

21 Mildred missed the ferry, what's going to happen?

22 She should go home.  How is she going to get home?

23 She should go to work.  He doesn't make the same

24 logical conclusion s.

25      So, I think definitely based upon his

20

1  life experience, based upon his own criminal record,

2  he knew something terrible was going to happen

3  inside there, but terrible is a home invasion

4  robbery.  Torturous and beyond human comprehension

5  is what they did to these victims.  And Mr. Aquart

6  clearly knew what he was doing because he went in

7  there with the unequivocal intention to do it.

8  Azikiwe Aquart, as he stated in court, knew what was

9  going to happen in there.  However, I don't think

10 that Mr. Taylor could have possibly understood the

11 extent of what was going to go on in there based

12 partly on the level of extremity to which it was

13 taken and based largely upon some of his limited

14 abilities.

15      Having said that, he's very differently

16 situated than an Efrain Johnson who, number one,

17 there is nothing to suggest that he has limited

18 capabilities, and number two, who never was able to

19 tell the truth.  So, in comparing those two people,

20 Mr. Taylor is a very, very different person than the

21 other defendants in this case.

22      THE COURT:  All right, thank you.

23      Mr. Casale.

24      MR. CASALE:  If the Court please, I have

25 to join the chorus of not being able to wrap my head

21

1  around what happened in this case.  In the three and

2  a half decades that I've been doing this, I've never

3  seen a crime this senseless and this vicious.  I

4  can't foresee anyone doing this, let alone a

5  slow-moving accomplice who essentially was there for

6  the ride.

7      For the longest time I struggled with

8  this and tried to make sense of it, and I guess

9  there is no sense that could be made of it.  These

10 folks lost their parents for no reason.  There is no

11 reason.  If what we understand from Mr. Taylor's

12 side of this is true, then what was in contemplation

13 was a beat down to chase them out of the

14 neighborhood, and in that world that happens.  But a

15 triple homicide, bludgeoning people to death, it's

16 hard for me to understand that the Aquarts entered

17 the house with that criminal state of mind.  It's

18 easier for me to accept that maybe that mental state

19 was formed once someone thought they were

20 recognized.  But maybe that's just a natural human

21 desire to try to make sense of something that you

22 can't make sense out of.

23      Be that as it may, I don't think there

24 is any dispute that John Taylor did not intend to

25 participate in a homicide.  There is no question

22

1  that he did not anticipate or expect that a homicide

2  would occur.  And as I say, it's hard for me to

3  reconcile in my own mind the Aquarts going there for

4  that purpose.  If they wanted to kill somebody,

5  they're drug dealers, they have guns.  It's

6  certainly less vicious than what happened, and could

7  actually result in someone not being caught without

8  the DNA and the other indicia that can produce a

9  prosecutable case.  But that wasn't going on in

10 Azibo's or Azikiwe's mind.

11      Ms. Dayton alludes to some of the

12 earlier discussions that took place in this case,

13 and there were many, and they went on for some time

14 because Mr. Taylor could not, and still has

15 difficulty wrapping his head around the notion of

16 felony murder, vicarious liability for the acts of

17 someone else.  And we would spend so much time to

18 get him to understand that.  We'd say yes, we

19 understand, John, it's a legal fiction, and he would

20 say, Fiction?  I'm being prosecuted?  I'm going to

21 jail for fiction?  And it would just go on like

22 this.  The allusion in Dr. Baranoski's report pales

23 in comparison to the actual conversations that took

24 place.

25      And yet, through it all, even though

23

1  John has the stereotypic room temperature IQ,
2  substantial reasoning problems, very deficient as an
3  abstract thinker, the rest of the world largely
4  agrees with him, that prosecution for murder based
5  on a theory of constructive liability is rejected
6  everywhere in the world except here.
7          We acquired the doctrine of felony
8  murder, as I understand it, we inherited it from the
9  Brits.  Yet the Brits by an act of parliament
10 abolished it 1957.  Every western European democracy
11 followed.  And what's most interested is in the
12 supreme court in Canada in 1990 by judicial decision
13 abolished it.  And that's interesting because, as
14 the Court knows, the doctrine of parliamentary
15 supremacy really doesn't allow for courts to
16 overturn duly enacted acts of parliament, but the
17 court in a very involved decision, I think it goes
18 by the heading of Regina v. Vaillancourt, discussed
19 at great length the fundamental underpinnings of the
20 criminal justice system.  We all operate under the
21 belief that these doctrines operate as deterrence.
22 The statistical evidence largely show that they do
23 not.
24          But be that as it may, the one line that
25 jumps out at me from the Canadian court -- you know

24

1  I'm desperate when I am reading Canadian Supreme
2  Court cases.
3          THE COURT:  The Canadian Supreme Court
4  is one of the most respected supreme courts in the
5  world these days.
6          MR. CASALE:  Then I'm not so desperate.
7  What they said was very interesting.  They said that
8  the principle of punishment much be proportionate to
9  the moral blameworthiness of the offender, is the
10 reason why felony murder can no longer exist in
11 Canada.  They can draft other statutes that provide
12 for accomplice liability, but they cannot impute the
13 mental state for murder on to someone who did not
14 intend that a murder occur.
15         And what is interesting about that is
16 the dissent in that case argued that criminal
17 liability could still be -- could be and should be
18 imposed, but yet the sentencing should take into
19 consideration that the particular defendant did not
20 actually commit a murder or intend that one be
21 committed.
22         THE COURT:  So, in effect a 5K motion
23 permits that analysis.
24         MR. CASALE:  Yes.  But what I found
25 really interesting about the Supreme Court of

25

1  Canada's decision was the reply from the majority to
2  what -- the dissent essentially echoed the
3  jurisprudence of the United States.  The majority
4  said, well, the problem with that is even if that
5  particular offender is given a probationary
6  sentence, he goes through the rest of his life
7  stamped and branded a murderer, and no good will
8  follow that.
9          Criminal sentencing really should focus
10 primarily on the moral blameworthiness of the
11 offender.  And if we use that metric here, a
12 substantial departure is fully warranted.  John has
13 all of the deficits that Dr. Baranoski pointed out,
14 and he did everything he could do within his power
15 to make right the wrong that he was part of, and yet
16 he still, no matter what your Honor does, will go
17 through life a triple murderer.  Whatever
18 penitentiary he goes to will be the kind of
19 penitentiary that houses triple murderers.  The
20 collateral consequences of the conviction alone are
21 hugely punitive.
22         As I am sure your Honor -- I hope your
23 Honor would agree that there's a great likelihood
24 that this crime would have occurred exactly as it
25 occurred that night if John Taylor wasn't there.  He

26

1  was not needed, necessary, integral.  His
2  involvement was simply that, he was there.  So, it
3  sort of underscores the notion of being in the wrong
4  place at the wrong time with the wrong people.  I
5  mean, it's every parent's nightmare.
6          Now, when you take a fellow like John,
7  with his criminal history, with his limitations,
8  that wrong place, wrong time, isn't drinking and
9  driving or getting involved in some kind of stupid
10 party, it's being in the epicenter of a triple
11 homicide.
12         THE COURT:  But it's not quite as
13 serendipitous as you seem to portray it since they
14 had a dry run the night before.
15         MR. CASALE:  True.
16         THE COURT:  Or a few days before.
17         MR. CASALE:  True.  If you look at it
18 through Mr. Taylor's eyes, there wasn't a dry run to
19 commit a homicide.  It was a dry run to shake these
20 people out of their location.  Rough them up, and
21 hopefully they'll run away.  I think that that was
22 the intention that even other defendants at least
23 vocalized was what was really behind this until it
24 spun so wildly out of control, and, again, for no
25 reason.  If the Court were going to characterize

27

```
1   this case, it would probably be that it is a case of
2   spontaneous lunacy because there is -- I mean, I
3   can't imagine what Azibo would have to say for just
4   why he did this.
5            Mr. Taylor, as you -- I mean, your Honor
6   saw him, probably has some sense of some feeling for
7   him, and all of the information that is provided to
8   you, I think the takeaway point is he's not a bad
9   guy.  He has his limitations, he has his deficits,
10  but he's not a bad guy.
11           What struck me is something that Ms.
12  Dayton also mentioned.  When he finally got out of
13  jail in the state court, went back down to North
14  Carolina, he didn't get back into that life, which
15  is about as unusual as it could possibly be.  He
16  just got a regular job and he was just leading a
17  regular working guy's life.  Then the federal agents
18  paid him a visit, his life changed, but I think the
19  government also pointed out it helped him to relieve
20  himself of a burden, a burden that undoubtedly he
21  compartmentalized, walked away from, it was
22  somewhere in the deep recesses of his mind, but as
23  it was told to me, the interviews started in North
24  Carolina where John was noticeably tense and then
25  not too long after that he was relaxed and the right
```

28

```
1   thing happened.
2            Now, these cases, they lack history and
3   precedent, they are so out on their own plain.  I
4   can think of hardly any case that bears significant
5   similarity.  The only one that comes to mind is the
6   case that your Honor had, which was the Fausto
7   Gonzales, where cooperators, who I would suggest had
8   a level of moral blameworthiness that is higher than
9   John Taylor's in this case, were handed out single
10  digit sentences.  One of the defendants, I believe
11  his name is Mario --
12           THE COURT:  Lopez.
13           MR. CASALE:  Pardon me?
14           THE COURT:  Lopez.
15           MR. CASALE:  Your Honor's correct.  I
16  try to forget these.  But so your Honor is --
17           THE COURT:  Mr. Lopez I think testified
18  about seven times.
19           MR. CASALE:  Oh, exactly.  Exactly.  He
20  went off to New York, exactly.  And not to compare
21  cases, because cases really aren't subject to
22  comparison like that, they're different people, that
23  -- the Gonzalez case was unusual because of its own
24  level of coldness and depravity, that people could
25  be killed for nothing but a couple of dollars in the
```

29

```
1   most brazen way possible, on the road with
2   gun-wielding assailants on the back of motorcycles
3   and all of those people involved knew about it and
4   helped create the links between shooter and hiring
5   party.
6            Well, be that as it may, the bottom line
7   is I think the metric of moral blameworthiness is an
8   important one, and it is one that your Honor might
9   take some comfort in in fashioning a sentence that
10  takes into consideration really the sad facts of
11  this case and how it got here.
12           THE COURT:  So, part of the metric is
13  not just moral blameworthiness, it's the other
14  factors under 3553, which include deterrence and
15  protection of public.  And when I look at Mr.
16  Taylor's record from 18 to 35, it's almost one
17  nonstop offense after another interrupted by periods
18  of violation of probation, of parole.  Much has been
19  made of his limitations.  While there may have been
20  a period of time in North Carolina after he'd
21  finished serving his sentence for a drug offense
22  here in which he was not any longer in the North
23  Carolina criminal justice system, what does all of
24  that say when the track record to date is one of
25  apparent inability or unwillingness to make that
```

30

```
1   difference between lawful behavior and unlawful
2   behavior, that last time having led to this
3   horrendous circumstance?
4            MR. CASALE:  Well, there is no question
5   his record casts a certain image, but in some
6   respects it's a misleading image because most of it
7   is the kind of criminal record that is seen with
8   some regularity in the lower courts around here, low
9   level drug offenders arrested and recycled through
10  the system year in and year out.  It's not a record
11  of a violent offender.
12           In terms of deterrence, that is one of
13  the cornerstone issues that has led the state of
14  Michigan to abolish felony murder, followed by
15  Hawaii and Kentucky.  The rest of the world says
16  there are no reliable statistics that say if an
17  accomplice is punished as severely as a perpetrator,
18  then it will deter people from becoming accomplices
19  in unplanned, unexpected events.
20           They don't have -- even the FBI,
21  actually the FBI statistics show that in robbery
22  cases the homicide rate goes up, but in others,
23  kidnappings and sexual assaults and the like, it
24  tends to go down.  I don't know what correlation
25  could be drawn from that.  But it seems that short
```

31

1  of having a firearm himself and interceding that
2  night, he couldn't have stopped what was going to
3  happen.  Not reporting it after the fact, of course,
4  doesn't change what was done.
5         Your Honor probably heard either during
6  the trials or through other sources that Mr. Taylor
7  was substantially -- was credibly concerned about
8  his own safety in jail facilities.  You know, the
9  Aquarts are not happy with him.  They have little to
10 no compunction about taking him out if they could.
11 That's been on his mind from the earliest of days
12 and one of the reasons, after all was said and done,
13 he packed it up and went back to North Carolina,
14 just started his own life anew.
15        Thank you.
16        THE COURT:  Shall I hear from Mr.
17 Taylor?
18        Good afternoon.
19        THE DEFENDANT:  Good afternoon.  John
20 Taylor.  I'm sorry for the victims and their loss.
21 I wish I could have done better.  And today,
22 sometimes the way I feel today I wish I could take
23 my life for to get theirs back because they didn't
24 deserve what they got.  I'm just sorry for the
25 victim and the Court, to the victims' family and the

32

1  Court -- and the Court.
2         THE COURT:  Mr. Taylor, obviously the
3  sentence that will be imposed will be long by
4  somebody's standards.  It will be a lot less than
5  life with no release.  But there will come a time
6  when you will be released.  What is your plan?  How
7  are you going to use time in prison to make sure
8  that you don't ever run with the wrong crowd again,
9  having seen the complete unthinkable disaster that
10 had led to this time?  What are you going to do to
11 get yourself in a position where you won't, out of
12 want or need for money, commit more crimes?  You
13 remember you told someone, maybe it was Dr.
14 Baranoski, that you became addicted for cash.  Tell
15 me what the plan is here.
16        THE DEFENDANT:  Well, your Honor, I
17 think everybody become addicted to cash.  You have
18 to need cash to live through your life with.
19        THE COURT:  Tell me what your plan is of
20 what you are going to do in prison that's going to
21 lead to having a life after you're released from
22 prison that simply involves no more crime.
23        THE DEFENDANT:  The same thing I was
24 doing when I was out.  I was enrolled in school.  I
25 was going to school in community college for better

33

1  my reading.  I could read, but I just can't read
2  fluent like everybody else can.  It take me just a
3  little bit more time just to read a little -- just
4  get my words out.  I got a couple ideas that I have,
5  that I wrote down; driving trucks, owning my own
6  trucks, food services.  I have a lot of ideas that I
7  would like to try to blossom.
8         THE COURT:  And what is it that you do
9  inside your head to make up for this horrible night
10 in August of 2005?
11        THE DEFENDANT:  I understand the
12 question, but I --
13        THE COURT:  I saw you on the stand when
14 you got to the point where you described seeing what
15 Azibo Aquart was doing to Tina Johnson, and you were
16 very shaken.
17        THE DEFENDANT:  I just don't -- I try to
18 just don't think about it.  I don't want -- I don't
19 think about it.  I don't like to see nobody get
20 hurt.  I don't even like watching shows seeing
21 somebody get killed.  I don't even like watching the
22 news anymore.
23        THE COURT:  You've got a lot of time to
24 think about what happened that night, how you got
25 involved, what your involvement was, how you came to

34

1  leave the scene.  Is there anything that you've
2  thought about that you would do differently if you
3  had it to do over?
4         THE DEFENDANT:  Yes, ma'am.
5         THE COURT:  What would that be?
6         THE DEFENDANT:  I would have went to the
7  police and told the police.  Or if I -- if I could
8  have stopped -- if I knew they was going in to kill
9  them, I would --
10        THE COURT:  I know you didn't know that.
11        THE DEFENDANT:  Or I wouldn't never been
12 with them.  But since I am in that situation, I
13 would have just went to the police station, the
14 police, and just got -- told the police about it.
15 But I was scared.  I didn't know what to do.  I
16 didn't know nobody in Connecticut.  I was just a
17 couple months up here.  They knew more people than I
18 did.
19        THE COURT:  Anything else you want to
20 say?
21        THE DEFENDANT:  No, ma'am.
22        THE COURT:  Anything else, Mr. Casale?
23        MR. CASALE:  No, your Honor.
24        THE COURT:  Ms. Dayton?
25        MS. DAYTON:  No, your Honor.

35

1      THE COURT:  Clearly the Court grants the
2  government's motion for 5K1.1 and departs below the
3  mandatory sentence of life with no release.  That's
4  the sentence that had you remained silent and had
5  you been convicted I would have no choice but to
6  impose.  That's the seriousness of what you were
7  headed for when you put on ski masks and you put on
8  the latex gloves and you saw bats being brought in
9  and you saw Azibo -- yes, Azibo Aquart with a gun,
10  and you crashed through unknown peoples apartment
11  door in the middle of the night and you saw how
12  confused and terrified they were.  And what you
13  didn't contemplate, I am sure, is the savagery that
14  would follow.
15      But, nonetheless, having put yourself in
16  that position, not once but twice, because you went
17  back a second time, there is a huge consequence that
18  you, too, must pay.  The Aquarts pay in one way, and
19  that is determined by law, and you pay a different
20  way.
21      The Court is required in considering
22  what that way is to think of a lot of different
23  aspects of the case.  The first is the nature and
24  the circumstances of the offense.  Now, I understand
25  that you had a long course in what is meant by

36

1  felony murder, that you understand you as a matter
2  of law can be held responsible for the intent of
3  others that you did not share.  Mr. Casale has very
4  eloquently articulated the difference between U.S.
5  law and the law of other countries, but we're here.
6  The fact that you did nothing for four years after
7  the offense until you got visited by law enforcement
8  is a factor that is difficult to weigh in the
9  equation.  Less difficult perhaps is the unfortunate
10  failure to make a report early on, even anonymously,
11  that would have shortened the investigation process
12  for the prosecution and perhaps shortened the time
13  period of uncertainty of the victims' families.
14      I am also to consider the history and
15  characteristics.  I know you are 35, soon to turn
16  36.
17      THE DEFENDANT:  Yes, ma'am.
18      THE COURT:  It doesn't appear to me that
19  you have any close family members around you now.
20  Do you?
21      THE DEFENDANT:  Yes, I have a few; not a
22  lot, but I have a few.
23      THE COURT:  You have -- although, as Mr.
24  Casale says, your criminal history record is not
25  uncommon, that nonetheless doesn't mean it isn't the

37

1  only thing that pretty much describes you to date.
2  If we describe people in terms of the jobs they've
3  held and the work they've done, 12 convictions to
4  date is not a good resume.  I understand that you've
5  had work, lawful work, that you were lawfully
6  employed when you were arrested this time, but it's
7  not a record of career building.
8      I am fully aware from Dr. Baranoski's
9  analysis that you work hard at understanding things,
10  you work hard at reading things, and that you are
11  not necessarily a person who gets the full picture
12  right away, if ever.  I understand that.  I credit
13  you for recognizing that you can do something about
14  that by going to the community college and improving
15  your reading.  And there's a lot more that you can
16  do on the educational front because you don't have a
17  high school degree and you don't have a GED, and
18  those are just basic minimal qualifications to be
19  looked at for most jobs that are going to be
20  worthwhile or long-term.  You'll have an opportunity
21  to do that, and really put your mind to it so that
22  when you come out you have more than when you went
23  in.
24      I'm also aware that your childhood,
25  while not abusive, was impoverished in many ways.

38

1  Your cooperation, as the government has made clear,
2  was extensive and crucial.  It is highly unclear
3  what a jury would have done if all they had heard
4  was the DNA evidence in this case.  But to have an
5  eyewitness bring home to them what all that
6  scientific evidence meant of what was on the gloves
7  and what was on some of the clothing, to paint that
8  portrait was a critical thing.  And you testified
9  not once, but twice, and it would appear that the
10  jury credited your account in the second case versus
11  another account that they obviously did not credit,
12  and I suspect that's because juries are pretty good
13  at telling who's being truthful.
14      I also find it significant Dr. Baranoski
15  found no antisocial or mental disorder
16  characteristics.  And I fully accept your remorse
17  for this.  You have said it in your own words in a
18  very strong way that at times you just wish you
19  could just trade your life for theirs because they
20  didn't deserve it.  Unfortunately, however, there
21  has not been much time for the Court to assess that
22  you've spent involved in lawful activity.  And of
23  great concern is the fact that, where offered the
24  opportunity, you've turned to unlawful activity.
25      To reflect the seriousness of the crime,

**GA1578**

39

1  but also of your involvement in it, recognizing that
2  the two are of very much different levels, to afford
3  deterrence that will come from having you serve a
4  term of imprisonment that not only disengages you
5  from what has otherwise been an adult lifetime of
6  criminal activity of whatever level, but gives you
7  the opportunity that I believe you will accept to
8  get educational and vocational training so that when
9  you come out, even with all of the stigma against
10  you that Mr. Casale is identifying, which is going
11  to make it very hard, which means you are going to
12  have to work really hard to overcome that, but the
13  public is entitled to be protected from further
14  criminal activity from you, in reflection of the
15  factors that the Court takes into consideration that
16  are more than simply Mr. Taylor's characteristics,
17  which the government has -- and your attorney have
18  come to see as having a great deal of positiveness,
19  the sentence that the Court will impose concurrently
20  on Counts One, Two and Three, is a sentence of
21  108 months.  That will be followed by five years of
22  supervised release.
23          The special conditions are that you
24  participate in a program of substance abuse and a
25  program -- and/or a program of mental health

40

1  counseling that's approved by the probation office
2  and that you pay for that program as you are able
3  financially; that you possess no gun or dangerous
4  weapon; and then if you are not employed full-time
5  that you participate in vocational training or
6  educational programs.
7          You shall not commit another federal,
8  state or local offense.  You shall not unlawfully
9  possess a controlled substance.  You shall refrain
10  from any unlawful use of a controlled substance and
11  submit to one drug test within 15 days of release on
12  supervised release and at least two periodic drug
13  tests thereafter for use of a controlled substance.
14          I'm not going to impose any fine on you
15  because you have no assets.  I will impose the
16  required $300 special assessment under 3013 that may
17  be paid out of the inmate financial responsibility
18  program, but beyond that, you can work and
19  accumulate money that will be available to you when
20  you get out so that your ideas can blossom.
21  Restitution is not an issue.  And you shall
22  cooperate in the collection of a DNA sample taken
23  either by the Bureau of Prisons or the probation
24  office.
25          You have the right to appeal this

41

1  sentence.  Any notice of appeal must be filed within
2  14 days.  If you cannot afford the cost of the
3  appeal, you may proceed in forma pauperis and at
4  your request the clerk will file the notice of
5  appeal for you.  If you can't afford counsel for the
6  appeal, the Court will appoint counsel for you at no
7  cost to you.  I note from your plea agreement with
8  the government that you agreed to waive your appeal
9  or collateral attack if your sentence was life or
10  less -- life, or less I guess, and five years of
11  supervised release.  It's a little difficult how it
12  might have been more.
13          The proportion that I have tried to
14  achieve, to the extent that proportion is in any way
15  dispositive or drives a sentence, it is, however, a
16  measure against which it can be assessed.  This is
17  about twice the total time -- it's less than twice
18  the total time that you have previously spent in
19  prison all-tolled, which is 62 months.  It's about
20  four times the longest sentence that you've ever
21  served, which is, by my understanding, 27 months.
22  That proportionality is used in light of all of the
23  other factors that the Court has considered.
24          Mr. Casale or Ms. Dayton, is there
25  anything I need to clarify that needs to be taken

42

1  care of other than discussing Counts Four through
2  Seven, and are there any recommendations?
3          MR. CASALE:  I was going to ask the
4  Court to consider recommending to the Bureau of
5  Prisons that Mr. Taylor receive addictive services
6  counseling, he spent his whole life using drugs, and
7  there will be the question of proper security, which
8  the government knows more about than I do.
9          THE COURT:  I asked whether --
10          MR. CASALE:  It would also probably be a
11  good idea for psychiatric, educational, whatever is
12  available to him.
13          THE COURT:  These are services that may
14  be available.  You need to ask for them, Mr. Taylor.
15  So, you will be assigned a counselor and you need to
16  ask for and keep asking for services and programs
17  and activities, because dead time is useless time.
18          I will recommend him for the 500-hour
19  program, but I believe he will not get a year off.
20  The 500-hour program is, nonetheless, a program for
21  people who have had substance abuse problems that
22  have kept them cycling through the criminal justice
23  system, and whether or not you got the reward, which
24  some people do, of a year off sentence should be
25  immaterial if you really are determined to change

43

```
1   the course of your life.
2               With respect to facility.
3               MR. CASALE:  If there's a facility in
4   North Carolina, that might be a good place to start,
5   and we could always work it out from there.  Is
6   Butner the only facility in North Carolina?
7               MS. DAYTON:  No.
8               THE COURT:  All right, anything from the
9   government?  You have a motion to dismiss those
10  counts.
11              MS. DAYTON:  Any remaining counts from
12  the underlying indictment yes, your Honor.
13              THE COURT:  And I think it's Four
14  through Seven.  They are dismissed.
15              MS. DAYTON:  Yes, thank you, your Honor.
16              THE COURT:  All right, is there anything
17  I have not been clear about or that has gone
18  unattended to that needs to be?
19              MR. CASALE:  There is not -- Mr. Taylor
20  is trying to do the math as we speak, and if I might
21  confirm that, he was given a nine-year sentence.
22              THE COURT:  A nine-year sentence.  You
23  have served already 28 and a half months of that
24  sentence.  If your conduct in prison is good, there
25  is approximately a 15-percent reduction in the
```

44

```
1   amount of time you serve, and the Bureau of Prisons
2   has a program by which it ordinarily releases
3   inmates from the facility to a halfway house to
4   serve the last six months of their sentence,
5   approximately, such that they can start working and
6   get themselves oriented to what may be a harder life
7   than even prison, which is the outside and lawful
8   productive behavior.  If all those things were taken
9   into account and played a role, you probably would
10  be in the Bureau of Prisons' custody for a little
11  over five more years.
12              Anything further?
13              MS. DAYTON:  Not from the government,
14  your Honor.
15              MR. CASALE:  No, your Honor.
16              PROBATION OFFICER:  I'm sorry, just one
17  other thing as far as supervised release.  If we
18  could order on the record that supervision of the
19  case be transferred to the jurisdiction in North
20  Carolina and skip that process of requesting it.
21              THE COURT:  All right, we will make that
22  a part of the direction here.
23              All right, Mr. Taylor, I hope at the end
24  of this that you do come out the way you envision
25  you want to, using your strengths to do it, and
```

45

```
1   recognizing that failing to do it and being led or
2   misled by others who are bad people is going to get
3   you not only deeper involved in the criminal justice
4   system, but is going to cause you more internal
5   agony as the deaths of the three victims here have.
6   So, I wish you luck on that.
7               THE DEFENDANT:  Thank you.
8               THE COURT:  We stand in recess.
9               (Proceedings concluded 3:50).
10
11
12
13          I certify that the foregoing is a correct
14  transcript from the record of proceedings in the
15  above-entitled matter.
16
17              4/23/12
18              Date
19
20              /S/  Sharon Montini
21              Official Reporter
22
23
24
25
```

1487

```
1              UNITED STATES DISTRICT COURT
2                 DISTRICT OF CONNECTICUT
3   * * * * * * * * * * * *    *
                                 *
4   UNITED STATES OF AMERICA,  * Case No 6cr160(JBA)
5                 Government,  *
                                 *
6         vs.                  *
                                 *
7   EFRAIN JOHNSON,            *
                                 * February 16, 2012
8                 Defendant.   *
                                 *
9   * * * * * * * * * * * *    *
10                TRIAL TRANSCRIPT
11                VOLUME VII
12  BEFORE: THE HONORABLE JANET BOND ARTERTON, U.S.D.J.
13
14  Appearances:
    FOR THE GOVERNMENT:      ALINA REYNOLDS, ESQ
15                           PETER MARKLE, ESQ.
                             United States Attorney's
16                           Office
                             1000 Lafayette Blvd
17                           Bridgeport, CT 06604
18
19  FOR THE DEFENDANT:       TODD BUSSERT, ESQ
                             FROST BUSSERT
20                           129 Church Street
                             New Haven, CT 06510
21
22
    Court Reporter:          Sharon Montini, RMR
23                           141 Church Street
                             New Haven, CT 06510
24
25  Proceedings recorded by mechanical stenography,
    transcript produced by computer
```

1488

1    THE COURT: Good morning, counsel,
2  ladies and gentlemen, Mr. Johnson. Please be
3  seated. All right, I have the government's witness
4  list.
5    MS. REYNOLDS: Yes, your Honor.
6    THE COURT: Are you not calling Lashika
7  Johnson?
8    MS. REYNOLDS: Yes, we are, but not
9  today. That was just for today.
10    THE COURT: Oh, just for tomorrow.
11    MS. REYNOLDS: Yes, I said that last
12  night, just to confirm our list for today.
13    THE COURT: Thank you. So, Dr. Shah is
14  first.
15    MS. REYNOLDS: She is, and she's here.
16  Just flew in last night.
17    THE COURT: Where is she coming from?
18    MS. REYNOLDS: Phoenix.
19    THE COURT: All right, let's bring in
20  the jury. Tomorrow we don't start 'til 9:30. Big
21  smile.
22    (Jury entered the courtroom.)
23    THE COURT: Good morning, ladies and
24  gentlemen. Please be seated.
25    All right, the government's next witness

1489

1  is on the stand.
2    Dr. Shah, would you kindly stand, raise
3  your right hand, the oath will be administered to
4  you.
5    M A L K A   S H A H,
6  Having first been duly sworn, was examined and
7  testified as follows:
8    THE WITNESS: My name is Dr. Malka Shah.
9  S-h-a-h, and I live in Suffield, Connecticut.
10    THE COURT: Would you pull the
11  microphone over towards you, please.
12    THE WITNESS: I will.
13    THE COURT: Thank you.
14    You may proceed.
15    THE WITNESS: Is that better?
16    THE COURT: Yes. It could be even
17  better.
18    THE WITNESS: How about now?
19    THE COURT: That's good. Thank you.
20    MS. REYNOLDS: Thank you, your Honor.
21  DIRECT EXAMINATION
22  BY MS. REYNOLDS:
23  Q.  Good morning, Dr. Shah.
24  A.  Good morning.
25  Q.  Are you currently working?

1490

1  A.  No, I had retired.
2  Q.  When did you retire?
3  A.  April 2008.
4  Q.  Prior to retiring where did you work?
5  A.  I worked at the Office of the Chief Medical
6  Examiner for the State of Connecticut.
7  Q.  How long did you work at the Office of the
8  Chief Medical Examiner?
9  A.  About 27 years.
10  Q.  And what position did you hold there?
11  A.  I was associate medical examiner. That was
12  my position.
13  Q.  Can you describe what an associate medical
14  examiner does.
15  A.  Medical examiner is an expert in forensic
16  pathology. I am a physician who did the training in
17  pathology and forensic pathology, and I worked as a
18  forensic pathologist at the medical examiner's
19  office.
20  Q.  What is your educational background?
21  A.  I finished my medical school from Bombay,
22  University Bombay, in 1971. I came to this country,
23  took the necessary exams, and started my residency
24  in pathology in Hartford Hospital in Connecticut
25  from 1972 to 1977. I was employed from '77 to '78,

1491

1  I did as a pathologist position at Mount Sinai
2  Hospital in Hartford. From '78 to '81 I took leave
3  of absence for personal reasons. Since July 1st,
4  1981, I was employed at the medical examiner's
5  office as an associate medical examiner until I
6  retired in 2008.
7  Q.  Okay. And as a staff pathologist at Mount
8  Sinai Hospital in Hartford, what were your duties
9  there?
10  A.  They were also related to doing the tissue
11  biopsy and analysis and examination, microscopic
12  slide examination, the laboratory analysis, as well
13  as the autopsies that I did as a staff pathologist.
14  Q.  And can you describe what your duties were
15  as an associate medical examiner? What did you do
16  for those 27 years?
17  A.  In the State of Connecticut any sudden
18  death that occurs in the State of Connecticut must
19  be reported to the medical examiner's office, and as
20  part of my duty, when all such deaths are reported,
21  I determine if the deceased individual requires an
22  autopsy to determine cause and manner of death. The
23  deceased individual is brought to the medical
24  examiner's office and I, or the other associates,
25  any of our member, did the autopsy and determined

1492

1 the cause and manner of death.
2     Q.   And you used the term "any sudden death."
3 What do you mean by that?
4     A.   Sudden death is related to a person who is
5 died unwitnessed by a physician.  It may be an
6 accident, homicide, suicide, or it can be even a
7 natural death.
8     Q.   How many -- approximately how many
9 autopsies did you perform during the course of your
10 career as a medical examiner in Connecticut?
11     A.   About 7,000 autopsies I performed.
12     Q.   And approximately how many -- or what was
13 the average you would perform in any given year?
14     A.   About 200 to 250 autopsies.  Sometimes 250
15 to more autopsies I did a year.
16     Q.   Were you licensed in Connecticut when you
17 were working as a medical examiner?
18     A.   Yes, I am.
19     Q.   And were you board certified?
20     A.   No, I was not.
21     Q.   And was that required?
22     A.   When I was employed, no, it was not
23 required.
24     Q.   Dr. Shah, during the course of your career
25 as a medical examiner, have you testified as an

1493

1 expert in the area of forensic pathology?
2     A.   Yes, I did.
3     Q.   Approximately how many times did you
4 testify?
5     A.   Since the medical examiner's office covered
6 the whole state, approximately once a month I would
7 testify in any of the counties when I had performed
8 an autopsy and required testimony.
9     Q.   So, you testified in state courts?
10     A.   State courts as well as a few cases of
11 federal courts; but they were very few.
12     Q.   So, mostly state court?
13     A.   Yes.
14     Q.   And were you also qualified as an expert in
15 the area of forensic pathology?
16     A.   Yes, I was.
17     MS. REYNOLDS:  Your Honor, at this time
18 the government would move Dr. Shah and offer her as
19 an expert in the area of forensic pathology.
20     MR. BUSSERT:  No objection.
21     THE COURT:  All right, Dr. Shah is so
22 qualified, and the role and status of an expert or
23 opinion witness has already been explained to the
24 jury.
25     You may proceed.

1494

1     MS. REYNOLDS:  Thank you, your Honor.
2     Q.   And I have a series of exhibits that I'm
3 going to use through Dr. Shah, starting with
4 Government's Exhibit 306, 307, 308, 309, 310, 310A,
5 311, 314, and 315A.  314 is her report, the other
6 exhibits are photographs, and at this time I would
7 move all of those as full exhibits.
8     THE COURT:  All right, if there is no
9 objection.
10     MR. BUSSERT:  No objection.
11     THE COURT:  They are admitted.
12     MS. REYNOLDS:  Thank you, your Honor.
13     Q.   Dr. Shah, I'm going to draw your attention
14 to August of 2005, and ask you, at that time were
15 you working as an associate medical examiner here in
16 Connecticut?
17     A.   Yes, I was.
18     Q.   And specifically I'm going to show you
19 what's been admitted in evidence as Government's
20 314, your autopsy report.  Take a look at that.  Do
21 you recognize that?
22     A.   Let me just go over it.  Yes, I do.
23     Q.   And is that autopsy report that you
24 prepared in connection with an autopsy performed on
25 August 25th of 2005?

1495

1     A.   Yes, it does.
2     Q.   And just, again, showing you that first
3 page of that document, at the top there it has the
4 name of the deceased, James Reid, correct?  You can
5 look on your report.
6     A.   Yes, it is.
7     Q.   And it's got the date that the deceased was
8 found dead, August 24, 2005, and then the date you
9 performed the autopsy, correct?
10     A.   Yes, it is.
11     Q.   Now, Doctor, can you describe the steps you
12 first take when a case is assigned you to when you
13 were -- working as a medical examiner, what's the
14 first thing you do?
15     A.   The first thing I do is start taking the
16 photographs of the deceased as he's received to our
17 office.
18     Q.   And do you, yourself, take those photos or
19 do you have someone actually assisting you
20 photographing the body?
21     A.   We have a photographer who I instruct on
22 what pictures I want taken for me.
23     Q.   Is there a case number assigned to every
24 case that comes in?
25     A.   Yes, there is.

1496

1    Q.   And with regard to this case, is that case
2  number up here at the top, the ME case number.
3    A.   Yes, it is.
4    Q.   And that's 05-10595?
5    A.   Yes, it is.
6    Q.   What's the purpose of that case number
7  being assigned?
8    A.   Each and every case that's reported, to
9  keep the chronology of the cases, as well as when a
10 report is generated, that report has this number on
11 each and every paper that includes that so that you
12 can make a packet out of it and a folder out of it
13 so anything that belongs to that particular case
14 number is assigned to the deceased individual.
15   Q.   And does that include the photographs you
16 take?  Would those photographs be marked in some way
17 with the case number?
18   A.   Yes, they are.  When the photographs are
19 taken, a label is placed on the deceased person and
20 each and every photograph includes that label so it
21 belong -- or assigned to the case, whoever the
22 deceased person is.
23   Q.   Doctor, do you know whether or not in this
24 case a representative from the medical examiner's
25 office responded to the crime scene?

1497

1    A.   Yes, I do.
2    Q.   And do you know who that was?
3    A.   Yes.
4    Q.   And who was it?
5    A.   The investigator's name is Alfred Camargo,
6  and the physician, who is an associate medical
7  examiner who responded to the scene, is Dr. Kanfer.
8  That is k-a-n-f-e-r.
9    Q.   And do you know whether or not photographs
10 were taken at the crime scene by Investigator
11 Camargo?
12   A.   Yes, they were.
13   Q.   And showing you what's been admitted in
14 evidence as Government's Exhibit 314A.  And I'll put
15 those up on the screen again.  Do you see those up
16 there, starting with the top photograph?
17   A.   Yes, I do see it.
18   Q.   And these were crime scene photographs.
19 Were these provided to you as part of your -- what
20 you would look at in arriving at your opinion and
21 conclusion in this case?
22   A.   Yes, they were.
23   Q.   And taking a look then at this photo to the
24 left of the screen, what do you see in that
25 photograph?

1498

1    A.   The photograph, which is on the left side,
2  I see that there are two deceased individual, one is
3  face down and one is face up.  And this particular
4  case pertains to the 05-10595.  S2 means scene two
5  picture.  I performed the autopsy on this individual
6  who is found face down.
7    Q.   And that's this individual here to the
8  left?
9    A.   Yes, it is.
10   Q.   And then just showing you -- focussing in
11 on photograph S1, is that a photograph of the
12 individual who you performed the autopsy on?
13   A.   Yes, it is, he's found face down.  You can
14 see his hands have a gray-colored duct tape on it
15 and a small mattress which is presently covering
16 part of his body.
17   Q.   And then showing you one more photograph
18 from the crime scene that was provided to you, do
19 you see that photograph?
20   A.   Yes, I do.  Can you raise it a little more.
21 Okay.
22   Q.   It's kind of hard to see.  These were
23 Polaroid photographs taken?
24   A.   Yes, they were.  We had Polaroid
25 photographs those days.

1499

1    Q.   What do you see in that photograph?
2    A.   Again, this deceased individual is found face down.
3  The face, what you see, is of another person because
4  his face is on the side.
5    Q.   That?
6    A.   That is another individual.  And that is
7  the deceased person that I performed the autopsy.
8  He's got gray-colored duct tape in the back of the
9  head.  You can see some red brown stains on the back
10 of the T-shirt, and it's a white and brown stripe --
11 I mean black and brown stripe T-shirt, half sleeves.
12 His hands, so you can see, has tape on it.
13   Q.   So, again, you had an opportunity to view
14 these photos as part of your investigation in this
15 case, your autopsy in this case?
16   A.   Yes, it did.
17   Q.   And did you receive any other information
18 from the medical examiner who responded to the scene
19 or from the investigator who responded to the scene?
20   A.   Yes, I did.
21   Q.   And what information did you receive?
22   A.   The deceased individuals were discovered on
23 August 24th in the morning time, maybe around ten, I
24 don't remember exactly, and the case was reported to
25 us at 10:23.  The captain -- or the sergeant who was

1500

1 there at the scene in Bridgeport indicated there
2 were three deceased individual found in the bedroom
3 and they were -- all had multiple trauma and they
4 were all bound and gagged.
5     Q.   Now, once these deceased individuals
6 arrived at the medical examiner's office, do you
7 know whether they all arrived at about the same
8 time?
9     A.   Yes, they did, because we had our own van
10 in which when the investigator and the medical
11 examiner left the scene brought the body back to the
12 medical examiner's office, and they stayed, the
13 deceased individual, as long as -- along with the
14 other two people stayed in the mortuary.
15     Q.   And once the three deceased individuals
16 arrived at the Office of the Chief Medical Examiner,
17 did all three -- were autopsies performed on all
18 three?
19     A.   Yes, they were.
20     Q.   And where is that done?  Where?
21     A.   It's done at the medical examiner's office
22 in Farmington.
23     Q.   And is there one room?  Were the autopsies
24 all performed in one room?
25     A.   Yes.  We have several tables on which a

1501

1 physician can work, one person can work on one
2 table, so that there are several tables and they can
3 go on along together.
4     Q.   And do you know which police department
5 responded to this crime scene and then do you know
6 whether or not they also came to the medical
7 examiner's office?
8     A.   Yes, the Bridgeport Police Department
9 responded and they did come to the autopsy.
10     Q.   So, Doctor, once the case was assigned to
11 you, it got the case number you've gotten certain
12 information from the crime scene, what steps do you
13 then take to begin your autopsy of James Reid?
14     A.   Once the photographs are taken, I collect
15 the external evidence from the deceased individual.
16 Once I collect that, I clean up the body and start
17 examining for the examination of the deceased
18 individual, which is called an external exam, which
19 is examination of the person from head to toe,
20 starting with height and weight, what are the
21 injuries or abnormalities that are present, the
22 clothing present.  I describe the clothing, remove
23 them, and also give it to the police department.
24 And that is the external examination.
25     Q.   And that external examination, as all parts

1502

1 of your examination, are included in your report,
2 correct?
3     A.   Yes, it is.
4     Q.   And how tall was Mr. Read?
5     A.   Mr. Read was 5'5 inches tall.
6     Q.   And how much did he weigh?
7     A.   He weighed 165 pounds.
8     Q.   And then you said you do a full external
9 examination of the body, correct?
10     A.   Yes.
11     Q.   And in this case I'm just going to show you
12 Government's Exhibit 306 and have you take a look at
13 that photograph.  And, again, here in this
14 photograph is the case number at the bottom,
15 correct?
16     A.   Yes.
17     Q.   And so can you describe the injuries that
18 you observed and that are photographed to the face
19 and head of Mr. Reid.
20     A.   The photograph, what you have here, is not
21 the one -- it's not cleaned up.  So, the black
22 discolored area on the forehead and on to the left
23 eyebrow you see is the blood stains.  On the face,
24 front part -- yeah, those are blood stains.
25     Q.   So, those are blood stains?

1503

1     A.   Yes.
2     Q.   Above his eye?
3     A.   Yes.  And what I see here is his mouth,
4 which is slightly twisted towards the right because
5 there are faint indentations present on the face,
6 which is like a compression type of a pattern as
7 opposed to an injury.
8     Q.   And what -- based on your viewing of the
9 photograph and the information you had, do you have
10 an opinion as to what could have caused those
11 compressions to the mouth area of Mr. Reid?
12     A.   In my opinion the duct tape which was
13 present at the scene which was removed by the police
14 officer, the indentations are caused by that.
15     Q.   And did you observe any other injuries or
16 indications of injuries to his face and head as you
17 began your autopsy and took photographs externally?
18     A.   Yes, I did see it on the upper lip of Mr.
19 Reid, the injuries, the inside part of the upper
20 lip.  Because his mouth was taped, he had teeth mark
21 at his left angle of the mouth as well as the right
22 side of the upper lip where there were bruises, and
23 small cuts were noted.
24     Q.   And that was on the lip and in the inside
25 of the lip?

1504

1    A.    Yes.

2    Q.    I'm going to show you what's been admitted

3    into evidence as Government's Exhibit 307, have you

4    take a look at that photograph.  And, again, this

5    has the case number at the bottom of the photograph?

6    A.    Yes, it does.

7    Q.    And then taking a look at this photograph,

8    can you describe what we're -- what you see here?

9    A.    In this photograph most of the blood has

10   been removed, but he has injuries present on the --

11   just above his left ear.  The redness you see in the

12   black hair, as well as -- yes.  And there is an

13   injury present there, and there is an injuries

14   present in the midline of the head right where your

15   ball point pen is.

16   Q.    And let me show you what's been admitted in

17   evidence as Government's Exhibit 309.  And, again,

18   we're just taking a look at photographs of the

19   external injuries, visible --

20   A.    Yes.

21   Q.    -- externally?

22   A.    Yes.

23   Q.    And taking a look at this photograph, again

24   with the case number at the bottom, what do you see

25   there?

1505

1    A.    This is the photograph of his right upper

2    arm, the top of the head -- I mean top of the

3    picture where his shoulder is, and the arm is in

4    front, sort of pronated, and you can see on the

5    front of the arm that there is a purplish red color,

6    sort of a circular pattern, or a contusion which is

7    an injury present on his upper arm.

8    Q.    And what is a contusion?

9    A.    Contusion is the injury to the body where

10   the skin is not broken; however, the tissue

11   underneath is crushed and causes the hemorrhage

12   which shows through the skin area.  Contusion in a

13   layman language would be called a bruise.

14   Q.    And what could cause -- in your opinion,

15   what could cause a contusion such as the one we're

16   viewing in Government Exhibit 309 to Mr Reid's arm?

17   A.    Any blunt object which has struck to his

18   upper arm caused that kind of injury.  It has a

19   pattern, sort of circular, so maybe an object that

20   has circular pattern.

21        MR. BUSSERT:  Objection, your Honor,

22   move to strike it as speculative when she said

23   "maybe," from that point forward.

24        THE COURT:  The question was what would

25   cause that, you said a blunt object which has struck

1506

1    the upper arm.  I'm going to overrule the objection.

2    Q.    And could the blunt object have been, for

3    example, a baseball bat?

4        MR. BUSSERT:  Objection.

5        THE COURT:  Sustained.

6    Q.    Could you tell us -- when you answered the

7    previous question you said any kind of blunt object.

8    What kind of blunt objects could it have been?

9    A.    When I said blunt object, it means an

10   object that has no sharp edges, a knife or scissors.

11   The blunt object could be a two-by-four or a door or

12   a crowbar or anything; a baseball bat, for that

13   matter.  However, I'm describing it has a circular

14   pattern to it.  So, it is more likely a circular

15   object, like a baseball bat.  That's what I would go

16   with.

17   Q.    And, again, all of these injuries, you

18   photographed first externally and then you proceed,

19   as you are proceeding in the autopsy you begin to

20   look to the inside of the body, correct?

21   A.    Yes, I do.

22   Q.    I'm going to show you Government's

23   Exhibit 310, which has been admitted in evidence,

24   and have you take a look at that injury.  If you

25   could describe what we're viewing in that

1507

1    photograph.

2    A.    This is Mr. Reid's -- again, right upper

3    arm, which is bent in front of his chest.  So, in

4    this particular photograph his head is to the

5    farther side, or the left side, of the photograph.

6    Q.    Okay.

7    A.    And what you are looking at is his elbow,

8    which is bent and it has --

9    Q.    This area here that I'm pointing to?

10   A.    Yes.  Yes, it is.

11   Q.    Okay.

12   A.    That there is a small laceration, which is

13   red in color, and a contusion, or a bruise, which is

14   of a blackish purple color.

15   Q.    And you mentioned a laceration.  What's the

16   difference between a laceration and a contusion?

17   A.    A contusion is one in which the overlaying

18   skin is not torn, whereas the laceration is where

19   the overlaying skin is torn and the soft tissue

20   underneath is exposed.

21   Q.    Now, did you do any further analysis with

22   regard to the elbow area of Mr. Reid's body?

23   A.    There are two separate contusions.  I

24   palpated it, that means I touched and feel the

25   elbow.  I did not feel any fracture on this

1508

1 particular arm.

2     Q. And I'm going to show you Government's

3 Exhibit 310A, which has been admitted in evidence,

4 and ask you, taking a look at that photograph,

5 describe the injuries that you see.

6     A. Yes, I do. This is his left elbow. In

7 this particular photograph Mr. Reid is laying face

8 up; however, his elbow of the left upper arm is bent

9 towards his head up this way. So, what you are

10 looking at is the front part of the elbow here. And

11 then there is an injury present on the left of the

12 elbow. There are two lacerations. Yeah, and a

13 slightly irregular looking area of the elbow is

14 seen.

15     Q. And when you see that slightly irregular

16 area of the elbow, do you make any further

17 examination of the body?

18     A. Again, I touched it to feel the shape and

19 bones of the elbow and there was a palpable fracture

20 that I could feel it on the elbow.

21     Q. So, this left elbow. When you say a

22 "fracture," what do you mean?

23     A. The bones were broken and I could feel the

24 broken bones there.

25     Q. Now, Doctor, I'm going to have you take a

1509

1 look at Government's Exhibit 308 that's been

2 admitted in evidence. And, again, just in this

3 photograph, the case number is at the bottom of the

4 photograph, correct?

5     A. Yes, it is.

6     Q. And can you describe what the process is

7 once? You've completed your external examination of

8 the body. What steps do you take next and what did

9 you find in this case?

10     A. The injuries which I could see or feel it

11 when he had his head hair present, I removed the

12 head hair to see the extent of the injury which were

13 present. So, what you are seeing here is -- the

14 black is his head hair, and the portion of the head

15 which has been -- head been shaved, and I see

16 that there are injuries present on the midline of

17 the head as well as on the left side of the head.

18 In this photograph Mr. Reid is laying face down, and

19 part of his left ear that you can see it.

20     Q. This here?

21     A. Yes, yes. And on the top of the ear area

22 where there is a laceration and injuries, as well as

23 the back part. It's slightly profile. So what you

24 see on the right side of the injury is exactly the

25 midline part of his head.

1510

1     Q. And if you could, using the pointer, if you

2 could point to the screen so that the jury see,

3 could you describe what you are pointing to and

4 describe the injury you see in the different areas

5 of laceration.

6     A. Can I get down? I think it will be a

7 little easier for me.

8     Q. Yes.

9     A. Will the microphone reach there?

10     Q. We have a special microphone.

11     A. In this photograph what you see, this is

12 the left ear, and the head is slightly tilted. This

13 is the midline portion of his, Mr. Reid's, head

14 where there is a laceration. And there is

15 another -- two lacerations, and the bridging across,

16 bridging across seen on this particular photograph

17 that I'm showing.

18     Q. And what are these injuries? Well, let me

19 ask you this: In your opinion how many times would

20 Mr. Reid have to be struck to result in that many

21 injuries to his head?

22     A. I see there are a total of three injuries

23 that I see. So, at least three times, and the

24 extent of the injuries is a lot more. If you

25 separate some of the edges, maybe three to five

1511

1 times he has been struck on his head.

2     Q. And do you have any opinion as to what

3 could have caused that type of injury to his head?

4     A. It's a blunt force trauma. That's all I

5 can say.

6     Q. When you say "blunt force trauma," what do

7 you mean?

8     A. It is a blunt object that has struck

9 Mr. Reid's head.

10     Q. And do you have any opinion as to what

11 blunt objects could cause that type of injury?

12     A. No, I cannot say that.

13     Q. Do you have any opinion as to what any --

14 what those injuries are consistent with as far as

15 blunt trauma?

16     A. A crowbar, a two-by-four, a baseball bat.

17 Anything can cause that kind of injuries.

18     Q. And you can't rule out any objects,

19 correct?

20     A. No, I can not.

21     Q. You can just say what it appears to be

22 consistent with?

23     A. Yes.

24     Q. So, Doctor, after you took the photographs

25 of the external injuries, do you then continue your

1512

1    autopsy?  What steps do you take at that point?
2        A.  I continued to do the internal examination
3    of Mr. Reid, which is the examination of the inside
4    of his organs, from chest, abdomen, neck, head and
5    brain.
6        Q.  And just based on your review of the
7    outside injuries and the photographs of the outside
8    injuries, did you reach any opinion as to the type
9    of injury?
10       A.  He has blunt traumatic injuries to his
11   head.  That's what I concluded.
12       Q.  So then going to your internal examination
13   and showing you what's been admitted in evidence as
14   Government's Exhibit 311, do you recognize what that
15   is a photograph of, and can you describe the
16   injuries you saw once you examined the inside of
17   Mr. Reid's head.
18       A.  Yes, I do.  I do recognize the photograph.
19   This is -- in this particular photograph Mr. Reid's
20   skull is exposed.  That means the hair and the skin
21   have been removed from the bony part of the skull,
22   and the top part of the picture, which shows that
23   there are injuries to the skull, the reflected part
24   of the skin, which is seen in the top upper most
25   part, shows the hemorrhages which were present

1513

1    associated with those fractures.
2        Q.  And I'm going to ask you just one more time
3    if you could, using the pointer and the microphone,
4    if you could point out what injuries you saw to the
5    skull area and the inside of his head, and explain
6    those to the jury.
7        A.  Okay.
8        Q.  Thank you.
9        A.  The way the photograph is orientated,
10   Mr. Reid's face is on this side here.  So, this is
11   the front part of your skull.  That is the front
12   part here.  And what you see is the back part of the
13   skull, which is up to here.  From here onward to the
14   -- almost the black line at the top, you see is the
15   back of the head skin, which is reflected backwards.
16   Most of the fractures which are present is in this
17   area, which is associated with the midline, as well
18   as fracturing, the laceration which was present on
19   this side.
20            So these lines, what you see are
21   fracture.  The bones fragmented such that some of
22   them were pushed inside and some of them just got
23   reflected along with the skin outside.  So there're
24   like small fracture fragments totally separated from
25   the skull and some of them remained in the skull and

1514

1    depressed inside.
2        Q.  And do you have any opinion as to what type
3    of blunt force trauma -- what type of force could
4    cause injuries like this?
5        A.  It is a blunt force trauma that can cause
6    this type of injury.  However, any blunt trauma will
7    cause the injury, which I cannot say object.
8    However, again, the objects which I described
9    before, two-by-four, crowbar, baseball bat can cause
10   this kind of injury.
11       Q.  And how much force could cause it; if you
12   can say?
13       A.  No, I cannot say.
14       Q.  You cannot say how much?
15       A.  No.
16       Q.  How many fractures or injuries did he have?
17   Could you tell from your autopsy and your review of
18   the photos --
19       A.  From my description, the fractures, the
20   skull is falling apart.  That means back part of the
21   skull.  You cannot say it's one or two, there are
22   more than one or two there.
23       Q.  And you said --
24       A.  And I did not count them.
25       Q.  So, there're numerous injuries to his head?

1515

1        A.  Yes.
2        Q.  And you said the back part of the skull is
3    falling apart?
4        A.  Yes, that's how I have described it.
5        Q.  And what do you mean by that?
6        A.  The back part, what I mean is that when the
7    skin is deflected, the bones which are separated
8    from the skull itself did get separated when the
9    flap is removed, skin flap is removed from the
10   skull.
11       Q.  And, Doctor, did you after completing your
12   autopsy, did you arrive at any conclusion or opinion
13   as to the cause of death of Mr. Reid?
14       A.  Yes, I did.
15       Q.  And what was the cause of death?
16       A.  The cause of death is blunt traumatic head
17   injuries.
18       Q.  And did you arrive at any opinion or
19   conclusion as to the manner of death?
20       A.  Yes, I did.
21       Q.  And what was that?
22       A.  I determined that as a homicide.
23       Q.  And, Doctor, did you also do further
24   examination as far as toxicology or any other -- is
25   there any other part to your report?

1516

1    A.  Yes, there is.

2    Q.  And what is toxicology?

3    A.  The body fluids which are collected at the

4    time of an autopsy, their analysis is done for the

5    drugs, prescription as well as nonprescription,

6    illegal drugs, and alcohol.  They are collected by

7    me, analysis is done in the laboratory of the Office

8    of the Chief Medical Examiner.

9    Q.  And showing you -- does that report become

10   part of your report?

11   A.  Yes, it does.

12   Q.  So, showing you the toxicology report in

13   this case, did you see any indication of drug use or

14   anything else that stood out to you as you reviewed

15   it?

16   A.  Yes, I did.

17   Q.  And what did you learn?

18   A.  Mr. Reid had cocaine present in his blood.

19   Q.  Now, Doctor, I just wanted to ask you a few

20   more questions actually about Government's

21   Exhibit 311, the photo of the inside of Mr. Reid's

22   head.  You mentioned blood vessels in one of your

23   answers.  What does that tell you when you go inside

24   the head and you see blood or blood vessels?

25   A.  The blood vessels are part of a normal

1517

1    anatomy of the person; however, the blood should be

2    within the vessels and not outside.  And in case of

3    Mr. Reid, because of the fracture and injury, the

4    blood vessels tore and caused the hemorrhages in the

5    back of the skin part of the head as well as within

6    the brain and around the brain.

7    Q.  And does that tearing of the blood vessels

8    tell you -- or mean anything to you as far as if the

9    body before it received these -- what the condition

10   of the body was before it received these injuries?

11   A.  In my opinion nobody has bleeding present,

12   otherwise it will affect your senses and your

13   mobility to move.  So, Mr. Reid did not have -- I

14   see only the injuries which are present and they

15   were not present before he sustained the injuries.

16        MS. REYNOLDS:  Can I just have one

17   moment, your Honor?

18        THE COURT:  Yes.

19        MS. REYNOLDS:  Nothing further at this

20   time, your Honor.  Thank you.

21        THE COURT:  Cross-examination.

22   CROSS-EXAMINATION

23   BY MR. BUSSERT:

24   Q.  Good morning, Dr. Shaw.

25   A.  Good morning.

1518

1    Q.  Would it be fair to say when Mr. Reid's

2    body first presented to the medical examiner's

3    office that on just sight inspection it looked like

4    he had sustained some major head injuries?

5    A.  Yes, it did.

6    Q.  So, I mean at that point did you have kind

7    of a sense that that was most likely the cause of

8    death?

9    A.  I do not presume anything until I finish

10   the autopsy.

11   Q.  Okay.  And what do you mean by that?

12   A.  That means he had head injuries, but he

13   could have had still injuries in his chest or

14   abdomen that I had not looked at it.  So, visibly

15   looking at it, it does look like he has head

16   injuries, but I still do need to rule out if there

17   is any other injury in the chest or the abdomen.

18   Q.  Or any other part of the body that would be

19   fatal?

20   A.  Yes.

21   Q.  And you would do that in the course of

22   every single autopsy you perform?

23   A.  Yes, I do.

24   Q.  And that's accepted practice at the medical

25   examiner's office?

1519

1    A.  Yes.

2    Q.  And in terms of -- I think you were asked

3    several questions about objects that were consistent

4    with causing the type of injuries that you observed.

5    And am I correct that you can kind of speculate as

6    to any number of things, but you can't say

7    definitively one way or another, correct?

8    A.  Yes.

9    Q.  And you weren't -- actually the medical

10   examiner's office wasn't actually presented with any

11   potential instrumentalities of death in terms of

12   being able to compare that with whatever injuries

13   were observed?

14   A.  No, it was not.

15        MR. BUSSERT:  Thank you.  No further

16   questions.

17        THE COURT:  Anything further?

18        MS. REYNOLDS:  No, your Honor.  Thank

19   you.

20        THE COURT:  All right, thank you, Dr.

21   Shaw.  You are excused.  You may step down.

22        THE WITNESS:  Thank you.

23        MR. MARKLE:  The government will call

24   Ray Clark.

25        THE COURT:  Mr. Clark, if you would

1520

1 please come to the witness stand and then remain
2 standing and raise your right hand, please.
3       N O R M A N   R A Y   C L A R K,
4 Having first been duly sworn, was examined and
5 testified as follows:
6       THE WITNESS:  My full name is Norman Ray
7 Clark, III, that's spelled c-l-a-r-k, and I reside
8 in the town of Olathe, Kansas.  Olathe spelled
9 o-l-a-t-h-e.
10       THE COURT:  All right, you may proceed.
11 DIRECT EXAMINATION
12 BY MR. MARKLE:
13    Q.   Good morning, Mr. Clark?
14    A.   Good morning.
15    Q.   How are you employed, Mr. Clark?
16    A.   I work for Sprint.
17    Q.   What is your role at Sprint?
18    A.   I'm a custodian of records.
19    Q.   What are your responsibilities as custodian
20 of records?
21    A.   Primarily I'm responsible for maintaining
22 as well as retrieving information pertaining to call
23 detail, subscriber, subscriber history, as well as
24 any other record Sprint maintains in the normal
25 course of business.

1521

1    Q.   And call detail records, could you just
2 briefly tell us what those are?
3    A.   Yes, call detail records are a record of
4 the incoming and outgoing calls for a particular
5 cell phone for a designated time frame.
6    Q.   And do they reflect duration of call and
7 information regarding the call?
8    A.   Yes, they do.
9    Q.   Incoming, outgoing numbers?
10    A.   That's correct, incoming, outgoing numbers,
11 duration of call, specific time the call began, and
12 on occasions other information as well.
13    Q.   And those are used for billing purposes?
14    A.   That is correct.
15    Q.   And are those kept in the regular course of
16 Sprint's business?
17    A.   Yes, they are.
18    Q.   And you also mentioned subscriber
19 information.  What does that entail?
20    A.   Subscriber information is information about
21 who the accountholder is, such as their name,
22 billing address, information about their account,
23 such as phone numbers assigned to it, equipment,
24 services provided.
25    Q.   And that, again, is kept in the regular

1522

1 course of business?
2    A.   Yes, it is.
3    Q.   And are those records made by Sprint,
4 prepared by Sprint?
5    A.   Yes, they are.
6    Q.   Maintained by Sprint?
7    A.   Yes.
8    Q.   And then collected by you at our request,
9 or anyone's request?
10    A.   That is correct.
11    Q.   I'm going to show you what's been marked
12 Government's Exhibit 275, 276 and 277, and ask you
13 if you can just confirm that those are documents
14 that you previously reviewed?
15    A.   Yes, these are the documents I reviewed
16 previously.
17    Q.   And as to each of those exhibits, are those
18 true and accurate copies of the documents that
19 Sprint had regarding subscriber and call detail
20 information concerning the various numbers, three
21 different telephone numbers?
22    A.   Yes.
23    Q.   And, again, that's information that's
24 maintained in the ordinary course of Sprint's
25 business?

1523

1    A.   That's correct.
2    Q.   And directing your attention first to the
3 item that's marked Government's Exhibit 275, can you
4 tell us what phone number those records pertain to?
5    A.   Sure.  275 is pertaining to phone number
6 (203) 504-0599.
7       MR. MARKLE:  The government would offer
8 274, 5 -- 275 and 276, your Honor.
9       MR. BUSSERT:  No objection.
10       THE COURT:  Okay wait.  It's 275, 6 and
11 7.
12       MR. MARKLE:  275, 276 and 277.  Sorry.
13       THE COURT:  Full exhibits.
14       MR. MARKLE:  Thank you.
15    Q.   As to 275, again, that number, who is the
16 subscriber listed on that 504-0599?
17    A.   It was -- well, the first record here has
18 it subscribed to a Ron Tonalos t-o-n-a-l-o-s.
19    Q.   You said the first.  Is there a second?  Is
20 there another subscriber listed?
21    A.   We had information that was requested for a
22 period of an entire year, and I believe that
23 sometime during the year that there was another
24 subscriber, because the period of time covered
25 actually covered two different subscribers for the

1524

```
1    phone.
2        Q.   From the period July 1, 2005 to August 31
3    2005, is there one subscriber, or is that the period
4    you are referring to?
5        A.   The period that that is referring to would
6    be the one that pertains to the name I've just read.
7        Q.   Mr. Tonalds, t-o-n-a-l-d-s?  Did I spell
8    that right?
9        A.   Tonalos.
10       Q.   Is there an address given for that
11   subscriber name?
12       A.   There is.
13       Q.   And what's the address?
14       A.   12 West Avenue in Norwalk, Connecticut.
15       Q.   And does that subscriber information or the
16   call detail records indicate when that account was
17   established?
18       A.   It does.
19       Q.   And what was that date?
20       A.   For that particular phone number, this
21   began on the 9th of March of 2005.
22       Q.   And is there an account that was
23   established on five -- on May 21st, 2004 reflected
24   in those records?
25       A.   Yes, it was a previous phone number that
```

1525

```
1    was used by the same person.
2        Q.   And let me ask you this:  Turning to
3    Government's Exhibit -- when you said a previous
4    phone number, what phone number was that?
5        A.   A phone number of (203) 549-4296.
6        Q.   Directing your attention to Government's
7    Exhibit 276, do the subscriber -- the subscriber
8    information call detail records reflect what number
9    those records pertain to?
10       A.   This is for phone number (203) 549-4624.
11       Q.   And who was the listed subscriber for that
12   phone?
13       A.   Is this once again for the same date range
14   you had mentioned beforehand of July through August
15   of 2005.
16       Q.   Is it July through August?
17       A.   This one has information for that period,
18   though there was a request for an entire year as
19   well.  But for that period of time there is a
20   subscriber listed.
21       Q.   And who is that?
22       A.   It's listed as Kytha, k-y-t-h-a, last name
23   Shaw.
24       Q.   And does it have an address?
25       A.   It does, but the default billing address
```

1526

```
1    for a prepaid phone.
2        Q.   Is that the Irvine California, P.O. Box?
3        A.   Yes, it is.
4        Q.   And that means there was no address given?
5        A.   That is correct.
6        Q.   And was February 5, 2005, the start date
7    for use of that telephone number?
8        A.   Yes, it was.
9        Q.   And it also says, I believe, on August 16,
10   2005, as an effective date.  Do you know what that
11   means?
12       A.   You said August 5, 2005, is an effective
13   date; is that correct?
14       Q.   I thought it reflected August 16, 2005,
15   with a notation of effective date, and I was just
16   wondering what that meant.
17       A.   The effective date for that was the name on
18   the account.  At some point in time it was
19   reverified on the 16th of August.
20       Q.   The Kytha Shaw name?
21       A.   That is correct.
22       Q.   And are there call detailed for 549-4624
23   from August 1st, 2005 to August 31st, 2005?
24       A.   Yes, there are.
25       Q.   Turning your attention, Mr. Clark, to
```

1527

```
1    Government's Exhibit 277, can you tell us what phone
2    number those records pertain to?
3        A.   277, this records for phone (203) 545-6682.
4        Q.   And is there a subscriber name?
5        A.   There is.
6        Q.   What is that?
7        A.   Lashika Q. Johnson.
8        Q.   And is there an address?
9        A.   1322 Stratford Avenue, Bridgeport,
10   Connecticut.
11       Q.   And are there -- is there an effective date
12   of June 23, 2005?  Is that correct?
13       A.   That is correct.
14       Q.   And the call detail records I believe for
15   Government's 277 are from June 2005 to
16   November 2005; am I correct on that?
17       A.   They are, but in this particular case
18   they're not true call detail records, but they are
19   the call summaries taken from bills for that time
20   frame.
21       Q.   And why are there not call detail records?
22       A.   At that particular time, because this
23   particular number, this Sprint number, where the
24   previous numbers we've been discussing actually
25   belonged to Nextel, Sprint only kept call detail
```

GA1590

1528

1 records at that time for 60 days.  After the 60-day
2 time frame only the bill summaries would be
3 available.  In this particular case when the request
4 is made to retrieve them, only the bill summaries
5 were available.
6     Q.   And the bill summaries, do those contain
7 similar information to what call detail records
8 would contain?
9     A.   They contained some similar information,
10 but they're in less detail.  For instance, incoming
11 phone calls will only be indicated as incoming,
12 where outgoing phone calls will have more
13 information.
14     Q.   What do you mean more information?
15     A.   It will have the number that was dialed as
16 well as the duration, where incoming would simply
17 say it was an incoming call and duration.
18     Q.   You don't know the number?
19     A.   Due to federal laws that was not able to be
20 provided.
21     Q.   Thank you.
22          MR. MARKLE:  I have no further
23 questions.
24          THE COURT:  Cross-examination?
25          MR. BUSSERT:  Briefly, your Honor.

1529

1 CROSS-EXAMINATION
2 BY MR .BUSSERT:
3     Q.   Mr. Clark, if you don't mind I would just
4 like you to take a look at one of these pages from
5 Government's Exhibit 275, which is the first, the
6 (203) 540-0599, phone discussed.  Do you see that
7 there?
8     A.   Yes, I do.
9     Q.   Looking at this, is it fair to say this is
10 the number associated with the account?
11     A.   That is correct.
12     Q.   And the next column is the date on which
13 the call was made or received?
14     A.   That is also correct.
15     Q.   And then the next column it says "call
16 initiate time."  Would that be the time the call was
17 either initiated by the person with the 0599 number
18 or received by that person?
19     A.   That is correct.
20     Q.   When we say "initiated," let's say I pick
21 up my phone and I try to dial out and sometimes it
22 seems to take forever before you actually hear the
23 ring tone.
24     A.   That is correct.
25     Q.   So, is it as soon as I start dialling or as

1530

1 soon as I start hearing the ring tone?
2     A.   On Nextel phone that time starts when you
3 actually have a call channel that's been assigned,
4 which means at the moment in time that it starts
5 ringing.
6     Q.   Okay.  And so then we have the next column,
7 which is the duration, correct?
8     A.   Yes.
9     Q.   And then type is inbound or outbound.  I
10 assume inbound is receiving a call?
11     A.   Yes.
12     Q.   And outbound is making a call?
13     A.   Yes.
14     Q.   Now it says "forwarded."  What does that
15 mean?
16     A.   Forwarded means the call went to voicemail.
17     Q.   Okay.  And then 911, is that whether or not
18 a call was made to 911?
19     A.   Yes.
20     Q.   And international is whether or not it was
21 an international call?
22     A.   That is correct.
23     Q.   And then "caller called" would be either
24 the person that the 0599 number was calling or
25 receiving a call from?

1531

1     A.   Yes.
2     Q.   And in terms of this, I mean this is
3 duration in seconds, correct?
4     A.   In this particular one, yes.
5     Q.   And so we don't know, or do we know, if you
6 can tell me, if it says forwarded, that suggests
7 that the receiving end -- or you tell me either way,
8 did the voicemail system pick up on one of the two
9 phones?
10     A.   When we have a duration, it means the
11 voicemail system did pick up because the duration
12 only begins at the moment that the system answers it
13 or the person answers it.  If the person doesn't
14 answer it or the voicemail didn't answer it, we
15 would see a duration of zero.
16     Q.   So, we see that on a couple places here,
17 just a duration of zero?
18     A.   Yes.
19     Q.   And we don't -- so if the voicemail picks
20 up, that's all we know, it just clicked in?
21     A.   That's correct.  We only know there is a
22 four second duration and the voicemail platform was
23 used.
24     Q.   Now, as to -- I think there is other
25 mention of this in the records, this one right here

1532

```
1    where there is two different entries in one little
2    block.  Why would that be?
3         A.   It's simply a formatting issue.
4         Q.   The line just didn't go through?
5         A.   Precisely.
6              MR. BUSSERT:  No further questions, your
7    Honor.
8              THE COURT:  Redirect?
9              MR. MARKLE:  Just one question, your
10   Honor.
11   REDIRECT EXAMINATION
12   BY MR. MARKLE:
13        Q.   If it wasn't forwarded to voicemail, it
14   doesn't reflect voicemail and there was duration,
15   does that mean somebody picked up on the other line?
16        A.   That's correct.
17        Q.   Both phones were answered -- the phone that
18   was called was answered?
19        A.   That's correct.
20   RECROSS-EXAMINATION
21   BY MR. BUSSERT:
22        Q.   If the call was answered, we don't know
23   from these records what was said, correct?
24        A.   This is just a record simply of what is
25   happening on the phone.
```

1533

```
1              MR. BUSSERT:  Thank you.
2              THE COURT:  All right, sir, thank you
3    very much.
4              THE WITNESS:  Thank you.
5              THE COURT:  You are excused.  You may
6    step down.
7              MR. MARKLE:  The government would call
8    Sue Johnson.
9              THE COURT:  All right, Ms. Johnson, if
10   you would come over to the witness stand, when you
11   get there please don't sit down, but raise your
12   right hand.
13        S U S A N   J O H N S O N,
14   Having first been duly sworn, was examined and
15   testified as follows:
16              THE WITNESS:  Susan Johnson,
17   j-o-h-n-s-o-n, Sullivan county.
18              THE COURT:  What state?
19              THE WITNESS:  New York.
20              THE COURT:  Thank you.
21   DIRECT EXAMINATION
22   BY MR. MARKLE:
23        Q.   Good morning, Ms. Johnson.
24        A.   Good morning.
25        Q.   Ms. Johnson, can you tell us how you are
```

1534

```
1    employed?
2         A.   I'm employed by T-Mobile.
3         Q.   What is your position with T-Mobile?
4         A.   I'm the custodian of records.
5         Q.   And what does that entail?
6         A.   We answer various subpoenas from law
7    enforcement agencies across the United States.
8         Q.   And did you do that in regards to your
9    appearance here?
10        A.   Yes.
11        Q.   And do you recall communicating -- or
12   amassing certain records for a telephone number
13   243-7312?
14        A.   Yes.
15        Q.   And that was a T-Mobile phone?
16        A.   Correct.
17        Q.   And for -- both area codes (203) --
18   543-4209?
19        A.   Yes.
20        Q.   And again a T-Mobile phone?
21        A.   Correct.
22        Q.   I'm going to show you what's been marked
23   Government's Exhibit 264 and -- 263 and 264, ask if
24   you recognize the documents contained in there?
25        A.   Yes, I do.
```

1535

```
1         Q.   And are those documents kept in the regular
2    course of T-Mobile's business?
3         A.   Yes, they are.
4         Q.   And did those records come from a search of
5    your business records?
6         A.   Yes.
7         Q.   And in regards to Government 263, what is
8    included amongst the documents that are in
9    Government's 263?
10        A.   Subscriber information as well as call
11   detail records.
12        Q.   And briefly, we've heard this, but if you
13   could just tell us, for T-Mobile purposes subscriber
14   information includes generally what?
15        A.   Generally the account number, the
16   subscriber name, Social Security number, date the
17   account was activated, and the phone number.
18        Q.   And call detail records include what?
19        A.   Incoming and outgoing phone calls or text
20   messages placed to or received from the cellular
21   telephone number.
22        Q.   And directing your attention to
23   Government's Exhibit 264, what phone number does
24   that pertain to?
25        A.   (203) 543-4209.
```

1536

```
 1    Q.   And can you tell from the records whether
 2   that's a prepaid phone or not?
 3    A.   Yes.
 4    Q.   And is it?
 5    A.   Yes, it's a prepaid.
 6    Q.   And what does that mean?
 7    A.   Prepaid means that the customer pays for
 8   the minutes upfront, they don't receive a bill in
 9   the mail.
10             MR. MARKLE:  And I am going to offer 263
11   and 264, your Honor.
12             MR. BUSSERT:  No objection.
13             THE COURT:  Full exhibit.
14    Q.   Government's 263, is there a -- looking at
15   the subscriber information, is there a subscriber
16   listed?
17    A.   No, there's not.
18    Q.   So there is no subscriber name?
19    A.   No.
20    Q.   That's not required on a prepaid phone?
21    A.   Correct.
22    Q.   And can you tell us when that account was
23   established?
24    A.   July 15, 2005.
25    Q.   And is there an indication of a refill
```

1537

```
 1   date?
 2    A.   Yes.
 3    Q.   And what's the date on that?
 4    A.   August 23, 2005.
 5    Q.   And what does a refill date mean?
 6    A.   Refill means that they went and purchased a
 7   prepaid coupon to refill minutes on to the phone to
 8   start using the phone again.
 9    Q.   So, they added minutes to their phone?
10    A.   Correct.
11    Q.   On August 23, 2005?
12    A.   Yes.
13    Q.   And the call detail records, for what
14   period of time do those record -- what period of
15   time do we have in Government 264?
16    A.   August 9, 2005 through August 31, 2005.
17    Q.   And do those call detail records reflect
18   when the last outgoing call was made from that
19   phone?
20    A.   Yes.
21    Q.   And could you tell us what that date was?
22    A.   August 24, 2005.
23    Q.   And do you know what time that was at?
24    A.   7:25 a.m.
25    Q.   Now, on your records for T-Mobile, is that
```

1538

```
 1   in Pacific Time?
 2    A.   Yes, it is.
 3    Q.   So, for Eastern Standard Time, what would
 4   you do?
 5    A.   You would have to add three minutes -- or
 6   three hours.
 7    Q.   So, it would be a call at 10:25 a.m.
 8   Eastern Standard Time?
 9    A.   Correct.
10    Q.   That's true for every call reflected on
11   there, obviously, correct?
12    A.   On these records, yes.
13    Q.   And is there a notation there that's of
14   significance by that phone call?
15    A.   The B67.
16    Q.   Is that a notation that's in your records?
17    A.   Yes.
18    Q.   And what does that mean?
19    A.   The "B" represents a star, which means that
20   the person making the outbound call was trying to
21   block their number.
22    Q.   So that the number would not show up on the
23   person receiving the call's phone?
24    A.   Correct.
25    Q.   But it is still reflected on the billing
```

1539

```
 1   records, call detail records?
 2    A.   Yes.
 3    Q.   And if a T-Mobile customer makes an
 4   incoming call and it is not answered, it goes to
 5   voicemail?
 6    A.   Yes.
 7    Q.   How is that reflected in terms of the
 8   billing?
 9    A.   If a T-Mobile subscriber receives an
10   incoming call and the call is not answered, it's
11   going to bypass the billing system and it's not
12   going to reflect on the records.
13    Q.   So, will it show as zero duration?
14    A.   Yes.
15    Q.   And if there is billable minutes shown on
16   your records, does that mean someone picked up the
17   phone and answered it?
18    A.   Yes, there was some sort of physical
19   connection.
20    Q.   And then, again, if there is an outgoing
21   call, if I make an outgoing call from a T-Mobile
22   phone and leave a message, will there be billable
23   minutes for that --
24    A.   Yes.
25    Q.   -- call?
```

1540

1   A.   Yes.
2   Q.   Now, directing your attention to
3   Government's Exhibit 264, do you know for what phone
4   number -- actually are there two documents.  Are
5   there two numbers in that?  Is there 264 and 265?
6   A.   Just 264.
7   Q.   For 264, can you tell us, is there
8   subscriber information?
9   A.   Yes.
10  Q.   And who is the subscriber?
11  A.   The name on the account, it states Mark
12  None Canney.
13  Q.   C-a-n-n-e-y?
14  A.   Correct.
15  Q.   And what phone number is that for?
16  A.   (203) 243-7132.
17  Q.   And was that a prepaid phone?
18  A.   Yes.
19  Q.   And obviously T-Mobile, correct?
20  A.   Correct.
21  Q.   So, the same questions I asked you
22  regarding the other phone, in terms of billable
23  minutes, duration, those would pertain to this phone
24  as well, correct?
25  A.   Yes.

1541

1   Q.   And is there an address for Mr. Canney?
2   A.   No.
3   Q.   And does it reflect when that phone,
4   243-7132, was activated?
5   A.   Yes.
6   Q.   And that means the first time it's put into
7   use, correct?
8   A.   Correct.
9   Q.   And what's the date on that?
10  A.   August 24, 2004.
11  Q.   And is there an indication of what's called
12  a refill date?
13  A.   Yes.
14  Q.   And what was the date of refill?
15  A.   August 24, 2005.
16  Q.   And in T-Mobile what does that mean, a
17  refill date?
18  A.   It means that the subscriber purchased
19  prepaid minutes, like a calling card, to add minutes
20  to the phone as the phone either ran out of minutes
21  or was near running out.
22  Q.   And the call detail records that you have
23  for 243-7312, what is the time period that those
24  cover?
25  A.   August 1, 2005 through August 31st, 2005.

1542

1   Q.   And, Ms. Johnson, in regards to -- there
2   was a refill date of August 24, 2005 from the call
3   detail records.  Can you determine when the last
4   outgoing call was made from that phone?
5   A.   The last outgoing call was August 24, 2005
6   at 11:15 a.m. Pacific Time.
7   Q.   So even though minutes were put on it on
8   that date, that was the last time it was used?
9   A.   Correct.
10  Q.   And do you know how many minutes were put
11  on it?
12  A.   No.
13  Q.   That's not reflected in the records?
14  A.   No, it's not.
15  Q.   And do you know when the last call that was
16  made to that phone was actually answered?
17  A.   August 24, 2005 at 11:34 Pacific Time.  It
18  was an incoming call.
19  Q.   So, the last incoming call is on August 24,
20  2005, the last outgoing call was on August 24, 2005,
21  and refill minutes were put on it on August 24,
22  2005?
23  A.   Correct.
24  Q.   Thank you.
25       MR. MARKLE:  I have no further

1543

1   questions.
2        THE COURT:  Cross-examination.
3        MR. BUSSERT:  No, your Honor.
4        THE COURT:  All right, thank you,
5   Ms. Johnson.  You may step down.  You are excused.
6        MR. MARKLE:  The government would
7   call -- may I have just one moment.  Latavia
8   Whittingham, your Honor.
9        THE COURT:  All right, Ms. Whittingham,
10  please remain standing when you get to the witness
11  stand and raise your right hand.
12       L A T A V I A   W H I T T I N G H A M,
13  Having first been duly sworn, was examined and
14  testified as follows:
15       THE WITNESS:  Latavia Whittingham,
16  w-h-i-t-t-i-n-g-h-a-m, Bridgeport, Connecticut.
17       THE COURT:  You may proceed.
18  DIRECT EXAMINATION
19  BY MR. MARKLE:
20  Q.   Good morning, Ms. Whittingham.
21  A.   Good morning.
22  Q.   Ms. Whittingham, how old are you?
23  A.   Twenty-eight.
24  Q.   And how far have you gone to school?
25  A.   To college.

**GA1594**

1544

```
1    Q.   And did you graduate college?
2    A.   No.
3    Q.   Completed some semesters there?
4    A.   Yes.
5    Q.   And are you presently employed?
6    A.   Yes.
7    Q.   And how are you employed?
8    A.   I work for Yale-New Haven Hospital.
9    Q.   And what's your position there?
10   A.   Environmental service.
11   Q.   And how long have you worked at the
12   Yale-New Haven Hospital?
13   A.   Two years.
14   Q.   And, Ms. Whittingham, are you related to
15   one of the victims in this case?
16   A.   Yes, Tina Johnson.
17   Q.   Tina Johnson, that was your mom?
18   A.   Yes.
19   Q.   And did you grow up with your mom?
20   A.   Yes.
21   Q.   You lived with here for a long period of
22   time?
23   A.   Yes.
24   Q.   And do you know a person by the name of
25   Leroy Whittingham?
```

1545

```
1    A.   Yes.
2    Q.   And who is that?
3    A.   That's my brother.
4    Q.   And --
5         THE COURT:  Would you pull the
6    microphone over closer, please.  Thank you.
7    Q.   In August of 2005, where were you living?
8    A.   Shelton, Connecticut.
9    Q.   And who were you living with in Shelton,
10   Connecticut?
11   A.   My mother, Tina Johnson; my two children,
12   Dantasia Whittingham and Tyrese Whittingham; and I
13   was living with my brother, Leroy Whittingham.
14   Q.   And were there times when your mother did
15   not stay with you in Shelton, Connecticut?
16   A.   Yes.
17   Q.   And were you aware of where she was?
18   A.   Yes.
19   Q.   And where was she staying during those
20   times she wasn't in Shelton in 2005?
21   A.   She was in Bridgeport.
22   Q.   Did you know where in Bridgeport?
23   A.   She was at Charles Street in Basil (sic)
24   house.
25   Q.   Did you know Basil?
```

1546

```
1    A.   Yes.
2    Q.   And did you know anyone else who lived
3    there?
4    A.   Tippy, James Reid, my mother (sic)
5    boyfriend.
6    Q.   And do you know, do you remember what the
7    apartment number was?
8    A.   Apartment 101, building 215.
9    Q.   215 Charles Street?
10   A.   Uh-huh (indicating affirmatively).
11   Q.   Did you go there?
12   A.   All the time.
13   Q.   Did you -- were you friendly with Basil,
14   Basil Williams?
15   A.   Yes.
16   Q.   James Reid?
17   A.   Yes.
18   Q.   And obviously you went to visit your mom?
19   A.   Yes.
20   Q.   And what would you do when you went to see
21   her there?
22   A.   Just went to go check on her, hi, what's
23   going on, what you doing.  In the beginning she came
24   home all the time, so I used to drop her off and
25   then pick her up, because we didn't live down there.
```

1547

```
1    I had the car, so we would go down to Bridgeport, I
2    would drop her off there, go do what I had to do, go
3    pick her up, go home.
4         But toward the summer of 2005, in
5    August, she started staying at Basil house.  So, I
6    would just stop by and check on her when I got out
7    of school, out of work, or whatever, swing by with
8    the kids, go check on her, say, hey, hi, stuff.
9    Q.   Did you have children?
10   A.   Yeah.
11   Q.   So, her grandchildren?
12   A.   Yes.
13   Q.   And you'd visit with them?
14   A.   Yes.
15   Q.   And in 2005, you said in August, she
16   started living there more regularly than in Shelton?
17   A.   Yes.
18   Q.   And basically staying there every night
19   sometime in August.
20   A.   Yes.
21   Q.   And when you would go to visit her, before
22   you would arrive -- or let me just ask you this:
23   Did she have a cell phone at the time?
24   A.   Yes.
25   Q.   Did you have a cell phone?
```

1548

```
1     A.    Yes.
2     Q.    Do you recall her cell phone number back in
3  August of 2005?
4     A.    Yes.
5     Q.    And what was telephone number?
6     A.    (203) 543-4209.
7     Q.    Do you remember your telephone?
8     A.    Yes.
9     Q.    And what was that?
10    A.    545-7582.
11    Q.    203?
12    A.    203 area code.
13    Q.    And how do you remember your number?
14    A.    My cell phone, that was my first prepaid
15  cell phone ever.  I got it my first semester at
16  college.  I had that phone from 2002 up until 2006.
17    Q.    And how about your mom's phone, how do you
18  remember that?
19    A.    Well, I testified about this in the last
20  trial, so --
21              MR. BUSSERT:  Objection.
22              THE WITNESS:  0h, sorry.
23              THE COURT:  Just answer the question,
24  please.
25    Q.    How do you remember it today?
```

1549

```
1     A.    I have a journal at home.  I keep journals,
2  since I was a little kid, and in that journal from
3  August is my mother's telephone number.  It was a
4  new number she had got.  So it wasn't like she
5  always that number.  So, I had to jot it down.
6     Q.    It was a relatively new number in August of
7  2005?
8     A.    Yeah.
9     Q.    So, you had to write it down at the time?
10    A.    Yeah.
11    Q.    And did you call it on a number of
12  occasions?
13    A.    All the time.  It was logged into my cell
14  phone.
15    Q.    How many times in August would you call
16  your mom on a daily basis?
17    A.    Multiple times a day I called her.  If I
18  wasn't calling, I was stopping by.  Sometimes I ran
19  out of minutes or she ran out of minutes, so I'd
20  just stop by.
21    Q.    Now, I'm sure you do, you remember the day
22  your mom was found murdered.
23    A.    Yes.
24    Q.    And do you remember prior to that when was
25  the last time you saw her?
```

1550

```
1     A.    The night before.
2     Q.    And do you know if she had a cell phone at
3  that time?
4     A.    Yes.
5     Q.    And why does that stand out in your mind?
6  How do you know that?
7     A.    Because I called her to let her know I was
8  stopping by.
9     Q.    And do you know that you had your cell
10  phone at that time?
11    A.    Yes.
12    Q.    Do you remember talking to her about your
13  cell phone?
14    A.    Yes.
15    Q.    And what was that about?
16    A.    I had no more minutes on my phone, so I
17  needed to stop by and pick up some money so I could
18  go buy me some more minutes for my phone.
19    Q.    Looking to mom for some money for your
20  phone?
21    A.    All the time.
22    Q.    And did you, in fact, visit her that night?
23    A.    Yeah.
24    Q.    To get the money and spend time with her?
25    A.    Yeah.
```

1551

```
1     Q.    And when you went there, do you recall,
2  that night or any time before, do you remember
3  seeing a hole in the wall of the apartment?
4     A.    No.
5     Q.    Do you remember whether or not there was a
6  hole in one of the walls in the apartment?
7     A.    No.
8     Q.    Do you know whether or not there was a
9  couch or more than one couch in the apartment?
10    A.    Yes.
11    Q.    Do you remember the night before she was
12  found murdered whether those couches were in the
13  apartment?
14    A.    Yes.
15    Q.    And what couches do you remember?
16    A.    The regular Basil couch, which was his
17  couch that belonged to the apartment, that was in
18  the living room, the long one, and there was a
19  smaller couch, and that couch was a couch my mother
20  got for my sister.  She had just moved into her
21  apartment and needed new furniture, so that was one
22  of the pieces of furniture that was supposed to go
23  up to my sister's apartment.
24    Q.    So that was just being kept at your mom's
25  until it was given to your sister?
```

1552

```
1    A.   Yeah, until she found a ride to bring it up
2  there.
3             MR. MARKLE:  If I may have just a
4  moment, your Honor.
5    Q.   Showing you what's been marked Government's
6  Exhibit 117, do you recognize the couch in that
7  photograph?
8    A.   Yes.
9    Q.   Do you recognize that room?
10   A.   Yes.
11   Q.   Is that the living room in your mom's
12 house?
13   A.   Yes.
14   Q.   And how do you recognize that couch?
15   A.   I been there lots of times, so I sat on
16 that couch before.
17   Q.   Is that usually where that couch was
18 located?
19   A.   No.
20   Q.   Where was it usually located?
21   A.   Up against the wall.
22   Q.   To the left?
23   A.   To the left of the picture, yeah, up
24 against the wall.
25   Q.   Left as we look at the photograph?
```

1553

```
1    A.   Uh-huh (indicating affirmatively).
2    Q.   And was that a pullout couch or just a
3  regular couch?
4    A.   Just a regular couch.
5    Q.   And showing you Government's Exhibit 116,
6  do you recognize what that's a photograph of?
7    A.   Yes.
8    Q.   And do you see your mom's bedroom in that
9  photograph?
10   A.   Yes.
11   Q.   And which one?  As we're looking at the
12 photograph, which room is it?
13   A.   Door on the left.
14   Q.   And do you know what the room on the right
15 is?
16   A.   That's Basil room.
17   Q.   You have to just speak up?
18   A.   That's Basil room.
19   Q.   Are those both bedrooms?
20   A.   Yes.
21   Q.   And there is a couch in the hallway of that
22 photograph.  Do you recognize that?
23   A.   Yes.
24   Q.   And what is that couch?
25   A.   That's the love seat that was supposed to
```

1554

```
1  go to my sister.
2    Q.   That's the love seat you were referring to
3  previously?
4    A.   Yeah.
5    Q.   Approximately what time did you see your
6  mom the night before you learned of her murder?
7    A.   That evening.  Sun was out.  Maybe seven,
8  between seven and eight.  I was about to go home to
9  Shelton.
10   Q.   And that was the last time you saw her
11 alive?
12   A.   Yes.
13             MR. MARKLE:  May I have just a moment,
14 your Honor.
15             THE COURT:  Yes.
16   Q.   In terms of the -- obviously the love seat
17 in the hallway.  Ms. Whittingham, have you seen it
18 in that hallway before?
19   A.   Yes.
20   Q.   So that's not out of the ordinary as
21 depicted in that photograph?
22   A.   No.
23   Q.   And if you are in that hallway looking
24 towards your mom's room or Basil's room, could you
25 still see into the bedrooms with that couch there?
```

1555

```
1    A.   Yes.
2    Q.   And about how tall are you?
3    A.   I'm 5'9.
4    Q.   And could you get around that couch by --
5  you'd have to walk around it, obviously.
6             MR. BUSSERT:  Objection, leading.
7    Q.   How do you get around that couch to get to
8  the bedroom?
9    A.   You walk around the side that's not blocked
10 by the couch.
11   Q.   And could you do that with a little
12 finesse?
13   A.   Yeah.
14   Q.   But you could see into each of the
15 bedrooms?
16   A.   Yeah.
17             MR. MARKLE:  Thank you.  I have no
18 further questions.
19             THE COURT:  Cross examination.
20 CROSS-EXAMINATION
21 BY MR. BUSSERT:
22   Q.   Hi, ma'am.
23   A.   Hi.
24   Q.   Just to follow up on that last question.
25 This photo is a fair and accurate representation of
```

1556

```
 1   kind of how the apartment looked?
 2       A.   Yes.
 3                THE COURT:  You are back at 116?
 4                MR. BUSSERT:  Yes, your Honor, I'm sorry
 5   for the record 116D.
 6       A.   Yes, it is.
 7       Q.   Okay.  And it appears, if we look on the
 8   right-hand side there into Basil's room, that there
 9   is some daylight coming through the window; is that
10   correct?
11       A.   Yes.
12       Q.   Thank you.  If you don't mind, I'd like to
13   ask you some additional questions, kind of following
14   up on what Mr. Markle asked.  I think you've testified
15   during your testimony just now that you've testified
16   previously, correct?
17       A.   Yes.
18       Q.   You testified last year?
19       A.   Yes.
20       Q.   And you've also testified in 2006, correct?
21       A.   Yes.
22       Q.   And please, I don't mean any disrespect by
23   this, I just need to ask some questions.  Your
24   mother had used crack for a number of years,
25   correct?
```

1557

```
 1       A.   Yes.
 2       Q.   And for most of that time when you were
 3   growing up she was what you would call a functional
 4   addict?
 5       A.   I mean, if that's what you want to call
 6   her, but she was always a mother.  We never was
 7   without food, shelter, clothing, anything.  So, she
 8   was a regular mother.
 9       Q.   And she would during those periods, maybe
10   until closer towards the end of her life, she would
11   use on the weekends or when she had time off, things
12   like that?
13       A.   Yeah.
14       Q.   But you and your brothers, you never wanted
15   for anything?
16       A.   Never.
17       Q.   And she was there when you needed her?
18       A.   Always.
19       Q.   Now, as I understand it, you all had lived
20   in Bridgeport until about 2003, correct?
21       A.   Yep.
22       Q.   That's when your mom got the Section 8
23   approval and you all moved to Shelton?
24       A.   Well, she moved up to Shelton and I moved
25   up later.  I had my own place in Norwalk.
```

1558

```
 1       Q.   Did Leroy go with her?
 2       A.   Leroy moved up there as soon as she moved
 3   up there.
 4       Q.   So, you guys joined her?
 5       A.   Later, yes.
 6       Q.   She was home, as I understand it, fairly
 7   regularly until about the end of July 2005; is that
 8   about right?
 9       A.   Yeah, she had lost her job and her car all
10   in the same time period.
11       Q.   And as I understand it, she lost her job
12   around May of 2005; is that correct?
13       A.   No, it was more the summer.  Her patient
14   she had passed away.
15       Q.   And was that Basil's wife?
16       A.   No.
17       Q.   It was a different patient?
18       A.   Yeah, a different patients.
19       Q.   Did she used to take care of Basil's wife?
20       A.   No, I'm going say that she knew Basil wife
21   from Stamford.  They all knew each other from
22   Stamford.
23       Q.   They grew up together?
24       A.   Yeah, something like that.
25       Q.   So, during that period of the summer of
```

1559

```
 1   2005, your mom was looking after Basil; fair to say?
 2       A.   Uh-huh (indicating affirmatively).
 3       Q.   She was, like, helping him pay his bills?
 4       A.   Well, helping him manage his money and
 5   paying his bills and stuff.
 6       Q.   I'm sorry.  And making sure he took his
 7   medication?
 8       A.   Took his medication, he ate, the apartment
 9   was clean.  Stuff like that, yeah.
10       Q.   And he lived in apartment 101, correct?
11       A.   Yes.
12       Q.   But in terms of your mom using, she had
13   been using at Charles Street for a few years before
14   that?
15       A.   Yes.
16       Q.   And that used to be up in Pops' apartment,
17   correct?
18       A.   Yes.
19       Q.   And that's apartment 211?
20       A.   Yes.
21       Q.   And when we talk about the recreation kinds
22   of things, she would go there after work, correct?
23       A.   Uh-huh (indicating affirmatively).
24       Q.   On the weekend and things like that?
25       A.   Yes.
```

1560

```
1    Q.   And that may have been as early as 2003; is
2    that correct?
3    A.   It could have been, yeah.
4    Q.   And even as far back as then you used to go
5    check on her?
6    A.   Yes.
7    Q.   You'd just pop in and see her?
8    A.   Yeah, all the time.  Usually I went there
9    to check on her when I was picking her up.
10   Q.   And on one of those occasions, I think it
11   was New Year's Eve, like, 2004?
12   A.   Yes, New Year's Day, 2004.
13   Q.   It just had been 2003?
14   A.   2003 into 2004, yes.
15   Q.   It was like 1:00 a.m., or something like
16   that?
17   A.   Uh-huh (indicating affirmatively).
18   Q.   And you went by there to see her?
19   A.   To pick her up, yeah.
20   Q.   To pick her up.  And that was the occasion
21   that you first met Azibo?
22   A.   Yes.
23   Q.   And how did you know Azibo?  What was the
24   name you knew him by?
25   A.   At that time I didn't know him as no name.
```

1561

```
1    Q.   How did he introduce himself?
2    A.   He didn't.  I knocked on the door looking
3    for my mother, he answered the door, he asked me who
4    I was looking for, I told him that I'm here to pick
5    up my mother.  She heard my voice, so she just came
6    to the door, or whatever, and she came outside and
7    talked to me in the hallway.
8    Q.   Was he trying to --
9    A.   Talk to me?
10   Q.   Yeah.
11   A.   Yeah, he was trying to persuade my mother
12   to let him talk to me, and telephone number, try to
13   talk to me.
14   Q.   And he gave you his number?
15   A.   No.
16   Q.   At some point?
17   A.   Later, a few days, he kept hounding my
18   mother about my number.  She asked me if she could
19   give it to him, I told her, yeah.  She gave it will
20   to him.
21   Q.   And around this point, early January 2004,
22   you guys started dating?
23   A.   We started talking.  We wasn't dating.
24   Q.   Well, you started hanging out with him;
25   fair to say?
```

1562

```
1    A.   Yeah.
2    Q.   You would go to his place?
3    A.   Yeah.
4    Q.   And at some point that stopped?
5    A.   Yes.
6    Q.   Can you explain to the jury why that
7    stopped?
8    A.   It wasn't my type of guy.
9         MR. MARKLE:  Your Honor, I'm going to
10   object, relevance.
11        THE COURT:  Well, if there is some
12   event, I don't know.  I'm going to permit that
13   question, but let's not get too far afield.
14        MR. BUSSERT:  If need be I'll approach
15   because I do claim it.
16        THE COURT:  Just ask the question and
17   get the answer.  You say he wasn't your type of guy.
18        THE WITNESS:  Yes, he wasn't.
19   Q.   And the reason for that is because you saw
20   him beat somebody up, correct?
21   A.   That, amongst other things.
22   Q.   But you did witness him beat somebody up,
23   correct?
24   A.   Yes.
25   Q.   And that was a prostitute?
```

1563

```
1    A.   Yes.
2    Q.   And this was at Charles Street?
3    A.   Yes.
4    Q.   On the second floor in the hallway?
5    A.   Yes.
6    Q.   And as you knew it, Azibo had four
7    prostitutes working for him?
8    A.   Yes.
9    Q.   And that was at Charles Street?
10   A.   Yes.
11   Q.   And they all worked out of James'
12   apartment, correct?
13   A.   As far as I knew, yes.
14   Q.   And in terms of that incident, you were out
15   there just talking to him in the hallway, right?
16   A.   Yeah, we was having a normal conversation.
17   Q.   And he was being sweet to you with nothing
18   wrong?
19   A.   Acting like a normal person, yes.
20   Q.   And then this woman came up complaining
21   about this guy who paid her some money, correct?
22   A.   Something about her not wanting to go with
23   the guy or something.
24   Q.   She was scared or something?
25   A.   Yeah, I guess she must have previously been
```

**GA1599**

1564

```
1   with the guy or something.
2        Q.   And Azibo snapped like that?
3        A.   Yes.
4        Q.   He just started beating on her?
5        A.   Yes.
6        Q.   And she was down on the floor and he
7   started stomping on her?
8        A.   Yes.
9        Q.   And you saw that, and whatever else may
10  have been going on, you said there were other
11  things, but that was it for you?
12       A.   It was a wrap, yes.
13       Q.   And that would have been around the end of
14  February or early March 2004?
15       A.   Yes.
16       Q.   Now, going back to this 2003-2004 period,
17  maybe even into early 2005, I don't know, Azibo and
18  your mom had been friendly at some point, correct?
19       A.   They was friendly the whole time she was
20  going to Charles Street.
21       Q.   And fair to say that he didn't treatment
22  her like other people that would go into Pops'
23  apartment?
24       A.   No, no.
25       Q.   How was this different?
```

1565

```
1        A.   As he told me, he respected my mom because
2   she worked and she only came to do what she did
3   after work, or whatever, and then she went home and
4   she went to work the next day and she handled her
5   business.  So, he respected that about her.
6        Q.   And am I correct that -- and I don't know
7   if it was regularly, but your mom used to --
8   occasionally used to run drugs for Azibo and take
9   him places?
10       A.   I don't know about running drugs for him,
11  no.  Did she give him a ride before, yes.  He helped
12  Tippy get a job at the car wash.
13       Q.   Do you recall telling the police -- using
14  the term "run drugs" for him, for Azibo?
15       A.   That my mother ran drugs for him?
16       Q.   Yeah.
17       A.   No.
18       Q.   Do you remember talking to the police
19  around August 31st of 2005?
20       A.   Yes.
21       Q.   And fair to say you saw -- in a sense,
22  Azibo saw your mother being disrespectful.  The
23  stuff going on in Basil's apartment, you saw it as
24  being respectful to him?
25       A.   Are you asking me that's what I think?
```

1566

```
1        Q.   Yeah.
2        A.   Yes.
3        Q.   I mean, she was only making like $200 a
4   week, right?
5        A.   If that.  I mean, she wasn't doing it for
6   long, what, three, four weeks.  So what's that,
7   total $200 a week times four, what $800?  Three,
8   600.  It wasn't making money like that.
9        Q.   In terms of his business, she was, like, no
10  threat to his business?
11       A.   No, no threat at all.
12       Q.   But he was threatening her.  I mean, he
13  started threatening her.  You knew about this.
14       A.   No.  If I would have known someone was
15  threatening my mother she wouldn't have been in the
16  building.  So, no, I did not know about the threats
17  until the night before.
18       Q.   Well, tell me about the night before.
19       A.   The night I seen her?
20       Q.   Yeah.
21       A.   The last time?
22       Q.   Yeah.
23       A.   I was trying to get my mother to go home
24  with me that night because I wanted to go out with
25  my friends, and I wanted her to baby-sit the kids
```

1567

```
1   for me, and she explained to me that she couldn't
2   come home that night because D was supposed to get
3   some bitches to fuck her up and she wanted to see
4   who he was going to get, and I told my mother not to
5   play with D like that, he's not wrapped too tight.
6        Q.   That he's not wrapped too tight.  But your
7   mom wasn't going to back down from this kid.
8        A.   He was like a little boy to her, which he
9   was.
10            MR. BUSSERT:  Thank you, your Honor.  No
11  further questions.
12            THE COURT:  Redirect.
13            MR. MARKLE:  Yes, your Honor.
14  REDIRECT EXAMINATION
15  BY MR. MARKLE:
16       Q.   Ms. Whittingham, did you tell your brother
17  Leroy about that?
18       A.   No, I went home to Shelton.  I didn't see
19  Poppy.
20       Q.   Was your brother concerned about your mom
21  as well?
22       A.   Yeah.
23       Q.   Was he going to the apartment more often
24  than he used to?
25       A.   Yeah.
```

**GA1600**

1568

```
1    Q.   In August of 2005, would it be fair to say
2  he was at the apartment much more often than
3  previously?
4    A.   Yeah, he was in Bridgeport a lot.
5    Q.   And he would be seen at your mother's
6  apartment?
7    A.   Yes.
8    Q.   So if somebody was worried about your
9  mother and/or --
10           MR. BUSSERT:  Objection.
11           MR. MARKLE:  Excuse me?
12           MR. BUSSERT:  This is calling for
13  speculation just as it's phrased.
14    Q.   If somebody was watching your mother's
15  apartment, would they see Leroy there more or less
16  often in August of 2005?
17    A.   More.
18    Q.   And when you saw Azibo hit this woman who
19  was a prostitute, where did that take place?
20    A.   It took place in the Charles Street
21  building on the second floor.  It's like a hallway
22  type thing.
23    Q.   In a hallway?
24    A.   Yeah.
25    Q.   He didn't have to break down a door?
```

1569

```
1    A.   No.
2    Q.   He didn't have to worry about other people
3  being with her?
4    A.   No.
5    Q.   She was all alone?
6    A.   Yeah.
7    Q.   She wasn't with another man?
8    A.   No.
9    Q.   Or two other men?
10    A.   No.
11    Q.   Or your brother wasn't there, was he?
12           MR. BUSSERT:  Objection.
13    A.   No.
14           MR. BUSSERT:  This is all leading, your
15  Honor.
16           THE COURT:  Sustained.
17    Q.   Did he need any help in attacking this
18  woman?
19    A.   No.
20           MR. MARKLE:  Thank you.
21           THE COURT:  Any recross?
22  RECROSS-EXAMINATION
23  BY MR. BUSSERT:
24    Q.   Azibo's anger was directed at your mother,
25  correct?  He was just angry with her, for whatever
```

1570

```
1  reason.
2    A.   I assumed he was just angry, period.
3    Q.   And, again, he was just not a right kind of
4  person.
5    A.   No.
6  RE-REDIRECT EXAMINATION
7  BY MR. MARKLE:
8    Q.   By the way, Ms. Whittingham, did you ever
9  tell Efrain Johnson about --
10           MR. BUSSERT:  Beyond the scope, your
11  Honor.
12    Q.   Did you ever him tell --
13           MR. BUSSERT:  Objection.
14    Q.   -- Efrain Johnson --
15           THE COURT:  Let's hear the question,
16  please.
17    Q.   Did you ever tell Efrain Johnson about
18  Azibo beating up this woman?
19    A.   No.
20    Q.   Did you ever tell Efrain Johnson --
21           MR. BUSSERT:  Objection, your Honor.
22  This is --
23           THE COURT:  Just a moment, please.  May
24  I see you at sidebar.
25           (Sidebar conference)
```

1571

```
1           THE COURT:  All right, your question is
2  what?
3           MR. MARKLE:  My question was whether she
4  ever told Efrain Johnson about any of this.  I'm
5  sorry, he's acting like -- the inference is that if
6  Azibo Aquart is this dangerous then Efrain Johnson
7  must be afraid of him.  But Efrain Johnson has to
8  know about this to be afraid of him.
9           MR. BUSSERT:  Your Honor?
10           THE COURT:  Well, does she know Efrain
11  Johnson?
12           MR. MARKLE:  I don't think so.
13           MR. BUSSERT:  First of all, it's not a
14  good faith question.  Second of all, I had two
15  questions on recross.  The question was, was Azibo
16  angry with your mother, his anger was directed
17  towards her, and he was a little -- whatever it may
18  be.  Now, he's asking leading questions knowing the
19  answer, which is they don't know each other and he
20  never said anything.
21           MR. MARKLE:  Okay, I'll ask her if he
22  knows him.
23           MR. BUSSERT:  Again it's beyond --
24           THE COURT:  It is beyond the scope.
25           MR. MARKLE:  I'm sorry?
```

**GA1601**

1572

```
1        THE COURT:  It really is beyond the
2   scope.  How can it be within the scope of Azibo was
3   just angry and not right?  My notes aren't quite
4   clear.  Who asked the questions about hitting the
5   prostitute in the hallway?
6        MR. BUSSERT:  That was on cross.  On
7   recross it was just angry at your mother and he's
8   just not right.  That was two questions, that was
9   it.
10       MR. MARKLE:  All right, I'll just ask
11  her if she knows Efrain Johnson.
12       MR. BUSSERT:  It's beyond the scope.
13       MR. MARKLE:  That question?
14       MR. BUSSERT:  Yes.
15       THE COURT:  I'm going to sustain the
16  objection.
17       (Side-bar concluded)
18       MR. MARKLE:  No further questions, your
19  Honor.
20       THE COURT:  All right, thank you, Ms.
21  Whittingham.  You may step down.  You are excused.
22  We'll take a 15-minute recess.
23       (Jury exited the courtroom.)
24       THE COURT:  All right, counsel, Mr.
25  Markle and Ms. Reynolds, as we move towards the
```

1573

```
1   issue of the admissibility of Dr. Williams
2   testimony, does the government plan to file any
3   written memorandum on the issue on the Daubert
4   issue?
5        MS. REYNOLDS:  Yes, your Honor, we just
6   haven't had an opportunity to finalize that, but
7   yes.
8        THE COURT:  So I'll have that by
9   tomorrow?
10       MS. REYNOLDS:  Yes.
11       THE COURT:  And footnote 2 in the
12  defendant's brief raises the issue of the
13  authentication of the autopsy photographs.  Are you
14  intending to bring in the photographer for that
15  authentication?
16       MS. REYNOLDS:  I believe we're
17  attempting to identify who the photographer was and
18  if she is available.
19       THE COURT:  All right.  And then is
20  there any -- let's see, I have your letter
21  identifying what Ms. Williams' proposed testimony
22  will be.  Is there any detail or refinement with
23  respect to the scope -- with respect to the opinion
24  she will be rendering?
25       MS. REYNOLDS:  No.
```

1574

```
1        THE COURT:  Is she rendering it as an
2   opinion on autopsy?
3        MS. REYNOLDS:  No, as an opinion based
4   on her review of the photographs.
5        THE COURT:  As a forensic.
6        MS. REYNOLDS:  As a forensic
7   pathologist.
8        THE COURT:  Pathologist.
9        MS. REYNOLDS:  With experience in doing
10  numerous autopsies involving blunt force trauma.
11       THE COURT:  Okay, thank you.
12       MR. BUSSERT:  Your Honor, could I just
13  note one thing, because I just thought of this as
14  I'm sitting here, and I may actually have to brief
15  this.  But based on Dr. Shaw's testimony, it appears
16  that all three of the assistant medical examiners
17  were present when these autopsies were performed.
18  It sounds almost as a simultaneous type thing.
19       I guess there is two issues.  One, Dr.
20  Williams would have been tainted by being present
21  with Dr. Evangelista, but two, given that the fact
22  that she's already testified, I know that -- I
23  believe at least with respect to, let's say, DEA
24  agents who testify as experts, the case law I
25  believe in this circuit is fairly clear that they
```

1575

```
1   can't then be offered to testify -- if they were
2   involved in the investigation, they can't then also
3   be called as an expert on drug activity if they're
4   actively involved in the investigation.  This would
5   seems to present an analogous situation.
6        If I can look at that.  If my memory of
7   the law is correct on that, you can't, let's say,
8   have the investigating case agent also be the
9   expert, that there has to be delineation so as not
10  to impermissibly taint their opinion one way or the
11  other, their testimony, and I think there is case
12  law.
13       THE COURT:  All right, I will invite
14  that case law tomorrow, please.
15       MR. BUSSERT:  Thank you, your Honor.
16       (Recess)
17       THE COURT:  All right, please be seated.
18  We'll bring in the jury.
19       MR. MARKLE:  The next witness is John
20  Taylor.
21       THE COURT:  The next witness is Mr.
22  Taylor?
23       MR. MARKLE:  Yes, do you want to have
24  him brought in?
25       THE COURT:  Yes.
```

1576

```
1   		All right, good morning, Mr. Taylor.
2   Bring in the jury.
3   		(Jury entered the courtroom.)
4   		THE COURT:  All right, please be seated,
5   ladies and gentlemen.
6   		All right, Mr. Taylor, will you please
7   stand and raise your right hand and the oath will be
8   administered to you.  And the microphone is movable,
9   so you can move it so you can speak into it.
10  		J O H N    T A Y L O R,
11  Having first been duly sworn, was examined and
12  testified as follows:
13  		THE WITNESS:  John Taylor, t-a-l --
14  t-a-y-l-o-r.  Residence, North Carolina, Pinetops.
15  		THE COURT:  All right, you may proceed.
16  DIRECT EXAMINATION
17  BY MR. MARKLE:
18  	Q.   Good morning, Mr. Taylor.
19  	A.   All right.
20  	Q.   Mr. Taylor, we've talked before, correct?
21  	A.   Yes, sir.
22  	Q.   On a number of occasions?
23  	A.   Yes, sir.
24  	Q.   I haven't seen you in about a week or so,
25  though, correct?
```

1577

```
1   	A.   Yes, sir.
2   	Q.   And can you tell the ladies and gentlemen
3   of the jury how old you are?
4   	A.   Thirty-five.
5   	Q.   And what's your birthday?
6   	A.   5/30 -- 5/30/76.
7   	Q.   And how far have you gone in school,
8   Mr. Taylor?
9   	A.   To my 9th grade year.
10  	Q.   And did you complete 9th grade?
11  	A.   No, sir.
12  	Q.   You dropped out of school at that time?
13  		MR. BUSSERT:  Objection.
14  	A.   Yes, sir.
15  		MR. BUSSERT:  Leading.
16  	Q.   What happened in 9th grade?
17  	A.   I didn't never finish school.  That was it.
18  	Q.   Are you known by any other names other than
19  John Taylor?
20  	A.   Yes.
21  	Q.   What's that?
22  	A.   Yes Yes and Black.
23  	Q.   Yes Yes?
24  	A.   Yes, sir.
25  	Q.   Where did that name come from?
```

1578

```
1   	A.   It was just a street name I carried when I
2   came up here.
3   	Q.   When you came up?
4   	A.   Yes, sir.
5   	Q.   Came up from where?
6   	A.   North Carolina.
7   	Q.   So, people you called you Yes Yes for a
8   number of years or only recently?
9   	A.   Only recently.
10  	Q.   And for how long have you been known as Yes
11  Yes?
12  	A.   Probably like four, five months maybe, at
13  least.  It wasn't that long.
14  	Q.   You said when you were in North Carolina?
15  	A.   No, when I was in up here.
16  	Q.   That's when you began to be called Yes Yes?
17  	A.   Yes, sir.
18  	Q.   So, we'll go through when you ended up up
19  here.  But any other names?
20  	A.   Black.
21  	Q.   And when did you start being referred to as
22  Black?
23  	A.   The same time I got Yes Yes.
24  	Q.   And where were you born?
25  	A.   Edgecomb County.
```

1579

```
1   	Q.   And where was that, what state?
2   	A.   Tarboro, North Carolina.
3   	Q.   And did you grow up there?
4   	A.   Yes, sir.
5   	Q.   And who did you live with as a kid?
6   	A.   My grandmother.
7   	Q.   And did you live with your mom?
8   	A.   No, she passed away.  My grandmom and
9   grandfather raised us, raised me and my sister.
10  	Q.   And do you remember how old you were when
11  your mom passed away?
12  	A.   No.
13  	Q.   Do you remember your mom?
14  	A.   No.
15  		MR. BUSSERT:  Objection, relevance.
16  		THE COURT:  Overruled, it's just
17  background.
18  	Q.   How about your dad, did you live with your
19  dad?
20  	A.   No, my dad came live with me -- with his
21  mother.  He was a rolling stone; basically, he was
22  here, he was there.
23  	Q.   So, he wasn't always with you?
24  	A.   No.
25  	Q.   So, you were raised by who?
```

**GA1603**

1580

```
1    A.   Grandfather and grandmother.
2    Q.   And do you have brothers and sisters?
3    A.   Yes.
4    Q.   How many brothers?
5    A.   Two brothers.
6    Q.   And how many sisters?
7    A.   Three sisters.
8    Q.   Are they half sisters?
9    A.   Yes.
10   Q.   And brothers?
11   A.   Yes.
12   Q.   And where did you go to high school or
13   school up until the 9th grade?
14   A.   Southwest High School.
15   Q.   And where was that?
16   A.   Pinetop.
17   Q.   Is that North Carolina?
18   A.   Yes, sir.
19   Q.   And are you presently in or out of prison?
20   Are you in prison?
21   A.   Yes, sir.
22   Q.   And are you taking any courses in prison?
23   A.   Yes, GED courses.
24   Q.   And how often do you take courses there?
25   A.   They only come like twice a week, so
```

1581

```
1    sometimes -- they try to get the juveniles in first
2    before they put people that's older.
3    Q.   So, you go to classes while you are in
4    prison?
5    A.   Yes, sir.
6    Q.   And have you gotten your GED yet?
7    A.   I have got my GED before, but I lost the
8    certificate and the wallet size, and, but I just --
9    I just want to get another one.
10   Q.   So, you have to go through it again?
11   A.   Yes, sir.
12   Q.   And have you ever lived in Connecticut?
13   A.   Yes.
14   Q.   And where did you live when you were in
15   Connecticut?
16   A.   Norwalk.
17   Q.   And why did you come up -- did you come to
18   Norwalk from North Carolina?
19   A.   Yes.
20   Q.   Why did you come to Connecticut?
21   A.   Change of life.  I wanted something
22   different.  I want to start over because when I was
23   down North Carolina I was just always into selling
24   drugs or hanging around the wrong people.
25   Q.   Getting in trouble in North Carolina?
```

1582

```
1    A.   Yes.
2    Q.   Going to jail?
3    A.   Yes.
4              MR. BUSSERT:  Leading, objection.
5              THE COURT:  Sustained.  Please don't
6    lead.
7    Q.   When you came to Connecticut, about how old
8    were you when you came to Connecticut?
9    A.   I think I was 30.
10   Q.   And who did you live with?
11   A.   My aunt.
12   Q.   And what was her name?
13   A.   Annie Lomba.
14   Q.   And were you working or selling drugs when
15   you lived with your aunt?
16   A.   I wasn't, I was working.
17   Q.   And what kind of jobs did you have?
18   A.   It was just this guy she knew that was
19   unloading, I was unloading drywalls off of a boom
20   truck and we was putting the drywalls inside the
21   buildings.  And that didn't work out, so I went and
22   found another job at Shop-Rite, a night stocker.
23   Q.   And did you do any other work?  Did you
24   work at a club or anything like that?
25             MR. BUSSERT:  Objection, leading.
```

1583

```
1              THE COURT:  Overruled.
2    Q.   Did you have any --
3    A.   Yes, I was a bouncer at nightclubs.
4    Q.   And you indicated that -- well, let me ask
5    you this:  For how long did you live with your aunt
6    in Connecticut, about?
7    A.   I came up in '04, November '04, so
8    roundabout maybe like in January.
9    Q.   And why did you leave your aunt's house?
10   A.   Because the guy she then wanted me to work
11   with, he wasn't paying me.  Like I was getting $75 a
12   day and I was working all day long, so he wasn't
13   paying me.  So I told him I didn't want to work with
14   him no more.
15   Q.   So, he was paying you, but not enough?
16   A.   Yes.
17   Q.   And why did that mean you left your aunt's
18   house, though?
19   A.   Because she felt like I didn't want to work
20   and this time I was just sitting around.  There
21   wasn't no jobs hiring.  So, I was going out every
22   day looking for doing -- going to Manpower, temp
23   agencies and stuff like that, doing application, but
24   she wanted me to do more, go more, go more, go more.
25   And I told her I was going as far as I could go to,
```

**GA1604**

1584

```
1    I couldn't get anything.
2        Q.   This was 2004?
3        A.   Yes, and led into 2005.
4        Q.   And did you have felony convictions by that
5    time?
6        A.   Yes, I already had felony conviction.
7        Q.   Did that help or hurt you get jobs?
8        A.   Hurt.
9        Q.   And when you left your aunt's house, did
10   you -- where did you go?
11       A.   When I left my aunt house I went to stay
12   with my cousin Amy.
13       Q.   And where did she live?
14       A.   Washington Village.
15       Q.   And what town was that in, city?
16       A.   Norwalk.
17       Q.   And when you lived with her, did you -- did
18   there come a time when you sold drugs again?
19       A.   Not right as soon as I start move in with
20   her.  That's when I had found another -- I landed
21   another job.  I was doing demolition in Bridgeport,
22   and I was doing that every week.
23       Q.   Were you giving money to Amy for rent?
24       A.   Yes.
25       Q.   And was it just the two of you would be
```

1585

```
1    there?
2        A.   Yes, sir.
3        Q.   And what happened with that living
4    arrangement?
5        A.   Well, at the time when I moved in I was
6    giving her rent money, and she was already had
7    eviction notice and I didn't know it, and at the
8    time I was working in Bridgeport, and my other
9    cousin called me and she said --
10            MR. BUSSERT:  Objection, hearsay.
11            MR. MARKLE:  Your Honor, I'm not
12   offering it for the truth, I'm offering it to show
13   what happened to him and where he lived.
14            THE COURT:  All right, is it possible to
15   just do that without conveying what she says?
16       Q.   Without -- don't tell me what anyone said
17   to you, but you learned of an eviction notice; is
18   that correct?
19       A.   Yes.
20       Q.   And did you go back to that apartment?
21       A.   Yes, it wasn't nothing there.  I couldn't
22   get back in because they took --
23       Q.   Why?
24       A.   The housing development took all the stuff.
25       Q.   And what happened to the stuff you had
```

1586

```
1    there?
2        A.   They had it, the housing development.
3        Q.   Did you ever get it back?
4        A.   No.
5        Q.   So, what were you left with at that time?
6        A.   The clothes I had on.  I worked in a dirty
7    pair of pants, a dirty shirt, boots, and that was
8    it, and a jacket.
9        Q.   And what did you do at that time?
10       A.   I didn't really couldn't do nothing, but
11   just get up the next morning and go back to work and
12   try to find how to get in touch with the housing
13   development, I would be able to go through the
14   stuff, find my clothes.
15       Q.   Did you ever get your stuff back?
16       A.   Yes, I -- no, I went.  I found the place,
17   somewhere in Stamford, I found it, but there was so
18   much stuff I couldn't go find it.  It was like in a
19   big container, and I tried to go through and I
20   couldn't find none of my stuff, so I just left it
21   alone.
22       Q.   So, where did you go and live?
23       A.   I went and stayed with my other cousin.
24       Q.   And who was that?
25       A.   Trish.
```

1587

```
1        Q.   And where was that?
2        A.   Norwalk, Washington Village.
3        Q.   Again in Norwalk?
4        A.   Yes.
5        Q.   And at that time did you remain -- did you
6    keep your job?
7        A.   Yes.
8        Q.   And did you help her with rent?
9        A.   Yes.
10       Q.   And did there come a time when you -- did
11   you -- for how long did you keep that job?
12       A.   I stayed around for like -- well, the job
13   stayed around for, like, two weeks, and then after I
14   finished that job he say he had another house for me
15   to do, but he didn't never get the contract for it.
16   So he just told me he was going to keep me on
17   standby.
18       Q.   And did you ever get called again to do
19   demolition work?
20       A.   No.
21       Q.   What did you do to make money at the time?
22       A.   Well, at the time I was still working on at
23   the nightclub on weekends, Friday, Saturday and
24   Sunday, so I kept that.  That money wasn't coming in
25   too much good.  That wasn't coming in either.  So
```

1588

```
1    her rent, how she was staying, I was making sure she
2    had money, you know, for just don't want to stay
3    with nobody free, you want to give them money for
4    the food and the rent and stuff.  I mean, I'm a big
5    guy, I like to eat.  So I had to give her money for
6    rent; I had to give her money for food and stuff
7    like that, so...
8        Q.   She's definitely charging you for food?
9        A.   Yes.  So I had -- I came down with -- the
10   job let me go, I had to come down, make a decision,
11   well, what I going to do.  I have a couple dollars
12   left, so I'm trying to look to buy drugs for to make
13   some money when I'm not working.
14       Q.   And did you in fact start to sell drugs?
15       A.   Yes.
16       Q.   And who did you -- how did that come about?
17   Who did you first meet in Connecticut when you were
18   living in Norwalk?
19       A.   This guy named Kosher.
20       Q.   Is that his full name?  Do you know
21   anything more than Kosher?
22       A.   No, that's the only name I know.
23       Q.   Do you know if that's his first name, last
24   name, real name?
25       A.   That's the only thing I know him by.
```

1589

```
1        Q.   Where did you meet him?
2        A.   Washington Village.
3        Q.   And what did you talk about with him?
4        A.   I told him, you know, that I didn't really
5    know too much people up here, that I didn't want to
6    mess with a lot of people.  I said, do you know
7    anybody I could be able to get work from?  He said,
8    it depend what you looking for.  I told him, I said,
9    well, I ain't really looking for selling crack, I
10   had enough, I did enough time with that.  So I told
11   him I said -- he said, well, how about some
12   marijuana?  So, I said, okay.
13       Q.   And did you -- did he introduce you to
14   someone who you could get marijuana from for resale?
15       A.   Yes.
16       Q.   And who was that?
17       A.   Dreddy.
18       Q.   And how did -- did you know Dreddy before
19   that?
20       A.   No.
21       Q.   Had you ever met Dreddy before that?
22       A.   Never met him.
23       Q.   So, who introduced you to Dreddy?
24       A.   Kosher.
25       Q.   I'm going to show you what's been marked
```

1590

```
1    Government's Exhibit 206, ask you if you recognize
2    the person in that photograph?
3        A.   Yes.
4        Q.   Who is that?
5        A.   Dreddy.
6        Q.   And after Kosher introduced you to Dreddy,
7    what, if anything, happened in regards to marijuana
8    sales?
9        A.   He had just left and came back like two
10   days later.  When he came back two days later, he
11   called me on my cell phone, he was, like, come
12   outside.  I'm, okay.  I came outside, we met in a
13   big park, and that's when him and some other guy
14   came over there and all of us started talking.  He
15   said, well, how much can I move.  I said -- I told
16   him, I said at the time I don't really know because
17   I'm not familiar with this place, I'm just looking
18   for to make some money.
19       Q.   Who asked you how much can you move?
20       A.   Dreddy.
21       Q.   Is that the person who did the talking?
22       A.   Yes.
23       Q.   The questioning?
24       A.   Yes.
25       Q.   And you told him you weren't sure.  So what
```

1591

```
1    happened after that?
2        A.   We started talking and one thing led to
3    another.  He just saying that, well, I'm going to go
4    see what's going to happen, I'm going to see.
5            MR. BUSSERT:  Objection, your Honor,
6    this is just part of the continuing objection we've
7    had with several of these witnesses.
8        Q.   Without telling me what he said, did there
9    come a time you got marijuana?
10           MR. BUSSERT:  Objection.
11           THE COURT:  He's rephrasing.  Your
12   objection is moot.
13       A.   Yes, ma'am.
14       Q.   Who did you get it from?
15       A.   Dreddy.
16       Q.   How did you get it?  Did you go to
17   Bridgeport or did he come to Norwalk?
18       A.   He came to Bridge -- well, I came to
19   Bridgeport and he came to Norwalk.
20       Q.   And would you always get it from Dreddy?
21       A.   Sometimes.  And like once I got -- I think
22   once or twice I got it from his brother.
23       Q.   At the beginning did you always get it from
24   Dreddy?
25       A.   Yes.
```

1592

1    Q.   And how was it packaged?
2    A.   In little bubble gum bottle.
3    Q.   How many bubble gum containers would you
4  get?
5    A.   I can't -- I can't remember, but I know it
6  was about like -- like maybe $1,000, $500 worth,
7  200.  It wasn't that much bottles, it was just like
8  the worth, like the price of the bottle, like there
9  they was $20 a bottle, so he probably give me like
10 $250 worth, but it was, like say it was like 10, 15,
11 20, 30 bottles at a time.
12   Q.   At a time?
13   A.   Yeah.
14   Q.   And how often would you see him?  Would you
15 see him ever day?
16   A.   No, probably like every other day.
17   Q.   Let me show you what's been marked
18 Government's Exhibit 200B and ask you if you -- have
19 you ever seen containers like that, Government's
20 200B?
21   A.   Yes.
22   Q.   And where have you seen those?
23   A.   The bottles that Dreddy gave me.
24   Q.   So, when you are saying the bottles that
25 marijuana was in, this is what you mean?

1593

1    A.   Yes.
2    Q.   This is just like the ones you got it in?
3    A.   Yes.
4    Q.   Almost every time?
5    A.   Yes.
6    Q.   Did it ever come packaged in any other way?
7    A.   No.
8    Q.   And those would be handed to you by Dreddy?
9    A.   Yes.
10   Q.   And what would you do with those bottles
11 containing marijuana?
12   A.   Some I used to smoke and some of them I
13 used to sell.
14   Q.   And how much of the money did you get to
15 keep?
16   A.   If he gave me -- it's hard, it all depends
17 how much he give me.  He probably, like if he give
18 me a thousand bottles, he'd probably say, like, you
19 keep 500 or 250 of it.  It all depended on what he
20 was giving me.  He was giving me a lot, so many, I
21 was moving them so much.
22   Q.   If you had $250 worth, how much would you
23 keep?
24   A.   Probably like 150 of it maybe.
25   Q.   And who -- does the rest go back to him?

1594

1    A.   Him.
2    Q.   And who is "him"?
3    A.   Dreddy.
4    Q.   And who would you give the money to?
5    A.   Dreddy.
6    Q.   And where were you selling the marijuana?
7    A.   In Washington Village.
8    Q.   And when Dreddy would come to Norwalk,
9  would he take a bus, train or drive?
10             MR. BUSSERT:  Objection.
11             THE COURT:  Overruled.  If your
12 objection was leading, overruled.
13   Q.   Bus, train or car, Dreddy?
14   A.   He came in a car.
15   Q.   And do you recall what kind of car he had?
16   A.   He had a burgundy four-door Cadillac and a
17 black four-door Tahoe.
18   Q.   And did you see him driving those vehicles?
19   A.   Yes.
20   Q.   Did you ever sell crack while you were in
21 Norwalk?
22   A.   No, but he had gave me some.
23   Q.   And who's "he"?
24   A.   Dreddy.
25   Q.   And did you use crack?

1595

1    A.   No.
2    Q.   Have you ever used crack?
3    A.   No.
4    Q.   Do you use marijuana?
5    A.   Yes.
6    Q.   Smoke it?
7    A.   Yes.
8    Q.   Any other drugs?
9    A.   No.
10   Q.   Cocaine?
11   A.   No.
12   Q.   Heroin?
13   A.   No.
14   Q.   And why wouldn't you -- you said he gave
15 you crack, but you would not sell it?
16   A.   No.
17   Q.   Why was that?
18   A.   I got a lot -- I got a lot of run-ins with
19 crack cocaine, so I decide I didn't want to deal
20 with crack cocaine no more.  I just didn't want to
21 bother with it no more.  I knew how to sell it, but
22 just coming to a new area, you already know who the
23 streetwalkers is and you don't know who the cops is,
24 and you don't know -- I just didn't want to deal
25 with that, getting arrested and coming to jail.

**GA1607**

1596

1    Q.    Were you aware of the penalties for selling
2  crack cocaine?
3    A.    Yes.
4    Q.    Were you aware of the penalties for selling
5  marijuana?
6    A.    Yes.
7    Q.    Were the crack cocaine penalties better or
8  worse than marijuana?
9    A.    The crack cocaine was worser than
10 marijuana.
11   Q.    Was that part of the reason?
12   A.    Yes.
13   Q.    Who were you living with at this time when
14 you were selling the marijuana on a regular basis?
15   A.    I was staying with my cousin and I had left
16 and start staying with another female.
17   Q.    And who was that?
18   A.    Denita.
19   Q.    Now, after you sold marijuana for a period
20 of time for Dreddy, did you, you know, know him by
21 any other name?
22   A.    No.
23   Q.    Did you know his real name?
24   A.    No.
25   Q.    After you sold marijuana for some time for

1597

1  Dreddy, did you ever go on a trip with Dreddy?
2    A.    Yes.
3    Q.    And do you recall around when that trip
4  was?
5    A.    It was like -- maybe like the first two
6  bags I got from him, and then less than two weeks, a
7  week, one of those.  And he called me up, told me,
8  he said, you from North Carolina.  I was, like, yes.
9  Then he was, like, I'm thinking about taking a trip.
10 I said, okay.  He said, would you like to go.  And I
11 said, no problem.
12   Q.    And was it your idea to go on the trip or
13 his?
14   A.    No, it was his idea.
15   Q.    And did you know where you were going to go
16 besides North Carolina -- did you say North
17 Carolina?
18   A.    No, I didn't know, he just told me just
19 pack up.
20   Q.    You didn't know exactly where you were
21 going?
22   A.    No.
23   Q.    And did you have any legitimate job at the
24 time?
25   A.    No.

1598

1    Q.    The only thing you were doing was selling
2  marijuana?
3    A.    Yes.
4    Q.    And what did you tell him when he asked if
5  you wanted to go on a trip?
6    A.    Yeah.  I told him, yeah, I'll go.
7    Q.    Did you have money from selling marijuana?
8    A.    Yes.
9    Q.    And did you, in fact, go on the trip?
10   A.    Yes.
11   Q.    And did anyone else go on the trip with
12 you?
13   A.    Dreddy, his girlfriend, and his brother and
14 I.
15   Q.    And do you know -- how did you know his
16 brother, by what name?
17   A.    The name that Dreddy told me, he said
18 Ziggy.
19   Q.    And did you know his girlfriend's name?
20   A.    No.
21   Q.    Did he tell you it and you just don't
22 remember it or --
23   A.    I -- well, the only thing I know is Shante,
24 Charmaine, Shante or Charmaine.
25   Q.    And I'm going to show you a photograph and

1599

1  ask you if you recognize this person, this man?
2    A.    Yes.
3    Q.    Government 207, who is that?
4    A.    That's Ziggy.
5    Q.    That's the person you knew as Ziggy?
6    A.    Yes.
7    Q.    And he went on the trip?
8    A.    Yes.
9    Q.    And did you -- how many -- so four people
10 went?
11   A.    Yes.
12   Q.    And how many cars did you go in?
13   A.    Two cars.
14   Q.    And did Ziggy drive a car or not?
15   A.    Yes.
16   Q.    And what kind of car did he have?
17   A.    Jeep Cherokee.
18   Q.    And do you know if that was his car or a
19 rental car?
20   A.    A rental.
21   Q.    And who drove -- who was the passenger in
22 Ziggy's car?
23   A.    Me.
24   Q.    You?
25   A.    Yes.

**GA1608**

1600

```
1     Q.   And what was the other car that was used to
2  go south?
3     A.   The burgundy Cadillac.
4     Q.   And who drove that car?
5     A.   Dreddy.
6     Q.   And who was riding with Dreddy?
7     A.   His girlfriend.
8     Q.   And on the way down did you have occasion
9  -- did you stop for gas?
10    A.   Yes.
11    Q.   And who paid for the gas?
12    A.   Dreddy.
13    Q.   For both cars?
14    A.   Yes.
15    Q.   And who paid for food?
16    A.   Dreddy.
17    Q.   For you?
18    A.   Yes.
19    Q.   For Shante?
20    A.   Yes.
21    Q.   For Ziggy?
22    A.   Yes.
23    Q.   And this was in the summertime, in August?
24    A.   Yes, sir.
25    Q.   And had you ever met Ziggy before this
```

1601

```
1  trip?
2     A.   First time.
3     Q.   And had you ever met Shante before this
4  trip?
5     A.   First time.
6     Q.   The only person you knew was Dreddy?
7     A.   Yes.
8     Q.   And was there anything about Shante that
9  you remember?  Was she physically -- what was her
10 condition?
11    A.   She was pregnant.
12    Q.   Pregnant?
13    A.   Yes.
14    Q.   And what was your understanding of the
15 relationship between her and Dreddy?
16    A.   Boyfriend, girlfriend.
17    Q.   And during the trip, was there any
18 marijuana used?
19    A.   Yes.
20    Q.   And who would use it?
21    A.   Me and Dreddy -- I mean, me and Ziggy.
22    Q.   And do you remember on your way down south
23 stopping anywhere, besides gas stations?
24    A.   Stopped to the Maryland House.
25    Q.   What's the Maryland House?
```

1602

```
1     A.   It's a gas station, a rest stop on 95.
2     Q.   And can you get food there?
3     A.   Yes.
4     Q.   Did you go inside?
5     A.   Yes.
6     Q.   And who went inside besides you?
7     A.   Everybody went inside.
8     Q.   And do you remember eating there?
9     A.   Yes.
10    Q.   And did you eventually get gas and leave?
11    A.   Yes.
12    Q.   And who paid again?
13    A.   Dreddy.
14    Q.   And did you have a cell phone during this
15 trip?
16    A.   Yes.
17    Q.   And did you have it for some time?
18    A.   Yes.
19    Q.   Do you remember your cell phone?
20    A.   504-099 -- oh, no, 0499.
21    Q.   And it's been a while since you've had that
22 phone?
23    A.   Yes.
24    Q.   Do you remember using it on that trip?
25    A.   Yes.
```

1603

```
1     Q.   And do you remember if Dreddy had a cell
2  phone?
3     A.   Yes.
4     Q.   And would you talk to him from car to car?
5     A.   Yes, his brother did.
6     Q.   Ziggy?
7     A.   Yes.
8     Q.   And did Ziggy have a cell phone?
9     A.   Yes, but he left it at the rest stop in the
10 Maryland House.
11    Q.   The one you just talked about?
12    A.   Yes.
13    Q.   And did you go back and get it?
14    A.   No.
15    Q.   So, after you left the Maryland House Ziggy
16 didn't have a phone?
17    A.   No.
18    Q.   So, you said he would talk to his brother,
19 though.  How would he do that?
20    A.   He was using my phone.
21    Q.   Do you remember after the Maryland House
22 where you first went down south?  Where did you
23 stop?  Where did you stop for a night?
24    A.   We got to Virginia.
25    Q.   And did you go anywhere special in
```

**GA1609**

1604

```
1    Virginia?
2         A.    We went to Busch Gardens the next morning.
3         Q.    And who paid for Busch Gardens?
4         A.    Dreddy.
5         Q.    Who paid for the hotel?
6         A.    Dreddy.
7         Q.    Did you have one room or two rooms?
8         A.    Two rooms.
9         Q.    Who did you stay with?
10        A.    Ziggy.
11        Q.    And you actually went to Busch Gardens?
12        A.    Yes.
13        Q.    What did you do there?
14        A.    Well, they rode on rides, but I don't do
15   rides, so they did all the riding and all the stuff.
16        Q.    Did you stay overnight or did you leave
17   Busch Gardens?
18        A.    We stayed at Busch Gardens the whole day,
19   and maybe like late that afternoon we -- that's when
20   Dreddy came up to me, he said, you said you were
21   from North Carolina, right?  I was, like, yeah.  He
22   was, like, well, we want to go to North Carolina,
23   visit some of your people.  I said, okay.
24        Q.    Some of your people?
25        A.    Yes.
```

1605

```
1         Q.    Your family?
2         A.    Whatever it could be, meaning a whole lot,
3    like family, my peoples.
4         Q.    You were okay with that?
5         A.    Yes.
6         Q.    And did you, in fact, go to North Carolina?
7         A.    Yes.
8         Q.    Do you remember where?
9         A.    Pinetops.
10        Q.    And did you have family there?
11        A.    Yes.
12        Q.    Did you visit family?
13        A.    Yes.
14        Q.    And still all four of you went?  You,
15   Ziggy --
16        A.    Yes, all four of us.
17        Q.    -- Shante and Dreddy?
18        A.    Yes.
19        Q.    Two cars?
20        A.    Two cars.
21        Q.    And what family member -- do you remember
22   who you went to visit in North Carolina?
23        A.    Well, I called some friends, I told them, I
24   said I was coming to North Carolina.  I told them, I
25   said depending what time we get there, do you think
```

1606

```
1    you be able to fire up a grill.  They said, yeah.
2    So we stopped by some friends' house first.
3         Q.    So, you were going to have a cookout?
4         A.    Yes.
5         Q.    And did you bring food to that cookout?
6         A.    We didn't -- it didn't happen that same
7    night we got there, but the next day we had a
8    cookout.
9         Q.    Down in North Carolina?
10        A.    Yes.
11        Q.    And did you guys bring food to it?
12        A.    Yes.
13        Q.    And where did you get the food from?
14        A.    Piggly Wiggly.
15        Q.    And why did you go to a Piggly Wiggly?
16        A.    It's the only grocery store in Pinetops.
17        Q.    Pinetops is a relatively small town?
18        A.    Yes.
19        Q.    And did you pay for that?
20        A.    No, I think Charmaine or -- somebody.
21   Charmaine.  Dreddy and Charmaine went with me.  I
22   took them to the Piggly Wiggly.
23        Q.    I'm going to show you a picture, when I can
24   find it -- I'm saying Shante and you're saying
25   Charmaine.  Was there only one woman that went on
```

1607

```
1    the trip?
2         A.    Yes.
3         Q.    Same woman that went all the way from
4    Connecticut down south?
5         A.    Yes.
6         Q.    The person who was pregnant?
7         A.    Yes.
8         Q.    Where did you stay when you were down in
9    North Carolina near Pinetops?
10        A.    We -- that night when we got there we left
11   and went to a hotel in Greenville.
12        Q.    And the next day you had the barbecue?
13        A.    Yes.
14        Q.    And where did you stay that night?  Do you
15   remember?  Did you stay in the area?
16        A.    We still stayed -- we still went back to
17   the hotel.
18        Q.    And while you were at the barbecue, or
19   cookout, did you ever leave that -- was it, at
20   whose house?
21        A.    A friend of mines, Annie.
22        Q.    Annie?
23        A.    Uh-huh (indicating affirmatively).
24        Q.    Did you ever leave there with Ziggy?
25        A.    Yes.
```

1608

```
1    Q.   For what purpose?
2    A.   We needed some marijuana, so I told him I
3  knew a couple places we can go.
4    Q.   Did you find some marijuana?
5    A.   Yes.
6    Q.   And did you visit any other family members
7  while you were in the Pinetops area?
8    A.   Yes, we stopped to where my aunt house.
9    Q.   And what's her name?
10   A.   Laura Willoughby.
11   Q.   Laura Willoughby?
12   A.   Yes.
13   Q.   And who went to your aunt's house with you?
14   A.   Ziggy.
15   Q.   Did Dreddy or Shante?
16   A.   No, just me and Ziggy.
17   Q.   Did you stay in the area of Pinetops that
18 night?
19   A.   Yes.
20   Q.   Do you remember where you stayed?
21   A.   We went back to the cookout.
22   Q.   And where did you sleep that night?
23   A.   Went back to the hotel.
24   Q.   So you left your aunt's house, went back to
25 the cookout?
```

1609

```
1    A.   Yes, we just --
2    Q.   -- to the hotel?
3    A.   Yes, yes.
4    Q.   The next day, did you stay in North
5  Carolina or did you go somewhere else?
6    A.   The next morning we woke up, we was like,
7  well, we went to -- I think it was KFC, and he was,
8  like, well, we going to be on our way to Georgia.
9  So, I was like --
10   Q.   Did you say KFC?
11   A.   Yes, sir.
12   Q.   You are having breakfast, lunch?
13   A.   I think it was like after twelve, okay, I
14 think it was.  KFC was open, so it had to be after
15 twelve.
16   Q.   And there was talk about going where?
17   A.   To Georgia.
18   Q.   And was that your decision?
19   A.   No.
20   Q.   Were you willing to go there?
21   A.   Yeah.
22   Q.   And did you guys go to Georgia?
23   A.   Yes.
24   Q.   On the way to Georgia, did anything happen
25 with the police?
```

1610

```
1    A.   Yes, we got pulled over.
2    Q.   Who got pulled over?
3    A.   Me and Dreddy.  I mean, me and Ziggy.
4    Q.   And why did you get pulled over?
5    A.   It was a state trooper sitting in the
6  middle in the median on the side, and it was another
7  car, we was behind it, and that car, when he seen
8  the state trooper, he put on brakes.  And so when he
9  put on brakes it made Ziggy like start going in
10 front, like he put on brakes, he got real close to
11 him, and so the cop just pulled us.
12   Q.   You got pulled over?
13   A.   Yes.
14   Q.   Did they search the car?
15   A.   Yes.
16   Q.   Did they find marijuana?
17   A.   No.
18   Q.   Did they find anything?
19   A.   They found a gun.
20   Q.   Was it your gun?
21   A.   No.
22   Q.   Where was the gun?
23   A.   Up under Ziggy's seat.
24   Q.   Did you see it?
25   A.   No.
```

1611

```
1    Q.   Did you see it before you got in the car?
2    A.   No.
3    Q.   You only saw it after the police found it?
4    A.   Yes.
5    Q.   Were you arrested for that?
6    A.   No.
7    Q.   Was Ziggy?
8    A.   No.
9    Q.   Did they give you back the gun?
10   A.   No.
11   Q.   So, they took the gun and you -- where did
12 you go?  Did you have to go to the police station or
13 anything?
14   A.   No, we just got back in the car and drove
15 off.
16   Q.   While you were stopped by the police, did
17 anyone -- where was Dreddy and Shante?
18   A.   They was already -- they pulled off at the
19 next exit.
20   Q.   Did they know something had happened?
21   A.   Well, at the time -- well, they knew that
22 we got pulled over.  So when we got pulled over the
23 cop came over to the car and got Ziggy's license and
24 he went back to the car, and then he came back to
25 the car and grabbed Ziggy out of the car, and that's
```

**GA1611**

1612

1 when Charmaine called me on my cell cell phone.
2    Q.   She called you while you were there with
3 the police being pulled over?
4    A.   Yes.
5    Q.   And why was that?
6    A.   She just called me and said, what's your
7 name, and I told her my name.
8    Q.   She didn't know your real name?
9    A.   No.
10    Q.   What did she know you as on the trip up
11 'til then?
12    A.   Yes Yes.
13    Q.   So, where did you get that name Yes Yes?
14    A.   It was just when I first came up I wasn't
15 really talkative person, all I would say yes, yes,
16 and that's about it.
17    Q.   Was it before you met Dreddy?
18    A.   Yes.
19    Q.   Before you met Ziggy?
20    A.   Yes.
21    Q.   Okay.  And how about Black, did you have --
22 when did you get that name?
23    A.   When I met Dreddy and Ziggy.
24    Q.   So, you didn't have that name before?
25    A.   No.

1613

1    Q.   Now, so, when you gave her your real name,
2 what did you tell her your real name was?
3    A.   John Taylor.
4    Q.   And do you know why she wanted your real
5 name?
6    A.   No.
7    Q.   Did it look like you were going to be
8 arrested at the time?
9    A.   No.
10    Q.   Did you know?
11    A.   No.
12    Q.   Did you -- so, the police let you go, but
13 they took the gun.  Did you find Shante and Dreddy?
14    A.   Yes, we got back in the car and went to the
15 next exit, and when we got to the next exit it was a
16 car lot -- not a car lot, like somewhere they fix
17 cars, mechanics, and we pulled over and we asked the
18 guy, we, like, you see a guy with a burgundy car?
19 He said, well, take the next exit.  So we got back
20 to the highway and took the next exit and that's
21 when we seen him at the hotel.
22    Q.   This is like a car repair shop?
23    A.   Yes.
24    Q.   So, you found Dreddy and Shante?
25    A.   Yes.

1614

1    Q.   And were they, in fact, at the next exit?
2    A.   Yes.
3    Q.   And where?
4    A.   At a hotel.
5    Q.   And did you stay at that hotel then?
6    A.   No, they had got the room and then I
7 overheard Charmaine -- well, Dreddy was telling
8 Charmaine, do you think we should stay there, and
9 Charmaine -- Dreddy was, like, no, everything came
10 already -- no, Ziggy said to Dreddy that --
11         MR. BUSSERT:  Objection, your Honor.
12    A.   -- that everything was okay.
13         THE COURT:  Can we start back.  So, the
14 question was:  "And did you stay at the hotel that
15 night?"  Do you want to clarify what hotel you are
16 referring to?
17    Q.   Right, after you were stopped by the police
18 you met up with them again by a hotel, correct?
19    A.   Yes.
20    Q.   And are you in Georgia at this time?
21    A.   No, still in North Carolina.
22    Q.   Okay.  And did you -- just yes or no -- did
23 you stay at the hotel that night?
24    A.   No.
25    Q.   And did you continue to drive?

1615

1    A.   Yes.
2    Q.   And where did you go?
3    A.   Georgia.
4    Q.   And where did you stay -- did you stay in
5 Georgia overnight?  Did you get a hotel that night?
6    A.   When we got to Georgia that night, yes.
7    Q.   You stayed at a hotel?
8    A.   Yes.
9    Q.   And did you meet anyone before you went to
10 the hotel, or did you go straight to a hotel?
11    A.   He was -- he was calling his uncle, but he
12 didn't never get -- he didn't get in contact with
13 him, so we stayed in a hotel.
14    Q.   Who is "he"?
15    A.   Dreddy.
16    Q.   So, it appeared he had family in Georgia?
17    A.   Yes.
18    Q.   And did you eventually go to anyone related
19 to Dreddy's home?
20    A.   Yes.
21    Q.   And do you know what the relationship was
22 with the person?
23    A.   Uncle.
24    Q.   And did you spend some time there?
25    A.   Yes.

1616

```
1    Q.   And what were you doing there?
2    A.   We went to his uncle house, stayed with him
3  that night.  He got up with one of his other -- his
4  cousins, and we would chill with them that night and
5  play spades and smoke more weed.
6    Q.   And did you have food and things like that?
7    A.   Yes.
8    Q.   And did there come a time while you were at
9  his cousin's house that you had a conversation with
10 Dreddy?  Did you have a talk with Dreddy?
11   A.   Yes.
12   Q.   And what did he tell you about?  Did he
13 talk to you about Connecticut?
14        MR. BUSSERT:  Objection.
15   Q.   What did he talk to you about?
16        MR. BUSSERT:  Objection.
17        THE COURT:  May I see you at sidebar,
18 please.
19            (Sidebar conference)
20        THE COURT:  What is your claim of -- why
21 is this not hearsay?
22        MR. MARKLE:  This is a co-conspirator
23 now, your Honor.  This is the beginning of the
24 conspiracy.
25        THE COURT:  What's the subject?  What's
```

1617

```
1  he going to say they talk about?
2        MR. MARKLE:  He is going to say he needs
3  his help in Connecticut.
4        THE COURT:  Mr. Bussert?
5        MR. BUSSERT:  Well, your Honor, I don't
6  think there is any claim that at this point that Mr.
7  Johnson is part of the conspiracy.
8        MR. MARKLE:  No, conspirators come in
9  and out of conspiracies at all different times, he
10 obviously comes in later.
11        THE COURT:  So, if this is when the
12 government claims that the conspiracy that's charged
13 in the indictment started, it seems to me that's an
14 exception.  Why not?
15        MR. BUSSERT:  Well, again, your Honor,
16 I'd claim, first, I didn't feel or I don't believe
17 that -- it would be similar if somebody actually
18 terminated from the conspiracy, right?  If you look
19 at it from the backside, which is there is a
20 conspiracy and somebody terminated, conversations
21 between former co-conspirators after the fact could
22 not be used.  I don't believe it is admissible
23 against the person after that point, after the --
24 their role in the conspiracy has ended.  I think
25 here you have an analogous situation in terms of Mr.
```

1618

```
1  Johnson wasn't part of anything at this point, he
2  wasn't staying in Bridgeport while this is going on.
3        THE COURT:  But that doesn't matter if
4  the conspiracy is underway.  So I will overrule the
5  objection and admit it conditionally to it being
6  shown to have been made in the course of and in
7  furtherance of the conspiracy that's charged.  Thank
8  you.
9            (Sidebar concluded)
10   Q.   Do you remember the question?
11   A.   No, sir.
12   Q.   Did you have a conversation with Dreddy
13 while you were at his cousin's house?
14   A.   Yes.
15   Q.   And did he say anything to you about
16 Connecticut?
17   A.   Yes.
18   Q.   What did he say?
19   A.   He said, would you help me when we get back
20 to Connecticut.
21   Q.   And did he say specifically what the help
22 was that he needed at that time?
23   A.   No.
24   Q.   And what did you say?
25   A.   Yes.
```

1619

```
1    Q.   And did you also hear Dreddy and Ziggy
2  talking about something that same -- around that
3  same time?
4    A.   Yes.
5    Q.   And what did you -- what did you hear them
6  talking about?
7        MR. BUSSERT:  Same objection, your Honor
8  for the record.
9        MR. MARKLE:  The same claim, your Honor.
10        THE COURT:  Same ruling.
11   Q.   What did you hear them talking about?
12   A.   He said that he had a problem with somebody
13 in the building he was in, that -- well, somebody in
14 his building was selling drugs out of his building.
15   Q.   And who said that?
16   A.   Dreddy to his brother.
17   Q.   And was anyone else involved in that
18 conversation?
19   A.   No.
20   Q.   He had a problem with somebody in his
21 building selling drugs?
22   A.   Yes.
23   Q.   And did you hear any further conversation
24 at that time?
25   A.   No, sir.
```

**GA1613**

1620

```
1    Q.   And where did you stay that night?
2    A.   We left, stayed with his uncle.
3    Q.   And do you recall the next day after you
4  stayed with his uncle where you went?  Did you stay
5  in Georgia?  Where did you go?
6    A.   No, the next morning we got up and started
7  going back -- coming back to Connecticut.
8    Q.   So, the morning after you heard this
9  conversation with somebody selling in his building
10  you headed north?
11    A.   Yes.
12    Q.   And same situation, are you -- who are you
13  driving with?
14    A.   With Ziggy.
15    Q.   And same vehicle?
16    A.   Yes.
17    Q.   And Dreddy and Shante?
18    A.   Yes.
19    Q.   Same burgundy Cadillac?
20    A.   Yes.
21    Q.   And along the way back, did you understand
22  you were heading home at this time?
23    A.   Yes.
24    Q.   And did you stop at any hotels between
25  Georgia and Connecticut?
```

1621

```
1    A.   No, I guess when we got -- I don't know
2  exactly where we was at the -- I don't know if it
3  was in Jersey or somewhere, but we stopped at a
4  little stop restaurant, a little area where you
5  just -- rest area, and Dreddy stopped there and
6  Ziggy stopped there.  So Dreddy was parked on this
7  side and we was parked right here right beside each
8  other and everybody took a nap.
9    Q.   And you remember that because you all took
10  a nap?
11    A.   Yes.
12    Q.   So, no hotel?
13    A.   No hotel.
14    Q.   No family?  Just in the car?
15    A.   Yes.
16    Q.   And while you are on this trip, did Ziggy
17  ever get a phone while you were down south?
18    A.   No.
19    Q.   So, did he continue to use your phone
20  during this trip down and back?
21    A.   Yes.
22    Q.   And when you got back to Connecticut,
23  where -- oh, by the way, the same, Dreddy is still
24  paying for the gas?
25    A.   Yes.
```

1622

```
1    Q.   Did you -- where did you go when you got
2  back to Connecticut?
3    A.   I got dropped off in Norwalk.
4    Q.   And do you recall whether you got home on
5  the weekend, weekday or weekend?
6    A.   I want to say Sunday morning when we got
7  back.  That's what I -- I'm not for sure.
8    Q.   Not for sure?
9    A.   I'm just going to say Sunday.
10    Q.   Best of your recollection it was -- well,
11  that's the best of your recollection?
12    A.   Yes.
13    Q.   Now, after being dropped off at your house,
14  did Ziggy stay there with you?
15    A.   No.
16    Q.   Did Dreddy?
17    A.   No.
18    Q.   So, they went on?
19    A.   Uh-huh (indicating affirmatively).
20    Q.   And did you hear from Dreddy again?
21    A.   Yes.
22    Q.   And how did he get in touch with you?
23    A.   He called me on my cell phone.
24    Q.   And approximately how long was this after
25  you arrived back from the trip south?
```

1623

```
1    A.   I don't exactly remember.
2    Q.   Was it one or two days or one or two weeks?
3    A.   It could have been like one or two days.
4    Q.   And how did he get in touch with you?
5    A.   He called me on the cell phone.
6    Q.   Did you still have marijuana from him to
7  sell?
8    A.   Yes.
9    Q.   And what did he say when he called you on
10  the cell phone?
11    A.   What are you doing, would you come up to
12  Bridgeport.  I said, yeah.
13    Q.   Do you know approximately what time this
14  was?
15    A.   No.
16    Q.   Did you -- so you said yes.  Did you go to
17  Bridgeport?
18    A.   Yes.
19    Q.   How did you get to Bridgeport?
20    A.   I jumped on the train from Norwalk.
21    Q.   Did you have a car of your own?
22    A.   No.
23    Q.   And when you -- so where did you get off
24  the train?
25    A.   Bridgeport.
```

1624

```
1    Q.   And what did you do when you got to
2  Bridgeport?  Did you see anyone?
3    A.   I called him, I told him I was in
4  Bridgeport.
5    Q.   Who did you call?
6    A.   Dreddy.  I mean Ziggy.  No, no, I called
7  Dreddy and Dreddy called Ziggy.
8    Q.   Did you have Ziggy's number?
9    A.   No.
10   Q.   Whose number did you have?
11   A.   Dreddy's.
12   Q.   And when you -- so after you called Dreddy,
13 did anyone come to the train station?
14   A.   Yes.
15   Q.   And who came?
16   A.   Ziggy.
17   Q.   And did Ziggy still have the Jeep rental?
18   A.   No.
19   Q.   What kind of car did he have?
20   A.   A black Toyota Corolla.
21   Q.   And do you remember if it was two doors or
22 four doors?
23   A.   Four doors.
24   Q.   And was anyone else with him?
25   A.   No.
```

1625

```
1    Q.   Anybody else with you?
2    A.   No.
3    Q.   Did you get in the car?
4    A.   Yes.
5    Q.   And where did you go?
6    A.   We got in the car and we drove around
7  Bridgeport a little bit.
8    Q.   Did he tell you why you were asked to come
9  up here?
10   A.   No.
11   Q.   Did you have any conversation about that
12 with Ziggy?
13   A.   No.
14   Q.   And did he show you anything in particular
15 in Bridgeport?
16   A.   He showed me where P.T. project was, that
17 was it, and a couple of place where they sold drugs
18 at.
19   Q.   And did you -- where did you go?
20   A.   We -- I got in the car, we drove around, he
21 showed them two places and we went to some parking
22 spot.
23   Q.   Did you see anyone when you got to that
24 parking spot?
25   A.   Yes, when we got there I seen that's when
```

1626

```
1  Dreddy drove over.
2    Q.   A parking spot or parking lot?
3    A.   I think a parking lot.
4    Q.   Were there other cars in the area?
5    A.   At the time there was only one car there.
6    Q.   About what time was it?
7    A.   I can't really remember.
8    Q.   Daytime, nighttime?
9    A.   It was nighttime.
10   Q.   Dark out?
11   A.   Yes.
12   Q.   Do you recall how Dreddy got there to meet
13 you?
14   A.   He drove the burgundy Cadillac.
15   Q.   And when Dreddy got there, what did you
16 guys do?
17   A.   When Dreddy got there, we -- everybody
18 loaded up in the black Corolla.
19   Q.   So, everybody is who?
20   A.   Ziggy and Dreddy and me.
21   Q.   And yourself?
22   A.   Yeah.
23   Q.   And who is driving?
24   A.   Ziggy.
25   Q.   Who's the front seat passenger?
```

1627

```
1    A.   Dreddy.
2    Q.   And so you are in the back?
3    A.   Yes.
4    Q.   And where did you go?
5    A.   We left and we -- he said something about
6  he had to get some duct tape.
7    Q.   Who said that?
8    A.   Dreddy.
9    Q.   And so where did you go?
10   A.   We rode around to one store and some other
11 store, but they didn't have it.  And --
12   Q.   Did you go into those stores?
13   A.   No.
14   Q.   Did Ziggy?
15   A.   No.
16   Q.   Did Dreddy?
17   A.   Dreddy did.
18   Q.   And, okay, so they didn't have it.  So,
19 what happened?
20   A.   He -- we got on some road, we drove
21 somewhere.  I don't really know where we went, but
22 we got on the highway and we rode somewhere, and
23 then we came off and then we came right by a
24 Walgreens.
25   Q.   Do you know Bridgeport?
```

1628

```
1      A.    No.
2      Q.    Like, could you drive around and find your
3  way around?
4      A.    No.
5      Q.    You said you came upon a Walgreens?
6      A.    Uh-huh (indicating affirmatively).
7      Q.    Was it open?
8      A.    Yes.
9      Q.    Did anyone go inside the Walgreens?
10     A.    Dreddy did.
11     Q.    And when he came out, did you see whether
12 or not he had anything?
13     A.    White Walgreens bag.
14     Q.    And do you know what was in it?
15     A.    Duct tape.
16     Q.    Now, eventually, going forward, you were
17 arrested and cooperated with law enforcement,
18 correct?
19     A.    Yes.
20     Q.    Did you ever take a ride and show them
21 where the Walgreens store was?
22     A.    Yes.
23     Q.    You were able to find it?
24     A.    Yes.
25     Q.    And you said that was the same Walgreens
```

1629

```
1  you went to?
2      A.    Yes.
3      Q.    And do you remember how far that store
4  was -- well, where did you go after Dreddy got back
5  in the car with the duct tape, the Walgreens bag?
6      A.    He just -- he got back in the car and we
7  just drove.  We got over there to where a diner was.
8      Q.    And do you remember about how long that
9  ride took from the Walgreens to the diner?
10     A.    It wasn't that long.  About a couple
11 seconds.
12     Q.    A couple seconds?
13     A.    Yeah, it wasn't that long.
14     Q.    Could you walk from the Walgreens to the
15 diner?
16     A.    At the time I wouldn't know if I could walk
17 from the diner to there.
18     Q.    So, it was a very short time?
19     A.    Yes.
20     Q.    And do you remember where the diner was,
21 like, how it was -- was it down the street?
22     A.    No.
23     Q.    Was it in the middle of the street at the
24 end of a street?
25     A.    It's on the corner.
```

1630

```
1      Q.    And did you know anything about the area
2  around the diner?
3      A.    No.
4      Q.    Did Dreddy say anything about the area
5  around the diner?
6      A.    No.
7      Q.    Did he refer to a building in the area?
8      A.    No.
9      Q.    Did you go in the diner?
10     A.    Yes.
11     Q.    And who went in?
12     A.    Me, Dreddy and Ziggy.
13     Q.    And when you were inside, did you have any
14 discussion with him?
15     A.    No.
16     Q.    Did you actually eat inside the diner?
17     A.    Yes.
18     Q.    And what did you do after you ate?
19     A.    Dreddy had got a phone call, then we, all
20 of us, had left out of the diner.
21     Q.    Dreddy got a phone call and what?
22     A.    When Dreddy got the phone call, he said
23 something to Ziggy, and all of us got up and went
24 outside the diner where we parked at.
25     Q.    Did you -- had you ever talked to Dreddy
```

1631

```
1  about getting a spot?
2      A.    Yes.
3      Q.    And what does that mean?
4      A.    He had said that -- that he was going to
5  put me up in the apartment building.
6      Q.    And do you know what apartment building he
7  meant?
8      A.    The third floor.
9      Q.    And where was it in regards to the diner?
10     A.    Right beside it.
11     Q.    And did you actually see that building when
12 you went to the diner?
13     A.    Yes.
14     Q.    And you could see it from the diner?
15     A.    Yes.
16     Q.    And I'm going to show you what's been
17 marked Government's Exhibit 102, ask you if you
18 recognize that as the front of the -- well, how do
19 you recognize that?
20     A.    That's the front of the building.
21     Q.    Of the building where you were going to
22 have a spot?
23     A.    Yes.
24     Q.    And what did it mean to have a spot?
25     A.    Selling there, to sell drugs.
```

1632

```
1    Q.   And you wanted that, right?
2    A.   Yes.
3    Q.   And who offered you that?
4    A.   Dreddy.
5    Q.   Now, you said after you ate he got a phone
6    call and you went outside?
7    A.   Yes.
8    Q.   Where did you go?
9    A.   We went on the -- the back of the diner
10   where we parked at.
11   Q.   And what's in the back of the diner?  Is it
12   a parking lot?
13   A.   Yes.
14   Q.   And did you see anyone else when you went
15   back there?
16   A.   Wasn't nobody there at the time when we got
17   there, but then that's when Big Guy came over there.
18   Q.   You are saying "Big Guy" and pointing to
19   the -- who are you pointing to, the person in the
20   middle?
21   A.   Yes.
22        MR. MARKLE:  May the record reflect the
23   defendant Efrain Johnson?
24        THE COURT:  It may.
25   Q.   Did you know his real name?
```

1633

```
1    A.   No.
2    Q.   Why do you call him Big Guy?
3    A.   That's the only name I knew him by.  I
4    didn't know him by any other name.
5    Q.   Did you meet him in that parking lot?
6    A.   Yes.
7    Q.   Did you meet anyone else in that parking
8    lot?
9    A.   No.
10   Q.   Who was in the parking lot after you left
11   the diner?
12   A.   Me, Dreddy, Ziggy and Big Guy.
13   Q.   And how did you even know to call him Big
14   Guy?
15   A.   I didn't never knew his name.
16   Q.   But who referred to him that way?
17   A.   Me.
18   Q.   That was your reference to him?
19   A.   Uh-huh (indicating affirmatively).
20   Q.   And showing you Government's Exhibit 110,
21   does this show -- do you recognize that photograph?
22   A.   Yes.
23   Q.   And as you look at that, to the right side,
24   what is that?
25   A.   Right here?
```

1634

```
1    Q.   Yes.
2    A.   That's the apartment building.
3    Q.   So, you are pointing to the building on the
4    right of the photograph?
5    A.   Yes.
6    Q.   And towards the left side on the -- there
7    is, it looks like a wall.  Is there a wall there?
8    A.   Yes, we parked right back here.
9    Q.   You are pointing towards the back area of
10   the wall?
11   A.   Yeah, close by where this little ramp at,
12   going up.
13   Q.   And so that's on the left side of
14   Government's 110, correct?  It's on the left side of
15   the photograph?
16   A.   Yes.
17   Q.   And is that where you met Big Guy?
18   A.   Yes, right back here.  Up where this
19   parking lot at.
20   Q.   It looks like there are some people in that
21   photograph at the edge of the wall.  Are you at that
22   end?
23   A.   We further back, right back here.
24   Q.   You are further away from those people?
25   A.   Yes.
```

1635

```
1    Q.   And did the four of you remain together
2    there?
3    A.   Yes.
4    Q.   And did Dreddy -- did you say hi to the
5    defendant or did you greet him?
6    A.   I think he probably introduced to us, but
7    like, hey, what's up.  That was about it.
8    Q.   Who introduced you?
9    A.   Dreddy.
10   Q.   And were you all close to each other out
11   there in the parking lot?
12   A.   Yes.
13   Q.   Standing next to one another?
14   A.   Yes.
15   Q.   And were there lights on in that parking
16   lot?
17   A.   Probably.  I couldn't remember, though.
18   Most likely, yes, I would think so because I see
19   everybody.
20   Q.   Do you remember seeing Dreddy's face?
21   A.   Yes.
22   Q.   The defendant's face?
23   A.   Yes.
24   Q.   Ziggy's face?
25   A.   Yes.
```

1636

1    Q.   I'm going to show you Government's
2 Exhibit 112, and ask you, again, I think this is a
3 better picture.  What does that picture show you?
4    A.   This the -- this the building.
5    Q.   You are pointing -- just for the record, I
6 have to say you are pointing to the left of the
7 photograph as we look at it?
8    A.   Yes.
9    Q.   Okay.
10   A.   This the building and that's the side of
11 the wall we crossed.
12   Q.   And when you said you were more towards the
13 -- you were trying to point on the other photograph,
14 you said there is a little, like, ledge area here --
15   A.   Yes.
16   Q.   -- where I'm pointing on the right side of
17 the photograph?
18   A.   Yes.
19   Q.   So, you were over the wall up here in the
20 parking lot?
21   A.   Yes.
22   Q.   While you were there with the defendant and
23 Ziggy and Dreddy, does Dreddy say anything to all of
24 you?
25   A.   He just went across the wall, he went

1637

1 across the wall that's -- first it was a girl coming
2 right down here, and then we was going across the
3 wall, but then we stopped and then the girl went by
4 and then that's when we crossed the wall and went
5 in.
6    Q.   And was there a conversation about why you
7 were going in?
8    A.   He had a problem with the people at the --
9 at the second floor.  I think second floor.
10   Q.   And who said that?
11   A.   Well, he didn't say second floor, but he
12 said, I got a problem with some people in this
13 building.
14   Q.   Do you know what the problem involved?
15   A.   They was selling drugs out of his -- one of
16 his -- out of his building.
17   Q.   Did he say it in those words?
18   A.   Yes, they was selling drugs out of his
19 building.
20   Q.   Was that while all four of you were
21 together?
22   A.   Yes.
23   Q.   And who said that?
24   A.   Dreddy.
25   Q.   And you heard him?

1638

1    A.   Yes.
2    Q.   And you were standing next to the
3 defendant?
4    A.   Yes.
5    Q.   And you were standing next to Ziggy?
6    A.   Yes.
7    Q.   What did it mean to you he had a problem in
8 the building with these people?
9    A.   Somebody was cutting in his money.
10   Q.   His money from what?
11   A.   Drugs, selling drugs.
12   Q.   And what were you going to do about it?
13   A.   Take them out.
14   Q.   And what does that mean?
15   A.   Me?  I was thinking take them out meaning
16 like take them out of business, not to --
17   Q.   You mentioned that somebody came by while
18 you were -- were you in the parking lot or closer to
19 the building when somebody came by?
20   A.   They was walking in the front of the
21 building.
22   Q.   Did you actually -- so how did you get over
23 towards the building?
24   A.   Across that wall right there where that
25 little gap at.

1639

1    Q.   And, again, where there is a little ledge
2 underneath?
3    A.   Yes.
4    Q.   And did you climb over that wall?
5    A.   Yes.
6    Q.   And, by the way, when you were in the
7 diner, did you have a bat with you?
8    A.   No.
9    Q.   Did Azibo?
10       MR. BUSSERT:  Objection, leading.
11       THE COURT:  Sustained.
12   Q.   Did you have any weapons with you in the
13 diner?
14   A.   No.
15   Q.   Did Azibo have any weapons that you could
16 see when you were in the diner?
17   A.   No.
18   Q.   Did Ziggy have any weapons when you --
19   A.   No.
20   Q.   And when you got to the parking lot, did
21 you see them walking with any weapons, Ziggy?
22   A.   No.
23   Q.   Yourself?
24   A.   No.
25   Q.   Azibo?

1640

```
1    A.   No.
2    Q.   Dreddy?
3    A.   No.
4    Q.   You know him as Azibo now, correct?
5    A.   Yes.
6    Q.   How about the defendant?
7    A.   Yes.
8    Q.   What did you see him with?
9    A.   He came up with two bats.
10   Q.   And when you climbed over that wall, did
11   you have a bat in your hand?
12   A.   No.
13   Q.   When you climbed over that wall, did Ziggy
14   have a bat in his hands?
15   A.   Yes.
16   Q.   Did Dreddy?
17   A.   Dreddy was already across the wall.
18   Q.   So, Dreddy went first?
19   A.   Yes.
20   Q.   Did you see him with any weapon?
21   A.   No.
22   Q.   Then who went next over the wall?
23   A.   Big Guy.
24   Q.   And did you see him with any weapon?
25   A.   Yes.
```

1641

```
1    Q.   And what was it?
2    A.   Bat.
3    Q.   And who went next?
4    A.   Me.
5    Q.   And did you have any weapon?
6    A.   No.
7    Q.   And did Ziggy -- did I miss it or is Ziggy
8    the last?
9    A.   He already -- everybody went across.
10   Q.   Did you see a gun at that time?
11   A.   No.
12   Q.   Did you ever move furniture, Mr. Taylor?
13   Did you ever help people move furniture?
14   A.   Yes.
15   Q.   Move out of an apartment, into an
16   apartment?
17   A.   Yes.
18   Q.   Did you have any -- did you have any
19   equipment to do that this night?
20   A.   No.
21   Q.   Did you have anything to slide stuff with,
22   carry stuff with?
23        MR. BUSSERT:  Objection, relevance.
24        THE COURT:  Basis.
25        MR. BUSSERT:  Relevance.
```

1642

```
1         THE COURT:  Overruled.
2    Q.   Did you have any of that kind of equipment?
3    A.   No.
4    Q.   When you helped friends move in or out of
5    an apartment in the past, did you have a bat with
6    you?
7    A.   No.
8    Q.   Did you have -- well, let me ask you this:
9    When you got to the building, where did you go?
10   A.   We went -- you saying when we got in the
11   building?
12   Q.   You tell me.  You went over the wall, where
13   did you go?
14   A.   All four of us, we crossed the wall, we
15   went to one of these -- it was one of these, I think
16   it was back doors.  Most likely it was one of these
17   doors.
18   Q.   I'm going to move this and see if I can
19   find another photograph so you can tell us where you
20   went.  Does Government's Exhibit 111, does that show
21   you an area that helps you tell us?
22   A.   Yes, we went through this door right here.
23   Q.   You are pointing.  So the door would be --
24   you are pointing to pillars, but the door --
25   A.   Yes.
```

1643

```
1    Q.   -- is that where the door was?
2    A.   Yes.
3    Q.   And is that under the building, or where is
4    that?
5    A.   Yes, the first floor.
6    Q.   That's where you referred to as the first
7    floor?
8    A.   Yes.
9    Q.   And who went in that door?  Was it locked
10   or unlocked?
11   A.   It was unlocked.
12   Q.   Did you have to smash it down or anything?
13   A.   No.
14   Q.   Who went in first?
15   A.   Dreddy went in, Ziggy, Big Guy and then
16   myself.
17   Q.   Was Dreddy far in front of you or right in
18   front of you?
19   A.   He was far in front of us.
20   Q.   And do you know where he went when he first
21   went through that door?
22   A.   No.
23   Q.   Showing you -- do you recognize what's
24   shown in Government's Exhibit 113B?
25   A.   Yes, that's the first floor.
```

**GA1619**

1644

```
1    Q.   Again, is it -- is the first floor the
2  garage?
3    A.   Yes.
4    Q.   And do you know which way we're looking as
5  we're looking at that photograph?
6    A.   The back of the garage.
7    Q.   And so that's not where you came.  Where it
8  looks like sunlight or whatever, that's not where
9  you came in?
10   A.   No.
11   Q.   And the -- after you entered that door on
12 what you are calling the first floor, where did you
13 go?
14   A.   We went up some stairs.
15   Q.   And where did you go when you went up the
16 stairs?
17   A.   We went up the stairs to the second floor.
18   Q.   So, the garage first floor?
19   A.   Yes.
20   Q.   You went up another floor?
21   A.   Yes.
22   Q.   And what did you do when you got to that
23 second floor?
24   A.   That's when we met Dreddy in the stairway.
25   Q.   And so Dreddy was there in the stairway?
```

1645

```
1    A.   Yes.
2    Q.   And what did you do when you met Dreddy?
3    A.   We went to the -- to the -- it's like a
4  hallway.  We went into the hallway and then that's
5  when we seen a girl.
6    Q.   And you said you saw a girl?
7    A.   Yes.
8    Q.   And what was she doing?
9    A.   She was waiting at the front of the door.
10   Q.   At the front of the door?
11   A.   Yes.
12   Q.   Of an apartment?
13   A.   Yes.
14   Q.   And was she doing anything at that door?
15   A.   She was, like, standing there at the time,
16 and then when we got -- when everybody got side up
17 right by where we supposed to be going in at, that's
18 when she knocked on the door.
19   Q.   Were you obvious?  Were you in the hallway?
20 Were you standing in front of the door?  Where were
21 you?
22   A.   We was not right directly in front -- not
23 in front of the doorway, but like in -- like on the
24 side.
25   Q.   And who was by your side?
```

1646

```
1    A.   Big Guy.
2    Q.   And where was Ziggy?
3    A.   In front of him.
4    Q.   And where was Dreddy?
5    A.   In front.
6    Q.   And was it obvious, like if somebody opened
7  that door would they see you?
8    A.   Out of that --
9         MR. BUSSERT:  Objection, it calls for
10 speculation.
11        THE COURT:  You are talking about the
12 sight lines.  Do you want to rephrase your question.
13        MR. MARKLE:  Yes, your Honor.
14   Q.   Would you have -- would you be able to see
15 the front door from where you were?
16   A.   Yes.
17   Q.   But were you standing right in front of it
18 or were you off to the side?
19   A.   Right, not directly in front of it, off to
20 the side.
21   Q.   Let me take you back a few steps.  Again,
22 showing you Government Exhibit 114, does that show
23 you the garage entrance that you came in through?
24   A.   No.
25   Q.   That's not the area.  That is a part of the
```

1647

```
1  garage; do you remember that?
2    A.   Yes.
3    Q.   But, again, we're going back to this
4  photograph 111.  That's the door you entered
5  through?
6    A.   Yes.
7    Q.   Now, when you came through that door, you
8  said you went up some stairs.  And, but before you
9  go up the stairs, does this appear -- do you
10 recognize what's depicted in Government 114A?
11   A.   That's where we just -- the second attempt.
12   Q.   That's not this time?
13   A.   No.
14   Q.   Okay.  So, when you are standing outside
15 the first time that you are at this apartment, the
16 woman knocks on the door?
17   A.   Yes.
18   Q.   And what happens after that?
19   A.   She just kept knocking.
20   Q.   And did anyone answer the door?
21   A.   No.
22   Q.   Did anyone open the door?
23   A.   No.
24   Q.   Did you force your way into the door?
25   A.   No.
```

1648

```
1    Q.   What did you do after she knocked and no
2  one answered?
3    A.   We left.
4    Q.   And where did you go?
5    A.   That's when me, Dreddy and Ziggy went
6  upstairs to the third floor.
7    Q.   Now, before the woman knocked on the door,
8  as you were standing in the hallway, how were you
9  dressed?
10   A.   We had masks and gloves.
11   Q.   And who brought the masks?
12   A.   Dreddy and Ziggy.
13   Q.   And who wore the masks?
14   A.   All of us.
15   Q.   The defendant?
16   A.   Yes.
17   Q.   You?
18   A.   Yes.
19   Q.   Dreddy and Ziggy?
20   A.   Yes.
21   Q.   All put on masks?
22   A.   Yes.
23   Q.   And could you see through -- could you see?
24   A.   Yes.
25   Q.   How were --
```

1649

```
1    A.   The nose and the eyes.
2    Q.   So, it's August and you are wearing masks?
3    A.   Yes.
4    Q.   And did you have anything else on unusual?
5    A.   Gloves.
6    Q.   What kind of gloves?
7    A.   Rubber gloves.
8    Q.   And who wore gloves?
9    A.   All of us.
10   Q.   And who brought the gloves?
11   A.   Dreddy and Ziggy.
12   Q.   And when did you put the gloves on?
13   A.   I think it was -- I think it was at the --
14  it was at the car, in the parking lot.
15   Q.   When did you put the mask on?
16   A.   When we got into the building.
17   Q.   And when did the defendant put the gloves
18  on?
19   A.   I think -- I think all of us put our gloves
20  in -- our gloves on at the car, but I'm not for
21  sure.
22   Q.   At the parking lot?
23   A.   Yes.
24   Q.   And are you for sure that by the time you
25  were by that door you all had gloves on?
```

1650

```
1    A.   Yes.
2    Q.   And are you for sure that by the time you
3  got to that door you all had masks on?
4    A.   Yes.
5        MR. BUSSERT:  Objection to the form of
6  the question, your Honor.
7        THE COURT:  Sustained.
8    Q.   Were you forced to put that mask on,
9  Mr. Taylor?
10   A.   No.
11   Q.   Was anyone forced to put the mask on?
12   A.   No.
13   Q.   Were you forced to put the gloves on?
14   A.   No.
15   Q.   Was anyone forced to put the gloves on?
16   A.   No.
17   Q.   Did Dreddy hold a gun to you and say put
18  this mask on?
19   A.   No.
20   Q.   Put these gloves on?
21   A.   No.
22   Q.   Did he hold a gun to the defendant?
23       MR. BUSSERT:  Objection to the form,
24  your Honor.
25   Q.   What did he say to the defendant about
```

1651

```
1  putting the gloves on?
2    A.   Nothing.
3    Q.   Did he order him to do that?
4    A.   Nope.
5    Q.   How about the mask?
6    A.   Nope.
7    Q.   Now, the woman knocked on the door, but
8  nobody answered, correct?
9    A.   Yes.
10   Q.   And where did you go?
11   A.   Me, Dreddy and Ziggy went upstairs to the
12  third floor.
13   Q.   And who led you up to that floor?
14   A.   Dreddy.
15   Q.   And where did the defendant go?
16   A.   He didn't come to the third floor with us.
17   Q.   And when you went to the third floor, did
18  you have bats with you?
19   A.   No.
20   Q.   Did Dreddy?
21   A.   No.
22   Q.   Did Ziggy?
23   A.   No.
24   Q.   Did you leave them downstairs?
25   A.   I don't know where they left them, but I
```

1652

1  know they didn't come with us.
2      Q.   And the defendant didn't come with you?
3      A.   No.
4      Q.   Did -- and did you have the mask on still
5  when you went up to this third floor?
6      A.   Yes, we had them, but I gave them to Ziggy.
7      Q.   And were you wearing them?
8      A.   Well, we took them off then, you know.
9      Q.   And how about the gloves?
10     A.   Took them off.
11     Q.   And what was the point of going upstairs,
12 what was there?
13     A.   That's where he was showing me where he was
14 going to set me up at.
15     Q.   And set you up meaning what?
16     A.   Sell drugs.
17     Q.   And who was going to set you up?
18     A.   Dreddy.
19     Q.   And did you actually go in an apartment?
20     A.   Yes.
21     Q.   Enter an apartment?
22     A.   Yes.
23     Q.   And who went in?
24     A.   All three of us.
25     Q.   And did Dreddy say anything about it when

1653

1  you were in the apartment?
2      A.   About selling the drugs?
3      Q.   Yes.
4      A.   Yes.  That's when he told me I'm -- you
5  going -- will be sitting right here and people going
6  to be coming upstairs and buying drugs.
7      Q.   And was there a specific area of the
8  apartment that he pointed out to you?
9      A.   The front of the building.
10     Q.   And what was that -- what was at the front
11 of the building?
12     A.   That's the lookout.
13     Q.   And was there a window in the apartment?
14     A.   Yes.
15     Q.   And is that what you mean by the front of
16 the building?
17     A.   Yes.
18     Q.   And actually while you were there, did you
19 see any drug transaction take place?
20     A.   Yes, it was a girl that -- when I was
21 standing at the window and looking, and Dreddy was
22 at the window at the same time, that's when he was
23 telling me all of this, and that's when the girl
24 came and was looking up, up, and she came up and he
25 said something to the girl that went to the door and

1654

1  then she came up, knocked on the door, she came in
2  and bought drugs.
3      Q.   Was anyone else in the apartment besides
4  you, Dreddy, Ziggy and this girl who came to buy
5  drugs?
6      A.   Some older guy was in the apartment in the
7  room in the back.
8      Q.   In a different apartment or the same
9  apartment?
10     A.   The same apartment, but it was like in the
11 bedroom.
12     Q.   And anyone else?
13     A.   And the girl that came to buy crack.
14     Q.   And for how long did you stay in the
15 apartment this night?
16     A.   I can't really say.  It wasn't no hour or
17 two.  It wasn't an hour.  I can't really --
18     Q.   Did you -- where did you go after you left
19 the apartment?
20     A.   Back to Norwalk.
21     Q.   And did you -- how did you get back to
22 Norwalk?
23     A.   Train.
24     Q.   And was this late night now?
25     A.   Not late enough to catch a train.

1655

1      Q.   Not late enough not to catch a train?
2      A.   Yes.
3      Q.   So, you took a train back?
4      A.   Yes.
5      Q.   And did you have -- did you talk to Dreddy
6  again after you got back to Norwalk?
7      A.   No.
8      Q.   Sometime later, not that same day, did you
9  talk to Dreddy?
10     A.   No.
11     Q.   Do you remember getting a phone call?
12     A.   Yes.
13     Q.   And who was that from?
14     A.   Dreddy.
15     Q.   So, when you say you didn't talk to Dreddy,
16 are you saying in person?
17          MR. BUSSERT:  Objection.
18          MR. MARKLE:  I'm trying to clarify.
19          THE COURT:  I think that's okay to
20 clarify.
21     Q.   You said you hadn't talked to Dreddy, you
22 meant person to person?
23     A.   Yes.
24     Q.   Did you receive a phone call --
25     A.   Yes.

1656

```
1    Q.   -- then.  And who called you?
2    A.   Dreddy.
3    Q.   And how many days, do you know, after what
4    you just talked about, the first time you tried to
5    go to the apartment?
6    A.   I'm not for sure.
7    Q.   Well, again, was it a couple days or couple
8    weeks?
9    A.   A couple days.
10   Q.   And what did he say to you?
11   A.   It was, like, he called me, Yes Yes, what's
12   up?  He said, what you doing?  I said, nothing.  He
13   said, do you want to come up?  I said, yeah.  He
14   said -- he said, come up and Big Boy got some girls
15   at the diner.
16   Q.   Some girls at the diner?
17   A.   Yes.  And I said, all right, I'll come up
18   then.
19   Q.   And did you come up to Bridgeport a second
20   time?
21   A.   Yes.
22   Q.   And did you -- how did you get here?
23   A.   I drove.
24   Q.   And whose car did you drive?
25   A.   My friend Denita's car.
```

1657

```
1    Q.   And how did you -- where did you go to?
2    A.   I didn't really know how to get off the
3    exit where I was going, so I got in touch with Ziggy
4    and he directed me to where I was going.
5    Q.   And did you -- where did you end up going
6    to in Bridgeport?
7    A.   To the same parking lot we met the first
8    time.
9    Q.   And was it daytime or nighttime?
10   A.   Nighttime.
11   Q.   And who did you meet when you got to that
12   same parking lot?
13   A.   Ziggy.
14   Q.   And what kind of car -- was he in a car?
15   A.   Yes.
16   Q.   What kind of car?
17   A.   The same black Corolla.
18   Q.   And was anyone else with him in that car?
19   A.   No.
20   Q.   And what did you do when you saw him arrive
21   in the Toyota Corolla?
22   A.   I got out of the car, he got out of the
23   car, and then we waited for Dreddy.
24   Q.   Waited in that same parking lot?
25   A.   Yes.
```

1658

```
1    Q.   And did Dreddy come there?
2    A.   Yes.
3    Q.   Did he drive?
4    A.   Yes.
5    Q.   What kind of car?
6    A.   The burgundy four-door Cadillac.
7    Q.   And, again, what car did you all remain --
8    did you get in one car or two cars?
9    A.   We all got in one car.
10   Q.   Which car?
11   A.   The black Toyota.
12   Q.   And who drove this time?
13   A.   Dreddy -- I mean Ziggy.
14   Q.   And who was the front seat passenger?
15   A.   Dreddy.
16   Q.   And you are in the back again?
17   A.   Yes.
18   Q.   And did you, in fact, go to the diner?
19   A.   No.
20   Q.   You thought you were, right?
21   A.   Yes.
22   Q.   And where did you go?
23   A.   Straight back over to the same apartment
24   building.
25   Q.   And where did you park this time?
```

1659

```
1    A.   We went up under the garage.
2    Q.   Ziggy was driving?
3    A.   Yes.
4    Q.   And you parked under the garage?
5    A.   I meant the first floor, not under -- down
6    in the parking spot.
7    Q.   Showing you Government's Exhibit 113, do
8    you recognize that as the parking lot?
9    A.   Yes.
10   Q.   And did you park in that parking lot?
11   A.   Yes.
12   Q.   And does that show the area you parked in
13   or is it further than that?
14   A.   It's in the far back.
15   Q.   It's in the far back of the parking lot?
16   A.   Yes, the very back of the building.
17   Q.   I'm showing you Government's Exhibit 113A.
18   Is that a picture of the area in which you parked in
19   the parking lot?  Or is it hard to tell from --
20   A.   Right back in the back, in the very back,
21   over here.
22   Q.   So, where it becomes very dark?
23   A.   Yes.
24   Q.   You can't see it?
25   A.   Yes.
```

**GA1623**

1660

```
1    Q.   And who drove to that parking area?
2    A.   Ziggy.
3    Q.   And did you guys stay in the car or get out
4  of the car?
5    A.   We got out of the car.
6    Q.   And did you -- when you were out of the
7  car, did you see anyone in the parking lot -- in the
8  parking garage area.
9    A.   No.
10   Q.   And what did you do when you got out of the
11 car?
12   A.   We got out of the car, we was behind --
13 well, I was behind the wall, and everybody was
14 behind the wall, then that's when we came out and
15 that's when Big Guy came over.
16   Q.   So when you say everybody was behind the
17 wall, who is everybody?
18   A.   Well, I was behind the wall, Ziggy was on
19 the driver's side and Dreddy was on the passenger
20 side.  So, when he shut the door, I shut the door,
21 and everybody started coming out, that's when he
22 came up.
23   Q.   So, you are just getting out of the car
24 walking towards the door of the garage?
25   A.   Yes.
```

1661

```
1    Q.   And you saw the defendant?
2    A.   Yes.
3    Q.   And did you see him arrive in a car?
4    A.   No.
5    Q.   Do you know how he got there?
6    A.   No.
7    Q.   Did he come with the three of you?
8    A.   No.
9    Q.   And when you got out of the car, did you
10 have a bat?
11   A.   No.
12   Q.   Did you have any weapon?
13   A.   No.
14   Q.   Did you see Azibo with any weapon?
15   A.   No.
16   Q.   Any bat?
17   A.   No.
18   Q.   Did you see Ziggy with any bat?
19   A.   No.
20   Q.   Any weapon?
21   A.   No.
22   Q.   And when the defendant approached you, did
23 you see any weapon?
24   A.   Yes.
25   Q.   What did you see him have?
```

1662

```
1    A.   Two bats.
2    Q.   Two bats?
3    A.   Yes.
4    Q.   And did he come over and meet with you?
5    A.   Yes, he met with everybody over there.
6    Q.   Now, the four of you are together again?
7    A.   Yes.
8    Q.   And did you see any mask at this time?
9    A.   No.
10   Q.   Did you see any gloves?
11   A.   Yes.
12   Q.   And who had the gloves?
13   A.   It was in Ziggy's pocket.
14   Q.   And did you -- did he give you -- what did
15 he do with the gloves?
16   A.   He gave us -- gave me some gloves, gave his
17 brother some, and Big Man some gloves.
18   Q.   And what did you do with the gloves?
19   A.   Put them on my hands.
20   Q.   What did the defendant do with his gloves?
21   A.   Put them on his hands.
22   Q.   Ziggy and Dreddy?
23   A.   Yes.
24   Q.   Everybody had gloves on?
25   A.   Yes.
```

1663

```
1    Q.   And where did you go?
2    A.   We went upstairs to the second floor.
3    Q.   And where did you go when you got to the
4  second floor?
5    A.   To the apartment building -- to the
6  apartment.
7    Q.   And did you walk right up to the door?
8    A.   Yes.
9    Q.   Who was in front?
10   A.   Dreddy, Ziggy, Big Boy and me.
11   Q.   That's the way you were in order?
12   A.   Yes.
13   Q.   And was there anyone -- before you got to
14 the door, did anyone come into the hallway or down
15 the stairs?
16   A.   If I'm not mistaken, yes, they did, but I
17 can't remember if it was the first one or the second
18 attempt.  I think it was the -- yeah, it was --
19 yeah, it was the second attempt, there was a Spanish
20 guy came downstairs that he was leaving and all of
21 us -- yes, it was the second attempt.  When we went,
22 when we got up to the second floor, the Spanish guy
23 came downstairs.  We went back downstairs and we hid
24 in the little bitty -- some little bitty rooms until
25 the Spanish guy left, and then we went back
```

1664

```
1    upstairs.
2        Q.    And showing you Government's Exhibit 114A,
3    does that show where you hid or not?
4        A.    Yes, that room.  It's a room right over
5    here in this corner.
6        Q.    There is a room to the --
7        A.    Yes.
8        Q.    -- to the left side of Government's
9    Exhibit 114A?
10       A.    Yes.
11       Q.    And who hid in that room?
12       A.    Me and Ziggy.
13       Q.    And where was the defendant?
14       A.    They went -- I think, I'm not for sure if
15   they went out or they went that way, but they came
16   out, out of that room.
17       Q.    You all left the hallway?
18       A.    Yes.
19       Q.    And once that person had left the building
20   or was out of there, where did you go back to?
21       A.    Went back upstairs to the second floor.
22       Q.    And just so we're straight, you are saying
23   the garage is -- you call that the first floor,
24   correct?
25       A.    Yes.
```

1665

```
1        Q.    And then you went up one flight of stairs?
2        A.    Yes.
3        Q.    And is that where you ended up?
4        A.    To the --
5        Q.    Is that where the apartment was?
6        A.    Yes, to the building apartment -- to the
7    apartment.
8        Q.    And when you got to the door this time, did
9    anyone knock on the door?
10       A.    No.
11       Q.    What was the next thing that happened when
12   you got to the door?  Let me ask you this:  Did you
13   have the mask on at this time?
14       A.    Yes.
15       Q.    Did you have a mask on when you hid down
16   there when the person came by?
17       A.    No, we just flipped them up, put them like
18   on the top of our head.
19       Q.    But you had already put it on?
20       A.    Yes.
21       Q.    And were you the only one with a mask on?
22       A.    No.
23       Q.    Did Dreddy have a mask on?
24       A.    Yes.
25       Q.    Ziggy?
```

1666

```
1        A.    Yes.
2        Q.    The defendant?
3        A.    Yes.
4        Q.    And when you went to the door on this
5    second floor, did you all have masks on?
6        A.    Yes.
7        Q.    Pulled back down?
8        A.    Yes.
9        Q.    Did you all have gloves on?
10       A.    Yes.
11       Q.    What happened at the doorway?
12       A.    Dreddy came, everybody got lined back up
13   again, and Dreddy kicked the door in, boom, boom,
14   the door came open.
15       Q.    Was the door forced open?
16       A.    Yeah, it was kicked open, yes.
17       Q.    Did anyone ever -- did anyone knock on that
18   door that night?
19       A.    No.
20       Q.    The second night?
21       A.    No.
22       Q.    Did anyone ever come to the door to
23   answer -- open it?
24       A.    Yes.
25       Q.    Did they actually open it?  Or was it
```

1667

```
1    already opened?
2        A.    I don't think he actually opened it.
3        Q.    And when Dreddy -- how did -- you are
4    saying "boom, boom," but how did he do that?  With
5    his hand?
6        A.    With his feet.
7        Q.    He kicked the door?
8        A.    Yes.
9        Q.    And did it come open?
10       A.    Yes.
11       Q.    And what was the first thing you saw when
12   the door opened?
13       A.    The older guy.
14       Q.    And where was he?
15       A.    He was standing right in the hallway, right
16   -- not in the hallway, like right in the den room
17   area.
18       Q.    Was he inside the apartment?
19       A.    Yes.
20       Q.    And you say an older guy.  Did he -- why do
21   you say that?  Did he look old?
22       A.    Yes.
23       Q.    Did he say -- who went in first?
24       A.    Dreddy.
25       Q.    And who went in after Dreddy?
```

**GA1625**

1668

```
1    A.    Ziggy.
2    Q.    And at that time did Dreddy have any
3  weapon?
4    A.    Yes, he had a gun.
5    Q.    Had you seen that gun before?
6    A.    No.
7    Q.    And what did he do with that gun?
8    A.    He pointed it.
9    Q.    He had it out?
10   A.    Yes.
11   Q.    Pointed it at who?
12   A.    The guy was coming -- we was coming in.
13   Q.    And what did he say to him?
14   A.    Get on the ground, get on the ground.
15   Q.    And where were you?
16   A.    Coming in.
17   Q.    And where was the defendant?
18   A.    Coming in.
19   Q.    All four with masks on?
20   A.    Uh-huh (indicating affirmatively).
21   Q.    Gloves on?
22   A.    Uh-huh (indicating affirmatively).
23         THE COURT:  You need to say yes or no.
24   A.    Sorry, yes.
25   Q.    And where did the old man go?
```

1669

```
1    A.    Back in the bedroom.
2    Q.    And did you see anyone else come out of any
3  bedroom or any room in that apartment at that time?
4    A.    No.
5    Q.    Did you ever see anyone come out of a
6  bedroom at any time after that?
7    A.    No.
8    Q.    So once the old man was ordered back to his
9  bedroom, did you ever see anyone leave the bedrooms?
10   A.    No.
11   Q.    Any of the victims?
12   A.    No.
13   Q.    Did you ever have a confrontation with
14 anyone in the living room?
15   A.    No.
16   Q.    Did anyone remain in the living room?
17   A.    No.
18   Q.    And is there any doubt in your mind that
19 you went into that apartment?
20   A.    I went -- I know I went in that apartment.
21   Q.    Dreddy was in that apartment?
22   A.    Yes.
23   Q.    Ziggy was in that apartment?
24   A.    Yes.
25   Q.    And the defendant?
```

1670

```
1    A.    Yes.
2         MR. BUSSERT:  Your Honor, I'm just going
3  to object to the continuing use of this form.
4         THE COURT:  As leading?
5         MR. BUSSERT:  Yes, your Honor,
6  repeatedly leading.
7         THE COURT:  All right, please do not
8  lead, Mr. Markle.
9         MR. MARKLE:  Yes, your Honor.
10   Q.    Did you, prior to entering that apartment,
11 had you -- while you were at the diner parking lot
12 or in the stairway, were you drinking alcohol?
13   A.    No.
14   Q.    Were you smoking marijuana?
15   A.    No.
16   Q.    Did you see the defendant drinking alcohol
17 or smoking marijuana from the time you met up with
18 him to the time you entered the apartment?
19   A.    No.
20   Q.    Dreddy, Ziggy?
21   A.    No.
22   Q.    What was your understanding -- did Dreddy
23 talk to you about what you should do when you
24 entered that apartment?
25   A.    He said something about her son, he might
```

1671

```
1  have been there.
2    Q.    And what was your role?
3    A.    I guess control him or --
4    Q.    Did you have a bat when you entered the
5  apartment?
6    A.    No.
7    Q.    Who had the bats when you went into the
8  apartment?
9         MR. BUSSERT:  Objection, your Honor,
10 this has been asked and answered.
11        THE COURT:  This is when they're in the
12 apartment?
13        MR. MARKLE:  Yes, your Honor.
14        THE COURT:  I'm going to permit the
15 question, but why don't we have lunch first.  All
16 right?  Is there a better breaking --
17        MR. MARKLE:  That's fine, your Honor.
18        THE COURT:  All right, let's do that.
19        (Jury exited the courtroom)
20        THE COURT:  All right, we'll be back at
21 20 past one.
22        Mr. Taylor, you will go back upstairs,
23 please don't discuss your testimony with anybody.
24        THE WITNESS:  Okay.
25        THE COURT:  Thank you.  Stand in recess.
```

GA1626

1672

```
1    (Recess)
2         THE COURT:  All right, would you have
3    Mr. Taylor brought in, please.
4         All right, please bring in the jury.
5         (Jury entered the courtroom.)
6         THE COURT:  Please be seated, ladies and
7    gentlemen.  Continued direct examination of
8    Mr. Taylor by Mr. Markle.
9         MR. MARKLE:  Thank you, your Honor.
10   Q.   Mr. Taylor, you are still under oath.
11   Mr. Taylor, you had just sort of ended where you
12   began on the second night.  You just entered the
13   apartment, correct?
14   A.   Yes.
15   Q.   And after you entered -- I'm going to go
16   back a little bit.  Where did the person you
17   describe as an old man go to?
18   A.   The bedroom.
19   Q.   And did you see the bedroom that he went
20   to?
21   A.   Yes.
22   Q.   And if you are looking down the hallway
23   towards the bedrooms, which side was it on?  Do you
24   remember?
25   A.   On his right side.
```

1673

```
1    Q.   And did you ever see him come out of that
2    bedroom after he went in there?
3    A.   No.
4    Q.   And from the moment you entered the
5    apartment, did you ever hit any of the three
6    victims?
7    A.   No.
8    Q.   With your hands?
9    A.   No.
10   Q.   With any kind of weapon whatsoever?
11   A.   No.
12   Q.   Did you touch them with anything?
13   A.   No.
14   Q.   Did you help duct tape them?
15   A.   No.
16   Q.   And did the old man say anything as he
17   retreated to his bedroom?
18   A.   What was going on.
19   Q.   He was asking that?
20   A.   Yeah.
21   Q.   And did anyone say anything to him?
22   A.   Just get on the ground.
23   Q.   And did he, in fact, get on the ground?
24   A.   Yes.
25   Q.   And where was Dreddy at this time?
```

1674

```
1    A.   In the room with the other two, the male
2    and the female.
3    Q.   And as you go in, you said you entered into
4    a living room; is that correct?
5    A.   Yes.
6    Q.   And then where do you go if you are in that
7    living room?  How does the apartment -- how is the
8    apartment set up?  Is there a hallway?
9    A.   It's a hallway right in between where the
10   bedrooms -- where -- the bedrooms, the left and the
11   right bedroom, and the bathroom, and you got the
12   kitchen and then you have the window.
13   Q.   And did you see Dreddy -- did you see
14   anybody go into the bedroom on the left as you --
15   A.   Yes.
16   Q.   And who went in there?
17   A.   Dreddy and Ziggy.
18   Q.   And where did the defendant go?
19   A.   He was standing in the door of the right
20   apartment -- the right bedroom.
21   Q.   And when you -- where did you go?
22   A.   Ziggy -- Dreddy had told me to go over
23   there and look out the window.
24   Q.   And did you do that?
25   A.   Yes.
```

1675

```
1    Q.   And did you remain there the entire time?
2    A.   Yes and no.
3    Q.   Okay, explain.
4    A.   When I got over, when he told me to go over
5    to the window, I stood over the window, and I just
6    heard duct tape, duct tape, duct tape, so I kept
7    going back and forth.
8    Q.   What was the noise you heard?
9    A.   The duct tape sound.
10   Q.   Can you describe it?
11   A.   (Indicating).
12   Q.   And where did you hear that coming from?
13   A.   Out of the two bedrooms.
14   Q.   And do you know who was doing the duct
15   taping at that time?
16   A.   Yes.
17   Q.   Could you see that?
18   A.   Yes.
19   Q.   How did you see that from the living room
20   area?
21   A.   Because I was going back and forth.
22   Q.   And that's what you mean by yes and no?
23   A.   Yes.
24   Q.   So, when you went back, you went back
25   toward the bedrooms?
```

1676

```
1     A.    Yes.
2     Q.    How far down the hallway did you go?
3     A.    Probably like halfway of the hallway.
4     Q.    And from where you were, what could you
5   see?
6     A.    Both bedrooms.
7     Q.    And could you see the floors of those
8   bedrooms?
9     A.    Yes.
10    Q.    And what did you see on the floor?  If you
11  are looking at the left bedroom, what did you see on
12  the floor of that bedroom?
13    A.    The male and the female.
14    Q.    And what did you see happening to them at
15  that time?
16    A.    They was getting duct taped.
17    Q.    And who was doing the duct taping?
18    A.    Dreddy and Ziggy.
19    Q.    Did you see the defendant duct taping at
20  that time?
21    A.    No.
22    Q.    Did you leave that area at any time?
23    A.    Yes.
24    Q.    To go back where?
25    A.    To the window.
```

1677

```
1     Q.    And did you continue to hear duct taping?
2     A.    Yes.
3     Q.    Did you ever see the person in the bedroom
4   to the right?
5     A.    Yes.
6     Q.    And was that a -- that was the old man?
7     A.    Yes.
8     Q.    And was he on the ground, standing up, on
9   the bed?
10    A.    He was on the ground.
11    Q.    And were his feet towards the door or head
12  towards the door?
13    A.    His head was toward the door.
14    Q.    And did you see whether or not -- when you
15  went back down that hallway, did you see whether or
16  not he was duct taped?
17    A.    When I went back down he wasn't duct taped.
18    Q.    He was just laying on the ground?
19    A.    Yes.
20    Q.    And who was standing by the doorway of that
21  bedroom?
22    A.    Big Guy.
23    Q.    The defendant?
24    A.    Yes.
25    Q.    And after you went back away from there,
```

1678

```
1   you said you heard more duct taping?
2     A.    Yes.
3     Q.    Did you -- what happened then?
4     A.    I went back to the window, and that's when
5   I seen somebody coming and I said, somebody coming.
6   That's when Dreddy -- Ziggy came out and he looked
7   he said, oh, it's nobody.  And then that's when they
8   went back in the room.
9     Q.    Who is they?
10    A.    Dreddy and Ziggy.
11    Q.    Were in the left bedroom?
12    A.    Yes.
13    Q.    And how did you see that?  Did you also go
14  back down that way?
15    A.    Yes.
16    Q.    And who had the bats at that time?
17    A.    Dreddy and Ziggy.
18    Q.    And do you recall -- did you see a couch in
19  the hallway when you went down there?
20    A.    No.
21    Q.    And how about a couch in the living room?
22    A.    Yes.
23    Q.    Now, going back to when you first came in,
24  was anything done with that couch?
25    A.    Yes, me and Dreddy had pushed the couch to
```

1679

```
1   -- for to keep the door from -- when he kicked the
2   door in, it came off the hinge -- not the hinges,
3   but the lock, and we pushed the door -- the couch to
4   the door to keep the door from opening up.
5     Q.    And you said you and Dreddy pushed that
6   couch?
7     A.    Yes.
8     Q.    And did that keep the door shut?
9     A.    Yes.
10    Q.    Was that a big couch or --
11    A.    It was long.  Yeah, it was a real long
12  couch.
13    Q.    And that was towards the beginning of
14  entering the apartment?
15    A.    Yes.
16    Q.    Now, after you heard the sound of duct
17  taping, what did you next hear?
18    A.    After the duct taping was going over,
19  that's when I was standing over here, standing over,
20  and I came back.  When I came back that's --
21    Q.    You still standing over here?
22    A.    When I was standing over by the window.
23    Q.    By the window?
24    A.    When I came back, when I came back that's
25  when I seen -- no, at first it was I was standing
```

1680

1  over here, and then the duct tape was finished and
2  then I heard somebody, like a real yell, like,
3  (indicating).  So then I was, like it was a strange
4  noise.  So I was, like, well, you know, I'll go back
5  and look.
6          So, I go back and look.  When I go back
7  and look, that's when I seen Dreddy standing over
8  them like, boom, boom.  Like, what are you doing.
9      Q.   What did he have in his hands?
10     A.   He had a bat.  Then I said, I said, what
11 are you doing?  He said, come and get you some.  I
12 said, no, I'm out of here.
13     Q.   Did you see Ziggy?
14     A.   Yes.
15     Q.   What was he doing?
16     A.   The same thing.
17     Q.   With what?
18     A.   The bat.
19     Q.   The same thing, swinging?
20     A.   Yes.
21     Q.   Can you take the pointer there and just
22 stand up and show us how they -- were they swinging
23 it like a baseball bat?
24     A.   They were standing over in the room, I was
25 standing right here, he was standing over, boom,

1681

1  boom.
2      Q.   Swinging it vertically from his head down
3  to his feet?
4      A.   Yeah.  And Ziggy was over there doing the
5  same thing.  And then I looked, I said, what's going
6  on?  I'm standing right in the hallway, I said,
7  what's going on?  He said, come and get you some.
8      Q.   Who said that?
9      A.   Dreddy.  And I said, no, I'm out of here.
10 So, then I'm getting up and walking out, I pushed --
11 the couch is wedged up to the door, so I pushed the
12 couch with my body, and I came out the door.  That's
13 when Ziggy came behind me.
14     Q.   The couch by the front door?
15     A.   Yes, sir.
16     Q.   When you saw them swinging the bat who was
17 Dreddy hitting with his bat?
18     A.   The female.
19     Q.   And who was Ziggy hitting with his bat?
20     A.   The male.
21     Q.   Did you ever see the other man who you said
22 was the old man, did you ever see him get hit with
23 the bat?
24     A.   No.
25     Q.   And when Ziggy and Dreddy were swinging the

1682

1  bats at the woman and the man, where was the
2  defendant?
3      A.   Standing at the door.
4      Q.   Right next door to that bedroom?
5      A.   Yes.
6      Q.   Could he see what was going on?
7      A.   Yes.
8      Q.   Could he hear what was going on?
9      A.   Yes.
10     Q.   And where was the old man at that time?
11     A.   Still on the floor.
12     Q.   Of the other bedroom?
13     A.   Yes.
14     Q.   Did you ever try to stop Ziggy or Dreddy?
15     A.   Nope.
16     Q.   Did the defendant ever try to stop Ziggy or
17 Dreddy?
18     A.   No.
19     Q.   When you pushed the couch out of the way,
20 did anyone -- was anyone with you, following you?
21     A.   Yes, Ziggy came out behind me.
22     Q.   Now, before you left, was there anytime
23 where anyone had to -- do you remember the latex
24 gloves?
25     A.   Yes.

1683

1      Q.   Was there anything done with the latex
2  gloves while you were still in the apartment?
3      A.   Well, before the lady was yelling, before
4  the beating, because it was right after I had said
5  somebody was to the -- somebody was coming up, and
6  that's when they came, Dreddy and Ziggy came back
7  and looked and said it wasn't nobody.  I guess when
8  they was duct taping the gloves came off, I guess
9  when they were doing the duct taping, so he came and
10 got gloves.
11     Q.   Who got new gloves?
12     A.   Yes.
13     Q.   Who?
14     A.   Dreddy and Ziggy.
15     Q.   They both changed gloves?
16     A.   Yes.
17     Q.   What did they do with the old gloves?
18     A.   I held the plastic bag and Dreddy and Ziggy
19 put the gloves in the bag and I gave the bag back to
20 them.
21     Q.   And at any time while you in the apartment,
22 did you see Dreddy or Ziggy or the defendant take
23 any items from any of the people?
24     A.   Yes.
25     Q.   What was that?

**GA1629**



1684

```
1    A.   Ziggy had -- after I told -- after Ziggy --
2  after Dreddy had told me, do you want some, I said,
3  no, and then I was on my way out, that's when Ziggy
4  was on his way out, he grabbed a phone and some cash
5  off a table or a counter.
6    Q.   By the --
7    A.   By the -- going out towards the door.
8    Q.   By the front door?
9    A.   Yes.
10   Q.   And do you know where that money and
11 telephone -- was it a cell phone?
12   A.   Yes.
13   Q.   Where that money and cell phone came from?
14   A.   Out of the bedroom with the two -- the male
15 and female was at.
16   Q.   And how do you know that?
17   A.   Because I seen them when Dreddy took --
18 came out of there and put it on the table.
19   Q.   Did you hear -- when Dreddy said do you
20 want some --
21   A.   Yes.
22   Q.   -- what was he saying to you?
23   A.   Telling me to come and get -- do I want
24 some.  Do I want to come in there and start beating
25 on them myself.
```

1685

```
1    Q.   Did you agree to do that in any way?
2    A.   Nope.
3    Q.   Did you see whether or not the woman he was
4  hitting had duct tape on her?
5    A.   Yeah, she had duct tape on her.
6    Q.   Where?
7    A.   Her mouth, her legs and her hands.
8    Q.   And how about the man that Ziggy was
9  beating?
10   A.   I really couldn't see him but like his head
11 part, but he was duct taped as well.
12   Q.   You could see his head had duct tape?
13   A.   Yes.
14   Q.   But you can't say his hands and legs for
15 sure?
16   A.   Yes.
17   Q.   And as you -- when you moved the couch out
18 of the way, where did you go?
19   A.   I went out -- I left, I looked back, that's
20 when I seen Ziggy come behind me.  So, me and Ziggy
21 went downstairs.
22   Q.   So you and Ziggy left the apartment?
23   A.   Yes.
24   Q.   And did you have the bats with you?
25   A.   Nope.
```

1686

```
1    Q.   Did Ziggy have the bats with him?
2    A.   Nope.
3    Q.   Did he have any kind of weapon?
4    A.   That's when Dreddy had handed him the gun.
5    Q.   Inside the apartment or outside?
6    A.   Inside the apartment.
7    Q.   But he left with it?
8    A.   Yes.
9    Q.   But did he have any bats?
10   A.   No.
11   Q.   So when you and Ziggy left the apartment,
12 who was still in the apartment?
13   A.   Big Guy and Dreddy.
14   Q.   And where were the bats?
15   A.   Still inside the apartment.
16   Q.   And whose car did you go to when you got to
17 the parking lot?
18   A.   We got back in the same car we came in, the
19 black Corolla.
20   Q.   And who drove?
21   A.   Ziggy.
22   Q.   And did you talk about what just happened?
23   A.   Nope.
24   Q.   Did you say anything about what just
25 happened?
```

1687

```
1    A.   Nope.
2    Q.   Where did you go?
3    A.   We left, went to another apartment.
4    Q.   And was that a place you chose or he chose?
5    A.   Ziggy chose.
6    Q.   And did you go in that apartment?
7    A.   Yes.
8    Q.   And what, if anything, did you do or he do
9  in that apartment?
10   A.   He went and he changed pants.
11   Q.   Do you know why he changed pants?
12   A.   Because when we was inside the car he was
13 driving down the street he said, I got something on
14 me.
15   Q.   From?
16   A.   From whatever happened inside the
17 apartment.
18   Q.   Did you see a lot of blood in that room?
19   A.   I can't really say I did because the only
20 thing I remember was just him hitting her with the
21 bats.  I don't know if -- I don't think I did see
22 any blood at all.
23   Q.   Did you see blood on Ziggy's clothes?
24   A.   No.
25   Q.   But he changed them?
```

1688

```
1    A.   Yes.
2    Q.   And then did you change your clothes?
3    A.   No.
4    Q.   Did you need to change your clothes?
5    A.   No.
6    Q.   Did you have blood on your clothes?
7    A.   No.
8    Q.   And did you stay at -- do you know whose
9  apartment that was?
10   A.   No.
11   Q.   Did you stay at that apartment?
12   A.   No.
13   Q.   Other than him changing his clothes?
14   A.   No, he changed his clothes and we got back
15  in the car and we drove off again.
16   Q.   And where did you go?
17   A.   To another apartment building on a one-way
18  street.
19   Q.   You remember it was a one-way street?
20   A.   Yes.
21   Q.   Do you remember anything else about the
22  area?
23   A.   A dark-skinned girl was in there.
24   Q.   Do you remember any buildings in the area
25  or anything other than a one-way street?
```

1689

```
1    A.   I think -- I'm not for sure.  I know when I
2  asked him -- there was peoples on the other side of
3  the street.  It was a club or something.
4    Q.   There were a bunch of people out?
5    A.   Yes.
6    Q.   Is it fair to say this was fairly late at
7  night or early in the morning now?
8    A.   Yes.
9    Q.   Still dark?
10   A.   Yes.
11   Q.   And did you choose this other -- this
12  second apartment to go to or did Ziggy?
13   A.   Ziggy did.
14   Q.   And did you get out of the car and go in
15  the apartment?
16   A.   Yes.
17   Q.   And on the way there, did you talk about
18  what had just happened?
19   A.   No.
20   Q.   Did you want to talk about it?
21   A.   No.
22   Q.   Did you want to -- why not?
23   A.   I was trying to figure out how to get out
24  of here, get away from him.  I don't know want to be
25  around him no more.  I don't know what he's going to
```

1690

```
1  do to me.
2    Q.   Do you know where Dreddy or the defendant
3  were at that time?
4    A.   No.  The only thing I know, when I left he
5  was inside the apartment.
6    Q.   And the second apartment, did you go in it?
7    A.   Yes.
8    Q.   And who else went in?
9    A.   Just me and Ziggy.
10   Q.   And was -- do you know whose apartment it
11  was?
12   A.   Nope.
13   Q.   Did anyone -- was anyone else there?
14   A.   Nope.
15   Q.   Was the door open, did he smash it down?
16   A.   He had a key, he went inside.
17   Q.   And did you stay at that apartment?
18   A.   Just for him -- enough time for him to
19  change clothes.
20   Q.   This is the second apartment.  Did he
21  change clothes again?
22   A.   This is the second or the third apartment?
23   Q.   Did you go --
24   A.   I went to a third apartment.
25   Q.   Okay, so the first apartment is where the
```

1691

```
1  beatings, the people were killed?
2    A.   The first apartment was beating where
3  people was killed.  The second apartment where he
4  changed clothes.  The third apartment, that's where
5  we was on the third floor.
6    Q.   I'm sorry.  So, I mean the third apartment
7  in your --
8    A.   Yes.
9    Q.   And you went in?
10   A.   We went upstairs, yes.
11   Q.   And did he have a key to that apartment?
12   A.   No, he just walked in.
13   Q.   It was open?
14   A.   Yes.
15   Q.   And did you stay at that apartment?
16   A.   Yes.
17   Q.   And he had already changed his clothes?
18   A.   Yes.
19   Q.   And did you see anyone else at this third
20  apartment?
21   A.   When we going -- we parked on the side of
22  the street and we walked over.  We walked on the
23  one-way street and walked right up to the apartment.
24  There was some people standing out in front of the
25  apartment.  And me and him just -- he went in first,
```

**GA1631**

1692

```
 1  I went in next, he went up there to the third floor,
 2  and while we was up there waiting, that's when I was
 3  looking out the window, and you could see people all
 4  walking up and down the street all the way, some on
 5  this side of the street, some on this side.  That's
 6  when a dark-skinned girl kept coming back upstairs,
 7  she coming upstairs, coming back downstairs.
 8      Q.   Did you know her?
 9      A.   No.
10      Q.   The people outside, is that why you thought
11  there was a club in the area?
12      A.   When I asked him what was all them people,
13  he said there was a club down the street.
14      Q.   And this is -- on the way there, did you
15  see -- by the time you left the first apartment and
16  got to the third apartment, did you see the gun that
17  he had?
18      A.   No, he had left it at the second apartment.
19      Q.   And did you see the money that he had?
20      A.   No.
21      Q.   Did he ever offer you the money?
22      A.   No.
23      Q.   Did he ever give you the money?
24      A.   No.
25      Q.   What about the cell phone?
```

1693

```
 1      A.   He asked me did I want a cell phone.
 2      Q.   Did you accept it?
 3      A.   No.
 4      Q.   Did you take it?
 5      A.   No.
 6      Q.   Who kept it?
 7      A.   Ziggy did.
 8      Q.   That's the cell phone from the apartment?
 9      A.   Yes.
10      Q.   The first apartment where the people were
11  killed?
12      A.   Yes.
13      Q.   At this third apartment you finally went
14  inside, you are looking out the window, do you stay
15  there for a while?
16      A.   Yes, we stayed there for a little while.
17      Q.   Do you drink, smoke marijuana?
18           MR. BUSSERT:  Objection.
19      Q.   Do nothing?
20           THE COURT:  Don't lead.
21      Q.   What do you do there?
22      A.   We just smoked weed and drink, and then at
23  the time I'm sitting there trying to figure out how
24  to get away.
25      Q.   Is Dreddy there?
```

1694

```
 1      A.   No.
 2      Q.   Is the defendant?
 3      A.   No.
 4      Q.   Do you stay there overnight or do you
 5  leave?
 6      A.   I left.  I told him, I told Ziggy I had
 7  something to do in the morning.
 8      Q.   And how do you get back to your car?
 9      A.   He drove me back to the parking lot.
10      Q.   And where do you go?
11      A.   He direct me how to get back to the highway
12  to get to Norwalk.
13      Q.   And do you go to Norwalk?
14      A.   Yes.
15      Q.   And where do you go?
16      A.   Back to Denita's apartment.
17      Q.   And what do you do when you get there?
18      A.   Sleep.
19      Q.   And do you call or talk to Dreddy?
20      A.   Not right after I got there.  Maybe like
21  the next -- maybe next day, I think.  Yeah, the
22  next day.  I called him the next day.
23      Q.   And does he -- do you talk to him or does
24  he -- or not?
25      A.   No, I didn't talk to him.
```

1695

```
 1      Q.   And you're calling the cell phone you had
 2  for him?
 3      A.   Yes.
 4      Q.   And he doesn't answer?
 5      A.   No.
 6      Q.   Do you call more than once?
 7      A.   Yes.
 8      Q.   A lot?
 9      A.   Yes.
10      Q.   Do you call from your cell phone?
11      A.   Yes, and Denita's phone.
12      Q.   You used Denita's phone?
13      A.   Yes, her house phone.
14      Q.   And did he pick up that time?
15      A.   No, sir.
16      Q.   Do you eventually see Dreddy?
17      A.   Maybe like two, three days later, that's
18  when he came back and gave me some more bottles.
19      Q.   A lot?
20      A.   Yes, he came in the black Toyota.
21      Q.   Dreddy did?
22      A.   Yes.
23      Q.   Was he with Ziggy or alone?
24      A.   He was alone.
25      Q.   Do you ever see the defendant again after
```

1696

```
 1   August 24, 2005?
 2       A.   Nope.
 3       Q.   Last time you saw him was in apartment 101
 4   where the people were killed?
 5       A.   Yes.
 6       Q.   Did you take the additional marijuana, the
 7   marijuana from Dreddy that time?
 8       A.   Yes.
 9       Q.   And did you sell it?
10       A.   No.
11       Q.   Did you -- why didn't you sell it?
12       A.   Because at the time I started thinking I
13   got to get away from him, I don't want to be dealing
14   with him like that no more.  Plus, I already had his
15   crack; I didn't really know how to give it back to
16   him.  So, I got the marijuana, but then the people
17   started complaining, so I said I'm just going to
18   give it all back.
19       Q.   Did you ever -- what did you do with the
20   crack cocaine that Dreddy had given you some time
21   ago?
22       A.   I just put it up.
23       Q.   And did you ever get rid of it?
24       A.   No.
25       Q.   Did you ever sell it?
```

1697

```
 1       A.   No.
 2       Q.   Did you ever give it to anyone?
 3       A.   I gave it back to Ziggy.
 4       Q.   And how did you excuse not selling it?
 5       A.   I told him the people didn't like it.
 6       Q.   And how about the marijuana?
 7       A.   I told him the people didn't like it.
 8       Q.   And it was given back?
 9       A.   Yes.
10       Q.   Did you ever -- and so did you stay in
11   Norwalk at this time?
12       A.   Yes.
13       Q.   And did there come a time a few weeks after
14   the murders that you got arrested?
15       A.   Yes.
16       Q.   And what were you arrested for?
17       A.   Narcotics.
18       Q.   And was it Dreddy's narcotics?
19       A.   No.
20       Q.   Ziggy's?
21       A.   No.
22       Q.   You had gotten them from someone else?
23       A.   Yes.
24       Q.   And did you have to go to jail?
25       A.   Yes.
```

1698

```
 1       Q.   And when you were in jail, did you -- where
 2   were you held?
 3       A.   In Bridgeport.
 4       Q.   Bridgeport Correctional Center?
 5       A.   Yes.
 6       Q.   While you were there, did you see anyone
 7   you knew?
 8       A.   Yes, I seen Dreddy.
 9       Q.   And did you talk to him?
10       A.   Yes.
11       Q.   Did you talk to him about the murders?
12       A.   He didn't really -- we didn't -- he didn't
13   really talk about the murder.  The only thing he was
14   just telling me, you know, be quiet, don't talk to
15   nobody.  Don't tell nobody nothing.  If anybody come
16   up and talk to you, don't say nothing to them.
17            That was about it.  And said his baby
18   mother got rid of the bats, that's it.
19       Q.   His baby mothers -- mother?
20       A.   Yeah.
21       Q.   His baby mother got rid of the bats?
22       A.   Yeah.
23       Q.   Did he say anything else about his baby
24   mother?
25       A.   That's when I was talking to him and I was
```

1699

```
 1   telling him that -- at first he asked me what I was
 2   in jail for, and I told him I was in jail for
 3   possession.  And then he give me his baby mother
 4   phone number, two numbers, because he said she was
 5   going to bond me out of jail.
 6       Q.   Even though you were caught with someone
 7   else's drugs?
 8       A.   Yes.
 9       Q.   They were going to help you out with bond?
10       A.   Yes.
11       Q.   And did you have conversations with his
12   baby's mother?
13       A.   Yes.
14       Q.   About that?
15       A.   Yes.
16       Q.   And did you ever get bonded out?
17       A.   No.
18       Q.   And I'm going to show you Government's
19   Exhibit 222.  I'll just show you 222.  Do you
20   recognize this photograph?
21       A.   Yes.
22       Q.   Who is that?
23       A.   Charmaine.
24       Q.   Is that Charmaine?
25       A.   Yes.
```

1700

1   Q.   Is that the baby's mom?
2   A.   Yes.
3   Q.   Is that the person I'm referring to as
4   Shante?
5   A.   Yes.
6   Q.   And that's the woman who was pregnant?
7   A.   Yes.
8   Q.   And where did you know her from, what trip?
9   A.   To North Carolina, Virginia and Georgia.
10  Q.   And is that the person you just talked
11  about, you spoke to about bond?
12  A.   Yes.
13  Q.   And how did you get her phone number?
14  A.   Dreddy wrote it down.
15  Q.   And where did you see Dreddy and how was he
16  able to give that to you?
17  A.   When we met up at Bridgeport.
18  Q.   And why was he interested in helping you
19  get out of jail?
20       MR. BUSSERT:  Objection.  It calls for
21  speculation.
22  Q.   Did he say why he was interested in helping
23  you get out of jail?
24  A.   Because he said --
25       MR. BUSSERT:  Objection, hearsay.

1701

1        MR. MARKLE:  I'll withdraw it.
2   Q.   Did you ever talk to Dreddy about doing
3   anything else with him?
4   A.   Yes.
5   Q.   And did you have intentions to do a drug
6   business elsewhere?
7   A.   Yes.
8   Q.   So, if you got released you would sell
9   drugs?
10  A.   Yes.
11  Q.   Did you ever call Ziggy about the bond
12  situation?
13  A.   Yes.
14  Q.   Did you have conversations on the phone
15  from prison, jail, with Ziggy?
16  A.   Yes.
17  Q.   You were in jail, he wasn't?
18  A.   Yes.
19  Q.   And how did you get Ziggy's number?
20  A.   Through Charmaine.
21  Q.   Now, you said you went to jail on this drug
22  charge.  How long did you serve on that?
23  A.   Two and a half.  They gave me two and a
24  half, I think I did like a year.
25  Q.   Two and a half years?

1702

1   A.   Yes.
2   Q.   And when you were released, were you on
3   parole?
4   A.   Yes.
5   Q.   And where were you released to?  Where did
6   you go?
7   A.   AIC program in Waterbury.
8   Q.   And that's an alternative incarceration
9   program?
10  A.   Yes.
11  Q.   In Waterbury, Connecticut?
12  A.   Yes.
13  Q.   And did you successfully complete parole?
14  A.   Yes.
15  Q.   Now, as you've already indicated, that
16  wasn't the first time you'd been convicted of a
17  felony, correct?
18  A.   Correct.
19  Q.   In fact, Mr. Taylor, January 20, 1994, you
20  were convicted of a felony; is that correct?
21  A.   Correct.
22  Q.   And in February 15, 1995, you were
23  convicted of a felony?
24  A.   Correct.
25  Q.   August 12, 1997?

1703

1   A.   Correct.
2   Q.   November 6, 2002?
3   A.   Correct.
4   Q.   And then August 25, 2006, is the one you
5   are talking about, correct?
6   A.   Correct.
7   Q.   All of those were felony convictions,
8   correct?
9   A.   Yes.
10  Q.   Now, directing your attention to -- so you
11  stayed in Waterbury, you completed parole?
12  A.   Yes.
13  Q.   Were there conditions that you work, go to
14  school?  Any conditions?
15  A.   You went every day to look for a job, and
16  so I got up five o'clock in the morning and went to
17  a temp agency that -- went there, like, three times,
18  and they gave me a job.  And ever since then, I was
19  working ever since until I came off parole.
20  Q.   You were working?
21  A.   I was.
22  Q.   What kind of work was that?
23  A.   Loading and unloading trucks.
24  Q.   And where?
25  A.   MBI in --

1704

```
1    Q.   Was it in Waterbury?
2    A.   No, it was outside of Waterbury.
3    Q.   Was it in Connecticut?
4    A.   Yes.
5    Q.   And for how long did you work there?
6    A.   Seven, eight months.
7    Q.   And why did that job end?
8    A.   It was layoff time.  They started laying
9    temps off.
10   Q.   And you were one of the newer hires?
11   A.   Yes.
12   Q.   And did you remain in Waterbury?
13   A.   Yes.
14   Q.   And did you find other work?
15   A.   I started doing nightclub jobs.  I started
16   doing bouncing in nightclubs.
17   Q.   And did you remain in Waterbury?
18   A.   Yes.
19   Q.   Did there come a time when you went back
20   down south?
21   A.   At the time when I -- when the nightclubs
22   -- I started looking for other jobs, going out every
23   day, and I couldn't find a job, couldn't get a job,
24   so the landlord was giving me like a little lenience
25   on the rent, so I decided, do you know what, I just
```

1705

```
1    don't want to keep playing him no more thinking I'm
2    not really looking for a job, so I went back to
3    North Carolina.
4    Q.   So, you were not able to find a good paying
5    job up here?
6    A.   No, sir.
7    Q.   And did you still have family in North
8    Carolina?
9    A.   Yes, sir.
10   Q.   And did you go -- who did you go and live
11   with in North Carolina?
12   A.   My cousin.
13   Q.   Are you back in Pinetops?
14   A.   No.
15   Q.   What town?
16   A.   Raleigh.
17   Q.   Raleigh?
18   A.   Uh-huh (indicating affirmatively).
19   Q.   And I don't know if you remember the exact
20   date, but December, in December of 2009 do you
21   remember law enforcement coming to visit you?
22   A.   Yes.
23   Q.   And do you remember where they found you?
24   A.   Yes.
25   Q.   Where was that?
```

1706

```
1    A.   My grandmother house.
2    Q.   In what town or city?
3    A.   Pinetops.
4    Q.   Is your grandmother living or passed away?
5    A.   Passed away.
6    Q.   Was she living in 2009?
7    A.   No.
8    Q.   Who were you living with -- what were you
9    doing at that house?
10   A.   That was my aunt house.
11   Q.   Your aunt had moved into that house?
12   A.   Yes.
13   Q.   And were you staying with your aunt or
14   visiting your aunt?
15   A.   I was just visiting.  It was after the
16   holidays.
17   Q.   And so you were there for Thanksgiving?
18   A.   Yes.
19   Q.   And when the police came -- prior to that,
20   had anyone ever questioned you about the homicides
21   four years earlier?
22   A.   No.
23   Q.   Did you expect to be arrested for the
24   homicides that had happened four years earlier?
25   A.   No.
```

1707

```
1    Q.   Were you expecting law enforcement to show
2    up at your grandmother's house?
3    MR. BUSSERT:  Objection, relevance.
4    THE COURT:  I'm going to permit it.
5    MR. BUSSERT:  I would claim this, your
6    Honor.  I'm going to ask to approach.
7    MR. MARKLE:  I'll withdraw it, your
8    Honor.
9    Q.   Were you surprised to see law enforcement?
10   A.   Yes.
11   Q.   Did you agree to speak with them?
12   A.   Yes.  Well, not really because they already
13   came in, but I ain't had no other choice.
14   Q.   Did you ask them to leave?
15   A.   No.
16   Q.   Did you -- did they threaten you?
17   A.   Nope.
18   MR. BUSSERT:  Objection.  I'm going to
19   claim this, your Honor, this whole line.
20   THE COURT:  I'll see you at sidebar.
21   (Sidebar conference)
22   THE COURT:  When you say "this whole
23   line," you mean this whole set of questions about
24   law enforcement, the first question?
25   MR. BUSSERT:  Yes.  And I think what
```

1708

```
1   this series of questions is intended to do, your
2   Honor, as Mr. Markle well knows, Mr. Taylor lied
3   repeatedly, repeatedly, from the first time Ms.
4   Dayton and her colleagues came down to see him.  And
5   I think at this point he's not trying to impeach his
6   witness.  Clearly he's trying to, essentially,
7   preemptively bolster his credibility, and I don't
8   think that's permissible on direct.
9              MR. MARKLE:  Your Honor, I don't have to
10  sit with my hands still to let Mr. Bussert bring out
11  --
12             THE COURT:  I guess what I don't
13  understand is --
14             MR. BUSSERT:  What he wants to do is
15  have Mr. Taylor say I lied and lied and then at some
16  point I started telling the truth.
17             THE COURT:  Right.
18             MR. BUSSERT:  Ever since then I started
19  telling the truth.  That's not proper direct; that's
20  trying to bolster his credibility.  His credibility
21  has not been called into question.  Obviously, it
22  will be, but that's the witness they chose.
23             MR. MARKLE:  Well, I think I have a
24  right --
25             THE COURT:  Is this going to be done in
```

1709

```
1   the form of what he told the agents had happened or
2   didn't happen?  I mean, tell me how this is going to
3   be asked.
4              MR. MARKLE:  I would -- well, first of
5   all, your Honor, I'm trying to show that the agents
6   didn't go -- I think I'm allowed to show the setting
7   of whatever he did takes place, but in terms of --
8              THE COURT:  Assume so.
9              MR. MARKLE:  Yeah, I would bring out
10  that at first he was not truthful, and he'll admit
11  that.
12             MR. BUSSERT:  So, again, is he doing it
13  for purpose of impeachment?  No, he's not.  He's not
14  trying to impeach his own witness.  He's trying to
15  bolster him to preemptively, you know, bolster his
16  credibility to say he told you on direct he lied the
17  first few times.
18             MR. MARKLE:  So I should look to the
19  jury like I'm keeping it from them and have you
20  bring it out that --
21             MR. BUSSERT:  That's the way I think the
22  rules apply.
23             MR. MARKLE:  I don't think so.
24             THE COURT:  When you say the rules, what
25  do you mean?  Why can't he offer on direct what this
```

1710

```
1   witness has said about his involvement in these
2   murders?
3              MR. BUSSERT:  Well, again, that goes to
4   trying to use prior consistent or inconsistent
5   statements.  What's the purpose of this?  The
6   purpose is either to show the prior inconsistent
7   statements, which would be for impeachment, which
8   he's not trying to do, or prior consistent
9   statements, because suddenly he started to tell the
10  truth, which is to bolster his credibility which is
11  in response to the attack on credibility.  The
12  government chose him; they know the weakness of it.
13  Attorney Markle told the jury, because he knows, he
14  already told them he's a liar.  He knows that.  But
15  he's not allowed to try with preemptive questions to
16  bolster his credibility, say, don't worry, he
17  already told you on direct he turned the corner, now
18  he's credible.  They're going to show the
19  cooperation agreement, all you have to do is tell
20  the truth, the standard tactic the government tries
21  to use, and it's improper.
22             MR. MARKLE:  I think I can impeach him,
23  your Honor.  I think I have a right to make the jury
24  understand that he was not candid from the get-go,
25  that the government is not hiding that from them.
```

1711

```
1              THE COURT:  Why do you get to impeach
2   him?
3              MR. MARKLE:  I think I can front -- tell
4   things that are bad about him, just like I can ask
5   about his felony convictions.  I don't have to act
6   like this is a perfectly fine person.
7              THE COURT:  So you are going to get to
8   his cooperation agreement?
9              MR. MARKLE:  Yes.  I just think, your
10  Honor, the government is going to be put in the
11  posture as though -- let's all pretend he's not
12  going to impeach his credibility.  Well, we know
13  that's going to happen.
14             THE COURT:  It seems to me where it is
15  clear, which it certainly is, that you will be
16  bringing up his prior falsehoods to law enforcement.
17             MR. BUSSERT:  To be clear --
18             THE COURT:  Then it's not bolstering.
19             MR. BUSSERT:  To be clear, I don't know
20  which falsehoods I'm going to bring up.  There have
21  been falsehoods before to law enforcement and there
22  have been falsehoods after he testified in the
23  Aquart case.  I don't know which of those I'm going
24  to select, there is so many, your Honor, and I don't
25  think the government should be able to try and ask
```

1712

```
1   about all of them and try to build him up.
2            THE COURT:  All right, but my whole
3   point is, without regard to what you are going to
4   do, the --
5            MR. BUSSERT:  I mean, for him to come in
6   and say I lied, now I'm telling the truth, for him
7   basically to vouch for himself to say what I'm now
8   telling is the truth is completely impermissible.
9            THE COURT:  What authority do you have
10  from the Second Circuit?
11           MR. BUSSERT:  What authority do they
12  have for the proffer?
13           THE COURT:  It's admissible until it
14  isn't admissible, right?
15           MR. BUSSERT:  I don't think that's
16  necessarily so.
17           THE COURT:  Isn't there a presumption of
18  admissibility until there isn't?
19           MR. BUSSERT:  I just don't think this is
20  relevant on direct.
21           MR. MARKLE:  I don't have authority for
22  every question I'm asking, I'll be candid about
23  that, but you are objecting and just saying it's
24  totally impermissible.
25           MR. BUSSERT:  I cited the rules.  He's
```

1713

```
1   not trying to impeach the witness, he's trying to
2   build his credibility.
3            MR. MARKLE:  I'd ask if when he was
4   interviewed if he was --
5            THE COURT:  I'm going to permit it at
6   this time.  This goes beyond that.  This will be
7   your cross-examination that he is not a man good to
8   his word.  I agree with Mr. Markle that the
9   government doesn't have to be put in the position of
10  looking as if it is proffering a witness who has at
11  all times been honest.  But I don't want to go
12  through chapter and verse, I'm sure we will get
13  that.  But to the extent that it rightfully
14  anticipates that there will be cross-examination
15  impeaching his credibility, I don't think it is
16  improper for at least the recognition that he has
17  not always been honest.  So you've made your
18  objection.
19           MR. BUSSERT:  As I understand the
20  Court's ruling, that means the government will not
21  be permitted through this series of questions to get
22  in all the particular versions of events he's given.
23  He can say yes, I wasn't truthful, I said stuff that
24  wasn't truthful, but I can get into different things
25  he said and when he changed his story.
```

1714

```
1            THE COURT:  Well, I didn't hear Mr.
2   Markle saying he's going into that detail.  You are
3   going into the detail of having met with them on
4   whatever occasions and not having been truthful.
5            MR. MARKLE:  I'm going into the
6   generalized way of doing it and not specifics.
7            THE COURT:  That's fine.
8            (Sidebar concluded)
9            MR. MARKLE:  Thank you, your Honor.
10  Q.   Mr. Taylor, were you coerced or threatened
11  while you were in Pinetops by the law enforcement
12  agents?  Did they force you to do anything?
13  A.   No.  No, sir.
14  Q.   Did you agree to cooperate or talk to them?
15  A.   Yes, sir.
16  Q.   And did you talk to them?
17  A.   Yes, sir.
18  Q.   And is it fair to say that you were not
19  truthful when you first spoke to them?
20  A.   Yes, sir.
21  Q.   And they met with you over a long period of
22  time in Pinetops; is that correct?
23  A.   Yes, sir.
24  Q.   And is it fair to say you were not
25  completely truthful over the time of that entire
```

1715

```
1   conversation, correct?
2   A.   Yes, sir.
3   Q.   And why were you not truthful?
4            MR. BUSSERT:  Objection.
5            THE COURT:  Your claim?
6            MR. MARKLE:  I'll withdraw it, your
7   Honor.
8   Q.   Did there come a time that you were placed
9   under arrest?
10  A.   Yes.
11  Q.   And were you arrested for the murders?
12  A.   Yes.
13  Q.   And were you brought back to Connecticut?
14  A.   Yes.
15  Q.   And when you were interviewed in Pinetops,
16  did you have an attorney there?
17  A.   No.
18  Q.   And when you came back to Connecticut, did
19  you get an attorney?
20  A.   Yes.
21  Q.   And an attorney was appointed for you?
22  A.   Yes, sir.
23  Q.   And did you subsequently -- when you got
24  back to Connecticut, did you eventually enter a
25  guilty plea?
```

**GA1637**

1716

```
 1    A.   Yes.
 2    Q.   And do you remember what you pled guilty
 3  to?
 4    A.   Three counts of felony murder.
 5    Q.   And was that after you had an opportunity
 6  to talk with -- meet with your attorneys?
 7    A.   Yes.
 8    Q.   In fact, you had two attorneys, correct?
 9    A.   Yes.
10    Q.   And I'm going to show you what's been
11  marked Government's Exhibit 247.  And you heard the
12  term plea agreement, Mr. Taylor?
13    A.   Yes, sir.
14    Q.   You talked about that with your attorney?
15    A.   Yes.
16    Q.   Showing you Government's 247, do you
17  recognize that document?
18    A.   Yes, sir.
19    Q.   Can you read?
20    A.   Not good.
21    Q.   Fair enough.  Okay.  Did you read this or
22  did they read it to you, or both?
23    A.   We both.
24    Q.   You read it?
25    A.   Yeah.
```

1717

```
 1    Q.   And they read it?
 2    A.   Then they read it to me.
 3    Q.   And you understood it?
 4    A.   Yes.
 5    Q.   Does page 9 have your signature on it?
 6    A.   Yes.
 7    Q.   You are pointing to the top signature?
 8    A.   Yes.
 9    Q.   John Taylor?
10    A.   Yes.
11    Q.   And is that the full plea agreement that
12  you signed, agreed to?
13    A.   Yes.
14    Q.   And do you understand --
15         MR. MARKLE:  I would offer Government's
16  247, your Honor.
17         MR. BUSSERT:  No objection.
18         THE COURT:  Full exhibit.
19    Q.   And did you sign another agreement at that
20  time, Mr. Taylor?  Do you remember what's called a
21  cooperation agreement?
22    A.   Yes.
23    Q.   And, again, did you have an opportunity
24  when you executed or when you saw this --
25    A.   Yes.
```

1718

```
 1    Q.   Showing you Government's 247A, do you
 2  recognize this document?
 3    A.   Yes.
 4    Q.   And is that the entirety of what I call
 5  "cooperation agreement"?
 6    A.   Yes.
 7    Q.   And, again, if you look at page 5, do you
 8  recognize any signatures?
 9    A.   Yes.
10    Q.   Top one?
11    A.   Yes.
12    Q.   And whose signature?
13    A.   Mine.
14    Q.   And did you sign that?
15    A.   Yes.
16    Q.   Voluntarily?
17    A.   Yes.
18    Q.   And what was your understanding under the
19  plea agreement when you pled guilty to three counts,
20  what were the penalties you faced?
21    A.   Life sentence.
22    Q.   And for each of those counts?
23    A.   Yes.
24    Q.   And did you -- and what was your
25  understanding with regards to the cooperation
```

1719

```
 1  agreement?
 2    A.   To tell the truth.
 3    Q.   And what could happen if you told the
 4  truth?
 5    A.   I could get a lesser sentence.
 6    Q.   So, a lesser sentence than life?
 7    A.   Yes.
 8    Q.   Have you been sentenced?
 9    A.   No.
10    Q.   When you were arrested in Pinetops, were
11  you then in custody, in jail?  When they arrested
12  you December?
13    A.   Yes.
14    Q.   2009?
15    A.   Yes.
16    Q.   And you were -- they held you in jail,
17  correct?
18    A.   Yes.
19    Q.   And when you came to Connecticut, were you
20  held -- were you still in jail?
21    A.   Yes.
22    Q.   And when you got your attorneys, were you
23  still in jail?
24    A.   Yes.
25    Q.   And when you pled guilty, did we let you
```

**GA1638**

1720

```
1    out?
2        A.   No.
3        Q.   Still in jail?
4        A.   Yes.
5        Q.   When you signed the cooperation agreement,
6    did you get let out?
7        A.   No.
8        Q.   Remained in jail?
9        A.   Yes.
10       Q.   And fair to say you -- since you signed
11   that cooperation agreement you've met with the law
12   enforcement officers a lot of times?
13       A.   Yes.
14       Q.   And after each of those times, did you get
15   let out of jail?
16       A.   No.
17       Q.   Where did you go after you met with them?
18       A.   Where did I go after I met?
19       Q.   Yeah, did you go home or back to jail?
20       A.   Back to jail.
21       Q.   And so -- and after you testify here today,
22   do you go free?
23       A.   I go back to jail.
24       Q.   Have you been sentenced yet?
25       A.   No.
```

1721

```
1        Q.   So, you are still waiting to see what
2    you'll get?
3        A.   Yes.
4        Q.   I just want to go back, Mr. Taylor, show
5    you Government's Exhibit 116K, ask you if you
6    recognize the room depicted in that photograph?
7        A.   Yes.
8        Q.   And what is that?
9        A.   That's the living room.
10       Q.   And the living room of what?
11       A.   Of the second floor apartment.
12       Q.   One apartment up -- I mean one flight up
13   from the garage?
14       A.   Yes.
15       Q.   And the couch to the left, do you recognize
16   that couch?
17       A.   Yes.
18       Q.   And is that where you saw that couch on
19   that day?
20       A.   Yes.
21       Q.   That night you went in there, that's where
22   it was?
23       A.   Yes.
24       Q.   Was that table there?
25       A.   Yes.
```

1722

```
1        Q.   Was that window there?
2        A.   Yes.
3        Q.   Is that the window you are talking about
4    that you looked out?
5        A.   Yes.
6        Q.   And after you entered that apartment with
7    the three people that you already identified, do you
8    recall, do you see where the couch is located in
9    Government's 117E?
10       A.   Yes.
11       Q.   And how did that couch get there?
12       A.   We pushed it to the door.
13       Q.   And when you left, what did you do with
14   that couch?
15       A.   Pushed it out from the door.
16       Q.   Showing you government's 117H --
17           MR. BUSSERT:  At this point, your Honor,
18   I'm going to object.  I think this has all been
19   asked and answered.
20           MR. MARKLE:  I'm clarifying.
21           MR. BUSSERT:  I don't think there has
22   been any confusion.
23           MR. MARKLE:  Maybe counsel is not
24   confused, but I have an obligation to make sure I
25   didn't do a great job the first time around.
```

1723

```
1            THE COURT:  You have an obligation --
2            MR. MARKLE:  To make it clear.
3            THE COURT:  -- to make sure you didn't
4    go a good job?
5            MR. MARKLE:  To make it clear.
6            THE COURT:  I'm going to permit any
7    clarity you can bring to the situation, it's within
8    the bounds.
9        Q.   Showing you government's 117H, Mr. Taylor,
10   do you recognize that photograph?
11       A.   Yes.
12       Q.   And from where it's taken, like where you
13   are standing looking at it, what's that door at the
14   end of it?
15       A.   That's the -- the door right here?
16       Q.   Standing up pointing to the middle of 117H.
17       A.   Yeah, and I stood behind right here and
18   pushed it with my body and came and went out the
19   door.
20       Q.   Is that the couch you pushed away from the
21   door?
22       A.   Yeah.
23       Q.   And that allowed you to leave?
24       A.   Yes, sir.
25       Q.   I'm going to show you what's been marked
```

1724

```
1   Government's Exhibit 231A and ask you if you
2   recognize that sheet of paper?
3       A.   Yes.
4       Q.   And how do you recognize that?
5       A.   That's the paper that Dreddy gave me and
6   wrote down for me when we was in jail together.
7       Q.   And that's the piece of paper that had
8   Shante's name on it?
9       A.   Yes.
10          MR. MARKLE:  I would offer 231A, your
11  Honor, if it wasn't a full exhibit.
12          MR. BUSSERT:  No objection, your Honor.
13  Next time I'd ask if the government could please
14  show it to counsel first.
15          MR. MARKLE:  I'm sorry, I made a
16  mistake, and I hear counsel.
17          THE COURT:  All right, it's a full
18  exhibit now.
19      Q.   Mr. Taylor, you said you looked -- you were
20  in the hallway.  I'm going to show you 116D and ask
21  you if you recognize that photograph?
22      A.   Yes.
23      Q.   When you went down that hallway, is that
24  how you saw the hallway?
25      A.   No, the chair wasn't there.
```

1725

```
1       Q.   That chair to the left was not there?
2       A.   No.
3       Q.   Are those the bedrooms you referred to as
4   the left and right bedrooms?
5       A.   Yes.
6       Q.   Were they there?
7       A.   Yes.
8       Q.   Showing you Government's Exhibit 170, do
9   you recognize that photograph?
10      A.   Yes.
11      Q.   Is that -- and what do you see in that
12  photograph?
13      A.   That's how you see -- that's how you could
14  see the lady laying down right here.
15      Q.   Pointing to the left bedroom?
16      A.   Yes.
17      Q.   And where was the man?
18      A.   Right here.  Both over here, head to head.
19      Q.   They were head to head?
20      A.   Yes.
21      Q.   And how about the bedroom to the right
22  which is kind of blocked?
23      A.   That's where he was standing right over
24  here.
25      Q.   So, it shows exactly where the defendant
```

1726

```
1   was standing when --
2       A.   Right here in this area.
3       Q.   You are pointing to the -- really, the
4   center of the photograph?
5       A.   Yes, yes.
6       Q.   And what's behind that?
7       A.   That's where -- what's behind it?
8       Q.   Yeah, into that bedroom.
9       A.   That's where the older guy was.
10      Q.   You said you saw people head to head.
11  Showing you 121-4, do you recognize that photograph?
12      A.   Yes.
13      Q.   Mr. Taylor, is that the scene that you saw
14  in the left bedroom when you went down that hallway?
15      A.   Yes.
16      Q.   And is that where you saw the woman and
17  man?
18      A.   Yes.
19      Q.   Is that how you saw them?
20      A.   Yes.
21      Q.   Obviously the numbers were not there,
22  correct, those are -- there weren't placards there,
23  correct?  Yes?
24      A.   Yes.
25      Q.   Showing you Government's Exhibit 120-2, is
```

1727

```
1   that how you saw the man in the right bedroom?
2       A.   No.
3       Q.   What's different about that in that
4   photograph?
5       A.   He facing the wall.
6       Q.   His -- you had told us previously --
7           MR. BUSSERT:  Objection.
8       Q.   Where was his head when you saw him?
9       A.   At the door.
10      Q.   So, where his feet are in this picture?
11      A.   Yes.
12      Q.   Do you know how he got to that position?
13      A.   No.
14      Q.   And when his head was where his feet were,
15  where was the defendant?
16      A.   Standing at the door.
17      Q.   With about the view we have in that
18  picture?
19      A.   Yes.
20      Q.   Mr. Taylor, do you have any agreements
21  other than the two signed agreements with the
22  government?
23      A.   No.
24      Q.   Are there any secret agreements with the
25  government?
```

1728

```
1    A.    No.
2    Q.    Have you been paid for your testimony?
3    A.    No.
4    Q.    Has anyone promised you anything in return
5  for your testimony?
6    A.    No.
7    Q.    And do you think it's going to be up to the
8  government what sentence you get?
9    A.    Yes.
10   Q.    And do you understand that the sentence
11 will be imposed by the judge?
12   A.    Yes.
13   Q.    And has your attorney promised you
14 anything?
15   A.    No.
16   Q.    Have any law enforcement officers?
17   A.    No.
18        MR. MARKLE:  I have no further
19 questions.  Thank you, your Honor.
20        THE COURT:  All right, why don't we
21 begin cross-examination of Mr. Taylor tomorrow.
22 We'll start that at 9:30.
23        Please leave your notebooks here, and
24 don't discuss the case.
25        (Jury exited the courtroom.)
```

1729

```
1        THE COURT:  All right Mr. Taylor, we
2  will see you tomorrow at 9:30.  Please don't discuss
3  your testimony with anyone.
4        In terms of our timing tomorrow, the
5  government will be presenting -- there will be
6  cross-examination of Mr. Taylor.  Ms. Johnson will
7  testify.  Who else?
8        MS. REYNOLDS:  Special Agent Chris
9  Munger.
10        THE COURT:  Anyone else?
11        MS. REYNOLDS:  I think that's all for
12 tomorrow, your Honor.  After Special Agent Munger I
13 think our only remaining witnesses are Lauren
14 Dellavolpe, the FBI, she's the telephone number
15 analyst, Tom Martin and a medical examiner to be
16 named.
17        THE COURT:  You hope.
18        MS. REYNOLDS:  We hope.
19        THE COURT:  Already named.
20        MS. REYNOLDS:  Already named.  It could,
21 you know.
22        THE COURT:  Who may testify or may not.
23        MS. REYNOLDS:  Correct.
24        THE COURT:  Depending on what happens
25 Tuesday.
```

1730

```
1        MS. REYNOLDS:  And we'll see.  We're
2  still looking into whether Mr. Evangelista may
3  testify at this point.
4        THE COURT:  Is there a medical examiner
5  other than either Dr. Williams or Dr. Evangelista?
6        MS. REYNOLDS:  No, your Honor.
7        THE COURT:  So that's not -- unless it's
8  Dr. Evangelista on Friday, it's not any medical
9  examiner.
10        MS. REYNOLDS:  Correct, or next week.
11        THE COURT:  And then Tuesday, who is
12 left?  A possible medical examiner.
13        MS. REYNOLDS:  Well, if we don't get to
14 Lauren Dellavolpe, she would be Tuesday, and Tom
15 Martin.  I think between the cross-examination of
16 Mr. Taylor, Special Agent Chris Munger and Lashika
17 Johnson, that will probably get us through.
18        THE COURT:  Remind me who Tom Martin is.
19        MS. REYNOLDS:  He's the blood splatter
20 expert.
21        THE COURT:  All right, Mr. Bussert, the
22 moment is upon us to know your witnesses.
23        MR. BUSSERT:  Your Honor.
24        THE COURT:  Is it appropriate at this
25 time that I should advise Mr. Johnson about his
```

1731

```
1  right to testify or not testify.
2        MR. BUSSERT:  I think we could probably
3  reserve that, if we could, your Honor, for Tuesday.
4        THE COURT:  I actually want to get him
5  thinking about it.  Okay?
6        MR. BUSSERT:  That's fine.
7        THE COURT:  Mr. Johnson, you have the
8  right to testify.  You have no obligation to
9  testify.  And the decision about whether you testify
10 is your decision.  You should make that decision
11 after you have consulted with Mr. Bussert and listen
12 carefully to what he says about the positives and
13 the negatives of testifying.  If you testify, the
14 government will cross-examine; that
15 cross-examination will include many things,
16 including your prior criminal history and other
17 things that may bear on proof of your guilt or your
18 credibility.
19        So, I will need to know after you had
20 time to reflect on whether you will testify or you
21 will not testify, and after you've thoroughly
22 discussed it with Mr. Bussert, what your decision
23 is.  Because that will determine how long this trial
24 is and when we will be able to anticipate closings.
25 All right?
```

1732

```
1    THE DEFENDANT:  Yes, ma'am.
2    THE COURT:  Any questions?
3    THE DEFENDANT:  No, your Honor.
4    THE COURT:  Anything further?
5    MS. REYNOLDS:  We would ask for the
6  defendant's other witnesses.  He was asked to
7  provide those names today.
8    MR. BUSSERT:  As I indicated in an
9  e-mail last night to chambers and copy to the
10 government, we are actively working on that.  And as
11 we -- names become available, and there may be some,
12 we will provide those with contact information to
13 the government.
14    THE COURT:  All right, you're really
15 going to need to make your decisions.
16    MR. BUSSERT:  Yes, your Honor.
17    THE COURT:  And give the information
18 over because they, too, have to prepare for their
19 cross-examinations.
20    MS. REYNOLDS:  We would -- I'm sorry.
21    THE COURT:  And that is going to be upon
22 us possibly as early as Friday.
23    MR. BUSSERT:  At this time, your Honor,
24 and I'll definitely notify the government if
25 otherwise, but I think at this point any witnesses
```

1733

```
1  outside of Mr. Johnson would probably consist of
2  reputation witnesses.  So I think their testimony
3  would be fairly limited.
4    MS. REYNOLDS:  We still need their
5  names, and we would also need any report of
6  interviews of those witnesses if they exist, and, if
7  not, any investigator notes.
8    THE COURT:  All right, so by Friday we
9  will have the shape of the rest of the trial in
10 hand.  Anything else before we return tomorrow at
11 9:30?
12    MS. REYNOLDS:  No, your Honor.
13    MR. BUSSERT:  No.
14    THE COURT:  Thank you, we stand in
15 recess.
16    (Recess)
17
18
19
20
21
22
23
24
25
```

1734

```
1              I N D E X
2  WITNESS                          PAGE
3  MALKA SHAH
4  Direct Examination by Ms. Reynolds    1489
5  Cross-Examination by Mr. Bussert      1517
6
7  NORMAN RAY CLARK
8  Direct Examination by Mr. Markle      1520
9  Cross-Examination by Mr. Bussert      1529
10 Redirect Examination by Mr. Markle    1532
11 Recross-Examination by Mr. Bussert    1532
12
13 SUSAN JOHNSON
14 Direct Examination by Mr. Markle      1533
15
16 LATAVIA WHITTINGHAM
17 Direct Examination by Mr. Markle      1543
18 Cross-Examination by Mr. Bussert      1555
19 Redirect Examination by Mr. Markle    1567
20 Recross-Examination by Mr. Bussert    1569
21 Re-Redirect Examination by Mr. Markle 1570
22
23 JOHN TAYLOR
24 Direct Examination by Mr. Markle      1576
25
```

1735

```
1    I certify that the foregoing is a
2  correct transcript from the record of proceedings in
3  the above-entitled matter.
4
5         2/17/12
6          Date
7
8       /S/  Sharon Montini
9        Official Reporter
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1736

```
 1              UNITED STATES DISTRICT COURT
 2                DISTRICT OF CONNECTICUT
 3   * * * * * * * * * * *     *
                               *
 4   UNITED STATES OF AMERICA, * Case No 6cr160(JBA)
 5                Government,   *
                               *
 6        vs.                  *
                               *
 7   EFRAIN JOHNSON,           *
                               * February 17, 2012
 8                Defendant.   *
                               *
 9   * * * * * * * * * * * *   *
10                  TRIAL TRANSCRIPT
11                    VOLUME VIII
12   BEFORE: THE HONORABLE JANET BOND ARTERTON, U.S.D.J.
13
14   Appearances:
     FOR THE GOVERNMENT:    ALINA REYNOLDS, ESQ
15                          PETER MARKLE, ESQ.
                            United States Attorney's
16                          Office
                            1000 Lafayette Blvd
17                          Bridgeport, CT 06604
18
19   FOR THE DEFENDANT:     TODD BUSSERT, ESQ
                            FROST BUSSERT
20                          129 Church Street
                            New Haven, CT 06510
21
22   Court Reporter:        Sharon Montini, RMR
23                          141 Church Street
                            New Haven, CT 06510
24
     Proceedings recorded by mechanical stenography,
25   transcript produced by computer
```

1737

```
 1            THE COURT:  Good morning, counsel,
 2   ladies and gentlemen, Mr. Johnson.
 3            THE DEFENDANT:  Good morning, ma'am.
 4            THE COURT:  We're waiting for Mr. Taylor
 5   and one juror.
 6            MR. BUSSERT:  Your Honor, while we're
 7   waiting, I provided a copy of this case, it was the
 8   -- I'll hand it up, it's the issue I noted yesterday
 9   about questions for Dr. Williams if she was still
10   being calling, testifying as to the --
11            THE COURT:  This is your taint theory.
12            MR. BUSSERT:  Yes, your Honor.
13            THE COURT:  Have there been any
14   adjustments in the government's intention as you do
15   the research and consider the defendant's arguments
16   with respect to what the government's plans are for
17   a medical examiner witness?
18            MS. REYNOLDS:  There have been some more
19   adjustments, your Honor.  We're trying to --
20   actually -we sent a subpoena for Dr. Evangelista
21   today, and I've been reaching out for him.  We're
22   going to try to have him here for Tuesday as a
23   witness.  We intend to file a motion to preclude
24   defense from getting into on cross-examination of
25   him, of Dr. Evangelista, a pending charge because
```

1738

```
 1   it's just an allegation and not a finding.
 2            THE COURT:  When you say "get into," do
 3   you mean something other than having him acknowledge
 4   that there is this pending charge?
 5            MS. REYNOLDS:  I mean other than having
 6   him acknowledge, and also possibly even asking him
 7   about it.
 8            THE COURT:  All right, so your motion in
 9   limine is with respect to the details of the charge
10   that has not been adjudicated.
11            MS. REYNOLDS:  Correct.  I mean --
12            THE COURT:  To short-circuit that, Mr.
13   Bussert, do you -- what would be your position if it
14   were clear to the jury that the witness stood
15   accused of perjury in a -- another state, another
16   proceeding, but related to his opinion as a medical
17   examiner?
18            MR. BUSSERT:  I think, as your Honor
19   just phrased it, I don't think we would want to
20   bring out anymore information than that.
21            THE COURT:  So, have I saved you some
22   work?
23            MS. REYNOLDS:  I hope so, your Honor.
24   We still, however, haven't been able to get in touch
25   with Dr. Evangelista, so we still have the fallback
```

1739

```
 1   of Dr. Williams.  I just want to make sure we
 2   have -- we're hoping that works out.  We've got
 3   three calls out to his secretary, we sent a
 4   subpoena.
 5            THE COURT:  Otherwise, we're here at
 6   8:00 a.m. Tuesday morning.
 7            MS. REYNOLDS:  Which would not make
 8   everyone happy.
 9            THE COURT:  It makes me very happy.
10            MS. REYNOLDS:  So that's our plan,
11   anyway, and we'll follow up on that throughout the
12   day to make sure we can get him here.
13            THE COURT:  So, I then think that we
14   should tentatively schedule our charge conference
15   for Tuesday after we conclude evidence for the day.
16   I will send you a discussion draft some time tonight
17   so that you can either respond by e-mail to Ms.
18   Flagg over the weekend and give us a jump start on
19   your claims for -- your claims, or you will be ready
20   to proceed right after we finish the evidence for
21   the day.  All right.
22            MS. REYNOLDS:  And, your Honor, I would
23   at this time also renew our request for a list of
24   the defendant's proposed witnesses.
25            THE COURT:  Yes.
```

1740

```
1    MS. REYNOLDS:  We still haven't received
2  that.
3         THE COURT:  Mr. Bussert?
4         MR. BUSSERT:  Your Honor, I'm not
5  playing coy.  Obviously I don't have a list.  As
6  soon as I get a name or names, with each name that
7  comes in, I would turn it immediately over to the
8  government.
9         THE COURT:  But there is a timing
10 problem here.
11        MS. REYNOLDS:  We're happy to take the
12 universe of names at this time.  And it's not like
13 he has to call them, but if we just had --
14        MR. BUSSERT:  I will check with my
15 investigator's part of it.  It is also just to get
16 good addresses to give the government rather than
17 just names.
18        THE COURT:  Mr. Johnson, have you been
19 considering the matter of your decision on whether
20 you will testify or not?
21        THE DEFENDANT:  Yes, ma'am.
22        THE COURT:  Are you still considering it
23 or are you prepared to tell me your decision?
24        THE DEFENDANT:  I didn't make my
25 decision yet, ma'am, but I --
```

1741

```
1         MR. BUSSERT:  We're going to meet over
2  the weekend, your Honor, if that's all right, prior
3  to Tuesday.
4         THE COURT:  That's fine.  We just need
5  to prepare to move on.
6         Is Mr. Taylor here?
7         All right, good morning, Mr. Taylor.
8         THE WITNESS:  Good morning.
9         THE COURT:  You will remain under oath
10 during your cross-examination and the further
11 testimony you'll give today.  All right?
12        THE WITNESS:  Yes, ma'am.
13        THE COURT:  All right, please bring the
14 jury in.
15        (Jury entered the courtroom.)
16        THE COURT:  All right, good morning,
17 ladies and gentlemen.  Please be seated.  We will
18 continue now with Mr. Taylor's testimony on
19 cross-examination by Mr. Bussert.
20        You may proceed.
21        MR. BUSSERT:  Thank you, your Honor.
22        J O H N   T A Y L O R,
23 Having previously been duly sworn, was examined and
24 testified as follows:
25 CROSS-EXAMINATION
```

1742

```
1  BY MR. BUSSERT:
2     Q.   Yesterday you were shown a copy of your
3  plea agreement, correct?
4     A.   Correct.
5         MR. BUSSERT:  And for the record, your
6  Honor, this is Government's Exhibit 247, page 2.
7         MR. MARKLE:  Your Honor, I don't know --
8         THE COURT:  Can you move the microphone
9  over.  When you turn away, you are not amplified.
10        MR. MARKLE:  Your Honor, just for the
11 record, I'm not sure if I offered that as a full
12 exhibit, and I would.  Obviously counsel has no
13 objection.
14        THE COURT:  So the plea agreement, 247,
15 is in as a full exhibit.
16        MR. MARKLE:  And the cooperation
17 agreement?
18        THE COURT:  And 274A is also in.  Thank
19 you.  All right.
20    Q.   All right, so if we look at this here under
21 the penalties section, and I think the second
22 paragraph, the first sentence, it says, Count One,
23 Two and Three each carry a penalty of life
24 imprisonment, correct?
25    A.   Correct.
```

1743

```
1     Q.   And you understand as you are sitting there
2  that you face life imprisonment, correct?
3     A.   Correct.
4     Q.   And that's what they call a mandatory
5  minimum.  Are you familiar with that term?
6     A.   No.
7     Q.   Are you familiar with the term "mandatory
8  minimum"?
9     A.   Mandatory minimum?
10    Q.   Yes.
11    A.   I think that's my -- I'm not for sure,
12 but -- no.
13    Q.   Okay.  As you are sitting there today, you
14 face life, correct?
15    A.   Yes.
16    Q.   Life without parole?
17    A.   The only thing I know is life.  I don't
18 know the parole part or nothing.
19    Q.   You don't know anything about parole in the
20 federal system?
21    A.   No.
22    Q.   I'm going to turn your attention to page 4
23 of the agreement.  This concerns the guidelines
24 calculations.  Do you remember reviewing this prior
25 to enter your guilty plea?  Yes?
```

1744

```
1    A.   Yes.
2    Q.   If we look down here, it says a total
3  offense level of 43 and Criminal History Category VI
4  carries an imprisonment of life, correct?
5    A.   Correct.
6    Q.   So, as you sit here today, you are facing
7  life based on your guilty plea, correct?
8    A.   Correct.
9    Q.   Now, I think you said your name is John
10 Fitzgerald Taylor, correct?
11   A.   Correct.
12   Q.   You also go by the name Fitzgerald?
13   A.   Correct.
14   Q.   And you go by the name Fitz?
15   A.   Only family members call me that.
16   Q.   But if they call you that you, you go by
17 it?
18   A.   Yes.
19   Q.   And you go by Yes Yes?
20   A.   Yes, yes.
21   Q.   That's because you are a good helper,
22 correct?
23   A.   I would help anybody who need my help.
24   Q.   And Black, that's another name you have?
25   A.   Somebody gave me.
```

1745

```
1    Q.   Dreddy gave you?
2    A.   Yes.
3    Q.   And you used the name X Fitz before?
4    A.   No.
5    Q.   No?  Okay.  And you've given the name John
6  Jefferson Taylor?
7    A.   No.
8    Q.   You didn't give that name to Dr. Baranoski?
9    A.   No.
10   Q.   And the name James Taylor?
11   A.   No.
12   Q.   You hail from Pinetops, North Carolina; is
13 that correct?
14   A.   Correct.
15   Q.   From Bynum Park?
16   A.   Correct.
17   Q.   Your father is John Shorty Garden?
18   A.   John Arthur Garden.
19   Q.   Does he go by the name Shorty?
20   A.   That's his name that they gave him when he
21 was growing up.
22   Q.   And he will be 70 years old in a couple of
23 weeks.
24   A.   Yes.
25   Q.   If you could look at your monitor there on
```

1746

```
1  the right, I'm going to show you what's marked as
2  Defendant's H.  Do you recognize who that is?
3    A.   Yes.
4    Q.   Who is that?
5    A.   My father.
6    Q.   He lives in Tarboro?
7    A.   Yeah, convalescent home.
8    Q.   And his mom raised you, Suzy?
9    A.   Yes.
10   Q.   And you said, I think yesterday, you have
11 other family still in the area, correct?
12   A.   Yes.
13   Q.   And you said, I think, your aunt Laura Mae
14 lives in your grandmother's house.
15   A.   Yes.
16   Q.   And that's the over on Langley Circle.
17   A.   Yes.
18   Q.   And that's the house you grew up in.
19   A.   Yes.
20   Q.   And your cousin Jeffrey, does he live with
21 his mom?
22   A.   Yes.
23   Q.   And that's his mother, correct?
24   A.   Yes.
25   Q.   And he has like two teeth in the back?  He
```

1747

```
1  only has like two teeth in his mouth, right?
2    A.   Yes.
3    Q.   And your cousin Nicky lives in Raleigh.
4    A.   Yes.
5    Q.   And I think you testified yesterday that
6  you stopped going to school in ninth grade, correct?
7    A.   Correct.
8    Q.   Does that have anything to do with the riot
9  you were involved with?
10   A.   No.
11   Q.   That's the riot guns and knives and brass
12 knuckles were found.
13   A.   No.
14   Q.   And I think you testified yesterday, this
15 may not be exact, but you said something to the
16 effect of you were always selling drugs and hanging
17 around with the wrong people pretty much your whole
18 life, correct?
19   A.   Correct.
20   Q.   That goes back to high school, correct?
21   A.   Correct.
22   Q.   You said you moved to Connecticut to get a
23 fresh start.
24   A.   Yes.
25   Q.   The reality is you might have some
```

1748

```
1   outstanding warrants in North Carolina you were
2   trying to get away from?
3       A.   No, when I left I made sure I didn't have
4   any warrants.
5       Q.   Under North Carolina law you are known --
6   you are what is known as a habitual felon, correct?
7       A.   I'm not for sure.
8       Q.   When you picked up charges it had habitual
9   felon on your charges, correct?
10      A.   No, I never got hit with habitual felon.
11      Q.   No?
12      A.   Never.
13      Q.   Now, you came to Connecticut around
14  Thanksgiving 2004.
15      A.   Yes.
16      Q.   You drove up with Laura Mae and Jeffrey.
17      A.   Yes.
18      Q.   You'd just got out of prison.
19      A.   I been out of prison for like two, three
20  years then, I think.
21      Q.   And I think you testified you just didn't
22  want to stay in North Carolina anymore.
23      A.   Exactly.
24      Q.   So, you lived with your aunt in Norwalk.
25      A.   Yes.
```

1749

```
1       Q.   But you guys were fighting about your
2   behavior.
3       A.   No, not behavior.
4       Q.   What were you fighting about?
5       A.   Just about she wanted me to go get a job
6   and I was going to get a job, but it wasn't good
7   enough for her.
8       Q.   Were you fighting about your drug selling?
9       A.   No.
10      Q.   And then you went to live with your cousin
11  Amy.
12      A.   Yes.
13      Q.   At what point did you move to 90 Pleasant
14  Street in Waterbury?
15      A.   After I got out of prison.  After I got out
16  of -- after I found my job, then I found an
17  apartment, was saving some money, and I got out of
18  the program and I got paroled to my own place.
19      Q.   And you were living with a Jamaican guy
20  there.
21      A.   No, there was no Jamaican guy.
22      Q.   You never told your family that?
23      A.   There was never a Jamaican guy there.
24      Q.   Dreddy is Jamaican, right?
25      A.   I don't know.
```

1750

```
1       Q.   How about Ziggy?
2       A.   I don't know.
3       Q.   And you also I think mentioned yesterday
4   you had stayed with a woman Denita.
5       A.   Yes.
6       Q.   She lives in Carlton Court in Norwalk.
7       A.   Yes.
8       Q.   She's married and had a husband who was in
9   prison.
10      A.   I don't know about that.
11      Q.   You don't know about that?
12      A.   I know she's married, but I don't know he's
13  in prison or not.
14      Q.   Okay.  Now, in terms of your most recent
15  conviction in Connecticut, you were arrested in
16  September of 2005, correct?
17      A.   Oh, yes.
18      Q.   About three weeks after all of the stuff
19  we're talking about.
20      A.   Yes.
21      Q.   About three weeks after that, right?
22      A.   Yes.
23      Q.   And I think you testified yesterday that
24  you saw Azibo at the jail, right?
25      A.   Yes.
```

1751

```
1       Q.   Bridgeport Correctional?
2       A.   Yes.
3            MR. BUSSERT:  Your Honor, I'm going to
4   offer -- I think we're going to have to get a CD
5   after the fact, but a call that's on the
6   government's computer, and I don't think there is
7   any objection to this.  With Ms. Tenero's
8   assistance.
9       Q.   And I think you testified yesterday that --
10           MR. BUSSERT:  It's been previously
11  marked as Government's 606, your Honor, but we'll
12  mark it as Defendant's I, and we have a transcript
13  that accompanies that we'll mark as Defendants I-1,
14  just for purposes of the jury's review as the call
15  is being played.
16      Q.   Now, sir, again, you made calls from the
17  jail, correct?
18      A.   Correct.
19      Q.   And you made calls to Shante from the jail.
20      A.   Correct.
21      Q.   And Shante was Azibo's girlfriend.
22      A.   Correct.
23      Q.   So, I'm going to play this call, which I
24  believe was made September 26, 2005, 7:30 p.m., so
25  about two weeks after you got arrested.  I'll put
```

**GA1646**

1752

```
1    this up so we can follow along.
2              (Recording played)
3        Q.   And you got 30 months on that case,
4    correct?  That's what you were sentenced to?
5        A.   Correct.
6        Q.   And that's nothing for you.
7        A.   Just a narcotic possession case.
8        Q.   Huh?
9        A.   It was just a possession case.
10       Q.   Yeah, but you could do 30 months standing
11   on your head, right?
12       A.   No, I didn't really want to do it, but I
13   was going to try to get out and get probation maybe.
14       Q.   Well, that's what you thought you were
15   going to get in this case originally, right?
16       A.   Excuse me?
17       Q.   Probation.  You just -- you were going to
18   get probation in this case.  You didn't understand
19   why they were doing all of this to you.
20            MR. MARKLE:  Which case, your Honor?
21       Q.   This case.  This case you are sitting here
22   for.
23            THE COURT:  The one he pled guilty to?
24            MR. BUSSERT:  Yes.
25       Q.   The one you pled guilty to, sir, you
```

1753

```
1    thought you were going to get probation in this
2    case, not plead to life in prison.
3        A.   No, I never thought that.
4        Q.   And if we go back to this call, your cousin
5    doesn't trust you because you are lying.  That's
6    your family, right?
7        A.   Yes.
8            MR. MARKLE:  Object, your Honor.  The
9    document speaks for itself.  He doesn't know what
10   his cousin is thinking.
11           THE COURT:  Overruled.  The question is
12   he doesn't think that his cousin thinks he's being
13   truthful.  Is that the question?
14       Q.   Your cousin thinks you were lying.
15       A.   No.
16       Q.   No?
17           MR. MARKLE:  But that's what I'm
18   objecting to.  He doesn't know what his cousin is
19   thinking.  He knows what your Honor said.
20           THE COURT:  Would you rephrase.
21       Q.   You heard Ms. Pettway say, "He doesn't know
22   if he trust you because you be lying."  You heard
23   that, correct?
24       A.   Yes.
25       Q.   And did you understand that to mean your
```

1754

```
1    cousin didn't think you were trustworthy?
2        A.   Because he didn't want to put the money up,
3    that's it.
4        Q.   Because he didn't trust you?
5        A.   No, just because it's a lot of money to put
6    up for somebody.
7        Q.   How much money was it for that little case?
8        A.   I don't even know because I didn't know
9    nothing about no bonds up here.
10       Q.   You just said it was a lot of money, so how
11   do you know how much it was?
12       A.   Because she told me it was.
13       Q.   How much was it?
14       A.   I don't know.
15       Q.   And then you make a reference, you say, "me
16   and brother-in-law, me and brother-in-law got
17   something going on."  You are referring to Shante's
18   brother-in-law Ozzie, correct?
19       A.   Yes.
20       Q.   Yeah, because you and Ozzie got some work
21   going on, right?
22       A.   Yes.
23       Q.   Dealing some crack?
24       A.   That's what Dreddy told me when I was in
25   jail, when they bond me out, we was going to go down
```

1755

```
1    south.
2        Q.   And you were paroled on that prior
3    Connecticut case on July 30, 2007.  Is that when you
4    went to AIC, around there?
5        A.   I think so.
6        Q.   So, you were locked up for a little less
7    than two years, correct?
8        A.   Correct.
9        Q.   And during that time you received five
10   incident reports while you were in the DOC?
11       A.   I think so.
12       Q.   Now, going to 2005, you testified yesterday
13   that you met Dreddy through Kosher, correct?
14       A.   Correct.
15       Q.   And you said you didn't meet Ziggy until
16   you left for the trip to Georgia, correct?
17       A.   Correct.
18       Q.   You had never known Ziggy before that?
19       A.   Never.
20       Q.   Not at all.
21       A.   Not at all.
22       Q.   That's your testimony?
23       A.   Yes.
24       Q.   And that was around August 2005, correct?
25       A.   Correct.
```

1756

```
1    Q.   Now, in terms of your plea agreement,
2  before you could actually plead guilty in this case
3  you had to fill out a petition to enter a guilty
4  plea.  Do you remember sitting down and writing some
5  stuff down for the court?
6           MR. BUSSERT:  If I could approach, your
7  Honor.
8           THE COURT:  You may.
9           MR. BUSSERT:  Mark this as Defendant's
10 J.
11   Q.   Sir, I'm going to turn your attention to
12 page 13 of what's been marked as Defendant's J.  Do
13 you recognize that?
14   A.   Yes.
15   Q.   What is that?
16   A.   That's the plea agreement I wrote out.
17   Q.   This is actually -- if we could just go
18 back.  What's on the first page?  What's this
19 called?
20   A.   The U.S. state district attorney.  Oh.
21   Q.   Right there.
22   A.   Plea agreement.
23   Q.   Does it say "Petition to Enter a Plea of
24 Guilty"?
25   A.   Yes.
```

1757

```
1    Q.   And if we turn to page 13, is this your
2  handwriting?
3    A.   Yes.
4    Q.   You wrote out this.  All of this stuff
5  that's handwritten, you wrote all of that stuff
6  down?
7    A.   Yes.
8           MR. BUSSERT:  Your Honor, we'd offer
9  this as a full exhibit.
10          THE COURT:  Your position, Mr. Markle?
11          MR. MARKLE:  If I can just have a
12 moment.
13          No objection, your Honor.
14          THE COURT:  Defendant's J is a full
15 exhibit.
16          MR. BUSSERT:  Thank you.
17   Q.   All right, sir, if you could look on the
18 screen there to your right.  This is your
19 handwriting, correct?
20   A.   Correct.
21   Q.   And you wrote "Some time in 2005 I met
22 Azibo and Azikiwe Aquart through a person I know as
23 Kosher and hoped to be able to earn money by selling
24 drugs.  I was given crack to sell."  Correct, you
25 wrote that?
```

1758

```
1    A.   Yes.
2    Q.   And, again, it's your testimony that you
3  didn't meet Ziggy until August when you were getting
4  ready to leave for the trip.  That's what you
5  testified to?
6    A.   Well, a week or two right after that.  Just
7  a week or two.  He gave me the drugs one week,
8  invite me the next week.
9    Q.   I'm not clear, sir.  You testified
10 yesterday that before you -- before the day you got
11 in that Jeep with Ziggy you had never met him
12 before.  Wasn't that your testimony?  Isn't that
13 what you said yesterday?
14   A.   Yes.
15   Q.   That was the first time you saw him?
16   A.   First time.
17   Q.   And this says "Some time in 2005 I met
18 Azibo and Azikiwe Aquart through a person I know as
19 Kosher," correct?
20   A.   Correct.
21   Q.   So, you met both of them through Kosher?
22   A.   No, I only met Dreddy through Kosher.
23   Q.   Okay.
24   A.   Ziggy came through Dreddy.
25   Q.   Okay.  And you worked dealing drugs for
```

1759

```
1  both Azibo and Azikiwe, correct?
2    A.   I don't understand the question.
3    Q.   You would agree that in 2005 you dealt
4  drugs in Connecticut, correct?
5    A.   Yes.
6    Q.   And part of your drug dealing activity
7  involved selling drugs for and with Azibo and
8  Azikiwe Aquart, correct?
9    A.   Correct.
10   Q.   You got marijuana and crack from Azibo.
11   A.   Correct.
12   Q.   You sold it in Norwalk.
13   A.   Correct.
14   Q.   And one of the supposed reasons you started
15 selling drugs was to get clothes to replace those
16 you had lost after you had been evicted from your
17 cousin's house.
18   A.   Well, yes, correct for get clothes and also
19 for get enough money to pay for -- to find somewhere
20 to stay, too.
21   Q.   Well, after you left Amy's -- was it Amy
22 who got evicted?
23   A.   Yes.
24   Q.   Where did you go live?
25   A.   With my cousin.
```

1760



```
1    Q.   Which cousin?
2    A.   Trish.
3    Q.   So, there's another cousin?
4    A.   Yes.
5    Q.   Which you didn't mention yesterday.
6    A.   I wasn't asked.
7    Q.   Okay.  So, you had a place to stay.
8    A.   Yes.
9    Q.   But you needed to sell drugs to get a place
10   to stay.
11   A.   I needed money for to get a place to stay.
12   Q.   You had a place to stay, but you needed
13   money to get a place to stay?
14   A.   Yes, because it was only temporary.
15   Q.   At any time that you lived in Connecticut,
16   were you ever without a place to stay?
17   A.   Yes.
18   Q.   When?
19   A.   When I got -- when she -- when the housing
20   development came in and took her stuff.
21   Q.   Uh-huh.
22   A.   I didn't have nowhere to go.
23   Q.   Where did you go that night?
24   A.   I stayed with my cousin.
25   Q.   So, you had a place to go.
```

1761

```
1    A.   Just for that night.
2    Q.   And where did you go the next night?
3    A.   I got up and went to work the next morning,
4    then I came back over there and I told her, could I
5    come back stay the night, until the week is up,
6    because I'd get paycheck and I figured I could go
7    find me a room or something.
8    Q.   So, you were getting a paycheck?
9    A.   Uh-huh (indicating affirmatively).
10   Q.   And you had a cousin nice enough to take
11   you in.
12   A.   Yes, sir.
13   Q.   And she let you stay that whole week.
14   A.   Yes.
15   Q.   And then did you stay after that?  Did you
16   continue to stay with her?
17   A.   Yes.
18   Q.   How long did you stay with -- was it Trish?
19   A.   Yes.
20   Q.   How long did you stay with her?
21   A.   I don't remember.
22   Q.   A week, another week, a month?
23   A.   It might be another week maybe.  I don't
24   know, I'm not for sure.
25   Q.   After that where did you go stay?
```

1762

```
1    A.   After that?
2    Q.   Yes, after that?
3    A.   I got arrested.
4    Q.   You were arrested, I think we've
5    established, around September 12, 2005.  Is that
6    correct?
7    A.   Correct.
8    Q.   So, you had stayed with Trish the two weeks
9    before that?
10   A.   I'm not sure.  I don't remember how long I
11   stayed with Trish.
12   Q.   Where were you staying when you got
13   arrested?
14   A.   Trish.
15   Q.   Okay.
16   A.   No, no, I was staying with somebody else.
17   Q.   Who was that?
18   A.   Denita.
19   Q.   How long were you staying with Denita?
20   A.   I don't remember either, but maybe about a
21   month.
22   Q.   And did you live with Trish before Denita,
23   or was there somebody else?
24   A.   There was Amy, Trish and then Denita.
25   Q.   At any point -- well, strike that.  Let me
```

1763

```
1    rephrase the question.  You moved to Connecticut
2    around Thanksgiving of 2004, right?
3    A.   Yes.
4    Q.   You got arrested on September 12, 2005,
5    correct?
6    A.   Yes.
7    Q.   Every night that you were up in
8    Connecticut, you had a place to lay your head,
9    correct?
10   A.   Yes.
11   Q.   You never slept out on the street.
12   A.   No.
13   Q.   And as you said, when you got kicked out of
14   Amy's place, you were working.
15   A.   Yes.
16   Q.   And you were waiting for your next
17   paycheck.
18   A.   Yes.
19   Q.   But the reason you started selling drugs,
20   you said, was not only to get clothes, but to get a
21   place to stay.
22   A.   Yes.
23   Q.   Isn't it more accurate that once you met
24   Dreddy and Ziggy through Kosher that your work was
25   just selling drugs with Ziggy and Dreddy?
```

1764

```
1    A.   I ain't understand you.
2    Q.   Once Kosher introduced you to the Aquart
3  brothers, you went back to your old ways from North
4  Carolina and just started selling drugs again.
5    A.   Well, at that time I ain't had no more job
6  then.
7    Q.   So, you would agree that's what happened?
8    A.   Agree to what, the selling drugs?
9    Q.   Yeah, once you met the Aquart brothers you
10 started selling drugs again.
11   A.   Yes.
12   Q.   Marijuana and crack.
13   A.   Marijuana.
14   Q.   Well, let's talk about that for a second.
15 You were asked yesterday if you sold $250 of
16 marijuana how much did you keep.  You said $150,
17 correct?
18   A.   Just a -- yes.
19   Q.   That was your testimony, correct?
20   A.   Yes.
21   Q.   So, I think I understand it -- excuse me,
22 I'm looking at Government's 200B.  These are the
23 little bottles, right?
24   A.   Yes.
25   Q.   You don't know where these came from, but
```

1765

```
1  this is what it looks like.
2    A.   Yes.
3    Q.   And one of these sells for $20, correct?
4    A.   Yes.
5    Q.   So, if we were talking about $250 worth,
6  we're talking about 12 bottles, correct?
7    A.   Yes.
8    Q.   And yesterday you talked about Dreddy
9  giving you a thousand bottles at a time, correct?
10   A.   Yes.
11   Q.   That's a lot of clothes, isn't it?
12   A.   It all depend.  Yes.
13   Q.   Now, in terms of Dreddy and Ziggy, you used
14 to ride around in the car with them, correct?
15   A.   With who?
16   Q.   With Dreddy and Ziggy.  You guys used to
17 drive around together.
18        MR. MARKLE:  Your Honor, I would ask
19 counsel to be more specific.
20        THE COURT:  If you can attach a time
21 frame to your question, please.
22   Q.   Prior to August of 2005, when you were
23 dealing drugs with the Aquart brothers, you used to
24 ride around in the car with them, correct?
25   A.   Where?  In Connecticut?
```

1766

```
1    Q.   In Connecticut, wherever.
2    A.   No.
3    Q.   The Aquart brothers treated you right.
4    A.   Yes.
5    Q.   They treated you fair.
6    A.   Yes.
7    Q.   They treated you with respect.
8    A.   Yes.
9    Q.   Dreddy would ask you what you think.
10   A.   No.
11   Q.   You don't recall telling Dr. Baranoski
12 that?
13        MR. MARKLE:  Your Honor, I'm going to
14 object to questions regarding Dr. Baranoski.
15        MR. BUSSERT:  I'll claim it.
16        MR. MARKLE:  May we approach?
17        THE COURT:  Yes.
18        (Sidebar conference)
19        MR. BUSSERT:  Your Honor, we feel that
20 not only the substance of what he told Dr. Baranoski
21 but the fact that he was referred for assessment,
22 was seen for that purpose, is completely ripe for
23 cross-examination.  We rely on U.S. v Robinson,
24 which is 583 F.3d 1265.  It's a Tenth Circuit 2009
25 case.
```

1767

```
1        THE COURT:  Do you have a copy of it for
2  me?
3        MR. BUSSERT:  I don't, unfortunately.
4        THE COURT:  But I don't understand --
5  let me just break that down.  He was not referred.
6  You said he was referred for that purpose.  What do
7  you mean?
8        MR. BUSSERT:  He was referred for
9  assessment.
10       THE COURT:  What do you mean by "that
11 purpose"?  The assessment was for sentencing.
12       MR. BUSSERT:  He was referred for a
13 psychological assessment.
14       THE COURT:  No, he was referred for a
15 psychological assessment to be used in aid of
16 sentencing.  So now I want to know why --
17       MR. BUSSERT:  Respectfully, your Honor,
18 while the timing, it may not be advantageous for the
19 government's case, perhaps it could have waited
20 until the conclusion of this case, the realty of it
21 is that it occurred, it's available, it's pertinent
22 to his credibility, and I think --
23       THE COURT:  This is leading to your
24 claim that that report should come in.
25       MR. BUSSERT:  No, I don't think the
```

1768

```
 1   report, but I think I should be free to be able to
 2   ask him questions about it, about things that he
 3   said, and I made a very concerted effort to focus on
 4   those things that are either clear in Dr.
 5   Baranoski's notes or she testified to the other day.
 6   I'm not going to get into the whole moving Shante
 7   and all that stuff, that's not really involved here,
 8   but in terms of his relationship with the Aquart
 9   brothers and how he described that to her, I think
10   it's all relevant.
11             THE COURT:  All right, what's the
12   government's position?
13             MR. MARKLE:  Your Honor, I think it's
14   hearsay.  It's not inconsistent.  He said they were
15   fair to me, they respected me.  I've looked at the
16   notes, your Honor.  The notes have approximately
17   four quotations, as I remember, which she said were
18   actually his words, not her words, not her
19   recollection.  I think one is "rolling stone," one
20   was -- I have them written down.  There is four
21   things in quotes out of whatever, a 12-page, 13-page
22   assessment.  It's not his statement.  It was never
23   -- I mean, I've already argued this.
24             MR. BUSSERT:  Your Honor, it's customary
25   and it's routine that if it was a 302 and I would
```

1769

```
 1   say, didn't you tell the agents this, there would be
 2   no question that's a permissible question.
 3             THE COURT:  Here is what we're going to
 4   do, because you all have sort of --
 5             MR. BUSSERT:  I can ask the question, he
 6   can deny it, and that's the end.
 7             THE COURT:  I want you to move to
 8   another section of the examination of him at this
 9   time so that we can at the recess have a clearer
10   colloquy of where you are going with this if you are
11   going beyond that which Baranoski said were his
12   words.  Okay?
13             MR. BUSSERT:  Well, just for everybody's
14   purposes, I don't intend to show him the
15   evaluations, I don't intend to offer the evaluation,
16   I don't intend to show him the notes.  If he wants
17   to deny he said it, so be it.
18             THE COURT:  Okay, but at the recess I
19   want to know if you are claiming and will be
20   examining on something beyond what Dr. Baranoski
21   testified were his words put in quotes.
22             MR. BUSSERT:  Okay.
23             (Sidebar concluded)
24        Q.   So, just to reiterate, sir, you agree that
25   you felt the Aquarts treated you right and treated
```

1770

```
 1   you fair, correct?
 2        A.   Correct.
 3        Q.   And you felt honored when they asked you to
 4   go down south with them, correct?
 5        A.   Wasn't no honor, it was just somebody ask
 6   you to go down south.  It's like somebody saying
 7   would you like to go fishing.  You know, it's not an
 8   honor.
 9        Q.   Driving 15 miles -- or excuse me, 15 hours
10   to Atlanta is like going fishing?
11        A.   No, it's not like going fishing, but it's
12   like somebody asking you do you want to go fishing
13   this weekend, that's not honor, it's like you don't
14   have nothing to do, hey, let's go.
15        Q.   And when you went on that trip, Dreddy
16   wanted to know if he could count on you, right?
17        A.   Never talked about that.
18        Q.   And when you hung out with the Aquart
19   brothers, you knew because of your size that part of
20   their motivation was for protection, have you around
21   for protection.
22        A.   No.
23        Q.   Well, in terms of your testimony yesterday,
24   you testified that your role in going into the
25   apartment the second time, for going to the
```

1771

```
 1   apartment the second time was to control the son,
 2   correct?
 3        A.   That's what I was told.
 4        Q.   And you were down with that.  You agreed to
 5   do that.
 6        A.   That's what I was told.
 7        Q.   I'm not saying what you were told, I'm
 8   saying you went in there because you agreed to do
 9   that, that was going to be your job.
10        A.   Yes.
11        Q.   You said control him, correct?  That was
12   your testimony "control him"?
13        A.   Yes.
14        Q.   So, what were you going to do, bear hug
15   him?
16        A.   If it came down to it, yes.
17        Q.   You were going to do more than that,
18   correct?
19        A.   You just said bear hug.
20        Q.   I know, but you said if it came down to
21   that.  But if it came down to more than that, you
22   were going to do what was necessary, right?
23        A.   No.
24        Q.   Well, how were you planning to control this
25   young man?
```

1772

```
 1      A.   If it came down to a bear hug.
 2      Q.   That's it?  Were you going to lay on top of
 3 him?
 4      A.   Yes.
 5      Q.   How do you normally control individuals?
 6      A.   I never been in a predicament like that,
 7 so --
 8      Q.   Never been in a predicament like that.
 9           MR. MARKLE:  Your Honor, I object to the
10 comments and ask for questions.
11           THE COURT:  Sustained.
12      Q.   You testified that when you went in the
13 apartment all you saw was an old guy, right?
14      A.   Yes.
15      Q.   When you first went in, and he got pushed
16 back to the back bedroom, right?
17      A.   Yes.
18      Q.   You testified no one ever came out of the
19 bedrooms after that, right?
20      A.   No one, no.
21      Q.   None of the other people came out?
22      A.   No.
23      Q.   Except Dreddy went running back, right?
24 You testified he went running back.  When all of the
25 chaos began, he went into the back bedrooms.
```

1773

```
 1      A.   I understand you, but then I don't.
 2      Q.   Okay, what don't you understand?
 3      A.   You said Dreddy run back.  That's it,
 4 that's the only thing I understand.
 5      Q.   You said you guys went into the apartment,
 6 correct?
 7      A.   Correct.
 8      Q.   You were at the very end.
 9      A.   Yes.
10      Q.   You are the biggest guy, but you are in the
11 back.
12      A.   Yes.
13      Q.   Right?  And Dreddy and Ziggy, they pushed
14 the old guy back to the bedroom.  Is that what I
15 understand happened?
16      A.   Well, the guy just started going back in
17 the back room.  With Dreddy telling him to get down
18 on the ground, he started going back in the back, in
19 the bedroom.
20      Q.   And Dreddy went back there with him?
21      A.   No, Dreddy went into the other room and
22 Ziggy went in the other room, and me and Big Guy was
23 standing there in the door.
24      Q.   So, as I understand it then, Dreddy and
25 Ziggy went back to the bedrooms like that, they
```

1774

```
 1 split up?
 2      A.   Yes.
 3      Q.   But then Dreddy stopped what he was doing
 4 and came back to help you move a couch, right?
 5 That's your testimony?
 6      A.   Yes, he stopped doing what he was doing.
 7 He helped me to -- no, he came out before everybody
 8 got -- everybody got on the ground, he came back
 9 out, and when Ziggy was in the room with them and
10 Big Guy was right here, and me and him standing
11 beside each other.  Then when Dreddy came back out,
12 he said, come on, help me push this couch.  I said,
13 okay.  We pushed the couch to the door and wedged
14 the door.
15      Q.   So, Dreddy went in carrying a gun, right?
16 You testified to that.
17      A.   Yes, he was carrying a gun.
18      Q.   That's what you said.  And you also say
19 that there were some baseball bats, right?
20      A.   Yes.
21      Q.   But he stopped everything to help you move
22 that little couch.  You know, you couldn't move that
23 couch by yourself?
24      A.   Well, you saying everything.  What do you
25 mean?
```

1775

```
 1      Q.   He came out of that back bedroom, whatever
 2 was going on in there, to help you move a couch.
 3 That's your testimony.
 4      A.   What -- I'm going to tell you what was
 5 going on in there was when we got in the room again,
 6 Dreddy was in the room and Ziggy was in the room and
 7 Big Guy was standing in the door, Dreddy came out of
 8 the room before duct taping.  There wasn't no duct
 9 taping, wasn't nothing going on in there, now Dreddy
10 comes out, said, come on, can you help me push this
11 couch.  I helped him push the couch to the door.
12      Q.   So he left those people in the bedroom?
13      A.   With Ziggy.
14      Q.   Ziggy.  So, Ziggy was with the two people?
15      A.   Yes.
16      Q.   And the old guy was by himself at that
17 point then?
18      A.   Big Guy was standing in the door.
19      Q.   I thought you said Big Guy was standing
20 with you when Dreddy came out.
21      A.   Both of us was standing right beside each
22 other at the door.
23      Q.   But you said you were standing by the
24 window yesterday.  You said you stood by the window,
25 you came over, you saw Big Guy, and then you went
```

**GA1652**

1776

```
1   back, but you never said you were standing by Big
2   Guy.
3       A.   Okay, we got inside the apartment, Dreddy
4   and Ziggy went inside, Big Guy, me.  Big Guy was in
5   the front standing in the door where I was at.
6   Dreddy came out of the room, asked me to push the
7   couch, help him push the couch to the door.  Pushed
8   the couch to the door, wedge the couch, Dreddy told
9   me, he said, Black, can you go stand over here, look
10  out the window.  Dreddy went back in the room with
11  the people.  Now he duct taping.
12      Q.   Well, you hear duct taping.
13      A.   Yes, I'm hearing duct taping.
14      Q.   You can't see anything.
15      A.   Okay.
16      Q.   No, no, let's be clear about this.  You
17  said you are standing by the window in the corner,
18  correct, in the living room?
19      A.   Correct.
20      Q.   And then you say Dreddy is duct taping?
21      A.   I go back and forth.
22      Q.   Back and forth?
23      A.   Now, I hear duct taping by the window, I go
24  back and look, I see Dreddy duct taping, I go back
25  to the window, that's when I see somebody coming,
```

1777

```
1   coming upstairs, I said I saw somebody coming.  Then
2   somebody came over, oh, it's nobody, then everybody
3   went right back doing what they was doing.
4       Q.   I guess I have one question about all of
5   this, and that is, when did you go look for the son?
6       A.   Who said that?
7       Q.   I'm asking you that.
8       A.   I never said that.
9       Q.   No, I'm asking you when did you go look for
10  him?
11      A.   When did I go look for him?
12      Q.   Yes.
13      A.   I don't think nobody went look for nobody's
14  son.
15      Q.   Well, that was your job, I thought, to
16  control the son.  So, your job was to locate and
17  control the son, no?  That's what you just said.
18      A.   The son wasn't even there.  There only
19  three people there.
20      Q.   I realize that, but did you ever go look
21  for him?
22           MR. MARKLE:  Where, your Honor?
23      Q.   In the apartment, did you ever look in the
24  apartment for this son?
25      A.   Wasn't no son there.
```

1778

```
1       Q.   So, your role in this was to control the
2   son, but he wasn't there, so you just went and stood
3   by the window.
4       A.   I did what I was told.
5       Q.   And when you went in there, you had been
6   talking to Dreddy, he was going to set you up with
7   your own spot, correct?
8       A.   I'm not understanding.  You saying when I
9   was in where?
10      Q.   Before you went into that apartment that
11  morning.  You know what I'm referring to, correct?
12      A.   Before I went in?
13      Q.   The apartment.
14      A.   Which apartment?
15      Q.   Ms. Johnson's apartment where those three
16  people were.  The apartment we're talking where
17  these crimes occurred.
18      A.   Yes.
19      Q.   Okay?
20      A.   Yes, yes.
21      Q.   Before you went in there, I'm not saying
22  like a minute before, but a couple days before, you
23  had spoken with Dreddy and he was going to set you
24  up with a spot at Charles Street, correct?
25      A.   No, that was after the fact.
```

1779

```
1       Q.   It was after the fact?
2       A.   After we left -- after the first attempt we
3   went into the apartment, not the --
4       Q.   Okay.
5       A.   That was way before, okay.
6       Q.   So, after the first attempt he talked to
7   you about I'm going to set you up here at Charles
8   Street, correct?
9       A.   On the third floor.
10      Q.   Yeah, on the third floor, which is -- you
11  consider the garage the first floor.
12      A.   Yes.
13      Q.   So, in terms of when you guys actually
14  break into the apartment, this was a job addition
15  for you, correct?
16      A.   This was a job?
17      Q.   Dreddy was looking for you to take over the
18  spot.
19      A.   No, I wasn't -- only thing I knew, he said
20  he was going to set me up just for sell drugs on the
21  third floor.
22      Q.   Right.
23      A.   That's it.
24      Q.   You were going to sell crack.
25      A.   Yes.
```

**GA1653**

1780

1       Q.   And crack makes more money than marijuana,
2   correct?
3       A.   Yes.
4       Q.   And you'd been dealing crack your whole
5   life?
6       A.   Yes.
7       Q.   So, this was time for you to stake your
8   claim in Connecticut.  You moved up here to get a
9   fresh start, right?
10      A.   Yes.
11      Q.   You moved up to get a fresh start.  So,
12  this is your opportunity to get your own drug spot
13  in Connecticut, correct?
14      A.   No.
15      Q.   I mean, didn't you have to show Dreddy what
16  you were able to do?
17      A.   No.
18      Q.   You didn't have to show him you could keep
19  people in line?
20      A.   No.
21      Q.   Push out the competition if they needed to
22  be pushed out?
23      A.   No.
24      Q.   Well, didn't you testify yesterday that
25  Dreddy was talking about moving these people out of

1781

1   the building?
2       A.   That was all before I came in the picture.
3   So, whatever he had going on before I came in the
4   picture, that was already -- he was already planning
5   on doing this way before I came in the picture.
6       Q.   So be it, but your testimony was that he
7   told you that these people were cutting in on his
8   business, right?  They were cutting his money out,
9   they got to move them out?
10      A.   I overheard him talking to his brother.  So
11  he wasn't telling me.
12      Q.   But you knew.
13      A.   Well, I knew because I was overhearing.  I
14  was ear hustling, basically.
15      Q.   Ear hustling, whatever you want to call it,
16  you knew, right?  So, you were at Charles Street
17  where you were going to take over the drug spot,
18  your boss went in that apartment, and all you did
19  was go and stand by the window?  That's your
20  testimony?
21      A.   That's what I did.
22      Q.   And when you say you were ear hustling,
23  that's when you were down south, right?
24      A.   Yes.
25      Q.   So, when you came up to Connecticut, you

1782

1   were down for whatever, whenever, correct?
2       A.   No.
3       Q.   Let's talk about the trip down south.  You
4   testified that you drove with Ziggy, correct?
5       A.   Correct.
6       Q.   In the Jeep, correct?
7       A.   Correct.
8       Q.   And Dreddy drove with Shante, correct?
9       A.   Correct.
10      Q.   And that was in the Cadillac.
11      A.   Correct.
12      Q.   The red one.
13      A.   Correct.
14      Q.   And you drove to Busch Gardens, correct,
15  the first day?
16      A.   Ziggy drove to Busch Gardens.
17      Q.   Well, the group?
18      A.   Okay, yes.
19      Q.   The group drove, okay.  And you were alone
20  in that car with Ziggy for eight hours, correct?
21      A.   Correct.
22      Q.   What did you guys talk about?
23      A.   We didn't really talk, we smoke,
24  chitchatted.
25      Q.   About what?  What did you chitchat about?

1783

1       A.   Nothing really.
2       Q.   Nothing really?
3       A.   Women.
4       Q.   Women.  What else?
5       A.   Smoking.
6       Q.   Smoking.  What else?
7       A.   That's about it.
8       Q.   Eight hours all you did was chitchat,
9   smoke, talk about smoking and women, right?
10      A.   Yes.
11      Q.   Wouldn't you agree eight hours to spend
12  alone with somebody in a car, that's not a small
13  amount of time, that's a decent amount of time,
14  right?
15      A.   Yes.
16      Q.   And you had been dealing drugs with Ziggy
17  before that, correct?
18      A.   No.
19      Q.   Because you met Ziggy through Kosher.
20          MR. MARKLE:  Your Honor, objection.
21  That's a misstatement.  He already went over that,
22  he said it was incorrect.
23          THE COURT:  Sustained.
24      Q.   So, you go to Busch Gardens, right?
25      A.   Yes.

1784

```
1    Q.   You spent -- the group spent most of the
2  day there, correct?
3    A.   Yes.
4    Q.   And then it's on to home sweet home in
5  North Carolina, correct?
6    A.   Yes.
7    Q.   For a barbecue.
8    A.   Yes.
9    Q.   A North Carolina barbecue.
10   A.   If you want to say that, yeah.
11   Q.   People in North Carolina take pride in
12 their barbecue.
13   A.   Yes.
14   Q.   Who was at this barbecue?
15   A.   Friends.
16   Q.   Like?
17   A.   Friends of mines.
18   Q.   Like who were they?
19   A.   Annie, her husband, her kids, their
20 friends.
21   Q.   And you introduced your friends the Aquarts
22 to them?
23   A.   Yes.
24   Q.   And then you went on to Atlanta, correct?
25   A.   Correct.
```

1785

```
1    Q.   You weren't going to stay in North
2  Carolina, right?  You were home, but you weren't
3  going to stay home, right?
4    A.   No.
5    Q.   You had been bouncing around from place to
6  place in Connecticut, selling drugs to get money for
7  a roof over your head, you said, but you weren't
8  going to just stay in North Carolina with your
9  family.
10   A.   I was already staying up here now.
11   Q.   And this is where the money was, right?
12   A.   No, it's where I had a little job,
13 nightclub.
14   Q.   What do you call your job selling drugs
15 with Dreddy?
16   A.   What did I call my job selling drugs?  I
17 don't understand that.
18   Q.   You said "I had a little job."  At this
19 point you admit you were selling drugs with Dreddy.
20 You had that little job, right?
21   A.   Little, yes.
22   Q.   You weren't going to leave that behind,
23 right?  You were coming back up, right, with your
24 boys, the Aquarts?
25   A.   We came down together, so we all leave
```

1786

```
1  together.
2    Q.   Of course.  So, then it's from Pinetops to
3  Atlanta, correct?
4    A.   Correct.
5    Q.   And that's another eight hours in the car
6  with Ziggy, right?
7    A.   Correct.
8    Q.   So, what did you and your new friend talk
9  about this time?
10   A.   Nothing.
11   Q.   Nothing.  You didn't speak to him at all?
12   A.   Yeah, we talked.  We're like going over the
13 rides and the women, the people we met, all the
14 people there.  General talk, that's it.
15   Q.   General talk.  Didn't talk about drugs?
16   A.   Nope.
17   Q.   When you got to Georgia, you picked up
18 drugs, correct?
19   A.   No.
20   Q.   No?  You've been in the drug game a long
21 time, correct?
22   A.   Yes.
23   Q.   And so you know that the whole purpose of
24 driving down in separate cars is to protect people,
25 right?
```

1787

```
1    A.   No.
2    Q.   One car has got the drugs, one car has got
3  the person watching the drugs?
4    A.   No.  One reason I think we went with two
5  cars, because I'm a big guy and a little bitty
6  Cadillac he was driving, his baby momma was
7  pregnant, so it's a small Cadillac, so she would
8  have been real uncomfortable then with me sitting
9  behind her or her sitting in the back seat.
10   Q.   Couldn't the four of you fit in the Jeep
11 that you were in?
12   A.   It was a little bitty Jeep, too.  No room
13 in those Jeeps.
14   Q.   So, it's your testimony that it was cheaper
15 to take two cars down and pay for gas for two cars
16 than maybe rent a little bit bigger car that would
17 fit everybody?
18       MR. MARKLE:  I don't think he said it
19 was cheaper, your Honor.
20       THE COURT:  I don't know where that --
21 do you want to clarify that, Mr. Bussert.
22   Q.   You testified yesterday that when you drove
23 down you stopped to get gas, correct?
24   A.   Yes.
25   Q.   And that each time you stopped for gas,
```

1788

1   Dreddy paid for the gas, correct?
2      A.   Correct.
3      Q.   And this was also a rental car, correct?
4      A.   Correct.
5      Q.   But the Cadillac was too small for four
6   people, correct?
7      A.   Correct.
8      Q.   And the Jeep was too small for four people?
9      A.   Correct.
10     Q.   Did you ask Ziggy why they just didn't get
11  a bigger car to rent so that you guys could all
12  drive together?
13     A.   Well, it wasn't like we was talking about
14  it.  That was my assumption that I was thinking,
15  that that would -- they probably was thinking.
16     Q.   But I think you testified yesterday you
17  guys got pulled over, right?
18     A.   Yes.
19     Q.   You and Ziggy, right?
20     A.   Yes.
21     Q.   And Ziggy had a gun?
22     A.   Yes.
23     Q.   You didn't know anything about the gun?
24     A.   No.
25     Q.   But Dreddy wasn't in that car, right?

1789

1      A.   No.
2      Q.   It was lucky for him, right?  If you guys
3   had all shared a car, he might have got in trouble.
4      A.   I don't know.  I thought all of us would
5   get in trouble, me and Ziggy anyway, but we didn't.
6      Q.   Didn't Ziggy and Dreddy bring you down
7   south to handle any problems that might come up if
8   there was any problems with the drug dealing.
9      A.   I don't know nothing about no drug dealing.
10     Q.   But you do know a little bit about drug
11  dealing with respect to Azibo, right?  At this point
12  you were dealing drugs with Azibo, correct?  You
13  testified to that.
14     A.   Azibo had gave me some marijuana, that was
15  it.
16     Q.   That was it.  So, you guys finish your
17  business in Georgia, correct?  Whatever happened you
18  guys decided to leave, correct?
19     A.   When you said "finish your business in
20  Georgia," what do you mean?
21     Q.   At some point you guys were in Georgia and
22  you left, correct?  And you drove straight through,
23  except I think you said you took a nap up in New
24  Jersey, correct?
25     A.   Yes.

1790

1      Q.   And that's about a 15-hour drive, correct?
2      A.   Possibly.
3      Q.   And Azibo is in a rush back, right, because
4   he has to get that product on the street, right?
5      A.   I don't know what product you are talking
6   about.
7      Q.   Yesterday you talked about two different
8   trips to Charles Street, correct?
9      A.   Correct.
10     Q.   You mentioned a moment ago, correct, you
11  said there were two different trips, right?
12     A.   Yes.
13     Q.   I think you testified the first time Dreddy
14  called you and you took the train up, correct?
15     A.   Correct.
16     Q.   And you guys went to a diner?
17     A.   Correct.
18     Q.   And you testified when you get that call
19  you didn't really know what it was about, just
20  Dreddy called you, you showed up, correct?
21     A.   Correct.
22     Q.   And then nothing happened and you went
23  home, correct?
24          MR. MARKLE:  Objection, your Honor,
25  "nothing happened."

1791

1      Q.   You guys didn't go into the apartment that
2   night, correct?
3      A.   Correct.
4      Q.   And then you went home?
5      A.   Correct.
6      Q.   And you went home on the train?
7      A.   Correct.
8      Q.   What time was that?
9      A.   I don't know.
10     Q.   Was it late?
11     A.   I know it was nighttime.  I don't remember
12  what time it was.
13     Q.   Before or after midnight?  Do you know?
14     A.   No, not for sure.
15     Q.   And then you testified yesterday you got a
16  call a couple nights later, correct?
17     A.   Correct.
18     Q.   And then this time you said Dreddy told you
19  that Big Guy has some girls at the diner, correct?
20     A.   Correct.
21     Q.   You weren't going to miss that.  You got
22  dressed and left, right?
23     A.   Correct.
24     Q.   And this time you drove up?
25     A.   Correct.

1792



```
1    Q.   Didn't take the train, you drove up, you've
2    got to get there, correct?
3    A.   Correct.
4    Q.   And you get there and there is no girls.
5    A.   Correct.
6    Q.   Which must have been little disappointing,
7    right?
8    A.   Correct.
9    Q.   Can you explain this:  Why is it that both
10   times you came up to Bridgeport, the first time and
11   the second time, why were you dressed in all black
12   both times if you didn't know?
13   A.   Why was I dressed all in black?
14   Q.   Yeah.
15   A.   Because I work in nightclubs and nine out
16   of ten I used to keep my blacks on just in case he
17   called me, I go, go work, go to work.
18   Q.   When you showed up both times Ziggy and
19   Dreddy were all dressed in black, right?
20   A.   I don't remember what they was dressed in.
21   Q.   You don't remember?
22   A.   No.
23   Q.   So, it's just a coincidence you show up
24   dressed in black twice and you go into Charles
25   Street twice, correct?
```

1793

```
1    A.   Correct.
2    Q.   And nothing about that first night scared
3    you off from coming back the second night, correct?
4    A.   Correct.
5    Q.   You are down for whatever, whenever?
6    A.   Correct.
7    Q.   Also, I think you made mention yesterday,
8    the first night you guys climbed over a wall; is
9    that correct?
10   A.   The first night?
11   Q.   Yeah.
12   A.   Yes.
13   Q.   How tall are you?
14   A.   Maybe six, six and a half, maybe 6'1.
15   Q.   How much do you weigh?
16   A.   Now I weigh 386, maybe 387.
17   Q.   How much did you weigh then?  Approximately
18   the same, 10, 20 pounds?
19   A.   No, I weigh more now.
20   Q.   You weigh more now.  So, as I understand
21   your testimony from yesterday, the first night it
22   was you, correct?
23   A.   Correct.
24   Q.   You were there.  And you are dressed in all
25   black, correct?
```

1794

```
1    A.   Correct.
2    Q.   And Ziggy and Dreddy, right?
3    A.   Correct.
4    Q.   And they both -- you said you don't
5    remember if they were dressed in all black.  That's
6    your testimony?
7    A.   Correct.
8    Q.   They both have like these long dreadlocks,
9    correct?
10   A.   Correct.
11   Q.   I think, like, Dreddy's comes down to his,
12   butt, correct?
13   A.   Correct.
14   Q.   Ziggy's as well?
15   A.   Correct.
16   Q.   And then you said this guy was here, too,
17   right, the Big Guy?
18   A.   Yes.
19   Q.   And you said -- so it's the four of you in
20   the parking lot at the diner, correct?
21   A.   Correct.
22   Q.   Two guys are carrying bats, correct?
23   A.   Correct.
24   Q.   That was your testimony.  And you are
25   climbing over a wall, right, late at night?
```

1795

```
1    Correct?
2    A.   Correct.
3    Q.   In an area police have known for
4    drug-related violence, correct?
5    A.   I don't know nothing about that.
6    Q.   Did you know anything about the raids on
7    Charles Street before that night?
8    A.   Don't know nothing about that.
9    Q.   Fair to say, though, that if anybody had
10   seen you that would have raised a lot of suspicions;
11   don't you think?
12   A.   If anybody would have seen?
13   Q.   Seen you four guys with two bats climbing
14   over walls?
15   A.   Yes.
16   Q.   That might have raised some eyebrows,
17   right?
18   A.   Yes.
19   Q.   But who cares, right?  Dreddy wasn't
20   concerned about that, right?
21   A.   At the time I don't think nobody was
22   concerned about it.
23   Q.   I mean, if Dreddy got arrested before he
24   reached his destination, he didn't care, right?
25   A.   I don't know about that.
```

1796

```
1    Q.   The second time you said you parked in the
2    garage, correct?
3    A.   Correct.
4    Q.   Yesterday there seemed to be a lot of
5    confusion about the name Shante and Charmaine.
6    Would you agree with that?  You would say Charmaine,
7    Mr. Markle would say Shante?
8    A.   Yes.
9    Q.   And do you know Shante Pettway to be
10   Dreddy's girlfriend?
11   A.   Yes.
12   Q.   But you knew a Charmaine Pettway as well,
13   correct?
14   A.   Yes.
15   Q.   She's a girl you helped rob at gunpoint in
16   North Carolina, correct?
17   A.   No.
18   Q.   No?
19   A.   No.
20   Q.   That's not the time you were carrying that
21   metal pipe?
22   A.   What metal pipe?
23   Q.   The metal pipe?
24   A.   I don't --
25           MR. MARKLE:   Objection.
```

1797

```
1    A.   I don't know nothing about no metal pipe.
2           MR. MARKLE:  There's no relevance.
3           THE COURT:  It's been asked and
4    answered.  Let's have the next question, please.
5    Q.   Yesterday Mr. Markle asked you about some
6    of your felony convictions, correct?
7    A.   Correct.
8    Q.   And one of your conviction is for aiding
9    and abetting --
10          MR. MARKLE:  I object, your Honor.
11          THE COURT:  May I see you at sidebar,
12   please.
13          (Sidebar conference).
14          THE COURT:  Where are you going next.
15          MR. BUSSERT:  I just wanted to confirm.
16   I believe this is a felony conviction.
17          THE COURT:  Okay, but not what the
18   felony conviction is for.
19          MR. BUSSERT:  I think the rule allows
20   it.  If your Honor would like, I've got authority in
21   my binder I can cite, but I think the rule does
22   allow this.
23          THE COURT:  I don't.
24          MR. BUSSERT:  If I can get the
25   authority, just for the record.
```

1798

```
1           THE COURT:  All right.
2           MR. BUSSERT:  We read 609(a)(1), it
3    allows the admission of the nature of the witness's
4    prior felony conviction, including the statutory
5    name of the offense, date of conviction and the
6    sentence imposed subject to a 403 analysis, and
7    Estrada, U.S. v Estrada, 430 F.3d 606 --
8           THE COURT:  Circuit?
9           MR. BUSSERT:  Second Circuit, your
10   Honor, 2005, seems to be the case most on point and
11   there is language in there, "609(a)(1) presumes all
12   felonies are at least somewhat probative of a
13   witness's propensity to testify truthfully."  So, I
14   believe this might be in there.  The Advisory
15   Committee Notes make clear that while the prior
16   conviction of a government witness are likely to --
17   I'm sorry, "the Advisory Committee Notes make clear
18   that while prior convictions of a government witness
19   is likely to inflame the jury or invite a propensity
20   inference, they may cause unfair prejudice to the
21   government's interest in a fair trial or
22   embarrassment to the witness."  I think that's the
23   403 analysis that's at issue, and I think this is
24   directly relevant, directly on point.
25          THE COURT:  So what you propose is to
```

1799

```
1    ask him what the felony conviction was for.
2           MR. BUSSERT:  I propose to say you were
3    convicted of aiding and abetting common law robbery,
4    and that was August 1997.  I'll ask him what the
5    original charge was.
6           MR. MARKLE:  The government's position
7    is he's entitled to ask, as the government already
8    brought out, he's convicted of a felony offense on
9    such and such a date and not what type of crime it
10   was.  It just leaves the jury to speculate what was
11   behind it, and obviously he got in the facts of
12   that, which he already did by starting that way and
13   then going back to the conviction.
14          THE COURT:  So, does the ten-year
15   limitation -- is there a ten-year limitation
16   implicated here?
17          MR. BUSSERT:  I think the government's
18   already opened the door relative to putting it on
19   the record yesterday.  So, I think whatever the
20   implication is, it has been waived.
21          THE COURT:  All right, let me take
22   another look at Estrada and let's leave the area of
23   his prior criminal history for after the recess.
24          MR. BUSSERT:  Okay, and I would just say
25   in terms of your Honor's deliberations, I would just
```

1800

```
1   simply note that, again, this isn't just any other
2   witness.  This is the key witness.  I don't think
3   there is a more important from the defense case than
4   this.  So the idea that he may suffer some
5   embarrassment, or whatever else there may be, I
6   mean, ultimately what's at the heart of this case on
7   some level --
8            THE COURT:  None of these felony
9   convictions -- is it correct, none of the felony
10  convictions are directly crimes involving falsehood
11  or --
12            MR. BUSSERT:  I'll go to that next.
13            THE COURT:  What's that?
14            MR. BUSSERT:  In the underlying conduct
15  he -- actually it was his -- I'm not really as
16  concerned about the conviction.  There was a --
17            THE COURT:  Are any felony convictions
18  for crimes involving fraud or false statements?
19            MR. BUSSERT:  He had a stolen motorcycle
20  case, and I don't really care about the conviction
21  as much as the fact that he lied to police when
22  asked about it, and that I do seek to inquire about
23  in terms of his veracity because he completely
24  denied any knowledge of this and completely
25  separated himself from it.  I think that's
```

1801

```
1   permissible.
2            THE COURT:  All right, anything else in
3   your proffer?
4            MR. BUSSERT:  No, I think in terms of
5   his priors those are the only two instances we're
6   looking at.
7            THE COURT:  And the common law robbery
8   in '97 you were intending to ask something about
9   truth tellingness there?
10            MR. BUSSERT:  No, no.
11            THE COURT:  Okay.
12            MR. BUSSERT:  Simply I want to confirm
13  that he was convicted of aiding and abetting common
14  law robbery, particularly since he says he knows
15  nothing about this.
16            THE COURT:  Particularly what?
17            MR. BUSSERT:  I think this Ms. Pettway
18  was the victim.  I mean, frankly, she was an
19  18-year-old girl and he and three other people, they
20  came in, him and couple other guys, and one of the
21  guys had a gun, a shot was fired, she went running
22  out.
23            THE COURT:  This is the North Carolina
24  Ms. Pettway.
25            MR. MARKLE:  This is according to a
```

1802

```
1   police report.
2            MS. REYNOLDS:  You can't get into
3   underlying facts.
4            MR. BUSSERT:  I'm not getting into the
5   underlying facts, but I'm just saying the government
6   brought out there was confusion about these names
7   and there is a reason for that confusion, and
8   regardless --
9            THE COURT:  And you've --
10            MR. BUSSERT:  -- this conviction comes
11  in.
12            THE COURT:  You've examined him that he
13  knew a Charmaine Pettway in North Carolina.
14            MR. BUSSERT:  Yes.
15            THE COURT:  And you say that the aiding
16  and abetting common law robbery was common law
17  robbery of her?
18            MR. BUSSERT:  And two other people,
19  which I won't get into the particulars.  All I want
20  to do is establish that he was convicted of aiding
21  and abetting common law robbery in August of 1997,
22  which is consistent with the inquiry the government
23  made yesterday in terms of bringing out his priors.
24            MR. MARKLE:  And the fact is he was
25  convicted of a felony.  We don't object to that, we
```

1803

```
1   already brought it out.  The purpose of bringing out
2   a robbery serves no additional purpose.  The jury is
3   instructed somebody who has felony convictions, that
4   might be something they might want to consider.
5   It's not whether it's a felony conviction for
6   robbery, a felony conviction for murder, a felony
7   conviction for whatever.  It has no significance.
8   The significance is a felony conviction.
9            MR. BUSSERT:  Well --
10            MR. MARKLE:  If it's a crime of
11  dishonesty, as the Judge has indicated, that's a
12  different matter.
13            THE COURT:  Okay.
14            MR. BUSSERT:  If we understand the
15  narrow construction of Rule 609, we think that it's
16  wrong facially, and two, that the Court has the
17  discretion.  I'm not going to get into prior drug
18  possession or what it may be.  This is an
19  appropriate inquiry relative to this case and
20  relative to his testimony in feigning any kind of
21  intent or anything else.
22            THE COURT:  Okay, move into that area
23  after the recess.
24            (Sidebar concluded)
25   Q.  Let's talk about bats.  Yesterday Mr.
```

1804

```
1   Markle asked you about the federal agents coming to
2   your aunt's house in December of 2009, correct?
3       A.   Correct.
4       Q.   And I think you testified that you had been
5   staying at your aunt's house for a little bit before
6   that, correct?
7       A.   I don't understand.
8       Q.   You said you had been staying through the
9   holidays or something.  Was that your testimony?
10      A.   No, I always came through for the holidays,
11  that's it.
12      Q.   The reality was you just showed up that
13  morning.  You were just coming to visit.
14      A.   Where, to my aunt house?
15      Q.   Yes.
16      A.   Yes.
17      Q.   And in that house -- well, let me step
18  back.  You are at the house, correct?
19      A.   Yes.
20      Q.   Your cousin Jeffrey is there.
21      A.   Yes.
22      Q.   And when the agents came, there was Agent
23  Munger?
24      A.   Correct.
25      Q.   Blond-haired guy?
```

1805

```
1       A.   Correct.
2       Q.   Detective Donaldson, I understand, kind of
3   a big guy?
4       A.   Yes.
5       Q.   Sergeant Gonzalez, who is also kind of a
6   big guy?
7       A.   Correct.
8       Q.   And Ms. Dayton?  Ms. Dayton?  Was a woman
9   there?
10      A.   Yes.
11      Q.   The prosecutor?
12      A.   Yes.
13      Q.   You guys are all at the house, correct?
14      A.   Yes.
15      Q.   And you've got your 2001 Cadillac Seville
16  parked out front, correct?
17      A.   Yes.
18      Q.   You agree a Cadillac is a good car for a
19  drug dealer?
20      A.   Just a car for -- just a car.
21      Q.   Just a car.  Dreddy had two Cadillacs,
22  right?
23      A.   I don't know.  I don't know -- yes, he had
24  two Cadillacs.  Yes.
25      Q.   Yes.  And you earned the money for that
```

1806

```
1   Cadillac working at the warehouse in Waterbury.  Is
2   that where you got the money for that?
3       A.   Yes.
4       Q.   How much were you making an hour there?
5       A.   I think it was 10.50.  I think.
6       Q.   10.50.  And at that point you actually were
7   living on your own in Waterbury, correct?
8       A.   Yes.
9       Q.   You were paying rent?
10      A.   Yes.
11      Q.   And you got laid off after, like, eight
12  months?
13      A.   Yes, after I got out of the program.
14      Q.   You made enough money to get that Cadillac,
15  correct?
16      A.   Yes.
17      Q.   So, you've got four federal officers,
18  correct, at your house, and I'm counting the state
19  ones.  You had four federal officials altogether,
20  right?
21      A.   Yes.
22      Q.   And you are in Pinetop, correct?  Pinetops
23  or Pinetop?
24      A.   Pinetop.
25      Q.   You are in Pinetop, which is pretty out of
```

1807

```
1   the way, you agree?  I mean, it's country.
2       A.   North Carolina is country.
3       Q.   Yeah.  And so you've got to be sitting
4   there thinking to yourself how did these people find
5   you.  Yeah?
6       A.   I'm not thinking that either.
7       Q.   What are you thinking when you've got four
8   federal agents sitting at your front door?
9       A.   Exactly what I'm thinking, four federal
10  agents at my front door.
11      Q.   But you are a nice guy, you invite them in,
12  right?
13      A.   Yes.
14      Q.   You guys all go sit down in the living
15  room, right?
16      A.   Yes.
17      Q.   And you take the big sofa chair, right?
18      A.   Yes.
19      Q.   They start asking you some questions?
20      A.   Yes.
21      Q.   You started giving them some answers?
22      A.   Yes.
23      Q.   But it's pretty clear everyone knows you
24  are not telling the truth, right?
25      A.   Yes.
```

1808

1    Q.   And I think one of the first things you
2  told them was that you'd only been in Connecticut a
3  month before you got arrested on your crack case,
4  right?  The September of 2005 arrest, you told them
5  you had only been there a month before?
6    A.   I don't remember.
7    Q.   You don't deny saying it, you just don't
8  remember it, correct?
9    A.   I don't remember.
10   Q.   You must have been pretty scared?
11   A.   Yes.  Four federal agents at my door, yes.
12   Q.   Yeah, in your living room.
13   A.   Yeah, sitting down in my living room.
14   Q.   In your grandma's house that you grew up
15 in?
16   A.   Yes.
17   Q.   You've got a federal prosecutor, an FBI
18 agent, and two other officers there, correct?
19   A.   Correct.
20   Q.   And while nobody is saying it, you know why
21 they're there?
22   A.   No.
23   Q.   No inkling why they're there to see you?
24   A.   No.
25   Q.   All of these people came down from

1809

1  Connecticut and you had no idea?
2    A.   I didn't even know they was from
3  Connecticut.
4    Q.   Now, you testified yesterday on direct that
5  during this initial sit down you lied, correct?
6    A.   Yes.
7    Q.   You lied a lot, correct?
8    A.   Yes.
9    Q.   So, I'm going to ask you about some of
10 these lies.
11   A.   Okay.
12   Q.   And just to be clear, what time did they
13 come to the house that day?
14   A.   I don't remember the time.
15   Q.   Was it morning?
16   A.   Maybe morning.
17   Q.   They didn't leave until about four o'clock,
18 right?
19   A.   I wouldn't even know what time.
20   Q.   So, you start off and you told them you
21 didn't know anybody named Dreddy; is that correct?
22   A.   Correct.
23   Q.   And when you tell them you don't know
24 anybody named Dreddy, they say let's start again,
25 correct?

1810

1    A.   Correct.
2    Q.   Let's try this again.  And you continued to
3  lie, correct?
4    A.   Correct.
5    Q.   Agent Munger, the blond guy, he showed you
6  some photos, right?
7    A.   Correct.
8    Q.   What's he got, like, a BlackBerry or
9  something like that?
10   A.   Yes.
11   Q.   He pulls up a photo of Dreddy, right?
12   A.   Yes.
13   Q.   He shows you a picture of Ziggy?
14   A.   Correct.
15   Q.   He shows you a picture of this guy,
16 correct?
17   A.   Correct.
18   Q.   And you tell him, I don't know any of those
19 guys.
20   A.   Correct.
21   Q.   And you told them the only place you'd been
22 to in Bridgeport is your brother's house on East
23 Main Street; is that correct?
24   A.   Correct.
25   Q.   That was a lie, right?

1811

1    A.   Yes.
2    Q.   And in terms of your brother's house, you
3  testified yesterday that you have two brothers and
4  three sisters.
5    A.   Yes.
6    Q.   Are they involved with drug selling at all?
7    A.   No.
8    Q.   None of them?
9    A.   No.
10   Q.   Not at all?
11   A.   No.
12   Q.   Sir, you talked about your Connecticut
13 conviction, correct?
14   A.   Correct.
15   Q.   And you actually got sentenced in that case
16 in August of 2006, right?
17   A.   Yes.
18   Q.   And you appeared in court that day before
19 Judge Holden.  Do you remember a Judge Holden?
20   A.   I don't remember his name.
21   Q.   You had a female public defendant
22 representing you.
23   A.   Yes.
24   Q.   And you entered a guilty plea and you were
25 sentenced that same day, right?

**GA1661**

1812

1    A.    Yes.
2    Q.    And the judge gave you an opportunity to
3 speak on your own behalf, correct?
4    A.    Correct.
5    Q.    And part of speaking on your own behalf,
6 correct, is to try and get some leniency for a
7 sentence you might receive, right?
8    A.    Try to get probation.
9    Q.    Try and get probation.  And you told the
10 judge:  I have brothers and sisters here, an aunt,
11 that they have their own family, their own problem,
12 and half of them, some of them on drugs.
13          Did you say that to the judge?
14    A.    Yes, I have family members that is on
15 drugs, but not my brothers and sisters.
16    Q.    And then you went on to tell the judge that
17 some of them are doing worse things than you were
18 doing selling drugs, right?
19    A.    Yes.
20    Q.    These family members that you were living
21 with in Connecticut, were they on drugs?
22    A.    No.
23    Q.    Which ones are those?
24    A.    Which one is what?
25    Q.    Which are the family members that had the

1813

1 drug problems?  Do you know their names?
2          MR. MARKLE:  I'm going to object.
3          THE COURT:  I'm sorry, you asked him
4 these family members you were living with in
5 Connecticut, were they on drugs?  No.  Which ones
6 are those.  I think you need to clarify the
7 question.
8          MR. BUSSERT:  I will.  I apologize, your
9 Honor.
10    Q.    You told the judge in your prior case that
11 you had family who was on drugs, correct?
12    A.    Yes.
13    Q.    Who were you referring to?
14    A.    Cousins.
15          MR. MARKLE:  I object, your Honor.  I
16 don't know the relevancy of family members on drugs.
17          THE COURT:  I'll permit the question,
18 but just that question.
19    Q.    Who were the family members in Connecticut
20 who were on drugs?
21          THE COURT:  That's a different question.
22          MR. BUSSERT:  Just to clarify because I
23 think he made --
24          THE COURT:  Are there family members in
25 Connecticut who were on drugs at the time you spoke

1814

1 in the sentencing for your drug charge?
2          THE WITNESS:  Yes.
3          THE COURT:  All right.  That's the
4 question.
5          MR. BUSSERT:  And if I could ask a
6 follow-up question, your Honor.
7          THE COURT:  You may.
8    Q.    What were their names?
9          MR. MARKLE:  I'm going to object, your
10 Honor.
11          THE COURT:  I'm going to sustain the
12 objection.
13          MR. BUSSERT:  I would claim it, your
14 Honor.
15          THE COURT:  Let's the move on, please,
16 I'll take it up at the recess.
17    Q.    Going back to your interview.  Again, this
18 interview is at your house was December of 2009,
19 correct, your grandma's house?
20    A.    Correct.
21    Q.    Getting back to that interview, you told
22 the agents you had only been to your brothers in
23 Bridgeport, correct?
24    A.    Correct.
25    Q.    And you denied knowing Dreddy or Ziggy,

1815

1 correct?
2    A.    Yes.
3    Q.    And then they told you again, said maybe we
4 should start again, correct?
5    A.    I don't understand your question.
6    Q.    It wasn't going well, they didn't think you
7 were telling the truth, they said let's try this
8 again, right?
9    A.    Correct.
10    Q.    That happened many times during this little
11 meeting, right?
12    A.    Yes.
13    Q.    And then you admitted knowing Dreddy,
14 correct?
15    A.    Correct.
16    Q.    And you told them that you bought both
17 marijuana and crack from Dreddy to sell in Norwalk,
18 correct?
19    A.    Didn't buy.  He gave me the drugs, the
20 marijuana.
21    Q.    So, you denied telling them that you bought
22 that from him?
23    A.    I never bought.
24    Q.    Do you deny telling them you got crack from
25 Dreddy to sell in Norwalk?

1816

```
1     A.    Excuse me?
2     Q.    Do you deny telling the agents that you got
3  crack from Dreddy to sell in Norwalk?
4     A.    That I denied?
5     Q.    Do you deny that you told them that?  Did
6  you tell them that?
7     A.    Probably.  I don't remember.
8     Q.    But your testimony now is it was only
9  marijuana?
10    A.    And crack.
11    Q.    Well, when did the crack start?
12    A.    Maybe like -- he gave me a bag like after
13 we came back from Georgia.
14    Q.    And that was to get you ready for selling
15 at his spot on Charles Street, correct?
16    A.    Nope.  I don't know why he gave it to me,
17 he just gave it to me.
18    Q.    And, again, you never talked about drug
19 dealing with Ziggy in all of those hours in the car,
20 correct?
21    A.    Correct.
22    Q.    You also told the agents that you and Ba
23 had traveled to Georgia and that's where you met
24 Dreddy and his girlfriend down there, correct?
25 That's the first time you talked about that, right?
```

1817

```
1     A.    Correct, Ba was Dreddy.
2     Q.    Was Ba Dreddy or Ziggy?
3     A.    Dreddy.
4     Q.    Dreddy, okay.  But you told them that you
5  met Dreddy once you got to Georgia.  I know this is
6  confusing, but the first time you told them about
7  going to Georgia, you told them that you and Ba
8  drove down together and you met up with Dreddy and
9  his girlfriend.  That was the first time you told
10 them, correct?
11    A.    I don't remember that.
12    Q.    You told them while you were in Georgia
13 Dreddy said he needed your help and would pay you,
14 right?
15    A.    Dreddy said that he needed my help, but
16 never was paying.  He never said ain't paying
17 nobody.
18    Q.    So, you deny telling the agents that Dreddy
19 said he would pay you?
20    A.    Maybe I did, maybe it was a lie, but I
21 don't remember it.
22    Q.    And you told the agents that after you guys
23 got back, Dreddy -- when you say got back, got back
24 from down south, Dreddy drove down to Stamford and
25 picked you up and brought you to Bridgeport.  You
```

1818

```
1  told the agents that, correct?
2     A.    That was a lie.
3     Q.    And you told them that right away because
4  you said actually it was the train, right?  You took
5  the train.
6     A.    I don't understand.
7     Q.    You told them Stamford, but you realized
8  you didn't want to say that, so you told them you
9  took the train out of Bridgeport.  You caught
10 yourself that time.
11    A.    I'm not understanding what you saying.
12    Q.    You just acknowledged that you told the
13 agents Dreddy came to Stamford to pick you up and
14 bring you back to Bridgeport.  That was a lie you
15 told them, correct?
16    A.    That never happened.
17    Q.    I know, but you told them that, but it was
18 a lie.
19    A.    Yes.
20    Q.    Right.  And as soon as you told them that
21 you caught yourself and you said, oh, no, I took the
22 train up to Bridgeport, right?  You corrected
23 yourself back in December of 2009, right?
24    A.    I don't remember.
25    Q.    Okay.  Do you remember telling them --
```

1819

```
1  strike that.  You told them then that when you took
2  the train up Dreddy and Ba picked you up at the
3  train station and you guys drove over to Charles
4  Street, correct?
5     A.    Dreddy was Ba.
6     Q.    Did you tell them Dreddy and Ba?
7     A.    No, Dreddy was Ba.
8     Q.    Dreddy was Ba.  And then -- but you told
9  them you guys drove over to Charles Street, correct?
10    A.    Yes.
11    Q.    And then you told the agents that the two
12 of the -- the two other guys went into the Charles
13 Street building while you waited down in the car,
14 correct?
15    A.    Excuse me?
16    Q.    You told the agents that the two other guys
17 went into the building while you waited in the car?
18    A.    Yes, I remember saying that.
19    Q.    And you told them that nothing happened,
20 those guys came back and you all left.
21    A.    Yes.
22    Q.    Then you told the officers that the same
23 thing happened the next night, right?  You guys went
24 over to Charles Street the next night, right?  You
25 told the agents this, that you guys went over to
```

1820

```
1   Charles Street again the next night?
2      A.   Yes, I went -- you asking me --
3      Q.   You told the agents this.
4      A.   The same thing the second night or are you
5   saying --
6      Q.   That you went back to Charles Street the
7   second night.  You told the agents this as you are
8   going through this interview, right?
9      A.   Yes.
10     A.   I'm just walking through this.  And, again,
11  you said Dreddy and Ziggy went in the house -- or,
12  excuse me, went into the building and you sat in the
13  car.
14     A.   Yes.
15     Q.   The second night, same thing.
16     A.   Yes, that was a lie.
17     Q.   But you told the agents that when Dreddy
18  and Ziggy came out of the house or out of the
19  building that night they had bats and clothes with
20  them, correct?
21     A.   I don't remember.
22     Q.   Did you tell the agents that you saw them
23  put them in the trunk?
24     A.   I don't remember.
25     Q.   Did you tell the agents that you knew they
```

1821

```
1   were bats by the distinctive sound they made while
2   in the trunk?
3      A.   Oh, I remember.  I remember saying that.
4      Q.   You remember that?
5      A.   Yes.
6      Q.   They were, like, hitting against each
7   other.
8      A.   But that was a lie.
9      Q.   That was a lie?
10     A.   Yes.
11     Q.   And then you told the agents that after
12  that they drove you back to Norwalk, correct?
13     A.   Yes.
14     Q.   And that Azibo paid you.
15     A.   Excuse me?
16     Q.   You told the agents that when they dropped
17  you off in Norwalk, that Azibo paid you.
18     A.   No.
19     Q.   You didn't tell the agents that?
20     A.   No.
21     Q.   And at this point in your rendition of the
22  events the agents stopped you again, correct, and
23  said, we don't think you are being honest, right?
24     A.   Right.
25     Q.   So, then we start again, correct?
```

1822

```
1      A.   Right.
2      Q.   And so this time you talked to them about
3   going to the diner that first night, correct?
4   Right?
5      A.   Who talked about going to the diner?
6      Q.   You did.  You told the agents about going
7   to the diner the first night, correct?
8      A.   Yes.
9      Q.   And you told the agents how Dreddy said he
10  wanted you to run the building for him, correct?
11     A.   He didn't say nothing about running the
12  building.  He just say I will leave you up there for
13  to sell some drugs.
14     Q.   In drug phrases --
15     A.   Meaning that selling drugs and watching
16  somebody selling drugs are -- he was having somebody
17  up there selling the drugs, I was going to watch it.
18     Q.   So, you were going to be in charge.
19     A.   You could say.
20     Q.   Well, I'm not asking if I'm going to say
21  it.  It was your understanding you were going to be
22  in charge, you were going to be like the lieutenant.
23     A.   Yes, my understanding.  No lieutenant.  I
24  don't know nothing about no lieutenant.
25     Q.   You never heard that term before?
```

1823

```
1      A.   Yes, I have, in the military.
2      Q.   Okay.  Have you ever served in the
3   military?
4      A.   No.
5      Q.   You never associated with the military?
6      A.   No.
7      Q.   You heard the term associated with the
8   military.  There are lieutenants in the military.
9      A.   Yes.
10     Q.   Gotcha.  So being the person who oversees
11  the drug selling, it's somewhat similar to running
12  the drug selling, correct?
13     A.   Yes.
14     Q.   But you told the agents during this version
15  of events that it wasn't until the second night that
16  you actually went into the Charles Street
17  apartments, correct?
18     A.   I'm not understanding.
19     Q.   Huh?
20     A.   I don't understand what you are saying.
21     Q.   Again, you told many versions of events,
22  correct?  This day in December 2009 in your
23  grandma's house you told a lot of different
24  versions, correct?
25     A.   Correct, some was truth and was some lies.
```

**GA1664**

1824

```
1    Q.   And as to this version, you told them the
2  first night you guys just went to the diner, Dreddy
3  talked about running the building, or watching over,
4  and that was it.  That was the first night, correct?
5    A.   Dreddy never talked to me about running no
6  building inside the diner.
7    Q.   You didn't tell the agents that?
8    A.   Maybe it was a lie.
9    Q.   Do you ever get confused keeping up with
10 all of your lies?
11   A.   If it's a lie, yes.  You can't remember a
12 lie.
13   Q.   So, this version of the story, it wasn't
14 until the second night that you went to Charles
15 Street, into the building itself, correct?
16   A.   Correct.
17   Q.   And it was you and Dreddy and Ziggy,
18 correct?
19   A.   And Big Man.
20   Q.   In this version right now, okay.  You
21 Dreddy and Ziggy?
22   A.   And Big Man.
23   Q.   This one you parked again in the garage,
24 right?
25   A.   Didn't say park in the garage, said went
```

1825

```
1  inside of the building.
2    Q.   Inside the -- you drove and parked in the
3  garage.  You told the agents this, correct?
4         THE COURT:  Okay, we need to clarify.
5  You are asking him what he told the agents versus
6  what his testimony is here as to what happened?  Can
7  you make that distinction, please.
8         MR. BUSSERT:  I will try, your Honor.  I
9  will try.
10   Q.   Mr. Taylor, I'm going to refer to what I'll
11 call your fifth version of events in December of
12 2009, okay?  And in this version, did you tell the
13 agents that you went to the diner the first night,
14 but did not go to the building?
15   A.   No.
16   Q.   Did you tell the agents that on the second
17 night you parked in the garage?
18   A.   Yes.
19   Q.   And did you tell the agents that, again,
20 you waited in the car while Ziggy and Dreddy went up
21 into the building?
22   A.   Yes, I did, and they were also a lie.
23   Q.   And you told the agents, again, that Dreddy
24 and Ziggy came back and placed bats in a black bag
25 in the trunk?
```

1826

```
1    A.   Yes, I did, and that also was a lie.
2    Q.   And you told them that the black bag was a
3  duffle bag, correct?
4    A.   Yes, and that was a lie.
5    Q.   And then you told them you guys left the
6  garage, correct?
7    A.   Me and Ziggy left the garage, yes.
8    Q.   You told them that you were driving?
9    A.   Yes, that was also a lie.
10   Q.   And then you told the agents that you went
11 to some apartment, correct?
12   A.   That was the truth, we did go to an
13 apartment.
14   Q.   And then you told the agents that you went
15 to the train station, correct?
16   A.   That was the truth, I did go to the train
17 station.
18   Q.   And then you told the agents that when you
19 got out you knew the bats were in the trunk because
20 you could hear them hitting against each other?
21   A.   Yes, I said that, but that was also a lie.
22   Q.   And the agents didn't believe you once
23 again, right?
24   A.   Yes.
25   Q.   So, you started again.
```

1827

```
1    A.   Yes.
2    Q.   So now we'll discuss what we'll call
3  version six of your story.  And you start this one
4  telling the agents about arriving at the train
5  station, correct?  You came up -- you came to the
6  train station in Bridgeport, correct?
7    A.   Yes, the first time.
8    Q.   And then Dreddy met you there at the train
9  station, correct?
10   A.   Ziggy met me at the train station.
11   Q.   Did you tell the agents that Dreddy had you
12 drive from the train station over to Charles Street?
13   A.   No.
14   Q.   You didn't tell the agents that?
15   A.   No.
16   Q.   Did you tell the agents again that you
17 drove to the garage?
18   A.   That I drove to the garage?  No.
19   Q.   That the car went to the garage at Charles
20 Street?
21   A.   That the car -- that the car went to the
22 garage?
23   Q.   I don't care if it's Ziggy driving or
24 Dreddy driving or you driving, that the car that
25 picked you up from the train station drove to the
```

**GA1665**

1828

```
1   garage at Charles Street; did you tell the agents
2   that?
3       A.   No.
4       Q.   And did you tell the agents about a Spanish
5   woman?
6       A.   Yes.
7       Q.   And during this version of events, you
8   didn't say anything about bats, correct?
9       A.   What event?
10      Q.   The first night, this version of the first
11  night, you didn't say anything about bats, correct?
12      A.   What about it?
13           MR. MARKLE:   Again, I think it has to be
14  clear.
15           THE COURT:   Let's be clear you are
16  talking about what he told the agents versus what
17  he -- he's testifying now.
18           MR. BUSSERT:   I understand, your Honor.
19           THE COURT:   Do you understand that
20  distinction, Mr. Taylor?
21           THE WITNESS:   No, ma'am.
22           THE COURT:   Okay, let's clarify the next
23  question, please.
24           MR. BUSSERT:   Yes, your Honor.
25      Q.   Mr. Taylor, directing your attention to
```

1829

```
1   what we're calling for purposes of the discussion
2   your sixth version of events to the agents, did you
3   tell the agents -- or, excuse me, did you not tell
4   the agents anything about bats during that first
5   night on this version, correct?
6       A.   I --
7            MR. MARKLE:   Again, your Honor, if we
8   could use the date I think it would be easier.
9            MR. BUSSERT:   As I understand it, there
10  is a first night and second night.
11           MR. MARKLE:   No, I mean the date.
12           THE COURT:   You are talking about
13  December '09.
14           MR. BUSSERT:   This entire line of
15  inquiry is about his December proffer or meeting
16  with the government at the house.
17           THE COURT:   Do you understand that?
18  This is asking you what you told the agents when
19  they came to your aunt's house in Pinetop in
20  December '09.
21           THE WITNESS:   Yes, ma'am.
22           THE COURT:   That's all this questioning
23  is about.
24           THE WITNESS:   Okay.
25           THE COURT:   It's not about what you are
```

1830

```
1   -- or have testified happened, it's what you told
2   the agents in December of '09 when they came to
3   Pinetop.
4            THE WITNESS:   Okay.
5            THE COURT:   Okay?
6            THE WITNESS:   Okay.
7            THE COURT:   Next question, please.
8       Q.   Skip ahead, same version of events,
9   December 2009, version six.  Did you tell the agents
10  that a few days after that first night Dreddy came
11  to Norwalk and gave you money and more drugs?
12      A.   After the -- you say after the first night?
13      Q.   Dreddy came to Norwalk and gave you money
14  and more drugs?
15      A.   No, he didn't -- I didn't see him no more.
16           THE COURT:   Okay, this is -- remember
17  this is what you told the agents.
18           THE WITNESS:   Oh, that was --
19           THE COURT:   Okay.
20           THE WITNESS:   That was a lie.
21      Q.   That was -- so you told the agents that,
22  but that was a lie.
23      A.   Yes.
24           THE WITNESS:   This was still in when I
25  was in North Carolina?
```

1831

```
1            THE COURT:   Yes.
2            THE COURT:   Okay.
3       Q.   I'm going to ask you a lot of questions,
4   we're going to be here probably the next 45 minutes
5   the way we're going, and it's all going to be about
6   what you told the agents in North Carolina.  When we
7   stop, I'll make it very clear and then we'll move on
8   to other questions.  Okay?  So, we're on the same
9   page.
10           THE COURT:   Why don't we take a recess.
11  Let's take a 15-minute recess.
12           (Jury exited the courtroom)
13           THE COURT:   All right, Mr. Taylor, you
14  can go back with the marshals.
15           I'd like to review with counsel --
16  please be seated -- the Estrada decision with
17  respect to Mr. Taylor's prior felonies.
18           The defendant proffers a conviction for
19  aiding and abetting common law robbery in August of
20  '97, and a theft of a motorcycle, and I don't know
21  the date of that.  It seems to me, following the
22  logic and analysis of Estrada, first of all, neither
23  of those is a conviction that automatically is
24  admissible as bearing directly on honesty, but that
25  the analysis called for under Estrada is to look at
```

1832

the gradations among the crimes in terms of their
bearing on truthfulness, which the Second Circuit
says lies at the heart of the Rule 403 analysis that
the district courts must undertake when determining
whether to admit for impeachment purposes evidence
of a witness's conviction, including their statutory
names, under 609(a)(1), which is what the defendant
is offering.

The analysis that Estrada engages in
looks at considerable case law, including pre-rule
case law, in which the graduations are distinguished
between crimes that reflect adversely on a person's
integrity which, therefore, would bear on honesty,
such as deceit, fraud and theft, versus acts of
violence which, internal quote, may result from a
short temper, combative nature, extreme provocation
or other causes, and generally have little or no
direct bearing on honesty and veracity.

It seems to me this distinction between
convictions which rest on dishonest conduct, and
thus relate to credibility, versus those which are
of violent or assaultive crimes, which do not,
dictates that the proper weighing is that the
statutory name of the August '97 conviction, which
is violent or assaultive crimes, only gets

1833

referenced as a felony conviction in August '97 and
whatever sentence was imposed, but that the theft of
the motorcycle, in whatever year that was, may be
identified as it has some bearing on credibility.

And it was just those two convictions,
correct?

MR. BUSSERT:  But as I noted, your
Honor, with respect to the motorcycle incident, I'm
actually less interested, I guess, in eliciting
affirmation of his conviction than I am in actually
going into his underlying dealings with police where
the record indicates that he lied pretty blatantly
in terms of having any knowledge about this.  And
there were independent witnesses, being family
members, who had seen him with these vehicles.  He
just blatantly lied to the police.

THE COURT:  I'm not going to permit you
to go into the underlying record or facts of a
conviction because under Rule 403 that is inviting a
whole other proceeding to determine whether or not
what is in the report is, in fact, accurate, and I
don't think that it bears, within the meaning of
609(a)(1), on the value of the felony as bearing on
credibility.  So, I'm going to impose that
limitation and permit you to identify the theft

1834

crime, but not the violence crime by statutory name.
MR. BUSSERT:  Relative to the line of
inquiry and his ready admissions he lied repeatedly
to federal agents, may I ask if he ever lied to
police or law enforcement?
THE COURT:  I don't know where that
goes.
MR. BUSSERT:  I think it just shows a
pattern of lying and trying to evade responsibility
for his own conduct.  If he says no, then I move on,
if he says yes, then I'll proceed accordingly.
MR. MARKLE:  That line -- I'm sorry.
THE COURT:  Okay.
MR. MARKLE:  He hasn't denied lying, so
it's not like Mr. Bussert is confronted with a
witness who is saying I never lied.  He has now, for
perhaps a half hour, admitted lying.
THE COURT:  I think that the probative
value of any other lies to other police in other
circumstances not related to Mr. Taylor's
culpability in this is so remotely probative given
that it is clear to the jury that Mr. Taylor is --
has not been one always to tell the truth, that the
403 analysis is such that the probative value is so
minimal in comparison to whatever extension and

1835

enlargement of this trial would be necessitated.  So
the answer is no.
MR. BUSSERT:  Just --
THE COURT:  Now, with respect to the
other issue, which was --
MR. BUSSERT:  Just with respect to that
issue, if I could just note briefly for record, I
understand the Court's ruling, and just for the
record, we would note that we believe it's a due
process violation in terms of allowing us to inquire
and cross-examine Mr. Taylor.
THE COURT:  That's fine.
MR. MARKLE:  Your Honor, in regard --
THE COURT:  I think the jury will have
no doubt as to the challenge that you give to Mr.
Taylor's credibility.
Let me go -- let me just clarify,
however, the other issue, which is with respect to
examining on Dr. Baranoski's examination.  Would you
give me a synthesis, Mr. Bussert, on what the
proffer here is.
MR. BUSSERT:  I think there's
established case law, your Honor, that affirms Mr.
Johnson's right to look at every facet of relevant
evidence pertaining to Mr. Taylor's credibility,

1836

```
 1   including evidence of his mental capacity, his
 2   ability to comprehend and correctly relate the
 3   truth, and where particularly, in citing to the
 4   Robinson case we cited at sidebar, because this is
 5   the government's star witness, and really the key
 6   link in the government's case against Mr. Johnson,
 7   the court says, "the importance of full
 8   cross-examination to disclose possible biases
 9   necessarily increased."  In deciding McConnell v
10   U.S., 393 F.2d 404, which is a Fifth Circuit case
11   from 1966, it says, "where the government's case may
12   stand or fall on the jury's belief of one witness,
13   its credibility is subject to close scrutiny."
14            THE COURT:  And I don't think there is
15   any dispute that that applies.  The question -- I
16   don't see how Robertson impacts your desire to
17   question Mr. Taylor beyond what Dr. Baranoski
18   specifically ascribes to him.  But -- that's why I
19   asked for the clarity.
20            MR. BUSSERT:  I understand the
21   government's claim, from what I understand, they
22   would like to shut down any inquiry of Baranoski
23   entirely.  That's my interpretation.  I could be
24   wrong.
25            THE COURT:  Let's get your proffer
```

1837

```
 1   first.  What is it that you are wishing -- offering
 2   to educe.
 3            MR. BUSSERT:  I wish to educe -- and
 4   again --
 5            THE COURT:  Just tell me what it is.
 6            MR. BUSSERT:  Again, to be clear, not
 7   for purposes of showing him the report or showing
 8   him notes or anything, just simply be able to ask
 9   him, as I've been doing in relation to the 302
10   related to this December meeting, to ask him, did
11   you say to Dr. Baranoski?  If he says no, then I'll
12   move on.  But I think I'm allowed to ask him that.
13   And then I think I would also like to get to the
14   fact that he saw Dr. Baranoski after the Aquart
15   trial, he saw her twice, he saw her at the jail, and
16   that after that issues came up about things that he
17   said that were inconsistent with his testimony in a
18   prior trial and that he saw her again for purposes
19   of clarification.
20            I think that is fundamental to his
21   veracity and his version of events, because I think
22   even if you look at the report and you look at the
23   notes, your Honor, there is not a single word in
24   there about Efrain Johnson or a skinny -- or chubby,
25   light-skinned guy or bats or anything else, and if
```

1838

```
 1   the government wants to rehabilitate him and say
 2   they didn't ask, so be it, but he didn't say a word
 3   about it.  He was asked about it and he didn't say a
 4   word it.
 5            THE COURT:  So, this is not an issue
 6   about Robinson.  You have ample information about
 7   this witness's capacity, I have made sure of that.
 8   So, that's not what you are inquiring about now.
 9            MR. BUSSERT:  I'm citing Robinson more
10   for the proposition the government, my
11   interpretation is, they seem to be claiming
12   everything with Baranoski is off limits because
13   somehow it's not appropriate, and I don't agree.  My
14   issue is more so with the inconsistencies in his
15   statements or other statements he had made to the
16   doctor.
17            THE COURT:  But your problem is we went
18   through a whole hearing on this, and with respect to
19   the statements at issue, which is what the third
20   meeting was about, it was not Mr. Taylor's
21   inconsistency, it was his lack of clarity to Dr.
22   Baranoski, and she has accepted that.
23            MR. BUSSERT:  Again --
24            THE COURT:  So, my question to you is,
25   are you going beyond those statements that she puts
```

1839

```
 1   in quotes as directly attributable to Mr. Taylor.
 2            MR. BUSSERT:  I am relying not only on
 3   those statements, but her testimony of the other day
 4   where she clarified certain things.  So let's say
 5   the issue -- I think the questions I asked her
 6   about, you thought Dreddy was fair, whatever, the
 7   respect thing, and those are not in quotes in her
 8   notes, but I asked her specifically, that's what he
 9   told you, and she said, yes, that is what he told
10   me, even though it wasn't in quotes in the notes.
11            THE COURT:  And you were free to ask and
12   you have asked him.
13            MR. BUSSERT:  Thank you.
14            THE COURT:  That he thought they were
15   fair and --
16            MR. BUSSERT:  Exactly.
17            THE COURT:  But that is different from
18   what I understand you to be saying is, you told
19   Baranoski A, B and C.
20            MR. BUSSERT:  If he says to me --
21            THE COURT:  You can ask him -- you can
22   ask him on cross-examination whatever you wish that
23   is -- that you that you may have been inspired to ask by Dr.
24   Baranoski's report.  But the distinction is between
25   that, and he agrees with it or he doesn't agree with
```

1840

```
 1  it, versus "you told Dr. Baranoski."  The reason for
 2  that distinction is that there is a whole other
 3  sphere of what he told, what he meant, what she
 4  interpreted, and I'm not going to prolong this trial
 5  or in any way confuse the jury with that very
 6  ancillary thing.
 7          You are free to ask all the questions
 8  that deal with his mental capacity, all of the --
 9  and the Robinson, what I'm call the Robinson issues.
10  You are free to ask him what he has -- where he has
11  lied to law enforcement.  You are free to ask him
12  questions that may have their origins in Dr.
13  Baranoski's report, but I cannot imagine a 403
14  balancing that would say all of that colloquy
15  between Dr. Baranoski, Mr. Taylor, and what he said
16  here and what he meant there, that that probative
17  value outweighs all the prejudicial consequences
18  under 403 of prolonging, confusing, and would of
19  necessity require calling Dr. Baranoski, which I
20  really think is inappropriate.
21          MR. BUSSERT:  I would like to make --
22  just respond briefly with respect to two points,
23  your Honor.  One, I'm not looking to get in
24  everything, and I said this at sidebar, I'm not
25  looking to get into the whole, you know, was he
```

1841

```
 1  working as a mover for Dreddy.  I mean, I think it's
 2  clear I'm not getting into any of that stuff or her
 3  -- she was confused and his linear thinking.  I
 4  don't want to get into any of that.
 5          But it's clear, and she testified it was
 6  clear that he says Dreddy was fair to me, Ziggy were
 7  fair to me.  She attributed that statement to him,
 8  and if he says no, they weren't, I think it's
 9  completely permissible to say, didn't you say that
10  to Dr. Baranoski?  I have good faith.  We had that
11  testimony in this court that he said this to her.
12  And I can say, did you say that to Dr. Baranoski?
13  Just like the 302s, it's the exact same analysis,
14  did you say this to the agents?  No, yes, it was a
15  lie, then I move on.
16          Frankly, your Honor, we could be here
17  for three days if I went up to him and wanted to
18  refresh recollection.  I just want to be able to ask
19  the questions, if he denies it and says --
20          THE COURT:  But you are not telling me
21  specifically what you want to ask, and there was no
22  objection and no restraint on your saying -- asking
23  him you thought the Aquart brothers were fair and
24  respectful and all that stuff, and that was fine,
25  that's the right way to do it.
```

1842

```
 1          MR. BUSSERT:  But if he denies it, says
 2  no, I never thought that, I should be able to ask
 3  him, didn't you say that to Dr. Baranoski?  Because
 4  he did, she testified to it, and if he denies it
 5  still, so be it.  There is obviously a limit after
 6  that for collateral impeachment in terms of how far
 7  I can go, but I'm at least allowed to ask him that
 8  question.
 9          MR. MARKLE:  The difference is when Mr.
10  Bussert -- first of all, he is ignoring the Court's
11  request to give us an idea of what the other
12  questions are.  We keep hearing about this respect
13  and honor one.  That's been asked, that's been
14  answered.  As your Honor has said, that was
15  appropriate, there was no objection.
16          But where we're going with this, the
17  government should not be put in a position of having
18  to stand up and object as though it's hiding
19  evidence, which we all know is not admissible
20  because we have had the benefit of the doctor's
21  testimony ahead of time.  Now, maybe that didn't
22  inure to the defendant's benefit, but that has
23  edified all of us so we know that much of what he
24  claims John Taylor said.  The doctor has said no,
25  that was my mistake.
```

1843

```
 1          THE COURT:  Here is how we're going to
 2  handle it.  Mr. Bussert, you should be able to ask
 3  you want, note the ones that you believe he has
 4  denied whereas he affirmatively stated it to Dr.
 5  Baranoski, and we will examine -- it's going to be
 6  truncated because I can't do it all at the same
 7  time, I can't go through her report and have you
 8  point to me where -- or her testimony, where he said
 9  it and where he didn't say it.  That's the problem,
10  and I'm just not going to just have this thing run
11  on when, in fact, we have clarified -- you have the
12  full benefit of what Dr. Baranoski does say he said.
13          MR. MARKLE:  And, your Honor, along
14  those lines, just so I can, the doctor said that the
15  things in her report that were in quotes are things
16  that he actually said to me.  There's a 14-page
17  report.  I've gone through it.  There's in quotes,
18  there are, "rolling stone," "I don't like violence,"
19  "they didn't deserve to die," "treated with
20  respect," "you watch for somebody," some reference
21  to "dust" which I can't read the second word, "gets
22  stuff" and "help move."  Those are the only words in
23  the entire 14-page report that I see in quotes, your
24  Honor.
25          THE COURT:  What I understand Mr.
```

1844

```
1    Bussert seeking ultimately to get to is that at no
2    time did Mr. Taylor tell Dr. Baranoski anything
3    about the defendant.  But that's the problem, is
4    that you get into she didn't ask, there was nothing,
5    --
6              MR. BUSSERT:  So be it, that's the
7    answer and I'll live with that.
8              MR. MARKLE:  No, your Honor, that
9    shouldn't be the answer.
10             THE COURT:  But I don't think that's
11   appropriate because I think the inference there,
12   without more, is that he was hiding the ball when
13   this is --
14             MR. BUSSERT:  He was.
15             THE COURT:  No.
16             MR. BUSSERT:  He was minimizing his --
17             THE COURT:  See, I've tried to sort out
18   how we will handle this and give you the opportunity
19   to show me where it is clear that she says he said
20   that to her beyond the ones that you find in the
21   notes quoted, and we'll take it up in that way.
22             MR. BUSSERT:  I just have one -- why
23   can't I impeach by omission?  Why is that
24   impermissible?
25             THE COURT:  Because the context --
```

1845

```
1              MR. BUSSERT:  Describe what happened and
2    he doesn't say anything about bats?
3              THE COURT:  The context of all of Dr.
4    Baranoski is not the same as when agents are asking
5    him about this crime.  She specifically said she was
6    not asking him other than the general parameters,
7    and didn't know -- you remember she said that she
8    didn't have any of that.
9              MR. BUSSERT:  Which I think is all the
10   more telling about his lies.
11             THE COURT:  I think you've got apples
12   and oranges there.  I think that's an organized way
13   to approach it.
14             The only other thing is the names of his
15   Connecticut family members on drugs.  Who are they?
16   Are they any of the people he lived with?
17             MR. BUSSERT:  I think he's lying.  I
18   just want to know.  I don't think there are any
19   people.  I think he's -- I just want to know can he
20   actually name people.  I think he's completely
21   lying, and I think that's fair to say okay, who are
22   they.  It's untrue.  And I think it's a fair
23   question to say, well, if there are people, who are
24   they.  Because I think it's untrue and he can't come
25   up with it and he has duped courts time and time
```

1846

```
1    again in terms of trying to get probation and
2    everything else.  This guy has a pattern of lying
3    going back at least 15 years.
4              MR. MARKLE:  I don't understand.  I'm
5    not sure I understand that one, your Honor, to be
6    honest.
7              THE COURT:  Okay, it seems to me that if
8    it's not Amy, Trish or --
9              MR. MARKLE:  Denita.
10             THE COURT:  The third cousin.
11             MR. MARKLE:  Denita.
12             THE COURT:  I don't think she is a
13   cousin.  She's not a family member.  That it really
14   didn't have -- that its probative value is
15   outweighed by naming these people who have nothing
16   to do within case, calling them out as being
17   junkies.
18             MR. BUSSERT:  We would -- then I think
19   the appropriate remedy for that is to seal that
20   portion of the record, just continue it here in
21   court and seal the record.
22             THE COURT:  I'm not going to permit that
23   unless -- you can ask whether Trish or Amy had drug
24   problems, but beyond that, that's what we're going
25   to do.
```

1847

```
1              All right, let's take a five-minute
2    recess ourselves.
3              (Recess)
4              THE COURT:  All right, please bring in
5    the jury.
6              (Jury entered the courtroom.)
7              THE COURT:  Please be seated.
8              All right, Mr. Bussert, will you
9    continue, please.
10             MR. BUSSERT:  Thank you, your Honor.
11   Q.   Now, sir, just as a frame of reference,
12   going forward here, we're still back in December of
13   2009, in North Carolina at your grandma's house in
14   Pinetops, you are still talking to the agents, as I
15   refer to it the sixth version of your story, and you
16   had just testified before the break that you had
17   lied to the agents and you told them a few days
18   after the first day Dreddy came to Norwalk and gave
19   you money and more drugs.  You said that was a lie?
20   A.   Repeat the question again.
21   Q.   Sure.  As I understood your testimony
22   before we took the break, you said there was the
23   first night and then you said a few days later
24   Dreddy came to Norwalk and gave you money and more
25   drugs, and you said you told them that, but that was
```

1848

```
1   a lie.
2        A.   No, that was the truth.
3        Q.   That was the truth.  Okay.
4        A.   Yes.
5        Q.   And then you proceeded to tell the agents
6   that Ziggy used to re-up you with crack, correct?
7   You told the agents that?
8        A.   Ziggy what?
9        Q.   Re-upped you with crack.  He's the one who
10  used to give you more crack.
11       A.   That was a lie.
12       Q.   That was a lie.  And then you told the
13  agents that you asked Ziggy where the other drugs
14  were that you had been promised.  Did you tell the
15  agents that?
16       A.   I don't remember that.
17       Q.   Okay.  And then you started to tell the
18  agents again about the trip down south, and you told
19  the agents that Dreddy approached you about helping
20  him when you got back to Connecticut.  You told the
21  agents that.
22       A.   Yes.
23       Q.   And you told the agents that Dreddy was
24  talking about needing to move someone out.
25       A.   Yes.
```

1849

```
1        Q.   And Dreddy wanted you to run a crack spot.
2        A.   Yes.
3        Q.   And in terms of the second night, the night
4   that the killings occurred, you told the agents that
5   Dreddy was dressed in all black?
6        A.   I don't remember that.
7        Q.   Okay.  Do you remember telling the agents
8   that Ziggy was dressed in all black?
9        A.   I don't remember.
10       Q.   Do you remember telling the agents that you
11  were dressed in all black?
12       A.   Yes.
13       Q.   And, again, that was the night you were
14  going to go meet the girls at the diner, right?
15  Isn't that what you testified to yesterday, that was
16  your story yesterday, you were going to go meet the
17  girls at the diner that night?
18       A.   Now we out of North Carolina?
19       Q.   Yes, I am.  You told the agents in North
20  Carolina you were dressed in all black, but --
21       A.   Right.
22       Q.   But I think, as you explained earlier
23  today, you just happened to wear all black, but you
24  were going up -- on that occasion you were going up
25  the second time to meet girls at a diner.  That was
```

1850

```
1   your understanding of why you were going up to
2   Bridgeport.
3        A.   Yes, for the second attempt.
4        Q.   You just happened to be dressed all in
5   black.
6        A.   Yes, because the only thing I knew, I was
7   going to be working at a nightclub that night, but
8   nothing happened.
9        Q.   Now, going back to North Carolina.
10       A.   Okay.
11       Q.   You told the agents at this point about a
12  box of blue hospital rubber gloves in the car,
13  right?  You told the agents about that?
14       A.   Yes.
15       Q.   Now, I'm going to go a little bit outside
16  of North Carolina.  I want to be clear, in terms of
17  blue rubber gloves, that's something you've been
18  consistent about in always talking to the agents.
19  You've always talked about these blue rubber gloves,
20  right?
21       A.   Yes.
22       Q.   You told them that repeatedly.  You said
23  everybody was wearing blue rubber gloves.
24       A.   Yes.
25       Q.   Everyone in that apartment was wearing blue
```

1851

```
1   rubber gloves.  That's your testimony?
2        A.   Yes, I thought.  I knew I had rubber gloves
3   on.
4        Q.   But you --
5        A.   Blue rubber gloves on.
6        Q.   But you said you saw other people wearing
7   blue rubber gloves, correct?
8        A.   Maybe I said it, maybe not.  I'm not sure.
9   But I know everybody had rubber gloves on.
10       Q.   Let me refer you to the Defendant's Exhibit
11  J, which is the thing you had written down before.
12  Underneath here it says "everyone had masks and blue
13  rubber gloves," right?
14       A.   Yes.
15       Q.   That's what your story is?
16       A.   Yes.
17       Q.   Now going back to North Carolina.
18       A.   Okay.
19       Q.   And the story, this version of events
20  you're telling the agents, you then tell them again
21  about going to the building, the parking lot
22  underneath with Dreddy and Ziggy, right?  You told
23  them this again.  You told them this multiple times,
24  the second night you went to the building and parked
25  underneath.
```

1852

```
1     A.   Yes.
2     Q.   And this time you told the agents that you
3   actually got out of the car, but you just stood by
4   it, correct?
5     A.   I don't remember.
6     Q.   Okay.
7     A.   If all three of us -- if this was the
8   second attempt, all three of us get out of the car.
9            MR. MARKLE:  Your Honor, I think we have
10  to clarify where we're at here.
11           MR. BUSSERT:  I apologize, your Honor.
12  I realize this can be confusing.
13    Q.   We're going -- again, we're back in North
14  Carolina, sitting in the big sofa chair in Pinetops,
15  we're talking about what we're calling the sixth
16  version of your story, and we are talking about the
17  second night.  Okay?
18           And this time in telling the agents
19  about the second night, I think we established
20  before, prior you said you sat in the car, but this
21  time you actually told them you got out of the car.
22  This version of the events, this time you say you
23  got out of the car but you just waited by it,
24  correct.
25    A.   All three of us got out of the car.
```

1853

```
1     Q.   Okay.
2     A.   If this was the second attempt we went up
3   under the garage, all three of us got out of the
4   car.
5     Q.   Okay.  And you told the agents they went
6   inside and you just waited by the car, when you were
7   talking to the agents on this occasion?
8     A.   I don't remember that.
9     Q.   Okay.  And then you told the agents that
10  Dreddy and Ziggy came back with a black bag, but
11  with no blue rubber gloves.  Do you remember telling
12  the agents that?
13    A.   I don't remember that.
14    Q.   Do you remember telling the agents that all
15  of you, the three of you, drove to a house and
16  Dreddy and Ziggy changed clothes?
17    A.   I don't remember that.
18    Q.   Did you tell the agents that Dreddy and
19  Ziggy put their clothes in a garage bag?
20    A.   I don't remember that.
21    Q.   Now, when we say you don't remember, you
22  are not saying that it didn't happen, you are just
23  saying you just don't remember?
24    A.   Don't remember.
25    Q.   And then you told the agents that Dreddy
```

1854

```
1   and Ziggy left you at this house and some guy showed
2   up.
3     A.   I don't remember that.
4     Q.   And then you told them that Dreddy and
5   Ziggy came back.
6     A.   I don't remember that.
7     Q.   Did you tell the agents that all of you
8   went to a dark-skinned female's apartment?
9     A.   Me and Ziggy went to a dark-skinned female
10  apartment.
11    Q.   Did you tell them at the apartment that you
12  drank, smoked weed and got loud?
13    A.   We smoked and drank, but I don't know about
14  the getting loud part.
15    Q.   You told the agents about that, right?
16    A.   The smoke and drink, yes.
17    Q.   And then you told the agents that while you
18  are at the apartment Dreddy is talking to you about
19  setting you up.
20    A.   At what apartment?
21    Q.   The apartment where you are smoking and
22  getting or drinking.
23    A.   I never seen Dreddy at that apartment where
24  we was smoking and drinking at.  That was me and
25  Ziggy only ones at that apartment, the dark-skinned
```

1855

```
1   girl apartment.
2     Q.   And then you told the agents that Dreddy
3   was not happy with one of his workers, correct?
4     A.   That's what he had told me way before.
5     Q.   And then you told the agents that you saw
6   two kids at the female's apartment?
7     A.   Yes, that was a lie.
8     Q.   That was a lie.  Why would you lie about
9   kids?
10    A.   Why would I lie about kids?
11    Q.   Yeah, why would you put kids into this
12  story if it's a lie?
13    A.   Scared.  I didn't have nothing else to say.
14  I was just saying anything.
15    Q.   You would say anything?
16    A.   No, I wouldn't say.  I was just saying
17  anything just for to get them out of my house.  I
18  didn't want them there no more.
19    Q.   Understood.  So, when you don't want to
20  confront a problem, you'll say anything; is that
21  what I understand?
22    A.   No.
23    Q.   Just on this occasion.
24    A.   Not on this occasion.  I didn't want to own
25  up to no three murders that I didn't do.
```

1856

```
1    Q.  And after you told the agents about the two
2  kids, which you said was lie, you told the agents
3  that bats weren't in the car when you went into the
4  building, but were put in after.  Did you tell the
5  agents that?
6    A.  What did you say again?
7    Q.  After you told the agents about the two
8  kids in the apartment, you told them that there were
9  no bats in the car when you went in the building,
10  but there were bats put in afterwards?
11    A.  I don't remember that.
12    Q.  Did you tell the agents that?
13    A.  I don't remember that.
14    Q.  You don't remember that.  At some point you
15  had to go to the bathroom?
16    A.  Yes.
17    Q.  The agents let you get up from the chair,
18  right?
19    A.  Yes.
20    Q.  And they let you go to the bathroom?
21    A.  Yes.
22    Q.  Then you got yourself a SunDrop soda.
23    A.  Yes.
24    Q.  Did you get any food?
25    A.  No.
```

1857

```
1    Q.  Were you getting hungry?
2    A.  No.
3    Q.  And you come back into the room after the
4  break and you start back again, right?
5    A.  Yes.
6    Q.  You tell the agents you are not being
7  truthful.  You tell them you are lying, right?
8    A.  Yes.
9    Q.  And you start crying?
10    A.  Yes.
11    Q.  And then we start again, correct?
12    A.  Correct.
13    Q.  Now, for purposes of this, these questions,
14  we'll call this version No. 7, okay?  All right?
15    A.  Okay.
16    Q.  So, we're clear where this, we are, this is
17  the version you told after you went to the bathroom
18  and you got the nice cold SunDrop soda in your hand,
19  right?
20    A.  Yes.
21    Q.  You remember this.  All right.  Now, this
22  time you start with you, Dreddy and Ziggy going to
23  Charles Street.  This is what you told the agents,
24  three of you went to Charles Street?
25    A.  And Big Man.
```

1858

```
1    Q.  You said you told the agents that on this
2  version?
3    A.  All four of us went to Charles Street.
4    Q.  You told in version No. 7, you are saying
5  you included a reference to the light -- the chubby
6  guy?
7    A.  Yes.
8      MR. MARKLE:  "Version seven," I don't
9  think is helpful, your Honor.  Again, I think we
10  have to say December 2009 in Pinetops.
11      THE COURT:  Let's be clear so he
12  understands that's what the question is.
13    Q.  So, in the seventh version of the story you
14  were telling the agents in December of 2009, the
15  version that started after you came back from the
16  bathroom and were sitting in the chair with your
17  soda.  Are you saying now that you told the agents
18  that the light-skinned chubby guy was with you?
19  That's when you brought his name into the
20  discussion?
21    A.  He was always in the discussion.  He was
22  always with us.
23    Q.  You told the agents that you guys went to
24  the lookout apartment, correct?
25    A.  Yes, me, Dreddy and Ziggy.
```

1859

```
1    Q.  Yes.  You told the agents that you knew the
2  apartment was owned by a Spanish woman?
3    A.  Yes.
4    Q.  I'm going to show you what's been marked as
5  Government's Exhibit 217.  Do you recognize her?
6    A.  Yes.
7    Q.  Who is that?
8    A.  The Spanish lady.
9    Q.  And you saw her when you went to the
10  lookout apartment, correct?
11    A.  Yes.
12    Q.  Now, I'm just going to deviate from our
13  trip to Pinetops, okay?  Yesterday you testified
14  when you went to the lookout apartment there was
15  only some old man in the back room.  You never
16  mentioned a Spanish woman then?
17    A.  Because I was never asked for a Spanish
18  woman.
19    Q.  Okay, so that's why you didn't mention it?
20    A.  Yes.
21    Q.  But you are here to tell the truth, right?
22    A.  Yes.
23    Q.  And help the jury understand what happened.
24    A.  Yes.
25    Q.  Okay, thank you.  Now we're back to
```

GA1673

1860

```
1    Pinetops.
2         A.    Okay.
3         Q.    Soda, went to the bathroom, sit in the
4    chair.
5         A.    The Spanish lady did come up.
6         Q.    I'll take that up at a later point.
7         A.    Oh, okay.
8         Q.    You are talking to the agents, okay.  You
9    just told them about the Spanish woman, correct?
10        A.    Yes.
11        Q.    Who you recognized, correct?
12        A.    Yes.
13        Q.    And you tell the agents, again back in
14   Pinetops, how Dreddy and Ziggy took rope and duct
15   tape and a bag from the lookout apartment and went
16   downstairs.  You told the agents that?
17        A.    Yes.
18        Q.    Is that true?
19        A.    No, that was a lie.
20        Q.    That was a lie.  And you told the agents
21   that before leaving the apartment Dreddy and Ziggy
22   gave you a pack of crack to sell.  Did you tell the
23   agents that?
24        A.    Yes, that was a lie.
25        Q.    That was a lie.  And you told the agents
```

1861

```
1    when Dreddy and Ziggy got back they changed their
2    clothes.  Did you tell the agents that?
3         A.    I'm not for sure.
4         Q.    Did you tell the agents that at that point
5    all three of you left out of the lookout apartment?
6         A.    Yes.
7         Q.    But then did you tell the agents that while
8    in the lookout apartment Dreddy told you he had a
9    problem with the person on the first floor?  Did you
10   tell the agents that?
11        A.    Yes.
12        Q.    Was that a lie?
13        A.    No, that was the truth.
14        Q.    He told you that in the lookout apartment?
15        A.    It was the truth, but it wasn't told inside
16   of the apartment, it was told somewhere else.
17        Q.    So that was a part lie?
18        A.    That was the truth.
19        Q.    Well, he told you it.
20        A.    He told me.
21        Q.    But he didn't tell you inside the
22   apartment.
23        A.    Yes.
24        Q.    So, it's a half truth, half lie, right?
25        A.    Well --
```

1862

```
1         Q.    That he told you is the truth, where he --
2         A.    Yes.
3         Q.    -- where he told you is a lie?
4         A.    Right.
5         Q.    And then did you tell the agents that
6    Dreddy told you he was going to go downstairs and
7    rob those people in that apartment?
8         A.    I don't remember that.
9         Q.    You don't remember, okay.  And then did you
10   tell the agents that you saw two bloody bats outside
11   the car?  Did you tell the agents that?
12        A.    Yes, that was a lie.
13        Q.    That's another lie.  Okay.  And did you
14   tell the agents that you saw blood on all three of
15   your pants?  Did you tell the agents that?
16        A.    What do you mean?
17        Q.    You told the agents that you saw blood on
18   your pants, Dreddy's pants and Ziggy's pants.  Do
19   you remember telling them that?
20        A.    Never told them that.
21        Q.    Did you tell the agents at that point that
22   -- you said it was just Ziggy who said something
23   about blood on his pants?
24        A.    Yes.  We was on our way.  We was in the
25   car, leaving.
```

1863

```
1         Q.    And then you told the agents that all three
2    of you left together.  You told the agents that.
3         A.    Yes, I remember telling them that.
4         Q.    Okay, thank you.  Was it a lie?
5         A.    No, that was the truth.  All three of us
6    did leave together at a point in time.
7         Q.    Okay.  Now, at this point you would agree
8    you've told the agents many, many different versions
9    of what occurred, right?
10        A.    Yes.
11        Q.    And at no point yet have you put yourself
12   inside apartment 101, correct?
13        A.    I don't remember.
14        Q.    Anything we discussed, there hasn't been
15   anything mentioned about you going inside that
16   apartment on the second night, is there?
17        A.    You never asked me.
18        Q.    But there was no mention of it.
19        A.    You never asked me.
20        Q.    That's true, I'm talking about what you
21   told the agents.
22        A.    Not for me.
23        Q.    Up to this point, you hadn't said to the
24   agents that you went inside the apartment.  I mean,
25   you stayed away from that for a long time.
```

1864

```
1    A.    Yes.
2    Q.    Right?  Okay.  And you didn't tell the
3    agents that you had any involvement with anything
4    that went on in that apartment up to this point.
5    You were still not telling them anything about that,
6    right?
7    A.    Yes.
8    Q.    So, you are just an innocent bystander,
9    right?
10   A.    I don't know.
11   Q.    That's what you kept telling them.
12   A.    I don't know how you say innocent
13   bystander, I --
14   Q.    As to what went on in that apartment, you
15   didn't have anything to do with it.  That's what you
16   are telling them.  You kept telling them up to this
17   point in Pinetops.  That's what you are telling the
18   agents, you had nothing to do inside that apartment.
19   A.    Yes.
20   Q.    So, you are consistent about that at that
21   point.
22   A.    Yes.
23   Q.    And you are consistent about the blue
24   gloves, correct?
25   A.    Yes.
```

1865

```
1    Q.    And what happens next?  The agents start to
2    ask you some questions, right?
3    A.    Yes.
4    Q.    They still don't believe you.
5    A.    Yes.
6    Q.    So, you tell the agents again about the
7    Spanish female with the long hair, right, inside the
8    lookout apartment?  You told them that?
9    A.    Yes.
10   Q.    And this time you said you stayed in the
11   apartment with this Spanish woman while Dreddy and
12   Ziggy left and that they came back with a
13   light-skinned chubby guy.  You told the agents that?
14   A.    Yes.
15   Q.    And truth be told, this is the first time
16   you mentioned the light-skinned chubby guy to the
17   agents, correct?
18   A.    Maybe and maybe not.  I don't remember.
19   Q.    And then you told the agents that the four
20   of you walked down the stairs and Dreddy knocked on
21   the door.  You told the agents that?
22   A.    Never said that.
23   Q.    You never said that?
24   A.    No.
25   Q.    Did you tell the agents that when the woman
```

1866

```
1    opened the door you guys rushed in?  Did you tell
2    the agents that?
3    A.    No.
4    Q.    You did not?
5    A.    No.
6    Q.    Did you tell the agents that Dreddy was
7    carrying a gun and saying he was a cop?  Did you
8    tell the agents that?
9    A.    Yeah, that was the truth and that also was
10   a lie.
11   Q.    So, based on your testimony yesterday, am I
12   correct to assume that you are saying the truth was
13   that Dreddy was carrying a gun and the lie was he
14   was saying he was a cop?
15   A.    Yes.
16   Q.    And then did you tell -- well, you told the
17   agents that Dreddy told the woman to get down on the
18   ground.  Did you the tell the agents that?
19   A.    The lady was already on the ground.  He
20   told everybody to get on the ground.
21   Q.    The question is, did you tell the agents
22   that Dreddy told the woman to get on the ground?
23   Did you tell the agents that?
24   A.    Yes.
25   Q.    And then did you tell the agents that Ziggy
```

1867

```
1    handed you and Dreddy duct tape?
2    A.    Excuse me?
3    Q.    Did you tell the agents -- strike that.
4    You told the agents that Ziggy handed you and Dreddy
5    duct tape.  Is that correct?
6    A.    Ziggy handed me and Dreddy duct tape?
7    Q.    Yes, did you tell the agents that?
8    A.    No.
9    Q.    Did you tell the agents that you saw Dreddy
10   duct tape all three people?
11   A.    No.
12   Q.    You didn't tell them that.
13   A.    No.
14   Q.    And did you tell the agents that Dreddy
15   told you not to stand in front of the window?  Did
16   you tell the agents that?
17   A.    He told me not to stand directly in front
18   of the window.
19   Q.    That's what you told the agents?
20   A.    Yes.
21   Q.    Okay.
22   A.    But stand at the window.
23   Q.    Sir?
24   A.    But not directly in front of the window.
25   Q.    I'm just trying to know if you told the
```

1868

```
1   agents this.  And then you told the agents that
2   Dreddy told you to wait in the car.  You told the
3   agents that?
4       A.   Yes.
5       Q.   That was a lie?
6       A.   That was a lie.
7       Q.   That was a lie, okay.  And then did you
8   tell the agents that Dreddy came out and you saw him
9   carrying two bats?  Did you tell the agents
10  that?
11      A.   I don't remember that.
12      Q.   You don't remember that.  And then did you
13  tell the agents about going back to that apartment?
14  You previously discussed about going to the
15  apartment afterwards.  You told the agents about
16  that?
17      A.   The third apartment or --
18      Q.   Yeah, I guess where you were drinking and
19  getting high and all that stuff.
20      A.   Did I tell them that?
21      Q.   Yeah.
22      A.   Yes.
23      Q.   And at this point Agent Munger shows you
24  his phone again, correct?
25      A.   At what point?
```

1869

```
1       Q.   After you told the agents about Dreddy
2   telling you to wait in the car, which you said was a
3   lie, Agent Munger shows you his phone again, right,
4   with the pictures on it?
5       A.   I guess.  I'm not for sure.
6       Q.   And he shows you the picture of Dreddy,
7   right?
8       A.   Yes.
9       Q.   And you say that's Dreddy.  You tell him.
10      A.   Yeah, he showed me the pictures.
11      Q.   And this time you are, like, that's Dreddy,
12  right?
13      A.   Yes.
14      Q.   And he shows you the picture of Ziggy,
15  right?
16      A.   Yes.
17      Q.   And you are, like, that's Ziggy?
18      A.   Uh-huh (indicating affirmatively).
19      Q.   And they show you his picture and you say
20  that's the light-skinned chubby guy?
21      A.   Yes.
22      Q.   Who you don't know from Adam, except you
23  recognize him from that one night.
24      A.   Both nights.
25      Q.   That's your story, right?
```

1870

```
1       A.   Yes, that's my story.
2       Q.   And then they proceeded to ask you more
3   questions, correct?
4       A.   Yes.
5       Q.   And you told the agents then that it was
6   Ziggy you saw carry the bloody bats, correct?
7       A.   I don't remember saying that.
8       Q.   Okay.  You told the agents that Ziggy put
9   the bats in a black bag in the trunk.
10      A.   I don't remember.
11      Q.   Don't remember, okay.  And you told the
12  agents that you and Ziggy left together, correct?
13      A.   Yes, we did leave together.
14      Q.   That's what you told the agents?
15      A.   Yes.
16      Q.   And then you told the agents that you and
17  Ziggy headed to the apartment, to that other
18  apartment, correct?
19      A.   Yes.
20      Q.   And then you told the agents that Dreddy
21  and this gentleman showed up later at that
22  apartment, correct?  Did you tell the agents that?
23      A.   I don't remember.
24      Q.   Don't remember, okay.  And then the agents
25  started to really kind of ask you some more
```

1871

```
1   questions, and at this point you told the agents
2   that you went from the lookout apartment to the
3   garage and got bats there.  Do you remember telling
4   the agents that?
5       A.   I don't remember that.
6       Q.   Don't remember that, okay.  Again, this was
7   a very long day for you, correct?
8       A.   Yes.
9       Q.   You were telling a lot of different
10  stories, correct?
11      A.   Truth and lies.
12      Q.   Truth and lies.  And then you told the
13  agents that after going to the garage you guys went
14  up to the apartment on the first floor, right?  You
15  told the agents that.  I think from your perspective
16  it's the second floor, right?  The garage is the
17  first floor, you went up one story?
18      A.   Repeat the question.
19      Q.   You told the agents that you went up to the
20  apartment on the first floor, apartment 101?
21      A.   Yes.
22      Q.   And you told the agents that then you saw
23  the bats taken out at that point, correct?
24      A.   Don't remember.
25      Q.   Don't remember that.  Okay.  And you told
```

**GA1676**

1872

```
1    the agents you saw Dreddy with a gun.
2         A.   Yes.
3         Q.   And this time you told the agents that the
4    old man opened the door, right?
5         A.   Yes.
6         Q.   And you told the agents that the door had a
7    chain on it, right?
8         A.   Don't remember that.
9         Q.   You don't remember telling them that it
10   opened and the guy was looking through the chain?
11        A.   No.
12        Q.   And then at this point you told the agents
13   that Dreddy forced the door open yelling, police,
14   correct?  That's what you told the agents.
15        A.   Repeat the question again.
16        Q.   You told the agents that Dreddy forced the
17   door open yelling, police?
18        A.   That was the couple interviews -- couple --
19   earlier when I told them that.
20        Q.   You didn't repeat that again?
21        A.   Excuse me?
22        Q.   You didn't repeat that version of it again?
23        A.   I don't know if I did or not.  I'm not for
24   sure.
25        Q.   It's tough, I know.  And this is the time
```

1873

```
1    that you started talking about Dreddy pushing the
2    old guy back to the bedroom, correct?
3         A.   Yes.
4         Q.   And you told them that -- you told the
5    agents that the woman and the other man were just
6    sitting on the bed in the other bedroom, correct?
7         A.   Yes.
8         Q.   So, let me just go outside of being in
9    Pinetop.  So, you are saying that they were just
10   sitting there on the bed, just sitting there?
11        A.   Well, when I got there they was on the
12   ground.  But other than -- by the time I got in the
13   room.
14        Q.   I'm confused.  You told the agents that
15   they were sitting on the bed in the other bedroom.
16   Was that a lie?
17        A.   I don't remember saying that, but I know
18   when we got in the room Dreddy told them to get on
19   the floor.
20        Q.   Okay.
21        A.   So, they had to be sitting on the bed when
22   we got in there.
23        Q.   I'm confused.  I said to you did you tell
24   the agents that the woman and the other man were
25   just sitting in the bedroom, and a moment ago you
```

1874

```
1    said yes, you told the agents that, correct?
2         A.   They had to be sitting on the bed when
3    Dreddy told them to get on the floor.  They wasn't
4    standing up.  They must have been laying on the bed
5    or sitting on the bed.
6         Q.   So, you are the just assuming --
7         A.   No, I'm not assuming.
8         Q.   -- their position.
9         A.   I was there and I seen it.
10        Q.   What did you see?
11        A.   I seen Dreddy go inside, told the man to
12   get back in the room, he went back in the room, the
13   two couples by the bed.  By the time I got up in the
14   room, they was on the floor.  She was laying here,
15   he was laying here.
16        Q.   So, what you saw were two people laying on
17   the floor; that's your testimony?
18        A.   Well, what I saw was -- yes.
19        Q.   Your testimony here is that you saw two
20   people laying on the floor?
21        A.   Yes.
22        Q.   Now going back to --
23        A.   You know.
24        Q.   Now going back to Pinetop, jump back, did
25   you tell the agents that the woman and the other man
```

1875

```
1    were just sitting on the bed in the other bedroom?
2    Did you tell the agents that?  You said yes?
3         A.   I maybe said yes, maybe -- I don't know.
4    You can assume anybody in the room nine times out of
5    ten they was in the bed.  I may have said it and
6    then I may have said --
7         Q.   You told the agents that you saw everyone
8    being bound with duct tape, correct?
9         A.   I seen two people.
10             MR. MARKLE:  Your Honor, that's not --
11   the next line is "they too got on the floor after
12   being on the bed."  It's being read out of context.
13             MR. BUSSERT:  Again, I apologize, your
14   Honor, I guess I'm confusing Mr. Taylor's current
15   claim to his Pinetops claim.  So, I'll bring us back
16   to Pinetops.
17             THE COURT:  All right, we're back in
18   Pinetops, December '09.  Okay, that's what the next
19   question is about.
20             THE WITNESS:  Okay.
21             THE COURT:  Thank you.
22        Q.   So, we're on version nine now.  Did you
23   tell the agents at this point that you saw everyone
24   being bound with duct tape?
25        A.   I don't remember.
```

1876

```
1    Q.   You told the agents that Dreddy, Ziggy and
2    this gentleman were all wearing blue rubber gloves,
3    correct?
4    A.   Yes.
5    Q.   And that's the truth.  Your testimony today
6    is that statement to the agents was the truth.
7    A.   Yes, we all had rubber gloves.
8    Q.   Blue rubber gloves?
9    A.   Yes.
10   Q.   And at this point you told -- you told the
11   agents that at this point Dreddy yelled at you to
12   put gloves on, right?
13   A.   Yes.
14   Q.   You didn't have gloves on and you told the
15   agents Dreddy told you to put gloves on.
16   A.   Yes, I told the agent that when I was in
17   there, that I didn't have any gloves on and Dreddy
18   came up and told me to put gloves on, but that was a
19   lie.
20   Q.   That was a lie?
21   A.   Yes.
22   Q.   Okay.  So, after you told that lie about
23   Dreddy telling you to put the gloves on, you told
24   the agents that Dreddy had a gun, right?  You told
25   the agents that?
```

1877

```
1    A.   Excuse me?
2    Q.   After telling the agents the lie about
3    Dreddy having you put the gloves on, you told the
4    agents that Dreddy had a gun, right?
5    A.   He did have a gun.
6    Q.   That's what you told the agents?
7    A.   Yes.
8    Q.   Then you told the agents that Ziggy and
9    this guy had bats, correct?
10   A.   Yes.
11   Q.   This guy right here.  Okay.  Now, going
12   back to yesterday -- this can be confusing -- going
13   back to yesterday, you never said he had a bat
14   inside the apartment or you saw him with a bat in
15   the apartment, correct?
16   A.   He -- we got across the wall, he had a bat
17   in his hand, he went inside of the building, he had
18   had a bat in his hand inside of the hallway.
19   Q.   Let me stop you, please.  That's not the
20   question.  The question was, yesterday did you say
21   anything about this gentleman having a bat inside
22   the apartment?
23   A.   Yes, he did have a bat.  He went inside
24   with the bat when we went inside.
25   Q.   Yesterday --
```

1878

```
1    A.   Him and Ziggy had a bat and Dreddy had the
2    gun.  That's what I said.
3    Q.   Yesterday the only reference you made to
4    bats inside of the apartment were with respect to
5    Dreddy and Ziggy swinging them against the victims
6    heads, correct?
7    A.   Yes.
8         MR. MARKLE:  That's a different
9    question, your Honor.
10        THE COURT:  This is not clear, Mr.
11   Bussert.  Is that a separate question from the
12   previous question or is it integrated?
13        MR. BUSSERT:  It's integrated.
14        THE COURT:  I think we'll need to step
15   back and ask those again then to be clear what is
16   from which time frame.
17   Q.   Going back to your testimony yesterday, the
18   only time you made reference to bats inside the
19   apartment was when you saw Dreddy and Ziggy swinging
20   them, correct?
21   A.   Yes.
22   Q.   Now, I'm going to go back to Pinetops, all
23   right.  We're almost done.  I'm going to go back.
24   This is the very end of your stories.  Okay?  You
25   tell the agents that your job was to handle the son,
```

1879

```
1    correct?
2    A.   That's what I was told.
3    Q.   That's what you told the agents?
4    A.   Yes.
5    Q.   And you told the agents that the tape was
6    bought at the corner store.
7    A.   The tape was bought at Walgreen.
8    Q.   Did you tell the agents it was bought at a
9    corner store?
10   A.   I don't remember telling the agents that.
11   Q.   And did you tell the agents that when you
12   left the apartment you saw someone and called Dreddy
13   on your cell phone?  Did you tell the agents that?
14   A.   No.
15   Q.   You didn't tell them that?
16   A.   That I saw someone call Dreddy on the
17   phone?
18   Q.   Yes, did you tell the agents that?
19   A.   No.
20   Q.   Now, at that point you were arrested.
21   After all of these stories they finally put the
22   cuffs on you, right?
23   A.   Yes.
24   Q.   And you were shocked, right?  You were
25   shocked that you were being arrested?
```

1880

```
1    A.   Yes.
2    Q.   Okay.  You thought you talked your way out
3  of all of this.
4    A.   Yes.
5    Q.   And that was on December 2nd, 2009,
6  correct?
7    A.   December 2nd, yes.
8    Q.   And the next day you were presented in
9  federal court in rally North Carolina, correct?
10   A.   Yes.
11   Q.   You had a public defender appointed to
12 represent you, correct?
13   A.   Yes.
14   Q.   You had an hearing there in the courthouse,
15 correct?
16   A.   Yes.
17   Q.   And then you were transported up to
18 Connecticut, correct?
19   A.   Yes.
20   Q.   Then you next met with the government on
21 January 15, 2010.
22   A.   Yes.
23   Q.   And again on February 3rd of 2010, correct?
24   A.   I don't remember the exact dates, but --
25   Q.   I'm not trying to trip you up on dates.  It
```

1881

```
1  sounds correct?  I mean, January 15th, about three
2  weeks later you met with them again?
3    A.   I'm not for sure.  I remember I met them
4  again, but I'm not for sure on the dates.
5    Q.   And then you met them again on March 24,
6  2010?
7    A.   Like I said, I'm not for sure with the
8  dates.  I know I met them again, but I'm not for
9  sure with the dates.
10   Q.   And then you met them again on June 18,
11 2010?
12   A.   I'm not for sure with the dates again.
13   Q.   And then you entered your guilty plea on
14 October 18, 2010, correct?
15   A.   I --
16   Q.   Approximately.
17   A.   I think so.  I'm not sure.
18   Q.   And sometime between the point that you
19 were arrested on December 2nd and before you came up
20 and met with the government here in Connecticut, you
21 learned it was this guy who had identified you as
22 the fourth person on Charles Street, correct?
23   A.   I didn't know nothing.
24   Q.   You didn't get a copy of the affidavit that
25 was used for your arrest?
```

1882

```
1    A.   The complaint.
2    Q.   Yeah, the underlying complaint where the
3  agent put all of the facts in.  Did you have a
4  chance to look at that?  Did your lawyer give you a
5  copy?
6    A.   Yes, but it wasn't nothing I could read, it
7  was all black lines.
8    Q.   And after you pled guilty, you met with
9  government again like a week later, correct, talked
10 with them again?
11   A.   Yes.
12   Q.   And then, as you testified yesterday, you
13 testified last year, correct?
14   A.   Yes.
15   Q.   And in preparation for that testimony you
16 met with the government again to get ready to
17 testify last year?
18   A.   Yes.
19   Q.   Just like for your testimony now, last
20 couple of days, you've met with the government
21 again, correct?
22   A.   Yes.
23   Q.   As Attorney Markle said yesterday, you've
24 spent a lot of time with the government, correct?
25   A.   Yes.
```

1883

```
1    Q.   During any of these meetings with federal
2  prosecutors, FBI agents, all these federal
3  officials, did you ever see a tape recorder in the
4  room?
5    A.   No.
6    Q.   Did they ever record any of your statements
7  to make sure we could all review that?
8    A.   I don't know if they did or not.  I don't
9  know.
10   Q.   And during the course of all of these
11 meetings with the government, you told them that you
12 lied and lied again on December 2nd of 2009,
13 correct?
14   A.   Repeat the question.
15   Q.   You've had all of these meetings with the
16 government since they first came to your house in
17 Pinetop, right?
18   A.   Right.
19   Q.   And over the course of that time you had to
20 tell them all of the times you lied when you were in
21 Pinetop, right?
22   A.   Yes.
23   Q.   And even as you were talking to them
24 pursuant to the terms of your cooperation -- well,
25 excuse me, strike that.  You had a proffer agreement
```

1884

1 the first time you met with them before you had a
2 cooperation agreement. Was there another form you
3 signed?
4     A.   I think so.
5     Q.   And that type of agreement, just like your
6 cooperation agreement, says you can get in trouble
7 for lying, correct?
8     A.   Correct.
9     Q.   But even with that, even as you were having
10 these meetings throughout 2010, you had to tell the
11 government you were still lying to them, correct?
12     A.   Correct.
13     Q.   So, when you met with the government in
14 June of 2010, you told them you had lied to them by
15 saying your intent to go into the apartment was to
16 rob the place, right?  You told them that was a lie?
17     A.   No, I never told them that was a lie.
18     Q.   You never told them that?
19     A.   That we was attempt to be a robbery?
20     Q.   Yes.  You had told them that before, but
21 that was a lie.
22     A.   I told them that's what I thought it was
23 going to be, a robbery, but I didn't know it was
24 going to turn out to be what it was.
25     Q.   So, you don't recall in June 2010 telling

1885

1 them that the idea of robbing the place, that that
2 was actually a lie?
3     A.   I don't remember telling them that it was a
4 robbery?
5     Q.   You told them at some point before that
6 that it was a robbery, correct?
7     A.   Yes.
8     Q.   And then in June of 2010 you said, no, no,
9 I lied to you, it wasn't a robbery.
10     A.   I'm not for sure.
11     Q.   Not for sure.  Okay.  Again, they call you
12 Yes Yes because you are always ready to help,
13 correct?
14     A.   Yes.
15     Q.   And you are actually a pretty quick
16 learner, right?
17     A.   You could say.
18     Q.   You helped Dreddy before, right?
19     A.   No.
20     Q.   You didn't help Dreddy?
21     A.   You said help Dreddy before?
22     Q.   Yeah, you helped Dreddy before selling
23 drugs and stuff.  You helped Dreddy.
24     A.   I was trying to help myself.
25     Q.   I'm talking way back in the day, back in

1886

1 2005, you were helping Dreddy sell drugs, right?
2     A.   Yes.
3     Q.   And his brother Ozzie, right?
4     A.   Yes.
5     Q.   Or Ziggy?
6     A.   Yes.
7     Q.   Same guy.  And now you are helping the
8 government, right?
9     A.   Yes.
10     Q.   Yesterday Mr. Markle asked you:  "And do
11 you think it's going to be up to the government what
12 sentence you get?"  And you answered:  "Yes."  That
13 was your answer?
14     A.   Repeat the question again.
15     Q.   Yesterday Mr. Markle asked you:  "And do
16 you think it's going to be up to the government what
17 sentence you get?"  You answered:  "Yes."  Right?
18     A.   Yes.
19     Q.   That was your testimony, right?
20     A.   Yes.
21     Q.   Because that's the truth, right?
22     A.   The truth to what?
23     Q.   It's up to the government what sentence you
24 are going to get?
25     A.   I -- yes.

1887

1     Q.   If they don't file that motion for you,
2 that 5K motion, you are spending the rest of your
3 life in prison, right?
4     A.   All I know right now I'm spending the rest
5 of my life in prison.
6     Q.   You know the only way you are going to get
7 out from underneath that is if the government files
8 that motion for you, right?
9     A.   What motion?
10     Q.   The 5K motion, the cooperation motion.
11     A.   I don't really know too much about it,
12 but --
13     Q.   You don't know too much about what the
14 government is going to do if you testify truthfully?
15     A.   Help me get a lesser sentence, that's all I
16 know.
17     Q.   And help you get a lesser sentence, do you
18 know that they file a motion on your behalf?
19     A.   I don't.
20     Q.   You don't know the procedure.
21     A.   No.
22     Q.   But you know you need the government to
23 help you get the lesser sentence, right?
24     A.   Yes.
25     Q.   In order for that to happen, you need the

1888

```
1    jury to convict this man, correct?
2        A.    I don't know nothing about that.  I'm here
3    to tell the truth.
4        Q.    And just to -- one second.
5            MR. BUSSERT:  Can I approach, your
6    Honor?
7            THE COURT:  Yes.
8            (Sidebar conference)
9            MR. BUSSERT:  I just wanted to clarify,
10   I thought the Court's ruling was I could ask him
11   what the label of the conviction was, you were
12   convicted of aiding and abetting common law --
13           THE COURT:  No, the opposite.  Because
14   that's the crime of violence or assault that Estrada
15   says doesn't bear on credibility.  The theft part.
16           MR. BUSSERT:  The theft.
17           THE COURT:  You can.
18           MR. BUSSERT:  Okay.
19           THE COURT:  Ask him the statutory name
20   of that, whatever it is what is it.
21           MS. REYNOLDS:  It's stolen goods, or
22   something, possession of stolen goods.
23           (Sidebar concluded)
24       Q.    Mr. Taylor, again I think it seems pretty
25   clear that you've lied a lot in this case, correct?
```

1889

```
1        A.    No.
2        Q.    In the course of this case, since you were
3    arrested -- well, since you were approached by the
4    agents in December of 2009, you have lied a lot.
5        A.    I lied when we was in North Carolina and I
6    also told the truth in North Carolina.
7        Q.    And whatever your story is, it's consistent
8    that you didn't touch anybody in that apartment,
9    right?
10       A.    Never touched nobody in that apartment.
11       Q.    That's what you say.  And that your job,
12   again, as you understood it, was control the son,
13   right?
14       A.    Yes.
15       Q.    So you were okay with that, right?  You
16   were going to control him?
17       A.    Yes.
18       Q.    And, again, by control you mean what?
19           MR. MARKLE:  It's been asked and
20   answered, your Honor.
21           THE COURT:  Sustained.
22       Q.    And am I right that of the four of you, of
23   you and Dreddy and Ziggy and him, physically you are
24   clearly the largest of the four individuals,
25   correct?
```

1890

```
1        A.    I guess so.
2        Q.    You guess.  I mean, you call this guy Big
3    Guy, but you have to have at least 100 pounds on
4    him, right?
5        A.    Maybe he lost weight.  It look like he lost
6    weight to me.
7        Q.    Would it actually come as a surprise to you
8    he's actually gained weight since 2005?
9            MR. MARKLE:  Your Honor?
10           THE COURT:  Sustained.
11           MR. MARKLE:  That's argument.
12       Q.    And so your claim now is that you've lied
13   before, right?
14       A.    My claim now that I lied before?
15       Q.    That you've lied before, right?
16       A.    I claim --
17           MR. MARKLE:  Asked and answered, your
18   Honor.
19           THE COURT:  Sustained.
20       Q.    But you want this jury to believe what you
21   are saying now, right?
22       A.    Only thing I'm here to do for is to tell
23   the truth.  That's it.
24       Q.    So the government will file that thing and
25   get you less than life, right?
```

1891

```
1            MR. MARKLE:  Asked and answered.
2            THE COURT:  Sustained.
3            MR. BUSSERT:  No further questions.
4            THE COURT:  All right, redirect.
5            MR. MARKLE:  Yes, your Honor.  Thank
6    you.
7    REDIRECT EXAMINATION
8    BY MR. MARKLE:
9        Q.    Mr. Taylor, you indicated that you're to be
10   truthful, correct?
11       A.    Yes.
12       Q.    Does that have anything to do with whether
13   the defendant is convicted or not?
14       A.    No.
15       Q.    What's important to you about the outcome
16   of this case?
17       A.    Just tell the truth.
18       Q.    And who decides your sentence?  When you
19   say the government, who's going to impose sentence
20   on you?
21       A.    The judge.
22       Q.    Am I?
23       A.    No.
24       Q.    Is AUSA Reynolds?
25           MR. BUSSERT:  Objection, leading.
```

1892

```
1      A.   No.
2           THE COURT:  Yes, please don't lead.
3      Q.   You said you are a quick learner.
4      A.   Yes.
5      Q.   Are you a quick learner?
6      A.   Yes.
7      Q.   Try your best?
8      A.   Yes.
9      Q.   Do you think you are a good liar?
10     A.   No.
11     Q.   When you made up the name Ba, where did
12 that come from?
13     A.   It's whatever came from my head.
14     Q.   How about Fan?
15     A.   I was looking at the ceiling fan and came
16 up with Fan.
17          MR. BUSSERT:  Objection.  There was no
18 testimony to that on cross.  It's beyond the scope.
19          THE COURT:  This is going back to --
20          MR. MARKLE:  Pinetop.
21          THE COURT:  Pinetop.
22          MR. BUSSERT:  There was no questioning
23 about Fan.
24          THE COURT:  I'm going to overrule the
25 objection the issues of what were said at Pinetop
```

1893

```
1  was the subject of cross-examination.  Overruled.
2      Q.   There was reference to you testifying last
3  year.  That wasn't with this defendant, correct?
4      A.   No.
5      Q.   And when you said in Pinetop and you said
6  here that Azibo's glove ripped, was that a lie?
7      A.   No, that was the truth.
8      Q.   And when you said in Pinetop and you said
9  here that Dreddy had a gun, was that a lie?
10     A.   That was the truth.
11     Q.   And when you said in Pinetop and you said
12 here that Ziggy and the defendant had bats, was that
13 a lie?
14     A.   That was the truth.
15     Q.   And you said you, all of you -- there was
16 duct tape and it was gray, was that a lie?
17     A.   That was the truth.
18     Q.   And there was a man and a woman in the
19 bedroom and they were on the floor, was that a lie?
20     A.   That was the truth.
21     Q.   And there was an old man on the floor of
22 the other bedroom, was that a lie?
23     A.   That was the truth.
24     Q.   And the defendant was standing by the
25 bedroom doorway the entire time, is that a lie?
```

1894

```
1      A.   That's the truth.
2      Q.   All of the stuff you've talked about in
3  Pinetop, did you ever see a report of what you said
4  in Pinetop?
5      A.   No.
6      Q.   Did you ever give a written statement down
7  in Pinetop?
8           MR. BUSSERT:  Objection, relevance.
9           THE COURT:  Overruled.
10     Q.   Did you ever give a statement in Pinetop?
11     A.   No.
12     Q.   Did you ever sign anything in Pinetop?
13     A.   No.
14     Q.   Did you ever have a chance to change it or
15 correct it, the report that was made?
16     A.   No.
17     Q.   And when you were in Pinetop and when you
18 testified, you saw a picture of Dreddy and you said
19 that's the guy who went into the apartment with you
20 both times -- well, the attempt and then went in the
21 second time, correct?
22     A.   Yes.
23     Q.   And the picture of Ziggy, is that the same
24 guy who went the first time and then went in the
25 second time?
```

1895

```
1      A.   Yes.
2      Q.   And you see the defendant.  Is that the guy
3  that went the first time and went in the second
4  time?
5      A.   Yes.
6      Q.   Now, you were shown what -- I think the
7  plea petition, the thing you wrote about what you
8  did when you pled guilty.
9      A.   Yes.
10     Q.   And I'm going to read you this and ask you
11 if this is your full thing that you wrote.  "Some
12 time in 2005 I met Azibo and Azikiwe Aquart through
13 a person I know as Kosher.  And hoped to be able to
14 earn money by selling drugs."
15     A.   Yes.
16     Q.   Do you remember writing that?
17     A.   Yes.
18     Q.   "I was given crack to sell.  I took a trip
19 with them to the south."  Was that true?
20     A.   Yes.
21     Q.   Did you, in fact, sell the crack?
22     A.   No.
23     Q.   Did you -- is that the crack you talked
24 about giving back to Ziggy?
25     A.   Yes.
```

**GA1682**

1896

```
1    Q.   Did you take a trip south?
2    A.   Yes.
3    Q.   "During the trip I was told they needed my
4  help with something in Connecticut."  Is that true?
5    A.   Yes.
6    Q.   "When we returned to Connecticut I met the
7  Aquarts in Bridgeport and was given details about a
8  person in a downstairs apartment."
9    A.   Yes.
10   Q.   Is that true?  Is that what you wrote?
11   A.   Yes.
12   Q.   "They had a problem with.  The next day I
13 returned to Bridgeport and was told we were going to
14 rob the woman in the downstairs apartment."  Is that
15 what you wrote?
16   A.   Yes.
17   Q.   Why?
18   A.   Because that's what I was told.
19   Q.   "I was told I was there in case the son or
20 the woman was there with friends."  Was that the
21 truth?
22   A.   Yes.
23   Q.   "Azibo had a handgun and Azikiwe and Efrain
24 Johnson had baseball bats."  Was that the truth?
25   A.   Yes.
```

1897

```
1    Q.   Did you know at that time that the
2  defendant's name was actually Efrain Johnson?
3    A.   No.
4    Q.   Did you know it when you wrote this?
5    A.   No.
6    Q.   Who told you the name?  How did you know
7  Big Boy was Efrain Johnson?
8    A.   Through my attorney.
9    Q.   So, when you put in here that "Azibo had a
10 handgun and Azikiwe and Efrain Johnson had baseball
11 bats," who's Azikiwe?
12   A.   The brother of Dreddy.
13   Q.   Who you knew as Zee?
14   A.   And Zee.
15   Q.   And Ziggy?
16   A.   Ziggy.
17   Q.   Did you ever know him as Ozzie?
18   A.   No.
19   Q.   And you say "Ziggy and Efrain Johnson had
20 baseball bats."  Who is Efrain Johnson?
21   A.   Big Guy.
22   Q.   Is that the man sitting in court today?
23   A.   Yes.
24   Q.   And "everyone had masks."  Was that true?
25   A.   Yes.
```

1898

```
1    Q.   And "blue rubber gloves"?
2    A.   Yes.
3    Q.   Is that what you wrote?
4    A.   Yes.
5    Q.   And "Azibo kicked in the door."
6    A.   Yes.
7    Q.   "And we went in."
8    A.   Yes.
9    Q.   "I saw three people."  Was that the
10 victims?
11   A.   Yes.
12   Q.   "I was told to be a lookout."  Is that
13 true?
14   A.   Yes.
15   Q.   "I saw the people duct taped and beaten
16 with bats."  Is that true?
17   A.   Yes.
18   Q.   "By Azibo and Azikiwe."
19   A.   Yes.
20   Q.   You never claimed that you saw him swinging
21 the bat, did you?
22   A.   No.
23   Q.   And why didn't you say that?
24   A.   Because I never seen him swing no bat.
25   Q.   And you didn't say you saw him with the
```

1899

```
1  duct tape.  Why didn't you say that?
2    A.   Because I never seen him with the duct
3  tape.
4    Q.   But you want to help yourself, Mr. Taylor.
5  Why didn't you say something bad about --
6         MR. BUSSERT:  Objection.  It's a series
7  of leading questions, your Honor.  It's beyond the
8  pale.
9         THE COURT:  Okay, starting back with
10 "you never claimed."  That's a leading question.
11 Would you rephrase from there and let's get it
12 straight.
13        MR. MARKLE:  Yes, your Honor, I'll
14 withdraw that.
15   Q.   Let me finish with what you wrote.  You
16 said "I asked about what they were doing and left."
17 Is that what happened?
18   A.   Yes.
19   Q.   And did you, in fact, leave the apartment?
20   A.   Yes.
21   Q.   And when you left, who was there?
22   A.   Ziggy and Big Boy.
23   Q.   Who did you leave with?
24   A.   Ziggy -- I meant Dreddy and Big Boy, and I
25 left with Ziggy.
```

**GA1683**

1900

```
 1    Q.   When you went the first time and the second
 2  time, when you were in the parking lot, did the
 3  defendant ever try and leave?
 4    A.   No.
 5    Q.   When you were in the stairway the first
 6  time or the second time, did the defendant ever try
 7  and leave?
 8    A.   No.
 9    Q.   When you were in the apartment the second
10  time, did the defendant ever try and leave?
11    A.   No.
12    Q.   Did you ever see the defendant forced into
13  Charles Street?
14    A.   No.
15         MR. BUSSERT:  Objection.  Same reason as
16  yesterday, your Honor.  Objection, leading.
17         THE COURT:  Overruled.
18    Q.   Did you ever see him forced into Charles
19  Street?
20    A.   No.
21    Q.   Did you ever see Dreddy point a gun at you?
22    A.   No.
23    Q.   At Ziggy?
24    A.   No.
25    Q.   At the defendant?
```

1901

```
 1    A.   No.
 2    Q.   Who is the only person he pointed a gun at?
 3    A.   The victims.
 4    Q.   And who were the only people ordered at
 5  gunpoint to do anything that night?
 6    A.   The victims.
 7    Q.   When you first met with law enforcement in
 8  Pinetops up until the last time when you were
 9  getting ready to testify in this trial, were you
10  ever told it was okay to lie?  Did everyone every
11  say it was okay to lie, John Taylor?
12    A.   It wasn't.
13    Q.   And every time you did lie, what did the
14  agents say to you?
15    A.   You're not truthful.
16    Q.   And did they say that's okay?
17    A.   They say it's not true, start over again.
18    Q.   What did they tell you you had to do?
19    A.   Tell the truth.
20    Q.   Were you ever told you had to say something
21  bad about the defendant?
22    A.   No.
23    Q.   So, why did you say that Azibo hit the
24  woman with the bat?
25    A.   Because I seen him.
```

1902

```
 1    Q.   And why did you say Ziggy hit the man with
 2  the bat?
 3    A.   Because I seen him.
 4    Q.   And why did you say the defendant brought
 5  the bats.
 6    A.   Because I seen him.
 7    Q.   Have you to this date been given anything
 8  in return for your testimony, Mr. Taylor?
 9    A.   No.
10    Q.   Is the only thing you've gotten from the
11  agents?  A decent lunch?
12    A.   That's it.
13    Q.   Was it even decent?
14         MR. BUSSERT:  Objection.
15         THE COURT:  Sustained.
16    Q.   Is that all you've gotten, Mr. Taylor?
17    A.   Yes, sir.
18    Q.   Have you been paid?
19    A.   No.
20    Q.   Have you been promised anything?
21    A.   No.
22    Q.   Have you been given anything?
23    A.   No.
24    Q.   Have you been let out of jail for one
25  minute?
```

1903

```
 1    A.   Just to come to court and testify.
 2    Q.   In custody?
 3    A.   In custody.
 4    Q.   Have you ever been at liberty since the day
 5  you were arrested in Pinetop to today?
 6    A.   No.
 7    Q.   Thank you.
 8         THE COURT:  Recross.  Do you know, let's
 9  take lunch.  Is that all right with you, Mr.
10  Bussert?
11         MR. BUSSERT:  I won't be that long, your
12  Honor, maybe ten minutes.
13         THE COURT:  Okay, go ahead.
14  RECROSS-EXAMINATION
15  BY MR. BUSSERT:
16    Q.   When you met with the agents in Pinetop,
17  you repeatedly told them about seeing bloody bats
18  outside of the apartment, didn't you?
19    A.   And that was a lie.
20    Q.   Did you tell the agents that you saw bloody
21  bats outside of the apartment; yes or no?
22    A.   And that was a lie.
23    Q.   Did you tell them?
24         MR. MARKLE:  Objection, your Honor.
25    Q.   Yes or no?
```

1904

1    MR. MARKLE: It's been answer, asked and
2    answered.
3    THE COURT: Okay, but he hasn't quite
4    answered it. The question is, did you tell the
5    agents. That's just yes or no.
6    A.   Yes.
7    Q.   And you told the agents about the
8    distinctive clanking of the bats inside of the
9    truck -- trunk, didn't you?
10   A.   Yes, and that was a lie.
11   MR. BUSSERT: Move to strike the second
12   portion, your Honor, as nonresponsive.
13   THE COURT: Granted.
14   MR. BUSSERT: Thank you.
15   Q.   Mr. Markle just read this to you. This is
16   your statement. You say "help them with something
17   in Connecticut." And then you say "when we returned
18   to Connecticut I met the Aquarts in Bridgeport and
19   was given details about a person in a downstairs
20   apartment they had a problem with. The next day I
21   returned and was told we were going in," correct?
22   And you were there to help handle the son, and then
23   you talk about all of this other stuff, correct?
24   A.   Correct.
25   Q.   Right? Am I reading this correctly?

1905

1    A.   Correct.
2    Q.   When you say "I met the Aquarts in
3    Bridgeport," do you say anything about the
4    light-skinned chubby guy? Do you say that right
5    here? Do you see Efrain Johnson's name right here?
6    A.   Excuse me?
7    Q.   Right here, did you write Efrain Johnson's
8    name right here when you said "I met the Aquarts in
9    Bridgeport"? You don't say I met the Aquarts and
10   Efrain Johnson. "I met the Aquarts."
11   A.   I met --
12   Q.   Can you read that, sir? What does it say?
13   A.   I met Dreddy and Ziggy at the train
14   station.
15   THE COURT: Mr. Taylor, he's referring
16   to what wrote you in your petition to plea.
17   THE WITNESS: Yes, ma'am.
18   A.   I met Dreddy and Ziggy.
19   Q.   Right here it says --
20   A.   "I met the Aquarts in Bridgeport."
21   Q.   Thank you. And, again, this was right
22   before you pled guilty, correct?
23   A.   Yes.
24   Q.   This was after numerous meetings with the
25   government, correct?

1906

1    A.   Yes.
2    Q.   And this was done with the assistance of
3    your lawyers, correct?
4    A.   Yes.
5    Q.   To try and help you get the cooperation
6    agreement, correct?
7    A.   I don't --
8    Q.   When you pled guilty you had a cooperation
9    agreement, correct?
10   A.   Yes.
11   Q.   Yes. And that cooperation agreement is the
12   thing that you need to get less than a life
13   sentence, correct?
14   A.   Correct.
15   Q.   You also said -- you also just said in
16   response to Mr. Markle's question that you never
17   heard Ziggy called by the name Ozzie, correct?
18   A.   Correct.
19   Q.   Turning your attention to your phone call
20   with Ms. Pettway, "no, I told Ozzie I didn't."
21   Correct?
22   A.   I didn't know who she was talking about.
23   Q.   That's your words, "no, I told Ozzie I
24   didn't."
25   A.   Because I repeated who she was talking

1907

1    about. I knew she was talking about Ziggy. I knew
2    she was talking about Ziggy because he was the only
3    person who could have came bond me out.
4    Q.   And you said that you gave the crack back
5    to Dreddy because you were trying to distance
6    yourself from him, correct?
7    A.   Yes.
8    Q.   And from Ziggy, right? You didn't want
9    anything to do with him, correct?
10   A.   I gave it to Ziggy.
11   Q.   Yeah, you were trying to get away from
12   those guys, right?
13   A.   Yes.
14   Q.   But in that call you are talking about the
15   brother-in-law and having to deal with him, and you
16   said before that was with Ziggy.
17   MR. MARKLE: Your Honor, it's
18   argumentative and I think it's beyond the scope.
19   THE COURT: I'm going to permit it.
20   Q.   Correct?
21   A.   Repeat the question.
22   THE COURT: Do you understand the
23   question?
24   A.   No.
25   THE COURT: All right, would you break

1908

1 that down, please.
2            MR. BUSSERT:  Yes, I can, your Honor.
3      Q.   When Mr. Markle just stood up here he asked
4 you, he said, you gave the crack back, correct?
5      A.   Correct.
6      Q.   And what you had said yesterday was you
7 gave the crack back because you were trying to get
8 away from these guys, correct?
9      A.   Correct.
10     Q.   But as I said before, this reference "me
11 and brother-in-law got something going on" that
12 means you and Ziggy got something going on, correct?
13     A.   Yes, because Dreddy had told me that while
14 we was in jail before I got out of jail.
15     Q.   So, you weren't trying to distance yourself
16 from the Aquart brothers, you were trying to get
17 closer to them.
18     A.   No, I was trying to get out on bond to get
19 away from them.  That's the only way I can get out
20 of bond -- get out on bond.
21            MR. BUSSERT:  Thank you, your Honor.  No
22 further questions.
23            MR. MARKLE:  Very briefly, your Honor.
24 RE-REDIRECT EXAMINATION
25 BY MR. MARKLE:

1909

1      Q.   The night of the murder?
2      A.   Yes.
3      Q.   The night of the murders who did you meet
4 first?  When you came to Bridgeport who did you
5 first see?
6      A.   Dreddy, Ziggy and Big Man.
7      Q.   In that order?
8      A.   Yes.
9      Q.   You were with Dreddy and Ziggy before you
10 were with Big Man?
11     A.   Yes.
12     Q.   And, Mr. Taylor, your one-page written
13 facts --
14     A.   Yes.
15     Q.   -- that's not everything you know about
16 this case, is it?
17     A.   No, that was just brief.
18     Q.   You now testified for --
19            THE COURT:  No, don't lead, please.
20     Q.   Have you -- what was it?
21     A.   Just a brief on what I seen and what --
22 what happened.
23     Q.   Thank you.
24            MR. MARKLE:  No further questions, your
25 Honor.

1910

1            THE COURT:  All right, Mr. Taylor, you
2 are excused.  You may step down.
3            We will take lunch.  Do the jurors have
4 any request for the length of lunch?  Is a half an
5 hour too short?  Let's be back at 20 'til two then.
6 Thank you.
7            (Jury exited the courtroom).
8            THE COURT:  All right, the next witness
9 will be who?
10            MR. MARKLE:  I'm sorry, your Honor.
11            MS. REYNOLDS:  Special Agent Chris
12 Munger.
13            MR. MARKLE:  Lashika Johnson is present,
14 your Honor.  I'm not sure if we'll get to her.
15            THE COURT:  Okay.
16            MR. MARKLE:  That would be the order.
17            THE COURT:  That's your order.  All
18 right.
19            MR. BUSSERT:  Your Honor, I mean, there
20 has been some previous issues we may need to take up
21 after the lunch break relative to the opening
22 argument about the appropriate scope of inquiry of
23 Agent Munger concerning Mr. Johnson's prior proffer
24 statements which --
25            MR. MARKLE:  Yes, I'll state for the

1911

1 record we don't intend to get into the proffer
2 statements.
3            THE COURT:  The only thing the
4 government has claimed it would be referencing would
5 be Mr. Johnson's post-arrest, post-Miranda
6 statements.  Is that --
7            MR. MARKLE:  Correct.
8            THE COURT:  And that's differentiated
9 from any of the proffer statements.
10            MR. MARKLE:  That's correct, your Honor.
11            THE COURT:  And you will be held to
12 that.
13            MR. MARKLE:  Yes, your Honor.
14            THE COURT:  And that's your concern.
15            MR. BUSSERT:  No.  Actually I am seeking
16 to inquire about the other statements.  The
17 government doesn't want that to come out.
18            THE COURT:  You can't do that.
19            MR. BUSSERT:  I guess the question is
20 why.
21            THE COURT:  Because it's his statement.
22 It's hearsay.
23            MR. BUSSERT:  So is his post-arrest
24 statement.
25            MS. REYNOLDS:  We can offer it, you

**GA1686**

1912

```
1   can't.
2            MR. MARKLE:  It's hearsay, your Honor.
3   He obviously --
4            MR. BUSSERT:  It's a statement against
5   penal interest.  I mean its the exact same -- in
6   terms of it's ongoing, it's essentially a six-part
7   confession.  And I think -- and beyond that, I'd
8   like to be able to inquire of Agent Munger of his
9   affidavit where he relies on information Mr. Johnson
10  gave him.
11           MR. MARKLE:  I don't know the relevance
12  of that, your Honor.
13           THE COURT:  Well, I don't know the
14  affidavit either.
15           MS. REYNOLDS:  And it wasn't his
16  affidavit, it was Special Agent Matt King.
17           MR. BUSSERT:  There is two affidavits,
18  there is affidavit in support of the arrest warrant.
19           THE COURT:  That Agent Munger --
20           MR. BUSSERT:  No, that's the one
21  Attorney Reynolds is referring to.  And then there
22  is a separate affidavit in support of the search
23  warrant to take swabs from Mr. Taylor, and that's
24  the one Agent Munger filed.
25           THE COURT:  That's his affidavit.
```

1913

```
1            MR. BUSSERT:  Yes.  I mean, I only have
2   a redacted copy of it, and my reading of it, if the
3   government claims otherwise I'll stand corrected,
4   but the first affidavit the government filed did not
5   file under seal in North Carolina, so it's clear
6   they named Mr. Johnson as a cooperating witness and
7   gave a lot of the particulars of the cooperation he
8   provided, and that was Agent King, that was the
9   first one, and then Agent Munger subsequently filed
10  another one, and as I read it, and there are things
11  redacted, it appears as if it tracks pretty much
12  identically in terms of the background information,
13  and I believe they were filed within the same day,
14  or a day or so.  So, my reading is the agents relied
15  on the same background information with respect to
16  --
17           THE COURT:  You lost me where you are
18  going.
19           MR. BUSSERT:  Well --
20           THE COURT:  You have an affidavit by
21  Agent Munger, some of which is redacted.
22           MR. BUSSERT:  Yes, but I believe it's
23  consistent with the other affidavit, and so --
24           THE COURT:  Also by Munger.
25           MR. BUSSERT:  So if government wants to
```

1914

```
1   give me an unredacted copy, they just haven't
2   provided this in discovery.
3            MR. MARKLE:  Not provided an unredacted
4   copy, but I'm not understanding why it's being
5   offered.  I don't understand the --
6            THE COURT:  Well, Agent Munger is going
7   to testify.
8            MR. MARKLE:  Yes, your Honor.
9            THE COURT:  Agent Munger has given an
10  affidavit under oath.  That's what I understood Mr.
11  Bussert to say.
12           MR. BUSSERT:  Yes.
13           MS. REYNOLDS:  An affidavit for a search
14  warrant of the swab.
15           MR. BUSSERT:  Yeah, for the swabs of
16  Mr. Taylor down in North Carolina.  He took like
17  saliva swabs and he filed the affidavit in support
18  of that.
19           THE COURT:  Can I see a copy of it?
20           MR. BUSSERT:  I don't have an unredacted
21  copy, the government has.
22           MR. MARKLE:  Yes, your Honor.
23           MR. BUSSERT:  Just in terms of this
24  generally, I would note I think the government has
25  opened the door to a more expanded inquiry of Agent
```

1915

```
1   Munger given Mr. Markle's opening statement when he
2   claimed -- he said to the jury, you'll hear from
3   Lashika Johnson, you'll here from Agent Munger, and
4   Mr. Johnson made statements to Agent Munger, but you
5   know, he told Lashika more than he ever told Agent
6   Munger, which is clearly not true.  He talked to
7   Agent Munger and all the agents hours and hours on
8   end.  And I know the government claims he said other
9   things to his sister, but relatively speaking that's
10  not true, and I think it gives a false impression
11  that somehow Mr. Johnson came in once, gave a
12  statement and somehow was talking separately to his
13  sister, and I think government has opened the door
14  in terms of that to be able to inquire what he said,
15  because they essentially claimed in their opening,
16  and they're going to seek to give the representation
17  to the jury, that he spoke to him once, and I think
18  at a minimum, because the way I prepared my cross,
19  your Honor, I realize this is an issue for the
20  government, I think it's at least appropriate to say
21  to Mr. Johnson met with him, not getting into the
22  particulars, but the day that he met with him, and
23  then I would rely on my other questions of Agent
24  Munger, but I need --
25           THE COURT:  Anything from the
```

1916

```
1    government?
2              MR. MARKLE:  No, your Honor.  I'd like
3    to take this all in.
4              THE COURT:  All right, we'll be back at
5    a little before 20 'til two to take this up.
6    Anything you can give me that will be of greater
7    focus would also be appreciated.  Thank you.
8              (Recess)
9              THE COURT:  All right, so I have
10   reviewed the opening statement, and the defendant
11   relies on the government's opening in which the
12   government said, "And FBI Special Agent Munger will
13   tell you that he then informed the defendant that
14   the DNA found on a torn piece of latex glove found
15   in the duct tape binding Tina wrists," and so forth,
16   through the confession of March 6th, and then goes
17   on to say, "but not the whole truth and you will
18   know that because his own sister, the defendant's
19   sister, will tell you that he told her more than he
20   ever told the agents."
21             Is there anything else that you rely on
22   from the opening, Mr. Bussert, that you claim
23   entitles you to get into the issue of proffer
24   sessions with Agent Munger that are pursuant to the
25   proffer agreement?
```

1917

```
1              MR. BUSSERT:  Not with respect to the
2    opening, your Honor, but we would cite additional
3    authority, if we could be heard on that.
4              THE COURT:  Cite additional what?
5              MR. BUSSERT:  Cite additional authority.
6    I mean, I think, as the proffer agreements, which I
7    believe the Court has been previously provided, make
8    clear, and I think this is fairly standard language,
9    paragraph 7 of both agreements references the
10   limited waiver that the government's previously
11   relied on in terms of what it claims to be when the
12   information provided in the proffer sessions is
13   admissible.
14             But, again -- well, actually one second.
15   As to paragraph 8, and I think I noted this
16   previously, it says, "it is further understood that
17   if the government determines that Johnson has
18   intentionally provided false, misleading and
19   inaccurate statements or information at this
20   meeting, this agreement will become null and void."
21             So, I think there is that initial issue
22   relative to how binding or nonbinding these
23   agreements are.  This seems to be what the
24   government's relying on to try to preclude inquiry.
25             But beyond that, and I'm happy to have
```

1918

```
1    the Court make this inquiry of Mr. Johnson, but the
2    agreement embodies it, and I think as a practical
3    matter, Rule 410 is really meant as a protection to
4    Mr. Johnson.  Rather than working towards his
5    detriment, I think it works towards his benefit, and
6    I think the proffer agreement reflects that to the
7    extent he does not go to trial.  But I think that he
8    could and would be agreeable to a limited waiver of
9    his 410 rights as to Section 410(a)(4), which
10   specifically covers statements made during plea
11   discussions with an attorney for the prosecuting
12   authority, if the discussions do not result in a
13   guilty plea or they result in a later withdrawn
14   guilty plea.
15             So, I think that's really the purpose of
16   those proffer statements, and I think that based on
17   my conversations with Mr. Johnson, that he would be
18   willing to make that limited waiver of his rights
19   with respect to the protections the rules of
20   evidence provide.
21             And then obviously there is the question
22   of just as a practical matter whether or not the
23   government has opened the door.  And then
24   additionally, whether it's proper and permissible to
25   get into the fact that -- just acknowledge the fact
```

1919

```
1    that there were additional proffer sessions, without
2    getting into the substance of what was said there.
3    And then, finally, the issue of Agent Munger's
4    affidavit and the representations of Mr. Johnson
5    that he relied on in seeking authority from the
6    Court in obtaining the search warrant.
7              THE COURT:  Yes, go ahead.
8              MR. MARKLE:  I would still submit that I
9    don't see the relevance, your Honor.  And also I
10   would just --
11             THE COURT:  Relevance of what?  There
12   are many things.
13             MR. MARKLE:  Let me start with the
14   proffer agreement, your Honor -- the proffer
15   statement.  Because the government enters into a
16   proffer agreement with somebody does not mean that
17   the government's waiving its objection to hearsay at
18   a subsequent trial.  It's obviously a somewhat
19   unusual posture that a defendant who proffered a
20   number of times ends up at trial, that doesn't
21   usually happen, but that does happen, and then more
22   unusual that he actually wants to put in his proffer
23   statement.  But it still remains hearsay, your
24   Honor.  He can't avoid the rules of hearsay just
25   because there was a proffer agreement.  If he wants
```

1920

```
1   to take the stand and talk about what he did with
2   agents present, that's his right to do, but we have
3   the right to cross-examine that.  Under 801(d)(2),
4   as a hearsay exception, he is not a party opponent.
5   This is not something being offered by a party
6   against a party opponent, that's clear.  And under
7   804(b)(3), to be admissible as against his interest,
8   the declarant must be unavailable.  And the
9   declarant, Mr. Johnson, is not unavailable.  He does
10  have no obligation to testify or put on a defense,
11  but that doesn't make him unavailable, that's his
12  decision, and that's what the rules of evidence
13  create, that's his dilemma.
14          Insofar as my opening, your Honor, I
15  think it will become clear that what I was referring
16  to was not a literal accounting of how many words he
17  said to Special Agent Munger versus how many words
18  he recited to his sister.  There are important facts
19  that he did not tell Agent Munger that he admitted
20  to his sister, such as -- well, there will be
21  testimony from her about -- not from his own words,
22  but about a -- what we would call is consistent with
23  the first attempt.  There were admissions made to
24  sister about masks and bats and getting rid of the
25  evidence; things that he never admitted to Agent
```

1921

```
1   Munger, not in his post-arrest statements and I
2   don't believe in any of his proffer statements.
3           So, the government perhaps should have
4   worded that a bit more carefully, but opening
5   statements are just that, they're not evidence.  I
6   don't think that opens up the door to all of the
7   proffer statements the defendant ever made.
8           I would also say that we don't see the
9   relevance of it because -- to the fact of someone
10  meeting with agents, your Honor.  The inquiry would
11  be did he meet with agents and was that information
12  put in an affidavit, that really has nothing to do
13  with this trial, your Honor.  If Agent Munger hadn't
14  put it in an affidavit does that mean it is not
15  admissible?  And it doesn't prove anything.  John
16  Taylor, we just heard, met with agents a zillion
17  times and counsel claims he was not truth.  So, the
18  fact of meeting with agents, it doesn't mean
19  anything.  It has no relevance to the question of
20  the defendant's guilt and the admissibility of this
21  evidence.
22          MR. BUSSERT:  Can I respond briefly,
23  your Honor?
24          THE COURT:  Yes.
25          MR. BUSSERT:  I think if the Court
```

1922

```
1   adopts the government's position with respect to the
2   hearsay analysis, then the March 6th statement
3   shouldn't come in either.  Again, this is all just
4   one large confession.  The first one was --
5           THE COURT:  But that's not --
6           MR. BUSSERT:  If I --
7           THE COURT:  That's a statement of a
8   party opponent, that's --
9           MR. BUSSERT:  It's his statement.
10          THE COURT:  That's true.
11          MR. BUSSERT:  Yes.
12          THE COURT:  But it comes in under a
13  whole different section.
14          MR. BUSSERT:  It's not a statement of a
15  party opponent, it's a statement against penal
16  interest.  He's implicating himself in these
17  offenses.  And if government's to be believed -- I
18  just want to be clear.  As I said previously, I'm
19  not looking to get into all of the proffer
20  statements.  I'm not.  I understand the government's
21  concerns and not really needing to get into a tit
22  for tat with Agent Munger.  What I really wanted to
23  focus on in terms of my cross-examination are
24  representations that he relied on in terms of the
25  affidavit, and I'll limit it just to that.
```

1923

```
1           The idea, though, that it's hearsay,
2   these are all statements.  So, either it's -- his
3   continuing statements about his role and what
4   occurred, they're all statements against penal
5   interest or they're not.  I don't think the fact
6   that counsel is present or a piece of paper has been
7   signed, again that piece of paper that was signed
8   was a protection for him because if he just
9   continued to talk to the police and talk to the
10  agents time and time again without a proffer
11  agreement, there would be no question that all of
12  it's admissible.  The protection is for him, to
13  protect him in his efforts at that point to
14  potentially try and cooperate with the government in
15  its investigation.  That's the purpose.
16          And so, again, it's his rights under the
17  rules, and if he would seek to waive, and I think he
18  would, then I think that's permissible.
19          THE COURT:  So 801(d)(2) admission by
20  the party opponent says, this is under the section
21  "statements which are not hearsay," is, "the
22  statement is offered against a party and is the
23  party's own statement in either an individual or
24  representative capacity," et cetera.
25          So that's why I'm not understanding your
```

1924

```
1   claim that what Mr. Johnson said offered by the
2   government is hearsay.
3              MR. BUSSERT:  Well, again, your Honor is
4   citing and the government is citing the distinction of
5   a party opponent.  That's not the exception I'm
6   talking about.  I'm talking about a statement
7   against penal interest.
8              THE COURT:  Well, I'm talking about what
9   isn't hearsay.
10             MR. BUSSERT:  That's what a confession come
11  is.  Why does the confession come in.
12             THE COURT:  No, Mr. Bussert, don't keep
13  changing the issue.  You said the confession, the
14  March 6th statement --
15             MR. BUSSERT:  That's what we call it.
16             THE COURT:  -- is hearsay.  I'm saying
17  that I don't understand that position under
18  801(d)(2) where it is an admission by a party
19  opponent.
20             MR. BUSSERT:  What I'm saying, your
21  Honor --
22             THE COURT:  That's not hearsay.
23             MR. BUSSERT:  What I'm saying is under
24  the government's analysis, it's all the same.  There
25  is no distinction except for this proffer agreement
```

1925

```
1   to distinguish the statements that were made on
2   March 6th and the statements that were made after.
3              THE COURT:  It depends on who is
4   offering them.  That's the difference.
5              MR. BUSSERT:  And that's I think what is
6   problematic, that they're trying to -- they want to
7   offer a brief portion and say you can only ask as to
8   this when there is the reality that there is much
9   more.
10             THE COURT:  Okay, I have heard you and I
11  am not persuaded by your argument.  Obviously
12  everything is different if Mr. Johnson makes his
13  decision to testify, none of this analysis applies,
14  but I disagree with your application of 801(d)(2).
15  And I really do not think that the statement on page
16  73 opened the door to all of the proffer sessions.
17  And I must also say that I agree that I see no
18  probative value in the statement that Mr. Johnson
19  had other meetings with agents.  It is, if anything,
20  confusing, encourages jury speculation on what
21  that's all about when it isn't going to be about
22  anything.  So, I find myself in agreement with the
23  government on the three points.
24             MR. BUSSERT:  And how about Agent
25  Munger's affidavit, your Honor?  Is that off limits
```

1926

```
1   as well, in terms of representations he made about
2   what Mr. Johnson told him?  Because he's not clear
3   from where those statements derive from, which date.
4              THE COURT:  So, I've looked at his
5   affidavit that I have, the unredacted --
6              MR. BUSSERT:  Which --
7              THE COURT:  The redacted affidavit.  And
8   you can question on the redacted affidavit.
9              MR. BUSSERT:  Well, I either need an
10  unredacted copy, which I was never provided, or if
11  I'm correct and the government would just simply
12  concede that in terms of the background information
13  that was provided in the unredacted affidavit, that
14  it's the same as the redacted, and I'll just
15  reference that, I mean obviously it's not going to
16  go in as an exhibit, I'll rely on that.
17             THE COURT:  The redactions are what?
18             MR. MARKLE:  I think we're still trying
19  to find an unredacted.
20             MS. REYNOLDS:  Which affidavit?  We do
21  have an unredacted of John Taylor's arrest warrant,
22  but that was not prepared by Special Agent Munger,
23  that was an application by Special Agent Matt King,
24  and I believe the witness John Taylor testified that
25  when he was presented in court he was given a
```

1927

```
1   complaint, but there were black lines through it.
2   But I'm not sure which affidavit we're talking
3   about.
4              MR. BUSSERT:  If we -- the reference
5   here Agent King's is the unredacted, which was in
6   you support of the arrest warrant.  And Agent
7   Munger's has redacted which was in support of the
8   search warrant.  And the portion that I'm interested
9   in inquiring about is Agent King's -- well,
10  actually, I think on both, they start page 3,
11  background of investigation, paragraph 7, and as
12  I've read them, at least in the portions of Agent
13  Munger's that are not redacted, they appear fairly
14  identical in, and the portions that are redacted
15  appear consistent with what would be redactions as
16  to what's in Agent King's, and the only reason the
17  spacing seems different between the two documents is
18  the font size between the two documents.  So, I
19  based my draft cross-examination on the assumption,
20  especially given the timing, because I think Agent
21  King's is dated 2 -- 12/2/09 and Agent Munger's is
22  dated 12/1/09, but it seemed more likely that one
23  borrowed the portion from the other.  So unless the
24  government's going to say somehow Agent Munger's is
25  different.
```

1928

```
1              THE COURT:  All I have is the redacted
2   version and your surmise.  That's all I have.
3              MR. BUSSERT:  Well, maybe --
4              THE COURT:  I don't -- is the government
5   making an attempt to get the unredacted affidavit?
6              MS. REYNOLDS:  We did do that, your
7   Honor.  We have an unredacted of the John Taylor
8   arrest warrant and we have copies we can give.
9              THE COURT:  No, not the arrest warrant.
10  Because Agent Munger is the next witness.
11             MS. REYNOLDS:  Correct, but I think he's
12  referred to both affidavits, I'm not sure, but-
13             THE COURT:  You are referring to the
14  search warrant, the buccal swab warrant.
15             MR. BUSSERT:  Yes, that's the redacted.
16             MS. REYNOLDS:  So the best we could do,
17  your Honor, is we have the search and seizure
18  warrant for John Taylor's buccal swabs and DNA.  It
19  still has black lines, but you can actually read it.
20  So, I have copies of that and it is it's readable --
21  well, at least this one is readable.  We just
22  couldn't find the unredacted, your Honor.
23             THE COURT:  All right, give it to Mr.
24  Bussert.
25             MS. REYNOLDS:  You can read it.
```

1929

```
1              THE COURT:  It leaves me a bit in the
2   dark.
3              MR. BUSSERT:  It's true you can read it.
4   One can read it.  Yes, you can see through it.
5              MS. REYNOLDS:  I think it matters how
6   many times you copy it.
7              MR. BUSSERT:  I guess the question is,
8   is it permissible to --
9              THE COURT:  Can I see --
10             MR. BUSSERT:  Is the Court's ruling
11  precluding me from asking questions?
12             THE COURT:  I don't have any idea what's
13  under the black lines.
14             MS. REYNOLDS:  So under the black lines
15  is information that was provided by Mr. Johnson
16  about Mr. Taylor, a description of him.  There is
17  information that says, although he couldn't identify
18  in the photo lineup, he described him as being from
19  out of town, he's a Big Guy.  So, it's a description
20  of events that was summarized in order to obtain
21  probable cause to get buccal swab.
22             THE COURT:  So now you can see through
23  the redaction.  What is the government's position
24  with respect to examination of Agent Munger with
25  respect to what he testified -- what he put in the
```

1930

```
1   affidavit?
2              MR. MARKLE:  Our position is the same as
3   we just previously argued, your Honor.  It's just
4   another way of trying to put in the information
5   provided by the defendant.  It has no --
6              THE COURT:  Well, it does seem that way.
7              MR. MARKLE:  Whether it's contained in
8   one affidavit, five affidavits, ten affidavits, no
9   affidavits, it's hearsay.
10             THE COURT:  So, you are saying that the
11  substance of what can be read through the black
12  lines comes from the proffer agreements.
13             MR. MARKLE:  Yes, your Honor.
14             THE COURT:  I understand.  I don't think
15  that, therefore, it would be at all sensible to
16  permit examination on that when the proffer
17  agreements are not coming in, and the -- unless and
18  until the government has a proper basis for
19  admitting them in rebuttal or Mr. Johnson wants to
20  talk about them in his own testimony.  So, that does
21  not change that.
22             Okay, are we ready to proceed then?
23             MS. REYNOLDS:  Yes.
24             MR. MARKLE:  Yes, your Honor.
25             MR. BUSSERT:  Just for the record, Mr.
```

1931

```
1   Johnson's position is that the Court's ruling
2   essentially compels him to have to testify.
3              THE COURT:  It does not, and I've been
4   really clear he has no obligation to testify.
5              MR. BUSSERT:  Well, again --
6              THE COURT:  I also want to be clear that
7   he can't have -- you know, he can't do this as an
8   end-run around it.
9              MR. BUSSERT:  Again, the government is
10  giving the misimpression that he only met once and
11  gave one statement, and the only way that that fact
12  can be clarified is for him to testify.  Forgetting
13  the substance of what he said, it --
14             THE COURT:  Mr. Bussert, I've ruled it
15  is not relevant whether he met with him on any other
16  time.
17             MR. BUSSERT:  I think in light of --
18  especially in light of the testimony of John Taylor,
19  where the government essentially tried to bolster
20  him and talk about all of his truthful sessions, I
21  think it is entirely relevant.
22             THE COURT:  I'm unpersuaded.
23             Please bring in the jury.
24             (Jury entered the courtroom.)
25             THE COURT:  All right, I'm sorry, ladies
```

1932

```
1   and gentlemen, that our other matters that we needed
2   to take up kept you neither at lunch nor outside of
3   your jury room on such a pretty day.  Please be
4   seated.
5              We will now proceed with the
6   government's next witness.
7              Sir, if you would kindly raise your
8   right hand, you will be sworn.
9         C H R I S T O P H E R   M U N G E R,
10  Having first been duly sworn, was examined and
11  testified as follows:
12             THE WITNESS:  Special Agent Christopher
13  Munger, m-u-n-g-e-r, town of residence, Norwalk,
14  Connecticut.
15             THE COURT:  You may proceed.
16             MR. MARKLE:  Thank you, your Honor.
17  DIRECT EXAMINATION
18  BY MR. MARKLE:
19     Q.   Special Agent Munger, can you tell us how
20  you are employed.
21     A.   I'm employed with the FBI.
22     Q.   For how long have you been so employed?
23     A.   16 and a half years.
24     Q.   And continuous service as an FBI agent?
25     A.   Yes.
```

1933

```
1      Q.   And prior to that, did you have law
2   enforcement or any other similar training?
3      A.   I was in the Marine Corp for six years.
4      Q.   And any other law enforcement training?
5      A.   No.
6      Q.   And as a -- well, presently what's your
7   current assignment?
8      A.   I'm currently assigned to the New York
9   office, and I'm on an organized crime task force.
10     Q.   Do you recall what your assignment was in
11  August of 2005?
12     A.   In August 2005 I was assigned to an
13  organized crime task force in White Plains, New
14  York.
15     Q.   In May of 2006, what was your assignment?
16     A.   I transferred to New Haven and I was
17  assigned to the Bridgeport office, specifically the
18  Bridgeport Safe Streets Task Force.
19     Q.   And what was the Safe Streets Task Force?
20     A.   We did cases against gangs and drug
21  enterprises in Fairfield County.
22     Q.   And what was your position in that task
23  force?
24     A.   At the time I was just one of the agents on
25  the task force.
```

1934

```
1      Q.   Were there a number of agents assigned to
2   the task force?
3      A.   At that time there were -- it was myself
4   and one other agent.
5      Q.   And a number of local police officers?
6      A.   Yes.
7      Q.   And any state police officers?
8      A.   No, not at that time.
9      Q.   Have you received training in the course of
10  your law enforcement years?
11     A.   Yes.
12     Q.   And does that include the seizing and
13  preserving of physical evidence?
14     A.   Yes.
15     Q.   Did that include drugs as well as
16  associated items?
17     A.   Yes.
18     Q.   Have you participated in a number of
19  federal and state arrests concerning drugs and
20  related items?
21     A.   Yes, I have.
22     Q.   Have you participated both in applying for
23  and participated actually in the search and seizure
24  regarding drugs and/or related items?
25     A.   Yes.
```

1935

```
1      Q.   And fair to say hundreds of those?
2      A.   Close to it, yes.
3      Q.   Somewhere short -- I mean a little bit
4   below 100?
5      A.   Around 100.
6      Q.   Were you present on May 24, 2006 when
7   Azikiwe Aquart was arrested?
8      A.   Yes, I was.
9      Q.   And where did that arrest take place?
10     A.   It took place in a hip hop shop located on
11  I believe Grand Avenue in Bridgeport, Connecticut.
12     Q.   And did you have a federal arrest warrant
13  at that time?
14     A.   Yes, we did.
15     Q.   And you were actually present when that
16  arrest was made?
17     A.   Yes, I was.
18     Q.   And at the time he was arrested, were any
19  items seized from his person?
20     A.   Yes, there were.
21     Q.   And what were those?
22     A.   Among several items, there was some -- I
23  mean, a list of everything?  There were two cell
24  phones and there was a knife, a couple other items.
25  But two cell phones were secured from his person.
```

**GA1692**

1936

```
1      Q.   The items -- were the cell phones of any
2  significance?
3      A.   Yes, they were.
4      Q.   And who was responsible for seizing those
5  items?
6      A.   I was responsible.
7      Q.   And what was done with the cell phones that
8  were seized from Mr. Aquart?
9      A.   We secured the cell phones and then
10 processed them into evidence.
11     Q.   I'm going to show you what's been marked
12 government's Exhibit 269 and 270, and ask if you've
13 had a chance to look at these items previously and
14 if you recognize them.
15     A.   Yes, I do.  I have seen them previously and
16 I do recognize them.
17     Q.   And could you tell us what those are.
18     A.   Those are the two cell phones that we
19 recovered when we arrested Azikiwe Aquart.
20     Q.   And once you seized those phones, what was
21 done with those phone numbers?  Where were they
22 maintained or kept?
23     A.   They were secured in a locker, evidence
24 locker, and then entered into evidence when we took
25 them up to New Haven, to the office.
```

1937

```
1      Q.   Could anyone go in and out and take that
2  evidence?
3      A.   No, they cannot.
4      Q.   Do those phones appear to be in
5  substantially the same condition as when you seized
6  them?
7      A.   Yes.
8      Q.   And have they been in the custody or
9  maintained by the FBI since the time they were
10 seized?
11     A.   Yes, they have.
12     Q.   And did you perform a search of those
13 phones?
14     A.   Yes, I did.
15     Q.   And what does a search allow you to find?
16     A.   Conducting a search warrant on the phone, I
17 could go in and check the contacts, the address book
18 of a phone.  I could go in and record the
19 incoming calls, outgoing calls, any information in
20 there that is -- that you or anyone would put in
21 your cell phone that's personal to you.
22     Q.   And did you perform that search?
23     A.   Yes.
24     Q.   Did you -- was there an address book in one
25 of those phones of Mr. Aquart's?
```

1938

```
1      A.   Yes.
2      Q.   And that's like an electronic address book?
3  Is that what we're talking about?
4      A.   Exactly.
5      Q.   And of the number -- did you actually
6  visibly look at the contacts or address book of Mr.
7  Aquart's phone?
8      A.   Yes.
9      Q.   And in regards to that phone, the silver
10 phone is marked -- what number does that bear?
11     A.   This is Government's Exhibit 269.
12     Q.   And in 269, were there any names or numbers
13 that were of significance to you?
14     A.   Yes, there were.
15     Q.   Were you actively investigating or a part
16 of the team investigating the triple murder at
17 Charles Street in August of 2005?
18     A.   Yes, I was.  I was the case agent?
19     Q.   And in regard to searching that phone, what
20 was the first item that you saw in the address book
21 that was of significance to you?
22     A.   I saw Put and Put2.
23     Q.   Put, p-u-t?
24     A.   P-u-t.
25     Q.   And Put2?
```

1939

```
1      A.   Put with the No. 2 after it.
2      Q.   And did you -- were you familiar with
3  Efrain Johnson?
4      A.   Yes, I was.
5      Q.   And do you know whether he was known by any
6  other name?
7      A.   Yes, I do.
8      Q.   And what was that?
9      A.   Pootney.
10     Q.   P-o-o-t-n-e-y?
11     A.   I think I spelled it p-u-t-n-e-y, but it
12 was spelled different ways.  It's phonetic.
13     Q.   Is that what you associated with Put and
14 Put2?
15     A.   Yes, I did.
16     Q.   Was there a number associated with the name
17 Put in the address book of Azikiwe Aquart's cell
18 phone?
19     A.   Yes, there was.
20     Q.   And what was that number?
21     A.   I don't recall off the top of my head, but
22 I know I put it in the 302 in a table.
23     Q.   Do you have a copy of that report?  No?
24 Let me see if I can find an item that might
25 refresh -- I'm going to go back to that.  And do you
```

1940

```
 1   recall whether there was a telephone number by the
 2   Put2 in the address book?
 3        A.   Yes, there are.
 4        Q.   And was there any other significant
 5   information in the address book?
 6        A.   Yes.
 7        Q.   And what was that?
 8        A.   At the bottom, there was just the letter Z
 9   and a phone number next to it.
10        Q.   And why was the letter Z of significance to
11   you?
12        A.   Because Azikiwe Aquart, who we took the
13   phones off, his name, one of his street names, his
14   name was Zee.
15        Q.   And did you retrieve or note any
16   identifying features of Exhibit 269?
17        A.   Yes, I did.
18        Q.   And did the phone have what is called an
19   IMEI, or International Mobility Equipment Identifier
20   number?
21        A.   Yes, it did.
22        Q.   And is that similar to a serial number for
23   a phone?
24        A.   Yes.
25        Q.   And can you, as to Exhibit 269 that had --
```

1941

```
 1   is that the phone that had Put and Put2 in it?
 2        A.   Yes.
 3        Q.   And Z?
 4        A.   Yes.
 5        Q.   And the correlating numbers?
 6        A.   Yes.
 7        Q.   Did you discover the IMEI number?
 8        A.   By taking it apart you can see the IMEI
 9   number.
10        Q.   Did you do that previously?
11        A.   I did it when we took it into evidence, and
12   then I did it when we did the search warrant.
13        Q.   And is that a T-Mobile Motorola phone, by
14   the way?
15        A.   Yes, it is.
16        Q.   And could you tell us what the IMEI number
17   is here in court.  Can you open that and look at it?
18        A.   Yes, I can.  Okay, it is 010280002049613.
19        Q.   Thank you.  As to the second phone,
20   Government's Exhibit 270.  Is that --
21        A.   Yes, it is.
22        Q.   Did that have any names or numbers that
23   were of significance to you based on your
24   investigation to date?
25        A.   Not really, no.
```

1942

```
 1        Q.   Special Agent Munger, I'll ask you this:
 2   Were you present when items were seized from Efrain
 3   Johnson, the defendant?
 4        A.   Yes.
 5        Q.   And was he under arrest at that time?
 6        A.   Yes, he was.
 7        Q.   And do you recall what date that was?
 8        A.   That was March 6, 2007.
 9        Q.   And do you see the defendant Efrain Johnson
10   in the courtroom?
11        A.   Yes, I do right there.
12        Q.   Seated where?
13        A.   He's sitting in the center of the table
14   with a light blue shirt.
15        Q.   Thank you.
16             MR. MARKLE:  May the record indicate the
17   defendant, your Honor?
18             THE COURT:  Yes.
19        Q.   And were any cell phones seized from the
20   defendant, Efrain Johnson, on March 6, 2007?
21        A.   Yes, there were two phones seized.
22        Q.   And how were those cell phones secured once
23   they were seized?
24        A.   They were secured.  They're logged into
25   evidence and put into evidence.  There is a chain of
```

1943

```
 1   custody.
 2        Q.   And did you take possession of those two
 3   phones?
 4        A.   I took possession of those two phones, yes.
 5        Q.   And, again, they were kept at an evidence
 6   room at FBI?
 7        A.   Yes, they're put into evidence.
 8        Q.   And did you later examine those two cell
 9   phones?
10        A.   We never did a search warrant on those
11   phones.
12        Q.   Did you examine them for any identifying
13   information?
14        A.   Yes, we did.
15        Q.   So, you didn't actually search the address
16   book of either of these phones?
17        A.   Yes, correct.
18        Q.   And showing you Government's Exhibit 271
19   and 272, have you had occasion to see these
20   previously and can you identify those?
21        A.   Yes, those are the phones that we seized
22   when we arrested Efrain Johnson.
23             MR. MARKLE:  Government would offer 269,
24   270, 271 and 272, your Honor as full exhibits.
25             MR. BUSSERT:  No objection.
```

1944

```
 1            THE COURT:  All right, 269, 270, 271 and
 2   272 are full exhibits.
 3       Q.   And as to Government's Exhibit 271, is that
 4   the silver or the black phone there?
 5       A.   It's the silver.
 6       Q.   And did you previously, and could you now,
 7   tell us what the -- were you familiar with a SIM
 8   card?
 9       A.   Yes.
10       Q.   Is that a way to identify a number
11   associated with a phone?
12       A.   Yes.
13       Q.   And have you previously looked at the SIM
14   card for Government's Exhibit 271?
15       A.   Yes, I have.
16       Q.   And could you do that now and just read off
17   what the SIM card number is for Exhibit 271?
18       A.   Okay.
19       Q.   It's small?
20       A.   Yes.  00080831847830o.
21       Q.   Now, you indicated that those phones were
22   seized at the time the defendant was arrested,
23   correct?
24       A.   Yes.
25       Q.   Was he arrested at that time on murder
```

1945

```
 1   charges?
 2       A.   No, he was not.
 3            MR. BUSSERT:  Objection.
 4            THE COURT:  Basis?
 5            MR. BUSSERT:  Approach?
 6            (Sidebar conference)
 7            MR. BUSSERT:  He has a pending case.
 8   The question was asked he was arrested.  To the
 9   extent you ask him questions about what occurred
10   here, I'm afraid it gives the implication he was
11   arrested for one thing, now he's being questioned
12   about another, which has issues of bringing in
13   questions of criminal history which are not
14   permissible at this stage.  The clear implication is
15   he was arrested for something else, but then they
16   asked him questions about this.
17            THE COURT:  But it's not a criminal
18   history because there is no conviction.  But what --
19            MR. MARKLE:  I was just showing that he
20   was going to be questioned and it was --
21            MR. BUSSERT:  I just --
22            MR. MARKLE:  -- that he wasn't -- when
23   they first started to ask him.  It's leading in to
24   Charles Street questioning.
25            THE COURT:  So you asked him --
```

1946

```
 1            MR. MARKLE:  I don't even need to ask
 2   it, your Honor.  We can have it stricken and they
 3   could be instructed to disregard it.
 4            THE COURT:  All right.
 5            (Sidebar concluded).
 6            THE COURT:  All right, the last question
 7   and answer are stricken and to be disregarded.
 8            Please proceed.
 9            MR. MARKLE:  Thank you, your Honor.
10       Q.   Special Agent Munger, after the phones are
11   seized from the defendant, where was he taken?
12       A.   He was transported to the FBI office in
13   Bridgeport, Connecticut.
14       Q.   And at the Bridgeport office, where was he
15   taken there?
16       A.   He was taken to an interview room within my
17   task force area.
18       Q.   And at the time he was -- while he was at
19   the FBI building, office, did there -- approximately
20   what time was this at?
21       A.   It was between eight, nine o'clock that he
22   was transported.
23       Q.   And were you present the entire time?
24       A.   I was present for -- I transported him to
25   the office and put him in the particular interview
```

1947

```
 1   room.
 2       Q.   And is that a cell or is that a room?
 3       A.   It's a room with a table and chairs.
 4       Q.   And at that time when he was in that room,
 5   who else was present?
 6       A.   Myself, Sergeant Juan Gonzalez Jr, and
 7   Police Officer John Andrews, both of the Bridgeport
 8   Police Department.
 9       Q.   And at that time was he advised of his
10   Miranda rights?
11       A.   Yes, he was.
12       Q.   And how was that done?
13       A.   It was done orally and then we had him read
14   them.
15       Q.   And I'm going to show you what's been
16   marked Government's Exhibit 174 and ask you if you
17   recognize this form.
18       A.   Yes, this is an FD-395, which is an advice
19   of rights form.
20       Q.   And do you recognize that in relationship
21   to the interview of Mr. Efrain Johnson?
22       A.   Yes.
23       Q.   And how do you know -- what was done with
24   that advice of rights?
25       A.   It was dated, placed the date and time, I
```

1948

```
1    signed it as a witness, I believe it's Jay-Jay's
2    signature underneath me, that's Sergeant Gonzalez,
3    and the defendant's signature.
4        Q.   And you signed it as a witness and he
5    signed, the defendant signed it, was that before or
6    after it was read to him?
7        A.   It was after.
8        Q.   And could you just read it out loud to the
9    ladies and gentlemen of the jury so they know what's
10   on it.
11              MR. BUSSERT:  Objection.
12              MR. MARKLE:  I'd offer it as a full
13   exhibit, your Honor?
14              MR. BUSSERT:  No objection.
15              THE COURT:  174 is a full exhibit.
16       A.   Would you like me to read it.
17       Q.   Yes?
18       A.   Okay.  "Advice of rights" title at the top.
19   "Your rights before we ask you any questions you
20   must understand your rights.
21              "You have the right to remain silent.
22              "Anything you say can be used against
23   you in court.
24              "You have the right to talk to a lawyer
25   for advice before we ask you any questions.
```

1949

```
1              "You have the right to have a lawyer
2    with you during questioning.
3              "If you cannot afford a lawyer, one will
4    be appointed for you before any questioning if you
5    wish.
6              "If you decide to answer questions now
7    without a lawyer present, you have the right to stop
8    answering at any time."
9              And then below that it says "I have read
10   this statement of my rights and I understand what my
11   rights are.  At this time I am willing to answer
12   questions without a lawyer present."  And then it
13   was signed by the defendant.
14       Q.   And did you see him sign that form?
15       A.   Yes, I did.
16       Q.   And that's why you are the witness.
17       A.   That's why I'm the witness.
18       Q.   And was he forced to sign that?
19       A.   No, he was not.
20       Q.   Was he threatened?
21       A.   No, he was not.
22       Q.   Did he appear to you to understand his
23   rights?
24       A.   Yes.
25       Q.   Was he -- did he appear to be under the
```

1950

```
1    influence of alcohol?
2        A.   He did not appear to be under the influence
3    of alcohol or anything.
4        Q.   Or drugs?
5        A.   No.
6        Q.   Was he coherent?
7        A.   Yes, he was.
8        Q.   You were able to talk to him and he was
9    able to respond?
10       A.   Yes.
11       Q.   And did you have any difficulty
12   understanding him during the time you spent with him
13   on March 6th?
14       A.   Not at all.
15       Q.   And after he signed the waiver, did you
16   proceed to talk to him?
17       A.   Yes, we did.
18       Q.   And at that time, or any time thereafter up
19   until the interview ended, did he ask to see an
20   attorney?
21       A.   No, he did not.
22       Q.   And explain the interview.  Was it a
23   question and answer or just a narrative by the
24   defendant?  How did you proceed?
25       A.   It was a question and answer.
```

1951

```
1        Q.   And approximately how long did the
2    interview take?
3        A.   Approximately about three hours.
4        Q.   And was that continuous questioning and
5    answer?
6        A.   For the most part.  But, I mean, I'm sure
7    there were breaks.  I do remember taking a break.
8        Q.   And do you remember how the interview was
9    initiated?  What was the first thing discussed with
10   the defendant?
11       A.   We asked the defendant if he was aware of
12   the triple homicide that occurred at 215 Charles
13   Street in August of 2005.
14       Q.   And what did the defendant say in response
15   to that question?
16       A.   He said that he was aware of it, he learned
17   about it on the local news.
18       Q.   Did you ask further questions of him after
19   that?
20       A.   Yes, we did.
21       Q.   And what was next asked of the defendant?
22   Or how did it proceed?
23       A.   We asked if he had ever been to 215 Charles
24   Street, to which he answered that he had prior,
25   eight or nine years prior to that date, the date we
```

**GA1696**

1952

```
1    were talking to him, and he was visiting a friend by
2    the name of AK, that was his nickname, who lived on,
3    like, the second or third floor of the apartment
4    building.
5         Q.   So, on March 6, 2007, he said that he had
6    not been to Charles Street --
7              MR. BUSSERT:   Objection.  I think the
8    answer was clear, it doesn't need to be repeated.
9              THE COURT:   Sustained.
10        Q.   What date did the interview take place on?
11        A.   March 6, 2007.
12        Q.   And did he indicate whether or not he had
13   ever been back to Charles Street?
14        A.   After he told us that he hadn't been there
15   for eight or anyone years.  He said that was the
16   last time he'd been there.
17        Q.   And what did you do at that point of the
18   interview?
19        A.   At that point I pulled out a facsimile of a
20   report generated by the Connecticut state lab and I
21   informed him that this was a DNA match in which his
22   DNA was found at the crime scene at apartment 101,
23   215 Charles Street, and slid it across the table for
24   him to look at.
25        Q.   And after informing him that his DNA had
```

1953

```
1    been -- or match had been made of his DNA, did he
2    respond to that?
3         A.   Yes, he changed his story.
4         Q.   And what did he say at that time?
5         A.   At that time he said that a Jamaican male
6    that goes by the name of Dreddy had asked him to,
7    the night prior to the homicide, to knock on the
8    door at 101, the apartment 101 at 215 Charles
9    Street, to determine whether they're selling crack
10   out of that apartment.
11        Q.   And did he say anything happened -- did he
12   say he did that?
13        A.   He said he knocked on the door, a woman
14   answered, they got into an argument, he spit in her
15   face and she shut the door and that was it.
16        Q.   Did he say anything else about what
17   happened on that night before the murders?
18        A.   No.  He said that was his entire
19   involvement.
20        Q.   And what, if anything, did you say to the
21   defendant upon hearing that version?  I'll call it
22   version two.
23        A.   Okay.  At that point I explained to him
24   that the DNA that was found at the crime scene was
25   not contained within saliva, it was contained within
```

1954

```
1    sweat, and the sweat was found within the tips of
2    rubber or latex gloves that were caught in the
3    middle of duct tape that was used -- that was on and
4    used to bind the legs and feet -- I mean the hands
5    and feet of Tina Johnson.
6         Q.   And was the information you were saying to
7    the defendant accurate?
8         A.   Yes.
9         Q.   And what did he say upon your advising him
10   where the DNA was found?
11        A.   Then he took pause and he said, can I start
12   over?  We told him he could.
13        Q.   And did he continue to talk to you?
14        A.   Yes.
15        Q.   And what did he then, thereafter, tell you?
16        A.   He started by saying, you know, that he had
17   met Dreddy previous.
18        Q.   Did you know who Dreddy was?
19        A.   Dreddy was --
20        Q.   Did you know from your investigation?
21        A.   Yes, yes, I knew who Dreddy was.
22        Q.   Did he refer to him simply as Dreddy?
23        A.   D or Dreddy.
24        Q.   Go ahead.
25        A.   Okay.  He said he met Dreddy at -- in
```

1955

```
1    approximately the summer of 2005.  He was standing
2    outside the Yellow Bird.  The Yellow Bird is a
3    social club.
4         Q.   Did he tell you that or did you know that
5    from your investigation?
6         A.   I mean, he told us that there.  I honestly
7    don't remember if I already knew it, but he told
8    us that at that point what the Yellow Bird was.
9              And he was hanging outside the Yellow
10   Bird and Dreddy had come up and was talking to a few
11   people there, and he was introduced.  Dreddy offered
12   to sell him marijuana and they formulated a -- or
13   started a relationship in which Dreddy provided him
14   marijuana for resale, personal use and resale.
15        Q.   Dreddy would provide the defendant with
16   marijuana?
17        A.   Yes.
18        Q.   For personal use and resale?
19        A.   Uh-huh (indicating affirmatively).
20        Q.   And that's what the defendant told you?
21        A.   That's what he told me, yes.
22        Q.   And did he go on to discuss his
23   relationship with Dreddy or his knowledge of the
24   events leading up to the murders?
25        A.   Yes.  He said the day before the homicide,
```

**GA1697**

1956

```
1   you know, the early afternoon, Dreddy stopped by and
2   gave him two bags of weed, he didn't specify the
3   size or the amount, but for him to sell, and a
4   little bit later that same day, so more late
5   afternoon, Dreddy came by again and gave him -- gave
6   him two more bags to sell, but then gave him two
7   additional bags for free and said --
8        Q.   This is according to the defendant?
9        A.   According to the defendant.
10       Q.   And what happened when he was given the two
11  bags for free, according to the defendant?
12       A.   Dreddy said that he might need him later
13  tonight to help him do something.
14       Q.   Again, those are the defendant's words, as
15  best you can recall?
16       A.   Yes.
17       Q.   And did he say what happened after he
18  received those two bags for resale, two bags for
19  free and that discussion?
20       A.   Yes.  He continued to hang out and party at
21  the Yellow Bird, and when the bar, or the club/bar,
22  closed at about, you know, somewhere around
23  3:00 a.m. in the morning, everybody kind of filtered
24  down Stratford Avenue and hung out and partied in
25  front of the defendant's sister's apartment, Lashika
```

1957

```
1   Johnson, on Stratford Avenue.
2        Q.   And that was the defendant's sister's
3   apartment?
4        A.   Yes.
5        Q.   And did the defendant tell you what
6   happened while he was at the -- near his sister's
7   apartment?
8        A.   He was hanging out outside on the street,
9   and Dreddy came around the corner, just kind of
10  appeared from around the corner, he didn't see him
11  come from a car, didn't see him pull over, just came
12  from around the corner, walked up to him and began
13  talking to him.
14       Q.   And did he describe the person by name or
15  physical build?
16       A.   At that time I don't recall.  I would have
17  to see my 302 whether he had made a physical
18  description.  He did say he was a Jamaican male with
19  dreadlocks.
20       Q.   What did the defendant then do?
21       A.   While they were talking, a car pulled up,
22  it was a black car.  The defendant described it as
23  like similar to a Geo Prism.  And as it pulled up,
24  there was a large black male inside, and Dreddy
25  said, go ahead and get in.  The defendant got in the
```

1958

```
1   car with the black male who they referred to as Big
2   Dude.
3        Q.   Is that what you learned from the defendant
4   or --
5        A.   From the defendant.
6        Q.   And did he say whether or not he had ever
7   seen that person before?
8        A.   He said he never seen him before.
9        Q.   And did he say who referred to him as Big
10  Dude?
11       A.   I asked him.  Specifically I said, is that
12  a nickname or is that a description, and he said, I
13  don't know, but I heard Dreddy call him Big Dude.
14       Q.   And what did the defendant do when Big Dude
15  arrived?
16       A.   He got in the car with Big Dude, and when
17  they pulled off, Dreddy walked in the reverse
18  direction and walked around the corner from where he
19  came from.  He walked back around the corner.
20       Q.   And did the defendant indicate whether or
21  not he had any conversation with Big Dude?
22       A.   No.  They drove -- I think there was no
23  talking while they were driving, so he never spoke
24  with him.  They drove to a -- pulled over in a gas
25  station, I believe it's on the corner of Hollister
```

1959

```
1   and Orange, and then after leaving the gas station,
2   they drove to a diner on Main Street, at the cross
3   of Charles and Main.
4        Q.   And did the defendant tell you what he and
5   Big Dude did when they got to the area of the diner?
6        A.   They parked in the parking lot, they got
7   out, and they went down to -- they walked down to
8   the basement under 215 Charles Street, which is
9   adjacent to the parking lot of the diner.  And once
10  they were down in the basement, the basement garage,
11  they met up with Dreddy, or Azibo, and his brother
12  Zee, Azikiwe Aquart.
13       Q.   And did he indicate what, if anything,
14  happened after they met?
15       A.   When the four of them got together, they
16  walked through the garage up to the first floor and
17  kind of gathered outside of apartment 101.
18       Q.   And, again, did he go on to tell you what
19  happened once they were in that hallway?
20       A.   Yes.  The defendant went up and knocked on
21  the door, acting like a cocaine customer or a crack
22  cocaine customer, and a woman answered the door.
23  And once the door was cracked, they bum rushed into
24  the apartment.
25            The defendant and the Big Dude pushed
```

1960

```
1   the woman into the living room and the -- and then
2   Azibo and Azikiwe Aquart went down the hallway and
3   pushed an unknown male back into a room that he was
4   coming out of.
5       Q.   And, again, this is the defendant telling
6   you this?
7       A.   This is the defendant telling me this, yes.
8       Q.   And did he indicate what, if anything, did
9   Big Dude do at that time?  Was there anything with
10  gloves?  Well, tell us what he said.
11      A.   Yeah, when they got into the living room,
12  he, Big Dude, handed rubber gloves to Efrain and
13  told him to put it on.  After he put the rubber
14  gloves on, the defendant started to duct tape the
15  woman, and she was, you know, what's going on,
16  what's going on?  And he said, calm down, calm down,
17  you know, if you calm down nothing is going to
18  happen.
19      Q.   Who said she was --
20      A.   I'm sorry, the defendant said -- the
21  defendant told me that she was saying, you know,
22  what's going on, what's going on?  And that he told
23  her, calm down, calm down, nothing is going to
24  happen.  And at that point the big dude, according
25  to the defendant, leaned over and punched her and
```

1961

```
1   then ripped the duct tape out of his hands because
2   he wasn't taping fast enough and started to take
3   over the process of taping.
4       At that point, the defendant backed up
5   against the living room wall where he could kind of
6   see down the hallway.  And he's obviously right next
7   to what is going on with the female victim.
8       Q.   Did he indicate whether he saw or heard
9   anything at that time?
10      A.   He said he saw the big dude pull out like a
11  long object from his pants or from the side of his
12  pants, something like that, and wail off and hit her
13  on the side of the head.
14      Q.   And did he say whether he could ever hear
15  any commotion or any noise while he was in the
16  apartment?
17      A.   As it pertains to what was going on down
18  the hall, he was trying to look down the hall and
19  see what was going on there, because he knew that
20  that's where Azibo and Azikiwe had gone, and all he
21  could hear -- he couldn't see anything, but he could
22  hear moaning and punching, and after the big dude
23  struck the woman, he bolted out of the apartment.
24      Q.   And where did he tell you he went?
25      A.   He said he went out on to Charles Street
```

1962

```
1   and started walking in the direction of Madison
2   Avenue, which would be away from Main, away from the
3   diner, so in the reverse direction, and he began
4   calling on his cell phone for a taxi service.  He
5   was able to tell us it was the one that, you know,
6   is 333-3333.
7       Q.   And did he say what phone he used to make
8   that call?
9       A.   I believe he said it was his phone.  I
10  think he only had one phone at that time.
11      Q.   And what happened after he made that
12  telephone call?
13      A.   Before any cab showed up, Dreddy, or Azibo,
14  pulled up in the Geo Prism-like car and pulled up
15  alongside him and said, get in.  At that point the
16  Big Dude and Azikiwe were not there, it was only
17  Azibo.  So, he jumped in the car and Azibo took the
18  defendant to his girlfriend's house.  She lived on
19  Harral Avenue on Bridgeport.  That's what he told
20  me.
21      Q.   And after he got to his girlfriend's house,
22  did he say whether or not --
23           THE COURT:  Who is "his"?  Who is "his"?
24      Q.   The defendant, did he tell you what, if
25  anything, happened -- is everything you've told us
```

1963

```
1   about what the person said according to the
2   defendant?
3       A.   Yes.
4       Q.   During this couple hour interview?
5       A.   Yes.
6       Q.   Did he go on to tell you what happened once
7   he got to his girlfriend's house, or apartment?
8       A.   Yes, he got to his girlfriend's house and
9   they proceeded to get into an argument for about an
10  hour because she didn't like him being out late, and
11  he had enough, so he called his friend, who he only
12  referred to as K, who came over, picked him up and
13  took him to his sister Lashika's house, which is the
14  apartment that's located over on Stratford Avenue.
15  When he showed up --
16      Q.   Let me ask you this:  In the course of your
17  interview, did you ever have occasion to show the
18  defendant any photo arrays?
19      A.   Yes.
20      Q.   And did you -- let me show you what's been
21  marked Government's Exhibit 175, and ask you if you
22  recognize -- is that a photo array?
23      A.   Yes.
24      Q.   And is that one of the photo arrays you
25  showed to the defendant?
```

1964

1    A.   Yes, it is.

2    Q.   Was he able to identify anybody in the

3 photographs, in this photo array?

4    A.   Yes, he was.

5         MR. MARKLE:  Offer it as a full exhibit

6 your Honor.

7         MR. BUSSERT:  No objection.

8         THE COURT:  175 is a full exhibit.

9    Q.   And when you showed it to him, is that

10 exactly how Government's 175 was when you showed it

11 to him?

12    A.   Yes, it was.

13    Q.   And did you suggest to him who any of those

14 people were?

15    A.   No, I did not.

16    Q.   And was he able to identify one or more of

17 the people in that photo array?

18    A.   Yes, he was.

19    Q.   And I see one of the pictures is obviously

20 circled with initials by it.

21    A.   Yes.

22    Q.   Who did the circle?

23    A.   When he identified -- we told him to circle

24 and initial the photo that he could identify.

25    Q.   And those are his initials?

1965

1    A.   So that is the defendant's pen mark around

2 the picture and his initials.

3    Q.   And who has that a photograph of?

4    A.   Azibo Aquart.

5    Q.   And according to the defendant, who was

6 that?

7    A.   Dreddy.

8    Q.   And I'm going to show you Government's

9 Exhibit 176, ask you if you recognize this exhibit.

10    A.   Yes.

11    Q.   And is that one of the photo arrays you

12 showed to the defendant on March 6, 2011?

13    A.   Yes.

14    Q.   And, again, did you suggest to him anyone

15 to select in this photo array, 176?

16    A.   No.

17    Q.   And did he agree to look at it and attempt

18 to identify anyone?

19    A.   Yes, he did.

20    Q.   And, again, one of the photographs in 176

21 is circled; who circled it?

22    A.   The defendant circled it and initialed.

23    Q.   And who did he identify that person who is

24 circled and initialed to be?

25    A.   He identified that person as Zee, the

1966

1 brother of Dreddy.

2    Q.   Did you show him any other photographs on

3 that evening?

4    A.   We showed him several single photographs

5 for the purpose of -- for instance, we showed him a

6 single photo of Rodney Womble.

7    Q.   And why did you show him photographs of

8 Rodney Womble?

9    A.   Because during the interview he had

10 referenced the large individual as Big Dude, and

11 halfway through the interview he started saying "Big

12 Man," and Rodney Womble's nickname is Big Man, he's

13 a large man and he was involved in this case and

14 already arrested in this case, and to be -- I showed

15 him several photographs because I did not have a

16 photo array and I didn't want to single out one

17 photo.  He went through all of the photos and didn't

18 recognize anyone to include the photographs of

19 Rodney Womble.

20    Q.   He did not recognize Rodney Womble?

21    A.   Did not recognize.

22    Q.   Now, you said that he went to his -- he

23 told you he went to his girlfriend's house, correct?

24    A.   Uh-huh (indicating affirmatively).

25    Q.   And then he got --

1967

1    A.   Yes.

2    Q.   -- he got a ride from K?

3    A.   Yes.

4    Q.   And where did he get a ride to?

5    A.   To his sister's apartment.

6    Q.   And what did the defendant do when he told

7 you he got to his sister's apartment?

8    A.   When he arrived he saw Azibo, Dreddy;

9 Azikiwe, or Zee; and the Big Dude arriving at the

10 same time.

11    Q.   And so according to the defendant, they

12 arrived separately, but at the -- I mean those three

13 and him?

14    A.   Yes.

15    Q.   At the same time, but in separate vehicles.

16    A.   Yes.

17    Q.   And what did they do at that time?

18    A.   They walked upstairs to his sister's

19 apartment, with the exception of the big dude, who

20 at that point drove off.

21    Q.   And did he tell you what, if anything, he

22 did with Azikiwe Aquart, Azibo Aquart, at his

23 sister's apartment the night of the murder, the

24 morning of the murder?

25    A.   They walked up in the apartment.  It was

1968

```
1  not locked, so they walked in, sat down.  His sister
2  Lashika was in the shower, so they sat down and
3  watched TV.  He ended up going to sleep.  When he
4  woke up on the couch, Azibo Aquart and Azikiwe
5  Aquart were gone.
6     Q.  And was that the extent of the information
7  provided to you on March 6, 2007, from the
8  defendant?
9     A.  Yes.
10    Q.  Thank you.
11            MR. MARKLE:  May I just have a moment?
12            THE COURT:  Yes.
13            MR. MARKLE:  I have no further
14 questions, your Honor.
15            THE COURT:  Cross-examination.
16 CROSS-EXAMINATION
17 BY MR. BUSSERT:
18    Q.  Agent Munger, you were, I think, just asked
19 there at the end is that the extent of the
20 information that Mr. Johnson provide you on March 6,
21 2007, correct?
22    A.  To the best of my recollection without
23 reviewing my notes.
24    Q.  He also told you that he never saw the big
25 dude again, correct?
```

1969

```
1     A.  Yes, he did say that.
2     Q.  And he also told you that before Azibo
3  Aquart was arrested, two weeks later, that he saw
4  him once before, correct?  He saw him once during
5  that two-week period?
6     A.  Once during that two-week period.
7     Q.  And Azibo asked how he was doing and that
8  was the extent of the conversation?
9     A.  Yes.
10    Q.  Now, you referenced -- I think you
11 referenced in your direct testimony, just referenced
12 you may need to review your 302 in your testimony.
13    A.  Yep.
14    Q.  Can you explain to the ladies and gentlemen
15 of what is a 302?
16    A.  A 302, I write a report based upon an
17 interview, and it is my recollection of that
18 interview.  And that's our main report that we
19 write.
20    Q.  It's like an FBI police report,
21 essentially?
22    A.  Exactly.
23    Q.  And at some point were you the lead case
24 agent on this investigation with respect to the
25 murders at Charles Street?
```

1970

```
1     A.  Yes, I was.
2     Q.  How many, if you could just ballpark, how
3  many 302s did you prepare with respect to this case?
4     A.  Ballparking?
5     Q.  Yeah.
6     A.  Somewhere between 80 and 120.  Somewhere in
7  there.
8     Q.  Just as a practical matter, as an FBI
9  special agent -- well, let's just reference back to
10 this period of time, 2007.  On average how many
11 reports would you prepare a year?
12    A.  Oh, I have no idea.
13    Q.  Hundreds?
14    A.  I haven't calculated that.
15    Q.  Just --
16    A.  On average throughout my career?
17    Q.  You produce a lot of reports, fair to say,
18 correct?
19    A.  Not hundreds, but yes.
20    Q.  You said it was 80 to 120 just for this
21 investigation.
22    A.  For this investigation.
23    Q.  But as a practical matter, you are
24 preparing these things all the time, typing up notes
25 and preparing reports?
```

1971

```
1     A.  Sure.  I don't know what the number is.
2     Q.  Okay.  And it would be fair to say that
3  before testifying today, you reviewed your 302
4  report with respect to your March 6th interview with
5  Mr. Johnson, correct?
6     A.  Yes.
7     Q.  And would it be fair to say you probably
8  would not have had as accurate recollection of what
9  occurred had you just come in here off the street
10 and not had a chance to look at that report first,
11 correct?
12    A.  That's correct, yes.
13    Q.  Now, you described the Yellow Bird as a
14 social club.  That's the term you used on direct.
15    A.  Yes.
16    Q.  It's a bar, correct?
17    A.  It's a bar, but I don't think it's
18 licensed.  It doesn't have a liquor license.
19    Q.  So, it's an illegal bar?
20    A.  I'm not familiar with the liquor law,
21 liquor commission, but people can rent it, is my
22 understanding.  People could rent it and throw a
23 party there, get a DJ, buy their own liquor.  But I
24 don't believe they have a liquor license, whoever
25 owns the Yellow Bird.
```

1972

```
1     Q.   And being an agent with Safe Streets Task
2  Force, you are aware that the Yellow Bird has been
3  around -- at least prior to 2005 it had been around
4  for some time, correct?
5     A.   Yes.
6     Q.   It was kind of like the local place to go,
7  drink, somebody would rent and all of the
8  neighborhood people would go?
9     A.   That's one of the Bridgeport places.
10    Q.   Yep.  And that's on the east end of
11 Bridgeport, correct?
12    A.   That is in the east end, yes.
13    Q.   Now, at some point during your interview of
14 Mr. Johnson on the 6th, did you give him a break to
15 kind of like think about things?
16    A.   I believe so, just because in the period of
17 three hours I'm sure we had to go to the bathroom or
18 take a break.
19    Q.   And specifically did you give him a break
20 after you informed him of the fact that the DNA of
21 his as found at the crime scene within a rubber
22 glove, did you say, why don't you just take a few
23 minutes to think about that and I'll be back?
24    A.   No.
25    Q.   You didn't do that?
```

1973

```
1     A.   No.
2     Q.   You said this interview took place at the
3  FBI field office in Bridgeport?
4     A.   Yes.
5     Q.   Were there any members of Mr. Johnson's
6  family situated elsewhere in the FBI field office at
7  that time?
8     A.   Yes.
9     Q.   Would that have been his sister Lashika
10 Johnson?
11    A.   Yes, it was.
12    Q.   Do you know whether or not Mr. Johnson was
13 able to see his sister from the interview room
14 during the course of your meeting with him at any
15 point with the door open?
16    A.   Yes, I believe that he saw her.  The way
17 the passageway goes right in front of the door, I'm
18 pretty sure he saw her.
19    Q.   And that was before he started spelling out
20 all of these details about what happened with
21 Dreddy, correct?
22    A.   I do not recall when that happened, what
23 order that happened in.
24    Q.   And with respect to your testimony, you
25 said, talking about the Yellow Bird that night, I
```

1974

```
1  think you testified Johnson continued hanging out
2  and partying at the Yellow Bird until closing.  Is
3  that essentially what you testified to?
4     A.   Yes.
5     Q.   He actually told you drinking, correct?
6  Not hanging out, drinking at the Yellow Bird?
7     A.   He said drinking, partying, yep.
8     Q.   Getting high?
9     A.   I believe he said he was smoking marijuana.
10    Q.   And actually in terms of your arrest of Mr.
11 Johnson that day, he actually had a blunt taken on
12 off of his person at the time of the arrest,
13 correct?
14    A.   I believe so.
15    Q.   And can you explain to the ladies and
16 gentlemen of the jury what a blunt is?
17    A.   A blunt is a large joint of marijuana.
18    Q.   And you testified that with respect to Mr.
19 Johnson and Azibo Aquart speaking out on the street
20 there at 3:00 a.m., the Geo Prism pulled up, you
21 testified I think to the effect of Aquart said, go
22 ahead and get in with that gentleman in the car,
23 correct?
24    A.   Yes.
25    Q.   In fact, the report actually says Aquart
```

1975

```
1  instructed Johnson, correct?
2     A.   That's very well possible, yes.
3     Q.   You testified that with respect to after
4  Mr. Johnson knocked on the door, you talked about
5  doing that, that when the unknown female opened the
6  door, they all pushed her or they all bum rushed the
7  door, correct?
8     A.   Yes.
9     Q.   The reality is in your notes you actually
10 said the big dude rushed in with E.F. and others
11 behind, correct?
12    A.   Yes, but --
13    Q.   That's what you wrote down in your notes,
14 correct?
15    A.   Yes.
16    Q.   Not they bum rushed, it was Big Dude rushed
17 in with E.F. and others behind, right?
18    A.   Yes.
19    Q.   Your report, your 302 report, is based in
20 part on your contemporaneous notes that are taken,
21 correct?
22    A.   In part.  Also in part on my memory.
23    Q.   Okay.  But fair to say that "Big Dude
24 rushed in with E.F. and others behind" is more
25 specific than the pronoun "they"?  You would agree
```

1976

```
1    with that?
2        A.   Yes, but my memory has --
3        Q.   Did you not have your notes available to
4    you when you prepared this report?
5        A.   No, I had my notes.
6        Q.   And you testified that Big Dude and the
7    defendant -- you said Mr. Johnson said that he and
8    the Big Dude pushed the woman into the living room.
9    That was your testimony, correct?
10       A.   Yes.
11       Q.   Your report says Big Dude grabbed the woman
12   and rushed into the living room, correct?
13       A.   Say that again.  I'm sorry.
14       Q.   Your report says Big Dude grabbed the woman
15   and rushed into the living room, correct?
16       A.   I would have to see the report.  Yes,
17   that's what it says.
18       Q.   Thank you.  And you testified that when Mr.
19   Johnson was trying to calm down Tina Johnson, he
20   said, calm down and nothing is going to happen,
21   correct?
22       A.   Yes.
23       Q.   And actually in your report it says, and no
24   one would get hurt, correct?
25       A.   Whatever it says in the report is what I
```

1977

```
1    think I just said on direct.
2        Q.   Now, you talked about being an agent for
3    many years, correct?
4        A.   Yes.
5        Q.   And in your capacity as an FBI special
6    agent, would you say that you have various
7    technologies available to you in terms of your
8    investigations?
9        A.   Yes.
10       Q.   You have the ability to do Title III
11   intercepts, correct?
12       A.   Yes.
13       Q.   And that's more colloquially called a tap
14   to people's phones, correct?
15       A.   Yes.
16       Q.   And that is with court permission?
17       A.   Yes.
18       Q.   And you have things like body wires that
19   confidential informants wear when they go out so you
20   can listen to what's being going said, correct?
21       A.   Yes.
22       Q.   And you can record those statements that
23   are being made, correct?
24       A.   Yes.
25       Q.   And sometimes you'll make consensually
```

1978

```
1    recorded calls where the cooperating witness is on
2    one phone and they're calling somebody you are
3    interested in looking at, and you'll record those
4    conversations, correct?
5        A.   Yes.
6        Q.   And because the person, the cooperating
7    witness, is making the call, it's not illegal to
8    record that call, correct?
9        A.   Correct.
10       Q.   Okay.  So you have all of these abilities
11   to record things.  Did you record your interview
12   with Mr. Johnson?
13       A.   No.
14       Q.   And in the course of your investigation as
15   the case agent in this case, did you record the
16   interviews of any cooperating witness?
17       A.   No.
18       Q.   And Mr. Markle showed you two photo arrays,
19   correct?
20       A.   Yes.
21       Q.   And you also said that you gave Mr. Johnson
22   a series of photographs, one of which included a
23   photograph of Rodney Womble, correct?
24       A.   Yes.
25       Q.   Did you ever show Mr. Johnson a photograph
```

1979

```
1    of John Taylor on March 6, 2007?
2        A.   No.
3        Q.   And that is because on March 6, 2007, John
4    Taylor was not a suspect in the murders at 101
5    Charles Street -- or 215 Charles Street, correct?
6        A.   Correct.
7        Q.   Thank you.
8            MR BUSSERT:  No further questions.
9            THE COURT:  Redirect.
10           MR. MARKLE:  Very briefly.
11   REDIRECT EXAMINATION
12   BY MARKLE:
13       Q.   You were asked, Special Agent Munger, about
14   the term "bum rush the door."  Do you recall
15   anything about the interview that helps you remember
16   that?
17       A.   Yes.  What the defendant had said was, my
18   memory, is that they bum rushed the door.  When it
19   cracked open, it was like everyone came up behind
20   him and shoved him through the door.  So, he was as
21   bum rushed as the woman.
22       Q.   So, this is how they entered the apartment?
23       A.   Yes.
24       Q.   And this was after first saying he hadn't
25   been there since 1998 or 1999?
```

**GA1703**

1980

```
1        A.    Yes.
2        Q.    And then saying he had been there but he
3   only spit on the woman?
4        A.    Correct.
5        Q.    Thank you.
6             MR. MARKLE:  Nothing further your Honor.
7   RECROSS-EXAMINATION
8   BY MR. BUSSERT:
9        Q.    Just two questions.  It was also after he
10  had seen his sister, correct?
11       A.    I'm sorry, what?
12       Q.    You said it was after he told you that he
13  hadn't been there for eight years and after he told
14  you he had spit on the woman.  It was also after he
15  had seen his sister in the hallway, correct?
16       A.    You are losing me now.  I'm sorry.
17       Q.    The reality is, Mr. Johnson saw his sister
18  in your office before he started giving you all of
19  these details, correct?
20       A.    I don't recall the exact order, but I don't
21  believe so.  We arrested her later in the evening.
22  So, I believe all of this happened before --
23       Q.    Okay.
24       A.    -- he saw her.
25       Q.    Either way, it's not reflected in your
```

1981

```
1   report, correct?
2        A.    Correct.
3        Q.    And to be clear, as I understand it, he
4   knocked on the door -- this is what he told you, he
5   knocked on the door, it opened, and he got pushed in
6   -- as the woman was getting pushed back, he got
7   pushed in with everybody else?  Is that what you
8   just said?
9        A.    Yes, the bum rush.
10       Q.    So, he basically got forced in the
11  apartment?
12       A.    That's what he said, yes.
13       Q.    With the Big Guy pushing behind him?
14       A.    Correct, that's what he said.
15            THE COURT:  Anything further?
16            MR. MARKLE:  No, your Honor.
17            THE COURT:  Thank you, Agent Munger.
18  You may step down.  You are excused.
19            Please call your next witness.
20            MR. MARKLE:  The government would call
21  Lashika Johnson, your Honor.
22            THE COURT:  Ms. Johnson, will you please
23  raise your right hand.  Don't sit down yet.  The
24  oath will be administered.
25            L A S H I K A    J O H N S O N,
```

1982

```
1   Having first been duly sworn, was examined and
2   testified as follows:
3            THE WITNESS:  Lashika Johnson,
4   Bridgeport, Connecticut.  Last name j-o-h-n-s-o-n,
5   Bridgeport Connecticut.
6            THE COURT:  You may proceed.
7            MR. MARKLE:  Thank you, your Honor.
8   DIRECT EXAMINATION
9   BY MR. MARKLE:
10       Q.    Good afternoon, Ms. Johnson.
11       A.    Hello.
12       Q.    Ms. Johnson, we've met before, correct?
13       A.    Right.
14       Q.    We've talked outside the courtroom?
15       A.    Correct.
16       Q.    Could you tell the ladies and gentlemen how
17  old you are?
18       A.    Twenty-eight.
19       Q.    And where were you born?
20       A.    Bridgeport.
21       Q.    And did you remain in Bridgeport for your
22  entire life?
23       A.    Yes.
24       Q.    So, you were born raised in Bridgeport?
25       A.    Yes.
```

1983

```
1        Q.    And do you have any children?
2        A.    I have three.
3        Q.    Three.  And what are their ages?
4        A.    Twelve, eight and seven.
5        Q.    And how far have you gone in school,
6   Ms. Johnson?
7        A.    Tenth grade.
8        Q.    I'm sorry?
9        A.    Tenth grade.
10       Q.    Just speak up a little bit.  And did you
11  ever obtain your GED or go back to school?
12       A.    No.
13       Q.    And are you presently working?
14       A.    Yes.
15       Q.    And where are you working?
16       A.    I work for a grocery store called Food
17  Bizarre in my neighborhood.
18       Q.    And is that a full-time or part-time job?
19       A.    Part-time.
20       Q.    And are you also trying to get a school bus
21  driver's permit?
22       A.    I have my school bus driver's permit.  I
23  don't have my CDL license yet.
24       Q.    So, you are training to be a school bus
25  driver?
```

1984



```
1    A.   Correct.
2    Q.   And how often do you work, every day?
3    A.   No, I work three, maybe a little more days
4  a week.
5    Q.   And who are you presently living with?
6    A.   Myself and my seven-year old daughter.
7    Q.   Where are your other children?
8    A.   My 12-year-old is in South Carolina with
9  his grandmother and my eight-year-old is in
10 Bridgeport with his grandmother.
11   Q.   And Lashika, Ms. Johnson, are you related
12 to the defendant?
13   A.   Yes.
14   Q.   And what's your relationship?
15   A.   He's my brother.
16   Q.   And is Efrain Johnson, the defendant, older
17 or younger than you?
18   A.   He's older.
19   Q.   And growing up, or now, was he known by any
20 other names other than Efrain Johnson?
21   A.   We called him Pootney.
22   Q.   Pootney?
23   A.   Uh-huh (indicating affirmatively).
24   Q.   Any other names?
25   A.   Maybe Diddy or Pootney, that's it.
```

1985

```
1    Q.   And was that a name that was recently given
2  to him or a name he's had for a long time?
3    A.   No, we've been calling him those names for
4  a long time.
5        THE COURT:  You need to pull the
6  microphone closer or speak louder.  Thank you.
7    Q.   And you are aware, and have been aware,
8  that your brother was charged with some serious
9  crimes, murders involving this case?
10   A.   Correct.
11   Q.   And when is the last time you've talked to
12 him?
13   A.   I haven't spoken to him in probably over a
14 year.
15   Q.   Have you had any contact?
16   A.   Other than maybe signing a Christmas card
17 or birthday card with my mother, no.
18   Q.   You'd put your name on those?
19   A.   Right.
20   Q.   And are you aware whether or not your
21 brother has any children?
22   A.   Yes.
23   Q.   And how many children does he have?
24   A.   My brother has seven.
25   Q.   And are you aware of -- do you know the
```

1986

```
1  name Kytha Shaw?
2    A.   Kytha.
3    Q.   Kytha, I'm sorry.  You obviously know it.
4    A.   Yes.
5    Q.   How do you know her?
6    A.   She's the mother of three of his children.
7    Q.   And just, Ms. Johnson, did you know Tina
8  Johnson, one of the victims in this case?
9    A.   No.
10   Q.   No relationship, obviously, correct?
11   A.   No.
12   Q.   You've never met her, to your knowledge?
13   A.   No.
14   Q.   Ms. Johnson, did you know a person by the
15 name of Azibo Aquart?
16   A.   Yes.
17   Q.   And did you know him by that name or by any
18 other name?
19   A.   I knew him by that name and by Dreddy.
20   Q.   And do you recall when you first met
21 Dreddy, or Azibo Aquart?
22   A.   I don't remember the exact day, but it was
23 like fall, winter of 2004.  Around that time.
24   Q.   Do you remember that -- when was your
25 daughter born?
```

1987

```
1    A.   My daughter was born in 2004, May.
2    Q.   So, it was some time after?
3    A.   After she was born.
4    Q.   And where were you living at the time?
5    A.   Stratford Ave, in Bridgeport.
6    Q.   And do you remember the number of Stratford
7  Avenue?
8    A.   1322 or 24.
9    Q.   And was that an apartment or a home?
10   A.   It was an apartment.
11   Q.   And who were you living with at that time?
12   A.   Myself and two -- my two children.
13   Q.   And was your brother living at that
14 apartment?
15   A.   Kind of, yeah.  He had keys and he spent
16 the night and most of his clothes was there.
17   Q.   Just keep up a little bit.
18   A.   He had a key and his clothes was there and
19 he spent the night a lot of time.
20   Q.   But not every night?
21   A.   Not every night.
22   Q.   And can you describe what kind of street
23 you lived on?
24   A.   One-way street, pretty busy.
25   Q.   Busy?
```

1988

```
 1      A.   Yeah.
 2      Q.   Were there any recreational things in the
 3   area or clubs or anything like that?
 4      A.   There was a pool hall like a block away.
 5      Q.   And how did you first meet Azibo Aquart, or
 6   Dreddy?
 7      A.   I was hanging out kind of late one evening
 8   and I met him over by the Chinese restaurant near my
 9   house.
10      Q.   And do you remember whether or not you were
11   working at the time?
12      A.   I don't think so.
13      Q.   Was there a time you were working at Stop &
14   Shop?
15      A.   Yeah, I was working at Stop & Shop before I
16   had my daughter.
17      Q.   Before you had your daughter.  So, before
18   you met Dreddy?
19      A.   Yes.
20      Q.   And how were you making money at that time?
21      A.   When I met Dreddy?
22      Q.   Yeah.
23      A.   I was getting benefits from the city, the
24   state.  So, I wasn't really making any money at that
25   time.
```

1989

```
 1      Q.   Did there come a time where you started to
 2   make money from selling drugs?
 3      A.   Yes.
 4      Q.   And what kind of drugs was that?
 5      A.   Marijuana.
 6      Q.   And were you actually selling it?
 7      A.   Yes.
 8      Q.   And who was supplying you with the
 9   marijuana?
10      A.   At first I was helping my brother sell
11   marijuana, but --
12      Q.   Did you make some money from doing that?
13      A.   Not really, but a few dollars.  Yeah.
14      Q.   And then for how long did you do that with
15   your brother, or help your brother?
16      A.   Not long.
17      Q.   When you say your "brother," Efrain,
18   correct?
19      A.   Yes.
20      Q.   Do you have any other brothers?
21      A.   No.
22      Q.   Days, weeks, months?
23      A.   Maybe a few weeks.
24      Q.   And why did that stop?
25      A.   Because I didn't -- I needed to make a
```

1990

```
 1   little bit more money than I was making, so I didn't
 2   want to continue on with him, I just looked for
 3   other sources.
 4      Q.   And did you find another source of
 5   marijuana?
 6      A.   Yes.
 7      Q.   And who was that?
 8      A.   A friend of mines; his name Squeaky.
 9      Q.   Squeaky?
10      A.   Yes.
11      Q.   Do you know his real name?
12      A.   Tyler.
13      Q.   Do you know his last name?
14      A.   Bember.
15      Q.   And did Squeaky, in fact, supply you with
16   marijuana?
17      A.   Yes, he did.
18      Q.   And for how long -- were you making more
19   money from selling that?
20      A.   Yes.
21      Q.   For how long did that go on?
22      A.   Only for another -- maybe another month or
23   so.  Like a little bit more than that, but not long.
24      Q.   During that same time, did you have any
25   relationship with Dreddy, or Azibo Aquart?
```

1991

```
 1      A.   We were friends, but we weren't like
 2   serious yet.
 3      Q.   So, you didn't have a romantic
 4   relationship?
 5      A.   Yes, yes.
 6      Q.   You did at that time?
 7      A.   Yes.
 8      Q.   But you did not have -- did you
 9   subsequently sell drugs for him?
10      A.   Yes.
11      Q.   But that had not started at this point?
12      A.   No.
13      Q.   So, you said you had -- Squeaky was your
14   source of supply.  And you said that lasted a month.
15   Why did that end?
16      A.   It didn't really end.  I found out later on
17   that the person who I thought was the supplier,
18   which was Squeaky, wasn't the supplier, it was
19   actually Dreddy.  So, I started dealing with Dreddy
20   instead of Squeaky.  Instead of going through
21   Squeaky, I went straight to Dreddy.
22      Q.   So, unbeknownst to you, Dreddy, while you
23   had a romantic relationship, was the source for
24   Squeaky?
25      A.   Yes.
```

GA1706

1992

```
1      Q.    And you are buying from Squeaky and
2  selling?
3      A.    I didn't buy anything from Squeaky.
4      Q.    I mean being provided?
5      A.    Right.
6      Q.    And approximately when did you start
7  selling marijuana for Dreddy, or Azibo Aquart?
8      A.    A little while after I stopped -- well, I
9  didn't stop getting it from him ever, there was just
10  one day I needed more and Dreddy brought it and
11  that's who I just did it with from then on.
12      Q.    And did your being supplied with marijuana
13  by Dreddy, or Azibo Aquart, continue into 2005?
14      A.    Yes.
15      Q.    Did it continued up until the time he went
16  to jail?
17      A.    Yes.
18      Q.    And when you would get the marijuana from
19  Dreddy, do you recall how it was packaged?
20      A.    At first he was giving it to me in small
21  plastic bags, and then he started giving it to me in
22  plastic bubbles.
23      Q.    I'm going to show you what's been marked
24  Government's 200B and ask you if you recognize those
25  containers.
```

1993

```
1      A.    Yes.
2      Q.    Are those -- you said plastic.  What did
3  you describe it as?
4      A.    Plastic bubbles.
5      Q.    Is that what you mean by plastic bubbles?
6      A.    Yes.
7      Q.    And those are similar to the way it was
8  packaged by the Dreddy?
9      A.    Yes.
10      Q.    And how many bubbles would you get when you
11  got it from Dreddy?
12      A.    Maybe six to eight, or something like that,
13  in each package.
14      Q.    I'm sorry?
15      A.    Maybe six to eight in each package.
16      Q.    And how many packages?
17      A.    I never really had a set amount, a number
18  that he would give me at a time.
19      Q.    Do you know approximately how much monies
20  worth of marijuana you'd get at a time?
21      A.    Each package would be worth maybe 120
22  bucks, or a little more, or whatever.  I really
23  don't remember the exact number.
24      Q.    And you would get more than one package at
25  a time?
```

1994

```
1      A.    Yes.
2      Q.    And how much of that -- do you recall what
3  portion was yours after you sold that package?
4      A.    It was either between 40 and 60 bucks.  I
5  can't remember exactly the number.
6      Q.    Into your pocket?
7      A.    Yes.
8      Q.    And the remainder?
9      A.    Would go to him.
10      Q.    Dreddy?
11      A.    Dreddy.
12      Q.    During that time, did your brother know you
13  were selling marijuana for Dreddy?
14      A.    I think so.
15          MR. BUSSERT:  Objection, foundation.
16      Well, do you know for a fact whether he
17  knew?
18      A.    I don't remember if he knew right away.
19      Q.    I'm sorry?
20      A.    I don't remember if he knew right away who
21  it was for.
22      Q.    And for the time you dealt with Dreddy up
23  until he was arrested, did the marijuana always come
24  in those kind of containers?
25      A.    Yes.
```

1995

```
1      Q.    And did you have your own customers or did
2  Dreddy give you customers to take care of?
3      A.    Both.
4      Q.    Both?
5      A.    Both.
6      Q.    Did you ever sell cocaine?
7      A.    No.
8      Q.    Ever sell crack cocaine?
9      A.    A little, but not for -- not a lot.
10      Q.    Was that for yourself or for someone else?
11      A.    For Dreddy.
12      Q.    And did you ever use marijuana?
13      A.    Yes.
14      Q.    But you haven't for a long time, correct?
15      A.    No.
16      Q.    When did you stop, how long ago?
17      A.    Nine, about eight, nine years ago.
18      Q.    How about cocaine, did you ever use
19  cocaine?
20      A.    No.
21      Q.    Did you ever use crack cocaine?
22      A.    No.
23      Q.    Did you ever use heroin?
24      A.    No.
25      Q.    And the occasions that you said sold crack,
```

1996

1　did you get any of the money from those sales?
2　　A.　Yeah.
3　　Q.　Who got more of the money, you or Dreddy?
4　　A.　Dreddy.
5　　Q.　In early 2005, do you remember where Dreddy
6　was living?
7　　A.　I believe he was -- I believe I remember
8　him living at Hallett Street.
9　　Q.　And had you gone to Hallet Street on
10　occasion?
11　　A.　A few times.
12　　Q.　And did he -- do you know, is that where he
13　actually lived, slept, stayed?
14　　A.　Yes, to my knowledge.
15　　Q.　Do you know whether or not he had a
16　girlfriend at the time?
17　　A.　Not immediately, but I found out that he
18　had eventually after a while.
19　　Q.　But while you were having a romantic
20　relationship you weren't aware of it?
21　　A.　No.
22　　Q.　And do you recall if the Hallett Street
23　apartment was furnished?
24　　A.　Yes.
25　　Q.　It appeared to be a place where somebody

1997

1　would stay?
2　　A.　Yes.
3　　Q.　Did he, Dreddy, have any term that he
4　referred to Hallett Street by?
5　　A.　He called it his office.
6　　Q.　And do you know why he called it his
7　office?
8　　A.　Because usually that's where he kept his
9　drugs or --
10　　Q.　Have you -- had you been there on occasion
11　and seen drugs there?
12　　A.　Yes.
13　　Q.　What kind of drugs?
14　　A.　Crack.
15　　Q.　And what was being done with the crack?
16　　A.　He was cutting it up and bagging it for
17　distribution.
18　　Q.　And how would he cut it up?
19　　A.　With a razor into small pieces.
20　　Q.　Did you ever see his brother, Azikiwe
21　Aquart, there doing that?
22　　A.　No.
23　　Q.　Did you ever see your brother there doing
24　that?
25　　A.　No.

1998

1　　Q.　Did you ever see a person by the name of
2　John Taylor there doing that?
3　　A.　No.
4　　Q.　And the times that you seen him doing that,
5　bagging up, do you know what was done with the crack
6　cocaine as it was bagged up, how was it kept?
7　　A.　Well, he left the house and left me there
8　and it was just on the table.
9　　Q.　And was it packaged at that time or
10　still --
11　　A.　You some of it.
12　　Q.　Some of it?
13　　A.　Yes.
14　　Q.　And the packages, were they in baggies?
15　　A.　Yes.
16　　Q.　And what would he do with each of the
17　individual baggies?
18　　A.　He would burn them and put them in a pile.
19　　Q.　When you say "burn them," what do you mean?
20　　A.　Like burn the end of the bags to keep them
21　closed.
22　　Q.　So, they're sealed?
23　　A.　Yes.
24　　Q.　To your knowledge, when Dreddy was
25　supplying you with marijuana and you saw him with

1999

1　these packaging crack, do you know whether he had
2　any legitimate job?
3　　A.　He worked at a car wash.
4　　Q.　And do you know if he worked there
5　regularly?
6　　A.　To my knowledge, yes.
7　　Q.　And did you know Rodney Womble?
8　　A.　I didn't know him, I met him.
9　　Q.　And how did you meet him?　Did you meet him
10　through Dreddy?
11　　A.　Yes.
12　　Q.　Do you know whether or not he worked at the
13　car wash?
14　　A.　I don't remember.
15　　Q.　Do you know, were you ever present when Mr.
16　Womble did anything in regards to Dreddy's drug
17　business?
18　　A.　I think Womble picked something up from me
19　or gave me something one time.　I don't remember
20　which one it was, but I met him at my house.
21　　Q.　And that something was money?
22　　A.　It was either money -- it was either he
23　picked up money from me or he dropped off weed, or
24　both.　It had something to do with Dreddy.
25　　Q.　Had you ever been to Charles Street before

2000

```
1   you met Dreddy?
2       A.   No.
3       Q.   Have you been to Charles Street after you
4   met Dreddy?
5       A.   Yes.
6       Q.   And did he refer to Charles Street in any
7   specific way?
8       A.   He said "the building."
9       Q.   And do you know why he called it "the
10  building"?
11          MR. BUSSERT:  Objection, calls for
12  speculation.
13          THE COURT:  Well, the question is do you
14  know, and that's just a yes or no.  Do you know why
15  he called it the building.
16          THE WITNESS:  No.
17      Q.   And when you went to the building with him,
18  do you recall why?
19      A.   I went to the building one time to go bring
20  the old man that lived there to the grocery store,
21  to pick him up and drop him off back home after the
22  grocery trip.
23      Q.   Did you know his name?
24      A.   I don't remember.
25      Q.   And did you know him before that?
```

2001

```
1       A.   No.
2       Q.   Did Dreddy know him?
3       A.   Yes.
4       Q.   And did you ever go there in connection
5   with your marijuana business?
6       A.   Yeah, I went there one time.
7       Q.   And what was that for?
8       A.   To bring somebody weed.
9       Q.   Did you ever go to Charles Street again
10  besides those two times?
11      A.   No.
12      Q.   Was there a time after the murders that you
13  went to Charles Street?
14      A.   Yes.
15      Q.   And why did you go there after the murders?
16      A.   To pick up Dreddy's brother.
17      Q.   And who was Dreddy's brother?
18      A.   Ozzie.
19      Q.   That's what you knew him as?
20      A.   Yes.
21      Q.   And did Dreddy have a car?
22      A.   Yes.
23      Q.   But did Dreddy go with you?
24      A.   No.
25      Q.   And how many days after the murders was
```

2002

```
1   this?
2       A.   I don't remember how many days after it
3   was.  I just remember it was pretty close.
4       Q.   Are those the only times you ever went to
5   Charles Street?
6       A.   Yes.
7       Q.   And did you, in fact, pick up his brother
8   on that day?
9       A.   Yes.
10      Q.   And where did you take him?
11      A.   I don't remember, but I did pick him up.
12      Q.   Do you remember ever going to Norwalk,
13  Connecticut with Dreddy?
14      A.   Yes.
15      Q.   And what was the purpose of that trip?
16      A.   I don't know.  I rode in the car with him.
17      Q.   Did you see him with drugs during that
18  trip?
19      A.   No.
20      Q.   Did you see him with money during that
21  trip?
22      A.   Yes, money.
23      Q.   And was it a large amount of money --
24      A.   Yes.
25      Q.   -- or small?  Large?
```

2003

```
1       A.   Large.
2       Q.   How was it contained?
3       A.   It was in a shoe box.
4       Q.   And do you know what denominations?  Was it
5   singles, fives, tens?
6       A.   I don't know.
7       Q.   Do you know exact amount?
8       A.   No.
9       Q.   Do you know what he did with that money
10  when you got to Norwalk?
11      A.   No.  He didn't do anything with it, it
12  stayed in the car.
13      Q.   So, did you return to Bridgeport with the
14  money; as far as you know?
15      A.   Yes.
16      Q.   Did Dreddy own any vehicles?
17      A.   Yeah, he own a few.
18      Q.   What kind of vehicles; do you remember?
19      A.   Two Cadillacs and a truck.
20      Q.   Do you remember another Cadillac?
21      A.   I remember a red Cadillac, a blue Cadillac,
22  and a black truck.
23      Q.   And when you say truck, was it a truck or
24  was it like an SUV?
25      A.   SUV.
```

GA1709

2004

```
 1      Q.   And would you drive in those cars with him?
 2      A.   Yes.
 3      Q.   And had you ever seen Dreddy, or Azibo
 4   Aquart, with a firearm, a gun?
 5      A.   Yes.
 6      Q.   And how many different guns have you seen
 7   him with?
 8      A.   Two.
 9      Q.   And do you remember what either one of them
10   looked like?
11      A.   One of them was a small one and the other
12   one was a bigger one with -- like a revolver and a
13   beam on it.
14      Q.   With a beam on it?
15      A.   Yes.
16      Q.   Like a --
17      A.   A laser beam light.
18      Q.   And do you recall what color either of them
19   were?
20      A.   I think they were both silver.
21      Q.   And how did you know of the guns?  Where
22   did you see them?
23      A.   He gave them to me to hold them.
24      Q.   And where did you hold them?
25      A.   At my house.
```

2005

```
 1      Q.   And where in your house did you hold them?
 2      A.   On top of a shelf in my bedroom.
 3      Q.   And do you still have those guns?
 4      A.   No.
 5      Q.   What happened to them?
 6      A.   I gave them to his brother.
 7      Q.   Ozzie?
 8      A.   Yes.
 9      Q.   And who told you to give them to Ozzie?
10      A.   Ozzie called me for them.
11      Q.   Was that before or after the murders?
12      A.   After.
13      Q.   Did you ever see them again?
14      A.   No.
15      Q.   Do you know what Dreddy's relationship was
16   with the man who you bought grocery for in Charles
17   Street?
18      A.   He just called him Pops.
19      Q.   And do you know whether or not drugs were
20   sold from that apartment?
21      A.   No.
22      Q.   Were you aware of a time when there with a
23   raid on that apartment?
24      A.   Yes.
25      Q.   And Pops got arrested?
```

2006

```
 1      A.   Yes.
 2      Q.   And what was done after Pops got arrested?
 3      A.   Dreddy asked me to bond Pops out of jail.
 4      Q.   And did you do that?
 5      A.   Yes.
 6      Q.   And who gave you the money to do that?
 7      A.   Dreddy.
 8      Q.   And did you know Pops at all other than
 9   through Dreddy before that?
10      A.   No.
11           THE COURT:  We are now past 3:30.  Is
12   this a suitable stopping time?
13           MR. MARKLE:  That's fine.
14           THE COURT:  All right, ladies and
15   gentlemen, we will recess and resume Tuesday at
16   9:00 a.m.  Monday is a holiday, the court is closed.
17   Enjoy your weekend.  Leave your notebooks here.
18   Please do not discuss the case.  Please do not pay
19   any attention to anything you might cross, if there
20   is anything, about the case.
21           (Jury exited the courtroom.)
22           THE COURT:  All right, Ms. Johnson, we
23   will need you here at nine o'clock on Tuesday.
24   Please do not discuss your testimony with anyone.
25           THE WITNESS:  Okay.
```

2007

```
 1           THE COURT:  All right, thank you.
 2           Is there anything further before we
 3   recess?  Does the government have any further
 4   information about whether the 8:00 a.m. hearing is
 5   necessary.
 6           MS. REYNOLDS:  The 8:00 a.m. hearing is
 7   not necessary.  Contact has been made with Dr. Frank
 8   Evangelista and he will be here at 9:00 a.m. on
 9   Tuesday morning.  So we expect to call him as a
10   witness at that time.
11           MR. BUSSERT:  All of this for that.
12           THE COURT:  We are now --
13           MS. REYNOLDS:  We've all learned a lot
14   about a very important issue to Justice Scalia and
15   the justices of the Supreme Court.
16           THE COURT:  Is there anything else we
17   need to take up before we recess?
18           MR. BUSSERT:  No, your Honor.
19           MS. REYNOLDS:  Other than we want a list
20   of the defendant's witnesses.
21           MR. BUSSERT:  Honestly, at this point I
22   think there is a better than likely chance there
23   won't be lay witnesses.
24           THE COURT:  Mr. Johnson, have you made
25   any determination about?
```

2008

```
1          MR. BUSSERT:  We'll advise the Court on
2   Tuesday about that, your Honor.
3          THE COURT:  All right.  On Tuesday we
4   will finish with Ms. Johnson, we will have Ms.
5   Dellavolpe and Mr. Martin.
6          MS. REYNOLDS:  And Dr. Evangelista.
7          THE COURT:  Dr. Evangelista.
8          MR. BUSSERT:  With scathing cross.
9          THE COURT:  All right, thank you very
10  much.  Have a pleasant weekend.
11          (Proceedings concluded 3:40)
```

2009

```
1                 I N D E X
2   WITNESS                                    PAGE
3   JOHN TAYLOR
4   Cross-Examination by Mr. Bussert           1741
5   Redirect Examination by Mr. Markle         1891
6   Recross-Examination by Mr. Bussert         1903
7   Re-Redirect Examination by Mr. Markle      1909
8
9   CHRISTOPHER MUNGER
10  Direct Examination by Mr. Markle           1932
11  Cross-Examination by Mr. Bussert           1968
12  Redirect Examination by Mr. Markle         1979
13  Recross-Examination by Mr. Bussert         1980
14
15  LASHIKA JOHNSON
16  Direct Examination by Mr. Markle           1982
```

2010

```
1          I certify that the foregoing is a
2   correct transcript from the record of proceedings in
3   the above-entitled matter.
4
5              2/18/12
6               Date
7
8          /S/  Sharon Montini
9            Official Reporter
```

**GA1711**



```
 1              UNITED STATES DISTRICT COURT
 2                DISTRICT OF CONNECTICUT
 3   * * * * * * * * * * * *        *
                                    *
 4   UNITED STATES OF AMERICA,      * Case No 6cr160(JBA)
 5               Government,         *
                                    *
 6        vs.                        *
                                    *
 7   EFRAIN JOHNSON,                 *
 8               Defendant.          * February 21, 2012
                                    *
 9   * * * * * * * * * * * *        *
10               TRIAL TRANSCRIPT
11                  VOLUME IX
12   BEFORE: THE HONORABLE JANET BOND ARTERTON, U.S.D.J.
13
14   Appearances:
     FOR THE GOVERNMENT:     ALINA REYNOLDS, ESQ
15                           PETER MARKLE, ESQ.
                             United States Attorney's
16                           Office
                             1000 Lafayette Blvd
17                           Bridgeport, CT 06604
18
19   FOR THE DEFENDANT:      TODD BUSSERT, ESQ
                             FROST BUSSERT
20                           129 Church Street
                             New Haven, CT 06510
21
22
     Court Reporter:         Sharon Montini, RMR
23                           141 Church Street
                             New Haven, CT 06510
24
     Proceedings recorded by mechanical stenography,
25   transcript produced by computer
```

```
 1        MS. REYNOLDS:  I believe Lashika Johnson
 2   is here.
 3        THE COURT:  All right, good morning, Ms.
 4   Johnson.  Would you kindly return to the stand, and
 5   you remain under oath.
 6        L A S H I K A   J O H N S O N,
 7   Having previously been duly sworn, was examined and
 8   testified as follows:
 9   CONTINUED DIRECT EXAMINATION
10   BY MR. MARKLE:
11   A.   Good morning.
12   Q.   Hi.
13        THE COURT:  And pull the microphone over
14   because I know you are a soft speaker.  Okay.
15   Q.   Ms. Johnson, feeling better today?
16   A.   Not very much, but a little bit.
17   Q.   Ms. Johnson, I think we were talking about
18   back in 2005, and directing your attention to that
19   time period.  Do you know whether or not your
20   brother had a job in 2005?
21   A.   I don't remember.  I remember he had a job,
22   I don't remember exactly when.
23   Q.   What kind of job did he have that you
24   remember?
25   A.   He worked at Cracker Barrel for a little
```

```
 1   while, but not long.  But he worked at Cracker
 2   Barrel.
 3   Q.   What's a little while?
 4   A.   Like probably less than a week.
 5   Q.   Less than a week?  And that's the only job
 6   you remember?
 7   A.   Yeah.
 8   Q.   Did he have a cell phone at that time?
 9   A.   Yeah.
10   Q.   Did he have the cell phone in August of
11   2005?
12   A.   Yeah.
13   Q.   Do you remember the number?
14   A.   No.
15   Q.   Do you remember whether he had more than
16   one cell phone?
17   A.   No, I think he had one.
18   Q.   Do you remember him using a rental car in
19   August of 2005?
20   A.   Yeah.
21   Q.   And do you remember what kind of rental car
22   it was?
23   A.   It was a Toyota.
24   Q.   Do you remember what kind, color, anything?
25   A.   It was either red or burgundy, or something
```

```
 1   like that.
 2   Q.   And did you have a cell phone back in
 3   August 2005?
 4   A.   Yes.
 5   Q.   And do you remember your number?
 6   A.   No.
 7   Q.   And when you got your cell phone, did you
 8   use your name when you gave the information about
 9   subscriber and who's going to use it?  Did you use
10   your name?
11   A.   I had two cell phones.  My Sprint cell
12   phone was in my name.
13   Q.   Lashika Johnson?
14   A.   Yes.
15   Q.   And did you use your Stratford Avenue
16   address?
17   A.   Probably.
18   Q.   That was your real address at the time?
19   A.   Yes.
20   Q.   And I think I asked you this, but did your
21   brother know Azibo Aquart?
22   A.   He knew him from him -- from Azibo being
23   around me.
24   Q.   And that includes August of 2005?  It was
25   before that, a little bit before that, and up to
```

2027

```
1   August 2005?
2       A.   Yeah.
3       Q.   And do you know whether or not your brother
4   got marijuana to sell from Azibo Aquart?
5       A.   No, he didn't get marijuana to sell from
6   him.
7       Q.   You didn't know of that?
8       A.   No, I didn't know that.
9       Q.   August 23, 2005, the day before the
10  murders, okay --
11      A.   Okay.
12      Q.   -- do you -- or actually that night, do you
13  remember what you were doing?  Do you remember where
14  you were?
15      A.   I believe that was the night that we had a
16  party.
17      Q.   Where was that party?
18      A.   We had a party at a little club we used to
19  hang at called the Yellow Bird.
20      Q.   The yellow bird?
21      A.   Yeah.
22      Q.   You are saying "we."  Who had the party?
23      A.   Well, my brother was the promoter, and we
24  all hung out, worked, helped sell drinks, whatever
25  else.
```

2028

```
1       Q.   So, you could rent the Yellow Bird?
2       A.   Yes.
3       Q.   Or use the Yellow Bird?
4       A.   Yes, rent it.
5       Q.   And would you make money by renting it?
6       A.   You could make money, but we didn't that
7   night.
8       Q.   Okay, it didn't work out?
9       A.   No.
10      Q.   And did you go to the club?  You were there
11  that night?
12      A.   Yes.
13      Q.   Was your brother there that night?
14      A.   Yes.
15      Q.   And do you recall how late you stayed at
16  the club?
17      A.   Well, the club closed at one o'clock on a
18  weekday, so we left at maybe 1:15, 1:30, a little
19  bit after that to clean up, or whatever.
20      Q.   And when you left, where did you go?
21      A.   When we left the Yellow Bird, we all drove
22  to Denny's.
23      Q.   And did you go straight to Denny's?
24      A.   Probably.
25      Q.   Do you remember whose car you were in?
```

2029

```
1   Were you driving or --
2       A.   No, I wasn't driving, I was in a car with
3   my friend Tasha and her friend.
4       Q.   And did anyone else go to Denny's that
5   night?
6       A.   Yeah, my brother went and his girlfriend at
7   the time and a few other people went.
8       Q.   Do you remember your brother's -- what was
9   his girlfriend's name?
10      A.   Tanya.
11      Q.   And do you remember what car he drove in?
12      A.   He drove in the rental car.
13      Q.   The Toyota?
14      A.   Yeah.
15      Q.   And you said you went to Denny's.  Did you
16  all actually get to Denny's?
17      A.   Yes.
18      Q.   And when you got to Denny's, did you go in?
19      A.   Yes.
20      Q.   What did you do there?
21      A.   We ate.
22      Q.   And had you been drinking at the club?
23      A.   Yeah.
24      Q.   And was your brother drinking at the club?
25      A.   Yeah.
```

2030

```
1       Q.   From the time you left the club to the time
2   you got to Denny's, were you drinking any more?
3       A.   I don't remember.
4       Q.   In the car were you drinking?
5       A.   I don't remember.
6       Q.   At Denny's were you drinking?
7       A.   No.
8       Q.   And were you using any drugs that night?
9       A.   No.
10      Q.   Did you see your brother using drugs that
11  night?
12      A.   No.
13      Q.   And did you all actually eat at Denny's?
14      A.   Yes.
15      Q.   Was Azibo Aquart at Denny's with you?
16      A.   No.
17      Q.   Did you speak to Azibo while you were at
18  Denny's?
19      A.   Yeah.
20      Q.   And was that by phone?
21      A.   By phone.
22      Q.   And do you recall if you called him or if
23  he called you?
24      A.   I don't remember who called who, but I
25  remember I spoke to him.
```

**GA1713**

2031

```
1     Q.   And was it before you ate, while you ate,
2   after you ate?
3     A.   I don't remember.
4     Q.   Did you actually talk to him?
5     A.   Yes.
6     Q.   And what did he want -- why was he calling
7   you?
8     A.   Again, I don't remember who called who, but
9   basically I remember the conversation was:  I just
10  woke up, I been asleep all day.  From him, from him
11  telling me he been asleep all day, and I was telling
12  him that we were eating and that we were at Denny's,
13  and he asked me where my brother was.
14    Q.   And what did you tell him?
15    A.   I told him that he was with me.
16    Q.   And did you continue to talk to him?  Or
17  what happened at that time?
18    A.   I don't remember if I hung up my phone and
19  he called my brother's phone, but either way, he
20  wanted to speak to my brother.  So, I think I either
21  handed him the phone or -- I don't remember what
22  phone, but I remember he wanted to speak to my
23  brother or he asked about my brother.
24    Q.   And did you know at that time what their
25  association or relationship was?
```

2032

```
1     A.   No, just my brother and my boyfriend.
2     Q.   As far as you knew?
3     A.   As far as I knew.
4     Q.   Did you ask him why he wanted to speak to
5   your brother?
6     A.   No.
7     Q.   Did you hear the conversation that they
8   had?
9     A.   No.
10    Q.   Now, going back a few nights before
11  August 20th -- that was August 23rd into the 24th,
12  right, because it went past midnight?  It started at
13  the club on the 23rd and then the 24th you are at
14  Denny's?
15    A.   Okay.
16    Q.   And so in the few nights before that, had
17  you seen your brother with Dreddy, with Azibo?
18    A.   Yeah, when I woke up.  I believe that he
19  told me -- my brother told me something about he had
20  to go somewhere, and I don't know, he had to go
21  somewhere with Dreddy the night -- a couple nights
22  before, and then I don't remember exactly, but I
23  believe when I woke up this night again they were
24  together in my house, but -- or maybe I didn't even
25  go to sleep, but I remember them either coming back
```

2033

```
1   together or -- I just knew for sure that they were
2   together that night, too.
3     Q.   This is a couple nights before?
4     A.   Right.
5     Q.   And do you know why he had to go see Dreddy
6   or go be with Dreddy?
7     A.   No.
8     Q.   Do you remember what he told you?
9     A.   Something about handle something with
10  Dreddy.
11    Q.   And do you know what that was?
12    A.   No.
13    Q.   And you said he came back with Dreddy?
14    A.   They came back, because I remember thinking
15  they came back pretty fast, it couldn't have been
16  nothing crazy.
17    Q.   So, shortly after he said I have to go
18  something with Dreddy, he left?
19    A.   Right.
20    Q.   Then a short time later he came back?
21    A.   Right.
22    Q.   With Dreddy.  Is that correct?
23    A.   Correct.
24    Q.   And when you say he and Dreddy came back,
25  came back to where?
```

2034

```
1     A.   My house.
2     Q.   And where were you living at the time?
3     A.   Stratford Ave.
4     Q.   Now, going back to the early morning hours
5   of August 24th, you are at Denny's again?
6     A.   Okay.
7     Q.   And after Dreddy called and asked to speak
8   to your brother and spoke to your brother, did you
9   guys stay at Denny's?
10    A.   We finished up eating, and then drove home.
11    Q.   And how did you get home?
12    A.   The same way I came.  I came with Tasha,
13  her friend, and I drove home with them as well.
14    Q.   And do you remember how your brother left
15  or where he went?
16    A.   Same way he came, he left in the same car
17  he came in.
18    Q.   And do you know where he went?
19    A.   I'm assuming he went to drop Tanya off.
20    Q.   You didn't see that?
21    A.   No.
22    Q.   But he was with Tanya?
23    A.   Right.
24    Q.   Did you see him after that?
25    A.   No.
```

2035

```
1    Q.   Did your brother have a driver's license?
2    A.   No.
3    Q.   Where was your brother living on August 24,
4  2005?
5    A.   Well, pretty much he was living with me,
6  but he was staying with his girlfriend from time to
7  time.
8    Q.   Okay, so not every night at your place?
9    A.   No.
10   Q.   Did he have clothes at your place?
11   A.   Yes, most of his clothes.
12   Q.   I'm sorry?
13   A.   Most of his clothes.
14   Q.   Did he have a key to your place?
15   A.   Yes.
16   Q.   Now, once you parked on -- you went to
17 Stratford Avenue, right?
18   A.   Yes.
19   Q.   After Denny's?
20   A.   Yes.
21   Q.   Did you see anyone when you got there?
22   A.   Not when I pulled up, but shortly after I
23 got out of the car, yes.
24   Q.   And what happened then?  Who did you see?
25 Where were you?  What were you doing?
```

2036

```
1    A.   I was going up my stairs to go inside of my
2  house, and I don't remember exactly how or -- how I
3  saw him, but I saw Dreddy walking from his car to
4  Union Ave.
5    Q.   Does Union Ave intersect with Stratford
6  Ave?
7    A.   Yes.
8    Q.   And did you see what car Dreddy had?
9    A.   He had his red car.
10   Q.   The Cadillac?
11   A.   Yes.
12   Q.   And were you expecting to see Dreddy?
13   A.   No.
14   Q.   Had you -- when you talked to him at
15 Denny's, had you said I'll meet you at my apartment
16 in an hour?
17   A.   No.
18   Q.   So, you didn't have plans to see him?
19   A.   No.
20   Q.   The last person he spoke to was your
21 brother?
22   A.   Yes.
23   Q.   And was Dreddy alone or with anyone else?
24   A.   No, he was by hisself (sic).
25   Q.   And did he walk up to you?  Did you talk to
```

2037

```
1  him?
2    A.   No.
3    Q.   Did he walk towards your apartment or away
4  from it?
5    A.   Away from it.
6    Q.   And you didn't call out to him or anything?
7    A.   No.
8    Q.   Did you see him meet with anyone there?
9    A.   No, I just saw him go to the corner and he
10 just kind of like disappeared.
11   Q.   And what did you do at that time?
12   A.   I went upstairs -- or I went to bed.
13 However I saw him, he disappeared, I disappeared, I
14 ended up in bed.
15   Q.   You went into your apartment?
16   A.   Yeah.
17   Q.   Who else went with you?
18   A.   Tasha.
19   Q.   And what did you do when you got to your
20 apartment?
21   A.   I went to bed.
22   Q.   It was late now?
23   A.   Yes.
24   Q.   And did you sleep through the night?
25   A.   No.  I fell asleep, yes, but I didn't sleep
```

2038

```
1  through the night.
2    Q.   How come?  What happened?
3    A.   When I woke up, I heard loud noises or
4  voices, and I got out of my bed.
5    Q.   Did you recognize the voices that you
6  heard?
7    A.   Some of them, but I wasn't too sure of who
8  all was there.
9    Q.   What voices did you recognize?
10   A.   I recognized my brother's and maybe
11 Dreddy's.
12   Q.   Your brother's and Dreddy's?
13   A.   Yes.
14   Q.   And did you know Dreddy's brother?
15   A.   Yes.
16   Q.   What was his name?
17   A.   Ozzie.
18   Q.   And did you recognize his voice?
19   A.   He sounded kind of like Dreddy, so it
20 wouldn't have been -- I wouldn't have been able to
21 say, oh, that's Ozzie and that's Dreddy.  It would
22 have been more so I knew Dreddy was in the building,
23 but I didn't know --
24   Q.   And was there a voice besides your
25 brother's, which you obviously recognized, Dreddy's
```

**GA1715**

2039

1  which you could recognize, a voice that was
2  unfamiliar to you?
3      A.   I thought so waking up out of my sleep like
4  it was another voice.
5      Q.   How would you describe that voice?
6      A.   Maybe a little bit deeper.
7      Q.   But you can't say for sure who that was?
8      A.   No.
9      Q.   And did Tasha -- did you come out of your
10  bedroom at that time?
11      A.   Yes.
12      Q.   And did Tasha wake up and come out also?
13      A.   No.
14      Q.   And when you came out, did you see anyone?
15      A.   I saw my brother, Dreddy, and Dreddy's
16  brother.
17      Q.   Now, was that right after you woke up or
18  was that a little bit after you heard the voices?
19      A.   I woke up.  Well, I was waking up out of my
20  sleep and I could hear them, but eventually I woke
21  up all the way and got up and went out.
22      Q.   And when you went in the living room, about
23  what time was it?  Was it dark, light, daytime,
24  nighttime?
25      A.   It was going like into -- like it was still

2040

1  a little bit dark, but coming into the morning,
2  like.
3      Q.   And did you see anyone in your apartment?
4      A.   Dreddy, my brother and his brother.
5      Q.   Dreddy and Ozzie.
6      A.   Ozzie.
7      Q.   And your brother?
8      A.   Yes.
9      Q.   And does your bedroom lead right into the
10  living room?
11      A.   Yes.
12      Q.   And where were they -- were they standing
13  or sitting?
14      A.   I think they were sitting.
15      Q.   Like, what's in your living room?  Is there
16  a couch, chairs?
17      A.   My couches and my TV.
18      Q.   Was the TV on or off; do you know?
19      A.   It was on.
20      Q.   And do you remember anything?  Did anything
21  catch your attention about these three people in
22  your living room?
23      A.   That didn't have -- that they weren't fully
24  dressed.
25      Q.   They weren't?  I'm sorry?

2041

1      A.   That they weren't fully dressed.
2      Q.   Who wasn't fully dressed?
3      A.   Dreddy and his brother.
4      Q.   When you say not fully dressed, how were
5  they dressed?
6      A.   They had on socks, boxers and T-shirts.
7      Q.   So, they had no real shirt or pants on?
8      A.   No.
9      Q.   No shoes or sneakers?
10      A.   No.
11      Q.   And how about your brother?
12      A.   My brother had on, like, a T-shirt and
13  jeans, and I think -- I think sneakers.
14      Q.   And is that how he was dressed earlier at
15  the club?
16      A.   I don't remember.
17      Q.   Is that how he was dressed at Denny's?
18      A.   I don't remember.
19      Q.   And what were they doing?
20      A.   They were just sitting there talking.
21      Q.   And did you see their clothes hanging on a
22  chair, by the couch, on the floor?
23      A.   No.
24      Q.   Did you see their shoes or sneakers
25  anywhere in your apartment obvious to you?  Did you

2042

1  see them?
2      A.   Not Dreddy and his brother, no.
3      Q.   And did you ask what was going on?
4      A.   No.
5      Q.   What did you do?
6      A.   I sat down on the couch for a little while
7  and I wondered why they weren't dressed, but I never
8  again didn't ask questions.
9      Q.   And after you sat there for a little bit,
10  were you asked to do anything?
11      A.   Yeah, Dreddy asked me to take the bags that
12  was by the door to the dumpster.
13      Q.   And were there bags by the door?
14      A.   Yes.
15      Q.   And how many bags?
16      A.   It was either two or three.
17      Q.   And did you ask him why?
18      A.   No.
19      Q.   Why didn't you ask him what's going on, why
20  do I have to do that?
21      A.   Just cuz I didn't really -- I don't know, I
22  just don't ask questions.
23      Q.   And did you do anything with the bags?
24      A.   Yes.  He told me to put -- take them and
25  put them in the dumpster, like, a few blocks away

2043

```
1    from my house.
2        Q.   And is there a dumpster by your house?
3        A.   Yes.
4        Q.   Right by your apartment?
5        A.   Yes.
6        Q.   But you didn't go there?
7        A.   No.
8        Q.   Did you go a few blocks away with the bags?
9        A.   Yes.
10       Q.   Did you take anything else with you?
11       A.   On my way out the door he handed me a black
12   drill.
13       Q.   A black?
14       A.   Drill.
15       Q.   Drill.  Did you take that?
16       A.   Yes.
17       Q.   Did you have anything on your hands or were
18   you barehanded?
19       A.   He handed me some gloves.
20       Q.   Did you put them on?
21       A.   Yes.
22       Q.   And did you use those when you carried the
23   bags and the drill?
24       A.   Yes.
25       Q.   And did anyone help you with the bags or
```

2044

```
1    drill?
2        A.   No, I did that myself.
3        Q.   And do you know what was in the two or
4    three bags that you took?
5        A.   I didn't open the bag, but I assumed that
6    it was clothes.
7        Q.   You've carried clothes before?
8        A.   Yes.
9        Q.   Seemed similar to the weight of clothes?
10       A.   Yes.
11       Q.   And they weren't dressed?
12       A.   Right.
13       Q.   And did you walk or drive to the dumpster a
14   few blocks away?
15       A.   I drove.
16       Q.   You drove?
17       A.   Yeah.
18       Q.   Your car?
19       A.   Yes.
20       Q.   And did you -- what did you do with the
21   bags?
22       A.   Put them in the dumpster.
23       Q.   What did you do with the drill?
24       A.   Put it in the dumpster.
25       Q.   What did you do with the gloves you had on?
```

2045

```
1        A.   The dumpster.
2        Q.   Were they winter gloves, cleaning gloves?
3        A.   No, regular hospital, clear gloves.
4        Q.   Did you ever see that drill before?
5        A.   Yes.
6        Q.   When?
7        A.   Dreddy used the drill to put a peephole in
8    my door.
9        Q.   And did he leave the drill in your
10   apartment after he did that?
11       A.   Yes.
12       Q.   Did you see it at your apartment?
13       A.   Yes.
14       Q.   And did he ever take it back from your
15   apartment?
16       A.   Yes.
17       Q.   So the night that you took it, it hadn't
18   been in your apartment for some period of time?
19       A.   No.
20       Q.   What did you do after you went to the
21   dumpster and put the items in there?
22       A.   I went back home.
23       Q.   And when you got back home, who was there?
24       A.   I know for sure Dreddy was there, but at
25   some point my brother or his brother left, but I
```

2046

```
1    don't remember which one left first or when exactly
2    they left.
3        Q.   Did there come a time when you had to leave
4    the apartment again?
5        A.   Yes.
6        Q.   And why was that?
7        A.   Because Dreddy asked me to take his car and
8    bring it home to park it in front of his house.
9        Q.   And how far is his home from your home?
10       A.   Maybe three, three blocks.
11       Q.   A short distance?
12       A.   Yes.
13       Q.   And did you agree to do that?
14       A.   Yes.
15       Q.   Did you ask him why?
16       A.   No, he said something about -- something
17   about so it look like he been home all night, or
18   something like that.
19       Q.   Did you do this?
20       A.   Yes.
21       Q.   So, did you - who drove his car?
22       A.   I drove his car.
23       Q.   And where did you drive it to?
24       A.   To Read Street where his house was.
25       Q.   And how did you get back to your apartment?
```

**GA1717**

2047

```
1      A.   Well, before I left my house, I woke Tasha
2  up and asked her to help me, bring me back home.
3      Q.   So, she followed you to Read Street?
4      A.   Yes.
5      Q.   In your car?
6      A.   Yes.
7      Q.   And Dreddy stayed at the apartment?
8      A.   Yes.
9      Q.   And you are not sure if your brother or
10 Ozzie were still there?
11     A.   I'm not sure when they left, no.
12     Q.   And then where did you go?  After you
13 parked his car, what did you do?
14     A.   I went inside of his house to get him some
15 clothes.
16     Q.   Him, Dreddy?
17     A.   Dreddy, yes.
18     Q.   You had a key?
19     A.   He gave me his car key and his house keys
20 together.
21     Q.   Did you get him some clothes?
22     A.   Yes.
23     Q.   Do you remember getting him some clothes?
24     A.   Yes.
25     Q.   Did you bring them back to him?
```

2048

```
1      A.   Yes.
2      Q.   And did you ever ask Dreddy why you had to
3  dump the clothes or drill?
4      A.   No.
5      Q.   Did you ever ask Ozzie?
6      A.   No.
7      Q.   Did you ever ask your brother?
8      A.   No.
9      Q.   And did there come a time when just you, I
10 guess Tasha was still at your apartment, and Dreddy
11 were the only three at your apartment?
12     A.   Tasha was with me dropping the car off.
13     Q.   So, then did you go back to the apartment
14 after you dropped -- got the clothes?
15     A.   Yes.
16     Q.   And did you give those clothes to Dreddy?
17     A.   Yes.
18     Q.   Do you know how his brother got clothes?
19     A.   No.
20     Q.   Do you know whether he even got clothes?
21     A.   No.
22     Q.   And your brother had clothes at the
23 apartment?
24     A.   Yes.
25     Q.   Did you go back to your apartment?
```

2049

```
1      A.   Yes.
2      Q.   And did you stay with Dreddy?
3      A.   Yes.
4      Q.   Do you recall whether or not Dreddy
5  received a phone call later that morning?
6      A.   Yes, he received a phone call, but I'm not
7  exactly sure who he was talking to.
8      Q.   Do you remember what he said to the person
9  he was talking to?
10     A.   "Why are you calling me from this phone,"
11 something else, but I don't remember exactly what.
12     Q.   And did he seem happy or upset?  Or what
13 was his mood when he said "why are you calling me
14 from this phone"?
15     A.   He seemed a little irritated.
16     Q.   But you don't know for sure who he was
17 talking to?
18     A.   No.
19     Q.   How did you first learn, Ms. Johnson, about
20 the Charles Street murders?
21     A.   I woke up -- after I finally went back to
22 sleep, I woke up a little bit later that day, and
23 Tasha needed to go home to wash clothes, so we left
24 and went to her house, and I saw it on the news.
25     Q.   Saw it on the news?
```

2050

```
1      A.   Yes.
2      Q.   So, it wasn't from Dreddy?
3      A.   No.
4      Q.   Ozzie?
5      A.   No.
6      Q.   Your brother?
7      A.   No.
8      Q.   And did you ever go back to -- or did you
9  ever go to Charles Street after the murders?
10     A.   Yes.
11     Q.   And why did you do that?
12     A.   Dreddy asked me to go pick his brother up.
13     Q.   Ozzie?
14     A.   Ozzie.
15     Q.   And do you remember how long after the
16 murders that was?
17     A.   No, I don't remember, but it was shortly
18 after.
19     Q.   And were there still police in the area
20 when you went?
21     A.   No.
22     Q.   You did, in fact, go?
23     A.   Yes.
24     Q.   Did Dreddy have a car at that time?
25     A.   Yes.
```

**GA1718**

2051

```
1    Q.   Did Dreddy go with you?
2    A.   No.
3    Q.   You took your own car?
4    A.   Yes.
5    Q.   Anyone go with you?
6    A.   I think Tasha went with me.
7    Q.   Was your brother still staying with you at
8  Stratford Ave after the murders?
9    A.   Yeah, pretty much.
10   Q.   Same sort of pattern?
11   A.   Yes.
12   Q.   And before Dreddy got arrested, did you go
13 to a music festival with him?
14   A.   Yes.
15   Q.   And where with that?
16   A.   In New York.
17   Q.   Do you remember where in New York?
18   A.   Either Queens or Brooklyn, or something
19 like that.
20   Q.   Do you remember how long after the murders
21 that was?
22   A.   Just a couple days.
23   Q.   And before he was arrested, obviously,
24 correct?
25   A.   Yes.
```

2052

```
1    Q.   And do you remember who else went?
2    A.   Me, Ozzie and my brother, Dreddy and one of
3  the girls.  I can't remember which one it was.
4    Q.   And did you go in one car or two cars?
5    A.   One.
6    Q.   Just one?
7    A.   Yes.
8    Q.   And whose car?
9    A.   Dreddy's.
10   Q.   Which car?
11   A.   The red one, red Cadillac.
12   Q.   And was that like just an evening of music,
13 a daylong thing?  How long were you there for?
14   A.   We was there from maybe early afternoon to
15 a little bit later in the evening.
16   Q.   And did you all stay together at the music
17 festival?
18   A.   Yeah.
19   Q.   And did you all come home together?
20   A.   Yes.
21   Q.   And after Dreddy, or Azibo Aquart, was
22 arrested, did you still associate with his brother?
23   A.   Periodically, yes.
24   Q.   And did you still -- for what purpose?
25   A.   Well, he was still supplying me with the
```

2053

```
1  weed that I was getting from Dreddy before.
2    Q.   And that didn't -- did that last for a long
3  time, or not?
4    A.   No.
5    Q.   And why not?
6    A.   Because the weed that he had given me
7  wasn't any good, so I didn't -- I gave it back to
8  him.
9    Q.   He was giving you -- providing you with
10 marijuana to sell?
11   A.   Yes.
12   Q.   And it was a bad quality?
13   A.   Yes.
14   Q.   And you also mentioned, I think, did there
15 come a time when he came to your apartment to pick
16 something up?
17   A.   He came to pick the guns up a little bit
18 after that.
19   Q.   And those guns were whose?
20   A.   Dreddy's.
21   Q.   And the last time you saw them, who had
22 them?  Who took them and you never saw them?
23   A.   The guns?
24   Q.   Yeah.
25   A.   Dreddy's brother, Ozzie.
```

2054

```
1    Q.   Did you ever go to the police and tell them
2  what you knew about this case?
3    A.   No.
4    Q.   Why not?
5    A.   It was just, one, I was a little bit in
6  denial about what happened, and then, two, I didn't
7  want to get my brother in any trouble.
8    Q.   And were you still in a relationship with
9  Dreddy as well?
10   A.   Up until he went to jail, yes.
11   Q.   And sometime after the murders, did you go
12 to Philadelphia?
13   A.   Yes.
14   Q.   And why did you go there?
15   A.   I brought my brother to my mom's.
16   Q.   You drove him?
17   A.   Yes.
18   Q.   And did anyone else go with you?
19   A.   Ozzie went with me.
20   Q.   Ozzie, Dreddy's brother?
21   A.   Yes.
22   Q.   And did your brother stay in Philadelphia?
23   A.   Yes.
24   Q.   Did you and Ozzie stay in Philadelphia?
25   A.   No.
```

2055

```
1     Q.   Did you stay overnight?
2     A.   No.
3     Q.   You came back?
4     A.   Right after.  We came back as soon as we
5   dropped him off.
6     Q.   Do you know about how long your brother
7   stayed there?
8     A.   He stayed maybe a month or so.  I don't
9   remember exactly how long.
10    Q.   Before going to Philadelphia, did you talk
11  to your brother about the murders?
12    A.   No.
13    Q.   Did you ask him about the murders on
14  occasion?
15    A.   Later, later down the line.
16    Q.   And so it was after he came back from
17  Philadelphia?
18    A.   Yes.
19    Q.   And where did you talk to him about it?
20    A.   I believe I talked to him about it at my
21  apartment.  I had moved from Stratford Ave. to
22  Andover Street in Bridgeport.
23    Q.   And who was living with you there?
24    A.   At this time it was me and my kids and my
25  brother.  Same scenario, his clothes and stuff is
```

2056

```
1   there and he stayed there if he needed to.
2     Q.   And when you talked to him about it, was
3   anyone else present in the room?
4     A.   No.
5     Q.   It was just a conversation between you and
6   him?
7     A.   Yes.
8     Q.   And why did you ask him about it?
9     A.   Because time is going and it had been so
10  long and I -- I speculated what happened, and now it
11  was just like the curiosity was just a lot and I
12  wanted to know anything, something.
13    Q.   And when you asked him, what did he say to
14  you?
15         MR. BUSSERT:  Objection.
16         THE COURT:  May I see you at sidebar,
17  please.
18         (Sidebar conference)
19         THE COURT:  Basis?
20         MR. BUSSERT:  Hearsay, your Honor.  I
21  don't know exactly what she's going to say, but it
22  appears to be hearsay.
23         THE COURT:  Why hearsay?
24         MR. BUSSERT:  Well, I'm assuming it's an
25  out of Court statement made by Mr. Johnson.
```

2057

```
1          THE COURT:  Right.
2          MR. BUSSERT:  Correct.
3          THE COURT:  Why does that make it
4   hearsay?
5          MR. BUSSERT:  Assuming it's offered -- I
6   don't know exactly what she's going to say, but I'm
7   assuming it's offered for the truth of the matter
8   asserted.
9          MR. MARKLE:  It definitely is, as an
10  admission.
11         THE COURT:  Why is it not an admission?
12         MR. BUSSERT:  I don't know what she's
13  going to say, so I guess what the government's offer
14  is -- she's made various statements about what he
15  said to her.  I'm not sure which of these this is.
16         THE COURT:  But no matter which it is,
17  it wouldn't seem to me that it falls under the
18  hearsay rule, an admission that has presumably
19  relevance.
20         MR. BUSSERT:  Well --
21         THE COURT:  Anything from the
22  government?
23         MR. MARKLE:  It's clearly an admission
24  by the defendant, your Honor, to his own sister and
25  it's an exception to the hearsay rule.
```

2058

```
1          THE COURT:  Or it's just not hearsay
2   under the rules.
3          MR. MARKLE:  Or it's not hearsay,
4   correct.
5          THE COURT:  I'm going to permit it.
6          MR. BUSSERT:  I would just say two
7   things, your Honor, for the record.  I would note
8   that we believe this is inconsistent with the
9   Court's ruling about Mr. Johnson's statements to
10  Agent Munger, which we argue were all admissions and
11  should have been able to come in, the statements
12  made during the proffer sessions.  That's just for
13  the record.  I understand the Court's ruling on
14  that.
15         Then secondly, I may be passing a kidney
16  stone, I was -- well, better part of Saturday I was
17  at home writhing in pain for the better part of
18  Saturday, so I'll just see how it goes.  I'm okay,
19  but it's picking up a little, so I'll let you know.
20         THE COURT:  I'm sorry.
21         (Sidebar concluded)
22    Q.   Ms. Johnson, when you were alone with your
23  brother, what did he say to you?
24    A.   Well, I had asked him -- finally I just
25  was, like, what happened, are you going to ever tell
```

2059

1  me what happened?  And he just was like -- the first
2  thing he said was, those people were alive, when I
3  left those people were alive.  And then he said
4  something like, like, I didn't hurt anybody, but I
5  helped tie them up, I helped tie somebody up, or
6  something like that.
7      Q.  And did he say anything about roughing
8  anyone up?
9          MR. BUSSERT:  Objection, leading.
10         THE COURT:  Sustained.
11     Q.  Did he say anything more about what he did?
12     A.  He said, I roughed them up, I helped rough
13  them up a little bit.  But again, he said to me, I
14  didn't -- when I left they were alive.
15     Q.  And were those his words?  Are "rough them
16  up" my words or his words?
17     A.  Those were his words.
18     Q.  His words?
19     A.  Yes.
20     Q.  And did he tell you who helped him do this?
21     A.  No.
22     Q.  Did you ask him who was there?
23     A.  No.
24     Q.  Did he say who was in the apartment when he
25  left?

2060

1      A.  I don't think so.  I just think he said
2  when -- he said, they were alive when we left, or
3  something like that.
4      Q.  And who is the "we"?
5      A.  I'm guessing him.
6      Q.  No, did he tell you who it was?
7      A.  No.
8      Q.  Did he say who was left in the apartment
9  besides the victims, when he left, when your brother
10  left?
11     A.  I don't remember, but something leads me to
12  believe it was Dreddy that was left.
13     Q.  Did you ask him about the evidence, what
14  happened to it?
15     A.  I think I said something like, well, what
16  happened to the rest of the stuff, or something, and
17  he said, well, we got rid of everything before we
18  came here.
19     Q.  And what was "everything"?
20     A.  If I'm not mistaken, it was bats and
21  something else, but I don't remember all what else
22  he said.
23     Q.  Did he ever mention any other items that
24  you can remember besides bats?
25     A.  No.

2061

1      Q.  Did you ask him who brought the bats?
2      A.  No.
3      Q.  Did you ask him who actually got rid of the
4  bats?
5      A.  No.
6      Q.  Did he tell you this before or after he was
7  arrested?
8      A.  Before.
9      Q.  Did he ever give you more information about
10  the murders?
11     A.  No.
12     Q.  And did you -- you weren't present at the
13  apartment, correct?
14     A.  No.
15     Q.  Did you ever see bats?
16     A.  No.
17     Q.  Did you know of bats until your brother
18  mentioned bats?
19     A.  No.
20     Q.  Do you recall the first time that law
21  enforcement came to talk to you?
22     A.  I remember, but I don't remember the date.
23     Q.  Not the date?
24     A.  No.
25     Q.  And did you tell them the truth at that

2062

1  time?
2      A.  No.
3      Q.  Did you know at that time that your brother
4  was involved?
5      A.  Yeah.
6      Q.  Did you know that Dreddy was involved?
7      A.  Yes.
8      Q.  Orzie?
9      A.  Yes.
10     Q.  Did you tell them about getting rid of the
11  garbage bags and the drill?
12     A.  No.
13     Q.  Did you tell about your brother and Dreddy
14  and another voice in your apartment when you woke
15  up?
16     A.  No.
17     Q.  Why didn't you tell them about that when
18  they came to you?
19     A.  Because, again, I didn't -- I thought it
20  would go away.  I didn't want to get anybody in
21  trouble.
22     Q.  When you say "anybody," does that include
23  yourself?
24     A.  Yes.
25     Q.  Your brother?

**GA1721**

2063

```
1      A.   Yes.
2      Q.   Dreddy?
3      A.   Yes.
4      Q.   Ozzie?
5      A.   Yes.
6      Q.   Did you eventually get an attorney to
7   represent you when you were talking to law
8   enforcement?
9      A.   Yes.
10     Q.   And do you remember entering into what's
11  called a proffer agreement?
12     A.   Yes.
13     Q.   And did you read that agreement?
14     A.   Yes.
15     Q.   Talk to your attorney about it?
16     A.   Yes.
17     Q.   Sign it?
18     A.   Yes.
19     Q.   And was that the only agreement that you
20  ever entered into?
21     A.   Yes.
22     Q.   You weren't charged with a crime in this
23  case?
24     A.   No.
25     Q.   So, you don't have a plea agreement or
```

2064

```
1   cooperation agreement?
2      A.   No.
3      Q.   And what did that proffer agreement -- what
4   was your understanding of that agreement?
5      A.   My understanding of that is if I told the
6   truth that I wouldn't be charged with anything.
7      Q.   And even after signing that, did you tell
8   the whole truth at once?
9      A.   No.
10     Q.   And, again, why not?
11     A.   Because I thought that I would protect --
12     Q.   You would what?
13     A.   That I would be protecting some people if I
14  didn't say certain things.
15     Q.   And who were you most concerned about
16  helping?
17     A.   Myself and my brother.
18     Q.   Has this been an easy or difficult thing
19  for you?
20     A.   Difficult.
21     Q.   Do you have any reason you would want to
22  hurt your brother, Ms. Johnson?
23     A.   No.
24     Q.   And as to what happened in your apartment
25  on August 24, 2005, how do you know what happened
```

2065

```
1   there?
2      A.   I'm sorry?
3      Q.   How do you know what happened inside your
4   apartment?  Did you see it with your own eyes in
5   your apartment?
6      A.   What do you mean, them?
7      Q.   Did you see them there?
8      A.   Yes.
9      Q.   And you saw the bags that you took to the
10  dumpster?
11     A.   Yes.
12     Q.   And the drill?
13     A.   Yes.
14     Q.   And as to what went on in the other
15  apartment where the people were killed, how do you
16  know anything about that?
17     A.   Other than what I read on the news and what
18  pieces I got from whatever, the streets or -- that's
19  all.
20     Q.   And from your brother?
21     A.   Yes.
22     Q.   You never were told what happened in there
23  by a person named John Taylor?
24     A.   No.
25     Q.   By Dreddy?
```

2066

```
1      A.   No.
2      Q.   By Ozzie?
3      A.   No.
4           MR. MARKLE:  May I just have a moment,
5   your Honor?
6           THE COURT:  Yes.
7           MR. MARKLE:  I have no further
8   questions.
9           Thanks, Ms. Johnson.
10          THE COURT:  Cross-examination.
11          BY MR. BUSSERT:  Thank you, your Honor.
12  CROSS-EXAMINATION
13  BY MR. BUSSERT:
14     Q.   Lashika, you've talked a little bit this
15  afternoon about your meetings with the government,
16  correct?  Or this morning, excuse me.
17     A.   Correct.
18     Q.   Fair to say you've had several meetings
19  with them?
20     A.   Yes.
21     Q.   And at points during those meetings you
22  told them about your relationship with Dreddy,
23  correct?
24     A.   Yes.
25     Q.   And I think as you testified to a little
```

2067

```
1   bit on Friday, you told them a little bit about
2   yourself, correct?
3       A.   Correct.
4       Q.   You told them the number of kids you have,
5   right?
6       A.   Yes.
7       Q.   You told them you didn't use drugs?
8       A.   Yes.
9       Q.   You maybe smoked marijuana once in a while,
10  but -- right?
11      A.   Yes.
12      Q.   Did you talk to them at all about your
13  drinking problem?
14      A.   No.
15      Q.   You've had one, correct?  You've struggled
16  with alcohol at various points?
17      A.   I wouldn't say I had a problem.
18      Q.   Did you tell them about when you were
19  younger and you went to the hospital for your mental
20  health issues?
21      A.   I don't remember.  It could have came up.
22      Q.   Are you currently taking medications?
23      A.   I'm supposed to be.
24      Q.   Do you take them all the time?
25      A.   No.
```

2068

```
1       Q.   Now, we first met back in 2007, correct?
2       A.   Yes.
3       Q.   And if I recall correctly, that was back
4   over on Lafayette Boulevard, correct, that office
5   building?
6       A.   Possibly, yes.
7       Q.   I mean, do you recall being nervous about
8   coming to see me that day?
9       A.   Possibly.  It could be possible.
10      Q.   Do you remember having expressing some
11  concerns about the FBI office being located in that
12  building?
13      A.   Yeah, because that's where they had taken
14  me prior to that.
15      Q.   The first time, when you had contact with
16  law enforcement, they actually brought you in, they
17  didn't just ask you to come, correct?
18      A.   Correct.
19      Q.   And that was the same day that they had
20  arrested Efrain?
21      A.   I think, to my knowledge.
22      Q.   And so when we met for the first time it
23  was at a law office in that building, correct?
24      A.   I think.
25      Q.   Okay.  But you had a little hesitation to
```

2069

```
1   go in there, correct?
2       A.   Correct.
3       Q.   Because the FBI was in there?
4       A.   Yes.
5       Q.   And after that we met several times, right?
6       A.   Uh-huh (indicating affirmatively).
7       Q.   And I think, as you said just a few moments
8   ago, at first you didn't really want to talk about
9   what happened in 2005, correct?
10      A.   Correct.
11      Q.   And eventually we spoke about you going and
12  talking with the government, correct?
13      A.   Uh-huh (indicating affirmatively).
14      Q.   You have to actually answer.
15      A.   Yes, correct.
16      Q.   Was it your understanding at that point
17  that the idea of you talking to the government was
18  actually to help your brother?
19      A.   Repeat that.
20      Q.   When you and I talked about you going and
21  speaking with the government, it was the idea that
22  by your talking with the government, with the
23  prosecutors and the agents, it would actually be to
24  help Efrain?
25      A.   No.
```

2070

```
1       Q.   You don't remember that?  Do you remember
2   my trying to help you get a lawyer so when you go in
3   you'd have somebody to represent you?
4       A.   Yes.
5       Q.   And you went in I think with the
6   understanding, correct, that they weren't going to
7   charge you, right, if you talked to them?
8       A.   Yes.
9       Q.   And that was important to you, right, not
10  to be charged?
11      A.   Yes.
12      Q.   You don't want to go to jail?
13      A.   No.
14      Q.   You've got three kids?
15      A.   Yes.
16      Q.   What do your kids mean to you?
17      A.   Everything.
18      Q.   So, I'm not trying to pin you down on the
19  date, but you met with the government for the first
20  time after that initial time when Efrain got
21  arrested somewhere around September 2008?
22      A.   Possibly.
23      Q.   And you told them a lot about your
24  relationship with Dreddy, correct?
25      A.   Yes.
```

2071

```
1       Q.   And it's fair to say that you actually
2   loved Dreddy?
3       A.   I did.  I had a soft spot for him.
4       Q.   I mean, he was good to you, correct?
5       A.   Yes.
6       Q.   He bought you furniture for your apartment,
7   correct?
8       A.   Yes.
9       Q.   Provided for you, correct?
10      A.   Yes.
11      Q.   Was good to your kids?
12      A.   Yes.
13      Q.   There was nothing about Dreddy in terms of
14  his relationship with you that was negative?
15      A.   No.
16      Q.   Okay.  And in that first meeting with the
17  government, you talked to them about what happened
18  that morning in your apartment, correct?
19      A.   Yes.
20      Q.   And you explained that you never asked
21  Dreddy or Ozzie or Efrain about what happened,
22  correct?
23      A.   Correct.
24      Q.   And the only thing you said at that point
25  was Efrain had told you when he left the apartment
```

2072

```
1   those people were alive, correct?
2       A.   Correct.
3       Q.   And I think you had also told them at that
4   point that in terms of Efrain and Dreddy and drug
5   activity, all you knew was Efrain was getting some
6   personal use quantities of marijuana; is that
7   correct?
8       A.   At that time, yes.
9       Q.   And so, you've testified that you actually
10  sold marijuana that Dreddy gave you, correct?
11      A.   Yes.
12      Q.   And these are larger -- I mean, at least in
13  terms of the quantity, you were getting larger than
14  personal use that you were selling to other people,
15  correct?
16      A.   Yes.
17      Q.   And Efrain wasn't involved with that,
18  right?
19      A.   No.
20      Q.   That was between you and Dreddy?
21      A.   Yes.
22      Q.   And is it fair to say that even though --
23  well, let's step back.  You and Efrain are fairly
24  close, correct?
25      A.   Yes.
```

2073

```
1       Q.   I mean, you grew up together?
2       A.   Yes.
3       Q.   Not an easy childhood?
4       A.   No.
5       Q.   But as close as you guys are, you wouldn't
6   necessarily tell him about your drug dealing
7   activity with Dreddy; that was your business,
8   correct?
9       A.   Pretty much.
10      Q.   And things that Efrain did would be his
11  business, correct?
12      A.   Correct.
13      Q.   Is it fair to say that you don't even know
14  when Efrain started buying marijuana from Dreddy?
15      A.   Yeah.
16      Q.   And the government's asked you about if
17  Efrain had a job during this time, correct?
18      A.   Yes.
19      Q.   And it's fair to say that you mentioned,
20  like, this one night he was hosting a party at the
21  Yellow Bird, correct?
22      A.   Yes.
23      Q.   But he had been doing that for a little
24  while before, correct?
25      A.   Yes.
```

2074

```
1       Q.   And he'd do it like on Tuesday nights?
2       A.   Yes.
3       Q.   And sometimes on Saturdays?
4       A.   Saturdays, possibly Saturdays.
5       Q.   And while that night you were asked if you
6   made any money that night, and you said no, but you
7   could make money, correct?
8       A.   Yes.
9       Q.   And Efrain didn't have big bills; fair to
10  say?  Correct?
11      A.   What do you mean, as far as expenses?
12      Q.   Like, he didn't pay you rent, did he?
13      A.   No.
14      Q.   And he would either stay with his
15  girlfriends or the mothers of his kids, correct?
16      A.   Yes.
17      Q.   And in the summer of 2005, I think you
18  testified on Friday he had seven children.  How many
19  children did he have in 2005, during that summer?
20      A.   Maybe four or five by then.
21      Q.   Cora was pregnant by that point then,
22  right?
23      A.   I don't remember.
24      Q.   But there were different women in his life
25  at that point, correct?
```

**GA1724**

2075

```
1       A.    Correct.
2       Q.    Fair to say that when Efrain was -- back in
3   2005, I mean there were several women in his life,
4   correct?
5       A.    Correct.
6       Q.    There was Cora?
7       A.    Kytha.
8       Q.    Tanya?
9       A.    Tanya.
10      Q.    And as best you know, all of these women
11  worked, correct?
12      A.    As best I know, yes.
13      Q.    And Efrain would watch the kids?
14      A.    Yes.
15      Q.    So, they would go to work during the day
16  and he would stay home and watch the children,
17  right?
18      A.    Yes.
19      Q.    So, are you aware that at various points
20  they would also give him money just to -- you know,
21  if he needed some money, they would give him money?
22      A.    I'm sure of it.
23      Q.    And in terms of Efrain and the kids, I
24  mean, well, actually as best you know, how -- in
25  terms of him watching the kids, who would he watch
```

2076

```
1   during the day?
2       A.    At that point he was watching Cora's babies
3   and -- both of them, or the one that isn't his, and
4   then Tanya's son when he was born, too.
5       Q.    And would he also pick up his son after
6   school?
7       A.    Yes, Tashon (ph).
8       Q.    And so fair to say that most of Efrain's
9   days were kind of spent providing childcare,
10  correct?
11      A.    Yeah.
12      Q.    And most of his nights were spent getting
13  drunk and getting high?
14      A.    Yeah.
15      Q.    Right?  I mean --
16      A.    Yeah.
17      Q.    Fair to say, that was a pretty regular
18  pattern?
19      A.    Yeah.
20      Q.    Once the mothers came home, he was done
21  with his thing, he would --
22      A.    Yes.
23      Q.    Okay.  So going to the Yellow Bird, that
24  was a fairly regular occurrence, correct?
25      A.    Yes.
```

2077

```
1       Q.    And when we say Efrain would get high, we
2   are talking about marijuana, correct?
3       A.    Yes.
4       Q.    And how much marijuana did Efrain smoke?
5       A.    I couldn't count.
6       Q.    A lot?
7       A.    A lot.
8       Q.    I mean, he was stoned most of the time,
9   correct?
10      A.    Most of the time.
11      Q.    I mean, even when he was watching the kids,
12  sometimes he would smoke then?
13      A.    I don't know, I wasn't there.
14      Q.    And in terms of his drinking, what was his
15  drink of choice?
16      A.    Hennessy.
17      Q.    And fair to say that before you'd even go
18  to the Yellow Bird that Efrain could start drinking
19  before he went out, correct?
20      A.    Yes.
21      Q.    He might have a couple half-pints before he
22  would hit the club?
23      A.    Yes.
24      Q.    And when he got there he would continue to
25  drink, right?
```

2078

```
1       A.    Yes.
2       Q.    And when we say drink, he would drink what?
3       A.    Hennessy.
4       Q.    And how would he drink it, by the cup?
5       A.    By the cup.
6       Q.    Was there any ice in the cups?
7       A.    Probably not.
8       Q.    So, he would just pour it.  Can you show
9   the jury just how big a cup would be at the bar?
10      A.    Eight-ounces.
11      Q.    And he would drink, what, five or six cups
12  a night?
13      A.    Maybe more.
14      Q.    Okay.  And, again, this is a fairly
15  standard pattern for him?
16      A.    Yes.
17      Q.    Did Efrain sleep a lot during this period?
18      A.    Well, like you said, I don't know because
19  he wasn't always at my house during the day, but
20  whenever he was at the house, maybe he would sleep a
21  little bit during the day, but so would I.  So
22  again --
23      Q.    I mean, do you know, does Efrain have
24  sleeping problems?
25      A.    I heard him say he didn't sleep well, but I
```

2079

```
1    wasn't aware of how bad it was.
2        Q.   Okay.  So, going to this night that you
3    were asked about a few a little while ago, you guys
4    were all at the Yellow Bird, correct?
5        A.   Correct.
6        Q.   It's likely that Efrain had been drinking
7    before you guys got there?
8        A.   Yes.
9        Q.   Likely he had been smoking marijuana?
10       A.   Yes.
11       Q.   And in terms of how much Efrain smoked,
12   would you describe to the jury what would he smoke?
13   Would he smoke from a pipe, from a joint?
14       A.   From a cigar.
15       Q.   And what's that called?
16       A.   A blunt.
17       Q.   So, how does one make a blunt; if you know?
18       A.   You got to crack it open and take out the
19   tobacco, then fill it with marijuana.
20       Q.   So he would fill essentially a cigar casing
21   with marijuana?
22       A.   Yes.
23       Q.   And he would just basically smoke that all
24   day?
25       A.   Yes.
```

2080

```
1        Q.   And was he wearing blue jeans that night?
2        A.   I don't remember.
3        Q.   White T-shirt?
4        A.   When I saw him -- I don't remember what he
5    had on the night when I saw him.  When I woke up, he
6    had on a white beater T-shirt.
7        Q.   And white tennis shoes?
8        A.   I don't remember.
9        Q.   Okay.  I mean, were those -- blue jeans and
10   a white T-shirt, were those things Efrain would
11   commonly wear during that period?
12       A.   Yes.
13       Q.   Kind of like a standard uniform?
14       A.   Yes.
15       Q.   Clean white shoes.
16       A.   Yes.
17       Q.   Bright white shirt.
18       A.   Yes.
19       Q.   And blue jeans.
20       A.   Yes.
21       Q.   Now, going back to that first meeting with
22   the government and after you got your lawyer, there
23   was no talk about bats or anything at that meeting,
24   correct?
25       A.   I don't remember.
```

2081

```
1        Q.   Do you remember you met with the government
2    about a week later, September of 2008?
3        A.   I remember I been to several meetings.  I
4    don't remember when they were, what dates, how
5    close.  I don't remember.
6        Q.   Do you remember a meeting around this time
7    when you first started meeting with the government
8    where you kind of broke down crying?
9        A.   Yes.
10       Q.   Am I correct, at that meeting were Ms.
11   Reynolds and Mr. Markle?  Correct?
12       A.   No.
13       Q.   Do you remember an Attorney Dayton, Ms.
14   Dayton, another prosecutor?
15       A.   What's her first name.
16       Q.   Tracy?
17       A.   I remember Tracy.
18       Q.   And some of the agents were there?
19       A.   Yes.
20       Q.   And am I correct at that meeting that Ms.
21   Dayton, Tracy, yelled at you?
22       A.   Yes.
23       Q.   And she stood up and threatened to put you
24   in shackles?
25       A.   Yes.
```

2082

```
1        Q.   She said if you didn't start saying what
2    they wanted to hear they were going to take you off
3    to jail?
4        A.   She didn't put it in exactly those words.
5        Q.   She threatened you'd be going to jail?
6        A.   Yes.
7        Q.   That you were going to lose your children?
8        A.   Yes.
9        Q.   How did that make you feel?
10       A.   It didn't feel too good.
11       Q.   Scared?
12       A.   Yes.
13       Q.   And they had to basically take a break at
14   that point, right?
15       A.   Yes.
16       Q.   And give you some time to gather yourself,
17   right?
18       A.   Yes.
19       Q.   And fair to say that at that point, and
20   even today, the government doesn't really know all
21   of the things you've gone through in your life,
22   correct?
23       A.   No.
24       Q.   I mean, you've had some pretty traumatic
25   things happen to you in your life, correct?
```

2083

```
1      A.   Yes.
2      Q.   But I think fair to say that Ms. Dayton,
3  Tracy, made clear to you that either you get down
4  with the program with what the government was
5  looking to do or you were going to jail; is that the
6  message?
7      A.   I don't know really how to word -- that you
8  are wording it completely correct.
9      Q.   I mean, did you feel that if you didn't
10 start saying different things that you could be
11 going to jail?
12     A.   Yeah.
13     Q.   You could lose your kids?
14     A.   Yeah.
15     Q.   You grew up in Bridgeport, correct?
16     A.   Yes.
17     Q.   And you've seen a lot of federal
18 prosecutions in your day, I would assume, correct?
19     A.   Not a lot.  A few.
20     Q.   You've seen friends of yours get picked up?
21     A.   My uncles, not really friends.
22     Q.   And there's an understanding in the
23 community of what it means to cooperate with the
24 government, correct?
25     A.   Correct.
```

2084

```
1      Q.   And it's also fair to say you grew up in
2  Bridgeport.  I mean, it's a city, but it's also in
3  some ways a very small place, correct, a lot of
4  people know about each other's business, things like
5  that?
6      A.   Correct.
7      Q.   I think, as you testified to earlier, you
8  heard about this case in the news, correct?
9      A.   Yes.
10     Q.   But you also heard about it on the street,
11 correct?
12     A.   Yes.
13     Q.   There were rumors circulating for years,
14 correct?
15     A.   Yes.
16     Q.   Probably still are?
17     A.   Yes.
18     Q.   Just people talking.  And so with that, I
19 would assume you've heard a lot of different things
20 about this case over the years?
21     A.   Yes.
22     Q.   And it puts you in a somewhat difficult
23 position, I would assume, in terms of you have the
24 risk of jail as told to you by the prosecutor and
25 you've got your brother over here, correct?
```

2085

```
1      A.   Yes.
2      Q.   And it must be a difficult position to be
3  in?
4      A.   Yes.
5      Q.   When you first told the government about
6  this conversation where you said the bats were
7  discussed, were you aware that John Taylor had been
8  arrested at that point?
9      A.   No.
10     Q.   You had a meeting with them at some point
11 in early 2010?
12     A.   Probably.
13     Q.   Okay.  And just a couple final things.  In
14 terms of the night at Denny's when Dreddy called, he
15 talked to Efrain, correct?
16     A.   Yes.
17     Q.   Was there any rush to leave?  Did anybody
18 get up and run out of there?
19     A.   No.
20     Q.   Did Efrain seem, like, I got to get going
21 right now?
22     A.   No.
23     Q.   Everybody kind of continued doing what they
24 were doing, you left when you left?
25     A.   Yes.
```

2086

```
1      Q.   And in terms of the next morning, am I
2  correct that when you got up that morning you were
3  not too happy?
4      A.   Yes, I wasn't.
5      Q.   Because these loud men were talking all out
6  in your living room?
7      A.   Yes.
8      Q.   And you had been out partying the night
9  before?
10     A.   Yes.
11     Q.   And you wanted to sleep?
12     A.   Yes.
13     Q.   And fair to say that your brother had seen
14 you in that type of mood before?
15     A.   Yes.
16     Q.   And he knew it was probably the best time
17 to leave the apartment?
18     A.   Probably.
19     Q.   He left right around then, correct?  He saw
20 you and said, I'll see you later?
21     A.   I don't remember when exactly he left.
22     Q.   Okay.  And in terms of the trip to
23 Philadelphia with Ozzie, Efrain had asked you to
24 drive him down, correct?
25     A.   Yes.
```

**GA1727**

2087

1    Q.   And did he explain to you he was just
2  trying to clear his head for a while?
3    A.   Yes.
4    Q.   And your mother lives in Philly, correct,
5  at the time?
6    A.   Yes.
7    Q.   And they're pretty close?
8    A.   Yes.
9    Q.   And then you came over with Ozzie, correct?
10   A.   Yes.
11   Q.   You didn't tell Efrain ahead of time that
12  Ozzie was coming, correct?
13   A.   I don't think so.
14   Q.   Do you know what motivation Ozzie had to be
15  in that car that day?
16   A.   I basically asked him would he come.
17   Q.   Okay, but that had nothing to do with
18  Efrain?
19   A.   No, I needed somebody to ride back and
20  forth with me.
21   Q.   And during that drive to and from -- well,
22  to Philly, I guess, when Efrain was in the car,
23  there was no talk about Charles Street, right?
24   A.   No.
25   Q.   The two of them just got high, correct?

2088

1    A.   I don't remember.  Possibly.
2    Q.   It wouldn't surprise you if they did?
3    A.   No.
4    Q.   Nothing unusual about that drive, correct?
5    A.   No.
6    Q.   Thank you.
7         THE COURT:  Redirect.
8         MR. MARKLE:  Yes, thank you, your Honor.
9  REDIRECT EXAMINATION
10  BY MR. MARKLE:
11   Q.   Ms. Johnson, when your brother saw Ozzie in
12  the car, did he say he's not going to Philadelphia
13  with us?
14   A.   No.
15   Q.   Did he object to him taking the ride with
16  you?
17   A.   No.
18   Q.   You talked about this conversation with Ms.
19  Dayton.  Was your attorney present during that
20  interview?
21   A.   I think so.
22   Q.   And didn't she in fact tell you that you
23  should take some time and talk to your attorney?
24   A.   Yes.
25   Q.   And you were allowed to talk to your

2089

1  attorney privately?
2    A.   Yes.
3    Q.   Without any agent, prosecutor, anyone
4  there?
5    A.   Yes.
6    Q.   And were you able to do that?
7    A.   Yes.
8    Q.   And your attorney and you have a
9  discussion, I assume?
10   A.   Yes.
11   Q.   And then you came back in and provided
12  information?
13   A.   Yes.
14   Q.   And, again, you provided information, but
15  were concerned about yourself?
16   A.   Yes.
17   Q.   And your brother?
18   A.   I was concerned about him, too, but --
19  yeah, I guess.
20   Q.   Was there anything that Ms. Dayton or
21  anyone could say that would make you lie about your
22  brother?
23   A.   No.
24   Q.   Is there any fear about your children that
25  would make you lie about your own brother?

2090

1    A.   No.
2    Q.   Who paid for the rent for your apartment?
3    A.   Well, at the time I was getting money from
4  welfare and I was selling a little bit of weed, so I
5  paid for my own rent.
6    Q.   Did your brother give you any money?
7    A.   Not for my bills and stuff, no.
8    Q.   And do you know that he rented a car and
9  paid $1,600 for that car for the month of August?
10   A.   No.
11   Q.   And you don't know -- you didn't give him
12  money for that, did you?
13   A.   No.
14   Q.   Do you know if any of his girlfriend's gave
15  him money for that?
16   A.   I don't know.
17   Q.   You said he would smoke a blunt or
18  marijuana when he was watching his children?
19   A.   Oh, I don't know that.  I wasn't there.  I
20  don't know if he was smoking with the kids.
21   Q.   And the night of August 24, 2005, you said
22  he was drinking and smoking marijuana?
23   A.   Yes.
24   Q.   Did you see him smoking marijuana?
25   A.   At the club.

2091

```
 1      Q.   And after the club did you see him smoking
 2   marijuana?
 3      A.   No.
 4      Q.   And was he able to drive his car from the
 5   Yellow Bird club to Denny's restaurant?
 6      A.   Yes.
 7      Q.   And was he able to drive his car from
 8   Denny's restaurant back to Stratford Avenue?
 9      A.   Yes.
10      Q.   Did he need anyone else to drive his car?
11      A.   No.
12      Q.   And on the morning of August 24, 2005, your
13   brother wasn't with his children watching them,
14   correct?
15      A.   No.
16      Q.   He was sitting in your apartment with
17   Dreddy, Ozzie, and they were undressed waiting for
18   you to get rid of clothes?
19      A.   Yes.
20      Q.   And there were -- none of his children were
21   there that he was watching, correct?
22      A.   No.
23      Q.   He was sitting with his two friends?
24      A.   Yes.
25           MR. BUSSERT:  Objection to
```

2092

```
 1   characterization.
 2           THE COURT:  Sustained.
 3      Q.   And your concern for yourself, Ms. Johnson,
 4   and your concern, your understanding of the proffer
 5   agreement if you lie what happens?
 6      A.   That I will go to jail.
 7      Q.   And if you tell the truth what happens?
 8      A.   Then I wouldn't be charged with anything.
 9      Q.   Thank you.
10           MR. MARKLE:  No further questions, your
11   Honor.
12           THE COURT:  Recross.
13           MR. BUSSERT:  Briefly, your Honor.
14   RECROSS-EXAMINATION
15   BY MR. BUSSERT:
16      Q.   Lashika, just to clarify, that morning of
17   the 24th, it was only Dreddy and Ozzie that were
18   undressed, correct?
19      A.   Correct.
20      Q.   Efrain was dressed, right?
21      A.   Correct.
22      Q.   And you can't recall as you sit here today
23   whether or not it's the same clothes he was wearing
24   the night before or not?
25      A.   No.
```

2093

```
 1      Q.   And in terms of his driving to Denny's,
 2   he'd been drinking, correct?
 3      A.   Yes.
 4      Q.   A lot?
 5      A.   Yes.
 6      Q.   So, maybe he shouldn't have been driving,
 7   but he did?
 8      A.   Yes.
 9      Q.   And you weren't in the car with him
10   driving?
11      A.   No.
12      Q.   So, you don't know how his driving was?
13      A.   No.
14      Q.   But probably fair to say that he was
15   driving under the influence, correct?
16      A.   Correct.
17      Q.   Of both alcohol and marijuana?
18      A.   Yes.
19      Q.   And you are not a toxicologist, correct?
20      A.   No.
21      Q.   You don't know how long alcohol stays in
22   one's system or anything like that, correct?
23      A.   No.
24      Q.   And also you were asked a couple of
25   questions about this break and being able to talk to
```

2094

```
 1   your lawyer in that meeting when Ms. Dayton talked
 2   to you, correct?
 3      A.   Yes.
 4      Q.   Fair to say Ms. Dayton was there, right?
 5      A.   Yes.
 6      Q.   Tracy was there.  Your lawyer was there,
 7   right?
 8      A.   Yes.
 9      Q.   There were several agents there, right?
10      A.   Yes.
11      Q.   There may have been another prosecutor or
12   two there, right?
13      A.   Maybe.
14      Q.   And she didn't seem to have any hesitation
15   to yell at you and say if you don't do this we're
16   going to send you to jail and take away your kids in
17   front of everybody in that whole room, correct?
18      A.   Correct.
19      Q.   And she made clear she was going to have
20   those agents who were present take you out of that
21   room right then and take you to jail, correct?
22      A.   Correct.
23      Q.   She didn't seem uncomfortable telling you
24   that, right?
25      A.   No.
```

2095

1    Q.   And fair to say that she's pretty -- had a
2  pretty forceful demeanor when she did that?
3    A.   Yes.
4    Q.   Okay.
5         MR. BUSSERT:  Thank you.
6  RE-REDIRECT EXAMINATION
7  BY MR. MARKLE:
8    Q.   Ms. Johnson, have I ever yelled at you?
9    A.   No.
10   Q.   Have I ever threatened to take your
11  children away?
12   A.   No.
13   Q.   Has Ms. Reynolds?
14   A.   No.
15   Q.   Have you been treated fairly since we met?
16   A.   Yes.
17   Q.   Have you been threatened to say anything?
18   A.   No.
19   Q.   Had you ever been told you'd better say
20  something bad about your brother or anything else?
21   A.   No.
22   Q.   Are you telling us about your brother
23  because it's the truth or because you've been
24  threatened?
25   A.   Because it's the truth.

2096

1         THE COURT:  All right, thank you, Ms.
2  Johnson.  You are excused.  You may step down.  We
3  will take a recess of 15 minutes.
4         (Jury exited the courtroom.)
5         THE COURT:  All right, Ms. Reynolds, is
6  your next witness Dr. Evangelista?
7         MS. REYNOLDS:  Yes, your Honor.
8         THE COURT:  All right, we'll take a
9  15-minute recess.
10        How are you doing, Mr. Bussert?
11        MR. BUSSERT:  I think I'm doing better,
12  your Honor.  This happened last time, there is like
13  these days after when I kind of feel it and it
14  starts to build up, but it seems to have subsided.
15  I think I will be okay.
16        THE COURT:  Stand in recess.
17        (Recess)
18        THE COURT:  All right, are we ready for
19  the jury?
20        MS. REYNOLDS:  Yes, your Honor.
21        MR. BUSSERT:  Yes, your Honor.
22        (Jury entered the courtroom.)
23        THE COURT:  Please be seated, ladies and
24  gentlemen.
25        All right, the government's next witness

2262

1              I N D E X
2  WITNESS                              PAGE
3  LIZA MONTINI
4  Direct Examination by Mr. Markle      2014
5  Cross-Examination by Mr. Bussert      2021
6
7  LASHIKA JOHNSON
8  Continued Examination by Mr. Markle   2024
9  Cross-Examination by Mr. Bussert      2066
10 Redirect Examination by Mr. Markle    2088
11 Re-Recross-Examination by Mr. Bussert 2092
12 Re-Redirect Examination by Mr. Markle 2095
13
14 FRANK EVANGELISTA
15 Direct Examination by Mr. Markle      2097
16 Cross-Examination by Mr. Bussert      2127
17
18 LAUREN DELLAVOLPE
19 Direct Examination by Mr. Markle      2133
20 Cross-Examination by Mr. Bussert      2186
21 Redirect Examination by Mr. Markle    2197
22
23
24
25

2263

1  TOM MARTIN
2  Direct Examination by Mr. Markle      2198
3  Cross-Examination by Mr. Bussert      2253
4  Redirect Examination by Mr. Markle    2256
5
6
7
8         I certify that the foregoing is a correct
9  transcript from the record of proceedings in the
10 above-entitled matter.
11
12         2/22/12
13         Date
14
15         /S/  Sharon Montini
16         Official Reporter
17
18
19
20
21
22
23
24
25

1

```
 1            UNITED STATES DISTRICT COURT
 2              DISTRICT OF CONNECTICUT
 3   * * * * * * * * * * *    *
                              *
 4   UNITED STATES OF AMERICA,  * Case No 6cr160(JBA)
 5            Government,        *
                                *
 6          vs.                 *
                                *
 7   EFRAIN JOHNSON             * March 8, 2011
                                *
 8            Defendant.        *
                                *
 9   * * * * * * * * * * * *    *
10                HEARING TRANSCRIPT
11   BEFORE:  THE HONORABLE JANET BOND ARTERTON U.S.D.J.,
12
     Appearances:
13   FOR THE GOVERNMENT:  ALINA REYNOLDS, ESQ
                          TRACY DAYTON, ESQ.
14                        PETER MARKLE, ESQ.
                          United States Attorney's Office
15                        915 Lafayette Blvd
                          Bridgeport, CT 06604
16
17
18   FOR THE DEFENDANT:   DAVID HOOSE, ESQ
19                        Sasson, Turnbull & Hoose
                          100 Main Street
20                        Northampton, MA 01060
21                        TODD ALLEN BUSSERT, ESQ.
                          Frost Bussert
22                        129 Church Street
                          New Haven, CT 06510
23   Court Reporter:  Sharon Montini, RMR
24   Proceedings recorded by mechanical stenography,
     transcript produced by computer
25
```

2

```
 1            THE COURT:  Good afternoon, counsel,
 2   ladies and gentlemen.  Please be seated.  We're here
 3   this afternoon in the matter of United States v.
 4   Efrain Johnson, docket 06cr160.
 5            May I have appearances, starting with
 6   the government.
 7            MS. DAYTON:  Tracy Dayton for the
 8   government, here with Peter Markle, Alina Reynolds,
 9   and Special Agent Christopher Munger, your Honor.
10            THE COURT:  Thank you.
11            For the defendant?
12            MR. HOOSE:  David Hoose for the
13   defendant Efrain Johnson.
14            MR. BUSSERT:  Todd Bussert, your Honor.
15            THE COURT:  All right.  And good
16   afternoon, Mr. Johnson.
17            THE DEFENDANT:  Good afternoon, ma'am.
18            THE COURT:  I will ask Mr. Johnson and
19   his attorneys to come to the lectern, please.  Mr.
20   Johnson, it's my understanding that our purpose here
21   today is to allow you to plead guilty, change your
22   plea and plead guilty to Counts One, Two and Three
23   of a substitute information that charges you with
24   three counts of drug-related murder, in violation of
25   21, United States Code, 841(b)(1)(A) and
```

3

```
 1   848(e)(1)(A).
 2            THE DEFENDANT:  Yes.
 3            THE COURT:  And is that also 18 U.S.C.
 4   Section 2?
 5            MS. DAYTON:  Yes, your Honor.
 6            THE COURT:  All right.  Is that your
 7   understanding of our purpose here today.
 8            THE DEFENDANT:  Yes, ma'am.
 9            THE COURT:  Before I can accept your
10   guilty plea, I want -- I must ask you questions
11   while you are under oath to make sure it's a valid
12   plea, that is, that you know what rights you are
13   giving up, that you're competent, there is a factual
14   basis for your plea, and that your plea is
15   voluntary.  All right?
16            THE DEFENDANT:  Yes, ma'am.
17            THE COURT:  So if you have any questions
18   for me, tell me, I'll reword the question.  If you
19   need to speak with your counsel at any time, step
20   back from the microphone and do that.
21            All right, please place the defendant
22   under oath.
23            (Oath administered)
24            THE COURT:  All right, you have been
25   sworn, your answers from here on will be subject to
```

4

```
 1   perjury or making a false statement if you willfully
 2   fail to answer truthfully.  Do you understand that?
 3            THE DEFENDANT:  Yes.
 4            THE COURT:  You have a right to remain
 5   silent, which means you are not required to make any
 6   statement.  If you make a statement, that statement
 7   can, and probably would be, used against you if this
 8   matter were to go to trial.  Do you understand that?
 9            THE DEFENDANT:  Yes, ma'am.
10            THE COURT:  And even if you make a
11   statement, you may stop at any time.  Do you
12   understand?
13            THE DEFENDANT:  Yes, ma'am.
14            THE COURT:  You have the right to
15   counsel, which means you have the right to be
16   represented by an attorney at every stage of the
17   criminal proceedings against you, and if you cannot
18   afford counsel, one will be appointed for you, as
19   these two were, at no cost to you.  Do you
20   understand?
21            THE DEFENDANT:  Yes, ma'am.
22            THE COURT:  All right.  Now, I
23   understand that it's necessary for you to waive
24   indictment before we get to the stage of entering a
25   plea to an information.
```

5

```
 1              THE DEFENDANT:  Yes, ma'am.
 2              THE COURT:  All right.  Has waiver of
 3   indictment been explained to you?
 4              THE DEFENDANT:  Yes, ma'am.
 5              THE COURT:  I'm going to ask the
 6   government, nonetheless, to explain what is meant by
 7   waiver of indictment and then hand up the
 8   information for filing.
 9              MS. DAYTON:  Yes, your Honor.
10              Mr. Johnson, because you have been
11   charged --
12              THE COURT:  Mr. Hoose, can you move just
13   a little aside.  I can't see Ms. Dayton.
14              MS. DAYTON:  Do you know what, I can
15   come stand over here.  I think I'm loud enough that
16   you can hear me.
17              You would have the right, because you've
18   been charged with a crime that is punishable by
19   imprisonment for more than one year, to have the
20   case presented to a grand jury.  A grand jury is
21   made up of at least 16 people, and at least 12
22   people would have to agree that there was probable
23   cause, which means it's more likely than not, that
24   you had been -- that you had committed the crime for
25   which you are being accused of, in this case several
```

6

```
 1   crimes.
 2              Because you will be pleading to an
 3   information, we will not be presenting these
 4   particular crimes to a grand jury.  You were
 5   indicted on other counts, so you would have to waive
 6   that right in order to be able to proceed ahead
 7   today with your plea.
 8              THE COURT:  All right, do you understand
 9   the explanation of waiver of indictment?
10              THE DEFENDANT:  Yes, ma'am.
11              THE COURT:  And that also includes the
12   waiver of the right to challenge the composition of
13   the grand jury, because you have the right to have a
14   federal grand jury comprised of a fair cross-section
15   of the area from which an indictment is returned and
16   the right to challenge any under -- alleged
17   under-representation in that jury pool.
18              All right, do you understand that?
19              THE DEFENDANT:  Yes, ma'am.
20              THE COURT:  All right.  And, Mr. Hoose,
21   Mr. Bussert, have you explained to Mr. Johnson
22   what's meant by waiving indictment?
23              MR. HOOSE:  We have, your Honor.
24              THE COURT:  And does he in your opinion
25   understand the explanation of the rights he will
```

7

```
 1   waive if he waives his right to indictment?
 2              MR. HOOSE:  In our opinion he does, your
 3   Honor.
 4              THE COURT:  All right.  Let me then --
 5   thank you.  So the information will be filed.
 6              MS. DAYTON:  Thank you, your Honor.
 7              THE COURT:  And I will start with some
 8   questioning, Mr. Johnson.  What is your full name,
 9   and please tell me any other names that you have
10   been known by or that you have used.
11              THE DEFENDANT:  Efrain Benny Johnson.
12              THE COURT:  What's the middle name?
13              THE DEFENDANT:  Benny.
14              THE COURT:  Benny.
15              THE DEFENDANT:  B-e-n-n-y.
16              THE COURT:  Not Benjamin.
17              THE DEFENDANT:  No, ma'am.
18              THE COURT:  Okay.
19              THE DEFENDANT:  My nickname Pootney,
20   p-o-o-t-n-e-y.
21              THE COURT:  How old are you?
22              THE DEFENDANT:  Twenty-eight.
23              THE COURT:  And what is your schooling
24   or education?
25              THE DEFENDANT:  Sixth grade.
```

8

```
 1              THE COURT:  Did you complete sixth
 2   grade?
 3              THE DEFENDANT:  Yes, ma'am.
 4              THE COURT:  And where was that?
 5              THE DEFENDANT:  McKinley.
 6              THE COURT:  Pardon?
 7              THE DEFENDANT:  McKinley School.
 8              THE COURT:  Where is that?
 9              THE DEFENDANT:  It's on the east end of
10   Bridgeport, Connecticut.
11              THE COURT:  And when was that?
12              THE DEFENDANT:  I don't know the exact
13   date.
14              THE COURT:  About?
15              THE DEFENDANT:  '93, '94.
16              THE COURT:  Have you had any difficulty
17   in communicating with your lawyers for any reason?
18              THE DEFENDANT:  No, ma'am.
19              THE COURT:  Are you now or have you
20   recently been under the care of any physician, any
21   psychiatrist, any counselor or any social worker --
22              THE DEFENDANT:  Yes, ma'am.
23              THE COURT:  -- for any condition?
24              THE DEFENDANT:  Yes, ma'am.
25              THE COURT:  Okay, would you tell me what
```

9

```
1    that is.
2                THE DEFENDANT:  To deal with what I'm
3    going through.
4                THE COURT:  Can you put the microphone
5    closer to him, please.
6                MR. HOOSE:  Sure.
7                THE DEFENDANT:  To deal with what I'm
8    going through.
9                THE COURT:  So you have seen a
10   counselor, a psychiatrist.  Who have you seen?
11               THE DEFENDANT:  Her name is Hope Hill,
12   and Brenda -- I don't know the last name.  Woods.
13               MR. HOOSE:  Woods.
14               THE COURT:  And they are counselors or
15   they are psychiatrists or they are psychologists?
16   Do you know?
17               THE DEFENDANT:  Psychiatrist.
18               THE COURT:  And have they prescribed any
19   medication for you?
20               THE DEFENDANT:  No, ma'am.
21               THE COURT:  Are you under the care of
22   any physician for any other medical condition?
23               THE DEFENDANT:  No, ma'am.
24               THE COURT:  In the past 48 hours, have
25   you taken any narcotic drugs, any medication, any
```

10

```
1    alcoholic beverage?
2                THE DEFENDANT:  No, ma'am.
3                THE COURT:  Have you ever been
4    hospitalized or treated in an outpatient program for
5    narcotic addiction or substance abuse, including
6    alcohol?
7                THE DEFENDANT:  No, ma'am.
8                THE COURT:  As you stand here, is your
9    mind clear?
10               THE DEFENDANT:  Yes, ma'am.
11               THE COURT:  And do you understand what
12   is going on?
13               THE DEFENDANT:  Yes, ma'am.
14               THE COURT:  Counsel, have you had any
15   difficulty for any reason in communicating with Mr.
16   Johnson?
17               MR. HOOSE:  No, your Honor.
18               THE COURT:  And have you had enough time
19   and information to permit meaningful discussion with
20   him about his case?
21               MR. HOOSE:  I believe we have, your
22   Honor.
23               THE COURT:  Does he in your opinion
24   understand the rights that he will waive if he
25   pleads guilty?
```

11

```
1                MR. HOOSE:  In my opinion he does, your
2    Honor.
3                THE COURT:  Does he understand the
4    nature of our proceedings today?
5                MR. HOOSE:  I believe he does, your
6    Honor.
7                THE COURT:  Do you have any doubt as to
8    Mr. Johnson's competence to plead at this time.
9                MR. HOOSE:  I do not, your Honor.
10               THE COURT:  And have you advised him of
11   the maximum sentence and minimum sentence that can
12   be -- and fine that can be imposed?
13               MR. HOOSE:  We have, your Honor.
14               THE COURT:  And have you discussed with
15   him how the advisory guidelines and the Booker
16   decision may impact that sentencing?
17               MR. HOOSE:  We have, your Honor.
18               THE COURT:  And have you advised him of
19   the collateral consequences to his guilty plea on
20   these charges?
21               MR. HOOSE:  We have, your Honor.
22               THE COURT:  Are there any collateral
23   consequences that are particular to Mr. Johnson?
24               MR. HOOSE:  None that I'm aware of, your
25   Honor.
```

12

```
1                THE COURT:  All right.  You are a U.S.
2    citizen?
3                THE DEFENDANT:  Yes, ma'am.
4                THE COURT:  So there is no question of
5    deportation.
6                All right, Mr. Johnson, have you had
7    enough opportunity and information to discuss your
8    case with your attorneys?
9                THE DEFENDANT:  Yes, ma'am.
10               THE COURT:  Are you satisfied to have
11   them represent you?
12               THE DEFENDANT:  Yes, ma'am.
13               THE COURT:  Is there any way in which
14   you are not fully satisfied with your attorneys'
15   advice and representation?
16               THE DEFENDANT:  No, ma'am.
17               THE COURT:  Now, you've received a copy
18   of the information that we've been referring to,
19   have you?
20               THE DEFENDANT:  Yes, ma'am.
21               THE COURT:  Is that in front of you on
22   the desk?
23               THE DEFENDANT:  Yes, ma'am.
24               THE COURT:  Okay.  And have you
25   consulted with your attorneys about this
```

**GA1733**

13

```
1   information?
2           THE DEFENDANT:  Yes, ma'am.
3           THE COURT:  And do you understand the
4   three charges in this?
5           THE DEFENDANT:  Yes, ma'am.
6           THE COURT:  Okay.  I want to make sure
7   that you understand that even if you are guilty, you
8   don't have to plead guilty.  And I'm saying that
9   because it is the government's burden under our
10  system of law to prove a defendant guilty of any
11  crime that they're accused of beyond a reasonable
12  doubt.  If the government can't meet its burden of
13  proof, the jury has the duty to find that defendant
14  not guilty even if the defendant is guilty.  Do you
15  understand that distinction?
16          THE DEFENDANT:  Yes, ma'am.
17          THE COURT:  So when jurors from time to
18  time return a verdict of not guilty in a criminal
19  case, when everyone in the courtroom listening to
20  all of the evidence and trial thought the defendant
21  was probably guilty, what the jury is saying in
22  those cases with its not guilty verdict is not that
23  it found the defendant innocent, but that it found
24  the government didn't meet this high burden of proof
25  beyond a reasonable doubt.  Do you understand?
```

14

```
1           THE DEFENDANT:  Yes, ma'am.
2           THE COURT:  That's why I'm saying that
3   even if you are guilty, you have a choice.  You may
4   plead guilty, as you've indicated to me at the
5   beginning of our hearing that you wanted to do, or
6   you may change your mind and say to the government,
7   prove it, meet your burden of proving my guilt
8   beyond a reasonable doubt.  And you will exercise
9   that option later on in the proceeding when the
10  clerk asks you how do you plead.  Do you understand
11  that?
12          THE DEFENDANT:  Yes, ma'am.
13          THE COURT:  If you plead not guilty,
14  then the Constitution and federal laws guarantee you
15  a speedy, public trial with the assistance of your
16  attorneys at every stage of the proceedings on the
17  charges contained in the information.  Do you
18  understand that?
19          THE DEFENDANT:  Yes, ma'am.
20          THE COURT:  And at trial you would be
21  presumed innocent.  The government has to overcome
22  that presumption and prove you guilty by competent
23  evidence and beyond a reasonable doubt.  You don't
24  have to prove that you are innocent.  And if the
25  government fails, the jury has a duty to find you
```

15

```
1   not guilty.  Do you understand?
2           THE DEFENDANT:  Yes, ma'am.
3           THE COURT:  There are additional rights
4   that you have if you wish to proceed by way of a
5   jury trial.  Your right of confrontation requires
6   that the government's witnesses have to come into
7   court and testify in your presence.  You have the
8   right to cross-examine those witnesses, the right of
9   your counsel to cross-examine all of the
10  government's witnesses, to object to the
11  government's evidence, to offer evidence on your
12  behalf, to use a subpoena to obtain the attendance
13  of witnesses to testify at trial on your behalf.  Do
14  you understand those rights?
15          THE DEFENDANT:  Yes, ma'am.
16          THE COURT:  Further, at trial you would
17  have the right to testify, but that would be your
18  choice.  You could never be forced to testify.  A
19  further extension of the right to remain silent that
20  I went over with you at the beginning is the
21  provision in the Constitution that no defendant in a
22  criminal case can ever be forced to take the witness
23  stand and say anything that could be used to show
24  that he's guilty of the crime he's charged with.
25  So, if you decided to go to trial, but you decided
```

16

```
1   not to testify, I would instruct the jury that you
2   were exercising this right and they were prohibited
3   from drawing any negative inference or holding that
4   against you in any way.  Do you understand?
5           THE DEFENDANT:  Yes, ma'am.
6           THE COURT:  Now, if you plead guilty,
7   I'm going to have to ask you questions about what
8   you did in order to satisfy myself that you are
9   guilty of the charges that you seek to plead guilty
10  to.  You'll have to answer my questions, and in
11  doing that, presumably you will be acknowledging
12  your guilt.  So, you are going to be giving up
13  exactly this right I've been talking to you about,
14  and that is the right not to say anything that shows
15  that you are guilty of the crimes charged.  And,
16  further, if you answer any of the questions falsely,
17  your answers may later be used against you in a
18  prosecution for perjury or making a false statement.
19  Do you understand that?
20          THE DEFENDANT:  Yes, ma'am.
21          THE COURT:  All right.  If you plead
22  guilty and if I accept your plea, you are going be
23  giving up your constitutional right to a trial and
24  the other rights I've been discussing and there
25  won't be any trial of any kind.  Do you understand
```

**GA1734**

17

```
1    that?
2              THE DEFENDANT:  Yes, ma'am.
3              THE COURT:  All right.  Now, have you
4    executed the waiver of indictment?
5              MR. HOOSE:  Yes, we'd hand it up with
6    your permission.
7              THE COURT:  That may be filed.
8              I'll get into the particularities of
9    your plea agreement with the government in just a
10   moment, but before we go further, I want to make
11   sure that you understand, and you understand that I
12   understand, that any plea that you enter today will
13   be conditional, that is, it is conditioned on the
14   Court accepting and agreeing to be bound by your
15   plea agreement.  I'm not going to do that today, I
16   don't know anything about you, I will only do that
17   after I get the presentence report and after -- and
18   at the sentencing hearing when I hear from everyone
19   who -- with respect to a sentence and the
20   circumstances that bear on determining what an
21   appropriate sentence is.  If I determine from all of
22   that that this is -- that the agreed-upon sentence
23   that you and the government have agreed on is for
24   some reason inappropriate, I will tell you that, you
25   will have the opportunity to withdraw your guilty
```

18

```
1    plea and we will proceed.  Also, if I do not agree
2    with this, the government, if it is -- if the
3    sentence proposed is to be lower than what is agreed
4    upon, the government will withdraw its plea
5    agreement and then the matter will be tried on the
6    counts also of the indictment.  All right?
7              THE DEFENDANT:  Yes, ma'am.
8              THE COURT:  Because one of the
9    conditions of the plea agreement is that the counts
10   in the indictment get dismissed after sentencing.
11   Okay, but there are consequences of your pleading
12   guilty that I want to go over with you now.
13             You will be deprived of certain federal
14   rights; the right to vote, to hold public office, to
15   serve on a jury, to possess firearms.  You are not a
16   prevailing party under the Hyde Amendment, so you
17   aren't entitled to seek attorney's fees or
18   litigation expenses.  And a DNA sample will be
19   collected by the Bureau of Prisons or the probation
20   office for analysis and indexing.  The government
21   reserves its right to notify state or federal
22   agencies that might license you or that might do
23   business with you about the circumstances of your
24   conviction, and if they obtain permission from the
25   Court, they may notify current employers or future
```

19

```
1    employers of your conviction.  Do you understand
2    that consequence?
3              THE DEFENDANT:  Yes, ma'am.
4              THE COURT:  Now, you are also, by
5    pleading guilty, giving up your right to have DNA
6    testing performed on physical evidence related to
7    this case that is in the government's possession and
8    to have that physical evidence preserved.  As a
9    result, any physical evidence that the government
10   has will likely be destroyed or otherwise
11   unavailable to you for DNA testing in the future.
12   If your case went to trial and you were convicted
13   and you could demonstrate that results of a DNA test
14   could tend to prove innocence, then you could file a
15   motion requiring DNA testing of such physical
16   evidence under 18, United States Code, 3600 and
17   3600(a).  But that's what you give up if you plead
18   guilty.
19             Are you willing to give up your right to
20   a trial and the other rights I've been discussing
21   with you?
22             THE DEFENDANT:  Yes, ma'am.
23             THE COURT:  All right.  So I want now to
24   go over the plea agreement.  Is that in front of you
25   right now?
```

20

```
1              MR. HOOSE:  I have the --
2              THE COURT:  Why don't you leave it in
3    front of Mr. Johnson.  Have you discussed that with
4    your attorneys?
5              THE DEFENDANT:  Yes, ma'am.
6              MR. HOOSE:  Judge, if we may, I'll give
7    you the signed copies.  We have extra copies for
8    him.
9              THE COURT:  Okay, you've already signed
10   it?
11             THE DEFENDANT:  Yes, ma'am.
12             MR. HOOSE:  We have.
13             THE COURT:  All right.
14             Now, you have read this agreement before
15   you signed it?
16             THE DEFENDANT:  Yes, ma'am.
17             THE COURT:  And by your signature you
18   said you understood it and you agreed to be bound by
19   it.
20             THE DEFENDANT:  Yes, ma'am.
21             THE COURT:  All right, I'm going to ask
22   Ms. Dayton to outline the terms of this agreement.
23             MS. DAYTON:  Yes, your Honor.  Under the
24   terms of the agreement, the government has agreed to
25   file the substitute information, which we've already
```

**GA1735**

21

```
1   filed.  The substitute information charges three
2   counts of drug-related murder related to the murders
3   of Tina Johnson, James Reid and Basil Williams.  And
4   just at this moment, your Honor, I would like to put
5   on that the victims' families have all been notified
6   regarding the proceedings today pursuant to law and
7   whoever was able to be here is here today.
8            THE COURT:  All right.
9            MS. DAYTON:  In return, the defendant
10  has agreed that he would plead guilty to Counts One,
11  Two and Three of the information charging him with
12  murder while engaged in a drug-trafficking offense.
13  The mandatory minimum penalty for each of the counts
14  is 20 years of imprisonment and a maximum penalty of
15  life, your Honor, with a $250,000 fine available for
16  each count.  Also, the defendant will be required to
17  pay a special assessment of a total of $300, $100
18  for each count of conviction.  The defendant has
19  also agreed to forfeit the money that was seized
20  from him on the day of his arrest, which was
21  approximately $120.
22           In return for the defendant's guilty
23  plea, guilty pleas I should say, the government has
24  agreed to do several things.  One, at the time of
25  sentencing it will move -- if your Honor accepts
```

22

```
1   this plea, the government will move to dismiss the
2   remaining counts of the four superseding indictments
3   against the defendant, all of which held more severe
4   penalties than is charged in the information.
5   Specifically, under the indictment the defendant was
6   facing charges of violent crimes in aid of
7   racketeering for which the defendant could have been
8   sentenced to mandatory life imprisonment.
9            We've reached a guideline stipulation,
10  your Honor, pursuant to Federal Rule of Criminal
11  Procedure 11(c)(1)(C), and that is, the stipulation
12  is the defendant will receive a sentence of 300 to
13  420 months of incarceration, the range to be
14  determined by your Honor in the event that you
15  accept the plea.
16           The defendant has agreed to waive his
17  rights to appeal or collaterally attack the sentence
18  in any manner as long as the sentence doesn't exceed
19  420 months' imprisonment, your Honor.
20           And I believe that your Honor has hit
21  upon everything else with the exception of the
22  statute of limitations, which means that in the
23  event that for some reason his plea was later to
24  have been found to not have been valid, the
25  defendant agrees that the government would have the
```

23

```
1   right to go back and reinitiate prosecution for all
2   of the events underlying the indictment in this
3   case, the fourth superseding indictment of this
4   case.
5            THE COURT:  All right, thank you.
6            Mr. Johnson, does the written agreement,
7   that you have a copy of, which you have in front of
8   you that you've signed, outlined by Ms. Dayton,
9   fully and accurately reflect what you understand the
10  agreement is that you've entered into with the
11  government?
12           THE DEFENDANT:  Yes, ma'am.
13           THE COURT:  Has the entire agreement
14  that you've reached with the government been put
15  down in writing?
16           THE DEFENDANT:  Yes, ma'am.
17           THE COURT:  Have any promises been made
18  to you by the government that haven't been put down
19  in writing?
20           THE DEFENDANT:  No, ma'am.
21           THE COURT:  Other than the promises that
22  are contained in the written agreement, has anyone
23  made any promises to you that have caused you to
24  plead guilty?
25           THE DEFENDANT:  No, ma'am.
```

24

```
1            THE COURT:  Has anyone threatened you or
2   intimidated you in any way that has affected your
3   decision to pled guilty?
4            THE DEFENDANT:  No, ma'am.
5            THE COURT:  Has anyone made any promises
6   to you what your sentence will be, apart from the
7   fact that you have stipulated in your plea agreement
8   that the sentence should be between 300 to
9   420 months?
10           THE DEFENDANT:  No, ma'am.
11           THE COURT:  And you understand that even
12  if there is -- even with that stipulation, it still
13  depends on whether the Court will accept the plea
14  agreement and agree to be bound by it, and also
15  where within that range the sentence would be
16  imposed if the Court does agree to that.  So, you
17  won't know what your sentence will be until the day
18  it's imposed on the day of sentencing.  Do you
19  understand that?
20           THE DEFENDANT:  Yes, ma'am.
21           THE COURT:  All right, this plea
22  agreement doesn't bind any other federal authority
23  or any state or local authority, only the Office of
24  the U.S. Attorney for the District of Connecticut.
25  And you have specifically agreed in this plea
```

25

```
1   agreement, if it becomes the binding plea agreement,
2   that you won't appeal or collaterally attack in any
3   proceeding, including a motion under 28, United
4   States Code, 2255 or 2241, your conviction or your
5   sentence imposed by the Court if that sentence is
6   not more than 420 months.
7                THE DEFENDANT:  Yes.
8                THE COURT:  Five years' supervised
9   release, restitution and forfeiture, no matter what
10  analysis the Court uses to get to that sentence.  Do
11  you understand that?
12               THE DEFENDANT:  Yes, ma'am.
13               THE COURT:  All right, the plea
14  agreement has been signed and it has been handed to
15  the clerk for filing.
16               I want to talk to you about the
17  sentencing scheme under the statutes under which you
18  are charged in these three counts.  The offense of
19  murder while engaged in drug trafficking contains a
20  mandatory minimum penalty of 20 years, a maximum
21  penalty of life, and a fine of $250,000 for each
22  count.  Do you understand that?
23               THE DEFENDANT:  Yes, ma'am.
24               THE COURT:  And the Court could impose a
25  term of supervised release of up to five years that
```

26

```
1   begins after completion of any term of imprisonment,
2   and if you violated the terms of supervised release,
3   you could be returned to prison for an additional
4   five years without giving you any credit for time
5   you may have spent on supervised release.  Do you
6   understand that?
7                THE DEFENDANT:  Yes, ma'am.
8                THE COURT:  All right.  The alternative
9   fine statute probably doesn't apply since the
10  statutory fine is $250,000.  If a fine is imposed
11  and it's over $2,500, interest is charged on the
12  unpaid balance if it isn't paid within 15 days, and
13  you are obligated to pay a special assessment of
14  $100 for each of the three counts of conviction, for
15  a total of $300, to the clerk on the day of
16  sentencing.
17               Is restitution an issue in this case?
18               MS. DAYTON:  Your Honor, there is
19  actually an -- under 3663(a) there is mandatory
20  restitution which I think can be dealt with at the
21  time of sentencing.
22               THE COURT:  And there is also in the
23  plea agreement a forfeiture of the currency seized
24  from you, $120, and you've made the representations
25  that permit the government to forfeit that money as
```

27

```
1   the proceeds of illegal conduct or used in any
2   manner or part to commit or facilitate the
3   commitment of the offense.
4                Now, I indicated earlier that the
5   sentencing guidelines are advisory; after the Booker
6   decision they're not mandatory.  I've also explained
7   to you the peculiarities of your plea, which is only
8   operative -- which only works if the Court accepts
9   the terms of it.  The Court is required to determine
10  the applicable sentencing guidelines, consider them
11  in their advisory role, along with the other factors
12  that are set out in 3553(a), and tailor the
13  appropriate sentence in your case.  If the Court
14  believes that the sentencing range that you and the
15  government have agreed to is that appropriate
16  sentence, then the Court will let you know at
17  sentencing.
18               Any sentencing determinations are made
19  by a preponderance of the evidence, not beyond a
20  reasonable doubt; they're made by the Court, not by
21  the jury; they're based on evidence that's in the
22  presentence report that's submitted from you, the
23  government, and you have the right to withdraw your
24  guilty plea if your sentence is different from the
25  stipulation in your plea agreement.  All right?
```

28

```
1                THE DEFENDANT:  Yes, ma'am.
2                THE COURT:  As was previously stated,
3   you and the government have agreed under Federal
4   Rule of Criminal Procedure 11(c)(1)(C) that a
5   sentence of 300 to 420 months is a reasonable and
6   appropriate sentence.  You recognize that you could
7   otherwise be subjected to more severe penalties that
8   could include a mandatory minimum term of life
9   imprisonment under the VICAR counts in the
10  indictment?
11               THE DEFENDANT:  Yes, ma'am.
12               THE COURT:  And that regardless of what
13  may be the applicable guideline range in your case,
14  you will not be seeking a sentence of less than
15  300 months and will not suggest that the Court
16  consider a sentence below 300 months.
17               We already went over what happens if the
18  Court does do that, meaning rejects the plea
19  agreement, the government withdraws the plea
20  agreement and you can withdraw your guilty plea, or
21  not, as you choose.  So, we will wait 'til
22  sentencing when we get the presentence report, we
23  hear from you, your attorney, the government, and
24  then you can know with certainty what the guidelines
25  will be, whether the Court will accept your
```

**GA1737**

29

```
 1   stipulation, whether the Court will deem there to be
 2   grounds to depart or they should be inapplicable for
 3   some reason.
 4         I want to make sure that you understand
 5   that subject to the terms of your plea agreement,
 6   you may be able to appeal your conviction if you
 7   think the guilty plea was somehow unlawful or
 8   involuntary or there is some fundamental defect in
 9   our proceedings, including unconstitutionally
10   ineffective assistance of counsel, that you didn't
11   waive by your guilty plea.
12         There is a statutory right to appeal
13   your sentence if you think it's contrary to law.
14   You've specifically agreed that you would not appeal
15   or collaterally attack it under any of the statutes
16   that permit you to do so if the sentence is not over
17   420 months, five years of supervised release, and
18   the restitution and forfeiture that will be
19   determined.  If there is to be a notice of appeal,
20   it has to be filed within ten days of judgment being
21   entered in your case.  If you can't afford the cost
22   of the appeal, you may request the clerk to prepare
23   and file the notice of appeal for you as you proceed
24   in forma pauperis.  If you can't afford counsel for
25   the appeal, the Court will appoint counsel for you
```

30

```
 1   at no cost to you.
 2         Do you understand all these rights that
 3   you will be waiving, the right to trial and these
 4   other rights?
 5         THE DEFENDANT:  Yes, ma'am.
 6         THE COURT:  All right, now let's go to
 7   the counts that you have agreed to plead guilty to,
 8   Counts One, Two and Three, charging you with murder
 9   while engaged in a drug trafficking offense.  I'm
10   going to ask the government to identify the elements
11   of these offenses.  They're set out in the plea
12   agreement, but if Ms. Dayton would kindly give that
13   to us in simple form.  These are the elements, each
14   of which -- these are the facts, each of which the
15   government has to prove beyond a reasonable doubt
16   before you could be convicted if you went to trial.
17   If the government proved two out of three elements,
18   but not the third, the jury would have the
19   obligation to find you not guilty.  Do you
20   understand?
21         THE DEFENDANT:  Yes, ma'am.
22         THE COURT:  All right, what are the
23   elements of these counts, please.
24         MS. DAYTON:  Thank you.  For each count
25   the elements are the same, and that's that you
```

31

```
 1   murdered or aided and abetted, which means assisted
 2   or helped, in the murder of another person, in this
 3   case it would be Tina Johnson, James Reid and Basil
 4   Williams; that the murder was committed while either
 5   you or your co-defendants -- in this case it would
 6   be Azibo Aquart and Azikiwe Aquart, with whom you
 7   are charged, while they, with your knowledge, were
 8   involved in a conspiracy to sell crack cocaine, over
 9   50 grams of crack cocaine; and the conspiracy is
10   just an agreement between two or more people to
11   engage in illegal behavior.  So, basically you would
12   have to know or be a part of their conspiracy to
13   sell drugs, and that they committed these murders
14   with your assistance and that you acted knowingly
15   and intentionally.  So that means there was no
16   accident or mistake.
17         THE COURT:  All right, have you read the
18   charges against you, Mr. Johnson?
19         THE DEFENDANT:  Yes, ma'am.
20         THE COURT:  Do you want me to read the
21   charges against you or do you want to waive a
22   reading of the charges?
23         THE DEFENDANT:  I'd like to waive it.
24         THE COURT:  All right, would you tell me
25   what you understand, just in your own words, that
```

32

```
 1   you are charged with in the information.
 2         THE DEFENDANT:  Three counts of murder,
 3   aiding and abetting.
 4         THE COURT:  Aiding and abetting murder
 5   that is in connection with drug trafficking.
 6         THE DEFENDANT:  Yes, ma'am.
 7         THE COURT:  All right.  And the
 8   conspiracy to distribute has to be 50 grams or more
 9   and it has to be cocaine base.
10         THE DEFENDANT:  Yes, ma'am.
11         THE COURT:  Do you have any questions
12   for the Court or for your attorneys before we get to
13   the key event that brings you here today?
14         THE DEFENDANT:  No, ma'am.
15         THE COURT:  All right, please tell me
16   what it is that you did that shows that you are in
17   fact guilty of the charges in Counts One, Two and
18   Three to which you are offering to plead guilty.
19         THE DEFENDANT:  I helped someone --
20   Dreddy -- gain access to someone's house, and I
21   taped the person up.  And that's it.
22         THE COURT:  Okay, we're going to be a
23   little more specific.  Can you tell me the time
24   frame.
25         THE DEFENDANT:  August 24th.
```

33

```
1          THE COURT:  And you helped someone.  Who
2   is the someone?
3          THE DEFENDANT:  Dreddy.  Azibo.
4          THE COURT:  And you helped him do what?
5          THE DEFENDANT:  Tape Tina Johnson up,
6   and I drove him from the scene.
7          THE COURT:  Now, you are charged in
8   Count One with assisting one of the co-defendants to
9   commit the murder of Tina Johnson and in Count Two
10  James Reid and in Count Three Basil Williams.  I
11  haven't heard anything more than about Tina Johnson.
12         THE DEFENDANT:  I drove Azibo to Tina
13  Johnson's apartment.  When I got there, I put on
14  gloves, I helped him gain entry by knocking on the
15  door, and when they went in there, I helped him tape
16  her up, and then I drove him away from there, Azibo.
17         THE COURT:  What about Basil Williams
18  and James Reid?
19         THE DEFENDANT:  I didn't touch them or
20  talk to them.
21         THE COURT:  Were they there?
22         THE DEFENDANT:  Yes, ma'am.
23         THE COURT:  Did you know what Azibo
24  Aquart or others with him were going to do to the
25  three victims?
```

34

```
1          THE DEFENDANT:  No, ma'am.
2          THE COURT:  Now, one of the -- the first
3   element of the count of drug-related murder has that
4   you murdered or you aided and abetted the murder,
5   assisted or helped in the murder of another person.
6   You've told me that you helped Azibo tape Tina
7   Johnson up.
8          THE DEFENDANT:  Yes, ma'am.
9          THE COURT:  In what way did you help
10  with the murder of Basil Williams or James Reid?
11  You brought Azibo to the place and you took him
12  away?
13         THE DEFENDANT:  Yes, ma'am.
14         THE COURT:  And the second element is
15  that the murders were committed while you or your
16  co-defendants, you or your co-defendants, with your
17  knowledge, were engaged in a drug trafficking
18  offense involving crack cocaine of more than
19  50 grams.  Tell me what you knew of or were involved
20  with in terms of drug trafficking and Azibo Aquart
21  or others.
22         THE DEFENDANT:  I wasn't involved in the
23  drug trafficking business at all, and I didn't know
24  what kind of drugs he sold.  I never asked.  Oh,
25  besides from marijuana that I bought from him that I
```

35

```
1   used for myself.
2          THE COURT:  So you say you did not have
3   any knowledge of Azibo Aquart's and others drug
4   trafficking of cocaine base.
5          THE DEFENDANT:  Yes, ma'am.
6          THE COURT:  Yes, you didn't have
7   knowledge?
8          THE DEFENDANT:  No, I didn't have no
9   knowledge.
10         MS. DAYTON:  Your Honor, I can probably
11  end this.  This was not our understanding of how the
12  factual recitation was going to come out and this
13  does not qualify for a proper allocution.  I think
14  the government can prove otherwise, than what Mr.
15  Johnson is stating right now, and I think at this
16  point either he needs to speak with his attorneys or
17  we should probably stop the plea because the
18  government does not agree that this qualifies under
19  this statute.
20         THE COURT:  All right, I'm going to
21  recess our proceedings today because -- and that's
22  why I went over the elements of the offense with
23  you, then I go over the facts that you tell me to
24  see whether it matches up with the elements of the
25  offense, and in that way that's what I meant by a
```

36

```
1   valid plea, that there is actually a factual basis
2   for it.  And I think we should postpone any
3   continuation of this hearing to another date.  All
4   right?
5          THE DEFENDANT:  Yes, ma'am.
6          THE COURT:  Okay.
7          MS. DAYTON:  Are we going to adjourn for
8   30 minutes or are we adjourning for today, your
9   Honor?
10         THE COURT:  I was planning on adjourning
11  for today since there seems to be such a major gap.
12         MS. DAYTON:  We had -- I realize this is
13  not your Honor's problem, but between us, I mean --
14         THE COURT:  We don't need to go into
15  that.
16         MS. DAYTON:  But we had a deadline.  So,
17  the government --
18         THE COURT:  What deadline?
19         MS. DAYTON:  Today is -- we're done
20  after today.  That's why we would ask if we could
21  just adjourn for a short period of time, perhaps
22  they can speak with Mr. Johnson.  Because,
23  otherwise, we won't have to bother your Honor with
24  this again.
25         THE COURT:  Is that what you would like
```

**GA1739**

37

```
1   to do?
2           MR. HOOSE:  I think you should give us a
3   few minutes, your Honor.
4           THE COURT:  That's fine, take what time
5   you need.  Let me know.
6           We stand in recess.
7           (Recess)
8           THE COURT:  All right, I understand, Mr.
9   Johnson, the government, correct me if I'm wrong,
10  made a deadline for today for you to enter a guilty
11  plea to the three counts of the information in order
12  to have the plea agreement be in effect.
13          THE DEFENDANT:  Yes, ma'am.
14          THE COURT:  Do you understand that?
15          THE DEFENDANT:  Yes, ma'am.
16          THE COURT:  And, Ms. Dayton, if Mr.
17  Johnson does not proceed with his guilty plea to
18  this information in these three counts today, what
19  happens?
20          MS. DAYTON:  Your Honor, the government
21  is withdrawing the offer and our willingness to
22  enter into the plea agreement.  The only other thing
23  I can suggest, and I don't know if this is something
24  your Honor wants to try, or counsel even wants to
25  try, is I could outline some of the government
```

38

```
1   witness -- witness -- evidence, and perhaps that
2   would help.  But, I don't know that.
3           THE COURT:  I asked some pretty pointed
4   questions and got some very clear answers, and so I
5   don't know why that would be of benefit.
6           MS. DAYTON:  Fair enough.  So, yes,
7   today was the deadline.
8           THE COURT:  All right.  All right then,
9   is it your desire, Mr. Johnson that we just put this
10  -- we cease this proceeding, this change of plea
11  proceeding?
12          THE DEFENDANT:  Yes, ma'am.
13          THE COURT:  All right.  You understand
14  what the problem is, that there is nothing that
15  you've told me that involves Counts Two and Three.
16          THE DEFENDANT:  Yes.
17          THE COURT:  Only Count One.
18          THE DEFENDANT:  Yes.
19          THE COURT:  And that's why I would not
20  be able to accept your guilty plea to Counts Two and
21  Three, and there is a further question about whether
22  even Count One was a complete allocution, whether
23  the facts that you recited would state specifically
24  the crime that is charged in Count One.
25          THE DEFENDANT:  Yes, ma'am.
```

39

```
1           THE COURT:  Which involves a crack
2   conspiracy.
3           THE DEFENDANT:  Yes, ma'am.
4           MS. DAYTON:  Your Honor, it's the
5   government's position that the murders were
6   committed in concert, there were four persons
7   involved, the defendant, Azibo Aquart, Azikiwe
8   Aquart and John Taylor, and that the four of --
9   their presence, and taping the victims, and they
10  each had different roles to play during the course
11  of the murders, it's not that each person, each
12  defendant laid their hands on each victim.
13          So, it's the government's belief that
14  that is not actually the issue underlying the plea
15  here today, that the bigger problem is with respect
16  to the admission -- or failure to admit knowledge
17  regarding the narcotics trafficking conspiracy.
18          THE COURT:  All right, even though you
19  had said that you didn't touch or talk to James Reid
20  or Basil Williams, the government is saying that Mr.
21  Johnson's assistance with even just Tina Johnson is
22  nonetheless sufficient assistance for Counts Two and
23  Three.
24          MS. DAYTON:  Yes, your Honor, it would
25  be sort of like -- to use a hypothetical -- like
```

40

```
1   robbing a bank, one person is the getaway driver,
2   one person has the gun, one person is collecting the
3   money, everybody has a role to achieve a common
4   purpose.  Here the common purpose was to kill the
5   three victims that were in there and each defendant,
6   it is the government's position, played a role in
7   that.
8           THE COURT:  But not all the same role.
9           MS. DAYTON:  Not all the same role.
10          MR. HOOSE:  Your Honor, may I just
11  attempt to clarify here one thing that -- one
12  question that was not put pointedly but I think
13  everyone acknowledges, which is that Mr. Johnson
14  acknowledged he helped gain access.  Mr. Aquart was
15  not able to get into that apartment because --
16          THE COURT:  Mr. Azibo Aquart.
17          MR. HOOSE:  Yes, because he was a known
18  entity, and Mr. Johnson knocking at the door as an
19  unknown person enabled the door to be opened for
20  them to get access to everyone inside.  And again,
21  in an effort to clarify, to the extent that it's
22  necessary, my understanding, after talking with
23  Attorney Dayton, is that the issue here is Mr.
24  Johnson's inability to acknowledge the government's
25  allegation that Mr. Azibo Aquart was engaged in a
```

41

```
 1    crack cocaine -- specifically a crack cocaine
 2    conspiracy of in excess of 50 grams.
 3              MS. DAYTON:  Not just Azibo Aquart,
 4    Azikiwe Aquart as well.  And John Taylor was
 5    involved in it, too.  But yes, that's right, that
 6    there was a narcotics trafficking conspiracy that
 7    his co-defendants were involved in, regardless of
 8    which ones he knew were involved.  We know he -- at
 9    a minimum, the government can prove that this
10    defendant was aware that Azibo Aquart was involved
11    in a large-scale crack cocaine trafficking
12    conspiracy.
13              THE COURT:  If my notes are correct, Mr.
14    Johnson said he did not know anything about Azibo
15    Aquart's crack drug trafficking.
16              Did I write that down correctly?
17              THE DEFENDANT:  Yes, ma'am.
18              THE COURT:  Well, that seems to be where
19    the hold up is.  Right?
20              MR. HOOSE:  Right.
21              THE COURT:  Okay.  All right then, we
22    will conclude our proceeding.
23              Anything further?
24              MR. HOOSE:  No, your Honor.
25              THE COURT:  Anything further, Mr.
```

42

```
 1    Johnson?
 2              THE DEFENDANT:  No, your Honor.
 3              THE COURT:  We stand in recess.  Thank
 4    you.
 5
 6
 7
 8         I certify that the foregoing is a correct
 9    transcript from the record of proceedings in the
10    above-entitled matter.
11
12                        4/27/13
13                         Date
14
15                    /S/  Sharon Montini
16                     Official Reporter
17
18
19
20
21
22
23
24
25
```

**GA1741**

1

```
                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - x
                                 :
UNITED STATES OF AMERICA         : No. 3:06CR-160(SRU)
                                 : 915 Lafayette Boulevard
                   vs.           : Bridgeport, Connecticut
                                 :
AZIKIWE AQUART A/K/A ZEE         : August 26, 2011
                                 :
- - - - - - - - - - - - - - - - x

                         PLEA HEARING

B E F O R E :

     THE HONORABLE STEFAN R. UNDERHILL, U. S. D. J.

A P P E A R A N C E S :

     FOR THE GOVERNMENT:

          OFFICE OF THE UNITED STATES ATTORNEY
               1000 Lafayette Boulevard
               Bridgeport, Connecticut  06604
          BY:  ALINA REYNOLDS, AUSA
               TRACY DAYTON, AUSA
               PETER MARKLE, AUSA
               JACABED RODRIQUEZ-COSS (Capital Case Unit)

     FOR THE DEFENDANT:

          COLLEEN QUINN BRADY, ESQ.
               99 Hudson Street, 8th FL
               New York, New York  10013

          ROTHMAN, SCHNEIDER, SOLOWAY & STERN, LLP
               100 Lafayette Street, Suite 501
               New York, New York  10013
          BY:  DAVID STERN, ESQ.

          ROBERT J. SULLIVAN, ESQ.
               190 Main Street
               Westport, Connecticut  06880
```

2

```
                    Susan E. Catucci, RMR
                    Official Court Reporter
                     915 Lafayette Boulevard
                 Bridgeport, Connecticut  06604
                     Tel: (917)703-0761
```

3

```
 1                  (12:05 o'clock p. m.)
 2          THE COURT:  Good afternoon.  We're here in the
 3   matter of United States v. Azikiwe Aquart.  May I have
 4   appearances, please?
 5          MS. DAYTON:  Yes.  Tracy Dayton for the
 6   government, Your Honor.  I am here with Peter Markle,
 7   Alina Reynolds and Jacabed Rodriguez-Coss.
 8          THE COURT:  Thank you.
 9          MR. STERN:  David Stern for Mr. Aquart, with
10   Colleen Brady and Bob Sullivan.
11          THE COURT:  Very good, thank you.
12          I understand that we're here for entry of a
13   guilty plea to Counts Two, Three and Four of the Fifth
14   Superseding Indictment.  Mr. Stern, is that correct?
15          MR. STERN:  That is correct.
16          THE COURT:  It's my understanding that
17   Mr. Aquart has not ever been arraigned on the Fifth
18   Superseding Indictment.  Are you willing on his behalf to
19   waive formal arraignment?
20          MR. STERN:  I am.  He intends to plead guilty to
21   that indictment.  He waives the formal reading of it.
22          THE COURT:  Very good, thank you.
23          MS. DAYTON:  Your Honor, and if I may just for
24   the record just indicate what the changes were --
25          THE COURT:  Please.
```

4

```
 1          MS. DAYTON:  -- on the indictment.
 2          So, the counts are all the same in terms of
 3   its -- I guess Mr. Aquart.  We removed Azibo Aquart from
 4   the indictment.  He was in the fourth superseding
 5   indictment.
 6          In order to comply with the Fair Sentencing Act,
 7   we changed the quantity of narcotics in the conspiracy
 8   from 50 grams to 280 grams.
 9          And then in terms of the dates of the
10   conspiracy, it previously -- and this relates to all the
11   conspiracy, to commit murder in aid of racketeering and
12   the racketeering enterprise in general -- it previously
13   read Fall 2004 to August 24th of 2005.  We changed the
14   latter date to December of 2005.  But any evidence that
15   went out to December 2005 was previously given to the
16   defense so these are, while they are not really
17   substantive changes, it was mostly just to comply with the
18   Fair Sentencing Act that we made the change, and to remove
19   Azibo Aquart.
20          THE COURT:  All right, thank you.
21          Mr. Aquart, the first thing I want to tell you
22   is that I'm in no hurry today.  If you decide to plead
23   guilty to one or more of these charges, you're going to be
24   giving up some important constitutional rights and
25   accepting certain very significant consequences.  I want
```

5

```
1   to make sure you understand each of those rights before
2   you waive them, and each of those consequences before you
3   accept them.  So if at any time I or anyone else says
4   anything that either causes you concern or that confuses
5   you in any way, please let me know and we'll try and
6   address your concern.  All right?
7           THE DEFENDANT:  Yes.
8           THE COURT:  All right.  Let me start by advising
9   you of certain rights that you have today and at all
10  times.  The first is the right to remain silent, which
11  means you don't have to say anything at all in court
12  today.  You don't have to answer my questions, you don't
13  have to make a statement of any kind.  If you start
14  speaking, you can stop whenever you want to, and you can
15  speak with your counsel before you say anything in court.
16  Do you understand?
17          THE DEFENDANT:  Yes, I do.
18          THE COURT:  Whatever you do say in court will be
19  taken down for the record by my court reporter, and could
20  be used against you in either this or some other case.  Do
21  you understand that?
22          THE DEFENDANT:  Yes.
23          THE COURT:  You have the right to counsel, not
24  only today but at every stage of the proceedings in this
25  case.  And you have the right to have counsel appointed
```

6

```
1   for you at no cost if you cannot afford counsel.  Do you
2   understand that?
3           THE DEFENDANT:  I do.
4           THE COURT:  Your private conversations or
5   communications with your lawyers are protected by what's
6   called the attorney-client privilege.  So you can feel
7   very comfortable speaking privately with them and
8   seeking -- giving them whatever information is necessary
9   for them to provide you with the best advice.  Do you
10  understand that?
11          THE DEFENDANT:  Yes.
12          THE COURT:  Before we can proceed further with
13  entry of a guilty plea, I have to ask you certain
14  questions and receive answers under oath.  That means
15  waiving your right to remain silent to that extent.  Are
16  you prepared to do that?
17          THE DEFENDANT:  Yes.
18          THE COURT:  All right.  I would ask that you
19  stand and raise your right hand to be sworn to tell the
20  truth.
21          (Whereupon the Defendant was duly sworn by the
22  Clerk.)
23          THE DEFENDANT:  Yes.
24          THE COURT:  All right.  Now that you've been
25  sworn to tell the truth, should you make any false
```

7

```
1   statement under oath, you could can prosecuted either for
2   making a false statement or for perjury.  Do you
3   understand that?
4           THE DEFENDANT:  I do.
5           THE COURT:  What is your full name please?
6           THE DEFENDANT:  Azikiwe Aquart.
7           THE COURT:  Have you ever used any other names?
8           THE DEFENDANT:  No.
9           THE COURT:  What is a your date of birth?
10          THE DEFENDANT:  Xxxx, '79.
11          THE COURT:  And how far did you go in school?
12          THE DEFENDANT:  Fourteenth grade.
13          THE COURT:  Are you currently under the care of
14  either a doctor or a psychiatrist?
15          THE DEFENDANT:  No.
16          THE COURT:  Are you currently taking any
17  prescription medications?
18          THE DEFENDANT:  No.
19          THE COURT:  Is your mind clear today?
20          THE DEFENDANT:  Yes.
21          THE COURT:  Do you understand what's going on?
22          THE DEFENDANT:  Yes.
23          THE COURT:  Have you had a chance to speak with
24  your lawyers about your case in general?
25          THE DEFENDANT:  I have.
```

8

```
1           THE COURT:  And about today's proceeding?
2           THE DEFENDANT:  Yes.
3           THE COURT:  Are you satisfied with their
4   representation of you so far?
5           THE DEFENDANT:  Yes.
6           THE COURT:  Mr. Stern, in your communications
7   with Mr. Aquart, especially recently, have you developed
8   any concerns whatsoever about his competency to proceed
9   today with the entry of a guilty plea?
10          MR. STERN:  I have no difficulty with his
11  competency.
12          THE COURT:  Mr. Aquart, the charges that we're
13  talking about today are Counts Two, Three and Four of a
14  document called the the fifth superseding indictment.
15  Have you had a chance to read the fifth superseding
16  indictment?
17          THE DEFENDANT:  Yes.
18          THE COURT:  And have you had a chance to discuss
19  that document, and specifically the charges set forth in
20  Counts Two, Three and Four, with your lawyers?
21          THE DEFENDANT:  Yes.
22          THE COURT:  And do you understand what it is
23  that you're charged with in those counts?
24          THE DEFENDANT:  I understand.
25          THE COURT:  All right.  Just to be sure, I'm
```

**GA1743**

9

```
 1   going to ask Ms. Dayton to very briefly describe in
 2   general terms the nature of the charges in Counts Two,
 3   Three and Four of the fifth superseding indictment, and
 4   also to set forth the penalties that Mr. Aquart faces
 5   should he plead guilty to those charges today.
 6             MS. DAYTON:  Yes, Your Honor.
 7             Counts Two, Three and Four are identical, with
 8   the exception of the victim names in each count.
 9             Each one is a murder in aid of racketeering.  In
10   Count Two the victim is Tina Johnson, and in Count Three,
11   the victim is James Reid, and in Count Four, the victim is
12   Basil Williams.
13             Each of these is in violation of Title 18,
14   United States Code, Section 1959(a)(1), and Title 18,
15   United States Code, Section Two.
16             If the defendant were to plead guilty today,
17   he'd be facing a term of life imprisonment.  If he were to
18   go to trial, he'd be facing life imprisonment or the death
19   penalty.  And, in fact, we have filed notice to seek the
20   death penalty in this case.
21             He would also be facing up to a 250,000-dollar
22   fine on each count of -- I should have said that penalty
23   is for each count.  A 250,000-dollar fine for each count;
24   five years of supervised release in the event that he was
25   ever released, on each count; and $100 special assessment
```

10

```
 1   on each count.
 2             I do want to add for the record, Your Honor,
 3   that there are representatives from Tina Johnson's family
 4   and Basil Williams' family here today, and Mr. Ried's
 5   family unfortunately was not able to be here today.
 6             THE COURT:  Thank you.
 7             Mr. Aquart, do you understand the nature of the
 8   charges against you in Counts Two, Three and Four?
 9             THE DEFENDANT:  Yes.
10             THE COURT:  And do you understand the penalty
11   that you face should you plead guilty to one or more of
12   those counts today?
13             THE DEFENDANT:  Yes.
14             THE COURT:  I need to advise you of various
15   rights that you would have should you plead not guilty to
16   Counts Two, Three and Four of the fifth superseding
17   indictment; specifically the various rights that you would
18   be giving up in the event that you do plead guilty.
19             Let me start with the fundamental fact that you
20   are not required to plead guilty to any of these charges,
21   even if you are actually guilty.  That is, even if you
22   committed these crimes, you have the right to plead not
23   guilty and go to trial and require that the government
24   prove your guilt beyond a reasonable doubt.
25             Do you understand that you have a right to plead
```

11

```
 1   not guilty even if you committed these crimes?
 2             THE DEFENDANT:  Yes.
 3             THE COURT:  And the way you do that, that is,
 4   the way you put the burden of proving your guilt beyond a
 5   reasonable doubt on the government is simply by saying not
 6   guilty when you are asked how it is you plead.
 7             If you plead not guilty, you're entitled to a
 8   speedy and public trial before a jury of 12 persons and
 9   you are entitled to the assistance of a lawyer in
10   defending against the charges in the superseding
11   indictment.
12             At trial, you would be presumed innocent and the
13   government would have to overcome that presumption and
14   prove your guilt to a standard of beyond a reasonable
15   doubt.  And the jury would have to unanimously find that
16   that standard had been proven or they would have a legal
17   duty to find you not guilty.  You would have any
18   obligation whatsoever to prove that you're innocent.
19             During the course of a trial, witnesses for the
20   government would be required to come here into court and
21   to testify under oath and in your presence.  You would
22   have the right to confront them, which means that your
23   lawyers would be allowed to ask them questions either to
24   show that they are not telling the truth, or to bring out
25   information that might be helpful to your defense.
```

12

```
 1             And you'd have the right to object to evidence
 2   offered by the government, and you'd have the right to
 3   present evidence of your own in defense of these charges.
 4             At trial you would have the right to testify if
 5   you wanted to, but you could not be required to testify.
 6   Just as you have the right to remain silent today, you'd
 7   have the right to remain silent throughout your trial.
 8   What's more, if you exercise that right and decided not to
 9   testify at trial, I would instruct the jury that they
10   could not consider the fact that you had not testified as
11   any evidence of your guilt.  So that the jury would not be
12   permitted to assume that you're guilty or infer that
13   you're guilty because you made the decision not to testify
14   at trial.
15             Now, whether or not you yourself testified, you
16   would have the right to call others as witnesses, and you
17   would have the ability to compel the attendance and
18   testimony of reluctant witnesses by serving them with
19   what's called a subpoena.  And a subpoena quite simply is
20   a form of court order requiring someone to come to court
21   and to testify.  So, if there's someone who knows
22   something about your case but does not want to come to
23   court or become involved, you may be able to compel them
24   to do so and to come into court and testify by serving
25   them with a subpoena.
```

13

```
1          Do you understand all of the rights that I've
2     just described?
3          THE DEFENDANT:  I understand.
4          THE COURT:  And do you understand that these are
5     rights that you would waive or give up in the event that
6     you plead guilty to one or more of these charges today?
7          THE DEFENDANT:
8          THE COURT:  Is it your wish to plead guilty to
9     one or more of these charges today and waive each of the
10    rights that I just described?
11         THE DEFENDANT:  Yes.
12         THE COURT:  If you decide to plead guilty I'm
13    going to have to ask you questions about what you did
14    because I cannot accept a guilty plea unless I'm satisfied
15    that you, in fact, committed the crimes with which you are
16    charged.  So, in order to plead guilty you're going to
17    have to admit your guilt here in court.
18         If you plead guilty and I accept your plea,
19    you're going to be giving up your constitutional right to
20    a trial and all the other rights that I just described.
21    If you plead guilty, there will be no trial of any kind
22    and there will be no jury that decides any issue in your
23    case.  So a jury will not decide whether you've been
24    proven guilty beyond a reasonable doubt, and a jury will
25    not decide any issue of fact that might affect the
```

14

```
1     sentence in this case.  Instead, if there are any issues
2     of fact that need to be decided at sentencing, as the
3     sentencing judge I will decide those.
4          And I will decide them by a much lower standard
5     of proof, what we call the "preponderance of the
6     evidence."  And I would decide them without regard to the
7     rules of evidence, meaning I could hear testimony and
8     receive evidence that the jury might not be permitted to
9     hear.  Do you understand all of that?
10         THE DEFENDANT:  Yes.
11         THE COURT:  And do you understand that if you
12    plead guilty in this case, that that is going to end the
13    question of your guilt or innocence; that if you receive a
14    sentence that you're not happy with, you cannot for that
15    reason withdraw your guilty plea and come back into court
16    and ask for a trial at that time.  Do you understand?
17         THE DEFENDANT:  Yes.
18         THE COURT:  You also understand that if you
19    plead guilty, you will lose the right to appeal your
20    conviction, meaning the fact of your guilt?
21         THE DEFENDANT:  I know.
22         THE COURT:  There are some limitations on your
23    right to appeal your sentence which we'll discuss when we
24    discuss the plea agreement.
25         There are certain collateral consequences of
```

15

```
1     pleading guilty to any felony in federal court and I want
2     make sure you understand those.
3          First off, by pleading guilty to any felony,
4     you'll lose certain valuable civil rights, including the
5     right to vote, the right to serve on a jury, the right to
6     hold public office and the right to possess any type of
7     firearm or ammunition.  Do you understand?
8          THE DEFENDANT:  Yes.
9          THE COURT:  Every person convicted of a felony
10    in federal court is required to provide a DNA sample that
11    will be analyzed and used by law enforcement for law
12    enforcement purposes.  Do you understand that?
13         THE DEFENDANT:  Yes.
14         THE COURT:  Do you understand each of these
15    additional consequences of pleading guilty?
16         THE DEFENDANT:  Yes.
17         THE COURT:  Are you willing to accept them?
18         THE DEFENDANT:  Yes.
19         THE COURT:  I need to describe how sentencing
20    works in the federal court, and I want to make sure you
21    understand that when sentencing you, I have to consider
22    all of the factors set forth in a statute called 18 USC
23    Section 3553(a).
24         And significantly in your case, I'm bound to
25    apply the statutes that apply, the sentencing statutes
```

16

```
1     that apply in your case.  Do you understand that?
2          THE DEFENDANT:  Yes.
3          THE COURT:  I'm also, I also need to advise you
4     I'm also required to calculate and consider the sentencing
5     guidelines in your case.  Are you familiar in general
6     terms with the sentencing guidelines?
7          THE DEFENDANT:  Yes.
8          THE COURT:  And have you discussed those with
9     your counsel?
10         THE DEFENDANT:  Yes.
11         MR. STERN:  Judge, to be completely accurate
12    about that, the sentencing guidelines in this case are a
13    little bit irrelevant so I haven't gone through a detailed
14    discussion --
15         THE COURT:  Well, I frankly was sitting here
16    wondering under the circumstances why I'm going over it
17    myself.  I'm inclined to do that, so --
18         MR. STERN:  I'm not suggesting you shouldn't do
19    it but I am suggesting I haven't had in depth
20    conversations with him about the guidelines.
21         THE COURT:  I understand, and I agree with you
22    that they are irrelevant in this case.  I do think I need
23    to touch that base, so that's why I did.
24         Mr. Aquart, do you have any questions about how
25    the sentence is going to be calculated in your case?
```

17

```
1         THE DEFENDANT:  No.
2         THE COURT:  All right.  Let's turn to the plea
3    agreement.  I understand there is a written plea
4    agreement.  Has it been fully executed?
5         MR. STERN:  It has not.
6         THE COURT:  All right.  If you're prepared to do
7    so, this would be a good time.
8         (All Defense Counsel signing, Defendant
9    signing.)
10        MS. DAYTON:  May I --
11        (Hands Court)
12        THE COURT:  Mr. Aquart, I've just been handed an
13   11 page document.  It takes the form of a letter dated
14   August 26, 2011.  It's addressed to your lawyers,
15   Mr. Stern, Ms. Brady and Mr. Sullivan.  And it is from
16   Ms. Dayton.  You and your lawyers have signed it on page
17   nine which is the last page of the letter, as well as on
18   page ten which is an attachment entitled Stipulation of
19   Offense Conduct.  The last page, page 11, is entitled
20   Rider Concerning Restitution.
21        Did you have a chance to read this entire
22   document before you signed it?
23        THE DEFENDANT:  Yes, I did.
24        THE COURT:  Did you have a chance to discuss it
25   with your lawyers before you signed it?
```

18

```
1         THE DEFENDANT:  Yes, I have.
2         THE COURT:  And do you understand what it says?
3         THE DEFENDANT:  Yep.
4         THE COURT:  Just to be sure, I'm going to ask
5    Ms. Dayton to summarize the principal provisions of the
6    plea agreement letter.  If she says anything that either
7    surprises you or that is different from your understanding
8    of this document, I need you to tell me that, all right?
9         THE DEFENDANT:  Yes.
10        MS. DAYTON:  Do you want me to touch on the
11   elements now or no?
12        THE COURT:  I think we should.  Before you do
13   that, let me make sure that Mr. Aquart understands what we
14   mean by "elements."
15        One of the things, Mr. Aquart, that Ms. Dayton
16   is going to review are what we call the elements of the
17   offense, which are set forth in writing at the bottom of
18   page one and at the top of page two.  The elements of an
19   offense quite simply are the matters that the prosecutor
20   would have to prove to a jury, an unanimous jury of 12,
21   and to a standard of beyond a reasonable doubt, before
22   that jury could find you guilty of a particular charge.
23        So the elements of an offense are the essence of
24   the offense, if you will.  Do you understand what we mean
25   by elements of an offense?
```

19

```
1         THE DEFENDANT:  Yes.
2         THE COURT:  All right.  Ms. Dayton?
3         MS. DAYTON:  Thank you, Your Honor.
4         Under the terms of the plea agreement, the
5    defendant has agreed to plead guilty to Counts Two, Three
6    and Four of the fifth superseding indictment, each of
7    which, as I said earlier, charge him with murder in aid of
8    racketeering.
9         For Count Three, the elements of the offense are
10   that the defendant murdered or assisted in the murder of
11   James Reid in violation of the laws of the State of
12   Connecticut; that the defendant acted with the purpose of
13   either gaining entrance to or maintaining and increasing
14   his position in the Aquart enterprise which was a
15   racketeering enterprise engaged in narcotics trafficking
16   activity and that the defendant acted knowingly and
17   intentionally.
18        With respect to Count Two, which is the murder
19   of Tina Johnson, and Count Four, which is the murder of
20   Basil Williams, the elements are that the defendant,
21   acting with one or more other persons, committed or
22   attempted to commit a robbery, and that in the course and
23   in furtherance of that robbery, one or more of the
24   participants in the robbery caused the death of Tina
25   Johnson, and caused the death of Basil Williams, neither
```

20

```
1    of whom were participants in the crime, in violation of
2    the laws of the State of Connecticut.
3         The defendant participated in the robbery and
4    the murders as consideration for the receipt of, or
5    consideration, promise or agreement to pay anything of
6    value from the enterprise which was engaged in
7    racketeering activity, which is narcotics trafficking
8    again, and he acted knowingly and intentionally.
9         And moving onto the penalties, Your Honor, in
10   addition, there's mandatory restitution under the laws in
11   this case and the restitution relates to the funeral
12   expenses for the three victims, which will be joint and
13   several with the four defendants who are charged with
14   these murders, Your Honor.
15        The sentencing guidelines are life for each of
16   the counts.  The government has agreed to, that the
17   defendant should receive two points off for acceptance of
18   responsibility and that the guidelines are still life.
19        The fine range is 25,000 to 250,000-dollars for
20   each count.
21        And $300 is the special assessment, $100 for
22   each count.
23        The defendant has agreed to plead guilty and, in
24   return, the government is going to dismiss the remaining
25   counts of the indictment against the defendant and dismiss
```

21

```
1    the underlying indictment against the defendant, and also
2    at the time of sentencing, Your Honor, the government is
3    going to withdraw the notice to seek the death penalty.
4         Under the terms of the plea agreement, the
5    defendant has also agreed not to appeal or collaterally
6    attack his sentence under 2255 or any other forum if he
7    doesn't receive anything more than three life sentences,
8    understanding he can't really get more than life, but
9    three life sentences, a 250,000-dollar fine, restitution,
10   and five years of supervised release on each count.
11        The defendant has also agreed that in the event
12   for some reason this plea was to be overturned, that the
13   government would reinstitute any of the charges against
14   the defendant, even if the statute of limitations had run
15   on some of them, such as the conspiracy to the drug count,
16   there is no statute of limitations on the murder and the
17   murder counts.
18        THE COURT:  Let me just go back briefly to the
19   waiver of the right to appeal or collaterally attack,
20   although the heading there just mentions the sentence, the
21   body of it indicates that that waiver extends to an
22   agreement not to appeal or collaterally attack either the
23   conviction or the sentence of imprisonment under certain
24   circumstances.  I just want to be sure that we're all on
25   the same page.
```

22

```
1         MS. DAYTON:  Should I -- yes, it's not to
2    appeal, period.
3         THE COURT:  Right.
4         MS. DAYTON:  Correct.
5         There is also, the defendant has agreed under
6    this to waive any rights related to immigration status.
7    It's my understanding he's a permanent legal resident, I
8    think?
9         MR. STERN:  He is.  The greatest thing was it
10   was likely favored to deport him, but that's obviously not
11   going to happen, so he's waiving nothing but I guess he's
12   willing to waive that.
13        MS. DAYTON:  And then on the Hyde Amendment,
14   he's not a prevailing party, meaning he was not
15   inappropriately arrested on these charges, and at the
16   conclusion of the sentencing, all of the defendants'
17   criminal liability for narcotics trafficking and the
18   murders committed in the District of Connecticut will have
19   been satisfied.
20        THE COURT:  All right.  Mr. Stern, anything to
21   add to that summary?
22        MR. STERN:  No.
23        THE COURT:  All right.  Mr. Aquart, do you have
24   any disagreement with anything Ms. Dayton said when she
25   was describing the plea agreement?
```

23

```
1         THE DEFENDANT:  No.
2         THE COURT:  Was her summary consistent with your
3    understanding of the plea agreement?
4         THE DEFENDANT:  Yes.
5         THE COURT:  I want to go over a couple things
6    just to make sure that you understand them fully.
7         First, she recited, and as I noted before, it's
8    set forth on pages one and two, are the elements of these
9    three offenses.  Do you understand each of these elements,
10   that is, specifically what the government would have to
11   prove beyond a reasonable doubt before you could be
12   convicted of these crimes at trial?
13        THE DEFENDANT:  Yes.
14        THE COURT:  Do you understand that each of the
15   charges in Counts Two, Three, and Four carry a mandatory
16   penalty of life in imprisonment, so that if you plead
17   guilty you will be sentenced to life imprisonment?
18        THE DEFENDANT:  Yes.
19        THE COURT:  On page five is the section
20   regarding the waiver of the right to appeal or
21   collaterally attack either your conviction or your
22   sentence.  This section sets forth your agreement that in
23   the event that you receive a sentence that does not exceed
24   three terms of life imprisonment; five years of supervised
25   release; restitution; and a 250,000-dollar fine on each
```

24

```
1    count, that you are agreeing that you will not either
2    appeal or collaterally attack either your conviction or
3    your sentence.  In short, what that means is if those
4    circumstances are met, your case is over in any court.
5         (Defendant conferring with counsel)
6         (Pause)
7         THE COURT:  Do you understand?
8         THE DEFENDANT:  Yes.
9         THE COURT:  Page ten is entitled Stipulation of
10   Offense Conduct.  The word "stipulation" in essence means
11   agreement, and by signing that page you're agreeing that
12   the factual statements set forth on that page are true and
13   accurate.  Do you understand?
14        THE DEFENDANT:  Yep.
15        THE COURT:  Are those statements in fact true
16   and accurate?
17        THE DEFENDANT:  Yeah.
18        THE COURT:  And the last page is a Rider
19   Concerning Restitution.  Restitution is a court order that
20   you pay money to the victim or victims of your crimes.
21   And do you understand that if you plead guilty that you
22   will be required to pay restitution, specifically funeral
23   expenses for the victims jointly and severally with your
24   co-defendants.
25        (Defendant conferring with counsel.)
```

25

```
1         (Pause)
2         THE DEFENDANT:  I understand.
3         THE COURT:  All right.  Is the plea agreement
4  that we've been discussing the entire agreement that
5  you've reached with the government concerning your
6  decision to plead guilty to these three charges?
7         THE DEFENDANT:  Yes.
8         THE COURT:  Has anybody made any representations
9  or promises to you that were not put down in writing here?
10         THE DEFENDANT:  No.
11         THE COURT:  Has anybody sought to force you or
12  intimidate you, coerce you in any way into signing this
13  agreement or into pleading guilty today?
14         THE DEFENDANT:  No.
15         THE COURT:  Whose decision is it for you to
16  plead guilty?
17         THE DEFENDANT:  Mine's.
18         THE COURT:  And have you decided to plead guilty
19  to Counts Two, Three and Four of the fifth superseding
20  indictment because you, in fact, committed the crimes
21  charged there?
22         THE DEFENDANT:  Yeah.
23         THE COURT:  All right.  I'm going to direct that
24  the written plea agreement and the stipulation of offense
25  conduct and rider concerning restitution attached to that
```

26

```
1  agreement be filed with the court.
2         Mr. Aquart, I'm going to return now to the
3  concept of the elements of these offenses.  We've reviewed
4  those when we reviewed your plea agreement but I'm going
5  to ask at this time Ms. Dayton to set forth an evidentiary
6  proffer, meaning statements sufficient to show that the
7  government has proof that would enable the jury to find
8  you guilty of each of these three charges.
9         In short, she's going to describe the conduct
10  that she on behalf of the government believes makes you
11  guilty of these charges.  When she's done I'm going to ask
12  you if you disagree with anything that she has said.
13         MS. DAYTON:  Your Honor, if we were to go to
14  trial, the government would present witnesses with respect
15  to the racketeering enterprise who worked for the
16  enterprise, who sold crack contain, over 280 grams, during
17  the course of the conspiracy.  And they would testify
18  regarding Mr. Aquart's role, this defendant's role in the
19  offense.  I say "this defendant" because there are two
20  Aquarts.
21         We would also put on witnesses, a witness who
22  was present inside the apartment building, inside the
23  apartment when the murders were committed and who
24  participated in the murders and who could testify
25  regarding Mr. Aquart's role in the murders.  And not only
```

27

```
1  his role but their reasons for being there, including the
2  fact that there was a rivalry, that the enterprise, that
3  they went there partly for the purpose of committing a
4  robbery and partly for the purpose of committing murder.
5  And that, in fact, Tina Johnson, James Reid and Basil
6  Williams died as a result of acts committed by the
7  defendant and others inside the apartment building.
8         To prove the deaths, we'd put on police
9  officers, medical examiners, amongst other people.  It's
10  my understanding that Mr. Aquart's attorneys have shared
11  with him the transcripts of a trial against one of the
12  co-defendants which delineated the proof that would also
13  be presented against Mr. Aquart in this case.
14         THE COURT:  All right.  Thank you.
15         Mr. Stern, I understand that Mr. Aquart intends
16  to, in lieu of a colloquy, intends to read a statement
17  that would satisfy the elements of these offenses.
18         MR. STERN:  The statement he intends to read is
19  a statement which is part of the plea agreement, page ten
20  of the plea agreement.
21         THE COURT:  All right.
22         MR. STERN:  And with your permission, he will
23  read that into the record and he admits that those are in
24  fact his role in this crime.
25         THE COURT:  Very good.  Thank you.
```

28

```
1         THE DEFENDANT:  "I and the government stipulate
2  to the following offense conduct that gives rise to the
3  defendant's agreement to plead guilty.
4         "With respect to Count Three, murder of James
5  Reid, for the purpose of maintaining my position in the
6  criminal racketeering enterprise described in the fifth
7  superseding indictment, which is an enterprise engaged in
8  narcotics trafficking, the activities of which affect
9  interstate commerce, I, on August 24th of 2005, knowingly,
10  willfully and intentionally murdered James Reid.  The
11  murder which took place in Bridgeport, Connecticut, was
12  in, in violation of the laws of the State of Connecticut.
13         With respect to Count Two, murder of Tina
14  Johnson, and Count Four, murder of Basil Williams, in
15  exchange for the receipt of, or in exchange for a promise
16  or agreement to pay anything of pecuniary value from a
17  criminal racketeering enterprise, I agreed to participate
18  in what I believed would be a robbery with Azibo Aquart,
19  John Taylor and Efrain Johnson.
20         "Pursuant to my agreement, on August 24th, 2005,
21  I went to apartment 101 in the Charles Street Apartments
22  in Bridgeport, Connecticut, with Azibo Aquart, John Taylor
23  and Efrain Johnson in order to commit the robbery, and
24  during the commission of the crime, other participants in
25  the crime murdered Tina Johnson and Basil Williams in
```

29

```
1   violation of the laws of the State of Connecticut."
2           THE COURT:  All right, thank you.  Any further
3   inquiry needed?
4           MS. DAYTON:  No, but I just believe you were
5   going to inquire of the defendant if he agreed with the
6   government's ability to prove those elements.
7           THE COURT:  Fair enough.  Mr. Aquart, do you
8   agree that the government has sufficient evidence to prove
9   each of the elements that are listed in the plea agreement
10  and that you just described in what you read in the
11  stipulation of offense conduct?
12          THE DEFENDANT:  Yeah.
13          MS. DAYTON:  Nothing else.  Thank you, Your
14  Honor.
15          THE COURT:  Mr. Aquart, it's now time to take
16  your plea to each of the three counts in the fifth
17  superseding indictment, Counts Two, Three and Four.
18          We can read those counts out loud to you or you
19  can waive that reading, if you would prefer.
20          THE DEFENDANT:  That won't be necessary.
21          THE COURT:  All right, thank you.  I would ask
22  the courtroom deputy please to put Mr. Aquart to plea.
23          THE CLERK:  Yes, Your Honor.  In the case of the
24  United States v. Azikiwe Aquart, an a/k/a Zee and Ziggy,
25  Criminal Number 3:06CR-160, as to Counts Two, Three and
```

30

```
1   Four of the fifth superseding indictment, charging you
2   with a violation of Title 18, United States Code, Sections
3   1959(a)(1), and Title 18, United States Code, Section 2,
4   what is your plea?
5           THE DEFENDANT:  Guilty.
6           THE CLERK:  Your Honor, the defendant pleads
7   guilty to Counts Two, Three and Four of the fifth
8   superseding indictment.
9           THE COURT:  Thank you.  On the basis of the
10  written plea agreement, the stipulation of offense conduct
11  attached to that agreement, and the statements made by
12  Mr. Aquart under oath in open court today, it is the
13  finding of the court in the case of United States v.
14  Azikiwe Aquart that Mr. Aquart is fully competent and
15  capable of entering an informed please, he's aware of the
16  nature of the charges and the consequences of the pleas,
17  and that the pleas of guilty are knowing and voluntary
18  pleas, supported by an independent basis in fact
19  satisfying each of the essential elements of these
20  offenses.
21          Mr. Aquart is, therefore, adjudged guilty of
22  Counts Two, Three and Four of the fifth superseding
23  indictment, and his pleas to those counts are accepted.
24  Findings of guilty shall enter and this case is referred
25  to the U. S. Probation Office for a presentence
```

31

```
1   investigation.
2           Mr. Aquart, the next thing that's going to
3   happen in your case, or will happen quite soon in your
4   case, is that you'll be interviewed, as most likely will
5   your family and friends, by an U. S. Probation Officer.
6   The U. S. Probation Office works for the Court, not for
7   the prosecutor, but I need to advise you, whatever you
8   tell the probation officer could be used against you at
9   your sentencing.  Do you understand that?
10          THE DEFENDANT:  Yes.
11          THE COURT:  All right.  And because this is an
12  important proceeding in your case, you have the right to
13  have your lawyers present during that interview.  Are you
14  aware of that or do you understand that?
15          THE DEFENDANT:  I understand that.
16          MR. STERN:  I would like to be notified.  I will
17  be present for the interview.
18          THE COURT:  Yes, thank you.
19          I'd like to set the following schedule and hear
20  if there's any concerns about that schedule.  Mr. Aquart
21  should be presented for sentencing at 3:00 p. m. on
22  November 14th, 2011, here in Courtroom One in Bridgeport.
23          The presentence report must be disclosed to the
24  defendant, counsel for the defendant and to the government
25  by October 7th; objections must be submitted by
```

32

```
1   October 21; and a revised presentence report must be
2   disclosed to counsel and the Court by November 4th.
3   Sentencing motions or memoranda should be filed at least
4   seven days in advance of sentencing with any objections or
5   responses due four days in advance of sentencing.
6           Any questions or concerns regarding that
7   schedule?
8           MS. DAYTON:  No, Your Honor.
9           MR. STERN:  No.
10          THE COURT:  Is there anything else we should
11  take up today?
12          MR. STERN:  Not that I'm aware of.
13          MS. DAYTON:  No, thank you.
14          THE COURT:  Thank you.  We'll stand in recess.
15          (Whereupon the above matter was adjourned at
16  12:50 o'clock, p. m.)
```

33

C E R T I F I C A T E


    I, Susan E. Catucci, RMR, Official Court

Reporter for the United States District Court for the

District of Connecticut, do hereby certify that the

foregoing pages are a true and accurate transcription of

my shorthand notes taken in the aforementioned matter to

the best of my skill and ability.



    /S/ Susan E. Catucci
_____

      Susan E. Catucci, RMR
       Official Court Reporter
       915 Lafayette Boulevard
   Bridgeport, Connecticut  06604
        Tel: (917) 703-0761