# 12-5086

*To Be Argued By:*
TRACY LEE DAYTON

## United States Court of Appeals

### FOR THE SECOND CIRCUIT
### Docket No. 12-5086

————

UNITED STATES OF AMERICA,

*Appellee,*

-vs-

AZIBO AQUART, aka D, aka Dreddy, aka Jumbo,
aka Azibo Smith, aka Azibo Siwatu Jahi Smith,

*Defendant-Appellant,*

(For continuation of caption, see inside cover)

————

ON APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF CONNECTICUT

### SUPPLEMENTAL BRIEF FOR THE UNITED
### STATES OF AMERICA

DEIRDRE M. DALY
*United States Attorney*
*District of Connecticut*

TRACY LEE DAYTON
JACABED RODRIGUEZ-COSS
SANDRA S. GLOVER
*Assistant United States Attorneys*

LESLIE R. CALDWELL
*Assistant Attorney General*

SUNG-HEE SUH
*Deputy Assistant*
*Attorney General*

DAVID M. LIEBERMAN
*Attorney*
*Criminal Division*
*Appellate Section*

AZIKIWE AQUART, aka Zee, Nathaniel Grant, aka
Correctional Officer Stone, EFRAIN JOHNSON,

    *Defendants.*

# **Table of Contents**

Table of Authorities ............................................. iii

Statement of Issues Presented for Review ......... x

Preliminary Statement ........................................ 1

I. Congress did not violate the sovereignty of the State of Connecticut by enacting the drug-related murder and VICAR statutes. ............... 5

   A. Congress did not offend the principles of federalism by enacting laws that place no affirmative burden on the State of Connecticut. .................................................. 5

   B. The federal government may seek the death penalty for crimes committed in a jurisdiction where capital punishment is proscribed by state law. ............................. 9

   C. Aquart's claim fails the Supremacy Clause. 13

   D. It would violate due process to permit imposition of the federal death penalty only in those states that do not prohibit capital punishment. ............................................... 16

II. Congress properly exercised its legislative
authority under the Commerce Clause in
enacting the drug-related murder and VICAR
statutes pursuant to which Aquart was
convicted. ...................................................... 19

A. The drug-related murder statute ............ 19

B. The violent crimes in aid of racketeering
statute ...................................................... 21

C. The Supreme Court's decisions in *Lopez*
and *Morrison* do not undermine the consti-
tutionality of the drug-related murder and
VICAR statutes ....................................... 24

D. The death penalty provisions of the drug-
related murder and VICAR statutes are
constitutional exercises of congressional
authority under the "Necessary and Prop-
er Clause." ............................................... 30

E. Aquart's criminal conduct fell squarely
within the activity prohibited by the drug-
related murder and the VICAR statutes
and therefore imposition of the death pen-
alty in his case was proper. ..................... 35

Conclusion ....................................................... 39

Federal Rule of Appellate Procedure 32(a)(7)(C)
Certification

ii

# Table of Authorities

Pursuant to "Blue Book" rule 10.7, the Government's citation of cases does not include "certiorari denied" dispositions that are more than two years old.

## Cases

*Alden v. Maine,*
   527 U.S. 706 (1999) ..................................... 5, 6

*Arizona v. United States,*
   132 S. Ct. 2492 (2012) ..................................... 6

*Armstrong v. Exceptional Child Center, Inc.,*
   135 S. Ct. 1378 (2015) ................................... 32

*Burroughs v. United States,*
   290 U.S. 534 (1934) ...................................... 34

*Chandler v. Johnston,*
   133 F.2d 139 (9th Cir. 1943) ........................ 32

*City of New York v. Beretta U.S.A. Corp.,*
   524 F.3d 384 (2d Cir. 2008) ....................... 6, 7

*Cleveland v. United States,*
   329 U.S. 14 (1946) .......................................... 8

*Dean v. University at Buffalo School of Medicine and Biomedical Sciences,*
   804 F.3d 178 (2d Cir. 2015) ........................... 3

*Edgar v. MITE Corp.*,
 457 U.S. 624 (2012) ..................................... 15

*Gonzales v. Raich*,
 545 U.S. 1 (2005) ...................................*passim*

*Gregory v. Ashcroft*,
 501 U.S. 452 (1991) ........................................ 5

*Heath v. Alabama*,
 474 U.S. 82 (1985) ......................................... 5

*Lore v. City of Syracuse*,
 670 F.3d 127 (2d Cir. 2012) ........................... 3

*Mistretta v. United States*,
 488 U.S. 361 (1989) ..................................... 31

*M'Culloch v. Maryland*,
 17 U.S. 316 (1819) ................ 14, 15, 32, 33, 34

*New York v. United States*,
 505 U.S. 144 (1992) ........................................ 7

*Printz v. United States*,
 521 U.S. 898 (1997) ........................................ 7

*Roper v. Simmons*,
 543 U.S. 551 (2005) ..................................... 35

*Connecticut v. Santiago*,
 122 A.3d 1 (Conn. 2015) ................................. 2

iv

*Skipper v. South Carolina,*
    476 U.S. 1 (1986) ........................................... 35

*Stone v. City and County of San Francisco,*
    968 F.2d 850 (9th Cir. 1992) ........................ 14

*Sunshine Anthracite Coal Co. v. Adkins,*
    310 U.S. 381 (1940) ...................................... 30

*United States v. Acosta-Martinez,*
    252 F.3d 13 (1st Cir. 2001) ..................... 10, 11

*United States v. Aguilar,*
    585 F.3d 652 (2d Cir. 2009) .............. 20, 26, 28

*United States v. Ayala,*
    601 F.3d 256 (4th Cir. 2010) ........................ 31

*United States v. Barrett,*
    496 F.3d 1079 (10th Cir. 2007) .................... 26

*United States v. Britt,*
    112 Fed. Appx. 352 (5th Cir. 2004) .............. 27

*United States v. Comstock,*
    560 U.S. 126 (2010) ............................ 5, 33, 34

*United States v. Concepcion,*
    983 F.2d 369 (2d Cir. 1992) ......................... 22

*United States v. Crenshaw,*
    359 F.3d 977 (8th Cir. 2004) ........................ 23

v

*United States v. Dantzler*,
   771 F. 3d 137 (2d Cir. 2014) ........................... 4

*United States v. Davis*,
   906 F.2d 829 (2d Cir. 1990) ...................... 8, 12

*United States v. Feliciano*,
   223 F.3d 102 (2d Cir. 2000) .............. 23, 28, 29

*United States v. Fell*,
   571 F.3d 264 (2d Cir. 2009) ................ 6, 16, 17

*United States v. Fox*,
   95 U.S. 670 (1877) ........................................ 30

*United States v. Genao*,
   79 F.3d 1333 (2d Cir. 1996) .......................... 21

*United States v. Goodwin*,
   141 F.3d 394 (2d Cir. 1997) .................... 21, 26

*United States v. Hager*,
   721 F.3d 167 (4th Cir. 2013), *cert. denied*, 134
   S. Ct. 1936 (2014) ........................................ 26

*United States v. Jacques*,
   No. 2:08cr117, 2011 WL 3881033 (D. Vermont
   September 2, 2011) .................... 11, 12, 17, 18

*United States v. Johnson*,
   900 F. Supp. 2d 949 (N.D. Iowa 2012) .......... 12

*United States v. Lampley*,
   127 F.3d 1231 (10th Cir. 1997) ...................... 8

vi

*United States v. Lanza*,
   260 U.S. 377 (1922) ........................................ 6

*United States v. Lopez*,
   514 U.S, 549 (1995) .............. 19, 24, 25, 26, 28

*United States v. Mapp*,
   170 F.3d 328 (2d Cir. 1999).................... 23, 29

*United States v. Meskini*,
   319 F.3d 88 (2d Cir. 2003)........................ 7, 31

*United States v. Miller*,
   116 F.3d 641 (2d Cir. 1997).......................... 21

*United States v. Morrison*,
   529 U.S. 598 (2000) .................... 24, 25, 26, 28

*United States v. Nascimento*,
   491 F.3d 25 (1st Cir. 2007).......................... 23

*United States v. O'Reilly*,
   No. 05-80025, 2007 WL 2421378 (E.D. Mich.
   Aug. 23, 2007) .............................................. 12

*United States v. Parkes*,
   497 F.3d 220 (2d Cir. 2007).......................... 28

*United States v. Pleau*
   680 F.3d 1 (1st Cir. 2012) (en banc) ....... 14, 15

*United States v. Plotts*,
   347 F.3d 873 (10th Cir. 2003) ................. 31, 32

*United States v. Richardson,*
　　793 F.3d 612 (6th Cir. 2015) ......................... 31

*United States v. Ricketts,*
　　317 F.3d 540 (6th Cir. 2003) ........................ 27

*United States v. Tom,*
　　565 F.3d 497 (8th Cir. 2009) ........................ 31

*United States v. Torres,*
　　129 F.3d 710 (2d Cir. 1997).................... 28, 29

*United States v. Tuck Chong,*
　　123 F. Supp. 2d 563 (D. Hawaii 1999) . 8, 9, 12

*United States v. Turkette,*
　　452 U.S. 576 (1981) ..................................... 22

*United States v. Umana,*
　　750 F.3d 320 (4th Cir. 2014), *cert. denied,* 135
　　S. Ct. 2856 (2015)................................... 23, 29

*United States v. Walker,*
　　142 F.3d 103 (2d Cir. 1998).............. 20, 21, 26

*Williamson v. Mazda Motor of America, Inc.,*
　　562 U.S. 323 (2011) ...................................... 13

## Statutes

18 U.S.C. § 924 ............................................. 9, 10

18 U.S.C. § 1952B ............................................ 22

18 U.S.C. § 1959........................................*passim*

21 U.S.C. § 801 ............................................. 20, 34

21 U.S.C. § 848 ............................................. *passim*

42 U.S.C. § 13891 ............................................. 24

## Other Authorities

Pub. L. No. 91-452 ............................................. 22

Pub. L. No. 98-473 ............................................. 22

U.S. Const., art. I, § 8, cl. 18 ............................ 30

U.S. Const. art. VI ............................................. 13

## Statement of Issues
## Presented for Review

I.  Whether Connecticut's elimination of the death penalty for state crimes precludes imposition of the federal death penalty for the federal crimes the defendant committed here?

II. Whether the death penalty is a "necessary and proper" punishment for the offenses in this case?

x

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

## Docket No. 12-5086

_____

UNITED STATES OF AMERICA,

*Appellee,*

-vs-

AZIBO AQUART, aka D, aka Dreddy, aka Jumbo, aka Azibo Smith, aka Azibo Siwatu Jahi Smith,

*Defendant-Appellant.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT

## SUPPLEMENTAL BRIEF FOR THE UNITED STATES OF AMERICA

## Preliminary Statement

On September 10, 2015, after the Connecticut Supreme Court held that the Connecticut Constitution prohibits imposition of the death penalty for state offenses, Azibo Aquart requested permission to file a supplemental brief to address one issue: "whether the imposition of the death penalty in federal court, in a state which

prohibits the death penalty as violative of its constitution, constitutes cruel and unusual punishment under the Eighth Amendment." Dkt. 158-2, 2 (citing *Connecticut v. Santiago*, 122 A.3d 1 (Conn. 2015)). This Court granted Aquart permission to file a supplemental brief on this "one additional issue." Dkt. 162.

The supplemental brief that Aquart filed does not address this "one additional issue," however. Indeed, Aquart expressly states that he is *not* raising an Eighth Amendment claim. ASB3. Instead, Aquart argues that because the State of Connecticut no longer permits capital punishment, imposition of a death sentence in his case would violate Connecticut's sovereignty and the Tenth Amendment. Aquart Supplemental Brief ("ASB") 2. Additionally, Aquart raises what he characterizes as an "as-applied" challenge[1] to the death penalty provisions of the Controlled Substances Act ("CSA") and the violent crimes in aid of racketeering ("VICAR") statute, claiming that, under the circumstances of his case, those

---

[1] Aquart claims that he is not disputing: (1) Congress's power, pursuant to the Commerce Clause, to enact the drug-related murder and VICAR statutes; or (2) the federal government's authority to punish violations of federal law. ASB2-3. Although Aquart claims that he is not arguing that "imposition of a death sentence in Connecticut violates the Tenth Amendment," ASB3, that is a major thrust of his brief.

2

provisions violate the Necessary and Proper Clause. *See* ASB2-3. Specifically, Aquart asserts that the murders of which he was convicted were "non-economic and essentially local in nature" and that the federal government therefore lacked the authority to seek the death penalty for his crimes. *See* ASB2; ASB17.

This Court should not reach any of Aquart's present claims because they were not the issues authorized by this Court's order. In addition, the legal foundation for Aquart's newly raised "Necessary and Proper" claim is unrelated to the Connecticut Supreme Court decision in *Santiago* and, in fact, was available to Aquart long before that court issued its decision. Accordingly, because there are no changed circumstances to warrant Aquart's failure to press the "Necessary and Proper" claim in his opening brief, it should be deemed abandoned. *Dean v. University at Buffalo School of Medicine and Biomedical Sciences*, 804 F.3d 178, 192 (2d Cir. 2015); *Lore v. City of Syracuse*, 670 F.3d 127, 149 (2d Cir. 2012).

Should this Court choose to reach the merits of this new claim, it should review for plain error because Aquart never raised this claim below. The plain error "standard is met when (1) there is an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; (3) the error affected the appellant's substantial rights, which in the ordinary case means it affected the

outcome of the district court proceedings; and (4) the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *United States v. Dantzler*, 771 F. 3d 137, 141 (2d Cir. 2014) (internal quotations omitted).

Viewed under any standard, Aquart's arguments are without merit. To begin, under the doctrine of dual sovereignty, the federal government has the power to independently determine what shall be an offense against its authority and how it intends to punish such offenses. Accordingly, federal courts have universally rejected the claim that seeking the death penalty for a violation of federal law in a non-death penalty state violates the Tenth Amendment. Moreover, Aquart's murderous acts, undertaken in furtherance of his narcotics trafficking enterprise, were not purely local offenses outside of federal jurisdiction. Rather, they were violent crimes committed in furtherance of criminal activities that affect interstate commerce—such as narcotics trafficking and racketeering activity—and the federal government has a substantial interest in suppressing both those criminal activities and the violent crimes committed in furtherance of those activities.

4

## I. Congress did not violate the sovereignty of the State of Connecticut by enacting the drug-related murder and VICAR statutes.

Aquart alleges that the statutes pursuant to which he was sentenced "violate[] the principle of state sovereignty." *See* ASB12. This claim is without merit. Neither 21 U.S.C. § 848(e)(1)(A) nor 18 U.S.C. § 1959 "invade state sovereignty or otherwise improperly limit the scope of powers that remain with the States." *United States v. Comstock*, 560 U.S. 126, 144 (2010) (internal quotation omitted).

## A. Congress did not offend the principles of federalism by enacting laws that place no affirmative burden on the State of Connecticut.

The United States Constitution recognizes that the several states and the federal government are dual and separate sovereigns. *See Alden v. Maine*, 527 U.S. 706, 714-15 (1999); *Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991). The principle of dual and separate sovereignty permits the states and the federal government to simultaneously define and enforce their own criminal law, consistent with their own interests and independent constitutional constraints. *See Heath v. Alabama*, 474 U.S. 82, 88 (1985) (recognizing that when a defendant commits a criminal act that is proscribed by two sovereigns, he

5

has committed two distinct offenses and may be criminally liable to each sovereign); *Alden*, 527 U.S. at 713 (recognizing that the federal government has broad, "often plenary authority over matters within its recognized competence," but that states retain their own sovereignty). Moreover, "an act denounced as a crime by both national and state sovereignties is an offense against the peace and dignity of both and may be punished by each." *United States v. Lanza*, 260 U.S. 377, 382 (1922). From the existence of this constitutional structure follows the possibility that laws can be in conflict or at cross-purposes. *See Arizona v. United States*, 132 S. Ct. 2492, 2500 (2012).

But, as this Court has explained, "[f]ederal statutes validly enacted under one of Congress's enumerated powers—here, the Commerce Clause—cannot violate the Tenth Amendment unless they commandeer the states' executive officials . . . or legislative processes." *City of New York v. Beretta U.S.A. Corp.*, 524 F.3d 384, 396-97 (2d Cir. 2008) (internal citations and quotations omitted); *see also United States v. Fell*, 571 F.3d 264, 269 (2d Cir. 2009) (Raggi, J., concurring in denial of rehearing en banc) ("The selection of a federal jury to hear a case arising under federal law involves the exercise of exclusive federal power. It does not intrude on any state *function*; much less does it trench on the exercise of any state *power*. It poses no interference with

6

legitimate state *activities*.") (emphasis in original).

In short, the federal government may not compel a state to "promulgate and enforce laws and regulations." *Printz v. United States*, 521 U.S. 898, 926 (1997) (citation and internal quotation marks omitted). In fact, "'[e]ven where Congress has the authority under the Constitution to pass laws requiring or prohibiting certain acts, it lacks the power directly to compel the States to require or prohibit those acts. . . . [T]he Commerce Clause, for example, authorizes Congress to regulate interstate commerce directly; it does not authorize Congress to regulate state governments' regulation of interstate commerce.'" *Id.* at 924 (quoting *New York v. United States*, 505 U.S. 144, 166 (1992)).

Here, however, Congress has acted entirely within its enumerated powers. That is, Congress enacted statutes to prohibit criminal activities that affect interstate commerce and prescribed sentences that "in its view reflect[ed] the seriousness of the underlying offense[s] . . . ." *United States v. Meskini*, 319 F.3d 88, 91 (2d Cir. 2003). Congress did not seek to compel the State of Connecticut to legislate or to enforce federal laws. Nor did it "commandeer any branch of state government" by imposing an affirmative duty on the State. *See City of New York*, 524 F.3d at 397 (internal quotation omitted). Indeed, Connecticut remains free to criminalize and pun-

7

ish violations of State law in accordance with the acts of its own legislature and to outlaw imposition of the death penalty, even for brutal acts of murder such as the ones perpetrated by Aquart.

Simply stated, Aquart has failed to demonstrate that Congress offended the principles of federalism by enacting a death penalty provision that places absolutely no affirmative burden on the State. Federal laws criminalizing conduct within traditional areas of state law, whether or not the states criminalize the same conduct, are commonplace under the dual-sovereign concept of our federalist system and involve no *per se* infringement of state authority. *See, e.g., Cleveland v. United States*, 329 U.S. 14, 19 (1946) (holding prohibition on interstate transportation for purposes of prostitution was not an invasion of traditional area of state regulation). The federal government need not defer to state interests in defining crimes, and Aquart's argument to the contrary relies on the "flawed premise" that the government lacks constitutional authority to punish federal crimes. *United States v. Tuck Chong*, 123 F. Supp. 2d 563, 567 (D. Hawaii 1999) (citing *United States v. Davis*, 906 F.2d 829 (2d Cir. 1990)). "[S]o long as there is a constitutionally authorized federal nexus, the federal government is free to act anywhere within the United States." *Id.* at 567 (quoting *United States v. Lampley*, 127 F.3d 1231, 1246 (10th Cir. 1997)). Because the federal government has con-

8

stitutional authority to proscribe and punish the offenses Aquart committed, the defendant has failed to establish a Tenth Amendment violation.

## B. The federal government may seek the death penalty for crimes committed in a jurisdiction where capital punishment is proscribed by state law.

Aquart also claims that the State of Connecticut's policy against imposing the death penalty should override the federal government's interest in seeking whatever penalty it deems appropriate for a violation of federal law. *See* ASB16-18. Noticeably absent from Aquart's brief is any citation to the numerous federal courts that have rejected Tenth Amendment claims like the one he makes now.

In *Tuck Chong*, for example, the defendant, who was charged with a violation of 18 U.S.C. § 924(j), moved to strike the notice of intent to seek the death penalty based, in part, on a claim that the Tenth Amendment prohibited a death sentence because the murder took place in Hawaii, which is a non-death penalty state. 123 F. Supp. 2d at 565. In rejecting the defendant's claim, the court noted that his argument was based upon the "flawed premise" that the federal government lacked the authority to prosecute and sentence the defendant for crimes committed against the United States. *Id.* at 567. The court explained that "Congress determined that

a sentence of death is available for a violation of § 924(j)," and that "the federal government has the power to provide for such a sentence, despite that the charged offense took place in a state that does not provide for a similar sentence," without violating the Tenth Amendment or the State's sovereignty. *Id.*

Similarly, in *United States v. Acosta-Martinez*, 252 F.3d 13, 18 (1st Cir. 2001), defendants charged with a federal capital offense— murder of a federal witness—moved to dismiss the notice of intent to seek the death penalty. The defendants claimed, *inter alia*, that the federal government should not be permitted to seek the death penalty in Puerto Rico because the law of the Commonwealth did not permit such a penalty. The First Circuit rejected this argument, explaining that Puerto Rico has the authority to bar the death penalty in criminal proceedings in the Commonwealth courts, but that Congress retains the power to prosecute and penalize violations of the federal law in the Courts of the United States, even when such violations occur in Puerto Rico. *Id.* at 19-20. The Court explained that because there was "no claim, nor could there be, that this is purely a local Puerto Rican matter in which the United States government has no interest . . . [t]he federal interest in punishing violations of federal law is manifest." *Id.* at 19. The Court further noted that, "Puerto Rico is not alone in its abhorrence of the

10

death penalty. Some twelve states join it in its views. But those state constitutions also do not trump federal criminal law when Congress intends otherwise . . . There is little reason to think that the federal interest in defining the punishment for federal crimes would have been considered by Congress to be a matter for local veto power." *Id.* at 20.

Likewise, in *United States v. Jacques*, No. 2:08cr117, 2011 WL 3881033 (D. Vermont September 2, 2011), the defendant argued that "imposition of the federal death penalty for a traditionally state-law offense, such as kidnapping, in a state that does not authorize the death penalty under its own laws" violates the Tenth Amendment. *Id.* at *2. The court rejected the defendant's argument. First, the court explained that the "federal kidnapping statute is an unremarkable and facially valid exercise of Congress's long-established power to regulate the channels and instrumentalities of interstate commerce under the Commerce Clause, regardless of whether the underlying conduct is also amenable to proscription under a state's police power." *Id.* (citation and internal quotation marks omitted). In addition, the court found that "a Tenth Amendment violation does not arise simply because the United States government, by virtue of federal legislation, has chosen to make the death penalty applicable for federal crimes even in states that do not authorize capital punishment

11

under state law." *Id.* at *3. Relying on *Tuck Chong* and *United States v. Davis*, 906 F.2d 829, 832 (2d Cir. 1990), the court found that under the doctrine of dual sovereignty, "[t]he federal government may, independent of the State of [Vermont], determine the appropriate punishment for a crime against the United States." *Id.* at *3 (quoting *Tuck Chong*, 123 F. Supp. 2d at 567).

Other courts have reached similar conclusions. *See, e.g.*, *United States v. O'Reilly*, No. 05-80025, 2007 WL 2421378, *3-4 (E.D. Mich. Aug. 23, 2007) (holding that imposition of federal death penalty for violation of federal law in a non-death penalty state did not violate Tenth Amendment); *United States v. Johnson*, 900 F. Supp. 2d 949, 961–63 (N.D. Iowa 2012) (citing *Jacques* and rejecting argument "that a Tenth Amendment violation arises simply because the United States government, by virtue of federal legislation, has chosen to make the death penalty applicable for federal crimes, even in states that do not authorize capital punishment under state law, because it ignores the doctrine of dual sovereignty").

As these courts have all recognized, Congress has the authority to impose the death penalty for federal crimes, regardless of any State's policy on the death penalty. Because Aquart has presented no reason to question the unanimous

12

holdings of these courts, his Tenth Amendment argument should be rejected.

## C. Aquart's claim fails the Supremacy Clause.

The failings of Aquart's Tenth Amendment argument are further evident when viewed through the lens of the Supremacy Clause. In particular, Aquart extols a form of reverse preemption, whereby a state's choice not to permit the death penalty would eviscerate the federal government's power and prerogative to proceed with a federal death penalty prosecution in that state. This idea is in direct contravention of the Supremacy Clause.

The Supremacy Clause provides:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or laws of any State to the Contrary notwithstanding.

U.S. Const., art. VI, § 2. It is beyond dispute that, "[u]nder ordinary conflict pre-emption principles, a state law [that] stands as an obstacle to the accomplishment and execution of the full purposes and objectives of a federal law" is void. *See Williamson v. Mazda Motor of America, Inc.*, 562 U.S. 323, 330 (2011). Relatedly, a state may not, consistent with the Supremacy Clause,

13

legislate concerning areas of exclusive federal jurisdiction. *M'Culloch v. Maryland*, 17 U.S. 316, 360-61 (1819) (striking down state tax on Second Bank of the United States). Nor may a state law "stand in the way of a federal court's remedial scheme." *Stone v. City and County of San Francisco*, 968 F.2d 850, 862 (9th Cir. 1992).

The First Circuit recently considered the Supremacy Clause in the context of a potential death penalty case in Rhode Island, a non-death penalty state. Jason Pleau was indicted on charges of Hobbs Act robbery and causing death through the use of a firearm during a crime of violence. 680 F.3d 1, 3 (1st Cir. 2012) (en banc). At the time the indictment was returned, Pleau was serving a state sentence, and thus the federal government sought a writ of habeas corpus *ad prosequendum* from the district court to secure custody of Pleau. When the district court ordered Pleau to be delivered into federal custody, Pleau appealed and the Governor of Rhode Island, who opposed the death penalty, intervened on Pleau's behalf. *Id.* at 3-4.

The First Circuit sitting en banc ordered that Pleau be produced for federal prosecution. The Court explained that, [u]nder the Supremacy Clause, the habeas statute—like any other valid federal measure—overrides any contrary position or preference of the state . . . . *Id.* at 6 (citations omitted). The Court continued:

14

The Supremacy Clause operates in only one direction and has nothing to do with comity: it provides that Congress' enactments are "the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. That there is an overriding federal interest in prosecuting defendants indicted on federal crimes needs no citation . . . .

* * *

One can hardly imagine Congress . . . empowering a state governor to veto a federal court habeas writ—designed to bring a federally indicted prisoner to federal court for trial on federal charges—because the governor opposed the federal penalty that might be imposed if a conviction followed.

*Id.* at 6-7.

These precepts preclude Aquart's Tenth Amendment theory. State laws abolishing capital punishment, if construed as precluding imposition of the death penalty pursuant to the Federal Death Penalty Act, would frustrate "accomplishment and execution of the full purposes and objectives of Congress." *Edgar v. MITE Corp.*, 457 U.S. 624, 634 (2012). Such state action in an area of federal jurisdiction is void under the Supremacy Clause. *See M'Culloch*, 17 U.S. at 316.

15

### D. It would violate due process to permit imposition of the federal death penalty only in those states that do not prohibit capital punishment.

Aquart states that he is not proposing that "the federal government must refrain from seeking the death penalty in all cases." *See* ASB17-18. Instead, he suggests that capital punishment should "remain[] available for murders committed in states that have provided for it in their own penal statutes, and in states that have not banned it as a matter of state constitutional law." ASB18. Aquart's position is untenable. To suggest that the Federal Death Penalty Act ("FDPA") should differ in application based upon the state in which one lives would create the very geographical disparity that Aquart, in his opening brief, proclaimed to be a hallmark of an unconstitutional death penalty system.[2] And, it would defy precedent by making imposition of the death penalty a function of local politics and state boundaries.

The inevitability of such disparities was precisely what troubled many members of this Court in *Fell*. In that case, this Court considered, in the context of an Eighth Amendment

---

[2] Aquart argued in his opening brief that capital punishment violates the Eighth Amendment because it turns on "such a wholly arbitrary factor . . . as the location of the trial." *See* AOB226.

16

claim, whether each state's adoption or rejection of the death penalty should somehow be factored into the selection of federal capital juries serving therein. *See* 571 F.3d at 268-78 (Raggi, J., concurring in denial of rehearing en banc). In rejecting the proposition, Judge Raggi explained that local proclivities concerning the death penalty cannot be permitted to affect FDPA cases:

> The Eighth Amendment, no less than other provisions of the Constitution, must apply equally throughout the states. Nothing in the Court's jurisprudence has ever suggested that federalism warrants retailoring the Eighth Amendment in each state—or each vicinage—to test federal death sentences by reference to local practices.

*Id.* at 274.

Similarly, in *Jacques*, the defendant, like Aquart, argued that courts should apply a state-by-state standard in order to determine the constitutionality of seeking the federal death penalty in any given state. The district court rejected the defendant's position reasoning that it would create more constitutional concerns than it purports to address. *See Jacques*, 2011 WL 3881033, at *3. The court explained that:

> Under the FDPA, like many other post-*Furman* capital sentencing schemes, narrowing is accomplished through the use of

17

eligibility factors which, to be valid, must
make [the] defendant's conduct 'worse or
more heinous than that of other defend-
ants charged with capital crimes. Deter-
mining that certain offenders convicted of
death-eligible offenses under federal law
would not be eligible for the death penalty
simply because of the district in which
they were tried—while others, convicted of
the same federal offenses in other districts
would be eligible—would violate the prin-
ciple that, to be rational, narrowing must
be based on the heinousness of the offense.

*Id.* at *5 (internal citations and quotation marks
omitted).

The same principles apply with equal force
here. Aquart's stance permitting disjointed im-
position of the federal death penalty would be a
clear violation of Supreme Court mandates that
require reasoned and individualized sentencing
schemes, and would lead to unconstitutional and
arbitrary applications of federal law. According-
ly, for this and all the reasons described above,
Aquart's Tenth Amendment argument fails.

18

## II. Congress properly exercised its legislative authority under the Commerce Clause in enacting the drug-related murder and VICAR statutes pursuant to which Aquart was convicted.

Aquart concedes, as he must, that Congress may outlaw narcotics trafficking and racketeering activity because such conduct has an effect on interstate commerce. *See* ASB5. Nonetheless, Aquart argues that the government should not be permitted to prosecute drug-related murders or murders in aid of racketeering—especially ones that he has committed—alleging that "[t]hey are, in essence, local crimes." ASB7; *see also* ASB12 ("[T]he federal government has no jurisdictional interest in the local murders of which Aquart has been convicted."). Aquart is wrong.

### A. The drug-related murder statute

Aquart asserts that the drug-related murders of which he was convicted had "no federal nexus themselves" and that it was only their connection to drug trafficking that supported federal jurisdiction. ASB4. That fact is, at the same time, correct and irrelevant. It is well-established that, pursuant to the Commerce Clause, "Congress has the power to regulate activities that substantially affect interstate commerce." *Gonzales v. Raich*, 545 U.S. 1, 17 (2005); *United States v. Lopez*, 514 U.S, 549, 558-59

19

(1995). This includes the "power to regulate purely local activities that are part of an economic 'class of activities' that have a substantial effect on interstate commerce." *Gonzales*, 545 U.S. at 17.

To that end, Congress enacted the Controlled Substances Act, which applies both to inter- and intra-state narcotics trafficking, precisely because Congress determined that local drug trafficking has a substantial effect on interstate commerce. *See* 21 U.S.C. § 801(3) (noting that the "manufacture, local distribution, and possession [of narcotics] . . . have a substantial and direct effect upon interstate commerce"); *see also United States v. Walker*, 142 F.3d 103, 111 (2d Cir. 1998) (noting Congress's finding that "local narcotics activity substantially affects interstate commerce"). Congress expressly declined to differentiate between interstate and intrastate narcotics trafficking for enforcement purposes, *see* 21 U.S.C. § 801(5), reasoning that "[f]ederal control of the intrastate incidents of the traffic in controlled substances is essential to the effective control of the interstate incidents of such traffic." 21 U.S.C. § 801(6).

In 1988, Congress amended the CSA to add Section 848(e)(1)(A). From the outset, it was clear that the purpose of the statute was to punish drug-related killings. *See United States v. Aguilar*, 585 F.3d 652, 659 (2d Cir. 2009) (citing 134 Cong. Rec. 32,638 (Oct. 21, 1988) (statement

20

of Sen. McConnell) ("The drug bill also authorizes the death penalty in drug related killings.")).

In the years following the enactment of Section 848(e)(1)(A), this Court and the Supreme Court have repeatedly upheld the constitutionality of the CSA and its various provisions reasoning that "the activities regulated by the CSA are quintessentially economic." *Gonzales*, 545 U.S. at 25; *see also Walker*, 142 F.3d at 111 ("[T]he Controlled Substances Act concerns an obviously economic activity, drug trafficking."); *United States v. Miller*, 116 F.3d 641, 674 (2d Cir. 1997); *United States v. Goodwin*, 141 F.3d 394, 399 (2d Cir. 1997) ("[D]rug trafficking activity clearly is a proper subject for federal regulation . . . ."); *United States v. Genao*, 79 F.3d 1333, 1337 (2d Cir. 1996) ("Congress has made specific findings that local narcotics activity has a substantial effect on interstate commerce.").

In short, there is no dispute that Congress had authority, under the Commerce Clause, to regulate drug trafficking and drug-related murders.

## B. The violent crimes in aid of racketeering statute

In 1970, Congress enacted the Racketeer Influenced and Corrupt Organizations Act ("RICO"), as Title IX of the Organized Crime Control Act. The purpose of the Act was to combat organized criminal activity because, as Congress ex-

21

plained, it "drains billions of dollars from America's economy" and "weaken[s] the stability of the Nation's economic system." *See* Organized Crime Control Act of 1970, Congressional Statement of Findings and Purpose, Pub. L. No. 91-452, 84 Stat. 922, 922-23 (1970). Importantly, Congress made plain that RICO applied to both inter- and intra-state criminal activity. *See United States v. Turkette*, 452 U.S. 576, 586-87 (1981).

In 1984, Congress enacted the Comprehensive Crime Control Act, Pub. L. No. 98-473, Ch. X, Part A (Oct. 12, 1984), which added, inter alia, a new offense, violent crimes in aid of racketeering activity.[3] Congress designed § 1959 to complement RICO by making it a federal crime to commit violent crimes for the purpose of maintaining or increasing one's position within a RICO enterprise that is "engaged in, or the activities of which affect, interstate or foreign commerce." *United States v. Concepcion*, 983 F.2d 369, 380 (2d Cir. 1992) (quoting 18 U.S.C. § 1959(b)(2)).

This Court has repeatedly upheld the constitutionality of the VICAR statute reasoning that, "Congress enacted section 1959 in view of the Federal Government's strong interest . . . in suppressing the activities of organized criminal

---

[3] This offense, initially codified as 18 U.S.C. § 1952B, was renumbered in 1988 as 18 U.S.C. § 1959, without any substantive change.

22

enterprises." *United States v. Mapp*, 170 F.3d 328, 336 (2d Cir. 1999) (internal quotations omitted); *see also United States v. Feliciano*, 223 F.3d 102, 118 (2d Cir. 2000) (RICO narcotics trafficking is an "economic activity that in the aggregate ha[s] a substantial effect on interstate commerce"); *accord United States v. Umana*, 750 F.3d 320, 337 (4th Cir. 2014) (upholding constitutionality of § 1959 under the Commerce Clause because "Congress could rationally have concluded that proscribing reputation-enhancing violence committed by members of a criminal enterprise would disrupt the interstate commerce that the enterprise itself engages in"), *cert. denied*, 135 S. Ct. 2856 (2015); *United States v. Nascimento*, 491 F.3d 25, 43 (1st Cir. 2007) ("Given the obvious ties between organized violence and racketeering activity—the former is a frequent concomitant of the latter—we defer to Congress's rational judgment, as part of its effort to crack down on racketeering enterprises, to enact a statute that targeted organized violence."); *United States v. Crenshaw*, 359 F.3d 977, 986 (8th Cir. 2004) (upholding constitutionality of § 1959 under the Commerce Clause, noting that "[i]t seems . . . clear that criminal enterprises use violence or the threat of violence in connection with their commercial activities").

23

### C. The Supreme Court's decisions in *Lopez* and *Morrison* do not undermine the constitutionality of the drug-related murder and VICAR statutes.

Despite the precedent to the contrary, Aquart argues that the Supreme Court's decisions in *United States v. Lopez*, 514 U.S, 549 (1995), and *United States v. Morrison*, 529 U.S. 598 (2000), stand for the proposition that the federal government may not criminalize murders such as the ones he committed because they are "non-economic" criminal activity. ASB5-7. Aquart over-reads those cases.

In *Lopez*, the Court held that Congress had exceeded its Commerce Clause authority by enacting the Gun-Free School Zones Act, which made it a federal offense "for any individual knowingly to possess a firearm at a place that the individual knows, or has reasonable cause to believe, is a school zone." 514 U.S. at 551. The Court found the Act unconstitutional because it "neither regulate[d] a commercial activity nor contain[ed] a requirement that the possession be connected in any way to interstate commerce." *Id.*

Five years after *Lopez*, the Supreme Court decided *Morrison*, where it held that Congress lacked the authority to enact 42 U.S.C. § 13891, a portion of the Violence Against Women Act which provided a civil remedy for victims of gender-motivated violence. 529 U.S. at 601-602. The

24

Court found that "[g]ender-motivated crimes of violence are not, in any sense of the phrase, economic activity." *Id.* at 613. Additionally, "[l]ike the Gun-Free School Zones Act at issue in *Lopez*, § 13981 contain[ed] no jurisdictional element" requiring proof that the federal cause of action was "in pursuance of Congress' power to regulate interstate commerce." *Id.* Accordingly, the Court found § 13981 to be an unconstitutional exercise of Congress's Commerce Clause power. *Id.* at 619.

These cases do not control here because the statutes at issue in *Lopez* and *Morrison* are distinguishable from the statutes under which Aquart was convicted. With respect to the drug-related murder statute, as the Supreme Court has explained,

> Unlike those at issue in *Lopez* and *Morrison*, the activities regulated by the CSA are quintessentially economic. . . . The CSA is a statute that regulates the production, distribution, and consumption of commodities for which there is an established, and lucrative, interstate market. Prohibiting the intrastate possession or manufacture of an article of commerce is a rational (and commonly utilized) means of regulating commerce in that product.

*Gonzales*, 545 U.S. at 25-26 (footnote omitted).

25

Similarly, this Court has declined to extend *Lopez* or *Morrison* to invalidate § 848(e)(1)(A), finding the statutes at issue in those cases to be distinguishable. *See Goodwin*, 141 F.3d at 399 ("We have repeatedly held that the Controlled Substances Act concerns an obviously economic activity substantially affecting interstate commerce, namely, narcotics trafficking, and have sustained the Act against criminal defendants' *Lopez* challenges.") (internal citations and quotation marks omitted); *Walker*, 142 F.3d at 111 (noting that the "Controlled Substances Act concerns an obviously economic activity, drug trafficking" and therefore "Congress was within its power under the Commerce Clause" when it enacted 21 U.S.C. § 848(e)(1)(A)); *see also Aguilar*, 585 F.3d at 658, 661 (finding that proof of a substantive connection between the defendant's drug dealing activities and the charged murder are sufficient to "(1) ensur[e] a sufficient nexus between § 848(e)(1)(A) homicides and Congress's commerce powers, and (2) remain[] faithful to Congress's apparent intent that the statute reach "drug-related killings"); *accord United States v. Hager*, 721 F.3d 167, 183 (4th Cir. 2013) (rejecting Commerce Clause challenge to § 848(e)(1)(A) because the evidence established a "substantial connection" between the drug conspiracy and the charge murder), *cert. denied*, 134 S. Ct. 1936 (2014); *cf. United States v. Barrett*, 496 F.3d 1079, 1120 (10th Cir. 2007) (rejecting Commerce Clause challenge to § 848(e)(1)(B) be-

26

cause "[a]n intentional killing in violation of this statute is within the power of Congress because it is intertwined with the commission of an underlying federal drug trafficking crime, which itself impinges on interstate . . . commerce over which the Congress has undoubted control") (internal quotation marks omitted).

In short, this Court's precedent has long established that narcotics trafficking is an economic class of activity that Congress may properly regulate. Drug-related murders are but a subset of that class of activity and are therefore also properly subject to regulation; *see Gonzales*, 545 U.S. at 26 (Congress may include a "narrower class of activities within [a] larger regulatory scheme") (internal quotation marks omitted); *United States v. Britt*, 112 Fed. Appx. 352, 356 (5th Cir. 2004) (finding that Congress properly enacted § 848(e)(1)(A) pursuant to its Commerce Clause powers because "[m]urder relating to or in furtherance of such properly regulated activity can clearly be proscribed by the federal government"); *cf. United States v. Ricketts*, 317 F.3d 540, 543 (6th Cir. 2003) ("[A] firearm murder committed in carrying out a drug conspiracy also substantially affects interstate commerce.").

Moreover, Congress's power to regulate drug-related murders includes those that are intrastate in nature because, like the other provisions of the CSA, the "interstate nexus requirement" is met by the narcotics trafficking aspect of the

27

crime. *See Gonzales*, 545 U.S. at 22 ("That the regulation ensnares some purely intrastate activity is of no moment. As we have done many times before, we refuse to excise individual components of that larger scheme."). Thus, to prove a violation of § 848(e)(1)(A) the government need only establish a substantive connection between the murder and the economic activity, *i.e.*, the narcotics trafficking. *See Aguilar*, 585 F.3d at 658. Nothing more is required because "[u]nder the CSA, an effect on interstate commerce is not an element" of the offense. *United States v. Parkes*, 497 F.3d 220, 229 (2d Cir. 2007).

This Court has also considered the constitutionality of the VICAR statute on multiple occasions following the *Lopez* and *Morrison* decisions and has rejected claims similar to the one Aquart now raises. *See Feliciano*, 223 F.3d at 117-19; *United States v. Torres*, 129 F.3d 710, 717 (2d Cir. 1997).

For instance, in *Feliciano*, the defendants were convicted of murder in aid of racketeering; the underlying racketeering activity was narcotics trafficking. On appeal, the defendants challenged the fact that they were prosecuted by federal versus state authorities. 223 F.3d at 107. The *Feliciano* Court rejected the defendants' claim, holding that because the government proved that the defendants committed the murder "for the sake of their membership in a gang that . . . engaged over several years in selling co-

28

caine, crack cocaine, and heroin," it had satisfied the interstate commerce requirement of VICAR. *Id.* at 118. The Court also rejected the defendants' contention that the VICAR statute targets "noneconomic criminal activity" that is within "the exclusive jurisdiction of state and local government." *Id.* at 119. Rather, the Court explained that, "because any predicate murder [under § 1959 must] bear a strong relationship to racketeering activity that affects interstate commerce, it does not risk improperly making purely local crimes a matter of federal concern." *Id.* (internal quotations omitted); *see also Mapp*, 170 F.3d at 336 (holding that the government must prove that the violent crime was undertaken "as an integral aspect of membership" in a racketeering enterprise); *Torres*, 129 F.3d at 717 ("Section 1959 incorporates a jurisdictional element requiring a nexus between the offense in question and interstate commerce."). Again, once the substantive connection between the murder and the defendant's position in a racketeering enterprise that affects interstate commerce is established, no more need be shown. *See Umana*, 750 F.3d at 337-38 (fact that murder itself did not affect interstate commerce is irrelevant to Commerce Clause analysis).

29

### D. The death penalty provisions of the drug-related murder and VICAR statutes are constitutional exercises of congressional authority under the "Necessary and Proper Clause."

Aquart also claims that even to the extent the federal government may legitimately criminalize drug-related murders and murders in aid of racketeering, that the death penalty provisions of those statutes nonetheless violate the Constitution's Necessary and Proper Clause. *See* ASB10-16. Aquart misreads governing law.

The Necessary and Proper Clause grants Congress the power,

> To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof.

U.S. Const., art. I, § 8, cl. 18.

Under long settled law, this Clause and others grant Congress authority to fashion penalties for violations of federal laws. *See Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 393 (1940) ("Congress may impose penalties in aid of the exercise of any of its enumerated powers."); *United States v. Fox*, 95 U.S. 670, 672 (1877) ("There is no doubt of the competency of Congress to provide, by suitable penalties, for the

30

enforcement of all legislation necessary or proper to the execution of powers with which it is intrusted."); *United States v. Richardson*, 793 F.3d 612, 632 (6th Cir. 2015) ("The Supreme Court has recognized that 'Congress, of course, has the power to fix the sentence for a federal crime . . . .'") (quoting *Mistretta v. United States*, 488 U.S. 361, 364 (1989) (internal citations omitted)), *petn. for cert. filed*, No. 15-6053 (Sept. 6, 2015); *United States v. Ayala*, 601 F.3d 256, 265 (4th Cir. 2010) ("[T]he power to define criminal offenses and to prescribe the punishments to be imposed upon those found guilty of them [ ] resides wholly with the Congress."); *United States v. Tom*, 565 F.3d 497, 502 (8th Cir. 2009) ("That Congress has the authority under the Necessary and Proper Clause to criminalize and punish certain activities as a means of effectuating its enumerated powers is beyond dispute."); *United States v. Plotts*, 347 F.3d 873, 879 (10th Cir. 2003) ("[P]ursuant to the Necessary and Proper Clause, Congress may fashion penalties for the violation of valid federal laws."); *cf. Meskini*, 319 F.3d at 91 ("With very few limitations, Congress is free to prescribe any sentence that in its view reflects the seriousness of the underlying offense and the characteristics of the offender.").

The scope of Congress's power to set penalties is broad:

Subject only to constitutional limitations, such as those prohibiting cruel and unu-

31

sual punishment, excessive fines, the en-
actment of ex post facto laws, the imposi-
tion of double jeopardy, and those guaran-
teeing equal protection of the laws, due
process of law, etc., the legislature may fix
the punishment for crime as it sees fit. Its
power is practically unlimited; it may take
property, liberty, or life, in punishment for
an infraction of the law, so long as it does
not in so doing infringe or violate any of
the guaranties secured to all citizens by
the Constitution.

*Plotts*, 347 F.3d at 878-79 (quoting *Chandler v.
Johnston*, 133 F.2d 139, 142 (9th Cir. 1943)); *see
Armstrong v. Exceptional Child Center, Inc.*, 135
S. Ct. 1378, 1383 (2015) (explaining that Neces-
sary and Proper Clause "vests Congress with
broad discretion over the manner of implement-
ing its enumerated powers"). This broad authori-
ty makes sense because the power to prohibit
criminal activity would be meaningless if Con-
gress could not also impose a punishment for
committing the proscribed act. *See M'Culloch*, 17
U.S. at 356 ("The convention well knew that it
was utterly vain and nugatory, to give to con-
gress certain specific powers, without the means
of enforcing those powers.").

Aquart argues, however, that because the
government infrequently seeks the death penal-
ty that it cannot be considered "essential to ei-
ther of the criminal statutes at issue." ASB8. In

32

substance, he argues that the cautious exercise of prosecutorial discretion renders the death penalty unconstitutional. His argument rests on an overly narrow reading of the Necessary and Proper Clause.

The Supreme Court has long held that "the word 'necessary' does not mean 'absolutely necessary.'" *Comstock*, 560 U.S. at 134 (quoting *M'Culloch*, 17 U.S. at 413-15). Rather, "the Constitution's grants of specific federal legislative authority are accompanied by broad power to enact laws that are 'convenient, or useful' or 'conducive' to the authority's 'beneficial exercise.'" *Id.* at 133-34 (quoting *M'Culloch*, 17 U.S. at 413, 418); *see also M'Culloch* ("'Necessary and proper' are, then, equivalent to needful and adapted[.]").

Significantly, as noted in *Comstock*, the Constitution leaves the choice of means to Congress. 560 U.S. at 135. Thus, "necessary" does not "exclude[] the choice of means, and leave[] to congress, in each case, that only which is most direct and simple." *M'Culloch*, 17 U.S. at 413. Rather, the term "necessary" is to be "understood as employing any means calculated to produce the end . . . ." *Id.* at 413-14. In short,

> If it can be seen that the means adopted are really calculated to attain the end, the degree of their necessity, the extent to which they conduce to the end, the closeness of the relationship between the

33

means adopted and the end to be attained,
are matters for congressional determina-
tion alone.

*Comstock*, 560 U.S. at 135 (quoting *Burroughs v.
United States*, 290 U.S. 534, 547-48 (1934)).
Moreover,

The court, in inquiring whether con-
gress had made a selection of constitution-
al means, is to compare the law in ques-
tion with the powers it is intended to carry
into execution; not in order to ascertain
whether other or better means might have
been selected, for that is the legislative
province, but to see whether those which
have been chosen have a natural connec-
tion with any specific power; whether they
are adapted to give it effect; whether they
are appropriate means to an end.

*M'Culloch*, 17 U.S. at 357.

Applying these standards here, the drug-
related murder and VICAR statutes are reason-
ably adapted and rational means by which to
combat the "substantial and detrimental effect"
that narcotics trafficking enterprises, such as
Aquart's, have upon the "health and general wel-
fare of the American people." *See* 21 U.S.C.
§ 801(2). Furthermore, Congress's decision to ex-
tend the death penalty as a possible penalty for
murders committed in furtherance of narcotics
trafficking and racketeering activity is rationally

34

related to the government's valid goals of deterring and punishing heinous crimes. *See Roper v. Simmons*, 543 U.S. 551, 571 (2005) ("[T]here are two distinct social purposes served by the death penalty: retribution and deterrence of capital crimes by prospective offenders." (internal quotations omitted)). In fact, the Supreme Court has recognized that retribution and deterrence are "important and legitimate interests . . . and that these interests provide the necessary justification for imposing the death penalty." *Skipper v. South Carolina*, 476 U.S. 1, 13 (1986) (internal citations and quotations omitted).

## E. Aquart's criminal conduct fell squarely within the activity prohibited by the drug-related murder and the VICAR statutes and therefore imposition of the death penalty in his case was proper.

As noted above, Aquart argues that the application of the drug-related murder and VICAR statutes to his particular circumstances is unconstitutional. Putting aside the legal arguments discussed above, this "as-applied" challenge is essentially a challenge to the sufficiency of the evidence insofar as Aquart claims that the proof was insufficient to establish a connection between the murders and interstate commerce. This claim fails because the required connection between Aquart's crimes and interstate com-

35

merce was explicitly presented—and proved—to the jury as an element of the government's case.

With respect to the drug related murders, the district court instructed the jurors, in relevant part, that the government must prove that Aquart murdered the victims "because of and as part of the defendant's engaging in or working in furtherance of the conspiracy to distribute or to possess with intent to distribute 50 grams or more of cocaine base." GA1047. The district court also explained that the government must prove that, "there was some substantive connection between the defendant's role in the narcotics trafficking conspiracy and his role in the killing." GA1047-48.

Aquart does not contest the sufficiency of the proof that he conspired to distribute and possess with intent to distribute 50 grams or more of cocaine base, or that there was a substantive connection between the murders and the drug conspiracy. In other words, even Aquart concedes that the government established all that the law required it to prove with respect to his guilt on these counts.

With respect to the murders in aid of racketeering, the district court instructed the jury, in relevant part, that the government must prove that Aquart held a position in an enterprise that was engaged in racketeering activity and that the racketeering activities of the enterprise affected interstate commerce. GA1041. The district

36

court defined "racketeering activity" to include "narcotics trafficking in violation of federal law." GA1041. The district also instructed the jury that the government must prove that "at least one of the defendant's purposes for committing the murders was to maintain or increase his position in the racketeering enterprise." GA1044. The court expressly instructed the jury that if it found that "the defendant was not motivated at all by the desire to maintain or increase his position in the enterprise, but was motivated only by other factors, then [it] must find the defendant not guilty" of these counts. GA1044.

The evidence adduced at trial overwhelmingly established that Aquart's racketeering enterprise affected interstate commerce and that Aquart committed the murders to maintain and increase his position in the enterprise.[4] *See* Gov't Opening Brief at 75-84 (addressing Aquart's claim that the evidence was insufficient to prove the interstate commerce and motive elements of the VICAR offenses). Moreover, the jury was unambiguously instructed that the government must prove the jurisdictional element, namely,

---

[4] In his opening brief, Aquart contested the sufficiency of the proof that his enterprise affected interstate commerce and that his motive for committing the murders was to maintain or increase his position in the enterprise. *See* AOB228-30. Aquart acknowledged, however, that his claims are foreclosed by this Court's precedent. *See* AOB228.

37

that the enterprise affected interstate commerce, as well as the substantive connection between the murders and Aquart's position in the enterprise. By its verdict, the jury indicated that the government had met its burden.

That Aquart wants the government to be required to prove something beyond what the law requires, namely, that the homicides themselves affected interstate commerce, is of no moment. The government met its burden vis-à-vis the jurisdictional elements of the charges. That is, it proved beyond a reasonable doubt that the three murders Aquart committed were meaningfully intertwined with the underlying narcotics trafficking conspiracy and carried out in order to maintain or increase his position in a racketeering enterprise that impinged on interstate commerce. Nothing more was required.

38

## Conclusion

For the foregoing reasons, the judgment of the district court should be affirmed.

Dated: February 16, 2016

Respectfully submitted,

DEIRDRE M. DALY
UNITED STATES ATTORNEY
DISTRICT OF CONNECTICUT

TRACY LEE DAYTON
ASSISTANT U.S. ATTORNEY

Sandra S. Glover
Assistant United States Attorney (of counsel)

39

## Federal Rule of Appellate Procedure 32(a)(7)(C) Certification

This is to certify that the foregoing brief complies with the 14,000 word limitation of Fed. R. App. P. 32(a)(7)(B), in that the brief is calculated by the word processing program to contain approximately 7,882 words, exclusive of the Table of Contents, Table of Authorities, Addendum, and this Certification.

TRACY LEE DAYTON
ASSISTANT U.S. ATTORNEY